

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMJ:CNC
F. #2013R00948

610 Federal Plaza
Central Islip, New York 11722

November 13, 2013

**FILED**
IN CLERK'S OFFICE
DISTRICT COURT E D N Y

★  NOV 13 2013  ★

**LONG ISLAND OFFICE**

By Hand

The Honorable Joseph F. Bianco
United States District Judge
Eastern District of New York
920 Federal Plaza
Central Islip, New York 11722

      Re:  United States v. Phillip A. Kenner, et al.
          Criminal Docket No. 13-607(JFB)

Dear Judge Bianco:

      The government respectfully submits this letter with regard to the pre-trial detention of defendants PHILLIP A. KENNER and TOMMY C. CONSTANTINE, also known as "Tommy C. Hormovitis," who were arrested today in Scottsdale, Arizona in the above-captioned case. The defendants will appear before a United States Magistrate Judge in the District of Arizona prior to their appearance in the Eastern District of New York, which has been scheduled for December 11, 2013, at 11 a.m. For the reasons detailed below, the government requests that permanent orders of detention be issued as to both defendants, pursuant to Title 18, United States Code, Section 3142(e).

I.    RELEVANT LEGAL STANDARDS FOR DETENTION

      "The Bail Reform Act authorizes pretrial detention upon the court's finding that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community.'" United States v. Agnello, 101 F. Supp.2d 108, 109 (E.D.N.Y. 2000). Section 3142(f)(1) of Title 18 of the United States Code requires that, upon motion of the government, the Court shall conduct a hearing to determine:

                whether any condition or combination of
                conditions set forth in subsection (c) of

this section will reasonably assure the appearance of the person as required and the safety of any other person and the community.

Upon the government's motion or upon the Court's own motion, a detention hearing may be conducted in a case that involves:

    (A)  a serious risk that [the defendant] will flee; or

    (B)  a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure or intimidate, or attempt to intimidate, a prospective witness . . . .

18 U.S.C. § 3142(f)(2).

At a detention hearing, the Court shall consider, among other factors, "the available information concerning –"

    (1)  the nature and circumstances of the offense charged . . . ;

    (2)  the weight of the evidence against the person;

    (3)  the history and characteristics of the person, including --

        (A)  the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

        (B)  whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release . . .

2

for an offense under Federal,
State, or local law; and

(4) the nature and seriousness of the danger to any
person or the community that would be posed by
the person's release.

18 U.S.C. § 3142(g).

Detention may be ordered on risk-of-flight grounds if the
government establishes such grounds by a preponderance of the
evidence. United States v. Chimurenga, 760 F.2d 400, 405-06 (2d
Cir. 1985). Detention may be ordered on dangerousness grounds
if the government establishes such grounds by clear and
convincing evidence. See 18 U.S.C. § 3142(f)(2). The rules
governing admissibility of evidence at trial, however, do not
apply in a detention hearing. Id.; Fed.R.Evid. 1101(d)(3).

Although the Eighth Amendment prohibits the imposition of
excessive bail, no defendant has an absolute right to be
released on bail following arrest. United States v. Salerno,
481 U.S. 739, 749 (1987).

II. FACTUAL PROFFER AND ARGUMENT IN SUPPORT OF DETENTION

A.   Overview of the Investigation

On November 13, 2013, defendants KENNER and CONSTANTINE
were arrested by law enforcement officers, including special
agents of the Federal Bureau of Investigation ("FBI") and
Internal Revenue Service ("IRS"). The arrest warrants were
signed by the Honorable Arlene R. Lindsay, United States
Magistrate Judge for the Eastern District of New York ("EDNY"),
on October 29, 2013, based on an indictment that was returned
that same day by a grand jury sitting in the EDNY. The
indictment is captioned United States of America v. Phillip A.
Kenner and Tommy C. Constantine, also known as "Tommy C.
Hormovitis," CR 13-607 (JFB) and is attached as Exhibit A.

The indictment charges KENNER and CONSTANTINE with wire
fraud conspiracy, substantive wire fraud and money laundering
conspiracy, all in or about and between 2002 and 2013. As
alleged in the indictment, between 2002 and 2013, KENNER and
CONSTANTINE orchestrated and executed a scheme to fraudulently
induce several investors to invest money with entities and to
deposit money into bank accounts that KENNER and CONSTANTINE
controlled by falsely stating that the funds would be invested

3

in real estate, small, privately held companies and a legal defense fund for the benefit of the investors, when, in fact, KENNER and CONSTANTINE intended to improperly divert a substantial portion of the funds to bank accounts they controlled and used the funds for their personal benefit, for unrelated business ventures and to conceal their fraudulent scheme. The total losses to the victims due to KENNER and CONSTANTINE's fraudulent scheme are in excess of $15 million.

