# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **13-07383M** |
| vs. | ) Phoenix, Arizona |
| | ) November 18, 2013 |
| **Tommy C. Constantine**, | ) 3:07 p.m. |
| | ) |
| Defendant. | ) |
| _____ | ) |


### BEFORE:  THE HONORABLE BRIDGET S. BADE, MAGISTRATE JUDGE

### TRANSCRIPT OF PROCEEDINGS

### DETENTION HEARING - PART 2

**APPEARANCES:**

**For the Government:**
           U.S. ATTORNEY'S OFFICE
           By:  **Dominic William Lanza, Esq**.
           40 North Central Avenue, Suite 1200
           Phoenix, AZ  85004

**For the Defendant Tommy C. Constantine:**
           WILENCHIK & BARTNESS, P.C.
           By: **Dennis I. Wilenchik, Esq.**
                **Carmen A. Chenal, Esq.**
           2810 North Third Street
           Phoenix, AZ  85004

Transcriptionist:
Elizabeth A. Lemke
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC. 34
Phoenix, Arizona  85003-2150
(602) 322-7247

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

1                    P R O C E E D I N G S

2        (Called to the order of court at 3:07 p.m.).

3             THE COURT:  Good afternoon.  You may be seated.

4             THE CLERK:  Magistrate docket 13-7383.  *United States*

5    *of America v. Tommy C. Constantine*.  This is a continuation of

6    a detention hearing.

7             MR. LANZA:  Good afternoon, Your Honor.  Dominic

8    Lanza on behalf of the United States.

9             THE COURT:  Good afternoon, Mr. Lanza.

10            MR. WILENCHIK:  Good afternoon, Your Honor.  I

11   haven't been here before.  I was out of town.  Dennis

12   Wilenchik on behalf of Mr. Constantine along with Carmen

13   Chenal.

14            THE COURT:  Good afternoon, Mr. Wilenchik.  Good

15   afternoon, Ms. Chenal.  Good afternoon, Mr. Constantine.

16            Mr. Wilenchik, did you file your Notice of

17   Appearance?

18            MS. CHENAL:  Oh, yes.  We did that last week.

19            THE COURT:  On Friday?

20            MS. CHENAL:  Yeah, both for Dennis and myself, yes.

21            MR. WILENCHIK:  Does the Court not have that, Your

22   Honor?  If not, I can get the office to send one over.

23            THE COURT:  No.  I assume you're correct that it's in

24   the docket.  I just haven't received a copy of it or seen a

25   copy of it, so I just wanted to ensure that that happened.

1          This is a continuation of a detention hearing that

2     began last Friday, November 15th, and proceeded for close to

3     an hour on Friday.  And it's been continued at the defendant's

4     request.

5          Ms. Chenal, I have received a new witness and exhibit

6     list that you submitted and a binder with those proposed

7     exhibits.

8          I have also received your motion for one of your

9     witnesses to testify telephonically.  I granted that motion

10    somewhat reluctantly, I must tell you, because that witness

11    was here present in the courtroom on Friday and you had the

12    opportunity to call her.

13         And then I received an e-mail through my Judicial

14    Assistant asking to have two more witnesses testify

15    telephonically.

16         I have not made any decision on that issue.  When we

17    discussed the presentation of witnesses on Friday, you had

18    responded to my questions that Mrs. Constantine, Mrs. Kiki

19    Constantine, the defendant's mother, would testify as to the

20    property that the defendant has proposed to post as security

21    for a bond.

22         You did not tell me what Ms. Jennifer Constantine

23    would testify as to, but you identified your remaining

24    witnesses as character witnesses and indicated that perhaps

25    you didn't need them to testify because you had character

1    letters.

2         So at this point I don't know the nature of the

3    intended testimony of these individuals or whether it will be

4    necessary to have them testify telephonically or not and you

5    may not have determined that yet at this point.

6         And so my conclusion was to continue with the hearing

7    and make that decision as we come to it, should it be

8    necessary for you to present those witnesses or should you

9    decide that you would like to present those witnesses.  I'm

10   certainly not precluding you from doing that yet at this

11   point.

12        We had heard argument and proffer from the

13   government.  Then Ms. Chenal presented argument and proffered

14   various facts.  And that's where we concluded on Friday.

15        The defense was still making their presentation.

16   Mr. Wilenchik, are you going to be presenting today?

17        MR. WILENCHIK:  Yes, I am, Your Honor.

18        THE COURT:  How would you like to proceed?

19        MR. WILENCHIK:  You know, in the interests of time,

20   Your Honor, I think I would like to establish first the issue

21   on the house.

22        If the Court has any questions on that, I can call --

23   again, because we have short time, I can call Constantine's

24   mother and talk about the house.  I talked informally to

25   Mr. Lanza about it; asked any questions he had about that.

1          I think, without speaking for him, that those have

2     been sort of resolved.  He may have some additional issues,

3     but if the Court, though, has any questions about that

4     security, I would be happy to spend the time.  Otherwise, I

5     would rather call with the time we have Mr. D'Ambrosio, who I

6     think is a more pertinent witness to the actual substance of

7     why we are here.

8          THE COURT:  All right.  Well, let me tell you this,

9     Mr. Wilenchik.

10          My reaction to the information regarding the property

11    to be posted is that I'm going forward under the assumption

12    that it is worth the stated amount of $500,000 and that there

13    is that amount of equity in the property.

14          I'm not asking that you prove that up for purposes of

15    today's hearing.

16          MR. WILENCHIK:  Okay.

17          THE COURT:  I'm assuming that that is, indeed, the

18    case.

19          As you know, when property is posted to secure a

20    bond, there are quite a few steps involved and a great deal of

21    paperwork that has to be filled out.  And you have already

22    begun the process of conferring with Mr. Lanza.  But the

23    government has to be satisfied as to the amount of the equity.

24          We don't do it very often, because it is very

25    cumbersome and difficult.  The last time I did it, the

UNITED STATES DISTRICT COURT

1    property was not in Arizona and it took about a month to have

2    all the signing accomplished, the courtesy signing in another

3    district, and finalized the paperwork.

4         Clearly, we can do it much faster now because the

5    property is here.

6         MR. WILENCHIK:  Yes.

7         THE COURT:  But I don't think it's something that

8    could be accomplished today.  And so for that reason, I'm just

9    assuming that the property exists, it's worth the amount you

10   stated, the equity is there.

11        MR. WILENCHIK:  Right.

12        THE COURT:  And so should that be my ultimate

13   decision --

14        MR. WILENCHIK:  Okay.

15        THE COURT:  -- we will go forward with how to secure

16   the property.

17        MR. WILENCHIK:  I appreciate that very much, Your

18   Honor.  The only other point I wanted to raise on those kinds

19   of issues before we get rolling here is the issue of, you

20   know, sort of to cut to the chase, if the Court decides to

21   release Mr. Constantine -- I believe there's lots of reasons

22   why the Court should do that -- there is the possibility of an

23   ankle bracelet -- it was called to my attention -- that can

24   confirm his whereabouts at any given time if there is any

25   concern about that.

1              I'm here today, Your Honor, and I apologize for not
2     being able to be here Friday.  I was out of town on a prior
3     engagement.  But I can tell you for what it's worth since I
4     haven't had the opportunity to speak that I have known this
5     man for a good period of time.
6              I have represented him on various things, including a
7     civil matter related to the matter that we won and got
8     attorneys' fees for.  I am happy to discuss that later, but I
9     would just indicate at this point that I'm more than happy to
10    proceed however the Court wishes.
11             If the Court wishes questions asked, I'm happy.  I
12    think I know a lot about these issues to answer the Court.  He
13    has been working with the federal authorities in the Southern
14    District along with an Attorney Ed Little from Hughes Hubbard
15    there, a very large law firm, for years, at least three to
16    four years to my knowledge; cooperating fully and providing
17    all information to them.
18             For whatever reason they chose not to proceed.  And
19    then these alleged victims, two of whom work for a guy who is
20    basically what I would call a serious enemy of Mr. Constantine
21    in Mexico, who are the two complainants that the newspaper
22    features all the time, these two individuals basically set out
23    to stir up the U.S. Attorney in the Central District of Long
24    Island who really had no history with this case who is behind
25    this now.  And I can tell you that from personal knowledge and

1    have confirmed this with Mr. Little as well.

2           I just want to say that Mr. Constantine not only

3    voluntarily traveled at his own expense to New York to meet

4    with the U.S. Attorney previously, but also had a CPA who did

5    an audit of these books go and meet with or talk with -- I

6    can't swear that he met with them.  I think he talked with

7    them over the phone.

8           I'm not certain of that about whether he actually

9    physically met.  But I know he provided all documentation.

10   And I know he spoke with the U.S. Attorney in the Southern

11   District that has not brought charges and has been

12   investigating this for years.

13          So there was a civil case in the Central District

14   that I was involved in with the same individuals.  That

15   dropped out of sight.  As I said, we won the civil case that

16   they brought to try to take over Eufora.  We won that and got

17   attorneys' fees of $50,000.

18          Mr. Constantine even offered, through our auspices,

19   to -- indirectly to have these people basically be paid back

20   their money minus their attorneys' fees for whatever they

21   claimed their investment in Eufora was since it was never a

22   direct investment.

23          And they rejected it and they continued to work,

24   apparently, on the sidelines, not known to us, with the

25   Central District of New York, who never even contacted

1  Mr. Constantine, never gave an opportunity to even surrender,

2  who never even talked to him or cared to talk to him, but

3  instead chose to get some headlines in New York in the Daily

4  News.

5          Now, that's the facts here, Judge.  And I'm happy to

6  call Mr. D'Ambrosio as my first witness who was one of the

7  defendants in that case who works at Eufora and has worked

8  side-by-side with Mr. Constantine for years at Eufora.

