ORIGINAL

UNITED STATES GRAND JURY

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :
                                   August 2009
-v-                               :Special

PHILLIP KENNER                    :

- - - - - - - - - - - - - - - - x

UNITED STATES COURTHOUSE
500 Pearl Street
New York, New York 10007

March 29, 2011
11:46 a.m.

APPEARANCES:

            ARLO DEVLIN-BROWN, ESQ.

                Assistant United States Attorney

                Rivka Teich, R.P.R., C.S.R.
                Acting Grand Jury Reporter

GRAND JURY
EXHIBIT

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500

1                         D. Sydor    03/29/11                    2

2              (Colloquy Precedes.)

3              (Witness Enters Room.)

4              (Time Noted: 11:46 a.m.)

5      DARRYL SYDOR, called as a witness, having been

6              first duly sworn by the Foreperson of the

7              Grand Jury; was examined and testified as

8              follows:

9      BY MR. DEVLIN-BROWN:

10         Q    My name is Arlo Devlin-Brown.  I'm an Assistant

11     United States Attorney.  You've been called today to

12     this Grand Jury pursuant to a subpoena, correct?

13         A    Yes.

14         Q    This Grand Jury is investigating various

15     offenses of securities fraud, bank fraud, wire fraud,

16     things of that nature.  You've been called as a witness

17     in that investigation, meaning you're not a subject of

18     the Grand Jury's inquiry, you're not a target of this

19     inquiry, but you're called because you have potentially

20     some information.

21              Would you state your name and spell it for the

22     for the record?

23         A    Darryl Sydor, D-A-R-R-Y-L, M., S-Y-D-O-R.

24         Q    I'm going to advise you of certain rights that

25     you and every witness has, just to make sure you

26     understand them.  Okay?

D. Sydor   03/29/11                                3

2        A    Okay.

3        Q    For one thing, you have the right not to

4    incriminate yourself, meaning you have the right not to

5    answer a question if the truthful answer would tend to

6    incriminate you.  Do you understand that?

7        A    Okay.

8        Q    Do you understand that what you're saying today

9    is taken down by the court reporter and that you're

10   under oath?

11       A    Yes.

12       Q    Do you understand that you have the right to

13   consult with an attorney during your testimony even if

14   that attorney can't be in this room?

15       A    Yes.

16       Q    Who is your attorney?

17       A    Ronald Richards.

18       Q    Does he represent other people connected to

19   this investigation or the subject matters?

20       A    Just the two others that are here, yes.

21       Q    If you need to consult with your attorney on

22   something just let us know or if you need a break for

23   some other reason.

24           Do you understand that because you're under

25   oath you're required to give truthful, non-misleading

26   answers to the Grand Jury?

D. Sydor    03/29/11                          4

2      A    Yes.

3      Q    Do you understand that if you make false

4    statements or give misleading testimony you could be

5    prosecuted even though you're not a subject of this

6    investigation?

7      A    Yes.

8      Q    These are crimes that you could be prosecuted

9    for perjury or obstruction of justice, making false

10    declarations to a Grand Jury?

11      A    Yes.

12      Q    Do you understand that these offenses include

13    not just -- let me give you an example, if you remember

14    something and you say "I don't remember," that falls

15    within the federal perjury laws.

16      A    Okay.

17      Q    Do you understand everything I've told you so

18    far?

19      A    Yes.

20      Q    Are you prepared then to proceed?

21      A    Yes.

22      Q    Let me start by getting a little background

23    about where are you from?

24      A    Alberta, Canada.

25      Q.   Are you a Canadian citizen?

26      A    Dual, American too.

5

D. Sydor    03/29/11

1

2    Q    Where do you live today?

3    A    Houston, Texas.

4    Q    What do you do for a living today?

5    A    Retired hockey player, now an assistant coach

6    with the Houston Arrows.

7    Q    How long were you a hockey player?

8    A    Eighteen seasons.

9    Q    All with the NHL?

10   A    Yes.

11   Q    What teams did you play for?

12   A    Los Angeles, went to Dallas, went to Columbus,

13   went to Tampa Bay, back to Dallas, went to St. Louis

14   back to Dallas.

15   Q    When did you retire?

16   A    Just this season here, so 2010.

17   Q    Let me ask you about an individual Phil Kenner,

18   do you know him?

