

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JMM/SK
F.#2013R00948

*610 Federal Plaza*
*Central Islip, New York 11722*

November 3, 2014

<u>By ECF with Courtesy Copy by Interoffice Mail</u>

The Honorable Joseph F. Bianco
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

    Re:    <u>United States v. Philip Kenner</u>
            <u>Criminal Docket No. 13-607(JFB)</u>

Dear Judge Bianco:

      The government respectfully submits this letter brief in opposition to the October 23, 2014 motion by defendant Phillip Kenner ("Kenner" or "the defendant") seeking (a) immediate inspection of a MacBook computer and iPhone seized from the defendant's residence, and (b) an evidentiary hearing and issuance of subpoenas to re-argue the defendant's pretrial detention.  For the reasons set forth below, the motions should be denied.

<u>Immediate Inspection of a MacBook and iPhone</u>

      The defendant requests an "opportunity to inspect the original contents" of a MacBook computer and iPhone seized from the defendant's residence.  ECF No. 112 at 4.

      The government has made the referenced MacBook computer and iPhone available for physical inspection by the defendant.  The government has also provided the defendant with a copy of the contents of the referenced MacBook computer and iPhone.  The government objects, however, to permitting the defendant to power up the MacBook computer and iPhone in order to inspect the "original" contents.

      Federal Rule of Criminal Procedure 16(a)(1)(E) provides:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or

> places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.

The defendant contends that "[w]here an item was obtained from or belongs to a defendant, the Rule 16 mandate to allow the defendant 'to inspect and to copy or photograph . . . documents, data . . . [and] tangible objects . . . within the government's possession, custody and control . . .' is unqualified." ECF No. 112 at 5. The defendant is wrong. Rule 16 expressly provides that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1); see United States v. Delia, 944 F.2d 1010, 1018 (2d Cir. 1991) (Rule 16(d)(1) "authorizes the district court to limit or otherwise regulate discovery").

There is good cause here. Permitting the defense to power up the MacBook computer and access the contents of that computer will alter the data on the computer. See Carroll Decl. ¶ 10. The same is true of the iPhone. See Carroll Decl. ¶ 12. Indeed, in order to avoid such alteration, it is the routine practice of law enforcement agents to work from an imaged copy of computers and digital media, not the original. See Carroll Decl. ¶ 8. This is true even in cases involving child pornography. See Spivack Decl. ¶¶ 3-5.[1]

Denying the inspection of the "original" contents of the MacBook computer and iPhone works no prejudice to the defendant because the defendant has copies of the contents of those devices and the means to review those contents. On March 24, 2014, the government provided the defendant with imaged copies of the electronic devices that were recovered from his home. ECF No. 48 at 1. On November 3, 2014, the government's firewall counsel provided the defendant with another copy (this one in pdf format) of the electronic materials that were seized from the defendant's home. ECF No. 111; ECF No. 114. These copies, connected to a computer, permit the defendant to inspect the files from the copied electronic devices (in much the same manner as government agents, see Carroll Decl. ¶ 11; see also Spivack Decl. ¶ 3). Moreover, the government provided the defendant with the model number information and access to technical assistance he requested so that he can obtain a new MacBook computer that he can use to review the imaged copy as if it were the original. ECF No. 84; see also Carroll Decl. ¶ 11; Spivack Decl. ¶ 3. Despite previously suggesting this option as a suitable alternative to accessing the original computer, ECF No.

---

[1] Maintaining the original digital evidence in its current form may prove important for purposes of authentication. See In the Matter of a Warrant, No. 14-M-309, 2014 WL 3583529, at *10 (S.D.N.Y. July 18, 2014) (recognizing that "it may be necessary for the Government to maintain a complete copy of the electronic information to authenticate evidence responsive to the warrant for purposes of trial"); United States v. Ganias, 755 F.3d 125, 139 (2d Cir. 2014) (allowing for the possibility that it may be "necessary to maintain a complete copy of the hard drive solely to authenticate evidence responsive to the original warrant").

