1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
        ---------------------------X
 3
      UNITED STATES OF AMERICA,          CR 13-00607
 4
 5          -against-
                                         U.S. Courthouse
 6                                       Central Islip, NY
      PHILLIP KENNER, et al.,
 7
                                         November 18, 2014
 8        Defendant.                     11:00 a.m.

 9      ---------------------------X

10
                      TRANSCRIPT OF PROCEEDINGS
11            BEFORE THE HONORABLE JOSEPH F. BIANCO
                 UNITED STATES DISTRICT JUDGE
12

13    APPEARANCES:

14    For the Government:        LORETTA E. LYNCH
                                 United States Attorney
15                               100 Federal Plaza
                                 Central Islip, NY 11722
16                               By:  JAMES MISKIEWICZ, ESQ.
                                     Assistant U.S. Attorney
17
      For the Defendant:         HALEY WEINBLATT & CALCAGNI, LLP
18                               1601 Veterans Memorial Highway,
                                 Suite 425
19                               Islandia, NY 11749
                                 By: RICHARD D. HALEY, ESQ.
20

21    Court Reporter:           Owen M. Wicker, R.P.R.
                                 100 Federal Plaza
22                               Central Islip, NY 11722
                                    (631) 712-6102
23

24

25    Proceedings recorded by mechanical stenography; transcript
      produced by computer transcription.
```

2

1          (Case called.)

2          MR. MISKIEWICZ:  Good morning, your Honor.

3   James Miskiewicz for the United States.

4          MR. HALEY:  Good morning, your Honor.  Richard

5   D. Haley pursuant to CJA, and my client Mr. Kenner.

6          THE COURT:  This is a detention hearing.

7          Are both sides ready to proceed?

8          MR. MISKIEWICZ:  Yes, your Honor.

9          MR. HALEY:  Yes, your Honor.

10          THE COURT:  I'm considering the issue de novo

11   because of the fact that the prior detention order was

12   without prejudice to renewal and the defendant had a bail

13   package and wanted to make an application, so given the

14   posture I'll let the Government go first.  Obviously I

15   received the initial letter way back in November of 2013,

16   as well as the supplemental letter in response to

17   Mr. Haley's letter, so I've reviewed those and you can

18   highlight anything you wish.

19          MR. MISKIEWICZ:  Then in that case, your Honor,

20   we would only incorporate by reference what we said

21   earlier in the prior two submissions -- may I speak from

22   the podium?

23          THE COURT:  Sure.

24          MR. MISKIEWICZ:  And I would only supplement

25   what we've said with a couple items that we have not cited

3

1    to before.  So this will be new material.

2            In that regard I have five Government Exhibits

3    I'd like to hand up to the Court.  I've already given

4    Mr. Haley copies of each.

5            If I may, your Honor, I've highlighted the most

6    relevant portions just to -- just for expediency to move

7    things along quickly.  If I may --

8            THE COURT:  Sure.

9            MR. MISKIEWICZ:  If I may just walk the Court

10   through what I believe is pertinent regarding the bail.

11           In essence, your Honor, one of the two most

12   basic questions a defendant should be able to answer

13   without equivocation or confusion -- one last item if I

14   may hand this up, your Honor, the pretrial service report

15   from Arizona.  I didn't mark this as an exhibit.  I

16   suppose it would be a Court's exhibit.

17           At the time of his arrest approximately a year

18   ago, Mr. Kenner was asked a fairly standard question,

19   where do you live.  He was also asked questions what he

20   owned.  Those are two questions any defendant should be

21   able to answer without any sort of confusion in order to

22   give any court some sense of security about releasing that

23   individual on bail.  And in pretrial service he indicated

24   that he lived at 10705 East Cactus Road, Scottsdale,

25   Arizona.  He claimed that he was at that address since

4

1    2001, approximately 12 years at that point.

2             Well, the defendant has said various things at

3    various times about his place of residence.  In

4    Government's 1, this is -- this was a deposition taken in

5    the part of arbitration proceedings, also the same

6    arbitration proceedings that we cited to in our last

7    submission on bail regarding how this alleged forgery

8    issue came to light.  And if you would look at the second

9    page there, Government's Exhibit 1, he's asked, and this

10   is in August of 2010, so it would have been, he should

11   have been answering it consistent what he called pretrial

12   services but instead of saying he lived at East Cactus

13   Road he claims to have been living at a different address

14   in a different state, 200 Hoover Avenue, Nevada.

15            Moreover, he's asked in the deposition is that

16   your property or is it somebody else's, or are you renting

17   it.  He says he's renting it.  When he's asked how does he

18   pay for it, he says he's borrowing the money and gives a

19   name of a realty company he's paying rent to, Smart Move.

20   That is August 2010.

21            In Government's Exhibit 2, the same proceeding

22   or same litigation.  He's asked, though, and this is at

23   the second deposition, he's asked once again, and by the

24   way this was a deposition taken telephonically so the

25   attorney, Ms. Swift is questioning to just understanding

5

1   where the defendant is calling in from and he says he's

2   calling in from Las Vegas, gives 200 Hoover Avenue, Las

3   Vegas address.

4           Then an interesting thing happens.  He was asked

5   the same questions he was asked a few months earlier

6   whether it is his home or if he rents.  He says no, it's a

7   friend of mine who owns this home and names an individual

8   Rebecca Baumgartner.

9           Do you pay rent to Ms. Baumgartner?

10          And he says no.

11          He's asked are you her guest?

12          Yes, I am.

13          Are you living in that house?

14          Yes, I am.

15          Then the questioner goes on to remind him a few

16  months earlier he was renting this house from a company

17  called Smart Move Realty, allegedly.

18          The questioner, starting at page 62, reads from

19  the prior transcript which is now part of Government's

20  Exhibit 1, and then at page 83 he's asked, now, I'm asking

21  you who is Smart Move Realty?

22          I don't know.

23          But you testified on August 11th that you are

24  making a rent payment for the 200 Hoover Avenue property,

25  to Smart Move Realty?

I believe just what you just read.

Yes. Where did you come up with that name?

I had seen that name on a check before.

I'm not going to reread the entire transcript, it's in the record for your Honor to read in detail, but he never really answers the question. He basically says, well, I said what I said earlier and I came up with a name, I think I may have seen it on a check. This is a question about where do you live. This is not rocket science.

To highlight this was not some mere slip of the tongue, your Honor, Government's Exhibit 3 is a portion of a transcript of a deposition of the defendant taken about a year later, April 28, 2011. The formatting on this is a little bit different. We got it in what we call text map format, it's a searchable format, but it is a portion of the transcript of that deposition. I've included the page where he identifies who he is.

Then about four pages in, it is marked page 29, he's asked the same questions.

What is your current address, and gives the same answer, 200 Hoover Avenue. This is the one he was renting but now is a guest there.

How long have you been at that current address?

Approximately two years.

7

1              It is entirely inconsistent what he claims to

2     pretrial services in Arizona 30 some-odd months later.  He

3     said he was there for 12 years.  The numbers don't add up.

