AO 106 (Rev. 04/10) Application for a Search Warrant

AUSA

# UNITED STATES DISTRICT COURT

for the

District of Arizona

SEALED

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

10705 East Cactus Road,
Scottsdale, Arizona 85259

)
)
)
)
)

Case No. 13-7368MB

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____Arizona_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1349, 1956(h) | Wire fraud , wire fraud conspiracy, money laundering conspiracy |

The application is based on these facts:

See Attachments C-1, C-2.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Approved by: Josh Damiec Larzal*

*Applicant's signature*

SA Josh Wayne, IRS-CI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: __November 13, 2013 @ 9:30a m.__

*Judge's signature*

City and state: Phoenix, Arizona

The Honorable Magistrate Judge Bridget S. Bade

*Printed name and title*

**ATTACHMENT A**
Property to Be Searched

The property to be searched is 10705 EAST CACTUS ROAD, SCOTTSDALE, ARIZONA 85259, further described as a gated and private two-story residence on approximately two acres of property. The SUBJECT PREMISES includes the main residence with an attached three-car garage, a separate garage and a separate theatre room. There is a separate guest house on the two-acre estate, but the government does not seek permission to search and will not search the guest house, which is located by the swimming pool. There are two gates on East Cactus Road that lead onto the SUBJECT PREMISES. The number "10705" does not appear to be displayed outside the residence. An aerial photograph of the SUBJECT PREMISES is included below:

SW-00000003



SW-00000004

## ATTACHMENT B
### Property to be Seized

1.    All records relating to violations of Title 18, United States Code, Section 1349 (wire fraud conspiracy), Title 18, United States Code, Section 1343 (wire fraud), and Title 18, United States Code, Section 1956(h) (money laundering conspiracy), and involving PHILLIP A. KENNER ("KENNER") and TOMMY C. CONSTANTINE ("CONSTANTINE"), also known as "Tommy C. Hormovitis," since 2002, specifically[1]:

    a.    records, including correspondence, relating to real estate investment and development in Hawaii, including, but not limited to, by the following entities: Little Isle IV, Big Isle Ventures LLC, Big Isle IV Ventures LLC, Big Isle V Ventures LLC, Big Isle VI Ventures LLC, Ka'u Holdings, LLC, Ula Makika, LLC, Moaula Farm and Ranch Company, LLC, Na'Alehu Ventures 2006 LLC, Lehman Brothers Holdings, Inc. LTD, Windwalker Real Estate, and Windwalker Hawaii Holdings, LLC;

---

[1]    For purposes of the requested warrant, the terms "records" and "information" include evidence of the specified crime(s) in whatever form and by whatever means it may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, or painting); any mechanical form (such as printing or typing); and any photographic form (such as videos, digital and print photographs, or photocopies).

SW-00000005

b. records, including correspondence, relating to Eufora, LLC, including investment in the company;

c. records, including correspondence, relating to the Global Settlement Fund ("GSF"), including the escrow account established by Ronald Richards, Esq. for GSF contributions and any instructions that were given to Ronald Richards, Esq. regarding the disbursement of funds from the GSF;

d. records, including correspondence, relating to the Led Better Development Company, LLC and the real property located at 18 North Haven Way, Sag Harbor, NY 11963;

e. any information recording KENNER's schedule, travel, telephone numbers, addresses, email addresses, bank accounts, employment, and investments from 2002 to the present;

f. any information recording CONSTANTINE's schedule, travel, telephone numbers, addresses, email addresses, bank accounts, employment, and investments from 2002 to the present;

2

SW-00000006

g.      records, including correspondence, relating to the following companies and

        entities: Constantine Management Group ("CMG"), Eufora LLC, AZ

        Eufora Partners, Urban Expansion, Intrigue Investments, Baja

        Development Corp., Avalon Airpark Real Estate Project, Avalon CMG

        LLC, AZ Falcon, Falcon 10 aircraft; Palms Place Hotel, Palms Place

        Penthouse units, Guidedog LLC and GDM33 LLC;

h.      records, including correspondence, relating to Kenneth Jowdy, Diamante

        Cabo San Lucas, Baja Development Corp., and Los Frailes;

i.      records, including correspondence, relating to KENNER's hockey player

        clients, including John Kaiser, Ethel Kaiser, Nicholas Privitello, Vincent

        Tesoriero, James Grdina, Thomas Milana, Timothy Gaarn, C.R. Gentry,

        and Robert Gaudet;

j.      records, including correspondence, relating to forging documents and/or

        signatures, backdating documents, and/or creating fictitious documents; and

3

SW-00000007

k.     all bank records, checks, credit card bills, account information, and other

financial records, including relating to lines of credit, safety deposit boxes,

and any of the entities of investments listed above in (a) through (j),

all of which constitute evidence, fruits, and instrumentalities of violations of Title 18,

United States Code, Section 1349 (wire fraud conspiracy), Title 18, United States Code,

Section 1343 (wire fraud), and Title 18, United States Code, Section 1956(h) (money

laundering conspiracy).

