# Exhibit B

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

PHILLIP A. KENNER, TRUST          ) NO. CV2012-055576
BENEFICIARY, THE SHANGRI-LA       )
TRUST 1999,                       )
                                  )
          Plaintiff,              )
vs.                               )
                                  )
JOHN KAISER, TRUSTEE, THE         )
SHANGRI-LA TRUST 1999;            )
JOHN KAISER, a married man;       )
ELIZABETH KAISER, a married       )
woman; JOHN AND JANE DOES I-VII,  )
                                  )
          Defendants.             )
JOHN R. KAISER, a married man as  )
his sole and separate property;   )
BRYAN BERARD, an unmarried man,   )
                                  )
          Counterclaimants.       )
vs.                               )
                                  )
PHILIP A. KENNER, a single man,   )
                                  )
          Counterdefendant.       )
TYSON and KATHY NASH, husband     )
and wife; DARRYL SYDOR; JERE      )
LEHTINEN; DIMITRI KHRISTICH;      )
WILLIAM RANFORD,                  )
                                  )
          Interveners.            )

DEPOSITION OF BRYAN BERARD

Phoenix, Arizona
October 9, 2014
8:42 a.m.

Prepared for:              BARTLOWE REPORTING SERVICES
                           357 North Fourth Avenue
                           Suite B
                           Phoenix, Arizona 85003
(COPY)                     (602) 254-9116

BY:  CRYSTAL BARTLOWE, RPR
Arizona Certified Reporter #50198

1       Q.      Would it be fair for anyone who reads this

2   transcript of your deposition to believe that if you

3   answered the question, it's only because you

4   understood the question?

5       A.      Yes.

6       Q.      When did you first meet Phil Kenner?

7       A.      What does that have to do with this case?

8   I don't feel like I have to answer that.

9       Q.      Well, you do, sir.

10      A.      Why?

11      Q.      Because I'm asking it.

12      A.      I don't think -- we're gonna -- do I go

13  ahead?  Compared to the ongoing indictment with Phil

14  Kenner --

15      Q.      When did you first meet Phil Kenner?

16      A.      I don't recall.  I don't recall.

17              MS. LAVONIER:  Mr. Berard's been instructed

18  not to answer that question by the FBI.

19              THE WITNESS:  Correct.

20              MR. BAKER:  The FBI has instructed him not

21  to answer the question when he first met Phil Kenner?

22              MS. LAVONIER:  Yes.

23              THE WITNESS:  I don't recall when I first

24  met Phil Kenner.

25      Q.      BY MR. BAKER:  Have you known him for more

1      Q.     Okay.

2      A.     End of story.

3      Q.     So it was at that point you decided -- you

4  and John Kaiser decided to cut Kenner out?

5      A.     I wasn't cutting -- I don't -- I guess I

6  don't know how to answer that -- understand that

7  question.

8      Q.     Well, here we have a deed -- we have the

9  deed in the trust -- even though I guess you weren't

10  aware of that -- with you and Phil Kenner as the

11  grantors, Kaiser as the trustee and beneficiary.  Now

12  we have this deed signed by the trustee, placing the

13  property in his own name and yours, no reference to

14  Kenner.

15         So I'm saying, was it your and Kaiser's

16  intention to cut Phil out of the deal, take him off

17  the deed of the house at the time you signed

18  Exhibit 11?

19      A.     Yes.

20      Q.     And that was because you believed Phil

21  Kenner had been doing what?

22      A.     I don't understand the question.

23      Q.     Do you believe he had been taking your

24  money, misappropriating your money --

25      A.     Yes.

1      Q.     -- stealing your money?  What do you think

2  he was doing?

3      A.     Yes.

4      Q.     All three?

5      A.     All three.

6      Q.     Did you confront Kenner about those

7  allegations?

8      A.     Yes.

9      Q.     When was that?

10      A.     I don't think this has anything to do with

11  the house, and I've been advised not to ask -- answer

12  these questions.

13      Q.     By whom?

14      A.     By the government.

15      Q.     You mean Matt --

16      A.     By the FBI.

17      Q.     Matt Gigliano (phonetic) or whatever his

18  name is?

19      A.     I don't know.

20             MS. LAVONIER:  The FBI's instructed him not

21  to answer this line of questioning.

