# Exhibit C

EFiled: Dec 05 2014 05:39PM EST
Transaction ID 56430565
Case No. 9782-ML

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

GREG de VRIES, an individual, and )
RAYMOND MURRAY, )
an individual )
                          )
        Plaintiffs, )
                          )
v.                         )       C.A. No. 9782-ML
                          )
DIAMANTE DEL MAR, L.L.C. )
                          )
        Defendant. )

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND CHALLENGING DEFENDANT'S PRIVILEGE LOG

Stamatios Stamoulis #4606
    stamoulis@swdelaw.com
Richard C. Weinblatt #5080
    weinblatt@swdelaw.com
Two Fox Point Centre
6 Denny Road Suite 307
Wilmington, DE 19809
Telephone: (302) 999-1540

Steven R. Main *Admitted pro hac vice*
Florida Bar #0144551
    smain@hrkmlaw.com
Christopher T. Hill *Admitted pro hac vice*
Florida Bar #0868371
    chill@hrkmlaw.com

Hill, Rugh, Keller & Main, P.L.
390 North Orange Avenue, Suite 1610
Orlando, Florida 32801
Telephone: (407) 926-7460
*Attorneys for Plaintiffs*

Dated: December 5, 2014

# TABLE OF CONTENTS

TABLE OF CITATIONS .................................................................................. ii

I.      Introduction & Background ........................................................... 1

II.     Defendant's Privilege Log ............................................................. 6

III.    The Chronology of the KSI Capital Loan & Significant Events............... 8

IV.     Memorandum of Law ................................................................. 13

V.      Conclusion .............................................................................. 20

i

# **TABLE OF CITATIONS**

## **CASES**

*First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 (Del. 1997).........17

*Garner v. Wolfinbarger*, 430 F.2d 1093, 1103-04 (5th Cir. 1970)............. 13, 14, 15

*Grimes v. DSC Communications Corp.*, 724 A.2d 561 (Del. Ch. 1998).................14

*Khanna v. Covad Communications Group, Inc.*, 2004 Del. Ch. LEXIS 11, 2004
    WL 187274, at *7 (Del. Ch. Jan. 23, 2004).....................................................14

*PharmAthene, Inc. v. SIGA Tech., Inc.*, 2009 Del.Ch. LEXIS 117, 2009 WL
    2031793 (Del. Ch. 2009) ..............................................................................20

*Saito v. McKesson HBOC, Inc.*, 2002 Del. Ch. LEXIS 125,
    2002 WL 31657622, at *12-13 (Del. Ch. Nov. 13, 2002)...................... 14, 15

*Sanders v. Ohmite Holdings, L.L.C.*, 17 A.3d 1186, 1193 (Del. Ch. 2011)............17

*Sealy Mattress Co. of N.J., Inc. v. Sealy Inc.*, 1987 Del.
    Ch. LEXIS 451, (Del.Ch. 1987) ..................................................................17

*Somerville S Trust v. USV P'rs, LLC*, 2002 Del. Ch. LEXIS 103, 2002 WL
    1832830, at *3, *5 n.7 (Del. Ch. 2002) ........................................................16

*Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*,
    95 A.3d 1264 (July 23, 2014) ......................................................................14

Plaintiffs, GREG deVRIES and RAYMOND MURRAY, pursuant to Chancery Court Rule 37(a)(2), hereby file this Memorandum of Law challenging Defendant's Privilege Log, dated November 17, 2013, and respectfully request this Court to enter an Order which compels Defendant, DIAMANTE DEL MAR, L.L.C., to produce a complete and unaltered set of all documents that are identified in the Privilege Log attached hereto as Exhibit "A", including a "clean", unredacted set of certain e-mail communications that were previously provided to Plaintiffs, but were heavily redacted based on an asserted attorney-client privilege. In further support of this Motion, Plaintiffs state as follows:

## I.     Introduction & Background

1.     The instant action involves Plaintiffs' demand to inspect the "books and records" of a Delaware limited liability company registered as Diamante Del Mar, L.L.C. ("DDM").[1]  As more fully described in the Verified Complaint, DDM was established for the purpose of acquiring (through its wholly-owned Mexican

---

[1] It should be noted that a similar "books and records" action is likewise before this Court in the companion case styled *Baja Ventures 2006, L.L.C. et al. v. Diamante Cabo San Lucas, L.L.C.*, Case No. 9782-ML, also filed in the Court of Chancery of the State of Delaware ("the DCSL action").  Both of these cases involve requests records made by or on behalf of a number of professional hockey players regarding the significant investments they have made in two separate real estate developments located in Baja, Mexico.  Both of these projects have been managed by the developer, Kenneth Jowdy; and, despite their significant capital investments, many of the hockey players maintain that Mr. Jowdy has failed to keep them apprised of the ongoing activities of either Diamanté entity.

1

subsidiary) all rights in or to approximately 10,000 acres of oceanfront real estate located in Baja California, Mexico.

2.     At the time Plaintiffs made their respective investments in the company, DDM had, in fact,  already acquired "legal, insurable title to the first three parcels of the Property, containing approximately 8,000 acres" of oceanfront property, including roughly three miles of "spectacular rugged Pacific coastline". *See* Verified Complaint, at paragraph 6, and DDM's 'Executive Summary & Appraisal', attached as Complaint Exhibit "B".[2]  According to the promotional materials disseminated by DDM, this "spectacular" oceanfront property was independently appraised as having a market value of $68,900,000 and, at the time Plaintiffs made their investments, DDM (or its subsidiary) owned this approximate 8,000 acre tract of land "free and clear" of any liens or encumbrances. *Id.*

3.     It is undisputed that Plaintiffs are both Class A Members of DDM and, as such, it has already been acknowledged and agreed that Plaintiffs "shall have access to DDM's books and records in accordance with certain terms set forth in the operating agreement." *See* DDM's Answer, at paragraph 11.[3]

---

[2] The remaining approximate 2,000 acres were held by DDM and its Mexican subsidiary as a leasehold interest. *See* Complaint Exhibit "B".

[3] Indeed, shortly after filing its Answer and Affirmative Defenses, DDM advised through its counsel that it was "planning to produce documents". *See* e-mail communication from attorney James McMillan, dated July 29, 2014, attached

4.      Up until the filing of the instant action, however, Plaintiffs had received very little (if any) meaningful information from DDM's Managing Member regarding the company's activities and operations for the past several years.   For example, while the company's Operating Agreement obligates the Managing Member to provide DDM's Class A Members with quarterly business reports, annual tax returns and annual financial statements, <u>none</u> of these documents were provided to Plaintiffs (or any other Class A Member) since at least 2010.  *See* DDM's Operating Agreement attached hereto as Exhibit "C", at Section 502.  In fact, as it relates to the aforementioned quarterly business reports, it does not appear that these periodic status reports were even prepared by DDM's Managing Member.   *See* e-mail communication from DDM's counsel, dated November 4, 2014 and attached hereto as Exhibit "D", confirming that the quarterly business reports do not appear to exist.

5.      Accordingly, Plaintiffs have essentially been kept in the dark regarding DDM's ongoing activities or operations for more than four (4) years.  In fact, in the absence of any periodic reports or other status updates since at least 2010, it was not until ***after*** Plaintiffs filed the instant lawsuit that they unfortunately learned for the very first time that their entire $1,000,000 investment

---

hereto as Exhibit "B".  Accordingly, based on its pleading and the representations of its counsel, it does not appear that DDM is contesting that Plaintiffs have a contractual and statutory right to inspect its books and records.

into the company was gone – completely lost as the end-result of a series of surreptitious transactions entered into by DDM's principal manager, Kenneth Jowdy[4] ("JOWDY"), without any notice to Plaintiffs or the company's other investors.

6.      Specifically, upon finally being provided with some of the company's books and records in connection with this lawsuit, Plaintiffs discovered that in or around September of last year the aforementioned 8,000 acres of "spectacular" oceanfront property, once owned "free and clear" by DDM and independently appraised at $68,900,000, had been fully surrendered to a lender called KSI Capital Corporation in connection with DDM's apparent default on $3,000,000 loan.  *See* Form 4797, filed as part of DDM's 2013 corporate tax return and attached hereto as Exhibit "E", reflecting that the property was "sold" on or about September 16, 2013.

7.      Plaintiffs were obviously shocked by the recent revelation that their significant investments, as well as the investments made by the company's other twelve (12) Class A Members,[5] had been lost in their entirety over such a

---

[4] In its Answer to the Verified Complaint, DDM admitted that its Managing Member is another limited liability company registered as Baja Management, L.L.C. and, in turn, further admitted that Kenneth Jowdy is the President and sole Managing Member of Baja Management.  *See* DDM's Answer, at paragraph 5.

