UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA

   - against-

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,
   also known as
   "Tommy C. Hormovitis,"

               Defendants.

------------------------------------------------------------X

Docket No. 13-cr-607 (JFB)

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TOMMY C. CONSTANTINE'S MOTION TO DISMISS OR IN THE ALTERNATIVE OTHER RELIEF

Defendant Tommy Constantine, through his attorneys, Robert P. LaRusso of LaRusso & Conway, LLP submits this memorandum of law in support of his motion (1) to dismiss the Indictment in its entirety for Government misconduct pursuant to Rule 12 of the Federal Rules of Criminal Procedure (Fed. R. Crim. P.) or in the alternative, for an evidentiary hearing;  (2) to dismiss Count Four of the Indictment for lack of venue pursuant to Rule 18 of the Fed. R. of Crim. P.; (3) to sever his trial from codefendant Phillip Kenner, pursuant to Rule 14 of the Fed. R. of C P.; and (4) to suppress an audio recording of a conversation between the defendants, or in the alternative, for a hearing on its authenticity and the production of the original recording on its original storage device for inspection and forensic examination pursuant to Rule 16 of the Fed. R. Crim. P.

**BACKGROUND**

On October 29, 2013, the Grand Jury indicted Defendants Phillip Kenner ("Kenner") and Tommy Constantine ("Constantine") in a ten count indictment where

Counts One through Seven and Ten pertain to both defendants. The Indictment laid out the particulars of, *inter alia,* three "schemes to defraud-" the "Hawaii Land Developments," "The Eufora Investments" and "The Global Settlement Fund." Count One charges a Conspiracy to Commit Wire Fraud, Counts Two through Seven are substantive Wire Fraud charges connected to one of the above schemes to defraud and Count Ten charges a Money Laundering Conspiracy.

Counts Eight and Nine are Wire Fraud charges pertaining to what the Government calls "The Led Better Fraud Scheme," an alleged scheme to defraud, wholly unrelated to Constantine, connected to the purchase of a piece of real property located in Sag Harbor, New York. Constantine is not named on these counts.

The events connected with the Indictment have birthed no fewer than fifteen separate civil law suits and arbitrations, comprising over thirty individual parties, in federal and state courts all over the country. This Indictment represents the relentlessly myopic pursuit of a single FBI agent who spent over two years trying for an Indictment in the Southern District, and when he could not get one, went forum shopping and ended up in the Eastern District.

Constantine and Kenner began to do business together as far back as 2002. Over the past decade they participated together in numerous financial transactions and investments. Accordingly, this case has yielded almost one million pages of documents disclosed by the Government. Judging from the nature of the allegations and the disclosures so far provided, the case against the two defendants is qualitatively and quantitatively different. Kenner is accused of being the individual who induced the various John Does to invest their money, as befits a man employed as a financial advisor with access to many high-income investors. In contrast, Constantine's role in the

alleged schemes is more circumscribed. Constantine, an entrepreneur who owned several businesses, is not alleged to have induced, let alone even spoken with, any of the John Doe NHL players prior to them making their investment in Eufora, a closely held Arizona company created by Constantine. Rather, the Indictment charges that monies were diverted to accounts that he controlled.

The Indictment's cast includes an un-indicted co-conspirator ("Co-conspirator 1"), along with 17 John Does and one Jane Doe. John Does 1 through 13 (collectively, "the hockey players") are investors and former professional hockey players who used Kenner as a financial advisor. John Does 14 and 15 are said to have invested with Kenner and Constantine. John Doe 16 is an attorney and John Doe 17 is described as a real estate developer. With the exception of the identity of Co-conspirator 1, the Government disclosed the identities of all these individuals in a September 8 letter to counsel for the defendants.

Significantly, some of the John Does have sided with Constantine and/or Kenner in some of the previously mentioned lawsuits against other John Does, particularly Ken Jowdy (John Doe 17). In fact, many of the John Doe victims have recently sued Jowdy,[1] a real estate developer who the Indictment casts in a radically different light than the one Constantine alleges is portrayed by the Government's incomplete discovery disclosures. See Affidavit of Tommy Constantine ("Aff") at ¶¶ 8, 33-36. Similarly, the Indictment appears to portray certain John Does as victims, when the facts and documents suggest otherwise.

