NB:JMM/SK
F.#2013R00948

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                          13 CR 607 (JFB)

     - against -

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,
     also known as
     "Tommy C. Hormovitis,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' <u>PRETRIAL MOTIONS</u>

LORETTA E. LYNCH
UNITED STATES ATTORNEY
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

Saritha Komatireddy
James Miskiewicz
Assistant United States Attorneys
     (Of Counsel)

PRELIMINARY STATEMENT

The defendants Phillip A. Kenner and Tommy C. Constantine are charged with conspiracy to commit wire fraud, aiding and abetting each other in the commission of substantive counts of wire fraud and conspiracy to commit money laundering in violation of Title 18, United States Code, Sections 2, 1343, 1349 and 1956(h).  By motion dated January 26, 2015, defendant Kenner moves for: (1) suppression of evidence recovered from a laptop computer and cell phone seized at the time of the defendant's arrest pursuant to a search warrant and (2) for the issuance of subpoenas to potential witnesses pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure.   For the reasons set forth below, Kenner's two motions should be denied.

As for defendant Constantine, on January 29, 2015, he moved for: (1) an order dismissing the indictment in its entirety on the basis of alleged government misconduct, (2) dismissal of Count Four (one of the substantive wire fraud counts) for lack of venue in the Eastern District of New York, (3) severance of his trial from co-defendant Kenner, and (4) exclusion of an audio recording between defendants Kenner and Constantine, made by Kenner and subsequently distributed by him to victims of the charged fraud.  For the reasons set forth below, the motion to dismiss the indictment and for severance of defendants should be denied.  As to Constantine's motion to dismiss Count Four for lack of venue, the government does not oppose the dismissal motion.   Finally, as to exclusion of the audio tape made by defendant Kenner, the government addresses the admissibility of the recording as to each of the individual defendants below.

## STATEMENT OF FACTS

On November 13, 2013, defendants Kenner and Constantine were arrested by law enforcement officers, including special agents of the Federal Bureau of Investigation ("FBI") and Internal Revenue Service ("IRS") pursuant to arrest warrants issued following the return of the indictment in this case on October 29, 2013. Additionally, a United States Magistrate Judge in the District of Arizona issued a search warrant authorizing, among other things, the seizure of a laptop and cell phone used by Kenner in furtherance of the charged frauds in the indictment.

Count One of the indictment alleges that between 2002 and 2013 the defendants conspired to defraud numerous victims—many of them professional hockey player who had previously engaged Kenner as a financial advisor to help manage their assets—by: (1) inducing them to invest in a real estate venture in Hawaii, open lines of credit collateralized by the victims' personal funds, from which Kenner then stole millions for his and Constantine's personal benefit; (2) by inducing many of the same victims to invest in a pre-paid credit card company named Eufora, run by Constantine, through which additional sums of money were stolen; and, (3) by inducing many of the same victims to contribute to a so-called Global Settlement Fund ("GSF") to litigate against a third-party—one of the individuals Kenner now seeks to subpoena pursuant to Rule 17(c)—who the defendants accused of being responsible for victim losses. Counts Two through Seven of the Indictment charge substantive wire frauds arising from the conspiracy in Count One.

The Hawaii Land Developments

Beginning in 2003, Kenner persuaded his hockey player clients to invest in the acquisition of several parcels of land in Hawaii. Kenner represented to his hockey player

clients that the goal was to develop the land for housing and recreational use and later sell it for a significant profit.  Based on Kenner's representations, the hockey player clients and other investors, including John Doe 14, a resident of this district, and Jane Doe 1, wired large sums of money to bank accounts controlled by Kenner for the Hawaii project.

Kenner also persuaded several of his hockey player clients to each transfer large accounts of bond and other equity funds formerly held at Charles Schwab to Northern Trust Bank, and also to open lines of credit at Northern Trust, secured by the player's personal funds.  The evidence at trial will show that Kenner made different, inconsistent, and false representations to his clients regarding the purpose of the lines of credit.  To some, he falsely told victims that the lines would not be drawn upon.  He told others that he would only access their line of credit with the player's permission that the money would be used exclusively for the initial development costs for the Hawaii project, and that Kenner would in any event replenish their lines of credit and pay interest once the Hawaii project received full funding through an investment bank.  None of the victims were told that the funds collateralizing the lines of equity, funds which for many of the player clients represented the whole of their retirement savings, would be depleted, certainly not for Kenner and Constantine's personal benefit.  Yet that is precisely what the defendants did.  Witness testimony, bank records, wire transfers will show that Kenner used the lines of credit to siphon millions from the player's bond and equity funds.  To conceal the theft, Kenner arranged to have Northern Trust Bank mail the statements for each of the lines of credit to his home in Scottsdale, Arizona.

Without his hockey player clients' knowledge or permission, Kenner stole his clients' assets to, among other things, buy and sell land  for himself in Hawaii that his clients

knew nothing about, to fraudulently obtain a personal interest in a Sag Harbor, New York real estate development, and to make interest payments on some lines in a stealing "from Peter to pay Paul" scheme to delay discovery of the scheme.  Kenner diverted money from the lines of credit, and his client's cash investment in Hawaii, to bank accounts controlled by Kenner and Constantine to pay personal mortgages, credit card bills and other personal expenses such as Constantine Management Group, LTD ("CMG"), which had no relation to the Hawaii project, but through which Constantine, using the player's stolen money, funded two race car teams that he ran, and to make payments on various personal expenses.

In 2009, Kenner failed to make interest payments on the lines of credit and, as a result Northern Trust Bank closed the lines of credit and liquidated the equity securing each line of credit.   John Does 1 through 8 lost a total of approximately $9 million due to Kenner's scheme.   Most of the parcels of land acquired for the Hawaii project were subsequently sold at foreclosure auctions or remain in foreclosure.

The Eufora Scheme

In or about 2002, defendant Constantine established Eufora, LLC ("Eufora"). Eufora issued pre-paid credit cards, and offered a "patented" service of reporting credit card transactions to one of the national credit bureaus to improve users' credit history.  Beyond the value of its patent, Eufora possessed few assets outright, and contracted with a third-party credit servicing corporation to track and settle its customer's use of Eufora credit cards. Between approximately February 2008 and December 2009, Kenner and Constantine convinced several of Kenner's hockey player clients, as well as a resident of the Eastern District of New York, to invest over $1.5 million in Eufora.  Financial records and analysis will show that Kenner and Constantine diverted much of the funds raised to bank accounts

that they or one other co-conspirator controlled.  As with the funds from the Hawaii project, the defendants diverted the money for purposes unrelated to Eufora.  Moreover, some of the investors in Eufora were promised equity membership in the company in exchange for their money.  In addition to the many diversions of capital for unrelated personal expenses, Constantine's intent to defraud investors by taking their money through false promises of giving them a share in the company will be established by, inter alia, Constantine's own court filings in civil litigation predating the instant indictment in which he denied that the funds he received from several investors was ever intended to secure to them an equity share in Eufora.

