**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

UNITED STATES OF AMERICA     |

   - against-              |

PHILLIP A. KENNER and     |
TOMMY C. CONSTANTINE,   |
    also known as         |
    "Tommy C. Hormovitis,"   |
                        |
        Defendants.    |
-------------------------------------------------------X

Docket No. 13-cr-607 (JFB)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TOMMY C.**
**CONSTANTINE'S MOTION TO DISMISS**
**OR IN THE ALTERNATIVE OTHER RELIEF**

Defendant Tommy Constantine, through his attorneys, Robert P. LaRusso of LaRusso & Conway, LLP submits this reply memorandum of law in support of his motion (1) to dismiss the Indictment in its entirety for Government misconduct pursuant to Rule 12 of the Federal Rules of Criminal Procedure (Fed. R. Crim. P.) or in the alternative, for an evidentiary hearing; (2) to dismiss Count Four of the Indictment for lack of venue pursuant to Rule 18 of the Fed. R. of Crim. P.; (3) to sever his trial from codefendant Phillip Kenner, pursuant to Rule 14 of the Fed. R. of C P.; and (4) to suppress an audio recording of a conversation between the defendants, or in the alternative, for a hearing on its authenticity and the production of the original recording on its original storage device for inspection and forensic examination pursuant to Rule 16 of the Fed. R. Crim. P.

Following the defendants' pre-trial motion, the Government presented a superseding indictment, which made moot the second prong of Constantine's motion, seeking dismissal of one of the substantive wire fraud counts. The Government has

removed that charge. Also, the Government has opted not to use the tape recording that Constantine sought to suppress.

The superseding indictment streamlines the allegations against Constantine, but retains the same deficiencies as the original charging document. The superseding indictment removes the specificity included in the original indictment, specificity which Constantine challenged as incorrect and unsupported by documentary evidence, and also removes several John Does originally purported to be victims. Additionally, the government's opposition papers fail to meaningfully rebut the arguments raised by Constantine. Accordingly, Constantine is entitled to the relief he seeks.


**POINT I. DISMISSAL OF THE INDICTMENT IS NECESSARY TO CURE THE IRREPARABLE PREJUDICE CAUSED BY THE GOVERNMENT'S MISCONDUCT**

Mindful of the Second Circuit's admonition that the cumulative impact of misconduct may cost the Government an indictment, the main thrust of misconduct raised in Constantine's opening brief has gone unchallenged by the Government. See United States v. Hogan, 712 F.2d 757 (2d Cir. 1983). Such issues raised in the opening brief included i) improperly interfering with judicial process by discouraging certain lawsuits which fail to support the Government's theory of this case while simultaneously encouraging a lawsuit that does so, and by directing a witness to withhold information during depositions; ii) deliberately presenting false information to the Grand Jury, or information that it should have known was untrue based on the availability of records in its possession;   iii) selectively withholding certain potentially exculpatory documents from the Grand Jury and/or the defendants post indictment and iv) concealing or

withholding key evidence including certain pages and several months of bank records of other participants in the fraud who the Government represents to be innocent victims.

The Government's opposition brief mischaracterizes Constantine's allegations of government misconduct. It completely ignores allegations of troubling conduct concerning investigating FBI Agent Matthew Galioto. Moreover, the Government flatly denies that the agent advised Berard to not answer questions which could have produced exculpatory evidence during the civil litigation between the John Does in Arizona. The Government denies this behavior even though, as set out in Constantine's opening brief, Berard, over ten times, stated in his deposition that such behavior occurred. Constantine's supporting affidavit also sets forth that Berard's attorney similarly stated, on the record, that Berard had been advised by the FBI not to answer certain inquiries. (Constantine Aff., 1-29-15, at ¶6).

The Government claims that the timing of such conduct makes it irrelevant because the Grand Jury had already rendered an indictment. However, Berard's answers could have been exculpatory for Constantine, and more significantly, there is a strong showing that Berard was in fact instructed by Galioto not to provide information. At a minimum, an evidentiary hearing is warranted to explore this alleged conduct.

Further, the Government ignores allegations that Galioto tried to convince Tyson Nash and William Ranford, both John Doe hockey player investors with a pending civil suit alleging fraud against John Does Berard and Kaiser, to redirect their lawsuit away from Berard and Kaiser and instead pursue a civil suit against Kenner, to better align with the Government's theory of the facts.

The Government's response to the allegations concerning the misconduct that resulted in counts six and seven (five and six in the superseding indictment), similarly

mis-characterizes Constantine's argument. For instance, the Government writes, "that some of Mr Privitello's $200,000 eventually was eventually [*sic*] redirected to a Eufora account is irrelevant, ...") (Govt. Br. at 25). Constantine's affidavit sets forth that this money was redirected, and used as intended within twenty-four hours of the mistaken wire. This is a significant difference that is overlooked by the Government. Similarly overlooked is the withholding of exculpatory evidence such as individual pages of bank statements that are missing from document production.

With respect to counts five and six of the superseding indictment, it is evident that the government has chosen to pivot in its allegations. The Government initially alleged that Constantine wrongfully took $155,000 of Privitello's intended $200,000 Eufora investment in AZ Falcon, an allegation which resulted in the seizure of a Falcon Jet owned by AZ Falcon Partners. Now, the Government ignores that allegation and alleges instead that Constantine did not give Privitello an interest in Eufora and used a portion of Privitello's money for a racing related lawsuit. As set forth in Constantine's supporting affidavit, these new allegations also have a faulty factual basis.

Finally, Constantine's opening brief and supporting affidavit concentrated heavily on the fact that the Government was ignoring documents and information in its possession that contradicted what was included in the original indictment. This includes both information about Constantine's financial transactions and also financial transactions involving other John Does, Government witnesses that detailed their role in fraud. In response, the Government chose not to refute such arguments. The Government has removed from the superseding indictment, certain John Does believed to be those that Constantine has stated are not aligned with the Government's case, particularly with its characterization of Ken Jowdy as a victim of the Global Settlement

4

Fund.  The Government has also removed nearly all the specificity of the original charging document which Constantine represented was factually incorrect, thus essentially conceding Constantine's position.


## POINT II. DEFENDANT CONSTANTINE'S CASE SHOULD BE SEVERED FROM THAT OF HIS CO-DEFENDANT

Constantine's case for severance, contrary to the Government's position, is strong.  The Government suggests that as it has made clear its intention not to introduce the Home Depot recording in its case-in-chief, that there are no remaining issues to justify severance (Govt. Br. at 33). However, this ignores the many documented instances of adversarial relations between the two defendants. The Supreme Court has held that mutually antagonistic defenses "may be so prejudicial in some circumstances as to mandate severance." Zafiro v. United States, 506 U.S. 534, 538 (1993).  And there are many instances of such mutual antagonism.  These include but are not limited to:

• Kenner's filings in Constantine's bankruptcy proceedings.
• The recording between Kristen Peca and Kenner where Kenner states that Constantine "f-ked" them with the "GSF."
• 2011 email sent by Kenner in which he placed the blame for the GSF fraud directly on Constantine:  "As you are all aware, Constantine has misappropriated the lion share of the GSF (Global Settlement) funds."

In response, the Government merely highlights the hearsay qualities of these examples. ('Constantine's reference to accusations in civil litigation made by him or Kenner against the other constitute hearsay and, absent some established exception, will not be admissible at the criminal trial." (Govt Br, at 31) First, with respect to the quoted email above (where Kenner accuses Constantine of misappropriation), that email was not part

of a civil litigation, but in fact was contained in a Government affidavit in support of a search warrant. Regardless of whether the above examples are ultimately admissible, they clearly show that the parties will adopt antagonistic defenses, and that the defense strategy posited by Constantine, "is more than bald conjecture given the knowledge of [his] prior testimony." U.S. v. Basciano 2007 WL 3124622 at *8 (E.D.N.Y. Oct. 23, 2007). The Second Circuit has acknowledged that severance is appropriate when the jury, "in order to believe the core of testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." United States v. Carpenter, 689 F.2d 21, 28 (2d Cir. 1982) (internal citation omitted).

