1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                           :
UNITED STATES OF AMERICA

                              CR-13-607


        -against-          :

                              United States Courthouse
                              Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

     Defendants.           :
                              March 13, 2015
- - - - - - - - - - - - - - X   2:30 p.m.

                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JOSEPH F. BIANCO
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        LORETTA E. LYNCH
                           United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  JAMES MISKIEWICZ, ESQ.
                           Assistant United States Attorney


For the Defendants:        RICHARD HALEY, ESQ.
                           For Mr. Kenner


                           ROBERT LA RUSSO, ESQ.
                           For Mr. Constantine


Court Reporter:            Mary Ann Steiger
                           100 Federal Plaza
                           Central Islip, New York 11722
                           (631) 712-6101


        Proceedings recorded by mechanical stenography.
            Transcript produced by computer.

2

1     THE CLERK:  Calling criminal case number

2  13-CR-607, United States of America vs. Phillip Kenner and

3  Tommy Constantine.

4     Counsel, please state your appearance for the

5  record.

6     MR. MISKIEWICZ:  Good afternoon, your Honor.

7     James Miskiewicz, for the United States.

8     THE COURT:  Good afternoon.

9     MR. HALEY:  Good afternoon, Judge.

10     Richard Haley, for the defendant Phillip Kenner

11  seated to my right.

12     THE COURT:  Good afternoon.

13     MR. LARUSSO:  Robert LaRusso, for

14  Mr. Constantine.

15     Good afternoon, your Honor.

16     With your permission, we have Mr. Constantine on

17  telephone call right now.

18     I would like to express my thanks.  I know it

19  was a late request and I appreciate the opportunity to

20  have Mr. Constantine call in rather than a personal

21  appearance and I thank the Court for that.

22     THE COURT:  Mr. Constantine, are you able to

23  hear everybody okay?

24     MR. CONSTANTINE: Yes, your Honor.

25     THE COURT:  If, at any point, you're having

3

1    trouble, let me know.

2              THE DEFENDANT:  I will.  Thank you.

3              THE COURT:  So, as you know, we're here for

4    argument on the defendants' motions, various pretrial

5    motions.

6              I did receive Mr. LaRusso's reply in connection

7    with his motion.

8              And as I discussed, Mr. Haley, I will give you a

9    chance to orally reply with respect to his motion.

10             You don't have to go through every aspect of

11   your motion.  It's a chance for you to highlight anything

12   you wish to highlight, and then I'll give the government a

13   chance to respond.

14             Mr. LaRusso, do you want to go first.

15             MR. LARUSSO:  Thank you, your Honor.

16             Your Honor, if I could just address the first

17   part of our motion and that is the motion to dismiss the

18   indictment for misconduct, governmental misconduct.

19             I would like to preface my remarks by saying

20   when I first began reviewing this case and discussing the

21   possibility of this motion, I was kind of a little

22   reluctant to put pen to paper.

23             But since the time I had that hesitation, I have

24   had an opportunity to talk to my client at length and

25   obviously more important, your Honor, I had an opportunity

4

1    to look at the indictment and the evidence that the

2    government has presented.

3          To be candid with the Court, I'm not as well

4    versed in the facts as my client because I have not had as

5    much time to review them, but there's enough information

6    that's been presented to me, reliable information, that

7    supported our request for the motion to dismiss.

8          What I think in a practical sense, Judge, I

9    don't think that motion can be addressed simply on papers.

10         I think, looking at the allegations of

11   impropriety, it raises the issue of a possible hearing,

12   and I think that's the first aspect I would like the Court

13   to examine at this point, whether or not enough

14   information is presented to the Court to warrant a hearing

15   to determine whether or not there was selective

16   presentation of evidence, selective withholding of

17   evidence in the first grand jury, that resulted in the

18   indictment.

19         I know having been before you, Judge, you read

20   all of the materials and you digest it very well and as I

21   talk and raise issues, you will pinpoint the critical

22   areas that are of concern to you and I'll be glad to

23   answer them if they become apparent.

24         In terms of an overall presentation, your Honor,

25   this is a very unusual case.  It began in the Southern

5

1    District of New York for a number of years.  And for

2    whatever reason we know they decided not to pursue the

3    matter; and, instead, they referred the matter over to the

4    Eastern District of New York.

5              And I can hazard a reasonable guess that it was

6    the case agent in this case, Mr. Galioto, who was

7    responsible for that presentation.

8              What was also very significant, Judge, is some

9    of the color behind this case.

10             The unknown shadow that is going to play a role

11   at this trial is a number of individuals, one of whom you

12   know from the paperwork, is a man by the name of Kenneth

13   Jowdy, who seems to have skirted his responsibilities in

14   this case, represented by a very well known lawyer in New

15   York City who was very instrumental in developing contact

16   with the Daily News and presented publicity detrimental to

17   my client prior to this indictment.

18             More importantly, Mr. Jowdy is represented by

19   Mr. Louie Freeh, who is a former director of the FBI.  I'm

20   not saying, Judge, and I will not ask the Court to draw

21   the conclusion that there's an impropriety in Mr. Freeh

22   representing Mr. Jowdy or Mr. Galioto, an FBI agent

23   pursuing the case, or any other reason, other than what he

24   felt was a legitimate criminal investigation, but it just

25   raises an important color in terms of how we look at the

6

1    facts.

2           THE COURT:  Let me just try to focus you a

3    little bit.

4           I have read the papers and some of the history

5    of the case we already discussed in connection with bail

6    applications and other issues, so I understand it started

7    in the Southern District.

8           For purpose of what you're arguing on the

9    dismissal, there are two things you appear to be arguing,

10   that there's a basis for a dismissal or review by the

11   Court of the grand jury transcript.

12          The first relates to an allegation that the

13   agent told a witness in a civil litigation deposition --

14   instructed the witness not to answer certain questions.

15          That's one, right?

16          MR. LARUSSO:  That's one.

17          THE COURT:  On that one --

18          MR. LARUSSO:  On that as well, Judge, it's kind

19   of a corollary to that.

20          There was also a civil litigation involving an

21   investment hockey player by the name of Tyson Nash.  He

22   was approached by Mr. Galioto to refrain from bringing a

23   suit against two of the government witnesses, Mr. Berard

24   and Mr. Kaiser, and he obviously did not listen to that

25   kind of request by Mr. Galioto, so there's a joint portion

7

1   of Mr. Galioto's conduct that we claim tried to interfere

2   with the judicial process.

3           And the important point here, Judge, is in

4   counter to the government's argument that it's irrelevant

5   to this case, is the questions in the deposition were

6   related to the global settlement.

7           THE COURT:  I know it couldn't have effected the

8   grand jury presentation, because it happened afterwards.

9   It could not have had any impact on the grand jury because

10  it happened afterwards.

11          In fact, in your reply, the lawyer, whatever

12  effort was or was not made with regard to preventing the

13  question from being answered, it looks like that through a

14  motion to compel the question was answered subsequently in

15  a telephonic deposition, a supplemental deposition.

16          I don't understand how that issue could be the

17  basis for a dismissal of an indictment that had already

18  been issued.  It's pre-attenuated, even assuming that it

19  occurred, it's so attenuated.

20          The standard for dismissal of an indictment, as

21  you know, is extremely high.  How could an indictment be

22  dismissed for something that happened afterwards in a

23  civil litigation?

24          MR. LARUSSO:  You know, Judge, that obviously

25  was of concern to me.

8

1          And what I realized by looking at these

2     post-indictment actions of Mr. Galioto, which I think are

3     clearly inappropriate, is that it colors the presentation

4     of the evidence to the grand jury.  It gives you an idea

5     or a mindset of the person who would selectively present

6     testimony before a grand jury.

7          This indictment was returned I think it was

8     about a year-and-a-half ago.  I wasn't around during the

9     early stages, Judge, but it wasn't that far back.

10          And these actions are consistent with an agent

11     who would selectively present testimony in the grand jury,

12     who would withhold information that may give the grand

13     jury a different view of the evidence.

14          Judge, we're looking at the grand jury in the

15     situation of trying to get a fair presentation.  And if

16     our allegations have a semblance of support that there

17     were facts that altered the government's theory of the

18     facts, not the theory of the case, then Mr. Galioto's

19     present conduct in trying to protect these witnesses and

20     trying to tell them to sue other people other than

21     government witnesses in terms of not talking about the

22     global settlement fund, all of which gives you an idea,

23     wait a minute, maybe there was some merit to these

24     allegations that are being made.

25          That's the point, Judge.  That's why I say it

9

1    relates back to the intent, it relates back to the person

2    who we are alleging was involved in the impropriety.

3            THE COURT:  And the second piece deals with

4    Mr. Privitello.

5            I read the back and forth on that, I read your

6    client's affidavit.  But putting aside the Sergei Gonchar

7    piece, that's a separate piece, and I'll ask the

8    Government about this, but it appears they may not be

9    pursuing that piece any longer.

10           But the core of what your client appears to be

11   claiming is that there's an explanation for where the

12   funds went and why they went there.

13           But, again, their failure to put in what his

14   explanation is of that, it is my understanding of the law,

15   is not a basis for a dismissal of the indictment.

16           In fact, I was reading his affidavit very

17   carefully and there appears to be an acknowledgement that

18   a portion of Mr. Privitello's funds, regardless of what

19   Mr. Gonchar told him he could or could not do with the

20   funds he was investing, that a portion of Mr. Privitello's

21   funds were used to pay for Mr. Constantine's personal

22   expenses, including the legal fees out of the other

23   lawsuit related to a race car team.  I'm not even sure

24   what it relates to.

25           In his affidavit, his response to that was most

1    of it was Mr. Gonchar's money, which I interpreted to be

2    an acknowledgment that a portion of it was

3    Mr. Privitello's money and apparently some of his money

4    also went to Mr. Gonchar -- Mr. Privitello's money went to

5    Mr. Gonchar.

6              So, again, I'm not sure I understand, and I saw

7    he has an explanation for why there's a theory that paying

8    the legal fees of a civil case was appropriate in some

9    way.  I saw something along those lines.

10             Again, as you know, it's a criminal case.  The

11   defendants may have explanations for what they're doing,

12   but the Government's failure to stand up in the grand

13   jury, even assuming they knew that was his explanation,

14   and tell the grand jury, well, Mr. Constantine, if he were

15   sitting here, would say this is why he did this, that's

16   not a basis for a dismissal of an indictment.

17             MR. LARUSSO:  Judge --

18             THE COURT:  Am I reading the facts wrong?

19             My understanding of the facts is some of it is

20   his money.  We can go back and forth about how much, but a

21   portion of Mr. Privitello's money was used apparently by

22   Mr. Constantine to pay for legal fees and to pay

23   Mr. Gonchar for something, or am I wrong about that?  I

24   thought that's what his affidavit acknowledged.

25             MR. LARUSSO:  I spoke to my client.  When you

11

1    have a factual dispute, that's for a trial, not for the

2    Court to make a determination.

3          My client showed me documentation and gave me

4    the history of these allegations.

5          Mr. Galioto was well aware of what happened with

6    that $155,000; yet, the indictment alleges that it went to

7    AC Falcon based upon that allegation that $155,000 that

8    was allegedly diverted was used to forfeit an airplane.

9          Well, Mr. Galioto was well aware, Judge, that

10   that money did not go to AC Falcon.  It went to a

11   different company called AC Avalon.

12         As soon as that money went to that company,

13   there was a correction made and it went to the proper

14   company, Eufora, and payment for bills.

15         So, right away, the first thing that comes to

16   mind is wait a minute.  You have 155,000.  The agent knew

17   or should have known, if he had looked at the proper

18   documentation, the bank records, he would have been able

19   to see that the money was diverted the next day

20   immediately back to the account where it should have been.

21         What the government does is they then take the

22   superseding indictment and they mask this.  They take out

23   the specific allegations in the indictment which we

24   demonstrated in our motion to dismiss was wrong, and they

25   now go from a specific allegation, which we refuted, to

12

1  now a general allegation, which I don't even know yet what

2  the personal expenses they claim were paid for by some of

3  the money that they claim was diverted.

4          So this is just one aspect of what we're looking

5  at.  We're not looking at just each one individually and

6  saying to the Court that there is no factual dispute.

7  There may be some factual disputes.  There's more to this.

8          The other thing that was very, very interesting,

9  Judge, is when we filed our motion and raised the issue of

10  evidence withholding to protect witnesses such as

11  Mr. Kaiser, evidence withholding to protect witnesses such

12  as Mr. Jowdy, and, Judge, you can almost tell from the

13  tone of my voice, the progression of my own unbelief of

14  what was taking place when you finally look at some of the

15  facts.

16          So the superseding indictment comes down.  We

17  removed the specific allegations.  We now have general

18  allegations that we're not sure exactly where the specific

19  funds were diverted to.  We will have to guess at that.

20  And maybe we should be asking the government for a bill of

21  particulars to give us a little more information on what

22  we're going to be defending.

23          There was another aspect, Judge, in addition to

24  the Privitello matter, in addition to the Kaiser

25  situation, in addition to the Ken Jowdy situation which

1    I'll discuss in a minute.  This came to me recently, very

2    recently.

3           Mr. Constantine and Mr. Kenner are accused of

4    diverting approximately $4.1 million from the global

5    settlement fund.  The Court knows what that is, why it was

6    brought into effect.

7           I had a chance to speak to Mr. Gonchar recently

8    and I learned from Mr. Gonchar that he hired a forensic

9    accountant by the name of Mr. Stempel, and Mr. Stempel

10   went through the expenditures from that account.

11          Mr. Gonchar is satisfied that the money was

12   spent -- and he's one of the hockey players and probably

13   one of the individuals who invested most -- that the money

14   was spent, as he understood it, and I know the government

15   is going to say there are other hockey players and they

16   have a different view of it, but the point I'm making,

17   Judge, is that even here there is a substantial question

18   regarding whether or not the grand jury had an opportunity

19   to review this critical evidence of a hockey player who in

20   indictment number one is a victim, and is no longer in the

21   indictment that's been returned by the Government.

22          Why?  This forensic accountant, did he testify

23   in the grand jury?  Did he give his report as to why the

24   $4.1 million in his mind was properly spent?

25          Clearly, he didn't because the grand jury

14

1    returned an indictment charging Mr. Kenner and

2    Mr. Constantine.  Another example.

3           The other one, Judge, is as much as a serving

4    instrument as the one I related.  In the old indictment, I

5    think it's paragraphs 31 and 32, the government talks

6    specifically about $700,000 being invested by hockey

7    players, and that the money was then diverted to

8    Mr. Kenner and to Mr. Constantine.

9           Well, I looked at the records.  Mr. Constantine

10   didn't get a penny of that.  The money went a portion to

11   Mr. Kaiser and as the indictment says, the first

12   indictment, he returned it to Mr. Kenner.

13          What the evidence doesn't show is that if you

14   got all the bank records, which we did not, especially

15   Mr. Kaiser who is a witness for the government, he got

16   more money than the $70,300 that the government claimed he

17   got in return, he got approximately $105,000 more.

18          So the point I'm making, Judge, when we start to

19   look at these isolated incidents, they mount up and the

20   superseding indictment is just further proof that

21   something was wrong in that grand jury, something

22   drastically wrong, because all my client wanted was a fair

23   presentation of the evidence before the grand jury.

24          It didn't happen and I'm not asking for a

25   dismissal because that's inappropriate now.  I'll be

1  asking for that if the Court gives us at least an

2  opportunity to have a hearing.

3      The last one that was very interesting to me,

4  and I'm just learning this, Judge, everybody says that

5  Mr. Jowdy is a victim.  Well, from what I'm learning,

6  Mr. Jowdy is more than a victim, he was a participant.

7      In the first indictment, paragraph 31, they talk

8  about $250,000 being invested by a John Doe number eight

9  in Eufora -- I'm sorry, in a Mexican land venture.

10     Instead, the allegation is that the money was

11 diverted to Eufora.

12     Well, there's no mention of Jowdy in that

13 $250,000, but the records are going to show that Mr. Jowdy

14 actually got $8 million for the land development from the

15 hockey players.  250 that's alleged in the indictment went

16 to his company.  I don't know if it was the Baha

17 Corporation or the Diamante Corporation.

18     But you know what Mr. Jowdy does? He takes the

19 $250,000, he then sends it to Eufora as his investment

20 under LMJ Management.

21     Where is this in the indictment?

22     The government withholds these records from

23 Mr. Jowdy, Baha, the LMJ, which would have shown Mr. Jowdy

24 was more than a victim, he was a participant in the

25 fraudulent scheme.

1            So when I looked at all these incidents, I said

2    to myself, well, wait a minute.  We have specific

3    allegations.  My client has alleged improprieties in

4    regards to at least three or four in the indictment.  He's

5    now coming in and he's faced with an indictment that no

6    longer has the specificity, they removed the questionable

7    factual material, and that's where Mr. Galioto's efforts

8    to interfere with the judicial process and to get somebody

9    to sue Mr. Kenner as opposed to Mr. Kaiser or Mr. Berard,

10   two of the government's witnesses, adds color to what

11   really transpired.

12            So I'm asking the Court, in terms of looking at

13   our questions regarding a fair review of the facts, that

14   there should at least be a hearing on the matters that I

15   have addressed here briefly.  I marked them as four

16   separate areas.

17            THE COURT:  Okay.  Do you want to address the

18   severance issue briefly.

19            MR. LARUSSO:  Yes, your Honor.

20            THE COURT:  My only question on that is they're

21   not going to introduce the Home Depot recording, so I want

22   you to confirm, I don't see any piece of evidence talking

23   about an e-mail to potentially raising some issue.

24            I'm not aware of any piece of evidence,

25   admissible evidence, that creates some confrontation

17

1   clause issue where Mr. Kenner is saying something about

2   your client in some piece of evidence that he won't be

3   able to challenge.  It's not an evidentiary issue at this

4   point.

5          MR. LARUSSO:  I think right now it's the

6   government's position that they're not going to use the

7   tape, that my argument that the introduction of that tape

8   would prejudice my client barring a severance has

9   obviously been removed.

10         But there always is and will be the possibility

11  that Mr. Kenner will testify in his own behalf, and that

12  he will then present his version of the facts and the

13  government would be able to introduce the tape and the

14  substance of the tape through him.

15         So I'm very -- I guess I look forward in

16  advancement as to what will happen at trial.  I see that

17  as a distinct possibility.

18         Your Honor, the tape is not the only reason

19  we're moving for severance.

20         We're also moving for severance on the grounds

21  that there are substantially antagonistic defenses between

22  Mr. Kenner and Mr. Constantine.  They're going to be

23  pointing the finger at each other.

24         THE COURT:  The cases are clear that finger

25  pointing is not sufficient for a severance.

1          The standard is for it to be so antagonistic to

2  warrant a separate trial, the jurors would have to, in

3  order to believe one person's defense, would have to

4  conclude that the other person was guilty.

5          And I don't see that as a situation here.  Even

6  if both defendants testified and said to the jury, well, I

7  didn't do anything wrong.  I gave the money to

8  Mr. Constantine, and Mr. Constantine says I didn't do

9  anything wrong, I gave the money to Mr. Kenner.

10          That doesn't necessarily -- the jury could have

11  found neither of them committed fraud, yet they relied on

12  each other, but neither of them committed any fraud.

13          Your argument to me in the first motion is that

14  there was no fraud at all, so why couldn't the jury

15  conclude that even though to some extent they may be

16  saying I wasn't responsible, he was responsible, the jury

17  could conclude that neither of them did anything wrong.

18          MR. LARUSSO:  There are substantial indications,

19  Judge, they're going to be pointing the finger at each

20  other and the jurors will have to decide if this person

21  says this, then the other has to be guilty.

22          For example, as I mentioned in the brief, the

23  government themselves in the search warrant that was

24  executed in Mr. Kenner's house, they referred to an e-mail

25  that Mr. Kenner had sent where he accuses Mr. Constantine

19

1    of misappropriating money from the global settlement fund.

2          Now I know from the facts of the case, Judge,

3    that Mr. Kenner reviewed all of the expenditures that were

4    attributed to the global settlement fund, and many of the

5    allegations stem from his belief that those expenditures

6    were inappropriate and Mr. Constantine was responsible for

7    the theft.

8          So just looking at the $4.1 million allegations

9    in the indictment, you've got two fingers pointing in the

10   direct opposite way.

11         I have Mr. Gonchar, and a forensic accountant,

12   and Mr. Constantine saying one thing, and I got Mr. Kenner

13   who will be taking the stand and at least on

14   cross-examination pointing the finger at Mr. Constantine.

15         That was actually the basis for that count, that

16   report that was done and reviewed by Mr. Kenner in regards

17   to the expenditures, but there's more than that.

18         THE COURT:  If Mr. Kenner says I didn't

19   misappropriate that money, any money that was taken out of

20   there was taken by Mr. Constantine.

21         And if Mr. Constantine has a legitimate

22   explanation for what happened to the money, it doesn't

23   matter that Mr. Kenner is saying I didn't take that money,

24   he took that money.  The question is whether or not

25   there's a legitimate reason.

1          MR. LARUSSO:  And that's the important thing.

2     What if the jury believes him and doesn't believe my

3     client?  I know they're going to say A and B, but it's

4     what the jury is going to do.  If the jury says I don't

5     believe you, I believe him, we're in the area where

6     antagonistic defenses are at least looked at by the Court

7     as a possibility for severance.

8          That's what I'm saying, Judge, is that if you

9     look at the facts, your client is going to say he didn't

10    do it, but if they don't believe him, then that means he's

11    going to be found guilty.

12         THE COURT:  I don't follow that.

13         If Mr. Kenner says I didn't take any money, that

14    money went to Mr. Constantine, right?

15         That doesn't necessarily mean Mr. Constantine

16    did anything wrong either.  Mr. Constantine can say, yeah,

17    I had that money, but the victim gave me permission to use

18    it in this manner.  It doesn't -- he's not necessarily

19    pointing the finger back at Mr. Kenner.

