2928

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA

                                   CR-13-607


            -against-         :

                                   United States Courthouse
                                   Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

      Defendants.            :
                                   June 8, 2015
- - - - - - - - - - - - - - - X   9:30 a.m.

                TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the Government:        KELLY T. CURRIE
                           Acting United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  JAMES MISKIEWICZ, ESQ.
                                SARITHA KOMATIREDDY, ESQ.
                           Assistant United States Attorney




For the Defendants:        HALEY, WEINBLATT & CALCAGNI
                           One Suffolk Square
                           1601 Veterans Memorial Highway
                           Islandia, NY  11749
                           BY: RICHARD HALEY, ESQ.
                           For Mr. Kenner

2929

For the Defendants:

                        LARUSSO & CONWAY
                        300 Old Country Road
                        Mineola, NY  11501
                        BY: ROBERT LARUSSO, ESQ.
                        For Mr. Constantine

                        ANDREW L. OLIVERAS, ESQ.
                        26 Strangford Court
                        Oceanside, NY  11572
                        For Mr. Constantine

Court Reporter:         Mary Ann Steiger
                        100 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6101

              Proceedings recorded by mechanical stenography.
                   Transcript produced by computer.

2930

THE CLERK:  All rise.

THE COURT:  Please be seated.

(Case called, appearances noted.)

THE COURT:  The jurors aren't all here, but we
have a few matters to discuss while we're waiting.

The first one, as was previewed to me last week,
we did receive a motion to quash the subpoena with respect
to Mr. Richards, and I have the government's letter in
response to that.

We don't have to discuss this now, obviously
Mr. LaPinta is not here.

Is Mr. Richards in New York today, or you don't
know?

MR. MISKIEWICZ:  No.  Actually, we have
attempted to get him.  We need to fly him in.  He's
resisting, given the basic information, so I believe he's
still somewhere on the West Coast.

THE COURT:  So we could -- Mr. LaPinta is
available, he said, today or tomorrow.  Do you want to try
to have him come in at lunch today?

MR. MISKIEWICZ:  That's fine.

THE COURT:  I will have Michelle call and see if
he's available at lunch.

MR. HALEY:  The other suggestion was perhaps we
could have him come at the end of the day rather than

break up a witness.

THE COURT:  I have something at 4:30 today, so I can't do it today.  Hopefully, he won't break up a witness. I don't think the issue is that complicated.

MR. HALEY:  My only thought on that, is Glen Murray going to be called today, do you know?

MR. MISKIEWICZ:  No.

MR. HALEY:  Thank you, Judge.  My only thought was that if that witness would be broken up.  I think it's a non-issue.

MR. LA RUSSO:  I apologize to the Court.

I got a call, I got a visit yesterday from Michael Soroka.  He told me he's been retained by Mr. Richards.  I don't know if the Government is aware of it.  I know he was in contact with him.

THE COURT:  When my deputy calls Mr. LaPinta, if he's changed lawyers, we will find that out.

MR. LA RUSSO:  I don't know if he's changed lawyers. He didn't tell me that. He said he was just another lawyer working with Mr. LaPinta.

THE COURT:  Okay.  I'm sure Mr. LaPinta will let us know if there's two lawyers involved.

One other thing was Mr. Oliveras did fax a letter from a Ms. Lagarde regarding her unavailability.

I assume, Mr. Haley, you have seen that letter?

2932

MR. HALEY: I have not, Judge.

THE COURT: Has the government given it some thought? Is there a stipulation regarding her testimony?

MR. MISKIEWICZ: No. We did discuss that last week, I think, or the week before.

Counsel indicates Mr. Constantine is unwilling to stipulate to anything that she would testify to, although we take issue with the characterization of what we would ask her to testify to. That's completely inaccurate.

The bottom line is they don't want to consent, and that's fine. We think she's maybe a 10 or 15 minute witness.

We understand that she has a family emergency. I think her father is in surgery in Louisiana. We indicated to her we didn't want to interrupt that, and that we would seek permission from the Court at the conclusion of this week when we rest our case in chief just to reserve the right to call her either next week or potentially the following week when she would be available.

We were advised yesterday, over the weekend at some point, that counsel for Mr. Constantine agreed with that, and then we got an e-mail late yesterday from counsel, Mr. Oliveras, indicating Mr. Constantine doesn't

2933

want to consent to that.

So obviously the decision is up to your Honor as to whether or not to permit us to reopen for essentially a ten minute witness, similar to many of the other attorneys who would testify about the diversion, yet another diversion of funds used by defendant Constantine in this case to do a variety of work, but particularly building a helipad or heliport on this personal property.

THE COURT: You've been in contact with her since you saw this letter, or you haven't spoken to her about it?

MR. MISKIEWICZ: Just by e-mail. I'm not sure which letter your Honor is referring to.

THE COURT: The June 6th letter to me.

MR. MISKIEWICZ: Yes.

Insofar as she says there's been -- we haven't really asked her to testify about anything about her knowledge of Mr. Constantine's intentions or whatever.

All we want, like every other attorney witness, her to say is she got paid, traced the money, produced the bill. We would then trace where that came from and in a nutshell it's a pretty simple piece of testimony.

MR. LA RUSSO: Your Honor, to complete the record, the government did provide us with a stipulation regarding her testimony. I reviewed it and at first I

2934

didn't see any problem with it.

My client advised me that one of the paragraphs is really a request to factually agree to certain aspects of these bills, which are completely opposite to our information, so we couldn't stipulate because the facts are different.  They're in contest regarding the billing, and that's the reason why the stipulation wasn't signed. We did review it, but we couldn't do it.

THE COURT:  That's fine.

I'm curious as to why you wouldn't allow the Government to reopen their case and take her out of order.

If her father is dying in Louisiana, I don't want her to fly up this week while her father is dying.

Is there a reason why you won't let the government reopen their case?

MR. LA RUSSO:  Your Honor, candidly with the Court, when I saw the letter, that's exactly what my initial reaction was and I didn't see a problem with it. I don't have a problem with it procedurally because it's within the Court's discretion to do so.

The only concern was the disruption of the witnesses that we will put on.  That came about after we made the offer to the government to be able to do it at some point later on.  So yes, your Honor, we were very concerned about that.  Our immediate reaction was to make

2935

that accommodation.

I'm understanding, Judge, and I'm learning this for the first time.  Mr. Oliveras has been in touch with her, I have not, and I understand that she would like to come sooner rather than later.

THE COURT:  Okay.  We may be wasting time talking about reopening the case because someone should contact her.  I presume the Government should contact her and tell her we need you for 10 minutes at some point this week.  We will take her out of turn this week as soon as she's available this week, and she can go back to Louisiana to be with her father.

MR. MISKIEWICZ:  We will do that.

We have one more application regarding this, and that is Mr. Constantine be directed to have no further contact with this witness because it seems like every time we do speak to her, or have even e-mail contact with her, she's reporting back information that didn't come from us.

We heard in this case other witnesses were advised they didn't have to show up, they weren't necessary.  Again, not from us.

We would just ask that Mr. Constantine be advised that his lawyers should contact her, if anyone, and that he really should desist from advising people about what their testimony is going to be about, whether

2936

they should be present here in the Eastern District of New York.

MR. LA RUSSO:  Your Honor, may I just respond briefly.

Mr. Oliveras has been handling this and the Court should be aware how we're handling it.  I haven't. May I ask him to make a statement regarding the contact with the witness?

MR. OLIVERAS:  First of all, Mr. Constantine has yet to contact any witnesses without his lawyers on the phone from today one.  Even if you knew the government witness or anybody related to this case, he's wants me on the phone.

I was the one who initiated the call and to initiate contact and see if someone was willing to speak with him -- with me on the phone.

He's never ever once told anybody not to show up.  That's patently false.  And especially with Ms. Lagarde, we told her -- I called her, I spoke to her. She reached out to me because she wasn't getting a response.  She didn't know why she needed to come.  I told her she needed to come because she's called and to tell the truth.  That's our common theme with everybody.

THE COURT:  Okay.  All right.  I think we spent enough time on that issue.

2937

Let me know after you speak with her what she says.

MR. MISKIEWICZ:  Will do.

THE COURT:  Juror number seven has provided a letter which we will make copies of so you can look at the letter itself.

It's from her employer, Chipotle.  She's a manager in Deer Park and they're claiming that it's affecting the operations of Chipotle not to have her there.  Please accept this letter as a humble request for immediate removal of juror number seven.  Let me speak to my deputy to see what her reaction to this is.

MR. HALEY:  Perhaps if we all had lunch at Chipotle it might resolve the issue.

THE COURT:  So what I'm thinking of doing with respect to this juror is to bring her out and tell her that we have a letter that we write to employers for this type of situation, and we're willing to call them or write a letter.  Usually I start with a letter.  But I don't want her to be worried about it.  I want to make sure she's not worried.  Any objection to bringing her out to talk to her?

MR. MISKIEWICZ:  No, your Honor.

MR. LA RUSSO:  No, your Honor.

MR. HALEY:  No, sir.

2938

THE COURT:  Okay.

(Juror number seven enters the courtroom.)

THE COURT:  Good morning, Ms. Pace.

JUROR NO. 7:  Good morning.

THE COURT:  I did get the letter you gave to
Michelle from your employer, and I wanted to speak to you
for a minute about that because obviously you have been
serving for a number of weeks and I want you to continue
to serve and not be worried about your employment, so let
me explain a few things.

First of all, it's against the law for them to
retaliate in any way for you serving on a jury.  They
can't take any adverse action against you, and usually big
companies like Chipotle are aware of that.

The second thing is this is not an unusual thing
to happen even when a juror works for a big company.  We
respond in two ways to this.  I want you to be comfortable
with what we do.

I can prepare a letter to respond to this
explaining we really need you to serve, you have to serve,
you don't have a choice.

JUROR NO. 7:  Yeah.

THE COURT:  My experience is usually that solves
the problem.

The second thing that we can do is I can

2939

actually speak to the person myself, but usually we reserve that until after the letter if they're still giving you a hard time about it.

I understand that obviously it's difficult for them, but they have to cope with the situation, all right?

So do you want me to prepare a letter that you can give to them?

JUROR NO. 7:  Yes, that will be great.

THE COURT:  I'll do that.

JUROR NO. 7:  Thank you so much.

THE COURT:  Thank you.

(Juror number seven returns to the jury room.)

THE COURT:  My deputy also told me Mr. Hoffman, who is the teacher, his students are graduating on June 25th.  He wants to continue to serve, but would like to go to the graduation; and, therefore, have a half day, and start in the afternoon on the 25th.

He also has some type of airline tickets for the 29th.  Again, he wants to stay and he was wondering if he gave a letter to the airlines if they would somehow give him a refund or not penalize him.  I'm not familiar with that.  We will work with him on that.

Are we ready to go?

MR. HALEY:  Your Honor, there is another issue I did alert your deputy to and I think it's important we

2940

address it now.

I received a long-awaited Northern Trust records
pursuant to the subpoena on Friday.  They were, however,
incomplete.  There were specific documents that I thought
would be made part of that record.

I spoke with Mr. Mark Dietz, and the government
can speak with him directly as well if they so desire.
His telephone number is (312) 444-7493.

I asked him, during the course of the
conversation, to look at his files and confirm that
certain documents that are in the file are maintained as
part of their business records, and specifically some of
those documents -- actually they are in connection with
the master note, Judge, promissory note, things of that
nature.

When I spoke with him on Friday, he said, oh,
yeah, we got those.  I said, well, they weren't delivered
through the subpoena.

The subpoena may have been -- it was his
interpretation of the subpoena.  I drafted it. Whether it
was too narrowly drawn or not, I don't know, but here's
the point, Judge.

I said, Mr. Dietz, we're reaching the end stage
of the trial.  I said, I'm going to speak with the
government and if I contact you and indicate as an officer

2941

of the Court that I've spoken with the government, would you then forward those documents along to me, and as an officer of the Court I will indeed send them along to the government as well as part of this submission without the need for a reservice of a subpoena, without the need for another business records certification.

I did make mention of that to Mr. Miskiewicz this morning, but I would like to have that authority to call him perhaps today to move this matter along under those circumstances.

THE COURT:  I hope he would be willing to do that.  You can tell him you discussed it with me and I'm hoping he's not going to require another subpoena.

MR. HALEY:  He was very cooperative in that regard, Judge, but I said I will make it a matter of record Monday morning.

THE COURT:  Okay.  Thank you.

MR. HALEY:  Thank you.

THE COURT:  Are we ready?

MS. KOMATIREDDY:  We have a couple of stipulations to read in before we continue.

THE COURT:  Let's bring in the jury.

THE CLERK:  All rise.

(The jury is present.)

THE COURT:  Please be seated.

2942

THE COURT: Good morning, members of the jury.

ALL JURORS:  Good morning.

THE COURT:  It's good to see everyone.  I hope you enjoyed your weekend.

We are ready to continue with the trial.  As you may remember, when we ended on Thursday, Mr. Manfredi was on the witness stand on direct examination so we will continue from that point.

Mr. Manfredi, I remind you that you're still under oath; do you understand?

THE WITNESS:  I do.


CHRISTOPHER MANFREDI,

      called as a witness, having been previously

      duly sworn, was examined and testified further

      as follows:


THE COURT:  Okay.

Go ahead, Ms. Komatireddy.

MS. KOMATIREDDY:  I want to read one stipulation before we continue with Mr. Manfredi.

THE COURT:  Is this in evidence?

MS. KOMATIREDDY:  Not yet.  The stipulation is marked stipulation 33.

THE COURT:  Any objection to stipulation 33

2943

being used?

             MR. LA RUSSO:  No, your Honor.

             MR. HALEY:  No, sir.

             THE COURT:  Stipulation 33 is admitted.

             (Government Exhibit 33 in evidence.)

             MS. KOMATIREDDY:  I'm going to read the first

paragraph.

             Government Exhibits 2404, 2405, 2407 through

2412, 2413, 2415, 2417, 2419 through 2439, 2501-A, 2501-B,

2502-A, 2502-B, 2503-A, 2503-B, and 5107 are title company

records and we move the admission of those records at this

time.

             THE COURT:  Any objection?

             MR. LA RUSSO:  No, your Honor.

             MR. HALEY:  No, sir.

             THE COURT:  The exhibits referred to in the

stipulation are all admitted.

             (Government Exhibits 2404, 2405, 2407 through

2412, 2413, 2415, 2417, 2419 through 2439, 2501-A, 2501-B,

2502-A, 2502-B, 2503-A, 2503-B and 5107 in evidence.)

             MS. KOMATIREDDY:  We're also going to move at

this time for the admission of exhibits that we already

disclosed to the defense last week, photographs marked

Government's Exhibit 915 through 921, certified copies of

deeds from the Hawaiian Bureau of Advances marked 9000

2944

through 9003-C, 9021-C, 9022-C, 9011-C and 9012-C, 9031

through 9032-C, 9041-C, 9037-C and 9071-C through 9078-C.

             THE COURT:  Any objection?

             MR. LA RUSSO:  No, your Honor.

             MR. HALEY:  No, sir.

             THE COURT:  Those exhibits are also admitted

into evidence.

             (Government Exhibits 915, 921, 9000 through

9003-C, 9021-C, 9022-C, 9011-C, 9012-C, 9031 through

9032-C, 9041-C, 9037-C, 9071-C through 9078-C in

evidence.)


DIRECT EXAMINATION

BY MS. KOMATIREDDY:

Q.    Mr. Manfredi, when we left off on Thursday, you were

talking about your role in the Hawaiian project and

Mr. Kenner's role.

             You had talked a little bit about what

Mr. Kenner had told you about himself.

             Do you remember that?

A.    Yes.

Q.    And I asked if he had sent you anything, and you said

an article from a magazine.

             I direct you to what's in evidence as

Government's Exhibit 726-L, and turning to page 66.

2945

Do you recognize that?

A.    Yes.

Q.    What is it?

A.    It's an article from Money Magazine from August 2001,
talks about the best advice money can buy is the cover
story, Michael Jordan on the cover, and page 66 details
Mr. Phil Kenner and his clients.

Q.    Is that the article that he sent you?

A.    Yes, in pdf form.

Q.    Pdf form by e-mail?

A.    Yes.

Q.    And you talked about how, as you went forward in this
project, that you were the person on the ground scouting
out property, and Mr. Kenner's role was to bring in the
financing; is that fair?

A.    Yes.

Q.    So let's talk a little bit about the project itself
and the land you acquired.

       Beginning with Little Honuapo, do you in fact
end of closing on that first 258 acre parcel that you
found?

A.    Yes.

Q.    I'm going to put up for the jury Government's Exhibit
917 in evidence.

       What are we looking at here?

2946

A.    That's the view from Honuapo.  Actually, that's the

north shoreline of Honuapo Bay.

Q.    When you closed on the property -- I'm going to

display for the jury 9071-C in evidence.

        Do you recognize this deed?

A.    Yes.

Q.    The tax map key number is at the bottom?

A.    Yes.

Q.    What's that deed for?

A.    That's for Little Honuapo or what we called at that

time 258.

Q.    And what was the date that you closed on or this deed

was recorded for Little Honuapo?

A.    December 24, 2003.

Q.    If you look at the grantor and the grantee, it looks

like this property is going from Kau Agrabusiness to Big

Isle IV Ventures, did I read that correctly?

A.    Yes.

Q.    Who controlled Big Isle IV Ventures?

A.    The managing member was Phil Kenner.

Q.    I'm going to turn to what's in evidence as

Government's Exhibit 5107.

        What was the purchase price for this property?

A.    $723,951.61.

Q.    And who provided the money to close on this property?

2947

A.    I don't know specifically where the money came from,
but it came through Phil Kenner and/or his clients.

Q.    So after you closed on Little Honuapo, do you end up
closing on any other properties?

A.    Yes.

Q.    Which one?

A.    I closed on what we called at that time 1500.

Q.    What do you call it now?

A.    It was later referred to as Honuapo.

Q.    I'm going to turn to what's in evidence as
Government's Exhibit 915.

        Can you describe what we're looking at there?

A.    That's the mountain view from the higher elevation of
that property.

Q.    When you say that property, you're referring to
Honuapo?

A.    Yes.

Q.    And turning your attention to Government's Exhibit
9031-C which is in evidence, what is this deed for?

A.    That's for Honuapo.

Q.    I'm also going to show you at the same time the top
of 9032-C.

        Do you see there's an additional tax map key
number there?

A.    Yes.

2948

Q.    Are those properties also associated with Honuapo?

A.    Yes.

        Those are two small parcels that were quick claim deeded, which is a different way of transferring it.

Q.    Around what time was this -- in or about -- was this property transferred over?

A.    December 29, 2004.

Q.    Looking at the grantee here, it says it goes from C. Brewer & Company to Big Isle V Ventures, LLC; is that fair?

A.    Yes.

Q.    Who controlled Big Isle V Ventures, LLC?

A.    I believe Phil Kenner was a managing member.

Q.    I'm going to turn your attention to what's in evidence as Government's Exhibit 2422.

        What was the purchase price for this larger Honuapo parcel?

A.    $3,856,000.

Q.    And who was responsible for bringing the money to this closing?

A.    That would be Phil Kenner.

Q.    Now, you told us about Little Honuapo, you told us about Honuapo.

        What was the next property that you sought to close on?

2949

A.    That would be Waikapuna.

Q.    Tell us about what happened with Waikapuna, did you
close on it as expected?

A.    No, there was a delay at closing.

Q.    Why?

A.    Financing was not in place.

Q.    Did you discuss that with Mr. Kenner?

A.    Yes.

Q.    What did he say?

A.    Financing was not in place.

Q.    Did he tell you why?

A.    No, not that I recall.

Q.    So what, if anything, happened in terms of getting
the financing in place?

A.    I'm sorry?

Q.    What, if anything, happened in terms of getting the
financing in place?

A.    Well, I wasn't privy to that part of the purchase.

Q.    Does there come a time where Mr. Kenner told you
about what he was doing to get the financing in place?

A.    Yes.

Q.    What did he say?

A.    He was trying to secure financing.

Q.    Did he secure any financing?

A.    Yes.

2950

Q.   What did he secure?

A.   There was a mortgage taken on Honuapo.

Q.   Do you remember who provided that mortgage?

A.   It was a company called Centrum Financial I think.

Q.   And I'm going to show you what's in evidence as
Government's Exhibit 9037-C.

     Is that the mortgage that you're talking about?

A.   Yeah, it appears to be.

Q.   This mortgage from Centrum Financial, can you specify
to us on that map, 945, what piece of property is
collateral for this mortgage?

A.   Do you want me to point to it?

Q.   Describe it by a label on the map.

A.   It would be -- the map is labeled Honuapo 1500, which
would be the middle of the three properties not including
Little Honuapo which is a portion of that on that map.

Q.   Looking at this mortgage in the amount of $3 million,
right?

A.   Yes.

Q.   Did that money -- withdrawn.

     Did you discuss with Mr. Kenner what happened to
the money from the mortgage?

A.   Yes, at some point we did.

Q.   What did he say?

A.   Well, the intention of this encumbrance or this

2951

mortgage was to leverage the equity in Honuapo to close
Waikapuna, and we weren't able to close Waikapuna on time
which caused consternation with the seller, and Mr. Kenner
said that he needed to invest this in a project in Mexico
that he was working on.

Q.    So after you take this mortgage and after Mr. Kenner
tells you the money is going to Mexico, what happens in
terms of closing on Waikapuna?

A.    Well, it was a series of inquiries or communications
made with what was referred to as hard money lenders.

      And a hard money lender is usually not the same
kinds of terms that you would get from conventional
financing through a bank.

Q.    I'm sorry, were you finished?  I apologize for that.

      During this time period you mentioned that
Waikapuna didn't close on time.

      Was there anything financial that resulted from
that?

A.    We had to enter into an extension agreement with the
seller, and there was a deposit that was put in place at
the time of that, the signing of that land sale contract,
and that deposit went to what's called hard, which means
the seller has the right to use it.  It's no longer
refundable in any way.

      And then the seller also wanted us to make

2952

payments on a weekly basis to extend the terms of that

contract.

Q.    Approximately how much were these payments on a

weekly basis?

A.    I think it was 62 or $64,000 a week more or less.  It

represented an interest payment essentially on the

purchase price.

Q.    Who was responsible for making sure the seller got

those weekly interest payments?

A.    Phil Kenner.

Q.    So what happens next in terms of you need money for

Waikapuna, what happens next?

A.    Well, we went on for a while making these payments

and I was continuing to communicate the particulars of the

project in terms of the land, in terms of what was

possible, in terms of entitlement to various perspective

lenders so that they could perform due diligence to

hopefully provide financing to close on Waikapuna.

Q.    Did you have any luck?

A.    Eventually I did yeah.

Q.    And what happened?

A.    Mr. Kenner brought forth a lender that was known at

that time as Urban Expansion, and it was a loan for $3

million.

Q.    I turn your attention to what's in evidence as

2953

Government's Exhibit 3802.

　　　　　Did there come a time when you saw the documents associated with the loan, Urban Expansion loan?

A.    Yes.

Q.    And I'm just going to turn your attention here to a couple of items.

　　　　　It says the loan amount is three and a half million dollars at an interest rate of 15 percent, with a prepayment penalty of $2 million.

　　　　　Did I read that right?

A.    Yes, that's correct.

Q.    Did you discuss this loan with Mr. Kenner?

A.    At some point, yeah.

Q.    What did you discuss?

A.    I mean within the context of the hard money lenders, this one seemed a bit harder than the others.

Q.    Why?

A.    Well, it was short-term, 3.5 million on a property that I think the purchase price was 4.2.

　　　　　The prepayment penalty may or may not have been an issue depending on when the loan was repaid, but also involved a carveout and a deed back of a portion of the property that was fairly valuable in comparison to the overall property.

Q.    When you say carveout, what do you mean by that?

2954

A.    Well, it was -- the intention was to subdivide out

123 or 1 24 acre portion of the 2015 acres I think it was,

and then deed that back to the Urban Expansion group, that

lender.

Q.    Fast forwarding a moment, did that property every

actually get deeded back?

A.    No.

Q.    Looking back at the terms of the loan, did you

discuss those terms with Mr. Kenner?

A.    At some point.

Q.    What did he say?

A.    I don't remember.

Q.    Were you part of the decision-making to enter into

this loan?

A.    Well, no, I really didn't have -- really didn't have

a choice.

        We had been through the gamut of trying to find

these hard money lenders, and this happened even before

Centrum, so I was working on it pretty much nonstop and

not being able to close on Waikapuna, not having been

successful to that point, you know, there wasn't a lot of

choices left.

Q.    So after you get this loan, do you end up closing on

Waikapuna?

A.    Yes.

2955

Q.    I'm going to turn your attention to Government's

Exhibit 916.

          What are we looking at there?

A.    That's a view of the shoreline of Waikapuna.

Q.    I'm going to turn your attention to what's in

evidence as Government's Exhibit 9072-C.

          What property is this deed for?

A.    That's for Waikapuna.

Q.    Looking at the grantor and grantee, it goes from C.

Brewer & Company to Kau Holding Company?

A.    Yes.

Q.    What does Kau mean, by the way?

A.    Kau is a word that was attributed to the district I

think from the early Polynesians that were looking at the

mountain from the shoreline and it resembles a woman's

breast.

Q.    Kau Holding Company, who controlled that entity?

A.    I believe Phil Kenner was a managing member.

Q.    Looking at the closing document for -- looking at

what's in evidence as Government's Exhibit 2427, what was

the purchase price for Waikapuna, approximately?

A.    $4,296,000.

Q.    Who was responsible for bringing that money to the

closing?

A.    Phil Kenner.

Manfredi  -  Direct/Komatireddy

2956

Q.    Now, there's one more property on that map on 945.
It's labeled Moaula.

        Did you ever close on that property?

A.    Yes.

Q.    When?

A.    I believe that was August of 2006.

Q.    What happens in August 2006?

A.    Well, we got financing through Lehman Brothers
Holdings.

Q.    Were you part of the discussions for that financing?

A.    Yes.

Q.    What was the deal with Lehman Brothers?

A.    Well, Lehman was going to provide financing to close
on Moaula, which is that further most parcel on the map,
provide development capital and pay all the accounts
payable which had been mounting and quote/unquote take out
other investors.

Q.    What do you mean by take out other investors?

A.    Buyout their investments, take them out of the deal.

Q.    I'm going to turn your attention to what's in
evidence as Government's Exhibit 2417.

        Have you seen this before? Do you want a paper
copy, would that be easier?

A.    Yes.

        (Exhibit handed.)

2957

Q.     Have you seen that before?

          MR. HALEY:  Judge, I'm sorry, what exhibit is

that?

          MS. KOMATIREDDY:  2417.

          MR. HALEY:  Thank you.

A.     Yes.

Q.     What is that?

A.     Closing statement of monies that were dispersed when

closing Moaula with Lehman Brothers Holding and capital.

Q.     That's the money going in and out with Lehman

financing?

A.     I'm sorry?

Q.     That's the money going in and out with Lehman

financing; is that fair?

A.     Yeah, I would say that that's fair.

Q.     I'm going to walk through a couple of things on the

closing statement.

          When you look at this and you see on page 2 --

first of all, what was the total amount of the Lehman

financing?

A.     It was 105,445,000 now more or less.

Q.     Did all of that money actually come out as cash in

the beginning?

A.     No.  Not to my knowledge, no.

Q.     Let's look at what does come out.

2958

Looking at page 2, do you see at the bottom here a list of charges?

A.    Yes.

Q.    Can you describe for us what those are?

A.    Do you want me to go through them one-by-one?

Q.    Just summarize them?

A.    They're accounts payable.  Some were legal fees incurred during the closing, title, fees, accounts payable.

Q.    When you say accounts payable, are these -- when were these bills accrued?

A.    Leading up to the closing or prior.

We have water services was a consultant that had done water source development studies, you have archeological consultants of the Pacific.

Q.    Why hadn't these guys been made?

A.    We didn't have the money.

Q.    Turning your attention to what's labeled as loan payoff, there's a loan payoff, 1303, to Urban Expansion, do you see that?

A.    Yes.

Q.    What's the approximate payoff there to Urban Expansion?

A.    $6,935,000 more or less.

Q.    There's another loan payoff, 1304, what's the payoff

2959

to Naalehuhi Ventures?

A.    $6,834,000, more or less.

Q.    Going to page 4 of this exhibit, we also talked about
the Centrum loan payoff.

      I direct your attention to what's noted here as
equity funding; do you see that?

A.    Yes.

Q.    What's the approximate payoff to equity funding?

A.    $3,939,000, more or less.

Q.    Earlier, when you looked at the Centrum loan, you saw
it was a $3 million loan, right?

A.    Yes.

Q.    Do you know why the payoff was more than 3.9 million?

A.    I don't.

Q.    In terms of the money that goes back to Naalehuhi
Ventures, did you get any money after the Lehman closing?

A.    I did.

Q.    What did you get money for?

A.    Backpay.

Q.    Can you tell us generally approximately what amounts
and what was the backpay for?

A.    Well, I was making about $100,000 a year from the
project and I also had some expenses.

Q.    And you got paid back for all of that?

A.    I believe I did.

2960

Q.    Looking back at our sequence of events, let's take a step back a for a moment.

I want you to focus on 2003, 2004, early 2005 before Urban Expansion, okay?

During that time, did you ever see Mr. Constantine come to Hawaii?

A.    No.

Q.    Did you ever see Mr. Constantine on the land that is the Hawaii project?

A.    No.

Q.    Did you ever have any serious discussions with Mr. Constantine about raising money for the Hawaii project?

A.    No, not that I recall, no.

Q.    Now, in terms of giving us a sense of what the land itself is like, can anyone just go and walk onto it?

A.    Well, you'd have to hop a fence.

Q.    There's a fence?

A.    Yeah.

Waikapuna and Honuapo are leased to ranching operations.  There's active ranching going on, there's cattle fences and gates.

Q.    Who has the keys to those fences and gates?

A.    It would be the seller, would be the tenant or the ranchers, and I had keys as well.

2961

Q.    Now, you talked about you working with Mr. Kenner and Mr. Kenner being someone who would bring money to the project.

        When Mr. Kenner was looking for financing, did you ever communicate with him about his search for financing?

A.    Can you repeat the question?

Q.    Did you communicate with Mr. Kenner about his search for financing?

A.    Sure.

Q.    What kinds of things would you do in conjunction with him?

A.    I would respond to requests for -- we would call it an investor packet, which would have basic information about the property, what the basic scheme was, development scheme, things like photographs and various studies that had been completed to that point, things like survey, archeology, soil studies, environmental studies, et cetera.

Q.    Do you recall ever putting together that kind of packet for Mr. Constantine?

A.    Not that I recall.

Q.    I'm going to turn your attention to what's in evidence as Government's Exhibit 1751, page 2, and I'm going to show you a bank record that shows $130,000 going

2962

into Constantine Management Group on December 30, 2004.

        To your knowledge, is there any work that you
saw Mr. Constantine do on the Hawaii project that would
warrant that kind of payment?

A.    Not that I'm aware of.  That's the first time I've
ever seen that.

Q.    Turning to page 14 of Government's Exhibit 1751 on
April 21st, 2005, there's a payment going to Constantine
Management Group of $37,500.

        To your knowledge, is there any reason related
to work on the Hawaii project for Mr. Constantine getting
paid that kind of money?

        MR. HALEY:  Judge, I object to the leading
nature of the question.

        THE COURT:  Overruled for the reasons already
discussed.

        You can answer that.

A.    My answer would be no.

Q.    I'm going to turn your attention to 1751, page 17.

        On May 27, 2005, do you see an incoming wire of
$60,000 and $20,000 to Mr. Constantine from -- to
Constantine Management Group to the Little Isle IV
account.

        To your knowledge, is there any reason connected
to work on the Hawaii project for Mr. Constantine to be

2963

receiving that kind of money?

A.    No.

Q.    Lastly, I'm going to turn your attention to Government's Exhibit 1751, page 20, where you see Constantine Management Group getting an incoming wire transfer from Ula Makika of $25,000 and $3500.

        To your knowledge, is there any reason, based on work on the Hawaii project, for Mr. Constantine to be getting that kind of money?

A.    No.

Q.    Ula Makika, can you tell us what that means?

A.    Red mosquito.

Q.    Finally, I'm going to turn your attention to Government's Exhibit 946, another version of this map also in evidence.

        946 has a red square on it.  Do you see that, Mr. Manfredi?

A.    Yes.

Q.    What's in the red square?

A.    That is a pair of subdivisions that are adjacent to each other, one is known as Discovery Harbor and the other is known as Mark Twain Estates.

Q.    Now, was there any land where Discovery Harbor and Mark Twain Estates were part of the Hawaii project that Lehman ended investing in?

A.    No.

Q.    Were you involved in the purchase of any property in Mark Twain or Discovery Harbor?

A.    I wasn't involved in the purchase, but I was involved in scouting those properties and negotiating them.

Q.    Okay.

        I'm going to turn your attention to Government's Exhibit 920.

        What are we looking at there?

A.    That was the Mark Twain lot after it was cleared, and the yellow line represents a location of a house pad.

Q.    I'm going to turn your attention to what's in evidence as Government's Exhibit 9000-C, a warranty deed recorded January 11, 2005, and Government's Exhibit 9001-C, a corrected warranty deed later in 2005.

        Do you see both of those?

A.    Can I see the whole document?

Q.    Absolutely.

        (Exhibit handed.)

Q.    Looking at those tax map key numbers, what property is the deed for -- or those deeds for?

A.    I believe this is for Mark Twain, what we called Mark Twain lot.

Q.    In terms of the Mark Twain lot, what was the entity that the Mark Twain lot went to, the buying entity?

2965

A.    Big Isle VI Ventures, LLC.

Q.    I'm going to turn your attention to what's in evidence as 2501-A.

        Looking at the settlement statement, what was the purchase price for the Mark Twain lot?

A.    $79,000.

Q.    Who was responsible for bringing that money to the closing?

A.    Phil Kenner.

Q.    You said there were also a subdivision called Discovery Harbor; is that right?

A.    Yes.

Q.    I'm going to turn your attention to what's in evidence as Government's Exhibit 919.

        What are we looking at there?

A.    That's a view of the golf course taken from a lot ultimately purchased at Discovery Harbor.

Q.    Turning to 9021-C, is that the lot that you helped purchase in Discovery Harbor?

A.    That's a lot that I scouted, yes.

Q.    A lot you scouted?

A.    And negotiated the purchase and sale agreement.

Q.    It says the buyer here is Big Isle VI Ventures, correct?

A.    Yes.

2966

Q.   The same company we saw on the last deed?

A.   Yes.

Q.   Looking at Government's Exhibit 2502-A, which is in evidence, entitled buyer final closing statement, what was the purchase price for this property?

A.   $85,000.

Q.   Finally --

A.   I'm sorry, $86,000.

Q.   Finally, I'm going to turn your attention -- you said there were several lots in Discovery Harbor, so I'm going to turn your attention to Government's Exhibit 918.

        What are we looking at there?

A.   That's the view.  The foreground is cleared lots at Discovery Harbor and the view is in the background.

Q.   Did you end up scouting out additional lots for purchase in Discovery Harbor?

A.   Yes.

Q.   Turning your attention to 9011-C which is in evidence, is this the deed for those additional four lots it looks like?

A.   Yes.

Q.   Turning your attention to 2503-A in evidence, the buyer final closing statement, what was the purchase price for these four Discovery Harbor lots?

A.   266,000.  I can't see the bottom.  266,000.

Q.    Looking back at the deed, 9011-C, what is the entity
that purchases this property?

A.    Big Isle VI Ventures, LLC.

Q.    Who controlled that entity?

A.    Phil Kenner was the managing member I believe.

Q.    With respect to these Discovery Harbor lots, did you
discuss with Mr. Kenner the purpose of buying them?

A.    For investment purposes, except that was -- the
Discovery Harbor lots were for investment purposes.

Q.    Now, you said you were involved with scouting out the
purchase of these properties.

           Were you involved in their sale?

A.    No, ma'am.

Q.    Do you know what happened to them?

A.    I believe they were ultimately sold.

Q.    Have you seen any money from the sale of those
properties, Mark Twain or Discovery Harbor?

A.    No, ma'am.

           MS. KOMATIREDDY:  No further questions.

           THE COURT:  Cross-examination.

           MR. HALEY:  Yes, sir.

           Ms. Komatireddy, may I see Government's Exhibit
2417 and 1751.  Maybe perhaps they're still up here.

           MS. KOMATIREDDY:  Here you go.

           MR. HALEY:  Thank you.

2968

CROSS-EXAMINATION

BY MR. HALEY:

Q.   Mr. Manfredi, good morning, sir.

A.   Good morning.

Q.   My name is Rick Haley and I represent Phil Kenner.

        How many years, sir, were you involved
personally with what I'll call the Hawaii project?

        And by that I mean everything you testified to
in terms of the purchase, development, financing.  That's
what I mean by the Hawaii project.

        How many years were you involved in the Hawaii
project?

A.   Let's see.  I would say from 2000 -- early 2002 until
probably 2009.

Q.   A lot of time, energy and effort on your part during
that period of time went into the project in terms of your
responsibilities as CEO, correct?

A.   I was not the CEO.

Q.   Excuse me, sir.

        What title did you hold?

A.   I was chief operating officer.

Q.   You're right.  I misspoke.

        As COO, is it fair to state that over that
period of time a lot of time, energy and effort you
devoted to the project; isn't that true?

2969

A.    That's fair to say, yes.

Q.    If I understand your direct testimony, sir, there was a division of responsibility, was there not?

You detailed to this jury your responsibility for purposes of the Hawaii project, and it was understood that Phil Kenner's responsibility was to obtain the financing; isn't that true?

A.    That's true.

Q.    And correct me if I'm wrong, your focus was to fulfill your responsibilities as COO, and you expected Phil Kenner to fulfill his responsibilities in terms of his obligations to acquire the financing; is that a true statement?

A.    That's true.

Q.    Well, when you were asked questions about Government's Exhibit 1751, bank records concerning your awareness of payments made to Tommy Constantine, your answer was I wasn't unaware of those payment.

Wasn't that your testimony?

A.    Yes.

Q.    Well, throughout this arrangement where you were the chief operating officer and Phil was responsible for the financing, it wasn't an instance, was it, sir, where every time Phil Kenner acquired financing or made a payment in connection with the financing, he would sit down with you

2970

and go over bank records.

That didn't happen, did it?

A.   No.

Q.   Because you each had a different responsibility,
isn't that true, for purpose of developing the project?

A.   Largely, yes.

Q.   Well, when you were asked a question as to whether or
not you ever saw Tommy Constantine, met Tommy Constantine,
were aware of any work Tommy Constantine did with
reference to the project, did you, in each and every
instance, have personal interaction with every lender that
may have had some role in the development of the property;
yes or no?

A.   Well, I wasn't asked that question.

Q.   I thought you were asked, sir, and I apologize, I
thought you were asked the question whether you ever saw
or met Tommy Constantine.

Were you asked that question?

A.   No.

I was asked if I ever saw Tommy Constantine on
the property.

Q.   Very well, and you're correct in that regard.

As relates to various lenders throughout the
development of the property, and by the property I mean
the Hawaii project, in each and every instance did you see

Manfredi  -  Cross/Haley

2971

those lenders physically on the property?

A.    No.

             (Continued on next page.)

**Manfredi - Cross/Haley**

BY MR. HALEY (Cont'd):

Q.    But we can state for certain, can we not, sir, that money certainly came into the project for purposes of the development of the property, it came in from various sources, did it not?

A.    I'm not fully aware of the various sources.

        But I think that's a fair statement.  The primary source of the funding was Phil Kenner, however it came to him.

Q.    Because that was his job, was it not?

A.    Yes.

Q.    To bring in the financing?

A.    That's accurate, yes.

Q.    And when you were asked the questions about Phil Kenner being a managing member of various LLCs, do you know what LLCs means, sir, in terms of the corporate designation?

A.    I do.

Q.    What does it mean?

A.    Limited liability company, I believe.

Q.    Okay.

A.    Company or corporation, I'm not sure.

Q.    And as it relates to the rule of a managing member of the limited liability corporation or company, do you have an understanding that the managing member had the

**Manfredi - Cross/Haley**

obligation and the authority to fill the obligations as
set forth in the operating agreement?

A.   I don't understand your question.

Q.   I want you to understand it, sir.

          Do you have an understanding, as you sit here
today, as to the authority that's granted a managing
member of an LLC, yes or no?

A.   Generally, yes.

Q.   And is it true, sir, that the managing member, unlike
let's say other members of the LLC who may be investors
like yourself, it's the managing member's role to manage
the LLC, to make the goals of the LLC happen.

          Isn't that a fair statement in terms of the role
of the managing member?

A.   I would say that the managing member is responsible
overall.

Q.   Yes.

A.   But in terms of reaching the goals of the LLC, I
think that's a broader question.

Q.   Well, it's fair to state that both you and
Phil Kenner had an idea as to what the goals of the Hawaii
project would be, and to the extent that you each had
responsibilities, you both were working toward that goal,
were you not?

A.   Yes.

2974

Q.   Now, with reference to Government Exhibit 2417, this
is the closing statement for what I'll call the
Lehman Brothers financing.

     Is that a fair statement?

A.   Yes.

Q.   And we can agree, can we not, sir, that as a result
of the efforts of Phil Kenner, he obtained financing from
Lehman Brothers for purposes of filling the objectives of
the Hawaii project in the amount of $105 million, that's
what it says, does it not?

A.   It says -- yes.

Q.   By the way, were you aware that as a result of Lehman
closing, there were to be certain milestone payments made
as the property was then developed in conjunction with
Lehman, Windwalker, things of that nature, does that have
some meaning to you?

A.   Yes.

Q.   And would you tell the jury what these milestone
payments consisted of and, to your understanding, if you
recall, the amounts of those milestone payments?

A.   I don't recall each milestone.

     And without seeing the agreement, I'm not aware
with a high degree of confidence of the amount of the
milestone payments.

Q.   So if I would suggest to you that the milestone

2975

payments from Lehman that would have been gone to Ula
Makika --

          MR. LARUSSO:  Withdrawn.

BY MR. HALEY:

Q.   If I were to suggest to you that the milestone
payments pursuant to the Lehman closing slash deal were
$4 million that would have gone to Naalehu Ventures, does
that refresh your recollection?

A.   That may be true.

          I prefer to see a document before I say that I
have knowledge of that.

Q.   I'm only asking for your best recollection, sir.

          Who, following the Lehman closing, was the
managing member of Naalehu Ventures, if you know?

A.   I believe it was Phil Kenner, or an entity he
controlled.

          I don't know if it was personally or -- it may
have been an LLC that he controlled that was a managing
member.

Q.   Do you have any knowledge or recollection as to
actually following the Lehman closing, John Kaiser became
the managing member of Naalehu Ventures.

          Does that ring a bell?

A.   I wasn't aware of that.

          That wasn't the case at the Lehman closing, but

I believe that happened subsequently.

Q.    Do you have a recollection that subsequent to the

Lehman closing, John Kaiser became the managing member of

Naalehu Ventures, correct, that's what you just said?

A.    I have anecdotal knowledge of that, but I don't know

for sure that that happened.

Q.    Okay.

A.    Or, if it did, when it happened.

Q.    Okay.

        But we can agree, based upon your prior

testimony, that if it were a fact that John Kaiser became

managing member of Naalehu Ventures following the Lehman

closing, it would have been his responsibility to pursue

those milestone payments.

        Isn't that a fair statement, if he was the

managing member?

                MS. KOMATIREDDY:  Objection.

                THE COURT:  That's okay.

                You can answer that.

A.    Well, it's a hypothetical.

Q.    Yes, I realize that, sir.

        My question is given your knowledge of

obligations of a managing member, would you agree that he

was the managing member of Naalehu Ventures, and $4

million in milestone payments were to be made to Naalehu

2977

Ventures, it was his responsibility, as managing member,
to pursue that.

        Wouldn't you agree?

A.    Yes.

Q.    How long have you known John?

A.    I have known John probably 15 years.

Q.    How would you characterize your relationship with
John Kaiser today, friends, enemies, acquaintances?

A.    I would say friends.

Q.    This Hawaii project, in connection with the land, it
was you and John Kaiser that I'll use the word first
incubated the idea of these purposes of Hawaii, for the
purpose of land development, is that a fair statement?

A.    No.

Q.    Okay.

A.    It would be true only for 258, the little Honu'Apo.

Q.    Okay.

A.    The other purchases were encouraged by Phil Kenner.

        We didn't have the wherewithal and financing to
go after the larger parcels.  We were only interested at
that time in the 258 acres.

Q.    But be those other purchases that were incurred by
Phil Kenner, you and John Kaiser understood that they had
the potential to return a great deal of money for your
investment.

2978

        Isn't that true?

A.    That's true.

Q.    As a matter of fact, when you testified you had a
salary of a hundred K -- $100,000 -- your compensation in
terms of being involved in the Hawaii project also
entitled you to an equity interest in one or more
entities.

        Is that correct?

A.    Yes.

Q.    By the way, at the time of the Lehman closing, in
addition to the return of salary, sir, did you also
receive a $175,000 bonus from the moneys that were then
paid out as relates to the moneys coming from the Lehman
closing?

A.    I don't recall if that was characterized as a bonus.

Q.    How would you characterize it?

A.    My understanding was it was back pay.

Q.    Now, the Hawaii project properties that have been
depicted in photographs, on maps, at various points in
time you, certainly visualized these properties.

        Is that true?  You saw them.

A.    Yes.

Q.    As relates to each one of those properties, if you
recall, did John Kaiser also see those properties?

A.    Yes.

Manfredi - Cross/Haley

Q.   You were asked questions about how the properties
were segregated in terms of perimeter, fences, I believe
in times there were cattle on the property.

          Do you recall those questions?

A.   I don't understand your question.

Q.   Do you recall, sir, during your direct testimony
being asked questions about whether some of these
properties were fenced and how you would gain access to
the properties?

          Do you recall those questions?

A.   Yes.

Q.   Throughout the period of time that these properties
were part and parcel of the Hawaii project, were you
present when John Kaiser physically viewed these
properties?

A.   Yes.

Q.   And would you and he walk these properties together
to get a sense as to the amount of acreage, the
environment, have a sense as to how these properties had
the potential for development?

          Did that occur?

A.   Yes.

Q.   Did you and John Kaiser, let's say, ever have to,
like, step over a fence to get into these properties?

A.   Yeah, that's fair to say, sure.

Manfredi - Cross/Haley

There was, you know, perimeter fences and cross fences.  So it's not just one boundary fence.

So it would be fair to say that, yeah.

Q.    At least, sir, when that occurred, when you observed John Kaiser, say, step over a fence to view the properties, at least at that point in time, he didn't appear to have any problem with his neck or back, did he?

A.    No.

Q.    Did you ever fly across country with John Kaiser, and by that I mean from the east coast to Hawaii via commercial aircraft?

A.    Yes.

Q.    Could you give us some sense when you and John flew halfway around the world, John Kaiser, did you fly business class, what level class did you fly?

I'm just curious.

A.    I don't remember in every instance.

There were a lot of flights.

Q.    And John --

A.    I'm speaking for myself.

I can't recall the number of occasions that John Kaiser might have traveled.  I would often fly either first class or business class.

Q.    Okay.

A.    If that's your question.

Q.    But when the times John Kaiser did fly with you,
would you each get your own luggage at the conclusion of
the flight, you take your luggage out of the airport, you
take his luggage out of the airport, things like that
occurred?

A.    Yeah, I think that's accurate.

Q.    During those periods of time, do you have any memory
of John Kaiser complaining about his neck or back when he
picked up the luggage he took with him?

          Yes or no?

A.    Well, yes.

Q.    Do you have knowledge as to John Kaiser's former
employment?

A.    Sorry, I didn't hear.

Q.    Do you know what John Kaiser -- what his former
occupation was?

A.    Yes.

Q.    And what was his former occupation?

A.    Police officer.

Q.    Do you know if he completed his 20 years or if he
retired on a disability pension?

A.    I believe he retired disability.

Q.    Do you know if his claims for his disability pension
was based upon a claim that he had injured his back and
neck while working as a police officer?

2982

Do you have an awareness that that was the claim
under which he obtained a disability pension?

A.    Yes.

Q.    Mr. Manfredi, were you aware that Phil Kenner
personally guaranteed the Centrum $3 million loan for the
1,500 acre Honu'Apo parcel in 2005?

A.    You are asking me if he personally guaranteed it
with --

Q.    With the bank, gave a personal --

A.    I thought you said -- the way you asked the question,
I thought you meant that the property was collateral.

Q.    No.

I want you to understand.

A.    I'm sorry.

Q.    As part of the financing of that property, were you
aware that Phil Kenner personally guaranteed that loan?

A.    No.

Q.    Were you aware that Phil Kenner personally guaranteed
the Centrum $3.7 million extension loan for the 1,500 acre
Honu'Apo parcel in or about February of 2006?

A.    I wasn't aware there was an extension loan.

Q.    Were you aware that Phil Kenner personally guaranteed
the Urban Expansion $3.5 million loan for the 2015 acre
Waikapuna parcel of property?

A.    No.

Q.   And, again, sir, I guess my question to you would be,
because it was Phil's obligation to obtain the financing,
you did not request to view and analyze all the underlying
loan documents that brought that money into the project.

         Correct?

A.   That would be correct.

Q.   Sir, were you part of the Hawaii partners' efforts to
acquire a quarry and Big Island Cement company between
2005 and 2006?

         Does that ring a bell?

A.   Yes.

Q.   And what was your understanding of the purpose of
that particular acquisition as relates to the development
of the Hawaii project?

A.   That had potential for aggregate concrete for
construction.

         There was also a nursery which was a part of the
property that would offer a significant amount of
decorative plantings use and landscaping.

Q.   Whose idea was it to do that?

A.   Probably mine.

Q.   I'm sorry?

A.   Probably mine.

Q.   Pretty good idea, was it not?

A.   Yeah, yeah, I would say it was a pretty good idea.

Manfredi - Cross/Haley

2984

Q.   Was Phil Kenner resistant to that proposal of yours?

          Did he say to you not a bad idea, or words to
that effect?

A.   I don't believe he was resistant.

Q.   He was or was not?

A.   Was not.

Q.   Now, the article that was shown to you in connection
with Phil Kenner's Money Magazine segment, you remember
being shown that by the government.

          Correct?

A.   Yes.

Q.   And, indeed, it will be available for the jury to
see, sir.

          But do you remember, did Phil show you the
magazine containing the article or did you testify on
direct that it was sent to you in a PDF form, if you
recall?

A.   It was sent in a PDF.

Q.   This was in 2003, is that correct, that you met
Phil Kenner for the first time in the Hawaii?

A.   It may have been late '02 or early '03.

          I don't remember the exact date.

Q.   With reference to that meeting, do you recall where
you physically were located when you first saw Phil Kenner
as relates to that meeting?

Were you in a hotel, were you at a property, where were you?

A.   Well, the first communication was by telephone.

Q.   Okay.

And that was between you and Phil Kenner?

A.   Yes.

Q.   Following that telephone conversation -- by the way, when you spoke to Phil Kenner at that time, do you know where he was?

Was he in Hawaii?  Did he arrive -- was he speaking to you elsewhere?  Do you know?

A.   I don't know where he was.

Q.   Following that telephone conference, what next happened?

A.   They signalled an interest in the property there and there came a time where we met him in Hawaii.

Q.   Did you meet him in a hotel?

Did you meet him at one or more property locations?  Where did that meeting take place?

A.   Hard to know.

I don't remember.  At some point we were on the property.

Q.   Let's talk about when you were on the property.

Were you there before Phil arrived or did he arrive in advance of you?

Manfredi - Cross/Haley

2986

A.    I don't recall.

Q.    Do you recall how he arrived?

A.    No.

Q.    Do you know if he arrived in a rental car?

A.    I imagine so.

Q.    Well, do you have any memory of Phil Kenner arriving at that property on that day, let's say, in a multimillion dollar helicopter?

A.    That I would remember and I do not remember that.

Q.    Would you agree, sir, that someone that's, say, has a net worth of one half billion dollars may have the ability to either rent or buy his own helicopter?

      Is that a fair statement?

A.    I imagine that's a fair statement, yeah.

Q.    Okay.

      After the meeting with Phil Kenner on the property, what next happened?  Where did you go and what did you talk about?

A.    I mean, this is, what, 13 some odd years ago.

Q.    Yes, sir.

A.    I don't recall the exact time line, where we went from there, where we stayed.

Q.    Okay.

A.    I just don't commit that -- those details to memory.

Q.    But I take it, sir, you don't have a memory of, let's

Manfredi - Cross/Haley

2987

say, meeting Phil thereafter in some palatial property
that overlooked, let's say, the waters of Big Island
Hawaii, you don't have a memory of that.

Correct?

A.    No.

Q.    Now, does the name North Point Properties mean
anything to you?

A.    Not that I recall.

Q.    Did you ever have an arrangement with John Kaiser to
acquire property, land in Sag Harbor, New York through an
LLC known as North Point Properties?

A.    I remember looking at land out there.

But I don't think I was a member of that -- I
don't think I was a member of that ultimate purchase.  And
I don't recall the entity that would have taken title to
it.

I imagine North Point Properties is what it was.

Q.    You don't have a memory?

A.    No.

Q.    Well, do you have any memory, sir, of ever being
involved in a business deal with John Kaiser where
property would be purchased here on Long Island and John
Kaiser and others would contribute the capital and you
would be obtaining a percentage interest in the property
because you were going to put the time, energy and effort

Manfredi - Cross/Haley

2988

to do what you actually did with Hawaii, kind of like
develop the property?

        Do you have any memory of that kind of
arrangement with John Kaiser?

A.   As I said, I remember scouting a property there with
John.

        But I don't think that I was part of that deal
going forward.

Q.   When you say you remember scouting a property with
John near there, we are talking about out on the east end
of Long Island, Sag Harbor property?

A.   Yes.

        MR. HALEY:  Your Honor, I have just a few
exhibits to mark.

        I think this might be an appropriate time.

        THE COURT:  Okay.

        Why don't we take a break.  Don't discuss the
case.

        (Jury leaves the courtroom.)

        (Recess.)

        (Continued on the next page.)

2989

(Following a recess.)

THE COURT:  Please be seated.

Are you ready, Mr. Haley?

MR. HALEY:  Yes, sir.

Thank you.

THE COURT:  Let's bring in Mr. Manfredi and the jury.

How much longer do you have?

MR. HALEY:  Not long, Judge.

THE COURT:  How long do you think?

MR. LARUSSO:  I hope to take us to lunch, Judge.

THE COURT:  Okay.

Take us to lunch or finish by lunch?

MR. LARUSSO:  Optimistically, finish by lunch.

THE COURT:  Okay.

It's my practice to show you anything I send out.  I'll show it to you before I send it out.

MR. HALEY:  Thank you, Judge.

MR. LARUSSO:  We have a copy.

THE COURT:  I'm going to show you also the one that I am going to send out so you can see the wording that I am using once I draft it.

MR. LARUSSO:  Thanks, Judge.

THE COURT:  Okay.

THE CLERK:  All rise.

2990

(Jury enters the courtroom.)

THE COURT:  Please be seated.

Go ahead, Mr. Haley.

MR. HALEY:  Thank you, Judge.

BY MR. HALEY:

Q.   Mr. Manfredi, just by way of background because we
did break for a moment, I believe the last question I
asked you related to any business dealings you may have
had with John Kaiser concerning property out in
Sag Harbor.

Do you remember that question?

A.   I remember the line of questioning.

Q.   Okay.

And I believe, sir, correct me if it doesn't
square with your recollection, that you had some memory of
going with John Kaiser to see some property out in that
general location.

Is that true?

A.   Yes.

Q.   In 2005, to your knowledge, did John Kaiser live at 9
Saxon Court, Smithtown, New York?

A.   Not sure of the address or the date.

Q.   Well, do you have any memory of John Kaiser having a
residence in Smithtown?

A.   Yes.

2991

Q.   And do you know if it was at 9 Saxon Court, or not?

A.   I don't know if it was No. 9, but...

Q.   Okay.

     Was there a point in time, sir, that you lived at 3 Barker Drive in Stony Brook, New York?

A.   Yes.

Q.   And do you recall the years where you lived -- and I say live, that was your residence, what years you lived at that location?

A.   I don't recall the year.

Q.   All right.

     Sir, I'm going to take -- I'm going to ask that you take a look at a document marked Kenner Exhibit 86 and it's a photocopy.

     Would you take time to look at that document.

     (There was a pause in the proceedings.)

BY MR. HALEY:

Q.   And in the photocopies, sir, do you see your signature on that document?

A.   Yes.

Q.   Would you kindly take a look at Kenner Exhibit 87.

A.   Yes.

Q.   And on the photocopy, do you see your signature on that document?

A.   Yes.

Manfredi - Cross/Haley

2992

MR. HALEY:  Your Honor, I'd offer Kenner Exhibit 86 and 87 into evidence.

MS. KOMATIREDDY:  No objection.

MR. LARUSSO:  No objection, your Honor.

THE COURT:  Kenner 86 and 87 are admitted.

(Whereupon, Defense Exhibits Kenner 86 and 87 were received in evidence as of this date.)

BY MR. HALEY:

Q.    Sir, with reference to Kenner Exhibit 87 in evidence entitled election by a small business corporation, do you see under the block election information North Point Properties, Inc.?

A.    Yes.

Q.    You do see it, sir?

A.    I see it.

Q.    And, indeed, in the second block there are a number of names, including your name and it sets forth percentage ownership interest at least as relates to North Point Properties, Inc.

Do you see that, sir?

A.    Yes.

Q.    And going to Kenner Exhibit 87 entitled election by a federal corporation to be treated as a New York S Corporation, in the block that follows do you also see once again a percentage ownership interest of various

2993

individuals including yourself as relates to North Point
Properties, Inc.?

A.    Yes.

Q.    Do those documents, sir, refresh your recollection
that in or about 2005 you did have a percentage interest
in an entity known as North Point Properties, Inc.?

A.    Yes.

Q.    And if you recall, sir, did you acquire that
ownership interest by making any capital contribution to
North Point Properties, Inc., and I think you know what a
capital contribution is, correct?

A.    Yes.

Q.    And what is your understanding of a capital
contribution?

A.    Money.

Q.    Have you ever been aware of an instance, sir, where
an individual, let's say, acquires an ownership interest
in an LLC because they are contributing not, let's say,
capital, but they are going to contribute what I'll call
sweat equity, work and labor?

        Have you ever seen that type of occurrence?

A.    Yes.

Q.    Do these two documents refresh your recollection,
sir, that with reference to North Point Properties, Inc.,
you were acquiring a percentage interest in that --

actually corporation, it's Inc., because you had an
agreement with John Kaiser that though others would be
contributing capital to the project you would contribute,
let's say, your work and sweat equity in order to acquire
that interest.

        Does that ring a bell at all?

A.    Yes.

Q.    Do you have a recollection, sir, that there came a
time where you received money from John Kaiser for the
purpose of buying out your equity interest in North Point
Properties, Inc.?

A.    No.

Q.    You don't have a recollection of that?

        Do you have a recollection, sir?  That never
happened --

        MR. HALEY:  I withdraw the question --

A.    I don't have a recollection, no.

Q.    You don't have a recollection.

        Do you know, as you sit here today, whatever
happened to your 25 percent ownership interest in
North Point Properties, Inc.?

A.    I would say I abandoned it.

Q.    Thank you, Mr. Manfredi.

        MR. HALEY:  No further questions.

        MR. LARUSSO:  Thank you, your Honor.

2995

CROSS-EXAMINATION

BY MR. LARUSSO:

Q.   Good morning, Mr. Manfredi.

         How are you?

A.   Okay.

Q.   My name is Bob LaRusso.

         I represent Mr. Constantine.

A.   Good morning.

Q.   Good morning.

         You testified that you were the guy on the
ground and Phil Kenner was responsible for securing the
funding.

         When you say guy on the ground, just explain
that to us.

A.   I don't think I used those terms.

Q.   I believe you recall being asked a question by the
government I believe on Thursday asking whether you were
the guy on the ground?

A.   I think that's a fair characterization.

Q.   And how would you understand that term?

A.   I was the individual spending the most time in
Hawaii, engaged in the day-to-day activities there in
terms of scouting the properties, due diligence on the
properties, negotiating the contracts and managing various
consultants.

2996

            And I was beginning to gain title to the first

of those properties.

Q.   And it was Mr. Kenner who was responsible for

securing the funding with these projects.

            Is that correct?

A.   Yes.

Q.   Did you ever yourself become involved in raising

money for these projects?

A.   I mean I was, I would say, a contributor to that.

Q.   When you say you were a contributor to that, would it

be fair to say that you, yourself, may have sent

information to lenders or potential lenders?

A.   Yes.

Q.   So, in addition to Mr. Kenner, you played some role

in trying to find funding for the Hawaiian projects, is

that right?

A.   Yes.

Q.   How many potential lenders did you actually send

information to to try to secure funding?

A.   I don't recall a number.

Q.   More than one?

A.   Yes.

Q.   And alone and by yourself, were you able to secure

any funding by yourself because of your efforts?

A.   By myself, no.

2997

Q.    Aside from Mr. Kenner and his efforts to secure
funding, did you work with anybody else to try and secure
funding for the Hawaiian projects?

A.    No.

Q.    So when you say you didn't do it by yourself, you
were referring to the fact it was Mr. Kenner and the
funding that you have already testified to.

          Is that right?

A.    I don't understand your question.

Q.    When I asked you if you attempted to secure funding,
you said yes, I did.  I contacted some lenders.  I asked
was Mr. Kenner involved in those efforts.

          Was he?

A.    Mr. Kenner was involved in those efforts, yes.

Q.    In all of those efforts?

A.    I would say yes.

Q.    Do you remember at any point in time speaking with
the FBI back in 2010 and telling them that you, yourself,
were responsible for securing fundings for the Hawaiian
projects?

A.    No.

Q.    Would you take a look at that document that's to your
immediate left.  Yes, please.

          It's marked for identification as 3500 CM 2.
There is some highlighted portions, the top portions,

2998

probably the first third of that page.

Just read it to yourself.

(There was a pause in the proceedings.)

A.    Okay.

Q.    Does it refresh your recollection that you may have told the agents back in 2010 who were investigating the case that you actually did get one or two lenders for the Hawaiian projects?

A.    No.

Q.    That doesn't refresh your recollection?

A.    No.

Q.    Well, you testified, I believe it was today, that Kenner, if I got it right, brought money into the Waikapuna project and then later testified that the money came from a company called Urban Expansion.

Do you remember that?

A.    Yes.

Q.    Isn't it a fact, Mr. Manfredi, that Mr. Constantine was the person responsible for bringing that money into the project, the Hawaiian project?

A.    I don't know.

Q.    Isn't it a fact that it was Mr. Constantine who was responsible for bringing the money that was able to secure the closing for the Waikapuna property?

A.    I don't know that either.

Case 2:13-cr-00607-JFB-AYS   Document 293   Filed 07/02/15   Page 72 of 230 PageID #: 2130

2999

Q.   Well, again, look at the document.

Down towards the lower third of that document, my question is do you remember telling the agents back in 2010, specifically October 12, 2010, in a telephone conversation that Constantine brought in money to project Hawaii, more than $3 million?

Do you remember telling the agents back in 2010 that it was Mr. Constantine who was responsible for bringing that money in?

A.   No.

Q.   Did you have anything to do with the negotiations for the loan with Urban Expansion?

A.   No.

Q.   So all the information you are receiving was coming from Mr. Kenner.

Is that correct?

A.   All the information --

Q.   Poor question.  Let me back up.

Before the loan was actually completed, the information you were receiving regarding that was coming from Mr. Kenner, is that correct?

A.   Concerning this loan, yes.

Q.   Let me ask you, do you know who the principals were behind Urban Expansion?

A.   No.

3000

Q.   Do you know, as you sit here today, that it was
Mr. Constantine and a man by the name of Mr. Gardina?

A.   I know that today based on documentation.

Q.   But back at the time that the loan was taking place,
all you knew was that Mr. Kenner had secured funding from
a company called Urban Expansion.

        Is that correct?

A.   Can you ask that question again.

Q.   Back this is, I think, 2005 actually, October of
2005, the only information you had regarding this loan was
the Waikapuna closing was coming from Mr. Kenner and that
he had secured money from a company called Urban
Expansion.

        Is that what you are testifying to?

A.   Yes, but I knew that Mr. Constantine was a part of
Urban Expansion.

Q.   At that time?

A.   Well, not all of 2005, but I believe either shortly
before or shortly after the loan closed.

Q.   Do you recall either shortly before or at the closing
or thereafter, that Mr. Constantine was the person that
brought in the other principal of Urban Expansion?

A.   I don't know that.

Q.   By the way, back then, we'll use that time frame, and
even now, do you have any personal knowledge of people

3001

that Mr. Kenner may have engaged to help find funding for

Hawaii?

A.    Some.

Q.    But not all, is that correct?

A.    I think that's fair.

Q.    Dealing with the we'll call it the Waikapuna loan, I

guess would be the best way to describe it, did you have

any personal knowledge as to what the terms of that

agreement were in regards to the conveyance of the 123.9

acres that you talked about as the carve out parcel?

A.    Yes.

Q.    What did you understand the term regarding carve out?

A.    That parcel was to be subdivided from the entire

parcel, and deeded to Urban Expansion.

Q.    And were you aware at the time of this deal that $1.5

million of that Urban Expansion loan was to be used to pay

for that parcel of land?

A.    Can you repeat that.

Q.    Do you recall --

        MR. LARUSSO:  One moment.

        (There was a pause in the proceedings.)

BY MR. LARUSSO:

Q.    Were you aware that the entire agreement called for

$5 million, and not the amount that you testified to that

I think you said $3 million or $3.5?

Manfredi - Cross/LaRusso

3002

A.    I think it's broken into a number of different
sections.

          3.5 was the loan amount.

Q.    And?

A.    And there was a $2 million prepayment penalty plus
interest, plus the deed pay.

Q.    Do you recall any terms of the loan dealing with an
equity contribution -- an additional $1.5 million?

A.    I'm not aware of that, no.

Q.    Now, this carve out that was supposed to result in a
deed, as you testified here today, that 123.9 acre parcel,
was that ever conveyed?

A.    Conveyed to?

Q.    Was there ever a closing on that property, to the
people who were supposed to get the carve out?

A.    You mean Urban Expansion?

Q.    Yes.

A.    No, that didn't happen.

Q.    Why?

A.    I don't know.

Q.    Now, were you still working in Hawaii -- how long
have you been working on these projects from I guess the
early 2000s up until when?

A.    I started in early '02, and I believe I stayed to
some point in '09.

3003

Q.   We'll take that time period, did you ever learn that the parcel was never conveyed because the land was never deeded to Urban Expansion?

A.   I know that the land was not deeded to Urban Expansion.

I know that there were plans to subdivide the parcel in a chronological order in the context of the other parcels, and that that chronology had not occurred prior to my departure.

Q.   And because that did not occur, there was no deed given over to Urban Expansion for that carve out piece of property?

A.   That's correct.

Q.   Now, you testified about a Lehman loan that would be you recall being around August of 2006?

A.   Yes.

Q.   And what happened to that Lehman project, that Lehman loan?

MR. LARUSSO:  Let me ask it more directly.

BY MR. LARUSSO:

Q.   Lehman folded, didn't it?

A.   Lehman Brothers did file bankruptcy.

Q.   And the company that was formed called Windwalker failed to meet their milestones.

Is that correct?

Manfredi - Cross/LaRusso

A.    Prior to -- that's correct, prior to Lehman Brothers'
failure, yes.

Q.    You also testified that you never spoke with
Mr. Constantine in regards to the Hawaiian projects.

           Is that correct?

A.    I don't believe I testified to that effect, sir.

Q.    Well, did you speak to Mr. Constantine at any point
in regards to the Hawaiian projects?

A.    Yes.

Q.    In person or by e-mail?

A.    I recall in person.

Q.    How many times?

A.    One that I recall.

Q.    And where was that?

A.    That was in Scottsdale, Arizona.

Q.    Other than that one -- when was that?

           I should put a time frame on that, Mr. Manfredi.

A.    I don't recall the exact year.

           It was prior to '05.

Q.    Other than that one face-to-face meeting with
Mr. Constantine, would it be fair to say that you also
corresponded with him by e-mail?

A.    Yes.

Q.    And it would be in regards to the Hawaiian projects.

           Is that correct?

Manfredi - Cross/LaRusso

3005

A.    Yes.

Q.    Let me show you what has been marked for
identification as C 58, C 61, C 188 and C 189.

        You can take them out of the sleeve -- actually,
I'll take them out because some of them are multiple pages
and I'd like you to take a look at them.

        This is C 58, C 61, this will be C 188 and this
will be C 189.  Are those e-mail communications between
you and Mr. Tommy Constantine during the years 2005 and
2006?

        (There was a pause in the proceedings.)

A.    What's your question?

Q.    Are those e-mail communications between you and
Mr. Constantine between 2005 and 2006?

A.    I would say yes.

        MR. LARUSSO:  Your Honor, may I ask that these
be received at this time?

        MS. KOMATIREDDY:  No objection.

        MR. HALEY:  No objection, Judge.

        THE COURT:  Those exhibits are admitted.

        (Whereupon, Defense Exhibits C 58, C 61, C 188
and C 189 were received in evidence as of this date.)

BY MR. LARUSSO:

Q.    Mr. Manfredi, I'm going to show you the first one in
chronological order, which is C 58 once it focuses.

3006

This is an e-mail that's captioned conference call, and dated November 18, 2005.  It's from you to Mr. Constantine.

Is that correct?

A.    It appears to be.

I don't recognize, you know, the Gmail at the top.

Q.    Did you have --

A.    So I don't, you know, I can't certify, you know, to the accuracy of these.

They appear to be what you said.

Q.    Did you have any conversation with anybody about these e-mails before appearing here today?

A.    No.

Q.    Were you ever asked to produce e-mails that you may have had showing your communication with Mr. Tommy Constantine?

A.    No.

Q.    So would it be fair to say this is the first time in quite a while that you saw this e-mail?

Is that correct?  Is that your testimony?

A.    I think that's accurate, yes.

Q.    Would you agree with me that in this e-mail you are corresponding with Mr. Constantine and your statement at the top, Tommy, please call me.  I don't have your number,

thanks, is actually in response to an earlier e-mail.

        Is that correct?

A.    According to what's printed on this page, yes.

Q.    Mr. Constantine --

A.    Let me quantify that, unless I were to see this
specific message in my outbox, you know, it doesn't ring
bells for me.

Q.    Let's see if we can ring some bells.

        Mr. Constantine is e-mailing you before you
respond to him.  He cc's it to you, actually, and sends it
to Phil Kenner, cc's it to you and it's the subject of a
conference call, e-mail is November 17, 2005, a day before
you respond.

        You see that in the second header down about the
middle of the page?

A.    Yes.

Q.    And in this message Mr. Constantine is stating, we
have a conference call scheduled for tomorrow at 3 p.m.
with investors Mortgage of Arizona.

        Do you see that?

A.    Yes.

Q.    And then it goes on to say, they have been looking at
the package for the last ten days, and in brackets it
says, at $15 million for Waikapuna only, end brackets,
they have a few questions and will give us an answer right

3008

away.

          They want to speak to both of you, please
advise, TC.

          And both of you, the e-mail is sent to
Mr. Kenner and to Mr. You -- and to you, Mr. Manfredi, you
see that?

A.    I see it.

Q.    Well, do you have a recollection now having looked at
this e-mail that Mr. Constantine was setting up a
conference call for you and Mr. Kenner to discuss with a
lender $15 million for the Waikapuna project?

A.    I don't have a recollection of that, but I do see it
on the page.

Q.    Well, let me ask you this, Mr. Manfredi, we know that
there was a closing to buy the Waikapuna property in
October of 2005.

          Is that correct?

A.    Yes.

Q.    And that was only so that the property could be
purchased and become part of the entire Hawaiian project.

          Is that right?

A.    Yes.

Q.    But it hadn't been developed, correct?

A.    Yes.

Q.    And in order to develop it, lenders had to be

3009

approached to provide money so that the developing could
take place.

A.    Yes.

Q.    Do you have a recollection that after you were
successful in buying this piece of property, that you
and/or Mr. Constantine and Mr. Kenner were seeking to find
a lender to provide $15 million so that you could go
forward with the Waikapuna project?

A.    I don't agree with all the elements of that question.

Q.    Tell me what you agree with and then tell me what you
don't agree with.

A.    You would have to repeat it.

        MR. LARUSSO:  Owen, would you do that for me,
please?

        THE COURT:  That's Paul.

        MR. LARUSSO:  Paul, I'm sorry.

        (Record read.)

A.    Well, there's a number of elements to that question.

        One is the dollar amount, which I do not recall,
and the other is the three parties that you mentioned in
the question, myself, Mr. Kenner and Mr. Constantine.

Q.    Let's not leave that one hanging.

        You have no recollection of Mr. Constantine
being involved, is that what you are telling us?

A.    Yes.

3010

Q.   You have no recollection of this e-mail coming -- you

sending it to Mr. Constantine discussing the meeting with

the lender for the Waikapuna property?

A.   I do not recall sending that e-mail, sir.

Q.   By the way, are you still an acquaintance of

Mr. Kaiser?

A.   I am.

Q.   When was the last time you spoke to Mr. Kaiser?

A.   About a week ago.

Q.   Did you discuss his testimony?

A.   No.

Q.   Did you discuss what testimony you were going to

give?

A.   No.

Q.   Did Mr. Kaiser mention cross-examination at all that

took place when he appeared for this trial?

A.   No.

Q.   Are you aware of any efforts Mr. Constantine had done

to try and get funding for the projects such as from a man

by the name of Steve Hilton?

A.   No.

Q.   This Waikapuna property, I think you testified that

were it not for the Urban Expansion loan, Mr. Kenner would

have to continue to pay weekly payments of over $60,000

because of the default on the purchase contract.

3011

             Is that correct?

A.    I don't think I said that.

Q.    What did you say in regards to the weekly penalties
that had to be paid?

A.    I said that there were weekly payments that were
being made to extend the contract.

Q.    Why were the payments necessary to extend the
contract?

A.    Funding -- financing was not in place.

Q.    How much money had been put down on the property to
purchase it?

             Do you know?

A.    I don't recall.

Q.    Approximately a million dollars?

A.    I don't recall.

Q.    Isn't it a fact that if those payments hadn't been
made, Mr. Manfredi, the lender could have taken that
property for himself because of the default in failing to
come up with the money?

A.    What lend?

             There was no lender at that point.

Q.    Who was the contract to purchase the property with?

A.    The seller would have been either Kau Business or
C. Brewer.

Q.    And they were the ones that contracted to sell the

3012

property, correct?

A.    Correct.

Q.    And the contract terms has not been fulfilled and
that's why Mr. Kenner had to come up with this $60,
$62,000 a week, as you call it, interest payments in order
to extend the contract.

A.    Correct.

Q.    Again, so without the moneys from Urban Expansion,
Mr. Kenner would have been in default of that contract and
have lost the down payment, whatever the amount might have
been, if he didn't find that funding.

A.    Well, you are making an assumption based on a
timeline and you are also making an assumption that Urban
Expansion money was the only money in the world.

Q.    Well, was anybody else coming up with the money at
that time, Mr. Manfredi?

A.    No, sir.

Q.    It was pretty urgent to get that money from Urban
Expansion to pay off this contract so that they could
purchase the property.

        Is that correct?

A.    You would have to define urgent.

Q.    Any other lender come forward and say, I'll pay the
money, forget Urban Expansion, I can give you better
deals?

3013

A.    No, sir, not to my knowledge.

Q.    By the way, one of the obligations that you assumed
was to provide information so lenders could do their due
diligence.

          Is that correct?

A.    Yes, sir.

Q.    What kind of information do you provide so that
lenders can determine whether or not to invest in, in this
particular case, the Hawaiian project?

A.    It would have been things like survey, soil studies,
legal opinions, the possibility of current zoning and
potential future zoning, appraisal.

Q.    Let me show you what's been marked and received in
evidence as C 61.

          This is captioned the Tucker parcels up in the
upper left hand corner.

          You see that, Mr. Manfredi?

A.    Yes, sir.

Q.    And this is dated January 16, 2006, and it's an
e-mail from you to Mr. Constantine with a cc to
Phil Kenner's office.

          You see that?

A.    Yes.

          (Continued on next page.)

Manfredi - Cross/LaRusso

3014

Q     I'll just read your response or your comment at this
point:

          Aloha Tommy, I'm forwarding this e-mail on
behalf of Phil Kenner.  Please contact me should you have
any questions or need further information.  Cheers,
Christopher?

          Below there is information regarding the Tucker
parcel, dated January 15th, the day before, you state
purchase price expected at 4-4.5 million.  See attached
appraisal and map on page 24 therein.

          Then there's a list of items TMK 25 acres and
16 acres, zoning.  Finishing up with two attachments you
see on the back.

          Does this refresh your recollection that you
were sending information regarding parcels that needed
funding, both Mr. Kenner and in fact now telling
Mr. Constantine that you would give him the information
for his use.

A     Can you show me page 2 of that again, please.

Q     As soon as, if you can, focus, let me know when you
had a chance to read that.

A     No.

Q     No.  Meaning no, this doesn't help refresh your
recollection that you are sending information to Mr. Tommy
Constantine with regard to the need for funding?

3015

A     Yes.

Q     Well, would you agree with me that the information at the bottom of the page starting with TMK, going through zoning, into the attachments, would be information you would normally send to a lender that was willing to do due diligence to the projects in Hawaii?

A     Yes.

Q     Tell us what all of those TMK zoning and attachments have to do with funding in layman's terms?

A     TMK is a tax map key that refers to the property.  In New York it would refer to section, block and lot.

          Zoning is relating to permitted land use.

Q     And the zoning down here, the second zoning that appears?

A     This particular document, it says RM 3 which is a multifamily with a maximum of one dwelling per 3,000 square feet.  And CV-10 which is a commercial village, meaning 10,000 square feet per building site.

Q     And I believe there is also references to appraisals and maps.  This is all information a lender would need to do his due diligence; is that correct?

A     Well, different lenders would require different information, so if you say it's all the information a lender would need, I can't say that with all certainty.

Q     Let me refer to the Tucker parcel.  What is the

Tucker parcel?

A    Tucker was a seller of a parcel or the owner of a parcel of a potential seller of a parcel of land adjacent to Waikapuna.

Q    Do you have a recollection, Mr. Manfredi, now that there were discussions with at least Mr. Kenner with regards to finding funding for the Tucker parcels?

A    Yes.

Q    Do you now have a recollection now that we've been talking about that Mr. Constantine would be provided information by you so he could try and find a lender to pay for the development of the Tucker properties?

A    I honestly do not recall communicating directly with Tommy Constantine.

Q    How about indirectly by e-mail?

        Do you.  Do you have a recollection now?

A    No, sir.

Q    By the way, this last one is January 16, 2006.  That would be after the contract had been paid for on the Waikapuna property; is that correct?

A    Can you repeat that.

Q    I'll withdraw that.  I'll move on.

        I'll show you the next exhibit that is received in evidence.  This is C 188.  This is one captioned Title Records for Hawaii, and it is dated March 19, 2006.  It's

3017

an e-mail from you, Mr. Manfredi, to Tommy Constantine.

Hi Tommy, the title reports for the Honu'apo property are attached.  I'll fax you the mortgage shortly.  Thanks, Chris.

Do you have a recollection of sending this to Mr. Constantine directly?

A    No.

Q    By the way, the attachments that appear here, are you able to identify for us what these attachments are?

A    No.

Q    If you went back into your computer, you would be able to do this, correct?

A    Yes.

Q    Did the Government ever ask you to produce any of the e-mails and attachments that you sent to Tommy Constantine, if any?

A    No.

Q    Let me show you the last exhibit that was received in evidence, C 189.  Again, this is an e-mail captioned Hawaii mortgage, March 19, 2006.  Again from you to Mr. Constantine.

Tommy:  Please find mortgage attached for the Hawaiian property.  I sent the updated title reports earlier.  Let me know should you have any questions or need any additional information.

3018

Thank you,

Chris.

Then there are attachments down at the bottom, recorded mortgage.  Do you see that?

A    I see it.

Q    Did you have any recollection of communicating with Mr. Constantine regarding a Hawaii mortgage?

A    I don't have a recollection of that, sir.

Q    Do you have any recollection of any Hawaiian mortgages that this e-mail may be referring to?

A    Yeah.

Q    What mortgage are we talking about and what piece of property?

A    Well, the only mortgage that existed at that would have been the Centrum loan.

Q    As you think back is there any reason why you are sending this information back to Mr. Constantine?

A    I don't recall sending it to Mr. Constantine.

Q    I'll just show you one more document.  I'll mark it separately with the Court's permission C-189 A.

Mr. Manfredi, the last e-mail we talked about was C-189, okay.  Is that correct?

A    If you say so.

Q    No, the one I last displayed.  The Hawaiian mortgage dated March 19, 2006, with attached mortgage?

3019

          C 189, is that the attachment that goes with

this e-mail?  Take a look at that.

A     I don't know.  Without being able to open this PDF

with that file name, I don't know if that points to this

(indicating).

Q     Take a look at the document.  Have you ever seen the

Big Aisle V Ventures mortgage from Centrum Financial

Services before?

A     Yes.

Q     Does this refresh your recollection that this is the

mortgage that is being referred to in his e-mail?

          MS. KOMATIREDDY:  Objection, asked and answered.

          THE COURT:  He already said that.  The only

mortgage he had was with Centrum he said.

          MR. LARUSSO:  Now that he looked at the pages --

          THE COURT:  You asked him if it refreshed his

recollection whether it refreshes --

          MR. LARUSSO:  Your Honor, you are correct.  I

apologize.

          May I have one moment, your Honor?

          Your Honor, I have no further questions.

          THE COURT:  Redirect.

          (Continued.)

3020

REDIRECT EXAMINATION

BY MS. KOMATIREDDY:

Q    You have been shown on cross-examination four e-mails
C 58, C 61, C 188 and C 189.  Do you still have them up
there with you?

A    I don't have them.

Q    You don't have them.  It's okay.  I'll give it back
to you.  I'll put on the screen.  Do you remember during
your direct testimony we went through this timeline.  Take
a look at that.

         Is that a fair and accurate depiction of the
events we discussed?

A    Can I take a moment?

         MS. KOMATIREDDY:  Go ahead.

A    Yes.

         MS. KOMATIREDDY:  At this time the Government
moves the timeline GX 50 into evidence.

         MR. HALEY:  I'm sorry, I have no objection,
Judge.

         MR. LARUSSO:  No objection, your Honor.

         THE COURT:  GX 50 admitted.

         (Whereupon, Government Exhibit 50 was received
in evidence.)

Q    Now you have those e-mails in front of you.  Take a
look at C 58, the first one that defense counsel showed

3021

you.

What is the date of that e-mail?

A    Friday, November 18, 2005.

Q    What about C 61, what is the date of that e-mail?

A    Did you say C 61?

Q    Yes.

A    Monday, January 16, 2006.

Q    What about C 188.  What is the date of that e-mail?

A    March 19, 2006.

Q    And finally C 189.  What is the date of that e-mail?

A    March 19, 2006.

Q    So every single one of those is after the Urban

Expansion loan?

A    Yes.

        MS. KOMATIREDDY:  No further questions.

        THE COURT:  Anything further?

        MR. HALEY:  Really brief, Judge.  Thank you.

RECROSS EXAMINATION

BY MR. HALEY:

Q    Mr. Manfredi, Mr. LaRusso asked you a question

concerning the land sale contract with C. Brewer, and the

time when that contract would expire if the extension

payments were made.  Do you recall that?

A    I don't recall him asking me about the date that the

contract would expire, sir.

3022

Q    Well, isn't it true, sir, that had the Urban

Expansion money not been obtained when it was obtained,

that contract extension would expire ten days later.

Isn't that true?

A    I can't say that in all certainty without seeing the

document.

Q    Well, I believe we -- were you aware that should that

loan -- excuse me.  Should the contract extension not take

place, the loss to the Hawaiian project would have been

about $1 million, correct?

A    Again, without seeing documentation, I can't testify

to that, sir.

Q    Well, if it were a fact, sir, that contract extension

would have expired ten days after the Urban loan monies

came in, would you consider that urgent.  Yes or no?

A    Yes.

          MR. HALEY:  I have no further questions.  Thank

you, Judge.

          THE COURT:  Mr. LaRusso, anything else?

          MR. LARUSSO:  No, thank you, your Honor.

          THE COURT:  You may step down, Mr. Manfredi.

          You may step down.

          MS. KOMATIREDDY:  May I read in one stipulation

before lunch?

          THE COURT:  I was going to keep going.

3023

MS. KOMATIREDDY:  Even better.

MR. MISKIEWICZ:  Our witness is a few minutes away.

THE COURT:  Why don't you read the stipulation and we'll break until 1:30.

MS. KOMATIREDDY:  At this time we move in Stip 34.

THE COURT:  Any objection.

MR. LARUSSO:  No, your Honor.

MR. HALEY:  No, your Honor.

When the Government did that on the box, Judge, (indicating) I thought she meant that box and I have no document.

MS. KOMATIREDDY:  It is hereby stipulated and agreed by and between the United States of America, and the defendants Phillip A. Kenner and Tommy C. Constantine through their attorneys, that:

If re-called at as a witness at trial Darryl Sydor would testify that Government 770 (indicating) consists of a package sent by Mr. Sydor to the U.S. Attorney's Office for the Eastern District of New York on June 3, 2015.

Government's Exhibit 770 contains the binders that Mr. Sydor received from the defendant Kenner in connection with Mr. Sydor's investment in the Hawaii

3024

project.

          After testifying at trial last week Mr. Sydor

returned to his home in Minnesota, recovered the foregoing

binders from storage and sent them to the U.S. Attorney's

Office.  This stipulation and Government Exhibit 770 is

admissible as evidence at trial.

          The Government moves 770 in evidence.

          MR. LARUSSO:  No objection, your Honor.

          MR. HALEY:  No objection.  I'll trust the

contents of the box.

          THE COURT:  Government's Exhibit 770 is

admitted.

          (Whereupon, Government Exhibit 770 was received

in evidence.)

          THE COURT:  We'll take the lunch break and we'll

continue at 1:30.  Don't discuss the case.  Have a good

lunch.

          (Whereupon, the jury exits the courtroom.)

          THE COURT:  Who is the next witness?

          MR. MISKIEWICZ:  Brian Berard.

          THE COURT:  Any issues that we can discuss.

          MR. LARUSSO:  There may be one.  There were

taped conversations made between Mr. Berard and

Mr. Gaudet.  Depending upon how his testimony goes on

direct, we may -- it's like a page and a half of

3025

transcripts, Judge, but I can't tell you what we
anticipate.

          THE COURT:  Do you have it set up?

          MR. LARUSSO:  We're all set up and we hope to
avoid the problem we had last time.

          MR. HALEY:  Your Honor, there is an issue that
implicates a Bruton matter and it's an e-mail sent by
Brian Berard to Phil Kenner regarding his understanding as
to the use and purposes of the Global Settlement Fund
assuming he authenticates the e-mail and at that point
that's just an assumption.  It does contain paragraphs
that clearly implicate Bruton, so I don't know if your
Honor would like to see it.

          THE COURT:  This is an e-mail from Kenner to
Berard.

          MR. HALEY:  No, from Berard to Mr. Kenner.  It's
these paragraphs that go down from here to there.

          MR. LARUSSO:  I don't know if I'll have an
objection, but I'll talk to my client over lunch, but I
remember seeing this.  I haven't focused on it, but I
think there may not be a problem.

          THE COURT:  All right.  I'll see you at 1:30.

          (Whereupon, a recess was taken.)

3026

A F T E R N O O N   S E S S I O N


            THE COURT:  Please be seated.

            Are we ready to go?

            MR. LA RUSSO:  I've got an issue, but I think we
can do it at the end of the day.  It's the issue regarding
the e-mails.  The government hasn't been objecting, so I
think we can talk about it later.  We don't need to do it
now.

            MR. MISKIEWICZ:  Also, Judge, an update on
Ms. Lagarde.

            We attempted -- it's probably been eight or nine
telephone calls.  She's not returning any of the phone
calls.  I e-mailed her over the break.

            Also during the break we contacted a Mr. Steven
Earl from her former law firm.  Apparently, she's not
retired.

            Mr. Earl was actually the person who produced
the records we asked her to come and testify about.

            Contrary to what's been suggested earlier, and
I'm raising this not with any particular application in
mind, but I may have an application later this week, what
Mr. Earl advised us is he was yelled at by defense counsel
for even responding to the subpoena, accused of acting
unethically, and basically he's well aware of the

3027

situation, well aware of efforts to keep Ms. Lagarde off the stand.

Right now, we're going to continue as the government can trying to make her available and getting her on time.  We may have an application later in the week up to and including either reopening our case should we not be able to secure her appearance in time for the close of the government's case in chief.

And so I don't know right now which defense counsel for Mr. Constantine he was referring to, but that is what we have been advised.

MR. LA RUSSO:  Your Honor, just for the record, I've never spoken to this individual.  I never had a chance to speak to Mr. Oliveras.  This is the first time I'm hearing of this.  I don't even know the man, Judge, I've never spoken with him.

MR. OLIVERAS:  This is the first time I'm hearing of this as well.  I've never spoken to this individual.  The only person I spoke to was Linda Lagarde.

MR. HALEY:  While we're rounding off the group, I haven't spoken with the individual.

THE COURT:  I'm sure the government will get to the bottom of it.

All right, let's bring in the jury.

THE CLERK:  All rise.

3028

        (The jury is present.)

        THE COURT:  Please be seated, members of the jury.

        I'm going to ask the government to call its next witness.

        MR. MISKIEWICZ:  The government calls Bryan Berard.

        THE COURT:  Mr. Berard, if you can come up to the witness stand over here and remain standing once you get there for the oath.


BRYAN BERARD,

            called as a witness, having been first

            duly sworn, was examined and testified

            as follows:


        THE CLERK:  Please state your name and spell it for the record.

        THE WITNESS:  Bryan Berard, B-R-Y-A-N, B-E-R-A-R-D.

        THE COURT:  Be seated, Mr. Berard, and stay close to the mike so everyone can hear you, Mr. Berard.

        Okay, Mr. Miskiewicz.

        MR. MISKIEWICZ:  Thank you, your Honor.

Berard  -  Direct/Miskiewicz

3029

DIRECT EXAMINATION

BY MR. MISKIEWICZ:

Q.    Good afternoon, Mr. Berard.

          Mr. Berard, where do you currently live?

A.    I live in Brimfield, Massachusetts.

Q.    Were you born and raised in New England?

A.    Yes, in Woonsocket, Rhode Island.

Q.    You where an NHL player, correct?

A.    Yes, I was for 11 seasons.

Q.    You were a first-round draft pick?

A.    Yes, I was.

Q.    And what team did you originally play for?

A.    The New York Islanders in 1996.

Q.    And how old were you when you were first drafted to
the NHL?

A.    I was 18 years old.

Q.    And after the Islanders, just briefly, tell us what
other teams you played and when did you ultimately retire
from the NHL?

A.    I started my career in 1996 with the New York
Islanders.  I played roughly about three seasons for them.

          I continued on with the Toronto Maple Leafs, New
York Rangers, Boston Bruins, Chicago Black Hawks, Columbus
Blue Jackets, and retired in 2008 with the New York
Islanders.

3030

Q.    Are you familiar with one of the defendants in this case, a man by the name of Phil Kenner?

A.    Yes, I am.

Q.    How did you meet him?

A.    I met Phil Kenner roughly, I would say, about 20 years ago.

        I met him actually in my hometown of Woonsocket, Rhode Island.

        Phil Kenner drove to my house with at that time a business associate of his, Derek Sanderson, and they met myself and my parents for the first time at my parents' home.

Q.    How old were you?

A.    Roughly I would say around 18 years old.

Q.    At 18 were you, based on scouting reports already, pretty well-known that you were going to be drafted into the NHL?

A.    I was.  I was lucky.  But, you know, the scouting reports had me going probably number one or number two overall in the NHL draft.

Q.    Mr. Sanderson, who is he?

A.    Derek Sanderson was a former Boston Bruin NHL player, a very successful career as well, and someone I was familiar with that played in the NHL.

Q.    Do you see Mr. Kenner in the courtroom today?

Official Court Reporter

3031

A.   Yes, I do.

          MR. HALEY:   Identification conceded, Judge.

          THE COURT:   The identification has been

conceded.

          MR. MISKIEWICZ:   Thank you.

BY MR. MISKIEWICZ:

Q.   So approximately what year was it that you met

Mr. Kenner?

A.   I would say roughly probably sometime in 1994.

Q.   Did there come a time that you hired him to perform

any services for you?

A.   Yes.  I would say probably even before I was drafted

in 1995.  I was drafted that summer.  Myself and Phil

Kenner and the company was State Street Bank.  I hired him

to be my financial advisor.

Q.   In hiring him to be your financial advisor, what was

the reason for doing that?

          In other words, why didn't you watch out for

your money on your own, why did you need a financial

advisor?

A.   Well, I grew up in Woonsocket, Rhode Island, five

siblings, six of us, and my dad was a mechanic probably

making $40,000 a year.

          My family didn't know anything about investing,

and we knew sooner or later that I was going to be drafted

3032

and coming into making some money.

Q.    Did you pay Mr. Kenner to manage your money?

A.    Yes, he got a percentage.

Q.    Of what?

A.    Of basically what the portfolio would be, a certain
percentage of whatever he's investing for you.

Q.    In the early years when you were playing for the NHL
and making money and after you hired Mr. Kenner, what
kinds of investments did he place you into?

A.    Early on it was just simple portfolio stuff, stock,
bonds, and really it was that simple.

Q.    Are you familiar with a company -- well, withdrawn.

         Standard Advisors, did you ever hear of that
company?

A.    Yes, that was Mr. Kenner's.

Q.    That was after he left some other companies?

A.    Yes, that was after Phil -- he started with State
Street, then he was with Assante I believe.  I know he was
with Assante, and moved onto his company Standard
Advisors.

Q.    Did you remain with him when he moved out on his own
into Standard Advisors?

A.    Yes, I did.

Q.    In addition to having a business relationship paying
him to manage your money, did you have any social

Berard  -  Direct/Miskiewicz

3033

relationship?

A.    Yes, as long we were doing business, we became really good friends.

Q.    Did you travel together from time to time?

A.    We traveled.  We went to Vegas together.  Mr. Kenner spent probably at least I know of one Christmas at my house in Rhode Island.

Q.    I direct your attention to what's been referred to in this trial as a Hawaii land development.

        Were you ever an investor in any Hawaii land development?

A.    Yes, I was.

Q.    How did you become an investor in an Hawaii land development?

A.    Mr. Kenner, Phil, brought an opportunity for me to invest in this land deal in Hawaii sometime in 2004.

        I flew to Hawaii on the Big Island.  It was during the lockout season so I wasn't playing hockey.

        And Phil Kenner along with myself and a friend of mine, gave us a tour of the property and got my interest.

        And it was a great piece of property, beautiful, in Hawaii and I invested $100,000 towards the project.

Q.    I don't know if you recognize it, looking at Government's 946 up on the board there, do any of the

Berard  -  Direct/Miskiewicz

3034

properties that are depicted there look familiar?

A.    They all do.

Q.    Do you recognize the names?

A.    Yes.

Q.    What do you recognize those names and those

properties to be?

            Were they the Hawaii land development that

Mr. Kenner involved you in?

A.    Yes.

Q.    Now, when you say you invested $100,000, was that in

some sort of a wire transfer of cash somewhere?

A.    Yes, $100,000 to an LLC setup by Mr. Kenner.

Q.    Do you remember the name of the LLC?

A.    I believe it was Little Isle IV I believe it was or

Little Isle.

Q.    Okay.

            In addition to the opening up or the --

withdrawn.

            That $100,000, was it -- explain to the members

of the Grand Jury --

            THE COURT:  The jury.

            MR. MISKIEWICZ:  I'm sorry.  We're beyond that

point.  Sorry about that.

BY MR. MISKIEWICZ:

Q.    Would you please explain to the members of the jury

3035

what your $100,000 was intended for?

A.    The $100,000 was basically going towards a down payment on the property I believe.  I know it was a down payment so we could basically hold the property until we could find a bank to do the closing, to purchase the rest of the property.

Q.    And did there ever come a time that you opened up a line of credit in connection with your investment in Hawaii?

A.    Yes.

Q.    Why did you open up a line of credit?

A.    Really Phil Kenner asked me to open up a line of credit.

Q.    Okay.

       When he asked you to do so, did he explain to you what the purpose of the line of credit would be?

A.    What I remember is it was -- basically we had to make interest payments until we could close on the property until Lehman Brothers could close on the property in Hawaii.

Q.    We will get there in a minute, but were you an investor in other properties in other places, specifically Mexico?

A.    Yes, two places in Mexico.

Q.    When you opened up your line of credit with respect

3036

to the Hawaii deal, did you have any understanding as to how that line of credit funding could be used?

A.    I didn't think any of the money -- I thought it would be interest payments.  I didn't think any of the money would be used out of my line of credit.

Q.    What about investing portions of your line of credit to places let's say in Mexico?

A.    No.

        At that time I was already invested.  One was in the El Rosario property in Mexico, and then the other was in Cabo San Lucas, and my investments were 500,000 on the El Rosario property, and 200,000 on the Cabo San Lucas property.

Q.    So was there any -- withdrawn.

        Did you get statements contemporaneous with the operation of your line of credit sent to your house or anywhere you were working at the time, if you recall?

A.    My line of credit, no.

Q.    I show you a document that's in evidence by stipulation, 2134.

        Mr. Berard, showing you 2134, first of all, at the time that your line of credit was in operation, did you get that document?

A.    I never saw this document, no.

Q.    It does indicate at the very top it's in your name,

Berard  -  Direct/Miskiewicz

3037

correct?

A.    That is correct.

Q.    There's a series of numbers, an account number and says note, right?

A.    Correct.

Q.    I'm going to ask you to just focus on the first several transactions here, but specifically I'm going to focus your attention on what's referred to as a note increase on or about March 24, 2005.

        Do you see what I have highlighted there?

A.    Yes, I do.

Q.    There is what looks like a $265,000 increase in your note, do you see that?

A.    Yes.

Q.    First of all, what was your recollection of the total amount that could be borrowed against your line of credit?

A.    I think it was close or roughly in the $700,000 range.

Q.    What was the collateral?  What was securing that line of credit, if you know?

A.    I do.

        It was a pledge account in Northern Trust Bank. I put 1.1 million in Northern Trust.

Q.    Was that cash or something else that you put in Northern Trust?

Berard  -  Direct/Miskiewicz

3038

A.    We moved it over in cash and I believe it was invested in bonds and stocks.

Q.    So at or about this time, March 24, 2005, did you know that your line of credit had already been increased or borrowed against to the amount of $685,000?

A.    No, I did not.

Q.    Showing you another document that's also in evidence by stipulation, Government's 2017.

            Showing you the wire transfer there -- excuse me.

            Showing you deposits first and directing your attention to that date we were looking at a little bit earlier, March 24, do you see that?

A.    Yes, I do.

Q.    Were you aware of a $265,000 deposit -- a withdrawal from your line of credit and then a deposit of that same amount into an account belonging to Big Isle VI Ventures?

A.    No.

Q.    Did you know whether or not you were invested in any manner in a company by the name of Big Isle VI Ventures, LLC?

A.    No.

Q.    Do you believe you were?

A.    Not at all.

Q.    Were you familiar with the LLCs that essentially made

3039

up this umbrella of Little Isle IV?

A.    I was aware of some of the LLCs, correct.

Q.    Big Isle VI Ventures, was that one of them?

A.    I can't remember.

Q.    Looking at the top of that exhibit back to 2017, specifically March 24, do you see the money being paid into something called Fidelity National Title Insurance?

A.    Yes.

Q.    Do you know what that money was being spent on on that day?

A.    I have no idea what that is.

Q.    Are you familiar with -- in Hawaii, there's been testimony regarding exhibit 946 and specifically that red square.

        Are you familiar with subdivisions that are called Discovery Harbor lots and/or Mark Twain lots?

A.    Not at all.

Q.    Did you believe that you were investing in such pieces of property?

A.    No.

Q.    Have you ever seen any return on investments?  That is to say, any proceeds or profits or even losses for that matter with respect to the sale of Discovery Harbor lots?

A.    No.

Q.    Now, did there come a time that anything happened to

3040

the line of credit that you had with Northern Trust?

A.    Yes.

      It basically was taken from me.

Q.    How did you find out about that?

A.    Honestly, I was playing in Russia.  I got back in

2009, and basically remember just kind of getting a phone

call from Northern Trust that I lost close to a million

dollars in my pledge account.

Q.    And at that time did you know what the balance, the

outstanding balance was on that line of credit?

A.    No, not at all.

Q.    Was Mr. Kenner still your financial advisor during

the period of time the line of credit was in operation?

A.    Yes, he was.

Q.    Did you receive any communication with him whatsoever

about what was the status of your line of credit prior to

you getting that notification from Northern Trust?

A.    No.  I called him after that phone call.

Q.    When you called him after that phone call what, if

anything, first of all, what, if anything, did you tell

him?

A.    I thought that money was safe, that it was a pledged

account, and there was not a chance that I would lose it.

Q.    When you received this notice of default letter, was

this before or after Lehman Brothers came along, if you

Berard  -  Direct/Miskiewicz

3041

know?

A.   It would have been after Lehman Brothers.

Q.   At that point even if -- withdrawn.

When you told him you thought the money was safe what, if anything, did Mr. Kenner tell you in response?

A.   Really just that, you know, I invested more money now, you get a bigger percentage of an equity piece in the project and things were going well.

Q.   If you can elaborate on that.  You just got a notice of default.  Mr. Kenner tells you you have a bigger equity piece?

A.   Basically go from --

MR. HALEY:  I object.  I object.

THE COURT:  Sustained as to form.  Ask him to explain it further, okay.

A.   I can explain it further.

I go from basically investing $100,000 into the Hawaii land deal to closely investing a million dollars, so I wasn't happy, I was confused.

And I did think that money was safe, so I would think it goes from 100,000 to over a million dollars invested in a land deal in Hawaii.

Q.   Did there ever come a time that you received any sort of documentation reflecting the fact that you were now a larger equity holder in Little Isle IV or the Hawaii

Berard  -  Direct/Miskiewicz

3042

venture, generally speaking?

A.    No.  I trusted Phil.  Again, we were very close.  I
really didn't even ask.

Q.    As of today, you got that letter of credit in 2000 --
I mean the letter of default or notice of default in 2009?

A.    It would have been sometime late spring of '09 when I
got back from Russia.

Q.    Between '09 and today, have you gotten anything out
of the million dollars plus the $100,000 that you
initially invested suggesting you have a bigger equity
stake in Hawaii?

A.    No, I have not.

Q.    Was there ever a time when there was some litigation
or settlement with Northern Trust?

A.    I have.  I have settled with Northern Trust.

Q.    What, if anything, did you get by way of a return as
a result of that settlement?

A.    I think roughly after lawyer fees and stuff, it was
close to 300,000.

Q.    Out of approximately a million that the line of
credit was extended to?

A.    Yes.

        I guess I lost probably now over 700,000.

Q.    And have you ever had a discussion with Mr. Kenner
about that bigger equity stake?

3043

A.    I have not spoken to Phil Kenner since the summer/fall of 2010.

Q.    With respect to the litigation anyway and ultimately the settlement, have you seen anything that suggested to you that you have any equity whatsoever in the land in Hawaii that was invested back in 2004?

A.    I have not.  I have asked Phil Kenner, you know, after things went south for paperwork, and I never received any paperwork from Mr. Kenner.

Q.    I just want to show you very briefly what's in evidence by stipulation as Government's 2114.

       Do you see that on the screen in front of you?

A.    Yes.

Q.    Is that one of the letters you received notifying you that your line of credit was now in default?

A.    I actually saw this letter probably for the first time I would probably say sometime in 2000 -- late 2010, 2011, when I asked Northern Trust for all my records.

Q.    Okay.

       But, again, is this one of the things that you were sent advising you that your line of credit was now being essentially closed and other action was being taken against you?

A.    That's correct.

       (Continued on next page.)

Berard - Direct/Miskiewicz

3044

BY MR. MISKIEWICZ (Cont'd):

Q.    Mr. Berard, are you familiar with a piece of property in the Sag Harbor area of Long Island sometimes referred to as Led Better?

A.    Yes, I am.

Q.    And what do you know about that?

A.    I invested in Led Better $375,000 for the purchase of the property.

Q.    How did you learn about Led Better?

A.    Led Better was the LLC we bought the property under.

        I became familiar with the property, I got a phone call from Phil Kenner asking if I would be interested in being partners with John Kaiser on the purchase of a property out in the Hamptons.

        MR. LARUSSO:  Your Honor, may we have a limiting instruction with regard to this testimony?

        THE COURT:  As you recall, members of the jury, with respect to the Sag Harbor property, Mr. Constantine is not charged in connection with that.

        And the testimony as relates to the Sag Harbor property only relates to Mr. Kenner.

BY MR. MISKIEWICZ:

Q.    Mr. Berard, did you ever have a conversation with Mr. Kenner about investing in the Sag Harbor property?

A.    Yes, I did, a few times.

3045

Q.   What if anything did he tell you about who your
partners were going to be in that property?

A.   My understanding would be just myself and one
partner, John Kaiser who lived out east in the Hamptons.

Q.   When you say your understanding, your understanding
based on what?

A.   I knew John and his family built homes out in eastern
Long Island and, you know, I knew they were looking or
John was looking to purchase the property.

Q.   But did Mr. Kenner specifically tell you anything
about who your partners would be?

A.   No.

     I had no idea.

Q.   What did he say about the Sag Harbor property?

A.   Really if I would be interested --

     THE COURT:  When you say he, who are you saying?

Q.   What did he, meaning Mr. Kenner, tell you if anything
about who your partners would be.

A.   I did not know.

Q.   All right.

A.   He didn't tell me anything.

Q.   What did he, Mr. Kenner, tell you about what was
going to happen on that property, if anything?

A.   I took a drive out there, I have frequently been to
the Hamptons, so I drove to the property.  I took a look.

3046

It was a great piece of property in Sag Harbor.
It was just land.  I knew at some point that John -- that
we would build a home there and we would have an
investment property and put it on the market for sale.

Q.   So do you recall where you sent any of the money that
you were investing in Sag Harbor?

A.   Yes.

I made two separate wires to the LLC,
Led Better.

Q.   And you sent it to Led Better?

A.   That's correct.

Q.   For a total of how much?

A.   $375,000.

Q.   I'll show you what's in evidence as
Government Exhibit 1401 and specifically the second page
of 1401, I'll zoom in on what I'm referring to.

Can you for the record there is -- actually
there are two transactions there that I have highlighted.
Can you for the record tell the members of the jury what
if anything that represents by way of money from you?

A.   I wired in two separate wires, I wired out of my
Northern Trust bank account $275,000, and then the next
day I wired out of my Charles Schwab account $100,000, an
extra $100,000, so totaling $375,000 to Led Better.

Q.   On page one of that same document, there is a wire

3047

transfer from Ula Makika in the amount of $395,000.

Do you know a Michael Peca?

A.    I played against Michael Peca, yes.

Q.    Did you ever have a conversation with Mr. Peca at or about this time in 2006 about him being a partner of yours in Sag Harbor?

A.    Not at all.

Q.    Ever since then?

A.    Never.

Q.    Did you ever see any documentation to suggest that he was a partner in Led Better?

A.    No.

Q.    Eventually you did see documentation regarding the Led Better development company, did you not?

A.    That's correct.

Q.    How did you first find out about the Led Better development company and who was a partner in that company?

A.    I would say sometime in late 2010, 2011 we started going through some documentation, myself and John Kaiser, we were hurting for cash and I wanted to put the property on the market, the property in Sag Harbor, list it and get it in the market, hopefully to try to sell.

Q.    And did there ever come a time that you saw the operating agreement for Led Better?

A.    Yes.

Berard - Direct/Miskiewicz

3048

I saw it at John Kaiser's house for the first time.

Q.    Show you what's in evidence as Government Exhibit 703, specifically page two of 703.

For the record, who are the individuals listed there as members or partners of Led Better development company?

A.    Phil Kenner, Brian Berard, John Kaiser, Vincent Tesoriero, I guess is his name.

Q.    Of these individuals, the other three individuals in addition to yourself, when you first invested $375,000 did you know whether or not Mr. Kenner was a partner of yours?

A.    I did not.

I thought I was a 50/50 partner with John Kaiser.

Q.    All right.

So you didn't even know about Vincent Tesoriero?

A.    No, I did not.

Q.    And for the record, anywhere on that list of partners or equity owners does the name Michael Peca appear?

A.    No.

Q.    Now, you said that you were -- I think you used the word hurting for cash at some point in 2010, 2011.

What if anything did you do with respect to the Led Better property?

Berard - Direct/Miskiewicz

3049

A.   Well, I wanted to put it on the market.

          So I took control and basically listed it with
an agent out in Sag Harbor to find out that a few things,
for one the LLC wasn't set up properly.  So I had to --

          MR. HALEY:  I would object to this hearsay, is
this his own personal knowledge?

          I would object.

          THE COURT:  Sustained.

BY MR. MISKIEWICZ:

Q.   Did you do anything to have it listed for purposes of
sale?

A.   Yes.

          I had to set up the LLC properly so we could put
it on the market.

Q.   Did you learn at any point anything about the status
of the real estate taxes related to that property?

          MR. HALEY:  Again, your Honor, just asking for
hearsay or is it from own personal knowledge?

          That's my objection.  I think it's going to
elicit knowledge.  That's why I object.

          THE COURT:  Is this so he can explain what steps
he took after that?

          MR. MISKIEWICZ:  Yes, your Honor.

          THE COURT:  I'll allow it for that purpose.

          He can explain what steps he took after learning

3050

whatever it is he learned about the taxes.

        MR. HALEY:  Thank you, Judge.

        THE COURT:  Go ahead.

A.   Well, I did not know about the taxes until after John Kaiser's partner told me that they almost lost the property, that the taxes were not being paid on the property.

        I did not know that at all.

Q.   Did you have any conversation with Mr. Kenner afterwards regarding the taxes being paid or not paid?

A.   I did not.

        I stopped talking to Phil Kenner.

Q.   And do you know whether or not the property was ultimately sold?

A.   Yes, we sold the property.

Q.   Now, are you familiar with the term Global Settlement Fund?

A.   I'm familiar, yes.

Q.   What do you know about the Global Settlement Fund?

A.   At the time Phil Kenner and Tommy Constantine pushed the Global Settlement Fund and was something for me to put up $250,000 for the Global Settlement Fund.

Q.   And, first of all, did you ever meet Mr. Constantine in person?

A.   Yes, I have.

Berard - Direct/Miskiewicz

3051

Q.   Do you see him in the courtroom today?

A.   Yes, I do.

Q.   Would you point to him and --

A.   That's Tommy Constantine.

          MR. LARUSSO:  Concede the identification, your

Honor.

          MR. MISKIEWICZ:  Thank you.

          THE COURT:  The identification is conceded.

BY MR. MISKIEWICZ:

Q.   When did you first meet Mr. Constantine?

A.   I met Tommy probably sometime in 2003, 2004 in

Chicago.

Q.   And with respect the Global Settlement Fund, you said

that somebody had pitched you regarding that.

          Who pitched you to contribute to the Global

Settlement Fund?

A.   Both Tommy Constantine and Phil Kenner.

Q.   Was that in person or by phone or how did that

happen?

A.   I would say both.

Q.   Let's focus on Mr. Kenner.

          Did you talk to him in person about the Global

Settlement Fund?

A.   Yes.

Q.   Where were you when you had that conversation?

Berard - Direct/Miskiewicz

A.    Could have been New York, Boston, or Phoenix, Scottsdale.

Q.    Is it fair to say that for a period of time you saw Mr. Kenner pretty frequently?

A.    Yes.

Q.    Both for business as well as social reasons?

A.    That's correct, we were friends, close friends.

Q.    Is that why you don't remember right now as to where you were when you had this conversation?

A.    There were many conversations on the Global Settlement Fund.

Q.    Okay.

      And what if anything did Mr. Kenner tell you about the reasons for setting up this Global Settlement Fund?

A.    The Global Settlement Fund was really supposed to be for lawyer fees, really to go after a separate project down in Cabo San Lucas, Ken Jowdy, it was a big expense.

      At the same time it was some ex -- some hockey players, ex-clients of Phil Kenner, that started to sue Phil in litigation in civil court.

Q.    When you say it was supposed to be for that reason, who told you it was supposed to be for that reason?

A.    Both Tommy and Phil.

Q.    What you are saying is that the intent or the purpose

of the money are you saying that either or both of the defendants said that to you?

A.   That's correct.

It was going towards basically the fight to try to recoup some money down in Mexico.

Q.   What if anything did Mr. Kenner tell you about -- what did Ken Jowdy have to do with the necessity to sue?

A.   Really just that he blamed Jowdy for misappropriating funds that is went to Mexico.

Q.   And at that time did you see any documentation, by that I mean wire transfer records, bank records, contracts, anything to support what Mr. Kenner was telling you about Mr. Jowdy?

A.   I did not, no.

Q.   But you believed him, correct?

A.   I did, I trusted him.

Q.   And what if anything did Mr. Constantine tell you about the purpose of the Global Settlement Fund?

A.   Pretty much the same thing, as well as it would go towards the guys that were suing Phil, that we could try to buy them out of the investments that they made, so hopefully they could drop the lawsuits.

Q.   Are you familiar with a person by the name of Owen Nolan?

A.   Yes, I am, played hockey against him.

3054

Q.   And at or about this time, when you are being told by
Mr. Constantine and/or Mr. Kenner about lawsuits, do you
know whether or not Mr. Owen Nolan had a lawsuit pending
against one or the other?

A.   Yes.

        I actually was in Arizona, I think it was in
2009, Owen Nolan -- there was an arbitration, sued
Phil Kenner and I testified at that arbitration hearing.

Q.   Who were you testifying in behalf of?

A.   I testified in behalf of Phil Kenner.

        Both was prepped by his lawyer Ron Richards and
Tom Baker.

Q.   Did you testify under oath?

A.   Yes, I did.

Q.   Were you testifying truthfully, to the best of your
knowledge at the time?

A.   Absolutely.

Q.   And the basis of your knowledge, whatever you
testified to in that arbitration, what was the basis of
your knowledge, if anything?

A.   Really I mean the questions they asked, you know, I
really didn't -- I was prepped again by Ron Richards,
asked me about -- brought up Paris Valley Arizona home and
asked me if I was familiar with money going from Hawaii to
Mexico.

Berard - Direct/Miskiewicz

3055

Q.   And did you have any firsthand knowledge about any of
those -- about the money going from Hawaii to Mexico?

        MR. HALEY:  Objection.

        Just the leading -- I object.  Without a
speaking objection, I object.

        THE COURT:  Overruled.

        That one's okay.  You can answer that.

A.   I was only familiar with what Phil Kenner told me
about some money that was going from Hawaii to Mexico.

Q.   Did you become aware from Mr. Kenner about the result
of that Owen Nolan lawsuit?

A.   Actually I did not.

        I did not find out until months later that
Kenner lost a decision in roughly I think it was a $2.3
million judgment that Owen Nolan won against Phil Kenner.

Q.   Did you have a conversation with Mr. Kenner about
Mr. Nolan ever collecting money as a result of that
lawsuit?

A.   After I found out that he lost the settlement, he
lost the lawsuit and had a settlement, I asked Mr. Kenner,
basically how are you going to pay Owen Nolan the $2.3
judgment.

        And, quote, he said, Owen Nolan will never see a
penny out of me.

Q.   At this time you still had a relationship with

3056

Mr. Kenner?

A.    No, not at all.

Q.    Okay.

Now, did you end up contributing to the Global Settlement Fund?

A.    I did not.

Q.    Why not?

A.    At that time I just did not have the liquid ability to.

I was actually in Russia playing and making pretty decent money.  Phil Kenner actually flew over to Russia.  At that time I think he had some other business involving another lawsuit, but stopped in the town I was playing about 60 miles south of Moscow, stopped in to see myself and another player, another ex-client of his, trying to -- for us to give him money going towards the Global Settlement Fund.

Q.    What if anything did he say about your contributing to the fund?

A.    Just that both myself and the other player that we haven't contributed yet and we were one of a few guys that hadn't given any money and whatever we could do, whatever money we could give towards the Global Settlement Fund would go a long way.

Q.    Were they looking for a specific sum of money to be

Berard - Direct/Miskiewicz

3057

contributed?

A.    Starter was $250 and then at that time, you know, it was really whatever you could do, 50, 100, 125, they were looking for whatever we could do.

Q.    Did you at any point contribute any amount of money towards this settlement fund or this legal fund?

A.    I did not.

        I would have, I was in Russia, but actually the team owner didn't like that Mr. Kenner was there --

        MR. HALEY:  Objection, Judge.

        THE COURT:  Sustained.

A.    I did not, no.

Q.    Okay.

        Despite that, did there come a time that you became somehow involved in conversations with either Mr. Constantine or Mr. Kenner over the status of the Global Settlement Fund?

A.    Back in Russia the conversation between me and Tommy Constantine became more about the Global Settlement Fund.

        Phil seemed to drop that issue and then I received phone calls from Tommy talking about the Global Settlement Fund and, you know, whatever I could do, 50, 75, 100,000, would you please send as soon as possible.

Q.    And when you say whatever you could do, is that what Mr. Constantine was asking you?

Berard - Direct/Miskiewicz

3058

A.    He was.

Again, just saying that I was one of the few guys that hadn't contributed to the Global Settlement Fund and, you know, kept asking me for money.

Q.    Were you ever aware that there was a lawsuit filed by Mr. Richards against Ken Jowdy?

A.    Yes, I was part of the lawsuit.

Q.    Did you ever know that you were noticed, that is to say, there was a request put in for your deposition?

A.    I did not until after the fact.

Q.    Mr. Richards didn't tell you that?

A.    He did not.

Q.    What about Mr. Constantine or Mr. Kenner, did they say that you were being requested to appear for a deposition in that lawsuit?

A.    I never knew I was.

Q.    Do you know what happened to that lawsuit?

A.    It was dropped.

Q.    Do you know why it was dropped?

MR. HALEY:  Judge --

THE COURT:  Sustained, unless this was from Mr. Kenner or Mr. Constantine, unless he had a discussion with Mr. Kenner or Mr. Constantine about that.

MR. MISKIEWICZ:  I'll rephrase that question, then.

Berard - Direct/Miskiewicz

3059

        MR. HALEY:  Thank you.

BY MR. MISKIEWICZ:

Q.   Only with respect to if you got information from
Mr. Kenner or Constantine, did either one of them tell you
why the lawsuit was dropped?

A.   Basically it was the time of the Olympics, hockey was
going on and it was going to be tough to try to get
everyone together to proceed with the lawsuit.

Q.   Were you playing in the Olympics?

A.   I did not play that year, no.

Q.   All right.

        Are you familiar with a company by the name of
Eufora?

A.   Yes, I am.

Q.   I'm going to show you --

        MR. MISKIEWICZ:  One second, your Honor.

        (There was a pause in the proceedings.)

BY MR. MISKIEWICZ:

Q.   I'll show you what's marked for identification as
Government Exhibit 723.

        Mr. Berard, showing you 723 for identification,
do you recognize any of the signatures or initials on that
document?

A.   Yes.

        That's my signature.

Berard - Direct/Miskiewicz

3060

Q.    And is that a wire transfer record?

A.    Yes, it is, sir.

Q.    And do you have an independent recollection of authorizing that wire?

A.    Yes.

          I invested $100,000 to Eufora.

          MR. MISKIEWICZ:  The government moves for the admission of 723.

          MR. HALEY:  Judge, may I see it one moment.

          Mr. Miskiewicz did show it to me, but I would like to look at it.

          (There was a pause in the proceedings.)

          MR. HALEY:  No objection.

          MR. LARUSSO:  No objection, your Honor.

          THE COURT:  723 is admitted.

          (Whereupon, Government Exhibit 723 was received in evidence, as of this date.)

BY MR. MISKIEWICZ:

Q.    Very quickly, Mr. Berard, what's the date of your wire transfer?

A.    The date is December 23, 2003.

Q.    And it's $100,000 going to Johnson Bank in Phoenix, Arizona and the account name is Eufora.

          Is this your investment in Eufora?

A.    Yes, it is.

Berard - Cross/Haley

3061

Q.    Have you to this day gotten any documentation

reflecting your ownership in Eufora?

A.    I believe not, no.

Q.    Any idea of what happened to your investment after

you made the investment?

A.    I have yet to see any money back on the investment.

I'm not familiar with basically what happened to Eufora.

I thought it went under.

Q.    Okay.

        MR. MISKIEWICZ:  Just a moment, your Honor.

        (There was a pause in the proceedings.)

        MR. MISKIEWICZ:  Thank you, very much,

Mr. Berard.

        No further questions.

        THE COURT:  Cross-examination.

        MR. HALEY:  May I see Government Exhibit 723.

        MR. MISKIEWICZ:  Yes.

CROSS-EXAMINATION

BY MR. HALEY:

Q.    Mr. Berard, you were shown just a short while ago

Government Exhibit 723 and without hesitation you were

able to identify that writing as your signature.

        Correct?

A.    That's my signature, correct.

Q.    And we can agree this is a photocopy of the document,

Berard - Cross/Haley

3062

is that correct?

A.    Yes.

Q.    Now, this document, sir, I will tell you is marked
Kenner Exhibit 88.

          All right?

A.    Yes.

Q.    And you are entitled to take a look at the entire
document and I frankly request that you do just to have a
gross sense of the document, and then I'm going to ask you
a question with respect to the last page of the document.

          Okay?

A.    Okay.

Q.    Please do that.

          Just so you have an understanding as to its
fundamental content.

          THE COURT:  What exhibit number is that?

          MR. HALEY:  Your Honor, it's --

          THE WITNESS:  88.

          MR. HALEY:  Judge, I may have made a mistake in
connection with our exhibits.

          There may already be a Kenner Exhibit 88.

          THE COURT:  Actually I don't think there is an
88.

          MR. HALEY:  Maybe I didn't make a mistake.

BY MR. HALEY:

Berard - Cross/Haley

3063

Q.    Did you have an opportunity to look at that document?

A.    I have, yes.

Q.    I see.

And as relates to the photocopy of this document, is that your signature?

A.    That's my signature, yes.

Q.    Now, when you testified a short while ago --

MR. HALEY:  Withdrawn.

Your Honor, I would offer this document in evidence as Kenner Exhibit 88.

MR. MISKIEWICZ:  No objection.

MR. LARUSSO:  No objection.

THE COURT:  Kenner 88 is admitted.

(Whereupon, Defense Exhibit Kenner 88 was received in evidence as of this date.)

BY MR. HALEY:

Q.    Sir, when you look at what is now Kenner 88 in evidence, can we agree that part of this exhibit there is a schedule A that indicates members and percentages and your name appears on that document.

Do you see that?

A.    That's correct.

Q.    As a matter of fact, your name appears as the very first name of member, does it not?

A.    That's correct.

Berard - Cross/Haley

3064

Q.   And it reflects that Brian Berard has a 6.35 -- 36 percent interest, is that correct?

A.   6.36, that's correct.

Q.   Thank you.

     When you testified on direct, and, sir, your recollection would prevail, did or did you not testify on direct that at no point in time to this day have you ever received any documentation from Phil Kenner reflecting your membership interest in let's say Little Isle IV, is that correct?

A.   That's the first time I had seen my percentage in the deal Little Isle IV.

Q.   Well, were you aware that there was a point in time when there was a closing in the Lehman Brothers, as a result the $105 million loan they were making to what I'll call the Hawaiian project in order to continue the development?

     Did you acquire some knowledge of that?

A.   I was aware of Lehman Brothers, yes.

Q.   And were you aware, sir, that in connection with that loan, various documents were created which required the signature of the owners of Little Isle IV in order to facilitate and complete that loan?

     Were you aware of that?

A.   I believe so.

3065

Q.   Did or did you not receive this document marked
Kenner Exhibit 88 that says, limited liability company
agreement of Little Isle IV, and it begins with the date
of the agreement?

         Did or did you not receive this document?

A.   I do not remember ever receiving this document.

Q.   These events as relates to the Lehman loan, they go
back nine years, do they not?

A.   That's correct.

Q.   And I'm sure, sir, you are trying today to do your
level best to recall events that went back nine years ago.

         I'm sure that's your intent today, isn't that
true?

A.   I'm familiar with most of the stuff that went on,
correct.

Q.   Well, so when you say in the answer to my last
question, I don't remember seeing this document, that's
undoubtedly a truthful answer that you are giving to this
jury.

         Correct?

A.   That's correct.

Q.   But your lack of memory, sir, is not such that you
would say to this jury under oath without equivocation, I
never received this document.

         You can't say that, can you?

Berard - Cross/Haley

3066

A.    Can you rephrase the question, please?

Q.    Sure.

       Due to your lack of memory, sir, as you told us a moment ago, I don't remember receiving this document and we are going back nine years, correct?

A.    Nine years, roughly.

Q.    As a result of your memory concerning events that go back nine years ago, can you say under oath without question that at no point, given the myriad of things that were going on with reference to the investment back there, that you never received this document, Kenner Exhibit 88?

A.    Yes, I never received documents on the Hawaii deal from Phil Kenner.

Q.    Did you ask for the documents at some point in time, hey, Phil, I got money in Hawaii, can you send me some documents?

       Did you have that type of conversation with Phil, yes or no?

A.    Absolutely, yes.

Q.    And did Phil respond in substance, I'm not giving you any documents?

       Is that what he said to you?

A.    No.

       He said that actually that his computers were stolen and he could not produce any of the documents.

**Berard - Cross/Haley**

3067

Q.   When do you say he said his computers were stolen and he could not produce any documents, nine years ago?

When do you say that happened?

A.   Roughly I don't remember.

It would have been sometime with the lawsuit with Kristie Myrick.

Q.   How would you describe your relationship with John Kaiser today?

A.   He's a close friend.

Q.   How would you describe your relationship with Ken Jowdy today?

A.   I would say it's a business relationship.

Q.   Employer-employee?

A.   I work for a sales company.

I bring clients down to the Diamante property, yes, they are basically looking to entertain, to take them golfing, to show them the land down in Mexico.

Q.   Who gave you that contract?

A.   Actually it was between Ken Jowdy and then also Ironman Sales, a company down there.

Q.   But the person that gave you and/or the company you work for in connection with a remuneration you are going to receive for this work is Ken Jowdy, is that correct?

A.   I actually engaged them.

Q.   Ken Jowdy signed the contract, though, right?

Berard - Cross/Haley

3068

A.    I do not have a contract.

Q.    Well, with the relationship that you have -- by the way, when you say property in Mexico, what's the name of that property?

A.    Diamante.

Q.    Is it Diamante Cabo San Lucas?

A.    Yes, it is, Diamante Cabo San Lucas, correct.

Q.    Tell the jury what is Diamante Cabo San Lucas?

A.    It's a golf resort down in Cabo San Lucas.

        We have two golf courses now, 36 holes, and it's right on the Pacific ocean.

Q.    Does it cater to a particular clientele?

A.    I'd say both.

        We have time shares, fractionals I would say is 20, 25 percent of the property and the other percentage is real estate, purchased real estate.

Q.    Does it cater to a particular clientele, sir, is my question?

A.    No.

        We have next to wealthy clients to people that buy time shares.

Q.    Are some of those wealthy clients professional athletes?

A.    As of now we have a few members, correct.

Q.    How about Roger Clemens?

Berard - Cross/Haley

3069

A.   He is not.

Q.   By the way, do you know of any of your own personal knowledge close relationship between Ken Jowdy and Roger Clemens?

A.   I believe they are friends.

Q.   So as relates to your current employment, would you simply tell us what you do by way of bringing prospective purchasers to the Diamante Cabo San Lucas resort, what do you do?

A.   Very simple, it's pretty much a tour guide.

         Show them the property, play golf with them, even sometimes get down and show them downtown Cabo San Lucas.

Q.   For what purpose, what is your goal in doing that?

A.   I'd like them to either buy property, time share or become a member of the club, Diamante's golf course.

Q.   And in return for that endeavor, you receive -- how are you compensated?

A.   I'm actually compensated per month, and it's just basically expenses.

         I pay all my own expenses.  I pay for my plane tickets, food, everything when I'm down in Cabo San Lucas.

Q.   But if you are successful in getting someone to purchase an ownership interest in whatever form as relates to Diamante Cabo San Lucas, you get compensated for that,

3070

don't you?

A.   Just per month, like I told you.

Q.   Okay.

          And isn't it true, sir, that the entity and
person who would be instrumental in seeing to it that you
got paid is Ken Jowdy?

          Isn't that true?

A.   He's the founder, he's I guess the managing member of
Diamante, yes.

Q.   When you say you guess, you know that, don't you --

A.   I do know that, yes, he's the managing member.

Q.   Okay.

          The managing member of Diamante Cabo San Lucas,
correct me if I'm wrong, has a great deal of discretion
and authority as to who he decides to hire and who he
wants associated with his entity by way of sales people,
things of that nature.

          Would you agree with that as a general
proposition?

A.   I agree.

Q.   Have there ever been a security issue, sir, as
relates to the running of Diamante Cabo San Lucas that you
are aware of?

A.   I am not aware of security issues.

Q.   Does the name John Bonti mean anything to you?

Berard - Cross/Haley

3071

A.    Yes.

     He's the ex-FBI agent, John Bonti, that is in charge of chief security of the property, yes.

Q.    When you have had prospective purchasers look at the property, has there ever been an instance when -- we are talking about Mexico -- where a purchaser might say, hey, I'm a little concerned about security down there?

     Has that ever come up?

A.    I have not discussed that, no.

Q.    Not whether you discussed it, sir.

     Has any prospective purchaser ever said to you, in sum and substance, great looking property, I'm paraphrasing, I read about things that happen in Mexico, are there any security concerns?

     Has that ever been mentioned by a prospective purchaser, yes or no?

A.    Not to me, no.

Q.    Well, you are certainly aware, sir, that there's been security issues in Diamante Cabo San Lucas, correct?

A.    I am not --

     MR. MISKIEWICZ:  Objection, relevance.

A.    No.

Q.    Well, John Kaiser was assaulted there, wasn't he?

A.    He was not --

     MR. MISKIEWICZ:  Objection.

Berard - Cross/Haley

3072

A.    Not on the property, no.

        THE COURT:  Sustained on relevance grounds.

BY MR. HALEY:

Q.    With reference to the property itself, Diamante

Cabo San Lucas, have you seen John Kaiser in or about the

property on occasion?

A.    Yes, I do.

Q.    To your knowledge, what is his position with Diamante

Cabo San Lucas?

A.    He's head of all vertical construction.

Q.    Just for my edification, sir, when you say vertical

construction, we are talking about going up, right?

A.    Buildings, yes.

Q.    Is there a distinction between vertical construction

and horizontal construction?

A.    I believe in construction vertical is buildings.

Q.    Okay.

A.    It's not my specialty.

Q.    By the way, are there -- is there still building

going on at Cabo San Lucas where additional buildings are

being constructed?

A.    Yes.

        I would say it's probably only 20 to 25 percent

complete, the whole property.

Q.    So a lot still has to be done to develop the whole

Berard - Cross/Haley

property, true?

A.    That's true, yes.

Q.    And John Kaiser is the person in charge of the
building or building those vertical structures, correct?

A.    Yes.

Q.    Have you seen him physically on location, sir, with
let's say he's walking through the project perhaps going
down into the basement or walking up the stairs to look at
uncompleted building or some in construction?

A.    Yes, absolutely, many times.

Q.    Very actively involved from your perspective in terms
of making sure that that property is properly developed by
way of the vertical construction.

          Is that true?

          MR. MISKIEWICZ:  Objection, relevance.

          THE COURT:  I'll allow the last answer to stand,
but I think we can move on.

          Can you repeat the answer.

          THE WITNESS:  Yes.

          When I have been on the property he was very
involved.

BY MR. HALEY:

Q.    Final question, sir, as relates to that.

          Are there any plans to your knowledge as relates
to the development of Diamante Cabo San Lucas to build

Berard - Cross/Haley

3074

let's say a White Castle hamburger restaurant?

A.    Not that I know of, no.

Q.    By the way, when was the last time you spoke to John Kaiser?

A.    Probably Friday, Saturday.

Q.    As a matter of fact, as relates to your relationship with Mr. Kaiser, you and he on more than one occasion have given interviews to the media in connection with this particular case.

         Isn't that true?

A.    What do you mean interviews?

Q.    Well, where a news media, print media organization interviews you so that you will give them information that you say is what occurred with reference to Phil Kenner's arrest and everything you have been testifying to.

         Isn't that true?

A.    I have been asked questions, yes.

Q.    And, as a matter of fact, the media interviews involving questions asked of you also involved questions asked of John Kaiser, isn't that true?

A.    I believe so, yes.

Q.    And the result of those media interviews would be media articles where both you and he would be quoted in the media.

         Isn't that true?

Berard - Cross/Haley

3075

A.    That's correct.

Q.    Sir, did you become aware that Phil Kenner ultimately was arrested in connection with this indictment for which he is standing trial?

A.    Yes, I did.

Q.    The day of or the day after his arrest, did an article appear in the media where you or John Kaiser were quoted extensively based on those interviews about the case?

        Yes or no?

A.    I don't know the timing, but, yes.

Q.    Well, reference to the interviews that you gave to the media, they would ask you questions and you would answer those questions to the best of your ability.

        Is that correct?

A.    That's correct.

Q.    And would you endeavor, sir, as you were talking to the media, to be truthful in your answers to the media when they asked the questions?

        Yes or no?

A.    Best of my knowledge, yes.

Q.    Now, if you recall, sir, the interview of you by let's say a reporter or a member of the news media, that would take place sometime before the article itself was published.

Berard - Cross/Haley

3076

Isn't that true?

MR. MISKIEWICZ:  Objection, relevance.

THE COURT:  I'll let him question regarding if he made statements to the media.

Go ahead.

A.   I don't know the timing.

I have been called many times by the Daily News and a few other reporters to talk about this case.

Q.   But my question is, sir, let's say you talk about the case on day one, the article reflecting what you told the media, that comes out not contemporaneous with the statement you have made to the media, but several days later.

Isn't that true?

A.   Whenever I was interviewed, yes.

Q.   Do you recall giving an interview --

MR. HALEY:  Can I have one moment, Judge.

THE COURT:  Yes.

(There was a pause in the proceedings.)

BY MR. HALEY:

Q.   Sir, I'm going to ask you to take a look at an exhibit called Kenner 89.

Don't read any part of it into the record.  I just want you to take a look at it.

A.   Okay.

Berard - Cross/Haley

3077

Q.    Does that appear, sir, to be the -- a newspaper
article that was published November 14, 2013 that includes
statements made -- you made when interviewed by members of
the news media with reference to claims made in this case?

A.    Yes.

Q.    Now, when you were interviewed as relates to this
particular article, the statements you made to the news
media, were you aware at that point in time, sir, that
Phil Kenner had been indicted by a grand jury?

A.    Could you ask that question one more time, please?

Q.    Sure.

A.    Sorry.

Q.    When you were interviewed in connection with this
November 14th, 2013 article, which interviews presumably
took place a few days before, were you aware at that point
in time that Phil Kenner had been indicted by a grand
jury?

A.    Indict -- I don't understand the question.

Q.    Sure.  I want you to understand, Mr. Berard.  It's
not a trick question.

        When you gave the interview a few days prior to
November 14th, 2013, had someone told you in sum and
substance that a grand jury had returned an indictment
charging Phil with various federal offenses?

        MR. MISKIEWICZ:  Objection to form, a few days

Berard - Cross/Haley

3078

before.

        THE COURT:  Do you understand the question?

        THE WITNESS:  I kind of don't.

        Sorry, Judge.

        THE COURT:  Mr. Haley, rephrase it.

BY MR. HALEY:

Q.   When you were interviewed by the news media --

        MR. HALEY:  Let me do this, Judge, as well.

        I withdraw that question.

BY MR. HALEY:

Q.   Sir, I want you to take a look at Kenner Exhibit 90.

        Again, take your time.  Sir, is it fair to state that actually there were two articles as relates to interviews you and John Kaiser gave to the news media in or about November of 2013, one dated November 13th, 2013, and the next dated November 14th, 2013.

        Is that true?

A.   I guess that's correct.

Q.   I don't want you do guess.

A.   There were many times I talked to the Daily News, so --

Q.   I have no doubt.

A.   I don't have the dates.

        (Continued on next page.)

Berard - Cross/Haley

3079

CROSS-EXAMINATION (Cont'd)

BY MR. HALEY:

Q    Only as it relates to these particular documents.

Does this refresh your recollection one article came out

November 13, 2013, and the next article, the follow day,

November 14, 2013.

A    These two documents, that is correct.

Q    When you were giving the interviews to the news media

as relates to those articles, were you aware at that point

in time that in addition to what you were telling the

media, a grand jury had returned formal charges against

Phil Kenner?

         Yes or no?

A    I don't recall.

Q    Were you aware, sir, that just before the press

release, were you aware that November 13, 2014 article

appeared in the daily news just a moment ago?

         THE COURT:  I thought you said 13.

         MR. HALEY:  Excuse me.  13.  Thank you.

Q    -- That earlier that morning the FBI had released its

own press release?

A    I was not aware, no.

Q    Sir, would you kindly take a look at Kenner

Exhibit 91.

A    Yes.

Berard - Cross/Haley

3080

Q    Does that document in any way refresh your recollection or give you an awareness that the same day that you -- the press release with reference to the Daily News article based upon your interviews on November 13, 2013, that's when the article appeared, that earlier that day the FBI had it's own press release?

A    I've never seen this, no.

Q    Is the name Special Agent Matt Galioto familiar to you?

A    Yes.

Q    In what way is that name familiar?

A    He's the FBI agent in this case.

Q    And between now and today, could you give us -- between now and today -- sir, between let's say the time you first started investing in the project today, how many conversations would you say you had with Special Agent Matt Galioto?

A    I can't recall.  I would say ten or so more.

Q    Incidentally as relates to one or more of those conversations, do you know if he took notes of what you were saying?

A    I don't know.  I don't recall.

Q    Well, when is the last time to the best of your memory that you spoke with Agent Matt Galioto?

A    Today.

Berard - Cross/Haley

3081

Q    And where did that occur?

A    In the federal building.

Q    In an office?

A    U.S. Attorney's Office here, yes.

Q    And how long did that conversation take place?

A    Today might have been only a few minutes.

Q    Can you recall the last conversation you had with Special Agent Matt Galioto that took more than a few minutes, let's say a half hour or more in duration?

A    Probably a month or so ago.

Q    When and where did that occur?

A    In this building.

Q    In the U.S. Attorney's Office?

A    Yes.

Q    I take it -- withdrawn.

        Was part of the conversation a discussion concerning this case, the allegations, the questions that might be asked of you, things of that nature?

A    It was involving this case, correct.

Q    When you spoke during that period of time, do you know if anyone was taking notes of your conversations?

A    Not that I recall.

Q    Laine Donlon, I believe you testified, is a friend of yours?

A    Yes, close friend.

3082

Q    And how long have you maintained this close friendship between yourself and Laine Donlon?

A    Ten plus years I've been friends with her.

Q    As a matter of fact, you've told us that when you went to Hawaii she accompanied you, is that true?

A    That's correct.

Q    When you testified on direct that you thought your line of credit was being utilized only for Hawaii, is it your testimony that at no point in time you became aware that your line of credit and/or others committed to the Hawaii project were being used to extend a loan to Ken Jowdy with a return of 15 percent interest on that loan?

A    Absolutely not.  My money was not supposed to be used in Mexico.

Q    That's not my question sir.  I know you told that on direct.  My question is did there not come a point in time, though you are certain you weren't told to it initially, but did there come a time that you learned that line of credit money was being used for purposes of extending a loan to Ken Jowdy at 15 percent interest?

A    I heard of it, but I never heard of a line of credit loan.

        A Mexican loan is what I heard through Phil Kenner.

Q    But do you have an understanding that the source of

3083

that money was coming out of Little Isle IV?

A    I did not know that, no.

Q    Well, I know you told us that you have a recollection of testifying in the Nolan arbitration, correct?

A    That's correct.

Q    And you understood, sir, that the point in time, that the questions -- withdrawn.

         You understood at that point in time the answers that you gave to the questions were under oath, true?

A    That's correct, yes.

Q    Now, you said on direct that information that you provided to the arbitrators as relates to that proceeding, that information was given to you by Phil Kenner, is that what you said?

A    That was prepared by Phil's lawyers, Ron Richards and Tom Baker.

Q    Well, at any point in time when you were asked questions during that arbitration, did or did you not say in answer to a question, I'm answering the questions but I was prepped by Ron Richards, an attorney, and I don't know the answer of this to my own personal knowledge.  Did you say something like that?

         Yes or no?

A    No.

Q    Well, when Ron Richards prepped you, did you say to

3084

him in sum and substance, look, Ron, I can't testify to that because I don't know that to be a fact.  Did you say something like that to him.

          Yes or no?

A    No.

Q    Well, take a look at this document marked Kenner Exhibit 92, Mr. Berard, and it's an excerpt but I'll give you the entire transcript if you need it, sir.

          Please take a look what is there and I would ask that you read it to yourself so you are comfortable that you can identify that document.

A    I'm familiar with this document, yes.

Q    And what is it?

A    This is the Court transcript of the Nolan arbitration in 2013 between Phillip Kenner and Owen Nolan and how I testified.

Q    It's excerpts of that testimony, is it not?

A    Yes, sir.

          MR. HALEY:  Your Honor, I would offer that as Kenner Exhibit 92 in evidence.

          MR. MISKIEWICZ:  May we approach, your Honor?

          THE COURT:  Why don't we take the break.

          Take the afternoon break.  Don't discuss the case.

          (Whereupon, at this time the jury exits the

3085

courtroom.)

        THE COURT:  You may take a 15-minute break.

        (Witness excused).

        THE COURT:  Someone give me a copy of it.  Do you have a copy of it?

        MR. LARUSSO:  I'm sorry, Judge, I do.

        THE COURT:  What was the objection?

        MR. MISKIEWICZ:  I'm not sure where -- which portion of this excerpt constitutes impeachment and even if there was a question and answer that would constitute impeachment of what the witness has said so far.  I don't believe still there is any basis for the admission wholesale that is in this portion of the deposition.

        THE COURT:  I think that is correct, Mr. Haley, but why don't you tell me -- you can obviously impeach him on things that are inconsistent, but if there is no objection, that's one thing.  But they object.

        MR. HALEY:  Your Honor, thank you.  That's why I isolated excerpts of the testimony, I'm not offering the exhibits en masse.  I would be reading excerpts that I do believe represent a prior inconsistent statement.  My position is the Government can argue in front of the jury it's not an inconsistent statement.  We believe it is an inconsistent statement.  I'll be quite specific, your Honor.

Berard - Cross/Haley

3086

Page 914.

Line 13.

Question:  Some of the questions though may not appear immediately to be prior inconsistent statements are necessary so the jury has a sense so that the question didn't come out of nowhere, that there was a sequence as relates to the questioning of this particular witness, and, for example, on 914, I did include by Mr. Richards: Do you know who the first pick of the 1994 NHL draft?

Answer:  Yes.

Who is that?

'94

Jonovaski.

But to get to the more relevant point, Judge:

Are you an investor in some real estate deal in Cabo.

Yes.

Prior to investing in those transactions can you tell the panel what type of diligence --

THE COURT:  I've looked at it.  I understand you may need to give context, sometime, but for example, I think the portion you are interested in is page 1690 --

A    Correct, sir.

MR. HALEY:  Fine, your Honor.

THE COURT:  Start there.  Page 915, line 9.

Berard - Cross/Haley

3087

MR. HALEY:  Thank you, your Honor.

THE COURT:  And go to the end, okay.

MR. HALEY:  Thank you, Judge.

THE COURT:  We'll take a break.

THE COURT:  Rather than offer it, read it into the record.

MR. HALEY:  Yes.

(Whereupon, a recess was taken.)

THE COURT:  All right.  Ready to go.

MR. HALEY:  Yes.

THE COURT:  I want you to know it's 3:35 and we hadn't had one sidebar.  I just want you to know.

MR. HALEY:  It's going to be the Government, Judge.

THE COURT:  All right.  Bring Mr. Berard in.

(Whereupon, the jury at this time enters the courtroom.)

THE COURT:  Please be seated.  Continue, Mr. Haley.

MR. HALEY:  Thank you.

Q   Mr. Berard, just a point of reference.  I believe we left off and we were asking questions about your knowledge of money coming out of the Hawaii project being loaned to Ken Jowdy.

Do you recall questions of that type?

3088

A    Yes.

Q    As relates to the testimony you gave in the
arbitration back in May of 2009, sir, isn't it true that
you gave the following answers to these particular
questions at that time.

        Question:  When you were -- as far as the Hawaii
deal, were you made aware of any sort of transaction
Mr. Kenner set up where you can give a commitment or
pledge a line of credit in lieu of putting all your money
in initially?

        Answer:  Yes.

        Question:  Can you tell the panel what was your
understanding?

        Answer:  Basically the company -- it was set up.
The company would make the payment.  I would pledge the
money, obviously to get the loan for the property.  Again,
the company would pay the payments, and I wasn't
forfeiting all the amount of money for the prior piece of
property.

        THE COURT:  It doesn't say "prior."

        MR. HALEY:  Excuse me.  Piece of property,
Judge.  Thank you.

        Question:  Were you aware that Mr. Kenner got a
credit line against some of the securities or investments
you had?

3089

Answer:  Yes.

Question:  And later on, were you aware that Mr. Kenner started lending this money to another principal in the Cabo project named Ken Jowdy?

Answer:  Yes.

Question:  Were you aware that he had disclosed to you that he was going to lend this money at a rate of interest to benefit the investors?

Answer:  Yes."

Your Honor I'll excerpt that portion.

THE COURT:  Yes.

MR. HALEY:  By Mr. Richards.

Question:  Where did you think the money that Mr. Jowdy -- were you told where the money was going to be used that was given to Mr. Jowdy as far as the Mexican project?

Was there anything you were told about that?

Answer:  Basically just loan him the money for the property.

Question:  What about bank statements?  Did you have any problem getting any of your bank statements from Mr. Kenner at any time?

Answer:  Not at all."

Finally, sir.

Question:  And prior to signing any of these

Berard - Cross/Haley

3090

documents, did you have access to your own attorney unconnected to Mr. Kenner to review this?

       Answer:  Yes, I did.

       We have a family attorney back home.  Before I sign any documents basically -- I went to his office, sat with him, we reviewed them and I signed them basically and I signed them and basically FedExed them to Phil."

       That was your testimony at that time, correct, sir?

A    That's correct.

Q    By the way, in your prep session with Mr. Ronald Richards, did he prep you to when asked the question, and prior to signing any of these documents did you have access to your attorney unconnected to Mr. Kenner to review this?

       Answer:  Yes, I did.  We have a family attorney back home.  Before I sign any document basically, I went to his office, sat with him, we reviewed them, and I signed them and basically FedExed them to Phil. "

       Did Mr. Richards prep you to say that to give that answer to that question, sir?

       Yes or no.

A    No.

Q    I showed you a document earlier, sir, admitted as Kenner 88, Limited Liability Company Agreement of Little

3091

Isle IV LLC, wherein we identified a percentage interest

on a portion of that document.

        Do you remember that?

A    That's correct.

Q    Sir, I'm going to ask you to take a look at a

document marked Kenner Exhibit 93.

        Again you are entitled to look at the whole

document and I would suggest at least that you have a

gross understanding of the document -- there's a page

upside down.

        Before you answer my question simply take a look

at the document?

A    Yes.

Q    Do you recognize this document, sir?

A    I've never seen this document.

Q    As relates to the last page of the document, and

again, it's a photocopy.  There's handprinted writing on

the document.  That's not your handprinted writing, is it?

A    That is not, no.

Q    Is that your signature however, sir?

A    That's my signature, yes.

        MR. HALEY:  Your Honor, I'd offer this as Kenner

Exhibit 93.

        MR. MISKIEWICZ:  No objection.

        MR. LARUSSO:  No objection, your Honor.

Berard - Cross/Haley

3092

THE COURT:  93 is admitted.

(Whereupon, Defendant's Exhibit 93 was received in evidence.)

Q    Sir, I'm again showing you O a document, Kenner Exhibit 94.  Take your time to look at that document.

As relates to Kenner Exhibit 94, have you seen this document before?

A    I have not, no.

Q    Sir, could you kindly take a look at Kenner 95?

A    Yes.

Q    Have you seen this document before today?

A    I've seen this one, yes.

Q    I see.  On the photocopy, do you see a signature on that document?

A    Yes.

MR. HALEY:  Your Honor, we'd offer this as Kenner Exhibit 95.

MR. MISKIEWICZ:  No objection.

MR. HALEY:  No objection.

THE COURT:  95 is admitted.

(Whereupon, Defendant's Exhibit 95 was received in evidence.)

Q    Now, at any point in time, sir, did you become aware of a document created by John Kaiser, where John Kaiser listed his interest in Led Better Development Company as

Berard - Cross/Haley

3093

50 percent, your interest, that is, 25 percent, and the

interest of a Vincent J. Desoriero as 25 percent?

A    No, I'm not.

Q    What did the Sag Harbor property sell for?  How much?

A    Roughly probably I would say the low seven hundreds.
700,000.

Q    I see.  And the money that you put into the Led
Better -- withdrawn.

         Was it 375,000 that you would invest in that
property?

A    That's correct.

Q    How much of that sales price was returned to you,
sir?

A    Again, I don't recall the sales price but I got
50 percent of the sales price.

Q    Could we agree, sir, if it's in the low 700's, and
you get 50 percent, that is approximating at least 350 at
that point.

         Is that your testimony?

A    I would say so, a little lower.  Roughly a 17 to
20 percent loss I took so I don't remember the exact
number.

Q    Did John Kaiser ever show you any of the closing
documents that were created when Led Better Development
Corp. purchased the property?

Berard - Cross/Haley

3094

A    No.

Q    Does an attorney by the name of Simon Detesh, D-e-t-e-s-h mean anything to you?

A    No.

Q    Did you ever ask Mr. Kaiser to provide you copies of the closing documents with reference to that closing when the property was purchased by Led Better?

A    No.

Q    So I take it as you sit here today, sir, you've never seen those documents, is that true?

A    That's correct.

Q    Sir, I apologize because I guess it is implicit in the last question I asked, but at any point in time did any law enforcement agent or member of the U.S. Attorney's Office, show you the documents that were created with reference to the Led Better closing where the property was purchased?

A    Did they ever show me?

Q    Yes.

A    Yes, I've seen the documents that we went through.

Q    Do you have a memory of seeing documents that were created when the Led Better property was purchased? That's my question?

A    No, I've not.

Q    To the best of your memory those documents were not

Berard - Cross/Haley

3095

shown to you by the federal agents or the U.S. Attorney; is that correct?

A    No, they were not.

Q    You did understand, sir, and I'm sorry for jumping around for a bit, but you'll stay with me.

You did understand, sir, the percentage interest that you would receive in the Hawaii project, was correlated to the amount of your monetary commitment to the property.  You have that understanding, do you not?

A    Yes.

Q    So to state the obvious, sir, did you have an understanding just as a matter of simple math, the more you contributed to the Hawaiian project the greater your percentage interest in the Hawaiian development would be, correct?

A    Yes.

Q    When you were asked, sir, by the government whether you've ever received to this day, any return on those investments and you answered no, you recall those questions, correct?

A    Yes.

Q    Do you know what if any obstacle Phil Kenner has faced in terms of pursuing a claim against Mr. Jowdy for money he asserts was loaned to Ken Jowdy and not repaid? Do you have any idea as to the obstacles he faced pursuant

3096

that lawsuit?

A     Obstacles?

Q     Yes, sir.

A     I don't understand the question.

Q     Well, with reference to Eufora, you were asked a question:  Have you ever received a return of investment as relates to Eufora.

         You recall that, correct?

A     Yes.

Q     And you answered no, true?

A     Yes.

Q     But you are aware that Phil Kenner pursued by way of litigation an effort to see to it that the books and records of Eufora LLC reflected your ownership interest. You are aware of that, are you not?

A     Yes.

Q     As a matter of fact, that involved actually retention of an attorney by the name of Michael Stolper, true?

A     Ask that question again, please.  You confused me a little bit.

Q     No point in confusing, Mr. Berard.  I can do that on my own.

         You were aware, sir, that effort as relates to Eufora and one's ownership interest, specifically the investors' ownership interest, did at some point involve

3097

the retention of an attorney to move in that direction by
way of lawsuits, correct?

A    I don't know if we ever gave money to Michael
Stolper.

        I really don't understand the question, sir.

Q    Well, does the name Michael Stolper mean something to
you?

A    Yes, a lawyer in New York.

Q    What was your understanding, sir, as to the reason
Michael Stolper became engaged with you and Phil Kenner
and perhaps others?

A    We were trying to save Eufora from an outside
purchaser.

Q    Okay.  And within the context of that lawsuit, if you
know, did it also include not only saving it from an
outside purchaser but ensuring that the books and records
of that company accurately reflected every investors'
ownership interest.

        Do you recall that being part of the effort?

A    I don't recall.

Q    So you don't recall but it may or may not be part of
the effort?

A    Books and records, I don't recall.

Q    Well, would you be surprised to learn that that was
also part and parcel of the effort to make sure that the

Berard - Cross/Haley

3098

books and records accurately reflected every investor's ownership interest including yourself?

A    I wouldn't be surprised.  It's an investment, no.

Q    With reference to the Global Settlement Fund, I believe you testified on direct that the Global Settlement Fund was set up for, and you used the word "lawyers' fees," true?

A    Yes.

Q    And within the context of the use of Global Settlement Fund for lawyers' fees, the name Kristin Myrick was mentioned, isn't that true?

A    Yes.

Q    And the name Kristin Myrick was mentioned to you by Phil Kenner as being part and parcel of lawyers' fees, usage of funds, correct?

A    No, that had nothing do with the Global Settlement.

Q    Well, do you know, sir, the nature of the lawsuit involving Phil Kenner and Kristin Myrick?

A    Yes.

Q    Is it your belief that she sued him, is that your belief?

A    I believe he sued her, I believe.

Q    Do you know if the content of that lawsuit through the pleadings themselves and discovery was to obtain records that she possessed that relate to the Hawaiian

3099

project.

          Did you know that?

A     I do not.

Q     Well, did you have an understanding that Kristin Myrick was employed by Phil during the period of time that the Hawaiian project was underway and part of her duties and responsibilities was to assist Phil Kenner in maintaining the books and records with reference to the Hawaiian project.

          Did you have an understanding on that?

A     She was working for him, Phil Kenner.

Q     But she was working for Phil Kenner at the time when Phil Kenner was to your knowledge involved in developing the Hawaii project?

A     Would have been around the same time, yes.

Q     By the way, when you invest in Hawaii, you and Phil Kenner, or did Phil discuss with you how the investment would be organized from a corporate structure, something known an LLC?

A     No.

Q     Well, did you have an understanding as to who would have the control, but also the responsibility for use of the line of credit funds when you invested?

A     No.

Q     You had no understanding of that?

3100

A     No understanding, no.

Q     Was the name managing member ever mentioned to you --
withdrawn.  Was the name "managing member" or the term
"managing member," ever discussed between you and Phil in
relation to your investment in the Hawaiian project?

A     I don't recall.

Q     Well, at any point in time, sir, did you become aware
by way of document or someone you spoke with, including
Phil Kenner, that Phil Kenner was the managing member for
the Hawaiian project?

A     I believe he was, yes.

Q     You testified on direct, sir, that you have personal
knowledge of a lawsuit being filed against Ken Jowdy,
correct?

A     I did, yes.

Q     And to your knowledge, that lawsuit was dropped by
your words, because it was tough getting everyone together
to pursue the lawsuit.

          That's what you recall?

A     That's what we were told, yes.

Q     Well, you were never told by anyone that the lawsuit
was dropped because a judge determined that the loan
itself was a result of a forgery.  You were never told
that, correct?

A     I was not.

3101

Q    Sir, as relates to your line of credit, isn't it true
that as a result of the line of credit being lost,
whatever terminology you wish to use, you suffered not a
financial loss of $1.1 million but you suffered a
financial loss of $589,732.37.

         Do you recall that?

A    I thought it was a little closer to 700,000, but it's
in the ballpark.

Q    Okay.  And you were then able to settle with Northern
Trust for the sum of, I believe, you said about 300,000?

A    Yes, just under 300,000, I think.

Q    So we don't need to do the math but your actual loss
was that differential -- I withdraw the question.

         MR. HALEY:  May I have a moment, Judge.

Q    Sir, we talked about managing members and I believe
you said a short while ago that you were aware that Phil
Kenner became the managing member of Little Isle IV?

A    I believe he was, yes.

Q    Did you become aware, sir, that John Kaiser became
the managing member of a entity named Lake Naalehu
Ventures 2006?

A    No, I did not.

Q    Now, as a result of your relationship between
yourself and John Kaiser, were there instances where John
Kaiser loaned you money?

Berard - Cross/Haley

3102

A     No.

Q     Well, on August 23, 2010, is it not true that $95,000 was transferred via wire to you out of an account in the name of John Kaiser at TD Bank?

A     That's correct.

Q     And what was, so we understand, sir, what was the purpose of that money coming your way by way of a wire transfer?

A     The money went in actually into an escrow account into the lawyers' firm, putting in 250,000.  And money went from the lawyers' escrow account to John Kaiser, not the whole 250 but the 90,000.  John sent me back my money out of his account.

Q     And the reason you sent him the money in the first instance, what was the reason for that?

A     The 250,000 was going -- it was during Eufora when we were trying to basically trying to save the money from an outside buyer, purchaser.

Q     Well, on June 25, 2010, was the sum of $55,000 wired to you directly from John Kaiser's account at TD Bank?

A     Yes.

Q     Yes?

A     Yes.

Q     Was that part of this transaction you were telling us about?

3103

A     I believe so.  I'm not positive, to be honest with

you.

        I don't recall that.

Q     Do you know Ethel Kaiser?

A     I believe that is John's mother.

Q     Have you met her?

A     One time at a golf tournament.

Q     Did John Kaiser ever tell you that his mother had a

brokerage account where she maintains her investments?

A     No.

Q     Did she ever tell you that she had a brokerage

account where she maintained her investments?

A     No.

Q     Where do you reside now, Mr. Berard?

A     Wenham, Massachusetts.

Q     When was the last time you were in Hawaii?

A     It would have been probably sometime 2011, 2012.

Q     As relates to your current employment vis-à-vis

Diamonte Cabo San Lucas, do you on occasion fly to

Diamonte Cabo San Lucas?

A     I do, yes.

Q     To meet with clients, yes?

A     I have, yes.

Q     During those times have you had occasion to meet with

Ken Jowdy?  Yes or no?

3104

A     Yes.

Q     On those occasions have you had occasion to meet with John Kaiser?  Yes or no?

A     Yes.

Q     Were there instances where you were meeting with John Kaiser and Ken Jowdy was also present, the three of you together.  Did that happen?

A     Yes.

Q     Mr. Berard, during those meetings, did you ever discuss this case and the charges that were pending against Phil Kenner.

        Yes or no?

A     I would say yes.

Q     Incidentally, during those meetings, if you recall, was his director of security present, John Bonti?

A     No.

Q     Did he have any lawyers present during the course of those meetings, yes or no?

A     No.

        MR. HALEY:  Your Honor, I have no further questions of this witness.  Thank you.

        THE COURT:  Mr. LaRusso.  Thank you.

            (Continued.)

3105

CROSS-EXAMINATION

BY MR. LARUSSO:

Q    Good afternoon, Mr. Berard.  How are you?

A    How are you?

Q    My name is Bob LaRusso.

         You mentioned a few minutes ago, and I'm not
sure I caught all of it, it's late in the day so I'll ask
you if you can help me out if you could.

         You said that you had given money to Mr. Kaiser
to save the company, which I believe was Eufora, from an
outside buyer?

A    I put money in a lawyers' escrow account in New York
City during the time we were trying to serve Eufora.

Q    Do you know the name of the lawyer?

A    It was through Michael Stolper.  I do not.

Q    Do you know when you put that money in?

A    I believe it was sometime in 2010 but I do not
recall.

Q    It would have been approximately a year after you had
returned from Russia playing hockey?

A    I would say so, yes.

Q    And do you know -- did you wire -- I'm sorry.  Did
anyone else contribute to the efforts to save the company
by buying from an outside buyer?

A    I believe there were a few people, John Kaiser being

3106

one of them.

Q    Other than you and Mr. Kaiser, do you know anyone else that was involved at this time?

A    Uhm, there was a few names.  I don't recall now.

Q    Mr. Gaarn, Timothy Gaarn?

A    He might have been involved, yes.

Q    CR Gentry?

A    He was definitely involved yes.

Q    When you say definitely, he was part of the discussions that were taking place at this point in time regarding the raising of money to save the company from an outside buyer?

A    He was involved, yes.

Q    Did he contribute any money?

A    No.

Q    Do you know what the purpose of raising money was?

A    Yes.  I believe we were trying to say the patents that we believe that Tommy Constantine told us were sold to Mr. Volpe, I believe, overseas.

Q    And when this effort was being made, were you able to -- withdraw that.

         Was there also an effort underway not only to buy this loan but also to take the company over from Mr. Kaiser -- I'm sorry -- from Mr. Constantine?

A    No.

3107

Q    Do you know when in 2010 this was taking place, Mr. Berard?

A    I want to say it was the springtime/summer, but I honestly, I don't know exactly what time of the year it was in.

Q    When, if you did, first meet with Mr. Stolper?

A    First met Mr. Stolper through a mutual friend, but again I don't recall.  It would have been sometime in 2010.

Q    Do you remember the name of that mutual friend?

A    I do not to be honest with you.  It was -- I called, I think I called a friend in New York.  I was living in New York City at the time and he recommended Mr. Stolper.

Q    Not a good friend, I would imagine?

A    He lived in New York and I was trying to contact a lawyer and he introduced me to Mr. Stolper.

Q    So you spoke with this person, this friend, and he referred you over to Mr. Stolper?

A    That's correct.

Q    Were you the only one at this time looking for a lawyer?

A    There was a group of us who were trying to basically find a lawyer to help us with Eufora.

Q    Who was the group?

A    As I recall, myself, John Kaiser, Phil Kenner, again

3108

Timothy Gaarn I think was involved, CR Gentry, probably would have been a few other players as well, NHL players.

Q    And did you and/or any of that group actually meet with Mr. Stolper?

A    I met with Mr. Stolper plenty of times.  I believe the group did as well.  One time in New York City we met with him once.

Q    Would it be fair to say that this meeting we are talking about had to have occurred before you would make the contribution that you just talked about?

A    I believe so, yes.

Q    And do you recall at any point in time during the meeting a discussion ensued about a loan that was -- withdraw.

        Was there any discussion about a man by the name of Brent Nerguzian?

        Did I get that right?

A    Yes, that name is familiar.

Q    Do you remember Mr. Nerguizian's name coming up with these earlier discussions with the group, and I'll use the name "group" and if for some other reason other people were involved please correct me.  I'll use it to name the people you identified, okay.

A    Yes.

Q    With regards to Mr. Nerguizian, did you come to learn

3109

in the discussions that he actually had a loan, a Eufora loan?

A    My memory says that I believe that Tommy had a loan out to Mr. Brent.  Can't pronounce the last name.

Q    I think we'll know who you are talking about.

A    And basically that loan needs to be repaid off as well.

Q    My question is during discussions about Brent, the loan that he had, was mention made of the fact that the patents were being used as collateral for that loan?

A    I don't recall.

Q    Does the name Neptune mean anything to you?

A    It has to do with something with Mr. Brent, I believe, yes.

            (Continued.)

3110

BY MR. LARUSSO:

Q.    Might have been the company that he used to extend the loan to Eufora?

A.    It sounds familiar, yes.

Q.    Now, in your meetings, the early meetings before the money were being contributed, do you recall if any discussion ensued about contacting Brent in regards to buying the loan?

A.    I don't recall.

Q.    At this point in time was there any discussion regarding the importance of buying the loan from your point of view as well as the other individuals?

A.    The importance would have been save the patents, correct.

Q.    The person who owns the loan would own the patents?

A.    To my knowledge I thought the loan was a personal loan of Tommy Constantine.

Q.    When you say personal loan, you're talking about the loan that Brent had?

A.    That is correct.

Q.    Let me withdraw that.

      You don't recall that the loan that Brent and his company had was with Eufora; is that your testimony?

A.    I didn't think it was Eufora.

      Yes, it is.

3111

Q.    Would it surprise you to learn it was with Eufora and not with Mr. Constantine?

A.    You say surprise?  I didn't understand the loan in general.

Q.    Well, do you remember any discussions about going to talk to Brent to buy the loan?

A.    I do not, no.

Q.    Do you know if or did you come to learn that somebody in your group actually went to talk to Mr. Brent?

A.    Not to my knowledge, no.

Q.    I'm just going to ask you a few questions about investments.  I know it's late and I don't want to get into a topic that will take us over, so a few questions.

        You testified that one of the investments you made through Mr. Kenner was $500,000 in northern Baja; is that correct?

A.    That's correct, yes.

Q.    You referred to it as El Rosario?

A.    Correct.

Q.    Is it also known as Diamante Del Mar?

A.    Yes, it is.

Q.    Who is the project manager?  Who was the person who was behind that project?

A.    It would have been Ken Jowdy and Phil Kenner.

Q.    You actually went and visited that location; is that

Berard  -  Cross/LaRusso

3112

not correct?

A.    Yes, I did.

Q.    You invested because, quote, you loved it, end quote?

A.    Very nice piece of property.

Q.    You were not the only one to invest in -- I'll call it Diamante Del Mar.  That's the word that's been used more frequently during the trial.  I know you used El Rosario, so if that's all right with you?

A.    That's fine.

Q.    You weren't the only investor in Diamante Del Mar, were you?

A.    No.

       To my knowledge, I would say probably seven to nine.

Q.    Would it be fair to say that the investments that those hockey players and you made in Del Mar totaled somewhere in the neighborhood of seven or $8 million?

A.    I would say pretty close, yes.

Q.    Do you know what construction, if anything took place in the northern Baja, the Del Mar investment?

A.    There wasn't much construction.  There was a lot of land.  I guess land construction.  They did build -- it wasn't completed -- but a runway for planes to land on.

Q.    And you also recall that Mr. Jowdy took out a loan for $8 million on that property as well as receiving the

3113

investment money from you and the other hockey players?

A.    I wasn't aware of that at that time, no.

Q.    You came to learn that; is that correct?

A.    That's correct, yes.

Q.    Did you also come to learn that Mr. Jowdy did not make the invest payments on that loan?

A.    I did, yes.

Q.    Did you also come to learn that the investment, and I don't know if this is the proper phrase, correct me if it doesn't match your understanding, went south?

A.    Yes.

      The money was lost, correct, foreclosed on.

Q.    Now, when there was a foreclosure and the land was lost and your investment was lost, did you discuss with Mr. Jowdy your investment that you lost in Del Mar?

A.    Not at that time, no.

Q.    Would it be fair to say that at some point you did discuss the monies that you had invested and lost in Del Mar?

A.    Yes, absolutely.

Q.    And as a result of those discussions, did you receive any equity in any other projects that Mr. Jowdy was involved in?

A.    I have not, no.

Q.    Was there any discussion about you receiving any

Berard - Cross/LaRusso

3114

other investments?

A.    No.

Q.    Did you get anything, after you lost your investment in Del Mar, to replace what you had lost?

A.    I have not, no.

Q.    However, you do, I believe, tell us that you've been working for a company that's affiliated with Mr. Jowdy's Diamante Cabo San Lucas; is that right?

A.    That's correct, yes.

Q.    You went and solicited that opportunity; is that correct?

A.    When I was down on the property, yes.

Q.    Part of that solicitation was actually going and talking to Mr. Jowdy in part; is that correct?

A.    That's correct.

Q.    Now, in those discussions, did you ever ask Mr. Jowdy what he did with the loan proceeds that he took out on the Del Mar?

A.    I never did, no.

Q.    You know it was about $3 million, right?

A.    I do now, yes.

Q.    And you never asked him, in all the time you've been working with him, what happened to that money?

A.    I never asked him, no.

Q.    By the way, Mr. Constantine had nothing to do with

3115

the investment you made in northern Baja, correct?

A.    He did not, no.

Q.    You also invested 200,000 in Cabo San Lucas, you told us?

A.    Yes.

Q.    That you saw and found, quote, a great piece of property, end quote?

A.    It is.  It's Cabo.  It's very nice.

Q.    Mr. Constantine had nothing to do with that investment; is that correct?

A.    At that time, no.

Q.    We talked about the Hawaiian investment and lines of credit.  I'm not going to go through that.

         At the time you made those investments and discussed it with Mr. Kenner, the line of credit, Mr. Constantine had nothing to do with those; is that correct?

A.    That's correct.

Q.    You talked about Led Better.

         I think it's obvious from the Judge's instruction, he had nothing to do with Led Better and Sag Harbor; is that correct?

A.    That's correct.

Q.    Do you know of an investment known as Paradise Valley?

Berard  -  Cross/LaRusso

3116

A.    Yes, I do.

Q.    Tell me what you know about Paradise Valley, whether you were involved in it?

          I'll withdraw that.  I'll make --

          MR. LARUSSO: If I can lead a little, Judge, so we can get in and out.

Q.    You made an investment in Paradise Valley?

A.    I did, yes.

Q.    How much did you invest in Paradise Valley?

A.    Now as we sit here today, probably close to 500,000.

Q.    Mr. Constantine had nothing to do with Paradise Valley; is that correct?

A.    No.

Q.    Some of the individuals that were involved with Paradise Valley were Mr. Kaiser and Mr. Privitello; is that correct?

A.    That's correct.

Q.    As a matter of fact, Mr. Privitello put a $250,000 mechanic's lien on the property after he had done his work; is that correct?

A.    That is correct.

Q.    It didn't make you to happy, did it?

A.    It did not, no.

Q.    You were trying to sell the property?

A.    Yes, we were.

**Berard  -  Cross/LaRusso**

3117

Q.    And the mechanic's lien prevented you from selling it at that time?

A.    Correct.

Q.    What you did is contact Mr. Kaiser, and shortly after contacting Mr. Kaiser the mechanic's lien was removed; is that right?

A.    I believe so, yes.

Q.    That still left an outstanding debt of 250,000.

        Did Mr. Privitello come after you for that?

A.    No.

Q.    Do you know if he came after anybody for that 250?

A.    I believe he has not.

Q.    Did you ever hear of a place called Las Frailes?

A.    Yes.

Q.    Did you make an investment in that?

A.    Yes, I did.

Q.    How much?

A.    500,000.

Q.    And, again, Mr. Constantine had nothing to do with that?

A.    He did not.

Q.    You mentioned that you invested $100,000 I believe it was around December of 2003 in Eufora; is that right?

A.    That's correct.

Q.    Would it be fair to say that -- I withdraw that.

3118

That was an investment in a company that Mr. Constantine was the principal of; is that correct?

A.    Yes.

Q.    Actually the founder?

A.    Yes.

Q.    And a person who actually developed the patents that brought so much value to the company; is that right?

A.    Yes.

Q.    We will get back to that in just a minute.

And, lastly, in terms of investments, the Global Settlement Fund, you told us that you did not invest?

A.    I did not, no.

Q.    And that's because you didn't have any money at the time?

A.    That is correct.

Q.    Even though Mr. Constantine continued to ask you, as did Mr. Kenner; is that right?

A.    Correct.

Q.    Did you ever invest with Mr. Constantine in Playboy Enterprises?

A.    I did not, but I gave Tommy roughly $38,000 for lawyer fees on Playboy.  I don't know if it was for racing, or what it was, but I wired him $38,000.

Q.    Was it $38,000 or was it something a little less?

A.    I believe it was roughly around that, $38,000.

Berard - Cross/LaRusso

3119

Q.    The money that you wired was wired while you were playing in Russia; is that correct.

A.    To be honest with you, I don't know the timing of it.

Q.    But he did tell you that he was looking to acquire Playboy Enterprises; is that correct?

A.    Yes.

Q.    And he asked you to help in regards to the acquisition of Playboy Enterprises?

A.    Correct.

        As I sit here, it might have been 18,000.  The numbers 38,000 or 18,000 are going back and forth, and so I want to be clear about it.

Q.    And I want to make sure we don't have a misunderstanding.  If I have a document I'm going to show it to you so we can move on.

        MR. LARUSSO:  May I approach, your Honor?

BY MR. LARUSSO:

Q.    I'm going to show you a document that's marked for identification as C-182.

        And I'm only using this to refresh your recollection.

A.    Please do.

Q.    Just take a look at this and after looking at it, does it refresh your recollection that in January of 2009 you sent 32,000?

3120

A.    That's the number.

Q.    $500 to Mr. Constantine?

A.    That's correct.

Q.    To acquire Playboy Enterprises?

A.    That's correct.

Q.    I assume, before you made the contribution, there was a full discussion regarding what the purpose of the money was?

A.    Yes.

         I believe it was for lawyer fees, correct.

         MR. LARUSSO:  Your Honor, I'm going to be going into a subject that will last a while.

         THE COURT:  Why don't we stop for the day and reconvene tomorrow morning at 9:30.

         Don't discuss the case, don't read or listen to anything about the case.  Have a good night.

         (The jury is excused.)

         THE COURT:  You can step down, Mr. Berard.

         THE WITNESS:  Thank you.

         (The witness steps down.)

         THE COURT:  If everyone can be seated.

         So what's the lineup for tomorrow after Mr. Berard?

         MR. MISKIEWICZ:  May I have a moment?

         (Pause in proceedings.)

3121

MR. OLIVERAS:  Your Honor, I just got a call from Linda Lagarde.  She called me and wants me to call her back, and I don't know if you want me to do that in your presence so we can get in touch with her.

MR. MISKIEWICZ:  I'm sorry?

MR. OLIVERAS:  Linda Lagarde just called me and left me a message to call her back, and I'm asking if you want me to do that with you?

MR. MISKIEWICZ:  I'm asking she be here.  That's all.  It's a simple request.  I don't want to be part of that conversation.

MR. LARUSSO:  May I ask that we call her back and see what her availability is for this week so we don't have to delay?  Can I ask Mr. Oliveras to step outside and make the call and report to the Court?

THE COURT:  Sure.

MR. MISKIEWICZ:  The lineup is we have -- I apologize.  These are the people we have for tomorrow.  It's not necessarily in this order.

Mr. Glen Murray, one of the last hockey players will be on.  I think he's already here in town.  Rick Rosenboom.  We're attempting to get Mr. Steve Ross back here, the attorney who had been here last week I believe, and right now that's who we have.

I anticipate that should get us through given

what I anticipate to be the rest of the cross with

Mr. Berard.

            THE COURT:  Okay.

            We are still trying to get Mr. LaPinta.  I think

either tomorrow during the lunch or at the end of the day.

            I'm a little concerned because as I was reading

his letter he's indicating that Mr. Richards has all these

commitments this week all over the country.  So I don't

know where Mr. Richards is right now, but I'm a little

concerned about that.

            MR. MISKIEWICZ:  We have been attempting to

serve Mr. Richards for approximately a month.  He's

refused service on a number of occasions.

            He engaged Mr. LaPinta a month ago and directed

Mr. LaPinta to not accept service through counsel.

            So, again, I may have an application later in

the week depending on your Honor's ruling.  But from our

point of view this is an effort to evade testifying here.

            MR. HALEY:  Judge, if I may, I'm not sure that

my cross-examination of Mr. Murray may be that extensive

and I mention that to the Court because if Mr. LaPinta is

available tomorrow, that could be an issue that could be

taken up by the Court.

            THE COURT:  We're trying to get him in tomorrow

at some point.  I would rather do that at the lunch break

3123

or at the end of the day rather than take court time.
Today we had no sidebars and we had a lot of court time,
which is the way I like to have it.

How much longer do you have on your cross?

MR. LARUSSO:  I know this is frightening to look
at, these two binders, but I was thinking about an hour,
Judge.

To be honest with you, I'm not sure I'm going to
have a difficult time.  He seems to be fairly direct in
his responses and I allocated more time thinking I was
going to have problems.  So if it continues like that, it
will be less than an hour.

THE COURT:  I don't know how long you were
anticipating those other witnesses, Mr. Murray and the
other ones, you think they'll take them through the rest
of the day?

MR. MISKIEWICZ:  We will make sure we don't run
out of witnesses.  I know Mr. Oliveras is back.  I'm
wondering if we have an update.

MR. OLIVERAS:  Ms. Lagarde can take an overnight
flight tomorrow to be here on Wednesday morning, and hopes
to get on first thing and get out.

THE COURT:  We will take her out of order
Wednesday morning.

MR. MISKIEWICZ:  Thank you, your Honor.

3124

THE COURT:  Have a good night.

MR. LARUSSO:  Just one other issue, and it's kind of festering.

There have been in front of the jury several inferences that we have been using doctored e-mailed, and I want and try and make sure this issue is put to rest and we don't have to deal with this at summation time.  And I know the government has their view, and I'm not here to debate that.

I would like the Court's permission for a subpoena to be served on Mr. Manfredi so those four e-mails we introduced through him can be shown to be e-mails he received back in 2009.

I don't want this issue to continue.  I didn't want to subpoena him because of the possibility that this may be raised later either in the trial or during summations.

He says he has the e-mails.  I would like to give him an opportunity to produce them and match them up with the ones we introduced.  We have other ways of doing it.  I contact an expert.

THE COURT:  That's easy.  Can you just check on his computer and see whether he has those four e-mails?  And, if so, the government will stipulate that's what he would say, similar to what we did today with the box,

3125

something along those lines.

          MR. MISKIEWICZ:  That's not a problem.

          We will have our -- we do have our own
inferences that we will be arguing about the nature of the
e-mails.

          If he has them and he's got them, that means he
got them.  He testified though -- I don't think we're ever
going to be able to stipulate that somehow the getting of
them changed his testimony.

          THE COURT:  Yes.  His memory is his memory, and
he had no memory of them, but if the government is going
to suggest in summation we don't know whether he actually
received those e-mails, Mr. LaRusso should have the
opportunity to see whether or not they're on his computer.

          MR. MISKIEWICZ:  That's true.  We will get them
and turn them over.  I don't think he has to issue a
subpoena.  If he reports back to us he doesn't have them,
we will let the Court know.

          MR. LARUSSO:  So the Court knows, there's been a
lot of e-mails and we're trying to find a way to quickly
put someone on the stand to say that when you access
Google, his account at Google, there's no way that those
e-mails could be doctored.

          I have already contacted an outside expert.  He
told me it's impossible.  Granted, the government has a

different view of it.  I'm trying to do it another way, Judge.  I may be able to do it on my case and that's what I'm working on right now.

THE COURT: Okay.

MR. MISKIEWICZ:  Your Honor, Mr. LaRusso indicated that he had 10 or 12 witnesses.  We're getting pretty close to the end, and we would like to know who they are and any discovery sooner rather than later so we don't have delays.

MR. LARUSSO:  My partner has been working on that aspect of the case so we don't have any delays.  We will pick up as soon as the government's case is over and after Mr. Kenner finishes testifying.

I think we're down to 10.  We had it at 15.  We had a meeting over the weekend.  He's going to try and put the documents together that these witnesses will be introducing.  I hope mid-week by Thursday I can give him as much as I have.  Mr. Conway is working on that, your Honor.

THE COURT:  Sounds fair.  All right.  Thank you. Have a good night.

(Proceedings in this matter are recessed until Tuesday, June 9, 2015, at 9:30 a.m.)

3127

WITNESSES

| | |
|---|---|
| CHRISTOPHER MANFREDI | 2942 |
| DIRECT EXAMINATION | 2944 |
| BY MS. KOMATIREDDY | |
| CROSS-EXAMINATION | 2968 |
| BY MR. HALEY | |
| CROSS-EXAMINATION | 2995 |
| BY MR. LARUSSO | |
| REDIRECT EXAMINATION | 3020 |
| BY MS. KOMATIREDDY | |
| RECROSS EXAMINATION | 3021 |
| BY MR. HALEY | |
| BRYAN BERARD | 3028 |
| DIRECT EXAMINATION | 3029 |
| BY MR. MISKIEWICZ | |
| CROSS-EXAMINATION | 3061 |
| BY MR. HALEY | |
| CROSS-EXAMINATION | 3104 |
| BY MR. LARUSSO | |

EXHIBITS

| | |
|---|---|
| Government Exhibit 33 in evidence | 2943 |
| Government Exhibits 2404, 2405, 2407 through | 2943 |
| 2412, 2413, 2415, 2417, 2419 through 2439, | |

3128

2501-A, 2501-B, 2502-A, 2502-B, 2503-A,

2503-B and 5107 in evidence

Government Exhibits 915, 921, 9000 through      2944

9003-C, 9021-C, 9022-C, 9011-C, 9012-C, 9031

through 9032-C, 9041-C, 9037-C, 9071-C

through 9078-C in evidence

Government Exhibit 723 was received in         3060

evidence


Defense Exhibits Kenner 86 and 87 were          2992

received in evidence

Defense Exhibits C 58, C 61, C 188 and C 189    3005

were received in evidence

Defense Exhibit Kenner 88 was received in       3063

evidence

Defendant's Exhibit 93  was received in         3092

evidence

Defendant's Exhibit 95 was received in          3092

evidence


Government Exhibit 50 was received in           3020

evidence

Government Exhibit 770 was received in          3024

3129

evidence

1

## $

**$100,000** [15] - 2959:22, 2978:4, 3033:23, 3034:10, 3034:12, 3034:19, 3035:1, 3035:2, 3041:17, 3042:9, 3046:23, 3046:24, 3060:6, 3060:22, 3117:22
**$105** [2] - 2974:9, 3064:15
**$130,000** [1] - 2961:25
**$15** [3] - 3007:24, 3008:11, 3009:7
**$175,000** [1] - 2978:12
**$20,000** [1] - 2962:21
**$25,000** [1] - 2963:6
**$250** [1] - 3057:2
**$250,000** [2] - 3050:22, 3116:18
**$265,000** [2] - 3037:12, 3038:15
**$275,000** [1] - 3046:22
**$3,856,000** [1] - 2948:18
**$3,939,000** [1] - 2959:9
**$3500** [1] - 2963:6
**$37,500** [1] - 2962:9
**$375,000** [4] - 3044:7, 3046:13, 3046:24, 3048:11
**$38,000** [4] - 3118:21, 3118:23, 3118:24, 3118:25
**$395,000** [1] - 3047:1
**$4,296,000** [1] - 2955:22
**$40,000** [1] - 3031:23
**$500** [1] - 3120:2
**$500,000** [1] - 3111:15
**$55,000** [1] - 3102:19
**$589,732.37** [1] - 3101:5
**$6,834,000** [1] - 2959:2
**$6,935,000** [1] - 2958:24
**$60** [1] - 3012:4
**$60,000** [2] - 2962:21, 3010:24
**$62,000** [1] - 3012:5
**$64,000** [1] - 2952:5
**$685,000** [1] - 3038:5
**$700,000** [1] - 3037:17
**$723,951.61** [1] - 2946:24
**$79,000** [1] - 2965:6
**$85,000** [1] - 2966:6
**$86,000** [1] - 2966:8
**$95,000** [1] - 3102:2

## '

**'02** [2] - 2984:21, 3002:24
**'03** [1] - 2984:21
**'05** [1] - 3004:19
**'09** [2] - 3002:25, 3042:6
**'94** [1] - 3086:12

**'09** [1] - 3042:8

## 0

**0** [1] - 3092:4

## 1

**1** [2] - 2954:2, 3022:10
**1,500** [2] - 2982:6, 2982:19
**1.1** [2] - 3037:23, 3101:4
**1.5** [2] - 3001:15, 3002:8
**10** [4] - 2932:12, 2935:9, 3126:6, 3126:14
**10,000** [1] - 2928:15, 2929:14, 3057:3
**100** [3] - 2928:15, 2929:14, 3057:3
**100,000** [2] - 3041:21, 3057:23
**105,445,000** [1] - 2957:21
**11** [2] - 2964:14, 3029:9
**11501** [1] - 2929:3
**11572** [1] - 2929:6
**11722** [2] - 2928:15, 2929:15
**11749** [1] - 2928:22
**12** [2] - 2999:4, 3126:6
**123** [1] - 2954:2
**123.9** [2] - 3001:9, 3002:11
**125** [1] - 3057:3
**13** [7] - 2986:19, 3079:5, 3079:16, 3079:18, 3079:19, 3080:4, 3086:2
**1303** [1] - 2958:19
**13O4** [1] - 2958:25
**13th** [1] - 3078:15
**14** [3] - 2962:7, 3077:2, 3079:6
**1401** [2] - 3046:15, 3046:16
**14th** [3] - 3077:14, 3077:22, 3078:16
**15** [6] - 2932:12, 2953:8, 2977:6, 3082:12, 3082:20, 3126:14
**15-minute** [1] - 3085:2
**1500** [2] - 2947:7, 2950:14
**15th** [1] - 3014:8
**16** [4] - 3013:19, 3014:12, 3016:18, 3021:7
**1601** [1] - 2928:21
**1690** [1] - 3086:22
**17** [3] - 2962:19, 3007:12, 3093:20
**1751** [2] - 2961:24, 2962:7, 2962:19, 2963:4, 2967:23, 2969:16
**18** [5] - 3006:2, 3021:3, 3029:16, 3030:14, 3030:15

**18,000** [2] - 3119:10, 3119:11
**188** [7] - 3005:3, 3005:7, 3005:21, 3016:24, 3020:4, 3021:8, 3128:13
**189** [8] - 3005:3, 3005:8, 3005:22, 3017:19, 3019:1, 3020:4, 3021:10, 3128:13
**19** [5] - 3016:25, 3017:20, 3018:25, 3021:9, 3021:11
**1994** [2] - 3031:9, 3086:9
**1995** [1] - 3031:13
**1996** [2] - 3029:13, 3029:20
**1:30** [3] - 3023:5, 3024:16, 3025:22

## 2

**2** [7] - 2953:9, 2957:18, 2958:1, 2961:24, 2997:24, 3002:5, 3014:19
**2.3** [2] - 3055:14, 3055:21
**20** [6] - 2963:4, 2981:20, 3030:5, 3068:15, 3072:23, 3093:21
**200,000** [3] - 3036:12, 3115:3
**2000** [3] - 2968:13, 3042:4, 3043:17
**2000s** [1] - 3002:23
**2001** [1] - 2945:4
**2002** [1] - 2968:13
**2003** [6] - 2946:14, 2960:3, 2984:19, 3051:11, 3060:21, 3117:23
**2004** [6] - 2948:7, 2960:3, 2962:1, 3033:16, 3043:6, 3051:11
**2005** [20] - 2960:3, 2962:8, 2962:20, 2964:14, 2964:15, 2982:6, 2983:9, 2990:20, 2993:5, 3000:9, 3000:10, 3000:18, 3005:9, 3005:14, 3006:2, 3007:12, 3008:16, 3021:3, 3037:9, 3038:3
**2006** [17] - 2956:6, 2956:7, 2982:20, 2983:9, 3003:15, 3005:10, 3005:14, 3013:19, 3016:18, 3016:25, 3017:20, 3018:25, 3021:7, 3021:9, 3021:11, 3047:5, 3101:21
**2008** [1] - 3029:24
**2009** [7] - 2968:14, 3040:6, 3042:5, 3054:7, 3088:3, 3119:24, 3124:13
**2010** [14] - 2997:18, 2998:6, 2999:4, 2999:7,

3043:2, 3043:17, 3047:18, 3048:23, 3102:2, 3102:19, 3105:17, 3107:1, 3107:9
**2011** [4] - 3043:18, 3047:18, 3048:23, 3103:17
**2012** [1] - 3103:17
**2013** [10] - 3077:2, 3077:14, 3077:22, 3078:15, 3078:16, 3079:5, 3079:6, 3080:5, 3084:15
**2014** [1] - 3079:16
**2015** [5] - 2928:9, 2954:2, 2982:23, 3023:22, 3126:23
**2017** [2] - 3038:8, 3039:5
**2114** [1] - 3043:11
**2134** [2] - 3036:20, 3036:21
**21st** [1] - 2962:8
**23** [2] - 3060:21, 3102:2
**24** [7] - 2946:14, 2954:2, 3014:10, 3037:9, 3038:3, 3038:13, 3039:6
**2404** [3] - 2943:8, 2943:18, 3127:24
**2405** [3] - 2943:8, 2943:18, 3127:24
**2407** [3] - 2943:8, 2943:18, 3127:24
**2412** [3] - 2943:9, 2943:19, 3127:25
**2413** [3] - 2943:9, 2943:19, 3127:25
**2415** [3] - 2943:9, 2943:19, 3127:25
**2417** [7] - 2943:9, 2943:19, 2956:21, 2957:4, 2967:23, 2974:1, 3127:25
**2419** [3] - 2943:9, 2943:19, 3127:25
**2422** [1] - 2948:15
**2427** [1] - 2955:20
**2439** [3] - 2943:9, 2943:19, 3127:25
**25** [7] - 2994:20, 3014:11, 3068:15, 3072:23, 3093:1, 3093:2, 3102:19
**250** [2] - 3102:12, 3117:11
**250,000** [3] - 3102:10, 3102:16, 3117:8
**2501-A** [4] - 2943:9, 2943:19, 2965:3, 3128:1
**2501-B** [3] - 2943:9, 2943:19, 3128:1
**2502-A** [4] - 2943:10, 2943:20, 2966:3, 3128:1
**2502-B** [3] - 2943:10, 2943:20, 3128:1
**2503-A** [4] - 2943:10, 2943:20, 2966:22, 3128:1
**2503-B** [3] - 2943:10, 2943:20, 3128:2

2

**258** [4] - 2945:20, 2946:11, 2977:16, 2977:21
**25th** [2] - 2939:15, 2939:17
**26** [1] - 2929:6
**266,000** [2] - 2966:25
**27** [1] - 2962:20
**29** [1] - 2948:7
**2942** [1] - 3127:3
**2943** [2] - 3127:23, 3127:24
**2944** [2] - 3127:4, 3128:3
**2968** [1] - 3127:6
**2992** [1] - 3128:11
**2995** [1] - 3127:8
**29th** [1] - 2939:19

## 3

**3** [11] - 2950:17, 2952:23, 2959:11, 2982:5, 2991:5, 2999:6, 3001:25, 3007:18, 3015:15, 3023:22, 3114:20
**3,000** [1] - 3015:17
**3.5** [4] - 2953:18, 2982:23, 3001:25, 3002:3
**3.7** [1] - 2982:19
**3.9** [1] - 2959:13
**30** [1] - 2962:1
**300** [1] - 2929:3
**300,000** [3] - 3042:19, 3101:10, 3101:11
**3005** [1] - 3128:13
**3020** [2] - 3127:10, 3128:23
**3021** [1] - 3127:12
**3024** [1] - 3128:25
**3028** [1] - 3127:14
**3029** [1] - 3127:15
**3060** [1] - 3128:7
**3061** [1] - 3127:17
**3063** [1] - 3128:15
**3092** [2] - 3128:17, 3128:19
**3104** [1] - 3127:19
**312** [1] - 2940:8
**32,000** [1] - 3119:25
**33** [5] - 2942:24, 2942:25, 2943:4, 2943:5, 3127:23
**34** [1] - 3023:7
**350** [1] - 3093:17
**3500** [1] - 2997:24
**36** [2] - 3064:1, 3068:10
**375,000** [1] - 3093:9
**38,000** [1] - 3119:11
**3802** [1] - 2953:1
**3:35** [1] - 3087:11

## 4

**4** [3] - 2959:3, 2975:7, 2976:24

**4-4.5** [1] - 3014:9
**4.2** [1] - 2953:19
**444-7493** [1] - 2940:8
**4:30** [1] - 2931:2

## 5

**5** [1] - 3001:24
**50** [9] - 3020:17, 3020:21, 3020:22, 3057:3, 3057:22, 3093:1, 3093:15, 3093:17, 3128:23
**50/50** [1] - 3048:14
**500,000** [3] - 3036:11, 3116:10, 3117:18
**5107** [4] - 2943:10, 2943:20, 2946:22, 3128:2
**58** [7] - 3005:3, 3005:7, 3005:21, 3005:25, 3020:4, 3020:25, 3128:13

## 6

**6.35** [1] - 3064:1
**6.36** [1] - 3064:3
**60** [1] - 3056:14
**61** [8] - 3005:3, 3005:7, 3005:21, 3013:14, 3020:4, 3021:4, 3021:5, 3128:13
**62** [1] - 2952:5
**631** [1] - 2929:15
**66** [2] - 2944:25, 2945:6
**6th** [1] - 2933:14

## 7

**7** [4] - 2938:4, 2938:22, 2939:8, 2939:10
**700's** [1] - 3093:16
**700,000** [3] - 3042:23, 3093:6, 3101:7
**703** [2] - 3048:4
**712-6101** [1] - 2929:15
**723** [8] - 3059:20, 3059:21, 3060:8, 3060:15, 3060:16, 3061:16, 3061:21, 3128:7
**726-L** [1] - 2944:25
**75** [1] - 3057:23
**770** [7] - 3023:19, 3023:23, 3024:5, 3024:7, 3024:11, 3024:13, 3128:25

## 8

**8** [3] - 2928:9, 3112:17, 3112:25
**86** [5] - 2991:13, 2992:2,

2992:5, 2992:6, 3128:11
**87** [7] - 2991:21, 2992:2, 2992:5, 2992:6, 2992:9, 2992:22, 3128:11
**88** [12] - 3062:4, 3062:18, 3062:21, 3062:23, 3063:10, 3063:13, 3063:14, 3063:17, 3065:2, 3066:11, 3090:25, 3128:15
**89** [1] - 3076:22

## 9

**9** [5] - 2990:20, 2991:1, 2991:2, 3086:25, 3126:23
**90** [1] - 3078:11
**90,000** [1] - 3102:12
**9000** [3] - 2943:25, 2944:8, 3128:3
**9000-C** [1] - 2964:13
**9001-C** [1] - 2964:15
**9003-C** [3] - 2944:1, 2944:9, 3128:4
**9011-C** [3] - 2944:1, 2944:9, 2966:18, 2967:1, 3128:4
**9012-C** [3] - 2944:1, 2944:9, 3128:4
**9021-C** [4] - 2944:1, 2944:9, 2965:18, 3128:4
**9022-C** [3] - 2944:1, 2944:9, 3128:4
**9031** [3] - 2944:1, 2944:9, 3128:4
**9031-C** [1] - 2947:19
**9032-C** [4] - 2944:2, 2944:10, 2947:22, 3128:5
**9037-C** [4] - 2944:2, 2944:10, 2950:6, 3128:5
**9041-C** [3] - 2944:2, 2944:10, 3128:5
**9071-C** [4] - 2944:2, 2944:10, 2946:4, 3128:5
**9072-C** [1] - 2955:6
**9078-C** [3] - 2944:2, 2944:10, 3128:6
**91** [1] - 3079:24
**914** [2] - 3086:1, 3086:8
**915** [5] - 2943:24, 2944:8, 2947:11, 3086:25, 3128:3
**916** [1] - 2955:2
**917** [1] - 2945:24
**918** [1] - 2966:11
**919** [1] - 2965:14
**92** [2] - 3084:7, 3084:20
**920** [1] - 2964:8
**921** [3] - 2943:24, 2944:8, 3128:3
**93** [5] - 3091:6, 3091:23,

3092:1, 3092:2, 3128:17
**94** [2] - 3092:5, 3092:6
**945** [2] - 2950:10, 2956:1
**946** [4] - 2963:14, 2963:16, 3033:25, 3039:13
**95** [5] - 2932:9, 3092:17, 3092:20, 3092:21, 3128:19
**9:30** [3] - 2928:9, 3120:14, 3126:23

## A

**a.m** [2] - 2928:9, 3126:23
**abandoned** [1] - 2994:22
**ability** [3] - 2986:11, 3056:8, 3075:14
**able** [14] - 2934:23, 2951:2, 2954:20, 2996:23, 2998:23, 3017:9, 3017:12, 3019:3, 3027:7, 3061:22, 3101:9, 3106:20, 3125:8, 3126:2
**absolutely** [6] - 2964:18, 3054:17, 3066:19, 3073:10, 3082:13, 3113:20
**accept** [2] - 2937:10, 3122:15
**access** [4] - 2979:8, 3090:1, 3090:14, 3125:21
**accommodation** [1] - 2935:1
**accompanied** [1] - 3082:5
**according** [1] - 3007:3
**account** [18] - 2962:23, 3037:3, 3037:22, 3038:17, 3040:8, 3040:23, 3046:22, 3046:23, 3060:23, 3102:3, 3102:9, 3102:11, 3102:13, 3102:20, 3103:9, 3103:12, 3105:12, 3125:22
**accounts** [4] - 2956:15, 2958:7, 2958:8, 2958:10
**accrued** [1] - 2958:11
**accuracy** [1] - 3006:10
**accurate** [4] - 2972:13, 2981:6, 3006:22, 3020:11
**accurately** [2] - 3097:17, 3098:1
**accused** [1] - 3026:24
**acquaintance** [1] - 3010:5
**acquaintances** [1] - 2977:8
**acquire** [8] - 2969:12, 2983:8, 2987:10, 2993:8, 2994:4, 3064:18, 3119:4, 3120:4
**acquired** [2] - 2945:18, 2969:24
**acquires** [1] - 2993:17
**acquiring** [1] - 2993:25

3

**acquisition** [2] - 2983:13, 3119:8
**acre** [6] - 2945:20, 2954:2, 2982:6, 2982:19, 2982:23, 3002:11
**acreage** [1] - 2979:18
**acres** [2] - 2954:2, 2977:21, 3001:10, 3014:11, 3014:12
**acting** [1] - 3026:24
**Acting** [1] - 2928:14
**action** [2] - 2938:13, 3043:22
**active** [1] - 2960:21
**actively** [1] - 3073:11
**activities** [1] - 2995:22
**actual** [1] - 3101:12
**addition** [6] - 2978:11, 2996:14, 3032:24, 3034:17, 3048:11, 3079:10
**additional** [6] - 2947:23, 2966:15, 2966:19, 3002:8, 3017:25, 3072:20
**address** [2] - 2963:20, 3016:3
**adjacent** [2] - 2963:20, 3016:3
**admissible** [1] - 3024:6
**admission** [4] - 2943:11, 2943:22, 3060:8, 3085:12
**admitted** [12] - 2943:4, 2943:17, 2944:6, 2992:5, 3005:20, 3020:21, 3024:12, 3060:15, 3063:13, 3090:24, 3092:1, 3092:20
**advance** [1] - 2985:25
**Advances** [2] - 2943:25
**adverse** [1] - 2938:13
**advice** [2] - 2945:5
**advise** [1] - 3008:3
**advised** [6] - 2932:22, 2934:2, 2935:20, 2935:23, 3026:23, 3027:11
**advising** [2] - 2935:24, 3043:21
**advisor** [4] - 3031:15, 3031:16, 3031:20, 3040:12
**Advisors** [3] - 3032:13, 3032:20, 3032:22
**affecting** [1] - 2937:9
**affiliated** [1] - 3114:7
**afternoon** [4] - 2939:17, 3029:3, 3084:23, 3105:3
**afterwards** [1] - 3050:10
**Agent** [4] - 3080:8, 3080:16, 3080:24, 3081:8
**agent** [4] - 3049:3, 3071:2, 3080:12, 3094:14
**agents** [2] - 2998:6,

2999:3, 2999:7, 3095:1
**aggregate** [1] - 2983:15
**ago** [14] - 2986:19, 3010:9, 3030:6, 3061:20, 3063:7, 3065:11, 3066:4, 3066:8, 3067:2, 3079:17, 3081:10, 3101:16, 3105:6, 3122:14
**Agrabusiness** [1] - 2946:16
**agree** [16] - 2934:3, 2974:6, 2976:10, 2976:23, 2977:3, 2986:10, 3006:23, 3009:9, 3009:10, 3009:11, 3015:2, 3061:25, 3063:18, 3070:18, 3070:20, 3093:16
**agreed** [2] - 2932:23, 3023:15
**agreement** [2] - 2951:19, 2965:22, 2973:2, 2974:22, 2994:2, 3001:9, 3001:23, 3047:24, 3065:3, 3065:4
**Agreement** [1] - 3090:25
**ahead** [5] - 2942:19, 2990:3, 3020:14, 3050:3, 3076:5
**aircraft** [1] - 2980:11
**airline** [1] - 2939:18
**airlines** [1] - 2939:20
**airport** [2] - 2981:3, 2981:4
**Aisle** [1] - 3019:7
**alert** [1] - 2939:25
**ALL** [1] - 2942:2
**allegations** [1] - 3081:17
**allocated** [1] - 3123:10
**allow** [3] - 2934:10, 3049:24, 3073:16
**almost** [1] - 3050:5
**aloha** [1] - 3014:3
**alone** [1] - 2996:23
**AMERICA** [1] - 2928:3
**America** [1] - 3023:15
**amount** [18] - 2950:17, 2953:7, 2957:19, 2974:9, 2974:23, 2979:18, 2983:18, 3001:24, 3002:3, 3009:19, 3012:10, 3037:16, 3038:5, 3038:17, 3047:1, 3057:5, 3088:18, 3095:8
**amounts** [2] - 2959:20, 2974:20
**analyze** [1] - 2983:3
**ANDREW** [1] - 2929:5
**anecdotal** [1] - 2976:5
**Ann** [1] - 2929:14
**answer** [16] - 2962:17, 2962:18, 2969:18, 2976:19, 3007:25, 3055:7, 3065:16, 3065:18, 3073:16, 3073:18,

3075:14, 3083:19, 3083:21, 3085:10, 3090:21, 3091:11
**Answer** [10] - 3086:10, 3088:11, 3088:14, 3089:1, 3089:5, 3089:9, 3089:18, 3089:23, 3090:3, 3090:16
**answered** [3] - 3019:12, 3095:19, 3096:10
**answering** [1] - 3083:19
**answers** [3] - 3075:18, 3083:8, 3088:4
**anticipate** [3] - 3025:2, 3121:25, 3122:1
**anticipating** [1] - 3123:14
**anyway** [1] - 3043:3
**apologize** [6] - 2931:11, 2951:14, 2970:15, 3019:19, 3094:12, 3121:18
**appear** [8] - 2980:7, 3006:11, 3017:8, 3048:20, 3058:14, 3057:5, 3077:1, 3086:4
**appearance** [1] - 3027:7
**appearances** [1] - 2930:3
**APPEARANCES** [1] - 2928:13
**appeared** [3] - 3010:16, 3079:17, 3080:5
**appearing** [1] - 3006:13
**application** [5] - 2935:14, 3026:21, 3026:22, 3027:5, 3122:16
**appraisal** [2] - 3013:12, 3014:10
**appraisals** [1] - 3015:19
**approach** [2] - 3084:21, 3119:16
**approached** [1] - 3009:1
**appropriate** [1] - 2988:15
**approximate** [2] - 2958:22, 2959:8
**approximating** [1] - 3093:17
**April** [1] - 2962:8
**arbitration** [7] - 3054:7, 3054:8, 3054:19, 3083:4, 3083:18, 3084:14, 3088:3
**arbitrators** [1] - 3083:12
**archeological** [1] - 2958:15
**archeology** [1] - 2961:18
**area** [1] - 3044:3
**argue** [1] - 3085:22
**arguing** [1] - 3125:4
**Arizona** [5] - 3004:15, 3007:19, 3054:6, 3054:23, 3060:23
**arrangement** [3] - 2969:21, 2987:9, 2988:4

**arrest** [2] - 3074:15, 3075:6
**arrested** [1] - 3075:3
**arrive** [2] - 2985:10, 2985:25
**arrived** [3] - 2985:24, 2986:2, 2986:4
**arriving** [1] - 2986:6
**article** [16] - 2944:23, 2945:4, 2945:8, 2984:7, 2984:15, 3075:7, 3075:24, 3076:10, 3077:2, 3077:7, 3077:14, 3079:4, 3079:5, 3079:16, 3080:4, 3080:5
**articles** [3] - 3074:21, 3078:13, 3079:9
**aside** [1] - 2997:1
**aspect** [1] - 3126:11
**aspects** [1] - 2934:3
**Assante** [2] - 3032:18, 3032:19
**assaulted** [1] - 3071:23
**asserts** [1] - 3095:24
**assist** [1] - 3099:7
**Assistant** [1] - 2928:17
**associate** [1] - 3030:10
**associated** [3] - 2948:1, 2953:3, 3070:16
**assume** [2] - 2931:25, 3120:6
**assumed** [1] - 3013:2
**assuming** [1] - 3025:10
**assumption** [3] - 3012:12, 3012:13, 3025:11
**athletes** [1] - 3068:23
**attached** [4] - 3014:9, 3017:3, 3017:22, 3018:25
**attachment** [1] - 3019:1
**attachments** [7] - 3014:12, 3015:4, 3015:8, 3017:8, 3017:9, 3017:15, 3018:3
**attempted** [3] - 2930:15, 2997:10, 3026:12
**attempting** [2] - 3121:22, 3122:11
**attention** [24] - 2947:18, 2948:14, 2952:25, 2953:5, 2955:1, 2955:5, 2956:20, 2958:18, 2959:5, 2961:23, 2962:19, 2963:3, 2963:13, 2964:7, 2964:12, 2965:2, 2965:13, 2966:9, 2966:11, 2966:18, 2966:22, 3033:8, 3037:8, 3038:12
**attorney** [10] - 2933:19, 3083:20, 3090:1, 3090:4, 3090:14, 3090:16, 3094:2, 3096:18, 3097:1, 3121:23
**Attorney** [3] - 2928:14, 2928:17, 3095:1
**Attorney's** [5] - 3023:21,

4

3024:4, 3081:4, 3081:13, 3094:14
**attorneys** [2] - 2933:4, 3023:17
**attributed** [1] - 2955:13
**August** [5] - 2945:4, 2956:6, 2956:7, 3003:15, 3102:2
**authenticates** [1] - 3025:10
**authority** [4] - 2941:8, 2973:1, 2973:6, 3070:15
**authorizing** [1] - 3060:4
**availability** [1] - 3121:13
**available** [7] - 2930:19, 2930:23, 2932:21, 2935:11, 2984:12, 3027:4, 3122:22
**avoid** [1] - 3025:5
**awaited** [1] - 2940:2
**aware** [53] - 2931:14, 2936:6, 2938:14, 2962:5, 2970:9, 2972:6, 2974:12, 2974:22, 2975:24, 2982:4, 2982:16, 2982:18, 2982:21, 2982:22, 2993:16, 3001:15, 3001:23, 3002:9, 3010:18, 3022:7, 3026:25, 3027:1, 3038:15, 3039:2, 3055:10, 3058:5, 3064:13, 3064:19, 3064:20, 3064:24, 3070:23, 3070:24, 3071:18, 3075:2, 3077:8, 3077:15, 3079:9, 3079:15, 3079:16, 3079:22, 3082:9, 3088:7, 3088:23, 3089:2, 3089:6, 3092:23, 3096:12, 3096:15, 3096:24, 3100:7, 3101:16, 3101:19, 3113:2
**awareness** [3] - 2969:17, 2982:1, 3080:2

## B

**B-E-R-A-R-D** [1] - 3028:20
**background** [2] - 2966:14, 2990:6
**backpay** [2] - 2959:19, 2959:21
**bad** [1] - 2984:2
**Baja** [3] - 3111:15, 3112:20, 3115:1
**Baker** [3] - 3054:12, 3083:16
**balance** [2] - 3040:9, 3040:10
**ballpark** [1] - 3101:8
**bank** [10] - 2951:13, 2961:25, 2969:16, 2970:1,

2982:9, 3035:5, 3046:22, 3053:11, 3089:20, 3089:21
**Bank** [5] - 3031:14, 3037:22, 3060:22, 3102:4, 3102:20
**bankruptcy** [1] - 3003:22
**Barker** [1] - 2991:5
**based** [9] - 2963:7, 2976:10, 2981:24, 3000:3, 3012:12, 3030:15, 3045:6, 3075:8, 3080:4
**basement** [1] - 3073:8
**basic** [3] - 2930:16, 2961:14, 2961:15
**basis** [5] - 2952:1, 2952:4, 3054:18, 3054:19, 3085:12
**Bay** [1] - 2946:2
**beautiful** [1] - 3033:22
**became** [11] - 2975:21, 2976:3, 2976:11, 3033:2, 3044:11, 3057:15, 3057:19, 3082:9, 3097:10, 3101:17, 3101:19
**become** [9] - 2996:7, 3008:20, 3033:13, 3055:10, 3069:16, 3075:2, 3092:23, 3100:7, 3101:19
**BEFORE** [1] - 2928:11
**beginning** [3] - 2945:19, 2957:23, 2996:1
**begins** [1] - 3065:3
**behalf** [3] - 3014:4, 3054:9, 3054:10
**behind** [2] - 2999:24, 3111:23
**belief** [2] - 3098:20, 3098:21
**bell** [3] - 2975:23, 2983:10, 2994:6
**bells** [2] - 3007:7, 3007:8
**belonging** [1] - 3038:17
**below** [1] - 3014:7
**benefit** [1] - 3089:8
**BERARD** [2] - 3028:12, 3127:14
**Berard** [33] - 3024:20, 3024:23, 3025:8, 3025:15, 3025:16, 3028:7, 3028:8, 3028:19, 3028:21, 3028:22, 3029:3, 3029:4, 3036:21, 3044:2, 3044:23, 3048:8, 3059:21, 3060:19, 3061:13, 3061:20, 3064:1, 3077:19, 3084:7, 3087:15, 3087:21, 3096:21, 3103:14, 3104:9, 3105:3, 3107:2, 3120:18, 3120:23, 3122:2
**best** [9] - 2945:6, 2975:12, 3001:7, 3054:15, 3065:11,

3075:14, 3075:21, 3080:23, 3094:25
**Better** [21] - 3044:4, 3044:7, 3044:9, 3044:10, 3046:9, 3046:10, 3046:24, 3047:11, 3047:14, 3047:16, 3047:24, 3048:6, 3048:25, 3092:25, 3093:8, 3093:24, 3094:7, 3094:16, 3094:22, 3115:19, 3115:21
**better** [2] - 3012:24, 3023:1
**between** [19] - 2983:8, 2985:5, 3005:8, 3005:13, 3005:14, 3023:15, 3024:23, 3042:8, 3057:18, 3067:19, 3069:3, 3072:14, 3080:13, 3080:14, 3082:2, 3084:15, 3100:4, 3101:23
**beyond** [1] - 3034:22
**BIANCO** [1] - 2928:11
**big** [3] - 2938:13, 2938:16, 3052:18
**Big** [14] - 2946:16, 2946:19, 2948:9, 2948:12, 2965:1, 2965:23, 2967:3, 2983:8, 2987:2, 3019:7, 3033:17, 3038:17, 3038:20, 3039:3
**bigger** [4] - 3041:7, 3041:10, 3042:10, 3042:25
**bill** [1] - 2933:21
**billing** [1] - 2934:6
**billion** [1] - 2986:11
**bills** [2] - 2934:4, 2958:11
**binders** [3] - 3023:23, 3024:4, 3123:6
**bit** [6] - 2944:18, 2945:17, 2953:16, 3038:12, 3095:5, 3096:20
**Black** [1] - 3029:23
**blamed** [1] - 3053:8
**block** [4] - 2992:11, 2992:16, 2992:24, 3015:11
**Blue** [1] - 3029:24
**board** [1] - 3033:25
**Bob** [2] - 2995:6, 3105:5
**bonds** [2] - 3032:11, 3038:2
**Bonti** [3] - 3070:25, 3071:2, 3104:15
**bonus** [2] - 2978:12, 2978:15
**books** [5] - 3096:13, 3097:16, 3097:23, 3098:1, 3099:8
**born** [1] - 3029:6
**borrowed** [2] - 3037:16, 3038:5
**Boston** [3] - 3029:23, 3030:22, 3052:1

**bottom** [7] - 2932:11, 2946:7, 2958:1, 2966:25, 3015:3, 3018:3, 3027:23
**bought** [1] - 3044:10
**boundary** [1] - 2980:2
**box** [4] - 3023:11, 3023:12, 3024:10, 3124:25
**brackets** [2] - 3007:23, 3007:24
**break** [13] - 2931:1, 2931:3, 2988:17, 2990:7, 3023:5, 3024:15, 3026:14, 3026:15, 3084:22, 3084:23, 3085:2, 3087:4, 3122:25
**breast** [1] - 2955:16
**Brent** [9] - 3108:16, 3109:4, 3109:8, 3109:13, 3110:7, 3110:19, 3110:22, 3111:6, 3111:9
**Brewer** [4] - 2948:9, 2955:10, 3011:24, 3021:21
**Brian** [4] - 3024:20, 3025:8, 3048:8, 3064:1
**brief** [1] - 3021:17
**briefly** [3] - 2936:4, 3029:17, 3043:10
**Brimfield** [1] - 3029:5
**bring** [9] - 2937:16, 2941:22, 2945:14, 2961:2, 2972:12, 2989:6, 3027:24, 3067:15, 3087:15
**bringing** [8] - 2937:21, 2948:19, 2955:23, 2965:7, 2998:19, 2998:23, 2999:9, 3069:7
**broader** [1] - 2973:19
**broken** [2] - 2931:9, 3002:1
**brokerage** [2] - 3103:9, 3103:11
**Brook** [1] - 2991:5
**Brothers** [11] - 2956:8, 2956:12, 2957:9, 2974:3, 2974:8, 3003:22, 3035:19, 3040:25, 3041:2, 3064:14, 3064:19
**Brothers'** [1] - 3004:1
**brought** [8] - 2952:22, 2983:4, 2998:13, 2999:5, 3000:22, 3033:15, 3054:23, 3118:7
**Bruin** [1] - 3030:22
**Bruins** [1] - 3029:23
**Bruton** [2] - 3025:7, 3025:12
**BRYAN** [3] - 3028:12, 3028:19, 3127:14
**Bryan** [2] - 3028:6, 3028:19
**build** [3] - 3046:3, 3073:25, 3112:22

5

**building** [8] - 2933:7, 3015:18, 3072:19, 3073:4, 3073:9, 3081:2, 3081:12
**buildings** [3] - 3072:13, 3072:16, 3072:20
**built** [1] - 3045:7
**Bureau** [1] - 2943:25
**business** [13] - 2940:12, 2941:6, 2980:15, 2980:23, 2987:21, 2990:8, 2992:10, 3030:10, 3032:24, 3033:2, 3052:6, 3056:12, 3067:12
**Business** [1] - 3011:23
**but..** [1] - 2991:2
**buy** [8] - 2945:5, 2986:12, 3008:15, 3053:21, 3068:21, 3069:15, 3106:23, 3111:6
**buyer** [7] - 2965:23, 2966:4, 2966:23, 3102:18, 3105:11, 3105:24, 3106:12
**buying** [7] - 2964:25, 2967:7, 2994:10, 3009:5, 3105:24, 3110:8, 3110:11
**buyout** [1] - 2956:19
**BY** [46] - 2928:16, 2928:22, 2929:4, 2944:14, 2968:2, 2972:1, 2975:4, 2990:5, 2991:17, 2992:8, 2995:2, 3001:22, 3003:20, 3005:23, 3020:2, 3021:19, 3029:2, 3031:6, 3034:24, 3044:1, 3044:22, 3049:9, 3051:9, 3059:2, 3059:18, 3060:18, 3061:19, 3062:25, 3063:16, 3072:3, 3073:22, 3076:20, 3078:6, 3078:10, 3079:2, 3105:2, 3110:1, 3119:17, 3127:5, 3127:7, 3127:9, 3127:11, 3127:13, 3127:16, 3127:18, 3127:20

## C

**C-182** [1] - 3119:19
**C-189** [2] - 3018:20, 3018:22
**Cabo** [25] - 3036:11, 3036:12, 3052:18, 3068:6, 3068:7, 3068:8, 3068:9, 3069:8, 3069:13, 3069:22, 3069:25, 3070:13, 3070:22, 3071:19, 3072:5, 3072:9, 3072:20, 3073:25, 3086:16, 3089:4, 3103:19, 3103:20, 3114:8, 3115:3, 3115:8
**CALCAGNI** [1] - 2928:20

**candidly** [1] - 2934:16
**capital** [8] - 2956:15, 2957:9, 2987:23, 2993:9, 2993:11, 2993:13, 2993:19, 2994:3
**captioned** [4] - 3006:1, 3013:15, 3016:24, 3017:19
**car** [1] - 2986:4
**career** [2] - 3029:20, 3030:23
**carve** [5] - 3001:10, 3001:12, 3002:10, 3002:15, 3003:11
**carveout** [2] - 2953:22, 2953:25
**case** [31] - 2930:3, 2932:18, 2933:7, 2934:11, 2934:15, 2935:7, 2935:19, 2936:12, 2975:25, 2988:18, 2998:7, 3013:9, 3024:16, 3027:6, 3027:8, 3030:2, 3074:9, 3075:9, 3076:8, 3076:10, 3077:4, 3080:12, 3081:17, 3081:19, 3084:24, 3104:10, 3120:15, 3120:16, 3126:2, 3126:11, 3126:12
**cash** [6] - 2957:22, 3034:11, 3037:24, 3038:1, 3047:20, 3048:23
**Castle** [1] - 3074:1
**cater** [2] - 3068:12, 3068:17
**cattle** [2] - 2960:22, 2979:3
**caught** [1] - 3105:7
**caused** [2] - 2951:3
**cc** [1] - 3013:20
**cc's** [2] - 3007:10, 3007:11
**Cement** [1] - 2983:8
**Central** [3] - 2928:6, 2928:15, 2929:15
**Centrum** [10] - 2950:4, 2950:9, 2954:19, 2959:4, 2959:10, 2982:5, 2982:19, 3018:15, 3019:7, 3019:14
**CEO** [2] - 2968:17, 2968:18
**certain** [6] - 2934:3, 2940:11, 2972:2, 2974:13, 3032:5, 3082:17
**certainly** [3] - 2972:3, 2978:20, 3071:18
**certainty** [2] - 3015:24, 3022:5
**certification** [1] - 2941:6
**certified** [1] - 2943:24
**certify** [1] - 3006:9
**cetera** [1] - 2961:19
**chance** [3] - 3014:21, 3027:14, 3040:23

**changed** [3] - 2931:17, 2931:18, 3125:9
**characterization** [2] - 2932:8, 2995:19
**characterize** [2] - 2977:7, 2978:16
**characterized** [1] - 2978:15
**charge** [2] - 3071:3, 3073:3
**charged** [1] - 3044:19
**charges** [3] - 2958:2, 3079:11, 3104:10
**charging** [1] - 3077:24
**Charles** [1] - 3046:23
**check** [1] - 3124:22
**cheers** [1] - 3014:5
**Chicago** [2] - 3029:23, 3051:12
**chief** [5] - 2932:18, 2968:21, 2969:22, 3027:8, 3071:3
**Chipotle** [4] - 2937:7, 2937:9, 2937:14, 2938:14
**choice** [2] - 2938:21, 2954:16
**choices** [1] - 2954:22
**Chris** [2] - 3017:4, 3018:2
**Christmas** [1] - 3033:6
**Christopher** [1] - 3014:6
**CHRISTOPHER** [2] - 2942:13, 3127:3
**chronological** [2] - 3003:7, 3005:25
**chronology** [1] - 3003:8
**circumstances** [1] - 2941:10
**City** [3] - 3105:13, 3107:13, 3108:6
**civil** [1] - 3052:21
**claim** [4] - 2948:4, 2981:24, 2982:1, 3095:23
**claiming** [1] - 2937:8
**claims** [2] - 2981:23, 3077:4
**class** [4] - 2980:15, 2980:23
**clear** [1] - 3119:12
**cleared** [2] - 2964:10, 2966:13
**clearly** [1] - 3025:12
**Clemens** [2] - 3068:25, 3069:4
**CLERK** [5] - 2930:1, 2941:23, 2989:25, 3027:25, 3028:17
**client** [3] - 2934:2, 3025:19, 3056:15
**clientele** [2] - 3068:12, 3068:17
**clients** [7] - 2945:7, 2947:2, 3052:20, 3067:15,

3068:20, 3068:22, 3103:22
**close** [26] - 2946:25, 2948:25, 2949:3, 2951:1, 2951:2, 2951:16, 2952:18, 2954:20, 2956:3, 2956:13, 3027:7, 3028:22, 3035:18, 3035:19, 3037:17, 3040:7, 3042:2, 3042:19, 3052:7, 3067:9, 3069:3, 3081:25, 3082:1, 3112:18, 3116:10, 3126:7
**closed** [6] - 2946:3, 2946:12, 2947:3, 2947:7, 3000:19, 3043:22
**closely** [1] - 3041:18
**closer** [1] - 3101:7
**closing** [38] - 2945:20, 2947:4, 2948:20, 2949:4, 2951:8, 2954:23, 2955:19, 2955:24, 2957:8, 2957:9, 2957:17, 2958:8, 2958:12, 2959:16, 2965:8, 2966:4, 2966:23, 2974:2, 2974:13, 2975:6, 2975:13, 2975:21, 2975:25, 2976:3, 2976:13, 2978:10, 2978:14, 2998:24, 3000:11, 3000:20, 3002:14, 3008:15, 3035:5, 3064:14, 3093:23, 3094:6, 3094:16
**club** [1] - 3069:16
**CM** [1] - 2997:24
**Coast** [1] - 2930:17
**coast** [1] - 2980:10
**collateral** [4] - 2950:11, 2982:11, 3037:19, 3109:10
**collecting** [1] - 3055:17
**Columbus** [1] - 3029:23
**comfortable** [2] - 2938:17, 3084:10
**coming** [11] - 2978:13, 2999:14, 2999:20, 3000:11, 3010:1, 3012:15, 3032:1, 3083:1, 3087:23, 3102:7, 3108:19
**comment** [1] - 3014:1
**commercial** [2] - 2980:11, 3015:17
**commit** [1] - 2986:24
**commitment** [2] - 3088:8, 3095:8
**commitments** [1] - 3122:8
**committed** [1] - 3082:10
**common** [1] - 2936:23
**communicate** [3] - 2952:14, 2961:5, 2961:8
**communicating** [2] - 3016:13, 3018:6
**communication** [3] - 2985:3, 3006:16, 3040:15

**communications** [3] - 2951:9, 3005:8, 3005:13
**companies** [2] - 2938:14, 3032:16
**Company** [6] - 2948:9, 2955:10, 2955:17, 3090:25, 3092:25
**company** [39] - 2938:16, 2943:10, 2950:4, 2966:1, 2972:20, 2972:22, 2972:24, 2983:8, 2998:15, 3000:6, 3000:12, 3003:23, 3031:14, 3032:12, 3032:14, 3032:19, 3038:20, 3047:14, 3047:17, 3048:7, 3059:12, 3065:2, 3067:14, 3067:20, 3067:21, 3088:14, 3088:15, 3088:17, 3097:17, 3105:10, 3105:23, 3106:11, 3106:23, 3110:2, 3110:23, 3114:7, 3118:1, 3118:7
**comparison** [1] - 2953:23
**compensated** [3] - 3069:18, 3069:19, 3069:25
**compensation** [1] - 2978:4
**complaining** [1] - 2981:8
**complete** [3] - 2933:23, 3064:23, 3072:24
**completed** [4] - 2961:17, 2981:20, 2999:19, 3112:23
**completely** [2] - 2932:9, 2934:4
**complicated** [1] - 2931:4
**computer** [4] - 2929:25, 3017:11, 3124:23, 3125:14
**computers** [1] - 3066:24, 3067:1
**concede** [1] - 3051:5
**conceded** [3] - 3031:2, 3031:4, 3051:8
**concern** [1] - 2934:21
**concerned** [4] - 2934:25, 3071:7, 3122:6, 3122:10
**concerning** [6] - 2969:16, 2990:9, 2999:22, 3021:21, 3066:7, 3081:17
**concerns** [1] - 3071:14
**conclusion** [2] - 2932:18, 2981:2
**concrete** [1] - 2983:15
**conference** [5] - 2985:13, 3006:1, 3007:12, 3007:18, 3008:10
**confidence** [1] - 2974:23
**confirm** [1] - 2940:10
**confused** [2] - 3041:19, 3096:19
**confusing** [1] - 3096:21

**conjunction** [2] - 2961:11, 2974:14
**connected** [1] - 2962:24
**connection** [13] - 2940:13, 2969:25, 2977:10, 2984:7, 3023:25, 3035:8, 3044:19, 3062:20, 3064:20, 3067:22, 3074:8, 3075:3, 3077:13
**consent** [2] - 2932:11, 2933:1
**consider** [1] - 3022:15
**consisted** [1] - 2974:19
**consists** [1] - 3023:20
**CONSTANTINE** [1] - 2928:7
**Constantine** [95] - 2929:4, 2929:7, 2932:6, 2932:23, 2932:25, 2933:6, 2935:15, 2935:22, 2936:9, 2960:6, 2960:8, 2960:12, 2961:21, 2962:1, 2962:3, 2962:8, 2962:11, 2962:21, 2962:22, 2962:25, 2963:5, 2963:8, 2969:17, 2970:8, 2970:9, 2970:17, 2970:20, 2995:7, 2998:18, 2998:22, 2999:5, 2999:8, 3000:2, 3000:15, 3000:21, 3004:4, 3004:7, 3004:21, 3005:9, 3005:14, 3006:3, 3006:17, 3006:24, 3007:4, 3007:9, 3007:17, 3008:9, 3009:6, 3009:21, 3009:23, 3010:2, 3010:18, 3013:20, 3014:17, 3014:25, 3016:10, 3016:14, 3017:1, 3017:6, 3017:16, 3017:21, 3018:7, 3018:17, 3018:18, 3023:16, 3027:10, 3044:18, 3050:20, 3050:23, 3051:4, 3051:10, 3051:17, 3053:17, 3054:2, 3057:16, 3057:19, 3057:25, 3058:13, 3058:22, 3058:23, 3059:4, 3106:18, 3106:24, 3110:17, 3111:2, 3114:25, 3115:9, 3115:16, 3116:11, 3117:19, 3118:2, 3118:16, 3118:19, 3120:2
**Constantine's** [1] - 2933:18
**consternation** [1] - 2951:3
**constitute** [1] - 3085:10
**constitutes** [1] - 3085:9
**constructed** [1] - 3072:21
**construction** [11] - 2983:16, 3072:10, 3072:12, 3072:14,

3072:15, 3072:16, 3073:9, 3073:13, 3112:19, 3121:21, 3112:22
**consultant** [1] - 2958:13
**consultants** [2] - 2958:15, 2995:25
**Cont'd** [3] - 2972:1, 3044:1, 3079:1
**contact** [15] - 2931:15, 2933:9, 2935:8, 2935:16, 2935:17, 2935:23, 2936:7, 2936:10, 2936:15, 2940:25, 3014:4, 3107:15, 3117:4, 3124:21
**contacted** [3] - 2997:11, 3026:15, 3125:24
**contacting** [2] - 3110:7, 3117:5
**contain** [1] - 3025:11
**containing** [1] - 2984:15
**contains** [1] - 3023:23
**contemporaneous** [2] - 3036:15, 3076:11
**content** [2] - 3062:15, 3098:23
**contents** [1] - 3024:10
**contest** [1] - 2934:6
**context** [5] - 2953:15, 3003:7, 3086:21, 3097:14, 3098:9
**continue** [12] - 2938:8, 2939:15, 2941:21, 2942:5, 2942:8, 2942:21, 3010:24, 3024:16, 3027:3, 3064:16, 3087:18, 3124:14
**Continued** [5] - 3013:24, 3019:23, 3078:24, 3104:23, 3109:15
**continued** [5] - 2971:3, 2988:21, 3029:22, 3043:25, 3118:16
**continues** [1] - 3123:11
**continuing** [1] - 2952:14
**contract** [20] - 2951:21, 2952:2, 3010:25, 3011:6, 3011:8, 3011:22, 3012:3, 3012:6, 3012:9, 3012:19, 3016:19, 3021:21, 3021:22, 3021:25, 3022:3, 3022:8, 3022:13, 3067:18, 3067:25, 3068:1
**contracted** [1] - 3011:25
**contracts** [2] - 2995:24, 3053:12
**contrary** [1] - 3026:20
**contribute** [7] - 2987:23, 2993:19, 2994:3, 3051:15, 3057:5, 3105:23, 3106:14
**contributed** [5] - 3056:21, 3057:1, 3058:3, 3095:13,

3110:6
**contributing** [4] - 2993:18, 2994:3, 3056:4, 3056:18
**contribution** [6] - 2993:9, 2993:11, 2993:14, 3002:8, 3108:10, 3120:6
**contributor** [2] - 2996:9, 2996:10
**control** [2] - 3049:2, 3099:22
**controlled** [6] - 2946:19, 2948:12, 2955:17, 2967:4, 2975:16, 2975:18
**conventional** [1] - 2951:12
**conversation** [16] - 2940:10, 2985:7, 2999:5, 3006:12, 3044:23, 3047:4, 3050:9, 3051:25, 3052:9, 3055:16, 3057:18, 3066:17, 3081:5, 3081:7, 3081:16, 3121:11
**conversations** [6] - 3024:23, 3052:10, 3057:15, 3080:16, 3080:20, 3081:21
**conveyance** [1] - 3001:9
**conveyed** [3] - 3002:12, 3002:13, 3003:2
**CONWAY** [1] - 2929:2
**Conway** [1] - 3126:18
**COO** [2] - 2968:23, 2969:10
**cooperative** [1] - 2941:14
**cope** [1] - 2939:5
**copies** [3] - 2937:5, 2943:24, 3094:5
**copy** [4] - 2956:23, 2989:19, 3085:4, 3085:5
**corner** [1] - 3013:16
**Corp** [1] - 3093:25
**corporate** [2] - 2972:16, 3099:18
**Corporation** [1] - 2992:24
**corporation** [5] - 2972:22, 2972:24, 2992:10, 2992:23, 2994:1
**correct** [135] - 2953:11, 2965:24, 2968:17, 2969:9, 2970:22, 2976:4, 2978:8, 2983:5, 2983:6, 2984:10, 2984:19, 2987:4, 2990:14, 2993:11, 2996:5, 2999:16, 2999:21, 3000:7, 3001:4, 3003:13, 3003:25, 3004:1, 3004:5, 3004:25, 3006:4, 3006:21, 3007:2, 3008:17, 3008:23, 3011:1, 3012:1, 3012:2, 3012:7, 3012:21, 3013:5, 3015:21, 3016:20, 3017:12, 3018:22,

3019:18, 3022:10, 3029:8, 3037:1, 3037:2, 3037:5, 3039:2, 3043:24, 3046:11, 3047:15, 3052:7, 3053:3, 3053:15, 3061:23, 3061:24, 3062:1, 3063:22, 3063:25, 3064:2, 3064:3, 3064:10, 3065:9, 3065:15, 3065:20, 3065:21, 3066:5, 3067:23, 3068:7, 3068:24, 3070:14, 3071:19, 3073:4, 3075:1, 3075:15, 3075:16, 3078:18, 3079:7, 3081:19, 3082:6, 3083:4, 3083:5, 3083:10, 3085:14, 3086:23, 3090:8, 3090:10, 3091:4, 3093:11, 3094:11, 3095:2, 3095:15, 3095:20, 3096:8, 3097:2, 3098:15, 3100:14, 3100:24, 3102:5, 3107:19, 3108:22, 3110:14, 3110:20, 3111:16, 3111:17, 3111:19, 3112:1, 3113:3, 3113:4, 3113:9, 3113:12, 3114:9, 3114:11, 3114:14, 3114:15, 3115:1, 3115:10, 3115:17, 3115:18, 3115:22, 3115:23, 3116:12, 3116:16, 3116:17, 3116:20, 3116:21, 3117:3, 3117:24, 3118:2, 3118:15, 3118:18, 3119:2, 3119:5, 3119:9, 3120:3, 3120:5, 3120:10
**corrected** [1] - 2964:15
**correctly** [1] - 2946:17
**correlated** [1] - 3095:8
**corresponded** [1] - 3004:22
**corresponding** [1] - 3006:24
**counsel** [7] - 2932:6, 2932:23, 2932:25, 3020:25, 3026:23, 3027:10, 3122:15
**country** [2] - 2980:9, 3122:8
**Country** [1] - 2929:3
**couple** [3] - 2941:20, 2953:6, 2957:16
**course** [4] - 2940:9, 2965:16, 3069:16, 3104:17
**courses** [1] - 3068:10
**Court** [16] - 2929:6, 2929:14, 2931:11, 2932:17, 2934:17, 2936:6, 2941:1, 2941:3, 2990:21, 2991:1, 3084:14, 3121:15, 3122:21, 3122:23,

3125:18, 3125:19
**court** [3] - 3052:21, 3123:1, 3123:2
**COURT** [132] - 2928:1, 2930:2, 2930:4, 2930:18, 2930:22, 2931:2, 2931:16, 2931:21, 2932:2, 2933:9, 2933:14, 2934:9, 2935:6, 2936:24, 2937:4, 2937:15, 2938:1, 2938:3, 2938:5, 2938:23, 2939:9, 2939:11, 2939:13, 2941:11, 2941:17, 2941:19, 2941:22, 2941:25, 2942:1, 2942:3, 2942:18, 2942:22, 2942:25, 2943:4, 2943:13, 2943:16, 2944:3, 2944:6, 2962:15, 2967:20, 2976:18, 2988:16, 2989:2, 2989:6, 2989:10, 2989:12, 2989:15, 2989:20, 2989:24, 2990:2, 2992:5, 3005:20, 3009:15, 3019:13, 3019:16, 3019:22, 3020:21, 3021:16, 3022:19, 3022:21, 3022:25, 3023:4, 3023:8, 3024:11, 3024:15, 3024:19, 3024:21, 3025:3, 3025:14, 3025:22, 3026:3, 3027:22, 3028:2, 3028:8, 3028:21, 3031:3, 3034:21, 3041:14, 3044:17, 3045:16, 3049:8, 3049:21, 3049:24, 3050:3, 3051:8, 3055:6, 3057:11, 3058:21, 3060:15, 3061:15, 3062:16, 3062:22, 3063:13, 3072:2, 3073:16, 3076:3, 3076:18, 3078:2, 3078:5, 3079:18, 3084:22, 3085:2, 3085:4, 3085:7, 3085:14, 3086:20, 3086:25, 3087:2, 3087:4, 3087:5, 3087:9, 3087:11, 3087:15, 3087:18, 3088:20, 3089:11, 3092:1, 3092:20, 3104:22, 3120:13, 3120:18, 3120:21, 3121:16, 3122:3, 3122:24, 3123:13, 3123:23, 3124:1, 3124:22, 3125:10, 3126:4, 3126:20
**Court's** [3] - 2934:20, 3018:20, 3124:10
**Courthouse** [1] - 2928:6
**courtroom** [2] - 2938:2, 2988:19, 2990:1, 3024:18, 3030:25, 3051:1, 3085:1, 3087:17

**cover** [2] - 2945:5, 2945:6
**CR** [2] - 3106:7, 3108:1
**CR-13-607** [1] - 2928:4
**created** [5] - 3064:21, 3092:24, 3093:24, 3094:15, 3094:22
**credit** [34] - 3035:8, 3035:11, 3035:13, 3035:16, 3035:25, 3036:2, 3036:5, 3036:6, 3036:16, 3036:18, 3036:22, 3037:16, 3037:20, 3038:4, 3038:16, 3040:1, 3040:10, 3040:13, 3040:16, 3042:4, 3042:21, 3043:15, 3043:21, 3082:8, 3082:10, 3082:19, 3082:21, 3088:9, 3088:24, 3099:23, 3101:1, 3101:2, 3115:13, 3115:15
**cross** [8] - 2967:20, 2980:1, 3010:15, 3020:3, 3061:15, 3122:1, 3122:20, 3123:4
**CROSS** [9] - 2968:1, 2995:1, 3061:18, 3079:1, 3105:1, 3127:6, 3127:8, 3127:17, 3127:19
**cross-examination** [5] - 2967:20, 3010:15, 3020:3, 3061:15, 3122:20
**CROSS-EXAMINATION** [9] - 2968:1, 2995:1, 3061:18, 3079:1, 3105:1, 3127:6, 3127:8, 3127:17, 3127:19
**curious** [2] - 2934:10, 2980:16
**current** [3] - 3013:11, 3069:6, 3103:18
**CURRIE** [1] - 2928:14
**CV-10** [1] - 3015:17

# D

**dad** [1] - 3031:22
**daily** [1] - 3079:17
**Daily** [2] - 3076:7, 3078:20, 3080:3
**Darryl** [1] - 3023:18
**date** [16] - 2946:12, 2984:22, 2990:22, 2992:7, 3005:22, 3021:2, 3021:4, 3021:8, 3021:10, 3021:24, 3038:12, 3060:17, 3060:19, 3060:21, 3063:15, 3065:3
**dated** [7] - 3006:2, 3013:19, 3014:8, 3016:25, 3018:25, 3078:15, 3078:16
**dates** [1] - 3078:23

**day-to-day** [1] - 2995:22
**days** [7] - 3007:23, 3022:3, 3022:14, 3076:12, 3077:15, 3077:21, 3077:25
**deal** [17] - 2956:12, 2956:19, 2975:6, 2977:24, 2987:21, 2988:7, 3001:15, 3033:16, 3036:1, 3041:18, 3041:22, 3064:12, 3066:12, 3070:14, 3086:15, 3088:7, 3124:7
**dealing** [2] - 3001:6, 3002:7
**dealings** [1] - 2990:8
**deals** [1] - 3012:25
**debate** [1] - 3124:9
**debt** [1] - 3117:8
**December** [5] - 2946:14, 2948:7, 2962:1, 3060:21, 3117:23
**decent** [1] - 3056:11
**decides** [1] - 3070:15
**decision** [2] - 2933:2, 2954:13, 3055:14
**decision-making** [1] - 2954:13
**decorative** [1] - 2983:19
**deed** [16] - 2946:5, 2946:9, 2946:12, 2947:19, 2953:22, 2954:3, 2955:7, 2964:13, 2964:15, 2964:21, 2966:1, 2966:19, 2967:1, 3002:6, 3002:11, 3003:10
**deeded** [5] - 2948:4, 2954:6, 3001:14, 3003:3, 3003:4
**deeds** [2] - 2943:25, 2964:21
**Deer** [1] - 2937:8
**default** [8] - 3010:25, 3011:18, 3012:9, 3040:24, 3041:10, 3042:5, 3043:15
**defendant** [2] - 2933:6, 3023:24
**Defendant's** [4] - 3092:2, 3092:21, 3128:17, 3128:19
**defendants** [3] - 3023:16, 3030:1, 3053:2
**Defendants** [3] - 2928:8, 2928:20, 2929:1
**Defense** [6] - 2992:6, 3005:21, 3063:14, 3128:11, 3128:13, 3128:15
**defense** [4] - 2943:23, 3020:25, 3026:23, 3027:9
**define** [1] - 3012:22
**definitely** [2] - 3106:8, 3106:9
**degree** [1] - 2974:23

8

**Del** [9] - 3111:20, 3112:6, 3112:10, 3112:16, 3112:20, 3113:15, 3113:18, 3114:4, 3114:18
**delay** [2] - 2949:4, 3121:14
**delays** [2] - 3126:9, 3126:11
**delivered** [1] - 2940:17
**departure** [1] - 3003:9
**depicted** [2] - 2978:19, 3034:1
**depiction** [1] - 3020:11
**deposit** [4] - 2951:20, 2951:22, 3038:15, 3038:16
**deposition** [3] - 3058:9, 3058:15, 3085:13
**deposits** [1] - 3038:11
**deputy** [4] - 2931:16, 2937:12, 2939:13, 2939:25
**Derek** [2] - 3030:10, 3030:22
**describe** [6] - 2947:12, 2950:13, 2958:4, 3001:7, 3067:7, 3067:10
**designation** [1] - 2972:17
**desire** [1] - 2940:7
**desist** [1] - 2935:24
**Desoriero** [1] - 3093:2
**despite** [1] - 3057:14
**detailed** [1] - 2969:4
**details** [2] - 2945:6, 2986:24
**determine** [1] - 3013:8
**determined** [1] - 3100:22
**Detesh** [1] - 3094:2
**DETESH** [1] - 3094:3
**develop** [3] - 2988:2, 3008:25, 3072:25
**developed** [4] - 2974:14, 3008:23, 3073:12, 3118:6
**developing** [3] - 2970:5, 3009:1, 3099:13
**development** [21] - 2956:15, 2958:14, 2961:15, 2968:9, 2970:12, 2970:24, 2972:4, 2977:13, 2979:20, 2983:13, 3016:12, 3033:9, 3033:11, 3033:14, 3034:7, 3047:14, 3047:17, 3048:6, 3064:17, 3073:25, 3095:14
**Development** [2] - 3092:25, 3093:24
**devoted** [1] - 2968:25
**Diamante** [18] - 3067:15, 3068:5, 3068:6, 3068:7, 3068:8, 3069:8, 3069:25, 3070:9, 3070:13, 3070:22, 3071:19, 3072:4, 3072:8, 3073:25, 3111:20, 3112:6,

3112:10, 3114:8
**Diamante's** [1] - 3069:16
**Diamonte** [2] - 3103:19, 3103:20
**Dietz** [2] - 2940:6, 2940:23
**different** [7] - 2934:6, 2948:4, 2970:4, 3002:1, 3015:22, 3126:1
**differential** [1] - 3101:13
**difficult** [2] - 2939:4, 3123:9
**diligence** [6] - 2952:17, 2995:23, 3013:4, 3015:6, 3015:21, 3086:19
**DIRECT** [4] - 2944:13, 3029:1, 3127:4, 3127:15
**direct** [17] - 2942:7, 2944:24, 2959:5, 2969:2, 2979:6, 2984:16, 3020:9, 3024:25, 3033:8, 3064:5, 3064:7, 3082:7, 3082:16, 3083:11, 3098:5, 3100:12, 3123:9
**directed** [2] - 2935:15, 3122:14
**directing** [1] - 3038:11
**direction** [1] - 3097:1
**directly** [5] - 2940:7, 3003:19, 3016:13, 3017:6, 3102:20
**director** [1] - 3104:15
**disability** [4] - 2981:21, 2981:22, 2981:23, 2982:2
**disclosed** [2] - 2943:23, 3089:6
**Discovery** [15] - 2963:21, 2963:23, 2964:3, 2965:11, 2965:17, 2966:5, 2966:10, 2966:14, 2966:16, 2966:24, 2967:6, 2967:9, 2967:17, 3039:16, 3039:23
**discovery** [2] - 3098:24, 3126:8
**discretion** [2] - 2934:20, 3070:14
**discuss** [21] - 2930:5, 2930:10, 2932:4, 2949:7, 2950:21, 2953:12, 2953:14, 2954:9, 2967:7, 2988:17, 3008:10, 3010:10, 3010:12, 3024:16, 3024:21, 3084:23, 3099:17, 3104:10, 3113:14, 3113:18, 3120:15
**discussed** [7] - 2941:12, 2962:16, 3020:12, 3071:9, 3071:10, 3100:4, 3115:15
**discussing** [1] - 3010:2

**discussion** [9] - 3042:24, 3058:22, 3081:16, 3108:13, 3108:15, 3110:7, 3110:10, 3113:25, 3120:7
**discussions** [10] - 2956:10, 2960:11, 3016:6, 3106:10, 3108:20, 3109:1, 3109:8, 3111:5, 3113:21, 3114:16
**dispersed** [1] - 2957:8
**display** [1] - 2946:4
**displayed** [1] - 3018:24
**disruption** [1] - 2934:21
**distinction** [1] - 3072:14
**DISTRICT** [3] - 2928:1, 2928:1, 2928:11
**District** [2] - 2936:1, 3023:21
**district** [1] - 2955:13
**diversion** [2] - 2933:5, 2933:6
**division** [1] - 2969:3
**doctored** [2] - 3124:5, 3125:23
**document** [61] - 2955:19, 2964:17, 2975:10, 2991:13, 2991:15, 2991:19, 2991:24, 2997:22, 2999:1, 2999:2, 3015:15, 3018:19, 3019:6, 3022:6, 3023:13, 3036:19, 3036:23, 3036:24, 3038:7, 3046:25, 3059:23, 3061:25, 3062:3, 3062:8, 3062:9, 3062:10, 3063:1, 3063:5, 3063:9, 3063:20, 3065:1, 3065:5, 3065:6, 3065:17, 3065:24, 3066:4, 3066:11, 3080:1, 3084:6, 3084:11, 3084:12, 3090:17, 3090:24, 3091:2, 3091:6, 3091:8, 3091:9, 3091:12, 3091:14, 3091:15, 3091:16, 3091:18, 3092:4, 3092:5, 3092:7, 3092:11, 3092:14, 3092:24, 3100:8, 3119:14, 3119:18
**documentation** [9] - 3000:3, 3022:11, 3041:24, 3047:10, 3047:13, 3047:19, 3053:10, 3061:1, 3064:8
**documents** [28] - 2940:4, 2940:11, 2940:13, 2941:2, 2953:2, 2983:4, 2993:4, 2993:23, 3064:21, 3066:12, 3066:14, 3066:16, 3066:21, 3066:25, 3067:2, 3079:3,

3079:7, 3090:1, 3090:5, 3090:13, 3093:24, 3094:6, 3094:10, 3094:15, 3094:20, 3094:21, 3094:25, 3126:16
**dollar** [2] - 2986:8, 3009:19
**dollars** [7] - 2953:8, 2986:11, 3011:14, 3040:8, 3041:18, 3041:21, 3042:9
**done** [4] - 2958:14, 3010:18, 3072:25, 3116:19
**Donlon** [2] - 3081:23, 3082:2
**doubt** [1] - 3078:22
**down** [27] - 2969:25, 2999:2, 3007:14, 3011:10, 3012:10, 3015:13, 3018:3, 3022:21, 3022:22, 3025:17, 3035:2, 3035:3, 3052:18, 3053:5, 3067:15, 3067:17, 3067:20, 3068:9, 3069:12, 3069:22, 3071:7, 3073:8, 3091:10, 3114:12, 3120:18, 3120:20, 3126:14
**downtown** [1] - 3069:12
**draft** [4] - 2989:22, 3029:10, 3030:20, 3086:9
**drafted** [6] - 2940:20, 3029:14, 3030:16, 3031:12, 3031:13, 3031:25
**drawn** [1] - 2940:21
**Drive** [1] - 2991:5
**drive** [1] - 3045:24
**drop** [2] - 3053:22, 3057:20
**dropped** [5] - 3058:18, 3058:19, 3059:5, 3100:16, 3100:22
**drove** [2] - 3030:9, 3045:25
**due** [6] - 2952:17, 2995:23, 3013:3, 3015:5, 3015:21, 3066:3
**duly** [2] - 2942:15, 3028:14
**duration** [1] - 3081:9
**during** [26] - 2940:9, 2951:15, 2958:8, 2960:5, 2968:15, 2979:6, 2981:7, 3005:9, 3020:8, 3026:15, 3033:18, 3040:12, 3081:20, 3083:18, 3099:5, 3102:16, 3103:24, 3104:9, 3104:14, 3104:17, 3105:13, 3108:12, 3109:8, 3112:7, 3122:5, 3124:16
**duties** [1] - 3099:6
**dwelling** [1] - 3015:16
**dying** [2] - 2934:12, 2934:13

# E

**e-mail** [33] - 2932:24, 2933:12, 2935:17, 2945:10, 3004:10, 3004:22, 3005:8, 3005:13, 3006:1, 3006:20, 3006:23, 3007:1, 3007:12, 3008:4, 3008:9, 3010:1, 3010:4, 3013:20, 3014:3, 3016:15, 3017:1, 3017:19, 3018:10, 3018:21, 3019:2, 3019:11, 3021:2, 3021:4, 3021:8, 3021:10, 3025:7, 3025:10, 3025:14
**e-mailed** [2] - 3026:14, 3124:5
**e-mailing** [1] - 3007:9
**e-mails** [14] - 3006:13, 3006:15, 3017:15, 3020:3, 3020:24, 3026:7, 3124:12, 3124:13, 3124:18, 3124:23, 3125:5, 3125:13, 3125:20, 3125:23
**Earl** [3] - 3026:16, 3026:18, 3026:23
**early** [9] - 2955:14, 2960:3, 2968:13, 2984:21, 3002:23, 3002:24, 3032:7, 3032:10, 3110:5
**easier** [1] - 2956:23
**east** [3] - 2980:10, 2988:10, 3045:4
**EASTERN** [1] - 2928:1
**Eastern** [2] - 2936:1, 3023:21
**eastern** [1] - 3045:7
**easy** [1] - 3124:22
**edification** [1] - 3072:11
**effect** [2] - 2984:3, 3004:6
**effort** [11] - 2968:15, 2968:24, 2987:25, 3096:13, 3096:23, 3097:19, 3097:22, 3097:25, 3106:20, 3106:22, 3122:18
**efforts** [10] - 2974:7, 2983:7, 2996:24, 2997:1, 2997:12, 2997:14, 2997:15, 3010:18, 3027:1, 3105:23
**eight** [1] - 3026:12
**either** [14] - 2932:19, 2980:22, 2986:12, 2998:25, 3000:18, 3000:20, 3011:23, 3027:6, 3053:1, 3057:15, 3059:4, 3069:15, 3122:5, 3124:16
**El** [4] - 3036:10, 3036:12,

3111:18, 3112:7
**elaborate** [1] - 3041:9
**election** [3] - 2992:10, 2992:11, 2992:22
**elements** [2] - 3009:9, 3009:18
**elevation** [1] - 2947:13
**elicit** [1] - 3049:20
**elsewhere** [1] - 2985:11
**emergency** [1] - 2932:14
**employed** [1] - 3099:5
**employee** [1] - 3067:13
**employer** [3] - 2937:7, 2938:6, 3067:13
**employer-employee** [1] - 3067:13
**employers** [1] - 2937:17
**employment** [4] - 2938:9, 2981:13, 3069:6, 3103:18
**en** [1] - 3085:20
**encouraged** [1] - 2977:18
**encumbrance** [1] - 2950:25
**end** [16] - 2930:25, 2940:23, 2945:20, 2947:3, 2954:23, 2966:15, 2988:10, 3007:24, 3026:6, 3056:4, 3087:2, 3112:3, 3115:7, 3122:5, 3123:1, 3126:7
**endeavor** [2] - 3069:17, 3075:17
**ended** [2] - 2942:6, 2963:25
**enemies** [1] - 2977:8
**energy** [3] - 2968:15, 2968:24, 2987:25
**enforcement** [1] - 3094:14
**engaged** [5] - 2995:22, 3001:1, 3067:24, 3097:10, 3122:14
**England** [1] - 3029:6
**enjoyed** [1] - 2942:4
**ensued** [2] - 3108:13, 3110:7
**ensuring** [1] - 3097:16
**enter** [2] - 2951:19, 2954:13
**Enterprises** [4] - 3118:20, 3119:5, 3119:8, 3120:4
**enters** [3] - 2938:2, 2990:1, 3087:16
**entertain** [1] - 3067:16
**entire** [5] - 3001:13, 3001:23, 3008:20, 3062:7, 3084:8
**entities** [1] - 2978:7
**entitled** [6] - 2966:4, 2978:6, 2992:10, 2992:22, 3062:7, 3091:7

**entitlement** [1] - 2952:16
**entity** [11] - 2955:17, 2964:24, 2964:25, 2967:1, 2967:4, 2975:15, 2987:15, 2993:6, 3070:4, 3070:16, 3101:20
**environment** [1] - 2979:19
**environmental** [1] - 2961:18
**equity** [16] - 2951:1, 2959:6, 2959:8, 2978:6, 2993:20, 2994:4, 2994:10, 3002:8, 3041:7, 3041:10, 3041:25, 3042:10, 3042:25, 3043:5, 3048:20, 3113:22
**equivocation** [1] - 3065:23
**escrow** [3] - 3102:9, 3102:11, 3105:12
**especially** [1] - 2936:18
**ESQ** [5] - 2928:16, 2928:16, 2928:22, 2929:4, 2929:5
**essentially** [4] - 2933:3, 2952:6, 3038:25, 3043:22
**estate** [4] - 3049:16, 3068:16, 3086:15
**Estates** [2] - 2963:22, 2963:24
**et** [1] - 2961:18
**Ethel** [1] - 3103:4
**Eufora** [21] - 3059:13, 3060:6, 3060:23, 3060:24, 3061:2, 3061:7, 3096:5, 3096:7, 3096:14, 3096:24, 3097:12, 3102:16, 3105:10, 3105:13, 3107:23, 3109:1, 3110:3, 3110:23, 3110:24, 3111:1, 3117:23
**evade** [1] - 3122:18
**events** [5] - 2960:1, 3020:12, 3065:7, 3065:11, 3066:7
**eventually** [2] - 2952:20, 3047:13
**evidence** [60] - 2942:22, 2943:5, 2943:20, 2944:7, 2944:11, 2944:24, 2945:24, 2946:4, 2946:21, 2947:10, 2947:19, 2948:15, 2950:5, 2952:25, 2955:6, 2955:20, 2956:21, 2961:24, 2963:15, 2964:13, 2965:3, 2965:14, 2966:4, 2966:19, 2966:22, 2992:2, 2992:7, 2992:9, 3005:22, 3013:14, 3016:24, 3017:19, 3020:17, 3020:23, 3024:6,

3024:7, 3024:14, 3036:19, 3038:7, 3043:11, 3046:14, 3048:3, 3060:17, 3063:10, 3063:15, 3063:18, 3084:20, 3092:3, 3092:22, 3127:23, 3128:2, 3128:6, 3128:8, 3128:12, 3128:14, 3128:16, 3128:18, 3128:20, 3128:24, 3129:1
**ex** [4] - 3052:19, 3052:20, 3056:15, 3071:2
**ex-client** [1] - 3056:15
**ex-clients** [1] - 3052:20
**ex-FBI** [1] - 3071:2
**exact** [4] - 2984:22, 2986:21, 3004:18, 3093:21
**exactly** [2] - 2934:17, 3107:4
**examination** [6] - 2942:7, 2967:20, 3010:15, 3020:3, 3061:15, 3122:20
**EXAMINATION** [17] - 2944:13, 2968:1, 2995:1, 3020:1, 3021:18, 3029:1, 3061:18, 3079:1, 3105:1, 3127:4, 3127:6, 3127:8, 3127:10, 3127:12, 3127:15, 3127:17, 3127:19
**examined** [2] - 2942:15, 3028:14
**example** [2] - 3086:8, 3086:21
**except** [1] - 2967:8
**excerpt** [3] - 3084:7, 3085:9, 3089:10
**excerpts** [3] - 3084:17, 3085:19, 3085:20
**excuse** [5] - 2968:19, 3022:8, 3038:9, 3079:19, 3088:21
**excused** [1] - 3120:17
**excused)** [1] - 3085:3
**Exhibit** [69] - 2943:5, 2943:24, 2944:25, 2945:23, 2946:22, 2947:11, 2947:18, 2948:15, 2950:6, 2953:1, 2955:2, 2955:6, 2955:20, 2956:21, 2956:25, 2961:24, 2962:7, 2963:4, 2963:14, 2964:8, 2964:13, 2964:14, 2964:19, 2965:14, 2966:3, 2966:11, 2967:22, 2969:16, 2974:1, 2991:13, 2991:21, 2992:1, 2992:9, 2992:22, 3020:22, 3023:23, 3024:5, 3024:11, 3024:13, 3046:15, 3048:3, 3059:20, 3060:16, 3061:16, 3061:21, 3062:4,

10

3062:21, 3063:10,
3063:14, 3065:2, 3066:11,
3078:11, 3079:24, 3084:7,
3084:20, 3091:6, 3091:23,
3092:2, 3092:5, 3092:6,
3092:17, 3092:21,
3127:23, 3128:7, 3128:15,
3128:17, 3128:19,
3128:23, 3128:25
**exhibit** [9] - 2957:2,
2959:3, 3016:23, 3017:18,
3039:5, 3039:13, 3062:16,
3063:18, 3076:22
**EXHIBITS** [1] - 3127:22
**Exhibits** [9] - 2943:8,
2943:18, 2944:8, 2992:6,
3005:21, 3127:24, 3128:3,
3128:11, 3128:13
**exhibits** [7] - 2943:16,
2943:22, 2944:6, 2988:14,
3005:20, 3062:20, 3085:20
**existed** [1] - 3018:14
**exits** [2] - 3024:18, 3084:25
**Expansion** [27] - 2952:23,
2953:3, 2954:3, 2958:19,
2958:23, 2960:4, 2982:23,
2998:15, 2999:12,
2999:24, 3000:6, 3000:13,
3000:16, 3000:22,
3001:14, 3001:16,
3002:16, 3003:3, 3003:5,
3003:11, 3010:23, 3012:8,
3012:14, 3012:19,
3012:24, 3021:13, 3022:2
**expected** [3] - 2949:3,
2969:10, 3014:9
**expense** [1] - 3052:18
**expenses** [3] - 2959:23,
3069:20, 3069:21
**experience** [1] - 2938:23
**expert** [2] - 3124:21,
3125:24
**expire** [3] - 3021:22,
3021:25, 3022:3
**expired** [1] - 3022:14
**explain** [9] - 2938:10,
2995:13, 3034:19,
3034:25, 3035:15,
3041:15, 3041:16,
3049:21, 3049:25
**explaining** [1] - 2938:20
**extend** [6] - 2952:1,
3011:6, 3011:7, 3012:6,
3082:11, 3110:2
**extended** [1] - 3042:21
**extending** [1] - 3082:20
**extension** [7] - 2951:19,
2982:19, 2982:21,
3021:22, 3022:3, 3022:8,
3022:13

**extensive** [1] - 3122:20
**extensively** [1] - 3075:8
**extent** [1] - 2973:22
**extra** [1] - 3046:24

# F

**face** [2] - 3004:20
**face-to-face** [1] - 3004:20
**faced** [2] - 3095:23,
3095:25
**facilitate** [1] - 3064:23
**fact** [19] - 2945:19,
2976:11, 2978:3, 2997:6,
2998:18, 2998:22,
3011:16, 3014:16,
3022:13, 3041:24,
3058:10, 3063:23, 3074:6,
3074:18, 3082:4, 3084:2,
3096:17, 3109:9, 3116:18
**facts** [1] - 2934:5
**factually** [1] - 2934:3
**failed** [1] - 3003:24
**failing** [1] - 3011:18
**failure** [1] - 3004:2
**fair** [29] - 2945:15, 2948:10,
2957:14, 2957:15,
2968:23, 2969:1, 2972:7,
2973:13, 2973:20, 2974:4,
2976:15, 2977:13,
2979:25, 2980:3, 2986:13,
2986:14, 2995:19,
2996:11, 3001:5, 3004:21,
3006:19, 3020:11, 3052:3,
3078:12, 3108:8, 3112:15,
3113:17, 3117:25, 3126:20
**fairly** [2] - 2953:23, 3123:9
**false** [1] - 2936:18
**familiar** [23] - 2939:21,
3030:1, 3030:24, 3032:12,
3034:1, 3038:25, 3039:12,
3039:15, 3044:2, 3044:11,
3050:16, 3050:18,
3053:23, 3054:24, 3055:8,
3059:12, 3061:7, 3065:14,
3080:8, 3080:11, 3084:12,
3108:18, 3110:4
**family** [5] - 2932:14,
3031:24, 3045:7, 3090:4,
3090:16
**far** [3] - 3085:11, 3088:6,
3089:15
**fast** [1] - 2954:5
**father** [4] - 2932:15,
2934:12, 2934:13, 2935:12
**fax** [2] - 2931:23, 3017:3
**FBI** [5] - 2997:18, 3071:2,
3079:20, 3080:6, 3080:12
**February** [1] - 2982:20

**federal** [4] - 2992:23,
3077:24, 3081:2, 3095:1
**Federal** [2] - 2928:15,
2929:14
**FedExed** [2] - 3090:7,
3090:19
**fees** [9] - 2958:7, 2958:8,
3042:18, 3052:17, 3098:7,
3098:10, 3098:14,
3118:22, 3120:10
**feet** [2] - 3015:17, 3015:18
**fence** [5] - 2960:17,
2960:18, 2979:24, 2980:2,
2980:5
**fenced** [1] - 2979:8
**fences** [5] - 2960:22,
2960:23, 2979:2, 2980:1,
2980:2
**festering** [1] - 3124:3
**few** [22] - 2930:5, 2938:10,
2988:13, 3007:25, 3023:2,
3044:25, 3049:3, 3056:21,
3058:2, 3068:24, 3076:8,
3077:15, 3077:21,
3077:25, 3081:6, 3081:8,
3105:6, 3105:25, 3106:4,
3108:2, 3111:11, 3111:13
**Fidelity** [1] - 3039:7
**fight** [1] - 3053:4
**file** [3] - 2940:11, 3003:22,
3019:4
**filed** [2] - 3058:5, 3100:13
**files** [1] - 2940:10
**fill** [1] - 2973:1
**filling** [1] - 2974:8
**final** [3] - 2966:4, 2966:23,
3073:23
**finally** [5] - 2963:13,
2966:7, 2966:9, 3021:10,
3089:24
**Financial** [3] - 2950:4,
2950:9, 3019:7
**financial** [7] - 2951:17,
3031:15, 3031:16,
3031:19, 3040:12, 3101:4,
3101:5
**financing** [32] - 2945:15,
2949:6, 2949:10, 2949:14,
2949:17, 2949:20,
2949:23, 2949:24,
2951:13, 2952:18, 2956:8,
2956:10, 2956:13,
2957:11, 2957:14,
2957:20, 2961:4, 2961:6,
2961:9, 2968:9, 2969:7,
2969:12, 2969:23,
2969:24, 2969:25,
2972:12, 2974:3, 2974:7,
2977:19, 2982:15, 2983:2,
3011:9

**fine** [5] - 2930:21, 2932:12,
2934:9, 3086:24, 3112:9
**finish** [2] - 2989:13,
2989:14
**finished** [1] - 2951:14
**finishes** [1] - 3126:13
**finishing** [1] - 3014:12
**firm** [2] - 3026:16, 3102:10
**first** [44] - 2930:6, 2933:25,
2935:3, 2936:9, 2938:11,
2943:6, 2945:20, 2957:19,
2962:5, 2977:11, 2980:23,
2984:20, 2984:24, 2985:3,
2996:1, 2998:1, 3005:24,
3006:19, 3020:25,
3027:14, 3027:17,
3028:13, 3029:10,
3029:14, 3030:11,
3036:21, 3037:6, 3037:15,
3038:11, 3040:20,
3043:16, 3047:16, 3048:1,
3048:11, 3050:23,
3051:10, 3063:24,
3064:11, 3080:15, 3086:9,
3102:14, 3107:6, 3107:7,
3123:22
**first-round** [1] - 3029:10
**firsthand** [1] - 3055:1
**five** [1] - 3031:21
**flew** [3] - 2980:13, 3033:17,
3056:11
**flight** [2] - 2981:3, 3123:21
**flights** [1] - 2980:18
**fly** [8] - 2930:15, 2934:13,
2980:9, 2980:14, 2980:15,
2980:22, 2981:1, 3103:19
**focus** [6] - 2960:3, 2969:9,
3014:20, 3037:6, 3037:8,
3051:21
**focused** [1] - 3025:20
**focuses** [1] - 3005:25
**folded** [1] - 3003:21
**follow** [1] - 3079:5
**following** [8] - 2932:20,
2975:13, 2975:21,
2976:12, 2985:7, 2985:13,
2989:1, 3088:4
**follows** [3] - 2942:16,
2992:24, 3028:15
**food** [1] - 3069:22
**foreclosed** [1] - 3113:12
**foreclosure** [1] - 3113:13
**foregoing** [1] - 3024:3
**foreground** [1] - 2966:13
**forfeiting** [1] - 3088:18
**forgery** [1] - 3100:23
**forget** [1] - 3012:24
**form** [6] - 2945:9, 2945:10,
2984:16, 3041:14,
3069:24, 3077:25

**formal** [1] - 3079:11
**formed** [1] - 3003:23
**former** [5] - 2981:12, 2981:15, 2981:18, 3026:16, 3030:22
**forth** [4] - 2952:22, 2973:2, 2992:17, 3119:11
**forward** [5] - 2941:2, 2945:12, 2988:8, 3009:8, 3012:23
**forwarding** [2] - 2954:5, 3014:3
**founder** [2] - 3070:8, 3118:4
**four** [5] - 2966:19, 2966:24, 3020:3, 3124:11, 3124:23
**fractionals** [1] - 3068:14
**Frailes** [1] - 3117:13
**frame** [2] - 3000:24, 3004:17
**frankly** [1] - 3062:8
**frequently** [3] - 3045:24, 3052:4, 3112:7
**Friday** [4] - 2940:3, 2940:16, 3021:3, 3074:5
**friend** [9] - 3033:19, 3067:9, 3081:23, 3081:25, 3107:7, 3107:10, 3107:12, 3107:14, 3107:17
**friends** [7] - 2977:8, 2977:9, 3033:3, 3052:7, 3069:5, 3082:3
**friendship** [1] - 3082:2
**frightening** [1] - 3123:5
**front** [4] - 3020:24, 3043:12, 3085:22, 3124:4
**fulfill** [2] - 2969:10, 2969:11
**fulfilled** [1] - 3012:3
**full** [1] - 3120:7
**fully** [1] - 2972:6
**Fund** [23] - 3025:9, 3050:17, 3050:19, 3050:21, 3050:22, 3051:13, 3051:16, 3051:23, 3052:11, 3052:15, 3052:16, 3053:18, 3056:5, 3056:17, 3056:23, 3057:17, 3057:19, 3057:22, 3058:3, 3098:4, 3098:6, 3098:10, 3118:11
**fund** [1] - 3056:19, 3057:6
**fundamental** [1] - 3062:15
**funding** [22] - 2959:6, 2959:8, 2972:8, 2995:12, 2996:4, 2996:15, 2996:19, 2996:24, 2997:2, 2997:3, 2997:7, 2997:10, 3000:5, 3001:1, 3010:19, 3011:9,

3012:11, 3014:16, 3014:25, 3015:9, 3016:7, 3036:2
**fundings** [1] - 2997:19
**funds** [4] - 2933:6, 3053:9, 3098:15, 3099:23
**future** [1] - 3013:12

# G

**Gaarn** [3] - 3106:5, 3108:1
**gain** [2] - 2979:8, 2996:1
**Galioto** [4] - 3080:8, 3080:17, 3080:24, 3081:8
**gamut** [1] - 2954:17
**Gardina** [1] - 3000:2
**gates** [2] - 2960:22, 2960:23
**Gaudet** [1] - 3024:24
**general** [3] - 2990:17, 3070:18, 3111:4
**generally** [2] - 2959:20, 2973:8, 3042:1
**Gentry** [2] - 3106:7, 3108:1
**given** [11] - 2930:16, 2932:2, 2976:22, 3003:11, 3056:22, 3066:9, 3074:8, 3083:13, 3089:15, 3105:9, 3121:25
**glen** [1] - 3121:20
**Glen** [1] - 2931:5
**Global** [24] - 3025:9, 3050:16, 3050:19, 3050:21, 3050:22, 3051:13, 3051:15, 3051:22, 3052:10, 3052:14, 3052:16, 3053:18, 3056:4, 3056:17, 3056:23, 3057:17, 3057:19, 3057:21, 3058:3, 3098:4, 3098:5, 3098:9, 3098:16, 3118:10
**Gmail** [1] - 3006:6
**goal** [2] - 2973:23, 3069:14
**goals** [3] - 2973:12, 2973:18, 2973:21
**golf** [6] - 2965:16, 3068:9, 3068:10, 3069:11, 3069:16, 3103:7
**golfing** [1] - 3067:17
**Google** [2] - 3125:22
**Government** [31] - 2928:14, 2931:14, 2934:11, 2935:8, 2943:5, 2943:8, 2943:18, 2944:8, 2974:1, 3017:14, 3020:16, 3020:22, 3023:11, 3023:19, 3024:5, 3024:7, 3024:13, 3046:15, 3048:3,

3059:20, 3060:16, 3061:16, 3061:21, 3085:22, 3087:13, 3127:23, 3127:24, 3128:3, 3128:7, 3128:23, 3128:25
**government** [22] - 2932:2, 2933:24, 2934:15, 2934:23, 2936:11, 2940:6, 2940:25, 2941:1, 2941:4, 2984:9, 2995:17, 3026:7, 3027:4, 3027:22, 3028:4, 3028:6, 3060:7, 3095:17, 3124:8, 3124:24, 3125:11, 3125:25
**government's** [3] - 2930:8, 3027:8, 3126:12
**Government's** [30] - 2943:24, 2944:25, 2945:23, 2946:22, 2947:11, 2947:18, 2948:15, 2950:6, 2953:1, 2955:1, 2955:6, 2955:20, 2956:21, 2961:24, 2962:7, 2963:4, 2963:14, 2964:7, 2964:13, 2964:14, 2965:14, 2966:3, 2966:11, 2967:22, 2969:16, 3023:23, 3024:11, 3033:25, 3038:8, 3043:11
**graduating** [1] - 2939:14
**graduation** [1] - 2939:16
**Grand** [1] - 3034:20
**grand** [4] - 3077:9, 3077:16, 3077:23, 3079:11
**granted** [2] - 2973:6, 3125:25
**grantee** [3] - 2946:15, 2948:8, 2955:9
**grantor** [2] - 2946:15, 2955:9
**great** [7] - 2939:8, 2977:24, 3033:22, 3046:1, 3070:14, 3071:12, 3115:6
**greater** [1] - 3095:13
**grew** [1] - 3031:21
**gross** [2] - 3062:9, 3091:9
**ground** [4] - 2945:13, 2995:11, 2995:13, 2995:18
**grounds** [1] - 3072:2
**group** [9] - 2954:3, 3027:20, 3107:22, 3107:24, 3108:3, 3108:6, 3108:20, 3108:21, 3111:9
**Group** [4] - 2962:1, 2962:9, 2962:22, 2963:5
**guaranteed** [5] - 2982:5, 2982:7, 2982:16, 2982:18, 2982:22
**guess** [11] - 2983:1, 3001:7, 3002:22, 3042:23,

3048:9, 3070:8, 3070:10, 3078:18, 3078:19, 3094:12, 3112:22
**guide** [1] - 3069:10
**guy** [3] - 2995:10, 2995:13, 2995:18
**guys** [4] - 2958:16, 3053:20, 3056:21, 3058:3
**GX** [2] - 3020:17, 3020:21

# H

**HALEY** [91] - 2928:20, 2928:22, 2930:24, 2931:5, 2931:8, 2932:1, 2937:13, 2937:25, 2939:24, 2941:14, 2941:18, 2943:3, 2943:15, 2944:5, 2957:2, 2957:5, 2962:13, 2967:21, 2967:25, 2968:2, 2972:1, 2975:4, 2988:13, 2989:4, 2989:9, 2989:18, 2990:4, 2990:5, 2991:17, 2992:1, 2992:8, 2994:16, 2994:24, 3005:19, 3020:18, 3021:17, 3021:19, 3022:17, 3023:10, 3024:9, 3025:6, 3025:16, 3027:20, 3031:2, 3041:13, 3049:5, 3049:17, 3050:2, 3055:3, 3057:10, 3058:20, 3059:1, 3060:9, 3060:13, 3061:16, 3061:19, 3062:17, 3062:19, 3062:24, 3062:25, 3063:8, 3063:16, 3072:3, 3073:22, 3076:17, 3076:20, 3078:6, 3078:8, 3078:10, 3079:2, 3079:19, 3084:19, 3085:18, 3086:24, 3087:1, 3087:3, 3087:7, 3087:10, 3087:13, 3087:20, 3088:21, 3089:12, 3091:22, 3092:16, 3092:19, 3101:14, 3104:20, 3122:19, 3127:7, 3127:13, 3127:18
**Haley** [7] - 2931:25, 2968:5, 2989:3, 2990:3, 3078:5, 3085:14, 3087:19
**half** [5] - 2939:16, 2953:7, 2986:11, 3024:25, 3081:9
**halfway** [1] - 2980:14
**hamburger** [1] - 3074:1
**Hamptons** [3] - 3044:14, 3045:4, 3045:25
**hand** [1] - 3013:16
**handed** [2] - 2956:25, 2964:19
**handling** [2] - 2936:5,

2936:6
**handprinted** [2] - 3091:17, 3091:18
**hanging** [1] - 3009:22
**happy** [2] - 3041:19, 3116:22
**Harbor** [30] - 2963:21, 2963:23, 2964:3, 2965:11, 2965:17, 2965:19, 2966:10, 2966:14, 2966:16, 2966:24, 2967:6, 2967:9, 2967:17, 2987:10, 2988:11, 2990:10, 3039:16, 3039:23, 3044:3, 3044:18, 3044:20, 3044:24, 3045:14, 3046:1, 3046:6, 3047:6, 3047:21, 3049:3, 3093:4, 3115:22
**hard** [7] - 2939:3, 2951:10, 2951:11, 2951:22, 2953:15, 2954:18, 2985:20
**harder** [1] - 2953:16
**Hawaii** [67] - 2960:6, 2960:9, 2960:12, 2962:3, 2962:11, 2962:25, 2963:8, 2963:24, 2968:7, 2968:10, 2968:11, 2969:5, 2970:25, 2973:21, 2974:9, 2977:10, 2977:12, 2978:5, 2978:18, 2979:13, 2980:10, 2983:7, 2983:14, 2984:20, 2985:10, 2985:16, 2987:3, 2988:1, 2995:22, 2999:6, 3001:2, 3002:21, 3015:6, 3016:25, 3017:20, 3018:7, 3023:25, 3033:9, 3033:10, 3033:13, 3033:16, 3033:17, 3033:23, 3034:7, 3035:9, 3035:20, 3036:1, 3039:12, 3041:18, 3041:22, 3041:25, 3042:11, 3043:6, 3054:24, 3055:2, 3055:9, 3066:12, 3066:15, 3082:5, 3082:8, 3082:11, 3087:23, 3088:6, 3095:7, 3099:14, 3099:16, 3103:16
**Hawaiian** [25] - 2943:25, 2944:16, 2996:15, 2997:3, 2997:19, 2998:8, 2998:20, 3004:4, 3004:8, 3004:24, 3008:20, 3013:9, 3017:23, 3018:9, 3018:24, 3022:9, 3064:16, 3095:13, 3095:14, 3098:25, 3099:6, 3099:9, 3100:5, 3100:10, 3115:12
**Hawks** [1] - 3029:23
**head** [1] - 3072:10
**header** [1] - 3007:14

**hear** [4] - 2981:14, 3028:22, 3032:13, 3117:13
**heard** [4] - 2935:19, 3082:21, 3082:23
**hearing** [3] - 3027:15, 3027:18, 3054:8
**hearsay** [2] - 3049:5, 3049:18
**helicopter** [2] - 2986:8, 2986:12
**helipad** [1] - 2933:8
**heliport** [1] - 2933:8
**help** [5] - 3001:1, 3014:23, 3105:8, 3107:23, 3119:7
**helped** [1] - 2965:18
**hereby** [1] - 3023:14
**hesitation** [1] - 3061:21
**hi** [1] - 3017:2
**high** [1] - 2974:23
**higher** [1] - 2947:13
**highlighted** [3] - 2997:25, 3037:10, 3046:18
**Highway** [1] - 2928:21
**Hilton** [1] - 3010:20
**himself** [2] - 2944:19, 3011:18
**hire** [1] - 3070:15
**hired** [3] - 3031:10, 3031:14, 3032:8
**hiring** [1] - 3031:16
**hockey** [8] - 3033:18, 3052:19, 3053:25, 3059:6, 3105:20, 3112:16, 3113:1, 3121:20
**Hoffman** [1] - 2939:13
**hold** [2] - 2968:20, 3035:4
**holder** [1] - 3041:25
**Holding** [3] - 2955:10, 2955:17, 2957:9
**Holdings** [1] - 2956:9
**holes** [1] - 3068:10
**home** [6] - 3024:3, 3030:12, 3046:3, 3054:23, 3090:4, 3090:17
**homes** [1] - 3045:7
**hometown** [1] - 3030:7
**honest** [4] - 3103:1, 3107:11, 3119:3, 3123:8
**honestly** [3] - 3016:13, 3040:5, 3107:4
**Honor** [55] - 2933:2, 2933:13, 2933:23, 2934:16, 2934:24, 2936:3, 2937:23, 2937:24, 2939:24, 2943:2, 2943:14, 2944:4, 2988:13, 2992:1, 2992:4, 2994:25, 3005:16, 3019:18, 3019:20, 3019:21, 3020:20, 3022:20, 3023:9, 3023:10,

3024:8, 3025:6, 3025:13, 3027:12, 3028:24, 3044:15, 3049:17, 3049:23, 3051:6, 3059:16, 3060:14, 3061:10, 3062:17, 3063:9, 3084:19, 3084:21, 3085:18, 3085:25, 3086:24, 3087:1, 3089:10, 3091:22, 3091:25, 3092:16, 3104:20, 3119:16, 3120:11, 3121:1, 3123:25, 3126:5, 3126:19
**Honor's** [1] - 3122:17
**HONORABLE** [1] - 2928:11
**Honu'apo** [4] - 2977:16, 2982:6, 2982:20, 3017:2
**Honuapo** [18] - 2945:19, 2946:1, 2946:2, 2946:10, 2946:13, 2947:3, 2947:9, 2947:16, 2947:20, 2948:1, 2948:17, 2948:22, 2948:23, 2950:2, 2950:14, 2950:16, 2951:1, 2960:20
**hop** [1] - 2960:17
**hope** [5] - 2941:11, 2942:3, 2989:11, 3025:4, 3126:17
**hopefully** [4] - 2931:3, 2952:18, 3047:22, 3053:22
**hopes** [1] - 3123:21
**hoping** [1] - 2941:13
**horizontal** [1] - 3072:15
**hotel** [2] - 2985:1, 2985:17
**hour** [3] - 3081:9, 3123:6, 3123:12
**house** [5] - 2964:11, 3030:9, 3033:7, 3036:16, 3048:1
**humble** [1] - 2937:10
**hundred** [1] - 2978:4
**hundreds** [1] - 3093:5
**hurting** [3] - 3047:20, 3048:23
**hypothetical** [1] - 2976:20

**I**

**idea** [10] - 2973:21, 2977:12, 2983:20, 2983:24, 2983:25, 2984:2, 3039:11, 3045:13, 3061:4, 3095:25
**identification** [9] - 2997:24, 3005:3, 3031:2, 3031:3, 3051:5, 3051:8, 3059:19, 3059:21, 3119:19
**identified** [2] - 3091:1, 3108:23
**identify** [3] - 3017:9,

3061:22, 3084:11
**imagine** [4] - 2986:5, 2986:14, 2987:17, 3107:14
**immediate** [3] - 2934:25, 2937:11, 2997:23
**immediately** [1] - 3086:4
**impeach** [1] - 3085:15
**impeachment** [2] - 3085:9, 3085:11
**implicate** [1] - 3025:12
**implicates** [1] - 3025:7
**implicit** [1] - 3094:12
**importance** [2] - 3110:11, 3110:13
**important** [1] - 2939:25
**impossible** [1] - 3125:25
**inaccurate** [1] - 2932:10
**Inc** [9] - 2992:12, 2992:19, 2993:2, 2993:6, 2993:10, 2993:24, 2994:1, 2994:11, 2994:21
**incidentally** [2] - 3080:19, 3104:14
**include** [2] - 3086:8, 3097:15
**includes** [1] - 3077:2
**including** [6] - 2950:15, 2992:17, 2993:1, 3027:6, 3098:2, 3100:8
**incoming** [2] - 2962:20, 2963:5
**incomplete** [1] - 2940:4
**inconsistent** [5] - 3085:16, 3085:21, 3085:23, 3085:24, 3086:4
**increase** [2] - 3037:9, 3037:12
**increased** [1] - 3038:4
**incubated** [1] - 2977:12
**incurred** [2] - 2958:8, 2977:22
**indeed** [3] - 2941:3, 2984:12, 2992:16
**independent** [1] - 3060:3
**indicate** [2] - 2940:25, 3036:25
**indicated** [2] - 2932:16, 3126:6
**indicates** [2] - 2932:6, 3063:19
**indicating** [4] - 2932:25, 3023:12, 3023:19, 3122:7
**indicating)** [1] - 3019:5
**indict** [1] - 3077:18
**indicted** [2] - 3077:9, 3077:16
**indictment** [2] - 3075:3, 3077:23
**indirectly** [1] - 3016:15
**individual** [5] - 2993:17,

13

2995:21, 3027:13, 3027:19, 3027:21
**individuals** [6] - 2993:1, 3048:5, 3048:10, 3110:12, 3116:14
**inferences** [2] - 3124:5, 3125:4
**information** [30] - 2930:16, 2934:5, 2935:18, 2961:14, 2992:11, 2996:12, 2996:19, 2999:14, 2999:17, 2999:20, 3000:10, 3013:3, 3013:7, 3014:5, 3014:7, 3014:15, 3014:17, 3014:24, 3015:2, 3015:4, 3015:20, 3015:23, 3016:11, 3017:25, 3018:17, 3059:3, 3074:13, 3083:11, 3083:13
**initial** [1] - 2934:18
**initials** [1] - 3059:22
**initiate** [1] - 2936:15
**initiated** [1] - 2936:14
**injured** [1] - 2981:24
**inquiries** [1] - 2951:9
**insofar** [1] - 2933:16
**instance** [7] - 2969:23, 2970:11, 2970:25, 2980:17, 2993:16, 3071:5, 3102:15
**instances** [2] - 3101:24, 3104:5
**instruction** [2] - 3044:16, 3115:21
**instrumental** [1] - 3070:5
**Insurance** [1] - 3039:7
**intended** [1] - 3035:1
**intent** [2] - 3052:25, 3065:12
**intention** [2] - 2950:25, 2954:1
**intentions** [1] - 2933:18
**interaction** [1] - 2970:11
**interest** [37] - 2952:6, 2952:9, 2953:8, 2978:6, 2985:15, 2987:24, 2992:18, 2992:25, 2993:5, 2993:9, 2993:17, 2993:25, 2994:5, 2994:10, 2994:20, 3002:6, 3012:5, 3033:21, 3035:18, 3036:4, 3064:2, 3064:9, 3069:24, 3082:12, 3082:20, 3089:8, 3091:1, 3092:25, 3093:1, 3093:2, 3095:6, 3095:14, 3096:14, 3096:24, 3096:25, 3097:18, 3098:2
**interested** [4] - 2977:20, 3044:13, 3045:15, 3086:22
**interpretation** [1] -

2940:20
**interrupt** [1] - 2932:16
**interview** [3] - 3075:22, 3076:16, 3077:21
**interviewed** [5] - 3076:15, 3077:3, 3077:6, 3077:13, 3078:7
**interviews** [11] - 3074:8, 3074:11, 3074:13, 3074:18, 3074:22, 3075:8, 3075:12, 3077:14, 3078:14, 3079:8, 3080:4
**introduced** [3] - 3107:16, 3124:12, 3124:20
**introducing** [1] - 3126:17
**invest** [10] - 2951:4, 3013:8, 3033:16, 3093:9, 3099:16, 3112:5, 3113:6, 3116:9, 3118:11, 3118:19
**invested** [17] - 3033:23, 3034:10, 3036:9, 3038:2, 3038:19, 3041:6, 3041:22, 3042:10, 3043:6, 3044:7, 3048:11, 3060:6, 3099:23, 3112:3, 3113:18, 3115:3, 3117:22
**investigating** [1] - 2998:6
**investing** [11] - 2963:25, 3031:24, 3032:6, 3036:6, 3039:18, 3041:17, 3041:18, 3044:24, 3046:6, 3080:15, 3086:18
**investment** [28] - 2967:8, 2967:9, 2977:25, 3023:25, 3035:8, 3046:4, 3060:24, 3061:4, 3061:5, 3061:6, 3066:10, 3096:6, 3098:3, 3099:17, 3100:5, 3112:20, 3113:1, 3113:8, 3113:14, 3113:15, 3114:3, 3115:1, 3115:10, 3115:12, 3115:24, 3116:7, 3117:15, 3118:1
**investments** [15] - 2956:19, 3032:9, 3036:11, 3039:21, 3053:21, 3088:24, 3095:19, 3103:9, 3103:12, 3111:12, 3111:14, 3112:15, 3114:1, 3115:14, 3118:10
**investor** [6] - 2961:14, 3033:10, 3033:13, 3035:22, 3086:15, 3112:10
**investor's** [1] - 3098:1
**investors** [5] - 2956:17, 2956:18, 2973:10, 3007:19, 3089:8
**investors'** [2] - 3096:25, 3097:17
**involve** [1] - 3096:25

**involved** [31] - 2931:22, 2953:22, 2964:2, 2964:4, 2967:10, 2967:12, 2968:6, 2968:11, 2978:5, 2987:21, 2996:7, 2997:12, 2997:14, 3009:24, 3034:8, 3057:15, 3073:11, 3073:21, 3074:19, 3096:17, 3099:13, 3106:3, 3106:6, 3106:8, 3106:13, 3108:1, 3108:22, 3113:23, 3116:3, 3116:14
**involving** [4] - 3056:13, 3074:19, 3081:19, 3098:18
**Ironman** [1] - 3067:20
**Island** [11] - 2983:8, 2987:2, 2987:22, 2988:11, 3029:7, 3030:8, 3031:21, 3033:7, 3033:17, 3044:3, 3045:8
**Islanders** [1] - 3029:13, 3029:17, 3029:21, 3029:25
**Islandia** [1] - 2928:22
**Isle** [22] - 2946:17, 2946:19, 2948:9, 2948:12, 2962:22, 2965:1, 2965:23, 2967:3, 3034:14, 3034:15, 3038:17, 3038:20, 3039:1, 3039:3, 3041:25, 3064:9, 3064:12, 3064:22, 3065:3, 3083:1, 3091:1, 3101:17
**Islip** [3] - 2928:6, 2928:15, 2929:15
**isolated** [1] - 3085:19
**issue** [17] - 2931:4, 2931:10, 2932:8, 2936:25, 2937:14, 2939:24, 2953:21, 3025:6, 3026:5, 3026:6, 3057:20, 3070:21, 3122:22, 3124:2, 3124:6, 3124:14, 3125:16
**issues** [3] - 3024:21, 3070:24, 3071:19
**items** [2] - 2953:6, 3014:11
**itself** [6] - 2937:6, 2945:17, 2960:16, 3072:4, 3075:24, 3100:23
**IV** [13] - 2946:17, 2946:19, 2962:22, 3034:14, 3039:1, 3041:25, 3064:9, 3064:12, 3064:22, 3065:3, 3083:1, 3091:1, 3101:17

**J**

**Jackets** [1] - 3029:24
**JAMES** [1] - 2928:16
**January** [6] - 2964:14, 3013:19, 3014:8, 3016:18,

3021:7, 3119:24
**job** [1] - 2972:10
**John** [69] - 2975:21, 2976:3, 2976:11, 2977:5, 2977:6, 2977:8, 2977:11, 2977:23, 2978:24, 2979:14, 2979:23, 2980:5, 2980:9, 2980:13, 2980:14, 2980:19, 2980:21, 2981:1, 2981:8, 2981:12, 2981:15, 2987:9, 2987:21, 2987:22, 2988:4, 2988:6, 2988:10, 2990:9, 2990:16, 2990:20, 2990:23, 2994:2, 2994:9, 3044:13, 3045:4, 3045:7, 3045:9, 3046:2, 3047:19, 3048:1, 3048:8, 3048:14, 3050:4, 3067:7, 3070:25, 3071:2, 3071:23, 3072:5, 3073:3, 3074:3, 3074:20, 3075:7, 3078:14, 3092:24, 3093:23, 3101:19, 3101:24, 3102:4, 3102:11, 3102:12, 3102:20, 3103:8, 3104:3, 3104:5, 3104:15, 3105:25, 3107:25
**John's** [1] - 3103:5
**Johnson** [1] - 3060:22
**Jonovaski** [1] - 3086:13
**Jordan** [1] - 2945:6
**JOSEPH** [1] - 2928:11
**Jowdy** [29] - 3052:18, 3053:7, 3053:8, 3053:13, 3058:6, 3067:11, 3067:19, 3067:23, 3067:25, 3069:3, 3070:6, 3082:12, 3082:20, 3087:24, 3089:4, 3089:14, 3089:15, 3095:23, 3095:24, 3100:13, 3103:25, 3104:6, 3111:24, 3112:24, 3113:5, 3113:15, 3113:22, 3114:14, 3114:16
**Jowdy's** [1] - 3114:7
**Judge** [34] - 2931:8, 2932:1, 2935:2, 2940:14, 2940:22, 2941:15, 2989:9, 2989:11, 2989:18, 2989:23, 2990:4, 3005:19, 3020:19, 3021:17, 3022:18, 3023:11, 3025:1, 3026:10, 3027:15, 3031:2, 3050:2, 3057:10, 3076:17, 3078:4, 3078:8, 3085:6, 3086:14, 3087:3, 3087:14, 3088:22, 3101:14, 3116:5, 3123:7, 3126:2
**judge** [7] - 2957:2, 2962:13, 3058:20, 3060:9, 3062:19, 3100:22, 3122:19
**JUDGE** [1] - 2928:11

**Judge's** [1] - 3115:20
**judgment** [2] - 3055:15, 3055:22
**jumping** [1] - 3095:4
**June** [6] - 2928:9, 2933:14, 2939:14, 3023:22, 3102:19, 3126:23
**juror** [6] - 2937:4, 2937:11, 2937:16, 2938:2, 2938:16, 2939:12
**JUROR** [4] - 2938:4, 2938:22, 2939:8, 2939:10
**JURORS** [1] - 2942:2
**jurors** [1] - 2930:4
**jury** [33] - 2928:11, 2938:12, 2939:12, 2941:22, 2941:24, 2942:1, 2945:23, 2946:4, 2969:4, 2974:18, 2984:12, 2989:7, 3024:18, 3027:24, 3028:1, 3028:3, 3034:21, 3034:25, 3044:17, 3046:19, 3065:19, 3065:23, 3068:8, 3077:9, 3077:17, 3077:23, 3079:11, 3084:25, 3085:22, 3086:5, 3087:16, 3120:17, 3124:4
**Jury** [3] - 2988:19, 2990:1, 3034:20

## K

**Kaiser** [64] - 2975:21, 2976:3, 2976:11, 2977:8, 2977:11, 2977:23, 2978:24, 2979:14, 2979:23, 2980:5, 2980:9, 2980:14, 2980:22, 2981:1, 2981:8, 2981:15, 2987:9, 2987:21, 2987:23, 2988:4, 2990:9, 2990:16, 2990:20, 2990:23, 2994:2, 2994:9, 3010:6, 3010:8, 3010:15, 3044:13, 3045:4, 3047:19, 3048:8, 3048:15, 3067:8, 3071:23, 3072:5, 3073:3, 3074:4, 3074:7, 3074:20, 3075:7, 3078:14, 3092:24, 3093:23, 3094:5, 3101:19, 3101:24, 3101:25, 3102:4, 3102:11, 3103:4, 3103:8, 3104:3, 3104:6, 3105:9, 3105:25, 3106:2, 3106:24, 3107:25, 3116:15, 3117:4, 3117:5
**Kaiser's** [4] - 2981:12, 3048:1, 3050:5, 3102:20
**Kau** [6] - 2946:16, 2955:10, 2955:12, 2955:13, 2955:17, 3011:23

**keep** [2] - 3022:25, 3027:1
**KELLY** [1] - 2928:14
**Ken** [18] - 3052:18, 3053:7, 3058:6, 3067:10, 3067:19, 3067:23, 3067:25, 3069:3, 3070:6, 3082:11, 3082:20, 3087:24, 3089:4, 3095:24, 3100:13, 3103:25, 3104:6, 3111:24
**Kenner** [195] - 2928:23, 2944:19, 2945:7, 2946:20, 2947:2, 2948:13, 2948:21, 2949:7, 2949:19, 2950:21, 2951:3, 2951:6, 2952:10, 2952:22, 2953:12, 2954:9, 2955:18, 2955:25, 2961:1, 2961:2, 2961:4, 2961:8, 2965:9, 2967:5, 2967:7, 2968:5, 2969:11, 2969:24, 2972:8, 2972:15, 2973:21, 2974:7, 2975:15, 2977:18, 2977:23, 2982:4, 2982:16, 2982:18, 2982:22, 2984:1, 2984:20, 2984:24, 2985:5, 2985:8, 2986:6, 2986:16, 2991:13, 2991:21, 2992:1, 2992:5, 2992:6, 2992:9, 2992:22, 2995:11, 2996:3, 2996:14, 2997:1, 2997:6, 2997:12, 2997:14, 2998:13, 2999:15, 2999:21, 3000:5, 3000:11, 3001:1, 3007:11, 3008:5, 3008:10, 3009:6, 3009:21, 3010:23, 3012:4, 3012:9, 3014:4, 3014:16, 3016:6, 3023:16, 3023:24, 3025:8, 3025:14, 3025:16, 3030:2, 3030:5, 3030:9, 3030:25, 3031:8, 3031:14, 3032:2, 3032:8, 3033:5, 3033:15, 3033:19, 3034:8, 3034:12, 3035:12, 3040:12, 3041:5, 3041:10, 3042:24, 3043:1, 3043:7, 3043:9, 3044:12, 3044:21, 3044:24, 3045:10, 3045:17, 3045:22, 3048:8, 3048:12, 3050:9, 3050:12, 3050:20, 3051:17, 3051:21, 3052:4, 3052:13, 3052:20, 3053:6, 3053:12, 3054:2, 3054:8, 3054:10, 3055:8, 3055:10, 3055:14, 3055:15, 3055:16, 3055:20, 3056:1, 3056:11, 3057:9, 3057:16, 3058:13, 3058:22, 3058:23, 3059:4, 3062:4, 3062:21, 3063:10, 3063:13, 3063:14, 3063:17, 3064:8, 3065:2,

3066:11, 3066:13, 3075:2, 3076:22, 3077:9, 3077:16, 3078:11, 3079:12, 3079:23, 3082:24, 3083:13, 3084:6, 3084:15, 3084:20, 3088:8, 3088:23, 3089:3, 3089:22, 3090:2, 3090:14, 3090:25, 3091:6, 3091:22, 3092:4, 3092:6, 3092:9, 3092:17, 3095:22, 3096:12, 3097:10, 3098:14, 3098:18, 3099:7, 3099:11, 3099:12, 3099:13, 3099:17, 3100:9, 3101:17, 3104:11, 3107:25, 3111:15, 3111:24, 3115:15, 3118:17, 3126:13, 3128:11, 3128:15
**KENNER** [1] - 2928:7
**Kenner's** [7] - 2944:17, 2945:14, 2969:6, 2984:8, 3013:21, 3032:15, 3074:14
**kept** [1] - 3058:4
**key** [4] - 2946:7, 2947:23, 2964:20, 3015:10
**keys** [2] - 2960:23, 2960:25
**kind** [11] - 2961:20, 2962:4, 2962:12, 2963:1, 2963:9, 2988:1, 2988:3, 3013:7, 3040:6, 3078:3, 3124:3
**kindly** [3] - 2991:21, 3079:23, 3092:9
**kinds** [2] - 2951:12, 2961:11, 3032:9
**knowledge** [35] - 2933:18, 2957:24, 2962:2, 2962:10, 2962:24, 2963:7, 2975:11, 2975:20, 2976:5, 2976:22, 2981:12, 2990:20, 3000:25, 3001:8, 3013:1, 3049:6, 3049:18, 3049:20, 3054:16, 3054:18, 3054:20, 3055:1, 3064:18, 3069:3, 3072:8, 3073:24, 3075:21, 3083:21, 3087:22, 3099:13, 3100:13, 3100:16, 3110:16, 3111:10, 3112:13
**known** [11] - 2952:22, 2963:21, 2963:22, 2977:5, 2977:6, 2987:11, 2993:6, 3030:16, 3099:19, 3111:20, 3115:24
**knows** [1] - 3125:19
**Komatireddy** [2] - 2942:19, 2967:22
**KOMATIREDDY** [24] - 2928:16, 2941:20, 2942:20, 2942:23, 2943:6,

2943:21, 2944:14, 2957:4, 2967:19, 2967:24, 2976:17, 2992:3, 3005:18, 3019:12, 3020:2, 3020:14, 3020:16, 3021:15, 3022:23, 3023:1, 3023:6, 3023:14, 3127:5, 3127:11
**Kristie** [1] - 3067:6
**Kristin** [4] - 3098:10, 3098:13, 3098:18, 3099:4

## L

**LA** [11] - 2931:11, 2931:18, 2933:23, 2934:16, 2936:3, 2937:24, 2943:2, 2943:14, 2944:4, 3026:5, 3027:12
**label** [1] - 2950:13
**labeled** [3] - 2950:14, 2956:2, 2958:18
**labor** [1] - 2993:20
**lack** [2] - 3065:22, 3066:3
**Lagarde** [8] - 2931:24, 2936:19, 3026:11, 3027:1, 3027:19, 3121:2, 3121:6, 3123:20
**Laine** [2] - 3081:23, 3082:2
**Lake** [1] - 3101:20
**land** [30] - 2945:18, 2951:21, 2952:15, 2960:8, 2960:15, 2963:23, 2977:10, 2977:13, 2987:10, 2987:12, 3001:17, 3003:2, 3003:4, 3015:12, 3016:3, 3021:21, 3033:9, 3033:10, 3033:13, 3033:16, 3034:7, 3041:18, 3041:22, 3043:5, 3046:2, 3067:17, 3112:22, 3112:23, 3113:13
**landscaping** [1] - 2983:19
**LaPinta** [9] - 2930:11, 2930:18, 2931:16, 2931:20, 2931:21, 3122:4, 3122:14, 3122:15, 3122:21
**largely** [1] - 2970:6
**larger** [3] - 2948:16, 2977:20, 3041:25
**LaRusso** [7] - 2995:6, 3021:20, 3022:19, 3104:22, 3105:5, 3125:13, 3126:5
**LARUSSO** [46] - 2929:2, 2929:4, 2975:3, 2989:11, 2989:14, 2989:19, 2989:23, 2992:4, 2994:25, 2995:2, 3001:20, 3001:22, 3003:19, 3003:20, 3005:16, 3005:23,

15

3009:13, 3009:16,
3019:15, 3019:18,
3020:20, 3022:20, 3023:9,
3024:8, 3024:22, 3025:4,
3025:18, 3044:15, 3051:5,
3060:14, 3063:12, 3085:6,
3091:25, 3105:2, 3110:1,
3116:5, 3119:16, 3119:17,
3120:11, 3121:12, 3123:5,
3124:2, 3125:19, 3126:10,
3127:9, 3127:20
**Las** [1] - 3117:13
**last** [26] - 2930:6, 2932:4,
2943:23, 2966:1, 2990:7,
3007:23, 3010:8, 3016:18,
3017:18, 3018:21,
3018:24, 3024:2, 3025:5,
3062:10, 3065:16,
3073:16, 3074:3, 3080:23,
3081:7, 3091:16, 3094:13,
3103:16, 3109:4, 3120:12,
3121:20, 3121:23
**lastly** [2] - 2963:3, 3118:10
**late** [7] - 2932:24, 2984:21,
3042:6, 3043:17, 3047:18,
3105:7, 3111:12
**law** [3] - 2938:11, 3026:16,
3094:14
**lawsuit** [20] - 3054:3,
3055:11, 3055:18,
3055:20, 3056:13, 3058:5,
3058:7, 3058:15, 3058:17,
3059:5, 3059:8, 3067:5,
3096:1, 3097:14, 3098:17,
3098:23, 3100:13,
3100:16, 3100:18, 3100:21
**lawsuits** [3] - 3053:22,
3054:2, 3097:2
**lawyer** [11] - 2931:20,
3042:18, 3052:17,
3054:11, 3097:8, 3105:14,
3107:16, 3107:21,
3107:23, 3118:22, 3120:10
**lawyers** [7] - 2931:17,
2931:19, 2931:22,
2935:23, 2936:10,
3083:15, 3104:17
**lawyers'** [2] - 3098:6,
3098:10, 3098:14,
3102:10, 3102:11, 3105:12
**layman's** [1] - 3015:9
**lead** [1] - 3116:5
**leading** [3] - 2958:12,
2962:13, 3055:4
**Leafs** [1] - 3029:22
**learn** [10] - 3003:1, 3044:9,
3049:15, 3097:24,
3108:25, 3111:1, 3111:8,
3113:3, 3113:5, 3113:8
**learned** [2] - 3050:1,

3082:18
**learning** [2] - 2935:2,
3049:25
**leased** [1] - 2960:20
**least** [7] - 2980:4, 2980:6,
2992:18, 3016:6, 3033:6,
3091:8, 3093:17
**leave** [1] - 3009:22
**leaves** [1] - 2988:19
**Led** [21] - 3044:4, 3044:7,
3044:9, 3044:10, 3046:9,
3046:10, 3046:24,
3047:11, 3047:14,
3047:16, 3047:24, 3048:6,
3048:25, 3092:25, 3093:7,
3093:24, 3094:7, 3094:16,
3094:22, 3115:19, 3115:21
**left** [38] - 2944:15, 2954:22,
2997:23, 3013:16,
3032:16, 3087:22, 3117:8,
3121:7
**legal** [3] - 2958:7, 3013:11,
3057:6
**Lehman** [34] - 2956:8,
2956:12, 2956:13, 2957:9,
2957:10, 2957:13,
2957:19, 2959:16,
2963:25, 2974:3, 2974:8,
2974:12, 2974:15, 2975:1,
2975:6, 2975:13, 2975:21,
2975:25, 2976:3, 2976:12,
2978:10, 2978:13,
3003:14, 3003:17,
3003:21, 3003:22, 3004:1,
3035:19, 3040:25, 3041:2,
3064:14, 3064:19, 3065:7
**lend** [2] - 3011:20, 3089:7
**lender** [14] - 2951:11,
2952:22, 2954:4, 2970:11,
3008:11, 3009:7, 3010:3,
3011:17, 3011:21,
3012:23, 3015:5, 3015:20,
3015:24, 3016:11
**lenders** [15] - 2951:10,
2952:17, 2953:15,
2954:18, 2970:23, 2971:1,
2996:12, 2996:18,
2997:11, 2998:7, 3008:25,
3013:3, 3013:8, 3015:22
**lending** [1] - 3089:3
**less** [7] - 2952:5, 2957:21,
2958:24, 2959:2, 2959:9,
3118:24, 3123:12
**letter** [23] - 2930:8,
2931:24, 2931:25,
2933:10, 2933:13,
2933:14, 2934:17, 2937:5,
2937:6, 2937:10, 2937:17,
2937:19, 2938:5, 2938:19,
2939:2, 2939:6, 2939:20,

3040:24, 3042:4, 3042:5,
3043:16, 3122:7
**letters** [1] - 3043:14
**level** [2] - 2980:15, 3065:11
**leverage** [1] - 2951:1
**Liability** [1] - 3090:25
**liability** [3] - 2972:20,
2972:24, 3065:2
**lien** [3] - 3116:19, 3117:1,
3117:5
**lieu** [1] - 3088:9
**limited** [3] - 2972:20,
2972:24, 3065:2
**Limited** [1] - 3090:25
**limiting** [1] - 3044:15
**Linda** [3] - 3027:19,
3121:2, 3121:6
**line** [38] - 2932:11,
2964:11, 2986:21,
2990:12, 3035:8, 3035:11,
3035:12, 3035:16,
3035:25, 3036:2, 3036:5,
3036:6, 3036:16, 3036:18,
3036:22, 3037:16,
3037:19, 3038:4, 3038:16,
3040:1, 3040:10, 3040:13,
3040:16, 3042:20,
3043:15, 3043:21, 3082:8,
3082:10, 3082:19,
3082:21, 3086:2, 3086:25,
3088:9, 3088:24, 3099:23,
3101:1, 3101:2, 3115:15
**lines** [2] - 3115:12, 3125:1
**lineup** [2] - 3120:22,
3121:17
**liquid** [1] - 3056:8
**list** [4] - 2958:2, 3014:11,
3047:21, 3048:19
**listed** [4] - 3048:5, 3049:2,
3049:10, 3092:25
**listen** [1] - 3120:15
**litigation** [4] - 3042:13,
3043:3, 3052:21, 3096:13
**live** [4] - 2990:20, 2991:8,
3029:4, 3029:5
**lived** [5] - 2991:4, 2991:7,
2991:8, 3045:4, 3107:15
**living** [1] - 3107:12
**LLC** [22] - 2948:9, 2948:12,
2965:1, 2967:3, 2973:7,
2973:10, 2973:12,
2973:18, 2975:18,
2987:11, 2993:18,
3034:12, 3034:13,
3038:21, 3044:10, 3046:8,
3049:4, 3049:13, 3091:1,
3096:14, 3099:19
**LLCs** [4] - 2972:15,
2972:16, 3038:25, 3039:2
**loan** [72] - 2952:23, 2953:3,

2953:7, 2953:12, 2953:21,
2954:8, 2954:14, 2954:23,
2958:18, 2958:19,
2958:25, 2959:4, 2959:10,
2959:11, 2982:5, 2982:16,
2982:19, 2982:21,
2982:23, 2983:4, 2999:12,
2999:19, 2999:22, 3000:4,
3000:10, 3000:19, 3001:6,
3001:16, 3002:3, 3002:7,
3003:14, 3003:18,
3010:23, 3018:15,
3021:13, 3022:8, 3022:14,
3064:15, 3064:21,
3064:23, 3065:7, 3082:11,
3082:12, 3082:20,
3082:22, 3082:23,
3088:16, 3089:18,
3100:22, 3106:23,
3108:13, 3109:1, 3109:2,
3109:3, 3109:6, 3109:9,
3109:10, 3110:3, 3110:8,
3110:11, 3110:15,
3110:16, 3110:17,
3110:18, 3110:19,
3110:22, 3111:3, 3111:6,
3112:24, 3113:6, 3114:17
**loaned** [3] - 3087:23,
3095:24, 3101:25
**located** [1] - 2984:24
**location** [5] - 2964:11,
2990:17, 2991:9, 3073:6,
3111:25
**locations** [1] - 2985:19
**lockout** [1] - 3033:18
**long-awaited** [1] - 2940:2
**look** [37] - 2937:5, 2940:10,
2946:15, 2957:18,
2957:25, 2991:13,
2991:15, 2991:21,
2997:22, 2999:1, 3005:6,
3019:2, 3019:6, 3020:10,
3020:25, 3034:1, 3045:25,
3060:11, 3062:7, 3063:1,
3063:17, 3071:4, 3073:8,
3076:21, 3076:24,
3078:11, 3079:23, 3084:1,
3084:6, 3084:9, 3091:5,
3091:7, 3091:11, 3092:5,
3092:9, 3119:23, 3123:5
**looked** [4] - 2959:10,
3008:8, 3019:15, 3086:20
**looking** [34] - 2945:25,
2947:12, 2948:8, 2950:17,
2954:8, 2955:3, 2955:9,
2955:14, 2955:19, 2958:1,
2960:1, 2961:4, 2964:9,
2964:20, 2965:4, 2965:15,
2966:3, 2966:12, 2967:1,
2987:12, 3007:22,

3033:24, 3038:12, 3039:5,
3045:8, 3045:9, 3056:25,
3057:4, 3067:16, 3071:12,
3107:20, 3119:4, 3119:23
**looks** [3] - 2946:15,
2966:20, 3037:12
**lose** [1] - 3040:23
**loss** [5] - 3022:9, 3093:21,
3101:4, 3101:5, 3101:12
**losses** [1] - 3039:22
**lost** [15] - 3012:10, 3040:7,
3042:23, 3050:5, 3055:14,
3055:19, 3055:20, 3101:2,
3113:12, 3113:14,
3113:15, 3113:18, 3114:3,
3114:4
**Louisiana** [3] - 2932:15,
2934:12, 2935:12
**loved** [1] - 3112:3
**low** [2] - 3093:5, 3093:16
**lower** [2] - 2999:2, 3093:20
**Lucas** [22] - 3036:11,
3036:12, 3052:18, 3068:6,
3068:7, 3068:8, 3068:9,
3069:8, 3069:13, 3069:22,
3069:25, 3070:13,
3070:22, 3071:19, 3072:5,
3072:9, 3072:20, 3073:25,
3103:19, 3103:20, 3114:8,
3115:3
**luck** [1] - 2952:19
**lucky** [1] - 3030:18
**luggage** [4] - 2981:2,
2981:3, 2981:4, 2981:9
**lunch** [13] - 2930:20,
2930:23, 2937:13,
2989:11, 2989:13,
2989:14, 3022:24,
3024:15, 3024:17,
3025:19, 3122:5, 3122:25

# M

**ma'am** [2] - 2967:13,
2967:18
**magazine** [2] - 2944:23,
2984:15
**Magazine** [2] - 2945:4,
2984:8
**mail** [33] - 2932:24,
2933:12, 2935:17,
2945:10, 3004:10,
3004:22, 3005:8, 3005:13,
3006:1, 3006:20, 3006:23,
3007:1, 3007:12, 3008:4,
3008:9, 3010:1, 3010:4,
3013:20, 3014:3, 3016:15,
3017:1, 3017:19, 3018:10,
3018:21, 3019:2, 3019:11,

3021:2, 3021:4, 3021:8,
3021:10, 3025:7, 3025:10,
3025:14
**mailed** [2] - 3026:14,
3124:5
**mailing** [1] - 3007:9
**mails** [14] - 3006:13,
3006:15, 3017:15, 3020:3,
3020:24, 3026:7, 3124:12,
3124:13, 3124:18,
3124:23, 3125:5, 3125:13,
3125:20, 3125:23
**maintained** [3] - 2940:11,
3082:1, 3103:12
**maintaining** [1] - 3099:8
**maintains** [1] - 3103:9
**Makika** [4] - 2963:6,
2963:11, 2975:2, 3047:1
**man** [5] - 3000:2, 3010:19,
3027:15, 3030:2, 3108:15
**manage** [3] - 2973:11,
3032:2, 3032:25
**Management** [4] - 2962:1,
2962:9, 2962:22, 2963:5
**manager** [2] - 2937:8,
3111:22
**managing** [32] - 2946:20,
2948:13, 2955:18, 2967:5,
2972:15, 2972:23,
2972:25, 2973:6, 2973:9,
2973:11, 2973:14,
2973:15, 2975:14,
2975:18, 2975:22, 2976:3,
2976:12, 2976:16,
2976:23, 2976:24, 2977:1,
2995:24, 3070:8, 3070:11,
3070:13, 3100:2, 3100:3,
3100:4, 3100:9, 3101:15,
3101:17, 3101:20
**Manfredi** [25] - 2942:6,
2942:9, 2942:21, 2944:15,
2963:17, 2968:3, 2982:4,
2989:6, 2990:6, 2994:23,
2995:3, 2998:18, 3004:17,
3005:24, 3008:5, 3008:14,
3011:17, 3012:16,
3013:17, 3016:5, 3017:1,
3018:21, 3021:20,
3022:21, 3124:11
**MANFREDI** [2] - 2942:13,
3127:3
**manner** [1] - 3038:20
**map** [12] - 2946:7, 2947:23,
2950:10, 2950:13,
2950:14, 2950:16, 2956:1,
2956:14, 2963:14,
2964:20, 3014:10, 3015:10
**Maple** [1] - 3029:22
**maps** [2] - 2978:19,
3015:20

**Mar** [9] - 3111:20, 3112:6,
3112:10, 3112:16,
3112:20, 3113:15,
3113:19, 3114:4, 3114:18
**March** [9] - 3016:25,
3017:20, 3018:25, 3021:9,
3021:11, 3037:9, 3038:3,
3038:13, 3039:6
**Mark** [11] - 2963:22,
2963:24, 2964:3, 2964:10,
2964:22, 2964:24,
2964:25, 2965:5, 2967:17,
3039:16
**mark** [3] - 2940:6, 2988:14,
3018:19
**marked** [13] - 2942:24,
2943:23, 2943:25,
2991:13, 2997:24, 3005:2,
3013:13, 3059:19, 3062:3,
3065:1, 3084:6, 3091:6,
3119:18
**market** [5] - 3046:4,
3047:21, 3047:22, 3049:1,
3049:14
**Mary** [1] - 2929:14
**Massachusetts** [2] -
3029:5, 3103:15
**masse** [1] - 3085:20
**master** [1] - 2940:14
**match** [2] - 3113:10,
3124:19
**math** [2] - 3095:12,
3101:12
**Matt** [4] - 3080:8, 3080:17,
3080:24, 3081:8
**matter** [3] - 2941:9,
2941:15, 2978:3, 3025:7,
3039:23, 3063:23, 3074:6,
3074:18, 3082:4, 3095:12,
3096:17, 3116:18, 3126:22
**matters** [1] - 2930:5
**maximum** [1] - 3015:16
**mean** [21] - 2953:15,
2953:25, 2955:12,
2956:18, 2968:8, 2968:10,
2970:24, 2972:19,
2980:10, 2986:19, 2987:6,
2996:9, 3002:16, 3042:5,
3053:11, 3054:21,
3070:25, 3074:11, 3094:3,
3097:6, 3109:12
**meaning** [4] - 2974:16,
3014:23, 3015:18, 3045:17
**means** [4] - 2951:22,
2963:11, 2972:16, 3125:6
**meant** [2] - 2982:11,
3023:12
**mechanic** [1] - 3031:22
**mechanic's** [3] - 3116:19,
3117:1, 3117:5

**mechanical** [1] - 2929:24
**media** [21] - 3074:8,
3074:12, 3074:18,
3074:22, 3074:23,
3074:24, 3075:7, 3075:13,
3075:18, 3075:23, 3076:4,
3076:11, 3076:12, 3077:4,
3077:8, 3078:7, 3078:14,
3079:8, 3079:11
**meet** [11] - 2985:17,
2985:18, 3003:24, 3030:4,
3050:23, 3051:10,
3103:22, 3103:24, 3104:2,
3107:6, 3108:3
**meeting** [11] - 2984:23,
2984:25, 2985:19,
2986:16, 2987:1, 3004:20,
3010:2, 3104:5, 3108:8,
3108:13, 3126:15
**meetings** [5] - 3104:9,
3104:14, 3104:18, 3110:5
**member** [35] - 2946:20,
2948:13, 2955:18, 2967:5,
2972:15, 2972:23,
2972:25, 2973:7, 2973:9,
2973:14, 2973:15,
2975:14, 2975:19,
2975:22, 2976:3, 2976:12,
2976:16, 2976:23,
2976:24, 2977:1, 2987:13,
2987:14, 3063:24,
3069:16, 3070:8, 3070:11,
3070:13, 3075:23,
3094:14, 3100:2, 3100:3,
3100:4, 3100:9, 3101:17,
3101:20
**member's** [1] - 2973:11
**members** [12] - 2942:1,
2973:10, 3028:2, 3034:19,
3034:25, 3044:17,
3046:19, 3048:6, 3063:19,
3068:24, 3077:3, 3101:15
**membership** [1] - 3064:9
**Memorial** [1] - 2928:21
**memory** [20] - 2981:7,
2986:6, 2986:24, 2986:25,
2987:3, 2987:18, 2987:20,
2988:3, 2990:15, 2990:23,
3065:22, 3066:3, 3066:7,
3080:24, 3094:21,
3094:25, 3109:3, 3125:10,
3125:11
**mention** [4] - 2941:7,
3010:15, 3109:9, 3122:21
**mentioned** [8] - 2951:15,
3009:20, 3071:15,
3098:11, 3098:13, 3100:2,
3105:6, 3117:22
**message** [3] - 3007:6,
3007:17, 3121:7

**met** [13] - 2970:8, 2970:17, 2984:19, 2985:16, 3030:5, 3030:7, 3030:10, 3031:7, 3051:11, 3103:6, 3107:7, 3108:5, 3108:6
**Mexican** [2] - 3082:23, 3089:15
**Mexico** [16] - 2951:4, 2951:7, 3035:23, 3035:24, 3036:7, 3036:10, 3053:5, 3053:9, 3054:25, 3055:2, 3055:9, 3067:17, 3068:3, 3071:6, 3071:13, 3082:14
**Michael** [10] - 2931:13, 2945:6, 3047:2, 3047:3, 3048:20, 3096:18, 3097:3, 3097:6, 3097:10, 3105:15
**Michelle** [2] - 2930:22, 2938:6
**mid** [1] - 3126:17
**mid-week** [1] - 3126:17
**middle** [2] - 2950:15, 3007:15
**might** [10] - 2937:14, 2980:22, 2988:15, 3012:10, 3071:6, 3081:6, 3081:18, 3106:6, 3110:2, 3119:10
**mike** [1] - 3028:22
**miles** [1] - 3056:14
**milestone** [9] - 2974:13, 2974:18, 2974:20, 2974:21, 2974:24, 2974:25, 2975:5, 2976:14, 2976:25
**milestones** [1] - 3003:24
**million** [37] - 2950:17, 2952:24, 2953:8, 2953:9, 2953:18, 2959:11, 2959:13, 2974:9, 2975:7, 2976:25, 2982:5, 2982:19, 2982:23, 2999:6, 3001:16, 3001:24, 3001:25, 3002:5, 3002:8, 3007:24, 3008:11, 3009:7, 3011:14, 3014:9, 3022:10, 3037:23, 3040:7, 3041:18, 3041:21, 3042:9, 3042:20, 3055:15, 3064:15, 3101:4, 3112:17, 3112:25, 3114:20
**mind** [1] - 3026:22
**mine** [3] - 2983:21, 2983:23, 3033:20
**Mineola** [1] - 2929:3
**Minnesota** [1] - 3024:3
**minute** [5] - 2932:12, 2933:4, 2938:7, 3035:21, 3118:9
**minutes** [5] - 2935:9, 3023:2, 3081:6, 3081:9,

3105:6
**misappropriating** [1] - 3053:8
**MISKIEWICZ** [56] - 2928:16, 2930:14, 2930:21, 2931:7, 2932:4, 2933:12, 2933:15, 2935:13, 2937:3, 2937:23, 3023:2, 3024:20, 3026:10, 3028:6, 3028:24, 3029:2, 3031:5, 3031:6, 3034:22, 3034:24, 3044:1, 3044:22, 3049:9, 3049:23, 3051:7, 3051:9, 3058:24, 3059:2, 3059:16, 3059:18, 3060:7, 3060:18, 3061:10, 3061:12, 3061:17, 3063:11, 3071:21, 3071:25, 3073:15, 3076:2, 3077:25, 3084:21, 3085:8, 3091:24, 3092:18, 3120:24, 3121:5, 3121:9, 3121:17, 3122:11, 3123:17, 3123:25, 3125:2, 3125:15, 3126:5, 3127:16
**Miskiewicz** [3] - 2941:7, 3028:23, 3060:10
**misspoke** [1] - 2968:22
**mistake** [2] - 3062:19, 3062:24
**misunderstanding** [1] - 3119:14
**Moaula** [3] - 2956:2, 2956:14, 2957:9
**moment** [13] - 2954:5, 2960:2, 2990:7, 3001:20, 3019:20, 3020:13, 3060:9, 3061:10, 3066:4, 3076:17, 3079:17, 3101:14, 3120:24
**Monday** [2] - 2941:16, 3021:7
**monetary** [1] - 3095:8
**money** [115] - 2933:20, 2945:5, 2946:25, 2947:1, 2948:19, 2950:20, 2950:22, 2951:7, 2951:10, 2951:11, 2952:11, 2953:15, 2954:18, 2955:23, 2957:10, 2957:13, 2957:22, 2958:17, 2959:15, 2959:16, 2959:18, 2960:12, 2961:2, 2962:12, 2963:1, 2963:9, 2965:7, 2967:16, 2972:3, 2977:24, 2983:4, 2993:15, 2994:9, 2996:8, 2998:13, 2998:14, 2998:19, 2998:23, 2999:5, 2999:9, 3000:12, 3009:1, 3011:10, 3011:19,

3012:14, 3012:15, 3012:18, 3012:24, 3022:2, 3031:19, 3032:1, 3032:2, 3032:8, 3032:25, 3036:3, 3036:4, 3039:6, 3039:9, 3040:22, 3041:4, 3041:6, 3041:20, 3046:5, 3046:20, 3053:1, 3053:5, 3054:24, 3055:2, 3055:9, 3055:17, 3056:11, 3056:16, 3056:22, 3056:23, 3056:25, 3057:5, 3058:4, 3061:6, 3066:15, 3082:13, 3082:19, 3083:1, 3087:23, 3088:9, 3088:16, 3088:18, 3089:3, 3089:7, 3089:13, 3089:14, 3089:18, 3093:7, 3095:24, 3097:3, 3101:25, 3102:7, 3102:9, 3102:10, 3102:12, 3102:14, 3102:17, 3105:9, 3105:12, 3105:16, 3106:11, 3106:14, 3106:16, 3110:6, 3113:1, 3113:12, 3114:23, 3118:13, 3119:1, 3120:7
**Money** [2] - 2945:4, 2984:8
**moneys** [3] - 2978:12, 2978:13, 3012:8
**monies** [3] - 2957:8, 3022:14, 3113:18
**month** [5] - 3069:19, 3070:2, 3081:10, 3122:12, 3122:14
**months** [1] - 3055:13
**morning** [15] - 2938:3, 2938:4, 2941:8, 2941:16, 2942:1, 2942:2, 2968:3, 2968:4, 2995:3, 2995:8, 2995:9, 3079:20, 3120:14, 3123:21, 3123:24
**mortgage** [21] - 2950:2, 2950:3, 2950:7, 2950:9, 2950:11, 2950:17, 2950:22, 2951:1, 2951:6, 3017:3, 3017:20, 3017:22, 3018:4, 3018:7, 3018:12, 3018:14, 3018:24, 3018:25, 3019:7, 3019:11, 3019:14
**Mortgage** [1] - 3007:19
**mortgages** [1] - 3018:10
**Moscow** [1] - 3056:14
**mosquito** [1] - 2963:12
**most** [3] - 2956:14, 2995:21, 3065:14
**mother** [2] - 3103:5, 3103:8
**motion** [1] - 2930:7
**mountain** [2] - 2947:13, 2955:15
**mounting** [1] - 2956:16

**move** [8] - 2941:9, 2943:11, 2943:21, 3016:22, 3023:6, 3073:17, 3097:1, 3119:15
**moved** [3] - 3032:19, 3032:21, 3038:1
**moves** [3] - 3020:17, 3024:7, 3060:7
**MR** [204] - 2930:14, 2930:21, 2930:24, 2931:5, 2931:7, 2931:8, 2931:11, 2931:18, 2932:1, 2932:4, 2933:12, 2933:15, 2933:23, 2934:16, 2935:13, 2936:3, 2936:9, 2937:3, 2937:13, 2937:23, 2937:24, 2937:25, 2939:24, 2941:14, 2941:18, 2943:2, 2943:3, 2943:14, 2943:15, 2944:4, 2944:5, 2957:2, 2957:5, 2962:13, 2967:21, 2967:25, 2968:2, 2972:1, 2975:3, 2975:4, 2988:13, 2989:4, 2989:9, 2989:11, 2989:14, 2989:18, 2989:19, 2989:23, 2990:4, 2990:5, 2991:17, 2992:1, 2992:4, 2992:8, 2994:16, 2994:24, 2994:25, 2995:2, 3001:20, 3001:22, 3003:19, 3003:20, 3005:16, 3005:19, 3005:23, 3009:13, 3009:16, 3019:15, 3019:18, 3020:18, 3020:20, 3021:17, 3021:19, 3022:17, 3022:20, 3023:2, 3023:9, 3023:10, 3024:8, 3024:9, 3024:20, 3024:22, 3025:4, 3025:6, 3025:16, 3025:18, 3026:5, 3026:10, 3027:12, 3027:17, 3027:20, 3028:6, 3028:24, 3029:2, 3031:2, 3031:5, 3031:6, 3034:22, 3034:24, 3041:13, 3044:1, 3044:15, 3044:22, 3049:5, 3049:9, 3049:17, 3049:23, 3050:2, 3051:5, 3051:7, 3051:9, 3053:3, 3057:10, 3058:20, 3058:24, 3059:1, 3059:2, 3059:16, 3059:18, 3060:7, 3060:9, 3060:13, 3060:14, 3060:18, 3061:10, 3061:12, 3061:16, 3061:17, 3061:19, 3062:17, 3062:19, 3062:24, 3062:25, 3063:8, 3063:11, 3063:12, 3063:16,

3071:21, 3071:25, 3072:3, 3073:15, 3073:22, 3076:2, 3076:17, 3076:20, 3077:25, 3078:6, 3078:8, 3078:10, 3079:2, 3079:19, 3084:19, 3084:21, 3085:6, 3085:8, 3085:18, 3086:24, 3087:1, 3087:3, 3087:7, 3087:10, 3087:13, 3087:20, 3088:21, 3089:12, 3091:22, 3091:24, 3091:25, 3092:16, 3092:18, 3092:19, 3101:14, 3104:20, 3105:2, 3110:1, 3116:5, 3119:16, 3119:17, 3120:11, 3120:24, 3121:1, 3121:5, 3121:6, 3121:9, 3121:12, 3121:17, 3122:11, 3122:19, 3123:5, 3123:17, 3123:20, 3123:25, 3124:2, 3125:2, 3125:15, 3125:19, 3126:5, 3126:10, 3127:7, 3127:9, 3127:13, 3127:16, 3127:18, 3127:20

**MS** [23] - 2941:20, 2942:20, 2942:23, 2943:6, 2943:21, 2944:14, 2957:4, 2967:19, 2967:24, 2976:17, 2992:3, 3005:18, 3019:12, 3020:2, 3020:14, 3020:16, 3021:15, 3022:23, 3023:1, 3023:6, 3023:14, 3127:5, 3127:11

**multifamily** [1] - 3015:16
**multimillion** [1] - 2986:7
**multiple** [1] - 3005:5
**Murray** [4] - 2931:6, 3121:20, 3122:20, 3123:14
**mutual** [2] - 3107:7, 3107:10
**myriad** [1] - 3066:9
**Myrick** [5] - 3067:6, 3098:10, 3098:13, 3098:18, 3099:5

## N

**Naalehu** [8] - 2975:7, 2975:14, 2975:22, 2976:4, 2976:12, 2976:24, 2976:25, 3101:20
**Naalehuhi** [2] - 2959:1, 2959:15
**name** [42] - 2968:5, 2987:6, 2992:17, 2995:6, 3000:2, 3010:20, 3019:4, 3028:17, 3030:2, 3034:13, 3036:25, 3038:20, 3048:9, 3048:20,

3053:23, 3059:12, 3060:23, 3063:20, 3063:23, 3063:24, 3068:3, 3070:25, 3080:8, 3080:11, 3094:2, 3096:18, 3097:6, 3098:10, 3098:13, 3100:2, 3100:3, 3102:4, 3105:5, 3105:14, 3107:10, 3108:15, 3108:18, 3108:19, 3108:21, 3108:22, 3109:4, 3109:12
**named** [2] - 3089:4, 3101:20
**names** [4] - 2992:17, 3034:3, 3034:5, 3106:4
**narrowly** [1] - 2940:21
**National** [1] - 3039:7
**nature** [7] - 2940:15, 2962:14, 2974:15, 3070:17, 3081:18, 3098:17, 3125:4
**near** [1] - 2988:10
**necessarily** [1] - 3121:19
**necessary** [3] - 2935:21, 3011:7, 3086:5
**necessity** [1] - 3053:7
**neck** [3] - 2980:7, 2981:8, 2981:25
**need** [16] - 2930:15, 2935:9, 2938:20, 2941:5, 2952:11, 3014:5, 3014:25, 3015:20, 3015:24, 3017:25, 3026:8, 3031:19, 3084:8, 3086:21, 3101:12
**needed** [4] - 2936:21, 2936:22, 2951:4, 3014:15
**needs** [1] - 3109:6
**negotiated** [1] - 2965:22
**negotiating** [2] - 2964:5, 2995:24
**negotiations** [1] - 2999:11
**neighborhood** [1] - 3112:17
**Neptune** [1] - 3109:12
**Nerguizian** [1] - 3108:25
**Nerguizian's** [1] - 3108:19
**Nerguzian** [1] - 3108:16
**net** [1] - 2986:11
**never** [26] - 2936:17, 2994:14, 3003:2, 3004:3, 3027:13, 3027:16, 3027:18, 3036:24, 3043:8, 3047:9, 3055:23, 3058:16, 3065:24, 3066:11, 3066:12, 3080:7, 3082:21, 3091:15, 3094:9, 3100:21, 3100:23, 3114:19, 3114:22, 3114:24
**NEW** [1] - 2928:1
**New** [23] - 2928:6, 2928:15,

2929:15, 2930:12, 2936:1, 2987:10, 2990:21, 2991:5, 2992:23, 3015:11, 3023:21, 3029:6, 3029:13, 3029:20, 3029:22, 3029:24, 3052:1, 3097:8, 3105:12, 3107:12, 3107:13, 3107:15, 3108:6
**news** [8] - 3074:12, 3075:23, 3077:4, 3077:7, 3078:7, 3078:14, 3079:8, 3079:17
**News** [3] - 3076:7, 3078:20, 3080:4
**newspaper** [1] - 3077:1
**next** [18] - 2932:19, 2948:24, 2952:11, 2952:12, 2971:3, 2985:13, 2986:17, 2988:21, 3013:24, 3016:23, 3024:19, 3028:4, 3043:25, 3046:22, 3068:20, 3078:16, 3078:24, 3079:5
**NHL** [10] - 3029:8, 3029:15, 3029:19, 3030:17, 3030:20, 3030:22, 3030:24, 3032:7, 3086:9, 3108:2
**nice** [2] - 3112:4, 3115:8
**night** [3] - 3120:16, 3124:1, 3126:21
**nine** [8] - 3026:12, 3065:8, 3065:11, 3066:5, 3066:6, 3066:8, 3067:2, 3112:14
**NO** [4] - 2938:4, 2938:22, 2939:8, 2939:10
**Nolan** [11] - 3053:24, 3054:3, 3054:7, 3055:11, 3055:15, 3055:17, 3055:21, 3055:23, 3083:4, 3084:14, 3084:15
**non** [1] - 2931:10
**non-issue** [1] - 2931:10
**nonstop** [1] - 2954:19
**normally** [1] - 3015:5
**north** [1] - 2946:2
**North** [11] - 2987:6, 2987:11, 2987:17, 2992:11, 2992:18, 2993:1, 2993:6, 2993:10, 2993:24, 2994:10, 2994:21
**Northern** [12] - 2940:2, 3037:22, 3037:23, 3037:25, 3040:1, 3040:7, 3040:17, 3042:14, 3042:15, 3043:18, 3046:22, 3101:9
**northern** [1] - 3111:15, 3112:20, 3115:1
**note** [5] - 2940:14, 3037:4,

3037:8, 3037:13
**noted** [2] - 2930:3, 2959:5
**notes** [2] - 3080:20, 3081:21
**nothing** [7] - 3098:16, 3114:25, 3115:9, 3115:16, 3115:21, 3116:11, 3117:19
**notice** [3] - 3040:24, 3041:9, 3042:5
**noticed** [1] - 3058:8
**notification** [1] - 3040:17
**notifying** [1] - 3043:14
**November** [13] - 3006:2, 3007:12, 3021:3, 3077:2, 3077:14, 3077:22, 3078:15, 3078:16, 3079:5, 3079:6, 3079:16, 3080:4
**nowhere** [1] - 3086:6
**number** [21] - 2937:4, 2937:11, 2938:2, 2938:8, 2939:12, 2940:8, 2946:7, 2947:24, 2980:21, 2992:16, 2996:20, 3002:1, 3006:25, 3009:18, 3030:19, 3037:3, 3062:16, 3093:22, 3120:1, 3122:13
**numbers** [3] - 2964:20, 3037:3, 3119:11
**nursery** [1] - 2983:17
**nutshell** [1] - 2933:22
**NY** [3] - 2928:22, 2929:3, 2929:6

## O

**oath** [6] - 2942:10, 3028:10, 3054:13, 3065:23, 3066:8, 3083:9
**object** [9] - 2962:13, 3041:13, 3049:5, 3049:7, 3049:20, 3055:4, 3055:5, 3085:17
**objecting** [1] - 3026:7
**objection** [35] - 2937:21, 2942:25, 2943:13, 2944:3, 2976:17, 2992:3, 2992:4, 3005:18, 3005:19, 3019:12, 3020:18, 3020:20, 3023:8, 3024:8, 3024:9, 3025:19, 3049:19, 3055:3, 3055:5, 3057:10, 3060:13, 3060:14, 3063:11, 3063:12, 3071:21, 3071:25, 3073:15, 3076:2, 3077:25, 3085:7, 3085:17, 3091:24, 3091:25, 3092:18, 3092:19
**objectives** [1] - 2974:8
**obligation** [2] - 2973:1,

2983:2
**obligations** [4] - 2969:12, 2973:1, 2976:23, 3013:2
**observed** [1] - 2980:4
**obstacle** [1] - 3095:22
**obstacles** [2] - 3095:25, 3096:2
**obtain** [3] - 2969:6, 2983:2, 3098:24
**obtained** [4] - 2974:7, 2982:2, 3022:2
**obtaining** [1] - 2987:24
**obvious** [2] - 3095:11, 3115:20
**obviously** [6] - 2930:10, 2933:2, 2938:7, 2939:4, 3085:15, 3088:16
**occasion** [5] - 3072:6, 3074:7, 3103:19, 3103:24, 3104:2
**occasions** [3] - 2980:21, 3104:2, 3122:13
**occupation** [2] - 2981:16, 2981:18
**occur** [4] - 2979:21, 3003:10, 3081:1, 3081:11
**occurred** [5] - 2980:4, 2981:5, 3003:8, 3074:14, 3108:9
**occurrence** [1] - 2993:21
**ocean** [1] - 3068:11
**Oceanside** [1] - 2929:6
**October** [3] - 2999:4, 3000:9, 3008:16
**odd** [1] - 2986:19
**OF** [3] - 2928:1, 2928:3, 2928:10
**offenses** [1] - 3077:24
**offer** [8] - 2934:23, 2983:18, 2992:1, 3063:9, 3084:19, 3087:5, 3091:22, 3092:16
**offering** [1] - 3085:19
**office** [4] - 3013:21, 3081:3, 3090:5, 3090:18
**Office** [5] - 3023:21, 3024:5, 3081:4, 3081:13, 3094:15
**officer** [6] - 2940:25, 2941:3, 2968:21, 2969:22, 2981:19, 2981:25
**often** [1] - 2980:22
**Old** [1] - 2929:3
**old** [4] - 3029:14, 3029:16, 3030:13, 3030:14
**Oliveras** [7] - 2931:23, 2932:25, 2935:3, 2936:5, 3027:14, 3121:14, 3123:18
**OLIVERAS** [6] - 2929:5, 2936:9, 3027:17, 3121:1,

3121:6, 3123:20
**Olympics** [2] - 3059:6, 3059:9
**once** [6] - 2936:17, 2989:22, 2992:25, 3005:25, 3028:9, 3108:7
**One** [1] - 2928:21
**one** [73] - 2930:6, 2931:23, 2934:2, 2935:14, 2936:11, 2936:14, 2942:20, 2947:6, 2953:16, 2956:1, 2958:5, 2963:21, 2978:6, 2978:23, 2980:2, 2985:18, 2986:11, 2989:20, 2996:21, 2998:7, 3001:20, 3004:13, 3004:16, 3004:20, 3005:24, 3009:19, 3009:22, 3013:2, 3015:16, 3016:18, 3016:24, 3019:20, 3020:25, 3021:12, 3022:23, 3024:22, 3030:1, 3030:19, 3033:6, 3036:9, 3039:3, 3043:14, 3043:20, 3045:3, 3046:25, 3049:4, 3054:4, 3056:21, 3058:2, 3059:4, 3059:16, 3060:9, 3074:7, 3076:10, 3076:17, 3077:10, 3078:15, 3079:4, 3080:19, 3085:17, 3087:12, 3092:12, 3103:7, 3106:1, 3107:20, 3108:6, 3111:14, 3112:5, 3121:20, 3124:2
**one's** [2] - 3055:7, 3096:24
**one-by-one** [1] - 2958:5
**ones** [3] - 3011:25, 3123:15, 3124:20
**open** [3] - 3019:3, 3035:11, 3035:12
**opened** [2] - 3035:7, 3035:25
**opening** [1] - 3034:17
**operating** [4] - 2968:21, 2969:22, 2973:2, 3047:24
**operation** [3] - 3036:16, 3036:22, 3040:13
**operations** [2] - 2937:9, 2960:21
**opinions** [1] - 3013:11
**opportunity** [5] - 3033:15, 3063:1, 3114:10, 3124:19, 3125:14
**opposite** [1] - 2934:4
**optimistically** [1] - 2989:14
**order** [10] - 2934:11, 2994:4, 3003:7, 3005:25, 3008:25, 3012:5, 3064:16, 3064:22, 3121:19, 3123:23

**organization** [1] - 3074:12
**organized** [1] - 3099:18
**originally** [1] - 3029:12
**outbox** [1] - 3007:6
**outside** [8] - 3097:12, 3097:16, 3102:18, 3105:11, 3105:24, 3106:12, 3121:14, 3125:24
**outstanding** [2] - 3040:10, 3117:8
**overall** [3] - 2953:24, 2973:16, 3030:20
**overlooked** [1] - 2987:2
**overnight** [1] - 3123:20
**overruled** [1] - 2962:15
**Overruled** [1] - 3055:6
**overseas** [1] - 3106:19
**Owen** [9] - 3009:13, 3053:23, 3054:3, 3054:7, 3055:11, 3055:15, 3055:21, 3055:23, 3084:15
**own** [15] - 2981:2, 2986:12, 3031:19, 3032:21, 3049:6, 3049:18, 3069:2, 3069:21, 3079:21, 3080:6, 3083:21, 3090:1, 3096:22, 3110:15, 3125:3
**owner** [2] - 3016:2, 3057:9
**owners** [2] - 3048:20, 3064:22
**ownership** [12] - 2992:18, 2992:25, 2993:9, 2993:17, 2994:20, 3061:2, 3069:24, 3096:14, 3096:24, 3096:25, 3097:18, 3098:2
**owns** [1] - 3110:15

## P

**p.m** [1] - 3007:18
**Pace** [1] - 2938:3
**Pacific** [2] - 2958:15, 3068:11
**package** [2] - 3007:23, 3023:20
**packet** [2] - 2961:14, 2961:21
**pad** [1] - 2964:11
**page** [31] - 2944:25, 2945:6, 2957:18, 2958:1, 2959:3, 2961:24, 2962:7, 2962:19, 2963:4, 2971:3, 2988:21, 2998:1, 3007:3, 3007:15, 3008:13, 3013:24, 3014:10, 3014:19, 3015:3, 3024:25, 3046:25, 3048:4, 3062:10, 3078:24, 3086:1, 3086:22,

3086:25, 3091:9, 3091:16
**pages** [2] - 3005:5, 3019:15
**paid** [11] - 2933:20, 2959:24, 2962:12, 2978:13, 3011:4, 3016:19, 3039:6, 3050:6, 3050:10, 3070:6
**pair** [1] - 2963:20
**palatial** [1] - 2987:1
**panel** [2] - 3086:19, 3088:12
**paper** [1] - 2956:22
**paperwork** [2] - 3043:8, 3043:9
**Paradise** [6] - 3115:24, 3116:2, 3116:7, 3116:9, 3116:11, 3116:15
**paragraph** [1] - 2943:7
**paragraphs** [3] - 2934:2, 3025:11, 3025:17
**paraphrasing** [1] - 3071:13
**parcel** [22] - 2945:20, 2948:17, 2956:14, 2979:13, 2982:6, 2982:20, 2982:24, 3001:10, 3001:13, 3001:14, 3001:17, 3002:11, 3003:2, 3003:7, 3014:8, 3015:25, 3016:1, 3016:2, 3016:3, 3097:25, 3098:14
**parcels** [6] - 2948:3, 2977:20, 3003:8, 3013:15, 3014:15, 3016:7
**parents** [1] - 3030:11
**parents'** [1] - 3030:11
**Paris** [1] - 3054:23
**Park** [1] - 2937:8
**part** [29] - 2940:5, 2940:12, 2941:4, 2949:18, 2954:13, 2956:10, 2963:24, 2968:15, 2979:13, 2982:15, 2983:7, 2983:17, 2988:7, 3000:15, 3008:20, 3058:7, 3063:18, 3076:23, 3081:16, 3097:19, 3097:21, 3097:25, 3098:14, 3099:6, 3102:24, 3106:9, 3114:13, 3114:14, 3121:10
**particular** [11] - 2983:13, 3013:9, 3015:15, 3026:21, 3068:12, 3068:17, 3074:9, 3077:7, 3079:3, 3086:7, 3088:4
**particularly** [1] - 2933:7
**particulars** [1] - 2952:14
**parties** [1] - 3009:20
**partner** [8] - 3045:4, 3047:5, 3047:11, 3047:17,

3048:12, 3048:14, 3050:5, 3126:10
**partners** [6] - 3044:13, 3045:2, 3045:11, 3045:18, 3048:6, 3048:19
**partners'** [1] - 2983:7
**patently** [1] - 2936:18
**patents** [5] - 3106:17, 3109:10, 3110:13, 3110:15, 3118:6
**Paul** [2] - 3009:15, 3009:16
**pause** [8] - 2991:16, 2998:3, 3001:21, 3005:11, 3059:17, 3060:12, 3061:11, 3076:19
**Pause** [1] - 3120:25
**pay** [13] - 2956:15, 2978:17, 3001:16, 3002:6, 3010:24, 3012:19, 3012:23, 3016:12, 3032:2, 3055:21, 3069:21, 3088:17
**payable** [4] - 2956:16, 2958:7, 2958:9, 2958:10
**paying** [1] - 3032:24
**payment** [9] - 2952:6, 2962:4, 2962:8, 2969:18, 2969:24, 3012:10, 3035:3, 3035:4, 3088:15
**payments** [23] - 2952:1, 2952:3, 2952:9, 2952:13, 2969:17, 2974:13, 2974:19, 2974:20, 2974:24, 2975:1, 2975:6, 2976:14, 2976:25, 3010:24, 3011:5, 3011:7, 3011:16, 3012:5, 3021:23, 3035:18, 3036:4, 3088:17, 3113:6
**payoff** [8] - 2958:19, 2958:22, 2958:25, 2959:4, 2959:8, 2959:13
**pdf** [2] - 2945:9, 2945:10
**PDF** [3] - 2984:16, 2984:18, 3019:3
**Peca** [4] - 3047:2, 3047:3, 3047:4, 3048:20
**penalize** [1] - 2939:21
**penalties** [1] - 3011:3
**penalty** [3] - 2953:9, 2953:20, 3002:5
**pending** [2] - 3054:3, 3104:10
**penny** [1] - 3055:24
**pension** [3] - 2981:21, 2981:23, 2982:2
**people** [9] - 2935:24, 3000:25, 3002:15, 3068:20, 3070:16, 3105:25, 3108:21, 3108:23, 3121:18

**per** [4] - 3015:16, 3015:18, 3069:19, 3070:2
**percent** [13] - 2953:8, 2994:20, 3064:2, 3068:15, 3072:23, 3082:12, 3082:20, 3093:1, 3093:2, 3093:15, 3093:17, 3093:21
**percentage** [13] - 2987:24, 2992:17, 2992:25, 2993:5, 2993:25, 3032:3, 3032:6, 3041:7, 3064:11, 3068:15, 3091:1, 3095:6, 3095:14
**percentages** [1] - 3063:19
**perform** [2] - 2952:17, 3031:10
**perhaps** [6] - 2930:24, 2937:13, 2941:9, 2967:23, 3073:7, 3097:11
**perimeter** [2] - 2979:2, 2980:1
**period** [9] - 2951:15, 2968:16, 2968:24, 2979:12, 3003:1, 3040:13, 3052:3, 3081:20, 3099:5
**periods** [1] - 2981:7
**permission** [2] - 2932:17, 3018:20, 3124:10
**permit** [1] - 2933:3
**permitted** [1] - 3015:12
**person** [19] - 2939:1, 2945:13, 2998:19, 3000:21, 3004:10, 3004:11, 3026:18, 3027:19, 3050:24, 3053:23, 3067:21, 3070:5, 3073:3, 3107:17, 3110:15, 3111:22, 3118:6
**personal** [12] - 2933:8, 2970:11, 2982:9, 3000:25, 3001:8, 3049:6, 3049:18, 3069:2, 3083:21, 3100:12, 3110:16, 3110:18
**personally** [7] - 2968:7, 2975:17, 2982:5, 2982:7, 2982:16, 2982:18, 2982:22
**perspective** [2] - 2952:16, 3073:11
**phil** [1] - 3030:9
**Phil** [101] - 2945:7, 2946:20, 2947:2, 2948:13, 2948:21, 2952:10, 2955:18, 2955:25, 2965:9, 2967:5, 2968:5, 2969:6, 2969:11, 2969:22, 2969:24, 2972:8, 2972:15, 2973:21, 2974:7, 2975:15, 2977:18, 2977:23, 2982:4, 2982:16, 2982:18, 2982:22, 2984:1, 2984:8,

2984:14, 2984:20, 2984:24, 2985:5, 2985:8, 2985:24, 2986:6, 2986:16, 2987:1, 2995:11, 3007:11, 3013:21, 3014:4, 3025:8, 3030:2, 3030:5, 3031:13, 3032:17, 3033:15, 3033:19, 3035:12, 3042:2, 3043:1, 3043:7, 3044:12, 3048:8, 3050:12, 3050:20, 3051:17, 3052:20, 3052:21, 3052:24, 3053:20, 3054:8, 3054:10, 3055:8, 3055:15, 3056:11, 3057:20, 3064:8, 3066:13, 3066:15, 3066:18, 3066:20, 3074:14, 3075:2, 3077:9, 3077:16, 3077:24, 3079:12, 3082:23, 3083:13, 3090:7, 3090:19, 3095:22, 3096:12, 3097:10, 3098:14, 3098:18, 3099:5, 3099:7, 3099:11, 3099:12, 3099:13, 3099:16, 3099:17, 3100:4, 3100:9, 3101:16, 3104:11, 3107:25, 3111:24
**Phil's** [2] - 2983:2, 3083:15
**PHILLIP** [1] - 2928:7
**Phillip** [2] - 3023:16, 3084:15
**Phoenix** [2] - 3052:1, 3060:22
**phone** [10] - 2936:11, 2936:13, 2936:16, 3026:13, 3040:6, 3040:18, 3040:19, 3044:12, 3051:18, 3057:21
**photocopies** [1] - 2991:18
**photocopy** [6] - 2991:14, 2991:23, 3061:25, 3063:4, 3091:17, 3092:13
**photographs** [2] - 2943:23, 2961:16, 2978:19
**phrase** [1] - 3113:9
**physically** [4] - 2971:1, 2979:14, 2984:24, 3073:6
**pick** [3] - 3029:10, 3086:9, 3126:12
**picked** [1] - 2981:9
**piece** [14] - 2933:22, 2950:10, 3003:11, 3009:5, 3018:12, 3033:22, 3041:7, 3041:11, 3044:2, 3046:1, 3088:18, 3088:21, 3112:4, 3115:6
**pieces** [1] - 3039:19
**pitched** [2] - 3051:14, 3051:15

**place** [20] - 2949:6, 2949:10, 2949:14, 2949:17, 2949:20, 2951:20, 2985:19, 3000:4, 3009:2, 3010:16, 3011:9, 3022:9, 3032:9, 3075:24, 3077:15, 3081:5, 3106:10, 3107:1, 3112:19, 3117:13
**places** [3] - 3035:22, 3035:24, 3036:7
**plane** [1] - 3069:21
**planes** [1] - 3112:23
**plans** [2] - 3003:6, 3073:24
**plantings** [1] - 2983:19
**play** [3] - 3029:12, 3059:10, 3069:11
**Playboy** [5] - 3118:19, 3118:22, 3119:5, 3119:8, 3120:4
**played** [6] - 2996:14, 3029:18, 3029:21, 3030:24, 3047:3, 3053:25
**player** [4] - 3029:8, 3030:22, 3056:15, 3056:20
**players** [6] - 3052:20, 3108:2, 3112:16, 3113:1, 3121:20
**playing** [8] - 3032:7, 3033:18, 3040:5, 3056:10, 3056:14, 3059:9, 3105:20, 3119:2
**Plaza** [2] - 2928:15, 2929:14
**pleadings** [1] - 3098:24
**pledge** [4] - 3037:22, 3040:8, 3088:9, 3088:15
**pledged** [1] - 3040:22
**plenty** [1] - 3108:5
**plus** [4] - 3002:5, 3002:6, 3042:9, 3082:3
**point** [54] - 2932:23, 2934:24, 2935:9, 2940:22, 2942:8, 2950:12, 2950:23, 2953:13, 2954:10, 2954:21, 2961:17, 2980:6, 2985:21, 2991:4, 2997:17, 3002:25, 3004:7, 3011:21, 3014:2, 3025:10, 3034:23, 3041:3, 3046:2, 3048:23, 3049:15, 3051:3, 3057:5, 3064:7, 3064:13, 3066:9, 3066:14, 3077:8, 3077:15, 3079:9, 3082:9, 3082:16, 3083:6, 3083:8, 3083:17, 3086:14, 3087:21, 3092:23, 3093:18, 3094:13, 3096:21, 3096:25, 3100:7, 3106:10, 3108:12, 3110:10, 3110:12, 3113:17,

3122:18, 3122:25
**Point** [11] - 2987:6, 2987:11, 2987:17, 2992:11, 2992:18, 2993:1, 2993:6, 2993:10, 2993:24, 2994:10, 2994:21
**points** [2] - 2978:19, 3019:4
**police** [2] - 2981:19, 2981:25
**Polynesians** [1] - 2955:14
**poor** [1] - 2999:18
**portfolio** [3] - 3032:5, 3032:10
**portion** [8] - 2950:16, 2953:22, 2954:2, 3085:9, 3085:13, 3086:22, 3089:10, 3091:2
**portions** [3] - 2997:25, 3036:6
**position** [2] - 3072:8, 3085:22
**positive** [1] - 3103:1
**possessed** [1] - 3098:25
**possibility** [2] - 3013:11, 3124:15
**possible** [2] - 2952:16, 3057:23
**potential** [7] - 2977:24, 2979:20, 2983:15, 2996:12, 2996:18, 3013:12, 3016:3
**potentially** [1] - 2932:20
**practice** [1] - 2989:16
**prefer** [1] - 2975:10
**prep** [3] - 3090:11, 3090:12, 3090:20
**prepare** [2] - 2938:19, 2939:6
**prepared** [1] - 3083:15
**prepayment** [3] - 2953:9, 2953:20, 3002:5
**prepped** [4] - 3054:11, 3054:22, 3083:20, 3083:25
**presence** [1] - 3121:4
**present** [7] - 2936:1, 2941:24, 2979:14, 3028:1, 3104:6, 3104:15, 3104:17
**press** [4] - 3079:15, 3079:21, 3080:3, 3080:6
**presumably** [1] - 3077:14
**presume** [1] - 2935:8
**pretty** [12] - 2933:22, 2954:19, 2983:24, 2983:25, 3012:18, 3030:16, 3052:4, 3053:19, 3056:11, 3069:10, 3112:18, 3126:7
**prevail** [1] - 3064:6
**prevented** [1] - 3117:1

**previewed** [1] - 2930:6
**previously** [1] - 2942:14
**price** [12] - 2946:23, 2948:16, 2952:7, 2953:19, 2955:21, 2965:5, 2966:5, 2966:23, 3014:9, 3093:12, 3093:14, 3093:15
**primary** [1] - 2972:8
**principal** [2] - 3000:22, 3089:3, 3118:2
**principals** [1] - 2999:23
**print** [1] - 3074:12
**printed** [1] - 3007:3
**Privitello** [3] - 3116:15, 3116:18, 3117:9
**privy** [1] - 2949:18
**problem** [9] - 2934:1, 2934:18, 2934:19, 2938:24, 2980:7, 3025:5, 3025:21, 3089:21, 3125:2
**problems** [1] - 3123:11
**procedurally** [1] - 2934:19
**proceed** [1] - 3059:8
**proceeding** [1] - 3083:12
**proceedings** [10] - 2991:16, 2998:3, 3001:21, 3005:11, 3059:17, 3060:12, 3061:11, 3076:19, 3120:25, 3126:22
**PROCEEDINGS** [1] - 2928:10
**Proceedings** [1] - 2929:24
**proceeds** [2] - 3039:22, 3114:17
**produce** [5] - 3006:15, 3017:14, 3066:25, 3067:2, 3124:19
**produced** [3] - 2929:25, 2933:20, 3026:18
**professional** [1] - 3068:22
**profits** [1] - 3039:22
**project** [64] - 2944:16, 2945:13, 2945:17, 2951:4, 2952:15, 2959:23, 2960:9, 2960:13, 2961:3, 2962:3, 2962:11, 2962:25, 2963:8, 2963:24, 2968:7, 2968:10, 2968:12, 2968:16, 2968:25, 2969:5, 2970:5, 2970:10, 2970:25, 2972:3, 2973:22, 2974:9, 2977:10, 2978:5, 2978:18, 2979:13, 2983:4, 2983:14, 2994:3, 2998:14, 2998:20, 2999:5, 3003:17, 3008:11, 3008:20, 3008:9, 3013:9, 3022:9, 3024:1, 3033:23, 3041:8, 3052:17, 3064:16, 3073:7, 3080:15, 3082:11, 3087:23, 3089:4, 3089:16,

3095:7, 3095:13, 3099:1, 3099:6, 3099:9, 3099:14, 3100:5, 3100:10, 3111:22, 3111:23
**projects** [13] - 2996:4, 2996:8, 2996:15, 2997:3, 2997:20, 2998:8, 3002:22, 3004:4, 3004:8, 3004:24, 3010:19, 3015:6, 3113:22
**promissory** [1] - 2940:14
**pronounce** [1] - 3109:4
**proper** [1] - 3113:9
**properly** [3] - 3049:4, 3049:13, 3073:12
**Properties** [11] - 2987:6, 2987:11, 2987:17, 2992:12, 2992:19, 2993:2, 2993:6, 2993:10, 2993:24, 2994:11, 2994:21
**properties** [26] - 2947:4, 2948:1, 2950:15, 2964:5, 2967:11, 2967:17, 2978:18, 2978:20, 2978:23, 2978:24, 2979:1, 2979:8, 2979:9, 2979:12, 2979:15, 2979:17, 2979:19, 2979:24, 2980:6, 2995:23, 2995:24, 2996:2, 3016:12, 3034:1, 3034:6, 3035:22
**property** [137] - 2933:8, 2945:14, 2946:3, 2946:16, 2946:23, 2946:25, 2947:14, 2947:15, 2948:6, 2948:24, 2950:10, 2953:18, 2953:23, 2953:24, 2954:5, 2955:7, 2956:1, 2956:3, 2961:15, 2964:2, 2964:20, 2966:5, 2967:2, 2970:12, 2970:21, 2970:24, 2971:1, 2972:4, 2974:14, 2979:3, 2982:11, 2982:15, 2982:24, 2983:18, 2985:1, 2985:15, 2985:18, 2985:22, 2985:23, 2986:7, 2986:17, 2987:1, 2987:10, 2987:22, 2987:24, 2988:2, 2988:5, 2988:9, 2988:11, 2990:9, 2990:16, 2998:24, 3002:14, 3003:12, 3008:15, 3008:19, 3009:5, 3010:3, 3010:22, 3011:10, 3011:18, 3011:22, 3012:1, 3012:20, 3015:10, 3016:20, 3017:3, 3017:23, 3018:13, 3033:20, 3033:22, 3035:3, 3035:4, 3035:6, 3035:18, 3035:19, 3036:10, 3036:12,

3036:13, 3039:19, 3044:2, 3044:8, 3044:10, 3044:11, 3044:14, 3044:18, 3044:21, 3044:24, 3045:2, 3045:9, 3045:14, 3045:23, 3045:25, 3046:1, 3046:4, 3047:20, 3047:21, 3048:25, 3049:16, 3050:6, 3050:7, 3050:13, 3050:15, 3067:15, 3068:3, 3068:4, 3068:15, 3069:11, 3069:15, 3071:3, 3071:5, 3071:12, 3072:1, 3072:4, 3072:6, 3072:24, 3073:1, 3073:12, 3073:20, 3088:16, 3088:19, 3088:21, 3089:19, 3093:4, 3093:10, 3093:25, 3094:7, 3094:16, 3094:22, 3095:9, 3112:4, 3112:25, 3114:12, 3115:7, 3116:19, 3116:24
**proposal** [1] - 2984:1
**proposition** [1] - 3070:19
**prospective** [4] - 3069:7, 3071:4, 3071:11, 3071:15
**provide** [9] - 2933:24, 2952:18, 2956:13, 2956:15, 3009:1, 3009:7, 3013:3, 3013:7, 3094:5
**provided** [5] - 2937:4, 2946:25, 2950:3, 3016:10, 3083:12
**published** [2] - 3075:25, 3077:2
**purchase** [27] - 2946:23, 2948:16, 2949:18, 2952:7, 2953:19, 2955:21, 2964:2, 2964:4, 2965:5, 2965:19, 2965:22, 2966:5, 2966:16, 2966:23, 2967:11, 2968:9, 2987:14, 3010:25, 3011:11, 3011:22, 3012:20, 3014:9, 3035:5, 3044:7, 3044:14, 3045:9, 3069:24
**purchased** [8] - 2965:17, 2987:22, 3008:20, 3068:16, 3093:25, 3094:7, 3094:17, 3094:22
**purchaser** [6] - 3071:6, 3071:11, 3071:16, 3097:13, 3097:16, 3102:18
**purchasers** [2] - 3069:8, 3071:4
**purchases** [3] - 2967:2, 2977:18, 2977:22
**purpose** [13] - 2967:7, 2970:5, 2977:13, 2983:12, 2994:10, 3035:16, 3049:24, 3052:25,

22

3053:18, 3069:14, 3102:7, 3106:16, 3120:7
**purposes** [9] - 2967:8, 2967:9, 2969:5, 2972:3, 2974:8, 2977:12, 3025:9, 3049:10, 3082:19
**pursuant** [3] - 2940:3, 2975:6, 3095:25
**pursue** [3] - 2976:13, 2977:2, 3100:18
**pursued** [1] - 3096:12
**pursuing** [1] - 3095:23
**pushed** [1] - 3050:20
**put** [22] - 2934:22, 2945:23, 2951:20, 2987:25, 3004:17, 3011:10, 3020:8, 3037:23, 3037:24, 3046:4, 3047:20, 3049:1, 3049:13, 3050:21, 3058:9, 3093:7, 3105:12, 3105:16, 3116:18, 3124:6, 3125:21, 3126:15
**putting** [3] - 2961:20, 3088:9, 3102:10

## Q

**quantify** [1] - 3007:5
**quarry** [1] - 2983:8
**quash** [1] - 2930:7
**questioning** [2] - 2990:12, 3086:7
**questions** [35] - 2967:19, 2969:15, 2972:14, 2979:1, 2979:4, 2979:7, 2979:10, 2994:24, 3007:25, 3014:5, 3017:24, 3019:21, 3021:15, 3022:17, 3054:21, 3061:14, 3074:17, 3074:19, 3075:13, 3075:14, 3075:19, 3081:17, 3083:7, 3083:9, 3083:18, 3083:19, 3086:3, 3087:22, 3087:25, 3088:5, 3095:20, 3104:21, 3111:11, 3111:13
**quick** [1] - 2948:3
**quickly** [2] - 3060:19, 3125:20
**quite** [2] - 3006:20, 3085:24
**quote** [5] - 3055:23, 3112:3, 3115:6, 3115:7
**quote/unquote** [1] - 2956:16
**quoted** [2] - 3074:23, 3075:8

## R

**racing** [1] - 3118:23
**raised** [2] - 3029:6, 3124:16
**raising** [5] - 2960:12, 2996:7, 3026:21, 3106:11, 3106:16
**ranchers** [1] - 2960:25
**ranching** [2] - 2960:20, 2960:21
**range** [1] - 3037:18
**Rangers** [1] - 3029:23
**rate** [2] - 2953:8, 3089:7
**rather** [6] - 2930:25, 2935:5, 3087:5, 3122:25, 3123:1, 3126:8
**re** [1] - 3023:18
**re-called** [1] - 3023:18
**reached** [1] - 2936:20
**reaching** [2] - 2940:23, 2973:18
**reaction** [3] - 2934:18, 2934:25, 2937:12
**read** [16] - 2941:21, 2942:20, 2943:6, 2946:17, 2953:10, 2998:2, 3009:17, 3014:1, 3014:21, 3022:23, 3023:4, 3071:13, 3076:23, 3084:10, 3087:5, 3120:15
**reading** [2] - 3085:20, 3122:6
**ready** [6] - 2939:23, 2941:19, 2942:5, 2989:3, 3026:4, 3087:9
**real** [4] - 3049:16, 3068:16, 3086:15
**realize** [1] - 2976:21
**really** [20] - 2933:17, 2934:3, 2935:24, 2938:20, 2954:15, 3021:17, 3032:11, 3033:2, 3035:12, 3041:6, 3042:3, 3045:15, 3052:16, 3052:17, 3053:8, 3054:21, 3054:22, 3057:3, 3097:5
**reason** [13] - 2934:7, 2934:14, 2962:10, 2962:24, 2963:7, 3018:16, 3031:17, 3052:22, 3052:23, 3097:9, 3102:14, 3102:15, 3108:21
**reasons** [3] - 2962:15, 3052:6, 3052:14
**receive** [9] - 2930:7, 2978:12, 3040:15, 3065:1, 3065:5, 3067:23, 3069:17, 3095:7, 3113:21
**received** [36] - 2940:2,

2992:7, 2994:9, 3005:17, 3005:22, 3013:13, 3016:23, 3017:18, 3020:22, 3023:24, 3024:13, 3040:24, 3041:23, 3043:9, 3043:14, 3057:21, 3060:16, 3063:15, 3064:8, 3065:24, 3066:11, 3066:12, 3092:2, 3092:21, 3095:18, 3096:6, 3124:13, 3125:13, 3128:7, 3128:12, 3128:14, 3128:15, 3128:17, 3128:19, 3128:23, 3128:25
**receiving** [7] - 2963:1, 2999:14, 2999:20, 3065:6, 3066:4, 3112:25, 3113:25
**Recess** [1] - 2988:20
**recess** [3] - 2989:1, 3025:23, 3087:8
**recessed** [1] - 3126:22
**recognize** [8] - 2945:1, 2946:5, 3006:6, 3033:24, 3034:3, 3034:5, 3059:22, 3091:14
**recollection** [38] - 2975:8, 2975:12, 2975:20, 2976:2, 2990:15, 2993:4, 2993:23, 2994:8, 2994:13, 2994:14, 2994:17, 2994:18, 2998:5, 2998:10, 3008:8, 3008:12, 3009:4, 3009:23, 3010:1, 3014:14, 3014:24, 3016:5, 3016:9, 3016:16, 3017:5, 3018:6, 3018:8, 3018:9, 3019:10, 3019:17, 3037:15, 3060:3, 3064:6, 3079:4, 3080:2, 3083:3, 3119:21, 3119:24
**recommended** [1] - 3107:13
**reconvene** [1] - 3120:14
**Record** [1] - 3009:17
**record** [13] - 2933:24, 2940:5, 2941:16, 2961:25, 3027:12, 3028:18, 3046:17, 3046:19, 3048:5, 3048:19, 3060:1, 3076:23, 3087:6
**recorded** [4] - 2929:24, 2946:13, 2964:14, 3018:4
**records** [17] - 2940:2, 2940:12, 2941:6, 2943:11, 2969:16, 2970:1, 3026:19, 3043:18, 3053:11, 3096:14, 3097:16, 3097:23, 3098:1, 3098:25, 3099:8
**Records** [1] - 3016:25
**recoup** [1] - 3053:5

**recovered** [1] - 3024:3
**RECROSS** [2] - 3021:18, 3127:12
**red** [4] - 2963:12, 2963:16, 2963:19, 3039:13
**redirect** [1] - 3019:22
**REDIRECT** [2] - 3020:1, 3127:10
**refer** [2] - 3015:11, 3015:25
**reference** [17] - 2970:10, 2974:1, 2984:23, 2992:9, 2993:24, 3066:10, 3072:4, 3074:14, 3075:12, 3077:4, 3080:3, 3087:21, 3094:6, 3094:16, 3096:5, 3098:4, 3099:8
**references** [1] - 3015:19
**referred** [9] - 2943:16, 2947:9, 2951:10, 3019:11, 3033:8, 3037:8, 3044:3, 3107:18, 3111:18
**referring** [6] - 2933:13, 2947:15, 2997:6, 3018:10, 3027:10, 3046:16
**refers** [1] - 3015:10
**reflected** [3] - 3096:14, 3097:17, 3098:1
**reflecting** [4] - 3041:24, 3061:2, 3064:8, 3076:10
**reflects** [1] - 3064:1
**refresh** [12] - 2975:8, 2993:4, 2993:23, 2998:5, 2998:10, 3014:14, 3014:23, 3019:10, 3079:4, 3080:1, 3119:20, 3119:24
**refreshed** [1] - 3019:16
**refreshes** [1] - 3019:17
**refund** [1] - 2939:21
**refundable** [1] - 2951:24
**refused** [1] - 3122:13
**regard** [4] - 2941:15, 2970:22, 3014:25, 3044:16
**regarding** [22] - 2931:24, 2932:3, 2933:25, 2934:6, 2935:14, 2936:7, 2999:20, 3000:10, 3001:12, 3014:7, 3014:15, 3018:7, 3025:8, 3026:6, 3039:13, 3047:13, 3050:10, 3051:14, 3076:3, 3106:11, 3110:11, 3120:7
**regards** [9] - 3001:9, 3004:4, 3004:8, 3004:24, 3011:3, 3016:7, 3108:25, 3110:7, 3119:7
**relate** [1] - 3098:25
**related** [4] - 2936:12, 2962:10, 2990:8, 3049:16
**relates** [32] - 2970:23, 2972:23, 2978:13, 2978:23, 2983:13,

2984:25, 2992:18, 2993:1, 3044:20, 3044:21, 3063:4, 3065:7, 3069:6, 3069:24, 3070:22, 3073:23, 3073:24, 3074:6, 3077:6, 3078:13, 3079:3, 3079:9, 3080:19, 3083:12, 3086:7, 3088:2, 3091:16, 3092:6, 3096:7, 3096:23, 3101:1, 3103:18
**relating** [1] - 3015:12
**relation** [1] - 3100:5
**relationship** [11] - 2977:7, 3032:24, 3033:1, 3055:25, 3067:7, 3067:10, 3067:12, 3068:2, 3069:3, 3074:6, 3101:23
**release** [4] - 3079:16, 3079:21, 3080:3, 3080:6
**released** [1] - 3079:20
**relevance** [4] - 3071:21, 3072:2, 3073:15, 3076:2
**relevant** [1] - 3086:14
**remain** [2] - 3028:9, 3032:21
**remember** [36] - 2942:6, 2944:20, 2950:3, 2954:12, 2980:17, 2984:8, 2984:14, 2984:22, 2985:21, 2986:9, 2987:12, 2988:5, 2988:9, 2990:11, 2990:12, 2997:17, 2998:16, 2999:3, 2999:7, 3020:8, 3025:20, 3034:13, 3035:17, 3039:4, 3040:6, 3052:8, 3065:6, 3065:17, 3066:4, 3067:4, 3091:3, 3093:21, 3107:10, 3108:19, 3111:5
**remind** [1] - 2942:9
**removal** [1] - 2937:11
**removed** [1] - 3117:5
**remuneration** [1] - 3067:22
**rent** [1] - 2986:12
**rental** [1] - 2986:4
**reopen** [3] - 2933:3, 2934:11, 2934:15
**reopening** [2] - 2935:7, 3027:6
**repaid** [3] - 2953:21, 3095:24, 3109:6
**repeat** [5] - 2961:7, 3001:18, 3009:12, 3016:21, 3073:18
**rephrase** [3] - 3058:24, 3066:1, 3078:5
**replace** [1] - 3114:4
**report** [1] - 3121:15
**Reporter** [1] - 2929:14
**reporter** [1] - 3075:23
**reporters** [1] - 3076:8

**reporting** [1] - 2935:18
**reports** [5] - 3017:2, 3017:23, 3030:15, 3030:19, 3125:17
**represent** [3] - 2968:5, 2995:7, 3085:21
**represented** [1] - 2952:6
**represents** [2] - 2964:11, 3046:20
**request** [6] - 2934:3, 2937:10, 2983:3, 3058:9, 3062:8, 3121:10
**requested** [1] - 3058:14
**requests** [1] - 2961:13
**require** [2] - 2941:13, 3015:22
**required** [1] - 3064:21
**resembles** [1] - 2955:15
**reserve** [2] - 2932:19, 2939:2
**reservice** [1] - 2941:5
**reside** [1] - 3103:14
**residence** [2] - 2990:24, 2991:8
**resistant** [2] - 2984:1, 2984:4
**resisting** [1] - 2930:16
**resolve** [2] - 2937:14
**resort** [2] - 3068:9, 3069:8
**respect** [11] - 2930:7, 2937:16, 2967:6, 3035:25, 3039:23, 3043:3, 3044:18, 3048:24, 3051:13, 3059:3, 3062:10
**respond** [7] - 2936:3, 2938:17, 2938:19, 2961:13, 3007:10, 3007:13, 3066:20
**responding** [1] - 3026:24
**response** [5] - 2930:9, 2936:21, 3007:1, 3014:1, 3041:5
**responses** [1] - 3123:10
**responsibilities** [5] - 2968:17, 2969:10, 2969:11, 2973:23, 3099:7
**responsibility** [7] - 2969:3, 2969:4, 2969:6, 2970:4, 2976:13, 2977:1, 3099:22
**responsible** [12] - 2948:19, 2952:8, 2955:23, 2965:7, 2969:22, 2973:15, 2995:11, 2996:3, 2997:19, 2998:19, 2998:23, 2999:8
**rest** [5] - 2932:18, 3035:5, 3122:1, 3123:15, 3124:6
**restaurant** [1] - 3074:1
**result** [13] - 2974:6, 2974:12, 3002:10, 3042:17, 3055:10,

3055:17, 3064:15, 3066:7, 3074:22, 3100:23, 3101:2, 3101:23, 3113:21
**resulted** [1] - 2951:17
**retained** [1] - 2931:13
**retaliate** [1] - 2938:12
**retention** [2] - 3096:17, 3097:1
**retire** [1] - 3029:18
**retired** [4] - 2981:21, 2981:22, 3026:17, 3029:24
**return** [8] - 2977:24, 2978:11, 3039:21, 3042:16, 3069:17, 3082:12, 3095:18, 3096:6
**returned** [5] - 3024:3, 3077:23, 3079:11, 3093:12, 3105:20
**returning** [1] - 3026:13
**returns** [1] - 2939:12
**review** [4] - 2934:8, 3090:2, 3090:15
**reviewed** [3] - 2933:25, 3090:6, 3090:18
**Rhode** [3] - 3029:7, 3030:8, 3031:21, 3033:7
**RICHARD** [1] - 2928:22
**Richards** [17] - 2930:8, 2930:12, 2931:14, 3054:11, 3054:22, 3058:6, 3058:11, 3083:15, 3083:20, 3083:25, 3086:8, 3089:12, 3090:12, 3090:20, 3122:7, 3122:9, 3122:12
**Rick** [2] - 2968:5, 3121:21
**ring** [5] - 2975:23, 2983:10, 2994:6, 3007:6, 3007:8
**rise** [4] - 2930:1, 2941:23, 2989:25, 3027:25
**RM** [1] - 3015:15
**Road** [1] - 2929:3
**ROBERT** [1] - 2929:4
**Roger** [2] - 3068:25, 3069:3
**role** [7] - 2944:16, 2944:17, 2945:14, 2970:12, 2973:11, 2973:13, 2996:14
**Ron** [6] - 3054:11, 3054:22, 3083:15, 3083:20, 3083:25, 3084:1
**Ronald** [1] - 3090:11
**room** [1] - 2939:12
**Rosario** [4] - 3036:10, 3036:12, 3111:18, 3112:8
**Rosenboom** [1] - 3121:22
**Ross** [1] - 3121:22
**roughly** [13] - 2929:21, 3030:5, 3030:14, 3031:9, 3037:17, 3042:18,

3055:14, 3066:6, 3067:4, 3093:5, 3093:20, 3118:21, 3118:25
**round** [1] - 3029:10
**rounding** [1] - 3027:20
**rule** [1] - 2972:23
**ruling** [1] - 3122:17
**run** [1] - 3123:17
**running** [1] - 3070:22
**runway** [1] - 3112:23
**Russia** [5] - 3040:5, 3042:7, 3056:10, 3056:12, 3057:8, 3057:18, 3105:20, 3119:2
**RUSSO** [11] - 2931:11, 2931:18, 2933:23, 2934:16, 2936:3, 2937:24, 2943:2, 2943:14, 2944:4, 3026:5, 3027:12

**S**

**safe** [3] - 3040:22, 3041:4, 3041:20
**Sag** [15] - 2987:10, 2988:11, 2990:10, 3044:3, 3044:18, 3044:20, 3044:24, 3045:14, 3046:1, 3046:6, 3047:6, 3047:21, 3049:3, 3093:4, 3115:21
**salary** [2] - 2978:4, 2978:11
**sale** [8] - 2951:21, 2965:22, 2967:12, 2967:16, 3021:21, 3039:23, 3046:4, 3049:11
**sales** [5] - 3067:14, 3070:16, 3093:12, 3093:14, 3093:15
**Sales** [1] - 3067:20
**San** [22] - 3036:11, 3036:12, 3052:18, 3068:6, 3068:7, 3068:8, 3068:9, 3069:8, 3069:13, 3069:22, 3069:25, 3070:13, 3070:22, 3071:19, 3072:5, 3072:9, 3072:20, 3073:25, 3103:19, 3103:20, 3114:8, 3115:3
**Sanderson** [3] - 3030:10, 3030:21, 3030:22
**SARITHA** [1] - 2928:16
**sat** [2] - 3090:5, 3090:18
**Saturday** [1] - 3074:5
**save** [6] - 3097:12, 3102:17, 3105:10, 3105:23, 3106:11, 3110:13
**saving** [1] - 3097:15
**saw** [18] - 2933:10,

24

2934:17, 2953:2, 2959:10,
2962:3, 2966:1, 2970:8,
2970:16, 2970:20,
2978:21, 2984:24,
3006:20, 3036:24,
3043:16, 3047:23, 3048:1,
3052:3, 3115:6
**Saxon** [2] - 2990:21,
2991:1
**schedule** [1] - 3063:19
**scheduled** [1] - 3007:18
**scheme** [2] - 2961:15,
2961:16
**Schwab** [1] - 3046:23
**Scottsdale** [2] - 3004:15,
3052:2
**scouted** [2] - 2965:20,
2965:21
**scouting** [9] - 2945:13,
2964:5, 2966:15, 2967:10,
2988:5, 2988:9, 2995:23,
3030:15, 3030:18
**screen** [2] - 3020:8,
3043:12
**search** [2] - 2961:5, 2961:8
**season** [1] - 3033:18
**seasons** [2] - 3029:9,
3029:21
**seated** [9] - 2930:2,
2941:25, 2989:2, 2990:2,
3026:3, 3028:2, 3028:21,
3087:18, 3120:21
**second** [7] - 2938:15,
2938:25, 2992:16,
3007:14, 3015:13,
3046:15, 3059:16
**section** [1] - 3015:11
**sections** [1] - 3002:2
**secure** [10] - 2949:23,
2949:24, 2950:1, 2996:19,
2996:23, 2997:1, 2997:2,
2997:10, 2998:23, 3027:7
**secured** [2] - 3000:5,
3000:12
**securing** [4] - 2995:11,
2996:4, 2997:19, 3037:19
**securities** [1] - 3088:24
**security** [7] - 3070:21,
3070:24, 3071:3, 3071:7,
3071:14, 3071:19, 3104:15
**see** [73] - 2930:22, 2934:1,
2934:18, 2936:15,
2937:12, 2942:3, 2947:23,
2957:18, 2958:1, 2958:20,
2959:6, 2960:5, 2960:8,
2962:20, 2963:4, 2963:16,
2964:16, 2964:17,
2966:25, 2967:22,
2968:13, 2970:25,
2975:10, 2978:24,

2984:13, 2989:21,
2990:16, 2991:18,
2991:23, 2992:11,
2992:14, 2992:15,
2992:20, 2992:24, 3007:5,
3007:8, 3007:14, 3007:20,
3008:6, 3008:7, 3008:12,
3013:17, 3013:22, 3014:9,
3014:13, 3018:4, 3018:5,
3025:13, 3025:22,
3030:25, 3037:10,
3037:13, 3038:13, 3039:6,
3043:12, 3047:10,
3047:13, 3051:1, 3053:10,
3055:23, 3056:14, 3060:9,
3061:6, 3061:16, 3063:3,
3063:21, 3092:13, 3093:7,
3096:13, 3121:13,
3124:23, 3125:14
**seeing** [7] - 2974:22,
3022:5, 3022:11, 3025:20,
3065:17, 3070:5, 3094:21
**seek** [1] - 2932:17
**seeking** [1] - 3009:6
**segment** [1] - 2984:8
**segregated** [1] - 2979:2
**sell** [4] - 3011:25, 3047:22,
3093:4, 3116:24
**seller** [9] - 2951:3,
2951:20, 2951:23,
2951:25, 2952:8, 2960:24,
3011:23, 3016:2, 3016:3
**selling** [1] - 3117:1
**send** [8] - 2941:3, 2989:16,
2989:17, 2989:21,
2996:18, 3015:5, 3057:23,
3066:15
**sending** [7] - 3010:2,
3010:4, 3014:15, 3014:24,
3017:5, 3018:17, 3018:18
**sends** [1] - 3007:10
**sense** [6] - 2960:15,
2979:18, 2979:19,
2980:13, 3062:9, 3086:5
**sent** [18] - 2944:22, 2945:8,
2984:16, 2984:18,
2996:11, 3008:4, 3017:15,
3017:23, 3023:20, 3024:4,
3025:7, 3036:16, 3043:21,
3046:5, 3046:10, 3102:12,
3102:14, 3119:25
**separate** [3] - 3046:8,
3046:21, 3052:17
**separately** [1] - 3018:20
**sequence** [2] - 2960:1,
3086:6
**series** [2] - 2951:9, 3037:3
**serious** [1] - 2960:11
**serve** [6] - 2938:9,
2938:20, 2939:15,

3105:13, 3122:12
**served** [1] - 3124:11
**service** [2] - 3122:13,
3122:15
**Services** [1] - 3019:8
**services** [2] - 2958:13,
3031:11
**serving** [2] - 2938:8,
2938:12
**session** [1] - 3090:11
**set** [8] - 2973:2, 3025:3,
3025:4, 3049:4, 3049:13,
3088:8, 3088:14, 3098:6
**sets** [1] - 2992:17
**setting** [2] - 3008:9,
3052:14
**settle** [1] - 3101:9
**settled** [1] - 3042:15
**Settlement** [24] - 3025:9,
3050:16, 3050:19,
3050:21, 3050:22,
3051:13, 3051:16,
3051:23, 3052:11,
3052:14, 3052:16,
3053:18, 3056:5, 3056:17,
3056:23, 3057:17,
3057:19, 3057:22, 3058:3,
3098:4, 3098:5, 3098:10,
3098:16, 3118:11
**settlement** [7] - 2965:4,
3042:14, 3042:17, 3043:4,
3055:19, 3055:20, 3057:6
**setup** [1] - 3034:12
**seven** [7] - 2937:4,
2937:11, 2938:2, 2939:12,
3093:5, 3112:13, 3112:17
**several** [4] - 2966:10,
3037:7, 3076:12, 3124:4
**share** [1] - 3069:15
**shares** [2] - 3068:14,
3068:21
**shoreline** [3] - 2946:2,
2955:4, 2955:15
**short** [4] - 2953:18,
3061:20, 3063:7, 3101:16
**short-term** [1] - 2953:18
**shortly** [5] - 3000:18,
3000:19, 3000:20, 3017:3,
3117:4
**show** [31] - 2935:20,
2936:17, 2947:21, 2950:5,
2961:25, 2984:14,
2989:16, 2989:17,
2989:20, 3005:2, 3005:24,
3013:13, 3014:19,
3016:23, 3017:18,
3018:19, 3036:19,
3043:10, 3046:14, 3048:3,
3059:15, 3059:19,
3060:10, 3067:17,

3069:11, 3069:12,
3093:23, 3094:15,
3094:18, 3119:14, 3119:18
**showed** [2] - 3020:25,
3090:24
**showing** [7] - 3006:16,
3036:21, 3038:7, 3038:9,
3038:11, 3059:21, 3092:4
**shown** [6] - 2984:7,
2984:9, 3020:3, 3061:20,
3095:1, 3124:12
**shows** [1] - 2961:25
**siblings** [1] - 3031:22
**sidebar** [1] - 3087:12
**sidebars** [1] - 3123:2
**sign** [2] - 3090:5, 3090:17
**signalled** [1] - 2985:15
**signature** [11] - 2991:19,
2991:23, 3059:25,
3061:22, 3061:24, 3063:5,
3063:6, 3064:22, 3091:20,
3091:21, 3092:13
**signatures** [1] - 3059:22
**signed** [5] - 2934:7,
3067:25, 3090:6, 3090:7,
3090:19
**significant** [1] - 2983:18
**signing** [3] - 2951:21,
3089:25, 3090:13
**similar** [2] - 2933:4,
3124:25
**Simon** [1] - 3094:2
**simple** [6] - 2933:22,
3032:10, 3032:11,
3069:10, 3095:12, 3121:10
**simply** [2] - 3069:7,
3091:11
**single** [1] - 3021:12
**sit** [7] - 2969:25, 2973:5,
2994:19, 3000:1, 3094:9,
3116:10, 3119:10
**site** [1] - 3015:18
**situation** [3] - 2937:18,
2939:5, 3027:1
**six** [1] - 3031:22
**slash** [1] - 2975:6
**sleeve** [1] - 3005:4
**small** [2] - 2948:3, 2992:10
**Smithtown** [2] - 2990:21,
2990:24
**social** [2] - 3032:25,
3052:6
**soil** [2] - 2961:18, 3013:10
**sold** [4] - 2967:15,
3050:14, 3050:15, 3106:18
**solicitation** [1] - 3114:13
**solicited** [1] - 3114:10
**solves** [1] - 2938:23
**someone** [10] - 2935:7,
2936:15, 2961:2, 2986:10,

3030:23, 3069:23, 3077:22, 3085:4, 3100:8, 3125:21

**sometime** [12] - 3031:9, 3033:16, 3042:6, 3043:17, 3047:18, 3051:11, 3067:5, 3075:24, 3086:21, 3103:17, 3105:17, 3107:8

**sometimes** [2] - 3044:3, 3069:12

**somewhere** [3] - 2930:17, 3034:11, 3112:17

**soon** [4] - 2935:10, 3014:20, 3057:23, 3126:12

**sooner** [3] - 2935:5, 3031:25, 3126:8

**Soroka** [1] - 2931:13

**sorry** [19] - 2949:15, 2951:14, 2957:2, 2957:12, 2966:8, 2981:14, 2982:14, 2983:22, 3009:16, 3020:18, 3034:22, 3034:23, 3077:12, 3078:4, 3085:6, 3095:4, 3105:22, 3106:24, 3121:5

**sort** [3] - 3034:11, 3041:23, 3088:7

**sought** [1] - 2948:24

**sounds** [2] - 3110:4, 3126:20

**source** [3] - 2958:14, 2972:8, 3082:25

**sources** [2] - 2972:5, 2972:6

**south** [3] - 3043:8, 3056:14, 3113:10

**speaking** [5] - 2980:20, 2985:11, 2997:17, 3042:1, 3055:5

**Special** [3] - 3080:8, 3080:16, 3081:8

**specialty** [1] - 3072:18

**specific** [4] - 2940:4, 3007:6, 3056:25, 3085:24

**specifically** [11] - 2940:12, 2947:1, 2999:4, 3035:22, 3037:7, 3039:6, 3039:13, 3045:10, 3046:15, 3048:4, 3096:24

**specify** [1] - 2950:9

**spell** [1] - 3028:17

**spending** [1] - 2995:21

**spent** [2] - 2936:24, 3033:6, 3039:9

**spoken** [7] - 2933:10, 2941:1, 3027:13, 3027:16, 3027:18, 3027:21, 3043:1

**spring** [1] - 3042:6

**springtime/summer** [1] - 3107:3

**Square** [1] - 2928:21

**square** [6] - 2963:16, 2963:19, 2990:15, 3015:17, 3015:18, 3039:14

**stage** [1] - 2940:23

**stairs** [1] - 3073:8

**stake** [2] - 3042:11, 3042:25

**stand** [5] - 2942:7, 3027:2, 3028:9, 3073:16, 3125:21

**Standard** [3] - 3032:13, 3032:19, 3032:22

**standing** [1] - 3028:9, 3075:4

**start** [3] - 2937:19, 2939:17, 3086:25

**started** [7] - 3002:24, 3029:20, 3032:17, 3047:18, 3052:20, 3080:15, 3089:3

**starter** [1] - 3057:2

**starting** [1] - 3015:3

**state** [7] - 2968:23, 2972:2, 2973:20, 3014:8, 3028:17, 3078:12, 3095:11

**State** [2] - 3031:14, 3032:17

**statement** [20] - 2936:7, 2957:8, 2957:17, 2965:4, 2966:4, 2966:23, 2969:13, 2972:7, 2973:13, 2974:2, 2974:4, 2976:15, 2977:13, 2986:13, 2986:14, 3006:24, 3076:12, 3085:21, 3085:23, 3085:24

**statements** [7] - 3036:15, 3076:4, 3077:3, 3077:7, 3086:4, 3089:20, 3089:21

**STATES** [3] - 2928:1, 2928:3, 2928:11

**States** [4] - 2928:6, 2928:14, 2928:17, 3023:15

**stating** [1] - 3007:17

**status** [3] - 3040:16, 3049:15, 3057:16

**stay** [3] - 2939:19, 3028:21, 3095:5

**stayed** [2] - 2986:22, 3002:24

**Steiger** [1] - 2929:14

**stenography** [1] - 2929:24

**step** [7] - 2960:2, 2979:24, 2980:5, 3022:21, 3022:22, 3120:18, 3121:14

**steps** [3] - 3049:21, 3049:25, 3120:20

**Steve** [2] - 3010:20, 3121:22

**Steven** [1] - 3026:15

**still** [14] - 2930:17, 2939:2,

2942:9, 2967:23, 3002:21, 3010:5, 3020:4, 3040:12, 3055:25, 3072:19, 3072:25, 3085:12, 3117:8, 3122:4

**Stip** [1] - 3023:6

**stipulate** [4] - 2932:7, 2934:5, 3124:24, 3125:8

**stipulated** [1] - 3023:14

**stipulation** [15] - 2932:3, 2933:24, 2934:7, 2942:20, 2942:23, 2942:24, 2942:25, 2943:4, 2943:17, 3022:23, 3024:5, 3036:20, 3038:8, 3043:11

**stipulations** [1] - 2941:21

**stock** [1] - 3032:10

**stocks** [1] - 3038:2

**stolen** [2] - 3066:25, 3067:1

**Stolper** [12] - 3096:18, 3097:4, 3097:6, 3097:10, 3105:15, 3107:6, 3107:7, 3107:13, 3107:16, 3107:18, 3108:4, 3108:5

**Stony** [1] - 2991:5

**stop** [1] - 3120:13

**stopped** [3] - 3050:12, 3056:13, 3056:14

**storage** [1] - 3024:4

**story** [1] - 2945:6

**Strangford** [1] - 2929:6

**Street** [3] - 3031:14, 3032:18

**structure** [1] - 3099:18

**structures** [1] - 3073:4

**students** [1] - 2939:14

**studies** [4] - 2958:14, 2961:16, 2961:18, 3013:10

**stuff** [3] - 3032:10, 3042:18, 3065:14

**subdivide** [2] - 2954:1, 3003:6

**subdivided** [1] - 3001:13

**subdivision** [1] - 2965:10

**subdivisions** [2] - 2963:20, 3039:15

**subject** [2] - 3007:11, 3120:12

**submission** [1] - 2941:4

**subpoena** [7] - 2930:7, 2940:3, 2940:18, 2940:19, 2940:20, 2941:5, 2941:13, 3026:24, 3124:11, 3124:15, 3125:17

**subsequent** [1] - 2976:2

**subsequently** [1] - 2976:1

**substance** [4] - 3066:20, 3071:12, 3077:23, 3084:1

**successful** [4] - 2954:21,

3009:5, 3030:23, 3069:23

**sue** [2] - 3052:20, 3053:7

**sued** [3] - 3054:7, 3098:20, 3098:22

**suffered** [2] - 3101:3, 3101:4

**Suffolk** [1] - 2928:21

**suggest** [5] - 2974:25, 2975:5, 3047:10, 3091:8, 3125:12

**suggested** [2] - 3026:20, 3043:4

**suggesting** [1] - 3042:10

**suggestion** [1] - 2930:24

**suing** [1] - 3053:20

**sum** [6] - 3056:25, 3071:12, 3077:22, 3084:1, 3101:10, 3102:19

**summarize** [1] - 2958:6

**summation** [2] - 3124:7, 3125:12

**summations** [1] - 3124:17

**summer** [1] - 3031:13

**summer/fall** [1] - 3043:2

**support** [1] - 3053:12

**supposed** [6] - 3002:10, 3002:15, 3052:16, 3052:22, 3052:23, 3082:13

**surgery** [1] - 2932:15

**surprise** [2] - 3111:1, 3111:3

**surprised** [2] - 3097:24, 3098:3

**survey** [2] - 2961:17, 3013:10

**sustained** [1] - 3041:14

**Sustained** [4] - 3049:8, 3057:11, 3058:21, 3072:2

**sweat** [2] - 2993:20, 2994:4

**sworn** [2] - 2942:15, 3028:14

**Sydor** [4] - 3023:19, 3023:20, 3023:24, 3024:2

**Sydor's** [1] - 3023:25

---

# T

**talks** [1] - 2945:5

**taped** [1] - 3024:23

**tax** [4] - 2946:7, 2947:23, 2964:20, 3015:10

**taxes** [5] - 3049:16, 3050:1, 3050:4, 3050:6, 3050:10

**TC** [1] - 3008:3

**TD** [2] - 3102:4, 3102:20

**teacher** [1] - 2939:14

**team** [2] - 3029:12, 3057:9

**teams** [1] - 3029:18

**telephone** [6] - 2940:8,

2985:3, 2985:7, 2985:13, 2999:4, 3026:13

**ten** [6] - 2933:4, 3007:23, 3022:3, 3022:14, 3080:18, 3082:3

**tenant** [1] - 2960:24

**term** [5] - 2953:18, 2995:20, 3001:12, 3050:16, 3100:3

**terminology** [1] - 3101:3

**terms** [31] - 2949:13, 2949:16, 2951:8, 2951:12, 2952:1, 2952:11, 2952:15, 2952:16, 2954:8, 2954:9, 2959:15, 2960:15, 2964:24, 2968:9, 2968:16, 2969:11, 2972:16, 2973:13, 2973:18, 2978:5, 2979:2, 2995:15, 2995:23, 3001:8, 3002:7, 3012:3, 3015:9, 3073:11, 3095:23, 3118:10

**Tesoriero** [2] - 3048:9, 3048:17

**testified** [26] - 2942:15, 2968:8, 2978:3, 2995:10, 2997:7, 2998:12, 2998:14, 3001:24, 3002:11, 3003:14, 3004:3, 3004:6, 3010:22, 3028:14, 3054:8, 3054:10, 3054:19, 3063:7, 3064:5, 3081:23, 3082:7, 3084:16, 3098:5, 3100:12, 3111:14, 3125:7

**testify** [11] - 2932:7, 2932:9, 2933:5, 2933:17, 2984:15, 3022:11, 3023:19, 3026:19, 3054:13, 3064:6, 3084:1

**testifying** [8] - 3000:14, 3024:2, 3054:9, 3054:15, 3074:15, 3083:4, 3122:18, 3126:13

**testimony** [24] - 2932:3, 2933:22, 2933:25, 2935:25, 2969:2, 2969:19, 2976:11, 2979:6, 3006:21, 3010:10, 3010:12, 3020:9, 3024:24, 3039:13, 3044:16, 3044:20, 3082:9, 3084:17, 3085:19, 3088:2, 3090:8, 3093:19, 3110:23, 3125:9

**THE** [143] - 2928:11, 2930:1, 2930:2, 2930:4, 2930:18, 2930:22, 2931:2, 2931:16, 2931:21, 2932:2, 2933:9, 2933:14, 2934:9, 2935:6, 2936:24, 2937:4, 2937:15, 2938:1, 2938:3,

2938:5, 2938:23, 2939:9, 2939:11, 2939:13, 2941:11, 2941:17, 2941:19, 2941:22, 2941:23, 2941:25, 2942:1, 2942:3, 2942:11, 2942:18, 2942:22, 2942:25, 2943:4, 2943:13, 2943:16, 2944:3, 2944:6, 2962:15, 2967:20, 2976:18, 2988:16, 2989:2, 2989:6, 2989:10, 2989:12, 2989:15, 2989:20, 2989:24, 2989:25, 2990:2, 2992:5, 3005:20, 3009:15, 3019:13, 3019:16, 3019:22, 3020:21, 3021:16, 3022:19, 3022:21, 3022:25, 3023:4, 3023:8, 3024:11, 3024:15, 3024:19, 3024:21, 3025:3, 3025:14, 3025:22, 3026:3, 3027:22, 3027:25, 3028:2, 3028:8, 3028:17, 3028:19, 3028:21, 3031:3, 3034:21, 3041:14, 3044:17, 3045:16, 3049:8, 3049:21, 3049:24, 3050:3, 3051:8, 3055:6, 3057:11, 3058:21, 3060:15, 3061:15, 3062:16, 3062:18, 3062:22, 3063:13, 3072:2, 3073:16, 3073:19, 3076:3, 3076:18, 3078:2, 3078:3, 3078:5, 3079:18, 3084:22, 3085:2, 3085:4, 3085:7, 3085:14, 3086:20, 3086:25, 3087:2, 3087:4, 3087:5, 3087:9, 3087:11, 3087:15, 3087:18, 3088:20, 3089:11, 3092:1, 3092:20, 3104:22, 3120:13, 3120:18, 3120:19, 3120:21, 3121:16, 3122:3, 3122:24, 3123:13, 3123:23, 3124:1, 3124:22, 3125:10, 3126:4, 3126:20

**theme** [1] - 2936:23

**themselves** [1] - 3098:24

**thereafter** [2] - 2987:1, 3000:21

**therefore** [1] - 2939:16

**therein** [1] - 3014:10

**thinking** [3] - 2937:15, 3123:6, 3123:10

**third** [2] - 2998:1, 2999:2

**three** [6] - 2950:15, 2953:7, 3009:20, 3029:21, 3048:10, 3104:6

**throughout** [3] - 2969:21,

2970:23, 2979:12

**Thursday** [4] - 2942:6, 2944:15, 2995:17, 3126:17

**tickets** [2] - 2939:18, 3069:22

**timeline** [3] - 3012:13, 3020:9, 3020:17

**timing** [3] - 3075:11, 3076:6, 3119:3

**Timothy** [2] - 3106:5, 3108:1

**title** [7] - 2943:10, 2958:8, 2968:20, 2987:15, 2996:1, 3017:2, 3017:23

**Title** [2] - 3016:24, 3039:7

**TMK** [4] - 3014:11, 3015:3, 3015:8, 3015:10

**today** [34] - 2930:12, 2930:19, 2930:20, 2931:2, 2931:3, 2931:6, 2936:11, 2941:9, 2973:6, 2977:8, 2994:19, 2998:12, 3000:1, 3000:3, 3002:11, 3006:13, 3030:25, 3042:4, 3042:8, 3051:1, 3065:10, 3065:12, 3067:8, 3067:11, 3080:13, 3080:14, 3080:15, 3080:25, 3081:6, 3092:11, 3094:9, 3116:10, 3123:2, 3124:25

**together** [8] - 2961:20, 2979:17, 3033:4, 3033:5, 3059:8, 3100:17, 3104:7, 3126:16

**Tom** [2] - 3054:12, 3083:16

**TOMMY** [1] - 2928:7

**Tommy** [28] - 2969:17, 2970:8, 2970:9, 2970:17, 2970:20, 3005:9, 3006:17, 3006:25, 3014:3, 3014:24, 3016:14, 3017:1, 3017:2, 3017:15, 3017:22, 3023:16, 3050:20, 3051:4, 3051:11, 3051:17, 3052:24, 3057:18, 3057:21, 3106:18, 3109:3, 3110:17, 3118:21

**tomorrow** [9] - 2930:19, 3007:18, 3120:14, 3120:22, 3121:18, 3122:5, 3122:22, 3122:24, 3123:21

**took** [14] - 2981:9, 3010:16, 3045:24, 3045:25, 3049:2, 3049:22, 3049:25, 3077:15, 3080:20, 3081:8, 3093:21, 3112:19, 3112:24, 3114:17

**top** [6] - 2947:21, 2997:25, 3006:7, 3006:25, 3036:25, 3039:5

**topic** [1] - 3111:13

**Toronto** [1] - 3029:22

**total** [3] - 2957:19, 3037:15, 3046:12

**totaling** [1] - 3046:24

**totalled** [1] - 3112:16

**touch** [2] - 2935:3, 3121:4

**tough** [2] - 3059:7, 3100:17

**tour** [2] - 3033:20, 3069:10

**tournament** [1] - 3103:7

**toward** [1] - 2973:23

**towards** [8] - 2999:2, 3033:23, 3035:2, 3053:4, 3053:20, 3056:16, 3056:23, 3057:6

**town** [2] - 3056:13, 3121:21

**trace** [1] - 2933:21

**traced** [1] - 2933:20

**transaction** [2] - 3088:7, 3102:24

**transactions** [3] - 3037:7, 3046:18, 3086:18

**transcript** [3] - 2929:25, 3084:8, 3084:14

**TRANSCRIPT** [1] - 2928:10

**transcripts** [1] - 3025:1

**transfer** [8] - 2963:6, 3034:11, 3038:9, 3047:1, 3053:11, 3060:1, 3060:20, 3102:8

**transferred** [2] - 2948:6, 3102:3

**transferring** [1] - 2948:4

**travel** [1] - 3033:4

**traveled** [2] - 2980:22, 3033:5

**treated** [1] - 2992:23

**trial** [10] - 2940:24, 2942:5, 3010:16, 3023:18, 3024:2, 3024:6, 3033:9, 3075:4, 3112:7, 3124:16

**trick** [1] - 3077:20

**true** [39] - 2968:25, 2969:7, 2969:8, 2969:12, 2969:14, 2970:5, 2973:9, 2975:9, 2977:16, 2978:1, 2978:2, 2978:21, 2990:18, 3022:1, 3022:4, 3065:13, 3070:4, 3070:7, 3073:1, 3073:2, 3073:14, 3074:10, 3074:16, 3074:20, 3074:25, 3076:1, 3076:14, 3078:17, 3082:5, 3083:9, 3088:3, 3094:10, 3096:10, 3096:18, 3098:7, 3098:11, 3101:1, 3102:2, 3125:15

**Trust** [12] - 2940:2, 3037:22, 3037:23, 3037:25, 3040:1, 3040:7,

27

3040:17, 3042:14, 3042:15, 3043:18, 3046:22, 3101:10
**trust** [1] - 3024:9
**trusted** [2] - 3042:2, 3053:16
**truth** [1] - 2936:23
**truthful** [2] - 3065:18, 3075:18
**truthfully** [1] - 3054:15
**try** [11] - 2930:19, 2996:19, 2997:2, 3010:19, 3016:11, 3047:22, 3053:4, 3053:20, 3059:7, 3124:6, 3126:15
**trying** [18] - 2949:23, 2954:17, 2996:15, 3027:4, 3056:16, 3065:10, 3097:12, 3102:17, 3105:13, 3106:17, 3107:15, 3107:22, 3116:24, 3122:4, 3122:24, 3125:20, 3126:1
**Tucker** [7] - 3013:16, 3014:7, 3015:25, 3016:1, 3016:2, 3016:7, 3016:12
**Tuesday** [1] - 3126:23
**turn** [20] - 2935:10, 2946:21, 2947:10, 2948:14, 2952:25, 2953:5, 2955:1, 2955:5, 2956:20, 2961:23, 2962:19, 2963:3, 2963:13, 2964:7, 2964:12, 2965:2, 2965:13, 2966:9, 2966:11, 3125:16
**turning** [7] - 2944:25, 2947:18, 2958:18, 2962:7, 2965:18, 2966:18, 2966:22
**Twain** [11] - 2963:22, 2963:24, 2964:3, 2964:10, 2964:22, 2964:23, 2964:24, 2964:25, 2965:5, 2967:17, 3039:16
**two** [16] - 2931:22, 2938:17, 2948:3, 2993:23, 2998:7, 3014:12, 3030:19, 3035:24, 3046:8, 3046:18, 3046:21, 3048:4, 3068:10, 3078:13, 3079:7, 3123:6
**type** [6] - 2937:18, 2939:18, 2993:21, 3066:17, 3086:19, 3087:25

### U

**U.S** [6] - 3023:20, 3024:4, 3081:4, 3081:13, 3094:14, 3095:1
**Ula** [4] - 2963:6, 2963:11, 2975:1, 3047:1

**ultimate** [1] - 2987:14
**ultimately** [6] - 2965:17, 2967:15, 3029:18, 3043:3, 3050:14, 3075:2
**umbrella** [1] - 3039:1
**unavailability** [1] - 2931:24
**unaware** [1] - 2969:18
**uncompleted** [1] - 3073:9
**unconnected** [2] - 3090:2, 3090:14
**under** [11] - 2941:9, 2942:10, 2982:2, 2992:11, 3044:10, 3054:13, 3061:8, 3065:23, 3066:8, 3083:9, 3101:11
**underlying** [1] - 2983:3
**understood** [4] - 2969:5, 2977:23, 3083:6, 3083:8
**underway** [2] - 3099:6, 3106:22
**undoubtedly** [1] - 3065:18
**unethically** [1] - 3026:25
**UNITED** [3] - 2928:1, 2928:3, 2928:11
**United** [4] - 2928:6, 2928:14, 2928:17, 3023:15
**unless** [3] - 3007:5, 3058:21, 3058:22
**unlike** [1] - 2973:9
**unusual** [1] - 2938:15
**unwilling** [1] - 2932:6
**up** [51] - 2931:1, 2931:3, 2931:9, 2933:2, 2934:13, 2935:20, 2936:18, 2945:23, 2947:3, 2954:23, 2958:12, 2966:15, 2967:23, 2981:9, 2999:18, 3002:23, 3008:9, 3011:19, 3012:4, 3012:15, 3013:15, 3014:12, 3020:4, 3025:3, 3025:4, 3027:6, 3028:8, 3031:21, 3033:25, 3034:17, 3035:7, 3035:11, 3035:12, 3035:25, 3039:1, 3049:4, 3049:13, 3050:22, 3052:14, 3054:23, 3056:4, 3071:8, 3072:12, 3073:8, 3088:8, 3088:14, 3098:6, 3108:19, 3122:23, 3124:19, 3126:12
**update** [2] - 3026:10, 3123:19
**updated** [1] - 3017:23
**upper** [1] - 3013:16
**upside** [1] - 3091:10
**Urban** [28] - 2952:23, 2953:3, 2954:3, 2958:19, 2958:22, 2960:4, 2982:23, 2998:15, 2999:12, 2999:24, 3000:6, 3000:12,

3000:16, 3000:22, 3001:14, 3001:16, 3002:16, 3003:3, 3003:4, 3003:11, 3010:23, 3012:8, 3012:13, 3012:18, 3012:24, 3021:12, 3022:1, 3022:14
**urgent** [3] - 3012:18, 3012:22, 3022:15
**usage** [1] - 3098:15
**utilized** [1] - 3082:8

### V

**Valley** [7] - 3054:23, 3115:25, 3116:2, 3116:7, 3116:9, 3116:12, 3116:15
**valuable** [1] - 2953:23
**value** [1] - 3118:7
**variety** [1] - 2933:7
**various** [11] - 2952:16, 2961:16, 2970:23, 2972:4, 2972:6, 2972:15, 2978:19, 2992:25, 2995:24, 3064:21, 3077:24
**Vegas** [1] - 3033:5
**venture** [1] - 3042:1
**Ventures** [21] - 2946:17, 2946:19, 2948:9, 2948:12, 2959:1, 2959:16, 2965:1, 2965:23, 2967:3, 2975:7, 2975:14, 2975:22, 2976:4, 2976:12, 2976:24, 2977:1, 3019:7, 3038:17, 3038:20, 3039:3, 3101:21
**version** [1] - 2963:14
**vertical** [6] - 3072:10, 3072:11, 3072:14, 3072:16, 3073:4, 3073:13
**Veterans** [1] - 2928:21
**VI** [6] - 2965:1, 2965:23, 2967:3, 3038:17, 3038:20, 3039:3
**via** [2] - 2980:10, 3102:3
**view** [12] - 2946:1, 2947:13, 2955:4, 2965:16, 2966:13, 2966:14, 2980:5, 2983:3, 3110:12, 3122:18, 3124:8, 3126:1
**viewed** [1] - 2979:14
**village** [1] - 3015:18
**Vincent** [3] - 3048:8, 3048:17, 3093:2
**vis-à-vis** [1] - 3103:18
**visit** [1] - 2931:12
**visited** [1] - 3111:25
**visualized** [1] - 2978:20
**Volpe** [1] - 3106:19

### W

**Waikapuna** [27] - 2949:1, 2949:2, 2951:2, 2951:8, 2951:16, 2952:12, 2952:18, 2954:20, 2954:24, 2955:4, 2955:8, 2955:21, 2960:20, 2982:24, 2998:14, 2998:24, 3000:11, 3001:6, 3007:24, 3008:11, 3008:15, 3009:8, 3010:3, 3010:22, 3016:4, 3016:20
**waiting** [1] - 2930:5
**walk** [3] - 2957:16, 2960:16, 2979:17
**walking** [2] - 3073:7, 3073:8
**wants** [5] - 2936:12, 2939:15, 2939:19, 3070:16, 3121:2
**warrant** [1] - 2962:4
**warranty** [2] - 2964:13, 2964:15
**wasting** [1] - 2935:6
**watch** [1] - 3031:18
**water** [2] - 2958:13, 2958:14
**waters** [1] - 2987:2
**ways** [2] - 2938:17, 3124:20
**wealthy** [2] - 3068:20, 3068:22
**Wednesday** [2] - 3123:21, 3123:24
**week** [22] - 2930:6, 2932:5, 2932:18, 2932:19, 2932:20, 2934:13, 2935:10, 2935:11, 2943:23, 2952:5, 3010:9, 3012:5, 3024:2, 3026:22, 3027:5, 3121:13, 3121:23, 3122:8, 3122:17, 3126:17
**weekend** [3] - 2932:22, 2942:4, 3126:15
**weekly** [6] - 2952:1, 2952:4, 2952:9, 3010:24, 3011:3, 3011:5
**weeks** [1] - 2938:8
**WEINBLATT** [1] - 2928:20
**well-known** [1] - 3030:16
**Wenham** [1] - 3103:15
**West** [1] - 2930:17
**whatsoever** [2] - 3040:15, 3043:5
**wherein** [1] - 3091:1
**wherewithal** [1] - 2977:19
**White** [1] - 3074:1
**whole** [5] - 2964:17,

3072:24, 3072:25, 3091:7, 3102:12
**wholesale** [1] - 3085:13
**willing** [4] - 2936:15, 2937:18, 2941:11, 3015:5
**Windwalker** [2] - 2974:15, 3003:23
**wire** [12] - 2962:20, 2963:5, 3034:11, 3038:9, 3046:25, 3053:11, 3060:1, 3060:4, 3060:20, 3102:3, 3102:7, 3105:22
**wired** [7] - 3046:21, 3046:23, 3102:19, 3118:23, 3119:1
**wires** [2] - 3046:8, 3046:21
**wish** [1] - 3101:3
**withdraw** [9] - 2994:16, 3016:22, 3078:9, 3101:13, 3106:21, 3108:14, 3110:21, 3116:4, 3117:25
**withdrawal** [1] - 3038:15
**withdrawn** [11] - 2950:20, 2975:3, 3032:12, 3034:18, 3036:14, 3041:3, 3063:8, 3081:15, 3083:7, 3093:8, 3100:3
**witness** [22] - 2931:1, 2931:4, 2931:9, 2932:13, 2933:4, 2933:19, 2935:16, 2936:8, 2936:12, 2942:7, 2942:14, 3023:2, 3023:18, 3024:19, 3028:5, 3028:9, 3028:13, 3085:3, 3085:11, 3086:7, 3104:21, 3120:20
**WITNESS** [6] - 2942:11, 3028:19, 3062:18, 3073:19, 3078:3, 3120:19
**witnesses** [7] - 2934:22, 2935:19, 2936:10, 3123:14, 3123:18, 3126:6, 3126:16
**WITNESSES** [1] - 3127:1
**woman's** [1] - 2955:15
**won** [1] - 3055:15
**wondering** [2] - 2939:19, 3123:19
**Woonsocket** [3] - 3029:7, 3030:7, 3031:21
**word** [5] - 2955:13, 2977:11, 3048:23, 3098:6, 3112:6
**wording** [1] - 2989:21
**words** [3] - 2984:2, 3031:18, 3100:17
**works** [1] - 2938:16
**world** [2] - 2980:14, 3012:14
**worried** [3] - 2937:20, 2937:21, 2938:9

**worth** [1] - 2986:11
**write** [2] - 2937:17, 2937:18
**writing** [3] - 3061:22, 3091:17, 3091:18

## Y

**year** [8] - 2959:22, 2991:10, 3004:18, 3031:7, 3031:23, 3059:10, 3105:19, 3107:4
**years** [19] - 2968:6, 2968:11, 2977:6, 2981:20, 2986:19, 2991:7, 2991:8, 3005:9, 3029:16, 3030:6, 3030:14, 3032:7, 3065:8, 3065:11, 3066:5, 3066:6, 3066:8, 3067:2, 3082:3
**yelled** [1] - 3026:23
**yellow** [1] - 2964:11
**yesterday** [3] - 2931:12, 2932:22, 2932:24
**YORK** [1] - 2928:1
**York** [22] - 2928:6, 2928:15, 2929:15, 2930:12, 2936:2, 2987:10, 2990:21, 2991:5, 2992:23, 3015:11, 3023:21, 3029:13, 3029:20, 3029:23, 3029:24, 3052:1, 3097:8, 3105:12, 3107:12, 3107:13, 3107:15, 3108:6
**yourself** [14] - 2973:11, 2993:1, 2996:7, 2996:11, 2996:23, 2996:24, 2997:5, 2997:18, 2998:2, 3048:11, 3082:2, 3084:10, 3098:2, 3101:24

## Z

**zoning** [8] - 3013:11, 3013:12, 3014:12, 3015:4, 3015:8, 3015:12, 3015:13
**zoom** [1] - 3046:16