UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                        :

UNITED STATES OF AMERICA

                      CR-13-607


       -against-      :

                     United States Courthouse
                     Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

    Defendants.      :
                     June 10, 2015
- - - - - - - - - - - - - - - X  9:30 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the Government:     KELLY T. CURRIE
                         Acting United States Attorney
                         100 Federal Plaza
                         Central Islip, New York 11722
                         BY:  JAMES MISKIEWICZ, ESQ.
                              SARITHA KOMATIREDDY, ESQ.
                         Assistant United States Attorney




For the Defendants:     HALEY, WEINBLATT & CALCAGNI
                         One Suffolk Square
                         1601 Veterans Memorial Highway
                         Islandia, NY  11749
                         BY: RICHARD HALEY, ESQ.
                         For Mr. Kenner

3346

For the Defendants:

                        LARUSSO & CONWAY
                        300 Old Country Road
                        Mineola, NY  11501
                        BY: ROBERT LARUSSO, ESQ.
                        For Mr. Constantine


                        ANDREW L. OLIVERAS, ESQ.
                        26 Strangford Court
                        Oceanside, NY  11572
                        For Mr. Constantine

Court Reporter:         Mary Ann Steiger
                        100 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6101


          Proceedings recorded by mechanical stenography.
              Transcript produced by computer.

3347

```
 1              THE CLERK:  All rise.

 2              THE COURT:  Please be seated.

 3              (Case called, appearances noted.)

 4              THE COURT:  The jurors are all here and we are

 5   ready to go?

 6              MR. MISKIEWICZ:  Yes.

 7              MR. LARUSSO:  Yes, your Honor.

 8              THE COURT:  Let's bring in Mr. Rozenboom and the

 9   jury.

10              (The witness resumes the stand.)

11              THE COURT:  Good morning, sir, if you could come

12   up here and wait for the jury to come in.

13              THE CLERK:  All rise.

14              (The jury is present.)

15              THE COURT:  Please be seated.

16              Good morning, members of the jury.

17              ALL JURORS:  Good morning.

18              THE COURT:  It's good to see everyone again this

19   morning.

20              As you know, when we ended yesterday,

21   Mr. Rozenboom was on cross-examination by Mr. LaRusso, so

22   we will continue from that point.

23              Mr. Rozenboom, I remind you that you're still

24   under oath; do you understand?

25              THE WITNESS:  Yes, I do.
```

Rozenboom  -  Cross/LaRusso

3348

1  RICHARD ROZENBOOM,

2          called as a witness, having been previously

3          duly sworn, was examined and testified further

4          as follows:

5

6          THE COURT:  If you could pull the mike a little

7  closer to you, and is the green light on?

8          THE WITNESS:  Yes, it is.

9

10 CROSS-EXAMINATION

11 BY MR. LARUSSO:

12 Q.   Good morning, Mr. Rozenboom.

13          How are you?

14 A.   I'm fine.

15 Q.   Yesterday during your examination you mentioned at

16 one point that Mr. Constantine wanted to buy the Falcon, I

17 think you testified, pretty bad at some point; is that

18 correct, the Falcon 10?

19 A.   Yes.

20 Q.   Do you recall, at any point in your discussions with

21 Mr. Constantine, where he indicated that he represented a

22 larger group in regards not only to the Falcon 10, but

23 also to Diamante Air?

24 A.   I'm not sure I recall anything like that.

25 Q.   Do you recall, at any point in time, either in

Rozenboom  -  Cross/LaRusso

3349

1   speaking with Mr. Constantine or in any e-mail

2   communications with him, where he told you that he was

3   representing or was part of a group that was seeking a

4   global settlement in regards to matters of a man by the

5   name of Ken Jowdy?

6   A.    There were a couple of conversations where he alluded

7   that there was some effort to pursue Mr. Jowdy for some

8   dispute that was going on.

9   Q.    198 was received in evidence, and I'm going to turn

10  to the e-mail that was received as C 198 yesterday.  It

11  was a string of e-mails between you and Mr. Constantine.

12            I don't know if you recall the last few

13  questions where we talked about it, but I will display

14  portions of it for you.

15            I'm looking at page 3 of 4 and it is a portion

16  of the e-mail.  I'm going to direct your attention to

17  those two highlighted portions, particularly the second

18  one.

19            And while you're looking at it, I will read it

20  into the record.

21            FYI, I have hired an attorney, Ron Richards, who

22  represents our entire group as part of the global

23  settlement, and in brackets, all matters between our side

24  and Jowdy, et al, and will have him assist me, Gonchar and

25  Kenner to review and execute whatever settlement docs

Rozenboom - Cross/LaRusso

3350

1 you/your attorney provides to us.

2 Does that refresh your recollection that

3 Mr. Constantine was talking to you not just in reference

4 to the Falcon 10, but also talking to you about the entire

5 package in regards to this Global Settlement Fund?

6 A. That's what it appears in this document.

7 My focus at the time when we were discussing was

8 my line of business in the two aircraft and getting that

9 resolved.

10 Anything else really wasn't my center of

11 influence or focus, but that is what that document alludes

12 to, something to that effect, but the details, specific

13 details, I don't know anything beyond that.

14 Q. But you have some recollection Mr. Constantine was

15 representing another group of people, the particulars of

16 which you don't recall at this point?

17 A. That is correct.

18 Q. Okay.

19 MR. LARUSSO: I apologize to the Court. The

20 original for the some reason we haven't located and the

21 copies, so I'm using mine and I crossed out some

22 handwritten information that's not relevant, okay?

23 THE COURT: Okay.

24 BY MR. LARUSSO:

25 Q. Mr. Rozenboom, I'm just going to read this.

Rozenboom   -   Cross/LaRusso

3351

1          This is page 2 of 4 in the string e-mail.

2          Just to be clear, the parties participating in

3     the global settlement have already deposited the necessary

4     funds in Ron Richards' trust account for you and I to

5     settle the Falcon and Metro loans as you and I have

6     discussed.

7          The only issue pending is the new 425k

8     loan/guarantee.

9          Does that provide you with any further details

10    especially in regards to where the money was coming from

11    to payoff both the loans?

12    A.   As I read the e-mail, the correspondence here, where

13    the money was coming from I had no idea.

14          And as it references the parties, I didn't know

15    if that was specifically monies of Kenner and other

16    parties, that being Gonchar.

17          As a matter of fact, in one point in time I

18    thought that Tommy, although I may not have an e-mail to

19    that effect, but in a conversation I thought that Sergei

20    was putting some money into the transaction to come up

21    with the differential between the value of the airplane,

22    the Falcon being purchased, and that $363,000 that needed

23    to cover the deficiency.

24          But as to -- other than the guarantors, no other

25    parties names were shared with me.

Rozenboom   -   Cross/LaRusso

3352

1      I have no idea who those other parties were, if

2  there were any, other than what this corresponds alludes

3  to.  I didn't have no idea who they were.

4  Q.   Okay.  Let me just ask a few questions.

5      The information in the e-mail, you don't know

6  who the parties are, you never talked to them?

7  A.   No.

8  Q.   You had no specific information regarding it, but my

9  question to you is that is an e-mail between you and

10  Mr. Constantine exchanging information relative to the two

11  loans on the aircraft?

12  A.   That is correct.

13  Q.   Would it be fair to say then that during your

14  discussions with Mr. Constantine, you weren't just dealing

15  with the Falcon 10, you were dealing with the entire

16  package; is that correct?

17  A.   Well, I refer to it as the two aircraft on the

18  Diamante loans.

19  Q.   That's fair.

20      By the way, have you, in your line of business,

21  repossessed many airplanes?

22  A.   Yes.

23  Q.   You're in the business obviously in large part

24  lending money for the purchase of aircraft; is that

25  correct?

Rozenboom  -  Cross/LaRusso

3353

1   A.   My responsibility is on the other end as opposed to

2   the lending, which is to satisfy a loan and sometimes it

3   requires the collateral to be if you will captured,

4   recovered and sold.

5   Q.   When you resell the airplanes, I believe as you were

6   contemplating doing with the Falcon 10 with

7   Mr. Constantine, would it be customary or do you impose

8   upon the buyer that he or she take all responsibility for

9   the entire loan if it included additional airplanes?

10         Do you understand the question?

11  A.   I'm not sure I can answer that.  If you can ask the

12  question again.

13  Q.   In this particular case there were two airplanes?

14  A.   Yes.

15  Q.   And you were -- I think you testified that it was

16  your intent or interest to try and package the deal and

17  not parcel it out.  That is, to sell one plane off and the

18  other plane off; is that correct?

19  A.   That is correct.

20  Q.   Isn't it also true that in many other instances where

21  somebody comes to you to buy one of the repossessed

22  planes, you don't impose upon them the responsibility of

23  taking on the entire series of loans that maybe related to

24  that loan?

25  A.   Every situation is different, and those deals are

Rozenboom  -  Cross/LaRusso

3354

1  facts intensive, the collateral, who the guarantors are.

2          There are a whole number of different factors,

3  but it can be.  I try to resolve the entire relationship.

4          There are times when there's the one where there

5  might be an anxious buyer laying out there, if you will,

6  and wants to acquire that asset and if it can be something

7  that can be done relatively conveniently with the

8  cooperation of the debtor, that is an option that would be

9  considered and may happen.

10  Q.   In this case, you decided not to exercise that

11  option, you wanted to do a global disposition of the loan

12  with Diamante Air?

13  A.   That is correct.

14  Q.   You testified that the forbearance and partial

15  settlement agreement was executed June 3rd of 2009; is

16  that correct?

17          Let me just show this to you.  This is the

18  forbearance and partial settlement agreement you testified

19  to?

20  A.   Yeah.

21          I know it was in June of 2009.  The specific

22  date I'm not that certain of.

23  Q.   This is exhibit 4212, and I'll just turn to the last

24  page.

25  A.   That helps me.  June 3rd, yes.

Rozenboom  -  Cross/LaRusso

3355

1  Q.   Turning to paragraph G 3 which I believe was part of

2  your testimony.

3        Without reading the whole thing, can you explain

4  to us, particularly paragraph 3, what the intent of those

5  particular paragraphs is regarding and it's called

6  disposition of the Fairchild.

7        (Pause in proceedings.)

8        Do you recall testifying to that on direct

9  examination, this portion that I believe you were directed

10  to, G 3?

11       I'm asking you to take a look at all of it and

12  explain what these provisions are.

13  A.   As I recall the conversation today or the question

14  centered around G 1, but I do remember this aspect of the

15  contract or the agreement in reading through that.

16       And it was basically that we could jointly move

17  to try to sell the Fairchild Metro and that there was a

18  threshold of dollars that was hopefully going to be the

19  expectation that we could receive from that aircraft, but

20  if we didn't, there was a reserve set up in escrow for

21  potential deficiency of $50,000.  That's basically what

22  that was.

23  Q.   You testified to that yesterday.

24       What about paragraph 3 in particular?

25  A.   Paragraph what?

Rozenboom    -    Cross/LaRusso

3356

1    Q.    Paragraph 3 of subdivision G.

2    A.    Paragraph 3 is what I just referred to, unless

3    there's something else you want to ask me a question.  I'm

4    not sure what you're trying to get at.

5    Q.    In effect, this agreement calls for both parties to

6    make efforts to try and sell the Fairchild to receive as

7    much money as possible to satisfy the debt; is that

8    correct?

9    A.    It does, yes.

10   Q.    How long do you recall it taking to finally sell the

11   Metro 3?

12   A.    A little over a year.

13   Q.    Before that sale -- let me ask you, if the plane was

14   not sold, what would have been the consequences from your

15   point of view only?

16   A.    Well, it would be -- maybe that's not -- it wouldn't

17   be sold.  The bank -- at $510,000 and the fact it didn't

18   sell at that number and what happened is we had an offer

19   for 370 is what I recall and I consulted, because I had to

20   get Tommy Constantine's permission, if you will consent to

21   sell the aircraft for a price lower than 510, which I did

22   obtain, and it sold.  Had it not sold, I would probably

23   pursue the debtor and guarantors for payment on that

24   aircraft.

25   Q.    Who would be the debtors?

3357

1  A.    The debtor would be Diamante Air, and the guarantors

2  were Gonchar and Kenner.

3  Q.    In regards to Diamante Air, who would be the

4  individuals that would be subject to that kind of action?

5  A.    Well, there is no individuals in that situation.

6  It's a limited liability corporation, if you will, so I

7  would be going after the assets of that limited liability

8  corporation.

9  Q.    Do you know what the term limited liability in good

10  standing means?

11  A.    Yes.

12  Q.    Can you just explain what that means?

13  A.    Each state has -- technically each state has a place

14  where corporations are incorporated, and annually they

15  have to submit financial reports to those states.  If they

16  fail to do that and pay a fee, they fall out of good

17  standing.

18  Q.    How would that affect the liability of the individual

19  members of an LLC, if this particular company was not in

20  good standing?

21  A.    It limits its ability to borrow money, I can tell you

22  that, but other than that I'm not sure I can answer that

23  aspect.

24  Q.    Do you know if Diamante Air was in good standing at

25  the time that you were negotiating the resolution of these

Rozenboom  -  Cross/LaRusso

3358

1   loans?

2   A.   I don't know that.

3   Q.   If the LLC was not in good standing, would it give

4   you the opportunity to go after members because of that

5   lack of standing?

6   A.   That would be -- I don't know the answer to that.  I

7   would have to pursue that.  That's not a path that I have

8   pursued in my career.  I would have to consult with my

9   legal advisor to support that avenue.

10   Q.   You knew at the time that Diamante Air had a number

11   of members.  We went through that yesterday; is that

12   correct?

13   A.   That is correct.

14   Q.   In addition to Mr. Kenner and Mr. Gonchar and

15   Mr. Jowdy, correct?

16   A.   That is correct.

17   Q.   Just for the record, you didn't know who those other

18   individuals were, did you?

19   A.   Not until you pointed it out.  But I still, if you

20   asked me what their names were now, I couldn't tell you.

21   But there were other people, yes.

22        The thing -- and I want to try and answer your

23   question -- is that there is a corporation, Diamante Air.

24   Going after the corporation is who I could go after for

25   collection of that debt; and the guarantors, which were

Rozenboom  -  Cross/LaRusso

3359

1   Kenner and Gonchar, and that was -- unless my attorney who

2   would assist me in going down the path, we never named in

3   our complaint, when we sued Diamante Air and the

4   guarantors, any other individual.  We were going after

5   Diamante Air and the guarantors and that's all that we

6   were going after in our lawsuit.

7   Q.   But it would be fair to say that -- withdraw that.

8        In regards to this particular aircraft, you said

9   it took approximately a year to sell?

10  A.   It did.

11  Q.   There were difficulties in selling that aircraft?

12  A.   Well, yes, there were a number of difficulties.  Not

13  only the aircraft, but just the general state of the

14  economy.

15       After 2008, most of the people here can probably

16  think and you can think in the back of your head,

17  2008-2009, that was a very hard economic times for a lot

18  of people, and the people that were buying airplanes were

19  a very thin herd of folks to buy this type of airplane, so

20  the buyers kind of had dried up.

21  Q.   I'm going to try and see if I can ask you a number of

22  questions and move onto another topic.

23       But during the period of time between the

24  forbearance agreement, which is June 3rd of 2009, and a

25  year later when the aircraft was sold, you said

Rozenboom   -   Cross/LaRusso

3360

1    Mr. Constantine had placed ads for the sale of the

2    airplane; is that correct?

3    A.    That is correct.  I saw those ads.

4    Q.    So, according to you, you recall that he was making

5    efforts, as were you, to try and locate a buyer for the

6    Metro 3; is that right?

7    A.    That is correct.

8    Q.    Do you remember him corresponding with you that he

9    had a number of -- I'll call it sales leads, to possibly

10   sell the Metro 3 during that period of time?

11   A.    I do.

12   Q.    And he communicated with you the interest of some of

13   the buyers and where the airplane was and what

14   specifications, and you exchanged information like that

15   during that period; is that fair?

16   A.    Yes.

17   Q.    That saves me showing you three e-mails.

18          Thank you.

19          Showing you 211, if you could take a look at

20   this, please.

21          Do you recall, this an e-mail between you and

22   Mr. Constantine, June 18, 2010, in regards to your

23   discussions in reference to the sale of the Metro 3?

24   A.    I do.

25          MR. LARUSSO:  Your Honor, may I ask this be

Rozenboom  -  Cross/LaRusso

3361

1   received at this time?

2           MS. KOMATIREDDY:  No objection, your Honor, with

3   respect to all of the e-mails, just with the same limiting

4   instruction.

5           MR. HALEY:  No objection, Judge.

6           THE COURT:  It's received.  211 is admitted with

7   the same instructions that I gave you yesterday, that it's

8   not being admitted for the truth of Mr. Constantine's

9   statement, but it's for his state of mind.

10          (Defense Exhibit 211 in evidence.)

11  BY MR. LARUSSO:

12  Q.   Mr. Rozenboom, this is a June 18 e-mail from you to

13  Tommy and a man by the name of Peter Murphy.

14          This is your e-mail; is that correct?

15  A.   Yes, it is.

16  Q.   Could you tell us, rather than me read all this,

17  would you explain to the jury what you were communicating

18  to Mr. Constantine and why?

19  A.   The salient point is the highlighted aspect.

20          We attempted to try to sell the aircraft for a

21  year, and the best price that we, at that time, I thought

22  I could get out of this airplane, was this offer that had

23  been received for $380,000, so that's what this is about.

24  Q.   Just prior to that, it says it's the best offer you

25  had received at this point in time and you wanted to take

Rozenboom   -   Cross/LaRusso

3362

1    it; is that correct?

2    A.    I did.

3    Q.    You made it pretty clear to Mr. Constantine that if

4    he didn't take it, you may end up pursuing litigation in

5    regards to it?

6    A.    I may have said something along that line, yes.

7    Q.    Now, this refers to an offer by a Mr. Diffley?

8    A.    Yes.

9    Q.    I believe you testified that -- withdraw that.

10          Do you know who first made contact with

11   Mr. Diffley and who negotiated with Mr. Diffley in regards

12   to the price on the Metro 3?

13   A.    Well, I spoke with him, but I believe that there was

14   somebody else at the bank but right now, today, I couldn't

15   tell you who that was.

16   Q.    Well, do you have any recollection that it was

17   Mr. Constantine who first made contact with Mr. Diffley

18   and discussed with him the possible terms of purchasing

19   the Metro 3?

20   A.    No, I don't recall that.

21   Q.    Let me just show you two e-mails marked C 209 and 207

22   for identification, and ask you, do you recognize these as

23   additional e-mail communications between you and

24   Mr. Constantine prior to the disposition of sale of the

25   Metro 3?

Rozenboom  -  Cross/LaRusso

3363

1          They're relatively short and please read all of

2     it.

3          (Pause in proceedings.)

4          You could read the whole thing.  I will direct

5     your attention to a portion just below the middle of C

6     209.

7          (Pause in proceedings.)

8     A.   I do recall those.

9     Q.   You recall these e-mails?

10    A.   I do.

11    Q.   Do these e-mails indicate that Mr. Constantine made

12    contact with Mr. Diffley and was actually doing some

13    negotiations with regards to the purchase price?

14    A.   It does indicate that, yes.

15    Q.   So you would agree with me that this may have been

16    his client in terms of trying to secure and purchase the

17    Metro 3?

18    A.   It does indicate that, yes.

19          MR. LARUSSO:  Your Honor, may I ask that 207 and

20    209 be received.

21          MS. KOMATIREDDY:  Same position.  No objection.

22          MR. HALEY:  No objection.

23          THE COURT:  209 and 207 are admitted.

24          (Defense Exhibits 207 and 209 in evidence.)

25

Rozenboom  -  Cross/LaRusso

3364

1    BY MR. LARUSSO:

2    Q.   Now, you talked about coming to a resolution of the

3    sale of the Metro 3.

4              I believe you said that -- well, let me just

5    show you what's been marked 212 and ask you if this e-mail

6    outlines, between you and Mr. Constantine, outlines

7    essentially the terms of the deal that you were

8    negotiating for the sale of the Metro 3.

9              (Pause in proceedings.)

10             I can assume, Mr. Rozenboom, you hadn't seen

11   this prior to your testifying or during your preparation

12   period; is that correct?

13   A.   I have not.

14   Q.   Do you recognize it as an e-mail communication

15   between you and Mr. Constantine?

16   A.   I do.

17             (Pause in proceedings.)

18   Q.   The question was, does this appear to outline the

19   terms of the agreement between you and Mr. Constantine?

20   A.   It was an agreement or open dialogue, e-mail

21   dialogue, on what it would take to resolve.

22             I don't think all those terms were agreed to in

23   any type of form, but it was a foundation for structuring

24   an arrangement.

25             MR. LARUSSO:  May I introduce C 212 at this

Rozenboom  -  Cross/LaRusso

3365

1  time?

2          MS. KOMATIREDDY:  No objection.

3          MR. HALEY:  No objection.

4          THE COURT:  C 212 is admitted.

5          (Defense Exhibit C 212 in evidence.)

6  BY MR. LARUSSO:

7  Q.   I'm just pointing to the highlighted sections where

8  it talks about there's an agreement with regards to the

9  sale to Mr. Larry Diffley and that's the 380,000 we have

10  been talking about; is that correct?

11  A.   Yes.

12  Q.   The second one is the escrow monies that you

13  testified to that were provided at the time in the

14  original forbearance agreement that we talked about

15  earlier dated June 3rd, 2009?

16  A.   Yes.

17  Q.   The last paragraph says:

18          1st Source Bank receives 55,000 from Sergei

19  Gonchar in good faith.

20          That was the difference between the sell price

21  and what the bank wanted for the sale of the plane to

22  satisfy the deficiency; is that correct?

23  A.   Yes.

24          THE COURT:  It says good fund.

25  A.   In good funds, not good faith.

Rozenboom  -  Cross/LaRusso

3366

1   Q.   In good fund?

2   A.   Yes.

3   Q.   Do you know if that money was paid by Mr. Gonchar?

4   A.   I don't recall.

5   Q.   It was paid though, was it not?

6   A.   I would have to check the bank's records on that.  I

7   don't recall right now.

8   Q.   So the best recollection, whatever the deficiency was

9   between 380,000 that the bank wanted, it was paid?

10           MS. KOMATIREDDY:  Objection, asked and answered.

11           THE COURT:  You can answer that.

12   A.   I don't recall.  I would have to take a look at the

13   loan history to be able to answer that with any certainty.

14   Q.   Do you know what the term fractional ownership means,

15   fractional ownership program?

16   A.   I have a vague understanding of it.

17   Q.   In your line of business have you ever come to use or

18   hear about that term?

19   A.   I have.

20   Q.   What was your understanding of the term?

21   A.   Well, there are people that sell a portion of an

22   aircraft to parties, other parties.

23   Q.   Do you recall that sometime after the closing that

24   you've been testifying to of the Falcon 10, the

25   transaction with AZ Falcon Partners was put together by

Rozenboom - Cross/LaRusso

3367

1   Mr. Constantine as a fractional ownership program with the

2   Falcon 10 and the AZ Falcon Partners; do you recall that?

3   A.   I don't recall it that way, no.

4   Q.   Do you have any recollection that the transaction

5   involved multiple owners of that one airplane, the Falcon

6   10?

7   A.   AZ, if we're talking about AZ Falcon Partners, my

8   understanding of that was that that company was going to

9   be owned by a lady by the name of Fergusson and Tommy was

10  going to run that and/or manage that aircraft.

11          I don't recall today any aspect of it being a

12  fractional, no.

13  Q.   Do you know in regards -- you mentioned I believe

14  amended and operating agreement, do you recall that?

15          My notes might be off on that.  Excuse me.  Do

16  you remember testifying about an amended operating

17  agreement?

18  A.   There was a document that was submitted yesterday I

19  believe on that line.

20          I don't remember the document number.

21  Q.   Nor do I.

22          But do you remember after the loan had been

23  extended to I believe it was AZ Partners by your company?

24  You testified to that the other day.

25  A.   Yes.

3368

1    Q.    And there came a time when there were payments not

2    being made.

3              Do you remember talking to Mr. Constantine at

4    all about that?

5    A.    Yes.

6    Q.    And do you recall him telling you that there was a

7    falling out with some of his partners which was causing

8    him some financial hardship in meeting those payments?

9    A.    Yes.

10   Q.    Did he ever tell you who those other partners were?

11   Do you remember who they were?

12   A.    He may have said their names, but that was -- I was

13   trying to get money.  I wasn't focusing in on who he was

14   getting the money from.  I just wanted to get paid.

15   Q.    Do you remember him ever saying that the other

16   participants were hockey players, NHL hockey players?

17   A.    He did make some overtures that they were -- I think

18   he told me that some of them are or one of them were

19   hockey players.  I know that was something that he said.

20   Q.    It's something that you would remember, and you do

21   remember it?

22   A.    I remember.  As far as the individual names, no.

23   Q.    To the extent that Mr. Constantine was having

24   difficulties and struggling with making payments at times,

25   after all is said and done, did Mr. Constantine hold up,

Rozenboom - Cross/LaRusso

3369

1  from your point of view, his obligations to you, the bank,

2  financially and otherwise?

3  A.  I think to answer that question he was cooperative in

4  assisting in getting the loan paid bank and the bank

5  getting satisfied.

6         Did we get paid back in full?  No.  We took a

7  little bit of a shortfall.  But that was all negotiated

8  and agreed to.  The bank was willing to do it.  We wanted

9  to collect a bigger part of the monies and move on.

10  Q.  So your testimony then is that in those efforts he

11  was cooperative and you --

12  A.  I did say that, yes, he was cooperative.

13  Q.  You also testified about the log books.

14         Do you know who was responsible for holding and

15  maintaining the log books?

16  A.  Usually that is the party who is operating the

17  aircraft.

18  Q.  At the time that you became involved in collecting

19  the loans, that would have been Mr. Ken Jowdy; is that

20  correct?

21  A.  It was my understanding in conversations with Tommy

22  and/or Ken.  I'm not sure which one shared.  I know for

23  sure Tommy told me that.

24         THE COURT:  You said Ken.  You're talking

25  about --

Rozenboom  -  Cross/LaRusso

3370

1    THE WITNESS:  Mr. Kenner.  Thank you.

2  A.    That Mr. Jowdy had -- they believed that he had

3  access and/or control of the log books.

4         I recall in an e-mail I read recently that Phil

5  Kenner was trying to check his records, thought he knew

6  where they were.

7         This is about the time we were trying to get the

8  June agreement put together and there was some problems

9  locating the log books for the Falcon 10.

10        Subsequently, I was told by Tommy that he never

11 was able to recover those log books for the Falcon 10.  I

12 was able -- he had in his possession the one for the

13 Metro.  Those were turned over to the bank and turned over

14 to the people that were operating that aircraft for us and

15 ultimately the buyer.

16 Q.    Whose obligation is it to maintain the log book, to

17 have custody of them?

18 A.    Typically the operator.

19 Q.    When you say the operator, the operator/owners?

20 A.    In every situation it's different, but whoever is

21 operating the aircraft, that could be an owner, that could

22 be a party who is contacted to perform routine maintenance

23 on the aircraft.  They would need the log book to make

24 those entries.  Whoever is operating the aircraft is the

25 party that usually controls those log books.

Rozenboom  -  Cross/LaRusso

3371

1   Q.   Is it customary for the potential buyers to take

2   possession of an aircraft log book before they actually

3   purchase the aircraft itself?

4   A.   Not usually take possession is not how I would

5   characterize it.

6          They certainly have possession of them to be

7   able to do their due diligence and review those log books.

8   Q.   Now, you testified that Mr. Constantine was

9   cooperative in trying to resolve the two loan

10  deficiencies.

11         Did you make any efforts to contact Mr. Jowdy

12  and solicit his cooperation?

13  A.   Early on I did.

14  Q.   Tell us the results of those efforts?

15  A.   I may have received one phone call from him and he

16  shared with me that he did not have the log books.

17  Q.   Did you make any other efforts with Mr. Jowdy to try

18  and get information to resolve these two loans?

19  A.   Not that I recall.

20  Q.   He was the managing member; is that correct, of

21  Diamante Air?

22  A.   Mr. -- I did in the very beginning.

23         Mr. Jowdy told me that I needed to talk with

24  Ken -- excuse me -- Mr. Kenner to get the loan -- to get

25  the money from him.

Rozenboom  -  Cross/LaRusso

3372

1    Q.   Do you remember any discussions with Mr. Jowdy and/or

2    an attorney representing him regarding their participation

3    in the sale of the two aircraft?

4            MS. KOMATIREDDY:  Objection, hearsay.

5            THE COURT:  Sustained.

6    BY MR. LARUSSO:

7    Q.   Do you know a man by the name of Mr. Harvey, Thomas

8    Harvey?

9    A.   That doesn't mean anything to me.

10   Q.   Did you communicate in any way, just yes or no, with

11   Mr. Jowdy during your efforts to try and sell the two

12   airplanes, other than what you testified to?

13   A.   I may have got a phone call from Mr. Jowdy.  I do

14   remember getting a phone call from him.  But it was more

15   from the standpoint that he was trying to dig for

16   information is what I recall.

17           And given that my efforts were moving forward

18   with maybe a global settlement, that was my focus with

19   Mr. Constantine and Gonchar and Kenner, so that was my

20   focus.

21   Q.   Do you have any recollection, during the efforts to

22   sell the airplanes and during the period of the efforts to

23   sell the Metro 3, anyone trying to interfere or prevent

24   the agreement you reach with Mr. Constantine from not

25   going forward?

Rozenboom  -  Cross/LaRusso

3373

1      Do you remember anybody trying to interfere with

2  that?

3  A.    Yeah, I vaguely remember something along that line.

4  Q.    Do you remember who they were?

5  A.    No.

6  Q.    Just one more exhibit if I could.

7          Mr. Rozenboom, would you take a look at what's

8  marked C 213.

9          Do you recognize that as an e-mail between you

10  and Mr. Constantine around June 2009?

11          (Pause in proceedings.)

12  A.    I do remember that e-mail.

13          And I think this was actually followed up with a

14  conversation, a phone call with Tommy.

15          MR. LARUSSO:  May I ask that C 213 be received.

16          MS. KOMATIREDDY:  No objection, with the same

17  limiting instruction.

18          MR. HALEY:  No objection.

19          THE COURT:  It's admitted with the same

20  instruction as before.

21          (Defense Exhibit C 213 in evidence.)

22  BY MR. LARUSSO:

23  Q.    I'm going to publish this to the jury if I could and

24  I'll give you a chance to explain the follow-up

25  conversation that you had.

Rozenboom  -  Cross/LaRusso

3374

1    This is June 18, 2009, from Mr. Constantine to

2  you, and it's:

3    Rick, can you please advise Shane Harris at

4  Atlantic that I am now authorized to make decisions with

5  respect to the airplane.

6    Also, I would advise him that Mr. Jowdy and

7  Mr. Harvey may be inquiring and/or sending someone over to

8  try and gain access to the airplane.

9    Please advise him as to their attempts to

10  negatively impact the dealings between us thus far, and

11  that Atlantic's personnel should be on high alert in this

12  regard.

13    My concern is that Jowdy and Harvey are in close

14  proximity to where the aircraft is located, and I would

15  not put it past them to try to do something to the

16  airplane.

17    In other words, if it's not me or someone from

18  Cabin Crafters, they should not be allowed within 100 feet

19  of the airplane.

20    Can you explain who Shane Harris of Atlantic is?

21  A.    Shane Harris was the party there that had custody of

22  the aircraft.  It was in his control to release it or

23  grant access to it.

24  Q.    Do you know which aircraft they're talking about?

25  A.    The Falcon 10.

Rozenboom  -  Redirect/Komatireddy

3375

1   Q.   Down at the bottom is the word Cabin Crafters; what

2   is that?

3   A.   I believe that was the party that had done or was

4   doing some work on the interior of the Falcon 10.

5   Q.   And Mr. Harvey, you never met or spoke to Mr. Harvey;

6   is that correct?

7   A.   Not that I recall.

8   Q.   Do you know what, if any, relationship he had to

9   Mr. Jowdy?

10  A.   No.

11  Q.   Did either Mr. Jowdy or a man by the name of

12  Mr. Harvey try to contact you as you recall?

13  A.   Mr. Harvey, no.

14       I had already testified that Jowdy did call

15  fishing for what was going on with the aircraft.

16       MR. LARUSSO:  Your Honor, just one moment.

17       (Pause in proceedings.)

18       MR. LARUSSO:  Your Honor, no further questions.

19       THE COURT:  Any redirect?

20

21  REDIRECT EXAMINATION

22  BY MS. KOMATIREDDY:

23  Q.   Mr. Rozenboom, you were asked on cross about the

24  lawsuit you brought against Diamante Air, Kenner and

25  Gonchar, correct?

Rozenboom  -  Redirect/Komatireddy

3376

1   A.   Correct.

2   Q.   I'm going to refer you to 4212, page 3.

3        What was the amount of the outstanding loan?

4   A.   $1,341,046.86.

5   Q.   Who were the guarantors on that loan?

6   A.   Sergei Gonchar and Phil Kenner.

7   Q.   Now, we also looked at 4222, and you testified this

8   payment of $415,000 was part of an agreement to resolve

9   that loan and that lawsuit, correct?

10  A.   Yes.

11  Q.   Do you know where he got -- Mr. Constantine got that

12  $415,000 from?

13  A.   I'm not sure where he got that from.

14  Q.   We went over the aircraft purchase agreement and

15  counsel asked you about the terms of the purchase.

16       4207, in this purchase agreement, there's

17  another lien called the Constantine lien, correct?

18  A.   There is.

19  Q.   As of this agreement, the plane goes to AZ Falcon

20  Partners, AZ Falcon Partners has to pay Constantine

21  $250,000?

22       MR. LARUSSO:  Your Honor, beyond the scope of

23  cross.  This was never raised.

24       THE COURT:  Overruled.  You can answer that.

25  A.   The aircraft was sold with the understanding that

Rozenboom  -  Redirect/Komatireddy

3377

1   those liens were not going to be satisfied by the bank and

2   they would still remain with the aircraft.

3   Q.   And, therefore, the owner of the aircraft would be

4   responsible for them?

5   A.   They would be attachments to the aircraft so

6   ultimately the owner of the aircraft would be responsible,

7   yes.

8   Q.   You were asked about an operating agreement for AZ

9   Falcon and who owned AZ Falcon.

10          You testified someone by the name of the

11  Fergusson owned it and Mr. Constantine was the managing

12  member?

13  A.   That's how I remember it, yes.

14  Q.   Referring you to 4218, the operating agreement of AZ

15  Falcon Partners that came in yesterday, turning to the

16  last page, when you said Fergusson, is that the Fergusson

17  you're referring to?

18  A.   Sue Ellen, yes.

19  Q.   As far as you were concerned, she was the owner of AZ

20  Falcon?

21  A.   Yes.

22  Q.   Finally -- actually, do you know who she is, Sue

23  Ellen Ferguson?

24  A.   I actually spoke with her.

25  Q.   Is she a hockey player?

Rozenboom - Redirect/Komatireddy

3378

1  A.   She is not a hockey player.

2  Q.   Finally, referring to C 198, Mr. LaRusso read out to

3  you I believe this line:

4        FYI, I have hired an attorney, Ronald Richards,

5  who represents our entire group as part of the global

6  settlement, all matters between our side and Jowdy, et al,

7  and will have him assist me, Gonchar and Kenner to review

8  and execute whatever settlement docs you/your attorney

9  provides to us.

10       Do you remember that?

11 A.   I do.

12 Q.   That's an e-mail from Mr. Constantine to you,

13 correct?

14 A.   Yes.

15 Q.   I'm going to highlight the paragraph above it.

16       Would you read it into the record for us?

17 A.   Gonchar and Kenner are counting on me to get the

18 settlement agreement done with you.

19       The object of my being involved is for Kenner

20 and Gonchar to get it settled and not have to spend

21 anymore money with their attorneys.

22       I understand that your intent with respect to

23 your suggestion below is simply to help move things in the

24 right direction, but contacting his attorney for a

25 settlement agreement draft is going to trigger another

**Rozenboom  -  Recross/LaRusso**

3379

1   significant legal bill, which is going to make Sergei and

2   Phil blow a gasket.

3          MS. KOMATIREDDY:  No further questions.

4          THE COURT:  Anything further, Mr. Haley?

5          MR. HALEY:  I have no questions of

6   Mr. Rozenboom.

7          Thank you.

8          MR. LARUSSO:  Just a few, Judge, if I may.

9

10  RECROSS-EXAMINATION

11  BY MR. LARUSSO:

12  Q.   You received this.  K 97 was the Diamante Air limited

13  liability operation agreement which listed the members.

14         Do you remember this?  Do you recall you

15  discussed that?

16  A.   I remember discussing that.

17  Q.   Do you know how much each one of the members

18  contributed to Diamante Air?

19  A.   I do not.

20  Q.   Do you know they contributed over $250,000 each?

21  A.   I do not.

22         MS. KOMATIREDDY:  Objection.

23         THE COURT:  Mr. LaRusso, when he says he doesn't

24  know, you don't need to ask the next question.

25         MR. LARUSSO:  I will move on.

Rozenboom  -  Recross/LaRusso

3380

1    BY MR. LARUSSO:

2    Q.   Would it be fair to say that if Mr. Constantine did

3    not salvage the asset, the asset being a Falcon for these

4    investors, that their equity would have been totally lost?

5    A.   I'm not sure.

6         I need to know what their investment is in order

7    to tell you if their investment would be totally lost.

8         But given that the loan wouldn't be paid off in

9    full, I can conclude or extrapolate that would be a fair

10   assessment.

11   Q.   Do you recall any efforts made by Mr. Constantine to

12   reconstruct log books for the Falcon 10 using over 30

13   years of maintenance records and sending you a photograph

14   of them via e-mail?

15        MS. KOMATIREDDY:  Objection, scope.

16        THE COURT:  Overruled.  You can answer.

17   A.   I know, in a conversation that Tommy and I had, that

18   he was attempting to reconstruct the log books.

19        All the ancillary information that you just gave

20   me, I'm not sure I can answer, but I know he was

21   attempting to reconstruct the log books.

22   Q.   In regards to that Constantine loan, did you know

23   what the particulars of that -- the Constantine lien was,

24   do you know the particulars of that?

25   A.   No, I personally don't know.

Rozenboom  -  Recross/LaRusso

3381

1  Q.   Were you aware at the time that Mr. Constantine was

2  involved in having the Falcon 10 repaired, both by way of

3  interior work as well as maintenance work?

4           MS. KOMATIREDDY:  Objection.

5           THE COURT:  Overruled.  You can answer if you

6  know.

7  A.   I don't know that personally, but Tommy did report

8  that to me early on in him expressing an interest in

9  trying to acquire that aircraft.

10  Q.   The bank didn't make any payments towards those, did

11  they, the repairs and maintenance of the plane at this

12  point in time?

13  A.   We did not.

14  Q.   Do you know if Mr. Constantine paid for them out of

15  his own pocket?

16  A.   I do not know the answer to that.

17           MR. LARUSSO:  No further questions, your Honor.

18           THE COURT:  You can step down, Mr. Rozenboom.

19           Thank you.

20           (The witness steps down.)

21           THE COURT:  Okay, the next witness.

22           MR. MISKIEWICZ:  The government calls Lynne

23  Lagarde.

24           THE COURT:  Ms. Lagarde, if you could come to

25  the witness stand and remain standing once you get there

Lagarde  -  Direct/Miskiewicz

3382

1   for the oath.

2

3   LYNNE LAGARDE,

4                 called as a witness, having been first

5                 duly sworn, was examined and testified

6                 as follows:

7

8                 THE COURT:  Be seated.

9                 Please state your name and spell it for the

10  record.

11                THE WITNESS:  Lynne Lagarde, L-Y-N-N-E,

12  L-A-G-A-R-D-E.

13                THE COURT:  As you're doing, Ms. Lagarde, stay

14  close to the mike and keep your voice up.

15                Thank you.

16                Go ahead, Mr. Miskiewicz.

17                MR. MISKIEWICZ:  Thank you, your Honor.

18

19  DIRECT EXAMINATION

20  BY MR. MISKIEWICZ:

21  Q.   Good morning, Ms. Lagarde.

22                My name is Jim Miskiewicz.  I'm a prosecutor in

23  this case.

24                You are an attorney, are you not?

25  A.   I am a retired attorney.

Lagarde - Direct/Miskiewicz

3383

1    Q.   Where were you admitted to practice law?

2    A.   The state of Arizona and Kentucky.

3    Q.   You know one of the defendants in this case, do you

4    not, Tommy Constantine?

5    A.   Yes, I do.

6    Q.   You've represented him for a number of years, have

7    you not?

8    A.   Yes, I have.

9    Q.   Do you see him in the courtroom today?

10   A.   Yes, I do.

11          MR. LARUSSO:  Conceding identification, your

12   Honor.

13          THE COURT:  Okay, the identification is

14   conceded.

15   BY MR. MISKIEWICZ:

16   Q.   Fair to say you represented him in a variety of

17   matters for over 20 years?

18   A.   Close to 20 years, yes.

19   Q.   Now, what is the nature of your practice?

20   A.   I'm a land use attorney.  I do zoning and municipal

21   work appearing before planning commissions and city

22   councils.

23   Q.   Is it a fair statement that you are not a litigating

24   attorney, meaning you don't bring lawsuits?

25   A.   No.

Lagarde - Direct/Miskiewicz

3384

1    Q.    That is a fair statement?

2    A.    Yes, it is a fair statement.  I do not bring

3    lawsuits.  I've never been in a courtroom other than this.

4    Q.    Well, welcome.

5          What is the name of the law firm that you were a

6    partner?

7    A.    Earl, Curley & Lagarde.

8    Q.    Now, in May of 2009, by the way, when you were

9    subpoenaed to appear here today, you were also subpoenaed

10   to produce certain records, were you not?

11   A.    My law firm was initially subpoenaed and my partner

12   sent records, my former partner.

13   Q.    Would you be familiar with what those records look

14   like if they were produced by your former law firm?

15   A.    Yes.

16   Q.    In or about May of 2009, do you recall receiving,

17   from Mr. Constantine, approximately $10,000 in legal fees

18   for a matter that your firm referred to as the Dixileta

19   matter?

20   A.    You know, I never see the money when it comes in.  It

21   is simply posted on the bills.  So I probably never knew

22   exactly that that money came in.

23          And I don't know what matter money was sent for

24   at that time because I was working on more than one case

25   for Mr. Constantine, as I explained when I was called, and

Lagarde  -  Direct/Miskiewicz

3385

1    I wanted to review my records before I said anything about

2    that billing.

3            And I have reviewed my records and there's at

4    least some confusion about what matter was being paid.

5    Q.   Let me show you what's been produced and has now been

6    numbered for identification as Government's Exhibit 3920

7    through Government's Exhibit 3932.

8            Take a look at that and take your time.

9            (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Lagarde - Direct/Miskiewicz

3386

1   BY MR. MISKIEWICZ (Cont'd):

2   Q.   First of all, have you seen such documents generated

3   by your law firm in the past?

4   A.   Yes, I have.

5            MR. MISKIEWICZ:  May I approach one more time, I

6   think I started with 3920.

7   BY MR. MISKIEWICZ:

8   Q.   Is that right?

9   A.   Yes.

10  Q.   Let me add one, 3919, you see that in front of you?

11  A.   Yes.

12  Q.   What are these documents?

13  A.   These are my billing records and they reflect the

14  amount that was billed and the amount that was paid.

15  Q.   And they are on the letterhead of Earl, Curley &

16  Lagarde, correct?

17  A.   Yes, they are.

18  Q.   And they are each dated or months and dates during

19  which the time you were -- before you retired, while you

20  were still a partner at that firm.

21           Correct?

22  A.   Yes.

23  Q.   And the information that would have been contained or

24  reflected on these documents, would it have been the usual

25  course of business at your firm to keep such records?

Lagarde - Direct/Miskiewicz

3387

1   A.    Yes, it was.

2   Q.    And would these records have been kept in the

3   ordinary course of business at your firm?

4   A.    Yes.

5   Q.    And would the information therein be inputted at or

6   about the time that either the work or the bills were

7   generated, in other words, these were kept

8   contemporaneously with the dates reflected on each one of

9   these documents?

10  A.    Yes, they were.

11        The actual work I did ended in 2007, and the

12  bill was paid two years later.

13  Q.    Let us just be able to conclude with one question.

14        Are these bids -- you understand what a business

15  record is, correct?

16  A.    Yes.

17  Q.    Are these business records of Earl, Curley & Lagarde?

18  A.    Yes, they are.

19  Q.    The government moves for the admission of

20  Government Exhibit 3919 through 3932?

21        THE COURT:  You said through, I thought it was

22  3919, 3920 and 3932.

23        Is it more than three documents?

24        MR. MISKIEWICZ:  I'm sorry.  I'll read them all

25  in.

Lagarde - Direct/Miskiewicz

3388

1          It's 3919, 3920, 3921, 22, 23, 24, 25, 26, 27,

2     28, 29, 30, 31 and 32.

3          THE COURT:  So 3919 through 3932.

4          MR. MISKIEWICZ:  Yes, your Honor.

5          THE COURT:  Any objection?

6          MR. HALEY:  No, sir.

7          MR. LARUSSO:  No, your Honor.

8          THE COURT:  Those exhibits are admitted.

9          (Whereupon, Government Exhibits 3919 through

10    3932 were received in evidence, as of this date.)

11    BY MR. MISKIEWICZ:

12    Q.   Now, you -- I think you volunteered that some of

13    these records were for work done in 2007.

14    A.   And before, yes.

15    Q.   And before.

16          Could you explain that, and while you are

17    explaining that I'd like to retrieve 3919 because I don't

18    have a copy.

19    A.   Do you want me to explain the work that I did?

20    Q.   No.

21          Explain what you mean by the fact that some of

22    the work was done and if it was paid in 2007.

23          THE COURT:  2009.

24          MR. MISKIEWICZ:  I'm sorry.

25

Lagarde - Direct/Miskiewicz

3389

1    BY MR. MISKIEWICZ:

2    Q.    2009.

3    A.    Tommy was a very good client of mine.

4          He was a very trustworthy client.  We had built

5    over the years a very trusting relationship.  There were

6    times when Tommy was out of the country or somewhere else

7    and I was not always paid immediately, but I was always

8    paid.

9          Because there had been two years that had

10   intervened -- between the times the bills were paid, there

11   was another matter on which I was billing Tommy at the

12   same time that was his business property in Scottsdale, an

13   office property.  When Tommy called to ask me what was

14   owed, I told him he owed about $9,700, and that's all I

15   told Tommy, and he apparently sent money because the next

16   time after this I reviewed my bills and they were all

17   paid.

18         But Tommy may not have known what bill he was

19   paying and that's why I wanted to review my records and go

20   back and look at the bill on the other matter which was

21   about the same amount, so it was not unusual and not only

22   that, I had other clients who sometimes weren't able to

23   pay right away.

24         In Tommy's case, the city of Scottsdale had put

25   some onerous requirements on him, and I thought he was

Lagarde - Direct/Miskiewicz

3390

1    being treated unfairly, and so I didn't have any problem

2    waiting to be paid.

3    Q.    You felt that he was being treated unfairly with

4    respect to which matter that you represented him on?

5    A.    Actually both matters.

6          The city is very rigid on the application of a

7    very sensitive land development and in the commercial land

8    regulations and a lot was being required of Tommy that I

9    thought was unnecessary in both cases.

10   Q.    What were both matters?

11   A.    One was a drainage situation with regard to some

12   property in north Scottsdale, and the other was the design

13   of the office facility and certain permitting that the

14   city required.

15   Q.    The office facility, do you know, was that a business

16   or was it a residential property that you were

17   representing him on in that matter?

18   A.    That was a business property.

19   Q.    Was that --

20   A.    It was a commercial property, and that's why the

21   design regulations applied.

22   Q.    Were you at that property during any point in your

23   representation?

24   A.    Yes.

25   Q.    They were hangars, right?

Lagarde - Direct/Miskiewicz

3391

1    A.   Yes, it was an airpark office hangar facility.

2    Q.   At the Scottsdale Airport, correct?

3    A.   Correct.

4    Q.   And it was -- to your knowledge at that time it was a

5    series of hangars owned by Mr. Constantine?

6              MR. MISKIEWICZ:  I'll withdraw the question.

7    A.   Yeah, I never was --

8    Q.   Was he --

9              MR. MISKIEWICZ:  Ma'am, I withdrew --

10   A.   I never knew --

11             MR. MISKIEWICZ:  I withdrew the question.

12   A.   Okay.

13   Q.   By the way, fair to say that Tommy Constantine in

14   your years as you have indicated in prior testimony that

15   he was probably your favorite client, correct?

16   A.   You know, I hate to insult Tommy, but he was not my

17   favorite client.

18        I had a lot of very good clients and he was one

19   of my favorite clients, I would say that, but I am sworn

20   to tell the truth.

21   Q.   Okay.

22        But you trusted him?

23   A.   Yes, I did.

24   Q.   And that was one of the reasons that despite the fact

25   that sometimes bills were late being paid, you had a good

Lagarde - Direct/Miskiewicz

3392

1   track record, you knew you were going to get your money

2   back.

3           Correct?

4   A.   That's correct.

5   Q.   And you also felt that he had good grounds to pursue

6   whatever litigation there was with respect to this

7   drainage thing, as well as the airpark.

8           Correct?

9   A.   Correct, and that was not litigation.

10          It was simply administrative proceedings and

11  permits that the city requires of property owners.

12  Q.   Land use?

13  A.   Land use that was my -- you know, what I was doing

14  for Tommy.

15  Q.   Okay.

16          Now, when you bill a client, particularly one

17  like Mr. Constantine who has -- who you represented in a

18  number of different matters, your firm, does it not, it

19  keeps track of what you are billing for and for which of

20  those matters you are billing.

21          Correct?

22  A.   Yes.

23  Q.   As an attorney, if you have one client who's engaged

24  in numerous matters, whether it's litigation or land use

25  or whatever, as an attorney you keep track of how much

Lagarde - Direct/Miskiewicz

3393

1    time you worked on the matter.

2            Right?

3    A.    Yes, I do.

4    Q.    So if you have a phone call and the phone call lasts

5    15 minutes and the phone call is about matter X, you keep

6    note of that and then you charge your client,

7    Mr. Constantine or anybody, a pro rata share of whatever

8    your hourly billing is.

9            Right?

10   A.    Yes, I do.

11   Q.    And if you have in this hypothetical if there is

12   matter X, Y, and Z, you have a 15-minute call on matter Y

13   or matter Z, each one of those will be billed differently

14   or billed to a different engagement.

15           Correct?

16   A.    That's correct.

17   Q.    All right.

18           Now, when you receive or your firm --

19           MR. MISKIEWICZ:  Withdrawn.

20   BY MR. MISKIEWICZ:

21   Q.    Let me actually now show you what's in evidence now

22   as 3919 on the overhead projector.

23           (The above-mentioned exhibit was published to

24   the jury.)

25

Lagarde - Direct/Miskiewicz

3394

1   BY MR. MISKIEWICZ:

2   Q.    Ms. Lagarde, can you see it to your right --

3   actually, I found my copy.

4            It's also on the screen.

5   A.    You did take it from me.

6   Q.    It's also on the screen to your right.

7   A.    Okay.

8   Q.    3919, this indicates the account history for -- from

9   your firm for Mr. Constantine who is listed as the client

10  here?

11  A.    Yes.

12  Q.    And it indicates there was a payment applied to a

13  previous balance of -- well, a payment of $9,707.50 was

14  applied.

15           Correct?

16  A.    Yes.

17  Q.    And he got a discount.

18  A.    Yes.

19  Q.    Per you?

20  A.    Yes.

21  Q.    And so the total payment and adjustments made were

22  $10,575.77, correct?

23  A.    Yes.

24  Q.    And that wiped out the previous balance?

25  A.    Yes, it did.

Lagarde - Direct/Miskiewicz

3395

1    Q.   All right.

2         Do you know what engagement or what case was

3    that --

4         MR. MISKIEWICZ:  Withdrawn.

5    BY MR. MISKIEWICZ:

6    Q.   What was the second case that you were working on at

7    or about this time?

8         You said there were two, the drainage issue and

9    the airpark.

10   A.   The airpark case.

11   Q.   In addition to the airpark, what was the drainage

12   issue about?

13   A.   The drainage issue was on this case.

14   Q.   Was there a second case?

15   A.   No, just the airpark case and this case.

16        Those were the two cases that I was working on

17   for Tommy at the time.

18   Q.   What property was the drainage about?

19   A.   The Pima and Dixileta case was the property on which

20   the drainage issue arose.

21   Q.   And that was a residential property, correct?

22   A.   Yes, it was.

23   Q.   That was Mr. Constantine's personal home, wasn't it?

24   A.   It was never actually his home.

25        It was under construction at the time.

Lagarde - Direct/Miskiewicz

3396

1   Q.   And do you know why -- what was the drainage issue

2   that you were trying to resolve in this land use case?

3   A.   There was a fairly significant wash that ran through

4   Tommy's property.

5        In the desert when there is a significant wash

6   like that with a significant flow, it's designated as a

7   floodway and a floodplain and the city is very strict

8   about how it is to be treated.

9        There was a wall around the property, and it had

10  to be sized correctly and there were some issues about

11  that.  It had all been done in the past, but there was a

12  new engineer, and he wanted everything recalculated.

13  Q.   Do you know whether or not there was ever an effort

14  to accommodate a helicopter on that property as part of

15  this litigation -- not litigation, but this engagement?

16  A.   At the time the City of Scottsdale -- they had no

17  regulations against someone landing a helicopter on the

18  property.

19        And I think Tommy had landed a helicopter on the

20  property, so an issue was raised whether he could continue

21  to do that or whether the city was going to pass a

22  regulation to prevent it.  That was a very -- I wouldn't

23  say minor, but a small part of the case, by far the most

24  work was on the drainage.

25  Q.   So they were related -- the drainage issue was

Lagarde - Direct/Miskiewicz

3397

1   related to personal or the residential home on which

2   Mr. Constantine at some point landed helicopters?

3   A.   Correct.

4   Q.   You said the $9,707 that's received in this or

5   reflected as having been received here, what was this for?

6            What work was that for?

7   A.   It was applied to the Pima and Dixileta case.

8            But I'm not sure if that's what Mr. Constantine

9   realized he was paying because the other bill was $9,700

10  something as well, and it was also two years behind.

11  Q.   Let me show you what's been marked for identification

12  as Lagarde 1.

13           That's another invoice from your firm, isn't it?

14  A.   Yes.

15           This is the invoice on the airpark case.

16  Q.   And, again, that's a bill issued by your office,

17  correct, your firm?

18  A.   Yes, it is.

19  Q.   During the time that you were still a partner at the

20  firm?

21  A.   Yes, it is.

22  Q.   While you were doing work for Mr. Constantine?

23  A.   Two years after I completed the work for

24  Mr. Constantine.

25  Q.   Okay.

Lagarde - Direct/Miskiewicz

3398

1          And kept in the regular course of business at

2    your firm?

3    A.    Yes.

4    Q.    Maintained there, correct?

5    A.    Yes.

6    Q.    And there is also some attachment there, is there

7    not?

8    A.    Yes.

9          The actual document that you gave me is the

10   letter from my office manager advising that the account

11   balance was $9,700.53 that was past due and attached to

12   that is the billing statement that showed the last bill

13   that was sent in September of 2007.

14         That letter was dated in September of 2007.

15   Q.    And the attachment also is a business record

16   generated, kept, maintained in the regular course of

17   business of your firm during the time you were a partner

18   there.

19         Correct?

20   A.    Yes, it was.

21         MR. MISKIEWICZ:  The government moves for the

22   admission of Lagarde 1.

23         MR. LARUSSO:  No objection, Judge.

24         MR. HALEY:  No objection, Judge.

25         THE COURT:  Lagarde 1 is admitted.

Lagarde - Direct/Miskiewicz

3399

1          (Whereupon, Government Exhibit Lagarde 1 was

2     received in evidence, as of this date.)

3     BY MR. MISKIEWICZ:

4     Q.   So that we both confirm -- excuse me.

5               MR. MISKIEWICZ:  Withdrawn.

6     BY MR. MISKIEWICZ:

7     Q.   One last document I want to show you, what's been

8     marked for identification as 3917.

9               Again, Ms. Lagarde, this is also a payment

10    history for work done by you and/or your firm for

11    Mr. Constantine during the period of time when you were a

12    partner there.

13              Correct?

14    A.   Yes.

15              This is not the kind of documentation that I

16    normally saw.  This was simply kept by the office manager.

17    So I'm not as familiar with this particular piece of

18    paper.

19    Q.   So you never saw it before?

20              Is it your testimony you don't know what that

21    is?

22    A.   When I asked my partner to send me what he had

23    provided to you he sent me this.

24              But, again, before then, no.  I had not seen

25    this.  This is not a document that I as an attorney would

Lagarde - Direct/Miskiewicz

3400

1   have ever reviewed.  It was simply kept by our office

2   manager.

3          Before that, no, I had not seen that document.

4   Q.   All right.

5          Let me show you Lagarde 1, this is the document

6   that is now in evidence.

7          For the record, the first page of Lagarde 1 is

8   on your letterhead dated September 17, 2007, correct?

9   A.   Yes, it is.

10  Q.   And it's signed by somebody by the name of

11  Judy L. Sullivan?

12  A.   Yes, it is.

13         She's our -- was our office manager.

14  Q.   And we don't have to read it, but basically this is

15  to advise Mr. Constantine that somebody else, that Steve

16  Hilton, that they have an outstanding balance by your firm

17  for work done by you, correct?

18  A.   Yes, that's correct.

19  Q.   That's $9,753?

20  A.   Yes.

21  Q.   And as you said, that's pretty close to what's now in

22  evidence as 3919, Exhibit 3919, which had a previous

23  balance of $10,575.77.

24         Correct?

25  A.   Yes.

Lagarde - Direct/Miskiewicz

3401

1    Q.   The difference is, and I want to see if I can put

2    them next to each other, in what's over on the left, this

3    $10,000 bill refers to a particular client number, right?

4    A.   Yes, that is.

5    Q.   What's the client number there?

6    A.   3129.

7    Q.   Dash?

8    A.   000.

9    Q.   And --

10   A.   That referenced the matter number.

11        So, I'm sorry.  When you asked me the client

12   number, the client number is 3129.  The matter number is

13   dash 000.

14   Q.   So 3129 would refer to Mr. Constantine?

15   A.   Yes.

16   Q.   Dash 000 would refer to a particular --

17   A.   Matter.

18   Q.   -- matter.

19        Which in this case is the Dixileta matter,

20   right?

21   A.   Yes.

22   Q.   And then this 2007 document over on the right where

23   there is an outstanding balance of a little over $9,700,

24   that refers to, again, the same client number, 3129,

25   that's Tommy Constantine, right?

Lagarde - Direct/Miskiewicz

3402

1    A.    Yes.

2    Q.    And it's dash 001, a different engagement.

3          Right?

4    A.    Yes.

5    Q.    And in that case, the engagement involved apparently

6    Constantine and Hilton, correct?

7    A.    Yes.

8    Q.    And you also refer to it as the airpark engagement,

9    right?

10   A.    Yes.

11   Q.    Below that.

12   A.    Yes.

13   Q.    So Lagarde 1 has to do with work being done on the

14   airpark and 3919 has to do with the drainage issue at the

15   residential property that Mr. Constantine used to land

16   helicopters on.

17   A.    Yes.

18   Q.    I'll show you a document that's in evidence,

19   Government Exhibit 1102, and specifically page two.

20          I'm going to focus your attention on a

21   transaction dated 5/19 of 2009.  You see that on the

22   screen in front of you?

23   A.    Yes, I do.

24   Q.    There are a couple of different -- well, there's two

25   different 5/19s there, but I'm asking you to read for the

Lagarde - Direct/Miskiewicz

3403

1    record what's the second one that's listed there in the

2    box that you can see?

3    A.    The $10,000?

4    Q.    To who?

5    A.    Earl, Curley and Lagarde.

6    Q.    Can you read for the record where that money came

7    from?

8    A.    Law offices of Ronald Richards.

9    Q.    Do you know Ron Richards?

10   A.    Pardon me?

11   Q.    Do you know Ronald Richards?

12   A.    No, I do not, and I never saw the wire transfer.

13          Again, as an attorney, I don't see when bills

14   were paid.  They just get paid.  It gets noted.  I never

15   even knew it was a wire transfer until this matter came

16   up, and I don't know what that Ronald Richards is.

17   Q.    So I hate to ask you a negative question, but do you

18   know a Ken Jowdy?

19   A.    Pardon me?

20   Q.    Do you know anybody by the name of Ken Jowdy?

21   A.    No, I do not.

22   Q.    Did you do any work on a Ken Jowdy matter for

23   Mr. Constantine?

24   A.    No.

25          I have never heard that name.

Lagarde - Direct/Miskiewicz

3404

1  Q.    What about doing any work regarding any land

2  acquisitions in Mexico?

3              MR. LARUSSO:  Your Honor, I object.

4              THE COURT:  No, that's okay.

5              You can answer that.

6  A.    No.

7  Q.    Were you ever doing any work, land use work for

8  hockey players?

9  A.    Yes, I have done land use work for hockey players.

10 Q.    Through or as part of your representation of

11 Mr. Constantine?

12 A.    No.

13 Q.    Now, you said you didn't know -- I think your

14 testimony earlier was you didn't know when you received

15 money, $10,000, and it was applied towards the Pima and

16 Dixileta engagement, the one with the drainage issues and

17 the helicopter, you didn't know if that was

18 Mr. Constantine's intent.

19              Right?

20 A.    Right, because when he called me, I just said around

21 $9,700, and that was the same for both cases.

22 Q.    And you were asked prior to your testimony you know

23 your firm was asked to produce records related to any kind

24 of work you did for Mr. Constantine during this period of

25 time.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Lagarde - Direct/Miskiewicz

3405

1          Correct?

2     A.     Yes.

3     Q.     Where's the payment for this Lagarde 1?

4     A.     Pardon me?

5     Q.     Where's the payment, where's the document reflecting

6     payment for Lagarde 1, the airpark?

7     A.     In my office billing records.

8     Q.     Would you be able to retrieve those later on today

9     and produce them for the court?

10    A.     No, I'm not --

11    Q.     We have e-mail.

12    A.     As you know, I have been in New Orleans in the

13    hospital with my father.

14          I have not been anywhere near Phoenix since he

15    had his surgery.  There is no way I can produce those

16    documents any time before the next several weeks, and they

17    were not being paid, as I understood it, directly by

18    Mr. Constantine.

19          You will see Mr. Hilton on that.  He was paying

20    those, so I don't know the business relationship between

21    Mr. Hilton and Tommy other than they were partners and

22    there may have been other partners in that property, but I

23    can't produce those records right now.

24    Q.     First of all, I'm very sorry for your family crisis.

25          My question simply is this, can somebody else

Lagarde - Direct/Miskiewicz

3406

1    from your firm produce a record showing who paid

2    Mr. Constantine's engagement with respect to the airpark,

3    and, specifically, whether or not it was Mr. Constantine

4    or Mr. Hilton or somebody else?

5            Can somebody do that?  Can somebody produce

6    those here for the court and for the jury?

7    A.   Those records I brought to my home so that I could

8    review them, so they are at my house.

9            The records were paid by an entity called 82

10   Hangar LLC, or something like that.  They had been sent to

11   our office by Mr. Hilton at the time of the billing.  I

12   don't know exactly when they were paid.

13           I do know that part of this check -- or this

14   money went to that file as well.

15   Q.   So what you are saying, Ms. Lagarde, is that work

16   back in 2007 was paid for, if not entirely then

17   substantially by Mr. Hilton, not Mr. Constantine?

18   A.   I can't say that.

19           I don't know what the arrangement was.  The

20   bills were being sent from Mr. Hilton's office.  They were

21   partners.  I can't say that it was Mr. Hilton paying or he

22   and Tommy had an arrangement or a fund that they were

23   using.

24           I never got into the business relationships of

25   my clients.

Lagarde - Direct/Miskiewicz

3407

1  Q.  So is it -- are you saying that you don't know

2  whether the airpark balance, whether there even was an

3  airpark balance remaining when this $10,000 came in from

4  the Ron Richards account?

5  A.  Yes.

6       I looked at my files.  It was about $300 balance

7  on that airpark account.

8  Q.  So $300 from the Ron Richards wire transfer would

9  have been applied to the airpark?

10  A.  My office would have done that, yes.

11  Q.  And then the balance went to the house with the

12  helicopter?

13  A.  A helicopter landed there infrequently.

14       I think that's a little bit harsh to say the

15  house with the helicopter.  It was the house that had a

16  lot of problems.

17       But, yes, it would have been applied by my

18  office manager to that case.

19       MR. MISKIEWICZ:  May I just have a moment, your

20  Honor.

21       THE COURT:  Yes.

22       (There was a pause in the proceedings.)

23       MR. MISKIEWICZ:  Thank you, Ms. Lagarde.

24       Again, I'm very sorry.  I have no further

25  questions.

Lagarde - Cross/LaRusso

3408

1        THE COURT:  Cross-examination.

2        MR. HALEY:  I have no questions, your Honor.

3        THE COURT:  Mr. LaRusso.

4        MR. LARUSSO:  May I, your Honor.

5    CROSS-EXAMINATION

6    BY MR. LARUSSO:

7    Q.    Ms. Lagarde, my name is Bob LaRusso.

8          I represent Mr. Constantine and we are both very

9    sorry for the situation you are in.  I'll try to keep this

10   as short as I can.

11   A.    Thank you.

12   Q.    The two documents or packages that were shown to you

13   were Government Exhibit 3911 and there were a number of

14   numbers after that.  I'm going to place that on your

15   left-hand side.

16         Okay?

17   A.    Yes --

18         THE COURT:  3911?

19         MR. LARUSSO:  3919, I apologize, Judge.

20   BY MR. LARUSSO:

21   Q.    3919 and then the subsequent numbers that they put in

22   the record.

23   A.    Yes.

24   Q.    They also gave you Lagarde 1.

25         MR. LARUSSO:  Do you have that?

Lagarde - Cross/LaRusso

3409

1          MR. MISKIEWICZ:  I'm sorry, I wasn't listening.

2          THE COURT:  Lagarde 1, do you have that?

3          MR. MISKIEWICZ:  Yes.

4          MR. LARUSSO:  Thank you.

5   BY MR. LARUSSO:

6   Q.    I'm going to show you Lagarde 1 and you testified on

7   direct examination that there was confusion about what was

8   being paid.

9          Do you remember that testimony?

10  A.    Yes.

11  Q.    And you also testified that Mr. Constantine was

12  unaware the payment went to the wrong invoice.

13         Do you remember that testimony?

14  A.    Yeah.

15         I would have never told that, yes.

16  Q.    What I'd like you to do, just explain to the jury

17  what you meant when you said there was confusion about

18  what was being paid, and use those two invoices that we

19  have been discussing during your testimony?

20  A.    I apologize.  I'm just a little emotional.  It has

21  not to do with this.  It has to do with my father who's

22  ill.

23         When I was first called about this, I saw the

24  documents and I said, yes.  That money was applied to the

25  Pima and Dixileta case, but I said I know I was working on

Lagarde - Cross/LaRusso

3410

1    another case for Tommy at the same time, and I didn't tell

2    him which case he owed the money on.

3          So I wanted to be sure of which case he was

4    paying and I couldn't be sure because on the phone I just

5    told him $9,700 and I didn't know which case it was.  So

6    that's what the confusion was, and I wanted to be accurate

7    and I didn't want anyone to be misled because I spoke, you

8    know, just very fast and said, oh, yeah, that's what he

9    paid when it may not have been the case.

10   Q.   So what did you then look to determine where the

11   money was actually or should have actually been paid to?

12   A.   Well, that's why I brought my files home.

13   Q.   What did you find after looking at your files in

14   regards to where that payment should have been made to?

15   A.   Well, actually the payment was for Pima and Dixileta

16   and it should have been partially there and partially on

17   the other case because the airpark case had been paid by

18   that 82nd Hangar, LLC that had come from Mr. Hilton.

19         But it was still not clear to me whether Tommy

20   knew that that had been paid.  That's where I thought the

21   confusion lay and I never made it clear to Tommy what he

22   was paying.

23   Q.   You alluded to a conversation with Mr. Constantine.

24         Would that have been at or about the time of the

25   payment which we know to be about May of 2009?

Lagarde - Cross/LaRusso

3411

1    A.    Yes.

2    Q.    Tell us about that, please.

3    A.    Tommy called me, and he said, Lynne, I want to get

4    you paid up.  I know it's been a while that I have owed

5    you, you know, what do I owe you?

6          Tommy was always very busy.  I didn't go and

7    look at anything.  I said, Tom, it's about $9,700 and

8    that's all I said.

9    Q.    Was there any discussion about any document that he

10   may have been alluding to in that conversation?

11   A.    No.

12         He didn't allude to any document.  He just asked

13   me what he owed me and I told him.

14   Q.    And at the time you were telling him what he owed,

15   were you referring to the airpark or were you referring to

16   the home, the residence?

17   A.    I honestly can't say what I was referring to.

18         I just have a number in my mind that he owed me,

19   and I know that sounds like I should have known, but I

20   knew Tommy owed me a number because the last letter I saw

21   was on the airpark case and it was $9,700.

22   Q.    You mentioned $9,700.

23         Would you take a look at the second page, the

24   balance is $9,818, is that correct?

25   A.    Yes, it is.

Lagarde - Cross/LaRusso

3412

1    Q.    And how do you describe the difference?

2    A.    I really have no idea.

3          I feel embarrassed by that, although it was an

4    error in Tommy's benefit.  My bills showed an amount of

5    $9,818, but my office manager put $9,753.  The only thing

6    I would have seen because I always looked at the letters

7    before they went out, I saw the $9,753, I wouldn't have

8    seen this invoice.  It wouldn't have been attached.

9          So that's what I remembered and that's what I

10   told Tommy.

11   Q.    So Tommy was under the impression that the bill that

12   was being paid was the one for the airpark.

13         Is that correct?

14   A.    I don't know what his impression was, but because

15   that was the last thing he received from me, I thought

16   that this was the bill he might have thought he was

17   paying.

18   Q.    Just to be clear, at the time you were speaking with

19   Mr. Constantine in May of 2009, there were actually two

20   open bills.

21         Is that correct?

22   A.    Yes, there were.

23   Q.    And your discussions with him were in reference to

24   the airpark.

25         Is that correct?

Lagarde - Cross/LaRusso

3413

1  A.   When I spoke to him, I didn't make clear which matter

2  it was.

3        I just said $9,700.

4  Q.   Okay.

5        MR. LARUSSO:  May I just have a moment, your

6  Honor.

7        (There was a pause in the proceedings.)

8

9        MR. LARUSSO:  Thank you, very much, and my

10  condolences, please, I hope all works out well for your

11  family.

12        THE WITNESS:  Thank you.

13        THE COURT:  Thank you.

14        Any redirect?

15        MR. MISKIEWICZ:  No, your Honor.

16        THE COURT:  Thank you, Ms. Lagarde, and good

17  luck with your father.

18        THE WITNESS:  Thank you for your accepting the

19  situation, your Honor.

20        THE COURT:  Sure.

21        We'll take the morning break.  Don't discuss the

22  case.

23        (Jury leaves the courtroom.)

24        THE COURT:  Everyone can be seated.

25        Who's next?

3414

1          MR. MISKIEWICZ:  Lani Donlan.

2          THE COURT:  Are there any issues with respect to

3     her?

4          MR. LARUSSO:  I don't even know what she's going

5     to testify to other than maybe signatures.

6          THE COURT:  Okay.

7          This deals with Mr. Kenner.

8          MR. MISKIEWICZ:  Mostly about signatures and

9     Mr. Kenner and somewhat about a loan she was not party to,

10     but had essentially brokered with respect to penthouse --

11     not the penthouse -- but the Palms condominium unit.

12          MR. HALEY:  I will have questions, Judge.

13          THE COURT:  I assume she's going to be pretty

14     brief, then, right?

15          MR. MISKIEWICZ:  On direct, yes.

16          THE COURT:  Okay.

17          MR. MISKIEWICZ:  And then we have Jackson

18     Stewart and Glenn Murray.

19          THE COURT:  Okay.

20          Let's take a break.

21          (Recess.)

22          (Continued on next page.)

23

24

25

3415

1           (Following a recess.)

2           THE COURT:  Please be seated.

3           We'll bring in the jury.

4           MR. MISKIEWICZ:  Your Honor, we do have a

5     stipulation that the parties have entered into and we'll

6     read it.

7           THE COURT:  Okay.

8           MR. LARUSSO:  Your Honor, while we are waiting

9     for the jury, may I just make a request.

10          In regards to one of the witnesses, I don't know

11    if it's going to be this morning or this afternoon,

12    Mr. Jackson Stewart, there was a very tumultuous

13    relationship between my client and Mr. Stewart.  I

14    understand that he's being called in regards to work that

15    he had done for Mr. Constantine and payments.

16          If it's just that, obviously I have no problem.

17    I'm just concerned we are going to get into the bad blood

18    between the two of them and I don't see any relevancy in

19    regards to why his testimony would need to get into that

20    area.

21          THE COURT:  Do you expect that to come out other

22    than what relates to the payment itself?

23          MS. KOMATIREDDY:  Your Honor, I'll proffer the

24    testimony, I'm aware of the bad blood.  We discussed with

25    Mr. Stewart this morning we didn't think it was necessary

3416

1    to go into that area.

2            Mr. Constantine made various representations

3    about his wealth in the relevant time frame, 2006, 2007,

4    so we expect the testimony to be about those

5    representations and the payments.

6            THE COURT:  Okay.

7            THE CLERK:  All rise.

8            (Jury enters the courtroom.)

9            THE COURT:  Everyone can be seated.

10           Next witness.

11           MR. MISKIEWICZ:  Your Honor --

12           THE COURT:  Oh, you have a stipulation.

13           MR. MISKIEWICZ:  We do have a stipulation, your

14   Honor, if I may read it into the record now.

15           THE COURT:  What number is it?

16           MR. MISKIEWICZ:  Sorry about that.

17           It's stipulation No. 35.

18           THE COURT:  Is there any objection to

19   stipulation 35 being admitted?

20           MR. HALEY:  No, sir.

21           MR. LARUSSO:  I believe it relates to Mr. Ross.

22           Is that the number?

23           MR. MISKIEWICZ:  Yes.

24           MR. LARUSSO:  No objection.

25           THE COURT:  Stipulation 35 is admitted and can

3417

1   be read to the jury.

2           (Whereupon, Government Exhibit Stipulation 35

3   was received in evidence, as of this date.)

4           MR. MISKIEWICZ:  The stipulation would read in

5   relevant as follows:

6           1.  The law firm of Gilmartin, Magence,

7   M-A-G-E-N-C-E, and Ross, LLP, hereafter the Ross firm,

8   assists in the origination and administration of private

9   loans.  In 2008 the Ross firm set up the Palms lending

10  trust in order to issue a loan, hereafter the loan,

11  secured by two condominium units at Palms Place in

12  Las Vegas, Nevada, hereafter the Palms condos.

13          Defendant Constantine was a borrower on the loan

14  and defendant Kenner was the guarantor on the loan.  After

15  the loan went into default, the Ross firm foreclosed on

16  the Palms condos and sold them to other individuals.

17          Government Exhibits 3507, 3508 and 3511, through

18  3513 are true and accurate copies of loan documents

19  submitted to the Ross firm for the loan.

20          Government Exhibits 3505, 3506 are true and

21  accurate copies of closing statements for sales of real

22  property conducted by Stewart Title of Nevada.

23          Government Exhibits 3509 and 3510 are true and

24  accurate copies of deeds of trust for sales of real

25  property conducted by Stewart Title of Nevada.

3418

1          Government Exhibit 3502 is a true and accurate

2     copy of an accounting of payments made to the Ross firm

3     for the loan.

4          Government Exhibits 3503 and 3504 are true and

5     accurate copies of deeds executed and recorded for the

6     Palms condos.

7          Lastly, Government Exhibit 4408 is a true and

8     accurate copy of a payment ledger for units at Palms Place

9     in Las Vegas, Nevada.

10          Government Exhibits 4409 and 4410 are true and

11     accurate copies of escrow receipts for sales of real

12     property conducted by Stewart Title of Nevada.

13          This stipulation and Government Exhibits 3502

14     through 3513 and 4408 through 4410 are admissible as

15     evidence at trial.

16          THE COURT:  So you are offering those exhibit?

17          MR. MISKIEWICZ:  We are.

18          THE COURT:  Any objection?

19          MR. LARUSSO:  No, your Honor.

20          MR. HALEY:  No, sir.

21          THE COURT:  So the exhibits referenced in the

22     stipulation 35 are admitted.

23          (Whereupon, Government Exhibits 3502 through

24     3513 and 4408 through 4410 were received in evidence, as

25     of this date.)

Donlan - Direct/Miskiewicz

3419

1          MR. MISKIEWICZ:  The government calls Lani

2     Donlan.

3          THE CLERK:  Please remain standing and raise

4     your right hand.

5     **LANI DONLAN,**

6          having been duly sworn, was examined

7          and testified as follows:

8          THE CLERK:  Please state your name and spell it

9     for the record.

10         THE WITNESS:  Lani McGuire Donlan, L-A-N-I,

11    M-C-G-U-I-R-E, D-O-N-L-A-N.

12         THE COURT:  You can be seated.

13         Ms. Donlan, just pull the mike up close to you

14    and keep your voice up.

15         Okay?

16         THE WITNESS:  Okay.

17         THE COURT:  Go ahead.

18         MR. MISKIEWICZ:  Thank you, your Honor.

19    DIRECT EXAMINATION

20    BY MR. MISKIEWICZ:

21    Q.   Good morning, Ms. Donlan.

22    A.   Good morning.

23    Q.   Ms. Donlan, what do you currently do for a living?

24    A.   I sell real estate.

25    Q.   And how long have you been in that business?

Donlan - Direct/Miskiewicz

3420

1  A.   June 16th will be 19 years.

2        THE COURT:  Ms. Donlan, I think you might have

3  accidentally hit the button.

4        THE WITNESS:  Oh, it's on.

5  A.   June 16th will be 19 years.

6  Q.   Where did you originally start working in real

7  estate?

8  A.   In Boston, Massachusetts.

9  Q.   Is that where you are from?

10  A.   Yes.

11  Q.   Do you know the defendant -- one of the defendants in

12  this case, Phil Kenner?

13  A.   I do.

14  Q.   Do you see him in the courtroom today?

15  A.   Yes.

16        MR. HALEY:  Identification conceded, Judge.

17        THE COURT:  The identification is conceded.

18  BY MR. MISKIEWICZ:

19  Q.   When did you meet Mr. Kenner?

20  A.   2003.

21  Q.   How did you meet him?

22  A.   Through Kristie Myrick and Brian Berard, separately,

23  but got to know him through both.

24  Q.   Did there ever come a time that you worked either for

25  him or through one of his companies?

Donlan - Direct/Miskiewicz

3421

1    A.    Yes, end of '04, early '05.

2    Q.    What did you do for Mr. Kenner during that period of

3    time?

4    A.    There was a project in Hawaii I was studying to get

5    my real estate brokers -- we were going to be the realtors

6    on -- living in Hawaii selling the property.

7    Q.    Does the name Little Isle IV mean anything to you?

8    A.    Yes.

9    Q.    Were you working for that firm or the other firm?

10   A.    It was Big Isle Ventures.

11   Q.    Did you ever travel to Hawaii to look at the

12   properties that you were going to be selling?

13   A.    Yes.

14   Q.    At some point did you travel there with Mr. Brian

15   Berard?

16   A.    Yes.

17   Q.    How do you know Mr. Berard?

18   A.    Through mutual friends.

19          He grew up in Rhode Island -- in Boston.  I have

20   friends that played hockey with him, mutual, became

21   friends probably 16 years ago, I'd say 15, 16.

22   Q.    Would you say you are still friends?

23   A.    Best of friends, yeah.

24   Q.    At the time that you were working for

25   Big Isle Ventures and Mr. Kenner, was it strictly

Donlan - Direct/Miskiewicz

3422

1    employer-employee or did you become social friends with

2    any of the other employees who were engaged by that firm?

3    A.    We were all friends.

4    Q.    When you say we were all friends, who are you talking

5    about?

6    A.    Phil, Kristie, myself, Johnny Kaiser, guy -- Chris

7    Manfredi, Brian.

8    Q.    By the way, did you ever have an opportunity to

9    invest in Hawaii?

10   A.    No.

11   Q.    Did there come a time or any point in your career

12   that you worked for Prudential Real Estate?

13   A.    Yes.

14   Q.    And when you did, where would see that located?

15   A.    77 North Washington Street in Boston.

16   Q.    From time to time did Mr. Kenner ever visit you

17   there?

18   A.    Yeah, one time, yeah.

19   Q.    Do you have any approximate knowledge about -- as to

20   when?

21   A.    It was '05 and it was either Memorial Day weekend or

22   Labor Day weekend.

23         I remember it was right before the holiday

24   weekend.

25   Q.    Any reason why you remember that?

Donlan - Direct/Miskiewicz

3423

1    A.   Yes.

2         Because I had to stay in the office for an hour

3    while he finished doing his stuff.

4    Q.   Do you know what stuff he was doing?

5    A.   He was signing names of the -- his clients on to a

6    piece of paper to send over to I thought it was a bank to

7    get them money, to release money for those guys.

8    Q.   Is that what he told you?

9    A.   Yes.

10   Q.   Explain to the members of the jury, when you say sign

11   people's names, first of all, the names of who?

12        Who are you referring to?

13   A.   The guys that he was -- advised for, the hockey guys.

14        He had each one of their signatures on separate

15   pages and he was doing them all on one page.

16   Q.   Now, when you say the hockey guys, first of all, did

17   you personally meet them?

18   A.   Yeah, I knew a handful of them.

19        I didn't meet them all.

20   Q.   Who did you know?

21   A.   Well, Brian Berard, Greg DeVries, Glenn Murray, those

22   are the moneys -- Jason Woolley, the ones that I knew

23   personally.

24        I met a bunch of the other guys, but we don't

25   have a friendship.

3424

1    DIRECT EXAMINATION (Continued)

2    BY MR. MISKIEWICZ:

3    Q.   And what relationship did those people have to

4    Mr. Kenner, if you know?

5    A.   They were friends.  They were -- he was, what I

6    thought, their financial advisor.

7    Q.   So describe to the members of the jury, what did you

8    see Mr. Kenner doing with respect to the signatures?

9    A.   Taking each individual contract, putting it under one

10   piece of paper, and he would sign -- say, I'll use an

11   example.

12          Like Glen Murray's name.  He would sign his name

13   and I would photocopy that.  Then he would take the next

14   one, Brian Berard, and put it under and sign it onto the

15   same sheet of paper so that all the guys were on one

16   sheet.

17   Q.   When you say put a piece of paper, do you mean

18   tracing?

19   A.   Tracing.

20   Q.   And then eventually all these signatures, did he do

21   it once and then that was it?  Or was it multiple times?

22   A.   Well, it's photocopies.  I would photocopy that and

23   then give him the next one until he was finished, that all

24   the signatures were on this one sheet of paper.

25   Q.   And do you know what he did with that piece of paper?

Donlan - Direct/Mr. Miskiewicz

3425

1    A.    He sent it to, I thought the bank.  I don't know who

2    he sent it to.  But I know it had to do with the

3    financials of the guys.

4    Q.    All right.  And again, what year is this?

5    A.    '05.

6    Q.    Are you familiar with an individual by the name of

7    Tommy Constantine?

8    A.    Yes.

9    Q.    Did you ever meet Mr. Constantine?

10   A.    Yes.

11   Q.    Do you see him in the courtroom today?

12   A.    Yes.

13   Q.    Can you point to him and describe an item of

14   clothing --

15             MR. LaRUSSO:  We concede the identification,

16   your Honor.

17             THE COURT:  Okay.  They are conceding the

18   identification.

19   BY MR. MISKIEWICZ:

20   Q.    How did you meet Mr. Constantine?

21   A.    Through Phil, in Arizona.

22   Q.    When he was introduced to you by Mr. Kenner, what if

23   anything did Mr. Kenner tell you about Mr. Constantine?

24   A.    They were business partners.  They were you starting,

25   like I remember, like a firm, energy drinks, just doing

Donlan - Direct/Mr. Miskiewicz

3426

1    business.

2    Q.    In what year was that?

3    A.    I think it was '06.  '07.

4    Q.    You met him where?

5    A.    In Arizona.

6    Q.    Do you know an individual by the name of Steven Ross?

7    A.    Yes.

8    Q.    Who is Mr. Ross?

9    A.    He is a lender -- he's an attorney in Boston.  He was

10   a lender, more like a lender to people that didn't need to

11   pay high interest rates to get a loan.  I knew him all

12   through doing real estate transactions.

13   Q.    And I'm sorry.  You said, did you from time to time

14   deal with him as part of your real estate work?

15   A.    Yes.  He would be a closing attorney at some of the

16   deals I worked with.  And I just knew him just from being

17   in real estate.

18   Q.    Did there ever come a time that you introduced

19   personally, face to face or otherwise, Mr. Ross to either

20   Mr. Constantine or Kenner?

21   A.    Yes, both of those, via email.

22   Q.    And what was the purpose of making that introduction?

23   A.    To help them get financing for the units in Las Vegas

24   till the guys they had lined up to buy it were ready to

25   purchase it.

3427

1   Q.   When you say to get financing, who was looking to get

2   financing?

3   A.   Phil and Tommy were looking to get financing.  In

4   fact I think it was Ethan Moreau or Owen Nolan wanted to

5   buy the two units from them within like a six-month

6   period.

7   Q.   Now, did Mr. Kenner and/or Mr. Constantine tell you

8   they were looking to finance?

9   A.   Yes.

10  Q.   How did you find that out?

11  A.   Phil asked me if I knew anyone who could do the

12  financing.

13  Q.   And you thought of Mr. Ross?

14  A.   I did.

15  Q.   Do you know whether or not there was any further

16  communication after you made this introduction between

17  Mr. Ross and/or the defendants?

18  A.   Yes.  They were going back and forth about the

19  property.  I don't want to say for sure but I believe

20  Steve even went down to Vegas to check it out.  He would

21  constantly put me on the emails to keep me abreast of

22  what's going on.

23  Q.   Who would put you on the emails?

24  A.   Steven Ross.

25  Q.   So would you be cc'd on emails that are between

Donlan - Direct/Mr. Miskiewicz

3428

1    Mr. Ross and the defendants?

2    A.    Yes.

3    Q.    Showing you what has been marked for identification

4    as -- withdrawn.

5          Do you know whether or not a loan was made?

6    A.    Yes, it was made.

7    Q.    Do you know what the amount was?

8    A.    I believe it was one million.

9    Q.    And do you know whatever happened with respect to the

10   repayment on that loan for those Palms condominium units?

11   A.    Yes.

12         MR. HALEY:  I would object, Judge.  It is not of

13   her own personal knowledge.

14         THE COURT:  Sustained.

15   BY MR. MISKIEWICZ:

16   Q.    Were you in communication?  In other words, did the

17   defendants cc you with respect to communications that went

18   back and forth regarding whatever happened to the loan?

19   A.    Yes.  Steve Ross would just --

20   Q.    Just yes.

21   A.    Yes.

22   Q.    So based on the communications that you were a party

23   to, just yes or no if you know, whatever happened to the

24   loan, meaning communication, between, emails between the

25   defendants and Mr. Ross?

Donlan - Direct/Mr. Miskiewicz

3429

1   A.   Yes.

2   Q.   Do you know what happened to the million dollar loan?

3   A.   Yes.

4   Q.   What happened?

5        MR. HALEY:  Judge, I just object on relevance

6   grounds.

7        THE COURT:  No.  Overruled.

8        You can answer.

9   A.   They foreclosed on the units.

10  BY MR. MISKIEWICZ:

11  Q.   Who foreclosed?

12  A.   They stopped paying on the loan and the taxes and

13  they foreclosed.

14  Q.   You say they foreclosed, meaning who foreclosed?

15  A.   Steve Ross and the lending people that lent the money

16  foreclosed on the units that they gave the loan for.

17       MR. MISKIEWICZ:  May I have a moment, your

18  Honor?

19       (There was a pause in the proceedings.)

20       MR. MISKIEWICZ:  No further questions.

21       THE COURT:  Cross-examination?

22       MR. LaRUSSO:  Your Honor, just briefly can we

23  have a sidebar?  I know we have been doing very well.

24       (Continued on the following page.)

25

Donlan - Direct/Mr. Miskiewicz

3430

1          (Discussion at sidebar ensued as follows.)

2          MR. LaRUSSO:  The reason I asked for a sidebar

3     is, my client said he's not on those emails.

4          Do we have the emails?  I don't remember ever

5     seeing them.  Sorry to do this, judge.

6          MR. MISKIEWICZ:  I thought I gave him copies of

7     all the emails.  All right.  I have additional copies.

8          MR. LaRUSSO:  If he is on there, obviously -- he

9     says he wasn't on the emails, so if he was I would like to

10    take look at the emails.

11         THE COURT:  Are you going to go first?

12         MR. HALEY:  Yes.

13         THE COURT:  Why don't you look at them while he

14    is examining.

15         MR. MISKIEWICZ:  Judge, I have some emails.  I

16    don't know that I have everything but I have some.

17    Whatever I have, have been produced.

18         THE COURT:  She didn't say Mr. Constantine was

19    on those emails.

20         MR. LaRUSSO:  She said the defendants.  She did.

21         THE COURT:  Do you want to qualify that?

22         MR. MISKIEWICZ:  I will.

23         THE COURT:  I didn't catch that.

24         MR. LaRUSSO:  Then we don't have to do anything

25    if the government wants to stipulate to that.

Donlan - Direct/Mr. Miskiewicz

3431

1          MR. MISKIEWICZ:  Let me look at the emails.

2          MR. HALEY:  Why don't I begin.

3          (Discussion at sidebar was concluded.)

4          (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Donlan - Cross/Mr. Haley

3432

1    (The following ensued in open court.)

2    MR. LaRUSSO:  Thank you very much, judge.

3    THE COURT:  Go ahead, Mr. Haley.

4

5    CROSS-EXAMINATION

6    BY MR. HALEY:

7    Q.   Miss Donlan, my name is Rick Haley.  I represent Mr.

8    Kenner.

9    A.   Um-hmm.

10   Q.   You are not simply friendly with Brian Berard but, by

11   your own testimony, the two of you are the best of

12   friends.  Correct?

13   A.   Yes.

14   Q.   And that's a friendship that has gone back how many

15   years, ma'am?

16   A.   15.  16.

17   Q.   As you sit here today, that relationship you have

18   with Brian Berard, being best of friends, that's true as

19   you sit here at this very moment.  Is that correct?

20   A.   Yes.

21   Q.   You are aware, are you not, of the dispute between

22   Brian Berard, your best of friend, and Phil Kenner?

23   MR. MISKIEWICZ:  Objection to form.

24   MR. HALEY:  I will rephrase it, judge.

25   BY MR. HALEY:

Donlan - Cross/Mr. Haley

3433

1   Q.   Are you aware, ma'am, that there is a deep-seated

2   dispute between Phil Kenner and Brian Berard concerning

3   the relationship Brian Berard had with Phil Kenner as his

4   financial advisor?

5          You are aware of that dispute.  Correct?

6   A.   Yes.

7          MR. MISKIEWICZ:  Objection.  I am just asking

8   that there be a clarification of which dispute.

9          MR. HALEY:  I will clarify.

10  BY MR. HALEY:

11  Q.   Are you aware, ma'am -- withdrawn.

12         Brian Berard has on more than one occasion gone

13  out publicly, has he not, to do interviews with the news

14  media to state to the world his dispute with Phil Kenner?

15  Isn't that true?

16  A.   It's Brian's business.  Yes.

17  Q.   Well, you are aware of the fact that he has gone out

18  publicly to state to the world his dispute with Phil

19  Kenner.  Isn't that true?

20         MR. MISKIEWICZ:  Objection.  Asked and answered.

21         MR. HALEY:  No, she said it was his business.

22  She didn't answer this question.

23         THE COURT:  Overruled.  You can answer the

24  question.

25  A.   I'm aware that they have a dispute, if that is the

Donlan - Cross/Mr. Haley

3434

1   question you're asking me.

2   BY MR. HALEY:

3   Q.   Well, you are aware that he has gone out publicly, he

4   has been quoted in the media with reference to his side of

5   the dispute.  Correct?

6   A.   Yes.

7   Q.   As a matter of fact, take a look as Kenner Exhibit 89

8   and 90, simply for identification, ma'am.

9   A.   I'm aware.

10  Q.   You are aware of these.  Correct?

11  A.   Yes.

12  Q.   As a matter of fact, the dispute involving Brian

13  Berard and Phil Kenner, as featured in the media, is one

14  in which he is, if you will, allied with John Kaiser.

15  Would you agree with that?

16          MR. MISKIEWICZ:  Objection.

17          THE COURT:  Overruled.

18  A.   I don't know what you are asking me.

19  BY MR. HALEY:

20  Q.   Well, the articles that you have seen, I just showed

21  you Kenner Exhibit --

22  A.   I don't remember the articles.  I have just seen

23  them.

24  Q.   Okay.  With reference to Kenner Exhibit 90.

25          Having looked at that document, my question is

Donlan - Cross/Mr. Haley

3435

1    simply this.

2            Is it fair to state that not only it has been

3    Brian Berard who has publicly pronounced by way of

4    interviews to the media his dispute with Phil Kenner, but

5    also John Kaiser?  They have done so together, have they

6    not?

7    A.   Yes, there's a dispute between them.

8    Q.   My question is, ma'am, isn't it true that the dispute

9    involving Brian Berard's public pronouncements have gone

10   hand in hand with the same public pronouncements and

11   disputes involving John Kaiser, as indicated by what you

12   have in front of you?

13           MR. MISKIEWICZ:  Objection, relevancy.

14   A.   I don't understand that question.

15           THE COURT:  Sustained.

16           Miss Donlan, if the government objects, you have

17   to remain silent until I have ruled on the objection.

18           The objection is sustained as to form.  I think

19   we have covered this.

20           MR. HALEY:  Very well.

21   BY MR. HALEY:

22   Q.   Well, given your relationship with Brian, is it fair

23   to state, ma'am, that as far as the dispute he has with

24   Phil Kenner is concerned, you would be supportive of that

25   dispute rather than nonsupportive?

Donlan - Cross/Mr. Haley

3436

1        Is that a fair statement to make, as a general

2   proposition?  Yes or no?

3   A.   No, because I was very close to Phil Kenner, too.

4   Q.   Well, when was the first time you contacted any

5   person associated with law enforcement relative to your

6   testimony concerning what you say was visualizing Phil

7   Kenner trace signatures?

8        When was the first time you did that?

9   A.   I didn't contact anybody.  I was contacted.  I'm not

10  sure of the date.  A couple of years ago.

11  Q.   Who contacted you?

12  A.   I believe was Matt.

13  Q.   You are using a first name Matt.  Do you mean Special

14  Agent --

15  A.   Yes, Matt Galioto, I think.

16  Q.   So when you say Matt, you mean Special Agent Matthew

17  Galioto of the Federal Bureau of Investigation.  Correct?

18  A.   Yes.

19  Q.   And do you know, ma'am, if it was Brian Berard that

20  suggested to Matt that he speak with you?

21  A.   I don't know that.

22  Q.   So I take it, do you have any reason to believe that

23  it was Phil Kenner who contacted Matt to request that the

24  FBI speak with you?

25  A.   I'm going back to 2012.  I don't remember.  I just

3437

1   remember being shocked with all this stuff.  That's it.  I

2   don't remember.

3   Q.    When you say being shocked with all this stuff, are

4   you talking about --

5   A.    Sickened, is what I mean.

6   Q.    Oh.  And that was a result of what event?  Phil's

7   arrest and what you read about the arrest in the media?

8   Is that what you are referring to when you say you were

9   sickened?

10  A.    No.  I was just sickened because they were friends.

11  Q.    You said that you have been selling real estate for

12  the past 19 years.  True?

13  A.    Yes.

14  Q.    And as relates to that profession or occupation, you

15  have dealt with attorneys before.  Is that correct?

16  A.    Yes.

17  Q.    And as a result of that occupation and profession,

18  you have dealt with banks and officials of banks.  Is that

19  correct?

20  A.    Yes.

21  Q.    You have you have been present at closings.  Is that

22  true, ma'am?

23  A.    Yes.

24  Q.    And you understand, ma'am, as a result of that

25  occupation that, let's say for real estate closings, it is

Donlan - Cross/Mr. Haley

3438

1   important that persons that are signing the documents are

2   placing let's say their original signatures on the

3   documents unless there is, let's say, a power of attorney

4   that allows for someone to put their signature on the

5   document.  Is that true?

6   A.   Yes.

7   Q.   You say you observed Phil Kenner in 2005-2006, I

8   believe your testimony was, trace various signatures of

9   particular individuals.  Is that right?

10  A.   Yes.

11          MR. MISKIEWICZ:  Objection to the form.  It was

12  not 2006.

13  A.   Five.

14  BY MR. HALEY:

15  Q.   What year was it, ma'am?

16  A.   2005.

17          MR. HALEY:  Thank you, Mr. Miskiewicz.

18  BY MR. HALEY:

19  Q.   You say that it was in 2005 that you observed Phil

20  Kenner trace signatures of various individuals.

21          Is that what your testimony was?  Yes or no?

22  A.   Yes.

23  Q.   When he did that, as you say, what did you say to

24  him?

25  A.   He said all the guys weren't -- it was off season.

Donlan - Cross/Mr. Haley

3439

1  The guys weren't around.  Everybody was getting along.  I

2  assumed that he had the right to do it.  He had their okay

3  to do this.

4  Q.  So is it your testimony that, when you say you saw

5  him doing this, you said:  *What are you doing, Phil?*

6        Is that what your testimony is?

7  A.  No.  He told me straight out that the guys are all

8  away.  Not everybody was in the same place.  It was to

9  benefit them.  And he had to get this paperwork to, I

10  forget.  And it was to benefit the guys.  And everyone was

11  getting along.  Everybody was in contact with Phil.

12        So I assumed that he had their okay.

13  Q.  Now, I know this goes back to 2005, do you recall

14  what he was wearing that day?

15  A.  No.

16  Q.  And I know you said it was, what, on a Memorial Day

17  weekend?

18  A.  I remember it was either Memorial Day or Labor Day

19  weekend.  It was a long weekend.

20  Q.  Well, we can agree, ma'am, that Memorial Day and

21  Labor Day were not back to back; there were some months

22  between --

23  A.  Yes.  I don't remember if it was the end of May or

24  the beginning of September.  I just remember it was around

25  that time.

Donlan - Cross/Mr. Haley

3440

1  Q.    And I believe you testified on direct this was the

2  only time that Phil Kenner, as you told us under oath, was

3  present at the Prudential building with you in Boston.

4  Correct?

5  A.    As far as I recall, it was the only time that he was

6  in my office.  There was extra room.  They didn't care if

7  he was there.  He was telling people that I worked for

8  about Cabo.

9  Q.    When you say there was extra room there in this

10  office, were there other rooms that Phil could go to be

11  private when this building is essentially empty on

12  Memorial Day or Labor Day?

13          Was that a fact?  Or was it only the one room

14  that he had to stay in with you?

15  A.    The room is this dig, with desks in it.  In real

16  estate we work when everybody else is off of work so it

17  makes sense there would be people in the office.  It is

18  not like it is a 9-to-5 job.

19  Q.    That is not my question, ma'am.  My question is

20  simply while you were there.  I'm just asking you to

21  reconstruct what you say happened that day.

22          This is a large room with various desks?

23  A.    Yes.

24  Q.    Is that you are referring to?

25          As relates to this large room, are there other

Donlan - Cross/Mr. Haley

3441

1   rooms off the large room where someone can go for, let's

2   say, privacy?

3   A.   Yes.  They are private offices though.  There was a

4   conference room and there are three or four side offices

5   with the people that owned the company.  That was their

6   offices.

7   Q.   But where you say Phil did the tracing that you

8   observed, was it is in the larger room?  Was it in a

9   conference room?  Was it in one of the private offices?

10   Where do you say that happened?

11   A.   At one of the desks right next to me.

12   Q.   But I takes it, ma'am, and I wasn't there, that Phil

13   had an opportunity, given the size of the room, itself,

14   given the fact that there was an adjoining conference

15   room, to do what you said he did, outside your presence.

16   He had the opportunity.  Correct?

17   A.   No, because you can't go -- the owners of the company

18   would not let somebody they didn't really know into their

19   office to be using their stuff, sit at their desk.

20   Q.   But the owners weren't there that day.

21   A.   Yes.  Mike Lane was there.  The people were in and

22   out all day.  They would never allow him to go into

23   somebody else's office.

24   Q.   What about the conference room?

25   A.   It's wide open.  It is a glass.  You can see in.

Donlan - Cross/Mr. Haley

3442

1  It's just a table for people to come in and sign

2  documents.

3  Q.   I see.  But the conference room, I take it, is

4  separate and distinct from the desk that you say Phil was

5  sitting at next to you to do this tracing.  Isn't that

6  true?

7  A.   No.  It is like where the jurors ar sitting, just a

8  glass window.  You can see everything.  You can see in.

9  You can see out.

10  Q.   I understand that, ma'am, but is there -- it is a

11  glass wall.  But at least that wall, the glass provides

12  some privacy, does it not, between the location where you

13  say Phil was sittings next to you, and, if persons were in

14  the conference room?  Is that a fair statement?

15  A.   Yes.

16  Q.   Have you ever had occasion, ma'am, as you worked at

17  this location to see people in the conference room where

18  let's say their backs are turned to you and you cannot

19  physically see whether they are signing a paper or what

20  they are doing with a document?

21       Has that occurred in the past?

22  A.   I don't even know.  I don't understand what you are

23  asking me.

24       Could you see into the conference room?  Yes.  I

25  never took time to look in there.

Donlan - Cross/Mr. Haley

3443

1   Q.   On the day that you --

2   A.   He wasn't in conference room.

3   Q.   I understand that, ma'am.  My question is simply

4   this.

5            On the day that you say Phil Kenner was seated

6   next to you next to a desk, was there anything physically

7   preventing him from moving to a different part of the

8   office or into the conference room in order to conduct

9   this tracing of signatures that you say occurred?  That is

10  my question.

11  A.   I don't remember.  I don't remember if the conference

12  room was occupied.  I don't remember.

13  Q.   All right.  Was anyone else with you, ma'am, who was

14  in a position to see Phil Kenner trace these signatures as

15  you say occurred?  Anyone else?

16  A.   No.  I don't know.  People were in and out of the

17  office.  Nobody was asking him what he was doing.  In real

18  estate everybody works for themselves.  Nobody is paying

19  attention to what somebody else is doing.  They knew a

20  friend of mine was using a desk.

21  Q.   But you were paying attention because --

22  A.   Because I had to make the copies.  Yes, I was paying

23  attention.

24  Q.   The incident, you told us, occurred in 2005.  Is that

25  true?

Donlan - Cross/Mr. Haley

3444

1  A.   Yes.

2  Q.   And after you saw Phil as you say signing or tracing

3  various signatures of hockey players that you knew --

4  correct?

5  A.   Yes.

6  Q.   -- you then told each one of these hockey players

7  what you saw Phil doing it.  Yes or no?

8  A.   No.

9  Q.   Well, again, who was Mr. Ross?

10 A.   Steven Ross.  He is an attorney in Boston.  He

11 worked, he does law firm work and he also works for a

12 secondary loan company lending money.

13 Q.   And the loan involving Phil Kenner and Steve Ross

14 occurred in 2009.  Is that correct?

15 A.   2008.

16 Q.   2008.  And this was a loan wherein Phil Kenner was

17 signing documents because he was a guarantor.  Is that

18 correct?

19 A.   Yes.

20 Q.   And it was an instance where money was being

21 submitted, bank money, to let's say Phil Kenner and Tommy

22 Constantine for the purpose of acquiring this loan.  Is

23 that true?

24 A.   Yes.

25 Q.   And at that point in time how would you describe your

3445

1   relationship with attorney Ross?

2   A.   Fine.  Good?

3   Q.   Well, given your occupation and being in the field,

4   ma'am, have you ever had an instance where there was a

5   claim that documents during a banking transaction

6   involving real estate may or may not have been forged, or

7   things of that nature?

8   A.   I didn't understand that.

9   Q.   I would like you to understand so I will rephrase the

10  question.

11        You say you saw Phil Kenner tracing someone

12  else's signature on a document to be submitted to a bank.

13  That is your testimony signature, is it not?

14  A.   Yes.

15  Q.   And armed with that knowledge you told us a moment

16  ago you never told any of the hockey players that that

17  occurred.  True?

18  A.   No.

19  Q.   Did you ever tell attorney Ross words to the

20  effect -- by the way, what was his first name?

21  A.   Steven Ross.

22  Q.   That was his first name?

23  A.   Yes.

24  Q.   Four years later, armed with that knowledge --

25  A.   Three years later.

Donlan - Cross/Mr. Haley

3446

1    Q.    -- when you were involved with a real estate

2    transaction where Phil Kenner was a borrower, did you ever

3    tell attorney Ross words to the effect:  *Steve, this is a*

4    *banking transaction involving signatures, involving an*

5    *obligation for Phil Kenner to repay, and I've got to tell*

6    *you something, I saw Phil Kenner four years ago tracing*

7    *the signatures of other persons outside their presence?*

8          Did you ever say anything like that?

9    A.    No because I didn't think --

10   Q.    The question is simply this.

11         Did you ever say anything like that in any form

12   or any substance to Steve Ross at any point before the

13   closing or after the closing?  Yes or no?

14   A.    No.

15   Q.    When the loan was foreclosed on, as you told us, that

16   meant, did it not, that loan payments weren't made and

17   Phil Kenner, at least pursuant to your testimony, did not

18   for whatever reason fulfill his contractual obligation

19   under the loan.  Isn't that true?

20   A.    Yes.

21   Q.    And when that occurred, ma'am, did you not have a

22   conversation with Steven Ross to the effect:  *You know,*

23   *Steve, I'm not surprised because I've got to tell you --*

24   A.    No, I didn't.

25   Q.    Ma'am, it's fine.  Usually you have to wait for the

Donlan - Cross/Mr. Haley

3447

1   question to be concluded before you answer the question.

2   But okay.  That's fine.

3           Did Brian Berard know you were coming here to

4   testify as a witness in this trial?  Yes or no?

5   A.   Yes.

6   Q.   When was the last time you had any conversation with

7   Brian Berard concerning the fact that you were being

8   called here to testify?

9   A.   I was here yesterday, so I saw Brian yesterday.

10  Q.   And before that, before yesterday, when was the last

11  time you had an opportunity to speak with Brian Berard

12  concerning the fact that you were being called here to

13  testify as a witness for the government?

14  A.   Monday.  I saw him Monday.

15  Q.   And if you recall, before that time when was the last

16  time you had a conversation with Brian Berard concerning

17  the fact that you were being called here to testify as a

18  government witness?

19  A.   We didn't really have a conversation.  He knew I was

20  coming.  I don't remember the last time we discussed it.

21  Q.   Well, he knew, did he not, the reason you were called

22  as a government witness?  Isn't that true?

23          Brian Berard knew the reason you were being

24  called as a government witness.  Isn't that true?

25  A.   Yes.

Donlan - Cross/Mr. Haley

3448

1   Q.   Before your testimony here today, were you

2   interviewed by any of the prosecutors and/or the FBI

3   agents assigned to the case, including Matt?

4   A.   Was I talked to by them before this, today?

5   Q.   Yes.

6   A.   Yes.

7   Q.   Do you recall the first time you talked to them

8   before today?

9   A.   Two years ago.

10  Q.   Do you recall the last time you talked to them before

11  today?

12  A.   Monday.

13  Q.   And where did that conversation take place?

14  A.   Here when I got to the -- sorry.  Yesterday, when I

15  got to the courthouse.

16  Q.   Who was present during the course of that

17  conversation?

18  A.   Jim.  Matt.  Josh.

19  Q.   And just for purposes of the record, when you say

20  Jim, you are speaking of James Miskiewicz, attorney James

21  Miskiewicz.  Is that correct?

22  A.   Yes.

23  Q.   And just for purposes of the record, when you say

24  Josh, you are referring to Special Agent Josh Wayne of the

25  Internal Revenue Service?

Donlan - Cross/Mr. Haley

3449

1   A.   Yes.

2   Q.   And you know who Matt is, for purposes of the record.

3        How long did that meeting with James Miskiewicz

4   and Josh take place?

5   A.   Ten minutes.

6   Q.   You answered their questions.  Is that true?

7   A.   Yes.

8   Q.   When you answered their questions, did you see any

9   one of the group taking notes of what you stayed to them?

10  A.   I don't think so.  I don't remember.

11  Q.   Before that time on Monday was there a time that also

12  you were interviewed by Jim, Josh, and Matt concerning

13  your appearance here today?

14  A.   I think it was like February.

15  Q.   Of what year?

16  A.   2015.

17  Q.   And who was present during that meeting?

18  A.   I believe it was all three.  It was on the phone.

19  Q.   It was on the phone?

20  A.   Yes.

21  Q.   As relates to that conference call, were you advised

22  that the discussion you were having with them, they were

23  taking notes of that conversation?

24  A.   I don't remember.

25  Q.   Now, you say that you were with Brian Berard in

Donlan - Cross/Mr. Haley

3450

1   Hawaii back many years ago.  Is that true?

2   A.    Yes.

3   Q.    Do you recall what year that was?

4   A.    Yes.  That was '05.  We were there for Phil Kenner's

5   birthday.

6   Q.    You and Brian came out together, I take it, on the

7   same flight?

8   A.    Brian, Phil, Kristie Myrick, and myself.

9   Q.    Did you see some of the property that was to be part

10  of what we are calling the Hawaii land project?

11  A.    Yes.

12  Q.    You know what I mean by the Hawaii land project.  Is

13  that correct?

14  A.    Yes.

15  Q.    And with reference to the Hawaii land project, did

16  you see documents and paperwork as pertains to that either

17  in Phil's possession, Brian's possession, or Kristie

18  Myrick's possession?

19  A.    I don't remember.

20  Q.    Well, was it your impression that this Hawaii land

21  project was real?

22  A.    Yes.

23  Q.    I mean, you didn't have an impression, ma'am, that

24  Phil Kenner was truing to engage in any sort of -- I'll

25  withdraw that question.

Donlan - Cross/Mr. Haley

3451

1    Did there come a point in time when you left the

2    employ of Phil Kenner?

3    A.    Excuse me?

4    Q.    I'm sorry, ma'am.  I turned my back.  I apologize.

5    That was rude.

6         Did there come a point in time that you --

7    withdrawn.

8         Were you employed by Phil Kenner during any

9    period of time?

10         And I apologize.  You may have testified to that

11   on direct.

12   A.    Yes.

13   Q.    Did there come a point in time where you left his

14   employ?  Yes or no?

15   A.    I didn't leave.  It was just Hawaii was sold and in

16   Mexico it was, we got terminated.

17   Q.    Who terminated you in Mexico?

18   A.    I was under the impression it was Ken Jowdy who told

19   me that everyone just got laid off.

20   Q.    Now I'm going to ask you to take a look, ma'am, at a

21   document received in evidence as Kenner Exhibit 93.

22         You are entitled to take a look at the entire

23   document but let me ask you to take a look at the last

24   page of that document.

25   A.    Um-hmm.

Donlan - Cross/Mr. Haley

3452

1   Q.   And given your relationship with Brian Berard over

2   the years, would you say you have some familiarity with

3   his signature?

4   A.   Yes.

5   Q.   Do you see his signature on that document?

6   A.   Yes.  It looks like his signature.

7   Q.   Okay.  In other words this --

8   A.   I know what it says.  I don't know exactly what it

9   looks like.  I know what it looks like.  That resembles

10  it. (Sic.

11  Q.   Well, you had no reason to -- do you have reason to

12  believe that this signature is a forgery?

13  A.   No.

14  Q.   Other than that instance you claim in Providence,

15  Rhode Island, were there any other instances where you

16  claim that you saw Phil Kenner tracing someone's signature

17  over -- a piece of paper.

18  A.   That was in Boston, not Providence.

19  Q.   Excuse me.  You are correct.  In Boston.

20  A.   No.

21  Q.   As relates to Kenner Exhibit 95.  Take a look at that

22  document.

23  A.   I can't validate this is his signature, no.  I think

24  it looks like it but I don't know.

25           Is that what you are asking me?

Donlan - Cross/Mr. Haley

3453

1   Q.   I haven't asked you a question yet.  I just want you

2   to take a look at it.

3   A.   Okay.

4   Q.   Have you taken a look at it?

5   A.   Yes.

6   Q.   Do you see Brian Berard's signature on that document?

7   A.   I do.

8        Well, I don't if it is his.  I see a signature

9   that says Brian Berard.  But it reassembles the signature.

10  It looks like his.

11       Actually -- yes.

12  Q.   Well, you hesitated a moment.  Actually what?

13  A.   It just didn't look like a B.  That's all.

14  Q.   So is there some question -- ma'am, I don't want --

15  A.   I'm not a signature analyst.  I don't know.  It looks

16  like and just think, I don't know, Brian's?  Yes.  I don't

17  know.

18  Q.   Ma'am, are you here pursuant to a subpoena where the

19  subpoena was served upon you either by a federal agent,

20  process server, or a US Marshal, stating that you should

21  be here today?

22  A.   I don't believe so.  I wasn't served.

23       I don't really know what subpoena means so...

24  Q.   It would be a document that says actually *Subpoena* on

25  top of it.

Donlan - Cross/Mr. Haley

3454

1   A.   No.

2   Q.   That begins --

3   A.   I haven't.  Sorry.

4   Q.   What a subpoena is is a document that says *Subpoena*

5   on it and you will see language:  *"You are commanded to*

6   *appear."*

7          Were you served with that sort of document --

8   A.   No.

9   Q.   -- in order for you to be here today?

10  A.   No.

11  Q.   So it is fair to state that you are here essentially

12  voluntarily?  The government asked you to come here today

13  to testify.  Isn't that true?

14  A.   Yes.

15  Q.   And did Brian likewise encourage you in some way to

16  be here to testify as a government witness?  Yes or no?

17  A.   No.

18  Q.   Well, he didn't advise you that you should not come,

19  did he?

20          MR. MISKIEWICZ:  Objection.

21          MR. HALEY:  I will withdraw that, judge.

22  BY MR. HALEY:

23  Q.   The document that you say you saw Phil Kenner signed

24  by way of tracing signatures, is it your testimony that

25  all of those signatures were being traced onto one single

Donlan - Cross/Mr. Haley

3455

1   page?  Is that your testimony?

2   A.    Yes.

3   Q.    And what was above the signatures as you -- you were

4   there.  Tell us what was above the signatures that you say

5   you saw Phil tracing on this one piece of paper?  What did

6   it say on top of it?

7   A.    It was one piece of paper.  I didn't read it.  I just

8   knew that he was doing this to benefit the guys.  And

9   everyone was in a happy place so I thought it was okay.  I

10  didn't read the form.  I just made copies.

11  Q.    Well, so my question was this, ma'am.  What was above

12  the, on the paper?  What was above the area where you say

13  you saw Phil tracing these signatures?  What did it say up

14  top?

15  A.    I didn't read it.

16  Q.    Well, you knew it was a -- did it say bank statement?

17  Withdrawn.  You said on direct --

18  A.    It didn't say it was a banking statement.

19  Q.    I see.  Well, it was your impression that it was a

20  financial document.  That is the best of your memory.  Is

21  that what you are saying?

22  A.    I was under the impression that it had something to

23  do with Hawaii and I assumed it was being sent over to a

24  bank.  I don't remember what it was.  I just remember it

25  took an hour to do the signatures.

Donlan - Cross/Mr. Haley

3456

1   Q.   So your statement that it was a financial document,

2   that is really based on an assumption.  Correct?

3   A.   An assumption.  Yes.

4   Q.   And your best memory is that it had something to do

5   with Hawaii.  Correct?

6   A.   Yes.

7   Q.   I assume, ma'am, that when this occurred in 2005, did

8   you retain -- you -- any copies of the documents that you

9   say you saw Phil signing and then I believe I said you

10  copied them as well.  Correct?

11  A.   I made copies of them as he was doing it.

12  Q.   And did you retain copies of these documents?  Yes or

13  no?

14  A.   Not that I know of.  I thought I had someone, emailed

15  but I don't know.  I was trying to scan them to send to

16  him so he could send them out.

17  Q.   Did you retain your email going back to 2005?

18  A.   No, I don't think so.

19  Q.   When you said a moment ago I thought --

20  A.   I said I saved a lot of stuff that had to do with

21  Hawaii but it wasn't paperwork.

22          I made him the copies.  I sent them out.  I

23  don't know.  I don't know.

24  Q.   Well, what you did retain in terms of these emails,

25  did you provide those documents to the government?

3457

1    A.    Not that I know of.

2    Q.    Well, did the government ask you for the emails that

3    you say were generated as relates to things Phil Kenner

4    asked you to do and things of that nature?

5    A.    I sent them emails I had between us, but I don't

6    remember exactly which ones.

7    Q.    Well, did the government ever ask you if you have an

8    email including the attachments reflecting this instance

9    where you claim you saw Phil Kenner --

10   A.    I don't remember.

11   Q.    You don't remember whether they asked you for that?

12   A.    Probably.  I don't remember.  I'm assuming they did.

13   I just don't remember.

14   Q.    Well, as relates to what you just testified to,

15   ma'am, is there some means by which we can obtain a copy

16   of this document you say you saw Phil tracing signatures

17   on?  That is my question.

18   A.    I don't know.  I don't know.  It's in '05.  I don't

19   have it.  I have the memory of it.  It's just something I

20   really remembered.

21   Q.    I know you are not certain whether or not it occurred

22   on Memorial Day or Labor Day, but do you know what part of

23   the weekend it occurred:  Saturday, Sunday, Monday?

24   A.    No.  I'm thinking Thursday or Friday.

25   Q.    I see.  And did you know in advance that Phil was

Donlan - Cross/Mr. Haley

3458

1   coming out to meet with you, as you say?

2   A.   He came to the Boston often.

3   Q.   In 2005 he came to Boston often.  Is that your

4   testimony?

5   A.   In general.  I mean, he came out a couple of times.

6   I don't remember exactly.  He came a good amount of times

7   to Boston.  It wasn't a planned trip.  I just remember him

8   coming in.

9   Q.   The other times Phil came the Boston, do you know

10  whether he met with or who he saw or where he was?

11  A.   I don't.  He would go see guys that he dealt with

12  that played in the area.  He would go out with myself.  He

13  became friends with my friends.

14  Q.   When was the last time you spoke with Phil Kenner?

15  A.   2010.

16  Q.   And during that conversation with Phil Kenner, I take

17  it you and he discussed what you say you saw him doing?

18  A.   No.

19  Q.   Well, let me finish for this gentleman here.

20  A.   Sorry.

21  Q.   I take it when you last spoke with Phil Kenner in

22  2010, you and he discussed what you say you saw him do in

23  2005 at your offices in Boston.  Did you discuss that with

24  him?

25  A.   No.

Donlan - Cross/Mr. Haley

3459

1   Q.   Do you recall approximately when in 2010 you spoke to

2   Phil about this?

3   A.   I didn't speak to Phil about this.

4   Q.   Oh.  Do you recall approximately when in 2010 you had

5   this last conversation with Phil?  Was it the early part

6   of the year, the middle part of the year, the latter part

7   of the year?

8   A.   Mid.

9   Q.   Was that a face-to-face conversation?

10  A.   No.  He was in Hawaii.  My sister Allie was living

11  down there the last time I spoke to him.  He wanted to see

12  my sister.

13  Q.   So I take it, ma'am, at no point in time following

14  this event in 2005, at least up to the point in time you

15  last saw Phil Kenner in 2010, you and he ever had a

16  discussion where you said words to the effect:  *Phil, what*

17  *was that all about?  You know that document that I saw you*

18  *sign other people's names?  What was that all about?*

19       You never asked him that?

20  A.   No.

21  Q.   I know you told us earlier, ma'am, that you never

22  told any of the hockey players, the specific ones that you

23  say you saw Phil tracing their names, about what happened.

24       You never told them.  Is that correct?

25  A.   Not until later on.  Like two-thousand probably

Donlan - Cross/Mr. Haley

3460

1    eleven, ten.

2    Q.    Who do you say you told?

3    A.    I remember I told Jason Wooley and Brian Berard.

4    Q.    And let's say when you told Brian Berard, what did he

5    say in response to what you told him?

6    A.    He didn't know what the document was.  And just I

7    just had a memory of that happening so I don't remember

8    what his reaction was.

9    Q.    Well, when you told Jason Wooley what you saw, what

10   did he say to you?

11   A.    I don't remember.

12   Q.    Other than these two people -- well, did you ever

13   tell Glenn Murray this?  Yes or no?

14   A.    No.  I haven't spoken to Glenn.

15   Q.    Well, you certainly would be able to speak with

16   Glenn, would you not?  You could find out where he was and

17   give him a call and talk to him about it?

18   A.    Yes.

19   Q.    Any prohibition that you are aware of that would

20   prevent you from doing so?

21   A.    No.

22   Q.    Other than Jason Wooley and Brian, as you say, did

23   you ever tell any other hockey players?

24   A.    No, I don't remember.

25   Q.    When you say *no, I don't remember*:  Is the answer:

Donlan - Cross/Mr. Haley

3461

1    *No, I did not?* Or:  *I may have and I don't remember?*

2           What is your testimony?

3    A.   I don't remember.

4    Q.   So I take it you have no memory of what their

5    reaction was when and if you ever told them.  Correct?

6    A.   No.

7           MR. HALEY:  May I have one moment, judge.

8           (Counsel and client confer.)

9    BY MR. HALEY:

10   Q.   Ma'am, I'm going to ask you to take a look at a

11   document marked Kenner Exhibit 99.  Take your time.

12          Do you recognize that document?

13   A.   No.  I don't remember this but yes, I remember the

14   loan.

15          So I recognize me being on there.  I just don't

16   really remember the email.

17          MR. MISKIEWICZ:  The government stipulates to

18   its admissibility.

19          MR. HALEY:  Thank you, judge.

20          THE COURT:  What number?

21          MR. HALEY:  Kenner Government Exhibit 99.

22          THE COURT:  Any objection, Mr. LaRusso?

23          MR. LaRUSSO:  No objection.

24          THE COURT:  Defendant's Exhibit 99 is admitted.

25          (Defense Exhibit 99 in evidence.)

Donlan - Cross/Mr. LaRusso

3462

1    Q.   One final question.  Can we agree that in June of

2    2008 -- withdrawn.

3          Do you see your email address on Kenner Exhibit

4    99?

5    A.   Yes.

6    Q.   Finally, ma'am.  In or about the time that Mr. Ross

7    was involved in the loan involving the million dollars in

8    guarantee, did you have the ability to communicate with

9    Mr. Ross via email?  Yes or no?

10   A.   Yes.

11          MR. HALEY:  I have no further questions.  Thank

12   you.

13          MR. LaRUSSO:  I have just like two questions, if

14   you don't mind.

15          THE COURT:  Sure.

16

17   CROSS-EXAMINATION

18   BY MR. LaRUSSO:

19   Q.   Good afternoon, Miss Donlan.

20          You testified that the, I will call it the Ross

21   loan, at some point went into foreclosure.  Is that

22   correct?

23   A.   Yes.

24   Q.   Is that around 2010?

25   A.   I believe yes.  Probably -- it was definitely 2010.

Donlan - Redirect/Mr. Miskiewicz

3463

1   Q.    And to your knowledge do you know if Mr. Constantine

2   ever met with or spoke to Mr. Ross prior to the condos

3   going into foreclosure?

4   A.    I know that they were in contact.  I don't know how

5   much they spoke.  It was my understanding that they were

6   all in emails together.

7   Q.    Do you know if Mr. Constantine was on the mail like

8   you, on a cc?

9   A.    I thought he was on some of them.  I don't remember.

10  Q.    I will just show you what has been marked for

11  identification LD-1.

12         Just take a look at this one document.

13         Does refresh your recollection --

14  A.    Yes.

15  Q.    -- that he was cc'd, like you?

16  A.    Yes.

17         MR. LaRUSSO:  No further questions, Judge.

18         THE COURT:  Redirect?

19         MR. MISKIEWICZ:  Briefly.

20

21  REDIRECT EXAMINATION

22  BY MR. MISKIEWICZ:

23  Q.    Miss Donlan, you were asked by Mr. Haley a series of

24  questions about whether you understood that eventually

25  there it was a dispute between Mr. Berard and Mr. Kenner.

Donlan - Redirect/Mr. Miskiewicz

3464

1           Do you remember those questions?

2   A.    Yes.

3   Q.    And you said you were sickened, I believe, at some

4   point.

5   A.    Yes.

6   Q.    Would you describe to the members of the jury, what

7   was your relationship with Mr. Kenner during the period of

8   time that you knew him up until the last time you spoke to

9   him?

10  A.    We were very, very close friends.  And I would say

11  for a period of time we were very, very good friends.

12  Q.    And simultaneously were you very, very close friends

13  with Mr. Berard?

14  A.    Yes.

15  Q.    And continue to be.  Correct?

16  A.    Yes.

17  Q.    And is this your first time testifying in court with

18  respect to any matter having to do with Mr. Kenner?

19  A.    No.

20  Q.    You know a Kristie Myrick?

21  A.    Yes.

22  Q.    You know there was a lawsuit?

23  A.    Yes.

24          MR. HALEY:  Judge, I think this is going beyond.

25          THE COURT:  Sustained.  It is beyond the scope.

Donlan - Redirect/Mr. Miskiewicz

3465

1   BY MR. MISKIEWICZ:

2   Q.   Well, did you ever participate in any way to try to

3   help Mr. Kenner, between the time you met him and the last

4   time you spoke to him, with respect to any civil

5   litigation?

6   A.   Yes.

7   Q.   You testified in his behalf in a lawsuit?

8   A.   I did.  Yes.

9   Q.   Do you have any grudge against him?

10  A.   No.  Saddened.  That's it.

11  Q.   Withdrawn.

12       I'm sorry.  *Saddened?*

13       And you were asked a series of questions about

14  trying to pinpoint when did that event occur at the

15  Prudential office:  Memorial Day or Labor Day weekend.

16       Do you have any recollection, where did you go

17  or what did you do after this one-hour episode of making

18  copies?

19  A.   If I can remember, I was going away.  I either went

20  to Nantucket, if it was Memorial Day.  Or we went to New

21  York.

22       Right after Labor Day it was right before the US

23  Open.  Phil had come to New York so I can't remember if he

24  was there on that or I was just getting out of the office

25  to go to Nantucket.

Donlan - Redirect/Mr. Miskiewicz

3466

1   Q.   When you say *we*, who do you go with?

2   A.   Kristie Myrick came.

3   Q.   And Mr. Kenner was part of that?

4   A.   The one in New York he was.

5   Q.   Okay.  So if this happened on the Labor Day weekend,

6   that would have been sometime around the US Open?

7   A.   Yes.

8   Q.   So is it fair to say that you traveled to various

9   places together as friends with Mr. Kenner --

10  A.   Yes.

11  Q.   -- over a period of time.

12       And lastly, why didn't you tell either Mr. Ross

13  or any of the hockey players about this tracing until, as

14  you said, much latter?

15  A.   I believed that he was doing it truly to help the

16  guys.  They all trusted each other, got along, and it was

17  for their benefit.

18  Q.   You didn't think there was anything wrong or

19  suspicious about it?

20  A.   No.

21  Q.   You were friends with Brian Berard.  Did you ever

22  tell him?

23  A.   They were friends so I just thought he was doing the

24  right thing.

25       MR. MISKIEWICZ:  No further questions.

Donlan - Recross/Mr. Haley

3467

1    MR. HALEY:  Briefly, judge.

2

3    RECROSS-EXAMINATION

4    BY MR. HALEY:

5    Q.   We can agree, can we not, Miss Doan, that there is no

6    longer any friendship between you and --

7    A.   Yes.

8    Q.   -- Phil?

9    A.   Sorry.

10   Q.   Let me finish.  I think you know what the question

11   might be.

12   A.   Sorry.

13   Q.   For this gentleman's sake.

14        We can agree, can we not, Miss Donlan, that

15   there is no longer any friendship that exists between Phil

16   Kenner and Brian Berard as you sit here today?  Isn't that

17   true?

18   A.   Yes.

19   Q.   And as a matter of fact.  Would you say that not only

20   is there no longer a friendship between the two of them,

21   but the relationship between the two of them, meaning Phil

22   Kenner and Brian Berard, who is still one of your best

23   friends, is one of personal, deep-seated personal dislike?

24   A.   Sorry?

25        MR. HALEY:  Okay.  Judge, I have no further

3468

1    questions.

2              THE COURT:  You can step down.  Thank you.

3              (The witness was excused.)

4              THE COURT:  Let's take the lunch break.  We will

5    reconvene at 2 o'clock.  Is that long enough?  2 o'clock.

6              Please don't discuss the case.  Have a good

7    lunch.

8              (Lunch recess taken at 1:10 pm.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3469

1              A F T E R N O O N     S E S S I O N

2

3              THE CLERK:  All rise.

4              THE COURT:  Please be seated.  Let's bring in

5    the jury and the next witness.

6              MS. KOMATIREDDY:  Your Honor, we would like to

7    move in a few documents by certification as discussed

8    yesterday.  I discussed it with defense counsel and

9    there's no longer an objection and then we will be calling

10   Glen Murray.

11             THE COURT:  Okay.

12             THE CLERK:  All rise.

13             THE COURT:  Please be seated.

14             The government can proceed.

15             MS. KOMATIREDDY:  At this time we would like to

16   move in several stipulations, stipulations marked 41

17   through 46.

18             THE COURT:  Any objection?

19             MR. LARUSSO:  I didn't know the numbers, but I

20   signed them and have no objection.

21             MR. HALEY:  No objection.  I recognize my

22   signature, Judge.  I have no objection to those exhibits

23   going into evidence.

24             THE COURT:  Stipulations 41 through 46 are

25   admitted.

3470

1    (Government's Exhibits 41 through 46 in

2   evidence.)

3        MS. KOMATIREDDY:   Those stipulations reference

4   Government's Exhibits 4404 through 4407, 4403. The

5   foregoing are law firm records.

6        Government's Exhibit 715, an escrow company

7   record, Government's Exhibit 3907 through 3909 and 4401

8   through 4402 which are bank records and business records.

9   We also move those into evidence.

10        THE COURT:   Any objection to those exhibits as

11   per the stipulation coming in?

12        MR. LARUSSO:   No.

13        MR. HALEY:   No, sir.

14        THE COURT:   All those exhibits are admitted into

15   evidence as well.

16        (Government's Exhibits 4404 through 4407, 403,

17   715, 3907 through 3909 and 4401 through 4402 in evidence.)

18        MS. KOMATIREDDY:   At this time, I would like to

19   read stipulation 45 in relevant part.

20        On May 12, 2009, Nussbaum & Gillis, PC, received

21   a payment in the amount of $500,000 on behalf of the

22   defendant Constantine.

23        The payment came in the form of a wire transfer

24   from an account in the name of the law offices of Ronald

25   Richards.

3471

1    One day after receiving the foregoing payment,

2    an employee of Nussbaum & Gillis, PC, remitted the

3    $500,000 to a representative of Stephen J. Hilton Family

4    Trust; hereinafter the Hilton Trust.

5         As part of a settlement agreement with the

6    Hilton Trust to paydown a loan and any other obligations

7    owed to the Hilton Trust by Tommy Constantine, Constantine

8    Management Group, and Avalon CMG, and to get Avalon CMG

9    out of bankruptcy.

10         Government's Exhibit 4303 is a true and accurate

11   copy of an order dismissing the bankruptcy case of Avalon

12   CMG pursuant to the foregoing settlement agreement.

13         Government's Exhibit 4304 is a true and accurate

14   copy of a check drawn on the bank account of Nussbaum &

15   Gillis, PC, and Harris Bank and the confirmation of

16   receipt of the bank.

17         On May 27, 2009, Nussbaum & Gillis, PC, received

18   a payment in the amount of $747.14 on behalf of the

19   defendant Constantine.

20         That payment came in the form of a wire transfer

21   from an account in the name of the law offices of Ronald

22   Richards.

23         The payment was applied to outstanding legal

24   fees for work performed by Nussbaum & Gillis, PC, on

25   Avalon CMG's bankruptcy case.

3472

1        Government's Exhibits 4301 and 4306 are true and

2   accurate copies of portions of monthly account statements

3   for the bank account of Nussbaum & Gillis, PC, at Harris

4   Bank.

5        This stipulation and Government's Exhibit 4301,

6   4303, 4304 and 4306 are admissible in evidence at trial.

7        At this time, the government moves those

8   exhibits into evidence.

9        THE COURT:  Any objection?

10       MR. LARUSSO:  No, your Honor.

11       MR. HALEY:  No, your Honor.

12       THE COURT:  Those exhibits are admitted as well.

13       (Government Exhibits 4301, 4303, 4304 and 4306

14   in evidence.)

15       MS. KOMATIREDDY:  Lastly, your Honor, we would

16   like to move in several exhibits pursuant to the business

17   records certifications.

18       The exhibits have been marked Government's

19   Exhibits 3331 through 3336, 3341 R, 3342 through 3349,

20   3339, 3902, 3340 and 3903 through 3906.

21       These are business records of various racing

22   companies.

23       THE COURT:  Any objection?

24       MR. LARUSSO:  No, your Honor.

25       MR. HALEY:  No, sir.

3473

1        THE COURT:  Those exhibits are admitted into

2   evidence.

3            (Government's Exhibits 3331 through 3336, 3341

4   R, 3342 through 3349 in evidence.)

5        MS. KOMATIREDDY:  And Government's Exhibits 3940

6   through 3947, which are business records of Cabin

7   Crafters, Inc.

8        THE COURT:  Any objection?

9        MR. LARUSSO:  No, your Honor.

10       MR. HALEY:  No, sir.

11       THE COURT:  Those exhibits are admitted as well.

12           (Government Exhibits 3940 through 3947 in

13   evidence.)

14       MS. KOMATIREDDY:  Thank you, Judge.

15       MR. MISKIEWICZ:  The government calls Glen

16   Murray.

17       THE COURT:  Mr. Murray, if you could come up to

18   the witness stand over here and remain standing for the

19   oath.

20

21   GLEN MURRAY,

22           called as a witness, having been first

23           duly sworn, was examined and testified

24           as follows:

25

3474

1           THE CLERK:  Please state your name and spell it

2      for the record.

3           THE WITNESS:  Glen, G-L-E-N, Murray,

4      M-U-R-R-A-Y.

5           THE COURT:  Be seated, Mr. Murray, and just pull

6      the mike close to you and keep your voice up.

7           Go ahead, Mr. Miskiewicz.

8           MR. MISKIEWICZ:  Thank you, your Honor.

9

10     DIRECT EXAMINATION

11     BY MR. MISKIEWICZ:

12     Q.   Good afternoon, Mr. Murray.

13          Mr. Murray, what do you currently do for a

14     living?

15     A.   I work for the LA Kings Hockey Club.

16     Q.   What do you do for the LA Kings?

17     A.   Hockey operations.

18          I work with the draft pick players that are

19     coming on our team.

20     Q.   Prior to your current position, what did you do?

21     A.   I played professionally.

22     Q.   You were in the NHL?

23     A.   Yes.

24     Q.   And what position did you play?

25     A.   Forward.

Murray  -  Direct/Miskiewicz

3475

1    Q.    How long did you play in the NHL?

2    A.    17 years.

3    Q.    How old were you when you started?

4    A.    19.

5    Q.    What year was that?

6    A.    1990, '91, '92.

7    Q.    When did you retire from pro hockey?

8    A.    Six years ago now.

9          My last season was '08 or '09, or '09, '10.  I

10   can't remember.  That's bad.  One of those years.

11   Q.    Do you know one of the defendants in this case, Phil

12   Kenner, Phillip Kenner?

13   A.    Yes.

14   Q.    And how long have you known Phillip Kenner?

15   A.    Probably since '94, maybe '95, '93.

16   Q.    How did you meet him?

17   A.    Through a friend of one of the players I played with

18   on the team.

19   Q.    What team was that?

20   A.    Boston.

21   Q.    Do you remember who the friend was who introduced you

22   to Mr. Kenner?

23   A.    Yes.

24          It was Joe Juneau.

25   Q.    He was another player, correct?

Murray  -  Direct/Miskiewicz

3476

1    A.    Yes.

2    Q.    Playing for Boston at the time?

3    A.    Yes.

4    Q.    Do you see Mr. Kenner in the courtroom today?

5    A.    Yes.

6              MR. HALEY:   Identification conceded, Judge.

7              THE COURT:   The identification has been

8    conceded.

9              MR. MISKIEWICZ:   Thank you.

10   BY MR. MISKIEWICZ:

11   Q.    When you were introduced to Mr. Kenner, did you, at

12   any point, hire him for any services?

13   A.    He was my financial advisor I guess you can say

14   eventually within a few years of meeting him.

15   Q.    And give us a ballpark approximately of what year

16   would that have been?

17   A.    I don't know exactly, but I would say ballpark

18   between '93 and '95 or 6.

19   Q.    What were you hiring him to do when you hired him as

20   your financial advisor?

21   A.    Just to kind of look after my money or just to give

22   loans or mortgages, whatever they may be, different things

23   that I didn't really know that and as I look back didn't

24   have time to kind of understand or take care of.

25              Yes, I hired him to do that for me.

Murray  -  Direct/Miskiewicz

3477

1    Q.   Were you in your early 20s when you hired him?

2    A.   Yes.

3    Q.   And did he manage any stocks or bond portfolios that

4    you had by way of savings?

5    A.   Did he manage it?  I don't know if he did.

6         I know he worked for a company called State

7    Street I think it was back in the day.  I don't know if he

8    actually took care of the bonds or stocks.

9    Q.   Are you familiar with whether or not Mr. Kenner went

10   on to different companies after working for State Street?

11   A.   Well, I think it was State Street too.  I can't

12   remember the next one, the second one.

13   Q.   There was a second one?

14   A.   There was another one, but I can't remember the

15   names.

16         There was Freedom Capital, State Street,

17   Standard Advisors I think it was.

18   Q.   Do you know whether or not there came a time that

19   Mr. Kenner was working for himself on his own?

20   A.   I just remember the other one, Assante it was called.

21         I'm sorry, can you repeat the question again?

22   Q.   Do you remember whether or not Mr. Kenner ever went

23   out and started working for himself, his own company?

24   A.   I think that was the one, Standard Advisors.

25   Q.   When he did that, were you still -- was he still your

Murray  -  Direct/Miskiewicz

3478

1   financial advisor?

2   A.   Yeah.

3        I switched from whichever was the last one to

4   Standard Advisors, yes.

5   Q.   And when he was your financial advisor working on his

6   own as Standard Advisors, did you have any stock or bond

7   portfolio invested at that time if you recall?

8   A.   Yeah, but that was through Charles Schwab.

9   Q.   But you had an account at Charles Schwab?

10  A.   Yes.

11  Q.   Generally speaking, what were the nature of your

12  investments at that time through your portfolio with

13  Charles Schwab?

14  A.   Just the stocks and bonds, like I said.

15  Q.   Did there come a time that you invested in something

16  that's been referred to in this trial as the Hawaii land

17  deal?

18  A.   Yeah, I invested.

19  Q.   When did you do that?

20  A.   I couldn't give you an exact date.

21  Q.   Approximately when?

22  A.   I would be guessing, but late '90s, maybe 2000s.  I

23  don't know.  I can't remember.

24  Q.   Do you recall the name Big Isle IV or Little Isle IV?

25  A.   That sounds familiar.  Those sound familiar.

Murray  -  Direct/Miskiewicz

3479

1   Q.   Did it have anything to do with this Hawaii land

2   deal?

3   A.   I think so.

4   Q.   I'm going to show you what's been admitted into

5   evidence as Government's Exhibit 1520.

6            Showing you on the screen now something that's

7   in evidence as Government's Exhibit 1520, do you see your

8   signature at the bottom?

9   A.   Yes.

10  Q.   Does that look like your signature?

11  A.   Yes.

12  Q.   For the record, could you tell us in bold what does

13  it say there?

14  A.   Please wire 100,000 using the following instructions.

15  Q.   That wire was coming out of an account of yours?

16  A.   Charles Schwab, yes.

17  Q.   Where was it going?

18           Who is the beneficiary of the $100,000?

19  A.   Big Isle IV it says here.

20  Q.   Would that have been at or about the time you

21  invested in the Hawaii land deal?

22  A.   I think so.

23  Q.   Now, who first spoke to you about investing in a real

24  estate venture in Hawaii?

25  A.   Phil.

Murray  -  Direct/Miskiewicz

3480

1    Q.    What, if anything, did he say?

2    A.    I have an opportunity.  We have some great land to

3    buy and we're going to develop it.

4    Q.    What, if anything, were you going to get in exchange

5    for your $100,000?

6    A.    I don't know, hopefully profit, get your money back

7    and more.

8    Q.    Where was the money supposed to go, to what end was

9    the money supposed to be spent?

10   A.    Towards the property.

11   Q.    The property where?

12   A.    In Hawaii, Big Isle IV.

13   Q.    Did you, at some point, transfer your stock and bond

14   fund from Charles Schwab to a different institution?

15   A.    Not that I know of, no.

16   Q.    Are you familiar with a company by the name of

17   Northern Trust bank?

18   A.    Yes.

19   Q.    Did there ever come a time that you agreed to open a

20   line of credit through Northern Trust bank?

21   A.    I don't remember agreeing to it, but I know that it

22   happened.

23   Q.    And was this done in connection with the Hawaii

24   investment or anything else?

25   A.    The Hawaii investment.

Murray  -  Direct/Miskiewicz

3481

1   Q.   As you sit here today, you don't have an independent

2   recollection of agreeing to it, but do you believe at some

3   point you had a conversation with Mr. Kenner about it?

4   A.   About the Hawaii project?

5   Q.   The line of credit.

6   A.   Yes.  I would assume I did, yes.

7   Q.   So what, if anything, do you recall Mr. Kenner

8   telling you the line of credit was going to be used for

9   with respect to the Hawaii project?

10  A.   I think, if I can remember, the money was for the

11  Hawaii project, to develop the project, develop the land

12  and pay the people that are looking after it and whatever.

13  Q.   Now, during that period of time, and I'm going to

14  show you another document that's also in evidence.

15           I'm going to ask you if this refreshes your

16  recollection about transferring assets over to Northern

17  Trust.

18           I'm showing you what's in evidence as

19  Government's Exhibit 1523.

20           And as you see at the top, it says dated October

21  26, 2004.  It's directed to Charles Schwab.

22           Do you see that?

23  A.   Yes.

24  Q.   Do you see where the body of the wire transfer order

25  or letter, whatever you want to call it, says, dear

3482

1    Charles Schwab and Company, do you see that?

2    A.    Yes.

3    Q.    It's asking that a million dollars be sent from your

4    Schwab account to Northern Trust.

5            Do you see that?

6    A.    Yes.

7    Q.    Does that help refresh your recollection at all that

8    you did at some point transfer funds and open an account

9    in Northern Trust?

10   A.    I mean, I don't really remember this document.

11   Q.    Do you have any doubt that's your signature?

12   A.    No.

13           It looks like my signature, yes.

14   Q.    So just today, or in 2015, you don't remember a

15   specific wire transfer from October 2004, but do you have

16   any doubt at some point you had agreed to do this?

17   A.    Yes.

18   Q.    If you agreed to do it, who would have been advising

19   you at that time?

20   A.    Phil.

21   Q.    And do you have any recollection of how much of a

22   line of credit at Northern Trust was ultimately extended

23   to you?

24   A.    No, I don't remember the exact amount.

25   Q.    Did you get any statements from Northern Trust during

Murray  -  Direct/Miskiewicz

3483

1   the time that the line of credit was open?

2   A.   I did get statements, but it didn't necessarily

3   have -- I got that for maybe a month or two.  They didn't

4   come very often.  Very rarely did I get a statement, but I

5   recall having statements from Northern Trust.

6   Q.   Showing you what's also in evidence as Government's

7   Exhibit 2176, and focusing on the heading there.

8         For the record, this is an account statement,

9   correct?

10  A.   Yes.

11  Q.   In whose name?

12  A.   In my name.

13  Q.   Do you remember getting a statement that looks like

14  this at some point?

15  A.   Maybe.  It looks familiar but...

16  Q.   You don't recall?

17  A.   Yeah.  That's probably the statement.

18         MR. HALEY:  Mr. Miskiewicz, what exhibit is

19  that?

20         MR. MISKIEWICZ:  2176.

21         MR. HALEY:  Thank you.

22  BY MR. MISKIEWICZ:

23  Q.   Now, what we were just looking at is a statement for

24  the period March 1, 2009, to March 31, 2009.

25         Back in 2004, when a million dollars was

Murray  -  Direct/Miskiewicz

3484

1   transferred over to Northern Trust Company from your

2   Charles Schwab account, do you recall getting statements

3   back then?

4   A.   Statements from?

5   Q.   Northern Trust?

6            MR. HALEY:  I believe that was asked and

7   answered.

8            THE COURT:  Now he's asking about 2004.  He's

9   asking whether he got it in that time frame.

10  A.   Can you repeat the question again.

11  Q.   At or about the time that your million dollars was

12  transferred over to Northern Trust, and you opened up a

13  Northern Trust account, do you recall getting any

14  statements back then, back in 2004?

15  A.   No.

16  Q.   I show you a document that's also in evidence,

17  Government's Exhibit 2137.

18            I'm going to just highlight a part of this

19  exhibit so we can all see it.

20            In the upper left-hand corner it says Glen

21  Murray, correct?

22  A.   Yes.

23  Q.   I'm going to show you the whole thing.  You can look

24  at the paper copy.

25            Mr. Murray, have you ever seen that document

3485

1    before?

2    A.    No.

3    Q.    Is this the first time you're seeing it?

4    A.    Yes.

5    Q.    You've had interaction or interviews with law

6    enforcement agents prior to your testimony here today,

7    correct?

8    A.    Yes.

9    Q.    Has anybody ever shown you that exhibit?

10   A.    No.

11   Q.    So you're absolutely sure this is the very first time

12   you're seeing it?

13   A.    Yes.

14   Q.    Do you see where it indicates the earliest date is

15   10/29/2004, and there's something that says new note at

16   the top of the first page, do you see that?

17   A.    Yes.

18   Q.    Do you see where a couple of lines down, November 10,

19   2004, there's a comment that says note increase?

20   A.    Yes.

21   Q.    And the amount is $1 million?

22   A.    Yes.

23   Q.    And then balance it says a million?

24   A.    Yes.

25   Q.    Now, did anybody, I know you said you didn't see this

Murray  -  Direct/Miskiewicz

3486

1    document, but did anybody, in or about November of 2004,

2    tell you that your line of credit was drawn up and down in

3    the amount of a million dollars?

4    A.    No.

5    Q.    When did you learn that, if you did, at any point if

6    you recall?

7    A.    Today.

8    Q.    Did there come a time that you were given a

9    notification from Northern Trust about a default?

10   A.    No.

11   Q.    Do you know what the status is of this line of

12   credit, as you sit here today?

13   A.    I would assume it's paid off.

14   Q.    Who would have paid it?

15   A.    I don't know.

16   Q.    I'm going to go back to an exhibit I showed you a

17   moment ago, Government's Exhibit 2176 in evidence.

18          Do you see it on the screen next to you?

19   A.    Yes.

20   Q.    I'm going to direct your attention to the third page

21   of that exhibit, particularly the box where it says

22   financial summary, do you see that?

23   A.    Um-hum, yes.

24   Q.    Do you see, at the very bottom line, where it says

25   total under the column change?

3487

1    A.    Yes.

2    Q.    In parenthesis, it's -- do you know what the

3    parenthesis refers to in accounting?

4    A.    No.

5    Q.    Well, would you just read what does it say in

6    parenthesis for purposes of that line under the column

7    change?

8    A.    The total at the bottom?

9    Q.    What is that last number?

10   A.    1.249,775 and 40.

11   Q.    So $1,249,775.40?

12   A.    Yes.

13   Q.    Do you know whether or not -- you don't know if

14   that's a positive or negative?

15   A.    No.

16   Q.    There are a number of other exhibits that have been

17   entered into in this trial, and I'll take you through a

18   couple.  I have questions about what's depicted in these.

19        Government's Exhibit 22, and I will focus in on

20   a section of that.

21        This depicts a withdrawal from a line of credit

22   in the name of Michael Peca.

23        Do you know who Michael Peca is?

24   A.    Yes.

25   Q.    Who is he?

Murray  -  Direct/Miskiewicz

3488

1   A.    He's a hockey player.  He used to be a hockey player.

2   Q.    You never played with him?

3   A.    I did when I was 16, 17 years old I played with him.

4   Q.    Is that in a youth league or NHL?

5   A.    No, it was like the junior leagues.

6   Q.    There is an indication here that during this period

7   of time $60,000 was drawn from his line of credit and went

8   through an account in the name of Little Isle IV ventures,

9   and that $5,817.80 was paid through your line of credit,

10  Northern Trust, and the transaction period is April 23,

11  2007.

12          At this time, did you owe Michael Peca any

13  money?

14  A.    No.

15  Q.    Did he owe you money?

16  A.    No.

17  Q.    Did he borrow money or did you lend him money at all?

18  A.    No.

19  Q.    Did you know, at this time in 2007, anything about

20  the transactions that are depicted in that chart?

21  A.    No.

22  Q.    Did Mr. Kenner tell you that?

23  A.    No.

24  Q.    Showing you what's in evidence as Government's 23,

25  again, this is for the period May 18, 2007, again $101,000

Murray - Direct/Miskiewicz

3489

1    draw down against Mr. Peca's line of credit, of which

2    $9,495.77 was paid to your line of credit.

3            Did you know that was happening when it happened

4    at this time?

5    A.    No.

6    Q.    Again, at any point did you owe Mr. Peca any money?

7    A.    No.

8    Q.    And if I were to go through another series of charts

9    like this, and ask you whether or not you owed, for

10   instance, Darryl Sydor or Owen Nolan or William Ranford or

11   any other NHL hockey player, at that time did you owe them

12   money?

13   A.    No.

14   Q.    Did you loan them money?

15   A.    No.

16   Q.    If there are wire transfers showing drawdowns from

17   your line of credit during this period of time, were you

18   ever made aware that that was happening at that time?

19   A.    No.

20   Q.    Mr. Murray, you said you did -- you were not aware of

21   a default on your line of credit, correct?

22   A.    Correct.

23   Q.    I'm showing you what's been received in evidence as

24   Government's Exhibits 2125, and it's dated March 19, 2009.

25           It's directed to you, correct?

3490

1   A.    Correct.

2   Q.    This is a Manhattan Beach California address?

3   A.    Yes.

4   Q.    Were you living there at that time?

5   A.    Yes, that's where I live.

6   Q.    Do you have any recollection of seeing this notice of

7   default and intent to sell collateral?

8   A.    No.

9   Q.    2126, also in evidence, is a letter talking about

10  taking control of assets pledged for that line of credit

11  and sent -- it doesn't say who it's sent to other than

12  it's regarding your account.

13          Did you know that assets were being liquidated

14  to payoff a line of credit?

15  A.    No.

16  Q.    Mr. Murray, are you familiar with a company by the

17  name of Eufora?

18  A.    Yes, vaguely.

19  Q.    How did you become familiar with that company?

20  A.    Through Phil.

21  Q.    And what, if anything, did -- when you say Phil, you

22  mean Mr. Kenner?

23  A.    Mr. Kenner, yes.

24  Q.    What, if anything, did Mr. Kenner tell you about

25  Eufora?

Murray   -   Direct/Miskiewicz

3491

1    A.    That it was a credit card company getting started.

2    Q.    Did he tell you who was running the business?

3    A.    Yes.

4    Q.    Who?

5    A.    Tommy Constantine.

6    Q.    Did you ever personally meet Mr. Constantine?

7    A.    Yes, once.

8    Q.    Would you recognize him if you saw him again today?

9    A.    Yes.

10   Q.    Do you see him in the courtroom?

11   A.    Yes.

12            MR. LARUSSO:  Concede the identification, your

13   Honor.

14            THE COURT:  Yes.

15   BY MR. MISKIEWICZ:

16   Q.    Where did you meet Mr. Constantine?

17   A.    In Manhattan Beach, California.

18   Q.    Where you were living?

19   A.    That's where I live, yes.

20   Q.    Did he say anything to you about Eufora during that

21   meeting?

22   A.    Just about the credit card company.

23   Q.    What did he tell you?

24   A.    I can't really remember exactly what it was, but they

25   were doing -- just explaining it to me, but I can't

Murray   -   Direct/Miskiewicz

3492

1   exactly remember what it was going to be or do.

2   Q.   Do you recall whether or not -- do you recall making

3   a $166,000 investment back in 2004?

4   A.   Yes.

5   Q.   And showing you what's also in evidence as

6   Government's 1522, this is a document that's dated

7   September 27, 2004.

8        Is that your signature at the bottom?

9   A.   Yes.

10  Q.   And it's directed to who?

11       Who is the recipient of these instructions?

12  A.   The recipient is Eufora.

13  Q.   That's where the money is being sent to, Eufora, is

14  that what you mean?

15  A.   Yes, that's what I mean.

16  Q.   Where is the money coming out of?

17  A.   My Charles Schwab.

18  Q.   In the amount of 166,000?

19  A.   Yes.

20  Q.   And you intended to invest money in Eufora at that

21  time, correct?

22  A.   Correct.

23  Q.   Did you do that based on anything that either

24  Mr. Kenner or Mr. Constantine told you regarding the

25  company?

Murray  -  Direct/Miskiewicz

3493

1   A.   Yes, that's why I invested in it.

2   Q.   Did they indicate to you -- I know you said you don't

3   recall right now what they said in 2004 about the company,

4   but whatever they said about the company, were you

5   convinced it was a potentially good investment?

6   A.   Yes.

7   Q.   No guarantee, right?

8   A.   Is there ever?

9   Q.   Just making sure.

10  A.   All right.

11  Q.   When you sent the money, did you understand the money

12  was going to be used for Eufora?

13  A.   Yes.

14        MR. HALEY:  Judge, too late.

15  BY MR. MISKIEWICZ:

16  Q.   Now, did there come a time that you invested

17  additional sums of money in Eufora?

18  A.   Not that I recall, no.

19  Q.   I'm going to show you what's been received in

20  evidence as Government's 2211.

21        This is a statement from Johnson Bank for

22  Eufora, LLC, do you see that?

23  A.   Yes.

24  Q.   And it indicates here that there's a deposit in the

25  form of an incoming wire on 12/29, and the 12/29 that

3494

1    we're talking about here is the end of 2008; do you see

2    that?

3    A.    Yes, I do.

4    Q.    So here it says it's an incoming wire into the Eufora

5    account in the amount of $100,000, and can you read who's

6    the originator or the ORG of that?

7    A.    Glen Murray, 1320 10th Street, Manhattan Beach.

8    Q.    That's where you were living at the time?

9    A.    Yes.

10    Q.    Do you have any recollection authorizing this wire

11    payment into Eufora at this time, 12/29/2008?

12    A.    Did it come from my Charles Schwab?

13    Q.    That's a good question.

14          There's an incoming wire in your name.  Did you

15    have a Charles Schwab account at the time?

16    A.    Yes.  What year is that?

17    Q.    12/29/2008.

18    A.    Yes.

19    Q.    Do you have any reason to believe that that was some

20    other Glen Murray at --

21    A.    No.

22    Q.    Do you know whether or not you authorized that

23    payment -- is it possible you authorized that payment into

24    Eufora at the time?

25    A.    Quite possibly, yes.

Murray  -  Direct/Miskiewicz

3495

1   Q.   You, even though you don't recall, you might have had

2   a conversation with Mr. Kenner or Constantine or somebody

3   else at the time and decided to invest additional money?

4        MR. LARUSSO:  Objection, your Honor.

5        THE COURT:  Sustained as to form.

6   BY MR. MISKIEWICZ:

7   Q.   Do you know whether or not Mr. Kenner and Constantine

8   just took your money, or do you think you authorized them

9   to deposit $100,000 in your name into Eufora?

10  A.   Yes, I think I would have authorized the money into

11  Eufora, yes.

12  Q.   You just don't recall right now?

13  A.   I don't recall.

14  Q.   You have no doubt, and there's no reason to doubt

15  that you had a conversation like that, you were trying to

16  put money into the company at that time?

17  A.   Yes.

18  Q.   I do want to show you though the next couple of pages

19  in that Exhibit 2211, specifically page 3 all the way down

20  at the bottom of 2211.

21        This transaction now is -- the date is 12/31/08,

22  the last day of 2008, New Year's Eve.  There's $100,000

23  going out, do you see that?

24  A.   Yes, I do.

25  Q.   The beneficiary that's listed here is Timothy R.

Murray  -  Direct/Miskiewicz

3496

1   Gaarn.

2           Do you know Timothy R. Gaarn?

3   A.   At the time?  Now I've come to know who he is, but at

4   the time, no.

5   Q.   Did you, insofar as this 100,000 represents any

6   portion of your deposit into the account a couple days

7   earlier, did you know that your money was going to

8   Mr. Gaarn's account?

9   A.   No.

10  Q.   If you were investing in Eufora in late December

11  2008, would you have authorized the money to go into the

12  Eufora account and back out to Mr. Gaarn?

13          MR. HALEY:  Objection.

14          THE COURT:  Sustained as to form.

15  BY MR. MISKIEWICZ:

16  Q.   Where did you intend your money to go?

17          You said you didn't remember specifically this

18  $100,000 transaction.  But if, assuming you authorized it,

19  where did you intend the money to go to?

20  A.   Eufora.

21  Q.   What about going to Eufora, but immediately going out

22  to Mr. Gaarn, did you authorize that?

23          MR. HALEY:  I object.

24          THE COURT:  Sustained.

25          MR. MISKIEWICZ:  All right.

Murray  -  Direct/Miskiewicz

3497

1    BY MR. MISKIEWICZ:

2    Q.    I show you an exhibit that's been received in

3    evidence as 2301, Wachovia account in the name of Timothy

4    R. Gaarn, and specifically on page 1, the account summary

5    shows an opening balance on 12/30 of zero, deposits of

6    $100,000.

7              Do you see that?

8    A.    Yes, I do.

9    Q.    And the deposit that's referenced there came in,

10   $100,000 from Johnson Bank, the originator being Eufora.

11             Did you know this was happening at the time?

12   A.    No.

13   Q.    On page 2 of 4 of that exhibit, on 12/31, after the

14   $100,000 came in, $81,127.

15             Do you see that, a funds transfer?

16   A.    Yes.

17   Q.    Who is it sent to?

18   A.    Phillip Kenner.

19   Q.    Did you intend, in or about December '08 when you

20   sent the $100,000 to Eufora, to have at least a portion of

21   that money sent to Phillip A. Kenner?

22   A.    No.

23   Q.    Did you know it was happening?

24   A.    No.

25   Q.    Did anybody tell you that you were buying shares that

3498

1   belonged to any other investors in Eufora at that time?

2              MR. HALEY: Objection, your Honor.

3              THE COURT:  That's okay.  You can answer that.

4   A.   No.

5   Q.   Did you know whether or not Mr. Kenner owned any

6   shares of Eufora at or about this time?

7   A.   I didn't know.  I wasn't sure, no.

8   Q.   I'm going to show you what's in evidence as

9   Government's 2214.

10              Again, this is a Johnson bank account in the

11   name of Eufora.

12              Do you see that?

13   A.   Yes.

14   Q.   And then towards the bottom here, under deposits,

15   this is 2009, March 19, 2009, do you see an incoming wire

16   of $100,000?

17   A.   Yes.

18   Q.   And who is the sender of the wire?

19   A.   Myself.

20   Q.   Do you have any independent recollection, as you sit

21   here today, of authorizing that $100,000 wire?

22   A.   No.

23   Q.   Going to page 3 of that statement, the day after your

24   wire arrived, do you see a transaction indicating $100,000

25   going out?

3499

1    A.   Yes.

2    Q.   Who is it going out to?

3    A.   To Timothy Gaarn.

4    Q.   Back then, you said you didn't know who he was?

5    A.   Correct.

6    Q.   How did you learn or have you learned who he is?

7    A.   Yes.

8         I guess he was working for Eufora, someone told

9    me.

10   Q.   Did Mr. Kenner or Mr. Constantine tell you that?

11   A.   No.

12   Q.   Is it possible you learned that during your

13   preparation for testimony today?

14        MR. HALEY:  Judge, I object.

15        THE COURT:  Sustained.

16   BY MR. MISKIEWICZ:

17   Q.   But you don't know, as you sit here today on your

18   own, you don't know who Mr. Gaarn is?

19        MR. HALEY:  Objection, your Honor, asked and

20   answered.

21        Objection.  Sorry for the speaking objection.

22        THE COURT:  I thought he testified before at the

23   time.  I don't remember him asking as you sit here today.

24        As you sit here today, what do you know about

25   Mr. Gaarn?

Murray  -  Direct/Miskiewicz

3500

1    THE WITNESS:  Just I think he worked for Eufora.

2  That's it.

3  BY MR. MISKIEWICZ:

4  Q.   Did you know about this $100,000 wire transfer coming

5  out of the Eufora account on March 20, 2009?

6  A.   No.

7  Q.   And showing you what's in evidence as Government's

8  2303, page 2 -- sorry.  Wrong exhibit.  Let me do it this

9  way.

10    If there were a number of accounts that I went

11  through here showing money going from you to Eufora, did

12  you authorize any of that money to go to Mr. Gaarn and/or

13  others?

14  A.   No.

15  Q.   Did anybody at the time, and I'm specifically talking

16  about late 2008, first half of 2009, did anybody -- did

17  you ever authorize anybody to do that with your money with

18  respect to your investments in Eufora?

19    MR. HALEY:  Objection.

20    THE COURT:  Overruled.  You can answer it.

21  A.   Can you repeat the question.  Sorry.

22  Q.   Did you ever authorize -- withdrawn.

23    Did anybody ever tell you about any money that

24  you invested in Eufora going to Mr. Gaarn and/or others?

25  A.   No.

3501

1   Q.   Did Mr. Kenner tell you about those transactions at

2   the time?

3            MR. HALEY:  I assume anybody, Judge -- I object.

4   Judge, I withdraw the objection.  Let's move on.  I

5   withdraw the objection.

6            THE COURT:  You can answer.

7   A.   No.

8   Q.   What about Mr. Constantine?

9   A.   No.

10  Q.   Finally, are you familiar with something called the

11  Global Settlement Fund?

12  A.   Yes.

13  Q.   What do you know about the Global Settlement Fund?

14  A.   It was a fund that was set up through a group of

15  players to try and get our money back in different

16  projects that we were invested in.

17  Q.   And specifically which projects, do you recall?

18  A.   All of them.  I don't know specifically which

19  projects.  I think Mexico.

20            (Continued on next page.)

21

22

23

24

25

Murray - Direct/Miskiewicz

3502

1  BY MR. MISKIEWICZ (Cont'd):

2  Q.   Do you know who was the developer in Mexico?

3  A.   To my recollection, Ken Jowdy.

4  Q.   And what was -- did you contribute to something

5  called the GSF, Global Settlement Fund?

6  A.   Yes.

7  Q.   Do you remember how much?

8  A.   Unfortunately, yes.

9  Q.   How much?

10  A.   $250,000.

11  Q.   I'm showing you what's been received in evidence as

12  Government Exhibit 1504.

13       This is a wire transfer instructions dated May

14  19, 2009.

15       Correct?

16  A.   Correct.

17  Q.   And it says here, Phil Kenner is attorney in fact for

18  Glenn Murray.

19       At or about this time did you provide

20  essentially what's called a power of attorney to

21  Mr. Kenner?

22  A.   It sounds -- yes.

23  Q.   Is it true that your financial advisor, Mr. Kenner,

24  could engage certain transactions in your name?

25  A.   Yes.

3503

1  Q.   And you knew that was -- you knew that was happening,

2  correct?

3  A.   Yes.

4  Q.   You permitted him to do that, right?

5  A.   Yes.

6  Q.   Can you see who the beneficiary account name is for

7  this $250,000 wire transfer?

8  A.   The law offices of Ronald Richards and Associates.

9  Q.   Now, you said you understood that the money was to

10  help get your investments back, and you said everything.

11       You mentioned Mexico.  Was there anything else?

12  A.   I mean, not that I could remember, but lawyer fees, I

13  would assume that was part of it.

14  Q.   What do you mean lawyer fees?

15       You were paying lawyer fees or you were getting

16  lawyer --

17  A.   Well, everything.

18       It was however we were going to get our money

19  back in these different investments.

20  Q.   Beyond Mexico and Ken Jowdy, do you have any

21  recollection of anywhere else that the money was going to

22  be spent?

23  A.   No.

24  Q.   Do you recall either Mr. Kenner or Mr. Constantine

25  advising you that the money might be spent in other things

3504

1    in addition to lawyer fees?

2            MR. HALEY:  Your Honor -- withdrawn.

3    A.   Other things, no, just to somehow be able to get our

4    money back for the other investments.

5    Q.   Let me show you what I'm marking for identification

6    as GM, for Glenn Murray-1.

7            MR. MISKIEWICZ:  The government moves for the

8    admission of GM-1.

9            MR. HALEY:  I'm pretty sure I know what it is,

10   Judge.

11           MR. MISKIEWICZ:  Oh, sorry.

12           MR. HALEY:  That's okay.

13           (There was a pause in the proceedings.)

14           MR. HALEY:  No objection, your Honor.

15           THE COURT:  Mr. LaRusso, you said no objection?

16           MR. LARUSSO:  I did, Judge.

17           THE COURT:  GM-1 is admitted.

18           (Whereupon, Government Exhibit GM-1 was received

19   in evidence, as of this date.)

20   BY MR. MISKIEWICZ:

21   Q.   Showing you what's now in evidence as GM-1.

22           (The above-mentioned exhibit was published to

23   the jury.)

24   BY MR. MISKIEWICZ:

25   Q.   The way e-mails work, let's focus on the bottom, just

3505

1  very briefly, who -- can you see who this is from?

2  A.    Yeah, Phil Kenner.

3  Q.    And it's being sent to you, correct?

4  A.    Correct.

5  Q.    And Gmuzz that's --

6  A.    That's my e-mail, yes.

7  Q.    It's also an nickname you went by?

8  A.    Yes, it's my nickname, yes.

9  Q.    And this e-mail is to you, correct?

10  A.    Correct.

11  Q.    Without getting into any of the details it does make

12  reference to your $250,000, correct?

13  A.    Correct.

14  Q.    Which was sent per Government Exhibit 1504 of May

15  19th.

16  A.    Correct.

17  Q.    This says May 18th, but it's indicating that $250,000

18  is going to the Ron Richards' trust account for your

19  proportionate contribution to the Global Settlement Fund.

20        It then goes on to say that in addition to

21  paying various legal fees, this would also get you

22  membership agreements from Tommy.

23        Who's Tommy?

24  A.    That would be Tommy Constantine.

25  Q.    Is that who you cc'd there?

3506

1    A.    Yes.

2    Q.    Membership agreements from Tommy for your acquisition

3    of additional interest in Eufora, as well as your new LLC

4    and operating agreements reflecting your ownership

5    interest in the Avalon Airpark real estate project, the

6    Falcon 10 aircraft and two Palms Place condominium units.

7          Does this refresh your recollection that

8    $250,000 -- your $250,000 in the Global Settlement Fund

9    was supposed to also go to these other things?

10   A.    Yeah, I mean, that's the e-mail.

11         That's my name.  That's sent to me, yes.  So I

12   must have read it.

13   Q.    My question about this is, have you ever received any

14   documentation showing any increased ownership interest in

15   Eufora?

16   A.    No.

17   Q.    As you sit here today, have you received any return

18   from this company known as Eufora?

19   A.    No.

20   Q.    Do you know where your money is?

21   A.    Gone, probably.

22         MR. HALEY:  Well --

23   BY MR. MISKIEWICZ:

24   Q.    What about this Falcon 10 aircraft?

25         At or about this time, when you got this e-mail,

3507

1    did anybody -- this is from Mr. Kenner -- did Mr. Kenner

2    tell you that he previously had a loan on a Falcon 10

3    aircraft?

4    A.    I don't recall, no.

5          I wasn't involved in any of that stuff there.

6    Q.    And did Mr. Kenner and/or Mr. Constantine tell you

7    that the Falcon 10 aircraft loan went into default and

8    they bought the aircraft?

9    A.    I don't recall him telling me, no.

10   Q.    Do you know where the aircraft is today?

11   A.    No idea.

12   Q.    Did you ever get a fractional share, to your

13   knowledge, of this aircraft?

14   A.    No.

15   Q.    Did you ever see the aircraft?

16   A.    No.

17   Q.    Do you know a Sue Ellen Ferguson?

18   A.    No.

19   Q.    If there is documentation suggesting she eventually

20   bought the aircraft with Mr. Constantine, were you ever

21   shown that?

22   A.    No.

23   Q.    At or about the time or any time after this e-mail?

24   A.    No.

25   Q.    The Palms condominium units, do you know what's being

3508

1    referred to there, which condominium units?

2    A.    I don't know which ones, no.

3    Q.    Did you have any discussion with either

4    Mr. Constantine or Mr. Kenner at about this time about you

5    getting an ownership interest in condo units in the Palms

6    Hotel in Las Vegas?

7    A.    Through the Global Settlement Fund?

8          No.

9    Q.    Were you told you were going to get a piece of condos

10   in the Palms through any other matter?

11   A.    No.

12   Q.    Do you know who owns the condos today?

13   A.    No.

14   Q.    The Avalon Airpark real estate project, did you get

15   any documentation showing -- or reflecting your ownership

16   interest in the Avalon Airpark real estate project?

17         Did you ever get anything?

18   A.    I don't recall, no.

19   Q.    Did Mr. Constantine tell you that the Avalon Airpark

20   was foreclosed upon?

21   A.    No.

22   Q.    Do you know who owns it today?

23   A.    No.

24         MR. MISKIEWICZ:  One moment, your Honor, please.

25         THE COURT:  Yes.

Murray - Cross/Haley

3509

1    (There was a pause in the proceedings.)

2    MR. MISKIEWICZ:  Thank you, very much,

3  Mr. Murray.

4    I have no further questions.

5    THE COURT:  Cross-examination.

6    MR. HALEY:  Yes, sir.

7    May I see the government Government Exhibits,

8  not the charts, but the exhibits that were just utilized,

9  specifically GM-1.

10  CROSS-EXAMINATION

11  BY MR. HALEY:

12  Q.   Mr. Murray, good afternoon, sir.

13  A.   Hello.

14  Q.   My name is Rick Haley and I represent Phil Kenner.

15    You and I haven't met before today, correct,

16  sir?

17  A.   Correct.

18  Q.   You said a while ago, sir, that with reference to

19  GM-1, when shown this document, you looked at it, you saw

20  it was your Gmail address and I believe you testified

21  that's my Gmail address, so I must have read this

22  document.

23    Correct?

24  A.   Correct.

25  Q.   Was it your habit, sir, over the years when you

Murray - Cross/Haley

3510

1   received, let's say, documents from Phil Kenner or some

2   other party as relates to, let's say, new investments that

3   were specifically addressed to you, you would typically

4   read those documents?

5   A.    Yes.

6   Q.    Because it was, I mean, important to you.  It's

7   addressed to you.

8         It involves your investment either from your

9   financial advisor or let's say a bank and there would be

10  no reason not to read it if you had the opportunity and

11  time, you would read it.

12        Correct?

13  A.    Correct.

14  Q.    Over the years when Phil was your financial advisor,

15  was there ever an incident where you would ask Phil a

16  question about your investments, the status of your

17  investments and Phil would say in substance, well, I'm not

18  going to answer your question?

19        Did that ever happen?

20  A.    No.

21  Q.    Isn't it true, sir, that over the years when Phil was

22  your investment advisor, if you wanted the time to speak

23  with him about investments, Phil would give you that time,

24  wouldn't he?

25  A.    Correct.

Murray - Cross/Haley

3511

1   Q.   Over the years when Phil was your investment advisor,

2   isn't it true, sir, if there was something that you wanted

3   him to explain to you with reference to your investment,

4   he would give you that explanation, isn't that true?

5   A.   Correct.

6   Q.   Now, I have no doubt, sir, that today, under oath,

7   you are testifying to the best of your recollection.

8          Isn't that true?

9   A.   Correct.

10  Q.   But the conversations that you had with Phil with

11  reference to the Hawaii investment and the project, as

12  well as Eufora, they go back several years now, do they

13  not?

14  A.   Yes.

15  Q.   Let's speak about your memory in connection with the

16  Hawaii investment.

17         You do have a memory of Phil recommending the

18  Hawaii investment to you because he was encouraged that

19  this property in Hawaii would be a productive investment.

20         You have a memory of that, is that correct?

21  A.   Yes.

22  Q.   Do you recall where that conversation with Phil took

23  place?

24         Your home, his home?

25  A.   No.

Murray - Cross/Haley

3512

1   Q.   Do you have a recollection as to whether anyone else

2   was present during that conversation?

3   A.   No.

4   Q.   Do you have a recollection as to how long that

5   conversation took place?

6   A.   How long?

7   Q.   Yes, sir.

8   A.   No.

9   Q.   Well, whenever you met with Phil in connection with

10  your financial investments, when Phil left that meeting,

11  did you have a sense that Phil had not fully explained the

12  investment to you in terms of answering any questions or

13  giving you an understanding as to what it was about?

14         Would Phil at least try to do that, to the best

15  of your memory?

16  A.   Yes.

17  Q.   We know, sir, that by your direct testimony you

18  invested $100,000 in Hawaii, the project, correct?

19  A.   Correct.

20  Q.   And then we know, sir, that you ultimately signed a

21  document authorizing your line of credit to be accessed by

22  Phil for purposes of the Hawaii project.

23         Isn't that correct?

24  A.   Yes.

25  Q.   Sir, do you have a recollection or not that during

Murray - Cross/Haley

3513

1    the course of the conversation you had with Phil in

2    connection with your Hawaii investment it was explained to

3    you that by virtue of your investment monetarily, you

4    would be obtaining a percentage interest in the project?

5            You would actually become an equity owner, part

6    of the project, do you remember something like that being

7    discussed?

8    A.    Sounds familiar, yes.

9    Q.    And did you have a sense and an understanding that

10   the greater your monetary commitment, to let's say the

11   Hawaiian project, vis-à-vis let's say the monetary

12   commitment of others, you would get a greater ownership

13   interest, a greater equity interest?

14           Do you have a sense of having that

15   understanding?

16   A.    Yes.

17   Q.    Are you able, sir, today, as you recollect that

18   conversation with Phil regarding the Hawaii investment,

19   that he did or did not discuss with you the manner in

20   which the lines of credit were going to be drawn upon and

21   used?

22           Do you know -- are you here to say that,

23   absolutely, it was not discussed?  It may have been

24   discussed, I just don't have any recollection?

25   A.    How the line of credit was going to be used?

Murray - Cross/Haley

3514

1  Q.   Yes, sir.

2         The question is this:

3         Do you have a recollection today, as you sit

4  here, that the lines of credit in connection with the

5  commitment of the line of credit to the Hawaii project,

6  that there was no discussion between you and Phil as

7  regards to the use of that line of credit?

8         What's your testimony on that?  What's your best

9  recollection today?

10  A.   No, I didn't know the exact use of that line of

11  credit.

12  Q.   That's your best recollection today, correct?

13  A.   Yes, as of today, yes.

14  Q.   There did come a point in time, did there not --

15  well, were you familiar, sir, do you have a recollection

16  of an event in which Lehman Brothers, the lenders, became

17  involved in the Hawaii project and by virtue of some money

18  loaned by Lehman Brothers, you returned -- you received a

19  return on some part of your investments in the Hawaii

20  project?

21         Do you have a memory of that?

22  A.   No, I don't.

23  Q.   Well, if I were to suggest to you as relates to the

24  $100,000 that you invested, you did get a return of -- you

25  did receive a return of $5,000 -- you did receive a return

Murray - Cross/Haley

3515

1   in 2006 of $42,553 with reference to that $100,000 you

2   had.

3   A.   I might have.

4           Now it's sounding -- yes, I might have.  I can't

5   remember, but I might have, yeah.

6   Q.   Mr. Murray, that's fine.

7           Listen, this is a long time ago.  This is not a

8   quiz or a test.  I'm just asking for your best

9   recollection.

10  A.   Okay.

11  Q.   And, sir, do you also have a recollection that an

12  additional $385,481.75 was also paid out to you in August

13  of 2006 with reference to replenishment of a portion of

14  your line of credit?

15          Do you remember getting that check?

16  A.   Do I remember getting a check for $300,000?

17  Q.   Yes, sir, actually to be specific, $385,481.75?

18  A.   That sounds familiar, yes.

19  Q.   Okay.

20          Incidentally, did you over the years, if you

21  recall, receive documentation, paperwork from Phil that

22  had some relevance and association with your Hawaiian

23  investment by getting some packages of material, things of

24  that nature?

25  A.   Yes, I did eventually get some packages, yes.

Murray - Cross/Haley

3516

1           Did I read them?  No.

2    Q.    I wasn't going to ask you this question.

3    A.    I thought that was going to be your next question.

4    Q.    All right.

5           But you did receive them, correct?

6    A.    Correct.

7    Q.    And I take it, sir, you had the opportunity to read

8    them, should you so choose, correct?

9    A.    Correct.

10   Q.    As a matter of fact, is one of the reasons, or

11   perhaps the reason you didn't read those documents is

12   because they may have been perhaps, let's say, 7, 8, 9

13   inches, maybe 10 inches in depth or greater?

14   A.    Correct.

15   Q.    You do remember, sir, based on your direct testimony,

16   signing the Standard Advisors agreement, you remember Phil

17   was at some point in his own business known as Standard

18   Advisors?

19   A.    Correct.

20   Q.    Do you remember, and again, Mr. Murray, I know this

21   goes back a long time, but do you remember, sir, signing a

22   document involving the Standard Advisors agreement whereby

23   Phil and you had notched something in writing concerning

24   your contractual arrangement with Phil as relates to the

25   services he was going to provide to you as your business

Murray - Cross/Haley

3517

1   manager/financial advisor?

2   A.    Correct.

3   Q.    Do you know where that agreement is today?

4         Did you retain it or not?

5   A.    No idea, no.

6   Q.    Okay.

7         You testified, sir, that you did get statements

8   from Northern Trust, but not often, but I did receive

9   statements on occasion from Northern Trust.

10        Is that true?

11  A.    Correct.

12  Q.    And as relates to the default letter, sir, admitted

13  in evidence as Government Exhibit 2125 and this document

14  here, sir, I want you to see this document, but I'll put

15  it up on the screen for all to see, I think you were asked

16  a question on direct by the government as to whether or

17  not you received this notice of default, the default

18  letter.

19        Correct?

20  A.    Correct.

21  Q.    And was your testimony no or I don't recall?

22        Do you remember what you said?

23  A.    If I saw that?

24  Q.    Yes.

25  A.    Well, I don't remember what my answer was, but it was

Murray - Cross/Haley

3518

1    sent to me.

2          So I might have took a peek at it.

3    Q.  Well, you might have took a peek at it, which is

4    fine, but we are talking about a two-page document,

5    correct?

6          It wouldn't take a lot of peeking to read this,

7    correct?

8    A.  Correct.

9    Q.  And it is entitled in big bold letters notice of

10   default intent to sell collateral, you can agree with

11   that.

12         Correct?

13   A.  Correct.

14   Q.  Whatever your answer, whether you said no, I did not

15   receive it, or I don't recall, we can agree, sir, that as

16   relates to this particular document --

17         MR. HALEY:  Withdrawn.

18   BY MR. HALEY:

19   Q.  Did you live at 3120 10th Street, Manhattan Beach,

20   California, 90266 in or about March of 2009?

21   A.  You said 3120, it's 1320, but, yes.

22   Q.  1320, you are correct.  Thank you.

23         Well, as relates to this document we can agree,

24   sir, that Northern Trust, for whatever reason, maybe given

25   the content of the letter, sent it via Federal Express and

Murray - Cross/Haley

3519

1    certified mail, return receipt requested dash, dash,

2    personal and confidential.  That's what it says on the

3    document.

4         Correct?

5    A.   Correct.

6    Q.   And over the years, sir, if you would receive let's

7    say a document return receipt requested, I take it you

8    would presumably sign the return receipt.

9         True?

10   A.   Correct.

11   Q.   Do you have any memory sometime after March of 2009

12   reaching out to Phil to talk about the status of your line

13   of credit and your collateral, or not?

14   A.   I'm sure I think we talked about it.

15        Yes.

16   Q.   When you would talk about those matters, much like

17   you testified before, Phil would at least answer whatever

18   question you had, true?

19   A.   Correct.

20   Q.   The account statement for Northern Trust, we can

21   agree, sir, that the address is listed on this document is

22   your address, correct?

23   A.   Correct.

24   Q.   And should you have chosen to take a peek at it, is

25   it fair to state, sir, that at least as relates to the

Murray - Cross/Haley

3520

1    content of the document, itself, it's capable of being

2    read.

3              Correct?

4    A.    Correct.

5    Q.    And let's say in or about March of 2009, if you

6    decided to take a peek at a document like this and read it

7    and had any questions as to what it meant, you had access

8    to Phil Kenner by way of contacting him to discuss it.

9              Is that true?

10   A.    Correct.

11             THE COURT:  Why don't we take the afternoon

12   break.

13             Don't discuss the case.

14             (Jury leaves the courtroom.)

15             (Recess.)

16             (Continued on next page.)

17

18

19

20

21

22

23

24

25

Murray - Cross/Haley

3521

1       (Following a recess.)

2       THE COURT:  Okay.

3       We'll get the jury and if you would get

4    Mr. Murray.

5       (There was a pause in the proceedings.)

6       THE CLERK:  All rise.

7       (Jury enters the courtroom.)

8       THE COURT:  Everyone can be seated.

9       Go ahead, Mr. Haley.

10      MR. HALEY:  Thank you, your Honor.

11   BY MR. HALEY:

12   Q.   I'm going to have you take a look at a document

13   that's also an account statement which if you compare it

14   to Government Exhibit 2176, I want you to be able to

15   understand the content.

16       Does this appear to be, sir, an account

17   statement with reference to your account that was the

18   following month's account statement with reference to your

19   account?

20       Is that true?

21   A.   Correct.

22   Q.   As a matter of fact, we have the same address and

23   your name, is that true?

24   A.   Correct.

25   Q.   And, of course, the same account number?

Murray - Cross/Haley

3522

1    A.   Yes.

2    Q.   Okay.

3         MR. HALEY:  Your Honor, I would offer that as

4    Kenner Exhibit 100.

5         I don't believe there is an objection.

6         MR. MISKIEWICZ:  No objection.

7         MR. LARUSSO:  No objection, your Honor.

8         THE COURT:  Kenner Exhibit 100 is admitted.

9         (Whereupon, Defense Exhibit Kenner 100 was

10   received in evidence as of this date.)

11        MR. HALEY:  Thank you.

12        May I have one quick moment, Judge?

13        THE COURT:  Yes.

14   BY MR. HALEY:

15   Q.   Mr. Murray, I'm going to have you take a look at

16   Kenner Exhibit 101, if we can compare Government Exhibit

17   2176 now to Kenner Exhibit 100, Kenner Exhibit 101, in

18   evidence 2176 reflects the account statement for March 1,

19   2009 to March 31, 2009.

20        Can we agree?

21   A.   Yes.

22   Q.   And Kenner Exhibit 100 reflects the account statement

23   for April 1, 2009 through May -- excuse me -- April 1,

24   2009, through April 30, 2009.

25        Is that correct?

Murray - Cross/Haley

3523

1  A.   Correct.

2  Q.   And the document I'm showing you now reflects the

3  statement for that account, same account numbers, your

4  address, for May 1, 2009 through May 8, 2009.

5        Is that correct?

6  A.   Yes.

7  Q.   Okay.

8        MR. HALEY:  Your Honor, I offer that as Kenner

9  Exhibit 101.

10        MR. MISKIEWICZ:  No objection.

11        MR. LARUSSO:  No objection.

12        THE COURT:  101 is admitted.

13        (Whereupon, Defense Exhibit Kenner 101 was

14  received in evidence as of this date.)

15  BY MR. HALEY:

16  Q.   Sir, do you know if in or about 2009 you were having

17  any difficulty receiving mail through the United States

18  Postal Service, though a government agency, were you

19  having any difficulty receiving mail --

20  A.   No.

21  Q.   -- through the United States Postal Service?

22  A.   No.

23  Q.   With reference to the questions asked of you by the

24  government concerning your memory of the conversations you

25  had with Phil Kenner, with respect to your decision to

Murray - Cross/Haley

3524

1    invest in Eufora, when to the best of your memory did that

2    first conversation take place?

3    A.    I don't remember.

4    Q.    Would it have been in 2008, based upon what you have

5    seen in evidence?

6    A.    Yes, I guess so.

7    Q.    Do you know where that conversation occurred?

8    A.    Manhattan Beach.

9    Q.    I'm sorry?

10   A.    Manhattan Beach.

11   Q.    Is that your home?

12   A.    That's the hometown I live in, yes, Manhattan Beach,

13   California.

14   Q.    So as best you recall, it occurred, let's say, in the

15   comfort -- well, did it occur in your home, a

16   restaurant --

17   A.    Restaurant.

18   Q.    I see.

19         Was it just you and Phil that had that

20   conversation, do you recall?

21         Or was anyone else present?

22   A.    Tommy Constantine.

23   Q.    I'm talking, sir, about the first time, the first

24   time Phil mentioned to you Eufora, was Tommy Constantine

25   present during that conversation?

Murray - Cross/Haley

3525

1    A.    What I recall, yes.

2    Q.    Okay.

3          When you testified on direct pursuant to a

4    specific question from Mr. Miskiewicz, were you told your

5    money would be used for Eufora, you answered yes.

6          Correct?

7    A.    Correct.

8    Q.    Now, this conversation that you are having --

9          MR. HALEY:  Withdrawn.

10   BY MR. HALEY:

11   Q.    Do you know when in 2008, what season it was?

12   A.    No, I can't remember.

13   Q.    Do you have a recollection as to approximately the

14   duration in time during the course of this conversation?

15   A.    How long did it take?

16   Q.    Yes, sir.

17   A.    Couple hours, maybe.

18         It was dinner, I think.

19   Q.    And do you have a sense during the couple-of-hour

20   conversation with Phil Kenner and Tommy Constantine, as

21   you sit here today, that they wouldn't answer any question

22   you might have about your investment, that they would

23   withhold information?

24         Did you have a sense that they were somehow not

25   answering any question?

Murray - Cross/Haley

3526

1    A.    No.

2    Q.    Now, and I don't mean to be facetious, sir, you

3    didn't take notes at that meeting, I take it, did you?

4    A.    No.

5    Q.    And, again, I don't mean to be facetious, it wasn't

6    recorded with a stenographer present in terms of what was

7    said or who said what?

8    A.    No.

9    Q.    But you do have a memory that it was being

10   recommended to you as a solid investment, but one that

11   brought forth risk, is that true?

12   A.    Of course, yes.

13   Q.    I think you said on direct, you know, what isn't

14   risky?

15         You are a hockey player, so you know risk.

16   A.    Correct.

17   Q.    Did you have an understanding, sir, to the best of

18   your recollection, that you were acquiring an interest in

19   a privately held company as opposed to one that's listed

20   on the public stock exchange like Microsoft or something

21   like that?

22         Did you have an understanding of that?

23   A.    I understood it was not one offered.

24   Q.    It was not?

25   A.    Correct.

Murray - Cross/Haley

3527

1    Q.    And did you have an understanding, sir, that --

2              MR. HALEY:  Withdrawn.

3    BY MR. HALEY:

4    Q.    Do you know why Tommy Constantine was present at that

5    meeting?

6    A.    He was the one starting up Eufora.

7    Q.    Well, when you say starting up Eufora, sir, again you

8    weren't taking notes.

9              Did he say, I'm starting up Eufora, or is it

10   possible he said, I'm an owner in Eufora?

11   A.    Yeah, it's possible he said that, yeah, he was the

12   owner of Eufora, correct.

13   Q.    It's unfair of me, sir, to ask you questions to try

14   to reconstruct the memory of this conversation, and that's

15   not my intent.

16             But with reference to what was said to you and

17   your memory of what was said to you, do you recall whether

18   or not there was some discussion one way or another about

19   the fact that what you were acquiring was a percentage in

20   that privately held company, which percentage was part and

21   parcel of Tommy Constantine's ownership interest?

22             In other words, he was giving up some of his

23   interest in the company so that you could acquire an

24   interest by way of what he was essentially relinquishing,

25   if you remember?

Murray - Cross/Haley

3528

1    A.    I don't remember which percentage, no.

2    Q.    But you had an idea you were getting a percentage,

3    correct?

4    A.    Yes.

5    Q.    And do you know one way or another, sir, as you sit

6    here today, the means by which you were acquiring that

7    percentage?

8          Was it being issued by the board of directors?

9    Was Tommy Constantine relinquishing part of his ownership

10   interest?

11         Do you have any memory one way or the other in

12   that respect?

13   A.    No.

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

3529

1  CROSS-EXAMINATION

2  BY MR. HALEY:

3  Q.   You were asked questions by the government if, as you

4  sit here today, you have received any return on your

5  investment in Eufora.

6        Do you recall those questions?

7  A.   Yes.

8  Q.   Do you know one way or another as you sit here today

9  whether or not your interest in Eufora was or is reflected

10  on the books and records?

11  A.   Pardon me.

12  Q.   Do you have any knowledge one way or another as to

13  whether or not -- withdrawn.

14        Do you have any knowledge as you sit here today,

15  sir, that your investment in Eufora is wholly and totally

16  valueless?

17        Do you have any understanding that it has no

18  value?

19  A.   I would assume it has no value.

20  Q.   And that's an assumption on your part.

21  A.   Yes, it is an assumption.

22  Q.   Did someone tell you that it has no value?

23  A.   No.

24  Q.   Okay.  And that assumption is based upon -- it is not

25  argumentative, judge -- the assumption is based upon the

Murray - Cross/Mr. Haley

3530

1  fact that as of today you have not yet received, let's

2  say, specific documentation by way of, let's say, a

3  certificate of membership interest or seen the books and

4  records.

5          Is that correct?

6  A.  Correct.

7  Q.  Now let's go to the point in time where you had other

8  conversations with Phil Kenner after your initial

9  investment where Tommy Constantine was present and Phil

10  recommended further investments in Eufora.

11          Do you remember you then contributed, the

12  government showed you documents where you authorized Phil

13  to transfer monies from your account to Eufora?

14  A.  Correct.

15  Q.  And the government asked you if the name Timothy

16  Gaarn was familiar to you, and I believe you said

17  something like he worked there.  And then there was some

18  testimony about when you learned he worked there.

19          Do you recall some questions about that?

20  A.  I did.  Yes.  I didn't know him at the time but I've

21  come to know the name.

22  Q.  Well, let's talk about that conversation where you're

23  meeting Phil who is now recommending further investment in

24  Eufora.

25          Tommy Constantine wasn't present during that

Murray - Cross/Mr. Haley

3531

1   conversation, I take it?

2   A.    No.

3   Q.    Where did that conversation take place?

4   A.    I don't remember.

5   Q.    Do you recall or have some sense, sir -- again, we

6   are only asking for your best recollection, Mr. Murray --

7   as to how long that conversation took place.

8   A.    The one with Phil?

9   Q.    Yes.

10  A.    No, I don't recall.  I don't remember how long it

11  was.  No.

12  Q.    But you did talk about it.  Correct?

13  A.    Correct.

14  Q.    And I always say this sir, and I don't mean to be

15  facetious, but I take it during that conversation you

16  weren't taking notes.

17  A.    True.

18  Q.    There wasn't a tape recorder that was memorializing

19  what was said between you and Phil.  Is that true?

20  A.    Correct.

21  Q.    And indeed there was nobody like this stenographer

22  present.  Is that true?

23  A.    True.

24  Q.    So is it fair to state, sir, that because of the time

25  that elapsed, you are not able to state today under oath

Murray - Cross/Mr. Haley

3532

1   with any degree of specificity, you started talking about

2   Eufora, and from the moment you started talking about

3   Eufora to the end of our conversation, this is precisely

4   what was told to me by Phil Kenner.

5        You can't stay that, can you?

6   A.   Correct.

7   Q.   Did there ever come a point in time, sir, following

8   the conversation you had with Phil concerning the Eufora

9   investments, both the investment where Tommy Constantine

10  was present and the additional investments where you are

11  speaking with Phil alone, that you reached out to Phil and

12  said:  *Phil, I'd like to discuss with you again my Eufora*

13  *investments, where they stand, how I acquired my interest*;

14  things of that nature?

15       Does that happen after those conversations?

16  A.   Not that I recall, no.

17  Q.   Did you maintain contact with Phil Kenner following

18  these conversations that occurred with reference to your

19  Eufora investments?  I mean, did you continue to stay in

20  contact with Phil?

21  A.   Yes.

22  Q.   Did you ever ask him before today about the status of

23  your Eufora investments?

24  A.   No.

25  Q.   And anticipating redirect, sir:  I assume you didn't

3533

1     ask him because Phil Kenner is your trusted financial

2     advisor.  Is that true?

3     A.    Correct.

4     Q.    You were asked again questions, sir, about whether

5     you have ever received a return on your investment in

6     Hawaii, whether you have ever received by way of monetary

7     compensation, return on investment in Eufora, and you

8     answered definitively as of today no.  Correct?

9     A.    Correct.

10    Q.    Does the name Ken Jowdy mean anything to you, sir?

11    A.    Yes.

12    Q.    And as a result of a dispute involving yourself and

13    Ken Jowdy, it is true, is it not, that you prevailed in a

14    one million dollar judgment against Ken Jowdy as a result

15    of that dispute.  Is that correct?

16    A.    Correct.

17    Q.    Today, as you sit on this witness stand, how much of

18    that one million dollar judgment against Ken Jowdy have

19    you received?

20    A.    Zero.

21    Q.    Not a penny?

22    A.    No.

23    Q.    Did you have a lawyer in connection with that

24    lawsuit, sir?

25    A.    Yes.

Murray - Cross/Mr. Haley

3534

1    Q.    When did you obtain that judgment?  Approximately.

2    A.    Four years maybe now.  Three, four years.

3    Q.    Not telling us what was said between you and your

4    attorney, do you have any idea, sir, as to the interest

5    that would be running on a one million dollar judgment

6    that was obtained, how long years ago?

7    A.    Four.

8    Q.    Do you have any idea of the interest that is running

9    on that?

10   A.    Do I know a number?

11   Q.    Yes, sir.

12   A.    10 percent.

13   Q.    If I were suggest to you, maybe as high as 12

14   percent.

15         Well, where did you obtain that judgment, sir?

16   In what state?

17   A.    Nevada.

18   Q.    We can all do the math as to what that is worth today

19   at 10 percent on a million dollar judgment going back four

20   years.

21         Now, Phil Kenner also assisted, did he not, in

22   efforts by an attorney by the name of Michael Stolper to

23   commence an investigation, indeed lawsuit, with reference

24   to Eufora?  Let me back up.

25         Does the name Michael Stolper mean anything to

Murray - Cross/Mr. Haley

3535

1    you?

2    A.    No.  I don't recall that name.

3    Q.    Okay.  This goes back some time, too.  Correct?

4    A.    Correct.

5    Q.    Well, do you recall an instance, sir, where Phil

6    Kenner assisted you in bringing a document called a

7    pleading in bankruptcy court to preserve your interest

8    with reference to a bankruptcy proceeding filed by Tommy

9    Constantine?

10          Do you remember that?

11   A.    No, I don't remember that.

12   Q.    Mr. Murray, would you kindly take a look at Kenner

13   Exhibit 102.  It is 13 pages in length, sir.  But I'm

14   going to ask you if your signature appears on that

15   document.

16   A.    Yes.

17          MR. LaRUSSO:  Your Honor, this is twice.  May I

18   have a side bar, please?

19          THE COURT:  Yes.

20          (Continued on the following page.)

21

22

23

24

25

Murray - Cross/Mr. Haley

3536

1      (Discussion at sidebar ensued as follows.)

2          MR. LaRUSSO:  I'm looking at the caption of this

3   proceeding.  This is the bankruptcy proceeding.

4          THE COURT:  I assume this is just a very general

5   question.  We had other witness that he asked about this

6   filing.  You are not asking any of the details of the

7   document, right?

8          MR. HALEY:  Your Honor, I'm sensitive obviously

9   to those issues.

10          Under other circumstances my inclination would

11   be to offer it into evidence, but let me just collect my

12   thoughts for a moment, judge, only because he has

13   acknowledged this is a document he signed.

14          THE COURT:  I am not saying you can't

15   authenticate it, but not what allegations were made in a

16   civil lawsuit, unless it is inconsistent with something he

17   says here today.

18          MR. HALEY:  It is not the offer of proof, judge,

19   not in terms of being relevant and material in connection

20   with the allegations made.  It is from my perspective

21   relevant and material insofar as my client is charged with

22   conspiratorial conduct with Tommy Constantine,

23   specifically with reference to Eufora.

24          What occurs is Tommy Constantine then files a

25   petition, bankruptcy petition, wherein he claims falsely

Murray - Cross/Mr. Haley

3537

1    that he never had an interest in Eufora.  In an effort to

2    protect his interest --

3              THE COURT:  I understand.

4              MR. HALEY:  Judge, I'm just going to ask him --

5              THE COURT:  I think it is fine to say that he

6    made an effort in connection with Tommy Constantine's

7    bankruptcy to preserve his interest in Eufora.

8              MR. HALEY:  Very well.  I will do that.

9              MR. LaRUSSO:  Fine.  Thank you.

10             (Discussion at sidebar was concluded.)

11             (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Murray - Cross/Mr. Haley

3538

1     (The following ensued in open court.)

2  BY MR. HALEY:

3  Q.   Sir, with reference to this particular document,

4  Kenner 102, without reading any portion of the document

5  into the record, could you simply read that first sentence

6  to yourself.  Okay?

7           And I believe you did testify that that is your

8  signature on the last part of that document.  Is that

9  true?

10  A.   That's correct.

11  Q.   I'm simply going to ask you to take a look at what is

12  here as relates to this part of the document.  So my

13  question to you, sir, is, does this refresh your

14  recollection as to whether or not Phil Kenner at some

15  point in time assisted you in filing actually this

16  specific document in connection with a bankruptcy

17  proceeding commenced by Tommy Constantine in order for you

18  to preserve your rights.

19  A.   Correct.

20  Q.   It refreshes your recollection?

21  A.   Well, it is in the print, yes.

22  Q.   It refreshes your recollection?

23  A.   Yes.

24  Q.   Sir, in addition to assisting you in that are

25  bankruptcy proceeding we referred to a moment ago, did

Murray - Cross/Mr. Haley

3539

1   Phil Kenner assist you with reference to that lawsuit you

2   brought against Ken Jowdy where ultimately you obtained

3   that one million dollar judgment?

4   A.   Yes.

5   Q.   There has been questions asked of various witnesses,

6   sir, in this case about an investment they made involving

7   a project known as Diamante Delamar in Mexico, wherein Ken

8   Jowdy was involved.  And my question to you is this, sir.

9        Did there come a point in time that you invested

10  $500,000 in a project known as Diamante Delamar?

11  A.   Correct.

12  Q.   That was a project involving Ken Jowdy as reference

13  to your understanding of him having some ownership

14  interest.  Is that correct?

15  A.   Correct.

16  Q.   Today, as you sit here today, have you ever received

17  a penny back from that $500,000 investment in Diamante

18  Delamar?  Yes or no?

19  A.   No.

20  Q.   Do you have an understanding, sir, based upon your

21  memory of events by way of conversations you had with Phil

22  Kenner or others, that with respect to the Hawaii project

23  and the money invested in the Hawaii project, that Ken

24  Jowdy owes the investors in that Hawaii project, including

25  yourself as an investor, money on the loan made to him?

Murray - Cross/Mr. LaRusso

3540

1    If you recall.

2    A.    Does Ken Jowdy owe me money?

3    Q.    Do you have an understanding, sir -- that is not the

4    question because we know the answer is no.

5          My question is, sir, do you have an

6    understanding, based upon conversations you have had with

7    individuals, that as relates the Hawaii investment, the

8    Hawaii project, Ken Jowdy also, by virtue of a loan made

9    to him for monies from the Hawaii project, has not paid

10   that back?

11   A.    Correct.  No, he hasn't.

12         MR. HALEY:  Mr. Murray, it has been my pleasure,

13   sir.

14         Thank you.

15         THE WITNESS:  Thank you.

16         THE COURT:  Mr. LaRusso?

17         MR. LaRUSSO:  Thank you, your Honor.

18

19   CROSS-EXAMINATION

20   BY MR. LaRUSSO:

21   Q.    I know it's late in the afternoon, Mr. Murray.

22         How are you?  My name is Rob LaRusso.  I

23   represent Mr. Constantine.

24         You have told us on a number of occasions that

25   you met Mr. Constantine on one occasion.  Am I correct?

Murray - Cross/Mr. LaRusso

3541

1   A.   Yes.

2   Q.   And I believe that you said the one occasion that you

3   recall was when he was with Mr. Kenner, and in that

4   meeting they discussed Eufora.  Am I correct?  Is that

5   your recollection?

6   A.   Yes.

7   Q.   I believe you also said that you don't recall when

8   that meeting actually took place, from your independent

9   recollection.  Is that right?

10  A.   Right.

11  Q.   Would it be fair to say it would be many years ago?

12  Is that correct?

13  A.   Yes.

14  Q.   Okay.  You do recall some specifics of the meeting?

15  That is, it was in California.  Correct?

16  A.   Correct.

17  Q.   And it was at a restaurant called Hennessee's.  Is

18  that also correct?

19  A.   That's it.  Yes.  Correct.

20  Q.   You are smiling that you remember.

21  A.   That I remember.  Yes.

22  Q.   So that is the one and only meeting that you had with

23  Mr. Constantine.  Is that right?

24  A.   Right.

25  Q.   And would it be fair to say that you really don't

3542

1   know what year that meeting actually took place?  Is that

2   fair?

3   A.    That's fair.

4   Q.    In regards to that meeting, do you remember what the

5   last team you played for was?

6   A.    During that meeting?

7   Q.    No.  No.  What NHL hockey team.  The last one.

8   A.    Yes.

9   Q.    Who was that?

10  A.    Boston.

11  Q.    You were residing in California at the time you were

12  playing for Boston?

13  A.    After I finished playing.  Yes.

14  Q.    When you finished playing.  That would have been the

15  '08-09 season.  Is that right?

16  A.    Correct.

17  Q.    Now, we know from the government's exhibit that has

18  been received -- this is the exhibit the government

19  introduced as GM-1.  And there were some questions asked

20  of you about this email.  And you looked at it and said I

21  recognize the email address, and your answer was to an

22  extent I read it.  Is that correct?

23  A.    Correct.

24  Q.    But to be fair to you, you don't remember as you are

25  testifying today the full extent of the information that

3543

1  is contained in that.  You have no independent

2  recollection other than what is written here.

3  A.    Correct.

4  Q.    We know this was made in 2009.  Correct?

5  A.    Correct.

6  Q.    We know that was a discussion about the global

7  settlement fund.  Is that correct?

8  A.    That's correct.

9  Q.    Do you have, and you use this as a point of reference

10  some six year ago.

11          Do you remember speaking with Mr. Constantine

12  about the global settlement fund along with Mr. Kenner?

13  A.    There was a conference call that I think he was on.

14  Q.    Do you remember whether or not there was an in-person

15  meeting with Mr. Constantine wherein -- with you and Mr.

16  Kenner in regard to the global settlement fund?  Around

17  this time.

18  A.    Around this time, no, I don't.  The only meeting I

19  remember, which I don't know the date, is the one at

20  Hennessee's which you just told me.

21  Q.    My question is, did the meeting at Hennessee's occur

22  at or about the time you were asked to contribute to the

23  global settlement fund?

24  A.    Maybe.  I don't recall.

25  Q.    So it is possible that it was around this period of

3544

1    time.  Is that correct?

2    A.    Correct.

3    Q.    Would it be fair to say that the meetings you had

4    with Mr. Constantine more than likely did not occur eleven

5    years ago; it would be more like maybe five or six years

6    ago?

7    A.    Correct, I guess.

8    Q.    And I'm not trying to in any way trap you.  Please

9    understand I'm just trying see, with my questionings and

10   with some of the documents, if we can narrow some of the

11   time frames that you met with Mr. Constantine.

12          So to sum up on this point, it would be fair to

13   say that you would not dispute the fact that your meeting

14   with Mr. Constantine and Mr. Kenner could have occurred at

15   or about the time of this email that you received

16   regarding the global settlement.

17   A.    It could have, yes.

18   Q.    Again, I'm not going to read the email, but your

19   understanding of the global settlement fund.  You

20   mentioned on direct examination a number of purposes that

21   you were told.  Do you remember what those were?

22   A.    Yes.  Lawyer fees and different things that trying to

23   get our investments back.

24   Q.    When you say different things.  I believe you

25   testified different projects.  Is that also --

3545

1   A.   Okay.  Different projects.

2   Q.   I don't want to put words in your mouth.

3   A.   I don't know if I said that but okay.

4   Q.   What were those different projects?  Or different

5   things.  It doesn't matter.

6   A.   I don't know.  I don't recall --

7   Q.   Well, you do remember --

8   A.   -- exactly.

9   Q.   One of them was Mexico.  I believe that is one of the

10  projects that you talked about.  Okay?

11  A.   Right.

12  Q.   Do you recall any discussion about Ken Jowdy?

13  A.   He was probably in the discussion, I'm sure.

14  Q.   The global settlement fund was set up, or its most

15  significant purpose was to go after Ken Jowdy for the

16  money that you and other hockey players had invested in

17  projects down in Mexico.

18       Is that correct?

19  A.   That's correct.

20  Q.   And when we talk about Mr. Jowdy, is it your

21  recollection that you were contributing, along with the

22  other hockey players, for legal fees so that actions could

23  be taken against him to recover your investments?

24  Correct?

25  A.   Correct.

3546

1    Q.    Do you recall, now that you have had a chance to

2    looks at that email we talked about, that there were other

3    purposes discussed with you at the initial time of your

4    investment?  Other than taking legal action against

5    Mr. Jowdy.

6    A.    Well, in the email.  You are referring to the email?

7    Q.    Have you had a chance to review the email --

8    A.    I looked at the email.

9    Q.    You read it.  And you don't have any objection to the

10   fact that that may have been part of your discussions with

11   Mr. Constantine and Mr. Kenner.

12   A.    Correct.

13   Q.    Would it be fair to say that if you ever had any

14   questions, knowing the relationship you had with

15   Mr. Kenner and Mr. Constantine, they would have answered

16   questions as comprehensively and fully as they could?  Is

17   that correct?

18   A.    Correct.

19   Q.    So if you wanted answers to hangars and airplanes, if

20   that conversation came up and you asked them, they would

21   have answered it.  Is that correct?

22   A.    I would assumed so.  Yes.

23   Q.    Sticking with the global settlement fund, which takes

24   us around 2009.  Did you continue any kind of

25   communication with Mr. Constantine in regards to the

Murray - Cross/Mr. LaRusso

3547

1    progress of the global settlement fund?

2    A.   None that I recall.  No.

3    Q.   Do you recall the name of the lawyer, if one was

4    hired, that was going to represent your interest in

5    regards to the purposes of the global settlement fund?

6    A.   Yes.

7    Q.   What was his name?

8    A.   Ron Richards.

9    Q.   Do you remember any communications with Mr. Ron

10   Richards in regard to the progress of the global

11   settlement fund, to fulfill the purposes --

12   A.   No.

13   Q.   -- as you understood?

14   A.   No.

15   Q.   By your answer, can I ask you:  No, you don't

16   remember?  There may have been but as you testify here

17   today you don't remember any email communications or any

18   conversations?

19   A.   I don't remember any email conversations.  There

20   might have been but I don't believe.

21   Q.   At this point you don't you recall them.

22   A.   Yes.

23   Q.   Do you have any recollection of being asked to

24   participate in conference calls that were set up by

25   Mr. Constantine so that you could be updated with regards

3548

1   to the progress of the global settlement fund?

2   A.   I remember a couple.  Yes.

3   Q.   Would it work in this manner?  That you would get

4   notification by email of a conference call, and then you

5   would email back saying whether you were available or

6   whether you were not available?

7        Is that correct?

8   A.   That sounds about right.  Yes.

9   Q.   And in those conference calls that you did

10  participate in, did Mr. Constantine provide information

11  regarding the progress or the status of the global

12  settlement fund?

13  A.   Did he provide?

14  Q.   If you remember.

15  A.   I don't remember but I'm sure I was on a few of the

16  calls, yes.

17  Q.   And the purpose of the calls was the global

18  settlement fund, so as you think back to the period of

19  those conference calls you would say that it would be, the

20  subject would have been the global settlement fund?

21  A.   Yes.

22  Q.   I'm going to show you --

23       THE COURT:  Mr. LaRusso, it is 4:30.  I don't

24  know what you are about to do now.

25       MR. LaRUSSO:  This is a good point to break,

Murray - Cross/Mr. LaRusso

3549

1  Judge.

2  THE COURT:  We are going to recess now and will

3  reconvene tomorrow morning at 9:30.  Don't discuss the

4  case.  Have a good night.

5  (The following ensued in the absence of the jury

6  at 4:30 pm.)

7  THE COURT:  Everyone can be seated.

8  After Mr. Murray finishes tomorrow.  Who is

9  next?

10  MR. MISKIEWICZ:  John Osborne.  And Jackson

11  Stewart.  Blake Rosser.  If we can get to him, possibly

12  Chris Petrellese.  And that would probably be the end of

13  the day.

14  THE COURT:  And do you think you will fill up a

15  good part of Monday, too?

16  MR. MISKIEWICZ:  Depending upon the hearing

17  tomorrow, Monday would be Ronald Richards and Joshua

18  Wayne.

19  THE COURT:  Okay.  Assuming only two witnesses

20  on Monday, that wouldn't take the whole day.

21  MR. MISKIEWICZ:  No.  We will be resting at that

22  point.

23  THE COURT:  So we will recess until tomorrow.

24  But at this point, Mr. Haley, are you going to

25  go first or who is going first?

Murray - Cross/Mr. LaRusso

3550

1      MR. LaRUSSO:  That is the way we had discussed

2  it.

3      MR. HALEY:  Yes, sir.  It is.  And I have

4  advised Mr. Miskiewicz that my client will be testifying.

5      It is my preference, judge, that Vincent

6  Tesoriero testify first.  The subpoena is returnable

7  Monday, but I'm not going to hold up this trial.

8      In other words if Mr. Tesoriero is not

9  available, I believe then we will proceed with my client's

10  testimony.

11      THE COURT:  Are you still intending on calling

12  Mr. Jowdy?

13      MR. HALEY:  We have to have discussions related

14  to that.

15      MR. LaRUSSO:  The agreement reached by my

16  partner with his attorney was that we would get back to

17  him.  We haven't made a final decision on Mr. Jowdy.  It

18  is obviously based upon what information we have developed

19  on the government's case.  So I don't know the answer

20  right now.  Sorry.

21      THE COURT:  When you were saying you have ten

22  witnesses and your case will take a week, was that with

23  Mr. Jowdy?

24      MR. LaRUSSO:  No.  Without.  So I am leaning not

25  to call him.

Murray - Cross/Mr. LaRusso

3551

1      THE COURT:  Okay.  I think he could be on the

2  stand for a while.

3      MR. LaRUSSO:  That is why I have not included

4  him in my list right now.

5      THE COURT:  Okay.  I'm not committing you, but

6  right now you anticipate you are going to call

7  Mr. Tesoriero.

8      MR. HALEY:  Correct.

9      THE COURT:  And Mr. Kenner.

10      MR. HALEY:  Correct.

11      THE COURT:  Any other witnesses other than Mr.

12  Jowdy potentially?

13      MR. HALEY:  I am glad we are having this

14  discussion in this respect, Judge.  And I think, I don't

15  want to commit the government.  There is of course Scott

16  Romanowski, the investigator in connection with the notes.

17  And I think one of the notes we may have already put in

18  evidence.  The other note of course has to deal with his

19  notes with reference a conversation with Mr. Kaiser, just

20  that excerpt.  And I don't want to commit the government.

21  I think we are talking perhaps stipulating as to the

22  admission of that particular part of the notes.

23      THE COURT:  You are going to reach out to

24  someone.  Will you be able to confirm that?

25      MR. MISKIEWICZ:  If he is going to be called, we

Murray - Cross/Mr. LaRusso

3552

1   will assist with getting him here.  But we haven't had the

2   conversation about what specifically Mr. Haley wants to

3   admit.  We can probably work that out.

4           MR. HALEY:  What I will do, Judge, is, this

5   evening I will excerpt that aspect of those notes from

6   that are actual exhibit, itself, and then I will discuss

7   that with Mr. Miskiewicz.

8           The only other potential witness, judge, in

9   light of some testimony that was adduced today, would be

10  this Jason Wooley.  But I will not delay the trial.  I

11  think what we could do is I could begin my case by way of

12  Mr. Tesoriero and my client and then we could move with

13  Mr. LaRusso's case, and then Mr. Wooley maybe can get

14  stuck in at some point in time out of order.  I suspect

15  the testimony would take, if we decide to bring him in,

16  all of 15 minutes, judge, candidly.

17          THE COURT:  Okay.

18          MR. LaRUSSO:  Judge, so I wold let the court

19  know.  We are hoping to start our case, it looks like,

20  Wednesday.  That might be a little bit I don't know,

21  maybe --

22          THE COURT:  -- ambitious.

23          MR. LaRUSSO:  Yes, judge.  But I'm preparing for

24  Wednesday morning.

25          I know that we are looking at Mr. Gonchar,

Murray - Cross/Mr. LaRusso

3553

1  Mr. D'Ambrosio, and Mr. Stempler, but right now the order

2  hasn't been set.

3          Mr. Conway, who has basically been taking this

4  part of the case, has had some issues to deal with.  So I

5  will be meeting with him Friday morning and I will tell

6  the government what our list of witness issues are.

7          I will try my best to give them an order of the

8  witnesses so they have a tally of who will be called when.

9  That is where I am on that, judge.

10         THE COURT:  All right.  Any other issues we need

11 to discuss today?

12         MR. LaRUSSO:  There is one other.  And it is

13 really my fault, judge.

14         I have been trying to stipulate as much as I

15 possibly can within the rules, and there have been some

16 glitches here and there.

17         We stipulated to Mr. Nussbaum.  I signed the

18 stipulation and I overlooked a point that may be

19 significant.  I don't know.  Mr. Nussbaum was paid to put

20 money into a temporary bankruptcy, not to take it out, and

21 I signed a stip not to take it out.  So I would like to

22 look at the bank records and discuss it with the

23 government.  Hopefully, we can resolve that.  That appears

24 to be a stip that I signed and I overlooked.  It was my

25 mistake.

Murray - Cross/Mr. LaRusso

3554

1          THE COURT:  Okay.

2          MR. LaRUSSO:  I just want to alert the court.

3     And I apologize to the government.  It may not be an

4     issue.

5          THE COURT:  I'm not sure I understand.  The

6     money:  What is the issue?

7          MR. LaRUSSO:  Put Avalon into bankruptcy.

8     Avalon.  I said money.  It should have been Avalon.  But

9     in fact what happened, it was put into.  The stip said not

10    to take out.  That is the way I read it.  Is that right?

11    My client is more familiar with the facts.  Let me put it

12    this way.  I will try to talk to the government and get it

13    resolved.

14         THE COURT:  All right.  Have a good night.

15         (Proceedings adjourned at 4:40 pm.)

16

17

18

19

20

21

22

23

24

25

3555

1                        WITNESSES

2

3       RICHARD ROZENBOOM                          3348

4       CROSS-EXAMINATION                          3348

5       BY MR. LARUSSO

6       REDIRECT EXAMINATION                       3375

7       BY MS. KOMATIREDDY

8       RECROSS-EXAMINATION                        3379

9       BY MR. LARUSSO

10      LYNNE LAGARDE                              3382

11      DIRECT EXAMINATION                         3382

12      BY MR. MISKIEWICZ

13      CROSS-EXAMINATION                          3408

14      BY MR. LARUSSO

15      LANI DONLAN                                3419

16      DIRECT EXAMINATION                         3419

17      BY MR. MISKIEWICZ

18      CROSS-EXAMINATION                          3432

19      BY MR. HALEY

20      CROSS-EXAMINATION                          3462

21      BY MR. LaRUSSO

22      REDIRECT EXAMINATION                       3463

23      BY MR. MISKIEWICZ

24      RECROSS-EXAMINATION                        3467

25      BY MR. HALEY

3556

1   GLEN MURRAY                                     3473

2   DIRECT EXAMINATION                              3474

3   BY MR. MISKIEWICZ

4   CROSS-EXAMINATION                               3509

5   BY MR. HALEY

6   CROSS-EXAMINATION                               3540

7   BY MR. LaRUSSO

8

9                    EXHIBITS

10  Government Exhibits 3919 through 3932 were      3388

11  received in evidence

12  Government Exhibit Lagarde 1 was received in    3399

13  evidence

14  Government Exhibit Stipulation 35 was           3417

15  received in evidence

16  Government Exhibits 3502 through 3513 and       3418

17  4408 through 4410 were received in evidence

18  Government's Exhibits 41 through 46 in          3470

19  evidence

20  Government's Exhibits 4404 through 4407, 403,   3470

21  715, 3907 through 3909 and 4401 through 4402

22  in evidence

23  Government Exhibits 4301, 4303, 4304 and 4306   3472

24  in evidence

25  Government's Exhibits 3331 through 3336, 3341   3473

3557

1    R, 3342 through 3349 in evidence

2    Government Exhibits 3940 through 3947 in        3473

3    evidence

4    Government Exhibit GM-1 was received in          3504

5    evidence

6

7

8    Defense Exhibit 211 in evidence                  3361

9    Defense Exhibits 207 and 209 in evidence         3363

10   Defense Exhibit C 212 in evidence                3365

11   Defense Exhibit C 213 in evidence                3373

12   Defense Exhibit 99 in evidence                   3461

13   Defense Exhibit Kenner 100 was received in       3522

14   evidence

15   Defense Exhibit Kenner 101 was received in       3523

16   evidence

17

18

19

20

21

22

23

24

25

1

## $

**$1,249,775.40** [1] - 3487:11
**$1,341,046.86** [1] - 3376:4
**$10,000** [5] - 3384:17, 3401:3, 3403:3, 3404:15, 3407:3
**$10,575.77** [2] - 3394:22, 3400:23
**$100,000** [17] - 3479:18, 3480:5, 3494:5, 3495:9, 3495:22, 3496:18, 3497:6, 3497:10, 3497:14, 3497:20, 3498:16, 3498:21, 3498:24, 3500:4, 3512:18, 3514:24, 3515:1
**$101,000** [1] - 3488:25
**$166,000** [1] - 3492:3
**$250,000** [8] - 3376:21, 3379:20, 3502:10, 3503:7, 3505:12, 3505:17, 3506:8
**$300** [2] - 3407:6, 3407:8
**$300,000** [1] - 3515:16
**$363,000** [1] - 3351:22
**$380,000** [1] - 3361:23
**$385,481.75** [2] - 3515:12, 3515:17
**$415,000** [2] - 3376:8, 3376:12
**$42,553** [1] - 3515:1
**$5,000** [1] - 3514:25
**$5,817.80** [1] - 3488:9
**$50,000** [1] - 3355:21
**$500,000** [4] - 3470:21, 3471:3, 3539:10, 3539:17
**$510,000** [1] - 3356:17
**$60,000** [1] - 3488:7
**$747.14** [1] - 3471:18
**$81,127** [1] - 3497:14
**$9,495.77** [1] - 3489:2
**$9,700** [9] - 3389:14, 3397:9, 3401:23, 3404:21, 3410:5, 3411:7, 3411:21, 3411:22, 3413:3
**$9,700.53** [1] - 3398:11
**$9,707** [1] - 3397:4
**$9,707.50** [1] - 3394:13
**$9,753** [3] - 3400:19, 3412:5, 3412:7
**$9,818** [2] - 3411:24, 3412:5

**'**

**'04** [1] - 3421:1
**'05** [5] - 3421:1, 3422:21, 3425:5, 3450:4, 3457:18
**'06** [1] - 3426:3

**'07** [1] - 3426:3
**'08-09** [1] - 3542:15
**'10** [1] - 3475:9
**'90s** [1] - 3478:22
**'91** [1] - 3475:6
**'92** [1] - 3475:6
**'93** [2] - 3475:15, 3476:18
**'94** [1] - 3475:15
**'95** [2] - 3475:15, 3476:18
**'O8** [2] - 3475:9, 3497:19
**'O9** [2] - 3475:9

## 0

**000** [3] - 3401:8, 3401:13, 3401:16
**001** [1] - 3402:2

## 1

**1** [22] - 3355:14, 3397:12, 3398:22, 3398:25, 3399:1, 3400:5, 3400:7, 3402:13, 3405:3, 3405:6, 3408:24, 3409:2, 3409:6, 3417:6, 3483:24, 3485:21, 3497:4, 3522:18, 3522:23, 3523:4, 3556:12
**1.249,775** [1] - 3487:10
**10** [23] - 3345:9, 3348:18, 3348:22, 3350:4, 3352:15, 3353:6, 3366:24, 3367:2, 3367:6, 3370:9, 3370:11, 3374:25, 3375:4, 3380:12, 3381:2, 3485:18, 3506:6, 3506:24, 3507:2, 3507:7, 3516:13, 3534:12, 3534:19
**10/29/2004** [1] - 3485:15
**100** [3] - 3345:15, 3346:20, 3374:18, 3522:4, 3522:8, 3522:9, 3522:17, 3522:22, 3557:13
**100,000** [2] - 3479:14, 3496:5
**101** [6] - 3522:16, 3522:17, 3523:9, 3523:12, 3523:13, 3557:15
**102** [2] - 3535:13, 3538:4
**10th** [2] - 3494:7, 3518:19
**1102** [1] - 3402:19
**11501** [1] - 3346:3
**11572** [1] - 3346:7
**11722** [2] - 3345:15, 3346:21
**11749** [1] - 3345:22
**12** [2] - 3470:20, 3534:13
**12/29** [1] - 3493:25
**12/29/2008** [2] - 3494:11,

3494:17
**12/30** [1] - 3497:5
**12/31** [1] - 3497:13
**12/31/08** [1] - 3495:21
**13** [1] - 3535:13
**1320** [3] - 3494:7, 3518:21, 3518:22
**15** [4] - 3393:5, 3421:21, 3432:16, 3502:16
**15-minute** [1] - 3393:12
**1504** [2] - 3502:12, 3505:14
**1520** [2] - 3479:5, 3479:7
**1522** [1] - 3492:6
**1523** [1] - 3481:19
**16** [4] - 3421:21, 3432:16, 3488:3
**1601** [1] - 3345:21
**166,000** [1] - 3492:18
**16th** [2] - 3420:1, 3420:5
**17** [3] - 3400:8, 3475:2, 3488:3
**18** [4] - 3360:22, 3361:12, 3374:1, 3488:25
**18th** [1] - 3505:17
**19** [7] - 3420:1, 3420:5, 3437:12, 3475:4, 3489:24, 3498:15, 3502:14
**198** [3] - 3349:9, 3349:10, 3378:2
**1990** [1] - 3475:6
**19th** [1] - 3505:15
**1:10** [1] - 3468:8
**1st** [1] - 3365:18

## 2

**2** [5] - 3351:1, 3468:5, 3497:13, 3500:8
**20** [3] - 3383:17, 3383:18, 3500:5
**2000s** [1] - 3478:22
**2003** [1] - 3420:20
**2004** [10] - 3481:21, 3482:15, 3483:25, 3484:8, 3484:14, 3485:19, 3486:1, 3492:3, 3492:7, 3493:3
**2005** [9] - 3438:16, 3438:19, 3439:13, 3443:24, 3456:7, 3456:17, 3458:3, 3458:23, 3459:14
**2005-2006** [1] - 3438:7
**2006** [4] - 3416:3, 3438:12, 3515:1, 3515:13
**2007** [12] - 3387:11, 3388:13, 3388:22, 3398:13, 3398:14, 3400:8, 3401:22, 3406:16, 3416:3, 3488:11, 3488:19, 3488:25
**2008** [11] - 3359:15,

3417:9, 3444:15, 3444:16, 3462:2, 3494:1, 3495:22, 3496:11, 3500:16, 3524:4, 3525:11
**2008-2009** [1] - 3359:17
**2009** [37] - 3354:15, 3354:21, 3359:24, 3365:15, 3373:10, 3374:1, 3384:8, 3384:16, 3388:23, 3389:2, 3402:21, 3410:25, 3412:19, 3444:14, 3470:20, 3471:17, 3483:24, 3489:24, 3498:15, 3500:5, 3500:16, 3502:14, 3518:20, 3519:11, 3520:5, 3522:19, 3522:23, 3522:24, 3523:4, 3523:16, 3543:4, 3546:24
**2010** [8] - 3360:22, 3458:15, 3458:22, 3459:1, 3459:4, 3459:15, 3462:24, 3462:25
**2012** [1] - 3436:25
**2015** [3] - 3345:9, 3449:16, 3482:14
**207** [4] - 3362:21, 3363:23, 3363:24, 3557:9
**209** [6] - 3362:21, 3363:6, 3363:20, 3363:23, 3363:24, 3557:9
**20s** [1] - 3477:1
**211** [4] - 3360:19, 3361:6, 3361:10, 3557:8
**212** [5] - 3364:5, 3364:25, 3365:4, 3365:5, 3557:10
**2125** [2] - 3489:24, 3517:13
**2126** [1] - 3490:9
**213** [4] - 3373:8, 3373:15, 3373:21, 3557:11
**2137** [1] - 3484:17
**2176** [6] - 3483:7, 3483:20, 3486:17, 3521:14, 3522:17, 3522:18
**22** [2] - 3388:1, 3487:19
**2211** [3] - 3493:20, 3495:19, 3495:20
**2214** [1] - 3498:9
**23** [3] - 3388:1, 3488:10, 3488:24
**2301** [1] - 3497:3
**2303** [1] - 3500:8
**24** [1] - 3388:1
**25** [1] - 3388:1
**26** [3] - 3346:7, 3388:1, 3481:21
**27** [3] - 3388:1, 3471:17, 3492:7
**28** [1] - 3388:2
**29** [1] - 3388:2
**2O7** [1] - 3363:19

**3**

**3** [21] - 3349:15, 3355:1, 3355:4, 3355:10, 3355:24, 3356:1, 3356:2, 3356:11, 3360:6, 3360:10, 3360:23, 3362:12, 3362:19, 3362:25, 3363:17, 3364:3, 3364:8, 3372:23, 3376:2, 3495:19, 3498:23
**30** [3] - 3380:12, 3388:2, 3522:24
**300** [1] - 3346:3
**31** [3] - 3388:2, 3483:24, 3522:19
**3120** [2] - 3518:19, 3518:21
**3129** [4] - 3401:6, 3401:12, 3401:14, 3401:24
**32** [1] - 3388:2
**3331** [3] - 3472:19, 3473:3, 3556:25
**3336** [3] - 3472:19, 3473:3, 3556:25
**3339** [1] - 3472:20
**3340** [1] - 3472:20
**3341** [3] - 3472:19, 3473:3, 3556:25
**3342** [3] - 3472:19, 3473:4, 3557:1
**3348** [2] - 3555:3, 3555:4
**3349** [3] - 3472:19, 3473:4, 3557:1
**3361** [1] - 3557:8
**3363** [1] - 3557:9
**3365** [1] - 3557:10
**3373** [1] - 3557:11
**3375** [1] - 3555:6
**3379** [1] - 3555:8
**3382** [2] - 3555:10, 3555:11
**3388** [1] - 3556:10
**3399** [1] - 3556:12
**3408** [1] - 3555:13
**3417** [1] - 3556:14
**3418** [1] - 3556:16
**3419** [2] - 3555:15, 3555:16
**3432** [1] - 3555:18
**3461** [1] - 3557:12
**3462** [1] - 3555:20
**3463** [1] - 3555:22
**3467** [1] - 3555:24
**3470** [2] - 3556:18, 3556:20
**3472** [1] - 3556:23
**3473** [3] - 3556:1, 3556:25, 3557:2
**3474** [1] - 3556:2
**35** [6] - 3416:17, 3416:19, 3416:25, 3417:2, 3418:22, 3556:14
**3502** [4] - 3418:1, 3418:13,

3418:23, 3556:16
**3503** [1] - 3418:4
**3504** [2] - 3418:4, 3557:4
**3505** [1] - 3417:20
**3506** [1] - 3417:20
**3507** [1] - 3417:17
**3508** [1] - 3417:17
**3509** [2] - 3417:23, 3556:4
**3510** [1] - 3417:23
**3511** [1] - 3417:17
**3513** [4] - 3417:18, 3418:14, 3418:24, 3556:16
**3522** [1] - 3557:13
**3523** [1] - 3557:15
**3540** [1] - 3556:6
**370** [1] - 3356:19
**380,000** [2] - 3365:9, 3366:9
**3902** [1] - 3472:20
**3903** [1] - 3472:20
**3906** [1] - 3472:20
**3907** [3] - 3470:7, 3470:17, 3556:21
**3909** [3] - 3470:7, 3470:17, 3556:21
**3911** [2] - 3408:13, 3408:18
**3917** [1] - 3399:8
**3919** [15] - 3386:10, 3387:20, 3387:22, 3388:1, 3388:3, 3388:9, 3388:17, 3393:22, 3394:8, 3400:22, 3402:14, 3408:19, 3408:21, 3556:10
**3920** [4] - 3385:6, 3386:6, 3387:22, 3388:1
**3921** [1] - 3388:1
**3932** [6] - 3385:7, 3387:20, 3387:22, 3388:3, 3388:10, 3556:10
**3940** [3] - 3473:5, 3473:12, 3557:2
**3947** [3] - 3473:6, 3473:12, 3557:2
**3rd** [4] - 3354:15, 3354:25, 3359:24, 3365:15

**4**

**4** [3] - 3349:15, 3351:1, 3497:13
**40** [1] - 3487:10
**403** [2] - 3470:16, 3556:20
**41** [4] - 3469:16, 3469:24, 3470:1, 3556:18
**4207** [1] - 3376:16
**4212** [2] - 3354:23, 3376:2
**4218** [1] - 3377:14
**4222** [1] - 3376:7
**425k** [1] - 3351:7

**4301** [3] - 3472:1, 3472:5, 3472:13, 3556:23
**4303** [4] - 3471:10, 3472:6, 3472:13, 3556:23
**4304** [4] - 3471:13, 3472:6, 3472:13, 3556:23
**4306** [4] - 3472:1, 3472:6, 3472:13, 3556:23
**4401** [3] - 3470:7, 3470:17, 3556:21
**4402** [3] - 3470:8, 3470:17, 3556:21
**4403** [1] - 3470:4
**4404** [3] - 3470:4, 3470:16, 3556:20
**4407** [3] - 3470:4, 3470:16, 3556:20
**4408** [4] - 3418:7, 3418:14, 3418:24, 3556:17
**4409** [1] - 3418:10
**4410** [4] - 3418:10, 3418:14, 3418:24, 3556:17
**45** [1] - 3470:19
**46** [4] - 3469:17, 3469:24, 3470:1, 3556:18
**4:30** [2] - 3548:23, 3549:6
**4:40** [1] - 3554:15

**5**

**5/19** [1] - 3402:21
**5/19s** [1] - 3402:25
**510** [1] - 3356:21
**55,000** [1] - 3365:18

**6**

**6** [1] - 3476:18
**631** [1] - 3346:21

**7**

**7** [1] - 3516:12
**712-6101** [1] - 3346:21
**715** [3] - 3470:6, 3470:17, 3556:21
**77** [1] - 3422:15

**8**

**8** [2] - 3516:12, 3523:4
**82** [1] - 3406:9
**82nd** [1] - 3410:18
**89** [1] - 3434:7

**9**

**9** [1] - 3516:12
**9-to-5** [1] - 3440:18
**90** [2] - 3434:8, 3434:24
**90266** [1] - 3518:20
**93** [1] - 3451:21
**95** [1] - 3452:21
**97** [1] - 3379:12
**99** [6] - 3461:11, 3461:21, 3461:24, 3461:25, 3462:4, 3557:12
**9:30** [2] - 3345:9, 3549:3

**A**

**a.m** [1] - 3345:9
**ability** [2] - 3357:21, 3462:8
**able** [13] - 3366:13, 3370:11, 3370:12, 3371:7, 3387:13, 3389:22, 3405:8, 3460:15, 3504:3, 3513:17, 3521:14, 3531:25, 3551:24
**above-mentioned** [2] - 3393:23, 3504:22
**abreast** [1] - 3427:21
**absence** [1] - 3549:5
**absolutely** [2] - 3485:11, 3513:23
**accepting** [1] - 3413:18
**access** [4] - 3370:3, 3374:8, 3374:23, 3520:7
**accessed** [1] - 3512:21
**accidentally** [1] - 3420:3
**accommodate** [1] - 3396:14
**according** [1] - 3360:4
**account** [42] - 3351:4, 3394:8, 3398:10, 3407:4, 3407:7, 3470:24, 3471:14, 3471:21, 3472:2, 3472:3, 3478:9, 3479:15, 3482:4, 3482:8, 3483:8, 3484:2, 3484:13, 3488:8, 3490:12, 3494:5, 3494:15, 3496:6, 3496:8, 3496:12, 3497:3, 3497:4, 3498:10, 3500:5, 3503:6, 3505:18, 3519:20, 3521:13, 3521:16, 3521:17, 3521:18, 3521:19, 3521:25, 3522:18, 3522:22, 3523:3, 3530:13
**accounting** [2] - 3418:2, 3487:3
**accounts** [1] - 3500:10
**accurate** [11] - 3410:6,

3417:18, 3417:21, 3417:24, 3418:1, 3418:5, 3418:8, 3418:11, 3471:10, 3471:13, 3472:2
**acknowledged** [1] - 3536:13
**acquire** [3] - 3354:6, 3381:9, 3527:23
**acquired** [1] - 3532:13
**acquiring** [4] - 3444:22, 3526:18, 3527:19, 3528:6
**acquisition** [1] - 3506:2
**acquisitions** [1] - 3404:2
**Acting** [1] - 3345:14
**action** [2] - 3357:4, 3546:4
**actions** [1] - 3545:22
**actual** [3] - 3387:11, 3398:9, 3552:6
**add** [1] - 3386:10
**addition** [5] - 3358:14, 3395:11, 3504:1, 3505:20, 3538:24
**additional** [8] - 3353:9, 3362:23, 3430:7, 3493:17, 3495:3, 3506:3, 3515:12, 3532:10
**address** [9] - 3462:3, 3490:2, 3509:20, 3509:21, 3519:21, 3519:22, 3521:22, 3523:4, 3542:21
**addressed** [2] - 3510:3, 3510:7
**adduced** [1] - 3552:9
**adjoining** [1] - 3441:14
**adjourned** [1] - 3554:15
**adjustments** [1] - 3394:21
**administration** [1] - 3417:8
**administrative** [1] - 3392:10
**admissibility** [1] - 3461:18
**admissible** [2] - 3418:14, 3472:6
**admission** [4] - 3387:19, 3398:22, 3504:8, 3551:22
**admit** [1] - 3552:3
**admitted** [22] - 3361:6, 3361:8, 3363:23, 3365:4, 3373:19, 3383:1, 3388:8, 3398:25, 3416:19, 3416:25, 3418:22, 3461:24, 3469:25, 3470:14, 3472:12, 3473:1, 3473:11, 3479:4, 3504:17, 3517:12, 3522:8, 3523:12
**ads** [2] - 3360:1, 3360:3
**advance** [1] - 3457:25
**advise** [5] - 3374:3, 3374:6, 3374:9, 3400:15, 3454:18
**advised** [3] - 3423:13, 3449:21, 3550:4

**advising** [3] - 3398:10, 3482:18, 3503:25
**advisor** [14] - 3358:9, 3424:6, 3433:4, 3476:13, 3476:20, 3478:1, 3478:5, 3502:23, 3510:9, 3510:14, 3510:22, 3511:1, 3517:1, 3533:2
**Advisors** [7] - 3477:17, 3477:24, 3478:4, 3478:6, 3516:16, 3516:18, 3516:22
**affect** [1] - 3357:18
**afternoon** [6] - 3415:11, 3462:19, 3474:12, 3509:12, 3520:11, 3540:21
**agency** [1] - 3523:18
**Agent** [3] - 3436:14, 3436:16, 3448:24
**agent** [1] - 3453:19
**agents** [2] - 3448:3, 3485:6
**ago** [17] - 3421:21, 3436:10, 3445:16, 3446:6, 3448:9, 3450:1, 3456:19, 3475:8, 3486:17, 3509:18, 3515:7, 3534:6, 3538:25, 3541:11, 3543:10, 3544:5, 3544:6
**agree** [11] - 3363:15, 3434:15, 3439:20, 3462:1, 3467:5, 3467:14, 3518:10, 3518:15, 3518:23, 3519:21, 3522:20
**agreed** [5] - 3364:22, 3369:8, 3480:19, 3482:16, 3482:18
**agreeing** [2] - 3480:21, 3481:2
**agreement** [28] - 3354:15, 3354:18, 3355:15, 3356:5, 3359:24, 3364:19, 3364:20, 3365:8, 3365:14, 3367:14, 3367:17, 3370:8, 3372:24, 3376:8, 3376:14, 3376:16, 3376:19, 3377:8, 3377:14, 3378:18, 3378:25, 3379:13, 3471:5, 3471:12, 3516:16, 3516:22, 3517:3, 3550:15
**agreements** [3] - 3505:22, 3506:2, 3506:4
**ahead** [5] - 3382:16, 3419:17, 3432:3, 3474:7, 3521:9
**Air** [13] - 3348:23, 3354:12, 3357:1, 3357:3, 3357:24, 3358:10, 3358:23, 3359:3, 3359:5, 3371:21, 3375:24, 3379:12, 3379:18
**aircraft** [42] - 3350:8, 3352:11, 3352:17,

3352:24, 3355:19, 3356:21, 3356:24, 3359:8, 3359:11, 3359:13, 3359:25, 3361:20, 3366:22, 3367:10, 3369:17, 3370:14, 3370:21, 3370:23, 3370:24, 3371:2, 3371:3, 3372:3, 3374:14, 3374:22, 3374:24, 3375:15, 3376:14, 3376:25, 3377:2, 3377:3, 3377:5, 3377:6, 3381:9, 3506:6, 3506:24, 3507:3, 3507:7, 3507:8, 3507:10, 3507:13, 3507:15, 3507:20
**airpark** [20] - 3391:1, 3392:7, 3395:9, 3395:10, 3395:11, 3395:15, 3397:15, 3402:8, 3402:14, 3405:6, 3406:2, 3407:2, 3407:3, 3407:7, 3407:9, 3410:17, 3411:15, 3411:21, 3412:12, 3412:24
**Airpark** [4] - 3506:5, 3508:14, 3508:16, 3508:19
**airplane** [10] - 3351:21, 3359:19, 3360:2, 3360:13, 3361:22, 3367:5, 3374:5, 3374:8, 3374:16, 3374:19
**airplanes** [8] - 3352:21, 3353:5, 3353:9, 3353:13, 3359:18, 3372:12, 3372:22, 3546:19
**Airport** [1] - 3391:2
**al** [2] - 3349:24, 3378:6
**alert** [2] - 3374:11, 3554:2
**ALL** [1] - 3347:17
**allegations** [2] - 3536:15, 3536:20
**Allie** [1] - 3459:10
**allied** [1] - 3434:14
**allow** [1] - 3441:22
**allowed** [1] - 3374:18
**allows** [1] - 3438:4
**allude** [1] - 3411:12
**alluded** [2] - 3349:6, 3410:23
**alludes** [2] - 3350:11, 3352:2
**alluding** [1] - 3411:10
**alone** [1] - 3532:11
**ambitious** [1] - 3552:22
**amended** [2] - 3367:14, 3367:16
**AMERICA** [1] - 3345:3
**amount** [14] - 3376:3, 3386:14, 3389:21, 3412:4, 3428:7, 3458:6, 3470:21, 3471:18, 3482:24,

3485:21, 3486:3, 3492:18, 3494:5
**analyst** [1] - 3453:15
**ancillary** [1] - 3380:19
**ANDREW** [1] - 3346:6
**Ann** [1] - 3346:20
**annually** [1] - 3357:14
**answer** [30] - 3353:11, 3357:22, 3358:6, 3358:22, 3366:11, 3366:13, 3369:3, 3376:24, 3380:16, 3380:20, 3381:5, 3381:16, 3404:5, 3429:8, 3433:22, 3433:23, 3447:1, 3460:25, 3498:3, 3500:20, 3501:6, 3510:18, 3517:25, 3518:14, 3519:17, 3525:21, 3540:4, 3542:21, 3547:15, 3550:19
**answered** [10] - 3366:10, 3433:20, 3449:6, 3449:8, 3484:7, 3499:20, 3525:5, 3533:8, 3546:15, 3546:21
**answering** [2] - 3512:12, 3525:25
**answers** [1] - 3546:19
**anticipate** [1] - 3551:6
**anticipating** [1] - 3532:25
**anxious** [1] - 3354:5
**apologize** [6] - 3350:19, 3408:19, 3409:20, 3451:4, 3451:10, 3554:3
**appear** [4] - 3364:18, 3384:9, 3454:6, 3521:16
**appearance** [1] - 3449:13
**APPEARANCES** [1] - 3345:13
**appearances** [1] - 3347:3
**appearing** [1] - 3383:21
**application** [1] - 3390:6
**applied** [9] - 3390:21, 3394:12, 3394:14, 3397:7, 3404:15, 3407:9, 3407:17, 3409:24, 3471:23
**approach** [1] - 3386:5
**approximate** [1] - 3422:19
**April** [4] - 3488:10, 3522:23, 3522:24
**ar** [1] - 3442:7
**area** [4] - 3415:20, 3416:1, 3455:12, 3458:12
**argumentative** [1] - 3529:25
**Arizona** [3] - 3383:2, 3425:21, 3426:5
**armed** [2] - 3445:15, 3445:24
**arose** [1] - 3395:20
**arrangement** [4] - 3364:24, 3406:19, 3406:22, 3516:24

4

arrest [2] - 3437:7
arrived [1] - 3498:24
articles [2] - 3434:20, 3434:22
aspect [5] - 3355:14, 3357:23, 3361:19, 3367:11, 3552:5
Assante [1] - 3477:20
assessment [1] - 3380:10
asset [3] - 3354:6, 3380:3
assets [4] - 3357:7, 3481:16, 3490:10, 3490:13
assigned [1] - 3448:3
assist [5] - 3349:24, 3359:2, 3378:7, 3539:1, 3552:1
Assistant [1] - 3345:17
assisted [3] - 3534:21, 3535:6, 3538:15
assisting [2] - 3369:4, 3538:24
assists [1] - 3417:8
associated [1] - 3436:5
Associates [1] - 3503:8
association [1] - 3515:22
assume [10] - 3364:10, 3414:13, 3456:7, 3481:6, 3486:13, 3501:3, 3503:13, 3529:19, 3532:25, 3536:4
assumed [4] - 3439:2, 3439:12, 3455:23, 3546:22
assuming [3] - 3457:12, 3496:18, 3549:19
assumption [6] - 3456:2, 3456:3, 3529:20, 3529:21, 3529:24, 3529:25
Atlantic [2] - 3374:4, 3374:20
Atlantic's [1] - 3374:11
attached [2] - 3398:11, 3412:8
attachment [1] - 3398:6, 3398:15
attachments [2] - 3377:5, 3457:8
attempted [1] - 3361:20
attempting [2] - 3380:18, 3380:21
attempts [1] - 3374:9
attention [7] - 3349:16, 3363:5, 3402:20, 3443:19, 3443:21, 3443:23, 3486:20
Attorney [2] - 3345:14, 3345:17
attorney [28] - 3349:21, 3350:1, 3359:1, 3372:2, 3378:4, 3378:8, 3378:24, 3382:24, 3382:25, 3383:20, 3383:24, 3392:23, 3392:25,

3399:25, 3403:13, 3426:9, 3426:15, 3438:3, 3444:10, 3445:1, 3445:19, 3446:3, 3448:20, 3502:17, 3502:20, 3534:4, 3534:22, 3550:16
attorneys [2] - 3378:21, 3437:15
August [1] - 3515:12
authenticate [1] - 3536:15
authorize [4] - 3496:22, 3500:12, 3500:17, 3500:22
authorized [8] - 3374:4, 3494:22, 3494:23, 3495:8, 3495:10, 3496:11, 3496:18, 3530:12
authorizing [3] - 3494:10, 3498:21, 3512:21
available [3] - 3548:5, 3548:6, 3550:9
Avalon [11] - 3471:8, 3471:11, 3471:25, 3506:5, 3508:14, 3508:16, 3508:19, 3554:7, 3554:8
avenue [1] - 3358:9
aware [14] - 3381:1, 3415:24, 3432:21, 3433:1, 3433:5, 3433:11, 3433:17, 3433:25, 3434:3, 3434:9, 3434:10, 3460:19, 3489:18, 3489:24
AZ [11] - 3366:25, 3367:2, 3367:7, 3367:23, 3376:19, 3376:20, 3377:8, 3377:9, 3377:14, 3377:19

## B

backs [1] - 3442:18
bad [4] - 3348:17, 3415:17, 3415:24, 3475:10
balance [13] - 3394:13, 3394:24, 3398:11, 3400:16, 3400:23, 3401:23, 3407:2, 3407:3, 3407:6, 3407:11, 3411:24, 3485:23, 3497:5
ballpark [2] - 3476:15, 3476:17
bank [26] - 3356:17, 3362:14, 3365:21, 3366:9, 3369:1, 3369:4, 3369:8, 3370:13, 3377:1, 3381:10, 3423:6, 3425:1, 3444:21, 3445:12, 3455:16, 3455:24, 3470:8, 3471:14, 3471:16, 3472:3, 3480:17, 3480:20, 3498:10, 3510:9, 3553:22

Bank [5] - 3365:18, 3471:15, 3472:4, 3493:21, 3497:10
bank's [1] - 3366:6
banking [3] - 3445:5, 3446:4, 3455:18
bankruptcy [12] - 3471:9, 3471:11, 3471:25, 3535:7, 3535:8, 3536:3, 3536:25, 3537:7, 3538:16, 3538:25, 3553:20, 3554:7
banks [2] - 3437:18
bar [1] - 3535:18
based [10] - 3428:22, 3456:2, 3492:23, 3516:15, 3524:4, 3529:24, 3529:25, 3539:20, 3540:6, 3550:18
Beach [7] - 3490:2, 3491:17, 3494:7, 3518:19, 3524:8, 3524:10, 3524:12
became [4] - 3369:18, 3421:20, 3458:13, 3514:16
become [3] - 3422:1, 3490:19, 3513:5
BEFORE [1] - 3345:11
begin [2] - 3431:2, 3552:11
beginning [2] - 3371:22, 3439:24
begins [1] - 3454:2
behalf [3] - 3465:7, 3470:21, 3471:18
behind [1] - 3397:10
belonged [1] - 3498:1
below [1] - 3363:5, 3378:23, 3402:11
beneficiary [1] - 3479:18, 3495:25, 3503:6
benefit [9] - 3384:21, 3387:6, 3389:10, 3389:16, 3391:25, 3403:13, 3406:20, 3412:4, 3412:20
Berard [29] - 3420:22, 3421:15, 3421:17, 3423:21, 3424:14, 3432:10, 3432:18, 3432:22, 3433:2, 3433:3, 3433:12, 3434:13, 3435:3, 3436:19, 3447:3, 3447:7, 3447:11, 3447:16, 3447:23, 3449:25, 3452:1, 3453:9, 3460:3, 3460:4, 3463:25, 3464:13, 3466:21, 3467:16, 3467:22
Berard's [2] - 3435:9, 3453:6
best [20] - 3361:21, 3361:24, 3366:8, 3421:23, 3432:11, 3432:18, 3432:22, 3455:20, 3456:4, 3467:22, 3511:7, 3512:14, 3514:8, 3514:12, 3515:8,

3524:1, 3524:14, 3526:17, 3531:6, 3553:7
between [39] - 3349:11, 3349:23, 3351:21, 3352:9, 3359:23, 3360:21, 3362:23, 3364:6, 3364:15, 3364:19, 3365:20, 3366:9, 3373:9, 3374:10, 3378:6, 3389:10, 3405:20, 3415:13, 3415:18, 3427:16, 3427:25, 3428:24, 3432:21, 3433:2, 3435:7, 3439:22, 3442:12, 3457:5, 3463:25, 3465:3, 3467:6, 3467:15, 3467:20, 3467:21, 3476:18, 3514:6, 3531:19, 3534:3
beyond [5] - 3350:13, 3376:22, 3464:24, 3464:25, 3503:20
BIANCO [1] - 3345:11
bids [5] - 3387:14
big [1] - 3518:9
Big [5] - 3421:10, 3421:25, 3478:24, 3479:19, 3480:12
bigger [1] - 3369:9
bill [11] - 3379:1, 3387:12, 3389:18, 3389:20, 3392:16, 3397:9, 3397:16, 3398:12, 3401:3, 3412:11, 3412:16
billed [3] - 3386:14, 3393:13, 3393:14
billing [9] - 3385:2, 3386:13, 3389:11, 3392:19, 3392:20, 3393:8, 3398:12, 3405:7, 3406:11
bills [9] - 3384:21, 3387:6, 3389:10, 3389:16, 3391:25, 3403:13, 3406:20, 3412:4, 3412:20
birthday [1] - 3450:5
bit [3] - 3369:7, 3407:14, 3552:20
Blake [1] - 3549:11
blood [2] - 3415:17, 3415:24
blow [1] - 3379:2
board [1] - 3528:8
Bob [1] - 3408:7
body [1] - 3481:24
bold [2] - 3479:12, 3518:9
bond [3] - 3477:3, 3478:6, 3480:13
bonds [2] - 3477:8, 3478:14
book [3] - 3370:16, 3370:23, 3371:2
books [13] - 3369:13, 3369:15, 3370:3, 3370:9,

5

3370:11, 3370:25, 3371:7, 3371:16, 3380:12, 3380:18, 3380:21, 3529:10, 3530:3
**borrow** [2] - 3357:21, 3488:17
**borrower** [2] - 3417:13, 3446:2
**Boston** [17] - 3420:8, 3421:19, 3422:15, 3426:9, 3440:3, 3444:10, 3452:18, 3452:19, 3458:2, 3458:3, 3458:7, 3458:9, 3458:23, 3475:20, 3476:2, 3542:10, 3542:12
**bottom** [8] - 3375:1, 3479:8, 3486:24, 3487:8, 3492:8, 3495:20, 3498:14, 3504:25
**bought** [2] - 3507:8, 3507:20
**box** [2] - 3403:2, 3486:21
**brackets** [1] - 3349:23
**break** [5] - 3413:21, 3414:20, 3468:4, 3520:12, 3548:25
**Brian** [35] - 3420:22, 3421:14, 3422:7, 3423:21, 3424:14, 3432:10, 3432:18, 3432:22, 3433:2, 3433:3, 3433:12, 3434:12, 3435:3, 3435:9, 3435:22, 3436:19, 3447:3, 3447:7, 3447:9, 3447:11, 3447:16, 3447:23, 3449:25, 3450:6, 3450:8, 3452:1, 3453:6, 3453:9, 3454:15, 3460:3, 3460:4, 3460:22, 3466:21, 3467:16, 3467:22
**Brian's** [3] - 3433:16, 3450:17, 3453:16
**brief** [1] - 3414:14
**briefly** [4] - 3429:22, 3463:19, 3467:1, 3505:1
**bring** [6] - 3347:8, 3383:24, 3384:2, 3415:3, 3469:4, 3552:15
**bringing** [1] - 3535:6
**brokered** [1] - 3414:10
**brokers** [1] - 3421:5
**Brothers** [2] - 3514:16, 3514:18
**brought** [5] - 3375:24, 3406:7, 3410:12, 3526:11, 3539:2
**building** [2] - 3440:3, 3440:11
**built** [1] - 3389:4
**bunch** [1] - 3423:24
**Bureau** [1] - 3436:17

**business** [28] - 3350:8, 3352:20, 3352:23, 3366:17, 3386:25, 3387:3, 3387:14, 3387:17, 3389:12, 3390:15, 3390:18, 3398:1, 3398:15, 3398:17, 3405:20, 3406:24, 3419:25, 3425:24, 3426:1, 3433:16, 3433:21, 3470:8, 3472:16, 3472:21, 3473:6, 3491:2, 3516:17, 3516:25
**busy** [1] - 3411:6
**but..** [1] - 3483:15
**button** [1] - 3420:3
**buy** [6] - 3348:16, 3353:21, 3359:19, 3426:24, 3427:5, 3480:3
**buyer** [4] - 3353:8, 3354:5, 3360:5, 3370:15
**buyers** [3] - 3359:20, 3360:13, 3371:1
**buying** [2] - 3359:18, 3497:25
**BY** [84] - 3345:16, 3345:22, 3346:4, 3348:11, 3350:24, 3361:11, 3364:1, 3365:6, 3372:6, 3373:22, 3375:22, 3379:11, 3380:1, 3382:20, 3383:15, 3386:1, 3386:7, 3388:11, 3389:1, 3393:20, 3394:1, 3395:5, 3399:3, 3399:6, 3408:6, 3408:20, 3409:5, 3419:20, 3420:18, 3424:2, 3425:19, 3428:15, 3429:10, 3432:6, 3432:25, 3433:10, 3434:2, 3434:19, 3435:21, 3438:14, 3438:18, 3454:22, 3461:9, 3462:18, 3463:22, 3465:1, 3467:4, 3474:11, 3476:10, 3483:22, 3491:15, 3493:15, 3495:6, 3496:15, 3497:1, 3499:16, 3500:3, 3502:1, 3504:20, 3504:24, 3506:23, 3509:11, 3518:18, 3521:11, 3522:14, 3523:15, 3525:10, 3527:3, 3529:2, 3538:2, 3540:20, 3555:5, 3555:7, 3555:9, 3555:12, 3555:14, 3555:17, 3555:19, 3555:21, 3555:23, 3555:25, 3556:3, 3556:5, 3556:7

---

## C

**Cabin** [3] - 3374:18, 3375:1, 3473:6

**Cabo** - 3440:8
**CALCAGNI** [1] - 3345:20
**California** [6] - 3490:2, 3491:17, 3518:20, 3524:13, 3541:15, 3542:11
**candidly** [1] - 3552:16
**cannot** [1] - 3442:18
**capable** [1] - 3520:1
**Capital** [1] - 3477:16
**caption** [1] - 3536:2
**captured** [1] - 3353:3
**card** [2] - 3491:1, 3491:22
**care** [3] - 3440:6, 3476:24, 3477:8
**career** [2] - 3358:8, 3422:11
**case** [47] - 3347:3, 3353:13, 3354:10, 3382:23, 3383:3, 3384:24, 3389:24, 3395:2, 3395:6, 3395:10, 3395:13, 3395:14, 3395:15, 3395:19, 3396:2, 3396:23, 3397:7, 3397:15, 3401:19, 3402:5, 3407:18, 3409:25, 3410:1, 3410:2, 3410:3, 3410:5, 3410:9, 3410:17, 3411:21, 3413:22, 3420:12, 3448:3, 3468:6, 3471:11, 3471:25, 3475:11, 3520:13, 3539:6, 3549:4, 3550:19, 3550:22, 3552:11, 3552:13, 3552:19, 3553:4
**cases** [3] - 3390:9, 3395:16, 3404:21
**catch** [1] - 3430:23
**causing** [1] - 3368:7
**cc** [2] - 3428:17, 3463:8
**cc'd** [3] - 3427:25, 3463:15, 3505:25
**center** [1] - 3350:10
**centered** [1] - 3355:14
**Central** [3] - 3345:6, 3345:15, 3346:21
**certain** [5] - 3354:22, 3384:10, 3390:13, 3457:21, 3502:24
**certainly** [2] - 3371:6, 3460:15
**certainty** [1] - 3366:13
**certificate** [1] - 3530:3
**certification** [1] - 3469:7
**certifications** [1] - 3472:17
**certified** [1] - 3519:1
**chance** [3] - 3373:24, 3546:1, 3546:7
**change** [2] - 3486:25, 3487:7
**characterize** [1] - 3371:5

**charge** [1] - 3393:6
**charged** [1] - 3536:21
**Charles** [11] - 3478:8, 3478:9, 3478:13, 3479:16, 3480:14, 3481:21, 3482:1, 3484:2, 3492:17, 3494:12, 3494:15
**chart** [1] - 3488:20
**charts** [2] - 3489:8, 3509:8
**check** [7] - 3366:6, 3370:5, 3406:13, 3427:20, 3471:14, 3515:15, 3515:16
**choose** [1] - 3516:8
**chosen** [1] - 3519:24
**Chris** [2] - 3422:6, 3549:12
**circumstances** [1] - 3536:10
**city** [7] - 3383:21, 3389:24, 3390:6, 3390:14, 3392:11, 3396:7, 3396:21
**City** [1] - 3396:16
**civil** [2] - 3465:4, 3536:16
**claim** [4] - 3445:5, 3452:14, 3452:16, 3457:9
**claims** [1] - 3536:25
**clarification** [1] - 3433:8
**clarify** [1] - 3433:9
**clear** [6] - 3351:2, 3362:3, 3410:19, 3410:21, 3412:18, 3413:1
**CLERK** [9] - 3347:1, 3347:13, 3416:7, 3419:3, 3419:8, 3469:3, 3469:12, 3474:1, 3521:6
**client** [21] - 3363:16, 3389:3, 3389:4, 3391:15, 3391:17, 3392:16, 3392:23, 3393:6, 3394:9, 3401:3, 3401:5, 3401:11, 3401:12, 3401:24, 3415:13, 3430:3, 3461:8, 3536:21, 3550:4, 3552:12, 3554:11
**client's** [1] - 3550:9
**clients** [5] - 3389:22, 3391:18, 3391:19, 3406:25, 3423:5
**close** [9] - 3374:13, 3382:14, 3383:18, 3400:21, 3419:13, 3436:3, 3464:10, 3464:12, 3474:6
**closer** [1] - 3348:7
**closing** [5] - 3366:23, 3417:21, 3426:15, 3446:13
**closings** [2] - 3437:21, 3437:25
**clothing** [1] - 3425:14
**Club** [1] - 3474:15
**CMG** [3] - 3471:8, 3471:12
**CMG's** [1] - 3471:25

6

collateral [5] - 3353:3, 3354:1, 3490:7, 3518:10, 3519:13
collect [2] - 3369:9, 3536:11
collecting [1] - 3369:18
collection [1] - 3358:25
column [2] - 3486:25, 3487:6
comfort [1] - 3524:15
coming [12] - 3351:10, 3351:13, 3364:2, 3447:3, 3447:20, 3458:1, 3458:8, 3470:11, 3474:19, 3479:15, 3492:16, 3500:4
commanded [1] - 3454:5
commence [1] - 3534:23
commenced [1] - 3538:17
comment [1] - 3485:19
commercial [1] - 3390:7, 3390:20
commissions [1] - 3383:21
commit [2] - 3551:15, 3551:20
commitment [3] - 3513:10, 3513:12, 3514:5
committing [1] - 3551:5
communicate [2] - 3372:10, 3462:8
communicated [1] - 3360:12
communicating [1] - 3361:17
communication [5] - 3364:14, 3427:16, 3428:16, 3428:24, 3546:25
communications [6] - 3349:2, 3362:23, 3428:17, 3428:22, 3547:9, 3547:17
companies [3] - 3420:25, 3472:22, 3477:10
Company [2] - 3482:1, 3484:1
company [22] - 3357:19, 3367:8, 3367:23, 3441:5, 3441:17, 3444:12, 3470:6, 3477:6, 3477:23, 3480:16, 3490:16, 3490:19, 3491:1, 3491:22, 3492:25, 3493:3, 3493:4, 3495:16, 3506:18, 3526:19, 3527:20, 3527:23
compare [2] - 3521:13, 3522:16
compensation [1] - 3533:7
complaint [1] - 3359:3
completed [1] - 3397:23
comprehensively [1] - 3546:16
computer [1] - 3346:25
concede [2] - 3425:15,

3491:12
conceded [5] - 3383:14, 3420:16, 3420:17, 3476:6, 3476:8
conceding [2] - 3383:11, 3425:17
concern [1] - 3374:13
concerned [3] - 3377:19, 3415:17, 3435:24
concerning [9] - 3433:2, 3436:6, 3447:7, 3447:12, 3447:16, 3449:12, 3516:23, 3523:24, 3532:8
conclude [2] - 3380:9, 3387:13
concluded [3] - 3431:3, 3447:1, 3537:10
condo [1] - 3508:5
condolences [1] - 3413:10
condominium [6] - 3414:11, 3417:11, 3428:10, 3506:6, 3507:25, 3508:1
condos [6] - 3417:12, 3417:16, 3418:6, 3463:2, 3508:9, 3508:12
conduct [2] - 3443:8, 3536:22
conducted [3] - 3417:22, 3417:25, 3418:12
confer [1] - 3461:8
conference [17] - 3441:4, 3441:9, 3441:14, 3441:24, 3442:3, 3442:14, 3442:17, 3442:24, 3443:2, 3443:8, 3443:11, 3449:21, 3543:13, 3547:24, 3548:4, 3548:9, 3548:19
confidential [1] - 3519:2
confirm [2] - 3399:4, 3551:24
confirmation [1] - 3471:15
confusion [5] - 3385:4, 3409:7, 3409:17, 3410:6, 3410:21
connection [10] - 3480:23, 3511:15, 3512:9, 3513:2, 3514:4, 3533:23, 3536:19, 3537:6, 3538:16, 3551:16
consent [1] - 3356:20
consequences [1] - 3356:14
considered [1] - 3354:9
conspiratorial [1] - 3536:22
Constantine [125] - 3346:4, 3346:8, 3348:16, 3348:21, 3349:1, 3349:11, 3350:3, 3350:14, 3352:10, 3352:14, 3353:7, 3360:1,

3360:22, 3361:18, 3362:3, 3362:17, 3362:24, 3363:11, 3364:6, 3364:15, 3364:19, 3367:1, 3368:3, 3368:23, 3368:25, 3371:8, 3372:19, 3372:24, 3373:10, 3374:1, 3376:11, 3376:17, 3376:20, 3377:11, 3378:12, 3380:2, 3380:11, 3380:22, 3380:23, 3381:1, 3381:14, 3383:4, 3384:17, 3384:25, 3391:5, 3391:13, 3392:17, 3393:7, 3394:9, 3397:2, 3397:8, 3397:22, 3397:24, 3399:11, 3400:15, 3401:14, 3401:25, 3402:6, 3402:15, 3403:23, 3404:11, 3404:24, 3405:18, 3406:3, 3406:17, 3408:8, 3409:11, 3410:23, 3412:19, 3415:15, 3416:2, 3417:13, 3425:7, 3425:9, 3425:20, 3425:23, 3426:20, 3427:7, 3430:18, 3444:22, 3463:1, 3463:7, 3470:22, 3471:7, 3471:19, 3491:5, 3491:6, 3491:16, 3492:24, 3495:2, 3495:7, 3499:10, 3501:8, 3503:24, 3505:24, 3507:6, 3507:20, 3508:4, 3508:19, 3524:22, 3524:24, 3525:20, 3527:4, 3528:9, 3530:9, 3530:25, 3532:9, 3535:9, 3536:22, 3536:24, 3538:17, 3540:23, 3540:25, 3541:23, 3543:11, 3543:15, 3544:4, 3544:11, 3544:14, 3546:11, 3546:15, 3546:25, 3547:25, 3548:10
CONSTANTINE [1] - 3345:7
Constantine's [7] - 3356:20, 3361:8, 3395:23, 3404:18, 3406:2, 3527:21, 3537:6
constantly [1] - 3427:21
construction [1] - 3395:25
consult [1] - 3358:8
consulted [1] - 3356:19
Cont'd [2] - 3386:1, 3502:1
contact [10] - 3362:10, 3362:17, 3363:12, 3371:11, 3375:12, 3436:9, 3439:11, 3463:4, 3532:17, 3532:20
contacted [5] - 3370:22, 3436:4, 3436:9, 3436:11,

3436:23
contacting [2] - 3378:24, 3520:8
contained [2] - 3386:23, 3543:1
contemplating [1] - 3353:6
contemporaneously [1] - 3387:8
content [3] - 3518:25, 3520:1, 3521:15
continue [5] - 3347:22, 3396:20, 3464:15, 3532:19, 3546:24
Continued [8] - 3414:22, 3424:1, 3429:24, 3431:4, 3520:16, 3528:14, 3535:20, 3537:11
continued [2] - 3385:9, 3501:20
contract [2] - 3355:15, 3424:9
contractual [2] - 3446:18, 3516:24
contribute [2] - 3502:4, 3543:22
contributed [3] - 3379:18, 3379:20, 3530:11
contributing [1] - 3545:21
contribution [1] - 3505:19
control [3] - 3370:3, 3374:22, 3490:10
controls [1] - 3370:25
conveniently [1] - 3354:7
conversation [43] - 3351:19, 3355:13, 3373:14, 3373:25, 3380:17, 3410:23, 3411:10, 3446:22, 3447:6, 3447:16, 3447:19, 3448:13, 3448:17, 3449:23, 3458:16, 3459:5, 3459:9, 3481:3, 3495:2, 3495:15, 3511:22, 3512:2, 3512:5, 3513:1, 3513:18, 3524:2, 3524:7, 3524:20, 3524:25, 3525:8, 3525:14, 3525:20, 3527:14, 3530:22, 3531:1, 3531:3, 3531:7, 3531:15, 3532:3, 3532:8, 3546:20, 3551:19, 3552:2
conversations [11] - 3349:6, 3369:21, 3511:10, 3523:24, 3530:8, 3532:15, 3532:18, 3539:21, 3540:6, 3547:18, 3547:19
convinced [1] - 3493:5
Conway [1] - 3553:3
CONWAY [1] - 3346:2
cooperation [2] - 3354:8,

3371:12
**cooperative** [4] - 3369:3, 3369:11, 3369:12, 3371:9
**copied** [1] - 3456:10
**copies** [16] - 3350:21, 3417:18, 3417:21, 3417:24, 3418:5, 3418:11, 3430:6, 3430:7, 3443:22, 3455:10, 3456:8, 3456:11, 3456:12, 3456:22, 3465:18, 3472:2
**copy** [8] - 3388:18, 3394:3, 3418:2, 3418:8, 3457:15, 3471:11, 3471:14, 3484:24
**corner** [1] - 3484:20
**corporation** [4] - 3357:6, 3357:8, 3358:23, 3358:24
**corporations** [1] - 3357:14
**correct** [204] - 3348:18, 3350:17, 3352:12, 3352:16, 3352:25, 3353:18, 3353:19, 3354:13, 3354:16, 3356:8, 3358:12, 3358:13, 3358:15, 3358:16, 3360:2, 3360:3, 3360:7, 3361:14, 3362:1, 3364:12, 3365:10, 3365:22, 3369:20, 3371:20, 3375:6, 3375:25, 3376:1, 3376:9, 3376:17, 3378:13, 3386:16, 3386:21, 3387:15, 3391:2, 3391:3, 3391:15, 3392:3, 3392:4, 3392:8, 3392:9, 3392:21, 3393:15, 3393:16, 3394:15, 3394:22, 3395:21, 3397:3, 3397:17, 3398:4, 3398:19, 3399:13, 3400:8, 3400:17, 3400:18, 3400:24, 3402:6, 3405:1, 3411:24, 3412:13, 3412:21, 3412:25, 3432:12, 3432:19, 3433:5, 3434:5, 3434:10, 3436:17, 3437:15, 3437:19, 3440:4, 3441:16, 3444:4, 3444:14, 3444:18, 3448:21, 3450:13, 3452:19, 3456:2, 3456:5, 3456:10, 3459:24, 3461:5, 3462:22, 3464:15, 3475:25, 3483:9, 3484:21, 3485:7, 3489:21, 3489:22, 3489:25, 3490:1, 3492:21, 3492:22, 3499:5, 3502:15, 3502:16, 3503:2, 3505:3, 3505:4, 3505:9, 3505:10, 3505:12, 3505:13, 3505:16, 3509:15, 3509:17, 3509:23, 3509:24, 3510:12,

3510:13, 3510:25, 3511:5, 3511:9, 3511:20, 3512:18, 3512:19, 3512:23, 3514:12, 3516:5, 3516:6, 3516:8, 3516:9, 3516:14, 3516:19, 3517:2, 3517:11, 3517:19, 3517:20, 3518:5, 3518:7, 3518:8, 3518:12, 3518:13, 3518:22, 3519:4, 3519:5, 3519:10, 3519:19, 3519:22, 3519:23, 3520:3, 3520:4, 3520:10, 3521:21, 3521:24, 3522:25, 3523:1, 3523:5, 3525:6, 3525:7, 3526:16, 3526:25, 3527:12, 3528:3, 3530:5, 3530:6, 3530:14, 3531:12, 3531:13, 3531:20, 3532:6, 3533:3, 3533:8, 3533:9, 3533:15, 3533:16, 3535:3, 3535:4, 3538:10, 3538:19, 3539:11, 3539:14, 3539:15, 3540:11, 3540:25, 3541:4, 3541:12, 3541:15, 3541:16, 3541:18, 3541:19, 3542:16, 3542:22, 3542:23, 3543:3, 3543:4, 3543:5, 3543:7, 3543:8, 3544:1, 3544:2, 3544:7, 3545:18, 3545:19, 3545:24, 3545:25, 3546:12, 3546:17, 3546:18, 3546:21, 3548:7, 3551:8, 3551:10
**correctly** [1] - 3396:10
**correspondence** [1] - 3351:12
**corresponding** [1] - 3360:8
**corresponds** [1] - 3352:2
**councils** [1] - 3383:22
**counsel** [2] - 3376:15, 3469:8
**Counsel** [1] - 3461:8
**counting** [1] - 3378:17
**country** [1] - 3389:6
**Country** [1] - 3346:3
**couple** [11] - 3349:6, 3402:24, 3436:10, 3458:5, 3485:18, 3487:18, 3495:18, 3496:6, 3525:17, 3525:19, 3548:2
**couple-of-hour** [1] - 3525:19
**course** [11] - 3386:25, 3387:3, 3398:1, 3398:16, 3448:16, 3513:1, 3521:25, 3525:14, 3526:12, 3551:15, 3551:18

**Court** [3] - 3346:7, 3346:20, 3350:19
**COURT** [148] - 3345:1, 3347:2, 3347:4, 3347:8, 3347:11, 3347:15, 3347:18, 3348:6, 3350:23, 3361:6, 3363:23, 3365:4, 3365:24, 3366:11, 3369:24, 3372:5, 3373:19, 3375:19, 3376:24, 3379:4, 3379:23, 3380:16, 3381:5, 3381:18, 3381:21, 3381:24, 3382:8, 3382:13, 3383:13, 3387:21, 3388:3, 3388:5, 3388:8, 3388:23, 3398:25, 3404:4, 3407:21, 3408:1, 3408:3, 3408:18, 3409:2, 3413:13, 3413:16, 3413:20, 3413:24, 3414:2, 3414:6, 3414:13, 3414:16, 3414:19, 3415:2, 3415:7, 3415:21, 3416:6, 3416:9, 3416:12, 3416:15, 3416:18, 3416:25, 3418:16, 3418:18, 3418:21, 3419:12, 3419:17, 3420:2, 3420:17, 3425:17, 3428:14, 3429:7, 3429:21, 3430:11, 3430:13, 3430:18, 3430:21, 3430:23, 3432:3, 3433:23, 3434:17, 3435:15, 3461:20, 3461:22, 3461:24, 3462:15, 3463:18, 3464:25, 3468:2, 3468:4, 3469:4, 3469:11, 3469:13, 3469:18, 3469:24, 3470:10, 3470:14, 3472:9, 3472:12, 3472:23, 3473:1, 3473:8, 3473:11, 3473:17, 3474:5, 3476:7, 3484:8, 3491:14, 3495:5, 3496:14, 3496:24, 3498:3, 3499:15, 3499:22, 3500:20, 3501:6, 3504:15, 3504:17, 3508:25, 3509:5, 3520:11, 3521:2, 3521:8, 3522:8, 3522:13, 3523:12, 3535:19, 3536:4, 3536:14, 3537:3, 3537:5, 3540:16, 3548:23, 3549:2, 3549:7, 3549:14, 3549:19, 3549:23, 3550:11, 3550:21, 3551:1, 3551:5, 3551:9, 3551:11, 3551:23, 3552:11, 3552:22, 3553:10, 3554:1, 3554:5, 3554:14
**court** [8] - 3405:9, 3406:6, 3432:1, 3464:17, 3535:7,

3538:1, 3552:18, 3554:2
**courthouse** [1] - 3448:15
**Courthouse** [1] - 3345:6
**courtroom** [10] - 3383:9, 3384:3, 3413:23, 3416:8, 3420:14, 3425:11, 3476:4, 3491:10, 3520:14, 3521:7
**cover** [1] - 3351:23
**covered** [1] - 3435:19
**CR-13-607** [1] - 3345:4
**Crafters** [3] - 3374:18, 3375:1, 3473:7
**credit** [27] - 3480:20, 3481:5, 3481:8, 3482:22, 3483:1, 3486:2, 3486:12, 3487:21, 3488:7, 3488:9, 3489:1, 3489:2, 3489:17, 3489:21, 3490:10, 3490:14, 3491:1, 3491:22, 3512:21, 3513:20, 3513:25, 3514:4, 3514:5, 3514:7, 3514:11, 3515:14, 3519:13
**crisis** [1] - 3405:24
**CROSS** [13] - 3348:10, 3408:5, 3432:5, 3462:17, 3509:10, 3529:1, 3540:19, 3555:4, 3555:13, 3555:18, 3555:20, 3556:4, 3556:6
**cross** [6] - 3347:21, 3375:23, 3376:23, 3408:1, 3429:21, 3509:5
**CROSS-EXAMINATION** [13] - 3348:10, 3408:5, 3432:5, 3462:17, 3509:10, 3529:1, 3540:19, 3555:4, 3555:13, 3555:18, 3555:20, 3556:4, 3556:6
**cross-examination** [4] - 3347:21, 3408:1, 3429:21, 3509:5
**crossed** [1] - 3350:21
**Curley** [4] - 3384:7, 3386:15, 3387:17, 3403:5
**current** [1] - 3474:20
**CURRIE** [1] - 3345:14
**custody** [2] - 3370:17, 3374:21
**customary** [2] - 3353:7, 3371:1

## D

**D'Ambrosio** [1] - 3553:1
**D-O-N-L-A-N** [1] - 3419:11
**Darryl** [1] - 3489:10
**dash** [6] - 3401:7, 3401:13, 3401:16, 3402:2, 3519:1
**date** [13] - 3354:22,

8

3388:10, 3399:2, 3417:3,
3418:25, 3436:10,
3478:20, 3485:14,
3495:21, 3504:19,
3522:10, 3523:14, 3543:19
**dated** [9] - 3365:15,
3386:18, 3398:14, 3400:8,
3402:21, 3481:20,
3489:24, 3492:6, 3502:13
**dates** [2] - 3386:18, 3387:8
**days** [1] - 3496:6
**deal** [8] - 3353:16, 3364:7,
3426:14, 3478:17, 3479:2,
3479:21, 3551:18, 3553:4
**dealing** [2] - 3352:14,
3352:15
**dealings** [1] - 3374:10
**deals** [3] - 3353:25,
3414:7, 3426:16
**dealt** [3] - 3437:15,
3437:18, 3458:11
**dear** [1] - 3481:25
**debt** [2] - 3356:7, 3358:25
**debtor** [3] - 3354:8,
3356:23, 3357:1
**debtors** [1] - 3356:25
**December** [2] - 3496:10,
3497:19
**decide** [1] - 3552:15
**decided** [3] - 3354:10,
3495:3, 3520:6
**decision** [2] - 3523:25,
3550:17
**decisions** [1] - 3374:4
**deeds** [2] - 3417:24,
3418:5
**deep** [2] - 3433:1, 3467:23
**deep-seated** [2] - 3433:1,
3467:23
**default** [9] - 3417:15,
3486:9, 3489:21, 3490:7,
3507:7, 3517:12, 3517:17,
3518:10
**defendant** [5] - 3417:13,
3417:14, 3420:11,
3470:22, 3471:19
**Defendant's** [1] - 3461:24
**Defendants** [3] - 3345:8,
3345:20, 3346:1
**defendants** [8] - 3383:3,
3420:11, 3427:17, 3428:1,
3428:17, 3428:25,
3430:20, 3475:11
**Defense** [14] - 3361:10,
3363:24, 3365:5, 3373:21,
3461:25, 3522:9, 3523:13,
3557:8, 3557:9, 3557:10,
3557:11, 3557:12,
3557:13, 3557:15
**defense** [1] - 3469:8

**deficiencies** [1] - 3371:10
**deficiency** [4] - 3351:23,
3355:21, 3365:22, 3366:8
**definitely** [1] - 3462:25
**definitively** [1] - 3533:8
**degree** [1] - 3532:1
**Delamar** [3] - 3539:7,
3539:10, 3539:18
**delay** [1] - 3552:10
**depicted** [2] - 3487:18,
3488:20
**depicts** [1] - 3487:21
**deposit** [4] - 3493:24,
3495:9, 3496:6, 3497:9
**deposited** [1] - 3351:3
**deposits** [2] - 3497:5,
3498:14
**depth** [1] - 3516:13
**describe** [5] - 3412:1,
3424:7, 3425:13, 3444:25,
3464:6
**desert** [1] - 3396:5
**design** [2] - 3390:12,
3390:21
**designated** [1] - 3396:6
**desk** [4] - 3441:19, 3442:4,
3443:6, 3443:20
**desks** [3] - 3440:15,
3440:22, 3441:11
**despite** [1] - 3391:24
**details** [5] - 3350:12,
3350:13, 3351:9, 3505:11,
3536:6
**determine** [1] - 3410:10
**develop** [3] - 3480:3,
3481:11
**developed** [1] - 3550:18
**developer** [1] - 3502:2
**development** [1] - 3390:7
**DeVries** [1] - 3423:21
**dialogue** [2] - 3364:20,
3364:21
**Diamante** [17] - 3348:23,
3352:18, 3354:12, 3357:1,
3357:3, 3357:24, 3358:10,
3358:23, 3359:3, 3359:5,
3371:21, 3375:24,
3379:12, 3379:18, 3539:7,
3539:10, 3539:17
**difference** [3] - 3365:20,
3401:1, 3412:1
**different** [20] - 3353:25,
3354:2, 3370:20, 3392:18,
3393:14, 3402:2, 3402:24,
3402:25, 3443:7, 3476:22,
3477:10, 3480:14,
3501:15, 3503:19,
3544:22, 3544:24,
3544:25, 3545:1, 3545:4
**differential** [1] - 3351:21

**differently** [1] - 3393:13
**difficulties** [3] - 3359:11,
3359:12, 3368:24
**difficulty** [2] - 3523:17,
3523:19
**Diffley** [5] - 3362:7,
3362:11, 3362:17,
3363:12, 3365:9
**dig** [2] - 3372:15, 3440:15
**diligence** [1] - 3371:7
**dinner** [1] - 3525:18
**direct** [15] - 3349:16,
3355:8, 3363:4, 3409:7,
3414:15, 3440:1, 3451:11,
3455:17, 3486:20,
3512:17, 3516:15,
3517:16, 3525:3, 3526:13,
3544:20
**DIRECT** [7] - 3382:19,
3419:19, 3424:1, 3474:10,
3555:11, 3555:16, 3556:2
**directed** [3] - 3355:9,
3481:21, 3489:25, 3492:10
**direction** [1] - 3378:24
**directly** [1] - 3405:17
**directors** [1] - 3528:8
**discount** [1] - 3394:17
**discuss** [3] - 3413:21,
3458:23, 3468:6, 3513:19,
3520:8, 3520:13, 3532:12,
3549:3, 3552:6, 3553:11,
3553:22
**discussed** [15] - 3351:6,
3362:18, 3379:15,
3415:24, 3447:20,
3458:17, 3458:22, 3469:7,
3469:8, 3513:7, 3513:23,
3513:24, 3541:4, 3546:3,
3550:1
**discussing** [3] - 3350:7,
3379:16, 3409:19
**discussion** [10] - 3411:9,
3449:22, 3459:16, 3508:3,
3514:6, 3527:18, 3543:6,
3545:12, 3545:13, 3551:14
**Discussion** [4] - 3430:1,
3431:3, 3536:1, 3537:10
**discussions** [7] - 3348:20,
3352:14, 3360:23, 3372:1,
3412:23, 3546:10, 3550:13
**dislike** [1] - 3467:23
**dismissing** [1] - 3471:11
**display** [1] - 3349:13
**disposition** [3] - 3354:11,
3355:6, 3362:24
**dispute** [19] - 3349:8,
3432:21, 3433:2, 3433:5,
3433:8, 3433:14, 3433:18,
3433:25, 3434:5, 3434:12,
3435:4, 3435:7, 3435:8,

3435:23, 3435:25,
3463:25, 3533:12,
3533:15, 3544:13
**disputes** [1] - 3435:11
**distinct** [1] - 3442:4
**DISTRICT** [3] - 3345:1,
3345:1, 3345:11
**Dixileta** [7] - 3384:18,
3395:19, 3397:7, 3401:19,
3404:16, 3409:25, 3410:15
**Doan** [1] - 3467:5
**docs** [2] - 3349:25, 3378:8
**document** [67] - 3350:6,
3350:11, 3367:18,
3367:20, 3398:9, 3399:7,
3399:25, 3400:3, 3400:5,
3401:22, 3402:18, 3405:5,
3411:9, 3411:12, 3434:25,
3438:5, 3442:20, 3445:12,
3451:21, 3451:23,
3451:24, 3452:5, 3452:22,
3453:6, 3453:24, 3454:4,
3454:7, 3454:23, 3455:20,
3456:1, 3457:16, 3459:17,
3460:6, 3461:11, 3461:12,
3463:12, 3481:14,
3482:10, 3484:16,
3484:25, 3486:1, 3492:6,
3509:19, 3509:22,
3512:21, 3516:22,
3517:13, 3517:14, 3518:4,
3518:16, 3518:23, 3519:3,
3519:7, 3519:21, 3520:1,
3520:6, 3521:12, 3523:2,
3535:6, 3535:15, 3536:7,
3536:13, 3538:3, 3538:4,
3538:8, 3538:12, 3538:16
**documentation** [6] -
3399:15, 3506:14,
3507:19, 3508:15,
3515:21, 3530:2
**documents** [24] - 3386:2,
3386:12, 3386:24, 3387:9,
3387:23, 3405:16,
3408:12, 3409:24,
3417:18, 3438:1, 3438:3,
3442:2, 3444:17, 3445:5,
3450:16, 3456:8, 3456:12,
3456:25, 3469:7, 3510:1,
3510:4, 3516:11, 3530:12,
3544:10
**dollar** [6] - 3429:2,
3533:14, 3533:18, 3534:5,
3534:19, 3539:3
**dollars** [6] - 3355:18,
3462:7, 3482:3, 3483:25,
3484:11, 3486:3
**done** [15] - 3354:7,
3368:25, 3375:3, 3378:18,
3388:13, 3388:22,

3396:11, 3399:10, 3400:17, 3402:13, 3404:9, 3407:10, 3415:15, 3435:5, 3480:23
**DONLAN** [2] - 3419:5, 3555:15
**Donlan** [12] - 3414:1, 3419:2, 3419:10, 3419:13, 3419:21, 3419:23, 3420:2, 3432:7, 3435:16, 3462:19, 3463:23, 3467:14
**doubt** [5] - 3482:11, 3482:16, 3495:14, 3511:6
**down** [12] - 3359:2, 3375:1, 3381:18, 3381:20, 3427:20, 3459:11, 3468:2, 3485:18, 3486:2, 3489:1, 3495:19, 3545:17
**draft** [2] - 3378:25, 3474:18
**drainage** [12] - 3390:11, 3392:7, 3395:8, 3395:11, 3395:13, 3395:18, 3395:20, 3396:1, 3396:24, 3396:25, 3402:14, 3404:16
**draw** [1] - 3489:1
**drawdowns** [1] - 3489:16
**drawn** [4] - 3471:14, 3486:2, 3488:7, 3513:20
**dried** [1] - 3359:20
**drinks** [1] - 3425:25
**due** [2] - 3371:7, 3398:11
**duly** [4] - 3348:3, 3382:5, 3419:6, 3473:23
**duration** [1] - 3525:14
**during** [37] - 3348:15, 3352:13, 3359:23, 3360:10, 3360:15, 3364:11, 3372:11, 3372:21, 3372:22, 3386:18, 3390:22, 3397:19, 3398:17, 3399:11, 3404:24, 3409:19, 3421:2, 3445:5, 3448:16, 3449:17, 3451:8, 3458:16, 3464:7, 3481:13, 3482:25, 3488:6, 3489:17, 3491:20, 3499:12, 3512:2, 3512:25, 3524:25, 3525:14, 3525:19, 3530:25, 3531:15, 3542:6

---

**E**

---

**e-mail** [26] - 3349:1, 3349:10, 3349:16, 3351:1, 3351:12, 3351:18, 3352:5, 3352:9, 3360:21, 3361:12, 3361:14, 3362:23, 3364:5, 3364:14, 3364:20, 3370:4, 3373:9, 3373:12, 3378:12,

3380:14, 3405:11, 3505:6, 3505:9, 3506:10, 3506:25, 3507:23
**e-mails** [7] - 3349:11, 3360:17, 3361:3, 3362:21, 3363:9, 3363:11, 3504:25
**earl** [1] - 3403:5
**Earl** [3] - 3384:7, 3386:15, 3387:17
**earliest** [1] - 3485:14
**early** [5] - 3371:13, 3381:8, 3421:1, 3459:5, 3477:1
**EASTERN** [1] - 3345:1
**economic** [1] - 3359:17
**economy** [1] - 3359:14
**effect** [7] - 3350:12, 3351:19, 3356:5, 3445:20, 3446:3, 3446:22, 3459:16
**effort** [4] - 3349:7, 3396:13, 3537:1, 3537:6
**efforts** [12] - 3356:6, 3360:5, 3369:10, 3371:11, 3371:14, 3371:17, 3372:11, 3372:17, 3372:21, 3372:22, 3380:11, 3534:22
**either** [15] - 3348:25, 3375:11, 3387:6, 3420:24, 3422:21, 3426:19, 3439:18, 3450:16, 3453:19, 3465:19, 3466:12, 3492:23, 3503:24, 3508:3, 3510:8
**elapsed** [1] - 3531:25
**eleven** [2] - 3460:1, 3544:4
**Ellen** [3] - 3377:18, 3377:23, 3507:17
**email** [19] - 3426:21, 3456:17, 3457:8, 3461:16, 3462:3, 3462:9, 3542:20, 3542:21, 3544:15, 3544:18, 3546:2, 3546:6, 3546:7, 3546:8, 3547:17, 3547:19, 3548:4, 3548:5
**emailed** [1] - 3456:14
**emails** [16] - 3427:21, 3427:23, 3427:25, 3428:24, 3430:3, 3430:4, 3430:7, 3430:9, 3430:10, 3430:15, 3430:19, 3431:1, 3456:24, 3457:2, 3457:5, 3463:6
**embarrassed** [1] - 3412:3
**emotional** [1] - 3409:20
**employ** [2] - 3451:2, 3451:14
**employed** [1] - 3451:8
**employee** [2] - 3422:1, 3471:2
**employees** [1] - 3422:2

**employer** [1] - 3422:1
**employer-employee** [1] - 3422:1
**empty** [1] - 3440:11
**encourage** [1] - 3454:15
**encouraged** [1] - 3511:18
**end** [8] - 3353:1, 3362:4, 3421:1, 3439:23, 3480:8, 3494:1, 3532:3, 3549:12
**ended** [2] - 3347:20, 3387:11
**energy** [1] - 3425:25
**enforcement** [2] - 3436:5, 3485:6
**engage** [2] - 3450:24, 3502:24
**engaged** [2] - 3392:23, 3422:2
**engagement** [8] - 3393:14, 3395:2, 3396:15, 3402:2, 3402:5, 3402:8, 3404:16, 3406:2
**engineer** [1] - 3396:12
**ensued** [5] - 3430:1, 3432:1, 3536:1, 3538:1, 3549:5
**entered** [2] - 3415:5, 3487:17
**enters** [2] - 3416:8, 3521:7
**entire** [8] - 3349:22, 3350:4, 3352:15, 3353:9, 3353:23, 3534:3, 3378:5, 3451:22
**entirely** [1] - 3406:16
**entitled** [2] - 3451:22, 3518:9
**entity** [1] - 3406:9
**entries** [1] - 3370:24
**episode** [1] - 3465:17
**equity** [3] - 3380:4, 3513:5, 3513:13
**error** [1] - 3412:4
**escrow** [4] - 3355:20, 3365:12, 3418:11, 3470:6
**especially** [1] - 3351:10
**ESQ** [5] - 3345:16, 3345:16, 3345:22, 3346:4, 3346:6
**essentially** [6] - 3364:7, 3414:10, 3440:11, 3454:11, 3502:20, 3527:24
**estate** [16] - 3419:24, 3420:7, 3421:5, 3426:12, 3426:14, 3426:17, 3437:11, 3437:25, 3440:16, 3443:18, 3445:6, 3446:1, 3479:24, 3506:5, 3508:14, 3508:16
**Estate** [1] - 3422:12
**et** [2] - 3349:24, 3378:6

**Ethan** [1] - 3427:4
**Eufora** [59] - 3490:17, 3490:25, 3491:20, 3492:12, 3492:13, 3492:20, 3493:12, 3493:17, 3493:22, 3494:4, 3494:11, 3494:24, 3495:9, 3495:11, 3496:10, 3496:12, 3496:20, 3496:21, 3497:10, 3497:20, 3498:1, 3498:6, 3498:11, 3499:8, 3500:1, 3500:5, 3500:11, 3500:18, 3500:24, 3506:3, 3506:15, 3506:18, 3511:12, 3524:1, 3524:24, 3525:5, 3527:6, 3527:7, 3527:9, 3527:10, 3527:12, 3529:5, 3529:9, 3529:15, 3530:10, 3530:13, 3530:24, 3532:2, 3532:3, 3532:8, 3532:12, 3532:19, 3532:23, 3533:7, 3534:24, 3536:23, 3537:1, 3537:7, 3541:4
**Eve** [1] - 3495:22
**evening** [1] - 3552:5
**event** [4] - 3437:6, 3459:14, 3465:14, 3514:16
**events** [1] - 3539:21
**eventually** [5] - 3424:20, 3463:24, 3476:14, 3507:19, 3515:25
**evidence** [69] - 3349:9, 3361:10, 3363:24, 3365:5, 3373:21, 3388:10, 3393:21, 3399:2, 3400:6, 3400:22, 3402:18, 3417:3, 3418:15, 3418:24, 3451:21, 3461:25, 3469:23, 3470:2, 3470:9, 3470:15, 3470:17, 3472:6, 3472:8, 3472:14, 3473:2, 3473:4, 3473:13, 3479:5, 3479:7, 3481:14, 3481:18, 3483:6, 3484:16, 3487:17, 3488:24, 3489:23, 3490:9, 3492:5, 3493:20, 3497:3, 3498:8, 3500:7, 3502:11, 3504:19, 3504:21, 3517:13, 3522:10, 3522:18, 3523:14, 3524:5, 3536:11, 3551:18, 3556:11, 3556:13, 3556:15, 3556:17, 3556:19, 3556:22, 3556:24, 3557:1, 3557:3, 3557:5, 3557:8, 3557:9, 3557:10, 3557:11, 3557:12, 3557:14, 3557:16
**exact** [3] - 3478:20,

3482:24, 3514:10
**exactly** [9] - 3384:22, 3406:12, 3452:8, 3457:6, 3458:6, 3476:17, 3491:24, 3492:1, 3545:8
**EXAMINATION** [28] - 3348:10, 3375:21, 3379:10, 3382:19, 3408:5, 3419:19, 3424:1, 3432:5, 3462:17, 3463:21, 3467:3, 3474:10, 3509:10, 3529:1, 3540:19, 3555:4, 3555:6, 3555:8, 3555:11, 3555:13, 3555:16, 3555:18, 3555:20, 3555:22, 3555:24, 3556:2, 3556:4, 3556:6
**examination** [8] - 3347:21, 3348:15, 3355:9, 3408:1, 3409:7, 3429:21, 3509:5, 3544:20
**examined** [4] - 3348:3, 3382:5, 3419:6, 3473:23
**examining** [1] - 3430:14
**example** [1] - 3424:11
**excerpt** [2] - 3551:20, 3552:5
**exchange** [2] - 3480:4, 3526:20
**exchanged** [1] - 3360:14
**exchanging** [1] - 3352:10
**excuse** [6] - 3367:15, 3371:24, 3399:4, 3451:3, 3452:19, 3522:23
**excused** [1] - 3468:3
**execute** [2] - 3349:25, 3378:8
**executed** [2] - 3354:15, 3418:5
**exercise** [1] - 3354:10
**Exhibit** [61] - 3361:10, 3365:5, 3373:21, 3385:6, 3385:7, 3387:20, 3399:1, 3400:22, 3402:19, 3408:13, 3417:2, 3418:1, 3418:7, 3434:7, 3434:21, 3434:24, 3451:21, 3452:21, 3461:11, 3461:21, 3461:24, 3461:25, 3462:3, 3470:6, 3470:7, 3471:10, 3471:13, 3472:5, 3479:5, 3479:7, 3481:19, 3483:7, 3484:17, 3486:17, 3487:19, 3495:19, 3502:12, 3504:18, 3505:14, 3517:13, 3521:14, 3522:4, 3522:8, 3522:9, 3522:16, 3522:17, 3522:22, 3523:9, 3523:13, 3535:13,

3556:12, 3556:14, 3557:4, 3557:8, 3557:10, 3557:11, 3557:12, 3557:13, 3557:15
**exhibit** [16] - 3354:23, 3373:6, 3393:23, 3418:16, 3483:18, 3484:19, 3485:9, 3486:16, 3486:21, 3497:2, 3497:13, 3500:8, 3504:22, 3542:17, 3542:18, 3552:6
**Exhibits** [28] - 3363:24, 3388:9, 3417:17, 3417:20, 3417:23, 3418:4, 3418:10, 3418:13, 3418:23, 3470:3, 3470:4, 3470:16, 3472:1, 3472:13, 3472:19, 3473:3, 3473:5, 3473:12, 3489:24, 3509:7, 3556:10, 3556:16, 3556:18, 3556:20, 3556:23, 3556:25, 3557:2, 3557:9
**exhibits** [13] - 3388:8, 3418:21, 3469:22, 3470:10, 3470:14, 3472:8, 3472:12, 3472:16, 3472:18, 3473:1, 3473:11, 3487:16, 3509:8
**EXHIBITS** [1] - 3556:9
**exists** [1] - 3467:15
**expect** [2] - 3415:21, 3416:4
**expectation** [1] - 3355:19
**explain** [12] - 3355:3, 3355:12, 3357:12, 3361:17, 3373:24, 3374:20, 3388:16, 3388:19, 3388:21, 3409:16, 3423:10, 3511:3
**explained** [3] - 3384:25, 3512:11, 3513:2
**explaining** [2] - 3388:17, 3491:25
**explanation** [1] - 3511:4
**Express** [1] - 3518:25
**expressing** [1] - 3381:8
**extended** [2] - 3367:23, 3482:22
**extent** [3] - 3368:23, 3542:22, 3542:25
**extra** [2] - 3440:6, 3440:9
**extrapolate** [1] - 3380:9

**F**

**face** [4] - 3426:19, 3459:9
**face-to-face** [1] - 3459:9
**facetious** [1] - 3526:2, 3526:5, 3531:15
**facility** [3] - 3390:13, 3390:15, 3391:1

**fact** [22] - 3351:17, 3356:17, 3388:21, 3391:24, 3427:4, 3433:17, 3434:7, 3434:12, 3440:13, 3441:14, 3447:7, 3447:12, 3447:17, 3467:19, 3502:17, 3516:10, 3521:22, 3527:19, 3530:1, 3544:13, 3546:10, 3554:9
**factors** [1] - 3354:2
**facts** [2] - 3354:1, 3554:11
**fail** [1] - 3357:16
**fair** [27] - 3352:13, 3352:19, 3359:7, 3360:15, 3380:2, 3380:9, 3383:16, 3383:23, 3384:1, 3384:2, 3391:13, 3435:2, 3435:22, 3436:1, 3442:14, 3454:11, 3466:8, 3519:25, 3531:24, 3541:11, 3541:25, 3542:2, 3542:3, 3542:24, 3544:3, 3544:12, 3546:13
**Fairchild** [3] - 3355:6, 3355:17, 3356:6
**fairly** [1] - 3396:3
**faith** [2] - 3365:19, 3365:25
**Falcon** [31] - 3348:16, 3348:18, 3348:22, 3350:4, 3351:5, 3351:22, 3352:15, 3353:6, 3366:24, 3366:25, 3367:2, 3367:5, 3367:7, 3370:9, 3370:11, 3374:25, 3375:4, 3376:19, 3376:20, 3377:9, 3377:15, 3377:20, 3380:3, 3380:12, 3381:2, 3506:6, 3506:24, 3507:2, 3507:7
**fall** [1] - 3357:16
**falling** [1] - 3368:7
**falsely** [1] - 3536:25
**familiar** [16] - 3384:13, 3399:17, 3425:6, 3477:9, 3478:25, 3480:16, 3483:15, 3490:16, 3490:19, 3501:10, 3513:8, 3514:15, 3515:18, 3530:16, 3554:11
**familiarity** [1] - 3452:2
**Family** [1] - 3471:3
**family** [2] - 3405:24, 3413:11
**far** [6] - 3368:22, 3374:10, 3377:19, 3396:23, 3435:23, 3440:5
**fast** [1] - 3410:8
**father** [3] - 3405:13, 3409:21, 3413:17
**fault** [1] - 3553:13
**favorite** [3] - 3391:15, 3391:17, 3391:19

**FBI** [2] - 3436:24, 3448:2
**featured** [1] - 3434:13
**February** [1] - 3449:14
**Federal** [4] - 3345:15, 3346:20, 3436:17, 3518:25
**federal** [1] - 3453:19
**fee** [1] - 3357:16
**fees** [9] - 3384:17, 3471:24, 3503:12, 3503:14, 3503:15, 3504:1, 3505:21, 3544:22, 3545:22
**feet** [1] - 3374:18
**felt** [2] - 3390:3, 3392:5
**Ferguson** [2] - 3377:23, 3507:17
**Fergusson** [4] - 3367:9, 3377:11, 3377:16
**few** [6] - 3349:12, 3352:4, 3379:8, 3469:7, 3476:14, 3548:15
**field** [1] - 3445:3
**file** [1] - 3406:14
**filed** [1] - 3535:8
**files** [4] - 3407:6, 3410:12, 3410:13, 3536:24
**filing** [2] - 3536:6, 3538:15
**fill** [1] - 3549:14
**final** [2] - 3462:1, 3550:17
**finally** [5] - 3356:10, 3377:22, 3378:2, 3462:6, 3501:10
**finance** [1] - 3427:8
**financial** [16] - 3357:15, 3368:8, 3424:6, 3433:4, 3455:20, 3456:1, 3476:13, 3476:20, 3478:1, 3478:5, 3486:22, 3502:23, 3510:9, 3510:14, 3512:10, 3533:1
**financially** [1] - 3369:2
**financials** [1] - 3425:3
**financing** [5] - 3426:23, 3427:1, 3427:2, 3427:3, 3427:12
**fine** [8] - 3348:14, 3445:2, 3446:25, 3447:2, 3515:6, 3518:4, 3537:5, 3537:9
**finish** [2] - 3458:19, 3467:10
**finished** [4] - 3423:3, 3424:23, 3542:13, 3542:14
**finishes** [1] - 3549:8
**firm** [32] - 3384:5, 3384:11, 3384:14, 3384:18, 3386:3, 3386:20, 3386:25, 3387:3, 3392:18, 3393:18, 3394:9, 3397:13, 3397:17, 3397:20, 3398:2, 3398:17, 3399:10, 3400:16, 3404:23, 3406:1, 3417:6, 3417:7, 3417:9, 3417:15,

3417:19, 3418:2, 3421:9, 3422:2, 3425:25, 3444:11, 3470:5

**first** [30] - 3362:10, 3362:17, 3382:4, 3386:2, 3400:7, 3405:24, 3409:23, 3423:11, 3423:16, 3430:11, 3436:4, 3436:8, 3436:13, 3445:20, 3445:22, 3448:7, 3464:17, 3473:22, 3479:23, 3485:3, 3485:11, 3485:16, 3500:16, 3524:2, 3524:23, 3538:5, 3549:25, 3550:6

**fishing** [1] - 3375:15

**five** [2] - 3438:13, 3544:5

**flight** [1] - 3450:7

**floodplain** [1] - 3396:7

**floodway** [1] - 3396:7

**flow** [1] - 3396:6

**focus** [7] - 3350:7, 3350:11, 3372:18, 3372:20, 3402:20, 3487:19, 3504:25

**focusing** [2] - 3368:13, 3483:7

**folks** [1] - 3359:19

**follow** [1] - 3373:24

**follow-up** [1] - 3373:24

**followed** [1] - 3373:13

**following** [14] - 3415:1, 3429:24, 3431:4, 3432:1, 3459:13, 3479:14, 3521:1, 3521:18, 3532:7, 3532:17, 3535:20, 3537:11, 3538:1, 3549:5

**follows** [7] - 3348:4, 3382:6, 3417:5, 3419:7, 3430:1, 3473:24, 3536:1

**forbearance** [4] - 3354:14, 3354:18, 3359:24, 3365:14

**foreclosed** [9] - 3417:15, 3429:9, 3429:11, 3429:13, 3429:14, 3429:16, 3446:15, 3508:20

**foreclosure** [2] - 3462:21, 3463:3

**foregoing** [3] - 3470:5, 3471:1, 3471:12

**forged** [1] - 3445:6

**forgery** [1] - 3452:12

**forget** [1] - 3439:10

**form** [11] - 3364:23, 3432:23, 3435:18, 3438:11, 3446:11, 3455:10, 3470:23, 3471:20, 3493:25, 3495:5, 3496:14

**former** [2] - 3384:12, 3384:14

---

**forth** [3] - 3427:18, 3428:18, 3526:11

**forward** [3] - 3372:17, 3372:25, 3474:25

**foundation** [1] - 3364:23

**four** [7] - 3441:4, 3445:24, 3446:6, 3534:2, 3534:7, 3534:19

**fractional** [5] - 3366:14, 3366:15, 3367:1, 3367:12, 3507:12

**frame** [2] - 3416:3, 3484:9

**frames** [1] - 3544:11

**Freedom** [1] - 3477:16

**Friday** [2] - 3457:24, 3553:5

**friend** [4] - 3432:22, 3443:20, 3475:17, 3475:21

**friendly** [1] - 3432:10

**friends** [21] - 3421:18, 3421:20, 3421:21, 3421:22, 3421:23, 3422:1, 3422:3, 3422:4, 3424:5, 3432:12, 3432:18, 3437:10, 3458:13, 3464:10, 3464:11, 3464:12, 3466:9, 3466:21, 3466:23, 3467:23

**friendship** [5] - 3423:25, 3432:14, 3467:6, 3467:15, 3467:20

**front** [3] - 3386:10, 3402:22, 3435:12

**fulfill** [2] - 3446:18, 3547:11

**full** [3] - 3369:6, 3380:9, 3542:25

**fully** [2] - 3512:11, 3546:16

**Fund** [7] - 3350:5, 3501:11, 3501:13, 3502:5, 3505:19, 3506:8, 3508:7

**fund** [19] - 3365:24, 3366:1, 3406:22, 3480:14, 3501:14, 3543:7, 3543:12, 3543:16, 3543:23, 3544:19, 3546:23, 3547:1, 3547:5, 3547:10, 3548:1, 3548:11, 3548:17, 3548:20

**funds** [4] - 3351:4, 3365:25, 3482:8, 3497:15

**FYI** [2] - 3349:21, 3378:4

---

## G

**Gaarn** [11] - 3496:1, 3496:2, 3496:12, 3496:22, 3497:4, 3499:3, 3499:18, 3499:25, 3500:12,

---

3500:24, 3530:16

**Gaarn's** [1] - 3496:8

**gain** [1] - 3374:8

**Galioto** [2] - 3436:15, 3436:17

**gasket** [1] - 3379:2

**general** [4] - 3359:13, 3436:1, 3458:5, 3536:4

**generally** [1] - 3478:11

**generated** [4] - 3386:2, 3387:7, 3398:16, 3457:3

**gentleman** [1] - 3458:19

**gentleman's** [1] - 3467:13

**Gillis** [3] - 3470:20, 3471:2, 3471:15, 3471:17, 3471:24, 3472:3

**Gilmartin** [1] - 3417:6

**given** [9] - 3372:17, 3380:8, 3435:22, 3441:13, 3441:14, 3445:3, 3452:1, 3486:8, 3518:24

**glad** [1] - 3551:13

**glass** [2] - 3441:25, 3442:8, 3442:11

**Glen** [6] - 3424:12, 3469:10, 3473:15, 3484:20, 3494:7, 3494:20

**GLEN** [3] - 3473:21, 3474:3, 3556:1

**glen** [1] - 3474:3

**Glenn** [7] - 3414:18, 3423:21, 3460:13, 3460:14, 3460:16, 3502:18, 3504:6

**glitches** [1] - 3553:16

**global** [21] - 3349:4, 3349:22, 3351:3, 3354:11, 3372:18, 3378:5, 3543:6, 3543:12, 3543:16, 3543:23, 3544:16, 3544:19, 3544:14, 3546:23, 3547:1, 3547:5, 3547:10, 3548:1, 3548:11, 3548:17, 3548:20

**Global** [7] - 3350:5, 3501:11, 3501:13, 3502:5, 3505:19, 3506:8, 3508:7

**GM** [1] - 3504:6

**GM-1** [8] - 3504:8, 3504:17, 3504:18, 3504:21, 3509:9, 3509:19, 3542:19, 3557:4

**Gmail** [2] - 3509:20, 3509:21

**Gmuzz** [1] - 3505:5

**Gonchar** [14] - 3349:24, 3351:16, 3357:2, 3358:14, 3359:1, 3365:19, 3366:3, 3372:19, 3375:25, 3376:6, 3378:7, 3378:17, 3378:20, 3552:25

---

**Government** [33] - 3345:14, 3387:20, 3388:9, 3399:1, 3402:19, 3408:13, 3417:2, 3417:17, 3417:20, 3417:23, 3418:1, 3418:4, 3418:7, 3418:10, 3418:13, 3418:23, 3461:21, 3472:13, 3473:12, 3502:12, 3504:18, 3505:14, 3509:7, 3517:13, 3521:14, 3522:16, 3556:10, 3556:12, 3556:14, 3556:16, 3556:23, 3557:2, 3557:4

**government** [34] - 3381:22, 3387:19, 3398:21, 3419:1, 3430:25, 3435:16, 3447:13, 3447:18, 3447:22, 3447:24, 3454:12, 3454:16, 3456:25, 3457:2, 3457:7, 3461:17, 3469:14, 3472:7, 3473:15, 3504:7, 3509:7, 3517:16, 3523:18, 3523:24, 3529:3, 3530:12, 3530:15, 3542:18, 3551:15, 3551:20, 3553:6, 3553:23, 3554:3, 3554:12

**Government's** [30] - 3385:6, 3385:7, 3470:1, 3470:4, 3470:6, 3470:7, 3470:16, 3471:10, 3471:13, 3472:1, 3472:5, 3472:18, 3473:3, 3473:5, 3479:5, 3479:7, 3481:19, 3483:6, 3484:17, 3486:17, 3487:19, 3488:24, 3489:24, 3492:6, 3493:20, 3498:9, 3500:7, 3556:18, 3556:20, 3556:25

**government's** [2] - 3542:17, 3550:19

**grant** [1] - 3374:23

**great** [1] - 3480:2

**greater** [4] - 3513:10, 3513:12, 3513:13, 3516:13

**green** [1] - 3348:7

**Greg** [1] - 3423:21

**grew** [1] - 3421:19

**grounds** [2] - 3392:5, 3429:6

**Group** [1] - 3471:8

**group** [7] - 3348:22, 3349:3, 3349:22, 3350:15, 3449:3, 3449:9, 3501:14

**grudge** [1] - 3465:9

**GSF** [1] - 3502:5

**guarantee** [2] - 3462:8, 3493:7

**guarantor** [2] - 3417:14,

---

3444:17
**guarantors** [8] - 3351:24, 3354:1, 3356:23, 3357:1, 3358:25, 3359:4, 3359:5, 3376:5
**guess** [4] - 3476:13, 3499:8, 3524:6, 3544:7
**guessing** [1] - 3478:22
**guy** [1] - 3422:6
**guys** [15] - 3423:7, 3423:13, 3423:16, 3423:24, 3424:15, 3425:3, 3426:24, 3438:25, 3439:1, 3439:7, 3439:10, 3455:8, 3458:11, 3466:16

## H

**habit** [1] - 3509:25
**Haley** [8] - 3379:4, 3432:3, 3432:7, 3463:23, 3509:14, 3521:9, 3549:24, 3552:2
**HALEY** [95] - 3345:20, 3345:22, 3361:5, 3363:22, 3365:3, 3373:18, 3379:5, 3388:6, 3398:24, 3408:2, 3414:12, 3416:20, 3418:20, 3420:16, 3428:12, 3429:5, 3430:12, 3431:2, 3432:6, 3432:24, 3432:25, 3433:9, 3433:10, 3433:21, 3434:2, 3434:19, 3435:20, 3435:21, 3438:14, 3438:17, 3438:18, 3454:21, 3454:22, 3461:7, 3461:9, 3461:19, 3461:21, 3462:11, 3464:24, 3467:1, 3467:4, 3467:25, 3469:21, 3470:13, 3472:11, 3472:25, 3473:10, 3476:6, 3483:18, 3483:21, 3484:6, 3493:14, 3496:13, 3496:23, 3498:2, 3499:14, 3499:19, 3500:19, 3501:3, 3504:2, 3504:9, 3504:12, 3504:14, 3506:22, 3509:6, 3509:11, 3518:17, 3518:18, 3521:10, 3521:11, 3522:3, 3522:11, 3522:14, 3523:8, 3523:15, 3525:9, 3525:10, 3527:2, 3527:3, 3529:2, 3536:8, 3536:18, 3537:4, 3537:8, 3538:2, 3540:12, 3550:3, 3550:13, 3551:8, 3551:10, 3551:13, 3552:4, 3555:19, 3555:25, 3556:5
**half** [1] - 3500:16
**hand** [5] - 3408:15, 3419:4,

3435:10, 3484:20
**handful** [1] - 3423:18
**handwritten** [1] - 3350:22
**hangar** [1] - 3391:1
**Hangar** [2] - 3406:10, 3410:18
**hangars** [3] - 3390:25, 3391:5, 3546:19
**happy** [1] - 3455:9
**hard** [1] - 3359:17
**hardship** [1] - 3368:8
**Harris** [5] - 3374:3, 3374:20, 3374:21, 3471:15, 3472:3
**harsh** [1] - 3407:14
**Harvey** [8] - 3372:7, 3372:8, 3374:7, 3374:13, 3375:5, 3375:12, 3375:13
**hate** [2] - 3391:16, 3403:17
**Hawaii** [42] - 3421:4, 3421:6, 3421:11, 3422:9, 3450:1, 3450:10, 3450:12, 3450:15, 3450:20, 3451:15, 3455:23, 3456:5, 3456:21, 3459:10, 3478:16, 3479:1, 3479:21, 3479:24, 3480:12, 3480:23, 3480:25, 3481:4, 3481:9, 3481:11, 3511:11, 3511:16, 3511:18, 3511:19, 3512:18, 3512:22, 3513:2, 3513:18, 3514:5, 3514:17, 3514:19, 3533:6, 3539:22, 3539:23, 3539:24, 3540:7, 3540:8, 3540:9
**Hawaiian** [2] - 3513:11, 3515:22
**head** [1] - 3359:16
**heading** [1] - 3483:7
**hear** [1] - 3366:18
**heard** [1] - 3403:25
**hearing** [1] - 3549:16
**hearsay** [1] - 3372:4
**held** [2] - 3526:19, 3527:20
**helicopter** [7] - 3396:14, 3396:17, 3396:19, 3404:17, 3407:12, 3407:13, 3407:15
**helicopters** [2] - 3397:2, 3402:16
**hello** [1] - 3509:13
**help** [6] - 3378:23, 3426:23, 3465:3, 3466:15, 3482:7, 3503:10
**helps** [1] - 3354:25
**Hennessee's** [3] - 3541:17, 3543:20, 3543:21
**herd** [1] - 3359:19
**hereafter** [3] - 3417:7,

3417:10, 3417:12
**hereinafter** [1] - 3471:4
**hesitated** [1] - 3453:12
**high** [3] - 3374:11, 3426:11, 3534:13
**highlight** [2] - 3378:15, 3484:18
**highlighted** [3] - 3349:17, 3361:19, 3365:7
**Highway** [1] - 3345:21
**Hilton** [3] - 3400:16, 3402:6, 3405:19, 3405:21, 3406:4, 3406:11, 3406:17, 3406:21, 3410:18, 3471:3, 3471:4, 3471:6, 3471:7
**Hilton's** [1] - 3406:20
**himself** [2] - 3477:19, 3477:23
**hire** [1] - 3476:12
**hired** [6] - 3349:21, 3378:4, 3476:19, 3476:25, 3477:1, 3547:4
**hiring** [1] - 3476:19
**history** [3] - 3366:13, 3394:8, 3399:10
**hit** [1] - 3420:3
**hmm** [2] - 3432:9, 3451:25
**Hockey** [1] - 3474:15
**hockey** [25] - 3368:16, 3368:19, 3377:25, 3378:1, 3404:8, 3404:9, 3421:20, 3423:13, 3423:16, 3444:3, 3444:6, 3446:16, 3459:22, 3460:23, 3466:13, 3474:17, 3475:7, 3488:1, 3489:11, 3526:15, 3542:7, 3545:16, 3545:22
**hold** [2] - 3368:25, 3550:7
**holding** [1] - 3369:14
**holiday** [1] - 3422:23
**home** [10] - 3395:23, 3395:24, 3397:1, 3406:7, 3410:12, 3411:16, 3511:24, 3524:11, 3524:15
**hometown** [1] - 3524:12
**honestly** [1] - 3411:17
**Honor** [50] - 3347:7, 3360:25, 3361:2, 3363:19, 3375:16, 3375:18, 3376:22, 3381:17, 3382:17, 3383:12, 3388:4, 3388:7, 3404:3, 3407:20, 3408:2, 3408:4, 3413:6, 3413:15, 3413:19, 3415:4, 3415:8, 3415:23, 3416:11, 3416:14, 3418:19, 3419:18, 3425:16, 3429:18, 3429:22, 3469:6, 3472:10, 3472:11, 3472:15, 3472:24, 3473:9,

3474:8, 3491:13, 3495:4, 3498:2, 3499:19, 3504:2, 3504:14, 3508:24, 3521:10, 3522:3, 3522:7, 3523:8, 3535:17, 3536:8, 3540:17
**HONORABLE** [1] - 3345:11
**hope** [1] - 3413:10
**hopefully** [3] - 3355:18, 3480:6, 3553:23
**hoping** [1] - 3552:19
**hospital** [1] - 3405:13
**Hotel** [1] - 3508:6
**hour** [4] - 3423:2, 3455:25, 3465:17, 3525:19
**hourly** [1] - 3393:8
**hours** [1] - 3525:17
**house** [4] - 3406:8, 3407:11, 3407:15
**hum** [1] - 3486:23
**hypothetical** [1] - 3393:11

## I

**idea** [9] - 3351:13, 3352:1, 3352:3, 3412:2, 3507:11, 3517:5, 3528:2, 3534:4, 3534:8
**identification** [17] - 3362:22, 3383:11, 3383:13, 3385:6, 3397:11, 3399:8, 3420:16, 3420:17, 3425:15, 3425:18, 3428:3, 3434:8, 3463:11, 3476:6, 3476:7, 3491:12, 3504:5
**ill** [1] - 3409:22
**immediately** [2] - 3389:7, 3496:21
**impact** [1] - 3374:10
**important** [2] - 3438:1, 3510:6
**impose** [2] - 3353:7, 3353:22
**impression** [7] - 3412:11, 3412:14, 3450:20, 3450:23, 3451:18, 3455:19, 3455:22
**in-person** [1] - 3543:14
**Inc** [1] - 3473:7
**inches** [2] - 3516:13
**incident** [2] - 3443:24, 3510:15
**incidentally** [1] - 3515:20
**inclination** [1] - 3536:10
**included** [2] - 3353:9, 3551:3
**including** [3] - 3448:3, 3457:8, 3539:24
**incoming** [4] - 3493:25,

13

3494:4, 3494:14, 3498:15
**inconsistent** [1] - 3536:16
**incorporated** [1] - 3357:14
**increase** [1] - 3485:19
**increased** [1] - 3506:14
**indeed** [2] - 3531:21, 3534:23
**independent** [4] - 3481:1, 3498:20, 3541:8, 3543:1
**indicate** [4] - 3363:11, 3363:14, 3363:18, 3493:2
**indicated** [3] - 3348:21, 3391:14, 3435:11
**indicates** [4] - 3394:8, 3394:12, 3485:14, 3493:24
**indicating** [2] - 3498:24, 3505:17
**indication** [1] - 3488:6
**individual** [6] - 3357:18, 3359:4, 3368:22, 3424:9, 3425:6, 3426:6
**individuals** [7] - 3357:4, 3357:5, 3358:18, 3417:16, 3438:9, 3438:20, 3540:7
**influence** [1] - 3350:11
**information** [14] - 3350:22, 3352:5, 3352:8, 3352:10, 3360:14, 3371:18, 3372:16, 3380:19, 3386:23, 3387:5, 3525:23, 3542:25, 3548:10, 3550:18
**infrequently** [1] - 3407:13
**initial** [2] - 3530:8, 3546:3
**inputted** [1] - 3387:5
**inquiring** [1] - 3374:7
**insofar** [2] - 3496:5, 3536:21
**instance** [6] - 3444:20, 3445:4, 3452:14, 3457:8, 3489:10, 3535:5
**instances** [2] - 3353:20, 3452:15
**institution** [1] - 3480:14
**instruction** [3] - 3361:4, 3373:17, 3373:20
**instructions** [4] - 3361:7, 3479:14, 3492:11, 3502:13
**insult** [1] - 3391:16
**intend** [3] - 3496:16, 3496:19, 3497:19
**intended** [1] - 3492:20
**intending** [1] - 3550:11
**intensive** [1] - 3354:1
**intent** [7] - 3353:16, 3355:4, 3378:22, 3404:18, 3490:7, 3518:10, 3527:15
**interaction** [1] - 3485:5
**interest** [28] - 3353:16, 3360:12, 3381:8, 3426:11, 3506:3, 3506:5, 3506:14,

3508:5, 3508:16, 3513:4, 3513:13, 3526:18, 3527:21, 3527:23, 3527:24, 3528:10, 3529:9, 3530:3, 3532:13, 3534:4, 3534:8, 3535:7, 3537:1, 3537:2, 3537:7, 3539:14, 3547:4
**interfere** [2] - 3372:23, 3373:1
**interior** [2] - 3375:4, 3381:3
**Internal** [1] - 3448:25
**intervened** [1] - 3389:10
**interviewed** [2] - 3448:2, 3449:12
**interviews** [3] - 3433:13, 3435:4, 3485:5
**introduce** [1] - 3364:25
**introduced** [5] - 3425:22, 3426:18, 3475:21, 3476:11, 3542:19
**introduction** [2] - 3426:22, 3427:16
**invest** [4] - 3422:9, 3492:20, 3495:3, 3524:1
**invested** [13] - 3478:7, 3478:15, 3478:18, 3479:21, 3493:1, 3493:16, 3500:24, 3501:16, 3512:18, 3514:24, 3539:9, 3539:23, 3545:16
**investigation** [1] - 3534:23
**Investigation** [1] - 3436:17
**investigator** [1] - 3551:16
**investing** [2] - 3479:23, 3496:10
**investment** [32] - 3380:6, 3380:7, 3480:24, 3480:25, 3492:3, 3493:5, 3510:8, 3510:22, 3511:1, 3511:3, 3511:11, 3511:16, 3511:18, 3511:19, 3512:12, 3513:2, 3513:3, 3513:18, 3515:23, 3525:22, 3526:10, 3529:5, 3529:15, 3530:9, 3530:23, 3532:9, 3533:5, 3533:7, 3539:6, 3539:17, 3540:7, 3546:4
**investments** [19] - 3478:12, 3500:18, 3503:10, 3503:19, 3504:4, 3510:2, 3510:16, 3510:17, 3510:23, 3512:10, 3514:19, 3530:10, 3532:9, 3532:10, 3532:13, 3532:19, 3532:23, 3544:23, 3545:23
**investor** [1] - 3539:25

**investors** [3] - 3380:4, 3498:1, 3539:24
**invoice** [4] - 3397:13, 3397:15, 3409:12, 3412:8
**invoices** [1] - 3409:18
**involved** [15] - 3369:18, 3378:19, 3381:2, 3402:5, 3446:1, 3462:7, 3507:5, 3514:17, 3539:8
**involves** [1] - 3510:8
**involving** [12] - 3434:12, 3435:9, 3435:11, 3444:13, 3445:6, 3446:4, 3462:7, 3516:22, 3533:12, 3539:6, 3539:12
**Island** [2] - 3421:19, 3452:15
**Islandia** [1] - 3345:22
**Isle** [8] - 3421:7, 3421:10, 3421:25, 3478:24, 3479:19, 3480:12, 3488:8
**Islip** [3] - 3345:6, 3345:15, 3346:21
**issue** [12] - 3351:7, 3395:8, 3395:12, 3395:13, 3395:20, 3396:1, 3396:20, 3396:25, 3402:14, 3417:10, 3554:4, 3554:6
**issued** [2] - 3397:16, 3528:8
**issues** [7] - 3396:10, 3404:16, 3414:2, 3536:9, 3553:4, 3553:6, 3553:10
**item** [1] - 3425:13
**itself** [5] - 3371:3, 3415:22, 3417:13, 3520:1, 3552:6
**IV** [6] - 3421:7, 3478:24, 3479:19, 3480:12, 3488:8

---

**J**

**Jackson** [3] - 3414:17, 3415:12, 3549:10
**JAMES** [1] - 3345:16
**James** [3] - 3448:20, 3449:3
**Jason** [5] - 3423:22, 3460:3, 3460:9, 3460:22, 3552:10
**Jim** [4] - 3382:22, 3448:18, 3448:20, 3449:12
**job** [1] - 3440:18
**Joe** [1] - 3475:24
**John** [4] - 3434:14, 3435:5, 3435:11, 3549:10
**Johnny** [1] - 3422:6
**Johnson** [3] - 3493:21, 3497:10, 3498:10
**jointly** [1] - 3355:16

**JOSEPH** [1] - 3345:11
**Josh** [5] - 3448:18, 3448:24, 3449:4, 3449:12
**Joshua** [1] - 3549:17
**Jowdy** [42] - 3349:5, 3349:7, 3349:24, 3358:15, 3369:19, 3370:2, 3371:11, 3371:17, 3371:23, 3372:1, 3372:11, 3372:13, 3374:6, 3374:13, 3375:9, 3375:11, 3375:14, 3378:6, 3403:18, 3403:20, 3403:22, 3451:18, 3502:3, 3503:20, 3533:10, 3533:13, 3533:14, 3533:18, 3539:2, 3539:8, 3539:12, 3539:24, 3540:2, 3540:8, 3545:12, 3545:15, 3545:20, 3546:5, 3550:12, 3550:17, 3550:23, 3551:12
**judge** [24] - 3429:5, 3430:5, 3430:15, 3432:2, 3432:24, 3454:21, 3461:7, 3461:19, 3464:24, 3467:1, 3467:25, 3493:14, 3499:14, 3501:4, 3529:25, 3536:12, 3536:18, 3550:5, 3552:8, 3552:16, 3552:18, 3552:23, 3553:9, 3553:13
**JUDGE** [1] - 3345:11
**Judge** [20] - 3361:5, 3379:8, 3398:23, 3398:24, 3408:19, 3414:12, 3420:16, 3428:12, 3463:17, 3469:22, 3473:14, 3476:6, 3501:3, 3504:10, 3504:16, 3522:12, 3537:4, 3549:1, 3551:14, 3552:4
**judgment** [7] - 3533:14, 3533:18, 3534:1, 3534:5, 3534:15, 3534:19, 3539:3
**Judy** [1] - 3400:11
**June** [14] - 3345:9, 3354:15, 3354:21, 3354:25, 3359:24, 3360:22, 3361:12, 3365:15, 3370:8, 3373:10, 3374:1, 3420:1, 3420:5, 3462:1
**Juneau** [1] - 3475:24
**junior** [1] - 3488:5
**jurors** [2] - 3347:4, 3442:7
**JURORS** [1] - 3347:17
**jury** [20] - 3345:11, 3347:9, 3347:12, 3347:14, 3347:16, 3361:17, 3373:23, 3393:24, 3406:6, 3409:16, 3415:3, 3415:9, 3417:1, 3423:10, 3424:7,

3464:6, 3469:5, 3504:23, 3521:3, 3549:5
**Jury** [4] - 3413:23, 3416:8, 3520:14, 3521:7

## K

**Kaiser** [5] - 3422:6, 3434:14, 3435:5, 3435:11, 3551:19
**keep** [8] - 3382:14, 3386:25, 3392:25, 3393:5, 3408:9, 3419:14, 3427:21, 3474:6
**keeps** [1] - 3392:19
**KELLY** [1] - 3345:14
**Ken** [23] - 3349:5, 3369:19, 3369:22, 3369:24, 3371:24, 3403:18, 3403:20, 3403:22, 3451:18, 3502:3, 3503:20, 3533:10, 3533:13, 3533:14, 3533:18, 3539:2, 3539:7, 3539:12, 3539:23, 3540:2, 3540:8, 3545:12, 3545:15
**Kenner** [147] - 3345:23, 3349:25, 3351:15, 3357:2, 3358:14, 3359:1, 3370:1, 3370:5, 3371:24, 3372:19, 3375:24, 3376:6, 3378:7, 3378:17, 3378:19, 3414:7, 3414:9, 3417:14, 3420:12, 3420:19, 3421:2, 3421:25, 3422:16, 3424:4, 3424:8, 3425:22, 3425:23, 3426:20, 3427:7, 3432:8, 3432:22, 3433:2, 3433:3, 3433:14, 3433:19, 3434:7, 3434:13, 3434:21, 3434:24, 3435:4, 3435:24, 3436:3, 3436:7, 3436:23, 3438:7, 3438:20, 3440:2, 3443:5, 3443:14, 3444:13, 3444:16, 3444:21, 3445:11, 3446:2, 3446:5, 3446:6, 3446:17, 3450:24, 3451:2, 3451:8, 3451:21, 3452:16, 3452:21, 3454:23, 3457:3, 3457:9, 3458:14, 3458:16, 3458:21, 3459:15, 3461:11, 3461:21, 3462:3, 3463:25, 3464:7, 3464:18, 3465:3, 3466:3, 3466:9, 3467:16, 3467:22, 3475:12, 3475:14, 3475:22, 3476:4, 3476:11, 3477:9, 3477:19, 3477:22, 3481:3, 3481:7, 3488:22,

3490:22, 3490:23, 3490:24, 3492:24, 3495:2, 3495:7, 3497:18, 3497:21, 3498:5, 3499:10, 3501:1, 3502:17, 3502:21, 3502:23, 3503:24, 3505:2, 3507:1, 3507:6, 3508:4, 3509:14, 3510:1, 3520:8, 3522:4, 3522:8, 3522:9, 3522:16, 3522:17, 3522:22, 3523:8, 3523:13, 3523:25, 3525:20, 3530:8, 3532:4, 3532:17, 3533:1, 3534:21, 3535:6, 3535:12, 3538:4, 3538:14, 3539:1, 3539:22, 3541:3, 3543:12, 3543:16, 3544:14, 3546:11, 3546:15, 3551:9, 3557:13, 3557:15
**KENNER** [1] - 3345:7
**Kenner's** [1] - 3450:4
**Kentucky** [1] - 3383:2
**kept** [6] - 3387:2, 3387:7, 3398:1, 3398:16, 3399:16, 3400:1
**kind** [7] - 3357:4, 3359:20, 3399:15, 3404:23, 3476:21, 3476:24, 3546:24
**kindly** [1] - 3535:12
**Kings** [2] - 3474:15, 3474:16
**knowing** [1] - 3546:14
**knowledge** [9] - 3391:4, 3422:19, 3428:13, 3445:15, 3445:24, 3463:1, 3507:13, 3529:12, 3529:14
**known** [7] - 3389:18, 3411:19, 3475:14, 3506:18, 3516:17, 3539:7, 3539:10
**KOMATIREDDY** [21] - 3345:16, 3361:2, 3363:21, 3365:2, 3366:10, 3372:4, 3373:16, 3375:22, 3379:3, 3379:22, 3380:15, 3381:4, 3415:23, 3469:6, 3469:15, 3470:3, 3470:18, 3472:15, 3473:5, 3473:14, 3555:7
**Kristie** [6] - 3420:22, 3422:6, 3450:8, 3450:17, 3464:20, 3466:2

## L

**L-A-G-A-R-D-E** [1] - 3382:12
**LA** [2] - 3474:15, 3474:16
**Labor** [8] - 3422:22, 3439:18, 3439:21, 3440:12, 3457:22,

3465:15, 3465:22, 3466:5
**lack** [1] - 3358:5
**lady** [1] - 3367:9
**Lagarde** [28] - 3381:23, 3381:24, 3382:11, 3382:13, 3382:21, 3384:7, 3386:16, 3387:17, 3394:2, 3397:12, 3398:22, 3398:25, 3399:1, 3399:9, 3400:5, 3400:7, 3402:13, 3403:5, 3403:3, 3405:6, 3406:15, 3407:23, 3408:7, 3408:24, 3409:2, 3409:6, 3413:16, 3556:12
**LAGARDE** [2] - 3382:3, 3555:10
**laid** [1] - 3451:19
**land** [20] - 3383:20, 3390:7, 3392:12, 3392:13, 3392:24, 3396:2, 3402:15, 3404:1, 3404:7, 3404:9, 3450:10, 3450:12, 3450:15, 3450:20, 3478:16, 3479:1, 3479:21, 3480:2, 3481:11
**landed** [3] - 3396:19, 3397:2, 3407:13
**landing** [1] - 3396:17
**Lane** [1] - 3441:21
**language** [1] - 3454:5
**Lani** [3] - 3414:1, 3419:1, 3419:10
**LANI** [3] - 3419:5, 3419:10, 3555:15
**large** [4] - 3352:23, 3440:22, 3440:25, 3441:1
**larger** [2] - 3348:22, 3441:8
**Larry** [1] - 3365:9
**LARUSSO** [54] - 3346:2, 3346:4, 3347:7, 3348:11, 3350:19, 3350:24, 3360:25, 3361:11, 3363:19, 3364:1, 3364:25, 3365:6, 3372:6, 3373:15, 3373:22, 3375:16, 3375:18, 3376:22, 3379:8, 3379:11, 3379:25, 3380:1, 3381:17, 3383:11, 3388:7, 3398:23, 3404:3, 3408:4, 3408:6, 3408:19, 3408:20, 3408:25, 3409:4, 3409:5, 3413:5, 3413:9, 3414:4, 3415:8, 3416:21, 3416:24, 3418:19, 3469:19, 3470:12, 3472:10, 3472:24, 3473:9, 3491:12, 3495:4, 3504:16, 3522:7, 3523:11, 3555:5, 3555:9, 3555:14
**LaRusso** [38] - 3347:21,

3378:2, 3379:23, 3408:3, 3408:7, 3425:15, 3429:22, 3430:2, 3430:8, 3430:20, 3430:24, 3432:2, 3461:22, 3462:18, 3463:17, 3504:15, 3535:17, 3536:2, 3537:9, 3540:16, 3540:17, 3540:20, 3540:22, 3548:23, 3548:25, 3550:1, 3550:15, 3550:24, 3551:3, 3552:18, 3552:23, 3553:12, 3554:2, 3554:7, 3555:21, 3556:7
**LaRusso's** [1] - 3552:13
**Las** [4] - 3417:12, 3418:9, 3426:23, 3508:6
**last** [28] - 3349:12, 3354:23, 3365:17, 3377:16, 3398:12, 3399:7, 3411:20, 3412:15, 3447:6, 3447:10, 3447:15, 3447:20, 3448:10, 3451:23, 3458:14, 3458:21, 3459:5, 3459:11, 3459:15, 3464:8, 3465:3, 3475:9, 3478:3, 3487:9, 3495:22, 3538:8, 3542:5, 3542:7
**lastly** [3] - 3418:7, 3466:12, 3472:15
**lasts** [1] - 3393:4
**late** [6] - 3391:25, 3478:22, 3493:14, 3496:10, 3500:16, 3540:21
**latter** [2] - 3459:6, 3466:14
**law** [14] - 3383:1, 3384:5, 3384:11, 3384:14, 3386:3, 3403:8, 3417:6, 3436:5, 3444:11, 3470:5, 3470:24, 3471:21, 3485:5, 3503:8
**lawsuit** [9] - 3359:6, 3375:24, 3376:9, 3464:22, 3465:7, 3533:24, 3534:23, 3536:16, 3539:1
**lawsuits** [2] - 3383:24, 3384:3
**lawyer** [8] - 3503:12, 3503:14, 3503:15, 3503:16, 3504:1, 3533:23, 3544:22, 3547:3
**lay** [1] - 3410:21
**laying** [1] - 3354:5
**LD-1** [1] - 3463:11
**leads** [1] - 3360:9
**league** [1] - 3488:4
**leagues** [1] - 3488:5
**leaning** [1] - 3550:24
**learn** [2] - 3486:5, 3499:6
**learned** [3] - 3499:6,

3499:12, 3530:18
**least** [8] - 3385:4, 3442:11, 3446:17, 3459:14, 3497:20, 3512:14, 3519:17, 3519:25
**leave** [1] - 3451:15
**leaves** [2] - 3413:23, 3520:14
**ledger** [1] - 3418:8
**left** [6] - 3401:2, 3408:15, 3451:1, 3451:13, 3484:20, 3512:10
**left-hand** [2] - 3408:15, 3484:20
**legal** [7] - 3358:9, 3379:1, 3384:17, 3471:23, 3505:21, 3545:22, 3546:4
**Lehman** [2] - 3514:16, 3514:18
**lend** [1] - 3488:17
**lender** [3] - 3426:9, 3426:10
**lenders** [1] - 3514:16
**lending** [5] - 3352:24, 3353:2, 3417:9, 3429:15, 3444:12
**length** [1] - 3535:13
**lent** [1] - 3429:15
**letter** [8] - 3398:10, 3398:14, 3411:20, 3481:25, 3490:9, 3517:12, 3517:18, 3518:25
**letterhead** [2] - 3386:15, 3400:8
**letters** [2] - 3412:6, 3518:9
**liability** [5] - 3357:6, 3357:7, 3357:9, 3357:18, 3379:13
**lien** [3] - 3376:17, 3380:23
**liens** [1] - 3377:1
**light** [2] - 3348:7, 3552:9
**likely** [1] - 3544:4
**likewise** [1] - 3454:15
**limited** [4] - 3357:6, 3357:7, 3357:9, 3379:12
**limiting** [2] - 3361:3, 3373:17
**limits** [1] - 3357:21
**line** [32] - 3350:8, 3352:20, 3362:6, 3366:17, 3367:19, 3373:3, 3378:3, 3480:20, 3481:5, 3481:8, 3482:22, 3483:1, 3486:2, 3486:11, 3486:24, 3487:6, 3487:21, 3488:7, 3488:9, 3489:1, 3489:2, 3489:17, 3489:21, 3490:10, 3490:14, 3512:21, 3513:25, 3514:5, 3514:7, 3514:10, 3515:14, 3519:12

lined [1] - 3426:24
**lines** [3] - 3485:18, 3513:20, 3514:4
**liquidated** [1] - 3490:13
**list** [2] - 3551:4, 3553:6
**listed** [6] - 3379:13, 3394:9, 3403:1, 3495:25, 3519:21, 3526:19
**listen** [1] - 3515:7
**listening** [1] - 3409:1
**litigating** [1] - 3383:23
**litigation** [7] - 3362:4, 3392:6, 3392:9, 3392:24, 3396:15, 3465:5
**live** [4] - 3490:5, 3491:19, 3518:19, 3524:12
**living** [2] - 3419:23, 3421:6, 3459:10, 3474:14, 3490:4, 3491:18, 3494:8
**LLC** [6] - 3357:19, 3358:3, 3406:10, 3410:18, 3493:22, 3506:3
**LLP** [1] - 3417:7
**loan** [47] - 3353:2, 3353:9, 3353:24, 3354:11, 3366:13, 3367:22, 3369:4, 3371:9, 3371:24, 3376:3, 3376:5, 3376:9, 3380:8, 3380:22, 3414:9, 3417:10, 3417:13, 3417:14, 3417:15, 3417:18, 3417:19, 3418:3, 3426:11, 3428:5, 3428:10, 3428:18, 3428:24, 3429:2, 3429:12, 3429:16, 3444:12, 3444:13, 3444:16, 3444:22, 3446:15, 3446:16, 3446:19, 3461:14, 3462:7, 3462:21, 3471:6, 3489:14, 3507:2, 3507:7, 3539:25, 3540:8
**loan/guarantee** [1] - 3351:8
**loaned** [1] - 3514:18
**loans** [10] - 3351:5, 3351:11, 3352:11, 3352:18, 3353:23, 3358:1, 3369:19, 3371:18, 3417:9, 3476:22
**locate** [1] - 3360:5
**located** [3] - 3350:20, 3374:14, 3422:14
**locating** [1] - 3370:9
**location** [2] - 3442:12, 3442:17
**log** [14] - 3369:13, 3369:15, 3370:3, 3370:9, 3370:11, 3370:16, 3370:23, 3370:25, 3371:2, 3371:7, 3371:16, 3380:12,

3380:18, 3380:21
**look** [34] - 3355:11, 3360:19, 3366:12, 3373:7, 3384:13, 3385:8, 3389:20, 3410:10, 3411:7, 3411:23, 3421:11, 3430:10, 3430:13, 3431:1, 3434:7, 3442:25, 3451:20, 3451:22, 3451:23, 3452:21, 3453:2, 3453:4, 3453:13, 3461:10, 3463:12, 3476:21, 3476:23, 3479:10, 3484:23, 3521:12, 3522:15, 3535:12, 3538:11, 3553:22
**looked** [7] - 3376:7, 3407:6, 3412:6, 3434:25, 3509:19, 3542:20, 3546:8
**looking** [10] - 3349:15, 3349:19, 3410:13, 3427:1, 3427:3, 3427:8, 3481:12, 3483:23, 3536:2, 3552:25
**looks** [11] - 3452:6, 3452:9, 3452:24, 3453:10, 3453:15, 3482:13, 3483:13, 3483:15, 3546:2, 3552:19
**lost** [2] - 3380:4, 3380:7
**lower** [1] - 3356:21
**luck** [1] - 3413:17
**lunch** [2] - 3468:4, 3468:7
**Lunch** [1] - 3468:8
**Lynne** [3] - 3381:22, 3382:11, 3411:3
**LYNNE** [2] - 3382:3, 3382:11, 3555:10

## M

**M-U-R-R-A-Y** [1] - 3474:4
**ma'am** [33] - 3391:9, 3432:15, 3433:1, 3433:11, 3434:8, 3435:8, 3435:23, 3436:19, 3437:22, 3437:24, 3438:15, 3439:20, 3440:19, 3441:12, 3442:10, 3442:16, 3443:3, 3443:13, 3445:4, 3446:21, 3446:25, 3450:23, 3451:4, 3451:20, 3453:14, 3453:18, 3455:11, 3456:7, 3457:15, 3459:13, 3459:21, 3461:10, 3462:6
**Magence** [1] - 3417:6
**MAGENCE** [1] - 3417:7
**mail** [30] - 3349:1, 3349:10, 3349:16, 3351:1, 3351:12, 3351:18, 3352:5, 3352:9,

3360:21, 3361:12, 3361:14, 3362:23, 3364:5, 3364:14, 3364:20, 3370:4, 3373:9, 3373:12, 3378:12, 3380:14, 3405:11, 3463:7, 3505:6, 3505:9, 3506:10, 3506:25, 3507:23, 3519:1, 3523:17, 3523:19
**mails** [7] - 3349:11, 3360:17, 3361:3, 3362:21, 3363:9, 3363:11, 3504:25
**maintain** [2] - 3370:16, 3532:17
**maintained** [2] - 3398:4, 3398:16
**maintaining** [1] - 3369:15
**maintenance** [4] - 3370:22, 3380:13, 3381:3, 3381:11
**man** [4] - 3349:4, 3361:13, 3372:7, 3375:11
**manage** [3] - 3367:10, 3477:3, 3477:5
**Management** [1] - 3471:8
**manager** [6] - 3398:10, 3399:16, 3400:2, 3400:13, 3407:18, 3412:5
**manager/financial** [1] - 3517:1
**managing** [2] - 3371:20, 3377:11
**Manfredi** [1] - 3422:7
**Manhattan** [7] - 3490:2, 3491:17, 3494:7, 3518:19, 3524:8, 3524:10, 3524:12
**manner** [2] - 3513:19, 3548:3
**March** [10] - 3483:24, 3489:24, 3498:15, 3500:5, 3518:20, 3519:11, 3520:5, 3522:18, 3522:19
**marked** [10] - 3362:21, 3364:5, 3373:8, 3397:11, 3399:8, 3428:3, 3461:11, 3463:10, 3469:16, 3472:18
**marking** [1] - 3504:5
**Marshal** [1] - 3453:20
**Mary** [1] - 3346:20
**Massachusetts** [1] - 3420:8
**material** [3] - 3515:23, 3536:19, 3536:21
**math** [1] - 3534:18
**matt** [1] - 3448:18
**Matt** [9] - 3436:12, 3436:13, 3436:15, 3436:16, 3436:20, 3436:23, 3448:3, 3449:2, 3449:12
**matter** [30] - 3351:17, 3384:18, 3384:19,

3384:23, 3385:4, 3389:11, 3389:20, 3390:4, 3390:17, 3393:1, 3393:5, 3393:12, 3393:13, 3401:10, 3401:12, 3401:17, 3401:18, 3401:19, 3403:15, 3403:22, 3413:1, 3434:7, 3434:12, 3464:18, 3467:19, 3508:10, 3516:10, 3521:22, 3545:5

**matters** [10] - 3349:4, 3349:23, 3378:6, 3383:17, 3390:5, 3390:10, 3392:18, 3392:20, 3392:24, 3519:16

**Matthew** [1] - 3436:16

**McGuire** [1] - 3419:10

**MCGUIRE** [1] - 3419:11

**mean** [24] - 3372:9, 3388:21, 3421:7, 3424:17, 3436:13, 3436:16, 3437:5, 3450:12, 3450:23, 3458:5, 3482:10, 3490:22, 3492:14, 3492:15, 3503:12, 3503:14, 3506:10, 3510:6, 3526:2, 3526:5, 3531:14, 3532:19, 3533:10, 3534:25

**meaning** [4] - 3383:24, 3428:24, 3429:14, 3467:21

**means** [6] - 3357:10, 3357:12, 3366:14, 3453:23, 3457:15, 3528:6

**meant** [3] - 3409:17, 3446:16, 3520:7

**mechanical** [1] - 3346:25

**media** [5] - 3433:14, 3434:4, 3434:13, 3435:4, 3437:7

**meet** [10] - 3420:19, 3420:21, 3423:17, 3423:19, 3425:9, 3425:20, 3458:1, 3475:16, 3491:6, 3491:16

**meeting** [21] - 3368:8, 3449:3, 3449:17, 3476:14, 3491:21, 3512:10, 3526:3, 3527:5, 3530:23, 3541:4, 3541:8, 3541:14, 3541:22, 3542:1, 3542:4, 3542:6, 3543:15, 3543:18, 3543:21, 3544:13, 3553:5

**meetings** [1] - 3544:3

**member** [2] - 3371:20, 3377:12

**members** [9] - 3347:16, 3357:19, 3358:4, 3358:11, 3379:13, 3379:17, 3423:10, 3424:7, 3464:6

**membership** [3] - 3505:22, 3506:2, 3530:3

**Memorial** [9] - 3345:21, 3422:21, 3439:16, 3439:18, 3439:20, 3440:12, 3457:22, 3465:15, 3465:20

**memorializing** [1] - 3531:18

**memory** [18] - 3455:20, 3456:4, 3457:19, 3460:7, 3461:4, 3511:15, 3511:17, 3511:20, 3512:15, 3514:21, 3519:11, 3523:24, 3524:1, 3526:9, 3527:14, 3527:17, 3528:11, 3539:21

**mentioned** [2] - 3348:15, 3367:13, 3393:23, 3411:22, 3503:11, 3504:22, 3524:24, 3544:20

**met** [10] - 3375:5, 3423:24, 3426:4, 3458:10, 3463:2, 3465:3, 3509:15, 3512:9, 3540:25, 3544:11

**Metro** [14] - 3351:5, 3355:17, 3356:11, 3360:6, 3360:10, 3360:23, 3362:12, 3362:19, 3362:25, 3363:17, 3364:3, 3364:8, 3370:13, 3372:23

**Mexico** [10] - 3404:2, 3451:16, 3451:17, 3501:19, 3502:2, 3503:11, 3503:20, 3539:7, 3545:9, 3545:17

**Michael** [5] - 3487:22, 3487:23, 3488:12, 3534:22, 3534:25

**Microsoft** [1] - 3526:20

**mid** [1] - 3459:8

**middle** [2] - 3363:5, 3459:6

**might** [15] - 3354:5, 3367:15, 3412:16, 3420:2, 3467:11, 3495:1, 3503:25, 3515:3, 3515:4, 3515:5, 3518:2, 3518:3, 3525:22, 3547:20, 3552:20

**mike** [4] - 3348:6, 3382:14, 3419:13, 3474:6

**Mike** [1] - 3441:21

**million** [14] - 3428:8, 3429:2, 3462:7, 3482:3, 3483:25, 3484:11, 3485:21, 3485:23, 3486:3, 3533:14, 3533:18, 3534:5, 3534:19, 3539:3

**mind** [3] - 3361:9, 3411:18, 3462:14

**mine** [3] - 3350:21, 3389:3, 3443:20

**Mineola** [1] - 3346:3

**minor** [1] - 3396:23

**minutes** [3] - 3393:5, 3449:5, 3552:16

**MISKIEWICZ** [101] - 3345:16, 3347:6, 3381:22, 3382:17, 3382:20, 3383:15, 3386:1, 3386:5, 3386:7, 3387:24, 3388:4, 3388:11, 3388:24, 3389:1, 3391:6, 3391:9, 3391:11, 3393:19, 3393:20, 3394:1, 3395:4, 3395:5, 3398:21, 3399:3, 3399:5, 3399:6, 3407:19, 3407:23, 3409:1, 3409:3, 3413:15, 3414:1, 3414:8, 3414:15, 3414:17, 3415:4, 3416:11, 3416:13, 3416:16, 3416:23, 3417:4, 3418:17, 3419:1, 3419:18, 3419:20, 3420:18, 3424:2, 3425:19, 3428:15, 3429:10, 3429:17, 3429:20, 3430:6, 3430:15, 3430:22, 3431:1, 3432:23, 3433:7, 3433:20, 3434:16, 3435:13, 3438:11, 3454:20, 3461:17, 3463:19, 3463:22, 3465:1, 3466:25, 3473:15, 3474:8, 3474:11, 3476:9, 3476:10, 3483:20, 3483:22, 3491:15, 3493:15, 3495:6, 3496:15, 3496:25, 3497:1, 3499:16, 3500:3, 3502:1, 3504:7, 3504:11, 3504:20, 3504:24, 3506:23, 3508:24, 3509:2, 3522:6, 3523:10, 3549:10, 3549:16, 3549:21, 3551:25, 3555:12, 3555:17, 3555:23, 3556:3

**Miskiewicz** [11] - 3382:16, 3382:22, 3438:17, 3448:20, 3448:21, 3449:3, 3474:7, 3483:18, 3525:4, 3550:4, 3552:7

**misled** [1] - 3410:7

**miss** [2] - 3432:7, 3463:23

**Miss** [4] - 3435:16, 3462:19, 3467:5, 3467:14

**mistake** [1] - 3553:25

**moment** [15] - 3375:16, 3407:19, 3413:5, 3429:17, 3432:19, 3445:15, 3453:12, 3456:19, 3461:7, 3486:17, 3508:24, 3522:12, 3532:2, 3536:12, 3538:25

**Monday** [9] - 3447:14, 3448:12, 3449:11,

3457:23, 3549:15, 3549:17, 3549:20, 3550:7

**monetarily** [1] - 3513:3

**monetary** [3] - 3513:10, 3513:11, 3533:6

**money** [75] - 3351:10, 3351:13, 3351:20, 3352:24, 3356:7, 3357:21, 3366:3, 3368:13, 3368:14, 3371:25, 3378:21, 3384:20, 3384:22, 3384:23, 3389:15, 3392:1, 3403:6, 3404:15, 3406:14, 3409:24, 3410:2, 3410:11, 3423:7, 3429:15, 3444:12, 3444:20, 3444:21, 3476:21, 3480:6, 3480:8, 3480:9, 3481:10, 3488:13, 3488:15, 3488:17, 3489:6, 3489:12, 3489:14, 3492:13, 3492:16, 3492:20, 3493:11, 3493:17, 3495:3, 3495:8, 3495:10, 3495:16, 3496:7, 3496:11, 3496:16, 3496:19, 3497:21, 3500:11, 3500:12, 3500:17, 3500:23, 3501:15, 3503:9, 3503:18, 3503:21, 3503:25, 3504:4, 3506:20, 3514:17, 3525:5, 3539:23, 3539:25, 3540:2, 3545:16, 3553:20, 3554:6, 3554:8

**moneys** [1] - 3423:22

**monies** [5] - 3351:15, 3365:12, 3369:9, 3530:13, 3540:9

**month** [2] - 3427:5, 3483:3

**month's** [1] - 3521:18

**monthly** [1] - 3472:2

**months** [2] - 3386:18, 3439:21

**Moreau** [1] - 3427:4

**morning** [14] - 3347:11, 3347:16, 3347:17, 3347:19, 3348:12, 3382:21, 3413:21, 3415:11, 3415:25, 3419:21, 3419:22, 3549:3, 3552:24, 3553:5

**mortgages** [1] - 3476:22

**most** [3] - 3359:15, 3396:23, 3545:14

**mostly** [1] - 3414:8

**mouth** [1] - 3545:2

**move** [11] - 3355:16, 3359:22, 3369:9, 3378:23, 3379:25, 3469:7, 3469:16, 3470:9, 3472:16, 3501:4,

3552:12
**moves** [4] - 3387:19, 3398:21, 3472:7, 3504:7
**moving** [2] - 3372:17, 3443:7
**MR** [273] - 3347:6, 3347:7, 3348:11, 3350:19, 3350:24, 3360:25, 3361:5, 3361:11, 3363:19, 3363:22, 3364:1, 3364:25, 3365:3, 3365:6, 3372:6, 3373:15, 3373:18, 3373:22, 3375:16, 3375:18, 3376:22, 3379:5, 3379:8, 3379:11, 3379:25, 3380:1, 3381:17, 3381:22, 3382:17, 3382:20, 3383:11, 3383:15, 3386:1, 3386:5, 3386:7, 3387:24, 3388:4, 3388:6, 3388:7, 3388:11, 3388:24, 3389:1, 3391:6, 3391:9, 3391:11, 3393:19, 3393:20, 3394:1, 3395:4, 3395:5, 3398:21, 3398:23, 3398:24, 3399:3, 3399:5, 3399:6, 3404:3, 3407:19, 3407:23, 3408:2, 3408:4, 3408:6, 3408:19, 3408:20, 3408:25, 3409:1, 3409:3, 3409:4, 3409:5, 3413:5, 3413:9, 3413:15, 3414:1, 3414:4, 3414:8, 3414:12, 3414:15, 3414:17, 3415:4, 3415:8, 3416:11, 3416:13, 3416:16, 3416:20, 3416:21, 3416:23, 3416:24, 3417:4, 3418:17, 3418:19, 3418:20, 3419:1, 3419:18, 3419:20, 3420:16, 3420:18, 3424:2, 3425:15, 3425:19, 3428:12, 3428:15, 3429:5, 3429:10, 3429:17, 3429:20, 3429:22, 3430:2, 3430:6, 3430:8, 3430:12, 3430:15, 3430:20, 3430:22, 3430:24, 3431:1, 3431:2, 3432:2, 3432:6, 3432:23, 3432:24, 3432:25, 3433:7, 3433:9, 3433:10, 3433:20, 3433:21, 3434:2, 3434:16, 3434:19, 3435:13, 3435:20, 3435:21, 3438:11, 3438:14, 3438:17, 3438:18, 3454:20, 3454:21, 3454:22, 3461:7, 3461:9, 3461:17, 3461:19, 3461:21, 3461:23,

3462:11, 3462:13, 3462:18, 3463:17, 3463:19, 3463:22, 3464:24, 3465:1, 3466:25, 3467:1, 3467:4, 3467:25, 3469:19, 3469:21, 3470:12, 3470:13, 3472:10, 3472:11, 3472:24, 3472:25, 3473:9, 3473:10, 3473:15, 3474:8, 3474:11, 3476:6, 3476:9, 3476:10, 3483:18, 3483:20, 3483:21, 3483:22, 3484:6, 3491:12, 3491:15, 3493:14, 3493:15, 3495:4, 3495:6, 3496:13, 3496:15, 3496:23, 3496:25, 3497:1, 3498:2, 3499:14, 3499:16, 3499:19, 3500:3, 3500:19, 3501:3, 3502:1, 3504:2, 3504:7, 3504:9, 3504:11, 3504:12, 3504:14, 3504:16, 3504:20, 3504:24, 3506:22, 3506:23, 3508:24, 3509:2, 3509:6, 3509:11, 3518:11, 3518:18, 3521:10, 3521:11, 3522:3, 3522:6, 3522:7, 3522:11, 3522:14, 3523:8, 3523:10, 3523:11, 3523:15, 3525:9, 3525:10, 3527:2, 3527:3, 3529:2, 3535:17, 3536:2, 3536:8, 3536:18, 3537:4, 3537:8, 3537:9, 3538:2, 3540:12, 3540:17, 3540:20, 3548:25, 3549:10, 3549:16, 3549:21, 3550:1, 3550:3, 3550:13, 3550:15, 3550:24, 3551:3, 3551:8, 3551:10, 3551:13, 3551:25, 3552:4, 3552:18, 3552:23, 3553:12, 3554:2, 3554:7, 3555:5, 3555:9, 3555:12, 3555:14, 3555:17, 3555:19, 3555:21, 3555:23, 3555:25, 3556:3, 3556:5, 3556:7
**MS** [20] - 3361:2, 3363:21, 3365:2, 3366:10, 3372:4, 3373:16, 3375:22, 3379:3, 3379:22, 3380:15, 3381:4, 3415:23, 3469:6, 3469:15, 3470:3, 3470:18, 3472:15, 3473:5, 3473:14, 3555:7
**multiple** [2] - 3367:5, 3424:21
**municipal** [1] - 3383:20
**Murphy** [1] - 3361:13

**Murray** [28] - 3414:18, 3423:21, 3460:13, 3469:10, 3473:16, 3473:17, 3474:3, 3474:5, 3474:12, 3474:13, 3484:21, 3484:25, 3489:20, 3490:16, 3494:7, 3494:20, 3502:18, 3509:3, 3509:12, 3515:6, 3516:20, 3521:4, 3522:15, 3531:6, 3535:12, 3540:12, 3540:21, 3549:8
**MURRAY** [2] - 3473:21, 3556:1
**Murray's** [1] - 3424:12
**Murray-1** [1] - 3504:6
**must** [2] - 3506:12, 3509:21
**mutual** [2] - 3421:18, 3421:20
**Myrick** [4] - 3420:22, 3450:8, 3464:20, 3466:2
**Myrick's** [1] - 3450:18

# N

**name** [51] - 3349:5, 3361:13, 3367:9, 3372:7, 3375:11, 3377:10, 3382:9, 3382:22, 3384:5, 3400:10, 3403:20, 3403:25, 3408:7, 3419:8, 3421:7, 3424:12, 3425:6, 3426:6, 3432:7, 3436:13, 3445:20, 3445:22, 3470:24, 3471:21, 3474:1, 3478:24, 3480:16, 3483:11, 3483:12, 3487:22, 3488:8, 3490:17, 3494:14, 3495:9, 3497:3, 3498:11, 3502:24, 3503:6, 3506:11, 3509:14, 3521:23, 3530:15, 3530:21, 3533:10, 3534:22, 3534:25, 3535:2, 3540:22, 3547:3, 3547:7
**named** [1] - 3359:2
**names** [10] - 3351:25, 3358:20, 3368:12, 3368:22, 3423:5, 3423:11, 3459:18, 3459:23, 3477:15
**Nantucket** [2] - 3465:20, 3465:25
**narrow** [1] - 3544:10
**nature** [6] - 3383:19, 3445:7, 3457:4, 3478:11, 3515:24, 3532:14
**near** [1] - 3405:14
**necessarily** [1] - 3483:2
**necessary** [2] - 3351:3,

3415:25
**need** [6] - 3370:23, 3379:24, 3380:6, 3415:19, 3426:10, 3553:10
**needed** [2] - 3351:22, 3371:23
**negative** [2] - 3403:17, 3487:14
**negatively** [1] - 3374:10
**negotiated** [2] - 3362:11, 3369:7
**negotiating** [2] - 3357:25, 3364:8
**negotiations** [1] - 3363:13
**Nevada** [6] - 3417:12, 3417:22, 3417:25, 3418:9, 3418:12, 3534:17
**never** [26] - 3352:6, 3359:2, 3370:10, 3375:5, 3376:23, 3384:3, 3384:20, 3384:21, 3391:7, 3391:10, 3395:24, 3399:19, 3403:12, 3403:14, 3403:25, 3406:24, 3409:15, 3410:21, 3441:22, 3442:25, 3445:16, 3459:19, 3459:21, 3459:24, 3488:2, 3537:1
**NEW** [1] - 3345:1
**new** [5] - 3351:7, 3396:12, 3485:15, 3506:3, 3510:2
**New** [8] - 3345:6, 3345:15, 3346:21, 3405:12, 3465:20, 3465:23, 3466:4, 3495:22
**news** [1] - 3433:13
**next** [25] - 3379:24, 3381:21, 3385:9, 3389:15, 3401:2, 3405:16, 3413:25, 3414:22, 3416:10, 3424:13, 3424:23, 3441:11, 3442:5, 3442:13, 3443:6, 3469:5, 3477:12, 3486:18, 3495:18, 3501:20, 3516:3, 3520:16, 3528:14, 3549:9
**NHL** [6] - 3368:16, 3474:22, 3475:1, 3488:4, 3489:11, 3542:7
**nickname** [2] - 3505:7, 3505:8
**night** [2] - 3549:4, 3554:14
**nobody** [3] - 3443:17, 3443:18, 3531:21
**Nolan** [2] - 3427:4, 3489:10
**none** [1] - 3547:2
**nonsupportive** [1] - 3435:25
**normally** [1] - 3399:16
**North** [1] - 3422:15

north [1] - 3390:12
Northern [18] - 3480:17, 3480:20, 3481:16, 3482:4, 3482:9, 3482:22, 3482:25, 3483:5, 3484:1, 3484:5, 3484:12, 3484:13, 3486:9, 3488:10, 3517:8, 3517:9, 3518:24, 3519:20
notched [1] - 3516:23
note [4] - 3393:6, 3485:15, 3485:19, 3551:18
noted [2] - 3347:3, 3403:14
notes [11] - 3367:15, 3449:9, 3449:23, 3526:3, 3527:8, 3531:16, 3551:16, 3551:17, 3551:19, 3551:22, 3552:5
notice [1] - 3490:6, 3517:17, 3518:9
notification [2] - 3486:9, 3548:4
November [2] - 3485:18, 3486:1
number [29] - 3354:2, 3356:18, 3358:10, 3359:12, 3359:21, 3360:9, 3367:20, 3383:6, 3392:18, 3401:3, 3401:5, 3401:10, 3401:12, 3401:24, 3408:13, 3411:18, 3411:20, 3416:15, 3416:22, 3461:20, 3487:9, 3487:16, 3500:10, 3521:25, 3534:10, 3540:24, 3544:20
numbered [1] - 3385:6
numbers [4] - 3408:14, 3408:21, 3469:19, 3523:3
numerous [1] - 3392:24
Nussbaum [8] - 3470:20, 3471:2, 3471:14, 3471:17, 3471:24, 3472:3, 3553:17, 3553:19
NY [3] - 3345:22, 3346:3, 3346:7

O

o'clock [2] - 3468:5
oath [6] - 3347:24, 3382:1, 3440:2, 3473:19, 3511:6, 3531:25
object [7] - 3378:19, 3404:3, 3428:12, 3429:5, 3496:23, 3499:14, 3501:3
objection [56] - 3361:2, 3361:5, 3363:21, 3363:22, 3365:2, 3365:3, 3366:10, 3372:4, 3373:16, 3373:18,

3379:22, 3380:15, 3381:4, 3388:5, 3398:23, 3398:24, 3416:18, 3416:24, 3418:18, 3432:23, 3433:7, 3433:20, 3434:16, 3435:13, 3435:17, 3435:18, 3438:11, 3454:20, 3461:22, 3461:23, 3469:9, 3469:18, 3469:20, 3469:21, 3469:22, 3470:10, 3472:9, 3472:23, 3473:8, 3495:4, 3496:13, 3498:2, 3499:19, 3499:21, 3500:19, 3501:4, 3501:5, 3504:14, 3504:15, 3522:5, 3522:6, 3522:7, 3523:10, 3523:11, 3546:9
objects [1] - 3435:16
obligation [3] - 3370:16, 3446:5, 3446:18
obligations [2] - 3369:1, 3471:6
observed [3] - 3438:7, 3438:19, 3441:8
obtain [4] - 3356:22, 3457:15, 3534:1, 3534:15
obtained [2] - 3534:6, 3539:2
obtaining [1] - 3513:4
obviously [5] - 3352:23, 3415:16, 3430:8, 3536:8, 3550:18
occasion [5] - 3433:12, 3442:16, 3517:9, 3540:25, 3541:2
occasions [1] - 3540:24
occupation [4] - 3437:14, 3437:17, 3437:25, 3445:3
occupied [1] - 3443:12
occur [4] - 3465:14, 3524:15, 3543:21, 3544:4
occurred [14] - 3442:21, 3443:9, 3443:15, 3443:24, 3444:14, 3445:17, 3446:21, 3456:7, 3457:21, 3457:23, 3524:7, 3524:14, 3532:18, 3544:14
occurs [1] - 3536:24
Oceanside [1] - 3346:7
October [2] - 3481:20, 3482:15
OF [3] - 3345:1, 3345:3, 3345:10
offer [8] - 3356:18, 3361:22, 3361:24, 3362:7, 3522:3, 3523:8, 3536:11, 3536:18
offered [1] - 3526:23
offering [1] - 3418:16
office [25] - 3389:13,

3390:13, 3390:15, 3391:1, 3397:16, 3398:10, 3399:16, 3400:1, 3400:13, 3405:7, 3406:11, 3406:20, 3407:10, 3407:18, 3412:5, 3423:2, 3440:6, 3440:10, 3440:17, 3441:19, 3441:23, 3443:8, 3443:17, 3465:15, 3465:24
offices [9] - 3403:8, 3441:3, 3441:4, 3441:6, 3441:9, 3458:23, 3470:24, 3471:21, 3503:8
officials [3] - 3437:18
often [4] - 3458:2, 3458:3, 3483:4, 3517:8
Old [1] - 3346:3
old [2] - 3475:3, 3488:3
OLIVERAS [1] - 3346:6
once [3] - 3381:25, 3424:21, 3491:7
One [1] - 3345:21
one [98] - 3348:16, 3349:18, 3351:17, 3353:17, 3353:21, 3354:4, 3365:12, 3367:5, 3368:18, 3369:22, 3370:12, 3371:15, 3373:6, 3375:16, 3379:17, 3383:3, 3384:24, 3386:5, 3386:10, 3387:8, 3387:13, 3390:11, 3391:18, 3391:24, 3392:16, 3392:23, 3393:13, 3399:7, 3403:1, 3404:16, 3412:12, 3415:10, 3420:11, 3420:25, 3422:18, 3423:14, 3423:15, 3424:9, 3424:14, 3424:15, 3424:23, 3424:24, 3428:8, 3433:12, 3434:13, 3440:13, 3441:9, 3441:11, 3444:6, 3449:9, 3454:25, 3455:5, 3455:7, 3461:7, 3462:1, 3463:12, 3465:17, 3466:4, 3467:22, 3467:23, 3471:1, 3475:10, 3475:11, 3475:17, 3477:12, 3477:13, 3477:14, 3477:20, 3477:24, 3478:3, 3508:24, 3516:10, 3522:12, 3526:10, 3526:19, 3526:23, 3527:6, 3527:18, 3528:5, 3528:11, 3529:8, 3529:12, 3531:8, 3533:14, 3533:18, 3534:5, 3539:3, 3540:25, 3541:2, 3541:22, 3542:7, 3543:19, 3545:9, 3547:3, 3551:17, 3553:12

one-hour [1] - 3465:17
onerous [1] - 3389:25
ones [4] - 3423:22, 3457:6, 3459:22, 3508:2
open [8] - 3364:20, 3412:20, 3432:1, 3441:25, 3480:19, 3482:8, 3483:1, 3538:1
Open [2] - 3465:23, 3466:6
opened [1] - 3484:12
opening [1] - 3497:5
operating [9] - 3367:14, 3367:16, 3369:16, 3370:14, 3370:21, 3370:24, 3377:8, 3377:14, 3506:4
operation [1] - 3379:13
operations [1] - 3474:17
operator [2] - 3370:18, 3370:19
operator/owners [1] - 3370:19
opportunity [8] - 3358:4, 3422:8, 3441:13, 3441:16, 3447:11, 3480:2, 3510:10, 3516:7
opposed [1] - 3353:1, 3526:19
option [2] - 3354:8, 3354:11
order [10] - 3380:6, 3417:10, 3443:8, 3454:9, 3471:11, 3481:24, 3538:17, 3552:14, 3553:1, 3553:7
ordinary [1] - 3387:3
ORG [1] - 3494:6
original [3] - 3350:20, 3365:14, 3438:2
originally [1] - 3420:6
origination [1] - 3417:8
originator [2] - 3494:6, 3497:10
Orleans [1] - 3405:12
Osborne [1] - 3549:10
otherwise [2] - 3369:2, 3426:19
outline [1] - 3364:18
outlines [1] - 3364:6
outside [3] - 3441:15, 3446:7
outstanding [4] - 3376:3, 3400:16, 3401:23, 3471:23
overhead [1] - 3393:22
overlooked [2] - 3553:18, 3553:24
overruled [7] - 3376:24, 3380:16, 3381:5, 3429:7, 3433:23, 3434:17, 3500:20
overtures [1] - 3368:17

**owe** [6] - 3411:5, 3488:12, 3488:15, 3489:6, 3489:11, 3540:2
**owed** [10] - 3389:14, 3410:2, 3411:4, 3411:13, 3411:14, 3411:18, 3411:20, 3471:7, 3489:9
**Owen** [2] - 3427:4, 3489:10
**owes** [1] - 3539:24
**own** [8] - 3381:15, 3428:13, 3432:11, 3477:19, 3477:23, 3478:6, 3499:18, 3516:17
**owned** [6] - 3367:9, 3377:9, 3377:11, 3391:5, 3441:5, 3498:5
**owner** [7] - 3370:21, 3377:3, 3377:6, 3377:19, 3513:5, 3527:10, 3527:12
**owners** [4] - 3367:5, 3392:11, 3441:17, 3441:20
**ownership** [11] - 3366:14, 3366:15, 3367:1, 3506:4, 3506:14, 3508:5, 3508:15, 3513:12, 3527:21, 3528:9, 3539:13
**owns** [2] - 3508:12, 3508:22

**P**

**package** [3] - 3350:5, 3352:16, 3353:16
**packages** [3] - 3408:12, 3515:23, 3515:25
**page** [28] - 3349:19, 3351:1, 3354:24, 3376:2, 3377:16, 3385:9, 3400:7, 3402:19, 3411:23, 3414:22, 3423:15, 3429:24, 3431:4, 3451:24, 3455:1, 3485:16, 3486:20, 3495:19, 3497:4, 3497:13, 3498:23, 3500:8, 3501:20, 3518:4, 3520:16, 3528:14, 3535:20, 3537:11
**pages** [3] - 3423:15, 3495:18, 3535:13
**paid** [40] - 3366:3, 3366:5, 3366:9, 3368:14, 3369:4, 3369:6, 3380:8, 3381:14, 3385:4, 3386:14, 3387:12, 3388:22, 3389:7, 3389:8, 3389:10, 3389:17, 3390:2, 3391:25, 3403:14, 3405:17, 3406:1, 3406:9, 3406:12, 3406:16, 3409:8, 3409:18, 3410:9, 3410:11, 3410:17, 3410:20, 3411:4, 3412:12, 3486:13,

3486:14, 3488:9, 3489:2, 3515:12, 3540:9, 3553:19
**Palms** [12] - 3414:11, 3417:9, 3417:11, 3417:12, 3417:16, 3418:6, 3418:8, 3428:10, 3506:6, 3507:25, 3508:5, 3508:10
**paper** [13] - 3399:18, 3423:6, 3424:10, 3424:15, 3424:17, 3424:24, 3424:25, 3442:19, 3452:17, 3455:5, 3455:7, 3455:12, 3484:24
**paperwork** [4] - 3439:9, 3450:16, 3456:21, 3515:21
**paragraph** [8] - 3355:1, 3355:4, 3355:24, 3355:25, 3356:1, 3356:2, 3365:17, 3378:15
**paragraphs** [1] - 3355:5
**parcel** [2] - 3353:17, 3527:21
**pardon** [4] - 3403:10, 3403:19, 3405:4, 3529:11
**parenthesis** [3] - 3487:2, 3487:3, 3487:6
**part** [34] - 3349:3, 3349:22, 3352:23, 3355:1, 3369:9, 3376:8, 3378:5, 3396:14, 3396:23, 3404:10, 3406:13, 3426:14, 3443:7, 3450:9, 3457:22, 3459:5, 3459:6, 3466:3, 3470:19, 3471:5, 3484:18, 3503:13, 3513:5, 3514:19, 3527:20, 3528:9, 3529:20, 3538:8, 3538:12, 3546:10, 3549:15, 3551:22, 3553:4
**partial** [2] - 3354:14, 3354:18
**partially** [2] - 3410:16
**participants** [1] - 3368:16
**participate** [3] - 3465:2, 3547:24, 3548:10
**participating** [1] - 3351:2
**participation** [1] - 3372:2
**particular** [12] - 3353:13, 3355:5, 3355:24, 3357:19, 3359:8, 3399:17, 3401:3, 3401:16, 3438:9, 3518:16, 3538:3, 3551:22
**particularly** [4] - 3349:17, 3355:4, 3392:16, 3486:21
**particulars** [3] - 3350:15, 3380:23, 3380:24
**parties** [10] - 3351:2, 3351:14, 3351:16, 3351:25, 3352:1, 3352:6, 3356:5, 3366:22, 3415:5
**partner** [9] - 3384:6,

3384:11, 3384:12, 3386:20, 3397:19, 3398:17, 3399:12, 3399:22, 3550:16
**partners** [6] - 3368:7, 3368:10, 3405:21, 3405:22, 3406:21, 3425:24
**Partners** [7] - 3366:25, 3367:2, 3367:7, 3367:23, 3376:20, 3377:15
**party** [8] - 3369:16, 3370:22, 3370:25, 3374:21, 3375:3, 3414:9, 3428:22, 3510:2
**pass** [1] - 3396:21
**past** [6] - 3374:15, 3386:3, 3396:11, 3398:11, 3437:12, 3442:21
**path** [2] - 3358:7, 3359:2
**Pause** [6] - 3355:7, 3363:3, 3363:7, 3364:9, 3364:17, 3375:17
**pause** [1] - 3373:11, 3407:22, 3413:7, 3429:19, 3504:13, 3509:1, 3521:5
**pay** [5] - 3357:16, 3376:20, 3389:23, 3426:11, 3481:12
**paydown** [1] - 3471:6
**paying** [13] - 3389:19, 3397:9, 3405:19, 3406:21, 3410:4, 3410:22, 3412:17, 3429:12, 3443:18, 3443:21, 3443:22, 3503:15, 3505:21
**payment** [24] - 3356:23, 3376:8, 3394:12, 3394:13, 3394:21, 3399:9, 3405:3, 3405:5, 3405:6, 3409:12, 3410:14, 3410:15, 3410:25, 3415:22, 3418:8, 3470:21, 3470:23, 3471:1, 3471:18, 3471:20, 3471:23, 3494:11, 3494:23
**payments** [8] - 3368:1, 3368:8, 3368:24, 3381:10, 3415:15, 3416:5, 3418:2, 3446:16
**payoff** [2] - 3351:11, 3490:14
**PC** [6] - 3470:20, 3471:2, 3471:15, 3471:17, 3471:24, 3472:3
**Peca** [4] - 3487:22, 3487:23, 3488:12, 3489:6
**Peca's** [1] - 3489:1
**peek** [4] - 3518:2, 3518:3, 3519:24, 3520:6
**peeking** [1] - 3518:6
**pending** [1] - 3351:7
**penny** [1] - 3533:21,

3384:11, 3384:12,
3539:17
**penthouse** [2] - 3414:10, 3414:11
**people** [19] - 3350:15, 3358:21, 3359:15, 3359:18, 3366:21, 3370:14, 3424:3, 3426:10, 3429:15, 3440:7, 3440:17, 3441:5, 3441:21, 3442:1, 3442:17, 3443:16, 3460:12, 3481:12
**people's** [2] - 3423:11, 3459:18
**per** [3] - 3394:19, 3470:11, 3505:14
**percent** [3] - 3534:12, 3534:14, 3534:19
**percentage** [6] - 3513:4, 3527:19, 3527:20, 3528:1, 3528:2, 3528:7
**perform** [1] - 3370:22
**performed** [1] - 3471:24
**perhaps** [3] - 3516:11, 3516:12, 3551:21
**period** [21] - 3359:23, 3360:10, 3360:15, 3364:12, 3372:22, 3399:11, 3404:24, 3421:2, 3427:6, 3451:9, 3464:7, 3464:11, 3466:11, 3481:13, 3483:24, 3488:6, 3488:10, 3488:25, 3489:17, 3543:25, 3548:18
**permission** [1] - 3356:20
**permits** [1] - 3392:11
**permitted** [1] - 3503:4
**permitting** [1] - 3390:13
**person** [2] - 3436:5, 3543:14
**personal** [6] - 3395:23, 3397:1, 3428:13, 3467:23, 3519:2
**personally** [6] - 3380:25, 3381:7, 3423:17, 3423:23, 3426:19, 3491:6
**personnel** [1] - 3374:11
**persons** [3] - 3438:1, 3442:13, 3446:7
**perspective** [1] - 3536:20
**pertains** [1] - 3450:16
**Peter** [1] - 3361:13
**petition** [2] - 3536:25
**Petrellese** [1] - 3549:12
**Phil** [125] - 3370:4, 3376:6, 3379:2, 3420:12, 3422:6, 3425:21, 3427:3, 3427:11, 3432:22, 3433:2, 3433:3, 3433:14, 3433:18, 3434:13, 3435:4, 3435:24, 3436:3, 3436:6, 3436:23,

3438:7, 3438:19, 3439:5, 3439:11, 3440:2, 3440:10, 3441:7, 3441:12, 3442:4, 3442:13, 3443:5, 3443:14, 3444:2, 3444:7, 3444:13, 3444:16, 3444:21, 3445:11, 3446:2, 3446:5, 3446:6, 3446:17, 3450:4, 3450:8, 3450:24, 3451:2, 3451:8, 3452:16, 3454:23, 3455:5, 3455:13, 3456:9, 3457:3, 3457:9, 3457:16, 3457:25, 3458:9, 3458:14, 3458:16, 3458:21, 3459:2, 3459:3, 3459:5, 3459:15, 3459:16, 3459:23, 3465:23, 3467:8, 3467:15, 3467:21, 3475:11, 3479:25, 3482:20, 3490:20, 3490:21, 3502:17, 3505:2, 3509:14, 3510:1, 3510:14, 3510:15, 3510:17, 3510:21, 3510:23, 3511:1, 3511:10, 3511:17, 3511:22, 3512:9, 3512:10, 3512:11, 3512:14, 3512:22, 3513:1, 3513:18, 3514:6, 3515:21, 3516:16, 3516:23, 3516:24, 3519:12, 3519:17, 3520:8, 3523:25, 3524:19, 3524:24, 3525:20, 3530:8, 3530:9, 3530:12, 3530:23, 3531:8, 3531:19, 3532:4, 3532:8, 3532:11, 3532:12, 3532:17, 3532:20, 3533:1, 3534:21, 3535:5, 3538:14, 3539:1, 3539:21

**Phil's** [2] - 3437:6, 3450:17
**Phillip** [4] - 3475:12, 3475:14, 3497:18, 3497:21
**PHILLIP** [1] - 3345:7
**Phoenix** [1] - 3405:14
**phone** [10] - 3371:15, 3372:13, 3372:14, 3373:14, 3393:4, 3393:5, 3410:4, 3449:18, 3449:19
**photocopies** [1] - 3424:22
**photocopy** [2] - 3424:13, 3424:22
**photograph** [1] - 3380:13
**physically** [2] - 3442:19, 3443:6
**pick** [1] - 3474:18
**piece** [9] - 3399:17, 3423:6, 3424:10, 3424:17, 3424:25, 3452:17, 3455:5, 3455:7, 3508:9
**Pima** [5] - 3395:19, 3397:7,

3404:15, 3409:25, 3410:15
**pinpoint** [1] - 3465:14
**place** [13] - 3357:13, 3408:14, 3439:8, 3448:13, 3449:4, 3455:9, 3511:23, 3512:5, 3524:2, 3531:3, 3531:7, 3541:8, 3542:1
**Place** [3] - 3417:11, 3418:8, 3506:6
**placed** [1] - 3360:1
**places** [1] - 3466:9
**placing** [1] - 3438:2
**plane** [6] - 3353:17, 3353:18, 3356:13, 3365:21, 3376:19, 3381:11
**planes** [1] - 3353:22
**planned** [1] - 3458:7
**planning** [1] - 3383:21
**play** [2] - 3474:24, 3475:1
**played** [7] - 3421:20, 3458:12, 3474:21, 3475:17, 3488:2, 3488:3, 3542:5
**player** [7] - 3377:25, 3378:1, 3475:25, 3488:1, 3489:11, 3526:15
**players** [16] - 3368:16, 3368:19, 3404:8, 3404:9, 3444:3, 3444:6, 3445:16, 3459:22, 3460:23, 3466:13, 3474:18, 3475:17, 3501:15, 3545:16, 3545:22
**playing** [4] - 3476:2, 3542:12, 3542:13, 3542:14
**Plaza** [2] - 3345:15, 3346:20
**pleading** [1] - 3535:7
**pleasure** [1] - 3540:12
**pledged** [1] - 3490:10
**pm** [3] - 3468:8, 3549:6, 3554:15
**pocket** [1] - 3381:15
**point** [48] - 3347:22, 3348:16, 3348:17, 3348:20, 3348:25, 3350:16, 3351:17, 3356:15, 3361:19, 3361:25, 3369:1, 3381:12, 3390:22, 3397:2, 3421:14, 3422:11, 3425:13, 3444:25, 3446:12, 3451:1, 3451:6, 3451:13, 3459:13, 3459:14, 3462:21, 3464:4, 3476:12, 3480:13, 3481:3, 3482:8, 3482:16, 3483:14, 3486:5, 3489:6, 3514:14, 3516:17, 3530:7, 3532:7, 3538:15, 3539:9, 3543:9, 3544:12, 3547:21,

3548:25, 3549:22, 3549:24, 3552:14, 3553:18
**pointed** [1] - 3358:19
**pointing** [1] - 3365:7
**portfolio** [2] - 3478:7, 3478:12
**portfolios** [1] - 3477:3
**portion** [8] - 3349:15, 3355:9, 3363:5, 3366:21, 3496:6, 3497:20, 3515:13, 3538:4
**portions** [3] - 3349:14, 3349:17, 3472:2
**position** [4] - 3363:21, 3443:14, 3474:20, 3474:24
**positive** [1] - 3487:14
**possession** [7] - 3370:12, 3371:2, 3371:4, 3371:6, 3450:17, 3450:18
**possible** [7] - 3356:7, 3362:18, 3494:23, 3499:12, 3527:10, 3527:11, 3543:25
**possibly** [4] - 3360:9, 3494:25, 3549:11, 3553:15
**Postal** [2] - 3523:18, 3523:21
**posted** [1] - 3384:21
**potential** [3] - 3355:21, 3371:1, 3552:8
**potentially** [2] - 3493:5, 3551:12
**power** [2] - 3438:3, 3502:20
**practice** [2] - 3383:1, 3383:19
**precisely** [1] - 3532:3
**preference** [1] - 3550:5
**preparation** [2] - 3364:11, 3499:13
**preparing** [1] - 3552:23
**presence** [2] - 3441:15, 3446:7
**present** [3] - 3347:14, 3437:21, 3440:3, 3448:16, 3449:17, 3512:2, 3524:21, 3524:25, 3526:6, 3527:4, 3530:9, 3530:25, 3531:22, 3532:10
**preserve** [3] - 3535:7, 3537:7, 3538:18
**presumably** [1] - 3519:8
**pretty** [5] - 3348:17, 3362:3, 3400:21, 3414:13, 3504:9
**prevailed** [1] - 3533:13
**prevent** [3] - 3372:23, 3396:22, 3460:20
**preventing** [1] - 3443:7
**previous** [3] - 3394:13,

3394:24, 3400:22
**previously** [2] - 3348:2, 3507:2
**price** [5] - 3356:21, 3361:21, 3362:12, 3363:13, 3365:20
**print** [1] - 3538:21
**privacy** [2] - 3441:2, 3442:12
**private** [4] - 3417:8, 3440:11, 3441:3, 3441:9
**privately** [2] - 3526:19, 3527:20
**pro** [2] - 3393:7, 3475:7
**problem** [2] - 3390:1, 3415:16
**problems** [2] - 3370:8, 3407:16
**proceed** [2] - 3469:14, 3550:9
**proceeding** [5] - 3535:8, 3536:3, 3538:17, 3538:25
**PROCEEDINGS** [1] - 3345:10
**proceedings** [14] - 3355:7, 3363:3, 3363:7, 3364:9, 3364:17, 3373:11, 3375:17, 3392:10, 3407:22, 3413:7, 3429:19, 3504:13, 3509:1, 3521:5
**Proceedings** [2] - 3346:25, 3554:15
**process** [1] - 3453:20
**produce** [7] - 3384:10, 3404:23, 3405:9, 3405:15, 3405:23, 3406:1, 3406:5
**produced** [4] - 3346:25, 3384:14, 3385:5, 3430:17
**productive** [1] - 3511:19
**profession** [2] - 3437:14, 3437:17
**professionally** [1] - 3474:21
**proffer** [1] - 3415:23
**profit** [1] - 3480:6
**program** [2] - 3366:15, 3367:1
**progress** [4] - 3547:1, 3547:10, 3548:1, 3548:11
**prohibition** [1] - 3460:19
**project** [29] - 3421:4, 3450:10, 3450:12, 3450:15, 3450:21, 3481:4, 3481:9, 3481:11, 3506:5, 3508:14, 3508:16, 3511:11, 3512:18, 3512:22, 3513:4, 3513:6, 3513:11, 3514:5, 3514:17, 3514:20, 3539:7, 3539:10, 3539:12, 3539:22,

3539:23, 3539:24, 3540:8, 3540:9
**projector** [1] - 3393:22
**projects** [8] - 3501:16, 3501:17, 3501:19, 3544:25, 3545:1, 3545:4, 3545:10, 3545:17
**pronounced** [1] - 3435:3
**pronouncements** [2] - 3435:9, 3435:10
**proof** [1] - 3536:18
**properties** [1] - 3421:12
**property** [27] - 3389:12, 3389:13, 3390:12, 3390:16, 3390:18, 3390:20, 3390:22, 3392:11, 3395:18, 3395:19, 3395:21, 3396:4, 3396:9, 3396:14, 3396:18, 3396:20, 3402:15, 3405:22, 3417:22, 3417:25, 3418:12, 3421:6, 3427:19, 3450:9, 3480:10, 3480:11, 3511:19
**proportionate** [1] - 3505:19
**proposition** [1] - 3436:2
**prosecutor** [1] - 3382:22
**prosecutors** [1] - 3448:2
**protect** [1] - 3537:2
**provide** [6] - 3351:9, 3456:25, 3502:19, 3516:25, 3548:10, 3548:13
**provided** [2] - 3365:13, 3399:23
**Providence** [2] - 3452:14, 3452:18
**provides** [3] - 3350:1, 3378:9, 3442:11
**provisions** [1] - 3355:12
**proximity** [1] - 3374:14
**Prudential** [3] - 3422:12, 3440:3, 3465:15
**public** [3] - 3435:9, 3435:10, 3526:20
**publicly** [4] - 3433:13, 3433:18, 3434:3, 3435:3
**publish** [1] - 3373:23
**published** [2] - 3393:23, 3504:22
**pull** [3] - 3348:6, 3419:13, 3474:5
**purchase** [8] - 3352:24, 3363:13, 3363:16, 3371:3, 3376:14, 3376:15, 3376:16, 3426:25
**purchased** [1] - 3351:22
**purchasing** [1] - 3362:18
**purpose** [4] - 3426:22, 3444:22, 3545:15, 3548:17

**purposes** [9] - 3448:19, 3448:23, 3449:2, 3487:6, 3512:22, 3544:20, 3546:3, 3547:5, 3547:11
**pursuant** [5] - 3446:17, 3453:18, 3471:12, 3472:16, 3525:3
**pursue** [4] - 3349:7, 3356:23, 3358:7, 3392:5
**pursued** [1] - 3358:8
**pursuing** [1] - 3362:4
**put** [20] - 3366:25, 3370:8, 3374:15, 3389:24, 3401:1, 3408:21, 3412:5, 3424:14, 3424:17, 3427:21, 3427:23, 3438:4, 3495:16, 3517:14, 3545:2, 3551:17, 3553:19, 3554:7, 3554:9, 3554:11
**putting** [2] - 3351:20, 3424:9

## Q

**qualify** [1] - 3430:21
**questionings** [1] - 3544:9
**questions** [35] - 3349:13, 3352:4, 3359:22, 3375:18, 3379:3, 3379:5, 3381:17, 3407:25, 3408:2, 3414:12, 3429:20, 3449:6, 3449:8, 3462:11, 3462:13, 3463:17, 3463:24, 3464:1, 3465:13, 3466:25, 3468:1, 3487:18, 3509:4, 3512:12, 3520:7, 3523:23, 3527:13, 3529:3, 3529:6, 3530:19, 3533:4, 3539:5, 3542:19, 3546:14, 3546:16
**quick** [1] - 3522:12
**quite** [1] - 3494:25
**quiz** [1] - 3515:8
**quoted** [1] - 3434:4

## R

**racing** [1] - 3472:21
**raise** [1] - 3419:3
**raised** [2] - 3376:23, 3396:20
**ran** [1] - 3396:3
**Ranford** [1] - 3489:10
**rarely** [1] - 3483:4
**rata** [1] - 3393:7
**rates** [1] - 3426:11
**rather** [2] - 3361:16, 3435:25
**reach** [2] - 3372:24, 3551:23

**reached** [2] - 3532:11, 3550:15
**reaching** [1] - 3519:12
**reaction** [2] - 3460:8, 3461:5
**read** [40] - 3349:19, 3350:25, 3351:12, 3361:16, 3363:1, 3363:4, 3370:4, 3378:2, 3378:16, 3387:24, 3400:14, 3402:25, 3403:6, 3415:6, 3416:14, 3417:1, 3417:4, 3437:7, 3455:7, 3455:10, 3455:15, 3470:19, 3487:5, 3494:5, 3506:12, 3509:21, 3510:4, 3510:10, 3510:11, 3516:1, 3516:7, 3516:11, 3518:6, 3520:2, 3520:6, 3538:5, 3542:22, 3544:18, 3546:9, 3554:10
**reading** [3] - 3355:3, 3355:15, 3538:4
**ready** [2] - 3347:5, 3426:24
**real** [20] - 3417:21, 3417:24, 3418:11, 3419:24, 3420:6, 3421:5, 3426:12, 3426:14, 3426:17, 3437:11, 3437:25, 3440:15, 3443:17, 3445:6, 3446:1, 3450:21, 3479:23, 3506:5, 3508:14, 3508:16
**Real** [1] - 3422:12
**realized** [1] - 3397:9
**really** [13] - 3350:10, 3412:2, 3441:18, 3447:19, 3453:23, 3456:2, 3457:20, 3461:16, 3476:23, 3482:10, 3491:24, 3541:25, 3553:13
**realtors** [1] - 3421:5
**reason** [14] - 3350:20, 3422:25, 3430:2, 3436:22, 3446:18, 3447:21, 3447:23, 3452:11, 3494:19, 3495:14, 3510:10, 3516:11, 3518:24
**reasons** [2] - 3391:24, 3516:10
**reassembles** [1] - 3453:9
**recalculated** [1] - 3396:12
**receipt** [4] - 3471:16, 3519:1, 3519:7, 3519:8
**receipts** [1] - 3418:11
**receive** [10] - 3355:19, 3356:6, 3393:18, 3514:25, 3515:21, 3516:5, 3517:8, 3518:15, 3519:6
**received** [48] - 3349:9, 3349:10, 3361:1, 3361:6,

3361:23, 3361:25, 3363:20, 3371:15, 3373:15, 3379:12, 3388:10, 3397:4, 3397:5, 3399:2, 3404:14, 3412:15, 3417:3, 3418:24, 3451:21, 3470:20, 3471:17, 3489:23, 3493:19, 3497:2, 3502:11, 3504:18, 3506:13, 3506:17, 3510:1, 3514:18, 3517:17, 3522:10, 3523:14, 3529:4, 3530:1, 3533:5, 3533:6, 3533:19, 3539:16, 3542:18, 3544:15, 3556:11, 3556:12, 3556:15, 3556:17, 3557:4, 3557:13, 3557:15
**receives** [1] - 3365:18
**receiving** [4] - 3384:16, 3471:1, 3523:17, 3523:19
**recently** [1] - 3370:4
**Recess** [2] - 3414:21, 3520:15
**recess** [5] - 3415:1, 3468:8, 3521:1, 3549:2, 3549:23
**recipient** [2] - 3492:11, 3492:12
**recognize** [8] - 3362:22, 3364:14, 3373:9, 3461:12, 3461:15, 3469:21, 3491:8, 3542:21
**recollect** [1] - 3513:17
**recollection** [40] - 3350:2, 3350:14, 3362:16, 3366:8, 3367:4, 3372:21, 3463:13, 3465:16, 3481:2, 3481:16, 3482:7, 3482:21, 3490:6, 3494:10, 3498:20, 3502:3, 3503:21, 3506:7, 3511:7, 3512:1, 3512:4, 3512:25, 3513:24, 3514:3, 3514:9, 3514:12, 3514:15, 3515:9, 3515:11, 3525:13, 3526:18, 3531:6, 3538:14, 3538:20, 3538:22, 3541:5, 3541:9, 3543:2, 3545:21, 3547:23
**recommended** [2] - 3526:10, 3530:10
**recommending** [2] - 3511:17, 3530:23
**reconstruct** [5] - 3380:12, 3380:18, 3380:21, 3440:21, 3527:14
**reconvene** [2] - 3468:5, 3549:3
**record** [22] - 3349:20, 3358:17, 3378:16,

3382:10, 3387:15, 3392:1, 3398:15, 3400:7, 3403:1, 3403:6, 3406:1, 3408:22, 3416:14, 3419:9, 3448:19, 3448:23, 3449:2, 3470:7, 3474:2, 3479:12, 3483:8, 3538:5

**recorded** [3] - 3346:25, 3418:5, 3526:6

**recorder** [1] - 3531:18

**records** [28] - 3366:6, 3370:5, 3380:13, 3384:10, 3384:12, 3384:13, 3385:1, 3385:3, 3386:13, 3386:25, 3387:2, 3387:17, 3388:13, 3389:19, 3404:23, 3405:7, 3405:23, 3406:7, 3406:9, 3470:5, 3470:8, 3472:17, 3472:21, 3473:6, 3529:10, 3530:4, 3553:22

**recover** [2] - 3370:11, 3545:23

**recovered** [1] - 3353:4

**RECROSS** [4] - 3379:10, 3467:3, 3555:8, 3555:24

**RECROSS-EXAMINATION** [4] - 3379:10, 3467:3, 3555:8, 3555:24

**redirect** [4] - 3375:19, 3413:14, 3463:18, 3532:25

**REDIRECT** [4] - 3375:21, 3463:21, 3555:6, 3555:22

**refer** [5] - 3352:17, 3376:2, 3401:14, 3401:16, 3402:8

**reference** [26] - 3350:3, 3360:23, 3412:23, 3434:4, 3434:24, 3450:15, 3470:3, 3505:12, 3509:18, 3511:3, 3511:11, 3515:1, 3515:13, 3521:17, 3521:18, 3523:23, 3527:16, 3532:18, 3534:23, 3535:8, 3536:23, 3538:3, 3539:1, 3539:12, 3543:9, 3551:19

**referenced** [3] - 3401:10, 3418:21, 3497:9

**references** [1] - 3351:14

**referred** [5] - 3356:2, 3384:18, 3478:16, 3508:1, 3538:25

**referring** [11] - 3377:14, 3377:17, 3378:2, 3411:15, 3411:17, 3423:12, 3437:8, 3440:24, 3448:24, 3546:6

**refers** [4] - 3362:7, 3401:3, 3401:24, 3487:3

**reflect** [1] - 3386:13

**reflected** [4] - 3386:24, 3387:8, 3397:5, 3529:9

**reflecting** [4] - 3405:5, 3457:8, 3506:4, 3508:15

**reflects** [3] - 3522:18, 3522:22, 3523:2

**refresh** [5] - 3350:2, 3463:13, 3482:7, 3506:7, 3538:13

**refreshes** [3] - 3481:15, 3538:20, 3538:22

**regard** [4] - 3374:12, 3390:11, 3543:16, 3547:10

**regarding** [10] - 3352:8, 3355:5, 3372:2, 3404:1, 3428:18, 3490:12, 3492:24, 3513:18, 3544:16, 3548:11

**regards** [22] - 3348:22, 3349:4, 3350:5, 3351:10, 3357:3, 3359:8, 3360:22, 3362:5, 3362:11, 3363:13, 3365:8, 3367:13, 3380:22, 3410:14, 3415:10, 3415:14, 3415:19, 3514:7, 3542:4, 3546:25, 3547:5, 3547:25

**regular** [2] - 3398:1, 3398:16

**regulation** [1] - 3396:22

**regulations** [3] - 3390:8, 3390:21, 3396:17

**related** [5] - 3353:23, 3396:25, 3397:1, 3404:23, 3550:13

**relates** [17] - 3415:22, 3416:21, 3437:14, 3440:25, 3449:21, 3452:21, 3457:3, 3457:14, 3510:2, 3514:23, 3516:24, 3517:12, 3518:16, 3518:23, 3519:25, 3538:12, 3540:7

**relationship** [14] - 3354:3, 3375:8, 3389:5, 3405:20, 3415:13, 3424:3, 3432:17, 3433:3, 3435:22, 3445:1, 3452:1, 3464:7, 3467:21, 3546:14

**relationships** [1] - 3406:24

**relative** [2] - 3352:10, 3436:5

**relatively** [2] - 3354:7, 3363:1

**release** [2] - 3374:22, 3423:7

**relevance** [2] - 3429:5, 3515:22

**relevancy** [2] - 3415:18, 3435:13

**relevant** [6] - 3350:22, 3416:3, 3417:5, 3470:19,

3536:19, 3536:21

**relinquishing** [2] - 3527:24, 3528:9

**remain** [5] - 3377:2, 3381:25, 3419:3, 3435:17, 3473:18

**remaining** [1] - 3407:3

**remember** [118] - 3355:14, 3360:8, 3367:16, 3367:20, 3367:22, 3368:3, 3368:11, 3368:15, 3368:20, 3368:21, 3368:22, 3372:1, 3372:14, 3373:1, 3373:3, 3373:4, 3373:12, 3377:13, 3378:10, 3379:14, 3379:16, 3409:9, 3409:13, 3422:23, 3422:25, 3425:25, 3430:4, 3434:22, 3436:25, 3437:1, 3437:2, 3439:18, 3439:23, 3439:24, 3443:11, 3443:12, 3447:20, 3449:10, 3449:24, 3450:19, 3455:24, 3457:6, 3457:10, 3457:11, 3457:12, 3457:13, 3458:6, 3458:7, 3460:3, 3460:7, 3460:11, 3460:24, 3460:25, 3461:1, 3461:3, 3461:13, 3461:16, 3463:9, 3464:1, 3465:19, 3465:23, 3475:10, 3475:21, 3477:12, 3477:14, 3477:20, 3477:22, 3478:23, 3480:21, 3481:10, 3482:10, 3482:14, 3482:24, 3483:13, 3491:24, 3492:1, 3496:17, 3499:23, 3502:7, 3503:12, 3513:6, 3515:5, 3515:15, 3515:16, 3516:15, 3516:16, 3516:20, 3516:21, 3517:22, 3517:25, 3524:3, 3525:12, 3527:25, 3528:1, 3530:11, 3531:4, 3531:10, 3535:10, 3535:11, 3541:20, 3541:21, 3542:4, 3542:24, 3543:11, 3543:14, 3543:19, 3544:21, 3545:7, 3547:9, 3547:16, 3547:17, 3547:19, 3548:2, 3548:14, 3548:15

**remembered** [2] - 3412:9, 3457:20

**remind** [1] - 3347:23

**remitted** [1] - 3471:2

**repaired** [1] - 3381:2

**repairs** [1] - 3381:11

**repay** [1] - 3446:5

**repayment** [1] - 3428:10

**repeat** [3] - 3477:21, 3484:10, 3500:21

**rephrase** [2] - 3432:24, 3445:9

**replenishment** [1] - 3515:13

**report** [1] - 3381:7

**Reporter** [1] - 3346:20

**reports** [1] - 3357:15

**repossessed** [2] - 3352:21, 3353:21

**represent** [5] - 3408:8, 3432:7, 3509:14, 3540:23, 3547:4

**representation** [2] - 3390:23, 3404:10

**representations** [2] - 3416:2, 3416:5

**representative** [1] - 3471:3

**represented** [5] - 3348:21, 3383:6, 3383:16, 3390:4, 3392:17

**representing** [4] - 3349:3, 3350:15, 3372:2, 3390:17

**represents** [3] - 3349:22, 3378:5, 3496:5

**request** [2] - 3415:9, 3436:23

**requested** [2] - 3519:1, 3519:7

**required** [2] - 3390:8, 3390:14

**requirements** [1] - 3389:25

**requires** [2] - 3353:3, 3392:11

**resell** [1] - 3353:5

**resembles** [1] - 3452:9

**reserve** [1] - 3355:20

**residence** [1] - 3411:16

**residential** [4] - 3390:16, 3395:21, 3397:1, 3402:15

**residing** [1] - 3542:11

**resolution** [2] - 3357:25, 3364:2

**resolve** [7] - 3354:3, 3364:21, 3371:9, 3371:18, 3376:8, 3396:2, 3553:23

**resolved** [2] - 3350:9, 3554:13

**respect** [19] - 3361:3, 3374:5, 3378:22, 3390:4, 3392:6, 3406:2, 3414:2, 3414:10, 3424:8, 3428:9, 3428:17, 3464:18, 3465:4, 3481:9, 3500:18, 3523:25, 3528:12, 3539:22, 3551:14

**response** [1] - 3460:5

**responsibility** [3] - 3353:1,

3353:8, 3353:22
**responsible** [3] - 3369:14, 3377:4, 3377:6
**restaurant** [3] - 3524:16, 3524:17, 3541:17
**resting** [1] - 3549:21
**result** [5] - 3437:6, 3437:17, 3437:24, 3533:12, 3533:14
**results** [1] - 3371:14
**resumes** [1] - 3347:10
**retain** [3] - 3456:8, 3456:12, 3456:17, 3456:24, 3517:4
**retire** [1] - 3475:7
**retired** [2] - 3382:25, 3386:19
**retrieve** [2] - 3388:17, 3405:8
**return** [11] - 3506:17, 3514:19, 3514:24, 3514:25, 3519:1, 3519:7, 3519:8, 3529:4, 3533:5, 3533:7
**returnable** [1] - 3550:6
**returned** [1] - 3514:18
**Revenue** [1] - 3448:25
**review** [7] - 3349:25, 3371:7, 3378:7, 3385:1, 3389:19, 3406:8, 3546:7
**reviewed** [3] - 3385:3, 3389:16, 3400:1
**Rhode** [2] - 3421:19, 3452:15
**RICHARD** [3] - 3345:22, 3348:1, 3555:3
**Richards** [14] - 3349:21, 3378:4, 3403:8, 3403:9, 3403:11, 3403:16, 3407:4, 3407:8, 3470:25, 3471:22, 3503:8, 3547:8, 3547:10, 3549:17
**Richards'** [2] - 3351:4, 3505:18
**Rick** [3] - 3374:3, 3432:7, 3509:14
**rights** [1] - 3538:18
**rigid** [1] - 3390:6
**rise** [6] - 3347:1, 3347:13, 3416:7, 3469:3, 3469:12, 3521:6
**risk** [2] - 3526:11, 3526:15
**risky** [1] - 3526:14
**Road** [1] - 3346:3
**Rob** [1] - 3540:22
**ROBERT** [1] - 3346:4
**Romanowski** [1] - 3551:16
**Ron** [8] - 3349:21, 3351:4, 3403:9, 3407:4, 3407:8, 3505:18, 3547:8, 3547:9

**Ronald** [8] - 3378:4, 3403:8, 3403:11, 3403:16, 3470:24, 3471:21, 3503:8, 3549:17
**room** [20] - 3440:6, 3440:9, 3440:13, 3440:15, 3440:22, 3440:25, 3441:1, 3441:4, 3441:8, 3441:9, 3441:13, 3441:15, 3441:24, 3442:3, 3442:14, 3442:17, 3442:24, 3443:2, 3443:8, 3443:12
**rooms** [2] - 3440:10, 3441:1
**Ross** [31] - 3416:21, 3417:7, 3417:9, 3417:15, 3417:19, 3418:2, 3426:6, 3426:8, 3426:19, 3427:13, 3427:17, 3427:24, 3428:1, 3428:19, 3428:25, 3429:15, 3444:9, 3444:10, 3444:13, 3445:1, 3445:19, 3445:21, 3446:3, 3446:12, 3446:22, 3462:6, 3462:9, 3462:20, 3463:2, 3466:12
**Rosser** [1] - 3549:11
**routine** [1] - 3370:22
**ROZENBOOM** [2] - 3348:1, 3555:3
**Rozenboom** [11] - 3347:8, 3347:21, 3347:23, 3348:12, 3350:25, 3361:12, 3364:10, 3373:7, 3375:23, 3379:6, 3381:18
**rude** [1] - 3451:5
**ruled** [1] - 3435:17
**rules** [1] - 3553:15
**run** [1] - 3367:10
**running** [3] - 3491:2, 3534:5, 3534:8

---

## S

**saddened** [2] - 3465:10, 3465:12
**sake** [1] - 3467:13
**sale** [9] - 3356:13, 3360:1, 3360:23, 3362:24, 3364:3, 3364:8, 3365:9, 3365:21, 3372:3
**sales** [4] - 3360:9, 3417:21, 3417:24, 3418:11
**salient** [1] - 3361:19
**salvage** [1] - 3380:3
**SARITHA** [1] - 3345:16
**satisfied** [2] - 3369:5, 3377:1
**satisfy** [3] - 3353:2, 3356:7, 3365:22

**Saturday** [1] - 3457:23
**saved** [1] - 3456:20
**saves** [1] - 3360:17
**savings** [1] - 3477:4
**saw** [31] - 3360:3, 3399:16, 3399:19, 3403:12, 3409:23, 3411:20, 3412:7, 3439:4, 3444:2, 3444:7, 3445:11, 3446:6, 3447:9, 3447:14, 3452:16, 3454:23, 3455:5, 3455:13, 3456:9, 3457:9, 3457:16, 3458:10, 3458:17, 3458:22, 3459:15, 3459:17, 3459:23, 3460:9, 3491:8, 3509:19, 3517:23
**scan** [1] - 3456:15
**Schwab** [12] - 3478:8, 3478:9, 3478:13, 3479:16, 3480:14, 3481:21, 3482:1, 3482:4, 3484:2, 3492:17, 3494:12, 3494:15
**scope** [2] - 3376:22, 3380:15, 3464:25
**Scott** [2] - 3551:15
**Scottsdale** [5] - 3389:12, 3389:24, 3390:12, 3391:2, 3396:16
**screen** [6] - 3394:4, 3394:6, 3402:22, 3479:6, 3486:18, 3517:15
**season** [4] - 3438:25, 3475:9, 3525:11, 3542:15
**seated** [15] - 3347:2, 3347:15, 3382:8, 3413:24, 3415:2, 3416:9, 3419:12, 3433:1, 3443:5, 3467:23, 3469:4, 3469:13, 3474:5, 3521:8, 3549:7
**second** [8] - 3349:17, 3365:12, 3395:6, 3395:14, 3403:1, 3411:23, 3477:12, 3477:13
**secondary** [1] - 3444:12
**section** [1] - 3487:20
**sections** [1] - 3365:7
**secure** [1] - 3363:16
**secured** [1] - 3417:11
**see** [69] - 3347:18, 3359:21, 3383:9, 3384:20, 3386:10, 3394:2, 3401:1, 3402:21, 3403:2, 3403:13, 3405:19, 3415:18, 3420:14, 3422:14, 3424:8, 3425:11, 3441:25, 3442:3, 3442:8, 3442:9, 3442:17, 3442:19, 3442:24, 3443:14, 3449:8, 3450:9, 3450:16, 3452:5, 3453:6, 3453:8, 3454:5, 3455:19,

**Saturday** cont.
3457:25, 3458:11, 3459:11, 3462:3, 3476:4, 3479:7, 3481:20, 3481:22, 3481:24, 3482:1, 3482:5, 3484:19, 3485:14, 3485:16, 3485:18, 3485:25, 3486:18, 3486:22, 3486:24, 3491:10, 3493:22, 3494:1, 3495:23, 3497:7, 3497:15, 3498:12, 3498:15, 3498:24, 3503:6, 3505:1, 3507:15, 3509:7, 3517:14, 3517:15, 3524:18, 3544:9
**seeing** [4] - 3430:5, 3485:3, 3485:12, 3490:6
**seeking** [1] - 3349:3
**sell** [17] - 3353:17, 3355:17, 3356:6, 3356:10, 3356:18, 3356:21, 3359:9, 3360:10, 3361:20, 3365:20, 3366:21, 3372:11, 3372:22, 3372:23, 3419:24, 3490:7, 3518:10
**selling** [4] - 3359:11, 3421:6, 3421:12, 3437:11
**send** [4] - 3399:22, 3423:6, 3456:15, 3456:16
**sender** [1] - 3498:18
**sending** [2] - 3374:7, 3380:13
**sense** [7] - 3440:17, 3512:11, 3513:9, 3513:14, 3525:19, 3525:24, 3531:5
**sensitive** [2] - 3390:7, 3536:8
**sent** [25] - 3384:12, 3384:23, 3389:15, 3398:13, 3399:23, 3406:10, 3406:20, 3425:1, 3425:2, 3455:23, 3456:22, 3457:5, 3482:3, 3490:11, 3492:13, 3493:11, 3497:17, 3497:20, 3497:21, 3505:3, 3505:14, 3506:11, 3518:1, 3518:25
**sentence** [1] - 3538:5
**separate** [2] - 3423:14, 3442:4
**separately** [1] - 3420:22
**September** [5] - 3398:13, 3398:14, 3400:8, 3439:24, 3492:7
**Sergei** [4] - 3351:19, 3365:18, 3376:6, 3379:1
**series** [5] - 3353:23, 3391:5, 3463:23, 3465:13, 3489:8
**served** [3] - 3453:19,

3453:22, 3454:7
**server** [1] - 3453:20
**Service** [3] - 3448:25, 3523:18, 3523:21
**services** [2] - 3476:12, 3516:25
**set** [6] - 3355:20, 3417:9, 3501:14, 3545:14, 3547:24, 3553:2
**settle** [1] - 3351:5
**settled** [1] - 3378:20
**Settlement** [7] - 3350:5, 3501:11, 3501:13, 3502:5, 3505:19, 3506:8, 3508:7
**settlement** [28] - 3349:4, 3349:23, 3349:25, 3351:3, 3354:15, 3354:18, 3372:18, 3378:6, 3378:8, 3378:18, 3378:25, 3471:5, 3471:12, 3543:7, 3543:12, 3543:16, 3543:23, 3544:16, 3544:19, 3545:14, 3546:23, 3547:1, 3547:5, 3547:11, 3548:1, 3548:12, 3548:18, 3548:20
**several** [4] - 3405:16, 3469:16, 3472:16, 3511:12
**Shane** [3] - 3374:3, 3374:20, 3374:21
**share** [2] - 3393:7, 3507:12
**shared** [3] - 3351:25, 3369:22, 3371:16
**shares** [2] - 3497:25, 3498:6
**sheet** [3] - 3424:15, 3424:16, 3424:24
**shocked** [2] - 3437:1, 3437:3
**short** [2] - 3363:1, 3408:10
**shortfall** [1] - 3369:7
**show** [21] - 3354:17, 3362:21, 3364:5, 3385:5, 3393:21, 3397:11, 3399:7, 3400:5, 3402:18, 3409:6, 3463:10, 3479:4, 3481:14, 3484:16, 3484:23, 3493:19, 3495:18, 3497:2, 3498:8, 3504:5, 3548:22
**showed** [5] - 3398:12, 3412:4, 3434:20, 3486:16, 3530:12
**showing** [18] - 3360:17, 3360:19, 3406:1, 3428:3, 3479:6, 3481:18, 3483:6, 3488:24, 3489:16, 3489:23, 3492:5, 3500:7, 3500:11, 3502:11, 3504:21, 3506:14, 3508:15, 3523:2
**shown** [4] - 3408:12,

3485:9, 3507:21, 3509:19
**shows** [1] - 3497:5
**Sic** [1] - 3452:10
**sickened** [4] - 3437:5, 3437:9, 3437:10, 3464:3
**side** [6] - 3349:23, 3378:6, 3408:15, 3434:4, 3441:4, 3535:18
**sidebar** [6] - 3429:23, 3430:1, 3430:2, 3431:3, 3536:1, 3537:10
**sign** [7] - 3423:10, 3424:10, 3424:12, 3424:14, 3442:1, 3459:18, 3519:8
**signature** [21] - 3438:4, 3445:12, 3445:13, 3452:3, 3452:5, 3452:6, 3452:12, 3452:16, 3452:23, 3453:6, 3453:8, 3453:9, 3453:15, 3469:22, 3479:8, 3479:10, 3482:11, 3482:13, 3492:8, 3535:14, 3538:8
**signatures** [22] - 3414:5, 3414:8, 3423:14, 3424:8, 3424:20, 3424:24, 3436:7, 3438:2, 3438:8, 3438:20, 3443:9, 3443:14, 3443:3, 3446:4, 3446:7, 3454:24, 3454:25, 3455:3, 3455:4, 3455:13, 3455:25, 3457:16
**signed** [8] - 3400:10, 3454:23, 3469:20, 3512:20, 3536:13, 3553:17, 3553:21, 3553:24
**significant** [4] - 3379:1, 3396:3, 3396:5, 3396:6, 3455:15, 3553:19
**signing** [8] - 3423:5, 3438:1, 3442:19, 3444:2, 3444:17, 3456:9, 3516:16, 3516:21
**silent** [1] - 3435:17
**simply** [14] - 3378:23, 3384:21, 3392:10, 3399:16, 3400:1, 3405:25, 3432:10, 3434:8, 3435:1, 3440:20, 3443:3, 3446:10, 3538:5, 3538:11
**simultaneously** [1] - 3464:12
**single** [1] - 3454:25
**sister** [2] - 3459:10, 3459:12
**sit** [19] - 3432:17, 3432:19, 3441:19, 3467:16, 3481:1, 3486:12, 3498:20, 3499:17, 3499:23, 3499:24, 3506:17, 3514:3, 3525:21, 3528:5, 3529:4,

3529:8, 3529:14, 3533:17, 3539:16
**sitting** [2] - 3442:5, 3442:7
**sittings** [1] - 3442:13
**situation** [6] - 3353:25, 3357:5, 3370:20, 3390:11, 3408:9, 3413:19
**six** [4] - 3427:5, 3475:8, 3543:10, 3544:5
**six-month** [1] - 3427:5
**size** [1] - 3441:13
**sized** [1] - 3396:10
**small** [1] - 3396:23
**smiling** [1] - 3541:20
**so..** [1] - 3453:23
**social** [1] - 3422:1
**sold** [9] - 3353:4, 3356:14, 3356:17, 3356:22, 3359:25, 3376:25, 3417:16, 3451:15
**solicit** [1] - 3371:12
**solid** [1] - 3526:10
**someone** [1] - 3374:7, 3374:17, 3377:10, 3396:17, 3438:4, 3441:1, 3445:11, 3456:14, 3499:8, 3529:22, 3551:24
**sometime** [3] - 3366:23, 3466:6, 3519:11
**sometimes** [3] - 3353:2, 3389:22, 3391:25
**somewhat** [1] - 3414:9
**somewhere** [1] - 3389:6
**sorry** [25] - 3387:24, 3388:24, 3401:11, 3405:24, 3407:24, 3408:9, 3409:1, 3416:16, 3426:13, 3430:5, 3448:14, 3451:4, 3454:3, 3458:20, 3465:12, 3467:9, 3467:12, 3467:24, 3477:21, 3499:21, 3500:8, 3500:21, 3504:11, 3524:9, 3550:20
**sort** [2] - 3450:24, 3454:7
**sound** [1] - 3478:25
**sounding** [1] - 3515:4
**sounds** [6] - 3411:19, 3478:25, 3502:22, 3513:8, 3515:18, 3548:8
**Source** [1] - 3365:18
**speaking** [7] - 3349:1, 3412:18, 3448:20, 3478:11, 3499:21, 3532:11, 3543:11
**Special** [3] - 3436:13, 3436:16, 3448:24
**specific** [9] - 3350:12, 3352:8, 3354:21, 3459:22, 3482:15, 3515:17, 3525:4, 3530:2, 3538:16

**specifically** [13] - 3351:15, 3402:19, 3406:3, 3495:19, 3496:17, 3497:4, 3500:15, 3501:17, 3501:18, 3509:9, 3510:3, 3536:23, 3552:2
**specifications** [1] - 3360:14
**specificity** [1] - 3532:1
**specifics** [1] - 3541:14
**spell** [3] - 3382:9, 3419:8, 3474:1
**spend** [1] - 3378:20
**spent** [3] - 3480:9, 3503:22, 3503:25
**spoken** [1] - 3460:14
**Square** [1] - 3345:21
**stand** [6] - 3347:10, 3381:25, 3473:18, 3532:13, 3533:17, 3551:2
**Standard** [7] - 3477:17, 3477:24, 3478:4, 3478:6, 3516:16, 3516:17, 3516:22
**standing** [9] - 3357:10, 3357:17, 3357:20, 3357:24, 3358:3, 3358:5, 3381:25, 3419:3, 3473:18
**standpoint** [1] - 3372:15
**start** [2] - 3420:6, 3552:19
**started** [6] - 3386:6, 3475:3, 3477:23, 3491:1, 3532:1, 3532:2
**starting** [4] - 3425:24, 3527:6, 3527:7, 3527:9
**State** [4] - 3477:6, 3477:10, 3477:11, 3477:16
**state** [17] - 3357:13, 3359:13, 3361:9, 3382:9, 3383:2, 3419:8, 3433:14, 3433:18, 3435:2, 3435:23, 3454:11, 3474:1, 3519:25, 3531:24, 3531:25, 3534:16
**statement** [24] - 3361:9, 3383:23, 3384:1, 3384:2, 3398:12, 3436:1, 3442:14, 3455:16, 3455:18, 3456:1, 3483:4, 3483:8, 3483:13, 3483:17, 3483:23, 3493:21, 3498:23, 3519:20, 3521:13, 3521:17, 3521:18, 3522:18, 3522:22, 3523:3
**statements** [10] - 3417:21, 3472:2, 3482:25, 3483:2, 3483:5, 3484:2, 3484:4, 3484:14, 3517:7, 3517:9
**STATES** [3] - 3345:1, 3345:3, 3345:11
**states** [1] - 3357:15
**States** [5] - 3345:6, 3345:14, 3345:17,

3523:17, 3523:21
**stating** [1] - 3453:20
**status** [5] - 3486:11, 3510:16, 3519:12, 3532:22, 3548:11
**stay** [5] - 3382:13, 3423:2, 3440:14, 3532:5, 3532:19
**stayed** [1] - 3449:9
**Steiger** [1] - 3346:20
**Stempler** [1] - 3553:1
**stenographer** [2] - 3526:6, 3531:21
**stenography** [1] - 3346:25
**step** [2] - 3381:18, 3468:2
**Stephen** [1] - 3471:3
**steps** [1] - 3381:20
**Steve** [8] - 3400:15, 3427:20, 3428:19, 3429:15, 3444:13, 3446:3, 3446:12, 3446:23
**Steven** [5] - 3426:6, 3427:24, 3444:10, 3445:21, 3446:22
**Stewart** [8] - 3414:18, 3415:12, 3415:13, 3415:25, 3417:22, 3417:25, 3418:12, 3549:11
**sticking** [1] - 3546:23
**still** [11] - 3347:23, 3358:19, 3377:2, 3386:20, 3397:19, 3410:19, 3421:22, 3467:22, 3477:25, 3550:11
**stip** [3] - 3553:21, 3553:24, 3554:9
**stipulate** [2] - 3430:25, 3553:14
**stipulated** [1] - 3553:17
**stipulates** [1] - 3461:17
**stipulating** [1] - 3551:21
**stipulation** [13] - 3415:5, 3416:12, 3416:13, 3416:17, 3416:19, 3416:25, 3417:4, 3418:13, 3418:22, 3470:11, 3470:19, 3472:5, 3553:18
**Stipulation** [2] - 3417:2, 3556:14
**stipulations** [4] - 3469:16, 3469:24, 3470:3
**stock** [3] - 3478:6, 3480:13, 3526:20
**stocks** [3] - 3477:3, 3477:8, 3478:14
**Stolper** [2] - 3534:22, 3534:25
**stopped** [1] - 3429:12
**straight** [1] - 3439:7
**Strangford** [1] - 3346:7
**Street** [7] - 3422:15,

3477:7, 3477:10, 3477:11, 3477:16, 3494:7, 3518:19
**strict** [1] - 3396:7
**strictly** [1] - 3421:25
**string** [2] - 3349:11, 3351:1
**structuring** [1] - 3364:23
**struggling** [1] - 3368:24
**stuck** [1] - 3552:14
**studying** [1] - 3421:4
**stuff** [7] - 3423:3, 3423:4, 3437:1, 3437:3, 3441:19, 3456:20, 3507:5
**subdivision** [1] - 3356:1
**subject** [2] - 3357:4, 3548:20
**submit** [1] - 3357:15
**submitted** [4] - 3367:18, 3417:19, 3444:21, 3445:12
**subpoena** [5] - 3453:18, 3453:19, 3453:23, 3454:4, 3550:6
**Subpoena** [2] - 3453:24, 3454:4
**subpoenaed** [2] - 3384:9, 3384:11
**subsequent** [1] - 3408:21
**subsequently** [1] - 3370:10
**substance** [2] - 3446:12, 3510:17
**substantially** [1] - 3406:17
**Sue** [3] - 3377:18, 3377:22, 3507:17
**sued** [1] - 3359:3
**Suffolk** [1] - 3345:21
**suggest** [2] - 3514:23, 3534:13
**suggested** [1] - 3436:20
**suggesting** [1] - 3507:19
**suggestion** [1] - 3378:23
**Sullivan** [1] - 3400:11
**sum** [1] - 3544:12
**summary** [2] - 3486:22, 3497:4
**sums** [1] - 3493:17
**Sunday** [1] - 3457:23
**support** [1] - 3358:9
**supportive** [1] - 3435:24
**supposed** [3] - 3480:8, 3480:9, 3506:9
**surgery** [1] - 3405:15
**surprised** [1] - 3446:23
**suspect** [1] - 3552:14
**suspicious** [1] - 3466:19
**sustained** [3] - 3372:5, 3428:14, 3435:15, 3435:18, 3464:25, 3495:5, 3496:14, 3496:24, 3499:15
**switched** [1] - 3478:3
**sworn** [5] - 3348:3, 3382:5,

3391:19, 3419:6, 3473:23
**Sydor** [1] - 3489:10

---

# T

**table** [1] - 3442:1
**talks** [1] - 3365:8
**tally** [1] - 3553:8
**tape** [1] - 3531:18
**taxes** [1] - 3429:12
**team** [5] - 3474:19, 3475:18, 3475:19, 3542:5, 3542:7
**technically** [1] - 3357:13
**temporary** [1] - 3553:20
**ten** [3] - 3449:5, 3460:1, 3550:21
**term** [4] - 3357:9, 3366:14, 3366:18, 3366:20
**terminated** [2] - 3451:16, 3451:17
**terms** [10] - 3362:18, 3363:16, 3364:7, 3364:19, 3364:22, 3376:15, 3456:24, 3512:12, 3526:6, 3536:19
**Tesoriero** [4] - 3550:6, 3550:8, 3551:7, 3552:12
**test** [1] - 3515:8
**testified** [31] - 3348:3, 3348:17, 3353:15, 3354:14, 3354:18, 3355:23, 3362:9, 3365:13, 3367:24, 3369:13, 3371:8, 3372:12, 3375:14, 3376:7, 3377:10, 3382:5, 3409:6, 3409:11, 3419:7, 3440:1, 3451:10, 3457:14, 3462:20, 3465:7, 3473:23, 3499:22, 3509:20, 3517:7, 3519:17, 3525:3, 3544:25
**testify** [10] - 3414:5, 3447:4, 3447:8, 3447:13, 3447:17, 3454:13, 3454:16, 3538:7, 3547:16, 3550:6
**testifying** [8] - 3355:8, 3364:11, 3366:24, 3367:16, 3464:17, 3511:7, 3542:25, 3550:4
**testimony** [35] - 3355:2, 3369:10, 3391:14, 3399:20, 3404:14, 3404:22, 3409:9, 3409:13, 3409:19, 3415:19, 3415:24, 3416:4, 3432:11, 3436:6, 3438:8, 3438:21, 3439:4, 3439:6, 3445:13, 3446:17, 3448:1, 3454:24,

3455:1, 3458:4, 3461:2, 3485:6, 3499:13, 3512:17, 3514:8, 3516:15, 3517:21, 3530:18, 3550:10, 3552:9, 3552:15
**THE** [169] - 3345:11, 3347:1, 3347:2, 3347:4, 3347:8, 3347:11, 3347:13, 3347:15, 3347:18, 3347:25, 3348:6, 3348:8, 3350:23, 3361:6, 3363:23, 3365:4, 3365:24, 3366:11, 3369:24, 3370:1, 3372:5, 3373:19, 3375:19, 3376:24, 3379:4, 3379:23, 3380:16, 3381:5, 3381:18, 3381:21, 3381:24, 3382:8, 3382:11, 3382:13, 3383:13, 3387:21, 3388:3, 3388:5, 3388:8, 3388:23, 3398:25, 3404:4, 3407:21, 3408:1, 3408:3, 3408:18, 3409:2, 3413:12, 3413:13, 3413:16, 3413:18, 3413:20, 3413:24, 3414:2, 3414:6, 3414:13, 3414:16, 3414:19, 3415:2, 3415:7, 3415:21, 3416:6, 3416:7, 3416:9, 3416:12, 3416:15, 3416:18, 3416:25, 3418:16, 3418:18, 3418:21, 3419:3, 3419:8, 3419:10, 3419:12, 3419:16, 3419:17, 3420:2, 3420:4, 3420:17, 3425:17, 3428:14, 3429:7, 3429:21, 3430:11, 3430:13, 3430:18, 3430:21, 3430:23, 3432:3, 3433:23, 3434:17, 3435:15, 3461:20, 3461:22, 3461:24, 3462:15, 3463:18, 3464:25, 3468:2, 3468:4, 3469:3, 3469:4, 3469:11, 3469:12, 3469:13, 3469:18, 3469:24, 3470:10, 3470:14, 3472:9, 3472:12, 3472:23, 3473:1, 3473:8, 3473:11, 3473:17, 3474:1, 3474:3, 3474:5, 3476:7, 3484:8, 3491:14, 3495:5, 3496:14, 3496:24, 3498:3, 3499:15, 3499:22, 3500:1, 3500:20, 3501:6, 3504:15, 3504:17, 3508:25, 3509:5, 3520:11, 3521:2, 3521:6, 3521:8, 3522:8, 3522:13, 3523:12, 3535:19, 3536:4, 3536:14, 3537:3, 3537:5, 3540:15, 3540:16,

3548:23, 3549:2, 3549:7, 3549:14, 3549:19, 3549:23, 3550:11, 3550:21, 3551:1, 3551:5, 3551:9, 3551:11, 3551:23, 3552:17, 3552:22, 3553:10, 3554:1, 3554:5, 3554:14

**themselves** [1] - 3443:18
**therefore** [1] - 3377:3
**therein** [1] - 3387:5
**thin** [1] - 3359:19
**thinking** [1] - 3457:24
**third** [1] - 3486:20
**Thomas** [1] - 3372:7
**thoughts** [1] - 3536:12
**thousand** [1] - 3459:25
**three** [6] - 3360:17, 3387:23, 3441:4, 3445:25, 3449:18, 3534:2
**threshold** [1] - 3355:18
**Thursday** [1] - 3457:24
**Timothy** [5] - 3495:25, 3496:2, 3497:3, 3499:3, 3530:15
**Title** [3] - 3417:22, 3417:25, 3418:12
**today** [60] - 3355:13, 3362:14, 3367:11, 3383:9, 3384:9, 3405:8, 3420:14, 3425:11, 3432:17, 3448:1, 3448:4, 3448:8, 3448:11, 3449:13, 3453:21, 3454:9, 3454:12, 3467:16, 3476:4, 3481:1, 3482:14, 3485:6, 3486:7, 3486:12, 3491:8, 3498:21, 3499:13, 3499:17, 3499:23, 3499:24, 3506:17, 3507:10, 3508:12, 3508:22, 3509:15, 3511:6, 3513:17, 3514:3, 3514:9, 3514:12, 3514:13, 3517:3, 3525:21, 3528:6, 3529:4, 3529:8, 3529:14, 3530:1, 3531:25, 3532:22, 3533:8, 3533:17, 3534:18, 3536:17, 3539:16, 3542:25, 3547:17, 3552:9, 3553:11
**together** [6] - 3366:25, 3370:8, 3435:5, 3450:6, 3463:6, 3466:9
**Tom** [1] - 3411:7
**Tommy** [57] - 3351:18, 3356:20, 3361:13, 3367:9, 3369:21, 3369:23, 3370:10, 3373:14, 3380:17, 3381:7, 3383:4, 3389:3, 3389:6, 3389:11,

3389:13, 3389:15, 3389:18, 3390:8, 3391:13, 3391:16, 3392:14, 3395:17, 3396:19, 3401:25, 3405:21, 3406:22, 3410:1, 3410:19, 3410:21, 3411:3, 3411:6, 3411:20, 3412:10, 3412:11, 3425:7, 3427:3, 3444:21, 3471:7, 3491:5, 3505:22, 3505:23, 3505:24, 3506:2, 3524:22, 3524:24, 3525:20, 3527:4, 3527:21, 3528:9, 3530:9, 3530:25, 3532:9, 3535:8, 3536:22, 3536:24, 3537:6, 3538:17
**TOMMY** [1] - 3345:7
**Tommy's** [3] - 3389:24, 3396:4, 3412:4
**tomorrow** [4] - 3549:3, 3549:8, 3549:17, 3549:23
**took** [13] - 3359:9, 3369:6, 3442:25, 3455:25, 3477:8, 3495:8, 3511:22, 3512:5, 3518:2, 3518:3, 3531:7, 3541:8, 3542:1
**top** [5] - 3453:25, 3455:6, 3455:14, 3481:20, 3485:16
**topic** [1] - 3359:22
**total** [3] - 3394:21, 3486:25, 3487:8
**totally** [3] - 3380:4, 3380:7, 3529:15
**towards** [4] - 3381:10, 3404:15, 3480:10, 3498:14
**trace** [4] - 3436:7, 3438:8, 3438:20, 3443:14
**traced** [1] - 3454:25
**tracing** [5] - 3424:18, 3424:19, 3441:7, 3442:5, 3443:9, 3444:2, 3445:11, 3446:6, 3452:16, 3454:24, 3455:5, 3455:13, 3457:16, 3459:23, 3466:13
**track** [3] - 3392:1, 3392:19, 3392:25
**transaction** [11] - 3351:20, 3366:25, 3367:4, 3402:21, 3445:5, 3446:2, 3446:4, 3488:10, 3495:21, 3496:18, 3498:24
**transactions** [4] - 3426:12, 3488:20, 3501:1, 3502:24
**transcript** [1] - 3346:25
**TRANSCRIPT** [1] - 3345:10
**transfer** [14] - 3403:12, 3403:15, 3407:8, 3470:23, 3471:20, 3480:13, 3481:24, 3482:8, 3482:15,

3497:15, 3500:4, 3502:13, 3503:7, 3530:13
**transferred** [2] - 3484:1, 3484:12
**transferring** [1] - 3481:16
**transfers** [1] - 3489:16
**trap** [1] - 3544:8
**travel** [2] - 3421:11, 3421:14
**traveled** [1] - 3466:8
**treated** [3] - 3390:1, 3390:3, 3396:8
**trial** [7] - 3418:15, 3447:4, 3472:6, 3478:16, 3487:17, 3550:7, 3552:10
**trigger** [1] - 3378:25
**trip** [1] - 3458:7
**true** [48] - 3353:20, 3417:18, 3417:20, 3417:23, 3418:1, 3418:4, 3418:7, 3418:10, 3432:18, 3433:15, 3433:19, 3435:8, 3437:12, 3437:22, 3438:5, 3442:6, 3443:25, 3444:23, 3445:17, 3446:19, 3447:22, 3447:24, 3449:6, 3450:1, 3454:13, 3467:17, 3471:10, 3471:13, 3472:1, 3502:23, 3510:21, 3511:2, 3511:4, 3511:8, 3517:10, 3519:9, 3519:18, 3520:9, 3521:20, 3521:23, 3526:11, 3531:17, 3531:19, 3531:22, 3531:23, 3533:2, 3533:13, 3538:9
**truing** [1] - 3450:24
**truly** [1] - 3466:15
**trust** [4] - 3351:4, 3417:10, 3417:24, 3505:18
**Trust** [22] - 3471:4, 3471:6, 3471:7, 3480:17, 3480:20, 3481:17, 3482:4, 3482:9, 3482:22, 3482:25, 3483:5, 3484:1, 3484:5, 3484:12, 3484:13, 3486:9, 3488:10, 3517:8, 3517:9, 3518:24, 3519:20
**trusted** [3] - 3391:22, 3466:16, 3533:1
**trusting** [1] - 3389:5
**trustworthy** [1] - 3389:4
**truth** [2] - 3361:8, 3391:20
**try** [20] - 3353:16, 3354:3, 3355:17, 3356:6, 3358:22, 3359:21, 3360:5, 3361:20, 3371:17, 3372:11, 3374:8, 3374:15, 3375:12, 3408:9, 3465:2, 3501:15, 3512:14, 3527:13, 3553:7, 3554:12

**trying** [18] - 3356:4, 3363:16, 3368:13, 3370:5, 3370:7, 3371:9, 3372:15, 3372:23, 3373:1, 3381:9, 3396:2, 3456:15, 3465:14, 3495:15, 3544:8, 3544:9, 3544:22, 3553:14
**tumultuous** [1] - 3415:12
**turn** [2] - 3349:9, 3354:23
**turned** [4] - 3370:13, 3442:18, 3451:4
**turning** [2] - 3355:1, 3377:15
**twice** [1] - 3535:17
**two** [35] - 3349:17, 3350:8, 3352:10, 3352:17, 3353:13, 3362:21, 3371:9, 3371:18, 3372:3, 3372:11, 3387:12, 3389:9, 3395:8, 3395:16, 3397:10, 3397:23, 3402:19, 3402:24, 3408:12, 3409:18, 3412:19, 3415:18, 3417:11, 3427:5, 3432:11, 3448:9, 3459:25, 3460:12, 3462:13, 3467:20, 3467:21, 3483:3, 3506:6, 3518:4, 3549:19
**two-page** [1] - 3518:4
**two-thousand** [1] - 3459:25
**type** [2] - 3359:19, 3364:23
**typically** [2] - 3370:18, 3510:3

## U

**ultimately** [5] - 3370:15, 3377:6, 3482:22, 3512:20, 3539:2
**um-hmm** [2] - 3432:9, 3451:25
**Um-hum** [1] - 3486:23
**unaware** [1] - 3409:12
**under** [15] - 3347:24, 3395:25, 3412:11, 3424:9, 3424:14, 3440:2, 3446:19, 3451:18, 3455:22, 3486:25, 3487:6, 3498:14, 3511:6, 3531:25, 3536:10
**understood** [5] - 3405:17, 3463:24, 3503:9, 3526:23, 3547:13
**unfair** [1] - 3527:13
**unfairly** [2] - 3390:1, 3390:3
**unfortunately** [1] - 3502:8
**unit** [1] - 3414:11
**UNITED** [3] - 3345:1,

3345:3, 3345:11
**United** [5] - 3345:6, 3345:14, 3345:17, 3523:17, 3523:21
**units** [11] - 3417:11, 3418:8, 3426:23, 3427:5, 3428:10, 3429:9, 3429:16, 3506:6, 3507:25, 3508:1, 3508:5
**unless** [4] - 3356:2, 3359:1, 3438:3, 3536:16
**unnecessary** [1] - 3390:9
**unusual** [1] - 3389:21
**up** [36] - 3347:12, 3351:20, 3355:20, 3359:20, 3362:4, 3368:25, 3373:13, 3373:24, 3382:14, 3403:16, 3411:4, 3417:9, 3419:13, 3419:14, 3421:19, 3426:24, 3455:13, 3459:14, 3464:8, 3473:17, 3474:6, 3484:12, 3486:2, 3501:14, 3517:15, 3527:6, 3527:7, 3527:9, 3527:22, 3534:24, 3544:12, 3545:14, 3546:20, 3547:24, 3549:14, 3550:7
**updated** [1] - 3547:25
**upper** [1] - 3484:20
**US** [3] - 3453:20, 3465:22, 3466:6
**usual** [1] - 3386:24
**utilized** [1] - 3509:8

### V

**vague** [1] - 3366:16
**vaguely** [2] - 3373:3, 3490:18
**validate** [1] - 3452:23
**value** [4] - 3351:21, 3529:18, 3529:19, 3529:22
**valueless** [1] - 3529:16
**variety** [1] - 3383:16
**various** [9] - 3416:2, 3438:8, 3438:20, 3440:22, 3444:3, 3466:8, 3472:21, 3505:21, 3539:5
**Vegas** [5] - 3417:12, 3418:9, 3426:23, 3427:20, 3508:6
**venture** [1] - 3479:24
**Ventures** [2] - 3421:10, 3421:25
**ventures** [1] - 3488:8
**Veterans** [1] - 3345:21
**via** [4] - 3380:14, 3426:21, 3462:9, 3518:25

**view** [2] - 3356:15, 3369:1
**Vincent** [1] - 3550:5
**virtue** [3] - 3513:3, 3514:17, 3540:8
**vis-à-vis** [1] - 3513:11
**visit** [1] - 3422:16
**visualizing** [1] - 3436:6
**voice** [3] - 3382:14, 3419:14, 3474:6
**voluntarily** [1] - 3454:12
**volunteered** [1] - 3388:12

### W

**Wachovia** [1] - 3497:3
**wait** [2] - 3347:12, 3446:25
**waiting** [2] - 3390:2, 3415:8
**wall** [3] - 3396:9, 3442:11
**wants** [3] - 3354:6, 3430:25, 3552:2
**wash** [2] - 3396:3, 3396:5
**Washington** [1] - 3422:15
**Wayne** [2] - 3448:24, 3549:18
**wealth** [1] - 3416:3
**wearing** [1] - 3439:14
**Wednesday** [2] - 3552:20, 3552:24
**week** [1] - 3550:22
**weekend** [9] - 3422:21, 3422:22, 3422:24, 3439:17, 3439:19, 3457:23, 3465:15, 3466:5
**weeks** [1] - 3405:16
**WEINBLATT** [1] - 3345:20
**welcome** [1] - 3384:4
**whereby** [1] - 3516:22
**wherein** [4] - 3444:16, 3536:25, 3539:7, 3543:15
**whichever** [1] - 3478:3
**whole** [5] - 3354:2, 3355:3, 3363:4, 3484:23, 3549:20
**wholly** [1] - 3529:15
**wide** [1] - 3441:25
**William** [1] - 3489:10
**willing** [1] - 3369:8
**window** [1] - 3442:8
**wiped** [1] - 3394:24
**wire** [21] - 3403:12, 3403:15, 3407:8, 3470:23, 3471:20, 3479:14, 3479:15, 3481:24, 3482:15, 3489:16, 3493:25, 3494:4, 3494:10, 3494:14, 3498:15, 3498:18, 3498:21, 3498:24, 3500:4, 3502:13, 3503:7

**withdraw** [7] - 3359:7, 3362:9, 3391:6, 3450:25, 3454:21, 3501:4, 3501:5
**withdrawal** [1] - 3487:21
**withdrawn** [15] - 3393:19, 3395:4, 3399:5, 3428:4, 3433:11, 3451:7, 3455:17, 3462:2, 3465:11, 3500:22, 3504:2, 3518:17, 3525:9, 3527:2, 3529:13
**withdrew** [2] - 3391:9, 3391:11
**withhold** [1] - 3525:23
**witness** [21] - 3347:10, 3348:2, 3381:20, 3381:21, 3381:25, 3382:4, 3416:10, 3447:4, 3447:13, 3447:18, 3447:22, 3447:24, 3454:16, 3468:3, 3469:5, 3473:18, 3473:22, 3533:17, 3536:5, 3552:8, 3553:6
**WITNESS** [12] - 3347:25, 3348:8, 3370:1, 3382:11, 3413:12, 3413:18, 3419:10, 3419:16, 3420:4, 3474:3, 3500:1, 3540:15
**witnesses** [6] - 3415:10, 3539:5, 3549:19, 3550:22, 3551:11, 3553:8
**WITNESSES** [1] - 3555:1
**wold** [1] - 3552:18
**Wooley** [5] - 3460:3, 3460:9, 3460:22, 3552:10, 3552:13
**Woolley** [1] - 3423:22
**word** [1] - 3375:1
**words** [10] - 3434:17, 3387:7, 3428:16, 3445:19, 3446:3, 3452:7, 3459:16, 3527:22, 3545:2, 3550:8
**works** [3] - 3413:10, 3443:18, 3444:11
**world** [2] - 3433:14, 3433:18
**worth** [1] - 3534:18
**writing** [1] - 3516:23
**written** [1] - 3543:2

### Y

**year** [17] - 3356:12, 3359:9, 3359:25, 3361:21, 3425:4, 3426:2, 3438:15, 3449:15, 3450:3, 3459:6, 3459:7, 3475:5, 3476:15, 3494:16, 3542:1, 3543:10
**Year's** [1] - 3495:22
**years** [41] - 3380:13,

3383:6, 3383:17, 3383:18, 3387:12, 3389:5, 3389:9, 3391:14, 3397:10, 3397:23, 3420:1, 3420:5, 3421:21, 3432:15, 3436:10, 3437:12, 3445:24, 3445:25, 3446:6, 3448:9, 3450:1, 3452:2, 3475:2, 3475:8, 3475:10, 3476:14, 3488:3, 3509:25, 3510:14, 3510:21, 3511:1, 3511:12, 3515:20, 3519:6, 3534:2, 3534:6, 3534:20, 3541:11, 3544:5
**yesterday** [13] - 3347:20, 3348:15, 3349:10, 3355:23, 3358:11, 3361:7, 3367:18, 3377:15, 3447:9, 3447:10, 3448:14, 3469:8
**YORK** [1] - 3345:1
**York** [6] - 3345:6, 3345:15, 3346:21, 3465:21, 3465:23, 3466:4
**you/your** [2] - 3350:1, 3378:8
**yourself** [3] - 3533:12, 3538:6, 3539:25
**youth** [1] - 3488:4

### Z

**zero** [2] - 3497:5, 3533:20
**zoning** [1] - 3383:20