3558

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
UNITED STATES OF AMERICA

                                        CR-13-607


            -against-            :

                                        United States Courthouse
                                        Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

        Defendants.             :
                                        June 11, 2015
- - - - - - - - - - - - - - - X   9:30 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the Government:        KELLY T. CURRIE
                           Acting United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  JAMES MISKIEWICZ, ESQ.
                                SARITHA KOMATIREDDY, ESQ.
                           Assistant United States Attorney




For the Defendants:        HALEY, WEINBLATT & CALCAGNI
                           One Suffolk Square
                           1601 Veterans Memorial Highway
                           Islandia, NY  11749
                           BY: RICHARD HALEY, ESQ.
                           For Mr. Kenner

3559

For the Defendants:

                        LARUSSO & CONWAY
                        300 Old Country Road
                        Mineola, NY  11501
                        BY: ROBERT LARUSSO, ESQ.
                        For Mr. Constantine


                        ANDREW L. OLIVERAS, ESQ.
                        26 Strangford Court
                        Oceanside, NY  11572
                        For Mr. Constantine

Court Reporter:         Mary Ann Steiger
                        100 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6101


              Proceedings recorded by mechanical stenography.
                  Transcript produced by computer.

3560

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.

3          (Case called, appearances noted.)

4          THE COURT:  The jurors are all here, are we

5     ready to go?

6          MR. HALEY:  Your Honor, I did request of your

7     clerk just a brief application to avoid sidebars.

8          THE COURT:  Okay.

9          MR. HALEY:  Actually, one of the issues I was

10    going to bring to the Court's attention I think can wait

11    until Monday.

12         THE COURT:  Okay.

13         MR. HALEY:  But there is an issue that I don't

14    want to forget about, judge, and that's why I want to

15    bring it to the Court's attention now.

16         As your Honor is well aware, on Thursday, when

17    we conclude, Mr. Kenner takes the laptop computer back to

18    MDC Brooklyn with him and then returns on Monday.

19         I will be meeting with my client tomorrow and on

20    Sunday.

21         In an effort to make sure the trial moves

22    smoothly, it's my hope that on Sunday, when I meet with

23    Mr. Kenner, he will be providing me a disk of documents

24    taken off of the computer that we will utilize for

25    purposes of his direct testimony.

3561

1    Indeed, I want to get those documents to the

2    government first thing Monday morning, if not even on

3    Sunday.

4    I'm telling you this, judge, because I need

5    today to allow -- I need today to give to my client this

6    package of plain disks -- and I represent as an officer of

7    the Court these are blank disks -- to allow him to take

8    the blank disks back with him to MDC Brooklyn so he might

9    accomplish that task over the weekend before I see him on

10   Sunday.

11   Typically, what would occur is I would mail them

12   to the facility so they would have an opportunity to look

13   through the disks before my client received the disks.

14   I cannot walk into MDC Brooklyn with these disks

15   and simply deliver them to Mr. Kenner when I meet with him

16   on Sunday.  I wouldn't be allowed to do so.  So --

17   THE COURT:  Let me ask the marshals that are in

18   the courtroom.

19   U.S. MARSHAL:  I don't know what MDC's policy is

20   going to be in accepting it.  I have no problem giving it

21   to him here.

22   THE COURT:  What I would suggest is whoever

23   takes him back to the jail, if Mr. Haley gives it to the

24   marshals taking him back to the jail, and they can give it

25   to the facility, and explain to them that I want him to

3562

1  have those disks over the weekend.  They're blank.  If

2  they want to look at them and confirm they're blank before

3  they give them to Mr. Kenner, that's fine.

4          U.S. MARSHAL:  Sure.  Certainly.

5          MR. HALEY:  Thank you, your Honor.

6          THE COURT:  All right.  Thank you.

7          U.S. MARSHAL:  There's not going to be a

8  supervisor there when he gets back.

9          THE COURT:  I'm going to give you an order as

10 well just to help you.  I'll say I'm directing that he be

11 given these disks to utilize over the weekend, and the MDC

12 can inspect them if they wish prior to giving them to him.

13         MR. LARUSSO:  Sorry to interrupt an issue that

14 doesn't apply to me, but I had a problem like this in

15 another case and I contacted -- I can't remember his name

16 in the legal department, but he kind of helped me out and

17 they were very helpful in the legal department when these

18 kind of issues arise.  Sometimes dealing with employees

19 that have regulations and they don't want to do anything

20 outside their regulations.  Maybe a call to the legal

21 department may help.

22         THE COURT:  Does the government have a contact

23 in the MDC in the legal department?

24         MR. MISKIEWICZ:  Yes.  I don't remember who it

25 is that we spoke to when this issue came up, but I'll find

3563

1    out.

2            THE COURT:  Okay.

3            MR. HALEY:  They do not take my phone calls,

4    Judge.

5            MR. MISKIEWICZ:  Nor mine.

6            MR. LARUSSO:  Your Honor, I have two matters.

7            Yesterday, at the end of the day, I talked about

8    a witness the government is calling, a man by the name of

9    Stewart.

10           To sum it up, there's bad blood between my

11   client and him and I'm concerned that what I know may come

12   out is dislike, even to the point when they found out, I

13   believe his wife found out about the arrest and basically

14   said they destroyed our life.

15           I'm concerned that that kind of information is

16   not necessary because all he's testifying to is the fact

17   that there were bills and they were paid.

18           THE COURT:  If you want, I'll give an

19   instruction when he comes in outside the presence of the

20   jury to explain to him if you're worried that he might

21   blurt something like that out.

22           MR. LARUSSO:  Maybe we can find out what kind of

23   admission my client made to him.

24           THE COURT:  I thought the government did that

25   yesterday.  Let's do it again.

3564

1      MS. KOMATIREDDY:  First, we're not planning to

2  ask him about how he found out about the arrest or

3  actually any agreement he had for the 2007 racing team.

4      He's going to testify as to the 2006-2007 racing

5  season, what Mr. Constantine told him about where he was

6  getting money from during that season, and about his own

7  personal wealth, and during that season there were bills

8  to Mr. Stewart, there was difficulty being paid, and

9  Mr. Constantine made representations where he would be

10 getting money from.

11     It's relevant because during that time he was

12 siphoning money out of the Hawaii accounts with

13 Mr. Kenner's assistance and using it to pay Mr. Stewart

14 and his company, so that is the relevance.

15     THE COURT:  Okay.

16     MR. LARUSSO:  Obviously, the offer of proof is

17 what we talked about before.  That makes it relevant.

18     So the record clear, it wasn't just bad blood

19 arising from the arrest.  It goes back to that time

20 period.  That was my concern.

21     THE COURT:  Bad blood related to other things?

22     MR. LARUSSO:  Yes.

23     THE COURT:  I will just tell him I don't want

24 him to go into the other disputes that he had with

25 Mr. Constantine.  He's just testifying about payments that

3565

1   Mr. Constantine made to him and what he said about his

2   wealth and money issues.

3           MS. KOMATIREDDY:  Exactly, your Honor, his

4   profession.

5           Obviously, one of the questions is whether in

6   any fraud case how a defendant is making money.  And so

7   this is the person who was the manager of his race car

8   team.  The defense's theory is that the defendant was

9   making money through racing.

10          THE COURT:  I'll give him an instruction.  I

11  understand the relevance.  On cross you're going to try to

12  establish bias --

13          MR. LARUSSO:  I'm hoping there's no cross.  I'm

14  looking to limit it to avoid that problem.

15          THE COURT:  All right.

16          MR. LARUSSO:  Not to belabor the point, the

17  other witness is a man by the name of Blake Rosser.  I

18  believe he was related to Mr. Stewart in some way.  It's

19  the same argument and I assume that's the position we can

20  follow the same when he testifies.

21          THE COURT:  I'll give him the same instruction.

22          MR. LARUSSO:  Lastly, I have to apologize to the

23  Court.  Last night I was going over the e-mails to show

24  Mr. Murray.  In an effort to keep them down, to avoid any

25  unnecessary and prolong examination, and I was looking at

3566

1    one of the e-mails and I made some marks on it.  It was

2    the original one that was in evidence and I should not

3    have done it obviously.

4              THE COURT:  It's already in?

5              MR. LARUSSO:  Yes, and I highlighted two parts

6    in red which I shouldn't have done.  I wanted to let the

7    Court know the original has markings.

8              THE COURT:  Are you substituting a copy?

9              MR. LARUSSO:  I'll show it to the government.

10   If it's all right, I would like to use it.

11             MR. OLIVERAS:  I have a copy of that.

12             THE COURT:  Let's substitute a copy.  Does it

13   matter whether it's the original or not?

14             MR. LARUSSO:  For me, no, just as long as the

15   Court is aware that it was done by accident.

16             THE COURT:  Substitute in a copy.

17             MR. LARUSSO:  All right.

18             THE COURT:  Let's bring in the jury and

19   Mr. Murray.

20             THE CLERK:  All rise.

21             (The jury is present.)

22             THE COURT:  Please be seated.

23             Good morning, members of the jury.

24             ALL JURORS:  Good morning.

25             THE COURT:  I hope you're all doing well this

Murray  -  Cross/LaRusso

3567

1    morning.

2           We are continuing now with the trial.  And as

3    you know from yesterday when we ended, Mr. Murray was on

4    cross-examination by Mr. LaRusso.  So we will continue

5    from that point.

6           Mr. Murray, I remind you that you're still under

7    oath; do you understand?

8           THE WITNESS:  Yes.

9

10   GLEN MURRAY,

11          called as a witness, having been previously

12          duly sworn, was examined and testified further

13          as follows:

14

15   CROSS-EXAMINATION

16   BY MR. LARUSSO:

17   Q.   Good morning, Mr. Murray.

18          Yesterday you testified about the $1 million

19   judgment that you got against Mr. Jowdy.  Just a few

20   questions on that.

21          Did that suit and judgment stem from monies that

22   you lent to Mr. Jowdy for the purposes of investing in a

23   Palms condo unit?

24   A.   Correct.

25   Q.   Did there come a time later that you learned that the

3568

1   money that you had given to Mr. Jowdy had actually been

2   diverted to the Mexican project down in Cabo and a house

3   in Las Vegas?

4   A.   Part of it, yes.

5   Q.   I'm going to show you what's been received in

6   evidence as Defendant's Exhibit C 31.

7        And you'll be glad to know I won't read much of

8   this, just a small portion of it.

9        Can you see that?

10  A.   Yes.

11  Q.   It's an e-mail from Mr. Constantine to a number of

12  the people which I assume you recognize your own e-mail

13  address?

14  A.   Correct.

15  Q.   It's dated July 27, 2009?

16  A.   Yes.

17  Q.   You recognize some of those other e-mail addresses as

18  other hockey players and participants in the Global

19  Settlement Fund?

20  A.   Correct.

21  Q.   Would you agree with me that this was an e-mail you

22  may have received from Mr. Constantine during this period

23  where he's giving you or providing you updates on the

24  Global Settlement Fund?

25  A.   Correct.

Murray - Cross/LaRusso

3569

1    Q.    Again, I'm just going to go to one portion and it

2    starts with as I said some -- by the way, you testified

3    that you read them, you may not remember what was in them;

4    is that correct?

5    A.    That's correct.

6              THE COURT:  Mr. Murray, I think you hit the

7    microphone button and turned it off.

8              THE WITNESS: Sorry.

9    Q.    The second paragraph down starts:

10              As I said, some of you invested and were

11   involved in this entity and some of you were not.

12              Again, by entity, it's obviously the AZ Falcon

13   Partners which you have no recollection of; is that

14   correct?

15   A.    Correct.

16   Q.    Therefore, this solution may not mean much to some of

17   you, but to those of you who were involved, it is

18   obviously very important and a great victory for our team.

19              In any case, as we discussed, all of us who

20   invested in the Global Settlement Fund are all banding

21   together and solving everyone's related investment issues

22   collectively and, therefore, everyone will be a

23   beneficiary of the various solutions that we accomplish

24   regardless of whether or not one was originally involved

25   in that particular investment.

3570

1    Do you recall having an e-mail communication

2    discussing the fact that you're part of a larger group

3    banding together to solve the issues of all parties?

4    A.    Yeah, that's the Global Settlement Fund.

5    Q.    As a matter of fact, that's what you testified to

6    yesterday, that there was a collective effort to solve

7    everyone's problems; is that correct?

8    A.    Yes.

9    Q.    Even though you may not have been involved in an

10   airplane or a hangar, it was still a collective effort?

11   A.    Correct.

12   Q.    In regards to the Global Settlement Fund, I believe

13   you testified that you were aware that conferences were

14   being arranged to discuss issues related to the Global

15   Settlement Fund.

16        Do you also remember any discussions regarding

17   the media publicity that was being written regarding

18   Mr. Jowdy and his activities and anything dealing with the

19   possible offer by Mr. Jowdy to pay back the hockey players

20   that was publicly made; do you recall that?

21   A.    I don't recall that at the time, no.

22   Q.    Let me show you what's been marked for identification

23   as C 214 and I'll take it out of the sleeve because you

24   may want to take a look at the other page.

25        Do you recognize that as an e-mail communication

Murray  -  Cross/LaRusso

3571

1  between you and Mr. Constantine in regards to a newspaper

2  article where Mr. Jowdy was offering to pay back the

3  monies to the hockey players, which would have included

4  yours as well?

5  A.   Are you asking me -- what was the question?  I was

6  reading it.

7  Q.   I apologize.

8        Do you recognize this e-mail as a communication

9  between you and Mr. Constantine regarding the subject that

10 I discussed?

11 A.   Yes.  That's my e-mail address, yes.

12 Q.   So you know it's an e-mail you had with

13 Mr. Constantine, but would it be fair to say -- two

14 questions -- you read it, but you have no recollection of

15 it at this point?

16 A.   Not at this point, but that's my address so I must

17 have.

18 Q.   Does the content refresh your recollection as to the

19 subject matter?

20 A.   About Ken Jowdy, yes.

21 Q.   It does.  Okay.

22        So this refreshes your recollection to the

23 extent that Mr. Jowdy publicly offered monies back to the

24 hockey players at some point; is that correct?

25 A.   I can't remember him offering money.  If he offered

Murray  -  Cross/LaRusso

3572

1    money, I would have taken it.

2    Q.    But you do remember --

3               MR. LARUSSO:  May I ask this be received in

4    evidence, your Honor, C 214?

5               MR. MISKIEWICZ:  We would ask the same limiting

6    instruction be given regarding the Tommy Constantine

7    portion of the exhibit.

8               THE COURT:  Okay.

9               Any objection, Mr. Haley?

10              MR. HALEY:  No, sir.

11              THE COURT:  C 214 is admitted.

12              With respect to Mr. Constantine's statement,

13   it's an e-mail, it's not admitted for the truth, they're

14   admitted for Mr. Constantine's state of mind at the time.

15              (Defense Exhibits C 214 in evidence.)

16   BY MR. LARUSSO:

17   Q.    Are you able to see that, Mr. Murray?

18   A.    Yes.

19   Q.    This is the e-mail we were talking about, June 21st,

20   2009.  It's actually at the top a response by you to

21   Mr. Constantine.  You're responding to obviously the

22   chain.

23              But the one portion I'll highlight is

24   Mr. Constantine is saying to all, Danica Wooley asked this

25   question regarding Jowdy's response in the New York Daily

Murray  -  Cross/LaRusso

3573

1    News today and that's in regards to the offer to settle.

2            Do you know who Danica Wooley is?

3    A.   I know her husband.  I don't know her.

4    Q.   Who is her husband?

5    A.   Jason Wooley.

6    Q.   Is he a professional hockey player?

7    A.   Yes.

8    Q.   Were you teammates?

9    A.   Teammates at one point, yes.

10   Q.   Were you aware that Danica Wooley was an attorney?

11   A.   No.

12   Q.   The response which is contained in here regarding the

13   newspaper article, this is your response:

14           Tommy, that's why he said just tell them to call

15   me and I'll give them their money back.

16           He wants are, A R E, group to start fighting

17   with each other and try to get us to separate.

18           Fuck him.  We are a team -- and I apologize for

19   the record, but it's what's there -- and we have to stick

20   together.

21           Just my thoughts.

22           Glen.

23           Mr. Murray, at this point in time, you were part

24   of this Global Settlement Fund?

25   A.   Correct.

Murray - Cross/LaRusso

3574

1    Q.    And it was important to you to express the thought

2    that you were together as a team going after Mr. Jowdy and

3    that's what you're telling Mr. Constantine at this point

4    in part?

5    A.    Correct.

6    Q.    You remember that aspect of it, correct?

7    A.    Staying together as a team, yes.

8    Q.    Did you ever hear of a man by the name of

9    Mr. Sonenglick?

10   A.    No.

11   Q.    Do you recall, at any point during the time that the

12   Global Settlement Fund was being discussed, whether or not

13   any offer had been made to try and recover the monies from

14   Mr. Jowdy so that the hockey players could receive some of

15   their investments back?

16   A.    I don't recall, no.

17   Q.    Again, this will take a few moments.

18         This is in evidence as C 24.  It's an e-mail

19   dated November 9, 2009, from Mr. Constantine again to the

20   members of the Global Settlement Fund and you're the first

21   e-mail address up there, Mr. Murray?

22   A.    Correct.

23   Q.    Fair to say you would have received this, read it,

24   but you don't remember the content; would that be fair?

25   A.    Correct.

Murray  -  Cross/LaRusso

3575

1   Q.   I'm just going to ask you to look at the one

2   paragraph that's highlighted and I'll read it while you're

3   looking at it and see if it refreshes your recollection

4   that there was a substantive offer made by Mr. Sonenglick

5   to the tune of about $15 million.

6            I am happy to report that we have executed the

7   memorandum of understanding, in brackets see attached doc,

8   with the buyer that I have been working with for almost a

9   year.

10           Specifically, he/we have executed an agreement

11  for him to purchase the Cabo loan from the bank, invest

12  further in and fully develop the Cabo project, as well as

13  provide the 15 million, in brackets and quotes, cashout,

14  end quote, of the deal for our settlement costs.

15           MR. MISKIEWICZ:  Objection to form.

16           My understanding is the limiting instruction

17  goes to state of mind, not the truth.

18           The question is, does this refresh your

19  recollection that there was a settlement agreement

20  offered.

21           THE COURT:  Sustained as to the form.

22  BY MR. LARUSSO:

23  Q.   Mr. Murray, after looking at this, do you have any

24  recollection of the conversation regarding a settlement

25  offer to you as a member or actually a settlement offer

Murray  -  Cross/LaRusso

3576

1    made to all the hockey players?

2    A.    There was no actual conversations, just an e-mail.

3    That's it.  That's what I remember.

4    Q.    Now, you told us that you knew a man by the name of

5    Ron Richards, correct?

6    A.    Correct.

7    Q.    He was the lawyer that was hired to bring the suit

8    against Mr. Jowdy?

9    A.    Correct.

10   Q.    And would it be fair to say that you were or were you

11   aware that you were a plaintiff in that case?

12   A.    Correct.

13   Q.    Do you remember if -- withdraw that.

14        Do you recall the result of that suit, what

15   happened?

16   A.    With Ken Jowdy?

17   Q.    Yes?

18   A.    Yes.

19   Q.    What happened?

20   A.    I won.

21   Q.    You won your suit?

22   A.    Against Ken Jowdy.

23   Q.    You talked about that the other day.  That's the suit

24   you brought individually against Mr. Jowdy.

25        Do you remember any suit being brought against

Murray  -  Cross/LaRusso

3577

1   Mr. Jowdy by you and the other hockey players who were

2   members of the Global Settlement Fund?

3   A.   I'm not quite sure, but maybe.  I don't know.

4   Q.   Again, just for identification purposes, I'm going to

5   show you three exhibits to try and move it along; C 104, C

6   104 A and 104 B.

7            And just look at the caption of these and I ask

8   you if that refreshes your recollection that there was

9   another suit that you were party to that was brought

10  against Mr. Jowdy.

11           (Pause in proceedings.)

12  A.   Yeah, I guess you're right.  Yes, there was lawsuits

13  going on.  But, yes, there's my name.

14  Q.   Just to be fair, when you say it's your name, do you

15  have a recollection of being collectively involved with

16  the other hockey players in a suit against Mr. Jowdy?

17  A.   Correct.

18  Q.   Do you have any recollection of what happened to the

19  suit that you were party to with the other hockey players?

20  A.   No, I don't.

21  Q.   Let me show you what's been marked for

22  identification.

23           And if I seem to be rushing, I hope that you

24  understand, and just answer the question and if it needs

25  to be rephrased, I will do so.

Murray - Cross/LaRusso

3578

1    I show you C 203 and ask if you received this

2  document in reference to these other exhibits.

3    Do you recall receiving that letter from Mr. Ron

4  Richards in regards to the suit you brought with the other

5  hockey players against Mr. Jowdy?

6  A.   I don't recall seeing it, no.

7  Q.   Okay.

8    Do you have any recollection -- just read this

9  to yourself, this part down here, and the one question I

10  will ask is does it refresh your recollection at all as to

11  whether or not you received any information regarding the

12  reason for the dismissal of the suit?

13    (Pause in proceedings.)

14  A.   I can't recall.

15  Q.   Okay.

16    Do you recall any discussion about the phrase

17  dismissal without prejudice?  Have you ever heard that in

18  reference to that lawsuit?

19  A.   I heard it but, no, I don't know exactly what it

20  means.

21  Q.   Fair to say at some point you would have learned, but

22  at this point you don't recall?

23  A.   Exactly, yes.

24  Q.   Just a few more areas if I may, Mr. Murray.

25    You testified, I believe yesterday, that you did

3579

1   not recall or remember a name Stolper, Michael Stolper, am

2   I accurate in that?

3   A.   Correct.

4   Q.   I'm going to show you what's been marked for

5   identification as C 37.

6        I'm going to turn to a separate page marked C 37

7   1.  Take a look at that.

8        You're shaking your head.  Do you have some

9   recollection now of receiving a correspondence from

10  Michael Stolper?

11  A.   I mean, I'm sure I did, yes.  My name is there.

12  Q.   Let me jump ahead a little bit.

13       The page immediately after C 37 marked 1, do you

14  recognize your signature on that page?

15  A.   Yes.

16  Q.   And having looked at the exhibit 37 1, and your

17  signature on the following page, does it refresh your

18  recollection that you were part of a group called AZ

19  Eufora Partners or AZ Eufora Members?

20  A.   Correct.

21  Q.   What was AZ Eufora, did you know what that stood for?

22  A.   Not really, but it looks like Arizona Eufora members.

23  Q.   Listed under that are all of the hockey players,

24  including yourself; is that correct?

25  A.   Correct.

Murray  -  Cross/LaRusso

3580

1  Q.    Were you aware that your interest in Eufora was being

2  held in a company called AZ Eufora?

3  A.    I can't recall that, but I knew it was some form of

4  Eufora.

5  Q.    Do you have a recollection, now that you have

6  examined some of these, having received a letter from

7  Michael Stolper regarding you and other hockey players

8  retaining him to bring a suit against Tommy Constantine?

9  A.    Now I remember.  There was lots of stuff I was

10  receiving and I didn't read sometimes.

11  Q.    But now you remember there was a collective effort

12  through an attorney by the name of Michael Stolper to go

13  after Mr. Constantine in regards to Eufora; is that fair?

14  A.    I guess so.  Yes, that's fair.

15  Q.    You have some recollection, but you don't have the

16  details because you didn't read the entire letter; is that

17  what you're telling us?

18  A.    Correct.

19  Q.    I'm going to direct your attention to this one

20  highlighted portion.  This is on page 4 of 5.  Would you

21  read that.

22         While you're reading that -- let me let you

23  finish that before I ask you a question.

24         (Pause in proceedings.)

25         Have you had a chance to read that?

Murray - Cross/LaRusso

3581

1    A.    Yes.

2    Q.    I think you testified yesterday you heard the name

3    Tim Gaarn, correct?

4    A.    Correct.

5    Q.    Did you hear the name C.R. Gentry?

6    A.    No.

7    Q.    In what context do you remember hearing the name Tim

8    Gaarn?

9    A.    I didn't remember until recently.

10   Q.    What do you remember about Mr. Gaarn?

11   A.    From this year?  From that year?

12   Q.    No, just from your recollection.

13   A.    Just he was a member of Eufora and worked through

14   Eufora.

15   Q.    Was he the managing member of AZ Eufora Partners, did

16   you know that?

17   A.    I did not know that, no.

18   Q.    In regards to this time frame, were you aware that

19   Mr. Gentry and Mr. Gaarn had been accused of wrongdoing?

20   A.    Was I aware?

21   Q.    Were you aware of it, just you?

22   A.    No.

23   Q.    Do you recall any discussions Michael Stolper or any

24   of the other hockey players regarding the fact that

25   Mr. Gaarn and a man by the name of C.R. Gentry had been

Murray  -  Cross/LaRusso

3582

1   removed by Mr. Constantine from the board of directors at

2   Eufora?

3   A.   No, I don't recall that.

4   Q.   That paragraph that you read doesn't refresh your

5   recollection?

6   A.   No.  It's page 4 of 5.  I didn't read all this stuff.

7   Q.   That's fine.  You don't remember and it doesn't

8   refresh your recollection.  I appreciate that.  Thank you.

9        Do you have any recollection of the group that

10  Mr. Stolper was representing, including yourself, that

11  they were looking to buy a loan that Eufora had?

12  A.   No.

13  Q.   Could you tell us what your understanding of your

14  participation in this representation was, what do you

15  remember?

16  A.   Nothing.

17       I just remember being a member of Eufora, but

18  didn't really pay attention enough to the things that were

19  going on.

20  Q.   Do you have any recollection, and this is outside of

21  the monies that you talked about, do you recall ever

22  giving substantial sums of money to Mr. Stolper as a fund

23  to buy the loan from Eufora?

24  A.   I don't recall, no.

25  Q.   It's possible?

Murray  -  Cross/LaRusso

3583

1   A.    Anything is possible, but I'm not sure.

2   Q.    Lastly, in terms of subject matter, do you remember,

3   around August of 2010, being notified that a shareholders

4   meeting of Eufora members was going to be held by

5   Mr. Constantine?

6   A.    I don't remember, but I'm sure you have an e-mail

7   that's going to refresh my memory.

8   Q.    I do.  This is C 215 for identification.

9           Do you recall receiving an e-mail around early

10  part of August 2010 from Mr. Constantine to you and the

11  other hockey players announcing the shareholders meeting

12  that was going to take place?

13  A.    I don't recall the e-mail, but it's there so I

14  received it.

15  Q.    You don't question the fact that you received the

16  e-mail, you just don't recall the contents of it at this

17  point in time that you're testifying?

18  A.    Correct.

19          MR. LARUSSO:  Your Honor, I would ask that C 215

20  be received and I'm not going to read it at this point.  I

21  want one or two more questions if I may.

22          MR. MISKIEWICZ:  With the same limiting

23  instruction, we have no objection.

24          MR. HALEY:  No objection.

25          THE COURT:  215 is admitted again with the same

Murray  -  Cross/LaRusso

3584

1   limiting instruction.  The statements in that e-mail by

2   Mr. Constantine are not for the truth, but his state of

3   mind.

4            (Defense Exhibit C 215 in evidence.)

5            MR. LARUSSO:  I apologize, judge, there is

6   something I would like to read if I may.

7   BY MR. LARUSSO:

8   Q.   Mr. Murray, Eufora, LLC, an Arizona limited liability

9   company, in brackets the company, is having a critical

10  meeting of all members at 10 a.m. Arizona time on

11  Wednesday, August 18, 2010, at the offices of the company,

12  and then gives an address in Arizona.

13            It talks about the attached memo notice to all

14  members, do you see that?

15  A.   It's a little blur, but I see it.

16  Q.   The point is, do you remember meeting or attending

17  this shareholders meeting in August of 2010?

18  A.   No, I don't remember.

19            MR. LARUSSO:  Mr. Murray, thank you very much.

20            THE COURT:  Redirect.

21            MR. MISKIEWICZ:  Yes.

22

23  REDIRECT EXAMINATION

24  BY MR. MISKIEWICZ:

25  Q.   Good morning, Mr. Murray.

Murray  -  Redirect/Miskiewicz

3585

1    A.    Good morning.

2    Q.    Mr. Murray, let's start with some questions you

3    received yesterday from Mr. Haley about your line of

4    credit.

5          First of all, when do you recall when you

6    learned -- withdrawn.

7          When did you learn or did you ever learn

8    firsthand that you received money or some amounts of money

9    back from your $100,000 investment in Hawaii?

10   A.    I don't remember.  I can't recall.

11   Q.    You were asked by Mr. Haley a question, and this is

12   at page 3515:

13         Well, if I were to suggest to you as relates to

14   the $100,000 that you invested, you did get a return of --

15   you did receive a return of -- you did receive a return of

16   $5,000, you did receive a return in 2006 of $42,553 with

17   reference to that $100,000 you had.

18         Answer: I might have. Now, it's sounding -- yes,

19   I might have.  I can't remember, but I might have, yes.

20         My question to you is I might have, where is

21   that document that shows you got any money back?

22   A.    I don't have one.

23   Q.    Do you know for a fact whether or not you got any

24   money back, meaning in a net fashion?  I don't mean you

25   got a check and there was other withdrawals.  I mean in a

3586

1    net fashion, did you ever get a $42,000 return on your

2    investment from Hawaii?

3    A.   I don't know how I got it, but I did get a check of

4    some sort for 40,000.

5    Q.   Do you know who that was from?

6    A.   At the time, no, I can't remember exactly.  It was 10

7    years ago.

8    Q.   You had many different investments with Mr. Kenner at

9    the time?

10   A.   Yes.

11   Q.   So are you able to say whether or not that $42,000

12   check that you got had anything to do with Hawaii versus

13   any other investment?

14   A.   It could have been any one of them, yes.

15   Q.   You were also asked again and this is on 3515 from

16   Mr. Haley.

17            And, sir, do you also have a recollection that

18   an additional $385,481.75 was also paid out to you in

19   August of 2006 with reference to the replenishment of a

20   portion of your line of credit?

21            Do you remember getting that check?

22            Answer:  Do I remember getting a check for

23   300,000?

24            Question:  Yes, sir.  Actually, to be specific,

25   and he repeats the number and you said that sounds

3587

1    familiar.

2              Do you recall getting a check for that amount as

3    you sit here, do you have an independent recollection?

4    A.    I mean, it's crazy that I don't recall 100 percent,

5    but I'm sure that I did get a check.  I don't know if

6    there's proof of it, but I think I did.

7    Q.    Let me show you what's in evidence as Government's

8    2137.

9              This is a loan transaction history for your line

10   of credit, and we will go to page 2 for the period August

11   of '06, specifically August 25, 2006, do you see where it

12   says special payment?

13   A.    Correct.

14   Q.    It's a special payment in the same amount that

15   Mr. Haley asked you about yesterday, isn't it?

16   A.    Yes.

17   Q.    That went to, according to this document, it went to

18   your line of credit, right?

19   A.    Yes.

20   Q.    As Mr. Haley asked you, it went to replenish, that is

21   reduce the balance of your line of credit?

22   A.    Yes.

23   Q.    My question to you is, first of all, even after that

24   $385,000 was paid, you had a line of credit outstanding,

25   meaning you had already borrowed, according to the bank

3588

1    after that special payment, $844,518.25, meaning you owed

2    the bank that amount of money, did you know that at the

3    time?

4    A.    No.

5    Q.    Did Mr. Kenner tell you that?

6    A.    Not that I recall.

7    Q.    And just before that $385,000 replenishment was paid,

8    do you see what the balance had been?  That would be the

9    number all the way to the upper right.

10   A.    Yes, I see it.

11   Q.    What's the balance?

12   A.    1.23 million.

13   Q.    One million two --

14   A.    1,230,000.

15   Q.    And you got that special payment and it was reduced

16   to 844, right?

17   A.    Correct.

18   Q.    Let me show you the next page.

19           After that special payment is made, 11/30/2007,

20   now what's your balance?

21   A.    The top one, 1.037.

22   Q.    Million?

23   A.    Correct.

24   Q.    That reduction, that replenishment, that ended up

25   going back up, didn't it?

Murray  -  Redirect/Miskiewicz

3589

1   A.   Correct.

2   Q.   So it wasn't a permanent reduction, was it?

3   A.   No.

4   Q.   In fact, so we are absolutely certain of this --

5        MR. HALEY:  Judge, I object.  Is that a

6   question, so we're absolutely certain?  I object.

7        THE COURT:  Sustained.  Just ask the questions.

8        MR. HALEY:  Thank you.

9   BY MR. MISKIEWICZ:

10  Q.   The last series of entries here are in 2009 and what

11  is the balance just before the loan payoff?

12  A.   1.2 million.

13  Q.   My question is, are you sure now that you got

14  replenished or a check or do you know?

15  A.   Well, no, I didn't get a check.

16  Q.   All right.

17       You were also asked a series of questions by

18  Mr. LaRusso about an exhibit marked C 214, and it's an

19  e-mail this has to do with Ken Jowdy lawsuit or I guess

20  press reports about the Ken Jowdy lawsuit.

21       One of the things that you were responding to in

22  this e-mail was a comment from Mr. Constantine.

23       And is it your understanding that

24  Mr. Constantine is writing to you, or is he writing or was

25  he writing to somebody else by the name of Danica?

Murray - Redirect/Miskiewicz

3590

1    A.    It seems like he's writing to someone else.

2    Q.    Okay.

3          At the bottom there it says then, of course,

4    there's the insane misappropriation of funds that he, and

5    you will agree he is Ken Jowdy, right?

6    A.    Correct.

7    Q.    That he has to answer for.

8          Now, other than what Mr. Constantine said in

9    this e-mail, what misappropriation of funds have you seen

10   evidence of?  You, yourself?

11   A.    I don't know.

12   Q.    So other than what Mr. Constantine may have been

13   writing to the Daily News or whatever here; do you, for a

14   fact, know there was in fact a misappropriation of funds

15   by Mr. Jowdy?

16   A.    No.

17         I didn't know exactly what he had done, no.

18   Q.    Now, you did at some point make a loan to Mr. Jowdy

19   of $800,000, right?

20   A.    Correct.

21   Q.    And who arranged that loan?

22   A.    Mr. Kenner.

23   Q.    And was that part of or separate from any amounts of

24   money you put into the Hawaii land deal?

25   A.    Separate.

Murray - Redirect/Miskiewicz

3591

1   Q.   And was it part of or separate from this line of

2   credit that you were asked about yesterday?

3   A.   Separate.

4   Q.   That line of credit you had was related to what

5   venture, what investment?

6   A.   The Hawaii.

7   Q.   Did you, when Mr. Kenner arranged that $800,000 loan

8   to Mr. Jowdy, do you remember you were asked some

9   questions about what the interest rate was do.

10          You recall what the interest rate was that you

11  were told by Mr. Kenner?

12  A.   I was told that I would get the money back in 60 to

13  90 days.

14  Q.   And do you remember what the interest rate was

15  supposed to be in the 60 or 90 days?

16  A.   Not offhand, but 10 percent maybe.

17  Q.   All right.  So maybe.  You're not sure?

18  A.   I'm not exactly sure.

19  Q.   Let me show you what's been marked for identification

20  as Government's 3500 GM-1.

21          I'll ask you to silently look at what I'm

22  pointing to, and see if that refreshes your recollection

23  of what that interest rate was that Mr. Kenner told you

24  you would be getting?

25  A.   Yes, it does.

Murray - Redirect/Miskiewicz

3592

1   Q.   All right.

2        So what was the interest rate that Mr. Kenner

3   told you you would be getting from Mr. Jowdy for lending

4   him $800,000?

5   A.   10 percent.

6   Q.   And you never got the money back?

7   A.   No.

8   Q.   And then you sued him?

9   A.   Correct.

10  Q.   Jowdy that is?

11  A.   Correct.

12  Q.   What discussions, if any, did you have with Mr. Jowdy

13  about that loan?

14  A.   None.

15  Q.   You never talked to him personally about a loan and

16  the terms of the loan?

17  A.   No.

18  Q.   Where did you get that information about 60 to 90

19  days and 10 percent?

20  A.   Mr. Kenner.

21  Q.   Do you know -- who did you give the money to, who did

22  you actually wire the money to?

23  A.   I can't remember exactly where it was wired, but I

24  got wire instructions from Phil.

25  Q.   You didn't get wiring instructions from Jowdy?

Murray  -  Redirect/Miskiewicz

3593

1   A.   No.

2   Q.   So I know you won the lawsuit.  It was a civil

3   lawsuit, right?

4   A.   Correct.

5   Q.   And you haven't gotten paid on it, right, not one

6   dime.

7        But as you sit here today, do you know what

8   Mr. Kenner did with the money loaned to Jowdy in Mexico?

9        MR. HALEY:  I object, judge.

10       There's been no evidence of that question just

11  asked of this witness.  I would object.  It's making

12  assumptions of a matters not in evidence, judge.  That's

13  the basis of my objection.

14       THE COURT:  He's asking if he knows what

15  happened to the money.

16       MR. MISKIEWICZ:  Yes.

17       THE COURT:  That's okay.  There's no assumptions

18  in that question.

19       Do you know what happened to that money?

20       MR. HALEY:  I apologize.  If that's all he

21  asked, do you know what happened to that money, I have no

22  objection.  I thought I heard something different.

23       THE COURT:  Maybe you did, but I'm changing the

24  question.

25       MR. HALEY:  I have no objection to your Honor's

Murray  -  Redirect/Miskiewicz

3594

1    question.

2            THE COURT:  Do you know what happened to that

3    money after you wired it?

4            THE WITNESS:  That was to go to pay for the

5    Palms condominiums.

6    BY MR. MISKIEWICZ:

7    Q.   My question is, do you know where the money went?

8    A.   No, not exactly.  To pay for the Palms, but I didn't

9    know where it was going exactly.  I can't remember.

10   Q.   After you got wire instructions from Mr. Kenner, my

11   question is, do you know what happened to the money after

12   that?

13   A.   No.

14   Q.   And you never dealt with Mr. Kenner other than the

15   time you sued him -- I'm sorry.

16           You never dealt with Mr. Jowdy other than the

17   lawsuit?

18   A.   Correct.

19   Q.   And you sued him and you won a million dollar

20   judgment, right?

21   A.   Correct.

22   Q.   Now, who was your lawyer when you sued Mr. Jowdy for

23   that million dollar arising out of that Palms condo

24   lawsuit?

25   A.   Ron Richards.

Murray  -  Redirect/Miskiewicz

3595

1   Q.   And do you remember, you were asked a little while

2   ago about how you participated in the Global Settlement

3   Fund and you received, among other things, C 214.

4           Mr. LaRusso said, you understood that you were

5   part of a collective effort to help everybody thanks to

6   Mr. Kenner and Constantine's efforts through the Global

7   Settlement Fund, right?

8   A.   Correct.

9   Q.   That was one of the ways you said fuck him, we're a

10  team and we have to stick together, right?

11  A.   Correct.

12  Q.   You were a team in the Global Settlement Fund?

13  A.   Correct.

14  Q.   Who paid Mr. Ron Richards when you won your lawsuit

15  against Jowdy?  Did it come out of the Global Settlement

16  Fund?

17  A.   No.

18  Q.   Who paid?

19  A.   I did.

20  Q.   How much?

21  A.   Over 100,000.

22  Q.   180,000?

23  A.   Pardon me?

24  Q.   Could it have been 180,000?

25  A.   It could have been.

Murray  -  Redirect/Miskiewicz

3596

1   Q.    Let me show you 3500 GM-1 again and see if it

2   refreshes your recollection as to how much you paid

3   Mr. Ron Richards to win your lawsuit against Ken Jowdy for

4   the loan for the Palms.

5   A.    Yeah, 140.

6   Q.    Out of your pocket?

7   A.    Correct.

8   Q.    Did you ever ask Mr. Richards, at or about that time,

9   hey, what about that Global Settlement Fund that I'm a

10  team member in, how come that's not coming out of the

11  Global Settlement Fund?  Did you ever ask him anything

12  like that?

13  A.    No.

14  Q.    You didn't?

15  A.    Did I ask him?

16  Q.    Did you ask him?

17  A.    After the case, yeah, I think I actually asked him

18  after the case was done, yes.

19  Q.    What did he tell you about what was left in the

20  Global Settlement Fund?

21  A.    Zero.

22  Q.    Finally, you were asked -- two more things.

23         In or about February of 2010, you were asked --

24  you were shown C 203, a letter from Ron Richards about the

25  lawsuit, not about the Palms unit, but the Global

Murray  -  Redirect/Miskiewicz

3597

1    Settlement Fund lawsuit.  Mr. LaRusso showed you a letter.

2    Do you remember seeing that letter just now?

3    A.   I remember seeing the lawsuit letters.

4    Q.   My question to you is this, very quickly.

5            Back in February 2009, were you playing hockey

6    at the time?

7    A.   Correct.

8    Q.   Were you part of the Olympics?

9    A.   No.

10   Q.   So if you had to be -- if you had to be called to

11   testify somewhere or give a deposition, there's nothing

12   from preventing you from showing up in California where

13   you live, right?

14   A.   Correct.

15           In February you're asking?

16   Q.   February 2010.

17   A.   2010?

18           No, there wouldn't have been.

19   Q.   I said 2009.

20   A.   2010 I was not playing.

21   Q.   Okay.  Obviously you weren't playing in the Olympics

22   either?

23   A.   No.

24   Q.   Was there anything preventing you from showing up to

25   a deposition in California?

Murray  -  Redirect/Miskiewicz

3598

1   A.   No.

2   Q.   To pursue a suit against Ken Jowdy?

3   A.   No.

4   Q.   We had a laugh on you, Mr. Murray, because of the

5   many, many, e-mails you were shown.  I apologize for that.

6          I'm going to show you something.  2178, this

7   also came in I believe as Kenner 101 yesterday.  It's in

8   evidence by stipulation.

9          I believe your testimony was you did not have a

10  good recollection of getting statements from Northern

11  Trust or, for that matter, many other things, correct?

12  A.   Correct.

13  Q.   Here's my question.

14         Do you see what it says at the bottom of the

15  exhibit that Mr. Haley showed you?  And it's also in as

16  Government 2178, about your closing balance under Northern

17  Trust line of credit, do you see that?

18  A.   Yes, I see it.

19  Q.   What does it say?

20  A.   The balance.

21  Q.   What is the balance?

22  A.   Zero.

23  Q.   Zero.  It was 1.4 million, $1,468,078.02.

24         Now it's zero, right?

25  A.   Right.

Murray - Redirect/Miskiewicz

3599

1   Q.   Did they send you an e-mail about that?

2   A.   No.

3        Not that I recall, no.

4   Q.   Did anybody tell you you've been wiped out?

5   A.   No.

6   Q.   Do you think it's funny?

7        MR. HALEY:  Judge, I object.

8        THE COURT:  Sustained.

9   BY MR. MISKIEWICZ:

10  Q.   Do you think it would have been funny --

11       MR. HALEY:  Objection.

12  BY MR. MISKIEWICZ:

13  Q.   -- had you known that at the time?

14       MR. HALEY:  Objection.

15       THE COURT:  Sustained.

16  BY MR. MISKIEWICZ:

17  Q.   You saw a great many e-mails.

18       Did you get anything from Mr. Constantine

19  telling you you've been wiped out?

20  A.   No.

21       MR. MISKIEWICZ:  I have no further questions.

22       THE COURT:  Mr. Haley.

23       MR. HALEY:  Yes, sir.

24       (Continued on next page.)

25

Murray - recross/Haley

3600

1      MR. HALEY:  May I see the loan transaction

2   history that the government has been using selectively?

3   RECROSS-EXAMINATION

4   BY MR. HALEY:

5   Q    Mr. Murray.  Good morning, sir.

6   A    Morning.

7   Q    Kindly take a look at a document marked Kenner

8   Exhibit 103.  You can look at the whole document.  To save

9   time, go to the last page of this document.  Do you see a

10  signature on that document?

11  A    Yes.

12      MR. HALEY:  Your Honor, I offer that as Kenner

13  Exhibit 103.

14      MR. MISKIEWICZ:  No objection.

15      THE COURT:  Mr. LaRusso, any objection?

16      MR. LaRUSSO:  On this, no.  Sorry, your Honor.

17      THE COURT:  C-103 admitted.

18      (Kenner Exhibit C-103 received in evidence.)

19  Q    With that in hand, sir, the first page of the

20  document has the name Glen Murray.  That name is familiar

21  to you, is it not, Glen Murray?

22  A    Yes.

23  Q    It's your name, correct, sir?  As relates to that

24  particular document, it has obligor number up top, 279590,

25  do you see that?

3601

1    A    Yes.

2    Q    It has an amount reflected on that document as to the

3    master note of the loan, is that almost $1,230,000?

4    A    Yes.

5    Q    It's dated October 29, 2005, is it not?

6    A    No.

7    Q    It's not dated as of October --

8    A    This is '04.

9    Q    I apologize.

10   A    My screen is not working here.  I thought you asked

11   me to look at this one.

12   Q    I am.  That is my mistake, sir.  It's dated as of

13   October 29, 2004.  Let me use this one.

14            Can you see it on your screen, sir?

15   A    Now I can, yes.

16   Q    And in or about that time, did you live at 30 Warwick

17   Circle, Andover, Massachusetts, 01810?

18   A    Yes.

19   Q    Is it your testimony today, sir, under oath, that at

20   no time prior to today did you ever see that document that

21   bears your signature?  That's not your testimony, is it?

22   A    No, I mean, I must have seen this document, it has my

23   name on it.

24   Q    In the government's direct examination of you, as

25   well as the redirect examination of you, we can agree that

Murray - recross/Haley

3602

1    you were not shown that document by the government.  We

2    can agree with that, that true?

3    A    This specific document?

4    Q    Yes.

5    A    Was I shown?  No.

6    Q    Were you interviewed by the government prior to your

7    testimony here today?

8    A    What do you consider interviewed?

9    Q    I will redefine.

10            Prior to your testimony here today, there was a

11   point in time, sir, that one or more of the prosecutors in

12   the presence, let's say, of the investigating agents asked

13   you questions before you testified today.

14   A    Yes.

15   Q    And where did that meeting take place, if you recall?

16   A    No meeting.  Phone calls.

17   Q    Well, was there ever, before you testified today, a

18   time where you met privately with any of the prosecutors

19   in this case, not by way of phone?

20   A    Face to face?

21   Q    Face to face.

22   A    No.

23   Q    Before you walked into this courtroom and took this

24   witness stand, did they introduce themselves in any

25   respect?

3603

1    A    Yes.

2    Q    At that point in time before you took the witness

3    stand, when they introduced themselves, did they say:

4    Before you testify we would like you to review various

5    documents in our possession with reference to your loan

6    with Northern Trust?  Was anything like that said?

7    A    No.

8    Q    We can agree, sir, can we not, that at least as far

9    as that document is concerned, you, back in 2004 -- and I

10   don't mean to be cute, sir -- had the mental acuity to

11   understand that number, $1,230,000, correct?

12   A    Did I understand it?  Of course, if I saw it, yes, I

13   would.

14   Q    Sir, I'm going to ask you to take a look at a

15   document already in evidence.

16        MR. HALEY:  Your Honor, I cannot at this point

17   recite by memory the government exhibit number.  But it is

18   the closing statement -- excuse me, it is the -- I

19   appreciate the government's assistance in this respect.

20        By agreement, your Honor, this document is

21   already in evidence.

22   Q    I ask you to look at every part of the document.

23   This document, sir, is conferring a period of time from

24   8/09/06 through 8/31/06.  Do you see that?

25   A    Yes.

Murray - recross/Haley

3604

1    THE COURT:  So the record is clear, we don't

2  have the government exhibit number, it's a Northern Trust

3  bank statement.

4    MR. HALEY:  Thank you, Judge.  I apologize for

5  the oversight.

6    THE COURT:  It's okay.

7  Q    Now, with reference to this document in evidence,

8  sir, we can agree, can we not, that on page 2 of the

9  document, it shows a number of wire transfers coming out

10  of that account to Charles Schwab in the amount of

11  $42,553, do you see that?

12  A    Yes.

13  Q    And on the third page of that document, we see again

14  more wire transfers going out to Charles Schwab and

15  company in the amount of 4,533?

16    THE COURT:  42.

17  Q    $42,553.  Do you see that, sir?

18  A    Correct.

19  Q    You maintained your account at Charles Schwab, as you

20  testified to, with reference to your investments with Phil

21  Kenner, correct?

22  A    Correct.

23    MR. HALEY:  Your Honor, may I have just a quick

24  moment, sir.

25  Q    I'm going to ask you to take a look at Kenner Exhibit

Murray - recross/Haley

3605

1    104.  Take a look at the entire document, but do you

2    recognize --

3              MR. MISKIEWICZ:  We stipulate to its admission.

4              THE COURT:  Any objections, Mr. LaRusso?

5              MR. LaRUSSO:  No objection.

6              THE COURT:  104 is admitted.

7              (Kenner Exhibit C-104 received in evidence.)

8    Q    With reference to Kenner Exhibit 104, sir, kindly

9    take a look at it, it's a statement from Charles Schwab

10   institutional statement period, August 1, 2006 through

11   August 31, 2006.  Glen Murray.  Of course, your address,

12   sir, at that time.

13             Going to the third page of that document, do you

14   see a deposit of $42,553.00?

15   A    Yes.

16   Q    Well, when you testified, sir, on cross-examination

17   that you had a recollection of receiving $42,553 in

18   connection with a return of a portion of your 100,000

19   investment in Hawaii, don't these documents support that

20   memory?

21   A    Well, they do.  I mean, if that's the right number, I

22   guess, yes.

23   Q    Well, on redirect, the government asked you:

24             Did Mr. Haley, in sum and substance, ask you

25   whether or not you received a return of $42,500 in

Murray - recross/Haley

3606

1    connection with your $100,000 Hawaii investment?

2                And I think he quoted from a transcript:  Yes, I

3    might have.

4                Then Mr. Miskiewicz says:  Where is that

5    document?

6                Do you remember when he asked you that a short

7    while ago?

8    A     Yes.

9    Q     Doesn't that appear to be the document, those two

10   documents, sir, the one that shows a wire transfer coming

11   out from Na'Alehu and a corresponding deposit in your

12   Schwab account of $42,553?  Doesn't that appear to be the

13   document; yes or no?

14   A     Yes.

15   Q     Do you know whether these documents were in

16   possession of the government, these bank records were in

17   possession of the government before you took the witness

18   stand today, sir?

19   A     I don't know.

20   Q     I quoted a figure to you of 385 some-odd-thousand

21   dollars.  Do you remember that quote?

22   A     Yes.

23   Q     That is a figure I quoted, sir.  I may or may not

24   have been correct in that regard.  But my question to you

25   is simply this:  Going back to the Northern Trust document

Murray - recross/Haley

3607

1    concerning the Na'Alehu ventures, statement period August

2    9, 2006 through August 31, 2006, do you see, sir, on 8/25,

3    a loan payment to account number 279590, actually, the

4    amount $401,933?

5    A    Yes, I see it.

6    Q    Does that loan account number 279590 mean anything to

7    you?

8    A    You just gave that to me, that number, what number

9    that was for?  No, that's for Northern Trust?

10   Q    Yes, sir.

11   A    Okay.

12   Q    Does that account number, 279590, mean anything to

13   you?

14   A    I mean, the numbers don't mean anything to me, but

15   you showed me the Northern Trust, so it's that account.

16   Q    We can agree, at least as far as the master note that

17   goes back to 2004 is concerned, though, it uses the term

18   obligor number 279590 that the Northern Trust loan payment

19   reflects a disbursement to an account, a loan account at

20   least in that document, bearing the number $279,590.

21        That's correct, is it not?

22   A    Correct.

23   Q    So your memory, sir, when you were asked on

24   cross-examination about whether you received monies back

25   from your 100,000 investment as well as some monies back

Murray - recross/Haley

3608

1  concerning your line of credit investment is actually

2  pretty good, you did receive money back, isn't that true?

3  A    Yes.  As you showed me, yes.

4  Q    When you were asked on direct by the government

5  whether or not you ever received a penny back from any of

6  the monies that you invested in Hawaii, and I believe at

7  that point you testified no, you were able through

8  cross-examination recreate some of your memory, were you

9  not?

10 A    Yes, a little bit.

11 Q    Now, when Mr. Miskiewicz asked you questions about

12 the lawsuit you brought against Ken Jowdy, you confirmed

13 that the loan agreement itself you had received through

14 and from Phil Kenner, is that correct?

15 A    Correct.

16 Q    But though you received the promissory note from Phil

17 Kenner, it was a promissory note wherein Ken Jowdy agreed

18 to pay you back the money that you were loaning, isn't

19 that true?

20        MR. MISKIEWICZ:  Objection; hearsay.

21        THE COURT:  Overruled based upon the redirect.

22 Go ahead.

23 A    Correct.

24 Q    And after litigation, by that I mean expenditure of

25 monies for lawyers and a trial of the matter presided over

Murray - recross/Haley

3609

1  by a judge, you received a determination by a court that

2  Mr. Jowdy was liable on that promissory note to the tune

3  of 1 million, correct?

4  A    Correct.

5  Q    And if -- you were asked a question about whether you

6  knew where the money went in connection with the loan you

7  gave pursuant to the promissory note signed by Mr. Jowdy.

8         Do you remember that question?  You said:  I

9  don't know where it went.

10  A    Correct.

11  Q    If I were to suggest to you that that loan that you

12  made to Ken Jowdy went to Ken Jowdy's escrow account,

13  would that refresh your recollection; yes or no?

14         MR. MISKIEWICZ:  Objection.

15         THE COURT:  Sustained.

16  Q    Now, during the cross-examination by Mr. LaRusso, you

17  were able to recollect the engagement of Mr. Stolper for

18  the purpose of bringing a lawsuit against Tommy

19  Constantine.  Do you remember that?

20  A    Yes.

21  Q    And isn't it true, sir, that in connection with that

22  effort to bring a lawsuit against Tommy Constantine, Phil

23  Kenner was part of that effort, was he not?

24  A    Correct.

25         MR. HALEY:  May I have a moment, Judge?

Murray - recross/LaRusso

3610

1              (Pause)

2   Q    Sir, with reference to the million dollar judgment

3   you obtained against Ken Jowdy with running interest, at

4   any point in time, it was your intent to share whatever

5   proceeds you received from that judgment with GSF members?

6              MR. MISKIEWICZ:  Objection.

7              THE COURT:  Overruled.  You can answer.

8   A    No.

9   Q    Once again, sir, thank you for your testimony.

10             MR. LaRUSSO:  Just a few, your Honor.

11  RECROSS-EXAMINATION

12  BY MR. LaRUSSO:

13  Q    You told us that your million dollar judgment is

14  uncollective, is that correct?

15             MR. MISKIEWICZ:  Objection.

16             THE COURT:  Sustained as to form.

17  Q    Are you aware that your judgment at this time against

18  Mr. Jowdy is uncollectible?

19  A    Uncollectible.

20  Q    At this point, you can't recover any money from Mr.

21  Jowdy?

22  A    I haven't recovered any money from Mr. Jowdy.

23  Q    Do you know where Mr. Jowdy's assets are?

24  A    No idea.

25  Q    Do you know -- is your testimony here today his

Murray - recross/LaRusso

3611

```
1    assets are in Mexico?
2              MR. MISKIEWICZ:  Objection.
3              THE COURT:  Sustained.
4    Q    To your knowledge, Mr. Murray, did Mr. Constantine
5    have anything to do with the lines of credit you have been
6    testifying to in the last half hour?
7    A    To my knowledge, no.
8    Q    And so there would be no reason -- do you recall --
9    withdrawn.
10             Last question, in regards to your investment in
11   Eufora, you were aware that Mr. Constantine was the
12   founder of the company, correct?
13   A    Correct.
14   Q    One of the most significant aspects of the company
15   were patents that had been obtained, do you recall that?
16             MR. MISKIEWICZ:  Objection.  Scope.
17             THE COURT:  It's okay.  You can answer.
18   A    Correct.
19   Q    And as you testify here today, are you aware that you
20   still have an interest in Eufora?
21   A    I have no idea.
22   Q    You don't know whether you do or you don't, is that
23   your testimony?
24   A    That's my testimony.
25   Q    Would it surprise you, do you still have an interest
```

Murray - recross/LaRusso

3612

1    in Eufora?

2    A    Very much so.

3              MR. MISKIEWICZ:  Objection.

4              THE COURT:  Sustained.

5              I want to remind the gentlemen when a lawyer

6    asks a question, the question is not evidence.

7              Thank you.

8              You can step down, Mr. Murray.

9              THE COURT:  We will take our morning break.

10   Don't discuss the case.

11             (The jury leaves the courtroom.)

12             THE COURT:  Everyone can be seated.

13             I want to make sure the lawyers understand that

14   -- everybody has been guilty of this to some extent, I

15   think defense counsel many more times than the

16   government -- if a witness says -- if you ask do you

17   recall, do you know of this, or recall this, and they

18   answer no, it's not proper then to say:  Would it surprise

19   you if I told you X, or would it surprise you if I told

20   you Y.  Then the lawyer is testifying as to facts which

21   may or may not be true.  Every lawyer in this courtroom

22   knows it's a completely proper question.  I want that to

23   stop.  It's gone on too many times.

24             MR. HALEY:  I have been guilty of that,

25   hopefully not too often.  It will not happen again.

Murray - recross/LaRusso

3613

1        MR. LaRUSSO:  I acknowledge I have done it.  It

2   will not happen again.

3        THE COURT:  It may be true he has an ownership

4   interest in Eufora or not.  Certainly he was not going to

5   be able to provide that.  In an attempt to suggest that to

6   the jury if it's true, you should do it through proper

7   evidence and then your summation.

8        MR. LaRUSSO:  So the Court knows I had a

9   good-faith basis.  Our first witness up will show the

10  Eufora interest for these hockey players still exists.

11       THE COURT:  I'm not suggesting it was bad faith.

12  It's not proper questioning.  Sometimes it may be true,

13  sometimes it may be not.  Even if it's in good faith, it

14  may be inaccurate.  Wait for the witness to put that

15  evidence on.

16       Who is next?

17       MR. MISKIEWICZ:  John Osborn, the handwriting

18  expert.  Your Honor, this morning I left a large two-page

19  document.

20       THE COURT:  I have it.  Is he a short witness?

21       MR. MISKIEWICZ:  Half-hour direct.

22       THE COURT:  Is Mr. Stewart here?  Is Mr. Stewart

23  next after him?

24       MS. KOMATIREDDY:  Yes.

25       THE COURT:  Is Mr. Stewart right outside?

Murray - recross/LaRusso

3614

```
 1              THE AGENT:  In the conference room.

 2              MR. MISKIEWICZ:  I would like to call Mr. Osborn

 3    next.

 4              THE COURT:  I would like Mr. Stewart to come in

 5    to give him the warning.  We will take a short break

 6    between the witnesses then.

 7              MR. MISKIEWICZ:  I want to add, I apologize on

 8    behalf of both defense attorneys.

 9              THE COURT:  Maybe you lost -- everybody has been

10    guilty.

11              MR. HALEY:  Thank you, I caught that as well.  I

12    don't think it's been exclusive to defense counsel.

13              THE COURT:  It has not.

14              (A recess was taken.)

15              THE COURT:  Please be seated.  Let's bring in

16    the jury.

17              (The jury enters the courtroom.)

18              THE COURT:  Please be seated.

19              Call your next witness.

20              MR. MISKIEWICZ:  The government calls John Paul

21    Osborn.

22

23    J O H N   P A U L   O S B O R N,

24         having been first duly sworn was

25         examined and testified as follows:
```

Osborn - direct/Miskiewicz

3615

1      THE COURT:  Please state your name, and spell

2   your last name for the record.

3      THE WITNESS:  John Paul Osborn, O.S.B.O.R.N.

4      THE COURT:  Please keep your voice up.  Go ahead

5   Mr. Miskiewicz.

6      MR. MISKIEWICZ:  Thank you, your Honor.

7   DIRECT EXAMINATION

8   BY MR. MISKIEWICZ:

9   Q    Mr. Osborn, tell us what you do for a living.

10  A    Forensic document examiner.

11  Q    Where are you located, where is your business

12  located?

13  A    My practice is located in Middlesex, New Jersey.

14  Q    How long have you been involved in this type of work?

15  A    I have been a forensic document examiner, including

16  my initial training period on a full-time basis for 32

17  years.

18  Q    Do you have your own company or work for somebody

19  else?

20  A    I run my own practice.

21  Q    Who are your other partners, if any, in your practice

22  who you have had in the past as partners in your practice?

23  A    The practice is a family practice.  I'm the fourth

24  generation to be running it.  I was formerly associated

25  with both my uncle, Russell Osborn, and father, Paul

Osborn - direct/Miskiewicz

3616

1    Osborn, until each of them passed away.  Currently, I have

2    a former intern and current associate Kevin Culbahy (ph)

3    working with me.

4    Q    Can you tell us what the status is of your formal

5    education?

6    A    I hold a bachelor's degree from Susquehanna

7    University, which is in Pennsylvania.  It's a degree in

8    communications.

9    Q    Are you presently associated with any professional

10   groups with respect to -- I should say are you currently

11   certified in any manner with respect to your area of

12   practice?

13   A    Yes, I received -- I went through the process of

14   certification testing and received certification from the

15   American Board of Forensic Document Examiners in 1990.

16   That board requires recertification for each five-year

17   period after the initial certification.  And I just

18   recently completed my recertification for the current

19   year, received recertification in 2010.

20   Q    Are you a member of any other professional

21   organizations, other than the one you just mentioned?

22   A    Yes.  I'm a member of the American Academy of

23   Forensic Sciences, New Jersey Association of Forensic

24   Sciences, Northeastern Association of Forensic Sciences,

25   American Society of Testing and Materials, and the

Osborn - direct/Miskiewicz

3617

1   American Society of Questioned Document Examiners,

2   currently serving as president of that organization.

3   Q    What work, if any, have you done in terms of research

4   and study in the field of forensic questioned document

5   examination?

6   A    Well, as I mentioned before, my certification board

7   requires recertification, and the means to achieve

8   recertification is by conducting research and presenting

9   that research at the various meetings of the different

10  organizations that I belong to.

11        So a good deal of the research that I have been

12  performing is done as a requirement of that

13  recertification process.  But I have also served in a

14  number of administrative roles in the various

15  organizations that I belong to.

16        I have been published in both the Journal of the

17  American Academy of Forensic Sciences, called the Journal

18  of Forensic Sciences, as well as the Journal of the

19  American Society Questioned Document Societies.  Both are

20  peer-reviewed professional journals.

21        And I have also participated in various

22  workshops, seminars and other continuing education

23  programs having to do specifically with the examination of

24  documents and the various areas that are areas of study by

25  document examiners involving everything from handwriting

3618

1    and signatures to alteration of the documents.

2    Q    In your field of work, are there any instruments or

3    tools which you use in connection with your examination of

4    questioned documents?

5    A    The bulk of the instruments that I use are basically

6    instruments that allow one to look at things in great

7    detail.  So magnification equipment.  I use a variety of

8    different kinds of hand magnifiers, as an example.  I use

9    stereoscopic microscopes, allows me to view

10   microscopically in three dimensions and a number of

11   measuring tools, calipers for measurement of thickness of

12   paper, and measuring tools for purposes of examining

13   things like the size of watermarks on papers and the

14   alignment of typewriting.  Then more specialized

15   equipment.

16              I use video spectral comparator, or VSC, used to

17   help to differentiate between things like writing inks,

18   utilizing different lighting sources, such as infrared and

19   ultraviolet light sources, electrostatic detection

20   apparatus, ESDA, used for the detection of tint

21   indentations in paper caused typically by a writing

22   instrument pressing on a sheet of paper and resulting

23   indentation on the sheet beneath.

24              I have a full research library, access to two

25   national laboratories for performing research for active

Osborn - direct/Miskiewicz

3619

1   cases, as well as academic research.

2   Q    Mr. Osborn, have you ever been qualified by any court

3   to offer expert testimony in the field of questioned

4   document examination?

5   A    Yes.  Over the course of my career, I have appeared

6   as an expert witness and given testimony on approximately

7   200 occasions, including Federal Courts, and including in

8   this particular district.

9   Q    Have you ever been qualified to offer such testimony

10  before any arbitration organizations?

11  A    Yes, American Arbitration Association; NASD, National

12  Association of Securities Dealers; American and New York

13  Stock Exchanges.  And then instrumental groups such as the

14  arbitrator for the Hotel Trades Commission in New York

15  City.

16  Q    In addition to testifying, or aside from testifying,

17  do you also perform questioned document examination that

18  does not necessarily result in your testifying in open

19  court?

20  A    Oh, yeah.  Many of the cases I examine have nothing

21  to do with courtroom litigation at all.  Matters involving

22  corporate security.  Many cases I examine result in

23  determinations that are unfavorable to the party I'm

24  working for, and in many of those cases I'm not asked to

25  testify, and many cases that I examine and report on are

Osborn - direct/Miskiewicz

3620

1  in some way, shape or form resolved before any need for

2  testimony comes up.

3          So I would say only about 10 percent of the

4  cases that I examine actually end up requiring my

5  testimony.

6  Q    Do you work solely for plaintiffs, or defendants, or

7  government law enforcement prosecutor agencies, or is it a

8  combination of all the above?

9  A    No, I am a completely independent, private

10 practitioner.  I work for defense attorneys and

11 prosecutors in criminal cases and attorneys representing

12 defendants and plaintiffs in civil cases.

13         MR. MISKIEWICZ:  Your Honor, at this time, I

14 would offer Mr. Osborn as a qualified forensic document

15 examiner.

16         MR. HALEY:  Judge, I believe under Dalbert, he

17 qualifies.  I have no objection.

18         MR. LaRUSSO:  No objection, your Honor.

19         THE COURT:  Let me give the jury an instruction

20 regarding that.  I will give it to you again at the end of

21 the case, but there is an instruction I want to give you

22 with respect to when someone is permitted to testify under

23 the Rules of Evidence, what's called an expert witness.

24         If scientific, technical or specialized

25 knowledge assists the jury to understand the evidence or

Osborn - direct/Miskiewicz

3621

1    decide a disputed fact, a witness with particular

2    knowledge, skill, experience, training or education may be

3    called to testify about such evidence or facts in issue in

4    the form of an opinion.  The Rules of Evidence ordinarily

5    do not permit witnesses to testify to opinions or

6    conclusions.  An exception to this rule exists for those

7    we call expert witnesses, who may state their opinions and

8    who may also state the reasons for their opinion.

9            You should consider the witness' opinions

10   received and give them such weight as you may think they

11   deserve.  If you should decide an opinion of the witness

12   is not based upon sufficient education and experience or

13   that the reasons given in support of the opinion are not

14   sound, or that the opinion is outweighed by other

15   evidence, you may disregard the opinion entirely.

16           In sum, an expert witness is, in all other

17   respects, the same as any other witness.  You should

18   consider his qualifications, experience, interest in the

19   outcome of the case, if any, his demeanor, all the other

20   factors you consider in assessing the credibility of any

21   other witness in a case.

22           With that instruction, we will proceed.

23           Go ahead.

24           MR. MISKIEWICZ:  Thank you, your Honor.

25   Q    Mr. Osborn, with respect to this case, did you

Osborn - direct/Miskiewicz

3622

1    examine certain documents at the request of the

2    government?

3    A    I did.

4    Q    Did you, after making an examination of certain

5    documents, render a report?

6    A    I did.

7    Q    Was that in writing?

8    A    Initially, it was a report that I reported verbally,

9    and then I produced a detailed written report, which was

10   then submitted to the U.S. Attorney's office.

11   Q    I will show you what's been admitted into evidence in

12   this case as Government's Exhibit 5104 and the documents

13   contained therein.

14        Mr. Osborn, are those the documents that you

15   were asked to analyze?

16   A    Exhibit 5104 is a series of two financial consulting

17   agreements, and I was asked to perform examinations of

18   those documents with specific respect to a signature

19   appearing on the last page of each.

20   Q    Just so we know what you are looking at or what you

21   were looking at.  This is the consulting agreement that

22   you were asked to look at?

23   A    One of the two, yes.

24   Q    As to the first that's contained in this exhibit, it

25   is dated, or purports to be an agreement entered into

3623

1    effect as of the 15th day of December 2004.  Is that what

2    it says there?

3    A    That's correct.

4    Q    And with respect to this portion of the exhibit, were

5    you asked specifically to analyze any of the signatures

6    that appear on the last page of that consulting agreement?

7    A    Yes.

8    Q    Which of the signatures, if any, were you asked to

9    evaluate?

10   A    The purported signature of John R. Kaiser, the one in

11   the center of the three that you see on the screen.

12   Q    And turning your attention to, in front of you, the

13   agreement dated, which indicates it's entered into and

14   effective as of the 1st day of June 2005, were you also

15   asked to analyze some portion of this document?

16   A    Yes, I was.

17   Q    Specifically were you asked to analyze the John R.

18   Kaiser signature that appears at the end?

19   A    Yes, that is correct.  It is the signature which

20   appears again in the center of the three signatures you

21   see on the screen right now.

22   Q    Approximately when did you make these or complete

23   this examination and complete -- generate a report?

24   A    The examinations were performed at the latter part of

25   April of this year and were culminated with the production

Osborn - direct/Miskiewicz

3624

1   of a written report on May 4th of this year.

2   Q    Now, having done the analysis, I'm going to show you

3   what is marked for identification as Osborn Number 1.  Did

4   you prepare the illustrations that are contained in Osborn

5   1?

6   A    Yes, these were two comparison charts which I

7   prepared and were appended to the report issued May 4th of

8   this year.

9   Q    How did you go about preparing them?

10  A    These two charts are each composites of the two

11  signatures submitted to me as questioned during the

12  dispute appearing on the two consulting agreements that we

13  just viewed on the screen.  And appearing at the top of

14  each chart, along with, on each chart, several examples of

15  other signatures submitted to me as being the known

16  signatures of John Kaiser, and which were used -- which

17  were used in the process of comparative analysis.

18  Q    So in addition to the signatures that are contained

19  in the exhibit that we just looked at, 5104, were you

20  provided other known copies or originals of John Kaiser's

21  signature?

22  A    I was.

23  Q    Did you include those known signatures that you were

24  provided in the charts that you created, which are on

25  Osborn 1?

Osborn - direct/Miskiewicz

3625

1    A    Not all of them, but a representative sampling of

2    that group.

3    Q    Would using Osborn 1 facilitate your ability to

4    testify about any of the conclusions that you have

5    reached?

6    A    Because the evidence I'm going to be testifying to is

7    visual evidence, it is made much more clear when one is

8    able to make direct comparisons between in this particular

9    problem question of known signatures, so certainly it

10    would help clarify my item.

11           MR. MISKIEWICZ:  Government moves for the

12    admission of Osborn 1.

13           MR. LaRUSSO:  No objection, your Honor.

14           MR. HALEY:  Your Honor, my mind did wander.

15    Osborn 1 is?  No objection.

16           THE COURT:  Osborn 1 is admitted.

17           (Osborn Exhibit 1 received in evidence.)

18    Q    Mr. Osborn, did you make exact duplicates of Osborn 1

19    for your testimony here today?

20    A    I did.

21           MR. MISKIEWICZ:  At this time, may we publish

22    the copies or hand out copies of Osborn 1 to the jury?

23           THE COURT:  Yes.

24    Q    Also, showing you two enlargements, which are also on

25    boards, both of which are also marked Osborn 1, are these

Osborn - direct/Miskiewicz

3626

1    identical to paper copies now published to the jury?

2    A    Other than the fact that they are much more greatly

3    enlarged, yes.

4              THE COURT:  So the record is clear, Osborn 1 is

5    a two-page document?

6              MR. MISKIEWICZ:  Yes.

7              Your Honor, we ask for permission at some point

8    to display these during the testimony.

9              THE COURT:  Yeah, they are just enlargements.

10   Yes.

11             MR. HALEY:  No objection.

12             MR. LaRUSSO:  No objection.

13   Q    I want to first get some background here, Mr. Osborn.

14             Could you tell the members of the jury what

15   problem or issue you were asked to evaluate with respect

16   to the John Kaiser signature that is in Government's 5104?

17   A    Yes, I was asked to perform examinations of each of

18   those two signatures, independent from one another, that

19   appear on the consulting agreements in 5104, and perform

20   comparative analysis of those signatures with the series

21   of known specimen signatures I received as being genuine

22   examples of John Kaiser's signature, in order to attempt

23   to determine whether or not John Kaiser -- whether or not

24   the signatures appearing on each one of those documents

25   are genuine or not genuine.

Osborn - direct/Miskiewicz

3627

1    Q    Were you able to reach a conclusion?

2    A    Yes.

3    Q    What was that conclusion?

4    A    With respect to each of the two signatures, it is my

5    opinion that it is highly probable the signatures are

6    attempted simulations, not the genuine signatures of John

7    Kaiser.

8    Q    First of all, I will ask you the reasons why, but can

9    you elaborate or -- withdrawn.

10           Explain to us what you mean by "genuine" versus

11   "simulation"?

12   A    The process that I endeavor to perform in making my

13   examinations will in very, very general terms result in

14   three possible conclusions with respect to the

15   authenticity of questioned signatures, and discounting the

16   potential of an inconclusive determination, or an instance

17   where no conclusion can be reached at all based on the

18   available evidence.

19           Those three conclusions are that a signature is

20   genuine; that a signature is non-genuine, but an attempt

21   to simulate the way the purported signatory writes his

22   name, in other words, an attempt at imitation; or that a

23   signature is non-genuine and is, or exhibits the natural

24   or otherwise disguised writing of another writer.

25           So what I'm doing is performing analysis

3628

1    initially to make that assessment, and then I'm going on

2    to perform comparative analysis in much more detail with a

3    series of known genuine signatures to identify evidence

4    that would support or refute either one of those three --

5    any one of those three possible conclusions.

6    Q    What I would like to do now is ask you how did you --

7    I would like you to give us the reasons, first I will ask

8    permission to allow Mr. Osborn to approach the jury box

9    with the blowups of Osborn 1?

10            THE COURT:  Yes, defense counsel can come stand

11   over here.

12   A    As indicated in performing these examinations, the

13   initial part of the methodology is to determine very

14   generally how the questioned signatures in each case, and

15   they appear at the very top of the first of two charts

16   that you have been provided with, compare with known

17   specimen signatures, representative example of the known

18   signatures I received are here in the section below.

19            And so right away it is possible to determine,

20   just by a fairly casual comparison, that the questioned

21   signatures, because they are pictorial, consistent with

22   the characteristics found and the appearance of the

23   signatures of John Kaiser, that they cannot be the product

24   of someone else's natural writing.  They are distinctive

25   enough, and their entire -- the entire series of

3629

1   characteristics that appear in the signatures is unique

2   enough that it can't be by coincidence the way somebody

3   else writes, so it has to be that these signatures are

4   either genuine signatures of John Kaiser, or they are

5   attempts by someone to simulate the way he writes.

6        So the process of examination then becomes a

7   great deal more, or involves itself a great deal more with

8   details, more subtle details of the signature.

9   Q   Mr. Osborn, if I can interrupt you here, when you say

10  pictorially similar that they look, in sum and substance,

11  they look a lot like genuine John Kaiser signatures that

12  you looked at from known exemplars?

13  A   Yes, their appearance is similar to the known

14  specimens of John Kaiser, and because of that, we can

15  eliminate the potential that they are the product of

16  someone else's natural handwriting, or disguised writing,

17  they must be genuine or attempts to simulate.

18       So my examinations would include looking at the

19  various characteristics that appear in each one of the

20  known specimens I received of John Kaiser's genuine

21  signature and that appears on the chart, as well as a

22  group of others that don't appear on the chart.

23       This is a representative sampling that appears

24  on the chart.  And not only looking at the consistent

25  individual forms of letters that appear in those known

Osborn - direct/Miskiewicz

3630

1    signatures and connections between letters and the --

2    general characteristics of the writing height and size

3    relationship of writing, letter spacing, the general size

4    of the signature, even things like to what extent is John

5    Kaiser's writing based on these specimens affected by

6    constricted areas in which to write a signature.

7    Q    When you say constricted areas, what do you mean?

8    A    For instance, many writers will constrict the size of

9    their signature to fit in a box, in a signature that is

10   written in a box, while others will violate the lines that

11   surround that signature box and sign their name in as

12   large a fashion as they feel.

13   Q    Mr. Osborn, sorry I cut you off, are you saying, in

14   essence, that when a person signs their name, they don't

15   necessary sign it identically every time?

16   A    That is exactly the point I'm getting at.  For that

17   reason and a number of other reasons, it is physically

18   impossible for someone to write a complex body of writing,

19   like this signature, exactly the same way twice.  And so

20   one of the purposes of the initial examination is to

21   compare and contrast the entire series of known, genuine

22   signatures to see to what degree John Kaiser is affected

23   by natural variation.

24          And it is quite obvious that none of these known

25   genuine signatures are identical to any other one, and we

Osborn - direct/Miskiewicz

3631

1    would expect that to be the case.  When someone signs

2    their name, it's not like they are a machine doing an

3    exact duplicate of the exact signature.  You will see

4    natural variations, one of the values of the signatures

5    itself that every signature you sign is unique onto

6    itself.

7              And once those examinations are completed, then

8    we look at detailed aspects of the questioned signatures

9    and compare them with what we know as the known specimens.

10             So chart number 2, which is the second of the

11   two-page series of charts, Exhibit Osborn 1 shows a couple

12   of examples of the known specimen signatures of John

13   Kaiser, and then the two questioned signatures at the top

14   of the chart, which are much more greatly enlarged, the

15   reason they are much more greatly enlarged, we are looking

16   at more subtle characteristics of writing, and they become

17   more important in terms of support for a conclusion of

18   non-genuineness and specifically with respect to evidence

19   indicative of an attempted simulation.

20             Because a simulation, when it's done carefully,

21   in order to accurately reflect what is seen in a model, a

22   simulation can be prepared in basically three different

23   cases:  It could be traced; it can be made as a product of

24   free-hand drawing with a model to reference, or it could

25   be a free-hand drawing modeled from memory, the memory of

Osborn - direct/Miskiewicz

3632

1    what someone's signature looks like.

2    Q    Mr. Osborn, when you say "model," what do you mean?

3    A    In other words, if you were modeling a signature or a

4    simulation of a signature based on a particular signature,

5    you are referring to that signature in order to attempt to

6    accurately recreate what you see.  So it is used as a

7    model.

8            And the result of that may very well be a pretty

9    accurate representation of what appears in the model

10   signature that you are using and that you are basing your

11   simulation on.

12           But what will happen is, your action is not

13   really a product of, or producing handwriting, it's

14   producing a drawing.  So when you think about the way

15   someone would execute very carefully and very meticulously

16   a simulation of the way another person writes, what you

17   will see will be evidence of that more laborious, more

18   meticulous process of execution, rather than the smooth,

19   even strokes with appropriate variation in pen pressure,

20   upward strokes and downward strokes and smooth, fluid

21   lines.

22           You will see evidence of a more slow and

23   laborious process of execution.  And that is what we see

24   in each one of these two signatures, and what represents

25   the evidence which supports conclusion of non-genuineness

Osborn - direct/Miskiewicz

3633

1   and conclusion these are the product of simulation.

2   Q    Mr. Osborn, for the record, when you say that's what

3   you see, this laborious characteristic, you are pointing

4   to what?

5   A    I'm pointing to right now the signatures as a whole.

6   But with respect to individual portions of the signature,

7   and as examples, we can look, for example, at the initial

8   upward stroke of the upper case letter J, you will see how

9   if you look at that carefully on the charts you have, the

10  line quality is wavering, it's tremulous, not smooth, even

11  in and straight.

12          And the same thing can be found with the

13  downward stroke of the following smaller, oh, right in

14  this section right here you will see tremulous line

15  quality perhaps a pause of the writing instrument.

16          With respect to the -- well, even though the

17  signature may be an attempt to simulate, there is still

18  the potential that a simulator will make errors in form.

19  And the consistent characteristic found throughout the

20  majority of John Kaiser's signature does not show this

21  very large size O, rather a small o, that does appear in

22  the second questioned signature, but in these examples and

23  the other known specimens that appear.

24          As well as this rather large looped connecting

25  stroke, which is not a usual characteristic.  But you will

Osborn - direct/Miskiewicz

3634

1    also note at the very bottom of that loop stroke, before

2    it connects to the following letter, H, another part of

3    the signature which contains a pause or a slowing down of

4    the writing instrument as it's executing a line.

5         You can note as another example of problems with

6    line quality the very top of the upper case letter R, and

7    that unusual jag, actually a pause of the writing

8    instrument before completing the top of that loop on the

9    R, and then coming down as opposed to the smoother quality

10   of that stroke that you see in these known signatures on

11   the second chart and the other specimens.

12   Q    Mr. Osborn, if I can stop you there, what you were

13   just referring to is what in your comparison chart is an

14   arrow that I think it's an arrow, G, pointing to the R?

15   A    Correct.

16   Q    Looking at the R, what is it about that that

17   indicates to you whether or not that is a simulation

18   versus a genuine R written by whoever wrote it?

19   A    Okay.  In any instance where someone is executing

20   their signature, an aberration can occur.  It is possible

21   that John Kaiser at one point in his life executed an R

22   with a similar directional change at the very top.

23        But my point is, it's not a single piece of

24   evidence indicating simulation.  It is the cumulative

25   effect of multiple instances where you have poor line

3635

1  quality indicating a slow, laborious meticulous process

2  of, in my opinion, simulation.

3  Q    As an example, that R with the letter G pointing to

4  it, you are referring to a squiggle very, very top,

5  doesn't loop?

6  A    Yes.

7  Q    Immediately up and down, seems to change a little bit

8  of the direction because it might be called a vector?

9  A    Two directional changes at the very top of the R,

10 they appear on the left and on the right of the very apex

11 of that R and the -- they are indicative of a pause of the

12 writing instrument before a continuation of that writing

13 instrument in not one, but two instances, and unlike the

14 single directional change made smoothly on the top portion

15 of the Rs in the known specimens, that's one of several

16 examples of this poor line quality, this evidence of a

17 drawing process.

18         Another appears at the point where the arrow

19 comes from the letter I and is the connecting stroke

20 between the K and following letter A, it's clearly a

21 wavering, tremulous portion of that handwritten line.

22         You will also notice a pause between the

23 connection between the I and the following letter, what is

24 a combination of letters S, E and R in Kaiser.  In the

25 second signature, just pointing out a few examples, you

Official Court Reporter

Osborn - direct/Miskiewicz

3636

1   will also see very, very poor line quality in the

2   connecting stroke between the J and the following letter

3   O, at the very top, that tremulous line quality.

4           You will see it again at the loop in the center

5   portion of the upper case letter R, as well as on the long

6   initial upward stroke of the R.  You will see it again in

7   the wavering stroke connecting the K to the following

8   letter A, and once again in the connecting stroke between

9   the final letters E and R, which is represented by that

10  downward stroke.

11          And again, aberrations will occur in anyone's

12  signature because of circumstance or other effects, so the

13  presence of one of these characteristics certainly isn't

14  enough to suggest that the signature is the product of

15  simulation.

16          But when you compare not only differences,

17  albeit subtle differences, between the questioned

18  signatures and known specimens, most particularly the

19  numerous occasions through each of the two signatures

20  where you have tremulous, slow, meticulously executed

21  lines, that is in essence a significant or fundamental

22  difference which provides a basis for concluding not

23  genuineness or specifically conclude these are the

24  simulation not natural execution of John Kaiser's

25  signature.

Osborn - direct/Miskiewicz

3637

1  Q    Mr. Osborn, with respect to the various indications

2  to you of a simulated as opposed to genuine signature,

3  your report or your chart, which heading, comparison chart

4  number 2, also moved into evidence as Osborn 1, each one

5  of those letters, arrows indicates to you an example of

6  tremulous line or changing of direction or something that

7  is inconsistent with a known exemplar?

8  A    They all do, and it is not any one of them, but their

9  overall cumulative effect, the effect of their combined

10 appearance in a single signature, and more particularly in

11 two individual separate signatures, purportedly written by

12 John Kaiser.

13 Q    For clarification, and for the record, the signature

14 on the top, this came from which of the two consulting

15 management agreements?

16 A    The one that was dated 12/15 of 2004, and there is

17 actually a caption to the upper left of that signature,

18 and the one below that, you see on your screen right now

19 is from the June 1st of 2005 document.  That caption

20 appears in the upper right above that signature.

21 Q    This is from -- the second one below is from the June

22 2005 management consulting agreement?

23 A    Correct.

24 Q    And what you are saying, the evidence of a simulated

25 signature appeared in both cases?

Osborn - direct/Miskiewicz

3638

1    A    Yes.

2    Q    One last area.  Did you perform or were you asked to

3    perform an analysis on handwriting of any of the

4    defendants in this case?

5    A    No.

6    Q    Even if you had been asked to perform an analysis,

7    would that have enabled you to identify the writer of what

8    you have now identified as two examples of simulations of

9    John Kaiser's signatures?

10   A    No, I would not have been able to make that

11   determination.

12   Q    Why?

13   A    When you attempt to simulate someone else's writing,

14   you consciously but very effectively hide your own

15   handwriting characteristics.  That's the purpose of the

16   simulation, to copy what someone else's writing looks like

17   to avoid writing like you normally do, because that's not

18   the way they write.  So that effectively would prevent,

19   regardless of the number of specimens and regardless of

20   the potential, you may have specimens of the very same

21   names as written by anyone else, would prevent you from

22   making a determination as to who wrote either one of those

23   signatures.

24           So while you can say those signatures are

25   non-genuine, you can say they are attempts to simulate,

Osborn - cross/Haley

3639

1  you cannot make a determination as to who may have written

2  them.

3          MR. MISKIEWICZ:  No further questions.

4          THE COURT:  Cross-examination.

5  CROSS-EXAMINATION

6  BY MR. HALEY:

7  Q    Mr. Osborn, my name is Rick Haley.  I represent Phil

8  Kenner.  Not less than five minutes ago, you stood in

9  front of the jury with these charts and testified, perhaps

10 within 15 feet of the jury, that we can conclude that

11 these signatures are non-genuine.  That was your direct

12 testimony, correct?

13 A    Correct.

14 Q    And you said that on more than one occasion, did you

15 not, in front of the jury about five minutes ago?

16 A    Yes.

17 Q    You didn't qualify that statement, did you:  We can

18 conclude that these signatures are non-genuine?  You

19 didn't qualify that statement?

20 A    Correct.

21 Q    Now, you rendered a report, did you not, in advance

22 of your testimony today that was provided to the

23 government, is that correct?

24 A    Yes.

25 Q    And you have an understanding, acknowledge, that that

Osborn - cross/Haley

3640

1    report would be provided to attorneys for the defendants

2    accused in this matter?

3    A    Yes.

4    Q    Just take a look at Kenner Exhibit 105.  Do you

5    recognize that document, sir?

6    A    Yes.

7    Q    What is it?

8    A    This is a copy of the report which I issued on May

9    4th of 2015; however, it does lack the signature page of

10   that report.

11   Q    But this is the report of your findings and report

12   that reflects your expert opinion as relates to those two

13   signatures in question, correct?

14   A    Yes.

15   Q    And sir, would we agree that in the written portion

16   of the report under the boldface heading findings, you

17   write --

18   A    Would you like me to read it?

19   Q    I will read it, sir.  I'm just asking the following,

20   if I read incorrectly, I know you will correct me:

21        Findings, it is highly probable in the opinion

22   of the undersigned that each of the two questioned

23   signatures are non-genuine and the product of an attempted

24   simulation of John Kaiser's signature.  This finding is

25   intended by the undersigned to express an opinion which

Osborn - cross/Haley

3641

1  meets and exceeds the threshold commonly described within

2  the phrase within a reasonable degree of medical

3  certainty.

4          That's what that paragraphs says, is that

5  correct?

6  A    No, it doesn't utilize the term "medical certainty."

7  Q    Excuse me.  It exposes my occasional medical

8  malpractice defense work.  I apologize.

9  A    It's okay.

10  Q    Let me, for purposes of clarity of the record --

11  Judge, I do apologize -- the first sentence I read

12  correctly, is that true?

13  A    Yes.

14  Q    The second sentence, I will read:  This finding,

15  intended by the undersigned, is to express an opinion

16  which meets and exceeds a threshold commonly described

17  within the phrase, paren, within a reasonable degree of

18  medical certainty , close paren.

19  A    Correct.

20  Q    When you use the words "highly probable," that is

21  italicized in that sentence; is it not?

22  A    It is.

23  Q    We can agree, sir, at least by way of your direct

24  testimony in front of the jury a short while ago, did you

25  not qualify your statement to the jury when you said:  We

Osborn - cross/Haley

3642

1    can conclude that these signatures are non-genuine by way

2    of saying it is highly probable in the opinion of the

3    undersigned that these signatures are non-genuine, you

4    didn't use that phraseology a moment ago, did you?

5    A    When the government asked the question what was your

6    conclusion, my response was it is highly probable that the

7    signatures are non-genuine and attempted simulations.

8    However, during the portion where I was --

9    Q    If I may, I asked a very direct question.  The

10   question is this:  When you testified a moment ago, and we

11   can have it read back, when you testified a moment ago

12   before this jury, did or did you not testify when asked

13   about the signatures on this document, which the jurors

14   were given by the government, so one can have any mystery

15   what we are talking about, did or did you not testify we

16   can conclude these signatures are non-genuine, did you or

17   did you not say that?

18   A    During which portion of my testimony?

19   Q    During the portion of your testimony when you stood

20   in front of the jury with these documents on that easel,

21   wasn't that your testimony; yes or no?

22   A    Yes.

23   Q    Now, the determination as to whether a signature is

24   genuine or non-genuine involves certain tests and

25   protocols you employ; is that correct?

Osborn - cross/Haley

3643

1    A    Yes.

2    Q    Fair to state, sir, what you do, I mean with a great

3    deal of respect, is more of an art than science; is that

4    true?

5    A    It is comparative analysis, which is accepted as

6    scientific, including my -- the preeminent forensic

7    science community, American Academy of Forensic Science,

8    you can call it an art, but it is considered by scientists

9    to be scientific.

10   Q    We are not talking about the use of my limited -- not

11   the use of computer simulations or commuter analysis,

12   correct, of signatures, as known signatures.  We are not

13   talking about that; are we?

14   A    Well, I mean, in this particular case, commuter

15   technology was only used to create illustrations for

16   purposes of demonstrative, or demonstrate the evidence;

17   however, examination of writing is possible to perform in

18   initial examinations based on commuter analysis and

19   comparison.  CEDAR-FOX is one example of a commuter system

20   capable of doing that.  Secret Service has another system.

21   Q    You utilized that commuter analysis in your analysis

22   in this?

23   A    No.  As I stated, the use of computers in this

24   particular case was limited only to the production of

25   illustrations.

Osborn - cross/Haley

3644

1    Q    I know that, sir.  My question to you was:  Is there

2    or is there not a computer authorized software program

3    that can be utilized for purposes of determining whether

4    signatures are genuine or non-genuine; yes or no?

5    A    Yes.

6             (Continued on the next page.)

Osborn - Cross/Haley

3645

1    CROSS-EXAMINATION (Cont'd)

2    BY MR. HALEY:

3    Q    What is the name of that program?

4    A    I believe that the name is Cedar Fox, but I'm not

5    sure.  It was developed by Dr. Sirhari, S-i-r-h-a-r-i who

6    is a professor in the SUNY system of schools, but that is

7    one type of software that does an initial analysis and

8    does examine things like visualization and different

9    things.  That type of software does exist.  It wasn't used

10   here.

11   Q    Let's back up, and I apologize.  Dr. Sirhari?

12   A    Dr. Sirhari.

13   Q    Is he well regarded in your field of study?

14   A    Yes, very much so.

15   Q    So is it fair to state, sir, that the computer

16   program he's developed by way of the software, given his

17   reputation in the community, is regarded as having some

18   value.  Yes or no?

19   A    Yes.

20   Q    And to avoid confusion on my part, in connection with

21   the engagement by the Government in this case in

22   connection with the signatures here, did you or did you

23   not take advantage of the computerized program/software

24   developed by this, sir?  Yes or no?

25   A    No.

Osborn - Cross/Haley

3646

1   Q    Now, you did say on direct that every time a person

2   signs their signature, it is going to be unique, correct?

3   A    That is correct.

4   Q    And we can agree, sir, can we not, at least as far as

5   these two signatures are concerned, which occurred on

6   different dates, this one occurring on 12/15/2004 and this

7   one on June 12, 2005, these two signatures at least by way

8   of appearance have unique characteristics.  They are not

9   identical, are they?

10  A    They are not identical to one another, and yes, they

11  do contain unique characteristics or a unique combination

12  of characteristics.

13  Q    If someone were to be utilizing tracing material,

14  let's say, they had someone's signature and they then do

15  that signature to trace that signature on documents, I

16  take it those tracings would typically in your experience

17  have a great deal more similarities than dissimilarities?

18  A    That's correct.

19       I would describe them, if I saw something that

20  contained that kind of evidence as being unnaturally

21  similar, not identical, but unnaturally similar.

22  Q    So can we conclude, sir, based upon your expertise,

23  that at least as relates to these two signatures which are

24  the signatures in question, when they were created, they

25  do not appear to be traced, is that a correct statement or

Osborn - Cross/Haley

3647

1    not?

2    A    No, that's an incorrect statement.

3    Q    Well, if the tracing of the signature involved the

4    same signature, in other words, you have a tracing of

5    someone's signature and then you reproduce it on one

6    document and at some later point in time he reproduces it

7    on another document, would it be fair to state because you

8    are tracing there would be more similarities than

9    dissimilarities between those signatures?

10   A    Yes, that's the key, that if you have two questioned

11   signatures and they are the product of simulation by

12   tracing of the same model signature, you will get what I

13   referred to previously as an unnatural similarity.

14   Q    On the various tests and protocols you used to

15   determine that is highly probable that these are not

16   genuine, could you just tell us of the protocols and

17   tests, what tests you did do?

18   A    I beg your pardon?

19   Q    Yes, sir.

20        Of the protocols and tests you did use for the

21   purposes of rendering these two signatures are non

22   genuine, tell us what tests and protocols you did use?

23   A    Well, there were no tests as one would perform, for

24   instance, a VSC test of writing to differentiate.  What

25   was performed was an examination and comparative analysis

Osborn - Cross/Haley

3648

1   and basically that involves the initial examination and

2   comparison of the known specimens with one another in

3   order to identify consistent individual features of

4   writing, to identify general characteristics of writing

5   and to look at range of variation.  To what extent do

6   these knowns vary from one another from the spectrum of

7   those knowns and utilizing that information, doing a

8   comparative analysis individually between each one of the

9   two questioned signatures and that entire group of known

10  specimens, to identify what differences are present, what

11  similarities are present and to gauge the significance of

12  each of those two.

13          In this particular instance the significant

14  evidence was evidence of laborious execution, evidence of

15  a process of simulation.

16  Q    Sir, you testified on direct that there are occasions

17  where the analysis involves let's say the indentation on

18  the paper, I guess pressure of the pen on the paper, is

19  that part and parcel of the analysis.  Yes or no?

20  A    Yes.

21  Q    And did you perform that specific analysis as part of

22  your comparison in this case?

23  A    Yes.

24  Q    And with reference to that analysis, you were dealing

25  with known samples from other documents; is that correct?

Osborn - Cross/Haley

3649

1    A    Correct.

2    Q    Are you able to compare, sir, the pressure that was

3    exerted let's say on the documents in question, when that

4    signature was signed against the pressure that was exerted

5    on the known samples.  Is that the type of comparison

6    made?  Yes or no?

7    A    Yes.

8    Q    And the documents that you had available to you, you

9    say they were representative samples of known documents,

10   if you know, true?

11   A    True.

12   Q    They were originals or copies?

13   A    A combination of both.

14   Q    Well, do you know which of those documents in terms

15   of an original document you utilized for purposes of what

16   I'll call this pressure analysis?

17   A    You can only make observations with regard to the

18   variation in pressure, that's what we're dealing with,

19   it's variation in pressure from an original.

20          There are some aspects of variation of pressure

21   you can glean from copies but you need to see original

22   samples and I did have original samples.

23   Q    Do you recall whether those original samples were in

24   originals in 2003, 2005, 2006, 2011.

25          Do you recall what years that were involved with

3650

1   reference to the original documents while you did these

2   pressure comparisons.  What years are you speaking?

3   A    I don't specifically recall, but they are listed in

4   my report with the dates.  We can certainly look at my

5   report to find that information out.

6   Q    Just so I understand.  These signatures on Osborn-1,

7   are what was represented to you for purposes of your

8   analysis, represented to you by the Government as being

9   known signatures; is that correct?

10  A    That is the way they were submitted to me, correct.

11  Q    And I'm pointing to the right side of the chart with

12  we say Na'alehi Ventures 2006, John Kaiser, on this part

13  of it?

14  A    Yes.

15  Q    -- And other matters, but can we agree at least by

16  the way of the naked eye for the nonexpert, there's

17  variations in these signatures; is that correct?

18  A    Oh, absolutely, yes, and I would expect to see that.

19  Q    Because we all sign our name differently under the

20  circumstances?

21  A    Every single signature I've written in my entire

22  lifetime, and I'm 56 years old, is unique unto itself.

23  Q    That's due to a variety of factors, like we age and

24  lose our hair?

25  A    I don't know necessarily loosing our hair has

Osborn - Cross/Haley

3651

1    anything to do with it, but we age.

2    Q    As I said before the circumstance under which we find

3    ourself would that be given a point in time, whether we

4    are rushing or whether we have more time to devote to our

5    signature?

6    A    Those are one or a couple examples of almost an

7    infinite number of things that can affect the way you

8    write your name.

9    Q    Incidentally, if in your experience, if someone is

10   presented let's say with a document that contains a

11   photocopy of your name, because it's a photocopy in and of

12   itself, would they be unable to attest to their signature?

13   A    I'm not -- not necessarily.  I mean one can look at a

14   photocopy and recognize characteristics of their own

15   signature and erroneously or not say that that is their

16   signature.

17   Q    Okay.  But erroneously or not, they can say that's my

18   signature and be correct.

19             In other words, the fact that it is a photocopy

20   doesn't prevent anyone as a matter of science or a matter

21   of law from saying that is my signature?

22             MR. MISKIEWICZ:  Objection --

23             MR. HALEY:  I'll withdraw that.

24   Q    Sir, in connection with your engagement by the U.S.

25   Attorney's Office, were you ever shown a document going

Osborn - Cross/Haley

3652

1    back to 19 -- excuse me, in connection with your

2    engagement by the Government, were you ever shown a

3    document going back to 2005 which contained multiple

4    signatures on it, to determine whether or not those

5    signatures were genuine or non genuine?  Yes or no?

6    A    No.

7         I should qualify that.  When you say multiple

8    signatures, each of the two documents that we're dealing

9    with here and are displayed on Osborn-1, are part of a

10   document containing multiple signatures insofar as each

11   signature page had a total of three signatures which is

12   more than one.  But when you refer to multiple, I assume

13   you are talking about a number of signatures much larger

14   than that?

15   Q    Yes, sir.

16   A    No, I was not asked to look at documents that were

17   submitted to me as questioned or in dispute that had any

18   more than a total of three signatures on them.

19        MR. HALEY:  Thank you.

20   Q    Now, this is not the first time you've testified as a

21   government witness?

22   A    Correct.

23   Q    You told us on direct you simply don't testify as a

24   government witness, you testify for defense attorneys,

25   private litigants.  I assume both plaintiff and defense

Osborn - Cross/Haley

3653

1    attorneys?

2    A    Correct.

3    Q    But in this case you were hired and compensated by

4    the Government as relates to your appearance here today,

5    true?

6    A    That is true.

7    Q    And though in other cases as you told us your

8    compensation may not include compensation for your

9    testimony, here you are being compensated for your

10   testimony, is that true?

11   A    Unless I'm doing a case on a pro bono basis for an

12   indigent, for instance, criminal defendant, I'm always

13   being compensated regardless of who I'm working for.

14   Q    Did you give that answer in sum and substance before

15   when you were asked that question?

16   A    Yes.

17            MR. MISKIEWICZ:  Objection.

18            THE COURT:  Overruled.

19   Q    Just so I understand, sir, in terms of your

20   compensation, how are you compensated by way of your

21   services rendered in this particular case by the

22   Government?  Simply break it down for us.

23   A    Contracted for a set hourly rate.  That hourly rate

24   is $250 per hour.  I'm asked to provide on a government

25   form an estimate for what I anticipate the total of my

3654

1  fees will be.  In this particular instance which I believe

2  is accurate, will be a total of $5,000.

3  Q    And that estimate, sir, includes the compensation you

4  will receive for your testimony today, is that true?

5  A    That is true.

6  Q    And just so I understand, sir, if your report did not

7  result in an instance where you would be called to

8  testify, your bill would be less, is that true?

9  A    Certainly, yes.  The time I'm spending here today I'm

10  compensated for and I wouldn't be spending time here

11  today, I assume, if my conclusion was that the signatures

12  were genuine.

13  Q    Well, if you recall, sir, how many documents were you

14  given by the government where it was represented to you

15  that the signature contained on the document was a known

16  signature?

17  A    I believe it was more than 30 specimens.

18  Q    And when you say "known signature," at least what you

19  were provided with was a representation that the

20  Government's investigation has revealed that the person is

21  affirming to the Government, stating to the Government on

22  that particular document, that that's my signature,

23  correct?

24        MR. MISKIEWICZ:  Objection to form.

25        THE COURT:  Do you understand the question, sir.

Osborn - Cross/Haley

3655

1        THE WITNESS:  Yes.

2        THE COURT:  You can answer.

3   A    The foundation upon which a signature is deemed to be

4   genuine is not relevant to me in terms of the courtroom

5   setting.  It is submitted to me as the genuine signature,

6   I depend upon it therefore as being genuine, and it is the

7   responsibility of the submitting party to establish for

8   the purpose of fact-finders the foundation for those

9   signatures.

10  Q    Okay.

11       If you recall, sir, was one of the signatures

12  that was submitted to you by the Government as a genuine

13  signature, a document containing the signature of John

14  Kaiser wherein the first paragraph read:  I acknowledge

15  receipt of the letter dated July 21, 2006, of Philip A.

16  Kenner (the letter to John Kaiser and Christopher

17  Manfredi) regarding the proposed joint venture and finance

18  and transaction involving my investments in Hawaii real

19  estate (the transactions).

20       Do you remember reviewing that particular

21  document as one of the purported to be known genuine

22  documents?

23  A    Not specifically but each one of the documents is

24  appended to my report.  It would be very easy to refer to

25  my report and find it, if you wish me to do that.

Osborn - Cross/Haley

3656

1    Q    Yes.

2    A    You do?

3    Q    I do, and I can get you the report.

4    A    I have my report.

5    Q    And I might be able to assist you in that regard,

6    sir.

7              The document I'm referring to, sir, I just read

8    into the record, at least the first sentence of that

9    document, do you see that as part of the report as being

10   one of the known genuine documents containing the

11   signatures of John Kaiser?

12   A    Yes.

13   Q    And that would be page 7 of your -- at least seven on

14   this document, not seven on the report, but that's what

15   appears on the bottom of that document?

16   A    The document is noted in my report as a known

17   document K-1 B.  It's a response form dated 7 of 2006.

18             THE WITNESS:  Counsel, that's my copy of the

19   report.  I think you have a file copy.

20             MR. HALEY:  I'll give it back to you.

21             May I have a moment, Judge?

22   Q    Sir, we can agree that the signatures in question

23   that you've rendered an opinion on, were created or were

24   involving documents in 2004 and 2005; is that correct?

25   A    Those are the dates that appeared on those documents.

Osborn - Cross/Haley

3657

1   Whether in fact they were actually executed on those

2   dates, I have no way of knowing.

3   Q    Fair enough.

4        And when you compared at least those signatures,

5   whether they were executed on that date or not, you sought

6   out, did you not, known signatures of John Kaiser within

7   those years.  Isn't that true?

8   A    I sought out examples which included generally

9   contemporaneous specimens of John Kaiser's signature, and

10  they are listed in my report.

11  Q    But some of the known signatures you received as

12  listed in your report and identified as you do, they go to

13  2011, do they not?

14  A    I believe some go to 2014 as well.  They are sided on

15  both sides of the date of the questioned signatures,

16  providing a spectrum of specimens from all of those years.

17  Q    But help me understand, sir.

18       If signatures over the years are unique and

19  change in circumstance, including the fact we simply age,

20  how does the known signature let's say in 2011 have any

21  relevance, except from being in the spectrum?  Is that

22  your testimony?

23  A    Yes, it provides a picture of how John Kaiser writes

24  from let's say the earliest dated signature which is from,

25  I believe, 2003, all the way up to signatures that are

3658

1   more recent than that, which are dated in 2012 and 2013,

2   and includes some which are generally contemporaneous with

3   this time period such as two from 2006.

4   Q    Now, lastly, in sum which are contemporaneous with

5   this time period, 2006, how many of those known originals

6   did you have in your analysis that you compared with that

7   came out of that time period 2005 and 2006?

8   A    There were a total of six signatures, two from 2005

9   and four from 2006.

10  Q    On various documents, correct?

11  A    I beg your pardon?

12  Q    On various documents.

13  A    Yes.

14  Q    And then you've included the spectrum which includes

15  others from 2003 as far as 2011, correct?

16  A    I believe 2013 and even maybe more recent, my report

17  lists K-1-J, which was a series of 18 signatures written

18  specifically at request but is undated.  And I don't know,

19  but that may have been produced at an even later point in

20  time.

21  Q    But in reference, sir, what was represented to you to

22  be the known signatures in that 2005-2006 period, all you

23  were given was a document to look at, isn't that true?

24  A    I beg your pardon?

25  Q    Yes.  With reference to the known signatures or

Osborn - Cross/Haley

3659

1  reported to you to be known signatures in that time period

2  2005-2006, all you were given was a document for

3  comparison and told this is a genuine signature, correct?

4  A    I was given a document bearing a signature John

5  Kaiser which was submitted to me as being a genuine

6  specimen.

7  Q    But you weren't given, I take it, sir, any background

8  information, though the document may have appeared on its

9  face to be a check or another document, you weren't given

10  any background information under the circumstances under

11  which John Kaiser came to sign that document on that

12  particular day; is that correct?

13  A    That is correct.

14        MR. HALEY:  May I have one moment, Judge.  Mr.

15  Osborn, I gave you back the report?

16        THE WITNESS:  You did.

17        MR. HALEY:  I have no further questions.

18        THE COURT:  Mr. LaRusso.

19        MR. LARUSSO:  No questions, your Honor.

20        THE COURT:  Redirect?

21        MR. MISKIEWICZ:  No, your Honor.

22        THE COURT:  You may step down, Mr. Osborn.

23        THE WITNESS:  Thank you.

24        THE COURT:  We'll take a lunch break.  We'll

25  reconvene at 2 o'clock.  Don't discuss the case.  Don't

3660

1   take the exhibits with you.  Leave those under your chair.

2              Thank you.

3              (Whereupon, at this time the jury exits the

4   courtroom.)

5              (Out of the presence of the jury.

6              THE COURT:  Is he here now?  Why don't you bring

7   him in.

8              (Potential witness enters the courtroom.)

9              Would you just step forward for a minute, sir.

10  You are Jackson Stewart.

11             POTENTIAL WITNESS:  That's correct.

12             THE COURT:  You will be testifying right after

13  lunch, but I just want to make sure you understand the

14  ruling I've made for purposes of your testimony.

15             The Government will be, I think you know, be

16  asking a series of questions of payments made to you by

17  Mr. Constantine for certain work and conversations you had

18  with him regarding that.

19             Do you understand that, correct.

20             POTENTIAL WITNESS:  Yes.

21             THE COURT:  My understanding, from speaking to

22  the lawyers there may be a much longer history or bad

23  blood between you and Mr. Constantine with respect to

24  disputes or other issues, but my ruling is that it not

25  relevant for purposes of the trial.

3661

1          The testimony you are giving is very limited on

2     the issue of those payments, what they were for and what

3     your conversations were, so I don't want you to be

4     testifying to your views as to his credibility, his

5     honesty or any opinions regarding him.  You shouldn't make

6     any reference to those.

7          Do you understand what you are saying.

8          PONTENTIAL WITNESS:  I understand.

9          THE COURT:  Thank you.

10         MR. MISKIEWICZ:  Thank you.

11         MR. LARUSSO:  Thank you very much, your Honor

12         (Continued.)

13

14

15

16

17

18

19

20

21

22

23

24

25

3662

1          A F T E R N O O N    S E S S I O N

2

3          THE CLERK:  All rise.

4          THE COURT:  Please be seated.

5          Sorry for the delay.  Are we ready to go?

6          MR. MISKIEWICZ:  Yes.

7          THE COURT:  Let's bring in the jury and

8    Mr. Stewart.

9          THE CLERK:  All rise.

10          (The jury is present.)

11          THE COURT:  Please be seated.

12          Next witness.

13          MS. KOMATIREDDY:  The government calls Jackson

14    Stewart.

15          THE COURT:  Mr. Stewart, if you could come up to

16    the witness stand over here and remain standing for the

17    oath.

18

19    JACKSON STEWART,

20              called as a witness, having been first

21              duly sworn, was examined and testified

22              as follows:

23

24          THE CLERK:  Please state and spell your name for

25    the record.

Stewart  -  Direct/Komatireddy

3663

1    THE WITNESS:  Jackson Stewart, S-T-E-W-A-R-T.

2

3    DIRECT EXAMINATION

4    BY MS. KOMATIREDDY:

5    Q.    Mr. Stewart, where do you live, sir?

6    A.    Rosemont, California.

7    Q.    What do you do for a living?

8    A.    I design and build race cars and manage racing teams.

9    Q.    How long --

10        THE COURT:  If you could pull the mike closer to

11   you.

12        Thank you.

13   BY MS. KOMATIREDDY:

14   Q.    How long have you been in the race car business?

15   A.    A little over 35 years.

16   Q.    Do you have your own business?

17   A.    Yes, I do, Unitech Racing Incorporated.

18   Q.    You said you've been in the business for

19   approximately 35 years.

20        What different roles have you played over the

21   course of those 35 years?

22   A.    I've been an engine builder, mechanic, engineer, team

23   owner and team manager.

24   Q.    Would it be fair to say you would be familiar with

25   the major players in the industry?

Stewart - Direct/Komatireddy

3664

1   A.   I think so, yes.

2   Q.   Did there come a time where you ran a racing team for

3   Mr. Tommy Constantine?

4   A.   Yes, I did.

5   Q.   Did you meet Mr. Constantine in person?

6   A.   Yes, I did.

7   Q.   Would you recognize him if you saw him again?

8   A.   Yes, I do.

9   Q.   Do you see Mr. Constantine in court right there?

10  A.   Right there.

11          MR. LARUSSO:  Concede the identification, your

12  Honor.

13          THE COURT:  Identification has been conceded.

14  BY MS. KOMATIREDDY:

15  Q.   What time period did you interact with

16  Mr. Constantine?

17  A.   From late 2005 through 2007.

18  Q.   Over the course of that time period as a whole, do

19  you have conversations with Mr. Constantine where he told

20  you about himself?

21  A.   Yes.

22  Q.   What did he tell you about who he was, his

23  background?

24  A.   He told me that he had managed and acquired

25  significant wealth, he owned a helicopter at the time and

Stewart  -  Direct/Komatireddy

3665

1   that he was re-entering the racing arena and wanted to

2   have a significant racing team.

3   Q.   When you say that he told you he had managed to

4   acquire significant wealth, does he do anything or show

5   you anything to substantiate that?

6   A.   Well, he talked about a home in the Scottsdale area

7   that had a go kart track around it and supposedly was

8   pretty valuable.

9           He said he owned a helicopter, and at one time

10  later in our relationship he showed me a day/night teller

11  receipt that had a small cash withdrawal on it, and he

12  showed a balance of something in excess of $2 million.

13  Q.   When you say a day/night teller receipt, you're

14  referring to an ATM machine?

15  A.   Yes.

16  Q.   You said he showed you the receipt and it had a

17  balance of $2 million on it?

18  A.   It was in excess of two million.

19  Q.   Did he say why he was showing it to you?

20  A.   We were in the midst of a discussion about money, and

21  he was using it to reassure me that he was wealthy.

22  Q.   Did he say anything about any businesses he ran?

23  A.   I was made aware that he owned a credit card company

24  called Eufora.

25  Q.   Over the course of your various conversations, did he

Stewart  -  Direct/Komatireddy

3666

1    ever identify anyone who he's working with or partnered

2    with in Eufora?

3    A.    I don't believe he identified anybody, but he did let

4    me know that he had partners in Eufora.

5    Q.    Did you come to meet anyone through that in the

6    context of that conversation?

7    A.    At the end of the 2007 is when I was introduced to a

8    couple of people, one of which was as Tommy's partner at

9    Miller Motorsports Park.

10   Q.    Do you remember the name of the person you were

11   introduced to?

12   A.    I believe it was Mr. Kenner.

13   Q.    You said that Mr. Constantine asked you to run a

14   racing team for him.

15         Did you in fact end up doing that?

16   A.    Yes.

17   Q.    During what racing season?

18   A.    Tommy was a customer of Blake Rosser's during the

19   2006 season and I was managing that team for Blake Rosser,

20   and then Tommy was a principal in the team that I was

21   managing in 2007.

22   Q.    And in managing that racing team, could you explain

23   what your role in the team was and what Mr. Constantine's

24   role was?

25   A.    My role would be all aspects of operating the team,

3667

1  from designing and building to cars, to logistics, race

2  strategy, chief engineer in a sense, crew chief, pretty

3  much every part of running a race team.

4  Q.   What was Mr. Constantine's role?

5  A.   Tommy was a driver and the source of the funding for

6  the team.

7  Q.   Now, in racing, are there different kinds of drivers?

8  A.   Yeah.

9       The business model for the type of racing we

10  were doing is kind of called ProAm, and typically a team

11  would have a professional driver and a funded amateur

12  driver, a gentleman driver.

13  Q.   Was Mr. Constantine a professional race car driver?

14  A.   No, he was not.

15  Q.   How do you define a professional race car driver?

16  A.   In my opinion that would be a driver who has achieved

17  enough in racing to be making a living as a driver.

18  Q.   Did Mr. Constantine tell you anything about how he

19  would be bringing money to the team?

20  A.   There was.  In the beginning it was described as a

21  sponsorship from Playboy.

22  Q.   Did he tell you the details of that sponsorship?

23  A.   Eventually he did mention -- did tell me that his

24  deal with Playboy was that he would receive free ad pages

25  and he would sell those ad pages and use those funds to

Stewart  -  Direct/Komatireddy

3668

1    fund the race team.

2         And then later he told me that he wasn't in fact

3    getting free ad pages, but he was paying a house rate for

4    ad pages, so the amount of money flowing from Playboy

5    wasn't as much as I was originally led to believe.

6    Q.   Now, during the time that you were running this race

7    car team, were you paid for your work?

8    A.   Yes.

9    Q.   Were the payments going to Unitech Racing?

10   A.   That's correct.

11   Q.   And those payments were made by Mr. Constantine; is

12   that right?

13   A.   Yes, they were.

14   Q.   I'm going to hand you what's been marked as

15   Government's Exhibit 3351.

16        Do you recognize that, sir?

17   A.   Yes, I do.

18   Q.   What is it?

19   A.   It's a register of all of the payments made by Tommy

20   over the course of the time period indicated.

21   Q.   Is the information in this register created by an

22   employee of Unitech at or near the time the payments are

23   made?

24   A.   Yes, it was.

25   Q.   Was it created in the ordinary course of Unitech's

Stewart  -  Direct/Komatireddy

3669

1  business?

2  A.   Yes, it was.

3  Q.   Is it kept in the ordinary course of Unitech's

4  business?

5  A.   Yes, it was.

6         MS. KOMATIREDDY:  The government moves 3351 into

7  evidence.

8         MR. LARUSSO:  No objection.

9         MR. HALEY:  No objection.

10         THE COURT:  3351 is admitted.

11         (Government Exhibit 3351 in evidence.)

12  BY MS. KOMATIREDDY:

13  Q.   Can you describe generally, and I will publish it to

14  the jury, could you describe generally what these payments

15  were paying for?

16  A.   They started out funding to build race cars that were

17  to be used in the 2007 season, and then they paid for the

18  actual running of the race team in 2007.

19  Q.   So, as an example, I'm going to hand you Government's

20  Exhibit 3358.

21         Do you recognize this?

22  A.   Yes, I do.

23  Q.   What is it?

24  A.   It's the register of the expenses that were incurred

25  at the Daytona race in 2007.

Stewart  -  Direct/Komatireddy

3670

1    Q.    Is this sort of an example of the kinds of expenses

2    that were being paid for by Mr. Constantine for the race

3    car team?

4    A.    Yes.

5    Q.    Is the register information here created at or near

6    the time that the costs are incurred?

7    A.    Yes.

8    Q.    Is it created in the ordinary course of Unitech's

9    business?

10   A.    Yes.

11   Q.    Is it kept in the ordinary course of Unitech's

12   business?

13   A.    Yes.

14          MS. KOMATIREDDY:  The government moves 3358 into

15   evidence.

16          THE COURT:  Any objection, Mr. LaRusso?

17          MR. LARUSSO:  No objection, your Honor.

18          MR. HALEY:  No, sir.

19          THE COURT:  3358 is admitted.

20          (Government Exhibit 3358 in evidence.)

21   BY MS. KOMATIREDDY:

22   Q.    Looking at this, it lists at the top car and crew

23   registration?

24   A.    Yes.

25   Q.    Shirts, logos on shirts, crew suits.

Stewart   -   Direct/Komatireddy

3671

1          Who's wearing those shirts and suits?

2     A.    The suits, I don't see anything on suits here.  I'm

3     sorry.  Shirts, sweatshirts and logos.

4               (Fire alarm sounds.)

5               THE COURT:  We have to exit the courthouse.

6               (Recess taken.)

7               (After recess.)

8               THE COURT:  Please be seated.

9               MS. KOMATIREDDY:  Judge, before we bring the

10    jury in, can I hand up an exhibit?

11              THE COURT:  Yes.

12              MS. KOMATIREDDY:  Any chance we can get this in?

13         Everything in this photo is paid for by stolen

14    hockey player money.  I understand that a video is longer.

15    We would like a visual to encompass the various invoices

16    we put in through the different racing companies and all

17    the different other companies.  I thought I would ask

18    before we do a sidebar.

19              MR. LARUSSO:  One part of me says yeah, maybe

20    they could get me in the photograph and I'll be glad to

21    take it.

22              The other part of me tells me I think we have

23    gone well beyond what the purpose of the witness's

24    testimony was.

25              We had Mr. Miskiewicz asking about helicopters

Stewart  -  Direct/Komatireddy

3672

1  and now the Playboy picture.  I don't think this is

2  relevant.

3          THE COURT:  I don't know that what he's

4  testified so far is irrelevant, but I don't think the

5  picture is necessary for the reasons we already discussed.

6          MS. KOMATIREDDY:  Thank you.

7          THE COURT:  Let's bring in the jury.

8          (The witness resumes the stand.)

9          THE CLERK:  All rise.

10          (The jury is present.)

11          THE COURT:  Please be seated.

12          I apologize for that.  I had a feeling it was a

13  false alarm, but obviously you can't take any chances.  So

14  that was your afternoon break.  I didn't know where

15  Michelle was bringing you.  I thought you were going to a

16  Ducks game she was taking you so far.

17          MR. LARUSSO:  Judge, something came to my

18  attention.  Can I have a brief sidebar?

19          THE COURT:  Yes.

20          (Continued on next page.)

21

22

23

24

25

Stewart  -  Direct/Komatireddy

3673

1          (The following takes place at sidebar.)

2          MR. LARUSSO:  I have had a chance to talk to my

3    client about this.  He says the only payment that may have

4    been relevant was the August 15th payment.  I want to know

5    why we have to introduce all of this if only one payment

6    is relevant?

7          MS. KOMATIREDDY:  It shows a connection in the

8    conspiracy, your Honor.

9          Actually, Mr. Kenner is responsible for some of

10   these payments and they come from the Hawaii account.

11         This is all during the time period

12   Mr. Constantine is siphoning money out from the Little

13   Isle and Ula Makika account.  On the bank statements

14   you'll see direct payments to Unitech during the time

15   period.

16         MR. LARUSSO:  That's fine.  I thought it was

17   only one.

18         MR. HALEY:  So I understand, the offer of proof

19   is that there are payments contained in this exhibit that

20   come out of some bank associated with Ula Makika.

21         MS. KOMATIREDDY:  From Ula Makika to Little

22   Isle, to CMG, to Unitech and they're close in time.

23         (Continued on next page.)

24

25

Stewart  -  Direct/Komatireddy

3674

1             (The following takes place in open court.)

2    BY MS. KOMATIREDDY:

3    Q.   Mr. Stewart, a few more questions.

4             You testified that you were familiar with some

5    of the players in the racing industry and I'm going to ask

6    you about a couple of them.

7             Are you familiar with Cynergy Racing?

8    A.   Yes.

9    Q.   Did you interact with Cynergy Racing when you were

10   running Mr. Constantine's race team?

11   A.   A little bit, yes.

12   Q.   What was the nature of that transaction, if there was

13   any?

14   A.   Tommy rented a Porsche for the Daytona and I had to

15   help arrange to get the car to Florida and do a lot of

16   work on the car and get it ready for the race.

17   Q.   Are you familiar with Finley Motorsports?

18   A.   Yes.

19   Q.   What kind of work do they do?

20   A.   They're similar to my company, except Rob Finley was

21   more like a gentleman driver who was organizing a team

22   more than actually having mechanical equipment to do the

23   regular racing.

24   Q.   Are you familiar with Desert Motorsports?

25   A.   No, I'm not.

Stewart   -   Cross/LaRusso

3675

1    Q.    Now, you noted that you had '06-'07 racing season.

2          Was there a budget for the season?

3    A.    Yes, there was.

4    Q.    Did all payments come in as planned?

5    A.    No, they did not.

6    Q.    Did you have a discussion with Mr. Constantine about

7    where he expected money to come in from?

8    A.    As I explained earlier, we talked about the Playboy

9    sponsorship.

10   Q.    Anything else?

11   A.    Towards the end of our relationship, he talked about

12   a deal that he had in Hawaii and a deal that he had in

13   Mexico, always assuring me that when those deals came to

14   fruition, everything was going to be great and there would

15   be plenty of money for everybody.

16          MS. KOMATIREDDY:  No further questions.

17          THE COURT:  Cross-examination.

18          MR. LARUSSO:  If I may, your Honor.

19

20   CROSS-EXAMINATION

21   BY MR. LARUSSO:

22   Q.    Mr. Stewart, the government showed you the list of

23   monies that were paid to you from May of '06 to September

24   '07; is that correct?

25   A.    Yes, they did.

Stewart   -   Cross/LaRusso

3676

1    Q.    All those bills were paid; is that correct?

2    A.    That's correct.

3    Q.    There's nothing outstanding, is there --

4    A.    No.

5    Q.    -- with regards to the bills that you had with

6    Mr. Constantine?

7    A.    No, there's not.

8    Q.    You mentioned that Mr. Constantine was responsible in

9    most respects for securing the sponsors and the financing

10   for the team; is that correct?

11   A.    Yes.

12   Q.    And one of the sponsors you mentioned was Playboy; is

13   that correct?

14   A.    Yes.

15   Q.    That wasn't the only sponsor, was it?

16   A.    No, it was not.

17   Q.    There was a publicly traded company called Uniden, do

18   you recall that?

19   A.    No, I don't.

20   Q.    I show you what's been marked for identification as C

21   219 and ask if you remember this as an e-mail

22   communication between you and Mr. Constantine on August

23   18, 2007, talking about money coming from Uniden?

24   A.    Uniden.

25         Yes, I do recall this.

Stewart  -  Cross/LaRusso

3677

1   Q.   You recall the e-mail and you recall the sponsor?

2   A.   Yes.

3   Q.   That's a publicly traded company; is that correct?

4   A.   I do not know that.

5   Q.   In addition to Playboy and in addition to Uniden,

6   thank you for the pronunciation, there were others,

7   weren't there?

8   A.   Yes.

9   Q.   Vonage?

10  A.   I don't believe Vonage was part of our program.

11  Q.   You don't have a recollection, or you're not sure?

12  A.   I'm not sure, but I don't believe Vonage was.

13  Q.   Did you ever hear the name?

14  A.   Yes.

15  Q.   Who was responsible for securing the sponsorship?

16  A.   Tommy.

17  Q.   Did you ever hear of a company called Taser?

18  A.   Yes.

19  Q.   That was a publicly traded company?

20  A.   I don't know that.

21  Q.   They're the ones that produce Tasers for the police

22  departments, did you know that?

23  A.   Yes.

24  Q.   Then another sponsor by the name of Life Lock, do you

25  recall that?

Stewart   -   Cross/LaRusso

3678

1   A.   Yes.

2   Q.   Have I left any out?  Do you remember any additional

3   sponsors?

4   A.   Palms Hotel on the car.  I think those.  I don't

5   recall any others.

6   Q.   I'm sorry, sir?

7   A.   I think that's it.

8   Q.   In evidence is 911.  It's a picture of a racing car.

9        I'm going to show you down below in the corner,

10  do you see the words V-O and you can't make it out?

11  A.   Yes.

12  Q.   N-A-G-E, Vonage?

13  A.   Yes.

14  Q.   Does that refresh your recollection that Vonage was

15  also a sponsor?

16  A.   I still don't know that they contributed to this car

17  or our team.

18  Q.   Would it be fair to say at least their name was on

19  the car?

20  A.   Yes.

21        There are several others that I know were not

22  contributors.

23  Q.   You mentioned that Mr. Constantine showed you an ATM

24  receipt for over $2 million; is that correct?

25  A.   Yes.

Stewart   -   Cross/LaRusso

3679

1   Q.   Was that in regards to some of the financial

2   difficulties that you were experiencing at this time in

3   securing the funding for your team and the cars you were

4   building?

5   A.   No, that was at a race when he was assuring me that

6   he was good for the money.

7   Q.   And the money meaning monies that you put out of

8   pocket for the team, Mr. Constantine would reimburse you

9   for expenses; is that correct?

10  A.   That's correct.

11  Q.   No reason to disbelieve what he was saying to you --

12  withdraw that.

13          Do you remember that part of the financial

14  difficulties that you experienced during the racing season

15  stemmed from the fact that you had undertaken

16  responsibility of building two cars to be raced, do you

17  remember that?

18  A.   Yes.

19  Q.   And in regards to that, isn't it a fact that

20  initially there was going to be one car that would be

21  raced and built by you, and then you and Mr. Constantine

22  undertook to build a second one; is that right?

23  A.   That's correct.

24  Q.   And isn't it also correct that you told

25  Mr. Constantine, look, I still have the utmost confidence

Stewart   -   Cross/LaRusso

3680

1    in you and our program.

2              I understand that we have fallen short on our

3    preparations for this season.

4              Do you remember telling him that in an e-mail?

5    A.    Yes.

6    Q.    That was in reference to the fact that you had

7    overcommitted yourself personally to building that second

8    race car?

9    A.    I had not overcommitted myself.

10   Q.    Do you remember telling him, certainly overcommitted

11   my personal financial resources and should never have

12   tried to build a second car until we have all the funding

13   in place.

14             Do you remember telling him that?

15   A.    Yes.

16   Q.    As a matter of fact, let me show you what's marked C

17   217 for identification.

18             Is that an e-mail that you sent to

19   Mr. Constantine on March 16, 2007, in regards to the

20   subject matter that we're now discussing?

21   A.    Yes.

22             MR. LARUSSO:  I'll ask it be received at this

23   time, your Honor.

24             MS. KOMATIREDDY:  No objection, your Honor.

25             MR. HALEY:  No objection, judge.

Stewart  -  Cross/LaRusso

3681

1           THE COURT:  C 217 is admitted.

2           (Defense Exhibit C 217 in evidence.)

3           MR. LARUSSO: Again, I'm not going to publish it

4    all.  If I may, your Honor, I would like to publish a

5    portion of it.

6    BY NR. LARUSSO:

7    Q.   C 217, March 16, 2007, Mr. Jackson Stewart to

8    Mr. Tommy Constantine.  That paragraph portion which is

9    highlighted, that's what we were talking about.

10          Tommy, I continue to have the utmost confidence

11   in you and our program.

12          I also understand that we, in brackets Unitech,

13   that's your company; isn't that correct?

14   A.   That's correct.

15   Q.   Racing, end bracket, have fallen short on our

16   preparations for this season.

17          I certainly overcommitted my personal financial

18   resources and should never have tried to build the second

19   car until we had all the funding in place.

20          That was your e-mail to Mr. Constantine in

21   regards to the situation at that time; is that correct?

22   A.   Yes.

23   Q.   How many races did Mr. Constantine actually

24   participate in under your management I guess is the proper

25   phrase?

Stewart  -  Cross/LaRusso

3682

1   A.   I think it was six.

2   Q.   Was that for both seasons?

3   A.   No, 2005 season -- I'm sorry, 2006 season.  We

4   competed in the entire season except for one race.  That

5   was under Blake Rosser's ownership of the team.

6   Q.   Between the two seasons, how many races did

7   Mr. Constantine participate in as a race car driver?

8   A.   Between 15 and 17 I believe.

9   Q.   And do you remember a man by the name of Mr. Pruitt?

10  A.   Absolutely.

11  Q.   To see if I can bring it full circle, Mr. Pruitt is

12  what you referred to as a gentleman driver?

13  A.   That's correct.

14  Q.   He was supposed to drive the second car; is that

15  correct?

16  A.   That is correct.

17  Q.   The car that you were going to build?

18  A.   Yes.

19  Q.   He contracted to pay money to do that; is that

20  correct?

21  A.   Yes, he did.

22  Q.   When that second car wasn't built, and he didn't get

23  his toy to play with, you filed suit, didn't you?

24        MS. KOMATIREDDY:  Objection.

25        THE COURT:  What relevance does that have?

Stewart  -  Redirect/Komatireddy

3683

1          MR. LARUSSO:  It came out on the government's

2    case before about the Pruitt suit and this is the end

3    result of it.  This is what led to it.

4          THE COURT:  Go ahead.

5    BY MR. LARUSSO:

6    Q.   Is that correct?

7    A.   That's not how I would describe it, no.

8    Q.   Would you describe it as he didn't get what he

9    contracted for to race the second car and he filed suit?

10   A.   That's correct.

11         MR. LARUSSO:  Just one moment, your Honor.

12         (Pause in proceedings.)

13         MR. LARUSSO:  Your Honor, no further questions.

14         THE COURT:  Mr. Haley?

15         MR. HALEY:  No questions.

16         THE COURT:  Redirect.

17         MS. KOMATIREDDY:  Thank you, your Honor.

18

19   REDIRECT EXAMINATION

20   BY MS. KOMATIREDDY:

21   Q.   Mr. Stewart, why didn't you have money to build a

22   second car?

23   A.   Tommy agreed to provide more money than he did, so as

24   the program was moving forward, the money wasn't coming in

25   and I don't think I'm supposed to get into those details.

Stewart  -  Redirect/Komatireddy

3684

1   Q.   You can now that they asked you about it.

2   A.   I learned that -- how Pruitt sent money to Tommy and

3   that money was not directed to us.

4   Q.   What did you have to do personally in order to keep

5   the '07 season going?

6   A.   I put over $400,000 on my credit cards, borrowed

7   money, $225,000 from a friend.

8   Q.   When is the last time -- have you had a chance to pay

9   off that credit card?

10  A.   I have paid off all the credit card debt.

11  Q.   When?

12  A.   It was paid off in 2012.

13  Q.   Have you ever gotten any of that money back from

14  Tommy Constantine?

15  A.   I never billed for it.

16  Q.   He never offered it back, did he?

17  A.   He implied that money would be paid when his deals

18  came to fruition.

19  Q.   Did they?

20  A.   No.

21        MS. KOMATIREDDY:  No further questions.

22

23  RECROSS-EXAMINATION

24  BY MR. LARUSSO:

25  Q.   Didn't you testify that over a million dollars was

Stewart  -  Recross/LaRusso

3685

1  paid to you and that there was no further obligation that

2  Mr. Constantine had to you?

3  A.   That's what I said.

4  Q.   Is that what you testified to on direct and cross?

5  A.   And that's exactly what I just said.

6  Q.   Mr. Constantine owed you no money, your bills were

7  paid; is that correct?

8  A.   That's correct.

9           MR. LARUSSO:  I have no further questions,

10  judge.

11           THE COURT:  You can step down, Mr. Stewart.

12           Thank you.

13           (The witness steps down.)

14           THE COURT:  Next witness.

15           MS. KOMATIREDDY:  The government calls Blake

16  Rosser.

17           THE COURT:  Sir, if you could come up to the

18  witness stand over here and remain standing for the oath.

19

20  BLAKE ROSSER,

21           called as a witness, having been first

22           duly sworn, was examined and testified

23           as follows:

24

25           THE COURT:  Please be seated.

Rosser  -  Direct/Komatireddy

3686

1        Please state your name and spell your last name

2   for the record.

3            THE WITNESS:  Blake Rosser, R-O-S-S-E-R.

4            THE COURT:  Mr. Rosser, if you could just pull

5   the mike close to you so we can all hear you.

6

7   DIRECT EXAMINATION

8   BY MS. KOMATIREDDY:

9   Q.   Where do you live, sir?

10  A.   I live in Las Vegas, Nevada.

11  Q.   And what do you do for a living?

12  A.   I am a developer and I build storage facilities.

13  Q.   Are you also in the race car business?

14  A.   I used to be back in 2006.  I started back in 2003

15  and 2006 was my final year.

16  Q.   Did there ever come a time that you did business with

17  Tommy Constantine?

18  A.   Yes.

19  Q.   Can you describe approximately when did that begin?

20  A.   I met him over the phone and I think we briefly met a

21  little bit in the fall of 2005, and we contracted to do a

22  race car team.  I had a team already.  He contracted with

23  me to run my second car.  He had a sponsorship deal and he

24  offered to sponsor partially my car during that season.  I

25  had a two-car team.

Rosser  -  Direct/Komatireddy

3687

1   Q.   Did you meet with Mr. Constantine during that time?

2   A.   I met him at the track testing at Daytona which was

3   typically in January.

4   Q.   Would you recognize him if you saw him today?

5   A.   Yes.

6           MR. LARUSSO:  Stipulate identification.

7           THE COURT:  Identification has been stipulated.

8   BY MS. KOMATIREDDY:

9   Q.   In 2006, can you just explain to us what the nature

10  of the transaction you had with Mr. Constantine?

11  A.   Basically he came to me because I had a two-car team.

12          He was interested in racing in that season, so

13  we basically created a contract that he would come, bring

14  sponsorship to the team, pay me directly through his

15  racing company, which at the time was Tommy Constantine

16  Racing, to race the season.

17          10 races were on the schedule and we basically

18  set up a deal where he was going to bring a sponsor.

19          I learned later once we started the contract

20  that it was going to be through Playboy and the Palms

21  Casino.

22          So I provided the equipment, which was all the

23  logistics to get the cars to the track, all the tires, the

24  crew workers and everything, fuel, paid all that, and he

25  was to pay me a set fee per race.

Rosser  -  Direct/Komatireddy

3688

1    Q.   Did Mr. Constantine in fact make payments?

2    A.   He did.

3    Q.   Did they all come in on time?

4    A.   No.

5    Q.   Let's start with Government's Exhibit 1733 in

6    evidence.

7              This is the August 2006 bank statement of

8    Constantine Management Group.  I'll turn to page 3.

9              There's a payment on here, Mr. Rosser, $50,000

10   to Vegas Marketing Promotions.

11             What is Vegas Marketing Promotions?

12   A.   That was the name of my company, the LLC I set up

13   that was handling the race car team.  That was basically

14   my race car company.

15   Q.   What was the $50,000 for?

16   A.   That was payment for stuff we did throughout the

17   season.

18             Basically we had a contract of 40,000 per race.

19   $8,000 was to go towards my car and sponsorship and 32,000

20   for the event was to cover Tommy's expense for me

21   providing a car for him.

22   Q.   As of August 2006, did you have various invoices

23   outstanding?

24   A.   Yes.

25             We were kind of in the second half of the

Rosser  -  Direct/Komatireddy

3689

1    season, and at the time we were trying to get comps.  We

2    had over $100,000 per our contract, including some of the

3    crash damage, some of the outside insurance that we

4    purchased for the vehicles in case there was crash damage

5    that would cover that.

6              (Continued on next page.)

Rosser - Direct/Komatireddy

3690

1    BY MS. KOMATIREDDY:  (Cont'd)

2    Q    Crash damage, can you explain that?

3    A    If you are driving a race car, you get in and get on

4    the track.  If you, basically, it's insurance, just like

5    car insurance, but for a racetrack.  It's a lot higher

6    premium, higher deductible.  The odds when you are racing

7    to have some kind of contact goes up.  So irregardless of

8    the driver or additional driver, because basically every

9    driver is responsible for their own vehicle, so there is

10   No-Fault in racing so the insurance was to cover that in

11   case of accidental damage.

12   Q    Were there a lot of crashes when Mr. Constantine was

13   racing the car?

14   A    Yes, there was.

15   Q    I'm handing you Government Exhibits 3381 through

16   3387.  Have you had a chance to review it before coming to

17   court today?

18   A    Yes.

19   Q    What are they?  Can you describe them generally?

20   A    This is damage at the Daytona event for the $649,370.

21         The second invoice, we did a promotional trip to

22   the Playboy Mansion.  We brought both cars for display

23   purposes for a party being done there for sponsorship, and

24   it was for the crew, delivering the cars to the Playboy

25   Mansion, set them up and return them there in a semi truck

Rosser - Direct/Komatireddy

3691

1    with a trailer, to cover the two vehicles, and that was

2    for $539,705.

3    Q    And the rest in which you describe them generally as

4    invoices created by Vegas Marketing Promotions?

5    A    Correct.

6    Q    Are these invoices created in the ordinary course of

7    the company's business?

8    A    Yes.

9    Q    Are they kept in the regular course of the company's

10   business?

11   A    Yes.

12   Q    You produced these to the government prior to today?

13   A    Yes.

14        MS. KOMATIREDDY:  The government moves 3381

15   through 3387 into evidence.

16        MR. LaRUSSO:  No objection, your Honor.

17        THE COURT:  Mr. Haley, any objection?

18        MR. HALEY:  No, sir.

19        THE COURT:  3381 to 3387 are admitted.

20        (Government Exhibits 3381 to 3387 received in

21   evidence.)

22   Q    I'm going to turn your attention to Government

23   Exhibit 3388.  Do you recognize this?

24   A    I do, it's an e-mail communication between Tommy and

25   myself.

Rosser - Direct/Komatireddy

3692

1    Q    Is that a true and accurate -- is that a true and

2    accurate copy of an e-mail communication between you and

3    Mr. Constantine?

4    A    Yes, it is.

5         MS. KOMATIREDDY:  Government moves 3388 into

6    evidence.

7         MR. LaRUSSO:  No objection, your Honor.

8         MR. HALEY:  No objection.

9         THE COURT:  3388 is admitted.

10        (Government Exhibit 3388 received in evidence.)

11   Q    That appears to be a confirmation of payment, is that

12   fair, reflecting the 50,000 payment we looked at earlier?

13   A    Correct.  That is a confirmation of that wire payment

14   to my company.

15   Q    Turning to Government Exhibit 1735, which is in

16   evidence, bank statement to Constantine Management Group,

17   October 2006, turning to page 2, there is a payment to

18   you, $175,000 on October 23, actually to Vegas Marketing

19   Promotions.  Again, that's your company?

20   A    That's correct.

21   Q    What is that payment for?

22   A    That was the payment for the race cars.  At the end

23   of the season, I agreed to sell the equipment to Tommy

24   Constantine because he wanted to continue to race in 2007.

25   And based on the cost and expense of what I dealt with in

Rosser - Direct/Komatireddy

3693

1    2006, I elected not to continue, so I sold him the two

2    race cars and various spares, and I think some additional

3    parts, hardware, things like that.

4    Q    In terms of the cost and expense, what are you

5    talking about in terms of the racing season where you were

6    involved?

7    A    It's expensive, if things don't go well, especially

8    scratch damage, you don't win.  There is prize money

9    involved at the end of the season, one win, one third

10   place finish, and a lot of crash damage, not only my car,

11   the one Tommy was driving.

12          So based on the budget I set forth for 2006 and

13   being basically with what was paid by sponsorship from

14   Tommy and what I contributed through my own situation and

15   sponsors, it just didn't seem to make sense to continue

16   beyond 2006.

17   Q    Now, around this time, halfway through the season of

18   2006, did you have any conversations with Mr. Constantine

19   about him getting you money?

20   A    Yeah.  We basically had conversations, I think

21   before, not sure exactly the time of the event, I want to

22   say maybe May or possibly June, but it was the one in

23   Alabama, not Miller, I think it's -- I can't think of the

24   name, Barber Motorsports Park.  At that time, he was

25   behind on some invoices, and I told him before I would

Rosser - Direct/Komatireddy

3694

1    deliver the cars to the track and allow him to enter the

2    vehicle, that he would need to catch up on his invoices.

3    Q    Did he tell you how he would come up with the money?

4    A    No.  He just said he was working on it, he needed

5    more time because he was trying to get more money out of

6    Playboy and had some other deals cooking.

7    Q    What were the other deals?

8    A    He didn't go into detail.  Said:  Be patient, don't

9    worry.  There will be plenty of money to continue on and

10   maybe even in 2007, if I so chose at that time.

11   Q    I will hand you what's been marked for identification

12   as Government Exhibit 3357.  You mentioned it was around

13   the time of the Barber race?

14   A    Correct.

15   Q    Does that refresh your recollection when the Barber

16   race was?

17   A    This is the 2007 schedule, so it's not always

18   accurate.  I would say 2006.  So I would say this -- it

19   says July 21st, 22nd, most likely around that time, the

20   event itself.

21   Q    Finally going to hand you what's marked Government

22   Exhibit 3389, 3390 and 3392.  Just identify them for the

23   record.

24   A    Okay.  These are agreements between Tommy and I for

25   the bill of sale for the purchase of the assets of the

Rosser - Direct/Komatireddy

3695

1    team, which was the two race cars, parts and bodywork,

2    drivetrain parts, which included one new engine, one low

3    mileage engine, one high mileage timed-out motor, and one

4    blown-up motor to Nissan transmissions in a clutch pack.

5    Q    What were the kind of cars you were selling Mr.

6    Constantine?

7    A    350Z street cars that were developed into race cars,

8    no longer street legal.

9    Q    Looking at 3389 and 3392, are those true and accurate

10   copies of e-mail communications between Mr. Constantine

11   and yourself?

12   A    Yes, it is.

13   Q    Looking at 3390, is that a true and accurate copy of

14   a document that you received from Mr. Constantine and that

15   you later signed?

16   A    Correct, yes, it is.

17          MS. KOMATIREDDY:  Government moves 3389, 3390

18   and 3392 into evidence.

19          MR. LaRUSSO:  No objection, your Honor.

20          MR. HALEY:  No objection, Judge.

21          THE COURT:  Those three documents are admitted.

22          (Government Exhibits 3389, 3390 and 3392

23   received in evidence.)

24          MS. KOMATIREDDY:  I'm going to publish briefly

25   for the jury --

Rosser - cross/LaRusso

3696

1   Q    Looking at 3390, this is the bill of sale you were

2   referring to?

3   A    Yes, that's correct.

4   Q    And when we looked earlier at the $175,000 payment,

5   it's for the things listed in this bill of sale?

6   A    Yes, that is correct.

7           MS. KOMATIREDDY:  No further questions.

8           THE COURT:  Cross-examination?

9           MR. LaRUSSO:  If I may, your Honor.

10  CROSS-EXAMINATION

11  BY MR. LaRUSSO:

12  Q    Good afternoon.  My name is Robert LaRusso.  I

13  represent Mr. Constantine.

14          You said that there was an outstanding invoice

15  in 2006 for about 100,000, is that correct?

16  A    Correct.

17  Q    Is that the last amount of money that Mr. Constantine

18  owed you from the relationship that you had?

19  A    No.

20  Q    What was the other part?

21  A    I believe that was either 50 percent of the original

22  contract or maybe a little beyond that.  I believe they

23  had five more races in the season.  It was about halfway.

24  Q    Do you remember Mr. Constantine having a sponsor by

25  the name of, hope I pronounce it properly, Uniden?  They

Rosser - cross/LaRusso

3697

1    contracted to pay him approximately $510,000, and then

2    reneged, only paid him about $250.  Do you remember that?

3              MS. KOMATIREDDY:  Objection.

4    A    I don't.  Uniden was not on our car.

5    Q    Do you know if he had sponsors for any other cars

6    later on?

7    A    I know he was working with Vonage.  Primarily our car

8    was Playboy at the time and Palms Casino.

9    Q    Do you remember at the time your relationship with

10   Mr. Constantine that he had to sue one or more sponsors to

11   collect monies that were promised?

12   A    I'm not aware.

13   Q    When you were -- tell me the racing period that you

14   worked with Mr. Constantine.  What was the time, you said

15   it was the '05 racing season?

16   A    2006.

17   Q    Just the 2006?

18   A    Just 2006.  I think we did possibly some testing in

19   the fall of 2005 before the season started.  I think that

20   was maybe late November.

21   Q    You said there were ten races scheduled?

22   A    Correct.

23   Q    He was racing one of the cars that he contracted to

24   use from you, is that correct?

25   A    That's correct.

Rosser - cross/LaRusso

3698

1   Q    Again, you were the responsible team member providing

2   the backup for that racing, is that correct?

3   A    Correct.

4   Q    Did Mr. Constantine race in all of those races?

5   A    We did not attend the final race of the reason;

6   Virginia.  That was the tenth race of the season.  I was

7   told he didn't want to go because Playboy wouldn't give

8   him the money since there were no television rights.

9   Q    You did not enter the tenth race?

10  A    No, I subtracted it off his contract.

11  Q    What was the time period for that last race?

12  A    I believe it was scheduled to be in October.

13  Q    Prior to that period of time, when the last race

14  wasn't run, did you have a good working relationship with

15  Mr. Constantine?

16  A    I wouldn't call it good.  I would call it a little

17  bit problematic at times.

18  Q    Let me show you what's been marked C-223.  See if you

19  remember this as an e-mail you sent to Mr. Constantine.

20  A    I'm not aware of this because -- I know we had

21  conversations, but at that point I was pretty much done

22  with moving forward.  I knew we were having a lot of

23  issues.

24  Q    Do you communicate with Mr. Constantine by e-mail?

25  A    I do.

**Rosser - cross/LaRusso**

3699

1    Q    Does that document contain your e-mail address?

2    A    It does.

3    Q    Do you recall, before appearing here today, producing

4    all your e-mail communications you had with Mr.

5    Constantine?

6    A    I produced the ones I was asked for.

7    Q    You didn't produce all the e-mail communications, did

8    you?

9    A    I was not asked to do that.

10   Q    Let me ask you, if I may, do you remember

11   communicating with Mr. Constantine and telling him in

12   effect --

13              MS. KOMATIREDDY:  Objection.  Reading from a

14   document.

15              MR. LaRUSSO:  I ask that C-223 be put in

16   evidence.

17              MS. KOMATIREDDY:  Objection; lack of foundation.

18              THE COURT:  No.  C-223 is admitted.

19              (Exhibit C-223 received in evidence.)

20              MR. LaRUSSO:  I will publish it to the jury at

21   this time, your Honor.

22   Q    This is towards the end of the 2006 season.  Are you

23   able to see that?

24   A    Yeah, I see that.

25   Q    September 6, 2006, that's the date of this e-mail

3700

1    that's in evidence.

2    A     Okay.

3    Q     That's your e-mail address, starts with Blake on the

4    left-hand side?

5    A     Yes, I see that.

6    Q     That's your e-mail address, correct?

7    A     That's correct.  I never received an e-mail from the

8    one up top, from eufora.com.  My e-mails were always Tommy

9    Constantine Racing.  And the part he speaks of did not

10   occur until the end of the season.  And we didn't have a

11   -- there wasn't a party in September because the party was

12   the final, at the end of the season.  The party was at the

13   Palms Casino.  Tommy had the contract for Grand-Am.  That

14   was in October, I believe, so there was still races to be

15   had.

16         So this doesn't quite make sense.  I know he did

17   well at Salt Lake, but other than that, that's not

18   something I recall whatsoever.

19   Q     My turn.

20         Did you have more than one party?

21   A     No.  There was one at the Playboy Mansion at the

22   beginning of the season.

23   Q     Do you remember in effect congratulating Mr.

24   Constantine again on an awesome drive and finish at Salt

25   Lake?

3701

1    A    No.

2    Q    Did you ever pat him on the back for the work he had

3    done at Salt Lake?

4    A    I don't believe so.

5    Q    You are saying this is a doctored, fabricated e-mail?

6    Is that what you are telling this jury?

7    A    I just don't recognize it.

8    Q    So it's possible that you may have sent this e-mail

9    to Mr. Constantine, you just don't want to say it's yours?

10        MS. KOMATIREDDY:  Objection.

11        THE COURT:  Sustained.  You don't have to answer

12   that.

13   Q    I ask as calmly as I can for the reporter, you don't

14   remember this e-mail?

15   A    I do not.

16   Q    No recollection of it?

17   A    I do not.

18   Q    But you are not saying that it's a doctored or forged

19   e-mail, you just don't know, is that it?

20   A    Correct.

21   Q    Did you ever offer congratulations to Mr. Constantine

22   for his Salt Lake efforts?

23   A    I don't believe so, because I was taken out by

24   another driver in that race, so I wasn't even around at

25   the podium or any part.  I was quite upset.  We were doing

3702

1    quite well at the time, and I was taken out by a lady car

2    driver, currently still driving.

3    Q    Do you ever remember telling Mr. Constantine we

4    should talk sometime about next year as teammates,

5    co-owners, customers or fellow competitors, remember

6    telling him that in an e-mail?

7    A    We discussed the 2007 season throughout the year as a

8    possibility of sponsorships were going to continue,

9    because of the relationship we had basically states in the

10   e-mails he wanted to move on with the team in October on

11   his own.

12   Q    Do you remember telling Mr. Constantine you wanted to

13   be his teammate, be a co-owner, you wanted to be a

14   customer, you wanted to have fellow competitors?  Do you

15   remember telling him that?

16   A    Not at that particular time.  We had conversations

17   throughout the season about the possibility of continuing

18   on as long as there was money to be had in the

19   sponsorship.  Only way it would work.

20   Q    Do you remember telling him you are doing exciting

21   things with Grand-Am, and Jackson would like to make plans

22   as to where I fit into that?  Do you remember telling Mr.

23   Constantine that?

24   A    It's possible, but I don't remember in this specific

25   e-mail.  I don't recognize the e-mail address, Eufora.

Rosser - cross/LaRusso

3703

1    Q    Can you tell us what Grand-Am is?

2    A    Of course.

3    Q    Tell us.

4    A    Grand American Racing.

5    Q    You can do some exciting things at Grand-Am that's in

6    the following season, right?

7    A    I was not, at that point I wasn't thinking about next

8    season.  We had too many issues that went out of the

9    window after the invoice in mail.

10   Q    Who was Jackson Stewart?

11   A    My crew chief company I hired to maintain my cars,

12   provide logistics, bring the cars to the track and

13   basically run the team.  I was the owner.

14   Q    Would you be willing to agree, at least at the end of

15   the e-mail, you said:  I would like to talk?

16              MS. KOMATIREDDY:  Objection.

17              THE COURT:  Sustained.

18              MR. LaRUSSO:  That's not his testimony.

19              THE COURT:  I sustained her objection.

20              MR. LaRUSSO:  No further questions.

21              THE COURT:  Mr. Haley, do you have any

22   questions?

23              MR. HALEY:  May we have a very brief sidebar?

24              (Continued on the next page.)

25

**Sidebar**

3704

1           (Sidebar.)

2           MR. HALEY:  This will be brief.

3           With reference to the last witness, these two

4    exhibits were identified and introduced in evidence.  I

5    think the government's offer of proof as to their theory

6    in connection with the money trail, we will address that

7    in terms of our defense.  My question, is there some offer

8    of proof that this individual also received monies?

9           MS. KOMATIREDDY:  The bank statements I went

10   through with him show the urban expansion loan proceeds

11   went to this witness.

12           (Sidebar concluded.)

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Rosser - redirect/Komatireddy

3705

1    REDIRECT EXAMINATION

2    BY MS. KOMATIREDDY:

3    Q    Mr. Rosser, on cross-examination you were asked about

4    your relationship with Mr. Constantine.

5    A    Yes.

6    Q    Do you remember that limiting instruction in prep?

7    A    The limit --

8    Q    Do you remember I told you not to say certain things?

9    A    Yes.

10   Q    It no longer applies.

11   A    Yes.

12   Q    What was your relationship?

13            MR. LaRUSSO:  I object.  That's not necessary,

14   that kind of a comment.

15            THE COURT:  I had made a ruling with regard to

16   certain matters she was referring to, but given the cross,

17   I will allow him to testify as to the nature.

18   Q    Tell the jury the nature of the relationship with Mr.

19   Constantine, how you left it.

20   A    Okay.  The nature of the relationship started off

21   interesting.  I was excited about finally getting a good

22   sponsor on board.  Didn't know much about Tommy's racing

23   background.  The part of having Playboy, I was excited;

24   thought it got exposure for myself and my team.  We had

25   smaller sponsors.  The previous year started off with a

Rosser - redirect/Komatireddy

3706

1    bang.  Money showed up on time.  After a few races, we

2    started having accidents.  I let my car not get repaired

3    one race, Phoenix, because I wanted that relationship to

4    continue.

5          When it became harder and harder to get money,

6    it was literally fighting tooth and nail.  Lot of e-mails

7    back and forth.  Name-calling.  I said okay, if we don't

8    get the car, bottom line, give me a check, cash or check

9    or you can't get in the car.  We need to get square.  I'm

10   not sure with sponsor.  I have numerous e-mails to back

11   that up.

12         Our relationship was rocky, argumentative.  A

13   lot of times, most of the times in the races, we didn't

14   speak too much.  We basically kind of did our own thing.

15   And at that time he was working with Jackson, already

16   talking about what he was going to possibly do next year.

17         Jackson said:  I may move with Tom.  I said:

18   Good luck.  When he offered to purchase the car at the end

19   of the season, I was more than happy to sell it to him

20   because of the e-mail.  Prior to that was ugly.  Didn't

21   agree on a lot of things.

22         That's why the e-mail, patting him on the back,

23   doesn't sound like it would have come out of my mouth.

24   After May, got rocky, got ugly, trying to get the money on

25   time to continue racing.

Meshinsky - direct/Komatireddy

3707

1           MS. KOMATIREDDY:  No further questions.

2    RECROSS EXAMINATION

3    BY MR. LaRUSSO:

4    Q    You got all the money you were owed?

5    A    Yeah, yes; one we subtracted out the race.

6    Q    You got it all?

7    A    Yes.

8           MR. LaRUSSO:  No further questions.

9           THE COURT:  You can step down, Mr. Rosser.

10   Thank you.

11          Next witness?

12          MS. KOMATIREDDY:  The government calls Bob

13   Meshinsky.

14   R O B E R T   M E S H I N S K Y,

15       having been first duly sworn was

16       examined and testified as follows:

17          THE COURT:  Be seated.  State your name, sir,

18   spell your last name for the record.

19          THE WITNESS:  Robert Meshinsky,

20   M.E.S.H.I.N.S.K.Y.

21   DIRECT EXAMINATION

22   BY MS. KOMATIREDDY:

23   Q    Mr. Meshinsky, where do you work?

24   A    Special Agent with the FBI in Phoenix, Arizona.

25   Q    How long have you worked for the FBI?

Meshinsky - direct/Komatireddy

3708

1   A    19 years.

2   Q    What is your title there?

3   A    Special Agent, and I'm also doing computer forensics.

4   Q    Can you describe for us the duties and

5   responsibilities that you have has Special Agent, and

6   particularly in computer forensics?

7   A    Computer forensics.  I'm CART coordinator,

8   responsible for the division's computer forensics team.  I

9   also handle cases as well involving computers.

10  Q    What does CART stand for?

11  A    Computer Analysis Response Team.

12  Q    Have you received any training in the forensic

13  analysis of computers and other electronic devices?

14  A    I have.

15  Q    Can you describe that for us?

16  A    Taken classes over the 18 years.  I have been doing

17  computer forensics, about 1,300 hours of training in

18  Windows environment, Apple environment, Lennox

19  environment, with cell phones, PDFs -- sorry, PDAs, GPS

20  units.

21  Q    About how many hours of training have you gone

22  through, in total?

23  A    Approximately 1,300.

24  Q    Have you received any certifications in the area of

25  forensic analysis of electronic devices?

Meshinsky - direct/Komatireddy

3709

1  A    I have certified in all of the items I just listed.

2  Q    Who issues those certifications?

3  A    The FBI lab.

4  Q    Approximately how many computers have you

5  forensically analyzed in your career?

6  A    I would say over 1,000.

7  Q    Have you testified in court before?

8  A    Yes, I have.

9  Q    Have you been qualified as an expert in court before?

10  A    Yes, I have.

11  Q    Have you ever been qualified -- not been qualified?

12  A    No.

13        MS. KOMATIREDDY:  We offer Mr. Meshinsky as an

14  expert in the field of forensic analysis imaging of

15  computers.

16        MR. HALEY:  I'm convinced.  No objection.

17        MR. LaRUSSO:  No objection.

18        THE COURT:  Same instruction I gave you as an

19  expert applies here.

20        Go ahead.

21  Q    I will take you back to November 2013, specifically

22  November 13, 2013.

23        What were you doing that day?

24  A    I was assigned to be on standby for a search warrant.

25  Q    Search warrant, what was going on in terms of were

Meshinsky - direct/Komatireddy

3710

1   you with other people?

2   A    I was.

3   Q    Who were you with?

4   A    Other FBI agents.

5   Q    What were they doing?

6   A    They were conducting a search warrant at a property

7   in Scottsdale.

8   Q    What was your understanding of what property that

9   was?

10  A    I cannot recall the address other than it was in

11  Scottsdale.

12  Q    What was your understanding who lived there?

13  A    Mr. Kenner.

14  Q    You said you were on standby.  What was your role on

15  the team?

16  A    My responsibilities were to seize any computers that

17  would be found, if they were found.

18  Q    I'm going to hand you what's been marked Government

19  Exhibit 922.  Do you recognize that?

20  A    I do.

21  Q    What is it?

22  A    It's the front door to the house.

23  Q    Is that a true and accurate, fair and accurate

24  depiction of the front door to the house you saw that day?

25  A    Yes.

Meshinsky - direct/Komatireddy

3711

1      MS. KOMATIREDDY:  Government moves 922 into

2  evidence.

3      MR. LaRUSSO:  No objection, your Honor.

4      MR. HALEY:  No objection, Judge.

5      THE COURT:  922 is admitted.

6      (Government Exhibit 922 received in evidence.)

7  Q    You said you were on standby.  Was there a time you

8  went into this home?

9  A    When I was called in.

10  Q    When you went into the home, where did you go?

11  A    There was a side entrance just off the kitchen.

12  Q    Where did you go when you went in?

13  A    When I went in, I walked through the kitchen,

14  proceeded to the office.

15  Q    Can you describe for us where in this home the office

16  is located?

17  A    Going through the front door, the office would be to

18  the right after you pass the living room.

19  Q    When you went into the office, can you describe

20  generally what it looked like?

21  A    Home office, musical instruments on the walls.  I

22  believe there was a keyboard there.  Couple of computers.

23  Other digital media.

24  Q    I will hand you what's been marked Government's

25  Exhibits 924, 925 and 950.  Do you recognize those?

Meshinsky - direct/Komatireddy

3712

1    A    I do.

2    Q    Are those fair and accurate depictions of the home

3    office in the home that you were searching that day?

4    A    Yes.

5            MS. KOMATIREDDY:  Government moves 924, 925 and

6    950 into evidence.

7            MR. HALEY:  Judge, I'm sure I have seen them.  I

8    just don't recall the exhibit numbers.  Can I just take a

9    look?

10           Thank you.  No objection.

11           MR. LaRUSSO:  No objection.

12           THE COURT:  Those three exhibits are admitted.

13           (Government Exhibits 924, 925 and 950 received

14   in evidence.)

15   Q    Turning to 924, is this the office you entered?

16   A    Yes.

17   Q    When you entered, what did you do?

18   A    My responsibilities were to look for the computers.

19   Q    Were there any computers?

20   A    Yes, there was two that I saw.

21   Q    Just looking at this picture, I'm going to point to

22   the desk area, is that a computer, one of the computers

23   that you saw?

24   A    That is.

25   Q    What did you do when you saw that computer?

Meshinsky - direct/Komatireddy

3713

| | |
|---|---|
| 1 | A    I saw that the computer was on.  I removed it, then |
| 2 | removed the power source and went into the living room |
| 3 | with the computer. |
| 4 | Q    When you picked up the computer, did you observe any |
| 5 | physical damage to the computer? |
| 6 | A    I did not. |
| 7 | Q    Was it broken in any way? |
| 8 | A    No. |
| 9 | Q    I'm going to hand you what's been marked as |
| 10 | Government Exhibit Device 1.  You can take it out of the |
| 11 | package and inspect it.  Do you recognize that? |
| 12 | A    I do. |
| 13 | Q    What is it? |
| 14 | A    It's an Apple laptop computer. |
| 15 | Q    Is that laptop computer you see in this photograph? |
| 16 | A    Yes. |
| 17 | Q    The one that was on and working when you found it? |
| 18 | A    Correct. |
| 19 | Q    Is that in substantially the same condition that you |
| 20 | found it in on November 13, 2013? |
| 21 | A    Yes. |
| 22 |         MS. KOMATIREDDY:  The government moves what's |
| 23 | been marked GX Device 1 in evidence. |
| 24 |         MR. LaRUSSO:  No objection, your Honor. |
| 25 |         MR. HALEY:  The actual computer itself? |

Meshinsky - direct/Komatireddy

3714

1      MS. KOMATIREDDY:  Yes, sir.

2      MR. HALEY:  No objection.

3      THE COURT:  GX Device 1 is admitted.

4      (Government Exhibit Device 1 received in

5  evidence.)

6  Q    You said you took this computer and went into the

7  living room; is that right?

8  A    Correct.

9  Q    What did you do when you got there?

10 A    When I got to the living room, I looked at the screen

11 to see if FileVault was running.

12 Q    What is FileVault?

13 A    FileVault is an encryption that's on the Apple

14 operating system, allows you to encrypt the hard drive, if

15 you so choose.

16 Q    Before you got to FileVault, you looked at the

17 screen, was the computer working?

18 A    Yes.

19 Q    Was there any error message that popped up?

20 A    No.

21 Q    Did you have to login?

22 A    No.

23 Q    When you looked for FileVault, how did you physically

24 do that?

25 A    I went to systems setting, found the securities tab,

Meshinsky - direct/Komatireddy

3715

1   found FileVault.  I looked to see if FileVault was

2   running.  It was not running.

3   Q    During the time that you were manipulating this

4   computer, was there any indication the hard drive was

5   crashed?

6   A    No.

7   Q    What happened after you checked FileVault?

8   A    After I checked FileVault, I powered it down like you

9   normally would.

10  Q    Then what did you do next?

11  A    I took that computer to the kitchen where they were

12  processing all of the evidence.

13  Q    Did you seize other computers as well during the

14  search warrant?

15  A    Yes.

16  Q    I'm going to hand you what's been marked as

17  Government Exhibit Device 2, Device 3.  Take a moment to

18  inspect those.  Can you describe for the record, what is

19  Device 2?

20  A    Device 2 is a MacBook Air laptop computer.

21  Q    And looking at the photograph of the desk in the

22  office, Government Exhibit 950 appears to be a silver

23  object right here?

24  A    Correct.

25  Q    Is that where Device 2 was?

3716

1   A    Yes, same laptop, but it's upside down.

2   Q    What's on top of it?

3   A    External hard drive.

4   Q    Looking at Device 3, do you recognize that?

5   A    Yes.

6   Q    What is it?

7   A    External hard drive, CD.

8   Q    The same one found in Mr. Kenner office?

9   A    Yes.

10  Q    Are Device 2 and Device 3 in substantially the same

11  condition when you found them on November 13, 2013?

12  A    Yes.

13          MS. KOMATIREDDY:  The government moves Device 2

14  and Device 3 in evidence.

15          MR. HALEY:  Can I have a brief voir dire?

16          THE COURT:  Yes.

17  VOIR DIRE EXAMINATION

18  BY MR. HALEY:

19  Q    When you received, sir, or seized, pursuant to your

20  testimony, Device 2 -- Device 1, Device 2 and Device 3,

21  you say you took them into the kitchen at some point, is

22  that correct?

23  A    Yes.

24  Q    Who was in the kitchen at that point in time?

25  A    Other members of the search team were there, and

Meshinsky - direct/Komatireddy

3717

1   that's where basically they were putting together all the

2   evidence they were seizing.

3   Q    Did there come a point in time these devices left the

4   premises?

5   A    Correct.

6   Q    Who took them from the premises?

7   A    The seizing agent.

8   Q    That wasn't you, correct?

9   A    No.

10  Q    Just so I understand, when was the last time you saw

11  these devices, the computers, since the time you seized

12  them back on November 13th up to today?

13  A    I saw them when they were in the lab when I imaged

14  them.

15          MR. HALEY:  Your Honor, I will get to that on my

16  cross.  Thank you.  I have no objection.

17          MR. LaRUSSO:  No objection.

18          THE COURT:  Device 2 and Device 3 are admitted.

19          (Government Exhibits Device 2 and Device 3

20  received in evidence.)

21  DIRECT EXAMINATION (Continued)

22  BY MS. KOMATIREDDY:

23  Q    Special Agent Meshinsky, with respect to all three

24  devices, looking at them today in the courtroom, how do

25  you recognize them to be the same devices you seized that

Meshinsky - direct/Komatireddy

3718

1     day in November of 2013?

2     A    We have a label that we have, has the case number,

3     date the search warrant took place, item number, location,

4     and then item description.  It was found by, in this case

5     found by myself.  We recertify another Special Agent that

6     was there.

7     Q    With respect to Device 2, the other laptop, was that

8     device physically damaged in any way?

9     A    Physically damaged, no.

10    Q    Did you image both laptop computers?

11    A    I did.

12    Q    Can you describe for us, what does it mean to image a

13    computer?

14    A    In this particular case, both these computers were

15    taken to the lab in Phoenix.  The hard drives were removed

16    from the computers, placed behind a forensic write

17    blocker.  No data can be written to them.  I used FTK

18    imaging.  And I conducted an image of the hard drives,

19    images like a photocopy of the hard drive bit for bit

20    copy.

21              (Continued on the next page.)

22

23

24

25

Meshinsky - Direct/Komatireddy

3719

1    Q    And you said you used a write block.  What does that

2    achieve?

3    A    The write blocker makes sure that no evidence, no

4    data is written from the exam machine to your original

5    evidence.

6    Q    Other than what you initially described with respect

7    to device one, checking as to an encryption program, did

8    you manipulate that device in any way?

9    A    No.

10   Q    After you conducted your imaging, is there a way to

11   check whether the imaging was successful?

12   A    Yes, the image when it is completed there is an MD5

13   hash that is created which is like an electronic

14   fingerprint unique to every, unique to each image.

15   Q    What does an MD5 hash look like?

16   A    A long number and letter combination.

17   Q    And did you -- how do you use an MD5 hash to verify

18   your imaging work properly?

19   A    I compare the beginning and the end if the numbers

20   are the same.

21   Q    With respect to devices one and two, did you check

22   whether the image was correct using the MD5 hash method?

23   A    Yes.

24   Q    And were they?

25   A    Yes.

Meshinsky - Direct/Komatireddy

3720

1           MS. KOMATIREDDY:  At this time we move

2    Stipulation 36 which has been signed by the parties.

3           THE COURT:  Any objection?

4           MR. HALEY:  No objection.

5           MR. LARUSSO:  No objection.

6           THE COURT:  Stipulation 36 and may be read to

7    the jury.

8           MS. KOMATIREDDY:  It is hereby stipulated and

9    agreed by and between the United States of America and the

10   defendants Phil A. Kenner and Tommy C. Constantine,

11   through their attorneys, that there are imaged copies of

12   Government's Exhibits device one, device two device and

13   three in the custody of the Government.

14          Each of the imaged copies reflects that the

15   original devices were fully operational at the time they

16   were seized.

17          Government's Exhibit 6001 through 6017, 6500

18   through 6503, and 6700 through 6712 are true and accurate

19   printed copies of files found on the devices.

20          This stipulation and the foregoing exhibits are

21   admissible as evidence at trial.

22          At this time the Government moves these exhibits

23   in evidence.

24          MR. HALEY:  No objection.

25          MR. LARUSSO:  No objection, your Honor.

Meshinsky - Direct/Komatireddy

3721

1        THE COURT:  The exhibits referred to in the

2   stipulation are admitted.

3        (Whereupon, Government Exhibit Stipulation 36

4   was received in evidence.)

5   Q    Publishing Government's Exhibit 6701 for the jury.

6   Pursuant to this stipulation, this is one of the files

7   found on the computer.

8        Special Agent Meshinsky, can you read for us on

9   the record the top left what is the name on there?

10  A    Peca, Michael.

11  Q    There is a number and then it says note, correct?

12  A    Correct.

13  Q    Actually at the very top this document is titled Loan

14  Transaction History, correct?

15  A    Correct.

16  Q    Going to Government's Exhibit 6702, there's another

17  document at the top that says Loan Transaction History,

18  and it's cut off at the top.

19  A    Yes.

20  Q    What is the name on the top there?

21  A    Berard, Bryan.

22  Q    You are not from New York, are you, Mr. Meshinsky?

23  A    I am not.

24  Q    Finally, looking at Government's Exhibit 6709, it

25  appears to be a bank statement, correct?

3722

1    A    Correct.

2    Q    For Little Isle IV, correct?

3    A    Correct.

4    Q    And it starts December 31, 2003.  Is the first

5    statement here?

6    A    That's correct.

7            MS. KOMATIREDDY:  No further questions.

8            THE COURT:  Okay.  Cross-examination.

9            MR. HALEY:  Thank you, Judge.

10   CROSS-EXAMINATION

11   BY MR. HALEY:

12   Q    Special Agent Meshinsky, good afternoon, sir.

13   A    Good afternoon.

14   Q    When you imaged the hard drives on the computers that

15   have been identified, actually there are two computers and

16   one stand-alone hard drive?

17   A    I only did the two computers.

18   Q    So the hard drive has not been imaged as of today?

19   A    It was imaged here in New York.

20   Q    Did you do the imaging of the hard drive in New York?

21   A    I did not.

22   Q    Do you know if was there a special agent, a forensic

23   analyst, who did that imaging, if you know?

24   A    I can take a look the a the label and see.

25   Q    Sure.

Meshinsky - Cross/Haley

3723

1   A    FBI New York office CART is the original evidence.  I

2   would guess it was imaged here by the CART examiner, yes.

3   Q    Do you know who that CART examiner would be?

4   A    Based on that drive, no.

5   Q    Do you know if that person has your level

6   credentials?  Yes or no?

7   A    Yes.

8   Q    When you say imaging and you used the term to verify

9   the MD5 --

10  A    -- Hash value.

11  Q    So I understand, sir, several years ago the British I

12  think for the first time cloned sheep.

13           My question to you is when you image that hard

14  drive off OF those original computers, is that like taking

15  the DNA out of the hard drive?  Is that a fair analogy or

16  not?

17           In other words, everything is identical, the

18  information, when that information was entered, the

19  software programs, the operational programs.  I mean is it

20  as if -- well, it's a mirror image, and is that a fair

21  statement.

22           I'm struggling with my explanation.  I look as

23  it as taking the DNA out.

24  A    That's exactly the case.

25  Q    Meaning I'm looking in the mirror I see this face and

3724

1    it is the same face I'm looking at, true?

2    A    Correct.

3    Q    Sir, with reference to your usual protocol, as

4    relates to coming on the scene of someone's residence

5    where you expect there to be computers, have there ever

6    been instances where knowing that you are going into a

7    private residence where someone's computer and/or

8    computers are going to be seized, you bring in equipment

9    on site where you can image the hard drives on the

10    computers at that time.

11            Has that occurred in the past?

12    A    That has occurred.

13    Q    And given your experience over the years, sir, can we

14    agree that a person's computer, particularly in this day

15    and age, a laptop computer, may contain evidence in terms

16    of crimes, whether it's -- I'll not use that, whether it

17    is financial records or pictures but it also can include a

18    great deal of personal information, wholly unrelated to

19    the investigation, is that a fair statement?

20    A    Correct.

21    Q    Who, if anyone, sir, when it came to the execution of

22    the search warrant at that location, and I believe it is a

23    matter of record Phil Kenner's home you saw at the front

24    door, who if anyone within the search warrant team, made

25    the determination that you would physically seize

3725

1    Mr. Kenner's computers from his residence, rather than

2    mirror image the hard drives on the scene in order that

3    those computers would still physically be available for

4    Mr. Kenner or his family to view?  Who made that

5    determination?

6    A     I can't recall at this time.

7    Q     You said that there was an encryption program on one

8    or more of the computers; is that correct?

9    A     File Vault is part of the operating system for Apple.

10   Q     When you say part of the operating system -- it's

11   just part of the operating system, it comes as part of the

12   computer you have an encryption program.  That's what you

13   are saying?

14   A     That's correct.  You can turn it on or off.

15   Q     So the existence of an encryption program on an Apple

16   computer is not something in and of itself sinister, is

17   that true?

18   A     Correct.

19   Q     You were able, were you not, sir, to easily access

20   the content contained on those computers once you seized

21   them pursuant to that search warrant; is that true -- I'll

22   rephrase the question.

23         Were there any passwords in place when you

24   seized those computers and accessed the information on

25   those computers such that you could not readily access it?

3726

1    A    There was no password.  The only computer that I

2    accessed of these two here was the first item.

3    Q    So though you were asked on direct about the

4    encryption program when you got the computers, no one had

5    activated some encryption program to see whoever obtained

6    the computer at that point in time could not access the

7    information, that's true; is that correct?

8    A    That's correct.  File Vault was not turned on.

9    Q    Were you present when FBI agents first entered

10   Mr. Kenner's home that day?

11   A    I was not.

12   Q    I take it then, sir, do you have any knowledge, sir,

13   as to how they entered the home, whether they rang the

14   doorbell, forcibly came in through the front or back door.

15   Do you have any knowledge as to how they entered the home

16   that day?

17   A    I do not.

18   Q    But is it fair to state, sir, that when you got there

19   and saw the computers in the office as has been depicted

20   in those photographs, that you saw no evidence of any

21   effort by Phil Kenner to either destroy or damage that

22   computer.  I mean they were on a desk, correct?

23   A    They were on a desk, correct.

24   Q    So after you first saw the computer on November 13,

25   2013, the next time you saw those computers, was in the

3727

1    lab, you said.  Is that true?

2    A    That's correct.

3    Q    And where was that lab, sir, located?

4    A    Phoenix, Arizona.

5    Q    I take it in offices of the Federal Bureau of

6    Investigation?

7    A    Yes.

8    Q    Was it your office or where within the office

9    complex?

10   A    It is the FBI building, a stand-alone building, and

11   my lab is on the third floor.

12   Q    Did you simply image the information on those

13   computers, sir, or did you also have occasion to look at

14   the content of the files on that computer?

15   A    I just imaged the files.  Excuse me, I imaged the

16   hard drive onto another hard drive and sent it here to New

17   York.

18   Q    When you say sent it here to New York, the imaged

19   hard drives?

20   A    The hard drive containing the images of these

21   computers.

22   Q    I see.

23        Meaning that those computers stayed in Arizona,

24   is that your testimony?

25   A    Correct.

3728

1    Q    And do you know what, if anything, occurred with

2    reference to those computers, the physical computers

3    themselves that stayed in Arizona?  Were they secured in

4    the locker?  Were they subject to further forensic

5    analysis by FBI agents?

6              Do you know what happened?

7    A    They were stored in evidence.

8    Q    Do you know -- well, I apologize sir, if I asked this

9    question before.

10             So since the day they were received on

11   November 13, 2013 up until today -- well, when -- from the

12   point they were received on November 13, 2013, when were

13   they removed from that vault in the FBI offices in Arizona

14   to this location?

15   A    I would have to check the chain of custody.

16   Q    Are you able to do that in connection with any

17   document you have in front of you, sir?

18   A    No -- excuse me, I can.

19   Q    Would you do that for us, please?

20   A    Sure.  Looking at this, it was shipped from Phoenix

21   via Federal Express on September 3, 2014.

22   Q    And do you know where it was located once it arrived

23   here in New York in September of 2014?

24   A    I do not.  I would assume they went into the evidence

25   room.

Meshinsky - Cross/Haley

3729

1    Q    When you say their evidence room --

2    A    I'm sorry, New York FBI evidence room.

3    Q    Just physically where is that located?

4    A    I do not know.  I would assume it is in the New York

5    office.

6    Q    Is the New York office in Manhattan, if you know?

7    A    I do not know.

8    Q    Do you have any knowledge, sir, in connection with

9    documents that have been produced in this proceeding that

10   are documents retrieved from the original hard drives of

11   those devices, as to how those documents were acquired?

12   Were they acquired off of the hard drives on the original

13   documents or were they acquired off the imaged hard

14   drives?

15   A    I do not.

16   Q    Well based upon your training and experience, once

17   you obtained the imaged hard drives, is it not true that

18   typically it is the imaged hard drives, if not

19   exclusively, the imaged hard drives that are used to

20   acquire electronic data and electronically stored files

21   for purposes of what is called Rule 16 discovery?

22            Does that mean something to you, Rule 16

23   discovery?

24   A    Yes.

25   Q    I hope I haven't made that question too convoluted.

Meshinsky - Cross/Haley

3730

1      My question is do you know what Rule 16

2  discovery is?

3  A    Yes.

4  Q    What is your understanding of Rule 16 discovery?

5           MS. KOMATIREDDY:  Objection, relevance.

6           THE COURT:  Yes.  I don't want him to get into

7  Rule 16 discovery.  If you have a question with respect to

8  the mirrored hard drive versus the other one -- and I

9  don't want him to come back from Arizona.

10          MR. HALEY:  And I'll make sure that doesn't

11 happen.

12          THE COURT:  Let's not get into Rule 16

13 discovery.

14 Q    Based upon your training and experience, sir, if the

15 U.S. Attorney's Office asked you to provide information to

16 them in connection with the prosecution of the case, would

17 you go to the imaged hard drive for purposes of retrieving

18 those electronically filed information, or would you go to

19 the original hard drive?

20 A    The image.  We only work off the image.

21          MR. HALEY:  I have no further questions.

22          MR. LARUSSO:  No question.

23          (Continued.)

24

25

3731

1   REDIRECT EXAMINATION

2   BY MS. KOMATIREDDY:

3   Q     On cross examination you were asked questions about

4   user passwords when you were going on to device one.  When

5   you logged off of device one, what, if anything, did you

6   observe about the information?

7   A     The user on in was Mr. Kenner.

8               MS. KOMATIREDDY:  No further questions.

9               MR. LARUSSO:  No further questions.

10              MR. HALEY:  No further questions.

11              THE COURT:  Members of the jury, that completes

12  your week.  I was hoping that the government would be able

13  to rest their case, but I spoke with the lawyers and I

14  anticipate that will happen sometime on Monday and then

15  we'll begin with the defense case which I continue to

16  estimate to be one to two weeks.  So that's the schedule

17  along that line.

18              Have a good weekend.  Don't listen or read

19  anything about the case.  Don't discuss the case.  I'll

20  see you Monday at 9:30.

21              Thank you.

22              (Whereupon, at this time the jury exits the

23  courtroom.)

24              THE COURT:  Why don't you be seated.  Why don't

25  you come up, Mr. LaPinta.  I just wanted to place some

3732

1    rulings on the record.

2         I think it is obvious but I think I want the

3    record to be clear:  We had discussion about limiting the

4    testimony of Mr. Stewart and Mr. Rosser and I gave them

5    instructions, and Mr. LaRusso had indicated to me, I said,

6    well, if you cross him on this you will make -- this will

7    all become relevant, and he's hoped there would not be

8    cross but there was which he's entitled to do, but with

9    respect to both witnesses the nature of the cross was to

10   suggest that with respect to first one, Mr. Rosser, that I

11   guess he's trying to suggest a couple things and the

12   Government obviously did not go into any of their things

13   on direct but it was suggested during the cross that there

14   was a good relationship with Mr. Constantine, he was

15   patting him on the back and everything was great, and

16   showed him an e-mail related to that.

17        So it's my view that the Government was then

18   entitled because he had opened the door to explore what

19   the nature of that relationship was.  So that's why that

20   ruling no longer applied.

21        Similarly with respect to Mr. Stuart on cross,

22   there was a suggestion that Mr. Stewart, and I don't know

23   how this is related to what the issues are in this case,

24   but for whatever reason, there was a discussion about how

25   he had overcommitted himself with respect to his funds,

3733

1    and there was the Pruitt lawsuit, Mr. Pruitt.  So that

2    opened the door for the Government to be able to discuss

3    the suggestion whether that -- the suggestion on cross

4    that it was Mr. Stuart's fault, that he was in the

5    financial condition he was in, for whatever strategic

6    reason and then the Government would ask him why he was in

7    the condition that he was in.

8              So that's the ruling.

9              MR. LARUSSO:  Your Honor, for the record, I

10   agree with the Court.  Based on the direct I felt I had to

11   and I did open the door and whatever objection I made

12   obviously I'll comply with the Court's ruling.

13             THE COURT:  Mr. LaPinta, come up.

14             I apologize.  I know you were supposed to be

15   here at four, you missed the fire drill, and I have to

16   leave in about 30 minutes.  So I'll give each side time.

17   I've read the papers including the letter you submitted

18   yesterday.  You don't have to walk me through.

19             MR. LAPINTA:  I will not, Judge.

20             THE COURT:  But so I'll give each side up to ten

21   minutes or so to state their position and then I'll place

22   my ruling on the record.

23             Just hold on one second.

24             MR. LARUSSO:  Just, one moment with Mr. LaPinta.

25             (Counsel confer.)

3734

1          THE COURT:  Okay, Mr. LaPinta.

2          MR. LAPINTA:  Yes, Judge, let me start by saying

3    since it is the Government's burden of proving probable

4    cause under the crime-fraud exception, perhaps they should

5    go first.

6          THE COURT:  Well, on the issue of privilege, you

7    have to prove that it is privileged, right?

8          MR. LAPINTA:  Right.

9          THE COURT:  I don't really care who goes first.

10         MR. LAPINTA:  That's fine.

11         THE COURT:  That's right under the crime-fraud

12   exception but --

13         MR. LAPINTA:  So I think clearly it is.

14         I read all the case law on this.  Also I said to

15   you the other day when I was here, this is not a mere

16   explanation of a bank ledger sheet describing the date of

17   deposit and the date of a transfer or withdrawal.  There

18   is more to it.

19         The exact language of the Government's

20   opposition reflects that and I made reference to that

21   particular sentence in my reply.

22         What we have here is a situation where this

23   lawyer was involved in a multitude of different issues

24   regarding a number of different witnesses in this trial.

25   Yes, his escrow account was used.  Yes, his escrow account

3735

1   was used to have moneys deposited from alleged victims and

2   obviously there were withdrawals made.

3          Putting aside when the withdrawals were made and

4   the amounts of withdrawals, anything else in terms of who

5   authorized the withdrawals, for what purpose, if they were

6   obtained from the client, are clearly privileged

7   information.  That information is not shattered by any

8   other doctrine except potentially the crime-fraud

9   exception.

10          Now, the Government in their papers

11  interestingly says they are not looking to introduce

12  privileged information so I don't think we get to the

13  crime-fraud exception here.  They don't want to introduce

14  or go close to introducing privileged information.  In

15  fact in their opposition papers those aren't mentioned,

16  they don't argue the crime-fraud exception.

17          So I haven't been here every day of the trial, I

18  don't know the record amply enough to comment in detail

19  whether probable cause has been established or not

20  regarding the use of this account.  I'm told that there

21  has been evidence introduced.  I would ask for you to

22  consider the following:  From Mr. Richards' point of view,

23  there has not been any illegal activity in this account.

24  The State Bar of California conducted a very thorough

25  investigation and found no wrongdoing on behalf of

3736

1   Mr. Richards.  There has been no charges lodged against

2   Mr. Richards regarding the operation of his escrow

3   account.

4            When we speak of a lawyer testifying at a trial

5   regarding intimate discussions about the transfers of

6   money held in a trust account we are treading on dangerous

7   waters regarding that privilege.  That's all I'll say.

8            I'll reflect -- I'll rely on my initial

9   submission regarding privilege.  If you want me to now

10  take a second step and talk about criminal crime-fraud

11  exception some more, I'll do that.  If you want me to talk

12  about the retainer and fee information, I'll talk about

13  Shargel and how I believe that case is much different than

14  here.

15            THE COURT:  Let me say a couple of things and

16  obviously I've sat through five weeks of trial.

17            MR. LAPINTA:  Yes.

18            THE COURT:  So I'm very familiar with that

19  escrow account, it has been litigated for hours with

20  numerous witnesses.  The first thing, maybe you will find

21  this surprising, but I think as the Government pointed out

22  the other day when you were here, we had numerous lawyers

23  come into this Court regarding payments made and fee

24  arrangements and transactions and moneys owed and

25  invoices, exactly the type of testimony that they are

3737

1    seeking to elicit from Mr. Richards and not a single

2    lawyer has even raised this issue.  So -- which I think is

3    a reflection why absent some special circumstance,

4    disclosure of client identity and fee information is not

5    privileged.  There is case after case after case that says

6    that.

7             The only situation -- I shouldn't say the only,

8    but the special circumstances that create the privilege

9    and even in that type of situation it would be if the fee

10   information itself would in and of itself disclose a

11   confidential communication.  The classic example given the

12   case law which you may have seen is when a client

13   anonymously pays back money to the IRS and obviously for

14   the lawyer to say, oh, that related to an anonymous

15   payment to the IRS, it would reveal a communication.  We

16   obviously don't have that type of situation here and in

17   fact as you are probably aware, many, many of the entries

18   on that escrow account that the Government seeks to elicit

19   relates to public lawsuits that Mr. Richards was involved

20   in.  Certainly can't be any privilege about a lawyer being

21   asked in connection with that public lawsuit, where you

22   publicly representing hockey players on this escrow

23   account, what moneys were there in connection with that

24   representation.

25             MR. LAPINTA:  Actually I agree with that.  I'm

3738

1    not saying --

2              THE COURT:  It's part of what the Government

3    wants to do, they've got a lot of entries and they want

4    them to articulate.  This is for the lawsuit against Ken

5    Jowdy; this was not.  So I don't know what would be

6    privileged about that, to be honest with you.

7              I'm hearing what you are saying and I don't

8    think we're disagreeing on the law, but as relates to this

9    escrow account when you look at the entry, certainly if

10   the Government wants to put a client on the stand because

11   there are some entries they contend that had nothing to do

12   with any lawsuits and had nothing to do with any legal

13   representation by Mr. Richards, so that can't possibly be

14   privilege.

15             If they asked Mr. Richards, do you see this

16   money going to Playboy Enterprises, is that in connection

17   with any representation of yours, was that payment

18   potentially representing -- I assume his answer based upon

19   what I understand, no, doesn't have anything to do with

20   race car repair.  So I don't understand.  That's my

21   understanding what the Government wants Mr. Richards to

22   testify about.  I don't understand how any of that can

23   implicate a privileged implication.

24             MR. LAPINTA:  Let me draw a hypothetical that

25   may be better to articulate.

3739

1          The question is posed, for example:

2     Mr. Richards, regarding the transfer out of your escrow

3     account on -- I'm making up this date up -- June 12, 2015,

4     what was that payment for?  Okay?

5               THE COURT:  Okay.

6               MR. LAPINTA:  And his answer would be:  My

7     client, Mr. Doe, told me that that payment was for this,

8     because he said to me that this is related to the purpose

9     of why I'm holding it, and he's authorized me to do it.

10    Okay.  That's a communication from a client.  That's more

11    than just explaining who is written on the check, the date

12    of the check.  It's a rationale, it's an explanation and

13    perhaps a mens rea of committing a crime that is

14    articulated to him from his client.

15              THE COURT:  That's a fair point.  I'll just ask

16    the Government if they asked him why, why was this money

17    sent here?  Certainly that could implicate a communication

18    and you have to get into the crime-fraud exception

19    obviously but that certainly would implicate potentially a

20    privileged communication.

21              I guess I'm not clear whether the Government is

22    intent on asking him those why questions:  Why did you

23    allow this money to go here?  Why did you allow this money

24    to go there?

25              MR. LAPINTA:  Because in their opposition they

3740

1   say they seek to call Mr. Richards to identify now in

2   their words the amounts and purposes of the fees he

3   received from the fund.

4          So --

5          THE COURT:  For his services.

6          MR. LAPINTA:  Sorry?

7          THE COURT:  For things that he did, right?

8          MR. LAPINTA:  Well, it doesn't say that.

9   Doesn't say specifically for things he did.  I read this

10  as being any transaction out of his escrow account

11  relating to the fund.

12         THE COURT:  Let me ask the Government to clarify

13  so we don't have ships passing in the night here.

14         Do you intend asking about particular

15  transactions, you know, why did you allow this money to go

16  here or there?

17         MS. KOMATIREDDY:  No, your Honor, there's an

18  accounting aspect to this and I realize there is a

19  separate communications aspect.  We're focused on the

20  accounting aspect.

21         The main question is who told you to wire the

22  money out?  And that basically goes to the accounting

23  aspect of this money and Mr. Richards' law firm's

24  accounting system would be assigned to a particular

25  client, the client trust account, money being held in

3741

1    escrow for a client, for that client's purposes, whatever

2    they might be, and it is relevant, as your Honor is aware

3    to this case, to understand who is in control of wiring

4    that money in and out.  If it's not Mr. Richards, which I

5    think Mr. Richards' answer would be it wasn't in his own

6    control, it wasn't his income, it was held on behalf of

7    someone else, it is fair game to ask the identity of the

8    client, and with respect to the money that did go to his

9    fees which are reflected as internal transfers in that

10   account, then it is fair game to ask the identity of the

11   client as to those fees and the engagement to which it

12   was.

13          As your Honor points out, there were multiple

14   public engagements that Mr. Richards had with either

15   Mr. Kenner or Mr. Constantine in May of 2009 that had

16   nothing to do with lawsuits against Ken Jowdy and we

17   believe that it is important to segregate out those law

18   firm fees for which Mr. Richards was being compensated for

19   a Jowdy suit versus other things.

20          THE COURT:  Okay.  So it sounds like a good way

21   of framing it.  The accounting aspects and not the

22   communication aspect.

23          MR. LAPINTA:  To that extent we would stipulate

24   to that.

25          I've spoken to both counsel.  We have a proposed

3742

1    stipulation that would address just that, the identity of

2    the client authorizing each of the transfers, when it took

3    place, what the transfer is for that's written on the

4    check.  That's easy.  We're willing to stipulate to that.

5            The next step.  Regarding the retainer

6    agreements and fee structures that is a little more webby

7    of a situation for the following reason:  There has been

8    at the initial inception of this attorney-client

9    relationship a written agreement for an hourly rate.

10   Afterwards, because there were so many things going on

11   related to that initial retainer, that billable retainer

12   was put aside and a flat fee retainer was engaged.

13           Now this is what is dangerous, that flat fee

14   retainer involves a number of different clients.  So

15   without specifically understanding the question regarding

16   that fee, you may be implicating other clients' confidence

17   besides these defendants' here.  It's dangerous because of

18   the unknown of the particular questions --

19           THE COURT:  Look, I saw in your letter, and I

20   believe we're way behind schedule on the trial so I'm all

21   in favor of a stipulation.  If it's a matter of an

22   accounting and there is no dispute, I don't see why

23   Mr. Richards has to be an accountant and sit up here and

24   go through basic accounting information, who authorized it

25   and in what amount and what it was for.  If there is an

3743

1    agreement on that, I don't know why the Government would

2    actually need Mr. Richards.

3          MR. MISKIEWICZ:  Your Honor, we'll attempt to

4    see if we can resolve it by way of stipulation between now

5    and Monday.  We've made the arrangements to have him here.

6    We'll obviously call it off.

7          THE COURT:  He's going to plan to be here, but I

8    would urge you, tomorrow we don't have court.  I would

9    urge you to talk to Mr. LaPinta and defense attorneys to

10   see if you can reach an agreement on that and if you reach

11   an agreement and everyone signs a stipulation he doesn't

12   need to be here on Monday.  You don't need to get my okay.

13         MR. MISKIEWICZ:  I had suggested a few days when

14   Mr. LaPinta was here to talk to counsel and get us a

15   proposed stipulation.  I haven't seen one yet.  I don't

16   know if we'll be able to agree.

17         THE COURT:  When you say get, why don't you put

18   together what you want of proof from Mr. Richards, and for

19   them to put the stipulation they are not sure what you

20   need from them.  I don't want you to waste time drafting

21   it.  Propose to them what the outline would be and if they

22   agree in principle --

23         MR. MISKIEWICZ:  I understand, your Honor.  I

24   believe we can.  We'll do it.

25         MR. LAPINTA:  We'll discuss that, your Honor,

3744

1   and hopefully we'll be able to present this to you that

2   will save you time, energy, and research.

3           THE COURT:  Well, I've done all the research.

4           MR. LARUSSO:  I'll sit down with Mr. LaPinta

5   right now.  We'll see if we can do it today so we don't

6   have to wait until tomorrow.

7           THE COURT:  My understanding of the Government's

8   theory of the case and the defense, I don't think why a

9   stipulation can't be reached, where there is a claim of

10  lack of authorization or something like that.

11          MR. MISKIEWICZ:  Your Honor, there's another

12  aspect to the subpoena which is a subpoena for records and

13  Mr. Richards has refused to turn over any records which

14  would be the underlying records that would substantiate

15  and frankly be able to provide to both parties to come to

16  a factual stipulation.  So we would ask those at least be

17  turned over immediately.

18          THE COURT:  I know, but if you need those

19  records to prove that Mr. Constantine authorized something

20  or that money went to a certain matter, if he's willing to

21  stipulate to that, then you don't need the underlying

22  records.  Only if there was a dispute about what you are

23  attempting to prove.

24          MR. MISKIEWICZ:  Well, we don't need to belabor

25  this.

3745

1          THE COURT:  This is what I'm worried about based

2     upon -- if you can reach a stipulation on this, this will

3     not be we'll get Mr. Richards on the stand and get him

4     off.  You could have him come up, we'll have to have

5     sidebars, dismiss the jury potentially and dismiss them

6     for a break.  But even on the accounting stuff I assume

7     Mr. Richards with as many matters and clients he has, will

8     not be able to sit there from memory and get into all the

9     documents and he'll be sitting up there just looking at

10    his firm's documents trying to figure out what was for

11    what matter and that's not going to take two minutes.

12    That's going to be, you know, a laborious process.  So I

13    think --

14          MR. MISKIEWICZ:  I represent to the Court we are

15    going to do everything we can to bang out a stipulation

16    that will obviate a need to call him to the stand.  We've

17    been working on this for four weeks now to try to get him

18    here and we're this close.

19          MR. LAPINTA:  He'll be here, ordered to be here.

20    He hasn't refused anything.  We haven't refused to submit

21    any documents, as far as I'm concerned, since I'm involved

22    in this case.

23          THE COURT:  You are new.

24          MR. LAPINTA:  Well, that's a good thing.  I will

25    say this, though.  To the extent that they are asking for

3746

1    certain records, he doesn't possess many of those records,
2    so he can't --
3            THE COURT:  I saw that in your letter too.
4            MR. LAPINTA:  Which is another obstacle we have
5    to deal with as well.
6            THE COURT:  I don't think Mr. Richards'
7    testimony, given what I think Mr. Constantine and
8    Mr. Kenner's defenses are in this case, that he's a
9    credible witness in this case.  I don't see it that way,
10   so I'm hopeful there will be a stipulation.
11           MR. LAPINTA:  Your Honor, if there is not a
12   stipulation, I asked for this in my papers, I would ask
13   them then for a hearing outside the presence of the jury
14   to outline this so that there is a clear path of where
15   this will go because I know what will happen here.  If
16   that is not done, there is going to be a major
17   confrontation and a faceoff, for lack of a better
18   expression, excuse the pun, that may not be the best in
19   light of the jury and the progress of this trial.
20           THE COURT:  When you say hearing, I will not
21   have -- that we'll have a dry run and see how it goes,
22   I'll not do that.  If it comes to that, we'll bring in
23   Mr. Richards and explain to him if I rule certain things
24   aren't privileged, I would explain to him I don't think it
25   is privileged and what the Government will ask you about.

3747

1    I think that is the best way to deal with it, not a

2    dialogue between him and the lawyers where it will go.

3    We'll not have let's try this out and see how that goes.

4              MR. LAPINTA:  That's a fair point and I agree.

5              In the alternative at the very least there

6    should be a detailed proffer by the Government so I can

7    make a record and argue privilege that is then defined by

8    the Court so there is no hiccups or accidental violations

9    of the privilege that don't attach to any of the witnesses

10   or defendants here.

11             THE COURT:  Again, talk to the Government about

12   those entries they are interested in.  They are doing a

13   pretty detailed offer of proof the way they want them in.

14   The way it would work out is with respect to anything that

15   is public or doesn't otherwise reveal by his

16   representation of someone, a confidential communication,

17   that that would be permissible.  So if the Government has

18   as an example, you present a hockey player in connection

19   with Ken Jowdy, yes.  On this escrow account, which moneys

20   represented work that you did on the escrow account, and

21   if they got to an entry that dealt with another hockey

22   player that had nothing to do with a public lawsuit, that

23   would potentially reveal something he was potentially

24   representing a hockey player on that would be problematic,

25   we'd have to have a sidebar and he would know that he had

3748

1    a right to ask for a sidebar if it pertained to that.  It

2    would not be pretty, would be time consuming.

3              MR. LAPINTA:  Just a litany in a laundry list of

4    items they want to explore in their opposition papers are

5    materials obtained from a state bar committee that has

6    other issues of privilege and confidentiality.

7              THE COURT:  They can point to you to which

8    entries they are interested in.  I think if you will enter

9    into a stipulation that will be the subject of a

10   stipulation as to --

11             MR. LAPINTA:  I'm generally an optimistic guy.

12   I don't have that optimism with this, but I'll certainly

13   do my best.

14             THE COURT:  If not, Mr. Richards will be here

15   Monday morning and it would not be productive to do it

16   this way.  But the Government says they'll make every

17   effort to make an effort, so obviously we'll need the

18   cooperation of the defense lawyers.

19             MR. LAPINTA:  And I trust that.

20             MR. MISKIEWICZ:  If your Honor, we may borrow

21   the courtroom.

22             THE COURT:  Yes.

23             MR. MISKIEWICZ:  Also one thing, sort of a

24   housekeeping matter regarding very quickly a photograph we

25   wanted to enter.  Mr. LaRusso had indicated that under

3749

1   certain conditions he would agree to stipulate to the

2   photograph.  So we ask that perhaps the Court can

3   reconsider. (Handing.)

4           THE COURT:  Very funny.

5           MR. LARUSSO:  I have a feeling I know what that

6   is.

7           MR. HALEY:  I know your Honor needs to leave,

8   and this is really off of the point, this is a matter we

9   reached agreement on.  This morning I gave Mr. Miskiewicz

10  the redacted copy of Kenner 43 which are the notes taken

11  regarding the interview, telephonic interview of Mr. John

12  Kaiser, on October 19, 2010.

13          The idea would be they'll be admitted as Kenner

14  43 in this form to avoid calling Criminal Investigator

15  Scott Jenowski (ph).

16          THE COURT:  I want the record to be clear, what

17  Mr. Miskiewicz said as a joke.  They put Mr. LaRusso's

18  face on a photograph and said it could not be admitted

19  into evidence.

20          MR. LARUSSO:  I had no objection.

21          MR. MISKIEWICZ:  We just found it.  We have a

22  million pages, Judge, of discovery.

23          THE COURT:  Have a good night.

24          Proceedings adjourned until Monday, June 15,

25  2015 at 9:30 a.m.)

3750

1                        WITNESSES

2    GLEN MURRAY                              3567

3    CROSS-EXAMINATION                        3567

4    BY MR. LARUSSO

5    REDIRECT EXAMINATION                     3584

6    BY MR. MISKIEWICZ

7                                             3584

8    RECROSS-EXAMINATION                      3600

9    BY MR. HALEY

10   RECROSS-EXAMINATION                      3610

11   BY MR. LaRUSSO

12   J O H N   P A U L   O S B O R N          3614

13   DIRECT EXAMINATION                       3615

14   BY MR. MISKIEWICZ

15   CROSS-EXAMINATION                        3639

16   BY MR. HALEY

17   JACKSON STEWART                          3662

18   DIRECT EXAMINATION                       3663

19   BY MS. KOMATIREDDY

20   CROSS-EXAMINATION                        3675

21   BY MR. LARUSSO

22   REDIRECT EXAMINATION                     3683

23   BY MS. KOMATIREDDY

24   RECROSS-EXAMINATION                      3684

25   BY MR. LARUSSO

3751

```
1    BLAKE ROSSER                              3685

2    DIRECT EXAMINATION                        3686

3    BY MS. KOMATIREDDY

4    CROSS-EXAMINATION                         3696

5    BY MR. LaRUSSO

6    REDIRECT EXAMINATION                      3705

7    BY MS. KOMATIREDDY

8    RECROSS EXAMINATION                       3707

9    BY MR. LaRUSSO

10   R O B E R T   M E S H I N S K Y           3707

11   DIRECT EXAMINATION                        3707

12   BY MS. KOMATIREDDY

13   VOIR DIRE EXAMINATION                     3716

14   BY MR. HALEY

15   DIRECT EXAMINATION (Continued)            3717

16   BY MS. KOMATIREDDY

17   CROSS-EXAMINATION                         3722

18   BY MR. HALEY

19   REDIRECT EXAMINATION                      3731

20   BY MS. KOMATIREDDY

21

22                     EXHIBITS

23   Government Exhibit 3351 in evidence       3669

24   Government Exhibit 3358 in evidence       3670

25
```

3752

| | |
|---|---|
| Defense Exhibits C 214 in evidence | 3572 |
| Defense Exhibit C 215 in evidence | 3584 |
| Defense Exhibit C 217 in evidence | 3681 |
| | |
| Kenner Exhibit C-103 received in evidence | 3600 |
| Kenner Exhibit c-104 received in evidence | 3605 |
| Osborn Exhibit 1 received in evidence | 3625 |
| Government Exhibits 3381 to 3387 received in evidence | 3691 |
| Government Exhibit 3388 received in evidence | 3692 |
| Government Exhibits 3389, 3390 and 3392 received in evidence | 3695 |
| Exhibit C-223 received in evidence | 3699 |
| Government Exhibit 922 received in evidence | 3711 |
| Government Exhibits 924, 925 and 950 received in evidence | 3712 |
| Government Exhibit Device 1 received in evidence | 3714 |
| Government Exhibits Device 2 and Device 3 received in evidence | 3717 |
| Government Exhibit Stipulation 36 was received in evidence | 3721 |

**1**

## $

**$1,230,000** [2] - 3601:3, 3603:11
**$1,468,078.02** [1] - 3598:23
**$100,000** [5] - 3585:9, 3585:14, 3585:17, 3606:1, 3689:2
**$15** [1] - 3575:5
**$175,000** [1] - 3692:18, 3696:4
**$225,000** [1] - 3684:7
**$250** [2] - 3653:24, 3697:2
**$279,590** [1] - 3607:20
**$385,000** [2] - 3587:24, 3588:7
**$385,481.75** [1] - 3586:18
**$400,000** [1] - 3684:6
**$401,933** [1] - 3607:4
**$42,000** [2] - 3586:1, 3586:11
**$42,500** [1] - 3605:25
**$42,553** [5] - 3585:16, 3604:11, 3604:17, 3605:17, 3606:12
**$42,553.00** [1] - 3605:14
**$5,000** [2] - 3585:16, 3654:2
**$50,000** [2] - 3688:9, 3688:15
**$510,000** [1] - 3697:1
**$539,705** [1] - 3691:2
**$649,370** [1] - 3690:20
**$8,000** [1] - 3688:19
**$800,000** [3] - 3590:19, 3591:7, 3592:4
**$844,518.25** [1] - 3588:1

## '

**'04** [1] - 3601:8
**'05** [1] - 3697:15
**'O6** [2] - 3587:11, 3675:23
**'O6-'07** [1] - 3675:1
**'O7** [2] - 3675:24, 3684:5

## 0

**01810** [1] - 3601:17

## 1

**1** [28] - 3567:18, 3579:7, 3579:13, 3579:16, 3605:10, 3609:3, 3624:3, 3624:5, 3624:25, 3625:3, 3625:12, 3625:15,
3625:16, 3625:17, 3625:18, 3625:22, 3625:25, 3626:4, 3628:9, 3631:11, 3637:4, 3713:10, 3713:23, 3714:3, 3714:4, 3716:20, 3752:9, 3752:19
**1,000** [1] - 3709:6
**1,230,000** [1] - 3588:14
**1,300** [2] - 3708:17, 3708:23
**1.037** [1] - 3588:21
**1.2** [1] - 3589:12
**1.23** [1] - 3588:12
**1.4** [1] - 3598:23
**10** [7] - 3584:10, 3586:6, 3591:16, 3592:5, 3592:19, 3620:3, 3687:17
**100** [3] - 3558:15, 3559:20, 3587:4
**100,000** [4] - 3595:21, 3605:18, 3607:25, 3696:15
**101** [1] - 3598:7
**103** [2] - 3600:8, 3600:13
**104** [6] - 3577:5, 3577:6, 3605:1, 3605:6, 3605:8
**105** [1] - 3640:4
**11** [1] - 3558:9
**11/30/2007** [1] - 3588:19
**11501** [1] - 3559:3
**11572** [1] - 3559:7
**11722** [2] - 3558:15, 3559:21
**11749** [1] - 3558:22
**12** [2] - 3646:7, 3739:3
**12/15** [1] - 3637:16
**12/15/2004** [1] - 3646:6
**13** [6] - 3709:22, 3713:20, 3716:11, 3726:24, 3728:11, 3728:12
**13th** [1] - 3717:12
**140** [1] - 3596:5
**15** [4] - 3575:13, 3639:10, 3682:8, 3749:24
**15th** [2] - 3623:1, 3673:4
**16** [8] - 3680:19, 3681:7, 3729:21, 3729:22, 3730:1, 3730:4, 3730:7, 3730:12
**1601** [1] - 3558:21
**17** [1] - 3682:8
**1733** [1] - 3688:5
**1735** [1] - 3692:15
**18** [4] - 3584:11, 3658:17, 3676:23, 3708:16
**180,000** [2] - 3595:22, 3595:24
**19** [3] - 3652:1, 3708:1, 3749:12
**1990** [1] - 3616:15
**1st** [2] - 3623:14, 3637:19

## 2

**2** [21] - 3587:10, 3604:8, 3631:10, 3637:4, 3659:25, 3665:12, 3665:17, 3678:24, 3692:17, 3715:17, 3715:19, 3715:20, 3715:25, 3716:10, 3716:13, 3716:20, 3717:18, 3717:19, 3718:7, 3752:21
**200** [1] - 3619:7
**2003** [5] - 3649:24, 3657:25, 3658:15, 3686:14, 3722:4
**2004** [6] - 3601:13, 3603:9, 3607:17, 3623:1, 3637:16, 3656:24
**2005** [14] - 3601:5, 3623:14, 3637:19, 3637:22, 3646:7, 3649:24, 3652:3, 3656:24, 3658:7, 3658:8, 3664:17, 3682:3, 3686:21, 3697:19
**2005-2006** [2] - 3658:22, 3659:2
**2006** [34] - 3585:16, 3586:19, 3587:11, 3605:10, 3605:11, 3607:2, 3649:24, 3650:12, 3655:15, 3656:17, 3658:3, 3658:5, 3658:7, 3658:9, 3666:19, 3682:3, 3686:14, 3686:15, 3687:9, 3688:7, 3688:22, 3692:17, 3693:1, 3693:12, 3693:16, 3693:18, 3694:18, 3696:15, 3697:16, 3697:17, 3697:18, 3699:22, 3699:25
**2006-2007** [1] - 3564:4
**2007** [14] - 3564:3, 3664:17, 3666:7, 3666:21, 3669:17, 3669:18, 3669:25, 3676:23, 3680:19, 3681:7, 3692:24, 3694:10, 3694:17, 3702:7
**2009** [7] - 3568:15, 3572:20, 3574:19, 3589:10, 3597:5, 3597:19, 3741:15
**2010** [10] - 3583:3, 3583:10, 3584:11, 3584:17, 3596:23, 3597:16, 3597:17, 3597:20, 3616:19, 3749:12
**2011** [4] - 3649:24, 3657:13, 3657:20, 3658:15
**2012** [2] - 3658:1, 3684:12

**2013** [10] - 3658:1, 3658:16, 3709:21, 3709:22, 3713:20, 3716:11, 3718:1, 3726:25, 3728:11, 3728:12
**2014** [3] - 3657:14, 3728:21, 3728:23
**2015** [4] - 3558:9, 3640:9, 3739:3, 3749:25
**203** [2] - 3578:1, 3596:24
**21** [1] - 3655:15
**2137** [1] - 3587:8
**214** [7] - 3570:23, 3572:4, 3572:11, 3572:15, 3589:18, 3595:3, 3752:2
**215** [5] - 3583:8, 3583:19, 3583:25, 3584:4, 3752:3
**217** [5] - 3680:17, 3681:1, 3681:2, 3681:7, 3752:4
**2178** [2] - 3598:6, 3598:16
**219** [1] - 3676:21
**21st** [2] - 3572:19, 3694:19
**22nd** [1] - 3694:19
**23** [1] - 3692:18
**24** [1] - 3574:18
**25** [1] - 3587:11
**26** [1] - 3559:7
**27** [1] - 3568:15
**279590** [5] - 3600:24, 3607:3, 3607:6, 3607:12, 3607:18
**29** [2] - 3601:5, 3601:13

## 3

**3** [10] - 3688:8, 3715:17, 3716:4, 3716:10, 3716:14, 3716:20, 3717:18, 3717:19, 3728:21, 3752:21
**30** [3] - 3601:16, 3654:17, 3733:16
**300** [1] - 3559:3
**300,000** [1] - 3586:23
**31** [4] - 3568:6, 3605:11, 3607:2, 3722:4
**32** [1] - 3615:16
**32,000** [1] - 3688:19
**3351** [5] - 3668:15, 3669:6, 3669:10, 3669:11, 3751:23
**3357** [1] - 3694:12
**3358** [5] - 3669:20, 3670:14, 3670:19, 3670:20, 3751:24
**3381** [5] - 3690:15, 3691:14, 3691:19, 3691:20, 3752:10
**3387** [5] - 3690:16, 3691:15, 3691:19, 3691:20, 3752:10

2

**3388** [5] - 3691:23, 3692:5, 3692:9, 3692:10, 3752:12
**3389** [5] - 3694:22, 3695:9, 3695:17, 3695:22, 3752:13
**3390** [6] - 3694:22, 3695:13, 3695:17, 3695:22, 3696:1, 3752:13
**3392** [5] - 3694:22, 3695:9, 3695:18, 3695:22, 3752:13
**35** [3] - 3663:15, 3663:19, 3663:21
**3500** [2] - 3591:20, 3596:1
**350Z** [1] - 3695:7
**3515** [2] - 3585:12, 3586:15
**3567** [2] - 3750:2, 3750:3
**3572** [1] - 3752:2
**3584** [3] - 3750:5, 3750:7, 3752:3
**36** [4] - 3720:2, 3720:6, 3721:3, 3752:23
**3600** [2] - 3750:8, 3752:7
**3605** [1] - 3752:8
**3610** [1] - 3750:10
**3614** [1] - 3750:12
**3615** [1] - 3750:13
**3625** [1] - 3752:9
**3639** [1] - 3750:15
**3662** [1] - 3750:17
**3663** [1] - 3750:18
**3669** [1] - 3751:23
**3670** [1] - 3751:24
**3675** [1] - 3750:20
**3681** [1] - 3752:4
**3683** [1] - 3750:22
**3684** [1] - 3750:24
**3685** [1] - 3751:1
**3686** [1] - 3751:2
**3691** [1] - 3752:10
**3692** [1] - 3752:12
**3695** [1] - 3752:13
**3696** [1] - 3751:4
**3699** [1] - 3752:15
**37** [4] - 3579:5, 3579:6, 3579:13, 3579:16
**3705** [1] - 3751:6
**3707** [3] - 3751:8, 3751:10, 3751:11
**3711** [1] - 3752:16
**3712** [1] - 3752:17
**3714** [1] - 3752:19
**3716** [1] - 3751:13
**3717** [2] - 3751:15, 3752:21
**3721** [1] - 3752:23
**3722** [1] - 3751:17
**3731** [1] - 3751:19
**385** [1] - 3606:20

## 4

**4** [2] - 3580:20, 3582:6
**4,533** [1] - 3604:15
**40,000** [2] - 3586:4, 3688:18
**42** [1] - 3604:16
**43** [2] - 3749:10, 3749:14
**4th** [2] - 3624:1, 3624:7, 3640:9

## 5

**5** [2] - 3580:20, 3582:6
**50** [1] - 3696:21
**50,000** [1] - 3692:12
**5104** [5] - 3622:12, 3622:16, 3624:19, 3626:16, 3626:19
**56** [1] - 3650:22

## 6

**6** [1] - 3699:25
**60** [3] - 3591:12, 3591:15, 3592:18
**6001** [1] - 3720:17
**6017** [1] - 3720:17
**631** [1] - 3559:21
**6500** [1] - 3720:17
**6503** [1] - 3720:18
**6700** [1] - 3720:18
**6701** [1] - 3721:5
**6702** [1] - 3721:16
**6709** [1] - 3721:24
**6712** [1] - 3720:18

## 7

**7** [2] - 3656:13, 3656:17
**712-6101** [1] - 3559:21

## 8

**8/09/06** [1] - 3603:24
**8/25** [1] - 3607:2
**8/31/06** [1] - 3603:24
**844** [1] - 3588:16

## 9

**9** [2] - 3574:19, 3607:2
**90** [3] - 3591:13, 3591:15, 3592:18
**911** [1] - 3678:8
**922** [5] - 3710:19, 3711:1,

3711:5, 3711:6, 3752:16
**924** [5] - 3711:25, 3712:5, 3712:13, 3712:15, 3752:17
**925** [4] - 3711:25, 3712:5, 3712:13, 3752:17
**950** [5] - 3711:25, 3712:6, 3712:13, 3715:22, 3752:17
**9:30** [3] - 3558:9, 3731:20, 3749:25

## A

**a.m** [3] - 3558:9, 3584:10, 3749:25
**aberration** [1] - 3634:20
**aberrations** [1] - 3636:11
**ability** [1] - 3625:3
**able** [19] - 3572:17, 3586:11, 3608:7, 3609:17, 3613:5, 3625:8, 3627:1, 3638:10, 3649:2, 3656:5, 3699:23, 3725:19, 3728:16, 3731:12, 3733:2, 3743:16, 3744:1, 3744:15, 3745:8
**absent** [1] - 3737:3
**absolutely** [4] - 3589:4, 3589:6, 3650:18, 3682:10
**academic** [1] - 3619:1
**academy** [1] - 3643:7
**Academy** [2] - 3616:22, 3617:17
**accepted** [1] - 3643:5
**accepting** [1] - 3561:20
**access** [4] - 3618:24, 3725:19, 3725:25, 3726:6
**accessed** [2] - 3725:24, 3726:2
**accident** [1] - 3566:15
**accidental** [2] - 3690:11, 3747:8
**accidents** [1] - 3706:2
**accomplish** [2] - 3561:9, 3569:23
**according** [2] - 3587:17, 3587:25
**account** [28] - 3604:10, 3604:19, 3606:12, 3607:3, 3607:6, 3607:12, 3607:15, 3607:19, 3609:12, 3673:10, 3673:13, 3734:25, 3735:20, 3735:23, 3736:3, 3736:6, 3736:19, 3737:18, 3737:23, 3738:9, 3739:3, 3740:10, 3740:25, 3741:10, 3747:19, 3747:20
**accountant** [1] - 3742:23
**accounting** [8] - 3740:18,

3740:20, 3740:22, 3740:24, 3741:21, 3742:22, 3742:24, 3745:6
**accounts** [1] - 3564:12
**accurate** [12] - 3579:2, 3632:9, 3654:2, 3692:1, 3692:2, 3694:18, 3695:9, 3695:13, 3710:23, 3712:2, 3720:18
**accurately** [2] - 3631:21, 3632:6
**accused** [2] - 3581:19, 3640:2
**achieve** [2] - 3617:7, 3719:2
**achieved** [1] - 3667:16
**acknowledge** [3] - 3613:1, 3639:25, 3655:14
**acquire** [2] - 3665:4, 3729:20
**acquired** [4] - 3664:24, 3729:11, 3729:12, 3729:13
**Acting** [1] - 3558:14
**action** [1] - 3632:12
**activated** [1] - 3726:5
**active** [1] - 3618:25
**activities** [1] - 3570:18
**activity** [1] - 3735:23
**actual** [3] - 3576:2, 3669:18, 3713:25
**acuity** [1] - 3603:10
**ad** [4] - 3667:24, 3667:25, 3668:3, 3668:4
**add** [1] - 3614:7
**addition** [4] - 3619:16, 3624:18, 3677:5
**additional** [4] - 3586:18, 3678:2, 3690:8, 3693:2
**address** [13] - 3568:13, 3571:11, 3571:16, 3574:21, 3584:12, 3605:11, 3699:1, 3700:3, 3700:6, 3702:25, 3704:6, 3710:10, 3742:1
**addresses** [1] - 3568:17
**adjourned** [1] - 3749:24
**administrative** [1] - 3617:14
**admissible** [1] - 3720:21
**admission** [3] - 3563:23, 3605:3, 3625:12
**admitted** [22] - 3572:11, 3572:13, 3572:14, 3583:25, 3600:17, 3605:6, 3622:11, 3625:16, 3669:10, 3670:19, 3681:1, 3691:19, 3692:9, 3695:21, 3699:18, 3711:5, 3712:12, 3714:3, 3717:18, 3721:2, 3749:13, 3749:18

3

**advance** [1] - 3639:21
**advantage** [1] - 3645:23
**affect** [1] - 3651:7
**affected** [2] - 3630:5, 3630:22
**affirming** [1] - 3654:21
**afternoon** [4] - 3672:14, 3696:12, 3722:12, 3722:13
**afterwards** [1] - 3742:10
**age** [4] - 3650:23, 3651:1, 3657:19, 3724:15
**agencies** [1] - 3620:7
**Agent** [7] - 3707:24, 3708:3, 3708:5, 3717:23, 3718:5, 3721:8, 3722:12
**AGENT** [1] - 3614:1
**agent** [2] - 3717:7, 3722:22
**agents** [4] - 3602:12, 3710:4, 3726:9, 3728:5
**ago** [10] - 3586:7, 3595:2, 3606:7, 3639:8, 3639:15, 3641:24, 3642:4, 3642:10, 3642:11, 3723:11
**agree** [21] - 3568:21, 3590:5, 3601:25, 3602:2, 3603:8, 3604:8, 3607:16, 3640:15, 3641:23, 3646:4, 3650:15, 3656:22, 3703:14, 3706:21, 3724:14, 3733:10, 3737:25, 3743:16, 3743:22, 3747:4, 3749:1
**agreed** [4] - 3608:17, 3683:23, 3692:23, 3720:9
**agreement** [15] - 3564:3, 3575:10, 3575:19, 3603:20, 3608:13, 3622:21, 3622:25, 3623:6, 3623:13, 3637:22, 3742:9, 3743:1, 3743:10, 3743:11, 3749:9
**agreements** [6] - 3622:17, 3624:12, 3626:19, 3637:15, 3694:24, 3742:6
**ahead** [6] - 3579:12, 3608:22, 3615:4, 3621:23, 3683:4, 3709:20
**air** [1] - 3715:20
**airplane** [1] - 3570:10
**Alabama** [1] - 3693:23
**alarm** [2] - 3671:4, 3672:13
**albeit** [1] - 3636:17
**alignment** [1] - 3618:14
**ALL** [1] - 3566:24
**alleged** [1] - 3735:1
**allow** [9] - 3561:5, 3561:7, 3618:6, 3628:8, 3694:1, 3705:17, 3739:23, 3740:15
**allowed** [1] - 3561:16
**allows** [2] - 3618:9,

3714:14
**almost** [3] - 3575:8, 3601:3, 3651:6
**alone** [2] - 3722:16, 3727:10
**alteration** [1] - 3618:1
**alternative** [1] - 3747:5
**amateur** [1] - 3667:11
**AMERICA** [1] - 3558:3
**America** [1] - 3720:9
**American** [10] - 3616:15, 3616:22, 3616:25, 3617:1, 3617:17, 3617:19, 3619:11, 3619:12, 3643:7, 3703:4
**amount** [10] - 3587:2, 3587:14, 3588:2, 3601:2, 3604:10, 3604:15, 3607:4, 3668:4, 3696:17, 3742:25
**amounts** [4] - 3585:8, 3590:23, 3735:4, 3740:2
**amply** [1] - 3735:18
**analogy** [1] - 3723:15
**analysis** [27] - 3624:2, 3624:17, 3626:20, 3627:25, 3628:2, 3638:3, 3638:6, 3643:5, 3643:11, 3643:18, 3643:21, 3645:7, 3647:25, 3648:8, 3648:17, 3648:19, 3648:21, 3648:24, 3649:16, 3650:8, 3658:6, 3708:11, 3708:13, 3708:25, 3709:14, 3728:5
**analyst** [1] - 3722:23
**analyze** [4] - 3622:15, 3623:5, 3623:15, 3623:17
**analyzed** [1] - 3709:5
**andover** [1] - 3601:17
**ANDREW** [1] - 3559:6
**Ann** [1] - 3559:20
**announcing** [1] - 3583:11
**anonymous** [1] - 3737:14
**anonymously** [1] - 3737:13
**Answer** [2] - 3585:18, 3586:22
**answer** [11] - 3577:24, 3590:7, 3610:7, 3611:17, 3612:18, 3653:14, 3655:2, 3701:11, 3738:18, 3739:6, 3741:5
**anticipate** [2] - 3653:25, 3731:14
**apex** [1] - 3635:10
**apologize** [15] - 3565:22, 3571:7, 3573:18, 3584:5, 3593:20, 3598:5, 3601:9, 3604:4, 3614:7, 3641:8, 3641:11, 3645:11, 3672:12, 3728:8, 3733:14
**apparatus** [1] - 3618:20

**appear** [13] - 3606:9, 3606:12, 3623:6, 3626:19, 3628:15, 3629:1, 3629:19, 3629:22, 3629:25, 3633:21, 3633:23, 3635:10, 3646:25
**appearance** [5] - 3628:22, 3629:13, 3637:10, 3646:8, 3653:4
**APPEARANCES** [1] - 3558:13
**appearances** [1] - 3560:3
**appeared** [4] - 3619:5, 3637:25, 3656:25, 3659:8
**appearing** [5] - 3622:19, 3624:12, 3624:13, 3626:24, 3699:3
**appended** [2] - 3624:7, 3655:24
**apple** [3] - 3708:18, 3713:14, 3714:13
**Apple** [2] - 3725:9, 3725:15
**application** [1] - 3560:7
**applied** [1] - 3732:20
**applies** [2] - 3705:10, 3709:19
**apply** [1] - 3562:14
**appreciate** [2] - 3582:8, 3603:19
**approach** [1] - 3628:8
**appropriate** [1] - 3632:19
**April** [1] - 3623:25
**arbitration** [2] - 3619:10, 3619:11
**arbitrator** [1] - 3619:14
**area** [5] - 3616:11, 3638:2, 3665:6, 3708:24, 3712:22
**areas** [2] - 3578:24, 3617:24, 3630:6, 3630:7
**arena** [1] - 3665:1
**argue** [2] - 3735:16, 3747:7
**argument** [1] - 3565:19
**argumentative** [1] - 3706:12
**arise** [1] - 3562:18
**arising** [2] - 3564:19, 3594:23
**Arizona** [10] - 3579:22, 3584:8, 3584:10, 3584:12, 3707:24, 3727:4, 3727:23, 3728:3, 3728:13, 3730:9
**arrange** [1] - 3674:15
**arranged** [3] - 3570:14, 3590:21, 3591:7
**arrangements** [2] - 3736:24, 3743:5
**arrest** [2] - 3563:13, 3564:2, 3564:19
**arrived** [1] - 3728:22
**arrow** [3] - 3634:14,

3635:18
**arrows** [1] - 3637:5
**art** [2] - 3643:3, 3643:8
**article** [2] - 3571:2, 3573:13
**articulate** [2] - 3738:4, 3738:25
**articulated** [1] - 3739:14
**aside** [3] - 3619:16, 3735:3, 3742:12
**aspect** [7] - 3574:6, 3740:18, 3740:19, 3740:20, 3740:23, 3741:22, 3744:12
**aspects** [5] - 3611:14, 3631:8, 3649:20, 3666:25, 3741:21
**assessing** [1] - 3621:20
**assessment** [1] - 3628:1
**assets** [3] - 3610:23, 3611:1, 3694:25
**assigned** [2] - 3709:24, 3740:24
**assist** [1] - 3656:5
**assistance** [2] - 3564:13, 3603:19
**Assistant** [1] - 3558:17
**assists** [1] - 3620:25
**associate** [1] - 3616:2
**associated** [3] - 3615:24, 3616:9, 3673:20
**association** [4] - 3616:23, 3616:24, 3619:11, 3619:12
**assume** [9] - 3565:19, 3568:12, 3652:12, 3652:25, 3654:11, 3728:24, 3729:4, 3738:18, 3745:6
**assumptions** [2] - 3593:12, 3593:17
**assuring** [2] - 3675:13, 3679:5
**ATM** [2] - 3665:14, 3678:23
**attach** [1] - 3747:9
**attached** [2] - 3575:7, 3584:13
**attempt** [8] - 3613:5, 3626:22, 3627:20, 3627:22, 3632:5, 3633:17, 3638:13, 3743:3
**attempted** [4] - 3627:6, 3631:19, 3640:23, 3642:7
**attempting** [1] - 3744:23
**attempts** [3] - 3629:5, 3629:17, 3638:25
**attend** [1] - 3698:5
**attending** [1] - 3584:16
**attention** [7] - 3560:10, 3560:15, 3580:19, 3582:18, 3623:12,

4

3672:18, 3691:22
**attest** [1] - 3651:12
**Attorney** [2] - 3558:14, 3558:17
**attorney** [3] - 3573:10, 3580:12, 3742:8
**Attorney's** [3] - 3622:10, 3651:25, 3730:15
**attorney-client** [1] - 3742:8
**attorneys** [8] - 3614:8, 3620:10, 3620:11, 3640:1, 3652:24, 3653:1, 3720:11, 3743:9
**August** [15] - 3583:3, 3583:10, 3584:11, 3584:17, 3586:19, 3587:10, 3587:11, 3605:10, 3605:11, 3607:1, 3607:2, 3673:4, 3676:22, 3688:7, 3688:22
**authenticity** [1] - 3627:15
**authorization** [1] - 3744:10
**authorized** [5] - 3644:2, 3735:5, 3739:9, 3742:24, 3744:19
**authorizing** [1] - 3742:2
**available** [3] - 3627:18, 3649:8, 3725:3
**avoid** [6] - 3560:7, 3565:14, 3565:24, 3638:17, 3645:20, 3749:14
**aware** [17] - 3560:16, 3566:15, 3570:13, 3573:10, 3576:11, 3580:1, 3581:18, 3581:20, 3581:21, 3610:17, 3611:11, 3611:19, 3665:23, 3697:12, 3698:20, 3737:17, 3741:2
**awesome** [1] - 3700:24
**AZ** [6] - 3569:12, 3579:18, 3579:19, 3579:21, 3580:2, 3581:15

## B

**bachelor's** [1] - 3616:6
**background** [5] - 3626:13, 3659:7, 3659:10, 3664:23, 3705:23
**backup** [1] - 3698:2
**bad** [5] - 3563:10, 3564:18, 3564:21, 3613:11, 3660:22
**balance** [10] - 3587:21, 3588:8, 3588:11, 3588:20, 3589:11, 3598:16, 3598:20, 3598:21, 3665:12, 3665:17
**banding** [2] - 3569:20,

3570:3
**bang** [2] - 3706:1, 3745:15
**bank** [12] - 3575:11, 3587:25, 3588:2, 3604:3, 3606:16, 3673:13, 3673:20, 3688:7, 3692:16, 3704:9, 3721:25, 3734:16
**bar** [1] - 3748:5
**Bar** [1] - 3735:24
**barber** [3] - 3693:24, 3694:13, 3694:15
**based** [15] - 3608:21, 3621:12, 3627:17, 3630:5, 3632:4, 3643:18, 3646:22, 3692:25, 3693:12, 3723:4, 3729:16, 3730:14, 3733:10, 3738:18, 3745:1
**basic** [1] - 3742:24
**basing** [1] - 3632:10
**basis** [5] - 3593:13, 3613:9, 3615:16, 3636:22, 3653:11
**bearing** [2] - 3607:20, 3659:4
**bears** [1] - 3601:21
**became** [1] - 3706:5
**become** [2] - 3631:16, 3732:7
**becomes** [1] - 3629:6
**BEFORE** [1] - 3558:11
**beg** [3] - 3647:18, 3658:11, 3658:24
**begin** [2] - 3686:19, 3731:15
**beginning** [3] - 3667:20, 3700:22, 3719:19
**behalf** [3] - 3614:8, 3735:25, 3741:6
**behind** [3] - 3693:25, 3718:16, 3742:20
**belabor** [2] - 3565:16, 3744:24
**belong** [3] - 3617:10, 3617:15
**below** [4] - 3628:18, 3637:18, 3637:21, 3678:9
**beneath** [1] - 3618:23
**beneficiary** [1] - 3569:23
**Berard** [1] - 3721:21
**best** [3] - 3746:18, 3747:1, 3748:13
**better** [2] - 3738:25, 3746:17
**between** [26] - 3563:10, 3571:1, 3571:9, 3614:6, 3618:17, 3625:8, 3630:1, 3635:20, 3635:22, 3635:23, 3636:2, 3636:8, 3636:17, 3647:9, 3648:8, 3660:23, 3676:22, 3682:6,

3682:8, 3691:24, 3692:2, 3694:24, 3695:10, 3720:9, 3743:4, 3747:2
**beyond** [3] - 3671:23, 3693:16, 3696:22
**BIANCO** [1] - 3558:11
**bias** [1] - 3565:12
**bill** [4] - 3654:8, 3694:25, 3696:1, 3696:5
**billable** [1] - 3742:11
**billed** [1] - 3684:15
**bills** [5] - 3563:17, 3564:7, 3676:1, 3676:5, 3685:6
**bit** [8] - 3579:12, 3608:10, 3635:7, 3674:11, 3686:21, 3698:17, 3718:19
**Blake** [3] - 3565:17, 3666:18, 3666:19, 3682:5, 3685:15, 3686:3, 3700:3
**BLAKE** [2] - 3685:20, 3751:1
**blank** [4] - 3561:7, 3561:8, 3562:1, 3562:2
**block** [1] - 3719:1
**blocker** [2] - 3718:17, 3719:3
**blood** [4] - 3563:10, 3564:18, 3564:21, 3660:23
**blown** [1] - 3695:4
**blown-up** [1] - 3695:4
**blowups** [1] - 3628:9
**blur** [1] - 3584:15
**blurt** [1] - 3563:21
**board** [5] - 3582:1, 3616:15, 3616:16, 3617:6, 3705:22
**boards** [1] - 3625:25
**Bob** [1] - 3707:12
**body** [1] - 3630:18
**bodywork** [1] - 3695:1
**boldface** [1] - 3640:16
**bono** [1] - 3653:11
**borrow** [1] - 3748:20
**borrowed** [2] - 3587:25, 3684:6
**bottom** [5] - 3590:3, 3598:14, 3634:1, 3656:15, 3706:8
**box** [4] - 3628:8, 3630:9, 3630:10, 3630:11
**bracket** [1] - 3681:15
**brackets** [4] - 3575:7, 3575:13, 3584:9, 3681:12
**break** [6] - 3612:9, 3614:5, 3653:22, 3659:24, 3672:14, 3745:6
**brief** [5] - 3560:7, 3672:18, 3703:23, 3704:2, 3716:15
**briefly** [2] - 3686:20, 3695:24

**bring** [17] - 3560:10, 3560:15, 3566:18, 3576:7, 3580:8, 3609:22, 3614:15, 3660:6, 3662:7, 3671:9, 3672:7, 3682:11, 3687:13, 3687:18, 3703:12, 3724:8, 3746:22
**bringing** [3] - 3609:18, 3667:19, 3672:15
**British** [1] - 3723:11
**broken** [1] - 3713:7
**Brooklyn** [3] - 3560:18, 3561:8, 3561:14
**brought** [6] - 3576:24, 3576:25, 3577:9, 3578:4, 3608:12, 3690:22
**Bryan** [1] - 3721:21
**budget** [2] - 3675:2, 3693:12
**build** [8] - 3663:8, 3669:16, 3679:22, 3680:12, 3681:18, 3682:17, 3683:21, 3686:12
**builder** [1] - 3663:22
**building** [6] - 3667:1, 3679:4, 3679:16, 3680:7, 3727:10
**built** [2] - 3679:21, 3682:22
**bulk** [1] - 3618:5
**burden** [1] - 3734:3
**Bureau** [1] - 3727:5
**business** [13] - 3615:11, 3663:14, 3663:16, 3663:18, 3667:9, 3669:1, 3669:4, 3670:9, 3670:12, 3686:13, 3686:16, 3691:7, 3691:10
**businesses** [1] - 3665:22
**button** [1] - 3569:7
**buy** [2] - 3582:11, 3582:23
**buyer** [1] - 3575:8
**BY** [59] - 3558:16, 3558:22, 3559:4, 3567:16, 3572:16, 3575:22, 3584:7, 3584:24, 3589:9, 3594:6, 3599:9, 3599:12, 3599:16, 3600:4, 3610:12, 3615:8, 3639:6, 3645:2, 3663:4, 3663:13, 3664:14, 3669:12, 3670:21, 3674:2, 3675:21, 3681:6, 3683:5, 3683:20, 3684:24, 3686:8, 3687:8, 3690:1, 3696:11, 3705:2, 3707:3, 3707:22, 3716:18, 3717:22, 3722:11, 3731:2, 3750:4, 3750:6, 3750:9, 3750:11, 3750:14, 3750:16, 3750:19, 3750:21, 3750:23, 3750:25, 3751:3, 3751:5,

5

3751:7, 3751:9, 3751:12, 3751:14, 3751:16, 3751:18, 3751:20

## C

**C-103** [3] - 3600:17, 3600:18, 3752:7
**c-104** [2] - 3605:7, 3752:8
**C-223** [5] - 3698:18, 3699:15, 3699:18, 3699:19, 3752:15
**C.R** [2] - 3581:5, 3581:25
**Cabo** [3] - 3568:2, 3575:11, 3575:12
**CALCAGNI** [1] - 3558:20
**California** [4] - 3597:12, 3597:25, 3663:6, 3735:24
**calipers** [1] - 3618:11
**calmly** [1] - 3701:13
**cannot** [5] - 3561:14, 3603:16, 3628:23, 3639:1, 3710:10
**capable** [1] - 3643:20
**caption** [3] - 3577:7, 3637:17, 3637:19
**car** [45] - 3565:7, 3663:14, 3667:13, 3667:15, 3668:7, 3670:3, 3670:22, 3674:15, 3674:16, 3678:4, 3678:8, 3678:16, 3678:19, 3679:20, 3680:8, 3680:12, 3681:19, 3682:7, 3682:14, 3682:17, 3682:22, 3683:9, 3683:22, 3686:13, 3686:22, 3686:23, 3686:24, 3686:25, 3687:11, 3688:13, 3688:14, 3688:19, 3688:21, 3690:3, 3690:5, 3690:13, 3693:10, 3697:4, 3697:7, 3702:1, 3706:2, 3706:8, 3706:9, 3706:18, 3738:20
**card** [3] - 3665:23, 3684:9, 3684:10
**cards** [1] - 3684:6
**care** [1] - 3734:9
**career** [2] - 3619:5, 3709:5
**carefully** [3] - 3631:20, 3632:15, 3633:9
**cars** [19] - 3663:8, 3667:1, 3669:16, 3679:3, 3679:16, 3687:23, 3690:22, 3690:24, 3692:22, 3693:2, 3694:1, 3695:1, 3695:5, 3695:7, 3697:5, 3697:23, 3703:11, 3703:12
**CART** [5] - 3708:7,

3708:10, 3723:1, 3723:2, 3723:3
**case** [52] - 3560:3, 3562:15, 3565:6, 3569:19, 3576:11, 3596:17, 3596:18, 3602:19, 3612:10, 3620:21, 3621:19, 3621:21, 3621:25, 3622:12, 3628:14, 3631:1, 3633:8, 3634:6, 3636:5, 3638:4, 3643:14, 3643:24, 3645:21, 3648:22, 3653:3, 3653:11, 3653:21, 3659:25, 3683:2, 3689:4, 3690:11, 3718:2, 3718:4, 3718:14, 3723:24, 3730:16, 3731:13, 3731:15, 3731:19, 3732:23, 3734:14, 3736:13, 3737:5, 3737:12, 3741:3, 3744:8, 3745:22, 3746:8, 3746:9
**cases** [12] - 3619:1, 3619:20, 3619:22, 3619:24, 3619:25, 3620:4, 3620:11, 3620:12, 3631:23, 3637:25, 3653:7, 3708:9
**cash** [2] - 3665:11, 3706:8
**cashout** [1] - 3575:13
**Casino** [1] - 3687:21
**casino** [2] - 3697:8, 3700:13
**casual** [1] - 3628:20
**catch** [1] - 3694:2
**caught** [1] - 3614:11
**caused** [1] - 3618:21
**CD** [1] - 3716:7
**CEDAR** [1] - 3643:19
**Cedar** [1] - 3645:4
**CEDAR-FOX** [1] - 3643:19
**cell** [1] - 3708:19
**center** [3] - 3623:11, 3623:20, 3636:4
**Central** [3] - 3558:6, 3558:15, 3559:21
**certain** [12] - 3589:4, 3589:6, 3622:1, 3622:4, 3642:24, 3660:17, 3705:8, 3705:16, 3744:20, 3746:1, 3746:23, 3749:1
**certainly** [1] - 3562:4, 3613:4, 3625:9, 3636:13, 3650:4, 3654:9, 3680:10, 3681:17, 3737:20, 3738:9, 3739:17, 3739:19, 3748:12
**certainty** [1] - 3641:3, 3641:6, 3641:18
**certification** [4] - 3616:14,

3616:17, 3617:6
**certifications** [2] - 3708:24, 3709:2
**certified** [2] - 3616:11, 3709:1
**chain** [2] - 3572:22, 3728:15
**chair** [1] - 3660:1
**chance** [5] - 3580:25, 3671:12, 3673:2, 3684:8, 3690:16
**chances** [1] - 3672:13
**change** [4] - 3624:22, 3635:7, 3635:14, 3657:19
**changes** [1] - 3635:9
**changing** [2] - 3593:23, 3637:6
**characteristic** [3] - 3633:3, 3633:19, 3633:25
**characteristics** [12] - 3628:22, 3629:1, 3629:19, 3630:2, 3631:16, 3636:13, 3638:15, 3646:8, 3646:11, 3646:12, 3648:4, 3651:14
**charges** [1] - 3736:1
**Charles** [4] - 3604:10, 3604:14, 3604:19, 3605:9
**chart** [12] - 3624:14, 3629:21, 3629:22, 3629:24, 3631:10, 3631:14, 3634:11, 3634:13, 3637:3, 3650:11
**charts** [7] - 3624:6, 3624:10, 3624:24, 3628:15, 3631:11, 3633:9, 3639:9
**check** [18] - 3585:25, 3586:3, 3586:12, 3586:21, 3586:22, 3587:2, 3587:5, 3589:14, 3589:15, 3659:9, 3706:8, 3719:11, 3719:21, 3728:15, 3739:11, 3739:12, 3742:4
**checked** [2] - 3715:7, 3715:8
**checking** [1] - 3719:7
**chief** [3] - 3667:2, 3703:11
**choose** [1] - 3714:15
**chose** [1] - 3694:10
**Christopher** [1] - 3655:16
**circle** [2] - 3601:17, 3682:11
**circumstance** [4] - 3636:12, 3651:2, 3657:19, 3737:3
**circumstances** [3] - 3650:20, 3659:10, 3737:8
**City** [1] - 3619:15
**civil** [2] - 3593:2, 3620:12
**claim** [1] - 3744:9

**clarification** [1] - 3637:13
**clarify** [2] - 3625:10, 3740:12
**clarity** [1] - 3641:10
**classes** [1] - 3708:16
**classic** [1] - 3737:11
**clear** [8] - 3564:18, 3604:1, 3625:7, 3626:4, 3732:3, 3739:21, 3746:14, 3749:16
**clearly** [3] - 3635:20, 3734:13, 3735:6
**CLERK** [6] - 3560:1, 3566:20, 3662:3, 3662:9, 3662:24, 3672:9
**clerk** [1] - 3560:7
**client** [20] - 3560:19, 3561:5, 3561:13, 3563:11, 3563:23, 3673:3, 3735:6, 3737:4, 3737:12, 3738:10, 3739:7, 3739:10, 3739:14, 3740:25, 3741:1, 3741:8, 3741:11, 3742:2, 3742:8
**client's** [1] - 3741:1
**clients** [2] - 3742:14, 3745:7
**clients'** [1] - 3742:16
**cloned** [1] - 3723:12
**close** [5] - 3641:18, 3673:22, 3686:5, 3735:14, 3745:18
**closer** [1] - 3663:10
**closing** [2] - 3598:16, 3603:18
**clutch** [1] - 3695:4
**CMG** [1] - 3673:22
**co** [2] - 3702:5, 3702:13
**co-owner** [1] - 3702:13
**co-owners** [1] - 3702:5
**coincidence** [1] - 3629:2
**collect** [1] - 3697:11
**collective** [4] - 3570:6, 3570:10, 3580:11, 3595:5
**collectively** [2] - 3569:22, 3577:15
**combination** [5] - 3620:8, 3635:24, 3646:11, 3649:13, 3719:16
**combined** [1] - 3637:9
**coming** [8] - 3596:10, 3604:9, 3606:10, 3634:9, 3676:23, 3683:24, 3690:16, 3724:4
**comment** [3] - 3589:22, 3705:14, 3735:18
**commission** [1] - 3619:14
**committee** [1] - 3748:5
**committing** [1] - 3739:13
**commonly** [2] - 3641:1, 3641:16
**communicate** [1] - 3698:24

**6**

communicating [1] - 3699:11
communication [13] - 3570:1, 3570:25, 3571:8, 3676:22, 3691:24, 3692:2, 3737:11, 3737:15, 3739:10, 3739:17, 3739:20, 3741:22, 3747:16
communications [5] - 3616:8, 3695:10, 3699:4, 3699:7, 3740:19
community [2] - 3643:7, 3645:17
commuter [5] - 3643:11, 3643:14, 3643:18, 3643:19, 3643:21
companies [2] - 3671:16, 3671:17
company [22] - 3564:14, 3580:2, 3584:9, 3584:11, 3604:15, 3611:12, 3611:14, 3615:18, 3665:23, 3674:20, 3676:17, 3677:3, 3677:17, 3677:19, 3681:13, 3687:15, 3688:12, 3688:14, 3692:14, 3692:19, 3703:11
company's [2] - 3691:7, 3691:9
comparative [6] - 3624:17, 3626:20, 3628:2, 3643:5, 3647:25, 3648:8
comparator [1] - 3618:16
compare [6] - 3628:16, 3630:21, 3631:9, 3636:16, 3649:2, 3719:19
compared [2] - 3657:4, 3658:6
comparison [9] - 3624:6, 3628:20, 3634:13, 3637:3, 3643:19, 3648:2, 3648:22, 3649:5, 3659:3
comparisons [2] - 3625:8, 3650:2
compensated [6] - 3653:3, 3653:9, 3653:13, 3653:20, 3654:10, 3741:18
compensation [4] - 3653:8, 3653:20, 3654:3
competed [1] - 3682:4
competitors [2] - 3702:5, 3702:14
complete [2] - 3623:22, 3623:23
completed [3] - 3616:18, 3631:7, 3719:12
completely [2] - 3612:22, 3620:9
completes [1] - 3731:11

completing [1] - 3634:8
complex [2] - 3630:18, 3727:9
comply [1] - 3733:12
composites [1] - 3624:10
comps [1] - 3689:1
computer [38] - 3559:25, 3560:17, 3560:24, 3643:11, 3644:2, 3645:15, 3708:3, 3708:6, 3708:7, 3708:8, 3708:11, 3708:17, 3712:22, 3712:25, 3713:1, 3713:3, 3713:4, 3713:5, 3713:14, 3713:15, 3713:25, 3714:6, 3714:17, 3715:4, 3715:11, 3715:20, 3718:13, 3721:7, 3724:7, 3724:14, 3724:15, 3725:12, 3725:16, 3726:1, 3726:6, 3726:22, 3726:24, 3727:14
computerized [1] - 3645:23
computers [36] - 3643:23, 3708:9, 3708:13, 3709:4, 3709:15, 3710:16, 3711:22, 3712:18, 3712:19, 3712:22, 3715:13, 3717:11, 3718:10, 3718:14, 3718:16, 3722:14, 3722:15, 3722:17, 3723:14, 3724:5, 3724:8, 3724:10, 3725:1, 3725:3, 3725:8, 3725:20, 3725:24, 3725:25, 3726:4, 3726:19, 3726:25, 3727:13, 3727:21, 3727:23, 3728:2
concede [1] - 3664:11
conceded [1] - 3664:13
concern [1] - 3564:20
concerned [6] - 3563:11, 3563:15, 3603:9, 3607:17, 3646:5, 3745:21
concerning [2] - 3607:1, 3608:1
conclude [7] - 3560:17, 3636:23, 3639:10, 3639:18, 3642:1, 3642:16, 3646:22
concluded [1] - 3704:12
concluding [1] - 3636:22
conclusion [8] - 3627:1, 3627:3, 3627:17, 3631:17, 3632:25, 3633:1, 3642:6, 3654:11
conclusions [5] - 3621:6, 3625:4, 3627:14, 3627:19, 3628:5
condition [4] - 3713:19,

3716:11, 3733:5, 3733:7
conditions [1] - 3749:1
condo [2] - 3567:23, 3594:23
condominiums [1] - 3594:5
conducted [3] - 3718:18, 3719:10, 3735:24
conducting [2] - 3617:8, 3710:6
confer [1] - 3733:25
conference [1] - 3614:1
conferences [1] - 3570:13
conferring [1] - 3603:23
confidence [3] - 3679:25, 3681:10, 3742:16
confidential [2] - 3737:11, 3747:16
confidentiality [1] - 3748:6
confirm [1] - 3562:2
confirmation [2] - 3692:11, 3692:13
confirmed [1] - 3608:12
confrontation [1] - 3746:17
confusion [1] - 3645:20
congratulating [1] - 3700:23
congratulations [1] - 3701:21
connecting [5] - 3633:24, 3635:19, 3636:2, 3636:7, 3636:8
connection [19] - 3605:18, 3606:1, 3609:6, 3609:21, 3618:3, 3635:23, 3645:20, 3645:22, 3651:24, 3652:1, 3673:7, 3704:6, 3728:16, 3729:8, 3730:16, 3737:21, 3737:23, 3738:16, 3747:18
connections [1] - 3630:1
connects [1] - 3634:2
consciously [1] - 3638:14
consider [5] - 3602:8, 3621:9, 3621:18, 3621:20, 3735:22
considered [1] - 3643:8
consistent [4] - 3628:21, 3629:24, 3633:19, 3648:3
conspiracy [1] - 3673:8
Constantine [99] - 3559:4, 3559:8, 3564:5, 3564:9, 3564:25, 3565:1, 3568:11, 3568:22, 3571:1, 3571:9, 3571:13, 3572:6, 3572:21, 3572:24, 3574:3, 3574:19, 3580:8, 3580:13, 3582:1, 3583:5, 3583:10, 3584:2, 3589:22, 3589:24, 3590:8, 3590:12, 3599:18,

3609:19, 3609:22, 3611:4, 3611:11, 3660:17, 3660:23, 3664:3, 3664:5, 3664:9, 3664:16, 3664:19, 3666:13, 3667:13, 3667:18, 3668:11, 3670:2, 3673:12, 3675:6, 3676:6, 3676:8, 3676:22, 3678:23, 3679:8, 3679:21, 3679:25, 3680:19, 3681:8, 3681:20, 3681:23, 3682:7, 3684:14, 3685:2, 3685:6, 3686:17, 3687:1, 3687:10, 3687:15, 3688:1, 3688:8, 3690:12, 3692:3, 3692:16, 3692:24, 3693:18, 3695:6, 3695:10, 3695:14, 3696:13, 3696:17, 3696:24, 3697:10, 3697:14, 3698:4, 3698:15, 3698:19, 3698:24, 3699:5, 3699:11, 3700:9, 3700:24, 3701:9, 3701:21, 3702:3, 3702:12, 3702:23, 3705:4, 3705:19, 3720:10, 3732:14, 3741:15, 3744:19, 3746:7
CONSTANTINE [1] - 3558:7
Constantine's [6] - 3572:12, 3572:14, 3595:6, 3666:23, 3667:4, 3674:10
constrict [1] - 3630:8
constricted [2] - 3630:6, 3630:7
consulting [7] - 3622:16, 3622:21, 3623:6, 3624:12, 3626:19, 3637:14, 3637:22
consuming [1] - 3748:2
Cont'd [1] - 3645:1
cont'd [1] - 3690:1
contact [2] - 3562:22, 3690:7
contacted [1] - 3562:15
contain [3] - 3646:11, 3699:1, 3724:15
contained [10] - 3573:12, 3622:13, 3622:24, 3624:4, 3624:18, 3646:20, 3652:3, 3654:15, 3673:19, 3725:20
containing [4] - 3652:10, 3655:13, 3656:10, 3727:20
contains [2] - 3634:3, 3651:10
contemporaneous [3] - 3657:9, 3658:2, 3658:4
contend [1] - 3738:11
content [4] - 3571:18, 3574:24, 3725:20, 3727:14
contents [1] - 3583:16
context [2] - 3581:7,

3666:6
**continuation** [1] - 3635:12
**continue** [10] - 3567:4, 3681:10, 3692:24, 3693:1, 3693:15, 3694:9, 3702:8, 3706:4, 3706:25, 3731:15
**continued** [3] - 3599:24, 3644:6, 3689:6
**Continued** [9] - 3661:12, 3672:20, 3673:23, 3703:24, 3704:13, 3717:21, 3718:21, 3730:23, 3751:15
**continuing** [3] - 3567:2, 3617:22, 3702:17
**contract** [7] - 3687:13, 3687:19, 3688:18, 3689:2, 3696:22, 3698:10, 3700:13
**contracted** [7] - 3653:23, 3682:19, 3683:9, 3686:21, 3686:22, 3697:1, 3697:23
**contrast** [1] - 3630:21
**contributed** [2] - 3678:16, 3693:14
**contributors** [1] - 3678:22
**control** [2] - 3741:3, 3741:6
**conversation** [2] - 3575:24, 3666:6
**conversations** [9] - 3576:2, 3660:17, 3661:3, 3664:19, 3665:25, 3693:18, 3693:20, 3698:21, 3702:16
**convinced** [1] - 3709:16
**convoluted** [1] - 3729:25
**CONWAY** [1] - 3559:2
**cooking** [1] - 3694:6
**cooperation** [1] - 3748:18
**coordinator** [1] - 3708:7
**copies** [10] - 3624:20, 3625:22, 3626:1, 3649:12, 3649:21, 3695:10, 3720:11, 3720:14, 3720:19
**copy** [12] - 3566:8, 3566:11, 3566:12, 3566:16, 3638:16, 3640:8, 3656:18, 3656:19, 3692:2, 3695:13, 3718:20, 3749:10
**corner** [1] - 3678:9
**corporate** [1] - 3619:22
**correct** [169] - 3567:24, 3568:14, 3568:20, 3568:25, 3569:4, 3569:5, 3569:14, 3569:15, 3570:7, 3570:11, 3571:24, 3573:25, 3574:5, 3574:6, 3574:22, 3574:25, 3576:5, 3576:6, 3576:9, 3576:12, 3577:17, 3579:3, 3579:20,

3579:24, 3579:25, 3580:18, 3581:3, 3581:4, 3583:18, 3587:13, 3588:17, 3588:23, 3589:1, 3590:6, 3590:20, 3592:9, 3592:11, 3593:4, 3594:18, 3594:21, 3595:8, 3595:11, 3595:13, 3596:7, 3597:7, 3597:14, 3598:11, 3598:12, 3600:23, 3603:11, 3604:18, 3604:21, 3604:22, 3606:24, 3607:21, 3607:22, 3608:14, 3608:15, 3608:23, 3609:3, 3609:4, 3609:10, 3609:24, 3610:14, 3611:12, 3611:13, 3611:18, 3623:2, 3623:19, 3634:15, 3637:23, 3639:12, 3639:13, 3639:20, 3639:23, 3640:13, 3640:20, 3641:5, 3641:19, 3642:25, 3643:12, 3646:2, 3646:3, 3646:18, 3646:25, 3648:25, 3649:1, 3650:9, 3650:10, 3650:17, 3651:18, 3652:22, 3653:2, 3654:23, 3656:24, 3658:10, 3658:15, 3659:3, 3659:12, 3659:13, 3660:11, 3660:19, 3668:10, 3675:24, 3676:1, 3676:2, 3676:10, 3676:13, 3677:3, 3678:24, 3679:9, 3679:10, 3679:23, 3679:24, 3681:13, 3681:14, 3681:21, 3682:13, 3682:15, 3682:16, 3682:20, 3683:6, 3683:10, 3685:7, 3685:8, 3691:5, 3692:13, 3692:20, 3694:14, 3695:16, 3696:3, 3696:6, 3696:15, 3696:16, 3697:22, 3697:24, 3697:25, 3698:2, 3698:3, 3700:6, 3700:7, 3701:20, 3713:18, 3714:8, 3715:24, 3716:22, 3717:5, 3717:8, 3719:22, 3721:11, 3721:12, 3721:14, 3721:15, 3721:25, 3722:1, 3722:2, 3722:3, 3722:6, 3724:2, 3724:20, 3725:8, 3725:14, 3725:18, 3726:7, 3726:8, 3726:22, 3726:23, 3727:2, 3727:25
**correctly** [1] - 3641:12
**correspondence** [1] - 3759:9
**corresponding** [1] -

3606:11
**cost** [2] - 3692:25, 3693:4
**costs** [2] - 3575:14, 3670:6
**counsel** [7] - 3612:15, 3614:12, 3628:10, 3656:18, 3733:25, 3741:25, 3743:14
**Country** [1] - 3559:3
**couple** [7] - 3631:11, 3651:6, 3666:8, 3674:6, 3711:22, 3732:11, 3736:15
**course** [15] - 3590:3, 3603:12, 3605:11, 3619:5, 3663:21, 3664:18, 3665:25, 3668:20, 3668:25, 3669:3, 3670:8, 3670:11, 3691:6, 3691:9, 3703:2
**court** [9] - 3609:1, 3619:2, 3619:19, 3664:9, 3674:1, 3690:17, 3709:7, 3709:9, 3743:8
**Court** [12] - 3559:7, 3559:20, 3561:7, 3565:23, 3566:7, 3566:15, 3613:8, 3733:10, 3736:23, 3745:14, 3747:8, 3749:2
**COURT** [174] - 3558:1, 3560:2, 3560:4, 3560:8, 3560:12, 3561:17, 3561:22, 3562:6, 3562:9, 3562:22, 3563:2, 3563:18, 3563:24, 3564:15, 3564:21, 3564:23, 3565:10, 3565:15, 3565:21, 3566:4, 3566:8, 3566:12, 3566:16, 3566:18, 3566:22, 3566:25, 3569:6, 3572:8, 3572:11, 3575:21, 3583:25, 3584:20, 3589:7, 3593:14, 3593:17, 3593:23, 3594:2, 3599:8, 3599:15, 3599:22, 3600:15, 3600:17, 3604:1, 3604:6, 3604:16, 3605:4, 3605:6, 3608:21, 3609:15, 3610:7, 3610:16, 3611:3, 3611:17, 3612:4, 3612:9, 3612:12, 3613:3, 3613:11, 3613:20, 3613:22, 3613:25, 3614:4, 3614:9, 3614:13, 3614:15, 3614:18, 3615:1, 3615:4, 3620:19, 3625:16, 3625:23, 3626:4, 3626:9, 3628:10, 3639:4, 3653:18, 3654:25, 3655:2, 3659:18, 3659:20, 3659:22, 3659:24, 3660:6, 3660:12,

3660:21, 3661:9, 3662:4, 3662:7, 3662:11, 3662:15, 3663:10, 3664:13, 3669:10, 3670:16, 3670:19, 3671:5, 3671:8, 3671:11, 3672:3, 3672:7, 3672:11, 3672:19, 3675:17, 3681:1, 3682:25, 3683:4, 3683:14, 3683:16, 3685:11, 3685:14, 3685:17, 3685:25, 3686:4, 3687:7, 3691:17, 3691:19, 3692:9, 3695:21, 3696:8, 3699:18, 3701:11, 3703:17, 3703:19, 3703:21, 3705:15, 3707:9, 3707:17, 3709:18, 3711:5, 3712:12, 3714:3, 3716:16, 3717:18, 3720:3, 3720:6, 3721:1, 3722:8, 3730:6, 3730:12, 3731:11, 3731:24, 3733:13, 3733:20, 3734:1, 3734:6, 3734:9, 3734:11, 3736:15, 3736:18, 3738:2, 3739:5, 3739:15, 3740:5, 3740:7, 3740:12, 3741:20, 3742:19, 3743:7, 3743:17, 3744:3, 3744:7, 3744:18, 3745:1, 3745:23, 3746:3, 3746:6, 3746:20, 3747:11, 3748:7, 3748:14, 3748:22, 3749:4, 3749:16, 3749:23
**Court's** [3] - 3560:10, 3560:15, 3733:12
**courthouse** [1] - 3671:5
**Courthouse** [1] - 3558:6
**courtroom** [12] - 3561:18, 3602:23, 3612:11, 3612:21, 3614:17, 3619:21, 3655:4, 3660:4, 3660:8, 3717:24, 3731:23, 3748:21
**Courts** [1] - 3619:7
**cover** [4] - 3688:20, 3689:5, 3690:10, 3691:1
**CR-13-607** [1] - 3558:4
**crash** [3] - 3689:3, 3689:4, 3693:10
**Crash** [1] - 3690:2
**crashed** [1] - 3715:5
**crashes** [1] - 3690:12
**crazy** [1] - 3587:4
**create** [2] - 3643:15, 3737:8
**created** [11] - 3624:24, 3646:24, 3656:23, 3668:21, 3668:25, 3670:5, 3670:8, 3687:13, 3691:4, 3691:6, 3719:13

8

**credentials** [1] - 3723:6
**credibility** [2] - 3621:20, 3661:4
**credible** [1] - 3746:9
**credit** [15] - 3585:4, 3586:20, 3587:10, 3587:18, 3587:21, 3587:24, 3591:2, 3591:4, 3598:17, 3608:1, 3611:5, 3665:23, 3684:6, 3684:9, 3684:10
**crew** [6] - 3667:2, 3670:22, 3670:25, 3687:24, 3690:24, 3703:11
**crime** [8] - 3734:4, 3734:11, 3735:8, 3735:13, 3735:16, 3736:10, 3739:13, 3739:18
**crime-fraud** [7] - 3734:4, 3734:11, 3735:8, 3735:13, 3735:16, 3736:10, 3739:18
**crimes** [1] - 3724:16
**criminal** [3] - 3620:11, 3653:12, 3736:10
**Criminal** [1] - 3749:14
**critical** [1] - 3584:9
**CROSS** [11] - 3567:15, 3639:5, 3645:1, 3675:20, 3696:10, 3722:10, 3750:3, 3750:15, 3750:20, 3751:4, 3751:17
**cross** [22] - 3565:11, 3565:13, 3567:4, 3605:16, 3607:24, 3608:8, 3609:16, 3639:4, 3675:17, 3685:4, 3696:8, 3705:3, 3705:16, 3717:16, 3722:8, 3731:3, 3732:6, 3732:8, 3732:9, 3732:13, 3732:21, 3733:3
**cross-examination** [10] - 3567:4, 3605:16, 3607:24, 3608:8, 3609:16, 3639:4, 3675:17, 3696:8, 3705:3, 3722:8
**CROSS-EXAMINATION** [11] - 3567:15, 3639:5, 3645:1, 3675:20, 3696:10, 3722:10, 3750:3, 3750:15, 3750:20, 3751:4, 3751:17
**Culbahy** [1] - 3616:2
**culminated** [1] - 3623:25
**cumulative** [2] - 3634:24, 3637:9
**current** [2] - 3616:2, 3616:18
**CURRIE** [1] - 3558:14
**custody** [2] - 3720:13, 3728:15
**customer** [2] - 3666:18, 3702:14

**customers** [1] - 3702:5
**cut** [2] - 3630:13, 3721:18
**cute** [1] - 3603:10
**Cynergy** [2] - 3674:7, 3674:9

**D**

**Daily** [2] - 3572:25, 3590:13
**Dalbert** [1] - 3620:16
**damage** [9] - 3689:3, 3689:4, 3690:2, 3690:11, 3690:20, 3693:8, 3693:10, 3713:5, 3726:21
**damaged** [2] - 3718:8, 3718:9
**dangerous** [3] - 3736:6, 3742:13, 3742:17
**Danica** [4] - 3572:24, 3573:2, 3573:10, 3589:25
**data** [8] - 3718:17, 3719:4, 3729:20
**date** [8] - 3657:5, 3657:15, 3699:25, 3718:3, 3734:16, 3734:17, 3739:3, 3739:11
**dated** [12] - 3568:15, 3574:19, 3601:5, 3601:7, 3601:12, 3622:25, 3623:13, 3637:16, 3655:15, 3656:17, 3657:24, 3658:1
**dates** [4] - 3646:6, 3650:4, 3656:25, 3657:2
**day/night** [2] - 3665:10, 3665:13
**days** [4] - 3591:13, 3591:15, 3592:19, 3743:13
**Daytona** [4] - 3669:25, 3674:14, 3687:2, 3690:20
**deal** [15] - 3575:14, 3590:24, 3617:11, 3629:7, 3643:3, 3646:17, 3667:24, 3675:12, 3686:23, 3687:18, 3724:18, 3746:5, 3747:1
**dealers** [1] - 3619:12
**dealing** [5] - 3562:18, 3570:18, 3648:24, 3649:18, 3652:8
**deals** [4] - 3675:13, 3684:17, 3694:6, 3694:7
**dealt** [4] - 3594:14, 3594:16, 3692:25, 3747:21
**debt** [1] - 3684:10
**December** [2] - 3623:1, 3722:4
**decide** [2] - 3621:1, 3621:11

**deductible** [1] - 3690:6
**deemed** [1] - 3655:3
**defendant** [3] - 3565:6, 3565:8, 3653:12
**Defendant's** [1] - 3568:6
**Defendants** [3] - 3558:8, 3558:20, 3559:1
**defendants** [6] - 3620:6, 3620:12, 3638:4, 3640:1, 3720:10, 3747:10
**defendants'** [1] - 3742:17
**Defense** [8] - 3572:15, 3584:4, 3681:2, 3752:2, 3752:3, 3752:4
**defense** [13] - 3612:15, 3614:8, 3614:12, 3620:10, 3628:10, 3641:8, 3652:24, 3652:25, 3704:7, 3731:15, 3743:9, 3744:8, 3748:18
**defense's** [1] - 3565:8
**defenses** [1] - 3746:8
**define** [1] - 3667:15
**defined** [1] - 3747:7
**degree** [3] - 3616:6, 3616:7, 3630:22, 3641:2, 3641:17
**delay** [1] - 3662:5
**deliver** [2] - 3561:15, 3694:1
**delivering** [1] - 3690:24
**demeanor** [1] - 3621:19
**demonstrate** [1] - 3643:16
**demonstrative** [1] - 3643:16
**department** [4] - 3562:16, 3562:17, 3562:21, 3562:23
**departments** [1] - 3677:22
**depicted** [1] - 3726:19
**depiction** [1] - 3710:24
**depictions** [1] - 3712:2
**deposit** [3] - 3605:14, 3606:11, 3734:17
**deposited** [1] - 3735:1
**deposition** [2] - 3597:11, 3597:25
**describe** [14] - 3646:19, 3669:13, 3669:14, 3683:7, 3683:8, 3686:19, 3690:19, 3691:3, 3708:4, 3708:15, 3711:15, 3711:19, 3715:18, 3718:12
**described** [4] - 3641:1, 3641:16, 3667:20, 3719:6
**describing** [1] - 3734:16
**description** [1] - 3718:4
**Desert** [1] - 3674:24
**deserve** [1] - 3621:11
**design** [1] - 3663:8
**designing** [1] - 3667:1
**desk** [4] - 3712:22,

**destroy** [1] - 3726:21
**destroyed** [2] - 3563:14
**detail** [4] - 3618:7, 3628:2, 3694:8, 3735:18
**detailed** [4] - 3622:9, 3631:8, 3747:6, 3747:13
**details** [5] - 3580:16, 3629:8, 3667:22, 3683:25
**detection** [2] - 3618:19, 3618:20
**determination** [8] - 3609:1, 3627:16, 3638:11, 3638:22, 3639:1, 3642:23, 3724:25, 3725:5
**determinations** [1] - 3619:23
**determine** [5] - 3626:23, 3628:13, 3628:19, 3647:15, 3652:4
**determining** [1] - 3644:3
**develop** [1] - 3575:12
**developed** [4] - 3645:5, 3645:16, 3645:24, 3695:7
**developer** [1] - 3686:12
**device** [28] - 3713:10, 3713:23, 3714:3, 3715:17, 3715:19, 3715:20, 3715:25, 3716:4, 3716:10, 3716:13, 3716:14, 3716:20, 3717:18, 3718:7, 3718:8, 3719:7, 3719:8, 3720:12, 3731:4, 3731:5
**Device** [6] - 3714:4, 3717:19, 3752:19, 3752:21
**devices** [10] - 3708:13, 3708:25, 3717:3, 3717:11, 3717:24, 3717:25, 3719:21, 3720:15, 3720:19, 3729:11
**devote** [1] - 3651:4
**dialogue** [1] - 3747:2
**difference** [1] - 3636:22
**differences** [3] - 3636:16, 3636:17, 3648:10
**different** [16] - 3586:8, 3593:22, 3617:9, 3618:8, 3618:18, 3631:22, 3645:8, 3646:6, 3663:20, 3667:7, 3671:16, 3671:17, 3734:23, 3734:24, 3736:13, 3742:14
**differentiate** [2] - 3618:17, 3647:24
**differently** [1] - 3650:19
**difficulties** [2] - 3679:2, 3679:14
**difficulty** [1] - 3564:8
**digital** [1] - 3711:23
**dime** [1] - 3593:6

9

dimensions [1] - 3618:10
dire [1] - 3716:15
DIRE [2] - 3716:17, 3751:13
DIRECT [10] - 3615:7, 3663:3, 3686:7, 3707:21, 3717:21, 3750:13, 3750:18, 3751:2, 3751:11, 3751:15
direct [17] - 3560:25, 3580:19, 3601:24, 3608:4, 3613:21, 3625:8, 3639:11, 3641:23, 3642:9, 3646:1, 3648:16, 3652:23, 3673:14, 3685:4, 3726:3, 3732:13, 3733:10
directed [1] - 3684:3
directing [1] - 3562:10
direction [2] - 3635:8, 3637:6
directional [3] - 3634:22, 3635:9, 3635:14
directly [1] - 3687:14
directors [1] - 3582:1
disagreeing [1] - 3738:8
disbelieve [1] - 3679:11
disbursement [1] - 3607:19
disclose [1] - 3737:10
disclosure [1] - 3737:4
discounting [1] - 3627:15
discovery [7] - 3729:21, 3729:23, 3730:2, 3730:4, 3730:7, 3730:13, 3749:22
discuss [6] - 3570:14, 3612:10, 3659:25, 3731:19, 3733:2, 3743:25
discussed [5] - 3569:19, 3571:10, 3574:12, 3672:5, 3702:7
discussing [2] - 3570:2, 3680:20
discussion [5] - 3578:16, 3665:20, 3675:6, 3732:3, 3732:24
discussions [4] - 3570:16, 3581:23, 3592:12, 3736:5
disguised [2] - 3627:24, 3629:16
disk [1] - 3560:23
disks [8] - 3561:6, 3561:7, 3561:8, 3561:13, 3561:14, 3562:1, 3562:11
dislike [1] - 3563:12
dismiss [2] - 3745:5
dismissal [2] - 3578:12, 3578:17
display [2] - 3626:8, 3690:22
displayed [1] - 3652:9

dispute [4] - 3624:12, 3652:17, 3742:22, 3744:22
disputed [1] - 3621:1
disputes [2] - 3564:24, 3660:24
disregard [1] - 3621:15
dissimilarities [2] - 3646:17, 3647:9
distinctive [1] - 3628:24
DISTRICT [3] - 3558:1, 3558:1, 3558:11
district [1] - 3619:8
diverted [1] - 3568:2
division's [1] - 3708:8
DNA [2] - 3723:15, 3723:23
doc [1] - 3575:7
doctored [2] - 3701:5, 3701:18
doctrine [1] - 3735:8
document [74] - 3578:2, 3585:21, 3587:17, 3600:7, 3600:8, 3600:9, 3600:10, 3600:20, 3600:24, 3601:2, 3601:20, 3601:22, 3602:1, 3602:3, 3603:9, 3603:15, 3603:20, 3603:22, 3603:23, 3604:7, 3604:9, 3604:13, 3605:1, 3605:13, 3606:5, 3606:9, 3606:13, 3606:25, 3607:20, 3613:19, 3615:10, 3615:15, 3616:15, 3617:1, 3617:4, 3617:19, 3617:25, 3619:4, 3619:17, 3620:14, 3623:15, 3626:5, 3637:19, 3640:5, 3642:13, 3647:6, 3647:7, 3649:15, 3651:10, 3651:25, 3652:3, 3652:10, 3654:15, 3654:22, 3655:13, 3655:21, 3656:7, 3656:9, 3656:14, 3656:15, 3656:16, 3656:17, 3658:23, 3659:2, 3659:4, 3659:8, 3659:9, 3659:11, 3695:14, 3699:1, 3699:14, 3721:13, 3721:17, 3728:17
documents [41] - 3560:23, 3561:1, 3603:5, 3605:19, 3606:10, 3606:15, 3617:24, 3618:1, 3618:4, 3622:1, 3622:5, 3622:12, 3622:14, 3622:18, 3626:24, 3642:20, 3646:15, 3648:25, 3649:3, 3649:8, 3649:9, 3649:14, 3650:1, 3652:8, 3652:16, 3654:13, 3655:22, 3655:23, 3656:10, 3656:24, 3656:25, 3658:10, 3658:12,

3695:21, 3729:9, 3729:10, 3729:11, 3729:13, 3745:9, 3745:10, 3745:21
Doe [1] - 3739:7
dollar [4] - 3594:19, 3594:23, 3610:2, 3610:13
dollars [2] - 3606:21, 3684:25
done [15] - 3566:3, 3566:6, 3566:15, 3590:17, 3596:18, 3613:1, 3617:3, 3617:12, 3624:2, 3631:20, 3690:23, 3698:21, 3701:3, 3744:3, 3746:16
door [8] - 3710:22, 3710:24, 3711:17, 3724:24, 3726:14, 3732:18, 3733:2, 3733:11
doorbell [1] - 3726:14
down [17] - 3565:24, 3568:2, 3569:9, 3578:9, 3612:8, 3634:3, 3634:9, 3635:7, 3663:22, 3659:22, 3678:9, 3685:11, 3685:13, 3707:9, 3715:8, 3716:1, 3744:4
downward [2] - 3632:20, 3633:13, 3636:10
Dr [2] - 3645:5, 3645:11
dr [1] - 3645:12
drafting [1] - 3743:20
draw [1] - 3738:24
drawing [4] - 3631:24, 3631:25, 3632:14, 3635:17
drill [1] - 3733:15
drive [19] - 3682:14, 3700:24, 3714:14, 3715:4, 3716:3, 3716:7, 3718:19, 3722:16, 3722:18, 3722:20, 3723:4, 3723:14, 3723:15, 3727:16, 3727:20, 3730:8, 3730:17, 3730:19
driver [16] - 3667:5, 3667:11, 3667:12, 3667:13, 3667:15, 3667:16, 3667:17, 3674:21, 3682:7, 3682:12, 3690:8, 3690:9, 3701:24, 3702:2
drivers [1] - 3667:7
drives [12] - 3718:15, 3718:18, 3722:14, 3724:9, 3725:2, 3727:19, 3729:10, 3729:12, 3729:14, 3729:17, 3729:18, 3729:19
drivetrain [1] - 3695:2
driving [3] - 3690:3, 3693:11, 3702:2
dry [1] - 3746:21

Ducks [1] - 3672:16
due [1] - 3650:23
duly [5] - 3567:12, 3614:24, 3662:21, 3685:22, 3707:15
duplicate [1] - 3631:3
duplicates [1] - 3625:18
during [22] - 3564:6, 3564:7, 3564:11, 3568:22, 3574:11, 3609:16, 3624:11, 3626:8, 3642:8, 3642:18, 3642:19, 3666:17, 3666:18, 3668:6, 3673:11, 3673:14, 3679:14, 3686:24, 3687:1, 3715:3, 3715:13, 3732:13
duties [1] - 3708:4

**E**

e-mail [51] - 3568:11, 3568:12, 3568:17, 3568:21, 3570:1, 3570:25, 3571:8, 3571:11, 3571:12, 3572:13, 3572:19, 3574:18, 3574:21, 3576:2, 3583:6, 3583:9, 3583:13, 3583:16, 3584:1, 3589:19, 3589:22, 3590:9, 3599:1, 3676:21, 3677:1, 3680:4, 3680:18, 3681:20, 3691:24, 3692:2, 3695:10, 3698:19, 3698:24, 3699:1, 3699:4, 3699:7, 3699:25, 3700:3, 3700:6, 3700:7, 3701:5, 3701:8, 3701:14, 3701:19, 3702:6, 3702:25, 3703:15, 3706:20, 3706:22, 3732:16
e-mails [8] - 3565:23, 3566:1, 3598:5, 3599:17, 3700:8, 3702:10, 3706:6, 3706:10
earliest [1] - 3657:24
early [1] - 3583:9
easel [1] - 3642:20
easily [1] - 3725:19
EASTERN [1] - 3558:1
easy [2] - 3655:24, 3742:4
education [4] - 3616:5, 3617:22, 3621:2, 3621:12
effect [6] - 3623:1, 3634:25, 3637:9, 3699:12, 3700:23
effective [1] - 3623:14
effectively [2] - 3638:14, 3638:18
effects [1] - 3636:12
effort [11] - 3560:21,

3565:24, 3570:6, 3570:10, 3580:11, 3595:5, 3609:22, 3609:23, 3726:21, 3748:17
**efforts** [2] - 3595:6, 3701:22
**either** [7] - 3597:22, 3628:4, 3629:4, 3638:22, 3696:21, 3726:21, 3741:14
**elaborate** [1] - 3627:9
**elected** [1] - 3693:1
**electronic** [4] - 3708:13, 3708:25, 3719:13, 3729:20
**electronically** [2] - 3729:20, 3730:18
**electrostatic** [1] - 3618:19
**elicit** [2] - 3737:1, 3737:18
**eliminate** [1] - 3629:15
**employ** [1] - 3642:25
**employee** [1] - 3668:22
**employees** [1] - 3562:18
**enabled** [1] - 3638:7
**encompass** [1] - 3671:15
**encrypt** [1] - 3714:14
**encryption** [7] - 3714:13, 3719:7, 3725:7, 3725:12, 3725:15, 3726:4, 3726:5
**end** [18] - 3563:7, 3575:14, 3620:4, 3620:20, 3623:18, 3666:7, 3666:15, 3675:11, 3681:15, 3683:2, 3692:22, 3693:9, 3699:22, 3700:10, 3700:12, 3703:14, 3706:18, 3719:19
**endeavor** [1] - 3627:12
**ended** [2] - 3567:3, 3588:24
**energy** [1] - 3744:2
**enforcement** [2] - 3620:7
**engaged** [1] - 3742:12
**engagement** [5] - 3609:17, 3645:21, 3651:24, 3652:2, 3741:11
**engagements** [1] - 3741:14
**engine** [3] - 3663:22, 3695:2, 3695:3
**engineer** [2] - 3663:22, 3667:2
**enlarged** [3] - 3626:3, 3631:14, 3631:15
**enlargements** [2] - 3625:24, 3626:9
**enter** [4] - 3694:1, 3698:9, 3748:8, 3748:25
**entered** [8] - 3622:25, 3623:13, 3712:15, 3712:17, 3723:18, 3726:9, 3726:13, 3726:15
**entering** [1] - 3665:1
**Enterprises** [1] - 3738:16
**enters** [2] - 3614:17,

3660:8
**entire** [8] - 3580:16, 3605:1, 3628:25, 3630:21, 3648:9, 3650:21, 3682:4
**entirely** [1] - 3621:15
**entitled** [2] - 3732:8, 3732:18
**entity** [2] - 3569:11, 3569:12
**entrance** [1] - 3711:11
**entries** [6] - 3589:10, 3737:17, 3738:3, 3738:11, 3747:12, 3748:8
**entry** [2] - 3738:9, 3747:21
**environment** [3] - 3708:18, 3708:19
**equipment** [6] - 3618:7, 3618:15, 3674:22, 3687:22, 3692:23, 3724:8
**erroneously** [2] - 3651:15, 3651:17
**error** [1] - 3714:19
**errors** [1] - 3633:18
**escrow** [13] - 3609:12, 3734:25, 3736:2, 3736:19, 3737:18, 3737:22, 3738:9, 3739:2, 3740:10, 3741:1, 3747:19, 3747:20
**ESDA** [1] - 3618:20
**especially** [1] - 3693:7
**ESQ** [5] - 3558:16, 3558:16, 3558:22, 3559:4, 3559:6
**essence** [2] - 3630:14, 3636:21
**establish** [2] - 3565:12, 3655:7
**established** [1] - 3735:19
**estate** [1] - 3655:19
**estimate** [3] - 3653:25, 3654:3, 3731:16
**Eufora** [26] - 3579:19, 3579:21, 3579:22, 3580:1, 3580:2, 3580:4, 3580:13, 3581:13, 3581:14, 3581:15, 3582:2, 3582:11, 3582:17, 3582:23, 3583:4, 3584:8, 3611:11, 3611:20, 3612:1, 3613:4, 3613:10, 3665:24, 3666:2, 3666:4, 3702:25
**eufora.com** [1] - 3700:8
**evaluate** [2] - 3623:9, 3626:15
**event** [4] - 3688:20, 3690:20, 3693:21, 3694:20
**eventually** [1] - 3667:23
**evidence** [102] - 3566:2, 3568:6, 3572:4, 3572:15, 3574:18, 3584:4, 3587:7,

3590:10, 3593:10, 3593:12, 3598:8, 3600:18, 3603:15, 3603:21, 3604:7, 3605:7, 3612:6, 3613:7, 3613:15, 3620:23, 3620:25, 3621:3, 3621:4, 3621:15, 3622:11, 3625:6, 3625:7, 3625:17, 3627:18, 3628:3, 3631:18, 3632:17, 3632:22, 3632:25, 3634:24, 3635:16, 3637:4, 3637:24, 3643:16, 3646:20, 3648:14, 3669:7, 3669:11, 3670:15, 3670:20, 3678:8, 3681:2, 3688:6, 3691:15, 3691:21, 3692:6, 3692:10, 3692:16, 3695:18, 3695:23, 3699:16, 3699:19, 3700:1, 3704:4, 3711:2, 3711:6, 3712:6, 3712:14, 3713:23, 3714:5, 3715:12, 3716:14, 3717:2, 3717:20, 3719:3, 3719:5, 3720:21, 3720:23, 3721:4, 3723:1, 3724:15, 3726:20, 3728:7, 3728:24, 3729:1, 3729:2, 3735:21, 3749:19, 3751:23, 3751:24, 3752:2, 3752:3, 3752:4, 3752:7, 3752:8, 3752:9, 3752:11, 3752:12, 3752:14, 3752:15, 3752:16, 3752:18, 3752:20, 3752:22, 3752:24
**exact** [4] - 3625:18, 3631:3, 3734:19
**exactly** [15] - 3565:3, 3578:19, 3578:23, 3586:6, 3590:17, 3591:18, 3592:23, 3594:8, 3594:9, 3630:16, 3630:19, 3685:5, 3693:21, 3723:24, 3736:25
**exam** [1] - 3719:4
**examination** [26] - 3565:25, 3567:4, 3601:24, 3601:25, 3605:16, 3607:24, 3608:8, 3609:16, 3617:5, 3617:23, 3618:3, 3619:4, 3619:17, 3622:4, 3623:23, 3629:6, 3630:20, 3639:4, 3643:17, 3647:25, 3648:1, 3675:17, 3696:8, 3705:3, 3722:8, 3731:3
**EXAMINATION** [39] - 3567:15, 3584:23, 3600:3, 3610:11, 3615:7, 3639:5, 3645:1, 3663:3, 3675:20, 3683:19, 3684:23, 3686:7, 3696:10, 3705:1, 3707:2, 3707:21, 3716:17,

3717:21, 3722:10, 3731:1, 3750:3, 3750:5, 3750:8, 3750:10, 3750:13, 3750:15, 3750:18, 3750:20, 3750:22, 3750:24, 3751:2, 3751:4, 3751:6, 3751:8, 3751:11, 3751:13, 3751:15, 3751:17, 3751:19
**examinations** [8] - 3622:17, 3623:24, 3626:17, 3627:13, 3628:12, 3629:18, 3631:7, 3643:18
**examine** [6] - 3619:20, 3619:22, 3619:25, 3620:4, 3622:1, 3645:8
**examined** [6] - 3567:12, 3580:6, 3614:25, 3662:21, 3685:22, 3707:16
**examiner** [5] - 3615:10, 3615:15, 3620:15, 3723:2, 3723:3
**examiners** [3] - 3616:15, 3617:1, 3617:25
**examining** [1] - 3618:12
**example** [12] - 3618:8, 3628:17, 3633:7, 3634:5, 3635:3, 3637:5, 3643:19, 3669:19, 3670:1, 3737:11, 3739:1, 3747:18
**examples** [10] - 3624:14, 3626:22, 3631:12, 3633:7, 3633:22, 3635:16, 3635:25, 3638:8, 3651:6, 3657:8
**exceeds** [2] - 3641:1, 3641:16
**except** [4] - 3657:21, 3674:20, 3682:4, 3735:8
**exception** [8] - 3621:6, 3734:4, 3734:12, 3735:9, 3735:13, 3735:16, 3736:11, 3739:18
**excess** [2] - 3665:12, 3665:18
**Exchanges** [1] - 3619:13
**excited** [2] - 3705:21, 3705:23
**exciting** [2] - 3702:20, 3703:5
**exclusive** [1] - 3614:12
**exclusively** [1] - 3729:19
**excuse** [6] - 3603:18, 3641:7, 3652:1, 3727:15, 3728:18, 3746:18
**execute** [1] - 3632:15
**executed** [6] - 3575:6, 3575:10, 3634:21, 3636:20, 3657:1, 3657:5

**11**

executing [2] - 3634:4, 3634:19
execution [5] - 3632:18, 3632:23, 3636:24, 3648:14, 3724:21
exemplar [1] - 3637:7
exemplars [1] - 3629:12
exerted [2] - 3649:3, 3649:4
Exhibit [38] - 3568:6, 3584:4, 3600:8, 3600:13, 3600:18, 3604:25, 3605:7, 3605:8, 3625:17, 3640:4, 3668:15, 3669:11, 3669:20, 3670:20, 3681:2, 3688:5, 3692:10, 3692:15, 3699:19, 3711:6, 3714:4, 3720:17, 3721:3, 3721:5, 3721:16, 3721:24, 3751:23, 3751:24, 3752:3, 3752:4, 3752:7, 3752:8, 3752:9, 3752:12, 3752:15, 3752:16, 3752:19, 3752:23
exhibit [22] - 3572:7, 3579:16, 3589:18, 3598:15, 3603:17, 3604:2, 3622:12, 3622:16, 3622:24, 3623:4, 3624:19, 3631:11, 3671:10, 3673:19, 3691:23, 3694:12, 3694:22, 3710:19, 3712:8, 3713:10, 3715:17, 3715:22
exhibits [10] - 3577:5, 3578:2, 3627:23, 3660:1, 3704:4, 3711:25, 3712:12, 3720:20, 3720:22, 3721:1
EXHIBITS [1] - 3751:22
Exhibits [12] - 3572:15, 3690:15, 3691:20, 3695:22, 3712:13, 3717:19, 3720:12, 3752:2, 3752:10, 3752:13, 3752:17, 3752:21
exist [1] - 3645:9
existence [1] - 3725:15
exists [2] - 3613:10, 3621:6
exit [1] - 3671:5
exits [2] - 3660:3, 3731:22
expansion [1] - 3704:10
expect [3] - 3631:1, 3650:18, 3724:5
expected [1] - 3675:7
expenditure [1] - 3608:24
expense [3] - 3688:20, 3692:25, 3693:4
expenses [3] - 3669:24, 3670:1, 3679:9
expensive [1] - 3693:7
experience [8] - 3621:2,

3621:12, 3621:18, 3646:16, 3651:9, 3724:13, 3729:16, 3730:14
experienced [1] - 3679:14
experiencing [1] - 3679:2
expert [10] - 3613:18, 3619:3, 3619:6, 3620:23, 3621:7, 3621:16, 3640:12, 3709:9, 3709:14, 3709:19
expertise [1] - 3646:22
explain [8] - 3561:25, 3563:20, 3627:10, 3666:22, 3687:9, 3690:2, 3746:23, 3746:24
explained [1] - 3675:8
explaining [1] - 3739:11
explanation [3] - 3723:22, 3734:16, 3739:12
explore [2] - 3732:18, 3748:4
exposes [1] - 3641:7
exposure [1] - 3705:24
Express [1] - 3728:21
express [3] - 3574:1, 3640:25, 3641:15
expression [1] - 3746:18
extent [6] - 3571:23, 3612:14, 3630:4, 3648:5, 3741:23, 3745:25
external [2] - 3716:3, 3716:7
eye [1] - 3650:16

**F**

fabricated [1] - 3701:5
face [3] - 3602:20, 3602:21, 3659:9, 3723:25, 3724:1, 3749:18
faceoff [1] - 3746:17
facilitate [1] - 3625:3
facilities [1] - 3686:12
facility [2] - 3561:12, 3561:25
fact [24] - 3563:16, 3570:2, 3570:5, 3581:24, 3583:15, 3585:23, 3589:4, 3590:14, 3621:1, 3626:2, 3651:19, 3655:8, 3657:1, 3657:19, 3666:15, 3668:2, 3679:15, 3679:19, 3680:6, 3680:16, 3688:1, 3735:15, 3737:17
fact-finders [1] - 3655:8
factors [2] - 3621:20, 3650:23
facts [2] - 3612:20, 3621:3
factual [1] - 3744:16
fair [25] - 3571:13, 3574:23, 3574:24, 3576:10,

3577:14, 3578:21, 3580:13, 3580:14, 3643:2, 3645:15, 3647:7, 3657:3, 3663:24, 3678:18, 3692:12, 3710:23, 3712:2, 3723:15, 3723:20, 3724:19, 3726:18, 3739:15, 3741:7, 3741:10, 3747:4
fairly [1] - 3628:20
faith [3] - 3613:9, 3613:11, 3613:13
Falcon [1] - 3569:12
fall [2] - 3686:21, 3697:19
fallen [2] - 3680:2, 3681:15
false [1] - 3672:13
familiar [5] - 3587:1, 3600:20, 3663:24, 3674:4, 3674:7, 3674:17, 3674:24, 3736:18
family [2] - 3615:23, 3725:4
far [7] - 3603:8, 3607:16, 3646:4, 3658:15, 3672:4, 3672:16, 3745:21
fashion [3] - 3585:24, 3586:1, 3630:12
father [1] - 3615:25
Fault [1] - 3690:10
fault [1] - 3733:4
favor [1] - 3742:21
FBI [10] - 3707:24, 3707:25, 3709:3, 3710:4, 3723:1, 3726:9, 3727:10, 3728:5, 3728:13, 3729:2
features [1] - 3648:3
February [4] - 3596:23, 3597:5, 3597:15, 3597:16
Federal [3] - 3558:15, 3559:20, 3619:7, 3727:5, 3728:21
fee [9] - 3687:25, 3736:12, 3736:23, 3737:4, 3737:9, 3742:6, 3742:12, 3742:13, 3742:16
fees [5] - 3654:1, 3740:2, 3741:9, 3741:11, 3741:18
feet [1] - 3639:10
fellow [2] - 3702:5, 3702:14
felt [1] - 3733:10
few [8] - 3567:19, 3574:17, 3578:24, 3610:10, 3635:25, 3674:3, 3706:1, 3743:13
field [5] - 3617:4, 3618:2, 3619:3, 3645:13, 3709:14
fighting [2] - 3573:16, 3706:6
figure [3] - 3606:20,

3606:23, 3745:10
file [3] - 3656:19, 3725:9, 3726:8
filed [3] - 3682:23, 3683:9, 3730:18
files [5] - 3720:19, 3721:6, 3727:14, 3727:15, 3729:20
FileVault [9] - 3714:11, 3714:12, 3714:13, 3714:16, 3714:23, 3715:1, 3715:7, 3715:8
final [4] - 3636:9, 3686:15, 3698:5, 3700:12
finally [4] - 3596:22, 3694:21, 3705:21, 3721:24
finance [1] - 3655:17
financial [7] - 3622:16, 3679:1, 3679:13, 3680:11, 3681:17, 3724:17, 3733:5
financing [1] - 3676:9
finders [1] - 3655:8
findings [3] - 3640:11, 3640:16, 3640:21
fine [4] - 3562:3, 3582:7, 3673:16, 3734:10
fingerprint [1] - 3719:14
finish [3] - 3580:23, 3693:10, 3700:24
Finley [2] - 3674:17, 3674:20
Fire [1] - 3671:4
fire [1] - 3733:15
firm [1] - 3741:18
firm's [2] - 3740:23, 3745:10
first [29] - 3561:2, 3564:1, 3574:20, 3585:5, 3587:23, 3600:19, 3613:9, 3614:24, 3622:24, 3626:13, 3627:8, 3628:7, 3628:15, 3641:11, 3652:20, 3655:14, 3656:8, 3662:20, 3685:21, 3707:15, 3722:4, 3723:12, 3726:2, 3726:9, 3726:24, 3732:10, 3734:5, 3734:9, 3736:20
firsthand [1] - 3585:8
fit [2] - 3630:9, 3702:22
five [5] - 3616:16, 3639:8, 3639:15, 3696:23, 3736:16
five-year [1] - 3616:16
flat [2] - 3742:12, 3742:13
floor [1] - 3727:11
Florida [1] - 3674:15
flowing [1] - 3668:4
fluid [1] - 3632:20
focused [1] - 3740:19
follow [1] - 3565:20
following [13] - 3579:17, 3633:13, 3634:2, 3635:20,

**12**

3635:23, 3636:2, 3636:7, 3640:19, 3673:1, 3674:1, 3703:6, 3735:22, 3742:7
**follows** [5] - 3567:13, 3614:25, 3662:22, 3685:23, 3707:16
**forcibly** [1] - 3726:14
**foregoing** [1] - 3720:20
**Forensic** [3] - 3616:23, 3616:24
**forensic** [15] - 3615:10, 3615:15, 3616:15, 3617:4, 3617:17, 3617:18, 3620:14, 3643:6, 3643:7, 3708:12, 3708:25, 3709:14, 3718:16, 3722:22, 3728:4
**forensically** [1] - 3709:5
**forensics** [5] - 3708:3, 3708:6, 3708:7, 3708:8, 3708:17
**forged** [1] - 3701:18
**forget** [1] - 3560:14
**form** [11] - 3575:15, 3575:21, 3580:3, 3610:16, 3620:1, 3621:4, 3633:18, 3653:25, 3654:24, 3656:17, 3749:14
**formal** [1] - 3616:4
**former** [1] - 3616:2
**formerly** [1] - 3615:24
**forms** [1] - 3629:25
**forth** [2] - 3693:12, 3706:7
**forward** [3] - 3660:9, 3683:24, 3698:22
**foundation** [3] - 3655:3, 3655:8, 3699:17
**founder** [1] - 3611:12
**four** [3] - 3658:9, 3733:15, 3745:17
**fourth** [1] - 3615:23
**Fox** [1] - 3645:4
**FOX** [1] - 3643:19
**frame** [1] - 3581:18
**framing** [1] - 3741:21
**frankly** [1] - 3744:15
**fraud** [8] - 3565:6, 3734:4, 3734:11, 3735:8, 3735:13, 3735:16, 3736:10, 3739:18
**free** [4] - 3631:24, 3631:25, 3667:24, 3668:3
**free-hand** [2] - 3631:24, 3631:25
**friend** [1] - 3684:7
**front** [11] - 3623:12, 3639:9, 3639:15, 3641:24, 3642:20, 3710:22, 3710:24, 3711:17, 3724:23, 3726:14, 3728:17
**fruition** [1] - 3675:14,

3684:18
**FTK** [1] - 3718:17
**fuck** [2] - 3573:18, 3595:9
**fuel** [1] - 3687:24
**full** [3] - 3615:16, 3618:24, 3682:11
**full-time** [1] - 3615:16
**fully** [2] - 3575:12, 3720:15
**fund** [4] - 3582:22, 3668:1, 3740:3, 3740:11
**Fund** [18] - 3568:19, 3568:24, 3569:20, 3570:4, 3570:12, 3570:15, 3573:24, 3574:12, 3574:20, 3577:2, 3595:3, 3595:7, 3595:12, 3595:16, 3596:9, 3596:11, 3596:20, 3597:1
**fundamental** [1] - 3636:21
**funded** [1] - 3667:11
**funding** [5] - 3667:5, 3669:16, 3679:3, 3680:12, 3681:19
**funds** [5] - 3590:4, 3590:9, 3590:14, 3667:25, 3732:25
**funny** [5] - 3599:6, 3599:10, 3749:4

**G**

**Gaarn** [5] - 3581:3, 3581:8, 3581:10, 3581:19, 3581:25
**game** [3] - 3672:16, 3741:7, 3741:10
**gauge** [1] - 3648:11
**general** [4] - 3627:13, 3630:2, 3630:3, 3648:4
**generally** [9] - 3628:14, 3657:8, 3658:2, 3669:13, 3669:14, 3690:19, 3691:3, 3711:20, 3748:11
**generate** [1] - 3623:23
**generation** [1] - 3615:24
**gentleman** [3] - 3667:12, 3674:21, 3682:12
**gentlemen** [1] - 3612:5
**Gentry** [3] - 3581:5, 3581:19, 3581:25
**genuine** [42] - 3626:21, 3626:25, 3627:6, 3627:10, 3627:20, 3627:23, 3628:3, 3629:4, 3629:11, 3629:17, 3629:20, 3630:21, 3630:25, 3634:18, 3637:2, 3638:25, 3639:11, 3639:18, 3640:23, 3642:1, 3642:3, 3642:7, 3642:16, 3642:24, 3644:4, 3647:16, 3647:22, 3652:5, 3654:12,

3655:4, 3655:5, 3655:6, 3655:12, 3655:21, 3656:10, 3659:3, 3659:5
**genuineness** [3] - 3631:18, 3632:25, 3636:23
**given** [18] - 3562:11, 3568:1, 3572:6, 3619:6, 3621:13, 3642:14, 3645:16, 3653:1, 3654:14, 3658:23, 3659:2, 3659:4, 3659:7, 3659:9, 3705:16, 3724:13, 3737:11, 3746:7
**glad** [2] - 3568:7, 3671:20
**glean** [1] - 3649:21
**GLEN** [2] - 3567:10, 3750:2
**glen** [1] - 3573:22
**Glen** [3] - 3600:20, 3600:21, 3605:11
**Global** [18] - 3568:18, 3568:24, 3569:20, 3570:4, 3570:12, 3570:14, 3573:24, 3574:12, 3574:20, 3577:2, 3595:2, 3595:6, 3595:12, 3595:15, 3596:9, 3596:11, 3596:20, 3596:25
**GM-1** [2] - 3591:20, 3596:1
**good-faith** [1] - 3613:9
**government** [49] - 3561:2, 3562:22, 3563:8, 3563:24, 3566:9, 3600:2, 3602:1, 3602:6, 3603:17, 3604:2, 3605:23, 3606:16, 3606:17, 3608:4, 3612:16, 3614:20, 3620:7, 3622:2, 3625:11, 3639:23, 3642:5, 3642:14, 3652:21, 3652:24, 3653:24, 3654:14, 3662:13, 3669:6, 3670:14, 3675:22, 3685:15, 3691:12, 3691:14, 3691:22, 3692:5, 3692:15, 3694:12, 3694:21, 3695:17, 3707:12, 3710:18, 3711:1, 3712:5, 3713:10, 3713:22, 3715:17, 3715:22, 3716:13, 3731:12
**Government** [53] - 3558:14, 3598:16, 3645:21, 3650:8, 3652:2, 3653:4, 3653:22, 3654:21, 3655:12, 3660:15, 3669:11, 3670:20, 3690:15, 3691:20, 3692:10, 3695:22, 3711:6, 3712:13, 3714:4, 3717:19, 3720:13, 3720:22, 3721:3, 3732:12, 3732:17, 3733:2, 3733:6, 3735:10, 3736:21,

3737:18, 3738:2, 3738:10, 3738:21, 3739:16, 3739:21, 3740:12, 3743:1, 3746:25, 3747:6, 3747:11, 3747:17, 3748:16, 3751:23, 3751:24, 3752:10, 3752:12, 3752:13, 3752:16, 3752:17, 3752:19, 3752:21, 3752:23
**government's** [7] - 3601:24, 3603:19, 3622:12, 3626:16, 3683:1, 3704:5, 3711:24
**Government's** [14] - 3587:7, 3591:20, 3654:20, 3668:15, 3669:19, 3688:5, 3720:12, 3720:17, 3721:5, 3721:16, 3721:24, 3734:3, 3734:19, 3744:7
**GPS** [1] - 3708:19
**Grand** [4] - 3700:13, 3702:21, 3703:1, 3703:5
**grand** [1] - 3703:4
**Grand-Am** [4] - 3700:13, 3702:21, 3703:1, 3703:5
**great** [10] - 3569:18, 3599:17, 3618:6, 3629:7, 3643:2, 3646:17, 3675:14, 3724:18, 3732:15
**greatly** [3] - 3626:2, 3631:14, 3631:15
**group** [8] - 3570:2, 3573:16, 3579:18, 3582:9, 3625:2, 3629:22, 3648:9, 3692:16
**Group** [1] - 3688:8
**groups** [2] - 3616:10, 3619:13
**GSF** [1] - 3610:5
**guess** [9] - 3577:12, 3580:14, 3589:19, 3605:22, 3648:18, 3681:24, 3723:2, 3732:11, 3739:21
**guilty** [3] - 3612:14, 3612:24, 3614:10
**guy** [1] - 3748:11
**GX** [2] - 3713:23, 3714:3

**H**

**hair** [2] - 3650:24, 3650:25
**HALEY** [67] - 3558:20, 3558:22, 3560:6, 3560:9, 3560:13, 3562:5, 3563:3, 3572:10, 3583:24, 3589:5, 3589:8, 3593:9, 3593:20, 3593:25, 3599:7, 3599:11,

**13**

3599:14, 3599:23, 3600:1,
3600:4, 3600:12, 3603:16,
3604:4, 3604:23, 3609:25,
3612:24, 3614:11,
3620:16, 3625:14,
3626:11, 3639:6, 3645:2,
3651:23, 3652:19,
3656:20, 3659:14,
3659:17, 3669:9, 3670:18,
3673:18, 3680:25,
3683:15, 3691:18, 3692:8,
3695:20, 3703:23, 3704:2,
3709:16, 3711:4, 3712:7,
3713:25, 3714:2, 3716:15,
3716:18, 3717:15, 3720:4,
3720:24, 3722:9, 3722:11,
3730:10, 3730:21,
3731:10, 3749:7, 3750:9,
3750:16, 3751:14, 3751:18
**Haley** [14] - 3561:23,
3572:9, 3585:3, 3585:11,
3586:16, 3587:15,
3587:20, 3598:15,
3599:22, 3605:24, 3639:7,
3683:14, 3691:17, 3703:21
**half** [3] - 3611:6, 3613:21,
3688:25
**half-hour** [1] - 3613:21
**halfway** [2] - 3693:17,
3696:23
**hand** [15] - 3600:19,
3618:8, 3625:22, 3631:24,
3631:25, 3668:14,
3669:19, 3671:10,
3694:11, 3694:21, 3700:4,
3710:18, 3711:24, 3713:9,
3715:16
**handing** [1] - 3690:15
**Handing** [1] - 3749:3
**handle** [1] - 3708:9
**handling** [1] - 3688:13
**handwriting** [6] - 3613:17,
3617:25, 3629:16,
3632:13, 3638:3, 3638:15
**handwritten** [1] - 3635:21
**hangar** [1] - 3570:10
**happy** [2] - 3575:6,
3706:19
**hard** [28] - 3714:14,
3715:4, 3716:3, 3716:7,
3718:15, 3718:18,
3718:19, 3722:14,
3722:16, 3722:18,
3722:20, 3723:13,
3723:15, 3724:9, 3725:2,
3727:16, 3727:19,
3727:20, 3729:10,
3729:12, 3729:13,
3729:17, 3729:18,
3729:19, 3730:8, 3730:17,

3730:19
**harder** [2] - 3706:5
**hardware** [1] - 3693:3
**hash** [4] - 3719:13,
3719:15, 3719:17, 3719:22
**Hash** [1] - 3723:10
**Hawaii** [12] - 3564:12,
3585:9, 3586:2, 3586:12,
3590:24, 3591:6, 3605:19,
3606:1, 3608:6, 3655:18,
3673:10, 3675:12
**he/we** [1] - 3575:10
**head** [1] - 3579:8
**heading** [2] - 3637:3,
3640:16
**hear** [5] - 3574:8, 3581:5,
3677:13, 3677:17, 3686:5
**heard** [4] - 3578:17,
3578:19, 3581:2, 3593:22
**hearing** [4] - 3581:7,
3738:7, 3746:13, 3746:20
**hearsay** [1] - 3608:20
**height** [1] - 3630:2
**held** [5] - 3580:2, 3583:4,
3736:6, 3740:25, 3741:6
**helicopter** [2] - 3664:25,
3665:9
**helicopters** [1] - 3671:25
**help** [7] - 3562:10,
3562:21, 3595:5, 3618:17,
3625:10, 3657:17, 3674:15
**helped** [1] - 3562:16
**helpful** [1] - 3562:17
**hereby** [1] - 3720:8
**hiccups** [1] - 3747:8
**hide** [1] - 3638:14
**high** [1] - 3695:3
**higher** [2] - 3690:5, 3690:6
**highlight** [1] - 3572:23
**highlighted** [4] - 3566:5,
3575:2, 3580:20, 3681:9
**highly** [6] - 3627:5,
3640:21, 3641:20, 3642:2,
3642:6, 3647:15
**Highway** [1] - 3558:21
**himself** [2] - 3664:20,
3732:25
**hired** [3] - 3576:7, 3653:3,
3703:11
**History** [2] - 3721:14,
3721:17
**history** [3] - 3587:9,
3600:2, 3660:22
**hit** [1] - 3569:6
**hockey** [22] - 3568:18,
3570:19, 3571:3, 3571:24,
3573:6, 3574:14, 3576:1,
3577:1, 3577:16, 3577:19,
3578:5, 3579:23, 3580:7,
3581:24, 3583:11, 3597:5,

3613:10, 3671:14,
3737:22, 3747:18,
3747:21, 3747:24
**hold** [2] - 3616:6, 3733:23
**holding** [1] - 3739:9
**home** [11] - 3665:6, 3711:8,
3711:10, 3711:15,
3711:21, 3712:2, 3712:3,
3724:23, 3726:10,
3726:13, 3726:15
**honest** [1] - 3738:6
**honesty** [1] - 3661:5
**Honor** [54] - 3560:6,
3560:16, 3562:5, 3563:6,
3565:3, 3572:4, 3583:19,
3600:12, 3600:16,
3603:16, 3603:20,
3604:23, 3610:10,
3613:18, 3615:6, 3620:13,
3620:18, 3621:24,
3625:13, 3625:14, 3626:7,
3659:19, 3659:21,
3661:11, 3664:12,
3670:17, 3673:8, 3675:18,
3680:23, 3680:24, 3681:4,
3683:11, 3683:13,
3683:17, 3691:16, 3692:7,
3695:19, 3696:9, 3699:21,
3711:3, 3713:24, 3717:15,
3720:25, 3733:9, 3740:17,
3741:2, 3741:13, 3743:3,
3743:23, 3743:25,
3744:11, 3746:11,
3748:20, 3749:7
**Honor's** [1] - 3593:25
**HONORABLE** [1] - 3558:11
**hope** [5] - 3560:22,
3566:25, 3577:23,
3696:25, 3729:25
**hoped** [1] - 3732:7
**hopeful** [1] - 3746:10
**hopefully** [2] - 3612:25,
3744:1
**hoping** [2] - 3565:13,
3731:12
**hotel** [1] - 3619:14
**Hotel** [1] - 3678:4
**hour** [3] - 3611:6, 3613:21,
3653:24
**hourly** [3] - 3653:23,
3742:9
**hours** [3] - 3708:17,
3708:21, 3736:19
**house** [4] - 3568:2, 3668:3,
3710:22, 3710:24
**housekeeping** [1] -
3748:24
**husband** [2] - 3573:3,
3573:4
**hypothetical** [1] - 3738:24

**I**

**idea** [3] - 3610:24,
3611:21, 3749:13
**identical** [6] - 3626:1,
3630:25, 3646:9, 3646:10,
3646:21, 3723:17
**identically** [1] - 3630:15
**identification** [14] -
3570:22, 3577:4, 3577:22,
3579:5, 3583:8, 3591:19,
3624:3, 3664:11, 3664:13,
3676:20, 3680:17, 3687:6,
3687:7, 3694:11
**identified** [5] - 3638:8,
3657:12, 3666:3, 3704:4,
3722:15
**identify** [7] - 3628:3,
3638:7, 3648:3, 3648:4,
3648:10, 3666:1, 3694:22,
3740:1
**identity** [3] - 3737:4,
3741:7, 3741:10, 3742:1
**illegal** [1] - 3735:23
**illustrations** [3] - 3624:4,
3643:15, 3643:25
**image** [13] - 3718:10,
3718:12, 3718:18,
3719:12, 3719:14,
3719:22, 3723:13,
3723:20, 3724:9, 3725:2,
3727:12, 3730:20
**imaged** [15] - 3717:13,
3720:11, 3720:14,
3722:14, 3722:18,
3722:19, 3723:2, 3727:15,
3727:18, 3729:13,
3729:17, 3729:18,
3729:19, 3730:17
**images** [2] - 3718:19,
3727:20
**imaging** [8] - 3709:14,
3718:18, 3719:10,
3719:11, 3719:18,
3722:20, 3722:23, 3723:8
**imitation** [1] - 3627:22
**immediately** [3] - 3579:13,
3635:7, 3744:17
**implicate** [3] - 3738:23,
3739:17, 3739:19
**implicating** [1] - 3742:16
**implication** [1] - 3738:23
**implied** [1] - 3684:17
**important** [4] - 3569:18,
3574:1, 3631:17, 3741:17
**impossible** [1] - 3630:18
**inaccurate** [1] - 3613:14
**inception** [1] - 3742:8
**incidentally** [1] - 3651:9

**include** [4] - 3624:23, 3629:18, 3653:8, 3724:17
**included** [4] - 3571:3, 3657:8, 3658:14, 3695:2
**includes** [3] - 3654:3, 3658:2, 3658:14
**including** [9] - 3579:24, 3582:10, 3615:15, 3619:7, 3643:6, 3657:19, 3689:2, 3733:17
**income** [1] - 3741:6
**inconclusive** [1] - 3627:16
**inconsistent** [1] - 3637:7
**Incorporated** [1] - 3663:17
**incorrect** [1] - 3647:2
**incorrectly** [1] - 3640:20
**incurred** [2] - 3669:24, 3670:6
**indeed** [1] - 3561:1
**indentation** [2] - 3618:23, 3648:17
**indentations** [1] - 3618:21
**independent** [1] - 3587:3, 3620:9, 3626:18
**indicated** [4] - 3628:12, 3668:20, 3732:5, 3748:25
**indicates** [3] - 3623:13, 3634:17, 3637:5
**indicating** [2] - 3634:24, 3635:1
**indication** [1] - 3715:4
**indications** [1] - 3637:1
**indicative** [2] - 3631:19, 3635:11
**indigent** [1] - 3653:12
**individual** [5] - 3629:25, 3633:6, 3637:11, 3648:3, 3704:8
**individually** [2] - 3576:24, 3648:8
**industry** [2] - 3663:25, 3674:5
**infinite** [1] - 3651:7
**information** [26] - 3563:15, 3578:11, 3592:18, 3648:7, 3650:5, 3659:8, 3659:10, 3668:21, 3670:5, 3723:18, 3724:18, 3725:24, 3726:7, 3727:12, 3730:15, 3730:18, 3731:6, 3735:7, 3735:12, 3735:14, 3736:12, 3737:4, 3737:10, 3742:24
**infrared** [1] - 3618:18
**initial** [12] - 3615:16, 3616:17, 3628:13, 3630:20, 3633:7, 3636:6, 3643:18, 3645:7, 3648:1, 3736:8, 3742:8, 3742:11
**inks** [1] - 3618:17

**insane** [1] - 3590:4
**insofar** [1] - 3652:10
**inspect** [3] - 3562:12, 3713:11, 3715:18
**instance** [8] - 3627:16, 3630:8, 3634:19, 3647:24, 3648:13, 3653:12, 3654:1, 3654:7
**instances** [3] - 3634:25, 3635:13, 3724:6
**institutional** [1] - 3605:10
**instruction** [12] - 3563:19, 3565:10, 3565:21, 3572:6, 3575:16, 3583:23, 3584:1, 3620:19, 3620:21, 3621:22, 3705:6, 3709:18
**instructions** [4] - 3592:24, 3592:25, 3594:10, 3732:5
**instrument** [6] - 3618:22, 3633:15, 3634:4, 3634:8, 3635:12, 3635:13
**instrumental** [1] - 3619:13
**instruments** [4] - 3618:2, 3618:5, 3618:6, 3711:21
**insurance** [4] - 3689:3, 3690:4, 3690:5, 3690:10
**intend** [1] - 3740:14
**intended** [2] - 3640:25, 3641:15
**intent** [2] - 3610:4, 3739:22
**interact** [2] - 3664:15, 3674:9
**interest** [12] - 3580:1, 3591:9, 3591:10, 3591:14, 3591:23, 3592:2, 3610:3, 3611:20, 3611:25, 3613:4, 3613:10, 3621:18
**interested** [3] - 3687:12, 3747:12, 3748:8
**interesting** [1] - 3705:21
**interestingly** [1] - 3735:11
**intern** [1] - 3616:2
**internal** [1] - 3741:9
**interrupt** [2] - 3562:13, 3629:9
**interview** [2] - 3749:11
**interviewed** [2] - 3602:6, 3602:8
**intimate** [1] - 3736:5
**introduce** [4] - 3602:24, 3673:5, 3735:11, 3735:13
**introduced** [5] - 3603:3, 3666:7, 3666:11, 3704:4, 3735:21
**introducing** [1] - 3735:14
**invest** [1] - 3575:11
**invested** [4] - 3569:10, 3569:20, 3585:14, 3608:6
**investigating** [1] - 3602:12
**Investigation** [1] - 3727:6

**investigation** [3] - 3654:20, 3724:19, 3735:25
**Investigator** [1] - 3749:14
**investing** [1] - 3567:22
**investment** [11] - 3569:21, 3569:25, 3585:9, 3586:2, 3586:13, 3591:5, 3605:19, 3606:1, 3607:25, 3608:1, 3611:10
**investments** [4] - 3574:15, 3586:8, 3604:20, 3655:18
**invoice** [3] - 3690:21, 3696:14, 3703:9
**invoices** [7] - 3671:15, 3688:22, 3691:4, 3691:6, 3693:25, 3694:2, 3736:25
**involved** [13] - 3569:11, 3569:17, 3569:24, 3570:9, 3577:15, 3615:14, 3647:3, 3649:25, 3693:6, 3693:9, 3734:23, 3737:19, 3745:21
**involves** [5] - 3629:7, 3642:24, 3648:1, 3648:17, 3742:14
**involving** [5] - 3617:25, 3619:21, 3655:18, 3656:24, 3708:9
**irregardless** [1] - 3690:7
**irrelevant** [1] - 3672:4
**IRS** [2] - 3737:13, 3737:15
**Islandia** [1] - 3558:22
**Isle** [3] - 3673:13, 3673:22, 3722:2
**Islip** [3] - 3558:6, 3558:15, 3559:21
**issue** [6] - 3560:13, 3562:13, 3562:25, 3621:3, 3626:15, 3661:2, 3734:6, 3737:2
**issued** [2] - 3624:7, 3640:8
**issues** [13] - 3560:9, 3562:18, 3565:2, 3569:21, 3570:3, 3570:14, 3660:24, 3698:23, 3703:8, 3709:2, 3732:23, 3734:23, 3748:6
**italicized** [1] - 3641:21
**item** [4] - 3625:10, 3718:3, 3718:4, 3726:2
**items** [2] - 3709:1, 3748:4
**itself** [11] - 3608:13, 3629:7, 3631:5, 3631:6, 3650:22, 3651:12, 3694:20, 3713:25, 3725:16, 3737:10
**IV** [1] - 3722:2

**J**

**Jackson** [8] - 3660:10,

3662:13, 3663:1, 3681:7, 3702:21, 3703:10, 3706:15, 3706:17
**JACKSON** [2] - 3662:19, 3750:17
**jag** [1] - 3634:7
**jail** [2] - 3561:23, 3561:24
**JAMES** [1] - 3558:16
**January** [1] - 3687:3
**Jason** [1] - 3573:5
**Jenowski** [1] - 3749:15
**Jersey** [2] - 3615:13, 3616:23
**John** [35] - 3613:17, 3614:20, 3615:3, 3623:10, 3623:17, 3624:16, 3624:20, 3626:16, 3626:22, 3626:23, 3627:6, 3628:23, 3629:4, 3629:11, 3629:14, 3629:20, 3630:4, 3630:22, 3631:12, 3633:20, 3634:21, 3636:24, 3637:12, 3638:9, 3640:24, 3650:12, 3655:13, 3655:16, 3656:11, 3657:6, 3657:9, 3657:23, 3659:4, 3659:11, 3749:11
**joint** [1] - 3655:17
**joke** [1] - 3749:17
**JOSEPH** [1] - 3558:11
**journal** [3] - 3617:16, 3617:17, 3617:18
**journals** [1] - 3617:20
**Jowdy** [47] - 3567:19, 3567:22, 3568:1, 3570:18, 3570:19, 3571:2, 3571:20, 3571:23, 3574:2, 3574:14, 3576:8, 3576:16, 3576:22, 3576:24, 3577:1, 3577:10, 3577:16, 3578:5, 3589:19, 3589:20, 3590:5, 3590:15, 3590:18, 3591:8, 3592:3, 3592:10, 3592:12, 3592:25, 3593:8, 3594:16, 3594:22, 3595:15, 3596:3, 3598:2, 3608:12, 3608:17, 3609:2, 3609:7, 3609:12, 3610:18, 3610:21, 3610:22, 3738:5, 3741:16, 3741:19, 3747:19
**Jowdy's** [3] - 3572:25, 3609:12, 3610:23
**judge** [14] - 3560:14, 3561:4, 3584:5, 3589:5, 3593:9, 3593:12, 3599:7, 3609:1, 3620:16, 3641:11, 3671:9, 3680:25, 3685:10, 3712:7
**Judge** [12] - 3563:4,

3604:4, 3609:25, 3656:21, 3659:14, 3672:17, 3695:20, 3711:4, 3722:9, 3733:19, 3734:2, 3749:22
**JUDGE** [1] - 3558:11
**judgment** [7] - 3567:19, 3567:21, 3594:20, 3610:2, 3610:5, 3610:13, 3610:17
**July** [3] - 3568:15, 3655:15, 3694:19
**jump** [1] - 3579:12
**June** [9] - 3558:9, 3572:19, 3623:14, 3637:19, 3637:21, 3646:7, 3693:22, 3739:3, 3749:24
**jurors** [2] - 3560:4, 3642:13
**JURORS** [1] - 3566:24
**jury** [41] - 3558:11, 3563:20, 3566:18, 3566:21, 3566:23, 3612:11, 3613:6, 3614:16, 3614:17, 3620:19, 3620:25, 3625:22, 3626:1, 3626:14, 3628:8, 3639:9, 3639:10, 3639:15, 3641:24, 3641:25, 3642:12, 3642:20, 3660:3, 3660:5, 3662:7, 3662:10, 3669:14, 3671:10, 3672:7, 3672:10, 3695:25, 3699:20, 3701:6, 3705:18, 3720:7, 3721:5, 3731:11, 3731:22, 3745:5, 3746:13, 3746:19

## K

**K-1** [1] - 3656:17
**K-1-J** [1] - 3658:17
**Kaiser** [24] - 3623:10, 3623:18, 3624:16, 3626:16, 3626:23, 3627:7, 3628:23, 3629:4, 3629:11, 3629:14, 3630:22, 3631:13, 3634:21, 3635:24, 3637:12, 3650:12, 3655:14, 3655:16, 3656:11, 3657:6, 3657:23, 3659:5, 3659:11, 3749:12
**Kaiser's** [9] - 3624:20, 3626:22, 3629:20, 3630:5, 3633:20, 3636:24, 3638:9, 3640:24, 3657:9
**kart** [1] - 3665:7
**keep** [3] - 3565:24, 3615:4, 3684:4
**KELLY** [1] - 3558:14
**Ken** [16] - 3571:20, 3576:16, 3576:22,

3589:19, 3589:20, 3590:5, 3596:3, 3598:2, 3608:12, 3608:17, 3609:12, 3610:3, 3738:4, 3741:16, 3747:19
**KENNER** [1] - 3558:7
**Kenner** [44] - 3558:23, 3560:17, 3560:23, 3561:15, 3562:3, 3586:8, 3588:5, 3590:22, 3591:7, 3591:11, 3591:23, 3592:2, 3592:20, 3593:8, 3594:10, 3594:14, 3595:6, 3598:7, 3600:7, 3600:12, 3600:18, 3604:21, 3604:25, 3605:7, 3605:8, 3608:14, 3608:17, 3609:23, 3639:8, 3640:4, 3655:16, 3666:12, 3673:9, 3710:13, 3716:8, 3720:10, 3725:4, 3726:21, 3731:7, 3741:15, 3749:10, 3749:13, 3752:7, 3752:8
**Kenner's** [5] - 3564:13, 3724:23, 3725:1, 3726:10, 3746:8
**kept** [3] - 3669:3, 3670:11, 3691:9
**Kevin** [1] - 3616:2
**key** [1] - 3647:10
**keyboard** [1] - 3711:22
**kind** [12] - 3562:16, 3562:18, 3563:15, 3563:22, 3646:20, 3667:10, 3674:19, 3688:25, 3690:7, 3695:5, 3705:14, 3706:14
**kindly** [2] - 3600:7, 3605:8
**kinds** [3] - 3618:8, 3667:7, 3670:1
**kitchen** [5] - 3711:11, 3711:13, 3715:11, 3716:21, 3716:24
**knowing** [2] - 3657:2, 3724:6
**knowledge** [7] - 3611:4, 3611:7, 3620:25, 3621:2, 3726:12, 3726:15, 3729:8
**known** [41] - 3599:13, 3624:15, 3624:20, 3624:23, 3625:9, 3626:21, 3628:3, 3628:16, 3628:17, 3629:12, 3629:13, 3629:20, 3629:25, 3630:21, 3630:24, 3631:9, 3631:12, 3633:23, 3634:10, 3635:15, 3636:18, 3637:7, 3643:12, 3648:2, 3648:9, 3648:25, 3649:5, 3649:9, 3650:9, 3654:15, 3654:18, 3655:21, 3656:10,

3656:16, 3657:6, 3657:11, 3657:20, 3658:5, 3658:22, 3658:25, 3659:1
**knowns** [2] - 3648:6, 3648:7
**knows** [3] - 3593:14, 3612:22, 3613:8
**KOMATIREDDY** [64] - 3558:16, 3564:1, 3565:3, 3613:24, 3662:13, 3663:4, 3663:13, 3664:14, 3669:6, 3669:12, 3670:14, 3670:21, 3671:9, 3671:12, 3672:6, 3673:7, 3673:21, 3674:2, 3675:16, 3680:24, 3682:24, 3683:17, 3683:20, 3684:21, 3685:15, 3686:8, 3687:8, 3690:1, 3691:14, 3692:5, 3695:17, 3695:24, 3696:7, 3697:3, 3699:13, 3699:17, 3701:10, 3703:16, 3704:9, 3705:2, 3707:1, 3707:12, 3707:22, 3709:13, 3711:1, 3712:5, 3713:22, 3714:1, 3716:13, 3717:22, 3720:1, 3720:8, 3722:7, 3730:5, 3731:2, 3731:8, 3740:17, 3750:19, 3750:23, 3751:3, 3751:7, 3751:12, 3751:16, 3751:20

## L

**lab** [6] - 3709:3, 3717:13, 3718:15, 3727:1, 3727:3, 3727:11
**label** [2] - 3718:2, 3722:24
**laboratories** [1] - 3618:25
**laborious** [6] - 3632:17, 3632:23, 3633:3, 3635:1, 3648:14, 3745:12
**lack** [4] - 3640:9, 3699:17, 3744:10, 3746:17
**lady** [1] - 3702:1
**lake** [1] - 3700:17
**Lake** [3] - 3700:25, 3701:3, 3701:22
**land** [1] - 3590:24
**language** [1] - 3734:19
**LaPinta** [7] - 3731:25, 3733:13, 3733:24, 3734:1, 3743:9, 3743:14, 3744:4
**LAPINTA** [22] - 3733:19, 3734:2, 3734:8, 3734:10, 3734:13, 3736:17, 3737:25, 3738:24, 3739:6, 3739:25, 3740:6, 3740:8, 3741:23, 3743:25, 3745:19, 3745:24, 3746:4,

3746:11, 3747:4, 3748:3, 3748:11, 3748:19
**laptop** [8] - 3560:17, 3713:14, 3713:15, 3715:20, 3716:1, 3718:7, 3718:10, 3724:15
**large** [4] - 3613:18, 3630:12, 3633:21, 3633:24
**larger** [2] - 3570:2, 3652:13
**LaRusso** [41] - 3567:4, 3589:18, 3595:4, 3597:1, 3600:15, 3600:16, 3605:4, 3605:5, 3609:16, 3610:10, 3610:12, 3613:1, 3613:8, 3620:18, 3625:13, 3626:12, 3659:18, 3670:16, 3691:16, 3692:7, 3695:19, 3696:9, 3696:11, 3696:12, 3699:15, 3699:20, 3703:18, 3703:20, 3705:13, 3707:3, 3707:8, 3709:17, 3711:3, 3712:11, 3713:24, 3717:17, 3732:5, 3748:25, 3750:11, 3751:5, 3751:9
**LARUSSO** [55] - 3559:2, 3559:4, 3562:13, 3563:6, 3563:22, 3564:16, 3564:22, 3565:13, 3565:16, 3565:22, 3566:5, 3566:9, 3566:14, 3566:17, 3567:16, 3572:3, 3572:16, 3575:22, 3583:19, 3584:5, 3584:7, 3584:19, 3659:19, 3661:11, 3664:11, 3669:8, 3670:17, 3671:19, 3672:17, 3673:2, 3673:16, 3675:18, 3675:21, 3680:22, 3681:3, 3681:6, 3683:1, 3683:5, 3683:11, 3683:13, 3684:24, 3685:9, 3687:6, 3720:5, 3720:25, 3730:22, 3731:9, 3733:9, 3733:24, 3744:4, 3749:5, 3749:20, 3750:4, 3750:21, 3750:25
**LaRusso's** [1] - 3749:17
**Las** [2] - 3568:3, 3686:10
**last** [17] - 3565:23, 3589:10, 3600:9, 3611:6, 3611:10, 3615:2, 3622:19, 3623:6, 3638:2, 3684:8, 3686:1, 3696:17, 3698:11, 3698:13, 3704:3, 3707:18, 3717:10
**lastly** [3] - 3565:22, 3583:2, 3658:4
**late** [2] - 3664:17, 3697:20
**latter** [1] - 3623:24
**laugh** [1] - 3598:4

**16**

laundry [1] - 3748:3
law [7] - 3620:7, 3651:21, 3734:14, 3737:12, 3738:8, 3740:23, 3741:17
lawsuit [19] - 3578:18, 3589:19, 3589:20, 3593:2, 3593:3, 3594:17, 3594:24, 3595:14, 3596:3, 3596:25, 3597:1, 3597:3, 3608:12, 3609:18, 3609:22, 3733:1, 3737:21, 3738:4, 3747:22
lawsuits [4] - 3577:12, 3737:19, 3738:12, 3741:16
lawyer [10] - 3576:7, 3594:22, 3612:5, 3612:20, 3612:21, 3734:23, 3736:4, 3737:2, 3737:14, 3737:20
lawyers [7] - 3608:25, 3612:13, 3660:22, 3731:13, 3736:22, 3747:2, 3748:18
learn [2] - 3585:7
learned [5] - 3567:25, 3578:21, 3585:6, 3684:2, 3687:19
least [16] - 3603:8, 3607:16, 3607:20, 3641:23, 3646:4, 3646:7, 3646:23, 3650:15, 3654:18, 3656:8, 3656:13, 3657:4, 3678:18, 3703:14, 3744:16, 3747:5
leave [3] - 3660:1, 3733:16, 3749:7
leaves [1] - 3612:11
led [2] - 3668:5, 3683:3
ledger [1] - 3734:16
left [9] - 3596:19, 3613:18, 3635:10, 3637:17, 3678:2, 3700:4, 3705:19, 3717:3, 3721:9
left-hand [1] - 3700:4
legal [6] - 3562:16, 3562:17, 3562:20, 3562:23, 3695:8, 3738:12
lending [1] - 3592:3
Lennox [1] - 3708:18
lent [1] - 3567:22
less [2] - 3639:8, 3654:8
letter [23] - 3578:3, 3580:6, 3580:16, 3596:24, 3597:1, 3597:2, 3630:3, 3633:8, 3634:2, 3634:6, 3635:3, 3635:19, 3635:20, 3635:23, 3636:2, 3636:5, 3636:8, 3655:15, 3655:16, 3719:16, 3733:17, 3742:19, 3746:3
letters [6] - 3597:3, 3629:25, 3630:1, 3635:24,

3636:9, 3637:5
level [1] - 3723:5
liability [1] - 3584:8
liable [1] - 3609:2
library [1] - 3618:24
Life [1] - 3677:24
life [2] - 3563:14, 3634:21
lifetime [1] - 3650:22
light [2] - 3618:19, 3746:19
lighting [1] - 3618:18
likely [1] - 3694:19
limit [2] - 3565:14, 3705:7
limited [4] - 3584:8, 3643:10, 3643:24, 3661:1
limiting [6] - 3572:5, 3575:16, 3583:22, 3584:1, 3705:6, 3732:3
line [22] - 3585:3, 3586:20, 3587:9, 3587:18, 3587:21, 3587:24, 3591:1, 3591:4, 3598:17, 3608:1, 3633:10, 3633:14, 3634:4, 3634:6, 3634:25, 3635:16, 3635:21, 3636:1, 3636:3, 3637:6, 3706:8, 3731:17
lines [4] - 3611:5, 3630:10, 3632:21, 3636:21
list [2] - 3675:22, 3748:3
listed [3] - 3579:23, 3650:3, 3657:10, 3657:12, 3696:5, 3709:1
listen [1] - 3731:18
lists [2] - 3658:17, 3670:22
litany [1] - 3748:3
literally [1] - 3706:6
litigants [1] - 3652:25
litigated [1] - 3736:19
litigation [2] - 3608:24, 3619:21
live [5] - 3597:13, 3601:16, 3663:5, 3686:9, 3686:10
lived [1] - 3710:12
living [8] - 3615:9, 3663:7, 3667:17, 3686:11, 3711:18, 3713:2, 3714:7, 3714:10
LLC [2] - 3584:8, 3688:12
loan [23] - 3575:11, 3582:11, 3582:23, 3587:9, 3589:11, 3590:18, 3590:21, 3591:7, 3592:13, 3592:15, 3592:16, 3596:4, 3600:1, 3601:3, 3603:5, 3607:3, 3607:6, 3607:18, 3607:19, 3608:13, 3609:6, 3609:11, 3704:10
Loan [2] - 3721:13, 3721:17
loaned [1] - 3593:8
loaning [1] - 3608:18

located [7] - 3615:11, 3615:12, 3615:13, 3711:16, 3727:3, 3728:22, 3729:3
location [3] - 3718:3, 3724:22, 3728:14
Lock [1] - 3677:24
locker [1] - 3728:4
lodged [1] - 3736:1
logged [1] - 3731:5
login [2] - 3714:21
logistics [3] - 3667:1, 3687:23, 3703:12
logos [2] - 3670:25, 3671:3
look [37] - 3561:12, 3562:2, 3570:24, 3575:1, 3577:7, 3579:7, 3591:21, 3600:7, 3600:8, 3601:11, 3603:14, 3603:22, 3604:25, 3605:1, 3605:9, 3618:6, 3622:22, 3629:10, 3629:11, 3631:8, 3633:7, 3633:9, 3640:4, 3648:5, 3650:4, 3651:13, 3652:16, 3658:23, 3679:25, 3712:9, 3712:18, 3719:15, 3722:24, 3723:22, 3727:13, 3738:9, 3742:19
looked [10] - 3579:16, 3624:19, 3629:12, 3692:12, 3696:4, 3711:20, 3714:10, 3714:16, 3714:23, 3715:1
looking [2] - 3565:14, 3565:25, 3575:3, 3575:23, 3582:11, 3622:20, 3622:21, 3629:18, 3629:24, 3631:15, 3634:16, 3670:22, 3695:9, 3695:13, 3696:1, 3712:21, 3715:21, 3716:4, 3717:24, 3721:24, 3723:25, 3724:1, 3728:20, 3735:11, 3745:9
looks [3] - 3579:22, 3632:1, 3638:16
loop [4] - 3634:1, 3634:8, 3635:5, 3636:4
looped [1] - 3633:24
loosing [1] - 3650:25
lose [1] - 3650:24
lost [1] - 3614:9
low [1] - 3695:2
luck [1] - 3706:18
lunch [2] - 3659:24, 3660:13

**M**

M.E.S.H.I.N.S.K.Y [1] -

3707:20
MacBook [1] - 3715:20
machine [3] - 3631:2, 3665:14, 3719:4
magnification [1] - 3618:7
magnifiers [1] - 3618:8
mail [53] - 3561:11, 3568:11, 3568:12, 3568:17, 3568:21, 3570:1, 3570:25, 3571:8, 3571:11, 3571:12, 3572:13, 3572:19, 3574:18, 3574:21, 3576:2, 3583:6, 3583:9, 3583:13, 3583:16, 3584:1, 3589:19, 3589:22, 3590:9, 3599:1, 3676:21, 3677:1, 3680:4, 3680:18, 3681:20, 3691:24, 3692:2, 3695:10, 3698:19, 3698:24, 3699:1, 3699:4, 3699:7, 3699:25, 3700:3, 3700:6, 3700:7, 3701:5, 3701:8, 3701:14, 3701:19, 3702:6, 3702:25, 3703:9, 3703:15, 3706:20, 3706:22, 3732:16
mails [8] - 3565:23, 3566:1, 3598:5, 3599:17, 3700:8, 3702:10, 3706:6, 3706:10
main [1] - 3740:21
maintain [1] - 3703:11
maintained [1] - 3604:19
major [2] - 3663:25, 3746:16
majority [1] - 3633:20
Makika [3] - 3673:13, 3673:20, 3673:21
malpractice [1] - 3641:8
man [6] - 3563:8, 3565:17, 3574:8, 3576:4, 3581:25, 3682:9
manage [1] - 3663:8
managed [2] - 3664:24, 3665:3
management [2] - 3637:15, 3637:22, 3681:24, 3692:16
Management [1] - 3688:8
manager [2] - 3565:7, 3663:23
managing [4] - 3581:15, 3666:19, 3666:21, 3666:22
Manfredi [1] - 3655:17
Manhattan [1] - 3729:6
manipulate [1] - 3719:8
manipulating [1] - 3715:3
manner [1] - 3616:11
mansion [3] - 3690:22, 3690:25, 3700:21
March [2] - 3680:19,

3681:7
**marked** [21] - 3570:22, 3577:21, 3579:4, 3579:6, 3579:13, 3589:18, 3591:19, 3600:7, 3624:3, 3625:25, 3668:14, 3676:20, 3680:16, 3694:11, 3694:21, 3698:18, 3710:18, 3711:24, 3713:9, 3713:23, 3715:16
**marketing** [2] - 3691:4, 3692:18
**Marketing** [2] - 3688:10, 3688:11
**markings** [1] - 3566:7
**marks** [1] - 3566:1
**MARSHAL** [3] - 3561:19, 3562:4, 3562:7
**marshals** [2] - 3561:17, 3561:24
**Mary** [1] - 3559:20
**Massachusetts** [1] - 3601:17
**master** [2] - 3601:3, 3607:16
**material** [1] - 3646:13
**materials** [2] - 3616:25, 3748:5
**matter** [17] - 3566:13, 3570:5, 3571:19, 3583:2, 3598:11, 3608:25, 3640:2, 3651:20, 3680:16, 3680:20, 3724:23, 3742:21, 3744:20, 3745:11, 3748:24, 3749:8
**matters** [6] - 3563:6, 3593:12, 3619:21, 3650:15, 3705:16, 3745:7
**MD5** [5] - 3719:12, 3719:15, 3719:17, 3719:22, 3723:9
**MDC** [5] - 3560:18, 3561:8, 3561:14, 3562:11, 3562:23
**MDC's** [1] - 3561:19
**mean** [23] - 3569:16, 3579:11, 3585:24, 3585:25, 3587:4, 3601:22, 3603:10, 3605:21, 3607:6, 3607:12, 3607:14, 3608:24, 3627:10, 3630:7, 3632:2, 3643:2, 3643:14, 3651:13, 3718:12, 3723:19, 3726:22, 3729:22
**meaning** [6] - 3585:24, 3587:25, 3588:1, 3679:7, 3723:25, 3727:23
**means** [2] - 3578:20, 3617:7
**measurement** [1] -

3618:11
**measuring** [2] - 3618:11, 3618:12
**mechanic** [1] - 3663:22
**mechanical** [2] - 3559:25, 3674:22
**media** [2] - 3570:17, 3711:23
**medical** [4] - 3641:2, 3641:6, 3641:7, 3641:18
**meet** [2] - 3560:22, 3561:15, 3664:5, 3666:5, 3687:1
**meeting** [8] - 3560:19, 3583:4, 3583:11, 3584:10, 3584:16, 3584:17, 3602:15, 3602:16
**meetings** [1] - 3617:9
**meets** [2] - 3641:1, 3641:16
**member** [8] - 3575:25, 3581:13, 3581:15, 3582:17, 3596:10, 3616:20, 3616:22, 3698:1
**members** [11] - 3566:23, 3574:20, 3577:2, 3579:22, 3583:4, 3584:10, 3584:14, 3610:5, 3626:14, 3716:25, 3731:11
**Members** [1] - 3579:19
**memo** [1] - 3584:13
**memorandum** [1] - 3575:7
**Memorial** [1] - 3558:21
**memory** [4] - 3583:7, 3603:17, 3605:20, 3607:23, 3608:8, 3631:25, 3745:8
**mens** [1] - 3739:13
**mental** [1] - 3603:10
**mention** [1] - 3667:23
**mentioned** [7] - 3616:21, 3617:6, 3676:8, 3676:12, 3678:23, 3694:12, 3735:15
**mere** [1] - 3734:15
**Meshinsky** [8] - 3707:13, 3707:19, 3707:23, 3709:13, 3717:23, 3721:8, 3721:22, 3722:12
**message** [1] - 3714:19
**met** [4] - 3602:18, 3686:20, 3687:2
**method** [1] - 3719:22
**methodology** [1] - 3628:13
**meticulous** [2] - 3632:18, 3635:1
**meticulously** [2] - 3632:15, 3636:20
**Mexican** [1] - 3568:2
**Mexico** [3] - 3593:8, 3611:1, 3675:13

**Michael** [6] - 3579:1, 3579:10, 3580:7, 3580:12, 3581:23, 3721:10
**Michelle** [1] - 3672:15
**microphone** [1] - 3569:7
**microscopes** [1] - 3618:9
**microscopically** [1] - 3618:10
**middlesex** [1] - 3615:13
**midst** [1] - 3665:20
**might** [10] - 3561:8, 3563:20, 3585:18, 3585:19, 3585:20, 3606:3, 3635:8, 3656:5, 3741:2
**mike** [2] - 3663:10, 3686:5
**mileage** [2] - 3695:3
**Miller** [2] - 3666:9, 3693:23
**million** [19] - 3567:18, 3575:5, 3575:13, 3588:12, 3588:13, 3588:22, 3589:12, 3594:19, 3594:23, 3598:23, 3609:3, 3610:2, 3610:13, 3665:12, 3665:17, 3665:18, 3678:24, 3684:25, 3749:22
**mind** [4] - 3572:14, 3575:17, 3584:3, 3625:14
**mine** [1] - 3563:5
**Mineola** [1] - 3559:3
**minute** [1] - 3660:9
**minutes** [5] - 3639:8, 3639:15, 3733:16, 3733:21, 3745:11
**mirror** [3] - 3723:20, 3723:25, 3725:2
**mirrored** [1] - 3730:8
**misappropriation** [3] - 3590:4, 3590:9, 3590:14
**MISKIEWICZ** [54] - 3558:16, 3562:24, 3563:5, 3572:5, 3575:15, 3583:22, 3584:21, 3584:24, 3589:9, 3593:16, 3594:6, 3599:9, 3599:12, 3599:16, 3599:21, 3600:14, 3605:3, 3608:20, 3609:14, 3610:6, 3610:15, 3611:2, 3611:16, 3612:3, 3613:17, 3613:21, 3614:2, 3614:7, 3614:20, 3615:6, 3615:8, 3620:13, 3621:24, 3625:11, 3625:21, 3626:6, 3639:3, 3651:22, 3653:17, 3654:24, 3659:21, 3661:10, 3662:6, 3743:3, 3743:13, 3743:23, 3744:11, 3744:24, 3745:14, 3748:20, 3748:23, 3749:21, 3750:6, 3750:14

**Miskiewicz** [6] - 3606:4, 3608:11, 3615:5, 3671:25, 3749:9, 3749:17
**missed** [1] - 3733:15
**mistake** [1] - 3601:12
**model** [7] - 3631:21, 3631:24, 3632:2, 3632:7, 3632:9, 3647:12, 3667:9
**modeled** [1] - 3631:25
**modeling** [1] - 3632:3
**moment** [10] - 3604:24, 3609:25, 3642:4, 3642:10, 3642:11, 3656:21, 3659:14, 3683:11, 3715:17, 3733:24
**moments** [1] - 3574:17
**Monday** [9] - 3560:11, 3560:18, 3561:2, 3731:14, 3731:20, 3743:5, 3743:12, 3748:15, 3749:24
**money** [79] - 3564:6, 3564:10, 3564:12, 3565:2, 3565:6, 3565:9, 3568:1, 3571:25, 3572:1, 3573:15, 3582:22, 3585:8, 3585:21, 3585:24, 3588:2, 3590:24, 3591:12, 3592:6, 3592:21, 3592:22, 3593:8, 3593:15, 3593:19, 3593:21, 3594:3, 3594:7, 3594:11, 3608:2, 3608:18, 3609:6, 3610:20, 3610:22, 3665:20, 3667:19, 3668:4, 3671:14, 3673:12, 3675:7, 3675:15, 3676:23, 3679:6, 3679:7, 3682:19, 3683:21, 3683:23, 3683:24, 3684:2, 3684:3, 3684:7, 3684:13, 3684:17, 3685:6, 3693:8, 3693:19, 3694:3, 3694:5, 3694:9, 3696:17, 3698:8, 3702:18, 3704:6, 3706:1, 3706:5, 3706:24, 3707:4, 3736:6, 3737:13, 3738:16, 3739:16, 3739:23, 3740:15, 3740:22, 3740:23, 3740:25, 3741:4, 3741:8, 3744:20
**moneys** [4] - 3735:1, 3736:24, 3737:23, 3747:19
**monies** [13] - 3567:21, 3571:3, 3571:23, 3574:13, 3582:21, 3607:24, 3607:25, 3608:6, 3608:25, 3675:23, 3679:7, 3697:11, 3704:8
**morning** [13] - 3561:2, 3566:23, 3566:24, 3567:1, 3567:17, 3584:25, 3585:1, 3600:5, 3600:6, 3612:9,

3613:18, 3748:15, 3749:9
**most** [5] - 3611:14, 3636:18, 3676:9, 3694:19, 3706:13
**motor** [2] - 3695:3, 3695:4
**Motorsports** [3] - 3666:9, 3674:17, 3674:24
**motorsports** [1] - 3693:24
**mouth** [1] - 3706:23
**move** [4] - 3577:5, 3702:10, 3706:17, 3720:1
**moved** [1] - 3637:4
**moves** [12] - 3560:21, 3625:11, 3669:6, 3670:14, 3691:14, 3692:5, 3695:17, 3711:1, 3712:5, 3713:22, 3716:13, 3720:22
**moving** [2] - 3683:24, 3698:22
**MR** [222] - 3560:6, 3560:9, 3560:13, 3562:5, 3562:13, 3562:24, 3563:3, 3563:5, 3563:6, 3563:22, 3564:16, 3564:22, 3565:13, 3565:16, 3565:22, 3566:5, 3566:9, 3566:11, 3566:14, 3566:17, 3567:16, 3572:3, 3572:5, 3572:10, 3572:16, 3575:15, 3575:22, 3583:19, 3583:22, 3583:24, 3584:5, 3584:7, 3584:19, 3584:21, 3584:24, 3589:5, 3589:8, 3589:9, 3593:9, 3593:16, 3593:20, 3593:25, 3594:6, 3599:7, 3599:9, 3599:11, 3599:12, 3599:14, 3599:16, 3599:21, 3599:23, 3600:1, 3600:4, 3600:12, 3600:14, 3600:16, 3603:16, 3604:4, 3604:23, 3605:3, 3605:5, 3608:20, 3609:14, 3609:25, 3610:6, 3610:10, 3610:12, 3610:15, 3611:2, 3611:16, 3612:3, 3612:24, 3613:1, 3613:8, 3613:17, 3613:21, 3614:2, 3614:7, 3614:11, 3614:20, 3615:6, 3615:8, 3620:13, 3620:16, 3620:18, 3621:24, 3625:11, 3625:13, 3625:14, 3625:21, 3626:6, 3626:11, 3626:12, 3639:3, 3639:6, 3645:2, 3651:22, 3651:23, 3652:19, 3653:17, 3654:24, 3656:20, 3659:14, 3659:17, 3659:19, 3659:21, 3661:10,

3661:11, 3662:6, 3664:11, 3669:8, 3669:9, 3670:17, 3670:18, 3671:19, 3672:17, 3673:2, 3673:16, 3673:18, 3675:18, 3675:21, 3680:22, 3680:25, 3681:3, 3683:1, 3683:5, 3683:11, 3683:13, 3683:15, 3684:24, 3685:9, 3687:6, 3691:16, 3691:18, 3692:7, 3692:8, 3695:19, 3695:20, 3696:9, 3696:11, 3699:15, 3699:20, 3703:18, 3703:20, 3703:23, 3704:2, 3705:13, 3707:3, 3707:8, 3709:16, 3709:17, 3711:3, 3711:4, 3712:7, 3712:11, 3713:24, 3713:25, 3714:2, 3716:15, 3716:18, 3717:15, 3717:17, 3720:4, 3720:5, 3720:24, 3720:25, 3722:9, 3722:11, 3730:10, 3730:21, 3730:22, 3731:9, 3731:10, 3733:9, 3733:19, 3733:24, 3734:2, 3734:8, 3734:10, 3734:13, 3736:17, 3737:25, 3738:24, 3739:6, 3739:25, 3740:6, 3740:8, 3741:23, 3743:3, 3743:13, 3743:23, 3743:25, 3744:4, 3744:11, 3744:24, 3745:14, 3745:19, 3745:24, 3746:4, 3746:11, 3747:4, 3748:3, 3748:11, 3748:19, 3748:20, 3748:23, 3749:5, 3749:7, 3749:20, 3749:21, 3750:4, 3750:6, 3750:9, 3750:11, 3750:14, 3750:16, 3750:21, 3750:25, 3751:5, 3751:9, 3751:14, 3751:18
**MS** [63] - 3564:1, 3565:3, 3613:24, 3662:13, 3663:4, 3663:13, 3664:14, 3669:6, 3669:12, 3670:14, 3670:21, 3671:9, 3671:12, 3672:6, 3673:7, 3673:21, 3674:2, 3675:16, 3680:24, 3682:24, 3683:17, 3683:20, 3684:21, 3685:15, 3686:8, 3687:8, 3690:1, 3691:14, 3692:5, 3695:17, 3695:24, 3696:7, 3697:3, 3699:13, 3699:17, 3701:10, 3703:16, 3704:9, 3705:2, 3707:1, 3707:12, 3707:22, 3709:13, 3711:1, 3712:5, 3713:22, 3714:1, 3716:13, 3717:22, 3720:1,

3720:8, 3722:7, 3730:5, 3731:2, 3731:8, 3740:17, 3750:19, 3750:23, 3751:3, 3751:7, 3751:12, 3751:16, 3751:20
**multiple** [6] - 3634:25, 3652:3, 3652:7, 3652:10, 3652:12, 3741:13
**multitude** [1] - 3734:23
**Murray** [22] - 3565:24, 3566:19, 3567:3, 3567:6, 3567:17, 3569:6, 3572:17, 3573:23, 3574:21, 3575:23, 3578:24, 3584:8, 3584:19, 3584:25, 3585:2, 3598:4, 3600:5, 3600:20, 3600:21, 3605:11, 3611:4, 3612:8
**MURRAY** [2] - 3567:10, 3750:2
**musical** [1] - 3711:21
**must** [3] - 3571:16, 3601:22, 3629:17
**mystery** [1] - 3642:14

**N**

**Na'alehi** [1] - 3650:12
**Na'Alehu** [2] - 3606:11, 3607:1
**NAGE** [1] - 3678:12
**nail** [1] - 3706:6
**naked** [1] - 3650:16
**name** [48] - 3562:15, 3563:8, 3565:17, 3574:8, 3576:4, 3577:13, 3577:14, 3579:1, 3579:11, 3580:12, 3581:2, 3581:5, 3581:7, 3581:25, 3589:25, 3600:20, 3600:23, 3601:23, 3615:1, 3615:2, 3627:22, 3630:11, 3630:14, 3631:2, 3639:7, 3645:3, 3645:4, 3650:19, 3651:8, 3651:11, 3662:24, 3666:10, 3677:13, 3677:24, 3678:18, 3682:9, 3686:1, 3688:12, 3693:24, 3696:12, 3696:25, 3706:7, 3707:17, 3707:18, 3721:9, 3721:20
**name-calling** [1] - 3706:7
**names** [1] - 3638:21
**NASD** [1] - 3619:11
**national** [2] - 3618:25, 3619:11
**natural** [6] - 3627:23, 3628:24, 3629:16, 3630:23, 3631:4, 3636:24

**nature** [7] - 3674:12, 3687:9, 3705:17, 3705:18, 3705:20, 3732:9, 3732:19
**near** [2] - 3668:22, 3670:5
**necessarily** [3] - 3619:18, 3650:25, 3651:13
**necessary** [4] - 3563:16, 3630:15, 3672:5, 3705:13
**need** [15] - 3561:4, 3561:5, 3620:1, 3649:21, 3694:2, 3706:9, 3743:2, 3743:12, 3743:20, 3744:18, 3744:21, 3744:24, 3745:16, 3748:17
**needed** [1] - 3694:4
**needs** [2] - 3577:24, 3749:7
**net** [2] - 3585:24, 3586:1
**Nevada** [1] - 3686:10
**never** [9] - 3592:6, 3592:15, 3594:14, 3594:16, 3680:11, 3681:18, 3684:15, 3684:16, 3700:7
**NEW** [1] - 3558:1
**new** [2] - 3695:2, 3745:23
**New** [18] - 3558:6, 3558:15, 3559:21, 3572:25, 3615:13, 3616:23, 3619:12, 3619:14, 3721:22, 3722:19, 3722:20, 3723:1, 3727:16, 3727:18, 3728:23, 3729:2, 3729:4, 3729:6
**News** [2] - 3573:1, 3590:13
**newspaper** [2] - 3571:1, 3573:13
**next** [22] - 3588:18, 3599:24, 3613:16, 3613:23, 3614:3, 3614:19, 3644:6, 3662:12, 3672:20, 3673:23, 3685:14, 3689:6, 3702:4, 3703:7, 3703:24, 3704:13, 3706:16, 3707:11, 3715:10, 3718:21, 3726:25, 3742:5
**night** [3] - 3565:23, 3740:13, 3749:23
**Nissan** [1] - 3695:4
**No-Fault** [1] - 3690:10
**non** [16] - 3627:20, 3627:23, 3631:18, 3632:25, 3638:25, 3639:11, 3639:18, 3640:23, 3642:1, 3642:3, 3642:7, 3642:16, 3642:24, 3644:4, 3647:21, 3652:5
**non-genuine** [12] - 3627:20, 3627:23, 3638:25, 3639:11,

19

3639:18, 3640:23, 3642:1, 3642:3, 3642:7, 3642:16, 3642:24, 3644:4
**non-genuineness** [2] - 3631:18, 3632:25
**none** [2] - 3592:14, 3630:24
**nonexpert** [1] - 3650:16
**normally** [2] - 3638:17, 3715:9
**northeastern** [1] - 3616:24
**Northern** [4] - 3598:10, 3598:16, 3607:9, 3607:18
**northern** [4] - 3603:6, 3604:2, 3606:25, 3607:15
**note** [9] - 3601:3, 3607:16, 3608:16, 3608:17, 3609:2, 3609:7, 3634:1, 3634:5, 3721:11
**noted** [3] - 3560:3, 3656:16, 3675:1
**notes** [1] - 3749:10
**nothing** [8] - 3582:16, 3597:11, 3619:20, 3676:3, 3738:11, 3738:12, 3741:16, 3747:22
**notice** [2] - 3584:13, 3635:22
**notified** [1] - 3583:3
**November** [11] - 3574:19, 3697:20, 3709:21, 3709:22, 3713:20, 3716:11, 3717:12, 3718:1, 3726:24, 3728:11, 3728:12
**NR** [1] - 3681:6
**number** [31] - 3568:11, 3586:25, 3588:9, 3600:24, 3603:11, 3603:17, 3604:2, 3604:9, 3605:21, 3607:3, 3607:6, 3607:8, 3607:12, 3607:18, 3607:20, 3617:14, 3618:10, 3624:3, 3630:17, 3631:10, 3637:4, 3638:19, 3651:7, 3652:13, 3718:2, 3718:3, 3719:16, 3721:11, 3734:24, 3742:14
**numbers** [3] - 3607:14, 3712:8, 3719:19
**numerous** [4] - 3636:19, 3706:10, 3736:20, 3736:22
**NY** [3] - 3558:22, 3559:3, 3559:7

# O

**o'clock** [1] - 3659:25
**O.S.B.O.R.N** [1] - 3615:3
**oath** [4] - 3567:7, 3601:19, 3662:17, 3685:18

**object** [7] - 3589:5, 3589:6, 3593:9, 3593:11, 3599:7, 3705:13, 3715:23
**objection** [65] - 3572:9, 3575:15, 3583:23, 3583:24, 3593:13, 3593:22, 3593:25, 3599:11, 3599:14, 3600:14, 3600:15, 3605:5, 3608:20, 3609:14, 3610:6, 3610:15, 3611:2, 3611:16, 3612:3, 3620:17, 3620:18, 3625:13, 3625:15, 3626:11, 3626:12, 3651:22, 3653:17, 3654:24, 3669:8, 3669:9, 3670:16, 3670:17, 3680:24, 3680:25, 3682:24, 3691:16, 3691:17, 3692:7, 3692:8, 3695:19, 3695:20, 3697:3, 3699:13, 3699:17, 3701:10, 3703:16, 3703:19, 3709:16, 3709:17, 3711:3, 3711:4, 3712:10, 3712:11, 3713:24, 3714:2, 3717:16, 3717:17, 3720:3, 3720:4, 3720:5, 3720:24, 3720:25, 3730:5, 3733:11, 3749:20
**objections** [1] - 3605:4
**obligation** [1] - 3685:1
**obligor** [2] - 3600:24, 3607:18
**observations** [1] - 3649:17
**observe** [2] - 3713:4, 3731:6
**obstacle** [1] - 3746:4
**obtained** [6] - 3610:3, 3611:15, 3726:5, 3729:17, 3735:6, 3748:5
**obviate** [1] - 3745:16
**obvious** [2] - 3630:24, 3732:2
**obviously** [17] - 3564:16, 3565:5, 3566:3, 3569:12, 3569:18, 3572:21, 3597:21, 3672:13, 3732:12, 3733:12, 3735:2, 3736:16, 3737:13, 3737:16, 3739:19, 3743:6, 3748:17
**occasion** [2] - 3639:14, 3727:13
**occasional** [1] - 3641:7
**occasions** [3] - 3619:7, 3636:19, 3648:16
**occur** [4] - 3561:11, 3634:20, 3636:11, 3700:10
**occurred** [4] - 3646:5,

3724:11, 3724:12, 3728:1
**occurring** [1] - 3646:6
**Oceanside** [1] - 3559:7
**October** [9] - 3601:5, 3601:7, 3601:13, 3692:17, 3692:18, 3698:12, 3700:14, 3702:10, 3749:12
**odd** [1] - 3606:20
**odds** [1] - 3690:6
**OF** [4] - 3558:1, 3558:3, 3558:10, 3723:14
**offer** [17] - 3564:16, 3570:19, 3573:1, 3574:13, 3575:4, 3575:25, 3600:12, 3619:3, 3619:9, 3620:14, 3673:18, 3701:21, 3704:5, 3704:7, 3709:13, 3747:13
**offered** [6] - 3571:23, 3571:25, 3575:20, 3684:16, 3686:24, 3706:18
**offering** [2] - 3571:2, 3571:25
**offhand** [1] - 3591:16
**office** [16] - 3622:10, 3711:14, 3711:15, 3711:17, 3711:19, 3711:21, 3712:3, 3712:15, 3715:22, 3716:8, 3723:1, 3726:19, 3727:8, 3729:5, 3729:6
**Office** [2] - 3651:25, 3730:15
**officer** [1] - 3561:6
**offices** [3] - 3584:11, 3727:5, 3728:13
**often** [1] - 3612:25
**Old** [1] - 3559:3
**old** [1] - 3650:22
**OLIVERAS** [2] - 3559:6, 3566:11
**Olympics** [2] - 3597:8, 3597:21
**once** [7] - 3610:9, 3631:7, 3636:8, 3687:19, 3725:20, 3728:22, 3729:16
**One** [1] - 3558:21
**one** [113] - 3560:9, 3565:5, 3566:1, 3566:2, 3569:1, 3569:24, 3572:23, 3573:9, 3575:1, 3578:9, 3580:19, 3583:21, 3585:22, 3586:14, 3588:13, 3588:21, 3589:21, 3593:5, 3595:9, 3601:11, 3601:13, 3602:11, 3606:10, 3611:14, 3616:21, 3618:6, 3622:23, 3623:10, 3625:7, 3626:18, 3626:24, 3628:4, 3628:5, 3629:19, 3630:20, 3630:25, 3631:4, 3632:24,

3634:21, 3635:13, 3635:15, 3636:13, 3637:4, 3637:8, 3637:16, 3637:18, 3637:21, 3638:2, 3638:22, 3639:14, 3642:14, 3643:19, 3645:7, 3646:6, 3646:7, 3646:10, 3647:5, 3647:23, 3648:2, 3648:6, 3648:8, 3651:6, 3651:13, 3652:12, 3655:11, 3655:21, 3655:23, 3656:10, 3659:14, 3665:9, 3666:8, 3671:19, 3673:5, 3673:17, 3676:12, 3679:20, 3679:22, 3682:4, 3683:11, 3693:9, 3693:11, 3693:22, 3695:2, 3695:3, 3697:10, 3697:23, 3700:8, 3700:20, 3700:21, 3706:3, 3707:5, 3712:22, 3713:17, 3716:8, 3719:7, 3719:21, 3720:12, 3721:6, 3722:16, 3725:7, 3726:4, 3730:8, 3731:4, 3731:5, 3731:16, 3732:10, 3733:23, 3733:24, 3743:15, 3748:23
**ones** [2] - 3677:21, 3699:6
**open** [3] - 3619:18, 3674:1, 3733:11
**opened** [2] - 3732:18, 3733:2
**operating** [5] - 3666:25, 3714:14, 3725:9, 3725:10, 3725:11
**operation** [1] - 3736:2
**operational** [2] - 3720:15, 3723:19
**opinion** [15] - 3621:4, 3621:8, 3621:11, 3621:13, 3621:14, 3621:15, 3627:5, 3635:2, 3640:12, 3640:21, 3640:25, 3641:15, 3642:2, 3656:23, 3667:16
**opinions** [4] - 3621:5, 3621:7, 3621:9, 3661:5
**opportunity** [1] - 3561:12
**opposed** [2] - 3634:9, 3637:2
**opposition** [4] - 3734:20, 3735:15, 3739:25, 3748:4
**optimism** [1] - 3748:12
**optimistic** [1] - 3748:11
**order** [7] - 3562:9, 3626:22, 3631:21, 3632:5, 3648:3, 3684:4, 3725:2
**ordered** [1] - 3745:19
**ordinarily** [1] - 3621:4
**ordinary** [5] - 3668:25, 3669:3, 3670:8, 3670:11, 3691:6

**organization** [1] - 3617:2
**organizations** [4] - 3616:21, 3617:10, 3617:15, 3619:10
**organizing** [1] - 3674:21
**original** [17] - 3566:2, 3566:7, 3566:13, 3649:15, 3649:19, 3649:21, 3649:22, 3649:23, 3650:1, 3696:21, 3719:4, 3720:15, 3723:1, 3723:14, 3729:10, 3729:12, 3730:19
**originally** [2] - 3569:24, 3668:5
**originals** [4] - 3624:20, 3649:12, 3649:24, 3658:5
**Osborn** [39] - 3613:17, 3614:2, 3614:21, 3615:3, 3615:9, 3615:25, 3616:1, 3619:2, 3620:14, 3621:25, 3622:14, 3624:3, 3624:4, 3624:25, 3625:3, 3625:12, 3625:15, 3625:16, 3625:17, 3625:18, 3625:22, 3625:25, 3626:4, 3626:13, 3628:8, 3628:9, 3629:9, 3630:13, 3631:11, 3632:2, 3633:2, 3634:12, 3637:1, 3637:4, 3639:7, 3659:15, 3659:22, 3752:9
**Osborn-1** [2] - 3650:6, 3652:9
**otherwise** [2] - 3627:24, 3747:15
**ourself** [1] - 3651:3
**outcome** [1] - 3621:19
**outline** [2] - 3743:21, 3746:14
**outside** [6] - 3562:20, 3563:19, 3582:20, 3613:25, 3689:3, 3746:13
**outstanding** [4] - 3587:24, 3676:3, 3688:23, 3696:14
**outweighed** [1] - 3621:14
**overall** [1] - 3637:9
**overcommitted** [5] - 3680:7, 3680:9, 3680:10, 3681:17, 3732:25
**overruled** [3] - 3608:21, 3610:7, 3653:18
**oversight** [1] - 3604:5
**owed** [5] - 3588:1, 3685:6, 3696:18, 3707:4, 3736:24
**own** [12] - 3564:6, 3568:12, 3615:18, 3635:20, 3638:14, 3651:14, 3663:16, 3690:9, 3693:14, 3702:11, 3706:14, 3741:5
**owned** [3] - 3664:25, 3665:9, 3665:23

**owner** [3] - 3663:23, 3702:13, 3703:13
**owners** [1] - 3702:5
**ownership** [2] - 3613:3, 3682:5

## P

**pack** [1] - 3695:4
**package** [2] - 3561:6, 3713:11
**page** [33] - 3570:24, 3579:6, 3579:13, 3579:14, 3579:17, 3580:20, 3582:6, 3585:12, 3587:10, 3588:18, 3599:24, 3600:9, 3600:19, 3604:8, 3604:13, 3605:13, 3613:18, 3622:19, 3623:6, 3626:5, 3631:11, 3640:9, 3644:6, 3652:11, 3656:13, 3672:20, 3673:23, 3688:8, 3689:6, 3692:17, 3703:24, 3704:13, 3718:21
**pages** [5] - 3667:24, 3667:25, 3668:3, 3668:4, 3749:22
**paid** [23] - 3563:17, 3564:8, 3586:18, 3587:24, 3588:7, 3593:5, 3595:14, 3595:18, 3596:2, 3668:7, 3669:17, 3670:2, 3671:13, 3675:23, 3676:1, 3684:10, 3684:12, 3684:17, 3685:1, 3685:7, 3687:24, 3693:13, 3697:2
**palms** [2] - 3697:8, 3700:13
**Palms** [8] - 3567:23, 3594:5, 3594:8, 3594:23, 3596:4, 3596:25, 3678:4, 3687:20
**paper** [6] - 3618:12, 3618:21, 3618:22, 3626:1, 3648:18
**papers** [6] - 3618:13, 3733:17, 3735:10, 3735:15, 3746:12, 3748:4
**paragraph** [5] - 3569:9, 3575:2, 3582:4, 3655:14, 3681:8
**paragraphs** [1] - 3641:4
**parcel** [1] - 3648:19
**pardon** [4] - 3595:23, 3647:18, 3658:11, 3658:24
**paren** [2] - 3641:17, 3641:18
**Park** [1] - 3666:9
**park** [1] - 3693:24
**part** [36] - 3568:4, 3570:2,

3573:23, 3574:4, 3578:9, 3579:18, 3583:10, 3590:23, 3591:1, 3595:5, 3597:8, 3603:22, 3609:23, 3623:24, 3628:13, 3634:2, 3645:20, 3648:19, 3648:21, 3650:12, 3652:9, 3656:9, 3667:3, 3671:19, 3671:22, 3677:10, 3679:13, 3696:20, 3700:9, 3701:25, 3705:23, 3725:9, 3725:10, 3725:11, 3738:2
**partially** [1] - 3686:24
**participants** [1] - 3568:18
**participate** [2] - 3681:24, 3682:7
**participated** [2] - 3595:2, 3617:21
**participation** [1] - 3582:14
**particular** [20] - 3569:25, 3600:24, 3619:8, 3621:1, 3625:8, 3632:4, 3643:14, 3643:24, 3648:13, 3653:21, 3654:1, 3654:22, 3655:20, 3659:12, 3702:16, 3718:14, 3734:21, 3740:14, 3740:24, 3742:18
**particularly** [4] - 3636:18, 3637:10, 3708:6, 3724:14
**parties** [3] - 3570:3, 3720:2, 3744:15
**partner** [1] - 3666:8
**partnered** [1] - 3666:1
**partners** [3] - 3615:21, 3615:22, 3666:4
**Partners** [3] - 3569:13, 3579:19, 3581:15
**parts** [4] - 3566:5, 3693:3, 3695:1, 3695:2
**party** [9] - 3577:9, 3577:19, 3619:23, 3655:7, 3690:23, 3700:11, 3700:12, 3700:20
**pass** [1] - 3711:18
**passed** [1] - 3616:1
**passing** [1] - 3740:13
**password** [1] - 3726:1
**passwords** [2] - 3725:23, 3731:4
**past** [2] - 3615:22, 3724:11
**pat** [1] - 3701:2
**patents** [1] - 3611:15
**path** [1] - 3746:14
**patient** [1] - 3694:8
**patting** [2] - 3706:22, 3732:15
**Paul** [3] - 3614:20, 3615:3, 3615:25
**Pause** [3] - 3577:11, 3580:24, 3683:12

**pause** [7] - 3578:13, 3610:1, 3633:15, 3634:3, 3634:7, 3635:11, 3635:22
**pay** [12] - 3564:13, 3570:19, 3571:2, 3582:18, 3594:4, 3594:8, 3608:18, 3682:19, 3684:8, 3687:14, 3687:25, 3697:1
**paying** [2] - 3668:3, 3669:15
**payment** [23] - 3587:12, 3587:14, 3588:1, 3588:15, 3588:19, 3607:3, 3607:18, 3673:3, 3673:4, 3673:5, 3688:9, 3688:16, 3692:11, 3692:12, 3692:13, 3692:17, 3692:21, 3692:22, 3696:4, 3737:15, 3738:17, 3739:4, 3739:7
**payments** [14] - 3564:25, 3660:16, 3661:2, 3668:9, 3668:11, 3668:19, 3668:22, 3669:14, 3673:10, 3673:14, 3673:19, 3675:4, 3688:1, 3736:23
**payoff** [1] - 3589:11
**pays** [1] - 3737:13
**PDAs** [1] - 3708:19
**PDFs** [1] - 3708:19
**Peca** [1] - 3721:10
**peer** [1] - 3617:20
**peer-reviewed** [1] - 3617:20
**pen** [2] - 3632:19, 3648:18
**Pennsylvania** [1] - 3616:7
**penny** [1] - 3608:5
**people** [3] - 3568:12, 3666:8, 3710:1
**per** [4] - 3653:24, 3687:25, 3688:18, 3689:2
**percent** [6] - 3587:4, 3591:16, 3592:5, 3592:19, 3620:3, 3696:21
**perform** [12] - 3619:17, 3622:17, 3626:17, 3626:19, 3627:12, 3628:2, 3638:2, 3638:3, 3638:6, 3643:17, 3647:23, 3648:21
**performed** [2] - 3623:24, 3647:25
**performing** [4] - 3617:12, 3618:25, 3627:25, 3628:12
**perhaps** [5] - 3633:15, 3639:9, 3734:4, 3739:13, 3749:2
**period** [21] - 3564:20, 3568:22, 3587:10, 3603:23, 3605:10, 3607:1, 3615:16, 3616:17, 3658:3,

3658:5, 3658:7, 3658:22, 3659:1, 3664:15, 3664:18, 3668:20, 3673:11, 3673:15, 3697:13, 3698:11, 3698:13
**permanent** [1] - 3589:2
**permissible** [1] - 3747:17
**permission** [2] - 3626:7, 3628:8
**permit** [1] - 3621:5
**permitted** [1] - 3620:22
**person** [8] - 3565:7, 3630:14, 3632:16, 3646:1, 3654:20, 3664:5, 3666:10, 3723:5
**person's** [1] - 3724:14
**personal** [4] - 3564:7, 3680:11, 3681:17, 3724:18
**personally** [3] - 3592:15, 3680:7, 3684:4
**pertained** [1] - 3748:1
**ph** [1] - 3616:2
**ph)** [1] - 3749:15
**Phil** [9] - 3592:24, 3604:20, 3608:14, 3608:16, 3609:22, 3639:7, 3720:10, 3724:23, 3726:21
**Philip** [1] - 3655:15
**PHILLIP** [1] - 3558:7
**Phoenix** [5] - 3706:3, 3707:24, 3718:15, 3727:4, 3728:20
**phone** [4] - 3563:3, 3602:16, 3602:19, 3686:20
**phones** [1] - 3708:19
**photo** [1] - 3671:13
**photocopy** [5] - 3651:11, 3651:14, 3651:19, 3718:19
**photograph** [6] - 3671:20, 3713:15, 3715:21, 3748:24, 3749:2, 3749:18
**photographs** [1] - 3726:20
**phrase** [4] - 3578:16, 3641:2, 3641:17, 3681:25
**phraseology** [1] - 3642:4
**physical** [2] - 3713:5, 3728:2
**physically** [7] - 3630:17, 3714:23, 3718:8, 3718:9, 3724:25, 3725:3, 3729:3
**picked** [1] - 3713:4
**pictorial** [1] - 3628:21
**pictorially** [1] - 3629:10
**picture** [5] - 3657:23, 3672:1, 3672:5, 3678:8, 3712:21
**pictures** [1] - 3724:17
**piece** [1] - 3634:23
**place** [12] - 3583:12, 3602:15, 3673:1, 3674:1,

3680:13, 3681:19, 3693:10, 3718:3, 3725:23, 3731:25, 3733:21, 3742:3
**placed** [1] - 3718:16
**plain** [1] - 3561:6
**plaintiff** [2] - 3576:11, 3652:25
**plaintiffs** [2] - 3620:6, 3620:12
**plan** [1] - 3743:7
**planned** [1] - 3675:4
**planning** [1] - 3564:1
**plans** [1] - 3702:21
**play** [1] - 3682:23
**playboy** [7] - 3690:22, 3690:24, 3694:6, 3697:8, 3698:7, 3700:21, 3705:23
**Playboy** [9] - 3667:21, 3667:24, 3668:4, 3672:1, 3675:8, 3676:12, 3677:5, 3687:20, 3738:16
**played** [1] - 3663:20
**player** [5] - 3573:6, 3671:14, 3747:18, 3747:22, 3747:24
**players** [18] - 3568:18, 3570:19, 3571:3, 3571:24, 3574:14, 3576:1, 3577:1, 3577:16, 3577:19, 3578:5, 3579:23, 3580:7, 3581:24, 3583:11, 3613:10, 3663:25, 3674:5, 3737:22
**playing** [3] - 3597:5, 3597:20, 3597:21
**Plaza** [2] - 3558:15, 3559:20
**plenty** [2] - 3675:15, 3694:9
**pocket** [2] - 3596:6, 3679:8
**podium** [1] - 3701:25
**point** [43] - 3563:12, 3565:16, 3567:5, 3571:15, 3571:16, 3571:24, 3573:9, 3573:23, 3574:3, 3574:11, 3578:21, 3578:22, 3583:17, 3583:20, 3584:16, 3590:18, 3602:11, 3603:2, 3603:16, 3608:7, 3610:4, 3610:20, 3626:7, 3630:16, 3634:21, 3634:23, 3635:18, 3647:6, 3651:3, 3658:19, 3698:21, 3703:7, 3712:21, 3716:21, 3716:24, 3717:3, 3726:6, 3728:12, 3735:22, 3739:15, 3747:4, 3748:7, 3749:8
**pointed** [1] - 3736:21
**pointing** [7] - 3591:22, 3633:3, 3633:5, 3634:14,

3635:3, 3635:25, 3650:11
**points** [1] - 3741:13
**police** [1] - 3677:21
**policy** [1] - 3561:19
**POTENTIAL** [1] - 3661:8
**poor** [3] - 3634:25, 3635:16, 3636:1
**popped** [1] - 3714:19
**Porsche** [1] - 3674:14
**portion** [18] - 3568:8, 3569:1, 3572:7, 3572:23, 3580:20, 3586:20, 3605:18, 3623:4, 3623:15, 3635:14, 3635:21, 3636:5, 3640:15, 3642:8, 3642:18, 3642:19, 3681:5, 3681:8
**portions** [1] - 3633:6
**posed** [1] - 3739:1
**position** [2] - 3565:19, 3733:21
**possess** [1] - 3746:1
**possession** [3] - 3603:5, 3606:16, 3606:17
**possibility** [2] - 3702:8, 3702:17
**possible** [10] - 3570:19, 3582:25, 3583:1, 3627:14, 3628:5, 3628:19, 3634:20, 3643:17, 3701:8, 3702:24
**possibly** [4] - 3693:22, 3697:18, 3706:16, 3738:13
**Potential** [1] - 3660:8
**potential** [4] - 3627:16, 3629:15, 3633:18, 3638:20
**POTENTIAL** [2] - 3660:11, 3660:20
**potentially** [6] - 3735:8, 3738:18, 3739:19, 3745:5, 3747:23
**power** [1] - 3713:2
**powered** [1] - 3715:8
**practice** [7] - 3615:13, 3615:20, 3615:21, 3615:22, 3615:23, 3616:12
**practitioner** [1] - 3620:10
**preeminent** [1] - 3643:6
**prejudice** [1] - 3578:17
**premises** [2] - 3717:4, 3717:6
**premium** [1] - 3690:6
**prep** [1] - 3705:6
**preparations** [2] - 3680:3, 3681:16
**prepare** [1] - 3624:4
**prepared** [2] - 3624:7, 3631:22
**preparing** [1] - 3624:9
**presence** [5] - 3563:19, 3602:12, 3636:13, 3660:5, 3746:13

**present** [8] - 3566:21, 3648:10, 3648:11, 3662:10, 3672:10, 3726:9, 3744:1, 3747:18
**presented** [1] - 3651:10
**presenting** [1] - 3617:8
**presently** [1] - 3616:9
**presided** [1] - 3608:25
**president** [1] - 3617:2
**press** [1] - 3589:20
**pressing** [1] - 3618:22
**pressure** [9] - 3632:19, 3648:18, 3649:2, 3649:4, 3649:16, 3649:18, 3649:19, 3649:20, 3650:2
**pretty** [7] - 3608:2, 3632:8, 3665:8, 3667:2, 3698:21, 3747:13, 3748:2
**prevent** [3] - 3638:18, 3638:21, 3651:20
**preventing** [2] - 3597:12, 3597:24
**previous** [1] - 3705:25
**previously** [2] - 3567:11, 3647:13
**primarily** [1] - 3697:7
**principal** [1] - 3666:20
**principle** [1] - 3743:22
**printed** [1] - 3720:19
**private** [3] - 3620:9, 3652:25, 3724:7
**privately** [1] - 3602:18
**privilege** [9] - 3734:6, 3736:7, 3736:9, 3737:8, 3737:20, 3738:14, 3747:7, 3747:9, 3748:6
**privileged** [10] - 3734:7, 3735:6, 3735:12, 3735:14, 3737:5, 3738:6, 3738:23, 3739:20, 3746:24, 3746:25
**prize** [1] - 3693:8
**pro** [1] - 3653:11
**ProAm** [1] - 3667:10
**probable** [8] - 3627:5, 3640:21, 3641:20, 3642:2, 3642:6, 3647:15, 3734:3, 3735:19
**problem** [5] - 3561:20, 3562:14, 3565:14, 3625:9, 3626:15
**problematic** [2] - 3698:17, 3747:24
**problems** [2] - 3570:7, 3634:5
**proceed** [1] - 3621:22
**proceeded** [1] - 3711:14
**proceeding** [1] - 3729:9
**PROCEEDINGS** [1] - 3558:10
**Proceedings** [1] - 3559:25

21

**22**

**proceedings** [5] - 3577:11, 3578:13, 3580:24, 3683:12, 3749:24
**proceeds** [2] - 3610:5, 3704:10
**process** [11] - 3616:13, 3617:13, 3624:17, 3627:12, 3629:6, 3632:18, 3632:23, 3635:1, 3635:17, 3648:15, 3745:12
**processing** [1] - 3715:12
**produce** [2] - 3677:21, 3699:7
**produced** [6] - 3559:25, 3622:9, 3658:19, 3691:12, 3699:6, 3729:9
**producing** [3] - 3632:13, 3632:14, 3699:3
**product** [8] - 3628:23, 3629:15, 3631:23, 3632:13, 3633:1, 3636:14, 3640:23, 3647:11
**production** [2] - 3623:25, 3643:24
**productive** [1] - 3748:15
**profession** [1] - 3565:4
**professional** [7] - 3573:6, 3616:9, 3616:20, 3617:20, 3667:11, 3667:13, 3667:15
**professor** [1] - 3645:6
**proffer** [1] - 3747:6
**program** [13] - 3644:2, 3645:3, 3645:16, 3677:10, 3680:1, 3681:11, 3683:24, 3719:7, 3725:7, 3725:12, 3725:15, 3726:4, 3726:5
**program/software** [1] - 3645:23
**programs** [3] - 3617:23, 3723:19
**progress** [1] - 3746:19
**project** [2] - 3568:2, 3575:12
**prolong** [1] - 3565:25
**promised** [1] - 3697:11
**promissory** [4] - 3608:16, 3608:17, 3609:2, 3609:7
**promotional** [1] - 3690:21
**Promotions** [2] - 3688:10, 3688:11
**promotions** [2] - 3691:4, 3692:19
**pronounce** [1] - 3696:25
**pronunciation** [1] - 3677:6
**proof** [7] - 3564:16, 3587:6, 3673:18, 3704:5, 3704:8, 3743:18, 3747:13
**proper** [5] - 3612:18, 3612:22, 3613:6, 3613:12, 3681:24

**properly** [2] - 3696:25, 3719:18
**property** [2] - 3710:6, 3710:8
**propose** [1] - 3743:21
**proposed** [3] - 3655:17, 3741:25, 3743:15
**prosecution** [1] - 3730:16
**prosecutor** [1] - 3620:7
**prosecutors** [3] - 3602:11, 3602:18, 3620:11
**protocol** [1] - 3724:3
**protocols** [5] - 3642:25, 3647:14, 3647:16, 3647:20, 3647:22
**prove** [3] - 3734:7, 3744:19, 3744:23
**provide** [7] - 3575:13, 3613:5, 3653:24, 3683:23, 3703:12, 3730:15, 3744:15
**provided** [7] - 3624:20, 3624:24, 3628:16, 3639:22, 3640:1, 3654:19, 3687:22
**provides** [2] - 3636:22, 3657:23
**providing** [5] - 3560:23, 3568:23, 3657:16, 3688:21, 3698:1
**proving** [1] - 3734:3
**Pruitt** [5] - 3682:9, 3682:11, 3683:2, 3684:2, 3733:1
**public** [5] - 3737:19, 3737:21, 3741:14, 3747:15, 3747:22
**publicity** [1] - 3570:17
**publicly** [6] - 3570:20, 3571:23, 3676:17, 3677:3, 3677:19, 3737:22
**publish** [6] - 3625:21, 3669:13, 3681:3, 3681:4, 3695:24, 3699:20
**published** [2] - 3617:16, 3626:1
**publishing** [1] - 3721:5
**pull** [2] - 3663:10, 3686:4
**pun** [1] - 3746:18
**purchase** [3] - 3575:11, 3694:25, 3706:18
**purchased** [1] - 3689:4
**purported** [3] - 3623:10, 3627:21, 3655:21
**purportedly** [1] - 3637:11
**purports** [1] - 3622:25
**purpose** [6] - 3609:18, 3638:15, 3655:8, 3671:23, 3735:5, 3739:8
**purposes** [5] - 3560:25, 3567:22, 3577:4, 3618:12,

3630:20, 3641:10, 3643:16, 3644:3, 3647:21, 3649:15, 3650:7, 3660:14, 3660:25, 3690:23, 3729:21, 3730:17, 3740:2, 3741:1
**pursuant** [4] - 3609:7, 3716:19, 3721:6, 3725:21
**pursue** [1] - 3598:2
**put** [11] - 3590:24, 3613:14, 3671:16, 3679:7, 3684:6, 3699:15, 3738:10, 3742:12, 3743:17, 3743:19, 3749:17
**putting** [2] - 3717:1, 3735:3

**Q**

**qualifications** [1] - 3621:18
**qualified** [6] - 3619:2, 3619:9, 3620:14, 3709:9, 3709:11
**qualifies** [1] - 3620:17
**qualify** [4] - 3639:17, 3639:19, 3641:25, 3652:7
**quality** [8] - 3633:10, 3633:15, 3634:6, 3634:9, 3635:1, 3635:16, 3636:1, 3636:3
**Questioned** [1] - 3617:1
**questioned** [18] - 3617:4, 3617:19, 3618:4, 3619:3, 3619:17, 3624:11, 3627:15, 3628:14, 3628:20, 3631:8, 3631:13, 3633:22, 3636:17, 3640:22, 3647:10, 3648:9, 3652:17, 3657:15
**questioning** [1] - 3613:12
**questions** [34] - 3565:5, 3567:20, 3571:14, 3583:21, 3585:2, 3589:7, 3589:17, 3591:9, 3599:21, 3602:13, 3608:11, 3639:3, 3659:17, 3659:19, 3660:16, 3674:3, 3675:16, 3683:13, 3683:15, 3684:21, 3685:9, 3696:7, 3703:20, 3703:22, 3707:1, 3707:8, 3722:7, 3730:21, 3731:3, 3731:8, 3731:9, 3731:10, 3739:22, 3742:18
**quick** [1] - 3604:23
**quickly** [2] - 3597:4, 3748:24
**quite** [5] - 3577:3, 3630:24, 3700:16, 3701:25, 3702:1

**quote** [2] - 3575:14, 3606:21
**quoted** [3] - 3606:2, 3606:20, 3606:23
**quotes** [1] - 3575:13

**R**

**R-O-S-S-E-R** [1] - 3686:3
**race** [45] - 3565:7, 3663:8, 3663:14, 3667:1, 3667:3, 3667:13, 3667:15, 3668:1, 3668:6, 3669:16, 3669:18, 3669:25, 3670:2, 3674:10, 3674:16, 3679:5, 3680:8, 3682:4, 3682:7, 3683:9, 3686:13, 3686:22, 3687:16, 3687:25, 3688:13, 3688:14, 3688:18, 3690:3, 3692:22, 3692:24, 3693:2, 3694:13, 3694:16, 3695:1, 3695:7, 3698:4, 3698:5, 3698:6, 3698:9, 3698:11, 3698:13, 3701:24, 3706:3, 3707:5, 3738:20
**raced** [2] - 3679:16, 3679:21
**races** [9] - 3681:23, 3682:6, 3687:17, 3696:23, 3697:21, 3698:4, 3700:14, 3706:1, 3706:13
**racetrack** [1] - 3690:5
**Racing** [6] - 3663:17, 3668:9, 3674:7, 3674:9, 3681:15, 3687:16
**racing** [33] - 3564:3, 3564:4, 3565:9, 3663:8, 3664:2, 3665:1, 3665:2, 3666:14, 3666:17, 3666:22, 3667:7, 3667:9, 3667:17, 3671:16, 3674:5, 3674:23, 3675:1, 3678:8, 3679:14, 3687:12, 3687:15, 3690:6, 3690:10, 3690:13, 3693:5, 3697:13, 3697:15, 3697:23, 3698:2, 3700:9, 3703:4, 3705:22, 3706:25
**raised** [1] - 3737:2
**ran** [2] - 3664:2, 3665:22
**rang** [1] - 3726:13
**range** [1] - 3648:5
**rate** [9] - 3591:9, 3591:10, 3591:14, 3591:23, 3592:2, 3653:23, 3668:3, 3742:9
**rather** [4] - 3632:18, 3633:21, 3633:24, 3725:1
**rationale** [1] - 3739:12

**23**

**re** [1] - 3665:1
**re-entering** [1] - 3665:1
**rea** [1] - 3739:13
**reach** [4] - 3627:1, 3743:10, 3745:2
**reached** [4] - 3625:5, 3627:17, 3744:9, 3749:9
**read** [28] - 3568:7, 3569:3, 3571:14, 3574:23, 3575:2, 3578:8, 3580:10, 3580:16, 3580:21, 3580:25, 3582:4, 3582:6, 3583:20, 3584:6, 3640:18, 3640:19, 3640:20, 3641:11, 3641:14, 3642:11, 3655:14, 3656:7, 3720:6, 3721:8, 3731:18, 3733:17, 3734:14, 3740:9
**readily** [1] - 3725:25
**reading** [3] - 3571:6, 3580:22, 3699:13
**ready** [3] - 3560:5, 3662:5, 3674:16
**real** [1] - 3655:18
**realize** [1] - 3740:18
**really** [5] - 3579:22, 3582:18, 3632:13, 3734:9, 3749:8
**reason** [9] - 3578:12, 3611:8, 3630:17, 3631:15, 3679:11, 3698:5, 3732:24, 3733:6, 3742:7
**reasonable** [2] - 3641:2, 3641:17
**reasons** [6] - 3621:8, 3621:13, 3627:8, 3628:7, 3630:17, 3672:5
**reassure** [1] - 3665:21
**receipt** [5] - 3655:15, 3665:11, 3665:13, 3665:16, 3678:24
**receive** [7] - 3574:14, 3585:15, 3585:16, 3608:2, 3654:4, 3667:24
**received** [63] - 3561:13, 3568:5, 3568:22, 3572:3, 3574:23, 3578:1, 3578:11, 3580:6, 3583:14, 3583:15, 3583:20, 3585:3, 3585:8, 3595:3, 3600:18, 3605:7, 3605:25, 3607:24, 3608:5, 3608:13, 3608:16, 3609:1, 3610:5, 3616:13, 3616:14, 3616:19, 3621:10, 3625:17, 3626:21, 3628:18, 3629:20, 3657:11, 3680:22, 3691:20, 3692:10, 3695:14, 3695:23, 3699:19, 3700:7, 3704:8,

3708:12, 3708:24, 3711:6, 3712:13, 3714:4, 3716:19, 3717:20, 3721:4, 3728:10, 3728:12, 3740:3, 3752:7, 3752:8, 3752:9, 3752:10, 3752:12, 3752:14, 3752:15, 3752:16, 3752:17, 3752:19, 3752:22, 3752:24
**receiving** [5] - 3578:3, 3579:9, 3580:10, 3583:9, 3605:17
**recent** [2] - 3658:1, 3658:16
**recently** [2] - 3581:9, 3616:18
**recertification** [6] - 3616:16, 3616:18, 3616:19, 3617:7, 3617:8, 3617:13
**recertify** [1] - 3718:5
**recess** [3] - 3614:14, 3671:6, 3671:7
**recite** [1] - 3603:17
**recognize** [20] - 3568:12, 3568:17, 3570:25, 3571:8, 3579:14, 3605:2, 3640:5, 3651:14, 3664:7, 3668:16, 3669:21, 3687:4, 3691:23, 3701:7, 3702:25, 3710:19, 3711:25, 3713:11, 3716:4, 3717:25
**recollect** [1] - 3609:17
**recollection** [32] - 3569:13, 3571:14, 3571:18, 3571:22, 3575:3, 3575:19, 3575:24, 3577:8, 3577:15, 3577:18, 3578:8, 3578:10, 3579:9, 3579:18, 3580:5, 3580:15, 3581:12, 3582:5, 3582:8, 3582:9, 3582:20, 3586:17, 3587:3, 3591:22, 3596:2, 3598:10, 3605:17, 3609:13, 3677:11, 3678:14, 3694:15, 3701:16
**reconsider** [1] - 3749:3
**reconvene** [1] - 3659:25
**record** [23] - 3564:18, 3573:19, 3604:1, 3615:2, 3626:4, 3633:2, 3637:13, 3641:10, 3656:8, 3662:25, 3686:2, 3694:23, 3707:18, 3715:18, 3721:9, 3724:23, 3732:1, 3732:3, 3733:9, 3733:22, 3735:18, 3747:7, 3749:16
**recorded** [1] - 3559:25
**records** [9] - 3606:16, 3724:17, 3744:12, 3744:13, 3744:14,

3744:19, 3744:22, 3746:1
**recover** [2] - 3574:13, 3610:20
**recovered** [1] - 3610:22
**recreate** [2] - 3608:8, 3632:6
**RECROSS** [8] - 3600:3, 3610:11, 3684:23, 3707:2, 3750:8, 3750:10, 3750:24, 3751:8
**RECROSS-EXAMINATION** [6] - 3600:3, 3610:11, 3684:23, 3750:8, 3750:10, 3750:24
**red** [1] - 3566:6
**redacted** [1] - 3749:10
**redefine** [1] - 3602:9
**redirect** [6] - 3584:20, 3601:25, 3605:23, 3608:21, 3659:20, 3683:16
**REDIRECT** [6] - 3584:23, 3683:19, 3705:1, 3731:1, 3750:5, 3750:22, 3751:6, 3751:19
**reduce** [1] - 3587:21
**reduced** [1] - 3588:15
**reduction** [2] - 3588:24, 3589:2
**refer** [3] - 3652:12, 3655:24
**reference** [20] - 3578:2, 3578:18, 3585:17, 3586:19, 3603:5, 3604:7, 3604:20, 3605:8, 3610:2, 3631:24, 3648:24, 3650:1, 3658:21, 3658:25, 3661:6, 3680:6, 3704:3, 3724:3, 3728:2, 3734:20
**referred** [3] - 3647:13, 3682:12, 3721:1
**referring** [7] - 3632:5, 3634:13, 3635:4, 3656:7, 3665:14, 3696:2, 3705:16
**reflect** [2] - 3631:21, 3736:8
**reflected** [2] - 3601:2, 3741:9
**reflecting** [1] - 3692:12
**reflection** [1] - 3737:3
**reflects** [4] - 3607:19, 3640:12, 3720:14, 3734:20
**refresh** [10] - 3571:18, 3575:18, 3578:10, 3579:17, 3582:4, 3582:8, 3583:7, 3609:13, 3678:14, 3694:15
**refreshes** [5] - 3571:22, 3575:3, 3577:8, 3591:22, 3596:2
**refused** [2] - 3744:13, 3745:20

**refute** [1] - 3628:4
**regard** [4] - 3606:24, 3649:17, 3656:5, 3705:15
**regarded** [2] - 3645:13, 3645:17
**regarding** [26] - 3570:16, 3570:17, 3571:9, 3572:6, 3572:25, 3573:12, 3575:24, 3578:11, 3580:7, 3581:24, 3620:20, 3655:17, 3660:18, 3661:5, 3734:24, 3735:20, 3736:2, 3736:5, 3736:7, 3736:9, 3736:23, 3739:2, 3742:5, 3742:15, 3748:24, 3749:11
**regardless** [4] - 3569:24, 3638:19, 3653:13
**regards** [12] - 3570:12, 3571:1, 3573:1, 3578:4, 3580:13, 3581:18, 3611:10, 3676:5, 3679:1, 3679:19, 3680:19, 3681:21
**register** [4] - 3668:19, 3668:21, 3669:24, 3670:5
**registration** [1] - 3670:23
**regular** [2] - 3674:23, 3691:9
**regulations** [2] - 3562:19, 3562:20
**reimburse** [1] - 3679:8
**related** [10] - 3564:21, 3565:18, 3569:21, 3570:14, 3591:4, 3732:16, 3732:23, 3737:14, 3739:8, 3742:11
**relates** [8] - 3585:13, 3600:23, 3640:12, 3646:23, 3653:4, 3724:4, 3737:19, 3738:8
**relating** [1] - 3740:11
**relationship** [16] - 3630:3, 3665:10, 3675:11, 3696:18, 3697:9, 3698:14, 3702:9, 3705:4, 3705:12, 3705:18, 3705:20, 3706:3, 3706:12, 3732:14, 3732:19, 3742:9
**relevance** [5] - 3564:14, 3565:11, 3657:21, 3682:25, 3730:5
**relevant** [9] - 3564:11, 3564:17, 3655:4, 3660:25, 3672:2, 3673:4, 3673:6, 3732:7, 3741:2
**rely** [1] - 3736:8
**remain** [2] - 3662:16, 3685:18
**remember** [66] - 3562:15, 3562:24, 3569:3, 3570:16, 3571:25, 3572:2, 3574:6,

3574:24, 3576:3, 3576:13, 3576:25, 3579:1, 3580:9, 3580:11, 3581:7, 3581:9, 3581:10, 3582:7, 3582:15, 3582:17, 3583:2, 3583:6, 3584:16, 3584:18, 3585:10, 3585:19, 3586:6, 3586:21, 3586:22, 3591:8, 3591:14, 3592:23, 3594:9, 3595:1, 3597:2, 3597:3, 3606:6, 3606:21, 3609:8, 3609:19, 3655:20, 3666:10, 3676:21, 3678:2, 3679:13, 3679:17, 3680:4, 3680:10, 3680:14, 3682:9, 3696:24, 3697:2, 3697:9, 3698:19, 3699:10, 3700:23, 3701:14, 3702:3, 3702:5, 3702:12, 3702:15, 3702:20, 3702:22, 3702:24, 3705:6, 3705:8

**remind** [2] - 3567:6, 3612:5
**removed** [5] - 3582:1, 3713:1, 3713:2, 3718:15, 3728:13
**render** [1] - 3622:5
**rendered** [3] - 3639:21, 3653:21, 3656:23
**rendering** [1] - 3647:21
**reneged** [1] - 3697:2
**rented** [1] - 3674:14
**repair** [1] - 3738:20
**repaired** [1] - 3706:2
**repeats** [1] - 3586:25
**rephrase** [1] - 3725:22
**rephrased** [1] - 3577:25
**replenish** [1] - 3587:20
**replenished** [1] - 3589:14
**replenishment** [3] - 3586:19, 3588:7, 3588:24
**reply** [1] - 3734:21
**report** [31] - 3575:6, 3619:25, 3622:5, 3622:8, 3622:9, 3623:23, 3624:1, 3624:7, 3637:3, 3639:21, 3640:1, 3640:8, 3640:10, 3640:11, 3640:16, 3650:4, 3650:5, 3654:6, 3655:24, 3655:25, 3656:3, 3656:4, 3656:9, 3656:14, 3656:16, 3656:19, 3657:10, 3657:12, 3658:16, 3659:15
**reported** [2] - 3622:8, 3659:1
**reporter** [1] - 3701:13
**Reporter** [1] - 3559:20
**reports** [1] - 3589:20
**represent** [4] - 3561:6, 3639:7, 3696:13, 3745:14
**representation** [7] -

3582:14, 3632:9, 3654:19, 3737:24, 3738:13, 3738:17, 3747:16
**representations** [1] - 3564:9
**representative** [4] - 3625:1, 3628:17, 3629:23, 3649:9
**represented** [6] - 3636:9, 3650:7, 3650:8, 3654:14, 3658:21, 3747:20
**representing** [5] - 3582:10, 3620:11, 3737:22, 3738:18, 3747:24
**represents** [1] - 3632:24
**reproduce** [1] - 3647:5
**reproduces** [1] - 3647:6
**reputation** [1] - 3645:17
**request** [3] - 3560:6, 3622:1, 3658:18
**requirement** [1] - 3617:12
**requires** [2] - 3616:16, 3617:7
**requiring** [1] - 3620:4
**research** [9] - 3617:3, 3617:8, 3617:9, 3617:11, 3618:24, 3618:25, 3619:1, 3744:2, 3744:3
**residence** [3] - 3724:4, 3724:7, 3725:1
**resolve** [1] - 3743:4
**resolved** [1] - 3620:1
**resources** [2] - 3680:11, 3681:18
**respect** [29] - 3572:12, 3602:25, 3603:19, 3616:10, 3616:11, 3620:22, 3621:25, 3622:18, 3623:4, 3626:15, 3627:4, 3627:14, 3631:18, 3633:6, 3633:16, 3637:1, 3643:3, 3660:23, 3717:23, 3718:7, 3719:6, 3719:21, 3730:7, 3732:9, 3732:10, 3732:21, 3732:25, 3741:8, 3747:14
**respects** [2] - 3621:17, 3676:9
**responding** [2] - 3572:21, 3589:21
**response** [7] - 3572:20, 3572:25, 3573:12, 3573:13, 3642:6, 3656:17, 3708:11
**responsibilities** [3] - 3708:5, 3710:16, 3712:18
**responsibility** [2] - 3655:7, 3679:16
**responsible** [6] - 3673:9, 3676:8, 3677:15, 3690:9,

3698:1, 3708:8
**rest** [2] - 3691:3, 3731:13
**result** [7] - 3576:14, 3619:18, 3619:22, 3627:13, 3632:8, 3654:7, 3683:3
**resulting** [1] - 3618:22
**resumes** [1] - 3672:8
**retainer** [6] - 3736:12, 3742:5, 3742:11, 3742:12, 3742:14
**retaining** [1] - 3580:8
**retrieved** [1] - 3729:10
**retrieving** [1] - 3730:17
**return** [8] - 3585:14, 3585:15, 3585:16, 3586:1, 3605:18, 3605:25, 3690:25
**returns** [1] - 3560:18
**reveal** [3] - 3737:15, 3747:15, 3747:23
**revealed** [1] - 3654:20
**review** [2] - 3603:4, 3690:16
**reviewed** [1] - 3617:20
**reviewing** [1] - 3655:20
**RICHARD** [1] - 3558:22
**Richards** [27] - 3576:5, 3578:4, 3594:25, 3595:14, 3596:3, 3596:8, 3596:24, 3736:1, 3736:2, 3737:1, 3737:19, 3738:13, 3738:15, 3738:21, 3739:2, 3740:1, 3741:4, 3741:14, 3741:18, 3742:23, 3743:2, 3743:18, 3744:13, 3745:3, 3745:7, 3746:23, 3748:14
**Richards'** [4] - 3735:22, 3740:23, 3741:5, 3746:6
**Rick** [1] - 3639:7
**rights** [1] - 3698:8
**rise** [5] - 3560:1, 3566:20, 3662:3, 3662:9, 3672:9
**Road** [1] - 3559:3
**Rob** [1] - 3674:20
**Robert** [2] - 3696:12, 3707:19
**ROBERT** [1] - 3559:4
**rocky** [2] - 3706:12, 3706:24
**role** [5] - 3666:23, 3666:24, 3666:25, 3667:4, 3710:14
**roles** [2] - 3617:14, 3663:20
**Ron** [6] - 3576:5, 3578:3, 3594:25, 3595:14, 3596:3, 3596:24
**room** [8] - 3614:1, 3711:18, 3713:2, 3714:7, 3714:10, 3728:25, 3729:1, 3729:2
**Rosemont** [1] - 3663:6

**ROSSER** [2] - 3685:20, 3751:1
**Rosser** [10] - 3565:17, 3666:19, 3685:16, 3686:3, 3686:4, 3688:9, 3705:3, 3707:9, 3732:4, 3732:10
**Rosser's** [2] - 3666:18, 3682:5
**Rs** [1] - 3635:15
**rule** [2] - 3621:6, 3746:23
**Rule** [6] - 3729:21, 3729:22, 3730:1, 3730:4, 3730:7, 3730:12
**rules** [2] - 3620:23, 3621:4
**ruling** [7] - 3660:14, 3660:24, 3705:15, 3732:20, 3733:8, 3733:12, 3733:22
**rulings** [1] - 3732:1
**run** [6] - 3615:20, 3666:13, 3686:23, 3698:14, 3703:13, 3746:21
**running** [9] - 3610:3, 3615:24, 3667:3, 3668:6, 3669:18, 3674:10, 3714:11, 3715:2
**rushing** [2] - 3577:23, 3651:4
**Russell** [1] - 3615:25

## S

**S-T-E-W-A-R-T** [1] - 3663:1
**sale** [3] - 3694:25, 3696:1, 3696:5
**Salt** [4] - 3700:17, 3700:24, 3701:3, 3701:22
**samples** [6] - 3648:25, 3649:5, 3649:9, 3649:22, 3649:23
**sampling** [2] - 3625:1, 3629:23
**SARITHA** [1] - 3558:16
**sat** [1] - 3736:16
**save** [2] - 3600:8, 3744:2
**saw** [19] - 3599:17, 3603:12, 3646:19, 3664:7, 3687:4, 3710:24, 3712:20, 3712:23, 3712:25, 3713:1, 3717:10, 3717:13, 3724:23, 3726:19, 3726:20, 3726:24, 3726:25, 3742:19, 3746:3
**scene** [2] - 3724:4, 3725:2
**schedule** [4] - 3687:17, 3694:17, 3731:16, 3742:20
**scheduled** [2] - 3697:21, 3698:12
**schools** [1] - 3645:6

**Schwab** [5] - 3604:10, 3604:14, 3604:19, 3605:9, 3606:12
**science** [4] - 3643:3, 3643:7, 3651:20
**Sciences** [3] - 3616:23, 3616:24
**sciences** [2] - 3617:17, 3617:18
**scientific** [3] - 3620:24, 3643:6, 3643:9
**scientists** [1] - 3643:8
**scope** [1] - 3611:16
**Scott** [1] - 3749:15
**Scottsdale** [3] - 3665:6, 3710:7, 3710:11
**scratch** [1] - 3693:8
**screen** [8] - 3601:10, 3601:14, 3623:11, 3623:21, 3624:13, 3637:18, 3714:10, 3714:17
**search** [9] - 3709:24, 3709:25, 3710:6, 3715:14, 3716:25, 3718:3, 3724:22, 3724:24, 3725:21
**searching** [1] - 3712:3
**season** [37] - 3564:5, 3564:6, 3564:7, 3666:17, 3666:19, 3669:17, 3675:1, 3675:2, 3679:14, 3680:3, 3681:16, 3682:3, 3682:4, 3684:5, 3686:24, 3687:12, 3687:16, 3688:17, 3689:1, 3692:23, 3693:5, 3693:9, 3693:17, 3696:23, 3697:15, 3697:19, 3698:6, 3699:22, 3700:10, 3700:12, 3700:22, 3702:7, 3702:17, 3703:6, 3703:8, 3706:19
**seasons** [2] - 3682:2, 3682:6
**seated** [12] - 3560:2, 3566:22, 3612:12, 3614:15, 3614:18, 3662:4, 3662:11, 3671:8, 3672:11, 3685:25, 3707:17, 3731:24
**second** [20] - 3569:9, 3631:10, 3633:22, 3634:11, 3635:25, 3637:21, 3641:14, 3679:22, 3680:7, 3680:12, 3681:18, 3682:14, 3682:22, 3683:9, 3683:22, 3686:23, 3688:25, 3690:21, 3733:23, 3736:10
**Secret** [1] - 3643:20
**section** [2] - 3628:18, 3633:14
**secured** [1] - 3728:3

**securing** [3] - 3676:9, 3677:15, 3679:3
**securities** [2] - 3619:12, 3714:25
**security** [1] - 3619:22
**see** [71] - 3561:9, 3568:9, 3572:17, 3575:3, 3575:7, 3584:14, 3584:15, 3587:11, 3588:8, 3588:10, 3591:22, 3596:1, 3598:14, 3598:17, 3598:18, 3600:1, 3600:9, 3600:25, 3601:14, 3601:20, 3603:24, 3604:11, 3604:13, 3604:17, 3605:14, 3607:2, 3607:5, 3623:11, 3623:21, 3630:22, 3631:3, 3632:6, 3632:17, 3632:22, 3632:23, 3633:3, 3633:8, 3633:14, 3634:10, 3636:1, 3636:4, 3636:6, 3637:18, 3649:21, 3650:18, 3656:9, 3664:9, 3671:2, 3673:14, 3678:10, 3682:11, 3698:18, 3699:23, 3699:24, 3700:5, 3713:15, 3714:11, 3715:1, 3722:24, 3723:25, 3726:5, 3727:22, 3731:20, 3738:15, 3742:22, 3743:4, 3743:10, 3744:5, 3746:9, 3746:21, 3747:3
**seeing** [3] - 3578:6, 3597:2, 3597:3
**seek** [1] - 3740:1
**seeking** [1] - 3737:1
**seeks** [1] - 3737:18
**seem** [2] - 3577:23, 3693:15
**segregate** [1] - 3741:17
**seize** [3] - 3710:16, 3715:13, 3724:25
**seized** [7] - 3716:19, 3717:11, 3717:25, 3720:16, 3724:8, 3725:20, 3725:24
**seizing** [2] - 3717:2, 3717:7
**selectively** [1] - 3600:2
**sell** [3] - 3667:25, 3692:23, 3706:19
**selling** [1] - 3695:5
**semi** [1] - 3690:25
**seminars** [1] - 3617:22
**send** [1] - 3599:1
**sense** [3] - 3667:2, 3693:15, 3700:16
**sent** [7] - 3680:18, 3684:2, 3698:19, 3701:8, 3727:16, 3727:18, 3739:17

**sentence** [5] - 3641:11, 3641:14, 3641:21, 3656:8, 3734:21
**separate** [8] - 3573:17, 3579:6, 3590:23, 3590:25, 3591:1, 3591:3, 3637:11, 3740:19
**September** [3] - 3675:23, 3699:25, 3700:11, 3728:21, 3728:23
**series** [10] - 3589:10, 3589:17, 3622:16, 3626:20, 3628:3, 3628:25, 3630:21, 3631:11, 3658:17, 3660:16
**served** [1] - 3617:13
**service** [1] - 3643:20
**services** [2] - 3653:21, 3740:5
**serving** [1] - 3617:2
**set** [6] - 3653:23, 3687:18, 3687:25, 3688:12, 3690:25, 3693:12
**setting** [2] - 3655:5, 3714:25
**settle** [1] - 3573:1
**settlement** [4] - 3575:14, 3575:19, 3575:24, 3575:25
**Settlement** [18] - 3568:19, 3568:24, 3569:20, 3570:4, 3570:12, 3570:15, 3573:24, 3574:12, 3574:20, 3577:2, 3595:2, 3595:7, 3595:12, 3595:15, 3596:9, 3596:11, 3596:20, 3597:1
**seven** [2] - 3656:13, 3656:14
**several** [4] - 3624:14, 3635:15, 3678:21, 3723:11
**shaking** [1] - 3579:8
**shape** [1] - 3620:1
**share** [1] - 3610:4
**shareholders** [3] - 3583:3, 3583:11, 3584:17
**Shargel** [1] - 3736:13
**shattered** [1] - 3735:7
**sheep** [1] - 3723:12
**sheet** [3] - 3618:22, 3618:23, 3734:16
**shipped** [1] - 3728:20
**ships** [1] - 3740:13
**shirts** [3] - 3670:25, 3671:1, 3671:3
**short** [6] - 3606:6, 3613:20, 3614:5, 3641:24, 3680:2, 3681:15
**show** [23] - 3565:23, 3566:9, 3568:5, 3570:22, 3577:5, 3577:21, 3578:1,

3579:4, 3587:7, 3588:18, 3591:19, 3596:1, 3598:6, 3613:9, 3622:11, 3624:2, 3633:20, 3665:4, 3676:20, 3678:9, 3680:16, 3698:18, 3704:10
**showed** [11] - 3597:1, 3598:15, 3607:15, 3608:3, 3665:10, 3665:12, 3665:16, 3675:22, 3678:23, 3706:1, 3732:16
**showing** [4] - 3597:12, 3597:24, 3625:24, 3665:19
**shown** [6] - 3596:24, 3598:5, 3602:1, 3602:5, 3651:25, 3652:2
**shows** [5] - 3585:21, 3604:9, 3606:10, 3631:11, 3673:7
**side** [5] - 3650:11, 3700:4, 3711:11, 3733:16, 3733:20
**sidebar** [3] - 3671:18, 3672:18, 3673:1, 3703:23, 3747:25, 3748:1
**Sidebar** [2] - 3704:1, 3704:12
**sidebars** [2] - 3560:7, 3745:5
**sided** [1] - 3657:14
**sides** [1] - 3657:15
**sign** [5] - 3630:11, 3630:15, 3631:5, 3650:19, 3659:11
**signatory** [1] - 3627:21
**signature** [79] - 3579:14, 3579:17, 3600:10, 3601:21, 3622:18, 3623:10, 3623:18, 3623:19, 3624:21, 3626:16, 3626:22, 3627:19, 3627:20, 3627:23, 3629:8, 3629:21, 3630:4, 3630:6, 3630:9, 3630:11, 3630:19, 3631:3, 3631:5, 3632:1, 3632:3, 3632:4, 3632:5, 3632:10, 3633:6, 3633:17, 3633:20, 3633:22, 3634:3, 3634:20, 3635:25, 3636:12, 3636:14, 3636:25, 3637:2, 3637:10, 3637:13, 3637:17, 3637:20, 3637:25, 3640:9, 3640:24, 3642:23, 3646:2, 3646:14, 3646:15, 3647:3, 3647:4, 3647:5, 3647:12, 3649:4, 3650:21, 3651:5, 3651:12, 3651:15, 3651:16, 3651:18, 3651:21, 3652:11, 3654:15,

25

**26**

3654:16, 3654:18, 3654:22, 3655:3, 3655:5, 3655:13, 3657:9, 3657:20, 3657:24, 3659:3, 3659:4
**signatures** [91] - 3618:1, 3623:5, 3623:8, 3623:20, 3624:11, 3624:15, 3624:16, 3624:18, 3624:23, 3625:9, 3626:18, 3626:20, 3626:21, 3626:24, 3627:4, 3627:5, 3627:6, 3627:15, 3628:3, 3628:14, 3628:17, 3628:18, 3628:21, 3628:23, 3629:1, 3629:3, 3629:4, 3629:11, 3630:1, 3630:22, 3630:25, 3631:4, 3631:8, 3631:12, 3631:13, 3632:24, 3633:5, 3634:10, 3636:18, 3636:19, 3637:11, 3638:9, 3638:23, 3638:24, 3639:11, 3639:18, 3640:13, 3640:23, 3642:1, 3642:3, 3642:7, 3642:13, 3642:16, 3643:12, 3644:4, 3645:22, 3646:5, 3646:7, 3646:23, 3646:24, 3647:9, 3647:11, 3647:21, 3648:9, 3650:6, 3650:9, 3650:17, 3652:4, 3652:5, 3652:8, 3652:10, 3652:11, 3652:13, 3652:18, 3654:11, 3655:9, 3655:11, 3656:11, 3656:22, 3657:4, 3657:6, 3657:11, 3657:15, 3657:18, 3657:25, 3658:8, 3658:17, 3658:22, 3658:25, 3659:1
**signed** [4] - 3609:7, 3649:4, 3695:15, 3720:2
**significance** [1] - 3648:11
**significant** [6] - 3611:14, 3636:21, 3648:13, 3664:25, 3665:2, 3665:4
**signs** [4] - 3630:14, 3631:1, 3646:2, 3743:11
**silently** [1] - 3591:21
**silver** [1] - 3715:22
**similar** [6] - 3629:10, 3629:13, 3634:22, 3646:21, 3674:20
**similarities** [3] - 3646:17, 3647:8, 3648:11
**similarity** [1] - 3647:13
**similarly** [1] - 3732:21
**simply** [6] - 3561:15, 3606:25, 3652:23, 3653:22, 3657:19, 3727:12
**simulate** [6] - 3627:21,

3629:5, 3629:17, 3633:17, 3638:13, 3638:25
**simulated** [2] - 3637:2, 3637:24
**simulation** [17] - 3627:11, 3631:19, 3631:20, 3631:22, 3632:4, 3632:11, 3632:16, 3633:1, 3634:17, 3634:24, 3635:2, 3636:15, 3636:24, 3638:16, 3640:24, 3647:11, 3648:15
**simulations** [4] - 3627:6, 3638:8, 3642:7, 3643:11
**simulator** [1] - 3633:18
**single** [5] - 3634:23, 3635:14, 3637:10, 3650:21, 3737:1
**sinister** [1] - 3725:16
**siphoning** [2] - 3564:12, 3673:12
**Sirhari** [3] - 3645:5, 3645:11, 3645:12
**SIRHARI** [1] - 3645:5
**sit** [5] - 3587:3, 3593:7, 3742:23, 3744:4, 3745:8
**site** [1] - 3724:9
**sitting** [1] - 3745:9
**situation** [7] - 3681:21, 3693:14, 3734:22, 3737:7, 3737:9, 3737:16, 3742:7
**six** [2] - 3658:8, 3682:1
**size** [5] - 3618:13, 3630:2, 3630:3, 3630:8, 3633:21
**skill** [1] - 3621:2
**sleeve** [1] - 3570:23
**slow** [3] - 3632:22, 3635:1, 3636:20
**slowing** [1] - 3634:3
**small** [3] - 3568:8, 3633:21, 3665:11
**smaller** [2] - 3633:13, 3705:25
**smooth** [3] - 3632:18, 3632:20, 3633:10
**smoother** [1] - 3634:9
**smoothly** [2] - 3560:22, 3635:14
**societies** [1] - 3617:19
**society** [3] - 3616:25, 3617:1, 3617:19
**software** [5] - 3644:2, 3645:7, 3645:9, 3645:16, 3723:19
**sold** [1] - 3693:1
**solely** [1] - 3620:6
**solution** [1] - 3569:16
**solutions** [1] - 3569:23
**solve** [2] - 3570:3, 3570:6
**solving** [1] - 3569:21
**some-odd-thousand** [1] -

3606:20
**someone** [15] - 3590:1, 3620:22, 3628:24, 3629:5, 3629:16, 3630:18, 3631:1, 3632:15, 3634:19, 3638:13, 3638:16, 3646:13, 3651:9, 3741:7, 3747:16
**sometime** [2] - 3702:4, 3731:14
**sometimes** [4] - 3562:18, 3580:10, 3613:12, 3613:13
**somewhere** [1] - 3597:11
**Sonenglick** [2] - 3574:9, 3575:4
**Sorry** [1] - 3569:8
**sorry** [11] - 3562:13, 3594:15, 3600:16, 3630:13, 3662:5, 3671:3, 3678:6, 3682:3, 3708:19, 3729:2, 3740:6
**sort** [3] - 3586:4, 3670:1, 3748:23
**sought** [2] - 3657:5, 3657:8
**sound** [2] - 3621:14, 3706:23
**sounding** [1] - 3585:18
**sounds** [3] - 3586:25, 3671:4, 3741:20
**source** [2] - 3667:5, 3713:2
**sources** [2] - 3618:18, 3618:19
**spacing** [1] - 3630:3
**spares** [1] - 3693:2
**speaking** [2] - 3650:2, 3660:21
**speaks** [1] - 3700:9
**Special** [7] - 3707:24, 3708:3, 3708:5, 3717:23, 3718:5, 3721:8, 3722:12
**special** [8] - 3587:12, 3587:14, 3588:1, 3588:15, 3588:19, 3722:22, 3737:3, 3737:8
**specialized** [2] - 3618:14, 3620:24
**specific** [5] - 3586:24, 3602:3, 3622:18, 3648:21, 3702:24
**specifically** [13] - 3575:10, 3587:11, 3617:23, 3623:5, 3623:17, 3631:18, 3636:23, 3650:3, 3655:23, 3658:18, 3709:21, 3740:9, 3742:15
**specimen** [4] - 3626:21, 3628:17, 3631:12, 3659:6
**specimens** [15] - 3629:14, 3629:20, 3630:5, 3631:9, 3633:23, 3634:11,

3635:15, 3636:18, 3638:19, 3638:20, 3648:2, 3648:10, 3654:17, 3657:9, 3657:16
**spectral** [1] - 3618:16
**spectrum** [4] - 3648:6, 3657:16, 3657:21, 3658:14
**spell** [4] - 3615:1, 3662:24, 3686:1, 3707:18
**spending** [2] - 3654:9, 3654:10
**spoken** [1] - 3741:25
**sponsor** [9] - 3676:15, 3677:1, 3677:24, 3678:15, 3686:24, 3687:18, 3696:24, 3705:22, 3706:10
**sponsors** [7] - 3676:9, 3676:12, 3678:3, 3693:15, 3697:5, 3697:10, 3705:25
**sponsorship** [10] - 3667:21, 3667:22, 3675:9, 3677:15, 3686:23, 3687:14, 3688:19, 3690:23, 3693:13, 3702:19
**sponsorships** [1] - 3702:8
**Square** [1] - 3558:21
**square** [1] - 3706:9
**squiggle** [1] - 3635:4
**stand** [13] - 3602:24, 3603:3, 3606:18, 3628:10, 3662:16, 3672:8, 3685:18, 3708:10, 3722:16, 3727:10, 3738:10, 3745:3, 3745:16
**stand-alone** [2] - 3722:16, 3727:10
**standby** [3] - 3709:24, 3710:14, 3711:7
**standing** [2] - 3662:16, 3685:18
**start** [4] - 3573:16, 3585:2, 3688:5, 3734:2
**started** [7] - 3669:16, 3686:14, 3687:19, 3697:19, 3705:20, 3705:25, 3706:2
**starts** [4] - 3569:2, 3569:9, 3700:3, 3722:4
**state** [15] - 3572:14, 3575:17, 3584:2, 3615:1, 3621:7, 3621:8, 3643:2, 3645:15, 3647:7, 3662:24, 3686:1, 3707:17, 3726:18, 3733:21, 3748:5
**State** [1] - 3735:24
**statement** [17] - 3572:12, 3603:18, 3604:3, 3605:9, 3605:10, 3607:1, 3639:17, 3639:19, 3641:25, 3646:25, 3647:2, 3688:7,

3692:16, 3721:25, 3722:5, 3723:21, 3724:19
**statements** [4] - 3584:1, 3598:10, 3673:13, 3704:9
**STATES** [3] - 3558:1, 3558:3, 3558:11
**states** [1] - 3702:9
**States** [4] - 3558:6, 3558:14, 3558:17, 3720:9
**stating** [1] - 3654:21
**status** [1] - 3616:4
**stayed** [2] - 3727:23, 3728:3
**staying** [1] - 3574:7
**Steiger** [1] - 3559:20
**stem** [1] - 3567:21
**stemmed** [1] - 3679:15
**stenography** [1] - 3559:25
**step** [7] - 3612:8, 3659:22, 3660:9, 3685:11, 3707:9, 3736:10, 3742:5
**steps** [1] - 3685:13
**stereoscopic** [1] - 3618:9
**Stewart** [22] - 3563:9, 3564:8, 3564:13, 3565:18, 3613:22, 3613:25, 3614:4, 3660:10, 3662:8, 3662:14, 3662:15, 3663:1, 3663:5, 3674:3, 3675:22, 3681:7, 3683:21, 3685:11, 3703:10, 3732:4, 3732:22
**STEWART** [2] - 3662:19, 3750:17
**stick** [2] - 3573:19, 3595:10
**still** [11] - 3567:6, 3570:10, 3611:20, 3611:25, 3613:10, 3633:17, 3678:16, 3695:25, 3700:14, 3702:2, 3725:3
**stipulate** [6] - 3605:3, 3687:6, 3741:23, 3742:4, 3744:21, 3749:1
**stipulated** [2] - 3687:7, 3720:8
**stipulation** [18] - 3598:8, 3720:20, 3721:2, 3721:6, 3742:1, 3742:21, 3743:4, 3743:11, 3743:15, 3743:19, 3744:9, 3744:16, 3745:2, 3745:15, 3746:10, 3746:12, 3748:9, 3748:10
**Stipulation** [4] - 3720:2, 3720:6, 3721:3, 3752:23
**Stock** [1] - 3619:13
**stolen** [1] - 3671:13
**Stolper** [9] - 3579:1, 3579:10, 3580:7, 3580:12, 3581:23, 3582:10, 3582:22, 3609:17
**stood** [3] - 3579:21,

3639:8, 3642:19
**stop** [2] - 3612:23, 3634:12
**storage** [1] - 3686:12
**stored** [2] - 3728:7, 3729:20
**straight** [1] - 3633:11
**Strangford** [1] - 3559:7
**strategic** [1] - 3733:5
**strategy** [1] - 3667:2
**street** [2] - 3695:7, 3695:8
**stroke** [1] - 3633:8, 3633:13, 3633:25, 3634:1, 3634:10, 3635:19, 3636:2, 3636:6, 3636:7, 3636:8, 3636:10
**strokes** [3] - 3632:19, 3632:20
**structures** [1] - 3742:6
**struggling** [1] - 3723:22
**Stuart** [1] - 3732:21
**Stuart's** [1] - 3733:4
**study** [3] - 3617:4, 3617:24, 3645:13
**stuff** [4] - 3580:9, 3582:6, 3688:16, 3745:6
**subject** [6] - 3571:9, 3571:19, 3583:2, 3680:20, 3728:4, 3748:9
**submission** [1] - 3736:9
**submit** [1] - 3745:20
**submitted** [9] - 3622:10, 3624:11, 3624:15, 3650:10, 3652:17, 3655:5, 3655:12, 3659:5, 3733:17
**submitting** [1] - 3655:7
**subpoena** [2] - 3744:12
**substance** [3] - 3605:24, 3629:10, 3653:14
**substantial** [1] - 3582:22
**substantially** [2] - 3713:19, 3716:10
**substantiate** [2] - 3665:5, 3744:14
**substantive** [1] - 3575:4
**substitute** [2] - 3566:12, 3566:16
**substituting** [1] - 3566:8
**subtle** [3] - 3629:8, 3631:16, 3636:17
**subtracted** [2] - 3698:10, 3707:5
**successful** [1] - 3719:11
**sue** [1] - 3697:10
**sued** [3] - 3592:8, 3594:15, 3594:19, 3594:22
**sufficient** [1] - 3621:12
**Suffolk** [1] - 3558:21
**suggest** [7] - 3561:22, 3585:13, 3609:11, 3613:5, 3636:14, 3732:10, 3732:11

**suggested** [2] - 3732:13, 3743:13
**suggesting** [1] - 3613:11
**suggestion** [2] - 3732:22, 3733:3
**suit** [17] - 3567:21, 3576:7, 3576:14, 3576:21, 3576:23, 3576:25, 3577:9, 3577:16, 3577:19, 3578:4, 3578:12, 3580:8, 3598:2, 3682:23, 3683:2, 3683:9, 3741:19
**suits** [4] - 3670:25, 3671:1, 3671:2
**sum** [6] - 3563:10, 3605:24, 3621:16, 3629:10, 3653:14, 3658:4
**summation** [1] - 3613:7
**sums** [1] - 3582:22
**Sunday** [5] - 3560:20, 3560:22, 3561:3, 3561:10, 3561:16
**SUNY** [1] - 3645:6
**supervisor** [1] - 3562:8
**support** [4] - 3605:19, 3621:13, 3628:4, 3631:17
**supports** [1] - 3632:25
**supposed** [4] - 3591:15, 3682:14, 3683:25, 3733:14
**supposedly** [1] - 3665:7
**surprise** [3] - 3611:25, 3612:18, 3612:19
**surprising** [1] - 3736:21
**surround** [1] - 3630:11
**Susquehanna** [1] - 3616:6
**sustained** [11] - 3575:21, 3589:7, 3599:8, 3599:15, 3609:15, 3610:16, 3611:3, 3612:4, 3701:11, 3703:17, 3703:19
**sweatshirts** [1] - 3671:3
**sworn** [5] - 3567:12, 3614:24, 3662:21, 3685:22, 3707:15
**system** [8] - 3643:19, 3643:20, 3645:6, 3714:14, 3725:9, 3725:10, 3725:11, 3740:24
**systems** [1] - 3714:25

# T

**tab** [1] - 3714:25
**talks** [1] - 3584:13
**Taser** [1] - 3677:17
**Tasers** [1] - 3677:21
**task** [1] - 3561:9
**team** [49] - 3564:3, 3565:8, 3569:18, 3573:18, 3574:2,

3574:7, 3595:10, 3595:12, 3596:10, 3663:22, 3663:23, 3664:2, 3665:2, 3666:14, 3666:19, 3666:20, 3666:22, 3666:23, 3666:25, 3667:3, 3667:6, 3667:10, 3667:19, 3668:1, 3668:7, 3669:18, 3670:3, 3674:10, 3674:21, 3676:10, 3678:17, 3679:3, 3679:8, 3682:5, 3686:22, 3686:25, 3687:11, 3687:14, 3688:13, 3695:1, 3698:1, 3702:10, 3703:13, 3705:24, 3708:8, 3710:15, 3716:25, 3724:24
**Team** [1] - 3708:11
**teammate** [1] - 3702:13
**teammates** [3] - 3573:8, 3573:9, 3702:4
**teams** [1] - 3663:8
**technical** [1] - 3620:24
**technology** [1] - 3643:15
**telephonic** [1] - 3749:11
**television** [1] - 3698:8
**teller** [2] - 3665:10, 3665:13
**ten** [2] - 3697:21, 3733:20
**tenth** [2] - 3698:6, 3698:9
**term** [3] - 3607:17, 3641:6, 3723:8
**terms** [14] - 3583:2, 3592:16, 3617:3, 3627:13, 3631:17, 3649:14, 3653:19, 3655:4, 3693:4, 3693:5, 3704:7, 3709:25, 3724:15, 3735:4
**test** [1] - 3647:24
**testified** [25] - 3567:12, 3567:18, 3569:2, 3570:5, 3570:13, 3578:25, 3581:2, 3602:13, 3602:17, 3604:20, 3605:16, 3608:7, 3614:25, 3639:9, 3642:10, 3642:11, 3648:16, 3652:20, 3662:21, 3672:4, 3674:4, 3685:4, 3685:22, 3707:16, 3709:7
**testifies** [1] - 3565:20
**testify** [17] - 3564:4, 3597:11, 3603:4, 3611:19, 3619:25, 3620:22, 3621:3, 3621:5, 3625:4, 3642:12, 3642:15, 3652:23, 3652:24, 3654:8, 3684:25, 3705:17, 3738:22
**testifying** [12] - 3563:16, 3564:25, 3583:17, 3611:6, 3612:20, 3619:16, 3619:18, 3625:6, 3660:12,

**27**

**28**

3661:4, 3736:4
**testimony** [36] - 3560:25, 3598:9, 3601:19, 3601:21, 3602:7, 3602:10, 3610:9, 3610:25, 3611:23, 3611:24, 3619:3, 3619:6, 3619:9, 3620:2, 3620:5, 3625:19, 3626:8, 3639:12, 3639:22, 3641:24, 3642:18, 3642:19, 3642:21, 3653:9, 3653:10, 3654:4, 3657:22, 3660:14, 3661:1, 3671:24, 3703:18, 3716:20, 3727:24, 3732:4, 3736:25, 3746:7
**testing** [4] - 3616:14, 3616:25, 3687:2, 3697:18
**tests** [7] - 3642:24, 3647:14, 3647:17, 3647:20, 3647:22, 3647:23
**THE** [192] - 3558:17, 3560:1, 3560:2, 3560:4, 3560:8, 3560:12, 3561:17, 3561:22, 3562:6, 3562:9, 3562:22, 3563:2, 3563:18, 3563:24, 3564:15, 3564:21, 3564:23, 3565:10, 3565:15, 3565:21, 3566:4, 3566:8, 3566:12, 3566:16, 3566:18, 3566:20, 3566:22, 3566:25, 3567:8, 3569:6, 3569:8, 3572:8, 3572:11, 3575:21, 3583:25, 3584:20, 3589:7, 3593:14, 3593:17, 3593:23, 3594:2, 3594:4, 3599:8, 3599:15, 3599:22, 3600:15, 3600:17, 3604:1, 3604:6, 3604:16, 3605:4, 3605:6, 3608:21, 3609:15, 3610:7, 3610:16, 3611:3, 3611:17, 3612:4, 3612:9, 3612:12, 3613:3, 3613:11, 3613:20, 3613:22, 3613:25, 3614:1, 3614:4, 3614:9, 3614:13, 3614:15, 3614:18, 3615:1, 3615:3, 3615:4, 3620:19, 3625:16, 3625:23, 3626:4, 3626:9, 3628:10, 3639:4, 3653:18, 3654:25, 3655:1, 3655:2, 3656:18, 3659:16, 3659:18, 3659:20, 3659:22, 3659:23, 3659:24, 3660:6, 3660:12, 3660:21, 3661:9, 3662:3, 3662:4, 3662:7, 3662:9, 3662:11, 3662:15, 3662:24, 3663:1, 3663:10, 3664:13, 3669:10,

3670:16, 3670:19, 3671:5, 3671:8, 3671:11, 3672:3, 3672:7, 3672:9, 3672:11, 3672:19, 3675:17, 3681:1, 3682:25, 3683:4, 3683:14, 3683:16, 3685:11, 3685:14, 3685:17, 3685:25, 3686:3, 3686:4, 3687:7, 3691:17, 3691:19, 3692:9, 3695:21, 3696:8, 3699:18, 3701:11, 3703:17, 3703:19, 3703:21, 3705:15, 3707:9, 3707:17, 3707:19, 3709:18, 3711:5, 3712:12, 3714:3, 3716:16, 3717:18, 3720:3, 3720:6, 3721:1, 3722:8, 3730:6, 3730:12, 3731:11, 3731:24, 3733:13, 3733:20, 3734:1, 3734:6, 3734:9, 3734:11, 3736:15, 3736:18, 3738:2, 3739:5, 3739:15, 3740:5, 3740:7, 3740:12, 3741:20, 3742:19, 3743:7, 3743:17, 3744:3, 3744:7, 3744:18, 3745:1, 3745:23, 3746:3, 3746:6, 3746:20, 3747:11, 3748:7, 3748:14, 3748:22, 3749:4, 3749:16, 3749:23
**themselves** [3] - 3602:24, 3603:3, 3728:3
**theory** [3] - 3565:8, 3704:5, 3744:8
**therefore** [3] - 3569:16, 3569:22, 3655:6
**therein** [1] - 3622:13
**they've** [1] - 3738:3
**thickness** [1] - 3618:11
**thinking** [1] - 3703:7
**third** [4] - 3604:13, 3605:13, 3693:9, 3727:11
**thorough** [1] - 3735:24
**thoughts** [1] - 3573:21
**thousand** [1] - 3606:20
**three** [15] - 3577:5, 3618:10, 3623:11, 3623:20, 3627:14, 3627:19, 3628:4, 3628:5, 3631:22, 3652:11, 3652:18, 3695:21, 3712:12, 3717:23, 3720:13
**threshold** [2] - 3641:1, 3641:16
**throughout** [4] - 3633:19, 3688:16, 3702:7, 3702:17
**Thursday** [1] - 3560:16
**Tim** [2] - 3581:3, 3581:7
**timed** [1] - 3695:3
**timed-out** [1] - 3695:3

**tint** [1] - 3618:20
**tires** [1] - 3687:23
**title** [1] - 3708:2
**titled** [1] - 3721:13
**today** [28] - 3561:5, 3573:1, 3593:7, 3601:19, 3601:20, 3602:7, 3602:10, 3602:13, 3602:17, 3606:18, 3610:25, 3611:19, 3625:19, 3639:22, 3653:4, 3654:4, 3654:9, 3654:11, 3687:4, 3690:17, 3691:12, 3699:3, 3717:12, 3717:24, 3722:18, 3728:11, 3744:5
**together** [8] - 3569:21, 3570:3, 3573:20, 3574:2, 3574:7, 3595:10, 3717:1, 3743:18
**Tom** [1] - 3706:17
**TOMMY** [1] - 3558:7
**Tommy** [27] - 3572:6, 3573:14, 3580:8, 3609:18, 3609:22, 3664:3, 3666:18, 3666:20, 3667:5, 3668:19, 3674:14, 3677:16, 3681:8, 3681:10, 3683:23, 3684:2, 3684:14, 3686:17, 3687:15, 3691:24, 3692:23, 3693:11, 3693:14, 3694:24, 3700:8, 3700:13, 3720:10
**Tommy's** [3] - 3666:8, 3688:20, 3705:22
**tomorrow** [3] - 3560:19, 3743:8, 3744:6
**took** [9] - 3602:23, 3603:2, 3606:17, 3714:6, 3715:11, 3716:21, 3717:6, 3718:3, 3742:2
**tools** [3] - 3618:3, 3618:11, 3618:12
**tooth** [1] - 3706:6
**top** [22] - 3572:20, 3588:21, 3600:24, 3624:13, 3628:15, 3631:13, 3634:6, 3634:8, 3634:22, 3635:4, 3635:9, 3635:14, 3636:3, 3637:14, 3670:22, 3700:8, 3716:2, 3721:9, 3721:13, 3721:17, 3721:18, 3721:20
**total** [6] - 3652:11, 3652:18, 3653:25, 3654:2, 3658:8, 3708:22
**towards** [3] - 3675:11, 3688:19, 3699:22
**toy** [1] - 3682:23
**trace** [1] - 3646:15
**traced** [2] - 3631:23, 3646:25
**tracing** [5] - 3646:13,

3647:3, 3647:4, 3647:8, 3647:12
**tracings** [1] - 3646:16
**track** [6] - 3665:7, 3687:2, 3687:23, 3690:4, 3694:1, 3703:12
**traded** [3] - 3676:17, 3677:3, 3677:19
**trades** [1] - 3619:14
**trail** [1] - 3704:6
**trailer** [1] - 3691:1
**training** [7] - 3615:16, 3621:2, 3708:12, 3708:17, 3708:21, 3729:16, 3730:14
**transaction** [6] - 3587:9, 3600:1, 3655:18, 3674:12, 3687:10, 3740:10
**Transaction** [2] - 3721:14, 3721:17
**transactions** [2] - 3736:24, 3740:15
**transactions)** [1] - 3655:19
**transcript** [2] - 3559:25, 3606:2
**TRANSCRIPT** [1] - 3558:10
**transfer** [4] - 3606:10, 3734:17, 3739:2, 3742:3
**transfers** [5] - 3604:9, 3604:14, 3736:5, 3741:9, 3742:2
**transmissions** [1] - 3695:4
**treading** [1] - 3736:6
**tremulous** [6] - 3633:10, 3633:14, 3635:21, 3636:3, 3636:20, 3637:6
**trial** [11] - 3560:21, 3567:2, 3608:25, 3660:25, 3720:21, 3734:24, 3735:17, 3736:4, 3736:16, 3742:20, 3746:19
**tried** [2] - 3680:12, 3681:18
**trip** [1] - 3690:21
**truck** [1] - 3690:25
**true** [32] - 3602:2, 3608:2, 3608:19, 3609:21, 3612:21, 3613:3, 3613:6, 3613:12, 3641:12, 3643:4, 3649:10, 3649:11, 3653:5, 3653:6, 3653:10, 3654:4, 3654:5, 3654:8, 3657:7, 3658:23, 3692:1, 3695:9, 3695:13, 3710:23, 3720:18, 3724:1, 3725:17, 3725:21, 3726:7, 3727:1, 3729:17
**Trust** [3] - 3598:11, 3598:17, 3607:18
**trust** [8] - 3603:6, 3604:2, 3606:25, 3607:9, 3607:15, 3736:6, 3740:25, 3748:19

**29**

**truth** [3] - 3572:13, 3575:17, 3584:2
**try** [6] - 3565:11, 3573:17, 3574:13, 3577:5, 3745:17, 3747:3
**trying** [5] - 3689:1, 3694:5, 3706:24, 3732:11, 3745:10
**tune** [2] - 3575:5, 3609:2
**turn** [6] - 3579:6, 3688:8, 3691:22, 3700:19, 3725:14, 3744:13
**turned** [3] - 3569:7, 3726:8, 3744:17
**turning** [4] - 3623:12, 3692:15, 3692:17, 3712:15
**twice** [1] - 3630:19
**two** [58] - 3563:6, 3566:5, 3571:13, 3583:21, 3588:13, 3596:22, 3606:9, 3613:18, 3618:24, 3622:16, 3622:23, 3624:6, 3624:10, 3624:12, 3625:24, 3626:5, 3626:18, 3627:4, 3628:15, 3631:11, 3631:13, 3632:24, 3635:9, 3635:13, 3636:19, 3637:11, 3637:14, 3638:8, 3640:12, 3640:22, 3646:5, 3646:7, 3646:23, 3647:10, 3647:21, 3648:9, 3648:12, 3652:8, 3658:3, 3658:8, 3665:18, 3679:16, 3682:6, 3686:25, 3687:11, 3691:1, 3693:1, 3695:1, 3704:3, 3712:20, 3719:21, 3720:12, 3722:15, 3722:17, 3726:2, 3731:16, 3745:11
**two-car** [2] - 3686:25, 3687:11
**two-page** [3] - 3613:18, 3626:5, 3631:11
**type** [8] - 3615:14, 3645:7, 3645:9, 3649:5, 3667:9, 3736:25, 3737:9, 3737:16
**typewriting** [1] - 3618:14
**typically** [6] - 3561:11, 3618:21, 3646:16, 3667:10, 3687:3, 3729:18

## U

**U.S** [6] - 3561:19, 3562:4, 3562:7, 3622:10, 3651:24, 3730:15
**ugly** [2] - 3706:20, 3706:24
**Ula** [3] - 3673:13, 3673:20, 3673:21
**ultraviolet** [1] - 3618:19

**unable** [1] - 3651:12
**uncle** [1] - 3615:25
**uncollectible** [2] - 3610:18, 3610:19
**uncollective** [1] - 3610:14
**undated** [1] - 3658:18
**under** [17] - 3567:6, 3579:23, 3598:16, 3601:19, 3620:16, 3620:22, 3640:16, 3650:19, 3651:2, 3659:10, 3660:1, 3681:24, 3682:5, 3734:4, 3734:11, 3748:25
**underlying** [2] - 3744:14, 3744:21
**undersigned** [4] - 3640:22, 3640:25, 3641:15, 3642:3
**understood** [1] - 3595:4
**undertaken** [1] - 3679:15
**undertook** [1] - 3679:22
**unfavorable** [1] - 3619:23
**Uniden** [6] - 3676:17, 3676:23, 3676:24, 3677:5, 3696:25, 3697:4
**unique** [10] - 3629:1, 3631:5, 3646:2, 3646:8, 3646:11, 3650:22, 3657:18, 3719:14
**unit** [2] - 3567:23, 3596:25
**Unitech** [5] - 3663:17, 3668:9, 3668:22, 3673:14, 3673:22, 3681:12
**Unitech's** [4] - 3668:25, 3669:3, 3670:8, 3670:11
**UNITED** [3] - 3558:1, 3558:3, 3558:11
**United** [4] - 3558:6, 3558:14, 3558:17, 3720:9
**units** [1] - 3708:20
**university** [1] - 3616:7
**unknown** [1] - 3742:18
**unless** [1] - 3653:11
**unlike** [1] - 3635:13
**unnatural** [1] - 3647:13
**unnaturally** [2] - 3646:20, 3646:21
**unnecessary** [1] - 3565:25
**unrelated** [1] - 3724:18
**unto** [1] - 3650:22
**unusual** [1] - 3634:7
**up** [41] - 3562:25, 3563:10, 3574:21, 3588:24, 3588:25, 3597:12, 3597:24, 3600:24, 3613:9, 3615:4, 3620:2, 3620:4, 3635:7, 3645:11, 3657:25, 3662:15, 3666:15, 3671:10, 3685:17, 3687:18, 3688:12, 3690:7, 3690:25, 3694:2, 3694:3,

3695:4, 3700:8, 3706:1, 3706:11, 3713:4, 3714:19, 3717:12, 3728:11, 3731:25, 3733:13, 3733:20, 3739:3, 3742:23, 3745:4, 3745:9
**updates** [1] - 3568:23
**upper** [6] - 3588:9, 3633:8, 3634:6, 3636:5, 3637:17, 3637:20
**upset** [1] - 3701:25
**upside** [1] - 3716:1
**upward** [3] - 3632:20, 3633:8, 3636:6
**urban** [1] - 3704:10
**urge** [2] - 3743:8, 3743:9
**user** [2] - 3731:4, 3731:7
**uses** [1] - 3607:17
**usual** [3] - 3633:25, 3724:3
**utilize** [3] - 3560:24, 3562:11, 3641:6
**utilized** [3] - 3643:21, 3644:3, 3649:15
**utilizing** [3] - 3618:18, 3646:13, 3648:7
**utmost** [2] - 3679:25, 3681:10

## V

**valuable** [1] - 3665:8
**value** [2] - 3645:18, 3723:10
**values** [1] - 3631:4
**variation** [6] - 3630:23, 3632:19, 3648:5, 3649:18, 3649:19, 3649:20
**variations** [2] - 3631:4, 3650:17
**variety** [2] - 3618:7, 3650:23
**various** [15] - 3569:23, 3603:4, 3617:9, 3617:14, 3617:21, 3617:24, 3629:19, 3637:1, 3647:14, 3658:10, 3658:12, 3665:25, 3671:15, 3688:22, 3693:2
**vary** [1] - 3648:6
**Vault** [2] - 3725:9, 3726:8
**vault** [1] - 3728:13
**vector** [1] - 3635:8
**Vegas** [5] - 3568:3, 3686:10, 3688:10, 3688:11, 3691:4, 3692:18
**vehicle** [2] - 3690:9, 3694:2
**vehicles** [2] - 3689:4, 3691:1
**venture** [2] - 3591:5,

3655:17
**Ventures** [1] - 3650:12
**ventures** [1] - 3607:1
**verbally** [1] - 3622:8
**verify** [2] - 3719:17, 3723:8
**versus** [5] - 3586:12, 3627:10, 3634:18, 3730:8, 3741:19
**Veterans** [1] - 3558:21
**via** [1] - 3728:21
**victims** [1] - 3735:1
**victory** [1] - 3569:18
**video** [3] - 3618:16, 3671:14
**view** [4] - 3618:9, 3725:4, 3732:17, 3735:22
**viewed** [1] - 3624:13
**views** [1] - 3661:4
**violate** [1] - 3630:10
**violations** [1] - 3747:8
**Virginia** [1] - 3698:6
**visual** [2] - 3625:7, 3671:15
**visualization** [1] - 3645:8
**VO** [1] - 3678:10
**voice** [1] - 3615:4
**voir** [1] - 3716:15
**VOIR** [2] - 3716:17, 3751:13
**Vonage** [6] - 3677:9, 3677:10, 3677:12, 3678:12, 3678:14, 3697:7
**VSC** [2] - 3618:16, 3647:24

## W

**wait** [3] - 3560:10, 3613:14, 3744:6
**walk** [2] - 3561:14, 3733:18
**walked** [2] - 3602:23, 3711:13
**walls** [1] - 3711:21
**wander** [1] - 3625:14
**wants** [4] - 3573:16, 3738:3, 3738:10, 3738:21
**warning** [1] - 3614:5
**warrant** [8] - 3709:24, 3709:25, 3710:6, 3715:14, 3718:3, 3724:22, 3724:24, 3725:21
**Warwick** [1] - 3601:16
**waste** [1] - 3743:20
**watermarks** [1] - 3618:13
**waters** [1] - 3736:7
**wavering** [3] - 3633:10, 3635:21, 3635:21, 3636:7
**ways** [1] - 3595:9
**wealth** [3] - 3564:7, 3565:2, 3664:25, 3665:4
**wealthy** [1] - 3665:21

**wearing** [1] - 3671:1
**webby** [1] - 3742:6
**Wednesday** [1] - 3584:11
**week** [1] - 3731:12
**weekend** [4] - 3561:9, 3562:1, 3562:11, 3731:18
**weeks** [3] - 3731:16, 3736:16, 3745:10
**weight** [1] - 3621:10
**WEINBLATT** [1] - 3558:20
**whatsoever** [1] - 3700:18
**wherein** [2] - 3608:17, 3655:14
**whole** [3] - 3600:8, 3633:5, 3664:18
**wholly** [1] - 3724:18
**wife** [1] - 3563:13
**willing** [3] - 3703:14, 3742:4, 3744:20
**win** [3] - 3596:3, 3693:8, 3693:9
**window** [1] - 3703:9
**windows** [1] - 3708:18
**wiped** [2] - 3599:4, 3599:19
**wire** [8] - 3592:22, 3592:24, 3594:10, 3604:9, 3604:14, 3606:10, 3692:13, 3740:21
**wired** [2] - 3592:23, 3594:3
**wiring** [2] - 3592:25, 3741:3
**wish** [2] - 3562:12, 3655:25
**withdraw** [3] - 3576:13, 3651:23, 3679:12
**withdrawal** [2] - 3665:11, 3734:17
**withdrawals** [5] - 3585:25, 3735:2, 3735:3, 3735:4, 3735:5
**withdrawn** [3] - 3585:6, 3611:9, 3627:9
**WITNESS** [14] - 3567:8, 3569:8, 3594:4, 3615:3, 3655:1, 3656:18, 3659:16, 3659:23, 3660:11, 3660:20, 3661:8, 3663:1, 3686:3, 3707:19
**witness** [34] - 3563:8, 3565:17, 3567:11, 3593:11, 3602:24, 3603:2, 3606:17, 3612:16, 3613:9, 3613:14, 3613:20, 3614:19, 3619:6, 3620:23, 3621:1, 3621:11, 3621:16, 3621:17, 3621:21, 3652:21, 3652:24, 3660:8, 3662:12, 3662:16, 3662:20, 3672:8, 3685:13, 3685:14, 3685:18,

3685:21, 3704:3, 3704:11, 3707:11, 3746:9
**witness'** [1] - 3621:9
**witness's** [1] - 3671:23
**WITNESSES** [1] - 3750:1
**witnesses** [7] - 3614:6, 3621:5, 3621:7, 3732:9, 3734:24, 3736:20, 3747:9
**won** [5] - 3576:20, 3576:21, 3593:2, 3594:19, 3595:14
**Wooley** [4] - 3572:24, 3573:2, 3573:5, 3573:10
**words** [8] - 3627:22, 3632:3, 3641:20, 3647:4, 3651:19, 3678:10, 3723:17, 3740:2
**workers** [1] - 3687:24
**workshops** [1] - 3617:22
**worried** [2] - 3563:20, 3745:1
**worry** [1] - 3694:9
**write** [8] - 3630:6, 3630:18, 3638:18, 3640:17, 3651:8, 3718:16, 3719:1, 3719:3
**writer** [2] - 3627:24, 3638:7
**writers** [1] - 3630:8
**writes** [5] - 3627:21, 3629:3, 3629:5, 3632:16, 3657:23
**writing** [28] - 3589:24, 3589:25, 3590:1, 3590:13, 3618:17, 3618:21, 3622:7, 3627:24, 3628:24, 3629:16, 3630:2, 3630:3, 3630:5, 3630:18, 3631:16, 3633:15, 3634:4, 3634:7, 3635:12, 3638:13, 3638:16, 3638:17, 3643:17, 3647:24, 3648:4
**written** [16] - 3570:17, 3622:9, 3624:1, 3630:10, 3634:18, 3637:11, 3638:21, 3639:1, 3640:15, 3650:21, 3658:17, 3718:17, 3719:4, 3739:11, 3742:3, 3742:9
**wrongdoing** [2] - 3581:19, 3735:25
**wrote** [2] - 3634:18, 3638:22

## Y

**year** [13] - 3575:9, 3581:11, 3616:16, 3616:19, 3623:25, 3624:1, 3624:8, 3686:15, 3702:4, 3702:7, 3705:25, 3706:16

**years** [15] - 3586:7, 3615:17, 3649:25, 3650:2, 3650:22, 3657:7, 3657:16, 3657:18, 3663:15, 3663:19, 3663:21, 3708:1, 3708:16, 3723:11, 3724:13
**yesterday** [7] - 3563:7, 3563:25, 3567:3, 3567:18, 3570:6, 3578:25, 3581:2, 3585:3, 3587:15, 3591:2, 3598:7, 3733:18
**YORK** [1] - 3558:1
**York** [16] - 3558:6, 3558:15, 3559:21, 3572:25, 3619:12, 3619:14, 3721:22, 3722:19, 3722:20, 3723:1, 3727:17, 3727:18, 3728:23, 3729:2, 3729:4, 3729:6
**yourself** [6] - 3578:9, 3579:24, 3582:10, 3590:10, 3680:7, 3695:11

## Z

**zero** [4] - 3596:21, 3598:22, 3598:23, 3598:24