3753

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                                    :
UNITED STATES OF AMERICA
                                         CR-13-607


        -against-              :
                                    United States Courthouse
                                    Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

      Defendants.          :
                                    June 15, 2015
- - - - - - - - - - - - - - X    9:30 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the Government:        KELLY T. CURRIE
                           Acting United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  JAMES MISKIEWICZ, ESQ.
                                SARITHA KOMATIREDDY, ESQ.
                           Assistant United States Attorney




For the Defendants:        HALEY, WEINBLATT & CALCAGNI
                           One Suffolk Square
                           1601 Veterans Memorial Highway
                           Islandia, NY  11749
                           BY: RICHARD HALEY, ESQ.
                           For Mr. Kenner

3754

For the Defendants:

                              LARUSSO & CONWAY
                              300 Old Country Road
                              Mineola, NY  11501
                              BY: ROBERT LARUSSO, ESQ.
                              For Mr. Constantine


                              ANDREW L. OLIVERAS, ESQ.
                              26 Strangford Court
                              Oceanside, NY  11572
                              For Mr. Constantine

Court Reporter:               Mary Ann Steiger
                              100 Federal Plaza
                              Central Islip, New York 11722
                              (631) 712-6101

          Proceedings recorded by mechanical stenography.
             Transcript produced by computer.

3755

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.

3          (Case called, appearances noted.)

4          THE COURT:  We're still waiting for some jurors.

5          MR. LARUSSO:  There's a couple of issues I would

6     like to address with the Court, if we could.

7          Rick, do you want to go first?

8          MS. KOMATIREDDY:  Before we begin, I want to

9     apprise the Court that my trial partner, Jim Miskiewicz,

10    is unavailable this morning.

11         We're currently in the midst of proffering Ron

12    Richards, and I expect that will take until at least

13    lunch.  We are ready to move forward though.

14         THE COURT:  Okay.

15         MR. HALEY:  Your Honor, I guess I would begin

16    with unfortunately what transpired over the weekend, and

17    it's no one's fault, but I need to set forth what

18    transpired as relates to our inability to transfer onto a

19    CD disk the exhibits that we intend on introducing in the

20    defense case.

21         What had occurred, as your Honor may recall, is

22    your Honor issued an order that allowed blank disks to go

23    to the facility with my client, to be delivered by the

24    U.S. Marshal Service to the facility, so Phil has the

25    opportunity over the weekend to go through that

3756

1  electronically stored information, convert it to the disk,

2  I would then have the disk available to me for the purpose

3  of printing out our defense exhibits, and indeed giving

4  the government advance notice of what we intended to

5  introduce upon the defense case.

6          What transpired, Judge, so the Court is at least

7  aware of my efforts, I met my client Friday morning at MDC

8  Brooklyn, got there relatively early so we could spend

9  enough time defining the scope of what we needed in terms

10  of the defense exhibits.

11          I thought we achieved a great deal in terms of

12  having a meeting of the minds as to what we needed for

13  purposes of the defense case.

14          I then left the facility with the belief that

15  the next day, Saturday, Phil would be then utilizing his

16  computer, with the blank disks we provided, to transfer

17  and download all those defense exhibits with the

18  understanding I would then return early Sunday morning,

19  simply be there briefly to pick up the disks, return to my

20  office on Sunday, print out all of the exhibits, have them

21  premarked so we can move the matter along, and I would

22  deliver the disks or the exhibits to the government Sunday

23  afternoon.  Indeed, Ms. Komatireddy and myself were to

24  physically come here and do that.

25          What occurred, Judge, and I don't think -- it's

3757

1    not a fault issue and wasn't deliberate, my client was

2    available 9:30 Saturday morning to go to the location

3    where the computer is stored and the disks and begin that

4    process.

5            He was advised that something was going on, I

6    imagine some security concern at the facility, and he was

7    unable to go at 9:30.

8            He then sought the balance of the day to get to

9    the location where his computer is stored, and despite his

10   best efforts it didn't happen.

11           Sunday morning when I saw him my thought was

12   that he would then leave my presence and be able to

13   accomplish that yesterday.

14           Judge, I can give you greater detail.

15           THE COURT:  Give me the bottom line.

16           MR. HALEY:  The bottom line is this, Judge.

17           He wasn't able, not through his efforts, he

18   stood at the door and I'll accept what he tells me at face

19   value, two-and-a-half hours to get to the location where

20   his computer is located to do this.  It didn't happen.

21           So we're not in a position, Judge, to begin the

22   defense case today by way of putting my client on the

23   stand.  I can't put him on the stand because in relatively

24   short order while on the stand I will begin to introduce

25   defense exhibits.

3758

1          And to further advise the Court, however,

2    insofar as we get to the defense case today, I did make

3    arrangements with Vincent Tesoiero to be here at one p.m.

4    I met with him on Saturday and he's assured me he will be

5    here.  We can begin the defense case in that regard.

6          Judge, I would like to be a problem solver, so

7    as relates to the issue in connection with the defense

8    exhibits, Phil has the computer here today with him.  He

9    has the blank disks.

10          If given an opportunity sometime today, and it

11    will take several hours, Judge, for him to sit down with

12    the computer and transfer this material onto the disks.

13          Other issues are going to come up in a moment I

14    believe that may cause us regrettably to have some delay

15    in the trial today.

16          If that happens, Judge, and Phil can physically

17    remain here to download that information onto the disks, I

18    would have it, I can hand it to the government today

19    before Phil is returned to the MDC Brooklyn, they can copy

20    it and we will be ready to hit the ground running tomorrow

21    with Phil Kenner's testimony.

22          I wanted to alert the Court to that issue.

23          THE COURT:  What's your issue, Mr. LaRusso?

24          MR. HALEY:  There's another issue, but we join

25    in this issue.

3759

1      MR. LARUSSO:  Your Honor, about ten days ago my

2  partner made a request in an e-mail for the charts and

3  summary documents that the government was going to be

4  using in this case. I think sometime last week I made a

5  request and I don't remember what day it was.  It was an

6  oral request to Mr. Miskiewicz.

7      On Thursday and Friday and Saturday, I could be

8  very candid with the Court, unfortunately most of my time

9  was spent on trying to resolve the Ron Richards situation

10  to see if we can enter into a stipulation.

11      In addition, my partner and I met for many hours

12  discussing our case and we have arranged for me to prepare

13  that witness on Sunday over the telephone so he would be

14  available Thursday.  That's the day that we're

15  anticipating based upon what projections we got from

16  Mr. Haley.

17      In the morning when I got in, I got in early, I

18  didn't look at my e-mails right away, but shortly

19  thereafter I began receiving a number of e-mails attaching

20  the charts.  I saw the first one, I downloaded it, it

21  didn't seem like it was much of a problem, and then I saw

22  a second one and third one and a fourth one and fifth one.

23      Judge, I can be candid with you.  I was a little

24  shaken.  I would like to hand up to the Court the summary

25  charts that I downloaded.  They're over an inch-and-a-half

3760

1    thick and hopefully the court can get an idea of where I'm

2    going with this.

3            May I, your Honor?

4            THE COURT:  Yes.

5            MR. LARUSSO:  The first one presented no problem

6    to me.  I've seen many before.  I'll make some arguments

7    as I was reviewing it.  Even the second document, which is

8    a two-page document outlining some of the disbursements

9    from the Global Settlement Fund.

10           But when I began to see the remainder of the

11   documents it was clear to me, Judge, that it was going to

12   take me an inordinate amount of time, one, to read; two,

13   to understand; and, three, to verify.

14           I have to indicate to the Court that I really

15   didn't get to really look at this until later in the

16   afternoon after I finished with Mr. Soroka and my partner

17   on the Ron Richards case.

18           I immediately then sent all these by e-mail to

19   my client so at least he would have an opportunity to

20   examine them.  Clearly, he got in sometime around 10:00,

21   11:00 last night flying in from Arizona.

22           Two things.  I haven't made a complete analysis,

23   but what I got from just looking at these, it's like the

24   Government's whole case from A to Z.

25           These aren't summary charts.  This is a detailed

3761

1    analysis of not only the bank records, but all of the

2    disbursements.

3            It's not the purpose of summary charts, Judge,

4    as far as I know, to review the government's entire case.

5    It's like a summation.  And it take hours to review all of

6    these documents.

7            Leaving that aside, that burden is on me to

8    complete that, but my obligation to my client, before I

9    cross-examine what I think is a very critical witness, the

10   last two witnesses, everyone knows that summary witnesses

11   bring the evidence together in a clear focus for the jury.

12           And, yes, it is admissible to some extent, but

13   not admissible in the sense of being a summation.  I don't

14   think that's what the purpose of Rule 1006 was designed

15   for.

16           So I apologize to the Court.  I have not had the

17   time to sit down with my client and review this and

18   prepare a proper cross-examination.

19           Again, unlike Mr. Haley, I don't want to create

20   a problem for the Court.  I know how difficult it's been

21   to put this case before the jury in as short a time as

22   possible.  We extended ourselves beyond our projections.

23           I'm not asking for a week, I'm asking for an

24   opportunity to sit down with my client sometime today to

25   review these so I can properly address it when it's

3762

1    presented in the courtroom.

2           That's my position, Judge, in that regard.

3           MR. HALEY:  Your Honor, may I complete the

4    record in that regard?

5           THE COURT:  Yes.

6           MR. HALEY:  Only insofar as my client is

7    concerned, I, 15 minutes ago, gave him what your Honor has

8    right now, that inch-and-a-half compilation of summary

9    charts.

10          He hasn't had an opportunity to look at those.

11   He's had 20 minutes to look at those documents.  I do

12   know, looking at some of the documents, based upon my

13   awareness of some of the evidence, there are errors in

14   those which obviously for purposes of cross-examination,

15   cross-examining a witness who is going to put in a summary

16   chart claiming this is what the record reflects, I would

17   like the opportunity to point out to the jury that he

18   neglected to report other aspects of his analysis; and,

19   indeed, that would undermine his credibility, undermine

20   the usefulness of the summary charts.

21          It is impossible for me at this 11th hour, 11th

22   hour and 59 minutes, if you will, Judge, to have the

23   opportunity to sit down with my client in order to fathom

24   and fashion an effective cross-examination with reference

25   to those charts.

3763

1          My position, Judge, is this.

2          As the Court is well aware, my client was

3    arrested in November of 2013.  The government has had 20

4    months to produce charts of that nature before yesterday.

5          Now they were, according to my e-mail service,

6    e-mailed to me yesterday morning.  As I indicated, I was

7    at MDC Brooklyn in the morning.  I did see them in the

8    afternoon.  They have been printed out.

9          It is from my perspective, Judge, and, again,

10   not to sound dramatic, almost a Sixth Amendment concern

11   because I don't know how I can provide effective

12   assistance of counsel when I'm given these documents at

13   this late date to discuss with my client which, of course,

14   the tension we now have is no one wants to delay the case.

15         I'm looking to move forward with my defense.  I

16   need time to, as I indicated a moment ago, sit down with

17   my client and isolate the defense exhibits.

18         So from my perspective, Judge, I need to create

19   a record as far as that's concerned.

20         There's another matter I need to bring to the

21   attention of the Court, and that is I do know two

22   individuals have entered the courtroom.  It is a public

23   courtroom.  It's John Kaiser and Mr. Rizzi, both of whom

24   have previously testified in this case.

25         I anticipate that today there will be a defense

3764

1   witness and indeed Phil Kenner will be on the witness

2   stand this week.

3           And based upon his testimony, the government may

4   see fit to call either of those witnesses in rebuttal.

5           So as potential government witnesses, Judge, I

6   would respectfully request that either they be directed

7   not to sit through these proceedings; or, if they are

8   permitted to sit through the proceedings, there's a

9   concession by the government that they will not be

10  entitled to be called as rebuttal witnesses.

11          THE COURT:  Okay.

12          Let me ask the government, other than the

13  summary chart witnesses today, who do you have,

14  Mr. Richards, and who else do you have?

15          MS. KOMATIREDDY:  That's it for today,

16  Mr. Petrellese, who is the forensic accountant, Special

17  Agent Josh Wayne who will be putting in the flowcharts,

18  and Mr. Richards who is currently in a proffer.

19          Let me provide information that I think will

20  ease things to everyone.

21          First of all, Mr. LaRusso indicated that with

22  respect to the flowcharts and the two-page list of GSF

23  expenditures, those did not present a problem.

24          Indeed, those charts are all based on discovery

25  that was handed over a long time ago in this case.  As the

3765

1    Court is well aware, we started discovery in January 2014.

2           All of that information is based on information

3    that has since come into the record at trial, and is a

4    summary of evidence now in the record at trial.

5           We have also put together binders that correlate

6    with each flowchart.  I'm happy to make those available to

7    counsel if they want to take some time to review it.  The

8    binders indicate every documentary backup for each one of

9    these flowcharts, and I think that might make it easier.

10          We do intend to introduce the binders as

11   evidence as well to assist given the huge volume of

12   records in this case.  The purpose of both the flowcharts

13   and the binders is to enable the jury to navigate the

14   evidence more easily.

15          Second, with respect to the spreadsheets, those

16   are merely summaries of bank accounts.  They take years of

17   bank records and make them into ledgers that are Excel

18   spreadsheets.  They don't involve extra analysis other

19   than to summarize information already in the bank account.

20          Now, all those bank records have also been

21   turned over for quite some time now.

22          I thought that explanation may assist in any

23   cross-examination the defense may plan.

24          Finally, with respect to the witnesses in the

25   courtroom, Mr. Kaiser is a victim in this case and,

3766

1    therefore, he has a right to be here.

2              With respect to any potential role as a redirect

3    witness, the Second Circuit law on this is that presence

4    in this courtroom is not an automatic bar to future

5    testimony.  Any prejudice can be cured by proper

6    cross-examination as to what the witness heard and a

7    limiting instruction by the Court.

8              MR. HALEY:  May I address the last issue first?

9              THE COURT:  Yes.

10             MR. HALEY:  Frankly, Judge, I'm unfamiliar with

11   the Second Circuit law in that regard.  I suspect it

12   nevertheless as courts always do --

13             THE COURT:  I'm not familiar with that either.

14   I want the government to give me that case that says that

15   a Court has no right to exclude a victim from trial.

16             MS. KOMATIREDDY:  Not no right.  I'm happy to

17   give you the citation at a break, I'll run downstairs and

18   get it, it's certainly within the Court's discretion.  My

19   only argument is that it's not mandatory.

20             THE COURT:  Then in my discretion, my discretion

21   is as follows:

22             That anyone who is a potential witness in the

23   case, should not be in the courtroom.

24             If the government would represent that they're

25   not calling Mr. Kaiser and Mr. Rizzi in a rebuttal case,

3767

1    I'm more than happy to have them stay.  If you're not

2    willing to do that, then in my discretion I don't think

3    they should sit here and hear Mr. Kenner's testimony.

4           I think the most important thing in a trial is

5    arriving at the truth, and obviously witnesses hearing

6    what other witnesses are saying can compromise that.

7           So although he obviously has a right to be in

8    the courtroom as a victim, I believe the fundamental right

9    to due process trumps that in these types of situations.

10          So if you're not sure you're calling him as a

11   rebuttal witness, I'll ask that he not stay in the

12   courtroom.

13          MS. KOMATIREDDY:  Understood, your Honor.

14          THE COURT:  Does Mr. Rizzi fall in the same

15   category?

16          MS. KOMATIREDDY:  Mr. Rizzi is not a witness in

17   this case.

18          THE COURT:  Okay.

19          MR. LARUSSO:  Your Honor, can I address

20   Mr. Rizzi?

21          As the Court knows, we have been trying to make

22   or present evidence that my client offered Mr. Rizzi and

23   others their money back.

24          And I'll be honest with the Court, I haven't

25   made a decision what to do with Mr. Rizzi, whether to call

3768

1    him and confront him with his presence at the meeting on

2    the taped conversation.  I cannot represent to the Court

3    that I intend to call him.  I don't know at this point.

4    It depends on how my case goes and whether I think it's

5    relevant.

6          As to Mr. Kaiser, I don't intend to call him.

7    But Mr. Rizzi I can't make that representation.

8          THE COURT:  Mr. Rizzi and Mr. Kaiser, I'll ask

9    that you not sit during the trial.  I apologize that you

10   came here today.  Obviously once the evidence is completed

11   you're more than free to come to the summations.

12         And as you heard, I think it's very important

13   that potential witnesses not sit in the courtroom and hear

14   other people's testimony.  So I apologize that you came

15   here today, but I'll ask that you not stay, okay?

16         Thank you.

17         MR. HALEY:  Your Honor, may I make this

18   suggestion.

19         It strikes me, Judge, that no one in this

20   courtroom, not the government, nor the defense, looks to

21   delay this trial.  I believe we have had issues, but

22   everyone is trying to act diligently, and so if I may make

23   this suggestion, Judge.

24         If I have the opportunity today with my client

25   to complete the download of the defense exhibits on the

3769

1    disk, as well as today to discuss with him the summary

2    charts and flowcharts while he's here present in this

3    courthouse, I'll spend as much time as the marshal service

4    permits me until they have to take him back this afternoon

5    to do that.

6           It strikes me, Judge, that from my perspective

7    then my position with reference to not having sufficient

8    time would be eliminated.  I would then feel comfortable

9    in terms of my obligations to my client going forward.

10          What we can do, Judge, is depending upon the

11   application made tomorrow, your Honor will then render a

12   decision.  My argument that I didn't have sufficient time

13   would be eliminated.  Your Honor could make a

14   determination as to the admissibility of those charts.

15   The government can put on those two witnesses which would

16   be I assume relatively brief; is that correct?

17          MS. KOMATIREDDY:  I expect Mr. Petrellese to

18   take approximately 30 minutes and Special Agent Wayne

19   another 40 minutes.  Relatively brief.

20          MR. HALEY:  So we would then have an opportunity

21   for the government to conclude its case tomorrow, Judge.

22   I would then commence my defense case.

23          The only issue is Mr. Tesoiero.  I have no

24   problem -- may I have a quick moment with my client?

25          THE COURT:  Yes.

3770

1           (Pause in proceedings.)

2           MR. HALEY:  It's kind of unusual.  I know

3   Mr. Tesoiero is available both today and tomorrow.  He's

4   retired.  I met with him on Saturday.

5           It would be my preference that the government

6   conclude its case before Mr. Tesoiero is on the witness

7   stand.  He's scheduled to come today, but he's not

8   scheduled to come until one p.m.

9           The suggestion, Judge, is obviously one that no

10  one sees as a perfect solution, that perhaps the jury be

11  advised that there are matters -- I leave it up to the

12  Court.  That's my thought on that.

13          THE COURT:  I have to say several things.

14          First of all, I know no one wants to delay the

15  trial.

16          But the government should not be producing this

17  amount of charts on a weekend before these witnesses are

18  to testify.

19          It's not a reasonable expectation for the

20  government to believe the defense attorney is going to

21  have time to review and verify the information in these

22  charts.

23          The charts should go over to them way in

24  advance.  These are very detailed charts.  If it was one

25  chart, it would be one thing.  I'm glad you have the

3771

1    backup for them to review it.  There's no way this should

2    wait until the Sunday before the trial, so I'm not going

3    to make them cross witnesses for these charts.  Their

4    objection to that is I think well-founded.

5           In the future I want the government to know

6    that's not an acceptable time period with respect to this

7    level of detail; do you understand that?

8           MS. KOMATIREDDY:  Yes, sir.

9           THE COURT:  The second thing is these are very

10   short witnesses.  I don't mind putting them off until

11   tomorrow morning for the reasons defense counsel talked

12   about, but we also have Mr. Richards in the building and I

13   don't want to have him tomorrow too.  That could be the

14   whole day tomorrow if we have all these issues with

15   Mr. Richards tomorrow morning.

16          Mr. Richards, who is supposed to be on the

17   witness stand this morning, is being proffered downstairs

18   with I don't know to what end.  I don't know what that is

19   going to result in.  We have him tomorrow as well, which

20   is not a good situation.

21          We're essentially wasting a day with no

22   assurance to me that we're going to get to the defense

23   case in short order tomorrow morning.

24          So what's going on with respect to Mr. Richards,

25   why is he being proffered this morning?  I don't

3772

1   understand that.

2           MS. KOMATIREDDY:  Your Honor, we expect to have

3   Mr. Richards on the stand this morning.

4           His counsel approached us this morning at

5   approximately 8:30 and asked to meet with us.  They met

6   with Mr. Miskiewicz.  And they're in a room downstairs.

7   That's as much as I can tell you since I came up shortly

8   afterwards.

9           THE COURT:  What happened over the weekend?  Why

10  wasn't there dialogue over the weekend with Mr. LaPinta

11  and his client?  Why is this happening now?  What happened

12  over the weekend?

13          MR. LARUSSO:  Their point of view I can't speak

14  to, but I can speak as to my involvement with Mr. LaPinta

15  and Mr. Soroka.

16          They have been working -- we left Court Thursday

17  and we sat in there for an hour-and-a-half with the

18  government and we outlined what the government wanted by

19  way of stipulation.  It was a very productive meeting.

20          Then I know there was a lot of time on Friday

21  between all parties trying to work up a stipulation.  I'm

22  not sure when we prepared a stipulation.  I won't go into

23  it, Judge.  I want the Court to understand both sides

24  worked diligently.  I thought we had it.

25          THE COURT:  Do we have it or not have a

3773

1    stipulation?

2          MR. LARUSSO:  We're at a point, Judge, where

3    there are one or two points that need clarification.  I'm

4    hoping this proffer resolves it, because it's our

5    stipulation.  It's Mr. Constantine's stipulation.  It's

6    not Mr. Richards' stipulation.

7          We're willing to go at least partway in terms of

8    authorizing the government, but we put in a stipulation

9    that he's authorized Mr. Richards to disperse all the

10   monies listed in the chart, but there are other concerns

11   that the government is trying to resolve and I think

12   that's the purpose of the proffer, so they understand what

13   happened and then can stipulate to a factual rendition

14   that we're willing to do.

15         I would like to say we're almost there, but I

16   can't make that representation.  I'm not party to the

17   meeting.

18         THE COURT:  If I send the jury home, what's

19   going to happen to Mr. Richards?  I don't know what his

20   availability is tomorrow.  Does he and his counsel know

21   I'm about to send the jury home and he has to come back

22   tomorrow and testify?

23         MR. LARUSSO:  I don't think he's aware of that.

24         THE COURT:  This is all well and good.  I'm not

25   comfortable with the situation as it is.  You need to

3774

1   speak to Mr. Miskiewicz and find out what's going on.

2          MS. KOMATIREDDY:  If I may have five minutes, I

3   can go downstairs and check on the proffer.

4          My understanding from the weekend was there were

5   several drafts of the stipulation going back and forth.

6   We posed questions and asked for further clarification and

7   did not get that clarification.  So in our view it wasn't

8   sufficient.

9          His counsel came in this morning and asked for a

10  meeting with us under proffer agreement.  I can go

11  downstairs, get an update for the Court and return in 10

12  minutes if that's agreeable.

13         THE COURT:  Let's take a 15 minute break.

14         MR. HALEY:  Your Honor, may my client remain in

15  the courtroom?

16         THE COURT:  Yes, if the marshals could continue

17  to have him work.

18         (Recess taken.)

19         (After recess.)

20         THE COURT:  Please be seated.

21         Does the government want to update the Court?

22         MR. MISKIEWICZ:  We have Mr. Richards in the

23  building.  He is prepared to testify.

24         I think, I'm certainly confident that the

25  questions were going to pose to him are not going to

3775

1    broach any attorney/client privilege.  They will be purely

2    about accounting aspects of the Global Settlement Fund.

3          I need about an hour just to make sure that any

4    of the material that would arguably constitute 3500

5    material has been produced to the defense.  There's going

6    to be one or two pieces of Giglio material, and then I can

7    put him on the stand.  So that would be right before or

8    right after the lunch break, whichever the Court prefers.

9          THE COURT:  I just want to make sure, does

10   Mr. LaPinta -- he was very concerned last week.  He's not

11   concerned any longer?

12         MR. MISKIEWICZ:  Mr. LaPinta and Mr. Soroka were

13   in the room when I went through the proposed questions

14   just a while ago.

15         As you may have heard, our ability to work out a

16   stipulation didn't succeed, no fault of anybody's, but we

17   worked hard throughout the weekend and we couldn't.

18         He's prepared I think to permit his client to

19   testify to -- both men are prepared to permit their client

20   to testify along the lines of what we went through.

21         MR. LARUSSO:  Your Honor, obviously, I would

22   like to look at the 3500 and we will be ready to examine

23   him whenever they complete the direct.

24         My only concern, Judge, is that during his

25   testimony he does not invoke a privilege in front of the

3776

1    jury.  I'm just concerned there may be some kind of

2    adverse inference they may draw from it.  If we could work

3    it out beforehand, I would like to do that.  I would

4    hopefully speak to him to make sure that might not occur.

5              THE COURT:  The other thing is, and I didn't

6    raise this with Mr. LaPinta, but as relates to your

7    client, the privilege is your client's so he shouldn't be

8    invoking any privilege to protect Mr. Constantine unless

9    you want him to invoke a privilege.  He has no right to

10   say this would disclose a privileged communication with

11   Mr. Constantine.

12             I would suggest that you review the 3500

13   material, have a discussion with Mr. LaPinta before his

14   client takes the stand, and I want Mr. LaPinta -- he'll be

15   up here I'm sure.

16             MR. MISKIEWICZ:  They're all in the building.

17             THE COURT:  I'll speak to Mr. LaPinta briefly to

18   address that concern as well.

19             Let's reconvene at 11:45.

20             MR. MISKIEWICZ:  For the record, the 3500

21   material I'm referring to are documents that were turned

22   over in Rule 16.

23             So we all have the same universe of documents,

24   these are conflict letters that Mr. Richards sent out to

25   people like the Pecas and others years ago.

3777

1          We have, to the extent there were statements he

2     made to the California bar, those have been summarized in

3     our original motion.  It's not like there's FBI 302's or

4     notes.

5          I think I have one page of notes constituting

6     basically numbers just to make sure I understand what the

7     numbers were.  So it's not voluminous 3500 material or for

8     that matter anything they haven't already seen.

9          MR. LARUSSO:  I don't think it will take that

10     long.  I need 10 or 15 minutes.

11          THE COURT:  Why do we need an hour then?

12          MR. MISKIEWICZ:  I want to have a paralegal copy

13     the material, slap on an exhibit sticker and make sure

14     we're covered.  Maybe I can do it in less than an hour.

15          THE COURT:  Let's say 11:30.

16          MR. MISKIEWICZ:  Fine.

17          THE COURT:  All right.

18          MR. LARUSSO:  Thank you, Judge.

19          MR. HALEY:  Thank you, Judge.

20          (Recess taken.)

21          (After recess.)

22

23

24

25

3778

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.

3          Are we ready to go?

4          MR. MISKIEWICZ:  We are.

5          I believe Mr. LaPinta was just here.  He wanted

6   to have on the record that the Court has made a decision

7   regarding the attorney/client privilege issue pertaining

8   to what we anticipate we're going to elicit.

9          THE COURT:  Yes.  Do you know where he is?

10          MR. MISKIEWICZ:  He was with Mr. LaRusso.

11          MR. LARUSSO:  He's probably right outside.  I'll

12   get him, Judge.

13          (Pause in proceedings.)

14          THE COURT:  Good afternoon, Mr. LaPinta.

15          MR. LAPINTA:  Good afternoon, your Honor.

16          THE COURT:  I understand you're working with the

17   lawyers to try to focus what the anticipated testimony

18   would be, correct?

19          MR. LAPINTA:  We've been working hard and long

20   since I last saw you, and we're prepared to go forward at

21   this juncture.

22          There's not a stipulation that was able to be

23   reached.  However, we're moving forward.  Mr. Richards is

24   present.  He's ready, able and willing to take the witness

25   stand.

3779

1       Before he does so though, I would like a ruling

2   from the Court on my motion to quash the subpoena based on

3   the privilege issue because we discussed crime fraud

4   exception but there was no ruling.

5       THE COURT:  I know Mr. LaRusso is going to talk

6   to you.  He wanted to avoid any implication of privilege

7   while your client was on the stand.

8       Mr. LaRusso, have you had a chance to talk to

9   Mr. LaPinta?

10      MR. LARUSSO:  That's one thing I forgot and I

11  apologize to the Court.

12      (Pause in proceedings.)

13      MR. LARUSSO:  Just one moment, please.

14      (Pause in proceedings.)

15      MR. LARUSSO:  Your Honor, could we have a brief

16  sidebar with everybody?

17      THE COURT:  Yes.

18      (Continued on next page.)

19

20

21

22

23

24

25

3780

1          (The following takes place at sidebar.)

2          MR. LARUSSO:  I just want to let the Court know

3   what I did.

4          I spoke with Mr. LaPinta.  We discussed legal

5   requirements.  I've got to talk to my client.  He's

6   waiving for the limited purposes of any discussion about

7   the trust account, but he doesn't want an open privilege

8   allowing any kind of conversations.

9          He's advised me for purposes of his testimony

10  regarding the trust accounts and litigations that were

11  paid for, he's willing to waive it on that limited basis.

12         MR. LAPINTA:  This is the problem with that.

13  That resolves it regarding your client.  However, there

14  are a number of clients, the monies of which were

15  deposited into the account absent your ruling on crime

16  fraud.

17         THE COURT:  First of all, I'm uncomfortable

18  having a sidebar about this.  I think this should be in

19  open court.  There's no jury here.  I thought you had to

20  raise something else.  Let's do it in open court.

21         (Continued on next page.)

22

23

24

25

3781

1      (The following takes place in open court.)

2      THE COURT:  So, Mr. LaPinta, Mr. LaRusso's

3 position is that his client is willing to waive any

4 privilege that would exist with respect to the trust

5 account and the use of the monies in that account.

6      MR. LARUSSO:  In regards to that; yes, your

7 Honor.  I've spoken with my client and that's our position

8 right now in regards to waiving privilege for that limited

9 purpose.

10      THE COURT:  Let me close the loop.  If you want

11 to bring your client in for a minute, I'm happy to have

12 him hear this as well.

13      Do you think it would be helpful?

14      MR. LAPINTA:  Yes, I do.

15      THE COURT:  Good afternoon, Mr. Richards.

16      MR. RICHARDS:  Good afternoon, your Honor.

17      THE COURT:  I appreciate you -- I know you spent

18 several hours working with the lawyers trying to resolve

19 whatever issue may exist with respect to your testimony,

20 but I want to make clear, so you understand what my ruling

21 is, and we can hopefully avoid any issues as you're

22 testifying.

23      First of all, it's my ruling -- and I'm not

24 going to place the cases on the record because I have a

25 jury waiting several hours now.  I'll do that later today

3782

1    or tomorrow.

2          But it's my ruling that the identity of the

3    clients with respect to the trust account and the

4    transactions themselves are not privilege, absent some

5    special circumstances that I'm not aware of, where

6    discussing the transaction itself would reveal

7    communication by a client.

8          So absent that, it's my ruling that the client

9    identification and the fees relating to the matter that

10   you're representing the client on is not privilege.

11         And specifically as relates to conversations you

12   had with Mr. Constantine, it's my ruling that the crime

13   fraud exception would apply with respect to any

14   instructions Mr. Constantine gave you regarding that

15   account, how it should be managed, who should be paid, the

16   crime fraud exception covers those communications with

17   him.

18         In addition, Mr. LaRusso just put on the record

19   that his client waives any privilege with respect to the

20   trust accounts and the communications regarding the monies

21   allocated in the trust account as relates to it.  So there

22   is no issue.

23         The privilege belongs to Mr. Constantine.  So

24   you shouldn't, during your testimony, to the extent you

25   get any question where you're concerned that the

3783

1    privilege, that some type of privilege with respect to

2    Mr. Constantine might be violated, Mr. LaRusso can ask me

3    for a sidebar if he thinks this falls outside the crime

4    fraud exception or outside what his client is waiving.

5           You shouldn't sit up there invoking the

6    privilege on behalf of Mr. Constantine.

7           If the government, or any lawyer, asks you a

8    question about some transaction in that trust fund that

9    relates to another hockey player or another client, and

10   you're concerned that the transaction itself will reveal

11   confidential communication, then you can ask for a sidebar

12   on that.

13          I'm hoping that doesn't happen.  That's what I

14   was hoping was accomplished or settled during the hours

15   that you have been working with them.

16          That's the only thing I think you should be

17   raising at this point, okay?  Is that clear?

18          MR. LAPINTA:  We're both clear.

19          Thank you.

20          MR. MISKIEWICZ:  Something has just come up.

21          I was just handed by Mr. LaRusso a letter from

22   Mr. Richards to his then clients, the defendants, which in

23   effect I think would be a communication related to the

24   Jowdy lawsuit and why it was dismissed and under what

25   circumstances.

3784

1          Now, if he is waiving privilege for the limited

2   purpose of fees and the accounting aspects that are part

3   of the motion and the Court's ruling, that's fine.

4          But he should not be permitted to then

5   selectively open, and I think the case law is clear, you

6   can't use privilege as both a shield and a sword, get

7   certain things in here, not get other things that he's not

8   waived.

9          For instance, we are aware that there were a

10  great many of other communications and we also suspect

11  there are a great many other communications about why

12  hockey player plaintiffs in the Jowdy suit were not called

13  for depositions.

14          From our point of view it's because the whole

15  Jowdy lawsuit would crumble once they were exposed to

16  documentation outside of the control of these two

17  defendants.

18          We didn't seek that documentation, we're not

19  looking to pierce those communications between

20  Mr. Richards and his former clients.

21          But it appears now that Mr. LaRusso wants to

22  selectively do just that.  If he's going to do that, then

23  I would suggest that he can recall Mr. Richards on his

24  case if he wants to do that and also produce for us, with

25  his client's waiver of any privilege, all the

3785

1   communications that went into -- we're aware of some of

2   them -- we can't let these guys see the inside of a court

3   because this letter is not the full story of --

4           THE COURT:  Mr. LaRusso, if you're going to

5   start selectively introducing other communications

6   between -- I understood his testimony to be limited to

7   this account.

8           If you're going to start getting into other

9   communications regarding the substance of the lawsuit, you

10  are opening up the privilege not just to communications

11  regarding the account, but all communications that they

12  had regarding the merits to that lawsuit, problems with

13  that lawsuit, whether it had any merit whatsoever, the

14  availability to hockey players, all of those things would

15  be fair game for the government and all communications,

16  e-mails, letters, whatever it might be that relates to

17  that topic will have to be provided by Mr. Richards to the

18  government, not just one.

19          So I'm a little surprised to hear that you're

20  seeking to use Mr. Richards for those purpose too.  That's

21  a different can of warms.

22          MR. LARUSSO:  You may recall the government has

23  made it clear through their examination of the hockey

24  players that the reason this lawsuit was dismissed was

25  false or did not have a justifiable basis.

3786

1          I think Mr. Berard and one other hockey player

2     said, oh, I'm retired.  I could have testified at a

3     deposition.

4          But that's not the case, Judge.  What that

5     letter discloses is the true reason behind the dismissal.

6     It was part of an overall strategy, and the fact that

7     there were other hockey players playing in the Olympics,

8     and because the Judge had ordered the depositions at a

9     very expedited scheduling to take place at a particular

10    time that these hockey players weren't available, the

11    government is misleading this jury as to what transpired.

12          THE COURT:  Maybe you misheard me.  I didn't say

13    you couldn't do it, okay?  I just said that you have to

14    understand that if you do that, then I'm going to tell

15    Mr. Richards that he has to have someone in his office

16    produce all communications related between him and your

17    client regarding the merits of the underlying lawsuit so

18    the government could have potentially another e-mail where

19    Mr. Richards may have told your client none of the hockey

20    players are available, the case would crumble.  I don't

21    know if those e-mails exists.  I'm telling you so you do

22    this with open eyes.  If you introduce that letter, then

23    that's what Mr. Richards is going to have to do.

24          MR. LARUSSO:  First of all, the letter is not to

25    Mr. Constantine.  The letter is to the clients, the hockey

3787

1   players, who the government is relying upon to create a

2   false impression for the dismissal of the suit.

3            Secondly, this letter was circulated.  I believe

4   it went through Mr. Kaiser.  I forget exactly who the

5   parties were.

6            This is not a privileged communication anymore.

7   This was disclosed by the hockey players to whomever they

8   were aligned with at some point.  I don't know the answer.

9            This didn't come to me by way of a privileged

10  communication and you shouldn't disclose it.  It came to

11  me by way of the public arena.  I know Mr. Kaiser had it.

12  This is not Mr. Constantine's communication.

13           THE COURT:  I misunderstood.  I thought this

14  was.

15           MR. LARUSSO:  No, it's --

16           MR. MISKIEWICZ:  This is a letter.  It's not

17  even really.  It just says dear Jowdy lawsuit plaintiffs/

18  clients, which we're aware could have gone to the Pecas or

19  whoever, but also we are aware of internal communications

20  because they have been provided.

21           There was plenty of other communications shared

22  with victims by one or the other defendants at the time

23  either because of the Stolper lawsuit, and it's those

24  communications which really underlie -- this is the public

25  phase.

3788

1     There are lots of other communications

2 particularly between Kenner and Constantine and

3 Mr. Richards about the disaster and how idiotic they're

4 going to look if they have to dismiss the lawsuit, and at

5 the same time how they, for tactical reasons, can't

6 possibly allow these people to see the inside of a

7 courtroom.

8          THE COURT:  Where are those communications that

9 you say exist?

10          MR. MISKIEWICZ:  Some of them have been provided

11 in the Stolper lawsuit or shared by Kenner in his earlier

12 lawsuit, the one he was adverse to Mr. Constantine and we

13 have many copies.  They were exhibits in Court documents.

14          THE COURT:  Are they from Mr. Richards?

15          MR. MISKIEWICZ:  They are e-mail communications

16 between Kenner, Richards and Constantine.  They're like a

17 three-way communication.  And I would assume that is the

18 attorney/client relationship, those communications.

19          To say, oh, well, you can see this, but you

20 can't see what we really were thinking is again exactly

21 what Mr. LaRusso is trying to do by way of selectively

22 showing the public phase, but then wants to invoke the

23 privilege or I assume his client wants to invoke the

24 privilege about other matters.

25          Again, we had no desire to go through this.  We

3789

1    didn't subpoena those records for Mr. Richards.  We would

2    argue that they are -- I would seek to subpoena them from

3    the defendant.  We know he has them.

4         We're not saying that -- perhaps this isn't the

5    defense.  If they want to go down this path, it's up to

6    them.  We're not prepared.

7         This is really essentially sandbagging us.  We

8    did not proffer Mr. Richards for anything beyond what we

9    have said we wanted to elicit from him because he has the

10   privilege.

11        Now at the last minute to say, okay, the

12   privilege is gone for the limited purposes that we want to

13   use it for is basically sandbagging the government.  If

14   they want to call him, they should call him on their case.

15        MR. LARUSSO:  The point is clear here.

16        The Government is claiming they're being

17   sandbagged.  They're the ones that raised the issue before

18   this jury that this particular representation was shallow,

19   that the hockey players were deceived into spending money

20   for a lawsuit that really was going no place.

21        The lawyer who represented these individuals is

22   communicating with them and he's not communicating with my

23   client and he -- I wish the Court would look at this.

24   This is the lawyer who represents them giving them the

25   opportunity to understand the strategy.

3790

1        THE COURT:  Mr. LaRusso, why wouldn't it also be

2   relevant, given that you're going to put this before the

3   jury, to say this is what everybody understood the

4   strategy was.  If in fact there was another e-mail between

5   your client and Mr. Richards which would suggest a host of

6   different reasons, wouldn't that be misleading to the

7   jury?

8        MR. LARUSSO:  If I had them, I probably wouldn't

9   be offering this at this point.  I don't have those

10  e-mails, Judge.

11       THE COURT:  All I'm saying to you is you keep

12  telling my why it's important and I keep telling you

13  that's fine.

14       What I'm telling you is that it's my view you

15  would be opening up -- even if it's not to

16  Mr. Constantine, by suggesting this to the jury and

17  putting this into play in front of the jury by holding up

18  that letter to the jury in your summation and suggesting,

19  as you want to, that this is the reason that the lawsuit

20  was dismissed, this is what my client understood the

21  reason that the lawsuit was dismissed, that fact there are

22  communications that reflect a different understanding

23  between Mr. Richards and your client regarding the merits

24  of the lawsuit, that you're opening up the privilege to

25  that.  That's all I'm telling you.  Do you understand

3791

1    that?

2            MR. LARUSSO:  I do, your Honor.

3            THE COURT:  As far as the sandbagging and

4    recalling Mr. Richards, I'm not going to do that.

5            The government -- I'm going to go back to the

6    delay we have had here today where it's now 12:18, where

7    charts were dumped on the defense lawyers yesterday.  We

8    had the whole morning.  I'm not faulting Mr. Richards.

9    He's available.  The fact we wasted all this time is not

10   good and was avoidable, so I'm going to allow him to cross

11   him on that letter.

12           We will have a discussion about having a

13   subpoena going to Mr. Richards to produce e-mails between

14   him and Mr. Constantine regarding the lawsuit.  Maybe

15   Mr. Kenner as well if Mr. Haley pursues this as well.  And

16   if need be then the government can call him in their

17   rebuttal case, whatever they want to do.  I'm not going to

18   prohibit Mr. LaRusso from raising this in the cross given

19   where we are in this trial, okay?

20           MR. LARUSSO:  Your Honor, I understand the

21   Court's ruling.  I would hope that we have the same right

22   the government did when talking to the hockey players to

23   elicit the information that they elicited.  That's all I'm

24   asking.

25           THE COURT:  What is it?

3792

1       MR. LARUSSO:  From the hockey players.  Let's

2   say we call hockey players to discuss this aspect.

3       THE COURT:  For whatever reason this has been

4   discussed with numerous witnesses so I don't know what

5   you're asking me for.

6       MR. LARUSSO:  I understand.

7       THE COURT:  I don't believe it's a central issue

8   in the case, but that's been true for a lot of things we

9   spent a lot of time on.

10      MR. LARUSSO:  We're not going to use that on

11  cross at this point.  We're not going to use it that

12  letter.

13      THE COURT:  Okay.  We're going to bring the jury

14  in now.  How long is the direct?

15      MR. MISKIEWICZ:  Probably 20 to 30 minutes long.

16      THE COURT:  Okay.  How long do you anticipate

17  the cross is to be, Mr. Haley, and Mr. LaRusso, how long

18  do you think cross will be?

19      MR. LARUSSO:  Half hour maybe, Judge.

20      MR. HALEY:  I expect mine to be less than that,

21  Judge.

22      THE COURT:  Okay.

23      MR. LARUSSO:  Your Honor, before the jury comes

24  out, I was just advised that the government actually had a

25  copy of that Exhibit C 203.  It's on transcript page 3578.

3793

1    I showed it to Mr. Peca -- Mr. Murray and he couldn't

2    identify that document.  They had a copy of it.  We didn't

3    spring it on them.  A lot goes on during a trial.  I

4    forgot about it and I'm sure the government did too.

5           THE CLERK: All rise.

6           (The jury is present.)

7           THE COURT:  Please be seated.

8           Good afternoon, members of the jury.

9           I apologize for the long delay this morning.

10   The good news is that as a result of me working with the

11   lawyers this morning, I think we're actually going to

12   shorten the time you have to be here today.  I don't want

13   to promise this, but maybe you'll get out earlier today.

14   Even though you had to wait a long time, in the long run

15   it will save time today.

16          So the government is now going to call its next

17   witness and I'll ask them to do that now.

18          MR. MISKIEWICZ:  The government calls Ronald

19   Richards.

20          THE COURT:  Mr. Richards, if you could step

21   forward to the witness stand over here and remain standing

22   for the oath.

23

24

25

Richards - Direct/Miskiewicz

3794

1  RONALD RICHARDS,

2              called as a witness, having been first

3              duly sworn, was examined and testified

4              as follows:

5

6              THE COURT:  Please state your name and spell

7  your last name for the record.

8              THE WITNESS:  Ronald Richards, R-I-C-H-A-R-D-S.

9              THE COURT:  As you're doing there, Mr. Richards,

10  stay close to the mike and keep your voice up.

11              Okay, Mr. Miskiewicz.

12              MR. MISKIEWICZ:  Thank you, your Honor.

13

14  DIRECT EXAMINATION

15  BY MR. MISKIEWICZ:

16  Q.    Good morning, Mr. Richards.

17  A.    Good morning.

18  Q.    Mr. Richards, what do you for a living?

19  A.    I'm an attorney licensed in the State of California

20  and a member of various bars of various courts across the

21  United States.

22  Q.    How long have you been an attorney?

23  A.    Since June 1st, 1995.

24  Q.    Are you familiar with the two defendants in this

25  case, Phillip Kenner and Tommy Constantine?

Richards  -  Direct/Miskiewicz

3795

1   A.   Yes.

2   Q.   Did you represent either or both at one point or

3   another?

4   A.   Both.

5   Q.   Would you recognize them if you saw them in the

6   courtroom today?

7   A.   Yes.

8   Q.   Do you see Mr. Kenner?

9   A.   Yes.

10          MR. HALEY:  Identification conceded.

11          THE COURT:  Identification has been conceded.

12  BY MR. MISKIEWICZ:

13  Q.   Do you know Mr. Constantine?

14  A.   Yes.

15          MR. LARUSSO:  Identification conceded, your

16  Honor.

17          THE COURT:  That identification has been

18  conceded as well.

19  BY MR. MISKIEWICZ:

20  Q.   I want to focus your attention to approximately May

21  of 2009.

22          Did you have a conversation with Mr. Constantine

23  about money being placed in a bank account or escrow

24  account held in your law firm's name?

25  A.   Yes.

Richards  -  Direct/Miskiewicz

3796

1   Q.   What is the name of your law firm?

2   A.   The Law Office of Ronald Richards and Associates, a

3   PC, which stands for a professional corporation.

4   Q.   Where was -- and again I'm focusing on May '09 --

5   where was the escrow account located?  In other words,

6   what bank?

7   A.   First Century Bank in Los Angeles, California, 90067,

8   in the Century City area of Los Angeles.

9   Q.   In or about May of 2009, what, if anything, did

10  Mr. Constantine tell you about deposits that would be

11  coming to your escrow account?

12  A.   Just that I would be expecting a wire or wires.

13  Q.   And beyond that, was there any discussion about who

14  the wires would be originating from?

15  A.   Not that I recall.

16  Q.   Did you, thereafter, or did your escrow account,

17  thereafter, begin to see incoming wires?

18  A.   Yes.

19       When we would be able to see who would send

20  them, eventually we would get a ticket.  It's possible he

21  also said I would be expecting a wire from so and so, but

22  I can't remember the specific names at this point.

23  Q.   In any of the conversations was there any discussion

24  about wires coming in from clients of either Mr. Kenner or

25  Mr. Constantine?

Richards - Direct/Miskiewicz

3797

1    A.   I would say it's possibly clients of Mr. Kenner's,

2    but I don't remember anything specific.

3          It wasn't from people that were unconnected to

4    Mr. Constantine or Mr. Kenner.  That much I knew.

5    Q.   When you say clients potentially of Mr. Kenner, you

6    were aware of the business that Mr. Kenner was in,

7    correct?

8          MR. HALEY:  I would object as to form, Judge.

9          THE COURT:  Sustained as to form.

10          MR. HALEY:  Thank you.

11   BY MR. MISKIEWICZ:

12   Q.   Are you familiar with any hockey players that were

13   represented by Mr. Kenner?

14   A.   Yeah.  You mean the names of them?

15   Q.   Yes.

16   A.   Yes.

17   Q.   And was there any discussion about hockey players

18   being among those who would be wiring money into your

19   firm's escrow account?

20   A.   At some point either contemporaneous or shortly

21   thereafter, yes.

22   Q.   Now, did Mr. Kenner then say what you were going to

23   or supposed to do with -- I'm sorry -- withdrawn.

24          Did Mr. Kenner or Mr. Constantine say what you

25   were supposed to do with the money that was deposited into

Richards  -  Direct/Miskiewicz

3798

1   your escrow account?

2   A.   It's hard for me to answer that question as phrased,

3   because am I answering it for Kenner or Constantine?

4           Can you please clarify that for me.

5   Q.   We will break it down.

6           Did Mr. Kenner ever tell you where to send money

7   once it was deposited into your escrow account?

8   A.   No.

9   Q.   Did Mr. Constantine ever tell you?

10  A.   Yes.

11  Q.   Of the money that came in after May, beginning of May

12  2009, to the extent there were any disbursements from

13  monies associated with Mr. Constantine, who gave you

14  expressed direction to disburse that money?

15  A.   Mr. Constantine gave me expressed directions to

16  disburse the money, but I want to qualify my answer.

17          It is conceivable that Mr. Kenner at some point

18  sent me an e-mail not to disburse it, but just about the

19  matter.

20          I have thousands of e-mails.  I just want to

21  make sure I'm not overlooking something going back six

22  years.

23  Q.   Okay.

24          I'm going to show you what's been received in

25  evidence as Government's Exhibit 1102.

Richards  -  Direct/Miskiewicz

3799

```
1        THE COURT:  Is that screen on, Mr. Richards?

2        THE WITNESS:  Yes, your Honor.  Thank you.

3   BY MR. MISKIEWICZ:

4   Q.   Focusing your attention on the deposits, do you see

5   the date 5/5?

6        And, for the record, this is the date of the

7   Exhibit 1102 says, the end date is 5/29/09.

8        Wire transfers from, do you see S. Gonchar plus

9   K. Gonchar?

10  A.   Yes.

11  Q.   Are these -- and then after that do you see a wire

12  transfer from Michael Peca, Darryl Sydor, Jay McKee, Jere

13  Lehtinen, are these among the wire transfers that came in

14  after Mr. Constantine told you that your escrow account

15  would be receiving wire transfer deposits?

16  A.   Yes.

17  Q.   And this is -- do you see this is headed as -- is

18  this your escrow account?

19  A.   May I point?

20  Q.   Do you know whether or not that's your escrow account

21  statement?

22  A.   Yes, sir.

23        May I point to the screen?

24        THE COURT:  The screen won't pick up your

25  finger.
```

Richards  -  Direct/Miskiewicz

3800

1  A.    Do you want me to identify this.

2  Q.    Yes.

3  A.    This looks like a letter from a post office machine

4  where it says 1144 up above law offices.  That looks like

5  something to do with a sorting code for U.S. Mail.  So

6  that would be like in the plastic envelope when they put

7  it in the statement.

8          And on the right where it says 2100017561,

9  that's my escrow account and then it has enclosures of

10  nine and then it's three pages.

11  Q.    Did you at some point -- withdrawn.

12          In addition to your escrow account, did your

13  firm also maintain a separate account for actual payment

14  when you were retained to pursue matters in litigation?

15  A.    We have a separate corporate general account where we

16  would not put client money in the account.  That account

17  could have advanced fees or fees that are earned.

18          In this account we could also have unearned fees

19  and then when it's transferred into the general account

20  then they're earned.

21          So does that answer your question?

22  Q.    Well, my point is would you, from time to time after

23  May 2009, transfer any sums of money from the escrow

24  account to your general account?

25  A.    Yes.

Richards  -  Direct/Miskiewicz

3801

1   Q.   For what purpose?

2   A.   For legal fees, for services rendered or being

3   rendered.

4   Q.   Specifically during this period of time covered in

5   Government's 1102, which is a series of statements that

6   ends in March 31, 2010, did you represent either

7   Mr. Kenner or Mr. Constantine in litigation during which

8   time funds were transferred out of the escrow account into

9   your general account?

10  A.   That's a hard question to answer because those funds

11  were not related to Mr. Constantine's representation.

12       I represented the hockey players and Mr. Kenner

13  during that time period connected to those transfers.

14       Does that answer your question?

15  Q.   Okay.

16       So with respect to any litigation that you

17  pursued against anyone else either representing Mr. Kenner

18  or hockey players, did you transfer any money out of the

19  escrow account into the general fund account?

20  A.   Yes.

21  Q.   I'm going to show you what's been marked for

22  identification as Government's Exhibit RR-1.

23       Very briefly, do you recognize the information

24  that's contained on that document?

25  A.   Yes.

Richards  -  Direct/Miskiewicz

3802

1   Q.    What do you recognize that information to be?

2   A.    This is a summary chart of transfers that were made

3   from the trust account that's on the screen to the general

4   account, and it lists the client matter and a description

5   of the litigation paired to the client matter.

6   Q.    And is that based on a summary of entries that are

7   part of Government's 1102?

8   A.    Exactly.

9   Q.    So showing you on the screen a second page of 1102,

10  do you see where it says Xfer, I assume that means

11  transfer to corporate checking, and it says Phil Kenner

12  retainer under 5/14?

13  A.    That's correct.  That's exactly what it says.

14  Q.    And it's for $50,000.

15        But on that page there are a number of similarly

16  highlighted transactions like that, correct?

17  A.    Correct.

18  Q.    So are all of those transfers summarized on RR-1?

19        I don't mean necessarily on this page, but does

20  RR-1 contain those transfers plus others?

21  A.    It contains the four on the bank statement and the

22  four on the summary.  The four highlighted are on the

23  summary corresponding to the dates.  The summary is

24  accurate compared to the four transfers that are on the

25  exhibit on the screen in front of me at the present time.

Richards  -  Direct/Miskiewicz

3803

1   Q.   And you've had an opportunity to look through all of

2   the pages.

3           Are there other similar transfers?  For

4   instance, on the next page, 5/28, there's a $25,000

5   transfer?

6   A.   On 5/28 there's a $25,000 transfer that corresponds

7   to the $25,000 transfer on RR-1.

8   Q.   And on page 2 of 3 for the date 6/30/09, there's

9   another transfer, do you see that, of $100,000?

10  A.   Yes.

11  Q.   Is that also on RR-1?

12  A.   It is, but the date on RR-1 says 6/22.  I would amend

13  it to say 6/19.  It would match the bank statement.

14  Q.   Other than the date, it's reflected in RR-1, the

15  summary?

16  A.   Yes.

17  Q.   Page 1 of 2, the period 7/31 or date 7/31/09, do you

18  see a $25,000 transfer coming out on July 2nd, it says

19  transfer to corporate checking retainer?

20  A.   Yes.

21  Q.   Again, is that money that was transferred out of your

22  escrow account into your general account?

23  A.   Yes.

24  Q.   Is that also contained in RR-1?

25  A.   Yes.

Richards  -  Direct/Miskiewicz

3804

1   Q.   All of these -- were these then funds that were

2   transferred to the general account for use in litigation

3   either for hockey player clients or Mr. Kenner?

4   A.   Yes.

5        MR. MISKIEWICZ:  The government moves for the

6   admission of RR-1.

7        MR. HALEY:  No objection.

8        MR. LARUSSO:  No objection.

9        THE COURT:  RR-1 is admitted.

10       (Government Exhibit RR-1 in evidence.)

11   BY MR. MISKIEWICZ:

12   Q.   Publishing RR-1.

13        For the record, Mr. Richards, what is the total

14   amount that your firm received by way of fees to pursue

15   litigation either from Mr. Kenner or the hockey players

16   during this period of time?

17   A.   We received -- the total says 335,000, but I believe

18   based on the last entry we -- our -- the net amount we

19   received is 320,000 because 15,000 was for another lawyer

20   to handle the below LLCs on the list.  So I would say

21   between 320,000 and 335,000.

22   Q.   When you say the last one, you mean the last one

23   that's JT Fox, LLC?

24   A.   Right.

25        And don't ask me to pronounce the Hawaiian one.

Richards  -  Direct/Miskiewicz

3805

1   Q.   Also, for the record, what litigation did this

2   $335,000 pay for?  Can you read what the client matter

3   says?

4   A.   Yes.  Which one would you like me to address?

5   Q.   You can address all of them.

6        For the record, read what client matters did the

7   $335,000 go to pay for?

8   A.   It went to defend Mr. Kenner in the Nolan

9   arbitration, it went to pursue Mr. Jowdy in two lawsuits

10  that were amended two subsequent times, it went to filing

11  a separate extortion lawsuit against Mr. Harvey and

12  Mr. Jowdy, and it also went to defending Mr. Kenner in the

13  United States District Court with a lawsuit by Mr. Moreau

14  and Mr. Juneau, and Mr. Fox handled the LLCs for Little

15  Isle IV and the Hawaiian name.

16  Q.   Now, if there are disbursements that represented

17  funds that were sent under the authority of

18  Mr. Constantine, again, for the record, who did you

19  receive each and every one of those disbursements

20  authorizations from?

21  A.   Only Mr. Constantine.

22  Q.   And there's been evidence in this case of a

23  disbursement of $415,000 from the escrow account to a

24  company called Aerospace Reports.  That's on June 4th,

25  2009.

Richards - Direct/Miskiewicz

3806

1      If there was evidence of that being one of the

2  Constantine authorized funds, who authorized you to send

3  money to Aerospace Reports?

4  A.   Are you asking me to assume these facts to be true

5  and then testify?

6      I just want to understand what you're asking me.

7  Q.   There has been evidence of a $415,000 transfer at the

8  direction of Mr. Constantine to Aerospace Reports.

9      If you received that, who would you have

10  received that authorization from?

11  A.   If all those things were true, I would have received

12  it from Mr. Constantine.

13      But if you show me my bank record I can confirm

14  it was within the relevant time period.  Based on your

15  representation it would only have been from

16  Mr. Constantine.

17  Q.   Showing you a page from 1102, specifically the page

18  dated 6/30/09, that's your escrow account statement,

19  correct?

20  A.   Yes.

21  Q.   And on June 4th, '09, there's a wire transfer of

22  $415,000 to a company called Aerospace Reports?

23  A.   Okay.

24  Q.   Do you recall representing somebody by the name of

25  Aerospace Reports during that period of time?

Richards  -  Direct/Miskiewicz

3807

1   A.   I do recall.  We did not.

2   Q.   Who directed you to make that wire transfer?

3   A.   Tommy Constantine.

4   Q.   What about right below it?  I believe there's a wire

5   transfer 6/08 to Cabin Crafters for $75,000.

6        Who directed you to make that transfer?

7   A.   Tommy Constantine.

8   Q.   Right above it, a $450,000 wire transfer to Edenholm

9   Motorsports.

10       Who directed you to transfer $450,000 to

11  Edenholm Motorsports?

12  A.   Tommy Constantine.

13  Q.   Showing you what's dated 8/31/09, page 1 of 2,

14  there's a wire transfer of $40,000 on August 7 to AZ

15  Avalon Partners, do you see that?

16  A.   Yes, sir.

17  Q.   Who directed you to wire transfer $40,000 out to AZ

18  Avalon Partners?

19  A.   Tommy Constantine.

20  Q.   And also right above it there's another transfer

21  there for $4,065; do you see that?

22  A.   Yes.

23  Q.   Also to AZ Avalon Partners?

24  A.   Yes.

25  Q.   Who directed you to send that money there?

Richards  -  Direct/Miskiewicz

3808

1    A.    Tommy Constantine.

2    Q.    Back to the 6/30/09 statement of 1102, you already

3    testified that this was a transfer to your firm for a

4    retainer.  It's one of the transfers included in RR-1; is

5    that fair?

6    A.    Yes.

7    Q.    Below that is a transfer, also another Cabin Crafters

8    on June 30th of $86,426 and no cents.

9          Who authorized you to wire transfer money to

10   Cabin Crafters?

11   A.    Tommy Constantine.

12   Q.    There's a wire transfer to something called Eufora,

13   LLC, value load A; do you see that, for $5,000?

14   A.    Yes.

15         I think that's an abbreviated name, but that's

16   Tommy Constantine who authorized that.

17   Q.    And on June 15 of the highlighted markings there's

18   another wire transfer, outgoing wire transfer, to Edenholm

19   Motorsports on June 15 of $75,000; do you see that?

20   A.    Yes.

21   Q.    Who directed you to make that transfer?

22   A.    Tommy Constantine.

23   Q.    There's a June 11th wire transfer to a company or a

24   firm called Gilmartin, Magence & Ross; do you see that?

25   A.    Yes.

3809

1   Q.   For $15,000?

2   A.   13,331.

3        THE COURT:  The one he's referring to is 15.

4        THE WITNESS:  Sorry, your Honor.

5   A.   Yes, on June 11th, Tommy Constantine directed me to

6   wire that $15,000.

7   Q.   Back to the 5/29/09 page of 1102, above some of the

8   highlighted transfers which you already discussed, I show

9   you a $500,000 wire transfer on May 12.  Do you see that,

10  right above where I cut it off?

11  A.   Yes.

12  Q.   To a company by the name of Nussbaum & Gillis, PC?

13  A.   I see that.

14  Q.   Who authorized -- who directed you or authorized you

15  to make that wire transfer?

16  A.   Tommy Constantine.

17  Q.   And, again, there's another $45,000 another transfer

18  to Gilmartin, Magence & Ross, this time for 45,000 on

19  5/12.

20       Who authorized you or directed you to make that

21  transfer?

22  A.   Tommy Constantine.

23  Q.   There's a wire transfer to Carey Rodriguez Greenberg

24  for $8,000?

25  A.   Yes.

Richards  -  Direct/Miskiewicz

3810

1    Q.    Who directed you to do that?

2    A.    Tommy Constantine.

3    Q.    On 5/19 there's a $10,000 wire transfer to Earl,

4    Curley & Lagarde; do you see that?

5    A.    No.

6    Q.    Sorry.

7    A.    Yes.

8    Q.    Who authorized or directed you to make that transfer?

9    A.    Tommy Constantine.

10   Q.    On 5/20 there's a wire transfer to the Arizona Bar

11   Foundation for $55,000.

12         Do you recall who directed you or authorized you

13   to transfer that to the Arizona Bar Foundation?

14   A.    Tommy Constantine.

15   Q.    And also above it on 5/19, this one for 55,000 also

16   to the Arizona Bar Foundation, who directed you to do

17   that?

18   A.    Tommy Constantine.

19   Q.    5/14, Javier Barreras Duarte, do you know who that

20   is?

21   A.    At the time or now?

22   Q.    Who, if anybody, authorized you to send $22,000 to

23   whoever that person is?

24   A.    Tommy Constantine.

25   Q.    There's a $2400 payment to Dickinson Architects; do

Richards  -  Direct/Miskiewicz

3811

1   you see that?

2           Who authorized you or directed you to make a

3   $2400 payment to that architect?

4   A.   You know, I don't remember that one very well.  It's

5   a small amount.

6           If it's related to Mr. Constantine or

7   Mr. Kenner, then it would be Tommy Constantine.

8           But the name -- sometimes I do have small

9   vendors at this time period that dealt with other matters.

10  I can't say that one for sure.

11  Q.   Are you familiar with a recipient of money on 5/21 by

12  the name of Epstein, Becker & Green?

13  A.   Yes.

14  Q.   I'll try to find that.

15  A.   I think it's a check.

16  Q.   Okay.

17          Who authorized you to issue a check as opposed

18  to a wire transfer?  Here it is.

19          THE WITNESS: Just so we're clear, your Honor, I

20  can talk about anything related to these checks?

21          THE COURT:  Yes.

22  A.   So I think I told Mr. Constantine that we needed to

23  hire this law firm and I asked permission to write a check

24  to the law firm which I then tendered to the law firm.

25  That was the procedure on that check.

Richards  -  Direct/Miskiewicz

3812

1   Q.    So that was again done at Mr. Constantine's

2   direction?

3   A.    With his permission.

4   Q.    Or permission?

5   A.    Because I actually picked the law firm and I got his

6   permission to issue the check.

7   Q.    I am going to ask that you assume for purposes of

8   this exhibit there are a total of four other

9   disbursements, either wire transfers or checks, totaling

10  $90,000 to Epstein, Becker & Green.

11         Would those have all been done at

12  Mr. Constantine's direction?

13  A.    Yes.

14  Q.    And I showed you one Avalon Partners LLC transfer

15  from August.

16         Assume for this question that there are two

17  others, two other transfers in September and October of

18  '09, and that the total of three transfers amount to

19  $120,000 to AZ Avalon Partners, who authorized you to

20  transfer money from your escrow account to AZ Avalon

21  Partners, LLC, during that period of time?

22  A.    Tommy Constantine.

23  Q.    I think I showed you also one transfer on August 6,

24  2009, for an amount of $4,065 to a company called AZ

25  Falcon Partners.

Richards  -  Direct/Miskiewicz

3813

1    Assuming there were others between August and

2  November of '09 totaling -- several others totaling

3  $17,260, who would have authorized you to send money to AZ

4  Falcon Partners?

5  A.    Tommy Constantine.

6  Q.    Cabin Crafters?

7  A.    Tommy Constantine.

8  Q.    If there are a total of $161,000 in transfers or

9  disbursements to Cabin Crafters, all of that would have

10 been at the direction of Tommy Constantine?

11 A.    Assuming all that to be accurate, yes.

12 Q.    Carey Rodriguez, assuming there were additional

13 disbursements than the one I asked you totaling

14 $26,677.40, who would have directed you or authorized you

15 to make those transfers?

16 A.    Tommy Constantine.

17 Q.    If there was a total in here of $540,000 to Edenholm

18 Motorsports, in addition to the two I showed you and a

19 third on November 15, 2009, and all three let's say added

20 up to $540,000 in transfers, who directed you to make

21 those transfers?

22 A.    Assuming all the math and the facts are accurate,

23 Tommy Constantine.

24 Q.    There are a series of transfers throughout as early

25 as May 27, 2009, through March 22, 2010, to Eufora, LLC.

Richards  -  Direct/Miskiewicz

3814

1    Who would have -- who directed you to send any

2    money to Eufora, LLC, during that period of time from your

3    escrow account?

4    A.    Tommy Constantine.

5    Q.    There are also a total of $120,000 -- $120,050 in

6    transfers between June 30, 2009, and August 31st, 2009, to

7    a Eufora value load account, and specifically account

8    number 8010205337.

9          Assuming that math is correct, who would or who

10   did authorize you to send $120,050 to that value load

11   account?

12   A.    Tommy Constantine.

13   Q.    There's a $44,000 disbursement on July 27, 2009, from

14   your escrow account to First American Title Insurance.

15         Who, if you recall, directed you to send that

16   money?

17   A.    How much was the amount, sir?

18   Q.    $44,689.17?

19   A.    Tommy Constantine.

20   Q.    I showed you I believe one or two Gilmartin, Magence

21   & Ross transfers.

22         There are $120,000 in transfers out of the

23   account between May 12, 2009, and November 6, 2009.

24         Who directed you to send that money?

25   A.    Tommy Constantine.

3815

1  Q.   There's a company by the name of JBAZ Consulting, an

2  LLC, that received a transfer of $384,300 on July 13,

3  2009.

4        Who directed you to send that money there?

5  A.   Tommy Constantine.

6  Q.   There's a wire transfer of half a million dollars to

7  Neptune Company Asset Holdings on September 9, 2009.

8        Who directed you to send that money there?

9  A.   Tommy Constantine.

10  Q.   I believe I showed you one transfer for Nussbaum &

11  Gillis.

12        Assuming there are a total of two amounting to

13  $500,747.14, who directed you to send that money to

14  Nussbaum & Gillis from your escrow account?

15  A.   Tommy Constantine.

16  Q.   If there's a total of $8,130 in transfers to a

17  Richard Rozenboom, who directed you to send that money to

18  Richard Rozenboom?

19  A.   Tommy Constantine.

20  Q.   Are you familiar with the name Rubin Israel Palos

21  Carillo?

22  A.   Then or now?

23  Q.   So you know now, but you didn't know then?

24  A.   I can't remember then.  I know now.

25  Q.   Well if you -- do you know who authorized you or

Richards  -  Direct/Miskiewicz

3816

1   directed you to send $85,000 on November 6, 2009, to Rubin

2   Israel Palos Carillo?

3   A.   Tommy Constantine.

4          To clarify, when I said then, I meant at the

5   time I received the incoming wire, because then is a

6   little vague.  I learned subsequent and I don't know when.

7   Q.   Whether you know who that person is now or then, do

8   you have any question about your recollection that it was

9   Mr. Constantine who directed you to send that money?

10  A.   None.

11  Q.   Now on June 26, 2005, on Government's Exhibit 1102 --

12         THE COURT:  2009.  You said 2005.

13         MR. MISKIEWICZ:  Sorry.

14  BY MR. MISKIEWICZ:

15  Q.   2009, there's a $65,000 wire transfer to the firm

16  Sullivan & Cromwell.

17         Who directed you to send $65,000 to Sullivan &

18  Cromwell?

19  A.   Mr. Constantine.

20  Q.   Lastly, there's a $13,331 transfer on June 11, 2009,

21  to Southwest Aviation Insurance.

22         Who directed you to send that money there?

23  A.   Tommy Constantine.

24  Q.   There's been testimony in this trial, Mr. Richards,

25  about something called the Global Settlement Fund.

3817

1          My question to you is at the time of the

2    deposits and withdrawals from this account, your escrow

3    account, did you know what the Global Settlement Fund was?

4    A.    At the time I started receiving the deposits?

5    Q.    Correct.

6    A.    No.

7    Q.    You subsequently learned?

8    A.    Yes.

9    Q.    And did Mr. Constantine direct or give you any

10   direction as to whether some money was considered part of

11   the Global Settlement Fund and others was not, other

12   monies were not considered part of the Global Settlement

13   Fund?

14   A.    No.

15   Q.    You just took the direction that he gave you and made

16   the disbursements; is that fair?

17   A.    Very fair.

18   Q.    And lastly RR-1 has different sums of money that --

19   withdrawn.

20          Do other clients or did other clients of the Law

21   Offices of Ronald Richards and Associates also deposit

22   funds into this account?

23   A.    At the time?

24   Q.    At the time.

25          If you recall.

Richards  -  Direct/Miskiewicz

3818

1   A.   Well, that's hard to answer yes or no.

2        It's yes, but it's also funds coming from

3   third-parties paying settlements and other transactions,

4   not necessarily the clients putting their money into the

5   account unless it would be advanced fees.

6        Typically in that account it's from

7   third-parties or other people paying settlements and

8   claims that go into that account, not typically the client

9   money unless it's advanced fees.

10       But once it comes into the account for the

11  benefit of the client, then the client is in control of

12  that money.

13  Q.   So this account was not dedicated solely to money

14  that Mr. Constantine was directing to be deposited or

15  directing to be disbursed; is that correct?

16  A.   Correct.

17  Q.   Lastly, there was on a page dated 3/31/2010 of 1102,

18  and there's a transfer, a corporate checking, that says on

19  March 22, costs, Jowdy, 2009, $165.41.

20       Do you know what that is in reference to?

21  A.   Yes.

22  Q.   What's that in reference to?

23  A.   When the complaint was dismissed, there was Court

24  costs that needed to be paid, like filing fees, and so

25  that was paid for those costs; motion fees, fees to the

Richards  -  Direct/Miskiewicz

3819

1    court.

2    Q.    I'm sorry, I thought that was the last question.  I

3    have one last one.

4          Showing you what's dated 12/31/09, 1 of 2 in

5    Government's Exhibit 1102, and I direct your attention to

6    transfers, deposits in from Maureen B. Privitello on 12/7

7    for $150,000, and then a wire transfer from Nicholas L.

8    Privitello of $50,000 also on December 7th.

9          Do you have any recollection of who directed

10   that money to be deposited into your escrow account then?

11   A.    You mean do I have any recollection as to who

12   requested them to put it in my account or who told me?

13   Q.    Do you know?

14   A.    I'm assuming Mr. Constantine.

15   Q.    But you don't know?

16   A.    Well, I do know because then he asked me to wire it

17   out.  So if no one else asked me about it...

18   Q.    So you do recall that the money that came in from the

19   Privitellos was eventually wired out of your escrow

20   account?

21   A.    Yes.

22          In that last question you asked me about the

23   Jowdy costs, was that in February 2010?

24          I forgot to look at the date when you put that

25   on the screen.  I just want to make sure I'm not making a

Richards  -  Direct/Miskiewicz

3820

1    mistake.

2           That's March 2010.  That was related.  I just

3    wanted to be sure.

4           Thank you.

5    Q.   Back to December 7 of '09, that money, 150,000 -- a

6    total of $200,000 related to the same last name

7    Privitello, that money was -- you recall some portion of

8    that money being transferred out of the escrow account?

9    A.   I remember all of it being wired out of the escrow

10   account.

11   Q.   Who told you to wire the money out?

12   A.   Tommy Constantine.

13          MR. MISKIEWICZ:  Thank you.

14          No further questions.

15          THE COURT:  We're going to take the lunch break.

16   We will reconvene at 2:00.  I expect you to be out of here

17   by the afternoon break around 3:30.

18          Don't discuss the case.  Have a good lunch.

19          (The jury is excused.)

20          MR. HALEY:  Your Honor, I do not want to

21   inconvenience the marshals, but I'm told Mr. Kenner is

22   working diligently on that disk.  I'm told that he cannot

23   take the computer downstairs with him.

24          So in order to continue, we would like to have

25   Mr. Kenner stay seated here through the lunch hour and

**Richards  -  Direct/Miskiewicz**

3821

1   continue to work in an effort to complete that disk.

2            THE COURT:  Let me see if the marshals have the

3   manpower to do that.  Are you able to do that?

4            U.S. MARSHALL:  Yeah, I'll call down.

5            THE COURT:  Thank you.

6            MR. HALEY:  They ought to be commended.  They

7   have been magnificent.

8            THE COURT:  They're always the best.

9            MR. HALEY:  They are.  Thank you.

10           THE COURT:  So I'll see you at 2:00.

11           (A lunch recess is taken.)

12           (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**Proceedings**

3822

```
 1            A F T E R N O O N   S E S S I O N

 2

 3          THE COURT:  Please be seated.

 4          MR. LARUSSO:  May I ask the Court to just

 5   clarify your ruling that you made?  I don't want to run

 6   afoul of opening the door to a full-fledged inquiry

 7   regarding e-mail communications between Mr. Richards and

 8   anybody else.

 9              I don't know if you've seen the letter, Judge --

10          THE COURT:  No.

11          MR. LARUSSO:  May I hand it up to the Court,

12   please?  And this is a letter that was written by

13   Mr. Richards to all his clients.

14              As the Court knows, this letter was shown to

15   Mr. Murray last week.  The Government knew about it.  And

16   I've been advised this letter was also provided by the

17   Government during discovery.  This letter had made its way

18   through the public arena from the hockey players after

19   they had a chance to see it.

20              The reason this is significant, because it

21   undercuts the Government's theory about this lawsuit.  It

22   really lays bare exactly what happened in terms why the

23   case was dismissed and what the hockey players really

24   knew.

25              I'm trying to understand why allowing this
```

**Proceedings**

3823

 1    witness to lay out what he himself communicated to his

 2    clients in a letter that is no longer privileged, which

 3    explains to the jury in detail what happened, somehow

 4    opens the door for any communications Mr. Richards may

 5    have had with Mr. Constantine or anybody else.

 6              Then I got kind of scared.  I got three e-mails

 7    from Mr. Richards to the hockey players received in

 8    evidence before today that were discussed during the

 9    examination of those witnesses, and I also know that

10    Mr. Berard said to the jury that I was never told by my

11    attorney anything about the complaint or the allegations

12    in it, which I think is a -- I'm kind of a little

13    concerned, Judge, based upon your ruling.  I may have

14    other problems in terms of opening the door, which I don't

15    want do.

16              THE COURT:  Here's the way I look at it, and --

17    unless you can persuade me I'm looking at it the wrong

18    way.

19              The other hockey players' mental state as

20    relates to the lawsuit is not relevant at all.  It's all

21    hearsay.  And although you've been asking other hockey

22    players "what did you hear about the lawsuit?"  What was

23    going on with respect to the lawsuit is hearsay and their

24    state of mind as to the status of the lawsuit is

25    irrelevant.

**Proceedings**

3824

1          The only potential relevance something like this

2     letter may have to the jury is what your client's state of

3     mind was with respect to the lawsuit.

4          To the extent -- although you keep saying it is

5     the Government's theory of the case, I understand the

6     Government's theory of the case that there was a

7     fictitious lawsuit.  We obviously know it wasn't a

8     fictitious lawsuit, the lawsuit was filed.  So I don't

9     think they are claiming any fraud with respect to the

10    lawsuit itself.

11         You are saying this disproves the Government's

12    theory.

13         Your client took money on the escrow account and

14    spent it on things unrelated to the lawsuit, is their

15    claim.

16         To the extent that you want to prove any idea

17    this lawsuit was dismissed because it lacked merit, to the

18    extent you want to disprove that -- and you don't have to

19    explain it to me.  The only relevance is what your

20    client's state of mind was.  In other words, he wasn't

21    trying to just take the money for what he knew to be a

22    frivolous lawsuit.  He ended the lawsuit because of

23    whatever reasons Mr. Richards told him in this letter.

24         So the only relevance of this letter is to try

25    to show not what the hockey players thought -- that

**Proceedings**

3825

1   doesn't matter -- only your client, and if it is

2   introduced to show that this is what Tommy Constantine

3   understood was the reason for the dismissal of the

4   lawsuit.

5           You are opening the door, saying this is one

6   letter with respect to Tommy Constantine regarding the

7   dismissal of the lawsuit.  Maybe Mr. Richards told him

8   something else.  Although this is not a privileged

9   communication, I don't think -- even if it's not a

10  privileged communication, by you making this argument to

11  the jury - my client believed that lawsuit was great, it

12  had every chance of success and this was proof of that -

13  the Government should be entitled to explore whether in

14  fact your client had other information available to him

15  from the same person that this letter was written from,

16  not just anybody, that would show the lawsuit was weak.

17          It wouldn't be every communication with

18  Mr. Richards, but you would be potentially opening the

19  door to other communications with Mr. Richards - letter,

20  e-mail or orally - regarding the strength of that lawsuit.

21          That's the way I can explain it.

22          MR. LARUSSO:  That's the way I understood it.

23  And what I'm trying to do by seeking to admit this

24  evidence is what the Government was doing on their direct

25  case by eliciting information from the hockey players that

**Proceedings**

3826

1    they can draw the conclusion regarding the nature of the

2    suit and whether or not Mr. Constantine was well aware he

3    was defrauding the hockey players because this wasn't a

4    frivolous lawsuit, wasn't based on substantial

5    allegations.  They made motions, and at the end they

6    dismissed the case.

7            It was clear from the examination of Mr. Berard.

8    The question was:  You were available, weren't you?  You

9    could have testified at the deposition.

10           You know what, Judge?  They were ordered within

11   a very limited period of time, and this helps me in

12   countering that argument, that they will make -- or that

13   they made inferentially.

14           I can argue there are independent facts outside

15   of my client's state of mind that supports our position it

16   wasn't a frivolous lawsuit, it wasn't dismissed in

17   anticipation, not ever trying to resolve it completely.

18   This was done because they faced the possibility of

19   dismissal from a judge because the hockey players weren't

20   going to be available.

21           That's the reason, and --

22           THE COURT:  Mr. LaRusso, you explained it to me

23   three times.  If you think the necessary response --

24   again, if Mr. Richards had an e-mail where he sent an

25   e-mail to Tommy Constantine, notwithstanding this letter,

**Proceedings**

3827

1    that said, Mr. Constantine, that lawsuit against Jowdy is

2    frivolous.  We never found any evidence he did what he did

3    and it will go nowhere.  Your client can be potentially

4    waiving the privilege to that type of communication.  So

5    that's what I'm thinking.

6            And maybe you can try to convince me that still

7    remains privileged even though you are introducing this.

8    That's my thinking.  It wouldn't be a general waiver of

9    the privilege; it would be a waiver of the privilege

10   regarding communications regarding weaknesses in the

11   lawsuit, to the merits of the lawsuit.

12           MR. LARUSSO:  I don't think any of them exist,

13   Judge.

14           THE COURT:  Maybe that is true too.

15           MR. LARUSSO:  I don't want to go on a fishing

16   expedition with regards to it.

17           THE COURT:  I just want you to be aware that's

18   the Government's argument, and I'll entertain it.  I'm not

19   making a ruling on it, but it makes sense to me they

20   should be able to get any communications had with

21   Mr. Constantine that reflect weaknesses in the case

22   against Jowdy.  That would be the nature of the waiver.

23           MR. LARUSSO:  With regards to the fact that the

24   letter wasn't even written to him, I understand that.

25           THE COURT:  The only purpose is introducing

**Proceedings**

3828

1    it -- if it wasn't written by hand, they didn't see it,

2    then I would tell you it was irrelevant.

3              The only state of mind we care about is his

4    state of mind, not the hockey players', at least on this

5    issue.

6              MR. LARUSSO:  The other point, you've heard a

7    lot of testimony where we talked about what Mr. Berard was

8    told by Mr. Richards.  I mean, we have communications that

9    were introduced in evidence.  Let me make it clear.

10             There were three exhibits introduced during the

11   testimony of some of the hockey players.  They are in

12   evidence.

13             What they are are e-mail communications by

14   Mr. Richards to all of the hockey players telling them

15   about a consolidated complaint, keeping them updated on

16   the progress of the lawsuit.  And we introduced those

17   during the examination of the hockey players to show in

18   fact they were well aware of the nature of the lawsuit

19   because they were denying they had any real knowledge what

20   was going on.

21             You heard the testimony, Judge.  I don't have to

22   repeat it.

23             And this witness can shed some substance light

24   on the fact that their testimony was questionable in that

25   regard, and they were well aware of what was happening.

Richards - Direct/Miskiewicz

3829

1      There are other reasons like that, Judge, that

2   we wanted to go into those.

3      THE COURT:  You are trying to talk me into

4   letting you go into it, and I told you my thoughts.  You

5   can question Mr. Richards regarding this area.  You don't

6   have to persuade me why you need to do that.  I already

7   told you you may do so.

8      MR. MISKIEWICZ:  Your Honor, I have one last

9   question to reopen the direct for that reason.

10     MR. HALEY:  Judge, he said he had one last

11  question, as a matter of record.

12     THE COURT:  You never did that.

13     MR. HALEY:  Absolutely not.

14     THE COURT:  Mr. LaRusso, do you have any

15  objection to that?

16     MR. LARUSSO:  No, your Honor.

17     THE COURT:  All right.  Let's bring in the jury.

18     (Whereupon, the jury at this time enters the

19  courtroom.)

20     THE COURT:  Please be seated.

21     Before you start the cross-examination,

22  Mr. Miskiewicz has one last question.

23  DIRECT EXAMINATION

24  BY MR. MISKIEWICZ: (Continued)

25  Q    Showing you, Mr. Richards, a page from Government's

Richards - Cross/Haley

3830

1    1102, dated 7/31/09, and specifically there is a July 30th

2    wire transfer out of the escrow account in the amount of

3    $22,425.02.

4            Who directed you to do that transfer?

5    A    Tommy Constantine.

6    Q    And who is that money being sent to?

7    A    Phil Kenner.

8    Q    Would this have been covered by one of your internal

9    transfers from the general fund to represent Mr. Kenner?

10   A    I don't understand the question.

11   Q    In other words, was this money somehow related to

12   litigation that you were retained for Mr. Kenner?

13   A    No, I remember that transaction.  It was a cost

14   reimbursement for Mr. Kenner.

15   Q    What does a cost reimbursement mean?

16   A    From my recollection, he had expenses that he needed

17   reimbursed.  And Tommy had allowed some of them and not

18   allowed some of them, and that was what Tommy authorized

19   after he reviewed the expenses.  There were some he didn't

20   allow.

21           MR. MISKIEWICZ:  No further questions.

22           THE COURT:  Cross-examination.

23           Mr. Haley.

24           MR. HALEY:  Thank you.

25

Richards - Cross/Haley

3831

1    CROSS-EXAMINATION

2    BY MR. HALEY:

3    Q    Good afternoon, Mr. Richards.

4    A    Good afternoon, Mr. Haley.

5    Q    Do you have Government's Exhibit RR-1 in front of

6    you, sir?

7    A    Yes, I do.

8    Q    Now, the very first line item on that:  5/14/2009,

9    Ronald Richards, $50,000, Nolan arbitration, Kenner.

10          Do you see that line?

11   A    Yes, sir.

12   Q    You did indeed represent Phil Kenner, my client, in

13   connection with what is characterized as the Nolan

14   arbitration, correct?

15   A    Correct.

16   Q    Was that an arbitration commenced by Owen Nolan?

17   A    Yes.

18   Q    Do you know the authority under which he commenced

19   that arbitration?

20          Was there a document in place?  A contract?

21   A    Yes.

22   Q    And, sir, I will now have you take a look at what has

23   been marked --

24   A    When you say "authority," authority for the

25   jurisdiction of the arbitration?

Richards - Cross/Haley

3832

1   Q    Yes, sir.

2   A    Yes, I just wanted to clarify.

3        MR. HALEY:  Great questioning by a lawyer,

4   Judge.

5   Q    Take a look at Kenner Exhibit 56 -- excuse me -- for

6   identification.

7   A    It is 55.  Sorry.

8        MR. HALEY:  I'm sorry, 55 for identification.

9        THE WITNESS:  Yes.

10  Q    Do you recognize that document?

11  A    I mean, I don't recognize it specifically but -- I

12  recognize it specifically, but I recognize it from memory,

13  generally.  It's one of the engagements that Standard

14  Advisors, Inc., Mr. Kenner's company, provided his

15  clients, which had an arbitration provision which was the

16  basis of the jurisdiction that would hear the dispute.

17       This was an American Arbitration clause which

18  the parties agreed to have it in that forum.  Three

19  Arizona judges would decide the case.

20  Q    In other words, sir, that Standard Advisors agreement

21  was a contract between Phil Kenner and Owen Nolan, by

22  which Owen Nolan, if he had a dispute with Phil in

23  connection with Phil's work with respect to serving as his

24  business manager, financial advisor, he could arbitrate

25  that dispute rather than go to court?

3833

```
 1   A    He had to arbitrate the dispute.  He had no other

 2   choice.

 3              MR. HALEY:  Right.

 4   Q    And as relates to the arbitration provision, sir,

 5   isn't it true, sir, that the contract Phil had with Owen

 6   Nolan provided that the prevailing party, should they

 7   recover in one instance on Nolan's part a judgment or on

 8   Phil Kenner's part avoiding a judgment, would be

 9   recovering attorney's fees?

10   A    Reasonable attorney's fees, that is correct.

11   Q    With respect to that Owen Nolan arbitration, there

12   did come a point in time that the matter concluded, true?

13   A    Yes.

14   Q    If you recall, was there approximately five days of

15   testimony throughout that arbitration?

16   A    Yes.

17   Q    Was Ken Jowdy called as a witness during that

18   arbitration?

19   A    Yes.

20   Q    Which of the parties called Ken Jowdy as a witness?

21   A    Owen Nolan.

22   Q    Now, ultimately there was a finding by the

23   arbitrator; is that correct?

24   A    Yes.

25   Q    And is it fair to state that Mr. Owen Nolan obtained
```

Richards - Cross/Haley

3834

1  a partial judgment against Phil Kenner as a result of that

2  arbitration?

3  A    That's a fair characterization.

4  Q    Because he had obtained a partial judgment against

5  Phil Kenner, he was also then entitled to reasonable

6  attorney's fees; isn't that true?

7  A    Can I kind of look at the clause for a minute?

8  Q    Sure.

9  A    (Perusing.)  It was a broad clause, so he was

10  entitled to attorney's fees.

11  Q    Do you have a recollection, sir, as to whether or not

12  he actually obtained that as part of his judgment?

13  A    No, I don't have a recollection, but of course the

14  judgment would refresh my recollection.

15  Q    This does say Kenner Exhibit 56, sir.

16        Let me show you Kenner Exhibit 56 for

17  identification.  You need not take a look at the whole

18  document, but kindly take a look at paragraph eight on

19  page 11.

20        Just read it to yourself.

21  A    The last paragraph --

22  Q    Don't read it out loud.

23  A    I would never read it out loud.

24        The last paragraph cuts off on page 11.

25        Do you want me to stop reading?

Richards - Cross/Haley

3835

1   Q    Yes, sir.

2   A    I've read the latter part of page 11.

3   Q    Does that refresh your recollection as to whether or

4   not Owen Nolan, having obtained a partial judgement

5   against Phil Kenner, also received an award of attorney's

6   fees?

7   A    It does.

8   Q    Did he receive an award of attorney's fees?

9   A    Yes.

10  Q    Now, did you understand, sir, that at the point in

11  time you were representing Phil Kenner for purposes of the

12  Nolan arbitration, that there was a dispute between he and

13  Ken Jowdy?  Yes or no?

14  A    Between Mr. Nolan and Mr. Jowdy?

15  Q    Excuse me.  I'll rephrase the question.

16       When you represented Phil Kenner during the

17  course of the Nolan arbitration, did you understand that

18  at that point in time there was a dispute between Phil

19  Kenner and Ken Jowdy?

20  A    Yes, there was something going on at that time.

21  Q    All right.  Once again, sir, you did not call Ken

22  Jowdy as a witness on behalf of Phil Kenner, but Owen

23  Nolan called Ken Jowdy as a witness on his behalf; is that

24  correct?

25  A    That's correct.

Richards - Cross/Haley

3836

1   Q    Now, the next line item in connection with RR-1

2   indicates on 5/26/2009 --

3           MR. HALEY:  I don't have my copy, Judge.

4           THE WITNESS:  Do you want mine?  I think that is

5   the original copy there.

6           MR. HALEY:  Thank you.

7   Q    With reference again to the second line item,

8   5/26/2009, Ronald Richards and Associates, $75,000, Jowdy

9   litigation, 19 plaintiffs; do you see that?

10          Were one or more of those 19 plaintiffs hockey

11  players?

12  A    Yes.

13  Q    Were one or more of those 19 plaintiffs clients of

14  Phil Kenner's?

15  A    Yes.

16  Q    Now, going to the third line item, 5/26/2009,

17  $20,000, Moreau/Juneau Kenner; do you see that?

18          Did that involve similar arbitration claims, or

19  claims under the Standard Advisor agreement by Mr. Moreau

20  and Mr. Juneau, wherein they were seeking to have a

21  dispute arbitrated involving Phil Kenner, if you recall?

22  A    Those claims were from the same lawyer representing

23  Mr. Nolan.

24  Q    Okay.

25  A    And they were similar to Mr. Nolan's claims, but they

3837

1   were in a United States District Court in Los Angeles.

2   Q    I understand.

3        And as relates to that particular litigation and

4   that claim made by them, was there an anticipation on your

5   part that Ken Jowdy may very well be called as a witness

6   for them in that litigation?

7   A    Well, Ken Jowdy was a defendant in that litigation,

8   and he was a defendant in that litigation -- I think the

9   confusion is Mr. Nolan went right to arbitration.  He

10  didn't file a lawsuit in the district court.  I think

11  that -- now, again, I wasn't the original lawyer.  I came

12  on to do the trial.  I'm a trial lawyer.

13       He came on -- that went right to arbitration.

14  The other two, Moreau and Juneau, they already had active

15  lawsuits because Mr. Jowdy was a defendant in that

16  lawsuit.

17       So the answer was yes, I was expecting him to

18  participate because he was a defendant.

19  Q    So in other words, that Jowdy connection, for lack of

20  a better term -- correct?

21  A    Yes.

22  Q    With reference to the 5/27/2009 line item, you have

23  Jowdy litigation, 19 plaintiffs.  Is that simply an

24  additional charge with regard to the 19-plaintiff lawsuit

25  that you testified to a moment ago, or do you know?

Richards - Cross/Haley

3838

1    A     I just think an additional charge.  I can't tell you

2    exactly what it was.  It was related to those plaintiffs.

3    Q     And the next line item, $25,000, Nolan arbitration.

4          There was only one Nolan arbitration, correct?

5    A     Right.  That is correct.  But it just must have been

6    some additional -- you know how you said it was five days?

7    Maybe it would be two.  Sometimes trials go longer than

8    expected.

9          And I was in Arizona, and I lived in Los

10   Angeles, so can you imagine every night in the summer.

11   Q     Sir, the next line item, 6/22/2009, we have 100,000

12   Jowdy litigation, 19 plaintiffs.

13         I'm trying to understand:  When you see "Jowdy

14   litigation," were those all the same litigation, if you

15   recall?

16   A     This litigation lasted eight months with a lot of

17   effort and work, and so that's the same litigation, the

18   same original two lawsuits.  And there were different

19   things that went on with those original two complaints.

20   Q     And finally, sir, with reference to the $15,000 line

21   item, LLCs Moreau/Juneau, Little Isle IV, LLC, do you see

22   that?

23   A     Yes.

24   Q     As relates to that litigation, sir, did you have an

25   understanding as to -- well, withdrawn.

3839

1      Isn't it true as relates to that litigation,

2   hockey players held an equity interest in Na'alehu

3   Ventures 2006 LLC as well as Little Isle IV?  Is that your

4   understanding?

5   A    There was a conflict issue with the LLCs, so that's

6   why another lawyer was representing for, I guess, an

7   appearance in court.

8   Q    But when you look at that, when it has LLCs and

9   Moreau/Juneau Ventures, that involved an instance where

10  Moreau and Juneau brought some actions against those two

11  LLCs?

12  A    Yes, they were defendants in the district court

13  action.  They were being sued for the same claims.

14  Q    I have it.

15      And jumping up, sir, as relates to the line

16  above that, $25,000 Harvey/Jowdy, 19 plaintiffs/Kenner, do

17  you have a idea as to what the nature of that litigation

18  was, sir?

19  A    That was a blackmail extortion suit from Kenner

20  against Harvey and Jowdy.

21  Q    Who is Harvey?

22  A    Tom Harvey, a lawyer.

23  Q    The 19 plaintiffs, were one or more of those 19

24  plaintiffs hockey players?

25  A    Yes.  It was arising out of this whole relationship,

Richards - Cross/Haley

3840

1    the lawsuit.  The gravamen of the allegations arose out of

2    this relationship between this lawyer, Mr. Jowdy,

3    Mr. Kenner and the clients, or his clients.

4            It's a little vague as to every single nuance,

5    but there were e-mails that were issues, and when the case

6    turned over subject to a privilege or not, in litigation.

7    Q    Can we agree, sir, that RR-1 is a compilation of the

8    scope of work you performed involving Phil Kenner and

9    others that was paid out of the funds from your trust

10   account?

11   A    It's a summary of payments to our firm in a very

12   abbreviated scope.  It's not really a scope of work.  It's

13   just a -- it identifies litigation with a summary of

14   payments from the trust account to our general account.

15   It is not really a scope of work.

16   Q    Very well.

17   A    It identifies the matters.

18   Q    Okay.  And thank you for that clarification.

19   A    Thank you.

20   Q    You testified on direct that it was upon your

21   recommendation that Epstein Becker & Green were engaged

22   for some litigation purposes; is that correct?

23   A    For an employment purpose, correct.

24   Q    All right.  What was the nature of that litigation,

25   if you recall?

Richards - Cross/Haley

3841

1   A    An insider of Mr. Kenner's company named Kristin

2   Myrick was suing Mr. Kenner and his company for a lot of

3   claims that were embarrassing to this group and to

4   Mr. Kenner, and she had a lot of issues that are typical

5   when you find these type of employment claims.

6           So Epstein and Becker is a New York firm and an

7   LA firm that is very equipped to deal with employment

8   defense, and Mr. Kenner had a previous firm that was

9   representing his company, and I felt that this firm would

10  be better situated to represent them.  So I just referred

11  them to them, figuring that they would be a good fit for

12  them.  And they settled the case.

13  Q    Do you know, sir, within the context of that

14  litigation, if you know, Kristen Myrick was in possession

15  of corporate books and records as relates to the operation

16  of Little Isle IV?

17          MR. MISKIEWICZ:  Objection.  Scope.

18          THE COURT:  Overruled.

19          You may answer that.

20  A    She had records of these various companies that she

21  was keeping for Mr. Kenner, but that's from my input from

22  the litigation in reading the pleadings.  I never

23  interviewed Ms. Myrick.

24  Q    Sir, because you are an attorney at law, duly

25  licensed to practice law in the state of California and

Richards - Cross/Haley

3842

1  other jurisdictions, is it fair to state, sir, that in the

2  context of that litigation through something known as

3  pretrial discovery, the litigants like Phil Kenner would

4  be able to acquire those corporate records as that

5  litigation progressed?  Is that fair to state?

6  A    Yes, but -- I'm only licensed to practice in

7  California, but I'm a member of other bars, like the

8  United States Supreme Court and Second Circuit.  And I

9  appear pro hoc vice with permission of the Court.  But I

10 only hold one state license, and that is in California.

11            I wanted to clarify that.

12 Q    I appreciate that.

13            But as relates to your answer, the aspect and

14 character of that litigation would entitle the litigant,

15 in this case Phil Kenner, to acquire through pretrial

16 discovery those books and records; is that true?

17 A    Absolutely.

18 Q    So you said a moment ago that to the best of your

19 memory, Kristen Myrick brought the lawsuit against Phil

20 Kenner.

21            If I were to suggest to you it was the other way

22 around, would that refresh your recollection?

23 A    It could.  I mean, I wasn't their lawyer on the

24 lawsuit.  That may be correct.  I'm just saying I know the

25 concern was Kristen Myrick in her insider knowledge of

Richards - Cross/LaRusso

3843

1  that company.

2           There may have been a cross-complaint too.  I

3  just don't remember.  I wasn't the lawyer.

4           MR. HALEY:  Thank you, Mr. Richards.

5           THE WITNESS:  Thank you.

6           THE COURT:  Mr. LaRusso?

7           MR. LARUSSO:  Thank you, your Honor.

8  CROSS-EXAMINATION

9  BY MR. LARUSSO:

10  Q    Good afternoon, Mr. Richards.

11  A    Good afternoon, Mr. LaRusso.

12  Q    You testified this morning in answer to questions by

13  the Government that Mr. Privitello had wired money into

14  the trust account in December of 2009.

15           Do you recall that?

16  A    Yes.

17  Q    And that I believe you again, in response to a

18  question, testified that you assumed it was Tommy

19  Constantine who directed Mr. Privitello to send the money

20  to the trust account; is that right?

21  A    That's correct.

22  Q    You have no firsthand knowledge, do you, who gave

23  Mr. Privitello the instructions to wire the money into the

24  account?

25  A    No, I don't.

Richards - Cross/LaRusso

3844

1   Q    It's just possible that someone other than

2   Mr. Constantine could give him that information; is that

3   correct?

4   A    That's correct.

5   Q    Do you have that RR exhibit there?

6        Here it is, excuse me.

7        THE WITNESS:  I think Mr. Haley took it.

8        MR. LARUSSO:  No, it's up here.

9   Q    You've been talking about a number of litigations you

10  were involved in that you were paid moneys from the trust

11  account, and I believe there are one, two, three,

12  referencing the Jowdy litigation.

13       That's all the same litigation; is that correct?

14  A    Yes.

15  Q    And in regards to that litigation, who were your

16  clients?

17  A    The 19 plaintiffs in the complaint.

18  Q    When you say "complaint," do you remember when you

19  filed that complaint?

20  A    In June of 2009.

21  Q    I'm just going to show you what has been marked only

22  for identification purposes as C 104 A and 104 B.

23       You've seen those before appearing here today;

24  is that correct?

25  A    Yes.

Richards - Cross/LaRusso

3845

1   Q     Are those copies of a complaint that you filed in

2   regards to the Jowdy litigation?

3   A     Yes.

4   Q     Those are not file copies, are they?

5   A     No.

6   Q     Were any of those complaints circulated before you

7   actually filed the complaint itself?

8   A     Any of these or just complaints in general?

9   Q     Those complaints.

10  A     Yes, they were.

11  Q     How were they circulated and to whom?

12  A     By e-mail to the 19 hockey players and on to the 19

13  plaintiffs.

14  Q     And can you just tell us briefly, what part did you

15  do on the Jowdy litigation which has been referred to in

16  RR-1?

17  A     Well, initially we filed these complaints which were

18  timed with a press release, and we then got calls

19  immediately from the Southern District of New York and

20  other law enforcement, and then we started having our

21  client being interviewed relating to the allegations of

22  the complaint.

23          We were hit with what is called a demurrer, but

24  in English a motion to dismiss, attacking the theory of

25  individuals suing instead of suing on behalf of the

3846

1   company, the simplest way to say it.  This went on with a

2   series of back-and-forth motions.

3          We then -- Mr. Jowdy was refusing to provide any

4   documents related to these two investments, so we had to

5   file motions to compel his appearance.

6          They then moved to disqualify me, because of my

7   questioning of Mr. Jowdy in the arbitration, that I

8   represented Mr. Kenner.  They said it was different than

9   the theory I had in this case.  But our response was there

10  were different issues in the arbitration versus this case.

11         We finally got a court order for the documents.

12  We got the documents, and as a court order for the

13  deposition, they produced the documents.

14         The Court ordered them to come to my office, and

15  we videotaped them and deposed them for two full days.

16         We then appeared at a mediation with him, which

17  required preparation, and we were able to obtain a 50-acre

18  settlement offer from them.

19         That's all I can remember at the present time.

20  Q    Dealing with the Jowdy deposition, who was present

21  for the Jowdy deposition; do you recall?

22  A    John Kaiser.  I think Phil Kenner.  You know, if you

23  had the transcripts -- I actually intentionally have the

24  reporter list the people present -- then I wouldn't have

25  to guess.  They are on the face sheets of the transcripts,

Richards - Cross/LaRusso

3847

1    who was present.

2           But I remember John Kaiser specifically because

3    I was given an e-mail that morning by Sergei Gonchar

4    authorizing him to appear as his representation.  He

5    wasn't a party in the case.

6           And then I had other people there.  Players were

7    there sitting next to the deponent.  Myself, Mr. Jowdy's

8    lawyer.  They were all present.  But the names are on the

9    face sheet of the deposition.

10   Q    You anticipated my question in regards to Mr. Kaiser.

11          He was not a party in this litigation?

12   A    No, no.

13   Q    And I believe that's what you testified to?

14   A    He was not a party in the litigation, no.

15   Q    Can you tell us why he was present at a deposition

16   with Mr. Jowdy if he was not a party to the litigation?

17   A    Like I said, Mr. Gonchar indicated he wanted him

18   there as his representative, and he was a former police

19   officer, and everybody in the group liked him and

20   respected him.  And let's face it, they felt comfortable

21   with him.  He was law enforcement.

22   Q    Jumping to the mediation, did that take place also in

23   California?

24   A    It took place in front of retired Judge Robert

25   Altman.  I believe that's the judge's name.

Richards - Cross/LaRusso

3848

1  Q    What is a mediation?

2  A    You are in the middle of a civil suit, and both sides

3  are spending a lot of money.  And you say, hey, let's pay

4  a judge that is retired, not usually a practicing judge

5  like your Honor.  And the judge has been off the bench but

6  is still a very respected judge.  And both parties agree,

7  and you go to mediation.

8           And the judge goes from room to room.  And in

9  this room -- it was a very large room because all the

10  plaintiffs were there, and the judge tries to settle the

11  case.

12  Q    Was Mr. Kaiser there?

13  A    Yes.

14  Q    What role did he play?

15  A    Well, he was friendly with all these people.  I think

16  Mr. Kenner and him had business matters together, and he

17  was at his arbitration.  He was at the deposition.

18           I can't tell you -- I guess the same role

19  Mr. Constantine played, somewhat.

20  Q    Which was?

21  A    Which was someone liaisoning with the legal process

22  and assisting in this matter for 19 people that really

23  weren't that focused on the complexities of a lawsuit and

24  whether they should accept Mr. Jowdy's offer or not.

25  Q    Now, you mentioned also there were settlement

3849

1  discussions with Mr. Jowdy.

2          Did that take place on the date of the mediation

3  or did that take place another date?

4  A    Well, the mediation, we agreed in principle, was sort

5  of a working deal, and we narrowed the nuts and bolts of

6  it over the next few days.

7  Q    What were the discussions regarding settlement, and

8  what happened?

9  A    He basically was going to carve out 50 acres for the

10  players, he sent me a plot map --

11  Q    Who is "he"?

12  A    Mr. Jowdy.

13          Where they can have their 50 acres going to be

14  on the beach.

15          And the settlement broke down because the

16  players didn't want to do a press release, basically,

17  where you all stand next to the guy and say you are all

18  friends again.  There was so much animosity that they

19  would not -- that it broke down over that reason.

20          I was kind of surprised because I thought I

21  achieved the litigation objective of getting them

22  something back.

23          But the details never went through, and it went

24  back into litigation, which sometimes that does happen.

25          And the other issue was entitlements.  Because

Richards - Cross/LaRusso

3850

1  the 50 acres was sort of surrounded by the rest of the

2  development, there was going to be a dispute whether they

3  would have to provide the entitlements, the roads, the

4  sewerage.  And it became more complicated than we thought.

5        Those are the two -- goes back six years that I

6  remember, and it stood out.  And I was disappointed

7  because it didn't settle.

8  Q    I will not go into the information you provided to

9  Mr. Haley regarding the Moreau and Juneau suits.

10        But who do you represent with regards to the

11  Nolan arbitration with respect to Mr. Moreau and

12  Mr. Juneau?

13  A    I represented Mr. Kenner.

14  Q    Do you recall at any point in time in your

15  representation discussions about settling with Mr. Nolan

16  and/or the other two individuals?

17  A    Yes, I believe I settled one and I tried to settle

18  the other two.  I always try to settle cases.  Obviously,

19  being in a trial is not always the best result, usually,

20  in a civil case because it is expensive.

21  Q    What is your recollection with regards to the

22  settlements with regard to Mr. Moreau, Mr. Nolan and

23  Mr. Juneau?

24  A    I believe I offered a million dollars for Mr. Juneau

25  and Mr. Moreau; and $750,000 to Mr. Nolan.

Richards - Cross/LaRusso

3851

1   Q    And what happened?

2   A    I was able to settle Mr. Juneau; not Mr. Nolan and

3   Mr. Moreau.  It was half and half.

4        I settled it with Mr. Constantine much later at

5   a deposition he noticed.  And we were able to talk to him,

6   and he realized -- I mean to settle that case.  And it was

7   dismissed.

8        And I believe Mr. Moreau and Mr. Kenner just

9   dismissed his federal action after the lawyer -- after the

10  Nolan arbitration -- at some point after that arbitration.

11  Q    During the period of time that you are handling these

12  litigations and during the time you were receiving moneys

13  from the trust account, were you aware your efforts to

14  settle those particular lawsuits was part of a Global

15  Settlement Fund at that time?

16  A    What do you mean?

17       I don't know what you mean by that question.

18  Q    Did you know these particular lawsuits were part of

19  the reasons the moneys were deposited into your trust

20  account at the time?

21  A    You mean just the general wires that Mr. Miskiewicz

22  asked me about?

23  Q    Yes.

24  A    No, I wasn't part of any global plan, or it wasn't

25  part of my representation.  I was hired to file lawsuits

Richards - Cross/LaRusso

3852

1    and defend defendants.

2    Q    And you didn't discuss anything further than that?

3    A    With respect to the wires that Mr. Miskiewicz showed

4    me?

5    Q    Yes.

6    A    No, no one showed me.

7    Q    Let me show you what has been marked as Defendant's

8    Exhibit C-83 and 84, just to complete the record.

9         Do those documents refresh your recollection who

10   may have been present, other than the one you said at the

11   Jowdy deposition?

12   A    Yes, Greg DeVries was present.  He was one of the

13   plaintiffs.  Jason Wooly.  Mr. Kenner was present.  I

14   believe Mr. Constantine may have been on the phone

15   listening in.  I vaguely remember that, but that wasn't on

16   the record.

17        Mr. Kaiser was present.  Mr. Caffey Jowdy, Jr.,

18   Mr. Jowdy's brother.  And Tom Barker was the videographer.

19   Q    That's just to complete the record.

20   A    Yes.

21   Q    In regards to Mr. Constantine, you testified that he

22   was a client of yours.  He was also a defendant in the

23   Juneau-Moreau suit; is that correct?

24   A    In Los Angeles, correct.

25   Q    Did Mr. Constantine pay separately your role and

Richards - Cross/LaRusso

3853

1   services in regards to that lawsuit?

2   A    Yes.

3   Q    When I say "separately," it didn't come from the

4   trust account moneys that Mr. Miskiewicz was outlining for

5   you; is that correct?

6   A    It did not come from the withdrawals and deposits

7   that Mr. Miskiewicz showed me on the board.

8   Q    Do you know a man by the name of Mr. Sonenglick?

9   A    I do.  I represented him.

10  Q    In what capacity?  Tell us a little bit about that.

11  A    He was sued by Ken Jowdy for intentional interference

12  and malicious prosecution, and I took over an anti-slap

13  motion filed against Mr. Jowdy's complaint.

14        The Court granted that anti-slap motion, which

15  is just a motion you can file before the trial, and you

16  sometimes have privileges regarding to First Amendment and

17  freedom of speech, like you can't be sued for what you say

18  in a courtroom.  We have a procedure in California.  So I

19  represented him for that.

20        I was able to settle the case with Mr. Jowdy

21  after the dismissal.  We waived attorney's fees, and

22  Mr. Jowdy waived his appellate rights, and we settled the

23  case.

24  Q    Again, Murray, you told us you represented him in a

25  suit against Mr. Jowdy; is that correct?

3854

1   A    That's correct.

2   Q    Do you remember how much you were paid for that

3   representation?

4   A    I recall being paid about $42,000.

5   Q    You weren't paid $140,000, were you?

6   A    I do not recall being paid anywhere close near

7   140,000, but I could see how he could have thought close

8   to 140,000.

9   Q    How is that?

10  A    Because there was a local counsel as the trial was in

11  Las Vegas, and I had him hire the mayor's son, Ross

12  Goodman, who is a very good, well-respected lawyer there.

13  He's the mayor's son.  His friend is a very good lawyer

14  and everybody knows him on the west coast.  So he had a

15  $55,000 bill to a guy named Lars Evenson.

16          And there was a motion to withdraw, and the

17  lawyer withdrew from representation.

18          So at the last minute I was contacted by

19  Mr. Murray and Mr. Kenner to do this trial again in the

20  summer in Nevada.  And I had to go to Nevada for a couple

21  of days.  And believe me, I wasn't asking for that

22  assignment, but they felt that because of my experience

23  with Mr. Jowdy, that I would be the right trial lawyer to

24  come in and try the case.

25  Q    Did that end in a judgment for Mr. Murray?

Richards - Cross/LaRusso

3855

1   A    It did.  He was able to obtain a million dollar

2   judgment against Mr. Jowdy, and I recorded it in

3   California.  I also believe it was domesticated in Arizona

4   as well by Mr. Baker.

5   Q    Was that judgment collectable?

6   A    Well, Mr. Murray -- is it collectable?

7        It depends.  I'm not presently charged with

8   collecting it, so I would say right now it is not being

9   collected.  But it's there.  It is the only judgment I'm

10  aware of in the United States against Ken Jowdy.  I don't

11  know of any lawyer who went to trial and get a judgment.

12       His assets are in Mexico.  And when he testified

13  in this case related to the hockey players, he said all of

14  his assets were in Mexico.  And that was one of the

15  reasons why dismissing the case without prejudice -- means

16  they can file again.  That was a big consideration.  Why

17  sue somebody that doesn't have any assets in the United

18  States?

19  Q    You jumped ahead of what I was going to ask you.

20       With regard to the Jowdy litigation, what

21  happened to it?

22  A    It was -- the lawsuit was dismissed without

23  prejudice, meaning at any time someone could file it

24  again.  And since Mr. Jowdy was represented over and over

25  again, that all of these players have very good interests

3856

 1    in his development, that the clock isn't really ticking.

 2            Except he's never provided them any

 3    distributions, as far as I know, all these years.  That's

 4    been the reoccurring problem, which is what started the

 5    lawsuit from my office's point of view to begin with.

 6    Q    By the way, you mentioned that Mr. Jowdy was deposed.

 7    He was the defendant in civil litigation.

 8            Plaintiffs likewise would be deposed by the

 9    defendants?

10    A    Yes.

11    Q    Were there any efforts to depose the hockey players?

12    A    Yes, after the mediation broke down and we didn't

13    settle it.  So they got an expedited deposition schedule

14    to depose all the plaintiffs.

15    Q    And what happened?

16    A    Well, some of them were in the Olympics, but others

17    were around.  But they never got deposed because we

18    dismissed the lawsuit on the first day of depositions

19    without prejudice.

20    Q    Why was it dismissed at that point?

21    A    Because I personally felt pursuing it was going to be

22    a waste of money.  And if I had to sit there for 19

23    depositions, that would have been a very big fee event,

24    and it wouldn't have been a good use of resources when the

25    deponent had already testified very recently that he has

3857

1   no assets.

2           His address for his company was his father's

3   house in Danbury, Connecticut.  This isn't somebody that

4   has a big corporate structure in America.  All his eggs

5   are in one basket, and that is the development in Cabo.

6   The development up north had already been foreclosed on

7   and was lost.  That was the only assets that I was aware

8   of that was attachable.

9           In civil law we don't sue people with no

10  attachable assets in the jurisdiction they are in.

11          In the Vegas case, he did have a house

12  originally in Vegas that was his US address.  And when he

13  lost the house and lost the case, he put everything back

14  to his father's house or uncle's house.  He switches him

15  off back in Danbury.

16          Now there is active litigation in Delaware.

17  Q    I'll not get into it.

18  A    I'm not either, but it's still going on.  And

19  fortunately I'm not a part of it.

20  Q    Mr. Richards, you testified that -- I believe in

21  response to a question that Mr. Miskiewicz had asked you

22  regarding a 22,000 disbursement from the trust account,

23  and you classified it as a cost reimbursement.

24  A    I have a recollection.

25  Q    Do you have a particular amount that was approved for

3858

1    Mr. Constantine?

2    A    I do.

3    Q    Tell us about that.

4    A    There's a restaurant in Beverley Hills called

5    Mr. Chow, and Mr. Kenner put in an expense reimbursement

6    for work he was doing, and Tommy wouldn't authorize that

7    reimbursement.

8    Q    So in other words, he was not allowing trust fund

9    moneys to be paid for an expense that he felt was not

10   proper; is that correct?

11   A    He just -- I forgot -- again, that was his decision.

12   But for whatever reason, I just remembered that

13   restaurant.  He was not going to allow reimbursement for

14   that restaurant.  So he said no and authorized the rest of

15   it.

16        I remember it because he went through the

17   list -- a wire back to Mr. Kenner or Mr. Constantine, that

18   kind of stood out in my mind, so that's why I remember it

19   to this day.  It was sort of a comment, like, why is this

20   wire going back to Mr. Kenner.  I just remembered that

21   when you showed it to me.

22   Q    One or two more questions.

23        Mr. Brian Berard, he was one of the plaintiffs

24   in the Jowdy litigation, correct?

25   A    Correct.

3859

1    Q    And during the time that you were handling that

2    litigation, did you communicate, and if you did so, how,

3    with your clients?  What was the status regarding the

4    case?

5    A    I always did it by e-mail.  I had a column called

6    Jowdy clients, and I would press the button, Jowdy

7    clients, and it would be a compacted jacket in your e-mail

8    so if you clicked on it twice it would expand and would

9    expand to 19.  I built an address book, and I was going to

10   communicate that way.

11   Q    Particular to Mr. Berard?

12   A    He was on the e-mails, B Berard at something.

13   Q    Did you keep the hockey players, including

14   Mr. Berard, updated on the work you were performing on

15   their behalf on the Jowdy litigation?

16   A    I believe I did.

17   Q    Do you recall having a conversation with Mr. Berard

18   about the complaint and the allegations in the complaint,

19   whether or not he received that information from you?

20   A    I just remember sending him the complaint along with

21   everybody else.  That's what I remember.

22   Q    At a subsequent time after it was dismissed?

23   A    I remember he made a crack to somebody that he didn't

24   know that the complaint was dismissed, and I remember

25   specifically sending him an e-mail with a PDF of the prior

Richards - Redirect/Miskiewicz

3860

1    e-mail with my letter explaining why we were dismissing.

2    And I said, you should read your e-mails more carefully.

3    Because I would never dismiss a lawsuit without notifying

4    the clients and asking if anybody objects.

5              That was a big event, so I just didn't dismiss

6    it without sending a written communication about it.

7    Q    One more question.

8              You spent considerable time answering over 30

9    questions regarding the transfers of money being

10   authorized by Mr. Constantine from the trust account.

11             Would you have transferred any of that money if

12   you knew or felt there was any impropriety?

13             MR. MISKIEWICZ:  Objection.

14             THE COURT:  No, I'll allow that.  Overruled.

15             You can answer that.

16   A    You mean transferred it out of the trust?

17   Q    Yes.

18   A    No.

19             MR. LARUSSO:  No further questions, your Honor.

20             THE COURT:  Redirect?

21   REDIRECT EXAMINATION

22   BY MR. MISKIEWICZ:

23   Q    Mr. Richards, with respect to the questions you got

24   from counsel for Mr. Kenner about the Myrick lawsuit, do

25   you remember what the lawsuit alleged, Ms. Myrick against

**Richards - Redirect/Miskiewicz**

3861

1    your then alleged client Mr. Kenner?

2    A    If you show it to me then I may remember.

3    Q    Well, showing you a document, RR-2.  Showing you

4    RR-2, and I'll ask you to look at these three -- paragraph

5    14.  Just read it to yourself, and then I'll ask you a

6    question.

7    A    Okay.  You are asking me what Mr. Kenner alleged is

8    in the lawsuit, correct?

9    Q    I'll ask you those questions, but I think there is an

10   objection.

11              MR. HALEY:  Your Honor, may we approach, please?

12              THE COURT:  Yes.

13              (Whereupon, at this time the following took

14   place at the sidebar.)

15              (Continued.)

16

17

18

19

20

21

22

23

24

25

Richards - Redirect/Miskiewicz

3862

1    MR. MISKIEWICZ:  This is paragraph 14 I'm using

2  to refresh his recollection.

3    MR. HALEY:  Judge, I'm not sure what paragraph

4  14 says.

5    THE COURT:  I think this is consistent with it

6  (handing to counsel).

7    MR. HALEY:  My focus was very limited.  I'm a

8  little surprised it was moving in that direction.  There

9  was testimony that he was under the impression that she

10  had commenced a lawsuit against him, a date I pointed out

11  that he had commenced a lawsuit against her.  And I then

12  asked questions about how he would obtain pretrial

13  discovery with respect to the lawsuit.

14    I did not go into, as best I recall, specific

15  allegations made by the parties in the lawsuit for fear

16  there would be just distraction.

17    THE COURT:  I don't know how much detail this

18  paragraph you are going into --

19    MR. MISKIEWICZ:  Just within the nature of the

20  allegations made by Ms. Myrick in that lawsuit.  And it is

21  relevant because it was brought up because Ms. Becker

22  testified that fund moneys weren't going to be used by

23  anybody to defend Mr. Kenner in a lawsuit brought by his

24  former secretary who, among other things, was alleging

25  claims -- things they thought was defamatory.  The

Richards - Redirect/Miskiewicz

3863

1    defamatory nature.  She was saying, this guy is stealing

2    your money.

3           MR. HALEY:  Well, again, I think that is -- I

4    think if we start to go into the nature of the claims in

5    the lawsuit, Judge, I don't believe I've opened the door

6    as far as that.  I think I was very focused who commenced

7    the lawsuit and who obtained pretrial discovery.

8           Paragraph 14 I have no objection to.

9           MR. MISKIEWICZ:  Not admitting it.

10          THE COURT:  But going into the details.  If you

11   want to bring out that -- that Mr. Kenner was suing her

12   for making false accusations in general against him

13   related to investments and things like that, that is okay.

14   But I'll not allow you to go on line by line with respect

15   to the details.

16          MR. MISKIEWICZ:  That's fine.

17          MR. HALEY:  Thank you, Judge.

18          (End of sidebar conference.)

19          (Continued.)

20

21

22

23

24

25

Richards - Redirect/Miskiewicz

3864

1    MR. MISKIEWICZ:  Your Honor, may I lead on that?

2    THE COURT:  Yes.

3  BY MR. MISKIEWICZ:

4  Q    So, Mr. Richards, having had an opportunity to look

5  at RR-2, does that refresh your recollection as to what

6  the nature of the lawsuit was generally?

7  A    Yes.

8  Q    Is it fair to say Mr. Kenner was suing Ms. Myrick,

9  his former employee, because he believed that she was

10  making false allegations against him?

11  A    Yes.  We weren't the lawyer or the law firm.

12  Q    You were also asked by Mr. LaRusso -- withdrawn.

13        I have a couple of other things.

14        Both Mr. LaRusso and Mr. Haley asked you about

15  the lawsuit in California against Ken Jowdy, and I'll

16  refer to it as the 19-player or 19-plaintiff lawsuit.

17  A    Okay.

18  Q    Some other -- all of which I take it was paid for out

19  of this transfer from the escrow account into your own law

20  firm account as depicted in RR-1, correct?

21  A    Correct.

22  Q    Glen Murray, you said, you had actually received not

23  $140,000 or whatever he may have testified -- by the way,

24  who told you what he testified to?

25  A    It was in the Daily News.

Richards - Redirect/Miskiewicz

3865

1    Q    But you said that he had other counsel who also --

2    who he had to pay in that litigation against Jowdy?

3    A    He had a prior counsel, Mr. Lars Evenson, that he had

4    already run up a bill of 55,000.  And he had a pending

5    motion to withdraw.  He had local counsel that I brought

6    on.

7    Q    And did he also pay you some amount of money?

8    A    Yes, he paid both of us separately, Mr. Goodman and

9    himself.  His credit card.

10   Q    It didn't come out of the escrow account?

11   A    No.

12   Q    He paid you directly?

13   A    Yes, sir.

14   Q    And finally, on the other civil lawsuit, the

15   19-player lawsuit against Ken Jowdy, that was filed in

16   superior court in Los Angeles; is that correct?

17   A    That's correct.

18   Q    And it was filed in or about June 18th of 2009?

19   A    That's correct.

20   Q    And by February of 2010, it was dismissed?

21   A    Yes.

22   Q    Basically on your motion on behalf of the 19 players?

23   A    It wasn't a motion.  It was a form called request for

24   a dismissal that I signed and filed.  The minute the clerk

25   stamped "received," it's dismissed under California law.

3866

1    It wasn't a motion.

2    Q    And that was done without prejudice?

3    A    That's correct.

4    Q    Now, during this period of time were you in direct

5    communication -- other than e-mails, were you in direct

6    communication with these 19 players, or did

7    Mr. Constantine or Mr. Kenner act as, I think you

8    mentioned during your cross, liaison?

9    A    I mostly dealt with Mr. Constantine and their agent,

10   Mr. Kenner, but I also did receive e-mails from the

11   players directly, you know, if they liked something I did

12   or they had questions throughout this time.

13          So the majority of time was with Mr. Constantine

14   and Mr. Kenner, but I did have direct communication with

15   the players.

16   Q    And --

17   A    Some of the players.

18   Q    At the point of time that you recommended in your

19   best judgment to dismiss, you had obtained a videotaped

20   deposition of Mr. Jowdy?

21   A    Two days.

22   Q    So you are familiar with what Mr. Jowdy would have

23   said at trial, right, or what he said in response to the

24   deposition questions you gave him, correct?

25   A    I know what he said at the deposition, but I don't

Richards - Redirect/Miskiewicz

3867

1    know that's what he would say at trial.  I knew that's

2    what he testified under oath at the deposition, but I

3    don't know what he would have said at trial.

4    Q    My point is, you are familiar with what his

5    deposition testimony was because you were right there

6    during the questioning?

7    A    I was, but I don't know it today.  If you showed me,

8    I probably would remember it.

9    Q    I promise you I will not ask.

10          But I'll ask you this:  Mr. Peca, Mr. Sydor, Rem

11   Murray, Tyson Nash, William Ranford, they were all retired

12   hockey players.  They had nothing to do with the Olympics

13   that year in 2010.  They could have come to a deposition

14   at any point, right?

15   A    That's correct.

16   Q    And other players, Greg DeVries, Mr. Norstrom,

17   Mr. Rucchin, Mr. Rem Murray, Mr. Stolper, they weren't

18   even in the Olympics?

19   A    They were, but some of them did live far away.

20          If you are asking me why was that put out there,

21   that was the real reason why it was put out there with

22   respect to the justification to not do the deposition, the

23   separate justification for the dismissal.  But I can

24   address that if you want.

25   Q    I really only just want the truth.

Richards - Redirect/Miskiewicz

3868

1      What was the reason for the dismissal?  Because

2  everybody was spread out and it would have been too

3  expensive to have depositions, or was it because the

4  Olympics were going on and there was some sort of

5  scheduling conflict?

6  A    The most important reason was expense.  Some

7  people -- I can't tell you who was in the Olympics and who

8  wasn't, but I was told from Mr. Constantine and Mr. Kenner

9  that some were in the Olympics, or some were involved with

10  it.  That was one of the reasons.

11      But the other reasons were people lived far

12  away.  It seemed to be a waste of money to have all these

13  people deposed when the target defendant has no assets in

14  the United States.

15      So that was one of the justifications given to

16  try to buy some time with the other side during this

17  period after the settlement negotiations broke down.

18  Q    Isn't it true, sir, at some point Mr. Constantine

19  suggested, well, let's just go find some more defendants?

20  A    I don't know --

21  Q    I'm sorry, more plaintiffs?

22  A    You mean to become -- like corporate plaintiffs?

23  Q    Whoever.

24  A    But Mr. Constantine wasn't in charge of the legal

25  case with respect to that decision.  I think when I made

Richards - Redirect/Miskiewicz

3869

1    the decision to dismiss the case, it was the right

2    decision, and I wasn't going to refile it based on the

3    facts I know.

4            And Mr. Constantine and Mr. Kenner aren't going

5    to influence that decision with my firm's name on it.  I

6    made the decision to finish the case.

7    Q    You, based on your best judgment as their counsel,

8    somewhere between the filing in June of '09 and

9    February 2010 when depositions had begun, you came to the

10   conclusion this lawsuit was not going to go anywhere

11   because you wouldn't be able to get any assets from

12   Mr. Jowdy?

13   A    That's correct.

14   Q    And also, that was in addition to the fact there had

15   been some mediation.  You said there was a 50-acre offer

16   of some kind?

17   A    Yes.

18   Q    Where?

19   A    At the development in Cabo.  He had offered to carve

20   out 50 acres for the players.  But it never panned out

21   because it sounded good in theory, but when it came to

22   deliverables, like the press conference or the positive

23   press releases -- again, I don't handle the business side.

24   I was happy to settle it, but the clients and their

25   advisors and all the people involved in it just decided

Richards - Redirect/Miskiewicz

3870

1   not to settle it.  I would have liked to settle it, but it

2   wasn't my call.

3   Q    Okay.  Your lawsuit focused on allegations by your

4   clients, the 19 players, that Mr. Jowdy had mismanaged a

5   particular real estate venture, correct?

6   A    Generally correct.

7   Q    And that real estate venture in your complaint that

8   was filed focuses on something called Diamante el Rosario,

9   right?

10  A    That was one.  There was two.  There was one in Cabo.

11  There were two separate ventures.

12  Q    So your lawsuit covered both?

13  A    Yes.

14  Q    Now, you've been down to the Baja, California, area,

15  or did you become familiar as to where these two

16  properties were based on your litigation?

17  A    I don't like to go to Mexico.  I like staying here.

18  So if I've been forced to go to Cabo for a wedding or

19  something I didn't want to do --

20  Q    My question is, did you take a look at Google Maps to

21  get a sense how far one was from the other?

22  A    I know they're something like 800 miles apart.  One

23  was North and one was South Baja.

24  Q    And el Rosario, was that north or south?

25  A    I'm guessing the north.  I believe Diamante was in

Richards - Redirect/Miskiewicz

3871

1    the south.

2    Q    And el Rosario, based on your preparation of the

3    lawsuit, based on this time in June of 2009, was a

4    business failure?

5    A    Yes, because he borrowed money and caused it to be

6    lost in foreclosure.

7    Q    That was the allegation?

8    A    That was the allegation.

9    Q    And if there was a deposition, these 19 players would

10   have to come and testify and be shown records and testify

11   as to whether or not they knew any of those allegations

12   firsthand as opposed to secondhand, correct?

13   A    That's correct.

14   Q    And the offer was for 40 acres, not in the el Rosario

15   failure but rather in Cabo?

16   A    It was the 50 acres.

17   Q    50 acres, sorry.

18   A    In the development that is there today, that is

19   correct.

20   Q    And who told you that the players rejected that in

21   part because they didn't want to be seen and whatever,

22   some press coverages and everybody shaking hands and

23   making up?  Who told you that?

24            MR. HALEY:  Judge, I just object to the form.  I

25   just object to the form of the question.

Richards - Redirect/Miskiewicz

3872

1    THE COURT:  No, you can answer that.

2    A    Mr. Constantine.

3    Q    Did Mr. Constantine tell you that Mr. Kenner at that

4    time and today owns 40 percent of Cabo San Lucas, Ken

5    Jowdy's company?

6    A    Did he tell me that?

7    Q    Did he tell you that.

8    A    I mean, I know -- I believe from reading the

9    corporate documents he had an ownership interest in it,

10   yes.

11   Q    39 percent, right?

12   A    Yes.  If you show me the documents, I believe that

13   was correct.

14   Q    Did anybody, yourself included, tell the players that

15   they are suing a guy, Ken Jowdy, for allegedly mismanaging

16   things down in Mexico when in fact Mr. Kenner was almost a

17   half owner in that property?

18   A    Do I know if the players understood that?

19   Q    Did you tell them?

20   A    I don't remember having that specific discussion, but

21   I remember everybody knowing that Mr. Kenner and his group

22   owned, I guess, almost half and Mr. Jowdy, I guess, the

23   other half.  But I don't remember having a discussion of

24   that.

25   Q    You said you looked at the corporate records, right?

Richards - Redirect/Miskiewicz

3873

1    A    I did in the litigation six years ago, yes.

2    Q    So you know there is a parent company called Diamante

3    Cabo San Lucas which is on the top of this pyramid, let's

4    say?

5    A    Yes.

6    Q    And CSL and Cabo San Lucas Partners or LLC?

7    A    It sounds right, but without -- without having the

8    operating agreements, I wouldn't remember every name.

9    Q    That's where the players had an interest in Cabo,

10   that CSL group?

11   A    To the best of my recollection, that's what it sounds

12   like.

13   Q    There is something called Baja Ventures 2006 LLC, and

14   there is only one person who owns that, Mr. Kenner, and

15   that's 39 percent of the company.

16        Right?  You knew that.

17        MR. MISKIEWICZ:  He's nodding yes, Judge.

18        I would like you to answer the question without

19   influence from Mr. Kenner.

20        THE WITNESS:  I'm not looking at him; I'm

21   looking at you.

22        MR. HALEY:  I would object to that.

23        I object to that statement.

24        THE COURT:  The jury will disregard the

25   statement.  I'm sustaining this line of questioning.  It's

Richards - Recross/Haley

3874

1   over.  It's done.

2   Q    Next question.  What, if anything, does that have to

3   do with Hawaii?  In other words, what, if anything, does

4   this lawsuit have to do with investments in Hawaii?

5              MR. HALEY:  Objection, your Honor.

6              THE COURT:  Sustained.  It's done.

7              MR. MISKIEWICZ:  Thank you.  No further

8   questions.

9              MR. HALEY:  One question, Judge.

10  RECROSS-EXAMINATION

11  BY MR. HALEY:

12  Q    Mr. Richards, with reference to the 19 plaintiffs

13  versus Jowdy, as reflected in RR-1, and the expenses

14  associated with that, sir, as best you know, were paid out

15  of that trust account.

16              Is it not true, sir, that Phil Kenner paid

17  directly for expenses related to that lawsuit,

18  specifically deposition expenses as well as filing fees?

19  Do you recall that?

20  A    Which lawsuit are you referring to?

21  Q    That would be the lawsuit in Plaintiff's 19 versus

22  what Jowdy filed in California.

23  A    You are saying that Phil Kenner paid for the lawsuits

24  in the beginning or the end?

25  Q    Do you have a recollection that at the beginning of

3875

1    the lawsuit a deposition expense -- excuse me.

2           Do you have a recollection, sir, that at the

3    conclusion of the lawsuit a deposition expense

4    approximating $7,000 that involved a deposition of Ken

5    Jowdy was paid out of Phil Kenner's own pocket?  Do you

6    have a recollection of that?

7    A    You mean Phil Kenner paid for a transcript of the

8    video?

9    Q    Yes.

10   A    I vaguely recall Mr. Kenner paying a litigation bill.

11   Q    And you said a moment ago it was a videotaped

12   deposition?

13   A    A video, and someone transcribed -- like someone like

14   in --

15   Q    Those depositions that are videotaped and recorded

16   stenographically, are they typically more expensive?

17   A    Yes.  And this was a DVD.

18   Q    Not a VHS?

19   A    No, sir.  Those are long gone.

20          MR. HALEY:  I have no further questions.

21          MR. LARUSSO:  Just a few, your Honor.

22   RECROSS-EXAMINATION

23   BY MR. LARUSSO:

24   Q    Mr. Richards, did any of the hockey players object to

25   the dismissal of the Jowdy litigation at the time?

3876

1    A    No.

2    Q    As a matter of fact, before you actually filed that

3    dismissal you had been in communication with them?

4    A    I sent a letter saying I was going to dismiss it, and

5    if anybody had any issues to contact me.

6    Q    Your decision to dismiss was based in part, I believe

7    you said, on Mr. Jowdy's assets being in Mexico.  It was

8    not based on due to any lack of merit on your part?

9    A    I wouldn't say that.

10           When you say "lack of merit," I think that it

11   was -- that we were suing -- our direct claims and the

12   demurrer, the motion to dismiss, were based on a

13   derivative claim, a claim on behalf of the company.  So if

14   you win, all the money goes back to the company.

15           And as the discovery progressed and the case

16   progressed, there were some issues, I believe, with

17   respect to whether we would win the lawsuit.

18   Q    Mr. Constantine, do you acknowledge -- do you have

19   any interest in Cabo?

20   A    No.

21   Q    Do you recall, during the time that you were handling

22   the Jowdy litigation, participating in conference calls

23   that Mr. Constantine had set up with the hockey players?

24   A    I remember some conference calls.

25   Q    And do you recall the nature of the discussions at

Richards - Recross/LaRusso

3877

1    all?

2    A    Just general discussions about everything that is

3    going on with these -- you know, they all owned a bunch of

4    things together.  They owned one of these companies,

5    Eufora, the Airpark.

6         During Mr. Kenner's arbitration I went to the

7    Airpark to look at it, to see that it was there.

8    Q    So you did participate in these conference calls?

9    A    Not every conference call.  I said there were

10   conferences call I remember.

11        You asked me generally.  My own role was to talk

12   about the case.  But just from being an observer, it was

13   obvious to me everyone owned something together or had a

14   relationship.  They weren't strangers.  It wasn't only my

15   recollection to the restaurant.

16   Q    Generally other topics of conversation?

17   A    Generally other topics, that is correct.

18        MR. LARUSSO:  No further questions.

19        THE COURT:  Mr. Richards, you may step down.

20        Members of the jury, it is 3:30.  We'll end for

21   today.

22        The Government has two brief witnesses tomorrow

23   morning through which they'll seek to introduce summary

24   charts, so I expect them to be relatively brief, and then

25   we'll go into the defense case.  We can't deal with those

Proceedings

3878

1    witnesses today, but we'll do them the first thing in the

2    morning.

3            I want to remind you again, the Government has

4    the burden of proof at all times to prove the case, all

5    the elements of the crime, beyond a reasonable doubt.  But

6    the defendants do not have any obligation to present any

7    evidence, but they have the right to present evidence if

8    they wish to.

9            As I told you last week, they do intend to

10   present evidence.  So tomorrow Mr. Kenner's lawyer will go

11   first in presenting his evidence, followed by Mr. LaRusso.

12   So that's the procedure we'll follow.

13           Don't read or listen to anything regarding the

14   case.  Don't discuss the case.

15           I'll see you tomorrow morning at 9:30.

16           Thank you.

17           (Whereupon, at this time the jury exits the

18   courtroom.)

19           THE COURT:  If everybody will be seated.

20           Where in the rules of evidence are you able to

21   comment on the demeanor of a defendant as you are

22   questioning a witness in the trial?  You know you are not

23   permitted to do that.

24           You gave a reference to "the defendant shaking

25   his head yes."  You are correct if he does do that -- no

**Proceedings**

3879

1   one is suggesting Mr. Kenner has to shake his head to

2   agree upon something.  For you to point this out is not

3   proper.  You know that.  In the questioning of a witness,

4   referring to other people's demeanor in the courtroom, to

5   testify to that, what are the rules that would permit you

6   to do that?  It's fairly obvious it is not proper.

7          MR. MISKIEWICZ:  You are right, your Honor.  I

8   apologize.  I let the moment get the best of me.  Sorry

9   about that.

10         THE COURT:  It cannot happen again.  The jury is

11  observing what is happening in the courtroom.  If the

12  defendant is having any type of recollection, they are

13  observing what Mr. Kenner is doing.  And if you have any

14  issues with what he's doing -- and it is not appropriate

15  for the defendant to be shaking their head or making any

16  other kind of gestures with respect to any witnesses.

17         I'm happy to again warn you regarding that, but

18  do not do it under questioning of the witness.

19         MR. MISKIEWICZ:  Understood.

20         THE COURT:  Mr. Haley, I'll tell you to instruct

21  your client he shouldn't have reaction to testimony.  You

22  have since we asked you not to make innocuous gestures --

23         MR. HALEY:  I've been less innocuous.

24         THE COURT:  Yes, but I want you to speak to

25  Mr. Kenner again.  It is not acceptable.  I will not

**Proceedings**

3880

1    tolerate it.

2          MR. HALEY:  Your Honor, I will.  Oftentimes I'm

3    looking at the witness as he's seated, but I'll instruct

4    my client.

5          THE COURT:  So I want the Government to make

6    available these binders to facilitate Mr. LaRusso and

7    Mr. Haley's review of the charts.

8          MS. KOMATIREDDY:  They are in the courtroom,

9    available, your Honor.

10         THE COURT:  In terms of your overall objection,

11   Mr. LaRusso, I didn't look at every single chart.  To the

12   extent you believe these are not proper under the rules,

13   obviously if there is an issue of accuracy, you can

14   address them with the witness.  But if they are outside

15   what the rules anticipate -- I don't agree what you refer

16   to them as summation charts.  They are not inflammatory in

17   any way.  They are not argumentative in any way but just a

18   summary list of transactions.  And I don't view them --

19   I've seen exhibits that the Government has utilized that

20   have -- I don't want to say they are boring charts.  It is

21   a very long list of bank records and transactions and

22   lists the one for each player and each account in one

23   sheet of paper in the form of a summary.

24         I certainly think it is appropriate under the

25   rules, when I don't know how many pages of bank records

**Proceedings**

3881

1   are in this case, so the jury doesn't have to flip through

2   every single bank statement to figure out what

3   transactions are which for each hockey player and each

4   account.

5        If there are other transactions you believe that

6   should be in there that aren't in there, that goes to the

7   weight of the charts, and you can point that out.  But I

8   don't want to have a big battle tomorrow morning about the

9   admissibility of those charts in general.

10       MR. LARUSSO:  As of now, Judge, that is our

11  present approach, is to take what is missing or what they

12  present and on cross-examination attack it from that point

13  of view.

14       THE COURT:  If -- again, to save time, if you

15  believe there are other transactions that should be in a

16  chart of that nature from the same bank account in your

17  defense case, you can introduce your own summary chart

18  that contains a more complete version of the transactions,

19  if you think that would be easier.

20       MR. LARUSSO:  Judge, I'll not belabor the point.

21  We may do a little bit of that.  I'll not do it ad

22  infinitum.

23       But our concern when we first reviewed your

24  decision was that I saw a direct examination would take a

25  very long period of time, and all we'll hear is a

**Proceedings**

3882

1  summation of bank records.

2          THE COURT:  Believe me, when I saw the exhibits

3  I had the same concern.  I asked Ms. Komatireddy to tell

4  me how long it would be, and she said 20 or 30 minutes.

5          MS. KOMATIREDDY:  Your Honor, our intention is

6  to have Special Agent Wayne describe how he created the

7  charts for the first one or two, explain how the binders

8  match up and the exhibits match up, and just go through

9  the rest.  Should be 30 or 40 minutes.

10          MR. HALEY:  Your Honor, my only observation,

11  some of the charts have color coding on them, red and

12  green.  I guess the red means very bad.  Some of the color

13  connects with particular transactions.

14          THE COURT:  I don't have a particular color in

15  mind.

16          MS. KOMATIREDDY:  The boring charts are not in

17  color.  They are blue.  There is yellow and red.  Yellow

18  is incoming; red is outgoing.

19          MR. LARUSSO:  I don't have a color printer, your

20  Honor.

21          MR. HALEY:  Thank you.  We received them.

22          THE COURT:  If that represented something very

23  bad, that would be my concern.

24          Mr. LaPinta?

25          MR. LAPINTA:  May I approach the Court?

**Proceedings**

3883

1          THE COURT:  Yes.

2          Based upon Mr. LaRusso's cross-examination of

3     Mr. Richards, where I believe he got all he wanted to get

4     out with respect to the reasons for dismissal -- correct?

5          MR. LARUSSO:  Yes.

6          THE COURT:  I don't believe any privilege has

7     been waived with respect to communication between

8     Mr. Constantine and Mr. Richards.

9          Mr. Richards was asked what his reasons were for

10    doing it.  Mr. LaRusso didn't seek to use this letter that

11    we were discussing before.  So I think that was a fair

12    response to what Mr. LaRusso was concerned about and had

13    been implied by other questioning by other witnesses.  So

14    his reasons came out.

15          So I don't believe there is any basis for any

16    waiver of the privilege with respect to any other

17    communications on that issue.

18          MR. LAPINTA:  Your Honor, I agree.

19          My review of the transcript from the other day

20    that I was here, there is a significant misstating of a

21    word I would like to draw to your attention.  We can come

22    back and address this tomorrow.

23          3,746, line 9.  The Court states to me in

24    response to a question:  "I don't think Mr. Richards'

25    testimony, given what I think Mr. Constantine and

**Proceedings**

3884

1   Mr. Kenner's defenses are in this case, that he's a

2   `credible' witness in this case."

3          Your word was "critical" witness.

4          THE COURT:  The court reporter should change

5   that.  It was "critical," not "credible."

6          MR. LAPINTA:  Thank you.

7          THE COURT:  I was going to place my ruling on

8   the record that the testimony was not privileged, and as

9   related to the count, I believe the Crime Fraud Exception

10  applies.

11         I also want to make clear for purposes of your

12  client -- and there are cases that reflect this -- that my

13  conclusion that the Crime Fraud Exception applies is not a

14  finding that Mr. Richards did anything wrong with respect

15  to that account.  The case law is very clear.  There is

16  sufficient evidence to support the Crime Fraud Exception

17  with respect to the defendants.  The fact that a lawyer

18  may have unknowingly been involved in the transactions

19  would not prevent the exception from applying.

20         I want to make clear in ruling on that, I'm not

21  making any finding with respect to Mr. Richards' conduct

22  in the case.

23         MR. LARUSSO:  Thank you.

24         MS. KOMATIREDDY:  One more thing we need to

25  mention.

**Proceedings**

3885

```
1          Last week we proposed stipulations to the

2    defense with regard to various items pulled from the

3    computer.  Both defendants stipulated to both of the

4    items, but there is a set of exhibits that defendant

5    Constantine refused to stipulate to.

6          We'll ask that we have five minutes in the

7    morning to call the investigator and testify that he has

8    pulled these exhibits from a true imaged copied from one

9    of the electronic devices seized from Mr. Kenner's home.

10          I thought we would dispose of the computer

11    issues because of the stipulation, but apparently we need

12    a live witness for this.

13          MR. LARUSSO:  Your Honor, we can talk about it

14    in the morning because I think it will take a little

15    while.

16          THE COURT:  Let's talk about it now.

17          MR. LARUSSO:  I assume we were talking about the

18    text messages taken off Mr. Kenner's computer.

19          We're objecting, Judge, for a number of reasons,

20    but primarily these text messages are screen shots that

21    are on an iPhone or on a device that the person holds.

22    And after they take a picture of the e-mail, it is then

23    sent to the computer, and it is kept as a screen shot.

24    These are not text messages coming from the company that

25    provides the service.
```

**Proceedings**

3886

1          There's a big distinction here between the

2   e-mails that we were using during our case where they are

3   coming from the Google server, where there is no

4   allegation from our contact with experts, could in any way

5   cause any kind of deletions or alterations of the e-mails

6   we're using.

7          This, on the other hand, is subject to a

8   tremendous amount of alterations.  People can delete parts

9   by just pressing onto their iPhone, delete actual portions

10  of e-mail and move then from one place to another.  They

11  can actually create an e-mail as if they came from some

12  person and then save it into a computer.

13         This is coming from Mr. Kenner's computer.  It's

14  not coming from a reliable source.

15         I've had a chance to look through some of these,

16  Judge.  One that really struck me is the last one.  It's

17  not even Mr. Kenner.  It has JK on that, which is John

18  Kaiser.  And clearly, looking at it, there is -- there are

19  missing portions from one entry at 128 to the entry of

20  6/16.

21         You ask yourself:  Where is the rest of the

22  e-mail communication?

23         So having looked at this, Judge, and found it is

24  completely unreliable, we're going to object to the

25  introduction of any of these on those grounds.  If they

**Proceedings**

3887

1  want to go to the server, the company that records these,

2  they can do that, and then there would be no question and

3  I would have no objection.

4         But in terms of these, we'll object.

5         MS. KOMATIREDDY:  May I respond?

6         THE COURT:  Yes.

7         MS. KOMATIREDDY:  The Court is well aware text

8  messages are kept on the server.  They are routinely

9  admitted in criminal cases either from some kind of a

10 device -- a device could be a phone or computer.

11        With respect to that last exhibit, I'll withdraw

12 it.  We intend to introduce text messages that appear to

13 be text messages between Mr. Constantine and Mr. Kenner

14 and Mr. Kenner's screen shots and is saved on his hard

15 drive.  Those text messages have distinctive

16 characteristics.

17        And under 901(D)(4), because of the nature of

18 the text messages, their appearance, the jury can

19 determine for itself, using the date and time stamps of an

20 iPhone message, it's authenticity.  It meets what is

21 otherwise a very low bar of authenticity.

22        Mr. LaRusso's argument as to whether a

23 particular line in the middle is deleted, that goes to

24 weight, not admissibility.  Sure, they have one e-mail at

25 the top of the string they claim from Google's servers,

**Proceedings**

3888

1   but that doesn't speak to the authenticity.  When you

2   reply, you forward an e-mail, you can alter the thing

3   underneath that other people said or had.

4            If anything, a text message is more reliable

5   because an iPhone user -- you cannot fake what someone

6   else has sent you.  At most, you may be able to delete

7   something in between.

8            But if you accept the defense's argument as to

9   these messages, no text messages or no e-mails will come

10  in evidence.

11           THE COURT:  Your theory is that these are

12  co-conspirators' statements?

13           MS. KOMATIREDDY:  Yes.

14           The Court has seen the two text messages, 203-A

15  and 204-A, text messages on April 24, 2008.

16           And my reference under 901(B)(3), it says,

17  require the facts compare with respect to the text

18  messages already in evidence, and use their judgment in

19  looking at the reliability of these.  These text messages

20  refer to Constantine's wealth, bank balances in his

21  account.  All of those things can be compared and

22  corroborated by bank records already in evidence.

23           So we would ask that the Court permit the text

24  messages to be admitted.  And there needs to be an

25  instruction -- or if the defense wants to cross-examine or

**Proceedings**

3889

1   make an argument about whether this is a complete

2   conversation, it could go to weight.  But to say that goes

3   to admissibility is overbroad.

4           MR. LARUSSO:  Your Honor, we're not saying any

5   text messages can't be introduced.  That's wrong.  You can

6   get them from the company that provides the service.

7           Secondly, you can get the iPhone and be able to

8   reproduce it at that point in time.

9           These are not text messages.  These are screen

10  shots that are made on the phone and then e-mailed to his

11  computer.  That's the distinction here.  These aren't text

12  messages.  They are like artwork that people can actually

13  create.

14          I had Mr. Constantine create one for me from two

15  people who -- I need not describe who they are.  I wanted

16  to see if he could create it, and he did.

17          Now, screen shot it and send it to your

18  commuter.  You have a text message that looks as if it is

19  real.

20          The distinction here is what the Government --

21          THE COURT:  That could be true of any document.

22  Forget about technology.  You can do a search of someone's

23  house that have -- appear to be communications between

24  your client and Mr. Kenner, typed-up notes, handwritten

25  notes that appear to be communications between each of

**Proceedings**

3890

1   them.  You can make the same argument.  Anybody can go to

2   a computer and create communications between one another.

3   Handwritten.

4         Isn't that a possibility?

5         Like in a drug case, you have drug records that

6   are seized from a client that are potentially

7   co-conspirators' statements.  All of them are potentially

8   fabricated.

9         What's the difference?  Just because of

10  technology -- normally they go to the weight unless there

11  is obvious indication that they are fabricated.

12        MR. LARUSSO:  Judge, they are trying to

13  introduce something that is not a text message as a text

14  message, and there is no way you can authenticate a text

15  message by taking a screen shot off the computer.

16        If they had the text itself, I have no problem.

17  You can establish reliability and authenticity that way.

18  There is no way to establish authenticity from a screen

19  shot and say to the jury, these are text messages.  They

20  are not.  That's the point, Judge.

21        THE COURT:  Let me think about it.  It is a

22  little bit unusual to have a picture of a screen shot.

23        MR. LARUSSO:  It's unusual to me too.

24        THE COURT:  I'm not aware you can go back to a

25  company and get text messages from years and years ago.

**Proceedings**

3891

1          MR. LARUSSO:  I think there is a limited time

2     period, but you can get it from the phone.

3          THE COURT:  Was the cell phone searched for the

4     same messages or not?

5          I'll ask the Government.

6          MS. KOMATIREDDY:  Your Honor, we did execute a

7     search warrant on the cell phone seized on Mr. Kenner's

8     arrest solely for the purpose of the Home Depot tape

9     because authenticity was in question, but not the text

10    messages.

11         THE COURT:  Okay.

12         We have another issue with the general search,

13    so before Mr. Haley jumps all over me, I'm not sure we

14    should go back to the phone.

15         MS. KOMATIREDDY:  Why don't I hand over to the

16    Court this binder.

17         THE COURT:  I'll take a look at it.

18         Mr. Haley?

19         MR. HALEY:  Your Honor, if I may.  I believe

20    we're close to completing the discovery, the delivery of

21    the disk of the material we'll use for purposes of the

22    defense.

23         THE COURT:  We can take it until 4:30.

24         MR. HALEY:  If the Government will stick around,

25    I'll give them a disk and they can burn it.

**Proceedings**

3892

1           THE COURT:  You will call the other witness?

2           MR. LARUSSO:  I will.

3           THE COURT:  What time will he be here?

4           MR. LARUSSO:  He's scheduled to be here at 11.

5           I would like a break so I can discuss with him

6   briefly.

7           THE COURT:  All right.  Thank you.

8           Have a good night.

9           (Whereupon, the proceedings were adjourned until

10  Tuesday, June 16, 2015, at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings

3893

1                          WITNESSES

2                                             3793

3    RONALD RICHARDS

4    DIRECT EXAMINATION                       3794

5    BY MR. MISKIEWICZ

6    DIRECT EXAMINATION                       3829

7    BY MR. MISKIEWICZ

8    CROSS-EXAMINATION                        3830

9    BY MR. HALEY

10   CROSS-EXAMINATION                        3843

11   BY MR. LARUSSO

12   REDIRECT EXAMINATION                     3860

13   BY MR. MISKIEWICZ

14   RECROSS-EXAMINATION                      3874

15   BY MR. HALEY:

16   RECROSS-EXAMINATION                      3875

17   BY MR. LARUSSO

18

19                          EXHIBITS

20   Government Exhibit RR-1 in evidence      3804

21

22

23

24

25

1

## $

**$10,000** [1] - 3810:3
**$100,000** [1] - 3803:9
**$120,000** [3] - 3812:19, 3814:5, 3814:22
**$120,050** [2] - 3814:5, 3814:10
**$13,331** [1] - 3816:20
**$140,000** [2] - 3854:5, 3864:23
**$15,000** [3] - 3809:1, 3809:6, 3838:20
**$150,000** [1] - 3819:7
**$161,000** [1] - 3813:8
**$165.41** [1] - 3818:19
**$17,260** [1] - 3813:3
**$20,000** [1] - 3836:17
**$200,000** [1] - 3820:6
**$22,000** [1] - 3810:22
**$22,425.02** [1] - 3830:3
**$2400** [2] - 3810:25, 3811:3
**$25,000** [6] - 3803:4, 3803:6, 3803:7, 3803:18, 3838:3, 3839:16
**$26,677.40** [1] - 3813:14
**$335,000** [2] - 3805:2, 3805:7
**$384,300** [1] - 3815:2
**$4,065** [2] - 3807:21, 3812:24
**$40,000** [2] - 3807:14, 3807:17
**$415,000** [3] - 3805:23, 3806:7, 3806:22
**$42,000** [1] - 3854:4
**$44,000** [1] - 3814:13
**$44,689.17** [1] - 3814:18
**$45,000** [1] - 3809:17
**$450,000** [2] - 3807:8, 3807:10
**$5,000** [1] - 3808:13
**$50,000** [3] - 3802:14, 3819:8, 3831:9
**$500,000** [1] - 3809:9
**$500,747.14** [1] - 3815:13
**$540,000** [2] - 3813:17, 3813:20
**$55,000** [2] - 3810:11, 3854:15
**$65,000** [2] - 3816:15, 3816:17
**$7,000** [1] - 3875:4
**$75,000** [3] - 3807:5, 3808:19, 3836:8
**$750,000** [1] - 3850:25
**$8,000** [1] - 3809:24
**$8,130** [1] - 3815:16
**$85,000** [1] - 3816:1

**$86,426** [1] - 3808:8
**$90,000** [1] - 3812:10

## '

**'09** [5] - 3796:4, 3812:18, 3813:2, 3820:5, 3869:8
**'O9** [1] - 3806:21

## 1

**1** [3] - 3803:17, 3807:13, 3819:4
**10** [2] - 3774:11, 3777:10
**100** [2] - 3753:15, 3754:20
**100,000** [1] - 3838:11
**1006** [1] - 3761:14
**104** [2] - 3844:22
**10:00** [1] - 3760:20
**11** [5] - 3816:20, 3834:19, 3834:24, 3835:2, 3892:4
**1102** [12] - 3798:25, 3799:7, 3801:5, 3802:7, 3802:9, 3806:17, 3808:2, 3809:7, 3816:11, 3818:17, 3819:5, 3830:1
**1144** [1] - 3800:4
**11501** [1] - 3754:3
**11572** [1] - 3754:7
**11722** [2] - 3753:15, 3754:21
**11749** [1] - 3753:22
**11:00** [1] - 3760:21
**11:30** [1] - 3777:15
**11:45** [1] - 3776:19
**11th** [4] - 3762:21, 3808:23, 3809:5
**12** [2] - 3809:9, 3814:23
**12/31/09** [1] - 3819:4
**12/7** [1] - 3819:6
**128** [1] - 3886:19
**12:18** [1] - 3791:6
**13** [1] - 3815:2
**13,331** [1] - 3809:2
**14** [4] - 3861:5, 3862:1, 3862:4, 3863:8
**140,000** [2] - 3854:7, 3854:8
**15** [8] - 3753:9, 3762:7, 3774:13, 3777:10, 3808:17, 3808:19, 3809:3, 3813:19
**15,000** [1] - 3804:19
**150,000** [1] - 3820:5
**16** [2] - 3776:22, 3892:10
**1601** [1] - 3753:21
**18th** [1] - 3865:18
**19** [20] - 3836:9, 3836:10,

3836:13, 3837:23, 3838:12, 3839:16, 3839:23, 3844:17, 3845:12, 3848:22, 3856:22, 3859:9, 3865:22, 3866:6, 3870:4, 3871:9, 3874:12, 3874:21
**19-plaintiff** [2] - 3837:24, 3864:16
**19-player** [2] - 3864:16, 3865:15
**1995** [1] - 3794:23
**1st** [1] - 3794:23

## 2

**2** [4] - 3803:8, 3803:17, 3807:13, 3819:4
**20** [4] - 3762:11, 3763:3, 3792:15, 3882:4
**2005** [2] - 3816:11, 3816:12
**2006** [2] - 3839:3, 3873:13
**2008** [1] - 3888:15
**2009** [24] - 3795:21, 3796:9, 3798:12, 3800:23, 3805:25, 3812:24, 3813:19, 3813:25, 3814:6, 3814:13, 3814:23, 3815:3, 3815:7, 3816:1, 3816:12, 3816:15, 3816:20, 3818:19, 3843:14, 3844:20, 3865:18, 3871:3
**2010** [7] - 3801:6, 3813:25, 3819:23, 3820:2, 3865:20, 3867:13, 3869:9
**2013** [1] - 3763:3
**2014** [1] - 3765:1
**2015** [2] - 3753:9, 3892:10
**203** [1] - 3792:25
**203-A** [1] - 3888:14
**204-A** [1] - 3888:15
**2100017561** [1] - 3800:8
**22** [2] - 3813:25, 3818:19
**22,000** [1] - 3857:22
**24** [1] - 3888:15
**26** [2] - 3754:7, 3816:11
**27** [2] - 3813:25, 3814:13
**2:00** [2] - 3820:16, 3821:10
**2nd** [1] - 3803:18

## 3

**3** [1] - 3803:8
**3,746** [1] - 3883:23
**3/31/2010** [1] - 3818:17
**30** [6] - 3769:18, 3792:15, 3814:6, 3860:8, 3882:4, 3882:9

**300** [1] - 3754:3
**302's** [1] - 3777:3
**30th** [2] - 3808:8, 3830:1
**31** [1] - 3801:6
**31st** [1] - 3814:6
**320,000** [2] - 3804:19, 3804:21
**335,000** [2] - 3804:17, 3804:21
**3500** [5] - 3775:4, 3775:22, 3776:12, 3776:20, 3777:7
**3578** [1] - 3792:25
**3793** [1] - 3893:2
**3794** [1] - 3893:4
**3804** [1] - 3893:20
**3829** [1] - 3893:6
**3830** [1] - 3893:8
**3843** [1] - 3893:10
**3860** [1] - 3893:12
**3874** [1] - 3893:14
**3875** [1] - 3893:16
**39** [2] - 3872:11, 3873:15
**3:30** [2] - 3820:17, 3877:20

## 4

**40** [4] - 3769:19, 3871:14, 3872:4, 3882:9
**45,000** [1] - 3809:18
**4:30** [1] - 3891:23
**4th** [2] - 3805:24, 3806:21

## 5

**5/12** [1] - 3809:19
**5/14** [2] - 3802:12, 3810:19
**5/14/2009** [1] - 3831:8
**5/19** [2] - 3810:3, 3810:15
**5/20** [1] - 3810:10
**5/21** [1] - 3811:11
**5/26/2009** [3] - 3836:2, 3836:8, 3836:16
**5/27/2009** [1] - 3837:22
**5/28** [2] - 3803:4, 3803:6
**5/29/09** [2] - 3799:7, 3809:7
**5/5** [1] - 3799:5
**50** [6] - 3849:9, 3849:13, 3850:1, 3869:20, 3871:16, 3871:17
**50-acre** [2] - 3846:17, 3869:15
**55** [2] - 3832:7, 3832:8
**55,000** [2] - 3810:15, 3865:4
**56** [3] - 3832:5, 3834:15, 3834:16
**59** [1] - 3762:22

2

## 6

**6** [3] - 3812:23, 3814:23, 3816:1
**6/08** [1] - 3807:5
**6/16** [1] - 3886:20
**6/19** [1] - 3803:13
**6/22** [1] - 3803:12
**6/22/2009** [1] - 3838:11
**6/30/09** [3] - 3803:8, 3806:18, 3808:2
**631** [1] - 3754:21

## 7

**7** [2] - 3807:14, 3820:5
**7/31** [1] - 3803:17
**7/31/09** [2] - 3803:17, 3830:1
**712-6101** [1] - 3754:21
**7th** [1] - 3819:8

## 8

**8/31/09** [1] - 3807:13
**800** [1] - 3870:22
**8010205337** [1] - 3814:8
**84** [1] - 3852:8
**8:30** [1] - 3772:5

## 9

**9** [2] - 3815:7, 3883:23
**90067** [1] - 3796:7
**901(B)(3** [1] - 3888:16
**901(D)(4** [1] - 3887:17
**9:30** [5] - 3753:9, 3757:2, 3757:7, 3878:15, 3892:10

## A

**a.m** [2] - 3753:9, 3892:10
**abbreviated** [2] - 3808:15, 3840:12
**ability** [1] - 3775:15
**able** [17] - 3757:12, 3757:17, 3778:22, 3778:24, 3796:19, 3821:3, 3827:20, 3842:4, 3846:17, 3851:2, 3851:5, 3853:20, 3855:1, 3869:11, 3878:20, 3888:6, 3889:7
**absent** [3] - 3780:15, 3782:4, 3782:8
**absolutely** [2] - 3829:13, 3842:17

**accept** [3] - 3757:18, 3848:24, 3888:8
**acceptable** [2] - 3771:6, 3879:25
**accomplish** [1] - 3757:13
**accomplished** [1] - 3783:14
**according** [1] - 3763:5
**account** [86] - 3765:19, 3780:7, 3780:15, 3781:5, 3782:3, 3782:15, 3782:21, 3785:7, 3785:11, 3795:23, 3795:24, 3796:5, 3796:11, 3796:16, 3797:19, 3798:1, 3798:7, 3799:14, 3799:18, 3799:20, 3800:9, 3800:12, 3800:13, 3800:15, 3800:16, 3800:18, 3800:19, 3800:24, 3801:8, 3801:9, 3801:19, 3802:3, 3802:4, 3803:22, 3804:2, 3805:23, 3806:18, 3812:20, 3814:3, 3814:7, 3814:11, 3814:14, 3814:23, 3815:14, 3817:2, 3817:3, 3817:22, 3818:5, 3818:6, 3818:8, 3818:10, 3818:13, 3819:10, 3819:12, 3819:20, 3820:8, 3820:10, 3824:13, 3830:2, 3840:10, 3840:14, 3843:14, 3843:20, 3843:24, 3844:11, 3851:13, 3851:20, 3853:4, 3857:22, 3860:10, 3864:19, 3864:20, 3865:10, 3874:15, 3880:22, 3881:4, 3881:16, 3884:15, 3888:21
**accountant** [1] - 3764:16
**accounting** [2] - 3775:2, 3784:2
**accounts** [3] - 3765:16, 3780:10, 3782:20
**accuracy** [1] - 3880:13
**accurate** [3] - 3802:24, 3813:11, 3813:22
**accusations** [1] - 3863:12
**achieved** [2] - 3756:11, 3849:21
**acknowledge** [1] - 3876:18
**acquire** [2] - 3842:4, 3842:15
**acres** [7] - 3849:9, 3849:13, 3850:1, 3869:20, 3871:14, 3871:16, 3871:17
**act** [2] - 3768:22, 3866:7
**Acting** [1] - 3753:14
**action** [2] - 3839:13, 3851:9

**actions** [1] - 3839:10
**active** [2] - 3837:14, 3857:16
**actual** [2] - 3800:13, 3886:9
**ad** [1] - 3881:21
**added** [1] - 3813:19
**addition** [5] - 3759:11, 3782:18, 3800:12, 3813:18, 3869:14
**additional** [4] - 3813:12, 3837:24, 3838:1, 3838:6
**address** [13] - 3755:6, 3761:25, 3766:8, 3767:19, 3776:18, 3805:4, 3805:5, 3857:2, 3857:12, 3859:9, 3867:24, 3880:14, 3883:22
**adjourned** [1] - 3892:9
**admissibility** [4] - 3769:14, 3881:9, 3887:24, 3889:3
**admissible** [2] - 3761:12, 3761:13
**admission** [1] - 3804:6
**admit** [1] - 3825:23
**admitted** [3] - 3804:9, 3887:9, 3888:24
**admitting** [1] - 3863:9
**advance** [2] - 3756:4, 3770:24
**advanced** [3] - 3800:17, 3818:5, 3818:9
**adverse** [2] - 3776:2, 3788:12
**advise** [1] - 3758:1
**advised** [5] - 3757:5, 3770:11, 3780:9, 3792:24, 3822:16
**Advisor** [1] - 3836:19
**advisor** [1] - 3832:24
**advisors** [1] - 3869:25
**Advisors** [2] - 3832:14, 3832:20
**Aerospace** [5] - 3805:24, 3806:3, 3806:8, 3806:22, 3806:25
**afoul** [1] - 3822:6
**afternoon** [14] - 3756:23, 3760:16, 3763:8, 3769:4, 3778:14, 3778:15, 3781:15, 3781:16, 3793:8, 3820:17, 3831:3, 3831:4, 3843:10, 3843:11
**afterwards** [1] - 3772:8
**agent** [1] - 3866:9
**Agent** [3] - 3764:17, 3769:18, 3882:6
**ago** [11] - 3759:1, 3762:7, 3763:16, 3764:25, 3775:14, 3776:25, 3837:25, 3842:18, 3873:1, 3851:9

**3875:11, 3890:25
**agree** [5] - 3840:7, 3848:6, 3879:2, 3880:15, 3883:18
**agreeable** [1] - 3774:12
**agreed** [2] - 3832:18, 3849:4
**agreement** [3] - 3774:10, 3832:20, 3836:19
**agreements** [1] - 3873:8
**ahead** [1] - 3855:19
**Airpark** [2] - 3877:5, 3877:7
**alert** [1] - 3758:22
**aligned** [1] - 3787:8
**allegation** [3] - 3871:7, 3871:8, 3886:4
**allegations** [10] - 3823:11, 3826:5, 3840:1, 3845:21, 3859:18, 3862:15, 3862:20, 3864:10, 3870:3, 3871:11
**alleged** [3] - 3860:25, 3861:1, 3861:7
**allegedly** [1] - 3872:15
**alleging** [1] - 3862:24
**allocated** [1] - 3782:21
**allow** [6] - 3788:6, 3791:10, 3830:20, 3858:13, 3860:14, 3863:14
**allowed** [3] - 3755:22, 3830:17, 3830:18
**allowing** [3] - 3780:8, 3822:25, 3858:8
**almost** [4] - 3763:10, 3773:15, 3872:16, 3872:22
**alter** [1] - 3888:2
**alterations** [2] - 3886:5, 3886:8
**Altman** [1] - 3847:25
**amend** [1] - 3803:12
**amended** [1] - 3805:10
**Amendment** [2] - 3763:10, 3853:16
**AMERICA** [1] - 3753:3
**America** [1] - 3857:4
**American** [2] - 3814:14, 3832:17
**amount** [12] - 3760:12, 3770:17, 3804:14, 3804:18, 3811:5, 3812:18, 3812:24, 3814:17, 3830:2, 3857:25, 3865:7, 3886:8
**amounting** [1] - 3815:12
**analysis** [4] - 3760:22, 3761:1, 3762:18, 3765:18
**ANDREW** [1] - 3754:6
**Angeles** [6] - 3796:7, 3796:8, 3837:1, 3838:10, 3852:24, 3865:16
**animosity** [1] - 3849:18

3

**Ann** [1] - 3754:20
**answer** [14] - 3787:8, 3798:2, 3798:16, 3800:21, 3801:10, 3801:14, 3818:1, 3837:17, 3841:19, 3842:13, 3843:12, 3860:15, 3872:1, 3873:18
**answering** [2] - 3798:3, 3860:8
**anti** [2] - 3853:12, 3853:14
**anti-slap** [2] - 3853:12, 3853:14
**anticipate** [4] - 3763:25, 3778:8, 3792:16, 3880:15
**anticipated** [2] - 3778:17, 3847:10
**anticipating** [1] - 3759:15
**anticipation** [2] - 3826:17, 3837:4
**apart** [1] - 3870:22
**apologize** [6] - 3761:16, 3768:9, 3768:14, 3779:11, 3793:9, 3879:8
**appear** [5] - 3842:9, 3847:4, 3887:12, 3889:23, 3889:25
**appearance** [3] - 3839:7, 3846:5, 3887:18
**appearances** [1] - 3755:3
**APPEARANCES** [1] - 3753:13
**appeared** [1] - 3846:16
**appearing** [1] - 3844:23
**appellate** [1] - 3853:22
**application** [1] - 3769:11
**applies** [2] - 3884:10, 3884:13
**apply** [1] - 3782:13
**applying** [1] - 3884:19
**appreciate** [2] - 3781:17, 3842:12
**apprise** [1] - 3755:9
**approach** [3] - 3861:11, 3881:11, 3882:25
**approached** [1] - 3772:4
**appropriate** [2] - 3879:14, 3880:24
**approved** [1] - 3857:25
**approximating** [1] - 3875:4
**April** [1] - 3888:15
**arbitrate** [2] - 3832:24, 3833:1
**arbitrated** [1] - 3836:21
**arbitration** [26] - 3805:9, 3831:9, 3831:14, 3831:16, 3831:19, 3831:25, 3832:15, 3833:4, 3833:11, 3833:15, 3833:18, 3834:2, 3835:12, 3835:17, 3836:18, 3837:9, 3837:13,

3838:3, 3838:4, 3846:7, 3846:10, 3848:17, 3850:11, 3851:10, 3877:6
**Arbitration** [1] - 3832:17
**arbitrator** [1] - 3833:23
**architect** [1] - 3811:3
**Architects** [1] - 3810:25
**area** [3] - 3796:8, 3829:5, 3870:14
**arena** [1] - 3787:11, 3822:18
**arguably** [1] - 3775:4
**argue** [2] - 3789:2, 3826:14
**argument** [9] - 3766:19, 3769:12, 3825:10, 3826:12, 3827:18, 3887:22, 3888:8, 3889:1, 3890:1
**argumentative** [1] - 3880:17
**arguments** [1] - 3760:6
**arising** [1] - 3839:25
**Arizona** [7] - 3760:21, 3810:10, 3810:13, 3810:16, 3832:19, 3838:9, 3855:3
**arose** [1] - 3840:1
**arranged** [1] - 3759:12
**arrangements** [1] - 3758:3
**arrest** [1] - 3891:8
**arrested** [1] - 3763:19
**arriving** [1] - 3767:5
**artwork** [1] - 3889:12
**aside** [1] - 3761:7
**aspect** [2] - 3792:2, 3842:13
**aspects** [3] - 3762:18, 3775:2, 3784:2
**Asset** [1] - 3815:7
**assets** [9] - 3855:12, 3855:14, 3855:17, 3857:1, 3857:7, 3857:10, 3868:13, 3869:11, 3876:7
**assignment** [1] - 3854:22
**assist** [2] - 3765:11, 3765:22
**assistance** [1] - 3763:12
**Assistant** [1] - 3753:17
**assisting** [1] - 3848:22
**associated** [2] - 3798:13, 3874:14
**Associates** [3] - 3796:2, 3817:21, 3836:8
**assume** [8] - 3769:16, 3788:17, 3788:23, 3802:10, 3806:4, 3812:7, 3812:16, 3885:17
**assumed** [1] - 3843:18
**assuming** [7] - 3813:1, 3813:11, 3813:12,

3813:22, 3814:9, 3815:12, 3819:14
**assurance** [1] - 3771:22
**assured** [1] - 3758:4
**attachable** [2] - 3857:8, 3857:10
**attaching** [1] - 3759:19
**attack** [1] - 3881:12
**attacking** [1] - 3845:24
**attention** [5] - 3763:21, 3795:20, 3799:4, 3819:5, 3883:21
**attorney** [5] - 3770:20, 3794:19, 3794:22, 3823:11, 3841:24
**Attorney** [2] - 3753:14, 3753:17
**attorney's** [7] - 3833:9, 3833:10, 3834:6, 3834:10, 3835:5, 3835:8, 3853:21
**attorney/client** [3] - 3775:1, 3778:7, 3788:18
**August** [5] - 3807:14, 3812:15, 3812:23, 3813:1, 3814:6
**authenticate** [1] - 3890:14
**authenticity** [6] - 3887:20, 3887:21, 3888:1, 3890:17, 3890:18, 3891:9
**authority** [4] - 3805:17, 3831:18, 3831:24
**authorization** [1] - 3806:10
**authorizations** [1] - 3805:20
**authorize** [2] - 3814:10, 3858:6
**authorized** [20] - 3773:9, 3806:2, 3808:9, 3808:16, 3809:14, 3809:20, 3810:8, 3810:12, 3810:22, 3811:2, 3811:17, 3812:19, 3813:3, 3813:14, 3815:25, 3830:18, 3858:14, 3860:10
**authorizing** [2] - 3773:8, 3847:4
**automatic** [1] - 3766:4
**availability** [2] - 3773:20, 3785:14
**available** [13] - 3756:2, 3757:2, 3759:14, 3765:6, 3770:3, 3786:10, 3786:20, 3791:9, 3825:14, 3826:8, 3826:20, 3880:6, 3880:9
**Avalon** [6] - 3807:15, 3807:18, 3807:23, 3812:14, 3812:19, 3812:20
**Aviation** [1] - 3816:21
**avoid** [2] - 3779:6, 3781:21
**avoidable** [1] - 3791:10
**avoiding** [1] - 3833:8

**award** [2] - 3835:5, 3835:8
**aware** [19] - 3756:7, 3763:2, 3765:1, 3773:23, 3782:5, 3784:9, 3785:1, 3787:18, 3787:19, 3797:6, 3826:2, 3827:17, 3828:18, 3828:25, 3851:13, 3855:10, 3857:7, 3887:7, 3890:24
**awareness** [1] - 3762:13
**AZ** [7] - 3807:14, 3807:17, 3807:23, 3812:19, 3812:20, 3812:24, 3813:3

**B**

**back-and-forth** [1] - 3846:2
**backup** [2] - 3765:8, 3771:1
**bad** [3] - 3882:12, 3882:23
**Baja** [3] - 3870:14, 3870:23, 3873:13
**baker** [1] - 3855:4
**balance** [1] - 3757:8
**balances** [1] - 3888:20
**bank** [17] - 3761:1, 3765:16, 3765:17, 3765:19, 3765:20, 3795:23, 3796:6, 3802:21, 3803:13, 3806:13, 3880:21, 3880:25, 3881:2, 3881:16, 3882:1, 3888:20, 3888:22
**Bank** [1] - 3796:7
**Bar** [3] - 3810:10, 3810:13, 3810:16
**bar** [3] - 3766:4, 3777:2, 3887:21
**bare** [1] - 3822:22
**Barker** [1] - 3852:18
**Barreras** [1] - 3810:19
**bars** [2] - 3794:20, 3842:7
**based** [20] - 3759:15, 3762:12, 3764:3, 3764:24, 3765:2, 3779:2, 3802:6, 3804:18, 3806:14, 3823:13, 3826:4, 3869:2, 3869:7, 3870:16, 3871:2, 3871:3, 3876:6, 3876:8, 3876:12, 3883:2
**basis** [4] - 3780:11, 3785:25, 3832:16, 3883:15
**basket** [1] - 3857:5
**battle** [1] - 3881:8
**beach** [1] - 3849:14
**became** [1] - 3850:4
**becker** [1] - 3862:21
**Becker** [4] - 3811:12,

4

3812:10, 3840:21, 3841:6
**become** [2] - 3868:22, 3870:15
**BEFORE** [1] - 3753:11
**beforehand** [1] - 3776:3
**began** [2] - 3759:19, 3760:10
**begin** [8] - 3755:8, 3755:15, 3757:3, 3757:21, 3757:24, 3758:5, 3796:17, 3856:5
**beginning** [3] - 3798:11, 3874:24, 3874:25
**begun** [1] - 3869:9
**behalf** [7] - 3783:6, 3835:22, 3835:23, 3845:25, 3859:15, 3865:22, 3876:13
**behind** [1] - 3786:5
**belabor** [1] - 3881:20
**belief** [1] - 3756:14
**belongs** [1] - 3782:23
**below** [3] - 3804:20, 3807:4, 3808:7
**bench** [1] - 3848:5
**benefit** [1] - 3818:11
**Berard** [9] - 3786:1, 3823:10, 3826:7, 3828:7, 3858:23, 3859:11, 3859:12, 3859:14, 3859:17
**best** [10] - 3757:10, 3821:8, 3842:18, 3850:19, 3862:14, 3866:19, 3869:7, 3873:11, 3874:14, 3879:8
**better** [2] - 3837:20, 3841:10
**between** [27] - 3772:21, 3784:19, 3785:6, 3786:16, 3788:2, 3788:16, 3790:4, 3790:23, 3791:13, 3804:21, 3813:1, 3814:6, 3814:23, 3822:7, 3832:21, 3835:12, 3835:14, 3835:18, 3840:2, 3869:8, 3883:7, 3886:1, 3887:13, 3888:7, 3889:23, 3889:25, 3890:2
**Beverley** [1] - 3858:4
**beyond** [4] - 3761:22, 3789:8, 3796:13, 3878:5
**BIANCO** [1] - 3753:11
**big** [6] - 3855:16, 3856:23, 3857:4, 3860:5, 3881:8, 3886:1
**bill** [3] - 3854:15, 3865:4, 3875:10
**binder** [1] - 3891:16
**binders** [6] - 3765:5, 3765:8, 3765:10, 3765:13, 3880:6, 3882:7

**bit** [3] - 3853:10, 3881:21, 3890:22
**blackmail** [1] - 3839:19
**blank** [3] - 3755:22, 3756:16, 3758:9
**blue** [1] - 3882:17
**board** [1] - 3853:7
**bolts** [1] - 3849:5
**book** [1] - 3859:9
**books** [2] - 3841:15, 3842:16
**boring** [2] - 3880:20, 3882:16
**borrowed** [1] - 3871:5
**bottom** [2] - 3757:15, 3757:16
**break** [7] - 3766:17, 3774:13, 3775:8, 3798:5, 3820:15, 3820:17, 3892:5
**Brian** [1] - 3858:23
**brief** [5] - 3769:16, 3769:19, 3779:15, 3877:22, 3877:24
**briefly** [5] - 3756:19, 3776:17, 3801:23, 3845:14, 3892:6
**bring** [5] - 3761:11, 3763:20, 3781:11, 3792:13, 3829:17, 3863:11
**broach** [1] - 3775:1
**broad** [1] - 3834:9
**broke** [4] - 3849:15, 3849:19, 3856:12, 3868:17
**Brooklyn** [3] - 3756:8, 3758:19, 3763:7
**brother** [1] - 3852:18
**brought** [5] - 3839:10, 3842:19, 3862:21, 3862:23, 3865:5
**building** [3] - 3771:12, 3774:23, 3776:16
**built** [1] - 3859:9
**bunch** [1] - 3877:3
**burden** [2] - 3761:7, 3878:4
**burn** [1] - 3891:25
**business** [5] - 3797:6, 3832:24, 3848:16, 3869:23, 3871:4
**button** [1] - 3859:6
**buy** [1] - 3868:16
**BY** [24] - 3753:16, 3753:22, 3754:4, 3794:15, 3795:12, 3795:19, 3797:11, 3799:3, 3804:11, 3816:14, 3829:24, 3831:2, 3843:9, 3860:22, 3864:3, 3874:11, 3875:23, 3893:5, 3893:7, 3893:9, 3893:11, 3893:13, 3893:15, 3893:17

# C

**C-83** [1] - 3852:8
**Cabin** [3] - 3807:5, 3808:7, 3808:10, 3813:6, 3813:9
**Cabo** [10] - 3857:5, 3869:19, 3870:10, 3870:18, 3871:15, 3872:4, 3873:3, 3873:6, 3873:9, 3876:14
**Caffey** [1] - 3852:17
**CALCAGNI** [1] - 3753:20
**California** [13] - 3777:2, 3794:19, 3796:7, 3841:25, 3842:7, 3842:10, 3847:23, 3853:18, 3855:3, 3864:15, 3865:25, 3870:14, 3874:22
**candid** [2] - 3759:8, 3759:23
**cannot** [4] - 3768:2, 3820:22, 3879:10, 3888:5
**capacity** [1] - 3853:10
**card** [1] - 3865:9
**care** [1] - 3828:3
**carefully** [1] - 3860:2
**Carey** [2] - 3809:23, 3813:12
**Carillo** [2] - 3815:21, 3816:2
**carve** [2] - 3849:9, 3869:19
**case** [78] - 3755:3, 3755:20, 3756:5, 3756:13, 3757:22, 3758:2, 3758:5, 3759:4, 3759:12, 3760:17, 3760:24, 3761:4, 3761:21, 3763:14, 3763:24, 3764:25, 3765:12, 3765:25, 3766:14, 3766:23, 3766:25, 3767:17, 3768:4, 3769:21, 3769:22, 3770:6, 3771:23, 3784:5, 3784:24, 3786:4, 3786:20, 3789:14, 3791:17, 3792:8, 3794:25, 3805:22, 3820:18, 3822:23, 3824:5, 3824:6, 3825:25, 3826:6, 3827:21, 3832:19, 3840:5, 3841:12, 3842:15, 3846:9, 3846:10, 3847:5, 3848:11, 3850:20, 3851:6, 3853:20, 3853:23, 3854:24, 3855:13, 3855:15, 3857:11, 3857:13, 3859:4, 3868:25, 3869:1, 3869:6, 3876:15, 3877:12, 3877:25, 3878:4, 3878:14, 3881:1, 3881:17, 3884:1, 3884:2, 3884:15, 3884:22, 3886:2, 3890:5

**cases** [4] - 3781:24, 3850:18, 3884:12, 3887:9
**category** [1] - 3767:15
**caused** [1] - 3871:5
**CD** [1] - 3755:19
**cell** [2] - 3891:3, 3891:7
**Central** [3] - 3753:6, 3753:15, 3754:21
**central** [1] - 3792:7
**cents** [1] - 3808:8
**Century** [2] - 3796:7, 3796:8
**certain** [1] - 3784:7
**certainly** [3] - 3766:18, 3774:24, 3880:24
**chance** [4] - 3779:8, 3822:19, 3825:12, 3886:15
**change** [1] - 3884:4
**character** [1] - 3842:14
**characteristics** [1] - 3887:16
**characterization** [1] - 3834:3
**characterized** [1] - 3831:13
**charge** [3] - 3837:24, 3838:1, 3868:24
**charged** [1] - 3855:7
**chart** [8] - 3762:16, 3764:13, 3770:25, 3773:10, 3802:2, 3880:11, 3881:16, 3881:17
**charts** [27] - 3759:2, 3759:20, 3759:25, 3760:25, 3761:3, 3762:9, 3762:20, 3762:25, 3763:4, 3764:24, 3769:2, 3769:14, 3770:17, 3770:22, 3770:23, 3770:24, 3771:3, 3791:7, 3877:24, 3880:7, 3880:16, 3880:20, 3881:7, 3881:9, 3882:7, 3882:11, 3882:16
**check** [6] - 3774:3, 3811:15, 3811:17, 3811:23, 3811:25, 3812:6
**checking** [3] - 3802:11, 3803:19, 3818:18
**checks** [2] - 3811:20, 3812:9
**choice** [1] - 3833:2
**Chow** [1] - 3858:5
**Circuit** [3] - 3766:3, 3766:11, 3842:8
**circulated** [3] - 3787:3, 3845:6, 3845:11
**circumstances** [2] - 3782:5, 3783:25
**citation** [1] - 3766:17
**City** [1] - 3796:8
**civil** [5] - 3848:2, 3850:20,

3856:7, 3857:9, 3865:14
**claim** [5] - 3824:15,
3837:4, 3876:13, 3887:25
**claiming** [3] - 3762:16,
3789:16, 3824:9
**claims** [11] - 3818:8,
3836:18, 3836:19,
3836:22, 3836:25,
3839:13, 3841:3, 3841:5,
3862:25, 3863:4, 3876:11
**clarification** [4] - 3773:3,
3774:6, 3774:7, 3840:18
**clarify** [5] - 3798:4, 3816:4,
3822:5, 3832:2, 3842:11
**classified** [1] - 3857:23
**clause** [3] - 3832:17,
3834:7, 3834:9
**clear** [14] - 3760:11,
3761:11, 3781:20,
3783:17, 3783:18, 3784:5,
3785:23, 3789:15,
3811:19, 3826:7, 3828:9,
3884:11, 3884:15, 3884:20
**clearly** [2] - 3760:20,
3886:18
**CLERK** [3] - 3755:1,
3778:1, 3793:5
**clerk** [1] - 3865:24
**clicked** [1] - 3859:8
**client** [64] - 3755:23,
3756:7, 3757:1, 3757:22,
3760:19, 3761:8, 3761:17,
3761:24, 3762:6, 3762:23,
3763:2, 3763:13, 3763:17,
3767:22, 3768:24, 3769:9,
3769:24, 3772:11,
3774:14, 3775:18,
3775:19, 3776:7, 3776:14,
3779:7, 3780:5, 3780:13,
3781:3, 3781:7, 3781:11,
3782:7, 3782:8, 3782:10,
3782:19, 3783:4, 3783:9,
3786:17, 3786:19,
3788:23, 3789:23, 3790:5,
3790:20, 3790:23,
3800:16, 3802:4, 3802:5,
3805:2, 3805:6, 3818:8,
3818:11, 3824:13, 3825:1,
3825:11, 3825:14, 3827:3,
3831:12, 3845:21,
3852:22, 3861:1, 3879:21,
3880:4, 3884:12, 3889:24,
3890:6
**client's** [5] - 3776:7,
3784:25, 3824:2, 3824:20,
3826:15
**clients** [26] - 3780:14,
3782:3, 3783:22, 3784:20,
3786:25, 3787:18,
3796:24, 3797:1, 3797:5,

3804:3, 3817:20, 3818:4,
3822:13, 3823:2, 3832:15,
3836:13, 3840:3, 3844:16,
3859:3, 3859:6, 3859:7,
3860:4, 3869:24, 3870:4
**clock** [1] - 3854:3
**close** [5] - 3781:10,
3794:10, 3854:6, 3854:7,
3891:20
**co** [2] - 3888:12, 3890:7
**co-conspirators'** [2] -
3888:12, 3890:7
**coast** [1] - 3854:14
**code** [1] - 3800:5
**coding** [1] - 3882:11
**collectable** [2] - 3855:5,
3855:6
**collected** [1] - 3855:9
**collecting** [1] - 3855:8
**color** [5] - 3882:11,
3882:12, 3882:14,
3882:17, 3882:19
**column** [1] - 3859:5
**comfortable** [3] - 3769:8,
3773:25, 3847:20
**coming** [8] - 3796:11,
3796:24, 3803:18, 3818:2,
3885:24, 3886:3, 3886:13,
3886:14
**commence** [1] - 3769:22
**commenced** [5] - 3831:16,
3831:18, 3862:10,
3862:11, 3863:6
**commended** [1] - 3821:6
**comment** [2] - 3858:19,
3878:21
**communicate** [2] - 3859:2,
3859:10
**communicated** [1] -
3823:1
**communicating** [2] -
3789:22
**communication** [19] -
3776:10, 3782:7, 3783:11,
3783:23, 3787:6, 3787:10,
3787:12, 3788:17, 3825:9,
3825:10, 3825:17, 3827:4,
3860:6, 3866:5, 3866:6,
3866:14, 3876:3, 3883:7,
3886:22
**communications** [31] -
3782:16, 3782:20,
3784:10, 3784:11,
3784:19, 3785:1, 3785:5,
3785:9, 3785:10, 3785:11,
3785:15, 3786:16,
3787:19, 3787:21,
3787:24, 3788:1, 3788:8,
3788:15, 3788:18,
3790:22, 3822:7, 3823:4,

3825:19, 3827:10,
3827:20, 3828:8, 3828:13,
3883:17, 3889:23,
3889:25, 3890:2
**commuter** [1] - 3889:18
**compacted** [1] - 3859:7
**companies** [2] - 3841:20,
3877:4
**Company** [1] - 3815:7
**company** [22] - 3805:24,
3806:22, 3808:23,
3809:12, 3812:24, 3815:1,
3832:14, 3841:1, 3841:2,
3841:9, 3843:1, 3846:1,
3857:2, 3872:5, 3873:2,
3873:15, 3876:13,
3876:14, 3885:24, 3887:1,
3889:6, 3890:25
**compare** [1] - 3888:17
**compared** [2] - 3802:24,
3888:21
**compel** [1] - 3846:5
**compilation** [2] - 3762:8,
3840:7
**complaint** [16] - 3818:23,
3823:11, 3828:15, 3843:2,
3844:17, 3844:18,
3844:19, 3845:1, 3845:7,
3845:22, 3853:13,
3859:18, 3859:20,
3859:24, 3870:7
**complaints** [5] - 3838:19,
3845:6, 3845:8, 3845:9,
3845:17
**complete** [10] - 3760:22,
3761:8, 3762:3, 3768:25,
3775:23, 3821:1, 3852:8,
3852:19, 3881:18, 3889:1
**completed** [1] - 3768:10
**completely** [2] - 3826:17,
3886:24
**completing** [1] - 3891:20
**complexities** [1] - 3848:23
**complicated** [1] - 3850:4
**compromise** [1] - 3767:6
**computer** [18] - 3754:25,
3756:16, 3757:3, 3757:9,
3757:20, 3758:8, 3758:12,
3820:23, 3885:3, 3885:10,
3885:18, 3885:23,
3886:12, 3886:13,
3887:10, 3889:11, 3890:2,
3890:15
**conceded** [4] - 3795:10,
3795:11, 3795:15, 3795:18
**conceivable** [1] - 3798:17
**concern** [8] - 3757:6,
3763:10, 3775:24,
3776:18, 3842:25,
3881:23, 3882:3, 3882:23

**concerned** [9] - 3762:7,
3763:19, 3775:10,
3775:11, 3776:1, 3782:25,
3783:10, 3823:13, 3883:12
**concerns** [1] - 3773:10
**concession** [1] - 3764:9
**conclude** [2] - 3769:21,
3770:6
**concluded** [1] - 3833:12
**conclusion** [4] - 3826:1,
3869:10, 3875:3, 3884:13
**conduct** [1] - 3884:21
**conference** [6] - 3863:18,
3869:22, 3876:22,
3876:24, 3877:8, 3877:9
**conferences** [1] - 3877:10
**confident** [1] - 3774:24
**confidential** [1] - 3783:11
**confirm** [1] - 3806:13
**conflict** [3] - 3776:24,
3839:5, 3868:5
**confront** [1] - 3768:1
**confusion** [1] - 3837:9
**connected** [1] - 3801:13
**Connecticut** [1] - 3857:3
**connection** [5] - 3758:7,
3831:13, 3832:23, 3836:1,
3837:19
**connects** [1] - 3882:13
**considerable** [1] - 3860:8
**consideration** [1] -
3855:16
**considered** [2] - 3817:10,
3817:12
**consistent** [1] - 3862:5
**consolidated** [1] - 3828:15
**conspirators'** [2] -
3888:12, 3890:7
**constantine** [1] - 3783:6
**Constantine** [108] - 3754:4,
3754:8, 3776:8, 3776:11,
3782:12, 3782:14,
3782:23, 3783:2, 3786:25,
3788:2, 3788:12, 3788:16,
3790:16, 3791:14,
3794:25, 3795:13,
3795:22, 3796:10,
3796:25, 3797:4, 3797:24,
3798:3, 3798:9, 3798:13,
3798:15, 3799:14, 3801:7,
3805:18, 3805:21, 3806:2,
3806:8, 3806:12, 3806:16,
3807:3, 3807:7, 3807:12,
3807:19, 3808:1, 3808:11,
3808:16, 3808:22, 3809:5,
3809:16, 3809:22, 3810:2,
3810:9, 3810:14, 3810:18,
3810:24, 3811:6, 3811:7,
3811:22, 3812:22, 3813:5,
3813:7, 3813:10, 3813:16,

3813:23, 3814:4, 3814:12, 3814:19, 3814:25, 3815:5, 3815:9, 3815:15, 3815:19, 3816:3, 3816:9, 3816:19, 3816:23, 3817:9, 3818:14, 3819:14, 3820:12, 3823:5, 3825:2, 3825:6, 3826:2, 3826:25, 3827:1, 3827:21, 3830:5, 3843:19, 3844:2, 3848:19, 3851:4, 3852:14, 3852:21, 3852:25, 3858:1, 3858:17, 3860:10, 3866:7, 3866:9, 3866:13, 3868:8, 3868:18, 3868:24, 3869:4, 3872:2, 3872:3, 3876:18, 3876:23, 3883:8, 3883:25, 3885:5, 3887:13, 3889:14

**CONSTANTINE** [1] - 3753:7

**Constantine's** [6] - 3773:5, 3787:12, 3801:11, 3812:1, 3812:12, 3888:20

**constitute** [1] - 3775:4

**constituting** [1] - 3777:5

**Consulting** [1] - 3815:1

**contact** [2] - 3876:5, 3886:4

**contacted** [1] - 3854:18

**contain** [1] - 3802:20

**contained** [2] - 3801:24, 3803:24

**contains** [2] - 3802:21, 3881:18

**contemporaneous** [1] - 3797:20

**context** [2] - 3841:13, 3842:2

**continue** [3] - 3774:16, 3820:24, 3821:1

**continued** [2] - 3821:12, 3829:24

**Continued** [4] - 3779:18, 3780:21, 3861:15, 3863:19

**contract** [3] - 3831:20, 3832:21, 3833:5

**control** [2] - 3784:16, 3818:11

**conversation** [5] - 3768:2, 3795:22, 3859:17, 3877:16, 3889:2

**conversations** [3] - 3780:8, 3782:11, 3796:23

**convert** [1] - 3756:1

**convince** [1] - 3827:6

**CONWAY** [1] - 3754:2

**copied** [1] - 3885:8

**copies** [3] - 3788:13, 3845:1, 3845:4

**copy** [6] - 3758:19, 3777:12, 3792:25, 3793:2,

3836:3, 3836:5

**corporate** [10] - 3800:15, 3802:11, 3803:19, 3818:18, 3841:15, 3842:4, 3857:4, 3868:22, 3872:9, 3872:25

**corporation** [1] - 3796:3

**correct** [55] - 3769:16, 3778:18, 3797:7, 3802:13, 3802:16, 3802:17, 3806:19, 3814:9, 3817:5, 3818:15, 3818:16, 3831:14, 3831:15, 3833:10, 3833:23, 3835:24, 3835:25, 3837:20, 3838:4, 3838:5, 3840:22, 3840:23, 3842:24, 3843:21, 3844:3, 3844:4, 3844:13, 3844:24, 3852:23, 3852:24, 3853:5, 3853:25, 3854:1, 3858:10, 3858:24, 3858:25, 3861:8, 3864:20, 3864:21, 3865:16, 3865:17, 3865:19, 3866:3, 3866:24, 3867:15, 3869:13, 3870:5, 3870:6, 3871:12, 3871:13, 3871:19, 3872:13, 3877:17, 3878:25, 3883:4

**correlate** [1] - 3765:5

**corresponding** [1] - 3802:23

**corresponds** [1] - 3803:6

**corroborated** [1] - 3888:22

**cost** [3] - 3830:13, 3830:15, 3857:23

**costs** [4] - 3818:19, 3818:24, 3818:25, 3819:23

**counsel** [12] - 3763:12, 3765:7, 3771:11, 3772:4, 3773:20, 3774:9, 3854:10, 3860:24, 3865:1, 3865:3, 3865:5, 3869:7

**counsel)** [1] - 3862:6

**count** [1] - 3884:9

**countering** [1] - 3826:12

**Country** [1] - 3754:3

**couple** [3] - 3755:5, 3854:20, 3864:13

**course** [2] - 3763:13, 3834:13, 3835:17

**court** [14] - 3760:1, 3780:19, 3780:20, 3781:1, 3785:2, 3819:1, 3832:25, 3837:10, 3839:7, 3839:12, 3846:11, 3846:12, 3865:16, 3884:4

**COURT** [127] - 3753:1, 3755:2, 3755:4, 3755:14, 3757:15, 3758:23, 3760:4,

3762:5, 3764:11, 3766:9, 3766:13, 3766:20, 3767:14, 3767:18, 3768:8, 3769:25, 3770:13, 3771:9, 3772:9, 3772:25, 3773:18, 3773:24, 3774:13, 3774:16, 3774:20, 3775:9, 3776:5, 3776:17, 3777:11, 3777:15, 3777:17, 3778:2, 3778:9, 3778:14, 3778:16, 3779:5, 3779:17, 3780:17, 3781:2, 3781:10, 3781:15, 3781:17, 3785:4, 3786:12, 3787:13, 3788:8, 3788:14, 3790:1, 3790:11, 3791:3, 3791:25, 3792:3, 3792:7, 3792:13, 3792:16, 3792:22, 3793:7, 3793:20, 3794:6, 3794:9, 3795:11, 3795:17, 3797:9, 3799:1, 3799:24, 3804:9, 3809:3, 3811:21, 3816:12, 3820:15, 3821:2, 3821:5, 3821:8, 3821:10, 3822:3, 3822:10, 3823:16, 3826:22, 3827:14, 3827:17, 3827:25, 3829:3, 3829:12, 3829:14, 3829:17, 3829:20, 3830:22, 3841:18, 3843:6, 3860:14, 3860:20, 3861:12, 3862:5, 3862:17, 3863:10, 3864:2, 3872:1, 3873:24, 3874:6, 3877:19, 3878:19, 3879:10, 3879:20, 3879:24, 3880:5, 3880:10, 3881:14, 3882:2, 3882:14, 3882:22, 3883:1, 3883:6, 3884:4, 3884:7, 3885:16, 3887:6, 3888:11, 3889:21, 3890:21, 3890:24, 3891:3, 3891:11, 3891:17, 3891:23, 3892:1, 3892:3, 3892:7

**Court** [48] - 3754:7, 3754:20, 3755:6, 3755:9, 3756:6, 3758:1, 3758:22, 3759:8, 3759:24, 3760:14, 3761:16, 3761:20, 3763:2, 3763:21, 3765:1, 3766:7, 3766:15, 3767:21, 3767:24, 3768:2, 3770:12, 3772:16, 3772:23, 3774:11, 3774:21, 3775:8, 3778:6, 3779:2, 3779:11, 3780:2, 3788:13, 3789:23, 3805:13, 3818:23, 3822:4, 3822:11, 3822:14, 3837:1, 3842:8, 3842:9, 3846:14, 3853:14, 3882:25, 3883:23, 3887:7, 3888:14,

3888:23, 3891:16

**Court's** [3] - 3766:18, 3784:3, 3791:21

**Courthouse** [1] - 3753:6

**courthouse** [1] - 3769:3

**courtroom** [19] - 3762:1, 3763:22, 3763:23, 3765:25, 3766:4, 3766:23, 3767:8, 3767:12, 3768:13, 3768:20, 3774:15, 3788:7, 3795:6, 3829:19, 3853:18, 3878:18, 3879:4, 3879:11, 3880:8

**courts** [2] - 3766:12, 3794:20

**coverages** [1] - 3871:22

**covered** [4] - 3777:14, 3801:4, 3830:8, 3870:12

**covers** [1] - 3782:16

**CR-13-607** [1] - 3753:4

**crack** [1] - 3859:23

**Crafters** [5] - 3807:5, 3808:7, 3808:10, 3813:6, 3813:9

**create** [8] - 3761:19, 3763:18, 3787:1, 3886:11, 3889:13, 3889:14, 3889:16, 3890:2

**created** [1] - 3882:6

**credibility** [1] - 3762:19

**credible** [1] - 3884:5

**credible'** [1] - 3884:2

**credit** [1] - 3865:9

**crime** [6] - 3779:3, 3780:15, 3782:12, 3782:16, 3783:3, 3878:5

**Crime** [3] - 3884:9, 3884:13, 3884:16

**criminal** [1] - 3887:9

**critical** [3] - 3761:9, 3884:3, 3884:5

**Cromwell** [2] - 3816:16, 3816:18

**CROSS** [4] - 3831:1, 3843:8, 3893:8, 3893:10

**cross** [20] - 3761:9, 3761:18, 3762:14, 3762:15, 3762:24, 3765:23, 3766:6, 3771:3, 3791:10, 3791:18, 3792:11, 3792:17, 3792:18, 3829:21, 3830:22, 3843:2, 3866:8, 3881:12, 3883:2, 3888:25

**cross-complaint** [1] - 3843:2

**CROSS-EXAMINATION** [4] - 3831:1, 3843:8, 3893:8, 3893:10

**cross-examination** [9] -

3761:18, 3762:14, 3762:24, 3765:23, 3766:6, 3829:21, 3830:22, 3881:12, 3883:2
**cross-examine** [2] - 3761:9, 3888:25
**cross-examining** [1] - 3762:15
**crumble** [2] - 3784:15, 3786:20
**CSL** [2] - 3873:6, 3873:10
**cured** [1] - 3766:5
**Curley** [1] - 3810:4
**CURRIE** [1] - 3753:14
**cut** [1] - 3809:10
**cuts** [1] - 3834:24

# D

**Daily** [1] - 3864:25
**Danbury** [2] - 3857:3, 3857:15
**Darryl** [1] - 3799:12
**date** [13] - 3763:13, 3799:5, 3799:6, 3799:7, 3803:8, 3803:12, 3803:14, 3803:17, 3819:24, 3849:2, 3849:3, 3862:10, 3887:19
**dated** [5] - 3806:18, 3807:13, 3818:17, 3819:4, 3830:1
**dates** [1] - 3802:23
**days** [7] - 3759:1, 3833:14, 3838:6, 3846:15, 3849:6, 3854:21, 3866:21
**deal** [4] - 3756:11, 3841:7, 3849:5, 3877:25
**dealing** [1] - 3846:20
**dealt** [2] - 3811:9, 3866:9
**dear** [1] - 3787:17
**deceived** [1] - 3789:19
**December** [3] - 3819:8, 3820:5, 3843:14
**decide** [1] - 3832:19
**decided** [1] - 3869:25
**decision** [11] - 3767:25, 3769:12, 3778:6, 3858:11, 3868:25, 3869:1, 3869:2, 3869:5, 3869:6, 3876:6, 3881:24
**dedicated** [1] - 3818:13
**defamatory** [2] - 3862:25, 3863:1
**defend** [3] - 3805:8, 3852:1, 3862:23
**defendant** [13] - 3789:3, 3837:7, 3837:8, 3837:15, 3837:18, 3852:22, 3856:7, 3868:13, 3878:21,

3878:24, 3879:12, 3879:15, 3885:4
**Defendant's** [1] - 3852:7
**defendants** [11] - 3783:22, 3784:17, 3787:22, 3794:24, 3839:12, 3852:1, 3856:9, 3868:19, 3878:6, 3884:17, 3885:3
**Defendants** [3] - 3753:8, 3753:20, 3754:1
**defending** [1] - 3805:12
**defense** [30] - 3755:20, 3756:3, 3756:5, 3756:10, 3756:13, 3756:17, 3757:22, 3757:25, 3758:2, 3758:5, 3758:7, 3763:15, 3763:17, 3763:25, 3765:23, 3768:20, 3768:25, 3769:22, 3770:20, 3771:11, 3771:22, 3775:5, 3789:5, 3791:7, 3841:8, 3877:25, 3881:17, 3885:2, 3888:25, 3891:22
**defense's** [1] - 3888:8
**defenses** [1] - 3884:1
**defining** [1] - 3756:9
**defrauding** [1] - 3826:3
**Delaware** [1] - 3857:16
**delay** [6] - 3758:14, 3763:14, 3768:21, 3770:14, 3791:6, 3793:9
**delete** [2] - 3886:8, 3886:9, 3888:6
**deleted** [1] - 3887:23
**deletions** [1] - 3886:5
**deliberate** [1] - 3757:1
**deliver** [1] - 3756:22
**deliverables** [1] - 3869:22
**delivered** [1] - 3755:23
**delivery** [1] - 3891:20
**demeanor** [2] - 3878:21, 3879:4
**demurrer** [2] - 3845:23, 3876:12
**denying** [1] - 3828:19
**depicted** [1] - 3864:20
**deponent** [2] - 3847:7, 3856:25
**depose** [2] - 3856:11, 3856:14
**deposed** [5] - 3846:15, 3856:6, 3856:8, 3856:17, 3868:13
**deposit** [1] - 3817:21
**deposited** [6] - 3780:15, 3797:25, 3798:7, 3818:14, 3819:10, 3851:19
**deposition** [24] - 3786:3, 3826:9, 3846:13, 3846:20,

3846:21, 3847:9, 3847:15, 3848:17, 3851:5, 3852:11, 3856:13, 3866:20, 3866:24, 3866:25, 3867:2, 3867:5, 3867:13, 3867:22, 3871:9, 3874:18, 3875:1, 3875:3, 3875:4, 3875:12
**depositions** [7] - 3784:13, 3786:8, 3856:18, 3856:23, 3868:3, 3869:9, 3875:15
**deposits** [7] - 3796:10, 3799:4, 3799:15, 3817:2, 3817:4, 3819:6, 3853:6
**Depot** [1] - 3891:8
**derivative** [1] - 3876:13
**describe** [2] - 3882:6, 3889:15
**description** [1] - 3802:4
**designed** [1] - 3761:14
**desire** [1] - 3788:25
**despite** [1] - 3757:9
**detail** [4] - 3757:14, 3771:7, 3823:3, 3862:17
**detailed** [2] - 3760:25, 3770:24
**details** [3] - 3849:23, 3863:10, 3863:15
**determination** [1] - 3769:14
**determine** [1] - 3887:19
**development** [6] - 3850:2, 3856:1, 3857:5, 3857:6, 3869:19, 3871:18
**device** [2] - 3885:21, 3887:10
**devices** [1] - 3885:9
**DeVries** [2] - 3852:12, 3867:16
**dialogue** [1] - 3772:10
**Diamante** [3] - 3870:8, 3870:25, 3873:2
**Dickinson** [1] - 3810:25
**difference** [1] - 3890:9
**different** [7] - 3785:21, 3790:6, 3790:22, 3817:18, 3838:18, 3846:8, 3846:10
**difficult** [1] - 3761:20
**diligently** [3] - 3768:22, 3772:24, 3820:22
**direct** [12] - 3775:23, 3792:14, 3817:9, 3819:5, 3825:24, 3829:9, 3840:20, 3866:4, 3866:5, 3866:14, 3876:11, 3881:24
**DIRECT** [4] - 3794:14, 3829:23, 3893:4, 3893:6
**directed** [31] - 3764:6, 3807:2, 3807:6, 3807:10, 3807:17, 3807:25, 3808:21, 3809:5, 3809:14,

3809:20, 3810:1, 3810:8, 3810:12, 3810:16, 3811:2, 3813:14, 3813:20, 3814:1, 3814:15, 3814:24, 3815:4, 3815:8, 3815:13, 3815:17, 3816:1, 3816:9, 3816:17, 3816:22, 3819:9, 3830:4, 3843:19
**directing** [2] - 3818:14, 3818:15
**direction** [8] - 3798:14, 3806:8, 3812:2, 3812:12, 3813:10, 3817:10, 3817:15, 3862:8
**directions** [1] - 3798:15
**directly** [3] - 3865:12, 3866:11, 3874:17
**disappointed** [1] - 3850:6
**disaster** [1] - 3788:3
**disburse** [3] - 3798:14, 3798:16, 3798:18
**disbursed** [1] - 3818:15
**disbursement** [3] - 3805:23, 3814:13, 3857:22
**disbursements** [9] - 3760:8, 3761:2, 3798:12, 3805:16, 3805:19, 3812:9, 3813:9, 3813:13, 3817:16
**disclose** [2] - 3776:10, 3787:10
**disclosed** [1] - 3787:7
**discloses** [1] - 3786:5
**discovery** [9] - 3764:24, 3765:1, 3822:17, 3842:3, 3842:16, 3862:13, 3863:7, 3876:15, 3891:20
**discretion** [4] - 3766:18, 3766:20, 3767:2
**discuss** [7] - 3763:13, 3769:1, 3792:2, 3820:18, 3852:2, 3878:14, 3892:5
**discussed** [5] - 3779:3, 3780:4, 3792:4, 3809:8, 3823:8
**discussing** [3] - 3759:12, 3782:6, 3883:11
**discussion** [8] - 3776:13, 3780:6, 3791:12, 3796:13, 3796:23, 3797:17, 3872:20, 3872:23
**discussions** [5] - 3849:1, 3849:7, 3850:15, 3876:25, 3877:2
**disk** [8] - 3755:19, 3756:1, 3756:2, 3769:1, 3820:22, 3821:1, 3891:21, 3891:25
**disks** [8] - 3755:22, 3756:16, 3756:19, 3756:22, 3757:3, 3758:9, 3758:12, 3758:17

8

**dismiss** [9] - 3788:4, 3845:24, 3860:3, 3860:5, 3866:19, 3869:1, 3876:4, 3876:6, 3876:12
**dismissal** [12] - 3786:5, 3787:2, 3825:3, 3825:7, 3826:19, 3853:21, 3865:24, 3867:23, 3868:1, 3875:25, 3876:3, 3883:4
**dismissed** [18] - 3783:24, 3785:24, 3790:20, 3790:21, 3818:23, 3822:23, 3824:17, 3826:6, 3826:16, 3851:7, 3851:9, 3855:22, 3856:18, 3856:20, 3859:22, 3859:24, 3865:20, 3865:25
**dismissing** [2] - 3855:15, 3860:1
**disperse** [1] - 3773:9
**dispose** [1] - 3885:10
**disprove** [1] - 3824:18
**disproves** [1] - 3824:11
**dispute** [8] - 3832:16, 3832:22, 3832:25, 3833:1, 3835:12, 3835:18, 3836:21, 3850:2
**disqualify** [1] - 3846:6
**disregard** [1] - 3873:24
**distinction** [3] - 3886:1, 3889:11, 3889:20
**distinctive** [1] - 3887:15
**distraction** [1] - 3862:16
**distributions** [1] - 3856:3
**District** [3] - 3805:13, 3837:1, 3845:19
**district** [2] - 3837:10, 3839:12
**DISTRICT** [3] - 3753:1, 3753:1, 3753:11
**document** [9] - 3760:7, 3760:8, 3793:2, 3801:24, 3831:20, 3832:10, 3834:18, 3861:3, 3889:21
**documentary** [1] - 3765:8
**documentation** [2] - 3784:16, 3784:18
**documents** [16] - 3759:3, 3760:11, 3761:6, 3762:11, 3762:12, 3763:12, 3776:21, 3776:23, 3788:13, 3846:4, 3846:11, 3846:12, 3846:13, 3852:9, 3872:9, 3872:12
**dollar** [1] - 3855:1
**dollars** [2] - 3815:6, 3850:24
**domesticated** [1] - 3855:3
**done** [6] - 3812:1, 3812:11, 3826:18, 3866:2, 3874:1,
3874:6
**door** [7] - 3757:18, 3822:6, 3823:4, 3823:14, 3825:5, 3825:19, 3863:5
**doubt** [1] - 3878:5
**down** [15] - 3758:11, 3761:17, 3761:24, 3762:23, 3763:16, 3789:5, 3798:5, 3821:4, 3849:15, 3849:19, 3856:12, 3868:17, 3870:14, 3872:16, 3877:19
**download** [2] - 3756:17, 3758:17, 3768:25
**downloaded** [2] - 3759:20, 3759:25
**downstairs** [6] - 3766:17, 3771:17, 3772:6, 3774:3, 3774:11, 3820:23
**drafts** [1] - 3774:5
**dramatic** [1] - 3763:10
**draw** [3] - 3776:2, 3826:1, 3883:21
**drive** [1] - 3887:15
**drug** [2] - 3890:5
**Duarte** [1] - 3810:19
**due** [2] - 3767:9, 3876:8
**duly** [2] - 3794:3, 3841:24
**dumped** [1] - 3791:7
**during** [28] - 3768:9, 3775:24, 3782:24, 3783:14, 3793:3, 3801:4, 3801:7, 3801:13, 3804:16, 3806:25, 3812:21, 3814:2, 3822:17, 3823:8, 3828:10, 3828:17, 3833:17, 3835:16, 3851:11, 3851:12, 3859:1, 3866:4, 3866:8, 3867:6, 3868:16, 3876:21, 3877:6, 3886:2
**DVD** [1] - 3875:17

# E

**e-mail** [24] - 3759:2, 3760:18, 3763:5, 3786:18, 3788:15, 3790:4, 3798:18, 3822:7, 3825:20, 3826:24, 3826:25, 3828:13, 3845:12, 3847:3, 3859:5, 3859:7, 3859:25, 3860:1, 3885:22, 3886:10, 3886:11, 3886:22, 3887:24, 3888:2
**e-mailed** [2] - 3763:6, 3889:10
**e-mails** [16] - 3759:18, 3759:19, 3785:16, 3786:21, 3790:10,
3791:13, 3798:20, 3823:6, 3840:5, 3859:12, 3860:2, 3866:5, 3866:10, 3886:2, 3886:5, 3888:9
**Earl** [1] - 3810:3
**early** [4] - 3756:8, 3756:18, 3759:17, 3813:24
**earned** [2] - 3800:17, 3800:20
**ease** [1] - 3764:20
**easier** [2] - 3765:9, 3881:19
**easily** [1] - 3765:14
**EASTERN** [1] - 3753:1
**Edenholm** [1] - 3807:8, 3807:11, 3808:18, 3813:17
**effect** [1] - 3783:23
**effective** [2] - 3762:24, 3763:11
**effort** [2] - 3821:1, 3838:17
**efforts** [5] - 3756:7, 3757:10, 3757:17, 3851:13, 3856:11
**eggs** [1] - 3857:4
**eight** [3] - 3834:18, 3838:16
**either** [14] - 3764:4, 3764:6, 3766:13, 3787:23, 3795:2, 3796:24, 3797:20, 3801:6, 3801:17, 3804:3, 3804:15, 3812:9, 3857:18, 3887:9
**el** [4] - 3870:8, 3870:24, 3871:2, 3871:14
**electronic** [1] - 3885:9
**electronically** [1] - 3756:1
**elements** [1] - 3878:5
**elicit** [3] - 3778:8, 3789:9, 3791:23
**elicited** [1] - 3791:23
**eliciting** [1] - 3825:25
**eliminated** [2] - 3769:8, 3769:13
**embarrassing** [1] - 3841:3
**employee** [1] - 3864:9
**employment** [3] - 3840:23, 3841:5, 3841:7
**enable** [1] - 3765:13
**enclosures** [1] - 3800:9
**End** [1] - 3863:18
**end** [6] - 3771:18, 3799:7, 3826:5, 3854:25, 3874:24, 3877:20
**ended** [1] - 3824:22
**ends** [1] - 3801:6
**enforcement** [2] - 3845:20, 3847:21
**engaged** [1] - 3840:21
**engagements** [1] - 3832:13
**English** [1] - 3845:24
**enter** [1] - 3759:10
**entered** [1] - 3763:22
**enters** [1] - 3829:18
**entertain** [1] - 3827:18
**entire** [1] - 3761:4
**entitle** [1] - 3842:14
**entitled** [4] - 3764:10, 3825:13, 3834:5, 3834:10
**entitlements** [2] - 3849:25, 3850:3
**entries** [1] - 3802:6
**entry** [3] - 3804:18, 3886:19
**envelope** [1] - 3800:6
**Epstein** [4] - 3811:12, 3812:10, 3840:21, 3841:6
**equipped** [1] - 3841:7
**equity** [1] - 3839:2
**errors** [1] - 3762:13
**escrow** [31] - 3795:23, 3796:5, 3796:11, 3796:16, 3797:19, 3798:1, 3798:7, 3799:14, 3799:18, 3799:20, 3800:9, 3800:12, 3800:23, 3801:8, 3801:19, 3803:22, 3805:23, 3806:18, 3812:20, 3814:3, 3814:14, 3815:14, 3817:2, 3819:10, 3819:19, 3820:8, 3820:9, 3824:13, 3830:2, 3864:19, 3865:10
**ESQ** [5] - 3753:16, 3753:16, 3753:22, 3754:4, 3754:6
**essentially** [2] - 3771:21, 3789:7
**establish** [2] - 3890:17, 3890:18
**estate** [2] - 3870:5, 3870:7
**Eufora** [5] - 3808:12, 3813:25, 3814:2, 3814:7, 3877:5
**Evenson** [2] - 3854:15, 3865:3
**event** [2] - 3856:23, 3860:5
**eventually** [2] - 3796:20, 3819:19
**evidence** [27] - 3761:11, 3762:13, 3765:4, 3765:11, 3765:14, 3767:22, 3768:10, 3798:25, 3804:10, 3805:22, 3806:1, 3806:7, 3823:8, 3825:24, 3827:2, 3828:9, 3828:12, 3878:7, 3878:10, 3878:11, 3878:20, 3884:16, 3888:10, 3888:18, 3888:22, 3893:20
**exactly** [6] - 3787:4, 3788:20, 3802:8, 3802:13,

3822:22, 3838:2
**examination** [14] -
3761:18, 3762:14,
3762:24, 3765:23, 3766:6,
3785:23, 3823:9, 3826:7,
3828:17, 3829:21,
3830:22, 3881:12,
3881:24, 3883:2
**EXAMINATION** [14] -
3794:14, 3829:23, 3831:1,
3843:8, 3860:21, 3874:10,
3875:22, 3893:4, 3893:6,
3893:8, 3893:10, 3893:12,
3893:14, 3893:16
**examine** [4] - 3760:20,
3761:9, 3775:22, 3888:25
**examined** [1] - 3794:3
**examining** [1] - 3762:15
**Excel** [1] - 3765:17
**except** [1] - 3856:2
**exception** [5] - 3779:4,
3782:13, 3782:16, 3783:4,
3884:19
**Exception** [3] - 3884:9,
3884:13, 3884:16
**exclude** [1] - 3766:15
**excuse** [4] - 3832:5,
3835:15, 3844:6, 3875:1
**excused** [1] - 3820:19
**execute** [1] - 3891:6
**exhibit** [5] - 3777:13,
3802:25, 3812:8, 3844:5,
3887:11
**Exhibit** [13] - 3792:25,
3798:25, 3799:7, 3801:22,
3804:10, 3816:11, 3819:5,
3831:5, 3832:5, 3834:15,
3834:16, 3852:8, 3893:20
**EXHIBITS** [1] - 3893:19
**exhibits** [17] - 3755:19,
3756:3, 3756:10, 3756:17,
3756:20, 3756:22,
3757:25, 3758:8, 3763:17,
3768:25, 3788:13,
3828:10, 3880:19, 3882:2,
3882:8, 3885:4, 3885:8
**exist** [4] - 3781:4, 3781:19,
3788:9, 3827:12
**exists** [1] - 3786:21
**exits** [1] - 3878:17
**expand** [2] - 3859:8,
3859:9
**expect** [6] - 3755:12,
3769:17, 3772:2, 3792:20,
3820:16, 3877:24
**expectation** [1] - 3770:19
**expected** [1] - 3838:8
**expecting** [3] - 3796:12,
3796:21, 3837:17
**expedited** [2] - 3786:9,

3856:13
**expedition** [1] - 3827:16
**expenditures** [1] - 3764:23
**expense** [5] - 3858:5,
3858:9, 3868:6, 3875:1,
3875:3
**expenses** [5] - 3830:16,
3830:19, 3874:13,
3874:17, 3874:18
**expensive** [3] - 3850:20,
3868:3, 3875:16
**experience** [1] - 3854:22
**experts** [1] - 3886:4
**explain** [3] - 3824:19,
3825:21, 3882:7
**explained** [1] - 3826:22
**explaining** [1] - 3860:1
**explains** [1] - 3823:3
**explanation** [1] - 3765:22
**explore** [1] - 3825:13
**exposed** [1] - 3784:15
**expressed** [2] - 3798:14,
3798:15
**extended** [1] - 3761:22
**extent** [8] - 3761:12,
3777:1, 3782:24, 3798:12,
3824:4, 3824:16, 3824:18,
3880:12
**extortion** [2] - 3805:11,
3839:19
**extra** [1] - 3765:18
**eyes** [1] - 3786:22

**F**

**fabricated** [2] - 3890:8,
3890:11
**face** [4] - 3757:18, 3846:25,
3847:9, 3847:20
**faced** [1] - 3826:18
**facilitate** [1] - 3880:6
**facility** [4] - 3755:23,
3755:24, 3756:14, 3757:6
**fact** [12] - 3786:6, 3790:4,
3790:21, 3791:9, 3825:14,
3827:23, 3828:18,
3828:24, 3869:14,
3872:16, 3876:2, 3884:17
**facts** [5] - 3806:4, 3813:22,
3826:14, 3869:3, 3888:17
**factual** [1] - 3773:13
**failure** [2] - 3871:4,
3871:15
**fair** [10] - 3785:15, 3808:5,
3817:16, 3817:17,
3833:25, 3834:3, 3842:1,
3842:5, 3864:8, 3883:11
**fairly** [1] - 3879:6
**fake** [1] - 3888:5

**Falcon** [2] - 3812:25,
3813:4
**fall** [1] - 3767:14
**falls** [1] - 3783:3
**false** [4] - 3785:25, 3787:2,
3863:12, 3864:10
**familiar** [3] - 3766:13,
3794:24, 3797:12,
3811:11, 3815:20,
3866:22, 3867:4, 3870:15
**far** [8] - 3761:4, 3763:19,
3791:3, 3856:3, 3863:6,
3867:19, 3868:11, 3870:21
**fashion** [1] - 3762:24
**father's** [2] - 3857:2,
3857:14
**fathom** [1] - 3762:23
**fault** [3] - 3755:17, 3757:1,
3775:16
**faulting** [1] - 3791:8
**FBI** [1] - 3777:3
**fear** [1] - 3862:15
**February** [3] - 3819:23,
3865:20, 3869:9
**Federal** [2] - 3753:15,
3754:20
**federal** [1] - 3851:9
**fee** [1] - 3856:23
**fees** [20] - 3782:9, 3784:2,
3800:17, 3800:18, 3801:2,
3804:14, 3818:5, 3818:9,
3818:24, 3818:25, 3833:9,
3833:10, 3834:6, 3834:10,
3835:6, 3835:8, 3853:21,
3874:18
**felt** [6] - 3841:9, 3847:20,
3854:22, 3856:21, 3858:9,
3860:12
**few** [3] - 3849:6, 3875:21
**fictitious** [2] - 3824:7,
3824:8
**fifth** [1] - 3759:22
**figure** [1] - 3881:2
**figuring** [1] - 3841:11
**file** [7] - 3837:10, 3845:4,
3846:5, 3851:25, 3853:15,
3855:16, 3855:23
**filed** [12] - 3824:8, 3844:19,
3845:1, 3845:7, 3845:17,
3853:13, 3865:15,
3865:18, 3865:24, 3870:8,
3874:22, 3876:2
**filing** [4] - 3805:10,
3818:24, 3869:8, 3874:18
**finally** [4] - 3765:24,
3838:20, 3846:11, 3865:14
**financial** [1] - 3832:24
**fine** [4] - 3777:16, 3784:3,
3790:13, 3863:16
**finger** [1] - 3799:25

**finish** [1] - 3869:6
**finished** [1] - 3760:16
**firm** [17] - 3796:1, 3800:13,
3804:14, 3808:3, 3808:24,
3811:23, 3811:24, 3812:5,
3816:15, 3840:11, 3841:6,
3841:7, 3841:8, 3841:9,
3864:11, 3864:20
**firm's** [3] - 3795:24,
3797:19, 3869:5
**first** [17] - 3755:7, 3759:20,
3760:5, 3764:21, 3766:8,
3770:14, 3780:17,
3781:23, 3786:24, 3794:2,
3796:7, 3831:8, 3856:18,
3878:1, 3878:11, 3881:23,
3882:7
**First** [2] - 3814:14, 3853:16
**firsthand** [2] - 3843:22,
3871:12
**fishing** [1] - 3827:15
**fit** [2] - 3764:4, 3841:11
**five** [4] - 3774:2, 3833:14,
3838:6, 3885:6
**fledged** [1] - 3822:6
**flip** [1] - 3881:1
**flowchart** [1] - 3765:6
**flowcharts** [5] - 3764:17,
3764:22, 3765:9, 3765:12,
3769:2
**flying** [1] - 3760:21
**focus** [4] - 3761:11,
3778:17, 3795:20, 3862:7
**focused** [3] - 3848:23,
3863:6, 3870:3
**focuses** [1] - 3870:8
**focusing** [1] - 3796:4,
3799:4
**follow** [1] - 3878:12
**followed** [1] - 3878:11
**following** [3] - 3780:1,
3781:1, 3861:13
**follows** [2] - 3766:21,
3794:4
**forced** [1] - 3870:18
**foreclosed** [1] - 3857:6
**foreclosure** [1] - 3871:6
**forensic** [1] - 3764:16
**forget** [2] - 3787:4, 3889:22
**forgot** [4] - 3779:10,
3793:4, 3819:24, 3858:11
**form** [6] - 3797:8, 3797:9,
3865:23, 3871:24,
3871:25, 3880:23
**former** [4] - 3784:20,
3847:18, 3862:24, 3864:9
**forth** [3] - 3755:17, 3774:5,
3846:2
**fortunately** [1] - 3857:19
**forum** [1] - 3832:18

**10**

**forward** [7] - 3755:13, 3763:15, 3769:9, 3778:20, 3778:23, 3793:21, 3888:2
**Foundation** [3] - 3810:11, 3810:13, 3810:16
**founded** [1] - 3771:4
**four** [5] - 3802:21, 3802:22, 3802:24, 3812:8
**fourth** [1] - 3759:22
**Fox** [1] - 3804:23
**fox** [1] - 3805:14
**frankly** [1] - 3766:10
**fraud** [6] - 3779:3, 3780:16, 3782:13, 3782:16, 3783:4, 3824:9
**Fraud** [3] - 3884:9, 3884:13, 3884:16
**free** [1] - 3768:11
**freedom** [1] - 3853:17
**Friday** [3] - 3756:7, 3759:7, 3772:20
**friend** [1] - 3854:13
**friendly** [1] - 3848:15
**friends** [1] - 3849:18
**frivolous** [4] - 3824:22, 3826:4, 3826:16, 3827:2
**front** [5] - 3775:25, 3790:17, 3802:25, 3831:5, 3847:24
**full** [3] - 3785:3, 3822:6, 3846:15
**full-fledged** [1] - 3822:6
**Fund** [7] - 3760:9, 3775:2, 3816:25, 3817:3, 3817:11, 3817:13, 3851:15
**fund** [5] - 3783:8, 3801:19, 3830:9, 3858:8, 3862:22
**fundamental** [1] - 3767:8
**funds** [8] - 3801:8, 3801:10, 3804:1, 3805:17, 3806:2, 3817:22, 3818:2, 3840:9
**future** [2] - 3766:4, 3771:5

## G

**game** [1] - 3785:15
**general** [17] - 3800:15, 3800:19, 3800:24, 3801:9, 3801:19, 3802:3, 3803:22, 3804:2, 3827:8, 3830:9, 3840:14, 3845:8, 3851:21, 3863:12, 3877:2, 3881:9, 3891:12
**generally** [6] - 3832:13, 3864:6, 3870:6, 3877:11, 3877:16, 3877:17
**gestures** [2] - 3879:16, 3879:22

**Giglio** [1] - 3775:6
**Gillis** [3] - 3809:12, 3815:11, 3815:14
**Gilmartin** [3] - 3808:24, 3809:18, 3814:20
**given** [4] - 3758:10, 3763:12, 3765:11, 3790:2, 3791:18, 3847:3, 3868:15, 3883:25
**glad** [1] - 3770:25
**Glen** [1] - 3864:22
**global** [1] - 3851:24
**Global** [7] - 3760:9, 3775:2, 3816:25, 3817:3, 3817:11, 3817:12, 3851:14
**Gonchar** [4] - 3799:8, 3799:9, 3847:3, 3847:17
**Goodman** [2] - 3854:12, 3865:8
**Google** [2] - 3870:20, 3886:3
**Google's** [1] - 3887:25
**Government** [16] - 3753:14, 3789:16, 3804:10, 3822:15, 3822:17, 3825:13, 3825:24, 3843:13, 3877:22, 3878:3, 3880:5, 3880:19, 3889:20, 3891:5, 3891:24, 3893:20
**government** [39] - 3756:4, 3756:22, 3758:18, 3759:3, 3763:3, 3764:3, 3764:5, 3764:9, 3764:12, 3766:14, 3766:24, 3768:20, 3769:15, 3769:21, 3770:5, 3770:16, 3770:20, 3771:5, 3772:18, 3773:8, 3773:11, 3774:21, 3783:7, 3785:15, 3785:18, 3785:22, 3786:11, 3786:18, 3787:1, 3789:13, 3791:5, 3791:16, 3791:22, 3792:24, 3793:4, 3793:16, 3793:18, 3804:5
**Government's** [14] - 3760:24, 3798:25, 3801:5, 3801:22, 3802:7, 3816:11, 3819:5, 3822:21, 3824:5, 3824:6, 3824:11, 3827:18, 3829:25, 3831:5
**government's** [1] - 3761:4
**granted** [1] - 3853:14
**gravamen** [2] - 3840:1
**great** [5] - 3756:11, 3784:10, 3784:11, 3825:11, 3832:3
**greater** [1] - 3757:14
**Green** [3] - 3811:12, 3812:10, 3840:21
**green** [1] - 3882:12

**Greenberg** [1] - 3809:23
**Greg** [2] - 3852:12, 3867:16
**ground** [1] - 3758:20
**grounds** [1] - 3886:25
**group** [4] - 3841:3, 3847:19, 3872:21, 3873:10
**GSF** [1] - 3764:22
**guess** [7] - 3755:15, 3839:6, 3846:25, 3848:18, 3872:22, 3882:12
**guessing** [1] - 3870:25
**guy** [4] - 3849:17, 3854:15, 3863:1, 3872:15
**guys** [1] - 3785:2

## H

**HALEY** [51] - 3753:20, 3753:22, 3755:15, 3757:16, 3758:24, 3762:3, 3762:6, 3766:8, 3766:10, 3768:17, 3769:20, 3770:2, 3774:14, 3777:19, 3792:20, 3795:10, 3797:8, 3797:10, 3804:7, 3820:20, 3821:6, 3821:9, 3829:10, 3829:13, 3830:24, 3831:2, 3832:3, 3832:8, 3833:3, 3836:3, 3836:6, 3843:4, 3861:11, 3862:3, 3862:7, 3863:3, 3863:17, 3871:24, 3873:22, 3874:5, 3874:9, 3874:11, 3875:20, 3879:23, 3880:2, 3882:10, 3882:21, 3891:19, 3891:24, 3893:9, 3893:15
**Haley** [12] - 3759:16, 3761:19, 3791:15, 3792:17, 3830:23, 3831:4, 3844:7, 3850:9, 3864:14, 3879:20, 3891:13, 3891:18
**Haley's** [1] - 3880:7
**half** [1] - 3757:19, 3759:25, 3762:8, 3772:17, 3792:19, 3815:6, 3851:3, 3872:17, 3872:22, 3872:23
**hand** [6] - 3758:18, 3759:24, 3822:11, 3828:1, 3886:7, 3891:15
**handed** [2] - 3764:25, 3783:21
**handing** [1] - 3862:6
**handle** [2] - 3804:20, 3869:23
**handled** [1] - 3805:14
**handling** [3] - 3851:11, 3859:1, 3876:21
**hands** [1] - 3871:22

**handwritten** [2] - 3889:24, 3890:3
**happy** [6] - 3765:6, 3766:16, 3767:1, 3781:11, 3869:24, 3879:17
**hard** [6] - 3775:17, 3778:19, 3798:2, 3801:10, 3818:1, 3887:14
**Harvey** [4] - 3805:11, 3839:20, 3839:21, 3839:22
**Harvey/Jowdy** [1] - 3839:16
**Hawaii** [2] - 3874:3, 3874:4
**Hawaiian** [2] - 3804:25, 3805:15
**head** [3] - 3878:25, 3879:1, 3879:15
**headed** [1] - 3799:17
**hear** [7] - 3767:3, 3768:13, 3781:12, 3785:19, 3823:22, 3832:16, 3881:25
**heard** [5] - 3766:6, 3768:12, 3775:15, 3828:6, 3828:21
**hearing** [1] - 3767:5
**hearsay** [2] - 3823:21, 3823:23
**held** [2] - 3795:24, 3839:2
**helpful** [1] - 3781:13
**helps** [1] - 3826:11
**highlighted** [4] - 3802:16, 3802:22, 3808:17, 3809:8
**Highway** [1] - 3753:21
**Hills** [1] - 3858:4
**himself** [2] - 3823:1, 3865:9
**hire** [2] - 3811:23, 3854:11
**hired** [1] - 3851:25
**hit** [2] - 3758:20, 3845:23
**hoc** [1] - 3842:9
**hockey** [44] - 3783:9, 3784:12, 3785:14, 3785:23, 3786:1, 3786:7, 3786:10, 3786:19, 3786:25, 3787:7, 3789:19, 3791:22, 3792:1, 3792:2, 3797:12, 3797:17, 3801:12, 3801:18, 3804:3, 3804:15, 3822:18, 3822:23, 3823:7, 3823:19, 3823:21, 3824:25, 3825:25, 3826:3, 3826:19, 3828:4, 3828:11, 3828:14, 3828:17, 3836:10, 3839:2, 3839:24, 3845:12, 3855:13, 3856:11, 3859:13, 3867:12, 3875:24, 3876:23, 3881:3
**hold** [2] - 3842:10
**holding** [1] - 3790:17

**11**

**Holdings** [1] - 3815:7
**holds** [1] - 3885:21
**home** [3] - 3773:18, 3773:21, 3885:9
**Home** [1] - 3891:8
**honest** [1] - 3767:24
**Honor** [48] - 3755:15, 3755:21, 3755:22, 3759:1, 3760:3, 3762:3, 3762:7, 3767:13, 3767:19, 3768:17, 3769:11, 3769:13, 3772:2, 3774:14, 3775:21, 3778:15, 3779:15, 3781:7, 3781:16, 3791:2, 3791:20, 3792:23, 3794:12, 3795:16, 3799:2, 3809:4, 3811:19, 3820:20, 3829:8, 3829:16, 3843:7, 3848:5, 3860:19, 3861:11, 3864:1, 3874:5, 3875:21, 3879:7, 3880:2, 3880:9, 3882:5, 3882:10, 3882:20, 3883:18, 3885:13, 3889:4, 3891:6, 3891:19
**HONORABLE** [1] - 3753:11
**hope** [1] - 3791:21
**hopefully** [3] - 3760:1, 3776:4, 3781:21
**hoping** [3] - 3773:4, 3783:13, 3783:14
**host** [1] - 3790:5
**hour** [8] - 3762:21, 3762:22, 3772:17, 3775:3, 3777:11, 3777:14, 3792:19, 3820:25
**hour-and-a-half** [1] - 3772:17
**hours** [7] - 3757:19, 3758:11, 3759:11, 3761:5, 3781:18, 3781:25, 3783:14
**house** [6] - 3857:3, 3857:11, 3857:13, 3857:14, 3889:23
**huge** [1] - 3765:11

**I**

**idea** [3] - 3760:1, 3824:16, 3839:17
**identification** [10] - 3782:9, 3795:10, 3795:11, 3795:15, 3795:17, 3801:22, 3832:6, 3832:8, 3834:17, 3844:22
**identifies** [2] - 3840:13, 3840:17
**identify** [2] - 3793:2, 3800:1
**identity** [1] - 3782:2

**idiotic** [1] - 3788:3
**imaged** [1] - 3885:8
**imagine** [2] - 3757:6, 3838:10
**immediately** [2] - 3760:18, 3845:19
**implication** [1] - 3779:6
**implied** [1] - 3883:13
**important** [4] - 3767:4, 3768:12, 3790:12, 3868:6
**impossible** [1] - 3762:21
**impression** [2] - 3787:2, 3862:9
**impropriety** [1] - 3860:12
**inability** [1] - 3755:18
**Inc** [1] - 3832:14
**inch** [2] - 3759:25, 3762:8
**inch-and-a-half** [2] - 3759:25, 3762:8
**included** [2] - 3808:4, 3872:14
**including** [1] - 3859:13
**incoming** [3] - 3796:17, 3816:5, 3882:18
**inconvenience** [1] - 3820:21
**indeed** [6] - 3756:3, 3756:23, 3762:19, 3764:1, 3764:24, 3831:12
**independent** [1] - 3826:14
**indicate** [2] - 3760:14, 3765:8
**indicated** [4] - 3763:6, 3763:16, 3764:21, 3847:17
**indicates** [1] - 3836:2
**indication** [1] - 3890:11
**individuals** [4] - 3763:22, 3789:21, 3845:25, 3850:16
**inference** [1] - 3776:2
**inferentially** [1] - 3826:13
**infinitum** [1] - 3881:22
**inflammatory** [1] - 3880:16
**influence** [2] - 3869:5, 3873:19
**information** [15] - 3756:1, 3758:17, 3764:19, 3765:2, 3765:19, 3770:21, 3791:23, 3801:23, 3802:1, 3825:14, 3825:25, 3844:2, 3850:8, 3859:19
**innocuous** [2] - 3879:22, 3879:23
**inordinate** [1] - 3760:12
**input** [1] - 3841:21
**inquiry** [1] - 3822:6
**inside** [2] - 3785:2, 3788:6
**insider** [2] - 3841:1, 3842:25
**insofar** [2] - 3758:2, 3762:6
**instance** [4] - 3784:9,

3803:4, 3833:7, 3839:9
**instead** [1] - 3845:25
**instruct** [2] - 3879:20, 3880:3
**instruction** [2] - 3766:7, 3888:25
**instructions** [2] - 3782:14, 3843:23
**Insurance** [3] - 3814:14, 3816:21
**intend** [6] - 3755:19, 3765:10, 3768:3, 3768:6, 3878:9, 3887:12
**intended** [1] - 3756:4
**intention** [1] - 3882:5
**intentional** [1] - 3853:11
**intentionally** [1] - 3846:23
**interest** [4] - 3839:2, 3872:9, 3873:9, 3876:19
**interests** [1] - 3855:25
**interference** [1] - 3853:11
**internal** [2] - 3787:19, 3830:8
**interviewed** [2] - 3841:23, 3845:21
**introduce** [8] - 3756:5, 3757:24, 3765:10, 3786:22, 3877:23, 3881:17, 3887:12, 3890:13
**introduced** [5] - 3825:2, 3828:9, 3828:10, 3828:16, 3889:5
**introducing** [4] - 3755:19, 3785:5, 3827:7, 3827:25
**introduction** [1] - 3886:25
**investigator** [1] - 3885:7
**investments** [3] - 3846:4, 3863:13, 3874:4
**invoke** [4] - 3775:25, 3776:9, 3788:22, 3788:23
**invoking** [2] - 3776:8, 3783:5
**involve** [2] - 3765:18, 3836:18
**involved** [6] - 3839:9, 3844:10, 3868:9, 3869:25, 3875:4, 3884:18
**involvement** [1] - 3772:14
**involving** [2] - 3836:21, 3840:8
**iPhone** [5] - 3885:21, 3886:9, 3887:20, 3888:5, 3889:7
**irrelevant** [2] - 3823:25, 3828:2
**Islandia** [1] - 3753:22
**Isle** [4] - 3805:15, 3838:21, 3839:3, 3841:16
**Islip** [3] - 3753:6, 3753:15, 3754:21

**isolate** [1] - 3763:17
**Israel** [2] - 3815:20, 3816:2
**issue** [22] - 3757:1, 3758:7, 3758:22, 3758:23, 3758:24, 3758:25, 3766:8, 3769:23, 3778:7, 3779:3, 3781:19, 3782:22, 3789:17, 3792:7, 3811:17, 3812:6, 3828:5, 3839:5, 3849:25, 3880:13, 3883:17, 3891:12
**issued** [1] - 3755:22
**issues** [12] - 3755:5, 3758:13, 3768:21, 3771:14, 3781:21, 3840:5, 3841:4, 3846:10, 3876:5, 3876:16, 3879:14, 3885:11
**it..** [1] - 3819:17
**item** [8] - 3831:8, 3836:1, 3836:7, 3836:16, 3837:22, 3838:3, 3838:11, 3838:21
**items** [2] - 3885:2, 3885:4
**itself** [6] - 3782:6, 3783:10, 3824:10, 3845:7, 3887:19, 3890:16
**IV** [4] - 3805:15, 3838:21, 3839:3, 3841:16

**J**

**jacket** [1] - 3859:7
**JAMES** [1] - 3753:16
**January** [1] - 3765:1
**Jason** [1] - 3852:13
**Javier** [1] - 3810:19
**Jay** [1] - 3799:12
**JBAZ** [1] - 3815:1
**Jere** [1] - 3799:12
**Jim** [1] - 3755:9
**JK** [1] - 3886:17
**John** [4] - 3763:23, 3846:22, 3847:2, 3886:17
**join** [1] - 3758:24
**JOSEPH** [1] - 3753:11
**Josh** [1] - 3764:17
**Jowdy** [67] - 3783:24, 3784:12, 3784:15, 3787:17, 3805:9, 3805:12, 3818:19, 3819:23, 3827:1, 3827:22, 3833:17, 3833:20, 3835:13, 3835:14, 3835:19, 3835:22, 3835:23, 3836:8, 3837:5, 3837:7, 3837:15, 3837:19, 3837:23, 3838:12, 3838:13, 3839:20, 3840:2, 3844:12, 3845:2, 3845:15, 3846:3, 3846:7, 3846:20, 3846:21,

3847:16, 3849:1, 3849:12, 3852:11, 3852:17, 3853:11, 3853:20, 3853:22, 3853:25, 3854:23, 3855:2, 3855:10, 3855:20, 3855:24, 3856:6, 3858:24, 3859:6, 3859:15, 3864:15, 3865:2, 3865:15, 3866:20, 3866:22, 3869:12, 3870:4, 3872:15, 3872:22, 3874:13, 3874:22, 3875:5, 3875:25, 3876:22

**Jowdy's** [6] - 3847:7, 3848:24, 3852:18, 3853:13, 3872:5, 3876:7

**Jr** [1] - 3852:17

**JT** [1] - 3804:23

**Judge** [55] - 3756:6, 3756:25, 3757:16, 3757:21, 3758:11, 3758:16, 3760:11, 3761:3, 3762:2, 3762:22, 3763:1, 3763:9, 3763:18, 3764:5, 3766:10, 3768:19, 3768:23, 3769:6, 3769:10, 3769:21, 3770:9, 3772:23, 3773:2, 3775:24, 3777:18, 3777:19, 3778:12, 3786:4, 3786:8, 3790:10, 3792:19, 3792:21, 3797:8, 3822:9, 3823:13, 3826:10, 3827:13, 3828:21, 3829:1, 3829:10, 3832:4, 3836:3, 3847:24, 3862:3, 3863:5, 3863:17, 3873:17, 3874:9, 3881:10, 3881:20, 3885:19, 3886:16, 3886:23, 3890:12, 3890:20

**judge** [11] - 3757:14, 3758:6, 3759:23, 3826:19, 3848:4, 3848:5, 3848:6, 3848:8, 3848:10, 3871:24

**JUDGE** [1] - 3753:11

**judge's** [1] - 3847:25

**judgement** [1] - 3835:4

**judges** [1] - 3832:19

**judgment** [14] - 3833:7, 3833:8, 3834:1, 3834:4, 3834:12, 3834:14, 3854:25, 3855:2, 3855:5, 3855:9, 3855:11, 3866:19, 3869:7, 3888:18

**July** [4] - 3803:18, 3814:13, 3815:2, 3830:1

**jumped** [1] - 3855:19

**jumping** [2] - 3839:15, 3847:22

**jumps** [1] - 3891:13

**juncture** [1] - 3778:21

**June** [17] - 3753:9, 3794:23, 3805:24, 3806:21, 3808:8, 3808:17, 3808:19, 3808:23, 3809:5, 3814:6, 3816:11, 3816:20, 3844:20, 3865:18, 3869:8, 3871:3, 3892:10

**Juneau** [10] - 3805:14, 3836:20, 3837:14, 3839:10, 3850:9, 3850:12, 3850:23, 3850:24, 3851:2, 3852:23

**Juneau-Moreau** [1] - 3852:23

**jurisdiction** [3] - 3831:25, 3832:16, 3857:10

**jurisdictions** [1] - 3842:1

**jurors** [1] - 3755:4

**jury** [36] - 3753:11, 3761:11, 3761:21, 3762:17, 3765:13, 3770:10, 3773:18, 3773:21, 3776:1, 3780:19, 3781:25, 3786:11, 3789:18, 3790:3, 3790:7, 3790:16, 3790:17, 3790:18, 3792:13, 3792:23, 3793:6, 3793:8, 3820:19, 3823:3, 3823:10, 3824:2, 3825:11, 3829:17, 3829:18, 3873:24, 3877:20, 3878:17, 3879:10, 3881:1, 3887:18, 3890:19

**justifiable** [1] - 3785:25

**justification** [2] - 3867:22, 3867:23

**justifications** [1] - 3868:15

**K**

**Kaiser** [13] - 3763:23, 3765:25, 3766:25, 3768:6, 3768:8, 3787:4, 3787:11, 3846:22, 3847:2, 3847:10, 3848:12, 3852:17, 3886:18

**keep** [5] - 3790:11, 3790:12, 3794:10, 3824:4, 3859:13

**keeping** [2] - 3828:15, 3841:21

**KELLY** [1] - 3753:14

**Ken** [15] - 3833:17, 3833:20, 3835:13, 3835:19, 3835:21, 3835:23, 3837:5, 3837:7, 3853:11, 3855:10, 3864:15, 3865:15, 3872:4, 3872:15, 3875:4

**Kenner** [94] - 3753:23,

3764:1, 3788:2, 3788:11, 3788:16, 3791:15, 3794:25, 3795:8, 3796:24, 3797:4, 3797:5, 3797:6, 3797:13, 3797:22, 3797:24, 3798:3, 3798:6, 3798:17, 3801:7, 3801:12, 3801:17, 3802:11, 3804:3, 3804:15, 3805:8, 3805:12, 3811:7, 3820:21, 3820:25, 3830:7, 3830:9, 3830:12, 3830:14, 3831:9, 3831:12, 3832:5, 3832:21, 3834:1, 3834:5, 3834:15, 3834:16, 3835:5, 3835:11, 3835:16, 3835:19, 3835:22, 3836:17, 3836:21, 3839:19, 3840:3, 3840:8, 3841:2, 3841:4, 3841:8, 3841:21, 3842:3, 3842:15, 3842:20, 3846:8, 3846:22, 3848:16, 3850:13, 3851:8, 3852:13, 3854:19, 3858:5, 3858:17, 3858:20, 3860:24, 3861:1, 3861:7, 3862:23, 3863:11, 3864:8, 3866:7, 3866:10, 3866:14, 3868:8, 3869:4, 3872:3, 3872:16, 3872:21, 3873:14, 3873:19, 3874:16, 3874:23, 3875:7, 3875:10, 3879:1, 3879:13, 3879:25, 3886:17, 3887:13, 3889:24

**KENNER** [1] - 3753:7

**Kenner's** [16] - 3758:21, 3767:3, 3797:1, 3832:14, 3833:8, 3836:14, 3841:1, 3875:5, 3877:6, 3878:10, 3884:1, 3885:9, 3885:18, 3886:13, 3887:14, 3891:7

**kept** [2] - 3885:23, 3887:8

**kind** [12] - 3770:2, 3776:1, 3780:8, 3823:6, 3823:12, 3834:7, 3849:20, 3858:18, 3869:16, 3879:16, 3886:5, 3887:9

**kindly** [1] - 3834:18

**knowing** [1] - 3872:21

**knowledge** [3] - 3828:19, 3842:25, 3843:22

**known** [1] - 3842:2

**knows** [4] - 3761:10, 3767:21, 3822:14, 3854:14

**Komatireddy** [2] - 3756:23, 3882:3

**KOMATIREDDY** [19] - 3753:16, 3755:8, 3764:15, 3766:16, 3767:13, 3767:16, 3769:17, 3771:8,

3772:2, 3774:2, 3880:8, 3882:5, 3882:16, 3884:24, 3887:5, 3887:7, 3888:13, 3891:6, 3891:15

**Kristen** [3] - 3841:14, 3842:19, 3842:25

**Kristin** [1] - 3841:1

**L**

**LA** [1] - 3841:7

**lack** [3] - 3837:19, 3876:8, 3876:10

**lacked** [1] - 3824:17

**Lagarde** [1] - 3810:4

**LaPinta** [14] - 3772:10, 3772:14, 3775:10, 3775:12, 3776:6, 3776:13, 3776:14, 3776:17, 3778:5, 3778:14, 3779:9, 3780:4, 3781:2, 3882:24

**LAPINTA** [8] - 3778:15, 3778:19, 3780:12, 3781:14, 3783:18, 3882:25, 3883:18, 3884:6

**large** [1] - 3848:9

**Lars** [2] - 3854:15, 3865:3

**LaRusso** [25] - 3758:23, 3764:21, 3778:10, 3779:5, 3779:8, 3782:18, 3783:2, 3783:21, 3784:21, 3785:4, 3788:21, 3790:1, 3791:18, 3792:17, 3826:22, 3829:14, 3843:6, 3843:11, 3864:12, 3864:14, 3878:11, 3880:6, 3880:11, 3883:10, 3883:12

**LARUSSO** [62] - 3754:2, 3754:4, 3755:5, 3759:1, 3760:5, 3767:19, 3772:13, 3773:2, 3773:23, 3775:21, 3777:9, 3777:18, 3778:11, 3779:10, 3779:13, 3779:15, 3780:2, 3781:6, 3785:22, 3786:24, 3787:15, 3789:15, 3790:8, 3791:2, 3791:20, 3792:1, 3792:6, 3792:10, 3792:19, 3792:23, 3795:15, 3804:8, 3822:4, 3822:11, 3825:22, 3827:12, 3827:15, 3827:23, 3828:6, 3829:16, 3843:7, 3843:9, 3844:8, 3860:19, 3875:21, 3875:23, 3877:18, 3881:10, 3881:20, 3882:19, 3883:5, 3884:23, 3885:13, 3885:17, 3889:4, 3890:12, 3890:23, 3891:1, 3892:2, 3892:4, 3893:11,

**13**

3893:17
**LaRusso's** [3] - 3781:2, 3883:2, 3887:22
**Las** [1] - 3854:11
**last** [26] - 3759:4, 3760:21, 3761:10, 3766:8, 3775:10, 3778:20, 3789:11, 3794:7, 3804:18, 3804:22, 3819:2, 3819:3, 3819:22, 3820:6, 3822:15, 3829:8, 3829:10, 3829:22, 3834:21, 3834:24, 3854:18, 3878:9, 3885:1, 3886:16, 3887:11
**lasted** [1] - 3838:16
**lastly** [3] - 3816:20, 3817:18, 3818:17
**late** [1] - 3763:13
**latter** [1] - 3835:2
**law** [19] - 3766:3, 3766:11, 3784:5, 3795:24, 3796:1, 3800:4, 3811:23, 3811:24, 3812:5, 3841:24, 3841:25, 3845:20, 3847:21, 3857:9, 3864:11, 3864:19, 3865:25, 3884:15
**Law** [2] - 3796:2, 3817:20
**lawsuit** [84] - 3783:24, 3784:15, 3785:9, 3785:12, 3785:13, 3785:24, 3786:17, 3787:17, 3787:23, 3788:4, 3788:11, 3788:12, 3789:20, 3790:19, 3790:21, 3790:24, 3791:14, 3805:11, 3805:13, 3822:21, 3823:20, 3823:22, 3823:23, 3823:24, 3824:3, 3824:7, 3824:8, 3824:10, 3824:14, 3824:17, 3824:22, 3825:4, 3825:7, 3825:11, 3825:16, 3825:20, 3826:4, 3826:16, 3827:1, 3827:11, 3828:16, 3828:18, 3837:10, 3837:16, 3837:24, 3840:1, 3842:19, 3842:24, 3848:23, 3853:1, 3855:22, 3856:5, 3856:18, 3860:3, 3860:24, 3860:25, 3861:8, 3862:10, 3862:11, 3862:13, 3862:15, 3862:20, 3862:23, 3863:5, 3863:7, 3864:6, 3864:15, 3864:16, 3865:14, 3865:15, 3869:10, 3870:3, 3870:12, 3871:3, 3874:4, 3874:17, 3874:20, 3874:21, 3875:1, 3875:3, 3876:17
**lawsuits** [7] - 3805:9,

3837:15, 3838:18, 3851:14, 3851:18, 3851:25, 3874:23
**lawyer** [23] - 3783:7, 3789:21, 3789:24, 3804:19, 3832:3, 3836:22, 3837:11, 3837:12, 3839:6, 3839:22, 3840:2, 3842:23, 3843:3, 3847:8, 3851:9, 3854:12, 3854:13, 3854:17, 3854:23, 3855:11, 3864:11, 3878:10, 3884:17
**lawyers** [4] - 3778:17, 3781:18, 3791:7, 3793:11
**lay** [1] - 3823:1
**lays** [1] - 3822:22
**lead** [1] - 3864:1
**learned** [2] - 3816:6, 3817:7
**least** [5] - 3755:12, 3756:6, 3760:19, 3773:7, 3828:4
**leave** [2] - 3757:12, 3770:11
**leaving** [1] - 3761:7
**ledgers** [1] - 3765:17
**left** [2] - 3756:14, 3772:16
**legal** [4] - 3780:4, 3801:2, 3848:21, 3868:24
**Lehtinen** [1] - 3799:13
**less** [3] - 3777:14, 3792:20, 3879:23
**letter** [29] - 3783:21, 3785:3, 3786:5, 3786:22, 3786:24, 3786:25, 3787:3, 3787:16, 3790:18, 3791:11, 3792:12, 3800:3, 3822:9, 3822:12, 3822:14, 3822:16, 3822:17, 3823:2, 3824:2, 3824:23, 3824:24, 3825:6, 3825:15, 3825:19, 3826:25, 3827:24, 3860:1, 3876:4, 3883:10
**letters** [2] - 3776:24, 3785:16
**letting** [1] - 3829:4
**level** [1] - 3771:7
**liaison** [1] - 3866:8
**liaisoning** [1] - 3848:21
**license** [1] - 3842:10
**licensed** [1] - 3794:19, 3841:25, 3842:6
**light** [1] - 3828:23
**likewise** [1] - 3856:8
**limited** [9] - 3780:6, 3780:11, 3781:8, 3784:1, 3785:6, 3789:12, 3826:11, 3862:7, 3891:1
**limiting** [1] - 3766:7
**line** [17] - 3757:15,

3757:16, 3831:8, 3831:10, 3836:1, 3836:7, 3836:16, 3837:22, 3838:3, 3838:11, 3838:20, 3839:15, 3863:14, 3873:25, 3883:23, 3887:23
**lines** [1] - 3775:20
**list** [6] - 3764:22, 3804:20, 3846:24, 3858:17, 3880:18, 3880:21
**listed** [1] - 3773:10
**listen** [1] - 3878:13
**listening** [1] - 3852:15
**lists** [2] - 3802:4, 3880:22
**litigant** [1] - 3842:14
**litigants** [1] - 3842:3
**litigation** [53] - 3800:14, 3801:7, 3801:16, 3802:5, 3804:2, 3804:15, 3805:1, 3830:12, 3836:9, 3837:3, 3837:6, 3837:7, 3837:8, 3837:23, 3838:12, 3838:14, 3838:16, 3838:17, 3838:24, 3839:1, 3839:17, 3840:6, 3840:13, 3840:22, 3840:24, 3841:14, 3841:22, 3842:2, 3842:5, 3842:14, 3844:12, 3844:13, 3844:15, 3845:2, 3845:15, 3847:11, 3847:14, 3847:16, 3849:21, 3849:24, 3855:20, 3856:7, 3857:16, 3858:24, 3859:2, 3859:15, 3865:2, 3870:16, 3873:1, 3875:10, 3875:25, 3876:22
**litigations** [3] - 3780:10, 3844:9, 3851:12
**live** [2] - 3867:19, 3885:12
**lived** [2] - 3838:9, 3868:11
**living** [1] - 3794:18
**LLC** [11] - 3804:23, 3808:13, 3812:14, 3812:21, 3813:25, 3814:2, 3815:2, 3838:21, 3839:3, 3873:6, 3873:13
**LLCs** [6] - 3804:20, 3805:14, 3838:21, 3839:5, 3839:8, 3839:11
**load** [3] - 3808:13, 3814:7, 3814:10
**local** [2] - 3854:10, 3865:5
**located** [2] - 3757:20, 3796:5
**location** [3] - 3757:2, 3757:9, 3757:19
**look** [23] - 3759:18, 3760:15, 3762:10, 3762:11, 3775:22, 3788:4, 3789:23, 3803:1, 3819:24,

3823:16, 3831:22, 3832:5, 3834:7, 3834:17, 3834:18, 3839:8, 3861:4, 3864:4, 3870:20, 3877:7, 3880:11, 3886:15, 3891:17
**looked** [2] - 3872:25, 3886:23
**looking** [10] - 3760:23, 3762:12, 3763:15, 3784:19, 3823:17, 3873:20, 3873:21, 3880:3, 3886:18, 3888:19
**looks** [4] - 3768:20, 3800:3, 3800:4, 3889:18
**loop** [1] - 3781:10
**Los** [6] - 3796:7, 3796:8, 3837:1, 3838:9, 3852:24, 3865:16
**lost** [4] - 3857:7, 3857:13, 3871:6
**loud** [2] - 3834:22, 3834:23
**low** [1] - 3887:21
**Lucas** [3] - 3872:4, 3873:3, 3873:6
**lunch** [6] - 3755:13, 3775:8, 3820:15, 3820:18, 3820:25, 3821:11

---

**M**

**machine** [1] - 3800:3
**Magence** [3] - 3808:24, 3809:18, 3814:20
**magnificent** [1] - 3821:7
**Mail** [1] - 3800:5
**mail** [24] - 3759:2, 3760:18, 3763:5, 3786:18, 3788:15, 3790:4, 3798:18, 3822:7, 3825:20, 3826:24, 3826:25, 3828:13, 3845:12, 3847:3, 3859:5, 3859:7, 3859:25, 3860:1, 3885:22, 3886:10, 3886:11, 3886:22, 3887:24, 3888:2
**mailed** [2] - 3763:6, 3889:10
**mails** [16] - 3759:18, 3759:19, 3785:16, 3786:21, 3790:10, 3791:13, 3798:20, 3823:6, 3840:5, 3859:12, 3860:2, 3866:5, 3866:10, 3886:2, 3886:5, 3888:9
**maintain** [1] - 3800:13
**majority** [1] - 3866:13
**malicious** [1] - 3853:12
**man** [1] - 3853:8
**managed** [1] - 3782:15

14

manager [1] - 3832:24
mandatory [1] - 3766:19
manpower [1] - 3821:3
map [1] - 3849:10
Maps [1] - 3870:20
March [4] - 3801:6, 3813:25, 3818:19, 3820:2
marked [4] - 3801:21, 3831:23, 3844:21, 3852:7
markings [1] - 3808:17
Marshal [1] - 3755:24
marshal [1] - 3769:3
MARSHALL [1] - 3821:4
marshals [3] - 3774:16, 3820:21, 3821:2
Mary [1] - 3754:20
match [3] - 3803:13, 3882:8
material [9] - 3758:12, 3775:4, 3775:5, 3775:6, 3776:13, 3776:21, 3777:7, 3777:13, 3891:21
math [2] - 3813:22, 3814:9
matter [13] - 3756:21, 3763:20, 3777:8, 3782:9, 3798:19, 3802:4, 3802:5, 3805:2, 3825:1, 3829:11, 3833:12, 3848:22, 3876:2
matters [7] - 3770:11, 3788:24, 3800:14, 3805:6, 3811:9, 3840:17, 3848:16
Maureen [1] - 3819:6
mayor's [2] - 3854:11, 3854:13
McKee [1] - 3799:12
MDC [3] - 3756:7, 3758:19, 3763:7
mean [16] - 3797:14, 3802:19, 3804:22, 3819:11, 3828:8, 3830:15, 3832:11, 3842:23, 3851:6, 3851:16, 3851:17, 3851:21, 3860:16, 3868:22, 3872:8, 3875:7
meaning [1] - 3855:23
means [3] - 3802:10, 3855:15, 3882:12
meant [1] - 3816:4
mechanical [1] - 3754:25
mediation [8] - 3846:16, 3847:22, 3848:1, 3848:7, 3849:2, 3849:4, 3856:12, 3869:15
meet [1] - 3772:5
meeting [5] - 3756:12, 3768:1, 3772:19, 3773:17, 3774:10
meets [1] - 3887:20
member [2] - 3794:20, 3842:7

members [2] - 3793:8, 3877:20
Memorial [1] - 3753:21
memory [2] - 3832:12, 3842:19
men [1] - 3775:19
mental [1] - 3823:19
mention [1] - 3884:25
mentioned [3] - 3848:25, 3856:6, 3866:8
merely [1] - 3765:16
merit [4] - 3785:13, 3824:17, 3876:8, 3876:10
merits [4] - 3785:12, 3786:17, 3790:23, 3827:11
message [6] - 3887:20, 3888:4, 3889:18, 3890:13, 3890:14, 3890:15
messages [22] - 3885:18, 3885:20, 3885:24, 3887:8, 3887:12, 3887:13, 3887:15, 3887:18, 3888:9, 3888:14, 3888:15, 3888:18, 3888:19, 3888:24, 3889:5, 3889:9, 3889:12, 3890:19, 3890:25, 3891:4, 3891:10
met [5] - 3756:7, 3758:4, 3759:11, 3770:4, 3772:5
Mexico [5] - 3855:12, 3855:14, 3870:17, 3872:16, 3876:7
Michael [1] - 3799:12
middle [2] - 3848:2, 3887:23
midst [1] - 3755:11
might [4] - 3765:9, 3776:4, 3783:2, 3785:16
mike [1] - 3794:10
miles [1] - 3870:22
million [3] - 3815:6, 3850:24, 3855:1
mind [9] - 3771:10, 3823:24, 3824:3, 3824:20, 3826:15, 3828:3, 3828:4, 3858:18, 3882:15
minds [1] - 3756:12
mine [2] - 3792:20, 3836:4
Mineola [1] - 3754:3
minute [6] - 3774:13, 3781:11, 3789:11, 3834:7, 3854:18, 3865:24
minutes [12] - 3762:7, 3762:11, 3762:22, 3769:18, 3769:19, 3774:2, 3774:12, 3777:10, 3792:15, 3882:4, 3882:9, 3885:6
misheard [1] - 3786:12
MISKIEWICZ [45] -

3753:16, 3774:22, 3775:12, 3776:16, 3776:20, 3777:12, 3777:16, 3778:4, 3778:10, 3783:20, 3787:16, 3788:10, 3788:15, 3792:15, 3793:18, 3794:12, 3794:15, 3795:12, 3795:19, 3797:11, 3799:3, 3804:5, 3804:11, 3816:13, 3816:14, 3820:13, 3829:8, 3829:24, 3830:21, 3841:17, 3860:13, 3860:22, 3862:1, 3862:19, 3863:9, 3863:16, 3864:1, 3864:3, 3873:17, 3874:7, 3879:7, 3879:19, 3893:5, 3893:7, 3893:13
Miskiewicz [11] - 3755:9, 3759:6, 3772:6, 3774:1, 3794:11, 3829:22, 3851:21, 3852:3, 3853:4, 3853:7, 3857:21
misleading [1] - 3786:11, 3790:6
mismanaged [1] - 3870:4
mismanaging [1] - 3872:15
missing [2] - 3881:11, 3886:19
misstating [1] - 3883:22
mistake [1] - 3820:1
misunderstood [1] - 3787:13
moment [8] - 3758:13, 3763:16, 3769:24, 3779:13, 3837:25, 3842:18, 3875:11, 3879:8
money [56] - 3767:23, 3789:19, 3795:23, 3797:18, 3797:25, 3798:6, 3798:11, 3798:14, 3798:16, 3800:16, 3800:23, 3801:18, 3803:21, 3806:3, 3807:25, 3808:9, 3811:11, 3812:20, 3813:3, 3814:2, 3814:16, 3814:24, 3815:4, 3815:8, 3815:13, 3815:17, 3816:9, 3816:22, 3817:10, 3817:18, 3818:4, 3818:9, 3818:12, 3818:13, 3819:10, 3819:18, 3820:5, 3820:7, 3820:8, 3820:11, 3824:13, 3824:21, 3830:6, 3830:11, 3843:13, 3843:19, 3843:23, 3848:3, 3856:22, 3860:9, 3860:11, 3863:2, 3865:7, 3868:12,

3871:5, 3876:14
moneys [6] - 3844:10, 3851:12, 3851:19, 3853:4, 3858:9, 3862:22
monies [6] - 3773:10, 3780:14, 3781:5, 3782:20, 3798:13, 3817:12
months [2] - 3763:4, 3838:16
Moreau [11] - 3805:13, 3836:19, 3837:14, 3839:10, 3850:9, 3850:11, 3850:22, 3850:25, 3851:3, 3851:8, 3852:23
Moreau/Juneau [3] - 3836:17, 3838:21, 3839:9
morning [29] - 3755:10, 3756:7, 3756:18, 3757:2, 3757:11, 3759:17, 3763:6, 3763:7, 3771:11, 3771:15, 3771:17, 3771:23, 3771:25, 3772:3, 3772:4, 3774:9, 3791:8, 3793:9, 3793:11, 3794:16, 3794:17, 3843:12, 3847:3, 3877:23, 3878:2, 3878:15, 3881:8, 3885:7, 3885:14
most [4] - 3759:8, 3767:4, 3868:6, 3888:6
mostly [1] - 3866:9
motion [14] - 3777:3, 3779:2, 3784:3, 3818:25, 3845:24, 3853:13, 3853:14, 3853:15, 3854:16, 3865:5, 3865:22, 3865:23, 3866:1, 3876:12
motions [3] - 3826:5, 3846:2, 3846:5
Motorsports [1] - 3807:9, 3807:11, 3808:19, 3813:18
move [4] - 3755:13, 3756:21, 3763:15, 3886:10
moved [1] - 3846:6
moves [1] - 3804:5
moving [2] - 3778:23, 3862:8
MR [162] - 3755:5, 3755:15, 3757:16, 3758:24, 3759:1, 3760:5, 3762:3, 3762:6, 3766:8, 3766:10, 3767:19, 3768:17, 3769:20, 3770:2, 3772:13, 3773:2, 3773:23, 3774:14, 3774:22, 3775:12, 3775:21, 3776:16, 3776:20, 3777:9, 3777:12, 3777:16, 3777:18, 3777:19, 3778:4, 3778:10, 3778:11, 3778:15, 3778:19, 3779:10, 3779:13,

3779:15, 3780:2, 3780:12, 3781:6, 3781:14, 3781:16, 3783:18, 3783:20, 3785:22, 3786:24, 3787:15, 3787:16, 3788:10, 3788:15, 3789:15, 3790:8, 3791:2, 3791:20, 3792:1, 3792:6, 3792:10, 3792:15, 3792:23, 3793:18, 3794:12, 3794:15, 3795:10, 3795:12, 3795:15, 3795:19, 3797:8, 3797:10, 3797:11, 3799:3, 3804:5, 3804:7, 3804:8, 3804:11, 3816:13, 3816:14, 3820:13, 3820:20, 3821:6, 3821:9, 3822:4, 3822:11, 3825:22, 3827:12, 3827:15, 3827:23, 3828:6, 3829:8, 3829:10, 3829:13, 3829:16, 3829:24, 3830:21, 3830:24, 3831:2, 3832:3, 3832:8, 3833:3, 3836:3, 3836:6, 3841:17, 3843:4, 3843:7, 3843:9, 3844:8, 3860:13, 3860:19, 3860:22, 3861:11, 3862:1, 3862:3, 3862:7, 3862:19, 3863:3, 3863:9, 3863:16, 3863:17, 3864:1, 3864:3, 3871:24, 3873:17, 3873:22, 3874:5, 3874:7, 3874:9, 3874:11, 3875:20, 3875:21, 3875:23, 3877:18, 3879:7, 3879:19, 3879:23, 3880:2, 3881:10, 3881:20, 3882:10, 3882:19, 3882:21, 3882:25, 3883:5, 3883:18, 3884:6, 3884:23, 3885:13, 3885:17, 3889:4, 3890:12, 3890:23, 3891:1, 3891:19, 3891:24, 3892:2, 3892:4, 3893:5, 3893:7, 3893:9, 3893:11, 3893:13, 3893:15, 3893:17
**MS** [18] - 3755:8, 3764:15, 3766:16, 3767:13, 3767:16, 3769:17, 3771:8, 3772:2, 3774:2, 3880:8, 3882:5, 3882:16, 3884:24, 3887:5, 3887:7, 3888:13, 3891:6, 3891:15
**Murray** [9] - 3793:1, 3822:15, 3853:24, 3854:19, 3854:25, 3855:6, 3864:22, 3867:11, 3867:17
**must** [1] - 3838:5

**Myrick** [9] - 3841:2, 3841:14, 3841:23, 3842:19, 3842:25, 3860:24, 3860:25, 3862:20, 3864:8

## N

**Na'alehu** [1] - 3839:2
**name** [17] - 3794:6, 3794:7, 3795:24, 3796:1, 3805:15, 3806:24, 3808:15, 3809:12, 3811:8, 3811:12, 3815:1, 3815:20, 3820:6, 3847:25, 3853:8, 3869:5, 3873:8
**named** [2] - 3841:1, 3854:15
**names** [3] - 3796:22, 3797:14, 3847:8
**narrowed** [1] - 3849:5
**Nash** [1] - 3867:11
**nature** [13] - 3763:4, 3826:1, 3827:22, 3828:18, 3839:17, 3840:24, 3862:19, 3863:1, 3863:4, 3864:6, 3876:25, 3881:16, 3887:17
**navigate** [1] - 3765:13
**near** [1] - 3854:6
**necessarily** [2] - 3802:19, 3818:4
**necessary** [1] - 3826:23
**need** [15] - 3755:17, 3763:16, 3763:18, 3763:20, 3773:3, 3773:25, 3775:3, 3777:10, 3777:11, 3791:16, 3829:6, 3834:17, 3884:24, 3885:11, 3889:15
**needed** [5] - 3756:9, 3756:12, 3811:22, 3818:24, 3830:16
**needs** [1] - 3888:24
**neglected** [1] - 3762:18
**negotiations** [1] - 3868:17
**Neptune** [1] - 3815:7
**net** [1] - 3804:18
**Nevada** [2] - 3854:20
**never** [10] - 3823:10, 3827:2, 3829:12, 3834:23, 3841:22, 3849:23, 3856:2, 3856:17, 3860:3, 3869:20
**nevertheless** [1] - 3766:12
**NEW** [1] - 3753:1
**New** [5] - 3753:6, 3753:15, 3754:21, 3841:6, 3845:19
**News** [1] - 3864:25
**news** [1] - 3793:10
**next** [13] - 3756:15,

3779:18, 3780:21, 3793:16, 3803:4, 3821:12, 3836:1, 3838:3, 3838:11, 3847:7, 3849:6, 3849:17, 3874:2
**Nicholas** [1] - 3819:7
**night** [3] - 3760:21, 3838:10, 3892:8
**nine** [1] - 3800:10
**Nolan** [25] - 3805:8, 3831:9, 3831:13, 3831:16, 3832:21, 3832:22, 3833:6, 3833:11, 3833:21, 3833:25, 3835:4, 3835:12, 3835:14, 3835:17, 3835:23, 3836:23, 3837:9, 3838:3, 3838:4, 3850:11, 3850:15, 3850:22, 3850:25, 3851:2, 3851:10
**Nolan's** [2] - 3833:7, 3836:25
**none** [2] - 3786:19, 3816:10
**normally** [1] - 3890:10
**Norstrom** [1] - 3867:16
**north** [3] - 3857:6, 3870:24, 3870:25
**North** [1] - 3870:23
**noted** [1] - 3755:3
**notes** [4] - 3777:4, 3777:5, 3889:24, 3889:25
**nothing** [1] - 3867:12
**notice** [1] - 3756:4
**noticed** [1] - 3851:5
**notifying** [1] - 3860:3
**notwithstanding** [1] - 3826:25
**November** [5] - 3763:3, 3813:2, 3813:19, 3814:23, 3816:1
**nowhere** [1] - 3827:3
**nuance** [1] - 3840:4
**number** [6] - 3759:19, 3780:14, 3802:15, 3814:8, 3844:9, 3885:19
**numbers** [2] - 3777:6, 3777:7
**numerous** [1] - 3792:4
**Nussbaum** [3] - 3809:12, 3815:10, 3815:14
**nuts** [1] - 3849:5
**NY** [3] - 3753:22, 3754:3, 3754:7

## O

**oath** [2] - 3793:22, 3867:2
**object** [8] - 3797:8, 3871:24, 3871:25,

3873:22, 3873:23, 3875:24, 3886:24, 3887:4
**objecting** [1] - 3885:19
**objection** [11] - 3771:4, 3804:7, 3804:8, 3829:15, 3841:17, 3860:13, 3861:10, 3863:8, 3874:5, 3880:10, 3887:3
**objective** [1] - 3849:21
**objects** [1] - 3860:4
**obligation** [2] - 3761:8, 3878:6
**obligations** [1] - 3769:9
**observation** [1] - 3882:10
**observer** [1] - 3877:12
**observing** [2] - 3879:11, 3879:13
**obtain** [3] - 3846:17, 3855:1, 3862:12
**obtained** [6] - 3833:25, 3834:4, 3834:12, 3835:4, 3863:7, 3866:19
**obvious** [3] - 3877:13, 3879:6, 3890:11
**obviously** [9] - 3762:14, 3767:5, 3767:7, 3768:10, 3770:9, 3775:21, 3824:7, 3850:18, 3880:13
**occur** [1] - 3776:4
**occurred** [2] - 3755:21, 3756:25
**Oceanside** [1] - 3754:7
**October** [1] - 3812:17
**OF** [3] - 3753:1, 3753:3, 3753:10
**offer** [4] - 3846:18, 3848:24, 3869:15, 3871:14
**offered** [3] - 3767:22, 3850:24, 3869:19
**offering** [1] - 3790:9
**office** [2] - 3756:20, 3786:15, 3800:3, 3846:14
**Office** [1] - 3796:2
**office's** [1] - 3856:5
**officer** [1] - 3847:19
**Offices** [1] - 3817:21
**offices** [1] - 3800:4
**oftentimes** [1] - 3880:2
**Old** [1] - 3754:3
**OLIVERAS** [1] - 3754:6
**Olympics** [7] - 3786:7, 3856:16, 3867:12, 3867:18, 3868:4, 3868:7, 3868:9
**once** [5] - 3768:10, 3784:15, 3798:7, 3818:10, 3835:21
**one** [91] - 3758:3, 3759:20, 3759:22, 3760:5, 3760:12, 3763:14, 3765:8, 3768:19,

**16**

3770:8, 3770:9, 3770:10, 3770:14, 3770:24, 3770:25, 3773:3, 3775:6, 3777:5, 3779:10, 3779:13, 3785:18, 3786:1, 3787:22, 3788:12, 3795:2, 3804:22, 3804:25, 3805:4, 3805:19, 3806:1, 3808:4, 3809:3, 3810:15, 3811:4, 3811:10, 3812:14, 3812:23, 3813:13, 3814:20, 3815:10, 3819:3, 3819:17, 3825:5, 3829:8, 3829:10, 3829:22, 3830:8, 3832:13, 3833:7, 3836:10, 3836:13, 3838:4, 3839:23, 3842:10, 3844:11, 3850:17, 3852:6, 3852:10, 3852:12, 3855:14, 3857:5, 3858:22, 3858:23, 3860:7, 3868:10, 3868:15, 3870:10, 3870:21, 3870:22, 3870:23, 3873:14, 3874:9, 3877:4, 3879:1, 3880:22, 3882:7, 3884:24, 3885:8, 3886:10, 3886:16, 3886:19, 3887:24, 3889:14, 3890:2
**One** [1] - 3753:21
**one's** [1] - 3755:17
**ones** [1] - 3789:17
**open** [6] - 3780:7, 3780:19, 3780:20, 3781:1, 3784:5, 3786:22
**opened** [1] - 3863:5
**opening** [7] - 3785:10, 3790:15, 3790:24, 3822:6, 3823:14, 3825:5, 3825:18
**opens** [1] - 3823:4
**operating** [1] - 3873:8
**operation** [1] - 3841:15
**opportunity** [12] - 3755:25, 3758:10, 3760:19, 3761:24, 3762:10, 3762:17, 3762:23, 3768:24, 3769:20, 3789:25, 3803:1, 3864:4
**opposed** [2] - 3811:17, 3871:12
**oral** [1] - 3759:6
**orally** [1] - 3825:20
**order** [7] - 3755:22, 3757:24, 3762:23, 3771:23, 3820:24, 3846:11, 3846:12
**ordered** [3] - 3786:8, 3826:10, 3846:14
**original** [5] - 3777:3, 3836:5, 3837:11, 3838:18, 3838:19

**originally** [1] - 3857:12
**originating** [1] - 3796:14
**otherwise** [1] - 3887:21
**ought** [1] - 3821:6
**ourselves** [1] - 3761:22
**outgoing** [2] - 3808:18, 3882:18
**outlined** [1] - 3772:18
**outlining** [2] - 3760:8, 3853:4
**outside** [6] - 3778:11, 3783:3, 3783:4, 3784:16, 3826:14, 3880:14
**overall** [2] - 3786:6, 3880:10
**overbroad** [1] - 3889:3
**overlooking** [1] - 3798:21
**overruled** [2] - 3841:18, 3860:14
**Owen** [9] - 3831:16, 3832:21, 3832:22, 3833:5, 3833:11, 3833:21, 3833:25, 3835:4, 3835:22
**own** [4] - 3864:19, 3875:5, 3877:11, 3881:17
**owned** [4] - 3872:22, 3877:3, 3877:4, 3877:13
**owner** [1] - 3872:17
**ownership** [1] - 3872:9
**owns** [2] - 3872:4, 3873:14

---

# P

**p.m** [2] - 3758:3, 3770:8
**page** [22] - 3760:8, 3764:22, 3777:5, 3779:18, 3780:21, 3792:25, 3802:9, 3802:15, 3802:19, 3803:4, 3803:8, 3803:17, 3806:17, 3807:13, 3809:7, 3818:17, 3821:12, 3829:25, 3834:19, 3834:24, 3835:2
**pages** [3] - 3800:10, 3803:2, 3880:25
**paid** [19] - 3780:11, 3782:15, 3818:24, 3818:25, 3840:9, 3844:10, 3854:2, 3854:4, 3854:5, 3854:6, 3858:9, 3864:18, 3865:8, 3865:12, 3874:14, 3874:16, 3874:23, 3875:5, 3875:7
**paired** [1] - 3802:5
**Palos** [2] - 3815:20, 3816:2
**panned** [1] - 3869:20
**paper** [1] - 3880:23
**paragraph** [8] - 3834:18, 3834:21, 3834:24, 3861:4, 3862:1, 3862:3, 3862:18,

3863:8
**paralegal** [1] - 3777:12
**parent** [1] - 3873:2
**part** [19] - 3784:2, 3786:6, 3802:7, 3817:10, 3817:12, 3833:7, 3833:8, 3834:12, 3835:2, 3837:5, 3845:14, 3851:14, 3851:18, 3851:24, 3851:25, 3857:19, 3871:21, 3876:6, 3876:8
**partial** [3] - 3834:1, 3834:4, 3835:4
**participate** [2] - 3837:18, 3877:8
**participating** [1] - 3876:22
**particular** [11] - 3786:9, 3789:18, 3837:3, 3851:14, 3851:18, 3857:25, 3859:11, 3870:5, 3882:13, 3882:14, 3887:23
**particularly** [1] - 3788:2
**parties** [8] - 3772:21, 3787:5, 3818:3, 3818:7, 3832:18, 3833:20, 3848:6, 3862:15
**partner** [4] - 3755:9, 3759:2, 3759:11, 3760:16
**Partners** [9] - 3807:15, 3807:18, 3807:23, 3812:14, 3812:19, 3812:21, 3812:25, 3813:4, 3873:6
**parts** [1] - 3886:8
**partway** [1] - 3773:7
**party** [6] - 3773:16, 3833:6, 3847:5, 3847:11, 3847:14, 3847:16
**path** [1] - 3789:5
**pause** [1] - 3778:13
**Pause** [3] - 3770:1, 3779:12, 3779:14
**pay** [6] - 3805:2, 3805:7, 3848:3, 3852:25, 3865:2, 3865:7
**paying** [3] - 3818:3, 3818:7, 3875:10
**payment** [2] - 3800:13, 3810:25, 3811:3
**payments** [2] - 3840:11, 3840:14
**PC** [2] - 3796:3, 3809:12
**PDF** [1] - 3859:25
**Peca** [2] - 3793:1, 3799:12, 3867:10
**Pecas** [2] - 3776:25, 3787:18
**pending** [1] - 3865:4
**people** [17] - 3776:25, 3788:6, 3797:3, 3818:7,

3846:24, 3847:6, 3848:15, 3848:22, 3857:9, 3868:7, 3868:11, 3868:13, 3869:25, 3886:8, 3888:3, 3889:12, 3889:15
**people's** [2] - 3768:14, 3879:4
**percent** [3] - 3872:4, 3872:11, 3873:15
**perfect** [1] - 3770:10
**performed** [1] - 3840:8
**performing** [1] - 3859:14
**perhaps** [2] - 3770:10, 3789:4
**period** [16] - 3771:6, 3801:4, 3801:13, 3803:17, 3804:16, 3806:14, 3806:25, 3811:9, 3812:21, 3814:2, 3826:11, 3851:11, 3866:4, 3868:17, 3881:25, 3891:2
**permission** [5] - 3811:23, 3812:3, 3812:4, 3812:6, 3842:9
**permit** [4] - 3775:18, 3775:19, 3879:5, 3888:23
**permits** [1] - 3769:4
**permitted** [3] - 3764:8, 3784:4, 3878:23
**person** [6] - 3810:23, 3816:7, 3825:15, 3873:14, 3885:21, 3886:12
**personally** [1] - 3856:21
**perspective** [3] - 3763:9, 3763:18, 3769:6
**persuade** [2] - 3823:17, 3829:6
**pertaining** [1] - 3778:7
**Perusing** [1] - 3834:9
**Petrellese** [2] - 3764:16, 3769:17
**phase** [2] - 3787:25, 3788:22
**Phil** [32] - 3755:24, 3756:15, 3758:8, 3758:16, 3758:19, 3758:21, 3764:1, 3802:11, 3830:7, 3831:12, 3832:21, 3832:22, 3833:5, 3833:8, 3834:1, 3834:5, 3835:5, 3835:11, 3835:16, 3835:18, 3835:22, 3836:14, 3836:21, 3840:8, 3842:3, 3842:15, 3842:19, 3846:22, 3874:16, 3874:23, 3875:5, 3875:7
**Phil's** [1] - 3832:23
**Phillip** [1] - 3794:25
**PHILLIP** [1] - 3753:7
**phone** [7] - 3852:14, 3887:10, 3889:10, 3891:2,

**17**

3891:3, 3891:7, 3891:14
**phrased** [1] - 3798:2
**physically** [2] - 3756:24, 3758:16
**pick** [2] - 3756:19, 3799:24
**picked** [1] - 3812:5
**picture** [2] - 3885:22, 3890:22
**pieces** [1] - 3775:6
**pierce** [1] - 3784:19
**place** [13] - 3780:1, 3781:1, 3781:24, 3786:9, 3789:20, 3831:20, 3847:22, 3847:24, 3849:2, 3849:3, 3861:14, 3884:7, 3886:10
**placed** [1] - 3795:23
**Plaintiff's** [1] - 3874:21
**plaintiffs** [20] - 3784:12, 3787:17, 3836:9, 3836:10, 3836:13, 3837:23, 3838:2, 3838:12, 3839:23, 3839:24, 3844:17, 3845:13, 3848:10, 3852:13, 3856:8, 3856:14, 3858:23, 3868:21, 3868:22, 3874:12
**plaintiffs/Kenner** [1] - 3839:16
**plan** [2] - 3765:23, 3851:24
**plastic** [1] - 3800:6
**play** [2] - 3790:17, 3848:14
**played** [1] - 3848:19
**player** [6] - 3783:9, 3784:12, 3786:1, 3804:3, 3880:22, 3881:3
**players** [54] - 3785:14, 3785:24, 3786:7, 3786:10, 3786:20, 3787:1, 3787:7, 3789:19, 3791:22, 3792:1, 3792:2, 3797:12, 3797:17, 3801:12, 3801:18, 3804:15, 3822:18, 3822:23, 3823:7, 3823:22, 3824:25, 3825:25, 3826:3, 3826:19, 3828:11, 3828:14, 3828:17, 3836:11, 3839:2, 3839:24, 3845:12, 3847:6, 3849:10, 3849:16, 3855:13, 3855:25, 3856:11, 3859:13, 3865:22, 3866:6, 3866:11, 3866:15, 3866:17, 3867:12, 3867:16, 3869:20, 3870:4, 3871:9, 3871:20, 3872:14, 3872:18, 3873:9, 3875:24, 3876:23
**players'** [2] - 3823:19, 3828:4
**playing** [1] - 3786:7

**Plaza** [2] - 3753:15, 3754:20
**pleadings** [1] - 3841:22
**plenty** [1] - 3787:21
**plot** [1] - 3849:10
**plus** [2] - 3799:8, 3802:20
**pocket** [1] - 3875:5
**point** [36] - 3762:17, 3768:3, 3772:13, 3773:2, 3783:17, 3784:14, 3787:8, 3789:15, 3790:9, 3792:11, 3795:2, 3796:22, 3797:20, 3798:17, 3799:19, 3799:23, 3800:11, 3800:22, 3828:6, 3833:12, 3835:10, 3835:18, 3850:14, 3851:10, 3856:5, 3856:20, 3866:18, 3867:4, 3867:14, 3868:18, 3879:2, 3881:7, 3881:12, 3881:20, 3889:8, 3890:20
**pointed** [1] - 3862:10
**points** [1] - 3773:3
**police** [1] - 3847:18
**portion** [1] - 3820:7
**portions** [2] - 3886:9, 3886:19
**pose** [1] - 3774:25
**posed** [1] - 3774:6
**position** [7] - 3757:21, 3762:2, 3763:1, 3769:7, 3781:3, 3781:7, 3826:15
**positive** [1] - 3869:22
**possession** [1] - 3841:14
**possibility** [2] - 3826:18, 3890:4
**possible** [3] - 3761:22, 3796:20, 3844:1
**possibly** [2] - 3788:6, 3797:1
**post** [1] - 3800:3
**potential** [5] - 3764:5, 3766:2, 3766:22, 3768:13, 3824:1
**potentially** [6] - 3786:18, 3797:5, 3825:18, 3827:3, 3890:6, 3890:7
**practice** [2] - 3841:25, 3842:6
**practicing** [1] - 3848:4
**preference** [1] - 3770:5
**prefers** [1] - 3775:8
**prejudice** [2] - 3766:5, 3855:15, 3855:23, 3856:19, 3866:2
**premarked** [1] - 3756:21
**preparation** [2] - 3846:17, 3871:2
**prepare** [2] - 3759:12, 3761:18

**prepared** [6] - 3772:22, 3774:23, 3775:18, 3775:19, 3778:20, 3789:6
**presence** [3] - 3757:12, 3766:3, 3768:1
**present** [2] - 3764:23, 3767:22, 3769:2, 3778:24, 3793:6, 3802:25, 3846:19, 3846:20, 3846:24, 3847:1, 3847:8, 3847:15, 3852:10, 3852:12, 3852:13, 3852:17, 3858:6, 3878:7, 3878:10, 3881:11, 3881:12
**presented** [2] - 3760:5, 3762:1
**presenting** [1] - 3878:11
**presently** [1] - 3855:7
**press** [1] - 3845:18, 3849:16, 3859:6, 3869:22, 3869:23, 3871:22
**pressing** [1] - 3886:9
**pretrial** [4] - 3842:3, 3842:15, 3862:12, 3863:7
**prevailing** [1] - 3833:6
**prevent** [1] - 3884:19
**previous** [1] - 3841:8
**previously** [1] - 3763:24
**primarily** [1] - 3885:20
**principle** [1] - 3849:4
**print** [1] - 3756:20
**printed** [1] - 3763:8
**printer** [1] - 3882:19
**printing** [1] - 3756:3
**privilege** [33] - 3775:1, 3775:25, 3776:7, 3776:8, 3776:9, 3778:7, 3779:3, 3779:6, 3780:7, 3781:4, 3781:8, 3782:4, 3782:10, 3782:19, 3782:23, 3783:1, 3783:6, 3784:1, 3784:6, 3784:25, 3785:10, 3788:23, 3788:24, 3789:10, 3789:12, 3790:24, 3827:4, 3827:9, 3840:6, 3883:6, 3883:16
**privileged** [2] - 3776:10, 3787:6, 3787:9, 3823:2, 3825:8, 3825:10, 3827:7, 3884:8
**privileges** [1] - 3853:16
**Privitello** [6] - 3819:6, 3819:8, 3820:7, 3843:13, 3843:19, 3843:23
**Privitellos** [1] - 3819:19
**pro** [1] - 3842:9
**problem** [2] - 3758:6, 3759:21, 3760:5, 3761:20, 3764:23, 3769:24, 3780:12, 3856:4, 3890:16
**problems** [2] - 3785:12,

3823:14
**procedure** [3] - 3811:25, 3853:18, 3878:12
**proceedings** [7] - 3764:7, 3764:8, 3770:1, 3778:13, 3779:12, 3779:14, 3892:9
**PROCEEDINGS** [1] - 3753:10
**Proceedings** [1] - 3754:25
**process** [3] - 3757:4, 3767:9, 3848:21
**produce** [4] - 3763:4, 3784:24, 3786:16, 3791:13
**produced** [3] - 3754:25, 3775:5, 3846:13
**producing** [1] - 3770:16
**productive** [1] - 3772:19
**professional** [1] - 3796:3
**proffer** [6] - 3764:18, 3773:4, 3773:12, 3774:3, 3774:10, 3789:8
**proffered** [2] - 3771:17, 3771:25
**proffering** [1] - 3755:11
**progress** [1] - 3828:16
**progressed** [3] - 3842:5, 3876:15, 3876:16
**prohibit** [1] - 3791:18
**projections** [2] - 3759:15, 3761:22
**promise** [2] - 3793:13, 3867:9
**pronounce** [1] - 3804:25
**proof** [2] - 3825:12, 3878:4
**proper** [6] - 3761:18, 3766:5, 3858:10, 3879:3, 3879:6, 3880:12
**properly** [1] - 3761:25
**properties** [1] - 3870:16
**property** [1] - 3872:17
**proposed** [2] - 3775:13, 3885:1
**prosecution** [1] - 3853:12
**protect** [1] - 3776:8
**prove** [2] - 3824:16, 3878:4
**provide** [4] - 3763:11, 3764:19, 3846:3, 3850:3
**provided** [9] - 3756:16, 3785:17, 3787:20, 3788:10, 3822:16, 3832:14, 3833:6, 3850:8, 3856:2
**provides** [2] - 3885:25, 3889:6
**provision** [2] - 3832:15, 3833:4
**public** [5] - 3763:22, 3787:11, 3787:24, 3788:22, 3822:18
**publishing** [1] - 3804:12

**18**

**pulled** [2] - 3885:2, 3885:8
**purely** [1] - 3775:1
**purpose** [12] - 3756:2, 3761:3, 3761:14, 3765:12, 3773:12, 3781:9, 3784:2, 3785:20, 3801:1, 3827:25, 3840:23, 3891:8
**purposes** [11] - 3756:13, 3762:14, 3780:6, 3780:9, 3789:12, 3812:7, 3835:11, 3840:22, 3844:22, 3884:11, 3891:21
**pursue** [3] - 3800:14, 3804:14, 3805:9
**pursued** [1] - 3801:17
**pursues** [1] - 3791:15
**pursuing** [1] - 3856:21
**put** [17] - 3757:23, 3761:21, 3762:15, 3765:5, 3769:15, 3773:8, 3775:7, 3782:18, 3790:2, 3800:6, 3800:16, 3819:12, 3819:24, 3857:13, 3858:5, 3867:20, 3867:21
**putting** [5] - 3757:22, 3764:17, 3771:10, 3790:17, 3818:4
**pyramid** [1] - 3873:3

## Q

**qualify** [1] - 3798:16
**quash** [1] - 3779:2
**questionable** [1] - 3828:24
**questioning** [8] - 3832:3, 3846:7, 3867:6, 3873:25, 3878:22, 3879:18, 3883:13
**questions** [17] - 3774:6, 3774:25, 3775:13, 3820:14, 3830:21, 3843:12, 3858:22, 3860:9, 3860:19, 3860:23, 3861:9, 3862:12, 3866:12, 3866:24, 3874:8, 3875:20, 3877:18
**quick** [1] - 3769:24
**quite** [1] - 3765:21

## R

**R-I-C-H-A-R-D-S** [1] - 3794:8
**raise** [2] - 3776:6, 3780:20
**raised** [1] - 3789:17
**raising** [2] - 3783:17, 3791:18
**Ranford** [1] - 3867:11
**rather** [2] - 3832:25,

3871:15
**reached** [1] - 3778:23
**reaction** [1] - 3879:21
**read** [10] - 3760:12, 3805:2, 3805:6, 3834:20, 3834:22, 3834:23, 3835:2, 3860:2, 3861:5, 3878:13
**reading** [3] - 3834:25, 3841:22, 3872:8
**ready** [5] - 3755:13, 3758:20, 3775:22, 3778:3, 3778:24
**real** [5] - 3828:19, 3867:21, 3870:5, 3870:7, 3889:19
**realized** [1] - 3851:6
**really** [15] - 3760:14, 3760:15, 3787:17, 3787:24, 3788:20, 3789:7, 3789:20, 3822:22, 3822:23, 3840:12, 3840:15, 3848:22, 3856:1, 3867:25, 3886:16
**reason** [14] - 3785:24, 3786:5, 3790:19, 3790:21, 3792:3, 3822:20, 3825:3, 3826:21, 3829:9, 3849:19, 3858:12, 3867:21, 3868:1, 3868:6
**reasonable** [4] - 3770:19, 3833:10, 3834:5, 3878:5
**reasons** [3] - 3771:11, 3788:5, 3790:6, 3824:23, 3829:1, 3851:19, 3855:15, 3868:10, 3868:11, 3883:4, 3883:9, 3883:14, 3885:19
**rebuttal** [5] - 3764:4, 3764:10, 3766:25, 3767:11, 3791:17
**recalling** [1] - 3791:4
**receive** [3] - 3805:19, 3835:8, 3866:10
**received** [15] - 3798:24, 3804:14, 3804:17, 3804:19, 3806:9, 3806:10, 3806:11, 3815:2, 3816:5, 3823:7, 3835:5, 3859:19, 3864:22, 3865:25, 3882:21
**receiving** [4] - 3759:19, 3799:15, 3817:4, 3851:12
**recently** [1] - 3856:25
**recess** [5] - 3774:18, 3774:19, 3777:20, 3777:21, 3821:11
**recipient** [1] - 3811:11
**recognize** [7] - 3795:5, 3801:23, 3802:1, 3832:10, 3832:11, 3832:12
**recollection** [20] - 3816:8, 3819:9, 3819:11, 3830:16, 3834:11, 3834:13,

3834:14, 3835:3, 3842:22, 3850:21, 3852:9, 3857:24, 3862:2, 3864:5, 3873:11, 3874:25, 3875:2, 3875:6, 3877:15, 3879:12
**recommendation** [1] - 3840:21
**recommended** [1] - 3866:18
**reconvene** [2] - 3776:19, 3820:16
**record** [21] - 3762:4, 3762:16, 3763:19, 3765:3, 3765:4, 3776:20, 3778:6, 3781:24, 3782:18, 3794:7, 3799:6, 3804:13, 3805:1, 3805:6, 3805:18, 3806:13, 3829:11, 3852:8, 3852:16, 3852:19, 3884:8
**recorded** [3] - 3754:25, 3855:2, 3875:15
**records** [17] - 3761:1, 3765:12, 3765:17, 3765:20, 3789:1, 3841:15, 3841:20, 3842:4, 3842:16, 3871:10, 3872:25, 3880:21, 3880:25, 3882:1, 3887:1, 3888:22, 3890:5
**recover** [1] - 3833:7
**recovering** [1] - 3833:9
**RECROSS** [2] - 3874:10, 3875:22, 3893:14, 3893:16
**RECROSS-EXAMINATION** [4] - 3874:10, 3875:22, 3893:14, 3893:16
**red** [4] - 3882:11, 3882:12, 3882:17, 3882:18
**REDIRECT** [2] - 3860:21, 3893:12
**redirect** [2] - 3766:2, 3860:20
**refer** [3] - 3864:16, 3880:15, 3888:20
**reference** [10] - 3762:24, 3769:7, 3818:20, 3818:22, 3836:7, 3837:22, 3838:20, 3874:12, 3878:24, 3888:16
**referencing** [1] - 3844:12
**referred** [2] - 3841:10, 3845:15
**referring** [4] - 3776:21, 3809:3, 3874:20, 3879:4
**refile** [1] - 3869:2
**reflect** [3] - 3790:22, 3827:21, 3884:12
**reflected** [2] - 3803:14, 3874:13
**reflects** [1] - 3762:16
**refresh** [6] - 3834:14,

3835:3, 3842:22, 3852:9, 3862:2, 3864:5
**refused** [1] - 3885:5
**refusing** [1] - 3846:3
**regard** [9] - 3758:5, 3762:2, 3762:4, 3766:11, 3828:25, 3837:24, 3850:22, 3855:20, 3885:2
**regarding** [26] - 3778:7, 3780:10, 3780:13, 3782:14, 3782:20, 3785:9, 3785:11, 3785:12, 3786:17, 3790:23, 3791:14, 3822:7, 3825:6, 3825:20, 3826:1, 3827:10, 3829:5, 3849:7, 3850:9, 3853:16, 3857:22, 3859:3, 3860:9, 3878:13, 3879:17
**regards** [11] - 3781:6, 3781:8, 3827:16, 3827:23, 3844:15, 3845:2, 3847:10, 3850:10, 3850:21, 3852:21, 3853:1
**regrettably** [1] - 3758:14
**reimbursed** [1] - 3830:17
**reimbursement** [6] - 3830:14, 3830:15, 3857:23, 3858:5, 3858:7, 3858:13
**rejected** [1] - 3871:20
**related** [14] - 3783:23, 3786:16, 3801:11, 3811:6, 3811:20, 3820:2, 3820:6, 3830:11, 3838:2, 3846:4, 3855:13, 3863:13, 3874:17, 3884:9
**relates** [15] - 3755:18, 3758:7, 3776:6, 3782:11, 3782:21, 3783:9, 3785:16, 3823:20, 3833:4, 3837:3, 3838:24, 3839:1, 3839:15, 3841:15, 3842:13
**relating** [2] - 3782:9, 3845:21
**relationship** [4] - 3788:18, 3839:25, 3840:2, 3877:14
**relatively** [5] - 3756:8, 3757:23, 3769:16, 3769:19, 3877:24
**release** [2] - 3845:18, 3849:16
**releases** [1] - 3869:23
**relevance** [3] - 3824:1, 3824:19, 3824:24
**relevant** [5] - 3768:5, 3790:2, 3806:14, 3823:20, 3862:21
**reliability** [2] - 3888:19, 3890:17
**reliable** [2] - 3886:14,

**19**

3888:4

**relying** [1] - 3787:1
**Rem** [2] - 3867:10, 3867:17
**remain** [3] - 3758:17, 3774:14, 3793:21
**remainder** [1] - 3760:10
**remains** [1] - 3827:7
**remember** [29] - 3759:5, 3796:22, 3797:2, 3811:4, 3815:24, 3820:9, 3830:13, 3843:3, 3844:18, 3846:19, 3847:2, 3850:6, 3852:15, 3854:2, 3858:16, 3858:18, 3859:20, 3859:21, 3859:23, 3859:24, 3860:25, 3861:2, 3867:8, 3872:20, 3872:21, 3872:23, 3873:8, 3876:24, 3877:10
**remembered** [3] - 3858:12, 3858:20
**remind** [1] - 3878:3
**render** [1] - 3769:11
**rendered** [2] - 3801:2, 3801:3
**rendition** [1] - 3773:13
**reoccurring** [1] - 3856:4
**reopen** [1] - 3829:9
**repeat** [1] - 3828:22
**rephrase** [1] - 3835:15
**reply** [1] - 3888:2
**report** [1] - 3762:18
**reporter** [2] - 3846:24, 3884:4
**Reporter** [1] - 3754:20
**Reports** [5] - 3805:24, 3806:3, 3806:8, 3806:22, 3806:25
**represent** [8] - 3766:24, 3768:2, 3795:2, 3801:6, 3830:9, 3831:12, 3841:10, 3850:10
**representation** [10] - 3768:7, 3773:16, 3789:18, 3801:11, 3806:15, 3847:4, 3850:15, 3851:25, 3854:3, 3854:17
**representative** [1] - 3847:18
**represented** [12] - 3789:21, 3797:13, 3801:12, 3805:16, 3835:16, 3846:8, 3850:13, 3853:9, 3853:19, 3853:24, 3855:24, 3882:22
**representing** [2] - 3782:10, 3801:17, 3806:24, 3835:11, 3836:22, 3839:6, 3841:9
**represents** [1] - 3789:24
**reproduce** [1] - 3889:8

**request** [5] - 3759:2, 3759:5, 3759:6, 3764:6, 3865:23
**requested** [1] - 3819:12
**require** [1] - 3888:17
**required** [1] - 3846:17
**requirements** [1] - 3780:5
**resolve** [4] - 3759:9, 3773:11, 3781:18, 3826:17
**resolves** [2] - 3773:4, 3780:13
**resources** [1] - 3856:24
**respect** [36] - 3764:22, 3765:15, 3765:24, 3766:2, 3771:6, 3771:24, 3781:4, 3781:19, 3782:3, 3782:13, 3782:19, 3783:1, 3801:16, 3823:23, 3824:3, 3824:9, 3825:6, 3832:23, 3833:11, 3850:11, 3852:3, 3860:23, 3862:13, 3863:14, 3867:22, 3868:25, 3876:17, 3879:16, 3883:4, 3883:7, 3883:16, 3884:14, 3884:17, 3884:21, 3887:11, 3888:17
**respected** [3] - 3847:20, 3848:6, 3854:12
**respectfully** [1] - 3764:6
**respond** [1] - 3887:5
**response** [7] - 3826:23, 3843:17, 3846:9, 3857:21, 3866:23, 3883:12, 3883:24
**rest** [4] - 3850:1, 3858:14, 3882:9, 3886:21
**restaurant** [4] - 3858:4, 3858:13, 3858:14, 3877:15
**result** [4] - 3771:19, 3793:10, 3834:1, 3850:19
**retained** [2] - 3800:14, 3830:12
**retainer** [3] - 3802:12, 3803:19, 3808:4
**retired** [5] - 3770:4, 3786:2, 3847:24, 3848:4, 3867:11
**return** [3] - 3756:18, 3756:19, 3774:11
**returned** [1] - 3758:19
**reveal** [2] - 3782:6, 3783:10
**review** [10] - 3761:4, 3761:5, 3761:17, 3761:25, 3765:7, 3770:21, 3771:1, 3776:12, 3880:7, 3883:19
**reviewed** [2] - 3830:19, 3881:23
**reviewing** [1] - 3760:7
**Richard** [2] - 3815:17, 3815:18
**RICHARD** [1] - 3753:22

**richards** [11] - 3764:14, 3773:9, 3773:19, 3785:17, 3785:20, 3786:19, 3786:23, 3790:23, 3791:8, 3791:13, 3794:9
**RICHARDS** [3] - 3781:16, 3794:1, 3893:3
**Richards** [62] - 3755:12, 3759:9, 3760:17, 3764:18, 3771:12, 3771:15, 3771:16, 3771:24, 3772:3, 3774:22, 3776:24, 3778:23, 3781:15, 3783:22, 3784:20, 3784:23, 3786:15, 3788:3, 3788:14, 3788:16, 3789:1, 3789:8, 3790:5, 3791:4, 3793:19, 3793:20, 3794:8, 3794:16, 3794:18, 3796:2, 3799:1, 3804:13, 3816:24, 3817:21, 3822:7, 3822:13, 3823:4, 3823:7, 3824:23, 3825:7, 3825:18, 3825:19, 3826:24, 3828:8, 3828:14, 3829:5, 3829:25, 3831:3, 3831:9, 3836:8, 3843:4, 3843:10, 3857:20, 3860:23, 3864:4, 3874:12, 3875:24, 3877:19, 3883:3, 3883:8, 3883:9, 3884:14
**Richards'** [3] - 3773:6, 3883:24, 3884:21
**rick** [1] - 3755:7
**rights** [1] - 3853:22
**rise** [3] - 3755:1, 3778:1, 3793:5
**Rizzi** [7] - 3763:23, 3766:25, 3767:20, 3767:22, 3767:25, 3768:7, 3768:8
**rizzi** [2] - 3767:14, 3767:16
**Road** [1] - 3754:3
**roads** [1] - 3850:3
**ROBERT** [1] - 3754:4
**Robert** [1] - 3847:24
**Rodriguez** [2] - 3809:23, 3813:12
**role** [5] - 3766:2, 3848:14, 3848:18, 3852:25, 3877:11
**Ron** [3] - 3755:11, 3759:9, 3760:17
**Ronald** [6] - 3793:18, 3794:8, 3796:2, 3817:21, 3831:9, 3836:8
**RONALD** [2] - 3794:1, 3893:3
**room** [6] - 3772:6, 3775:13, 3848:8, 3848:9
**Rosario** [4] - 3870:8, 3870:24, 3871:2, 3871:14

**Ross** [4] - 3808:24, 3809:18, 3814:21, 3854:11
**routinely** [1] - 3887:8
**Rozenboom** [2] - 3815:17, 3815:18
**RR** [1] - 3844:5
**RR-1** [21] - 3801:22, 3802:18, 3802:20, 3803:7, 3803:11, 3803:12, 3803:14, 3803:24, 3804:6, 3804:9, 3804:10, 3804:12, 3808:4, 3817:18, 3831:5, 3836:1, 3840:7, 3845:16, 3864:20, 3874:13, 3893:20
**RR-2** [3] - 3861:3, 3861:4, 3864:5
**Rubin** [2] - 3815:20, 3816:1
**Rucchin** [1] - 3867:17
**Rule** [2] - 3761:14, 3776:22
**rules** [5] - 3878:20, 3879:5, 3880:12, 3880:15, 3880:25
**ruling** [15] - 3779:1, 3779:4, 3780:15, 3781:20, 3781:23, 3782:2, 3782:8, 3782:12, 3784:3, 3791:21, 3822:5, 3823:13, 3827:19, 3884:7, 3884:20
**run** [4] - 3766:17, 3793:14, 3822:5, 3865:4
**running** [1] - 3758:20

## S

**San** [3] - 3872:4, 3873:3, 3873:6
**sandbagged** [1] - 3789:17
**sandbagging** [3] - 3789:7, 3789:13, 3791:3
**SARITHA** [1] - 3753:16
**sat** [1] - 3772:17
**Saturday** [5] - 3756:15, 3757:2, 3758:4, 3759:7, 3770:4
**save** [3] - 3793:15, 3881:14, 3886:12
**saved** [1] - 3887:14
**saw** [7] - 3757:11, 3759:20, 3759:21, 3778:20, 3795:5, 3881:24, 3882:2
**scared** [1] - 3823:6
**schedule** [1] - 3856:13
**scheduled** [3] - 3770:7, 3770:8, 3892:4
**scheduling** [2] - 3786:9, 3868:5
**scope** [6] - 3756:9, 3840:8, 3840:12, 3840:15, 3841:17
**screen** [15] - 3799:1,

3799:23, 3799:24, 3802:3, 3802:9, 3802:25, 3819:25, 3885:20, 3885:23, 3887:14, 3889:9, 3889:17, 3890:15, 3890:18, 3890:22
**search** [3] - 3889:22, 3891:7, 3891:12
**searched** [1] - 3891:3
**seated** [9] - 3755:2, 3774:20, 3778:2, 3793:7, 3820:25, 3822:3, 3829:20, 3878:19, 3880:3
**second** [6] - 3759:22, 3760:7, 3765:15, 3771:9, 3802:9, 3836:7
**Second** [3] - 3766:3, 3766:11, 3842:8
**secondhand** [1] - 3871:12
**secondly** [2] - 3787:3, 3889:7
**secretary** [1] - 3862:24
**security** [1] - 3757:6
**see** [40] - 3759:10, 3760:10, 3763:7, 3764:4, 3785:2, 3788:6, 3788:19, 3788:20, 3795:8, 3796:17, 3796:19, 3799:4, 3799:8, 3799:11, 3799:17, 3802:10, 3803:9, 3803:18, 3807:15, 3807:21, 3808:13, 3808:19, 3808:24, 3809:9, 3809:13, 3810:4, 3811:1, 3821:2, 3821:10, 3822:19, 3828:1, 3831:10, 3836:9, 3836:17, 3838:13, 3838:21, 3854:7, 3877:7, 3878:15, 3889:16
**seek** [4] - 3784:18, 3789:2, 3877:23, 3883:10
**seeking** [3] - 3785:20, 3825:23, 3836:20
**seem** [1] - 3759:21
**sees** [1] - 3770:10
**seized** [3] - 3885:9, 3890:6, 3891:7
**selectively** [4] - 3784:5, 3784:22, 3785:5, 3788:21
**send** [22] - 3773:18, 3773:21, 3796:19, 3798:6, 3806:2, 3807:25, 3810:22, 3813:3, 3814:1, 3814:10, 3814:15, 3814:24, 3815:4, 3815:8, 3815:13, 3815:17, 3816:1, 3816:9, 3816:17, 3816:22, 3843:19, 3889:17
**sending** [3] - 3859:20, 3859:25, 3860:6
**sense** [3] - 3761:13, 3827:19, 3870:21
**sent** [10] - 3760:18, 3776:24, 3798:18, 3805:17, 3826:24, 3830:6, 3849:10, 3876:4, 3885:23, 3888:6
**separate** [5] - 3800:13, 3800:15, 3805:11, 3867:23, 3870:11
**separately** [3] - 3852:25, 3853:3, 3865:8
**September** [2] - 3812:17, 3815:7
**Sergei** [1] - 3847:3
**series** [3] - 3801:5, 3813:24, 3846:2
**server** [3] - 3886:3, 3887:1, 3887:8
**servers** [1] - 3887:25
**Service** [1] - 3755:24
**service** [4] - 3763:5, 3769:3, 3885:25, 3889:6
**services** [2] - 3801:2, 3853:1
**serving** [1] - 3832:23
**set** [3] - 3755:17, 3876:23, 3885:4
**settle** [12] - 3848:10, 3850:7, 3850:17, 3850:18, 3851:2, 3851:6, 3851:14, 3853:20, 3856:13, 3869:24, 3870:1
**settled** [5] - 3783:14, 3841:12, 3850:17, 3851:4, 3853:22
**settlement** [5] - 3846:18, 3848:25, 3849:7, 3849:15, 3868:17
**Settlement** [7] - 3760:9, 3775:2, 3816:25, 3817:3, 3817:11, 3817:12, 3851:15
**settlements** [3] - 3818:3, 3818:7, 3850:22
**settling** [1] - 3850:15
**several** [6] - 3758:11, 3770:13, 3774:5, 3781:18, 3781:25, 3813:2
**sewerage** [1] - 3850:4
**shake** [1] - 3879:1
**shaken** [1] - 3759:24
**shaking** [3] - 3871:22, 3878:24, 3879:15
**shallow** [1] - 3789:18
**shared** [2] - 3787:21, 3788:11
**shed** [1] - 3828:23
**sheet** [2] - 3847:9, 3880:23
**sheets** [1] - 3846:25
**shield** [1] - 3784:6
**short** [4] - 3757:24, 3761:21, 3771:10, 3771:23
**shorten** [1] - 3793:12
**shortly** [3] - 3759:18, 3772:7, 3797:20
**shot** [5] - 3885:23, 3889:17, 3890:15, 3890:19, 3890:22
**shots** [3] - 3885:20, 3887:14, 3889:10
**show** [13] - 3798:24, 3801:21, 3806:13, 3809:8, 3824:25, 3825:2, 3825:16, 3828:17, 3834:16, 3844:21, 3852:7, 3861:2, 3872:12
**showed** [11] - 3793:1, 3812:14, 3812:23, 3813:18, 3814:20, 3815:10, 3852:3, 3852:6, 3853:7, 3858:21, 3867:7
**showing** [8] - 3788:22, 3802:9, 3806:17, 3807:13, 3819:4, 3829:25, 3861:3
**shown** [2] - 3822:14, 3871:10
**side** [2] - 3868:16, 3869:23
**sidebar** [7] - 3779:16, 3780:1, 3780:18, 3783:3, 3783:11, 3861:14, 3863:18
**sides** [2] - 3772:23, 3848:2
**signed** [1] - 3865:24
**significant** [2] - 3822:20, 3883:20
**similar** [3] - 3803:3, 3836:18, 3836:25
**similarly** [1] - 3802:15
**simplest** [1] - 3846:1
**simply** [2] - 3756:19, 3837:23
**single** [3] - 3840:4, 3880:11, 3881:2
**sit** [12] - 3758:11, 3761:17, 3761:24, 3762:23, 3763:16, 3764:7, 3764:8, 3767:3, 3768:9, 3768:13, 3783:5, 3856:22
**sitting** [1] - 3847:7
**situated** [1] - 3841:10
**situation** [3] - 3759:9, 3771:20, 3773:25
**situations** [1] - 3767:9
**six** [3] - 3798:21, 3850:5, 3873:1
**Sixth** [1] - 3763:10
**slap** [3] - 3777:13, 3853:12, 3853:14
**small** [2] - 3811:5, 3811:8
**solely** [2] - 3818:13, 3891:8
**solution** [1] - 3770:10
**solver** [1] - 3758:6
**someone** [7] - 3786:15, 3844:1, 3848:21, 3855:23, 3875:13, 3888:5
**sometime** [4] - 3758:10, 3759:4, 3760:20, 3761:24
**sometimes** [4] - 3811:8, 3838:7, 3849:24, 3853:16
**somewhat** [1] - 3848:19
**somewhere** [1] - 3869:8
**son** [2] - 3854:11, 3854:13
**Sonenglick** [1] - 3853:8
**Soroka** [3] - 3760:16, 3772:15, 3775:12
**sorry** [10] - 3797:23, 3809:4, 3810:6, 3816:13, 3819:2, 3832:7, 3832:8, 3868:21, 3871:17, 3879:8
**sort** [4] - 3849:4, 3850:1, 3858:19, 3868:4
**sorting** [1] - 3800:5
**sought** [1] - 3757:8
**sound** [1] - 3763:10
**sounded** [1] - 3869:21
**sounds** [2] - 3873:7, 3873:11
**source** [1] - 3886:14
**South** [1] - 3870:23
**south** [2] - 3870:24, 3871:1
**Southern** [1] - 3845:19
**Southwest** [1] - 3816:21
**special** [1] - 3782:5
**Special** [3] - 3764:16, 3769:18, 3882:6
**specific** [4] - 3796:22, 3797:2, 3862:14, 3872:20
**specifically** [10] - 3782:11, 3801:4, 3806:17, 3814:7, 3830:1, 3832:11, 3832:12, 3847:2, 3859:25, 3874:18
**speech** [1] - 3853:17
**spell** [1] - 3794:6
**spend** [2] - 3756:8, 3769:3
**spending** [2] - 3789:19, 3848:3
**spent** [5] - 3759:9, 3781:17, 3792:9, 3824:14, 3860:8
**spoken** [1] - 3781:7
**spread** [1] - 3868:2
**spreadsheets** [2] - 3765:15, 3765:18
**spring** [1] - 3793:3
**Square** [1] - 3753:21
**stamped** [1] - 3865:25
**stamps** [1] - 3887:19
**stand** [13] - 3757:23, 3757:24, 3764:2, 3770:7, 3771:17, 3772:3, 3775:7, 3776:14, 3778:25, 3779:7, 3793:21, 3849:17
**Standard** [3] - 3832:13, 3832:20, 3836:19

**21**

**standing** [1] - 3793:21
**stands** [1] - 3796:3
**start** [4] - 3785:5, 3785:8, 3829:21, 3863:4
**started** [4] - 3765:1, 3817:4, 3845:20, 3856:4
**state** [13] - 3794:6, 3823:19, 3823:24, 3824:2, 3824:20, 3826:15, 3828:3, 3828:4, 3833:25, 3841:25, 3842:1, 3842:5, 3842:10
**State** [1] - 3794:19
**statement** [9] - 3799:21, 3800:7, 3802:21, 3803:13, 3806:18, 3808:2, 3873:23, 3873:25, 3881:2
**statements** [4] - 3777:1, 3801:5, 3888:12, 3890:7
**STATES** [3] - 3753:1, 3753:3, 3753:11
**states** [1] - 3883:23
**States** [10] - 3753:6, 3753:14, 3753:17, 3794:21, 3805:13, 3837:1, 3842:8, 3855:10, 3855:18, 3868:14
**status** [2] - 3823:24, 3859:3
**stay** [5] - 3767:1, 3767:11, 3768:15, 3794:10, 3820:25
**staying** [1] - 3870:17
**stealing** [1] - 3863:1
**Steiger** [1] - 3754:20
**stenographically** [1] - 3875:16
**stenography** [1] - 3754:25
**step** [2] - 3793:20, 3877:19
**stick** [1] - 3891:24
**sticker** [1] - 3777:13
**still** [4] - 3755:4, 3827:6, 3848:6, 3857:18
**stipulate** [2] - 3773:13, 3885:5
**stipulated** [1] - 3885:3
**stipulation** [13] - 3759:10, 3772:19, 3772:21, 3772:22, 3773:1, 3773:5, 3773:6, 3773:8, 3774:5, 3775:16, 3778:22, 3885:11
**stipulations** [1] - 3885:1
**Stolper** [3] - 3787:23, 3788:11, 3867:17
**stood** [4] - 3757:18, 3850:6, 3858:18
**stop** [1] - 3834:25
**stored** [3] - 3756:1, 3757:3, 3757:9
**story** [1] - 3785:3
**strangers** [1] - 3877:14
**Strangford** [1] - 3754:7

**strategy** [3] - 3786:6, 3789:25, 3790:4
**strength** [1] - 3825:20
**strikes** [2] - 3768:19, 3769:6
**string** [1] - 3887:25
**struck** [1] - 3886:16
**structure** [1] - 3857:4
**subject** [2] - 3840:6, 3886:7
**subpoena** [4] - 3779:2, 3789:1, 3789:2, 3791:13
**subsequent** [3] - 3805:10, 3816:6, 3859:22
**subsequently** [1] - 3817:7
**substance** [2] - 3785:9, 3828:23
**substantial** [1] - 3826:4
**succeed** [1] - 3775:16
**success** [1] - 3825:12
**sue** [2] - 3855:17, 3857:9
**sued** [3] - 3839:13, 3853:11, 3853:17
**sufficient** [4] - 3769:7, 3769:12, 3774:8, 3884:16
**Suffolk** [1] - 3753:21
**suggest** [4] - 3776:12, 3784:23, 3790:5, 3842:21
**suggested** [1] - 3868:19
**suggesting** [3] - 3790:16, 3790:18, 3879:1
**suggestion** [3] - 3768:18, 3768:23, 3770:9
**suing** [7] - 3841:2, 3845:25, 3863:11, 3864:8, 3872:15, 3876:11
**suit** [7] - 3784:12, 3787:2, 3826:2, 3839:19, 3848:2, 3852:23, 3853:25
**suits** [1] - 3850:9
**Sullivan** [2] - 3816:16, 3816:17
**summaries** [1] - 3765:16
**summarize** [1] - 3765:19
**summarized** [2] - 3777:2, 3802:18
**summary** [23] - 3759:3, 3759:24, 3760:25, 3761:3, 3761:10, 3762:8, 3762:15, 3762:20, 3764:13, 3765:4, 3769:1, 3802:2, 3802:6, 3802:22, 3802:23, 3803:15, 3840:11, 3840:13, 3877:23, 3880:18, 3880:23, 3881:17
**summation** [5] - 3761:5, 3761:13, 3790:18, 3880:16, 3882:1
**summations** [1] - 3768:11
**summer** [2] - 3838:10,

3854:20
**sums** [2] - 3800:23, 3817:18
**Sunday** [6] - 3756:18, 3756:20, 3756:22, 3757:11, 3759:13, 3771:2
**superior** [1] - 3865:16
**support** [1] - 3884:16
**supports** [1] - 3826:15
**supposed** [3] - 3771:16, 3797:23, 3797:25
**Supreme** [1] - 3842:8
**surprised** [3] - 3785:19, 3849:20, 3862:8
**surrounded** [1] - 3850:1
**suspect** [2] - 3766:11, 3784:10
**sustained** [2] - 3797:9, 3874:6
**sustaining** [1] - 3873:25
**switches** [1] - 3857:14
**sword** [1] - 3784:6
**sworn** [1] - 3794:3
**Sydor** [2] - 3799:12, 3867:10

**T**

**tactical** [1] - 3788:5
**tape** [1] - 3891:8
**taped** [1] - 3768:2
**target** [1] - 3868:13
**technology** [2] - 3889:22, 3890:10
**telephone** [1] - 3759:13
**ten** [1] - 3759:1
**tendered** [1] - 3811:24
**tension** [1] - 3763:14
**term** [1] - 3837:20
**terms** [2] - 3756:9, 3756:11, 3769:9, 3773:7, 3822:22, 3823:14, 3880:10, 3887:4
**Tesoiero** [4] - 3758:3, 3769:23, 3770:3, 3770:6
**testified** [18] - 3763:24, 3786:2, 3794:3, 3808:3, 3826:9, 3837:25, 3840:20, 3843:12, 3843:18, 3847:13, 3852:21, 3855:12, 3856:25, 3857:20, 3862:22, 3864:23, 3864:24, 3867:2
**testify** [10] - 3770:18, 3773:22, 3774:23, 3775:19, 3775:20, 3806:5, 3871:10, 3879:5, 3885:7
**testifying** [1] - 3781:22
**testimony** [22] - 3758:21,

3764:3, 3766:5, 3767:3, 3768:14, 3775:25, 3778:17, 3780:9, 3781:19, 3782:24, 3785:6, 3816:24, 3828:7, 3828:11, 3828:21, 3828:24, 3833:15, 3862:9, 3867:5, 3879:21, 3883:25, 3884:8
**text** [26] - 3885:18, 3885:20, 3885:24, 3887:7, 3887:12, 3887:13, 3887:15, 3887:18, 3888:4, 3888:9, 3888:14, 3888:15, 3888:17, 3888:19, 3888:23, 3889:5, 3889:9, 3889:11, 3889:18, 3890:13, 3890:14, 3890:16, 3890:19, 3890:25, 3891:9
**THE** [139] - 3753:11, 3755:1, 3755:2, 3755:4, 3755:14, 3757:15, 3758:23, 3760:4, 3762:5, 3764:11, 3766:9, 3766:13, 3766:20, 3767:14, 3767:18, 3768:8, 3769:25, 3770:13, 3771:9, 3772:9, 3772:25, 3773:18, 3773:24, 3774:13, 3774:16, 3774:20, 3775:9, 3776:5, 3776:17, 3777:11, 3777:15, 3777:17, 3778:1, 3778:2, 3778:9, 3778:14, 3778:16, 3779:5, 3779:17, 3780:17, 3781:2, 3781:10, 3781:15, 3781:17, 3785:4, 3786:12, 3787:13, 3788:8, 3788:14, 3790:1, 3790:11, 3791:3, 3791:25, 3792:3, 3792:7, 3792:13, 3792:16, 3792:22, 3793:5, 3793:7, 3793:20, 3794:6, 3794:8, 3794:9, 3795:11, 3795:17, 3797:9, 3799:1, 3799:2, 3799:24, 3804:9, 3809:3, 3809:4, 3811:19, 3811:21, 3816:12, 3820:15, 3821:2, 3821:5, 3821:8, 3821:10, 3822:3, 3822:10, 3823:16, 3826:22, 3827:14, 3827:17, 3827:25, 3829:3, 3829:12, 3829:14, 3829:17, 3829:20, 3830:22, 3832:9, 3836:4, 3841:18, 3843:5, 3843:6, 3844:7, 3860:14, 3860:20, 3861:12, 3862:5, 3862:17, 3863:10, 3864:2, 3872:1, 3873:20, 3873:24, 3874:6, 3877:19, 3878:19, 3879:10, 3879:20,

**22**

3879:24, 3880:5, 3880:10, 3881:14, 3882:2, 3882:14, 3882:22, 3883:1, 3883:6, 3884:4, 3884:7, 3885:16, 3887:6, 3888:11, 3889:21, 3890:21, 3890:24, 3891:3, 3891:11, 3891:17, 3891:23, 3892:1, 3892:3, 3892:7

**themselves** [1] - 3782:4

**theory** [8] - 3822:21, 3824:5, 3824:6, 3824:12, 3845:24, 3846:9, 3869:21, 3888:11

**thereafter** [4] - 3759:19, 3796:16, 3796:17, 3797:21

**therefore** [1] - 3766:1

**thick** [1] - 3760:1

**thinking** [3] - 3788:20, 3827:5, 3827:8

**thinks** [1] - 3783:3

**third** [5] - 3759:22, 3813:19, 3818:3, 3818:7, 3836:16

**third-parties** [2] - 3818:3, 3818:7

**thoughts** [1] - 3829:4

**thousands** [1] - 3798:20

**three** [11] - 3760:13, 3788:17, 3800:10, 3812:18, 3813:19, 3823:6, 3826:23, 3828:10, 3832:18, 3844:11, 3861:4

**three-way** [1] - 3788:17

**throughout** [4] - 3775:17, 3813:24, 3833:15, 3866:12

**Thursday** [3] - 3759:7, 3759:14, 3772:16

**ticket** [1] - 3796:20

**ticking** [1] - 3856:1

**timed** [1] - 3845:18

**Title** [1] - 3814:14

**today** [29] - 3757:22, 3758:2, 3758:8, 3758:10, 3758:15, 3758:18, 3761:24, 3763:25, 3764:13, 3764:15, 3768:10, 3768:15, 3768:24, 3769:1, 3770:3, 3770:7, 3781:25, 3791:6, 3793:12, 3793:13, 3793:15, 3795:6, 3823:8, 3844:23, 3867:7, 3871:18, 3872:4, 3877:21, 3878:1

**together** [5] - 3761:11, 3765:5, 3848:16, 3877:4, 3877:13

**tolerate** [1] - 3880:1

**Tom** [2] - 3839:22, 3852:18

**TOMMY** [1] - 3753:7

**Tommy** [43] - 3794:25, 3807:3, 3807:7, 3807:12, 3807:19, 3808:1, 3808:11, 3808:16, 3808:22, 3809:5, 3809:16, 3809:22, 3810:2, 3810:9, 3810:14, 3810:18, 3810:24, 3811:7, 3812:22, 3813:5, 3813:7, 3813:10, 3813:16, 3813:23, 3814:4, 3814:12, 3814:19, 3814:25, 3815:5, 3815:9, 3815:15, 3815:19, 3816:3, 3816:23, 3820:12, 3825:2, 3825:6, 3826:25, 3830:5, 3830:17, 3830:18, 3843:18, 3858:6

**tomorrow** [18] - 3758:20, 3769:11, 3769:21, 3770:3, 3771:11, 3771:13, 3771:14, 3771:15, 3771:19, 3771:23, 3773:20, 3773:22, 3782:1, 3877:22, 3878:10, 3878:15, 3881:8, 3883:22

**took** [6] - 3817:15, 3824:13, 3844:7, 3847:24, 3853:12, 3861:13

**top** [2] - 3873:3, 3887:25

**topic** [1] - 3785:17

**topics** [2] - 3877:16, 3877:17

**total** [10] - 3804:13, 3804:17, 3812:8, 3812:18, 3813:8, 3813:17, 3814:5, 3815:12, 3815:16, 3820:6

**totaling** [4] - 3812:9, 3813:2, 3813:13

**transaction** [4] - 3782:6, 3783:8, 3783:10, 3830:13

**transactions** [11] - 3782:4, 3802:16, 3818:3, 3880:18, 3880:21, 3881:3, 3881:5, 3881:15, 3881:18, 3882:13, 3884:18

**transcribed** [1] - 3875:13

**transcript** [4] - 3754:25, 3792:25, 3875:7, 3883:19

**TRANSCRIPT** [1] - 3753:10

**transcripts** [2] - 3846:23, 3846:25

**transfer** [55] - 3755:18, 3756:16, 3758:12, 3799:12, 3799:15, 3800:23, 3801:18, 3802:11, 3803:5, 3803:6, 3803:7, 3803:9, 3803:18, 3803:19, 3806:7, 3806:21, 3807:2, 3807:5, 3807:6, 3807:8, 3807:10, 3807:14, 3807:17, 3807:20, 3808:3,

3808:7, 3808:9, 3808:12, 3808:18, 3808:21, 3808:23, 3809:9, 3809:15, 3809:17, 3809:21, 3809:23, 3810:3, 3810:8, 3810:10, 3810:13, 3811:18, 3812:14, 3812:20, 3812:23, 3815:2, 3815:6, 3815:10, 3816:15, 3816:20, 3818:18, 3819:7, 3830:2, 3830:4, 3864:19

**transferred** [7] - 3800:19, 3801:8, 3803:21, 3804:2, 3820:8, 3860:11, 3860:16

**transfers** [25] - 3799:8, 3799:13, 3801:13, 3802:2, 3802:18, 3802:20, 3802:24, 3803:3, 3808:4, 3809:8, 3812:9, 3812:17, 3812:18, 3813:8, 3813:15, 3813:20, 3813:21, 3813:24, 3814:6, 3814:21, 3814:22, 3815:16, 3819:6, 3830:9, 3860:9

**transpired** [4] - 3755:16, 3755:18, 3756:6, 3786:11

**tremendous** [1] - 3886:8

**trial** [5] - 3755:9, 3758:15, 3765:3, 3765:4, 3766:15, 3767:4, 3768:9, 3768:21, 3770:15, 3771:2, 3791:19, 3793:3, 3816:24, 3837:12, 3850:19, 3853:15, 3854:10, 3854:19, 3854:23, 3855:11, 3866:23, 3867:1, 3867:3, 3878:22

**trials** [1] - 3838:7

**tried** [1] - 3850:17

**tries** [1] - 3848:10

**true** [14] - 3786:5, 3792:8, 3806:4, 3806:11, 3827:14, 3833:5, 3833:12, 3834:6, 3839:1, 3842:16, 3868:18, 3874:16, 3885:8, 3889:21

**trumps** [1] - 3767:9

**trust** [21] - 3780:7, 3780:10, 3781:4, 3782:3, 3782:20, 3782:21, 3783:8, 3802:3, 3840:9, 3840:14, 3843:14, 3843:20, 3844:10, 3851:13, 3851:19, 3853:4, 3857:22, 3858:8, 3860:10, 3860:16, 3874:15

**truth** [2] - 3767:5, 3867:25

**try** [7] - 3778:17, 3811:14, 3824:24, 3827:6, 3850:18, 3854:24, 3868:16

**trying** [14] - 3759:9,

3767:21, 3768:22, 3772:21, 3773:11, 3781:18, 3788:21, 3822:25, 3824:21, 3825:23, 3826:17, 3829:3, 3838:13, 3890:12

**Tuesday** [1] - 3892:10

**turned** [3] - 3765:21, 3776:21, 3840:6

**twice** [1] - 3859:8

**two** [39] - 3757:19, 3760:8, 3760:12, 3760:22, 3761:10, 3763:21, 3764:22, 3769:15, 3773:3, 3775:6, 3784:16, 3794:24, 3805:9, 3805:10, 3812:16, 3812:17, 3813:18, 3814:20, 3815:12, 3837:14, 3838:7, 3838:18, 3838:19, 3839:10, 3844:11, 3846:4, 3846:15, 3850:5, 3850:16, 3850:18, 3858:22, 3866:21, 3870:10, 3870:11, 3870:15, 3877:22, 3882:7, 3888:14, 3889:14

**two-and-a-half** [1] - 3757:19

**two-page** [2] - 3760:8, 3764:22

**type** [4] - 3783:1, 3827:4, 3841:5, 3879:12

**typed** [1] - 3889:24

**typed-up** [1] - 3889:24

**types** [1] - 3767:9

**typical** [1] - 3841:4

**typically** [3] - 3818:6, 3818:8, 3875:16

**Tyson** [1] - 3867:11

**U**

**U.S** [3] - 3755:24, 3800:5, 3821:4

**ultimately** [1] - 3833:22

**unable** [1] - 3757:7

**unavailable** [1] - 3755:10

**uncle's** [1] - 3857:14

**uncomfortable** [1] - 3780:17

**unconnected** [1] - 3797:3

**under** [14] - 3774:10, 3783:24, 3802:12, 3805:17, 3831:18, 3836:19, 3862:9, 3865:25, 3867:2, 3879:18, 3880:12, 3880:24, 3887:17, 3888:16

**undercuts** [1] - 3822:21

**underlie** [1] - 3787:24

**23**

**underlying** [1] - 3786:17
**undermine** [2] - 3762:19
**underneath** [1] - 3888:3
**understood** [8] - 3767:13, 3785:6, 3790:3, 3790:20, 3825:3, 3825:22, 3872:18, 3879:19
**unearned** [1] - 3800:18
**unfamiliar** [1] - 3766:10
**unfortunately** [2] - 3755:16, 3759:8
**UNITED** [3] - 3753:1, 3753:3, 3753:11
**United** [10] - 3753:6, 3753:14, 3753:17, 3794:21, 3805:13, 3837:1, 3842:8, 3855:10, 3855:17, 3868:14
**universe** [1] - 3776:23
**unknowingly** [1] - 3884:18
**unless** [5] - 3776:8, 3818:5, 3818:9, 3823:17, 3890:10
**unlike** [1] - 3761:19
**unrelated** [1] - 3824:14
**unreliable** [1] - 3886:24
**unusual** [3] - 3770:2, 3890:22, 3890:23
**up** [29] - 3756:19, 3758:13, 3759:24, 3770:11, 3772:7, 3772:21, 3776:15, 3783:5, 3783:20, 3785:10, 3789:5, 3790:15, 3790:17, 3790:24, 3794:10, 3799:24, 3800:4, 3813:20, 3822:11, 3839:15, 3844:8, 3857:6, 3862:21, 3865:4, 3871:23, 3876:23, 3882:8, 3889:24
**update** [2] - 3774:11, 3774:21
**updated** [2] - 3828:15, 3859:14
**US** [1] - 3857:12
**usefulness** [1] - 3762:20
**user** [1] - 3888:5
**utilized** [1] - 3880:19
**utilizing** [1] - 3756:15

**V**

**vague** [2] - 3816:6, 3840:4
**vaguely** [2] - 3852:15, 3875:10
**value** [4] - 3757:19, 3808:13, 3814:7, 3814:10
**various** [4] - 3794:20, 3841:20, 3885:2
**Vegas** [3] - 3854:11,

3857:11, 3857:12
**vendors** [1] - 3811:9
**venture** [2] - 3870:5, 3870:7
**Ventures** [3] - 3839:3, 3839:9, 3873:13
**ventures** [1] - 3870:11
**verify** [2] - 3760:13, 3770:21
**version** [1] - 3881:18
**versus** [3] - 3846:10, 3874:13, 3874:21
**Veterans** [1] - 3753:21
**VHS** [1] - 3875:18
**vice** [1] - 3842:9
**victim** [3] - 3765:25, 3766:15, 3767:8
**victims** [1] - 3787:22
**video** [2] - 3875:8, 3875:13
**videographer** [1] - 3852:18
**videotaped** [4] - 3846:15, 3866:19, 3875:11, 3875:15
**view** [7] - 3772:13, 3774:7, 3784:14, 3790:14, 3856:5, 3880:18, 3881:13
**Vincent** [1] - 3758:3
**violated** [1] - 3783:2
**voice** [1] - 3794:10
**volume** [1] - 3765:11
**voluminous** [1] - 3777:7

**W**

**wait** [2] - 3771:2, 3793:14
**waiting** [2] - 3755:4, 3781:25
**waive** [2] - 3780:11, 3781:3
**waived** [4] - 3784:8, 3853:21, 3853:22, 3883:7
**waiver** [5] - 3784:25, 3827:8, 3827:9, 3827:22, 3883:16
**waives** [1] - 3782:19
**waiving** [5] - 3780:6, 3781:8, 3783:4, 3784:1, 3827:4
**wants** [7] - 3763:14, 3770:14, 3784:21, 3784:24, 3788:22, 3788:23, 3888:25
**warms** [1] - 3785:21
**warn** [1] - 3879:17
**warrant** [1] - 3891:7
**waste** [2] - 3856:22, 3868:12
**wasted** [1] - 3791:9
**wasting** [1] - 3771:21
**Wayne** [3] - 3764:17, 3769:18, 3882:6

**weak** [1] - 3825:16
**weaknesses** [2] - 3827:10, 3827:21
**wealth** [1] - 3888:20
**wedding** [1] - 3870:18
**week** [7] - 3759:4, 3761:23, 3764:2, 3775:10, 3822:15, 3878:9, 3885:1
**weekend** [8] - 3755:16, 3755:25, 3770:17, 3772:9, 3772:10, 3772:12, 3774:4, 3775:17
**weight** [4] - 3881:7, 3887:24, 3889:2, 3890:10
**WEINBLATT** [1] - 3753:20
**well-founded** [1] - 3771:4
**well-respected** [1] - 3854:12
**west** [1] - 3854:14
**whatsoever** [1] - 3785:13
**wherein** [1] - 3836:20
**whichever** [1] - 3775:8
**whole** [6] - 3760:24, 3771:14, 3784:14, 3791:8, 3834:17, 3839:25
**William** [1] - 3867:11
**willing** [6] - 3767:2, 3773:7, 3773:14, 3778:24, 3780:11, 3781:3
**win** [2] - 3876:14, 3876:17
**wire** [35] - 3796:12, 3796:21, 3799:8, 3799:11, 3799:13, 3799:15, 3806:21, 3807:2, 3807:4, 3807:8, 3807:14, 3807:17, 3808:9, 3808:12, 3808:18, 3808:23, 3809:6, 3809:9, 3809:15, 3809:23, 3810:3, 3810:10, 3811:18, 3812:9, 3815:6, 3816:5, 3816:15, 3819:7, 3819:16, 3820:11, 3830:2, 3843:23, 3858:17, 3858:20
**wired** [3] - 3819:19, 3820:9, 3843:13
**wires** [6] - 3796:12, 3796:14, 3796:17, 3796:24, 3851:21, 3852:3
**wiring** [1] - 3797:18
**wish** [2] - 3789:23, 3878:8
**withdraw** [3] - 3854:16, 3865:5, 3887:11
**withdrawals** [2] - 3817:2, 3853:6
**withdrawn** [5] - 3797:23, 3800:11, 3817:19, 3838:25, 3864:12
**withdrew** [1] - 3854:17
**witness** [32] - 3759:13, 3761:9, 3762:15, 3764:1,

3766:3, 3766:6, 3766:22, 3767:11, 3767:16, 3770:6, 3771:17, 3778:24, 3793:17, 3793:21, 3794:2, 3823:1, 3828:23, 3833:17, 3833:20, 3835:22, 3835:23, 3837:5, 3878:22, 3879:3, 3879:18, 3880:3, 3880:14, 3884:2, 3884:3, 3885:12, 3892:1
**WITNESS** [9] - 3794:8, 3799:2, 3809:4, 3811:19, 3832:9, 3836:4, 3843:5, 3844:7, 3873:20
**WITNESSES** [1] - 3893:1
**witnesses** [20] - 3761:10, 3764:4, 3764:5, 3764:10, 3764:13, 3765:24, 3767:5, 3767:6, 3768:13, 3769:15, 3770:17, 3771:3, 3771:10, 3792:4, 3823:9, 3877:22, 3878:1, 3879:16, 3883:13
**Wooly** [1] - 3852:13
**word** [2] - 3883:21, 3884:3
**words** [7] - 3796:5, 3824:20, 3830:11, 3832:20, 3837:19, 3858:8, 3874:3
**write** [1] - 3811:23
**written** [5] - 3822:12, 3825:15, 3827:24, 3828:1, 3860:6

**X**

**Xfer** [1] - 3802:10

**Y**

**year** [1] - 3867:13
**years** [8] - 3765:16, 3776:25, 3798:22, 3850:5, 3856:3, 3873:1, 3890:25
**yellow** [2] - 3882:17
**yesterday** [4] - 3757:13, 3763:4, 3763:6, 3791:7
**YORK** [1] - 3753:1
**York** [5] - 3753:6, 3753:15, 3754:21, 3841:6, 3845:19
**yourself** [4] - 3834:20, 3861:5, 3872:14, 3886:21