4094

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                      :
UNITED STATES OF AMERICA
                                          CR-13-607


            -against-          :
                                          United States Courthouse
                                          Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

      Defendants.            :
                                          June 17, 2015
- - - - - - - - - - - - - - - X    10:30 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the Government:        KELLY T. CURRIE
                           Acting United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  JAMES MISKIEWICZ, ESQ.
                                SARITHA KOMATIREDDY, ESQ.
                           Assistant United States Attorney




For the Defendants:        HALEY, WEINBLATT & CALCAGNI
                           One Suffolk Square
                           1601 Veterans Memorial Highway
                           Islandia, NY  11749
                           BY: RICHARD HALEY, ESQ.
                           For Mr. Kenner

4095

For the Defendants:

                                          LARUSSO & CONWAY
                                          300 Old Country Road
                                          Mineola, NY  11501
                                          BY: ROBERT LARUSSO, ESQ.
                                          For Mr. Constantine

                                          ANDREW L. OLIVERAS, ESQ.
                                          26 Strangford Court
                                          Oceanside, NY  11572
                                          For Mr. Constantine

Court Reporter:            Mary Ann Steiger
                                          100 Federal Plaza
                                          Central Islip, New York 11722
                                          (631) 712-6101

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

4096

1           THE CLERK:  All rise.

2           THE COURT:  Please be seated.

3           (Case called, appearances noted.)

4           THE COURT:  All of the jurors are here, are we

5    ready to go?

6           MR. LARUSSO:  We are.

7           May I just raise two issues?

8           Yesterday, I indicated to the Court the efforts

9    we're making to try and schedule our witnesses.

10           I spoke with my partner who has been doing the

11   bulk of the work, and right now we have the witnesses

12   lined up for Monday, Tuesday, Wednesday and Thursday.

13           I will have a list of who will testify when.  I

14   will provide that hopefully by the end of day or at least

15   by tomorrow.  I have documents that are about six inches

16   for two of the witnesses.  I will provide them tomorrow

17   and I'll try and accumulate as many as I can so we won't

18   have delays next week.

19           I will be able to start my case Monday and

20   continue according to the schedule my partner has

21   arranged.

22           MR. HALEY:  Your Honor, because I think it will

23   come up rapidly, I wanted to confirm with the government

24   that the government device number one is in the courtroom?

25           MR. MISKIEWICZ:  I don't know what --

4097

1          MR. HALEY:  It's the computer.

2          MR. MISKIEWICZ:  The laptop?

3          MR. HALEY:  The laptop.

4          MR. MISKIEWICZ: And that's device number one?

5          MR. HALEY:  That's device number one, yes.

6          MR. MISKIEWICZ:  It's here.

7          MR. HALEY:  And there is in evidence, Judge, a

8    box of documents that were provided by Mr. Sydor and

9    that's also present in the courtroom?

10          MS. KOMATIREDDY:  Yes.

11          MR. HALEY:  Thank you.

12          THE COURT:  I've spoken to the marshals in the

13   courtroom, and when Mr. Kenner testifies they're not going

14   to move.  I don't want them to escort him on the stand,

15   and so he will be left freely to walk up to the stand.

16          MR. HALEY:  Thank you, sir.

17          MR. MISKIEWICZ:  We renew our request that the

18   defense not make inquiry, in either direct or

19   cross-examination, of a prior Southern District grand jury

20   indictment or failure or the underlying indictment.  It

21   came up again yesterday as you know.

22          THE COURT:  Unless you get clearance from me,

23   there should be no reference to the Southern District

24   grand jury.  I don't know why it would come up in

25   Mr. Kenner's testimony.

4098

1          MR. HALEY:  Your Honor, I have a vivid memory of

2     your Honor's direction in that regard at the commencement

3     of the case.

4          THE COURT:  I'll put on the record that there is

5     case law with respect to the use of prior indictments.

6     This has been an ongoing issue and I will put the cases on

7     the record at some point today.

8          Again, Mr. LaRusso, this is something you keep

9     trying to pursue.  Do you have any case law to the

10    contrary you can point to my attention?  I'm not aware of

11    any case law that suggests when the government supersedes

12    an indictment, and abandons certain allegations of the

13    defense, you can put that prior allegation before the jury

14    and then disprove it for purposes of I guess undermining

15    the government's credibility as a whole.

16         As I said from the beginning of the case, to the

17    extent that a witness, an FBI agent or another witness,

18    lied in the grand jury or misled the grand jury and

19    prompted that type of allegation, you can certainly

20    question them on that conduct, but the allegation in and

21    of itself is not admissible.

22         MR. LARUSSO:  Your Honor, on that point, so I

23    can at least give the Court my thinking on it, a number of

24    years ago I had a situation where counsel for the defense

25    were trying to elicit information that the government had

4099

1   actually provided to a prior jury.  It was a retrial.

2          And they made factual allegations as to what

3   they were going to prove and the case law discussed that

4   being permissible because they were admissions by one of

5   the parties.

6          THE COURT:  That's different.

7          MR. LARUSSO:  I understand, Judge.

8          I'm trying to indicate to the Court that I was

9   trying to draw an analogy between the two and I was

10  looking for case law myself and I haven't found any

11  either.  That was the basis upon which I was pursuing.

12         THE COURT:  If the government makes some

13  representation to the Court or to a jury in a prior

14  proceeding, then that could be something you could bring

15  to the jury's attention.

16         The difference is an indictment, the case law is

17  clear that an indictment or allegations by the grand jury,

18  although we know in practice the government provides those

19  allegations to the grand jury, the indictment in and of

20  itself is what the grand jury did and, therefore, cannot

21  be attributed to an admission by the prosecution.

22         MR. LARUSSO:  What I'm trying to do is to show

23  those allegations stem from the investigators.  That was

24  provided, but I have not been able to do that, and the

25  Court called me on that the other day and you were

4100

1    correct.

2         THE COURT:  Again, if you had testimony from an

3    FBI agent that said this money was stolen, then certainly

4    you can point out they accused someone of stealing that

5    money and it wasn't true.  Unless you have that, you can't

6    use the indictment itself.

7         MR. LARUSSO:  I wanted the Court to know where I

8    was going.  It wasn't in a vacuum.

9         One other issue, if I may.  Again, this has been

10   a very monstrous case.  I wish I had a firmer grasp on all

11   of the issues.

12        I know before trial there was this tape that we

13   talked about yesterday and I and my client are hoping that

14   we would have an opportunity to examine the copy.  That's

15   all we were aware of, that there was a copy.

16        I was under the impression from my investigation

17   that the copy was somehow funneled through an attorney,

18   Mr. Stolper, and then got into the government's hands.  I

19   don't know how it got into the government hands, but they

20   provided a copy during discovery.

21        It's not a complete tape.  It shuts off after so

22   many minutes.  You can tell there was more to the

23   conversation.

24        We were looking to examine the tape for two

25   reasons; one, whether there was a deliberate cutting off

4101

1    of the conversation; and, number two, whether there was

2    any deletions during the portion that you can listen to.

3           My experience and my conversations are they can

4    do an analysis, but it's not going to be as well as if

5    they had the original.

6           I just found out today, and I don't know if this

7    is true, that Mr. Kenner recorded the conversation on one

8    of his cell phones.

9           I was always under the impression nobody had the

10   original.  I was just told it may still be in his phone,

11   and that phone is in the government's custody.  If I'm

12   wrong, I'll be glad to have no further conversation.  If

13   there is an original, that would put to rest, as far as

14   I'm concerned, whether there's a complete conversation or

15   partial conversation and I do feel I have an obligation to

16   inquire whether there is an original.  That's all I'm

17   asking at this point.

18          THE COURT:  Is the original on the phone?

19          MR. MISKIEWICZ:  It's on the phone and --

20          THE COURT:  The one you're going to play is

21   downloaded from the phone?

22          MR. MISKIEWICZ:  We received it in two different

23   ways.  Prior to the trial, during the investigation, we

24   received it I think through counsel for one of the

25   witnesses because the CD or a copy of it had been sent by

4102

1   Mr. Kenner I believe to John Kaiser some years ago, so we

2   got a copy of that.  That was provided in Rule 16

3   discovery to both attorneys.

4           Prior to the trial we executed a search warrant

5   on the iPhone.  We notified Mr. LaRusso because he had

6   been talking about the potential of subjecting the

7   recording to an analysis.  We notified him and co-counsel

8   Mr. Conway well before the start of the jury selection

9   that we have it, if you want it, you can look at it.  We

10  still have it.

11          We now prepared a CD which is a download from

12  the iPhone and provided a CD to Mr. Haley for his client

13  to review during one of the brakes to ascertain whether or

14  not he has any objections about the completeness of the

15  recording.

16          THE COURT:  That's easy.  Mr. LaRusso, obviously

17  they represented they still have what appears to be the

18  original recording.  So if you and your client want to

19  inspect that, the government should make it available to

20  you.  If you want an expert to come and listen to it on

21  the original phone, you can have that done as well.

22          MR. LARUSSO:  Your Honor, I would like to do

23  that.  I apologize to the government.  I don't have any

24  recollection of being told, but I know Mr. Miskiewicz was

25  in contact with my partner so I'm not disputing that.

4103

1    I'm just saying to the Court I was unaware of it

2    myself.  Again, the resolution is I will need time to

3    listen to that CD and I don't know how long it is, Judge,

4    20 minutes, 25 minutes.

5         THE COURT:  Mr. Kenner is going to be on the

6    stand on direct for most of the day, and I'll ask the

7    government to wait until the end of the cross to deal with

8    the tape issue to give you as much time as possible.

9         MR. LARUSSO:  My suggestion is, if it's all

10   right with the Court, I'll go after the government's cross

11   and I'll be prepared to proceed.  Quite candidly, I don't

12   know how much cross I will do after the government is

13   finished.

14        THE COURT:  After Court today you should inspect

15   that recording.

16        MR. LARUSSO: I appreciate it.

17        THE COURT:  Do you have your first witness?

18        MR. HALEY:  I do.

19        THE COURT:  Let's bring in the jury.

20        THE CLERK:  All rise.

21        (The jury is present.)

22        THE COURT:  Please be seated.

23        Good morning, members of the jury.

24        ALL JURORS:  Good morning.

25        THE COURT:  Good to see everyone again this

4104

1    morning.

2            As you'll recall, yesterday the government

3    rested its case so now we're going to proceed with the

4    defense case.

5            As I said yesterday, the lawyers have decided

6    that Mr. Haley is going to go first, so I'll ask Mr. Haley

7    to call his first witness.

8            MR. HALEY:  Your Honor, the defense of Phil

9    Kenner calls Vincent Tesoriero to the stand,

10   T-E-S-O-R-I-E-R-O.

11           THE COURT:  Mr. Tesoriero, if you could come

12   over here to the witness stand and remain standing for the

13   oath.

14

15   VINCENT TESORIERO,

16                called as a witness, having been first

17                duly sworn, was examined and testified

18                as follows:

19

20           THE CLERK:  Please state and spell your name for

21   the record.

22           THE WITNESS:  Vincent J. Tesoriero,

23   T-E-S-O-R-I-E-R-O.

24           THE COURT:  You can be seated.

25           Just pull your chair up and pull the mike up so

Tesoriero  -  Direct/Haley

4105

1    you're close to the mike.

2            Go ahead, Mr. Haley.

3            MR. HALEY:  Thank you, your Honor.

4

5    DIRECT EXAMINATION

6    BY MR. HALEY:

7    Q.    Mr. Tesoriero, good morning, sir.

8    A.    Good morning.

9    Q.    Today is not the first day you and I have met; is

10   that correct, sir?

11   A.    No.

12            We met Saturday.

13   Q.    Where did we meet, sir?

14   A.    At my home.

15   Q.    You were kind enough to let me into your home; is

16   that correct?

17   A.    I was.

18   Q.    I gave you a document to look at during that meeting;

19   is that correct?

20   A.    That is correct.

21   Q.    And what document did I give you, sir?

22   A.    It was a statement that I gave the Department of the

23   Treasury.

24   Q.    Do you recall when you gave that statement?

25   A.    I'm going to say it was -- the exact date, no.  Is it

Tesoriero  -  Direct/Haley

4106

1    on here?  September 2014.

2              THE COURT:  So the record is clear, the witness

3    is referring to what document?

4              THE WITNESS:  The actual copy of the statement.

5              MR. HALEY:  I'll mark it for identification

6    since there's been reference to it.

7              THE COURT:  That's fine.

8              (Pause in proceedings.)

9    BY MR. HALEY:

10   Q.   Mr. Tesoriero, I'm going to take -- I'm going to ask

11   you to take a look at a document that's been marked Kenner

12   Exhibit 200.

13             And does that simply refresh your recollection

14   as to the dates when you were interviewed?

15   A.   Yes.

16   Q.   What dates were you interviewed, sir?

17   A.   September 10, 2014, December 15, 2014.

18   Q.   Thank you.

19             Now, do you know a person by the name of John

20   Kaiser?

21   A.   I do.

22   Q.   How do you know Mr. Kaiser?

23   A.   He and I were police officers together in New York

24   City.

25   Q.   You're presently retired as a former public employee;

4107

1    is that correct?

2    A.    That is correct.

3    Q.    When you retired, what public employment were you

4    engaged in?

5    A.    I was part of the New York City Fire Department.

6    Q.    Just by way of background, sir, how long have you

7    been retired?

8    A.    May 2004.

9    Q.    Now, in connection with your interaction with John

10   Kaiser, did there come a point in time that you became

11   involved in an effort to purchase some property in Sag

12   Harbor for investment?

13   A.    That is correct.

14   Q.    Could you simply tell us, to the best of your memory,

15   how that investment came to take place?

16           Did you approach John Kaiser?  Did John Kaiser

17   approach you?

18   A.    He approached me.

19   Q.    Would you simply relate, to the best of your

20   recollection, what was discussed in connection with your

21   investment 'what did he say to you and what did you say to

22   him in substance?

23   A.    He had mentioned that there was property out in Sag

24   Harbor, North Haven, and that, you know, he was doing

25   timber frame constructions and he wanted to build

Tesoriero  -  Direct/Haley

4108

1  something of that nature out east.

2  Q.   As relates to the conversation you had with

3  Mr. Kaiser, did the name Chris Manfredi come up in

4  conversation?

5  A.   Yes, it did.

6  Q.   Would you tell the Court and jury, to the best of

7  your memory, what was said by Mr. Kaiser as relates to

8  Chris Manfredi?

9  A.   You want further explanation?  I don't understand the

10  question.

11  Q.   When you spoke with Mr. Kaiser, did he tell you

12  whether or not Chris Manfredi had an interest in this

13  property, and there was some effort on his part as relates

14  to what he wanted to do with Chris Manfredi's interest in

15  the property?

16  A.   Chris Manfredi and John were, I would say, somewhat

17  partners at the time and he was looking for an investor,

18  John was, and approached me and I also became aware of a

19  gentleman by the name of Tommy Milano that was also going

20  to be a party to this property out east.

21  Q.   Well, with reference to Mr. Manfredi in particular,

22  do you recall him telling you, sir, that he wanted to get

23  Mr. Manfredi out of the Sag Harbor deal and that Phil

24  Kenner and Bryan Berard were coming into the deal?

25        MS. KOMATIREDDY:  Objection, leading.

Tesoriero  -  Direct/Haley

4109

1        THE COURT:  Sustained as to form.

2   BY MR. HALEY:

3   Q.   Well, sir, when you were interviewed by the FBI back

4   in September and December of 2014, they asked you

5   questions; is that correct, sir?

6   A.   That's correct.

7   Q.   And you answered those question to the best of your

8   ability; is that true?

9   A.   That's true.

10  Q.   And do you recall whether or not the name Chris

11  Manfredi came up in terms of that interview by way of you

12  mentioning his name or the FBI mentioning his name?

13  A.   His name did come up.

14        With regards to this property, there were two

15  different times that it was purchased so you have to be

16  more specific.

17        The first time that this was purchased was

18  under, you know, an initial name of North Point

19  Properties, which was Chris Manfredi, myself, Tommy Milano

20  and John Kaiser.

21  Q.   You're correct, sir, and thank you for that

22  clarification.

23        Now, when the property was then being purchased

24  a second time or transferred, was Chris Manfredi part of

25  that new entity?

Tesoriero  -  Direct/Haley

4110

1    A.    No, he was not.

2    Q.    And what, if anything, did John Kaiser tell you about

3    Chris Manfredi in that regard as to whether he was going

4    to be part of the new purchase or not?

5    A.    No.

6                MS. KOMATIREDDY:  Objection, hearsay.

7                THE COURT:  Overruled.  You can answer.

8    A.    No, he was not going to be part of it.

9    Q.    And who, if anyone, told you that Chris Manfredi was

10   not going to be part of the new deal?

11   A.    John Kaiser did.

12   Q.    And did he tell you sir, with reference to the new

13   deal, who specifically was going to be part of the new

14   deal?

15   A.    He said who is going to be part of this deal is Phil

16   Kenner and Bryan Berard.

17   Q.    Were you present at the Sag Harbor closing during the

18   second deal?

19   A.    No, I was not.

20   Q.    As relates to the second deal, sir, what was your

21   understanding as to the percentage of ownership interest

22   in the second deal?

23   A.    The percentage of ownership interest?

24   Q.    Yes, sir.

25   A.    After the builder it would be 25 percent for each

4111

1    party.

2    Q.    To your knowledge, who were those parties, sir, the

3    four parties with reference to the new deal?

4    A.    It was Phil Kenner, John Kaiser, Bryan Berard and

5    myself.

6    Q.    Did there come a point in time, sir, to your

7    knowledge, the Sag Harbor was ultimately sold?

8    A.    That's correct.

9    Q.    When it was sold, did you see a document that

10   reflected what purported to be the ownership interest in

11   that property just before it was sold?

12   A.    No.

13          All documentation with regards to that was

14   either lost or destroyed.  I don't recall offhand what it

15   said.

16   Q.    Well, prior to the closing of the second deal, did

17   John Kaiser provide you documents in connection with the

18   operating agreement as relates to the Sag Harbor property?

19          Do you recall receiving documents from him?

20   A.    No, I don't.

21   Q.    Does the name Warren Gillmore mean anything to you,

22   sir?

23   A.    No, it doesn't.

24          MR. HALEY:  Thank you.

25          I have no further questions.

4112

1    CROSS-EXAMINATION

2    BY MS. KOMATIREDDY:

3    Q.    Mr. Tesoriero, good morning.

4    A.    Good morning.

5    Q.    You stated there were two sales of the Sag Harbor

6    property; one before 2006, and another in and around 2006;

7    is that right?

8    A.    That's correct.

9    Q.    When -- in the 2006 sale, you testified that you

10   understood that you would have a 25 percent share and

11   other parties would have a 25 percent share; is that fair?

12   A.    That would be of the profit, which there was none.

13   Q.    At the time that you invested -- I'm sorry, at the

14   time of the 2006 sale, did you know anyone by the name of

15   Michael Peca?

16   A.    At the time, no, but recently I was reminded of who

17   he was, a hockey player.

18   Q.    Do you know who he is?

19   A.    I know who he is.

20   Q.    Do you know him personally?

21   A.    No, I do not.

22   Q.    At that time in 2006, or at any time, did you have

23   any understanding that Michael Peca would be invested in

24   the Sag Harbor property with you?

25   A.    No, I did not.

Tesoriero  -  Cross/Komatireddy

4113

1  Q.  Did you have any understanding at that time in 2006,

2  or at any time, that Michael Peca would loan you or your

3  partners money to invest in the Sag Harbor property?

4  A.  No, I did not.

5       I don't have any recollection.

6  Q.  Have you ever met Michael Peca?

7  A.  No, I have not.

8  Q.  Have you ever talked to him?

9  A.  Never.

10      MS. KOMATIREDDY:  No further questions.

11      MR. LARUSSO:  No questions, your Honor.

12      THE COURT:  Redirect?

13      MR. HALEY:  No, sir.

14      THE COURT: You can step down, sir.

15      Thank you.

16      (The witness steps down.)

17      THE COURT:  Okay, please call your next witness.

18      MR. HALEY:  Yes, sir.

19      The defense of Phil Kenner calls Phil Kenner to

20  the witness stand.

21      THE COURT:  Mr. Kenner, please come up.

22  PHIL ANDREW KENNER,

23       called as a witness, having been first

24       duly sworn, was examined and testified

25       as follows:

4114

1          THE COURT:  Be seated.

2          Please state your name and spell your last name

3     for the record.

4          THE WITNESS:  Phil Andrew Kenner, K-E-N-N-E-R.

5          THE COURT:  Go ahead, Mr. Haley.

6          MR. HALEY:  Thank you, your Honor.

7          Your Honor, with the Court's permission, it's

8     going to be impossible for me to conduct direct without

9     referring to Mr. Kenner as Phil.

10          THE COURT:  Fine.

11

12     DIRECT EXAMINATION

13     BY MR. HALEY:

14     Q.    Phil, how old are you?

15     A.    46 years old.

16     Q.    And what's your marital status?

17     A.    Divorced.

18     Q.    When did that divorce take place?

19     A.    2006.

20     Q.    What is the name of your former wife?

21     A.    Tracy Kenner.

22     Q.    Do you have any children?

23     A.    Yes, I do.

24     Q.    How many children do you have?

25     A.    I have two children.

4115

1  Q.    What are their ages?

2  A.    I have a son who is 13 named Blake, and a daughter

3  who is 16 named Hailey.

4  Q.    How would you describe, sir, your relationship with

5  your children?

6  A.    Wonderful.

7  Q.    Mr. Kenner, Phil, have you ever been convicted of a

8  crime?

9  A.    No, I have not.

10  Q.    There came a point in time, sir, that you were

11  arrested in connection with the indictment for which you

12  are presently on trial; is that correct?

13  A.    Yes, sir.

14  Q.    When did that occur?

15  A.    November 13, 2013.

16  Q.    Where did that occur?

17  A.    In front of Golds Gym in Scottsdale, Arizona, where I

18  worked out for three or four years.

19  Q.    Would you simply describe, sir, just a summary of

20  your arrest and what transpired, just a summary of it,

21  sir, what occurred?

22  A.    On the morning of November 13, I arrived about early

23  morning, just after breakfast, at the gym and after I

24  parked my vehicle, I was walking to the gym through the

25  parking lot and I was approached by about 20 to 30 armed

Kenner  -  Direct/Haley

4116

1   federal agents who asked me to get down on the ground with

2   their guns pulled.

3        And so I got down on the ground, they handcuffed

4   me behind my back, and then shortly thereafter they lifted

5   me and carried me into the back of the squad car and then

6   I was taken to FBI headquarters in Phoenix, Arizona.

7   Q.   Approximately what time of day was this?

8   A.   I'm going to say late morning.

9   Q.   Other than the FBI agents at the time of your arrest,

10  was anyone else present?

11  A.   There were a number of people that were going in and

12  out of the gym that morning that were present.  There were

13  people from the breakfast diner that I eat at on a regular

14  basis that were also outside the breakfast diner, and

15  agents from a number of different organizations. I

16  couldn't tell you specifically who they were today.

17  Q.   Now, you testified a moment ago that upon being

18  placed in handcuffs, you were taken to the FBI offices

19  where, sir?

20  A.   In Phoenix, Arizona, about 25 minutes from where I

21  was arrested.

22  Q.   Did there come a point in time, sir, that you learned

23  that your home had been searched pursuant to a search

24  warrant?

25  A.   I did.

4117

1   Q.   At some point in time did you see that search

2   warrant?

3   A.   I did, several days later.

4   Q.   And without specifying the details or the content of

5   it, was the content of the search warrant, in terms of the

6   allegations, similar to the allegations in the current

7   indictment against you, sir?

8   A.   I believe they were consistent.

9   Q.   When you left your home that day who, if anyone, was

10  present in your home?

11  A.   My girlfriend was still at the home when I left that

12  morning.

13          MR. HALEY:  May I see government device number

14  one.

15          (Exhibit handed.)

16  BY MR. HALEY:

17  Q.   Sir, I'm going to hand you -- it's a laptop computer,

18  so I'm going to hand you a laptop computer introduced into

19  evidence as government device number one.

20          Do you recognize that?

21  A.   Yes, sir.

22  Q.   What is it?

23  A.   I believe this is the laptop computer that I used for

24  the last several years before my arrest.

25  Q.   When you say you believe it's the laptop computer, is

4118

1   there any reason to doubt it's not, sir?

2   A.    No.  I believe this is it.  It's got the dent where

3   it was dropped once by TSA security.

4   Q.    When you left your home that day to go to the gym,

5   where was that computer located?

6   A.    The computer was located in my office at my home.

7   Q.    And before it became government device number one in

8   your case, United States of America vs. Phillip Kenner,

9   13-CR-607, who did it belong to?

10  A.    It belonged to me.

11  Q.    When you left that day to go to the gym, in what

12  condition was government device number one?

13  A.    It was fully functioning.

14  Q.    Do you know, when you left for the gym that day,

15  whether it was running or turned off, if you know?

16  A.    I believe I left it in sleep mode because I was

17  working on some litigation papers that morning before I

18  went to the gym.

19  Q.    Sir, I'm going to ask you to take a look, and it

20  should show up on the screen, at that photograph

21  introduced into evidence by the government.

22        Do you recognize the room depicted in that

23  photograph?

24  A.    Yes.

25        That's my home office.

Kenner  -  Direct/Haley

4119

1  Q.    Incidentally, is there someone who's a magician in

2  your household?

3  A.    Yes.

4         I am and my daughter is.

5  Q.    Do you see depicted within Government Exhibit 924

6  what is now government device number one?

7  A.    Yes.

8         I believe you can see it in the middle of the

9  desk with the white paper reflection on the front edge of

10  the computer.

11  Q.    Taking a look at Government's Exhibit 925, do you see

12  your computer, now the government's computer, device

13  number one, in that picture?

14  A.    Yes, I do.

15         It appears that the cover is open on it at this

16  point.

17  Q.    Finally, sir, I think we have a keyboard there.  Can

18  you see government device number one depicted in that

19  picture?

20  A.    I don't believe I can from that angle.  It's probably

21  obscured behind the keyboard rack.

22  Q.    Now, on November 13, 2013 -- withdrawn.

23         Prior to November 13, 2013, were you aware that

24  you were under investigation by federal law enforcement

25  agents?

Kenner  -  Direct/Haley

4120

1   A.   Yes, I was.

2   Q.   How did you acquire that?

3   A.   Primarily I was alerted by several banking

4   institutions that I was dealing with during attempts to

5   wire money to lawyers I had retained in Mexico in pursuit

6   of litigation versus Ken Jowdy.

7            I was instructed that the bank would no

8   longer -- the banks would no longer authorize my wire

9   transfers to my attorneys in Mexico because they were

10  told -- I was told they were contacted by members of the

11  FBI investigating me.

12  Q.   When you purchased that government device number one,

13  when did you do that?

14  A.   I believe it was approximately 2008.

15  Q.   There's been testimony that the operating system for

16  that particular computer had with it an encryption

17  software.

18            Do you recall that testimony?

19  A.   I do.

20  Q.   Did you purchase that computer because it had

21  encryption software when you purchased it in 2008?

22  A.   No, I did not.

23  Q.   Prior to the seizure by the federal authorities on

24  November 13, 2013, did you utilize the encryption program

25  contained within government device number one to encrypt

Kenner  -  Direct/Haley

4121

1    any of your files?

2    A.    No, I did not.

3    Q.    Did your computer, that computer, have a password?

4    A.    It did not.

5    Q.    Meaning that anyone could simply turn it on and

6    acquire access to the information and files on that

7    computer; is that fair to state?

8    A.    That's a fair statement.

9    Q.    There has been introduced into evidence, Mr. Kenner,

10   as you're aware by way of stipulation, files, documents

11   and records that were acquired off of formerly your

12   computer, but now government device number one, but on

13   November 13, 2013, what, if any, additional information in

14   electronic format was contained on that computer?

15   A.    In addition to my business records, there would be

16   personal family photos, family letters, other things that

17   I had scanned for my children, home videos, et cetera.

18   Q.    There's been introduced into evidence, Mr. Kenner,

19   text messages which had been referred to as the bubble

20   messages; do you know what I'm talking about?

21   A.    Yes, sir.

22   Q.    And those bubble messages identified as various

23   Government's exhibits, and I won't go through the

24   Government's exhibit numbers, they were required off of

25   this unencrypted computer that formerly belonged to you;

Kenner  -  Direct/Haley

4122

1    is that true?

2    A.    I would believe so.

3    Q.    Mr. Kenner, during the period of time in 2013 when

4    you were aware that you were under an investigation by

5    federal agents, what, if any, efforts did you make to

6    either encrypt or destroy, delete information on

7    government device number one?

8    A.    None.

9    Q.    Prior to your arrest on November 13, 2013, sir, would

10   you simply tell us, as relates to your life at that point

11   in time, where were your energies and efforts devoted?

12   A.    Prior to my arrest?

13   Q.    Yes, sir.

14   A.    On a daily basis, although my children didn't live

15   with me, I would spent significant time with both of my

16   children and I would spend the remainder of my working

17   days working on litigation efforts to recover investments

18   primarily from Ken Jowdy inclusive of the loans that we

19   had given him from several different projects and

20   individuals.

21   Q.    Mr. Kenner, to get to the point, when you say the

22   investments, do these investments have any relationship to

23   your hockey player clients?

24   A.    Specifically they did.

25   Q.    Since your arrest on November 13, 2013, where have

Kenner  -  Direct/Haley

4123

1   your energies and efforts been devoted?

2   A.   Since my arrest 100 percent of my effort and energy

3   on a daily basis has been to defend the allegations in

4   this case, in this indictment, and to prepare for trial.

5   Q.   Could you give us some idea as to the nature of that

6   energy and effort?

7   A.   Throughout the time from November of 2013 until now,

8   I believe I reviewed somewhere in the neighborhood of two

9   million documents that have been turned over to me through

10  you from the government, and my ongoing review of those

11  documents in preparation of work product to prepare for

12  our defense at trial has been all consuming every day.

13  Q.   Sir, I'm going to ask you to take a look at what I

14  will mark as Kenner Exhibit 201, sir.

15              (Exhibit handed.)

16              Would you tell us what Kenner Exhibit 201 is,

17  sir?

18  A.   This is the replacement computer that was given to me

19  by you during preparation for this trial that I have been

20  working on for approximately the last nine months.

21  Q.   During the course of this trial, have you been

22  utilizing that computer at the desk throughout the trial?

23  A.   That's the one that I have been using.

24  Q.   You've been typing on it; is that correct?

25  A.   Yes, sir.

4124

1   Q.   You haven't been playing video games on it; is that

2   correct?

3   A.   I have not.

4   Q.   By the way, you know I want that back, right?

5   A.   I'm aware.  You've made that clear to me.

6   Q.   Could you give us some idea as to the quantity and

7   character of the information that you received from the

8   government through me that you just testified to a moment

9   ago?

10  A.   There have been documents that span the gamut from

11  tens and tens of thousands of bank records, pages of bank

12  records, thousands of pages of corporate contracts,

13  operating agreements related to the different investments

14  we have been discussing here for the last six weeks,

15  almost 100,000 text messages that were turned over to us,

16  tens of thousands of e-mails from the different parties

17  that we heard from throughout this trial, and a myriad of

18  personal documents that I've seen in evidence as well.

19  Q.   When you say personal documents, what are you

20  speaking of?

21  A.   In particular, I recall my ex-wife's job resume was

22  included, correspondence with regards to medical insurance

23  that I had over time, documents of that nature.

24  Q.   Is there any aspect of your life sir -- withdraw

25  that.

Kenner  -  Direct/Haley

4125

1        As relates to meetings involving you and I,

2   could you just give us some idea, give the jury some idea,

3   as to the frequency with which those meetings occurred,

4   and just some idea.

5   A.    In particular over the last year on a monthly basis

6   we would spend between a dozen and two dozen hours a month

7   in face-to-face communication, and then during that period

8   of time we would also have the opportunity to prepare and

9   pass work product back and forth to make our meetings as

10  efficient as possible during that period of time.

11  Q.    Sir, the documents that have thus far been introduced

12  into evidence for this Court and jury, are those documents

13  part and parcel of that quantity of information that has

14  been provided to you during the pendency of this case?

15  A.    Including the documents that were turned over to us

16  that I received as recently as Monday morning, yes.

17  Q.    Well, when you say including the documents that you

18  received as early as Monday morning, could you tell the

19  jury what you're referring to?

20  A.    On Monday morning, after I had met with you I believe

21  on Sunday, you told me the government had turned over

22  charts and records.

23  Q.    Sir, I'm not asking you to discuss conversations we

24  had.

25        My question is, with reference to those items

4126

1   that you received Monday morning -- you mean Monday

2   morning of this week; is that correct?

3   A.   That's correct, two days ago.

4   Q.   Just tell us what items you're referring to in terms

5   of the exhibits that were introduced by the government?

6   A.   The charts that refer to the cash flow analysis that

7   we heard the government experts and government agents and

8   special agents discuss over the last two days with the

9   records and charts that I received Monday morning for the

10  first time.

11  Q.   Do you know how you acquired them?  At what point in

12  time they were provided to counsel and at what point you

13  received them?

14  A.   From what I recall, they were turned over to you on

15  Sunday afternoon after we had met, and then you in turn

16  gave them to me on Monday morning when we got together at

17  the courtroom.

18  Q.   Mr. Kenner, we will be getting to those charts at

19  some later point in your testimony.

20           But is it fair to state, sir, that you at least

21  had the opportunity to review those charts, having been

22  provided them by me to you Monday morning and now you're

23  on the stand; is that correct?  During this period of time

24  you have had the opportunity to review them; is that

25  correct?

Kenner  -  Direct/Haley

4127

1   A.   Yes, sir.

2   Q.   And that was your first opportunity; isn't that true?

3   A.   Yes, sir.

4   Q.   Now, we will talk about this later, but these are the

5   carts, do you remember these?

6   A.   Yes, I do.

7   Q.   And these are the charts, right?

8   A.   Yes, sir.

9   Q.   So later in your testimony when I refer to carts and

10  charts, that's what I'm referring to, okay?

11  A.   Okay.  I understand.

12  Q.   You were present during the testimony of John Kaiser,

13  true?

14  A.   Yes, sir.

15  Q.   And when he took the witness stand, that was not the

16  first time you met John Kaiser; is that true?

17  A.   That is correct.

18  Q.   At the point in time that John Kaiser testified in

19  this trial, how would you describe your relationship with

20  John Kaiser?

21  A.   Adverse.

22  Q.   With regard to that adversity between you and he,

23  were you aware of public pronouncements he had made in the

24  news media as relates to the dispute between you and he?

25  A.   Yes, I'm very aware.

Kenner  -  Direct/Haley

4128

1    Q.    Now, you were present in Court when John Kaiser took

2    that very witness stand, raised his right hand and swore

3    to tell the truth, the whole truth, and nothing but the

4    truth.

5            You heard him say that; is that correct?

6    A.    Yes, sir.

7    Q.    And that's the same oath that you took a moment ago,

8    true?

9    A.    Yes, sir.

10   Q.    And he described to you -- excuse me.

11           He testified in front of this jury as to

12   transactions and conversations he says he had with you at

13   various points in time; is that correct?

14   A.    That's what I recall.

15   Q.    Of your own personal knowledge, sir, was his

16   testimony the truth, the whole truth, and nothing but the

17   truth?

18           MR. MISKIEWICZ:  Objection.

19           THE COURT:  Sustained as to form.

20   BY MR. HALEY:

21   Q.    Well, were there instances, sir, where John Kaiser

22   testified about the conversation or an event that he had

23   with you that you know to be untruthful; yes or no?

24   A.    Yes.

25           MR. MISKIEWICZ:  Objection, leading.

Kenner  -  Direct/Haley

4129

1      THE COURT:  That's okay.

2   A.    Yes.

3   Q.    Would you give us an example?

4   A.    I believe Mr. Kaiser had represented that on my first

5   introduction to him on the big island of Hawaii, that I

6   represented to him that I was worth a half billion

7   dollars.  I don't recall if he said 500 million or half

8   billion, but that was untrue and is untrue to this day.

9   Q.    What about your net worth, do you recall him making

10  any statements about your net worth?

11  A.    No.

12          I've never made a statement of that sort to

13  anybody, nor have I represented in any document form,

14  which I also believe he referenced in his testimony, that

15  he had seen documents I produced for banks referencing a

16  large sum of money such as that.

17  Q.    Meaning a net worth of $500 million, correct?

18  A.    Correct.

19  Q.    In all the almost two million documents,

20  approximately two million that you saw in the government's

21  discovery, did you ever see such a statement reflecting a

22  net worth of a half million dollars?

23  A.    No, I have not.

24  Q.    By the way, and we will get to that further in your

25  testimony, but would you describe to the best of your

4130

1    memory that meeting with John Kaiser in Hawaii, and just

2    tell the jury what transpired?

3    A.    A mutual friend of ours at the time named James

4    Melana had put me in touch with Chris Manfredi and John

5    Kaiser, who I was of the understanding they were looking

6    for investment partners on the big island of Hawaii on a

7    small piece of land that they put under contract about a

8    year prior and were unable to put together the cash to

9    close on the deal.

10          So I flew over to the big island of Hawaii and

11   rented a rental car, drove about an hour down south from

12   the Kona Airport down to Kanu District in the small town

13   of Na'alehu, which we heard about throughout the trial,

14   and I pulled up actually off the side of the road with the

15   same view that they showed us of Honu'apo Bay, and I sat

16   there parked for 15 minutes admiring the view they found,

17   and John Kaiser and Chris Manfredi walked down a very

18   steep hill, about a thousand feet of grade down to the

19   edge of the fence line, and yelled down to me that they

20   were on the property and instructed me to drive around in

21   my rental car back up to the property so we could meet

22   face-to-face onsite.

23   Q.    Sir, was there anything about that meeting that day

24   with John Kaiser that would suggest you had a net worth of

25   a half million dollars?

4131

1   A.    I don't believe so.

2   Q.    There came a point in time, sir, correct, that you

3   were with John Kaiser and Chris Manfredi at a different

4   location that day; is that correct?

5   A.    We spent approximately three or four hours on the

6   property, having most of our introductory conversations on

7   site.

8           As it got to be about dusk, they asked where I

9   was staying for the night.  I told them I hadn't made any

10  plans yet, so they actually invited me back to the cottage

11  that they rented in the neighboring town of Pahala where

12  the Honu'apo parcel actually was, and we had dinner at

13  their rental cabana and I stayed the night.

14  Q.    There's been introduced into evidence, sir, a Money

15  Magazine; do you recall that?

16  A.    Yes.

17  Q.    Did that in some way become part and parcel of your

18  meeting with John Kaiser and Chris Manfredi that day?

19  A.    No, it did not.

20  Q.    Did there come a point in time that it did?

21  A.    I don't believe so.

22  Q.    By the way, the Money Magazine article, is it

23  genuine?

24  A.    Yes, sir.

25  Q.    Now, is there another instance, sir, that you recall

4132

1    where John Kaiser had testified that you know to be

2    untruthful?

3    A.   Yes, sir.

4    Q.   Would you give us another example?

5    A.   John Kaiser had insinuated that a letter that he had

6    written to a joint venture partner in Hawaii, Alan Worden,

7    after he became the manager of the Hawaii partnership

8    after December 31st of 2007, he told the Court that I had

9    written that letter on his computer, and that is untrue.

10           In fact, in evidence I reviewed documents that

11   show the correspondence of the e-mail chain between John

12   Kaiser and Al Worden with respect to that initiated

13   e-mail, and references nothing about John not being the

14   authentic author of that document.

15           (Continued on next page.)

Kenner - Direct/Haley

4133

1      MR. HALEY:  May I have a moment, Judge?

2      THE COURT:  Yes.

3      MR. HALEY:  Excuse me, your Honor.

4      (There was a pause in the proceedings.)

5  BY MR. HALEY (Cont'd):

6  Q.   Mr. Kenner, I'm going to ask you to take a look at a

7  document.

8      Kindly take a look at what's been marked Kenner

9  Exhibit 202.

10  A.   Okay.

11  Q.   Do you recognize that document?

12  A.   Yes, I do.

13  Q.   What is it?

14  A.   This was the e-mail that John Kaiser had sent to

15  Allen warden, which also appears to be in response to some

16  communication that Alan Worden's chief operating officer

17  Kevin had sent to John.

18  Q.   Now, we can agree, sir, that there's no e-mail

19  designation on the top of that document, is that true?

20  A.   That is true.

21  Q.   How are you able to testify that's the e-mail?

22  A.   I had seen the actual e-mail in evidence.

23      MR. HALEY:  Your Honor, I offer that as Kenner

24  Exhibit 202.

25      MR. MISKIEWICZ:  May I voir dire?

Kenner - Voir Dire/Miskiewicz

4134

1    THE COURT: Yes.

2    VOIR DIRE EXAMINATION

3    BY MR. MISKIEWICZ:

4    Q.   Mr. Kenner --

5    A.   Yes, sir.

6    Q.   -- this document has no signature on it other than a

7    space for or a line for signature.

8         Correct?

9    A.   That is correct.

10   Q.   You didn't just see this document for the first time

11   in the few million pages that you have been reviewing.

12        You saw this quite a number of years ago, didn't

13   you?

14   A.   That is correct.

15   Q.   In fact, you produced that document in litigation

16   involving you and the United States Securities and

17   Exchange Commission.

18        Isn't that true?

19   A.   That is correct.

20   Q.   And prior to you producing it to the SEC, no one had

21   ever even seen this document before, isn't that true?

22   A.   That is untrue.

23        MR. MISKIEWICZ: We object to the admission of

24   this document.

25        THE COURT: Didn't you say it's already in

Kenner - Voir Dire/Miskiewicz

4135

1    evidence?

2              MR. HALEY:  I'm sorry, your Honor?

3              THE COURT:  Didn't you say it's already in

4    evidence?

5              MR. HALEY:  I'm offering that as Kenner

6    Exhibit -- I don't know what exhibit number -- it's Kenner

7    Exhibit 202, Judge.

8              THE COURT:  Okay.

9              MR. HALEY:  I believe there was an e-mail that

10   was previously introduced into evidence by the government.

11             I can't tell the court what document that is,

12   but I have an offer of proof.

13             THE COURT:  Why don't you approach.

14             MR. HALEY:  Thank you.

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Kenner - Voir Dire/Miskiewicz

4136

1          (Sidebar.)

2          THE COURT:  You think this is in evidence

3    already?

4          MR. HALEY:  Yes.

5          If I may, Judge, we can go back to the Kaiser

6    testimony.  This document in connection with the content I

7    believe was previously introduced into evidence by the

8    government that actually did contain the e-mail

9    designation on it, because questions were asked of the

10   government as to who provided the information contained in

11   that document and Mr. Kaiser said Phil Kenner provided

12   that information.

13         So it's most certainly an instance where the

14   government's opened the door to the introduction of that

15   document.  My client has testified that's the e-mail.  We

16   have laid a foundation by virtue of his own testimony

17   that's the e-mail.  It's a jury question as to what weight

18   or authenticity they give to the document.

19         But I believe it's already in evidence.  I can't

20   recall the exhibit number.

21         MR. MISKIEWICZ:  Mr. Kaiser was my witness.

22         I don't recall introducing it.  I do recall him

23   being asked questions about an e-mail an the contents of

24   an e-mail and I do recall him testifying as the witness

25   just said that the e-mail was written.

Kenner - Voir Dire/Miskiewicz

4137

1    I don't recall right now whether or not that

2  document ever went into evidence.

3         THE COURT:  Whether it's in evidence --

4         MR. MISKIEWICZ:  I'll withdraw the objection, or

5  I would ask that the e-mail be used, but nobody ever

6  confronted him with this document and I have no way of

7  right now being able to compare whatever the e-mail record

8  was and if counsel could help me whatever the exhibit was.

9         THE COURT:  I'm going to allow it into evidence.

10         I think through Mr. Kaiser's testimony the door

11  has been opened to allow this in.  I'll ask you to try to

12  locate the e-mail you think this came from.

13         MR. HALEY:  I will.

14         THE COURT:  And obviously if you want to recall

15  Mr. Kaiser on rebuttal you can do that.

16         MR. HALEY:  Thank you.

17         (Sidebar concluded.)

18         (Continued on next page.)

19

20

21

22

23

24

25

Kenner - Direct/Haley

4138

1              (In open court.)

2              THE COURT:  Mr. LaRusso, you have any objection?

3              MR. LARUSSO:  No, your Honor.

4              THE COURT:  202 is admitted.

5              (Whereupon, Defense Exhibit Kenner 202 was

6    received in evidence as of this date.)

7    DIRECT EXAMINATION

8    BY MR. HALEY:

9    Q.   Mr. Kenner, with reference to Kenner 202, who is

10   Alan?

11   A.   Alan is Alan Worden, who was the joint venture

12   managing member on our Hawaii project as of late August

13   2006.

14              He was introduced to myself, John Kaiser and

15   Chris Manfredi in or around the springtime, about April of

16   2006 by Masud Bhatti, B-H-A-T-T-I, from Lehman Brothers as

17   a potential joint venture partner in the subsequent $105

18   million funding we secured for the Hawaiian project.

19   Q.   And what reason would exist for John Kaiser rather

20   than yourself to be communicating with Alan Worden at that

21   time?

22   A.   As referenced in the last paragraph of the letter,

23   John Kaiser had become the managing member of Naalehu

24   Ventures which was the parent company of Little Isle IV

25   and the rest of our holding LLCs.

Kenner - Direct/Haley

4139

1        John had taken over managing member status on

2    December 31st of 2007, and from that point forward,

3    although he had participated in a very intense way with

4    both the closing and the post closing activities with

5    Alan Worden and his team, John was now in charge of 100

6    percent pursuing the $4 million milestone payments from

7    Alan Worden in addition to all of the administrative

8    issues that still needed to go on between our side of the

9    project and the control site led by Alan Worden and his

10   team.

11   Q.   What do you mean $4 million in milestone payments?

12   A.   As a portion of the deal that we struck with

13   Lehman Brothers and Alan Worden's team, which was signed

14   off in late August 2006, originally Lehman Brothers had

15   proposed to me that they would pay us $11 million at the

16   close of the deal to make our investors fairly close to

17   being whole for the invested capital we had in the deal.

18        Late in the deal, Lehman Brothers and

19   Alan Worden changed some of their tune with respect to the

20   $11 million and represented that they would pay us $7

21   million at the closing and according to some

22   Lehman Brothers committee which I was unfamiliar with,

23   determined that $4 million of the $11 would need to be

24   paid out over the subsequent 18 months.

25        It was a big sticking point for all of us

Kenner - Direct/Haley

4140

1   involved because we knew that in order to give up

2   management control of the deal and no longer have the

3   final say in how our development would proceed and actions

4   we would take to recover funds and then ultimately develop

5   the property, the $11 million made a lot of sense to us

6   because we would effectively be whole and not

7   out-of-pocket at the time, other than our outstanding loan

8   to Mr. Jowdy.

9   Q.   So when we look at that e-mail rather than reading it

10  into evidence, sir, the jury will have an opportunity to

11  read it, one of your first milestones, is that what he's

12  referring to?

13  A.   Yes, sir.

14  Q.   And given the operating agreement at that point in

15  time, the individual that had from your standpoint or to

16  your knowledge the obligation to pursue those milestones

17  on behalf of the members of Naalehu was who?

18  A.   John Kaiser.

19  Q.   After that e-mail what if any efforts did he take to

20  pursue those milestone payments on behalf of the

21  investors?

22  A.   None.

23  Q.   Now, again, when Mr. Kaiser testified, do you recall

24  him testifying to a conversation he says he had with you

25  where you told him about what happened in an Arizona

Kenner - Direct/Haley

4141

1   lawsuit with reference to the loan between you and

2   Mr. Jowdy?

3   A.   Yes, I do.

4        He told the court that I had told him the $5

5   plus million lawsuit I filed on behalf of Little Isle IV

6   in Ula Makika in the state of Arizona, John Kaiser told

7   the court that I told him the lawsuit was dismissed

8   because the judge said the loan agreement with Mr. Jowdy

9   was a forgery and that was also untrue.

10  Q.   Do you recall any other instances during the course

11  of John Kaiser's testimony where to your knowledge he

12  stated something to be untrue?

13  A.   The other items that I recall standing out had to do

14  with money that he represented was still due to him in two

15  instances in particular.

16       First, John Kaiser had referenced the $1 million

17  that he had invested into the Hawaii partners in August of

18  2005 through a deposit to Kahu holding companies.  He made

19  several representations that weren't true.

20       One was that he was unaware that any of his

21  money would be included in the loan to Mr. Jowdy, which

22  was patently untrue because, in fact, the main reason he

23  wanted to put the million dollars together was to

24  participate in the 15 percent loan to Mr. Jowdy at that

25  time.

Kenner - Direct/Haley

4142

1        Second, he testified that at the closing he had

2   received approximately $7 to $800,000 from the August 2006

3   Lehman Brothers closing, but I believe he referred to it

4   as moneys that were not related and were for other

5   purposes than the million dollars investment which is also

6   patently untrue.

7        As one of the conditions John Kaiser signing off

8   on the joint venture payment through his acknowledgment

9   and consent letter was that he wanted to be made 100

10  percent whole on the money he had invested or loaned to

11  the Hawaii partners in August of 2005, and as represented

12  on the Naalehu ventures, August 2006 bank record, John

13  Kaiser, through wire and through contractual obligations

14  was transferred I believe $1.176 million at that time.

15       So John Kaiser was the only member of the

16  Hawaiian partners that was made whole from previous

17  investments at that point in time.

18  Q.   When you refer to the Naalehu bank records, what are

19  you talking about?

20  A.   I believe we have seen them several times in

21  evidence.

22       The one I recall in particular was when Glenn

23  Murray was on the stand and we represented the $42,553

24  wire transfer that went from Naalehu's account to Glenn

25  Murray's Charles Schwab account in addition to the

4143

1    $401,000 line of credit disbursement that was made to

2    reduce the exposure in Mr. Murray's line of credit.

3    Q.   As relates to Mr. Kaiser's claim that he suffered a

4    loss as relates to what you just testified to, did he

5    further claim additional loss, yes or no?

6    A.   Could you restate that?

7         I couldn't hear the question.

8    Q.   Sure.

9         You testified that Mr. Kaiser told the jury

10   about the loss he suffered as relates to his Hawaii

11   investment.  That's what you referred to.

12        Is that correct?

13   A.   Yes, sir.

14   Q.   Did he make any other claim about a loss that he

15   sustained through investments with you, through you, that

16   you knew to be untrue?

17   A.   Yes, he did, with respect to the initial investment

18   he referred to us approximately as $1.6 million he

19   invested with me in a California beach house renovation

20   project.

21        I believe he referred to $1.6 million that he

22   invested and originally I believe he stated that he had

23   received none of that money back, but recanted shortly

24   afterwards and suggested he received maybe $300,000 back.

25        But I can assure you that through bank records

Kenner - Direct/Haley

4144

1   that have been turned over in evidence that Mr. Kaiser has

2   been paid back in full and in addition to the $1.6 million

3   he had alleged in that transaction.  In fact, I believe

4   Mr. Kaiser, through wire transfer on his behalf had been

5   transferred in the first five weeks after the closing of

6   that property approximately $1.165 million.

7            Several months later at the closing of an

8   Arizona renovation project, I also deposited $580,000 on

9   his behalf.  So we were already north of $1.6 million at

10  that point, in addition to other expenditures I made on

11  his behalf in the following years.

12  Q.   By the way, Mr. Kenner, your testimony here today is

13  not simply based on your memory of what John Kaiser

14  testified to several weeks ago.

15            Isn't that correct?

16  A.   Yes.

17  Q.   How did you refresh your recollection in terms of

18  what you are telling the jury now?

19  A.   After hearing Mr. Kaiser's testimony, which is also

20  what I did for each of the other witnesses during this

21  trial, I referred back to evidence that had been turned

22  over to us by the US Government through you and then to

23  me, and then I reviewed it on Kenner Exhibit 202.

24  Q.   In addition to doing that, did you have an

25  opportunity to actually read his testimony through what's

Kenner - Direct/Haley

4145

1   called the daily transcript?

2   A.   Yes.

3        Each day when the transcripts were complete I

4   would receive a copy from you within a day or two and I

5   have reread every day's transcript in the evenings.

6   Q.   A little out of order, Mr. Kenner, but let's talk

7   about the bottle of tequila.

8        THE COURT:  I don't think we can make it to 1

9   o'clock without a break, even though we started a little

10  late this morning.

11       Let's try to take a little shorter break and

12  then go to 1 o'clock.  Don't discuss the case.

13       (Jury leaves the courtroom.)

14       MR. HALEY:  Your Honor, I just wanted to alert

15  the court, I have a sentencing before Judge Wexler at 1

16  p.m., I don't know if the clerk advised you.

17       THE COURT:  I have a sentencing at 1:15.

18       MR. HALEY:  Okay.

19       Great.

20       THE COURT:  Okay?

21       MR. HALEY:  Thank you.

22       (Recess.)

23       (Continued on next page.)

24

25

Kenner - Direct/Haley

4146

1          (Following a recess.)

2          THE COURT:  Please be seated.

3          Let's bring in the jury.

4          MR. HALEY:  Your Honor, we will break at 1?

5          THE COURT:  Yes.

6          MR. HALEY:  Thank you.

7          (Jury enters the courtroom.)

8          THE COURT:  Everyone can be seated.

9          Go ahead, Mr. Haley.

10   BY MR. HALEY:

11   Q.   Now, Mr. Kenner, I believe before we broke

12   momentarily you referred to acknowledgment of a consent

13   letter.

14          Is that correct?

15   A.   Yes, sir.

16   Q.   I'm going to ask you to take a look at Kenner Exhibit

17   28.

18          You are entitled to read the whole document,

19   Mr. Kenner, but I believe you may have some prior

20   familiarity with that document.  So just take a look at

21   it, if you would.

22          (There was a pause in the proceedings.)

23   A.   Yes, sir.

24   Q.   Do you recognize that document?

25   A.   Yes, I do.

Kenner - Direct/Haley

4147

1    Q.    What is it?

2    A.    This is the letter from July 21, 2006, that was

3    prepared for both John Kaiser and Chris Manfredi to sign

4    as an acknowledgment and consent for their required

5    sign-off on the joint venture agreement funded by

6    Lehman Brothers.

7    Q.    Within the context of these transactions, did you

8    acquire an original or copy of that document?

9    A.    A copy of this document.

10   Q.    And how did you acquire a copy of the document?

11   A.    After all the closing documents were finalized and

12   signed off by all parties, my closing attorney out of

13   New York, a gentleman named Larry Markowitz had prepared a

14   final package for me that I received and then copied and

15   sent it on to all of my clients.

16   Q.    When you say after the closing, what closing are you

17   referring to, sir?

18   A.    The August 2006 closing with Lehman Brothers and

19   Alan Worden as the new managing partner through his entity

20   Windwalker.

21   Q.    Thank you.

22        MR. HALEY:  Your Honor, I'm offering that as

23   Kenner Exhibit 28 into evidence.

24        I don't believe there is an objection.

25        MR. MISKIEWICZ:  No objection.

Kenner - Direct/Haley

4148

1       MR. LARUSSO:  No objection, your Honor.

2       THE COURT:  Kenner 28 is admitted.

3       (Whereupon, Defense Exhibit Kenner 28 was

4   received in evidence as of this date.)

5   BY MR. HALEY:

6   Q.   Now, Mr. Kenner, as an exhibit the jury will have an

7   opportunity to read the entire document should they so

8   choose, but I want to read into the record at least a

9   portion of the response form.

10          As relates to the first paragraph of that

11  document it reads as follows, does it not:

12          I acknowledge receipt of the letter of July 21,

13  2006 of Phillip A. Kenner (the letter) to John Kaiser and

14  Christopher Manfredi regarding proposed joint venture and

15  financing transactions involving my investments in

16  Hawaiian real estate, the transactions.  I have signed and

17  dated this response form where indicated below to indicate

18  that I consent to the transactions described in the letter

19  and to make the following representations and warranties

20  to Naalehu ventures 2006, LLC, Naalehu and Mr. Kenner.

21          I'm going to just move to the second paragraph

22  which reads as follows:

23          I have been provided with the opportunity to

24  discuss any of my questions about the transactions,

25  Naalehu and joint venture with Phillip A. Kenner and

Kenner - Direct/Haley

4149

1    representative office the joint venture, as well as access

2    to all information about them that I have requested.  I

3    confirm that, in making my decision to consent to the

4    transactions, I have relied, as to legal, tax, and all

5    other matters, on independent investigations made by me

6    and my advisors, if any, and that I have investigated the

7    transactions to the full extent I deemed advisable.

8              Now, sir, with reference to that specific

9    document, Kenner Exhibit 28, and the response form as

10   indicated, in addition to receiving Kenner Exhibit 28 from

11   Mr. Markowitz, the closing attorney, did you receive any

12   other documents of this nature from him?

13   A.    There was a similar document that was sent out to all

14   the members of Little Isle IV in which each of them were

15   required by Lehman Brothers as a mandatory obligation of

16   the sign-off and funding of the deal to be returned to

17   Mr. Markowitz on our group's behalf as well.

18   Q.    And would that include hockey player clients that

19   testified in this proceeding?

20   A.    Each and every one of them.

21   Q.    Let's talk about the bottle of tequila because

22   Mr. Kaiser did testify about the tequila bottle.

23              Is that correct, sir?

24   A.    Yes, sir.

25   Q.    In what respect was his testimony untruthful as

4150

1    relates to what he told the jury about the tequila bottle?

2    A.   Specifically everything.

3         In detail, I have never possessed any of those

4    bottles or any similar version of those bottles that were

5    represented on the government's exhibit on the one-page

6    web page that was designed by a friend of mine.  Those

7    bottles have never been manufactured nor any similar

8    replica of them.

9         Next, I have never had any of that tequila in

10   the United States whatsoever.  I never received an import

11   license for the tequila, nor have I ever imported any of

12   that tequila into the United States.

13        Next, I don't believe I have ever been in

14   communication, that I recall, with a distributor friend of

15   Mr. Kaiser's who had requested bottles from me, nor have I

16   ever shipped any tequila to Mr. Kaiser in any form by UPS,

17   FedEx or any other US postal means.

18   Q.   Now, towards the conclusion of the government's case,

19   the jury saw a business card that had some relevance to

20   the tequila bottle issue.

21        Is that correct?

22   A.   Yes, I did see that.

23   Q.   Would you tell the jury what the tequila bottle is

24   all about, as you know?

25        What are we talking about?

Kenner - Direct/Haley

4151

1    A.    In or about 2008, when I was in settlement

2    discussions with Mr. Jowdy in Mexico between our

3    lawyers -- our various lawyers and Mr. Constantine as a

4    mediator, I had begun to pursue putting a brand together

5    for tequila, after six years I enjoyed tequila and in

6    Mexico seemed to be the beverage of the day down there.

7           As a result I was introduced through one of my

8    attorneys to a distributor and a manufacturer down in

9    Mexico, and in late 2008 I began to take very rudimentary

10   steps to put together a brand and an identity in Mexico,

11   which included spending about $9.95 at Vistaprint to get

12   that box of business cards.

13          So after 2009, every effort that I had made with

14   respect to starting a brand in Mexico, which didn't amass

15   to much, was put on hold when negotiations were ceased in

16   our settlement discussions with Mr. Jowdy and his

17   attorney, Mr. Harvey at the time.

18   Q.    Now, you speak of an attorney that was involved.

19          Who was that attorney?

20   A.    The attorney was Rubin Pollos.

21   Q.    There's been testimony, sir, of transfers from

22   Hawaiian accounts to Mr. Pollos.

23          Am I correct on that?

24   A.    No.

25          I believe you are referring to transfers from

Kenner - Direct/Haley

4152

1   the Global Settlement Fund to Mr. Pollos.

2   Q.   Excuse me, correct.

3          What if any relationship did Mr. Pollos have

4   with reference to any Jowdy litigation?

5   A.   Everything.

6          Mr. Pollos was one of the myriad of Mexican

7   attorneys I had employed since about 2007 to explore all

8   of my investor and options to recapture our equity

9   ownership interests in the two Mexican resorts in addition

10   to the tens of millions of dollars of loans that were

11   outstanding and unpaid by Mr. Jowdy at the time, and

12   several other business dealings we had with him in Mexico

13   as well.

14   Q.   Mr. Kenner, the moneys that were transferred from GSF

15   to Mr. Pollos that has been referred to in evidence, were

16   those moneys sent to him for purposes of you developing

17   your tequila bottle brand or were they sent to him for

18   purposes of the pursuit of Ken Jowdy, who is in Mexico

19   where most of his assets are located?

20   A.   100 percent to pursue Mr. Jowdy.

21   Q.   Moving on to Mr. Berard.

22          Were you present when Brian Berard testified

23   before this court and jury?

24   A.   Yes, sir.

25   Q.   At the point in time Mr. Berard testified, would you

Kenner - Direct/Haley

4153

1  kindly describe to the court and jury the nature of your

2  relationship with him at that time?

3  A.    Probably more hostile and adverse than Mr. Kaiser.

4  Q.    Now, with reference to what he testified to for the

5  jury, were there aspects of his testimony, sir, that you

6  knew to be untrue?

7  A.    Yes.

8  Q.    Can you give us an example?

9  A.    I believe Mr. Berard had testified that he was

10  unaware that his line of credit that was established as

11  part and parcel to his capital account investment in

12  Hawaii was to be used for loans for Mr. Jowdy in Mexico.

13        And one of the preliminary meetings I had with

14  respect to loaning money or the potential of loaning money

15  to Mr. Jowdy occurred during the NHL 2004-2005 lockout

16  when I believe Mr. Berard testified he traveled to Hawaii

17  to spend time with Mr. Kaiser and we spent a lot of time

18  during that visit discussing the fact that we had already

19  lent Mr. Jowdy pursuant to previous discussions and the

20  signing of a loan agreement with Mr. Jowdy, Mr. Berard was

21  one of the guys who was very much in support of continuing

22  the loan amounts and increasing the amounts to Mr. Jowdy

23  as necessary to support the ongoing development in Mexico.

24  Q.    Why?

25  A.    Mr. Berard had already invested $500,000 at Diamante

Kenner - Direct/Haley

4154

1    del Mar in or about 2003.

2            He knew and had taken an active role in

3    promoting that development to a number of his teammates

4    and other friends and people around the NHL.  He knew that

5    at that time in 2004-2005 we were looking to develop our

6    new primary site in Cabo San Lucas as opposed to in the

7    north Baja peninsula and Mr. Berard came down in December

8    of 2004 to Cabo San Lucas to view several of the potential

9    Diamante future sites.

10           So he was very interested, and actually spent a

11   lot of time back with me in those days understanding every

12   nuance that he could.  One of the nice things about

13   dealing with Mr. Berard back in those days is that he had

14   a family attorney which I believe he testified to in this

15   courtroom that would review all of his documents and

16   transactions before they would take place.

17           So I felt good and comfortable talking to him

18   about a lot of the details, specific details that were

19   going on, on a very regular basis.

20   Q.   Mr. Kenner, some of the government witnesses on

21   various questions, I believe even Mr. Berard, seemed to

22   have a failure of recollection on some of these events.

23           Do you recall that testimony?

24   A.   Yes, sir.

25   Q.   Do you know what would cause that failure of

4155

1   recollection?

2   A.   I do not.

3   Q.   Now, with reference to Mr. Berard's testimony as

4   relates to whether he ever received any money from his

5   investments in Hawaii, do you recall his answer to that

6   question?

7   A.   Yes, I do.

8        I believe Mr. Berard said that he did not

9   receive any money back from the Hawaiian project, but in

10  addition to being untrue, I believe he also had received

11  or in fact I know he received $42,553 in relation to his

12  $100,000 cash investment.

13       And if memory serves me right I believe he

14  received a line of credit paid down of approximately

15  $282,000 at that August 2006 closing.  Subsequent to the

16  closing, in addition to Mr. Berard, I spoke on the same

17  context with the other seven line of credit note holders

18  and alerted them not only to the pay downs of their

19  existing lines, but had discussed their ability to reduce

20  their collateral commitment at this point to the Hawaiian

21  project if they so choose -- chose to and Mr. Berard was

22  one of the guys that went through the papering process

23  with Alan Mascarella to do so.

24  Q.   We'll explore that a little later for the jury, but

25  thank you.

Kenner - Direct/Haley

4156

1          As relates to Mr. Berard's testimony in

2    connection with his knowledge of the use of his line of

3    credit, do you recall testimony in that respect?

4    A.    Yes.

5          I believe that he testified that he was unaware

6    of the use of it with respect to the loan to Mr. Jowdy and

7    that was simply untrue.

8          MR. HALEY:  Quick moment, Judge.

9          (There was a pause in the proceedings.)

10   BY MR. HALEY:

11   Q.    Sir, as relates to Mr. Berard, with reference to his

12   correspondence between himself and Northern Trust, do you

13   recall what he had to say about whether or not there was

14   communications between he and Northern Trust concerning

15   his account?

16         MR. HALEY:  Withdrawn.

17   BY MR. HALEY:

18   Q.    Let me ask you this, sir.

19         Kindly take a look at two documents, I'll have

20   you look at them together, marked Kenner Exhibit 203 and

21   204.

22   A.    Yes, sir.

23   Q.    You recognize those documents?

24   A.    Yes, I do.

25   Q.    What are they?

Kenner - Voir Dire/Miskiewicz

4157

1  A.   They are text messages that I was sent by Brian

2  Berard, one of them in October of 2008, and one of them in

3  April of 2009.

4  Q.   How did you acquire copies of those text messages?

5  A.   They were turned over to you during discovery during

6  this pretrial process.

7           And then you subsequently turned them over to

8  me.

9  Q.   Where did I receive them, to your knowledge?

10  A.   You received them from the US Government.

11  Q.   Sir, to your knowledge, are these text messages as

12  set forth in these two documents fair and accurate

13  reproductions of a text message between yourself and Brian

14  Berard as indicated by the dates set forth on each

15  document?

16  A.   Yes, sir.

17           MR. HALEY:  Your Honor, I offer them as Kenner

18  Exhibits 203 and 204.

19           MR. MISKIEWICZ:  May I have a voir dire?

20           THE COURT:  Yes.

21  VOIR DIRE EXAMINATION

22  BY MR. MISKIEWICZ:

23  Q.   Mr. Kenner, I'm going to ask you to look at -- I

24  don't have the numbers here, but the one that begins with

25  3063, is that one of them?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Kenner - Voir Dire/Miskiewicz

4158

1    A.    Yes, sir.

2    Q.    Is that's Exhibit 204, do you know where this text

3    message actually resides, what kind of a machine?

4    A.    During the discovery process, the US Government

5    turned over approximately 89,000 text messages to my

6    attorney who subsequently turned them over to me, which

7    were taken off of my iPhone.

8    Q.    So this -- you will agree this doesn't look like the

9    text messages, some of which have been shown in the trial.

10         Correct?

11   A.    That is correct.

12   Q.    It's not a screen shot of a text message?

13   A.    No, sir.

14   Q.    This is a text message that's in some other format.

15         Do you even know what some of these characters

16   mean?

17   A.    I believe I could describe each one of them.

18   Q.    Okay.

19         Go ahead.

20   A.    The number 3063 was the sequential file number on the

21   text delineated document that was given to me.

22         Plus 14015246929 was Mr. Berard's cell phone

23   number at the time from Rhode Island.  Brian Berard is the

24   name.  The asterisk appeared in all of the text message

25   delineated files.

Kenner - Voir Dire/Miskiewicz

4159

1        Then next to that in the next box is 10/1/2008,

2   which is the date that it was received, at time 201 in the

3   morning and 43 seconds and then UTC plus zero I'm assuming

4   was just a test phone reference to whatever time zone

5   stamp that the iPhone was using.

6        The next column says read, which indicates that

7   the message was sent to me and received on my end and then

8   the text message it is, I didn't FedEx docs back to you.

9   I'll give them tomorrow to you was the what would have

10  appeared in the bubble text.

11  Q.   And all --

12  A.   And I can go through Exhibit 203 if you look, sir.

13  Q.   That's fine.

14       And this is all what was in your phone, correct?

15  A.   Yes, sir.

16  Q.   So the government produced for you some tens of

17  thousands of documents that you already possessed.

18       Right?

19  A.   Since my arrest I didn't possess any documents --

20  other than what was turned over by the US Government.

21  Q.   You are saying this was in your phone?

22  A.   Yes, sir.

23  Q.   And beyond whatever you had in your phone, do you

24  have any other indication that this actually existed, this

25  actually went or was received by anybody?

Kenner - Direct/Haley

4160

1   A.   These two e-mails, Kenner Exhibit 203 and 204 were

2   both received by me.

3   Q.   And you have an independent recollection of that?

4   A.   Yes, sir.

5   Q.   Okay.

6        MR. MISKIEWICZ:  No further questions, and on

7   this note, and no objection.

8        MR. HALEY:  No objection, your Honor.

9        THE COURT:  203 and 204 are admitted.

10       MR. HALEY:  Thank you.

11       (Whereupon, Defense Exhibits Kenner 203 and 204

12   were received in evidence as of this date.)

13  DIRECT EXAMINATION

14  BY MR. HALEY:

15  Q.   Mr. Kenner, taking a look at 203 you see for purposes

16  of the record the text --

17       THE COURT:  Mr. Haley, just run your hand over

18  it so it focuses.

19       THE WITNESS:  Thank you, your Honor.

20  BY MR. HALEY:

21  Q.   We see -- well, it speaks for itself but I'll read

22  the text portion of it.

23       No rush, it's about NT line of credit and sign

24  the Schwab FedEx from Stef.

25       Do you have an understanding as to the meaning

Kenner - Direct/Haley

4161

1    of those words, sir?

2    A.    Yes, sir.

3    Q.    And what is the meaning of those words?

4    A.    In April of 2009 was the two -- the end of the

5    two-week period of time that Northern Trust had notified

6    all of the line of credit holders on or about March 19th

7    of 2009, that their collateral was being seized from their

8    loan accounts.

9              After a number of conversations with Mr. Berard,

10   he was -- he had another question about the Northern Trust

11   line of credit and our subsequent plans to pursue

12   Mr. Jowdy through litigation for the repayment of the loan

13   funds that -- some of which had come from these loans.

14             And, at the same time, all of the line of credit

15   holders were aware that we had attempted for four to five

16   months to transfer these loans to Bank of America which

17   Michael Peca testified to his awareness of that while he

18   was in front of this court --

19             MR. MISKIEWICZ:  Objection.

20             It's not responsive to the question.

21             THE COURT:  No.  Overruled.

22             You can finish the answer.

23   A.    And following the four to five-month negotiation with

24   Bank of America to attempt to transfer both their

25   investment accounts and their lines of credit, which

Kenner - Direct/Haley

4162

1    failed at the time due to the complexity of the

2    transaction and the time constraints from Northern Trust,

3    I contacted Charles Schwab -- although it's misspelled

4    there -- where a number of the accounts had previously

5    been held.

6              And the advisor at Greenberg Ram and Associates

7    and the institutional custodians at Charles Schwab had

8    agreed to take the loans back from us and give us a very

9    favorable deal.  If I remember correctly it was going to

10   be either a six or a nine-month period of time where they

11   weren't going to charge us any interest payments which

12   would have worked out very nicely for all of the line of

13   credit holders while we initiated our litigation in the

14   state of Arizona against Mr. Jowdy.

15             The Schwab --

16   Q.   Do you know who Stef is?

17   A.   Stef was my former assistant, and she had sent a

18   FedEx to each of the line of credit holders with the

19   transfer documents that they needed to transfer to sign

20   and transfer, and Mr. Berard was just asking a question

21   about that.

22             But every one of them had FedExed the transfer

23   documents back to Charles Schwab using my FedEx account

24   number.

25   Q.   Well, with reference to Kenner Exhibit 204, as

Kenner - Direct/Haley

4163

1    relates to the content of that, I didn't FedEx docs back

2    to you, I will give them tomorrow to you.

3            Did you have an understanding as to the meaning

4    of that text?

5    A.    Yes.

6            As normal protocol with my clients, when there

7    were banking documents or other important legal documents

8    that needed to be signed, my assistant at the time or

9    myself would send the packages to the clients by FedEx,

10   and typically that was the only way we could get them to

11   them because they were traveling with their NHL teams at

12   the time.

13           We usually only had a one-day window to get them

14   to the individuals and I guess I must have alerted

15   Mr. Berard at the time that I was going to fly into town

16   to meet with him for whatever reason, which was my normal

17   business practice.

18           So he was holding those FedEx documents instead

19   of mailing them back to me.

20   Q.    I'm going to show you three documents already in

21   evidence, a document Kenner Exhibit 88 and, sir, just

22   going to the last page of the document --

23   A.    Yes, sir.

24   Q.    -- whose signature appears on that document?

25   A.    Brian Berard.

Kenner - Direct/Haley

4164

1  Q.   And would you simply explain, sir, without going page

2  by page, your understanding of the purpose of this

3  document.

4         First of all, what is the document entitled?

5  A.   The document is limited liability company agreement

6  of Little Isle IV and it's dated April 26, 2006.

7  Q.   And though the document speaks for itself, sir, in

8  terms of the content of the document by way of the

9  language and the words, rather than have you read the

10  paragraphs in all 11 pages of that document, would you

11  describe to the court and jury how that document came to

12  be created and its purpose.

13  A.   Yes, sir.

14         As one of the preliminary steps to completing

15  the $105 million funding agreement with Lehman Brothers

16  and Alan Worden at Windwalker, we were restructuring and

17  redocumenting each one of the Hawaiian entities that would

18  eventually roll up into Naalehu Ventures as member

19  entities.

20         Our legal counsel at the time, Larry Markowitz

21  as well as cocounsel, Bill Najam and other attorneys out

22  of Carlsmith Ball in Hawaii created this limited liability

23  operating agreement which documented at the time on page

24  ten each of the members and the percent interest in the

25  Little Isle IV entity.

Kenner - Direct/Haley

4165

1        Now that we had a definitive point in time that

2    the capital contributions or the investment dollars had

3    been deposited prior to the Lehman Brothers closing, it

4    was a memorialization of all of the Little Isle IV members

5    at that point in time.

6    Q.    With reference to their percentage interest, as

7    reflected on what page, sir?

8    A.    Page ten.

9    Q.    At that point in April of 2006, was that percentage

10   interest indeed the percentage interest that each one of

11   them held in Little Isle IV as a limited liability

12   corporation?

13   A.    Yes, it was.

14   Q.    Incidentally, sir --

15          MR. HALEY:  Withdrawn.

16   BY MR. HALEY:

17   Q.    Sir, I'm going to ask you to take a look at Kenner

18   Exhibit 93 in evidence.

19   A.    Yes, sir.

20   Q.    And what is that?

21   A.    Kenner Exhibit 93 is an acknowledgment and consent

22   letter for all of the members of Little Isle IV that was

23   drafted in concert by Larry Markowitz, Bill Najam as my

24   attorneys, and the corporate attorneys and myself to

25   represent all of the deal points to each of the members of

Kenner - Direct/Haley

4166

1    Little Isle IV and ultimately ask them with respect to the

2    disclosures enclosed for their acknowledgment and consent

3    to sign off on the transaction.

4    Q.    And that happens to be the one that actually Brian

5    Berard actually signed.

6            Is that correct?

7    A.    On the last page, that's correct.

8    Q.    Okay.

9            THE COURT:  Mr. Haley, it's 1 o'clock.

10           Is this a good point to break?

11           MR. HALEY:  Thank you, Judge.

12           Thank you.

13           THE COURT:  We'll take the lunch recess and

14    reconvene at 2 o'clock.

15           Don't discuss the case.  Have a good lunch.

16           (Jury leaves the courtroom.)

17           (Luncheon recess.)

18           (Continued on next page.)

19

20

21

22

23

24

25

4167

1          A F T E R N O O N    S E S S I O N

2

3                THE CLERK:  All rise.

4                THE COURT:  Please be seated.

5                Mr. Kenner, you can come up to the witness

6      stand.

7                Let's bring in the jury.

8                (The witness resumes the stand.)

9                MR. MISKIEWICZ:  Your Honor, just briefly, we're

10     going to have an issue regarding Kenner 202.

11               Rather than delay the afternoon, we would like

12     to bring it up after the jury leaves today.  We have an

13     argument with regard to the admissibility of 202.

14               MR. HALEY:  It was the Alan Worden letter.

15               THE COURT:  It's already in.

16               MR. HALEY:  There may be a --

17               MR. MISKIEWICZ:  I would like to be heard.  I'll

18     wait until the end of the day.

19               THE COURT:  All right.

20               THE CLERK:  All rise.

21               (The jury is present.)

22               THE COURT:  Please be seated.

23               All right, Mr. Haley, go ahead.

24               MR. HALEY:  Thank you, Judge.

25

Kenner  -  Direct/Haley

4168

1    BY MR. HALEY:

2    Q.    Mr. Kenner, you were also present in Court, sir, when

3    Lani Donlan testified.

4          Do you recall her testimony?

5    A.    Yes, sir.

6    Q.    Now at the point in time that she testified, what was

7    your understanding of her relationship with Bryan Berard?

8    A.    They were best friends.

9    Q.    Do you know, sir, how long that relationship between

10   the two of them existed before her testimony?

11   A.    I believe they were best friends long before I met

12   Ms. Donlan in 2004.

13   Q.    Was there anything untruthful, sir, about her

14   testimony?

15   A.    All of her representations about the incidents

16   surrounding my tracing of signatures, my visitation to her

17   office at Prudential real estate, I've never been to her

18   office in Boston, her real estate office.

19          I think she represented that I met her boss Mike

20   Lane that day.  I've never met Mike Lane, to the best of

21   my recollection, at any point in time.

22          She represented that there was a significant

23   number of signatures on the page that she was assisting me

24   in tracing and/or scanning that day, and I don't recall in

25   any of the documentation I reviewed in this case, the two

4169

1  million documents, any document that I was ever present

2  that had a significant number of my clients' signatures

3  related to the Hawaii bank transactions all on one page

4  from 2005.

5  Q.   Sir, Michael Peca had testified during the course of

6  the proceeding.

7       Do you recall his testimony?

8  A.   Yes, sir.

9  Q.   And with reference to his testimony as relates to the

10  lines of credit, what is your knowledge as to the nature

11  and extent of his awareness of his line of credit and its

12  use?

13  A.   Mr. Peca was completely aware of the establishment of

14  his line of credit and the purpose behind it.

15       In addition, Mr. Peca had originally in our

16  conversation had inquired about how much money he could

17  invest in the Hawaii project through the use of his line

18  of credit.

19       And we originally established a $1.6 million

20  line of credit when he signed his first document.  I

21  believe that you had presented four documents that

22  Mr. Peca signed on different dates when he was on the

23  stand.

24       At four times in the first 365 days that his

25  line of credit was open, somewhere between month six and

Kenner  -  Direct/Haley

4170

1    month nine, Mr. Peca had asked if there was the ability

2    for him to increase his line of credit after we discussed

3    the fact that he had already replenished Mr. Nolan's line

4    of credit to the tune of $1.25 million, his buy-in into

5    the project.

6              And I informed Mr. Peca, after speaking to the

7    lender at the time at Northern Trust bank, I think his

8    name was Ed Lerner, I believe he told me that Mr. Peca's

9    line of credit could be increased to $1.775 million

10   without any additional collateral being transferred to the

11   bank.

12             So somewhere between month six and month nine

13   Mr. Peca's line of credit being open, we increased it to

14   the tune of another $175,000.

15   Q.   Sir, would you kindly take a look at --

16             MR. MISKIEWICZ:  Your Honor, may we approach?

17             (Continued on next page.)

18

19

20

21

22

23

24

25

Kenner  -  Direct/Haley

4171

1        (The following takes place at sidebar.)

2        MR. MISKIEWICZ:  I did object to Mr. Kenner's

3    responses to questions as being overly broad or not

4    responsive.  I'm renewing the objection.

5        This last answer went well beyond what was posed

6    to him.  And, moreover, he's weaving into this

7    conversations he has with other third-parties that are

8    being offered really for the truth.  I don't know what

9    else they're offered, about some guy at some bank who said

10   Mr. Peca's line of credit could be raised to 1.775 million

11   with no collateral.

12       I don't want to breakup the direct, but the

13   answers are weaving all kinds of both non-responsive

14   information as well as hearsay and that's my objection.

15       THE COURT:  The hearsay -- obviously, what this

16   defendant understood his state of mind to be regarding

17   Mr. Peca, what's being told by him or by the bank goes to

18   his state of mind and whether or not he was defrauding him

19   or not.  So --

20       MR. MISKIEWICZ:  Maybe a limiting instruction

21   along those lines as was the case with a number of

22   documents.

23       THE COURT:  Yes.

24       On the non-responsiveness, I don't think it's

25   productive to have Mr. Haley -- he's clearly asking about

Kenner  -  Direct/Haley

4172

1   the line of credit.  He's sticking to the line of credit.

2   If it went beyond the line of credit, I would sustain the

3   objection.

4         When you say he's weaving in, he's making clear

5   where the other information is coming from.  So although

6   he's referring to maybe what he told Mr. Peca and what he

7   learned from the bank, it relates to the line of credit

8   and he's trying to explain the circumstances surrounding

9   the line of credit.

10         As long as it sticks to the topic, even if it

11  weaves in multiple conversations, as long as he's clear as

12  to who is telling him what, I will allow it.

13         MR. MISKIEWICZ:  Okay.

14         MR. HALEY:  I am doing my best to ask

15  non-leading questions.

16         THE COURT:  You're doing fine.

17         (Continued on next page.)

18

19

20

21

22

23

24

25

Kenner  -  Direct/Haley

4173

1           (The following takes place in open court.)

2           THE COURT:  Members of the jury, let me give you

3      a limiting instruction regarding some of Mr. Kenner's

4      testimony just now and I won't keep giving you this

5      instruction.

6           I will make sure you understand generally how

7      this works.

8           To the extent that Mr. Kenner is reporting what

9      other people told him, for example what he learned from

10     Northern Trust bank or what he learned from Mr. Peca or

11     any other third-party, you can consider that not

12     necessarily for the truth of what that third-party was

13     telling him, but for his state of mind.

14          One of the key issues in the case is what is

15     Mr. Kenner's state of mind.  So he's allowed to testify,

16     even though it normally would be hearsay, he's allowed to

17     testify as to what information he was receiving from a

18     variety of source in terms of the transactions and what he

19     understood to be someone's awareness or non-awareness of

20     certain issues.

21          So it's being considered for his state of mind,

22     but not necessarily for the truth of what the person was

23     telling him.  I hope that's clear.

24          Go ahead, Mr. Haley.

25          MR. HALEY:  Your Honor, I'm going to return to

4174

1    the government device number one.

2    BY MR. HALEY:

3    Q.    Mr. Kenner, would you kindly take a look at two

4    documents marked Kenner Exhibit 205 and Kenner Exhibit 206

5    respectively, and I'll ask you questions with reference to

6    both documents.

7              Do you recognize both those documents?

8    A.    Yes, sir.

9    Q.    What are they?

10   A.    These are text messages that I received from Michael

11   Peca, one dated March 11, 2009, and a second one about 15

12   months later in June 13 of 2010.

13   Q.    Now those are, as depicted on those documents,

14   blocked out as text messages; is that correct?

15   A.    Yes, sir.

16   Q.    How did you acquire those particular documents,

17   specifically Kenner Exhibit 205 and Kenner Exhibit 206?

18   A.    Both Kenner Exhibits 205 and 206 were received

19   through discovery in this case prepared by the U.S.

20   Government, delivered to you, and then subsequently

21   delivered to me.

22   Q.    Are those text messages fair and accurate

23   reproductions of the text messages that were contained on

24   either your iPhone or your laptop computer?

25   A.    Yes, sir.

Kenner  -  Direct/Haley

4175

1    MR. HALEY:  Your Honor, I offer them as Kenner

2   Exhibits 205 and 206 respectively.

3    MR. MISKIEWICZ:  No objection.

4    MR. LARUSSO:  No objection.

5    THE COURT:  K 205 and 206 are admitted.

6    (Defense Exhibits K 205 and 206 in evidence.)

7   BY MR. HALEY:

8   Q.    Sir, this particular exhibit 205, can you describe

9   the circumstances under which you received the content of

10  that particular text message?

11  A.    Yes.

12          Mr. Peca and I had been discussing the status of

13  the loans to Ken Jowdy at that time and our desire as a

14  group of investors in the Hawaii project to either

15  continue to pay the monthly payments towards the lines of

16  credit to keep them current, or to let them go into

17  default and spend our resources pursuing Mr. Jowdy in

18  civil litigation at that time.

19          And Mr. Peca, in the second sentence, also got

20  another late notice from NT, Northern Trust bank, and is

21  referring to the fact that he was receiving loan

22  statements monthly at his home and realized that another

23  one of our loan statements were presented that it was late

24  and hadn't been paid.

25  Q.    There's another sentence there, sir, and perhaps it

4176

1    speaks for itself, but how did you take that remark?

2    A.    Mr. Peca was one of my clients who was always very

3    concerned about his credit, so it was a common theme

4    amongst us for years.

5    Q.    Were you insensitive to that, sir, that concern on

6    his part about his credit in any respect?

7    A.    Not in any respect was I insensitive to it.

8          We were realists at the time talking about what

9    the status of the loans were and how we wanted to proceed,

10   but it was an important issue to Mr. Peca so we certainly

11   addressed it.

12   Q.    Would you kindly take a look at Kenner 206.

13   A.    Can you focus that for me, please?

14   Q.    Yes.

15         Though the words are easily discernable, can you

16   simply describe what was your understanding of the content

17   of that e-mail at that point in time, and this is

18   occurring on what date, sir?

19   A.    This text message was sent to me on June 13 of 2010

20   about 8:00 at night from Mr. Peca to myself.

21         And he was asking with reference to our

22   decisions about 15 months earlier when we allowed the line

23   of credit to go into default and the collateral to be

24   seized, he was just referencing the fact that he was aware

25   that all of his line of credit, which at the time was

Kenner  -  Direct/Haley

4177

1   about 1.775 million was actually represented in his

2   ownership percentage in the Hawaii company, and he was

3   just checking on the status of the Hawaii capital account

4   and the Mexican capital accounts with Jowdy that we were

5   pursuing through litigation at that time.

6   Q.   When you say Hawaii capital account, could you be

7   more specific.

8        Where was his Hawaii capital account held in

9   terms of a corporate entity?

10  A.   He was a member of Little Isle IV, which I believe

11  was a 29 percent and change owner of Na'alehu Ventures

12  after the August 2006 joint venture with Lehman Brothers

13  funding us.

14  Q.   When he says Mex, that means what?

15  A.   He was referring to both entities in Mexico, the

16  Diamante Del Mar project which Mr. Jowdy had let go into

17  foreclosure at that time, and he was wondering what had

18  happened to the $500,000 investment through Mr. Jowdy, and

19  also was curious if we continued to make any progress with

20  Mr. Jowdy after the mediation had broke down in February

21  of 2010, and our subsequent decision through Ron Richards

22  to dismiss without prejudice the pending lawsuit in

23  California at that time.

24  Q.   Now, let me ask you this, Mr. Kenner.

25        Having received that e-mail from Michael Peca on

4178

1  or about June 13, 2010, what, if any, efforts did you take

2  to respond?

3  A.   At that time I would have called Michael Peca back to

4  discuss the details, because the issues he's referring to

5  there would have required more than just a simple one or

6  two line response.

7          So we would have spoken on the phone in or about

8  that date in order to discuss where we were in the

9  different cases and different actions we were continuing

10  to take.

11  Q.   Sir, I'm going to ask you to take a look at Kenner

12  exhibit 21 already in evidence.

13          Do you recall that e-mail?

14  A.   Yes, I do.

15          THE COURT:  Mr. Haley, you keep saying e-mail.

16          MR. HALEY:  Excuse me, Judge.  Thank you.  Text

17  messages.  Thank you.

18          THE WITNESS:  Thank you, your Honor.

19  BY MR. HALEY:

20  Q.   Would you kindly take a look at Kenner exhibit 21 in

21  evidence.

22          I know I had asked a question previously of

23  Mr. Peca as relates to that, but could you explain to us

24  what was your understanding in connection with the e-mail

25  you received from Mr. Peca as relates to the content of

Kenner  -  Direct/Haley

4179

1    that e-mail -- excuse me -- text message.

2    A.   Mr. Peca was one of my clients who made fairly

3    regular requests to have his files updated and to go

4    through documents he received in the mail.

5        And at the time I wasn't sure why he didn't have

6    any Mexico documents, but I recall speaking to him after

7    that reminding him that he had received the operating

8    agreements at the closing shortly after the closing in

9    March 2006 of the Diamante Cabo San Lucas transaction.

10       And I recall telling Mr. Peca that our

11   communication with Mr. Jowdy and his chief operating

12   officer Mr. Najam had effectively ceased by 2009, and that

13   he should contact Mr. Najam directly to get a copy of his

14   original subscription agreements for the $500,000 Diamante

15   Del Mar project.

16   Q.   With reference to the I have A-S-H-T-L-O-A-D of

17   Hawaii docs, what was your understanding of what he meant

18   by Hawaii docs?

19   A.   He was specifically referring to the four binders

20   that Darryl Sydor had sent to us after he left the

21   courtroom, which were the closing documents and joint

22   venture agreements between Lehman Brothers, Alan Worden

23   and Windwalker and our entity Na'alehu Ventures 2006, in

24   addition to his signed copies of the Little Isle IV 2006

25   acknowledgment and consent letter, and the 2006 Little

Kenner - Direct/Haley

4180

1  Isle IV operating agreement.

2  Q.   Now, as relates to your testimony in that regard,

3  removing from Government's Exhibit 770, are these the

4  documents you just referenced in your last answer, sir,

5  yes or no?

6  A.   Yes.

7         (Pause in proceedings.)

8  Q.   Mr. Kenner, kindly take a look at Kenner Exhibit 22

9  for identification.

10  A.   Yes, sir.

11  Q.   What is that document?

12  A.   This is a text message I received from Kristen Peca,

13  Michael Peca's wife, on March 21st, 2009, about 1:30 in

14  the afternoon, referencing the March 19 Northern Trust

15  default letters.

16  Q.   Sir, before you testify to the content, as relates to

17  that particular document, you said it's a text message

18  received from Kristen Peca; is that correct?

19  A.   Yes, sir.

20  Q.   How did you acquire that document?

21  A.   That document was part of the discovery that was

22  turned over by the U.S. Government to you, and

23  subsequently to me for in evidence.

24  Q.   Now, as relates to this document, is this a fair and

25  accurate reproduction of a text message that was contained

4181

1   either on your iPhone or on your computer?

2   A.   Yes, sir.

3          MR. HALEY:  Your Honor, I offer that as Kenner

4   Exhibit 22.

5          MR. MISKIEWICZ:  No objection.

6          MR. LARUSSO:  No objection, your Honor.

7          THE COURT:  K 22 is admitted.

8          (Defense Exhibit 22 in evidence.)

9   BY MR. HALEY:

10  Q.   With reference to the content of K 22, sir, could you

11  explain to us your understanding of the content of that

12  message as conveyed to you by Kristen Peca?

13  A.   Yes.

14         Subsequent to -- excuse me -- prior to receiving

15  this text message, Michael Peca and I had discussed the

16  status of the lines of credit and what our collective

17  decision was with respect to the pending default.

18         And it was somewhat unusual for Kristen Peca to

19  text me, but this was one of the ones that I did review

20  during discovery.

21         She had received the FedEx from Northern Trust

22  bank, referring to the March 19 letter of the defaults on

23  the line of credit and the subsequent collateral seizure,

24  and she was asking what was handled already, and that was

25  referring to the fact that we had at that point been

Kenner  -  Direct/Haley

4182

1   talking to the people at Charles Schwab and Lee Graham

2   Associates to take the lines of credit and underlying

3   collateral and transfer them over.

4           She's referring to the fact that my assistant,

5   Stephanie, had -- whether or not my assistant Stephanie

6   had prepared the transfer documents to Charles Schwab at

7   that point in time and sent them off to her.

8   Q.    Got a FedEx yesterday.

9           You took that to mean what it is, FedEx means a

10  document received from Federal Express, correct?

11  A.    Yes, sir.

12  Q.    Incidentally, Mr. Kenner, at any point in time did

13  you ever interfere with the delivery of mail to your

14  clients through the United States Postal Service?

15  A.    No, sir.

16  Q.    Now, Kristen Peca had testified that she had recorded

17  surreptitiously any number of conversations between you

18  and her.

19          Do you recall that testimony?

20  A.    Yes, sir, I do.

21  Q.    Did you have an opportunity, sir, before today, to

22  listen to those tape recordings?

23  A.    Yes, sir.

24  Q.    To your knowledge, how many hours of secretly

25  recorded conversations did she make of conversations

Kenner - Direct/Haley

4183

1    between you and her?

2    A.   I believe the recorded conversations between Michael

3    Peca and Kristen Peca and I were approximately four hours

4    and 56 minutes.

5    Q.   Did you have any idea you were being recorded?

6    A.   No, sir.

7    Q.   Were you in any way guarded in your conversations

8    with her during the course of those surreptitiously

9    recorded verbal exchanges?

10   A.   No, sir.

11   Q.   As related to Kristen Peca's testimony, was there an

12   aspect of her testimony that you knew to be untrue?

13   A.   Yes.

14   Q.   And what aspect of her testimony was untrue, to your

15   knowledge?

16   A.   I recall her making specific representations that in

17   her best understanding the lines of credit were supposed

18   to be open starting in 2005 when Michael signed the first

19   line of credit document for a period of six to nine

20   months.

21         They were very aware that the line of credit was

22   going to be opened until we had an opportunity to sell

23   some land and/or refinance the project down the road,

24   which happened almost in its entirety in August of 2006,

25   but throughout my conversations with both Michael and

Kenner - Direct/Haley

4184

1  Kristen in person and on the phone, we had always referred

2  to the time frames available to us to repay the loans in

3  their entirety and replenish the cash capital account as

4  well.

5         And during the February 2008 phone meeting which

6  I believe she referenced during her testimony, she also

7  had notes that we saw in the courtroom referring to a six

8  to nine month period of time while she was waiting for

9  what we expected the loans to be repaid as a result of the

10 $4 million loans under John Kaiser's control we had

11 expected to receive.

12 Q.   With reference to conversations you had with her over

13 a period of time while you were representing them as their

14 financial advisor, what, if any, representations did you

15 make to Kristen Peca about Mexico and let's say living in

16 a cave, hiding in a cave?

17 A.   None.

18 Q.   Well, the hours of conversations that you listened to

19 that were surreptitiously recorded between you and the

20 Pecas, did you hear any reference to her reminding you

21 that you once told her that you were hiding in a cave in

22 Mexico?

23 A.   No, sir.

24 Q.   Now, sir, you were present when William Ranford

25 testified; is that true?

4185

1    A.    Yes, sir.

2    Q.    As relates to his testimony concerning actually

3    government device number one, your computer, do you have a

4    memory of any testimony that he offered concerning the

5    operability of your computer and what you told him about

6    the operability of your computer?

7    A.    Yes, sir, I do.

8    Q.    And was that testimony truthful, to your knowledge?

9    A.    It was not.

10   Q.    In what respect was it untruthful?

11   A.    I met with Mr. Ranford approximately two weeks before

12   I was arrested in November of 2013 in Manhattan Beach,

13   California, at Starbucks on Rosecrans Avenue.

14        And the purpose of the meeting was to give

15   Mr. Ranford an update and status on our legal activity and

16   actions that were taking place in Mexico at the time

17   pursuant to our desire to continue to recover both

18   ownership interests and the approximate $20 million in

19   loans that Mr. Jowdy had unpaid at the time.

20        During that meeting, and very specifically we

21   chose that Starbucks so we could go through my computer

22   and look at the Diamante Cabo San Lucas website; and,

23   secondly, to look at the Mexican federal websites in order

24   to show Mr. Ranford the activity in the cases versus

25   Mr. Jowdy that had been ongoing in Mexico for several

Kenner  -  Direct/Haley

4186

1    years.

2              (Continued on next page.)

Kenner - Direct/Haley

4187

1    BY MR. HALEY (Cont'd):

2    Q.    Well, Mr. Ranford testified, sir, that when he made

3    inquiry about the status of his investments, projects,

4    things of that nature, you told him, I can't give you any

5    of that information, in sum and substance, because my

6    computer crashed.

7              Do you recall that testimony?

8    A.    Yes, I do.

9    Q.    Was that truthful testimony from your perspective,

10   sir?

11   A.    It was not.

12             My computer was present and working during our

13   meeting that day.

14   Q.    The same computer here, the device No. 1 that used to

15   be your computer right here?

16   A.    Yes, sir.

17   Q.    Now, sir, Steven Rucchin testified in this matter.

18             Is that correct?

19   A.    Yes, sir, I recall that.

20   Q.    And prior to your appearance here today, did you have

21   an opportunity to review the daily transcript of his

22   testimony?

23   A.    Yes, sir, I did.

24   Q.    And in that regard, Mr. Rucchin testified in

25   substance that he was unaware of the loss of the line of

4188

1    credit and his collateral until 2013.

2            Do you recall that testimony?

3    A.   Yes, I do.

4    Q.   Was that truthful testimony, sir?

5    A.   I don't believe it was.

6    Q.   Well, what level of communication did you have with

7    Mr. Rucchin prior to 2013, and what awareness did you have

8    based upon documents that were provided to him by Northern

9    Trust that would lead you to that answer?

10   A.    During our communications at that time, I believe

11   Mr. Rucchin had sent me a text message referring to a loan

12   statement that he had received at his residence in the

13   mail, referring to late payments that were due on his line

14   of credit.

15           At that time I remember the conversation

16   surrounding our group decision to allow the lines of

17   credit to go into default and use alternative method and

18   that was to seek restitution from Mr. Jowdy through a

19   civil litigation.

20           Mr. Rucchin had addressed the -- both the

21   February and March letter with me on the phone, and

22   understood completely our -- at least to my understanding,

23   understood completely what our strategy was as a group of

24   eight line of credit holders.

25           After the lines of credit were seized,

Kenner - Direct/Haley

4189

1   Mr. Rucchin also received or -- excuse me -- prior to the

2   lines of credit being seized, Mr. Rucchin also was aware

3   of our attempts, first to move the lines of credit to Bank

4   of America under more favorable terms, and then

5   subsequently signed transfer documents to be sent to

6   Charles Schwab and use my FedEex account to actually send

7   them back to the Charles Schwab investor in an attempt to

8   move it back and the underlying collateral at that period

9   of time.

10          After that was unsuccessful, I think we saw in

11  this courtroom both Mr. Rucchin's March 2009 statement

12  that showed the loss of approximately $1 million that was

13  designated in the negative brackets.  The following month

14  I believe there was $3 to $400,000 left in his account.

15  In order for any of the line of credit holders to shut

16  down their underlying collateral accounts, each one of

17  them was required to have a phone call with Northern Trust

18  bank and a representative from Schwab to make sure they

19  clearly understood what had just occurred, and each one of

20  them had to independently sign a transfer document for

21  Northern Trust bank to release the remaining underlying

22  collateral and have that sent to their account at Northern

23  Schwab (sic) which I believe each one of them did at that

24  time.

25          After that, Mr. Rucchin and I had made plans to

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

4190

1    get together.  He had asked me to secure some concert

2    tickets for him for a music show up in Toronto Canada from

3    a band that I used to work with and at that time he made

4    reference to the fact that his Northern Trust statements

5    about two months after the seizure still retained a

6    balance of approximately $13 and he asked even though I

7    was busy at the time if I wouldn't mind trying to get the

8    Northern Trust statements to turn off.

9    Q.   Mr. Kenner, would you kindly take a look at Kenner

10   Exhibit 207.

11   A.   Yes, sir.

12   Q.   Do you recognize that document?

13   A.   Yes, I do.

14   Q.   What is it?

15   A.   It is a text message from Steve Rucchin to myself

16   that was received on April 16th, 2009 at about 2:30 in the

17   afternoon.

18   Q.   Now, as relates to that text message, how do you

19   acquire this document, sir?

20   A.   This was delivered by the US Government to you in

21   evidence.

22        And you subsequently turned it over to me for

23   review.

24   Q.   The content of that document, is that a fair and

25   accurate reproduction of a text message that was derived

Kenner - Direct/Haley

4191

1    either from your iPhone or your laptop computer sent to

2    you by Mr. Steven Rucchin?

3    A.    Yes, it is.

4            MR. HALEY:  Your Honor, I offer that as Kenner

5    Exhibit 207.

6            MR. MISKIEWICZ:  No objection.

7            MR. LARUSSO:  No objection, your Honor.

8            THE COURT:  207 is admitted.

9            (Whereupon, Defense Exhibit Kenner 207 was

10   received in evidence as of this date.)

11   BY MR. HALEY:

12   Q.   Would you kindly, sir, explain to us the content of

13   the writing in the text message, as you understood it.

14   A.    At that time, in or about 2009, I recall Steve

15   Rucchin and I communicated quite a bit by text message.

16           But at this point he wanted to -- I believe he

17   had just completed his phone call with Northern Trust Bank

18   and conference call with Charles Schwab, an associate from

19   Charles Schwab at the time, and wanted to further

20   understand what our plan was with respect to the default,

21   the seizure of capital and also he was asking about the

22   $10,000 bill that he had received from Northern Trust

23   which was, again, one of the loan statements that each of

24   the clients would receive on a monthly basis directly from

25   Northern Trust Bank.

Kenner - Direct/Haley

4192

1   Q.   Phil, it says give me a call today.

2          How did you take it?  What was your

3   understanding of give me a call today?

4          What was he asking you to do?

5   A.   Other than the obvious, one of the communication

6   issues with my clients were that they were very busy

7   playing professional sports and traveling.

8          So on a regular basis someone would tell me,

9   give me a call today, give me a call tomorrow, give me a

10  call Saturday, so I would know when they would be

11  available to speak on the topics we were discussing with

12  respect to the financial conditions.

13  Q.   Well, we have seen thus far, Phil, a number of text

14  messages from your clients as now have been introduced in

15  evidence and not a corresponding text mail message from

16  you responding.

17          So why is that?

18  A.   There are corresponding text messages where I would

19  respond back to a number if not all of these text

20  messages.

21          But my typical protocol with my clients would be

22  when they would let me know by e-mail or text that they

23  needed to touch base on a specific issue, I would call

24  them on the phone and I typically spent somewhere between

25  10 and 12,000 minutes a month at this point in time

Kenner - Direct/Haley

4193

1    talking to my clients on the phone, monthly.

2    Q.    Why would you opt to discuss the matter with them

3    telephonically rather than through a text mail response?

4    A.    Many of our business dealings were not necessarily

5    straightforward, but they were complex business issues,

6    especially when we got into the point in time where the

7    recovery of those funds that were invested and other funds

8    that were loaned to Mr. Jowdy with respect to our projects

9    were requiring litigation in many different jurisdictions.

10             We had litigation going on in Arizona, in

11   Nevada, California, in Mexico, many of those at the same

12   time, and in and around April of 2009.  So there was much

13   to talk about and a phone call would be a much better way

14   to convey what was going on.

15   Q.    In that regard, as relates to that particular e-mail,

16   if you recall, did you give Steve a call or did you ignore

17   it?

18             If you recall, what if anything did you do after

19   receiving that e-mail?  I know it goes back to 2009, but

20   do you have any recollection or not?

21   A.    I recall speaking to not just Mr. Rucchin, but

22   specifically all of the line of credit holders at that

23   point in time on a very regular basis.

24   Q.    You were present in court when Darryl Sydor

25   testified, were you not, sir?

Kenner - Direct/Haley

4194

1    A.    Yes, sir.

2    Q.    Do you recall his testimony concerning when he saw

3    the default letters for the first time?

4    A.    Yes, sir, I do.

5    Q.    Now, for purposes of clarity of the record, when we

6    talk about default letters, what is your understanding of

7    the term default letters, sir?

8    A.    My understanding is that there were two letters that

9    were sent from Northern Trust Bank to each of the line of

10   credit holders, specifically to their current address of

11   record.

12            One was a notice of intent to seize collateral

13   that was mailed by Northern Trust Bank in February of

14   2009, and approximately one month later there was notice

15   that was sent via FedEx and certified mail to each one of

16   the clients at their home addresses which notified them

17   that their collateral had been seized, or was in the

18   process by Northern Trust to be seized pursuant to their

19   collateral securities agreements that they had signed over

20   the years.

21            (There was a pause in the proceedings.)

22   BY MR. HALEY:

23   Q.    Mr. Kenner, I'm going to ask you to take a look, to

24   move things along, sir, at three exhibits, one marked

25   Kenner Exhibit 65, one marked Kenner Exhibit 208, one

Kenner - Direct/Haley

4195

1    marked Kenner Exhibit 209.

2    A.   Okay.

3    Q.   Do you recognize those documents, sir?

4    A.   Yes, sir.

5    Q.   What are they?

6    A.   These are text message communications from Darryl

7    Sydor to myself, Kenner 208 references text messages he

8    sent to me on March 23rd of 2009.

9            Kenner Exhibit 65 references April 1st, 2009

10   text message correspondence.

11           And Kenner Exhibit 209 references April 1st,

12   2009 text messages.

13   Q.   Are those text messages --

14           MR. HALEY:  Withdrawn.

15   BY MR. HALEY:

16   Q.   How do you acquire those three documents, sir?

17   A.   These text messages were provided by the US

18   Government to you during pretrial discovery.

19           Subsequently, you turned them over to me for

20   review.

21   Q.   And is the text message depicted on each one of those

22   documents a true and accurate reproduction of the text

23   message that was contained on either your iPhone or

24   MacBook computer?

25   A.   Yes, sir, they are.

Kenner - Voir Dire/Miskiewicz

4196

1    MR. HALEY:  Your Honor, I'd offer them as Kenner

2  Exhibits 65, 208 and 209 in evidence.

3    THE COURT:  Voir dire?

4    THE COURT:  Yes.

5  VOIR DIRE EXAMINATION

6  BY MR. MISKIEWICZ:

7  Q.    Mr. Kenner, those are all text messages from

8  Mr. Sydor to you, correct?

9  A.    Yes, sir.

10  Q.    And in many of those text messages, he's responding

11  to a statement from you.

12      Correct?

13  A.    I believe on Kenner Exhibit 208, the second and third

14  text message appear to be part of a text message

15  communication where I'm asking him if he had received the

16  letters yet.

17  Q.    Well, but you didn't include the texts that he is

18  responding to in those exhibits, did you?

19  A.    No, sir.

20      These are just the text message that is

21  Mr. Sydor had sent to me.

22  Q.    But is that the way the government provided it to you

23  or did it provide you the whole conversation?

24  A.    This is the way the government provided them to me.

25  Q.    You are saying only Mr. Sydor's part is included in

Kenner - Direct/Haley

4197

1   those text messages, your statements are not anywhere in

2   the material that you were provided in discovery?

3   A.   That's not what I suggested.

4   Q.   Just so I'm clear, is that a complete conversation or

5   just one side of the conversation?

6   A.   All three of these are exhibits are just the text

7   messages that Mr. Sydor sent to me.

8          MR. MISKIEWICZ:  We would object on the rule of

9   completeness.

10         THE COURT:  Under the rule of completeness, if

11   you want to offer the other portions you can do that.

12         I'm going to admit these exhibits.

13         MR. HALEY:  Thank you, sir.

14         THE COURT:  Any objection, Mr. LaRusso?

15         MR. LARUSSO:  No, your Honor.

16         MR. HALEY:  Sorry.

17         (Whereupon, Defense Exhibits Kenner 65, 208 and

18   209 were received in evidence as of this date.)

19   DIRECT EXAMINATION

20   BY MR. HALEY:

21   Q.   Now, with reference to Kenner Exhibit 65 --

22   A.   Yes, sir.

23   Q.   I think the content of that speaks for itself --

24         MR. HALEY:  Withdrawn.

25         I apologize.

Kenner - Direct/Haley

4198

BY MR. HALEY:

Q.   Sir, as relates to the content of that particular
e-mail, if you recall, did that conference call take
place?

There is a reference to a conference call?

A.   Yes, it did.

Q.   And the other part of that speaks about verbal
confirmation.

What was your understanding of this verbal
confirmation phrase in that e-mail?

A.   During Mr. Sydor's testimony in this courtroom, he
alluded to the fact that he had not spoken with anybody at
Northern Trust Bank regarding the default on his line of
credit.

On the first text message in line four it refers
to a conference call and an hour with Aaron someone and
that is Aaron Mascarella who was here to testify in the
courtroom that he had been speaking with Mr. Mascarella.

And then the verbal confirmation was the
conference call between Charles Schwab, Northern Trust
Bank and the individual clients where they had to verbally
confirm with Northern Trust Bank that they understood what
had occurred with the seizure of their lines of credit and
their desire to have documents prepared for them so they
could individually sign for the remaining underlying

Kenner - Direct/Haley

4199

1   investment accounts to be transferred back to

2   Charles Schwab at that time.

3           And each one of the clients did, in fact, do so

4   and their accounts were closed within the following month

5   or two.

6   Q.   Just so we understand, how did you respond to, what's

7   it about she mentions something about verbal confirmation,

8   did you respond by way of a corresponding text message or

9   telephone call, if you recall?

10  A.   I don't recall as I sit here today.

11  Q.   Were you a participant in that verbal confirmation

12  telephone call between Darryl Sydor and Aaron Mascarella

13  concerning the verbal confirmation?

14  A.   No, sir.

15          I wasn't a participant in any of those

16  conference calls.

17  Q.   Taking a look at Kenner Exhibit 209, as relates to --

18  we'll go with the first one -- what was your understanding

19  as relates to the content of that e-mail when Darryl Sydor

20  said, what's this letter from Northern Trust all about?

21  A.   Although Mr. Sydor testified in this courtroom that

22  he had not seen the default letters until a week or two

23  before the trial, he's referring to those specific letters

24  that he had received via FedEx on or about March 23rd,

25  which was four days after Aaron Mascarella and Northern

Kenner - Direct/Haley

4200

1  Trust Bank mail them to him via FedEx and certified mail.

2  Q.   Dealing with those text messages, what if any

3  response did you give to Darryl Sydor as a result of

4  receiving those text messages, and how did you respond,

5  telephonically, by way of text, if you recall, if you

6  recall?

7  A.   I don't recall specifically how I responded or the

8  communication that ensued.

9       But there is a very high probability that both

10 by text and by phone we communicated about this,

11 specifically because the FedEx letter, although it spoke

12 for -- the contents spoke for itself in reference to the

13 Northern Trust letters, when he refers to and also the one

14 from Stef, that was the FedEx documents that

15 Charles Schwab had prepared in order to facilitate the

16 transfer of the existing loans and the underlying

17 collateral to be moved back to Charles Schwab.

18 Q.   With reference to the last portion, yeah, but what's

19 the other one?  It's cc'd to you also.

20      What was your understanding as to the meaning of

21 that?

22 A.   I believe in the March 19th mailings, if my memory

23 stands correct, there was a second document behind the

24 seizure of collateral letter that I was also cc'd on.

25      In fact, I was cc'd on all three letters, the

4201

1    one in February and I believe the two that were mailed

2    together in March.

3    Q.   Mr. Kenner, I'm going to show you several documents

4    marked for identification purposes, Kenner Exhibit 66, and

5    I'm really drawing your attention to the signature on the

6    document, sir.

7    A.   Yes, sir.

8    Q.   Kenner Exhibit 67, and, again, I'm really drawing

9    your attention to the signature.

10   A.   Yes, sir.

11   Q.   Kenner Exhibit 70, and I'm drawing your attention to

12   the signature, sir.

13   A.   Yes, sir.

14   Q.   Kenner Exhibit 71, I'm drawing your attention to the

15   signature, sir.

16   A.   Yes, sir.

17   Q.   Kenner Exhibit 68 and I'm drawing your attention to

18   the signature, sir.

19   A.   Yes, sir.

20   Q.   And Kenner Exhibit 69, and I'm drawing your attention

21   to the signature, sir.

22   A.   Yes, sir.

23            MR. HALEY:  May I have a moment, Judge.

24            (There was a pause in the proceedings.)

25   BY MR. HALEY:

**Kenner - Direct/Haley**

4202

1    Q.    As relates to those documents, sir --

2              MR. LARUSSO:  Judge, this one time may I look at

3    these?

4              I'm not sure what they are.

5              MR. HALEY:  I'm sorry.

6              MR. LARUSSO:  That's okay.

7              I'll look over your shoulder.  I know what they

8    are.  Thank you.

9    BY MR. HALEY:

10   Q.    Mr. Kenner, did you forge the signature of Darryl

11   Sydor on any one of those documents?

12   A.    No, sir.

13   Q.    I note, sir, at least as relates to Kenner Exhibit 70

14   there appears to be a signature --

15             MR. MISKIEWICZ:  Excuse me.

16             Have they been moved in evidence?

17             MR. HALEY:  They are offered for identification

18   purposes only.

19             MR. MISKIEWICZ:  Okay.

20             MR. HALEY:  I'd offer them into evidence, but

21   I --

22             MR. MISKIEWICZ:  No objection.

23             MR. HALEY:  Then they are offered into evidence,

24   Judge.

25             MR. LARUSSO:  No objection, Judge.

Kenner - Direct/Haley

4203

1       THE COURT:  66 through 70 are admitted.

2       (Whereupon, Defense Exhibits Kenner 66 through

3    70 were received in evidence as of this date.)

4    BY MR. HALEY:

5    Q.   With reference to Kenner Exhibit 70, there appears to

6    be not only a signature, but a hand print Darryl Sydor

7    actually in two locations.

8       You see that, sir?

9    A.   Yes.

10   Q.   Do you know who put that there, if you do?

11   A.   The top print I printed that out before I faxed this

12   document to Mr. Sydor.

13      And the bottom handwriting I believe would have

14   been done by somebody in our attorney's office in

15   collecting the signed signatures on behalf of

16   Lehman Brothers to make sure they had every signature from

17   every member.

18   Q.   Well, so there is no confusion in that regard, sir,

19   looking at that signature page which is response form, I

20   think that's been testified to previously in this

21   proceeding, which portion of that document, sir, did you

22   hand write on and what did you specifically hand write?

23   A.   Of the two handwritten printed names, mine is the

24   upper handwritten name that's more blocky with capital

25   letters.

4204

1          And I did that -- if we could see the top of

2     that page -- I did that just prior to faxing the entire

3     document to Mr. Sydor and you can see with my fax

4     confirmation on top of it.

5     Q.   What do you mean by that, sir, your fax confirmation

6     on the top?

7     A.   On the top right as part of my fax to Mr. Sydor you

8     can see my old fax number, 480-314-3795.

9          That was part of my fax to him.

10    Q.   What was your purpose, sir, in signing his block name

11    to that document?

12    A.   As part of the organization for this effort that you

13    saw with the four binders that were approximately 7 inches

14    thick, there was a tremendous amount of documentation

15    between the eight to ten law firms, all the other

16    ancillary people working on these documents.

17         And I wanted to make sure as they went out and

18    came back that we weren't missing any signatures for the

19    individuals that needed to sign off.

20    Q.   By the way, prior to your testimony today, sir, did

21    you take a look at this compilation of documents?

22    A.   Yes, sir, I did.

23         MR. HALEY:  Your Honor, may we have a brief

24    sidebar?

25         THE COURT:  Yes don't we take the break.

Kenner - Direct/Haley

4205

1    We'll take the afternoon break.  Don't discuss

2    the case.

3            (Jury leaves the courtroom.)

4            THE COURT:  You can step down for now.

5            THE WITNESS:  Thank you, your Honor.

6            (Witness steps down.)

7            MR. HALEY:  Your Honor, as the court will

8    recall, it was somewhat of a process, from my perspective,

9    an ordeal, obtaining the Northern Trust records from

10   Northern Trust.

11           As a matter of fact, I'm still awaiting the

12   records as relates to Owen Nolan that I was told would be

13   delivered to my office yesterday, they haven't yet -- I

14   shouldn't say that -- they were received on disk.  They

15   did not provide me the password and the telephone number

16   they gave me for the password is an incorrect telephone

17   number.

18           It's not to belabor the record, your Honor, but

19   I did provide these to Mr. Miskiewicz.  They haven't been

20   marked.  I would ask, Judge, that these be marked as

21   Kenner Exhibit or court exhibit, whatever we need to do,

22   it was produced pursuant to subpoena, as the Northern

23   Trust Bank records produced pursuant to subpoena.

24           That's really my question.

25           THE COURT:  It doesn't need to be marked as a

Kenner - Direct/Haley

4206

1    court exhibit.

2             It can be Kenner Exhibit 209 or 210, whatever

3    you are up to.

4             MR. HALEY:  210, Judge.

5             THE COURT:  And there can be a stipulation these

6    were produced from Northern Trust from the files.

7             MR. HALEY:  Understood that we are still waiting

8    Owen Nolan's Northern Trust documents.

9             THE COURT:  That's fine, we can put those in,

10   right?

11            MR. MISKIEWICZ:  Judge, we have no objection.

12            My understanding is that many of the documents

13   in there are duplicates.

14            THE COURT:  I'll let the jury know that.

15            MR. HALEY:  Some are, indeed, duplicates of

16   documents already in evidence.

17            THE COURT:  Okay.

18            MR. LARUSSO:  Respectfully, I know Mr. Haley has

19   an awful lot of work to do.

20            I haven't had a chance to look at them, but I'm

21   familiar with all of the other Northern Trust documents

22   produced by the government.  I don't anticipate any

23   objection, but at some point tomorrow or over the weekend

24   I'll hopefully get a copy and go through them and make

25   sure there is no specific objection.

Kenner - Direct/Haley

4207

1          With that qualification, I have no objection.

2          THE COURT:  All right.

3          Let's take our break.

4          (Recess.)

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4208

1              (Following a recess.)

2              THE COURT:  Be seated.

3              Let's bring in the jury, Mr. Kenner, come back

4    up.

5              (Witness resumes the stand.)

6              THE COURT:  What exhibit number is that,

7    Mr. Haley?

8              MR. HALEY:  Thank you, your Honor.

9              I marked it as Kenner Exhibit collectively as

10   210.

11             THE COURT:  Okay.

12             MR. LARUSSO:  Your Honor, my client just stepped

13   out to the bathroom.

14             THE COURT:  Okay.

15             MR. LARUSSO:  If you like I could put on the

16   record --

17             THE COURT:  Hold on.

18             MR. LARUSSO:  I'll put on the record while we

19   are waiting what my party --

20             THE COURT:  I don't want to do anything without

21   your client here.

22             Let's wait for him to come back.

23             MR. LARUSSO:  Thank you, your Honor.

24             (There was a pause in the proceedings.)

25             THE COURT:  Okay.

Kenner - Direct/Haley

4209

1         Mr. Constantine is back, let's bring in the

2    jury.  We can do that later, Mr. LaRusso.

3         MR. LARUSSO:  Sure.

4         THE COURT:  They are going to be a minute.

5         Everyone can sit down, if you want.

6         THE CLERK:  All rise.

7         (Jury enters the courtroom.)

8         THE COURT:  Everyone can be seated.

9         Members of the jury, there is a stipulation

10   between the parties that stack of documents that Mr. Haley

11   had before the break which has been marked as Kenner 210?

12        MR. HALEY:  Yes, sir.

13        THE COURT:  Are records that were in the files

14   of Northern Trust Bank that were obtained from Northern

15   Trust Bank by way of subpoena.

16        Mr. Haley served a subpoena on the bank.  He got

17   those documents from Northern Trust Bank and there is no

18   objection to their admission, correct?

19        MR. MISKIEWICZ:  No objection.

20        THE COURT:  Mr. LaRusso?

21        MR. LARUSSO:  None, your Honor.

22        THE COURT:  210 is admitted.

23        But so you are not confused, some of those

24   documents the government has already offered into

25   evidence.  So there are some documents that the parties

**Kenner - Direct/Haley**

4210

1   have already offered into evidence but Mr. Haley wants to

2   have a complete set.  So there may be duplicates, but it's

3   a complete set.

4          Yes?

5          MR. HALEY:  Yes, sir.

6          THE COURT:  Okay.

7          (Whereupon, Defense Exhibit Kenner 210 was

8   received in evidence as of this date.)

9          THE COURT:  Go ahead.

10  BY MR. HALEY:

11  Q.   Now, Mr. Kenner, let's take a look at Kenner Exhibit

12  64 in evidence, and there has been prior testimony with

13  respect to this particular letter.

14         How did this particular letter and document come

15  to be created?

16  A.   When Mr. Sydor or any of the other line of credit

17  holders initially set up and established the line of

18  credit at Northern Trust Bank, somebody from Northern

19  Trust Bank prepared this letter and sent it as part of the

20  package of documents to the individual line of credit

21  holders for them to sign and send back to the bank in

22  conjunction with their line of credit paperwork.

23         For Mr. Sydor it would have been in and around

24  the papers he signed in September of 2004.

25  Q.   Thank you.

4211

1          Now, with reference, sir, to Kenner Exhibit 210,

2     before you took the witness stand today did you have an

3     opportunity to look at those documents?

4     A.   Yes, sir.

5     Q.   Specifically, did you have an opportunity to look at

6     the signature that's contained on one or more of those

7     documents?

8     A.   Yes, sir, I did.

9     Q.   As relates to those signatures, Mr. Kenner, did you

10    forge any of those signatures?

11    A.   No, sir.

12    Q.   Now, Owen Nolan testified in these proceedings.

13          Do you recall his testimony?

14    A.   Yes, sir, I was present.

15    Q.   As relates to his testimony, I'm going to ask you to

16    take a look at Kenner Exhibit --

17          MR. HALEY:  Actually, withdrawn.

18    BY MR. HALEY:

19    Q.   As relates to his testimony, the testimony of Owen

20    Nolan, sir, do you recall his testimony as to when he

21    claimed he learned about the $2.2 million line of credit?

22    A.   Yes, I specifically do.

23    Q.   And what did he say about it?

24    A.   He told the court that he was first aware of his line

25    of credit, the $2.2 million line of credit, sometime in

4212

1    2008.

2    Q.    Well, to your knowledge, sir, was that completely

3    accurate testimony?

4    A.    It was factually inaccurate.

5    Q.    In what regard, from your perspective, was it

6    factually inaccurate?

7    A.    There are at least or three occurrences that I have

8    seen in evidence where there's direct proof that Mr. Nolan

9    was aware.

10           First in 2003, when the initial line of credit

11   was set up an his account was pledged for the Little Isle

12   IV initial line of credit of $500,000.

13           I had sent Mr. Nolan on December 15th, 2003, a

14   39-page fax in lieu of the bank sending it to him as a

15   FedEx because we were trying to close the 258 acre parcel

16   as Mr. Manfredi had mentioned prior to the close of 2003.

17   So Mr. Nolan had received a 39-page fax at his 416 Toronto

18   fax number, and had returned via Federal Express the

19   signature pages to Northern Trust Bank at that point in

20   time.

21           Second, the Little Isle IV pledged line of

22   credit that Mr. Juneau and Mr. Nolan had pledged against

23   had gone into default in or around early 2007, and at that

24   point in time, Northern Trust Bank had forwarded a default

25   letter to both Mr. Juneau and Mr. Nolan to their home

Kenner - Direct/Haley

4213

1    addresses.  Mr. Nolan would have received a default letter

2    with respect to his line of credit at that point in time.

3              And then, lastly, in December of 2007, Northern

4    Trust Bank was attempting to clean up their year-end

5    records and asked if I could put together packages with

6    them to get all of the line of credits resigned and put

7    all on the same payment schedule at that point in time.

8    So I had FedExed not just Mr. Nolan using my FedEx

9    account, but to all of the note holders, full packages of

10   renewals in December of '07 and Mr. Nolan and I had text

11   message and phone conversations between Christmas and New

12   Year's of 2007 before he used my FedEx account to FedEx

13   the entire line of credit package back to Northern Trust

14   on his own.

15   Q.   By the way, when you speak in terms of FedEx account,

16   and FedEx records, are you in possession of any

17   documentation that has reference to those FedEx mailings

18   you are referring to?

19   A.   Yes, sir.

20   Q.   And how did you acquire those documents?

21   A.   The US Government had turned those over to you in

22   pretrial, and, subsequently, you had turned over those

23   documents to me for review.

24   Q.   Mr. Kenner, would you kindly take a look at a

25   document marked Kenner Exhibit 211 for identification.

Kenner - Direct/Haley

4214

1   A.   Yes, sir.

2   Q.   Do you recognize that document?

3   A.   Yes, I do.

4   Q.   What is it?

5   A.   This is the document, the fax cover page of the

6   39-page document I sent via fax to Owen Nolan's fax number

7   in Toronto Canada at the time on December 15, 2003.

8         I was asking him to sign the three signature

9   pages where the signatures were required and inside the

10  package there noted that they sign here tag that he could

11  still see through the fax confirmation.

12        And then I ask for the documents to be returned

13  to Nelson Lerner at Northern Trust Bank and I enclosed the

14  Phoenix, Arizona address.  I tell him to do it via FedEx

15  and I said please send via international FedEx with my

16  FedEx number and then I sign it.  Let me know if you have

17  any questions before you sent them, PK, and then I sign it

18  PK.

19        MR. HALEY:  Your Honor, I'll reserve my rights

20  in terms of offering this into evidence subject to

21  connection in view of the fact that we are still waiting

22  for records that were subpoenaed from Northern Trust.

23        THE COURT:  Okay.

24        MR. HALEY:  As relates to Owen Nolan, Judge.

25

4215

1    BY MR. HALEY:

2    Q.    Do you remember when Nick Privitello testified?

3    A.    Yes, I do.

4    Q.    Was there an aspect of his testimony that you knew to

5    be untruthful, sir?

6    A.    Yes, sir.

7    Q.    What was that?

8    A.    I have never attended or participated in a $25,000

9    cabana party in my life.

10   Q.    Have you been to cabana parties at all?

11   A.    Yes, sir, I have.

12   Q.    And to the best of your recollection, the cabana

13   party you attended or paid for in whole or in part, what

14   kind of funds were expended by you?

15   A.    Well, on a fairly regular basis, after we had moved

16   our Diamante development offices to Las Vegas, on a

17   regular occurrence we would invite potential Diamante

18   investors to Las Vegas for a day or two on the weekends,

19   which was a fairly easy invitation.  And on Monday or

20   Tuesday of the following days we would fly them down to

21   Mexico.

22            And one of the events that people used to enjoy

23   coming in for was a Hard Rock Hotel Sunday rehab pool

24   party which would last from about 10 in the morning until

25   the about 6 in the evening and I would typically rent, in

4216

1  conjunction with Brian Berard who was helping me at the

2  time a cabana, and we would get between 12 and 15 people

3  that would come in for all food and all drink inclusive in

4  the party for the day.

5          And it would run a tab of about $1,500 for the

6  day and typically Mr. Berard and I would split that

7  expense.

8  Q.   Timothy Gaarn, sir, you were present when Timothy

9  Gaarn testified.

10          Is that correct?

11  A.   Yes, sir.

12  Q.   And during the course of the material you received

13  through me, did you have an occasion -- or did you receive

14  secretly recorded conversations between yourself and Tim

15  Gaarn?

16  A.   Yes, sir.

17  Q.   To the best of your memory, how many hours of

18  conversations were secretly recorded between the two of

19  you that were provided to you by the government?

20  A.   I believe approximately two hours and 35 minutes.

21  Q.   You weren't aware that you were being recorded, is

22  that true?

23  A.   No, sir.

24  Q.   Were you in any way guarded in your conversations

25  with Timothy Gaarn during those three hours and 35 minutes

4217

1   of conversation?

2   A.    It was two hours and 35 minutes.

3   Q.    Excuse me, thank you.

4   A.    But, no.

5         I was not guarded.

6   Q.    Well, at any point during that secretly recorded

7   conversation between you and he, was there ever an

8   instance when you and he had discussed anything associated

9   with defrauding your hockey player clients?

10  A.    No, sir.

11  Q.    The government introduced, Mr. Kenner, excerpts of

12  that conversation between you and Mr. Gaarn.

13        Do you recall that?

14  A.    Yes, I recall.

15  Q.    And, indeed, there was a transcript provided to the

16  jury as an aid and we were all able to listen to that

17  recording.

18        Do you recall that?

19  A.    Yes, sir, I do.

20  Q.    And rather than me playing the recording, sir, would

21  you describe to the court and jury, at least what you

22  meant by the words used in that conversation concerning I

23  believe tax filings and -- what did you mean -- would you

24  explain from your perspective what you meant by the words

25  you used in that recording?

4218

1           Do you recall them, first of all?

2     A.    Yes, sir.

3     Q.    And what were you discussing from your perspective?

4     A.    I believe there were a number of phone calls with

5     Mr. Gaarn and that also were not part and parcel to that

6     two hours and 35 minutes from whatever took place during

7     that extended period of time.

8           But I know Mr. Gaarn at the time was going

9     through a tax audit according to his representations to me

10    and he was asking for my tax advice based on the fact that

11    I had represented hundreds of professional athletes and

12    entertainers and had certainly gone through tax audits

13    with and on their behalf in the past.

14    Q.    But as relates to that conversation did it or did it

15    not involve moneys that you had acquired from Timothy

16    Gaarn by way of payments that came into his possession

17    through payments made into his account by hockey player

18    clients?

19          You understand that question?

20    A.    If I can take the liberty to believe I followed that,

21    I think that Mr. Gaarn was concerned with his tax

22    liability for selling his private shares that he owned and

23    testified to in this courtroom from Eufora.

24          Because he was using some of those funds to

25    repay me over $150,000 that he owed me at the time, and

Kenner - Direct/Haley

4219

1  then subsequently some of the funds that he had loaned to

2  me after that later in those transactions, he was

3  concerned as to how to represent that to his accountant,

4  if at all, at the time while he was going through that tax

5  audit.

6         And I was giving him advice that I had been

7  given through different tax advisors over the years on how

8  to deal with the IRS in that respect.

9         (Continued on next page.)

4220

1    BY MR. HALEY:

2    Q.   Did you, or did you not, say something about

3    different law enforcement agencies not communicating with

4    each other?

5    A.   Yes, sir.

6    Q.   What did you mean by that, sir?

7    A.   Well, my understanding primarily was based on

8    conversations and testimony I gave in front of the

9    Securities and Exchange Commission in 2011, when they had

10   represented to me, to the best of my understanding, that

11   they were not in communication with other agencies of law

12   enforcement with respect to conversations we had both on

13   and off the record during those three days of testimony.

14          By the way, the SPCA comment was a joke on that

15   recording as well.

16   Q.   Thank you, sir.

17          John McDonald, he testified in this proceeding?

18   A.   Yes.

19          I believe he was the Playboy comptroller

20   accountant.

21   Q.   And in what respect was his testimony, if you recall,

22   inconsistent with your recollection of events?

23   A.   I don't necessarily believe that he had any untruths

24   or any inconsistencies.

25          I believe he was referring to payments that I

4221

1  had made on behalf of Mr. Constantine that Mr. Constantine

2  owed one of the Playboy entities with respect to his

3  racing team.  He was referring to four or five payments

4  that I had sent directly on Mr. Constantine's behalf.

5  Q.   And those payments that you had sent on

6  Mr. Constantine's behalf, just describe the circumstances

7  and the source of those funds?

8  A.   The funds were all my funds from business earnings or

9  income.

10         And Mr. Constantine, from time to time, I would

11  help handle business for him as well since he was a well

12  traveled individual like most of my athletes, so from time

13  to time he would request if I could advance funds for him

14  and he would repay me subsequent to those transactions,

15  and I believe those were several of the occurrences that

16  occurred.

17  Q.   By the way, sir, you made reference in prior

18  testimony to an e-mail wherein the name Aaron was used,

19  and you said that was Aaron Mascarella of Northern Trust?

20  A.   Yes, sir, the gentleman that was here in this

21  courtroom.

22  Q.   With respect to his testimony, was there any aspect

23  of his testimony that you know to be inaccurate -- well,

24  let me ask you this, sir.

25         Did you ever instruct him at any point in time

4222

1    not to communicate with your clients?

2    A.    Never.

3    Q.    In connection, sir, with account statements that came

4    out of Northern Trust, did there come a point in time that

5    such statements were provided to you either directly or by

6    way of CC, or what's your best recollection as to account

7    statements of your clients as relates to Northern Trust

8    when Aaron Mascarella became involved in handling the

9    account?

10   A.    I believe Mr. Mascarella actually testified that for

11   all of the statements that my clients were sent, I was

12   always a CC copy on them so I would receive the same

13   monthly loan statements, bank statements, that Northern

14   Trust would mail directly to the clients themselves, and

15   those were very standard protocol for me whether it be

16   banks, attorneys, insurance agents, et cetera, with

17   respect to my clients.

18   Q.    Mr. Kenner, at any point in time did you conspire

19   with Mr. Mascarella to withhold material information from

20   your clients regarding the operations of their lines of

21   credit?

22   A.    No, sir.

23   Q.    Joe Juneau testified, correct?

24   A.    Yes.

25   Q.    As relates to Mr. Juneau's testimony, if you recall,

4223

1   was there any aspect of his testimony that you knew to be

2   inaccurate?

3   A.    Not that I specifically recall off the top of my

4   head.

5   Q.    During the course of his testimony was there some

6   testimony regarding his signature on a line where it was

7   actually, to your knowledge, signed by someone else?

8   A.    Yes.

9   Q.    Would you explain to the Court and jury based upon

10  your knowledge, personal knowledge, understanding, what

11  are we talking about what happened there?

12  A.    I believe on the July 2006 Little Isle IV operating

13  agreement that was prepared by attorneys for the Hawaii

14  partners, specifically Larry Markowitz and Bill Najam in

15  concert with the attorneys for Lehman Brothers and Alan

16  Worden and Windwalker at the time, they required that each

17  of the Little Isle IV members sign that document.

18        The signature that actually was on Mr. Juneau's

19  line was a signature for Dimitri Khristich, one of the

20  other investors in the Little Isle IV partnership.

21        Mr. Juneau's signature would have been returned

22  from Mr. Juneau to Larry Markowitz' office or someone else

23  collecting the documents, the signed signatures for

24  Mr. Juneau and the other clients on behalf of

25  Mr. Markowitz, and so that was Mr. Khristich's signature,

4224

1   not Mr. Juneau's signature, on that particular line.

2   Q.   Did you have enough familiarity with Mr. Khristich's

3   signature to recognize his signature?

4   A.   Yes, sir.

5   Q.   Mr. Kenner, it was a mistake, correct, that a --

6   Mr. Khristich's signature erroneously appeared over the

7   typewritten line for Darryl Sydor; isn't that what

8   happened?

9   A.   Actually Mr. Khristich's signature appeared on the

10  line above Mr. Juneau's printed name.

11  Q.   Excuse me.

12          MR. HALEY:  Your Honor, I'm now through with

13  this aspect of direct examination, moving into a different

14  area.

15          THE COURT:  Let's stop.  It's 4:31.  So we will

16  stop for today.

17          Don't read or listen to anything regarding the

18  case, don't discuss the case.  Have a safe trip home.

19  Tomorrow morning 9:30.

20          (The jury is excused.)

21          THE COURT:  If everyone could be seated.

22          (The witness steps down.)

23          THE COURT:  So, Mr. Haley, how much of tomorrow

24  do you think you'll be on direct, how much do you have

25  left?

4225

1        MR. HALEY:  A significant portion, Judge.  But

2    by way of projection, I envision I will conclude direct

3    such that it will give Mr. Miskiewicz as much time as he

4    wants to conduct cross-examination.

5        Judge, I don't know what to tell you.  It's

6    conceivable.  I think it's conceivable we could finish

7    Mr. Kenner's testimony tomorrow, but I think.

8        THE COURT:  Just like it was conceivable we

9    would finish his direct today?

10       MR. HALEY:  I deserve that.  Did I really say

11   that yesterday?

12       THE COURT:  Yes, you did.

13       MR. HALEY:  Your Honor --

14       THE COURT:  That's fine.

15       MR. HALEY:  It's late in the day and --

16       THE COURT:  The only thing I would suggest is I

17   think the way you're proceeding in terms of organization,

18   witness by witness, is very efficient.  But, and I know

19   Mr. Kenner is obviously familiar with these documents so

20   there's sometimes where he's reviewing a 20-page document

21   that I'm sure he's reviewed in the past.  If you can just

22   say to him have you reviewed this prior to today.  He

23   doesn't need to flip through 20 pages if he's already

24   familiar with the document.  Over the course of 20

25   documents, that could save some time.

4226

1        In addition, Mr. Miskiewicz, if you have been

2    provided documents that they're going to use tomorrow, I

3    would ask that you look at them so when Mr. Haley hands

4    them to you, each of those 30 seconds or a minute over the

5    course of a trial like this takes up a lot of time.

6        MR. HALEY:  Your Honor, it is not the fault of

7    the government.  Your Honor may recall that it was my

8    intention to have all these marked ahead of time.

9        THE COURT:  I'm not blaming him.  I understand

10   he didn't have that opportunity.  I assume now tonight he

11   does.

12       MR. HALEY:  Your Honor, I envision from this

13   that I have four spheres of inquiry.  We completed sphere

14   one.  Three spheres remain.  But those spheres I do not

15   anticipate will be as heavily laden with documents because

16   we will be moving into -- and frankly, your Honor, I don't

17   mind telling the Court, I intend on showing my client the

18   indictment and having him take a look at various aspects

19   of the indictment and testify in a narrative fashion from

20   his perspective as to what truly occurred and I think that

21   will be less laden with documents.  That's my point.

22       THE COURT:  What are the other two spheres,

23   carts and charts?

24       MR. HALEY:  Carts and charts, no.  I'll tell the

25   Court the other two spheres, your Honor, a sphere that is

4227

1    focused on issues relating to Ken Jowdy.  Some have been

2    touched upon.  I'm trying to avoid overlap.  And the last

3    sphere in all candor, Judge, is to have Mr. Kenner discuss

4    charts 1 through 14 that were introduced into evidence at

5    the close of the government's case.

6              THE COURT:  Okay.

7              Mr. LaRusso, you wanted to put on the record

8    your lineup for next week.

9              MR. LARUSSO:  Your Honor, Mr. Conway told me we

10   confirmed Mr. Kennedy and D'Ambrosio for Monday.

11   Mr. D'Ambrosio is going to be a long witness.  We think

12   those two witnesses will fill up the day.

13             On Tuesday we confirmed Jeff Foster and we're

14   still trying to work on Mr. Sonenglick and hockey player

15   DeVries.

16             On Wednesday we have Mr. Gonchar confirmed,

17   Mr. Sempel confirmed and the last witness Ms. Hancock and

18   that's for Thursday because we think we will need time on

19   Thursday.  If we need to, we may call her Wednesday.

20   That's our present schedule right now, your Honor.

21             THE COURT:  My only concern is that and believe

22   me I want Mr. Kenner to be done by tomorrow.  You should

23   be prepared, whoever your Monday witnesses are, you may

24   have to make an adjustment if Mr. Kenner's cross spills

25   into Monday to make that adjustment.

4228

1    I'm just concerned if those two are available

2  only Monday, and one is long, I'm concerned that he's not

3  going to be prepared to come back a different day if

4  necessary.

5    MR. LARUSSO:  I appreciate that, Judge.

6    We anticipated that problem.  Mr. Kennedy is a

7  short witness and Mr. D'Ambrosio said no problem staying

8  over until the following day.

9    THE COURT:  Okay.  You're going to review the

10 tape, the Home Depot tape?

11   MR. HALEY:  The plan is your Honor -- well, I

12 need a copy of the Home Depot tape and actually just

13 realized he can't take this back with him to the facility.

14 It's about 27 minutes.

15   What I can do, Judge, is if tomorrow -- I'm

16 trying to think this out.  If tomorrow morning Mr. Kenner

17 can be brought up to this courtroom a half hour in advance

18 of our starting time, then he can listen to it.

19   THE COURT:  Can the marshals bring him up at

20 9:00?

21   U.S. MARSHAL:  It might be easier to do it

22 downstairs, Judge.

23   MR. HALEY:  I apologize.  That will work because

24 I'm in control and possession of the laptop during Court

25 hours.  We will sit in the room.  Thank you.  That will

4229

1    work better.

2              THE COURT:  Okay.

3              I just want to -- I think I mentioned this a few

4    weeks ago and it's now getting closer.  There's a juror

5    who is the teacher and next Wednesday his students are

6    graduating in the morning.  He wants to remain on the jury

7    and said that he would miss that if he had to.  Otherwise,

8    he would only be able to be here for an afternoon session

9    starting at two.

10             The additional issue that he has is he has some

11   kind of a vacation planned for late June which he told

12   Michelle he was going to call the airline to see if he

13   could move it.  The only other time he could go on

14   vacation would be to begin on July 3rd.

15             So it raises two issues.  Do we want to lose a

16   half day next week.  But the other issue and my concern is

17   that and I'm projecting out a couple of weeks now,

18   optimistically if we were to end the defense case on the

19   25th, next Thursday, and the government, assuming the

20   government had no rebuttal case, then we would have over a

21   day of summations or close to a day of summations at least

22   and then my instructions on the law.  We're into June 30th

23   and I don't want to have a situation where a juror has a

24   flight on July 3rd and, therefore, deliberations, after

25   one or two days, they will have a problem.

4230

1       What I was thinking of doing with respect to him

2   is to tell him -- I can say we're going to excuse him for

3   that reason.  I don't know how badly he wants to stay on

4   the case.  He may say he's willing to forego the vacation.

5   And if that's true, then the question would be do we lose

6   that half day.

7       I'm throwing it out there.  I don't know if

8   anyone has any views on that.  If he's not willing to

9   forego the vacation, I think the decision is clear that we

10  have to excuse him because we can't have a juror who

11  absolutely has to be done by July 3rd.  We don't know how

12  long deliberations will take on a case that has gone on

13  for six weeks.

14      We don't have to address that tonight, but

15  that's the situation.

16      MR. MISKIEWICZ:  Your Honor, I don't have a

17  suggestion other than to perhaps give him the opportunity.

18  I don't want to put him in the position of having to pick

19  two lousy options, miss a vacation or miss graduation.

20      THE COURT:  I can tell him I'm excusing you and

21  not give him the option given the graduation and vacation.

22  He may then say I will forego both.

23      And given what Michelle has told me about your

24  graduation and you could move your vacation to July 3rd,

25  because I have to allow for deliberations, I can't have

4231

1   someone who is unavailable as of July 3rd, so I will

2   excuse you.  If he jumps back and says, I'm willing to

3   forego the vacation, then we will reconsider it.  I think

4   he's put a lot of time into the trial.  Whatever reason he

5   wants to forego vacation, I don't know if that should

6   deprive him of a chance to serve because he may be losing

7   money.

8          MR. LARUSSO:  Like we did with some of the other

9   jurors, we can hold them as long as we can in case things

10  develop better than we anticipate and maybe we can give

11  him the half day off.

12         THE COURT:  I'm going to hold him until next

13  Wednesday.  I'm more concerned about the July 3rd than I

14  am about the half day at this point.

15         MR. LARUSSO:  He's one of the jurors -- he's

16  very attentive, like they all have been to be candid with

17  you.  I think it's hard at this point to release one.

18         THE COURT:  I think you owe it to a juror to

19  give them an opportunity to deliberate when they invest

20  that much time, but we can't have a juror who has to leave

21  after two days of deliberations is not good.  You can't

22  have them rushing through deliberations because one of

23  them has a flight.  That makes the decision that much

24  easier.

25         MR. LARUSSO:  Absolutely.

4232

1        THE COURT:  We will table it for now.  I'll see

2   you tomorrow morning at 9:30.

3        MR. MISKIEWICZ:  Your Honor, I have one request

4   to put on the record.

5        I did have an objection.  The Court overruled

6   the objection on the issue of completeness regarding the

7   text.  The reason I raised it on that ground is apparently

8   these -- first of all, they don't have Bates numbers, we

9   don't know where they came from.  Secondly, what we were

10  given in digital format is a word processing document.

11  There's no way to ascertain where it came from, what

12  device, and for that matter how we can even search for

13  this material in the discovery.

14       So what I'm asking is for counsel to provide us

15  the entire text string.  We have no idea where this comes

16  from.  That's my application.

17       THE COURT:  Mr. Haley, there's thousands of text

18  messages.  For the government to have to search through --

19       MR. HALEY:  We will give them everything we

20  have.  Here's I guess the disconnect and the conundrum.

21  What we have we received from the government, correct?

22       THE DEFENDANT KENNER:  Yes, sir.

23       THE COURT:  He's not saying you didn't receive

24  it from him.  Somebody pulled out portions of a longer

25  string and the government doesn't know, can't easily

4233

1   access those strings because they're not organized in any

2   fashion.

3          MR. MISKIEWICZ:  That's what I'm advised.

4          MR. HALEY:  May I have a moment, Judge?

5   Mr. Kenner has been my paralegal.

6          MR. MISKIEWICZ:  Also, your Honor, I'm providing

7   both attorneys copies of the iPhone recordings that

8   included the Home Depot recording.

9          MR. HALEY:  Your Honor, if I may, and I have no

10  objection to allow him to address the Court directly on

11  the issue.

12         THE DEFENDANT KENNER:  Your Honor and

13  Mr. Miskiewicz, the documents that were provided to us,

14  the electronic format is in a text delineated format so

15  all of my sent messages are all on one file.

16         THE COURT:  Are they chronological?

17         THE DEFENDANT KENNER:  Yes, sir.  And all of the

18  received messages are on a separate file.  So in order to

19  search them out, I would have to go and look at the June

20  1st, 2010 text message from Mr. Sydor and then I have to

21  go to a reciprocating folder and find the June 1st

22  responses and line them up by time stamps.  They're not in

23  that bubble format that you have seen through some of the

24  other snapshot photographs through the iPhone.

25         THE COURT:  Both the received and sent are

4234

1    chronological?

2              THE DEFENDANT KENNER:  Yes, sir.

3              THE COURT:  They're not by person?

4              THE DEFENDANT KENNER:  No, sir.

5              MR. HALEY:  My only comment in that regard,

6    listening to my client's statement to the Court,

7    everything we received we received from the government

8    and, frankly, we're in the middle right now of the direct

9    examination of my client.  I need to spend that time with

10   him and continue.

11             THE COURT:  Given what he said, I don't think he

12   needs to do the work for the government.  If they are in

13   two separate files and they're in perfect chronological

14   order, the government can easily then, based upon the date

15   and time, find the corresponding chain just as easily as

16   Mr. Kenner could.  It's not as if he's not sitting there

17   with a more complete text in a file.  He doesn't have them

18   either.  If they were clearly disorganized, given the

19   number of text messages, that would be more difficult.  If

20   it's chronological, the government could do that.

21             MR. MISKIEWICZ:  Normally I would agree, your

22   Honor, and I will agree with your Honor, but I'm advised

23   that actually what we have is very different from what he

24   has because of the privilege review.

25             We will work it out and attempt to locate it.

4235

1    There may be things that they have that frankly we do not

2    have as the trial team because they were not produced to

3    us in the same format he has.  I don't think we need to

4    belabor it anymore tonight.

5              THE COURT:  All right.  Thank you.

6              (Proceedings in this matter are recessed until

7    Thursday, June 18, 2015, at 9:30 a.m.)

```
                                                          4236
1                          WITNESSES

2

3    VINCENT TESORIERO                             4104

4    DIRECT EXAMINATION                            4105

5    BY MR. HALEY

6    CROSS-EXAMINATION                             4112

7    BY MS. KOMATIREDDY

8    PHIL ANDREW KENNER                            4113

9    DIRECT EXAMINATION                            4114

10   BY MR. HALEY

11   VOIR DIRE EXAMINATION                         4134

12   BY MR. MISKIEWICZ

13   DIRECT EXAMINATION                            4138

14   BY MR. HALEY

15   VOIR DIRE EXAMINATION                         4157

16   BY MR. MISKIEWICZ

17   DIRECT EXAMINATION                            4160

18   BY MR. HALEY

19   VOIR DIRE EXAMINATION                         4196

20   BY MR. MISKIEWICZ

21   DIRECT EXAMINATION                            4197

22   BY MR. HALEY

23

24                         EXHIBITS

25   Defense Exhibit Kenner 202 was received in    4138
```

4237

| | | |
|---|---|---|
| 1 | evidence | |
| 2 | Defense Exhibit Kenner 28 was received in | 4148 |
| 3 | evidence | |
| 4 | Defense Exhibits Kenner 203 and 204 were | 4160 |
| 5 | received in evidence | |
| 6 | Defense Exhibits K 205 and 206 in evidence | 4175 |
| 7 | Defense Exhibit 22 in evidence | 4181 |
| 8 | Defense Exhibit Kenner 207 was received in | 4191 |
| 9 | evidence | |
| 10 | Defense Exhibits Kenner 65, 208 and 209 were | 4197 |
| 11 | received in evidence | |
| 12 | Defense Exhibits Kenner 66 through 70 were | 4203 |
| 13 | received in evidence | |
| 14 | Defense Exhibit Kenner 210 was received in | 4210 |
| 15 | evidence | |

1

**$**

**$1,500** [1] - 4216:5
**$1.165** [1] - 4144:6
**$1.176** [1] - 4142:14
**$1.25** [1] - 4170:4
**$1.775** [1] - 4170:9
**$10,000** [1] - 4191:22
**$100,000** [1] - 4155:12
**$105** [2] - 4138:17, 4164:15
**$11** [4] - 4139:15, 4139:20, 4139:23, 4140:5
**$13** [1] - 4190:6
**$150,000** [1] - 4218:25
**$175,000** [1] - 4170:14
**$20** [1] - 4185:18
**$25,000** [1] - 4215:8
**$282,000** [1] - 4155:15
**$300,000** [1] - 4143:24
**$400,000** [1] - 4189:14
**$401,000** [1] - 4143:1
**$42,553** [2] - 4142:23, 4155:11
**$500** [1] - 4129:17
**$500,000** [4] - 4153:25, 4177:18, 4179:14, 4212:12
**$580,000** [1] - 4144:8
**$800,000** [1] - 4142:2
**$9.95** [1] - 4151:11

**'**

**'07** [1] - 4213:10
**'what** [1] - 4107:21

**1**

**1** [9] - 4141:16, 4145:8, 4145:12, 4145:15, 4146:4, 4166:9, 4187:14, 4189:12, 4227:4
**1.6** [5] - 4143:18, 4143:21, 4144:2, 4144:9, 4169:19
**1.775** [2] - 4171:10, 4177:1
**10** [3] - 4106:17, 4192:25, 4215:24
**10/1/2008** [1] - 4159:1
**100** [6] - 4094:15, 4095:20, 4123:2, 4139:5, 4142:9, 4152:20
**100,000** [1] - 4124:15
**10:30** [1] - 4094:9
**11** [2] - 4164:10, 4174:11
**11501** [1] - 4095:3
**11572** [1] - 4095:7
**11722** [2] - 4094:15, 4095:21

**11749** [1] - 4094:22
**12** [1] - 4216:2
**12,000** [1] - 4192:25
**13** [12] - 4115:2, 4115:15, 4115:22, 4119:22, 4119:23, 4120:24, 4121:13, 4122:9, 4122:25, 4174:12, 4176:19, 4178:1
**13-CR-607** [1] - 4118:9
**14** [1] - 4227:4
**14015246929** [1] - 4158:22
**15** [7] - 4106:17, 4130:16, 4141:24, 4174:11, 4176:22, 4214:7, 4216:2
**15th** [1] - 4212:13
**16** [2] - 4102:2, 4115:3
**1601** [1] - 4094:21
**16th** [1] - 4190:16
**17** [1] - 4094:9
**18** [2] - 4139:24, 4235:7
**19** [2] - 4180:14, 4181:22
**19th** [2] - 4161:6, 4200:22
**1:15** [1] - 4145:17
**1:30** [1] - 4180:13
**1st** [4] - 4195:9, 4195:11, 4233:20, 4233:21

**2**

**2** [1] - 4166:14
**2.2** [2] - 4211:21, 4211:25
**20** [4] - 4103:4, 4115:25, 4225:23, 4225:24
**20-page** [1] - 4225:20
**200** [1] - 4106:12
**2003** [5] - 4154:1, 4212:10, 4212:13, 4212:16, 4214:7
**2004** [4] - 4107:8, 4154:8, 4168:12, 4210:24
**2004-2005** [2] - 4153:15, 4154:5
**2005** [4] - 4141:18, 4142:11, 4169:4, 4183:18
**2006** [26] - 4112:6, 4112:9, 4112:14, 4112:22, 4113:1, 4114:19, 4138:13, 4138:16, 4139:14, 4142:2, 4142:12, 4147:2, 4147:18, 4148:13, 4148:20, 4155:15, 4164:6, 4165:9, 4177:12, 4179:9, 4179:23, 4179:24, 4179:25, 4183:24, 4223:12
**2007** [6] - 4132:8, 4139:2, 4152:7, 4212:23, 4213:3, 4213:12
**2008** [7] - 4120:14, 4120:21, 4151:1, 4151:9, 4157:2, 4184:5, 4212:1

**2009** [16] - 4151:13, 4157:3, 4161:4, 4161:7, 4174:11, 4179:12, 4180:13, 4189:11, 4190:16, 4191:14, 4193:12, 4193:19, 4194:14, 4195:8, 4195:9, 4195:12
**201** [3] - 4123:14, 4123:16, 4159:2
**2010** [5] - 4174:12, 4176:19, 4177:21, 4178:1, 4233:20
**2011** [1] - 4220:9
**2013** [12] - 4115:15, 4119:22, 4119:23, 4120:24, 4121:13, 4122:3, 4122:9, 4122:25, 4123:7, 4185:12, 4188:1, 4188:7
**2014** [4] - 4106:1, 4106:17, 4109:4
**2015** [2] - 4094:9, 4235:7
**202** [10] - 4133:9, 4133:24, 4135:7, 4138:4, 4138:5, 4138:9, 4144:23, 4167:10, 4167:13, 4226:25
**203** [8] - 4156:20, 4157:18, 4159:12, 4160:1, 4160:9, 4160:11, 4160:15, 4237:4
**204** [8] - 4156:21, 4157:18, 4158:2, 4160:1, 4160:9, 4160:11, 4162:25, 4237:4
**205** [7] - 4174:4, 4174:17, 4174:18, 4175:5, 4175:6, 4175:8, 4237:6
**206** [7] - 4174:17, 4174:18, 4175:2, 4175:5, 4175:6, 4176:12, 4237:6
**207** [5] - 4190:10, 4191:5, 4191:8, 4191:9, 4237:8
**208** [6] - 4194:25, 4195:7, 4196:2, 4196:13, 4197:17, 4237:10
**209** [7] - 4195:1, 4195:11, 4196:2, 4197:18, 4199:17, 4206:2, 4237:10
**21** [4] - 4147:2, 4148:12, 4178:12, 4178:20
**210** [8] - 4206:2, 4206:4, 4208:10, 4209:11, 4209:22, 4210:7, 4211:1, 4237:14
**211** [1] - 4213:25
**21st** [1] - 4180:13
**22** [6] - 4180:8, 4181:4, 4181:7, 4181:8, 4181:10, 4237:7
**23rd** [2] - 4195:8, 4199:24
**25** [5] - 4103:4, 4110:25, 4112:10, 4112:11, 4116:20

**258** [1] - 4212:15
**25th** [1] - 4229:19
**26** [2] - 4095:7, 4164:6
**27** [1] - 4228:14
**28** [7] - 4146:17, 4147:23, 4148:2, 4148:3, 4149:9, 4149:10, 4237:2
**29** [1] - 4177:11
**2:30** [1] - 4190:16
**2O5** [1] - 4175:2
**2O6** [1] - 4174:4

**3**

**3** [1] - 4189:14
**30** [2] - 4115:25, 4226:4
**300** [1] - 4095:3
**3063** [2] - 4157:25, 4158:20
**30th** [1] - 4229:22
**31st** [2] - 4132:8, 4139:2
**35** [4] - 4216:20, 4216:25, 4217:2, 4218:6
**365** [1] - 4169:24
**39-page** [3] - 4212:14, 4212:17, 4214:6
**3rd** [6] - 4229:14, 4229:24, 4230:11, 4230:24, 4231:1, 4231:13

**4**

**4** [4] - 4139:6, 4139:11, 4139:23, 4184:10
**4104** [1] - 4236:3
**4105** [1] - 4236:4
**4112** [1] - 4236:6
**4113** [1] - 4236:8
**4114** [1] - 4236:9
**4134** [1] - 4236:11
**4138** [2] - 4236:13, 4236:25
**4148** [1] - 4237:2
**4157** [1] - 4236:15
**416** [1] - 4212:17
**4160** [2] - 4236:17, 4237:4
**4175** [1] - 4237:6
**4181** [1] - 4237:7
**4191** [1] - 4237:8
**4196** [1] - 4236:19
**4197** [2] - 4236:21, 4237:10
**4203** [1] - 4237:12
**4210** [1] - 4237:14
**43** [1] - 4159:3
**46** [1] - 4114:15
**480-314-3795** [1] - 4204:8
**4:31** [1] - 4224:15

2

**5**

**5** [1] - 4141:4
**500** [1] - 4129:7
**56** [1] - 4183:4

**6**

**6** [1] - 4215:25
**631** [1] - 4095:21
**64** [1] - 4210:12
**65** [6] - 4194:25, 4195:9, 4196:2, 4197:17, 4197:21, 4237:10
**66** [4] - 4201:4, 4203:1, 4203:2, 4237:12
**67** [1] - 4201:8
**68** [1] - 4201:17
**69** [1] - 4201:20

**7**

**7** [3] - 4139:20, 4142:2, 4204:13
**70** [6] - 4201:11, 4202:13, 4203:1, 4203:3, 4203:5, 4237:12
**71** [1] - 4201:14
**712-6101** [1] - 4095:21
**770** [1] - 4180:3

**8**

**88** [1] - 4163:21
**89,000** [1] - 4158:5
**8:00** [1] - 4176:20

**9**

**924** [1] - 4119:5
**925** [1] - 4119:11
**93** [2] - 4165:18, 4165:21
**9:00** [1] - 4228:20
**9:30** [3] - 4224:19, 4232:2, 4235:7

**A**

**a.m** [2] - 4094:9, 4235:7
**Aaron** [7] - 4198:16, 4198:17, 4199:12, 4199:25, 4221:18, 4221:19, 4222:8
**abandons** [1] - 4098:12
**ability** [3] - 4109:8, 4155:19, 4170:1

**able** [6] - 4096:19, 4099:24, 4133:21, 4137:7, 4217:16, 4229:8
**absolutely** [2] - 4230:11, 4231:25
**access** [3] - 4121:6, 4149:1, 4233:1
**according** [3] - 4096:20, 4139:21, 4218:9
**account** [20] - 4142:24, 4142:25, 4153:11, 4156:15, 4162:23, 4177:3, 4177:6, 4177:8, 4184:3, 4189:6, 4189:14, 4189:22, 4212:11, 4213:9, 4213:12, 4213:15, 4218:17, 4222:3, 4222:6, 4222:9
**accountant** [2] - 4219:3, 4220:20
**accounts** [8] - 4151:22, 4161:8, 4161:25, 4162:4, 4177:4, 4189:16, 4199:1, 4199:4
**accumulate** [1] - 4096:17
**accurate** [6] - 4157:12, 4174:22, 4180:25, 4190:25, 4195:22, 4212:3
**accused** [1] - 4100:4
**acknowledge** [1] - 4148:12
**acknowledgment** [6] - 4142:8, 4146:12, 4147:4, 4165:21, 4166:2, 4179:25
**acquire** [10] - 4120:2, 4121:6, 4147:8, 4147:10, 4157:4, 4174:16, 4180:20, 4190:19, 4195:16, 4213:20
**acquired** [3] - 4121:11, 4126:11, 4218:15
**acre** [1] - 4212:15
**Acting** [1] - 4094:14
**actions** [3] - 4140:3, 4178:9, 4185:16
**active** [1] - 4154:2
**activities** [1] - 4139:4
**activity** [2] - 4185:15, 4185:24
**actual** [2] - 4106:4, 4133:22
**addition** [13] - 4121:15, 4139:7, 4142:25, 4144:2, 4144:10, 4144:24, 4149:10, 4152:9, 4155:10, 4155:16, 4169:15, 4179:24, 4226:1
**additional** [4] - 4121:13, 4143:5, 4170:10, 4229:10
**address** [4] - 4194:10, 4214:14, 4230:14, 4233:10
**addressed** [2] - 4176:11, 4188:20

**addresses** [2] - 4194:16, 4213:1
**adjustment** [2] - 4227:24, 4227:25
**administrative** [1] - 4139:7
**admiring** [1] - 4130:16
**admissibility** [1] - 4167:13
**admissible** [1] - 4098:21
**admission** [3] - 4099:21, 4134:23, 4209:18
**admissions** [1] - 4099:4
**admit** [1] - 4197:12
**admitted** [8] - 4138:4, 4148:2, 4160:9, 4175:5, 4181:7, 4191:8, 4203:1, 4209:22
**advance** [2] - 4221:13, 4228:17
**adverse** [2] - 4127:21, 4153:3
**adversity** [1] - 4127:22
**advice** [2] - 4218:10, 4219:6
**advisable** [1] - 4149:7
**advised** [3] - 4145:16, 4233:3, 4234:22
**advisor** [2] - 4162:6, 4184:14
**advisors** [2] - 4149:6, 4219:7
**afternoon** [6] - 4126:15, 4167:11, 4180:14, 4190:17, 4205:1, 4229:8
**afterwards** [1] - 4143:24
**agencies** [2] - 4220:3, 4220:11
**agent** [2] - 4098:17, 4100:3
**agents** [8] - 4116:1, 4116:9, 4116:15, 4119:25, 4122:5, 4126:7, 4126:8, 4222:16
**ages** [1] - 4115:1
**ago** [9] - 4098:24, 4102:1, 4116:17, 4124:9, 4126:3, 4128:7, 4134:12, 4144:14, 4229:4
**agree** [4] - 4133:18, 4158:8, 4234:21, 4234:22
**agreed** [1] - 4162:8
**agreement** [10] - 4111:18, 4140:14, 4141:8, 4147:5, 4153:20, 4164:5, 4164:15, 4164:23, 4180:1, 4223:13
**agreements** [5] - 4124:13, 4179:8, 4179:14, 4179:22, 4194:19
**ahead** [8] - 4105:2, 4114:5, 4146:9, 4158:19, 4167:23, 4173:24, 4210:9, 4226:8
**aid** [1] - 4217:16

**airline** [1] - 4229:12
**Airport** [1] - 4130:12
**Al** [1] - 4132:12
**Alan** [17] - 4132:6, 4133:16, 4138:10, 4138:11, 4138:20, 4139:5, 4139:7, 4139:9, 4139:13, 4139:19, 4147:19, 4155:23, 4164:16, 4167:14, 4179:22, 4223:15
**alert** [1] - 4145:14
**alerted** [3] - 4120:3, 4155:18, 4163:14
**ALL** [1] - 4103:24
**allegation** [3] - 4098:13, 4098:19, 4098:20
**allegations** [8] - 4098:12, 4099:2, 4099:17, 4099:19, 4099:23, 4117:6, 4123:3
**alleged** [1] - 4144:3
**Allen** [1] - 4133:15
**allow** [6] - 4137:9, 4137:11, 4172:12, 4188:16, 4230:25, 4233:10
**allowed** [3] - 4173:15, 4173:16, 4176:22
**alluded** [1] - 4198:12
**almost** [3] - 4124:15, 4129:19, 4183:24
**alternative** [1] - 4188:17
**amass** [1] - 4151:14
**America** [4] - 4118:8, 4161:16, 4161:24, 4189:24
**AMERICA** [1] - 4094:3
**amount** [1] - 4204:14
**amounts** [2] - 4153:22
**analogy** [1] - 4099:9
**analysis** [4] - 4101:4, 4102:7, 4126:6
**ancillary** [1] - 4204:16
**ANDREW** [3] - 4095:6, 4113:22, 4236:8
**Andrew** [1] - 4114:4
**angle** [1] - 4119:20
**Ann** [1] - 4095:20
**answer** [6] - 4110:7, 4155:5, 4161:22, 4171:5, 4180:4, 4188:9
**answered** [1] - 4109:7
**answers** [1] - 4171:13
**anticipate** [3] - 4206:22, 4226:15, 4231:10
**anticipated** [1] - 4228:6
**apologize** [3] - 4102:23, 4197:25, 4228:23
**appear** [1] - 4196:14
**appearance** [1] - 4187:20
**appearances** [1] - 4096:3
**APPEARANCES** [1] - 4094:13

**appeared** [4] - 4158:24, 4159:10, 4224:6, 4224:9
**application** [1] - 4232:16
**appreciate** [2] - 4103:16, 4228:5
**approach** [4] - 4107:16, 4107:17, 4135:13, 4170:16
**approached** [3] - 4107:18, 4108:18, 4115:25
**approximate** [1] - 4185:18
**April** [9] - 4138:15, 4157:3, 4161:4, 4164:6, 4165:9, 4190:16, 4193:12, 4195:9, 4195:11
**area** [1] - 4224:14
**argument** [1] - 4167:13
**Arizona** [9] - 4115:17, 4116:6, 4116:20, 4140:25, 4141:6, 4144:8, 4162:14, 4193:10, 4214:14
**armed** [1] - 4115:25
**arranged** [1] - 4096:21
**arrest** [8] - 4115:20, 4116:9, 4117:24, 4122:9, 4122:12, 4122:25, 4123:2, 4159:19
**arrested** [3] - 4115:11, 4116:21, 4185:12
**arrived** [1] - 4115:22
**article** [1] - 4131:22
**ascertain** [2] - 4102:13, 4232:11
**ASHTLOAD** [1] - 4179:16
**aspect** [7] - 4124:24, 4183:12, 4183:14, 4215:4, 4221:22, 4223:1, 4224:13
**aspects** [2] - 4153:5, 4226:18
**assets** [1] - 4152:19
**Assistant** [1] - 4094:17
**assistant** [4] - 4162:17, 4163:8, 4182:4, 4182:5
**assisting** [1] - 4168:23
**associate** [1] - 4191:18
**associated** [1] - 4217:8
**Associates** [2] - 4162:6, 4182:2
**assume** [1] - 4226:10
**assuming** [2] - 4159:3, 4229:19
**assure** [1] - 4143:25
**asterisk** [1] - 4158:24
**athletes** [2] - 4218:11, 4221:12
**attempt** [3] - 4161:24, 4189:7, 4234:25
**attempted** [1] - 4161:15
**attempting** [1] - 4213:4
**attempts** [2] - 4120:4, 4189:3

**attended** [2] - 4215:8, 4215:13
**attention** [8] - 4098:10, 4099:15, 4201:5, 4201:9, 4201:11, 4201:14, 4201:17, 4201:20
**attentive** [1] - 4231:16
**attorney** [9] - 4100:17, 4147:12, 4149:11, 4151:17, 4151:18, 4151:19, 4151:20, 4154:14, 4158:6
**Attorney** [2] - 4094:14, 4094:17
**attorney's** [1] - 4203:14
**attorneys** [1] - 4102:3, 4120:9, 4151:8, 4152:7, 4164:21, 4165:24, 4222:16, 4223:13, 4223:15, 4233:7
**attributed** [1] - 4099:21
**audit** [2] - 4218:9, 4219:5
**audits** [1] - 4218:12
**August** [10] - 4138:12, 4139:14, 4141:17, 4142:2, 4142:11, 4142:12, 4147:18, 4155:15, 4177:12, 4183:12
**authentic** [1] - 4132:14
**authenticity** [1] - 4136:18
**author** [1] - 4132:14
**authorities** [1] - 4120:23
**authorize** [1] - 4120:23
**available** [4] - 4102:19, 4184:2, 4192:11, 4228:1
**Avenue** [1] - 4185:13
**avoid** [1] - 4227:2
**awaiting** [1] - 4205:11
**aware** [17] - 4098:10, 4100:15, 4108:18, 4119:23, 4121:10, 4122:4, 4124:5, 4127:23, 4127:25, 4161:15, 4169:13, 4176:24, 4183:21, 4189:2, 4211:24, 4212:9, 4216:21
**awareness** [5] - 4161:17, 4169:11, 4173:19, 4188:7
**awful** [1] - 4206:19

## B

**background** [1] - 4107:6
**badly** [1] - 4230:3
**Baja** [1] - 4154:7
**balance** [1] - 4190:6
**Ball** [1] - 4164:22
**band** [1] - 4190:3
**Bank** [21] - 4161:16, 4161:24, 4189:3, 4191:17,

4191:25, 4194:9, 4194:13, 4198:13, 4198:21, 4198:22, 4200:1, 4205:23, 4209:14, 4209:15, 4209:17, 4210:18, 4210:19, 4212:19, 4212:24, 4213:4, 4214:13
**bank** [21] - 4120:7, 4124:11, 4142:12, 4142:18, 4143:25, 4169:3, 4170:7, 4170:11, 4171:9, 4171:17, 4172:7, 4173:10, 4175:20, 4181:22, 4189:18, 4189:21, 4209:16, 4210:21, 4212:14, 4222:13
**banking** [2] - 4120:3, 4163:7
**banks** [3] - 4120:8, 4129:15, 4222:16
**base** [1] - 4192:23
**based** [6] - 4144:13, 4188:8, 4218:10, 4220:7, 4223:9, 4234:14
**basis** [10] - 4099:11, 4116:14, 4122:14, 4123:3, 4125:5, 4154:19, 4191:24, 4192:8, 4193:23, 4215:15
**Bates** [1] - 4232:8
**bathroom** [1] - 4208:13
**Bay** [1] - 4130:15
**Beach** [1] - 4185:12
**beach** [1] - 4143:19
**became** [5] - 4107:10, 4108:18, 4118:7, 4132:7, 4222:8
**become** [2] - 4131:17, 4138:23
**BEFORE** [1] - 4094:11
**began** [1] - 4151:9
**begin** [1] - 4229:14
**beginning** [1] - 4098:16
**begins** [1] - 4157:24
**begun** [1] - 4151:4
**behalf** [13] - 4140:17, 4140:20, 4141:5, 4144:4, 4144:9, 4144:11, 4149:17, 4203:15, 4218:13, 4221:1, 4221:4, 4221:6, 4223:24
**behind** [4] - 4116:4, 4119:21, 4169:14, 4200:23
**belabor** [2] - 4205:18, 4235:4
**belong** [1] - 4118:9
**belonged** [2] - 4118:10, 4121:25
**below** [1] - 4148:17
**Berard** [28] - 4108:24, 4110:16, 4111:4, 4152:21, 4152:22, 4152:25, 4153:9,

4153:16, 4153:20, 4153:25, 4154:7, 4154:13, 4154:21, 4155:8, 4155:16, 4155:21, 4156:11, 4157:2, 4157:14, 4158:23, 4161:9, 4162:20, 4163:15, 4163:25, 4166:5, 4168:7, 4216:1, 4216:6
**Berard's** [3] - 4155:3, 4156:1, 4158:22
**best** [14] - 4107:14, 4107:19, 4108:6, 4109:7, 4129:25, 4168:8, 4168:11, 4168:20, 4172:14, 4183:17, 4215:12, 4216:17, 4220:10, 4222:6
**better** [3] - 4193:13, 4229:1, 4231:10
**between** [30] - 4099:9, 4125:6, 4127:22, 4127:24, 4132:11, 4139:8, 4141:1, 4151:2, 4156:12, 4156:14, 4157:13, 4168:9, 4169:25, 4170:12, 4179:22, 4182:17, 4183:1, 4183:2, 4184:19, 4192:24, 4198:20, 4199:12, 4204:15, 4209:10, 4213:11, 4216:2, 4216:14, 4216:18, 4217:7, 4217:12
**beverage** [1] - 4151:6
**beyond** [3] - 4159:23, 4171:5, 4172:2
**Bhatti** [1] - 4138:13
**BHATTI** [1] - 4138:16
**BIANCO** [1] - 4094:11
**big** [4] - 4129:5, 4130:6, 4130:10, 4139:25
**Bill** [3] - 4164:21, 4165:23, 4223:14
**bill** [1] - 4191:22
**billion** [2] - 4129:6, 4129:8
**binders** [2] - 4179:19, 4204:13
**bit** [1] - 4191:15
**Blake** [1] - 4115:2
**blaming** [1] - 4226:9
**block** [1] - 4204:10
**blocked** [1] - 4174:14
**blocky** [1] - 4203:24
**boss** [1] - 4168:19
**Boston** [1] - 4168:18
**bottle** [7] - 4145:7, 4149:21, 4149:22, 4150:1, 4150:20, 4150:23, 4152:17
**bottles** [4] - 4150:4, 4150:7, 4150:15
**bottom** [1] - 4203:13
**box** [3] - 4097:8, 4151:12, 4159:1

**brackets** [1] - 4189:13
**brakes** [1] - 4102:13
**brand** [4] - 4151:4, 4151:10, 4151:14, 4152:17
**break** [8] - 4145:9, 4145:11, 4146:4, 4166:10, 4204:25, 4205:1, 4207:3, 4209:11
**breakfast** [3] - 4115:23, 4116:13, 4116:14
**breakup** [1] - 4171:12
**Brian** [7] - 4152:22, 4157:1, 4157:13, 4158:23, 4163:25, 4166:4, 4216:1
**brief** [1] - 4204:23
**briefly** [1] - 4167:9
**bring** [8] - 4099:14, 4103:19, 4146:3, 4167:7, 4167:12, 4208:3, 4209:1, 4228:19
**broad** [1] - 4171:3
**broke** [2] - 4146:11, 4177:20
**Brothers** [15] - 4138:16, 4139:13, 4139:14, 4139:18, 4139:22, 4142:3, 4147:6, 4147:18, 4149:15, 4164:15, 4165:3, 4177:12, 4179:22, 4203:16, 4223:15
**brought** [1] - 4228:17
**Bryan** [4] - 4108:24, 4110:16, 4111:4, 4168:7
**bubble** [4] - 4121:19, 4121:22, 4159:10, 4233:23
**build** [1] - 4107:25
**builder** [1] - 4110:25
**bulk** [1] - 4096:11
**business** [9] - 4121:15, 4150:19, 4151:12, 4152:12, 4163:17, 4193:4, 4193:5, 4221:8, 4221:11
**busy** [2] - 4190:7, 4192:6
**buy** [1] - 4170:4
**buy-in** [1] - 4170:4
**BY** [49] - 4094:16, 4094:22, 4095:4, 4105:6, 4106:9, 4109:2, 4112:2, 4114:13, 4117:16, 4128:20, 4133:5, 4134:3, 4138:8, 4146:10, 4148:5, 4156:10, 4156:17, 4157:22, 4160:14, 4160:20, 4165:16, 4168:1, 4174:2, 4175:7, 4178:19, 4181:9, 4187:1, 4191:11, 4194:22, 4195:15, 4196:6, 4197:20, 4198:1, 4201:25, 4202:9, 4203:4, 4210:10, 4211:18, 4215:1, 4220:1, 4236:5, 4236:7, 4236:10, 4236:12, 4236:14,

4236:16, 4236:18, 4236:20, 4236:22

## C

**cabana** [5] - 4131:13, 4215:9, 4215:10, 4215:12, 4216:2
**Cabo** [4] - 4154:6, 4154:8, 4179:9, 4185:22
**CALCAGNI** [1] - 4094:20
**California** [4] - 4143:19, 4177:23, 4185:13, 4193:11
**Canada** [2] - 4190:2, 4214:7
**candid** [1] - 4231:16
**candidly** [1] - 4103:11
**candor** [1] - 4227:3
**cannot** [1] - 4099:20
**capital** [10] - 4139:17, 4153:11, 4165:2, 4177:3, 4177:4, 4177:6, 4177:8, 4184:3, 4191:21, 4203:24
**car** [3] - 4116:5, 4130:11, 4130:21
**card** [1] - 4150:19
**cards** [1] - 4151:12
**Carlsmith** [1] - 4164:22
**carried** [1] - 4116:5
**carts** [4] - 4127:5, 4127:9, 4226:23, 4226:24
**case** [32] - 4096:3, 4096:19, 4098:3, 4098:5, 4098:9, 4098:11, 4098:16, 4099:3, 4099:10, 4099:16, 4100:10, 4104:3, 4104:4, 4118:8, 4123:4, 4125:14, 4145:12, 4150:18, 4166:15, 4168:25, 4171:21, 4173:14, 4174:19, 4205:2, 4224:18, 4227:5, 4229:18, 4229:20, 4230:4, 4230:12, 4231:9
**cases** [3] - 4098:6, 4178:9, 4185:24
**cash** [4] - 4126:6, 4130:8, 4155:12, 4184:3
**cave** [3] - 4184:16, 4184:21
**CC** [2] - 4222:6, 4222:12
**cc'd** [3] - 4200:19, 4200:24, 4200:25
**CD** [4] - 4101:25, 4102:11, 4102:12, 4103:3
**ceased** [2] - 4151:15, 4179:12
**cell** [2] - 4101:8, 4158:22
**Central** [3] - 4094:6, 4094:15, 4095:21
**certain** [2] - 4098:12,

4173:20
**certainly** [5] - 4098:19, 4100:3, 4136:13, 4176:10, 4218:12
**certified** [2] - 4194:15, 4200:1
**cetera** [2] - 4121:17, 4222:16
**chain** [2] - 4132:11, 4234:15
**chair** [1] - 4104:25
**chance** [2] - 4206:20, 4231:6
**change** [1] - 4177:11
**changed** [1] - 4139:19
**character** [1] - 4124:7
**characters** [1] - 4158:15
**charge** [2] - 4139:5, 4162:11
**Charles** [14] - 4142:25, 4162:3, 4162:7, 4162:23, 4182:1, 4182:6, 4189:6, 4189:7, 4191:18, 4191:19, 4198:20, 4199:2, 4200:15, 4200:17
**charts** [10] - 4125:22, 4126:6, 4126:9, 4126:18, 4126:21, 4127:7, 4127:10, 4226:23, 4226:24, 4227:4
**checking** [1] - 4177:3
**chief** [2] - 4133:16, 4179:11
**children** [7] - 4114:22, 4114:24, 4114:25, 4115:5, 4121:17, 4122:14, 4122:16
**choose** [2] - 4148:8, 4155:21
**chose** [2] - 4155:21, 4185:21
**Chris** [16] - 4108:3, 4108:8, 4108:12, 4108:14, 4108:16, 4109:10, 4109:19, 4109:24, 4110:3, 4110:9, 4130:4, 4130:17, 4131:3, 4131:18, 4138:15, 4147:3
**Christmas** [1] - 4213:11
**Christopher** [1] - 4148:14
**chronological** [4] - 4233:16, 4234:1, 4234:13, 4234:20
**circumstances** [3] - 4172:8, 4175:9, 4221:6
**City** [2] - 4106:24, 4107:5
**civil** [2] - 4175:18, 4188:19
**claim** [2] - 4143:3, 4143:5, 4143:14
**claimed** [1] - 4211:21
**clarification** [1] - 4109:22
**clarity** [1] - 4194:5

**clean** [1] - 4213:4
**clear** [8] - 4099:17, 4106:2, 4124:5, 4172:4, 4172:11, 4173:23, 4197:4, 4230:9
**clearance** [1] - 4097:22
**clearly** [3] - 4171:25, 4189:19, 4234:18
**CLERK** [6] - 4096:1, 4103:20, 4104:20, 4167:3, 4167:20, 4209:6
**clerk** [1] - 4145:16
**client** [8] - 4100:13, 4102:12, 4102:18, 4136:15, 4208:12, 4208:21, 4226:17, 4234:9
**client's** [1] - 4234:6
**clients** [25] - 4122:23, 4147:15, 4149:18, 4163:6, 4163:9, 4176:2, 4179:2, 4182:14, 4191:24, 4192:6, 4192:14, 4192:21, 4193:1, 4194:16, 4198:21, 4199:3, 4217:9, 4218:18, 4222:1, 4222:7, 4222:11, 4222:14, 4222:17, 4222:20, 4223:24
**clients'** [1] - 4169:2
**close** [8] - 4105:1, 4130:9, 4139:16, 4212:15, 4212:16, 4227:5, 4229:21
**closed** [1] - 4199:4
**closer** [1] - 4229:4
**closing** [21] - 4110:17, 4111:16, 4139:4, 4139:21, 4142:1, 4142:3, 4144:5, 4144:7, 4147:11, 4147:12, 4147:16, 4147:18, 4149:11, 4155:15, 4155:16, 4165:3, 4179:8, 4179:21
**co** [1] - 4102:7
**co-counsel** [1] - 4102:7
**cocounsel** [1] - 4164:21
**collateral** [16] - 4155:20, 4161:7, 4170:10, 4171:11, 4176:23, 4181:23, 4182:3, 4188:1, 4189:8, 4189:16, 4189:22, 4194:12, 4194:17, 4194:19, 4200:17, 4200:24
**collecting** [2] - 4203:15, 4223:23
**collective** [1] - 4181:16
**collectively** [1] - 4208:9
**column** [1] - 4159:6
**comfortable** [1] - 4154:17
**coming** [3] - 4108:24, 4172:5, 4215:23
**commencement** [1] - 4098:2
**comment** [2] - 4220:14,

4234:5

**Commission** [2] - 4134:17, 4220:9

**commitment** [1] - 4155:20

**committee** [1] - 4139:22

**common** [1] - 4176:3

**communicate** [1] - 4222:1

**communicated** [2] - 4191:15, 4200:10

**communicating** [2] - 4138:20, 4220:3

**communication** [9] - 4125:7, 4133:16, 4150:14, 4179:11, 4188:6, 4192:5, 4196:15, 4200:8, 4220:11

**communications** [3] - 4156:14, 4188:10, 4195:6

**companies** [1] - 4141:18

**company** [3] - 4138:24, 4164:5, 4177:2

**compare** [1] - 4137:7

**compilation** [1] - 4204:21

**complete** [7] - 4100:21, 4101:14, 4145:3, 4197:4, 4210:2, 4210:3, 4234:17

**completed** [2] - 4191:17, 4226:13

**completely** [4] - 4169:13, 4188:22, 4188:23, 4212:2

**completeness** [4] - 4102:14, 4197:9, 4197:10, 4232:6

**completing** [1] - 4164:14

**complex** [1] - 4193:5

**complexity** [1] - 4162:1

**comptroller** [1] - 4220:19

**computer** [34] - 4095:25, 4097:1, 4117:17, 4117:18, 4117:23, 4117:25, 4118:5, 4118:6, 4119:10, 4119:12, 4120:16, 4120:20, 4121:3, 4121:7, 4121:12, 4121:14, 4121:25, 4123:18, 4123:22, 4132:9, 4174:24, 4181:1, 4185:3, 4185:5, 4185:6, 4185:21, 4187:6, 4187:12, 4187:14, 4187:15, 4191:1, 4195:24

**conceivable** [3] - 4225:6, 4225:8

**concern** [3] - 4176:5, 4227:21, 4229:16

**concerned** [7] - 4101:14, 4176:3, 4218:21, 4219:3, 4228:1, 4228:2, 4231:13

**concerning** [6] - 4156:14, 4185:2, 4185:4, 4194:2, 4199:13, 4217:22

**concert** [3] - 4165:23, 4190:1, 4223:15

**conclude** [1] - 4225:2

**concluded** [1] - 4137:17

**conclusion** [1] - 4150:18

**condition** [1] - 4118:12

**conditions** [2] - 4142:7, 4192:12

**conduct** [3] - 4098:20, 4114:8, 4225:4

**conference** [6] - 4191:18, 4198:3, 4198:5, 4198:16, 4198:20, 4199:16

**confirm** [3] - 4096:23, 4149:3, 4198:22

**confirmation** [9] - 4198:8, 4198:10, 4198:19, 4199:7, 4199:11, 4199:13, 4204:4, 4204:5, 4214:11

**confirmed** [4] - 4227:10, 4227:13, 4227:16, 4227:17

**confronted** [1] - 4137:6

**confused** [1] - 4209:23

**confusion** [1] - 4203:18

**conjunction** [2] - 4210:22, 4216:1

**connection** [9] - 4107:9, 4107:20, 4111:17, 4115:11, 4136:6, 4156:2, 4178:24, 4214:21, 4222:3

**consent** [8] - 4142:9, 4146:12, 4147:4, 4148:18, 4149:3, 4165:21, 4166:2, 4179:25

**consider** [1] - 4173:11

**considered** [1] - 4173:21

**consistent** [1] - 4117:8

**conspire** [1] - 4222:18

**CONSTANTINE** [1] - 4094:7

**Constantine** [7] - 4095:4, 4095:8, 4151:3, 4209:1, 4221:1, 4221:10

**Constantine's** [2] - 4221:4, 4221:6

**constraints** [1] - 4162:2

**constructions** [1] - 4107:25

**consuming** [1] - 4123:12

**Cont'd** [2] - 4133:5, 4187:1

**contact** [2] - 4102:25, 4179:13

**contacted** [2] - 4120:10, 4162:3

**contain** [1] - 4136:8

**contained** [7] - 4120:25, 4121:14, 4136:10, 4174:23, 4180:25, 4195:23, 4211:6

**content** [16] - 4117:4, 4117:5, 4136:6, 4163:1, 4164:8, 4175:9, 4176:16,

4178:25, 4180:16, 4181:10, 4181:11, 4190:24, 4191:12, 4197:23, 4198:2, 4199:19

**contents** [2] - 4136:23, 4200:12

**context** [2] - 4147:7, 4155:17

**continue** [4] - 4096:20, 4175:15, 4185:17, 4234:10

**continued** [3] - 4132:15, 4177:19, 4186:2

**Continued** [8] - 4135:15, 4137:18, 4145:23, 4166:18, 4170:17, 4172:17, 4207:5, 4219:9

**continuing** [2] - 4153:21, 4178:9

**contract** [1] - 4130:7

**contracts** [1] - 4124:12

**contractual** [1] - 4142:13

**contrary** [1] - 4098:10

**contributions** [1] - 4165:2

**control** [4] - 4139:9, 4140:2, 4184:10, 4228:24

**conundrum** [1] - 4232:20

**conversation** [20] - 4100:23, 4101:1, 4101:7, 4101:12, 4101:14, 4101:15, 4108:2, 4108:4, 4128:22, 4140:24, 4169:16, 4188:15, 4196:23, 4197:4, 4197:5, 4217:1, 4217:7, 4217:12, 4217:22, 4218:14

**conversations** [21] - 4101:3, 4125:23, 4128:12, 4131:6, 4161:9, 4171:7, 4172:11, 4182:17, 4182:25, 4183:2, 4183:7, 4183:25, 4184:12, 4184:18, 4213:11, 4216:14, 4216:18, 4216:24, 4220:8, 4220:12

**convey** [1] - 4193:14

**conveyed** [1] - 4181:12

**convicted** [1] - 4115:7

**CONWAY** [1] - 4095:2

**Conway** [2] - 4102:8, 4227:9

**copied** [1] - 4147:14

**copies** [3] - 4157:4, 4179:24, 4233:7

**copy** [15] - 4100:14, 4100:15, 4100:17, 4100:20, 4101:25, 4102:2, 4106:4, 4145:4, 4147:8, 4147:9, 4147:10, 4179:13, 4206:24, 4222:12, 4228:12

**corporate** [3] - 4124:12,

4165:24, 4177:9

**corporation** [1] - 4165:12

**correct** [55] - 4100:1, 4105:10, 4105:16, 4105:19, 4105:20, 4107:1, 4107:2, 4107:13, 4109:5, 4109:6, 4109:21, 4111:8, 4112:8, 4115:12, 4123:24, 4124:2, 4126:2, 4126:3, 4126:23, 4126:25, 4127:17, 4128:5, 4128:13, 4129:17, 4129:18, 4131:2, 4131:4, 4134:8, 4134:9, 4134:14, 4134:19, 4143:12, 4144:15, 4146:14, 4149:23, 4150:21, 4151:23, 4152:2, 4158:10, 4158:11, 4159:14, 4166:6, 4166:7, 4174:14, 4180:18, 4182:10, 4187:18, 4196:8, 4196:12, 4200:23, 4209:18, 4216:10, 4222:23, 4224:5, 4232:21

**correctly** [1] - 4162:9

**correspondence** [4] - 4124:22, 4132:11, 4156:12, 4195:10

**corresponding** [4] - 4192:15, 4192:18, 4199:8, 4234:15

**cottage** [1] - 4131:10

**counsel** [7] - 4098:24, 4101:24, 4102:7, 4126:12, 4137:8, 4164:20, 4232:14

**Country** [1] - 4095:3

**couple** [1] - 4229:17

**course** [8] - 4123:21, 4141:10, 4169:5, 4183:8, 4216:12, 4223:5, 4225:24, 4226:5

**COURT** [123] - 4094:1, 4096:2, 4096:4, 4097:12, 4097:22, 4098:4, 4099:6, 4099:12, 4100:2, 4101:18, 4101:20, 4102:16, 4103:5, 4103:14, 4103:17, 4103:19, 4103:22, 4103:25, 4104:11, 4104:24, 4106:2, 4106:7, 4109:1, 4110:7, 4113:12, 4113:14, 4113:17, 4113:21, 4114:1, 4114:5, 4114:10, 4128:19, 4129:1, 4133:2, 4134:1, 4134:25, 4135:3, 4135:8, 4135:13, 4136:2, 4137:3, 4137:9, 4137:14, 4138:2, 4138:4, 4145:8, 4145:17, 4145:20, 4146:2, 4146:5, 4146:8,

4148:2, 4157:20, 4160:9,
4160:17, 4161:21, 4166:9,
4166:13, 4167:4, 4167:15,
4167:19, 4167:22,
4171:15, 4171:23,
4172:16, 4173:2, 4175:5,
4178:15, 4181:7, 4191:8,
4196:3, 4196:4, 4197:10,
4197:14, 4203:1, 4204:25,
4205:4, 4205:25, 4206:5,
4206:9, 4206:14, 4206:17,
4207:2, 4208:2, 4208:6,
4208:11, 4208:14,
4208:17, 4208:20,
4208:25, 4209:4, 4209:8,
4209:13, 4209:20,
4209:22, 4210:6, 4210:9,
4214:23, 4224:15,
4224:21, 4224:23, 4225:8,
4225:12, 4225:14,
4225:16, 4226:9, 4226:22,
4227:6, 4227:21, 4228:9,
4228:19, 4229:2, 4230:20,
4231:12, 4231:18, 4232:1,
4232:17, 4232:23,
4233:16, 4233:25, 4234:3,
4234:11, 4235:5
**court** [16] - 4135:11,
4138:1, 4141:4, 4141:7,
4145:15, 4152:23, 4153:1,
4161:18, 4164:11, 4173:1,
4193:24, 4205:7, 4205:21,
4206:1, 4211:24, 4217:21
**Court** [23] - 4095:7,
4095:20, 4096:8, 4098:23,
4099:8, 4099:13, 4099:25,
4100:7, 4103:1, 4103:10,
4103:14, 4108:6, 4125:12,
4128:1, 4132:8, 4168:2,
4223:9, 4226:17, 4226:25,
4228:24, 4232:5, 4233:10,
4234:6
**Court's** [1] - 4114:7
**Courthouse** [1] - 4094:6
**courtroom** [19] - 4096:24,
4097:9, 4097:13, 4126:17,
4145:13, 4146:7, 4154:15,
4166:16, 4179:21, 4184:7,
4189:11, 4198:11,
4198:18, 4199:21, 4205:3,
4209:7, 4218:23, 4221:21,
4228:17
**cover** [2] - 4119:15, 4214:5
**CR-13-607** [1] - 4094:4
**crashed** [1] - 4187:6
**created** [3] - 4164:12,
4164:22, 4210:15
**credibility** [1] - 4098:15
**credit** [65] - 4143:1,
4143:2, 4153:10, 4155:14,

4155:17, 4156:3, 4160:23,
4161:6, 4161:11, 4161:14,
4161:25, 4162:13,
4162:18, 4169:10,
4169:11, 4169:14,
4169:18, 4169:20,
4169:25, 4170:2, 4170:4,
4170:9, 4170:13, 4171:10,
4172:1, 4172:2, 4172:7,
4172:9, 4175:16, 4176:3,
4176:6, 4176:23, 4176:25,
4181:16, 4181:23, 4182:2,
4183:17, 4183:19,
4183:21, 4188:1, 4188:14,
4188:17, 4188:24,
4188:25, 4189:2, 4189:3,
4189:15, 4193:22,
4194:10, 4198:14,
4198:23, 4210:16,
4210:18, 4210:20,
4210:22, 4211:21,
4211:25, 4212:10,
4212:12, 4212:22, 4213:2,
4213:13, 4222:21
**credits** [1] - 4213:6
**crime** [1] - 4115:8
**cross** [6] - 4097:19,
4103:7, 4103:10, 4103:12,
4225:4, 4227:24
**CROSS** [2] - 4112:1,
4236:6
**cross-examination** [2] -
4097:19, 4225:4
**CROSS-EXAMINATION** [2]
- 4112:1, 4236:6
**curious** [1] - 4177:19
**current** [3] - 4117:6,
4175:16, 4194:10
**CURRIE** [1] - 4094:14
**custodians** [1] - 4162:7
**custody** [1] - 4101:11
**cutting** [1] - 4100:25

---

# D

**D'Ambrosio** [3] - 4227:10,
4227:11, 4228:7
**daily** [4] - 4122:14, 4123:3,
4145:1, 4187:21
**Darryl** [9] - 4179:20,
4193:24, 4195:6, 4199:12,
4199:19, 4200:3, 4202:10,
4203:6, 4224:7
**date** [12] - 4105:25, 4138:6,
4148:4, 4159:2, 4160:12,
4176:18, 4178:8, 4191:10,
4197:18, 4203:3, 4210:8,
4234:14
**dated** [3] - 4148:17,

4164:6, 4174:11
**dates** [4] - 4106:14,
4106:16, 4157:14, 4169:22
**daughter** [2] - 4115:2,
4119:4
**day's** [1] - 4145:5
**days** [12] - 4117:3,
4122:17, 4126:3, 4126:8,
4154:11, 4154:13,
4169:24, 4199:25,
4215:20, 4220:13,
4229:25, 4231:21
**deal** [22] - 4103:7, 4108:23,
4108:24, 4110:10,
4110:13, 4110:14,
4110:15, 4110:18,
4110:20, 4110:22, 4111:3,
4111:16, 4130:9, 4139:12,
4139:16, 4139:17,
4139:18, 4140:2, 4149:16,
4162:9, 4165:25, 4219:8
**dealing** [3] - 4120:4,
4154:13, 4200:2
**dealings** [2] - 4152:12,
4193:4
**December** [9] - 4106:17,
4109:4, 4132:8, 4139:2,
4154:7, 4212:13, 4213:3,
4213:10, 4214:7
**decided** [1] - 4104:5
**decision** [6] - 4149:3,
4177:21, 4181:17,
4188:16, 4230:9, 4231:23
**decisions** [1] - 4176:22
**deemed** [1] - 4149:7
**default** [14] - 4175:17,
4176:23, 4180:15,
4181:17, 4188:17,
4191:20, 4194:3, 4194:6,
4194:7, 4198:13, 4199:22,
4212:23, 4212:24, 4213:1
**defaults** [1] - 4181:22
**defend** [1] - 4123:3
**DEFENDANT** [5] - 4232:22,
4233:12, 4233:17, 4234:2,
4234:4
**defendant** [1] - 4171:16
**Defendants** [3] - 4094:8,
4094:20, 4095:1
**Defense** [8] - 4138:5,
4148:3, 4160:11, 4175:6,
4181:8, 4191:9, 4197:17,
4203:2, 4210:7, 4236:25,
4237:2, 4237:4, 4237:6,
4237:7, 4237:8, 4237:10,
4237:12, 4237:14
**defense** [8] - 4097:18,
4098:13, 4098:24, 4104:4,
4104:8, 4113:19, 4123:12,
4229:18

**definitive** [1] - 4165:1
**defrauding** [2] - 4171:18,
4217:9
**Del** [2] - 4177:16, 4179:15
**del** [1] - 4154:1
**delay** [1] - 4167:11
**delays** [1] - 4096:18
**delete** [1] - 4122:6
**deletions** [1] - 4101:2
**deliberate** [2] - 4100:25,
4231:19
**deliberations** [5] -
4229:24, 4230:12,
4230:25, 4231:21, 4231:22
**delineated** [3] - 4158:21,
4158:25, 4233:14
**delivered** [4] - 4174:20,
4174:21, 4190:20, 4205:13
**delivery** [1] - 4182:13
**dent** [1] - 4118:2
**Department** [2] - 4105:22,
4107:5
**depicted** [1] - 4118:22,
4119:5, 4119:18, 4174:13,
4195:21
**deposit** [1] - 4141:18
**deposited** [2] - 4144:8,
4165:3
**Depot** [3] - 4228:10,
4228:12, 4233:8
**deprive** [1] - 4231:6
**derived** [1] - 4190:25
**describe** [11] - 4115:4,
4115:19, 4127:19,
4129:25, 4153:1, 4158:17,
4164:11, 4175:8, 4176:16,
4217:21, 4221:6
**described** [2] - 4128:10,
4148:18
**deserve** [1] - 4225:10
**designated** [1] - 4189:13
**designation** [2] - 4133:19,
4136:9
**designed** [1] - 4150:6
**desire** [3] - 4175:13,
4185:17, 4198:24
**desk** [2] - 4119:9, 4123:22
**destroy** [1] - 4122:6
**destroyed** [1] - 4111:14
**detail** [1] - 4150:3
**details** [4] - 4117:4,
4154:18, 4178:4
**determined** [1] - 4139:23
**develop** [3] - 4140:4,
4154:5, 4231:10
**developing** [1] - 4152:16
**development** [4] - 4140:3,
4153:23, 4154:3, 4215:16
**device** [18] - 4096:24,
4097:4, 4097:5, 4117:13,

7

4117:19, 4118:7, 4118:12, 4119:6, 4119:12, 4119:18, 4120:12, 4120:25, 4121:12, 4122:7, 4174:1, 4185:3, 4187:14, 4232:12
**devoted** [2] - 4122:11, 4123:1
**DeVries** [1] - 4227:15
**Diamante** [8] - 4153:25, 4154:9, 4177:16, 4179:9, 4179:14, 4185:22, 4215:16, 4215:17
**difference** [1] - 4099:16
**different** [17] - 4099:6, 4101:22, 4109:15, 4116:15, 4122:19, 4124:13, 4124:16, 4131:3, 4169:22, 4178:9, 4193:9, 4219:7, 4220:3, 4224:13, 4228:3, 4234:23
**difficult** [1] - 4234:19
**digital** [1] - 4232:10
**Dimitri** [1] - 4223:19
**diner** [2] - 4116:13, 4116:14
**dinner** [1] - 4131:12
**dire** [3] - 4133:25, 4157:19, 4196:3
**DIRE** [6] - 4134:2, 4157:21, 4196:5, 4236:11, 4236:15, 4236:19
**DIRECT** [10] - 4105:5, 4114:12, 4138:7, 4160:13, 4197:19, 4236:4, 4236:9, 4236:13, 4236:17, 4236:21
**direct** [10] - 4097:18, 4103:6, 4114:8, 4171:12, 4212:8, 4224:13, 4224:24, 4225:2, 4225:9, 4234:8
**direction** [1] - 4098:2
**directly** [6] - 4179:13, 4191:24, 4221:4, 4222:5, 4222:14, 4233:10
**disbursement** [1] - 4143:1
**discernable** [1] - 4176:15
**disclosures** [1] - 4166:2
**disconnect** [1] - 4232:20
**discovery** [11] - 4100:20, 4102:3, 4129:21, 4157:5, 4158:4, 4174:19, 4180:21, 4181:20, 4195:18, 4197:2, 4232:13
**discuss** [11] - 4125:23, 4126:8, 4145:12, 4148:24, 4166:15, 4178:4, 4178:8, 4193:2, 4205:1, 4224:18, 4227:3
**discussed** [6] - 4099:3, 4107:20, 4155:19, 4170:2, 4181:15, 4217:8

**discussing** [5] - 4124:14, 4153:18, 4175:12, 4192:11, 4218:3
**discussions** [3] - 4151:2, 4151:16, 4153:19
**disk** [1] - 4205:14
**dismiss** [1] - 4177:22
**dismissed** [1] - 4141:7
**disorganized** [1] - 4234:18
**disprove** [1] - 4098:14
**dispute** [1] - 4127:24
**disputing** [1] - 4102:25
**distributor** [2] - 4150:14, 4151:8
**DISTRICT** [3] - 4094:1, 4094:1, 4094:11
**District** [3] - 4097:19, 4097:23, 4130:12
**divorce** [1] - 4114:18
**divorced** [1] - 4114:17
**docs** [4] - 4159:8, 4163:1, 4179:17, 4179:18
**document** [72] - 4105:18, 4105:21, 4106:3, 4106:11, 4111:9, 4129:13, 4132:14, 4133:7, 4133:11, 4133:19, 4134:6, 4134:10, 4134:15, 4134:21, 4134:24, 4135:11, 4136:6, 4136:11, 4136:15, 4136:18, 4137:2, 4137:6, 4146:18, 4146:20, 4146:24, 4147:8, 4147:9, 4147:10, 4148:7, 4148:11, 4149:9, 4149:13, 4157:15, 4158:21, 4163:21, 4163:22, 4163:24, 4164:3, 4164:4, 4164:5, 4164:7, 4164:8, 4164:10, 4164:11, 4169:1, 4169:20, 4180:11, 4180:17, 4180:20, 4180:21, 4180:24, 4182:10, 4183:19, 4189:20, 4190:12, 4190:19, 4190:24, 4200:23, 4201:6, 4203:12, 4203:21, 4204:3, 4204:11, 4210:14, 4213:25, 4214:2, 4214:5, 4214:6, 4223:17, 4225:20, 4225:24, 4232:10
**documentation** [4] - 4111:13, 4168:25, 4204:14, 4213:17
**documented** [1] - 4164:23
**documents** [78] - 4096:15, 4097:8, 4111:17, 4111:19, 4121:10, 4123:9, 4123:11, 4124:10, 4124:18, 4124:19, 4124:23, 4125:11, 4125:12, 4125:15, 4125:17,

4129:15, 4129:19, 4132:10, 4147:11, 4149:12, 4154:15, 4156:19, 4156:23, 4157:12, 4159:17, 4159:19, 4162:19, 4162:23, 4163:7, 4163:18, 4163:20, 4169:1, 4169:21, 4171:22, 4174:4, 4174:6, 4174:7, 4174:13, 4174:16, 4179:4, 4179:6, 4179:21, 4180:4, 4182:6, 4188:8, 4189:5, 4195:3, 4195:16, 4195:22, 4198:24, 4200:14, 4201:3, 4202:1, 4202:11, 4204:16, 4204:21, 4206:8, 4206:12, 4206:16, 4206:21, 4209:10, 4209:17, 4209:24, 4209:25, 4210:20, 4211:3, 4211:7, 4213:20, 4213:23, 4214:12, 4223:23, 4225:19, 4225:25, 4226:2, 4226:15, 4226:21, 4233:13
**dollars** [7] - 4129:7, 4129:22, 4130:25, 4141:23, 4142:5, 4152:10, 4165:2
**done** [4] - 4102:21, 4203:14, 4227:22, 4230:11
**Donlan** [2] - 4168:3, 4168:12
**door** [2] - 4136:14, 4137:10
**doubt** [1] - 4118:1
**down** [21] - 4113:14, 4113:16, 4116:1, 4116:3, 4130:11, 4130:12, 4130:17, 4130:18, 4130:19, 4151:6, 4151:8, 4154:7, 4155:14, 4177:20, 4183:23, 4189:16, 4205:4, 4205:6, 4209:5, 4215:20, 4224:22
**download** [1] - 4102:11
**downloaded** [1] - 4101:21
**downs** [1] - 4155:18
**downstairs** [1] - 4228:22
**dozen** [2] - 4125:6
**drafted** [1] - 4165:23
**draw** [1] - 4099:9
**drawing** [6] - 4201:5, 4201:8, 4201:11, 4201:14, 4201:17, 4201:20
**drink** [1] - 4216:3
**drive** [1] - 4130:20
**dropped** [1] - 4118:3
**drove** [1] - 4130:11
**due** [3] - 4141:14, 4162:1, 4188:13

**duly** [2] - 4104:17, 4113:24
**duplicates** [3] - 4206:13, 4206:15, 4210:2
**during** [39] - 4100:20, 4101:2, 4101:23, 4102:13, 4105:18, 4110:17, 4120:4, 4122:3, 4123:19, 4123:21, 4125:7, 4125:10, 4125:14, 4126:23, 4127:12, 4141:10, 4144:20, 4153:15, 4153:18, 4157:5, 4158:4, 4169:5, 4181:20, 4183:8, 4184:5, 4184:6, 4185:20, 4187:12, 4188:10, 4195:18, 4198:11, 4216:12, 4216:25, 4217:6, 4218:6, 4220:13, 4223:5, 4228:24
**dusk** [1] - 4131:8

## E

**e-mail** [31] - 4132:11, 4132:13, 4133:14, 4133:18, 4133:21, 4133:22, 4135:9, 4136:8, 4136:15, 4136:17, 4136:23, 4136:24, 4136:25, 4137:5, 4137:7, 4137:12, 4140:9, 4140:19, 4176:17, 4177:25, 4178:13, 4178:15, 4178:24, 4179:1, 4192:22, 4193:15, 4193:19, 4198:3, 4198:10, 4199:19, 4221:18
**e-mails** [2] - 4124:16, 4160:1
**early** [3] - 4115:22, 4125:18, 4212:23
**earnings** [1] - 4221:8
**easier** [2] - 4228:21, 4231:24
**easily** [4] - 4176:15, 4232:25, 4234:14, 4234:15
**east** [2] - 4108:1, 4108:20
**EASTERN** [1] - 4094:1
**easy** [3] - 4102:16, 4215:19
**eat** [1] - 4116:13
**Ed** [1] - 4170:8
**edge** [2] - 4119:9, 4130:19
**effectively** [2] - 4140:6, 4179:12
**efficient** [2] - 4125:10, 4225:18
**effort** [6] - 4107:11, 4108:13, 4123:2, 4123:6, 4151:13, 4204:12
**efforts** [7] - 4096:8, 4122:5, 4122:11, 4122:17, 4123:1,

8

4140:19, 4178:1
**eight** [2] - 4188:24, 4204:15
**either** [12] - 4097:18, 4099:11, 4111:14, 4122:6, 4162:10, 4174:24, 4175:14, 4181:1, 4191:1, 4195:23, 4222:5, 4234:18
**electronic** [2] - 4121:14, 4233:14
**elicit** [1] - 4098:25
**employed** [1] - 4152:7
**employee** [1] - 4106:25
**employment** [1] - 4107:3
**enclosed** [2] - 4166:2, 4214:13
**encrypt** [2] - 4120:25, 4122:6
**encryption** [3] - 4120:16, 4120:21, 4120:24
**end** [7] - 4096:14, 4103:7, 4159:7, 4161:4, 4167:18, 4213:4, 4229:18
**energies** [2] - 4122:11, 4123:1
**energy** [2] - 4123:2, 4123:6
**enforcement** [3] - 4119:24, 4220:3, 4220:12
**engaged** [1] - 4107:4
**enjoy** [1] - 4215:22
**enjoyed** [1] - 4151:5
**ensued** [1] - 4200:8
**enters** [2] - 4146:7, 4209:7
**entertainers** [1] - 4218:12
**entire** [4] - 4148:7, 4204:2, 4213:13, 4232:15
**entirety** [2] - 4183:24, 4184:3
**entities** [4] - 4164:17, 4164:19, 4177:15, 4221:2
**entitled** [2] - 4146:18, 4164:4
**entity** [5] - 4109:25, 4147:19, 4164:25, 4177:9, 4179:23
**envision** [2] - 4225:2, 4226:12
**equity** [1] - 4152:8
**erroneously** [1] - 4224:6
**escort** [1] - 4097:14
**especially** [1] - 4193:6
**ESQ** [5] - 4094:16, 4094:16, 4094:22, 4095:4, 4095:6
**established** [3] - 4153:10, 4169:19, 4210:17
**establishment** [1] - 4169:13
**estate** [3] - 4148:16, 4168:17, 4168:18

**et** [2] - 4121:17, 4222:16
**Eufora** [1] - 4218:23
**evening** [1] - 4215:25
**evenings** [1] - 4145:5
**event** [1] - 4128:22
**events** [3] - 4154:22, 4215:22, 4220:22
**eventually** [1] - 4164:18
**evidence** [61] - 4097:7, 4117:19, 4118:21, 4121:9, 4121:18, 4124:18, 4125:12, 4131:14, 4132:10, 4133:22, 4135:1, 4135:4, 4135:10, 4136:2, 4136:7, 4136:19, 4137:2, 4137:3, 4137:9, 4138:6, 4140:10, 4142:21, 4144:1, 4144:21, 4147:23, 4148:4, 4152:15, 4160:12, 4163:21, 4165:18, 4175:6, 4178:12, 4178:21, 4180:23, 4181:8, 4190:21, 4191:10, 4192:15, 4196:2, 4197:18, 4202:16, 4202:20, 4202:23, 4203:3, 4206:16, 4209:25, 4210:1, 4210:8, 4210:12, 4212:8, 4214:20, 4227:4, 4237:1, 4237:3, 4237:5, 4237:6, 4237:7, 4237:9, 4237:11, 4237:13, 4237:15
**ex** [1] - 4124:21
**ex-wife's** [1] - 4124:21
**exact** [1] - 4105:25
**examination** [4] - 4097:19, 4224:13, 4225:4, 4234:9
**EXAMINATION** [18] - 4105:5, 4112:1, 4114:12, 4134:2, 4138:7, 4157:21, 4160:13, 4196:5, 4197:19, 4236:4, 4236:6, 4236:9, 4236:11, 4236:13, 4236:15, 4236:17, 4236:19, 4236:21
**examine** [2] - 4100:14, 4100:24
**examined** [2] - 4104:17, 4113:24
**example** [4] - 4129:3, 4132:4, 4153:8, 4173:9
**excerpts** [1] - 4217:11
**Exchange** [2] - 4134:17, 4220:9
**exchanges** [1] - 4183:9
**excuse** [13] - 4128:10, 4133:3, 4152:2, 4178:16, 4179:1, 4181:14, 4189:1, 4202:15, 4217:3, 4224:11, 4230:2, 4230:10, 4231:2
**excused** [1] - 4224:20

**excusing** [1] - 4230:20
**executed** [1] - 4102:4
**exhibit** [12] - 4121:24, 4135:6, 4136:20, 4137:8, 4148:6, 4150:5, 4175:8, 4178:12, 4178:20, 4205:21, 4206:1, 4208:6
**Exhibit** [66] - 4106:12, 4117:15, 4119:5, 4119:11, 4123:14, 4123:15, 4123:16, 4133:9, 4133:24, 4135:6, 4135:7, 4138:5, 4144:23, 4146:16, 4147:23, 4148:3, 4149:9, 4149:10, 4156:20, 4158:2, 4159:12, 4160:1, 4162:25, 4163:21, 4165:18, 4165:21, 4174:4, 4174:17, 4180:3, 4180:8, 4181:4, 4181:8, 4190:10, 4191:5, 4191:9, 4194:25, 4195:1, 4195:9, 4195:11, 4196:13, 4197:21, 4199:17, 4201:4, 4201:8, 4201:11, 4201:14, 4201:17, 4201:20, 4202:13, 4203:5, 4205:21, 4206:2, 4208:9, 4210:7, 4210:11, 4211:1, 4211:16, 4213:25, 4236:25, 4237:2, 4237:7, 4237:8, 4237:14
**EXHIBITS** [1] - 4236:24
**Exhibits** [12] - 4157:18, 4160:11, 4174:18, 4175:2, 4175:6, 4196:2, 4197:17, 4203:2, 4237:4, 4237:6, 4237:10, 4237:12
**exhibits** [6] - 4121:23, 4126:5, 4194:24, 4196:18, 4197:6, 4197:12
**exist** [1] - 4138:19
**existed** [2] - 4159:24, 4168:10
**existing** [2] - 4155:19, 4200:16
**expected** [2] - 4184:9, 4184:11
**expended** [1] - 4215:14
**expenditures** [1] - 4144:10
**expense** [1] - 4216:7
**experience** [1] - 4101:3
**expert** [1] - 4102:20
**experts** [1] - 4126:7
**explain** [7] - 4164:1, 4172:8, 4178:23, 4181:11, 4191:12, 4217:24, 4223:9
**explanation** [1] - 4108:9
**explore** [1] - 4152:7, 4155:24
**exposure** [1] - 4143:2
**Express** [2] - 4182:10,

4212:18
**extended** [1] - 4218:7
**extent** [4] - 4098:17, 4149:7, 4169:11, 4173:8

**F**

**face** [4] - 4125:7, 4130:22
**face-to-face** [2] - 4125:7, 4130:22
**facilitate** [1] - 4200:15
**facility** [1] - 4228:13
**fact** [18] - 4132:10, 4134:15, 4141:22, 4144:3, 4153:18, 4155:11, 4170:3, 4175:21, 4176:24, 4181:25, 4182:4, 4190:4, 4198:12, 4199:3, 4200:25, 4205:11, 4214:21, 4218:10
**factual** [1] - 4099:2
**factually** [2] - 4212:4, 4212:6
**failed** [1] - 4162:1
**failure** [3] - 4097:20, 4154:22, 4154:25
**fair** [8] - 4112:11, 4121:7, 4121:8, 4126:20, 4157:12, 4174:22, 4180:24, 4190:24
**fairly** [4] - 4139:16, 4179:2, 4215:15, 4215:19
**familiar** [3] - 4206:21, 4225:19, 4225:24
**familiarity** [2] - 4146:20, 4224:2
**family** [3] - 4121:16, 4154:14
**far** [3] - 4101:13, 4125:11, 4192:13
**fashion** [2] - 4226:19, 4233:2
**fault** [1] - 4226:6
**favorable** [2] - 4162:9, 4189:4
**fax** [12] - 4204:3, 4204:5, 4204:7, 4204:8, 4204:9, 4212:14, 4212:17, 4212:18, 4214:5, 4214:6, 4214:11
**faxed** [1] - 4203:11
**faxing** [1] - 4204:2
**FBI** [8] - 4098:17, 4100:3, 4109:3, 4109:12, 4116:6, 4116:9, 4116:18, 4120:11
**February** [5] - 4177:20, 4184:5, 4188:21, 4194:13, 4201:1
**FedEex** [1] - 4189:6
**federal** [5] - 4116:1, 4119:24, 4120:23, 4122:5,

4185:23
**Federal** [4] - 4094:15, 4095:20, 4182:10, 4212:18
**FedEx** [26] - 4150:17, 4159:8, 4160:24, 4162:18, 4162:23, 4163:1, 4163:9, 4163:18, 4181:21, 4182:8, 4182:9, 4194:15, 4199:24, 4200:1, 4200:11, 4200:14, 4212:15, 4213:8, 4213:12, 4213:15, 4213:16, 4213:17, 4214:14, 4214:15, 4214:16, 4217:4
**FedExed** [2] - 4162:22, 4213:8
**feet** [1] - 4130:18
**felt** [1] - 4154:17
**fence** [1] - 4130:19
**few** [2] - 4134:11, 4229:3
**file** [4] - 4158:20, 4233:15, 4233:18, 4234:17
**filed** [1] - 4141:5
**files** [8] - 4121:1, 4121:6, 4121:10, 4158:25, 4179:3, 4206:6, 4209:13, 4234:13
**filings** [1] - 4217:23
**fill** [1] - 4227:12
**final** [2] - 4140:3, 4147:14
**finalized** [1] - 4147:11
**finally** [1] - 4119:17
**financial** [2] - 4184:14, 4192:12
**financing** [1] - 4148:15
**fine** [6] - 4106:7, 4114:10, 4159:13, 4172:16, 4206:9, 4225:14
**finish** [3] - 4161:22, 4225:6, 4225:9
**finished** [1] - 4103:13
**Fire** [1] - 4107:5
**firmer** [1] - 4100:10
**firms** [1] - 4204:15
**first** [28] - 4103:17, 4104:6, 4104:7, 4104:16, 4105:9, 4109:17, 4113:23, 4126:10, 4127:2, 4127:16, 4129:4, 4134:10, 4140:11, 4141:16, 4144:5, 4148:10, 4164:4, 4169:20, 4169:24, 4183:18, 4189:3, 4194:3, 4198:15, 4199:18, 4211:24, 4212:10, 4218:1, 4232:8
**five** [4] - 4144:5, 4161:15, 4161:23, 4221:3
**five-month** [1] - 4161:23
**flew** [1] - 4130:10
**flight** [2] - 4229:24, 4231:23
**flip** [1] - 4225:23

**flow** [1] - 4126:6
**fly** [2] - 4163:15, 4215:20
**focus** [1] - 4176:13
**focused** [1] - 4227:1
**focuses** [1] - 4160:18
**folder** [1] - 4233:21
**followed** [1] - 4218:20
**following** [11] - 4144:11, 4146:1, 4148:19, 4161:23, 4171:1, 4173:1, 4189:13, 4199:4, 4208:1, 4215:20, 4228:8
**follows** [4] - 4104:18, 4113:25, 4148:11, 4148:22
**food** [1] - 4216:3
**foreclosure** [1] - 4177:17
**forego** [5] - 4230:4, 4230:9, 4230:22, 4231:3, 4231:5
**forge** [2] - 4202:10, 4211:10
**forgery** [1] - 4141:9
**form** [8] - 4109:1, 4128:19, 4129:13, 4148:9, 4148:17, 4149:9, 4150:16, 4203:19
**format** [7] - 4121:14, 4158:14, 4232:10, 4233:14, 4233:23, 4235:3
**former** [3] - 4106:25, 4114:20, 4162:17
**formerly** [2] - 4121:11, 4121:25
**forth** [3] - 4125:9, 4157:12, 4157:14
**forward** [1] - 4139:2
**forwarded** [1] - 4212:24
**Foster** [1] - 4227:13
**foundation** [1] - 4136:16
**four** [14] - 4111:3, 4115:18, 4131:5, 4161:15, 4161:23, 4169:21, 4169:24, 4179:19, 4183:3, 4198:15, 4199:25, 4204:13, 4221:3, 4226:13
**frame** [1] - 4107:25
**frames** [1] - 4184:2
**frankly** [3] - 4226:16, 4234:8, 4235:1
**freely** [1] - 4097:15
**frequency** [1] - 4125:3
**friend** [3] - 4130:3, 4150:6, 4150:14
**friends** [3] - 4154:4, 4168:8, 4168:11
**front** [5] - 4115:17, 4119:9, 4128:11, 4161:18, 4220:3
**full** [3] - 4144:2, 4149:7, 4213:9
**fully** [1] - 4118:13
**functioning** [1] - 4118:13

**Fund** [1] - 4152:1
**funded** [1] - 4147:5
**funding** [4] - 4138:18, 4149:16, 4164:15, 4177:13
**funds** [11] - 4140:4, 4161:13, 4193:7, 4215:14, 4218:24, 4219:1, 4221:7, 4221:8, 4221:13
**funneled** [1] - 4100:17
**future** [1] - 4154:9

# G

**Gaarn** [9] - 4216:8, 4216:9, 4216:15, 4216:25, 4217:12, 4218:5, 4218:8, 4218:16, 4218:21
**games** [1] - 4124:1
**gamut** [1] - 4124:10
**generally** [1] - 4173:6
**gentleman** [3] - 4108:19, 4147:13, 4221:20
**genuine** [1] - 4131:23
**Gillmore** [1] - 4111:21
**girlfriend** [1] - 4117:11
**given** [10] - 4122:19, 4123:18, 4140:14, 4158:21, 4219:7, 4230:21, 4230:23, 4232:10, 4234:11, 4234:18
**glad** [1] - 4101:12
**Glenn** [2] - 4142:22, 4142:24
**Global** [1] - 4152:1
**Golds** [1] - 4115:17
**Gonchar** [1] - 4227:16
**Government** [1] - 4094:14, 4119:5, 4144:22, 4157:10, 4158:4, 4159:20, 4174:20, 4180:22, 4190:20, 4195:18, 4213:21
**government** [52] - 4096:23, 4096:24, 4098:11, 4098:25, 4099:12, 4099:18, 4100:19, 4102:19, 4102:23, 4103:7, 4103:12, 4104:2, 4117:13, 4117:19, 4118:7, 4118:12, 4118:21, 4119:6, 4119:18, 4120:12, 4120:25, 4121:12, 4122:7, 4123:10, 4124:8, 4125:21, 4126:5, 4126:7, 4135:10, 4136:8, 4136:10, 4154:20, 4159:16, 4174:1, 4185:3, 4196:22, 4196:24, 4206:22, 4209:24, 4216:19, 4217:11, 4226:7, 4229:19, 4229:20,

4232:18, 4232:21, 4232:25, 4234:7, 4234:12, 4234:14, 4234:20
**government's** [10] - 4098:15, 4100:18, 4101:11, 4103:10, 4119:12, 4129:20, 4136:14, 4150:5, 4150:18, 4227:5
**Government's** [4] - 4119:11, 4121:23, 4121:24, 4180:3
**grade** [1] - 4130:18
**graduating** [1] - 4229:6
**graduation** [3] - 4230:19, 4230:21, 4230:24
**Graham** [1] - 4182:1
**grand** [7] - 4097:19, 4097:24, 4098:18, 4099:17, 4099:19, 4099:20
**grasp** [1] - 4100:10
**great** [1] - 4145:19
**Greenberg** [1] - 4162:6
**ground** [3] - 4116:1, 4116:3, 4232:7
**group** [3] - 4175:14, 4188:16, 4188:23
**group's** [1] - 4149:17
**GSF** [1] - 4152:14
**guarded** [3] - 4183:7, 4216:24, 4217:5
**guess** [3] - 4098:14, 4163:14, 4232:20
**guns** [1] - 4116:2
**guy** [1] - 4171:9
**guys** [2] - 4153:21, 4155:22
**Gym** [1] - 4115:17
**gym** [7] - 4115:23, 4115:24, 4116:12, 4118:4, 4118:11, 4118:14, 4118:18

# H

**Hailey** [1] - 4115:3
**HALEY** [124] - 4094:20, 4094:22, 4096:22, 4097:1, 4097:3, 4097:5, 4097:7, 4097:11, 4097:16, 4098:1, 4103:18, 4104:8, 4105:3, 4105:6, 4106:5, 4106:9, 4109:2, 4111:24, 4113:13, 4113:18, 4114:6, 4114:13, 4117:13, 4117:16, 4128:20, 4133:1, 4133:3, 4133:5, 4133:23, 4135:2, 4135:5, 4135:9, 4135:14, 4136:4, 4137:13, 4137:16, 4138:8, 4145:14, 4145:18,

4145:21, 4146:4, 4146:6, 4146:10, 4147:22, 4148:5, 4156:8, 4156:10, 4156:16, 4156:17, 4157:17, 4160:8, 4160:10, 4160:14, 4160:20, 4165:15, 4165:16, 4166:11, 4167:14, 4167:16, 4167:24, 4168:1, 4172:14, 4173:25, 4174:2, 4175:1, 4175:7, 4178:16, 4178:19, 4181:3, 4181:9, 4187:1, 4191:4, 4191:11, 4194:22, 4195:14, 4195:15, 4196:1, 4197:13, 4197:16, 4197:20, 4197:24, 4198:1, 4201:23, 4201:25, 4202:5, 4202:9, 4202:17, 4202:20, 4202:23, 4203:4, 4204:23, 4205:7, 4206:4, 4206:7, 4206:15, 4208:8, 4209:12, 4210:5, 4210:10, 4211:17, 4211:18, 4214:19, 4214:24, 4215:1, 4220:1, 4224:12, 4225:1, 4225:10, 4225:13, 4225:15, 4226:6, 4226:12, 4226:24, 4228:11, 4228:23, 4232:19, 4233:4, 4233:9, 4234:5, 4236:5, 4236:10, 4236:14, 4236:18, 4236:22
**Haley** [20] - 4102:12, 4104:6, 4105:2, 4114:5, 4146:9, 4160:17, 4166:9, 4167:23, 4171:25, 4173:24, 4178:15, 4206:18, 4208:7, 4209:10, 4209:16, 4210:1, 4224:23, 4226:3, 4232:17
**half** [9] - 4129:6, 4129:7, 4129:22, 4130:25, 4228:17, 4229:16, 4230:6, 4231:11, 4231:14
**Hancock** [1] - 4227:17
**hand** [7] - 4117:17, 4117:18, 4128:2, 4160:17, 4203:6, 4203:22
**handcuffed** [1] - 4116:3
**handcuffs** [1] - 4116:18
**handed** [2] - 4117:15, 4123:15
**handle** [1] - 4221:11
**handled** [1] - 4181:24
**handling** [1] - 4222:8
**hands** [3] - 4100:18, 4100:19, 4226:3
**handwriting** [1] - 4203:13
**handwritten** [2] - 4203:23, 4203:24
**Harbor** [9] - 4107:12,

4107:24, 4108:23, 4110:17, 4111:7, 4111:18, 4112:5, 4112:24, 4113:3
**hard** [1] - 4231:17
**Hard** [1] - 4215:23
**Harvey** [1] - 4151:17
**Haven** [1] - 4107:24
**Hawaii** [24] - 4129:5, 4130:1, 4130:6, 4130:10, 4132:6, 4132:7, 4138:12, 4141:17, 4142:11, 4143:10, 4153:12, 4153:16, 4155:5, 4164:22, 4169:3, 4169:17, 4175:14, 4177:2, 4177:3, 4177:6, 4177:8, 4179:17, 4179:18, 4223:13
**Hawaiian** [7] - 4138:18, 4142:16, 4148:16, 4151:22, 4155:9, 4155:20, 4164:17
**head** [1] - 4223:4
**headquarters** [1] - 4116:6
**hear** [2] - 4143:7, 4184:20
**heard** [5] - 4124:17, 4126:7, 4128:5, 4130:13, 4167:17
**hearing** [1] - 4144:19
**hearsay** [4] - 4110:6, 4171:14, 4171:15, 4173:16
**heavily** [1] - 4226:15
**held** [3] - 4162:5, 4165:11, 4177:8
**help** [2] - 4137:8, 4221:11
**helping** [1] - 4216:1
**hiding** [2] - 4184:16, 4184:21
**high** [1] - 4200:9
**Highway** [1] - 4094:21
**hill** [1] - 4130:18
**himself** [1] - 4156:12
**hockey** [6] - 4112:17, 4122:23, 4149:18, 4217:9, 4218:17, 4227:14
**hold** [4] - 4151:15, 4208:17, 4231:9, 4231:12
**holders** [12] - 4155:17, 4161:6, 4161:15, 4162:13, 4162:18, 4188:24, 4189:15, 4193:22, 4194:10, 4210:17, 4210:21, 4213:9
**holding** [3] - 4138:25, 4141:18, 4163:18
**Home** [3] - 4228:10, 4228:12, 4233:8
**home** [14] - 4105:14, 4105:15, 4116:23, 4117:9, 4117:10, 4117:11, 4118:4, 4118:6, 4118:25, 4121:17,

4175:22, 4194:16, 4212:25, 4224:18
**Honor** [57] - 4096:22, 4098:1, 4098:22, 4102:22, 4104:8, 4105:3, 4113:11, 4114:6, 4114:7, 4133:3, 4133:23, 4135:2, 4138:3, 4145:14, 4146:4, 4147:22, 4148:1, 4157:17, 4160:8, 4160:19, 4167:9, 4170:16, 4173:25, 4175:1, 4178:18, 4181:3, 4181:6, 4191:4, 4191:7, 4196:1, 4197:15, 4204:23, 4205:5, 4205:7, 4205:18, 4208:8, 4208:12, 4208:23, 4209:21, 4214:19, 4224:12, 4225:13, 4226:6, 4226:7, 4226:12, 4226:16, 4226:25, 4227:9, 4227:20, 4228:11, 4230:16, 4232:3, 4233:6, 4233:9, 4233:12, 4234:22
**Honor's** [1] - 4098:2
**HONORABLE** [1] - 4094:11
**Honu'apo** [2] - 4130:15, 4131:12
**hope** [1] - 4173:23
**hopefully** [2] - 4096:14, 4206:24
**hoping** [1] - 4100:13
**hostile** [1] - 4153:3
**Hotel** [1] - 4215:23
**hour** [3] - 4130:11, 4198:16, 4228:17
**hours** [11] - 4125:6, 4131:5, 4182:24, 4183:3, 4184:18, 4216:17, 4216:20, 4216:25, 4217:2, 4218:6, 4228:25
**house** [1] - 4143:19
**household** [1] - 4119:2
**hundreds** [1] - 4218:11

**I**

**idea** [7] - 4123:5, 4124:6, 4125:2, 4125:4, 4183:5, 4232:15
**identification** [5] - 4106:5, 4180:9, 4201:4, 4202:17, 4213:25
**identified** [1] - 4121:22
**identity** [1] - 4151:10
**ignore** [1] - 4193:16
**import** [1] - 4150:10
**important** [2] - 4163:7, 4176:10
**imported** [1] - 4150:11

**impossible** [1] - 4114:8
**impression** [2] - 4100:16, 4101:9
**inaccurate** [4] - 4212:4, 4212:6, 4221:23, 4223:2
**inches** [2] - 4096:15, 4204:13
**incidentally** [3] - 4119:1, 4165:14, 4182:12
**incidents** [1] - 4168:15
**include** [2] - 4149:18, 4196:17
**included** [5] - 4124:22, 4141:21, 4151:11, 4196:25, 4233:8
**including** [2] - 4125:15, 4125:17
**inclusive** [2] - 4122:18, 4216:3
**income** [1] - 4221:9
**inconsistencies** [1] - 4220:24
**inconsistent** [1] - 4220:22
**incorrect** [1] - 4205:16
**increase** [1] - 4170:2
**increased** [2] - 4170:9, 4170:13
**increasing** [1] - 4153:22
**indeed** [3] - 4165:10, 4206:15, 4217:15
**independent** [2] - 4149:5, 4160:3
**independently** [1] - 4189:20
**indicate** [2] - 4099:8, 4148:17
**indicated** [4] - 4096:8, 4148:17, 4149:10, 4157:14
**indicates** [1] - 4159:6
**indication** [1] - 4159:24
**indictment** [12] - 4097:20, 4098:12, 4099:16, 4099:17, 4099:19, 4100:6, 4115:11, 4117:7, 4123:4, 4226:18, 4226:19
**indictments** [1] - 4098:5
**individual** [4] - 4140:15, 4198:21, 4210:20, 4221:12
**individually** [1] - 4198:25
**individuals** [3] - 4122:20, 4163:14, 4204:19
**information** [14] - 4098:25, 4121:6, 4121:13, 4122:6, 4124:7, 4125:13, 4136:10, 4136:12, 4149:2, 4171:14, 4172:5, 4173:17, 4187:5, 4222:19
**informed** [1] - 4170:6
**initial** [4] - 4109:18, 4143:17, 4212:10, 4212:12

11

initiated [2] - 4132:12, 4162:13
inquire [1] - 4101:16
inquired [1] - 4169:16
inquiry [3] - 4097:18, 4187:3, 4226:13
insensitive [2] - 4176:5, 4176:7
inside [1] - 4214:9
insinuated [1] - 4132:5
inspect [2] - 4102:19, 4103:14
instance [3] - 4131:25, 4136:13, 4217:8
instances [3] - 4128:21, 4141:10, 4141:15
instead [1] - 4163:18
institutional [1] - 4162:7
institutions [1] - 4120:4
instruct [1] - 4221:25
instructed [1] - 4120:7, 4130:20
instruction [4] - 4171:20, 4173:3, 4173:5
instructions [1] - 4229:22
insurance [2] - 4124:22, 4222:16
intend [1] - 4226:17
intense [1] - 4139:3
intent [1] - 4194:12
intention [1] - 4226:8
interaction [1] - 4107:9
interest [10] - 4108:12, 4108:14, 4110:21, 4110:23, 4111:10, 4162:11, 4164:24, 4165:6, 4165:10
interested [1] - 4154:10
interests [2] - 4152:9, 4185:18
interfere [1] - 4182:13
international [1] - 4214:15
interview [1] - 4109:11
interviewed [3] - 4106:14, 4106:16, 4109:3
introduced [14] - 4117:18, 4118:21, 4121:9, 4121:18, 4125:11, 4126:5, 4131:14, 4135:10, 4136:7, 4138:14, 4151:7, 4192:14, 4217:11, 4227:4
introducing [1] - 4136:22
introduction [2] - 4129:5, 4136:14
introductory [1] - 4131:6
invest [3] - 4113:3, 4169:17, 4231:19
invested [9] - 4112:13, 4112:23, 4139:17, 4141:17, 4142:10,

4143:19, 4143:22, 4153:25, 4193:7
investigated [1] - 4149:6
investigating [1] - 4120:11
investigation [4] - 4100:16, 4101:23, 4119:24, 4122:4
investigations [1] - 4149:5
investigators [1] - 4099:23
investment [13] - 4107:12, 4107:15, 4107:21, 4130:6, 4142:5, 4143:11, 4143:17, 4153:11, 4155:12, 4161:25, 4165:2, 4177:18, 4199:1
investments [9] - 4122:17, 4122:22, 4124:13, 4142:17, 4143:15, 4148:15, 4155:5, 4187:3
investor [3] - 4108:17, 4152:8, 4189:7
investors [5] - 4139:16, 4140:21, 4175:14, 4215:18, 4223:20
invitation [1] - 4215:19
invite [1] - 4215:17
invited [1] - 4131:10
involve [1] - 4163:14
involved [4] - 4107:11, 4140:1, 4151:18, 4222:8
involving [3] - 4125:1, 4134:16, 4148:15
iPhone [10] - 4102:5, 4102:12, 4158:7, 4159:5, 4174:24, 4181:1, 4191:1, 4195:23, 4233:7, 4233:24
IRS [1] - 4219:8
Island [3] - 4158:23
island [3] - 4129:5, 4130:6, 4130:10
Islandia [1] - 4094:22
Isle [17] - 4138:24, 4141:5, 4149:14, 4164:6, 4164:25, 4165:4, 4165:11, 4165:22, 4166:1, 4177:10, 4179:24, 4180:1, 4212:11, 4212:21, 4223:12, 4223:17, 4223:20
Islip [3] - 4094:6, 4094:15, 4095:21
issue [11] - 4098:6, 4100:9, 4103:8, 4150:20, 4167:10, 4176:10, 4192:23, 4229:10, 4229:16, 4232:6, 4233:11
issues [10] - 4096:7, 4100:11, 4139:8, 4173:14, 4173:20, 4178:4, 4192:6, 4193:5, 4227:1, 4229:15
items [3] - 4125:25, 4126:4, 4141:13

itself [8] - 4098:21, 4099:20, 4100:6, 4160:21, 4164:7, 4176:1, 4197:23, 4200:12
IV [17] - 4138:24, 4141:5, 4149:14, 4164:6, 4164:25, 4165:4, 4165:11, 4165:22, 4166:1, 4177:10, 4179:24, 4180:1, 4212:12, 4212:21, 4223:12, 4223:17, 4223:20

## J

JAMES [1] - 4094:16
James [1] - 4130:3
Jeff [1] - 4227:13
job [1] - 4124:21
Joe [1] - 4222:23
John [47] - 4102:1, 4106:19, 4107:9, 4107:16, 4108:16, 4108:18, 4109:20, 4110:2, 4110:11, 4111:4, 4111:17, 4127:12, 4127:16, 4127:18, 4127:20, 4128:1, 4128:21, 4130:1, 4130:4, 4130:17, 4130:24, 4131:3, 4131:18, 4132:1, 4132:5, 4132:11, 4132:13, 4133:14, 4133:17, 4138:14, 4138:19, 4138:23, 4139:1, 4139:5, 4140:18, 4141:6, 4141:11, 4141:16, 4142:7, 4142:12, 4142:15, 4144:13, 4147:3, 4148:13, 4184:10, 4220:17
joint [10] - 4132:6, 4138:11, 4138:17, 4142:8, 4147:5, 4148:14, 4148:25, 4149:1, 4177:12, 4179:21
joke [1] - 4220:14
JOSEPH [1] - 4094:11
Jowdy [33] - 4120:6, 4122:18, 4140:8, 4141:2, 4141:8, 4141:21, 4141:24, 4151:2, 4151:16, 4152:4, 4152:11, 4152:18, 4152:20, 4153:12, 4153:15, 4153:19, 4153:20, 4153:22, 4156:6, 4161:12, 4162:14, 4175:13, 4175:17, 4177:4, 4177:16, 4177:18, 4177:20, 4179:11, 4185:19, 4185:25, 4188:18, 4193:8, 4227:1
judge [4] - 4141:8, 4202:2, 4206:11, 4225:5
Judge [23] - 4097:7, 4099:7, 4103:3, 4133:1,

4135:7, 4136:5, 4145:15, 4156:8, 4166:11, 4167:24, 4178:16, 4201:23, 4202:24, 4202:25, 4205:20, 4206:4, 4214:24, 4225:1, 4227:3, 4228:5, 4228:15, 4228:22, 4233:4
JUDGE [1] - 4094:11
July [9] - 4147:2, 4148:12, 4223:12, 4229:14, 4229:24, 4230:11, 4230:24, 4231:1, 4231:13
jumps [1] - 4231:2
June [9] - 4094:9, 4174:12, 4176:19, 4178:1, 4229:11, 4229:22, 4233:19, 4233:21, 4235:7
Juneau [5] - 4212:22, 4212:25, 4222:23, 4223:22, 4223:24
Juneau's [5] - 4222:25, 4223:18, 4223:21, 4224:1, 4224:10
jurisdictions [1] - 4193:9
juror [5] - 4229:4, 4229:23, 4230:10, 4231:18, 4231:20
JURORS [1] - 4103:24
jurors [3] - 4096:4, 4231:9, 4231:15
jury [48] - 4094:11, 4097:19, 4097:24, 4098:13, 4098:18, 4099:1, 4099:13, 4099:17, 4099:19, 4099:20, 4102:8, 4103:19, 4103:21, 4103:23, 4108:6, 4125:2, 4125:12, 4125:19, 4128:11, 4130:2, 4136:17, 4140:10, 4143:9, 4144:18, 4146:3, 4148:6, 4150:1, 4150:19, 4150:23, 4152:23, 4153:1, 4153:5, 4155:24, 4164:11, 4167:7, 4167:12, 4167:21, 4173:2, 4206:14, 4208:3, 4209:2, 4209:9, 4217:16, 4217:21, 4223:9, 4224:20, 4229:6
Jury [5] - 4145:13, 4146:7, 4166:16, 4205:3, 4209:7
jury's [1] - 4099:15

## K

K-E-N-N-E-R [1] - 4114:4
Kahu [1] - 4141:18
Kaiser [55] - 4102:1, 4106:20, 4106:22, 4107:10, 4107:16, 4108:3, 4108:7, 4108:11, 4109:20, 4110:2, 4110:11, 4111:4,

4111:17, 4127:12,
4127:16, 4127:18,
4127:20, 4128:1, 4128:21,
4129:4, 4130:1, 4130:5,
4130:17, 4130:24, 4131:3,
4131:18, 4132:1, 4132:5,
4132:12, 4133:14, 4136:5,
4136:11, 4136:21,
4137:15, 4138:14,
4138:19, 4138:23,
4140:18, 4140:23, 4141:6,
4141:16, 4142:7, 4142:13,
4142:15, 4143:9, 4144:1,
4144:4, 4144:13, 4147:3,
4148:13, 4149:22,
4150:16, 4153:3, 4153:17
**Kaiser's** [6] - 4137:10,
4141:11, 4143:3, 4144:19,
4150:15, 4184:10
**Kanu** [1] - 4130:12
**keep** [4] - 4098:8, 4173:4,
4175:16, 4178:15
**KELLY** [1] - 4094:14
**Ken** [5] - 4120:6, 4122:18,
4152:18, 4175:13, 4227:1
**Kennedy** [2] - 4227:10,
4228:6
**Kenner** [138] - 4094:23,
4097:13, 4101:7, 4102:1,
4103:5, 4104:9, 4106:11,
4108:24, 4110:16, 4111:4,
4113:19, 4113:21, 4114:4,
4114:9, 4114:21, 4115:7,
4118:8, 4121:9, 4121:18,
4122:3, 4122:21, 4123:14,
4123:16, 4126:18, 4133:6,
4133:8, 4133:23, 4134:4,
4135:5, 4135:6, 4136:11,
4138:5, 4138:9, 4144:12,
4144:23, 4145:6, 4146:11,
4146:16, 4146:19,
4147:23, 4148:2, 4148:3,
4148:6, 4148:13, 4148:20,
4148:25, 4149:9, 4149:10,
4152:14, 4154:20,
4156:20, 4157:17,
4157:23, 4160:1, 4160:11,
4160:15, 4162:25,
4163:21, 4165:17,
4165:21, 4167:5, 4167:10,
4168:2, 4173:8, 4174:3,
4174:4, 4174:17, 4174:18,
4175:1, 4176:12, 4177:24,
4178:11, 4178:20, 4180:8,
4181:3, 4182:12, 4190:9,
4191:4, 4191:9, 4194:23,
4194:25, 4195:1, 4195:7,
4195:9, 4195:11, 4196:1,
4196:7, 4196:13, 4197:17,
4197:21, 4199:17, 4201:3,

4201:4, 4201:8, 4201:11,
4201:14, 4201:17,
4201:20, 4202:10,
4202:13, 4203:2, 4203:5,
4205:21, 4206:2, 4208:3,
4208:9, 4209:11, 4210:7,
4210:11, 4211:1, 4211:9,
4211:16, 4213:24,
4213:25, 4217:11,
4222:18, 4224:5, 4225:19,
4227:3, 4227:22, 4228:16,
4233:5, 4234:16, 4236:25,
4237:2, 4237:4, 4237:8,
4237:10, 4237:12, 4237:14
**KENNER** [8] - 4094:7,
4113:22, 4232:22,
4233:12, 4233:17, 4234:2,
4234:4, 4236:8
**Kenner's** [6] - 4097:25,
4171:2, 4173:3, 4173:15,
4225:7, 4227:24
**Kevin** [1] - 4133:17
**key** [1] - 4173:14
**keyboard** [2] - 4119:17,
4119:21
**Khristich** [1] - 4223:19
**Khristich's** [4] - 4223:25,
4224:2, 4224:6, 4224:9
**kind** [4] - 4105:15, 4158:3,
4215:14, 4229:11
**kindly** [11] - 4133:8,
4153:1, 4156:19, 4170:15,
4174:3, 4176:12, 4178:20,
4180:8, 4190:9, 4191:12,
4213:24
**kinds** [1] - 4171:13
**knowledge** [16] - 4111:2,
4111:7, 4128:15, 4140:16,
4141:11, 4156:2, 4157:9,
4157:11, 4160:10,
4182:24, 4183:15, 4185:8,
4212:2, 4223:7, 4223:10
**KOMATIREDDY** [7] -
4094:16, 4097:10,
4108:25, 4110:6, 4112:2,
4113:10, 4236:7
**Kona** [1] - 4130:12
**Kristen** [9] - 4180:12,
4180:18, 4181:12,
4181:18, 4182:16, 4183:3,
4183:11, 4184:1, 4184:15

L

**laden** [2] - 4226:15,
4226:21
**laid** [1] - 4136:16
**land** [2] - 4130:7, 4183:23
**Lane** [2] - 4168:20

**language** [1] - 4164:9
**Lani** [1] - 4168:3
**laptop** [9] - 4097:2, 4097:3,
4117:17, 4117:18,
4117:23, 4117:25,
4174:24, 4191:1, 4228:24
**large** [1] - 4129:16
**Larry** [5] - 4147:13,
4164:20, 4165:23,
4223:14, 4223:22
**LARUSSO** [32] - 4095:2,
4095:4, 4096:6, 4098:22,
4099:7, 4099:22, 4100:7,
4102:22, 4103:9, 4103:16,
4113:11, 4138:3, 4148:1,
4175:4, 4181:6, 4191:7,
4197:15, 4202:2, 4202:6,
4202:25, 4206:18,
4208:12, 4208:15,
4208:18, 4208:23, 4209:3,
4209:21, 4227:9, 4228:5,
4231:8, 4231:15, 4231:25
**LaRusso** [8] - 4098:8,
4102:5, 4102:16, 4138:2,
4197:14, 4209:2, 4209:20,
4227:7
**Las** [2] - 4215:16, 4215:18
**last** [15] - 4114:2, 4117:24,
4123:20, 4124:14, 4125:5,
4126:8, 4138:22, 4163:22,
4166:7, 4171:5, 4180:4,
4200:18, 4215:24, 4227:2,
4227:17
**lastly** [1] - 4213:3
**late** [11] - 4116:8, 4138:12,
4139:14, 4139:18,
4145:10, 4151:9, 4175:20,
4175:23, 4188:13,
4225:15, 4229:11
**law** [11] - 4098:5, 4098:9,
4098:11, 4099:3, 4099:10,
4099:16, 4119:24,
4204:15, 4220:3, 4220:11,
4229:22
**lawsuit** [4] - 4141:1,
4141:5, 4141:7, 4177:22
**lawyers** [4] - 4104:5,
4120:5, 4151:3
**lead** [1] - 4188:9
**leading** [3] - 4108:25,
4128:25, 4172:15
**learned** [5] - 4116:22,
4172:7, 4173:9, 4173:10,
4211:21
**least** [9] - 4096:14,
4098:23, 4126:20, 4148:8,
4188:22, 4202:13, 4212:7,
4217:21, 4229:21
**leave** [1] - 4231:20
**leaves** [4] - 4145:13,

4166:16, 4167:12, 4205:3
**led** [1] - 4139:9
**Lee** [1] - 4182:1
**left** [10] - 4097:15, 4117:9,
4117:11, 4118:4, 4118:11,
4118:14, 4118:16,
4179:20, 4189:14, 4224:25
**legal** [4] - 4149:4, 4163:7,
4164:20, 4185:15
**Lehman** [15] - 4138:16,
4139:13, 4139:14,
4139:18, 4139:22, 4142:3,
4147:6, 4147:18, 4149:15,
4164:15, 4165:3, 4177:12,
4179:22, 4203:16, 4223:15
**lender** [1] - 4170:7
**lent** [1] - 4153:19
**Lerner** [2] - 4170:8,
4214:13
**less** [1] - 4226:21
**letter** [22] - 4132:5, 4132:9,
4138:22, 4142:9, 4146:13,
4147:2, 4148:12, 4148:13,
4148:18, 4165:22,
4167:14, 4179:25,
4181:22, 4188:21,
4199:20, 4200:11,
4200:24, 4210:13,
4210:14, 4210:19,
4212:25, 4213:1
**letters** [12] - 4121:16,
4180:15, 4194:3, 4194:6,
4194:7, 4194:8, 4196:16,
4199:22, 4199:23,
4200:13, 4200:25, 4203:25
**level** [1] - 4188:6
**liability** [4] - 4164:5,
4164:22, 4165:11, 4218:22
**liberty** [1] - 4218:20
**license** [1] - 4150:11
**lied** [1] - 4098:18
**lieu** [1] - 4212:14
**life** [3] - 4122:10, 4124:24,
4215:9
**lifted** [1] - 4116:4
**limited** [3] - 4164:5,
4164:22, 4165:11
**limiting** [2] - 4171:20,
4173:3
**line** [62] - 4130:19, 4134:7,
4143:1, 4143:2, 4153:10,
4155:14, 4155:17, 4156:2,
4160:23, 4161:6, 4161:11,
4161:14, 4162:12,
4162:18, 4169:11,
4169:14, 4169:17,
4169:20, 4169:25, 4170:2,
4170:3, 4170:9, 4170:13,
4171:10, 4172:1, 4172:2,
4172:7, 4172:9, 4176:22,

4176:25, 4178:6, 4181:23, 4183:19, 4183:21, 4187:25, 4188:13, 4188:24, 4189:15, 4193:22, 4194:9, 4198:13, 4198:15, 4210:16, 4210:17, 4210:20, 4210:22, 4211:21, 4211:24, 4211:25, 4212:10, 4212:12, 4212:21, 4213:2, 4213:6, 4213:13, 4223:6, 4223:19, 4224:1, 4224:7, 4224:10, 4233:22
**lined** [1] - 4096:12
**lines** [14] - 4155:19, 4161:25, 4169:10, 4171:21, 4175:15, 4181:16, 4182:2, 4183:17, 4188:16, 4188:25, 4189:2, 4189:3, 4198:23, 4222:20
**lineup** [1] - 4227:8
**list** [1] - 4096:13
**listen** [7] - 4101:2, 4102:20, 4103:3, 4182:22, 4217:16, 4224:17, 4228:18
**listened** [1] - 4184:18
**listening** [1] - 4234:6
**litigation** [12] - 4118:17, 4120:6, 4122:17, 4134:15, 4152:4, 4161:12, 4162:13, 4175:18, 4177:5, 4188:19, 4193:9, 4193:10
**live** [1] - 4122:14
**living** [1] - 4184:15
**LLC** [1] - 4148:20
**LLCs** [1] - 4138:25
**loan** [16] - 4113:2, 4140:7, 4141:1, 4141:8, 4141:21, 4141:24, 4153:20, 4153:22, 4156:6, 4161:8, 4161:12, 4175:21, 4175:23, 4188:11, 4191:23, 4222:13
**loaned** [3] - 4142:10, 4193:8, 4219:1
**loaning** [2] - 4153:14
**loans** [13] - 4122:18, 4152:10, 4153:12, 4161:13, 4161:16, 4162:8, 4175:13, 4176:9, 4184:2, 4184:9, 4184:10, 4185:19, 4200:16
**locate** [2] - 4137:12, 4234:25
**located** [3] - 4118:5, 4118:6, 4152:19
**location** [1] - 4131:4
**locations** [1] - 4203:7
**lockout** [1] - 4153:15

**look** [41] - 4102:9, 4105:18, 4106:11, 4118:19, 4119:11, 4123:13, 4133:6, 4133:8, 4140:9, 4146:16, 4146:20, 4156:19, 4156:20, 4157:23, 4158:8, 4159:12, 4160:15, 4165:17, 4170:15, 4174:3, 4176:12, 4178:11, 4178:20, 4180:8, 4185:22, 4185:23, 4190:9, 4194:23, 4199:17, 4202:2, 4202:7, 4204:21, 4206:20, 4210:11, 4211:3, 4211:5, 4211:16, 4213:24, 4226:3, 4226:18, 4233:19
**looking** [6] - 4099:10, 4100:24, 4108:17, 4130:5, 4154:5, 4203:19
**lose** [2] - 4229:15, 4230:5
**losing** [1] - 4231:6
**loss** [6] - 4143:4, 4143:5, 4143:10, 4143:14, 4187:25, 4189:12
**lost** [1] - 4111:14
**lousy** [1] - 4230:19
**Lucas** [4] - 4154:6, 4154:8, 4179:9, 4185:22
**lunch** [2] - 4166:13, 4166:15
**Luncheon** [1] - 4166:17

# M

**MacBook** [1] - 4195:24
**machine** [1] - 4158:3
**Magazine** [2] - 4131:15, 4131:22
**magician** [1] - 4119:1
**mail** [40] - 4132:11, 4132:13, 4133:14, 4133:18, 4133:21, 4133:22, 4135:9, 4136:8, 4136:15, 4136:17, 4136:23, 4136:24, 4136:25, 4137:5, 4137:7, 4137:12, 4140:9, 4140:19, 4176:17, 4177:25, 4178:13, 4178:15, 4178:24, 4179:1, 4179:4, 4182:13, 4188:13, 4192:15, 4192:22, 4193:3, 4193:15, 4193:19, 4194:15, 4198:3, 4198:10, 4199:19, 4200:1, 4221:18, 4222:14
**mailed** [2] - 4194:13, 4201:1
**mailing** [1] - 4163:19

**mailings** [2] - 4200:22, 4213:17
**mails** [2] - 4124:16, 4160:1
**main** [1] - 4141:22
**Makika** [1] - 4141:6
**management** [1] - 4140:2
**manager** [1] - 4132:7
**managing** [4] - 4138:12, 4138:23, 4139:1, 4147:19
**mandatory** [1] - 4149:15
**Manfredi** [19] - 4108:3, 4108:8, 4108:12, 4108:16, 4108:21, 4108:23, 4109:11, 4109:19, 4109:24, 4110:3, 4110:9, 4110:4, 4130:17, 4131:3, 4131:18, 4138:15, 4147:3, 4148:14, 4212:16
**Manfredi's** [1] - 4108:14
**Manhattan** [1] - 4185:12
**manufactured** [1] - 4150:7
**manufacturer** [1] - 4151:8
**Mar** [3] - 4154:1, 4177:16, 4179:15
**March** [12] - 4161:6, 4174:11, 4179:9, 4180:13, 4180:14, 4181:22, 4188:21, 4189:11, 4195:8, 4199:24, 4200:22, 4201:2
**marital** [1] - 4114:16
**mark** [2] - 4106:5, 4123:14
**marked** [15] - 4106:11, 4133:8, 4156:20, 4174:4, 4194:24, 4194:25, 4195:1, 4201:4, 4205:20, 4205:25, 4208:9, 4209:11, 4213:25, 4226:8
**Markowitz** [7] - 4147:13, 4149:11, 4149:17, 4164:20, 4165:23, 4223:14, 4223:25
**Markowitz'** [1] - 4223:22
**MARSHAL** [1] - 4228:21
**marshals** [2] - 4097:12, 4228:19
**Mary** [1] - 4095:20
**Mascarella** [9] - 4155:23, 4198:17, 4198:18, 4199:12, 4199:25, 4221:19, 4222:8, 4222:10, 4222:19
**Masud** [1] - 4138:16
**material** [4] - 4197:2, 4216:12, 4222:19, 4232:13
**matter** [5] - 4187:17, 4193:2, 4205:11, 4232:12, 4235:6
**matters** [1] - 4149:5
**McDonald** [1] - 4220:17
**mean** [8] - 4111:21,

4126:1, 4139:11, 4158:16, 4182:9, 4204:5, 4217:23, 4220:6
**meaning** [6] - 4121:5, 4129:17, 4160:25, 4161:3, 4163:3, 4200:20
**means** [3] - 4150:17, 4177:14, 4182:9
**meant** [3] - 4179:17, 4217:22, 4217:24
**mechanical** [1] - 4095:25
**media** [1] - 4127:24
**mediation** [1] - 4177:20
**mediator** [1] - 4151:4
**medical** [1] - 4124:22
**meet** [3] - 4105:13, 4130:21, 4163:16
**meeting** [8] - 4105:18, 4130:1, 4130:23, 4131:18, 4184:5, 4185:14, 4185:20, 4187:13
**meetings** [4] - 4125:1, 4125:3, 4125:9, 4153:13
**Melana** [1] - 4130:4
**member** [7] - 4138:12, 4138:23, 4139:1, 4142:15, 4164:18, 4177:10, 4203:17
**members** [11] - 4103:23, 4120:10, 4140:17, 4149:14, 4164:24, 4165:4, 4165:22, 4165:25, 4173:2, 4209:9, 4223:17
**Memorial** [1] - 4094:21
**memorialization** [1] - 4165:4
**memory** [9] - 4098:1, 4107:14, 4108:7, 4130:1, 4144:13, 4155:13, 4185:4, 4200:22, 4216:17
**mentioned** [3] - 4107:23, 4212:16, 4229:3
**mentioning** [2] - 4109:12
**mentions** [1] - 4159:7
**message** [33] - 4157:13, 4158:3, 4158:12, 4158:14, 4158:24, 4159:7, 4159:8, 4175:10, 4176:19, 4179:1, 4180:12, 4180:17, 4180:25, 4181:12, 4181:15, 4188:11, 4190:15, 4190:18, 4190:25, 4191:13, 4191:15, 4192:15, 4195:6, 4195:10, 4195:21, 4195:23, 4196:14, 4196:20, 4198:15, 4199:8, 4213:11, 4233:20
**messages** [31] - 4121:19, 4121:20, 4121:22, 4124:15, 4157:1, 4157:4,

4157:11, 4158:5, 4158:9, 4174:10, 4174:14, 4174:22, 4174:23, 4178:17, 4192:14, 4192:18, 4192:20, 4195:7, 4195:12, 4195:13, 4195:17, 4196:7, 4196:10, 4197:1, 4197:7, 4200:2, 4200:4, 4232:18, 4233:15, 4233:18, 4234:19

**met** [10] - 4105:9, 4105:12, 4113:6, 4125:20, 4126:15, 4127:16, 4168:11, 4168:19, 4168:20, 4185:11

**method** [1] - 4188:17

**Mex** [1] - 4177:14

**Mexican** [4] - 4152:6, 4152:9, 4177:4, 4185:23

**Mexico** [19] - 4120:5, 4120:9, 4151:2, 4151:6, 4151:9, 4151:10, 4151:14, 4152:12, 4152:18, 4153:12, 4153:23, 4177:15, 4179:6, 4184:15, 4184:22, 4185:16, 4185:25, 4193:11, 4215:21

**Michael** [14] - 4112:15, 4112:23, 4113:2, 4113:6, 4161:17, 4169:5, 4174:10, 4177:25, 4178:3, 4180:13, 4181:15, 4183:2, 4183:18, 4183:25

**Michelle** [2] - 4229:12, 4230:23

**middle** [2] - 4119:8, 4234:8

**might** [1] - 4228:21

**mike** [2] - 4104:25, 4105:1

**Mike** [2] - 4168:19, 4168:20

**Milano** [2] - 4108:19, 4109:19

**milestone** [3] - 4139:6, 4139:11, 4140:20

**milestones** [2] - 4140:11, 4140:16

**million** [38] - 4123:9, 4129:7, 4129:17, 4129:19, 4129:20, 4129:22, 4130:25, 4134:11, 4138:18, 4139:6, 4139:11, 4139:15, 4139:20, 4139:21, 4139:23, 4140:5, 4141:5, 4141:16, 4141:23, 4142:5, 4142:14, 4143:18, 4143:21, 4144:2, 4144:6, 4144:9, 4164:15, 4169:1, 4169:19, 4170:4, 4170:9, 4171:10, 4177:1, 4184:10, 4185:18, 4189:12, 4211:21, 4211:25

**millions** [1] - 4152:10

**mind** [7] - 4171:16, 4171:18, 4173:13, 4173:15, 4173:21, 4190:7, 4226:17

**mine** [2] - 4150:6, 4203:23

**Mineola** [1] - 4095:3

**minute** [2] - 4209:4, 4226:4

**minutes** [12] - 4100:22, 4103:4, 4116:20, 4130:16, 4183:4, 4192:25, 4216:20, 4216:25, 4217:2, 4218:6, 4228:14

**Miskiewicz** [5] - 4102:24, 4205:19, 4225:3, 4226:1, 4233:13

**MISKIEWICZ** [44] - 4094:16, 4096:25, 4097:2, 4097:4, 4097:6, 4097:17, 4101:19, 4101:22, 4128:18, 4128:25, 4133:25, 4134:3, 4134:23, 4136:21, 4137:4, 4147:25, 4157:19, 4157:22, 4160:6, 4161:19, 4167:9, 4167:17, 4170:16, 4171:2, 4171:20, 4172:13, 4175:3, 4175:4, 4191:6, 4196:6, 4197:8, 4202:15, 4202:19, 4202:22, 4206:11, 4209:19, 4230:16, 4232:3, 4233:3, 4233:6, 4234:21, 4236:12, 4236:16, 4236:20

**misled** [1] - 4098:18

**miss** [3] - 4229:7, 4230:19

**missing** [1] - 4204:18

**misspelled** [1] - 4162:3

**mistake** [1] - 4224:5

**mode** [1] - 4118:16

**moment** [7] - 4116:17, 4124:8, 4128:7, 4133:1, 4156:8, 4201:23, 4233:4

**momentarily** [1] - 4146:12

**Monday** [15] - 4096:12, 4096:19, 4125:16, 4125:18, 4125:20, 4126:1, 4126:9, 4126:16, 4126:22, 4215:19, 4227:10, 4227:23, 4227:25, 4228:2

**Money** [2] - 4131:14, 4131:22

**money** [15] - 4100:3, 4100:5, 4113:3, 4120:5, 4129:16, 4141:14, 4141:21, 4142:10, 4143:23, 4153:14, 4155:4, 4155:9, 4169:16, 4231:7

**moneys** [4] - 4142:4, 4152:14, 4152:16, 4218:15

**monstrous** [1] - 4100:10

**month** [12] - 4125:6,

4161:23, 4162:10, 4169:25, 4170:1, 4170:12, 4184:8, 4189:13, 4192:25, 4194:14, 4199:4

**monthly** [6] - 4125:5, 4175:15, 4175:22, 4191:24, 4193:1, 4222:13

**months** [8] - 4123:20, 4139:24, 4144:7, 4161:16, 4174:12, 4176:22, 4183:20, 4190:5

**moreover** [1] - 4171:6

**morning** [28] - 4103:23, 4103:24, 4104:1, 4105:7, 4105:8, 4112:3, 4112:4, 4115:22, 4115:23, 4116:8, 4116:12, 4117:12, 4118:17, 4125:16, 4125:18, 4125:20, 4126:1, 4126:2, 4126:9, 4126:16, 4126:22, 4145:10, 4159:3, 4215:24, 4224:19, 4228:16, 4229:6, 4232:2

**most** [5] - 4103:6, 4131:6, 4136:13, 4152:19, 4221:12

**move** [7] - 4097:14, 4148:21, 4189:3, 4189:8, 4194:24, 4229:13, 4230:24

**moved** [3] - 4200:17, 4202:16, 4215:15

**moving** [4] - 4152:21, 4224:13, 4226:16

**MR** [195] - 4096:6, 4096:22, 4096:25, 4097:1, 4097:2, 4097:3, 4097:4, 4097:5, 4097:6, 4097:7, 4097:11, 4097:16, 4097:17, 4098:1, 4098:22, 4099:7, 4099:22, 4100:7, 4101:19, 4101:22, 4102:22, 4103:9, 4103:16, 4103:18, 4104:8, 4105:3, 4105:6, 4106:5, 4106:9, 4109:2, 4111:24, 4113:11, 4113:13, 4113:18, 4114:6, 4114:13, 4117:13, 4117:16, 4128:18, 4128:20, 4128:25, 4133:1, 4133:3, 4133:5, 4133:23, 4133:25, 4134:3, 4134:23, 4135:2, 4135:5, 4135:9, 4135:14, 4136:4, 4136:21, 4137:4, 4137:13, 4137:16, 4138:3, 4138:8, 4145:14, 4145:18, 4145:21, 4146:4, 4146:6, 4146:10, 4147:22, 4147:25, 4148:1, 4148:5, 4156:8, 4156:10, 4156:16, 4156:17, 4157:17, 4157:19, 4157:22, 4160:6, 4160:8, 4160:10, 4160:14,

4160:20, 4161:19, 4165:15, 4165:16, 4166:11, 4167:9, 4167:14, 4167:16, 4167:17, 4167:24, 4168:1, 4170:16, 4171:2, 4171:20, 4172:13, 4172:14, 4173:25, 4174:2, 4175:1, 4175:3, 4175:4, 4175:7, 4178:16, 4178:19, 4181:3, 4181:5, 4181:6, 4181:9, 4187:1, 4191:4, 4191:6, 4191:7, 4191:11, 4194:22, 4195:14, 4195:15, 4196:1, 4196:6, 4197:8, 4197:13, 4197:15, 4197:16, 4197:20, 4197:24, 4198:1, 4201:23, 4201:25, 4202:2, 4202:5, 4202:6, 4202:9, 4202:15, 4202:17, 4202:19, 4202:20, 4202:22, 4202:23, 4202:25, 4203:4, 4204:23, 4205:7, 4206:4, 4206:7, 4206:11, 4206:15, 4206:18, 4208:8, 4208:12, 4208:15, 4208:18, 4208:23, 4209:3, 4209:12, 4209:19, 4209:21, 4210:5, 4210:10, 4211:17, 4211:18, 4214:19, 4214:24, 4215:1, 4220:1, 4224:12, 4225:1, 4225:10, 4225:13, 4225:15, 4226:6, 4226:12, 4226:24, 4227:9, 4228:5, 4228:11, 4228:23, 4230:16, 4231:8, 4231:15, 4231:25, 4232:3, 4232:19, 4233:3, 4233:4, 4233:6, 4233:9, 4234:5, 4234:21, 4236:5, 4236:10, 4236:12, 4236:14, 4236:16, 4236:18, 4236:20, 4236:22

**MS** [6] - 4097:10, 4108:25, 4110:6, 4112:2, 4113:10, 4236:7

**multiple** [1] - 4172:11

**Murray** [1] - 4142:23

**Murray's** [2] - 4142:25, 4143:2

**music** [1] - 4190:2

**must** [1] - 4163:14

**mutual** [1] - 4130:3

**myriad** [2] - 4124:17, 4152:6

# N

**Na'alehu** [3] - 4130:13, 4177:11, 4179:23

**Naalehu** [8] - 4138:23,

4140:17, 4142:12, 4142:18, 4148:20, 4148:25, 4164:18
**Naalehu's** [1] - 4142:24
**Najam** [5] - 4164:21, 4165:23, 4179:12, 4179:13, 4223:14
**name** [20] - 4104:20, 4106:19, 4108:3, 4108:19, 4109:10, 4109:12, 4109:13, 4109:18, 4111:21, 4112:14, 4114:2, 4114:20, 4158:24, 4170:8, 4203:24, 4204:10, 4221:18, 4224:10
**named** [4] - 4115:2, 4115:3, 4130:3, 4147:13
**names** [1] - 4203:23
**narrative** [1] - 4226:19
**nature** [7] - 4108:1, 4123:5, 4124:23, 4149:12, 4153:1, 4169:10, 4187:4
**necessarily** [4] - 4173:12, 4173:22, 4193:4, 4220:23
**necessary** [2] - 4153:23, 4228:4
**need** [10] - 4103:2, 4139:23, 4205:21, 4205:25, 4225:23, 4227:18, 4227:19, 4228:12, 4234:9, 4235:3
**needed** [5] - 4139:8, 4162:19, 4163:8, 4192:23, 4204:19
**needs** [1] - 4234:12
**negative** [1] - 4189:13
**negotiation** [1] - 4161:23
**negotiations** [1] - 4151:15
**neighborhood** [1] - 4123:8
**neighboring** [1] - 4131:11
**Nelson** [1] - 4214:13
**net** [5] - 4129:9, 4129:10, 4129:17, 4129:22, 4130:24
**Nevada** [1] - 4193:11
**never** [10] - 4113:9, 4129:12, 4150:3, 4150:7, 4150:9, 4150:10, 4168:17, 4168:20, 4215:8, 4222:2
**NEW** [1] - 4094:1
**new** [8] - 4109:25, 4110:4, 4110:10, 4110:12, 4110:13, 4111:3, 4147:19, 4154:6
**New** [7] - 4094:6, 4094:15, 4095:21, 4106:23, 4107:5, 4147:13, 4213:11
**news** [1] - 4127:24
**next** [22] - 4096:18, 4113:17, 4132:15, 4135:15, 4137:18,

4145:23, 4150:9, 4150:13, 4159:1, 4159:6, 4166:18, 4170:17, 4172:17, 4186:2, 4207:5, 4219:9, 4227:8, 4229:5, 4229:16, 4229:19, 4231:12
**NHL** [3] - 4153:15, 4154:4, 4163:11
**nice** [1] - 4154:12
**nicely** [1] - 4162:12
**Nick** [1] - 4215:2
**night** [3] - 4131:9, 4131:13, 4176:20
**nine** [6] - 4123:20, 4162:10, 4170:1, 4170:12, 4183:19, 4184:8
**nine-month** [1] - 4162:10
**nobody** [2] - 4101:9, 4137:5
**Nolan** [12] - 4205:12, 4211:12, 4211:20, 4212:8, 4212:13, 4212:17, 4212:22, 4212:25, 4213:1, 4213:8, 4213:10, 4214:24
**Nolan's** [3] - 4170:3, 4206:8, 4214:6
**non** [4] - 4171:13, 4171:24, 4172:15, 4173:19
**non-awareness** [1] - 4173:19
**non-leading** [1] - 4172:15
**non-responsive** [1] - 4171:13
**non-responsiveness** [1] - 4171:24
**none** [6] - 4112:12, 4122:8, 4140:22, 4143:23, 4184:17, 4209:17
**normal** [2] - 4163:6, 4163:16
**normally** [2] - 4173:16, 4234:21
**north** [2] - 4144:9, 4154:7
**North** [2] - 4107:24, 4109:18
**Northern** [49] - 4156:12, 4156:14, 4161:5, 4161:10, 4162:2, 4170:7, 4173:10, 4175:20, 4180:14, 4181:21, 4188:8, 4189:17, 4189:21, 4189:22, 4190:4, 4190:8, 4191:17, 4191:22, 4191:25, 4194:9, 4194:13, 4194:18, 4198:13, 4198:20, 4198:22, 4199:20, 4199:25, 4200:13, 4205:9, 4205:10, 4205:22, 4206:6, 4206:8, 4206:21, 4209:14, 4209:17, 4210:18,

4212:19, 4212:24, 4213:3, 4213:13, 4214:13, 4214:22, 4221:19, 4222:4, 4222:7, 4222:13
**note** [4] - 4155:17, 4160:7, 4202:13, 4213:9
**noted** [2] - 4096:3, 4214:10
**notes** [1] - 4184:7
**nothing** [3] - 4128:3, 4128:16, 4132:13
**notice** [3] - 4175:20, 4194:12, 4194:14
**notified** [4] - 4102:5, 4102:7, 4161:5, 4194:16
**November** [10] - 4115:15, 4115:22, 4119:22, 4119:23, 4120:24, 4121:13, 4122:9, 4122:25, 4123:7, 4185:12
**NT** [2] - 4160:23, 4175:20
**nuance** [1] - 4154:12
**number** [45] - 4096:24, 4097:4, 4097:5, 4098:23, 4101:1, 4116:11, 4116:15, 4117:13, 4117:19, 4118:7, 4118:12, 4119:6, 4119:13, 4119:18, 4120:12, 4120:25, 4121:12, 4122:7, 4134:12, 4135:6, 4136:20, 4154:3, 4158:20, 4158:23, 4161:9, 4162:4, 4162:24, 4168:23, 4169:2, 4171:21, 4174:1, 4182:17, 4185:3, 4192:13, 4192:19, 4204:8, 4205:15, 4205:17, 4208:6, 4212:18, 4214:6, 4214:16, 4218:4, 4234:19
**numbers** [3] - 4121:24, 4157:24, 4232:8
**NY** [3] - 4094:22, 4095:3, 4095:7

## O

**o'clock** [4] - 4145:9, 4145:12, 4166:9, 4166:14
**oath** [2] - 4104:13, 4128:7
**object** [3] - 4134:23, 4171:2, 4197:8
**objection** [33] - 4108:25, 4110:6, 4128:18, 4128:25, 4137:4, 4138:2, 4147:24, 4147:25, 4148:1, 4160:7, 4160:8, 4161:19, 4171:4, 4171:14, 4172:3, 4175:3, 4175:4, 4181:5, 4181:6, 4191:6, 4191:7, 4197:14, 4202:22, 4202:25, 4206:11, 4206:23, 4206:25, 4207:1, 4209:18,

4209:19, 4232:5, 4232:6, 4233:10
**objections** [1] - 4102:14
**obligation** [3] - 4101:15, 4140:16, 4149:15
**obligations** [1] - 4142:13
**obscured** [1] - 4119:21
**obtained** [1] - 4209:14
**obtaining** [1] - 4205:9
**obvious** [1] - 4192:5
**obviously** [4] - 4102:16, 4137:14, 4171:15, 4225:19
**occasion** [1] - 4216:13
**occur** [2] - 4115:14, 4115:16
**occurred** [7] - 4115:21, 4125:3, 4153:15, 4189:19, 4198:23, 4221:16, 4226:20
**occurrence** [1] - 4215:17
**occurrences** [2] - 4212:7, 4221:15
**occurring** [1] - 4176:18
**Oceanside** [1] - 4205:7
**October** [1] - 4157:2
**OF** [3] - 4094:1, 4094:3, 4094:10
**offer** [9] - 4133:23, 4135:12, 4157:17, 4175:1, 4181:3, 4191:4, 4196:1, 4197:11, 4202:20
**offered** [7] - 4171:8, 4171:9, 4185:4, 4202:17, 4202:23, 4209:24, 4210:1
**offering** [3] - 4135:5, 4147:22, 4214:20
**offhand** [1] - 4111:14
**office** [9] - 4118:6, 4118:25, 4149:1, 4168:17, 4168:18, 4203:14, 4205:13, 4223:22
**officer** [2] - 4133:16, 4179:12
**officers** [1] - 4106:23
**offices** [2] - 4116:18, 4215:16
**Old** [1] - 4095:3
**old** [3] - 4114:14, 4114:15, 4204:8
**OLIVERAS** [1] - 4095:6
**once** [2] - 4118:3, 4184:21
**one** [90] - 4096:24, 4097:4, 4097:5, 4099:4, 4100:9, 4100:25, 4101:7, 4101:20, 4101:24, 4102:13, 4112:6, 4117:14, 4117:19, 4118:7, 4118:12, 4119:6, 4119:13, 4119:18, 4120:12, 4120:25, 4121:12, 4122:7, 4123:23, 4134:20, 4140:11, 4141:20, 4142:7,

4142:22, 4149:20, 4150:5, 4151:7, 4152:6, 4153:13, 4153:21, 4154:12, 4155:22, 4157:2, 4157:24, 4157:25, 4158:17, 4162:22, 4163:13, 4164:14, 4164:17, 4165:10, 4166:4, 4169:3, 4173:14, 4174:1, 4174:11, 4175:23, 4176:2, 4178:5, 4179:2, 4181:19, 4185:3, 4189:16, 4189:19, 4189:23, 4191:23, 4192:5, 4194:12, 4194:14, 4194:15, 4194:24, 4194:25, 4195:21, 4197:5, 4199:3, 4199:18, 4200:13, 4200:19, 4201:1, 4202:2, 4202:11, 4211:6, 4215:22, 4221:2, 4223:19, 4226:14, 4228:2, 4229:25, 4231:15, 4231:17, 4231:22, 4232:3, 4233:15

**One** [1] - 4094:21
**one-day** [1] - 4163:13
**one-page** [1] - 4150:5
**ones** [1] - 4181:19
**ongoing** [4] - 4098:6, 4123:10, 4153:23, 4185:25
**onsite** [1] - 4130:22
**open** [6] - 4119:15, 4138:1, 4169:25, 4170:13, 4173:1, 4183:18
**opened** [3] - 4136:14, 4137:11, 4183:22
**operability** [2] - 4185:5, 4185:6
**operating** [10] - 4111:18, 4120:15, 4124:13, 4133:16, 4140:14, 4164:23, 4179:7, 4179:11, 4180:1, 4223:12
**operations** [1] - 4222:20
**opportunity** [17] - 4100:14, 4125:8, 4126:21, 4126:24, 4127:2, 4140:10, 4144:25, 4148:7, 4148:23, 4182:21, 4183:22, 4187:21, 4211:3, 4211:5, 4226:10, 4230:17, 4231:19
**opposed** [1] - 4154:6
**opt** [1] - 4193:2
**optimistically** [1] - 4229:18
**option** [1] - 4230:21
**options** [2] - 4152:8, 4230:19
**ordeal** [1] - 4205:9
**order** [8] - 4140:1, 4145:6, 4178:8, 4185:23, 4189:15, 4200:15, 4233:18, 4234:14

**organization** [2] - 4204:12, 4225:17
**organizations** [1] - 4116:15
**organized** [1] - 4233:1
**original** [9] - 4101:5, 4101:10, 4101:13, 4101:16, 4101:18, 4102:18, 4102:21, 4147:8, 4179:14
**originally** [4] - 4139:14, 4143:22, 4169:15, 4169:19
**otherwise** [1] - 4229:7
**out-of-pocket** [1] - 4140:7
**outside** [1] - 4116:14
**outstanding** [2] - 4140:7, 4152:11
**overlap** [1] - 4227:2
**overly** [1] - 4171:3
**overruled** [3] - 4110:7, 4161:21, 4232:5
**owe** [1] - 4231:18
**owed** [2] - 4218:25, 4221:2
**Owen** [6] - 4205:12, 4206:8, 4211:12, 4211:19, 4214:6, 4214:24
**own** [3] - 4128:15, 4136:16, 4213:14
**owned** [1] - 4218:22
**owner** [1] - 4177:11
**ownership** [5] - 4110:21, 4110:23, 4111:10, 4152:9, 4177:2, 4185:18

**P**

**p.m** [1] - 4145:16
**package** [4] - 4147:14, 4210:20, 4213:13, 4214:10
**packages** [3] - 4163:9, 4213:5, 4213:9
**page** [24] - 4132:15, 4135:15, 4137:18, 4145:23, 4150:5, 4150:6, 4163:22, 4164:1, 4164:2, 4164:23, 4165:7, 4165:8, 4166:7, 4166:18, 4168:23, 4169:3, 4170:17, 4172:17, 4186:2, 4203:19, 4204:2, 4207:5, 4214:5, 4219:9
**pages** [7] - 4124:11, 4124:12, 4134:11, 4164:10, 4212:19, 4214:9, 4225:23
**Pahala** [1] - 4131:11
**paid** [5] - 4139:24, 4144:2, 4155:14, 4175:24, 4215:13
**paper** [1] - 4119:9
**papering** [1] - 4155:22

**papers** [2] - 4118:17, 4210:24
**paperwork** [1] - 4210:22
**paragraph** [3] - 4138:22, 4148:10, 4148:21
**paragraphs** [1] - 4164:10
**paralegal** [1] - 4233:5
**parcel** [6] - 4125:13, 4131:12, 4131:17, 4153:11, 4212:15, 4218:5
**parent** [1] - 4138:24
**parked** [2] - 4115:24, 4130:16
**parking** [1] - 4115:25
**part** [22] - 4107:5, 4108:13, 4109:24, 4110:4, 4110:8, 4110:10, 4110:13, 4110:15, 4125:13, 4131:17, 4153:11, 4176:6, 4180:21, 4196:14, 4196:25, 4198:7, 4204:7, 4204:9, 4204:12, 4210:19, 4215:13, 4218:5
**partial** [1] - 4101:15
**participant** [2] - 4199:11, 4199:15
**participate** [1] - 4141:24
**participated** [2] - 4139:3, 4215:8
**particular** [15] - 4108:21, 4120:16, 4124:21, 4125:5, 4141:15, 4142:22, 4174:16, 4175:8, 4175:10, 4180:17, 4193:15, 4198:2, 4210:13, 4210:14, 4224:1
**parties** [10] - 4099:5, 4111:2, 4111:3, 4112:11, 4124:16, 4147:12, 4171:7, 4209:10, 4209:25, 4215:10
**partner** [6] - 4096:10, 4096:20, 4102:25, 4132:6, 4138:17, 4147:19
**partners** [7] - 4108:17, 4113:3, 4130:6, 4141:17, 4142:11, 4142:16, 4223:14
**partnership** [2] - 4132:7, 4223:20
**party** [9] - 4108:20, 4111:1, 4173:11, 4173:12, 4208:19, 4215:9, 4215:13, 4215:24, 4216:4
**pass** [1] - 4125:9
**password** [3] - 4121:3, 4205:15, 4205:16
**past** [2] - 4218:13, 4225:21
**patently** [2] - 4141:22, 4142:6
**Pause** [2] - 4106:8, 4180:7
**pause** [6] - 4133:4, 4146:22, 4156:9, 4194:21,

**4201:24, 4208:24**
**pay** [4] - 4139:15, 4139:20, 4155:18, 4175:15
**payment** [2] - 4142:8, 4213:7
**payments** [11] - 4139:6, 4139:11, 4140:20, 4162:11, 4175:15, 4188:13, 4218:16, 4218:17, 4220:25, 4221:3, 4221:5
**Peca** [35] - 4112:15, 4112:23, 4113:2, 4113:6, 4161:17, 4169:5, 4169:13, 4169:15, 4169:22, 4170:1, 4170:6, 4171:17, 4172:6, 4173:10, 4174:11, 4175:12, 4175:19, 4176:2, 4176:10, 4176:20, 4177:25, 4178:3, 4178:23, 4178:25, 4179:2, 4179:10, 4180:12, 4180:18, 4181:12, 4181:15, 4181:18, 4182:16, 4183:3, 4184:15
**Peca's** [5] - 4170:8, 4170:13, 4171:10, 4180:13, 4183:11
**Pecas** [1] - 4184:20
**pendency** [1] - 4125:14
**pending** [2] - 4177:22, 4181:17
**peninsula** [1] - 4154:7
**people** [8] - 4116:11, 4116:13, 4154:4, 4173:9, 4182:1, 4204:16, 4215:22, 4216:2
**percent** [10] - 4110:25, 4112:10, 4112:11, 4123:2, 4139:6, 4141:24, 4142:10, 4152:20, 4164:24, 4177:11
**percentage** [6] - 4110:21, 4110:23, 4165:6, 4165:9, 4165:10, 4177:2
**perfect** [1] - 4234:13
**perhaps** [2] - 4175:25, 4230:17
**period** [11] - 4122:3, 4125:7, 4125:10, 4126:23, 4161:5, 4162:10, 4183:19, 4184:8, 4184:13, 4189:8, 4218:7
**permissible** [1] - 4099:4
**permission** [1] - 4114:7
**person** [4] - 4106:19, 4173:22, 4184:1, 4234:3
**personal** [5] - 4121:16, 4124:18, 4124:19, 4128:15, 4223:10
**personally** [1] - 4112:20

**perspective** [6] - 4187:9, 4205:8, 4212:5, 4217:24, 4218:3, 4226:20
**Phil** [13] - 4104:8, 4108:23, 4110:15, 4111:4, 4113:19, 4114:4, 4114:9, 4114:14, 4115:7, 4136:11, 4192:1, 4192:13
**PHIL** [2] - 4113:22, 4236:8
**PHILLIP** [1] - 4094:7
**Phillip** [3] - 4118:8, 4148:13, 4148:25
**Phoenix** [2] - 4116:6, 4116:20, 4214:14
**phone** [23] - 4101:10, 4101:11, 4101:18, 4101:19, 4101:21, 4102:21, 4158:22, 4159:4, 4159:14, 4159:21, 4159:23, 4178:7, 4184:1, 4184:5, 4188:21, 4189:17, 4191:17, 4192:24, 4193:1, 4193:13, 4200:10, 4213:11, 4218:4
**phones** [1] - 4101:8
**photograph** [2] - 4118:20, 4118:23
**photographs** [1] - 4233:24
**photos** [1] - 4121:16
**phrase** [1] - 4198:10
**pick** [1] - 4230:18
**picture** [2] - 4119:13, 4119:19
**piece** [1] - 4130:7
**PK** [2] - 4214:17, 4214:18
**place** [8] - 4107:15, 4114:18, 4154:16, 4171:1, 4173:1, 4185:16, 4198:4, 4218:6
**placed** [1] - 4116:18
**plan** [2] - 4191:20, 4228:11
**planned** [1] - 4229:11
**plans** [3] - 4131:10, 4161:11, 4189:25
**play** [1] - 4101:20
**Playboy** [2] - 4220:19, 4221:2
**player** [6] - 4112:17, 4122:23, 4149:18, 4217:9, 4218:17, 4227:14
**playing** [3] - 4124:1, 4192:7, 4217:20
**Plaza** [2] - 4094:15, 4095:20
**pledged** [3] - 4212:11, 4212:21, 4212:22
**plus** [3] - 4141:5, 4158:22, 4159:3
**pocket** [1] - 4140:7
**Point** [1] - 4109:18

**point** [52] - 4098:7, 4098:10, 4098:22, 4100:4, 4101:17, 4107:10, 4111:6, 4115:10, 4116:22, 4117:1, 4119:16, 4122:10, 4122:21, 4126:11, 4126:12, 4126:19, 4127:18, 4131:2, 4131:20, 4139:2, 4139:25, 4140:14, 4142:17, 4144:10, 4152:25, 4155:20, 4165:1, 4165:5, 4165:9, 4166:10, 4168:6, 4168:21, 4176:17, 4181:25, 4182:7, 4182:12, 4191:16, 4192:25, 4193:6, 4193:23, 4206:23, 4212:19, 4212:24, 4213:2, 4213:7, 4217:6, 4221:25, 4222:4, 4222:18, 4226:21, 4231:14, 4231:17
**points** [2] - 4128:13, 4165:25
**police** [1] - 4106:23
**Pollos** [6] - 4151:20, 4151:22, 4152:1, 4152:3, 4152:6, 4152:15
**pool** [1] - 4215:23
**portion** [7] - 4101:2, 4139:12, 4148:9, 4160:22, 4200:18, 4203:21, 4225:1
**portions** [2] - 4197:11, 4232:24
**posed** [1] - 4171:5
**position** [1] - 4230:18
**possess** [1] - 4159:19
**possessed** [2] - 4150:3, 4159:17
**possession** [3] - 4213:16, 4218:16, 4228:24
**possible** [2] - 4103:8, 4125:10
**post** [1] - 4139:4
**postal** [1] - 4150:17
**Postal** [1] - 4182:14
**potential** [5] - 4102:6, 4138:17, 4153:14, 4154:8, 4215:17
**practice** [2] - 4099:18, 4163:17
**prejudice** [1] - 4177:22
**preliminary** [2] - 4153:13, 4164:14
**preparation** [2] - 4123:11, 4123:19
**prepare** [3] - 4123:4, 4123:11, 4125:8
**prepared** [12] - 4102:11, 4103:11, 4147:3, 4147:13, 4174:19, 4182:6, 4198:24, 4200:15, 4210:19,

4223:13, 4227:23, 4228:3
**present** [18] - 4097:9, 4103:21, 4110:17, 4116:10, 4116:12, 4117:10, 4127:12, 4128:1, 4152:22, 4167:21, 4168:2, 4169:1, 4184:24, 4187:12, 4193:24, 4211:14, 4216:8, 4227:20
**presented** [2] - 4169:21, 4175:23
**presently** [2] - 4106:25, 4115:12
**pretrial** [4] - 4157:6, 4195:18, 4213:22
**previous** [2] - 4142:16, 4153:19
**previously** [5] - 4135:10, 4136:7, 4162:4, 4178:22, 4203:20
**primarily** [3] - 4120:3, 4122:18, 4220:7
**primary** [1] - 4154:6
**print** [2] - 4203:6, 4203:11
**printed** [3] - 4203:11, 4203:23, 4224:10
**private** [1] - 4218:22
**privilege** [1] - 4234:24
**Privitello** [1] - 4215:2
**probability** [1] - 4200:9
**problem** [3] - 4228:6, 4228:7, 4229:25
**proceed** [4] - 4103:11, 4104:3, 4140:3, 4176:9
**proceeding** [6] - 4099:14, 4149:19, 4169:6, 4203:21, 4220:17, 4225:17
**Proceedings** [1] - 4095:25
**proceedings** [10] - 4106:8, 4133:4, 4146:22, 4156:9, 4180:7, 4194:21, 4201:24, 4208:24, 4211:12, 4235:6
**PROCEEDINGS** [1] - 4094:10
**process** [5] - 4155:22, 4157:6, 4158:4, 4194:18, 4205:8
**processing** [1] - 4232:10
**produced** [9] - 4095:25, 4129:15, 4134:15, 4159:16, 4205:22, 4205:23, 4206:6, 4206:22, 4235:2
**producing** [1] - 4134:20
**product** [2] - 4123:11, 4125:9
**productive** [1] - 4171:25
**professional** [2] - 4192:7, 4218:11
**profit** [1] - 4112:12

**program** [1] - 4120:24
**progress** [1] - 4177:19
**project** [13] - 4138:12, 4138:18, 4139:9, 4143:20, 4144:8, 4155:9, 4155:21, 4169:17, 4170:5, 4175:14, 4177:16, 4179:15, 4183:23
**projecting** [1] - 4229:17
**projection** [1] - 4225:2
**projects** [3] - 4122:19, 4187:3, 4193:8
**promoting** [1] - 4154:3
**prompted** [1] - 4098:19
**pronouncements** [1] - 4127:23
**proof** [2] - 4135:12, 4212:8
**Properties** [1] - 4109:19
**property** [17] - 4107:11, 4107:23, 4108:13, 4108:15, 4108:20, 4109:14, 4109:23, 4111:11, 4111:18, 4112:6, 4112:24, 4113:3, 4130:20, 4130:21, 4131:6, 4140:5, 4144:6
**proposed** [2] - 4139:15, 4148:14
**prosecution** [1] - 4099:21
**protocol** [3] - 4163:6, 4192:21, 4222:15
**prove** [1] - 4099:3
**provide** [7] - 4096:14, 4096:16, 4111:17, 4196:23, 4205:15, 4205:19, 4232:14
**provided** [22] - 4097:8, 4099:1, 4099:24, 4100:20, 4102:2, 4102:12, 4125:14, 4126:12, 4126:22, 4136:10, 4136:11, 4148:23, 4188:8, 4195:17, 4196:22, 4196:24, 4197:2, 4216:19, 4217:15, 4222:5, 4226:2, 4233:13
**provides** [1] - 4099:18
**providing** [1] - 4233:6
**Prudential** [1] - 4168:17
**public** [3] - 4106:25, 4107:3, 4127:23
**pull** [1] - 4104:25
**pulled** [3] - 4116:2, 4130:14, 4232:24
**purchase** [3] - 4107:11, 4110:4, 4120:20
**purchased** [5] - 4109:15, 4109:17, 4109:23, 4120:12, 4120:21
**purported** [1] - 4111:10
**purpose** [5] - 4164:2, 4164:12, 4169:14,

4185:14, 4204:10
**purposes** [8] - 4098:14, 4142:5, 4152:16, 4152:18, 4160:15, 4194:5, 4201:4, 4202:18
**pursuant** [6] - 4116:23, 4153:19, 4185:17, 4194:18, 4205:22, 4205:23
**pursue** [6] - 4098:9, 4140:16, 4140:20, 4151:4, 4152:20, 4161:11
**pursuing** [4] - 4099:11, 4139:6, 4175:17, 4177:5
**pursuit** [2] - 4120:5, 4152:18
**put** [20] - 4098:4, 4098:6, 4098:13, 4101:13, 4130:4, 4130:7, 4130:8, 4141:23, 4151:10, 4151:15, 4203:10, 4206:9, 4208:15, 4208:18, 4213:5, 4213:6, 4227:7, 4230:18, 4231:4, 4232:4
**putting** [1] - 4151:4

### Q

**qualification** [1] - 4207:1
**quantity** [2] - 4124:6, 4125:13
**questions** [13] - 4109:5, 4111:25, 4113:10, 4113:11, 4136:9, 4136:23, 4148:24, 4154:21, 4160:6, 4171:3, 4172:15, 4174:5, 4214:17
**quick** [1] - 4156:8
**quite** [3] - 4103:11, 4134:12, 4191:15

### R

**racing** [1] - 4221:3
**rack** [1] - 4119:21
**raise** [1] - 4096:7
**raised** [3] - 4128:2, 4171:10, 4232:7
**raises** [1] - 4229:15
**Ram** [1] - 4162:6
**Ranford** [3] - 4184:24, 4185:15, 4187:2
**ranford** [2] - 4185:11, 4185:24
**rapidly** [1] - 4096:23
**rather** [6] - 4138:19, 4140:9, 4164:9, 4167:11, 4193:3, 4217:20
**read** [9] - 4140:11, 4144:25, 4146:18, 4148:7,

4148:8, 4159:6, 4160:21, 4164:9, 4224:17
**reading** [1] - 4140:9
**reads** [2] - 4148:11, 4148:22
**ready** [1] - 4096:5
**real** [3] - 4148:16, 4168:17, 4168:18
**realists** [1] - 4176:8
**realized** [2] - 4175:22, 4228:13
**really** [5] - 4171:8, 4201:5, 4201:8, 4205:24, 4225:10
**reason** [7] - 4118:1, 4138:19, 4141:22, 4163:16, 4230:3, 4231:4, 4232:7
**reasons** [1] - 4100:25
**rebuttal** [2] - 4137:15, 4229:20
**recanted** [1] - 4143:23
**recapture** [1] - 4152:8
**receipt** [1] - 4148:12
**receive** [9] - 4145:4, 4149:11, 4155:9, 4157:9, 4184:11, 4191:24, 4216:13, 4222:12, 4232:23
**received** [62] - 4101:22, 4101:24, 4124:7, 4125:16, 4125:18, 4126:1, 4126:9, 4126:13, 4138:6, 4142:2, 4143:23, 4143:24, 4147:14, 4148:4, 4150:10, 4155:4, 4155:10, 4155:11, 4155:14, 4157:10, 4159:2, 4159:7, 4159:25, 4160:2, 4160:12, 4174:10, 4174:18, 4175:9, 4177:25, 4178:25, 4179:4, 4179:7, 4180:12, 4180:18, 4181:21, 4182:10, 4188:12, 4189:1, 4190:16, 4191:10, 4191:22, 4196:15, 4197:18, 4199:24, 4203:3, 4205:14, 4210:8, 4212:17, 4213:1, 4216:12, 4232:21, 4233:18, 4233:25, 4234:7, 4236:25, 4237:2, 4237:5, 4237:8, 4237:11, 4237:13, 4237:14
**receiving** [7] - 4111:19, 4149:10, 4173:17, 4175:21, 4181:14, 4193:19, 4200:4
**recently** [2] - 4112:16, 4125:16
**Recess** [2] - 4145:22, 4207:4
**recess** [4] - 4146:1,

4166:13, 4166:17, 4208:1
**recessed** [1] - 4235:6
**reciprocating** [1] - 4233:21
**recognize** [10] - 4117:20, 4118:22, 4133:11, 4146:24, 4156:23, 4174:7, 4190:12, 4195:3, 4214:2, 4224:3
**recollection** [13] - 4102:24, 4106:13, 4107:20, 4113:5, 4144:17, 4154:22, 4155:1, 4160:3, 4168:21, 4193:20, 4215:12, 4220:22, 4222:6
**reconsider** [1] - 4231:3
**reconvene** [1] - 4166:14
**record** [17] - 4098:4, 4098:7, 4104:21, 4106:2, 4114:3, 4137:7, 4142:12, 4148:8, 4160:16, 4194:5, 4194:11, 4205:18, 4208:16, 4208:18, 4220:13, 4227:7, 4232:4
**recorded** [2] - 4095:25, 4101:7, 4182:16, 4182:25, 4183:2, 4183:5, 4183:9, 4216:14, 4216:14, 4216:18, 4216:21, 4217:6
**recording** [9] - 4102:7, 4102:15, 4102:18, 4103:15, 4217:17, 4217:20, 4217:25, 4220:15, 4233:8
**recordings** [2] - 4182:22, 4233:7
**records** [15] - 4121:11, 4121:15, 4124:11, 4124:12, 4125:22, 4126:9, 4142:18, 4143:25, 4205:9, 4205:12, 4205:23, 4209:13, 4213:5, 4213:16, 4214:22
**recover** [3] - 4122:17, 4140:4, 4185:17
**recovery** [1] - 4193:7
**redirect** [1] - 4113:12
**redocumenting** [1] - 4164:17
**reduce** [2] - 4143:2, 4155:19
**refer** [3] - 4126:6, 4127:9, 4142:18
**reference** [32] - 4097:23, 4106:6, 4108:21, 4110:12, 4111:3, 4125:25, 4138:9, 4141:1, 4149:8, 4152:4, 4153:4, 4155:3, 4156:11, 4159:4, 4162:25, 4165:6, 4169:9, 4174:5, 4176:21, 4179:16, 4181:10, 4184:12, 4184:20, 4190:4,

4197:21, 4198:5, 4200:12, 4200:18, 4203:5, 4211:1, 4213:17, 4221:17
**referenced** [5] - 4129:14, 4138:22, 4141:16, 4180:4, 4184:6
**references** [4] - 4132:13, 4195:7, 4195:9, 4195:11
**referencing** [3] - 4129:15, 4176:24, 4180:14
**referred** [9] - 4121:19, 4142:3, 4143:11, 4143:18, 4143:21, 4144:21, 4146:12, 4152:15, 4184:1
**referring** [23] - 4106:3, 4114:9, 4125:19, 4126:4, 4127:10, 4140:12, 4147:17, 4151:25, 4172:6, 4175:21, 4177:15, 4178:4, 4179:19, 4181:22, 4181:25, 4182:4, 4184:7, 4188:11, 4188:13, 4199:23, 4213:18, 4220:25, 4221:3
**refers** [2] - 4198:15, 4200:13
**refinance** [1] - 4183:23
**reflected** [2] - 4111:10, 4165:7
**reflecting** [1] - 4129:21
**reflection** [1] - 4119:9
**refresh** [2] - 4106:13, 4144:17
**regard** [10] - 4098:2, 4110:3, 4127:22, 4167:13, 4180:2, 4187:24, 4193:15, 4203:18, 4212:5, 4234:5
**regarding** [9] - 4148:14, 4167:10, 4171:16, 4173:3, 4198:13, 4222:20, 4223:6, 4224:17, 4232:6
**regards** [3] - 4109:14, 4111:13, 4124:22
**regular** [7] - 4116:13, 4154:19, 4179:3, 4192:8, 4193:23, 4215:15, 4215:17
**rehab** [1] - 4215:23
**relate** [1] - 4107:19
**related** [4] - 4124:13, 4142:4, 4169:3, 4183:11
**relates** [40] - 4108:2, 4108:7, 4108:13, 4110:20, 4111:18, 4122:10, 4125:1, 4127:24, 4143:3, 4143:4, 4143:10, 4148:10, 4150:1, 4155:4, 4156:1, 4156:11, 4163:1, 4169:9, 4172:7, 4178:23, 4178:25, 4180:2, 4180:16, 4180:24, 4185:2, 4190:18, 4193:15, 4198:2,

4199:17, 4199:19, 4202:1, 4202:13, 4205:12, 4211:9, 4211:15, 4211:19, 4214:24, 4218:14, 4222:7, 4222:25

**relating** [1] - 4227:1
**relation** [1] - 4155:11
**relationship** [7] - 4115:4, 4122:22, 4127:19, 4152:3, 4153:2, 4168:7, 4168:9
**release** [2] - 4189:21, 4231:17
**relevance** [1] - 4150:19
**relied** [1] - 4149:4
**remain** [3] - 4104:12, 4226:14, 4229:6
**remainder** [1] - 4122:16
**remaining** [2] - 4189:21, 4198:25
**remark** [1] - 4176:1
**remember** [4] - 4127:5, 4162:9, 4188:15, 4215:2
**reminded** [1] - 4112:16
**reminding** [2] - 4179:7, 4184:20
**removing** [1] - 4180:3
**renew** [1] - 4097:17
**renewals** [1] - 4213:10
**renewing** [1] - 4171:4
**renovation** [2] - 4143:19, 4144:8
**rent** [1] - 4215:25
**rental** [3] - 4130:11, 4130:21, 4131:13
**rented** [2] - 4130:11, 4131:11
**repaid** [1] - 4184:9
**repay** [3] - 4178:2, 4218:25, 4221:14
**repayment** [1] - 4161:12
**replacement** [1] - 4123:18
**replenish** [1] - 4184:3
**replenished** [1] - 4170:3
**replica** [1] - 4150:8
**Reporter** [1] - 4095:20
**reporting** [1] - 4173:8
**represent** [2] - 4165:25, 4219:3
**representation** [1] - 4099:13
**representations** [6] - 4141:19, 4148:19, 4168:15, 4183:16, 4184:14, 4218:9
**representative** [2] - 4149:1, 4189:18
**represented** [14] - 4102:17, 4129:4, 4129:6, 4129:13, 4139:20, 4141:14, 4142:11, 4142:23, 4150:5,

4168:19, 4168:22, 4177:1, 4218:11, 4220:10
**representing** [1] - 4184:13
**reproduction** [3] - 4180:25, 4190:25, 4195:22
**reproductions** [2] - 4157:13, 4174:23
**request** [3] - 4097:17, 4221:13, 4232:3
**requested** [2] - 4149:2, 4150:15
**requests** [1] - 4179:3
**required** [7] - 4121:24, 4147:4, 4149:15, 4178:5, 4189:17, 4214:9, 4223:16
**requiring** [1] - 4193:9
**reread** [1] - 4145:5
**reserve** [1] - 4214:19
**residence** [1] - 4188:12
**resides** [1] - 4158:3
**resigned** [1] - 4213:6
**resolution** [1] - 4103:2
**resorts** [1] - 4152:9
**resources** [1] - 4175:17
**respect** [26] - 4098:5, 4132:12, 4139:19, 4143:17, 4149:25, 4151:14, 4153:14, 4156:3, 4156:6, 4166:1, 4176:6, 4176:7, 4181:17, 4185:10, 4191:20, 4192:12, 4193:8, 4210:13, 4213:2, 4219:8, 4220:12, 4220:21, 4221:2, 4221:22, 4222:17, 4230:1
**respectfully** [1] - 4206:18
**respectively** [2] - 4174:5, 4175:2
**respond** [5] - 4178:2, 4192:19, 4199:6, 4199:8, 4200:4
**responded** [1] - 4200:7
**responding** [3] - 4192:16, 4196:10, 4196:18
**response** [8] - 4133:15, 4148:9, 4148:17, 4149:9, 4178:6, 4193:3, 4200:3, 4203:19
**responses** [2] - 4171:3, 4233:22
**responsive** [3] - 4161:20, 4171:4, 4171:13
**responsiveness** [1] - 4171:24
**rest** [2] - 4101:13, 4138:25
**restate** [1] - 4143:6
**rested** [1] - 4104:3
**restitution** [1] - 4188:18
**restructuring** [1] - 4164:16
**result** [2] - 4151:7, 4184:9, 4200:3

**resume** [1] - 4124:21
**resumes** [2] - 4167:8, 4208:5
**retained** [2] - 4120:5, 4190:5
**retired** [3] - 4106:25, 4107:3, 4107:7
**retrial** [1] - 4099:1
**return** [1] - 4173:25
**returned** [4] - 4149:16, 4212:18, 4214:12, 4223:21
**review** [12] - 4102:13, 4123:10, 4126:21, 4126:24, 4154:15, 4181:19, 4187:21, 4190:23, 4195:20, 4213:23, 4228:9, 4234:24
**reviewed** [6] - 4123:8, 4132:10, 4144:23, 4168:25, 4225:21, 4225:22
**reviewing** [2] - 4134:11, 4225:20
**Rhode** [1] - 4158:23
**RICHARD** [1] - 4094:22
**Richards** [1] - 4177:21
**rights** [1] - 4214:19
**rise** [5] - 4096:1, 4103:20, 4167:3, 4167:20, 4209:6
**road** [2] - 4130:14, 4183:23
**Road** [1] - 4095:3
**ROBERT** [1] - 4095:4
**Rock** [1] - 4215:23
**role** [1] - 4154:2
**roll** [1] - 4164:18
**Ron** [1] - 4177:21
**room** [2] - 4118:22, 4228:25
**Rosecrans** [1] - 4185:13
**Rubin** [1] - 4151:20
**Rucchin** [12] - 4187:17, 4187:24, 4188:7, 4188:11, 4188:20, 4189:1, 4189:2, 4189:25, 4190:15, 4191:2, 4191:15, 4193:21
**Rucchin's** [1] - 4189:11
**rudimentary** [1] - 4151:9
**Rule** [1] - 4102:2
**rule** [2] - 4197:8, 4197:10
**run** [2] - 4160:17, 4216:5
**running** [1] - 4118:15
**rush** [1] - 4160:23
**rushing** [1] - 4231:22

**S**

**safe** [1] - 4224:18
**Sag** [9] - 4107:11, 4107:23, 4108:23, 4110:17, 4111:7, 4111:18, 4112:5, 4112:24,

4113:3
**sale** [2] - 4112:9, 4112:14
**sales** [1] - 4112:5
**San** [4] - 4154:6, 4154:8, 4179:9, 4185:22
**SARITHA** [1] - 4094:16
**sat** [1] - 4130:15
**Saturday** [2] - 4105:12, 4192:10
**save** [1] - 4225:25
**saw** [7] - 4129:20, 4134:12, 4150:19, 4184:7, 4189:10, 4194:2, 4204:13
**scanned** [1] - 4121:17
**scanning** [1] - 4168:24
**schedule** [4] - 4096:9, 4096:20, 4213:7, 4227:20
**Schwab** [18] - 4142:25, 4160:24, 4162:3, 4162:7, 4162:15, 4162:23, 4182:1, 4182:6, 4189:6, 4189:7, 4189:18, 4189:23, 4191:18, 4191:19, 4198:20, 4199:2, 4200:15, 4200:17
**Scottsdale** [1] - 4115:17
**screen** [2] - 4118:20, 4158:12
**search** [7] - 4102:4, 4116:23, 4117:1, 4117:5, 4232:12, 4232:18, 4233:19
**searched** [1] - 4116:23
**seated** [1] - 4096:2, 4103:22, 4104:24, 4114:1, 4146:2, 4146:8, 4167:4, 4167:22, 4208:2, 4209:8, 4224:21
**SEC** [1] - 4134:20
**second** [12] - 4109:24, 4110:18, 4110:20, 4110:22, 4111:16, 4142:1, 4148:21, 4174:11, 4175:19, 4196:13, 4200:23, 4212:21
**secondly** [2] - 4185:23, 4232:9
**seconds** [2] - 4159:3, 4226:4
**secretly** [4] - 4182:24, 4216:14, 4216:18, 4217:6
**secure** [1] - 4190:1
**secured** [1] - 4138:18
**securities** [1] - 4194:19
**Securities** [2] - 4134:16, 4220:9
**security** [1] - 4118:3
**see** [20] - 4103:25, 4111:9, 4117:1, 4117:13, 4119:5, 4119:8, 4119:11, 4119:18, 4129:21, 4134:10,

4150:22, 4160:15, 4160:21, 4203:8, 4204:1, 4204:3, 4204:8, 4214:11, 4229:12, 4232:1
**seek** [1] - 4188:18
**seize** [1] - 4194:12
**seized** [6] - 4161:7, 4176:24, 4188:25, 4189:2, 4194:17, 4194:18
**seizure** [6] - 4120:23, 4181:23, 4190:5, 4191:21, 4198:23, 4200:24
**selection** [1] - 4102:8
**sell** [1] - 4183:22
**selling** [1] - 4218:22
**Sempel** [1] - 4227:17
**send** [4] - 4163:9, 4189:6, 4210:21, 4214:15
**sending** [1] - 4212:14
**sense** [1] - 4140:5
**sent** [31] - 4101:25, 4133:14, 4133:17, 4147:15, 4149:13, 4152:16, 4152:17, 4157:1, 4159:7, 4162:17, 4176:19, 4179:20, 4182:7, 4188:11, 4189:5, 4189:22, 4191:1, 4194:9, 4194:15, 4195:8, 4196:21, 4197:7, 4210:19, 4212:13, 4214:6, 4214:17, 4221:4, 4221:5, 4222:11, 4233:15, 4233:25
**sentence** [2] - 4175:19, 4175:25
**sentencing** [2] - 4145:15, 4145:17
**separate** [2] - 4233:18, 4234:13
**September** [4] - 4106:1, 4106:17, 4109:4, 4210:24
**sequential** [1] - 4158:20
**serve** [1] - 4231:6
**served** [1] - 4209:16
**serves** [1] - 4155:13
**Service** [1] - 4182:14
**session** [1] - 4229:8
**set** [6] - 4157:12, 4157:14, 4210:2, 4210:3, 4210:17, 4212:11
**settlement** [2] - 4151:1, 4151:16
**Settlement** [1] - 4152:1
**seven** [1] - 4155:17
**several** [13] - 4117:3, 4117:24, 4120:3, 4122:19, 4141:19, 4142:20, 4144:7, 4144:14, 4152:12, 4154:8, 4185:25, 4201:3, 4221:15
**share** [2] - 4112:10, 4112:11

**shares** [1] - 4218:22
**shipped** [1] - 4150:16
**short** [1] - 4228:7
**shorter** [1] - 4145:11
**shortly** [3] - 4116:4, 4143:23, 4179:8
**shot** [1] - 4158:12
**shoulder** [1] - 4202:7
**show** [7] - 4099:22, 4118:20, 4132:11, 4163:20, 4185:24, 4190:2, 4201:3
**showed** [2] - 4130:15, 4189:12
**showing** [1] - 4226:17
**shown** [1] - 4158:9
**shut** [1] - 4189:15
**shuts** [1] - 4100:21
**sic** [1] - 4189:23
**side** [3] - 4130:14, 4139:8, 4197:5
**sidebar** [2] - 4171:1, 4204:24
**Sidebar** [2] - 4136:1, 4137:17
**sign** [15] - 4147:3, 4147:5, 4149:16, 4160:23, 4162:19, 4166:3, 4189:20, 4198:25, 4204:19, 4210:21, 4214:8, 4214:10, 4214:16, 4214:17, 4223:17
**sign-off** [2] - 4147:5, 4149:16
**signature** [27] - 4134:6, 4134:7, 4163:24, 4201:5, 4201:9, 4201:12, 4201:15, 4201:18, 4201:21, 4202:10, 4202:14, 4203:6, 4203:16, 4203:19, 4211:6, 4212:19, 4214:8, 4223:6, 4223:18, 4223:19, 4223:21, 4223:25, 4224:1, 4224:3, 4224:6, 4224:9
**signatures** [9] - 4168:16, 4168:23, 4169:2, 4203:15, 4204:18, 4211:9, 4211:10, 4214:9, 4223:23
**signed** [15] - 4139:13, 4147:12, 4148:16, 4163:8, 4166:5, 4169:20, 4169:22, 4179:24, 4183:18, 4189:5, 4194:19, 4203:15, 4210:24, 4223:7, 4223:23
**significant** [4] - 4122:15, 4168:22, 4169:2, 4225:1
**signing** [3] - 4142:7, 4153:20, 4204:10
**similar** [4] - 4117:6, 4149:13, 4150:4, 4150:7
**simple** [1] - 4178:5

**simply** [10] - 4106:13, 4107:14, 4107:19, 4115:19, 4121:5, 4122:10, 4144:13, 4156:7, 4164:1, 4176:16
**sit** [3] - 4199:10, 4209:5, 4228:25
**site** [3] - 4131:7, 4139:9, 4154:6
**sites** [1] - 4154:9
**sitting** [1] - 4234:16
**situation** [3] - 4098:24, 4229:23, 4230:15
**six** [9] - 4096:15, 4124:14, 4151:5, 4162:10, 4169:25, 4170:12, 4183:19, 4184:7, 4230:13
**sleep** [1] - 4118:16
**small** [2] - 4130:7, 4130:12
**snapshot** [1] - 4233:24
**software** [2] - 4120:17, 4120:21
**sold** [3] - 4111:7, 4111:9, 4111:11
**someone** [7] - 4100:4, 4119:1, 4192:8, 4198:16, 4223:7, 4223:22, 4231:1
**sometime** [1] - 4211:25
**sometimes** [1] - 4225:20
**somewhat** [3] - 4108:16, 4181:18, 4205:8
**somewhere** [4] - 4123:8, 4169:25, 4170:12, 4192:24
**son** [1] - 4115:2
**Sonenglick** [1] - 4227:14
**sorry** [4] - 4112:13, 4135:2, 4197:16, 4202:5
**sort** [1] - 4129:12
**source** [2] - 4173:18, 4221:7
**south** [1] - 4130:11
**Southern** [2] - 4097:19, 4097:23
**space** [1] - 4134:7
**span** [1] - 4124:10
**SPCA** [1] - 4220:14
**speaking** [5] - 4124:20, 4170:6, 4179:6, 4193:21, 4198:18
**speaks** [5] - 4160:21, 4164:7, 4176:1, 4197:23, 4198:7
**special** [1] - 4126:8
**specific** [8] - 4109:16, 4149:8, 4154:18, 4177:7, 4183:16, 4192:23, 4199:23, 4206:25
**specifically** [16] - 4110:13, 4116:16, 4122:24, 4150:2, 4174:17, 4179:19,

4185:20, 4193:22, 4194:10, 4200:7, 4200:11, 4203:22, 4211:5, 4211:22, 4223:3, 4223:14
**specifying** [1] - 4117:4
**spell** [2] - 4104:20, 4114:2
**spend** [5] - 4122:16, 4125:6, 4153:17, 4175:17, 4234:9
**spending** [1] - 4151:11
**spent** [5] - 4122:15, 4131:5, 4153:17, 4154:10, 4192:24
**sphere** [3] - 4226:13, 4226:25, 4227:3
**spheres** [5] - 4226:13, 4226:14, 4226:22, 4226:25
**spills** [1] - 4227:24
**split** [1] - 4216:6
**spoken** [3] - 4097:12, 4178:7, 4198:12
**sports** [1] - 4192:7
**springtime** [1] - 4138:15
**squad** [1] - 4116:5
**Square** [1] - 4094:21
**stack** [1] - 4209:10
**stamp** [1] - 4159:5
**stamps** [1] - 4233:22
**stand** [15] - 4097:14, 4097:15, 4103:6, 4104:9, 4104:12, 4113:20, 4126:23, 4127:15, 4128:2, 4142:23, 4167:6, 4167:8, 4169:23, 4208:5, 4211:2
**standard** [1] - 4222:15
**standing** [2] - 4104:12, 4141:13
**standpoint** [1] - 4140:15
**stands** [1] - 4200:23
**Starbucks** [2] - 4185:13, 4185:21
**start** [2] - 4096:19, 4102:8
**started** [1] - 4145:9
**starting** [4] - 4151:14, 4183:18, 4228:18, 4229:9
**state** [11] - 4104:20, 4114:2, 4121:7, 4126:20, 4141:6, 4162:14, 4171:16, 4171:18, 4173:13, 4173:15, 4173:21
**statement** [10] - 4105:22, 4105:24, 4106:4, 4121:8, 4129:12, 4129:21, 4188:12, 4189:11, 4196:11, 4234:6
**statements** [13] - 4129:10, 4175:22, 4175:23, 4190:4, 4190:8, 4191:23, 4197:1, 4222:3, 4222:5, 4222:7, 4222:11, 4222:13

**STATES** [3] - 4094:1, 4094:3, 4094:11

**States** [8] - 4094:6, 4094:14, 4094:17, 4118:8, 4134:16, 4150:10, 4150:12, 4182:14

**status** [8] - 4114:16, 4139:1, 4175:12, 4176:9, 4177:3, 4181:16, 4185:15, 4187:3

**stay** [1] - 4230:3

**stayed** [1] - 4131:13

**staying** [2] - 4131:9, 4228:7

**stealing** [1] - 4100:4

**steep** [1] - 4130:18

**Stef** [4] - 4160:24, 4162:16, 4162:17, 4200:14

**Steiger** [1] - 4095:20

**stem** [1] - 4099:23

**stenography** [1] - 4095:25

**step** [2] - 4113:14, 4205:4

**Stephanie** [2] - 4182:5

**stepped** [1] - 4208:12

**steps** [5] - 4113:16, 4151:10, 4164:14, 4205:6, 4224:22

**Steve** [3] - 4190:15, 4191:14, 4193:16

**Steven** [2] - 4187:17, 4191:2

**sticking** [2] - 4139:25, 4172:1

**sticks** [1] - 4172:10

**still** [12] - 4101:10, 4102:10, 4102:17, 4117:11, 4139:8, 4141:14, 4190:5, 4205:11, 4206:7, 4214:11, 4214:21, 4227:14

**stipulation** [3] - 4121:10, 4206:5, 4209:9

**stolen** [1] - 4100:3

**Stolper** [1] - 4100:18

**stop** [2] - 4224:15, 4224:16

**straightforward** [1] - 4193:5

**Strangford** [1] - 4095:7

**strategy** [1] - 4188:23

**string** [2] - 4232:15, 4232:25

**strings** [1] - 4233:1

**struck** [1] - 4139:12

**students** [1] - 4229:5

**subject** [1] - 4214:20

**subjecting** [1] - 4102:6

**subpoena** [4] - 4205:22, 4205:23, 4209:15, 4209:16

**subpoenaed** [1] - 4214:22

**subscription** [1] - 4179:14

**subsequent** [8] - 4138:17,

4139:24, 4155:15, 4161:11, 4177:21, 4181:14, 4181:23, 4221:14

**subsequently** [9] - 4157:7, 4158:6, 4174:20, 4180:23, 4189:5, 4190:22, 4195:19, 4213:22, 4219:1

**substance** [3] - 4107:22, 4187:5, 4187:25

**suffered** [2] - 4143:3, 4143:10

**Suffolk** [1] - 4094:21

**suggest** [2] - 4130:24, 4225:16

**suggested** [2] - 4143:24, 4197:3

**suggestion** [2] - 4103:9, 4230:17

**suggests** [1] - 4098:11

**sum** [2] - 4129:16, 4187:5

**summary** [2] - 4115:19, 4115:20

**summations** [2] - 4229:21

**Sunday** [3] - 4125:21, 4126:15, 4215:23

**supersedes** [1] - 4098:11

**support** [2] - 4153:21, 4153:23

**supposed** [1] - 4183:17

**surreptitiously** [3] - 4182:17, 4183:8, 4184:19

**surrounding** [3] - 4168:16, 4172:8, 4188:16

**sustain** [1] - 4172:2

**sustained** [3] - 4109:1, 4128:19, 4143:15

**swore** [1] - 4128:2

**sworn** [2] - 4104:17, 4113:24

**Sydor** [20] - 4097:8, 4179:20, 4193:24, 4195:7, 4196:8, 4196:21, 4197:7, 4199:12, 4199:19, 4199:21, 4200:3, 4202:11, 4203:6, 4203:12, 4204:3, 4204:7, 4210:16, 4210:23, 4224:7, 4233:20

**Sydor's** [2] - 4196:25, 4198:11

**system** [1] - 4120:15

# T

**T-E-S-O-R-I-E-R-O** [2] - 4104:10, 4104:23

**tab** [1] - 4216:5

**table** [1] - 4232:1

**tag** [1] - 4214:10

**tape** [8] - 4100:12,

4100:21, 4100:24, 4103:8, 4182:22, 4228:10, 4228:12

**tax** [8] - 4149:4, 4217:23, 4218:9, 4218:10, 4218:12, 4218:21, 4219:4, 4219:7

**teacher** [1] - 4229:5

**team** [5] - 4139:5, 4139:10, 4139:13, 4221:3, 4235:2

**teammates** [1] - 4154:3

**teams** [1] - 4163:11

**telephone** [4] - 4199:9, 4199:12, 4205:15, 4205:16

**telephonically** [2] - 4193:3, 4200:5

**ten** [2] - 4164:24, 4165:8, 4204:15

**tens** [5] - 4124:11, 4124:16, 4152:10, 4159:16

**tequila** [1] - 4145:7, 4149:21, 4149:22, 4150:1, 4150:9, 4150:11, 4150:12, 4150:16, 4150:20, 4150:23, 4151:5, 4152:17

**term** [1] - 4194:7

**terms** [11] - 4109:11, 4117:5, 4126:4, 4144:17, 4164:8, 4173:18, 4177:9, 4189:4, 4213:15, 4214:20, 4225:17

**Tesoriero** [6] - 4104:9, 4104:11, 4104:22, 4105:7, 4106:10, 4112:3

**TESORIERO** [2] - 4104:15, 4236:3

**test** [1] - 4159:4

**testified** [42] - 4104:17, 4112:9, 4113:24, 4116:17, 4124:8, 4127:18, 4128:11, 4128:22, 4132:1, 4136:15, 4140:23, 4142:1, 4143:4, 4143:9, 4144:14, 4149:19, 4152:22, 4152:25, 4153:4, 4153:9, 4153:16, 4154:14, 4156:5, 4161:17, 4168:3, 4168:6, 4169:5, 4182:16, 4184:25, 4187:2, 4187:17, 4187:24, 4193:25, 4199:21, 4203:20, 4211:12, 4215:2, 4216:9, 4218:23, 4220:17, 4222:10, 4222:23

**testifies** [1] - 4097:13

**testify** [8] - 4096:13, 4133:21, 4149:22, 4173:15, 4173:17, 4180:16, 4198:17, 4226:19

**testifying** [2] - 4136:24, 4140:24

**testimony** [66] - 4097:25, 4100:2, 4120:15, 4120:18,

4126:19, 4127:9, 4127:12, 4128:16, 4129:14, 4129:25, 4136:6, 4136:16, 4137:10, 4141:11, 4144:12, 4144:19, 4144:25, 4149:25, 4151:21, 4153:5, 4154:23, 4155:3, 4156:1, 4156:3, 4168:4, 4168:10, 4168:14, 4169:7, 4169:9, 4173:4, 4180:2, 4182:19, 4183:11, 4183:12, 4183:14, 4184:6, 4185:2, 4185:4, 4185:8, 4187:7, 4187:9, 4187:22, 4188:2, 4188:4, 4194:2, 4198:11, 4204:20, 4210:12, 4211:13, 4211:15, 4211:19, 4211:20, 4212:3, 4215:4, 4220:8, 4220:13, 4220:21, 4221:18, 4221:22, 4221:23, 4222:25, 4223:1, 4223:5, 4223:6, 4225:7

**text** [72] - 4121:19, 4124:15, 4157:1, 4157:4, 4157:11, 4157:13, 4158:2, 4158:5, 4158:9, 4158:12, 4158:14, 4158:21, 4158:24, 4159:8, 4159:10, 4160:16, 4160:22, 4163:4, 4174:10, 4174:14, 4174:22, 4174:23, 4175:10, 4176:19, 4178:16, 4179:1, 4180:12, 4180:17, 4180:25, 4181:15, 4181:19, 4188:11, 4190:15, 4190:18, 4190:25, 4191:13, 4191:15, 4192:13, 4192:15, 4192:18, 4192:19, 4192:22, 4193:3, 4195:6, 4195:7, 4195:10, 4195:12, 4195:13, 4195:17, 4195:21, 4195:22, 4196:7, 4196:10, 4196:14, 4196:20, 4197:1, 4197:6, 4198:15, 4199:8, 4200:2, 4200:4, 4200:5, 4200:10, 4213:10, 4232:7, 4232:15, 4232:17, 4233:14, 4233:20, 4234:17, 4234:19

**texts** [1] - 4196:17

**THE** [140] - 4094:11, 4096:1, 4096:2, 4096:4, 4097:12, 4097:22, 4098:4, 4099:6, 4099:12, 4100:2, 4101:18, 4101:20, 4102:16, 4103:5, 4103:14, 4103:17, 4103:19, 4103:20, 4103:22,

4103:25, 4104:11,
4104:20, 4104:22,
4104:24, 4106:2, 4106:4,
4106:7, 4109:1, 4110:7,
4113:12, 4113:14,
4113:17, 4113:21, 4114:1,
4114:4, 4114:5, 4114:10,
4128:19, 4129:1, 4133:2,
4134:1, 4134:25, 4135:3,
4135:8, 4135:13, 4136:2,
4137:3, 4137:9, 4137:14,
4138:2, 4138:4, 4145:8,
4145:17, 4145:20, 4146:2,
4146:5, 4146:8, 4148:2,
4157:20, 4160:9, 4160:17,
4160:19, 4161:21, 4166:9,
4166:13, 4167:3, 4167:4,
4167:15, 4167:19,
4167:20, 4167:22,
4171:15, 4171:23,
4172:16, 4173:2, 4175:5,
4178:15, 4178:18, 4181:7,
4191:8, 4196:3, 4196:4,
4197:10, 4197:14, 4203:1,
4204:25, 4205:4, 4205:5,
4205:25, 4206:5, 4206:9,
4206:14, 4206:17, 4207:2,
4208:2, 4208:6, 4208:11,
4208:14, 4208:17,
4208:20, 4208:25, 4209:4,
4209:6, 4209:8, 4209:13,
4209:20, 4209:22, 4210:6,
4210:9, 4214:23, 4224:15,
4224:21, 4224:23, 4225:8,
4225:12, 4225:14,
4225:16, 4226:9, 4226:22,
4227:6, 4227:21, 4228:9,
4228:19, 4229:2, 4230:20,
4231:12, 4231:18, 4232:1,
4232:17, 4232:22,
4232:23, 4233:12,
4233:16, 4233:17,
4233:25, 4234:2, 4234:3,
4234:4, 4234:11, 4235:5
**theme** [1] - 4176:3
**themselves** [1] - 4222:14
**thereafter** [1] - 4116:4
**therefore** [2] - 4099:20,
4229:24
**thick** [1] - 4204:14
**thinking** [2] - 4098:23,
4230:1
**third** [4] - 4171:7, 4173:11,
4173:12, 4196:13
**third-parties** [1] - 4171:7
**third-party** [2] - 4173:11,
4173:12
**thousand** [1] - 4130:18
**thousands** [5] - 4124:11,
4124:12, 4124:16,

4159:17, 4232:17
**three** [12] - 4115:18,
4131:5, 4163:20, 4194:24,
4195:16, 4197:6, 4200:25,
4212:7, 4214:8, 4216:25,
4220:13, 4226:14
**throughout** [5] - 4123:7,
4123:22, 4124:17,
4130:13, 4183:25
**throwing** [1] - 4230:7
**Thursday** [5] - 4096:12,
4227:18, 4227:19,
4229:19, 4235:7
**tickets** [1] - 4190:2
**Tim** [1] - 4216:14
**timber** [1] - 4107:25
**Timothy** [4] - 4216:8,
4216:25, 4218:15
**today** [18] - 4098:7, 4101:6,
4103:14, 4105:9, 4116:16,
4144:12, 4167:12,
4182:21, 4187:20, 4192:1,
4192:3, 4192:9, 4199:10,
4204:20, 4211:2, 4224:16,
4225:9, 4225:22
**together** [10] - 4106:23,
4126:16, 4130:8, 4141:23,
4151:4, 4151:10, 4156:20,
4190:1, 4201:2, 4213:5
**TOMMY** [1] - 4094:7
**Tommy** [2] - 4108:19,
4109:19
**tomorrow** [14] - 4096:15,
4096:16, 4159:9, 4163:2,
4192:9, 4206:23, 4224:19,
4224:23, 4225:7, 4226:2,
4227:22, 4228:15,
4228:16, 4232:2
**tonight** [3] - 4226:10,
4230:14, 4235:4
**took** [6] - 4127:15, 4128:1,
4128:7, 4182:9, 4211:2,
4218:6
**top** [7] - 4133:19, 4203:11,
4204:1, 4204:4, 4204:6,
4204:7, 4223:3
**topic** [1] - 4172:10
**topics** [1] - 4192:11
**Toronto** [3] - 4190:2,
4212:17, 4214:7
**touch** [2] - 4130:4, 4192:23
**touched** [1] - 4227:2
**towards** [2] - 4150:18,
4175:15
**town** [3] - 4130:12,
4131:11, 4163:15
**tracing** [2] - 4168:16,
4168:24
**Tracy** [1] - 4114:21
**transaction** [4] - 4144:3,

4162:2, 4166:3, 4179:9
**transactions** [13] -
4128:12, 4147:7, 4148:15,
4148:16, 4148:18,
4148:24, 4149:4, 4149:7,
4154:16, 4169:3, 4173:18,
4219:2, 4221:14
**transcript** [5] - 4095:25,
4145:1, 4145:5, 4187:21,
4217:15
**TRANSCRIPT** [1] - 4094:10
**transcripts** [1] - 4145:3
**transfer** [3] - 4142:24,
4144:4, 4161:16, 4161:24,
4162:19, 4162:20,
4162:22, 4182:3, 4182:6,
4189:5, 4189:20, 4200:16
**transferred** [6] - 4109:24,
4142:14, 4144:5, 4152:14,
4170:10, 4199:1
**transfers** [3] - 4120:9,
4151:21, 4151:25
**transpired** [2] - 4115:20,
4130:2
**traveled** [2] - 4153:16,
4221:12
**traveling** [2] - 4163:11,
4192:7
**Treasury** [1] - 4105:23
**tremendous** [1] - 4204:14
**trial** [18] - 4410:12,
4101:23, 4102:4, 4115:12,
4123:4, 4123:12, 4123:19,
4123:21, 4123:22,
4124:17, 4127:19,
4130:13, 4144:21, 4158:9,
4199:23, 4226:5, 4231:4,
4235:2
**trip** [1] - 4224:18
**true** [18] - 4100:5, 4101:7,
4109:8, 4109:9, 4122:1,
4127:2, 4127:13, 4127:16,
4128:8, 4133:19, 4133:20,
4134:18, 4134:21,
4141:19, 4184:25,
4195:22, 4216:22, 4230:5
**truly** [1] - 4226:20
**Trust** [48] - 4156:12,
4156:14, 4161:5, 4161:10,
4162:2, 4170:7, 4173:10,
4175:20, 4180:14,
4181:21, 4188:9, 4189:17,
4189:21, 4190:4, 4190:8,
4191:17, 4191:22,
4191:25, 4194:9, 4194:13,
4194:18, 4198:13,
4198:20, 4198:22,
4199:20, 4200:1, 4200:13,
4205:9, 4205:10, 4205:23,
4206:6, 4206:8, 4206:21,

4209:14, 4209:15,
4209:17, 4210:18,
4210:19, 4212:19,
4212:24, 4213:4, 4213:13,
4214:13, 4214:22,
4221:19, 4222:4, 4222:7,
4222:14
**truth** [9] - 4128:3, 4128:4,
4128:16, 4128:17, 4171:8,
4173:12, 4173:22
**truthful** [3] - 4185:8,
4187:9, 4188:4
**try** [4] - 4096:9, 4096:17,
4137:11, 4145:11
**trying** [11] - 4098:9,
4098:25, 4099:8, 4099:9,
4099:22, 4172:8, 4190:7,
4212:15, 4227:2, 4227:14,
4228:16
**TSA** [1] - 4118:3
**Tuesday** [3] - 4096:12,
4215:20, 4227:13
**tune** [3] - 4139:19, 4170:4,
4170:14
**turn** [3] - 4121:5, 4126:15,
4190:8
**turned** [18] - 4118:15,
4123:9, 4124:15, 4125:15,
4125:21, 4126:14, 4144:1,
4144:21, 4157:5, 4157:7,
4158:5, 4158:6, 4159:20,
4180:22, 4190:22,
4195:19, 4213:21, 4213:22
**two** [50] - 4096:7, 4096:16,
4099:9, 4100:24, 4101:1,
4101:22, 4109:14, 4112:5,
4114:25, 4123:8, 4125:6,
4126:3, 4126:8, 4129:19,
4129:20, 4141:14, 4145:4,
4152:9, 4156:19, 4157:12,
4160:1, 4161:4, 4161:5,
4168:10, 4168:25, 4174:3,
4178:6, 4185:11, 4190:5,
4194:8, 4199:5, 4199:22,
4201:1, 4203:7, 4203:23,
4215:18, 4216:18,
4216:20, 4217:2, 4218:6,
4226:22, 4226:25,
4227:12, 4228:1, 4229:9,
4229:15, 4229:25,
4230:19, 4231:21, 4234:13
**two-week** [1] - 4161:5
**type** [1] - 4098:19
**typewritten** [1] - 4224:7
**typical** [1] - 4192:21
**typically** [4] - 4163:10,
4192:24, 4215:25, 4216:6
**typing** [1] - 4123:24

23

## U

**U.S** [3] - 4174:19, 4180:22, 4228:21
**Ula** [1] - 4141:6
**ultimately** [3] - 4111:7, 4140:4, 4166:1
**unable** [1] - 4130:8
**unavailable** [1] - 4231:1
**unaware** [5] - 4103:1, 4141:20, 4153:10, 4156:5, 4187:25
**under** [10] - 4100:16, 4101:9, 4109:18, 4119:24, 4122:4, 4130:7, 4175:9, 4184:10, 4189:4, 4197:10
**underlying** [7] - 4097:20, 4182:2, 4189:8, 4189:16, 4189:21, 4198:25, 4200:16
**undermining** [1] - 4098:14
**understood** [9] - 4112:10, 4171:16, 4173:19, 4188:22, 4188:23, 4189:19, 4191:13, 4198:22, 4206:7
**unencrypted** [1] - 4121:25
**unfamiliar** [1] - 4139:22
**UNITED** [3] - 4094:1, 4094:3, 4094:11
**United** [8] - 4094:6, 4094:14, 4094:17, 4118:8, 4134:16, 4150:10, 4150:12, 4182:14
**unless** [2] - 4097:22, 4100:5
**unpaid** [2] - 4152:11, 4185:19
**unsuccessful** [1] - 4189:10
**untrue** [14] - 4129:8, 4132:9, 4134:22, 4141:9, 4141:12, 4141:22, 4142:6, 4143:16, 4153:6, 4155:10, 4156:7, 4183:12, 4183:14
**untruthful** [6] - 4128:23, 4132:2, 4149:25, 4168:13, 4185:10, 4215:5
**untruths** [1] - 4220:23
**unusual** [1] - 4181:18
**up** [29] - 4096:12, 4096:23, 4097:15, 4097:21, 4097:24, 4104:25, 4108:3, 4109:11, 4109:13, 4113:21, 4118:20, 4130:14, 4130:21, 4140:1, 4164:18, 4167:5, 4167:12, 4190:2, 4206:3, 4208:4, 4210:17, 4212:11, 4213:4, 4226:5, 4227:12, 4228:17, 4228:19, 4233:22
**update** [1] - 4185:15
**updated** [1] - 4179:3
**upper** [1] - 4203:24
**UPS** [1] - 4150:16
**US** [8] - 4144:22, 4150:17, 4157:10, 4158:4, 4159:20, 4190:20, 4195:17, 4213:21
**UTC** [1] - 4159:3
**utilize** [1] - 4120:24
**utilizing** [1] - 4123:22

## V

**vacation** [8] - 4229:11, 4229:14, 4230:4, 4230:9, 4230:19, 4230:21, 4230:24, 4231:3, 4231:5
**vacuum** [1] - 4100:8
**variety** [1] - 4173:18
**various** [5] - 4121:22, 4128:13, 4151:3, 4154:21, 4226:18
**Vegas** [2] - 4215:16, 4215:18
**vehicle** [1] - 4115:24
**venture** [10] - 4132:6, 4138:11, 4138:17, 4142:8, 4147:5, 4148:14, 4148:25, 4149:1, 4177:12, 4179:22
**ventures** [2] - 4142:12, 4148:20
**Ventures** [4] - 4138:24, 4164:18, 4177:11, 4179:23
**verbal** [7] - 4183:9, 4198:7, 4198:9, 4198:19, 4199:7, 4199:11, 4199:13
**verbally** [1] - 4198:21
**version** [1] - 4150:4
**versus** [2] - 4120:6, 4185:24
**Veterans** [1] - 4094:21
**via** [7] - 4194:15, 4199:24, 4200:1, 4212:18, 4214:6, 4214:14, 4214:15
**video** [1] - 4124:1
**videos** [1] - 4121:17
**view** [4] - 4130:15, 4130:16, 4154:8, 4214:21
**views** [1] - 4230:8
**Vincent** [2] - 4104:9, 4104:22
**VINCENT** [2] - 4104:15, 4236:3
**virtue** [1] - 4136:16
**visit** [1] - 4153:18
**visitation** [1] - 4168:16
**Vistaprint** [1] - 4151:11
**vivid** [1] - 4098:1
**voir** [3] - 4133:25, 4157:19,

4196:3
**VOIR** [6] - 4134:2, 4157:21, 4196:5, 4236:11, 4236:15, 4236:19
**vs** [1] - 4118:8

## W

**wait** [3] - 4103:7, 4167:18, 4208:22
**waiting** [4] - 4184:8, 4206:7, 4208:19, 4214:21
**walk** [1] - 4097:15
**walked** [1] - 4130:17
**walking** [1] - 4115:24
**wants** [5] - 4210:1, 4225:4, 4229:6, 4230:3, 4231:5
**warden** [1] - 4133:15
**warrant** [4] - 4102:4, 4116:24, 4117:2, 4117:5
**warranties** [1] - 4148:19
**Warren** [1] - 4111:21
**ways** [1] - 4101:23
**weaves** [1] - 4172:11
**weaving** [3] - 4171:6, 4171:13, 4172:4
**web** [1] - 4150:6
**website** [1] - 4185:22
**websites** [1] - 4185:23
**Wednesday** [5] - 4096:12, 4227:16, 4227:19, 4229:5, 4231:13
**week** [6] - 4096:18, 4126:2, 4161:5, 4199:22, 4227:8, 4229:16
**weekend** [1] - 4206:23
**weekends** [1] - 4215:18
**weeks** [7] - 4124:14, 4144:5, 4144:14, 4185:11, 4229:4, 4229:17, 4230:13
**weight** [1] - 4136:17
**WEINBLATT** [1] - 4094:20
**Wexler** [1] - 4145:15
**whatsoever** [1] - 4150:10
**wherein** [1] - 4221:18
**white** [1] - 4119:9
**whole** [10] - 4098:15, 4128:3, 4128:16, 4139:17, 4140:6, 4142:10, 4142:16, 4146:18, 4196:23, 4215:13
**wife** [2] - 4114:20, 4180:13
**wife's** [1] - 4124:21
**William** [1] - 4184:24
**willing** [3] - 4230:4, 4230:8, 4231:2
**window** [1] - 4163:13
**Windwalker** [4] - 4147:20, 4164:16, 4179:23, 4223:16
**wire** [5] - 4120:5, 4120:8,

4142:13, 4142:24, 4144:4
**wish** [1] - 4100:10
**withdraw** [2] - 4124:24, 4137:4
**withdrawn** [6] - 4119:22, 4156:16, 4165:15, 4195:14, 4197:24, 4211:17
**withhold** [1] - 4222:19
**WITNESS** [6] - 4104:22, 4106:4, 4114:4, 4160:19, 4178:18, 4205:5
**Witness** [2] - 4205:6, 4208:5
**witness** [24] - 4098:17, 4103:17, 4104:7, 4104:12, 4104:16, 4106:2, 4113:16, 4113:17, 4113:20, 4113:23, 4127:15, 4128:2, 4136:21, 4136:24, 4167:5, 4167:8, 4211:2, 4224:22, 4225:18, 4227:11, 4227:17, 4228:7
**WITNESSES** [1] - 4236:1
**witnesses** [8] - 4096:9, 4096:11, 4096:16, 4101:25, 4144:20, 4154:20, 4227:12, 4227:23
**wonderful** [1] - 4115:6
**wondering** [1] - 4177:17
**word** [1] - 4232:10
**Worden** [13] - 4132:6, 4132:12, 4138:11, 4138:20, 4139:5, 4139:7, 4139:9, 4139:19, 4147:19, 4164:16, 4167:14, 4179:22, 4223:16
**Worden's** [2] - 4133:16, 4139:13
**words** [6] - 4161:1, 4161:3, 4164:9, 4176:15, 4217:22, 4217:24
**works** [1] - 4173:7
**worth** [6] - 4129:6, 4129:9, 4129:10, 4129:17, 4129:22, 4130:24
**write** [2] - 4203:22
**writing** [1] - 4191:13
**written** [3] - 4132:6, 4132:9, 4136:25

## Y

**year** [3] - 4125:5, 4130:8, 4213:4
**Year's** [1] - 4213:12
**year-end** [1] - 4213:4
**years** [12] - 4098:24, 4102:1, 4114:15, 4115:18, 4117:24, 4134:12,

24

4144:11, 4151:5, 4176:4,
4186:1, 4194:20, 4219:7
**yelled** [1] - 4130:19
**yesterday** [8] - 4096:8,
4097:21, 4100:13, 4104:2,
4104:5, 4182:8, 4205:13,
4225:11
**YORK** [1] - 4094:1
**York** [6] - 4094:6, 4094:15,
4095:21, 4106:23, 4107:5,
4147:13
**yourself** [3] - 4138:20,
4157:13, 4216:14

## Z

**zero** [1] - 4159:3
**zone** [1] - 4159:4