As alleged in the indictment, between 2002 and 2013, KENNER was a financial advisor to several former and current professional hockey players (hereinafter, "the hockey player clients"), who are identified as John Doe 1 through John Doe 13 in the indictment. KENNER's connection to professional hockey players began in the late 1980s, when KENNER attended college at Rensselaer Polytechnic Institute ("RPI") in Troy, New York. While at RPI, KENNER roomed with John Doe 9, who played hockey at RPI and later played in the National Hockey League ("NHL") for, among other teams, the Boston Bruins, Washington Capitals and Phoenix Coyotes. In addition, early in KENNER's career as a financial advisor, he worked at an investment management firm in Boston, Massachusetts with a former NHL player-turned financial advisor. It was while at this investment management firm in the late 1990s that KENNER built his clientele of NHL players. In approximately 2003, KENNER started his own investment management firm, named Standard Advisors, LLC. KENNER was a licensed financial advisor between approximately 1994 and 2004.

As further alleged in the indictment, in his role as financial advisor, KENNER recommended to his hockey player clients investments in real property and small, privately-held businesses. One of the real estate ventures KENNER persuaded his hockey player clients to invest in was the acquisition of several parcels of land on the Big Island of Hawaii ("the Hawaii project"). KENNER represented to his hockey player clients that the goal of these investments was to develop the acquired land parcels for housing and recreational use and later sell the developed parcels for a significant profit, which would, in turn, result in a significant monetary return for each investor. Based on KENNER's representations, the hockey player clients and other investors, including John Doe 14, a resident of the EDNY, and Jane Doe 1, wired large sums of money to bank accounts controlled by KENNER for the Hawaii project.

Moreover, KENNER persuaded several of his hockey player clients to each establish lines of credit at Northern Trust Bank and to transfer bonds and other equity held in their names to Northern Trust Bank to secure each line of credit. KENNER made

4

a variety of misrepresentations to his hockey player clients
regarding the purpose of each line of credit.  He falsely told
some of his hockey player clients that the line of credit would
not be drawn upon and would serve solely as collateral for the
Hawaii project.  He told other hockey player clients that he
would only access the line of credit with the player's
permission, that the money would be used exclusively for the
Hawaii project and that KENNER would be responsible for any and
all payments due on the line of credit.  KENNER assured his
hockey player clients that the collateral securing each line of
credit would never be touched.  To some of his hockey player
clients, KENNER falsely represented that he, too, had pledged
collateral to Northern Trust Bank to secure a line of credit.
To prevent his hockey player clients from learning the balance
of their lines of credit on a month-to-month basis, KENNER
arranged to have Northern Trust Bank mail the statements for
each of the lines of credit only to KENNER, at his home in
Scottsdale, Arizona.

Without his hockey player clients' knowledge or permission,
KENNER used the lines of credit to, among other things, purchase
land parcels for himself in Hawaii, to purchase an interest in a
piece of land in the EDNY and to make interest payments on the
lines of credit.  KENNER also diverted money from the lines of
credit, as well as the hockey player clients' initial $100,000
cash investment, to bank accounts controlled by KENNER and
CONSTANTINE for uses unrelated to the Hawaii project, including
to pay personal mortgages, credit card bills and other personal
expenses.  Financial records reveal that, between December 2004
and March 2006, KENNER, through a series of wire transfers,
directed approximately $2 million from the Hawaii project to
CONSTANTINE's holding company, Constantine Management Group, LTD
("CMG").  CMG had no relation to the Hawaii properties during
that time.  CONSTANTINE transferred the money to other corporate
accounts he controlled, as well as to two race car teams in
California.  CONSTANTINE also used the money to make payments on
personal mortgages and to pay for meals, limousines, rental
cars, and cellular telephone expenses.