9          Mr. Constantine lives within a five-mile radius, I

10  believe, of those offices; attends work there every single day

11  trying to build the company up, which these gentlemen who

12  basically claim to be the victims here, have no direct

13  interest in, never invested in directly, but rather, through

14  Mr. Kenner and with no record of who invested in it.  And

15  that's what we tried to get to the bottom of in the civil case

16  and we succeeded in that regard.

17          I believe this Complaint is frivolous.  I believe

18  that regardless of what the Court ultimately concludes on that

19  or whoever concludes on that, a jury, to claim that

20  Mr. Constantine is somehow a flight risk is really, really

21  stretching it.

22          He's not a flight risk.  I can tell you that for a

23  fact.  I can tell you he has a pregnant girlfriend/fiance.  I

24  can tell you he lives up in Silver Leaf in a rented house.  He

25  puts his mother's address down as a permanent address because

1   he does not own the house.

2            He has always done what he said he would do.  He has

3   been in a trial with me in Florida.  He has attended that

4   trial every day.  He has filed a bankruptcy and attended

5   dutifully.  He has an adversary proceeding next month in that

6   matter which I don't know what the status of that will be now

7   and I have every reason to believe he will show up.

8            I have every reason to believe in this case he

9   believes that he's in the right, that these people are

10  harassing him, that there is no substance to these claims

11  against him, that he intends to win this claim in front of a

12  jury or on motion, and that is sincerely what he contends in

13  this case and we contend.

14           There is just no good that can be done here other

15  than to be punitive to haul him back to New York where he does

16  not reside and put him in jail so that the prosecutor -- no

17  offense to Mr. Lanza, I don't personalize this to him

18  whatsoever -- but that the New York prosecutor can get

19  whatever pound of flesh she wants to get.

20           That's the facts.  And we were never given an

21  opportunity to attend any grand jury, to give a statement, to

22  do anything.  So that's where we sit right now, Your Honor, in

23  shock when he was arrested.

24           And I have consulted with his New York counsel and

25  can avow to the Court that that's exactly where he sits;

UNITED STATES DISTRICT COURT

```
1    totally in shock that this was even brought by some other U.S.

2    Attorney.  And I don't even think the two U.S. Attorneys

3    communicated with one another and even know that.  I don't

4    think the Southern District of New York attorneys who have

5    been working this file for years has had any clue that this

6    matter was going to be brought.  I guess that.  I don't know

7    that for a fact, but I would suspect that because they didn't

8    bring any charges.

9         The former police officer in question who's the one

10   who is sort of, what I call, the "ring leader" is the one who

11   actually, I believe the evidence will come out, got the U.S.

12   Attorney in Central District of Long Island in Islip where I

13   believe he resides to bring this claim.

14        But I can tell you, Judge, that the bottom line for

15   what's in front of you, I believe, is that he's appeared in

16   every hearing he has ever been involved in in the last seven

17   years or more.  We have defended every case that he has been

18   involved in in the last several years; always appeared,

19   including in New York, including in Florida, including in

20   Bankruptcy Court.

21        He has had no dealings with these hockey players

22   directly in this matter except to try to resolve this matter

23   and settle it with them and they have rejected it because

24   they're working with the government and trying to basically

25   get him and Mr. Kenner apparently as well.
```

UNITED STATES DISTRICT COURT

1    I can't speak for Mr. Kenner, but I can speak for

2    Mr. Constantine.  And I can tell you that he had a great idea

3    for this company Eufora.  He has been building it with people

4    like Mr. D'Ambrosio and others, never with any intent to steal

5    a nickel from any of these people.  Doesn't even really know a

6    lot of these people.

7         And yet they claim they own Eufora and tried to take

8    it over.  That's what this is all about.  And the fact that

9    they now work for his known enemy Mr. Jowdy in Mexico tells

10   you, I think, all you need to know about what really is going

11   on here.

12        So why they want him back in New York is pretty

13   obvious.  They want him back in New York so he can't really

14   defend himself.  He has to hire an attorney back in New York

15   full time that's going to be very expensive and costly.

16        I am fully familiar with these matters.  I can't --

17   although I'm licensed in the Eastern District of New York, as

18   well as New York in general, I cannot obviously travel back

19   there all the time to deal with this matter and meet him in

20   jail and so forth back there.

21        He needs to be home with his wife, his family

22   surrounding him, and I don't say that to gain any sympathy.

23   It's just a fact.  He needs to defend this case fully.

24        I will agree to any kind of reasonable restriction on

25   him.  There is no way he's going and flying out to other

1    countries or whatever this other U.S. Attorney says, because I

2    can tell you I'm fully familiar with all those operations.  I

3    can tell you he has no ownership interest, to my knowledge,

4    SetJet.

5        SetJet -- I was just on it this past week -- does not

6    fly out of the country right now and has no plans right now to

7    fly out of the country.  The only place it might fly would be

8    Cabo.  And it hasn't -- that the owner who I did talk to is

9    absolutely committed and Mr. Lassetter will tell you that -- I

10   think we sent the letter -- that there's no way that he's

11   going to allow his pilots or planes to be directed out of this

12   country.  It is just not going to ever happen.

13       And the Falcon which he has been managing, the Falcon

14   10 has now been seized for whatever crazy reason by the

15   government.  I don't even understand that, because

16   Mr. Constantine doesn't own the Falcon.  It's bizarre to me.

17   There are other individuals that are being hurt by that.

18       But putting that aside for the moment, the other two

19   Falcons are down.  They're not even flying.  And they are

20   going to require substantial maintenance and remediation.  And

21   the owners of those planes are not going to have

22   Mr. Constantine fly out of the country in them, even if they

23   could.

24       So he is just not a realistic flight risk, Your

25   Honor, is just the bottom line here.  And this case is just

UNITED STATES DISTRICT COURT

1    kind of a ridiculous case, quite honestly.  There is no

2    substance to this case.  I can tell you that because I have

3    been involved in it for years.

4            And how they got a U.S. Attorney to bring it, God

5    only knows, after they couldn't make it on a civil case, but

6    that's where we are.

7            I'm happy to surrender his passport to the Court

8    which I have with me.  Happy to do anything, like I said,

9    reasonably that would restrict him.  You know, he can check in

10   every week or every day for all I care.

11           And he's working a legitimate enterprise.  He will

12   agree not to fly anywhere outside the country or wherever you

13   want him not to fly and will continue to work, hopefully, at

14   Eufora and build that company up, which will benefit

15   everybody.

16           And if for whatever crazy reason the victims --

17   alleged victims in this case think that they're entitled to a

18   piece of that, it would only help them for him to do that.

19   But you see the reason they really don't want him there is

20   what I said.  They will try and take over Eufora in civil

21   court.  That's what they did.

22           They tried to claim Eufora as their company because I

23   understand it's a very valuable company.  That's why they

24   don't want him here and that's what's going on here.  And if

25   there's anything else going on, I haven't heard it and I would

1    like to hear it.

2           He's lived in this community, Your Honor, since 1995.

3    He's done nothing Criminal in this jurisdiction.  He did have

4    a prior drug-related offense which he told me about the first

5    time I met him and he tells everybody about.  There's a long

6    story with that which I won't bore you with.  But if the Court

7    wants to hear it, I would be more than happy to share it.  He

8    served his time and he learned his lesson when he was a young

9    man and that's it.  He doesn't do drugs and he doesn't engage

10   in, you know, those kinds of activities.

11          There's no way he's going to let his poor mother

12   suffer the consequences of putting up a bond if that's what

13   the Court does.  But I don't even think that's even necessary.

14   He's a member of the community and he's a good member of the

15   community.

16          This is an incident that I'm telling you has been

17   blown out of proportion by the news, as is typical, because

18   these guys look like -- are playing the victim.  They're not

19   victims.  They're aggressors.  They are very sophisticated

20   individuals who knew exactly what they were doing with

21   Mr. Kenner.

22          Mr. Kenner invested money with Mr. Constantine and

23   that's all she wrote.  And Mr. Constantine has a right to have

24   Mr. Kenner invest that money.  But then to say that somehow

25   Mr. Constantine is behind any of this is just absurd.  He had

1    no contact with any of these people except on one limited

2    situation involving Global Defense Fund.

3              And as far as he knew, the money was being put in

4    California in an attorney's trust account.  There's no misuse

5    of the plane money.  The plane was foreclosed on.  And a

6    hockey player, unrelated to these gentlemen, bought the plane

7    and leases it out to the Falcon Partners who own it, that

8    Mr. Constantine manages, and has no ownership interest in.

9              That's it.  It's just that simple, Judge.  And I,

10   again, am happy to answer anything for the purposes of the

11   loan, but I wasn't able to be here and I apologize for that.

12             But that's what I know about this matter.  I don't

13   think there is any question that this man is not a fight risk

14   and is not going out of this country.  He will be in New York.

15   He will defend himself.  And whether it's through me, a public

16   defender, or whomever, he will be defending himself.  And

17   there is no reason that the Court, that I can truly

18   understand, would want to detain this man in New York other

19   than just for the pleasure of these people who are out to get

20   him.

21             That's it, Judge.  And I apologize for being lengthy,

22   but I think it's important I tell you what I do know since I

23   have had personal contact with him and not Ms. Chenal.  I will

24   answer any questions you have, because I'm pretty well versed

25   on all this.

1          THE COURT:  All right.  I do need to advise you that

2     we have a Notice of Appearance that was filed for Ms. Chenal

3     on November 14th, but we don't have one yet for you,

4     Mr. Wilenchik.  If you could file one, tomorrow would be fine.

5          MR. WILENCHIK:  Sure.  Thanks, Judge.  I didn't

6     realize that.

7          THE COURT:  And the other -- I do have some questions

8     for you.

9          MR. WILENCHIK:  Please.

10         THE COURT:  Some of this confusion likely arises out

11    of the process where there's an interview with Pretrial

12    Services.

13         MR. WILENCHIK:  Yeah.

14         THE COURT:  And sometimes the information can be a

15    little confused, so I want to make sure I understand his

16    employment.