19   A    Yes.

20   Q    When did you first meet Mr. Kenner?

21   A    Would have met him in 1996, I played for Los

22   Angeles.

23   Q    How did you end up meeting him?

24   A    Just through other teammates that had him as a

25   business manager.

26   Q    Did you select him to be your business manager

```
 1                       D. Sydor   03/29/11                    6

 2     as well?

 3         A    Yes.

 4         Q    What did that mean?  What was he going to do

 5     for you?

 6         A    Look over just financial investments, just be

 7     my business manager, getting different investments and

 8     different securities.

 9         Q    When did you select him to be your business

10     manager?

11         A    Exact date I don't know.

12         Q    Best to your recollection?

13         A    1996, 1997 season.

14         Q    Is he still your business manager today?

15         A    Yes.

16         Q    Did you come to some kind of agreement with him

17     as to how he was going to be paid for managing your

18     investments?

19         A    Yes.  His normal pay of, you know, every two

20     months I believe, a percentage.

21         Q    A percentage of the total amount of money he

22     was managing?

23         A    Whatever I put into the investments, not the

24     investments, of what he was managing, yes.

25         Q    What type of investments did he manage on your

26     behalf?
```

1                    D. Sydor   03/29/11

2      A   He managed a lot.  He managed, you know, sales

3  of our houses that I bought throughout the years.  He

4  would help me with that, put me in contact with

5  different mortgage people.  Different investments like

6  Code Fire, TechNeck, properties that we're invested in

7  in today.

8      Q   Stocks and bonds as well?

9      A   He put me in touch with people, yes.

10     Q   Let's start with specific companies that he put

11  you in, not big publicly-traded companies.  Do you

12  remember some of those companies?

13     A   I remember some of them, yes.

14     Q   I have some names here.  I'll ask you if you

15  remember some of them, Impact Protective Equipment?

16     A   Yes.

17     Q   Who presented that investment to you?

18     A   That actually got presented by Richard Salgado,

19  also knew through Phil Kenner and other people he was an

20  exfootball player who retired at the time and got into a

21  shoulder pad company.

22     Q   How much did you invest?

23     A   I can't exactly remember.

24     Q   Around $100,000?

25     A   I'd say around $100,000.

26     Q   Was that in 2003?

D. Sydor   03/29/11                    8

2   A   Yeah.  I would have say around there, that's

3   when I started to make my earnings, that's probably when

4   I did that.

5   Q   Just so it's clear, I'm not sure you're not

6   going to remember exact dates or often exact amounts,

7   that's fine.  Just let the Grand Jury know it's your

8   best estimate or if it sounds right.

9   A   Okay.

10   Q   Did you get any of that money back?

11   A   No.

12   Q   Midland Celtic Title, does that name mean

13   anything to you?

14   A   No.

15   Q   A company Cleveland, Ohio?

16   A   What is the name of it?

17   Q   Midland Celtic Title?

18   A   No, that doesn't ring a bell.

19   Q   If you were investing -- if there was a

20   particular company for you to make a potential

21   investment in, who had authority to decide if you would

22   make that investment or not?

23   A   Myself.

24   Q   Could Mr. Kenner just make an investment

25   without asking you about it?

26   A   No.

1                         D. Sydor    03/29/11                    9

2          Q    Let me show you what we'll mark as Grand Jury

3    Exhibit 120.  I'm going to show you some documents on

4    the screen.  This signature on the bottom of the

5    document, does that look like your signature?

6          A    Yes.

7          Q    A wire request of August 28, 2003, signed by

8    you to wire $250,000 to Midland Celtic Title, does that

9    ring bells for you?

10         A    It doesn't ring bells, no, but that's my

11   signature.

12         Q    You don't have any specific recollection of

13   what, signing this or what that company was?

14         A    What date was that?

15         Q    It says here August 28, 2003.

16         A    No.

17         Q    That's fine.  Let me ask you about Prime Sports

18   One, does that name mean anything to you?

19         A    No.

20         Q    Do you remember investing in a company around

21   $70,000 in 2003?

22         A    Do you know what it is, like, what kind of

23   company?

24         Q    I don't think I do.  I'll show you a document

25   maybe it will help you, I don't know if it will.

26         A    Okay.

1                         D. Sydor   03/29/11                    10

2        Q    121, "Please mail check to Prime Sports One,"

3    it's for $70,000.  Is that your signature?

4        A    That might have been payment to like Richie

5    Salgado.  Maybe that was his company's name.  I can't

6    remember.