73 at 2, the defendant has chosen instead to insist on obtaining an opportunity to manipulate original digital evidence. The defendant offers no reason for his request.[2]

The defendant's proposal to inspect the original contents of the MacBook and iPhone is further untenable given the status of this case. The defendant proposes an opportunity to inspect the original MacBook and iPhone under the supervision of one of the undersigned attorneys and argues that a forensic mirror image will be admissible at trial. However, as previously explained, the imaged copies of the defendant's electronic media are undergoing a privilege review. The undersigned attorneys are presently walled off from the full contents of the MacBook and iPhone, as is the co-defendant. This means that inspection of the original MacBook and iPhone under the supervision of one of the undersigned attorneys would be inappropriate. Furthermore, the undersigned attorneys and the co-defendant are not in a position to assess the propriety of, and enter into, a stipulation regarding the authenticity and admissibility of the original computer or any imaged copy. Without such a stipulation, the defendant is not entitled to manipulate the original devices. See United States v. Reid, 43 F.R.D. 520, 522 (N.D. Ill. 1967) (refusing to permit defendant to inspect original drugs, which inspection would change custody and attributes of the evidence, without a stipulation). The Court should, at the very least, defer any ruling until the privilege review is complete and the prosecution team and co-defendant have had an opportunity to consider a stipulation.

Rule 16 Disclosures

The defendant repeats his request for disclosure of all alleged forgeries. The government has disclosed the documents that it is currently aware of as documents containing forged signatures. The government will identify additional such documents as they become known and available.

The government is aware of its discovery obligations, and has met and will continue to meet its obligations. The government will make ongoing disclosures as it discovers additional evidence or material in compliance with Rule 16's continuing duty to disclose. Fed. R. Crim. P. 16(c).

Re-opening of the Detention Hearing

By letter dated November 13, 2013, the government argued for the detention of the defendant on the grounds that he posed both a serious risk of flight and danger to the community. In support, the government proffered a number of facts as well as pieces of evidence to be adduced at trial. The government incorporates by reference its earlier submission, and only summarizes herein some of the grounds raised in favor of detention:

---

[2] The defendant, still to this date, has failed to make any specific showing that he is unable to access the files provided on the copies provided.

3

- The aggregate losses in this case exceeding $15 million, thereby exposing Kenner to a Guidelines range of imprisonment of between 168 to 210 months. See e.g., United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (a defendant's potential length of imprisonment upon conviction is properly considered within the context of a defendant's risk of flight).

- The overwhelming weight of the evidence from dozens of victims, and documentary evidence such as wire transfers. ECF No. 5 at 3-9.

- Kenner's ties to Mexico, potential availability of assets there and a network of associates; his claims of Mexican citizenship and admitted intention to others that he would flee. (Kenner "told another confidential source that, at a moment's notice, he could pack his duffle bag full of money, get in a car and never be seen again.") ECF No. 5 at 11.

- The defendant's apparent concealment of assets that would enable flight. ECF No. 5 at 11.

- Kenner's intimidation of witnesses. (See e.g., ECF No. 5 at 13: Kenner advised a defrauded victim to bring his 8-year-old son to a meeting "so he can see what it looks like when his dad gets an ass beating.")

In the present motion for subpoenas and an evidentiary hearing to re-argue bail, the defendant's argument can be summarized as follows: (1) not every victim of the Hawaii land fraud scheme alleged in the indictment was unaware of Kenner's potential ability to draw against lines of credit; (2) the defendant and co-defendant point to a signed consultancy agreement that, if a jury believes is authentic, might excuse both of about $2 million worth of fraudulent diversions out of a total fraud causing $15 million in losses; and, (3) someone else is responsible for the defendant's and co-defendant's enrichment, borne against the losses sustained by dozens of victims to whom the defendant acted as investment advisor. These grounds, all available to the defendant at the time of the first detention hearing, do not merit revisiting bail, issuance of subpoenas, or the holding of hearings.