4              He gives in fact another address two years prior

5     to the Hoover Street address, 4525 Dean Martin Boulevard,

6     Las Vegas.

7              How long did you live there?

8              Approximately two years.

9              Then prior to that:  Where did you live?

10             Now he says, 10705 East Cactus Road, Scottsdale,

11    Arizona, which would put his last time at that address at

12    somewhere around 2007.  Again, this predates what he told

13    pretrial services by about 32 months.

14             It's a simple question:  Where do you live?

15    Can't even give a simple answer or straight answer.

16             Moreover, if you look at Government's Exhibit 4,

17    your Honor, this is a couple of pages of a Bank of America

18    bank statement.  In the upper right-hand side I've

19    highlighted the reporting period or the cycle period.  It

20    is August 24, 2010 through September 22, 2010.  It would

21    have been immediately after that very first deposition

22    that I summarized the one in the arbitration.  He's

23    getting a bank statement in his name at the 10705 East

24    Cactus Road address, not in Las Vegas, in Scottsdale,

25    Arizona.

1          Now, by the way in his own name he has nothing,

2     and maybe that's not particularly relevant since he's

3     offering nothing by way of a bail package, but what he

4     says about his ownership of assets is, and in that regard

5     I would ask that the Court refer back to the very first

6     exhibit, Government's Exhibit 1, the last page of that

7     exhibit.

8          He's asked -- this is a portion of the

9     deposition where he's asked his ownership interest.

10    Page 33 of the deposition in Government's Exhibit 1.  He's

11    asked.

12          Question:  What about a Guide-Dog LLC?

13          Answer:  What about Guide-Dog LLC?

14          Question:  Do you have an ownership interest in

15    Guide-Dog LLC?

16          Answer:  I do not.

17          And he reiterates that.  He goes on, and in fact

18    the ownership interest has been transferred to John

19    Kaiser, one of the individuals referenced in the

20    submission by the defense.  This is August of 2010.

21          I've pulled a series of bank statements for

22    Guide-Dog LLC and they are marked as Government's

23    Exhibit 5.  They begin for the period 8/01/10, in other

24    words, right at the time of this deposition and they

25    continue through the beginning of September of 2010, all

1    of that is in Government's Exhibit 5.

2           Guide-Dog LLC is going to the same address,

3    again several months later he tells a different story,

4    tells pretrial services in Scottsdale Arizona he's living

5    there, been there for 12 years.  He's getting these

6    statements at this address.  He has claimed at the same

7    time as this statement that he has no ownership interest

8    in it and yet if you review just some of the pages, and I

9    didn't necessarily highlight everything that I thought was

10   relevant, but if you review here time and time again we

11   see Phillip Kenner receiving substantial sums of money on

12   behalf of or through Guide-Dog, LLC and spending

13   substantial sums of money.  In fact he goes through about

14   $100,000 in just this one month, the same month he claims

15   that he has no ownership interest in the company.

16          The third page, 3 of 6, I've just highlighted a

17   number of references here.  They all begin with the

18   letters INDN as in Nancy, DN, Phillip Kenner, where I've

19   been advised by the bank means that is a shorthand for

20   indication, and it is an indication of who was authorizing

21   the various debits indication.

22          If you look through these exhibits time and time

23   again it is Phillip Kenner, among others,, again, the

24   girlfriend or the woman he claims to be a guest of is also

25   named here.  Time and time again it is John Kaiser,

1   Phillip Kenner or Phil Kenner who is spending hundreds of

2   thousands of dollars via this corporation that he has

3   sworn in that deposition that very month he does not own.

4           So, in sum, your Honor, this is the thought,

5   material that we've not specifically referenced earlier,

6   and I think it is relevant because on the most basic of

7   questions this man has lied about where he lives, lies

8   about what he owns, and for that reason he is not a good

9   risk to be released on any bail but particularly an

10  unsecured personal recognizance bond.

11          Unless the Court has any questions, I've

12  concluded my presentation.

13          THE COURT:  No, I don't have any questions.

14  Thank you.

15          Go ahead, Mr. Haley.

16          MR. HALEY:  Thank you.

17          Your Honor, at the outset I would simply

18  indicate I have no objection to the introduction of the

19  exhibits that were offered by the Government for the

20  Court's consideration.  They were presented to the Court

21  without inquiry.  I don't object, so I will make that

22  clear for purposes of the record.

23          I would also, Judge, like to make clear for

24  purposes of the record, I did also provide counsel this

25  morning an exhibit we intend to introduce, dated July 21,

**11**

1   2006, entitled Little Isle IV LLC, dated July 21, 2006.

2   If I might approach the bench and have this marked as

3   Defendant's Exhibit A for purposes of the hearing.

4           THE COURT:  Thank you.

5           MR. HALEY:  Your Honor, also by way of

6   introductory remarks, we concede as demonstrated by my

7   client's prior testimony, that for a two-year period he

8   lived at a location identified consistently as 200 Hoover

9   Avenue in Nevada with a girlfriend.  At one point there

10  was a change in realtors which has been referred to by the

11  Government but we don't deny that for that two-year period

12  from approximately 2009 through 2011, he resided with a

13  girlfriend at 200 Hoover Avenue in Nevada.

14          In the pretrial services report he is asked a

15  question about his residence or domicile.  If I may,

16  Judge, there is clearly as this Court is well aware a

17  difference between domicile and residence.  There is

18  clearly a difference where you intend to permanently

19  reside which is known as ones domicile where you get your

20  mortgage statements, bank statements, driver's license

21  listed as your domicile or residence or in an area or an

22  event where you may be living for some short period of

23  time in some other location.  So when asked if the

24  defendant resided in Arizona for approximately 12 years

25  and recited at the above noted residence for 10 years,

1    there are references to the East Cactus address.  That's

2    the address they gave to pretrial services because that is

3    indeed his domicile and residence.

4         It goes on to say the defendant's ex-wife

5    verified his residential history, purchased the above

6    noted residence in 2001 while they were married.

7         I would think the Government would have a point

8    if they were demonstrating to this Court there were a

9    series of different addresses, that my client was a

10   vagabond, though he had a permanent residence at the East

11   Cactus address location, he was living here in one

12   instance and there in one instance.  He was all over the

13   face of the map but that's not the case.

14        All they have demonstrated to the Court there

15   was a two-year period where he resided with his girlfriend

16   at the 200 Hoover Avenue, Nevada, residence.

17        When he was asked in his deposition where he was

18   physically located at that point in time when deposed he

19   gave a truthful answer.

20        Judge, let me move on from that point.

21        It is always my practice, your Honor, in

22   addressing the Court on any issue to my own mind to recite

23   the law.  And I believe that helps the Court, at least

24   from an analytical standpoint, it certainly helps me from

25   an analytical standpoint.