2.     Computers[2] or storage media[3] that contain records or information (hereinafter

"COMPUTER") used as a means to commit violations of Title 18, United States Code,

Section 1349 (wire fraud conspiracy), Title 18, United States Code, Section 1343 (wire

fraud), and Title 18, United States Code, Section 1956(h) (money laundering conspiracy),

including the records listed above, in 1(a) through (k). All information obtained from

such computers or storage media will be maintained by the government for the purpose of

---

[2]     A "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, servers, and network hardware, such as wireless routers.

[3]     A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded. Examples include external hard drives, CDs, DVDs, and flash drives.

4

SW-00000008

authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing information that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Section 1349 (wire fraud conspiracy), Title 18, United States Code, Section 1343 (wire fraud), and Title 18, United States Code, Section 1956(h) (money laundering conspiracy), involving KENNER and. CONSTANTINE (also known as "Tommy C. Hormovitis") since 2002, specifically:

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, and correspondence;

b.  address book information, including names, telephone numbers, addresses and e-mail addresses; text messages and voicemail messages;

c.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as

5

well as evidence of the presence or absence of security software designed to detect malicious software;

d.    evidence of the lack of such malicious software;

e.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

f.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

g.    evidence of the times the COMPUTER was used;

h.    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

i.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

6

j.      contextual information necessary to understand the evidence described in this attachment.

all of which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1349 (wire fraud conspiracy), Title 18, United States Code, Section 1343 (wire fraud), and Title 18, United States Code, Section 1956(h) (money laundering conspiracy).

3.     With respect to all records and other materials seized pursuant to this search warrant, the United States will take precautionary measures to ensure that the law enforcement officers and prosecutors assigned to the underlying investigation will not review material to which the attorney-client privilege applies. Specifically, the following review procedures will be applied:

a.     At least one FBI Special Agent, who will no longer participate in the investigation (the "walled agent"), will be present during the search and will be consulted during the search concerning potential attorney-client issues. No other member of the team of FBI agents who have investigated this matter will be consulted during the search concerning such potential privilege issues.

7

b.      An Assistant United States Attorney ("AUSA") who will at no point be

assigned to any prosecution related to this matter (the "walled AUSA") will

be available by telephone to answer questions from the walled agent.

c.      Prior to the search, an AUSA will provide the agents participating in the

search, including the walled agent and the squad supervisor, with written

instructions concerning the procedures to use during the search to protect

privileged materials from disclosure.

d.      Computer files will be removed intact if possible and will be examined for

relevant files through word search techniques, and then the identified files

will be reviewed to determine relevance and the privileged status.

8

SW-00000012

## ATTACHMENT C-1:

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Joshua Wayne, being first duly sworn, hereby depose and state as follows:

### I.    INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of certain premises—specifically, the PREMISES KNOWN AND DESCRIBED AS 10705 EAST CACTUS ROAD, SCOTTSDALE, ARIZONA 85259 (the "SUBJECT PREMISES")– for the things described in Attachment B, which constitute evidence, fruits, and instrumentalities of a conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, wire fraud, in violation of Title 18, United States Code, Section 1343, and a conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

2.    I am a special agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been so employed for approximately 12 years. For the past two years, I have been assigned to an identify-theft squad on Long Island, New York. As an IRS-CI special agent, my duties and responsibilities include conducting investigations of individuals and business entities that have allegedly violated federal criminal laws of the United States, including Title 26, United States Code, Sections 7201 (tax evasion), 7203 (failure to file tax return) and 7206 (making false and fraudulent statements in tax return); and Title 18, United States Code, Sections 1028 (identity theft), 1028A (aggravated identity theft), 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1349 (mail/wire fraud conspiracy) and 1956 (money laundering).    During my

career as a special agent investigating white collar crimes, I have participated in the execution of dozens of search warrants for financial records and other evidence of financial crimes.

3.     I have personally participated in the investigation of the offenses discussed herein. I am familiar with the facts and circumstances of this investigation from a variety of sources, including: (a) my personal participation in this investigation, (b) information provided by other law enforcement officers, including oral and written reports, as well as notes of interviews, (c) information obtained from confidential sources of information, (d) interviews of witnesses and victims, (e) my review of documents, including financial records, analyses of financial records, email and text message communications, and business records; and (f) my review of photographs, including of the SUBJECT PREMISES and the targets of this investigation: PHILLIP A. KENNER ("KENNER") and TOMMY C. CONSTANTINE ("CONSTANTINE"), also known as "Tommy C. Hormovitis."[1]

## II.    THE SUBJECT PREMISES

4.     The SUBJECT PREMISES is located at 10705 East Cactus Road, Scottsdale, Arizona 85259 and is KENNER's residence. The SUBJECT PREMISES is a gated and private two-story residence on approximately two acres of property. The SUBJECT PREMISES includes the main residence with an attached three-car garage, a separate garage, a separate theatre room and a separate guest house. The property also includes a swimming pool and a tennis/basketball court. There are two gates on East Cactus Road that lead onto the SUBJECT PREMISES. The number