22             MR. BAKER:  Not to answer --

23             THE WITNESS:  That's correct.

24      Q.     BY MR. BAKER:  Let me get this clear.

25             Not to answer questions on whether you

1   confronted Kenner about dealings and monies relating

2   to the PV house?

3        A.    I can't --

4              MS. LAVONIER:  It has nothing to do with

5   these Promissory Notes.

6              THE WITNESS:  Correct.  I can answer that.

7        Q.    BY MR. BAKER:  Well, that's the question I

8   asked you.

9        A.    You did not.  That was not the question you

10  asked me.  You asked me if I was -- if I believe that

11  Kenner was stealing my money or all three above.  It

12  had nothing to do with the PV house.

13       Q.    Well, let's leave it to the PV house and

14  related to the PV house.

15             You said you and Kaiser --

16       A.    Rephrase the question.

17       Q.    -- you and Kaiser cut Kenner off, cut him

18  out of the house, using this Joint Tenancy Deed dated

19  March 9th, 2012, correct?

20       A.    Yes.

21       Q.    And at this time, March 2012, did you

22  believe Kenner had been misappropriating or stealing

23  or misusing monies relating to the PV house?

24       A.    Yes.

25       Q.    Why?

1      Q.    Before or after the foreclosure?

2      A.    Before.

3      Q.    Okay.  And what caused you to confront

4  Kenner with your allegations?

5      A.    Again, I'm not gonna answer that.

6      Q.    Why not?

7      A.    Because I've been instructed not to by the

8  FBI.

9      Q.    Relating to this house?

10     A.    The PV house?

11     Q.    Yes.

12     A.    Can you ask the question one more time,

13  please.

14     Q.    You confronted Kenner, prior to the

15  foreclosure proceedings, on misappropriation of monies

16  relating to the PV house?

17     A.    Yes.

18     Q.    All right.  What caused you to do that?

19     A.    Basically I learned that the home was going

20  into foreclosure through Wells Fargo.  Basically

21  Kenner waited about five months to tell me he was

22  behind in payments, and Kenner destroyed my credit.

23     Q.    All right.

24     A.    So your former client.

25     Q.    So at that point you confronted him and

1        A.      I don't recall.

2        Q.      Were you curious, when you saw that, as to

3   what Promissory Note Tyson Nash was referring to?

4        A.      I wasn't.  I don't know.  I don't recall.

5        Q.      You continue to respond:  Johnny been busy

6   with work and me with battle.

7                What's battle?

8        A.      Battle of the Blades.  It's a charity show

9   in Canada.

10       Q.      Okay.  Let's get on the phone this week and

11  I'll explain.  Johnny and I have been carrying the

12  mortgage and maintenance every month so we know we

13  want to sell it ASAP.  But want done right and right

14  price so people get their money back.

15               What did you mean by that?

16       A.      I don't -- I don't -- I don't recall, to be

17  honest with you.

18       Q.      Well, at this point Tyson Nash has referred

19  to his Promissory Note.

20       A.      This was in -- what's the date?  Oh, it's

21  right there.  It's October 11th.

22               So at this time, John and I haven't combed

23  through a lot of -- again, I can't give you much

24  detail because it goes into the investigation with the

25  FBI.  But at this time, you know, I believed that some

1  of Phil's clients would have money in the -- in the PV

2  house.

3       Q.    Which clients?

4       A.    Clients.

5       Q.    Which clients?

6       A.    I don't know.

7       Q.    Well, in October of 2011, you're stating

8  that:  Well, we need to relist it.  We need those

9  other two listings to go away.  The prior realtor was

10 crap.  We need a new one.  Everyone has to be patient

11 so we get the right price and the people get their

12 money back.

13             Is that a fair summary?

14      A.    That's what I wrote.  That's what I wrote,

15 yes.

16      Q.    Referring also as Tyson Nash as one of the

17 individuals to get his money back?

18      A.    Yes.

19      Q.    And that's based upon the Promissory Note?

20      A.    No.

21      Q.    What's it based upon?

22      A.    Mine and Tyson's conversation that he said

23 he put money towards the PV house.

24      Q.    Tyson responds:  Don't speak?  You guys beg

25 me for money to help and then don't pay me according

1  that house 10K a month?  Mortgage is for a million.

2  So we will net about 900K.  So not much money to go

3  around.

4          Why are you even telling him if you have

5  absolutely no intention of including him in everybody

6  gets some money?