[5] To the extent each of the fourteen (14) Class A Members invested $500,000 into DDM, the total combined losses for these investors is in excess of $7,000,000.

4

comparatively small lien and without any prior notice from JOWDY that their investment was even at risk of being surrendered.   In fact, Plaintiffs also independently discovered that DDM recently filed paperwork with the Delaware Secretary of State, on or about June 27, 2014, cancelling its status as an active limited liability company.[6]   *See* 'Entity Details' for DDM, as reflected on https://delecorp.delaware.gov, attached hereto as Exhibit "F".

8.    Ultimately, therefore, JOWDY's management of DDM over the course of the last several years has resulted in the following:   i) encumbering DDM's only asset, the 8,000 acres of real estate that was once owned free and clear; ii) completely surrendering the property over the aforementioned lien held by KSI Capital that represented less than 5% of the property's previously appraised value; and, ultimately; iii) dissolving the company, all without notifying any of DDM's Class A Members or providing them with the status reports called for under the company's Operating Agreement.

9.    All of these events have left Plaintiffs with serious and legitimate concerns regarding JOWDY's management of DDM and whether he breached the fiduciary duties he owes to its Class A Members, especially as it relates to the $3

---

[6] It is interesting to note that this cancellation paperwork was apparently filed by DDM just a few days after being served with Plaintiffs' Verified Complaint and Summons.

5

million loan obtained from KSI Capital and the subsequent events relating to that loan which ultimately led to DDM surrendering the property.

10.     As expressly set forth within the company's Operating Agreement, DDM's Managing Member "shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the Class A Members, including the safekeeping and use of all Company funds and assets." *See* Exhibit "C", at Section 601.

11.     Plaintiffs reasonably believe that JOWDY mismanaged the company and did not conduct DDM's affairs in the best interests of its Class A Members. Accordingly, they have demanded additional information and documents which specifically reference or relate to:   i) the circumstances surrounding the loan obtained from KSI Capital, ii) the subsequent lawsuit filed by KSI Capital after DDM defaulted on the loan; iii) JOWDY's settlement of this lawsuit and the terms of such settlement, and; iv) the events that transpired after the lawsuit was settled.

## II.   Defendant's Privilege Log

12.     In response to Plaintiffs' demand for books and records, DDM has produced some limited documents[7] -- which, again, enabled Plaintiffs to discover

---

[7] Following its Answer to the Complaint, DDM has been engaged in a "rolling", ongoing production of documents responsive to Plaintiffs' request for books and records, and has produced responsive documents on each of the following dates: i) September 2, 2014 (138 pages); ii) September 16, 2014 (26 pages);  iii) September

for the first time that JOWDY relinquished DDM's only asset in or around September of last year – but DDM has also withheld a number of other documents on the basis of an asserted attorney-client privilege.

13.    DDM served a corresponding Privilege Log on November 17, 2014 and has identified ninety-five (95) discrete items of "confidential e-mail communications" which in some way relate to the aforementioned series of events or transactions involving KSI Capital.[8]  A copy of this Privilege Log is attached hereto as Exhibit "A".

14.    Of the ninety-five (95) discrete items identified in Defendant's Privilege Log, it appears that forty-one (41) of those "confidential e-mail communications" were withheld in their entirety, and the remaining fifty-four (54) items were produced only after Defendant had made certain redactions.[9]  A set of the redacted e-mail communications produced by Defendant is attached hereto as Composite Exhibit "G".

---

24, 2014 (239 pages); iv) October 17, 2014 (689 pages), and; v) November 6, 2014 (8 pages).

[8] To be precise, of the ninety-five (95) discrete items, 92 of those items are identified as "confidential e-mail communications" and the remaining three (3) are drafts of letters of intent or other legal documents prepared by DDM's General Counsel/Vice President, William Najam.

[9] The items identified as P1 through P41 have not been produced at all, and the item identified with a bates-stamp number beginning with "DDM" were redacted, and then produced.

7

15.     Defendant's Privilege Log also identifies the various individuals between whom the "confidential e-mail communications" were exchanged.   In addition to JOWDY, the Privilege Log lists JOWDY's brother-in-law, William Najam, who is identified as DDM's General Counsel but also served as an officer of the now defunct company – namely its Vice-President.   *See* correspondence from Mr. Najam, dated June 10, 2014, attached hereto as Exhibit "H".   The Privilege Log further identifies Eric Fish, who represented DDM in the federal lawsuit filed by KSI Capital, as well as Fernando Garcia, a Mexican attorney who apparently handled all of DDM's legal affairs south of the border including JOWDY's dealing with KSI Capital.   Thomas Harvey and Laurence Markowitz are the two remaining attorneys identified in Defendant's Privilege Log, both of whom have provided general counsel to DDM and JOWDY on a variety of matters.

## III.   The Chronology of the KSI Capital Loan & Significant Events

16.     In support of their position that Defendant's reliance upon the attorney-client privilege should be overruled, so that Plaintiffs can obtain documents to further investigate their legitimate and good-faith concerns that JOWDY mismanaged the company and breached the fiduciary duties he owed to DDM's Class A Members, Plaintiffs offer the following chronology as it relates to the $3 million loan obtained from KSI Capital and a few of the significant events that followed:

8

| **Date** | **Event** |
|---|---|

**02/21/2006** - DDM entered into a 'Loan and Security Agreement' with KSI Capital Corp., a copy of which is attached hereto as Exhibit "I". KSI Capital extended a loan in the amount of $3 million; and, in turn, DDM provided a security interest in the 8,000 acres of real estate which, prior to the Agreement, was owned free and clear of any liens or encumbrances whatsoever. *See* Exhibit "I", at paragraph 6(i). JOWDY also executed a Personal Guaranty in conjunction with this Loan and Security Agreement, in which he individually and unconditionally guaranteed re-payment of the loan. *See* Exhibit "I", at paragraphs 1(o) and 6(b)&(c).

As part of the loan agreement, DDM expressly represented that "the proceeds from the Loan shall be used to assist [DDM] in developing the Real Property Collateral and making additional improvements to and upon the Usufruct Property…" and further agreed that the loan proceeds "will not be paid over or diverted by [DDM] to any member, manager, officer, director, mortgagee, shareholder of [DDM], any Guarantors or any other person". See Exhibit "I", at paragraphs 6(f) and 6(n).

At no time before DDM entered into the 'Loan and Security Agreement' did JOWDY notify or otherwise inform Plaintiffs that he intended to encumber the property with a $3 million mortgage/lien. Moreover, JOWDY also failed to provide Plaintiffs with a precise accounting as to where and how those loan proceeds were spent; however, based on the limited information that has been obtained, Plaintiffs reasonably believe that the proceeds were <u>not</u> used to develop or make additional improvement on the real property, as called for under the loan agreement, and may have been diverted to other third-parties or entities controlled by JOWDY.

9

01/05/2010  -  KSI Capital filed a six-count Complaint against DDM, JOWDY and the Mexican subsidiaries in the United States District Court, District of New Jersey.  A copy of this pleading is attached hereto as Exhibit "J".   The Complaint alleges that DDM defaulted on the $3 million loan, and included claims for breach of contract, default and unjust enrichment.   The Complaint also included claims against JOWDY, individually, based on his alleged default of the Personal Guaranty which provided an "unconditional guaranty of the full and prompt payment of [DDM's] indebtedness under the Note, and Jowdy personal obligates himself as a principal debtor." *See* Exhibit "J", at paragraph 54.

Again, JOWDY failed to notify or otherwise inform the Class A Members that KSI Capital had filed a lawsuit against himself and DDM, seeking actual and compensatory damages, as well as consequential and punitive damages in excess of $3,000,000.

11/15/2010  -  The lawsuit filed by KSI Capital was settled.  A copy of the parties' Settlement Agreement is attached hereto as Exhibit "K".   KSI Capital agreed that it would dismiss its pending action, without prejudice; and, in exchange, DDM, the Mexican subsidiaries and JOWDY, **in his individual capacity**, all agreed to execute Confessions of Judgment in favor of KSI Capital, in the amount of $3,929,502.26.  As reflected in the settlement agreement, KSI Capital promised that it would hold the aforementioned Confessions of Judgment in escrow until April 1, 2011, at which time KSI Capital would have the sole discretion to file the judgments and pursue enforcement.  A copy of the Confession of Judgment executed by JOWDY in his individual capacity, dated November 24, 2010, is attached hereto as Exhibit "L".