---

[1] Indeed they have sued him on several occasions and have initiated additional post-indictment litigation against him.

## POINT 1. DISMISSAL OF THE INDICTMENT IS NECESSARY TO CURE THE IRREPARABLE PREJUDICE CAUSED BY THE GOVERNMENT'S MISCONDUCT

"Federal courts have authority under their supervisory powers to oversee the administration of criminal justice within the federal courts." United States v. Johnson, 221 F.3d 83, 96 (2d Cir. 2000) (citations omitted). This power extends to the ability to dismiss indictments based on governmental misconduct. United States v. Simmons, 812 F.2d 818, 821 (2d Cir. 1987). Indeed, dismissal is warranted when outrageous government conduct amounts to a due process violation. To establish such a due process violation, a defendant must show "that the Government's conduct is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction." United States v. Al Kassar, 660 F.3d 108, 121 (2d Cir. 2011).

Admittedly, courts rarely dismiss indictments based on Government misconduct and neither Constantine, nor his counsel, make such serious assertions lightly. See United States v Bellomo, 944 F.Supp 1160, 1168 (S.D.N.Y. 1996) ("Dismissal of the Indictment for prosecutorial misconduct is an exceedingly rare sanction.") However, at times, it can be the cumulative impact of misconduct that will cost the Government an indictment. See United States v. Hogan, 712 F.2d 757 (2d Cir. 1983).

However, an indictment may be dismissed when the government "knowingly withholds from the grand jury 'substantial evidence negating guilt' such that it reasonably might be expected that the grand jury would not indict . . . when the grand jury is 'misled or misinformed . . .'" United States v. Montoua-Echeverria, 896 F.Supp. 148, 150-51 (S.D.N.Y. 1995)(citations omitted); see also, United States v. Fleurissaint,

4

No. 03 Cr. 06(RWS), 2004 WL 2101922, at *3-4 (S.D.N.Y. September 21, 2004)("The Second Circuit has stated an indictment may be dismissed for prosecutorial misconduct if the grand jury was misled or misinformed")

Here, the cumulative Government misconduct that warrants dismissal includes i) improperly interfering with judicial process by discouraging certain lawsuits which fail to support the Government's theory of this case while simultaneously encouraging a lawsuit that does so, and by directing a witness to withhold information during depositions; ii) deliberately presenting false information to the Grand Jury, or information that it should have known was untrue based on the availability of records in its possession; iii) selectively withholding certain potentially exculpatory documents from the Grand Jury and/or the defendants and iv) concealing or withholding key evidence including certain pages and several months of bank records of other participants in the fraud who the Government represents to be innocent victims.

Constantine's supporting affidavit details very troubling conduct concerning investigating FBI Agent Matthew Galioto. See Aff. at ¶¶ 3-8. Agent Galioto spent over two years attempting to indict in the Southern District, and took this case to the Eastern District when unable to secure an Indictment there.

According to the sworn testimony of Bryan Berard, Agent Galioto improperly instructed Bryan Berard, a John Doe hockey player investor who was testifying at a deposition in a civil litigation, to refrain from answering questions regarding the Global Settlement Fund. ("I've been instructed by the FBI not to speak about the Global Settlement Fund here today," he testified, repeatedly). See Aff. at ¶ 6 (p.136). Perhaps even more troubling, there are allegations that Galioto tried to convince Tyson Nash and William Ranford, both John Doe hockey player investors with a pending civil suit

5

against John Does 1 and 14, (Bryan Berard and John Kaiser respectively, who are themselves accused of perpetrating fraud) to instead file a civil suit against Kenner, to better align with the Government's theory of the facts. If these assertions are true, then the Government's selective myopia has gone too far and only a dismissal can adequately sanction it for such conduct.