The Global Settlement Fund

Through GSF the defendants stole even more money from the already twice-defrauded victims.  In or about Spring 2009, Kenner and Constantine met with several of Kenner's hockey player clients to persuade them to contribute to a GSF.  Victims will testify that Kenner and Constantine told them that GSF would be used primarily to litigate civil claims in connection with the hockey players' investments in real estate projects in Mexico, which Kenner and Constantine claimed were at a standstill because the developer of those projects, Kenneth Jowdy (John Doe 17), had misused their money.  Victims contributed approximately $4.1 million to GSF.  The funds were wired to the escrow account an attorney in Los Angeles, California, (John Doe 16), whom Kenner and Constantine claimed would represent the victims in the civil action against Jowdy.  This was the same attorney who represented Kenner in an arbitration action brought by some of Kenner's clients who, by 2008 and 2009, had concluded that they had been defrauded by the defendant.   The attorney receiving the GSF funds also prepared several other player clients prior to their appearances

before the Grand Jury in the Southern District of New York which initiated the investigation that eventually led to Kenner and Constantine's indictment in this district.

Financial records and analysis revealed that only a small fraction of the $4.1 million contributed to the GSF was used for legal proceedings against Jowdy.  The majority of the GSF money was transferred into bank accounts controlled by Constantine.  From there, the defendants used significant portions of the money for purposes unrelated to litigation against Jowdy or the other purported purposes of the GSF.  As the evidence will establish, some money was diverted to pay attorneys' fees in a legal matter involving Constantine's race car company.  Other funds were diverted so that Kenner could invest in a tequila company in Mexico, and to arrange for an associate to purchase Constantine's home in Arizona, which was going into foreclosure.

The Led Better Scheme

Counts Eight and Nine charge additional substantive wire fraud counts arising from Kenner defrauding certain victims in connection with a real estate development project in Sag Harbor, New York known as the "Led Better" project.  Between October 2006 and May 2012, Kenner acquired an ownership interest in a parcel of land in Sag Harbor, New York by defrauding John Doe 1 and John Doe 2.  Kenner represented to John Doe 1 that John Doe 1 could acquire a 50 percent interest in the Sag Harbor property by investing $375,000, thereby inducing John Doe 1 to wire funds to Kenner's bank account.  In addition to the $375,000 invested by John Doe 1, KENNER used $395,000 from John Doe 2's line of credit, established as part of the Hawaii development project without John Doe 2's knowledge or permission, to purchase the Sag Harbor property.  Kenner then created the Led Better Development Company, LLC ("Led Better") to purchase the Sag Harbor property.  He

instructed John Doe 14 and John Doe 18 to each wire $190,000 to him, which they did, to obtain a 25 percent interest each in the Sag Harbor property.

The Led Better operating agreement, which Kenner drafted, but did not disclose to John Does 1, 2, 14 or 18, stated that Kenner owned a 25% interest in the Sag Harbor property although he invested none of his own money into the project and in fact used money stolen from John Doe 2's Northern Trust line of credit to purchase the land through the Led Better LLC.  To conceal the scheme, Kenner continued to make interest payments on John Doe 2's line of credit, largely by transferring funds from other victims, until early 2009, and also directed Northern Trust to mail John Doe 2's monthly statements on his line of credit to Kenner's home in Arizona.  At the same time, while John Doe 1 believed, based on Kenner's representations, that he owned 50% of the in the Sag Harbor property, the Led Better operating agreement provided that John Doe 1 owned only 25% of the Sag Harbor property.

Money Laundering Conspiracy

Finally, Count Ten charges Kenner and Constantine conspiring to launder millions stolen through the Hawaii, Eufora, GSF and Led Better schemes. In executing their schemes to defraud, Kenner and Constantine often transferred money through various bank accounts -- sometimes on the same day -- to disguise, among other things, the source of the funds and who controlled the funds.

POINT ONE

KENNER'S MOTION TO SUPPRESS EVIDENCE
SEIZED FROM HIS LAPTOP AND iPHONE
PURSUANT TO A SEARCH WARRANT SHOULD BE DENIED

Pursuant to a search warrant issued in the District of Arizona on November 13, 2013 (the 2013 search warrant"), federal agents seized a laptop and iPhone at the time of Kenner's arrest on the pending indictment.  The execution of the search warrant has been preceded by an initial review by a prosecutor not assigned to the present matter for purposes of filtering from the prosecution team any electronic files that may constitute privileged communications between the defendant and one of several attorneys who have represented him in the past.  Kenner contends that the holding in United States v. Ganias, 755 F.3d 125 (2d Cir. 2014), requires suppression of any electronic evidence contained within those items. The defendant is wrong.

A.      The Execution of Search Warrants for Electronic Information

Warrants must be executed reasonably.  See Tennessee v. Garner, 471 U.S. 1, 7-8 (1985) (whether a search or seizure is reasonable depends not only on the existence of probable cause but also on "how it is carried out").  Courts assess reasonableness in light of all the circumstances.  See In re Terrorist Bombings of U.S. Embassies in East Africa, 553 F.3d 150, 152 (2d Cir. 2009); see also United States v. Wuagneux, 683 F.2d 1343, 1352 (11th Cir. 1982) ("[T]he magnitude of a search is insufficient, by itself, to establish a constitutional violation; rather, the relevant inquiry is whether the search and seizures were reasonable under all the circumstances.").

There are no rigid time limits on the execution of search warrants for electronic information.  As amended in 2009, Federal Rule of Criminal Procedure 41

specifically authorizes "later review" of seized electronic media, imposes no time limits, and

makes clear that the fourteen-day limit on the execution of an issued warrant does not apply

to "off-site copying [and] review."  Fed. R. Crim. P. 41(e)(2)(B).  The advisory committee

notes for that 2009 amendment explain:

> Computers and other electronic storage media commonly
> contain such large amounts of information that it is often
> impractical for law enforcement to review all of the information
> during execution of the warrant at the search location.  This rule
> acknowledges the need for a two-step process: officers may
> seize or copy the entire storage medium and review it later to
> determine what electronically stored information falls within the
> scope of the warrant. . . .  A substantial amount of time can be
> involved in the forensic imaging and review of information.
> This is due to the sheer size of the storage capacity of media,
> difficulties created by encryption and booby traps, and the
> workload of the computer labs.