## POINT III. DEFENDANT CONSTANTINE SHOULD BE PERMITTED TO INSPECT THE GRAND JURY MINUTES

Pursuant to Rule 6 of the Federal Rules of Criminal Procedure, Defendant Constantine respectfully moves this Court for the entry of an order requiring disclosure and production of the entire minutes of the proceedings before the two grand juries that issued both the original and superseding indictments. Alternatively, he moves for an order requiring production of said minutes to the Court for an *in camera* inspection so as to determine whether the decision to indict was substantially influenced by prejudicial conduct and/or the product of insufficient evidence.

Rule 6(e) of the Federal Rules of Criminal Procedure is "intended to preserve the tradition of grand jury secrecy, creating a general rule of confidentiality for all matters occurring before the grand jury." United States v. Smith, 123 F.3d 140, 148 (3d Cir. 1997) (internal quotation marks omitted) Nevertheless, Rule 6(e) contains several exceptions to this presumption of secrecy. For example, Rule 6(e)(3)(E)(ii) gives district courts the power to "authorize disclosure . . . of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. Pro. 6(e)(3)(E)(ii). The

district court has discretion to permit the disclosure of grand jury materials after assessing whether the need for disclosure outweighs the general policy of secrecy and confidentiality. <u>Pittsburgh Plate Glass Co. v. United States</u>, 360 U.S. 395, 399 (1959).

      Following the submission of Constantine's initial Motion to Dismiss, a superseding indictment was issued. The superseding indictment contains material changes from the original charging document, including an elimination of several John Doe victims and a complete abandonment of specificity. An examination of the grand juries' minutes are thus warranted to determine what information was presented to the Grand Jury that returned the superseding indictment. An examination of the first grand jury's minutes is necessary to compare and contrast the information presented before both grand juries. The fear that the Grand Jury returned an indictment on an improper basis is valid, given, *inter alia*, the allegations regarding Special Agent Galioto. <u>See</u> Constantine Aff. January 29, 2015 and March 9, 2015.

      This case presents one of those rare situations where this Court could, and should, exercise its supervisory powers over the conduct of the grand jury, and at least ensure itself that the grand jury was not misinstructed, misused or manipulated. In light of the serious irregularities raised herein, it is submitted that a serious doubt exists with respect to whether or not specific erroneous allegations contained in the original indictment (which have since been removed by the Government) were presented to the Grand Jury in order to bring the indictment. Furthermore, there remains a serious question as to whether or not certain John Doe victims (who have also been removed from the indictment by the Government) were improperly represented as such to the Grand Jury, when in fact those individuals did not consider themselves to be victims.

      Accordingly, an evidentiary hearing is requested to further develop these allegations; upon its conclusion, this Court should exercise its supervisory powers and grant the relief requested.

## **CONCLUSION**

Wherefore, for these reasons and any other reasons considered meritorious by the Court, Defendant Constantine respectfully requests an order for the following:

1. Dismissal of the Indictment in its entirety for Government misconduct, pursuant to Rule 12 of the Federal Rules of Criminal Procedure or in the alternative, for an evidentiary hearing;

2. Severance of his trial from codefendant Phillip Kenner, pursuant to Rule 14 of the Federal Rules of Criminal Procedure;

3. Disclosing and producing for inspection the minutes from both grand juries empanelled in this action, pursuant to Rule 6 of the Federal Rules of Criminal Procedure; and

4. And for such other and further relief this court deems just and proper.

Dated:       March 11, 2015
             Mineola, New York

Respectfully submitted,

Robert P. LaRusso, Esq.
LaRusso & Conway, LLP
300 Old Country Road
Mineola, NY 11501
(516)248-3520
rlarusso@larussoandconway.com

8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA

   - against-

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,
   also known as
   "Tommy C. Hormovitis,"

           Defendants.
-------------------------------------------------------------X

Docket No. 13-cr-607 (JFB)

**AFFIDAVIT OF TOMMY C. CONSTANTINE IN FURTHER SUPPORT OF HIS
MOTION TO DISMISS
OR IN THE ALTERNATIVE OTHER RELIEF**

     TOMMY CONSTANTINE, being duly sworn, deposes and states under penalty of

perjury as follows:

1.   I am a defendant in the above captioned case and I submit this affidavit in further

    support of my motion seeking an order (1) to dismiss the Indictment in its entirety for

    Government misconduct or in the alternative, for an evidentiary hearing;  (2) to

    dismiss Count Four of the Indictment for lack of venue; (3) to sever my trial from

    codefendant Phillip Kenner; and (4) to suppress an audio recording of a conversation

    between the defendants, or in the alternative, for a hearing on its authenticity and the

    production of the original recording on its original storage device for inspection and

    forensic examination.

2.   Based on the Government's superseding indictment and the Government's

    opposition brief, I understand that the parts of my motion seeking to suppress the

audio recording and to dismiss one of the substantive wire fraud counts are now moot.

3.   However, the other parts of my motion remain salient.

4.   I wish to respond to a few points the Government raised in its opposition papers. As was the case with the original indictment, the Government's opposition brief has set forth arguments with faulty factual bases.

5.   Specifically, the superseding indictment has completely changed the nature of the allegations concerning my purported dealings with Mr. Privitello. Challenged on the factual accuracy of the original charges concerning Privitello's investment, the Government opted to completely move the goalposts.

6.   First, the superseding indictment now charges, with respect to my handling of Privitello's investment, that I failed to give him an interest in the company. However, the Government fails to note that he was immediately tendered a return of 100% of his investment when the Eufora Board rejected his involvement and again, during and following the resulting civil litigation which he and others brought against me. Privitello was rejected as an investor because he aligned himself with Kenner, Gaarn, and Gentry, all co-conspirators in the fraud which I uncovered, as explained in my previous supporting affidavit.

7.   Second, the Government now alleges that a portion of Privitello's investment went to pay my attorney fees in a racing related lawsuit. Attached as Exhibit "A" are bank statements from the relevant time period from Eufora. This is the account which received Privitello's $50,000 and was part of the $200,000 that did not go to AZ Avalon and then Bancorp. As is evident from the records, prior to Privitello's $50,000 investment in Eufora, Sergei Gonchar (formerly John Doe 6, now removed from the

2

Indictment) deposited (also via attorney Richards' trust account) $250,000 and $130,000. The bank records show that most of the money I paid to my attorneys originated from the money Gonchar deposited in Eufora, not Privitello, as newly alleged by the Government in the superseding indictment.

8.      Additionally, at this time, Eufora had come under attack and was being disrupted by the plaintiff in the subject lawsuit because the plaintiff was seeking records from the company to attempt to establish my financial condition which was thought by the plaintiff to be relevant to its case. Specifically, to the best of my recollection, the plaintiff subpoenaed Eufora's records and attempted to garnish any wages or other compensation to which I may have been entitled.  On that basis, I and the other managers of the company authorized the payment of a relatively small amount of the fees that had been incurred in relation to this issue to defend the company from these disruptive efforts.