20         MR. LARUSSO:  It's even simpler than that,

21    Judge.

22         When Mr. Constantine -- when Mr. Kenner says

23    that Mr. Constantine took the money, he took it for

24    purposes other than what it should have been for, period,

25    end of story. That's why he claims in this indictment that

21

1    Mr. Constantine defrauded the investors by taking this

2    money.

3         It's very simple in terms of when you look at

4    the expenses, Mr. Kenner is going to say that they were

5    not related to the global settlement fund and

6    Mr. Constantine is going to say that they are.

7         The question is do you believe one or the other,

8    and you'll necessarily have a problem with the jury.

9    That's the point that I was making.

10        There are other aspects of this, Judge, to

11   provide support for the Court to realize Mr. Kenner's

12   position is antagonistic.

13        There was the counterclaim that my client filed

14   in one of the lawsuits where he was detailing the fraud

15   that Mr. Kenner and others were involved in.  That was an

16   exhibit to our original motion.

17        Then there was actually a recording that we

18   recently received.  I apologize.  We may not have recently

19   received it.  I haven't had a chance to really listen to

20   it.  I'm told it's a recording where Mr. Kenner accuses

21   Mr. Constantine in a curse word that he had in effect

22   taken the money from the global settlement.

23        So from the specific allegations that have been

24   made in prior proceedings, Judge, we know what the

25   parties' position are going to be.

1        And one of the things that I learned and, again,

2   I apologize.  I tried finding this in the status reports

3   before the Court, but I understand Mr. Kenner's lawyer at

4   one time actually said he may be acting as a prosecutor in

5   his examination of the witnesses at the trial, which leads

6   credence to the fact that they see the positions of the

7   codefendants as being antagonistic and warrant

8   consideration.

9        THE COURT:  I think that covers your motions,

10  right?

11       MR. LARUSSO:  It does, your Honor.

12       THE COURT:  I'll let the government respond to

13  that, Mr. Haley, before you go.

14       Go ahead, Mr. Miskiewicz.

15       MR. MISKIEWICZ:  Thank you, your Honor.

16       With respect to the motion for dismissal, if the

17  Court has any questions, I'll be happy to answer them.

18  Otherwise, we rest on our submission.

19       THE COURT:  Mr. LaRusso's argument is that the

20  indictment has essentially shifted; Mr. Gonchar is out,

21  and that there are aspects to certain allegations with

22  respect to the airplane that the government is now

23  disavowing.  I do want you to respond to that.

24       MR. MISKIEWICZ:  The government isn't disavowing

25  the overall fraud, and ultimately the nature of the Eufora

1  fraud is such that the defendants, both Kenner and

2  Constantine, but in this case we will focus on

3  Mr. Constantine, induced a number of individuals to invest

4  in a company based on certain representations about its

5  credit worthiness implicitly, and also its ability to make

6  money in the near term.

7          And specifically, for instance, as to

8  Mr. Privitello, on the nature of what he was getting for

9  the money he invested, that he would become an operating

10 member -- this was an LLC, not a corporation so that he

11 would get shares, but they got pro rata memberships in

12 this LLC.

13          And with respect to the wire transfers that we

14 have really deleted I guess is the right word in the

15 superseding indictment, is that that doesn't mean that we

16 disavowed the nature of the fraud.

17          We simply recognized that the strongest, if you

18 will, evidence is not this one tiny little piece of where

19 this money went.

20          It may very well have been an inadvertent

21 diversion at that stage, and ultimately temporarily went

22 back into Eufora for the sake of Eufora, but what the

23 overall evidence is going to show is that much of the

24 money was sent or used really for the defendant's own

25 personal benefit.

24

1          And with respect to Mr. Privitello, because that

2    was the wire transfer at issue, the evidence, the

3    documentary evidence, is going to show that

4    Mr. Constantine represented to Mr. Privitello that he

5    would obtain a 1.5 share of Eufora in exchange for his

6    investment, and other people would get other percentages.

7          And, yet, what he did and what he did even in

8    sworn affidavits in the Eastern District of New York in

9    civil litigation that preceded the indictment, he

10   disavowed ever making such an agreement and to this day

11   Mr. Privitello is out the money, he is out a percentage

12   interest in Eufora.  He has basically had his pocket

13   picked by Mr. Constantine.

14         So that misdirection probably was not the best

15   evidence of Mr. Constantine's fraudulent intent; and so

16   consequently, to streamline the case, the government did

17   redact it or removed it from the superseding indictment,

18   but we do not disavow and we have not changed our theory.

19         He took people's money, he used it for his own

20   benefit, and then he denied people what he had promised

21   that they would get in exchange for their investments.

22         MR. LARUSSO:  Your Honor, can I make one point?

23   I think it's partly in response, but I want to emphasize

24   this.

25         In the superseding indictment, the government

1   removed approximately eight victims.  It went from 19

2   hockey players to 11, one of whom is Mr. Gonchar who I

3   mentioned in my argument I've spoken with him and flatly

4   refutes the government's allegations in this indictment.

5          But there are others, others who are not aligned

6   with the Government witnesses.  There's evidence in the

7   grand jury that they were victims.  I don't know what

8   evidence was presented by Mr. Galioto regarding those

9   hockey players, and why they were victims of this massive

10  fraud, but they now have been removed, as have many of the

11  general allegations.

12         And the motion we're making is that we didn't

13  get a fair presentation.  There was not in any respect an

14  opportunity for the jurors to assess the relevant evidence

15  on now only 11 victims as opposed to 19.

16         Why they're no longer victims is a substantial

17  question, and why the specific allegations are removed is

18  also a substantial question in light of some of the issues

19  we raised with the Court.

20         I can't ask every single question regarding how

21  that money was spent and what the analysis showed. I hope

22  to be prepared to do that at trial.

23         I'm just raising the question that there is

24  something amiss here.  There was certainly not just

25  mistakes, but deliberate efforts to ignore evidence and

26

1   now the government's own superseding indictment adds fuel

2   to the fire.  They're conceding that these people weren't

3   the victims as they were allegedly portrayed in that grand

4   jury.

5           I appreciate the opportunity to make that

6   comment, your Honor.

7           MR. MISKIEWICZ:  May I respond?

8           THE COURT:  Yes.

9           MR. MISKIEWICZ:  There will no doubt be

10  testimony from Mr. Gonchar and other victims at trial

11  where they will say to this day they don't have a clue

12  what Mr. Constantine and Mr. Kenner have done with their

13  money.

14          Moreover, they will say that they've heard for

15  years allegations about fraud by a great number of people,

16  John Kaiser and Mr. Jowdy being among them.

17          What each of those victims will say, and

18  Mr. Gonchar is one of them since I've spoken to him, and I

19  anticipate that all of them will say that all those

20  allegations about fraudulent conduct by others comes from

21  and ends with the two defendants in this case.

22          And the litigation that has preceded here

23  basically I think it's really irrelevant, but if one were

24  to pour over the litigation, one would see that numerous

25  victims who claimed fraud on the part of the defendants

1   here in the civil context, the defendants responded in

2   exactly the same way that Mr. LaRusso is responding here

3   now, which is it's not us, it's other people.

4           So it may very well be that some of the

5   witnesses -- and frankly we're being careful in our

6   preparation because some of those witnesses are going to

7   see on the stand for the first time how the money went

8   into the pockets of the defendants, Kenner and

9   Constantine, and the fact that they have said in previous

10  context I think these guys were great, which is

11  essentially what Mr. Gonchar has said, is really going to

12  be perhaps one of the things I'll even affirmatively try

13  to get out from them, and then show them where the money

14  went and then we will see if Mr. Gonchar and other victims

15  continue to maintain that position, or if suddenly the

16  jury sees the light bulb go off in their heads and

17  realizes that the people that they thought were so great

18  for all these years are actually people who have stolen

19  all their money.

20          That's really ultimately -- it's an unusual sort

21  of twist to a complex white collar fraud, but I'm certain

22  that that is going to be something that I think will be

23  revealed throughout the trial.

24          It does not, however, require either an

25  evidentiary hearing or dismissal on the grounds of

1    government misconduct.  There has been no government

2    misconduct.

3            MR. LARUSSO:  Your Honor, just one last point.

4            I think what Mr. Miskiewicz is failing to

5    realize, Mr. Gonchar was listed as a victim.  He, himself,

6    doesn't believe he was, and there was no opportunity to

7    pursue that or present a fair documentation regarding

8    whether he was or wasn't right.

9            But be that as it may, the two points I wanted

10   to make is, and I don't know if Mr. Miskiewicz is aware of

11   this, but Mr. Jowdy has been sued for trying by a number

12   of hockey players.

13           There was $25 million invested in the Mexican

14   development that have been lost.  Nobody seems to be

15   focusing on that.  But there is a suit pending to try and

16   get the records for Mr. Jowdy.

17           I only say this because I know it's going to

18   dovetail into Mr. Haley's argument.

19           Mr. Jowdy is an individual who the government

20   attempted to protect by keeping him out of the indictment

21   in light of withholding the records I mentioned to you

22   before.

23           And in order to get a fair presentation, that

24   should have been done and it was never done.

25           I would ask the Court to consider not just the

29

1   Privitello situation, but all of the documents that the

2   government withheld.

3          THE COURT:  Do you want to address the

4   severance, Mr. Miskiewicz?

5          MR. MISKIEWICZ:  Yes, briefly, your Honor.

6          I think your Honor already addressed the issue

7   of antagonistic defenses, as well as the government's

8   indication that we were not intending to use, nor will we

9   use, the Home Depot tape recording because of the

10  possibility of a Bruton issue arising.

11         And if I didn't say so in our submission, that

12  would go for any e-mail authored by one defendant blaming

13  the other, unless there would be some basis by which we

14  could argue that it really did constitute a coconspirator

15  statement.

16         At this stage I can't say that I found such an

17  e-mail, and otherwise we would have presented that to your

18  Honor pretrial and make a determination of that

19  admissibility under 801(d)(2)(E).

20         I would only say this generally about the

21  argument in favor of severance raised by Mr. LaRusso, and

22  it is this.

23         Virtually all of the argument is premised on

24  Mr. LaRusso and/or Mr. Haley's ability to elicit

25  inadmissible hearsay in defense of their clients.

1           And what I mean by that is I suspect there will

2     be many, many questions of witnesses in this trial,

3     government witnesses in this trial, in which they attempt

4     to introduce into the record prior affidavits, other sorts

5     of e-mails, self-exculpatory type of e-mails from one

6     defendant or another, all of which will constitute an

7     effort to shift blame to another person and self-exculpate

8     whatever defendant happens to be running the

9     cross-examination at that moment.

10          And I say that because I suspect it's going to

11    be a reoccurring issue and may result in a lot of sidebars

12    and I have been trying to think of a way to catalogue all

13    of the potential documents that I suspect counsel are

14    going to try and offer at trial.  It's just so voluminous

15    at this stage, I'm not sure I can do that.

16          The fact that they will not be able to -- the

17    fact that they wish to introduce exculpating, blame

18    shifting hearsay is also not a reason for severance.

19          And I'm confident that the Court will, in due

20    course of time over the trial, make the evidentiary

21    rulings that need to be made at that moment as to whether

22    these documents are admissible or not.

23          So that doesn't answer the question about

24    whether or not the defendants take the stand and blame

25    each other; but, again, Mr. LaRusso's comment what if his

31

1   client takes the stand and the jury doesn't believe him,

2   his client doesn't have to take the stand, as he knows,

3   but if he does and the jury doesn't believe him, that's

4   not a basis for severance or any sort of violation.  In

5   fact, that's exactly what this forum is for.

6           So, other than that, if you have any questions

7   about our position regarding severance, we otherwise rest

8   on our papers.

9           THE COURT:  No, I don't have any other

10  questions.

11          I'm going to place the Court's ruling on the

12  record with respect to these.  I may issue a written

13  decision as well, but given obviously how close the trial

14  date is, I want to place an oral ruling on the record so

15  the parties can properly prepare.

16          First, with respect to the motion for severance,

17  the motion is denied for the following reasons:

18          First, as I think everyone concedes at this

19  point, the Court is aware and defense counsel has not

20  pointed the Court to any Bruton issue.

21          The Home Depot tape, as it stands now, is not

22  coming into evidence.  I'm not aware of any other evidence

23  that would create a Bruton problem, a confrontation clause

24  problem, such that severance would be warranted on that

25  basis.

32

1          The primary argument, the main argument, is

2     basically one of antagonistic defenses.  The law on that

3     is clear in numerous cases, and I just going to cite two;

4     United States vs. Escobar, 462 Fed.Appx. 58, Second

5     Circuit 2012, where the Circuit denotes a summary order

6     outlining the law as relates to antagonistic defenses in a

7     detailed way.

8          And the bottom line, as I have discussed, is

9     that merely finger pointing is not sufficient for there to

10    be a severance.

11         The second case I'll cite is United States vs.

12    Corsey, 512 Fed.Appx. 6, Second Circuit 2013.

13         The Court in that case explained it this way;

14    differing levels of culpability and proof are inevitable

15    in any multi-defendant trial, and standing alone are

16    insufficient grounds for separate trials.

17         And it says:  Our own review of the record

18    convinces us that this is not a case where the jury, in

19    order to believe one defendant's testimony, would have to

20    disbelieve the testimony of a codefendant. And they said

21    some antagonism does not require severance.

22         I conclude, based upon my understanding of this

23    case, that this is one of those situations where people

24    may attempt to shift blame or point fingers at each other.

25    The defendants, through their testimony or through their

33

1    lawyers, may seek to do that, but I heard no defense that

2    is going to be proffered by either Mr. Kenner or

3    Mr. Constantine that would be a situation where the jury,

4    in order to believe one defendant's testimony, would have

5    to disbelieve the testimony of the codefendant.

6           As I noted to Mr. LaRusso, the fact that they

7    may have given responsibility to each other for particular

8    aspects of money, or may have been under some

9    understanding how certain money should be used, does not

10   necessarily mean that the jury will have to disbelieve or

11   convict the codefendant.

12          The codefendant could have, through his own

13   testimony or through his lawyer's presentation of

14   evidence, perfectly good explanations for his position,

15   what he did with the money, what representations he made

16   to the victims that address any potential finger pointing

17   by the codefendant.

18          So I don't see this as one of those situations

19   where severance is required from an evidentiary basis or

20   from a basis of the defenses that I have heard from

21   Mr. LaRusso, so that motion is denied.

22          The motion to dismiss the indictment for grand

23   jury misconduct and I guess related misconduct as relates

24   to the deposition is denied.

25          I also don't believe there's a sufficient basis

34

1   for the Court to conduct an in camera inspection of the

2   grand jury minutes and the reasons for that is as follows:

3           The standard for dismissal of an indictment, as

4   both the Supreme Court and the Second Circuit has

5   emphasized in fact in a summary order in United States vs.

6   Howard, 216 F.3d 1074, Second Circuit 2000, Second Circuit

7   said:

8           Quote, the District Court cannot dismiss an

9   indictment because the prosecution presented unreliable,

10  misleading or incomplete evidence to the grand jury.

11          This is consistent with a Supreme Court case,

12  United States vs. Williams, 504 U.S. 36, 1992, where the

13  Supreme Court held if the indictment is otherwise valid,

14  the government's failure to disclose exculpatory evidence

15  to the grand jury is not a basis for dismissal of the

16  indictment.

17          There's another Supreme Court case, Costello vs.

18  United States, 350 U.S. 359, 1956, and finally, United

19  States vs. Jones, 164 F.3d 620, Second Circuit 1998, which

20  says:

21          Misleading testimony, including an inaccurate

22  summary of the evidence, absent other evidence for

23  prosecutorial misconduct alone, would not support

24  dismissal of the indictment.

25          I've just cited these cases as examples of how

35

1    high the standard is to dismiss an indictment based upon

2    an argument that the Government's presentation to the

3    grand jury was misleading or incomplete in some way

4    because of evidence that was left out.

5            Based upon the arguments that have been made by

6    defendant Constantine, I do not believe we're even in the

7    same realm, but anything that would question the validity

8    of the indictment and the grand jury's decision in this

9    case, the issues regarding the civil depositions are so

10   attenuated they certainly would not rise to any level

11   sufficient to question the grand jury's decision in the

12   case, or the agent's involvement in the presentation of

13   the grand jury; and, similarly, the government's decisions

14   with respect to not moving forward with respect to certain

15   victims or eliminating certain aspects of their case is

16   not a sufficient basis to dismiss an indictment.

17           And, in fact, as I noted, I carefully reviewed

18   Mr. Constantine's position with respect to some of these

19   issues; and although he has explanation that he seeks to

20   proffer for some aspects of the diverting of

21   Mr. Privitello's money, the government's failure to

22   present that version -- or I don't know what exactly they

23   should have done with respect to that -- or his claim is

24   what they should have done with respect to that, is not a

25   basis to dismiss the indictment.

36

1      And the bottom line is the government's core

2  fraud allegations with respect to the case, there's no

3  indication that there was any misconduct with respect to

4  those that would warrant dismissal of the indictment.

5      And I also conclude there's not a sufficient

6  basis for the Court to conduct an in camera review of the

7  transcript of the grand jury's proceeding for all the same

8  reasons.  I believe there's been an insufficient showing

9  to warrant that in this case, and for those reasons the

10  motion is denied.

11      Mr. Haley, I'll give you a chance to highlight

12  anything you want to highlight.

13      MR. HALEY:  Yes, sir.  Thank you.

14      Your Honor, I imagine I should --

15      THE COURT:  I'm sorry, one more thing.

16      To the extent Mr. LaRusso requested an

17  evidentiary hearing on that, for the same reasons I don't

18  believe an evidentiary hearing is appropriate because the

19  proffers as to what's being challenged would be

20  insufficient to meet the standard in any event in a

21  hearing.

22      For example, if there was a hearing where the

23  agent made some statement to a witness that could be

24  construed as not answering a question at a deposition,

25  even if that were established at a hearing in the

37

1    circumstances of this case, it would not warrant dismissal

2    of the indictment, or any relief with respect to the

3    indictment, so there's no purpose for an evidentiary

4    hearing on that or the other matters which are

5    insufficient to challenge the government's core allegation

6    as relates to this indictment.  Otherwise, you will have a

7    mini trial, a trial before the trial about the indictment,

8    and the aspects of the indictment that the defendant is

9    challenging, and that's not how the system works.

10         Go ahead, Mr. Haley.

11         MR. HALEY:  Thank you, Judge.

12         Your Honor, I guess I should begin with a little

13   bit of a confession.

14         In law school I did not do well in trusts and

15   estates.  I did not really understand the rule against

16   perpetuities.

17         I did fairly well in the rules of evidence,

18   Judge, and I know what self-serving inadmissible hearsay

19   is as a concept.

20         So when Mr. Miskiewicz says to the Court that he

21   proffers that the defense of Mr. Kenner will be based upon

22   an effort on my part to elicit self-serving inadmissible

23   hearsay, that will not take place.

24         What will take place, Judge, is questioning of

25   witnesses who have testified under oath previously,

38

1    specifically the testimony of Mr. Peca, who testified

2    before the grand jury impaneled in the Southern District

3    of New York, whose testimony is contradictory to material

4    allegations even in this superseding indictment concerning

5    his knowledge of the use of his line of credit.

6              It will be based upon the testimony of Darryl

7    Sydor before the grand jury impaneled in the Southern

8    District of New York, where he similarly testified full

9    awareness of the use of his funds as deposited in his line

10   of credit.

11             It will be based upon the grand jury testimony

12   of Mr. Stevenson who testified before the grand jury

13   impaneled in the Southern District of New York, who

14   testified as well that he was fully aware of the use of

15   his line of credit, and authorized Mr. Kenner to access

16   his line of credit to make investments in the Hawaii land

17   development which the government characterizes as a

18   scheme.

19             It will be based upon the testimony of John

20   Kaiser who testified in what is known as the Nolan

21   arbitration.

22             It will be based upon the testimony of

23   Mr. Berard who similarly testified in the Nolan

24   arbitration.

25             It will be based upon the testimony of Ken Jowdy

39

1    who similarly testified in the Nolan arbitration and also

2    testified in other proceedings on other occasions.

3            I respectfully submit to the Court that the

4    testimony given before a grand jury and testimony given

5    before an arbitration is not hearsay, Judge, and --

6            THE COURT:  I don't want to spend too much time

7    on what's hearsay and what's not hearsay.  I have other

8    matters on today.

9            The two aspects of your motion are the

10   computer --

11           MR. HALEY:  Yes, sir.

12           THE COURT:  -- the computer and the subpoenas,

13   so let's stay focused on that.

14           MR. HALEY:  Judge, as far as the Ganias decision

15   is concerned, I fully briefed the issue.  There's an

16   affidavit submitted in support of our motion.  I note the

17   government's response to that aspect of the motion is not

18   supported by affidavit.

19           So it appears, at least based on this record,

20   the government acknowledges that they're in possession of

21   personal information, significant amount of personal

22   information, contained on Mr. Kenner's MacBook computer.

23   It also appears, having been in possession of that

24   information for 16 months, it has not been purged.

25           And my argument as set forth in my brief before

40

1    the Court regarding Ganias, Ganias was focused on the need

2    to avoid what has been historically called the general

3    warrant, where the government will go in and simply seize

4    everything in sight and retain it for purposes of

5    conducting their investigation when aspects of what they

6    seized are clearly immaterial and irrelevant to the

7    prosecution.  But I made that argument, Judge, in my

8    papers and I will not repeat it for purposes of the

9    record.  I believe the issue is fully briefed.

10           Your Honor, I do appreciate the consideration

11   your Honor gave us today because it was my request that

12   the matter be put down for a hearing today.  We have a

13   trial date and there is a request for the issuance of Rule

14   17 subpoenas that we maintain, Judge, are material and

15   necessary to the defense of the action.

16           I know your Honor has reviewed the relevant

17   portions of Mr. Kenner's affidavit in that respect.  It

18   reads:  Of course, in consultation with my attorney, I

19   compiled a list of documents to be produced pursuant to

20   the subpoena which are relevant and material to my

21   defense.

22           Each document, as requested in the subpoena,

23   concerns transactions between myself and respective John

24   Does and Jane Doe with respect to the various allegations

25   in the indictment.