In August 2006, Lehman Brothers ("Lehman") agreed to
finance the Hawaii project up to $95 million.  At KENNER's
direction, it made an immediate $6.9 million payment to Urban
Expansion, a company controlled by CONSTANTINE and another
individual.  The $6.9 million was repayment for a $3.5 million
loan in October 2005 from Urban Expansion to a holding company
controlled by KENNER so that the Hawaii project could close on a

piece of property on the Big Island. [1]   Of the $6.9 million repayment to Urban Expansion, $2 million was a pre-payment penalty, which Lehman advised KENNER could be avoided by not paying off the entire loan.   However, KENNER insisted that the loan to Urban Expansion be paid back in full, to the detriment of his investors.   Lehman agreed to do so, but included a provision in the settlement agreement, which KENNER signed, that explicitly stated that KENNER was not to directly or indirectly receive any portion of the $6.9 million of the Lehman funds that was being used to pay off the Urban Expansion loan.   After Lehman paid Urban Expansion $6.9 million, just over $2 million was transferred to an account for CMG, controlled by CONSTANTINE.   Days later, CONSTANTINE transferred $669,000 to accounts controlled by KENNER, notwithstanding the prohibition in the settlement agreement with Lehman.   CONSTANTINE used his portion of the pre-payment penalty money to pay personal mortgages and loans, to make car payments, and to pay for airfare, hotels, car rentals, jewelry and cellular telephone expenses.   In addition, CONSTANTINE transferred $150,000 to two car racing teams and over $150,000 to other corporate accounts he controlled.   CONSTANTINE wired $17,000 to Unique Auto Sports, in the EDNY.   By November 2006, CONSTANTINE had depleted the $2 million that was transferred into his CMG account from Urban Expansion in August 2006.

In early 2009, KENNER failed to make interest payments on the lines of credit and, as a result, in late March 2009, Northern Trust Bank closed the lines of credit and liquidated the equity securing each line of credit.   John Does 1 through 8 lost a total of approximately $9 million due to KENNER's unauthorized use of their lines of credit.   Most of the parcels of land acquired for the Hawaii project have been sold at foreclosure auctions or remain in foreclosure.

In addition to the Hawaii project, KENNER persuaded several of his hockey player clients to invest in Eufora, LLC ("Eufora"), a company founded by CONSTANTINE in or about 2002 that sold prepaid debit cards.   Between approximately February 2008 and December 2009, KENNER and CONSTANTINE convinced several of KENNER's hockey player clients, as well as John Doe 15, a resident of the EDNY, to collectively invest over $1.5 million

---

[1]   It should be noted that the $3.5 million actually came out of the bank account of Intrigue Investments, which CONSTANTINE did not control or operate, as Urban Expansion was a shell company created just days prior to the $3.5 million loan and had no bank account at the time.

in Eufora. Financial records and analysis revealed that KENNER and CONSTANTINE diverted most of the $1.5 million to bank accounts that the defendants or another co-conspirator controlled and used the money for purposes unrelated to Eufora, including to pay personal mortgages, make automobile and credit card payments, and to pay for hotels, airplane tickets, meals and jewelry.

As the indictment further alleges, in or about Spring 2009, KENNER and CONSTANTINE met with several of KENNER's hockey player clients to persuade them to contribute to a legal defense fund known as the Global Settlement Fund ("GSF"). During KENNER and CONSTANTINE's national and international fundraising tour, they traveled through the EDNY. According to KENNER and CONSTANTINE, the GSF would be used primarily to litigate civil claims in connection with the hockey players' investments in real estate projects in Mexico, which KENNER and CONSTANTINE claimed were at a standstill because the developer of those projects, John Doe 17, had misused the investors' money. KENNER's hockey player clients contributed a total of approximately $4.1 million to the GSF. KENNER and CONSTANTINE directed the hockey player clients to wire their contributions to the escrow account of John Doe 16, an attorney in Los Angeles, California, whom KENNER and CONSTANTINE stated would represent them in the civil action against John Doe 17. John Doe 16 had represented KENNER in civil actions, including lawsuits against KENNER in 2008 and 2009 by some of his hockey player clients for fraud and breach of fiduciary duty.

Financial records and analysis revealed that only a small fraction of the $4.1 million contributed by KENNER's hockey player clients to the GSF between May 2009 and February 2010, was used for legal proceedings against John Doe 17. The majority of the GSF money was transferred into bank accounts controlled by CONSTANTINE. KENNER and CONSTANTINE used significant portions of the money for purposes unrelated to the Mexico litigation or the other purported purposes of the GSF, including to pay attorneys' fees in a legal matter involving a race car company that CONSTANTINE owned, for KENNER to invest in a tequila company in Mexico, and to arrange for an associate of CONSTANTINE to purchase CONSTANTINE's home in Arizona, which was going into foreclosure. In executing their scheme to defraud, KENNER and CONSTANTINE often transferred money through various bank accounts -- sometimes on the same day -- to disguise, among other things, the source of the funds and who controlled the funds.