17         What I understood from the Pretrial Services' report

18    was that he was employed with an entity called Arizona Falcon

19    Partners and that he was a manager of a fleet of airplanes and

20    that he had been employed there since 2009 earning $5,000 a

21    month.

22         Now, at Friday's hearing the government, as part of

23    their presentation, pointed to an alleged inconsistency

24    between that information and information in Mr. Constantine's

25    bankruptcy proceeding in which he stated -- at least as the

UNITED STATES DISTRICT COURT

1   government avows it -- that he didn't have any income for the

2   previous couple of years.

3           And then the Pretrial Services' report indicates that

4   he's the founder of Eufora?

5           MR. WILENCHIK:  Yes.  Arizona Eufora.

6           THE COURT:  And has been the manager of that business

7   but has not made any money in the business.

8           So my impression from the information I had until

9   your presentation was that his employment was as the manager

10  of a fleet of planes and that he -- that was the source of his

11  income.  And that while he was attempting to build up the

12  Eufora business, it was not yet a source of income.

13          MR. WILENCHIK:  I believe that's correct.

14          THE COURT:  But your comments here today confuse me

15  here a little as you talked about --

16          MR. WILENCHIK:   Okay.  I'll clarify.

17          THE COURT:  I thought Arizona Falcon Partners was an

18  entity and you talked about Falcons as if they were specific

19  aircraft.  So can you clarify his connection to the Arizona

20  Falcon Partners, if any, his employment, and his ability to

21  access aircraft?

22          MR. WILENCHIK:  Sure.  And, again, this is based on

23  what I know.  I'm happy to get further information from him to

24  clarify.  I don't want to say anything that's inaccurate.  And

25  by the way, if I do, just let me know, okay?

1          In fact, I would be happy if the government would

2    agree on this limited issue to have him testify to this if you

3    would understand it on this limited issue.

4          MR. LANZA:  I won't want to expand it.

5          MR. WILENCHIK:  Okay.  Then would that be okay for

6    the Court just have him answer these questions?

7          THE COURT:  Sure.

8          MR. WILENCHIK:  It would be better than coming from

9    me.

10         THE COURT:  You can do it however you wish,

11   Mr. Wilenchik.  You can have him placed under oath and

12   Mr. Lanza has represented that the government won't go beyond

13   this issue.

14         MR. WILENCHIK:  Yes.  Right.

15         THE COURT:  But, of course, you do recognize that he

16   is under oath and this matter is recorded?

17         MR. WILENCHIK:  I understand that.

18         THE COURT:  And he's giving up his right to remain

19   silent and this information could be used against him.

20         Alternatively, if you want to consult with him and

21   get the information and proffer it, we can proceed that way as

22   well.

23         MR. WILENCHIK:  Do you have a problem?

24         TOMMY C. CONSTANTINE:  No.

25         MR. WILENCHIK:  We'll put him under oath and he can

UNITED STATES DISTRICT COURT

1    answer those questions, because I think he can answer a lot

2    better and quicker than I can.  I have answers for it, but I

3    think you would like to hear it from him, if you could, and I

4    think that's the way to do it.

5            THE COURT:  All right.  Well, have him come to the

6    lectern at least for now.

7            Mr. Lanza, do you have any objection to Mr.

8    Constantine speaking from the lectern as opposed to the

9    witness stand?

10           MR. LANZA:  No objection.

11           MR. WILENCHIK:   Okay.

12    **(DEFENDANT SWORN)**

13           THE COURT:  And, Mr. Constantine, you just heard me

14    talking to your lawyer, and I will advise you specifically as

15    I did at your initial appearance last week, that you do have

16    the right to remain silent.  And that means you don't have to

17    stand up here and answer any questions.

18           And you also need to know that you have now just been

19    placed under oath and that this proceeding is being recorded.

20    And that anything that you say could be used against you.

21           So with that understanding, do you wish to answer

22    questions?

23           TOMMY C. CONSTANTINE:  I do with respect to the ones

24    that have been presented before me.

25           THE COURT:  My question to your attorney and I will

1    restate for you related to your employment.  And the confusion

2    I have is as to the nature of Arizona Falcon Partners, if that

3    is, indeed, an entity, or if "Falcon" refers to a specific

4    aircraft or perhaps both.

5              TOMMY C. CONSTANTINE:  May I answer?

6              THE COURT:  Yes.

7              TOMMY C. CONSTANTINE:  It is confusing because there

8    are actually three entities that each own an aircraft, each of

9    which are Falcons.  And then there's an entity called AZ

10   Falcon Partners, which is essentially a Part 91 management

11   company, which is what -- where I work.  And I manage the

12   aircraft which are in separate LLCs that are owned by

13   different individuals.

14             The one that's in question, which is the Falcon 10

15   which they seized, was at one time owned by Ken Jowdy and I

16   believe a few of Phil Kenner's clients and, I believe, Phil

17   Kenner.  The money, my understanding, that paid for that

18   airplane, came one hundred percent from Phil Kenner's clients.

19             Mr. Kenner and primarily Mr. Jowdy proceeded to use

20   all three aircraft.  There was three aircraft, including the

21   Falcon 10.  At will, essentially ran them into the ground,

22   leaving his players who all invested, I believe, a quarter of

23   a million dollars each, plus at least one that I know of, with

24   a $1.3 million personal guaranty for the loans for those

25   aircraft.

```
 1          The reason that I even know these people is because I
 2   was brought in by these two guys, Phil Kenner and Ken Jowdy,
 3   to try to remedy the situation, which I did.  I was able to
 4   alleviate the hockey players of their -- I'm sorry.  I was
 5   able to remedy the situation and save the aircraft as a
 6   collective group, alleviating huge financial ramifications for
 7   them and keeping the one airplane and I sold the other two
 8   airplanes in an environment that was unbearable.  I should
 9   have gotten a Pulitzer prize for it.
10          Then, after that happened and we were all happy,
11   Mr. Kenner turned on me and got the same people that I helped
12   save the airplane to sue me for Eufora.
13          MR. WILENCHIK:  Just stick to the question.
14          TOMMY C. CONSTANTINE:  I then lost the airplane.
15   Again, we lost the airplane again.  And then a separate group
16   of investors, the same investors that own the Falcon 20 and
17   Falcon 50 elected to go buy that airplane from the bank.  In
18   fact, they bought the loan from the bank.
19          And the only reason that that airplane is not
20   currently officially owned by Falcon 10 Partners which was the
21   successor entity, is because I asked them to simply place a
22   lien on the airplane for the amount of money that they have
23   invested and allow me to reconcile with the original owners
24   of -- the hockey players to try to retain some equity in it,
25   which is essentially, Your Honor, like somebody losing their
```

1    house to the bank and then the bank saying, yeah, but you can

2    still have a piece of it.

3              That's what I have engineered and that's what still

4    is in place.  Yet they have gone and taken the airplane away

5    which belongs really to the new investors that have --

6              MR. WILENCHIK:  Stick to the question the Judge asked

7    you.

8              TOMMY C. CONSTANTINE:  So the AZ Falcon Partners

9    entity technically owns the Falcon 10 but is only in that

10   instance because they haven't put it in Falcon 10 partners

11   yet.

12             And so Falcon 10 partners is the entity that I manage

13   because it manages all three airplanes for all of the owners

14   of Falcon 10, Falcon 20, and Falcon 50 partners.

15             THE COURT:  Okay.  So Arizona Falcon Partners

16   technically owns the Falcon 10 and that plane has been seized

17   by the government; is that correct?

18             TOMMY C. CONSTANTINE:  Correct.

19             THE COURT:  And then there were two other aircraft

20   also called Falcon.

21             MR. WILENCHIK:  20 and 50.

22             TOMMY C. CONSTANTINE:  "Falcon" is like saying

23   "Chevy."  So the 10 is one model, the 20 is another model, and

24   the 50 is another model.

25             THE COURT:  So the two other aircraft were sold

```
 1    essentially to a bank and then purchased by other investors?
 2              TOMMY C. CONSTANTINE:  Those airplanes were just
 3    bought independently of AZ Falcon and this Falcon 10 by -- it
 4    happens to be the same investors who invested in the 10, but
 5    they own the 20 and 50 in separate entities.  And I manage
 6    those assets for those investors through AZ Falcon Partners.
 7              THE COURT:  So you manage the Falcon 20, the Falcon
 8    15 and you did manage the Falcon 10 until it was seized?
 9              TOMMY C. CONSTANTINE:  Correct.  Correct.
10              THE COURT:  And are you a licensed pilot?
11              TOMMY C. CONSTANTINE:  I am not.  I trained in a
12    helicopter 15 years ago and I never got my license.  But if we
13    were stranded on an island, I could probably get us off if we
14    have a helicopter.
15              THE COURT:  The Pretrial Services' report states that
16    you believe you would lose your employment or not be allowed
17    to return to your place of employment due to this case.
18              And I assume that meant to Arizona Falcon Partners.
19    Do you believe you are going to return to managing these
20    aircraft for Arizona Falcon Partners.
21              TOMMY C. CONSTANTINE:  I do believe I still have an
22    opportunity to work at AZ Falcon Partners, but it's not fully
23    subscribed.  It's meant to have ten partners.  It only has
24    eight.  And the confusion with the gentleman that I was
25    speaking with was that I don't get a salary until we are fully
```

1    subscribed.

2           And as soon as I started explaining and then we both

3    realized that it was a part of this case, he said something

4    like "defensible" or something about the word "defense" and

5    don't talk about it anymore because it's about this case.

6           That's why the confusion of the 5,000.  I don't get

7    paid yet, but I will when it's fully subscribed.

8           I have to tell you that since this has happened

9    though, we have already been noticed of two partners

10   terminating, so I don't know where that's going to end up.

11   But this is the kind of damage that's being caused by all of

12   this.  But I hope that I will be able to go over there and

13   build that and Eufora into profitable businesses.