7        Q    Why would you be paying Salgado?

8        A    Rich did my life insurance too.

9        Q    You think, you're not sure?

10       A    I'm not sure.  I can't say yes or no.

11       Q    That's fine.  Exclusive Imports of Scottsdale,

12   does that ring any bells for you, a company in

13   Scottsdale, Arizona?

14       A    I'm thinking vehicles, but -- is there a total

15   on there?

16       Q    85,400.

17       A    I don't recall.

18       Q    It was in December 2003.

19       A    2003, 2004 was I was in Arizona at the time.

20       Q    Ice Luck Inc.?

21       A    That's my agent fees, my hockey agent.

22       Q    TechNeck Digital Arts Inc.?

23       A    I do.

24       Q    What is that?

25       A    If I recall right I want to say a gaming

26   company, like a new video game type thing, supposed to

```
 1                    D. Sydor   03/29/11              11
 2   come out.
 3        Q    Do you remember how much you invested, around
 4   100,000 sound right?
 5        A    Probably.
 6        Q    Did that work out?
 7        A    I haven't seen anything from it.
 8        Q    You haven't seen any?
 9        A    Any profit, that's what I meant.
10        Q    Or even getting your money back?
11        A    Or getting my money back.
12        Q    Integrated Telecommunications Inc.?
13        A    Integrated Telecommunications Inc., I'm not
14   sure.
15        Q    That one doesn't mean anything to you?
16        A    I'm sure there are a few that I have just
17   forgotten.
18        Q    I'll give you some specifics if it helps, might
19   have been something around June 2004, a company in
20   Syosset, New York?
21        A    I don't know.
22        Q    Let me put on the screen Exhibit 122, is that
23   your signature?
24        A    Yes.
25        Q    You hesitated for a moment.
26        A    You know, the "D" looks a little different.
```

2 Q What about the rest of it, what about the "S"

3 for Sydor?

4 A Looks fine to me.

5 Q $100,000 to North Fork Bank for Integrated

6 Telecommunications Inc. doesn't ring any bells though?

7 A If I -- the names, I not sure.  If I had more

8 on what it was the company it probably would ring bells.

9 Q That's fine.  What you're saying is you

10 understood what some of the companies did and you may

11 have forgotten the names?

12 A Right.

13 Q What about Tech Connect Corp.?

14 A TechNec, yes.

15 Q What did it do -- not TechNec, Tech Connect?

16 A I believe it was, maybe that was the video

17 gaming.

18 Q Rather than TechNec, you think Tech Connect was

19 the gaming?

20 A You asked me what the Digital --

21 Q Technique Digital Arts is what I said earlier,

22 now Tech Connect Corp.?

23 A I do remember these names, I don't know which

24 one is which.

25 Q One was a video game, what was the other one?

26 A That's what I'm saying.  This one may be the

1                              D. Sydor     03/29/11                    13

2       video gaming thing.  I know that I invested in Tech

3       Connect.

4              Q     Have you gotten any money back from that one?

5              A     No.

6              Q     Are there other companies that you remember,

7       whether you remember the name or whether you remember

8       what the company did that you invested in that had been

9       brought to your attention by Phil Kenner?

10             A     Can you repeat that?

11             Q     Are there any other companies that you remember

12      investing in that were bought to your attention by Phil

13      Kenner?

14             A     Have you mentioned Code Fire?

15             Q     I don't think I did, what is that?

16             A     I believe it was a credit card thing.

17             Q     Who was the person who ran Code Fire?

18             A     Who ran Code Fire, I don't know who owned it.

19             Q     Tommy Constantine, does that mean anything to

20      you?

21             A     That's Euphoria, that's a prepaid credit card

22      company too that I'm in.

23             Q     Did you invest in that?

24             A     Yes.

25             Q     How much did you invest in that?

26             A     Around $200,000.

D. Sydor   03/29/11                    14

1

2      Q    Do you know what happened to that investment?

3      A    Right now it's going through, not litigation, I

4   don't know the exact words.  But there are problems with

5   it not, with the company, but there is some

6   arguing inside I guess.

7      Q    What about the Code Share investment, how much

8   did you invest in that, what happened to that?

9      A    In what?

10     Q    Did you say --

11     A    Code Fire.

12     Q    Code Fire.

13     A    I want to say around 100,000.

14     Q    What was that company?

15     A    I can't remember what it was.

16     Q    Did you get that money back or do you know what

17  happened?