Detention & Standard for Renewal of Bail Applications

The Court issued an order of detention on December 4, 2013 finding that the defendant posed a risk of flight and danger to the community. The order specifically noted that the order was without prejudice to the defendant renewing an application for bail at a later date. While all pre-trial detention decisions are, in practice, without prejudice to subsequent review should circumstances change, a defendant is not entitled to perfunctorily revisit a prior bail determination pending trial. Indeed, 18 U.S.C. § 3142(f)(2) specifically limits such opportunity as follows:

4

> The hearing may be reopened before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such persons as required and the safety of any other person and the community.

Id.

Courts have strictly interpreted the provision within 18 U.S.C. § 3142(f)(2), holding that hearings should not be reopened if the evidence was available at the time of the initial hearing. See, e.g., United States v. Dillon, 938 F.2d 1412, 1415 (1st Cir. 1991); United States v. Hare, 873 F.2d 796, 799 (5th Cir. 1989); United States v. Flores, 856 F. Supp. 1400, 1405-07 (E.D. Cal. 1994). "New and material information for Section 3142(f)(2)(B) purposes consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." United States v. Rodriguez, No. 12-CR-83S, 2014 WL 2573327, at *2 (W.D.N.Y. June 9, 2014)(citations omitted).

None of the information detailed in the defendant's motion is new or unknown to the defendant at the time he was ordered detained. The present motion merely consists of the defendant's own self-serving evaluation of the strength of the case against him based on the extensive discovery provided by the government since arraignment, which incidentally he variously complains is either insufficient or burdensome. In fact, as summarized below, many of the facts proffered by the government previously, and newly disputed by the defendant, have long been part of Kenner's pre-indictment efforts to evade detection of his crime and excuses offered to various victims for their losses and his gains.

It is unclear whether the defendant's lengthy recitation of discovery production to date is a non sequitur or an implicit claim that the complexity of this case, and thus potential length of pre-trial detention, warrants release. What is clear is that, "the length of current or potential future detention cannot be considered under § 3142(f) since it is not material to the risk of flight or dangerousness." United States v. Gotti, 776 F.Supp. 666, 669 (E.D.N.Y. 1991)(citing Hare, supra).[3]

Even if Kenner's interpretation of the evidence against him were deemed new, it still fails to bear materially on risk of flight. See Hare, 873 F.2d at 799. For the reasons set forth in detail below, there is nothing in the new bail application that was not known to

---

[3] In citing Gotti, the government, of course, recognizes that the present case does not form a basis for a rebuttable presumption under § 3142(f)(1), only that under § 3142(f) generally, and subdivision (f)(2) specifically, the complexity of a case and volume of discovery is not a basis for revisiting the grant or denial of bail.

5

Kenner at the time this Court first ordered his detention that has a material bearing on his qualification for release. For the same reasons set forth below, the defendant's request for the issuances of subpoenas should be denied.

The Letters of Credit

The defendant raises no "information . . . that was not known to the movant at the time of [his detention] and that has a material bearing on the issue whether there are conditions of release" that would warrant bail. 18 U.S.C. § 3142(f)(2). That certain victims, specifically Michael Peca (John Doe 2) and Darryl Sydor (John Doe 4) testified in the grand jury that they were told by Kenner that their lines of credit might be drawn against for certain limited purposes, does not change the fact that they were defrauded by the defendant.

At trial, the evidence will show that Kenner induced over two dozen investors, mostly professional hockey players, to contribute between $50,000 to $100,000 each towards Little Isle IV, LLC, a limited liability company whose sole purpose was to purchase certain real property in Hawaii, and whose by-laws made Kenner the managing partner. Kenner also persuaded nine victims to establish lines of credit at Northern Trust Bank, a financial institution picked by Kenner. Although the defendant argues that victims Peca and Sydor understood that Kenner might draw down on those lines of credit for specific purposes related to Little Isle IV, that is beside the point. Each also understood that their individual lines of credit were insured by bonds, which formed the collateral behind the lines of credit, and were told by the defendant that those bonds would never be touched. Furthermore, Kenner represented that he would be responsible for all re-payments of any amounts drawn down against the lines of credit Peca or Sydor authorized, plus interest. All of these representations from Kenner, as alleged in the indictment and summarized in the government's earlier detention memorandum and proffer, were false.