1    For purpose of today's detention hearing, your

2  Honor, I'm relying upon the Second Circuit decision in

3  United States versus Friedman, 837 F.2d 48, a 1988 Second

4  Circuit decision that has withstood the test of time and

5  indeed the principles I would respectfully submit to the

6  Court as relates to the issue in a detention hearing still

7  prevail.

8    And I'm not hear, Judge, to read into the record

9  a principle of law of which the Court is not aware but

10  once again it really helps me in my analytical approach.

11    The Second Circuit back in 1988 when confronted

12  with the primary issue that is considered by a district

13  court in a detention hearing wrote as follows:  After a

14  motion for detention has been filed, the district court

15  must undertake a two step inquiry, citing United States

16  versus Shakur.  It must first determine by a preponderance

17  of the evidence that the defendant either has been charged

18  with one of the crimes enumerated in Section 3124(f), or

19  that the defendant presents a risk of flight or

20  obstruction of justice.

21    In Friedman, much like this case, your Honor,

22  the Second Circuit wrote:  In this case the Government

23  concedes that Friedman was not charged with a crime of

24  violence within the meaning of 18 U.S.C. 3142(f)(1)(A), or

25  any other crime enumerated in Section 3142(f)(1).  And

14

1    indeed, Judge, that is the case here.  The statutory

2    presumption does not apply here.

3            Notably, the Court went on to say:  However, the

4    Bail Reform Act does not permit the detention on the basis

5    of dangerousness on the absence of risk of flight,

6    obstruction of justice or an indictment for the offenses

7    enumerated above.

8            The final relevant remark by the Second Circuit,

9    Judge, because it goes, I think, to the heart of the

10   Government's presentation here, reads as follows.

11           In other cases concerning risk of flight, we

12   have required more than evidence of the commission of a

13   serious crime and the fact of a potentially long sentence

14   to support a finding of risk of flight.

15           That is the issue before this Court, I submit,

16   respectfully, an issue of risk of flight, Judge.

17           When the Government spends pages and pages of

18   argument suggesting to the Court that despite the

19   presumption of innocence, Mr. Kenner has committed serious

20   crimes for which upon conviction he faces a minimum term

21   of -- excuse me, for which upon conviction under the

22   United States begins his minimum term of imprisonment is

23   168 months, that argument, Judge, is not the determinative

24   factor for purposes of this Court rendering a

25   determination as to whether he should be released on bail

1    pending ultimately a jury determination as to whether or

2    not the Government had proven those allegations beyond a

3    reasonable doubt so as to justify a sentence by this Court

4    that may well result in a very lengthy term of

5    incarceration.  We're not there yet, Judge.

6            Let's talk about risk of flight.

7            In its November 13, 2013, detention letter to

8    the Court, and I'm highlighting what I believe again to be

9    the most salient points, the Government writes Kenner

10   frequently travels to Mexico.  That's true.  As a matter

11   of fact, Judge, in 2013, he went to Mexico twice.  The

12   last time he was in Mexico he was there to sign what was

13   known as a statutory filing in a lawsuit against a person

14   by the name of Ken Jowdy, who has a very personal

15   interest, Judge, in the outcome of these proceedings.

16   Indeed the attorneys here today, Tom Harvey, he attends

17   most of these reports as Ken Jowdy as to the outcome of

18   these proceedings.  So he did travel to Mexico twice for

19   purposes of that statutory filing.  It was preceded by a

20   trip to Mexico to meet with his attorneys by way of

21   initiating that lawsuit.

22           Judge, the Federal Bureau of Investigation is

23   aware of these facts.  They know that lawsuit is filed and

24   they know the purpose for which Phillip Kenner went to

25   them on those occasions.  On each and every instance

**16**

1    Phillip Kenner, my client, where Phillip Kenner my client

2    went to Mexico, was related to the ongoing civil dispute

3    between himself and Ken Jowdy.  I might add, Judge, it is

4    that civil dispute that actually in large part is

5    integrally related to the allegations in this indictment

6    and quite frankly integrally related to the defense of

7    this action.

8            THE COURT:  So you are saying the Government in

9    its internal bail letter says he's traveling to Mexico and

10   at least seven times in 2009, all of those are related to

11   the civil litigation?

12           MR. HALEY:  Yes, sir, every time he went down

13   there it is related to the civil litigation to Ken Jowdy.

14           THE COURT:  Travel in 2004.  It goes back to

15   2004?

16           MR. HALEY:  No.  May I answer your question?

17           (Counsel confers with defendant).

18           MR. HALEY:  The civil litigation started in

19   2009.

20           THE COURT:  What was the travel back to 2004

21   then?

22           MR. HALEY:  In 2004 he was a business partner

23   with Ken Jowdy in a entity named as Diamante Cabo San

24   Lucas.  Actually, Judge, there was another business entity

25   where he was involved with Ken Jowdy in terms of a

**17**

1    business relationship and that was also known as Diamante

2    Del Mar.

3          But in answer to your Honor's question, yes, all

4    the travels to Mexico throughout that period of time were

5    related to that relationship with Mr. Jowdy and the

6    dispute that ultimately developed as a result of that

7    relationship.

8          Judge, the dispute as relates to Ken Jowdy, is

9    indeed reflected already in part of the Rule 16 discovery

10   provided to the defense, and by that I mean, Judge, it

11   refers to a revolving line of credit wherein that entity,

12   Little Isle IV, LLC, loaned actually $7.5 million to Ken

13   Jowdy to help develop the Diamante Cabo San Lucas

14   property, Judge, which is a golf resort designed and

15   constructed by professional athletes to play golf there,

16   but for professional athletes to play golf.

17         The revolving line of credit, Judge, is one of

18   the documents that we submitted to the Court by way of our

19   original submission.  Your Honor may recall that when

20   pressed as to the forgeries allegedly committed by Phillip

21   Kenner, one of the representations made was that the

22   revolving line of credit signed by Ken Jowdy was a

23   forgery.  My client submitted an affidavit to that effect,

24   denied he forged Ken Jowdy's signature and as your Honor

25   may recall as part of that submission, there's testimony

18

1   by a Robert Gaudet in an American arbitration proceeding

2   wherein he affirmed not only his signature as the

3   attesting witness, but testified quite directly that he

4   saw Ken Jowdy sign that revolving line of credit.  There

5   is outstanding about $5.5 million owing on that loan.  Ken

6   Jowdy did repay a portion of it until he reached a point

7   where the business dispute between himself and Mr. Kenner

8   reached a point where he simply stopped paying, Judge, and

9   indeed that is a significant aspect of the lawsuits filed

10  against Ken Jowdy in Mexico.

11          Judge, to give you some idea as to the nature

12  and extent of this litigation, my client is not the only

13  one who has filed lawsuits against Ken Jowdy as relates to

14  his failure to acknowledge investments or his failure to

15  pay back money owed by his investors.  There are other

16  John Does actually listed in this indictment who have

17  brought suit against Ken Jowdy, one of which, Judge,

18  involves a civil action pending in the state of Delaware

19  for the books and records of Diamante Cabo San Lucas, and

20  Mr. Jowdy has engaged high-priced legal counsel to fight

21  an action which simply asks to see the books and records.