---

[1]     Because this affidavit is submitted for the limited purpose of establishing probable cause to search the SUBJECT PREMISES, I have not set forth each and every fact learned during the course of the investigation. Moreover, where the statements of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

2

"10705" does not appear to be displayed outside the residence. Witnesses and confidential sources of information who have been to and are familiar with KENNER's home have confirmed that the residence in the photograph included in Attachment A is Kenner's home, the SUBJECT PREMISES. Moreover, KENNER has provided the address of 10705 East Cactus Road, Scottsdale, Arizona 85259 as his address, including on records filed in federal court. For example, on March 21, 2013, KENNER submitted a complaint in connection with CONSTANTINE's bankruptcy in the United States Bankruptcy Court in the District of Arizona. See Case No. 12-BK-04842-EWH. On the cover page, KENNER listed his address as "10705 East Cactus Road, Scottsdale, Arizona 85259" and his email address as "Kenner33@gmail.com".

5.     It recently came to the attention of law enforcement that KENNER is advertising the SUBJECT PREMISES as a short-term vacation rental, with a minimum three-night stay, on the website "HomeAway." On October 29, 2013, an FBI agent acting in an undercover capacity (hereinafter, "the UC"), took a tour of the SUBJECT PREMISES with a real estate agent, under the guise of being interested in renting the SUBJECT PREMISES for family who planned to visit in December 2013. According to the real estate agent who provided the UC with a tour of the SUBJECT PREMISES, Kenner still resides in the SUBJECT PREMISES, but will temporarily leave the SUBJECT PREMISES when he has renters. The real estate agent further advised the UC that renters have access to the entire house, except for Kenner's home office and wine cellar. The door to the KENNER's home office was closed during the tour of the SUBJECT PREMISES. The real estate agent further advised the UC that the guesthouse, which is located next to the pool, is occupied by a tenant, who remains living in the guesthouse during

3

the short-term vacation rentals. Based on this information, the government does not seek permission at this time to search the guest house.

6. The real estate agent further advised the UC, in sum and substance, that renters would have wireless access to the Internet while staying at the SUBJECT PREMISES. While inside the SUBJECT PREMISES, the UC observed two Apple desktop computers in plain view in the kitchen. Shortly prior to entering the SUBJECT PREMISES, the UC observed KENNER drive away from the SUBJECT PREMISES.

## III. PROBABLE CAUSE

### A. The Scheme to Defraud

7. On October 29, 2013, a grand jury sitting in the Eastern District of New York returned a 10-count indictment charging KENNER and CONSTANTINE with conspiring to commit wire fraud, substantive wire fraud, and conspiring to commit money laundering, in violation of Title 18, United States Code, Sections 1343, 1349 and 1956(h) ("the EDNY indictment"). Based on the EDNY indictment, the Honorable Arlene R. Lindsay, United States Magistrate Judge for the Eastern District of New York, authorized arrest warrants for KENNER and CONSTANTINE. The EDNY indictment was filed under seal and is attached as Attachment C-2. The allegations in the EDNY indictment are incorporated as if fully set forth herein.

8. Based on my training and experience and the facts as set forth below, I believe there is probable cause to conclude that, between 2002 and 2013, KENNER and CONSTANTINE devised and executed a scheme to fraudulently induce several investors to invest money with entities and to deposit money into bank accounts that KENNER and CONSTANTINE controlled by falsely stating that the funds would be invested in real estate, small, privately-held companies

4

and a legal defense fund for the benefit of the investors, when, in fact, KENNER and CONSTANTINE intended to improperly divert a substantial portion of the funds to bank accounts they controlled and used the funds for their personal benefit, for unrelated business ventures and to conceal their fraudulent scheme. Based on financial records and analyses of the financial records in this case, I believe the total losses to the victims due to KENNER and CONSTANTINE's fraudulent scheme are in excess of $15 million.

9.       Between 2002 and 2013, KENNER was a financial advisor to several former and current professional hockey players (hereinafter, "the hockey player clients"), who are identified as John Doe 1 through John Doe 13 in the indictment. In his role as financial advisor, KENNER recommended to his hockey player clients investments in real property and small, privately-held businesses. One of the real estate ventures KENNER persuaded his hockey player clients to invest in was the acquisition of several parcels of land on the Big Island of Hawaii ("the Hawaii project"). KENNER represented to his hockey player clients that the goal of these investments was to develop the acquired land parcels for housing and recreational use and later sell the developed parcels for a significant profit, which would, in turn, result in a significant monetary return for each investor. Based on KENNER's representations, the hockey player clients and other investors, including John Doe 14, a resident of the Eastern District of New York, and Jane Doe 1, wired large sums of money to bank accounts controlled by KENNER for the Hawaii project.