7      A.    I wasn't saying Tyson's getting any money.

8  I don't recall.

9      Q.    So why are you even telling him this stuff?

10  It's none of his business then.

11      A.    I probably should have told him it's none

12  of his business.

13      Q.    Why didn't you just tell him:  Look.  You

14  don't have a Promissory Note.  We didn't get the

15  money.  Buzz off?

16      A.    I told you, I wasn't familiar with the

17  Promissory Note.

18      Q.    Tyson responds:  You find any more on

19  Fralies?

20          What does that mean?

21      A.    I'm not gonna discuss here.

22      Q.    What's Fralies?

23      A.    I'm not gonna discuss it here.

24          MS. LAVONIER:  Objection.  He can't answer

25  that question based on the FBI.

1            MR. BAKER:  Are you saying that's a female,

2    Fralies?

3            MS. LAVONIER:  No, I'm saying he can't

4    answer that question.

5            THE WITNESS:  You know what it is, too, so

6    stop being sarcastic.

7            MR. BAKER:  Do you know what it is?

8            (Consultation was had between Mr. Baker and

9    Mr. Harris.)

10            MR. HARRIS:  Say you've been instructed by

11    the FBI.  Are you gonna follow their advice, you know,

12    just to get it down on the record.

13            MR. BAKER:  Oh, we will.  We will.

14        Q.    He says:  That's my main concern.  Seems

15    Divo was fairly satisfied.  Gabo is peanuts compared

16    to that for me.

17            What does that mean?

18        A.    Divo is a player.  And that's Cabo, Mexico.

19            Anything else you need?

20        Q.    Fralies?

21        A.    I'm not telling 'ya.  I was -- I'm

22    instructed by the FBI not to speak.

23        Q.    Who at the FBI?

24        A.    You can find out.

25            MS. LAVONIER:  The FBI has instructed

1  Mr. Berard not to answer that question.

2          MR. BAKER:  The FBI's a big organization.

3          THE WITNESS:  Well, do your homework.

4          MS. LAVONIER:  He's not gonna be answering

5  that question.

6      Q.   BY MR. BAKER:  So you won't give the FBI

7  agent's name; is that correct?

8      A.   Correct.

9          MR. BAKER:  You're instructing him not to

10 answer that question?

11         MS. LAVONIER:  That's correct.

12     Q.   BY MR. BAKER:  You respond:  Yeah.  Come

13 down.  Let me know and I'll head down too.  You will

14 at least be happy to see Diamante is real and going

15 good.

16         That's in reference to the golf course with

17 Jowdy?

18     A.   Yes.

19     Q.   Are you currently employed by Jowdy?

20     A.   I'm employed by Diamante, yes.

21     Q.   What are the terms of your employment?

22         MS. LAVONIER:  Objection.  It's not

23 relevant to this issue today.

24     Q.   BY MR. BAKER:  What are the terms of your

25 employment?

Page 132

1     A.     I'm not gonna answer the question.

2     Q.     Are you not gonna answer it on the advice

3  of counsel?

4     A.     Yes.

5     Q.     Okay.  How long have you worked for Jowdy,

6  or Diamante?

7     A.     I don't know.  I don't recall.

8     Q.     More than a year?

9     A.     Yes.

10     Q.     More than two years?

11     A.     I don't think this is relevant to the --

12            MS. LAVONIER:  This is not relevant.  You

13  don't have to answer these.

14            MR. BAKER:  You're instructing him not to

15  answer?

16            MS. LAVONIER:  That's correct.

17     Q.     BY MR. BAKER:  Does John Kaiser work for

18  Diamante?

19     A.     I'm not gonna answer the question.

20     Q.     Why not?

21     A.     It's not relevant.

22     Q.     That's your sole basis?

23     A.     Yep.

24     Q.     Not relevant?

25     A.     That's correct.

1          The Interveners' funds allegedly sent to

2   Kenner were not used on the real property and did not

3   benefit the Kaiser Respondents.  End of quote.

4          Are you aware that's your position?

5      A.    My position is I will not speak anything

6   about the Global Settlement Fund here today, and I've

7   been instructed by the FBI.

8      Q.    Well, that's in your Settlement -- your

9   Settlement Conference Memorandum prepared by your

10  attorney.  So you're saying you will not discuss what

11  your attorney has put in writing?