Again, not only did JOWDY fail to notify or otherwise inform DDM's Class A Members that a lawsuit was filed by KSI Capital, he likewise failed to notify or inform them that this litigation was subsequently settled and

10

failed to disclose the terms of the settlement. In fact, it was not until after the instant action was filed that Plaintiffs finally obtained a copy of the aforementioned Settlement Agreement, on or about September 24, 2014 – almost four years after the agreement was executed.

06/29/2012 -   Because of JOWDY's failure to provide periodic status reports, Plaintiffs are largely unaware at this time of what significant events (if any) transpired in the months following the execution of the Settlement Agreement with KSI Capital. However, based on documents provided to Plaintiffs after the instant action was filed, it appears that DDM and JOWDY entered into an additional or supplemental agreement with KSI Capital on or about June 29, 2012. A copy of the Letter Agreement executed by JOWDY, as the Managing Member of DDM, is attached hereto as Exhibit "M".

Based on this Letter Agreement, it appears that, in lieu of KSI Capital executing on the Confessions of Judgment that were signed in conjunction with the Settlement Agreement entered into in November of 2010, DDM and JOWDY subsequently and alternatively agreed that they would execute all necessary "transfer documents" in order to facilitate the transfer of the 8,000 acres of Mexican real estate (previously appraised at $68,900,000) to KSI Capital's Mexican affiliate. *See* Exhibit "M", at Section (a). It was further agreed that these transfer documents would be held in escrow and not recorded in the Public Registry for a period of time, to allow DDM and JOWDY an opportunity to either satisfy the $3.5 million debt or "attempt to sell said properties to a third-party". *See* Exhibit "M", at Sections (e) and (f).

Once again, JOWDY inexplicably failed to notify or otherwise inform the Class A Members of this June, 2012 Letter Agreement with KSI Capital, and failed to report that he had executed certain transfer documents that would result in the full surrendering of the 8,000 acres of

11

"spectacular" oceanfront property unless certain conditions were met.

09/16/2013 -   It is likewise unknown to Plaintiffs at this time what events may have transpired between June of 2012 and September of 2013, or what efforts DDM and JOWDY took during this timeframe to sell the property, refinance the KSI Capital debt, or otherwise satisfy the conditions set forth in the June, 2012 Letter Agreement; but, based on the Form 4797 Schedule filed as part of DDM's 2013 tax return, it appears that DDM officially surrendered the property to KSI Capital on or about September 16, 2013. *See* Exhibit "E" attached hereto.

It was not until after this books and records action was filed that Plaintiffs had any idea that subject property had been surrendered.

17.    Based on the foregoing, Plaintiffs have good-faith and legitimate concerns that JOWDY breached his fiduciary duties and failed to conduct the affairs of DDM "in the best interests of the Company and of the Class A Members". *See* Exhibit "C", at Section 601.  As noted above, Plaintiffs were kept in the dark for almost five (5) years.  Now, in order to further investigate these concerns, Plaintiffs have demanded additional documents which reflect or relate to DDM and JOWDY's dealings relating to the $3 million loan obtained from KSI Capital, and the events that transpired following the settlement of the KSI Capital lawsuit.

18.    Part of DDM's response to Plaintiffs' request for records includes an extensive Privilege Log, which contains almost one hundred discrete items of

12

"confidential e-mail communications" that are responsive to Plaintiffs' records request. *See* Exhibit "A". DDM asserts that these documents are protected from disclosure pursuant to the attorney-client privilege. However, Plaintiffs respectfully submit that, in accordance with the *Garner* doctrine, there is a "fiduciary exception" to the documents that DDM is currently withholding and, upon a showing of good cause, Plaintiffs should be entitled to invade the asserted attorney-client privilege in order to investigate and prove whether JOWDY breached the fiduciary duties he owed to DDM's Class A Members.

### IV.    Memorandum of Law

In the seminal case of *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103-04 (5th Cir. 1970), the Fifth Circuit Court of Appeals was, perhaps, the first appellate court to recognize a "fiduciary exception" to the attorney-client privilege in a shareholder derivative action when it held:

> The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. *But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.* (emphasis added).

Essentially, the *Garner* doctrine authorizes a stockholder of a corporation to invade the corporation's attorney-client privilege in order to prove fiduciary breaches by those in control of the corporation upon a showing of good cause.

Although the *Garner* doctrine was first established in a plenary shareholder derivative lawsuit, the Supreme Court of Delaware has recently held that the doctrine is also applicable in a Section 220 "books and records" action. *See Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264 (July 23, 2014); *see also* Grimes v. DSC Communications Corp., 724 A.2d 561 (Del. Ch. 1998) (the Court of Chancery relied on the *Garner* doctrine to compel the production of documents in a Section 220 action); *Khanna v. Covad Communications Group, Inc.*, 2004 Del. Ch. LEXIS 11, 2004 WL 187274, at *7 (Del. Ch. Jan. 23, 2004) (discussing *Garner* and *Grimes* for the various factors to consider under the court's "good cause" analysis in a Section 220 action); *Saito v. McKesson HBOC, Inc.*, 2002 Del. Ch. LEXIS 125, 2002 WL 31657622, at *12-13 (Del. Ch. Nov. 13, 2002) (applying the *Garner* factors for "good cause" in a Section 220 books and records proceeding).

In a books and records action, however, the framework for resolving a challenge to a company's reliance on the attorney-client privilege is two-fold. First, the court must address the predicate issue of whether the documents that are sought to be inspected are essential to the plaintiff's stated purpose. If this

14

threshold matter is established, the plaintiff must then demonstrate or show "good cause" as to why the attorney-client privilege should not apply. *See Grimes, supra,* at 567-69 (making the "scope" determination, then stating that "[t]he remaining issue is whether the plaintiff is entitled to production of the documents that the defendant asserts are privileged.").

In determining whether the plaintiff has sufficiently met his "good cause" burden to overcome the asserted privilege, the *Garner* court listed several, non-exclusive factors that should be considered, including the following:

i) the number of shareholders and the percentage of stock they represent;

ii) the nature of the shareholders' claim and whether it is obviously colorable;

iii) the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources;

iv) whether, if the shareholders' claim is of wrongful action by the corporation, it is of a criminal nature, or illegal but not criminal, or of doubtful legality;

v) whether the communication is of advice concerning the litigation itself;

vi) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing, and;

vii) the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

15

*Garner*, at 1104; *see also Saito v. McKesson HBOC, Inc.*, 2002 Del.Ch. LEXIS 125 (2002) (also noting that, of the aforementioned factors, the least weight should be placed on (i) and further stating that "[o]nly if no other factor supports good cause will the ownership factor come into play").

With respect to the instant Motion, it is abundantly clear that Plaintiffs' request for documents satisfies both prongs of the two-part analytical framework. First, as part of both their pre-suit written request to DDM as well as the allegations of their Verified Complaint, Plaintiffs advised DDM (and JOWDY) that their demand to inspect the company's books and records was being made so that they could "further investigate whether there has been any mismanagement of DDM, especially as it relates to the $3,000,000 loan received from KSI Capital and the subsequent KSI Lawsuit." *See* Verified Complaint, at paragraph 25 and Complaint Exhibit "I". Moreover, DDM's Answer to the Verified Complaint is devoid of any affirmative defense that challenges or disputes the fact that Plaintiffs have indeed stated a valid and proper purpose.

Indeed, the Court of Chancery has frequently and repeatedly held that a Member's desire to review a company's books and records in order to investigate and evaluate the actions and performance of the company's managers is a valid and legitimate reason for requesting such information, and one that has a "reasonably related purpose to the member's interest as a member of the LLC". *See e.g* 6 Del.

16

C. § 18-305(a)(1); *Somerville S Trust v. USV P'rs, LLC*, 2002 Del. Ch. LEXIS 103, 2002 WL 1832830, at *3, *5 n.7 (Del. Ch. 2002) (holding that "investigat[ing] allegations of wrongdoing and mismanagement" was a proper purpose under Section 18-305); <u>accord</u> *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 (Del. 1997) (same, in corporate context); *Sanders v. Ohmite Holdings, L.L.C.*, 17 A.3d 1186, 1193 (Del. Ch. 2011) (holding that the plaintiff's stated purpose which included "evaluating the performance of Ohmite's management" was a proper one).