Other conduct justifying dismissal of the Indictment is the presentation of false information to the Grand Jury and the withholding of critical exculpatory information from that same body. Such conduct resulted in Counts Six and Seven, charges against Constantine that are devoid of any merit. Put simply, the documentary evidence does not back the Government's allegations. This is not an assertion made taking the documents and portraying them in a light more favorable for the defense. These are cold, hard, indisputable facts. The Government withheld critical evidence of bank statements and other records that would have "set the record straight." During discovery, these critical statements were mysteriously missing, and we can only conclude that the Agent withheld the same from the prosecutor. As the Tenth Circuit wrote, "[w]ithheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation that [lead to an Indictment]..." Bowen v. Maynard, 799 F.2d 593, 613 (10th Cir. 1986)

Constantine's affidavit sets out the specific detail regarding this argument, but it appears that there were at least four different pieces of information in the Government's possession and known to the Government that completely refute the charges it brought against Constantine on Counts Six and Seven. Pieces of information that were deliberately ignored and, seemingly deliberately withheld from the Grand Jury and, to the extent that such records were subsequently disclosed to Constantine post-

6

indictment, critical pages were missing, pages that would have exculpated Constantine. See Aff. at ¶¶ 9-18.

For example, at least four separate sources of information were in the Government's possession that conclusively showed that Counts Six and Seven were incorrect:

- Bank records from AZ Avalon Partners; which shows the incoming wire in question of $155,000 from Ron Richard's Trust account, and the subsequent almost immediate sending of $150,000 wire to Bancorp for Eufora's benefit and retaining $5,000 as legitimate and proper rent payment from Eufora which was due and owing.

- Subpoenaed bank statements from Attorney Ron Richards' Client Trust; which shows only one wire for $155,000 sent to AZ Avalon Partners and no wires in any similar amount made to AZ Falcon Partners.

- Forensic Accountant Robert Semple's Report; which provides for an accounting of Ron Richard's Trust account with respect to all related deposits made, including but not limited to the Global Settlement Fund and, while explaining the error on Ron Richard's own spreadsheet and that AZ Falcon never received a wire for $155,000, clearly and concisely explains that all money deposited in Richards' account was used for its intended purpose as previously authorized in writing.

- Emails from Constantine; indicating that there was a wire for $155,000 sent to AZ Avalon in error and that it should have been sent to Eufora with the intent being that $5,000 remain in Eufora and the remaining $150,000 be sent to Bancorp at as soon as possible.

See Aff. at ¶¶ 9-19. Moreover, during his proffer session in the Southern District of New York, Constantine explained the true nature of the transaction. See Aff. at ¶ 12.

Further, bank records for AZ Falcon Partners, the corporation that allegedly received the improper $155,000 diverted payment, have been produced to the defendant, but not for the very month the alleged transaction occurred (December 2009). See Aff. at ¶ 17. Had that December 2009 bank statement for AZ Falcon Partners

7

been produced to the Grand Jury, it is difficult to imagine how an indictment on Counts Six and Seven could have resulted.

Finally, as set out more fully in the accompanying supporting affidavit, the Government's disclosures suggests that it is actively seeking to diminish the culpability of certain John Does who will be witnesses for the Government. Certain records are missing from discovery that support Constantine's assertions that Kenner worked with others to commit fraud. These include bank records for John Kaiser (John Doe 14) that would show him receiving greater proceeds from the fraud than acknowledged by the Government, and bank records for Ken Jowdy controlled entities, that would show his role in the $250K fraud laid out in paragraph 31 of the Indictment. See Aff. at ¶¶ 26-35.

**POINT 2. COUNT FOUR SHOULD BE DISMISSED DUE TO A LACK OF VENUE**

The Federal Rules of Criminal Procedure provide for prosecution in the district where the offense occurred, unless a statute or other permissive procedure allows for another venue. It is well established that "the site of a charged offense must be determined from the nature of the crime alleged and the location of the act or acts constituting it." United States v. Cabrales, 524 U.S. 1, 5 (1998) (quotations and citations omitted). When an indictment alleges multiple counts, venue must be proper as to each count. U.S. v. Stephenson, 805 F.2d 867, 874 (2d Cir. 1990). When venue is challenged on a pretrial motion to dismiss, the Government must show that the indictment, on its face, alleges facts sufficient to support venue. U.S. v Peterson, 357 F. Supp 2d 748, 751-52 (S.D.N.Y. 2005) (internal citations omitted).