 Fed. R. Crim. P. 41(e)(2), 2009 Committee Notes.  The advisory committee also rejected

any attempt to formulate a uniform rule to govern the off-site review and copying of seized

electronic material.

> While consideration was given to a presumptive national or
> uniform time period within which any subsequent off-site
> copying or review of the media or electronically stored
> information would take place, the practical reality is that there is
> no basis for a "one size fits all" presumptive period. A
> substantial amount of time can be involved in the forensic
> imaging and review of information.  This is due to the sheer size
> of the storage capacity of media, difficulties created by
> encryption and booby traps, and the workload of the computer
> labs. The rule does not prevent a judge from imposing a
> deadline for the return of the storage media or access to the
> electronically stored information at the time the warrant is
> issued.  However, to arbitrarily set a presumptive time period
> for the return could result in frequent petitions to the court for
> additional time.

Id.

As the First Circuit has observed, "Courts have permitted some delay in the execution of search warrants involving computers because of the complexity of the search." United States v. Syphers, 426 F.3d 461, 469 (1st Cir. 2005) (citing United States v. Gorrell, 360 F. Supp. 2d 48, 55 n.5 (D.D.C. 2004) (ten month delay in processing of computer and camera seized, although "lengthy," "did not take the data outside the scope of the warrant such that it needs to be suppressed")); see also United States v. Winther, 2011 WL 5837083, *12 (E.D. Pa. Nov. 18, 2011) (citing cases and concluding forensic analysis outside fourteen-day time period did not violate Fourth Amendment); United States v. Burns, 2008 WL 4542990, *9 (N.D. Ill. Apr. 29, 2008) (citing cases upholding delays of various lengths as reasonable as a matter of law; finding ten-month delay reasonable); United States v. Hernandez, 183 F. Supp. 2d 468, 480 (D.P.R. 2002) (holding that "[n]either Fed. R. Crim. P. 41 nor the Fourth Amendment provides for a specific time limit in which a computer may undergo a government forensic examination after it has been seized pursuant to a search warrant"); United States v. Triumph Capital Group, Inc., 211 F.R.D. 31, 66 (D. Conn. 2002) ("[C]omputer searches are not, and cannot be subject to any rigid time limit because they may involve much more information than an ordinary document search, more preparation and a greater degree of care in their execution.").

Here, Kenner's laptop and cellphone were seized pursuant to a search warrant. Before any search took place, a privilege review team was installed to insure that the prosecutors and agents assigned to this case did not access material that was arguably privileged communications between Kenner and the various attorneys he has used for years

in connection with his various schemes to defraud.[1]   Accordingly, a privilege review of the seized computer and phone was conducted by an Assistant United States Attorney to ensure that no privileged materials were disclosed to prosecutors or agents in the indicted matter. That privilege review proved a massive undertaking.  The electronic material consisted of 64,468 documents (totaling over 300,000 pages), which were duplicated a second time for Kenner in November 2014 according to categories that the reviewing AUSA proposed were either privileged or clearly non-privileged.

The execution of the search warrants for these items was delayed further by counsel's assertion that he had not been provided with the correct password to access the categorized material.  That assertion proved false when, after the government provided counsel with additional duplicates of the reviewed material, counsel admitted to the reviewing AUSA that he had been misreading the correct password that had been provided to him in November.  To date, counsel for Kenner has not objected to the reviewing AUSA's determinations of what materials are or are not privileged and accordingly, searches of the non-privileged material by the trial team, have only now begun.

In light of these circumstances, the delay in execution of the warrants arises not out of government overreaching or tardiness but good faith efforts to protect Kenner's Sixth Amendment right to counsel.  Accordingly, the government submits that its execution

---

[1] At present, the government does not contend that civil counsel retained by Kenner were knowingly complicit in the defendant's fraudulent schemes.  The government contends only that Kenner used his counsel as a conduit to divert funds to Kenner and Constantine's personal benefit.  Furthermore, it is clear that counsel took litigation positions that, while beneficial to the defendants, were inconsistent with the interests of many of the victims. In at least one instance, counsel even disavowed any duty to the victims despite their contribution of millions to the GSF fund, which counsel used for his legal fees.

of the warrants only after the proper filtering by a privilege review prosecutor, a search that

has only commenced recently, is reasonable and not in violation of the Fourth Amendment.

B.        Ganias Does Not Provide Kenner With Grounds for Suppression

Kenner relies almost exclusively on Ganias as a basis for suppression.  That

case simply does not stand for any of the propositions that Kenner asserts and provides no

basis for suppression.

In Ganias, following information regarding fraud on the part of a government

contractor, agents obtained a search warrant for computer files possessed by the target's

accountant.  755 F.3d at 128.   Agents then seized the defendant's computer files by making

a duplicate or "image" copy of the original computer files, leaving the actual hardware with

the defendant.  Id. at 128-29.  "[S]ome thirteen months after the seizure, [agents] had isolated

and extracted the computer files that were relevant" to their initial investigation "and thus

covered by the search warrant.  Id. at 129.  Nonresponsive files, however, remained on the

imaged copy originally seized by law enforcement agents, and as the investigation expanded

into possible tax violations by Ganias, some two-and-a-half years after the seizure of the

computer files, agents obtained a new warrant to search through the electronic data for

evidence related to the newly-expanded tax fraud investigation.  Id.

Contrary to Kenner's contention, the issue in Ganias was not the

reasonableness of the length of time it took to conduct the original off-site review of the

imaged files—that  is, 13 months, or approximately the length of time spent here to

complete the initial privilege review.  In fact, the Court of Appeals in Ganias explicitly

declined to review whether the "resulting off-site sorting process was unreasonably long."