9.      Incidentally, Gonchar has already told the investigating FBI agents that he authorized me to use both the $250K he deposited in Richard's account towards the Global Settlement Fund ("GSF"), as well as other funds he invested in Eufora as I deemed necessary in my sole and absolute discretion.   I believe that the Government is ignoring what Gonchar, an individual who, according to the original indictment, was a John Doe victim is telling them. For example, in a detention letter filed by the Government on November 13, 2013, (attached as Exhibit "B"), the Government, on page 7, alleges misappropriation of GSF funds and states that I used GSF money for my racing company's lawsuit. Had the Government not ignored Gonchar telling them that he authorized me to use his $250K, (which was the very first deposit made into Richards' trust account for the GSF), the fact that almost immediately after Gonchar

3

made his deposit, I used $8000 of it for my racing company lawsuit would be correctly seen as being of no consequence.

10. Thus, as was the case with the original Indictment's allegations surrounding the GSF and Privitello's investment, these new allegations are also factually incorrect.

11. The changes to the allegations surrounding Privitello's investment are also notable because the original allegations (i.e. that I unlawfully diverted $155,000 intended for Eufora to AZ Falcon Partners) were used to justify the seizure of a Falcon 10 jet owned by AZ Falcon Partners. The new allegations relating to my refusal to confer upon him an ownership interest in Eufora do not justify such a seizure.

12. The Government also mischaracterizes the nature of the Global Settlement Fund. In its opposition brief, the Government observes that Privitello was instructed to deposit his investment in the attorney client trust account in California. The Government states "Privitello had no reason to contribute to the GSF, a fund ostensibly created to litigate against Kenneth Jowdy." (Govt.Br. at 25) But, the attorney's account was used for a variety of reasons beyond collecting funds for the GSF. In fact, there was nothing inappropriate about having Privitello deposit funds in that account. Gonchar and his accountant have also explained this to the investigating FBI agents and the AUSA as well as that he was the first person to make a deposit in Richards' trust account and that he was by far the largest depositor ($1.5 million vs. the next largest which was $300K).

13. Gonchar also explained that he authorized me to use those funds as was agreed and that in the end, I used the funds as promised and as intended. Again, the Government is ignoring what one of the alleged victims has told them about the facts of this case, because those facts do not comport with the Government's version of

4

events. But rather than acknowledge their erroneous allegations, they have simply removed him and other John Doe purported victims from the Indictment. Indeed, in response to my previous affidavit which stated that many of the John Does do not agree with the Government's case, particularly with respect to Jowdy, the Government removed an additional four John Does from the original indictment, including Gonchar.

14.     I was surprised to read the Government's denial that any law enforcement agent instructed government witness Berard not to answer questions about the Global Settlement Fund, especially because Berard himself testified under oath in his deposition repeatedly in this regard and ultimately named Agent Galioto as the specific person from the FBI who instructed him to do so. (See annexed Affidavit of Tom Baker, attorney for certain John Does in a civil action against Berard and Kaiser in Arizona, Exhibit "C")

15.     During Berard's deposition, when asked simply when he met Phil Kenner, Berard's attorney even interjected and stated on the record that Berard was "advised not to answer that question by the FBI." Furthermore, it was Berard and Kaiser who introduced the whole GSF matter into that lawsuit, even though they both admitted that neither of them had invested any funds into the GSF. According to the motion to compel filed by Baker, Berard and Kaiser's attorneys spent 15% and 22% of Nash's and Ranford's depositions (respectively) asking about the GSF and then Berard refused to answer GSF and other related questions in his deposition on the basis that a) he was  instructed not to answer such questions by the FBI and b) that they were irrelevant. I believe that Berard and Kaiser were instructed by Agent Galioto to seek information in order to bolster the Government's case by inquiring about the GSF,

and to simultaneously refuse to answer similar questions about the GSF and other related matters which would have inevitably provided exculpatory evidence.

16.     The superseding indictment removed all the specificity from the original indictment. My initial moving papers challenged the specific proof offered by the Government. For example, by closely examining the details provided in the original indictment, I was able to determine that the Government was attempting to sanitize the roles played by certain of its witnesses, such as John Kaiser, by failing to mention and withholding certain critical bank statements which show that he received over $105,000 of the proceeds from the alleged fraud over and above the $70,300 which the Government admits that he received and then immediately gave to Kenner. This language is now missing entirely from the superseding indictment. The superseding indictment is also missing the allegation that I unlawfully diverted $155,000 of Privitello's money (which was intended for Eufora) to AZ Falcon Partners. Furthermore, the Government has not addressed the fact that the specific bank statements for this particular transaction are also missing from their discovery production, notwithstanding the fact that the records were provided to the Government under subpoena by AZ Falcon Partners' bank. With these specific allegations now removed and the Government's failure to refute my allegations of such misconduct, the conclusion is that the Government concedes the validity of my earlier arguments.

17.     The Government also failed to refute my earlier allegations that Galioto attempted to convince certain John Doe victims to redirect their lawsuits away from Berard and Kaiser and toward Kenner, to align with the Government's version of the facts.

18.   Therefore, for all the reasons set out above, I respectfully ask this court for an order (1) dismissing the Indictment in its entirety for Government misconduct or in the alternative, for an evidentiary hearing; (2) severing my trial from codefendant Phillip Kenner; (3) disclosing and producing for inspection the minutes from both grand juries empanelled in this action, and (4) any other and further relief this court deems just and proper.

*[Remainder of page intentionally left blank]*

Dated:     Scottsdale, Arizona
              March 9, 2015

By: _____

NOTARY PUBLIC

Tommy Constantine

RENEE PERTNOY
Notary Public—Arizona
Maricopa County
Expires 10/31/2015

8

# EXHIBIT A

```
                                      002 00004 01              PAGE:    1
                                      ACCOUNT:      8010205246  12/31/2009
                                      DOCUMENTS:            21
```

```
         EUFORA LLC
         OPERATING ACCOUNT                                       30
         P O BOX 27590                                            1
         SCOTTSDALE AZ  85255                                    20
```

```
=================================================================
PHOENIX PLAZA                          TELEPHONE:602-629-1700
2901 North Central Ave, #100
Phoenix, AZ  85012
=================================================================
    ***********************************************************
    Beginning January 1, 2010, your available balance on your overdraft
protection line will no longer be included in your available checking
balance on the printed receipt when using the ATM.

=================================================================
        BUSINESS ANALYSIS CHECKING ACCOUNT 8010205246
=================================================================
```

```
                          LAST STATEMENT 11/30/09    136,939.05
MINIMUM BALANCE        3,109.13       8 CREDITS      272,462.65
AVG AVAILABLE BALANCE 41,342.76      44 DEBITS       394,581.69
AVERAGE BALANCE       41,342.76  THIS STATEMENT 12/31/09  14,820.01
```

```
- - - - - - - - - DEPOSITS - - - - - - - - -
REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT REF #.....DATE......AMOUNT
    12/03   3,027.65
```

```
- - - - - - - OTHER CREDITS - - - - - - - -
DESCRIPTION                                     DATE       AMOUNT
Internal Transfer                               12/04    1,100.00
Internal Transfer                               12/04    6,335.00
Internal Transfer                               12/07    7,000.00
WIRE/IN-200934200095;ORG AZ AVALON PARTNERS LLC 12/08    5,000.00
WIRE/IN-200934200309;ORG LAW OFFICES OF RONALD RICHARDS AND 12/08   50,000.00
WIRE/IN-200935100244;ORG LAW OFFICES OF RONALD RICHARDS AND 12/17  150,000.00
WIRE/IN-200936300336;ORG LAW OFFICES OF RONALD RICHARDS AND 12/29   50,000.00
              * * * C O N T I N U E D * * *
```

BNK-AB00000686

```
                                002 00004 01            PAGE:      2
                                ACCOUNT:        8010205246 12/31/2009
                                DOCUMENTS:            21
```