41

1          If you look at what's set forth, Judge, on

2     Schedule A of each one of those requests, it specifically

3     refers to transactions that cover the four-corners of that

4     indictment.  It specifically refers to John Does

5     identified in that indictment.

6          Judge, I'm not asking for a document from

7     Mr. Kaiser who, perhaps in application for a driver's

8     license, made a material misrepresentation such that that

9     would be used for impeachment purposes.

10          Those documents requested in the subpoenas are

11     tailored to the specific allegations in the complaint,

12     Judge.

13          THE COURT:  Do you consider 13 years of bank

14     records to be tailored?  13 years of a person's bank

15     records, that's tailoring?

16          MR. HALEY:  Your Honor, the answer is yes, if I

17     may respond.

18          The indictment covers a 13-year period.  The

19     bank records that we're looking for, if you look at those

20     subpoena requests in particular, let's start with the

21     Charles Schwab accounts.

22          What transpired here, Judge, as reflected in the

23     discovery presented by the government to date, is various

24     clients that were in contact with my client had funds

25     deposited in Charles Schwab.

42

1       There was a proposal by which they would

2   transfer those funds from Charles Schwab to Northern

3   Trust, and those funds would then be placed and utilized

4   to establish a line of credit.

5       The documents we're requesting in the Charles

6   Schwab subpoena in particular is limited to those specific

7   John Does.

8       There are other John Does, Judge.  We haven't

9   requested those documents because we acquired them already

10  in Rule 16 discovery.

11      Each one of these John Does with reference to

12  the transaction in Charles Schwab, as well as the request

13  by way of Northern Trust, signed documents on multiple

14  occasions authorizing these funds to go from Charles

15  Schwab and then into the Northern Trust line of credit.

16      And each one of those documents, Judge, the

17  transaction reports going down through to line 23, will

18  bear the signature of that John Doe and that will

19  demonstrate to the jury that each one of these John Does,

20  on multiple occasions, had to authorize the transfer and

21  use of their funds by Phil Kenner, and that stands in

22  direct contradiction to material aspects of this

23  indictment.

24      Judge, I might add, to give your Honor some

25  flavor, the arbitration I referred to a moment ago with

43

1    reference to the Nolan arbitration, in that arbitration,

2    Mr. Nolan, who will be called as a witness, signed a one

3    page document which reads as follows:

4           To Northern Trust:  Please allow Phillip A.

5    Kenner to access this outstanding LLC for direct deposit

6    into the Little Isle account at Northern Trust Bank.  He's

7    authorized to sign for the release of funds related to my

8    line of credit.

9           Thank you for your assistance in this matter,

10   signed Owen Nolan.

11          If those subpoenas are issued, Judge, for each

12   one of the John Does, we expect that you are going to see,

13   and what will be revealed in that subpoena, in those

14   subpoenaed records, is the same letter, either identical

15   or similar, from each one of those John Does.

16          And that goes to a direct allegation as set

17   forth in the indictment which claims that the investor

18   clients were unaware that Mr. Kenner was going to access

19   their line of credits and had no authority to do so.

20          THE COURT:  On the Northern Trust bank record

21   your client admits, in his affidavit, that he hasn't had a

22   chance to fully look at the Northern Trust records that

23   are in the discovery.  You apparently have some of them.

24   You may have the rest of them as well.

25          MR. HALEY:  Your Honor, I covered that this

44

1   morning with my client.

2          We haven't been able to access records as set

3   forth in that affidavit.  We indicated in the affidavit

4   that we would be looking at the records we have.  The

5   records we have are incomplete.

6          Judge, might I say this.

7          THE COURT:  Have you looked at every single

8   Nolan Trust bank record yet?

9          MR. HALEY:  The answer to that is yes, Judge.

10         Judge, if I may, what we're talking about here

11  is a subpoena to a third-party institution, a banking

12  institution.

13         And in order for me to be able to argue in front

14  of the jury that there was full knowledge and disclosure

15  as relates to these line of credits, I want the

16  opportunity to stand up in front of that jury and say a

17  subpoenaed was issued by the Court and pursuant to that

18  subpoena these records are delivered.

19         I don't want the jury to, or the government for

20  that matter, to make an argument that somehow that

21  subpoena did not cover the time period in question,

22  somehow those records did not cover the time period in

23  question.

24         I want to be able to say to the jury, this is a

25  full and complete representation of the records maintained

1    by that banking institution, and nowhere in those records

2    will you find a letter from Phil Kenner saying; Dear Sir:

3    Please direct that all future communications regarding

4    this individual's line of credit not be sent to his home

5    address; but, instead, be sent to me at my address in

6    Arizona.

7            Judge, we take a risk, because if those records

8    come in and there's such a document, which we maintain

9    does not exist, it will be utilized by the government.

10           Judge, one final comment.  We have -- if this

11   were a civil case -- Rule 45, I would respectfully submit

12   without question, would allow those subpoenas to issue.

13           If this were a civil case, and your Honor had a

14   document of this nature signed by Owen Nolan where he

15   acknowledges receipt of -- acknowledges authorization for

16   my client to utilize those funds for those purposes, and

17   there was a motion for summary judgment, your Honor would

18   grant the motion and Mr. Nolan's statement as he related

19   in the arbitration proceeding; well, there's a lot of

20   documents I signed that I don't read, would not, with all

21   due respect, be accepted by this Court to defeat that

22   motion for summary judgment.

23           THE COURT:  Okay.

24           Mr. Miskiewicz, your response.

25           MR. MISKIEWICZ:  Your Honor, I think a motion

46

1    for subpoenas, first of all, concedes that Mr. Haley

2    cannot make any of the elements under the Nixon standards.

3           And, alternatively, he is seeking to apply

4    what's been referred to by other courts as a more liberal

5    or permissive standard articulated by Judge Scheindlin in

6    the Southern District in a couple of cases there,

7    specifically Tucker and Nachamie.

8           The government's position is that he doesn't

9    even meet those standards, those more permissive

10   standards, because Judge Scheindlin, even if the Court

11   were inclined to adopt that as the basis for issuing Rule

12   17(c) subpoenas in a criminal case says, among other

13   things, that the defendant has to show that there is an

14   articulable suspicion that the documents may be material

15   to the defense, and that the subpoenas are reasonably

16   construed as material to the defense, and not unduly

17   oppressive for the purpose -- and not unduly oppressive

18   for the producing party to respond to.

19          There is nothing here but broad categories of

20   documents that are demanded by individuals and/or

21   companies, almost all of which have been assuredly gotten

22   by the defendant Mr. Kenner over the last eight, nine, ten

23   years of the operation of the fraud and various civil

24   litigation that has occurred.

25          There is absolutely nothing that he articulates

47

1    in his motion that suggests that this is anything but to

2    oppress parties and harass them.

3            Charles Schwab, it's important for the Court to

4    know that in most instances the victims here had accounts

5    at Charles Schwab predating the commencement of the Hawaii

6    property fraud aspect charged in count 1.

7            The evidence will be that the defendant

8    convinced them to move all of their securities, positions,

9    bonds, cash to a different bank, Northern Trust.

10           Accordingly, what possible relevance would

11   Charles Schwab have to any of the counts of the indictment

12   is something that he simply does not explain.

13           THE COURT:  Let me ask you to address

14   Mr. Haley's focus, for example, which is any

15   authorizations for the use of funds, to the extent they

16   have not been produced in discovery, why wouldn't it be an

17   important aspect of the case for Mr. Kenner to get

18   whatever authorizations exist in the Northern Trust bank

19   for the use of funds?

20           It seems to me that would be an important aspect

21   of the case, if it's not part of what's been produced

22   already.

23           MR. MISKIEWICZ:  First of all, your Honor, I'm

24   not sure I have heard from Mr. Haley that it hasn't been

25   produced.

1          And, frankly, my review of our Rule 16

2     production is any authorization by the victims, and there

3     are many letters like this giving power of attorney to the

4     defendant, to the extent the victims signed those, that's

5     been produced.

6          There are some of those in which victims have

7     looked at both in trial prep here and in civil litigation

8     previously where they have been able to say; that doesn't

9     really look like my signature, and that may be an issue at

10    trial as to whether or not they really signed documents

11    that are proffered, but I'm unaware of any authorization

12    documents that have not been produced in Rule 17 and, as I

13    say, there are quite a few.

14         With respect to its relevance to any of the

15    counts, there is no question that the defendants obtained

16    letters of credit with the knowledge of the victims for

17    specific purposes regarding development of the Hawaii

18    properties.

19         And some of them will even say they understood

20    that some of their money would go to a real estate

21    development in Northern California run originally by Mr.

22    Jowdy.  That's immaterial.

23         What none of the victims will say is I

24    authorized Mr. Kenner or Mr. Constantine to take money out

25    of my letter of credit and pay bills, personal bills, or

49

1    buy property that they, as their clients, had no interest

2    in.

3            One of the John Does, Bryan Berard -- I'm sorry,

4    Michael Peca, will testify that he had no idea that his

5    letter of credit money for the Hawaii properties was then

6    sucked out and used to buy property in Sag Harbor, which

7    is the Led Better property fraud alleged in the

8    indictment.

9            So Mr. Haley and the defendant's argument well,

10   we need these authorization letters, again, I think they

11   have them.

12           Secondly, they had them for a long time.

13           Thirdly, the nature of the fraud as it's going

14   to be established at trial, for instance, in Northern

15   Trust bank records, account records, those 13 years of

16   bank account records, they were sent to the defendant

17   Kenner specifically to conceal what was going on with

18   those letters of credit so that the victims could be

19   assured orally and falsely that their money was safe.

20           So I understand the manufactured exculpatory or

21   favorable evidence that Mr. Haley is intending to offer.

22   If we had it, we would give it to them.  He's

23   manufacturing a theory that really isn't favorable or

24   doesn't exculpate any of the basis of the charges here.

25           THE COURT:  What about -- is Mr. Berard a victim

50

1    in the case?

2              MR. MISKIEWICZ:  Yes.

3              THE COURT:  And so one of the things they're

4    requesting is all e-mail, text and supporting

5    documentation between Berard, Kenner and/or John Kaiser

6    relating to meetings and other things related to the

7    Hawaii joint venture with Adam Worth, along with Lehman

8    Brothers and Trimont Real Estate Advisors, Inc.

9              So, again, why wouldn't that -- obviously I have

10   concern with how broad they are, but that doesn't strike

11   me as particularly broad.

12             If he's going to be testifying regarding the

13   Hawaii joint venture, why shouldn't he provide e-mails

14   that relate to that?

15             MR. MISKIEWICZ:  Again, because I don't know

16   what the Lehman Brothers loan has anything to do with any

17   of the counts in this indictment.

18             THE COURT:  What about the Hawaii joint venture

19   though?

20             MR. MISKIEWICZ:  I'm not sure I understand.  You

21   mean all of the joint venture agreements?

22             THE COURT:  No, e-mails regarding the Hawaii

23   joint venture, e-mails regarding meetings, decisions,

24   potential legal actions regarding the Hawaii joint

25   ventures, is that part of this case?

1          MR. MISKIEWICZ:  Part of it, yes.

2          THE COURT:  If Mr. Berard is going to be

3    testifying about that joint venture, why shouldn't he have

4    to produce e-mails between him and Mr. Kenner and

5    Mr. Kaiser regarding that?  That doesn't seem to be

6    particularly onerous or broad.

7          MR. MISKIEWICZ:  I really don't have a strong

8    opposition to the production of the e-mails regarding

9    anything that he has to testify about.

10             Frankly, in preparation for trial, we have been

11   trying to see, and we have been periodically supplementing

12   Rule 16 discovery or early 3500 discovery with additional

13   e-mails and such that we have obtained from the various

14   victims.

15             So I guess on that issue, Mr. Berard's e-mail,

16   if they related specifically to the Hawaii venture, I

17   can't say that we have a strong opposition other than I

18   think it's our obligation to turn over affirmatively

19   anything that's favorable, and we take that seriously.

20          THE COURT:  You may not have it, right?

21          MR. MISKIEWICZ:  Well, we have though, and I

22   take it upon myself as part of my responsibility in

23   preparing witnesses to determine if they have

24   documentation that would constitute 3500 material, and

25   then within that if there's anything that would be

1   favorable, and that's what we have been doing, and we have

2   been doing that for a number of months.

3           If the Court wanted -- if the Court felt that

4   that was sufficiently focused enough, I see the Court's

5   point.  I'm not going to really argue about that.

6           My major concern here was the much broader

7   subpoena for demands both to the banks, again for the

8   reasons I have raised, and also with respect to some of

9   the other material here, it doesn't articulate anything

10  that they could say they have a reasonable grounds to say

11  is favorable to the defense or material to the defense, if

12  that were the standard, and I'm not sure that's the Nixon

13  standard which, again, we still contend is the standard.

14          THE COURT:  What about Mr. Kaiser?  There's four

15  pages of things with respect to Mr. Kaiser.  What's your

16  response?

17          MR. MISKIEWICZ:  That much of this material has

18  already been turned over in Rule 16 and/or it begins with

19  documents related to the distribution of funds from the

20  sale of the Sag Harbor property.

21          Again, that material has been disclosed to the

22  defense, to both defendants.

23          Moreover, the nature of the fraud is the fact

24  that he stole money from other people like Mr. Peca and

25  then stole -- and other victims to buy property and

1   asserted himself as the owner of the property.

2           So the disposition of funds from the seller of

3   that property, Mr. Kaiser and a number of other partners

4   own this property in Sag Harbor.  One of the partners

5   wanted to get out of that deal.  Mr. Kenner offered to buy

6   the property from Kaiser and his partners.

7           The nature of the fraud is how did he come up

8   with the money to buy Kaiser out?  And what he does was

9   stole the money from other people.

10          So what Mr. Kaiser then did with the money that

11  he didn't know was stolen by Kenner is, again, I think is

12  just engineered to harass Mr. Kaiser.

13          THE COURT:  Okay.  Let me address the computer

14  issue.  What's your response on the computer issue?

15          MR. MISKIEWICZ:  With respect to the computer

16  issue, Judge, we cited a number of cases as well as the

17  commentary to the rule governing the downloading and

18  sifting of very voluminous records from computers.

19          THE COURT:  Let me ask you this question.  This

20  is the bottom line question at this juncture and we had

21  some discussion on this months ago, but the privilege

22  review is complete, correct?

23          MR. MISKIEWICZ:  Yes.

24          THE COURT:  I understand the Ganias decision

25  would be assuming that there was no dispute regarding the

54

1   authenticity of the relevant documents that you now pulled

2   from the computer, a mirror image, right?  Are they a

3   mirror image?

4           MR. MISKIEWICZ:  That's what we're working with.

5   No.  We took the actual computer.  We have been working

6   with mirror images ever since.

7           THE COURT:  Right.

8           Let's assume Mr. Haley and Mr. LaRusso

9   stipulated to the authenticity of the relevant documents

10  that are now classified as the relevant documents at this

11  point in the litigation, why wouldn't the non-pertinent

12  documents, why couldn't the original computer then be

13  returned and the non-pertinent documents eliminated in

14  some way, because there's no reason for the government to

15  hold onto them at this point.

16          I understand if there's no agreement to

17  authenticity you have to hold the computer, pertinent or

18  not pertinent, because there could be an authenticity

19  problem.

20          But assuming that there's not, what would be the

21  reason for retaining the original computer with the

22  non-pertinent documents?

23          This is an independent issue of suppression, but

24  it's an issue of why the government is holding the

25  original computer at that point?

55

1          MR. MISKIEWICZ:  The short answer is nothing.

2          However, we've only recently gotten access to

3     the non-privileged documents and for that matter the

4     non-privileged sections of the hard drive in the original

5     computer.

6          So we're going full blast at this stage

7     commencing really the search of a piece of equipment that

8     was seized 15 months ago or so, and we're not in a

9     position to say what within that we're going to offer and,

10    therefore, we're not even in a position to solicit

11    stipulations from both counsel.  If they did it, I would

12    be happy to provide it.

13         THE COURT:  When you say we're searching, I

14    thought the search was done and the documents were

15    reviewed for privilege.  I'm confused.  I thought the

16    search already happened and that the privilege was

17    reviewing what had been culled from the search.  Isn't

18    that what happened?

19         MR. MISKIEWICZ:  My understanding is what

20    happened and, again, because I'm on the opposite side of

21    that wall, I haven't seen what's been produced to

22    Mr. Haley, but my understanding is he's been provided with

23    a list of documents that the taint review team determined

24    then contained attorney/client privileged material and

25    therefore is not going to be provided to us.

56

1      Could it be that there are photographs and stuff

2  that's immaterial within a terabyte full of data, we're

3  just not, as I say, we're just beginning that process now.

4      If there are -- if there is such material, we

5  would be happy to either destroy it, as they did in the

6  Ganias case, or suggested that that would be a way to do

7  it, or simply focus on those things that we think we are

8  going to use in the trial and that were within the search

9  warrant affidavit.

10      But because of the volume, we were just

11  beginning -- I don't want to say just beginning -- we are

12  at a stage where we're getting a handle on what's there.

13      There is one other issue with regard to just the

14  return of the machine if you will, and that is the imaged

15  copies are the imaged copies and they can tell us both

16  physically what you see and the metadata behind the

17  documents that survive.  There may also be deleted

18  material in that hard drive.  Again which, once it's

19  turned back over to the defense, we've lost complete

20  ability to harvest if you will.

21      THE COURT:  I know, but the theory of Ganias is

22  that the government shouldn't be able to -- once they do

23  their thorough search of the computer consistent with the

24  warrant, they shouldn't be able to hold the computer

25  indefinitely and continue to keep going back and

57

1    conducting subsequent searches.  That's the theory of

2    Ganias.  Is that the government -- otherwise, it's becomes

3    a general warrant at that point.  I understand the

4    voluminous nature of the materials.

5           To the extent the government thinks that you can

6    hold the computer indefinitely and keep going back into it

7    to find whether something has been deleted or not deleted,

8    I don't think Ganias would permit the government to do

9    that for a prolong period of time.

10          MR. MISKIEWICZ:  And I'm in total agreement with

11   that and I'm not suggesting that we have the right to do

12   that and we would be conducting, as we do in every case,

13   searches based on key words and ranges of documents or

14   date ranges that would hope to find those relevant

15   documents that are covered by the attachments to the

16   search warrant and nothing beyond that.

17          We're not -- in other words, what we are

18   specifically not doing is trolling through the hard drive

19   looking for material and seeing what's there.

20          We are methodically searching what's in the hard

21   drive but because of the volume and the number of

22   individuals, the number of transactions and the date

23   ranges, the search right now continues to go on.

24          THE COURT:  Okay.

25          Mr. Haley, briefly, please.

58

1          MR. HALEY:  Thank you, Judge.  I will endeavor

2   to be brief.  I appreciate your Honor's sentiment.

3          Your Honor, as far as Ganias is concerned, I

4   don't mean to be cute.  My argument is that the government

5   can walk and chew gum at the same time.

6          What do I mean by that, Judge.

7          To say that the privilege review team has the

8   computer and, accordingly, the prosecution team has to

9   wait until the privilege review team looks at the computer

10  before they can take any action, is drawing a distinction,

11  your Honor, that I think is not in accord with Ganias and

12  what do I mean by that?

13         When the privilege review team had the computer

14  in its possession, and they turned it on for the first

15  time, they certainly could, in a relatively short period

16  of time, see that there were files on that computer that

17  were personal files, no relevant materiality whatsoever to

18  the investigation, like kids pictures.

19         Now, I would concede that the government then

20  would have the right to open up that file to see if

21  they're looking at a bunch of children's pictures or

22  family pictures.  But once they have done that, they have

23  an obligation under Ganias to purging that information.

24         To say that the privilege review team somehow

25  gets isolated from the restrictions or the obligations

59

1   imposed by Ganias, I believe is a suggestion that somehow

2   the privilege review team is not part of the United States

3   team, and it is, and really that's my argument, Judge,

4   that there's some law review commentary that is cited in

5   my brief that suggested that Ganias has created a

6   defendant's right to have computer files purged and when

7   the government elects to not purge that information for an

8   extended period of time, and retains that information

9   whether they're looking at it or not, they're not entitled

10   to retain that information.

11         Ganias suggests that the remedy for that is

12   suppression of the documents that are otherwise arguably

13   relevant to the prosecution.

14         Judge, that's my argument.

15         Your Honor, if I may, with reference to the

16   subpoenas, in the superseding indictment the following

17   representation appears.

18         Kenner made a variety of misrepresentations to

19   the investors regarding lines of credit and their use.

20         Our position is he did not make

21   misrepresentations to the investors regarding the line of

22   credit and their use.

23         Our position is the documentary evidence which

24   will consist of documents signed by the Jane Doe or by the

25   John Does on multiple occasions over an extended period of

60

1   time, will reveal that they had full knowledge and

2   understanding of the use of the lines of credit.

3            THE COURT:  I know.  If you had done a subpoena

4   that said we want any and all communications relating to

5   the lines of credit and their use, that would be one

6   thing.

7            What you've given the Court is four pages of a

8   rider to John Kaiser with no explanation why each and

9   every one of these is relevant to the defense.

10           You asked for 12, 13 years of bank records for

11  Charles Schwab accounts of seven individuals.

12           And you can't give a subpoena that you want the

13  Court to approve for documents in advance of trial that to

14  me is a clearly overbroad fishing expedition, or cite to

15  me one example of something that may be in there that

16  might be relevant to the case.

17           If you want to put in a narrower request for

18  certain things, that's one thing.  To think that I'm going

19  to sign a subpoena that requests 12 years of bank records

20  for these individuals is not going to happen.

21           It doesn't meet the standard as the government

22  points to of Nixon.  It doesn't even meet the lower

23  standard of Judge Scheindlin.  It meets no standard.

24           If you want documents in advance of trial, they

25  have to be requests that are specifically targeted for

61

1    relevant evidence in the case and you have to make that

2    showing and the showing that you need it in advance of

3    trial.