7

As the indictment further alleges, in Counts Eight and Nine, in October 2006, KENNER engaged in a separate fraud scheme involving real estate in the EDNY. KENNER acquired an ownership interest in a parcel of land in Sag Harbor on Long Island, New York ("the Sag Harbor property") by defrauding John Doe 1 and John Doe 2. KENNER represented to John Doe 1 that John Doe 1 could acquire a 50% interest in the Sag Harbor property by investing $375,000, which John Doe 1 wired to a bank account KENNER controlled. In addition to the $375,000 invested by John Doe 1, KENNER used $395,000 from John Doe 2's line of credit, without John Doe 2's knowledge or permission, to purchase the Sag Harbor property. KENNER then created the Led Better Development Company, LLC ("Led Better") to purchase the Sag Harbor property. KENNER then instructed John Doe 14 and John Doe 18 to each wire $190,000 to him, which they did, to obtain a 25% interest each in the Sag Harbor property.

The Led Better operating agreement, which KENNER drafted, but did not disclose to John Does 1, 2, 14 or 18, stated that KENNER, John Doe 1, John Doe 14 and John Doe 18 each owned 25% of Led Better. Thus, KENNER acquired a 25% interest in the Sag Harbor property without using any of his own money. In addition to the 25% interest in the Sag Harbor property, KENNER obtained approximately $380,000.00 as part of the fraudulent scheme. While John Doe 1 believed, based on KENNER's representations, that he owned 50% of the in the Sag Harbor property, the Led Better operating agreement provided that John Doe 1 owned only 25% of the Sag Harbor property. To conceal his fraudulent scheme, KENNER continued to make interest payments on John Doe 2's line of credit until early 2009 and ensured that John Doe 2 did not receive monthly statements on his line of credit.

B.   The Nature and Circumstances of the Charged Offenses

Here, although the indictment does not charge a crime of violence or drug trafficking offense, the charged crimes of wire fraud conspiracy, wire fraud and money laundering conspiracy are nevertheless serious crimes. Furthermore, as the indictment alleges, there are well over a dozen victims of KENNER and CONSTANTINE's scheme, with aggregate losses exceeding $15 million. KENNER's victims were not strangers; some considered KENNER to be a close friend and trusted advisor.

KENNER and CONSTANTINE both face significant jail time. KENNER has been indicted on ten counts: one count of wire fraud conspiracy, eight counts of wire fraud and one count of money laundering conspiracy. Each of the counts carries a maximum term of imprisonment of 20 years. Moreover, KENNER faces an

advisory range of imprisonment of 168 to 210 months, pursuant to the United States Sentencing Guidelines ("the Guidelines"). The Guidelines calculation is driven by losses exceeding $7 million, more than 10 victims, KENNER's use of sophisticated means to perpetrate the fraud, KENNER's leadership role and his abuse of a position of trust, as a financial advisor to his hockey player clients.

CONSTANTINE has been indicted on eight counts: one count of wire fraud conspiracy, six counts of wire fraud and one count of money laundering conspiracy. CONSTANTINE faces an advisory range of imprisonment of 151 to 188 months under the Guidelines, assuming he falls into Criminal History Category II.

Due to the lengthy sentences both defendants face if convicted, KENNER and CONSTANTINE have a strong incentive to flee rather than face incarceration. Though not dispositive as to a finding of risk of flight, exposure to lengthy prison terms clearly is a factor weighing in favor of pre-trial detention. See United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007); see also United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.").

C.    The Weight of the Evidence

This factor weighs strongly in favor of detention. As a threshold matter, a grand jury already has found that probable cause supports the charges against KENNER and CONSTANTINE, which are set out in extensive detail in the speaking indictment. This, alone, is enough to show that the weight of the evidence supports detention.

The evidence against the defendants is overwhelming. Multiple victims will testify about the false representations made by KENNER and CONSTANTINE regarding the Hawaii project, the lines of credit, Eufora, the GSF and the Sag Harbor property. Financial records will show, among other things, that KENNER and CONSTANTINE diverted investor money for their own personal uses, for unrelated business ventures and to conceal their scheme to defraud. The government will introduce email communications, text messages and recorded conversations of the defendants in support of the charges. The government will also introduce at trial evidence that KENNER and CONSTANTINE forged signatures and created fictitious documents in furtherance of and to conceal their scheme to defraud.