14          THE COURT:  Where are these three aircraft?  Where

15   are they physically located?

16          TOMMY C. CONSTANTINE:  They're located at the

17   Scottsdale Airport.  Each of them have to be registered with

18   the City of Scottsdale Airport to a specific hangar and they

19   are very well known where they belong by the airport

20   authority.

21          MR. WILENCHIK:  Let me be clear, Your Honor, just to

22   clarify, the business at Arizona Eufora is conducted in the

23   same building that he's been in for many years.  And I don't

24   know what the ownership exactly of that building is.  You can

25   explain that in a minute.

1       But ever since I have known him, he has been in this

2  building which has a hangar attached to it on the Scottsdale

3  Airport.  Not withstanding, we have known about this case

4  brewing for years.  He has never made any effort, as I said,

5  to flee or go anywhere.

6       But Eufora is in the same location as the Arizona

7  Falcon Partners.  So the planes are all run out of his one

8  location there on 83rd Street and Scottsdale -- is it 83rd or

9  82nd?

10       TOMMY C. CONSTANTINE:  It's 82nd.

11       MR. WILENCHIK:  82nd.  I always get that wrong.  And

12  off Frank Lloyd Wright Boulevard.  That's where he goes every

13  day from his house in north Scottsdale and he leases.

14       TOMMY C. CONSTANTINE:  In fact, if you look at the

15  document, I gave them that address too.  But when I told him

16  it was my office, he scratched it off.  It's 16044 North 82nd

17  Street.  And I believe half of it is written on that document.

18  It's four miles from where I stay.

19       THE COURT:  All right.  Thank you, Mr. Constantine.

20       Mr. Lanza, was there anything you wanted to ask

21  Mr. Constantine?

22       MR. LANZA:  Yes.  How long have you been working in

23  this management capacity for AZ Falcon Partners in terms of

24  providing management purposes?

25       TOMMY C. CONSTANTINE:  Since its inception.

UNITED STATES DISTRICT COURT

1          MR. LANZA:  Say around 2009?

2          TOMMY C. CONSTANTINE:  I believe so.

3          MR. LANZA:  Approximately, how many hours a week do

4     you work providing these services?

5          TOMMY C. CONSTANTINE:  It varies because it depends

6     on how often the guys fly.  But whenever necessary, which

7     sometimes can be five hours a week and sometimes can be 50

8     hours a week.

9          MR. LANZA:  So continuously since 2009, you have

10    worked somewhere between roughly 5 to 50 hours a week for AZ

11    Falcon Partners every week for the last four years?

12         TOMMY C. CONSTANTINE:  Yes, but not exclusively.

13         MR. LANZA:  How much income in the aggregate have you

14    earned from this four years of 5 to 40 hours a week of

15    employment?

16         TOMMY C. CONSTANTINE:  I don't know.  And only

17    because I'm involved in an IRS matter, I would rather not even

18    guess.  I don't know.

19         MR. LANZA:  Have you earned any?

20         TOMMY C. CONSTANTINE:  I don't know.  I don't know

21    because I'm not sure what is classified as income.

22         MR. LANZA:  Have you ever received a check from AZ

23    Falcon Partners?

24         TOMMY C. CONSTANTINE:  Perhaps.  I don't know.

25         And again, this is not an area that I'm entirely

1    comfortable with, so to the extent I can invoke my whatever

2    right that is to remain silent, I would like to on that

3    subject.

4         MR. WILENCHIK:  You don't have to.

5         TOMMY C. CONSTANTINE:  "I don't know" is the answer

6    to that.  I don't want to guess and then be told I'm lying,

7    which has happened in everything else.

8         MR. LANZA:  Do you rely in part on the money you get

9    from AZ Falcon in whatever form or amount it might take to

10   fund your daily expenses, you know, rent, food, gas, that sort

11   of thing?

12        TOMMY C. CONSTANTINE:  I don't know how to answer

13   that question without more information because I think it's an

14   accounting question.

15        MR. LANZA:  Separate from characterizing that money

16   as income, how else might that money be characterized then if

17   you are uncomfortable characterizing the payments from AZ

18   Falcon as income?

19        TOMMY C. CONSTANTINE:  I don't even understand what

20   you said, but I would like to try.  Can you say it again

21   please?

22        MR. LANZA:  Regardless of whether it's income or some

23   other way of characterizing it, do you ever get money from AZ

24   Falcon?

25        TOMMY C. CONSTANTINE:  I mean, possibly, yeah.  It

1    depends on the circumstances.  Oftentimes, I need money to do

2    things for the company, yes.

3              MR. LANZA:  Do you ever --

4              TOMMY C. CONSTANTINE:  Sorry.

5              MR. LANZA:  Give an example of how you get money to

6    do things for the company.

7              TOMMY C. CONSTANTINE:  I might need to tip a line

8    guy.  I might need to buy a meal.  I might need to buy a part.

9    It's very common.

10             MR. LANZA:  Separate from money that you use to fund

11   AZ Falcon's affairs, do you ever receive money from AZ Falcon

12   that you use in any way for your own personal support?

13             TOMMY C. CONSTANTINE:  It's possible, but I don't

14   know -- I can't answer that without more information in front

15   of me and a conversation at least with my accountant.

16             MR. LANZA:  You filed for bankruptcy in 2012?

17             TOMMY C. CONSTANTINE:  I did.

18             MR. LANZA:  And you reviewed the schedules and

19   financial statements that were filed as part of those, that

20   filing?

21             TOMMY C. CONSTANTINE:  I have.

22             Can I ask my attorney a question, please?

23             MR. LANZA:  Sure.

24        (Discussion had between defendant and counsel.)

25             MR. WILENCHIK:  Your Honor, I do think, with all due

UNITED STATES DISTRICT COURT

1    respect to Mr. Lanza, this is going beyond the questions

2    relating to AZ Partners.  I think he has some discomfort

3    because he does not have his bankruptcy counsel here.

4          I'm not familiar with the bankruptcy and I am not

5    familiar with the bankruptcy proceeding other than an

6    adversary proceeding that I'm involved in.

7          Mr. Littler is his counsel.  His accountant is

8    Mr. Semple or has been Mr. Semple who I'm sure could be

9    contacted.  But I think he is uncomfortable because of the way

10   in which they handle the accounting of all these things and he

11   doesn't want to say something that can be proven to be wrong.

12         I think he's hesitant to answer that and I don't

13   think these are really related directly to the issue that we

14   raised or -- we'll waive the testimony on the Falcon.  If I'm

15   wrong, then maybe you can clarify.

16         MR. LANZA:  I'm not sure I can proceed, Your Honor.

17         The question that we agreed to limit the scope to was

18   to talk about AZ Falcon and the money you received from it.

19   We even pointed out on Friday that the government was alleging

20   there was a discrepancy between what the Pretrial Services'

21   report talks about an income and what the bankruptcy schedules

22   talk about an income.

23         These are the very things I'm trying to explore

24   through my questions here.  It's very limited.

25         MR. WILENCHIK:  Well, I don't object -- let me just

1    say this, Your Honor, please.

2         I don't object if he's asking about a specific

3    reference in a bankruptcy schedule to AZ Falcon Partners that

4    may be inconsistent with what he's saying at this hearing.  I

5    have no problem with that.

6         THE COURT:  Well, what Mr. Lanza is getting at is

7    what I had explained to you had occurred on Friday when you

8    weren't present, Mr. Wilenchik, was the government had

9    asserted in its proffer that the statement in the Pretrial

10   Services' report or the reported statement that he was

11   employed at Arizona Falcon Partners and receiving $5,000 a

12   month was, in the government's view, inconsistent with his

13   representations about income in his bankruptcy filings.

14        And I had asked you for some clarification on what is

15   Arizona Falcon Partners.

16        MR. WILENCHIK:  Right.

17        THE COURT:  In part trying to understand if he was

18   employed there.  My interest was not so much directed at the

19   financial implications, but as to the accessibility of

20   aircraft.  And I also was confused by the naming of the

21   aircraft as Falcons or the naming of the entity as Arizona

22   Falcon Partners.

23        MR. WILENCHIK:  Yeah.  That's what I thought.

24        THE COURT:  So you brought Mr. Constantine up to

25   testify on that.  And I know he's understandably agitated by

1    the proceedings and I think he's excited this afternoon to

2    some degree this afternoon to have an opportunity to present

3    his story or explain himself a little bit.

4         So he did go a bit beyond, but we had addressed about

5    what is this entity?  Where are these aircraft?  What are

6    they?  Do you manage them?  And he said some additional things

7    beyond that.

8         I don't think Mr. Lanza is going too far afield to

9    ask about income, because that's where this all began.  And

10   what he's exploring is the very proffer they made on Friday.

11        However, even though Mr. Constantine has been warned

12   about waiving his right to remain silent, this is just a

13   detention hearing.  This is not the trial.  I don't want to

14   put Mr. Constantine in a position of making incriminating

15   statements.

16        If he's willing to withdraw his testimony about any

17   kind of income issues, then I don't want to go into it in this

18   proceedings.

19        MR. WILENCHIK:  I just want to be clear, Your Honor.

20   All I think he said here and so we're clear on this is he was

21   trying to clarify, from what I heard, he was trying to clarify

22   a statement made about the $5,000.  And I thought what I heard

23   him say is that he was saying that that was misunderstood and

24   that he was talking about he might get that when they are

25   fully funded and fully -- have a full partnership.

1          But he did not say he was making $5,000 presently, if

2     that was not clear.

3          MR. LANZA:  I think that's never been what he said.

4     That's what his attorneys have said a couple of times.  But

5     let me say this, Your Honor --

6          THE COURT:  Well, he did say that it wasn't fully

7     subscribed; that there was eight members of the partnership

8     and not ten.  And I thought he was trying to express that the

9     income was prospective and that two partners had withdrawn.

10         MR. WILENCHIK:  Right.

11         THE COURT:  But I understand, Mr. Lanza, you were

12    asking him whether he has received any income from this

13    entity.