18     A    I believe they are all still invested, still

19  going.  I don't, I guess I'm gullible in that way.  I

20  haven't watched them every month to see where they are.

21     Q    No one is saying you're gullible.

22     A    I'm just saying I'm not one to always be on top

23  of things.

24     Q    Are there any investments that you've made

25  through Mr. Kenner that have paid off that you can think

26  of, other than stocks or bonds, any of these companies

2  that he put you into or land where you had gotten the

3  money back or made a profit?

4       A    I can't remember which company it was but I did

5  get one some money back.

6       Q    You're not sure which one?

7       A    I'm not sure.

8       Q    Have you been satisfied with his services as a

9  financial adviser?

10      A    Yeah, yeah.

11      Q    Why?

12      A    He's helped me on a lot of things not just the

13 investments, but I think we did a lot of good things and

14 still waiting for return.

15      Q    You have confidence that the return will be

16 coming some day?

17      A    Oh, yeah, yeah.

18      Q    Except in the companies that had gone bust,

19 right?

20      A    I believe the shoulder pad company is gone

21 bust, yeah.

22      Q    But you think some of the others might turn

23 around?

24      A    Yes.

25      Q    Let's talk about land deals. Did you invest in

26 real estate projects with Mr. Kenner?

1          D. Sydor   03/29/11                    16

2     A    I didn't invest with him.

3     Q    He brought to your attention?

4     A    Yes.

5     Q    What are the projects did you invest in?

6     A    Cabo San Lucas, Delmar, Baha, so El Rosario in

7  Mexico.

8     Q    That's two projects, the one El Rosario then

9  San Lucas?

10    A    Yes, and Hawaii.

11    Q    That would be the Little Isle IV?

12    A    Yes.

13    Q    How much did you put into each of these

14  investments?

15    A    First one El Rosario was $500,000.

16    Q    Do you remember when you invested in that?

17    A    2004, or five, I'm not sure.  If you have

18  documents you can -- so El Rosario was first, then

19  Hawaii then Cabo.

20    Q    How much did you invest in Hawaii?

21    A    500,000, and 200 in Cabo.

22    Q    Have you been to the El Rosario development.

23    A    No, I've seen the portfolio, that's it.  The

24  plan, I guess.

25    Q    What happened to that investment?

26    A    That was, first we were supposedly putting in

1                          D. Sydor   03/29/11                      17

2       an airport to get everything down there.  And then we

3       put that on hold and everything started picking up

4       around Cabo, so we put in Cabo.

5            Q    And you put in 250 in Cabo?

6            A    Yes, to purchase the land, yes.

7            Q    To help purchase the land?

8            A    Yes.

9            Q    Was the land purchased?

10           A    Purchased by us?

11           Q    Yes.

12           A    I believe so.

13           Q    Do you know what the status of that development

14      is at that point?

15           A    That's why we're here now, I think, because

16      it's supposedly built.  I found out two days ago the

17      golf course is built, there is no infrastructure in

18      buildings.  But we haven't seen anything back from that.

19           Q    Who did you find that out from two days agent?

20           A    When I was talking to my attorney, Ron

21      Richards.

22           Q    He's the source of the information that the

23      golf course has been built?

24           A    Not the source.

25           Q    But he's the one that one that told you?

26           A    He mentioned it to me.

1

2        Q    You put in some money into Little Isle IV as

3    well, correct?

4        A    Yes.

5        Q    You said before that was 500,000 am, I right?

6        A    Yes.

7        Q    What was that for?

8        A    That was for land.  I believe it's a sugar cane

9    farm or something, supposedly to develop.

10       Q    Did you get documents on what any of these

11   deals would be before you invested money?

12       A    Yes, I have all the documentation.

13       Q    Did you get it before you invested?

14       A    Yes, like the portfolio, the binders, and all

15   that, whatever the, I can't tell you exactly what

16   percentage I own of it.

17       Q    Where do you do your investment banking?  Do

18   you have accounts in certain banks?

19       A    Yes, Charles Schwab.  My personal bank is Bank

20   of America.

21       Q    In addition to the money you put into Little

22   Isle IV did you borrow more money to put into that

23   project?