Moreover, in focusing on just a few victims and their personal understanding of the purpose of their lines of credit, Kenner evades the actual fraud -- namely, that in December of 2004, Kenner fraudulently purchased land that had nothing to do with Little Isle IV, LLC, contrary to representations he made to the victim-investors. The $3.85 million purchase price for the Honu'apo parcel, records show, was funded entirely by Kenner's drawing down on four separate lines of credit put up by Darryl Sydor and three other victims, who the defendant fails to mention in his motion for bail.

Ironically, Kenner's theft from Sydor's letter of credit represented a very small part of the fraud. Kenner stole approximately $100,000 from Sydor's credit line to fund the purchase of Honu'apo. It is the other three victims, not mentioned in the motion, whose losses account for the remainder of this roughly $3.9 million facet of the defendant's over-arching scheme to defraud investors.

Kenner also completely ignores or misrepresents in his motion that each victim was unaware of the total balance of the line of credit on a month-to-month basis. How could that be? Through Northern Trust Bank, Kenner ensured that the individual

6

statements and balance sheets for each of the lines of credit were mailed to Kenner's own home in Arizona, not to the nine victims who he induced to open lines of credit solely for the purpose of Little Isle IV, LLC.

As counsel for Kenner must know from the extensive discovery provided in this matter, on July 19, 2005, Kenner secured a $3 million mortgage on the Honu'apo property, which he bought with cash stolen from four victim-investors in Little Isle IV, LLC. After closing costs, almost $2.6 million was wired into a bank account at Northern Trust in the name of Little Isle IV. That same day, Kenner began wiring large sums of money out of the account and diverted the funds to his own use. None of the money was used to repay the millions Kenner had stolen from his victims' lines of credit. Part of the diversion was a $1.5 million wire transfer to buy property in Cabo San Lucas, Mexico, which had no connection to the Hawaii investments the NHL players had agreed to participate in.

Incredibly, Kenner's motion for reconsideration of bail, and for a hearing at which he seeks to cross-examine certain other witnesses, completely avoids mention of this critical facet of the Hawaii land fraud charged in the indictment. For the reasons stated above, the testimonies cited by the defendant regarding their letters of credit do not undermine the strength of the evidence regarding this portion of the defendant's multi-facetted fraudulent scheme. Moreover, none of the defendant's interpretations constitute grounds to re-open the detention hearing under § 3142(f)(2).

The Forgeries and Subpoena to John Kaiser

As for the defendant's arguments about the nature of certain forgeries referenced in the government's prior detention memorandum, this too tries to obscure the point of the charges and fundamentally fails to state a ground for re-opening of bail hearings. As alleged in the indictment (see ¶¶ 25 to 28), after diverting some $3 million in investor funds, Kenner secured a $13.7 million loan from the now-defunct Lehman Brothers investment bank, ostensibly to develop the Hawaiian properties. Kenner and co-defendant Tommy Constantine then diverted millions from this loan for their personal benefit, not for the victim-investors.

As a result of that portion of the fraud having to do with the diversion of the Lehman Brothers loan, Kenner was sued by an investor (John Doe 8) in 2008 before the American Arbitration Association in Phoenix, Arizona. The victim-investor alleged that Kenner defrauded him in connection with various investments. As part of its investigation, the government learned about, and referenced summarily in its earlier detention memorandum, forgeries that grew out of that prior litigation. Specifically, in advance of arbitration Kenner and Constantine fraudulently created and backdated to 2004 and 2005 two so-called "Funding Consulting Agreements" by which Little Isle IV purportedly agreed to pay Constantine's holding company, CMG, a fee to supposedly raise funding for the Hawaii properties. In fact, CMG had no relation to the Hawaii properties during that time. Nevertheless, the Funding Consulting Agreements were used in arbitration to explain the $2 million fraudulent diversion that Kenner funneled co-conspirator Constantine. The Funding

Consulting Agreements are signed by Kenner and Constantine, and by a third individual, John Kaiser.