22          Judge, I could perhaps speak for another

23  15 minutes and that's not my intention, to describe to the

24  Court the myriad of civil lawsuits that underline this

25  indictment, civil lawsuits between my client and Ken

1    Jowdy, between Ken Jowdy and my client, civil lawsuit

2    involving him and Kaiser and others tangentially related

3    to the underlying indictment.

4           Let me move on from that point, Judge, but I

5    wanted to address that claim that my client's traveling to

6    Mexico for illicit purposes, that's what they are trying

7    to imply, it's not a crime to travel to Mexico.  Also I

8    said a moment ago all of his travel relates to his

9    business relationships with Ken Jowdy.

10          With respect to the Government's risk of flight

11   aspect, to his detention letter, it reads every -- each

12   and every prior instance involves Kenner's lawsuit versus

13   Jowdy -- excuse me.

14          The next argument they make is Kenner has

15   obtained Mexican citizenship and has a Mexican passport.

16   I don't know how to answer that to say it is simply

17   untrue.  He does not have a Mexican passport and he has

18   not obtained Mexican citizenship.  We believe the source

19   of that comes from two individuals, John Kaiser and Bryan

20   Berard who is Ken Jowdy, if you will, part of a cabal,

21   that have a personal interest in the outcome of this case

22   and indeed whereas John Kaiser was once a business partner

23   with Phillip Kenner, is no longer a business partner with

24   Phillip Kenner, and is indeed employed by Ken Jowdy,

25   indeed as best we know resides more often than not at Ken

20

1    Jowdy's property at Diamante Cabo San Lucas in Mexico than

2    he does in East Setauket.

3              Your Honor, as relates to that allegation that

4    he has a Mexican passport, Mexican citizenship, I would

5    put the Government to its proof in that regard as a

6    proffer, but I would respectfully suggest to the Court,

7    the Court should require more than an unsubstantiated

8    allegation as relates to that particular matter.

9              Your Honor, my client resides at the East Cactus

10   Road address.  He resides there with his current

11   girlfriend.  His wife lives approximately five miles away.

12   She lives with his two children, a son aged 12, a daughter

13   aged 15.  He has a close relationship to his ex-wife,

14   close relationship with his children.  Indeed, Judge,

15   throughout the voluminous amount of Rule 16 discovery, at

16   one point I listened to a tape-recorded conference between

17   my client and a person name Tim Gaarn.  My client was

18   unaware he was being recorded by Mr. Gaarn, but this

19   involves my client's recitation to Mr. Gaarn as to how

20   he's coaching his son's hockey team, the close

21   relationship he has with his son, how he's saving money by

22   coaching the team because he's otherwise able to avoid the

23   fees associating with having to pay for his son's

24   membership to be on the hockey team.  The point is he's

25   very close to his children.

**21**

1          In another paragraph set forth in the

2     Government's detention letter it speaks in terms of

3     transfers from Kenner, accounts or accounts controlled by

4     Kenner, in the United States, to a corporate account in

5     Mexico, and that is true, Judge.

6          What the Government's detention letter failed to

7     tell the Court is those transfers were transfers from an

8     account controlled by Kenner to a corporate account owned

9     and controlled by Ken Jowdy because they were in a

10    business relationship.  There's nothing illegal about

11    those transfers, Judge.  That is exactly what it involved.

12    I respectfully suggest the Federal Bureau Of Investigation

13    is aware that that was the purpose of those transfers.

14    Those transfers were not made to set up a resort by which

15    my client might secrete himself, should be released on

16    bail pending a speculative criminal prosecution in the

17    future.  Again, Judge, they were related to his

18    relationship with Ken Jowdy.

19          THE COURT:  What about the Government also

20    asserts he has a personal bank account in Mexico?  Are you

21    contesting that?

22          MR. HALEY:  (Counsel confers with defendant.)

23          Judge, what I'm advised is that many years ago

24    my client did have a personal bank account in Mexico.  I'm

25    advised that it is dormant and hasn't been used in --

1    three to four years, Judge.

2             THE COURT:  Okay.

3             MR. HALEY:  Judge, I don't know how to respond

4    when the Government writes to the Court based on these

5    unidentified sources that he is prepared to pack his

6    duffle bag with money and head to Australia.  It is

7    untrue.  He would leave his family, leave his residence in

8    Arizona, pack a duffle bag and fly to Australia?  And I'll

9    further demonstrate the absurdity of that claim but it is

10   untrue.

11            When he writes the defendant has that safe

12   deposit box, the last time was in 1999 and it was a

13   jointly held safe deposit box with his ex-wife and

14   contained things like birth certificates, deed to

15   residence, things of that nature.

16            I would invite the Government to provide the

17   Court with evidence beyond that one safe deposit box held

18   in 1999.

19            The final comment, Judge, I might make when they

20   speak in their November 13, 2013 detention letter of

21   access to cash or the expenditure of $40,000 in cash

22   within a year preceding his arrest, I would simply state

23   in response to that, Judge, that upon his arrest the

24   Government did seize $15,000 from my client's residence in

25   cash and as it relates to the $40,000 in expenditures that

**23**

1  year, in September, October and November of 2013, he made

2  mortgage payments of $7,000 monthly as relates to the East

3  Cactus Road address to Wells Fargo Bank.  If you subpoena

4  the records from Wells Fargo Bank I submit they will

5  reveal he made those deposits in September, October and

6  November in the amount of $7,000 per month, that would be

7  a $21,000 expenditure.

8       He makes payments of $800 monthly in truck

9  payments or at least he did at that time, Judge, which on

10 a yearly basis would be $9,600.  Those payments are made

11 directly to Chase Bank.  I would respectfully suggest if

12 the Government subpoenaed those records it would reveal

13 those payments were made to Chase Bank, about $1,500 in

14 average monthly bills consisting of payments for gas,

15 electric, cable, water, internet service.

16      I will say, Judge, my client does reside at a

17 residence that is quite large.  I'm advised it has

18 approximately two acres of property.  I don't know the

19 square footage of the home itself but I'm advised it is

20 rather large.

21      He does or did spend during that period of time,

22 Judge, $1,000 monthly for food, clothing, truck, fuel for

23 his truck, things of that nature.  We've exceeded, Judge,

24 the $40,000 that the Government claims that were spent

25 without I guess explanation or to suggest that somehow

24

1    there is illegal activity underlying expenditure over the

2    $40,000.  I've recited to the Court the purpose of those

3    expenditures.

4              Judge, what are some other factors that the

5    Court should consider in determining determining whether

6    or not my client truly presents himself as a flight risk?

7              We know this, Judge.  We know that he appeared

8    before the Security and Exchange Commission twice in 2011

9    to testify in response to an SEC subpoena in an

10   investigation of his financial activities.  He didn't flee

11   the country then, Judge.  Twice, Judge, in 2011.