10.      As a further part of the fraudulent scheme, KENNER persuaded several of his hockey player clients to each establish lines of credit at Northern Trust Bank and to transfer bonds and other equity held in their names to Northern Trust Bank to secure each line of credit. KENNER

5

made a variety of misrepresentations to his hockey player clients regarding the purpose of each line of credit. He falsely told some of his hockey player clients that the line of credit would not be drawn upon and would serve solely as collateral for the Hawaii project. He told other hockey player clients that he would only access the line of credit with his client's permission, that the money would be used exclusively for the Hawaii project and that Kenner would be responsible for any and all payments due on the line of credit. KENNER assured his hockey player clients that the collateral securing each line of credit would never be touched. To some of his hockey player clients, KENNER falsely represented that he, too, had pledged collateral to Northern Trust Bank to secure a line of credit. To prevent his hockey player clients from learning the balance of their lines of credit on a month-to-month basis, KENNER arranged to have Northern Trust Bank mail the statements for each of the lines of credit only to KENNER, at the SUBJECT PREMISES.

11.    Without his hockey player clients' knowledge or permission, KENNER used the lines of credit to, among other things, purchase land parcels for himself in Hawaii, to purchase an interest in a piece of land in the Eastern District of New York, and to make interest payments on the lines of credit. KENNER also diverted money from the lines of credit, as well as the hockey players' initial $100,000.00 cash investment, to bank accounts controlled by KENNER and CONSTANTINE for uses unrelated to the Hawaii project, including to pay personal mortgages, credit card bills, and other personal expenses. Financial records reveal that, between December 2004 and March 2006, KENNER, through a series of wire transfers, directed approximately $2 million from the Hawaii project to CONSTANTINE's holding company, Constantine Management Group, LTD ("CMG"). CMG had no relation to the Hawaii properties during that

6

SW-00000018

time. CONSTANTINE transferred the money to other corporate accounts he controlled, as well as to two race car teams in California. CONSTANTINE also used the money to make payments on personal mortgages and to pay for meals, limousines, rental cars, and cellular telephone expenses.

12. In August 2006, Lehman Brothers ("Lehman") agreed to finance the Hawaii project up to approximately $100 million. At KENNER's direction, Lehman made an immediate $6.9 million payment to Urban Expansion, a company controlled by CONSTANTINE and another individual. The $6.9 million was repayment for a $3.5 million loan in October 2005 from Urban Expansion to a holding company controlled by KENNER so that the Hawaii project could close on a piece of property on the Big Island.[2] Of the $6.9 million repayment to Urban Expansion, $2 million was a pre-payment penalty, which Lehman advised KENNER could be avoided by not paying off the entire loan. However, KENNER insisted that the loan to Urban Expansion be paid back in full, to the detriment of his investors. Lehman agreed to do so, but included a provision in the settlement agreement, which KENNER signed, that explicitly stated that KENNER was not to directly or indirectly receive any portion of the $6.9 million of the Lehman funds that was being used to pay off the Urban Expansion loan. After Lehman paid Urban Expansion $6.9 million, just over $2 million was transferred to an account for CMG, controlled by CONSTANTINE. Days later, CONSTANTINE transferred $669,000 to accounts controlled by KENNER, notwithstanding the prohibition in the settlement agreement with Lehman. CONSTANTINE used his portion of the pre-payment penalty money to pay personal mortgages

---

[2] It should be noted that the $3.5 million actually came out of the bank account of Intrigue Investments, which CONSTANTINE did not control or operate, as Urban Expansion was a shell company created just days prior to the $3.5 million loan and had no bank account at the time.

7

SW-00000019

and loans, to make car payments, and to pay for airfare, hotels, car rentals, jewelry, and cellular telephone expenses. In addition, CONSTANTINE transferred $150,000 to two car racing teams and over $150,000 to other corporate accounts he controlled. CONSTANTINE wired $17,000 to Unique Auto Sports, in the EDNY. By November 2006, CONSTANTINE had depleted the $2 million that was transferred into his CMG account from Urban Expansion in August 2006.

13.    In early 2009, Kenner failed to make interest payments on the lines of credit and, as a result, in late March 2009, Northern Trust Bank closed the lines of credit and liquidated the equity securing each line of credit. John Does 1 through 8 lost a total of approximately $9 million due to KENNER's use of their lines of credit. Most of the parcels of land acquired for the Hawaii project have been sold at foreclosure auctions or remain in foreclosure.

14.    In addition to the Hawaii project, KENNER persuaded several of his hockey player clients to invest in Eufora LLC ("Eufora"), a company founded by CONSTANTINE in or about 2002 that sold prepaid debit cards. Between approximately February 2008 and December 2009, KENNER and CONSTANTINE convinced several of KENNER's hockey player clients, as well as John Doe 15, a resident of the Eastern District of New York, to collectively invest over $1.5 million in Eufora. Financial records and analysis revealed that KENNER and CONSTANTINE diverted most of the $1.5 million to bank accounts they or another co-conspirator controlled, and used the money for purposes unrelated to Eufora, including to pay personal mortgages, make automobile and credit card payments, and to pay for hotels, airplane tickets, meals, and jewelry.