12     A.    That's correct.  It has to do with the

13  Global Settlement Fund.  We will not -- I've been

14  instructed by the FBI not to speak about the Global

15  Settlement Fund here today.

16     Q.    Is it your position that Kenner may have

17  provided the Promissory Notes to the Interveners --

18  that's the five Promissory Notes -- to secure the

19  payments made to the Global Settlement Fund?

20     A.    I just said, I'm not gonna respond to

21  anything from the Global Settlement Fund.  I've been

22  instructed by the FBI.

23     Q.    Do you believe the Interveners' funds

24  allegedly sent to Kenner were not used on the real

25  property and did not benefit the Kaiser Respondents?

1          That's you and Kaiser.

2     A.     You can ask that question one more time.

3     Q.     Do you believe that the Interveners' funds,

4  the monies wire transferred in response to the

5  Promissory Notes, sent to Kenner were not used on the

6  real property and did not benefit the Kaiser

7  Respondents?

8     A.     What real property?

9     Q.     The Paradise Valley real property.

10    A.     No.

11    Q.     What do you believe they were used on?

12    A.     Kenner's -- Kenner's other investments or

13 his lifestyle.

14    Q.     Okay.  But nothing to do with the Global

15 Settlement Fund?

16    A.     I'm not gonna answer a question with the

17 Global Settlement Fund.  I've been instructed by the

18 FBI.

19    Q.     The FBI -- do you know if the FBI

20 instructed your attorney not to make it an issue in

21 this case?

22    A.     I do not know.

23    Q.     Let me read you another passage from your

24 Settlement Conference Memorandum.

25          On November 13th, 2013, law enforcement

Page 138

1  officers arrested Kenner on a warrant from the Eastern

2  District of New York in Case Number CR 13-607.

3          Allegations in indictment include a scheme

4  to defraud 16 different people relating to real estate

5  investments.  The indictment states Kenner forged

6  signatures on documents and spent money that was meant

7  to be used for specific projects and investments for

8  himself and his coconspirator.

9          Kenner took advantage of the Interveners by

10  taking their money and providing them with forged

11  Promissory Notes and untrue promises.

12          Kaiser Respondents also had money taken

13  from them by Kenner.  Kaiser Respondents did not act

14  in concert with Kenner.  Kaiser Respondents should not

15  be held accountable for the actions of Kenner.

16          The Interveners' cause of action is against

17  Kenner for taking their money and providing false

18  promises and forged Promissory Notes.

19          Were you aware that that's your position,

20  as drafted by your attorney?

21      A.    Yes.

22      Q.    All right.  So tell me what law enforcement

23  officers arresting Kenner has to do with this case?

24      A.    That has to do with this case?

25      Q.    Yes.

1      A.    I don't know.

2      Q.    Well, it says here you're alleging

3  allegations of fraud, scheme to defraud, forged

4  signatures on documents, and monies spent on things

5  other than what it was to be used for.

6            Is that your position in this case?

7      A.    That's my position.  Phil Kenner is sitting

8  in jail with no bail, so I think a judge in the

9  Eastern District feels pretty -- pretty good about

10  that as well.

11     Q.    All right.  So you're saying that somehow

12  the allegations against him, completely unrelated to

13  the Paradise Valley property, is relevant in this

14  case?

15     A.    I don't understand the question.

16     Q.    Well, is Kenner charged with anything

17  having to do with the Paradise Valley property?

18     A.    No.

19     Q.    All right.  But yet you believe that what

20  he is charged with is relevant to this case?

21     A.    Yes.

22     Q.    All right.  And the FBI, whomever this

23  individual is, has authorized you to discuss this with

24  me?

25     A.    I'm not -- I'm not allowed to discuss the

1   Global Settlement Fund.

2      Q.    Is that the only thing you're not allowed

3   to discuss?

4      A.    No.  Two other things.

5      Q.    What are the other two things?

6      A.    Little Isle IV.

7      Q.    Uh-huh.

8      A.    And Ledbetter, LLC.

9      Q.    Okay.  Are there any allegations to the PV

10  property dealing with Ledbetter, LLC?

11     A.    I'm not gonna answer that question.

12     Q.    All right.  So if I ask you any questions

13  on Ledbetter, LLC -- and I have seen some

14  documentations with that LLC -- you refuse to answer

15  those questions?