Having satisfied the first prong of the analytical framework, therefore, it is equally clear that Plaintiffs have also demonstrated "good cause" under the *Garner* factors, in support of their demand to obtain complete, unredacted copies of the documents that are currently being withheld by DDM based on the attorney-client privilege. <u>See</u> *Sealy Mattress Co. of N.J., Inc. v. Sealy Inc.*, 1987 Del. Ch. LEXIS 451, (Del.Ch. 1987) (noting the three factors of paramount importance to consider when determining whether the requisite good cause is present to preclude invocation of the privilege are: (i) whether claim is colorable; (ii) necessity or desirability of information and its availability from other sources; and (iii) extent to which information sought is identified as opposed to a blind fishing expedition).

First, based on the facts and events set forth in Sections I and III above, Plaintiffs initially note that they are two of only fourteen (14) Class A Members of

17

this closely-held company, and eleven (11) of the other twelve (12) Class A Members are investor/owners similar to Plaintiffs – i.e. former professional hockey players who each invested $500,000 for their respective membership interest.

Second, Plaintiffs have clearly stated a "colorable claim" regarding their concern that JOWDY mismanagement the company and failed to protect their interests in connection with the $3 million loan obtained from KSI Capital.  Aside from the fact that JOWDY breached the Operating Agreement by failing to send quarterly business reports which, presumably, would have (or should have) mentioned or identified DDM's ongoing dealings with KSI Capital, the following facts are undisputed:

    i)    At the time Plaintiffs invested into DDM, the 8,000 acres of real estate was owned free and clear of any liens or encumbrances;

    ii)    Based on promotional materials distributed by DDM and JOWDY, this property was independently appraised as having a market value $68,900,000;

    iii)    JOWDY encumbered the property in February of 2006 by obtaining a $3 million loan from KSI Capital, for the stated reason of developing and making additional improvements on the property;

    iv)    DDM defaulted on this loan and, as part of the settlement of the subsequent lawsuit filed by KSI Capital, JOWDY executed several Confessions of Judgment, including a $3.9 million Confession of Judgment against him, in his individual capacity;

18

v)    KSI Capital never executed on these Confessions of Judgment; and, instead, JOWDY entered into a subsequent Letter Agreement in June of 2012, under which he executed certain "transfer documents" that would transfer ownership of the subject property to KSI Capital's affiliate if certain conditions were not met;

vi)   Without any notice to Plaintiffs or the other Class A Members, JOWDY surrendered the property – previously appraised at $68,900,000 – to KSI Capital and its affiliate in September of 2013 over a $3 million debt.

Based on these facts, Plaintiffs have presented at least a colorable claim that JOWDY breached his fiduciary duties and failed to protect the interests of DDM's Class A Members.

Plaintiffs have demanded that DDM produce documents that would provide additional insight into why and how the foregoing events occurred, and the "confidential e-mail communications" that he either sent or received and which are currently being withheld by DDM obviously represent the <u>only</u> written source that might further explain JOWDY's actions and decisions regarding DDM's ongoing dealings with KSI Capital.

Additionally, it should be evident that Plaintiffs are not engaged in any blind, fishing expedition. Indeed, the scope of their request is narrow (i.e. communications which reference or relate to the KSI Capital loan and subsequent

lawsuit), and the universe of documents has been expressly defined (i.e. those documents identified in Defendant's Privilege Log).

Lastly, the information that Plaintiffs have demanded does not involve the risk of revelation of trade secrets or other information in whose confidentiality DDM has an interest for independent reasons. In fact, as noted above, DDM does not even appear to be an ongoing entity any longer, having filed its cancellation paperwork with the Delaware Secretary of State.

### V.    Conclusion

Based on the foregoing, Plaintiffs have satisfied the two-prong analytical framework that is applicable to resolving this challenge to DDM's reliance on the attorney-client privilege. Specifically, they have clearly stated a valid and proper purpose to support their demand for the "confidential e-mail communication" that DDM is currently withholding, and they have demonstrated sufficient "good cause" under the *Garner* doctrine to preclude or overcome DDM's reliance on the attorney-client privilege. Accordingly, Plaintiffs respectfully request this Court to enter an Order which compels DDM to produce all of the documents identified in the Privilege Log attached hereto as Exhibit "A".[10]

---

[10] If the Court deems it appropriate or necessary, Plaintiffs would additionally or alternatively request that the Court order and undertake an *in camera* review of the documents identified in DDM's Privilege Log, to better evaluate whether the asserted privilege is applicable under the circumstances discussed herein. It is

20

WHEREFORE, Plaintiffs, GREG deVRIES and RAYMOND MURRAY, respectfully request this Court to enter an Order which overrules the asserted attorney-client privilege raised in the Privilege Log served by Defendant, DIAMANTE DEL MAR, L.L.C., based on the *Garner* doctrine, and Plaintiffs further request and Order which compels Defendant to produce those documents identified in its Privilege Log, including without limitation, a "clean", unredacted set of those e-mail communications previously provided, and to award any further or alternative relief that this Court deems fair and equitable under the circumstances.

Dated:  December 5, 2014

STAMOULIS & WEINBLATT LLC

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis #4606
    stamoulis@swdelaw.com
Richard C. Weinblatt #5080
    weinblatt@swdelaw.com
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
Telephone:  (302) 999-1540

*Attorneys for Plaintiffs*

---

well-established that, in a dispute over the contents of the demanded materials, an *in camera* inspection by the trial court may be appropriate to reach a decision. *See e.g., Re: PharmAthene, Inc. v. SIGA Tech., Inc.*, 2009 Del.Ch. LEXIS 117, 2009 WL 2031793 (Del. Ch. 2009) (discussing in camera review of documents claimed as privileged during discovery).

21

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| BAJA VENTURES 2006, L.L.C., and | ) | |
| CSL PROPERTIES 2006, L.L.C. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No.: 9752-ML |
| | ) | |
| DIAMANTÉ CABO SAN LUCAS, L.L.C. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' VERIFIED COMPLAINT**
**FOR INSPECTION OF BOOKS AND RECORDS**

Plaintiffs, BAJA VENTURES 2006, L.L.C., a Delaware limited liability company and CSL PROPERTIES 2006, L.L.C., a Delaware limited liability company, hereby file this Verified Complaint for the Inspection of Books and Records against Defendant, DIAMANTÉ CABO SAN LUCAS, L.L.C., a Delaware limited liability company, and further allege as follows:

**THE PARTIES**

1.      Plaintiff, BAJA VENTURES 2006, L.L.C. ("Baja Ventures"), is a limited liability company organized under the laws of the state of Delaware and having listed its principal place of business as 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

2.      Plaintiff, CSL PROPERTIES 2006, L.L.C. ("CSL Properties"), is a limited liability company organized under the laws of the state of Delaware and having listed its principal place of business as 10705 East Cactus Road, Scottsdale, Arizona 85259.

3.      Defendant, DIAMANTÉ CABO SAN LUCAS, L.L.C. ("DCSL"), is a closely-held limited liability company organized under the laws of the state of Delaware and having

listed its principal place of business in the United States as 2 Dogwood Drive, Danbury, Connecticut 06811, and in Mexico as Calle Obregon, 22800 Ensenada, Baja California, Mexico.

## FACTUAL BACKGROUND & HISTORY OF PARTIES

6.     The instant action ultimately arises out and relates to a Mexican real estate development known as Diamanté Cabo San Lucas.  As further detailed on its website, the Diamanté Cabo San Lucas property is described as follows:

> ### Diamante. Unreal real estate.
>
> Nestled on 1,500 acres of stunning coastline and magnificent dunes along 1.5 miles of Pacific coastline, Diamante is a paradise of beauty, privacy, luxury and world-class service.
>
> Just six short miles from downtown Cabo San Lucas, the first phase of this master-planned luxury community holds Sunset Hill home sites, Beach Estate home sites, Golf Villas and the Dunes Clubhouse and Residence Club — all integrated into the dramatic Baja landscape and the Davis Love III-designed Dunes Course. At Diamante, hand-crafted Hacienda-style architecture hints of another era when hospitality and relaxation were paramount.
>
> Construction has begun on the second golf course (El Cardonal, designed by Tiger Woods and his company Tiger Woods Design), a world-class spa, a 10-acre lagoon for water sports, a beach club, tennis complex, equestrian center and kid's camp.

www.diamantecabosanlucas.com/about/diamante-life.  *See also* website information attached hereto as Composite Exhibit "A".