Count Four of the Indictment, a wire fraud charge, does not properly allege venue because it does not allege any act "begun, continued, or completed" in the Eastern

District as required under 18 U.S.C. § 3237(a). Thus, Count Four must be dismissed. A wire fraud violation is a continuing offense. United States v. Story, 891 F.2d 988 (2d Cir. 1998). Pursuant to 18 U.S.C. § 3237(a), the prosecution of a continuing offense is proper "in any district in which the offenses were begun, continued, or completed."

The Indictment's description of Count Four's wire transmission reads:

> "$85,000 wire transfer from Co-Conspirator 1's account at Wachovia Bank in Closter, New Jersey to a Bank of America account in the name of Kenner in Scottsdale, Arizona."

Unlike the other five Wire Fraud counts, Count Four does not contain a single alleged connection to the Eastern District of New York; accordingly, this Count must be dismissed. The Southern District's holding in United States v. Korolkov, 870 F.Supp 60 (S.D.N.Y. 1994) is instructive. In Korolkov, venue for wire fraud was found to lay in a district where the bank accounts were located and through which wire transfers effectuating the scheme were routed, even though a defendant's acts occurred outside the district. Here, however, the wire transfer in question has no connection whatsoever to the Eastern District. Accordingly, Count Four must be dismissed.

### POINT 3. DEFENDANT CONSTANTINE'S CASE SHOULD BE SEVERED FROM THAT OF HIS CO-DEFENDANT

This Court should use its discretion to sever Constantine's case from that of his co-defendant on the grounds that each party's defense to the charges in the Indictment are antagonistic to the other's, that each defendant played comparatively uneven roles in the events of the Indictment, that there is widely differing proof as to each defendant, and that the risk of spillover prejudice if the defendants are tried together is substantial. Rule 14 of the Federal Rules of Criminal Procedure provides that a trial court may sever multi-defendant trials "[i]f it appears that a defendant or the government is prejudiced

by the joinder of defendants in the indictment." It is axiomatic that decisions on motions to sever are "committed to the sound discretion of the trial judge." United States v. Chang An-Lo, 851 F.2d 547, 556 (2d Cir. 1988). Courts have repeatedly granted defendant's motions for severance when there is a serious risk that a joint trial will prejudice a defendant. See United States v Williams, 181 F. Supp 2d 267, 301-02 (S.D.N.Y. 2001); United States v Upton , 856 F. Supp 727, 736 (E.D.N.Y. 1994); United States v Gallo, 668 F. Supp. 736, 749 (E.D.N.Y. 1987); United States v Gilbert, 504 F.Supp. 565 (S.D.N.Y 1980).

Admittedly, "there is a preference in the federal system for providing defendants who are indicted together with joint trials." Zafiro v. United States, 506 U.S. 534, 537 (1993). Indeed, "joint trials are often particularly appropriate where the defendants are charged with participating in the same criminal conspiracy." United States v. Spineli, 352 F.3d 48, 55 (2d Cir. 2003) Acknowledged within this policy is "the inevitable tolerance of some slight prejudice to codefendants, which is deemed outweighed by the judicial economies resulting from the avoidance of duplicative trials." U.S. v. Cardascia, 951 F.2d 474 482-83 (2d Cir. 1991).

However, the Supreme Court has instructed that a district court should grant a Rule 14 severance motion when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 534. The Zafiro Court stated that such risk could occur in a wide variety of circumstances, including situations where: (1) "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant;" (2) "evidence of a codefendant's wrongdoing in some

10

circumstances erroneously could lead a jury to conclude that a defendant was guilty;" (3) "many defendants are tried together in a complex case and they have markedly different degrees of culpability;" (4) "[there is] evidence that is probative of a defendant's guilt but technically admissible only against a codefendant;" and (5) "essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." Id. at 539. (internal citations omitted).