Id. at 137.   Rather, the Ganias Court considered "a more limited question: whether the

Fourth Amendment permits officials executing a warrant for the seizure of particular data on a computer to seize and indefinitely retain every file on that computer for use in future criminal investigations." Id. Because the seizure took place at the time of the initial search warrant and imaging of files, resulting in an initial search of some 13 months, followed over two years later by a second warrant supported by allegations of probable cause that went beyond the scope of the first, the Court of Appeals reasoned that if the initial "warrant authorized the Government to retain all the data on Ganias' computers on the off-chance the information would become relevant to a subsequent criminal investigation, it would be the equivalent of a general warrant." Id. Accordingly, the court concluded that "by seizing and indefinitely retaining non-responsive computer records," and thereafter searching the non-responsive records by means of a second warrant, the government violated the defendant's Fourth Amendment rights. Id. at 141.

Here, there has been no indefinite retention of non-responsive files. Insofar as the laptop or cell phone contain the kinds of non-responsive, purely family or otherwise personal materials alleged by the defendant, the warrant issued in this case in 2013 does not authorize the search or use of such material. Ganias does not provide a basis for suppression of the materials seized lawfully for the simple reason that there has been no successive expansion of the investigation, and no application for a second warrant, a circumstance that determinative to the Court of Appeals' decision in Ganias that the second warrant amounted to sanctioning of a practice of issuing a general warrant for files that may "become relevant to a subsequent criminal investigation." Id. at 137. Accordingly, Kenner's motion for suppression should be denied.

<u>POINT TWO</u>

KENNER'S MOTION FOR THE ISSUANCE
<u>OF RULE 17(c) SUBPOENAS SHOULD BE DENIED</u>

Kenner moves for the issuance of a subpoena to four individuals, three of whom are victims of the charged frauds, and two financial institutions for a broad array of records.   Despite conceding that the government's discovery in this case has equaled approximately one million documents, (Kenner Affidavit, ¶ 8), the defendant contends he should be permitted to subpoena broad groups of documents that have no specificity in time, date, origin or even whether the "communications" are genuine or self-serving hearsay from the defendant fabricated during the schemes charged in an effort to conceal his crimes.   For the reasons set forth below, Kenner's motion is without merit and should be rejected.

A.      <u>Applicable Law</u>

A subpoena issued pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure "may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." Fed.R.Crim.P. 17(c)(1). The Rule provides that "[t]he court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." <u>Id</u>. The Rule further provides that, "[o]n motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed.R.Crim.P. 17(c)(2).

The use of Rule 17 subpoenas in criminal cases is governed by the Supreme Court's decision in <u>United States v. Nixon</u>, 418 U.S. 683 (1974). The Nixon Court principally recognized that the Rule 17 subpoena "was not intended to provide a means of discovery for criminal cases," but its purpose is to enable a party to obtain and inspect

evidentiary material prior to trial.  Nixon, 418 U.S. at 698-99.  It therefore held that, in order

to require production of materials prior to trial, the moving party must show:

> (1) that the documents are evidentiary and relevant; (2) that they
> are not otherwise procurable reasonably in advance of trial by
> exercise of due diligence; (3) that the party cannot properly
> prepare for trial without such production and inspection in
> advance of trial and that the failure to obtain such inspection
> may tend unreasonably to delay the trial; and (4) that the
> application is made in good faith and is not intended as a
> general "fishing expedition."

Id. at 699-700 (citing Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951)).

The Court specified that, "[a]gainst this background," the subpoena proponent

must "clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." Id. at 700

(emphasis added).  Under Rule 17(c)(2), courts may quash subpoenas that are "unreasonable

or oppressive" or where it is clear that the subpoena proponent has not satisfied the threshold

requirements for issuance. See id. at 698-99; In re Irving, 600 F.2d 1027, 1034 (2d Cir.

1979).

"The burden of proving relevance and admissibility is on the proponent of the

subpoena." United States v. RW Professional  Leasing Services Corp., 228 F.R.D. 158, 162

(E.D.N.Y. 2005) (citing Nixon, 418 U.S. at 699-700); see also United States v. Brown, No.

95-168 (AGS), 1995 WL 387698, at *29 (S.D.N.Y. Jun. 30, 1995)(stating that the defendant

issuing the subpoena "has [the] burden of specifically identifying the materials sought and

showing that they are relevant and admissible").  This burden can only be  satisfied by

showing that "the documents sought are both relevant and admissible at the time of the

attempted procurement," and "[t]he fact that they are potentially relevant or may be

admissible is not sufficient." RW Professional Leasing Services Corp., 228 F.R.D. at 162

(citing <u>United States v. Marchisio</u>, 344 F.2d 653, 669 (2d Cir. 1965); <u>see also</u> <u>United States</u> <u>v. Cherry</u>, 876 F. Supp. 547, 553 (S.D.N.Y. 1995).  Indeed, "[i]f the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful [may] turn up, the specificity requirement will not be satisfied." <u>RW Professional Leasing Services Corp.</u>, 228 F.R.D. at 162 (internal quotations and citation omitted).  Applying those principles, including the requirement of establishing admissibility, the <u>Nixon</u> Court held that Rule 17 subpoenas could generally not be used to obtain impeachment materials. <u>See</u> <u>id</u>. at 701 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial.").

B.     The Requested Subpoenas Fail to Meet the <u>Nixon</u> Standards

        In his motion, Kenner proffers no specificity as to the documents or records sought and therefore cannot show their relevancy or admissibility.  <u>Id</u>. at 700.  Indeed, there appears to be a discrepancy between Kenner's stated need for documents, counsel's articulation for a basis, and the attachments to accompany the subpoenas themselves.  While Kenner contends that he has "compiled a list of documents to be produced which are relevant and material to my defense," the subpoena attachments do not seek any specific document or list of documents but rather broad categories of possible "communication" between the witnesses and the defendant.  <u>See generally</u> Schedule A, John R.  Kaiser, p. 1.  Certain requests seek records that would appear to suggest that some of the victims were able to recoup some of their losses after the completion of the charged frauds.  <u>Id</u>.  Meanwhile, counsel for Kenner solely argues that "the information sought may serve to impeach the credibility of the third-party witness. (Mem. of Law at 10).  However, the <u>Nixon</u> Court held that Rule 17 subpoenas could generally not be used to obtain impeachment materials. <u>See</u>

Nixon, 418 U.S. at 701 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial.").