EUFORA LLC

=======================================================================
              BUSINESS ANALYSIS CHECKING ACCOUNT 8010205246
=======================================================================
- - - - - - - - -   CHECKS - - - - - - - - - -
  CHECK #..DATE......AMOUNT   CHECK #..DATE......AMOUNT   CHECK #..DATE......AMOUNT
    1226*12/28      4.86     1302 12/23      60.42     1309 12/29      70.59
1292 12/04    780.00     1303 12/14    780.00     1310 12/23   1,100.00
1293 12/30  1,800.00     1304 12/30  1,800.00     1311 12/30   2,608.00
    1294*12/07  2,000.00     1305 12/15  2,000.00     1312 12/22   2,848.00
    1297*12/21     70.95     1306 12/18    780.00     1313 12/30     780.00
1300 12/29     47.00     1307 12/30  1,800.00     1314 12/30   2,000.00
1301 12/15    180.81     1308 12/22  2,000.00

(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE

              - - - - - - - - - OTHER DEBITS - - - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| WIRE/OUT-200933500203;BNF AZ AVALON PARTNERS LLC | 12/01 | 43,000.00 |
| Internal Transfer | 12/02 | 19,700.00 |
| WIRE/OUT-200933600121;BNF DISHZERO | 12/02 | 65,000.00 |
| Internal Transfer | 12/04 | 2,435.00 |
| WIRE/OUT-200933800099;BNF CAREY RODRIGUEZ GREENBURG;OBI | 12/04 | 13,377.57 |
|     ATTN KAREN PASCUALCAREY | | |
| Internal Transfer | 12/10 | 1,451.00 |
| Analysis Charge | 12/14 | 194.10 |
| Internal Transfer | 12/14 | 5,000.00 |
| APS APSCOM EP 730046284 | 12/15 | 681.09 |
| WIRE/OUT-200934900074;BNF SERGEI AND KSENIA GONCHAR | 12/15 | 6,250.00 |
| WIRE/OUT-200934900072;BNF CAREY RODRIGUEZ GREENBERG &;OBI | 12/15 | 15,000.00 |
|     ON BEHALF OF TOMMY CON | | |
| Internal Transfer | 12/18 | 4,250.00 |
| WIRE/OUT-200935200104;BNF BANCORP;OBI FBO EUFORA | 12/18 | 30,274.30 |
| WIRE/OUT-200935200106;BNF NEPTUNE CO ASSET HOLDINGS | 12/18 | 100,000.00 |
| Internal Transfer | 12/21 | 7,601.00 |
| Internal Transfer | 12/22 | 1,882.00 |
| Internal Transfer | 12/23 | 750.00 |
| Internal Transfer | 12/24 | 2,800.00 |
| Internal Transfer | 12/28 | 3,354.00 |
| Internal Transfer | 12/29 | 1,168.00 |
| Internal Transfer | 12/30 | 2,000.00 |
| WIRE/OUT-200936400153;BNF EVA PEDERSEN | 12/30 | 3,200.00 |
| WIRE/OUT-200936400149;BNF AZ AVALON PARTNERS LLC | 12/30 | 40,000.00 |
| Internal Transfer | 12/31 | 1,703.00 |

              * * * C O N T I N U E D * * *

```
                                    002 00004 01              PAGE:    3
                                    ACCOUNT:      8010205246  12/31/2009
                                    DOCUMENTS:            21
```

BNK-AB00000687

EUFORA LLC

==================================================================================
                BUSINESS ANALYSIS CHECKING ACCOUNT 8010205246
==================================================================================

              - - - ITEMIZATION OF OVERDRAFT AND RETURNED ITEM FEES - - -

       ****************************************************************
*                                                              TOTAL FOR
                                                               TOTAL        *
*                                                              THIS PERIOD
                                                               YEAR TO DATE
                                                               *
*                                                              *
*                                                              TOTAL
                                                               OVERDRAFT
                                                               FEES:
                                                               .00
                                                               .00      *
*                                                              TOTAL
                                                               RETURNED ITEM
                                                               FEES:
                                                               .00
                                                               .00      *
       ****************************************************************


              - - - - - - - DAILY BALANCE - - - - - - -
DATE..........BALANCE     DATE..........BALANCE     DATE..........BALANCE
12/01      93,939.05      12/14      55,684.03      12/24      27,155.46
12/02       9,239.05      12/15      31,572.13      12/28      23,796.60
12/03      12,266.70      12/17     181,572.13      12/29      72,511.01
12/04       3,109.13      12/18      46,267.83      12/30      16,523.01
12/07       8,109.13      12/21      38,595.88      12/31      14,820.01
12/08      63,109.13      12/22      31,865.88
12/10      61,658.13      12/23      29,955.46
```

```
002 00004 01                    PAGE:    4
ACCOUNT:        8010205246 12/31/2009
DOCUMENTS:               21
```

BNK-AB00000688

```
                              002 00004 01            PAGE:   1
                              ACCOUNT:      8010205246 11/30/2009
DOCUMENTS:          18
```

```
       EUFORA LLC
       OPERATING ACCOUNT                               30
       P O BOX 27590                                    0
       SCOTTSDALE AZ  85255                            18
```

```
===================================================================
PHOENIX PLAZA                      TELEPHONE:602-629-1700
2901 North Central Ave, #100
Phoenix, AZ  85012
```

```
===================================================================
       BUSINESS ANALYSIS CHECKING ACCOUNT 8010205246
===================================================================
```

|                       |           | LAST STATEMENT 10/30/09 | 48,548.40  |
|-----------------------|-----------|-------------------------|------------|
| MINIMUM BALANCE       | 6,939.05  | 4 CREDITS               | 393,000.00 |
| AVG AVAILABLE BALANCE | 45,378.96 | 23 DEBITS               | 304,609.35 |
| AVERAGE BALANCE       | 45,378.96 | THIS STATEMENT 11/30/09 | 136,939.05 |

```
 - - - - - - - OTHER CREDITS - - - - - - - -
```

| DESCRIPTION | DATE | AMOUNT |
|-------------|------|--------|
| WIRE/IN-200931000293;ORG LAW OFFICES OF RONALD RICHARDS AND | 11/06 | 250,000.00 |
| Internal Transfer | 11/17 | 7,000.00 |
| WIRE/IN-200932700223;ORG LAW OFFICES OF RONALD RICHARDS AND | 11/23 | 6,000.00 |
| WIRE/IN-200933400482;ORG LAW OFFICES OF RONALD RICHARDS AND | 11/30 | 130,000.00 |

```
 - - - - - - - - CHECKS - - - - - - - - -
```

| CHECK #..DATE......AMOUNT | CHECK #..DATE......AMOUNT | CHECK #..DATE......AMOUNT |
|---------------------------|---------------------------|---------------------------|
| 1265 11/09    976.30 | 1278 11/06   1,800.00 | 1286 11/23    780.00 |
| 1266*11/02     35.70 | 1279*11/09   2,000.00 | 1287 11/25   1,800.00 |
| 1269*11/02    875.00 | 1281 11/17      28.40 | 1288 11/23   2,000.00 |
| 1274*11/06  1,800.00 | 1282 11/13      20.02 | 1289 11/25    780.00 |
| 1276 11/03 20,870.00 | 1283 11/16     780.00 | 1290 11/25   1,800.00 |
| 1277 11/09    780.00 | 1284*11/25   1,800.00 | 1291 11/27   2,000.00 |

```
(*) INDICATES A GAP IN CHECK NUMBER SEQUENCE
```

```
 - - - - - - - - OTHER DEBITS - - - - - - - -
```

| DESCRIPTION | DATE | AMOUNT |
|-------------|------|--------|
| WIRE/OUT-200930600292;BNF SERGEI AND KSENIA GONCHAR | 11/02 | 6,250.00 |
| Analysis Charge | 11/09 | 173.57 |
| WIRE/OUT-200931300164;BNF NEPTUNE COMPANY ASSET HOLDINGS | 11/09 | 250,000.00 |
| Internal Transfer | 11/17 | 4,054.36 |

                * * * C O N T I N U E D * * *

BNK-AB00000689