4           I'm prepared, because I don't want the trial to

5    be delayed, to give you categories of documents of some of

6    the ones that you indicated today for the reasons I said

7    to the government; yes, even though they're endeavoring to

8    do it, I have no problem so that you and your client can

9    be comfortable that you're getting everything that's out

10   there, issuing a subpoena to a victim that they provide

11   all communications related to a particular transaction or

12   line of credit, but these are not narrow requests and

13   that's the problem.

14          If you don't make narrow requests, I'm going to

15   deny your application and we will wait until they have

16   testified.  You can ask, did you produce all documents you

17   had for a line of credit and they'll answer under oath

18   whatever they produced or not, and that's the way we will

19   deal with it.

20          This only deals with whether he gets them in

21   advance of trial, and this is not a sufficient showing for

22   him to get these broad categories of documents for

23   individuals in advance of trial.  That's the issue.

24          MR. HALEY:  May I respond?

25          THE COURT:  Yes.

1    MR. HALEY:  Your Honor, we went to great pains

2  to actually isolate specific documents so we're not going

3  through an alleged fishing expedition.  These 23 documents

4  that are listed are designed to make sure that the request

5  stays focused in terms of documents that were signed with

6  respect to the lines of credit.  That's why we did it.

7    If I asked for a subpoena that said give us any

8  and all banking records regarding lines of credit

9  maintained by the respective John Does during this period

10  of time, I suspect that would be overbroad and I

11  respectfully understand your Honor's hesitancy to issue

12  such a subpoena.  That would be broadly-based.

13    The time period we're asking for, it may be when

14  that subpoena comes in, it may be, depending upon the

15  particular investor, the particular John Doe, that we may

16  only get let's say one year that contains all those 23

17  documents.

18    THE COURT:  Why should you get the Charles

19  Schwab account of these -- the entire Charles Schwab

20  account of these individuals for 13 years, for 13 years,

21  because based on what Mr. Miskiewicz told me, in response

22  to communications with your client, they transferred money

23  from Charles Schwab to Northern Trust, and that's not even

24  a dispute in this case.  Nobody is disputing that they

25  transferred the money.  Why should you get 12 years of

63

1    their bank records?

2              MR. HALEY:  If I may, Judge, my theory is this,

3    that the transfers from the Charles Schwab account to the

4    line of credit indicate early on that there were

5    discussions between my client and respective investors as

6    relates to taking funds out of the Charles Schwab account

7    and going into the Northern Trust account.

8              When their signatures appears on those

9    documents, they could be requested to describe the

10   circumstances under which you came to transfer your

11   Charles Schwab funds to the line of credit, is that your

12   signature?  Yes.  And what, if any, discussions did you

13   have with Phil Kenner regarding that?  We're talking about

14   how these monies would be transferred from Charles Schwab.

15             THE COURT:  Does your Charles Schwab subpoena

16   limit it to transfers?  Does it limit it in any way to

17   transfers to the Northern Trust bank?  Does it?

18             MR. HALEY:  Your Honor, if I may, to answer your

19   question, the answer is no.  The answer is I will concede

20   that we do not need the Charles Schwab records, because I

21   will concede that the more critical point as relates to

22   the allegations as set forth in the indictment are the

23   records that come out of Northern Trust.

24             I will, for purposes of answering your Honor's

25   question, concede that issue, Judge.  We were looking to

64

1    obtain records that we believe are relevant and material

2    to the defense.  Your Honor takes a different view of the

3    Charles Schwab.  I'm not going to press the issue.  I will

4    concede that.

5              Your Honor, if I may, when Mr. Miskiewicz argues

6    to the Court that we haven't met the Nixon standard, I

7    believe we have.

8              Our position is, Judge, I need not set the bar

9    higher than it need be for purposes of my understanding of

10   the law.

11             My understanding of the law is that United

12   States v. Nixon does not apply.  I argued that in my

13   brief.

14             I believe, if your Honor finds Nixon does apply,

15   we met that standard.  I do endeavor to be brief.

16             I spent a great deal of time in this case

17   getting an understanding, at least from my perspective, of

18   the myriad financial transactions that went on.

19             When you speak in terms of the Kaiser

20   indictment, because I know your Honor mentioned that and

21   it's four pages, but what your Honor must understand is

22   this.

23             The Northport property was owned by John Kaiser

24   and three other individuals.  One of them was a Chris

25   Manfredi.  Mr. Kaiser wanted Manfredi out of the LLC.  So

1    Mr. Kaiser approached Phil Kenner --

2            THE COURT:  Mr. Haley, I don't mean to interrupt

3    you.  We're not going to go into the whole history with

4    the relationship with Mr. Kaiser.  It's 4:00.  It's not

5    going to cure, in my view, what is clearly an overbroad

6    request for a subpoena.

7            I'm going to place my ruling on the record with

8    respect to that without prejudice to you submitting

9    additional information to the Court.  We're not going to

10   do that orally here.  I'm not going to sit here and have

11   you go through and explain why four pages of requests to

12   John Kaiser are relevant to your case.  You can do that in

13   writing.  We're not going to sit here as you do that.

14           The Court's ruling is as under the Nixon

15   standard, United States vs. Nixon, which, in my view, is

16   what applies here, 18 U.S. 683, the standard for Rule 17

17   subpoena in advance of trial has not been met.

18           I have a broad category of requests from

19   individuals and from banks and Mr. Kenner has one or two

20   paragraphs in his affidavit, Mr. Haley mirrors those words

21   in his memorandum of law, and it is woefully insufficient

22   to support the Court, under the Nixon standard, requiring

23   all these categories of documents which in terms of how

24   broad they are with respect to the bank records to be

25   produced in advance of trial.

66

1          There is an insufficient showing that all these

2     categories of documents are evidentiary and relevant.

3          There's been no showing that they are not

4     otherwise procurable reasonably in advance of trial by the

5     exercise of due diligence.

6          There's no showing that they can't properly

7     prepare for trial without the production and inspection in

8     advance of trial, and that the failure to obtain such

9     inspection may tend to unreasonably delay the trial.

10         And I certainly conclude that the way they are

11    now, it is a fishing expedition even under Judge

12    Sheindlin's standard in the Tucker case.  And, as I said

13    before, it doesn't meet even that standard.  The Tucker

14    case was 2008 Westlaw 361127, Southern District of New

15    York, 2008.

16         Under her standard there has to be a showing

17    that the defendant has articulable suspicion the documents

18    may be material to his defense, and that it's not unduly

19    oppressive for the producing party to respond.

20         And, again, the categories of documents are way

21    too broad and no explanation has been provided as to why

22    they may be material to the defense, and I'm not going to

23    require them to be produced in advance of trial given the

24    way they have been presented to this Court.

25         I'm sensitive to the fact that Mr. Kenner wants

67

1   all of the documents that he needs to question the various

2   witnesses, and it's possible that some of these categories

3   of documents, that in order to not delay the trial, would

4   be helpful for him to have in advance of the trial to the

5   extent that they haven't already been produced and to the

6   extent that the government is not also seeking them from

7   the same individuals in the context of presenting the

8   evidence.

9          However, if, in fact, it's going to be done

10  under this rule, there would have to be a more narrow

11  request with an explanation for why those particular

12  documents are relevant to the defense and why they need to

13  be produced in advance of trial.

14         I'm willing to look at it again, but I'm not

15  going to blindly sign subpoenas for 12 years of bank

16  records for nine individuals who I have no information why

17  12 years of 13 years of bank records would be necessary.

18  I'm using that as an example.  John Kaiser is four pages

19  of requests.  I have no idea what each and every one of

20  those requests would relate to.

21         I understand the properties based on Mr. Haley's

22  explanation, I understand that, but that has to be

23  explained in more detail for me to sign off on those

24  subpoenas.  That's my ruling with regard to that.

25         On the computer issue I agree with the

68

1    government.  I'm denying the motion to suppress.  I agree

2    with the government's interpretation of Ganias in terms of

3    a suppression issue, whether the Court should suppress the

4    evidence from the laptop and the iPhone because the

5    Government has not neither purged nor returned not

6    pertinent e-mails.

7            The Ganias situation is entirely different.

8    It's where they held it for 13 months and then went to get

9    a second warrant, and at that stage the Court suppressed

10   and said it's been converted to a general warrant.

11           Here, I think it's obvious from the record and

12   numerous conferences we had regarding this that there's a

13   voluminous amount of records that exist with respect to

14   that computer.  It's further complicated by the privilege

15   review that has to be done.  There are over 300,000 pages

16   of documents that are in issue here.

17           So my conclusion is that there's been no

18   demonstration that the Government's efforts to review the

19   materials, pertinent and not pertinent, privilege and not

20   privilege, has been a bad faith effort by them to retain

21   Mr. Kenner's not pertinent e-mails for future use to try

22   to go back in and use them at some later time, or for any

23   bad faith purpose other than the fact that these records

24   are voluminous and there's got to be interaction between

25   the taint review team and Mr. Haley regarding the

69

1   privilege documents that's preventing the trial team from

2   getting access to the computer.

3           As I said before, I'm willing to fully ensure

4   that once if there's any authenticity issues that are --

5   if all authenticity issues are resolved, that the original

6   computer be returned or that once all these issues have

7   been resolved that it be purged, the non-pertinent

8   portions be purged, if there's not a stipulation regarding

9   authenticity of the relevant documents.

10          But we're not at that stage yet and the trial is

11  two months away.  This is one of these cases where the

12  review is continuing right up to the trial date. I'm not

13  sure exactly how this Ganias issue would be playing out in

14  this case.  We're so close to the trial.

15          But there certainly is no basis to suppress the

16  evidence because the government to this point has not

17  purged not pertinent e-mail or returned the computer in

18  light of the clearly ongoing review of both the pertinent

19  materials and the privileged materials as relates to the

20  computer, so the motion is denied.

21          Mr. Haley, on the subpoenas, I'm here every day.

22  If you and your client want to revise them, narrow them

23  and provide a short explanation for why each is relevant

24  to the case and do it ex parte, the government doesn't

25  have to see that, I'm here to look at it.  They have to be

70

1    narrowed.

2              Is there anything else?

3              MR. MISKIEWICZ:  Nothing from the government.

4              THE COURT:  Anything else, Mr. LaRusso?

5              MR. LARUSSO:  No.  Thank you, your Honor.

6              THE COURT:  Anything else, Mr. Haley?

7              MR. HALEY:  No, sir.

8              THE COURT:  Thank you.

9              MR. MISKIEWICZ:  Thank you, your Honor.

10             (Proceedings in this matter are concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## $

**$105,000** [1] - 14:17
**$155,000** [2] - 11:6, 11:7
**$25** [1] - 28:13
**$250,000** [3] - 15:8, 15:13, 15:19
**$70,300** [1] - 14:16
**$700,000** [1] - 14:6

## 1

**1** [1] - 47:6
**1.5** [1] - 24:5
**100** [2] - 1:14, 1:22
**1074** [1] - 34:6
**11** [2] - 25:2, 25:15
**11722** [2] - 1:15, 1:23
**12** [5] - 60:10, 60:19, 62:25, 67:15, 67:17
**13** [9] - 1:9, 41:13, 41:14, 49:15, 60:10, 62:20, 67:17, 68:8
**13-CR-607** [1] - 2:2
**13-year** [1] - 41:18
**15** [1] - 55:8
**155,000** [1] - 11:16
**16** [5] - 39:24, 42:10, 48:1, 51:12, 52:18
**164** [1] - 34:19
**17** [3] - 40:14, 48:12, 65:16
**17(c** [1] - 46:12
**18** [1] - 65:16
**19** [2] - 25:1, 25:15
**1956** [1] - 34:18
**1992** [1] - 34:12
**1998** [1] - 34:19

## 2

**2000** [1] - 34:6
**2008** [2] - 66:14, 66:15
**2012** [1] - 32:5
**2013** [1] - 32:12
**2015** [1] - 1:9
**216** [1] - 34:6
**23** [3] - 42:17, 62:3, 62:16
**250** [1] - 15:15
**2:30** [1] - 1:9

## 3

**300,000** [1] - 68:15
**31** [2] - 14:5, 15:7
**32** [1] - 14:5
**350** [1] - 34:18
**3500** [2] - 51:12, 51:24

## 359

**359** [1] - 34:18
**36** [1] - 34:12
**361127** [1] - 66:14

## 4

**4.1** [3] - 13:4, 13:24, 19:8
**45** [1] - 45:11
**462** [1] - 32:4
**4:00** [1] - 65:4

## 5

**504** [1] - 34:12
**512** [1] - 32:12
**58** [1] - 32:4

## 6

**6** [1] - 32:12
**620** [1] - 34:19
**631** [1] - 1:23
**683** [1] - 65:16

## 7

**712-6101** [1] - 1:23

## 8

**8** [1] - 15:14
**801(d)(2)(E)** [1] - 29:19

## A

**ability** [3] - 23:5, 29:24, 56:20
**able** [11] - 2:22, 11:18, 17:3, 17:13, 30:16, 44:2, 44:13, 44:24, 48:8, 56:22, 56:24
**absent** [1] - 34:22
**absolutely** [1] - 46:25
**AC** [3] - 11:7, 11:10, 11:11
**accepted** [1] - 45:21
**access** [6] - 38:15, 43:5, 43:18, 44:2, 55:2, 69:2
**accord** [1] - 58:11
**accordingly** [2] - 47:10, 58:8
**account** [10] - 11:20, 13:10, 43:6, 49:15, 49:16, 62:19, 62:20, 63:3, 63:6, 63:7
**accountant** [3] - 13:9, 13:22, 19:11

**accounts** [3] - 41:21, 47:4, 60:11
**accused** [1] - 13:3
**accuses** [2] - 18:25, 21:20
**acknowledged** [1] - 10:24
**acknowledgement** [1] - 9:17
**acknowledges** [3] - 39:20, 45:15
**acknowledgment** [1] - 10:2
**acquired** [1] - 42:9
**acting** [1] - 22:4
**action** [2] - 40:15, 58:10
**actions** [3] - 8:2, 8:10, 50:24
**actual** [1] - 54:5
**Adam** [1] - 50:7
**add** [1] - 42:24
**addition** [2] - 12:23, 12:24, 12:25
**additional** [2] - 51:12, 65:9
**address** [8] - 3:16, 16:17, 29:3, 33:16, 45:5, 47:13, 53:13
**addressed** [4] - 4:9, 16:15, 29:6
**adds** [2] - 16:10, 26:1
**admissibility** [1] - 29:19
**admissible** [2] - 16:25, 30:22
**admits** [1] - 43:21
**adopt** [1] - 46:11
**advance** [12] - 60:13, 60:24, 61:2, 61:21, 61:23, 65:17, 65:25, 66:4, 66:8, 66:23, 67:4, 67:13
**advancement** [1] - 17:16
**Advisors** [1] - 50:8
**affidavit** [12] - 9:6, 9:16, 9:25, 10:24, 39:16, 39:18, 40:17, 43:21, 44:3, 56:9, 65:20
**affidavits** [2] - 24:8, 30:4
**affirmatively** [2] - 27:12, 51:18
**afternoon** [5] - 2:6, 2:8, 2:9, 2:12, 2:15
**afterwards** [3] - 7:8, 7:10, 7:22
**agent** [5] - 5:6, 5:22, 6:13, 8:10, 11:16, 36:23
**agent's** [1] - 35:12
**ago** [4] - 8:8, 42:25, 53:21, 55:8
**agree** [2] - 67:25, 68:1
**agreement** [3] - 24:10, 54:16, 57:10
**agreements** [1] - 50:21
**ahead** [2] - 22:14, 37:10

**airplane** [2] - 11:8, 22:22
**aligned** [1] - 25:5
**allegation** [7] - 6:12, 11:7, 11:25, 12:1, 15:10, 37:5, 43:16
**allegations** [22] - 4:10, 8:16, 8:24, 11:4, 11:23, 12:17, 12:18, 16:3, 19:5, 19:8, 21:23, 22:21, 25:4, 25:11, 25:17, 26:15, 26:20, 36:2, 38:4, 40:24, 41:11, 63:22
**alleged** [4] - 15:15, 16:3, 49:7, 62:3
**allegedly** [2] - 11:8, 26:3
**alleges** [1] - 11:6
**alleging** [1] - 9:2
**allow** [2] - 43:4, 45:12
**almost** [2] - 12:12, 46:21
**alone** [2] - 32:15, 34:23
**altered** [1] - 8:17
**alternatively** [1] - 46:3
**AMERICA** [1] - 1:3
**America** [1] - 2:2
**amiss** [1] - 25:24
**amount** [2] - 39:21, 68:13
**analysis** [1] - 25:21
**Ann** [1] - 1:22
**answer** [9] - 4:23, 6:14, 22:17, 30:23, 41:16, 44:9, 55:1, 61:17, 63:18, 63:19
**answered** [2] - 7:13, 7:14
**answering** [2] - 36:24, 63:24
**antagonism** [1] - 32:21
**antagonistic** [8] - 17:21, 18:1, 20:6, 21:12, 22:7, 29:7, 32:2, 32:6
**anticipate** [1] - 26:19
**apologize** [2] - 21:18, 22:2
**apparent** [1] - 4:23
**appear** [1] - 6:9
**appearance** [2] - 2:4, 2:21
**APPEARANCES** [1] - 1:12
**application** [2] - 41:7, 61:15
**applications** [1] - 6:6
**applies** [1] - 65:16
**apply** [3] - 46:3, 64:12, 64:14
**appreciate** [4] - 2:19, 26:5, 40:10, 58:2
**approached** [2] - 6:22, 65:1
**appropriate** [2] - 10:8, 36:18
**approve** [1] - 60:13
**arbitration** [8] - 38:21, 38:24, 39:1, 39:5, 42:25, 43:1, 45:19

2

**area** [1] - 20:5
**areas** [2] - 4:22, 16:16
**arguably** [1] - 59:12
**argue** [3] - 29:14, 44:13, 52:5
**argued** [1] - 64:12
**argues** [1] - 64:5
**arguing** [2] - 6:8, 6:9
**argument** [19] - 3:4, 7:4, 17:7, 18:13, 22:19, 25:3, 28:18, 29:21, 29:23, 32:1, 35:2, 39:25, 40:7, 44:20, 49:9, 58:4, 59:3, 59:14
**arguments** [1] - 35:5
**arising** [1] - 29:10
**Arizona** [1] - 45:6
**articulable** [2] - 46:14, 66:17
**articulate** [1] - 52:9
**articulated** [1] - 46:5
**articulates** [1] - 46:25
**aside** [1] - 9:6
**aspect** [8] - 3:10, 4:12, 12:4, 12:23, 39:17, 47:6, 47:17, 47:20
**aspects** [9] - 21:10, 22:21, 33:8, 35:15, 35:20, 37:8, 39:9, 40:5, 42:22
**asserted** [1] - 53:1
**assess** [1] - 25:14
**assistance** [1] - 43:9
**Assistant** [1] - 1:16
**assume** [1] - 54:8
**assuming** [4] - 7:18, 10:13, 53:25, 54:20
**assured** [1] - 49:19
**assuredly** [1] - 46:21
**attachments** [1] - 57:15
**attempt** [2] - 30:3, 32:24
**attempted** [1] - 28:20
**attenuated** [3] - 7:18, 7:19, 35:10
**attorney** [2] - 40:18, 48:3
**Attorney** [2] - 1:14, 1:16
**attorney/client** [1] - 55:24
**attributed** [1] - 19:4
**authenticity** [7] - 54:1, 54:9, 54:17, 54:18, 69:4, 69:5, 69:9
**authored** [1] - 29:12
**authority** [1] - 43:19
**authorization** [4] - 45:15, 48:2, 48:11, 49:10
**authorizations** [2] - 47:15, 47:18
**authorize** [1] - 42:20
**authorized** [3] - 38:15, 43:7, 48:24
**authorizing** [1] - 42:14

**Avalon** - 11:11
**avoid** [1] - 40:2
**aware** [7] - 11:5, 11:9, 16:24, 28:10, 31:19, 31:22, 38:14
**awareness** [1] - 38:9

**B**

**bad** [2] - 68:20, 68:23
**Baha** [2] - 15:16, 15:23
**bail** [1] - 6:5
**bank** [18] - 11:18, 14:14, 41:13, 41:14, 41:19, 43:20, 44:8, 47:9, 47:18, 49:15, 49:16, 60:10, 60:19, 63:1, 63:17, 65:24, 67:15, 67:17
**Bank** [1] - 43:6
**banking** [3] - 44:11, 45:1, 62:8
**banks** [2] - 52:7, 65:19
**bar** [1] - 64:8
**barring** [1] - 17:8
**based** [16] - 11:7, 23:4, 32:22, 35:1, 35:5, 37:21, 38:6, 38:11, 38:19, 38:22, 38:25, 39:19, 57:13, 62:12, 62:21, 67:21
**basis** [18] - 6:10, 7:17, 9:15, 10:16, 19:15, 29:13, 31:4, 31:25, 33:19, 33:20, 33:25, 34:15, 35:16, 35:25, 36:6, 46:11, 49:24, 69:15
**bear** [1] - 42:18
**become** [2] - 4:23, 23:9
**becomes** [1] - 57:2
**BEFORE** [1] - 1:11
**began** [2] - 3:20, 4:25
**begin** [1] - 37:12
**beginning** [2] - 56:3, 56:11
**begins** [1] - 52:18
**behalf** [1] - 17:11
**behind** [2] - 5:9, 56:16
**belief** [1] - 19:5
**believes** [1] - 20:2
**benefit** [2] - 23:25, 24:20
**berard** [1] - 6:23
**Berard** [6] - 16:9, 38:23, 49:3, 49:25, 50:5, 51:2
**Berard's** [1] - 51:15
**best** [1] - 24:14
**Better** [1] - 49:7
**between** [6] - 17:21, 40:23, 50:5, 51:4, 63:5, 68:24
**beyond** [1] - 57:16
**BIANCO** [1] - 1:11
**bill** [1] - 12:20
**bills** [3] - 11:14, 48:25
**bit** [2] - 6:3, 37:13