## D.   History and Characteristics of the Defendants

### 1.   **PHILLIP A. KENNER**

Several facts necessitate KENNER's detention as a risk of flight.   First, KENNER frequently travels to Mexico and has developed significant ties in Mexico over the years.   In fact, based on information received by the government, KENNER plans to travel to Mexico in December for approximately one month. Border crossing records show that KENNER was in Mexico as recently as October 27, 2013, as well as in early October 2013 and in June 2013.[2]   The border crossing records further reveal that KENNER traveled to Mexico twice in 2012, four times in 2011, four times in 2010 and at least seven times in 2009. KENNER's travel to Mexico dates back to 2004.   KENNER possesses a current United States passport, which expires in December 2021.

Moreover, two of KENNER's victims have advised the government that KENNER told them he had obtained Mexican citizenship and had a Mexican passport; one of these victims observed KENNER with a Mexican passport.   While KENNER has two children who live near him in the Phoenix area, his children live primarily with KENNER's ex-wife.   Furthermore, KENNER might conclude that he would see his children more often in Mexico than while serving a lengthy prison sentence at a federal penitentiary.

The government's investigation further reveals that KENNER has at least one personal bank account in Mexico and that KENNER has, in the past, transferred money between a personal bank account in the United States and a corporate bank account in Mexico.   The investigation further reveals that KENNER has established a network of associates in Mexico over the past decade.   These factors exacerbate the risk of flight because they show that KENNER easily would be able to make a life for himself in Mexico if he chose to flee and avoid a lengthy prison term.   Cf. United States v. Enriquez, 2011 WL 5220233, *6 (D.N.M. Sept. 7, 2011) (finding that defendant was a flight

---

[2]   It is worth noting that not all of KENNER's border crossings from the United States into Mexico by car were captured and/or documented by U.S. immigration officials.   Thus, if the Court were to release KENNER, even on the condition that he surrender his passport, KENNER could easily travel to Mexico by car without being detected.

10

risk who should be detained in part because "Enriquez . . . has deep ties to Mexico, and has lived there in the past. Given the amount of time Enriquez faces at sentencing—approximately 70 months—Enriquez has a strong incentive to flee. . . . It is a short trip to Mexico . . . and electronic monitoring provides the Court little comfort, Enriquez could be in Mexico before the Court knew he was leaving El Paso."); United States v. Ruiz-Corral, 338 F. Supp. 2d 1195, 1198 (D. Colo. 2004) ("The defendant is a naturalized citizen originally from Mexico. It is not disputed that he retains significant family ties to Mexico, including . . . some [family members] whom defendant and his family visit at least annually. . . . [T]his Court believes that the potential length of incarceration that defendant is facing, possibly upwards of twenty years and more, is a strong incentive for defendant to flee to Mexico if he were released on bond.").

Second, in addition to his strong ties to Mexico, KENNER has expressed his desire and ability to leave the United States in the past, when he has faced legal and financial troubles. Several sources have advised the government that KENNER has made statements to them, to the effect that, he was prepared to pack his duffle bag with money and head to Australia. He told another confidential source that, at a moment's notice, he could pack his duffle bag full of money, get in his car and never be seen again. Given that KENNER now faces serious federal criminal charges and the prospect of a significant jail sentence, he is very likely to act on his earlier statements.

Third, KENNER has access to substantial quantities of cash. Sources have reported to the government that KENNER previously advised them that he maintains safety deposit boxes in a number of cities in the United States and at least one source witnessed KENNER with substantial quantities of cash, which KENNER claimed to have retrieved from a safety deposit box.

Moreover, KENNER sold two pieces of property in Hawaii in April 2013 and June 2013, respectively, that he acquired using his hockey player clients' money. KENNER received approximately $74,000 from the property sales, which proceeds were deposited into an account held in the name of KENNER's son at Chase Bank. Bank records show that, since the funds were deposited, KENNER has made several cash withdrawals from that Chase account, always in amounts of approximately $8000 and $9,000. Multiple withdrawals of slightly under $10,000 indicate that KENNER does not want to trigger any reporting requirements imposed upon the bank by federal law.