14         MR. LANZA:  I'm sensitive to the fact that it's

15    unusual to have somebody in a charged case under oath in this

16    proceeding.  I don't want to press it to an unfair advantage.

17    I think I can make the arguments I need to make on what's

18    already been testified to and I don't need to ask any more

19    questions.

20         THE COURT:  All right.  Thank you, Mr. Lanza.

21         MR. LANZA:  Thank you, Your Honor.

22         MR. WILENCHIK:  Your Honor, if you have any other

23    questions specifically as to that, I will have him respond.

24    If not, because I think that was helpful, but if not, I don't

25    intend to expand this as we just stated into his general

1    testimony.

2           THE COURT:  So there are three Falcon aircraft.  They

3    are currently physically located at the Scottsdale Airpark.

4    One has been seized by the government.  The other two are

5    owned by investors; is that correct?

6           TOMMY C. CONSTANTINE:  In the name of Falcon 20

7    Partners and Falcon 50 Partners, LLC, of which neither am I an

8    owner.

9           THE COURT:  You would manage those two LLCs and

10   manage the aircraft?

11          TOMMY C. CONSTANTINE:  I do.

12          MR. WILENCHIK:  Both of those planes, Your Honor, I

13   happen to know --

14          TOMMY C. CONSTANTINE:  They are not airworthy.  They

15   are in the middle of very extensive maintenance which will

16   take months.  It's a six-year check.  Every six years they

17   have to take both airplanes completely apart and inspect them.

18   One is just midstream and the other one is just getting

19   started.

20          THE COURT:  Thank you.  That's helpful.

21          Mr. Wilenchik, I would ask you to have

22   Mr. Constantine sit down again.

23          MR. WILENCHIK:  Yes.  Thank you, Your Honor.

24          TOMMY C. CONSTANTINE:  Thank you, Your Honor.

25          MR. WILENCHIK:  I mean, Your Honor, let me just say

1    this please.

2          I can call Mr. D'Ambrosio who really has a lot of the

3    information on Eufora.  He works there with Mr. Constantine.

4    I can get into a lot of the facts here about the Eufora case

5    and the alleged victims and their claims.

6          I can do it as quickly as I can, if the Court please,

7    just to establish he does show up every day.  He has never

8    stated that he's going to be leaving town or anything like

9    that throughout all the investigation he has gone through,

10   articles in the Fortune magazine about this, Daily News, you

11   name it.

12         He has never indicated any propensity to leave the

13   country, leave the state or jurisdiction, other than to go to

14   hearings that I have been to with him.

15         And he has no intention but to fight this fully.  And

16   as I said, Mr. D'Ambrosio was a party to that action, so I

17   think he has personal knowledge of this.  Or I can avow it.  I

18   mean, however you want to do it is fine with me.  But he is

19   here and I can put him on the stand just to quickly establish

20   what I just said.

21         THE COURT:  Well, he is --

22         MR. WILENCHIK:  If it's relevant to the Court.  If

23   it's not and I'm barking up the wrong tree, I'll get to

24   something that's more relevant.

25         THE COURT:  Well, let me ask you a few questions.  He

```
1    is Mr. Constantine's partner at Eufora?

2              MR. WILENCHIK:  Not a partner.  I mean, you know,

3    loosely I suppose you could say that.  But he is involved in

4    Eufora.  I'm not sure of his exact title at Eufora.  But he

5    does work with him very closely there every day.  Every time I

6    have seen them, they have been together there.  So they have a

7    long relationship that goes back in Eufora.

8              And I think he would be probably the best person to

9    know what his daily habits are, where he goes, how far he

10   lives, things like that, rather than calling his fiance who

11   obviously, you can appreciate, is a little distraught.

12             I think he would be a little more objective -- not

13   credible necessarily, because it's not that nobody else would

14   be credible, but I think more knowledgeable about, you know,

15   his restrictions.

16             THE COURT:  Well, I don't think there has been a

17   suggestion that Mr. Constantine has not resided here since, I

18   believe, 1995.

19             MR. WILENCHIK:  And worked here.

20             THE COURT:  And worked here.

21             The information that the government proffered was

22   that he had traveled internationally, fairly extensively, and

23   a great deal of that travel was in private aircraft.

24             MR. WILENCHIK:  I would like to address that.

25             THE COURT:  And, let's see, three trips to the
```

1   Bahamas this year.

2           MR. WILENCHIK:  Right.

3           THE COURT:  A trip to Mexico this year.  A trip to

4   Mexico last year.  A trip to Zurich last year.  Twelve trips

5   to Mexico between 2007 and 2009.

6           So I think the government's point was that he has

7   traveled extensively out of the country and that those trips

8   were on private aircraft other than the trip to Zurich.

9           Is Mr. D'Ambrosio going to address that?  I don't see

10  that the two are connected.  I don't think there was anything

11  in the government's proffer about Mr. Constantine's daily work

12  habits or where he lives or commutes.

13          MR. WILENCHIK:  I apologize.

14          I can just tell you quickly.  I don't know that he

15  can any more than I can.  And all I can tell you is, having

16  been personally familiar with that, is that I had been on the

17  Falcon planes with Mr. Constantine.

18          And he has a friend who is a mutual friend who has a

19  boat in the Bahamas that he and his fiance have vacationed on.

20  He has returned on the same plane as I have from another

21  location where we met up.  My daughter is in law school in

22  Washington where I'm at this week.

23          And they always come home.  And as far as Mexico, I'm

24  not exactly sure what the allegation is, but I would suspect

25  he's been to Cabo.  I know that as I said earlier that another

1    enterprise he has an involvement in, SetJet, which is

2    operating out of Scottsdale terminal, is considering going to

3    Cabo.  So it's very possible he went there for either a

4    vacation and/or to look into that issue.

5          I don't think he has any problem with agreeing not to

6    go out of the country whatsoever.  It's not necessary he goes

7    out of the country.  He has never gone out for any other

8    purpose other than vacation as far as I'm concerned that I

9    know, like all of us.

10         So I don't know what to say, other than I suppose any

11   one of us could be accused of going out of the country from

12   time to time including me.  I don't think there is anything to

13   make of that other than the fact that he would agree -- I'm

14   positive he would agree -- not to do that.  And as I said, to

15   wear an ankle bracelet or something, you know, if the

16   government is concerned about that, which I don't think is a

17   realistic concern about, the fact that they are private craft

18   is kind of meaningless at this point.  They're not even

19   operational and one has been seized.  That's the one that we

20   were on.

21         And so I don't know what to make of that.  There is

22   no way he's going on either of those planes at this point.

23   And as I said, the only other operation I know that he has any

24   involvement is -- and I'm not sure exactly what the

25   relationship is -- other than the fact that I think it was his

UNITED STATES DISTRICT COURT

1   brain child, but I know he's not the owner of SetJet which is

2   a service that runs -- I was just on it -- a wonderful service

3   that runs out of Scottsdale Airport terminal for the first

4   time and is owned by another individual who put the money in

5   the planes.

6          And I can tell you, Mr. Lassetter, that he is not

7   going to allow Mr. Constantine to travel anywhere outside the

8   country if the Court says that he can't travel outside the

9   country on any of those planes.

10          And frankly, they don't fly outside the country.

11   They fly right now to Vegas, Los Angeles, I believe San Diego

12   on occasion, maybe one other stop, but that's all I can recall

13   at the present time.

14          THE COURT:  Well, at this point in the proceedings,

15   Mr. Wilenchik, what I would like to determine is whether you

16   intend to call any of your witnesses.

17          Now I'm not suggesting that you need to do that.  I

18   had this conversation with Ms. Chenal on Friday as well.  And

19   as I understood her comments, she was indicating that the

20   witnesses would either be character witnesses or address the

21   property that's been suggested to be posted for the bond.

22          And that's my knowledge of what the witnesses would

23   say.  I have several letters from individuals who are

24   attesting to Mr. Constantine's good character.

25          MR. WILENCHIK:    Right.

UNITED STATES DISTRICT COURT

1          THE COURT:  Ms. Chenal seemed to be of the opinion

2     that the live witnesses might be redundant to what's in the

3     letters.  And this afternoon you've confirmed, I believe, that

4     Mrs. Constantine would address the property if she were to

5     testify and Mr. D'Ambrosio would talk about Mr. Constantine's

6     work habits and daily routine, and the other individuals on

7     your list, I'm assuming, are character witnesses.

8          MR. WILENCHIK:  Yeah.  The only other thing as to the

9     D'Ambrosio proffer I would say would be that he is aware of

10    the investigation in New York, has been for years now.  That

11    Mr. Constantine has talked to him about that investigation.

12    Has indicated full cooperation.  Gone to Manhattan.  Talked to

13    the FBI.  Talked to the U.S. Attorney.

14         Has always provided all documentation including

15    accounting records and cooperated in every way he knows how

16    because he intends to defend himself.  There is no indication

17    anywhere that I know of that the government can provide that

18    this man would in any way, shape, or form, I can tell you, and

19    know him, attempt to flee this jurisdiction, flee this case

20    and anything else.  He intends to defend the case.

21         THE COURT:  All right.  Well, then I can accept that

22    as a proffer that Mr. D'Ambrosio would testify that he had

23    discussions with Mr. Constantine in which Mr. Constantine

24    advised him of the investigation in New York, his trips to New

25    York to cooperate, and did not express to Mr. D'Ambrosio any

1    indication that he wished to flee.

2           MR. WILENCHIK:  And the final thing, Your Honor, I

3    said was that he would also testify that these individuals who

4    were sort of what I call the ring leaders, there's two of

5    them, work for Mr. Jowdy who is the individual that we just

6    heard Mr. Constantine mentioned, who is basically a sworn

7    enemy.