24       A    Did I put more money into Hawaii?

25       Q    You said you put in $500,000?

26       A    Yes.

1                      D. Sydor    03/29/11                    19

2       Q    Did you take out a loan to put in more money?

3       A    I believe $100,000 line of credit.

4       Q    $100,000 line of credit?

5       A    I believe so.

6       Q    Where did you get the line of credit?

7       A    Actually I think it was Northern Trust.

8       Q    Why did you borrow money?

9       A    Just through talking with Phil Kenner to

10   purchase some more, I believe, also help out the

11   transaction in Cabo to start building there.

12      Q    You think it was for about $100,000?

13      A    I think so.

14      Q    Let me show you a few more documents, Grand

15   Jury Exhibit 111, which is on the top it says "Northern

16   Trust Bank investment management account agreement."  Is

17   that handwriting yours on the top, "Owner Darryl Sydor"?

18      A    No, not my printing, no.

19      Q    What about this page of the document, numbered

20   657 on the bottom, is that your signature here?

21      A    Yes.

22      Q    Do you recall signing forms that gave Phil

23.  Kenner power of attorney to trade in your account as he

24   saw fit?

25      A    Not as he saw fit.

26      Q    What conditions were put on the power of

D. Sydor   03/29/11                    20

attorney?

    A   I would have to authorize any transactions, but he did have power of attorney to do that if I was playing hockey somewhere I couldn't get there; he had the power of attorney to make trades.

    Q   If I understand, you're saying from your own relationship with him he had to go to you to ask; but, from the bank's perspective he had the power to execute transactions in the account as if he was on the account, right, or are you not aware of that?

    A   He had to come through me first. I would have to he -- would have to come to me, I have to say yes then, he can make the transaction.

    Q   Let me show you Grand Jury Exhibit 113, is that your signature down there?

    A   Yes.

    Q   This is dated November 3, 2004, "Please allow Phillip A. Kenner to access the outstanding LOC for direct deposit into the Little Isle IV account at Northern Trust Bank. He is authorized to sign for the release of funds related to my LOC." Do you know what the LOC means there?

    A   Line of credit.

    Q   Do you remember signing this document?

    A   I signed it. I don't remember where and when I

1                    D. Sydor    03/29/11                      21

.2     signed it.

3          Q    Are you saying that because you see your

4      signature there or do you have a memory of signing this

5      document?

6          A    I do have a memory of signing a document like

7      that.

8          Q    Okay.  You thought your line of credit was for

9      about $100,000; is that right?

10         A    I thought, yes.

11         Q    Would it surprise you to learn that it was

12     actually up to $850,000?

13         A    That would surprise me, but I don't think my

14     memory is that bad.

15         Q    Let me show you what we'll mark Grand Jury

16     Exhibit 114.  Is that your signature down here?

17         A    It looks different than the other ones, but I

18     think they all look a little different.  But if that's

19     the way I sign it, yeah.

20         Q    I don't want you to say it's your signature

21     just because there is a signature above your name.  Does

22     it look to be your signature or not?

23         A    I'd have to say not sure, no.

24         Q    The document, the title, is "Change in terms

25     agreement," showing a loan $850,000, you as the borrower

26     and address care of Phil Kenner, interest rate of

D. Sydor    03/29/11                    22

2    seven-and-a-half percent, agreement dated November 3,

3    2007.  Do you remember being informed that there was a

4    loan taken out in this amount?

5         A    Is this for the Little Isle V?

6         Q    It's your memory.  I'm asking, do you remember

7    any loan authorizing him to take out a loan in your name

8    for that kind of money?

9         A    I can't recall.

10        Q    It would be the kind of thing you would recall

11   if you knew about?

12        A    I think if it was $850,000 I would.  But I do

13   know I did that line of credit to Hawaii.  I'm not sure

14   if that's what it was or not.

15        Q    Do you recall, for the line of credit that

16   you're talking, about the one to Hawaii, if you had to

17   put up something in order to get the line of credit?

18        A    If I have to put something up?

19        Q    Do you know if that was part of the deal you

20   had to --

21        A    I don't recall having to do that.

22        Q    You're familiar with what I'm talking about,

23   like if you had to put up stocks or bonds?