It is hardly certain at this stage that the government will seek to elicit from Kaiser testimony about the fake Funding Consulting Agreements. The government views the documents as Kenner and Constantine's self-serving hearsay, created to mask their crimes in arbitration. In fact, it is unclear how either defendant might offer the forgeries into evidence absent their waiver of the right not to testify, and subject to cross examination by the government. If asked, Kaiser will say that his signature on the consulting agreements is a forgery, that he never saw those documents or even met Constantine between 2004 and 2005. Indeed, documentary evidence would show that Kaiser was not even a member of Little Isle IV until approximately 2008.

That Kenner touts the authenticity of the very documents he and Constantine have used in the past to try to legitimize a $2 million diversion to CMG, is neither surprising nor grounds for re-visiting bail. Kenner's assertion of the legitimacy of the agreements certainly does not warrant the taking of testimony from Kaiser or any other witness whose assertion of forgery is known to the defendant and was known at the time of the detention hearing. While Kenner's and Constantine's apparent willingness to obstruct arbitration through the creation of phony documents was, and still is, one of many factors supporting detention, it was hardly dispositive as the Court noted in the most recent status conference. In sum, Kenner's continued offering of this bit of self-serving hearsay, (i.e., the Funding Consulting Agreements), like the other "straw man" arguments raised, does nothing to change the many grounds supporting detention.

The Global Settlement Fund Fraud & Subpoena to Kenneth Jowdy

The motion for a new bail hearing for the purpose of cross-examining Kenneth Jowdy is equally without merit. During the period covered by the scheme to defraud, Kenner raised millions from investors supposedly for real estate developments in Mexico and Hawaii that were under development by an associate of Kenner's, Kenneth Jowdy. While evidence at trial will show that some of the funds raised by Kenner were in fact used by Jowdy towards the real estate projects, Kenner and Constantine also fraudulently transferred millions of the funds raised to themselves. The $2 million diversion summarized above is one example of the diversions that only personally benefited the defendants. Other diversions amounted to favors to persons the defendants chose to share in the proceeds of their crimes. For instance, Kenner arranged for approximately $500,000 raised from three of his victims to be used to pay an American Express card in the name of his then-wife.

Despite this, Kenner and Constantine have sought, long before the current indictment, to shift blame for the losses sustained by the victims to their former associate Jowdy. What is more, as alleged in the indictment (see ¶¶ 34 to 37), the defendants used Jowdy to further victimize some of the same investors they had previously defrauded.

Beginning in 2009, Kenner and Constantine traveled across the United States and Canada to meet with and speak to more than a dozen of Kenner's hockey player clients who had invested in the Hawaii and Mexico real estate projects. By that point, the projects were obviously not producing returns on investments promised or expected due to the defendants' diversions. In multiple meetings and telephone calls, Kenner and Constantine told their victims that the real estate projects had failed because Jowdy had squandered their money. Kenner and Constantine then asked these same investors to contribute $250,000 each to a Global Settlement Fund (the "GSF") that would purportedly be used in connection with legal action against Jowdy to recover the funds lost in the failed real estate developments.

Between May 2009 and October 2009, Kenner and Constantine did raise approximately $4.1 million towards the GSF. However, the documentary evidence will show that they used only a small fraction of the $4.1 million on costs associated with the legal action against Jowdy. Most of the money was instead used by Constantine to acquire various other assets, to support his company, Eufora, and for purely personal purchases and expenses that in no way benefitted the contributors to the GSF.

It is clear that a major component of the defense at trial will be to continue to shift blame entirely to Jowdy. While the defendant has every right to raise plausible doubt in the minds of the jurors through blame-shifting, he has no right to test out that defense prior to trial under the guise of a new bail hearing. Accordingly, the defendant's motion to re-argue his bail by questioning Jowdy should be denied.

Conclusion

For the reasons set forth above, the motion for access and inspection of the defendant's MacBook and iPhone, as well as the motion for a bail hearing and subpoenas should be denied.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

/S/
By: _____
James Miskiewicz
Saritha Komatireddy
Assistant U.S. Attorneys

cc:   Richard Haley, Esq. (by ECF)

9