12             On June 24, 2009, he spoke with Assistant United

13   States Attorney Julian Moore of the U.S. Attorney's Office

14   in the Southern District of New York in a joint telephone

15   call with FBI Agent Mat Galioto who is present in the

16   Court and SEC Investigator Chris Castano, and the reason

17   he spoke with them, Judge, at that point in time is

18   because they had reached out to my client Phillip Kenner

19   to inquire further of him with respect to an investigation

20   of Ken Jowdy for what they thought at that time, what they

21   perceived that time was criminal activity conducted and

22   perpetrated by Ken Jowdy.

23             About one month later, Judge, he learned that

24   the investigation being conducted by the grand jury in the

25   Southern District of New York had turned around and he

25

1    knew was the target, the subject of the investigation.   He

2    knew this because all of his financial records before

3    being subpoenaed by the agents assigned to that

4    investigation, including Agent Galioto.  He learned

5    through Wells Fargo, Bank of America, Charles Schwab, and

6    Northern Trust and their corporate offices when he

7    inquired as to the subpoenas.  He was advised that he was

8    being investigated for fraudulent criminal activity, money

9    laundering, a litany of criminal activity by the federal

10   government.  Judge, that occurred in 2009.  Phillip Kenner

11   was arrested at the gym, I'm told, not far away from his

12   East Cactus residence in 2013.  From 2009 to 2013 there

13   was an active, vital investigation being conducted of him

14   by the Federal Bureau of Investigation.  He didn't travel

15   to Australia, he didn't secret himself in Mexico, overseas

16   or anything of that nature.  He did not flee, Judge, armed

17   with that knowledge.

18          Your Honor, I alluded to civil litigation

19   currently pending here in the United States of America and

20   Mexico.

21          The litigation in Mexico involving Ken Jowdy,

22   there are two civil cases in Arizona, civil litigation

23   against John Kaiser and Bryan Berard for fraudulent title

24   transfers involving real estate that was jointly owned by

25   them during various periods of time.  One was filed in

26

1    2012 in Arizona.

2              I might add, Judge, what is interesting about

3    that Arizona litigation, three of the John Does, Darryl

4    Sydor, Tyson Nash, and William Ramford, are intervenors

5    plaintiffs in that action against John Kaiser.

6              There's also, Judge, pending litigation here in

7    the state of New York where my client was a plaintiff

8    against John Kaiser in a disputed real estate matter and

9    again, Judge, that is in addition to the Arizona case

10   pending against John Kaiser by my client.

11             He's also, Judge, involved as a defendant in a

12   lawsuit in Arizona upon a counterclaim filed against him

13   by Tommy Constantine, his codefendant in this indictment.

14             If my client flees the jurisdiction, Judge, of

15   of the United States and becomes a fugitive, he's a bright

16   enough guy to know that he will then have defaulted on all

17   those causes of action.  He will then give us what he

18   believes to be legitimate claims based upon that

19   litigation.

20             I also mentioned previously, Judge, that though

21   he's not directly a plaintiff in the books and records

22   action, that books and records action is entitled Baja

23   Ventures 2006, LLC, versus Diamante Cabo San Lucas, and

24   that's the litigation brought by actually a number of John

25   Does.  And when I say "John Does," I'm referring to the

1    John Does in the indictment, of course, your Honor,

2    against Diamonte Cabo San Lucas particularly because they

3    are all investors in that company, and they simply want to

4    know from Ken Jowdy what has happened to their

5    investments?  What is the status of our investments in

6    Diamante Cabo San Lucas?  And Ken Jowdy, having hired

7    Pepper Hamilton, is resisting through litigation, simply

8    resisting, simply providing the books and records so they

9    might determine their interest.

10           My client is an integral and material witness as

11   relates to that, Judge, because he's the managing member

12   of Baja Ventures 2006, LLC, and indeed there was a

13   deposition of him a few weeks ago at the Queensboro

14   Correctional Facility which I attended, Mr. Harvey was

15   there, though he's not an attorney of record for Diamante

16   Cabo San Lucas, but he was there nonetheless to witness

17   that proceeding on behalf of Ken Jowdy.

18           THE COURT:  Let me ask one of the things the

19   Government proffers.  Mr. Kenner arranged for

20   approximately $500,000 that was obtained from three of the

21   victims to pay an American Express card in his former

22   wife's name.

23           Do you have a response to that?

24           MR. HALEY:  We have no idea, Judge, no idea what

25   the Government is talking about as relates to that

28

1   allegation.  The victim, perhaps the Government could

2   share the victims they are speaking of.  Perhaps we can

3   see the financial records that reflect those transfers.

4   Judge, we have no idea how to respond to that because we

5   have no idea as to the substance of that allegation.

6           THE COURT:  How do you respond to the fact that

7   with respect to the cabal property that they did not agree

8   to have their money invested in that project?  What is

9   your response to that.

10          MR. HALEY:  May I answer your question?

11          THE COURT:  You've been going on --

12          MR. HALEY:  Judge, there is grand jury testimony

13  that was actually part of the exhibit, submitted to this

14  Court in my November 13, 2013 letter.

15          THE COURT:  Okay.

16          MR. HALEY:  Where Mr. Peca in particular, when

17  asked that question, testified that he was fully aware

18  that the investments that were going through Little Isle

19  IV, LLC were going to be used to provide a loan for

20  purposes of the investment in the Diamante Cabo San Lucas

21  property.

22          As a matter of fact, we have arbitration

23  testimony from Bryan Berard, as well as as John Kaiser

24  that reflects knowledge of that same fact, Judge.

25          THE COURT:  All of the victims knew the money

1   was going to Cabo San Lucas.  Is that what your position

2   is?

3          MR. HALEY:  The answer to that is yes, Judge.

4   All the victims knew that the investment in Diamante Cabo

5   San Lucas which involved a $7.5 million loan from Little

6   Isle IV to Diamante Cabo San Lucas to develop that real

7   estate, they were all aware of that.

8          Judge, all I might say where the Government says

9   in the proffer they weren't aware, when you go to the

10  evidence, when you go to testimony, which is all we have

11  by way of a Rule 16 discovery at this point in time,

12  Judge, and ask that very question, they respond they were

13  aware.  As a matter of fact, Judge, as an aside, I'd like

14  the Court to be cognisant, and I think your Honor is, this

15  is a unique case.  This investigation started in the

16  Southern District of New York.  I surmise, your Honor,

17  having been a criminal practitioner for over 30 years that

18  the investigator took its file to the prosecutors in the

19  Southern District of New York in an effort to convince

20  testimony to move ahead with an indictment of Phillip

21  Kenner.  I surmise, you know, let's put a few of the

22  people, a few of the victims in front of the grand jury

23  before we decide to move ahead with that prosecution.