15.    In or about the Spring of 2009, KENNER and CONSTANTINE met with several of KENNER's hockey player clients to persuade them to contribute to a legal defense fund known as the Global Settlement Fund ("GSF"). According to KENNER and CONSTANTINE, the

8

SW-00000020

GSF would be used primarily to litigate civil claims in connection with the hockey players' investments in real estate projects in Mexico, which KENNER and CONSTANTINE claimed were at a standstill because the developer of those projects, John Doe 17, had misused the investors' money. KENNER's hockey player clients contributed a total of approximately $4.1 million to the GSF. KENNER and CONSTANTINE directed the hockey player clients to wire their contributions to the escrow account of John Doe 16, an attorney in Los Angeles, California, whom KENNER and CONSTANTINE stated would represent them in the civil action against John Doe 17.

16.    Financial records and analysis revealed that only a small fraction of the $4.1 million contributed by KENNER's hockey player clients to the GSF was used for legal proceedings against John Doe 17. The majority of the GSF money was transferred into bank accounts controlled by CONSTANTINE. KENNER and CONSTANTINE used significant portions of the money for purposes unrelated to the Mexico litigation or the other purported purposes of the GSF, including to pay attorneys' fees in a legal matter involving a race car company that CONSTANTINE owned, for KENNER to invest in a tequila company in Mexico, and to arrange for an associate of CONSTANTINE to purchase CONSTANTINE's home in Arizona, which was going into foreclosure. Financial records show that KENNER and CONSTANTINE often transferred money they obtained from KENNER's clients through various bank accounts – sometimes on the same day. Based on my training and experience and my knowledge of this investigation, I believe KENNER and CONSTANTINE did so in an effort to disguise, among other things, the source of the funds and who controlled the funds.

9

17.     KENNER is also charged alone in Counts Eight and Nine of the indictment with defrauding John Doe 1 and John Doe 2 in order to acquire an ownership interest in a parcel of land in Sag Harbor on Long Island, New York ("the Sag Harbor property"). In October 2006, KENNER represented to John Doe 1 that John Doe 1 could acquire a 50% interest in the Sag Harbor property by investing $375,000.00, which John Doe 1 wired to a bank account KENNER controlled. In addition to the $375,000.00 invested by John Doe 1, KENNER withdrew $395,000.00 from John Doe 2's line of credit, without John Doe 2's knowledge or permission, to purchase the Sag Harbor property. KENNER created the Led Better Development Company, LLC ("Led Better") to purchase the Sag Harbor property. After Led Better purchased the Sag Harbor property, KENNER instructed John Doe 14 and John Doe 18 to each wire $190,000.00 to him, which they did, to obtain a 25% interest each in the Sag Harbor property.

18.     The Led Better operating agreement, which KENNER drafted, but did not disclose to John Does 1, 2, 14 or 18, stated that KENNER, John Doe 1, John Doe 14, and John Doe 18 each owned 25% of Led Better, which owned the Sag Harbor property. Thus, KENNER acquired a 25% interest in the Sag Harbor property without using any of his own money. In addition to the 25% interest in the Sag Harbor property, KENNER obtained approximately $380,000.00 as part of the fraudulent scheme. While John Doe 1 believed, based on KENNER's representations, that he owned 50% of the Sag Harbor property, the Led Better operating agreement provided that John Doe 1 owned only 25% of the Sag Harbor property. To conceal his fraudulent scheme and to prevent John Doe 2 from learning that KENNER had used $395,000.00 to purchase property on Long Island for himself, KENNER continued to make interest payments on John Doe 2's line

10

SW-00000022

of credit until early 2009 and ensured that John Doe 2 did not receive monthly statements on his line of credit.

19.     In or about March 2010, John Doe 14 learned that KENNER had failed to pay the property taxes on the Sag Harbor property and that there was a lien on the property. It was during this same approximate time period that John Doe 14 and John Doe 18 learned that John Doe 1 was also a part owner of the Sag Harbor property. Moreover, it was during this approximate time period that John Does 1, 14, and 18 realized that KENNER did not invest any of his own money to purchase the Sag Harbor property, yet claimed to own 25% of the Sag Harbor property.

20.     KENNER eventually paid the property taxes in or about May 2010, by using money he obtained from John Doe 12 as a loan for a home renovation project in Paradise Valley, Arizona. In approximately May 2012, John Does 1, 14, and 18 sold the Sag Harbor property at a loss. In or about April 2013, KENNER sued John Doe 14 in connection with the Sag Harbor property. That lawsuit remains pending in Arizona state court.

      **B.     Evidence Within the SUBJECT PREMISES**

            **i.     Business Records and Email Correspondence**

21.     To further and conceal the scheme to defraud, KENNER often communicated with his hockey player clients and other investors via electronic mail ("email"), using a number of different email addresses, including kenner33@gmail.com, pak33@mac.com, pak33@me.com, pkenner@imvelocita.com, pkenner@tmo.blackberry.net, and phil@standardadvisors.com.