16     A.    That's correct.  Instructed by the FBI.

17     Q.    And you've also been instructed by the FBI

18  not to discuss your employment with Diamante in

19  Mexico?

20     A.    I don't think it's relevant to this case.

21     Q.    Okay.  So that objection is on relevancy,

22  not FBI instruction?

23     A.    Instructed -- yeah, from advice from my

24  lawyer, yes.  And it has nothing to do with the

25  Promissory Notes.

1          Are you representing Kenner or are you

2    representing your five clients?

3          Q.    Your objection is strictly relevance,

4    correct?

5          A.    Yes.

6          Q.    So tell me how Kenner took advantage of the

7    Interveners by taking their money and providing them

8    with forged Promissory Notes or untrue promises.

9          A.    I don't understand your question.

10          Q.    Well, you state in your Settlement

11    Conference Memorandum that Kenner took advantage of

12    the Interveners -- my clients -- by taking their money

13    and providing them with forged Promissory Notes or

14    untrue promises.

15          Do you agree with that statement?

16          A.    Yes.

17          Q.    And the forged Promissory Notes are which

18    ones, all of them?

19          A.    I do not know.  I am not a forgery expert.

20          Q.    All right.  Untrue promises, tell me what

21    those are.

22          A.    Untrue promises, I do not know.

23          Q.    All right.  So even though this statement

24    appears in your pleading, you have no information as

25    to the forged notes or the untrue promises?

1      A.      I don't get that question.

2      Q.      Well, again, your statement Kenner took

3  advantage of the Interveners by taking their money and

4  providing them with forged Promissory Notes or untrue

5  promises, I asked you which notes are forged, and you

6  tell me you don't know.  I asked you what are the

7  untrue promises you're referring to, and you tell me

8  you don't know.  Is that correct?

9      A.      I -- I don't understand.

10     Q.      What part of that don't you understand?

11     A.      I don't understand what you're asking me to

12  answer.

13     Q.      What are the untrue promises that Kenner

14  made to the Interveners?

15     A.      I don't know.  I wasn't -- it wasn't

16  promissory -- I wasn't involved in the Promissory Note

17  between Kenner, John, and your five clients.

18     Q.      So as to that statement, you have no idea

19  what the untrue promises are?

20     A.      Yes.

21     Q.      It says that Kaiser Respondents -- that's

22  you and John Kaiser -- also had money taken from them

23  by Kenner.

24             What monies did you have taken by Kenner?

25     A.      I don't think that's relevant to this

Page 143

1  deposition.

2  　　　　Q.　　It's exactly what this deposition is about.

3  　　　　　　MS. LAVONIER:  Objection.  You need to

4  limit that to only the PV house.  The instruction is

5  not to answer the other questions.

6  　　　　　　MR. BAKER:  I'll limit it to the contents

7  of your Settlement Memorandum.

8  　　　　　　THE WITNESS:  We can sit here all day if

9  you keep doing this.  I'm telling you that right now.

10  　　　　Q.　　BY MR. BAKER:  Well, I need to because I'm

11  entitled to.

12  　　　　A.　　Okay.

13  　　　　Q.　　Kaiser Respondents also had money taken

14  from them by Kenner.  Would you tell me what monies?

15  　　　　A.　　I'm not gonna speak about that.

16  　　　　　　MS. LAVONIER:  Anything that's not related

17  to the PV house, he will not be speaking about today.

18  　　　　Q.　　BY MR. BAKER:  And that's on advice of

19  counsel or the FBI?

20  　　　　A.　　Both.

21  　　　　Q.　　Kaiser Respondents did not act in concert

22  with Kenner.  What do you mean by that?

23  　　　　A.　　Can you ask me the question one more time?

24  　　　　Q.　　You state the Kaiser Respondents -- you and

25  John Kaiser -- did not act in concert with Kenner.

1     A.     I don't know what that means.

2     Q.     So we're clear, when you and Kenner

3  originally purchased this house, you intended to

4  partnership with Kenner, correct?

5     A.     Kenner was -- Kenner was basically on the

6  ground here in Arizona, so at that time Kenner asked

7  me to get involved in the house financially and I did

8  that.  Kenner was basically our on-ground here guy in

9  Phoenix.  I didn't know if he had money involved in

10  the house.  I just knew that I was basically -- the

11  name was going on -- the mortgage was going under my

12  name, and I knew that I would invest some money into

13  the property, and Phil Kenner was my business manager

14  and that's who I trusted at the time.