7.     Based on deposition testimony given by DCSL's sole Managing Member, KENNETH A. JOWDY ("JOWDY"), in a previous legal proceeding, the undeveloped Diamanté property was initially acquired in April of 2006 for a purchase price of approximately $75 million.  JOWDY has further testified that, in or around February of 2008, the partially developed Diamanté property was appraised as having a fair market value in the neighborhood of $450 million.  *See* Volume 1 of deposition transcript of Kenneth A. Jowdy, taken January 5,

2010, in the action styled *DeVries et al. v. Jowdy*, Case No. BC416081, filed in the Superior Court of the State of California, County of Los Angeles, Central District, at pp. 36, 168 and 296, with noted page excerpts attached hereto as Exhibit "B". The Diamanté property continues to be developed, yet this six (6) year-old appraisal information conveyed by DCSL's Managing Member at his deposition in January of 2010 is the last report Plaintiffs have received regarding the property's valuation.

7.      In compliance with Mexican law, the Diamanté property is owned by a Mexican limited liability corporation registered as Diamanté Cabo San Lucas S. de R. L. de C. V. ("the Mexican Subsidiary"). In turn, DCSL apparently owns 99% of the equity of the Mexican Subsidiary. According to the Operating Agreement for DCSL, the remaining 1% of equity in the Mexican Subsidiary is apparently owned by its Managing Member, Kenneth A. Jowdy.

*Diamanté Cabo San Lucas, L.L.C.*

8.      DCSL was formed in or around February 3, 2006, by the filing of a Certificate of Formation with the Secretary of State for the State of Delaware.

9.      Shortly thereafter, Plaintiffs entered into a 'Limited Liability Company Agreement of Diamanté Cabo San Lucas, L.L.C.', under which four (4) separate entities are identified as the Class A Members of DCSL. A copy of the 'Limited Liability Company Agreement of Diamanté Cabo San Lucas, L.L.C.' is attached hereto as Exhibit "C".

10.     As set forth in the Operating Agreement, the following four (4) entities are the original and current Class A Members of DCSL:

| | | | |
|---|---|---|---|
| i) | KAJ Holdings, L.L.C. | - | 40% Class A Membership Interest; |
| ii) | Baja Ventures 2006, L.L.C. | - | 39% Class A Membership Interest; |
| iii) | Diamanté Properties, L.L.C. | - | 13% Class A Membership Interest; |

    iv)  CSL Properties 2006, L.L.C. -  <u>8%</u> Class A Membership Interest

            **TOTAL -  100%**

  11.  Ultimately, therefore, Plaintiffs currently and collectively hold a 47% ownership interest in DCSL which, in turn, has a 99% equity stake in the Mexican company that owns the "luxury community" known as Diamanté Cabo San Lucas.

  12.  As noted above and within the Operating Agreement, itself, JOWDY is identified as the sole and exclusive Managing Member of DCSL.  JOWDY also has a significant ownership interest in DCSL, to the extent that he is the principal (if not sole) owner and manager of the entity with the biggest equity stake in DCSL – i.e. KAJ Holdings, L.L.C. and its 40% ownership interest.  Likewise, JOWDY is also the Managing Member of Diamanté Properties, L.L.C. (i.e. the fourth Class A Member of DCSL) and holds an additional 6.5% ownership interest in this entity as well.

  13.  As further discussed below, JOWDY has not only failed to provide Plaintiffs with the financial statements and written reports that he is obligated to disclose to DCSL's Members pursuant to the terms of its Operating Agreement, but JOWDY has likewise refused to accommodate Plaintiffs' recent requests to inspect DCSL's books and records.  Indeed, it has been several years since Plaintiffs were provided with any information whatsoever regarding the ongoing development of the Diamanté property.

*Baja Ventures 2006, L.L.C.*

  14.  With its 39% ownership interest, the Class A Member with the second largest equity stake in DCSL is Baja Ventures.

  15.  Baja Ventures was also formed in or around February of 2006, by the filing of its Certificate of Formation with the Secretary of State for the State of Delaware.  At the time of its

4

initial formation, the sole Member of Baja Ventures was an individual by the name of Phillip A. Kenner ("KENNER"). A copy of the 'Delaware Limited Liability Company Operating Agreement for Baja Ventures 2006, L.L.C.' is attached hereto as Exhibit "D".

16.     Beginning in approximately 2002, KENNER and JOWDY formed an amicable relationship as business associates and worked together as partners for several years, in connection with the development of a number of real estate projects throughout the United States and Mexico. In fact, KENNER and JOWDY were the two individuals who were principally responsible for securing the Mexican real estate that is now known as Diamanté Cabo San Lucas in April of 2006.

17.     However, approximately a year after closing on the Diamanté property, the relationship between KENNER and JOWDY abruptly soured and, since that time, KENNER and JOWDY have been embroiled in a series of bitter civil lawsuits and arbitration proceedings, as well as investigations undertaken by the Securities and Exchange Commission and the Federal Bureau of Investigation.

18.     In fact, as a result of the aforementioned FBI investigation, KENNER was recently indicted in federal court on a number of charges relating to an alleged conspiracy to commit wired fraud and money laundering. A copy of this Indictment, which was filed on October 29, 2013, in the action styled *United States of America v. Phillip A. Kenner and Tommy C. Constantine*, Criminal Case No. CD-13-00607, currently pending in the United States District Court in the Eastern District of New York is attached hereto as Exhibit "E" ("the Kenner criminal proceeding").

19.     Notably, while the multi-count Indictment filed against KENNER sets forth a detailed description of his alleged criminal acts and specifically identifies a number of other

companies that he allegedly created and managed, the government's complaint contains no reference whatsoever to Baja Ventures, DCSL or the luxury community known as Diamanté Cabo San Lucas. *See* Exhibit "E".

20.    Since his arrest more than six (6) months ago, KENNER has been incarcerated in a federal correctional facility after being denied bail at the detention hearing that was conducted on November 20, 2013. It was at this detention hearing that Mr. Kenner executed a General Durable Power of Attorney in favor Karlos Alberto De La Puerta Rodriguez ("DE LA PUERTA"), which gives DE LA PUERTA the power and authority to manage and conduct the affairs of Baja Ventures and CSL Properties while he is unavailable to do so himself. A copy of this Power of Attorney is attached hereto as Exhibit "F". In other words, to the extent KENNER remains incarcerated and is currently awaiting trial on the criminal charges that have been filed against him, DE LA PUERTA has been serving as the Acting Manager for both Baja Ventures and CSL Properties pursuant to the Power of Attorney executed by KENNER at his November 20th detention hearing.[1]

21.    DE LA PUERTA is a licensed Mexican attorney, and serves as counsel for Baja Ventures and CSL Properties with respect to certain ancillary legal proceedings that are ongoing in Baja California, Mexico, which likewise arise out of and relate to the Diamanté property. In fact, the crux of the Mexican legal proceedings relates to Plaintiffs' concurrent efforts to obtain information and documents relating to or in the possession of DCSL's Mexican Subsidiary – i.e. Diamanté Cabo San Lucas S. de R. L. de C. V. – which is also owned and controlled by JOWDY. In other words, Plaintiffs' are presently seeking relief in this Court against DCSL, a limited liability company formed and registered in Delaware, while their concurrent efforts in

---

[1] It is Plaintiffs' understanding that a trial date in the Kenner criminal proceeding has not yet been set.

Mexico are focused on DCSL's Mexican Subsidiary, the limited liability corporation formed and registered in Mexico as Diamanté Cabo San Lucas S. de R. L. de C. V., and the company that actually acquired the rights to develop the Diamanté property. To date, Plaintiffs have been completely frustrated in their efforts to obtain financial information and business records from either DCSL or its Mexican Subsidiary, and Plaintiffs reasonably believe that JOWDY will continue in his refusal to provide this information until he is ordered to do so.

22. As it relates to the <u>current</u> ownership of Baja Ventures, approximately two (2) month after KENNER's arrest and incarceration the company entered into a Convertible Loan Agreement ("CLA") with an individual by the name of Todd White, in or around January of 2014. The CLA was executed by DE LA PUERTA, in his capacity as Acting Manager for Baja Ventures, and was entered into by the company as a means to obtain the funding necessary to maintain the company's ongoing operations including the aforementioned legal proceedings against DCSL's Mexican Subsidiary. A copy of this 'Loan Agreement with Conversion Option' is attached hereto as Exhibit "G".

23. Mr. White exercised his conversion option under the CLA on or about March 4, 2014 and, upon doing so, was issued membership units in Baja Ventures representing a 26.4% ownership interest in this company. A copy of the Membership Certificate is attached hereto as Exhibit "H". Since acquiring this interest in Baja Ventures, supplemental paperwork has been filed with the Delaware Secretary of State reflecting Mr. White's status as a new Member of Baja Ventures. *See* Amended attached hereto as Exhibit "I".