The Supreme Court has recognized that district courts must be flexible in assessing prejudice, noting that "[t]he risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here." Id. Thus, other considerations that this Court has used in its severance analysis include "disparities in the amount or type of proof offered against each defendant," "disparities in the degrees of involvement by each defendant in the overall scheme" and "possible conflict between various defense theories or trial strategies." Upton, 856 F.Supp at 736 (citing Gallo, 668 F.Supp at 749).

Antagonistic Defenses

Although the Supreme Court has held that mutually antagonistic defenses are not prejudicial per se, such defenses "may be so prejudicial in some circumstances as to mandate severance." Zafiro, 506 U.S. at 538. The more fundamental and irreconcilable the inconsistency between defense theories, the greater the risk of such prejudice. Defenses are irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant. Thus, severance is appropriate when the jury, "in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." United States v. Carpentier, 689 F.2d 21, 28 (2d Cir. 1982) (internal citation omitted).

11

Applying these principles here, there can be little doubt that the likely trial defenses of Constantine and Kenner are mutually antagonistic and, if accepted, would "tend to preclude the acquittal of the other." First, perhaps the strongest bit of evidence the Government has against Constantine is an altered and incomplete audio recording, secretly recorded by Kenner, of a discussion between the two men at a Home Depot (the "Home Depot Recording" or "Recording"). Should the Government seek to introduce the Recording, Kenner would be the only party who could authenticate it. Constantine, in contrast, vehemently denies the authenticity and accuracy of the Recording. See Aff. at ¶¶ 52-55. Indeed, upon information and belief, counsel for defendant Kenner has stated in open court that he intends to act as a "second prosecutor" against Constantine. Severance is therefore appropriate as the defendants would be positioned in the manner described in Carpentier. ("In order to believe the core of testimony offered on behalf of that defendant, [the jury] must necessarily disbelieve the testimony offered on behalf of his co-defendant.") In fact, a joint trial appears to be the only way that the Home Depot Recording could be admissible; this Zafiro factor would thus support severance.

In United States v. Feyrer, the Second Circuit, affirming the denial of a Rule 14 severance motion, noted that "because each defendant was aware of the manipulation scheme involving the stock of the other's company, and in fact attended the same conspiratorial meeting in Las Vegas, proof of both schemes would be admissible against both defendants, even at severed trials." 333 F.3d 110, 115 (2d Cir. 2003). Here, however, Constantine's defense will include assertions that he was unaware of any schemes to defraud perpetrated by Kenner and others. See Aff. at ¶¶ 21-31. Constantine will demonstrate that they were highly secretive in their machinations, and that he

himself was misled about the true source of the monies that are alleged to have been diverted either into his bank accounts or used for his benefit. See Aff. at ¶¶ 21-31.

Moreover, Constantine has taken certain steps that are wholly inconsistent with and adverse to the idea that he was one of Kenner's co-conspirators. He not only denies having a role in any conspiracy, but he maintains that as soon as he discovered a fraud involving Kenner and two co-conspirators, that Constantine was the one who brought the attention of the conspiracy to the authorities. See Aff. at ¶¶ 44-45.

In United States v. Basciano, this Court granted severance where the co-defendants' defenses were in direct conflict, noting that "the defense strategy posited by the Codefendants…is more than bald conjecture given the knowledge of [the co-defendant's] prior testimony." 2007 WL 3124622 at *8 (E.D.N.Y. Oct. 23, 2007). Here, there is a reasonable belief that Kenner's defense will be to directly inculpate Constantine. The two men have been engaged for years in various adversarial litigations related to the facts that underlie the Indictment. See Aff. at ¶¶ 40-43. The arguments raised by Kenner in one such court filing relate to many of the allegations in the Indictment, and provide a likely road map for a defense strategy that Kenner might use to inculpate Constantine at a joint trial.[2] Similarly, earlier in this case, the Government submitted an affidavit with sworn admissions in support of a search warrant; it cited a 2011 email sent by Kenner in which he placed the blame for the GSF fraud directly on Constantine: "As you are all aware, Constantine has misappropriated the lion share of the GSF (Global Settlement) funds." See Aff. at ¶ 39. This represents another foreseeable

---

[2] Conversely, it is clear from his affidavit that Constantine will implicate Kenner for the frauds alleged in the Indictment.

road map of the strategy that Kenner will employ. Like in Basciano, "the defense strategy posited" by Kenner is "more than bald conjecture."