As for subpoenas to Northern Trust Bank and Charles Schwab, the attachments seek documents covering broad categories spanning some 13 years. The demands are also phrased in the form of argumentation rather than information, thus for instance, Kenner seeks "[a]ll documents signed by" a number of the John Doe's identified in the Indictment "relative to the Line of Credit [sic] which Kenner was specifically granted authorization to access for Little Isle IV, LLC." (Northern Trust Bank Attachment, p. 1). Certainly Kenner intends to argue as a defense that his player-victims authorized him to enrichment himself by depleting their bond funds and other asset accounts. However, Kenner fails to articulate why he should be permitted to subpoenas materials that either duplicates material provided in Rule 16 discovery, or is irrelevant to any issue of consequence at trial. Fed.R,Evid. 401. How USA Patriot Act forms, promissory notes beyond those related to the charged counts, if any, or any of the other documents sought by Kenner are both relevant and admissible is not explained in the motion. Under Nixon, the documents sought must be "both relevant and admissible at the time of the attempted procurement," and "[t]he fact that they are potentially relevant or may be admissible is not sufficient." RW Professional Leasing Services Corp., 228 F.R.D. at 162.

Finally, one of the subpoenas is directed to an individual who had no relation to any of the schemes charged in the indictment---Kenneth Jowdy. Although Kenner and Constantine used Jowdy to induce their victims to contribute to the GSF, Jowdy was

uninvolved with any of the charged counts.[2]   In fact, the victims identified as John Does in

the Indictment were not solicited by Jowdy for investments in any of the transactions charged

in the Indictment.   Moreover, victims will testify that allegations of Jowdy's theft and/or

mismanagement of Mexican development projects came solely from Kenner, who frequently

accused Jowdy of theft and fraud whenever the victims sought answers from Kenner, their

financial advisor, about the disposition of their assets and other losses.[3]

C.      Kenner's Reliance on Tucker is Misplaced

                As if to concede that the pending motion for Rule 17(c) subpoenas does not

meet Nixon's three requirements of relevancy, admissibility, and specificity, Kenner relies

---

[2] Through Kenner, Jowdy received investment funds from a number of Kenner's
victims for the purpose of developing resorts in Baja, Mexico.  The first of these ventures,
referred to as "El Rosario" or the "northern property," failed though not as a result fraud.  A
more recent development, known as the Cabo San Lucas ("CSL") property, is operational
and may yet return a profit to many of the same players and other investors victimized by
Kenner and Constantine through Hawaii, Eufora, GSF and Led Better.  Kenner diverted or
borrowed funds from two player investors to secure for himself a 38 percent equity stake in
the CSL parent development company.  However, Kenner obtained those funds from two
clients who are not named as John Does in the Indictment.  In various depositions, under
oath, Kenner has since alternately asserted his continued ownership stake in CSL and
disavowed his ownership in the CSL.

[3] In his motion, counsel for Kenner states that the defendant "does not concede that
the government has standing to object" application for issuance of subpoenas. (Notice of
Motion ¶ 15).  Assuming this to be a claim against government standing, Kenner is wrong.
The government has a legitimate interest in opposing the issuance of this broad proposed
subpoena because, as described in greater detail below, (1) the proposed subpoena has little,
if any, bearing on the issues relevant to the case, (2) it seeks inadmissible evidence, (3) it will
unnecessarily further delay the trial in this case, and (4) it unduly harasses victims. See, e.g.,
United States v. Orena, 883 F. Supp. 849 (E.D.N.Y. 1995).  Moreover, it is well-established
law in this Circuit and this district, regardless of the government's standing to oppose the
proposed subpoena, that the Court has an independent duty to review the propriety of the
proposed subpoena and determine whether it comports with the requirements of Rule 17 and
the Nixon factors. See In re Irving, 600 F.2d at 1034; United States v. Weisberg, No. 08-347
(NGG), 2011 WL 1327689, at *3-4 (E.D.N.Y. Apr. 5, 2011); United States v. Vasquez, 258
F.R.D. 68 (E.D.N.Y. 2009); Khan, 2009 WL 152582, at *2-3.

entirely on the district court's opinion in United States v. Tucker, 2008 WL 361127 (S.D.N.Y. February 7, 2008) as a basis for issuing the subpoenas anyway.  This Court should reject this approach.

In Tucker and in an earlier opinion, United States v. Nachamie, 91 F. Supp. 2d 552, 558 (S.D.N.Y. 2000), United States District Judge Scheindlin held that Nixon should not apply where production is sought by  "(a) a criminal defendant; (b) on the eve of trial; (c) from a non-party; (d) where the defendant has an articulable suspicion that the documents may be material to his defense." Tucker, 2008 WL 361127, at *5. The court formulated its own standard requiring a showing that the subpoena request was "(1) reasonable, construed as material to the defense, and (2) not unduly oppressive for the producing party to respond." Id. (quotations omitted).

Although the government respectfully recognizes the authoritative views of Judge Scheindlin, Tucker and Nachamie are not binding on this Court and have been viewed by other judges in this district as representing  "break[s] from long-standing precedent in this circuit." See United States v. Khan, No. 06-255 (DLI), 2009 WL 152582, at *2 (E.D.N.Y. Jan. 20, 2009); see also  United States v. Drakopoulos, No. 02-504 (SJ), 2003 WL 21143080, at *1 (E.D.N.Y. Jan. 13, 2003).  Moreover, to date, "all district courts within the Second Circuit, aside from the Tucker court, have applied the Nixon analysis to third-party subpoenas issued by the defense."  United States v. Barnes, No. 04-186(SCR), 2008 WL 9359654 *3 (S.D.N.Y., April 2, 2008)(citing United States v. Ferguson, 2007 WL 2815068 (D. Conn. Sept. 26, 2007)(collecting cases)).  On appeal, the Second Circuit declined in Barnes to "forego the Nixon standard for the more permissive standard employed in Tucker. . . ," and affirmed the district court's denial of the requested Rule 17(c) subpoenas because the

defendant's proffered speculation that the requested records would lead to the acquisition of impeachment evidence constituted a mere "fishing expedition" requiring that the subpoenas be quashed.  United States v. Barnes, 560 Fed.Appx. 36, 40 n. 1 (2d Cir. 2014).

        Here, despite the defendants' contention that the scope of the subpoenas is narrow (Def. Memo. at 10), an examination of the proposed subpoenas makes it evident that the request for the Rule 17(c) subpoena is a "fishing expedition" for "information that may serve to impeach the credibility of third-party witnesses."  Id.  That speculative proffer is precisely the type that led the Court of Appeals in Barnes to affirm the district court's denial of Rule 17 subpoenas sought by the defendant.  Even under Judge Scheindlin' s approach, the defendant's request for large categories of records, covering over a decade, with no specificity as to their relevance is both unreasonable fails to provide "an articulable suspicion that the documents may be material to his defense." Tucker, 2008 WL 361127, at *5. Accordingly, the motion for Rule 17(c) should be denied.