```
                              002 00004 01              PAGE:    2
                              ACCOUNT:      8010205246   11/30/2009
DOCUMENTS:          18
```

EUFORA LLC

```
================================================================
              BUSINESS ANALYSIS CHECKING ACCOUNT 8010205246
================================================================
- - - - - - - - OTHER DEBITS - - - - - - - -
DESCRIPTION                                    DATE        AMOUNT
Internal Transfer                              11/25     3,206.00

- - - ITEMIZATION OF NSF PAID AND RETURNED ITEM FEES - - -

                              THIS PERIOD        YEAR TO DATE

        NSF PAID ITEM FEE:            .00                 .00
        NSF RETURNED ITEM FEE:        .00                 .00
        OVERDRAFT FEES:               .00                 .00


- - - - - - - DAILY BALANCE - - - - - - - -
DATE..........BALANCE     DATE..........BALANCE     DATE..........BALANCE
11/02      41,387.70      11/13      12,967.81      11/25       8,939.05
11/03      20,517.70      11/16      12,187.81      11/27       6,939.05
11/06     266,917.70      11/17      15,105.05      11/30     136,939.05
11/09      12,987.83      11/23      18,325.05
```

BNK-AB00000690

# Exhibit B



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMJ:CNC                                          *610 Federal Plaza*
F. #2013R00948                                   *Central Islip, New York 11722*

November 13, 2013

**FILED**
IN CLERK'S OFFICE
DISTRICT COURT E D N Y

By Hand

★  FEB 13 2013  ★

**LONG ISLAND OFFICE**

The Honorable Joseph F. Bianco
United States District Judge
Eastern District of New York
920 Federal Plaza
Central Islip, New York 11722

        Re:  United States v. Phillip A. Kenner, et al.
             Criminal Docket No. 13-607(JFB)

Dear Judge Bianco:

        The government respectfully submits this letter with regard
to the pre-trial detention of defendants PHILLIP A. KENNER and
TOMMY C. CONSTANTINE, also known as "Tommy C. Hormovitis," who
were arrested today in Scottsdale, Arizona in the
above-captioned case.  The defendants will appear before a
United States Magistrate Judge in the District of Arizona prior
to their appearance in the Eastern District of New York, which
has been scheduled for December 11, 2013, at 11 a.m.  For the
reasons detailed below, the government requests that permanent
orders of detention be issued as to both defendants, pursuant to
Title 18, United States Code, Section 3142(e).

I.   <u>RELEVANT LEGAL STANDARDS FOR DETENTION</u>

        "The Bail Reform Act authorizes pretrial detention upon the
court's finding that 'no condition or combination of conditions
will reasonably assure the appearance of the person as required
and the safety of any other person in the community.'"  <u>United
States v. Agnello</u>, 101 F. Supp.2d 108, 109 (E.D.N.Y. 2000).
Section 3142(f)(1) of Title 18 of the United States Code
requires that, upon motion of the government, the Court shall
conduct a hearing to determine:

                whether any condition or combination of
                conditions set forth in subsection (c) of

this section will reasonably assure the appearance of the person as required and the safety of any other person and the community.

Upon the government's motion or upon the Court's own motion, a detention hearing may be conducted in a case that involves:

>   (A)   a serious risk that [the defendant] will flee; or

>   (B)   a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten, injure or intimidate, or attempt to intimidate, a prospective witness . . . .

18 U.S.C. § 3142(f)(2).

At a detention hearing, the Court shall consider, among other factors, "the available information concerning –"

>   (1)   the nature and circumstances of the offense charged . . . ;

>   (2)   the weight of the evidence against the person;

>   (3)   the history and characteristics of the person, including --

>>   (A)   the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

>>   (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release . . .

2

for an offense under Federal,
State, or local law; and

(4) the nature and seriousness of the danger to any
person or the community that would be posed by
the person's release.

18 U.S.C. § 3142(g).

Detention may be ordered on risk-of-flight grounds if the
government establishes such grounds by a preponderance of the
evidence. United States v. Chimurenga, 760 F.2d 400, 405-06 (2d
Cir. 1985). Detention may be ordered on dangerousness grounds
if the government establishes such grounds by clear and
convincing evidence. See 18 U.S.C. § 3142(f)(2). The rules
governing admissibility of evidence at trial, however, do not
apply in a detention hearing. Id.; Fed.R.Evid. 1101(d)(3).

Although the Eighth Amendment prohibits the imposition of
excessive bail, no defendant has an absolute right to be
released on bail following arrest. United States v. Salerno,
481 U.S. 739, 749 (1987).

II. FACTUAL PROFFER AND ARGUMENT IN SUPPORT OF DETENTION

A. Overview of the Investigation

On November 13, 2013, defendants KENNER and CONSTANTINE
were arrested by law enforcement officers, including special
agents of the Federal Bureau of Investigation ("FBI") and
Internal Revenue Service ("IRS"). The arrest warrants were
signed by the Honorable Arlene R. Lindsay, United States
Magistrate Judge for the Eastern District of New York ("EDNY"),
on October 29, 2013, based on an indictment that was returned
that same day by a grand jury sitting in the EDNY. The
indictment is captioned United States of America v. Phillip A.
Kenner and Tommy C. Constantine, also known as "Tommy C.
Hormovitis," CR 13-607 (JFB) and is attached as Exhibit A.

The indictment charges KENNER and CONSTANTINE with wire
fraud conspiracy, substantive wire fraud and money laundering
conspiracy, all in or about and between 2002 and 2013. As
alleged in the indictment, between 2002 and 2013, KENNER and
CONSTANTINE orchestrated and executed a scheme to fraudulently
induce several investors to invest money with entities and to
deposit money into bank accounts that KENNER and CONSTANTINE
controlled by falsely stating that the funds would be invested

3

in real estate, small, privately held companies and a legal
defense fund for the benefit of the investors, when, in fact,
KENNER and CONSTANTINE intended to improperly divert a
substantial portion of the funds to bank accounts they
controlled and used the funds for their personal benefit, for
unrelated business ventures and to conceal their fraudulent
scheme.  The total losses to the victims due to KENNER and
CONSTANTINE's fraudulent scheme are in excess of $15 million.

As alleged in the indictment, between 2002 and 2013, KENNER
was a financial advisor to several former and current
professional hockey players (hereinafter, "the hockey player
clients"), who are identified as John Doe 1 through John Doe 13
in the indictment.  KENNER's connection to professional hockey
players began in the late 1980s, when KENNER attended college at
Rensselaer Polytechnic Institute ("RPI") in Troy, New York.
While at RPI, KENNER roomed with John Doe 9, who played hockey
at RPI and later played in the National Hockey League ("NHL")
for, among other teams, the Boston Bruins, Washington Capitals
and Phoenix Coyotes.  In addition, early in KENNER's career as a
financial advisor, he worked at an investment management firm in
Boston, Massachusetts with a former NHL player-turned financial
advisor.  It was while at this investment management firm in the
late 1990s that KENNER built his clientele of NHL players.  In
approximately 2003, KENNER started his own investment management
firm, named Standard Advisors, LLC.  KENNER was a licensed
financial advisor between approximately 1994 and 2004.

As further alleged in the indictment, in his role as
financial advisor, KENNER recommended to his hockey player
clients investments in real property and small, privately-held
businesses.  One of the real estate ventures KENNER persuaded
his hockey player clients to invest in was the acquisition of
several parcels of land on the Big Island of Hawaii ("the Hawaii
project").  KENNER represented to his hockey player clients that
the goal of these investments was to develop the acquired land
parcels for housing and recreational use and later sell the
developed parcels for a significant profit, which would, in
turn, result in a significant monetary return for each investor.
Based on KENNER's representations, the hockey player clients and
other investors, including John Doe 14, a resident of the EDNY,
and Jane Doe 1, wired large sums of money to bank accounts
controlled by KENNER for the Hawaii project.

Moreover, KENNER persuaded several of his hockey player