**blame** [4] - 30:7, 30:17, 30:24, 32:24
**blaming** [1] - 29:12
**blast** [1] - 55:6
**blindly** [1] - 67:15
**bonds** [1] - 47:9
**bottom** [3] - 32:8, 36:1, 53:20
**brief** [6] - 18:22, 39:25, 58:2, 59:5, 64:13, 64:15
**briefed** [2] - 39:15, 40:9
**briefly** [4] - 16:15, 16:18, 29:5, 57:25
**bringing** [1] - 6:22
**broad** [8] - 46:19, 50:10, 50:11, 51:6, 61:22, 65:18, 65:24, 66:21
**broader** [1] - 52:6
**broadly** [1] - 62:12
**broadly-based** [1] - 62:12
**Brothers** [2] - 50:8, 50:16
**brought** [1] - 13:6
**Bruton** [3] - 29:10, 31:20, 31:23
**Bryan** [1] - 49:3
**bulb** [1] - 27:16
**bunch** [1] - 58:21
**buy** [5] - 49:1, 49:6, 52:25, 53:5, 53:8
**BY** [1] - 1:15

**C**

**California** [1] - 48:21
**camera** [2] - 34:1, 36:6
**candid** [1] - 4:3
**cannot** [2] - 34:8, 46:2
**car** [1] - 9:23
**careful** [1] - 27:5
**carefully** [2] - 9:17, 35:17
**case** [47] - 2:1, 3:20, 4:25, 5:6, 5:9, 5:14, 5:23, 6:5, 7:5, 8:18, 10:8, 10:10, 19:2, 23:2, 24:16, 26:21, 32:11, 32:13, 32:18, 32:23, 34:11, 34:17, 35:9, 35:12, 35:15, 36:2, 36:9, 37:1, 45:11, 45:13, 46:12, 47:17, 47:21, 50:1, 50:25, 56:6, 57:12, 60:16, 61:1, 62:24, 64:16, 65:12, 66:12, 66:14, 69:14, 69:24
**cases** [4] - 17:24, 32:3, 34:25, 46:6, 53:16, 69:11
**cash** [1] - 47:9
**catalogue** [1] - 30:12
**categories** [7] - 46:19, 61:5, 61:22, 65:23, 66:2, 66:20, 67:2

**category** [1] - 65:18
**Central** [3] - 1:6, 1:15, 1:23
**certain** [8] - 6:14, 22:21, 23:4, 27:21, 33:9, 35:14, 35:15, 60:18
**certainly** [5] - 25:24, 35:10, 58:15, 66:10, 69:15
**challenge** [2] - 17:3, 37:5
**challenged** [1] - 36:19
**challenging** [1] - 37:9
**chance** [7] - 3:9, 3:11, 3:13, 13:7, 21:19, 36:11, 43:22
**changed** [1] - 24:18
**characterizes** [1] - 38:17
**charged** [1] - 47:6
**charges** [1] - 49:24
**charging** [1] - 14:1
**Charles** [20] - 41:21, 41:25, 42:2, 42:5, 42:12, 42:14, 47:3, 47:5, 47:11, 60:11, 62:18, 62:19, 62:23, 63:3, 63:6, 63:11, 63:14, 63:15, 63:20, 64:3
**chew** [1] - 58:5
**children's** [1] - 58:21
**Chris** [1] - 64:24
**Circuit** [7] - 32:5, 32:12, 34:4, 34:6, 34:19
**circumstances** [2] - 37:1, 63:10
**cite** [3] - 32:3, 32:11, 60:14
**cited** [3] - 34:25, 53:16, 59:4
**City** [1] - 5:15
**civil** [11] - 6:13, 6:20, 7:23, 10:8, 24:9, 27:1, 35:9, 45:11, 45:13, 46:23, 48:7
**claim** [4] - 7:1, 12:2, 12:3, 35:23
**claimed** [2] - 14:16, 26:25
**claiming** [1] - 9:11
**claims** [2] - 20:25, 43:17
**classified** [1] - 54:10
**clause** [2] - 17:1, 31:23
**clear** [2] - 17:24, 32:3
**clearly** [6] - 8:3, 13:25, 40:6, 60:14, 65:5, 69:18
**CLERK** [1] - 2:1
**client** [23] - 3:24, 4:4, 5:17, 9:10, 10:25, 11:3, 14:22, 16:3, 17:2, 17:8, 20:3, 20:9, 21:13, 31:1, 31:2, 41:24, 43:21, 44:1, 45:16, 61:8, 62:22, 63:5, 69:22
**client's** [1] - 9:6
**clients** [4] - 29:25, 41:24, 43:18, 49:1
**close** [2] - 31:13, 69:14
**clue** [1] - 26:11

3

**coconspirator** [1] - 29:14
**codefendant** [5] - 32:20, 33:5, 33:11, 33:12, 33:17
**codefendants** [1] - 22:7
**collar** [1] - 27:21
**color** [3] - 5:9, 5:25, 16:10
**colors** [1] - 8:3
**comfortable** [1] - 61:9
**coming** [2] - 16:5, 31:22
**commencement** [1] - 47:5
**commencing** [1] - 55:7
**comment** [3] - 26:6, 30:25, 45:10
**commentary** [2] - 53:17, 59:4
**committed** [2] - 18:11, 18:12
**communications** [4] - 45:3, 60:4, 61:11, 62:22
**companies** [1] - 46:21
**company** [5] - 11:11, 11:12, 11:14, 15:16, 23:4
**compel** [1] - 7:14
**compiled** [1] - 40:19
**complaint** [1] - 41:11
**complete** [3] - 44:25, 53:22, 56:19
**complex** [1] - 27:21
**complicated** [1] - 68:14
**computer** [28] - 1:25, 39:10, 39:12, 39:22, 53:13, 53:14, 53:15, 54:2, 54:5, 54:12, 54:17, 54:21, 54:25, 55:5, 56:23, 56:24, 57:6, 58:8, 58:9, 58:13, 58:16, 59:6, 67:25, 68:14, 69:2, 69:6, 69:17, 69:20
**computers** [1] - 53:18
**conceal** [1] - 49:17
**concede** [5] - 58:19, 63:19, 63:21, 63:25, 64:4
**concedes** [2] - 31:18, 46:1
**conceding** [1] - 26:2
**concept** [1] - 37:19
**concern** [4] - 4:22, 7:25, 50:10, 52:6
**concerned** [2] - 39:15, 58:3
**concerning** [1] - 38:4
**concerns** [1] - 40:23
**conclude** [6] - 18:4, 18:15, 18:17, 32:22, 36:5, 66:10
**concluded** [1] - 70:10
**conclusion** [2] - 5:21, 68:17
**conduct** [5] - 7:1, 8:19, 26:20, 34:1, 36:6
**conducting** [3] - 40:5, 57:1, 57:12
**conferences** [1] - 68:12

**confession** [1] - 37:13
**confident** [1] - 30:19
**confirm** [1] - 16:22
**confrontation** [2] - 16:25, 31:23
**confused** [1] - 55:15
**connection** [2] - 3:6, 6:5
**consequently** [1] - 24:16
**consider** [2] - 28:25, 41:13
**consideration** [2] - 22:8, 40:10
**consist** [1] - 59:24
**consistent** [3] - 8:10, 34:11, 56:23
**CONSTANTINE** [2] - 1:7, 2:24
**constantine** [1] - 20:14
**Constantine** [37] - 1:20, 2:3, 2:14, 2:16, 2:20, 2:22, 10:14, 10:22, 13:3, 14:2, 14:8, 14:9, 17:22, 18:8, 18:25, 19:6, 19:12, 19:14, 19:20, 19:21, 20:15, 20:16, 20:22, 20:23, 21:1, 21:6, 21:21, 23:2, 23:3, 24:4, 24:13, 26:12, 27:9, 33:3, 35:6, 48:24
**Constantine's** [3] - 9:21, 24:15, 35:18
**constitute** [3] - 29:14, 30:6, 51:24
**construed** [2] - 36:24, 46:16
**consultation** [1] - 40:18
**contact** [2] - 5:15, 41:24
**contained** [2] - 39:22, 55:24
**contains** [1] - 62:16
**contend** [1] - 52:13
**context** [3] - 27:1, 27:10, 67:7
**continue** [2] - 27:15, 56:25
**continues** [1] - 57:23
**continuing** [1] - 69:12
**contradiction** [1] - 42:22
**contradictory** [1] - 38:3
**converted** [1] - 68:10
**convict** [1] - 33:11
**convinced** [1] - 47:8
**convinces** [1] - 32:18
**copies** [2] - 56:15
**core** [3] - 9:10, 36:1, 37:5
**corners** [1] - 41:3
**corollary** [1] - 6:19
**Corporation** [2] - 15:17
**corporation** [1] - 23:10
**correct** [1] - 53:22
**correction** [1] - 11:13
**Corsey** [1] - 32:12

**Costello** [1] - 34:17
**counsel** [4] - 2:4, 30:13, 31:19, 55:11
**count** [2] - 19:15, 47:6
**counter** [1] - 7:4
**counterclaim** [1] - 21:13
**counts** [3] - 47:11, 48:15, 50:17
**couple** [1] - 46:6
**course** [2] - 30:20, 40:18
**COURT** [52] - 1:1, 2:8, 2:12, 2:22, 2:25, 3:3, 6:2, 6:17, 7:7, 9:3, 10:18, 16:17, 16:20, 17:24, 19:18, 20:12, 22:9, 22:12, 22:19, 26:8, 29:3, 31:9, 36:15, 39:6, 39:12, 41:13, 43:20, 44:7, 45:23, 47:13, 49:25, 50:3, 50:18, 50:22, 51:2, 51:20, 52:14, 53:13, 53:19, 53:24, 54:7, 55:13, 56:21, 57:24, 60:3, 61:25, 62:18, 63:15, 65:2, 70:4, 70:6, 70:8
**Court** [46] - 1:22, 2:21, 4:3, 4:12, 4:14, 5:20, 6:11, 11:2, 12:6, 13:5, 15:1, 16:12, 20:6, 21:11, 22:3, 22:17, 25:19, 28:25, 30:19, 31:19, 31:20, 32:13, 34:1, 34:4, 34:8, 34:11, 34:13, 34:17, 36:6, 37:20, 39:3, 40:1, 44:17, 45:21, 46:10, 47:3, 52:3, 60:7, 60:13, 64:6, 65:9, 65:22, 66:24, 68:3, 68:9
**Court's** [3] - 31:11, 52:4, 65:14
**Courthouse** [1] - 1:6
**courts** [1] - 46:4
**cover** [3] - 41:3, 44:21, 44:22
**covered** [2] - 43:25, 57:15
**covers** [2] - 22:9, 41:18
**CR-13-607** [1] - 1:4
**create** [1] - 31:23
**created** [1] - 59:5
**creates** [1] - 16:25
**credence** [1] - 22:6
**credit** [23] - 23:5, 38:5, 38:10, 38:15, 38:16, 42:4, 42:15, 43:8, 45:4, 48:16, 48:25, 49:5, 49:18, 59:19, 59:22, 60:2, 60:5, 61:12, 61:17, 62:6, 62:8, 63:4, 63:11
**credits** [2] - 43:19, 44:15
**criminal** [4] - 2:1, 5:24, 10:10, 46:12
**critical** [3] - 4:21, 13:19,

63:21
**cross** [2] - 19:14, 30:9
**cross-examination** [2] - 19:14, 30:9
**culled** [1] - 55:17
**culpability** [1] - 32:14
**cure** [1] - 65:5
**curse** [1] - 21:21
**cute** [1] - 58:4

**D**

**Daily** [1] - 5:16
**Darryl** [1] - 38:6
**data** [1] - 56:2
**date** [6] - 31:14, 40:13, 41:23, 57:14, 57:22, 69:12
**deal** [3] - 53:5, 61:19, 64:16
**deals** [2] - 9:3, 61:20
**Dear** [1] - 45:2
**decide** [1] - 18:20
**decided** [1] - 5:2
**decision** [5] - 31:13, 35:8, 35:11, 39:14, 53:25
**decisions** [2] - 35:13, 50:23
**defeat** [1] - 45:21
**defendant** [13] - 2:10, 29:12, 30:6, 30:8, 32:15, 35:6, 37:8, 46:13, 46:22, 47:7, 48:4, 49:16, 66:17
**DEFENDANT** [1] - 3:2
**defendant's** [5] - 23:24, 32:19, 33:4, 49:9, 59:6
**Defendants** [2] - 1:8, 1:17
**defendants** [11] - 10:11, 18:6, 23:1, 26:21, 26:25, 27:1, 27:8, 30:24, 32:25, 48:15, 52:22
**defendants'** [1] - 3:4
**defending** [1] - 12:22
**defense** [18] - 18:3, 29:25, 31:19, 33:1, 37:21, 40:15, 40:21, 46:15, 46:16, 52:11, 52:22, 56:19, 60:9, 64:2, 66:18, 66:22, 67:12
**defenses** [6] - 17:21, 20:6, 29:7, 32:2, 32:6, 33:20
**defrauded** [1] - 21:1
**delay** [2] - 66:9, 67:3
**delayed** [1] - 61:5
**deleted** [4] - 23:14, 56:17, 57:7
**deliberate** [1] - 25:25
**delivered** [1] - 44:18
**demanded** [1] - 46:20
**demands** [1] - 52:7
**demonstrate** [1] - 42:19

4

demonstrated [1] - 11:24
demonstration [1] - 68:18
denied [6] - 24:20, 31:17, 33:21, 33:24, 36:10, 69:20
denotes [1] - 32:5
deny [1] - 61:15
denying [1] - 68:1
deposit [1] - 43:5
deposited [2] - 38:9, 41:25
deposition [6] - 6:13, 7:5, 7:15, 33:24, 36:24
depositions [1] - 35:9
Depot [3] - 16:21, 29:9, 31:21
describe [1] - 63:9
designed [1] - 62:4
destroy [1] - 56:5
detail [1] - 67:23
detailed [1] - 32:7
detailing [1] - 21:14
determination [2] - 11:2, 29:18
determine [2] - 4:15, 51:23
determined [1] - 55:23
detrimental [1] - 5:16
developing [1] - 5:15
development [2] - 15:14, 28:14, 38:17, 48:17, 48:21
Diamante [1] - 15:17
different [6] - 8:13, 11:11, 13:16, 47:9, 64:2, 68:7
differing [1] - 32:14
digest [1] - 4:20
diligence [1] - 66:5
direct [5] - 19:10, 42:22, 43:5, 43:16, 45:3
director [1] - 5:19
disavow [1] - 24:18
disavowed [2] - 23:16, 24:10
disavowing [2] - 22:23, 22:24
disbelieve [3] - 32:20, 33:5, 33:10
disclose [1] - 34:14
disclosed [1] - 52:21
disclosure [1] - 44:14
discovery [6] - 41:23, 42:10, 43:23, 47:16, 51:12
discuss [1] - 13:1
discussed [3] - 3:8, 6:5, 32:8
discussing [1] - 3:20
discussion [1] - 53:21
discussions [2] - 63:5, 63:12
dismiss [8] - 3:17, 4:7, 11:24, 33:22, 34:8, 35:1, 35:16, 35:25

dismissal [14] - 6:9, 6:10, 7:17, 7:20, 9:15, 10:16, 14:25, 22:16, 27:25, 34:3, 34:15, 34:24, 36:4, 37:1
dismissed [1] - 7:22
disposition [1] - 53:2
dispute [4] - 11:1, 12:6, 54:1, 62:24
disputes [1] - 12:7
disputing [1] - 62:24
distinct [1] - 17:17
distinction [1] - 58:10
distribution [1] - 52:19
DISTRICT [3] - 1:1, 1:1, 1:11
District [10] - 5:1, 5:4, 6:7, 24:8, 34:8, 38:2, 38:8, 38:13, 46:6, 66:14
diversion [1] - 23:21
diverted [6] - 11:8, 11:19, 12:3, 12:19, 14:7, 15:11
diverting [2] - 13:4, 35:20
document [5] - 40:22, 41:6, 43:3, 45:8, 45:14
documentary [2] - 24:3, 59:23
documentation [5] - 11:3, 11:18, 28:7, 50:5, 51:24
documents [49] - 29:1, 30:13, 30:22, 40:19, 41:10, 42:5, 42:9, 42:13, 42:16, 45:20, 46:14, 46:20, 48:10, 48:12, 52:19, 54:2, 54:9, 54:10, 54:12, 54:13, 54:22, 55:3, 55:14, 55:23, 56:17, 57:13, 57:15, 59:12, 59:24, 60:13, 60:24, 61:5, 61:16, 61:22, 62:2, 62:3, 62:5, 62:17, 63:9, 65:23, 66:2, 66:17, 66:20, 67:1, 67:3, 67:12, 68:16, 69:1, 69:9
Doe [5] - 15:8, 40:24, 42:18, 59:24, 62:15
done [1] - 19:16, 26:12, 28:24, 35:23, 35:24, 55:14, 58:22, 60:3, 67:9, 68:15
doubt [1] - 26:9
dovetail [1] - 28:18
down [3] - 12:16, 40:12, 42:17
downloading [1] - 53:17
drastically [1] - 14:22
draw [1] - 5:20
drawing [1] - 58:10
drive [4] - 55:4, 56:18, 57:18, 57:21
driver's [1] - 41:7
due [3] - 30:19, 45:21, 66:5
during [2] - 8:8, 62:9

## E

e-mail [7] - 16:23, 18:24, 29:12, 29:17, 50:4, 51:15, 69:17
e-mails [10] - 30:5, 50:13, 50:22, 50:23, 51:4, 51:8, 51:13, 68:6, 68:21
early [3] - 8:9, 51:12, 63:4
Eastern [2] - 5:4, 24:8
EASTERN [1] - 1:1
effect [2] - 13:6, 21:21
effected [1] - 7:7
effort [4] - 7:12, 30:7, 37:22, 68:20
efforts [3] - 16:7, 25:25, 68:18
eight [3] - 15:8, 25:1, 46:22
either [5] - 20:16, 27:24, 33:2, 43:14, 56:5
elects [1] - 59:7
elements [1] - 46:2
elicit [2] - 29:24, 37:22
eliminated [1] - 54:13
eliminating [1] - 35:15
emphasize [1] - 24:23
emphasized [1] - 34:5
end [1] - 20:25
endeavor [2] - 58:1, 64:15
endeavoring [1] - 61:7
ends [1] - 26:21
engineered [1] - 53:12
ensure [1] - 69:3
entire [1] - 62:19
entirely [1] - 68:7
entitled [1] - 59:9
equipment [1] - 55:7
Escobar [1] - 32:4
especially [1] - 14:14
ESQ [3] - 1:15, 1:17, 1:19
essence [1] - 53:24
essentially [2] - 22:20, 27:11
establish [1] - 42:4
established [2] - 36:25, 49:14
estate [1] - 48:20
Estate [1] - 50:8
estates [1] - 37:15
Eufora [9] - 11:14, 15:9, 15:11, 15:19, 22:25, 23:22, 24:5, 24:12
event [1] - 36:20
evidence [39] - 4:1, 4:16, 4:17, 8:4, 8:13, 12:10, 12:11, 13:19, 14:13, 14:23, 16:22, 16:24, 16:25, 17:2, 23:18, 23:23, 24:2, 24:3, 24:15, 25:6, 25:8, 25:14,

25:25, 31:22, 33:14, 34:10, 34:14, 34:22, 35:4, 37:17, 47:7, 49:21, 59:23, 61:1, 67:8, 68:4, 69:16
evidentiary [8] - 17:3, 27:25, 30:20, 33:19, 36:17, 36:18, 37:3, 66:2
ex [1] - 69:24
exactly [5] - 12:18, 27:2, 31:5, 35:22, 69:13
examination [3] - 19:14, 22:5, 30:9
examine [1] - 4:13
example [6] - 14:2, 18:22, 36:22, 47:14, 60:15, 67:18
examples [1] - 34:25
exchange [2] - 24:5, 24:21
exculpate [2] - 30:7, 49:24
exculpating [1] - 30:17
exculpatory [3] - 30:5, 34:14, 49:20
executed [1] - 18:24
exercise [1] - 66:5
exhibit [1] - 21:16
exist [3] - 45:9, 47:18, 68:13
expect [1] - 43:12
expedition [3] - 60:14, 62:3, 66:11
expenditures [4] - 13:10, 19:3, 19:5, 19:17
expenses [3] - 9:22, 12:2, 21:4
explain [2] - 47:12, 65:11
explained [2] - 32:13, 67:23
explanation [11] - 9:11, 9:14, 10:7, 10:13, 19:22, 35:19, 60:8, 66:21, 67:11, 67:22, 69:23
explanations [2] - 10:11, 33:14
express [1] - 2:18
extended [2] - 59:8, 59:25
extent [7] - 18:15, 36:16, 47:15, 48:4, 57:5, 67:5, 67:6
extremely [1] - 7:21

## F

F.3d [2] - 34:6, 34:19
faced [1] - 16:5
fact [14] - 7:11, 9:16, 22:6, 27:9, 30:16, 30:17, 31:5, 33:6, 34:5, 35:17, 52:23, 66:25, 67:9, 68:23
facts [11] - 4:4, 6:1, 8:17, 8:18, 10:18, 10:19, 12:15,