A review of bank records for accounts controlled by KENNER, which are known to the government, reveals that KENNER does not maintain substantial balances in any of the accounts. Rather, almost as soon as money is deposited into the accounts, KENNER withdraws cash, in amounts up to $9000, or uses the money to pay for living expenses. For instance, financial records reflect that, thus far in 2013, approximately $82,650 has been deposited into a corporate account controlled by KENNER. KENNER has withdrawn almost $40,000 in cash over the course of the year. He has used the other $40,000 to pay bills. KENNER's use of safety deposit boxes and the fact that he continuously withdraws cash from bank accounts he controls -- and keeps those accounts with low balances -- indicates that KENNER has access to substantial quantities of cash, which he could use to fund his flight from the United States.

The Court should find that KENNER's history and characteristics weigh strongly in favor of detention.

### 2. TOMMY C. CONSTANTINE

CONSTANTINE also poses a serious risk of flight. First, travel records reflect recent and substantial international travel. CONSTANTINE traveled to the Bahamas in late June 2013, April 2013 and March 2013. Travel records further reflect that, in March 2013, CONSTANTINE also traveled to Mexico. CONSTANTINE traveled to Zurich in December 2012 and to Mexico in August 2012. For all but the flight to Zurich, Constantine flew on privately-owned aircraft. In fact, the "Tommy Constantine" official website reports that Constantine is "a helicopter pilot and manages a fleet of privately owned Falcon business jets which are based at the Scottsdale Airport." Moreover, travel records indicate that CONSTANTINE traveled to Mexico at least twelve times between 2007 and 2009. CONSTANTINE possesses a current U.S. passport, which expires in September 2018.

Second, one of the victims in this case advised the government that both KENNER and CONSTANTINE advised him that CONSTANTINE has family in Greece and that CONSTANTINE could move to Greece if necessary. Because CONSTANTINE faces a potential Guidelines sentence of 151 to 188 months, he has a strong incentive to flee the United States rather than face prosecution. Moreover, the fact that CONSTANTINE has private aircrafts at his disposable increases the likelihood that he would be able to successfully flee the United States if released from custody.

Third, criminal history records indicate that, in 1993, when CONSTANTINE was twenty-six years old, he was convicted of a drug trafficking crime in Illinois and sentenced to six years' imprisonment. Despite CONSTANTINE's drug conviction and term of incarceration, he returned to a life of crime.

CONSTANTINE's substantial international travel and criminal history weigh in favor of detention.

> D. The Nature and Seriousness of the Danger to Victims and Witnesses Posed by the Defendants' Release

As to KENNER, this factor cuts in favor of detention. The government has in its possession a recording of a voicemail message, from approximately April 2011, that KENNER left for one of John Doe 14's family members (hereinafter "male individual #1" or "MI #1"). KENNER learned that MI #1 had warned Jane Doe 1, John Doe 14 and others to stay away from KENNER because he could not be trusted. On the recording, KENNER identified himself as "Phil Kenner" and, using other vulgar language, told MI #1 to "bring your son [who was approximately eight years old at the time] out to Arizona so he can see what it looks like when his dad gets an ass beating." KENNER went on to accuse MI #1 of "talking shit about things you don't know." At the end of the voicemail message, KENNER stated, in sum and substance, that he was going to add MI #1 to "the list with the other scum bags."

This recording demonstrates KENNER's capacity and propensity for threatening and intimidating witnesses. This behavior is likely to continue and escalate now that KENNER has been criminally charged and faces the very real possibility of lengthy incarceration.

In sum, based upon all of the information provided above, KENNER and CONSTANTINE both pose a substantial risk of flight and no condition or combination of conditions will reasonably assure their appearance at future court proceedings. Moreover, KENNER poses a danger to the victims and witnesses in this case and should be detained on that ground, as well.

III. CONCLUSION

For the reasons set forth above, as well as any additional facts that the government may present at the detention hearing, defendants PHILLIP A. KENNER and TOMMY C. CONSTANTINE, also

known as "Tommy C. Constantine," should be held without bail
pending trial.  The government requests permission to supplement
this motion upon completion of the applicable Pretrial Services
reports.

Respectfully submitted,

LORETTA E. LYNCH
UNITED STATES ATTORNEY

By:  /s/Carrie N. Capwell
     Carrie N. Capwell
     Assistant U.S. Attorney
     (631) 715-7836

cc:  Clerk of the Court (JFB) (By ECF once case is on PACER)
     Defense Counsel (By Hand or Email once appointed/retained)