8           That these individuals have seen to it to harm

9    Mr. Constantine.  That he is aware of all of that.  And most

10   importantly, I think, that he was present during discussions

11   with some of -- with these individuals about making offers to

12   basically pay whatever they had or claimed they had in this

13   Eufora company back to them minus whatever fees were incurred

14   in defending their frivolous lawsuit they filed in civil

15   court.

16          And that they rejected that, never got back to them,

17   and that they had no interest registered in Eufora.  It was

18   all done through Mr. Kenner in an LLC he had formed and

19   invested in Eufora.  Notwithstanding that, Mr. Constantine

20   offered to pay them back whatever money they could establish

21   they paid Mr. Kenner, not him.

22          I don't know what more he could do.

23          THE COURT:  All right.  Well, Mr. Wilenchik, I would

24   like to make some headway with this proceeding.

25          MR. WILENCHIK:  Yes.

```
1              THE COURT:  We're now coming up to the two-hour mark.

2    And so what I'm trying to establish is if you feel comfortable

3    resting on your proffer and your argument and we can move

4    forward or if you feel that you need to put on any of these

5    witnesses.  I think I understand from our fairly lengthy

6    discussion now your proffer as to the testimony from

7    Mr. D'Ambrosio and the other witnesses would be character

8    witnesses.

9              MR. WILENCHIK:  Yeah.  Those are character witnesses

10   who have known him for years.

11             The only final thing, Your Honor, if the

12   government -- and I respect Mr. Lanza greatly -- if the

13   government has any information, real information that this man

14   is a flight risk, I'm here today not only as a lawyer but as a

15   friend to try to deal with it and to try to answer it, any

16   concern, any real concerns as opposed to just "we want him

17   back there."

18             If there is some indication that the U.S. Attorney

19   back there has that this man has indicated to anyone that he

20   is going to flee, I would like to hear it and I'll address it

21   quickly and deal with it as best I can.  But right now I don't

22   know what else to do affirmatively to show the Court that this

23   man has no intention.

24             THE COURT:  Thank you, Mr. Wilenchik.  I will call on

25   Mr. Lanza and see if he has anything in response.
```

UNITED STATES DISTRICT COURT

1          MR. LANZA:  I don't have any further facts to

2    proffer.  I have some thoughts on the equity in the property.

3    I think that we have generally fleshed them out, but I don't

4    even think we need to go into it now because the Court has

5    said for purposes of this hearing it's simply willing to

6    accept there is a stated amount of equity in the property.

7          THE COURT:  That's correct.

8          MR. LANZA:  I have some thoughts on that, but I don't

9    think I need to go into it.

10         THE COURT:  Well, are the thoughts related to

11   logistical or administrative issues on how to address the

12   property should it be posted as security?  Or is it the

13   government's position that perhaps the property really doesn't

14   have the value or the equity that the defense has suggested?

15         MR. LANZA:  I think it's the latter.  Trust and

16   verify.  I think it's possible or likely it does have the

17   equity that has been represented, but there's a couple of

18   points that I was able to speak informally with the

19   defendant's mother beforehand that gave me comfort that my

20   concerns are misplaced.  But I still think it would need a

21   little more investigation just to conform those things.

22         THE COURT:  All right.  Mr. Lanza, is there anything

23   else that you wanted to present or say in response to what the

24   defense has presented?

25         MR. LANZA:  I don't have any more facts to proffer.

UNITED STATES DISTRICT COURT

```
 1    My final bit of argument I have already said my piece in the

 2    papers.

 3              A great deal of what Mr. Wilenchik said today, I

 4    think, really went to the element of how strong is the

 5    evidence in the case.  It was about the details of Eufora and

 6    all that.

 7              Typically, you get into discussion of the strength of

 8    the evidence in preindictment cases where it's just a

 9    complaint.  The grand jury has already found there's probable

10    cause to support these charges.  That's usually deemed

11    conclusive on the point that there is sufficient evidence or

12    somewhat strong evidence in the case.

13              That's the least important factor, in any event, in

14    the flight calculus.

15              I think the government's reasons for seeking

16    detention in this case are focused most on the fact that the

17    Guidelines are off the charts in this case.  And you've got a

18    defendant who has international ties, access to potentially

19    unaccounted-for cash related to the underlying scheme.

20              And in the New York proffer letter, one of the

21    victims advised that both Kenner and Constantine advised that

22    Constantine has family in Greece and that Constantine could

23    move to Greece, if necessary.

24              I think that's the element here that distinguishes

25    this from the usual white-collar case that has theoretically
```

UNITED STATES DISTRICT COURT

1    high Guidelines exposure.  When you've got a defendant who at

2    least some of the victims are saying has already laid the

3    groundwork for a flight plan, that's obviously very concerning

4    to us and I think that's probably the most crucial factor here

5    supporting the detention request.

6         The final point I'll make before I sit down relates

7    just to this point about income, you know, the little bit of

8    under-oath testimony today.

9         You know, the Pretrial Services, we deal with them a

10   lot.  They're usually pretty accurate what they put in their

11   report.  They wrote down that he said:  I make $5,000 a month

12   and I have since 2009.

13        The bankruptcy petition says he said under oath that

14   he had never made -- he hadn't made any money for years from

15   this AZ Falcon Partners.  And then he testified today that

16   he's worked 5 to 40 hours a week for four years.

17        Now, common sense tells us that people usually get a

18   little bit of income if they work that many hours for that

19   many years in companies that is essentially their full-time

20   employment.  It is not consistent with common sense that one

21   wouldn't make any income from that, which means that the

22   bankruptcy petition may have been inaccurate.

23        But then when I asked what I thought were some very

24   basic common sense questions that didn't need an advanced

25   accounting degree to answer, such as, "Did you make any

UNITED STATES DISTRICT COURT

1    income," there were nervous denials and concerns that the

2    question was too complex, which again, I don't know the true

3    answer, but I have concerns that there is not complete

4    truthfulness going on between all these different sources of

5    what the income picture is.

6         And that's just a further -- not the most powerful

7    factor, but a factor on -- a thumb on the scale here about are

8    these representations about truthfulness and "you can trust

9    me" something that the Court should accept?

10        THE COURT:  All right.  Thank you, Mr. Lanza.

11        Briefly, Mr. Wilenchik.  The government does have the

12   burden here.  And between Ms. Chenal's presentation and yours,

13   the defense has gone for two hours.  Mr. Lanza has probably

14   presented ten minutes over the last two days.  But I'm willing

15   to hear you one more time.

16        MR. WILENCHIK:  No problem with Mr. Lanza if he wants

17   to present more, that's fine with me.  I'm just trying to

18   respond to what he said.

19        THE COURT:  Go ahead.

20        MR. WILENCHIK:  First of all, Your Honor, whether or

21   not Mr. Constantine's bankruptcy petition and bankruptcy have

22   been properly handled is really not a matter here for the U.S.

23   Attorney or me or you, for that matter, I believe.  That's a

24   matter for the Bankruptcy Court.

25        And frankly, the little I know of that bankruptcy

```
1    proceeding, the courts and the Trustee have gone through all

2    that stuff.  So I would rather take their word for what they

3    have gone through on his records and what his creditors who

4    have the right to object to any of those schedules and any of

5    his bankruptcy filings can do to object to that bankruptcy,

6    more so than with all due respect to the presentence report

7    people who have a conversation with a man who is distraught

8    and saying a lot of things and probably just got it wrong.

9    That's all there is to it.

10        As far as expenses are concerned, I'm sure, like he

11   said, he does take expenses from these various operations to

12   live on.  I would assume that.  I don't know that, but I would

13   assume that, like Mr. Lanza does.  But I don't know what that

14   has to do with anything here.

15        And further, when Mr. Lanza says he has international

16   ties and so forth, I don't know of any international ties.

17   His family is sitting right here in this court.  No

18   international ties.  Nobody in Greece.  I didn't hear that.

19   Somebody hearsay saying he has people in Greece or something?

20   He doesn't even know what they're talking about.

21        So finally, Eufora.  The only reason that I discussed

22   Eufora with the Court, not so much to try the case here

23   substantively, but to give the Court a flavor for what we're

24   talking about and how weak it is and how ridiculous it is.

25        But more importantly, the reason for your purposes
```

UNITED STATES DISTRICT COURT

1   was to establish that he shows up every day at the same

2   location and has for years.  Knows about this proceeding

3   coming down on him.  It's no secret to anyone.  Has cooperated

4   with it and hasn't attempted to flee, but in fact, has

5   attempted to cooperate.

6          And yet there is in return what the government does,

7   notwithstanding that he has attempted to provide them all

8   documentation at their requests.  Always responded to them and

9   their investigators.  And now we hear that he's a flight risk

10  going to go to Greece.

11         Please, I think the Court is intelligent enough

12  certainly to understand this man is no flight risk.  He is no

13  danger to society.  He has a case like a lot of people do.

14  He's entitled to be out with his family.  And they are willing

15  to trust him enough to put up a bond, were willing to comply

16  with all of the presentence -- or pretrial, excuse me --

17  recommendations, Pretrial Services' recommendations as stated

18  on page 2 of our brief.

19         He's willing to even have an ankle bracelet if the

20  Court has any concern.  Willing to instruct at the

21  government's request anybody that he deals with with SetJet,

22  Falcon Partners that he has no ability to go outside this

23  country, including the pilots.  And we will go further and

24  submit his passport to the Court, which I don't know what else

25  we can do to assure that he is not leaving this country or

1    anywhere else.  And he's got a baby on the way to make matters

2    worse.

3          His mother is recovering from cancer.  This has been

4    a terrible situation.  He is not leaving his family unless the

5    Court orders it.  And we ask the Court to consider not to do

6    that.  There is just no basis for it.  It is just the

7    government being punitive.

8          I do have his passport, Your Honor, as well.

9          THE COURT:  All right.  Thank you, Mr. Wilenchik.

10         MR. WILENCHIK:  Thank you.

11         THE COURT:  As I understand the government's position

12   from reading their brief on detention and Mr. Lanza's

13   arguments and proffer over the last two days, the government

14   is not arguing that Mr. Constantine poses a danger to the

15   community.  Rather, they are arguing that he poses a risk of

16   flight.