24        A    Some kind of liquid.

25        Q    Collateral.  With a mortgage the bank can get

26   your house if you don't pay.  You're not familiar with

D. Sydor   03/29/11                    23

1
2      whether -- you don't think you had to put up anything
3      for the line of credit?
4           A    No.
5           Q    Let me show you what's been marked Grand Jury
6      Exhibit 115, it's titled "Pledge Agreement" dated
7      November 3, 2006.  Let me show you, start with the
8      signature page, does that look like your signature to
9      you?
10          A    It's a little loopy, not as sharp.
11          Q    So?
12          A    I don't think so, I mean, I sign it different,
13     not different, but sometimes it could look different.
14          Q    But it doesn't look familiar to you; is that
15     what you're saying?
16          A    It looks familiar, but.
17          Q    No one here can second guess you on this one.
18     In your judgment, is this your signature most likely or
19     most likely not?
20          A    I'd say most likely it's mine.
21          Q    Why do you say it's most likely yours?
22          A    Sometimes it looks different, it's not the
23     exact same every time.
24          Q    Without -- you're welcome to look through this
25     document as much as you want -- but I'll represent to
26     you that this document is an agreement to pledge

1                          D. Sydor    03/29/11                    24

2      collateral for the loan in the amount of the loan, which

3      was $850,000 putting up stocks and bonds.  You don't

4      remember signing anything like that or agreeing to

5      anything like that?

6           A.   No.

7           Q    Did you have an account with stocks and bonds

8      somewhere?

9           A    Yes.

10          Q    Where?

11          A    I believe it was Jim Graham, he's with Charles

12     Schwab.

13          Q    Jim Graham was the account holder?

14          A    Yes.

15          Q    As far as you know, you still have stocks and

16     bonds in that account?

17          A    Some of them, but some I've sold or cashed in

18     or whatever you want to say.

19          Q    Do you receive the statements from your Charles

20     Schwab account?

21          A    Yes.

22          Q    What about Northern Trust, do you get

23     statements from that account?

24          A    I don't believe I get any more from Northern

25     Trust.

26          Q    Do you recall losing roughly $850,000 of bonds

D. Sydor    03/29/11                    25

2  in March 2009 to pay off that line of credit?

3      A    No, I don't.

4      Q    Because you're not aware that you had a line of

5  credit in that amount?

6      A    I guess so, yes.

7      Q    How often do you communicate with Mr. Kenner

8  about your investments?

9      A    I don't really communicate with him about, I

10  mean, about the, right now just been communicating about

11  the land deals.

12      Q    Back to the land deals, you put in, as far as

13  you remember, about 500,000 to Little Isle IV?

14      A    Uh-huh.

15      Q    You thought it was about $100,000 line of

16  credit?

17      A    Yes.

18      Q    Was that also for Little Isle IV as far as you

19  know?

20      A    Yes, but then we put it towards Cabo for a

21  short-term loan for Mr. Jowdy until Lehman Brothers came

22  up with the money that was supposed to be paid back.

23      Q    Did you know in advance that it was going to be

24  used, this Little Isle IV money, to be used to salvage

25  the Cabo investment?

26      A    Yes.  It was to help with the short-term loan

D. Sydor    03/29/11                    26

to keep funding the Cabo, then it was supposed to be

paid back, but that's --

    Q    Paid back to you or back to Little Isle IV?

    A    Paid back to Little Isle IV.

    Q    So --

    A    Back to Hawaii, not to me personally.

    Q    But that didn't happen?

    A    That didn't happen.  And Lehman came up with

$129 million loan.  It was supposed to be back at

closing.

    Q    Did there ever come a point in time that you

started having concerns about your investments that

Mr. Kenner was managing?

    A    No.  Just now that I'm retired I was concerned,

when you're playing the game of hockey you're making

good money you don't -- like I said, a little gullible.

    Q    Was there a time when someone in his office

told you you should be careful?

    A    Yes, I know who you're talking about, Christy

Myrick.

    Q    What happened?  Just tell the Grand Jury what

happened?

    A    She actually approached me, I think via phone

call.  She was a secretary at the time for Phil.  And

she actually said, "You make sure you check into your

Case 2:13-cr-00607-JFB-AYS   Document 112-4   Filed 10/23/14   Page 27 of 32 PageID #: 554