24  They did.  They put Michael Peca before the grand jury,

25  they put Darryl Sydor before the grand jury, they put

1    Turner Stevenson before the grand jury.  Your Honor, I

2    have the grand jury testimony of Peca, I would submit, as

3    an exhibit, to assist the Court, and I can excerpt from

4    that, I would defy the Government to refute what they

5    said.  Despite the allegations that her signature was

6    forged on lines of credit, they testified to the contrary.

7    When asked specifically if they were aware that the money

8    involved in Little Isle IV was to be used in part to

9    finance the Cabo San Lucas property, Michael Peca

10   testified quite clearly, yes, I was aware.

11           So I hope I've answered your Honor's question in

12   that regard.

13           THE COURT:  Can you move to what you are

14   proposing to the bail package?

15           MR. HALEY:  Yes, your Honor.

16           Phillip Kenner does not have the financial

17   wherewithal to bring in a suretor or to post surety on his

18   own behalf.

19           By way of contrast, Judge, Tommy Constantine,

20   the codefendant in this matter, has been released on an

21   appearance bond as set by the Court which does involve, I

22   believe, 2.1 million in property, equity in property.

23   What is interesting when you read the Government's

24   detention letter, Phillip Kenner is as much as the devil

25   incarnate as Tommy Constantine is.  When you talk about

1    risk of flight, Tommy Constantine has a helicopter's

2    pilot's license.  Tommy Constantine has access to private

3    jets.  Phillip Kenner does not have access to private

4    jets.

5              So what I'm proposing, Judge, is the following.

6              That the Court set an appearance bond in an

7    amount the Court deems to be appropriate, unsecured, with

8    an additional condition that my client abide by all the

9    conditions as recommended in the pretrial services report

10   stemming from the District of Arizona which is set forth

11   on the last page, page 4 of that pretrial services report

12   with an additional requirement, that his release be

13   subject to home detention and specifically the home

14   detention, Judge, at the East Cactus Road residence.  That

15   would give to the extent there is any concern that my

16   client poses a flight risk, the Court assurance that he

17   will remain in that residence pending the final

18   determination of a jury of his peers pending the guilt of

19   these crimes.  Although this is not a factor as set forth

20   in the matter, I understand that, it would also facilitate

21   the preparation of trial as relates to this matter in

22   terms of my ability.  With the Court's permission I would

23   fly out to Arizona, be able to spend a great deal of time

24   with my client for an extended period of time to prepare

25   this case for the trial and that would ultimately expedite

1    the date for this trial.  That would be my proposal.

2              I'm prepared to make other remarks, your Honor,

3    but I would defer to the patience this Court has

4    demonstrated to this matter thus far.

5              Thank you, your Honor.

6              THE COURT:  Thank you.

7              Does the Government want to respond briefly?

8              MR. MISKIEWICZ:  Yes, your Honor.

9              Your Honor, we said enough regarding how this

10   shifting of blame to Ken Jowdy is really irrelevant in our

11   prior submission.  Using Ken Jowdy is actually a way of

12   defrauding the victims twice over in getting them to

13   invest in a so-called global settlement fund to mount

14   litigation against against Jowdy because of this Diamante

15   Cabo San Lucas, and Mr. Haley indicates correctly that

16   technically the plaintiff in that is a Limited Liability

17   Company called Baja Ventures 2006, LLC.

18             By way of background the way Baja Ventures

19   becomes involved in this real estate venture in Mexico, in

20   Cabo San Lucas is that the defendant borrows 2.5 million

21   and there are promissory notes provided in Rule 16 from

22   two of his investor clients in or about 2005.

23             In 2006, this Baja Ventures, LLC is formed and

24   it buys approximately 39 percent of this project, all of

25   this with borrowed money.

33

1    I didn't include every page in my earlier

2  exhibits, maybe I should include this, but in 2010,

3  Counsel indicated that all of those trips to Mexico, at

4  least up until a certain point, and I don't recall how far

5  back he went, I think 2009, but certainly by 2010 I

6  suppose what he would say and what he did say, all the

7  trips to Mexico were related to the litigation, the

8  litigation being Baja Ventures vs. Diamante Cabo San

9  Lucas.  Well, at page 34 of the deposition of December 15,

10  2010, this is the debtor's exam of Mr. Kenner.  He's

11  asked, and this was not included, but I can provide the

12  Court later a copy of the pages.

13    He was asked:  I went over his reference to

14  Guide-Dog, LLC.

15    Ironically on the next page he's asked how about

16  Baja Ventures?  Do you have an ownership interest in Baja

17  Ventures?

18    Baja Ventures, I don't recognize that.

19    He denies even having an ownership interest in

20  Baja Ventures, the company he now claims was the only

21  reason he was traveling to Mexico during this entire

22  period.  He also neglects to say prior to 2009 he owns a

23  house in the Pedregal section I believe of Cabo San Lucas,

24  another house purchased without knowledge of one of the

25  investors after he liquidated his interest in another

34

1   piece of real estate located in Hermosa Beach, California.

2            THE COURT:  Let me ask you to address this.

3   Mr. Haley said he has no idea what the Government's proof

4   is with respect to the diversion of some of the money the

5   victims paid to American Express accounts for his ex-wife.

6   What is that based upon?

7            MR. MISKIEWICZ:  That is based on bank

8   statements and wire transfers.  If I can check with the

9   agents.  I'm not sure we have them here.

10           (Counsel confer.)

11           MR. MISKIEWICZ:  I can provide the Court

12  afterwards with the relevant pages of the bank statements

13  that would show money going from the defendant to his

14  wife's American Express, your Honor.

15           THE COURT:  Okay.

16           MR. MISKIEWICZ:  So on December 15th of 2010, he

17  says he does not know what Baja Ventures is.

18           In the same litigation a few months earlier,

19  this is page 82 of that, he's asked:  What next?  What is

20  Diamante Cabo San Lucas.  What is that?

21           That's a Diamante real estate property in Cabo

22  San Lucas.  So he does acknowledge it.

23           Did you ever own that?

24           No.

25           Never owned it?

1          Do you know who did?

2          It's owned by Diamante Cabo San Lucas, and it

3    goes on.  It basically contradicts what he said just a few

4    months earlier.

5          So the defendant has used a number of people to

6    blame for the loss of tens of millions of dollars.

7    Mr. Jowdy is one of those individuals that he's blamed and

8    he's used to perpetrate the fraud.  He is currently

9    involved in that litigation.

10         There's every reason to believe based on what

11   we've already alleged or proffered about the creation of

12   phoney records justifying two million dollars worth of

13   siphoning of from the global settlement fund to

14   Constantine, there is every reason to believe if he is

15   released he will continue to perpetuate the fraud, and

16   with no bail package, without an ability to even identify

17   where he lives for sure.  He wasn't asked where are you

18   domiciled versus where do you reside?  He was asked where

19   are you?

20         He was asked do you have interest in certain

21   companies?  And he flatly lied.  He lied under oath.