22.     For instance, on June 18, 2006, KENNER sent John Doe 9 an email message from phil@standardadvisors.comwith the subject line: "Re: LOC docs for the Hawaii deal." A portion

11

of the email that KENNER wrote reads as follows: "Call me if necessary. I am on the west coast right now getting on a flight tonight to the east coast. The LOC [line of credit] is supported by you, [John Doe 8] and I. The $$$ is never out of your pocket, my pocket or [John Doe 8's] pocket, as it is a renewal of the old LOC that we already have out. The $540k-ish is your piece while never coming out of pocket for a $1. The LOC is getting repaid based on the development deal I am about to sign in the next 3 weeks. . . ."

23.     On July 26, 2006, KENNER sent John Doe 9 a letter via email from phil@standardadvisors.com with the subject line: "Hawai'i letter." The letter, which is dated July 21, 2006, is addressed to "the Members of Little Isle IV, LLC", has the address of the SUBJECT PREMISES (10705 East Cactus Road, Scottsdale, Arizona 85259) at the top of the first page, and has KENNER's name as the author of the letter. [3] In the email to John Doe 9, KENNER requested, in relevant part, that John Doe 9 "sign and return it to me ASAP." In the seven-page letter, KENNER shares "very positive developments" with his hockey player clients regarding their investments in the Hawaii project and, among other things, advises them that "we have reached an agreement with a developer, Windwalker Real Estate . . . and a lender, Lehman Brothers Holdings, Inc. . . ., for the continued development of the Parcels and the financing of its pre-development phase."

24.     On May 18, 2009, KENNER sent John Doe 2 and John Doe 2's wife an email from email account kenner33@gmail.com with the subject line: "Global Settlement." The email,

---

[3]     Little Isle IV, LLC is the holding company KENNER created and the bank account into which KENNER directed his hockey player clients to transfer their investment for the purchase of real estate in Hawaii. The fact that KENNER used his home address in connection with the Little Isle IV holding company, and that the line of credit monthly statements were sent to the SUBJECT PREMISES, shows that KENNER used his home as a business address, as well.

12

SW-00000024

which is signed "Phil," begins as follows: "Per our conversation, please acknowledge your approval and authorization for me to have wire transferred $250,000 to Attorney [John Doe 16's] Trust Account for your proportionate contribution to the Global Settlement Fund." At the end of the email, KENNER wrote: "Tommy [Constantine] has requested from all of us and will provide to us, written documentation of every element of this transaction. Please respond, ACKNOWLEDGED AND APPROVED, to this email accordingly ASAP."

25.    On April 19, 2011, KENNER sent an email to John Doe 14 and others from email account kenner33@gmail.com with the subject line: "Mexico update."[4] In the email, KENNER discusses his "fight" against [John Doe 17] in connection with the real estate development project in Cabo San Lucas, Mexico. KENNER further wrote: "As you are all aware, Constantine has misappropriated the lion share of the GSF (Global Settlement) funds, that would have been a great assistance to us in the Mexican pursuit of [John Doe 17], for his own benefit. It has left me with very few financial options while trying not to quit our legal pursuit." At the end of the email message, KENNER wrote: "DO NOT SHARE this information with anyone. It only further jeopardizes our desired goal!" In fact, financial records I have reviewed during this investigation reveal that KENNER received money via CONSTANTINE from the GSF.

26.    On July 12, 2012, KENNER sent another email from kenner33@gmail.com to his other email account, pak33@mac.com. The subject line is "Current [John Doe 17] Mexican legal updates, etc…" The email starts off with "Gentlemen:" and discusses various events that

---

[4]    The email message is addressed to email account pak33@mac.com, another of KENNER's email addresses. No other recipient email addresses are visible. More than likely, KENNER blind copied (bcc'd) the other recipients of this email so that each recipient could not see who else received the email message.

13

purportedly took place in Mexico concerning John Doe 17. Some of the victims of KENNER and CONSTANTINE's fraudulent scheme received this email message and provided it to the government.

27. On December 10, 2012, KENNER sent an email from his kenner33@gmail.com account to several of the victims, identified as John Does, in the EDNY indictment. The subject line of the email message is "Cabo testimony" and, in the email, KENNER advised the recipients of the email, in sum and substance, that the courts in Cabo San Lucas, Mexico, want to hear testimony from witnesses who invested in the Diamante Cabo project and transferred money to bank accounts controlled by John Doe 17.

28. KENNER continues to use email correspondence in connection with various issues concerning the John Does in this case. For instance, on March 25, 2013, KENNER sent an employee of a real estate company in Arizona an email from his pak33@me.com account regarding a lis pendens KENNER claimed had been placed on a property in Paradise Valley, Arizona. KENNER threatened to add the real estate company employee as a defendant to his lawsuit against John Doe 14 if she failed to notify the potential buyers of the purported lis pendens. In a response email from the real estate broker, the broker advised KENNER that "[t]he buyers have been informed that the Lis Pendens was falsely submitted and are moving forward with the closing." The real estate broker further advised KENNER he would have to discuss the matter with John Doe 1 and John 14, both victims in the EDNY prosecution of KENNER and CONSTATINE.