15     Q.     All right.  So your intent was to let him

16  handle the whole project and you just wanted to

17  benefit financially at the end?

18     A.     Yes.

19     Q.     The $50,000 you wire transferred to him in

20  2009, do you know what those funds were for?

21     A.     I don't recall.  I knew they were for the

22  PV home, but I don't know what, that I recall, for the

23  PV home.

24     Q.     Were the renovations occurring at that

25  time?

Page 152

1       A.    It looks like -- I do not know.  I can't

2   answer that.

3       Q.    Because he has not provided to us any

4   evidence of giving Phil Kenner $1.6 million.  Did you

5   ever discuss that with him?

6       A.    Yes.

7       Q.    And he stands by that story?

8       A.    Yes.

9       Q.    Does John Kaiser have a construction

10  company, Kaiser Construction?

11      A.    I do not know.  I don't recall.

12      Q.    Tell me why you believe each of my clients

13  is not entitled to monies that are being held in

14  escrow right now?

15      A.    Phil Kenner misused their funds.

16      Q.    Is that it?

17      A.    That's it.

18      Q.    No other reason?

19      A.    Phil Kenner misused their funds.

20      Q.    Okay.  Did you contribute to the Global

21  Settlement Fund?

22      A.    I'm not gonna answer a question to the

23  Global Settlement Fund.  I've been advised by the FBI.

24      Q.    Did John Kaiser contribute to the Global

25  Settlement Fund?

1      A.      Again, I'm not gonna answer that question.

2   I've been advised by the FBI.

3      Q.      Did you tell the, quote, FBI that the

4   Global Settlement Funds was somehow being used by you

5   as a defense in this lawsuit?

6      A.      I am not gonna answer a question about the

7   dealings in the Global Settlement.  I've been advised

8   by the FBI.

9      Q.      Have you read Tyson Nash's and William

10  Ranford's deposition transcripts?

11     A.      No.

12     Q.      Are you aware that your attorney spent

13  maybe 30 percent of the depositions on the Global

14  Settlement Fund?

15     A.      No.

16             MR. BAKER:  Okay.  We'll take a short

17  break.  We're about done.

18             (A recess was taken from 12:05 p.m. to

19  12:10 p.m.)

20     Q.      BY MR. BAKER:  Okay.  Mr. Berard, you have

21  refused to answer a number of questions today, stating

22  that the FBI told you not to answer these questions.

23             I just need to make it clear.  Are you

24  gonna follow the advice of the FBI and not answer the

25  questions that you've previously refused to answer?

Page 154

1      A.    Yes.

2      Q.    How would you describe the relationship

3 between Ken Jowdy and Phil Kenner?

4           MS. LAVONIER:  Objection.  This isn't

5 relevant to today.

6      Q.    BY MR. BAKER:  You can answer.

7      A.    I'm not gonna answer the question on the

8 advice of my counsel.

9      Q.    So you're not gonna advise on -- you're not

10 gonna answer on the advice of counsel based on

11 relevancy?

12     A.    Correct.

13     Q.    Ken Jowdy was the one who sued you in

14 California, correct?

15     A.    I believe so.

16     Q.    And Ken Jowdy is Diamante in Mexico; is

17 that fair to say?

18     A.    Is he?

19     Q.    Yes.

20     A.    No.

21     Q.    Is he the primary stakeholder?

22     A.    He's the founder.

23     Q.    Okay.  And as to how long you've worked

24 there, your relationship with Ken Jowdy, you won't

25 answer any of those questions?

Page 155

1      A.    No.  It has nothing to do with this case.

2      Q.    That's your only objection?

3      A.    Yes.

4            MR. BAKER:  All right.  All right.  That's

5  all I have.

6            MS. LAVONIER:  Did you bring that

7  Settlement Conference Memorandum?

8            MR. BAKER:  I told you I'd get it to you.

9            THE COURT REPORTER:  Do you want me to stay

10  on?

11            MR. BAKER:  No.  We're done.

12            (Discussion off the record.)

13            MS. LAVONIER:  We will review.

14            (Whereupon the deposition proceedings

15  concluded at 12:11 p.m.)

16

17

18

19

20

21

22

23

24

25