24. At this time, therefore, KENNER is no longer the sole Member of Baja Ventures and, at the behest of its newest Member, DE LA PUERTA has requested the opportunity to inspect DCSL's books and records so that Mr. White may further evaluate his recent investment

into Baja Ventures and determine whether and to what extent this investment has any marketable value.

***CSL Properties 2006, L.L.C.***

25.     CSL Properties was likewise formed in or around February of 2006, by the filing of a Certificate of Formation with the Secretary of State for the State of Delaware. A copy of the one-page 'Operating Agreement' for CSL Properties is attached hereto as Exhibit "J". As noted above, CSL Properties has an 8% ownership interest in DCSL, and as further detailed in the DCSL Operating Agreement, the individual Members of CSL Properties collectively made an initial cash contribution of $2,000,000. This $2,000,000 contribution from the individual Members of CSL Properties represents almost 30% of the initial capital contributed by DCSL's four (4) Class A Members prior to the acquisition of the Diamanté property in April of 2006. *See* Exhibit "C", at Register of Class A Members.

26.     There are fourteen (14) individual Members of CSL Properties, each of whom is either a former or current professional hockey player. The individual Members of CSL Properties, along with their respective ownership interests in this entity, are listed as follows:

|     |     |     |        |
| --- | --- | --- | ------ |
| i)   | Dimitri Khristich   | - | 12.5%; |
| ii)  | Vladimir Tsyplakov  | - | 12.5%; |
| iii) | Bryan Berard        | - | 10.0%; |
| iv)  | Michael Peca        | - | 10.0%; |
| v)   | Turner Stevenson    | - | 10.0%; |
| vi)  | Tyson Nash          | - | 5.0%;  |
| vii) | Ethan Moreau        | - | 5.0%;  |
| viii)| Steve Rucchin       | - | 5.0%;  |
| ix)  | Greg DeVries        | - | 5.0%;  |
| x)   | Brian Campbell      | - | 5.0%;  |
| xi)  | Sergei Gonchar      | - | 5.0%;  |

8

| | | | |
|---|---|---|---|
| xii) | Owen Nolan | - | 5.0%; |
| xiii) | Mattias Nortstrom | - | 5.0%, and; |
| xiv) | Darryl Sydor | - | 5.0% |
| | **TOTAL** | | **100%** |

*See* Exhibit "J".   Although he has no ownership interest in CSL Properties, the Operating Agreement for this entity identifies KENNER as its "Managing Member".  In fact, up until his arrest and incarceration, KENNER exclusively served as the <u>Manager</u> for CSL Properties and assumed the responsibilities for managing all of its affairs and operations.  Both JOWDY and the individual Members of CSL Properties recognized KENNER as the Manager of this entity.  *See eg.* Exhibit "B", deposition transcript of Kenneth A. Jowdy, with excerpts at pp. 243 and 249.

27.     Similar to Baja Ventures, DE LA PUERTA was appointed to serve as the Acting Manager for CSL Properties pursuant to the General Durable Power of Attorney executed by KENNER at his detention. *See* Exhibit "F".  As such, DE LA PUERTA has been vested with the power and authority to manage and conduct the affairs of CSL Properties while KENNER remains incarcerated awaiting trial and, as the Acting Manager of both Baja Ventures and CSL Properties, DE LA PUERTA has authorized the filing of this action.

28.     As the Acting Manager for CSL Properties, DE LA PUERTA has also conferred with a majority of its individual Members and currently has the support and approval to proceed with this request to inspect books and records from nine (9) of the fourteen (14) individual Members of CSL Properties, collectively representing 60% of the total ownership of this entity. Specifically, the nine (9) individual Members of CSL Properties who have joined in authorizing this action and have expressed their desire to obtain information and records regarding DCSL's current operations and its past and present financial performance include the following:  i) Dimitri Khristich (12.5%); ii) Vladimir Tsyplakov (12.5%); iii) Tyson Nash (10%); iv) Steve

9

Rucchin (5%); v) Greg DeVries (5%); vi) Brian Campbell (5%); vii) Sergei Gonchar (5%); viii) Mattias Nortstrom (5%), and; ix) Darryl Sydor (5%).

29.     This majority group of individual Members of CSL Properties has likewise requested DCSL to produce information and documents, so that they may undertake a current valuation of their significant investment into this company; but, as with Baja Ventures, JOWDY has similarly refused the request from a majority of the individual Members of CSL Properties to inspect DCSL's books and records.

### PLAINTIFFS' RIGHT TO INSPECT DCSL'S BOOKS & RECORDS, AND WRITTEN REQUEST FOR SAME

*DCSL Operating Agreement*

30.     In addition to the statutory rights conferred upon Members of a limited liability company pursuant to 6 Del. C. § 18-305, the Operating Agreement for DCSL also sets forth several provisions which more specifically detail Plaintiffs' right to receive or otherwise inspect and have access to the company's books and records.    Specifically, DCSL's Operating Agreement expressly provides as follows:

> **Section 502. Capital Determined; Financial Statements and Reports**.
>
> (a) At the end of each Fiscal Quarter, the books of account of the Company shall be closed and appropriate financial statements shall be prepared in accordance with generally accepted accounting principles and reflecting the Interests of the Members in accordance with Article Three. The financial statements of the Company shall be prepared and/or reviewed annually by such independent certified public accountants as are selected by the Managing Member.
>
> (b) After the end of each Fiscal Year, the Managing Member shall cause the Company's independent certified public accountants to prepare and transmit, as promptly as practicable after the close of the Fiscal Year, a report setting forth in sufficient detail such transactions effected by the Company during such Fiscal Year as

shall enable each Member to prepare its federal and state income tax returns. *The Managing Member shall mail such report to each Member and former Member (or its successor or legal representative) who may require such information in preparing his or her federal and state income tax returns, such information to include a copy of the Company's information return filed for federal and state income tax purposes.*

(c) Further, *the Managing Member shall prepare and transmit to each Member*, as promptly as practicable after (i) the close of each Fiscal Year, unaudited financial statements of the Company prepared in accordance with this Section 502 and (ii) the close of each Fiscal Quarter, *a business report of the Managing Member*.

**Section 505. Books and Records.**

*The Managing Member shall maintain complete and accurate books and records of* <u>all matters</u> *relating to the Company*, including, without limitation, copies of the Company's Certificate of Formation, this Agreement, all amendments to each and the Company's state and federal income tax returns. *Each Class A Member and its representatives shall have access to such books and records at any time during reasonable business hours for proper purposes, on at least ten business days' notice.* The Company shall maintain its books and records on the accrual method and shall utilize generally accepted accounting principles consistently applied in the preparation of its financial statements. All decisions as to accounting principles and tax elections (including, without limitation, elections as to depreciation methods) shall be made by the Managing Member in its sole discretion.

(emphasis added). *See* Exhibit "C".

*Written Request to Inspect DCSL's Books and Records*

31.     As further detailed above, there have been a number of significant events that have impacted Plaintiffs since November of 2013, beginning with KENNER's arrest and incarceraton on November 13, 2013.  Nevertheless, it is important to note that, even prior to KENNER's arrest, DCSL's Managing Member, JOWDY, has breached his obligations under the company's Operating Agreement by failing to provide Plaintiffs with any of the following

documents:   i) the year-end written reports prepared by the independent certified public accountant(s) charged with preparing or reviewing the company's financial statements;   ii) the year-end unaudited financial statements for the company, and;   iii) the quarterly "business reports" that JOWDY is obligated to prepare.   Plaintiffs have not received this information, or copies of these reports and records, since at least 2010.

32.   More recently, on May 12, 2014, Plaintiffs made a joint written request to JOWDY, through his attorney, to inspect, copy and examine DCSL's books, records and financial statements.   A copy of this e-mail communication to JOWDY's legal counsel, Thomas Harvey, Esq., is attached hereto as Exhibit "K".