Finally, although "[l]imiting instructions...often suffice as an alternative to granting a Rule 14 severance motion," this is not a matter where such an approach is likely to prove effective, since it is the actions of co-defendant's attorney, in his dual role as a zealous advocate and "second prosecutor," that Constantine must also seek to counter. Indeed, Kenner's counsel, "in order to zealously represent his client" can be expected to do "everything possible to convict [Constantine]" including using every opportunity during cross examination of government witnesses to vilify Constantine as a member of the conspiracy. See United States v. Tootick, 952 F.2d 1078, 1082 (9th Cir 1991). In this way, "cross examination of the government's witnesses becomes an opportunity to emphasize the guilt of the other defendant [and] the presentation of the co-defendant's case becomes a separate forum in which the defendant is accused and tried." Id.

Disparities of Proof and Alleged Involvement

Because "differing levels of culpability and proof are inevitable in any multi-defendant trial," these disparities "standing alone, are insufficient grounds for separate trials." Chang An-Lo, 851 F.2d at 557. Nevertheless, there are clearly cases "in which the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required to prevent unacceptable spillover prejudice." United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003). See also Upton, 856 F. Supp. at 736 (granting severance to defendants "named in a small portion of the indictment and against whom only a small portion of the evidence is relevant").

14

As more fully set out in Constantine's supporting affidavit, the Indictment is full of specific and detailed allegations against Kenner, but there is a comparative paucity of specific allegations against Constantine. Reading the Indictment, it is Kenner who comes across as the driving force behind its alleged schemes. He is repeatedly referenced throughout the Indictment as the individual who induced, persuaded and directed the investors to make payments. He solely persuaded several of his hockey player clients to each establish lines of credit, allegedly causing losses of approximately $9 million due to his unauthorized use of their lines of credit. And, there are two counts referencing a scheme to defraud in which Constantine is not alleged to have played any role. (Counts Eight and Nine). In fact, there seem to be more specific and detailed allegations made against Gaarn (Co-conspirator 1) and Kaiser (John Doe 14) in Counts One through Seven than there are against Constantine.

The evidence against Constantine appears to be mostly limited to the Home Depot Recording and documentary evidence that portions of certain investments were allegedly diverted to accounts controlled by Constantine. Cases involving such a disproportionate amount of evidence raise the specter of prejudicial spillover. Spillover prejudice occurs "when proof inadmissible against a defendant becomes part of his trial solely due to the presence of codefendants as to whom its admission is proper." United States v Williams, 181 F. Supp 2d 267, 301-02 (S.D.N.Y. 2001).

In sum, severance of Constantine from Kenner is both appropriate and necessary.

## POINT IV. AN AUDIO RECORDING MADE BY DEFENDANT KENNER SHOULD BE SUPPRESSED; IN THE ALTERNATIVE, THERE SHOULD BE A HEARING AS TO ITS AUTHENTICITY AND THE ORIGINAL PROVIDED FOR INSPECTION AND EXAMINATION

The Government's case versus Constantine looks to rely heavily upon a surreptitiously recorded, half-hour long audio digital recording made by Kenner on his iPhone of the two defendants discussing one of the events laid out in the Indictment, as previously noted, the Home Depot Recording. Constantine moves to suppress that recording, or, alternatively, seeks a hearing to determine its authenticity, completeness, chain of custody and audibility. Tape recordings generally are admissible upon a showing of authenticity, accuracy, and relevance. See United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir.1991). Pursuant to Fed. R. Evid 901(a), the authentication of any evidence is a condition precedent to its admissibility. "[B]ecause tape recordings are likely to have a strong effect on the jury and are susceptible to alteration, the Second Circuit requires their authenticity to be established by clear and convincing evidence." United States v. Dinero Express, Inc., 2000 WL 1134484, at *1 (S.D.N.Y. Aug.9, 2000). See also United States, v. Bello, 1991 WL 45046, *2 (S.D.N.Y. Mar. 28, 2001) ("The rule in the Second Circuit is that the government must produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of tape recordings of conversations") (internal citations and quotations omitted).