POINT THREE

THE DEFENDANTS' JOINT MOTION FOR
DISCLOSURE OF MATERIALS PURSUANT TO BRADY AND GIGLIO

Defendant Kenner, whose motions are joined where applicable by co-defendant Constantine, seeks an order directing that the government disclose material within the meaning of Brady v. Maryland, 373 U.S. 83 (1963); United States v. Giglio, 405 U.S. 150 (1972); United States v. Bagley, 476 U.S. 667 (1985).   The government acknowledges its constitutional duty to disclose such information to the defendants.  On June 18, 2014, the government provided to the defense transcripts of certain grand jury testimony by several victims recognizing that the defendants may view certain statements contained therein as potentially useful to the defense with respect to the Northern Trust lines of credit.  On July 19, 2014, upon the defendant's request, the government also provided copies of the grand jury exhibits associated with the victims' testimony.  The government hereby acknowledges its continuing obligation to disclose information that may be favorable to the defendants or useful to impeach government witnesses.  The government has assembled and marked pursuant to 18 U.S.C. § 3500 additional transcripts, law enforcement agent notes, and memoranda of interview of numerous witnesses in this matter.  As represented, the government has produced that material to defense counsel on February 23, 2015.  To the extent additional interviews are conducted prior to trial, or statements not contained within the material already disclosed, the government will supplement its discovery as expeditiously as possible.  Accordingly, the defendants' motion for an order directing disclosure is moot.

POINT FOUR

CONSTANTINE'S MOTION TO DISMISS
THE INDICTMENT SHOULD BE DENIED

Defendant Constantine moves to dismiss the indictment in its entirety based on

alleged prosecutorial misconduct.  Although Constantine makes four separate allegations of

misconduct, his grounds for dismissal amount to the following: First, he argues that dismissal

is warranted because an FBI agent purportedly discouraged one of the victims of the indicted

fraud, former NHL player Bryan Berard  (John Doe 1), from answering questions regarding

his contributions, at the behest of Kenner and Constantine, to the GSF during a civil

deposition that took place almost one year after the Indictment was returned in this case, in

litigation that had nothing to do with the GSF.  (Constantine Affidavit ¶6; Defendant's

Exhibit B).  Second, Constantine alleges that the government withheld exculpatory evidence

from the Grand Jury regarding the disposition of funds originating from two wire transfers

sent on December 7, 2009 by a victim of the Eufora scheme, Nicholas Privitello (John Doe

15).  (Constantine Affidavit ¶¶ 9-17).   Neither of the allegations constitutes a basis for

dismissal of the Indictment.

A.     Applicable Law

Pursuant to the Court's supervisory power, an indictment may be dismissed for

prosecutorial misconduct if the grand jury was misled or misinformed.  United States v.

Hogan, 712 F.2d 757, 761 (2d Cir.1983) (dismissing an indictment where the prosecutor

called the defendant a "real hoodlum" who should be "indicted as a 'matter of equity,' " and

presented hearsay, double hearsay, speculation, and false evidence resulting in the jury being

misled by the presentation); United States v. Estepa, 471 F.2d 1132, 1136 (2d Cir.1972)

(dismissing an indictment where the agent who testified had limited knowledge of the transaction at issue and likely misled grand jurors into thinking he was providing eyewitness testimony); see also Bank of Nova Scotia v. United States, 487 U.S. 250, 256 & 259 (1988)(holding dismissal warranted where there was " 'grave doubt' that the decision to indict was free from the substantial influence of [the misconduct]", or possibly if there is "a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process"). In order for prosecutorial misconduct to require a dismissal of the indictment, the prosecutor's conduct must amount to "a knowing or reckless misleading of the grand jury as to an essential fact." United States v. Lombardozzi, 491 F.3d 61, 66, 79 (2d Cir.2007).

B.     Analysis

Constantine alleges that an FBI agent ordered Mr. Berard not to answer certain question during a civil deposition in October 2014.   First, the government denies Constantine's claims and speculation that any law enforcement agent gave any instructions to any witness in civil litigation as to how to answer questions during depositions. Furthermore, Constantine's allegation, even if true, is irrelevant because the conduct complained of occurred well after the Grand Jury's decision to Indict.  Therefore, it could not logically play any role in the decision to indict.  Nova Scotia, supra.

Regarding the supposed concealment of favorable evidence as to wire transfers alleged in Counts Six and Seven, Constantine's recitation of facts amounts to a series of gross omissions.  At trial, Mr. Privitello will testify that in or about December 2009, he was induced to invest $200,000 in Eufora.  Evidence will show that Constantine directed Mr. Privitello to wire his funds to an attorney escrow account in California.  Unbeknownst to Mr.

Privitello, the attorney's escrow account was then being used by Kenner and Constantine to receive and disperse funds raised in connection with the GSF.  Being a first-time investor with either of the defendants, Mr. Privitello had no reason to contribute to the GSF, a fund ostensibly created to litigate against Kenneth Jowdy.  The only reason Mr. Privitello wired Constantine $200,000 in two transactions on December 7, 2009 was because he was assured a profit from Eufora's anticipated  success that would be secured by Constantine's promise to grant Privitello a 1.5 percent share of Eufora in exchange for his investment.

That some of Mr. Privitello's $200,000 eventually was eventually redirected to a Eufora account is irrelevant, and consequently, the government's choice not to limit the Grand Jury's information to the defendant's self-serving analysis is not concealment of favorable or exculpatory evidence.  Rather, what the evidence at trial will show is that after receiving Mr. Privitello's money, Constantine directed the attorney whose escrow account was used to accumulate GSF funds to send $21,250 of Mr. Privitello's funds to pay Constantine's personal expenses, specifically legal fees arising from the defendant's race car team and transfer $6,250 to another victim, the NHL player Sergei Gonchar, (John Doe 6), who had invested in the Hawaii project, the GSF and Eufora.