clients to each establish lines of credit at Northern Trust Bank
and to transfer bonds and other equity held in their names to
Northern Trust Bank to secure each line of credit.  KENNER made

4

a variety of misrepresentations to his hockey player clients regarding the purpose of each line of credit.  He falsely told some of his hockey player clients that the line of credit would not be drawn upon and would serve solely as collateral for the Hawaii project.  He told other hockey player clients that he would only access the line of credit with the player's permission, that the money would be used exclusively for the Hawaii project and that KENNER would be responsible for any and all payments due on the line of credit.  KENNER assured his hockey player clients that the collateral securing each line of credit would never be touched.  To some of his hockey player clients, KENNER falsely represented that he, too, had pledged collateral to Northern Trust Bank to secure a line of credit. To prevent his hockey player clients from learning the balance of their lines of credit on a month-to-month basis, KENNER arranged to have Northern Trust Bank mail the statements for each of the lines of credit only to KENNER, at his home in Scottsdale, Arizona.

Without his hockey player clients' knowledge or permission, KENNER used the lines of credit to, among other things, purchase land parcels for himself in Hawaii, to purchase an interest in a piece of land in the EDNY and to make interest payments on the lines of credit.  KENNER also diverted money from the lines of credit, as well as the hockey player clients' initial $100,000 cash investment, to bank accounts controlled by KENNER and CONSTANTINE for uses unrelated to the Hawaii project, including to pay personal mortgages, credit card bills and other personal expenses.  Financial records reveal that, between December 2004 and March 2006, KENNER, through a series of wire transfers, directed approximately $2 million from the Hawaii project to CONSTANTINE's holding company, Constantine Management Group, LTD ("CMG").  CMG had no relation to the Hawaii properties during that time.  CONSTANTINE transferred the money to other corporate accounts he controlled, as well as to two race car teams in California.  CONSTANTINE also used the money to make payments on personal mortgages and to pay for meals, limousines, rental cars, and cellular telephone expenses.

In August 2006, Lehman Brothers ("Lehman") agreed to finance the Hawaii project up to $95 million.  At KENNER's direction, it made an immediate $6.9 million payment to Urban Expansion, a company controlled by CONSTANTINE and another individual.  The $6.9 million was repayment for a $3.5 million loan in October 2005 from Urban Expansion to a holding company controlled by KENNER so that the Hawaii project could close on a

5

piece of property on the Big Island.[1]   Of the $6.9 million
repayment to Urban Expansion, $2 million was a pre-payment
penalty, which Lehman advised KENNER could be avoided by not
paying off the entire loan.   However, KENNER insisted that the
loan to Urban Expansion be paid back in full, to the detriment
of his investors.   Lehman agreed to do so, but included a
provision in the settlement agreement, which KENNER signed, that
explicitly stated that KENNER was not to directly or indirectly
receive any portion of the $6.9 million of the Lehman funds that
was being used to pay off the Urban Expansion loan.   After
Lehman paid Urban Expansion $6.9 million, just over $2 million
was transferred to an account for CMG, controlled by
CONSTANTINE.   Days later, CONSTANTINE transferred $669,000 to
accounts controlled by KENNER, notwithstanding the prohibition
in the settlement agreement with Lehman.   CONSTANTINE used his
portion of the pre-payment penalty money to pay personal
mortgages and loans, to make car payments, and to pay for
airfare, hotels, car rentals, jewelry and cellular telephone
expenses.   In addition, CONSTANTINE transferred $150,000 to two
car racing teams and over $150,000 to other corporate accounts
he controlled.   CONSTANTINE wired $17,000 to Unique Auto Sports,
in the EDNY.   By November 2006, CONSTANTINE had depleted the $2
million that was transferred into his CMG account from Urban
Expansion in August 2006.

    In early 2009, KENNER failed to make interest payments on
the lines of credit and, as a result, in late March 2009,
Northern Trust Bank closed the lines of credit and liquidated
the equity securing each line of credit.   John Does 1 through 8
lost a total of approximately $9 million due to KENNER's
unauthorized use of their lines of credit.   Most of the parcels
of land acquired for the Hawaii project have been sold at
foreclosure auctions or remain in foreclosure.

    In addition to the Hawaii project, KENNER persuaded several
of his hockey player clients to invest in Eufora, LLC
("Eufora"), a company founded by CONSTANTINE in or about 2002
that sold prepaid debit cards.   Between approximately February
2008 and December 2009, KENNER and CONSTANTINE convinced several
of KENNER's hockey player clients, as well as John Doe 15, a
resident of the EDNY, to collectively invest over $1.5 million

---

[1]   It should be noted that the $3.5 million actually came
out of the bank account of Intrigue Investments, which
CONSTANTINE did not control or operate, as Urban Expansion was a
shell company created just days prior to the $3.5 million loan
and had no bank account at the time.

in Eufora.   Financial records and analysis revealed that KENNER and CONSTANTINE diverted most of the $1.5 million to bank accounts that the defendants or another co-conspirator controlled and used the money for purposes unrelated to Eufora, including to pay personal mortgages, make automobile and credit card payments, and to pay for hotels, airplane tickets, meals and jewelry.

As the indictment further alleges, in or about Spring 2009, KENNER and CONSTANTINE met with several of KENNER's hockey player clients to persuade them to contribute to a legal defense fund known as the Global Settlement Fund ("GSF").   During KENNER and CONSTANTINE's national and international fundraising tour, they traveled through the EDNY.   According to KENNER and CONSTANTINE, the GSF would be used primarily to litigate civil claims in connection with the hockey players' investments in real estate projects in Mexico, which KENNER and CONSTANTINE claimed were at a standstill because the developer of those projects, John Doe 17, had misused the investors' money. KENNER's hockey player clients contributed a total of approximately $4.1 million to the GSF.   KENNER and CONSTANTINE directed the hockey player clients to wire their contributions to the escrow account of John Doe 16, an attorney in Los Angeles, California, whom KENNER and CONSTANTINE stated would represent them in the civil action against John Doe 17.   John Doe 16 had represented KENNER in civil actions, including lawsuits against KENNER in 2008 and 2009 by some of his hockey player clients for fraud and breach of fiduciary duty.

Financial records and analysis revealed that only a small fraction of the $4.1 million contributed by KENNER's hockey player clients to the GSF between May 2009 and February 2010, was used for legal proceedings against John Doe 17.   The majority of the GSF money was transferred into bank accounts controlled by CONSTANTINE.   KENNER and CONSTANTINE used significant portions of the money for purposes unrelated to the Mexico litigation or the other purported purposes of the GSF, including to pay attorneys' fees in a legal matter involving a race car company that CONSTANTINE owned, for KENNER to invest in a tequila company in Mexico, and to arrange for an associate of CONSTANTINE to purchase CONSTANTINE's home in Arizona, which was going into foreclosure.   In executing their scheme to defraud, KENNER and CONSTANTINE often transferred money through various bank accounts -- sometimes on the same day -- to disguise, among other things, the source of the funds and who controlled the funds.

As the indictment further alleges, in Counts Eight and Nine, in October 2006, KENNER engaged in a separate fraud scheme involving real estate in the EDNY. KENNER acquired an ownership interest in a parcel of land in Sag Harbor on Long Island, New York ("the Sag Harbor property") by defrauding John Doe 1 and John Doe 2. KENNER represented to John Doe 1 that John Doe 1 could acquire a 50% interest in the Sag Harbor property by investing $375,000, which John Doe 1 wired to a bank account KENNER controlled. In addition to the $375,000 invested by John Doe 1, KENNER used $395,000 from John Doe 2's line of credit, without John Doe 2's knowledge or permission, to purchase the Sag Harbor property. KENNER then created the Led Better Development Company, LLC ("Led Better") to purchase the Sag Harbor property. KENNER then instructed John Doe 14 and John Doe 18 to each wire $190,000 to him, which they did, to obtain a 25% interest each in the Sag Harbor property.