5

16:13, 17:12, 19:2, 20:9
**factual** [4] - 11:1, 12:6, 12:7, 16:7
**failing** [1] - 28:4
**failure** [5] - 9:13, 10:12, 34:14, 35:21, 66:8
**fair** [6] - 8:15, 14:22, 16:13, 25:13, 28:7, 28:23
**fairly** [1] - 37:17
**faith** [2] - 68:20, 68:23
**Falcon** [2] - 11:7, 11:10
**falsely** [1] - 49:19
**family** [1] - 58:22
**far** [3] - 8:9, 39:14, 58:3
**favor** [1] - 29:21
**favorable** [5] - 49:21, 49:23, 51:19, 52:1, 52:11
**FBI** [2] - 5:19, 5:22
**Fed.Appx** [2] - 32:4, 32:12
**Federal** [2] - 1:14, 1:22
**fees** [3] - 9:22, 10:8, 10:22
**felt** [2] - 5:24, 52:3
**few** [1] - 48:13
**file** [1] - 58:20
**filed** [2] - 12:9, 21:13
**files** [3] - 58:16, 58:17, 59:6
**final** [1] - 45:10
**finally** [2] - 12:14, 34:18
**financial** [1] - 64:18
**finger** [7] - 17:23, 17:24, 18:19, 19:14, 20:19, 32:9, 33:16
**fingers** [2] - 19:9, 32:24
**fire** [1] - 26:2
**first** [16] - 3:14, 3:16, 3:20, 4:12, 4:17, 6:12, 11:15, 14:11, 15:7, 18:13, 27:7, 31:16, 31:18, 46:1, 47:23, 58:14
**fishing** [3] - 60:14, 62:3, 66:11
**flatly** [1] - 25:3
**flavor** [1] - 42:25
**focus** [4] - 6:2, 23:2, 47:14, 56:7
**focused** [4] - 39:13, 40:1, 52:4, 62:5
**focusing** [1] - 28:15
**follow** [1] - 20:12
**following** [2] - 31:17, 59:16
**follows** [2] - 34:2, 43:3
**forensic** [3] - 13:8, 13:22, 19:11
**forfeit** [1] - 11:8
**former** [1] - 5:19
**forth** [7] - 9:5, 10:20, 39:25, 41:1, 43:17, 44:3, 63:22

**forum** [1] - 31:5
**forward** [2] - 17:15, 35:14
**four** [8] - 16:4, 16:15, 41:3, 52:14, 60:7, 64:21, 65:11, 67:18
**four-corners** [1] - 41:3
**frankly** [3] - 27:5, 48:1, 51:10
**fraud** [18] - 18:11, 18:12, 18:14, 21:14, 22:25, 23:1, 23:16, 25:10, 26:15, 26:25, 27:21, 36:2, 46:23, 47:6, 49:7, 49:13, 52:23, 53:7
**fraudulent** [3] - 15:25, 24:15, 26:20
**Freeh** [1] - 5:19
**freeh** [1] - 5:21
**front** [2] - 44:13, 44:16
**fuel** [1] - 26:1
**full** [6] - 38:8, 44:14, 44:25, 55:6, 56:2, 60:1
**fully** [5] - 38:14, 39:15, 40:9, 43:22, 69:3
**fund** [5] - 8:22, 13:5, 19:1, 19:4, 21:5
**funds** [10] - 9:12, 9:18, 9:20, 9:21, 12:19, 38:9, 41:24, 42:2, 42:3, 42:14, 42:21, 43:7, 45:16, 47:15, 47:19, 52:19, 53:2, 63:6, 63:11
**future** [2] - 45:3, 68:21

## G

**Galioto** [8] - 5:6, 5:22, 6:22, 6:25, 8:2, 11:5, 11:9, 25:8
**Galioto's** [3] - 7:1, 8:18, 16:7
**Ganias** [17] - 39:14, 40:1, 53:25, 56:6, 56:21, 57:2, 57:8, 58:3, 58:11, 58:23, 59:1, 59:5, 59:11, 68:2, 68:7, 69:13
**general** [6] - 12:1, 12:17, 25:11, 40:3, 57:3, 68:10
**generally** [1] - 29:20
**given** [6] - 31:13, 33:7, 39:4, 60:7, 66:23
**glad** [1] - 4:22
**global** [7] - 7:6, 8:22, 13:4, 19:1, 19:4, 21:5, 21:22
**Gonchar** [5] - 9:6, 9:19, 10:4, 10:5, 10:23, 13:7, 13:8, 13:11, 19:11, 22:20, 25:2, 26:10, 26:18, 27:11, 27:14, 28:5
**Gonchar's** [1] - 10:1

**governing** [1] - 53:17
**Government** [5] - 1:13, 9:8, 13:21, 25:6, 68:5
**government** [45] - 3:12, 4:2, 6:23, 8:21, 11:21, 12:20, 13:14, 14:5, 14:15, 14:16, 15:22, 17:13, 18:23, 22:12, 22:22, 22:24, 24:16, 24:25, 28:1, 28:19, 29:2, 30:3, 38:17, 39:20, 40:3, 41:23, 44:19, 45:9, 54:14, 54:24, 56:22, 57:2, 57:5, 57:8, 58:4, 58:19, 59:7, 60:21, 61:7, 67:6, 68:1, 69:16, 69:24, 70:3
**government's** [15] - 7:4, 8:17, 16:10, 17:6, 25:4, 26:1, 29:7, 34:14, 35:13, 35:21, 36:1, 37:5, 39:17, 46:8, 68:2
**Government's** [3] - 10:12, 35:2, 68:18
**governmental** [1] - 3:18
**grand** [32] - 4:17, 6:11, 7:8, 7:9, 8:4, 8:6, 8:11, 8:12, 8:14, 10:12, 10:14, 13:18, 13:23, 13:25, 14:21, 14:23, 25:7, 26:3, 33:22, 34:2, 34:10, 34:15, 35:3, 35:8, 35:11, 35:13, 36:7, 38:2, 38:7, 38:11, 38:12, 39:4
**grant** [1] - 45:18
**great** [5] - 26:15, 27:10, 27:17, 62:1, 64:16
**grounds** [4] - 17:20, 27:25, 32:16, 52:10
**guess** [7] - 5:5, 12:19, 17:15, 23:14, 33:23, 37:12, 51:15
**guilty** [3] - 18:4, 18:21, 20:11
**gum** [1] - 58:5
**guys** [1] - 27:10

## H

**HALEY** [15] - 1:17, 2:9, 36:13, 37:11, 39:11, 39:14, 41:16, 43:25, 44:9, 58:1, 61:24, 62:1, 63:2, 63:18, 70:7
**Haley** [17] - 2:10, 3:8, 22:13, 36:11, 37:10, 46:1, 47:24, 49:9, 49:21, 54:8, 55:22, 57:25, 65:2, 65:20, 68:25, 69:21, 70:6
**Haley's** [3] - 28:18, 47:14, 67:21
**haley's** [1] - 29:24

**half** [1] - 8:8
**handle** [1] - 56:12
**happy** [3] - 22:17, 55:12, 56:5
**harass** [2] - 47:2, 53:12
**Harbor** [3] - 49:6, 52:20, 53:4
**hard** [4] - 55:4, 56:18, 57:18, 57:20
**harvest** [1] - 56:20
**Hawaii** [10] - 38:16, 47:5, 48:17, 49:5, 50:7, 50:13, 50:18, 50:22, 50:24, 51:16
**hazard** [1] - 5:5
**heads** [1] - 27:16
**hear** [1] - 2:23
**heard** [4] - 26:14, 33:1, 33:20, 47:24
**hearing** [12] - 4:11, 4:14, 15:2, 16:14, 27:25, 36:17, 36:18, 36:21, 36:22, 36:25, 37:4, 40:12
**hearsay** [7] - 29:25, 30:18, 37:18, 37:23, 39:5, 39:7
**held** [2] - 34:13, 68:8
**helpful** [1] - 67:4
**hesitancy** [1] - 62:11
**hesitation** [1] - 3:23
**high** [2] - 7:21, 35:1
**higher** [1] - 64:9
**highlight** [4] - 3:11, 3:12, 36:11, 36:12
**himself** [2] - 28:5, 53:1
**hired** [1] - 13:8
**historically** [1] - 40:2
**history** [3] - 6:4, 11:4, 65:3
**hockey** [9] - 6:21, 13:12, 13:15, 13:19, 14:6, 15:15, 25:2, 25:9, 28:12
**hold** [4] - 54:15, 54:17, 56:24, 57:6
**holding** [1] - 54:24
**Home** [3] - 16:21, 29:9, 31:21
**home** [1] - 45:4
**Honor** [41] - 2:6, 2:15, 2:24, 3:15, 3:16, 3:25, 4:24, 16:19, 17:18, 22:11, 22:15, 24:22, 26:6, 28:3, 29:5, 29:6, 29:18, 36:14, 37:12, 40:10, 40:11, 40:16, 41:16, 42:24, 43:25, 45:13, 45:17, 45:25, 47:23, 58:3, 58:11, 59:15, 62:1, 63:18, 64:2, 64:5, 64:14, 64:20, 64:21, 70:5, 70:9
**Honor's** [3] - 58:2, 62:11, 63:24
**HONORABLE** [1] - 1:11
**hope** [2] - 25:21, 57:14

6

**house** [1] - 18:24
**Howard** [1] - 34:6

## I

**idea** [4] - 8:4, 8:22, 49:4, 67:19
**identical** [1] - 43:14
**identified** [1] - 41:5
**ignore** [1] - 25:25
**image** - 54:3
**imaged** [2] - 56:14, 56:15
**images** - 54:6
**imagine** - 36:14
**immaterial** [3] - 40:6, 48:22, 56:2
**immediately** [1] - 11:20
**impact** [1] - 7:9
**impaneled** [3] - 38:2, 38:7, 38:13
**impeachment** [1] - 41:9
**implicitly** [1] - 23:5
**important** [7] - 3:25, 5:25, 7:3, 20:1, 47:3, 47:17, 47:20
**importantly** [1] - 5:18
**imposed** [1] - 59:1
**improprieties** [1] - 16:3
**impropriety** [3] - 4:11, 5:21, 9:2
**inaccurate** [1] - 34:21
**inadmissible** [3] - 29:25, 37:18, 37:22
**inadvertent** [1] - 23:20
**inappropriate** [3] - 8:3, 14:25, 19:6
**Inc** [1] - 50:8
**incidents** [2] - 14:19, 16:1
**inclined** [1] - 46:11
**including** [2] - 9:22, 34:21
**incomplete** [3] - 34:10, 35:3, 44:5
**indefinitely** [2] - 56:25, 57:6
**independent** [1] - 54:23
**indicate** [1] - 63:4
**indicated** [2] - 44:3, 61:6
**indication** [2] - 29:8, 36:3
**indications** [1] - 18:18
**indictment** [66] - 3:18, 4:1, 4:18, 5:17, 7:17, 7:20, 7:21, 8:2, 8:7, 9:15, 10:16, 11:6, 11:22, 11:23, 12:16, 13:20, 13:21, 14:1, 14:4, 14:11, 14:12, 14:20, 15:7, 15:15, 15:21, 16:4, 16:5, 19:9, 20:25, 22:20, 23:15, 24:9, 24:17, 24:25, 25:4, 26:1, 28:20, 33:22, 34:3,
34:9, 34:13, 34:16, 34:24, 35:1, 35:8, 35:16, 35:25, 36:4, 37:2, 37:3, 37:6, 37:7, 37:8, 38:4, 40:25, 41:4, 41:5, 41:18, 42:23, 43:17, 47:11, 49:8, 50:17, 59:16, 63:22, 64:20
**individual** [1] - 28:19
**individual's** [1] - 45:4
**individually** [1] - 12:5
**individuals** [3] - 5:11, 13:13, 23:3, 46:20, 57:22, 60:11, 60:20, 61:23, 62:20, 64:24, 65:19, 67:7, 67:16
**induced** [1] - 23:3
**inevitable** [1] - 32:14
**information** [14] - 4:5, 4:6, 4:14, 8:12, 12:21, 39:21, 39:22, 39:24, 58:23, 59:7, 59:8, 59:10, 65:9, 67:16
**inspection** [3] - 34:1, 66:7, 66:9
**instance** [2] - 23:7, 49:14
**instances** [1] - 47:4
**instead** [3] - 5:3, 15:10, 45:5
**institution** [3] - 44:11, 44:12, 45:1
**instructed** [1] - 6:14
**instrument** [1] - 14:4
**instrumental** [1] - 5:15
**insufficient** [6] - 32:16, 36:8, 36:20, 37:5, 65:21, 66:1
**intending** [1] - 29:8, 49:21
**intent** [2] - 9:1, 24:15
**interaction** [1] - 68:24
**interest** [2] - 24:12, 49:1
**interesting** [2] - 12:8, 15:3
**interfere** [2] - 7:1, 16:8
**interpretation** [1] - 68:2
**interpreted** [1] - 10:1
**interrupt** [1] - 65:2
**introduce** [4] - 16:21, 17:13, 30:4, 30:17
**introduction** [1] - 17:7
**invest** [1] - 23:3
**invested** [3] - 13:13, 14:6, 15:8, 23:9, 28:13
**investigation** [3] - 5:24, 40:5, 58:18
**investing** [1] - 9:20
**investment** [3] - 6:21, 15:19, 24:6
**investments** [2] - 24:21, 38:16
**investor** [2] - 43:17, 62:15
**investors** [4] - 21:1, 59:19, 59:21, 63:5
**involved** [2] - 9:2, 21:15

**involvement** [1] - 35:12
**involving** [1] - 6:20
**iPhone** [1] - 68:4
**irrelevant** [3] - 7:4, 26:23, 40:6
**Isle** [1] - 43:6
**Islip** [3] - 1:6, 1:15, 1:23
**isolate** [1] - 62:2
**isolated** [2] - 14:19, 58:25
**issuance** [1] - 40:13
**issue** [32] - 4:11, 7:16, 12:9, 16:18, 16:23, 17:1, 17:3, 24:2, 29:6, 29:10, 30:11, 31:12, 31:20, 39:15, 40:9, 45:12, 48:9, 51:15, 53:14, 53:16, 54:23, 54:24, 56:13, 61:23, 62:11, 63:25, 64:3, 67:25, 68:3, 68:16, 69:13
**issued** [3] - 7:18, 43:11, 44:17
**issues** [8] - 4:21, 6:6, 25:18, 35:9, 35:19, 69:4, 69:5, 69:6
**issuing** [2] - 46:11, 61:10

## J

**James** [1] - 2:7
**JAMES** [1] - 1:15
**Jane** [2] - 40:24, 59:24
**John** [21] - 15:8, 26:16, 38:19, 40:23, 41:4, 42:7, 42:8, 42:11, 42:18, 42:19, 43:12, 43:15, 49:3, 50:5, 59:25, 60:8, 62:9, 62:15, 64:23, 65:12, 67:18
**joint** [8] - 6:25, 50:7, 50:13, 50:18, 50:21, 50:23, 50:24, 51:3
**Jones** [1] - 34:19
**JOSEPH** [1] - 1:11
**Jowdy** [18] - 5:13, 5:18, 5:22, 12:12, 12:25, 15:5, 15:6, 15:12, 15:13, 15:18, 15:23, 26:16, 28:11, 28:16, 28:19, 38:25, 48:22
**judge** [9] - 8:14, 10:17, 41:6, 42:24, 44:6, 44:10, 45:7, 45:10, 59:14
**Judge** [49] - 2:9, 4:8, 4:19, 5:8, 5:20, 6:18, 7:3, 7:24, 8:9, 8:25, 11:9, 12:9, 12:12, 12:23, 13:17, 14:3, 14:18, 15:4, 18:19, 19:2, 20:8, 20:21, 21:10, 21:24, 37:11, 37:18, 37:24, 39:5, 39:14, 40:7, 40:14, 41:1, 41:12, 41:22, 42:8, 42:16,

43:11, 44:9, 46:5, 46:10, 53:16, 58:1, 58:6, 59:3, 60:23, 63:2, 63:25, 64:8, 66:11
**JUDGE** [1] - 1:11
**judgment** [2] - 45:17, 45:22
**judicial** [2] - 7:2, 16:8
**juncture** [1] - 53:20
**jurors** [3] - 18:2, 18:20, 25:14
**jury** [48] - 4:17, 6:11, 7:8, 7:9, 8:4, 8:6, 8:11, 8:13, 8:14, 10:13, 10:14, 13:18, 13:23, 13:25, 14:21, 14:23, 18:6, 18:10, 18:14, 18:16, 20:2, 20:4, 21:8, 25:7, 26:4, 27:16, 31:1, 31:3, 32:18, 33:3, 33:10, 33:23, 34:2, 34:10, 34:15, 35:3, 35:13, 38:2, 38:7, 38:11, 38:12, 39:4, 42:19, 44:14, 44:16, 44:19, 44:24
**jury's** [3] - 35:8, 35:11, 36:7

## K

**Kaiser** [26] - 6:24, 12:11, 12:24, 14:11, 14:15, 16:9, 26:16, 38:20, 41:7, 50:5, 51:5, 52:14, 52:15, 53:3, 53:6, 53:8, 53:10, 53:12, 60:8, 64:19, 64:23, 64:25, 65:1, 65:4, 65:12, 67:18
**keep** [2] - 56:25, 57:6
**keeping** [1] - 28:20
**Ken** [2] - 12:25, 38:25
**KENNER** [1] - 1:7
**kenner** [2] - 20:13, 51:4
**Kenner** [45] - 1:18, 2:2, 2:10, 13:3, 14:1, 14:8, 14:12, 16:9, 17:1, 17:11, 17:22, 18:9, 18:25, 19:3, 19:12, 19:16, 19:18, 19:23, 20:19, 20:22, 21:4, 21:15, 21:20, 23:1, 26:12, 27:8, 33:2, 37:21, 38:15, 42:21, 43:5, 43:18, 45:2, 46:22, 47:17, 48:24, 49:17, 50:5, 53:5, 53:11, 59:18, 63:13, 65:1, 65:19, 66:25
**Kenner's** [6] - 18:24, 21:11, 22:3, 39:22, 40:17, 68:21
**Kenneth** [1] - 5:12
**key** [1] - 57:13
**kids** [1] - 58:18
**kind** [3] - 3:21, 6:18, 6:25

7

**knowledge** [4] - 38:5, 44:14, 48:16, 60:1
**known** [3] - 5:14, 11:17, 38:20
**knows** [2] - 13:5, 31:2

## L

**LA** [1] - 1:19
**land** [3] - 15:9, 15:14, 38:16
**laptop** [1] - 68:4
**LARUSSO** [16] - 2:13, 3:15, 6:16, 6:18, 7:24, 10:17, 10:25, 16:19, 17:5, 18:18, 20:1, 20:20, 22:11, 24:22, 28:3, 70:5
**LaRusso** [10] - 2:13, 3:14, 27:2, 29:21, 29:24, 33:6, 33:21, 36:16, 54:8, 70:4
**LaRusso's** [3] - 3:6, 22:19, 30:25
**last** [3] - 15:3, 28:3, 46:22
**late** [1] - 2:19
**law** [8] - 9:14, 32:2, 32:6, 37:14, 59:4, 64:10, 64:11, 65:21
**lawsuit** [1] - 9:23
**lawsuits** [1] - 21:14
**lawyer** [5] - 5:14, 7:11, 22:3
**lawyer's** [1] - 33:13
**lawyers** [1] - 33:1
**leads** [1] - 22:5
**learned** [2] - 13:8, 22:1
**learning** [2] - 15:4, 15:5
**least** [7] - 15:1, 16:4, 16:14, 19:13, 20:6, 39:19, 64:17
**Led** [1] - 49:7
**left** [1] - 35:4
**legal** [4] - 9:22, 10:8, 10:22, 50:24
**legitimate** [3] - 5:24, 19:21, 19:25
**Lehman** [2] - 50:7, 50:16
**length** [1] - 3:24
**letter** [4] - 43:14, 45:2, 48:25, 49:5
**letters** [4] - 48:3, 48:16, 49:10, 49:18
**level** [1] - 35:10
**levels** [1] - 32:14
**liberal** [1] - 46:4
**license** [1] - 41:8
**light** [4] - 25:18, 27:16, 28:21, 69:18
**limit** [2] - 63:16
**limited** [1] - 42:6

**line** [19] - 32:8, 36:1, 38:5, 38:9, 38:15, 38:16, 42:4, 42:15, 42:17, 43:8, 43:19, 44:15, 45:4, 53:20, 59:21, 61:12, 61:17, 63:4, 63:11
**lines** [6] - 10:9, 59:19, 60:2, 60:5, 62:6, 62:8
**list** [2] - 40:19, 55:23
**listed** [2] - 28:5, 62:4
**listen** [2] - 6:24, 21:19
**litigation** [9] - 6:13, 6:20, 7:23, 24:9, 26:22, 26:24, 46:24, 48:7, 54:11
**LLC** [4] - 23:10, 23:12, 43:5, 64:25
**LMJ** [2] - 15:20, 15:23
**loan** [1] - 50:16
**look** [13] - 4:1, 5:25, 12:14, 14:19, 17:15, 20:9, 21:3, 41:1, 41:19, 43:22, 48:9, 67:14, 69:25
**looked** [6] - 11:17, 14:9, 16:1, 20:6, 44:7, 48:7
**looking** [4] - 4:10, 8:1, 8:14, 12:4, 12:5, 16:12, 19:8, 41:19, 44:4, 57:19, 58:21, 59:9, 63:25
**looks** [2] - 7:13, 58:9
**LORETTA** [1] - 1:13
**lost** [2] - 28:14, 56:19
**Louie** [1] - 5:19
**lower** [1] - 60:22
**LYNCH** [1] - 1:13

## M

**MacBook** [1] - 39:22
**machine** [1] - 56:14
**mail** [7] - 16:23, 18:24, 29:12, 29:17, 50:4, 51:15, 69:17
**mails** [10] - 30:5, 50:13, 50:22, 50:23, 51:4, 51:8, 51:13, 68:6, 68:21
**main** [1] - 32:1
**maintain** [3] - 27:15, 40:14, 45:8
**maintained** [2] - 44:25, 62:9
**major** [1] - 52:6
**man** [1] - 5:12
**Management** [1] - 15:20
**Manfredi** [2] - 64:25
**manner** [1] - 20:18
**manufactured** [1] - 49:20
**manufacturing** [1] - 49:23
**March** [1] - 1:9
**marked** [1] - 16:15
**Mary** [1] - 1:22