17         The defense has put forth a number of arguments as to

18   why they believe that is not the case.  And then also, they

19   have proffered some factual information that I believe was

20   intended to establish that even should the Court conclude that

21   Mr. Constantine poses a risk of flight, that there are

22   conditions that could be fashioned to address that risk.

23         In part I am tempted to just tell you what I have

24   concluded without responding to any of the arguments the

25   defense has made.  But in the interests of a complete record,

1    I will respond to what's been presented.

2            The defense argued the first factor, the nature and

3    circumstances of the offense charged, and suggested that it

4    was extraordinary or unheard of or extremely unusual for the

5    government to seek detention of the defendant in something

6    other than a crime of violence or a case involving firearms or

7    drugs or a minor.  And that is simply not the case.

8            And in this Court's experience, the government

9    frequently seeks detention in cases that do not fall within

10   those parameters, and frequently seeks detention in cases in

11   which they do not have a presumption that there is a risk of

12   flight or danger.  They also frequently seek detention in

13   white-collar cases.

14           Now, that argument was used to suggest that the

15   government's motive in seeking detention in this case was

16   punitive or that there was some personal vendetta or that the

17   prosecutors in New York were seeking to impair

18   Mr. Constantine's ability to defend himself.  But there was no

19   evidence to support those arguments or those suggestions.

20           And really, the two factors that are at issue are the

21   weight of the evidence and the defendant's history and

22   characteristics.

23           The fourth factor, the nature and seriousness of the

24   danger to any person in the community, I do not believe is at

25   issue, because the government has not even suggested that

1   Mr. Constantine is a danger.

2          And as I noted, the first factor in my view is

3   neutral.  The government frequently seeks detention in these

4   sorts of cases.  There is nothing to suggest there is any

5   improper motive or that there is anything punitive in what

6   they are doing.

7          Both parties have argued quite a bit about the weight

8   of the evidence.  The government's point is that

9   Mr. Constantine has already been indicted.  The indictment

10  identifies 16 victims.  And the government proffers that

11  multiple victims will testify as to the scheme to defraud

12  them.

13         And so they argue that the government -- that they

14  have strong evidence.  And the reason that that evidence would

15  be significant is because it would relate to the defendant's

16  motive to flee.

17         The defense has argued quite extensively that the

18  government's case is very weak, that it is driven by

19  Mr. Constantine's enemies and others who wish to steal his

20  company or to do him harm in some fashion, and that ultimately

21  the government will not prevail, they will not be able to

22  prove their case beyond a reasonable doubt and, that he will

23  be acquitted.

24         In the Ninth Circuit the weight of the evidence is

25  the least important factor.  And so I am not giving it much

```
 1   weight, although I have fully appreciated that the government

 2   and the defense have diametrically opposed views on these

 3   issues.

 4        I think that the government has succeeded in

 5   establishing just on the basis of the indictment and the

 6   number of victims they have identified or alleged victims who

 7   will -- they say will testify -- that the defendant does have

 8   a motive to flee, particularly if their Guidelines calculation

 9   is correct.

10        Their Guidelines calculation was 151 to 188 months if

11   he is in Criminal History Category II.  And that's 12.5 years

12   to 15.6 years.  And so I believe the government's point was

13   that the person who has been indicted on charges with that

14   type of exposure would have the motivation to flee the

15   country.  And even with family members here, could conclude

16   that he would have a better opportunity of spending time with

17   his family if he left the country rather than if he faced the

18   possibility of going to prison for a very significant amount

19   of time.

20        All of this is a way of saying that I conclude that

21   Mr. Constantine does pose a risk of flight that needs to be

22   established by a preponderance of the evidence and I think

23   that evidence is present.  It includes the fact that he has

24   been indicted, the number of alleged victims who the

25   government proffers will testify, and the government's proffer
```

1     that Mr. Constantine and his co-defendant allegedly told one

2     of the victims who has contacted the government and will

3     allegedly testify to the fact that they said Mr. Constantine

4     could flee the country and would flee to Greece.

5            The other issue that was of serious concern to the

6     Court was the government's proffer that Mr. Constantine is a

7     pilot and has access to private aircraft.

8            Now, Mr. Constantine has clarified that he does not

9     have a pilot's license.  And he's explained more about his

10    association with these aircraft, and in fact, one of them is

11    seized and two of them are not operational.  And so the Court

12    no longer has a concern that he has ready access to private

13    aircraft that he could pilot himself and use to leave the

14    country.

15           So having concluded that he does pose a risk of

16    flight, the issue then becomes whether there are conditions

17    that could be fashioned to address that risk.  It is the

18    Court's conclusion that conditions can be fashioned to address

19    the risk of flight.  However, the conditions would be much

20    more exacting and demanding than the conditions proposed by

21    the Pretrial Services officer.

22           Our Pretrial Services officers do an excellent job.

23    They interview defendants under a short time frame and their

24    recommendations are respected by the Court.

25           But I can tell you in response to one of the defense

1    arguments that the Court should follow Pretrial Services'

2    recommendation or that the Court always follows Pretrial

3    Services' recommendation, but that is not the case.  It is

4    simply a recommendation.

5         And then additional information will come through,

6    you know, a hearing that goes on for over two hours.  And so

7    with the greatest respect for the Pretrial Services officer, I

8    do not believe that the conditions that were proposed on the

9    basis of a brief interview are sufficient based on the

10   additional information that the Court has received.

11        So I will order that he be released subject to

12   conditions.  The conditions are going to include the standard

13   conditions that we can go over a little later.

14        Also, that he will not travel out of the State of

15   Arizona, except to travel to and from the prosecuting district

16   which will be the Eastern District of New York.

17        That he will not travel on any private aircraft.

18        That he will wear a GPS monitoring bracelet or

19   anklet.

20        And that he will post or his mother will post a bond

21   in the amount of $500,000 secured by property.

22        Those are the general parameters of the conditions

23   I'm considering.  It will take, I estimate, at least a day for

24   Mr. Wilenchik and Mr. Lanza to confer on the issues regarding

25   the property to fill out the numerous forms that need to be

1    completed and the signing that needs to be accomplished to do

2    that.

3          So I would propose that we continue this until

4    Wednesday afternoon to allow all of these issues to be

5    addressed.  And at that time, assuming that the equity does

6    exist and all the issues with the property are in order, we

7    could go over the conditions at that time.

8          MR. WILENCHIK:  Your Honor, I know I will not be

9    here.  I will be in Washington DC, as I said earlier, so I

10   would just ask that Ms. Chenal be allowed in my place to

11   finalize those points.

12         THE COURT:  Yes.  That would be fine.

13         MR. WILENCHIK:  Thank you.

14         THE COURT:  There was something else I did want to

15   address.  There was a lot of argument about Mr. Constantine's

16   income, a lack of income, or what he represented in the

17   bankruptcy proceeding versus what he represented to Pretrial

18   Services or this Court about income.

19         And Mr. Wilenchik argued that that is really not

20   relevant.  It goes to the issues in the bankruptcy.  And

21   Mr. Lanza argued that it is at issue because it goes to

22   unaccounted-for cash.

23         MR. WILENCHIK:  I couldn't hear you, Your Honor.  Did

24   you say "accounted"?

25         THE COURT:  Well, unaccounted for.

```
 1          MR. WILENCHIK:  Oh.

 2          THE COURT:  The government's allegation that there

 3    are unaccounted-for sums of money, that there has been

 4    financial wrongdoing.

 5          And the Court agrees, those issues are relevant, in

 6    particular because the Court is concluding that a bond can be

 7    posted for his release.  And the allegation of unaccounted-for

 8    sums of cash is significant, because one could conclude that

 9    Mr. Constantine might simply flee and reimburse his mother for

10    the value of the property in some other fashion.

11          I believe that is a risk.  I don't believe the

12    government is out of bounds in arguing that or suggesting

13    that.  But I'm concluding that the bond, coupled with the

14    other -- I should say combined with the other conditions,

15    would be sufficient to address those risks.

16          I'm not going to stay my order, because one, the

17    government hasn't asked me yet to do that again, although they

18    did ask me to do that on Friday; and two, because

19    Mr. Constantine will not be released until Wednesday.

20          The government had previously asked me for one day

21    unless they can make a case why they would need additional

22    time to stay my order.  And they can seek an appeal in the

23    district court between now and Wednesday if they choose to do

24    so.

25          Mr. Lanza, did you wish to request any other stay?
```

1       MR. LANZA:  I would like to make declarative

2  statements rather than sort of muse out loud.

3       I don't know if what the Court has done today is a

4  formal order such that now we can go to the district court

5  judge in New York.  I don't know if the order won't -- the

6  release order won't be done until we come back on Wednesday,

7  at which point we would then need a stay until Thursday so we

8  can go to the judge.

9       In other words, I'm concerned if the New York

10 prosecutors try to go to the judge tomorrow, he would say this

11 is premature because there is no release order to be appealed

12 under 3145.

13      THE COURT:  That's true.  That is a good point.  And,

14 Mr. Lanza, I hadn't thought of that because it was my

15 intention not to have the release order until Wednesday

16 because I wanted to have some clarity on the issue of the

17 property and at least have the government satisfied with

18 respect to the equity in the property.

19      MR. LANZA:  What I would propose is that we come back

20 on Wednesday, get the release order finalized, and at that

21 point I would request a continuance -- or a stay until the

22 close of business on Thursday.