D. Sydor   03/29/11                          · 27

1
2    investments, all the investments". But I asked why, she
3    said, "Make sure you have all the documentations, all
4    that," which I did get all the documentation. So I did
5    inquire, I said, "What is going on?  Why are you saying
6    that." She goes, "Well, I'm going to be leaving. I'm
7    in an argument with Phil Kenner." She actually started
8    sleeping around with some hockey players that Phil was
9    the business manager with, so that's why she got fired.
10       Q    How do you know that she was sleeping around
11   with the hockey players?
12       A    I played with one of them so I saw it.
13       Q    He told you?
14       A    Yes.  But I did ask her, I said, "Is there any
15   concern about my money?" She said, "It's nothing about
16   that.  I'm not saying Phil is stealing your money or
17   doing anything, just make sure you get all your
18   documentation or paper work for your investment," which
19   is I did.
20       Q    What did you understand that to mean?  I mean,
21   on the one hand you better get your documentation and
22   paper work; on the other hand, she says, supposedly,
23   he's not stealing your money?
24       A    She was upset with him.  She could have said
25   make sure, watch, because he is stealing it.  She told
26   me he wasn't.  You don't have to be concerned with that,

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018 (212) 869-1500

1                       D. Sydor    03/29/11                    28

2      just be concerned with getting your documentation.  I

3      did a deposition with her and I believe that case got

4      thrown out, her case against Mr. Kenner.

5           Q    You were deposed in that case?

6           A    Yes, in Los Angeles.

7           Q    Are there any other cases that you've been a

8      party to relating to the land deals or Mr. Kenner?

9           A    Just this case here.

10          Q    Were you a plaintiff in a lawsuit in California

11     against Mr. Jowdy?

12          A    I don't believe I was.

13          Q    Did anyone ask you to be in one?

14          A    No.

15          Q    Here's one, have you heard of a company

16     Na'Alehu Ventures or Na'Feu Ventures?

17          A    Can you show me?

18          Q    I don't have a document.

19          A    Doesn't ring a bell.

20          Q    Do you remember getting about $40,000 from some

21     company back in August 2006?

22          A    That could have been where I mentioned earlier

23     about getting repaid or getting back, I'm not sure what

24     that is though.

25          Q    Did there ever come a point where you mentioned

26     you had concerns about your investments with Mr. Kenner?

1                    D. Sydor    03/29/11

2          A    No.

3          Q    You've never told him you have any concerns?

4          A    We would always talk about, you have concerns

5    when you make investments and they don't go the right

6    way but it's a risk going in, but you know it's a risk

7    going in.

8               MR. DEVLIN-BROWN:   I'm going to propose we

9          excuse the witness.

10              If you don't mind, sir, to wait out in the

11         hall.  We may be done with you completely.  It's

12         possible we will be done with you today or we may

13         have questions for you.

14              May I ask the witness be excused.

15              THE FOREPERSON:   Yes.

16              (Witness Excused.)

17              (Time Noted: 12:26 p.m.)

18              (Colloquy Follows.)

19

20

21

22

23

24

25

26

1                        D. Sydor   03/29/11                    30

2              (Colloquy Precedes.)

3              (Witness Enters Room.)

4              (Time Noted: 12:30 p.m.)

5              THE FOREPERSON:   I remind you, you are still

6         under oath.

7    BY MR. DEVLIN-BROWN:

8         Q    Do you recall on the Little Isle IV project

9    getting updates in writing from Mr. Kenner about the

10   status of the project, how it was going?

11        A    In writing?  I'd have to go home and check if

12   it's all there.  I know verbally he gave me updates.

13.       Q    Let me show you one document and see if you

14   might have gotten it or not.  110A is the number on the

15   document dated July 21, 2006, I'll give you time to look

16   through it.

17              Mr. Kenner is the author on the page six.  See

18   if that looks like anything you might have gotten one

19   way or another?

20        A    I remember getting something like this.  I

21   remember the thing here.  I didn't read through it all.

22        Q    You're pointing to something that lists

23   percentages?

24        A    Percentages.  And I probably have this at home

25   I remember this seeing the Walker real estate, but I did

26   not read through everything, every page.

1                          D. Sydor    03/29/11                          31

2              ·MR. DEVLIN-BROWN:   Understood.

3              I have no further questions for you, sir.

4        You're excused.

5              (Witness Excused.)

6              (Time Noted: 12:30 p.m.).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

·21

22

23

24

25

26

C E R T I F I C A T E

STATE OF NEW YORK     )

                      )

COUNTY OF NEW YORK    )


                I, RIVKA TEICH, hereby certify that

          the foregoing is a true and accurate transcript,

          to the best of my skill and ability, from my

          stenographic notes of this proceeding.


                        Rivka Teich, R.P.R., C.S.R.

                        Acting Grand Jury Reporter

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y. 10018  (212) 869-1500