22         There is no reason to take this man's word that

23   he will not flee or that he will not continue to be a

24   predator and defraud others.

25         Nothing further.

1          THE COURT:  Okay.

2          MR. HALEY:  May I respond briefly?

3          THE COURT:  Yes.

4          MR. HALEY:  Your Honor, let me address the last

5    remark.

6          It has been my intention here, Judge, to avoid

7    an evidentiary hearing because the statute does permit

8    presentation to the Court by way of proffer.

9          For each of the Government's proffer, we have

10   submitted a proffer in opposition.  If the Government now

11   presents these records that they claim exist from the

12   victims with respect to a $500,000 bill, American Express

13   bill, I understand made on behalf of his wife, I would

14   like to see those records.  I would ask, Judge, if that is

15   going to be the presentation by the Government, that there

16   be no determination today because we may very well want an

17   evidentiary hearing on that issue.

18         Let me also say this, Judge.  One of the

19   conditions, without assuming because again he's entitled

20   to the presumption of innocence.  One of the allegations

21   the pretrial services recommendations impose, the

22   defendant shall not maintain any financial account,

23   personal business related without prior notification and

24   approval of pretrial services.  The defendant shall

25   provide financial documentation directed by pretrial

1   services.

2           So the Government's argument, if released, the

3   defendant will continue to commit the financial crimes for

4   which he's yet to be convicted.  I respectfully submit to

5   the Court that addresses that concern.

6           I've been litigating again for over 30 years.

7   He was asked a question do you have any ownership interest

8   in Baja Ventures and he said I have never heard of that

9   entity and indeed it is not Baja Ventures, it is Baja

10  Ventures 2006, LLC.  I've been in civil litigation where I

11  don't describe the corporate entity and I get the same

12  answer, as I should.  We're involved in professionalism

13  where precision is important and they haven't yet done

14  their homework or they are sloppy in their questioning.

15  He has not heard of Baja Ventures.  He was not asked if he

16  knew about Baja Ventures 2006.  So he has not responded

17  falsely under oath.

18          I'll rest on the record we've established thus

19  far.

20          THE COURT:  What is your response to the

21  Guide-Dog LLC, the statements in the sworn testimony that

22  he has no ownership interest?

23          MR. HALEY:  If I may have a moment.

24          The only reason I wasn't prepared for that, is

25  because Guide-Dog LLC, is the first time I'm hearing of it

1  given the 12 pages of information submitted to the Court

2  for purposes of a bail detention hearing.  I would assume

3  that if it was that material and salient it would be

4  rendered initially to the Court, but the Government is

5  entitled to make that representation.  So if I may have a

6  moment?

7              THE COURT:  Sure.

8              (Counsel confers with defendant.)

9              MR. HALEY:  Judge, if I may.  We could perhaps

10  litigate this issue for 45 minutes.

11              THE COURT:  Don't do that.

12              MR. HALEY:  Let's not do that.  What I alluded

13  to, Judge, a myriad of business relationships between my

14  client and John Kaiser, and indeed they were once business

15  partners.  At the point in time he was asked that

16  question, he has been in negotiations with John Kaiser to

17  have John Kaiser assume the ownership interest in

18  Guide-Dog LLC.  Indeed, Judge, if you look at the

19  financial records, the financial records show that the

20  money coming into that account was coming from Kaiser's

21  mother, Ethel Kaiser, and payments were being made to

22  Kaiser and Berard, Judge.

23              To the extent there was an answer under those

24  circumstances where the ownership interest was in flux,

25  and that's what I'm being told by my client, I don't

1    believe that to be an outright material misstatement of

2    fact in a deposition.

3         Judge, I might add this.  I did by way of my

4    original motion papers to the Court request the

5    opportunity to call John Kaiser as a witness in this

6    proceeding.  I knew he would be an adverse witness but

7    from my perspective I had documentation that I could

8    present him with that would substantiate many of the

9    claims we are making to this Court as relates to our

10   proffer.  I make the decision not to proceed by way of an

11   evidentiary hearing and that's where we are today.

12        THE COURT:  The Court will place its ruling on

13   the record.

14        I'll ask the Government to submit the bank

15   records that relates to the American Express account.  I

16   don't believe there is any reason to hold off from the

17   decision, so I don't believe that piece of evidence is

18   dispositive of the bail question, but I think given the

19   Government's reference to that, Mr. Haley and his client

20   should have an opportunity to see as well as the Court

21   what the Government's documentation is with respect to

22   that.

23        I've carefully considered the factors under the

24   Bail Reform Act which I'll go through in a moment.  It's

25   my conclusion the Government has met its burden by a

40

1    preponderance of the evidence.  There are no condition or

2    combination of conditions that would reassure Mr. Kenner's

3    appearance in court.  I'll not reach the issue of

4    dangerousness.  There are allegations regarding

5    intimidation of witnesses and the Government has made

6    reference to I guess future economic harm but I don't

7    believe it is necessary to reach that issue in terms of

8    the risk of flight by the Court.

9            First with respect to the nature and

10   circumstance of the offense.  The defendant is charged

11   with a multimillion dollar fraud, an extremely serious

12   fraud involving a number of victims and is facing a

13   substantial sentence if he's convicted.  The Government

14   estimates the advisory guideline range to be somewhere

15   around 168 to 210 months, but I think it is certainly

16   reasonable to say that if he's convicted he will be facing

17   a substantial amount of time given the nature of this case

18   and the nature of the alleged fraud and this creates an

19   enormous risk of flight given the jail time that he faces

20   in the case.

21           With respect to the weight of the evidence,

22   again, I told Mr. Haley and his client a couple weeks ago

23   that we need to have an evidentiary hearing with respect

24   to the alleged forged documents because I was willing for

25   purposes of bail to assume that he could prove those

41

1    particular documents were not forged.

2           However, the Government has proffered a much

3    more extensive category of evidence with respect to how

4    they intended to prove the case with victims' testimony,

5    not limited to certain victims that defendant wishes to

6    focus on or certain individuals he wishes to focus on.

7    The Government has to proffer a more extensive range of

8    witnesses and documentary evidence, financial records,

9    e-mails, and other evidence in order to prove the case.

10   Obviously the grand jury found the evidence the Government

11   submitted sufficient to indict the defendant under the

12   probable cause standard and I have not heard, although

13   Mr. Haley and his client have disputed certain aspects of

14   the Government's case, I certainly have not heard a

15   proffer from the defense that leads me to believe the

16   Government's case here is substantially undermined with

17   respect to this factor.

18          In light of the extensive proffer the Government

19   has set forth in its bail letters which includes obviously

20   this alleged transfer of $500,000 to pay personal expenses

21   in an American Express account, among other things.  With

22   respect to the history and characteristics of the

23   defendant, this militates heavily against bail conditions

24   being sufficient in this case to reasonably assure his

25   appearance and I'm not referring to any prior record, I'm

1   referring to his relationship he has certainly in the

2   country of Mexico.  Whether or not the prior travel was in

3   part for litigation purposes, I think it is certainly

4   clear he has had business relationships in Mexico

5   involving property in Mexico.  At one point he had a

6   personal bank account in Mexico so there is no question

7   that he has ties to Mexico, and although he's obviously a

8   lifelong U.S. citizen at this point in his life, his ties

9   to the United States do not appear to me to be very

10  strong.

11          He's claiming that he has no money available to

12  him.  He's gotten nobody who is willing to even sign a

13  bond, no one has put up property but to sign a bond, and

14  despite his proffer to be clear that he has a close

15  relationship to his wife that will keep him in the United

16  States, there is no evidence of that given the jail time

17  he faces in this case.  There is no financial ties to the

18  United States at this point and there appears to be an

19  insufficient tie or ties to family, friends or otherwise

20  that would keep him in the United States to face these

21  extremely serious charges.

22          There's an enormous risk of flight here and as

23  far as my review of the pretrial services report and the

24  proffer from the Government with regard to assets and

25  millions of dollars that is no longer around.  I have no

43

1    assurance whatsoever that I can say there's no reasonable

2    basis to believe that any conditions that I would set

3    would reasonably assure his presence in court.

4           With respect to the issue of assets, again, I

5    want to note that we have a fraud here to have alleged

6    millions and millions of dollars.  Where the money all

7    went is not clear to the Court.

8           Putting aside to the issue of safe deposit

9    boxes, and according to the Government's proffer, to

10   sources that he's prepared to pack his duffle bag with

11   money and head to Australia or abroad, the Court believes

12   that given the nature of this fraud, the lack of an

13   explanation of where that money is, his ties to Mexico,

14   all of these things in combination, create an enormous

15   risk of flight that I don't believe can be addressed by

16   any conditions or combinations of conditions of bail.

17          Although I believe the Government has met its

18   burden of demonstrating no condition or combination of

19   conditions can reasonably assure his presence in court, I

20   would specifically note the bail package that is being

21   offered is woefully inadequate.  To offer it in a case of

22   this nature, outlining the factors that I just referred,

23   the enormous risk of flight for a defendant to offer

24   basically an unsecured appearance bond, means nothing.

25   The fact that he's signing a bond, if it's unsecured it

44

1    means absolutely nothing.  Although not every defendant I

2    have has the assets available to them and that

3    Mr. Constantine had to post, I released defendants who may

4    not have had financial assets but I had seven or ten

5    people all willing to sign a bond and put their financial

6    well being on the line even if they don't have a lot of

7    property, real property, to have moral suasion over the

8    defendant he would not leave them with a judgment against

9    them.  We have absolutely none of that here.

10         The bracelet, the Court is well aware of the

11   weaknesses of an electronic bracelet.  If the defendant

12   would cut off the bracelet and just leave his home, he

13   would have an enormous amount of forward time to leave his

14   home.  If the defendant wants to leave his home and cut

15   off the bracelet he would have at minimum a number of

16   hours of a head start before any government personnel,

17   before they would be able to determine whether or not

18   there was a malfunction of the equipment or some other

19   reason.

20         I don't believe the bracelet would be sufficient

21   to assure Mr. Kenner would appear in court for his trial.

22         So for those reasons, I'm ordering the defendant

23   to continue to be detained pending trial.

24         I'm obviously, I think I said this previously,

25   but I'll repeat it again, and I know this obviously has

1   voluminous documentary records that we've discussed at a

2   number of conferences, but as soon as Mr. Haley advises

3   the Court he will appear for trial I'll set this down.

4         I know Mr. Kenner was ready for a year and I'm

5   anxious to have his case ready to move forward and I'll

6   resolve any outstanding issues there are with respect to

7   his access to documents in the jail, but he can be assured

8   the minute he tells me, Mr. Haley, tell me he's ready to

9   try this case, it will be set down for trial.

10         So that's the ruling for the Court.

11         I want to spend one minute on the issue with the

12   computer.  I have another case waiting for over a half

13   hour now but I did get the Government's November 14th

14   letter.  They did have an agent go to the jail to try to

15   see what could be accessed and what could not be accessed

16   from that computer.  And Mr. Haley, again, I don't want to

17   spend a lot of time own this now but the bottom line is my

18   offer to you to resolve this problem continues to be on

19   the table which is as it appears from the Government 's

20   letter that Mr. Kenner can access at least portions of the

21   computer.

22         He's shaking his head no, but --

23         MR. HALEY:  Judge, I'm shaking my head yes.

24         THE COURT:  No, your client is shaking his head

25   no, but the Government -- I don't know whether they would

1    let you witness this if it makes everybody feel better.  I

2    would ask the Government to let you go in with them so

3    they could show you -- and if your client is saying no and

4    the Government is saying yes that might be the best way to

5    resolve this.  I'm not suggesting that you don't have a

6    right to have all the access to the computer

7    mirror-imaged, but at least for a start they said they

8    provided the e-mails on PDF.  Certainly doesn't matter

9    what computer you use, your client should be able to read

10   all the e-mails in PDF form.  He may want to start doing

11   that if he's not doing that already.

12          The bottom line is I would ask you, you know, if

13   you doubt what the Government is saying in this letter for

14   you to go into the jail and do a physical demonstrative

15   for you, but ultimately I told you this before and, again,

16   if you want CJA funds to retain some type of forensic

17   expert to look at this issue and/or purchase another piece

18   of equipment that could be used in the jail by Mr. Kenner

19   to view whatever items can't be reviewed, I'm prepared to

20   authorize that.

21          MR. HALEY:  Your Honor, briefly.

22          THE COURT:  Yes.

23          MR. HALEY:  I will indeed submit to your Honor a

24   request to hire a forensic expert for a multitude of

25   purposes and I will do that, and I thank the Court for

47

1    that suggestion in that regard.

2            I have some memory of these proceedings.  The

3    very first time we raised the issue with respect to access

4    of the computer I did mention that he's able to access

5    some of that information, the most critical or those

6    e-mails.  We provided those e-mails on PDF.  There are

7    thousands and thousands of e-mails in that form.  When you

8    are able to access them directly from the computer you can

9    look at that particular file and that file will reference

10   a date, time, if you will, even has a designation so you

11   immediately have some idea as to the materiality of that

12   particular file as opposed to thousands and thousands of

13   e-mails if you go side-by-side.

14           Judge, thank you.  I will hire an expert.

15           The matter of the computer, Judge, will be

16   addressed and I agree that will be my second salvo of the

17   pretrial motion.

18           THE COURT:  What is our next date?  I forgot.

19           Do we have another date set?

20           MR. HALEY:  Yes, your Honor, December 9th for

21   status conference, and I think we might be able to then

22   set an additional pretrial motion schedule.

23           THE COURT:  Thank you.  Have a good day.

24               (Proceedings adjourned.)

25