29. Records provided by Cox Communications indicate that "Philip Kenner" is a customer residing at 10705 East Cactus Road, Scottsdale, AZ 85258 and has been a customer of Cox

14

Communications since April 23, 2013. The records further indicate that KENNER last made a payment on October 25, 2013 and that the services provided to KENNER at the SUJBECT PREMISES include cable, high speed data service, and telephone service.

30.     Moreover, a confidential source of information, who is familiar with the SUBJECT PREMISES, advised the FBI that KENNER has a home office within the SUBJECT PREMISES, uses a laptop computer, and has access to the Internet at the SUBJECT PREMISES.

31.     John Doe 1, one of KENNER's hockey player victims, has advised the government that he stayed at the SUBJECT PREMISES as a guest in or about May 2009. John Doe 1 reported, in sum and substance, that during that visit, KENNER received a telephone call from another hockey player client. KENNER asked the client if KENNER could call the client back. John Doe 1 observed that, after hanging up, KENNER retrieved an external hard drive, which KENNER attached to his laptop computer. KENNER then called his client back and discussed business with that client, while looking at data on his computer.

          ii.     **Cellular telephone and other smart phone devices**

32.     Evidence gathered during this investigation reveals that KENNER frequently used his cellular telephone to communicate via text message with co-conspirators, including CONSTANTINE and another individual identified as "Co-Conspirator 1" in the EDNY indictment. Based on information provided by victims in this investigation, KENNER also communicated with them via text message.

33.     By way of example, on April 24, 2008, at approximately 8:10 a.m., KENNER sent the following test message to CONSTANTINE: "I'm sending CMG [a company controlled by Constantine] $100k today. Please send the extra $25k back to me. Thx…" Based on my

15

knowledge of this investigation, the $100,000 that KENNER referred to in the text message was a $100,000 investment in Eufora made by John Doe 13 on or about April 24, 2008. At 8:55 a.m., CONSTANTINE responded via text message: "$25k? I need $40k for Lawyers and $40k for GT car. Is that eufora $?" KENNER responded "Yes". CONSTANTINE replied via text message: "Are you cool if I just send the $17k? Im sorry to nickel and dime you but I have to lay out 80 straight away and I dont even have enough to get to the meeting in Cabo." KENNER responded "No problem."

34.     KENNER attached a copy of the above text message and several others as exhibits to a Complaint he filed in the United States Bankruptcy Court in the District of Arizona, in connection with CONSTANTINE's bankruptcy petition. See Case No. 12-BK-04842-EWH.

35.     More recently, in September 2012, KENNER and victim John Doe 2 engaged in a series of text message communications. At approximately 11:47 a.m., KENNER sent John Doe 2 a text message with a photograph of an airplane and wrote: "Constantine's new plane. How does this make you feel?" John Doe 2 responded: "how should we feel... the guy U brought into our lives and is spending our money is our fault . . . or is it Tommys fault AGAIN . . . that we haven't gotten [John Doe 17] arrested let C . . . . . how does the order go Im getting confused . . . [John Doe 8's] fault . . . [female's] fault . . . [John Doe 17's] fault . . . [John Doe 14's] fault . . . . [John Doe 1's] fault . . . [John Doe 17's] fault . . . back 2 Tommy now . . . O Ya forgot about [John Doe 9] and [another former hockey player] in there to." John Doe 2 provided copies of the above-described text messages to the government.

36.     In January 2013, KENNER sent a text message to the individual identified as Co-Conspirator 1 in the EDNY indictment. By way of background, in early 2009, Co-Conspirator 1

16

SW-00000028

allowed KENNER to transfer $700,000 of hockey player investments in Eufora through Co-Conspirator 1's account. Co-Conspirator 1 transferred most of the money out of his account to accounts controlled by KENNER and to other accounts, as directed by KENNER. On January 8, 2013, KENNER wrote to Co-Conspirator 1 via text message: "You know where I am!! I am talking to the FBI tomorrow about a threat [John Doe 1] sent me. Also, I am less than 2 weeks away from filing my nasty lawsuit against Gentry and his Co. Stupidity and greed are going to sink him! It's like watching Constantine all over again. I'm shocked!!"

37.    Also, on January 8, 2013, KENNER sent a text message to John Doe 14's brother, a resident of the Eastern District of New York. John Doe 14's brother worked on KENNER's home in Scottsdale – the SUBJECT PREMISES – between approximately 2010 and early 2012, and KENNER owes him money. KENNER has accused John Doe 14's brother of having stolen KENNER's tools. The text message from KENNER states: "Good. Please have them [the tools] in AZ by the end of January, so you can stay out of the business with your brother. He already got you into some trouble, but hopefully, there won't be any more. Pk"

38.    John Doe 14's brother has advised the FBI that he engaged in a further series of text message with KENNER in August 2013 concerning the tools and the money KENNER owes John Doe 14's brother. John Doe 14's brother showed the FBI agent these text messages. Thus, I respectfully submit that there is probable cause to believe that KENNER continues to use a cellular telephone, continues to use it for text messaging, and has the names and contact information of co-conspirators, witnesses, and victims saved in his cellular telephone, along with text messages concerning KENNER and CONSTANTINE'S scheme to defraud KENNER's hockey player clients, as well as other investors.

17

## IV.    TECHNICAL BACKGROUND

39.    As described above and in Attachment B, this application seeks permission to search for records constituting evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1343 (wire fraud), 1349 (mail/wire fraud conspiracy) and 1956(h) (money laundering conspiracy), that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of computers and electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

40.    I submit that if a computer[5] or storage medium[6] is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when

---

[5]    For purposes of the requested warrant, a computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers, and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

[6]    A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded. Examples include external hard drives, CDs and DVDs, and flash drives.

18

files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.　　Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.　　Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from the use of an operating system or application, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.　　Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.　　Based on actual inspection of other evidence related to this investigation (*e.g.*, email communications, correspondence with clients, operating agreements, promissory notes), I am aware that computer equipment was used to generate, store, and print

19

documents used in the wire fraud and money laundering scheme. As noted above, there is reason to believe that there is at least one computer currently located on the SUBJECT PREMISES.

41. As further described in Attachment B, this application seeks permission to locate not only electronic computer files that might serve as direct evidence of the crimes described on the warrant, but also electronic "attribution" evidence that establishes how the computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer or storage medium in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is

20

analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, Internet search histories, configuration files, user profiles, email, email address books, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.       A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how the computers were used, the purpose of their use, who used them, and when.

d.       The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Whether data stored on a computer is evidence may depend on the context provided by other information stored on the computer and the application of knowledge about how a computer functions. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.       Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

21

SW-00000033

42.    In most cases, a thorough search for information that might be stored on computers and

storage media often requires agents to seize such electronic devices and later review the media

consistent with the warrant.    In lieu of removing storage media from the premises, it is

sometimes possible to "image" the data stored on such devices. Generally speaking, imaging is

the taking of a complete electronic picture of the computer's data, including all hidden sectors

and deleted files.    Either seizure or imaging is often necessary to ensure the accuracy and

completeness of data recorded on the storage media, and to prevent the loss of the data either

from accidental or intentional destruction.    This is true because of the time required for

examination, technical requirements, and the variety of forms of electronic media, as explained

below:

    a.    *The time required for an examination.* As noted above, not all evidence takes the

    form of documents and files that can be easily viewed on-site. Analyzing electronic data

    for attribution evidence and conducting a proper forensic examination requires

    considerable time, and taking that much time on the SUBJECT PREMISES could be

    unreasonable. Given the ever-expanding data storage capacities of computers and storage

    media, reviewing such evidence to identify the items described in the warrant can take

    weeks or months, depending on the volume of data stored, and would be impractical and

    invasive to attempt on-site.

    b.    *Technical requirements.* Computers can be configured in several different ways,

    featuring a variety of different operating systems, application software, and

    configurations. Therefore, searching them sometimes requires tools or knowledge that

    might not be present on the search site.    The vast array of computer hardware and

                                            22

SW-00000034

software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.       *The variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

d.       Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would authorize seizing, imaging, or otherwise copying computers and storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## V.     SPECIAL PROCECURES TO PROTECT PRIVILEGED MATERIALS FROM DISCLOSURE

43.       Because the government is aware that KENNER has been and continues to be involved in several civil lawsuits, the government recognizes that materials covered by the attorney-client privilege, including correspondence and e-mail communications, might be present within the SUBJECT PREMISES. To ensure that the law enforcement officers and the Assistant United

23

States Attorneys working on the case will not review material to which the attorney-client privilege applies, the following procedures will be employed:

    a.    At least one FBI Special Agent, who will no longer participate in the investigation (the "walled agent"), will be present at the SUBJECT PREMISES during the search and will be consulted during the search concerning potential attorney-client issues. No other member of the team of FBI or IRS agents who have investigated this matter will be consulted during the search concerning such potential privilege issues.

    b.    An Assistant United States Attorney ("AUSA") who will at no point be assigned to any prosecution related to this matter (the "walled AUSA") will be available by telephone to answer questions from the walled agent at the SUBJECT PREMISES.

    c.    Prior to the search, an AUSA will provide the agents participating in the search of the SUBJECT PREMISES, including the walled agent and the squad supervisor, with written instructions concerning the procedures to use during the search of the SUBJECT PREMISES to protect privileged materials from disclosure.

44.    Computer files will be removed intact if possible and will be examined for relevant files through word search techniques, and then the identified files will be reviewed to determine relevance and the privileged status.

24

## VI.    CONCLUSION

45.      Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that in the SUBJECT PREMISES there exists evidence, fruits, and instrumentalities of a conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, wire fraud, in violation of Title 18, United States Code, Section 1343, and a conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h). Accordingly, a search warrant for the SUBJECT PREMISES described in Attachment A for the items described in Attachment B is requested.

WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS 10705 EAST CACTUS ROAD, SCOTTSDALE, ARIZONA 85259.

Joshua Wayne
Special Agent
Internal Revenue Service

Subscribed and sworn to before me
On November 15, 2013:

THE HONORABLE BRIDGET S. BADE
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF ARIZONA

25