33.   Specifically, Plaintiffs requested the opportunity to inspect and copy the following categories of documents:

1.   Minutes of any meetings of membership or management which in any way relate to the Class A Member Units owned by the Members;

2.   Records of any and all distributions to Class A Members since January 1, 2010;

3.   All financial statements for Diamanté Cabo San Lucas, L.L.C. that were prepared and/or reviewed annually by an independent certified public accountant, as more specifically described under Section 502(a) of the Operating Agreement;

4.   All quarterly "business reports" prepared by Mr. Jowdy, in accordance with Section 502(c) of the Operating Agreement, for the time period from January 1, 2010 through the present;

5.   All quarterly and annual financial reports, balance sheets, cash flow reports, statements of assets, liabilities and equity, statements of revenue and expenses, and any similar documentation reflecting the financial performance of Diamanté Cabo San Lucas, for the period from January 1, 2010 to the present;

6.   All federal and state tax returns filed by or on behalf of Diamanté Cabo San Lucas, L.L.C. from 2010 to the present, including all accompanying exhibits and schedules;

12

7. Any documents relating to any K-1 forms issued or to be issued by Diamanté Cabo San Lucas, L.L.C. to the Members since January 1, 2010;

8. Any documents which reflect or relate to any existing or current loans, lines of credit, mortgages and/or pledge and security agreements relating to any real property owned by Diamanté Cabo San Lucas, L.L.C., including without limitation, any loans, lines of credit, mortgages and/or pledge and security agreements held by or entered into with Danske Bank;

9. Documents which in way reflect the issuance of new or additional Class A Member units in Diamanté Cabo San Lucas, L.L.C., including without limitation any new membership units issued in connection with any efforts to raise capital at any time since January 1, 2010;

10. Documents reflecting the amount of any additional capital raised by Diamanté Cabo San Lucas, L.L.C., as a result of the sale or issuance of additional Class A Member Units since January 1, 2010;

11. Any appraisals and appraisal reports that have been prepared or performed since January 1, 2010 regarding the valuation of the property known as Diamanté Cabo San Lucas, including without limitation any appraisals or appraisal reports commissioned or requested by or on behalf of Danske Bank;

12. Any contracts, letters of intent or other documents which in any reference, reflect or otherwise relate to the opening or operation of any hotel and/or casino on the property known as Diamanté Cabo San Lucas, and;

13. The name and contact information for any and all accountants, auditors or accounting firms utilized by Diamanté Cabo San Lucas, L.L.C., in connection with the preparation of its financial statements and/or tax returns, during the time period from 2010 through the present, including without limitation, the name(s) and contact information of the independent certified public accountant(s) that are required under Section 502(a) of the Operating Agreement to prepare or review annually the company's financial statements

34.   As noted by the information displayed on the website for Diamanté Cabo San Lucas, there has been a significant amount of activity over the last several years, including the development of two separate golf courses as well as a 10-acre saltwater lagoon, a sports complex

13

with facilities for tennis, training, baseball and soccer, a spa and fitness center and a village complex with retail stores and restaurants.

35.     In light of these significant development activities, Plaintiffs have asked JOWDY for an opportunity to inspect DCSL's books and records so that their individual Members, including the professional hockey players who contributed almost 30% of the initial capital used to fund the Diamanté property more than eight (8) years ago, can conduct a current valuation of their respective ownership interests.  This request to inspect DCSL's books and records has a heightened significance to Plaintiffs, to the extent that it has been a number of years since any meaningful information has been disclosed at all and JOWDY has likewise failed to provide Plaintiffs with the company's unaudited financial statements, the year-end auditor's reports and the quarterly business reports that he is obligated to provide under DCSL's Operating Agreement.

36.     This Court has frequently and repeatedly held that a Member's desire to review a company's books and records in order to value its ownership interest is a valid and legitimate reason for requesting such information, and one that has a "reasonably related purpose to the member's interest as a member of the LLC".  *See e.g* 6 Del. C. § 18-305(a)(1);  *Somerville S Trust v. USV P'rs, LLC*, 2002 Del. Ch. LEXIS 103, 2002 WL 1832830, at *5 n.4 (Del. Ch. Aug. 2, 2002);  *Madison Ave. Inv. P'rs, LLC v. Am. First Real Estate Inv. P'rs, L.P*., 806 A.2d 165, 174 (Del. Ch. 2002); *Sanders v. Ohmite Holdings, L.L.C.*, 17 A.3d 1186 (Del. Ch. 2011).

### JOWDY'S OPPOSITION TO PLAINTIFFS' REQUEST TO INSPECT DCSL'S BOOKS & RECORDS

37.     Unfortunately, while JOWDY has previously testified under oath that he is willing to provide Plaintiffs with anything they are authorized to have or that he is required to

disclose under DCSL's Operating Agreement, he has wholly rejected Plaintiffs' recent written request to inspect the company's books and records. *See* e-mail communications from JOWDY's attorney, Thomas Harvey, Esq., dated May 12th and 24th attached hereto as Exhibit "L"; *see also* deposition transcript of Kenneth A. Jowdy, taken January 5, 2010, in the action styled *DeVries et al. v. Jowdy*, Case No. BC416081, filed in the Superior Court of the State of California, County of Los Angeles, Central District, at pp. 326, 582 and 713-14, with noted page excerpts attached hereto as Exhibit "M".

38. Based on the response to Plaintiffs' May 12th request to inspect DCSL's books and records, JOWDY's refusal to accommodate Plaintiffs' request for information and documents appears to be based on a variety of deficient explanations, including the following: i) KENNER's recent arrest and current incarceration somehow operates to stay or abate JOWDY's obligations under the Operating Agreement; ii) KENNER transferred complete ownership and control over Baja Ventures to another individual several years ago; iii) KENNER did not have the ability or authority to confer a Power of Attorney upon DE LA PUERTA at his detention hearing, and/or; iv) neither KENNER nor DE LA PUERTA is authorized to request information and documents on behalf of CSL Properties.

39. As further discussed below, none of the reasons given by JOWDY serve as a legitimate or justified basis for his refusal to accommodate Plaintiffs' request to inspect DCSL's books and records. Moreover, none of the unsupported or otherwise specious reasons he has given account for the fact that a majority group of the individual Members of CSL Properties wish to inspect DCSL's books and records; or, at a minimum, wish to have copies of the unaudited annual financial statements, the year-end auditor's report, and the quarterly business

reports that JOWDY is obligated to provide under the express terms of the DCSL Operating Agreement. JOWDY has provided none of these records for the last several years.

### *The request to inspect books and records was made on behalf of Plaintiffs, not Phillip Kenner*

40.     Based on his response to Plaintiffs' request for information and documents, it appears one of the principal reasons JOWDY has rejected the arises out of the fact that KENNER was indicted last November, and currently remains incarcerated awaiting trial on the charges brought against him. However, the request to inspect DCSL's books and records was conveyed on behalf Baja Ventures and CSL Properties, not KENNER, and both of these entities include other individual Members who clearly have a right to review the information and documents that have been requested.[2] Indeed, even if the request to inspect DCSL's books and records came from KENNER, himself, he should not be denied access to books and records simply because he is currently awaiting trial. Plaintiffs are not aware of anything that would operate to stay or abate Plaintiffs in exercising their rights under DCSL's Operating Agreement, simply because their Manager is currently unavailable to oversee their day-to-day operations. Moreover, KENNER obviously remains innocent until proven guilty on any of the charges on which he was indicted, and it is also significant to note that none of the allegations raised in the Indictment include any reference whatsoever to Plaintiffs, DCSL or the Diamanté property.

41.     As an alternative basis to support his rejection of Plaintiffs' request to inspect DCSL's books and records, JOWDY claims that KENNER previously transferred complete ownership and control of Baja Ventures to another individual, named John Kaiser, several years ago – well before his arrest. Accordingly, JOWDY asserts that not only does DE LA PUERTA

---

[2] It should be noted that the newest Member of Baja Ventures, Todd White, has never had any communications with KENNER; and, since KENNER's arrest in November of 2013, it is believed that none of the individual Members of CSL Properties have had any communication with him either.

not have the authority to make this request to inspect books and records as Baja Ventures' Acting Manager, but that Todd White's recent acquisition of an ownership interest in Baja Ventures is a nullity as well because Mr. Kaiser is the sole owner and manager of this entity. *See* Exhibit "L".

42.    However, despite multiple requests for JOWDY to provide documentation which confirms his representation that KENNER transferred ownership and control of Baja Ventures to John Kaiser several years ago, he has been unwilling or unable to do so.  Nothing has been filed with the Delaware Secretary of State which would in any way reflect this alleged transfer of ownership involving Baja Ventures, and Plaintiffs' own investigation has uncovered no documents whatsoever reflecting any transfer Baja Ventures' ownership and/or control from KENNER to John Kaiser.

43.    Accordingly, in the absence of any evidence to support JOWDY's unsubstantiated assertions, Plaintiffs are proceeding in this action with the understanding that DE LA PUERTA was duly vested with the authority to serve as Baja Ventures' Acting Manager pursuant to the Power of Attorney executed by KENNER, and that Todd White recently acquired a new ownership interest in Baja Ventures pursuant to the duly executed Convertible Loan Agreement entered into earlier this year.

### *The individual Members of CSL Properties would like to inspect DCSL's books and records*

44.    Regardless of JOWDY's unsupported assertions regarding the current ownership and management of Baja Ventures, the other Class A Member of DCSL – i.e. CSL Properties – has likewise requested to inspect the company's books and records. The fourteen (14) individual Members CSL Properties collectively contributed almost 30% of the initial capital used to acquire the Diamanté property more than eight years ago, and a majority of those individual

Members of CSL Properties would now like an opportunity to review certain information and documents so that they may undertake a current valuation of their respective investments and ownership interests – especially since JOWDY has failed to disclose the periodic reports and financial statements that he is obligated to provide under DCSL's Operating Agreement.

45.     Accordingly, even if this Court were to conclude that DE LA PUERTA somehow does not have the authority to pursue this action on behalf of Baja Ventures, JOWDY s refusal to produce the requested information and documents, as well as his ongoing failure to provide the unaudited financial statements and periodic reports called for under DCSL's Operating Agreement, has wholly frustrated the desire of a majority of the individual Members of CSL Properties to obtain information and documents relating to the ongoing development and performance of the Diamanté property.

46.     Plaintiffs have retained the undersigned law firms to pursue this action on their behalf, and are obligated to pay them a reasonable fee for their services.

47.     All conditions precedent to the bringing of this cause of action have been satisfied, performed or waived.

<u>COUNT I</u>

*Request for Information and Records pursuant to 6 Del. C. § 18-305*

Plaintiffs re-allege and incorporate herein by reference the allegations set forth in paragraphs one through forty-seven (1 – 47) stated previously.

48.     This is an action brought on behalf of two (2) Members of Diamanté Cabo San Lucas, L.L.C., a closely-held Delaware limited liability company, to enforce certain rights to information and access to records authorized under 6 Del. C. § 18-305.

49.     Section 18-305 of the Delaware Limited Liability Company Act grants Members of a limited liability company the right to "demand for any purpose reasonably related to the

member's interest as a member" certain of the limited liability company's books and records, subject to the requirement that a member's demand for such information must be in writing and must state the purposes for which inspection is sought.  6 Del. C. § 18-305(a) and (e).

50.     Baja Ventures and CSL Properties are two (2) of the four (4) Class A Members of DCSL and, collectively, the hold a 47% ownership in DCSL.  As such, Plaintiffs are entitled to receive or inspect the company's books and records relating to its ongoing operations and performance.

51.     On or about May 12, 2014, Plaintiffs made a written request to DCSL's Managing Member, through his attorney, asking to inspect and copy the company's books and records; and, specifically, thirteen (13) enumerated categories of information and documents. *See* Exhibit "K".

52.     Plaintiffs have requested DCSL's Managing Member to produce these documents and information, so that their individual Members can obtain a better understanding of the ongoing development of the Diamanté property, and undertake a current valuation of their respective ownership interests.  These legitimate and proper reasons that are reasonably related to Plaintiffs' interests a Class A Members of DCLA, and these valid reasons supporting their request for information and documents were communicated to DCSL's Managing Member, in the May 12th correspondence to his attorney. *See* Exhibit "K".

53.     Unfortunately, DCSL's Managing Member has rejected Plaintiffs' request, and refuses to provide Plaintiffs with the information and documents they have requested. Accordingly, the instant action is now necessary.

54.     Plaintiffs demand reimbursement of their costs and attorneys' fees incurred in connection with this action.

WHEREFORE, Plaintiffs, BAJA VENTURES 2006, L.L.C. and CSL PROPERTIES 2006, L.L.C., respectfully request this Court to enter an Order compelling Defendant, DIAMANTÉ CABO SAN LUCAS, L.L.C., to make available for inspection and copying the company's books and records pursuant to 6 Del. C. § 18-305, and to further award Plaintiffs the reimbursement of their attorney's fees and costs incurred in this action based on DCSL's unreasonable refusal to provide the requested information and documents, and, finally, Plaintiffs request any additional or alternative relief that this Court deems fair and equitable under the circumstances.

## COUNT II

### *Request to Inspect Books & Records Pursuant to DCSL Operating Agreement*

Plaintiffs re-allege and incorporate herein by reference the allegations in paragraphs one through forty-seven (1 – 47) stated previously

55.     This is an action to enforce Members' rights relating to the disclosure of certain financial information and reports, as well as access to the company's books and records, as further authorized and provided for under the Limited Liability Company Agreement of Diamanté Cabo San Lucas, L.L.C.

56.     As stated within the company's Operating Agreement, Baja Ventures and CSL Properties are two (2) of the four (4) Class A Members with an ownership interest in DCSL and, collectively, these two entities own 47% of DCSL's Class A membership units which, in turn, owns a 99% equity stake in the Diamanté property.

57.     As it relates to the Class A Members' right to receive or otherwise inspect and access records and information relating to DCSL's ongoing performance, the company's Operating Agreement expressly states that "[t]he Managing Member shall maintain complete and

accurate books and records of <u>all matters</u> relating to the Company...[and] [e]ach Class A Member and its representatives shall have access to such books and records at any time during reasonable business hours for proper purposes, on at least ten business days' notice." *See* Exhibit "C", at Section 505.

58.     Additionally, the DCSL Operating Agreement also provides that company's financial statements must either be prepared and/or reviewed annually by an independent certified public accountant(s) and, in conjunction with this preparation or review of the company's financial statements, the independent certified public accountant(s) shall prepare at the end of each fiscal year a written report which sets forth in sufficient detail the notable transactions undertaken by the Company during that year. *See* Exhibit "C", at Section 502(b). In turn, the DCSL's Managing Member is obligated to "mail such report to each Member and former Member (or its successor or legal representative) who may require such information in preparing his or her federal and state income tax returns, such information to include a copy of the Company's information return filed for federal and state income tax purposes." *Id.*

59.     DCSL's Managing Member is further obligated to "prepare and transmit to each Member, as promptly as practicable [the year-end] unaudited financial statements of the Company...and [at] the close of each Fiscal Quarter, a business report of the Managing Member."

60.     Plaintiffs state that, not only has JOWDY rejected their written request to inspect DCSL's books and records pursuant to Section 505 of the Operating Agreement, but JOWDY has also failed to provide Plaintiffs with any of the following:  i) the year-end written reports prepared by the independent certified public accountant(s) who have prepared or reviewed the

company's financial statements;  ii) the year-end unaudited financial statements for DCSL, and; iii) the quarterly "business reports" that JOWDY is obligated to prepare.

61.     More than ten (10) days have passed since Plaintiffs' initial request to inspect books and records was conveyed to JOWDY's counsel on May 12, 2014; and, to date, the requested information and documents have not been produced or otherwise been made available. In fact, as further discussed herein, JOWDY and his counsel have expressly rejected Plaintiffs' request to inspect DCSL's books and records.  See Exhibit "L".

62.     Plaintiffs' purposes for requesting access to DCSL's books and records are proper and reasonably related to their interests as Class A Members of DCSL.

63.     Based on JOWDY's refusal to provide Plaintiffs with the information and documents they have requested, the instant action is now necessary.

64.     Plaintiffs demand reimbursement of their costs and attorney's fees incurred in connection with this action.

WHEREFORE, Plaintiffs, BAJA VENTURES 2006, L.L.C. and CSL PROPERTIES 2006, L.L.C., respectfully request this Court to enter an Order compelling Defendant, DIAMANTÉ CABO SAN LUCAS, L.L.C., to make available for inspection and copying the company's books and records, as well as its unaudited financial statements, auditor reports and quarterly reports prepared by its Managing Member, pursuant to Sections 503 and 505 of its Operating Agreement, and to further award Plaintiffs the reimbursement of their attorney's fees and costs incurred in this action based on DCSL's unreasonable refusal to provide the requested information and documents, and, finally, Plaintiffs request any additional or alternative relief that this Court deems fair and equitable under the circumstances.

Dated this 11th day of June 2014.

Respectfully submitted,

STAMOULIS & WEINBLATT L.L.C.


  /s/ Stamatios Stamoulis
Stamatios Stamoulis
Delaware Bar No, 4606
Two Fox Point Centre
6 Denny Road Suite 307
Wilmington, DE 19809
Tel: 302-999-1540
Fax: 302-762-1688
stamoulis@swdelaw.com

*And, pending admission pro hac vice*

STEVEN R. MAIN
Florida Bar No. 0144551
CHRISTOPHER T. HILL
Florida Bar No. 0868371
HILL, RUGH, KELLER & MAIN, P.L.
390 North Orange Avenue, Suite 1610
Orlando, Florida 32801
Tel:  (407) 926-7460
Fax:  (407) 926-7461
smain@hrkmlaw.com
chill@hrkmlaw.com
*Attorneys for Plaintiffs*