In assessing whether a proffered sound recording is authentic, the Court is to consider a number of factors, including the following: (1) that the recording device used was capable of taping the conversation now offered in evidence; (2) that the operator of the device was competent to operate it; (3) that the recording is authentic and correct;

16

(4) that changes, additions, or deletions have not been made to the recording; (5) that the recording has been preserved in the manner that is presented to court; (6) that the speakers are identified, and (7) that the conversation elicited was made voluntarily and in good faith. Dinero Express, 2000 WL 1134484, at *1 n. 3; see also United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977).

For example, in Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd., the court refused to admit audiotapes on the basis that a proper foundation had not been established. 262 F. Supp. 2d 251, 263-64 (S.D.N.Y. 2003). The Court found that defendants had failed to establish "whether or not the tapes had been, or could have been edited or altered" and that the proffered foundational witness "could not testify as to the integrity of the tapes." Id. The Court "in fact noted that the tapes had been started and stopped in places, leading to the conclusion that the tapes were not integral or complete." Id.

Here, Constantine claims that the Home Depot Recording has been altered, is incomplete and that the tape is not a fair and accurate representation of the conversation. See Aff. at ¶¶ 52-55. Specifically, Constantine says that the early portions of the Recording have been altered to change the context of the conversation, and that the end of the conversation is missing. He also claims that he has become aware of other instances where Kenner has manipulated evidence and witness testimony in previous civil proceedings and that Kenner himself later admitted that he had altered the Recording. See Aff. at ¶ 54. Therefore, at a minimum, a hearing is required to assess the admissibility of the Recording.

In light of the standards articulated above, should the court determine that a hearing with respect to the authenticity of the Home Depot Recording is appropriate, it

is imperative that, prior to any such hearing, the defense has the opportunity to examine the original Recording on the original recording device. The nature of using an iPhone to record lets one easily "trim" a video with the swipe of a finger and save it as the original. See Affirmation in Support of Andrew Oliveras, Esq. ("Oliveras Aff"). See Oliveras Aff. ¶ 5. As already noted *supra* Constantine does not believe it is a fair and accurate representation of the conversation that he had, that the chronology of some of the statements have been altered and it is an incomplete recording where details of Kenner's involvement and liability are discussed. For these reasons, the only possible way to determine if the recording was altered would be to have a forensic examination conducted by a qualified expert of the iPhone used by Kenner to record the conversation. Additionally, as noted in the Supporting Affirmation of counsel Oliveras, the conversation clearly is cut short as Kenner is mid word when the recording stops. See Oliveras Aff. ¶ 6. Counsel also noted, admittedly to his untrained ear, a number of suspicious "beeping" sounds that, while possibly attributable to background noise, happen to coincide with what seems to be an unnatural change in tone and volume from one word to the next. See Oliveras' Aff ¶ 7. For these reasons, defendant Constantine should have the original recording made available for inspection and examination by counsel and a duly qualified expert for forensic analysis.

**CONCLUSION**

Wherefore, for these reasons and any other reasons considered meritorious by the Court, Defendant Constantine respectfully requests an order for the following:

1. Dismissal of the Indictment in its entirety for Government misconduct, pursuant to Rule 12 of the Fed. R. Crim. P.; or in the alternative, for an evidentiary hearing;

2. Should the dismissal be denied, dismissal of Count Four of the Indictment for lack of venue pursuant to Rule 18 of the Fed. R. of Crim. P.;

3. to sever his trial from codefendant Phillip Kenner, pursuant to Rule 14 of the Fed. R. of C P.; and

4. to suppress an audio recording of a conversation between the defendants, or in the alternative, for a hearing on its authenticity and the production of the original recording on its original storage device for inspection and forensic examination pursuant to Rule 16 of the Fed. R. Crim. P.

5. And for such other and further relief this court deems just and proper.

Dated: January 29, 2015
Mineola, New York

Respectfully submitted,

Robert P. LaRusso, Esq.
LaRusso & Conway, LLP
300 Old Country Road
Mineola, NY 11501
(516)248-3520
rlarusso@larussoandconway.com