Furthermore, in June 2012, Mr. Privitello consensually recorded a telephone call with Constantine to try to get some explanation as to the status of his investment in Eufora, almost three years old by then, which had borne no return, reimbursement or issuance of any agreement memorializing Privitello's promised 1.5 percent equity share in Eufora.  During that recording  Constantine is heard claiming that Eufora received no money from Mr. Privitello, and suggesting that the $200,000 wire transfer had been erroneously sent to the GSF attorney escrow account, not Eufora.  Constantine blamed the mistake on another

victim, John Kaiser (John Doe 14). When Mr. Privitello reminded Constantine that he had

sent the wire pursuant to directions he received from Constantine, not Kaiser, Constantine

simply disavowed any knowledge about where Mr. Privitello's money went.  This disavowal,

with embellishments and material inconsistencies, also appeared in a sworn affidavit filed by

Constantine in the Eastern District of New York in opposition to a lawsuit filed by Mr.

Privitello and others for a return of their funds.  See  Hughes et al. v. Constantine, 11-CV-

2692 (SJF) (WDW) (DE 11, Declaration of Constantine ¶¶31-37).  In Hughes, Constantine

denied that Privitello and the other plaintiffs, including a victim identified in the Indictment

as Jane Doe, had been promised any equity in Eufora in exchange for their investments

despite contemporaneous emails and statements from the defendant to the contrary.   Also

contrary to his claims on the Privitello recording, Constantine admitted in Hughes that he did

directed that wire transfers be made to the GSF attorney escrow account, but then claimed

the funds were only accepted "conditionally."  Id.  He then offered a different set of excuses

for taking Privitello, Jane Doe and other people's money and never returning or even

accounting for it.

            In sum, the government committed no misconduct or concealment of favorable

evidence with respect to obtaining the grand jury's decision to indict.  To the contrary,

Constantine's fraudulent actions, as summarized above, will support the wire frauds in

Counts Six and Seven.  His shifting explanations about the disposition of those funds, the

government will argue, evidenced the defendant's intent to steal money and defraud his

victims through Eufora.   Constantine's motion to dismiss the Indictment is therefore

meritless and should be denied.

POINT FIVE

CONSTANTINE'S MOTION FOR SEVERANCE SHOULD BE DENIED

Constantine moves to sever his trial from Kenner's contending prejudicial joinder under Fed. R. Crim. P. 14(a). (Def. Memo. 10). Specifically, Constantine argues that severance is warranted because (1) Kenner's consensual recording of himself and Constantine (the "Home Depot Recording") will create antagonistic defenses and (2) there is a supposed disparity of proof and culpability as between the two defendants that will prejudice Constantine at a joint trial. Put simply, as explained below, Constantine's arguments do not meet the high standard for trial severance based on prejudice, and his motion should be denied.

A.     Applicable Law

Fed. R. Crim. P. 8(b) permits joinder of parties "alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Under the Second Circuit's interpretation, Rule 8(b) permits joinder where charges are "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." United States v. Stewart, 433 F.3d 273, 314 (2d Cir. 2006) (citing United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989)).

There is a strong preference for joint trials in the federal court system, and a defendant seeking severance must meet a "heavy burden[.]" See United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998). This is particularly true where, as in the instant case, defendants have been charged together in a single indictment pursuant to Rule 8(b). Joint trials promote efficient use of judicial resources and "serve the interest of justice by avoiding

the scandal and inequity of inconsistent verdicts.   Zafiro v. United States, 506 U.S. 534, 537 (1993) (citations omitted).

The presumption in favor of joint trials is even stronger when "the crime charged involves a common scheme or plan." United States v. Ramos, 346 F. Supp. 2d 567, 569 (S.D.N.Y. 2004) (citing United States v. Turnoff, 853 F.2d 1037, 1042-43 (2d Cir. 1988)); see also United States v. Stewart, 433 F.3d 273, 314 (2d Cir.2006) (the joinder of defendants is proper where the case would otherwise have resulted in two essentially duplicate trials).

The Supreme Court standard for the granting of severance pursuant to Rule 14 is accordingly very high. A district court should grant severance only if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 537.   Rule 14 does not require severance, even if prejudice is shown. Id. at 538–39.   The rule leaves the type of relief granted to the sound discretion of the trial court. Id. As the Supreme Court has recognized, limiting instructions are often sufficient to cure any risk of prejudice. See id. at 539.

B.    The Defendants' Are Properly Joined Under Rule 8(b)

There is no dispute that Constantine and Kenner are properly joined under Rule 8(b).  The Led Better wire fraud counts charge only Kenner in Counts Eight and Nine although bank records will show that Constantine received profits from the fraud, which will be relevant to the money laundering conspiracy.  Constantine and Kenner are charged as coconspirators in Counts One and Ten, and as aiding and abetting each other in the substantive wire fraud Counts Two through Seven.  The documentary evidence, in particular

wire transfers showing the diversion of victim funds to the co-defendants' personal benefit, would be admissible even in separate trials.   Some witnesses' contacts  with Kenner were greater than with Constantine, but in sum, witnesses will testify that they relied upon representations from both in the course of being defrauded.   This is especially true in connection with the GSF and Eufora facets of the wire fraud conspiracy.   In the GSF portion of the scheme, several victims will testify that they were solicited to contribute to the fund at meetings during which Kenner and Constantine jointly appeared.   In fact, at least one witness will testify that Constantine did most of the talking during the GSF solicitation meeting while he pointed to a disheveled and supposedly hoarse Kenner who had been exhausted by his supposedly valiant attempts to recoup losses from Jowdy.   Regarding Eufora, as summarized in Point Four above, Constantine fraudulently indiced Mr. Privitello's investment by falsely promising an ownership share in the company, and then directed that the money be sent to the GSF attorney escrow account that both Kenner and Constantine from which the defendants benefitted.   This is simply not a case in which Constantine is "named in a small portion of the indictment and against whom only a small portion of the evidence is relevant."   United States v. Upton, 857 F.Supp 727, 736 (E.D.N.Y. 1994).   To the contrary, Constantine is named throughout the Indictment and the evidence, including his recorded admissions and misrepresentations will establish the existence of the conspiracy, his membership in it, and knowing participation as well as financial benefit from the achievement of its objectives.   In contrast, severed trials would consist of virtually identical evidence.   Stewart, 433 F.3d at 314.

C.      Constantine Fails to Establish Any Basis for Severance Under Rule 14

As for severance based on prejudice, with the exception of the Home Deport recording discussed below, Constantine points to no specific trial right that would "prevent the jury from making a reliable judgment about guilt or innocence." See  Zafiro, 506 U.S. at 537.   Constantine's effort to distinguish himself as a minor or unwitting player in fraud fails as a basis for severance.  Again, the evidence of his knowledge and intent will not suggest Constantine had some minor role in the conspiracy.  However, even if his role were minimal, such "disparity of proof" arguments are not typically been recognized as grounds for severance.  See United States v. Scarpa, 913 F.2d 993, 1014-15 (2d Cir. 1990) ("differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials") (citing United States v. Chang An-Lo, 851 F.2d 547,t 557 (2d Cir. 1988); United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993) ("joint trials involving defendants who are only marginally involved alongside those heavily involved are [nevertheless] constitutionally permissible"); United States v. Cervone, 907 F.2d 332, 341-42 (2d Cir. 1990) (same).

Constantine argues at length about the potential that his co-defendant will, during trial, seek to shift the blame of the fraud onto him.  Constantine appears to suggest that he will attempt  a similar strategy.  These vague claims cannot substitute for meeting his burden to establish a specific trial right that will be denied him in a joint trial.  Rather, a defendant must show that joinder will so severely prejudice him that he will be "denied a constitutionally fair trial. . ..  Merely establishing that a defendant would have had a better chance for acquittal at a separate trial is not sufficient to show substantial prejudice." United States v. Tutino, 883 F.2d 1125, 1130 (2d Cir. 1989), cert. denied, 493 U.S. 1081 (1990); see

<u>also</u> <u>Chang An-Lo</u>, 851 F.2d at 556.  The denial of a motion to sever under Rule 14 is reviewed for abuse of discretion and "will not be overturned unless the defendant demonstrates that the failure to sever caused him 'substantial prejudice' in the form of a 'miscarriage of justice.' " <u>United States v. Blakney</u>, 941 F.2d 114, 116 (2d Cir.1991) (<u>quoting</u> <u>United States v. Potamitis</u>, 739 F.2d 784, 790 (2d Cir. 1984).

   Constantine also fails in his attempt to liken the circumstances in this case to those in <u>United States v. Basciano</u>, 2007 WL 3124622 (E.D.N.Y., October 23, 2007), where Judge Garaufis granted a motion to sever trials because of the danger of spillover prejudice. Critical to the court's decision was the fact that the government would be permitted at a joint trial to move into evidence in support of a RICO conspiracy charge a judgment establishing that Basciano had been previously convicted of a murder, in which the co-defendants seeking severance were now also charged.  <u>Id</u>. 2007 WL 3124622 *4-5.   The government had also indicated it would seek the death penalty against Basciano at trial, although forego capital punishment for the co-defendants.   <u>Id</u>. 2007 WL 3124622 *2.   Under those unique circumstances, the court concluded that limiting instructions would be impractical and that the risk of spillover prejudice substantially great enough to necessitate severance.  <u>Id</u>.

   There is no analogous circumstance here.   Constantine's reference to accusations in civil litigation made by him or Kenner against the other constitute hearsay and, absent some established exception, will not be admissible at the criminal trial.  For that matter, whether alone or in a joint trial, Constantine offers no explanation as to how out-of-court, self-exculpating and blame-shifting accusations made previously by him or Kenner would be admissible.  Thus, unlike <u>Basciano</u>, this is not a case in which the presumption that jurors will adhere to any necessary limiting instructions "fades [because of] an overwhelming

probability that the jury will be called upon to perform humanly impossible feats of mental dexterity." Basciano, 2007 WL 3124622 at *4-5, (quoting United States v. McDermott, 245 F.3d 133, 139-40 (2d. Cir. 2001)).

C.     The Home Depot Recording

       Finally, Constantine's objection to the admission of a recording made by Kenner in an effort to negate Kenner's culpability[4] in a number of the frauds charged in the Indictment also fails to state a basis for severance.  The government recognizes that it bears the burden of establishing authenticity and other evidentiary foundation for the admission of any piece of evidence at trial.  At this stage, the government will not seek the admission of the recording during its case-in-chief.  The government does reserve the right to seek admission of appropriately redacted excerpts in the event either or both defendants choose to testify in their own behalf.  Under those circumstances, the government, with the Court's approval and outside the presence of the jury, will seek to offer certain statements within the Home Depot recording as admission pursuant to Fed.R.Evid 801(d)(2)(A) or (B).

       Though not raised by Constantine, the government is deeply aware of the defendant's Confrontation Clause rights.  See Bruton v. United States, 391 U.S. 123 (1968).  The government also acknowledges that the civil litigation that has preceded this Indictment has generated pleadings, emails, deposition transcripts, texts and sworn affidavits from one or the other defendant.  Again, while portions of such material may be admissible as admissions by one of the other defendant, most of it constitutes inadmissible hearsay.  At this

---

[4] To a large degree Kenner's efforts failed in that he implicitly admitted guilt in response to accusations from Constantine and at one point during the recording generated a statement from Constantine who analogized their conspiracy to a bank robbery in which Constantine played the role of getaway driver while Kenner was the gunman.

stage, it is impractical to catalogue every such potential piece of evidence.   More importantly however, for purpose of the severance motion, except for the Home Depot recording, Constantine points to no other evidence admissible at a joint or severed trial that would cause him substantial prejudice.   In sum, Constantine is unable to overcome the heavy burden for severance under Rule 14 because he has been unable to demonstrate that "there is a serious risk that a joint trial would compromise a specific trial right . . . or prevent the jury from making a reliable judgment about guilt or innocence." See Zafiro, 506 U.S. at 537. Accordingly, his motion for severance should be denied.

POINT SIX

CONSTANTINE'S REMAINING MOTIONS

Constantine also moves for dismissal of one of the substantive wire fraud counts (Count Four) on venue grounds, as well as "suppression" of the Home Depot recording.  The government concedes the lack of venue in Court Four.  Counsel for Kenner and Constantine have been notified that government  intends to re-present the Indictment to the Grand Jury within the next several days to delete Count Four, but also to make other revisions.  The government will not seek to add new charges.

As for the motion to suppress the Home Depot recording on authenticity grounds, in light of the government's stated intention not to use the recording in its case-in-chief, the motion is moot.  The government requests that the Court reserve any decision regarding admissibility until the defense case at trial, and deny Constantine's motion at this time without prejudice.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully requests that the

defendants' motions be denied.

Dated:       Central Islip, New York
             February 24, 2015

                                    Respectfully submitted,

                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York
                                    Attorney for Plaintiff
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201


                     By:     /s/_____
                             James Miskiewicz
                             Saritha Komatireddy
                             Assistant United States Attorney
                             (631) 715-7841/ 7825