The Led Better operating agreement, which KENNER drafted, but did not disclose to John Does 1, 2, 14 or 18, stated that KENNER, John Doe 1, John Doe 14 and John Doe 18 each owned 25% of Led Better. Thus, KENNER acquired a 25% interest in the Sag Harbor property without using any of his own money. In addition to the 25% interest in the Sag Harbor property, KENNER obtained approximately $380,000.00 as part of the fraudulent scheme. While John Doe 1 believed, based on KENNER's representations, that he owned 50% of the in the Sag Harbor property, the Led Better operating agreement provided that John Doe 1 owned only 25% of the Sag Harbor property. To conceal his fraudulent scheme, KENNER continued to make interest payments on John Doe 2's line of credit until early 2009 and ensured that John Doe 2 did not receive monthly statements on his line of credit.

B.   The Nature and Circumstances of the Charged Offenses

Here, although the indictment does not charge a crime of violence or drug trafficking offense, the charged crimes of wire fraud conspiracy, wire fraud and money laundering conspiracy are nevertheless serious crimes. Furthermore, as the indictment alleges, there are well over a dozen victims of KENNER and CONSTANTINE's scheme, with aggregate losses exceeding $15 million. KENNER's victims were not strangers; some considered KENNER to be a close friend and trusted advisor.

KENNER and CONSTANTINE both face significant jail time. KENNER has been indicted on ten counts: one count of wire fraud conspiracy, eight counts of wire fraud and one count of money laundering conspiracy. Each of the counts carries a maximum term of imprisonment of 20 years. Moreover, KENNER faces an

8

advisory range of imprisonment of 168 to 210 months, pursuant to the United States Sentencing Guidelines ("the Guidelines"). The Guidelines calculation is driven by losses exceeding $7 million, more than 10 victims, KENNER's use of sophisticated means to perpetrate the fraud, KENNER's leadership role and his abuse of a position of trust, as a financial advisor to his hockey player clients.

CONSTANTINE has been indicted on eight counts: one count of wire fraud conspiracy, six counts of wire fraud and one count of money laundering conspiracy. CONSTANTINE faces an advisory range of imprisonment of 151 to 188 months under the Guidelines, assuming he falls into Criminal History Category II.

Due to the lengthy sentences both defendants face if convicted, KENNER and CONSTANTINE have a strong incentive to flee rather than face incarceration. Though not dispositive as to a finding of risk of flight, exposure to lengthy prison terms clearly is a factor weighing in favor of pre-trial detention. See United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007); see also United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight.").

C.   The Weight of the Evidence

This factor weighs strongly in favor of detention. As a threshold matter, a grand jury already has found that probable cause supports the charges against KENNER and CONSTANTINE, which are set out in extensive detail in the speaking indictment. This, alone, is enough to show that the weight of the evidence supports detention.

The evidence against the defendants is overwhelming. Multiple victims will testify about the false representations made by KENNER and CONSTANTINE regarding the Hawaii project, the lines of credit, Eufora, the GSF and the Sag Harbor property. Financial records will show, among other things, that KENNER and CONSTANTINE diverted investor money for their own personal uses, for unrelated business ventures and to conceal their scheme to defraud. The government will introduce email communications, text messages and recorded conversations of the defendants in support of the charges. The government will also introduce at trial evidence that KENNER and CONSTANTINE forged signatures and created fictitious documents in furtherance of and to conceal their scheme to defraud.

9

D.   History and Characteristics of the Defendants

   1.   **PHILLIP A. KENNER**

     Several facts necessitate KENNER's detention as a risk of flight.   First, KENNER frequently travels to Mexico and has developed significant ties in Mexico over the years.   In fact, based on information received by the government, KENNER plans to travel to Mexico in December for approximately one month. Border crossing records show that KENNER was in Mexico as recently as October 27, 2013, as well as in early October 2013 and in June 2013.[2]   The border crossing records further reveal that KENNER traveled to Mexico twice in 2012, four times in 2011, four times in 2010 and at least seven times in 2009. KENNER's travel to Mexico dates back to 2004.   KENNER possesses a current United States passport, which expires in December 2021.

     Moreover, two of KENNER's victims have advised the government that KENNER told them he had obtained Mexican citizenship and had a Mexican passport; one of these victims observed KENNER with a Mexican passport.   While KENNER has two children who live near him in the Phoenix area, his children live primarily with KENNER's ex-wife.   Furthermore, KENNER might conclude that he would see his children more often in Mexico than while serving a lengthy prison sentence at a federal penitentiary.

     The government's investigation further reveals that KENNER has at least one personal bank account in Mexico and that KENNER has, in the past, transferred money between a personal bank account in the United States and a corporate bank account in Mexico.   The investigation further reveals that KENNER has established a network of associates in Mexico over the past decade.   These factors exacerbate the risk of flight because they show that KENNER easily would be able to make a life for himself in Mexico if he chose to flee and avoid a lengthy prison term.   Cf. United States v. Enriquez, 2011 WL 5220233, *6 (D.N.M.   Sept. 7, 2011) (finding that defendant was a flight

---

    [2]   It is worth noting that not all of KENNER's border crossings from the United States into Mexico by car were captured and/or documented by U.S. immigration officials.   Thus, if the Court were to release KENNER, even on the condition that he surrender his passport, KENNER could easily travel to Mexico by car without being detected.

risk who should be detained in part because "Enriquez . . . has deep ties to Mexico, and has lived there in the past. Given the amount of time Enriquez faces at sentencing—approximately 70 months—Enriquez has a strong incentive to flee. . . . It is a short trip to Mexico . . . and electronic monitoring provides the Court little comfort, Enriquez could be in Mexico before the Court knew he was leaving El Paso."); United States v. Ruiz-Corral, 338 F. Supp. 2d 1195, 1198 (D. Colo. 2004) ("The defendant is a naturalized citizen originally from Mexico. It is not disputed that he retains significant family ties to Mexico, including . . . some [family members] whom defendant and his family visit at least annually. . . . [T]his Court believes that the potential length of incarceration that defendant is facing, possibly upwards of twenty years and more, is a strong incentive for defendant to flee to Mexico if he were released on bond.").

Second, in addition to his strong ties to Mexico, KENNER has expressed his desire and ability to leave the United States in the past, when he has faced legal and financial troubles. Several sources have advised the government that KENNER has made statements to them, to the effect that, he was prepared to pack his duffle bag with money and head to Australia.   He told another confidential source that, at a moment's notice, he could pack his duffle bag full of money, get in his car and never be seen again.   Given that KENNER now faces serious federal criminal charges and the prospect of a significant jail sentence, he is very likely to act on his earlier statements.

Third, KENNER has access to substantial quantities of cash. Sources have reported to the government that KENNER previously advised them that he maintains safety deposit boxes in a number of cities in the United States and at least one source witnessed KENNER with substantial quantities of cash, which KENNER claimed to have retrieved from a safety deposit box.

Moreover, KENNER sold two pieces of property in Hawaii in April 2013 and June 2013, respectively, that he acquired using his hockey player clients' money.   KENNER received approximately $74,000 from the property sales, which proceeds were deposited into an account held in the name of KENNER's son at Chase Bank. Bank records show that, since the funds were deposited, KENNER has made several cash withdrawals from that Chase account, always in amounts of approximately $8000 and $9,000.   Multiple withdrawals of slightly under $10,000 indicate that KENNER does not want to trigger any reporting requirements imposed upon the bank by federal law.

A review of bank records for accounts controlled by KENNER, which are known to the government, reveals that KENNER does not maintain substantial balances in any of the accounts. Rather, almost as soon as money is deposited into the accounts, KENNER withdraws cash, in amounts up to $9000, or uses the money to pay for living expenses. For instance, financial records reflect that, thus far in 2013, approximately $82,650 has been deposited into a corporate account controlled by KENNER. KENNER has withdrawn almost $40,000 in cash over the course of the year. He has used the other $40,000 to pay bills. KENNER's use of safety deposit boxes and the fact that he continuously withdraws cash from bank accounts he controls -- and keeps those accounts with low balances -- indicates that KENNER has access to substantial quantities of cash, which he could use to fund his flight from the United States.

The Court should find that KENNER's history and characteristics weigh strongly in favor of detention.

### 2.   TOMMY C. CONSTANTINE

CONSTANTINE also poses a serious risk of flight. First, travel records reflect recent and substantial international travel. CONSTANTINE traveled to the Bahamas in late June 2013, April 2013 and March 2013. Travel records further reflect that, in March 2013, CONSTANTINE also traveled to Mexico. CONSTANTINE traveled to Zurich in December 2012 and to Mexico in August 2012. For all but the flight to Zurich, Constantine flew on privately-owned aircraft. In fact, the "Tommy Constantine" official website reports that Constantine is "a helicopter pilot and manages a fleet of privately owned Falcon business jets which are based at the Scottsdale Airport." Moreover, travel records indicate that CONSTANTINE traveled to Mexico at least twelve times between 2007 and 2009. CONSTANTINE possesses a current U.S. passport, which expires in September 2018.

Second, one of the victims in this case advised the government that both KENNER and CONSTANTINE advised him that CONSTANTINE has family in Greece and that CONSTANTINE could move to Greece if necessary. Because CONSTANTINE faces a potential Guidelines sentence of 151 to 188 months, he has a strong incentive to flee the United States rather than face prosecution. Moreover, the fact that CONSTANTINE has private aircrafts at his disposable increases the likelihood that he would be able to successfully flee the United States if released from custody.

12

Third, criminal history records indicate that, in 1993, when CONSTANTINE was twenty-six years old, he was convicted of a drug trafficking crime in Illinois and sentenced to six years' imprisonment. Despite CONSTANTINE's drug conviction and term of incarceration, he returned to a life of crime.

CONSTANTINE's substantial international travel and criminal history weigh in favor of detention.

> D.   The Nature and Seriousness of the Danger to Victims and Witnesses Posed by the Defendants' Release

As to KENNER, this factor cuts in favor of detention. The government has in its possession a recording of a voicemail message, from approximately April 2011, that KENNER left for one of John Doe 14's family members (hereinafter "male individual #1" or "MI #1"). KENNER learned that MI #1 had warned Jane Doe 1, John Doe 14 and others to stay away from KENNER because he could not be trusted. On the recording, KENNER identified himself as "Phil Kenner" and, using other vulgar language, told MI #1 to "bring your son [who was approximately eight years old at the time] out to Arizona so he can see what it looks like when his dad gets an ass beating." KENNER went on to accuse MI #1 of "talking shit about things you don't know." At the end of the voicemail message, KENNER stated, in sum and substance, that he was going to add MI #1 to "the list with the other scum bags."

This recording demonstrates KENNER's capacity and propensity for threatening and intimidating witnesses. This behavior is likely to continue and escalate now that KENNER has been criminally charged and faces the very real possibility of lengthy incarceration.

In sum, based upon all of the information provided above, KENNER and CONSTANTINE both pose a substantial risk of flight and no condition or combination of conditions will reasonably assure their appearance at future court proceedings. Moreover, KENNER poses a danger to the victims and witnesses in this case and should be detained on that ground, as well.

III. CONCLUSION

For the reasons set forth above, as well as any additional facts that the government may present at the detention hearing, defendants PHILLIP A. KENNER and TOMMY C. CONSTANTINE, also

13

known as "Tommy C. Constantine," should be held without bail pending trial. The government requests permission to supplement this motion upon completion of the applicable Pretrial Services reports.

Respectfully submitted,

LORETTA E. LYNCH
UNITED STATES ATTORNEY

By:   /s/Carrie N. Capwell
Carrie N. Capwell
Assistant U.S. Attorney
(631) 715-7836

cc:   Clerk of the Court (JFB) (By ECF once case is on PACER)
Defense Counsel (By Hand or Email once appointed/retained)

14

Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
                                                   |
UNITED STATES OF AMERICA                           |
                                                   |
    - against-                                     |
                                                   |       Docket No. 13-cr-607 (JFB)
PHILLIP A. KENNER and                              |
TOMMY C. CONSTANTINE,                              |
        also known as                              |
      "Tommy C. Hormovitis,"                       |
                                                   |
            Defendants.                            |
--------------------------------------------------X

### AFFIDAVIT OF THOMAS BAKER

THOMAS BAKER, being duly sworn, deposes and states under penalty of

perjury as follows:

1.      My name is Thomas Baker and I am an attorney duly licensed to

practice law in Arizona. I am over the age of eighteen and otherwise competent to

make this affidavit.

2.      I represent the Interveners (a number of which, I am informed, are

listed as "John Doe" victims in the above-caption indictment) in a civil action

brought against John Kaiser ("Kaiser") and Bryan Berard ("Berard"), whereby it

is alleged that Kaiser and Berard are attempting to avoid repaying certain loans

made by the Interveners for a real estate project in Arizona.

3.      During the discovery phases of that action, counsel for the

defendants questioned three of the Interveners about the "Global Settlement

Fund" ("GSF") (the same one that is part of the indictment of the above-

captioned action). As far as my clients and I knew, the GSF had nothing

whatsoever to do with our civil matter.

1

4.     Having had been questioned with respect to the GSF in our civil matter, it was incumbent upon me to explore such line of questioning to determine what relevance the GSF could possibly have to the subject matter of our pending civil action.

5.     When I attempted to ask the same or similar questions to Berard that were asked of my clients, he refused to answer stating numerous times that he had been instructed by the FBI not to answer any questions relating to the GSF.  When asked who at the FBI gave such instruction, he refused to answer.

6.     These refusals to answer a similar line of questioning imposed by their counsel and the refusal to provide the name of the individual at the FBI who gave those instructions, prompted a motion to compel, for at the very least, the name of the individual at the FBI who gave such instruction.

7.     The Trial Court granted the Interveners' motion to compel Berard to answer these questions and ordered Berard to re-appear telephonically for a continuation of his deposition.  I personally conducted Berard's initial in-person deposition and subsequent telephonic continuation. When I asked Berard during his telephonic continuation who in the FBI instructed him not to answer my questions, Berard stated that it was FBI agent Matt Galioto.

THOMAS BAKER

County of          )
                   ss.
State of Arizona   )

Subscribed and sworn to before me this 5th day of March, by Thomas M. Baker.

My Commission Expires:
6-15-16

OFFICIAL SEAL Notary Public
TRICIA GRAZIANO
Commission #165068
Notary Public - State of Arizona
MARICOPA COUNTY
My comm. expires June 15 2016

2