**mask** [1] - 11:22
**massive** [1] - 25:9
**material** [20] - 16:7, 38:3, 40:14, 40:20, 41:8, 42:22, 46:14, 46:16, 51:24, 52:9, 52:11, 52:17, 52:21, 55:24, 56:4, 56:18, 57:19, 64:1, 66:18, 66:22
**materiality** [1] - 58:17
**materials** [5] - 4:20, 57:4, 68:19, 69:19
**matter** [5] - 5:3, 12:24, 19:23, 40:12, 43:9, 44:20, 55:3, 70:10
**matters** [3] - 16:14, 37:4, 39:8
**mean** [9] - 20:15, 23:15, 30:1, 33:10, 50:21, 58:4, 58:6, 58:12, 65:2
**means** [1] - 20:10
**mechanical** [1] - 1:25
**meet** [5] - 36:20, 46:9, 60:21, 60:22, 66:13
**meetings** [2] - 50:6, 50:23
**meets** [1] - 60:23
**member** [1] - 23:10
**memberships** [1] - 23:11
**memorandum** [1] - 65:21
**mention** [1] - 15:12
**mentioned** [4] - 18:22, 25:3, 28:21, 64:20
**merely** [1] - 32:9
**merit** [1] - 8:23
**met** [3] - 64:6, 64:15, 65:17
**metadata** [1] - 56:16
**methodically** [1] - 57:20
**Mexican** [2] - 15:9, 28:13
**Michael** [1] - 49:4
**might** [3] - 42:24, 44:6, 60:16
**million** [5] - 13:4, 13:24, 15:14, 19:8, 28:13
**mind** [2] - 11:16, 13:24
**mindset** [1] - 8:5
**mini** [1] - 37:7
**minute** [4] - 8:23, 11:16, 13:1, 16:2
**minutes** [1] - 34:2
**mirror** [3] - 54:2, 54:3, 54:6
**mirrors** [1] - 65:20
**misappropriate** [1] - 19:19
**misappropriating** [1] - 19:1
**misconduct** [8] - 3:18, 28:1, 28:2, 33:23, 34:23, 36:3
**misdirection** [1] - 24:14
**Miskiewicz** [9] - 2:7, 22:14, 28:4, 28:10, 29:4, 37:20, 45:24, 62:21, 64:5

**MISKIEWICZ** [24] - 1:15, 2:6, 22:15, 22:24, 26:7, 26:9, 29:5, 45:25, 47:23, 50:2, 50:15, 50:20, 51:1, 51:7, 51:21, 52:17, 53:15, 53:23, 54:4, 55:1, 55:19, 57:10, 70:3, 70:9
**misleading** [3] - 34:10, 34:21, 35:3
**misrepresentation** [1] - 41:8
**misrepresentations** [2] - 59:18, 59:21
**mistakes** [1] - 25:25
**moment** [3] - 30:9, 30:21, 42:25
**money** [55] - 10:1, 10:3, 10:4, 10:20, 10:21, 11:10, 11:12, 11:19, 12:3, 13:11, 13:13, 14:7, 14:10, 14:16, 15:10, 18:7, 18:9, 19:1, 19:19, 19:22, 19:23, 19:24, 20:13, 20:14, 20:17, 20:23, 21:2, 21:22, 23:6, 23:9, 23:19, 23:24, 24:11, 24:19, 25:21, 26:13, 27:7, 27:13, 27:19, 33:8, 33:9, 33:15, 35:21, 48:20, 48:24, 49:5, 49:19, 52:24, 53:8, 53:9, 53:10, 62:22, 62:25
**monies** [1] - 63:14
**months** [6] - 39:24, 52:2, 53:21, 55:8, 68:8, 69:11
**moreover** [2] - 26:14, 52:23
**morning** [1] - 44:1
**most** [3] - 9:25, 13:13, 47:4
**motion** [30] - 3:7, 3:9, 3:11, 3:17, 3:21, 4:7, 4:9, 7:14, 11:24, 12:9, 18:13, 21:16, 22:16, 25:12, 31:16, 31:17, 33:21, 33:22, 36:10, 39:9, 39:16, 39:17, 45:17, 45:18, 45:22, 45:25, 47:1, 68:1, 69:20
**motions** [3] - 3:4, 3:5, 22:9
**mount** [1] - 14:19
**move** [1] - 47:8
**moving** [3] - 17:19, 17:20, 35:14
**MR** [54] - 2:6, 2:9, 2:13, 2:24, 3:15, 6:16, 6:18, 7:24, 10:17, 10:25, 16:19, 17:5, 18:18, 20:1, 20:20, 22:11, 22:15, 22:24, 24:22, 26:7, 26:9, 28:3, 29:5, 36:13, 37:11, 39:11, 39:14, 41:16, 43:25, 44:9, 45:25, 47:23, 50:2, 50:15, 50:20, 51:1, 51:7, 51:21, 52:17,

53:15, 53:23, 54:4, 55:1, 55:19, 57:10, 58:1, 61:24, 62:1, 63:2, 63:18, 70:3, 70:5, 70:7, 70:9
**multi** [1] - 32:15
**multi-defendant** [1] - 32:15
**multiple** [3] - 42:13, 42:20, 59:25
**must** [1] - 64:21
**myriad** [1] - 64:18

## N

**Nachamie** - 46:7
**name** [3] - 5:12, 6:21, 13:9
**narrow** [4] - 61:12, 61:14, 67:10, 69:22
**narrowed** [1] - 70:1
**narrower** [1] - 60:17
**Nash** [1] - 6:21
**nature** [8] - 22:25, 23:8, 23:16, 45:14, 49:13, 52:23, 53:7, 57:4
**near** [1] - 23:6
**necessarily** [5] - 18:10, 20:15, 20:18, 21:8, 33:10
**necessary** [2] - 40:15, 67:17
**need** [8] - 30:21, 40:2, 49:10, 61:2, 63:20, 64:8, 64:9, 67:12
**needs** [1] - 67:1
**never** [1] - 28:24
**NEW** [1] - 1:1
**New** [11] - 1:6, 1:15, 1:23, 5:1, 5:4, 5:14, 24:8, 38:3, 38:8, 38:13, 66:14
**News** [1] - 5:16
**next** [1] - 11:19
**nine** [2] - 46:22, 67:16
**Nixon** [9] - 46:2, 52:12, 60:22, 64:6, 64:12, 64:14, 65:14, 65:15, 65:22
**nobody** [2] - 28:14, 62:24
**Nolan** [8] - 38:20, 38:23, 39:1, 43:1, 43:2, 43:10, 44:8, 45:14
**Nolan's** [1] - 45:18
**non** [6] - 54:11, 54:13, 54:22, 55:3, 55:4, 69:7
**non-pertinent** [4] - 54:11, 54:13, 54:22, 69:7
**non-privileged** [2] - 55:3, 55:4
**none** [1] - 48:23
**Northern** [15] - 42:2, 42:13, 42:15, 43:4, 43:6, 43:20, 43:22, 47:9, 47:18, 48:21, 49:14, 62:23, 63:7, 63:17,

63:23
**Northport** [1] - 64:23
**note** [1] - 39:16
**noted** [2] - 33:6, 35:17
**nothing** [5] - 46:19, 46:25, 55:1, 57:16, 70:3
**nowhere** [1] - 45:1
**number** [13] - 2:1, 5:1, 5:11, 13:20, 15:8, 23:3, 26:15, 28:11, 52:2, 53:3, 53:16, 57:21, 57:22
**numerous** [3] - 26:24, 32:3, 68:12

## O

**oath** [2] - 37:25, 61:17
**obligation** [2] - 51:18, 58:23
**obligations** [1] - 58:25
**obtain** [3] - 24:5, 64:1, 66:8
**obtained** [2] - 48:15, 51:13
**obvious** [1] - 68:11
**obviously** [6] - 3:25, 6:24, 7:24, 17:9, 31:13, 50:9
**occasions** [4] - 39:2, 42:14, 42:20, 59:25
**occurred** [2] - 7:19, 46:24
**OF** [3] - 1:1, 1:3, 1:10
**offer** [3] - 30:14, 49:21, 55:9
**offered** [1] - 53:5
**old** [1] - 14:4
**once** [5] - 56:18, 56:22, 58:22, 69:4, 69:6
**one** [55] - 5:11, 6:15, 6:16, 6:17, 12:4, 12:5, 13:12, 13:13, 13:20, 14:3, 14:4, 15:3, 18:3, 19:12, 21:7, 21:14, 22:1, 22:4, 23:18, 24:22, 25:2, 26:18, 26:23, 26:24, 27:12, 28:3, 29:12, 30:5, 32:2, 32:19, 32:23, 33:4, 33:18, 36:15, 41:2, 42:11, 42:16, 42:19, 43:2, 43:12, 43:15, 45:10, 49:3, 50:3, 53:4, 56:13, 60:5, 60:9, 60:15, 60:18, 62:16, 64:24, 65:19, 67:19, 69:11
**onerous** [1] - 51:6
**ones** [1] - 61:6
**ongoing** [1] - 69:18
**open** [1] - 58:20
**operating** [1] - 23:9
**operation** [1] - 46:23
**opportunity** [9] - 2:19, 3:24, 3:25, 13:18, 15:2, 25:14, 26:5, 28:6, 44:16
**opposed** [2] - 16:9, 25:15

**opposite** [2] - 19:10, 55:20
**opposition** [2] - 51:8, 51:17
**oppress** [1] - 47:2
**oppressive** [2] - 46:17, 66:19
**oral** [1] - 31:14
**orally** [3] - 3:9, 49:19, 65:10
**order** [8] - 18:3, 28:23, 32:5, 32:19, 33:4, 34:5, 44:13, 67:3
**original** [6] - 21:16, 54:12, 54:21, 54:25, 55:4, 69:5
**originally** [1] - 48:21
**otherwise** [8] - 22:18, 29:17, 31:7, 34:13, 37:6, 57:2, 59:12, 66:4
**outlining** [1] - 32:6
**outstanding** [1] - 43:5
**overall** [3] - 4:24, 22:25, 23:23
**overbroad** [3] - 60:14, 62:10, 65:5
**Owen** [2] - 43:10, 45:14
**own** [8] - 12:13, 17:11, 23:24, 24:19, 26:1, 32:17, 33:12, 53:4
**owned** [1] - 64:23
**owner** [1] - 53:1

## P

**p.m** [1] - 1:9
**page** [1] - 43:3
**pages** [6] - 52:15, 60:7, 64:21, 65:11, 67:18, 68:15
**paid** [1] - 12:2
**pains** [1] - 62:1
**paper** [1] - 3:22
**papers** [4] - 4:9, 6:4, 31:8, 40:8
**paperwork** [1] - 5:12
**paragraph** [1] - 15:7
**paragraphs** [2] - 14:5, 65:20
**part** [5] - 3:17, 26:25, 37:22, 47:21, 50:25, 51:1, 51:22, 59:2
**parte** [1] - 69:24
**participant** [2] - 15:6, 15:24
**particular** [7] - 33:7, 41:20, 42:6, 61:11, 62:15, 67:11
**particularly** [2] - 50:11, 51:6
**particulars** [1] - 12:21
**parties** [2] - 31:15, 47:2
**parties'** [1] - 21:25

**partly** [1] - 24:23
**partners** [3] - 53:3, 53:4, 53:6
**party** [3] - 44:11, 46:18, 66:19
**pay** [4] - 9:21, 10:22, 48:25
**paying** [1] - 10:7
**payment** [1] - 11:14
**Peca** [3] - 38:1, 49:4, 52:24
**pen** [1] - 3:22
**pending** [1] - 28:15
**penny** [1] - 14:10
**people** [11] - 8:20, 24:6, 24:20, 26:2, 26:15, 27:3, 27:17, 27:18, 32:23, 52:24, 53:9
**people's** [1] - 24:19
**percentage** [1] - 24:11
**percentages** [1] - 24:6
**perfectly** [1] - 33:14
**perhaps** [2] - 27:12, 41:7
**period** [10] - 20:24, 41:18, 44:21, 44:22, 57:9, 58:15, 59:8, 59:25, 62:9, 62:13
**periodically** [1] - 51:11
**permission** [2] - 2:16, 20:17
**permissive** [2] - 46:5, 46:9
**permit** [1] - 57:8
**perpetuities** [1] - 37:16
**person** [5] - 8:5, 9:1, 18:4, 18:20, 30:7
**person's** [2] - 18:3, 41:14
**personal** [8] - 2:20, 9:21, 12:2, 23:25, 39:21, 48:25, 58:17
**perspective** [1] - 64:17
**pertinent** [12] - 54:11, 54:13, 54:17, 54:18, 54:22, 68:6, 68:19, 68:21, 69:7, 69:17, 69:18
**Phil** [4] - 42:21, 45:2, 63:13, 65:1
**PHILLIP** [1] - 1:7
**Phillip** [3] - 2:2, 2:10, 43:4
**photographs** [1] - 56:1
**physically** [1] - 56:16
**picked** [1] - 24:13
**pictures** [3] - 58:18, 58:21, 58:22
**piece** [9] - 9:3, 9:7, 9:9, 16:22, 16:24, 17:2, 23:18, 55:7
**pinpoint** [1] - 4:21
**place** [6] - 12:14, 31:11, 31:14, 37:23, 37:24, 65:7
**placed** [1] - 42:3
**play** [1] - 5:10
**player** [2] - 6:21, 13:19

**players** [7] - 13:12, 13:15, 14:7, 15:15, 25:2, 25:9, 28:12
**playing** [1] - 69:13
**Plaza** [2] - 1:14, 1:22
**pocket** [1] - 24:12
**pockets** [1] - 27:8
**point** [19] - 2:25, 4:13, 7:3, 8:25, 13:16, 14:18, 17:4, 21:9, 24:22, 28:3, 31:19, 32:24, 52:5, 54:11, 54:15, 54:25, 57:3, 63:21, 69:16
**pointed** [1] - 31:20
**pointing** [8] - 17:23, 17:25, 18:19, 19:9, 19:14, 20:19, 32:9, 33:16
**points** [2] - 28:9, 60:22
**portion** [6] - 6:25, 9:18, 9:20, 10:2, 10:21, 14:10
**portions** [2] - 40:17, 69:8
**portrayed** [1] - 26:3
**position** [13] - 17:6, 21:12, 21:25, 27:15, 31:7, 33:14, 35:18, 46:8, 55:9, 55:10, 59:20, 59:23, 64:8
**positions** [2] - 22:6, 47:8
**possession** [3] - 39:20, 39:23, 58:14
**possibility** [5] - 3:21, 17:10, 17:17, 20:7, 29:10
**possible** [3] - 4:11, 47:10, 67:2
**post** [1] - 8:2
**post-indictment** [1] - 8:2
**potential** [3] - 30:13, 33:16, 50:24
**potentially** [1] - 16:23
**pour** [1] - 26:24
**power** [1] - 48:3
**practical** [1] - 4:8
**pre** [1] - 7:18
**pre-attenuated** [1] - 7:18
**preceded** [2] - 24:9, 26:22
**predating** [1] - 47:5
**preface** [1] - 3:19
**prejudice** [2] - 17:8, 65:8
**premised** [1] - 29:23
**prep** [1] - 48:7
**preparation** [2] - 27:6, 51:10
**prepare** [2] - 31:15, 66:7
**prepared** [2] - 25:22, 61:4
**preparing** [1] - 51:23
**present** [6] - 8:5, 8:11, 8:19, 17:12, 28:7, 35:22
**presentation** [12] - 4:16, 4:24, 5:7, 7:8, 8:3, 8:15, 14:23, 25:13, 28:23, 33:13, 35:2, 35:12
**presented** [9] - 4:2, 4:6,

4:14, 5:16, 25:8, 29:17, 34:9, 41:23, 66:24
**presenting** [1] - 67:7
**press** [1] - 64:3
**pretrial** [2] - 3:4, 29:18
**preventing** [2] - 7:12, 69:1
**previous** [1] - 27:9
**previously** [2] - 37:25, 48:8
**primary** [1] - 32:1
**privilege** [12] - 53:21, 55:15, 55:16, 58:7, 58:9, 58:13, 58:24, 59:2, 68:14, 68:19, 68:20, 69:1
**privileged** [4] - 55:3, 55:4, 55:24, 69:19
**Privitello** [7] - 9:4, 12:24, 23:8, 24:1, 24:4, 24:11, 29:1
**Privitello's** [6] - 9:18, 9:20, 10:3, 10:4, 10:21, 35:21
**pro** [1] - 23:11
**problem** [6] - 21:8, 31:23, 31:24, 54:19, 61:8, 61:13
**proceeding** [2] - 36:7, 45:19
**PROCEEDINGS** [1] - 1:10
**proceedings** [3] - 21:24, 39:2, 70:10
**Proceedings** [1] - 1:25
**process** [3] - 7:2, 16:8, 56:3
**procurable** [1] - 66:4
**produce** [2] - 51:4, 61:16
**produced** [13] - 1:25, 40:19, 47:16, 47:21, 47:25, 48:5, 48:12, 55:21, 61:18, 65:25, 66:23, 67:5, 67:13
**producing** [2] - 46:18, 66:19
**production** [3] - 48:2, 51:8, 66:7
**proffer** [1] - 35:20
**proffered** [2] - 33:2, 48:11
**proffers** [2] - 36:19, 37:21
**progression** [1] - 12:13
**prolong** [1] - 57:9
**promised** [1] - 24:20
**proof** [2] - 14:20, 32:14
**proper** [2] - 11:13, 11:17
**properly** [3] - 13:24, 31:15, 66:6
**properties** [3] - 48:18, 49:5, 67:21
**property** [11] - 47:6, 49:1, 49:6, 49:7, 52:20, 52:25, 53:1, 53:3, 53:4, 53:6, 64:23
**proposal** [1] - 42:1
**prosecution** [4] - 34:9, 40:7, 58:8, 59:13

**prosecutor** [1] - 22:4
**prosecutorial** [1] - 34:23
**protect** [4] - 8:19, 12:10, 12:11, 28:20
**provide** [5] - 21:11, 50:13, 55:12, 61:10, 69:23
**provided** [2] - 55:22, 55:25, 66:21
**publicity** [1] - 5:16
**pulled** [1] - 54:2
**purge** [1] - 59:7
**purged** [6] - 39:24, 59:6, 68:5, 69:7, 69:8, 69:17
**purging** [1] - 58:23
**purpose** [4] - 6:8, 37:3, 46:17, 68:23
**purposes** [8] - 20:24, 40:5, 40:8, 41:9, 45:16, 48:17, 63:24, 64:9
**pursuant** [2] - 40:19, 44:17
**pursue** [2] - 5:2, 28:7
**pursuing** [1] - 5:23, 9:9
**put** [4] - 3:22, 9:13, 40:12, 60:17
**putting** [1] - 9:6

**Q**

**questionable** [1] - 16:6
**questioning** [1] - 37:24
**questions** [7] - 6:14, 7:5, 16:13, 22:17, 30:2, 31:6, 31:10
**quite** [1] - 48:13
**quote** [1] - 34:8

**R**

**race** [1] - 9:23
**raise** [1] - 4:21
**raised** [4] - 12:9, 25:19, 29:21, 52:8
**raises** [2] - 4:11, 5:25
**raising** [2] - 16:23, 25:23
**ranges** [3] - 57:13, 57:14, 57:23
**rata** [1] - 23:11
**rather** [1] - 2:20
**read** [5] - 4:19, 6:4, 9:5, 45:20
**reading** [2] - 9:16, 10:18
**reads** [2] - 40:18, 43:3
**real** [1] - 48:20
**Real** [1] - 50:8
**realize** [2] - 21:11, 28:5
**realized** [1] - 8:1
**realizes** [1] - 27:17
**really** [16] - 16:11, 21:19,

23:14, 23:24, 26:23, 27:11, 27:20, 29:14, 37:15, 48:9, 48:10, 49:23, 51:7, 52:5, 55:7, 59:3
**realm** [1] - 35:7
**reason** [7] - 5:2, 5:23, 17:18, 19:25, 30:18, 54:14, 54:21
**reasonable** [2] - 5:5, 52:10
**reasonably** [2] - 46:15, 66:4
**reasons** [7] - 31:17, 34:2, 36:8, 36:9, 36:17, 52:8, 61:6
**receipt** [1] - 45:15
**receive** [1] - 3:6
**received** [2] - 21:18, 21:19
**recently** [4] - 13:1, 13:2, 13:7, 21:18, 55:2
**recognized** [1] - 23:17
**record** [11] - 2:5, 30:4, 31:12, 31:14, 32:17, 39:19, 40:9, 43:20, 44:8, 65:7, 68:11
**recorded** [1] - 1:25
**recording** [4] - 16:21, 21:17, 21:20, 29:9
**records** [36] - 11:18, 14:9, 14:14, 15:13, 15:22, 28:16, 28:21, 41:14, 41:15, 41:19, 43:14, 43:22, 44:2, 44:4, 44:5, 44:18, 44:22, 44:25, 45:1, 45:7, 49:15, 49:16, 53:18, 60:10, 60:19, 62:8, 63:1, 63:20, 63:23, 64:1, 65:24, 67:16, 67:17, 68:13, 68:23
**redact** [1] - 24:17
**reference** [3] - 42:11, 43:1, 59:15
**referred** [4] - 5:3, 18:24, 42:25, 46:4
**refers** [2] - 41:3, 41:4
**reflected** [1] - 41:22
**refrain** [1] - 6:22
**refuted** [1] - 11:25
**refutes** [1] - 25:4
**regard** [3] - 7:12, 56:13, 67:24
**regarding** [24] - 13:18, 16:13, 25:8, 25:20, 28:7, 31:7, 35:9, 40:1, 45:3, 48:17, 50:12, 50:22, 50:23, 50:24, 51:5, 51:8, 54:1, 59:19, 59:21, 62:8, 63:13, 68:12, 68:25, 69:8
**regardless** [1] - 9:18
**regards** [2] - 16:4, 19:16
**relate** [2] - 50:14, 67:20
**related** [11] - 7:6, 9:23,

14:4, 21:5, 33:23, 43:7,
45:18, 50:6, 51:16, 52:19,
61:11
**relates** [11] - 6:12, 9:1,
9:24, 32:6, 33:23, 37:6,
44:15, 63:6, 63:21, 69:19
**relating** [2] - 50:6, 60:4
**relationship** [1] - 65:4
**relatively** [1] - 58:15
**release** [1] - 43:7
**relevance** [2] - 47:10,
48:14
**relevant** [18] - 25:14,
40:16, 40:20, 54:1, 54:9,
54:10, 57:14, 58:17, 59:13,
60:9, 60:16, 61:1, 64:1,
65:12, 66:2, 67:12, 69:9,
69:23
**reliable** [1] - 4:6
**relied** [1] - 18:11
**relief** [1] - 37:2
**reluctant** [1] - 3:22
**remarks** [1] - 3:19
**remedy** [1] - 59:11
**removed** [7] - 12:17, 16:6,
17:9, 24:17, 25:1, 25:10,
25:17
**reoccurring** [1] - 30:11
**repeat** [1] - 40:8
**reply** [3] - 3:6, 3:9, 7:11
**report** [2] - 13:23, 19:16
**Reporter** [1] - 1:22
**reports** [2] - 22:2, 42:17
**representation** [2] - 44:25,
59:17
**representations** [2] - 23:4,
33:15
**represented** [3] - 5:14,
5:18, 24:4
**representing** [1] - 5:22
**request** [10] - 2:19, 4:7,
6:25, 40:11, 40:13, 42:12,
60:17, 62:4, 65:6, 67:11
**requested** [5] - 36:16,
40:22, 41:10, 42:9, 63:9
**requesting** [2] - 42:5, 50:4
**requests** [10] - 41:2, 41:20,
60:19, 60:25, 61:12, 61:14,
65:11, 65:18, 67:19, 67:20
**require** [3] - 27:24, 32:21,
66:23
**required** [1] - 33:19
**requiring** [1] - 65:22
**resolved** [2] - 69:5, 69:7
**respect** [27] - 3:9, 22:16,
22:22, 23:13, 24:1, 25:13,
31:12, 31:16, 35:14, 35:18,
35:23, 35:24, 36:2, 36:3,
37:2, 40:17, 40:24, 45:21,
48:14, 52:8, 52:15, 53:15,

62:6, 65:8, 65:24, 68:13
**respectfully** [3] - 39:3,
45:11, 62:11
**respective** [3] - 40:23,
62:9, 63:5
**respond** [8] - 3:13, 22:12,
22:23, 26:7, 41:17, 46:18,
61:24, 66:19
**responded** [1] - 27:1
**responding** [1] - 27:2
**response** [7] - 9:25, 24:23,
39:17, 45:24, 52:16, 53:14,
62:21
**responsibilities** [1] - 5:13
**responsibility** [2] - 33:7,
51:22
**responsible** [4] - 5:7,
18:16, 19:6
**rest** [3] - 22:18, 31:7, 43:24
**restrictions** [1] - 58:25
**result** [1] - 30:11
**resulted** [1] - 4:17
**retain** [2] - 40:4, 59:10,
68:20
**retaining** [1] - 54:21
**retains** [1] - 59:8
**return** [2] - 14:17, 56:14
**returned** [8] - 8:7, 13:21,
14:1, 14:12, 54:13, 68:5,
69:6, 69:17
**reveal** [1] - 60:1
**revealed** [2] - 27:23, 43:13
**review** [20] - 4:5, 6:10,
13:19, 16:13, 32:17, 36:6,
48:1, 53:22, 55:23, 58:7,
58:9, 58:13, 58:24, 59:2,
59:4, 68:15, 68:18, 68:25,
69:12, 69:18
**reviewed** [5] - 19:3, 19:16,
35:17, 40:16, 55:15
**reviewing** [2] - 3:20, 55:17
**revise** [1] - 69:22
**Richard** [1] - 2:10
**RICHARD** [1] - 1:17
**rider** [1] - 60:8
**rise** [1] - 35:10
**risk** [1] - 45:7
**Robert** [1] - 2:13
**ROBERT** [1] - 1:19
**role** [1] - 5:10
**rule** [3] - 37:15, 53:17,
67:10
**Rule** [9] - 40:13, 42:10,
45:11, 46:11, 48:1, 48:12,
51:12, 52:18, 65:16
**rules** [1] - 37:17
**ruling** [5] - 31:11, 31:14,
65:7, 65:14, 67:24
**rulings** [1] - 30:21
**run** [1] - 48:21

**running** [1] - 30:8
**RUSSO** [1] - 1:19

## S

**safe** [1] - 49:19
**Sag** [3] - 49:6, 52:20, 53:4
**sake** [1] - 23:22
**sale** [1] - 52:20
**satisfied** [1] - 13:11
**saw** [2] - 10:6, 10:9
**Schedule** [1] - 41:2
**Scheindlin** [3] - 46:5,
46:10, 60:23
**scheme** [2] - 15:25, 38:18
**school** [1] - 37:14
**Schwab** [20] - 41:21, 41:25,
42:2, 42:6, 42:12, 42:15,
47:3, 47:5, 47:11, 60:11,
62:19, 62:23, 63:3, 63:6,
63:11, 63:14, 63:15, 63:20,
64:3
**search** [9] - 18:23, 55:7,
55:14, 55:16, 55:17, 56:8,
56:23, 57:16, 57:23
**searches** [2] - 57:1, 57:13
**searching** [2] - 55:13,
57:20
**seated** [1] - 2:11
**Second** [6] - 32:4, 32:12,
34:4, 34:6, 34:19
**second** [3] - 9:3, 32:11,
68:9
**secondly** [1] - 49:12
**sections** [1] - 55:4
**securities** [1] - 47:8
**see** [16] - 11:19, 16:22,
17:16, 18:5, 22:6, 26:24,
27:7, 27:14, 33:18, 43:12,
51:11, 52:4, 56:16, 58:16,
58:20, 69:25
**seeing** [1] - 57:19
**seek** [1] - 33:1
**seeking** [2] - 46:3, 67:6
**seeks** [1] - 35:19
**seem** [1] - 51:5
**sees** [1] - 27:16
**seize** [1] - 40:4
**seized** [2] - 40:6, 55:8
**selective** [2] - 4:15, 4:16
**selectively** [2] - 8:5, 8:11
**self** [4] - 30:5, 30:7, 37:18,
37:22
**self-exculpate** [1] - 30:7
**self-exculpatory** [1] - 30:5
**self-serving** [2] - 37:18,
37:22
**seller** [1] - 53:2
**semblance** [1] - 8:16

**sends** [1] - 15:19
**sense** [1] - 4:8
**sensitive** [1] - 66:25
**sent** [5] - 18:25, 23:24,
45:4, 45:5, 49:16
**sentiment** [1] - 58:2
**separate** [4] - 9:7, 16:16,
18:2, 32:16
**Sergei** [1] - 9:6
**seriously** [1] - 51:19
**serving** [3] - 14:3, 37:18,
37:22
**set** [6] - 39:25, 41:1, 43:16,
44:2, 63:22, 64:8
**settlement** [7] - 7:6, 8:22,
13:5, 19:1, 19:4, 21:5,
21:22
**seven** [1] - 60:11
**severance** [16] - 16:18,
17:8, 17:19, 17:20, 17:25,
20:7, 29:4, 29:21, 30:18,
31:4, 31:7, 31:16, 31:24,
32:10, 32:21, 33:19
**shadow** [1] - 5:10
**share** [1] - 24:5
**shares** [1] - 23:11
**Sheindlin's** [1] - 66:12
**shift** [2] - 30:7, 32:24
**shifted** [1] - 22:20
**shifting** [1] - 30:18
**short** [3] - 55:1, 58:15,
69:23
**show** [6] - 14:13, 15:13,
23:23, 24:3, 27:13, 46:13
**showed** [2] - 11:3, 25:21
**showing** [8] - 36:8, 61:2,
61:21, 66:1, 66:3, 66:6,
66:16
**shown** [1] - 15:23
**side** [1] - 55:20
**sidebars** [1] - 30:11
**sifting** [1] - 53:18
**sight** [1] - 40:4
**sign** [4] - 43:7, 60:19,
67:15, 67:23
**signature** [3] - 42:18, 48:9,
63:12
**signatures** [1] - 63:8
**signed** [9] - 42:13, 43:2,
43:10, 45:14, 45:20, 48:4,
48:10, 59:24, 62:5
**significant** [2] - 5:8, 39:21
**similar** [1] - 43:15
**similarly** [4] - 35:13, 38:8,
38:23, 39:1
**simple** [1] - 21:3
**simpler** [1] - 20:20
**simply** [5] - 4:9, 23:17,
40:4, 47:12, 56:7
**single** [2] - 25:20, 44:7

**sit** [2] - 65:10, 65:13
**sitting** [1] - 10:15
**situation** [7] - 8:15, 12:25, 18:5, 29:1, 33:3, 68:7
**situations** [2] - 32:23, 33:18
**skirted** [1] - 5:13
**solicit** [1] - 55:10
**soon** [1] - 11:12
**sorry** [3] - 15:9, 36:15, 49:3
**sort** [2] - 27:20, 31:4
**sorts** [1] - 30:4
**Southern** [7] - 4:25, 6:7, 38:2, 38:7, 38:13, 46:6, 66:14
**specific** [11] - 11:23, 11:25, 12:17, 12:18, 16:2, 21:23, 25:17, 41:11, 42:6, 48:17, 62:2
**specifically** [10] - 14:6, 23:7, 38:1, 41:2, 41:4, 46:7, 49:17, 51:16, 57:18, 60:25
**specificity** [1] - 16:6
**spend** [1] - 39:6
**spent** [5] - 13:12, 13:14, 13:24, 25:21, 64:16
**spoken** [2] - 25:3, 26:18
**stage** [7] - 23:21, 29:16, 30:15, 55:6, 56:12, 68:9, 69:10
**stages** [1] - 8:9
**stand** [7] - 10:12, 19:13, 27:7, 30:24, 31:1, 31:2, 44:16
**standard** [20] - 7:20, 18:1, 34:3, 35:1, 36:20, 46:5, 52:12, 52:13, 60:21, 60:23, 64:6, 64:15, 65:15, 65:16, 65:22, 66:12, 66:13, 66:16
**standards** [3] - 46:2, 46:9, 46:10
**standing** [1] - 32:15
**stands** [2] - 31:21, 42:21
**start** [2] - 14:18, 41:20
**started** [1] - 6:6
**state** [1] - 2:4
**statement** [3] - 29:15, 36:23, 45:18
**STATES** [3] - 1:1, 1:3, 1:11
**States** [14] - 1:6, 1:14, 1:16, 2:2, 2:7, 32:4, 32:11, 34:5, 34:12, 34:18, 34:19, 59:2, 64:12, 65:15
**status** [1] - 22:2
**stay** [1] - 39:13
**stays** [1] - 62:5
**Steiger** [1] - 1:22
**stem** [1] - 19:5
**Stempel** [1] - 13:9

**stenography** [1] - 1:25
**Stevenson** [1] - 38:12
**still** [1] - 52:13
**stipulated** [1] - 54:9
**stipulation** [1] - 69:8
**stipulations** [1] - 55:11
**stole** [3] - 52:24, 52:25, 53:9
**stolen** [2] - 27:18, 53:11
**story** [1] - 20:25
**streamline** [1] - 24:16
**strike** [1] - 50:10
**strong** [2] - 51:7, 51:17
**strongest** [1] - 23:17
**stuff** [1] - 56:1
**submission** [2] - 22:18, 29:11
**submit** [2] - 39:3, 45:11
**submitted** [1] - 39:16
**submitting** [1] - 65:8
**subpoena** [19] - 40:20, 40:22, 41:20, 42:6, 43:13, 44:11, 44:18, 44:21, 52:7, 60:3, 60:12, 60:19, 61:10, 62:7, 62:12, 62:14, 63:15, 65:6, 65:17
**subpoenaed** [2] - 43:14, 44:17
**subpoenas** [12] - 39:12, 40:14, 41:10, 43:11, 45:12, 46:1, 46:12, 46:15, 59:16, 67:15, 67:24, 69:21
**subsequent** [1] - 57:1
**subsequently** [1] - 7:14
**substance** [1] - 17:14
**substantial** [4] - 13:17, 18:18, 25:16, 25:18
**substantially** [1] - 17:21
**sucked** [1] - 49:6
**suddenly** [1] - 27:15
**sue** [2] - 8:20, 16:9
**sued** [1] - 28:11
**sufficient** [7] - 17:25, 32:9, 33:25, 35:11, 35:16, 36:5, 61:21
**sufficiently** [1] - 52:4
**suggested** [2] - 56:6, 59:5
**suggesting** [1] - 57:11
**suggestion** [1] - 59:1
**suggests** [2] - 47:1, 59:11
**suit** [2] - 6:23, 28:15
**summary** [5] - 32:5, 34:5, 34:22, 45:17, 45:22
**superseding** [9] - 11:22, 12:16, 14:20, 23:15, 24:17, 24:25, 26:1, 38:4, 59:16
**supplemental** [1] - 7:15
**supplementing** [1] - 51:11
**support** [5] - 8:16, 21:11,

34:23, 39:16, 65:22
**supported** [2] - 4:7, 39:18
**supporting** [1] - 50:4
**suppress** [3] - 68:1, 68:3, 69:15
**suppressed** [1] - 68:9
**suppression** [3] - 54:23, 59:12, 68:3
**Supreme** [4] - 34:4, 34:11, 34:13, 34:17
**survive** [1] - 56:17
**suspect** [4] - 30:1, 30:10, 30:13, 62:10
**suspicion** [2] - 46:14, 66:17
**sworn** [1] - 24:8
**Sydor** [1] - 38:7
**system** [1] - 37:9

**T**

**tailored** [2] - 41:11, 41:14
**tailoring** [1] - 41:15
**taint** [2] - 55:23, 68:25
**talks** [1] - 14:5
**tape** [7] - 17:7, 17:13, 17:14, 17:18, 29:9, 31:21
**targeted** [1] - 60:25
**team** [11] - 9:23, 55:23, 58:7, 58:8, 58:9, 58:13, 58:24, 59:2, 59:3, 68:25, 69:1
**telephone** [1] - 2:17
**telephonic** [1] - 7:15
**temporarily** [1] - 23:21
**ten** [1] - 46:22
**tend** [1] - 66:9
**terabyte** [1] - 56:2
**term** [1] - 23:6
**terms** [9] - 4:24, 5:25, 8:21, 16:12, 21:3, 62:5, 64:19, 65:23, 68:2
**testified** [11] - 18:6, 37:25, 38:1, 38:8, 38:12, 38:14, 38:20, 38:23, 39:1, 39:2, 61:16
**testify** [4] - 13:22, 17:11, 49:4, 51:9
**testifying** [2] - 50:12, 51:3
**testimony** [19] - 8:6, 8:11, 26:10, 32:19, 32:20, 32:25, 33:4, 33:5, 33:13, 34:21, 38:1, 38:3, 38:6, 38:11, 38:19, 38:22, 38:25, 39:4
**text** [1] - 50:4
**THE** [54] - 1:11, 2:1, 2:8, 2:12, 2:22, 2:25, 3:2, 3:3, 6:2, 6:17, 7:7, 9:3, 10:18, 16:17, 16:20, 17:24, 19:18,

20:12, 22:9, 22:12, 22:19, 26:8, 29:3, 31:9, 36:15, 39:6, 39:12, 41:13, 43:20, 44:7, 45:23, 47:13, 49:25, 50:3, 50:18, 50:22, 51:2, 51:20, 52:14, 53:13, 53:19, 53:24, 54:7, 55:13, 56:21, 57:24, 60:3, 61:25, 62:18, 63:15, 65:2, 70:4, 70:6, 70:8
**theft** [1] - 19:7
**themselves** [1] - 18:23
**theory** [8] - 8:17, 8:18, 10:7, 24:18, 49:23, 56:21, 57:1, 63:2
**therefore** [2] - 55:10, 55:25
**they've** [1] - 26:14
**thinks** [1] - 57:5
**third** [1] - 44:11
**third-party** [1] - 44:11
**thirdly** [1] - 49:13
**thorough** [1] - 56:23
**three** [2] - 16:4, 64:24
**throughout** [1] - 27:23
**tiny** [1] - 23:18
**today** [4] - 39:8, 40:11, 40:12, 61:6
**Tommy** [1] - 2:3
**TOMMY** [1] - 1:7
**tone** [1] - 12:13
**took** [5] - 19:24, 20:23, 24:19, 54:5
**total** [1] - 57:10
**transaction** [3] - 42:12, 42:17, 61:11
**transactions** [4] - 40:23, 41:3, 57:22, 64:18
**transcript** [3] - 1:25, 6:11, 36:7
**TRANSCRIPT** [1] - 1:10
**transfer** [4] - 24:2, 42:2, 42:20, 63:10
**transferred** [3] - 62:22, 62:25, 63:14
**transfers** [4] - 23:13, 63:3, 63:16, 63:17
**transpired** [2] - 16:11, 41:22
**trial** [43] - 5:11, 11:1, 17:16, 18:2, 22:5, 25:22, 26:10, 27:23, 30:2, 30:3, 30:14, 30:20, 31:13, 32:15, 37:7, 40:13, 48:7, 48:10, 49:14, 51:10, 56:8, 60:13, 60:24, 61:3, 61:4, 61:21, 61:23, 65:17, 65:25, 66:4, 66:7, 66:8, 66:9, 66:23, 67:3, 67:4, 67:13, 69:1, 69:10, 69:12, 69:14
**trials** [1] - 32:16

**tried** [2] - 7:1, 22:2
**Trimont** [1] - 50:8
**trolling** [1] - 57:18
**trouble** [1] - 3:1
**Trust** [15] - 42:3, 42:13, 42:15, 43:4, 43:6, 43:20, 43:22, 44:8, 47:9, 47:18, 49:15, 62:23, 63:7, 63:17, 63:23
**trusts** [1] - 37:14
**try** [5] - 6:2, 27:12, 28:15, 30:14, 68:21
**trying** [6] - 8:15, 8:19, 8:20, 28:11, 30:12, 51:11
**Tucker** [3] - 46:7, 66:12, 66:13
**turn** [1] - 51:18
**turned** [3] - 52:18, 56:19, 58:14
**twist** [1] - 27:21
**two** [10] - 6:9, 6:23, 16:10, 19:9, 26:21, 28:9, 32:3, 39:9, 65:19, 69:11
**type** [1] - 30:5
**Tyson** [1] - 6:21

# U

**U.S** [3] - 34:12, 34:18, 65:16
**ultimately** [3] - 22:25, 23:21, 27:20
**unaware** [2] - 43:18, 48:11
**unbelief** [1] - 12:13
**under** [13] - 15:20, 29:19, 33:8, 37:25, 46:2, 58:23, 61:17, 63:10, 65:14, 65:22, 66:11, 66:16, 67:10
**understood** [2] - 13:14, 48:19
**unduly** [3] - 46:16, 46:17, 66:18
**UNITED** [3] - 1:1, 1:3, 1:11
**United** [14] - 1:6, 1:14, 1:16, 2:2, 2:7, 32:4, 32:11, 34:5, 34:12, 34:18, 59:2, 64:11, 65:15
**unknown** [1] - 5:10
**unless** [1] - 29:13
**unreasonably** [1] - 66:9
**unreliable** [1] - 34:9
**unusual** [2] - 4:25, 27:20
**up** [6] - 10:12, 14:19, 44:16, 53:7, 58:20, 69:12
**utilize** [1] - 45:16
**utilized** [2] - 42:3, 45:9

# V

**valid** [1] - 34:13
**validity** [1] - 35:7
**variety** [1] - 59:18
**various** [6] - 3:4, 40:24, 41:23, 46:23, 51:13, 67:1
**venture** [8] - 15:9, 50:7, 50:13, 50:18, 50:21, 50:23, 51:3, 51:16
**ventures** [1] - 50:25
**versed** [1] - 4:4
**version** [2] - 17:12, 35:22
**victim** [8] - 13:20, 15:5, 15:6, 15:24, 20:17, 28:5, 49:25, 61:10
**victims** [21] - 25:1, 25:7, 25:9, 25:15, 25:16, 26:3, 26:10, 26:17, 26:25, 27:14, 33:16, 35:15, 47:4, 48:2, 48:4, 48:6, 48:16, 48:23, 49:18, 51:14, 52:25
**view** [5] - 8:13, 13:16, 64:2, 65:5, 65:15
**violation** [1] - 31:4
**virtually** [1] - 29:23
**voice** [1] - 12:13
**volume** [2] - 56:10, 57:21
**voluminous** [5] - 30:14, 53:18, 57:4, 68:13, 68:24
**vs** [8] - 2:2, 32:4, 32:11, 34:5, 34:12, 34:17, 34:19, 65:15

# W

**wait** [5] - 8:23, 11:16, 16:2, 58:9, 61:15
**walk** [1] - 58:5
**wall** [1] - 55:21
**wants** [1] - 66:25
**warrant** [14] - 4:14, 18:2, 18:23, 22:7, 36:4, 36:9, 37:1, 40:3, 56:9, 56:24, 57:3, 57:16, 68:9, 68:10
**warranted** [1] - 31:24
**Westlaw** [1] - 66:14
**whatsoever** [1] - 58:17
**white** [1] - 27:21
**whole** [1] - 65:3
**Williams** [1] - 34:12
**willing** [2] - 67:14, 69:3
**wire** [2] - 23:13, 24:2
**wish** [2] - 3:12, 30:17
**withheld** [1] - 29:2
**withhold** [1] - 8:12
**withholding** [4] - 4:16, 12:10, 12:11, 28:21

**withholds** [1] - 15:22
**witness** [5] - 6:13, 6:14, 14:15, 36:23, 43:2
**witnesses** [15] - 6:23, 8:19, 8:21, 12:10, 12:11, 16:10, 22:5, 25:6, 27:5, 27:6, 30:2, 30:3, 37:25, 51:23, 67:2
**woefully** [1] - 65:21
**word** [2] - 21:21, 23:14
**words** [3] - 57:13, 57:17, 65:20
**works** [1] - 37:9
**Worth** [1] - 50:7
**worthiness** [1] - 23:5
**writing** [1] - 65:13
**written** [1] - 31:12

# Y

**year** [2] - 8:8, 62:16
**year-and-a-half** [1] - 8:8
**years** [14] - 5:1, 26:15, 27:18, 41:13, 41:14, 46:23, 49:15, 60:10, 60:19, 62:20, 62:25, 67:15, 67:17
**YORK** [1] - 1:1
**York** [11] - 1:6, 1:15, 1:23, 5:1, 5:4, 5:15, 24:8, 38:3, 38:8, 38:13, 66:15