23      I know one day in detention is too long for somebody

24 who is, you know, feels they should be released, but we think

25 that's reasonable understand the circumstances.  That will

UNITED STATES DISTRICT COURT

```
 1    give the judge in New York a one-day window if he wants to
 2    further stay it to intervene.
 3              THE COURT:  Mr. Wilenchik.
 4              MR. WILENCHIK:  I have to say, Your Honor, under the
 5    circumstances, although the Court didn't order what I asked, I
 6    feel the Court's order is pretty comprehensive.
 7              I don't see any reason to keep him detained based on
 8    their whim of whether they want -- what they want to do.  I
 9    know you may disagree with me, but the fact of the matter is
10    it's his time in jail, not theirs.
11              And what I would say is I don't know what the issue
12    exactly here even is on the property.  That's why I offered
13    Mr. Lanza to talk directly with his mother who is here.
14              THE COURT:  Well, Mr. Wilenchik, it takes more than
15    that.  So I can start reading you a list of what you will have
16    to prepare.
17              MR. WILENCHIK:  Well --
18              THE COURT:  I mean, it's -- there's a significant
19    amount of paperwork that occurs.  I know Ms. Chenal suggested
20    on Friday that Mr. Lanza could consult with her for a few
21    minutes and it can all be taken care of.  That's not exactly
22    how it works.  It's a little more logistically involved in
23    that.  It's not to say it can't be done, but doing it in a day
24    is pretty short order.
25              MR. WILENCHIK:  Your Honor, all I was going to say
```

1    though is that if you'll permit me to finish that, if I may, I

2    wasn't trying to quibble with the Court on that.

3           What I was trying to say is that I don't see why the

4    order that the Court made can't be entered today.

5           THE COURT:  I'm not going to enter that order today,

6    because my order is somewhat conditional.  It depends upon the

7    government being satisfied with the equity in the property.

8           I'm assuming it for purposes of today's hearing.

9    Mr. Lanza has indicated he has some concerns, but he has

10   informally allayed some of those concerns.  But to give the

11   government the time to complete the process as reasonable and

12   also, frankly, you are going to need that time.  There's quite

13   a bit of paperwork you are going to have to fill out to post

14   that property.

15          It can't happen today.  It's possible it could happen

16   tomorrow.

17          MR. WILENCHIK:  I know, but the order, I'm saying,

18   could happen and the paperwork to post the property would be

19   post-order or else the order is conditional on that, I assume.

20          THE COURT:  I'm not going to sign the order today.  I

21   will sign the order on Wednesday, assuming everything is in

22   order.

23          Because a significant part of my conclusion is

24   posting the property as a security for the bond.  There are

25   many components to addressing the risk that is posed.  And

1    there is serious risk of flight.  I know you have argued that

2    you don't think he is a flight risk and that the Court should

3    not even conclude that.

4            But I disagree with you. I conclude he is a flight

5    risk and a serious one.  And my next consideration is whether

6    there were conditions that could be fashioned that could

7    reasonably address that risk.  And I have concluded that there

8    are.  They're going to include GPS monitoring, surrendering

9    his passport, not traveling out of the district, not traveling

10   on private aircraft.

11           MR. WILENCHIK:  Yes.

12           THE COURT:  Possibly not working at the air field.  I

13   don't have an objection or I'm not suggesting he couldn't work

14   at Eufora, his office is located there, but not managing

15   aircraft and posting the property as a security for the bond.

16           So there are many parts of it.  And Mr. Constantine

17   will remain in detention until we can resolve that.

18           MR. WILENCHIK:  And if the government, for whatever

19   reasons, Your Honor, does not -- because these courts,

20   certainly in their discretion, I guess I hear that if the

21   government is not satisfied, for whatever their reason, then

22   we can still argue that position, I assume, then on Wednesday?

23           THE COURT:  You can still argue on Wednesday.

24           MR. WILENCHIK:  Okay.  Because all I'm saying is we

25   provided an appraisal.  If they have questions about the

UNITED STATES DISTRICT COURT

1    appraisal, that's fair.  But I mean I don't know what else we

2    can do.

3              THE COURT:  Well, I gather from Mr. Lanza's remarks

4    that he is not arguing strongly or suggesting that there are

5    going to be issues with the property.  He's asking for some

6    time to resolve all of those issues, which I conclude is

7    reasonable.

8              And, quite frankly, you need some time too.  The

9    Clerk can give you the list of all the things that have to be

10   completed to post bond and it's not an easy process.

11             MR. WILENCHIK:  Thank you, Your Honor.

12             THE COURT:  So that is why I didn't think it was

13   realistic to try to reconvene before Wednesday.

14             MR. WILENCHIK:  Okay.  I understand.  I will get the

15   information to the Clerk and we will be back on Wednesday.

16   And I won't personally be, but Carmen will be back, and we can

17   hopefully get this resolved then.

18             THE COURT:  Let us give you a time.  I think my

19   calendar is full in the morning, but we have something in the

20   afternoon.

21             The difficulty we're having now, it looks like four

22   o'clock on Wednesday may be the earliest time.

23             All right.  Counsel, the two options are either 10:30

24   in the morning or four o'clock in the afternoon.

25             MR. WILENCHIK:  10:30 or four o'clock.

UNITED STATES DISTRICT COURT

```
 1          MS. CHENAL:  Wednesday, sure, at 10:30.

 2          THE COURT:  Mr. Lanza, 10:30 or 4:00 were the two

 3     openings on my calendar on Wednesday.  And is 10:30 in the

 4     morning going to be sufficient time?

 5          MR. LANZA:  They both work.  In conferring with

 6     Pretrial, I think four o'clock sounds like the better option

 7     for making sure we have enough time to dot the I's and cross

 8     the T's.

 9          THE COURT:  I agree.  It's going to be cutting it

10     close to try and do it by 10:30 in the morning.  We will set

11     it at 4:00.

12          And Mr. Constantine's family should bring clothing

13     for him, personal items that he would need, assuming that he's

14     released from the court -- no, I'm sorry, the government is

15     going to seek a stay.  But they can bring those items anyway

16     just in case he is released that day.  Just so it would be

17     possible for him to be released.

18          And you have his passport, Mr. Wilenchik.  If you

19     will give it to Ms. Chenal, we can have her surrender it to

20     the Pretrial Services officer on Wednesday.

21          MR. WILENCHIK:  So for clarity purposes only, Your

22     Honor, two things to understand what you just said.  I don't

23     want to misunderstand it.

24          First of all, you said something about bringing his

25     clothes and their seeking a stay.  Do I understand then that
```

```
 1    you are going to make a determination by Wednesday?  I just
 2    want to be clear, that's all.
 3              MR. LANZA:  I believe there's two different things
 4    going to happen.  First, between now and Wednesday, we're
 5    going to work together to make sure that the bond paperwork is
 6    squared away.
 7              MR. WILENCHIK:  Right.
 8              MR. LANZA:  Even assuming it is acceptable by
 9    Wednesday, once it's presented in court, we will then be
10    moving for a 24-hour stay of the release order; that if
11    granted, would mean that he could get out no earlier than
12    Thursday at 5:00 p.m.
13              And we anticipate that between Wednesday and
14    Thursday, the prosecutors in New York will be going before the
15    district court judge there to get a further stay which would
16    require him to stay in detention.  And it will be up to the
17    judge in New York whether to extend the stay beyond the 24
18    hours we're asking this Court.
19              MR. WILENCHIK:  Okay.  I understand.
20              The second thing was your Honor said something just
21    now that I wasn't clear on about perhaps not working around
22    aircraft or something.
23              Just so I'm again clear on that, as I indicated to
24    the Court earlier, my personal knowledge is that the office
25    building where he works and where Eufora is housed is
```

UNITED STATES DISTRICT COURT

1    immediately contiguous to a hangar where, although the

2    operational aircraft -- excuse me -- the aircraft are not

3    operational, they are there.

4            And if the Court meant that he would not be working

5    on the airplanes in the sense of, you know, obviously, I get

6    the idea of flying and all that.  I think everybody can be

7    advised of that.  But he has to come to that office to work.

8    That's near the planes.

9            THE COURT:  Right.  And I understood that and I

10   apologize, Mr. Wilenchik, I didn't make myself very clear.

11           MR. WILENCHIK:  Okay.

12           THE COURT:  What I was trying to stay is that I would

13   like to fashion a condition that he obviously not fly and that

14   he not be a passenger on a private aircraft.

15           MR. WILENCHIK:  Yes.  Yes.

16           THE COURT:  And that he also not work managing these

17   aircraft.  I didn't mean a restriction on the actual location

18   because I understood that his office space for Eufora was at

19   the airport or very close to it.

20           And so I wouldn't restrict him from doing that.  But

21   he has also indicated that perhaps he was going to lose the

22   position managing these aircraft in any case and a couple of

23   partners have withdrawn.

24           And so I think the wiser course of action is to pull

25   him away from any involvement managing aircraft and working

UNITED STATES DISTRICT COURT

1    with the aircraft, but that he could still work at his Eufora

2    office space.

3              MR. WILENCHIK:  I mean personally, I don't see any

4    issue there with him managing and scheduling and things like

5    that, but whatever the Court wants is fine.  I just want to

6    point out I don't think that is --

7              THE COURT:  All right.  I understand.

8              MR. WILENCHIK:  Yes.

9              THE COURT:  So we will reconvene Wednesday at four

10   o'clock.

11             And Mr. Wilenchik and Ms. Chenal, if you'll work with

12   Mr. Lanza.

13             MR. WILENCHIK:  Yes.

14             THE COURT:  You can come and approach the Clerk when

15   we are finished.  She can give you the listing of all the

16   forms that need to be completed for this process.  And then we

17   will reconvene on Wednesday and we will go from there.

18             MR. WILENCHIK:  Thank you, Your Honor.

19             MR. LANZA:  Thank you, Your Honor.

20             THE COURT:  Okay.

21        (Proceedings adjourned at 4:24 p.m.)

22                              *  *  *

23

24

25

1              C E R T I F I C A T E

2

3          I, ELIZABETH A. LEMKE, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8          DATED at Phoenix, Arizona, this 18th day of November,

9    2013.

10

11

12

13

14                      s/Elizabeth A. Lemke
                        ELIZABETH A. LEMKE
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT