5094

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA

                                    CR-13-607


          -against-            :

                                   United States Courthouse
                                   Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

     Defendants.         :
                                   June 29, 2015
- - - - - - - - - - - - - - - X   9:30 a.m.

            TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE JOSEPH F. BIANCO
      UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the Government:       KELLY T. CURRIE
                          Acting United States Attorney
                          100 Federal Plaza
                          Central Islip, New York 11722
                          BY:  JAMES MISKIEWICZ, ESQ.
                               SARITHA KOMATIREDDY, ESQ.
                          Assistant United States Attorney




For the Defendants:       HALEY, WEINBLATT & CALCAGNI
                          One Suffolk Square
                          1601 Veterans Memorial Highway
                          Islandia, NY  11749
                          BY: RICHARD HALEY, ESQ.
                          For Mr. Kenner

5095

For the Defendants:

                         LARUSSO & CONWAY
                         300 Old Country Road
                         Mineola, NY  11501
                         BY: ROBERT LARUSSO, ESQ.
                         For Mr. Constantine


                         ANDREW L. OLIVERAS, ESQ.
                         26 Strangford Court
                         Oceanside, NY  11572
                         For Mr. Constantine

Court Reporter:          Mary Ann Steiger
                         100 Federal Plaza
                         Central Islip, New York 11722
                         (631) 712-6101

                Proceedings recorded by mechanical stenography.
                  Transcript produced by computer.

5096

1          THE CLERK: All rise.

2          THE COURT:  Please be seated.

3          (Case called, appearances noted.)

4          MR. HALEY:  Your Honor, if I may, briefly?

5          First of all, I thank the Court for the Court's

6     indulgence.

7          Mr. Miskiewicz gave me an affidavit for my

8     client to review that was lengthy.  And the thought was he

9     would review it now, rather than taking that time on the

10    witness stand.  We have seen the time that goes by as

11    Mr. Kenner reviews documents.  That will save time.

12         There is one final matter, Judge, another

13    matter.

14         Towards the end of or during the course of

15    Mr. Miskiewicz' recross of Mr. Kenner, there was a

16    question asked about a grand jury subpoena that he

17    received from the Southern District of New York, and then

18    testimony about whether that subpoena was later withdrawn.

19         Your Honor may recall that it was left up in the

20    air as to whether such a document had even existed.  I did

21    provide Mr. Miskiewicz with both the subpoena as well as

22    the letter withdrawing the subpoena.

23         I bring it to the Court's attention because we

24    did not provide that in Rule 26.2 discovery.  I didn't

25    know it was going to come up.  I assumed the government

5097

1   would have been in possession of that.

2            I would, Judge, for purposes of not having to

3   re-redirect on that issue, simply ask that those documents

4   be marked as Kenner exhibits because they were referred to

5   in the recross of my client.

6            THE COURT:  That's fine.

7            Any objection to that?

8            MR. MISKIEWICZ:  No, your Honor, other than I

9   would note that the subpoena was from the Eastern District

10  issued simultaneously with the Southern District's

11  investigation.  We're talking apples and oranges here, but

12  we have no objection.

13           THE COURT:  What are the documents?

14           MR. HALEY:  Judge, it would be, and thank you

15  for that clarification, Mr. Miskiewicz, it would be -- the

16  subpoena could be marked as 239, and then the letter to

17  Ron Richards from the United States Attorney for the

18  Eastern District of New York, dated July 17, 2009,

19  regarding the service of the subpoena, I would ask that be

20  marked as Kenner Exhibit 240.

21           And, finally, the letter regarding please

22  disregard the Phil Kenner grand jury subpoena sent on July

23  17, 2009, and have that marked as Kenner Exhibit 241.

24           Thank you, Judge.

25           THE COURT:  Okay.

5098

1       Why don't you introduce those at the beginning

2   of your redirect.

3       MR. HALEY:  Yes, and my hope is to keep my

4   redirect small.

5       THE COURT:  You have no objection?

6       MR. LARUSSO:  No, I don't, Judge.

7       Judge, I would like to bring to the Court's

8   attention a little bit more information on this document

9   that we needed some time to look at.

10      In part, it alleges my client was involved in a

11  bankruptcy fraud.  It's an affidavit of Mr. Kenner's that

12  was introduced in Mr. Constantine's bankruptcy proceeding.

13  I believe it was 2012.

14      These allegations obviously, Judge, have not

15  been brought out to date and I don't understand the

16  relevancy of any of this information relative to a

17  possible bankruptcy fraud that my client was involved in.

18      First, we were never advised that this was going

19  to be part of the case and we've taken pains to avoid

20  bringing out other bad acts, such as I think most of the

21  Las Frailes situation to be one of them.

22      I would like the Court to look at these two

23  sections that I marked.  I'm not asking the Court to read

24  it all.  If I may?

25      MR. MISKIEWICZ:  Your Honor, I can maybe short

5099

1   circuit this.

2            My intention is not to offer the entire

3   affidavit or any excerpt.

4            My purpose in showing Mr. Kenner this is

5   directly in rebuttal to questions raised by Mr. LaRusso

6   about the sale of some private stock of Eufora stock in or

7   about 2009.

8            It's a rather lengthy affirmation by Mr. Kenner.

9   Nowhere does he indicate that there was any such deal and

10  I intend to bring that out.  That's why we gave it to him.

11           THE COURT:  You're not arguing bankruptcy fraud

12  against Mr. Constantine from that, are you?

13           MR. MISKIEWICZ:  No.

14           There are allegations in the affirmation in

15  which he indicates he made something like close to a

16  million dollars available to Mr. Constantine after

17  repeated dire requests of funding of Eufora and I think

18  that's in evidence.  It's probably more than a million

19  dollars by way of the various investors.

20           And then I'm going to ask him has he had an

21  opportunity to read the affirmation and where is it that

22  he says there was some sort of a sale or private sale of

23  stock.  It's nowhere.  That's it.

24           MR. LARUSSO:  It appears to me, Judge, that's

25  within the parameters of proper recross or re-recross.

5100

1   I'm just concerned about all these other allegations.

2           THE COURT:  Yes.  If anyone intends to question

3   or argue some type of bankruptcy fraud by Mr. Constantine,

4   before you do so I would want to hear what it is you're

5   seeking to elicit because we have been doing everything we

6   can on keeping the jury focused on what the issues are in

7   the case.

8           MR. HALEY:  I'll be the proverbial fly in the

9   ointment in this respect, Judge.

10          That affidavit, to the extent the government

11  asks those focused questions of my client, in my view

12  that's going to give this jury the wrong impression

13  because I do believe that from my perspective there's

14  going to be questions about that affidavit and under the

15  rule of completeness I would ask that the entire affidavit

16  be admitted into evidence.

17          Your Honor, let me say this.  It has been our

18  position and indeed evidence has been introduced during

19  the course of the trial that when Tommy Constantine filed

20  the bankruptcy petition in the District Court, that his

21  bankruptcy petition was false insofar as he failed to list

22  the ownership interest of various hockey player clients,

23  which ownership interest had been acquired by those hockey

24  player clients through the stock transfers that have been

25  testified to at great length.

5101

1          It is our position, Judge, that the bankruptcy

2     proceeding, at least as far as Mr. Constantine's failure

3     to acknowledge the ownership interest of those hockey

4     player clients, was in that respect false.

5          As a matter of fact, my client, there's been

6     testimony to that effect, assisted various hockey player

7     clients in bringing a claim in that bankruptcy proceeding

8     as claimants that, yes, we are creditors of the company.

9     As a matter of fact, Phil Kenner did it.  There's been a

10    lot of testimony in that respect.

11         So I'm of the view, Judge, that I cannot simply,

12    based upon my theory of the case, consent to that question

13    being asked of my client in that fashion without then

14    exploring the full content of the affidavit and I may very

15    well look then to introduce the full content of the

16    affidavit.

17         THE COURT:  I don't know.  What does the rest of

18    the affidavit have to do with whether or not there's a

19    private stock interest?

20         MR. HALEY:  May I see the affidavit, Judge?

21         THE COURT:  Yes.

22         MR. LARUSSO:  May I?  I gave the Court my copy.

23    I don't know if there's another one available.

24         THE COURT:  Yes.

25         (Pause in proceedings.)

5102

1           MR. HALEY:  Your Honor?

2           THE COURT:  Hold on one second.

3           (Pause in proceedings.)

4           MR. HALEY:  Judge, I may save the Court time.

5           I will, now I have an understanding that this

6    was the affidavit that Mr. Kenner filed with reference to

7    his adverse proceeding as distinct from the affidavits

8    that were filed by others where he assisted them in filing

9    them.  So if that's the question, and the only question of

10   Mr. Kenner, I withdraw my objection.

11          THE COURT:  Good.  I agree.

12          MR. HALEY:  Thank you, Judge.

13          THE COURT:  Alternate number 6 obviously is here

14   and he called on Friday.  I don't know exactly what

15   happened, but the situation with his daughter is resolved

16   to the extent he can continue to serve.

17          I did receive the government's letter regarding

18   objections they have to certain exhibits for

19   Mr. D'Ambrosio, but he's not your first witness.  Who is

20   your first witness?

21          MR. LARUSSO:  I was going to call Mr. Foster.

22   He missed his flight.  He's not coming in until tonight.

23   Mr. D'Ambrosio stood around, so he is the witness I have

24   to call.

25          THE COURT:  What about to Mr. Semple?

5103

1          MR. LARUSSO:  He agreed to come back.  He's

2   flying in tonight.  He's available tomorrow with the

3   Court's permission.  His family is on vacation.  He drove

4   down to Coronado.  He's willing to drive back tonight.

5   Can I put him on first thing in the morning?  It's a long

6   examination.

7          THE COURT:  That's fine.  Is there a list

8   somewhere as to who the John Does are in the indictment?

9          MS. KOMATIREDDY:  Yes.

10          THE COURT:  I want to substitute their names in

11   the indictment so the jury is not confused.

12          MR. LARUSSO:  Your Honor, I don't know if the

13   government has another copy.  Do you mind if I have that

14   back?  Thank you.

15          THE COURT:  Let's bring in the jury.

16          MR. HALEY:  Your Honor, Mr. Kenner should retake

17   the stand?

18          THE COURT:  Yes.

19

20   PHIL KENNER,

21          called as a witness, having been previously

22          duly sworn, was examined and testified further

23          as follows:

24

25          THE CLERK:  All rise.

5104

1          (The jury is present.)

2          THE COURT:  Please be seated.

3          Good morning, members of the jury.

4          ALL JURORS:  Good morning.

5          THE COURT:  It's good to see you this morning.

6     I hope you all had a good weekend.

7          And I appreciate alternate number 6 giving us a

8     call on Friday letting us know he addressed the situation

9     with his daughter and I'm glad that's okay and he's able

10    to continue with the trial.

11         So, as you know, we left off with Mr. Kenner on

12    recross examination by the government so we will continue

13    from that point.  I understand there's not much more to

14    go, and Mr. LaRusso has some recross as well and some

15    additional redirect by Mr. Haley.

16         I remind you you're still under oath,

17    Mr. Kenner.

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Go ahead, Mr. Miskiewicz.

20         MR. MISKIEWICZ:  Thank you, your Honor.

21

22    RECROSS-EXAMINATION

23    BY MR. MISKIEWICZ:

24    Q.   Mr. Kenner, during Mr. LaRusso's cross-examination

25    and perhaps elsewhere, you testified about a number of

Kenner  -  Recross/Miskiewicz

5105

1  transactions involving the sale of Eufora shares or equity

2  interest and I believe the phrase you used was private

3  stock.

4          Do you recall answering questions along those

5  lines?

6  A.   Yes, sir, I do.

7  Q.   Specifically, do you recall saying that your

8  understanding was that Mr. Constantine was selling shares

9  of Eufora to various investors through essentially private

10  sales of his own interests, correct?

11  A.   Yes, his own stock that he owned.

12  Q.   Now, prior to resumption of testimony, did you have

13  an opportunity to read a declaration that you filed under

14  oath in the United States Bankruptcy Court in the District

15  of Arizona?

16  A.   Yes, sir, I was able to briefly review it.

17  Q.   Okay.  And my question to you, sir, is this:

18          In that declaration you were, in essence, filing

19  in connection with a bankruptcy petition in Arizona filed

20  by Mr. Constantine, correct?

21  A.   I was filing an adverse proceeding in

22  Mr. Constantine's bankruptcy on my behalf.

23  Q.   And that was in or about 2013 that you filed an

24  affidavit or -- I'm sorry -- declaration adverse to

25  Mr. Constantine's petition for bankruptcy?

Kenner  -  Recross/Miskiewicz

5106

1    A.    Yes, sir, I believe that's when I filed the

2    declaration.

3    Q.    In that declaration, which goes on for a number of

4    pages, you did discuss specifically Eufora and you're

5    directing investors or third-party individuals to invest

6    large sums of money in Eufora, correct?

7    A.    I don't recall that specifically in the declaration.

8    Q.    Okay.

9          Well, do you recall indicating at some point

10   that you forwarded over a million dollars to Eufora by way

11   of either your own contributions or investors?

12   A.    My own contributions I believe it was referencing.

13   Q.    And, sir, having read the declaration, is it not

14   true, sir, that nowhere did you make reference to any

15   private sale of stock by Mr. Constantine to others?

16   A.    That wasn't the purpose of the declaration.

17         It was a declaration specific to my adverse

18   proceeding to his bankruptcy filing.

19   Q.    My question to you, sir, is in your declaration which

20   you signed and filed in federal bankruptcy court, did you

21   say anything in there about a private sale of stock by

22   Mr. Constantine to others?

23   A.    I think I only referenced the transaction between

24   Mr. Constantine and myself.

25   Q.    You were also asked on cross-examination a series --

5107

1   and also reopening of direct, questions with respect to

2   Sergei Gonchar.

3          You were asked a series of questions about the

4   Stolper lawsuit.

5          Do you recall being asked questions by Mr. Haley

6   and Mr. LaRusso?

7   A.   I believe I do recall a number of questions.  I don't

8   remember specifically who was asking them at this moment.

9   Q.   All right.

10          And, also, do you recall indicating that in sum

11  and substance your role was to attempt to buyout the

12  Neptune loan that was encumbering Eufora; do you recall

13  that testimony?

14  A.   I don't think I referenced my role was to buyout the

15  loan.

16          I think I referenced that part and parcel to

17  Mr. Stolper's efforts as a group, the intention was,

18  through his group efforts, to buyout Mr. Constantine's --

19  excuse me -- Mr. Nerguzian's loan from Neptune to Eufora.

20  Q.   You were also asked a series of questions about that

21  tape you made or a recording you made in Home Depot.

22          And specifically do you recall the numerous

23  references to Mr. Constantine indicating to you that he

24  requested that you stop the Stolper lawsuit?

25  A.   Yes, I do recall his requests.

5108

1   Q.   And also his indication to you that he was well aware

2   that you were -- or, in his opinion, well aware that you

3   were in fact, as he put it, the puppet master of that

4   lawsuit.

5           Do you recall those statements and the questions

6   that Mr. LaRusso asked you about the Home Depot tape?

7   A.   I do recall Mr. Constantine's comments referencing me

8   as the puppet master.

9           I do not recall, as I sit here today,

10  Mr. LaRusso's questions related to that.  I apologize.

11  Q.   Well, in fact, sir, let me ask you this.

12          Tyson Nash was one of the witnesses who

13  testified here, correct?

14  A.   Yes, sir, I recall Mr. Nash's testimony.

15  Q.   At or about just a little bit before the making of

16  the Home Depot recording, do you recall Mr. Nash asking

17  you via e-mail for documentation of various investments

18  that he had made?

19  A.   Not specifically.

20  Q.   I'm going to show you what's been marked as

21  Government's Exhibit 104 for identification.

22          (Exhibit handed.)

23          (Pause in proceedings.)

24          Mr. Kenner, my questions initially are is that a

25  series of e-mails back and forth between you and Tyson

Kenner  -  Recross/Miskiewicz

5109

1    Nash in or about July of 2010?

2    A.    They appear to be.

3          MR. MISKIEWICZ:  The government moves the

4    admission of 104.

5          MR. HALEY:  May we approach, Judge?

6          THE COURT: Yes.

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner  -  Recross/Miskiewicz

5110

1          (The following takes place at sidebar.)

2          THE COURT:  Okay.

3          MR. HALEY:  Apart from the fact that it's beyond

4    the scope of redirect or recross, that's not really my

5    primary objection.

6          My primary objection is this refers to the

7    failure of my client to deliver documents that follow in

8    the four corners of this indictment essentially in

9    connection with the Stolper lawsuit, or the Hawaiian lines

10   of credit, or Eufora, or anything of that nature.  I don't

11   see any relevance and materiality.

12         It seems to suggest that somehow he's refusing

13   to give documents generally to Mr. Nash.  This simply

14   talks about Las Frailes, and my memory is we stayed away

15   from it as 404(b) notification.

16         I understand he's being cross-examined and can

17   be cross-examined on matters that have materiality.  I

18   don't see this as having any materiality and relevance on

19   that score.

20         MR. MISKIEWICZ:  The e-mail string stands for

21   the proposition that at this stage, contrary to what he

22   described, he's very much a part of the Stolper lawsuit.

23         He was trying to find out who, in his words, the

24   rat or spy was.  We now know the spy apparently was

25   Mr. Gonchar who recorded a meeting with the Stolper

5111

1   plaintiffs.

2           And it also goes -- I have no objection to

3   redacting the reference to Las Frailes.  It does go to how

4   he is both intimately involved and also resistant to

5   turning over any records.

6           MR. HALEY:  If I may, Judge, this is the

7   paragraph I'm referring to that I object to primarily.

8           If the government just wants the first page of

9   the e-mail, that's different.

10          THE COURT:  I think there's a reference to the

11  rat up here.

12          MR. HALEY:  I didn't pick up the rat reference.

13  This is what I object to.

14          THE COURT:  Can the government redact out this?

15          MR. MISKIEWICZ:  Sure.

16          MR. HALEY:  Thank you, Judge.

17          MR. LARUSSO:  Mr. Miskiewicz said Mr. Gonchar

18  testified that he recorded the conversation.  He didn't.

19  The testimony was that --

20          THE COURT:  He left an open mike.

21          (Continued on next page.)

22

23

24

25

Kenner  -  Recross/Miskiewicz

5112

1           (The following takes place in open court.)

2           THE COURT:  Members of the jury, there's one

3     portion of the e-mail chain that's not relevant so it's

4     going to be redacted.

5           With that understanding, Government's Exhibit

6     104 is admitted.

7           (Government Exhibit 104 in evidence.)

8     BY MR. MISKIEWICZ:

9     Q.  Very briefly, Mr. Kenner.

10          In this series of e-mails back and forth between

11    you and Mr. Nash regarding the request for paperwork,

12    isn't it true, sir, that on that day in request or in

13    response to the request for paperwork, you wrote to

14    Mr. Nash, you help me find the rat.  I'll make sure we get

15    the docs.  Deal?

16          You wrote that, didn't you?

17    A.  Yes, sir, I did.

18    Q.  You wrote that?

19    A.  Yes, sir, I did.

20    Q.  Lastly, I believe you testified towards the end of

21    last week about the nature of the default on all of the

22    players' lines of credit.

23          Do you recall -- you testified that as part of

24    your review of discovery, there were a great many other

25    portions of recordings that were not played by the

5113

1    government, correct?

2    A.    I apologize.  I didn't follow that statement or

3    question.

4    Q.    In your direct examination and cross-examination you

5    did make a point that there were many hours of recordings

6    between you and/or Kristin Peca and/or others that were

7    not played, correct?

8    A.    I don't recall that testimony, but I do remember

9    reviewing that in discovery, many hours of recordings.

10   Q.    I believe it was your testimony that the decision to

11   allow all of the lines of credit to go into default was a

12   collective decision.

13         Do you recall testifying along those lines?

14   A.    Yes, sir.

15         I spoke to each of the individual clients of

16   mine, each of the hockey players, to discuss that prior to

17   allowing them to go into default.

18         MR. MISKIEWICZ:  I believe we have a stipulation

19   with respect to Government's Exhibit 506 A.

20         MR. HALEY:  Is that the transcript?

21         MR. MISKIEWICZ:  And the recording.

22         MR. HALEY:  We do, your Honor, at least I

23   stipulate to having it played.

24         MR. LARUSSO:  No objection, Judge.

25         THE COURT:  506 is the transcript or the

Kenner - Recross/Miskiewicz

5114

1   recording?

2           MR. MISKIEWICZ:  506 A.T would be the

3   transcript.  506 A is the actual recording.  The

4   transcript will appear on the screen.

5           THE COURT:  This portion that's reflecting the

6   transcript of 506 A is admitted.

7           And the transcript, members of the jury, is just

8   an aid and the previous instruction I gave you applies

9   here.

10          MR. HALEY:  Judge, I apologize.  I also have 506

11  B which is the transcript as well.

12          MR. MISKIEWICZ:  I was going to get to that

13  offer.  I offer that as well.

14          THE COURT:  Okay.  Any objection to that?

15          MR. HALEY:  No.  I think we can do it in

16  sequence, Judge.

17          MR. LARUSSO:  No objection.

18          THE COURT:  506 B is another portion of the

19  tape?

20          MR. MISKIEWICZ:  Yes.

21          THE COURT:  And 506 B.T --

22          MR. MISKIEWICZ:  Is the transcript.

23          THE COURT:  506 B.T is admitted as an aid.  506

24  B is admitted as well.

25          (Government Exhibits 506 A, 506A.T and 506 B and

Kenner  -  Recross/Miskiewicz

5115

1    506 B.T in evidence.)

2            MR. MISKIEWICZ:  Playing the recording, 506 A.

3            (Tape played.)

4            (Tape concluded.)

5    BY MR. MISKIEWICZ:

6    Q.   Mr. Kenner, that was your voice, correct?

7    A.   Yes, sir, that was me talking to Kristin Peca.

8            MR. MISKIEWICZ:  Now, we're playing and

9    displaying the transcript as an aid for government's 506

10   B.

11           (Tape played.)

12           (Tape concluded.)

13   BY MR. MISKIEWICZ:

14   Q.   Again, Mr. Kenner, that is your voice, correct?

15   A.   Yes, sir, that was me speaking to Kristin Peca.

16           MR. MISKIEWICZ:  Thank you.

17           No further questions.

18           THE COURT:  Mr. LaRusso.

19           MR. LARUSSO:  Thank you, your Honor.

20

21   RECROSS-EXAMINATION

22   BY MR. LARUSSO:

23   Q.   Good morning, Mr. Kenner.

24   A.   Good morning, sir.

25   Q.   I believe it was on examination by Mr Miskiewicz you

5116

1   were talking about the Centrum loan.

2          Do you recall the testimony particularly in

3   regards -- can you make that out or is it still blurry?

4   A.   I can't see it in front of me.

5   Q.   I don't know if it can get any better.  Just bear

6   with me a minute.

7          I believe this was government chart number 5.

8   We introduced a similar or a copy of the chart with the

9   addition of the July 27th, 2005, $290,000.

10         Do you recall testimony regarding this?

11  A.   In sum or substance I do.

12  Q.   I believe there was also questions about the bank

13  statement of Constantine Management Group dealing with the

14  transactions that are reflected in this chart,

15  particularly ones going from Ula Makika to

16  Mr. Constantine, CMG, and the 290,000 back to you.

17  A.   Yes, sir, I do recall that.

18  Q.   And I believe you had at some point requested an

19  opportunity to look at the entire bank statement; is that

20  correct?

21  A.   Yes, sir, I did.

22  Q.   Let me show you what's been marked for identification

23  as C 311.

24         (Exhibit handed.)

25         MR. LARUSSO:  Your Honor, at this time, I would

5117

1    like to offer if I can Defendant's Exhibit C 311.

2              MR. MISKIEWICZ:  No objection.  I believe it's

3    already in evidence.

4              MR. LARUSSO:  It may be a Government Exhibit as

5    well, your Honor.

6              MR. HALEY:  Doubly no objection.

7              THE COURT:  C 311 is admitted.

8              (Defense Exhibit C 311 in evidence.)

9    BY MR. LARUSSO:

10   Q.   Mr. Kenner, this is the -- it seems to be either a

11   little hazy or it's my glasses.

12              Can you make that out?

13   A.   I'm having difficulty as well.  Is there a copy I can

14   review?

15              MR. HALEY:  May I approach the witness, Judge,

16   and give him my copy?

17              THE COURT:  Yes.

18              MR. LARUSSO:  Thank you, Mr. Haley.

19   BY MR. LARUSSO:

20   Q.   Mr. Kenner, this is the bank statement for

21   Constantine Management Group covering the period July '05,

22   July 1st, '05, to July 31st, '05; is that correct?

23   A.   Yes, sir, it is.

24   Q.   Take a look so you have had a chance to examine the

25   entire statement.

5118

1          MR. HALEY:  Mr. LaRusso, only a portion is up on

2     the screen for the jury.

3     BY MR. LARUSSO:

4     Q.   While you're looking at it, I'm going to put the

5     second page up.

6     A.   Yes, sir, I reviewed it.

7     Q.   Mr. Kenner, my question is, looking at the entire

8     statement, can you tell us what your recollection is about

9     this?

10          And I'll show it to the jury, the $650,200

11     payment to CMG on July 21st of '05, and July 22nd, and

12     then the $290,000 return that you see at the bottom of the

13     statement on July 27 to Ula Makika.

14     A.   Yes, sir.

15     Q.   Could you explain that for us, please?

16     A.   Yes, sir.

17          To the best of my recollection the payment for

18     $350,000 on July 22nd was the amount that pursuant to the

19     funding consulting agreements I believe Mr. Constantine

20     had with our entities in Hawaii, there was a payment due.

21          And there was a miscommunication I believe with

22     the bank who I had been asking to transfer some of that

23     money to Mr. Constantine, and I don't recall if they asked

24     me to send a second fax to them to request it or a second

25     e-mail that they hadn't received it at that particular

5119

1    time, my request to transfer to Mr. Constantine.

2           But somewhere in the neighborhood of three to

3    four days later I was contacted by the bank, I think if I

4    recall, suggesting that there may have been a mistake and

5    they wired both 300 and $350,000.

6           So I let Mr. Constantine know.  I asked him to

7    return the 300,000 because it was supposed to be a

8    $350,000 payment, and he ultimately returned 290,000 and I

9    think we just deducted the extra 10,000 perhaps off the

10   next payment.

11   Q.   Do you see the July 27, $290,000 from E. Moreau?

12   A.   Yes, sir, I do.

13   Q.   What's that in reference to?

14   A.   That was a deposit that Mr. Moreau had put down with

15   Mr. Constantine on a separate deal they had done at the

16   Palms hotel which ultimately became the two Palms units

17   that we referred to in the Global Settlement Fund as being

18   contributed by Mr. Constantine and myself at that point in

19   time.

20   Q.   And would it be fair to say that based upon your

21   review of the entire statement, there is no conspiracy to

22   defraud anyone in regards to the transaction that we're

23   talking about here; is that correct?

24   A.   That is correct, sir.

25          MR. MISKIEWICZ:  Objection.

Kenner    -    Recross/LaRusso

5120

1     THE COURT:  Overruled.

2   BY MR. LARUSSO:

3   Q.    Mr. Kenner, do you remember testifying in sum and

4   substance that Mr. Peca had sent you a text message

5   regarding the purchase of the Neptune or Eufora loan and

6   that he had no prior knowledge of it?

7   A.    I believe that I received text messages from Mr. Peca

8   regarding his willingness or desire to be part of the loan

9   buyout group in spite of his testimony to the opposite.

10          I think, I believe, I also received a text

11  message from Bryan Berard confirming that Jay McKee would

12  join the Michael Stolper effort only if he could

13  contribute to the loan buyout proceedings.

14          And I believe Mr. Berard and Mr. McKee also

15  testified they had no knowledge in this courtroom of those

16  loan proceedings as well.

17  Q.    Let me show you what's been marked for identification

18  as C 326.

19          Can you identify this document for us, please?

20  A.    Yes, sir.

21          This is the July 14, 2010, text messages, two of

22  them, that I received from Michael Peca with respect to

23  what I just testified about, his desire to be part of the

24  loan buyout, and that if -- he actually refers to it and

25  suggests if he's not part of it, there might be a

**Kenner    -    Recross/LaRusso**

5121

1    lynching.

2              I guess he's referring to the fact he would be

3    very upset about it.

4              And he asked if there's -- if other money has

5    already been collected, and whose money previously was

6    sitting in escrow, and that previous money I believe was

7    from Mr. Berard, Mr. Kaiser and myself.

8              MR. LARUSSO:  Your Honor, I apologize.  I should

9    have interrupted.  May I move this into evidence as C 326.

10             MR. MISKIEWICZ:  No objection.

11             MR. HALEY:  No objection.

12             THE COURT:  326 is admitted.

13             (Defense Exhibit 326 in evidence.)

14   BY MR. LARUSSO:

15   Q.   I'm going to leave C 312 with you for just a moment.

16             And just display to the jury, this is the text

17   message you were referring to in your testimony a few

18   minutes ago; is that correct?

19   A.   The one that you just showed me; yes, sir.

20   Q.   Yes.

21             And the upper portion, who is texting that

22   portion?  That is, if not all willing members get a chance

23   to be part of the loan buyout, means more percent, there

24   may be a lynching, FYI?

25   A.   That was Mr. Peca texting me on July 14, 2010.

Kenner  -  Recross/LaRusso

5122

1   Q.   What did you understand him to be texting to you in

2   this message?

3   A.   This was pursuant to meetings that Mr. Stolper had

4   held with each of the members of the investigation group

5   which included Mr. Peca, Mr. Berard, Mr. Ranford,

6   Mr. Rucchin, Mr. McKee.

7           All of them had been notified that one of the

8   main intentions was to buyout the loan from Neptune.

9           And at this point, on or about July 14, I think

10  Mr. Peca, in addition to Mr. McKee, were very adamant they

11  wanted to put up additional money to receive additional

12  percentage ownership in Eufora at that time.

13  Q.   Your response is; has money been collected already?

14  A.   No.

15          You see where it says read, it means I received

16  those.  It was his follow-up to me about two minutes and

17  95 seconds later.

18          It's probably a second thought of Mr. Peca.  Has

19  money been collected already?  If not, whose money is

20  sitting in escrow?

21          Because during one of the calls either

22  Mr. Berard who's heading up a lot of that loan buyout

23  effort or Mr. Stolper had represented there was already

24  approximately $250,000 sitting in the lawyer's trust

25  account for that loan buyout purpose.

5123

1  Q.   Now, do you remember another hockey player by the

2  name of DeVries was involved in contributing to the

3  buyout?

4       If you need to, I left before you an exhibit

5  just to review for your refreshing your recollection.

6  Just read it to yourself and after reading it if it

7  refreshes your recollection regarding Mr. DeVries'

8  participation, then tell us what you remember and if you

9  don't tell us that as well.

10 A.   I recall the conversations in and around this point

11 in time.

12      A number of my clients had been notified that

13 prior to this Mr. Constantine had sold some of his private

14 stock in Eufora, and that subsequent to that, between I

15 believe December 29 of 2008, and May 24, 2009, Mr. Gaarn

16 had sold some stock.

17      And as the period of time continued for the next

18 year until May of 2010, I do recall a number of my

19 clients, including Mr. DeVries, desiring to buy additional

20 Eufora stock and wanting to know if anyone was interested

21 in selling their private stock and/or if there were any

22 other potential to help buyout some of the loan

23 proceedings.

24 Q.   Does that document refresh your recollection that

25 Mr. DeVries, and possibly Mr. Gonchar, were looking to

5124

1    contribute not to buyout the loan as the hostile group is

2    doing, but to buyout the loan that the company was trying

3    to get from Mr. Nerguzian and Neptune?

4            Do you understand the question?

5    A.   If you don't mind asking it again.  I'll listen to

6    the question and then read that.

7    Q.   Do you remember testimony from Mr. Gonchar that he

8    contributed money in an effort to buyout the loan and buy

9    Eufora, and not the group that was seeking to do it

10   hostile?

11   A.   Yes, sir, I do recall that.

12   Q.   Does this refresh your recollection that Mr. DeVries

13   was, like Mr. Gonchar, contributing monies to buyout the

14   loan not with the hostile group, but with the Eufora

15   group?

16   A.   I believe Mr. DeVries and Mr. Peca were interested in

17   doing it prior to Mr. Stolper's efforts, that is correct.

18   Q.   A few questions about Mr. Ranford.

19   A.   Yes, sir.

20   Q.   Would it be true that his primary interests were, or

21   one of his primary interests was expressed in regards to

22   Eufora that he wanted to be part of the Avalon airport

23   project as well?

24   A.   Yes, sir, that's correct.

25   Q.   Did he tell you that he also was interested in

5125

1   commercial real estate and he proposed his involvement in

2   Avalon because there was over 2.5 million in equity?

3            MR. MISKIEWICZ:  Objection.

4            THE COURT:  Overruled.

5   A.   Mr. Ranford was quite interested in the fact that the

6   Avalon buildings were worth a significant amount more than

7   the debt that was on the building at that point in time.

8   Q.   Do you remember, was there any discussion about what

9   that equity interest was in the Avalon Park at the time?

10  A.   I do recall discussions regarding the significance of

11  the equity that was held in the buildings at that time,

12  and that was one of the appealing elements to a number of

13  the individuals, but specifically Mr. Ranford I do recall

14  that.

15  Q.   This is during the period of the Global Settlement

16  Fund?

17  A.   Yes, sir, that's correct.

18  Q.   And, likewise, this is the same project, the Avalon

19  Park, that Mr. Nolan and Mr. Juneau were willing to walk

20  away from him; is that correct?

21            MR. MISKIEWICZ:  Objection.

22            THE COURT:  Overruled.  You can answer that.

23  A.   Yes, sir, that is correct.

24  Q.   And isn't it true that Mr. Ranford's money that he

25  invested went to the Avalon Park?

5126

1    MR. MISKIEWICZ:  Objection.

2    THE COURT:  Overruled.  You can answer it.

3  A.    Yes, sir.

4    If I recall correctly, I believe a significant

5  portion of Mr. Ranford's money went directly to Avalon as

6  part of the global settlement contribution.

7  Q.    Now, I believe you were asked a number of questions

8  about the efforts by Mr. Constantine to secure funding for

9  the Hawaiian projects.

10    I believe there was cross-examination about an

11  individual by the name of Mr. Losch.

12    Do you recall that?

13  A.    Kenner Losch and his partner David Dewar.

14  Q.    And you remember the efforts Mr. Constantine and you

15  made in an effort to try and get the funding for the

16  Hawaiian project from both Mr. Losch and his partner; is

17  that right?

18  A.    Mr. Constantine handled 90 percent of the initial

19  efforts with them until he thought it was at a point in

20  time that it was appropriate for me to sit in and begin

21  meeting with Mr. Losch and Mr. Dewar.

22  Q.    And do you recall that in the efforts to find the

23  funding from Mr. Losch and his partner, it took or there

24  was at least a substantial period of time discussing with

25  them that possibility; is that correct?

5127

1    MR. MISKIEWICZ:  Objection.

2    MR. LARUSSO:  That's a poorly phrased question.

3  BY MR. LARUSSO:

4  Q.   The negotiations and discussions with Mr. Losch and

5  his partner covered a number of months, approximately four

6  or five; is that correct?

7  A.   I recall it being quite a long period of time.

8         They had invited me to go see one of the

9  projects up in western Canada, which I was unable to see,

10  but I recall that was long before I made the decision to

11  walkaway from them once Lehman Brothers had come back to

12  the table.

13  Q.   And in regards to the efforts to secure funding, is

14  it unusual to have such long periods of time between the

15  beginning of the discussions and unfortunately maybe the

16  conclusion that no funding actually is obtained?

17  A.   No.

18         In my experience that happened quite often with

19  hard money lenders, banks that I was dealing with, and

20  other potential funding sources.

21  Q.   I'm going to take a minute and maybe to save some

22  time on examination I'll try and do this as a group.

23         (Pause in proceedings.)

24         Mr. Kenner, I'm going to show you collectively

25  what's been marked for identification as C 306, 307, 307

5128

1    A, C 308, C 308 A, 309 and C 310.

2            Would you take a look at these please.  And,

3    again, you haven't had a chance, I have not had an

4    opportunity to show these to you before appearing here

5    today; is that correct?

6    A.    No, sir.

7    Q.    After you look at them, if you recognize them, please

8    identify what they are?

9    A.    Would you like me to identify them one at a time?

10   Q.    You can do that.  You can do it collectively.  Maybe

11   individually would be better for the record.

12   A.    Exhibit C 306 is the December 27, 2005 series of

13   e-mails which includes myself, Mr. Losch, Mr. Dewar and

14   Mr. Constantine related to the potential funding

15   agreement.

16           C 307 is a February 24, 2006 e-mail.

17   Q.    While you're doing that, do you recognize these

18   e-mails?

19   A.    Yes, sir.

20   Q.    And you can properly identify them; is that correct?

21   A.    Yes, sir.

22           The entire group are e-mails from me with the

23   exception of C 307 A which looks like the funding

24   agreement.  I need to look at it.

25           C 307 is a series of e-mails again between the

5129

1  same four individuals; myself, Mr. Losch, Mr. Dewar and

2  Mr. Constantine.

3          (Pause in proceedings.)

4          Exhibit C 307 A is a February 16, 2006 funding

5  agreement for a loan amount of up to $15 million for the

6  Hawaiian project I believe which is part and parcel to

7  that correspondence with Mr. Losch, Mr. Dewar and

8  Mr. Constantine.

9  Q.   And whose memorandum of understanding with regards to

10 the 15 million is this?

11         MR. MISKIEWICZ:  Objection.

12         MR. LARUSSO:  I'll reserve that question until

13 after.

14 A.   The letter of intent is sent to Mr. Manfredi who

15 appeared here during the trial.

16         MR. MISKIEWICZ:  Objection.

17 BY MR. LARUSSO:

18 Q.   Let me ask it this way.

19         Is this a document that was attached to the

20 previous e-mail you were talking about?

21 A.   I believe it was.

22 Q.   Continue.  Identify the documents and then I'll move

23 them in and then talk about them specifically.

24 A.   It also includes myself as a potential -- excuse

25 me -- as a guarantor for the $15 million loan.

5130

1          C 308 is a March 10th, 2006 e-mail string

2     between Mr. Constantine, myself and Mr. Losch, Mr. Dewar

3     and appears to be a number of other individuals at his

4     company, a Mr. Rodd Miller and Mr. Brian Schneider with

5     respect to the joint venture proposal.

6     Q.   Can you likewise identify that e-mail?

7     A.   Yes, sir.

8          C 308 A is a letter of intent for the joint

9     venture we had been discussing with the same parties

10     signed by Mr. Losch on March 9, 2006.

11     Q.   Was that part of the previous e-mail you just

12     discussed?

13     A.   Yes, sir, it's part of this string of e-mails.

14     Q.   And the next document?

15          You remember receiving that, correct, in the

16     e-mail as an attachment?

17     A.   Yes, sir, I recall all of these.

18          C 309 is a Friday, March 10th, 2006 e-mail that

19     I believe we had seen previously.  I think you presented

20     this to me before where I mentioned Mr. Constantine as the

21     500 pound gorilla.

22          C 310 is an e-mail correspondence between

23     Mr. Constantine, myself and Mr. Losch and Mr. Dewar on

24     March 12, 2006, which is a further outlining of the deal

25     points that we were working towards at that point in March

5131

1   2006.

2           There may have been a couple more after this

3   that I recall, because at this point in time on March 26,

4   2006, 14 days after this last e-mail, C 310, I consummated

5   the $125 million loan with Lehman Brothers in Cabo San

6   Lucas, and it was on or about that date that Mr. Bahti

7   from Lehman Brothers suggested that I should not work with

8   any other group, not necessarily these gentlemen in

9   particular, but any other funding source, that now Lehman

10  Brothers could be my single funding source going forward

11  on all financial projects.

12          And I think that's what brought to an end the

13  joint venture, potential joint venture agreements with

14  Mr. Losch and Mr. Dewar and Mr. Constantine.

15  Q.   Have you identified all of the exhibits?

16  A.   Yes, sir, they are all accurate.

17          MR. LARUSSO:  Your Honor, at this time, I move

18  into evidence 306, 307, 307 A, 308, 308 A, 309 and 310.

19          MR. MISKIEWICZ:  Your Honor, 309 and 310 were

20  already offered by Mr. LaRusso under a different number.

21  They're already in evidence.

22          We object to 307 A.  I can provide the Court at

23  sidebar or later the basis for the objection.  We have no

24  objection to the remaining.

25          THE COURT:  Approach on 307 A.

Kenner  -  Recross/LaRusso

5132

1      (The following takes place at sidebar.)

2          MR. MISKIEWICZ:  My objection is simply that

3   it's unsigned, there's no foundation, there's no

4   indication that this went to Mr. Kenner as opposed to

5   Mr. Manfredi.  It's an unsigned letter and we have no idea

6   where it came from.

7          MR. LARUSSO:  This is an attachment part of the

8   correspondence going back and forth.  This is another

9   possible funding source and Mr. Kenner is providing it to

10  him in an effort to try and get him to fund.

11         THE COURT:  This is just part of the back and

12  forth exchange.  The fact that it's unsigned, the purpose

13  is to show it was -- there was significant efforts being

14  made back and forth to try and get funding, so overruled.

15         MR. MISKIEWICZ:  We do ask for a limiting

16  instruction this goes to the state of mind of the

17  defendant, but not necessarily for the truth.

18         MR. HALEY:  May I be heard?

19         THE COURT:  I'm not going to give that

20  instruction.  This relates to efforts back and forth.

21         MR. MISKIEWICZ:  Okay.

22         THE COURT:  Okay.

23         MR. HALEY:  Thank you.

24      (Continued on next page.)

25

5133

1           (The following takes place in open court.)

2           THE COURT:  Members of the jury, I'm admitting

3    that group of documents although some of them may be in

4    evidence already under other number designations.

5           (Defense Exhibits 306, 307, 307 A, 308, 308 A,

6    309 and 310 in evidence.)

7           MR. LARUSSO:  Thank you, your Honor.

8    BY MR. LARUSSO:

9    Q.   I'm not going to read all of them.  The first is C

10   306.

11          This is the e-mail of December 27, 2005, from

12   Mr. Losch to you, Mr. Kenner, and Mr. Dewar and

13   Mr. Constantine; is that correct?

14   A.   Yes, sir.

15   Q.   This is the earliest of the e-mails, December 27,

16   2005, that you have looked at?

17   A.   Yes, sir, it was.

18   Q.   I believe you testified the last one was in March of

19   2006; is that right?

20   A.   Yes, sir.

21   Q.   Subject -- of course, there were additional e-mails

22   following the last one that you reviewed here before the

23   July one?

24   A.   To the best of my recollection there were.

25   Q.   Just as a reference down here, this is from you I

5134

1   believe to Mr. Losch.

2           You're talking about; let me know when you would

3   like to schedule a visit to the big island.  I can help

4   with the logistics when ready.  Until then, please enjoy

5   the rest of the holidays.

6           That was your message to him; is that correct?

7   A.   That was with respect to their desire to see the land

8   early in the discussions.

9   Q.   And then Mr. Losch is responding; let's get the

10  Hawaiian trip planned next week.  And he's asking which

11  airline do you suggest; is that correct?

12  A.   Yes, sir.

13  Q.   Do you know if this trip actually took place?

14  A.   I believe that they -- either Mr. Losch or Mr. Dewar

15  made the trip with another associate or two but I was not

16  present during their trip.

17          There would have been other individuals who were

18  working for us on payroll at the time that would have

19  handled that trip.  It could have been Mr. Hawkins or

20  Mr. Manfredi who was here during this proceeding.

21  Q.   To your knowledge, he did take a trip to Hawaii?

22  A.   I believe they did.

23          That was one of their requirements they told

24  Mr. Constantine and I in my first meeting with them, that

25  in order to continue that wanted to know what they were

5135

1    talking about, not just pictures.

2    Q.    The next one is February 24, 2006.  This is Exhibit C

3    307.  I won't read the whole thing, but this is an e-mail

4    from you at the top to Mr. Losch, to his partner and to

5    Mr. Constantine.

6            Ken and David, in an effort to help facilitate a

7    deal between us, I have attached the LOI from Bridge

8    Capital with an early March closing.

9            I would like you both to respect that under all

10   normal circumstances I would not share these details with

11   any entity that I'm working with on a mutually beneficial

12   deal.

13           I would ask both of you, as we proceed towards a

14   potential agreement, you work as openly with me for the

15   long-term benefit of all interested parties.

16           That's you to both Mr. Losch and his partner; is

17   that correct?

18   A.    Yes, sir.

19           I want to make sure whatever information was in

20   my hands with respect to deals at the time that I was

21   being very transparent with them.

22   Q.    So this is not a deal with Mr. Losch you're referring

23   to, this is another possible funding source; is that

24   correct, for the Hawaiian projects?

25   A.    Yes, sir.

5136

1    There were always a number of them in play at

2  the time and this one may have been in fact another one

3  that Mr. Constantine had initiated.

4  Q.   And marked as C 307 -- let me back up.

5    The e-mail actually refers on the second page to

6  an attachment; is that correct?

7    It mentions Big Isle Ventures LOI?

8  A.   Yes,it does.

9  Q.   What does LOI mean?

10  A.   Letter of interest or letter of intent.

11  Q.   C 307 A, that's the attachment that you sent along

12  with that e-mail; is that correct?

13  A.   Yes, sir, it is.

14  Q.   And is this the LOI you were referring to in the

15  e-mail?

16  A.   Yes, I believe it's one that Mr. Constantine had

17  initiated and sent on to Mr. Manfredi who was handling all

18  of the due diligence paperwork for these deals on behalf

19  of myself and the group.

20  Q.   And I'm going to go through the next one; March 10th,

21  2006.  This is C 308.

22    March 10th, 2006, e-mail from you to

23  Mr. Constantine and attached is a message from Rodd Miller

24  to both you, Mr. Losch and Mr. Dewar and other parties; do

25  you see that?

5137

1   A.   Yes, sir, I do.

2   Q.   It says in the attached portion of this e-mail from

3   Mr. Miller, per our conversation yesterday afternoon,

4   please find the first cut at the JV proposal.

5        Please contact Ken to discuss any comments that

6   you may have.

7        Thank you, Rodd Miller, and there's an

8   attachment at the bottom?

9   A.   Yes, sir.

10        It also references at the top some of my

11  preliminary discussions that Mr. Constantine and I had

12  with their group about $15 million being paid out to our

13  group at the closing.

14        And I know it was one of the sticking points

15  with these gentlemen, but under that premise and one of

16  the things that deterred me ultimately from doing the deal

17  with these gentlemen was that Lehman Brothers proposed

18  they would pay us $11 million cash at the closing, which

19  then ultimately became $7 million and a $4 million payout

20  that Mr. Kaiser was unable to retrieve after the closing.

21  Q.   Your testimony is in reference to your comment TC,

22  the only thing missing is about 15 million to PK entity,

23  PK being Phil Kenner?

24  A.   Yes, sir, the Hawaiian entity.  They referred to them

25  as PK entity.  They didn't want to attempt to name all of

5138

1    the Hawaiian names at the time.

2    Q.    C 308 A, is this the attachment that was referred to

3    in the e-mail from Avenue Community?

4    A.    Avenue Community is one of their companies; that is

5    correct.

6    Q.    Who is their company?

7    A.    Excuse me.  I apologize.

8          The company that was owned in part by Mr. Dewar

9    and Mr. Losch.  I believe they were 50/50 partners in the

10   deal.

11   Q.    How would you describe this letter which is actually

12   signed on the back by Kenneth Losch as manager?

13   A.    That was the letter of intent or the joint venture

14   proposal that they had attached to the previous e-mail

15   outlining the preliminary steps that would need to be

16   handled.

17   Q.    And C 309, which is a March 10th, 2006 e-mail, and

18   I'm going to refer to the portion where you're writing to

19   Mr. Constantine.

20         Again, there is an attachment from Mr. Losch

21   regarding the deal, but you say you are the 500 pound

22   gorilla at PK.

23         What are you referring to when you say that?

24   A.    I think I may have testified to this previously, but

25   with respect to all of these very difficult funding

5139

1  arrangements Mr. Constantine, pursuant to his funding

2  consulting agreements with us, had continued to put some

3  very respectable and some very potential lenders and joint

4  venture partners of myself, Mr. Manfredi and Mr. Kaiser

5  and our group.

6          So, again, during these very difficult times, I

7  was thrilled to know one of the few people that was still

8  delivering.

9  Q.   And the last one is C 310.  This is the last of the

10  group of e-mails, March 12, 2006.

11          This is from Mr. Constantine to Mr. Dewar,

12  Mr. Losch and yourself relating to this funding

13  negotiations that is ongoing at the time?

14  A.   The funding in the joint venture opportunity, that's

15  correct.

16  Q.   Mr. Kenner, I'm going to ask you a few questions if I

17  may regarding the tape at Home Depot and I'll use the

18  transcript that was received to help us pinpoint the areas

19  that I would like to ask questions about.

20          I believe you were asked regarding a portion of

21  the conversation with Mr. Constantine as reflected on page

22  11, and I believe there was a highlighted portion and this

23  is not the copy that was shown to you but I believe this

24  is the highlighted portion that was shown to you where it

25  starts with Mr. Constantine talking to you.

5140

1    You're in deep and the word I believe was F'ing

2    shit.  If this stuff happens, you are in deep shit.  The

3    F'ing FBI is all over this F'ing thing and they're not

4    asking about anybody else and I'm trying to stop you from

5    burning down your own life.

6         Do you remember that?

7    A.   Yes, sir, I do.

8    Q.   When that highlighted portion was discussed with you,

9    there was an earlier portion that was not included that

10   says, you took it and you ran with it, Phil, and you

11   created a shit storm that may not be fixable and I'm here

12   to tell you that I'll put this shit over here.

13        That was not read to you; is that correct?

14   A.   That is the first time it was read to me just now.

15   Q.   When Mr. Constantine is talking to you at this point,

16   he's telling you, am I correct, that you're the one that

17   is in trouble, that you are the individual that may be

18   burning down your own life.  He uses the word you; is that

19   correct?

20   A.   Correct.

21   Q.   He's not using the word we in discussing the

22   situation; is that correct?

23   A.   No, sir, he was just referencing myself.

24   Q.   And that kind of conversation that Mr. Constantine

25   was having with you, he often referred to you when he was

Kenner  -  Recross/LaRusso

5141

1  discussing events, he used the word you?

2         MR. MISKIEWICZ:  Objection.

3         MR. LARUSSO:  I'll withdraw that, Judge.  It

4  speaks for itself.

5  BY MR. LARUSSO:

6  Q.   Again, let's talk a few minutes about the tape itself

7  if I may.

8         If I understand your testimony correctly, you

9  originally recorded it and after the recording you were

10  able to determine that the conversation lasted

11  approximately 56 minutes?

12  A.   Yes, sir.

13  Q.   And then after you had recorded it, you made a CD for

14  Mr. Stolper?

15  A.   After I spoke with Mr. Stolper on the phone and

16  informed him of the recording; yes, sir.

17  Q.   And you then sent the CD off to Mr. Stolper; is that

18  right?

19  A.   Yes, sir, I did.

20  Q.   There came a point in time that you re-listened to

21  that recording; is that correct?

22  A.   There was a point in time later, many years later in

23  or about September or October of 2013, when Mr. DeVries

24  and I were in Mexico together working with new attorneys

25  seeking a new arrest warrant for Mr. Jowdy and possession

5142

1    order for the courts to order to give our resort back to

2    my control.

3          Mr. DeVries and I were getting ready for dinner

4    one night and I happened upon the audio recording still on

5    my phone and I played him about the first seven or eight

6    minutes at that point in time and he told me, like many of

7    the others had, that they already had heard that from

8    Mr. Stolper who forwarded copies to all of the individuals

9    in our group.

10   Q.   At that point did you continue to listen to the

11   recording on your iPhone and realize there was a portion

12   missing?

13   A.   No, sir.

14   Q.   When did you realize there was a portion missing from

15   the conversation that you recorded?

16   A.   Actually I think the first time I realized it was

17   only about two weeks after the initial recording on August

18   2nd of that particular year.

19          I believe when Mr. Kaiser and Mr. Berard flew

20   into Phoenix on the morning of the shareholder meeting

21   with Mr. Constantine at Eufora's offices, I gave it to

22   them to play it and that's the first time I realized there

23   was only approximately 26 minutes of that meeting taped.

24   Q.   Do you know why there was 26 minutes missing on --

25   I'm sorry -- there was only 26 -- there were 26 minutes

5143

1   missing on the tape?

2   A.   I'm sorry.  I may have misspoken.  There was only 26

3   minutes on the recording on my phone at that point.

4           But to your question --

5   Q.   So there's 31 minutes missing?

6   A.   There were 30 more minutes missing.

7   Q.   What happened to that?

8   A.   I don't know.

9   Q.   When you recorded it for purposes of communicating it

10  to Mr. Stolper, you were under the belief you recorded the

11  entire conversation; is that correct?

12  A.   Yes, sir.

13  Q.   And have you come to learn that the copy he has,

14  likewise doesn't have the additional portion that is

15  missing from the tape?

16          MR. HALEY:  No objection.

17          MR. LARUSSO:  I'll withdraw that.

18  BY MR. LARUSSO:

19  Q.   By the way, the missing portion contained a

20  continuation of conversation you had with Mr. Constantine

21  and you; is that correct?

22  A.   Yes, sir, it did.

23          MR. LARUSSO:  Just one minute, your Honor, if I

24  may.

25          (Pause in proceedings.)

Kenner   -   Recross/LaRusso

5144

1    BY MR. LARUSSO:

2    Q.    Mr. Kenner, in the Urban Expansion loan, actually in

3    the Lehman loan, monies were paid to Urban Expansion to

4    satisfy the obligation that was entered back I believe you

5    said October 2005; is that correct?

6    A.    The obligation from the October 2005 Urban loan, that

7    is correct.

8    Q.    That contract was between Urban Expansion and I

9    believe you said Ka'u Holding Company?

10   A.    Ka'u Holding Company.

11   Q.    K-A apostrophe U Holding Company; is that right?

12   A.    Yes, sir.

13   Q.    Do you recall, in your discussions with either

14   Mr. Grdina or Mr. Constantine, representing that you were

15   the owner of Ka'u Holding?

16          I used the word owner, not managing member.

17   A.    I don't believe so.

18          I think there was some confusion in our early

19   discussions that perhaps Mr. Grdina was under the

20   impression I was the sole owner of Ka'u, but we

21   straightened that out relatively quickly in e-mails with

22   Mr. Constantine's lawyer at the time.

23   Q.    Let me show you what's been marked for identification

24   as C 138.

25          (Exhibit handed.)

5145

1           Do you recognize this as an e-mail from

2    Mr. Constantine to you in response to an original e-mail

3    from you to him?

4    A.   Yes.

5           I think this is an e-mail between myself,

6    Mr. Constantine, Mr. Grdina and Mr. Constantine's attorney

7    Todd Lockwood.

8    Q.   At the time, what time are we talking about?

9    A.   Just prior to the closing of the Urban Expansion

10   loan.

11          And as I read it, it actually still sounds a

12   little bit --

13   Q.   You can't talk about what's in it.

14          You recognize it as the e-mail between the

15   parties we just discussed?

16   A.   Yes, I do.

17          MR. LARUSSO:  May I ask it be received, your

18   Honor?

19          MR. MISKIEWICZ:  No objection.

20          MR. HALEY:  No objection.

21          THE COURT:  C 158 is admitted.

22          (Defense Exhibit C 158 in evidence.)

23   BY MR. LARUSSO:

24   Q.   It's the e-mail dated October 11, 2005, from

25   Mr. Constantine to you and the other individuals that you

5146

1    mentioned.

2              And attached to that is the e-mail from you,

3    Mr. Kenner, to Mr. Constantine dated October 11, 2005, at

4    10:13 p.m., the one Mr. Constantine wrote the same date at

5    11:50 p.m., did I say that correct?

6    A.   The bottom e-mail was the first e-mail and the top

7    e-mail was the response.

8    Q.   Now, I'm just going to read a portion here.

9              It says:  Tommy.  This is your communication to

10   him.

11             Please inform the attorneys that our deal is

12   going to be between your new entity which you understood

13   to be Urban Expansion; is that correct?

14   A.   I don't know if it was named at the time.  I knew

15   there was a new entity Mr. Constantine was forming.

16   Q.   And Ka'u Holding Company, LLC, I am the CEO and

17   managing member of this company as well as Big Isle

18   Ventures, LLC, (which the original appraisal was written

19   for) but I own the land in the name of Ka'u Holding, LLC.

20             I look forward to consummating our deal this

21   week.

22             Thanks to you and Jimmy for all your efforts

23   this week.

24             Did I read that correctly?

25   A.   Yes, sir.

5147

1    Q.   Just a few more questions.  I was able to find the

2    chart, but it's the one that was marked defendant's

3    exhibit C 7.  It's Government's Exhibit 7.

4         This contains additional writing that was made

5    during the examination of one of the earlier witnesses.

6         Do you remember this?  Do you recall this?

7    A.   Not specifically.

8    Q.   Do you see that, Mr. Kenner?

9    A.   I do see it.  Yes, sir.

10   Q.   My questions are in reference to the monies that were

11   coming from Constantine Management Group to First American

12   Title and to you.

13        Do you see those two, that would be on August

14   15, 2006, for $50,000, and August 22nd, 2006, 419,000; is

15   that correct?

16   A.   Yes, sir, I see those numbers.

17   Q.   At the time you received this money, you thought

18   these were proper payments for monies given to you; is

19   that correct?

20        You didn't, at any point, think this was part of

21   a scheme to defraud anybody; is that right?

22        MR. MISKIEWICZ:  Objection.

23        THE COURT:  Overruled.  You can answer that.

24   A.   None of these funds were part of a scheme to defraud,

25   that's correct.

Kenner   -   Recross/LaRusso

5148

1    BY MR. LARUSSO:

2    Q.   My question to you is at this time, which would be

3    August 2006, this is the Lehman closing, correct?

4    A.   Yes, sir, the Hawaiian Lehman closing.

5    Q.   The Grdina loan is October 2005, correct?

6    A.   Yes, sir.

7    Q.   Prior to October of 2005, do you recall any business

8    deals or transactions with Mr. Constantine in regards to

9    the Palms unit that you testified that he had acquired?  I

10   believe there are a number.  More than two I believe.

11        Do you recall any business deals with him such

12   as acquiring a percentage interest in it?

13   A.   Yes, sir.

14        Originally I was planning to acquire a portion

15   of -- a few of Mr. Constantine's units.

16        But if I recall correctly, I was waiting on some

17   of the personal loans that Mr. Jowdy had owed me.  And in

18   addition to about eight or $900,000 that he owed me at the

19   time, and he never paid me back, not in 2005, nor did he

20   ever pay me back for those numbers and most of them are

21   still on his Diamante Del Mar books and records as unpaid

22   expenses to me, loans and expenses to me.

23   Q.   I'm going to show you what is marked as 278, C 278.

24   I believe the government introduced it as another exhibit.

25        MR. MISKIEWICZ:  May we approach, your Honor?

Kenner  -  Recross/LaRusso

5149

1           THE COURT:  Let's take the morning break.  It's

2    11:30.  We will take the morning break.  Don't discuss the

3    case.

4               (The jury is excused.)

5               (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings

5150

1          (Out of the presence of the jury.)

2          THE COURT:  Please be seated.

3          What's the issue?  We have to get through

4    Mr. Kenner's testimony.

5          MR. LARUSSO:  I want to show him the financial

6    statement where listed are condominium units when he has a

7    percentage interest.  I assume he will say that is what he

8    got from Mr. Constantine, $1.5 million through the Urban

9    Expansion loan.  That was the end of my examination,

10   Judge.

11         MR. MISKIEWICZ:  The portions of this have

12   nothing to do with Mr. Kenner.

13         There seems to be attached to that a financial

14   statement for Sergei Gonchar.  This was provided by 1st

15   Source.  A couple pages were offered by the Government on

16   Mr. Kenner's cross.

17         The handwriting, we don't know -- basically I

18   would object to anything outside of any of the financial

19   statements that Mr. Kenner makes in his document, and

20   that's it.

21         Again, we've never seen this before, and it

22   would have helped if we'd seen it earlier.

23         MR. HALEY:  Your Honor, I also have an

24   objection.

25         I think we are so far afield from issues that

**Proceedings**

5151

1  are so far tangentially related to the issues at this

2  time, I would object to --

3         THE COURT:  Thank you, Mr. Haley, for joining me

4  on that.

5         MR. HALEY:  I'll stop talking at this point.

6         THE COURT:  Yes.  I'm sitting here and trying to

7  follow this, Mr. LaRusso.  I have no idea what you are

8  trying to do with this last point, and the Government's

9  objection is well taken.

10        I don't know -- is this Mr. Gonchar's financial

11  statement?  Are you trying to do that of Mr. Kenner?

12        MR. LARUSSO:  Judge, this is Mr. Kenner's

13  financial statement as far as I'm aware of.  The guarantee

14  of payment attached to it, I didn't break the exhibit

15  because it came together.

16        We're not interested in the guarantee from

17  Mr. Gonchar.  I want to question Mr. Kenner and see if he

18  remembers prior to the Gonchar loan he had secured

19  $1.5 million in assets he was putting down on the

20  financial statements from the Palms unit he got from

21  Mr. Constantine, that's all.

22        THE COURT:  I'll allow it if that is the only

23  thing.

24        MR. MISKIEWICZ:  We would ask for the documents

25  signed, purportedly signed, by Mr. Gonchar --

**Proceedings**

5152

```
1          THE COURT:  Are you going to introduce the

2    document?

3          MR. LARUSSO:  I will not introduce it, just show

4    it to him and explain it and then we're done.

5          THE COURT:  I'll only allow that.

6          Okay, Mr. Haley?

7          MR. HALEY:  Judge, may I have one moment?

8          (Counsel confers with defendant.)

9          MR. HALEY:  I would defer, obviously, to the

10   Court's ruling.  My position has previously been saved,

11   Judge.  I'm at a loss to understand relevance,

12   materiality, even tangential issues framed within the four

13   corners of the indictment.

14         THE COURT:  If Mr. Kenner is telling you that

15   there is something more to it, I'm giving him leeway on

16   relevance.  I still don't understand relevance, but as

17   long as there is no issue, I'll allow him to do it.  But I

18   still don't understand the relevance.

19         MR. HALEY:  I'm not sure he's going to get the

20   answer he's anticipating that Mr. Kenner will give.  I'm

21   not sure -- look, I can't testify for my client, Judge.  I

22   object.

23         THE COURT:  I don't understand the relevance.

24         MR. LARUSSO:  There's an awful lot of testimony

25   regarding the $1.5 million that Mr. Constantine was
```

Proceedings

5153

1   supposed to put into the Urban Expansion deal with a Kau

2   Holding, and there was a series of business transactions

3   going back and forth with Mr. Kenner and Constantine.  One

4   is the transfer of partial ownership in a number of

5   assets, including the Palm units and Avalon Park.  And the

6   financial statement reflect -- the $1.5 million reflects

7   part of Mr. Kenner's financial assets.

8            And as the Court knows, we'll be trying to

9   explain to the jurors the absence, or at least the

10  allegation, that the 1.5 was never put in by

11  Mr. Constantine pursuant to the agreement.

12           THE COURT:  So the argument is that 1.5 went to

13  Mr. Kenner in the form of interest in the Palm's unit.

14           MR. LARUSSO:  And I believe Avalon, which totals

15  the 1.5, Judge.

16           MR. HALEY:  Your Honor, he may not like the

17  answer but he can ask the question.

18           THE COURT:  And you'll be brief, correct?

19           MR. HALEY:  Yes, your Honor.  I have to discover

20  C-158, the e-mail.  I have four discrete areas.  Not a

21  stream, Judge, more like raindrops.

22           THE COURT:  Okay.  Let's take a short break.

23           (Whereupon, a recess was taken.)

24           THE COURT:  Please be seated.

25           MR. LARUSSO:  Your Honor, I have no further

Kenner - Recross/Haley

5154

1    questions.

2           MR. HALEY:  The time has been useful.  I have

3    further collapsed my efforts.

4           THE COURT:  All right.  Let's bring the jury in.

5           (Whereupon, the jury at this time enters the

6    courtroom.)

7           THE COURT:  Please be seated.

8           MR. HALEY:  No further questions, your Honor.

9           THE COURT:  Mr. Haley, go ahead.

10          MR. HALEY:  Thank you, your Honor.

11   RECROSS-EXAMINATION

12   BY MR. HALEY:

13   Q    Phil, on Thursday before we broke for the day,

14   Mr. Miskiewicz asked you some questions concerning a

15   subpoena that you had received in connection with

16   testifying before the grand jury; later a letter

17   rescinding that subpoena, advising you you did not have to

18   appear.

19          Do you recall those questions?

20   A    Yes, sir, I do.

21   Q    Would you kindly take a look at what has been marked

22   in evidence Kenner Exhibit --

23          THE COURT:  Pursuant to the discussion we had

24   earlier this morning, K-239, K-240, K-241, are admitted in

25   evidence.

Kenner - Recross/Haley

5155

1    MR. HALEY:  Thank you.

2    (Whereupon, Defendant's Exhibits K-239, K-240

3    and K-241 were received in evidence.)

4    Q    Tell us what that is, K-239.

5    A    K 239 was the subpoena I received from the U.S.

6    Attorney's Office to testify before the grand jury related

7    to Ken Jowdy.

8    Q    Okay.  I'm going to show you what is marked as Kenner

9    240.  It is in evidence.  Don't read it, but what is this?

10   A    Kenner Exhibit 240 is the cover letter that

11   accompanied the U.S. Attorney's grand jury subpoena for me

12   to appear and testify regarding Ken Jowdy.

13   Q    And Kenner 241, what is this?

14   A    Kenner Exhibit 241 was the letter on July 27, 2009,

15   ten days later, that was sent to my attorney regarding

16   cancelling my grand jury appearance.

17   MR. HALEY:  Thank you.

18   Q    Now, a moment ago a tape-recording was played,

19   acknowledged by you it is a conversation between yourself

20   and Kristin Peca.

21   You do say, "Sorry, I'm sorry for that."

22   Do you recall that part of the conversation?

23   A    Yes, sir, I believe that was the first conversation

24   we listened to.

25   Q    Would you describe the circumstances under which you

Kenner - Recross/Haley

5156

1   had that conversation with Kristin and what you meant by

2   that?

3   A    I was apologizing to her that she was not aware of

4   the Northern Trust seizure of their collateral.  But I

5   carried out all my business relationships with my hockey

6   player Kleins.  I didn't contact any of the wives or

7   girlfriends of the individuals with respect to any of

8   these business matters.  My clients were the hockey

9   players.

10         So I apologize that Ms. Peca didn't know about

11   that.  But that would have been Mr. Peca's responsibility,

12   to let his wife know pursuant to a conversation we had.

13         I had a series of conversations with Mr. Peca

14   leading up to the lines of credit, just like the rest of

15   the individuals.

16   Q    The exhibit that was shown to you, Exhibit No. 104,

17   from you to Tyson Nash, you used the word "rat," R-A-T; is

18   that correct?

19   A    I used the word R-A-T.

20   Q    That's not a nice word.  What did you mean by that,

21   "rat"?

22   A    I was just letting Tyson know it had been my belief

23   that he had been the person leaking information to

24   Mr. Constantine with respect to Mr. Stolper's

25   investigation.  And he vehemently denied it on the phone

5157

1   conversation.  And I was just telling him if it's not him,

2   he needs to help me find out who the rat was disseminating

3   information from Mr. Stolper's group to Mr. Constantine at

4   that point in time.

5   Q    Did you later come to learn who that person was?

6   A    Yes, sir, I did.

7   Q    And who was it?

8   A    It was Sergei Gonchar.

9   Q    And finally, with reference to the question asked of

10  you regarding your affidavit that you filed in connection

11  with the bankruptcy proceeding, that adversary

12  proceeding -- or the adversary affidavit you filed, you

13  were asked a question in connection as to why there was

14  not reference to other private stock sales in your

15  affidavit.

16         Do you recall that?

17  A    Yes, sir, I recall that question.

18  Q    What, if any, effort did you take to ensure that the

19  private stock sales that had occurred with reference to

20  your hockey player clients' investments in Eufora were

21  made known in that proceeding?

22  A    In addition to my own personal adverse proceeding I

23  filed against Mr. Constantine's bankruptcy proceeding

24  specific to my interactions with Mr. Constantine, I

25  assisted in the filing, I believe, of nine other adverse

Kenner - Recross/Haley

5158

1    proceedings versus Mr. Constantine's bankruptcy for nine

2    of my clients at that time.  And in each one of their

3    individual adverse proceeding filings, which is like a

4    lawsuit against the bankruptcy, we alerted the bankruptcy

5    court that each one of those individuals were investors in

6    Eufora through Mr. Constantine's private stock sales, and

7    we were seeking the Court's intervention on that, for each

8    one of them.

9            That's where they were represented, because

10   that's where it was appropriate to, not in a loan personal

11   affidavit.

12           MR. HALEY:  Thank you.  I have no further

13   questions.

14           THE COURT:  You may step down, Mr. Kenner.

15           Do the defendants rest?

16           MR. HALEY:  Your Honor, may we approach briefly?

17           (Whereupon, at this time the following took

18   place at the sidebar.)

19           (Continued.)

20

21

22

23

24

25

Kenner - Recross/Haley

5159

1      MR. HALEY:  Under normal circumstances I would

2  rest.  From my perspective, this is an abnormal case.

3      What we saw happen as relates to the

4  presentation of witnesses by Tommy Constantine,

5  particularly Sergei Gonchar, where there were allegations

6  consistent with  -- allegations in the indictment were

7  mentioned by that particular witness, and your Honor was

8  kind enough to give me the opportunity when I conducted my

9  redirect of my client to at least address that.

10      I don't know for certain, but it may happen that

11  as a result of the presentation by Mr. Constantine in his

12  defense, there may be matters I need to put Phil back on

13  the stand to address in some fashion.

14      THE COURT:  May I make a suggestion?

15      Why don't you rest now without prejudice to

16  asking him to reopen it if something new comes up.  I'll

17  tell that part to the jury.

18      MR. HALEY:  Thank you.  I understand.

19      (End of sidebar conference.)

20      (Continued.)

21

22

23

24

25

D'Ambrosio - Direct/LaRusso

5160

1          MR. HALEY:  The defense of Phil Kenner rests,

2     your Honor.  Thank you.

3          THE COURT:  As you know, Mr. LaRusso started his

4     presentation of evidence last week with Mr. Gonchar.  I'll

5     ask him to call his next witness.

6          MR. LARUSSO:  Your Honor, on behalf of

7     Mr. Constantine, we will call Mark D'Ambrosio.

8          THE COURT:  Come up, please.

9          Please raise your right hand.

10    **M A R K   D ' A M B R O S I O**,

11         called as a witness, having been first

12         duly sworn, was examined and testified

13         as follows:

14          THE COURT:  Please state your name and spell it

15    for the record.

16          THE WITNESS:  Mark D'Ambrosio, D, apostrophe,

17    A-M-B-R-O-S-I-O.

18          THE COURT:  And Mark, M-A-R-C or M-A-R-K?

19          THE WITNESS:  M-A-R-K.  Sorry about that.

20          THE COURT:  Please bring the mike down and keep

21    your voice up.

22    DIRECT EXAMINATION

23    BY MR. LARUSSO:

24    Q    Where do you presently reside?

25    A    Scottsdale, Arizona.

D'Ambrosio - Direct/LaRusso

5161

1  Q    How long have you presently resided in Scottsdale,

2  Arizona?

3  A    I was born and raised there.

4  Q    Can you tell us what your present occupation is?

5  A    Since 1998 I've been running the Software Web Mobile

6  Marketing Company?

7  Q    Would you describe what you are doing in layman's

8  terms?

9  A    Mostly software development and web marketing.

10  Q    Do you know a person by the name of Tommy

11  Constantine?

12  A    Yes.

13  Q    Do you see him here in court today?

14  A    Yes.

15        MR. LARUSSO:  Indicating the defendant, your

16  Honor.

17        MS. KOMATIREDDY:  No objection.  We concede the

18  identification.

19        THE COURT:  Do you concede the identification?

20        MR. HALEY:  I do, your Honor.

21        THE COURT:  Identification conceded.

22  Q    Tell us how you first came to meet Mr. Constantine.

23  A    I think I met Tommy in 1997, maybe '98.  He had a

24  place where he stored his race car at the time, and a

25  friend of mine worked at the adjacent body shop.  And

D'Ambrosio - Direct/LaRusso

5162

1   Mr. Constantine asked them to superimpose some graphics on

2   the trailer and the car so that when he was pitching

3   sponsorship, he would be able to show what the car looked

4   like.

5           They didn't have the ability to do that, and at

6   the time I was working part-time for my father's company

7   helping with computer graphics.  So I was introduced to

8   Tommy through a gentleman named Craig Johnson.

9   Q    After you were introduced to Mr. Constantine, did you

10  do any work for him?

11  A    He gave me a small project to work on.  He actually

12  came over to the house and worked on it with me.  And at

13  that time I was very interested in cars and racing, so

14  when he was over we kind of talked about racing and cars

15  as we were working on the graphics.  And that was a small

16  project.

17          After that we just kind of cultivated a

18  friendship over the course of the next three or four

19  years.

20  Q    Did there come a time in your relationship with

21  Mr. Constantine that you became involved with a company

22  called Eufora?

23  A    Yes.

24  Q    Could you tell us how you became involved in Eufora?

25  Give us the background for it?

D'Ambrosio - Direct/LaRusso

5163

1    A    Tommy was involved in motor sports marketing, and I

2    was doing marketing for my own products and -- my own

3    products and computer graphics.  I spent a lot of time

4    with Tommy.  We just brainstormed.  And one afternoon we

5    came up with -- at that time it was the concept of Eufora.

6           What it ended up being was much different than

7    what the original concept was because it evolved into

8    something much greater.  I think we started talking about

9    it in probably the end of 2000, to the end of 2001.

10   Q    Give us the initial idea what the concept of Eufora

11   was.

12   A    Initially it was -- my thought and goal was -- I saw

13   large success in companies doing multilevel marketing at

14   the time, and in my opinion you always had to buy or sell

15   a product nobody ever wanted.  That was really just a way

16   in order to get people into the system, in order to

17   convince people and incentivize them to make money.

18          So we came up with a concept where -- we wanted

19   to come up with a product that everybody uses and needs,

20   and it was a payment card, that people would get paid if

21   they were willing to help spread the word about the card.

22   Q    I assume your discussions continued with respect to

23   the cards to the development and formation of Eufora?

24   A    Over the next two years it evolved into something

25   much, much greater.  The first conversation was in the

5164

1    back of Tommy's pickup, sitting there.  And what it turned

2    out to be was something much, much greater than the

3    initial concept.

4    Q    When you say "turned out to be something much, much

5    greater," just give the jury an idea what it morphed into

6    for purposes of this part of the testimony.

7    A    Well, within 18 months we were talking to major banks

8    about issuing our card.  Prior to that Tommy had a friend

9    that he was introduced to that -- this gentleman owned a

10   very large subprime credit card company, and we -- Tommy

11   did a deal with him in terms of an advertising deal, and

12   it turned out to be very prosperous endeavor.

13          And we decided, hey, this is something we know

14   had a potential to be really big, and we started talking

15   to banks about issuing our own brand.

16   Q    Did there come a time when you incorporated Eufora

17   around August of 2001?

18   A    Yes, 2001.  We started working on it in 2000, but I

19   think we followed it up in 2001.

20   Q    Can you tell us, after incorporating the business,

21   what if any impact did 9/11 have on your business plan at

22   this point?

23   A    Well, I was very lucky to have and be working with

24   someone like Tommy at the time, because with his

25   experience with pitching sponsorship, I would give him the

D'Ambrosio - Direct/LaRusso

5165

1    leads, which bank we should work with, and he would start

2    literally at the customer service management and go to

3    upper management.

4           Knowing we started in 2000 and we were on our

5    third red line version, we were running an agreement with

6    Metris, M-E-T-R-I-S, Bank.  We were very close to signing

7    a deal with the Metris companies.  We had, I think, a

8    20,000-square-foot building we were just about to sign a

9    lease on, and September 11th happened, and the whole

10   landscape of the business changed.

11   Q    What happened?

12   A    Well, Metris kind of backed out of our deal, mostly

13   because, again, the credit card landscape changed so much

14   after 2001, mostly because -- the feedback that we got

15   back, the economy changed by -- people would go to the

16   internet, and now they were out of work, they would go and

17   apply for a credit card.

18          What they would do at that time, which they knew

19   very little about, is have an instant decision.  Somebody

20   who lost their job could go to one company, close the

21   browser, and get 30 or $40,000 worth of credit, where they

22   should have only gotten $5,000 of credit based on their

23   income.

24          What happened at that time was the Government

25   said, if you are issuing cards in this sector which they

5166

1   considered subprime -- and at the time, I think it was 620

2   or less -- that you had to have 20 percent in reserves

3   just sitting in the bank, just in case we have another

4   downfall, terrorist attack, what have you, that you needed

5   to have reserves.

6   Q    What happened with your idea with Eufora?

7   A    There were a couple banks that went out of business.

8   For us, we were then kind of starting back at -- starting

9   from scratch again.  We secured another bank, I think,

10  within a year from that.  Maybe 16 to 18 months after, we

11  secured another bank.

12        The problem with this bank was they only issued

13  superprime cards, so anything over 680 or 700 FICO score

14  and higher.

15  Q    Did there come a point in time when you and others

16  executed an operating agreement for Eufora?

17  A    Yes.  Prior to getting office space, I think we had

18  an operating agreement that was dated in 2002.

19  Q    Let me show you what has been marked as C-265.

20        Do you recognize this (handing)?

21  A    Yes.  This looks like the original operating

22  agreement with the original shareholders.

23  Q    You examined this before appearing here today; is

24  that correct?

25  A    Yes.

D'Ambrosio - Direct/LaRusso

5167

1  Q    Are there any signatures on that document, and if so,

2  where do they appear?

3  A    We have Tommy Constantine, my signature, Daniel

4  Kennedy, Matt Cotrell, C-O-T-R-E-L-L, Eric Edenholm, and

5  Phil Kenner.

6  Q    Do you recognize this as the original operating

7  agreement signed by you and those individuals?  Is that

8  correct?

9  A    Yes.

10             MR. LARUSSO:  May I ask C-265 be received at

11  this time?

12             MS. KOMATIREDDY:  No objection.

13             THE COURT:  Mr. Haley, any objection?

14             MR. HALEY:  May I have a moment, Judge?

15             I'm sorry, Judge.  Thank you.  No objection.

16             THE COURT:  C-265 is admitted.

17             (Whereupon, Defendant's Exhibit C-265 was

18  received in evidence.)

19  BY MR. LARUSSO:

20  Q    Mr. D'Ambrosio, I'll refer to a number of pages.

21  This is C-265.

22             This operating agreement was entered on

23  August 16, 2002; is that correct?

24             You have a screen right to your right.

25  A    Sorry about that.  Yes.

D'Ambrosio - Direct/LaRusso

5168

1           What was the question.

2    Q    This was entered August 16, 2002?

3    A    Yes.

4    Q    And who were the original members of Eufora?  And I'm

5    turning to page 3, if you need to use that.

6    A    Yes.  Tommy Constantine, myself, Matt Cotrell, C-9

7    Consulting, which is Mr. Kenner, Eric Edenholm, and LMJ

8    Management.

9    Q    And this document reflects the percentage ownerships

10   of these members; is that correct?

11   A    Yes.

12   Q    Read them into the record.

13   A    Tommy Constantine, 50 percent; Mark D'Ambrosio,

14   20 percent; Matt Cotrell, 10 percent C-9 Consulting, 10

15   percent; Eric Edenholm, 5 percent; LMJ Management, 5

16   percent.

17   Q    Who was C-9 Consulting?

18   A    Dan Kennedy.

19   Q    Who is LMJ management?

20   A    So to my knowledge it was Phil Kenner.  His signature

21   was on the signature page.

22   Q    What is capital contribution?

23   A    The definition, if a company needs money or capital

24   moving forward, any of the members are obligated to fund

25   the company.  If you are unable to fund based off of your

D'Ambrosio - Direct/LaRusso

5169

1    interest, then you get diluted.

2    Q    In regards to the incorporation or the operating

3    agreement we are talking about, what was the contribution

4    that each one of those individuals made in regards to

5    their percentage interest in the business?

6    A    I remember on this contract, maybe a couple pages

7    back, there should be dollar amounts for what everybody

8    contributed.

9    Q    You may be more familiar with this than I am.

10            Are you talking in the back of the agreement?

11   A    It should be.

12   Q    You are talking about the exhibit, I'm sorry.

13            Towards the end, there's a document marked

14   Exhibit A.

15   A    That looks correct.

16   Q    What does that reflect?

17   A    Tommy Constantine, 50,000.  We are talking about

18   capital contribution.

19            Matt Cotrell, 20,000.

20            Mark D'Ambrosio, 20,000.

21   Q    At the top it says C-9 Consulting, at the top?

22   A    Right.  C-9 did not contribute any capital, but they

23   were our technology partner so they were responsible for

24   developing the software.

25   Q    So in return for their promise to develop the

5170

1    software for Eufora, they were given a 10 percent

2    interest; is that correct?

3    A    Yes.

4    Q    Where did that 10 percent interest come from, if you

5    know?

6    A    Tommy's shares.

7    Q    Mr. Constantine was supposed to have a 60 percent

8    interest, and from that Mr. Kennedy was given 10 percent

9    for his contractual obligations; is that correct?

10   A    Yes.

11   Q    And then I believe there were two others.  You said

12   Eric Edenholm?

13   A    Yes.  $125,000 investment.  And LMJ -- I'm sorry, two

14   payments of 125 each, so 250,000 from Eric, and 250,000

15   from LMJ.

16   Q    If I could just for a moment ask you about

17   Mr. Kennedy.

18              How long did he remain working with Eufora?

19   A    I would say to the best of my knowledge it was more

20   than a year.  But around the second year we really were

21   growing, we needed a lot of technology, and he just didn't

22   have the resources and couldn't keep up.  So we kind of

23   phased him out, and I built my own team within Eufora and

24   hired our own software developers.

25   Q    Mr. Kennedy still retained at that time his 10

D'Ambrosio - Direct/LaRusso

5171

1     percent interest in Eufora; is that correct?

2                    MS. KOMATIREDDY:  Objection to form.

3                    THE COURT:  Overruled.

4                    You can answer that.

5     A     Yes.

6     Q     Did there come a time when his percentage interest in

7     the business changed?

8     A     Yes.

9     Q     Tell us about that.

10    A     Well, he could no longer fulfill his obligations to

11    be developing technology for us, so Tommy was mostly

12    funding the company at that time, so he elected to sell

13    his shares to put into, at that time, the company for

14    capital.

15    Q     How many occasions did he do that?

16    A     I think over the course of the lifetime of the

17    company, two different times.

18    Q     Okay.

19                    Would you just describe briefly the two times

20    Mr. Kennedy made transfers of his shares and to whom and

21    for what purpose?

22    A     One time was when the company needed capital, and

23    then a second time when Dan -- Dan's company was still

24    kind of helping, but there was a point when Dan --

25    honestly, I think he might have shut down his technology

D'Ambrosio - Direct/LaRusso

5172

1    company, and Tommy took back shares that he gave to Dan

2    Kennedy when we formed the company.

3    Q    Who did Dan Kennedy give those shares to?

4    A    I think it was Tommy's company, CMJ.

5    Q    Didn't give them back to Eufora; is that correct?

6    A    No.  They were not Eufora's shares.  They were

7    Tommy's shares.

8    Q    Let me show you what has been marked for

9    identification as C-267.

10          Do you recognize this?

11   A    Yes, I do.

12   Q    What do you recognize about that document?

13   A    That this is where --

14   Q    Try to keep your voice up.

15   A    Sorry.

16          This is where Tommy took back half of the shares

17   that Tommy originally gave to Dan Kennedy.

18   Q    When did this occur?

19   A    This is dated February 5, 2008.

20   Q    Did you see this document at or about the time it was

21   executed?

22   A    Yes.

23   Q    And what is this document?

24   A    This is where, again, Dan is giving back Tommy 4

25   percent of his remaining 8 percent.

D'Ambrosio - Voir Dire/Komatireddy

5173

1  Q    Is this document prepared and maintained by the

2  company in the ordinary course of business?

3  A    Yes.

4           MR. LARUSSO:  May I ask C-267 be received at

5  this time?

6  VOIR DIRE EXAMINATION

7  BY MS. KOMATIREDDY:

8  Q    Your signature is not on the document, right?

9  A    No.

10  Q    Did you actually watch it being signed?

11  A    Yes.

12  Q    When?

13  A    Probably that same day.

14  Q    You don't remember watching it being signed?

15  A    I was there when most of the documents were signed.

16  Q    Were or were not?

17  A    I was.

18  Q    You don't remember watching this document being

19  signed though?

20  A    I was there when all the transfers were done.

21  Q    You said you were there when most of the transfers

22  were done, and now you are saying when all the transfers

23  were done.  Which is it?

24  A    Unless there are other transfers, that one in

25  particular, yes.

D'Ambrosio - Direct/LaRusso

5174

1   Q    I'm asking you about this document that Mr. LaRusso

2   just put in front of you and showed you before you walked

3   in here today.

4          Can you tell me whether you walked in and saw

5   this document being signed on February 5, 2008?

6   A    Yes.

7          MS. KOMATIREDDY:  No objection.

8          MR. HALEY:  I have no objection.

9          THE COURT:  C-267 is admitted.

10         (Whereupon, Defendant's Exhibit C-267 was

11  received in evidence.)

12  DIRECT EXAMINATION

13  BY MR. LARUSSO:  (Continued)

14  Q    I'll display it, and read the pertinent parts.

15  A    Transfer of portion of membership interest of Eufora,

16  LLC.  The undersigned, C-9 Consulting, for valuable

17  consideration, the receipt of which is hereby

18  acknowledged, hereby transfers and conveys to the

19  Constantine Management Group all transferors' right, title

20  and interest in Eufora, LLC, an Arizona Limited Liability

21  Company, 4 percent of the 8 percent membership interest,

22  leaving 4 percent membership interest owned by C-9

23  Consulting.

24         Dated the 5th day of February, 2008.

25         And the typed portion says "William Daniel

5175

1   Kennedy," with the signature of the individual.

2   Q    Mr. Kenner began with a 10 percent interest.  This

3   document reflects him giving up 4 of 8 percent.

4        What happened to the other 2?

5   A    There was one time prior that he sold 2 percent, and

6   those funds went into operating.

7   Q    And these funds went to Mr. Constantine; is that

8   correct?

9   A    Yes.

10  Q    Nothing improper about that, was there?

11           MS. KOMATIREDDY:  Objection.

12           THE COURT:  Sustained.

13  Q    Do you know what Mr. Constantine did with the

14  interest that he got from Mr. Kennedy?

15  A    I think that he sold that interest, and some of the

16  money from the sale went into the company.  And, I mean,

17  it was Tommy's money, so --

18  Q    So when you say Mr. Constantine gave a portion of the

19  money that he made from the sale of those documents, it

20  went back into Eufora; is that correct?

21  A    Yes.

22           MS. KOMATIREDDY:  Objection.  That wasn't the

23  testimony.

24           THE COURT:  Overruled.

25  A    Yes.

D'Ambrosio - Direct/LaRusso

5176

1  Q    By the way, let me deal with your contributions.

2         You said that when you signed the operating

3  agreement you put $20,000 into the company; is that

4  correct?

5  A    That's correct.

6  Q    Is that the only money you put into the company over

7  the life of its existence?

8  A    No.

9  Q    The company still exists; is that correct?

10 A    Yes.

11 Q    So between the time you put $20,000 in pursuant to

12 the operating agreement until today, how much money have

13 you put into the company by way of other capital

14 contributions or by loan?

15 A    I don't know the exact number, but probably

16 $1.4 million.

17 Q    And how did that go in, as a capital contribution or

18 as a loan?

19 A    As a loan.

20 Q    You still owed that money today?

21 A    Yes.

22 Q    Where did you get that money?

23 A    My business.  Working hard and making it over time.

24 Some of it was borrowed when I needed it, or if the

25 company needed it for payroll, I would borrow from family

D'Ambrosio - Direct/LaRusso

5177

1   members and eventually pay it back.  And now the loan is

2   owed to you.

3   Q    You mentioned earlier the operating agreement

4   permitting a capital call; is that correct?

5   A    What do you mean?

6   Q    It's a poor question.

7            Are you familiar with the phrase "capital call"?

8   A    Yes.

9   Q    What is a capital call?

10  A    When a company needs capital, all the members are

11  legally obligated in order to fund the company to look

12  forward.  If they are not able to do so, they get diluted

13  based on their percentage what the capital requirement is.

14  Q    Who are the people that would be required, if called

15  upon, to make that kind of capital contribution?

16  A    All investors.

17  Q    So if somebody paid 100,000 and became an investor

18  and a capital call was made, they would be required to

19  give a portion to that capital call; is that correct?

20  A    Yes, depending what percentage they owned of the

21  company.

22  Q    During the life of Eufora until today, has a capital

23  call ever been made?

24  A    Not once.

25  Q    Why?

5178

1  A    Tommy and I argued about this.  I thought that we

2  should go to the investors, but Tommy never wanted to go

3  back to the investors to do a capital call.  We just

4  funded it ourselves.

5  Q    When you say "we funded it," were you aware how much

6  money Mr. Constantine put into the business after it was

7  formed?

8  A    I think a total of $3 million.

9  Q    And do you know how much he is owed as you are

10  testifying here today?

11  A    I think that number is close to $1.5 million.

12  Q    Do you know where Mr. Constantine was able to secure

13  his money that he put into the company?

14  A    I know where the majority of it came from, yes.

15  Q    Would you tell us from your knowledge, you know, how

16  Mr. Constantine was able to secure money for a loan to the

17  company?

18  A    Prior to starting with Eufora, Tommy had been very

19  successful and had a lot of assets.  During the time we

20  needed money, unfortunately, he had to sell those assets

21  or mortgage property to fund that, so we never had to do a

22  capital call so we could keep up with payroll.

23  Q    Can you tell us some of the assets that was sold by

24  Mr. Constantine to help run the company?

25  A    I know of a couple properties.  One in particular was

D'Ambrosio - Direct/LaRusso

5179

1    a large parcel he owned in north Arizona, a 40-acre parcel

2    that he mortgaged in order to fund the company, and also a

3    helicopter sale.

4    Q    Tell us about what knowledge you have regarding the

5    helicopter sale.

6    A    I know at one point Tommy had to sell or -- sell his

7    helicopter at the time to help fund the company.

8    Q    By the way, the property you described

9    Mr. Constantine had to take a mortgage out to help fun the

10   company, did it have a heliport on it?

11   A    No.  My understanding, that was the turnaround for

12   the bus.

13   Q    And what was it used for?

14   A    The bus?

15   Q    The turnaround.

16   A    Just so that when you pulled into the garage, you

17   could turn the bus around.

18   Q    Why is it referred to as a heliport?

19   A    I'm not sure who -- or why they refer to it --

20   Q    Does a helicopter use that area to land on the

21   property?

22   A    To my knowledge, no.

23   Q    By the way, were you familiar with some of the

24   sponsors of Mr. Constantine's racing activities?

25   A    Yes.

D'Ambrosio - Direct/LaRusso

5180

1  Q    Were any of those money saved by the sponsors

2  contributed likewise by Mr. Constantine to Eufora?

3  A    No directly, but I know Tommy borrowed or used some

4  of his sponsorship money to help fund Eufora.

5  Q    Can you give us some of the names of the sponsors you

6  became familiar with over time?

7  A    Playboy, Vonage, Uniden, BMW, Nissan, Palms Hotel,

8  Taser International.

9  Q    By the way, during the time that Eufora was in

10  existence, again, up until today, did you ever take a

11  salary?

12  A    I got a salary I think for one month.

13  Q    Do you remember when and why?

14  A    It was right after we got funding from Mr. Nerguzian,

15  and I think, again, I might have received two checks, but

16  I think I only remember one of them.

17  Q    How about Mr. Constantine?  Do you recall if he was

18  paid a salary during the life of Eufora?

19  A    At the same time, I think he did receive a check, but

20  those didn't last more than three months.

21  Q    By the way, you told us that you were not devoting

22  full-time to Eufora, you had another business; is that

23  correct?

24  A    Yes, I had my business that I started in 1998, and so

25  I needed to make a living, so I spent probably 70 percent

D'Ambrosio - Direct/LaRusso

5181

1  of my time working on Eufora and the other 30 percent

2  working on my own personal projects.

3  Q    Was Mr. Constantine devoting full-time to Eufora

4  during this time period?

5           Was Mr. Constantine devoting full-time to

6  Eufora?  Did he have other activities?

7  A    He had other activities, but what time period are you

8  talking about?

9  Q    Say between 2004 and 2007.

10  A    Well, I know when we first started he was tenacious

11  about getting Eufora started, and then around 2004, 2005,

12  he started working on a project in Hawaii.

13  Q    Do you know what the project was?

14  A    I don't know details.  I just know that it was a

15  large land parcel, a really great opportunity.  And I

16  heard bits and pieces as people walked into the office

17  that Tommy met with.

18  Q    What was Tommy's connection with this land project in

19  Hawaii?

20  A    My understanding, he was trying to find a partner to

21  develop the property and funding.

22  Q    And during the times that you were present in the

23  office, did you get to meet with any of the individuals

24  that he was discussing the possibility with partnering

25  with for the Hawaiian project?

D'Ambrosio - Direct/LaRusso

5182

1   A    I was not directly involved in the meetings, but

2   afterwards Tommy would say Meritage Homes, which was a

3   large developer in Arizona -- or a gentleman that was a

4   large developer of apartment buildings, his name was Ken

5   Losch.  After they left, Tommy would tell me who they

6   were.

7   Q    Do you know a person by the name of Craig Johnson?

8   A    Yes, that was the individual that introduced me to

9   Tommy.

10  Q    Did Mr. Johnson, at or about this time, have anything

11  to do with the raising of moneys for the Hawaii projects?

12  A    He was in the office a lot and was involved in those

13  meetings.

14  Q    Do you know what role he played and what he did?

15  A    He was working for a mortgage company at that time,

16  so I don't know exactly what role he played in that piece

17  of -- that area, but I assume he had a value of some sort.

18  Q    How long do you recall him working in that capacity?

19  A    He was there for -- I think that window was maybe

20  24 months or so.  And he was in and out of the office and

21  was present in a lot of the meetings when they were trying

22  to raise moneys for the Hawaiian project.

23  Q    Did you have a discussion with Mr. Constantine about

24  his raising money for a Hawaiian project?

25  A    Yes, I did.  You know, we would kind of argue about,

D'Ambrosio - Direct/LaRusso

5183

1    you know, why he wasn't focusing on the main business, and

2    we would have an argument about it and -- just how I had

3    to work on making a living, so did Tommy.  So he had to

4    work on other projects also.

5    Q    And was this a single episode or was it a series of

6    conversations with Mr. Constantine over this period of

7    time?

8    A    No, we had many conversations about it.

9    Q    Did any of them ever become heated?

10   A    Oh, yeah.

11   Q    And in what way?

12   A    Probably a couple weeks that went by that we didn't

13   talk to each other.

14   Q    What was your position in regards to what he was

15   doing?

16   A    After Tommy would actually sit me down and would

17   explain to me what he's working on and why he was doing

18   it, I wouldn't complain --

19            MS. KOMATIREDDY:  Your Honor, I object.

20            May we have a sidebar?

21            (Whereupon, at this time the following took

22   place at the sidebar.)

23            (Continued.)

24

25

D'Ambrosio - Direct/LaRusso

5184

1          MS. KOMATIREDDY:  The statements are being

2     offered for the truth, not for representations made to

3     investors.  They are not indicative of any state of mind.

4          The actual statement themselves have to do with

5     what Mr. LaRusso purports to be the facts of

6     Mr. Constantine raising money for the truth of whether he

7     in fact met with investors and raised money, which was a

8     disputed issue.

9          THE COURT:  He can testify who came in and out

10    of the office.  That is not hearsay.

11          In terms of what Mr. Constantine told him, it

12    goes to Mr. Constantine, his potential state of mind.

13          The Government is saying there were no efforts

14    being made and Mr. Constantine was pretending to make

15    efforts, if he was having discussions with a business

16    partner regarding his need to do that.  But if you want me

17    to give a limiting instruction, I will.

18          MS. KOMATIREDDY:  We would appreciate that.

19          THE COURT:  All right.

20          (End of sidebar conference.)

21          (Continued.)

22

23

24

25

5185

1              THE COURT:  Members of the jury, let me give you

2     a limiting instruction.

3              You heard testimony in the case, and to the

4     extent that Mr. D'Ambrosio is relaying what

5     Mr. Constantine told him he was doing in the Hawaii

6     project, he cannot offer those statements for the truth,

7     but they can be offered on the issue of Mr. Constantine's

8     state of mind at the time.  You can only consider it for

9     that purpose.

10             Go ahead.

11    Q    I would like you to tell us from your point of view

12    the nature of these discussions with Mr. Constantine about

13    his activities raising money for the Hawaiian project in

14    reference to his responsibilities with the company.

15    A    He was spending a lot of time meeting with people,

16    and the majority of his focus was raising money for these

17    development projects in Hawaii.

18    Q    And what was the position you took?

19    A    I was upset, I think for a number of different

20    reasons.

21             One, I wasn't benefitting from that.  And number

22    two, I thought we had a great opportunity with Eufora, and

23    I was wanting him to spend more time focusing on Eufora.

24    Q    By the way, did you ever invest in -- you said you

25    didn't have anything to do with Hawaii.  But what about

D'Ambrosio - Direct/LaRusso

5186

1   Mexico?  Did you make any investments at or about this

2   time in Mexico?

3   A    I gave a 100,000 investment in Mexico.  I don't have

4   the exact date, but either the end of 2005 or in 2006.

5   Q    Tell us the background to that investment.

6   A    I knew there was another project in Cabo that was an

7   amazing piece of property right on the beach, five miles

8   of beachfront property, 1500-acre parcel, and they were

9   working on developing the project.  And at that time I

10  decided to contribute $100,000.

11  Q    And from whom did you learn this information?

12  A    From Tommy.

13  Q    And to whom did you make the investment?

14  A    I sent the money -- I'm 90 percent sure it went to a

15  Mexican bank, a Mexican entity.

16  Q    What happened to your investment?

17  A    My investment, I think, in my opinion and from what

18  I've learned, was never recognized by Ken Jowdy.

19  Q    And did you make any efforts to recover the money

20  that you invested?

21  A    I did not.  From what I've learned, I was not going

22  to spend $200,000 to chase after my 100.  When I knew that

23  the group as a whole that has invested, from what I know,

24  tens of millions of dollars was not making any headway, I

25  was not going to make any headway by chasing my 100,000

D'Ambrosio - Direct/LaRusso

5187

1    investment.

2    Q    By the way, did you come to learn -- do you know Phil

3    Kenner, by the way?

4    A    Yes.

5    Q    Do you see him here in court?

6    A    Yes.

7              MR. HALEY:  Identification conceded.

8              THE COURT:  Identification conceded.

9    Q    Tell us how you knew Mr. Kenner during this period of

10   time.

11   A    I met Mr. Kenner through Tommy Constantine.

12   Q    Let me have you describe your relationship with him

13   during this period of time.

14   A    Over the course of probably 2001 to 2008, Tommy and

15   Phil were working on development projects.  When we needed

16   capital, Phil opted to buy more into the company because

17   he saw what we were working on and what we were doing.  I

18   didn't have a close personal relationship with Phil, but

19   he was in and out of the office, and that's pretty much

20   it.

21   Q    Did you come to learn from whom the moneys Mr. Kenner

22   was putting into Eufora came from?

23   A    Later on I learned that it was from investors, and

24   the majority of them being professional hockey players.

25   Q    As a member of Eufora, do you know how these hockey

5188

1   players held their interest in Eufora?

2   A    Yes.  They held their interest in Phil Kenner's

3   entities, and there was a number of them.  And that's how

4   they held their interest, not directly into the company.

5   Q    One of the entities that held the hockey players'

6   interest was AZ Eufora Partners?

7   A    Yes.

8   Q    Do you know a person by the name of C.R. Gentry?

9   A    Yes.

10  Q    Tell us how you came to know or meet Mr. C.R. Gentry.

11  A    Unfortunately, I met C.R. Gentry through one of my

12  employees.  She went to a networking event in north

13  Scottsdale; she met the gentleman.  I don't know what the

14  event was for.  The next day she met some interesting guys

15  that might be able to help with raising money.

16            And I'm not sure how soon after, but very

17  shortly after that I met with Mia, M-I-A, myself, met with

18  C.R.

19  Q    What was Mia's relationship with Eufora?

20  A    She was the VP of operations.

21  Q    How long was she VP of operations of Eufora?

22  A    She started with us in -- we launched in 2003, so a

23  little before 2003.  But she has been with the company

24  since day one.

25  Q    In regards to Mr. Gentry, where did you meet him at

5189

1   the time?

2   A    At a home in north Scottsdale.

3   Q    Tell us briefly what you discussed with him at that

4   point.

5   A    I went over the Eufora business and the business

6   model and what we were currently doing, and wanted to see

7   if there was any interest there to help us raise money.

8   Q    And did you come to some kind of agreement with

9   Mr. Gentry at that point?

10  A    Originally the agreement was based on the success of

11  them raising money, but eventually I ended up hiring C.R.

12  and -- at that time against Tommy's wishes.

13  Q    When you say "hiring" him, hiring him in what

14  capacity?

15  A    At that time he was being paid as a consultant to

16  help raise money.

17  Q    Had he been successful in raising any money at that

18  point?

19  A    Over his whole tenure, he was not successful in

20  raising money.

21  Q    There came a time when you discussed with Mr. Gentry

22  hiring him in a different capacity?

23  A    Yes.

24  Q    What was that?

25  A    Eventually he was president and CEO.

D'Ambrosio - Direct/LaRusso

5190

1   Q    You also mentioned a few moments ago over

2   Mr. Constantine's objection.  What do you mean by that?

3   A    Well, you know, C.R. did a really good job on selling

4   me his abilities, and I was desperate at the time.

5   Unfortunately, Tommy was out racing, so I didn't have any

6   other options, and I really didn't see how it could harm

7   us.  And I was paying out of my own pocket, and I really

8   didn't see any downside.

9         But Tommy told me I was wasting my time and

10  could tell that C.R. just didn't have the pedigree for

11  what we needed.

12  Q    When you say you were desperate with respect to

13  Mr. Gentry, the hiring, what do you mean by that?

14  A    In my opinion, we were desperate for funding and

15  advertising dollars, and we needed to raise capital.

16  Q    How did Mr. Gentry and why did Mr. Gentry become an

17  officer in the company after not providing any funding?

18  A    I think the best way to explain how it happened was

19  Tommy was successful in finding us a lender, and at that

20  time Tommy was still racing, and we needed someone to get

21  the appropriate documents to our lender.  And that lender

22  knew that Tommy was out racing, so that lender forced us

23  to kind of have C.R. as president and CEO.

24  Q    Who was this lender?

25  A    His name is Brent Nerguzian.

D'Ambrosio - Direct/LaRusso

5191

1   Q    Did he have a company?

2   A    Neptune.

3   Q    What was his relationship to you and Mr. Constantine

4   at the time, if anything?

5   A    Very close personal friend of Tommy, and Tommy is the

6   godfather of three of his children.

7   Q    By the way, where was Mr. Gentry living during the

8   period of time that he was working for Eufora?

9   A    He was living with me.

10  Q    How long did he live with you?

11  A    I think he worked for us for a total of three years,

12  and I would say he moved in probably after the first two

13  months of being a consultant and traveling back and forth

14  from Canada.

15         I had a home, and I had a home that, you know,

16  was -- had extra bedrooms, and I offered for him to stay

17  with me.

18  Q    How long did he stay with you?

19  A    Pretty much most of the three years, besides maybe

20  the first couple months.  I don't know exactly.

21  Q    How much rent did he pay you, if any?

22  A    Zero.

23  Q    You said back and forth to Canada.

24         What was the need for Mr. Gentry to travel into

25  Canada?

5192

1   A     That is where he resided and where his wife and

2   family was.

3   Q     How long -- let me back up and rephrase that.

4               During the time that Mr. Gentry worked for

5   Eufora, did he work five days a week?

6   A     There might be one or two weeks that he would maybe

7   work five days, but I would say 70 percent of his time for

8   over a month would be in Canada.  But there might have

9   been a particular situation where he may have needed to

10  stay a day or longer, that could be a five-day work week,

11  but more than half was in Canada.

12  Q     What salary was Mr. Gentry paid?

13  A     I know over the course of three years, close to

14  300,000.  And the reason I don't have the exact salary is

15  we were struggling for funding.  Sometimes he would have

16  to wait in order to be paid.  So approximately $300,000

17  over the course of three years.

18              And he also subsidized some of his hourly work

19  and basically sliced out a piece of the company for

20  himself.

21  Q     How did he go about doing that?

22  A     He did it with -- well, at the time when he was

23  working on organizing the loans for the lender, he gave

24  himself two and a half percent we later found out that he

25  felt he was entitled to.

D'Ambrosio - Direct/LaRusso

5193

1   Q    When you say "he gave himself two and a half percent"

2   of the business, what do you mean?

3   A    He shaved out two and a half percent of the company

4   while we were going through the funding process, because

5   at the time that was the first time any of the

6   shareholders or investors were diluted, when we got our

7   loan.  So he sliced out a piece of the company.

8           And he came to me and said Tommy was okay, and

9   he told Tommy that I said it was okay.  By the time we

10  uncovered it, neither of us said it was all right.

11  Q    Did he need to make any capital contribution for that

12  percentage?

13  A    No.

14          MR. LARUSSO:  Your Honor, I was going to go into

15  the Nerguzian loan.  Would this be an appropriate time?

16          THE COURT:  We'll take a lunch break.  We'll

17  reconvene at 2 o'clock.  Do not discuss the case.

18          (Whereupon, at this time the jury exits the

19  courtroom.)

20          THE COURT:  Everyone can be seated.  You may

21  take a break.

22          THE WITNESS:  Thank you.

23          THE COURT:  So, Mr. LaRusso, so we can avoid any

24  delays this afternoon, I was looking at the Government's

25  letter, and he has explained to me regarding this

**Proceedings**

5194

```
 1    recording how you are trying to get in the recording
 2    through this witness.
 3              What are you trying to do?
 4              MR. LARUSSO:  I'll give the Court as much
 5    background as I can.  I don't have it completely.
 6              This was a recording provided to us by the
 7    Government.  My understanding, they got it from Mr. Rizzi.
 8    It was a voice mail put on his telephone on June 28th of
 9    2010.  Mr. D'Ambrosio was present in the Eufora offices
10    when Mr. Constantine made the telephone call, so he knows
11    what message was being left on the phone.
12              THE COURT:  This is Mr. Constantine leaving a
13    voice mail on Mr. Rizzi's phone in his presence?
14              MR. LARUSSO:  Yes, that's what happened, your
15    Honor.  I went through this with him last night.
16              THE COURT:  What is the relevance?  What is on
17    the message?
18              MR. LARUSSO:  It's returning money to Mr. Rizzi.
19    He's one of the investors between Mr. Kaiser and
20    Mr. Privitello.  And there's a dispute, I guess,
21    aggressive dispute, regarding how the moneys that were
22    invested was treated by Mr. Constantine.
23              We're arguing the point in time they did not
24    want the money back, but they had other ulterior motive.
25    Also, Mr. Constantine's state of mind.  He wasn't looking
```

**Proceedings**

5195

1   to steal this money from the individuals.  He was looking

2   to give it back, and they didn't want it.

3           THE COURT:  This is prelitigation?

4           MR. LARUSSO:  Prelitigation, before the

5   shareholders meeting, before the Stolper letter when he

6   signs up all the hockey players.  This is June 28, 2010,

7   your Honor.

8           THE COURT:  What is the Government's position?

9           I read the Government's letter, but I did make

10  rulings with regards to the 2012 -- and discussions about

11  returning money in 2012 in the context of civil

12  litigation, but this seems to be much closer in time to

13  the time of the investment.

14          MS. KOMATIREDDY:  Your Honor, we would consider

15  this prelitigation based on our investigation.  Mr. Rizzi

16  at that point had threatened litigation against

17  Mr. Constantine.  So it's a self-serving statement that

18  occurs after that threat.

19          He alluded to both reporting Mr. Constantine to

20  the police and/or other measures for civil litigations.

21  This is approximately two or three months before the

22  complaint was officially filed, but it is already in the

23  works.  This is at a point after the money is stolen, six

24  months after, where the investors are looking for answers.

25  They are taking action.  And there is a statement made in

**Proceedings**

5196

1   the context of that very live dispute, and it is

2   self-serving hearsay.

3              THE COURT:  I'll overrule the objection.  I

4   think those are arguments that go to the weight as to

5   Mr. Constantine's state of mind.

6              But I think at that point in time it could be

7   much closer to the investment, that it has some probative

8   value with respect to his state of mind.

9              If the Government wants to point out during the

10  trial there may be other motivations, altruistic

11  motivations of Mr. Constantine's offer, the Government is

12  free to do that, but I don't think it should be precluded

13  on that ground.

14             Any other issues you expect with respect to his

15  testimony?

16             MR. LARUSSO:  I hope not, Judge.  I went through

17  it.  We don't even have that many more exhibits with him.

18  Mostly oral testimony.

19             THE COURT:  All right.  Have a good lunch.

20             MR. MISKIEWICZ:  Your Honor, there is actually

21  one thing.  We still have nothing from Mr. LaRusso

22  regarding any communications, contemporaneous or

23  otherwise, between Mr. D'Ambrosio and any of the material

24  that he's referring to.

25             THE COURT:  I'll be really unhappy if the

**Proceedings**

5197

```
 1    Government asks Mr. D'Ambrosio if he has texts or anything
 2    else --
 3                   MR. LARUSSO:  Judge, here's what is happening.
 4                   When we broke on Thursday, there were seven or
 5    eight things I had to do.  I asked that we look at all the
 6    e-mails that we have available and start printing them
 7    out.
 8                   Mr. Conway was able to look at and make a
 9    decision these should be turned over.
10                   I understand yesterday there should have been a
11    stack sent, at least -- I don't know how many.  But we're
12    still working on the project and still printing them out.
13    This is not an easy project --
14                   THE COURT:  Have you gotten anything from
15    Mr. Conway?
16                   MS. KOMATIREDDY:  Your Honor, we haven't
17    received Mr. D'Ambrosio's statements that pertain exactly
18    to what he's testifying.  He's testifying about the whole
19    history of Eufora, the ideas and this entire chronology.
20    We've got no statements related to Hawaii, no statements
21    to them having arguments about how Mr. Constantine is
22    spending his time and money.
23                   MR. LARUSSO:  If we have those we'll turn them
24    over, but we don't.  We were trying to comply with the
25    Court's time frame and --
```

## Proceedings

5198

1        THE COURT:  Whatever you have now, Mr. --

2        MR. LARUSSO:  In addition to what has already

3   been turned over, we have another stack.

4        THE COURT:  All right.  Thank you.

5        (Whereupon, a recess was taken.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5199

1          A F T E R N O O N   S E S S I O N

2

3          THE CLERK:  All rise.

4          THE COURT:  Please be seated.

5          MR. LARUSSO:  Your Honor, may I raise a possible

6    problem?  I guess I should have seen it last night.

7          But in going over my notes with the witness

8    again during the lunch period, one of the questions I'm

9    going to be asking him deals with the board of directors

10   firing Gaarn and Gentry.

11         He was on the board of directors and he signed

12   the authorization for their firing and the reasons that he

13   gives me are threefold; the two-and-a-half percent equity

14   that Gentry had given to himself, the secret negotiations

15   to buy the Nerguzian loan, and the third one I'm

16   rethinking and was going say they uncovered an illegal

17   fraud in regards to the Gaarn sale of his shares and then

18   the monies going into his own account.  That was the third

19   reason.

20         That's kind of like the ultimate issue the jury

21   will have to make a determination on.  I'm a little

22   concerned that as it comes out there may be an objection

23   and I don't think it's improper because it's why he led to

24   their firing, but I think it's highly prejudicial in

25   regards to -- so obviously I'm struggling with that

5200

1    reason, Judge.  It's what happened, it's what he told me.

2    He's been consistent in regards to it.

3         I'm kind of like thinking that if there's any

4    possibility of having some kind of a stipulation regarding

5    maybe an improper stock transaction, something that

6    doesn't take the issue away from the jury.

7         MR. HALEY:  Judge --

8         MR. LARUSSO:  That's my concern, Judge, at this

9    point.

10        MR. HALEY:  Yes, I would agree that this lay

11   witness is about to express his opinion within the context

12   of the reasons why he made a determination to fire certain

13   people, and then his opinion will be one of those reasons

14   was I perceived an improper, illegal stock transfer.

15        That's exactly what goes to an ultimate issue

16   for this jury to make a determination on.  Apart from

17   that, Judge, he expresses an opinion on that basis?

18        MR. LARUSSO:  It's not an opinion, Judge.  It's

19   why he took -- it's why he fired both Gaarn and Gentry.

20        THE COURT:  Let me ask, because the government

21   is going to cross him, is he going to be asked questions

22   about the Gaarn interest and what was transferred or not

23   transferred or not?

24        MR. MISKIEWICZ:  Initially we hadn't anticipated

25   that happening because all the discovery we had suggests

5201

1   that Mr. Gentry at least was not fired for any other

2   reasons that Mr. LaRusso is now articulating which, again,

3   brings us back to the lack of reverse discovery.

4          We've seen the transcript of the conference call

5   where Mr. Gentry was let go and what Mr. Constantine says

6   in that conference call with I think this witness present

7   is that he was released because they ran out of money.

8          So the fact that now we have this dual set of --

9   I have no idea where he's getting this from.  I don't know

10  when he's referring to the firing.  He's released in July

11  2009.

12         There's a conference call.  Mr. Constantine

13  makes very clear why he's being released, because they

14  don't have any money.  That's it.

15         So if there's a whole set of other explanations

16  and documentation, we haven't gotten it and we're really

17  now going to be at the point where we have no choice but

18  to ask for an opportunity to review all this material,

19  talk to other witnesses, find out whether or not any of

20  these documents are true.

21         MR. LARUSSO:  That's not true in this sense.

22  I'm not saying you misrepresented to the Court.  A little

23  more background on this may help the Court understand.

24         THE COURT:  I don't need background.  We've got

25  to keep the case moving.

5202

1        I have to say, Mr. LaRusso, believe me, I know

2   you have a lot going on.  I know you're making efforts to

3   comply with my order that you turn over relevant

4   documents.

5        But I would find it hard to believe that you and

6   your client just decided a few days ago that

7   Mr. D'Ambrosio was going to be one of your witnesses I

8   assume and he's someone probably for months, if not for

9   years, that you have known is an important witness for

10  your client.

11       So these documents you're turning over during

12  the lunch break, I understand it's hard to do that now

13  with all of the other things you have going on, but I

14  don't know why this wasn't done many, many weeks ago.  I

15  don't think this is a surprise in discovery as he's one of

16  the founding members of Eufora.

17       MR. MISKIEWICZ:  Your Honor, by the way, when I

18  say we haven't seen this, he did turn over a bunch of

19  material just before the break.  None of it has anything

20  to do with what Mr. LaRusso is now referring to about

21  these reasons.  If there is documentation, we still

22  haven't seen it.

23       MR. LARUSSO:  Your Honor, the reason why there's

24  no documentation here is you got -- and the government has

25  it.  There is a transfer.  There's a decision by the board

5203

1   of directors and lays out why they're fired.

2          And I asked the witness, why isn't it spelled

3   out, these reasons?  Because that's the public reason.

4   This is what we didn't want in the public record.  He's

5   been consistent in regards to that.  There are no

6   documents in regards to what he's saying, Judge.

7          THE COURT:  You don't care about the reasons

8   with respect to Mr. Gaarn.  You don't care about that.

9   You don't need to bring that out.  It's part of his

10  answer, is that why you're raising it with me?

11         MR. LARUSSSO:  It's important from our

12  perspective as to the uncovering of those transactions and

13  my client's non-involvement in them.

14         That's one of the things that we've been

15  scrupulously trying to elicit throughout the trial and

16  Gaarn himself said he knew of no involvement of

17  Mr. Constantine in the $700,000 transfers as far as I

18  know.

19         MR. HALEY:  Which, your Honor, ends the issue.

20  What do I mean by that?  This record is replete without

21  contradiction that as relates to the Gaarn stock

22  transfers, Tommy Constantine had no involvement in the

23  Gaarn stock transfers.  Mr. Gaarn testified that he didn't

24  have any involvement.  As a matter of fact, he said

25  repeatedly he did not based on a barrage of questions by

5204

1   Mr. LaRusso.  My client testified that Tommy Constantine

2   had no involvement in the Gaarn stock transfers as a

3   result again of my questioning and of a barrage of

4   questioning by Mr. LaRusso as well.

5        I might join in the chorus of the government.

6   We have not either received this level of discovery to be

7   able to address this issue.  If now this witness is going

8   to express an opinion that one of the reasons that they

9   discharged Gentry and Gaarn is because in their view there

10  was some improper or illegal transfers as relates to the

11  Gaarn transfers, that opens up a Pandora's box that

12  becomes a trial within a trial.

13       And again, Judge, I don't think that based upon

14  this record, it is entirely prejudicial, it is going to an

15  ultimate issue of fact, and it doesn't in any way in my

16  opinion address legitimately any aspect of the defense of

17  Tommy Constantine.

18       THE COURT:  I think the way to handle the

19  situation is I'll tell the witness that he can describe

20  the first two reasons for what he says is their decision

21  to terminate Mr. Gentry.  Obviously, the government can

22  cross if there was another reason related to money.

23       I'll tell him, to the extent one of the reasons

24  was that his view that it was an illegal transfer with

25  respect to Mr. Gaarn, any probative value of that which I

5205

1   think is extremely limited, would be substantially

2   outweighed by a danger of unfair prejudice to Mr. Kenner

3   having him opine on that.

4         If you want to ask him factual questions related

5   to Gaarn and the transfer independent of the reasons for

6   firing Mr. Gentry, you can obviously ask him were you

7   involved in any transfer to Mr. Gaarn.  If he says no,

8   that's fine.  Did Mr. Constantine ever tell you anything

9   regarding any transfers to Mr. Gaarn.  If you want to

10  establish factually your client had no involvement, that's

11  fine, but for him to conclude or to opine I conclude there

12  was an illegal transfer is prejudicial.

13         MR. LARUSSO:  He didn't opine.  He was told by

14  Mr. Constantine who examined the books and records exactly

15  what happened and then Mr. Semple the accountant came in

16  and verified it by his examination of the books and

17  records.

18         THE COURT:  Is that accountant going to testify?

19         MR. LARUSSO:  This is the one that took his

20  family to Coronado and indicated he will be flying in

21  tonight.  I've got my fingers crossed that he does.  Yes,

22  he is.  He's a forensic accountant.

23         MR. HALEY:  There also may also be, Judge,

24  questions asked of Mr. Semple that may result in his need,

25  quite frankly, this is not a threat, it's an observation,

5206

1    for him to consult independent counsel before he answers

2    some of those questions.  It goes directly to his

3    credibility and information I have in connection with the

4    manner in which they obtained a settlement with Northern

5    Trust, representations made by Northern Trust.

6            I alert the Court to that issue only because it

7    is an issue from my perspective.

8            MR. LARUSSO:  Judge --

9            MR. MISKIEWICZ:  Your Honor, also, if I may ask,

10   when does the firing occur, according to Mr. LaRusso's

11   information?

12           MR. LARUSSO:  There's a board of directors

13   decision that's made and it's a document I turned over to

14   you a while back.

15           MR. MISKIEWICZ:  When?

16           MR. LARUSSO:  I don't know the date.  It's on

17   the board of directors -- July 12, 2010.  It's Defendant's

18   Exhibit 271.

19           Judge, I apologize to the Court.  I know how

20   important it is to keep the jury busy.

21           This whole transaction that we're talking about

22   between Gaarn and Gentry at the time it was uncovered, it

23   was what the government alleged in the first indictment.

24           They alleged that the hockey players, some

25   hockey player bought shares back in 2002, 2003, and those

5207

1   shares, the monies that that hockey player supposedly was

2   buying was taken by Jowdy, given to Mr. Kenner through

3   LMJ, and then they tracked the history of those shares.

4           That's why if you remember on the tape there was

5   a reference to the hockey players applying their own

6   shares.

7           That was the government's theory in the first

8   case.  So this isn't coming as a surprise to the

9   government.  They know exactly what was going on back in

10  2010, that these shares that the hockey players are

11  alleged to have bought -- I'm sorry, Mr. Haley, I'm just

12  saying what the record is.  I'm sorry if I'm annoying you.

13  I don't mean to do that. It's a complete picture in terms

14  of this is not coming as a surprise.  That's my point,

15  Judge.

16          MR. HALEY:  I want the opportunity to call Tommy

17  Constantine to the stand.  I have a right to confront

18  these accusations being made by Tommy Constantine that at

19  least from what I'm hearing Mr. D'Ambrosio knows it

20  because this is what Tommy Constantine told him.

21          MR. MISKIEWICZ:  Also, your Honor, there is very

22  much again a deep question about the authenticity of any

23  of these notes which we do not have because there is a

24  recorded conference call in July 2009.  That's when C.R.

25  Gentry is essentially let go.  He continued to work as a

5208

1  consultant. He ceases to function as a CEO.

2  And it's very much a part of our case when --

3  and the only reason we offered a clip from the Privitello

4  Constantine conversation is because when Constantine says

5  when your money came in December 7, 2009, my CEO told me

6  we couldn't accept it. He's lying, because he is the CEO

7  as of July 2009.

8  So I'm troubled by a witness who is going to be

9  testifying about an event that does not comport with any

10  of our discovery we provided and certainly not with C.R.

11  Gentry who, by the way, who was the guy who was fired or

12  for that matter this recording and conference call where

13  the defendant is saying I'm taking over as CEO in July

14  2009. This is very bizarre. It's just bizarre.

15  Also, we object. I don't know about the

16  confrontation issue. I do object to Mr. D'Ambrosio

17  testifying about material that basically is spoon fed him

18  by the defendant. It's just essentially hearsay and we

19  submit it doesn't fall under any exception.

20  MR. LARUSSO: Mr. Miskiewicz has his view of the

21  evidence and he can question the witness if he wants with

22  regard to that.

23  In this particular case, Mr. Miskiewicz should

24  know that it was C.R. Gentry that sent an e-mail to

25  Mr. Kaiser and said; your shares are subject to approval

5209

1   by the board of directors, and it wasn't Mr. Constantine,

2   it wasn't Mr. D'Ambrosio.  That was C.R. Gentry who sent

3   the e-mail and the board of directors never approved it

4   and that's what the witness will testify to.

5            This allegation that there's some kind of

6   collusion here to manufacture testimony, I haven't seen

7   it.

8            I raised this issue, Judge, as an abundance of

9   caution because I know it's an ultimate issue in the case.

10  I felt it was relevant for him to explain why Gaarn and

11  Gentry were dismissed and technically it should get in.

12  It is highly prejudicial,  and I understand that, and my

13  question is in terms of dealing with it.

14           THE COURT:  Again, if he's going to testify

15  factually as to what Mr. Gaarn and/or Mr. Gentry did or

16  did not do, that's one thing, but him throwing out an

17  opinion like I concluded that there was illegal conduct

18  and, therefore, I fired him is an ultimate issue and we

19  don't care what he concluded.

20           So that's my concern is that he's going to sit

21  there and say I concluded it was an illegal transaction.

22  If he has facts that you want to bring to the Court's

23  attention through his interaction with Mr. Gentry through

24  documents that he saw, that's one thing.  We don't care

25  what his conclusion is.

5210

1    MR. LARUSSO:  I guess the point is I'm not

2   looking to have him give a conclusion as to the reasons

3   for the discharge.  It's somebody told him this and he

4   accepted it.

5    THE COURT:  Then you have to call again -- if

6   you're trying to establish that there was an improper

7   transaction because he was told it by another witness who

8   is going to testify tomorrow morning, is that who he was

9   told by?

10   MR. LARUSSO: No.  Mr. Constantine told him.

11   Mr. Semple doesn't come on later until after he looks an

12   at all of the book and records.

13   MR. HALEY:  Your Honor, with all due respect to

14   Mr. LaRusso, technically it's not admissible.  I don't

15   know what he means technically it's admissible.  I think

16   the record is crystal clear.

17   MR. LARUSSO:  The point, Judge, it's not being

18   offered for the truth.  It's being offered to explain why

19   what he did was to sign off on the board of directors

20   dismissal of both Gaarn and Gentry in July 2010.  That's

21   what that's there for, no other reason.

22    I bring it up because I wrestled with it before,

23   thought it was okay, and then I looked at it again and I

24   said, you know what, I should bring it up to the Court

25   because it deals with the ultimate issue in the case.

5211

1          MR. HALEY:  Your Honor, his state of mind is not

2    an issue here.  Mr. D'Ambrosio's state of mind is not an

3    issue here, such that there may be an exception to the

4    hearsay rule.

5          So to say that we're just trying to explain

6    things, I don't know.  I'm befuddled by that argument,

7    Judge.  I don't know how you then ever preclude someone

8    from testifying as to an ultimate issue of fact under such

9    circumstances when the answer is I'm just trying to

10   explain things.

11         THE COURT:  Whatever probative value this has,

12   and I view it as extremely limited, there's no probative

13   value as to his state of mind at the time.

14         To the extent there is an attenuated probative

15   value as to Mr. Constantine's state of mind for telling

16   this to him and, therefore, he concludes the same, I find

17   that the probative value is substantially outweighed by

18   the danger of unfair prejudice to the jury concluding that

19   it is being offered for the truth of the matter.

20         There is no need to do this because, as

21   Mr. Haley pointed out, there is no -- you can correct me

22   if I'm wrong, Mr. LaRusso, there is no allegation that

23   Mr. Constantine was involved with respect to the situation

24   with Mr. Gaarn, right?  There's no allegation.

25         MR. LARUSSO:  Right now, I look at the evidence

5212

1   and I agree with Mr. Haley 100 percent.  I don't know what

2   the Government's position is going to be so...

3               THE COURT:  In terms of Mr. Constantine you

4   mean?

5               MR. LARUSSO:  In regards to this transaction.

6               THE COURT:  In terms of Gaarn.  Is the

7   government going to argue to the jury that Mr. Constantine

8   was involved in Mr. Gaarn's transactions?

9               MR. MISKIEWICZ:  I think it's pled in the

10  indictment as to both of them were participating in those

11  diversions.

12              I agree with Mr. Haley that that's -- Mr. Gaarn

13  wasn't in a position to know and testified he didn't know

14  anything about the -- whether or not Constantine was

15  involved.

16              We intend to argue that this is part and parcel

17  of the conspiracy and given the way the money flows back

18  and forth this was essentially Mr. Constantine allowing

19  Mr. Kenner to cash out of Eufora and make some of the

20  money back that he shovels in the direction of

21  Mr. Constantine.

22              So that's our theory.  That's how it's pled in

23  the indictment.

24              MR. LARUSSO:  Judge, I think that's the concern

25  I have is that the government is going to make that

5213

1    argument without the evidence to put Mr. Constantine into

2    this illegal transaction that Mr. Gaarn and Mr. Gentry

3    were involved in.

4            They even have a chart, Judge, where they show

5    monies -- and I don't know the number of it -- but they

6    show monies going from Gaarn to Kenner to Mr. Constantine

7    and it's clear that the purpose of that chart is to

8    establish that Mr. Constantine is receiving proceeds from

9    these illegal transactions.

10           That will then dovetail into the argument that

11   Mr. Miskiewicz just made, that it's part of the conspiracy

12   and Mr. Constantine is as responsible for what happened

13   regarding the sales by Mr. Gaarn and the ultimate

14   distribution of the money.

15           I could deal with part of that on summation, but

16   my point is that all of this evidence that Mr. Constantine

17   uncovers these transactions, discloses it publicly.  Even

18   if it's not true, it certainly goes to what his state of

19   mind is.

20           Mr. D'Ambrosio says Mr. Constantine, I've known

21   him so long, told me that these transactions are done by

22   them.  Why would he publicly disclose transactions that he

23   had nothing to do with if in fact he had nothing to do

24   with them?

25           So intent at this point is probably the most

5214

1   critical part, and knowledge.  Knowledge, it goes hand and

2   hand.  Did he have knowledge of these transactions?  Was

3   he receiving money from these transactions knowing that

4   they were improper?  If he knew and publicly disclosed

5   that they were improper, wouldn't that negate a finding of

6   his involvement?

7           So this is why when I initially discussed this

8   with Mr. D'Ambrosio I said, this is good, it goes right to

9   the heart of the issue.

10          Mr. Haley, I really apologize if I'm disturbing

11  you.

12          MR. HALEY:  I apologize.

13          MR. LARUSSO:  I have an argument I have to make.

14  Please.  I apologize for the comment.  It's disturbing to

15  hear the pounding at the side of the table.

16          What I'm seeking to offer this, Judge, it's on

17  that point.  I'm trying to get the jurors to distance

18  themselves as far as I possibly can from the 700,000 with

19  relevant evidence.

20          And if you look at it in isolation, oh, sure,

21  it's highly prejudicial.  It goes to the ultimate issue,

22  but it also goes to whether my client had intention to

23  steal the money that went from Gaarn and Kenner to him.

24          I think it's a close question.  I brought it up

25  to the Court because of my concern for it and didn't want

5215

1    to have it come out in front of the jury and create a

2    problem possibly.  That was the reason I'm trying to offer

3    that testimony, Judge.

4           It sounds at first blush, my God, that's the

5    ultimate issue in the case.  Yet, from one side of the

6    view it's the ultimate issue in the case but on the other

7    side it's relevant to whether my client was involved

8    knowingly and intentionally.

9           MR. MISKIEWICZ:  Your Honor, if I could

10   supplement my objection.

11          If Mr. D'Ambrosio had firsthand knowledge that

12   there were transactions that were somehow impermissible

13   under their own operating agreement of some kind, I don't

14   think we would have an objection or there would be any

15   objection here.

16          He's not a witness who's qualified to say that

17   he had any of that information firsthand.  All he can

18   apparently say is this is what he was told by

19   Mr. Constantine and he's told that by Mr. Constantine at

20   the same moment that the Stolper lawsuit is beginning and

21   not too far from the moment in which he makes reference in

22   that Home Depot tape to the fact that he's aware of the

23   $700,000 that was stolen through Mr. Gaarn.

24          So that's about all I want to add to everything

25   else that we said and Mr. Haley said as to why this is

5216

1    improper.

2          MR. HALEY:  Your Honor, on the rarest occasion

3    in recent memory for me, I would join in the government's

4    argument in that respect.

5          I think your Honor was correct in your Honor's

6    determination previously that whatever relevance there may

7    be is far outweighed by the prejudicial impact.

8          I think your Honor is also correct.  It's one

9    thing if he's testifying to matters of fact based upon his

10   position that he held with Eufora in connection with

11   documents that he may have created or he may have

12   witnessed being created, things of that nature, but apart

13   from that, I think the record is replete with our basis

14   for our objection.

15         MR. LARUSSO:  You know, Judge, just one last

16   comment.

17         I'm listening to the argument here and I know

18   why I brought it up, because it was questionable in my

19   mind and I'm thinking of a possible way of avoiding any

20   prejudice to Mr. Haley's client or in any way prejudicing

21   the government's case.

22         Would the Court permit me to maybe ask him at

23   the time what led to the board's decision and say is it in

24   part the fact that he carved out two-and-a-half percent

25   interest for himself?  And this is the second part, that

5217

1    there was some effort to secretly buy the Neptune loan,

2    and leave the third one out.

3         You know why?  I was thinking, Judge, and

4    granted, Mr. Haley, I guess it triggered in my memory that

5    tape of the Home Depot actually discloses for

6    Mr. Constantine's standpoint what the accusation is if I'm

7    not mistaken.  I can use that, Judge, as a basis to argue

8    it.

9         THE COURT:  That's fine.  That was my suggestion

10   at the beginning.  I think your client's involvement or

11   non-involvement with respect to Mr. Gaarn is already out

12   there in the case and it is not necessary to bring that

13   through this witness.

14        You can argue based upon eight weeks of evidence

15   what evidence the government does or does not have with

16   respect to your client's involvement in Gaarn, including

17   the Home Depot tape.  Lead him through that.

18        MR. LARUSSO:  I will go out and explain it to

19   him.  I'll give him the two reasons, he will say yes, and

20   we will move on.  Would the court give me an opportunity

21   to do that?

22        THE COURT:  Yes.

23        (Pause in proceedings.)

24        (The witness resumes the stand.)

25        THE COURT:  Let's bring in the jury.

D'Ambrosio  -  Direct/LaRusso

5218

1      MR. LARUSSO:  Your Honor, for the record, I have

2  instructed him.  I will try and lead him through that

3  area.

4      THE COURT:  Good.  Let's bring in the jury.

5      THE CLERK:  All rise.

6      (The jury is present.)

7      THE COURT:  Please be seated.  I apologize for

8  the delay.  We are ready to continue now.

9      Go ahead, Mr. LaRusso.

10     MR. LARUSSO:  Thank you very much, your Honor.

11

12  BY MR. LARUSSO:

13  Q.   Mr. D'Ambrosio, I believe we left off raising the

14  Nerguzian or Neptune loan to Eufora.  I would like to

15  spend some time on that.

16      When do you recall the loan actually being

17  obtained from Mr. Nerguzian's company, Neptune?

18  A.   In 2009.  I don't know the specific date.

19      We had some -- or CR was negotiating the loan

20  and there was a time where Brent requested more and more

21  legal documents and more money spent with the attorneys.

22      And I know that we did receive some advance and

23  some bridge loans on that, on the loan.  I'm not sure of

24  the exact date that the loan was signed.

25  Q.   What do you mean by advance or bridge loan?

D'Ambrosio  -  Direct/LaRusso

5219

1    A.    Because we were hoping to close on his loan a lot

2    sooner than I guess he anticipated or we anticipated.

3            He kept on putting the loan provisions in there

4    and more and more to his favor and I learned this

5    afterwards.

6            And in the meantime we were out of money and in

7    order for us to be able to make payroll, CR would

8    negotiate with Brent to keep on getting advances every

9    time that we needed payroll, but the contract was not

10   signed.

11   Q.    So advances were used by Mr. Nerguzian to obtain

12   favorable terms of the loan; is that what you're saying?

13   A.    I learned that afterwards, yes.

14   Q.    There came a time that the loan was actually

15   executed; is that correct?

16   A.    Yes.

17   Q.    And you signed that loan?

18   A.    Yes.

19   Q.    Did you review all of the provisions of the loan?

20   A.    It was 200 pages long.

21   Q.    Who prepared it?

22   A.    We had some legal advice and mostly Brent Nerguzian's

23   law firm.

24   Q.    How much did it cost to prepare these legal documents

25   for the loan?

D'Ambrosio - Direct/LaRusso

5220

1    A.    He made sure we covered the cost and it was

2    approximately $200,000 for the loan docs.

3    Q.    At the time that you signed the loan documents, did

4    you read all of the pages?

5    A.    I was going off a number of things.  We didn't have

6    any other choices at that point and going off of an legal

7    opinion that we had.

8    Q.    What did you know of the provisions at the time you

9    signed it?

10   A.    I know that it was, you know, if everything kept

11   going as planned, that this loan was a convertible note

12   and was going to transfer into interest in the company and

13   I think the total amount was 3.6 million was the total

14   amount of the loan.

15   Q.    And were any assets pledged in regards to the loan

16   that you knew of at that time?

17   A.    Yes.

18         Brent required us to pledge the patents as

19   collateral.

20   Q.    Had the patents been pledged prior to this time?

21   A.    No.

22   Q.    We heard a lot of testimony about patents from you

23   and during this trial.

24         I'm going to show you what's marked for

25   identification as C 273, 274, 275, 276, 277, 304, 305,

D'Ambrosio  -  Direct/LaRusso

5221

1    272.   I apologize for the order.

2           Have you seen these before?

3    A.   Yes.

4           There's one I might not have seen because it was

5    recently issued within the last year or so.

6    Q.   Take a look quickly and make sure you're able to

7    testify that, one, you examined them before appearing

8    today and then I'll ask you what they are.

9    A.   We have five methods of establishing credit and the

10   payment card referral program, credit card referral

11   method, and payment card sweepstakes, so eight in total.

12   Q.   You kind of broken the patents down into three

13   categories.

14          Could you explain to us please what the patents

15   were and their importance to the business of Eufora?

16   A.   So the main patent which was filed -- I think the

17   first patent was filed in 2003, was a method for

18   establishing credit and a third-party loan that gets

19   loaded to a prepaid card.

20          I can go into detail.

21   Q.   Explain the importance of the patents to the business

22   of Eufora?

23   A.   Well, after we launched the company, Tommy was

24   successful in receiving about $3 million worth of

25   advertising media from a previous racing sponsorship and

5222

1   we were -- we had $3 million worth of advertising on the

2   AOL network.

3           And because we had a credit card -- at that time

4   it was initially a credit card referral system.

5           Because we signed with a bank that would issue

6   cards to individuals with great credit, we had to come up

7   with an alternative way for people to stay in the program

8   and have some sort of a card but that didn't have credit.

9           So the bank we were doing business with

10  introduced us to a new division of Mastercard that was

11  called prepaid card and this was six years before anybody

12  heard the term prepaid.

13          So as we conducted business, what we learned was

14  the majority of our applications -- and we had more than a

15  million applications within the first 24 months.  But with

16  the first couple 100,000 we realized that people who go to

17  the internet are looking for an extension of credit

18  because they traditionally have bad credit.

19          Individuals who have good credit get

20  solicitations in the mail.  So we were selling forks in a

21  world of spoons.

22          So we offered a prepaid card and a lot of

23  individuals didn't want the prepaid card so we had people

24  in the office calling them saying up, what's the reason

25  why you were denied this card?  And they said, well, it's

D'Ambrosio - Direct/LaRusso

5223

1    different than a credit card.  And we explained the

2    benefits of having a prepaid card as opposed to a secured

3    card at that time.

4          What a secured card is basically paying interest

5    on your own money.  But the best part of a secured card is

6    it reports to the credit bureaus and that's why people do

7    it.

8          So what we did was we realized that nobody

9    wanted prepaid because it didn't report to the credit

10   bureaus and if they could never segway to a prepaid card

11   to a regular credit card, there was no reason to have

12   prepaid.

13         So after learning that from our customers, Tommy

14   called and I don't know how he ended up at the credit

15   bureaus or TransUnion was the first one.  I don't know if

16   it was from a previous racing relationship or not, but we

17   got TransUnion to listen to what we had.

18         We did a data study that we shared some data, no

19   personal information, and after the study -- and the

20   reason why TransUnion was willing to do the study is they

21   wanted to be able to profile 60 million Americans that

22   don't have credit so they can't sell their information.

23         So this would potentially be a way for them to

24   have another source of revenue.  They participated in a

25   data study.

D'Ambrosio  -  Direct/LaRusso

5224

1      And what we learned was there was no spending

2   habit that could be model after.  One could load $100 and

3   not spend it for a year, or somebody could load $25 and

4   spend it the next day.

5      And there was also a different behavior that a

6   customer has when it's borrowed money as opposed to your

7   own money.

8      When you have an extension of credit, my

9   personal opinion is you feel like it's easier to spend

10  somebody else's money than it is your own money.

11     So it was that and the number two thing was

12  there was actually no extension of credit and there was no

13  monthly financial obligation.  So there wasn't a monthly

14  due of whatever that would report to the credit bureaus

15  monthly either positive or negatively.

16     So we went back to the drawing board and at the

17  time we charged $99 a year for our card because we don't

18  charge interest.  That's all the money that we made.

19     So what we came up with, as opposed to charging

20  them $100 upfront, what we did is we financed them the

21  $100 and we put it together and put a 24 month program

22  together.  We called it credit builder.  It had -- so if

23  you're putting forth a payment, it was a $240 loan, it was

24  $100 for the prepaid card plus the credit fee which was

25  $20.

D'Ambrosio  -  Direct/LaRusso

5225

1      And as soon as customers received our loan it

2  acted like an installment loan as opposed to a revolving

3  line of credit and that was something that worked really

4  well for us and that's when Tommy started working on

5  protecting this business method.

6  Q.   The business method ultimately was patented; is that

7  correct?

8  A.   Yes.

9      So there's five patents and the original one was

10  filed in 2003 and it covers a wide range of any type of

11  third-party loans, whether it's cash advance, an advance

12  on a tax return that gets loaded onto a prepaid card that

13  basically is an infringement of one of the five patents.

14  Q.   Who was primarily responsible for the preparation of

15  these patents and the filing and retaining of them?

16  A.   I had very little to do with this besides the initial

17  idea.  It was mostly Tommy.

18  Q.   After the credit builder was patented, what about the

19  other patents that you say Eufora obtained?

20  A.   Well, before I switch over to the other patents,

21  there's continuation patents which the last one has was

22  recently filed in 2014.

23      And what it a continuation patent is we

24  protected a certain business method and we can go back and

25  say this was the main method of what we were protecting

D'Ambrosio  -  Direct/LaRusso

5226

1  and we didn't have all of the details and didn't give you

2  all of the details, but this is part of the main process.

3  As long as it's not way outside the scope, they'll allow

4  you to protect additional claims on the original claim.

5  Q.  What were those additional aspects to the credit

6  builder?

7  A.  Tommy would need to answer those.  He was the one who

8  worked on them all.

9  Q.  And the other patents you were talking about?

10  A.  So the payment card referral program, that was the

11  initial idea where individuals would get paid for everyone

12  that they would wither send an e-mail or have someone fill

13  out an application that they directly solicited to get a

14  card.

15  Q.  And the last one?

16  A.  There's two there.  I'm not sure exactly what the

17  second piece covers, and then the last one is the

18  sweepstake program.

19  Q.  Could you explain that to us?

20  A.  So after we signed our deal with our first bank, they

21  loved the concept, but they said we don't want a whole

22  bunch of people getting credit cards because they can make

23  money and never use the cards.  They don't use the cards,

24  they don't make money.

25          So they said you need to come up with a way to

D'Ambrosio  -  Direct/LaRusso

5227

1    incentify customers to spend, and that's what frequent

2    miles are and points and why you see most cards that do

3    have reward programs to incentify.

4    Q.    How do the sweepstakes work?

5    A.    After they told us this, Tommy called me and told me

6    this is -- we needed to come up with something and he was

7    at the airport and as we were working on the project we

8    learned that one of the most successful company branded

9    cards was the GM card.

10           And what the GM card was a certain amount of

11   your spending, a certain percentage would allow you to get

12   credit towards a new GM vehicle.

13           I think at the peak I think they had a million

14   cardholders within the first 60 days or so, six months or

15   so, and then 12 million at the peak of the program.

16           So what we learned was, and us being car guys,

17   Americans love cars.  So what we came up with was a

18   sweepstakes program where you got an entry for every

19   dollar or certain denomination of what you spent on the

20   card as a sweepstakes entry.

21           And so if you were to spend $300 on the card,

22   you would get three entries.  And so for close to -- it's

23   probably more than a year, maybe three years, we were

24   actually giving away a $30,000 car each and every month to

25   one of our cardholders.

D'Ambrosio - Direct/LaRusso

5228

1  Q.  How important to Eufora was the sweepstake plan?

2  A.  Me, including Tommy, even others thought this was

3  amazing, getting a certain percentage back.

4           In order for anyone to realize any real benefits

5  from spending on a credit card, you literally have to

6  spend tens of thousands of dollars a year and for this,

7  this is something that literally is a life changing event

8  for someone to receive.

9           We recorded these calls and were basically

10  telling people you won a Mercedes.  They didn't believe

11  us.  We had one lady who didn't want to tell anybody until

12  she actually came to our office, got in the car and drove

13  away.

14           We felt this was very powerful especially since,

15  and maybe you guys are familiar with this, but Oprah,

16  years ago, gave everyone in her audience a Pontiac G6 and

17  we still talk about it today because again this is

18  something that the average individual probably couldn't

19  afford a brand-new $30,000 car with no debt.

20  Q.  Let me jump ahead if I could at this point.

21           Do you know what the value of these patents

22  alone are today?

23  A.  I was going to go backwards.  That's a great

24  question.

25           Both Visa and Mastercard are -- have and are

D'Ambrosio  -  Direct/LaRusso

5229

1    infringing on this patent.

2          It has a sweepstakes program where they give

3    away a certain vehicle depending on the spend.

4          And that one in particular was we had patents

5    before Visa or Mastercard was even offering programs like

6    this.

7          As relates to all of the patents, I would say

8    the sweepstakes and the credit building patents are

9    probably the most valuable.

10         And the reason is this gives the consumer the

11   ability to build credit with having no credit, not to

12   mention there's a lot of additional benefits that we

13   included in the card that no other prepaid card had

14   because we were creating the program and we wanted the

15   same look and feel for our members that had a credit card

16   and we kind of stumbled on this by accident.

17         It was kind of because we needed to create this

18   out of necessity to fill a void.  Our prepaid cardholders

19   had the same benefits as a credit cardholder; so travel

20   insurance, accidental death, all the same benefits that

21   you would get with a credit card on our prepaid card and

22   still to this day there's no prepaid card.

23   Q.   Are you in sales or marketing?

24   A.   Marketing.

25   Q.   Sorry.

D'Ambrosio  -  Direct/LaRusso

5230

1    I asked a few minutes ago about the value of

2    these patents today.

3        Are you able to put a value on them?  And if so,

4    how?

5    A.   Well in 2009, once we actually received the patent,

6    and the reason why I bring up 2009 is because prior to

7    this nobody believed that we could actually get a patent

8    on this and banks that we talked to almost didn't believe

9    we were reporting to the credit bureaus.

10       So as soon as we had this document was now we

11   could enforce it and go for licensing and try to secure a

12   bank to issue our own card.

13       But when you have a patent like this, the most

14   prosperous kind of event is licensing.  No reason to

15   re-create the wheel.  You license it to a bank and you get

16   a royalty and collect a check.  We were in talks with the

17   top three prepaid card issuers.

18   Q.   Who were they?

19   A.   Netspend was one of them.  We also were in talks with

20   Tysts and then Purpose Money which was Compucredit was

21   another one we spoke to, First Premiere, and I know I'm

22   missing one.

23   Q.   Metabank?

24   A.   Metabank, that was the bank that issued a lot of

25   different programs.

D'Ambrosio  -  Direct/LaRusso

5231

1         But, yes, Metabank directly.  They had a product

2    that was infringing on our patent.

3    Q.   You mentioned twice now there are companies, large

4    companies, infringing on your patents.

5         Have you or anyone sought any action against

6    these individuals.

7    A.   For example I can give two examples of companies that

8    are currently infringing.

9         MS. KOMATIREDDY:  Objection, your Honor,

10   relevance.

11        THE COURT:  Sustained.  This is way beyond the

12   scope.

13        MR. LARUSSO:  If I may, Judge, I'll go back to

14   the question regarding value.

15   Q.   Would you tell us what the value of the patents are?

16   A.   Well, when we were negotiating the licensing deals

17   we, depending on the bank, we would get anywhere from one

18   to three dollars per customer per month and these banks

19   have in the millions of customers.

20        So in my personal opinion if we were to get one

21   of these five deals, this is a 15 to $20 million a year

22   company with very little overhead maintaining the business

23   because there's really not much business when you're doing

24   the licensing piece.

25        These type of companies that have patents that

D'Ambrosio  -  Direct/LaRusso

5232

1   have protection for a certain amount of years usually take

2   at least that many years times your annual run rate and

3   sell for 10 times the earnings.

4   Q.   You testified that the company borrowed money from

5   Neptune in 2009, and you were familiar with some of the

6   provisions but not all of the provision.

7        There came a time when you learned those other

8   provision; is that correct?

9   A.   Yes.

10  Q.   In addition, did there come a time I think you

11  testified that Mr. Constantine was on the racing circuit;

12  is that correct?

13  A.   Yes.

14  Q.   Was he on the racing circuit during the time that the

15  Nerguzian loan was being negotiated?

16  A.   Yes, CR was.

17  Q.   Did there come a time that Mr. Constantine returned

18  to Eufora?

19  A.   Yes.

20  Q.   Approximately when if you recall?

21  A.   I know exactly where I was at when I got the phone

22  call.  I don't remember the exact date.

23  Q.   Approximately how long after the Nerguzian loan was

24  actually -- if you can?

25  A.   A couple months.

D'Ambrosio - Direct/LaRusso

5233

1   Q.   What was the condition of the company at the time he

2   returned?

3   A.   Well, we found out that CR unfortunately and I

4   wouldn't even know if I would call it negotiating because

5   the bad terms were bad.  There was a $500,000 fee that

6   Brent introduced and a 40 percent rev share clause that he

7   put in the loan which means that any deal that we do for

8   the life of the company, he would get 40 percent revenue

9   even if the loan was paid off.

10  Q.   Could you explain that in terms --

11  A.   For example, if we were to get $10 million a year in

12  licensing, he would retain or get four million of the 10

13  million, so he would get 40 percent of any deal.

14  Q.   If a deal was consummated during the life of the

15  loan, Mr. Nerguzian would benefit from that for the rest

16  of the term of that deal even if the loan had been paid

17  off?

18  A.   Term of -- not the deal, the company in perpetuity.

19  Q.   That's an owner's provision; is that correct?

20  A.   Yes.

21  Q.   Did there come a point in time when Mr. Gentry was

22  asked to leave Eufora?

23  A.   Yes.

24  Q.   At the time that he was asked to leave, was he put on

25  a paid leave of absence?

D'Ambrosio  -  Direct/LaRusso

5234

1    A.    We removed him as president and CEO.

2    Q.    Don't tell us the reason.  Just explain what happened

3    at this point?

4    A.    Yeah.

5          He was -- yes, he was removed and I just don't

6    know.  I'm pretty sure he was not getting paid.

7    Q.    Did there come a time after he had been removed from

8    his position and asked to leave the company, that he was

9    also removed from the board of directors?

10   A.    Yes.

11   Q.    Were you a member of the board of directors of

12   Eufora?

13   A.    Yes.

14         MR. LARUSSO:  With the Court's permission.

15   BY MR. LARUSSO:

16   Q.    At the time the decision was made to remove

17   Mr. Gentry, Mr. Gaarn was also removed; is that correct?

18   A.    Yes.

19   Q.    Would it be fair to say that amongst the reasons for

20   their discharge from the board of directors and from the

21   company of Eufora was that, one, Mr. Gentry had carved out

22   a two-and-a-half percent equity interest for himself?

23   A.    That was one of the reasons, yes.

24   Q.    Was another reason that you had come to learn in 2010

25   that he and Gentry were part -- he and Gaarn were part of

D'Ambrosio  -  Direct/LaRusso

5235

1    a group secretly trying to buy the Neptune loan?

2    A.    Yes.

3    Q.    There are other reasons?  Just yes or no?

4    A.    Yes.

5    Q.    By the way, did the board take written action in

6    regards to the discharge of both Gaarn and Gentry?

7    A.    I believe so, yes.

8    Q.    Were all the reasons that we re-numerated included

9    within the written decision of the board of directors as

10   far as you know?

11   A.    I'm sorry, one more time?

12   Q.    I'll withdraw that.

13         I'm going to show you what's been marked 271.

14         Do you recognize that?

15   A.    I think this is the removal of both CR and Tim Gaarn.

16   Q.    Do you recognize that as the decision of the board of

17   directors?

18   A.    Yes.

19   Q.    Is your signature on there?

20   A.    Yes.

21   Q.    Do you see other signatures on there?

22   A.    Yes.

23         Mia Aroso, VP of operations and board member,

24   Tommy Constantine and Daniel Kennedy.

25   Q.    Do all four signatures appear on that document?

D'Ambrosio  -  Direct/LaRusso

5236

1    A.    Yes.

2          MR. LARUSSO:  Your Honor, may I ask that C 271

3    be received?

4          MR. HALEY:  May I see the document?

5          MS. KOMATIREDDY:  Your Honor, I would ask if we

6    could reserve and address this at the break?

7          MR. HALEY:  I would make the same application.

8          THE COURT:  We will discuss this at the break.

9    BY MR. LARUSSO:

10   Q.    The decision by the board was July 12, 2010?

11   A.    That's the date on the document.

12   Q.    Does that correspond with your recollection?

13   A.    Yes.

14   Q.    Did there come a time, prior to that decision, that

15   you learned about an effort to takeover Eufora?

16   A.    Prior to that decision, yes.

17   Q.    Tell me what you learned?

18   A.    Well, we had two of the investors that we spoke to

19   regularly and it was mostly Tommy's relationships.

20         And once CR -- once we uncovered the numerous

21   reasons why CR and Tim were removed, my personal belief is

22   that CR was very upset about that and he was no longer

23   getting paid from us, so he basically accused us of trying

24   to strip the investors of their equity, so he decided to

25   tell the group of investors that our -- the hockey

5237

1  players, the majority of the hockey players, Tim and CR,

2  to try and buy the loan from our lender and foreclose on

3  the assets and basically try to strip us of our equity.

4  Q.   How would they -- that group buying the loan and

5  moving for foreclosure strip you from your control?

6  A.   Because CR had a relationship with Brent and the loan

7  was in default and the loan was in default mostly because

8  of Brent and CR.

9       CR would -- knew what the outstanding balance

10  was and we were in default, so Brent had the right to sell

11  the loan if he wanted to or foreclose on the assets.

12       And so with the group they devised a plan to try

13  to buy the loan, foreclose on the assets, and then strip

14  us of our equity.

15  Q.   Would it be fair to say that the assets were the

16  patents?

17  A.   Yes.

18  Q.   By the way, did you learn whether or not they were

19  successful in buying the loan from Mr. Nerguzian?

20  A.   Yes, they were not successful.

21  Q.   Do you recall participating or being involved in a

22  conversation between Mr. Nerguzian and Mr. Constantine

23  regarding the activities of that group to buy the loan

24  from him?

25  A.   Yes.

D'Ambrosio  -  Direct/LaRusso

5238

1  Q.    Where did that take place?

2  A.    Tommy's office.

3  Q.    Could you tell us what you heard at that time?

4  A.    Well, once Tommy figured out that Brent was actually

5  participating in this, which he was a board member so I

6  don't know why he would be talking to other members that

7  were just removed from the board, entertaining any type of

8  purchase, Tommy basically was screaming at him.

9  Q.    Were you present at this?

10 A.    Yes.

11 Q.    Tell us what happened?

12 A.    And so Tommy was just screaming at him and couldn't

13 believe that him being his friend would take a phone call

14 from these guys.

15        And basically Brent didn't say a word and Tommy

16 said, don't worry, we're going to get your loan paid off.

17        And Brent kind of -- he just kind of listened.

18 And my personal opinion, I don't think that he had much of

19 an argument because he got his hand caught in the cookie

20 jar.

21 Q.    What was the relationship between Mr. Nerguzian and

22 Mr. Constantine at that time?

23 A.    Well, up until that time they were great friends.

24 Tommy's the godfather of three of his children.  Up until

25 that point, from what I know, they had a great

D'Ambrosio  -  Direct/LaRusso

5239

1   relationship.

2   Q.   By the way, after this group was unsuccessful in

3   buying the loan, did they take any other action against

4   you and/or the company?

5   A.   Yes.

6        They sued me personally and Tommy and Mia Aroso

7   and Brent and accused us of buying the loan without their

8   participation.

9   Q.   And would those allegations also include the fact you

10  were trying to strip away the investor's interest in

11  Eufora?

12  A.   Yes.

13  Q.   Do you know when that lawsuit was filed against you

14  and Mr. Constantine and Mia Androzo?

15  A.   That had to be 2010 after the conference call that we

16  had with all of the investors.

17  Q.   Is that call the shareholders meetings?

18  A.   Yes.

19  Q.   In regards to the suit, if I can jump ahead

20  factually, you and others were successful in buying the

21  loan to Mr. Nerguzian; is that correct?

22  A.   Yes, with everybody's knowledge.

23  Q.   But the suit also included Mr. Nerguzian has a

24  defendant; is that correct?

25  A.   Yes.

D'Ambrosio  -  Direct/LaRusso

5240

1  Q.   Let me show you what's been marked for identification

2  as C 90.

3        I'm trying to see if this refreshes your

4  recollection as to the time period when the suit was

5  actual filed against you.

6  A.   Yes, this is the correct date.

7  Q.   Does it help refresh your recollection of the

8  approximate time the suit was filed?

9  A.   Yes.

10  Q.   When was that?

11  A.   October 5, 2010.

12  Q.   Does this suit in part allege the same conspiracy, to

13  take away the investor's interest by buying the loan from

14  Mr. Nerguzian?

15  A.   I guess that's what they suggested, even though I

16  told them from day one that wasn't the case.

17  Q.   Now, a few moments ago I asked you a question about

18  whether the loan from Mr. Nerguzian was purchased prior to

19  the filing of the suit.

20        That did occur; is that correct?

21  A.   Yes, that's correct.

22  Q.   What I would like you to do is explain to the jury

23  what you know regarding the purchase of the loan and who

24  was involved?

25  A.   So we created a reorganization plan that included

D'Ambrosio  -  Direct/LaRusso

5241

1    raising money to buyout the loan.  I'm sorry, purchase the

2    loan, not buy the loan.

3    Q.   Is there a difference?

4    A.   Yeah.  If we were just to payoff the loan, we would

5    still have the 40 percent cost.  So we started another

6    entity that was just going to buy the loan and then convey

7    that to the new entity.

8             And prior to this learning about other

9    activities, we reached out during the shareholders meeting

10   to all of the investors and wanted to wrap everybody into

11   the new company and have all of the investors own their

12   shares directly.

13   Q.   Let me back up.

14            You talked about the difference between buying a

15   loan or paying off a loan?

16   A.   If we were to pay off the loan.

17   Q.   And you used the word 40 or the number 40.

18            Would you explain what you were referring to

19   that at that point?

20   A.   If we just paid off the loan, we would still have

21   that 40 percent rev share in perpetuity for the life of

22   the company.

23            If we purchased the loan as opposed to payoff,

24   then the new entity, all those provision go away and the

25   new group of investors would convey that to the company.

D'Ambrosio  -  Direct/LaRusso

5242

1    Q.   I'm going to show you two documents marked for

2    identification as C 161 and 162.

3         Do you recognize these two documents?

4    A.   Yep.

5         This is the purchase agreement and the loan

6    conversion agreement.

7    Q.   Which one is which, identify it by number, please?

8    A.   The purchase agreement is C 161, and the loan

9    conversion is C 162.

10   Q.   What are these two agreements?

11   A.   This was the purchase agreement in order to buy the

12   loan, and then the loan conversion which would basically

13   convey the loan just as is if it were to be cash into the

14   new company, and these were both done at the exact same

15   time.

16        If you sign one and not the other, eventually

17   the party could, you know, run off with the loan and not

18   actually -- I'm sorry, run off with the assets and not

19   convert it.

20   Q.   Who are the signatures on these documents?

21   A.   C 162 --

22   Q.   That's the loan conversion agreement?

23   A.   Yes.  Dominick Volpe, myself, Mark D'Ambrosio, and

24   Tommy Constantine.

25   Q.   And the purchase agreement?

D'Ambrosio  -  Direct/LaRusso

5243

1    A.    Which is C 161.

2    Q.    Thank you.

3    A.    Mark D'Ambrosio for Eufora Capital II, myself for

4    Eufora and Tommy Constantine, and then we have also Brent

5    Nerguzian for Neptune, and also Brent Nerguzian for

6    Neptune Company Management, and then Dominick Volpe for

7    Eufora Capital III.

8          MR. LARUSSO:  Your Honor, may I ask that C 161

9    and 162 be received at this time?

10         MS. KOMATIREDDY:  Objection.

11         MR. HALEY:  Your Honor, I object.

12         THE COURT:  Approach.

13         (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

D'Ambrosio  -  Direct/LaRusso

5244

1          (The following takes place at sidebar.)

2          MR. HALEY:  Your Honor, I don't believe a proper

3   foundation has been laid but that's not my objection.  I

4   object to relevance and materiality.

5          I'm just not -- maybe it's me.  I'm missing the

6   point as we move into the issues in connection with

7   legitimacy of the civil lawsuits between the two of them.

8   I don't see it as --

9          MR. LARUSSO:  If I may, very briefly, there's

10  been an allegation that they stripped away the investors'

11  interest by these transaction.  It never happened.

12         THE COURT:  I have been here for the trial.  I

13  don't need a recap.

14         I think the authentication ground has been laid.

15  He signed it.  But I don't know how much more you have.

16  The level of detail is way too much.  We spent 20 minutes

17  on credit cards.  Way too much.

18         MR. LARUSSO:  I agree with the Court.  I didn't

19  anticipate that, Judge.

20         THE COURT:  You have to cut him off.  You have

21  to be more focused, okay?

22         MR. LARUSSO:  Maybe what I can see is if I see

23  an area where I can lead him. I'll do the best I can.

24         THE COURT:  Even though I'm allowing it in, I

25  agree with Mr. Haley.  These are side issues in the case.

D'Ambrosio  -  Direct/LaRusso

5245

1    I understand you want to rebut some of the things some of

2    the witnesses said, but they are side issues.  Keep that

3    in mind.

4                 (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5246

1        (The following takes place in open court.)

2        THE COURT: 161 and 162 are admitted.

3        (Defendant's Exhibits 161 and 162 in evidence.)

4        (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D'Ambrosio - Direct/LaRusso

5247

1  Q    Mr. D'Ambrosio, as briefly as you can, tell us why

2  these two agreements were signed on the same day, June 22,

3  2010?

4  A    They were required to be signed on the same day, like

5  I mentioned.  If one was signed and the other wasn't, then

6  potentially the purchaser would be able to have the assets

7  and not prejudice them to the company.

8  Q    So the purchase agreement give the assets to the

9  people who purchased the loan; is that correct?

10 A    Yes.

11 Q    And what does the conversion agreement do?

12 A    That basically converts the patent, if you will, at

13 that time, into the new entity, which is G4 Delaware.

14 Q    Does that include all the prior Eufora investors

15 including the hockey players?

16 A    At that time Eufora Capital 3 purchased the loan was

17 going into Eufora Delaware, which is the board

18 shareholders meeting, which we told everybody we wanted

19 them to participate in and they chose not to.

20          So Eufora Delaware has now conveyed the patents

21 to Eufora which, yes, everybody holds the shares of

22 Eufora.

23 Q    And then Eufora Capital becomes an investor like all

24 the other individuals; is that correct?

25 A    Yes.  And their investments is the patents and paying

5248

1    for the payments.

2    Q    Showing you what has been marked as C-279.

3         Do you recognize this chart?

4    A    Yes.

5    Q    What does this chart reflect?

6    A    Eufora Capital 3, which is the purchaser of the loan,

7    the intended parties and actual individuals that

8    participated into Eufora Delaware, and Eufora Delaware

9    into Eufora, and also all the NHL players' investment

10   being held in AZ Eufora Partners.

11   Q    Does this chart, as of the purchase agreement and the

12   conversion agreement, reflect the interest of the

13   investors in Eufora at that time?

14   A    Yes.

15        MR. LARUSSO:  Your Honor, may I ask that C-279

16   be received at this time?

17        MS. KOMATIREDDY:  What time frame?

18        THE COURT:  What time frame?

19        MR. LARUSSO:  June 22, 2010.

20        MS. KOMATIREDDY:  I have no objection.

21        MR. HALEY:  Judge, may I just have a brief voir

22   dire?

23        THE COURT:  Yes.

24   VI OR DIRE EXAMINATION

25   BY MR. HALEY:

D'Ambrosio - Direct/LaRusso

5249

1    Q    In chart that has been presented as C-279, as

2    reflects the ownership interests in various -- ownership

3    in Eufora, this is your review of the books and records in

4    order that you might testify of your own personal

5    knowledge as to the accuracy of the document?

6    A    I don't know about --

7    Q    Withdrawn.  Let me ask you this.

8         Who created this document?

9    A    I didn't create this document.

10   Q    Who did create the document, to your knowledge, this

11   document?

12   A    Tommy's attorney.

13   Q    Based on not what we said, based upon communications

14   you and he had, he created this chart?

15   A    Him and I?

16   Q    Yes.

17   A    No.  Showed to me, and he asked me if this was an

18   actual representation of what the shareholders had and how

19   everything went out, and this (indicating).

20         MR. HALEY:  I have no objection.

21         THE COURT:  C-279 is admitted.

22         (Whereupon, Defendant's Exhibit C-279 was

23   received in evidence.)

24   DIRECT EXAMINATION

25   BY MR. LARUSSO: (Continued)

5250

1   Q    Does this chart accurately reflect the investments in

2   Eufora as you know it today?

3   A    Yes.

4   Q    Can you make out on the screen to your right the

5   chart?

6   A    Yes.

7   Q    What I'd like you to do is explain from your

8   knowledge what the chart reflects.

9   A    So going from right to left you have the NHL players

10  that owned interest in AZ Eufora Partners, and you have

11  Eufora Capital 3, which is the purchaser of the loan and

12  the individuals that are associated or participated in the

13  purchase of that loan into Eufora Delaware.

14          And the orange column is all the shareholders

15  and/or individuals that owned Eufora.

16  Q    When you say actual investors on the right-hand side

17  underneath the purchase of the Neptune loan and the

18  intended investors, what does that represent?

19  A    When we decided we were going start a new company in

20  order to purchase the loan, we needed to raise money in

21  order to pay Brent off.  And Privitello, Kaiser, Rizzi,

22  were going to be part of that program and that group in

23  order to buy the loan and convey it to a new company.

24  Q    It says "intended investment."  What happened?

25  A    We learned very shortly after their investment they

D'Ambrosio - Direct/LaRusso

5251

1  were working with C.R. and Tim on trying to purchase the

2  loan from the lender and foreclose on the assets. As soon

3  as we learned that, that's when we went back to them and

4  said, we can't accept your investment. We'd like to give

5  you your money back.

6  Q    And the actual investors, who were they?

7  A    You have Sergei, the Volpe group, and that's it.

8  Those two entities.

9  Q    Those were the two, the individual and the entity

10 that was able to secure the loan; is that correct?

11 A    Yes.

12 Q    And in securing the loan from Mr. Nerguzian by Eufora

13 Capital 3, it was converted over to Eufora Delaware; is

14 that correct?

15 A    Yes.

16 Q    And Eufora Delaware got equity in return for getting

17 patents back to the company, correct?

18 A    Yes.

19 Q    By the way, you mentioned a few moments ago

20 Mr. Kaiser and Mr. Privitello had sought to make an

21 investment into Eufora; is that correct?

22 A    Yes.

23 Q    By the way, at the time that Eufora was operating,

24 was there any requirement that the board of directors

25 approve the investments before they become legal and

5252

1    binding?

2    A    Yes, the board has to approve every new investor.

3    Q    I believe you testified that the board of directors

4    did not approve these investments by Mr. Kaiser and by

5    Mr. Privitello; is that correct?

6    A    That's correct.

7    Q    And why was that?

8    A    Again, we learned very shortly after their investment

9    that they were working with the other group in order to

10   buy back the loan.  We call it the Stolper's group.

11   Q    What happened -- by the way, their total contribution

12   or their total intended investment was 400,000; is that

13   correct?

14   A    That's correct.

15   Q    What happened to their money after they had provided

16   it to Eufora?

17   A    It was used for what it was intended for.  All

18   investors, 150,000 for each investor went to pay down the

19   bank at that time, and 50,000 of each 200, went to

20   operating.

21   Q    Well, did there come a time -- withdraw that.

22        Let me show you what has been received in

23   evidence as chart number 20.

24        Do you see that?

25   A    Yes.

5253

```
1    Q    You've seen this before testifying today; is that
2    correct?
3    A    Yes.
4    Q    And there appears an entry on 12/7/09 for $155,000
5    down at AZ Avalon?
6    A    Yes.
7    Q    And AZ Avalon is not Eufora?
8    A    No.
9    Q    Did you know about that?
10   A    Yes, I heard about it because we were on a deadline
11   to pay off the bank, and the law office wired the
12   incorrect amount to the wrong account.
13   Q    Wrong account was AZ Avalon?
14   A    Only 5,000 was supposed to go to Avalon for rent.
15   Q    So AZ Avalon is the landlord for Eufora?
16   A    Yes.  And the correct amount was wired out the same
17   day.
18   Q    When you say "the correct amount," are you referring
19   to 12/8/09, to Bancorp?
20   A    Yes.
21   Q    What is their relation to Eufora?
22   A    Issuing bank.  Issues our payment card.
23   Q    Up here it shows on the same -- I'm sorry,
24   December 8, '09, 50,000 to Eufora, and then it shows
25   12/15/09, $15,000 Constantine expenses.  12/15/09 for
```

5254

1  15,000.  Do you see that?

2  A     Yes.

3  Q     Are you aware of that expense?

4  A     Yes.

5  Q     Were you aware of that expense at the time that

6  Eufora had sent the money to Carey Rodriguez Greenberg &

7  Paul?

8  A     Yes.

9  Q     Who were they?

10  A     The law firm defending Tommy in another case that the

11  gentleman that sued Tommy somehow wrapped up that company

12  in that lawsuit and subpoenaed our bank records.  And

13  Tommy was spending a lot of time speaking with this

14  attorney and at the time was financially strapped, and we

15  elected to participate in paying for the attorney because

16  he was spending the time working -- the attorney was

17  spending the time working on Eufora.

18  Q     Who is "we"?

19  A     "We" as in Eufora, me, Dan, made a decision to send

20  the money over to the attorney.

21        They needed board approval in order to do that,

22  so we got on the call, Tommy, myself and Dan.

23  Q     Was there any written decision made by the board

24  approving that?

25  A     We kept pretty good records of it, so I'm pretty sure

5255

1  we probably have records somewhere.

2  Q    Have you seen any recently?

3  A    No, not that I've been shown.

4           THE COURT:  Let's take a 15-minute break, and

5  then we'll go another half hour.  Don't discuss the case.

6           (Whereupon, at this time the jury exits the

7  courtroom.)

8           (Whereupon, a recess was taken.)

9           (Out of the presence of the jury.)

10           THE COURT:  Before I forget, the Government was

11  working on their jury instructions.  I assume the defense

12  has no objection to this because I'll give a copy of the

13  indictment to the jury.  And rather than be able to

14  mention the John Does in the indictment, I want the

15  Government to go through and put in actual names to the

16  John Doe references.

17           Any objection to that?

18           MR. LARUSSO:  No, your Honor.

19           MR. HALEY:  No, your Honor.  Thank you.

20           THE COURT:  And can you submit that tomorrow

21  morning?

22           MS. KOMATIREDDY:  Yes, Judge.

23           THE COURT:  Two other references that aren't Joe

24  Does.  (Perusing.)  Co-conspirator one in paragraph 13,

25  and Kenner, directly co-conspirator number one, known to

D'Ambrosio - Direct/LaRusso

5256

1    the grand jury to divert certain money --

2              MS. KOMATIREDDY:  Yes, Judge, that individual is

3    Tim Gaarn.

4              The other individuals referenced, the business

5    partner is --

6              THE COURT:  In the Sag Harbor -- no, paragraph

7    22.

8              MS. KOMATIREDDY:  That's Mr. Tesoiero.  I'm

9    happy to replace those names.

10             THE COURT:  So in paragraph 22, Kenner created

11   an operating agreement stating what it says, each

12   25 percent owners of Ledbetter.

13             Thank you.

14             (Whereupon, a recess was taken.)

15             THE COURT:  Please be seated.

16             Okay.  Please bring in the jury.

17             (Whereupon, the jury at this time enters the

18   courtroom.)

19             THE COURT:  Okay.  Please be seated.

20             MR. LARUSSO:  May I, your Honor?

21             THE COURT:  Mr. LaRusso.

22             MR. LARUSSO:  Thank you.

23   Q    Mr. D'Ambrosio, to your knowledge, did Mr. Privitello

24   ever ask for his money back?

25   A    No.

D'Ambrosio - Direct/LaRusso

5257

1   Q    In regards to the money that was contributed by

2   Mr. Kaiser and Mr. Privitello, how was that accounted for

3   in the loan conversion agreement?

4   A    It was not accounted for because their investment had

5   to be approved by the board, and we needed to return the

6   money.

7   Q    And let me show you what has been received in

8   evidence as C-162, position 1.3 highlighted.

9        Can you tell us what that means?

10  A    This is talking about the short-term debt of both

11  $200,000 investments.  There was two $200,000 investments,

12  a total of $400,000, in short-term debt.

13  Q    What does this refer to?

14  A    Obligations that we needed to give those loans back

15  to both Privitello and Kaiser.

16  Q    So the money that they had sent to Eufora was carried

17  as a short-term loan and a conversion agreement?

18  A    Yes.

19  Q    That's the highlighted portion, all of -- all Eufora

20  short-term debt, approximately 400,000 as of the date of

21  this agreement; is that right?

22  A    Yes.

23  Q    Now, you mentioned a shareholders meeting.  Where was

24  that?

25  A    That was held at our offices in north Scottsdale.

D'Ambrosio - Direct/LaRusso

5258

1    Q    Were you present?

2    A    Yes.

3    Q    Who else?

4    A    Mr. Nash and Brian Berard.

5    Q    Were any other investors able to participate in the

6    meeting?

7    A    We invited all investors, but only two showed up.

8    Q    Did any participate by way of conference call?

9    A    Yes, there was a handful on the call.  I don't

10   remember how many of all of the hockey players.

11   Q    Do you remember at any point during the conference

12   call the issue coming up of returning the moneys to either

13   Mr. Kaiser or Mr. Privitello or anyone involved in the

14   $400,000 we've been talking about?

15   A    Yes, it was mentioned again after Tommy had

16   previously offered and wanted to wire the money back to

17   them.  It was again noted on the call that we wanted to

18   make sure we sent them back their investment.

19   Q    Were both Mr. Rizzi and Mr. Privitello present at the

20   shareholders meeting when the money was offered back to

21   them?

22   A    I believe they were on the call, not at the office.

23   Q    Okay.  Do you recall an earlier occasion prior to the

24   shareholders meeting when Mr. Constantine offered money

25   back to either Mr. Privitello or Mr. Rizzi?

5259

1  A    I remember actually him calling both those

2  individuals, and I think he e-mailed also.  But I was in

3  his office when we left messages for both individuals.

4  Q    You specifically remember -- when you say "message,"

5  what do you mean, message?

6  A    They were not taking his calls, so I think he left

7  them a voice mail saying, give us your wiring

8  instructions.

9  Q    And were you present when Mr. Constantine left that

10  message on the telephone?

11  A    Yes.

12  Q    Let me show you what has been marked for

13  identification as C-280 and C-282.

14        Do you recognize these two?

15  A    Yes.

16  Q    How do you recognize them?

17  A    Well, I saw them in your office.  This is the

18  transcript.

19  Q    This is C-282.

20        And you recognize it why?

21  A    Because this is the transcript, and I seen it as I

22  listened to this audio file.

23  Q    And you dated and initialed the transcript yesterday;

24  is that correct?

25  A    Yes.

5260

1    Q    And the tape or the disk, you recognize it because

2    your initials were on it?

3    A    Yes.

4    Q    You compared -- listened to the tape and compared the

5    transcript?

6    A    Yes.

7    Q    Does that fairly and accurately represent the

8    conversation that appears on that tape?

9    A    Yes.

10            MR. LARUSSO:  I ask C-280 and C-282 be admitted.

11            MS. KOMATIREDDY:  No objection.

12            MR. HALEY:  No objection.

13            THE COURT:  C-280 and C-282 will be admitted as

14    an aid to the transcript.

15            (Whereupon, Defendant's Exhibits C-280 and C-282

16    were received in evidence.)

17    Q    Are you able to see that, Mr. D'Ambrosio?

18    A    Yes.

19    Q    Can we play it, please?

20            (Audio clip played.)

21    Q    Now, Mr. D'Ambrosio, you mentioned that sometime

22    around October of 2010 -- was that suit ultimately

23    dismissed?

24    A    Yes.

25    Q    Was there any impact on your company at or about the

5261

1    time that the suit was brought?

2    A    Absolutely.

3    Q    Would you tell us what happened?

4    A    Basically, prior to them filing suit, we tried to

5    come to an agreement not to file suit, and the reason was

6    because we knew this would basically be burning down the

7    house, if you will.  And anything that happened with the

8    company, unfortunately, would get published, and that

9    would eventually hurt the image of our company.  And once

10   they filed suit, it was kind of a kiss of death, in my

11   opinion.

12   Q    Do you know a man by the name of John Kaiser?

13   A    Yes.

14   Q    Do you recall a time seeing him at the offices of

15   Eufora?

16   A    Yes.

17   Q    And do you recall hearing a conversation or a portion

18   thereof between him and Mr. Constantine?

19   A    Yes.  He was -- to my memory, he was pretty much

20   there the whole day.  He was there for probably at least

21   five hours, maybe more.

22   Q    Did you participate in the conversation?

23   A    No.  I heard as I was walking back and forth.  But as

24   he was leaving, I was in the lobby as he was walking out.

25   Q    Could you tell us what you overheard at that time?

5262

1    A    I got more details from Tommy afterwards.

2    Q    No, just tell us what you heard at this point.

3              MS. KOMATIREDDY:  Objection, your Honor.

4              What is the time frame?

5    Q    Do you know what the time frame is while this was

6    occurring?

7    A    After the shareholders meeting and before the

8    lawsuit.

9    Q    Okay.

10   A    And the last thing he said was, I need 20 percent,

11   and I'm not going to take any less.  And basically he was

12   extorting us and said, I need 10 percent and Phil needs 10

13   percent, and then he walked out the door.

14   Q    By the way, after the suit was dismissed, were

15   attorney's fees granted to you and the other defendants in

16   the case?

17   A    Yes.

18             MS. KOMATIREDDY:  Objection.  Relevance.

19             THE COURT:  Sustained.  The jury will disregard

20   that as irrelevant.

21   BY MR. LARUSSO:

22   Q    One more series of questions, if I may,

23   Mr. D'Ambrosio.

24             Were you aware that Mr. Nash made an investment

25   to Eufora around April of 2008?

5263

1    A    Yes.

2    Q    And when were Eufora's offices actually built?

3    A    The current office that we're in now, we didn't get

4    the Certificate of Occupancy until November of 2008.  And

5    my team was working at home at the time, so we didn't rush

6    to get in the building, especially since everybody likes

7    working at home.  We didn't get in until the beginning of

8    2009.

9    Q    And where were you working prior to the Certificate

10   of Occupancy?  Where were you and the employees of Eufora

11   working?

12   A    We were working from home, and we were waiting for

13   the building to get finished.

14   Q    So at the time of the investment by Mr. Nash in April

15   of 2008, the office did not exist; is that correct?

16   A    No.

17   Q    Let me show you what has been marked for

18   identification as C-269 and 270.

19        Do you recognize those?

20   A    Yes.

21   Q    What are those?

22   A    Those are our offices in north Scottsdale.

23   Q    What do the photographs depict?

24   A    Construction and -- probably halfway complete.

25   Q    Is that the Eufora building we're talking about?

D'Ambrosio - Direct/LaRusso

5264

1    A    Yes.

2    Q    It would be fair to say these photographs were taken

3    in or about June of 2008?

4    A    It seems with the date stamp and looking at -- just

5    as I walked the property, it looks very close to probable,

6    you know, almost being completed.  But definitely a couple

7    of more months of work.

8    Q    Okay.

9         MR. LARUSSO:  Your Honor, may I ask 269 and 270

10   be received?

11        MS. KOMATIREDDY:  No objection.

12        MR. HALEY:  No objection.

13        THE COURT:  269 and 270 are admitted.

14        (Whereupon, Defendant's Exhibit C-269 and C-270

15   were received in evidence.)

16   BY MR. LARUSSO:

17   Q    Do you recall after you had moved into the offices

18   around January, you said, of 2009, seeing Mr. Nash at the

19   offices?

20   A    Yes.

21   Q    Approximately when?

22   A    Had to be after January of 2009, but I don't know

23   exactly what date he was in the office.

24   Q    And are you aware of any commercials that were

25   produced by your company, and if so, what information do

5265

1    you have?

2    A    Actually, Tommy was the one that produced -- I think

3    there was a total of three commercials.  I think we ended

4    up with two commercials that were produced in 2009.

5    Q    Approximately when were the discussions regarding the

6    commercial and its production in 2009?

7    A    I would say beginning to mid.  I just know we were in

8    the building, and I think we were there for a couple of

9    months before Mr. Nash visited.

10   Q    Let me show you what is in evidence as Government's

11   Exhibit 45-B.  You may not be able to see it because it is

12   in the red highlighted area.  But there is a name for

13   December 14, 2009, Joseph Lemon.

14            Do you know who that person is?

15   A    Yes, one of our employees.

16   Q    And there is the same entry we saw on the chart,

17   December 15, 2009, Carey Rodriguez Greenberg & Paul.  That

18   is the $50,000 we talked about before, correct?

19   A    Yes.

20   Q    On the second page of this exhibit, December 15,

21   2009, M-O-N-G-U-S is the first word, Solutions, LLC.

22            Do you know what that is?

23   A    That's one of our employees.

24   Q    I forgot one exhibit.  I apologize.

25            Showing you what is marked C-268.  What is this?

D'Ambrosio - Voir Dire/Komatireddy

5266

1   A    The Certificate of Occupancy for our office which is

2   dated November 25, 2008.

3        MR. LARUSSO:  Your Honor, may I ask that C-268

4   be received.

5        THE COURT:  Any objection?

6        MS. KOMATIREDDY:  May I have a voir dire?

7        THE COURT:  Yes.

8   VOIR DIRE EXAMINATION

9   BY MS. KOMATIREDDY:

10  Q    This document is not signed?

11  A    I don't think it requires to be signed.

12  Q    Answer the question.  There is no signature on it?

13  A    There is no signature on it.

14  Q    There is no seal, raised seal, from any public

15  official?

16  A    Looks like it's a copy.

17  Q    There's no raised seal from any public official,

18  right?

19  A    I don't know if this could be a raised seal or not.

20  Q    Is the seal raised to you?

21  A    I mentioned it was a copy.

22        MR. LARUSSO:  Your Honor, may I have a sidebar

23  on this, please?

24        THE COURT:  Yes.

25        (Whereupon, at this time the following took

D'Ambrosio - Voir Dire/Komatireddy

5267

1    place at the sidebar.)

2              (Continued.)

D'Ambrosio - Voir Dire/Komatireddy

5268

1      MR. LARUSSO:  The rules doesn't require us to

2  produce an original.  There is no reason to suspect that

3  this is not authentic.

4      If there's an objection to it because of some

5  fabrication of doctoring, I'd be glad to know that.

6      MS. KOMATIREDDY:  That is not a certified copy.

7  I have no idea where it came from.  I know what this says.

8  There has been no authentication.

9      THE COURT:  You can't authenticate a document of

10  this nature.  You can't do it.

11      MR. LARUSSO:  Okay.

12      (End of sidebar conference.)

13      (Continued.)

14

15

16

17

18

19

20

21

22

23

24

25

D'Ambrosio - Cross/Komatireddy

5269

1    DIRECT EXAMINATION

2    BY MR. LARUSSO:  (Continued)

3    Q    By the way, at the time that you approved the $15,000

4    expenditure for Carey Rodriguez on behalf of

5    Mr. Constantine, how much did Eufora owe Mr. Constantine?

6    A    I know Tommy has a total of $3 million in the

7    company, and I know currently he's around 1.5.  At that

8    given moment I'm not sure, but I would think at least 1.5.

9              MR. LARUSSO:  Your Honor, I think I failed to

10   move to introduce the patent themselves.  May I at this

11   time close out the direct examination by asking that

12   C-272, '73, '74, '75, '76, '77, and 304 and 305 be

13   received in evidence?

14             MS. KOMATIREDDY:  No objection.

15             MR. HALEY:  Judge, I apologize.

16             THE COURT:  These are the patents.

17             MR. HALEY:  No objection.

18             THE COURT:  The patents are admitted.

19             (Whereupon, Defendant's Exhibits C-272 through

20   C-277, and C-304 and C-305 were was received in evidence.)

21             MR. LARUSSO:  No further questions.

22             THE COURT:  Cross-examination.

23   CROSS-EXAMINATION

24   BY MS. KOMATIREDDY:

25   Q    December of 2009, do you remember this chart,

D'Ambrosio - Cross/Komatireddy

5270

1   Mr. D'Ambrosio?

2   A    Yes.

3   Q    You were just shown that chart, right?

4   A    Yes.

5   Q    And you testified about this December 15, 2009,

6   $15,000 payment to Carey Rodriguez Greenberg & Paul,

7   right?

8   A    Yes.

9   Q    You testified that you were aware of those events,

10  correct?

11  A    Yes.

12  Q    You testified that you -- let me back up.

13          You testified that it needed board approval,

14  correct?

15  A    Yes.

16  Q    And you testified that you, Tommy and Dan approved of

17  that expense, correct?

18  A    That's correct.

19  Q    On behalf of the board, correct?

20  A    Yes.

21  Q    When you are talking about Dan, you are referring to

22  William Daniel Kennedy, correct?

23  A    Yes.

24  Q    That expense happened in December of 2009, correct?

25  A    That's what it looks like, yes.

D'Ambrosio - Cross/Komatireddy

5271

1  Q    And you also testified that the members of the board

2  changed in July 2010, right?

3  A    The members of the board has changed two or three

4  times.  Through the last 14 years it has changed.

5  Q    And one of those times was July of 2010, right?

6  A    I have to see the document.

7  Q    Let's look at the document that Mr. LaRusso showed

8  you, C-271.

9           This is an action by written consent of the

10 members of Eufora, correct?

11 A    Yes.

12 Q    Look at the bottom two paragraphs on the first page.

13 The first page.

14 A    Yes.

15 Q    It says there that two members of the board, C.R.

16 Gentry and Tim Gaarn, are going to be replaced by two new

17 members, correct?

18 A    Yes.

19 Q    And the two new members are Dominick Volpe and

20 William Daniel Kennedy, correct?  Right down there on the

21 bottom of page 1.

22 A    Yes.

23 Q    So Daniel Kennedy is not a member of the board until

24 July of 2010, right?

25 A    I think Daniel Kennedy was a member of the board

5272

1    prior to that also.

2    Q    Who were the members of the board in December of

3    2009, Mr. D'Ambrosio?

4    A    Without having the document in front of me, I

5    wouldn't be able to tell you that at all.

6    Q    You don't remember who the members of the board was

7    who approved the expense?

8    A    It changed course from when we initially started the

9    company and who the investors are.

10   Q    It's true that Daniel Kennedy wasn't on the board in

11   December of 2009?

12   A    No, I think he was one of the original board members.

13   Q    The truth is, C.R. Gentry, who wasn't a member,

14   didn't approve that?

15   A    We didn't need him to.

16   Q    But he didn't approve it?

17   A    He didn't approve it.

18   Q    It's a yes or no question.  Did you get approval from

19   C.R. Kennedy?

20          Can you answer the question without looking at

21   Tommy Constantine?

22          MR. LARUSSO:  Objection, your Honor.

23          THE COURT:  The lawyers are not permitted to

24   comment on the witness's demeanor in the courtroom.

25          MR. LARUSSO:  Just for the record, she's

D'Ambrosio - Cross/Komatireddy

5273

1  standing behind me and she's looking at her, so I think it

2  was totally inappropriate that comment was made.

3          MS. KOMATIREDDY:  I apologize.

4          THE COURT:  The lawyers are not permitted to

5  comment on the demeanor of the witness.  That was an

6  inappropriate comment, and it will not happen again,

7  correct?

8          MS. KOMATIREDDY:  It will not happen again.

9          THE COURT:  All right.

10  BY MS. KOMATIREDDY:

11  Q    In December of 2009, you were a member of the Eufora

12  board, correct?

13  A    I've been a member since day one, yes.

14  Q    So in December of 2009 you were a member of the

15  Eufora board?

16  A    Yes.

17  Q    And you are here testifying today about the books and

18  records of Eufora, right?

19  A    Certain records and books.

20  Q    You are testifying today about different membership

21  interests, right?

22  A    Certain member interests.

23  Q    In direct, you answered questions about when

24  different people were removed from the board and when

25  others were added, right?

5274

1    A    Yes.   I said that Tim and C.R. were both removed,

2    yes.

3    Q    Who were the members of the board in December of

4    2009?

5    A    Like I mentioned, board members changed over the last

6    13 or 14 years.  Unless I have a document in front of me

7    who the board members were, to the best of my knowledge it

8    was Daniel Kennedy from day one, and I think -- I don't

9    know if I'm allowed to say it, but I think Daniel

10   was an -- he was a board member from day one.  And I have

11   no reason to believe he was not a board member at the

12   time.

13   Q    Were there more than three members of the board in

14   December of 2009?

15   A    Again, this is only a document that is dated for

16   2010, so --

17   Q    I'm asking you for your memory as a member of the

18   board of Eufora.  Can you tell us, were there more than

19   three members of the board in December of 2009?

20   A    I would have to have the document in front of me.

21   Q    You cannot answer that without having a document

22   today?

23   A    No.  I want to make sure that I was testifying to

24   something that was truthful.

25   Q    Can you tell us if there were more than three?

5275

1    A    At that time?

2    Q    In December of 2009.

3    A    I don't know.  Again, there is currently three, so --

4    we don't need to have five all the time, so I can't answer

5    that without actually having the documentation.  Plus, I

6    was not the one that was responsible for removing/adding

7    board members.  Like I said, it changed throughout the

8    life span of the company.

9    Q    Did you sign that document that you have in front of

10   you, C-271?

11   A    Yes, this is my signature.

12   Q    So you were responsible for removing and adding board

13   members?

14   A    Removing, yes.

15   Q    I'm going to ask you a series of yes or no questions.

16            Did you get Brent Nerguzian's approval to pay

17   that $15,000 to Tommy Constantine in December of 2009?

18   A    I can't answer that yes or no.

19   Q    Do you remember talking to Brent Nerguzian about it

20   at all?

21   A    I don't need his permission.

22   Q    Do you remember talking about it with Brent Nerguzian

23   at all?

24   A    Don't need to, no.

25   Q    The answer is no?

5276

1  A    No.

2  Q    Do you remember getting C.R. Gentry's permission in

3  December of 2009 for that $15,000 to go to Carey

4  Rodriguez; yes or no?

5  A    No, I don't think so.

6  Q    Do you remember getting Tim Gaarn's approval to pay

7  that $15,000 to Carey Rodriguez in December of 2009?

8  A    We could have.  Just how -- like I said, there was

9  only three of us that needed to decide on it, and to be

10  honest, it is not -- nothing that -- with there being such

11  a little amount and $1.5 million being owed to Tommy,

12  there was not that much question.

13  Q    I'll just repeat it one more time.

14        Do you remember getting Tim Gaarn's approval to

15  pay that $15,000 to Carey Rodriguez in December of 2009?

16  A    There was --

17        THE COURT:  Mr. D'Ambrosio, you have to let her

18  finish the question.  And she asked you a yes or no

19  question.  If you can't answer it yes or no, tell her you

20  can't answer it yes or no.

21        If there is an explanation for the yes or no,

22  Mr. LaRusso gets to get up after she's done and ask you if

23  you did or did not do something.  That's the way it works.

24  Okay?

25        THE WITNESS:  Okay.

**Proceedings**

5277

```
1              THE COURT:  What is the question?

2    Q    Do you remember getting Tim Gaarn's approval to spend

3    that $15,000 on Carey Rodriguez in December of 2009?

4    A    I'd have to answer yes or no?

5              I can't answer with a yes or no.

6    Q    And finally, do you remember getting Nick

7    Privitello's approval to spend that $15,000 to Carey

8    Rodriguez in December of 2009?

9    A    Again, yes or no?

10   Q    Yes or no.

11   A    I can't answer it yes or no.

12   Q    But you remember talking to Tommy and Dan?

13   A    Yes.

14   Q    And --

15             THE COURT:  It's 4:30.  We'll break for the day.

16   We'll reconvene at 9:30.

17             Don't discuss the case.  Don't form an opinion.

18             Have a good night.

19             (Whereupon, at this time the jury exits the

20   courtroom.)

21             MR. MISKIEWICZ:  Your Honor, before the witness

22   leaves, we have excerpts of that board of directors

23   meeting we intend to --

24             THE COURT:  Hold on for a second (addressing the

25   witness).
```

**Proceedings**

5278

```
 1              MR. MISKIEWICZ:  -- that we intend to impeach

 2    him with.

 3              I referenced the fact there was an earlier board

 4    of directors meeting where Mr. Gentry was released.  So to

 5    not waste time tomorrow morning, we ask that he be

 6    permitted to listen to the recording today before we leave

 7    for the evening, and then we can pick up from that point

 8    on tomorrow.  That's all.

 9              THE COURT:  Mr. D'Ambrosio, with the assistance

10    of Mr. Oliveras, I'll ask you to listen to that recording

11    either tonight or tomorrow morning, okay?

12              THE WITNESS:  Okay.

13              (Witness exits.)

14              THE COURT:  Ms.  Komatireddy, I cannot tell you

15    how disturbing it is to me that after I specifically,

16    specifically told your trial partner, Mr. Miskiewicz, that

17    it was unacceptable for him to refer to a witness looking

18    at Mr. Kenner -- and we had a long discussion about that.

19    And after last week when I warned all of the attorneys not

20    to make comments, yet you made the decision to do that

21    again.

22              I was absolutely floored by the fact that you

23    did that specifically after I told your trial partner he

24    could not do that.  I don't understand that.

25              Are you not able to follow the instructions of
```

**Proceedings**

5279

 1    the Court?

 2              MS. KOMATIREDDY:  I apologize, your Honor.  I

 3    don't have a good excuse.  I just apologize.

 4              May I ask for some guidance on this?

 5              THE COURT:  Yes.  What do you want to know?  I

 6    thought my instruction was clear.

 7              MS. KOMATIREDDY:  Your Honor, your instruction

 8    was clear.  It's not the way I expected it.  It came out

 9    wrong.

10              But my question is, it seems to me as a matter

11    of impeachment that one should be able to impeach a

12    witness, not taking cues from the defense, would be

13    permitted to ask the witness before you answer that

14    question:  Did you look at the defendants?

15              THE COURT:  No.

16              MS. KOMATIREDDY:  So that the demeanor would be

17    on the record.

18              THE COURT:  No.  In your summation -- you

19    comment on a witness's demeanor on summation.  If you want

20    to comment on his credibility to the jury and say, "Do you

21    believe he was looking at Mr. Constantine?" -- you can

22    argue to the jury.  You can take into account, and the

23    jury can reject or not, or accept, what you say was the

24    demeanor of the witness, whether or not the witness was

25    looking for cues from the defendant.  That's the proper

**Proceedings**

5280

1    way to make a commentary.  That is argument on the

2    witness's demeanor.

3              To inject your belief, your belief, during his

4    testimony that that is what he's doing is inserting you in

5    the testimony, as your argument is being asserted in the

6    middle of him trying to answer a question.

7              And, no, you can't ask a witness, "Are you

8    looking at Mr. Constantine or not?"  You don't understand

9    how ridiculous that question can be.

10             If defense counsel or the Government did it, to

11   ask each witness to comment on their demeanor -- no,

12   that's not the way it is done.  Everyone sees the demeanor

13   of the witness.  It is what it is.

14             If I believed a witness was doing anything

15   improper, I could instruct the witness not to do

16   something.  But that's not what happened today.  The

17   witness wasn't doing anything improper.

18             Even if a witness looked at a defendant, as long

19   as the -- even if he looked at him before answering a

20   question, there would be nothing to instruct the witness

21   on.  That would simply go to their demeanor.

22             But that's argument, and it cannot happen again.

23   I cannot stress that again.

24             And your -- the way -- you are asking this

25   witness way too many questions.  When you are not getting

**Proceedings**

5281

 1    a response that you want, you are asking him again the

 2    same question and the same question.  And I don't want

 3    that to happen tomorrow morning.

 4            I understand he may be a hostile witness for the

 5    Government, but that doesn't mean that -- you know, if he

 6    answers the question "I don't remember," unless you show

 7    me a document and -- showing me who the membership was,

 8    that is six, seven or eight questions regarding the fact

 9    that he doesn't remember.  He said he doesn't remember,

10    yet he's asked four or five questions.

11            If he has a document reflecting the membership,

12    then show it to him.  And if you believe he should

13    remember as a board member, that goes to the jury.

14    Doesn't go to four or five questions to him.

15            I don't want a repeat of that tomorrow morning.

16            MS. KOMATIREDDY:  Yes, that should be clarified,

17    your Honor, in the case.

18            THE COURT:  Now, on the issue of the board

19    minutes, C-271, you said you wanted to have a discussion

20    about it.  I don't know what is in there, but there is

21    something in there that --

22            MR. LARUSSO:  The Government was crossing him on

23    one of the paragraphs that was missing.

24            THE COURT:  I thought there was some other

25    paragraph in there that said something about misconduct.

**Proceedings**

5282

1    MR. HALEY:  There's a great number of

2 paragraphs, Judge, that speak in terms of our conclusions,

3 whereas, and things of that nature.  But I don't believe

4 Mr. Constantine can offer that as an exhibit to be marked

5 for identification.

6    THE COURT:  Okay.

7    MR. LARUSSO:  Your Honor, I can suggest to the

8 Court tomorrow on redirect, the signature page is signed

9 by Mr. Daniel Kennedy, who was being made a new member by

10 this.  And he signs this with the implication that he was

11 a member already.

12    So there is a portion I'm going to ask that it

13 be received, and clearly it would be that signature page

14 along with the other signature page.  I don't really need

15 anything more.  If there is a problem, I can redact all of

16 it other than that portion.

17    THE COURT:  Is there anything problematic on the

18 signature pages?

19    MR. LARUSSO:  Not that I know of, Judge.  But

20 maybe we can deal with this tomorrow.  I'll look at this

21 more closely, and I'll remove everything but the

22 signatures.  That would be fine with me.

23    THE COURT:  I just want to mark for the

24 record -- we forgot to give the jury the letter for his

25 employer, but we'll mark it for the record as a copy.

**Proceedings**

5283

1          The one we gave to defense counsel last week was

2    marked as Court Exhibit F, the final version.  Catholic

3    Charity, his employer, Court Exhibit G.  And there was

4    another one marked as Court Exhibit H.

5          Are there any other issues tomorrow?

6          What will you do with your witnesses,

7    Mr. LaRusso?

8          MR. LARUSSO:  Thank you for bringing that up,

9    Judge.

10          Mr. Semple is flying in from his vacation.  I'm

11   hoping that he'll have landed and I'll be able to talk to

12   him tonight.  I hope that it's all right by the Court to

13   put him on and make sure we get him done, so not be a half

14   hour late.  We should get him done by the morning.

15          THE COURT:  Who is this?

16          MR. LARUSSO:  Mr. Semple.

17          THE COURT:  No.

18          You want to interrupt this witness to do

19   Mr. Semple; is that correct?

20          MR. LARUSSO:  I'm afraid if his cross is too

21   long, we'll not get to him and he'll not be able to get

22   back to his family.

23          THE COURT:  But you have no issues with

24   Mr. D'Ambrosio?

25          MR. LARUSSO:  No.

**Proceedings**

5284

1          THE COURT:  So you will not finish tomorrow

2     then.

3          MR. LARUSSO:  I hope to finish Mr. Semple and

4     Mr. D'Ambrosio tomorrow.

5          THE COURT:  Do you have any other witnesses?

6          MR. LARUSSO:  I have one other witness flying

7     in.  Mr. DeVries is flying in and he doesn't look like

8     he'll be in.  And Mr. Kennedy I can't say yes or no.  I

9     just can't say.

10         I'll e-mail the Government and let them know.

11    If I don't finish, then I'll finish Wednesday.

12         Judge, I apologize.  This has been a very

13    difficult case for many reasons.  Putting in the kind of

14    time to be ready from day to day.  I know the Court wants

15    to finish this on Tuesday and hopefully have summations

16    and charge on Thursday.

17         I don't know if -- I'm trying to get some sleep,

18    trying to be able to abide by the Court's schedule, but is

19    there any possibility that we can put the summations off

20    until next week?  I don't know if the Court is willing to

21    entertain that application.

22         I haven't spoken to counsel or the Government

23    regarding it.  It's just that to put this together with

24    all the testimony that we've had and all the difficult

25    issues, I'm just afraid I'll be rushed into doing

**Proceedings**

5285

1    something.  I have a lot of help.  I will not deceive the

2    Court into thinking I don't.  There are a lot of people

3    helping me, but --

4              THE COURT:  That would be essentially taking --

5    if we were to finish the case tomorrow or after a few

6    hours on Wednesday, we could have another two days off.

7              And I remind you we have jurors -- one juror I

8    know has something July 16th, but I have to allow enough

9    time for them to deliberate.  That may sound far off.

10             As you know, I try to make every accommodation,

11   but that is an extraordinary thing to do, to tell the

12   jurors come back in five days.

13             Is anybody counting the weeks?  I think we're on

14   week nine.  For me to tell the jury -- I'm writing letters

15   to employers.  They have to get back to work.

16             MR. LARUSSO:  I understand.

17             THE COURT:  So you have to be prepared to go

18   forward this week.

19             MR. LARUSSO:  I understand.

20             THE COURT:  Okay?

21             MR. LARUSSO:  Yes.

22             THE COURT:  And also, as we're doing the

23   indictment, nobody has discussed the forfeiture part of

24   the case if there is a conviction.

25             Is there any discussions about the forfeiture

**Proceedings**

5286

1    part of the case?

2              MS. KOMATIREDDY:  We discussed this at the

3    outset.  I believe the defense is waiving a jury for that

4    so we can have a hearing at a later time.

5              MR. HALEY:  Yes, your Honor.

6              THE COURT:  I can only imagine what the jury's

7    reaction to that will be.  It would not be a short

8    proceeding.

9              So, okay.  Mr. Haley?

10             MR. HALEY:  Your Honor --

11             THE COURT:  I'm sorry.  Is the Government

12   anticipating a rebuttal case at this point?  We have some

13   ways to go, but based on what you know now?

14             MR. MISKIEWICZ:  I don't believe so.  We'll make

15   a final decision tonight about one potential witness, but

16   I don't believe so.

17             THE COURT:  Go ahead, Mr. Haley.

18             MR. HALEY:  I was actually working on my

19   summation this weekend as I was collating my exhibits.  I

20   do note that the C.R. Gentry spreadsheet where we had

21   concluded Mr. Kenner's testimony out of an agreement which

22   was admitted in evidence, but we haven't given it a Kenner

23   exhibit number.  I realized this at the close of my case.

24             THE COURT:  Which document?

25             MR. HALEY:  The C.R. Gentry spreadsheet, your

Proceedings

5287

1    Honor.

2            THE COURT:  Yes.

3            MS. KOMATIREDDY:  We have it as Kenner 228, your

4    Honor.

5            MR. HALEY:  Okay.  Thank you for the

6    Government's assistance.

7            I missed it through the myriad of exhibits.

8            THE COURT:  I know I gave a limiting

9    instruction.  We may not have had the number at that time.

10           All right.  Anything further?

11           MR. LARUSSO:  No, your Honor.

12           THE COURT:  Have a good night.

13           MR. LARUSSO:  Thank you, your Honor.

14           THE COURT:  If the Government can create a

15   redacted version of the indictment to put in the John Does

16   and take out the forfeiture part and the forfeiture

17   statutes and the forfeiture headings on the front.

18           MR. LARUSSO:  Your Honor, I'm sorry, that

19   includes the alias, I assume?

20           THE COURT:  Yes.

21           (Whereupon, the proceedings were adjourned until

22   Tuesday, June 30, 2015, at 9:30 a.m.)

23

24

25

5288

1                       WITNESSES

2

3    PHIL KENNER                            5103

4    RECROSS-EXAMINATION                    5104

5    BY MR. MISKIEWICZ

6    RECROSS-EXAMINATION                    5115

7    BY MR. LARUSSO

8    RECROSS-EXAMINATION                    5154

9    BY MR. HALEY:

10   M A R K   D ' A M B R O S I O          5160

11   DIRECT EXAMINATION                     5160

12   BY MR. LARUSSO:

13   VOIR DIRE EXAMINATION                  5173

14   BY MS. KOMATIREDDY:

15   DIRECT EXAMINATION                     5174

16   BY MR. LARUSSO:  (Continued)

17   VI OR DIRE EXAMINATION                 5248

18   BY MR. HALEY:

19   DIRECT EXAMINATION                     5249

20   BY MR. LARUSSO: (Continued)

21   VOIR DIRE EXAMINATION                  5266

22   BY MS. KOMATIREDDY:

23   DIRECT EXAMINATION                     5269

24   BY MR. LARUSSO:  (Continued)

25   CROSS-EXAMINATION                      5269

5289

```
 1    BY MS. KOMATIREDDY:

 2

 3                         EXHIBITS

 4    Government Exhibit 104 in evidence              5112

 5    Government Exhibits 506 A, 506A.T and 506 B     5114

 6    and 506 B.T in evidence

 7

 8

 9    Defense Exhibit C 311 in evidence              5117

10    Defense Exhibit 326 in evidence                5121

11    Defense Exhibits 306, 307, 307 A, 308, 308 A,  5133

12    309 and 310 in evidence

13    Defense Exhibit C 158 in evidence              5145

14    Defendant's Exhibits K-239, K-240 and K-241    5155

15    were received in evidence

16    Defendant's Exhibit C-265 was received in      5167

17    evidence

18    Defendant's Exhibit C-267 was received in      5174

19    evidence

20    Defendant's Exhibit C-279 was received in      5249

21    evidence

22    Defendant's Exhibits C-280 and C-282 were      5260

23    received in evidence

24    Defendant's Exhibit C-269 and C-270 were       5264

25    received in evidence
```

5290

1    Defendant's Exhibits C-272 through C-277, and    5269

2    C-304 and C-305 were was received in evidence

3

4

5    Defendant's Exhibits 161 and 162 in evidence    5246

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 5233:11
**$100** [4] - 5224:2, 5224:20, 5224:21, 5224:24
**$100,000** [1] - 5186:10
**$11** [1] - 5137:18
**$125** [1] - 5131:5
**$125,000** [1] - 5170:13
**$15** [3] - 5129:5, 5129:25, 5137:12
**$15,000** [9] - 5253:25, 5269:3, 5270:6, 5275:17, 5276:3, 5276:7, 5276:15, 5277:3, 5277:7
**$155,000** [1] - 5253:4
**$20** [2] - 5224:25, 5231:21
**$20,000** [2] - 5176:3, 5176:11
**$200,000** [4] - 5186:22, 5220:2, 5257:11
**$240** [1] - 5224:23
**$25** [1] - 5224:3
**$250,000** [1] - 5122:24
**$290,000** [3] - 5116:9, 5118:12, 5119:11
**$30,000** [2] - 5227:24, 5228:19
**$300** [1] - 5227:21
**$300,000** [1] - 5192:16
**$350,000** [3] - 5118:18, 5119:5, 5119:8
**$40,000** [1] - 5165:21
**$400,000** [2] - 5257:12, 5258:14
**$5,000** [1] - 5165:22
**$50,000** [2] - 5147:14, 5265:18
**$500,000** [1] - 5233:5
**$650,200** [1] - 5118:10
**$700,000** [2] - 5203:17, 5215:23
**$900,000** [1] - 5148:18
**$99** [1] - 5224:17

### '

**'05** [3] - 5117:21, 5117:22, 5118:11
**'09** [1] - 5253:24
**'73** [1] - 5269:12
**'74** [1] - 5269:12
**'75** [1] - 5269:12
**'76** [1] - 5269:12
**'77** [1] - 5269:12
**'98** [1] - 5161:23
**'O5** [1] - 5117:22

## 1

**1** [1] - 5271:21
**1.3** [1] - 5257:8
**1.4** [1] - 5176:16
**1.5** [11] - 5150:8, 5151:19, 5152:25, 5153:6, 5153:10, 5153:12, 5153:15, 5178:11, 5269:7, 5269:8, 5276:11
**10** [11] - 5168:14, 5170:1, 5170:4, 5170:8, 5170:25, 5175:2, 5232:3, 5233:12, 5262:12
**10,000** [1] - 5119:9
**100** [4] - 5094:15, 5095:20, 5186:22, 5212:1
**100,000** [4] - 5177:17, 5186:3, 5186:25, 5222:16
**104** [6] - 5108:21, 5109:4, 5112:6, 5112:7, 5156:16, 5289:4
**10:13** [1] - 5146:4
**10th** [5] - 5130:1, 5130:18, 5136:20, 5136:22, 5138:17
**11** [3] - 5139:22, 5145:24, 5146:3
**11501** [1] - 5095:3
**11572** [1] - 5095:7
**11722** [2] - 5094:15, 5095:21
**11749** [1] - 5094:22
**11:30** [1] - 5149:2
**11:50** [1] - 5146:5
**11th** [1] - 5165:9
**12** [5] - 5130:24, 5139:10, 5206:17, 5227:15, 5236:10
**12/15/09** [2] - 5253:25
**12/7/09** [1] - 5253:4
**12/8/09** [1] - 5253:19
**125** [1] - 5170:14
**13** [2] - 5255:24, 5274:6
**138** [1] - 5144:24
**14** [7] - 5120:21, 5121:25, 5122:9, 5131:4, 5265:13, 5271:4, 5274:6
**15** [7] - 5129:10, 5137:22, 5147:14, 5231:21, 5265:17, 5265:20, 5270:5
**15,000** [1] - 5254:1
**15-minute** [1] - 5255:4
**150,000** [1] - 5252:18
**1500-acre** [1] - 5186:8
**158** [3] - 5145:21, 5145:22, 5289:13
**16** [4] - 5129:4, 5166:10, 5167:23, 5168:2
**1601** [1] - 5094:21
**161** [7] - 5242:2, 5242:8,

5243:1, 5243:8, 5246:2, 5246:3, 5290:5
**162** [7] - 5242:2, 5242:9, 5242:21, 5243:9, 5246:2, 5246:3, 5290:5
**16th** [1] - 5285:8
**17** [2] - 5097:18, 5097:23
**18** [2] - 5164:7, 5166:10
**1997** [1] - 5161:23
**1998** [2] - 5161:5, 5180:24
**1st** [2] - 5117:22, 5150:14

## 2

**2** [3] - 5175:4, 5175:5, 5193:17
**2.5** [1] - 5125:2
**20** [5] - 5166:2, 5168:14, 5244:16, 5252:23, 5262:10
**20,000** [2] - 5169:19, 5169:20
**20,000-square-foot** [1] - 5165:8
**200** [2] - 5219:20, 5252:19
**2000** [3] - 5163:9, 5164:18, 5165:4
**2001** [6] - 5163:9, 5164:17, 5164:18, 5164:19, 5165:14, 5187:14
**2002** [4] - 5166:18, 5167:23, 5168:2, 5206:25
**2003** [5] - 5188:22, 5188:23, 5206:25, 5221:17, 5225:10
**2004** [2] - 5181:9, 5181:11
**2005** [13] - 5116:9, 5128:12, 5133:11, 5133:16, 5144:5, 5144:6, 5145:24, 5146:3, 5148:5, 5148:7, 5148:19, 5181:11, 5186:4
**2006** [18] - 5128:16, 5129:4, 5130:1, 5130:10, 5130:18, 5130:24, 5131:1, 5131:4, 5133:19, 5135:2, 5136:21, 5136:22, 5138:17, 5139:10, 5147:14, 5148:3, 5186:4
**2007** [1] - 5181:9
**2008** [10] - 5123:15, 5172:19, 5174:5, 5174:24, 5187:14, 5262:25, 5263:4, 5263:15, 5264:3, 5266:2
**2009** [39] - 5097:18, 5097:23, 5099:7, 5123:15, 5155:14, 5201:11, 5207:24, 5208:5, 5208:7, 5208:14, 5218:18, 5230:5, 5230:6, 5232:5, 5263:8,

5264:18, 5264:22, 5265:4, 5265:6, 5265:13, 5265:17, 5265:21, 5269:25, 5270:5, 5270:24, 5272:3, 5272:11, 5273:11, 5273:14, 5274:4, 5274:14, 5274:19, 5275:2, 5275:17, 5276:3, 5276:7, 5276:15, 5277:3, 5277:8
**2010** [20] - 5109:1, 5120:21, 5121:25, 5123:18, 5194:9, 5195:6, 5206:17, 5207:10, 5210:20, 5234:24, 5236:10, 5239:15, 5240:11, 5247:3, 5248:19, 5260:22, 5271:2, 5271:5, 5271:24, 5274:16
**2012** [3] - 5098:13, 5195:10, 5195:11
**2013** [2] - 5105:23, 5141:23
**2014** [1] - 5225:22
**2015** [2] - 5094:9, 5287:22
**21st** [1] - 5118:11
**22** [4] - 5247:2, 5248:19, 5256:7, 5256:10
**228** [1] - 5287:3
**22nd** [3] - 5118:11, 5118:18, 5147:14
**239** [2] - 5097:16, 5155:5
**24** [6] - 5123:15, 5128:16, 5135:2, 5182:20, 5222:15, 5224:21
**240** [3] - 5097:20, 5155:9, 5155:10
**241** [3] - 5097:23, 5155:13, 5155:14
**25** [2] - 5256:12, 5266:2
**250,000** [2] - 5170:14
**26** [7] - 5095:7, 5131:3, 5142:23, 5142:24, 5142:25, 5143:2
**26.2** [1] - 5096:24
**269** [2] - 5264:9, 5264:13
**27** [6] - 5118:13, 5119:11, 5128:12, 5133:11, 5133:15, 5155:14
**270** [3] - 5263:18, 5264:9, 5264:13
**271** [3] - 5206:18, 5235:13, 5236:2
**272** [1] - 5221:1
**273** [1] - 5220:25
**274** [1] - 5220:25
**275** [1] - 5220:25
**276** [1] - 5220:25
**277** [1] - 5220:25
**278** [2] - 5148:23
**27th** [1] - 5116:9
**28** [1] - 5195:6
**28th** [1] - 5194:8

1

2

**29** [2] - 5094:9, 5123:15
**290,000** [2] - 5116:16, 5119:8
**2nd** [1] - 5142:18

## 3

**3** [9] - 5168:5, 5178:8, 5221:24, 5222:1, 5247:16, 5248:6, 5250:11, 5251:13, 5269:6
**3.6** [1] - 5220:13
**30** [4] - 5143:6, 5165:21, 5181:1, 5287:22
**300** [2] - 5095:3, 5119:5
**300,000** [2] - 5119:7, 5192:14
**304** [2] - 5220:25, 5269:12
**305** [2] - 5220:25, 5269:12
**306** [6] - 5127:25, 5128:12, 5131:18, 5133:5, 5133:10, 5289:11
**307** [17] - 5127:25, 5128:16, 5128:23, 5128:25, 5129:4, 5131:18, 5131:22, 5131:25, 5133:5, 5135:3, 5136:4, 5136:11, 5289:11
**308** [12] - 5128:1, 5130:1, 5130:8, 5131:18, 5133:5, 5136:21, 5138:2, 5289:11
**309** [7] - 5128:1, 5130:18, 5131:18, 5131:19, 5133:6, 5138:17, 5289:12
**31** [1] - 5143:5
**310** [8] - 5128:1, 5130:22, 5131:4, 5131:18, 5131:19, 5133:6, 5139:9, 5289:12
**311** [5] - 5116:23, 5117:1, 5117:7, 5117:8, 5289:9
**312** [1] - 5121:15
**31st** [1] - 5117:22
**326** [5] - 5120:18, 5121:9, 5121:12, 5121:13, 5289:10

## 4

**4** [5] - 5137:19, 5172:24, 5174:21, 5174:22, 5175:3
**40** [7] - 5233:6, 5233:8, 5233:13, 5241:5, 5241:17, 5241:21
**40-acre** [1] - 5179:1
**400,000** [2] - 5252:12, 5257:20
**404(b** [1] - 5110:15
**419,000** [1] - 5147:14
**45-B** [1] - 5265:11
**4:30** [1] - 5277:15

## 5

**5** [6] - 5116:7, 5168:15, 5172:19, 5174:5, 5240:11
**5,000** [1] - 5253:14
**50** [1] - 5168:13
**50,000** [3] - 5169:17, 5252:19, 5253:24
**50/50** [1] - 5138:9
**500** [2] - 5130:21, 5138:21
**506** [18] - 5113:19, 5113:25, 5114:2, 5114:3, 5114:6, 5114:10, 5114:18, 5114:21, 5114:23, 5114:25, 5115:1, 5115:2, 5115:9, 5289:5, 5289:6
**506A.T** [2] - 5114:25, 5289:5
**5103** [1] - 5288:3
**5104** [1] - 5288:4
**5112** [1] - 5289:4
**5114** [1] - 5289:5
**5115** [1] - 5288:6
**5117** [1] - 5289:9
**5121** [1] - 5289:10
**5133** [1] - 5289:11
**5145** [1] - 5289:13
**5154** [1] - 5288:8
**5155** [1] - 5289:14
**5160** [2] - 5288:10, 5288:11
**5167** [1] - 5289:16
**5173** [1] - 5288:13
**5174** [2] - 5288:15, 5289:18
**5246** [1] - 5290:5
**5248** [1] - 5288:17
**5249** [2] - 5288:19, 5289:20
**5260** [1] - 5289:22
**5264** [1] - 5289:24
**5266** [1] - 5288:21
**5269** [3] - 5288:23, 5288:25, 5290:1
**56** [1] - 5141:11
**5th** [1] - 5174:24

## 6

**6** [2] - 5102:13, 5104:7
**60** [3] - 5170:7, 5223:21, 5227:14
**620** [1] - 5166:1
**631** [1] - 5095:21
**680** [1] - 5166:13

## 7

**7** [4] - 5137:19, 5147:3, 5208:5

**70** [2] - 5180:25, 5192:7
**700** [1] - 5166:13
**700,000** [1] - 5214:18
**712-6101** [1] - 5095:21

## 8

**8** [4] - 5172:25, 5174:21, 5175:3, 5253:24

## 9

**9** [1] - 5130:10
**9/11** [1] - 5164:21
**90** [3] - 5126:18, 5186:14, 5240:2
**95** [1] - 5122:17
**9:30** [3] - 5094:9, 5277:16, 5287:22

## A

**A-M-B-R-O-S-I-O** [1] - 5160:17
**a.m** [2] - 5094:9, 5287:22
**A.T** [1] - 5114:2
**abide** [1] - 5284:18
**abilities** [1] - 5190:4
**ability** [2] - 5162:5, 5229:11
**able** [27] - 5104:9, 5105:16, 5141:10, 5147:1, 5162:3, 5177:12, 5178:12, 5178:16, 5188:15, 5197:8, 5204:7, 5219:7, 5221:6, 5223:21, 5230:3, 5247:6, 5251:10, 5255:13, 5258:5, 5260:17, 5265:11, 5272:5, 5278:25, 5279:11, 5283:11, 5283:21, 5284:18
**abnormal** [1] - 5159:2
**absence** [2] - 5153:9, 5233:25
**absolutely** [2] - 5261:2, 5278:22
**abundance** [1] - 5209:8
**accept** [3] - 5208:6, 5251:4, 5279:23
**accepted** [1] - 5210:4
**accident** [1] - 5229:16
**accidental** [1] - 5229:20
**accommodation** [1] - 5285:10
**accompanied** [1] - 5155:11
**according** [1] - 5206:10
**account** [5] - 5122:25, 5199:18, 5253:12, 5253:13, 5279:22

**accountant** [3] - 5205:15, 5205:18, 5205:22
**accounted** [2] - 5257:2, 5257:4
**accuracy** [1] - 5249:5
**accurate** [1] - 5131:16
**accurately** [2] - 5250:1, 5260:7
**accusation** [1] - 5217:6
**accusations** [1] - 5207:18
**accused** [2] - 5236:23, 5239:7
**acknowledge** [1] - 5101:3
**acknowledged** [2] - 5155:19, 5174:18
**acquire** [1] - 5148:14
**acquired** [2] - 5100:23, 5148:9
**acquiring** [1] - 5148:12
**acted** [1] - 5225:2
**Acting** [1] - 5094:14
**action** [5] - 5195:25, 5231:5, 5235:5, 5239:3, 5271:9
**activities** [6] - 5179:24, 5181:6, 5181:7, 5185:13, 5237:23, 5241:9
**acts** [1] - 5098:20
**actual** [8] - 5114:3, 5184:4, 5240:5, 5248:7, 5249:18, 5250:16, 5251:6, 5255:15
**adamant** [1] - 5122:10
**add** [1] - 5215:24
**added** [1] - 5273:25
**adding** [1] - 5275:12
**addition** [6] - 5116:9, 5122:10, 5148:18, 5157:22, 5198:2, 5232:10
**additional** [10] - 5104:15, 5122:11, 5123:19, 5133:21, 5143:14, 5147:4, 5226:4, 5226:5, 5229:12
**address** [5] - 5159:9, 5159:13, 5204:7, 5204:16, 5236:6
**addressed** [1] - 5104:8
**addressing** [1] - 5277:24
**adjacent** [1] - 5161:25
**adjourned** [1] - 5287:21
**admissible** [2] - 5210:14, 5210:15
**admission** [1] - 5109:4
**admitted** [18] - 5100:16, 5112:6, 5114:6, 5114:23, 5114:24, 5117:7, 5121:12, 5145:21, 5154:24, 5167:16, 5174:9, 5246:2, 5249:21, 5260:10, 5260:13, 5264:13, 5269:18, 5286:22

3

admitting [1] - 5133:2
advance [4] - 5218:22, 5218:25, 5225:11
advances [2] - 5219:8, 5219:11
adversary [2] - 5157:11, 5157:12
adverse [7] - 5102:7, 5105:21, 5105:24, 5106:17, 5157:22, 5157:25, 5158:3
advertising [4] - 5164:11, 5190:15, 5221:25, 5222:1
advice [1] - 5219:22
advised [1] - 5098:18
advising [1] - 5154:17
affidavit [16] - 5096:7, 5098:11, 5099:3, 5100:10, 5100:14, 5100:15, 5101:14, 5101:16, 5101:18, 5101:20, 5102:6, 5105:24, 5157:10, 5157:12, 5157:15, 5158:11
affidavits [1] - 5102:7
affirmation [3] - 5099:8, 5099:14, 5099:21
afford [1] - 5228:19
afield [1] - 5150:25
afraid [5] - 5283:20, 5284:25
afternoon [3] - 5137:3, 5163:4, 5193:24
afterwards [4] - 5182:2, 5219:5, 5219:13, 5262:1
aggressive [1] - 5194:21
ago [9] - 5121:18, 5155:18, 5190:1, 5202:6, 5202:14, 5228:16, 5230:1, 5240:17, 5251:19
agree [6] - 5102:11, 5200:10, 5212:1, 5212:12, 5244:18, 5244:25
agreed [1] - 5103:1
agreement [35] - 5128:15, 5128:24, 5129:5, 5135:14, 5153:11, 5165:5, 5166:16, 5166:18, 5166:22, 5167:7, 5167:22, 5169:3, 5169:10, 5176:3, 5176:12, 5177:3, 5189:8, 5189:10, 5215:13, 5242:5, 5242:6, 5242:8, 5242:11, 5242:22, 5242:25, 5247:8, 5247:11, 5248:11, 5248:12, 5256:11, 5257:3, 5257:17, 5257:21, 5261:5, 5286:21
agreements [5] - 5118:19, 5131:13, 5139:2, 5242:10, 5247:2
ahead [7] - 5104:19,

5154:9, 5185:10, 5218:9, 5228:20, 5239:19, 5286:17
aid [4] - 5114:8, 5114:23, 5115:9, 5260:14
air [1] - 5096:20
airline [1] - 5134:11
airport [2] - 5124:22, 5227:7
alert [1] - 5206:6
alerted [1] - 5158:4
alias [1] - 5287:19
ALL [1] - 5104:4
allegation [5] - 5153:10, 5209:5, 5211:22, 5211:24, 5244:10
allegations [6] - 5098:14, 5099:14, 5100:1, 5159:5, 5159:6, 5239:9
allege [1] - 5240:12
alleged [3] - 5206:23, 5206:24, 5207:11
alleges [1] - 5098:10
allow [7] - 5113:11, 5151:22, 5152:5, 5152:17, 5226:3, 5227:11, 5285:8
allowed [1] - 5274:9
allowing [5] - 5113:17, 5212:18, 5244:24
alluded [1] - 5195:19
almost [2] - 5230:8, 5264:6
alone [1] - 5228:22
alternate [2] - 5102:13, 5104:7
alternative [1] - 5222:7
altruistic [1] - 5196:10
amazing [3] - 5186:7, 5228:3
AMERICA [1] - 5094:3
American [1] - 5147:11
Americans [2] - 5223:21, 5227:17
amount [11] - 5118:18, 5125:6, 5129:5, 5220:13, 5220:14, 5227:10, 5232:1, 5253:12, 5253:16, 5253:18, 5276:11
amounts [1] - 5169:7
ANDREW [1] - 5095:6
Androzo [1] - 5239:14
Ann [1] - 5095:20
annoying [1] - 5207:12
annual [1] - 5232:2
answer [22] - 5125:22, 5126:2, 5147:23, 5152:20, 5153:17, 5171:4, 5203:10, 5211:9, 5226:7, 5266:12, 5272:20, 5274:21, 5275:4, 5275:18, 5275:25, 5276:19, 5276:20, 5277:4, 5277:5, 5277:11, 5279:13,

5280:6
answered [1] - 5273:23
answering [2] - 5105:4, 5280:19
answers [3] - 5195:24, 5206:1, 5281:6
anticipate [1] - 5244:19
anticipated [2] - 5200:24, 5219:2
anticipating [1] - 5152:20, 5286:12
AOL [1] - 5222:2
apart [3] - 5110:3, 5200:16, 5216:12
apartment [1] - 5182:4
apologize [18] - 5108:10, 5113:2, 5114:10, 5121:8, 5138:7, 5156:10, 5206:19, 5214:10, 5214:12, 5214:14, 5218:7, 5221:1, 5265:24, 5269:15, 5273:3, 5279:2, 5279:3, 5284:12
apologizing [1] - 5156:3
apostrophe [2] - 5144:11, 5160:16
appealing [1] - 5125:12
appear [6] - 5109:2, 5114:4, 5154:18, 5155:12, 5167:2, 5235:25
appearance [1] - 5155:16
appearances [1] - 5096:3
APPEARANCES [1] - 5094:13
appeared [1] - 5129:15
appearing [3] - 5128:4, 5166:23, 5221:7
apples [1] - 5097:11
application [3] - 5226:13, 5236:7, 5284:21
applications [2] - 5222:14, 5222:15
applies [1] - 5114:8
apply [1] - 5165:17
applying [1] - 5207:5
appraisal [1] - 5146:18
appreciate [2] - 5104:7, 5184:18
approach [6] - 5109:5, 5117:15, 5131:25, 5148:25, 5158:16, 5243:12
appropriate [4] - 5126:20, 5158:10, 5190:21, 5193:15
approval [9] - 5208:25, 5254:21, 5270:13, 5272:18, 5275:16, 5276:6, 5276:14, 5277:2, 5277:7
approve [6] - 5251:25, 5252:2, 5252:4, 5272:14, 5272:16, 5272:17
approved [5] - 5209:3,

5257:5, 5269:3, 5270:16, 5272:7
approving [1] - 5254:24
approximate [1] - 5240:8
April [2] - 5262:25, 5263:14
area [5] - 5179:20, 5182:17, 5218:3, 5244:23, 5265:12
areas [2] - 5139:18, 5153:20
argue [7] - 5100:3, 5182:25, 5212:7, 5212:16, 5217:7, 5217:14, 5279:22
argued [1] - 5178:1
arguing [2] - 5099:11, 5194:23
argument [12] - 5153:12, 5183:2, 5211:6, 5213:1, 5213:10, 5214:13, 5216:4, 5216:17, 5238:19, 5280:1, 5280:5, 5280:22
arguments [2] - 5196:4, 5197:21
Arizona [7] - 5105:15, 5105:19, 5160:25, 5161:2, 5174:20, 5179:1, 5182:3
Aroso [2] - 5235:23, 5239:6
arrangements [1] - 5139:1
arrest [1] - 5141:25
articulating [1] - 5201:2
aspect [1] - 5204:16
aspects [1] - 5226:5
asserted [1] - 5280:5
assets [15] - 5151:19, 5153:5, 5153:7, 5178:19, 5178:20, 5178:23, 5220:15, 5237:3, 5237:11, 5237:13, 5237:15, 5242:18, 5247:6, 5247:8, 5251:2
assistance [2] - 5278:9, 5287:6
Assistant [1] - 5094:17
assisted [3] - 5101:6, 5102:8, 5157:25
associate [1] - 5134:15
associated [3] - 5250:12
assume [6] - 5150:7, 5163:22, 5182:17, 5202:8, 5255:11, 5287:19
assumed [1] - 5096:25
attached [8] - 5129:19, 5135:7, 5136:23, 5137:2, 5138:14, 5146:2, 5150:13, 5151:14
attachment [7] - 5130:16, 5132:7, 5136:6, 5136:11, 5137:8, 5138:2, 5138:20
attack [1] - 5166:4

4

**attempt** [2] - 5107:11, 5137:25
**attention** [3] - 5096:23, 5098:8, 5209:23
**attenuated** [1] - 5211:14
**attorney** [7] - 5145:6, 5155:15, 5249:12, 5254:14, 5254:15, 5254:16, 5254:20
**Attorney** [3] - 5094:14, 5094:17, 5097:17
**Attorney's** [2] - 5155:6, 5155:11
**attorney's** [1] - 5262:15
**attorneys** [4] - 5141:24, 5146:11, 5218:21, 5278:19
**audience** [1] - 5228:16
**audio** [3] - 5142:4, 5259:22, 5260:20
**August** [7] - 5142:17, 5147:13, 5147:14, 5148:3, 5164:17, 5167:23, 5168:2
**authentic** [1] - 5268:3
**authenticate** [1] - 5268:9
**authentication** [2] - 5244:14, 5268:8
**authenticity** [1] - 5207:22
**authorization** [1] - 5199:12
**available** [4] - 5099:16, 5101:23, 5103:2, 5197:6
**Avalon** [14] - 5124:22, 5125:2, 5125:6, 5125:9, 5125:18, 5125:25, 5126:5, 5153:5, 5153:14, 5253:5, 5253:7, 5253:13, 5253:14, 5253:15
**Avenue** [2] - 5138:3, 5138:4
**average** [1] - 5228:18
**avoid** [2] - 5098:19, 5193:23
**avoiding** [1] - 5216:19
**aware** [11] - 5108:1, 5108:2, 5151:13, 5156:3, 5178:5, 5215:22, 5254:3, 5254:5, 5262:24, 5264:24, 5270:9
**awful** [1] - 5152:24
**AZ** [7] - 5188:6, 5248:10, 5250:10, 5253:5, 5253:7, 5253:13, 5253:15

## B

**B.T** [4] - 5114:21, 5114:23, 5115:1, 5289:6
**backed** [1] - 5165:12
**background** [5] - 5162:25, 5186:5, 5194:5, 5201:23,

5201:24
**backwards** [1] - 5228:23
**bad** [4] - 5098:20, 5222:18, 5233:5
**Bahti** [1] - 5131:6
**balance** [1] - 5237:9
**Bancorp** [1] - 5253:19
**Bank** [1] - 5165:6
**bank** [22] - 5116:12, 5116:19, 5117:20, 5118:22, 5119:3, 5165:1, 5166:3, 5166:9, 5166:11, 5166:12, 5166:15, 5222:9, 5226:20, 5230:12, 5230:15, 5230:24, 5231:17, 5252:19, 5253:11, 5253:22, 5254:12
**Bankruptcy** [1] - 5105:14
**bankruptcy** [19] - 5098:11, 5098:12, 5098:17, 5099:11, 5100:3, 5100:20, 5100:21, 5101:1, 5101:7, 5105:19, 5105:22, 5105:25, 5106:18, 5106:20, 5157:11, 5157:23, 5158:1, 5158:4
**banks** [6] - 5127:19, 5164:7, 5164:15, 5166:7, 5230:8, 5231:18
**barrage** [2] - 5203:25, 5204:3
**based** [14] - 5101:12, 5119:20, 5165:22, 5168:25, 5177:13, 5189:10, 5195:15, 5203:25, 5204:13, 5216:9, 5217:14, 5249:13, 5286:13
**basis** [4] - 5131:23, 5200:17, 5216:13, 5217:7
**beach** [1] - 5186:7
**beachfront** [1] - 5186:8
**bear** [1] - 5116:5
**became** [6] - 5119:16, 5137:19, 5162:21, 5162:24, 5177:17, 5180:6
**become** [3] - 5183:9, 5190:16, 5251:25
**becomes** [2] - 5204:12, 5247:23
**bedrooms** [1] - 5191:16
**BEFORE** [1] - 5094:11
**befuddled** [1] - 5211:6
**began** [1] - 5175:2
**begin** [1] - 5126:20
**beginning** [6] - 5098:1, 5127:15, 5215:20, 5217:10, 5263:7, 5265:7
**behalf** [5] - 5105:22, 5136:18, 5160:6, 5269:4, 5270:19

**behavior** [1] - 5224:5
**behind** [1] - 5273:1
**belief** [5] - 5143:10, 5156:22, 5236:21, 5280:3
**beneficial** [1] - 5135:11
**benefit** [2] - 5135:15, 5233:15
**benefits** [5] - 5223:2, 5228:4, 5229:12, 5229:19, 5229:20
**benefitting** [1] - 5185:21
**Berard** [7] - 5120:11, 5120:14, 5121:7, 5122:5, 5122:22, 5142:19, 5258:4
**best** [7] - 5118:17, 5133:24, 5170:19, 5190:18, 5223:5, 5244:23, 5274:7
**better** [2] - 5116:5, 5128:11
**between** [25] - 5106:23, 5108:25, 5112:10, 5113:6, 5123:14, 5127:14, 5128:25, 5130:2, 5130:22, 5135:7, 5144:8, 5145:5, 5145:14, 5146:12, 5155:19, 5176:11, 5181:9, 5194:19, 5196:23, 5206:22, 5237:22, 5238:21, 5241:14, 5244:7, 5261:18
**beyond** [2] - 5110:3, 5231:11
**BIANCO** [1] - 5094:11
**Big** [2] - 5136:7, 5146:17
**big** [2] - 5134:3, 5164:14
**binding** [1] - 5252:1
**bit** [3] - 5098:8, 5108:15, 5145:12
**bits** [1] - 5181:16
**bizarre** [2] - 5208:14
**blurry** [1] - 5116:3
**blush** [1] - 5215:4
**BMW** [1] - 5187:13
**board** [54] - 5199:9, 5199:11, 5202:25, 5206:12, 5206:17, 5209:1, 5209:3, 5210:19, 5224:16, 5234:9, 5234:11, 5234:20, 5235:5, 5235:9, 5235:16, 5235:23, 5236:10, 5238:5, 5238:7, 5247:17, 5251:24, 5252:2, 5252:3, 5254:21, 5254:23, 5257:5, 5270:13, 5270:19, 5271:1, 5271:3, 5271:15, 5271:23, 5271:25, 5272:2, 5272:6, 5272:10, 5272:12, 5273:12, 5273:15, 5273:24, 5274:3, 5274:5, 5274:7, 5274:10, 5274:11,

5274:13, 5274:18, 5274:19, 5275:7, 5275:12, 5277:22, 5278:3, 5281:13, 5281:18
**board's** [1] - 5216:23
**body** [1] - 5161:25
**book** [1] - 5210:12
**books** [6] - 5148:21, 5205:14, 5205:16, 5249:3, 5273:17, 5273:19
**born** [1] - 5161:3
**borrow** [1] - 5176:25
**borrowed** [4] - 5176:24, 5180:3, 5224:6, 5232:4
**bottom** [5] - 5118:12, 5137:8, 5146:6, 5271:12, 5271:21
**bought** [2] - 5206:25, 5207:11
**box** [1] - 5204:11
**brainstormed** [1] - 5163:4
**brand** [2] - 5164:15, 5228:19
**brand-new** [1] - 5228:19
**branded** [1] - 5227:8
**break** [12] - 5149:1, 5149:2, 5151:14, 5153:22, 5193:16, 5193:21, 5202:12, 5202:19, 5236:6, 5236:8, 5255:4, 5277:15
**Brent** [19] - 5190:25, 5218:20, 5219:8, 5219:22, 5220:18, 5233:6, 5237:6, 5237:8, 5237:10, 5238:4, 5238:15, 5238:17, 5239:7, 5243:4, 5243:5, 5250:21, 5275:16, 5275:19, 5275:22
**Brian** [2] - 5130:4, 5258:4
**bridge** [2] - 5218:23, 5218:25
**Bridge** [1] - 5135:7
**brief** [2] - 5153:18, 5248:21
**briefly** [8] - 5096:4, 5105:16, 5112:9, 5158:16, 5171:19, 5189:3, 5244:9, 5247:1
**bring** [15] - 5096:23, 5098:7, 5099:10, 5103:15, 5154:4, 5160:20, 5203:9, 5209:22, 5210:22, 5210:24, 5217:12, 5217:25, 5218:4, 5230:6, 5256:16
**bringing** [3] - 5098:20, 5101:7, 5283:8
**brings** [1] - 5201:3
**broke** [2] - 5154:13, 5197:4
**broken** [1] - 5221:12
**Brothers** [5] - 5127:11, 5131:5, 5131:7, 5131:10,

5

5137:17
**brought** [5] - 5098:15, 5131:12, 5214:24, 5216:18, 5261:1
**browser** [1] - 5165:21
**Bryan** [1] - 5120:11
**build** [1] - 5229:11
**builder** [3] - 5224:22, 5225:18, 5226:6
**building** [7] - 5125:7, 5165:8, 5229:8, 5263:6, 5263:13, 5263:25, 5265:8
**buildings** [3] - 5125:6, 5125:11, 5182:4
**built** [2] - 5170:23, 5263:2
**bunch** [2] - 5202:18, 5226:22
**bureaus** [5] - 5223:6, 5223:10, 5223:15, 5224:14, 5230:9
**burning** [3] - 5140:5, 5140:18, 5261:6
**bus** [3] - 5179:12, 5179:14, 5179:17
**business** [31] - 5148:7, 5148:11, 5153:2, 5156:5, 5156:8, 5164:20, 5164:21, 5165:10, 5166:7, 5169:5, 5171:7, 5173:2, 5176:23, 5178:6, 5180:22, 5180:24, 5183:1, 5184:15, 5189:5, 5193:2, 5221:15, 5221:21, 5222:9, 5222:13, 5225:5, 5225:6, 5225:24, 5231:22, 5231:23, 5256:4
**busy** [1] - 5206:20
**buy** [15] - 5123:19, 5124:8, 5163:14, 5187:16, 5199:15, 5217:1, 5235:1, 5237:2, 5237:13, 5237:23, 5241:2, 5241:6, 5242:11, 5250:23, 5252:10
**buying** [8] - 5207:2, 5237:4, 5237:19, 5239:3, 5239:7, 5239:20, 5240:13, 5241:14
**buyout** [17] - 5107:11, 5107:14, 5107:18, 5120:9, 5120:13, 5120:24, 5121:23, 5122:8, 5122:22, 5122:25, 5123:3, 5123:22, 5124:1, 5124:2, 5124:8, 5124:13, 5241:1
**BY** [48] - 5094:16, 5094:22, 5095:4, 5104:23, 5112:8, 5115:5, 5115:13, 5115:22, 5117:9, 5117:19, 5118:3, 5120:2, 5121:14, 5127:3, 5129:17, 5133:8, 5141:5, 5143:18, 5144:1, 5145:23,

5148:1, 5154:12, 5160:23, 5167:19, 5173:7, 5174:13, 5218:12, 5234:15, 5236:9, 5248:25, 5249:25, 5262:21, 5264:16, 5266:9, 5269:2, 5269:24, 5273:10, 5288:5, 5288:7, 5288:9, 5288:12, 5288:14, 5288:16, 5288:18, 5288:20, 5288:22, 5288:24, 5289:1

## C

**C-158** [1] - 5153:20
**C-162** [1] - 5257:8
**C-265** [5] - 5166:19, 5167:10, 5167:16, 5167:17, 5167:21, 5289:16
**C-267** [5] - 5172:9, 5173:4, 5174:9, 5174:10, 5289:18
**C-268** [2] - 5265:25, 5266:3
**C-269** [3] - 5263:18, 5264:14, 5289:24
**C-270** [2] - 5264:14, 5289:24
**C-271** [3] - 5271:8, 5275:10, 5281:19
**C-272** [3] - 5269:12, 5269:19, 5290:1
**C-277** [2] - 5269:20, 5290:1
**C-279** [6] - 5248:2, 5248:15, 5249:1, 5249:21, 5249:22, 5289:20
**C-280** [5] - 5259:13, 5260:10, 5260:13, 5260:15, 5289:22
**C-282** [6] - 5259:13, 5259:19, 5260:10, 5260:13, 5260:15, 5289:22
**C-304** [2] - 5269:20, 5290:2
**C-305** [2] - 5269:20, 5290:2
**C-9** [7] - 5168:6, 5168:14, 5168:17, 5169:21, 5169:22, 5174:16, 5174:22
**C.R** [20] - 5188:8, 5188:10, 5188:11, 5188:18, 5189:11, 5190:3, 5190:10, 5190:23, 5207:24, 5208:10, 5208:24, 5209:2, 5251:1, 5271:15, 5272:13, 5272:19, 5274:1, 5276:2, 5286:20, 5286:25
**Cabo** [2] - 5131:5, 5186:6
**CALCAGNI** [1] - 5094:20
**Canada** [6] - 5127:9, 5191:14, 5191:23, 5191:25, 5192:8, 5192:11
**cancelling** [1] - 5155:16

**cannot** [6] - 5101:11, 5185:6, 5274:21, 5278:14, 5280:22, 5280:23
**capacity** [3] - 5182:18, 5189:14, 5189:22
**Capital** [8] - 5135:8, 5243:3, 5243:7, 5247:16, 5247:23, 5248:6, 5250:11, 5251:13
**capital** [22] - 5168:22, 5168:23, 5169:18, 5169:22, 5171:14, 5171:22, 5176:13, 5176:17, 5177:4, 5177:7, 5177:9, 5177:10, 5177:13, 5177:15, 5177:18, 5177:19, 5177:22, 5178:3, 5178:22, 5187:16, 5190:15, 5193:11
**car** [7] - 5161:24, 5162:2, 5162:3, 5227:16, 5227:24, 5228:12, 5228:19
**card** [43] - 5163:20, 5163:21, 5164:8, 5164:10, 5165:13, 5165:17, 5221:10, 5221:11, 5221:19, 5222:3, 5222:4, 5222:8, 5222:11, 5222:22, 5222:23, 5222:25, 5223:1, 5223:2, 5223:3, 5223:4, 5223:5, 5223:10, 5223:11, 5224:17, 5224:24, 5225:12, 5226:10, 5226:14, 5227:9, 5227:10, 5227:20, 5227:21, 5228:5, 5229:13, 5229:15, 5229:21, 5229:22, 5230:12, 5230:17, 5253:22
**cardholder** [1] - 5229:19
**cardholders** [3] - 5227:14, 5227:25, 5229:18
**cards** [10] - 5163:23, 5165:25, 5166:13, 5222:6, 5226:22, 5226:23, 5227:2, 5227:9, 5244:17
**care** [4] - 5203:7, 5203:8, 5209:19, 5209:24
**Carey** [5] - 5254:6, 5265:17, 5269:4, 5270:6, 5276:3, 5276:7, 5276:15, 5277:3, 5277:7
**carried** [2] - 5156:5, 5257:16
**cars** [3] - 5162:13, 5162:14, 5227:17
**carved** [2] - 5216:24, 5234:21
**case** [32] - 5096:3, 5098:19, 5100:7, 5101:12, 5149:3, 5159:2, 5166:3,

5185:3, 5193:17, 5201:25, 5207:8, 5208:2, 5208:23, 5209:9, 5210:25, 5215:5, 5215:6, 5216:21, 5217:12, 5240:16, 5244:25, 5254:10, 5255:5, 5262:16, 5277:17, 5281:17, 5284:13, 5285:5, 5285:24, 5286:1, 5286:12, 5286:23
**cash** [4] - 5137:18, 5212:19, 5225:11, 5242:13
**categories** [1] - 5221:13
**Catholic** [1] - 5283:2
**caught** [1] - 5238:19
**caution** [1] - 5209:9
**CD** [2] - 5141:13, 5141:17
**ceases** [1] - 5208:1
**Central** [3] - 5094:6, 5094:15, 5095:21
**Centrum** [1] - 5116:1
**CEO** [8] - 5146:16, 5189:25, 5190:23, 5208:1, 5208:5, 5208:6, 5208:13, 5234:1
**certain** [13] - 5102:18, 5159:10, 5200:12, 5225:24, 5227:10, 5227:11, 5227:19, 5228:3, 5229:3, 5232:1, 5256:1, 5273:19, 5273:22
**certainly** [2] - 5208:10, 5213:18
**Certificate** [3] - 5263:4, 5263:9, 5266:1
**certified** [1] - 5268:6
**chain** [1] - 5112:3
**chance** [3] - 5117:24, 5121:22, 5128:3
**changed** [10] - 5165:10, 5165:13, 5165:15, 5171:7, 5271:2, 5271:3, 5271:4, 5272:8, 5274:5, 5275:7
**changing** [1] - 5228:7
**charge** [2] - 5224:18, 5284:16
**charged** [1] - 5224:17
**charging** [1] - 5224:19
**Charity** [1] - 5283:3
**chart** [18] - 5116:7, 5116:8, 5116:14, 5147:2, 5213:4, 5213:7, 5248:3, 5248:5, 5248:11, 5249:1, 5249:14, 5250:1, 5250:5, 5250:8, 5252:23, 5265:16, 5269:25, 5270:3
**chase** [1] - 5186:22
**chasing** [1] - 5186:25
**check** [2] - 5180:19, 5230:16
**checks** [1] - 5180:15

**6**

**children** [2] - 5191:6, 5238:24
**choice** [1] - 5201:17
**choices** [1] - 5220:6
**chorus** [1] - 5204:5
**chose** [1] - 5247:19
**chronology** [1] - 5197:19
**circuit** [3] - 5099:1, 5232:11, 5232:14
**circumstances** [4] - 5135:10, 5155:25, 5159:1, 5211:9
**civil** [3] - 5195:11, 5195:20, 5244:7
**claim** [2] - 5101:7, 5226:4
**claimants** [1] - 5101:8
**claims** [1] - 5226:4
**clarification** [1] - 5097:15
**clarified** [1] - 5281:16
**clause** [1] - 5233:6
**clear** [5] - 5201:13, 5210:16, 5213:7, 5279:6, 5279:8
**clearly** [1] - 5282:13
**CLERK** [4] - 5096:1, 5103:25, 5199:3, 5218:5
**client** [17] - 5096:8, 5097:5, 5098:10, 5098:17, 5100:11, 5101:5, 5101:13, 5110:7, 5152:21, 5159:9, 5202:6, 5202:10, 5204:1, 5205:10, 5214:22, 5215:7, 5216:20
**client's** [3] - 5203:13, 5217:10, 5217:16
**clients** [9] - 5100:22, 5100:24, 5101:4, 5101:7, 5113:15, 5123:12, 5123:19, 5156:8, 5158:2
**clients'** [1] - 5157:20
**clip** [2] - 5208:3, 5260:20
**close** [13] - 5099:15, 5165:6, 5165:20, 5178:11, 5187:18, 5191:5, 5192:13, 5214:24, 5219:1, 5227:22, 5264:5, 5269:11, 5286:23
**closely** [1] - 5282:21
**closer** [2] - 5195:12, 5196:7
**closing** [7] - 5135:8, 5137:13, 5137:18, 5137:20, 5145:9, 5148:3, 5148:4
**CMG** [2] - 5116:16, 5118:11
**CMJ** [1] - 5172:4
**co** [2] - 5255:24, 5255:25
**co-conspirator** [2] - 5255:24, 5255:25
**collapsed** [1] - 5154:3

**collateral** [2] - 5156:4, 5220:19
**collating** [1] - 5286:19
**collect** [1] - 5230:16
**collected** [3] - 5121:5, 5122:13, 5122:19
**collective** [1] - 5113:12
**collectively** [2] - 5127:24, 5128:10
**collusion** [1] - 5209:6
**column** [1] - 5250:14
**coming** [5] - 5102:22, 5147:11, 5207:8, 5207:14, 5258:12
**comment** [10] - 5137:21, 5214:14, 5216:16, 5272:24, 5273:2, 5273:5, 5273:6, 5279:19, 5279:20, 5280:11
**commentary** [1] - 5280:1
**comments** [3] - 5108:7, 5137:5, 5278:20
**commercial** [2] - 5125:1, 5265:6
**commercials** [3] - 5264:24, 5265:3, 5265:4
**communicating** [1] - 5143:9
**communication** [1] - 5146:9
**communications** [2] - 5196:22, 5249:13
**Community** [2] - 5138:3, 5138:4
**companies** [7] - 5138:4, 5163:13, 5165:7, 5231:3, 5231:4, 5231:7, 5231:25
**company** [74] - 5101:8, 5124:2, 5130:4, 5138:6, 5138:8, 5146:17, 5162:6, 5162:21, 5164:10, 5165:20, 5168:23, 5168:25, 5171:12, 5171:13, 5171:17, 5171:22, 5171:23, 5172:1, 5172:2, 5172:4, 5173:2, 5175:16, 5176:3, 5176:6, 5176:9, 5176:13, 5176:25, 5177:10, 5177:11, 5177:21, 5178:13, 5178:17, 5178:24, 5179:2, 5179:7, 5179:10, 5182:15, 5185:14, 5187:16, 5188:4, 5188:23, 5190:17, 5191:1, 5192:19, 5193:3, 5193:7, 5218:17, 5220:12, 5221:23, 5227:8, 5231:22, 5232:4, 5233:1, 5233:8, 5233:18, 5234:8, 5234:21, 5239:4, 5241:11, 5241:22,

5241:25, 5242:14, 5247:7, 5250:19, 5250:23, 5251:17, 5254:11, 5260:25, 5261:8, 5261:9, 5264:25, 5269:7, 5272:9, 5275:8
**Company** [7] - 5144:9, 5144:10, 5144:11, 5146:16, 5161:6, 5174:21, 5243:6
**compared** [2] - 5260:4
**complain** [1] - 5183:18
**complaint** [1] - 5195:22
**complete** [2] - 5207:13, 5263:24
**completed** [1] - 5264:6
**completely** [1] - 5194:5
**completeness** [1] - 5100:15
**comply** [1] - 5197:24, 5202:3
**comport** [1] - 5208:9
**Compucredit** [1] - 5230:20
**computer** [3] - 5095:25, 5162:7, 5163:3
**concede** [2] - 5161:17, 5161:19
**conceded** [3] - 5161:21, 5187:7, 5187:8
**concept** [6] - 5163:5, 5163:7, 5163:10, 5163:18, 5164:3, 5226:21
**concern** [4] - 5200:8, 5209:20, 5212:24, 5214:25
**concerned** [2] - 5100:1, 5199:22
**concerning** [1] - 5154:14
**conclude** [2] - 5205:11
**concluded** [6] - 5115:4, 5115:12, 5209:17, 5209:19, 5209:21, 5286:21
**concludes** [1] - 5211:16
**concluding** [1] - 5211:18
**conclusion** [2] - 5127:16, 5209:25, 5210:2
**conclusions** [1] - 5282:2
**condition** [1] - 5233:1
**condominium** [1] - 5150:6
**conduct** [1] - 5209:17
**conducted** [2] - 5159:8, 5222:13
**conference** [11] - 5159:19, 5184:20, 5201:4, 5201:6, 5201:12, 5207:24, 5208:12, 5239:15, 5258:8, 5258:11, 5268:12
**confers** [1] - 5152:8
**confirming** [1] - 5120:11
**confront** [1] - 5207:17
**confrontation** [1] -

5208:16
**confused** [1] - 5103:11
**confusion** [1] - 5144:18
**connection** [9] - 5105:19, 5110:9, 5154:15, 5157:10, 5157:13, 5181:18, 5206:3, 5216:10, 5244:6
**consent** [2] - 5101:12, 5271:9
**consider** [2] - 5185:8, 5195:14
**consideration** [1] - 5174:17
**considered** [1] - 5166:1
**consistent** [3] - 5159:6, 5200:2, 5203:5
**conspiracy** [4] - 5119:21, 5212:17, 5213:11, 5240:12
**conspirator** [2] - 5255:24, 5255:25
**Constantine** [155] - 5095:4, 5095:8, 5099:12, 5099:16, 5100:3, 5100:19, 5105:8, 5105:20, 5106:15, 5106:22, 5106:24, 5107:23, 5116:13, 5116:16, 5117:21, 5118:19, 5118:23, 5119:1, 5119:6, 5119:15, 5119:18, 5123:13, 5126:8, 5126:14, 5126:18, 5128:14, 5129:2, 5129:8, 5130:2, 5130:20, 5130:23, 5131:14, 5133:13, 5134:24, 5135:5, 5136:3, 5136:16, 5136:23, 5137:11, 5138:19, 5139:1, 5139:11, 5139:21, 5139:25, 5140:15, 5140:24, 5142:21, 5143:20, 5144:14, 5145:2, 5145:6, 5145:25, 5146:3, 5146:4, 5146:15, 5147:11, 5148:8, 5150:8, 5151:21, 5152:25, 5153:3, 5153:11, 5156:24, 5157:3, 5157:24, 5159:4, 5159:11, 5160:7, 5161:11, 5161:22, 5162:1, 5162:9, 5162:21, 5167:3, 5168:6, 5168:13, 5169:17, 5170:7, 5174:19, 5175:7, 5175:13, 5175:18, 5178:6, 5178:12, 5178:16, 5178:24, 5179:9, 5180:2, 5180:17, 5181:3, 5181:5, 5182:23, 5183:6, 5184:6, 5184:11, 5184:12, 5184:14, 5185:5, 5185:12, 5187:11, 5191:3, 5194:10, 5194:12, 5194:22, 5195:17, 5195:19,

7

5197:21, 5201:5, 5201:12, 5203:17, 5203:22, 5204:1, 5204:17, 5205:8, 5205:14, 5207:17, 5207:18, 5207:20, 5208:4, 5209:1, 5210:10, 5211:23, 5212:3, 5212:7, 5212:14, 5212:18, 5212:21, 5213:1, 5213:6, 5213:8, 5213:12, 5213:16, 5213:20, 5215:19, 5232:11, 5232:17, 5235:24, 5237:22, 5238:22, 5239:14, 5242:24, 5243:4, 5253:25, 5258:24, 5259:9, 5261:18, 5269:5, 5272:21, 5275:17, 5279:21, 5280:8, 5282:4
**CONSTANTINE** [1] - 5094:7
**constantine's** [1] - 5105:25
**Constantine's** [19] - 5098:12, 5101:2, 5105:22, 5107:18, 5108:7, 5144:22, 5145:6, 5148:15, 5157:23, 5158:1, 5158:6, 5179:24, 5185:7, 5190:2, 5194:25, 5196:5, 5196:11, 5211:15, 5217:6
**construction** [1] - 5263:24
**consult** [1] - 5206:1
**consultant** [3] - 5189:15, 5191:13, 5208:1
**consulting** [2] - 5118:19, 5139:2
**Consulting** [6] - 5168:7, 5168:14, 5168:17, 5169:21, 5174:16, 5174:23
**consumer** [1] - 5229:10
**consummated** [2] - 5131:4, 5233:14
**consummating** [1] - 5146:20
**contact** [2] - 5137:5, 5156:6
**contacted** [1] - 5119:3
**contained** [1] - 5143:19
**contains** [1] - 5147:4
**contemporaneous** [1] - 5196:22
**content** [2] - 5101:14, 5101:15
**context** [3] - 5195:11, 5196:1, 5200:11
**continuation** [3] - 5143:20, 5225:21, 5225:23
**continue** [7] - 5102:16, 5104:10, 5104:12, 5129:22, 5134:25, 5142:10, 5218:8
**continued** [6] - 5123:17,

5139:2, 5149:5, 5163:22, 5207:25, 5246:4
**Continued** [7] - 5109:7, 5111:21, 5132:24, 5158:19, 5159:20, 5174:13, 5183:23, 5184:21, 5243:13, 5245:4, 5249:25, 5267:2, 5268:13, 5269:2, 5288:16, 5288:20, 5288:24
**contract** [3] - 5144:8, 5169:6, 5219:9
**contractual** [1] - 5170:9
**contradiction** [1] - 5203:21
**contrary** [1] - 5110:21
**contribute** [4] - 5120:13, 5124:1, 5169:22, 5186:10
**contributed** [5] - 5119:18, 5124:8, 5169:8, 5180:2, 5257:1
**contributing** [2] - 5123:2, 5124:13
**contribution** [8] - 5126:6, 5168:22, 5169:3, 5169:18, 5176:17, 5177:15, 5193:11, 5252:11
**contributions** [4] - 5106:11, 5106:12, 5176:1, 5176:14
**control** [2] - 5142:2, 5237:5
**conversation** [20] - 5111:18, 5137:3, 5139:21, 5140:24, 5141:10, 5142:15, 5143:11, 5143:20, 5155:19, 5155:22, 5155:23, 5156:1, 5156:12, 5157:1, 5163:25, 5208:4, 5237:22, 5260:8, 5261:17, 5261:22
**conversations** [4] - 5123:10, 5156:13, 5183:6, 5183:8
**conversion** [8] - 5242:6, 5242:9, 5242:12, 5242:22, 5247:11, 5248:12, 5257:3, 5257:17
**convert** [1] - 5242:19
**converted** [1] - 5251:13
**convertible** [1] - 5220:11
**converts** [1] - 5247:12
**convey** [4] - 5241:6, 5241:25, 5242:13, 5250:23
**conveyed** [1] - 5247:20
**conveys** [1] - 5174:18
**conviction** [1] - 5285:24
**convince** [1] - 5163:17
**Conway** [2] - 5197:8, 5197:15
**CONWAY** [1] - 5095:2

**cookie** [1] - 5238:19
**copies** [1] - 5142:8
**copy** [12] - 5101:22, 5103:13, 5116:8, 5117:13, 5117:16, 5139:23, 5143:13, 5255:12, 5266:16, 5266:21, 5268:6, 5282:25
**corners** [2] - 5110:8, 5152:13
**Coronado** [2] - 5103:4, 5205:20
**correct** [111] - 5105:10, 5105:20, 5106:6, 5108:13, 5113:1, 5113:7, 5115:6, 5115:14, 5116:20, 5117:22, 5119:23, 5119:24, 5121:18, 5124:17, 5124:24, 5125:17, 5125:20, 5125:23, 5126:25, 5127:6, 5128:5, 5128:20, 5130:15, 5133:13, 5134:6, 5134:11, 5135:17, 5135:24, 5136:6, 5136:12, 5138:5, 5139:15, 5140:13, 5140:16, 5140:19, 5140:20, 5140:22, 5141:21, 5143:11, 5143:21, 5144:5, 5144:7, 5146:5, 5146:13, 5147:15, 5147:19, 5147:25, 5148:3, 5148:5, 5153:18, 5156:18, 5166:24, 5167:8, 5167:23, 5168:10, 5169:15, 5170:2, 5170:9, 5171:1, 5172:5, 5175:8, 5175:20, 5176:4, 5176:5, 5176:9, 5177:4, 5177:19, 5180:23, 5211:21, 5216:5, 5216:8, 5219:15, 5225:7, 5232:8, 5232:12, 5233:19, 5234:17, 5239:21, 5239:24, 5240:6, 5240:20, 5240:21, 5247:9, 5247:24, 5251:10, 5251:14, 5251:17, 5251:21, 5252:5, 5252:6, 5252:13, 5252:14, 5253:2, 5253:16, 5253:18, 5259:24, 5263:15, 5265:18, 5270:10, 5270:14, 5270:17, 5270:18, 5270:19, 5270:22, 5270:24, 5271:10, 5271:17, 5271:20, 5273:7, 5273:12, 5283:19
**correctly** [4] - 5126:4, 5141:8, 5146:24, 5148:16
**correspond** [1] - 5236:12

**correspondence** [3] - 5129:7, 5130:22, 5132:8
**cost** [3] - 5219:24, 5220:1, 5241:5
**Cotrell** [4] - 5167:4, 5168:6, 5168:14, 5169:19
**COTRELL** [1] - 5167:4
**counsel** [4] - 5152:8, 5206:1, 5280:10, 5283:1, 5284:22
**counting** [1] - 5285:13
**Country** [1] - 5095:3
**couple** [1] - 5131:2, 5150:15, 5166:7, 5169:6, 5178:25, 5183:12, 5191:20, 5222:16, 5232:25, 5264:6, 5265:8
**course** [10] - 5096:14, 5100:19, 5133:21, 5162:18, 5171:16, 5173:2, 5187:14, 5192:13, 5192:17, 5272:8
**Court** [29] - 5095:7, 5095:20, 5096:5, 5098:22, 5098:23, 5100:20, 5101:22, 5102:4, 5105:14, 5131:22, 5153:8, 5194:4, 5201:22, 5201:23, 5206:6, 5206:19, 5210:24, 5214:25, 5216:22, 5244:18, 5279:1, 5282:8, 5283:2, 5283:3, 5283:4, 5283:12, 5284:14, 5284:20, 5285:2
**court** [8] - 5106:20, 5112:1, 5133:1, 5158:5, 5161:13, 5187:5, 5217:20, 5246:1
**COURT** [178] - 5094:1, 5096:2, 5097:6, 5097:13, 5097:25, 5098:5, 5099:11, 5100:2, 5101:17, 5101:21, 5101:24, 5102:2, 5102:11, 5102:13, 5102:25, 5103:7, 5103:10, 5103:15, 5103:18, 5104:2, 5104:5, 5104:19, 5109:6, 5110:2, 5111:10, 5111:14, 5111:20, 5112:2, 5113:25, 5114:5, 5114:14, 5114:18, 5114:21, 5114:23, 5115:18, 5117:7, 5117:17, 5120:1, 5121:12, 5125:4, 5125:22, 5126:2, 5131:25, 5132:11, 5132:19, 5132:22, 5133:2, 5145:21, 5147:23, 5149:1, 5150:2, 5151:3, 5151:6, 5151:22, 5152:1, 5152:5, 5152:14, 5152:23, 5153:12, 5153:18, 5153:22,

8

5153:24, 5154:4, 5154:7, 5154:9, 5154:23, 5158:14, 5159:14, 5160:3, 5160:8, 5160:14, 5160:18, 5160:20, 5161:19, 5161:21, 5167:13, 5167:16, 5171:3, 5174:9, 5175:12, 5175:24, 5184:9, 5184:19, 5185:1, 5187:8, 5193:16, 5193:20, 5193:23, 5194:12, 5194:16, 5195:3, 5195:8, 5196:3, 5196:19, 5196:25, 5197:14, 5198:1, 5198:4, 5199:4, 5200:20, 5201:24, 5203:7, 5204:18, 5205:18, 5209:14, 5210:5, 5211:11, 5212:3, 5212:6, 5217:9, 5217:22, 5217:25, 5218:4, 5218:7, 5231:11, 5236:8, 5243:12, 5244:12, 5244:20, 5244:24, 5246:2, 5248:18, 5248:23, 5249:21, 5255:4, 5255:10, 5255:20, 5255:23, 5256:6, 5256:10, 5256:15, 5256:19, 5256:21, 5260:13, 5262:19, 5264:13, 5266:5, 5266:7, 5266:24, 5268:9, 5269:16, 5269:18, 5269:22, 5272:23, 5273:4, 5273:9, 5276:17, 5277:1, 5277:15, 5277:24, 5278:9, 5278:14, 5279:5, 5279:15, 5279:18, 5281:18, 5281:24, 5282:6, 5282:17, 5282:23, 5283:15, 5283:17, 5283:23, 5284:1, 5284:5, 5285:4, 5285:17, 5285:20, 5285:22, 5286:6, 5286:11, 5286:17, 5286:24, 5287:2, 5287:8, 5287:12, 5287:14, 5287:20
**Court's** [10] - 5096:5, 5096:23, 5098:7, 5103:3, 5152:10, 5158:7, 5197:25, 5209:22, 5234:14, 5284:18
**Courthouse** [1] - 5094:6
**courtroom** [7] - 5120:15, 5154:6, 5193:19, 5255:7, 5256:18, 5272:24, 5277:20
**courts** [1] - 5142:1
**cover** [1] - 5155:10
**covered** [2] - 5127:5, 5220:1
**covering** [1] - 5117:21
**covers** [2] - 5225:10, 5226:17
**CR** [12] - 5218:19, 5219:7,

5232:16, 5233:3, 5235:15, 5236:20, 5236:21, 5236:22, 5237:1, 5237:6, 5237:8, 5237:9
**CR-13-607** [1] - 5094:4
**Craig** [2] - 5162:8, 5182:7
**create** [6] - 5215:1, 5229:17, 5230:15, 5249:9, 5249:10, 5287:14
**created** [7] - 5140:11, 5216:11, 5216:12, 5240:25, 5249:8, 5249:14, 5256:10
**creating** [1] - 5229:14
**credibility** [2] - 5206:3, 5229:20
**credit** [44] - 5110:10, 5112:22, 5113:11, 5156:14, 5164:10, 5165:13, 5165:17, 5165:21, 5165:22, 5221:9, 5221:10, 5221:18, 5222:3, 5222:4, 5222:6, 5222:8, 5222:17, 5222:18, 5222:19, 5223:1, 5223:6, 5223:9, 5223:11, 5223:14, 5223:22, 5224:8, 5224:12, 5224:14, 5224:22, 5224:24, 5225:3, 5225:18, 5226:5, 5226:22, 5227:12, 5228:5, 5229:8, 5229:11, 5229:15, 5229:19, 5229:21, 5230:9, 5244:17
**creditors** [1] - 5101:8
**critical** [1] - 5214:1
**CROSS** [2] - 5269:23, 5288:25
**cross** [11] - 5104:24, 5106:25, 5110:16, 5110:17, 5113:4, 5126:10, 5150:16, 5200:21, 5204:22, 5269:22, 5283:20
**CROSS-EXAMINATION** [2] - 5269:23, 5288:25
**cross-examination** [5] - 5104:24, 5106:25, 5113:4, 5126:10, 5269:22
**cross-examined** [2] - 5110:16, 5110:17
**crossed** [1] - 5205:21
**crossing** [1] - 5281:22
**crystal** [1] - 5210:16
**cues** [2] - 5279:12, 5279:25
**cultivated** [1] - 5162:17
**current** [1] - 5263:3
**CURRIE** [1] - 5094:14
**customer** [3] - 5165:2, 5224:6, 5231:18
**customers** [4] - 5223:13, 5225:1, 5227:1, 5231:19

**cut** [2] - 5137:4, 5244:20

# D

**D'Ambrosio** [32] - 5102:19, 5102:23, 5160:7, 5160:16, 5167:20, 5168:13, 5169:20, 5185:4, 5194:9, 5196:23, 5197:1, 5202:7, 5207:19, 5208:16, 5209:2, 5213:20, 5214:8, 5215:11, 5218:13, 5242:23, 5243:3, 5247:1, 5256:23, 5260:17, 5260:21, 5262:23, 5270:1, 5272:3, 5276:17, 5278:9, 5283:24, 5284:4
**D'Ambrosio's** [2] - 5197:17, 5211:2
**Dan** [12] - 5168:18, 5171:23, 5171:24, 5172:1, 5172:3, 5172:17, 5172:24, 5254:19, 5254:22, 5270:16, 5270:21, 5277:12
**Dan's** [1] - 5171:23
**danger** [2] - 5205:2, 5211:18
**Daniel** [11] - 5167:3, 5174:25, 5235:24, 5270:22, 5271:20, 5271:23, 5271:25, 5272:10, 5274:8, 5274:9, 5282:9
**data** [3] - 5223:18, 5223:25
**date** [13] - 5098:15, 5131:6, 5146:4, 5186:4, 5206:16, 5218:18, 5218:24, 5232:22, 5236:11, 5240:6, 5257:20, 5264:4, 5264:23
**dated** [2] - 5097:18, 5145:24, 5146:3, 5166:18, 5172:19, 5174:24, 5259:23, 5266:2, 5274:15
**daughter** [2] - 5102:15, 5104:9
**David** [2] - 5126:13, 5135:6
**days** [9] - 5119:3, 5131:4, 5155:15, 5192:5, 5192:7, 5202:6, 5227:14, 5285:6, 5285:12
**deadline** [1] - 5253:10
**deal** [26] - 5099:9, 5112:15, 5119:15, 5130:24, 5135:7, 5135:12, 5135:22, 5137:16, 5138:10, 5138:21, 5146:11, 5146:20, 5153:1, 5164:11, 5165:7, 5165:12, 5176:1, 5213:15, 5226:20, 5233:7, 5233:13, 5233:14, 5233:16, 5233:18, 5282:20

**dealing** [3] - 5116:13, 5127:19, 5209:13
**deals** [8] - 5135:20, 5136:18, 5148:8, 5148:11, 5199:9, 5210:25, 5231:16, 5231:21
**death** [2] - 5229:20, 5261:10
**debt** [5] - 5125:7, 5228:19, 5257:10, 5257:12, 5257:20
**deceive** [1] - 5285:1
**December** [26] - 5123:15, 5128:12, 5133:11, 5133:15, 5208:5, 5253:24, 5265:13, 5265:17, 5265:20, 5269:25, 5270:5, 5270:24, 5272:2, 5272:11, 5273:11, 5273:14, 5274:3, 5274:14, 5274:19, 5275:2, 5275:17, 5276:3, 5276:7, 5276:15, 5277:3, 5277:8
**decide** [1] - 5276:9
**decided** [5] - 5164:13, 5186:10, 5202:6, 5236:24, 5250:19
**decision** [19] - 5113:10, 5113:12, 5127:10, 5165:19, 5197:9, 5202:25, 5204:20, 5206:13, 5216:23, 5234:16, 5235:9, 5235:16, 5236:10, 5236:14, 5236:16, 5254:19, 5254:23, 5278:20, 5286:15
**declaration** [10] - 5105:13, 5105:18, 5105:24, 5106:2, 5106:3, 5106:7, 5106:13, 5106:16, 5106:17, 5106:19
**deducted** [1] - 5119:9
**deep** [3] - 5140:1, 5140:2, 5207:22
**default** [6] - 5112:21, 5113:11, 5113:17, 5237:7, 5237:10
**defendant** [8] - 5132:17, 5152:8, 5161:15, 5208:13, 5208:18, 5239:24, 5279:25, 5280:18
**Defendant's** [18] - 5117:1, 5155:2, 5167:17, 5174:10, 5206:17, 5246:3, 5249:22, 5260:15, 5264:14, 5269:19, 5289:14, 5289:16, 5289:18, 5289:20, 5289:22, 5289:24, 5290:1, 5290:5
**defendant's** [1] - 5147:2
**defendants** [3] - 5158:15, 5262:15, 5279:14
**Defendants** [3] - 5094:8,

5094:20, 5095:1
**defending** [1] - 5254:10
**Defense** [8] - 5117:8, 5121:13, 5133:5, 5145:22, 5289:9, 5289:10, 5289:11, 5289:13
**defense** [8] - 5159:12, 5160:1, 5204:16, 5255:11, 5279:12, 5280:10, 5283:1, 5286:3
**defer** [1] - 5152:9
**definitely** [1] - 5264:6
**definition** [1] - 5168:23
**defraud** [3] - 5119:22, 5147:21, 5147:24
**Del** [1] - 5148:21
**Delaware** [8] - 5247:13, 5247:17, 5247:20, 5248:8, 5250:13, 5251:13, 5251:16
**delay** [1] - 5218:8
**delays** [1] - 5193:24
**deliberate** [1] - 5285:9
**deliver** [1] - 5110:7
**delivering** [1] - 5139:8
**demeanor** [9] - 5272:24, 5273:5, 5279:16, 5279:19, 5279:24, 5280:2, 5280:11, 5280:12, 5280:21
**denied** [2] - 5156:25, 5222:25
**denomination** [1] - 5227:19
**depict** [1] - 5263:23
**deposit** [1] - 5119:14
**Depot** [7] - 5107:21, 5108:6, 5108:16, 5139:17, 5215:22, 5217:5, 5217:17
**describe** [6] - 5138:11, 5155:25, 5161:7, 5171:19, 5187:12, 5204:19
**described** [2] - 5110:22, 5179:8
**designations** [1] - 5133:4
**desire** [3] - 5120:8, 5120:23, 5134:7
**desiring** [1] - 5123:19
**desperate** [3] - 5190:4, 5190:12, 5190:14
**detail** [2] - 5221:20, 5244:16
**details** [5] - 5135:10, 5181:14, 5226:1, 5226:2, 5262:1
**determination** [4] - 5199:21, 5200:12, 5200:16, 5216:6
**determine** [1] - 5141:10
**deterred** [1] - 5137:16
**develop** [2] - 5169:25, 5181:21

**developer** [2] - 5182:3, 5182:4
**developers** [1] - 5170:24
**developing** [3] - 5169:24, 5171:11, 5186:9
**development** [4] - 5161:9, 5163:23, 5185:17, 5187:15
**devised** [1] - 5237:12
**devoting** [3] - 5180:21, 5181:3, 5181:5
**DeVries** [3] - 5123:2, 5123:19, 5123:25, 5124:12, 5124:16, 5141:23, 5142:3, 5284:7
**DeVries'** [1] - 5123:7
**Dewar** [13] - 5126:13, 5126:21, 5128:13, 5129:1, 5129:7, 5130:2, 5130:23, 5131:14, 5133:12, 5134:14, 5136:24, 5138:8, 5139:11
**Diamante** [1] - 5148:21
**difference** [2] - 5241:3, 5241:14
**different** [11] - 5111:9, 5131:20, 5163:6, 5171:17, 5185:19, 5189:22, 5223:1, 5224:5, 5230:25, 5273:20, 5273:24
**difficult** [4] - 5138:25, 5139:6, 5284:13, 5284:24
**difficulty** [1] - 5117:13
**diligence** [1] - 5136:18
**diluted** [3] - 5169:1, 5177:12, 5193:6
**dinner** [1] - 5142:3
**DIRE** [6] - 5173:6, 5248:24, 5266:8, 5288:13, 5288:17, 5288:21
**dire** [3] - 5099:17, 5248:22, 5266:6
**direct** [4] - 5107:1, 5113:4, 5269:11, 5273:23
**DIRECT** [8] - 5160:22, 5174:12, 5249:24, 5269:1, 5288:11, 5288:15, 5288:19, 5288:23
**directing** [1] - 5106:5
**direction** [1] - 5212:20
**directly** [10] - 5099:5, 5126:5, 5180:3, 5182:1, 5188:4, 5206:2, 5226:13, 5231:1, 5241:12, 5255:25
**directors** [17] - 5199:9, 5199:11, 5203:1, 5206:12, 5206:17, 5209:1, 5209:3, 5210:19, 5234:9, 5234:11, 5234:20, 5235:9, 5235:17, 5251:24, 5252:3, 5277:22, 5278:4

**discharge** [3] - 5210:3, 5234:20, 5235:6
**discharged** [1] - 5204:9
**disclose** [1] - 5213:22
**disclosed** [1] - 5214:4
**discloses** [2] - 5213:17, 5217:5
**discover** [1] - 5153:19
**discovery** [8] - 5096:24, 5112:24, 5113:9, 5200:25, 5201:3, 5202:15, 5204:6, 5208:10
**discrete** [1] - 5153:20
**discuss** [8] - 5106:4, 5113:16, 5137:5, 5149:2, 5193:17, 5236:8, 5255:5, 5277:17
**discussed** [8] - 5130:12, 5140:8, 5145:15, 5189:3, 5189:21, 5214:7, 5285:23, 5286:2
**discussing** [5] - 5126:24, 5130:9, 5140:21, 5141:1, 5181:24
**discussion** [5] - 5125:8, 5154:23, 5182:23, 5278:18, 5281:19
**discussions** [13] - 5125:10, 5127:4, 5127:15, 5134:8, 5137:11, 5144:13, 5144:19, 5163:22, 5184:15, 5185:12, 5195:10, 5265:5, 5285:25
**disk** [1] - 5260:1
**dismissal** [1] - 5210:20
**dismissed** [3] - 5209:11, 5260:23, 5262:14
**display** [2] - 5121:16, 5174:14
**displaying** [1] - 5115:9
**dispute** [3] - 5194:20, 5194:21, 5196:1
**disputed** [1] - 5184:8
**disregard** [2] - 5097:22, 5262:19
**disseminating** [1] - 5157:2
**distance** [1] - 5214:17
**distinct** [1] - 5102:7
**distribution** [1] - 5213:14
**DISTRICT** [3] - 5094:1, 5094:1, 5094:11
**District** [5] - 5096:17, 5097:9, 5097:18, 5100:20, 5105:14
**District's** [1] - 5097:10
**disturbing** [3] - 5214:10, 5214:14, 5278:15
**diversions** [1] - 5212:11
**divert** [1] - 5256:1
**division** [1] - 5222:10

**docs** [2] - 5112:15, 5220:2
**doctoring** [1] - 5268:5
**document** [43] - 5096:20, 5098:8, 5120:19, 5123:24, 5129:19, 5130:14, 5150:19, 5152:2, 5167:1, 5168:9, 5169:13, 5172:12, 5172:20, 5172:23, 5173:1, 5173:8, 5173:18, 5174:1, 5174:5, 5175:3, 5206:13, 5230:10, 5235:25, 5236:4, 5236:11, 5249:5, 5249:8, 5249:9, 5249:10, 5249:11, 5266:10, 5268:9, 5271:6, 5271:7, 5272:4, 5274:6, 5274:15, 5274:20, 5274:21, 5275:9, 5281:7, 5281:11, 5286:24
**documentation** [5] - 5108:17, 5201:16, 5202:21, 5202:24, 5275:5
**documents** [23] - 5096:11, 5097:3, 5097:13, 5107:7, 5110:13, 5129:22, 5133:3, 5151:24, 5173:15, 5175:19, 5190:21, 5201:20, 5202:4, 5202:11, 5203:6, 5209:24, 5216:11, 5218:21, 5219:24, 5220:3, 5242:1, 5242:3, 5242:20
**Doe** [1] - 5255:16
**dollar** [2] - 5169:7, 5227:19
**dollars** [7] - 5099:16, 5099:19, 5106:10, 5186:24, 5190:15, 5228:6, 5231:18
**Dominick** [3] - 5242:23, 5243:6, 5271:19
**done** [12] - 5119:15, 5152:4, 5173:20, 5173:22, 5173:23, 5202:14, 5213:21, 5242:14, 5276:22, 5280:12, 5283:13, 5283:14
**door** [1] - 5262:13
**doubly** [1] - 5117:6
**dovetail** [1] - 5213:10
**down** [15] - 5103:4, 5119:14, 5133:25, 5140:5, 5140:18, 5151:19, 5158:14, 5160:20, 5171:25, 5183:16, 5221:12, 5252:18, 5253:5, 5261:6, 5271:20
**downfall** [1] - 5166:4
**downside** [1] - 5190:8
**drawing** [1] - 5224:16
**drive** [1] - 5103:4
**drove** [2] - 5103:3, 5228:12
**dual** [1] - 5201:8

**due** [4] - 5118:20, 5136:18, 5210:13, 5224:14
**duly** [2] - 5103:22, 5160:12
**during** [29] - 5096:14, 5100:18, 5104:24, 5122:21, 5125:15, 5129:15, 5134:16, 5134:20, 5139:6, 5147:5, 5177:22, 5178:19, 5180:9, 5180:18, 5181:4, 5181:22, 5187:9, 5187:13, 5191:7, 5192:4, 5196:9, 5199:8, 5202:11, 5220:23, 5232:14, 5233:14, 5241:9, 5258:11, 5280:3

## E

**e-mail** [38] - 5108:17, 5110:20, 5111:9, 5112:3, 5118:25, 5128:16, 5129:20, 5130:1, 5130:6, 5130:11, 5130:16, 5130:18, 5130:22, 5131:4, 5133:11, 5135:3, 5136:5, 5136:12, 5136:15, 5136:22, 5137:2, 5138:3, 5138:14, 5138:17, 5145:1, 5145:2, 5145:5, 5145:14, 5145:24, 5146:2, 5146:6, 5146:7, 5153:20, 5208:24, 5209:3, 5226:12, 5284:10
**e-mailed** [1] - 5259:2
**e-mails** [12] - 5108:25, 5112:10, 5128:13, 5128:18, 5128:22, 5128:25, 5130:13, 5133:15, 5133:21, 5139:10, 5144:21, 5197:6
**earliest** [1] - 5133:15
**early** [3] - 5134:8, 5135:8, 5144:18
**earnings** [1] - 5232:3
**easier** [1] - 5224:9
**EASTERN** [1] - 5094:1
**Eastern** [2] - 5097:9, 5097:18
**easy** [1] - 5197:13
**economy** [1] - 5165:15
**Edenholm** [4] - 5167:4, 5168:7, 5168:15, 5170:12
**effect** [1] - 5101:6
**effort** [9] - 5120:12, 5122:23, 5124:8, 5126:15, 5132:10, 5135:6, 5157:18, 5217:1, 5236:15
**efforts** [16] - 5107:17, 5107:18, 5124:17, 5126:8, 5126:14, 5126:19,

5126:22, 5127:13, 5132:13, 5132:20, 5146:22, 5154:3, 5184:13, 5184:15, 5186:19, 5202:2
**eight** [6] - 5142:5, 5148:18, 5197:5, 5217:14, 5221:11, 5281:8
**either** [11] - 5106:11, 5117:10, 5122:21, 5134:14, 5144:13, 5186:4, 5204:6, 5224:15, 5258:12, 5258:25, 5278:11
**elected** [2] - 5171:12, 5254:15
**elements** [1] - 5125:12
**elicit** [2] - 5100:5, 5203:15
**elsewhere** [1] - 5104:25
**employees** [4] - 5188:12, 5263:10, 5265:15, 5265:23
**employer** [2] - 5282:25, 5283:3
**employers** [1] - 5285:15
**encumbering** [1] - 5107:12
**end** [8] - 5096:14, 5112:20, 5131:12, 5150:9, 5163:9, 5169:13, 5186:4
**End** [3] - 5159:19, 5184:20, 5268:12
**endeavor** [1] - 5164:12
**ended** [4] - 5163:6, 5189:11, 5223:14, 5265:3
**ends** [1] - 5203:19
**enforce** [1] - 5230:11
**enjoy** [1] - 5134:4
**ensure** [1] - 5157:18
**entered** [3] - 5144:4, 5167:22, 5168:2
**enters** [2] - 5154:5, 5256:17
**entertain** [1] - 5284:21
**entertaining** [1] - 5238:7
**entire** [9] - 5099:2, 5100:15, 5116:19, 5117:25, 5118:7, 5119:21, 5128:22, 5143:11, 5197:19
**entirely** [1] - 5204:14
**entities** [4] - 5118:20, 5188:3, 5188:5, 5251:8
**entitled** [1] - 5192:25
**entity** [12] - 5135:11, 5137:22, 5137:24, 5137:25, 5146:12, 5146:15, 5186:15, 5241:6, 5241:7, 5241:24, 5247:13, 5251:9
**entries** [1] - 5227:22
**entry** [4] - 5227:18, 5227:20, 5253:4, 5265:16
**episode** [1] - 5183:5
**equity** [10] - 5105:1,

5125:2, 5125:9, 5125:11, 5199:13, 5234:22, 5236:24, 5237:3, 5237:14, 5251:16
**Eric** [5] - 5167:4, 5168:7, 5168:15, 5170:12, 5170:14
**escrow** [2] - 5121:6, 5122:20
**especially** [2] - 5228:14, 5263:6
**ESQ** [5] - 5094:16, 5094:16, 5094:22, 5095:4, 5095:6
**essence** [1] - 5105:18
**essentially** [6] - 5105:9, 5110:8, 5207:25, 5208:18, 5212:18, 5285:4
**establish** [3] - 5205:10, 5210:6, 5213:8
**establishing** [1] - 5221:9, 5221:18
**estate** [1] - 5125:1
**Eufora** [5] - 5099:6, 5099:17, 5105:1, 5105:9, 5106:4, 5106:6, 5106:10, 5107:12, 5107:19, 5110:10, 5120:5, 5122:12, 5123:14, 5123:20, 5124:9, 5124:14, 5124:22, 5157:20, 5158:6, 5162:22, 5162:24, 5163:5, 5163:10, 5163:23, 5164:16, 5166:6, 5166:16, 5168:4, 5170:1, 5170:18, 5170:23, 5171:1, 5172:5, 5174:15, 5174:20, 5175:20, 5177:22, 5178:18, 5180:2, 5180:4, 5180:9, 5180:18, 5180:22, 5181:1, 5181:3, 5181:6, 5181:11, 5185:22, 5185:23, 5187:22, 5187:25, 5188:1, 5188:6, 5188:19, 5188:21, 5189:5, 5191:8, 5192:5, 5194:9, 5197:19, 5202:16, 5212:19, 5216:10, 5218:14, 5221:15, 5221:22, 5225:19, 5228:1, 5232:18, 5233:22, 5234:12, 5234:21, 5236:15, 5239:11, 5243:3, 5243:4, 5243:7, 5247:14, 5247:16, 5247:17, 5247:20, 5247:21, 5247:22, 5247:23, 5248:6, 5248:8, 5248:9, 5248:10, 5248:13, 5249:3, 5250:2, 5250:10, 5250:11, 5250:13, 5250:15, 5251:12, 5251:13,

5251:16, 5251:21, 5251:23, 5252:16, 5253:7, 5253:15, 5253:21, 5253:24, 5254:6, 5254:17, 5254:19, 5257:16, 5257:19, 5261:15, 5262:25, 5263:10, 5263:25, 5269:5, 5271:10, 5273:11, 5273:15, 5273:18, 5274:18
**Eufora's** [3] - 5142:21, 5172:6, 5263:2
**evening** [1] - 5278:7
**event** [5] - 5188:12, 5188:14, 5208:9, 5228:7, 5230:14
**events** [2] - 5141:1, 5270:9
**eventually** [5] - 5177:1, 5189:11, 5189:25, 5242:16, 5261:9
**evidence** [52] - 5099:18, 5100:16, 5100:18, 5112:7, 5115:1, 5117:3, 5117:8, 5121:9, 5121:13, 5131:18, 5131:21, 5133:4, 5133:6, 5145:22, 5154:22, 5154:25, 5155:3, 5155:9, 5160:4, 5167:18, 5174:11, 5208:21, 5211:25, 5213:1, 5213:16, 5214:19, 5217:14, 5217:15, 5246:3, 5249:23, 5252:23, 5257:8, 5260:16, 5264:15, 5265:10, 5269:13, 5269:20, 5286:22, 5289:4, 5289:6, 5289:9, 5289:10, 5289:12, 5289:13, 5289:15, 5289:17, 5289:19, 5289:21, 5289:23, 5289:25, 5290:2, 5290:5
**evolved** [2] - 5163:7, 5163:24
**exact** [6] - 5176:15, 5186:4, 5192:14, 5218:24, 5232:22, 5242:14
**exactly** [10] - 5102:14, 5182:16, 5191:20, 5197:17, 5200:15, 5205:14, 5207:9, 5226:16, 5232:21, 5264:23
**EXAMINATION** [22] - 5104:22, 5115:21, 5154:11, 5160:22, 5173:6, 5174:12, 5248:24, 5249:24, 5266:8, 5269:1, 5269:23, 5288:4, 5288:6, 5288:8, 5288:11, 5288:13, 5288:15, 5288:17, 5288:19, 5288:21,

**11**

5288:23, 5288:25
**examination** [14] - 5103:6, 5104:12, 5104:24, 5106:25, 5113:4, 5115:25, 5126:10, 5127:22, 5147:5, 5150:9, 5205:16, 5269:11, 5269:22
**examine** [1] - 5117:24
**examined** [7] - 5103:22, 5110:16, 5110:17, 5160:12, 5166:23, 5205:14, 5221:7
**example** [2] - 5231:7, 5233:11
**examples** [1] - 5231:7
**exception** [3] - 5128:23, 5208:19, 5211:3
**excerpt** [1] - 5099:3
**excerpts** [1] - 5277:22
**exchange** [1] - 5132:12
**excuse** [4] - 5107:19, 5129:24, 5138:7, 5279:3
**excused** [1] - 5149:4
**executed** [3] - 5166:16, 5172:21, 5219:15
**exhibit** [11] - 5123:4, 5128:12, 5147:3, 5148:24, 5151:14, 5156:16, 5169:12, 5265:20, 5265:24, 5282:4, 5286:23
**Exhibit** [39] - 5097:20, 5097:23, 5108:21, 5108:22, 5112:5, 5112:7, 5113:19, 5116:24, 5117:1, 5117:4, 5117:8, 5121:13, 5129:4, 5135:2, 5144:25, 5145:22, 5147:3, 5154:22, 5155:10, 5155:14, 5156:16, 5167:17, 5169:14, 5174:10, 5206:18, 5249:22, 5264:14, 5265:11, 5283:2, 5283:3, 5283:4, 5289:4, 5289:9, 5289:10, 5289:13, 5289:16, 5289:18, 5289:20, 5289:24
**EXHIBITS** [1] - 5289:3
**Exhibits** [12] - 5114:25, 5133:5, 5155:2, 5246:3, 5260:15, 5269:19, 5289:5, 5289:11, 5289:14, 5289:22, 5290:1, 5290:5
**exhibits** [6] - 5097:4, 5102:18, 5131:15, 5196:17, 5286:19, 5287:7
**exist** [1] - 5263:15
**existed** [1] - 5096:20
**existence** [2] - 5176:7, 5180:10
**exists** [1] - 5176:9

**exits** [4] - 5193:18, 5255:6, 5277:19, 5278:13
**Expansion** [2] - 5144:2, 5144:3, 5144:8, 5145:9, 5146:13, 5150:9, 5153:1
**expect** [1] - 5196:14
**expected** [1] - 5279:8
**expenditure** [1] - 5269:4
**expense** [5] - 5254:3, 5254:5, 5270:17, 5270:24, 5272:7
**expenses** [3] - 5148:22, 5253:25
**experience** [2] - 5127:18, 5164:25
**explain** [18] - 5118:15, 5152:4, 5153:9, 5183:17, 5190:18, 5209:10, 5210:18, 5211:5, 5211:10, 5217:18, 5221:14, 5221:21, 5226:19, 5233:10, 5234:2, 5240:22, 5241:18, 5250:7
**explained** [2] - 5193:25, 5223:1
**explanation** [1] - 5276:21
**explanations** [1] - 5201:15
**exploring** [1] - 5101:14
**express** [2] - 5200:11, 5204:8
**expressed** [1] - 5124:21
**expresses** [1] - 5200:17
**extension** [3] - 5222:17, 5224:8, 5224:12
**extent** [5] - 5100:10, 5102:16, 5185:4, 5204:23, 5211:14
**extorting** [1] - 5262:12
**extra** [2] - 5119:9, 5191:16
**extraordinary** [1] - 5285:11
**extremely** [2] - 5205:1, 5211:12

**F**

**F'ing** [3] - 5140:1, 5140:3
**fabrication** [1] - 5268:5
**facilitate** [1] - 5135:6
**fact** [22] - 5101:5, 5101:9, 5108:3, 5108:11, 5110:3, 5121:2, 5125:5, 5132:12, 5136:2, 5184:7, 5201:8, 5203:24, 5204:15, 5211:8, 5213:23, 5215:22, 5216:9, 5216:24, 5239:9, 5278:3, 5278:22, 5281:8
**facts** [2] - 5184:5, 5209:22
**factual** [1] - 5205:4
**factually** [3] - 5205:10,

5209:15, 5239:20
**failed** [2] - 5100:21, 5269:9
**failure** [2] - 5101:2, 5110:7
**fair** [4] - 5119:20, 5234:19, 5237:15, 5264:2
**fairly** [1] - 5260:7
**fall** [1] - 5208:19
**false** [2] - 5100:21, 5101:4
**familiar** [6] - 5169:9, 5177:7, 5179:23, 5180:6, 5228:15, 5232:5
**family** [5] - 5103:3, 5176:25, 5192:2, 5205:20, 5283:22
**far** [10] - 5101:2, 5150:25, 5151:1, 5151:13, 5203:17, 5214:18, 5215:21, 5216:7, 5235:10, 5285:9
**fashion** [2] - 5101:13, 5159:13
**father's** [1] - 5162:6
**favor** [1] - 5219:4
**favorable** [1] - 5219:12
**fax** [1] - 5118:24
**FBI** [1] - 5140:3
**February** [5] - 5128:16, 5129:4, 5135:2, 5172:19, 5174:5, 5174:24
**fed** [1] - 5208:17
**federal** [1] - 5106:20
**Federal** [2] - 5094:15, 5095:20
**fee** [2] - 5224:24, 5233:5
**feedback** [1] - 5165:14
**fees** [1] - 5262:15
**felt** [3] - 5192:25, 5209:10, 5228:14
**few** [13] - 5121:17, 5124:18, 5139:7, 5139:16, 5141:6, 5147:1, 5148:15, 5190:1, 5202:6, 5230:1, 5240:17, 5251:19, 5285:5
**FICO** [1] - 5166:13
**figured** [1] - 5238:4
**file** [2] - 5259:22, 5261:5
**filed** [20] - 5190:19, 5102:6, 5102:8, 5105:13, 5105:19, 5105:23, 5106:1, 5106:20, 5157:10, 5157:12, 5157:23, 5195:22, 5221:16, 5221:17, 5225:10, 5225:22, 5239:13, 5240:5, 5240:8, 5261:10
**filing** [8] - 5102:8, 5105:18, 5105:21, 5106:18, 5157:25, 5225:15, 5240:19, 5261:4
**filings** [1] - 5158:3
**fill** [2] - 5226:12, 5229:18

**final** [3] - 5096:12, 5283:2, 5286:15
**finally** [3] - 5097:21, 5157:9, 5277:6
**financed** [1] - 5224:20
**financial** [10] - 5131:11, 5150:5, 5150:13, 5150:18, 5151:10, 5151:13, 5151:20, 5153:6, 5153:7, 5224:13
**financially** [1] - 5254:14
**fine** [6] - 5097:6, 5103:7, 5205:8, 5205:11, 5217:9, 5282:22
**fingers** [1] - 5205:21
**finish** [7] - 5276:18, 5284:1, 5284:3, 5284:11, 5284:15, 5285:5
**finished** [1] - 5263:13
**fire** [1] - 5200:12
**fired** [5] - 5200:19, 5201:1, 5203:1, 5208:11, 5209:18
**firing** [6] - 5199:10, 5199:12, 5199:24, 5201:10, 5205:6, 5206:10
**firm** [2] - 5219:23, 5254:10
**first** [35] - 5096:5, 5098:18, 5102:19, 5102:20, 5103:5, 5111:8, 5133:9, 5134:24, 5137:4, 5140:14, 5142:5, 5142:16, 5142:22, 5146:6, 5155:23, 5160:11, 5161:22, 5163:25, 5181:10, 5191:12, 5191:20, 5193:5, 5204:20, 5206:23, 5207:7, 5215:4, 5221:17, 5222:15, 5222:16, 5223:15, 5226:20, 5227:14, 5265:21, 5271:12, 5271:13
**First** [2] - 5147:11, 5230:21
**firsthand** [2] - 5215:11, 5215:17
**five** [14] - 5127:6, 5186:7, 5192:5, 5192:7, 5192:10, 5221:9, 5225:9, 5225:13, 5231:21, 5261:21, 5275:4, 5281:10, 5281:14, 5285:12
**five-day** [1] - 5192:10
**fixable** [1] - 5140:11
**flew** [1] - 5142:19
**flight** [1] - 5102:22
**floored** [1] - 5278:22
**flows** [1] - 5212:17
**fly** [1] - 5100:8
**flying** [5] - 5103:2, 5205:20, 5283:10, 5284:6, 5284:7
**focus** [1] - 5185:16
**focused** [3] - 5100:6,

5100:11, 5244:21
**focusing** [2] - 5183:1, 5185:23
**follow** [5] - 5110:7, 5113:2, 5122:16, 5151:7, 5278:25
**follow-up** [1] - 5122:16
**followed** [1] - 5164:19
**following** [10] - 5110:1, 5112:1, 5132:1, 5133:1, 5133:22, 5158:17, 5183:21, 5244:1, 5246:1, 5266:25
**follows** [2] - 5103:23, 5160:13
**forced** [1] - 5190:22
**foreclose** [4] - 5237:2, 5237:11, 5237:13, 5251:2
**foreclosure** [1] - 5237:5
**forensic** [1] - 5205:22
**forfeiture** [5] - 5285:23, 5285:25, 5287:16, 5287:17
**forget** [1] - 5255:10
**forgot** [2] - 5265:24, 5282:24
**forks** [1] - 5222:20
**form** [3] - 5153:13, 5171:2, 5277:17
**formation** [1] - 5163:23
**formed** [2] - 5172:2, 5178:7
**forming** [1] - 5146:15
**forth** [12] - 5108:25, 5112:10, 5132:8, 5132:12, 5132:14, 5132:20, 5153:3, 5191:13, 5191:23, 5212:18, 5224:23, 5261:23
**forward** [5] - 5131:10, 5146:20, 5168:24, 5177:12, 5285:18
**forwarded** [2] - 5106:10, 5142:8
**foster** [1] - 5102:21
**foundation** [2] - 5132:3, 5244:3
**founding** [1] - 5202:16
**four** [11] - 5110:8, 5119:3, 5127:5, 5129:1, 5152:12, 5153:20, 5162:18, 5233:12, 5235:25, 5281:10, 5281:14
**Frailes** [3] - 5098:21, 5110:14, 5111:3
**frame** [5] - 5197:25, 5248:17, 5248:18, 5262:4, 5262:5
**framed** [1] - 5152:12
**frankly** [1] - 5205:25
**fraud** [5] - 5098:11, 5098:17, 5099:11, 5100:3, 5199:17
**free** [1] - 5196:12

**frequent** [1] - 5227:1
**Friday** [3] - 5102:14, 5104:8, 5130:18
**friend** [4] - 5161:25, 5164:8, 5191:5, 5238:13
**friends** [1] - 5238:23
**friendship** [1] - 5162:18
**front** [8] - 5116:4, 5174:2, 5215:1, 5272:4, 5274:6, 5274:20, 5275:9, 5287:17
**fulfill** [1] - 5171:10
**full** [5] - 5101:14, 5101:15, 5180:22, 5181:3, 5181:5
**full-time** [3] - 5180:22, 5181:3, 5181:5
**fun** [1] - 5179:9
**function** [1] - 5208:1
**Fund** [2] - 5119:17, 5125:16
**fund** [8] - 5132:10, 5168:24, 5168:25, 5177:11, 5178:21, 5179:2, 5179:7, 5180:4
**funded** [2] - 5178:4, 5178:5
**funding** [27] - 5099:17, 5118:19, 5126:8, 5126:15, 5126:23, 5127:13, 5127:16, 5127:20, 5128:14, 5128:23, 5129:4, 5131:9, 5131:10, 5132:9, 5132:14, 5135:23, 5138:25, 5139:1, 5139:12, 5139:14, 5171:12, 5180:14, 5181:21, 5190:14, 5190:17, 5192:15, 5193:4
**funds** [3] - 5147:24, 5176:6, 5175:7
**FYI** [1] - 5121:24

## G

**G4** [1] - 5247:13
**G6** [1] - 5228:16
**Gaarn** [37] - 5123:15, 5199:10, 5199:17, 5200:19, 5200:22, 5203:8, 5203:16, 5203:21, 5203:23, 5204:2, 5204:9, 5204:11, 5204:25, 5205:5, 5205:7, 5205:9, 5206:22, 5209:10, 5209:15, 5210:20, 5211:24, 5212:6, 5212:12, 5213:2, 5213:6, 5213:13, 5214:23, 5215:23, 5217:11, 5217:16, 5234:17, 5234:25, 5235:6, 5235:15, 5256:3, 5271:16

**Gaarn's** [4] - 5212:8, 5276:6, 5276:14, 5277:2
**garage** [1] - 5179:16
**generally** [1] - 5110:13
**gentleman** [5] - 5162:8, 5164:9, 5182:3, 5188:13, 5254:11
**gentlemen** [3] - 5131:8, 5137:15, 5137:17
**gentry** [1] - 5213:2
**Gentry** [40] - 5188:8, 5188:10, 5188:11, 5188:25, 5189:9, 5189:21, 5190:13, 5190:16, 5191:7, 5191:24, 5192:4, 5192:12, 5199:10, 5199:14, 5200:19, 5201:1, 5201:5, 5204:9, 5204:21, 5205:6, 5206:22, 5207:25, 5208:11, 5208:24, 5209:2, 5209:11, 5209:15, 5209:23, 5210:20, 5233:21, 5234:17, 5234:21, 5234:25, 5235:6, 5271:16, 5272:13, 5278:4, 5286:20, 5286:25
**Gentry's** [1] - 5276:2
**girlfriends** [1] - 5156:7
**given** [8] - 5147:18, 5170:1, 5170:8, 5199:14, 5207:2, 5212:17, 5269:8, 5286:22
**glad** [2] - 5104:9, 5268:5
**glasses** [1] - 5117:11
**global** [1] - 5126:6
**Global** [2] - 5119:17, 5125:15
**GM** [3] - 5227:9, 5227:10, 5227:12
**goal** [1] - 5163:12
**God** [1] - 5215:4
**godfather** [2] - 5191:6, 5238:24
**Gonchar** [13] - 5107:2, 5110:25, 5111:17, 5123:25, 5124:7, 5124:13, 5150:14, 5151:17, 5151:18, 5151:25, 5157:8, 5159:5, 5160:4
**Gonchar's** [1] - 5151:10
**gorilla** [2] - 5130:21, 5138:22
**Government** [22] - 5094:14, 5112:7, 5114:25, 5117:4, 5150:15, 5165:24, 5184:13, 5194:7, 5196:9, 5196:11, 5197:1, 5255:10, 5255:15, 5280:10, 5281:5, 5281:22, 5284:10, 5284:22, 5286:11,

5287:14, 5289:4, 5289:5
**government** [19] - 5096:25, 5100:10, 5103:13, 5104:12, 5109:3, 5111:8, 5111:14, 5113:1, 5116:7, 5148:24, 5200:20, 5202:24, 5204:5, 5204:21, 5206:23, 5207:9, 5212:7, 5212:25, 5217:15
**Government's** [11] - 5108:21, 5112:5, 5113:19, 5147:3, 5151:8, 5193:24, 5195:8, 5195:9, 5212:2, 5265:10, 5287:6
**government's** [5] - 5102:17, 5115:9, 5207:7, 5216:3, 5216:21
**grand** [7] - 5096:16, 5097:22, 5154:16, 5155:6, 5155:11, 5155:16, 5256:1
**granted** [2] - 5217:4, 5262:15
**graphics** [4] - 5162:1, 5162:7, 5162:15, 5163:3
**Grdina** [4] - 5144:14, 5144:19, 5145:6, 5148:5
**great** [9] - 5100:25, 5112:24, 5181:15, 5185:22, 5222:6, 5228:23, 5238:23, 5238:25, 5282:1
**greater** [4] - 5163:8, 5163:25, 5164:2, 5164:5
**Greenberg** [5] - 5254:6, 5265:17, 5270:6
**ground** [2] - 5196:13, 5244:14
**group** [31] - 5107:17, 5107:18, 5120:9, 5122:4, 5124:1, 5124:9, 5124:14, 5124:15, 5127:22, 5128:22, 5131:8, 5133:3, 5136:19, 5137:12, 5137:13, 5139:5, 5139:10, 5142:9, 5157:3, 5186:23, 5235:1, 5236:25, 5237:4, 5237:12, 5237:23, 5239:2, 5241:25, 5250:22, 5251:7, 5252:9, 5252:10
**Group** [4] - 5116:13, 5117:21, 5147:11, 5174:19
**growing** [1] - 5170:21
**guarantee** [2] - 5151:13, 5151:16
**guarantor** [1] - 5129:25
**guess** [7] - 5121:2, 5194:20, 5199:6, 5210:1, 5217:4, 5219:2, 5240:15
**guidance** [1] - 5279:4
**guy** [1] - 5208:11
**guys** [4] - 5188:14,

5227:16, 5228:15, 5238:14

**H**

habit [1] - 5224:2
HALEY [79] - 5094:20, 5094:22, 5096:4, 5097:14, 5098:3, 5100:8, 5101:20, 5102:1, 5102:4, 5102:12, 5103:16, 5109:5, 5110:3, 5111:6, 5111:12, 5111:16, 5113:20, 5113:22, 5114:10, 5114:15, 5117:6, 5117:15, 5118:1, 5121:11, 5132:18, 5132:23, 5143:16, 5145:20, 5150:23, 5151:5, 5152:7, 5152:9, 5152:19, 5153:16, 5153:19, 5154:2, 5154:8, 5154:10, 5154:12, 5155:1, 5155:17, 5158:12, 5158:16, 5159:1, 5159:18, 5160:1, 5161:20, 5167:14, 5174:8, 5187:7, 5200:7, 5200:10, 5203:19, 5205:23, 5207:16, 5210:13, 5211:1, 5214:12, 5216:2, 5236:4, 5236:7, 5243:11, 5244:2, 5248:21, 5248:25, 5249:20, 5255:19, 5260:12, 5264:12, 5269:15, 5269:17, 5282:1, 5286:5, 5286:10, 5286:18, 5286:25, 5287:5, 5288:9, 5288:18
Haley [17] - 5104:15, 5107:5, 5117:18, 5151:3, 5152:6, 5154:9, 5167:13, 5207:11, 5211:21, 5212:1, 5212:12, 5214:10, 5215:25, 5217:4, 5244:25, 5286:9, 5286:17
Haley's [1] - 5216:20
half [10] - 5172:16, 5192:11, 5192:24, 5193:1, 5193:3, 5199:13, 5216:24, 5234:22, 5255:5, 5283:13
halfway [1] - 5263:24
hand [5] - 5160:9, 5214:1, 5214:2, 5238:19, 5250:16
handed [3] - 5108:22, 5116:24, 5144:25
handful [1] - 5258:9
handing [1] - 5166:20
handle [1] - 5204:18
handled [3] - 5126:18, 5134:19, 5138:16
handling [1] - 5136:17
hands [1] - 5135:20

handwriting [1] - 5150:17
happy [1] - 5256:9
Harbor [1] - 5256:6
hard [4] - 5127:19, 5176:23, 5202:5, 5202:12
harm [1] - 5190:6
Hawaii [9] - 5118:20, 5134:21, 5181:12, 5181:19, 5182:11, 5185:5, 5185:17, 5185:25, 5197:20
Hawaiian [13] - 5110:9, 5126:9, 5126:16, 5129:6, 5134:10, 5135:24, 5137:24, 5138:1, 5148:4, 5181:25, 5182:22, 5182:24, 5185:13
Hawkins [1] - 5134:19
hazy [1] - 5117:11
heading [1] - 5122:22
headings [1] - 5287:17
headway [2] - 5186:24, 5186:25
hear [2] - 5100:4, 5214:15
heard [10] - 5132:18, 5142:7, 5181:16, 5185:3, 5220:22, 5222:12, 5238:3, 5253:10, 5261:23, 5262:2
hearing [3] - 5207:19, 5261:17, 5286:4
hearsay [4] - 5184:10, 5196:2, 5208:18, 5211:4
heart [1] - 5214:9
heated [1] - 5183:9
held [9] - 5122:4, 5125:11, 5188:1, 5188:2, 5188:4, 5188:5, 5216:10, 5248:10, 5257:25
helicopter [4] - 5179:3, 5179:5, 5179:7, 5179:20
heliport [2] - 5179:10, 5179:18
help [17] - 5112:14, 5123:22, 5134:3, 5135:6, 5139:18, 5157:2, 5163:21, 5178:24, 5179:7, 5179:9, 5180:4, 5188:15, 5189:7, 5189:16, 5201:23, 5240:7, 5285:1
helped [1] - 5150:22
helping [3] - 5162:7, 5171:24, 5285:3
hereby [2] - 5174:17, 5174:18
higher [1] - 5166:14
highlighted [6] - 5139:22, 5139:24, 5140:8, 5257:8, 5257:19, 5265:12
highly [3] - 5199:24, 5209:12, 5214:21
Highway [1] - 5094:21

himself [7] - 5192:20, 5192:24, 5193:1, 5199:14, 5203:16, 5216:25, 5234:22
hired [1] - 5170:24
hiring [5] - 5189:11, 5189:13, 5189:22, 5190:13
history [2] - 5197:19, 5207:3
hockey [22] - 5100:22, 5100:23, 5101:3, 5101:6, 5113:16, 5123:1, 5156:5, 5156:8, 5157:20, 5187:24, 5187:25, 5188:5, 5195:6, 5206:24, 5206:25, 5207:1, 5207:5, 5207:10, 5236:25, 5237:1, 5247:15, 5258:10
hold [2] - 5102:2, 5277:24
Holding [7] - 5144:9, 5144:10, 5144:11, 5144:15, 5146:16, 5146:19, 5153:2
holds [1] - 5247:21
holidays [1] - 5134:5
Home [7] - 5107:21, 5108:6, 5108:16, 5139:17, 5215:22, 5217:5, 5217:17
home [6] - 5189:2, 5191:15, 5263:5, 5263:7, 5263:12
Homes [1] - 5182:2
honest [1] - 5276:10
honestly [1] - 5171:25
Honor [81] - 5096:4, 5096:19, 5097:8, 5098:25, 5100:17, 5102:1, 5103:12, 5103:16, 5104:20, 5113:22, 5115:19, 5116:25, 5117:5, 5121:8, 5131:17, 5131:19, 5133:7, 5143:23, 5145:18, 5148:25, 5150:23, 5153:16, 5153:19, 5153:25, 5154:8, 5154:10, 5158:16, 5159:7, 5160:2, 5160:6, 5161:16, 5161:20, 5183:19, 5193:14, 5194:15, 5195:7, 5195:14, 5196:20, 5197:16, 5199:5, 5202:17, 5202:23, 5203:19, 5206:9, 5207:21, 5210:13, 5211:1, 5215:9, 5216:2, 5216:5, 5216:8, 5218:1, 5218:10, 5231:9, 5236:2, 5236:5, 5243:8, 5243:11, 5244:2, 5248:15, 5255:18, 5255:19, 5256:20, 5262:3, 5264:9, 5266:3, 5266:22, 5269:9, 5272:22, 5277:21, 5279:2, 5279:7, 5281:17, 5282:7,

5286:5, 5286:10, 5287:1, 5287:4, 5287:11, 5287:13, 5287:18
Honor's [1] - 5216:5
HONORABLE [1] - 5094:11
hope [5] - 5098:3, 5104:6, 5196:16, 5283:12, 5284:3
hopefully [1] - 5284:15
hoping [2] - 5219:1, 5283:11
hostile [4] - 5124:1, 5124:10, 5124:14, 5281:4
Hotel [1] - 5180:7
hotel [1] - 5119:16
hour [2] - 5255:5, 5283:14
hourly [1] - 5192:18
hours [4] - 5113:5, 5113:9, 5261:21, 5285:6
house [2] - 5162:12, 5261:7
hurt [1] - 5261:9

**I**

idea [9] - 5132:5, 5151:7, 5163:10, 5164:5, 5166:6, 5201:9, 5225:17, 5226:11, 5268:7
ideas [1] - 5197:19
identification [17] - 5108:21, 5116:22, 5120:17, 5127:25, 5144:23, 5161:18, 5161:19, 5161:21, 5172:9, 5187:7, 5187:8, 5220:25, 5240:1, 5242:2, 5259:13, 5263:18, 5282:5
identified [1] - 5131:15
identify [7] - 5120:19, 5128:8, 5128:9, 5128:20, 5129:22, 5130:6, 5242:7
II [1] - 5243:3
III [1] - 5243:7
illegal [9] - 5199:16, 5200:14, 5204:10, 5204:24, 5205:12, 5209:17, 5209:21, 5213:2, 5213:9
image [1] - 5261:9
imagine [1] - 5286:6
impact [3] - 5164:21, 5216:7, 5260:25
impeach [2] - 5278:1, 5279:11
impeachment [1] - 5279:11
impermissible [1] - 5215:12
implication [1] - 5282:10
importance [2] - 5221:15,

**14**

5221:21

**important** [4] - 5202:9, 5203:11, 5206:20, 5228:1

**impression** [2] - 5100:12, 5144:20

**improper** [11] - 5175:10, 5199:23, 5200:5, 5200:14, 5204:10, 5210:6, 5214:4, 5214:5, 5216:1, 5280:15, 5280:17

**inappropriate** [2] - 5273:2, 5273:6

**incentify** [2] - 5227:1, 5227:3

**incentivize** [1] - 5163:17

**include** [2] - 5239:9, 5247:14

**included** [6] - 5122:5, 5140:9, 5229:13, 5235:8, 5239:23, 5240:25

**includes** [3] - 5128:13, 5129:24, 5287:19

**including** [5] - 5123:19, 5153:5, 5217:16, 5228:2, 5247:15

**income** [1] - 5165:23

**incorporated** [1] - 5164:16

**incorporating** [1] - 5164:20

**incorporation** [1] - 5169:2

**incorrect** [1] - 5253:12

**indeed** [1] - 5100:18

**independent** [2] - 5205:5, 5206:1

**indicate** [1] - 5099:9

**indicated** [1] - 5205:20

**indicates** [1] - 5099:15

**indicating** [4] - 5106:9, 5107:10, 5107:23, 5161:15

**indicating** [1] - 5249:19

**indication** [2] - 5108:1, 5132:4

**indicative** [1] - 5184:3

**indictment** [12] - 5103:8, 5103:11, 5110:8, 5152:13, 5159:6, 5206:23, 5212:10, 5212:23, 5255:13, 5255:14, 5285:23, 5287:15

**individual** [9] - 5113:15, 5126:11, 5140:17, 5158:3, 5175:1, 5182:8, 5228:18, 5251:9, 5256:2

**individually** [1] - 5128:11

**individuals** [26] - 5106:5, 5125:13, 5129:1, 5130:3, 5134:17, 5142:8, 5145:25, 5156:7, 5156:15, 5158:5, 5167:7, 5169:4, 5181:23, 5195:1, 5222:6, 5222:19, 5222:23, 5226:11, 5231:6,

5247:24, 5248:7, 5250:12, 5250:15, 5256:4, 5259:2, 5259:3

**indulgence** [1] - 5096:6

**inform** [1] - 5146:11

**information** [12] - 5098:8, 5098:16, 5135:19, 5156:23, 5157:3, 5186:11, 5206:3, 5206:11, 5215:17, 5223:19, 5223:22, 5264:25

**informed** [1] - 5141:16

**infringement** [1] - 5225:13

**infringing** [4] - 5229:1, 5231:2, 5231:4, 5231:8

**initial** [6] - 5126:18, 5142:17, 5163:10, 5164:3, 5225:16, 5226:11

**initialed** [1] - 5259:23

**initials** [1] - 5260:2

**initiated** [2] - 5136:3, 5136:17

**inject** [1] - 5280:3

**inserting** [1] - 5280:4

**insofar** [1] - 5100:21

**installment** [1] - 5225:2

**instant** [1] - 5165:19

**instruct** [2] - 5280:15, 5280:20

**instructed** [1] - 5218:2

**instruction** [8] - 5114:8, 5132:16, 5132:20, 5184:17, 5185:2, 5279:6, 5279:7, 5287:9

**instructions** [3] - 5255:11, 5259:8, 5278:25

**insurance** [1] - 5229:20

**intend** [4] - 5099:10, 5212:16, 5277:23, 5278:1

**intended** [5] - 5248:7, 5250:18, 5250:24, 5252:12, 5252:17

**intends** [1] - 5100:2

**intent** [5] - 5129:14, 5130:8, 5136:10, 5138:13, 5213:25

**intention** [3] - 5099:2, 5107:17, 5214:22

**intentionally** [1] - 5215:8

**intentions** [1] - 5122:8

**interaction** [1] - 5209:23

**interactions** [1] - 5157:24

**interest** [40] - 5100:22, 5100:23, 5101:3, 5101:19, 5105:2, 5125:9, 5136:10, 5148:12, 5150:7, 5153:13, 5169:1, 5169:5, 5170:2, 5170:4, 5170:8, 5171:1, 5171:6, 5174:15, 5174:20, 5174:21, 5174:22, 5175:2, 5175:14, 5175:15, 5188:1,

5188:2, 5188:4, 5188:6, 5189:7, 5200:22, 5216:25, 5220:12, 5223:4, 5224:18, 5234:22, 5239:10, 5240:13, 5244:11, 5248:12, 5250:10

**interested** [7] - 5123:20, 5124:16, 5124:25, 5125:5, 5135:15, 5151:16, 5162:13

**interesting** [1] - 5188:14

**interests** [6] - 5100:15, 5124:20, 5124:21, 5249:2, 5273:21, 5273:22

**International** [1] - 5180:8

**internet** [2] - 5165:16, 5222:17

**interrupt** [1] - 5283:18

**interrupted** [1] - 5121:9

**intervention** [1] - 5158:7

**intimately** [1] - 5111:4

**introduce** [5] - 5098:1, 5101:15, 5152:1, 5152:3, 5269:10

**introduced** [10] - 5098:12, 5100:18, 5116:8, 5148:24, 5162:7, 5162:9, 5164:9, 5182:8, 5222:10, 5233:6

**invest** [2] - 5106:5, 5185:24

**invested** [4] - 5125:25, 5186:20, 5186:23, 5194:22

**investigation** [4] - 5097:11, 5122:4, 5156:25, 5195:15

**investment** [20] - 5170:13, 5186:3, 5186:5, 5186:13, 5186:16, 5186:17, 5187:1, 5195:13, 5196:7, 5248:9, 5250:24, 5250:25, 5251:4, 5251:21, 5252:8, 5252:12, 5257:4, 5258:18, 5262:24, 5263:14

**investments** [9] - 5108:17, 5157:20, 5186:1, 5247:25, 5250:1, 5251:25, 5252:4, 5257:11

**investor** [4] - 5177:17, 5247:23, 5252:2, 5252:18

**investor's** [2] - 5239:10, 5240:13

**investors** [30] - 5099:19, 5105:9, 5106:5, 5106:11, 5158:5, 5177:16, 5178:2, 5178:3, 5184:3, 5184:7, 5187:23, 5193:6, 5194:19, 5195:24, 5236:18, 5236:24, 5236:25, 5239:16, 5241:10, 5241:11, 5241:25, 5247:14, 5248:13,

5250:16, 5250:18, 5251:6, 5252:18, 5258:5, 5258:7, 5272:9

**investors'** [1] - 5244:10

**invited** [2] - 5127:8, 5258:7

**involved** [18] - 5098:10, 5098:17, 5111:4, 5123:2, 5162:21, 5162:24, 5163:1, 5182:1, 5182:12, 5205:7, 5211:23, 5212:8, 5212:15, 5213:3, 5215:7, 5237:21, 5240:24, 5258:13

**involvement** [11] - 5125:1, 5203:13, 5203:16, 5203:22, 5203:24, 5204:2, 5205:10, 5214:6, 5217:10, 5217:11, 5217:16

**involving** [1] - 5105:1

**iPhone** [1] - 5142:11

**irrelevant** [1] - 5262:20

**island** [1] - 5134:3

**Islandia** [1] - 5094:22

**Isle** [2] - 5136:7, 5146:17

**Islip** [3] - 5094:6, 5094:15, 5095:21

**isolation** [1] - 5214:20

**issue** [29] - 5097:3, 5150:3, 5152:17, 5184:8, 5185:7, 5199:20, 5200:6, 5200:15, 5203:19, 5204:7, 5204:15, 5206:6, 5206:7, 5208:16, 5209:8, 5209:9, 5209:18, 5210:25, 5211:2, 5211:3, 5211:8, 5214:9, 5214:21, 5215:5, 5215:6, 5222:5, 5230:12, 5258:12, 5281:18

**issued** [4] - 5097:10, 5166:12, 5221:5, 5230:24

**issuers** [1] - 5230:17

**issues** [12] - 5100:6, 5150:25, 5151:1, 5152:12, 5196:14, 5244:6, 5244:25, 5245:2, 5253:22, 5283:5, 5283:23, 5284:25

**issuing** [4] - 5164:8, 5164:15, 5165:25, 5253:22

**itself** [2] - 5141:4, 5141:6

---

## J

**JAMES** [1] - 5094:16

**January** [2] - 5264:18, 5264:22

**jar** [1] - 5238:20

**Jay** [1] - 5120:11

**Jimmy** [1] - 5146:22

**job** [2] - 5165:20, 5190:3

**Joe** [1] - 5255:23

**John** [5] - 5103:8, 5255:14,

5255:16, 5261:12, 5287:15
**Johnson** [3] - 5162:8, 5182:7, 5182:10
**join** [3] - 5120:12, 5204:5, 5216:3
**joining** [1] - 5151:3
**joint** [7] - 5130:5, 5130:8, 5131:13, 5138:13, 5139:3, 5139:14
**Joseph** [1] - 5265:13
**JOSEPH** [1] - 5094:11
**Jowdy** [6] - 5141:25, 5148:17, 5157:7, 5155:12, 5186:18, 5207:2
**Judge** [55] - 5096:12, 5097:2, 5097:24, 5098:6, 5098:14, 5099:24, 5100:9, 5101:1, 5101:11, 5101:20, 5102:12, 5109:5, 5111:6, 5111:16, 5113:24, 5114:16, 5117:15, 5141:3, 5150:10, 5151:12, 5152:7, 5152:11, 5152:21, 5153:15, 5153:21, 5167:14, 5167:15, 5196:16, 5197:3, 5200:1, 5200:8, 5200:17, 5200:18, 5203:6, 5204:13, 5205:23, 5207:15, 5209:8, 5210:17, 5211:7, 5213:4, 5214:16, 5215:3, 5216:15, 5217:3, 5217:7, 5231:13, 5244:19, 5248:21, 5255:22, 5256:2, 5269:15, 5282:2, 5282:19, 5283:9
**judge** [9] - 5097:14, 5098:7, 5102:4, 5114:10, 5200:7, 5206:8, 5206:19, 5212:24, 5284:12
**JUDGE** [1] - 5094:11
**July** [28] - 5097:18, 5097:22, 5109:1, 5116:9, 5117:21, 5117:22, 5118:11, 5118:13, 5118:18, 5119:11, 5120:21, 5121:25, 5122:9, 5133:23, 5155:14, 5201:10, 5206:17, 5207:24, 5208:7, 5208:13, 5210:20, 5236:10, 5271:2, 5271:5, 5271:24, 5285:8
**jump** [2] - 5228:20, 5239:19
**June** [7] - 5094:9, 5194:8, 5195:6, 5247:2, 5248:19, 5264:3, 5287:22
**Juneau** [1] - 5125:19
**juror** [1] - 5285:7
**JURORS** [1] - 5104:4
**jurors** [4] - 5153:9,

5214:17, 5285:7, 5285:12
**jury** [54] - 5094:11, 5096:16, 5097:22, 5100:6, 5100:12, 5103:11, 5103:15, 5104:1, 5104:3, 5112:2, 5114:7, 5118:2, 5118:10, 5121:16, 5133:2, 5149:4, 5150:1, 5154:4, 5154:5, 5154:16, 5155:6, 5155:11, 5155:16, 5155:17, 5164:5, 5185:1, 5193:18, 5199:20, 5200:6, 5200:16, 5206:20, 5211:18, 5212:7, 5215:1, 5217:25, 5218:4, 5218:6, 5240:22, 5255:6, 5255:9, 5255:11, 5255:13, 5256:1, 5256:16, 5256:17, 5262:19, 5277:19, 5279:20, 5279:22, 5279:23, 5281:13, 5282:24, 5285:14, 5286:3
**jury's** [1] - 5286:6
**JV** [1] - 5137:4

# K

**K-239** [4] - 5154:24, 5155:2, 5155:4, 5289:14
**K-240** [3] - 5154:24, 5155:2, 5289:14
**K-241** [3] - 5154:24, 5155:3, 5289:14
**KA** [1] - 5144:11
**Ka'u** [6] - 5144:9, 5144:10, 5144:15, 5144:20, 5146:16, 5146:19
**Kaiser** [13] - 5121:7, 5137:20, 5139:4, 5142:19, 5194:19, 5208:25, 5250:21, 5251:20, 5252:4, 5257:2, 5257:15, 5258:13, 5261:12
**Kau** [1] - 5153:1
**keep** [9] - 5098:3, 5160:20, 5170:22, 5172:14, 5178:22, 5201:25, 5206:20, 5219:8, 5245:2
**keeping** [1] - 5100:6
**KELLY** [1] - 5094:14
**Ken** [6] - 5135:6, 5137:5, 5155:7, 5155:12, 5182:4, 5186:18
**Kennedy** [21] - 5167:4, 5168:18, 5170:8, 5170:17, 5170:25, 5171:20, 5172:2, 5172:3, 5172:17, 5175:1, 5175:14, 5235:24, 5270:22, 5271:20, 5271:23, 5271:25,

5272:10, 5272:19, 5274:8, 5282:9, 5284:8
**Kenner** [68] - 5094:23, 5096:11, 5096:15, 5097:4, 5097:20, 5097:22, 5097:23, 5099:4, 5099:8, 5101:9, 5102:6, 5102:10, 5103:16, 5104:11, 5104:17, 5104:24, 5108:24, 5112:9, 5115:6, 5115:14, 5115:23, 5117:10, 5117:20, 5118:7, 5120:3, 5126:13, 5127:24, 5132:4, 5132:9, 5133:12, 5137:23, 5139:16, 5144:2, 5146:3, 5147:8, 5150:12, 5150:19, 5151:11, 5151:17, 5152:14, 5152:20, 5153:3, 5153:13, 5154:22, 5155:8, 5155:10, 5155:13, 5155:14, 5158:14, 5160:1, 5167:5, 5168:7, 5168:20, 5175:2, 5187:3, 5187:9, 5187:11, 5187:21, 5205:2, 5207:2, 5212:19, 5213:6, 5214:23, 5255:25, 5256:10, 5278:18, 5286:22, 5287:3
**KENNER** [3] - 5094:7, 5103:20, 5288:3
**Kenner's** [7] - 5098:11, 5150:4, 5150:16, 5151:12, 5153:7, 5188:2, 5286:21
**Kenneth** [1] - 5138:12
**kept** [5] - 5219:3, 5220:10, 5254:25
**kind** [25] - 5140:24, 5159:8, 5162:14, 5162:17, 5165:12, 5166:8, 5170:22, 5171:24, 5177:15, 5182:25, 5189:8, 5190:23, 5199:20, 5200:3, 5200:4, 5209:5, 5215:13, 5221:12, 5229:16, 5229:17, 5230:14, 5238:17, 5261:10, 5284:13
**kindly** [1] - 5154:21
**kiss** [1] - 5261:10
**Kleins** [1] - 5156:6
**knowing** [2] - 5165:4, 5214:3
**knowingly** [1] - 5215:8
**knowledge** [18] - 5120:6, 5120:15, 5134:21, 5168:20, 5170:19, 5178:15, 5179:4, 5179:22, 5214:1, 5214:2, 5215:11, 5239:22, 5249:5, 5249:10, 5250:8, 5256:23, 5274:7
**known** [4] - 5157:21,

5202:9, 5213:20, 5255:25
**knows** [3] - 5153:8, 5194:10, 5207:19
**Komatireddy** [1] - 5278:14
**KOMATIREDDY** [43] - 5094:16, 5103:9, 5161:17, 5167:12, 5171:2, 5173:7, 5174:7, 5175:11, 5175:22, 5183:19, 5184:1, 5184:18, 5195:14, 5197:16, 5231:9, 5236:5, 5243:10, 5248:17, 5248:20, 5255:22, 5256:2, 5256:8, 5260:11, 5262:3, 5262:18, 5264:11, 5266:6, 5266:9, 5268:6, 5269:14, 5269:24, 5273:3, 5273:8, 5273:10, 5279:2, 5279:7, 5279:16, 5281:16, 5286:2, 5287:3, 5288:14, 5288:22, 5289:1
**Kristin** [5] - 5113:6, 5115:7, 5115:15, 5155:20, 5156:1

# L

**lack** [1] - 5201:3
**lady** [1] - 5228:11
**laid** [2] - 5244:3, 5244:14
**land** [5] - 5134:7, 5146:19, 5179:20, 5181:15, 5181:18
**landed** [1] - 5283:11
**landlord** [1] - 5253:15
**landscape** [2] - 5165:10, 5165:13
**large** [8] - 5106:6, 5163:13, 5164:10, 5179:1, 5181:15, 5182:3, 5182:4, 5231:3
**LaRusso** [25] - 5099:5, 5104:14, 5107:6, 5108:6, 5115:18, 5118:1, 5131:20, 5151:7, 5160:3, 5174:1, 5184:5, 5193:23, 5196:21, 5201:2, 5202:1, 5202:20, 5204:1, 5204:4, 5210:14, 5211:22, 5218:9, 5256:21, 5271:7, 5276:22, 5283:7
**LARUSSO** [132] - 5095:2, 5095:4, 5098:6, 5099:24, 5101:22, 5102:21, 5103:1, 5103:12, 5111:17, 5113:24, 5114:17, 5115:19, 5115:22, 5116:25, 5117:4, 5117:9, 5117:18, 5117:19, 5118:3, 5120:2, 5121:8, 5121:14, 5127:2, 5127:3, 5129:12, 5129:17, 5131:17, 5132:7, 5133:7, 5133:8, 5141:3, 5141:5, 5143:17, 5143:18,

**16**

5143:23, 5144:1, 5145:17, 5145:23, 5148:1, 5150:5, 5151:12, 5152:3, 5152:24, 5153:14, 5153:25, 5160:6, 5160:23, 5161:15, 5167:10, 5167:19, 5173:4, 5174:13, 5193:14, 5194:4, 5194:14, 5194:18, 5195:4, 5196:16, 5197:3, 5197:23, 5198:2, 5199:5, 5200:8, 5200:18, 5201:21, 5202:23, 5205:13, 5205:19, 5206:8, 5206:12, 5206:16, 5208:20, 5210:1, 5210:10, 5210:17, 5211:25, 5212:5, 5212:24, 5214:13, 5216:15, 5217:18, 5218:1, 5218:10, 5218:12, 5231:13, 5234:14, 5234:15, 5236:2, 5236:9, 5243:8, 5244:9, 5244:18, 5244:22, 5248:15, 5248:19, 5249:25, 5255:18, 5256:20, 5256:22, 5260:10, 5262:21, 5264:9, 5264:16, 5266:3, 5266:22, 5268:1, 5268:11, 5269:2, 5269:9, 5269:21, 5272:22, 5272:25, 5281:22, 5282:7, 5282:19, 5283:8, 5283:16, 5283:20, 5283:25, 5284:3, 5284:6, 5285:16, 5285:19, 5285:21, 5287:11, 5287:13, 5287:18, 5288:7, 5288:12, 5288:16, 5288:20, 5288:24

**LaRusso's** [3] - 5104:24, 5108:10, 5206:10

**LARUSSSO** [1] - 5203:11

**Las** [3] - 5098:21, 5110:14, 5111:3

**last** [21] - 5112:21, 5131:4, 5133:18, 5133:22, 5139:9, 5151:8, 5160:4, 5180:20, 5194:15, 5199:6, 5216:15, 5221:5, 5225:21, 5226:15, 5226:17, 5262:10, 5271:4, 5274:5, 5278:19, 5283:1

**lasted** [1] - 5141:10

**lastly** [1] - 5112:20

**late** [1] - 5283:14

**launched** [2] - 5188:22, 5221:23

**law** [3] - 5219:23, 5253:11, 5254:10

**lawsuit** [10] - 5107:4, 5107:24, 5108:4, 5110:9, 5110:22, 5158:4, 5215:20, 5239:13, 5254:12, 5262:8

**lawsuits** [1] - 5244:7

**lawyer** [1] - 5144:22

**lawyer's** [1] - 5122:24

**lawyers** [2] - 5272:23, 5273:4

**lay** [1] - 5200:10

**layman's** [1] - 5161:7

**lays** [1] - 5203:1

**lead** [3] - 5217:17, 5218:2, 5244:23

**leading** [1] - 5156:14

**leads** [1] - 5165:1

**leaking** [1] - 5156:23

**learn** [7] - 5143:13, 5157:5, 5186:11, 5187:2, 5187:21, 5234:24, 5237:18

**learned** [15] - 5186:18, 5186:21, 5187:23, 5219:4, 5219:13, 5222:13, 5224:1, 5227:8, 5227:16, 5232:7, 5236:15, 5236:17, 5250:25, 5251:3, 5252:8

**learning** [2] - 5223:13, 5241:8

**lease** [1] - 5165:9

**least** [11] - 5101:2, 5113:22, 5126:24, 5153:9, 5159:9, 5197:11, 5201:1, 5207:19, 5232:2, 5261:20, 5269:8

**leave** [7] - 5121:15, 5217:2, 5233:22, 5233:24, 5233:25, 5234:8, 5278:6

**leaves** [1] - 5277:22

**leaving** [3] - 5174:22, 5194:12, 5261:24

**led** [2] - 5199:23, 5216:23

**Ledbetter** [1] - 5256:12

**leeway** [1] - 5152:15

**left** [11] - 5096:19, 5104:11, 5111:20, 5123:4, 5152:5, 5194:11, 5218:13, 5250:9, 5259:3, 5259:6, 5259:9

**legal** [5] - 5218:21, 5219:22, 5219:24, 5220:6, 5251:25

**legally** [1] - 5177:11

**legitimacy** [1] - 5244:7

**legitimately** [1] - 5204:16

**Lehman** [8] - 5127:11, 5131:5, 5131:7, 5131:9, 5137:17, 5144:3, 5148:3, 5148:4

**Lemon** [1] - 5265:13

**lender** [8] - 5190:19, 5190:21, 5190:22, 5190:24, 5192:23, 5237:2, 5251:2

**lenders** [2] - 5127:19, 5139:3

**length** [1] - 5100:25

**lengthy** [2] - 5096:8, 5099:8

**less** [2] - 5166:2, 5262:11

**letter** [18] - 5096:22, 5097:16, 5097:21, 5102:17, 5129:14, 5130:8, 5132:5, 5136:10, 5138:11, 5138:13, 5154:16, 5155:10, 5155:14, 5193:25, 5195:5, 5195:9, 5282:24

**letters** [1] - 5285:14

**letting** [2] - 5104:8, 5156:22

**level** [2] - 5204:6, 5244:16

**Liability** [1] - 5174:20

**license** [1] - 5230:15

**licensing** [5] - 5230:11, 5230:14, 5231:16, 5231:24, 5233:12

**life** [10] - 5140:5, 5140:18, 5176:7, 5177:22, 5180:18, 5228:7, 5233:8, 5233:14, 5241:21, 5275:8

**lifetime** [1] - 5171:16

**likewise** [4] - 5125:18, 5130:6, 5143:14, 5180:2

**Limited** [1] - 5174:20

**limited** [2] - 5205:1, 5211:12

**limiting** [4] - 5132:15, 5184:17, 5185:2, 5287:8

**line** [2] - 5165:5, 5225:3

**lines** [6] - 5105:5, 5110:9, 5112:22, 5113:11, 5113:13, 5156:14

**list** [2] - 5100:21, 5103:7

**listed** [1] - 5150:6

**listen** [5] - 5124:5, 5142:10, 5223:17, 5278:6, 5278:10

**listened** [5] - 5141:20, 5155:24, 5238:17, 5259:22, 5260:4

**listening** [1] - 5216:17

**literally** [3] - 5165:2, 5228:5, 5228:7

**litigation** [2] - 5195:12, 5195:16

**litigations** [1] - 5195:20

**live** [2] - 5191:10, 5196:1

**living** [4] - 5180:25, 5183:3, 5191:7, 5191:9

**LLC** [6] - 5146:16, 5146:18, 5146:19, 5174:16, 5174:20, 5265:21

**LMJ** [6] - 5168:7, 5168:15, 5168:19, 5170:13, 5170:15, 5207:3

**load** [2] - 5224:2, 5224:3

**loaded** [2] - 5221:19, 5225:12

**loan** [113] - 5107:12, 5107:15, 5107:19, 5116:1, 5120:5, 5120:8, 5120:13, 5120:16, 5120:24, 5121:23, 5122:8, 5122:22, 5122:25, 5123:22, 5124:1, 5124:2, 5124:8, 5124:14, 5129:5, 5129:25, 5131:5, 5144:2, 5144:3, 5144:6, 5145:10, 5148:5, 5150:9, 5151:18, 5158:10, 5176:14, 5176:18, 5176:19, 5177:1, 5178:16, 5193:7, 5193:15, 5199:15, 5217:1, 5218:14, 5218:16, 5218:19, 5218:23, 5218:24, 5218:25, 5219:1, 5219:3, 5219:12, 5219:14, 5219:17, 5219:19, 5219:25, 5220:2, 5220:3, 5220:11, 5220:14, 5220:15, 5221:18, 5224:23, 5225:1, 5225:2, 5232:15, 5232:23, 5233:7, 5233:9, 5233:15, 5233:16, 5235:1, 5237:2, 5237:4, 5237:6, 5237:7, 5237:11, 5237:13, 5237:19, 5237:23, 5238:16, 5239:3, 5239:7, 5239:21, 5240:13, 5240:18, 5240:23, 5241:1, 5241:2, 5241:4, 5241:6, 5241:15, 5241:16, 5241:20, 5241:23, 5242:5, 5242:8, 5242:12, 5242:13, 5242:17, 5242:22, 5247:9, 5247:16, 5248:6, 5250:11, 5250:13, 5250:17, 5250:20, 5250:23, 5251:2, 5251:10, 5251:12, 5252:10, 5257:3, 5257:17

**loans** [6] - 5148:17, 5148:22, 5192:23, 5218:23, 5225:11, 5257:14

**lobby** [1] - 5261:24

**Lockwood** [1] - 5145:7

**logistics** [1] - 5134:4

**LOI** [4] - 5135:7, 5136:7, 5136:9, 5136:14

**long-term** [1] - 5135:15

**look** [23] - 5098:9, 5098:22, 5101:15, 5116:19, 5117:24, 5128:2, 5128:7, 5128:24, 5146:20, 5152:21, 5154:21, 5177:11, 5197:5, 5197:8, 5211:25, 5214:20, 5221:6,

5229:15, 5271:7, 5271:12, 5279:14, 5282:20, 5284:7
**looked** [5] - 5133:16, 5162:3, 5210:23, 5280:18, 5280:19
**looking** [16] - 5118:4, 5118:7, 5123:25, 5193:24, 5194:25, 5195:1, 5195:24, 5210:2, 5222:17, 5264:4, 5272:20, 5273:1, 5278:17, 5279:21, 5279:25, 5280:8
**looks** [7] - 5128:23, 5166:21, 5169:15, 5210:11, 5264:5, 5266:16, 5270:25
**Losch** [26] - 5126:11, 5126:13, 5126:16, 5126:21, 5126:23, 5127:4, 5128:13, 5129:1, 5129:7, 5130:2, 5130:10, 5130:23, 5131:14, 5133:12, 5134:1, 5134:9, 5134:14, 5135:4, 5135:16, 5135:22, 5136:24, 5138:9, 5138:12, 5138:20, 5139:12, 5182:5
**loss** [1] - 5152:11
**lost** [1] - 5165:20
**love** [1] - 5227:17
**loved** [1] - 5226:21
**Lucas** [1] - 5131:6
**lucky** [1] - 5164:23
**lunch** [1] - 5193:16, 5196:19, 5199:8, 5202:12
**lying** [1] - 5208:6
**lynching** [2] - 5121:1, 5121:24

## M

**M-A-R-K** [1] - 5160:19
**mail** [42] - 5108:17, 5110:20, 5111:9, 5112:3, 5118:25, 5128:16, 5129:20, 5130:1, 5130:6, 5130:11, 5130:16, 5130:18, 5130:22, 5131:4, 5133:11, 5135:3, 5136:5, 5136:12, 5136:15, 5136:22, 5137:2, 5138:3, 5138:14, 5138:17, 5145:1, 5145:2, 5145:5, 5145:14, 5145:24, 5146:2, 5146:6, 5146:7, 5153:20, 5194:8, 5194:13, 5208:24, 5209:3, 5222:20, 5226:12, 5259:7, 5284:10
**mailed** [1] - 5259:2
**mails** [12] - 5108:25, 5112:10, 5128:13,

5128:18, 5128:22, 5128:25, 5130:13, 5133:15, 5133:21, 5139:10, 5144:21, 5197:6
**main** [5] - 5122:8, 5183:1, 5221:16, 5225:25, 5226:2
**maintained** [1] - 5173:1
**maintaining** [1] - 5231:22
**major** [1] - 5164:7
**majority** [5] - 5178:14, 5185:16, 5187:24, 5222:14, 5237:1
**Makika** [2] - 5116:15, 5118:13
**man** [1] - 5261:12
**management** [3] - 5165:2, 5165:3, 5168:19
**Management** [7] - 5116:13, 5117:21, 5147:11, 5168:8, 5168:15, 5174:19, 5243:6
**manager** [1] - 5138:12
**managing** [2] - 5144:16, 5146:17
**Manfredi** [5] - 5129:14, 5132:5, 5134:20, 5136:17, 5139:4
**manner** [1] - 5206:4
**manufacture** [1] - 5209:6
**Mar** [1] - 5148:21
**MARC** [1] - 5160:18
**March** [12] - 5130:1, 5130:10, 5130:18, 5130:24, 5130:25, 5131:3, 5133:18, 5135:8, 5136:20, 5136:22, 5138:17, 5139:10
**Mark** [6] - 5160:7, 5160:18, 5168:13, 5169:20, 5242:23, 5243:3
**mark** [3] - 5160:16, 5282:23, 5282:25
**MARK** [1] - 5160:18
**marked** [29] - 5097:4, 5097:16, 5097:20, 5097:23, 5098:23, 5108:20, 5116:22, 5120:17, 5127:25, 5136:4, 5144:23, 5147:2, 5148:23, 5154:21, 5155:8, 5166:19, 5169:13, 5172:8, 5220:24, 5235:13, 5240:1, 5242:1, 5248:2, 5259:12, 5263:17, 5265:25, 5282:4, 5283:2, 5283:4
**Marketing** [1] - 5161:6
**marketing** [6] - 5161:9, 5163:1, 5163:2, 5163:13, 5229:23, 5229:24
**Mary** [1] - 5095:20
**master** [2] - 5108:3, 5108:8
**Mastercard** [3] - 5222:10,

5228:25, 5229:5
**material** [4] - 5196:23, 5201:18, 5202:19, 5208:17
**materiality** [5] - 5110:11, 5110:17, 5110:18, 5152:12, 5244:4
**Matt** [4] - 5167:4, 5168:6, 5168:14, 5169:19
**matter** [8] - 5096:12, 5096:13, 5101:5, 5101:9, 5203:24, 5208:12, 5211:19, 5279:10
**matters** [4] - 5110:17, 5156:8, 5159:12, 5216:9
**McKee** [4] - 5120:11, 5120:14, 5122:6, 5122:10
**mean** [13] - 5136:9, 5156:20, 5175:16, 5177:5, 5190:2, 5190:13, 5193:2, 5203:20, 5207:13, 5212:4, 5218:25, 5259:5, 5281:5
**means** [5] - 5121:23, 5122:15, 5210:15, 5233:7, 5257:9
**meant** [1] - 5156:1
**meantime** [1] - 5219:6
**measures** [1] - 5195:20
**mechanical** [1] - 5095:25
**media** [1] - 5221:25
**meet** [4] - 5161:22, 5181:23, 5188:10, 5188:25
**meeting** [16] - 5110:25, 5126:21, 5134:24, 5142:20, 5142:23, 5185:15, 5195:5, 5241:9, 5247:18, 5257:23, 5258:6, 5258:20, 5258:24, 5262:7, 5277:23, 5278:4
**meetings** [5] - 5122:3, 5182:1, 5182:13, 5182:21, 5239:17
**member** [19] - 5144:16, 5146:17, 5187:25, 5234:11, 5235:23, 5238:5, 5271:23, 5271:25, 5272:13, 5273:11, 5273:13, 5273:14, 5273:22, 5274:10, 5274:11, 5274:17, 5281:13, 5282:9, 5282:11
**members** [31] - 5104:3, 5112:2, 5114:7, 5121:22, 5122:4, 5133:2, 5168:4, 5168:10, 5168:24, 5177:1, 5177:10, 5185:1, 5202:16, 5229:15, 5238:6, 5271:1, 5271:3, 5271:10, 5271:15, 5271:17, 5271:19, 5272:2, 5272:6, 5272:12, 5274:3, 5274:5, 5274:7, 5274:13,

5274:19, 5275:7, 5275:13
**membership** [6] - 5174:15, 5174:21, 5174:22, 5273:20, 5281:7, 5281:11
**memorandum** [1] - 5129:9
**Memorial** [1] - 5094:21
**memory** [5] - 5110:14, 5216:3, 5217:4, 5261:19, 5274:17
**mention** [2] - 5229:12, 5255:14
**mentioned** [13] - 5130:20, 5146:1, 5159:7, 5177:3, 5190:1, 5231:3, 5247:5, 5251:19, 5257:23, 5258:15, 5260:21, 5266:21, 5274:5
**mentions** [1] - 5136:7
**Mercedes** [1] - 5228:10
**Meritage** [1] - 5182:2
**message** [11] - 5120:4, 5120:11, 5121:17, 5122:2, 5134:6, 5136:23, 5194:11, 5194:17, 5259:4, 5259:5, 5259:10
**messages** [3] - 5120:7, 5120:21, 5259:3
**met** [9] - 5161:23, 5181:17, 5184:7, 5187:11, 5188:11, 5188:13, 5188:14, 5188:17
**Metabank** [2] - 5230:23, 5231:1
**metabank** [1] - 5230:24
**method** [6] - 5221:11, 5221:17, 5225:5, 5225:6, 5225:24, 5225:25
**methods** [1] - 5221:9
**Metris** [3] - 5165:6, 5165:7, 5165:12
**METRIS** [1] - 5165:6
**Mexican** [2] - 5186:15
**Mexico** [4] - 5141:24, 5186:1, 5186:2, 5186:3
**Mia** [4] - 5188:17, 5235:23, 5239:6, 5239:14
**MIA** [1] - 5188:17
**Mia's** [1] - 5188:19
**Michael** [2] - 5120:12, 5120:22
**mid** [1] - 5265:7
**middle** [1] - 5280:6
**might** [9] - 5120:25, 5171:25, 5180:15, 5188:15, 5192:6, 5192:8, 5204:5, 5221:4, 5249:4
**mike** [2] - 5111:20, 5160:20
**miles** [2] - 5186:7, 5227:2
**Miller** [4] - 5130:4, 5136:23, 5137:3, 5137:7
**million** [33] - 5099:16,

5099:18, 5106:10, 5125:2, 5129:5, 5129:10, 5129:25, 5131:5, 5137:12, 5137:18, 5137:19, 5137:22, 5150:8, 5151:19, 5152:25, 5153:6, 5176:16, 5178:8, 5178:11, 5220:13, 5221:24, 5222:1, 5222:15, 5223:21, 5227:13, 5227:15, 5231:21, 5233:11, 5233:12, 5233:13, 5269:6, 5276:11
**millions** [2] - 5186:24, 5231:19
**mind** [16] - 5103:13, 5124:5, 5132:16, 5184:3, 5184:12, 5185:8, 5194:25, 5196:5, 5196:8, 5211:1, 5211:2, 5211:13, 5211:15, 5213:19, 5216:19, 5245:3
**mine** [2] - 5113:16, 5161:25
**Mineola** [1] - 5095:3
**minute** [3] - 5116:6, 5127:21, 5143:23
**minutes** [14] - 5121:18, 5122:16, 5141:6, 5141:11, 5142:6, 5142:23, 5142:24, 5142:25, 5143:3, 5143:5, 5143:6, 5230:1, 5244:16, 5281:19
**miscommunication** [1] - 5118:21
**misconduct** [1] - 5281:25
**MISKIEWICZ** [52] - 5094:16, 5097:8, 5098:25, 5099:13, 5104:20, 5104:23, 5109:3, 5110:20, 5111:15, 5112:8, 5113:18, 5113:21, 5114:2, 5114:12, 5114:20, 5114:22, 5115:2, 5115:5, 5115:8, 5115:13, 5115:16, 5117:2, 5119:25, 5121:10, 5125:3, 5125:21, 5126:1, 5127:1, 5129:11, 5129:16, 5131:19, 5132:2, 5132:15, 5132:21, 5141:2, 5145:19, 5147:22, 5148:25, 5150:11, 5151:24, 5196:20, 5200:24, 5202:17, 5206:9, 5206:15, 5207:21, 5212:9, 5215:9, 5277:21, 5278:1, 5286:14, 5288:5
**Miskiewicz** [11] - 5096:7, 5096:21, 5097:15, 5104:19, 5111:17, 5115:25, 5154:14, 5208:20, 5208:23, 5213:11, 5278:16

**Miskiewicz'** [1] - 5096:15
**misrepresented** [1] - 5201:22
**missed** [2] - 5102:22, 5287:7
**missing** [12] - 5137:22, 5142:12, 5142:14, 5142:24, 5143:1, 5143:5, 5143:6, 5143:15, 5143:19, 5230:22, 5244:5, 5281:23
**misspoken** [1] - 5143:2
**mistake** [1] - 5119:4
**mistaken** [1] - 5217:7
**Mobile** [1] - 5161:5
**model** [2] - 5189:6, 5224:2
**moment** [9] - 5107:8, 5121:15, 5152:7, 5155:18, 5167:14, 5170:16, 5215:20, 5215:21, 5269:8
**moments** [3] - 5190:1, 5240:17, 5251:19
**Money** [1] - 5230:20
**money** [82] - 5106:6, 5118:23, 5121:4, 5121:5, 5121:6, 5122:11, 5122:13, 5122:19, 5124:8, 5125:24, 5126:5, 5127:19, 5147:17, 5163:17, 5168:23, 5175:16, 5175:17, 5175:19, 5176:6, 5176:12, 5176:20, 5176:22, 5178:6, 5178:13, 5178:16, 5178:20, 5180:1, 5180:4, 5182:24, 5184:6, 5184:7, 5185:13, 5185:16, 5186:14, 5186:19, 5188:15, 5189:7, 5189:11, 5189:16, 5189:17, 5189:20, 5194:18, 5194:24, 5195:1, 5195:11, 5195:23, 5197:22, 5201:7, 5201:14, 5204:22, 5208:5, 5212:17, 5212:20, 5213:14, 5214:3, 5214:23, 5218:21, 5219:6, 5223:5, 5224:6, 5224:7, 5224:10, 5224:18, 5226:23, 5226:24, 5232:4, 5241:1, 5250:20, 5251:5, 5252:15, 5254:6, 5254:20, 5256:1, 5256:24, 5257:1, 5257:6, 5257:16, 5258:16, 5258:20, 5258:24
**moneys** [5] - 5182:11, 5182:22, 5187:21, 5194:21, 5258:12
**MONGUS** [1] - 5265:21
**monies** [8] - 5124:13, 5144:3, 5147:10, 5147:18, 5199:18, 5207:1, 5213:5,

5213:6
**month** [5] - 5180:12, 5192:8, 5224:21, 5227:24, 5231:18
**monthly** [3] - 5224:13, 5224:15
**months** [15] - 5127:5, 5164:7, 5166:10, 5180:20, 5182:20, 5191:13, 5191:20, 5195:21, 5195:24, 5202:8, 5222:15, 5227:14, 5232:25, 5264:7, 5265:9
**Moreau** [2] - 5119:11, 5119:14
**morning** [17] - 5103:5, 5104:3, 5104:4, 5104:5, 5115:23, 5115:24, 5142:20, 5149:1, 5149:2, 5154:24, 5210:8, 5255:21, 5278:5, 5278:11, 5281:3, 5281:15, 5283:14
**morphed** [1] - 5164:5
**mortgage** [3] - 5178:21, 5179:9, 5182:15
**mortgaged** [1] - 5179:2
**most** [10] - 5098:20, 5148:20, 5173:15, 5173:21, 5191:19, 5213:25, 5227:2, 5227:8, 5229:9, 5230:13
**mostly** [9] - 5161:9, 5165:12, 5165:14, 5171:11, 5196:18, 5219:22, 5225:17, 5236:19, 5237:7
**motivations** [2] - 5196:10, 5196:11
**motive** [1] - 5194:24
**motor** [1] - 5163:1
**move** [5] - 5121:9, 5129:22, 5131:17, 5217:20, 5244:6, 5269:10
**moved** [2] - 5191:12, 5264:17
**moves** [1] - 5109:3
**moving** [3] - 5168:24, 5201:25, 5237:5
**MR** [259] - 5096:4, 5097:8, 5097:14, 5098:3, 5098:6, 5098:25, 5099:13, 5099:24, 5100:8, 5101:20, 5101:22, 5102:1, 5102:4, 5102:12, 5102:21, 5103:1, 5103:12, 5103:16, 5104:20, 5104:23, 5109:3, 5109:5, 5110:3, 5110:20, 5111:6, 5111:12, 5111:15, 5111:16, 5111:17, 5112:8, 5113:18, 5113:20,

5113:21, 5113:22, 5113:24, 5114:2, 5114:10, 5114:12, 5114:15, 5114:17, 5114:20, 5114:22, 5115:2, 5115:5, 5115:8, 5115:13, 5115:16, 5115:19, 5115:22, 5116:25, 5117:2, 5117:4, 5117:6, 5117:9, 5117:15, 5117:18, 5117:19, 5118:1, 5118:3, 5119:25, 5120:2, 5121:8, 5121:10, 5121:11, 5121:14, 5125:3, 5125:21, 5126:1, 5127:1, 5127:2, 5127:3, 5129:11, 5129:12, 5129:16, 5129:17, 5131:17, 5131:19, 5132:2, 5132:7, 5132:15, 5132:18, 5132:21, 5132:23, 5133:7, 5133:8, 5141:2, 5141:3, 5141:5, 5143:16, 5143:17, 5143:18, 5143:23, 5144:1, 5145:17, 5145:19, 5145:20, 5145:23, 5147:22, 5148:1, 5148:25, 5150:5, 5150:11, 5150:23, 5151:5, 5151:12, 5151:24, 5152:3, 5152:7, 5152:9, 5152:19, 5152:24, 5153:14, 5153:16, 5153:19, 5153:25, 5154:2, 5154:8, 5154:10, 5154:12, 5155:1, 5155:17, 5158:12, 5158:16, 5159:1, 5159:18, 5160:1, 5160:6, 5160:23, 5161:15, 5161:20, 5167:10, 5167:14, 5167:19, 5173:4, 5174:8, 5174:13, 5187:7, 5193:14, 5194:4, 5194:14, 5194:18, 5195:4, 5196:16, 5196:20, 5197:3, 5197:23, 5198:2, 5199:5, 5200:7, 5200:8, 5200:10, 5200:18, 5200:24, 5201:21, 5202:17, 5202:23, 5203:11, 5203:19, 5205:13, 5205:19, 5205:23, 5206:8, 5206:9, 5206:12, 5206:15, 5206:16, 5207:16, 5207:21, 5208:20, 5210:1, 5210:10, 5210:13, 5210:17, 5211:1, 5211:25, 5212:5, 5212:9, 5212:24, 5214:12, 5214:13, 5215:9, 5216:2, 5216:15, 5217:18, 5218:1, 5218:10, 5218:12, 5231:13, 5234:14, 5234:15, 5236:2, 5236:4, 5236:7, 5236:9, 5243:8,

5243:11, 5244:2, 5244:9, 5244:18, 5244:22, 5248:15, 5248:19, 5248:21, 5248:25, 5249:20, 5249:25, 5255:18, 5255:19, 5256:20, 5256:22, 5260:10, 5260:12, 5262:21, 5264:9, 5264:12, 5264:16, 5266:3, 5266:22, 5268:1, 5268:11, 5269:2, 5269:9, 5269:15, 5269:17, 5269:21, 5272:22, 5272:25, 5277:21, 5278:1, 5281:22, 5282:1, 5282:7, 5282:19, 5283:8, 5283:16, 5283:20, 5283:25, 5284:3, 5284:6, 5285:16, 5285:19, 5285:21, 5286:5, 5286:10, 5286:14, 5286:18, 5286:25, 5287:5, 5287:11, 5287:13, 5287:18, 5288:5, 5288:7, 5288:9, 5288:12, 5288:16, 5288:18, 5288:20, 5288:24

**MS** [42] - 5103:9, 5161:17, 5167:12, 5171:2, 5173:7, 5174:7, 5175:11, 5175:22, 5183:19, 5184:1, 5184:18, 5195:14, 5197:16, 5231:9, 5236:5, 5243:10, 5248:17, 5248:20, 5255:22, 5256:2, 5256:8, 5260:11, 5262:3, 5262:18, 5264:11, 5266:6, 5266:9, 5268:6, 5269:14, 5269:24, 5273:3, 5273:8, 5273:10, 5279:2, 5279:7, 5279:16, 5281:16, 5286:2, 5287:3, 5288:14, 5288:22, 5289:1

**multilevel** [1] - 5163:13
**mutually** [1] - 5135:11
**myriad** [1] - 5287:7

## N

**name** [12] - 5123:2, 5126:11, 5137:25, 5146:19, 5160:14, 5161:10, 5182:4, 5182:7, 5188:8, 5190:25, 5261:12, 5265:12
**named** [2] - 5146:14, 5162:8
**names** [5] - 5103:10, 5138:1, 5180:5, 5255:15, 5256:9
**Nash** [12] - 5108:12, 5108:16, 5109:1, 5110:13, 5112:11, 5112:14,

5156:17, 5258:4, 5262:24, 5263:14, 5264:18, 5265:9
**Nash's** [1] - 5108:14
**nature** [6] - 5110:10, 5112:21, 5185:12, 5216:12, 5268:10, 5282:3
**necessarily** [2] - 5131:8, 5132:17
**necessary** [1] - 5217:12
**necessity** [1] - 5229:18
**need** [22] - 5123:4, 5128:24, 5138:15, 5159:12, 5168:5, 5184:16, 5191:24, 5193:11, 5201:24, 5203:9, 5205:24, 5211:20, 5226:7, 5226:25, 5244:13, 5262:10, 5262:12, 5272:15, 5275:4, 5275:21, 5275:24, 5282:14
**needed** [22] - 5098:9, 5166:4, 5170:21, 5171:22, 5176:24, 5176:25, 5178:20, 5180:25, 5187:15, 5190:11, 5190:15, 5190:20, 5192:9, 5219:9, 5227:6, 5229:17, 5250:20, 5254:21, 5257:5, 5257:14, 5270:13, 5276:9
**needs** [5] - 5157:2, 5163:19, 5168:23, 5177:10, 5262:12
**negate** [1] - 5214:5
**negatively** [1] - 5224:15
**negotiate** [1] - 5219:8
**negotiated** [1] - 5232:15
**negotiating** [1] - 5218:19, 5231:16, 5233:4
**negotiations** [3] - 5127:4, 5139:13, 5199:14
**neighborhood** [1] - 5119:2
**Neptune** [14] - 5107:12, 5107:19, 5120:5, 5122:8, 5124:3, 5191:2, 5217:1, 5218:14, 5218:17, 5232:5, 5235:1, 5243:5, 5243:6, 5250:17
**Nerguzian** [22] - 5124:3, 5180:14, 5190:25, 5193:15, 5199:15, 5218:14, 5219:11, 5232:15, 5232:23, 5233:15, 5237:19, 5237:22, 5238:21, 5239:21, 5239:23, 5240:14, 5240:18, 5243:5, 5251:12, 5275:19, 5275:22
**Nerguzian's** [4] - 5107:19, 5218:17, 5219:22, 5275:16
**netspend** [1] - 5230:19
**network** [1] - 5222:2

**networking** [1] - 5188:12
**never** [11] - 5098:18, 5148:19, 5150:21, 5153:10, 5178:2, 5178:21, 5186:18, 5209:3, 5223:10, 5226:23, 5244:11
**NEW** [1] - 5094:1
**new** [20] - 5141:24, 5141:25, 5146:12, 5146:15, 5159:16, 5222:10, 5227:12, 5228:19, 5241:7, 5241:11, 5241:24, 5241:25, 5242:14, 5247:13, 5250:19, 5250:23, 5252:2, 5271:16, 5271:19, 5282:9
**New** [5] - 5094:6, 5094:15, 5095:21, 5096:17, 5097:18
**next** [19] - 5109:7, 5111:21, 5119:10, 5123:17, 5130:14, 5132:24, 5134:10, 5135:2, 5136:20, 5149:5, 5160:5, 5162:18, 5163:24, 5188:14, 5224:4, 5243:13, 5245:4, 5246:4, 5284:20
**NHL** [2] - 5248:9, 5250:9
**nice** [1] - 5156:20
**Nick** [1] - 5277:6
**night** [5] - 5142:4, 5194:15, 5199:6, 5277:18, 5287:12
**nine** [3] - 5157:25, 5158:1, 5285:14
**Nissan** [1] - 5180:7
**nobody** [4] - 5163:15, 5223:8, 5230:7, 5285:23
**Nolan** [1] - 5125:19
**non** [2] - 5203:13, 5217:11
**non-involvement** [2] - 5203:13, 5217:11
**none** [2] - 5147:24, 5202:19
**normal** [2] - 5135:10, 5159:1
**north** [5] - 5179:1, 5188:12, 5189:2, 5257:25, 5263:22
**Northern** [3] - 5156:4, 5206:4, 5206:5
**note** [3] - 5097:9, 5220:11, 5286:20
**noted** [2] - 5096:3, 5258:17
**notes** [2] - 5199:7, 5207:23
**nothing** [7] - 5150:12, 5175:10, 5196:21, 5213:23, 5276:10, 5280:20
**notification** [1] - 5110:15
**notified** [2] - 5122:7, 5123:12
**November** [2] - 5263:4,

5266:2
**nowhere** [3] - 5099:9, 5099:23, 5106:14
**number** [33] - 5102:13, 5104:7, 5104:25, 5106:3, 5107:7, 5116:7, 5123:12, 5123:18, 5125:12, 5126:7, 5127:5, 5130:3, 5131:20, 5133:4, 5136:1, 5148:10, 5153:4, 5167:20, 5176:15, 5178:11, 5185:19, 5185:21, 5188:3, 5213:5, 5220:5, 5224:11, 5241:17, 5242:7, 5252:23, 5255:25, 5282:1, 5286:23, 5287:9
**numbers** [2] - 5147:16, 5148:20
**numerated** [1] - 5235:8
**numerous** [2] - 5107:22, 5236:20
**NY** [3] - 5094:22, 5095:3, 5095:7

## O

**o'clock** [1] - 5193:17
**oath** [2] - 5104:16, 5105:14
**object** [11] - 5111:7, 5111:13, 5131:22, 5150:18, 5151:2, 5152:22, 5183:19, 5208:15, 5208:16, 5243:11, 5244:4
**objection** [65] - 5097:7, 5097:12, 5098:5, 5102:10, 5110:5, 5110:6, 5111:2, 5113:24, 5114:14, 5114:17, 5117:2, 5117:6, 5119:25, 5121:10, 5121:11, 5125:3, 5125:21, 5126:1, 5127:1, 5129:11, 5129:16, 5131:23, 5131:24, 5132:2, 5141:2, 5143:16, 5145:19, 5145:20, 5147:22, 5150:24, 5151:9, 5161:17, 5167:12, 5167:13, 5167:15, 5171:2, 5174:7, 5174:8, 5175:11, 5175:22, 5190:2, 5196:3, 5199:22, 5215:10, 5215:14, 5215:15, 5216:14, 5231:9, 5243:10, 5244:3, 5248:20, 5249:20, 5255:12, 5255:17, 5260:11, 5260:12, 5262:3, 5262:18, 5264:11, 5264:12, 5266:5, 5268:4, 5269:14, 5269:17, 5272:22
**objections** [1] - 5102:18
**obligated** [2] - 5168:24,

**20**

5177:11
**obligation** [3] - 5144:4, 5144:6, 5224:13
**obligations** [3] - 5170:9, 5171:10, 5257:14
**observation** [1] - 5205:25
**obtain** [1] - 5219:11
**obtained** [4] - 5127:16, 5206:4, 5218:17, 5225:19
**obviously** [6] - 5098:14, 5102:13, 5152:9, 5199:25, 5204:21, 5205:6
**occasion** [2] - 5216:2, 5258:23
**occasions** [1] - 5171:15
**Occupancy** [3] - 5263:4, 5263:10, 5266:1
**occupation** [1] - 5161:4
**occur** [3] - 5172:18, 5206:10, 5240:20
**occurred** [1] - 5157:19
**occurring** [1] - 5262:6
**occurs** [1] - 5195:18
**Oceanside** [1] - 5095:7
**October** [9] - 5141:23, 5144:5, 5144:6, 5145:24, 5146:3, 5148:5, 5148:7, 5240:11, 5260:22
**OF** [3] - 5094:1, 5094:3, 5094:10
**offer** [9] - 5099:2, 5114:13, 5117:1, 5185:6, 5196:11, 5214:16, 5215:2, 5282:4
**offered** [13] - 5131:20, 5150:15, 5184:2, 5185:7, 5191:16, 5208:3, 5210:18, 5211:19, 5222:22, 5258:16, 5258:23, 5258:24
**offering** [1] - 5229:5
**Office** [1] - 5155:6
**office** [18] - 5166:17, 5181:16, 5181:23, 5182:12, 5182:20, 5184:10, 5187:19, 5222:24, 5228:12, 5238:2, 5253:11, 5258:22, 5259:3, 5259:17, 5263:3, 5263:15, 5264:23, 5266:1
**officer** [1] - 5190:17
**offices** [8] - 5142:21, 5194:9, 5257:25, 5261:14, 5263:2, 5263:22, 5264:17, 5264:19
**official** [2] - 5266:15, 5266:17
**officially** [1] - 5195:22
**often** [2] - 5127:18, 5140:25
**ointment** [1] - 5100:9
**Old** [1] - 5095:3

**Oliveras** [1] - 5278:10
**OLIVERAS** [1] - 5095:6
**once** [7] - 5127:11, 5177:24, 5230:5, 5236:20, 5238:4, 5261:9
**One** [1] - 5094:21
**one** [117] - 5096:12, 5098:21, 5101:23, 5102:2, 5108:12, 5112:2, 5121:19, 5122:7, 5122:21, 5124:21, 5125:12, 5127:8, 5128:9, 5133:18, 5133:22, 5133:23, 5134:23, 5135:2, 5136:2, 5136:16, 5136:20, 5137:14, 5137:15, 5138:4, 5139:7, 5139:9, 5140:16, 5142:4, 5143:23, 5146:4, 5147:2, 5147:5, 5152:7, 5153:3, 5158:2, 5158:5, 5158:8, 5163:4, 5165:20, 5169:4, 5171:22, 5173:24, 5175:5, 5178:25, 5179:6, 5180:12, 5180:16, 5185:21, 5188:5, 5188:11, 5188:24, 5192:6, 5194:19, 5196:21, 5199:8, 5199:15, 5200:13, 5202:7, 5202:15, 5203:14, 5204:8, 5204:23, 5205:19, 5209:16, 5209:24, 5215:5, 5216:8, 5216:15, 5217:2, 5221:4, 5221:7, 5223:15, 5224:2, 5225:9, 5225:13, 5225:21, 5226:7, 5226:15, 5226:17, 5227:8, 5227:25, 5228:11, 5229:4, 5230:19, 5230:21, 5230:22, 5231:17, 5231:20, 5234:21, 5234:23, 5235:11, 5240:16, 5242:7, 5242:16, 5247:5, 5255:24, 5255:25, 5262:22, 5265:2, 5265:15, 5265:23, 5265:24, 5265:15, 5272:12, 5273:13, 5274:8, 5274:10, 5275:6, 5276:13, 5279:11, 5281:23, 5283:1, 5283:4, 5284:6, 5285:7, 5286:15
**ones** [1] - 5116:15
**ongoing** [1] - 5139:13
**open** [4] - 5111:20, 5112:1, 5133:1, 5246:1
**openly** [1] - 5135:14
**opens** [1] - 5204:11
**operating** [14] - 5166:16, 5166:18, 5166:21, 5167:6, 5167:22, 5169:2, 5175:6, 5176:2, 5176:12, 5177:3, 5215:13, 5251:23, 5252:20, 5256:11

**operations** [3] - 5188:20, 5188:21, 5235:23
**opine** [3] - 5205:3, 5205:11, 5205:13
**opinion** [17] - 5108:2, 5163:14, 5186:17, 5190:14, 5200:11, 5200:13, 5200:17, 5200:18, 5204:8, 5204:16, 5209:17, 5220:7, 5224:9, 5231:20, 5238:18, 5261:11, 5277:17
**opportunity** [11] - 5099:21, 5105:13, 5116:19, 5128:4, 5139:14, 5159:8, 5181:15, 5185:22, 5201:18, 5207:16, 5217:20
**opposed** [6] - 5132:4, 5223:2, 5224:6, 5224:19, 5225:2, 5241:23
**opposite** [1] - 5120:9
**Oprah** [1] - 5228:15
**opted** [1] - 5187:16
**options** [1] - 5190:6
**OR** [2] - 5248:24, 5288:17
**oral** [1] - 5196:18
**orange** [1] - 5250:14
**oranges** [1] - 5097:11
**order** [19] - 5134:25, 5142:1, 5163:16, 5177:11, 5179:2, 5192:16, 5202:3, 5219:7, 5221:1, 5228:4, 5242:11, 5249:4, 5250:20, 5250:21, 5250:23, 5252:9, 5254:21
**ordinary** [1] - 5173:2
**organizing** [1] - 5192:23
**original** [11] - 5145:2, 5146:18, 5163:7, 5166:21, 5166:22, 5167:6, 5168:4, 5225:9, 5226:4, 5268:2, 5272:12
**originally** [4] - 5141:9, 5148:14, 5172:17, 5189:10
**otherwise** [1] - 5196:23
**ourselves** [1] - 5178:4
**outlining** [2] - 5130:24, 5138:15
**outset** [1] - 5286:3
**outside** [2] - 5150:18, 5226:3
**outstanding** [1] - 5237:9
**outweighed** [3] - 5205:2, 5211:17, 5216:7
**overhead** [1] - 5231:22
**overheard** [1] - 5261:25
**overrule** [1] - 5196:3
**overruled** [8] - 5120:1, 5125:4, 5125:22, 5126:2, 5132:14, 5147:23, 5171:3,

5175:24
**owe** [1] - 5269:5
**owed** [6] - 5148:17, 5148:18, 5176:20, 5177:2, 5178:9, 5276:11
**own** [24] - 5105:10, 5105:11, 5106:11, 5106:12, 5140:5, 5140:18, 5146:19, 5157:22, 5163:2, 5164:15, 5170:23, 5170:24, 5181:2, 5190:7, 5199:18, 5207:5, 5215:13, 5223:5, 5224:7, 5224:19, 5230:12, 5241:11, 5249:4
**owned** [8] - 5105:11, 5138:8, 5164:9, 5174:22, 5177:20, 5179:1, 5250:10, 5250:15
**owner** [3] - 5144:15, 5144:16, 5144:20
**owner's** [1] - 5233:19
**owners** [1] - 5256:12
**ownership** [7] - 5100:22, 5100:23, 5101:3, 5122:12, 5153:4, 5249:2
**ownerships** [1] - 5168:9

**P**

**p.m** [2] - 5146:4, 5146:5
**page** [20] - 5109:7, 5111:8, 5111:21, 5118:5, 5132:24, 5136:5, 5139:21, 5149:5, 5168:5, 5168:21, 5243:13, 5245:4, 5246:4, 5265:20, 5271:12, 5271:13, 5271:21, 5282:8, 5282:13, 5282:14
**pages** [7] - 5106:4, 5150:15, 5167:20, 5169:6, 5219:20, 5220:4, 5282:18
**paid** [17] - 5137:12, 5144:3, 5148:19, 5163:20, 5177:17, 5180:18, 5189:15, 5192:12, 5192:16, 5226:11, 5233:9, 5233:16, 5233:25, 5234:6, 5236:23, 5238:16, 5241:20
**pains** [1] - 5098:19
**Palm** [1] - 5153:5
**Palm's** [1] - 5153:13
**Palms** [5] - 5119:16, 5148:9, 5151:20, 5180:7
**Pandora's** [1] - 5204:11
**paperwork** [3] - 5112:11, 5112:13, 5136:18
**paragraph** [5] - 5111:7, 5255:24, 5256:6, 5256:10, 5281:25

paragraphs [3] - 5271:12, 5281:23, 5282:2
parameters [1] - 5099:25
parcel [7] - 5107:16, 5129:6, 5179:1, 5181:15, 5186:8, 5212:16
Park [4] - 5125:9, 5125:19, 5125:25, 5153:5
part [41] - 5098:10, 5098:19, 5107:16, 5110:22, 5112:23, 5120:8, 5120:23, 5120:25, 5121:23, 5124:22, 5126:6, 5129:6, 5130:11, 5130:13, 5132:7, 5132:11, 5138:8, 5147:20, 5147:24, 5153:7, 5155:22, 5159:17, 5162:6, 5164:6, 5203:9, 5208:2, 5212:16, 5213:11, 5213:15, 5214:1, 5216:24, 5216:25, 5223:5, 5226:2, 5234:25, 5240:12, 5250:22, 5285:23, 5286:1, 5287:16
part-time [1] - 5162:6
partial [1] - 5153:4
participate [5] - 5247:19, 5254:15, 5258:5, 5258:8, 5261:22
participated [3] - 5223:24, 5248:8, 5250:12
participating [3] - 5212:10, 5237:21, 5238:5
participation [2] - 5123:8, 5239:8
particular [9] - 5118:25, 5131:9, 5142:18, 5159:7, 5173:25, 5178:25, 5192:9, 5208:23, 5229:4
particularly [3] - 5116:2, 5116:15, 5159:5
parties [5] - 5130:9, 5135:15, 5136:24, 5145:15, 5248:7
partner [12] - 5126:13, 5126:16, 5126:23, 5127:5, 5135:4, 5135:16, 5169:23, 5181:20, 5184:16, 5256:5, 5278:16, 5278:23
partnering [1] - 5181:24
partners [2] - 5138:9, 5139:4
Partners [3] - 5188:6, 5248:10, 5250:10
parts [1] - 5174:14
party [4] - 5106:5, 5221:18, 5225:11, 5242:17
patent [10] - 5221:16, 5221:17, 5225:23, 5229:1, 5230:5, 5230:7, 5230:13,

5231:2, 5247:12, 5269:10
patented [2] - 5225:6, 5225:18
patents [27] - 5220:18, 5220:20, 5220:22, 5221:12, 5221:14, 5221:21, 5225:9, 5225:13, 5225:15, 5225:19, 5225:20, 5225:21, 5226:9, 5228:21, 5229:4, 5229:7, 5229:8, 5230:2, 5231:4, 5231:15, 5231:25, 5237:16, 5247:20, 5247:25, 5251:17, 5269:16, 5269:18
Paul [5] - 5254:7, 5265:17, 5270:6
pause [3] - 5101:25, 5102:3, 5108:23
Pause [4] - 5127:23, 5129:3, 5143:25, 5217:23
pay [11] - 5137:18, 5148:20, 5177:1, 5191:21, 5241:16, 5250:21, 5252:18, 5253:11, 5275:6, 5276:6, 5276:15
paying [5] - 5190:7, 5223:4, 5241:15, 5247:25, 5254:15
payment [13] - 5118:11, 5118:17, 5118:20, 5119:8, 5119:10, 5151:14, 5163:20, 5221:10, 5221:11, 5224:23, 5226:10, 5253:22, 5270:6
payments [3] - 5147:18, 5170:14, 5248:1
payoff [2] - 5241:4, 5241:23
payout [1] - 5137:19
payroll [5] - 5134:18, 5176:25, 5178:22, 5219:7, 5219:9
peak [2] - 5227:13, 5227:15
Peca [14] - 5113:6, 5115:7, 5115:15, 5120:4, 5120:7, 5120:22, 5121:25, 5122:5, 5122:10, 5122:18, 5124:16, 5155:20, 5156:10, 5156:13
Peca's [1] - 5156:11
pedigree [1] - 5190:10
people [18] - 5139:7, 5163:16, 5163:17, 5163:20, 5165:15, 5177:14, 5181:16, 5185:15, 5200:13, 5222:7, 5222:16, 5222:23, 5223:6, 5226:22, 5228:10, 5247:9, 5273:24, 5285:2

per [3] - 5137:3, 5231:18
perceived [1] - 5200:14
percent [42] - 5121:23, 5126:18, 5166:2, 5168:13, 5168:14, 5168:15, 5168:16, 5170:1, 5170:4, 5170:7, 5170:8, 5171:1, 5172:25, 5174:21, 5174:22, 5175:2, 5175:3, 5175:5, 5180:25, 5181:1, 5186:14, 5192:7, 5192:24, 5193:1, 5193:3, 5199:13, 5212:1, 5216:24, 5233:6, 5233:8, 5233:13, 5234:22, 5241:5, 5241:21, 5256:12, 5262:10, 5262:12, 5262:13
percentage [11] - 5122:12, 5148:12, 5150:7, 5168:9, 5169:5, 5171:6, 5177:13, 5177:20, 5193:12, 5227:11, 5228:3
perhaps [3] - 5104:25, 5119:9, 5144:19
period [13] - 5117:21, 5123:17, 5125:15, 5126:24, 5127:7, 5181:4, 5181:7, 5183:6, 5187:9, 5187:13, 5191:8, 5199:8, 5240:4
periods [1] - 5127:14
permission [4] - 5103:3, 5234:14, 5275:21, 5276:2
permit [1] - 5216:22
permitted [4] - 5272:23, 5273:4, 5278:6, 5279:13
permitting [1] - 5177:4
perpetuity [2] - 5233:18, 5241:21
person [6] - 5156:23, 5157:5, 5161:10, 5182:7, 5188:8, 5265:14
personal [12] - 5148:17, 5157:22, 5158:10, 5181:2, 5187:18, 5191:5, 5223:19, 5224:9, 5231:20, 5236:21, 5238:18, 5249:4
personally [1] - 5239:6
perspective [4] - 5100:13, 5159:2, 5203:12, 5206:7
pertain [1] - 5197:17
pertinent [1] - 5174:14
Perusing [1] - 5255:24
petition [4] - 5100:20, 5100:21, 5105:19, 5105:25
phased [1] - 5170:23
Phil [15] - 5097:22, 5101:9, 5137:23, 5140:10, 5154:13, 5159:12, 5160:1, 5167:5, 5168:20, 5187:2, 5187:15, 5187:16,

5187:18, 5188:2, 5262:12
PHIL [2] - 5103:20, 5288:3
PHILLIP [1] - 5094:7
Phoenix [1] - 5142:20
phone [8] - 5141:15, 5142:5, 5143:3, 5156:25, 5194:11, 5194:13, 5232:21, 5238:13
photographs [2] - 5263:23, 5264:2
phrase [2] - 5105:2, 5177:7
phrased [1] - 5127:2
pick [2] - 5111:12, 5278:7
pickup [1] - 5164:1
picture [1] - 5207:13
pictures [1] - 5135:1
piece [6] - 5182:16, 5186:7, 5192:19, 5193:7, 5226:17, 5231:24
pieces [1] - 5181:16
pinpoint [1] - 5139:18
pitching [2] - 5162:2, 5164:25
PK [4] - 5137:22, 5137:23, 5137:25, 5138:22
place [12] - 5110:1, 5112:1, 5132:1, 5133:1, 5134:13, 5158:18, 5161:24, 5183:22, 5238:1, 5244:1, 5246:1, 5267:1
plaintiffs [1] - 5111:1
plan [4] - 5164:21, 5228:1, 5237:12, 5240:25
planned [2] - 5134:10, 5220:11
planning [1] - 5148:14
play [3] - 5136:1, 5142:22, 5260:19
playboy [1] - 5180:7
played [10] - 5112:25, 5113:7, 5113:23, 5115:3, 5115:11, 5142:5, 5155:18, 5182:14, 5182:16, 5260:20
player [9] - 5100:22, 5100:24, 5101:4, 5101:6, 5123:1, 5156:6, 5157:20, 5206:25, 5207:1
players [13] - 5113:16, 5156:9, 5187:24, 5188:1, 5195:6, 5206:24, 5207:5, 5207:10, 5237:1, 5247:15, 5250:9, 5258:10
players' [3] - 5112:22, 5188:5, 5248:9
playing [2] - 5115:2, 5115:8
Plaza [2] - 5094:15, 5095:20
pled [2] - 5212:9, 5212:22
pledge [1] - 5220:18

pledged [2] - 5220:15, 5220:20
plus [2] - 5224:24, 5275:5
pocket [1] - 5190:7
point [53] - 5104:13, 5106:9, 5113:5, 5116:18, 5119:18, 5122:9, 5123:10, 5125:7, 5126:19, 5130:25, 5131:3, 5140:15, 5141:20, 5141:22, 5142:6, 5142:10, 5143:3, 5147:20, 5151:5, 5151:8, 5157:4, 5164:22, 5166:15, 5171:24, 5179:6, 5185:11, 5189:4, 5189:9, 5189:18, 5194:23, 5195:16, 5195:23, 5196:6, 5196:9, 5200:9, 5201:17, 5207:14, 5210:1, 5210:17, 5213:16, 5213:25, 5214:17, 5220:6, 5228:20, 5233:21, 5234:3, 5238:25, 5241:19, 5244:6, 5258:11, 5262:2, 5278:7, 5286:12
pointed [1] - 5211:21
points [3] - 5130:25, 5137:14, 5227:2
police [1] - 5195:20
Pontiac [1] - 5228:16
poor [1] - 5177:6
poorly [1] - 5127:2
portion [28] - 5112:3, 5114:5, 5114:18, 5118:1, 5121:21, 5121:22, 5126:5, 5137:2, 5138:18, 5139:20, 5139:22, 5139:24, 5140:8, 5140:9, 5142:11, 5142:14, 5143:14, 5143:19, 5146:8, 5148:14, 5174:15, 5174:25, 5175:18, 5177:19, 5257:19, 5261:17, 5282:12, 5282:16
portions [2] - 5112:25, 5150:11
position [11] - 5100:18, 5101:1, 5152:10, 5183:14, 5185:18, 5195:8, 5212:2, 5212:13, 5216:10, 5234:8, 5257:8
positive [1] - 5224:15
possession [2] - 5097:1, 5141:25
possibility [4] - 5126:25, 5181:24, 5200:4, 5284:19
possible [5] - 5098:17, 5132:9, 5135:23, 5199:5, 5216:19
possibly [3] - 5123:25, 5214:18, 5215:2
potential [10] - 5123:22, 5127:20, 5128:14,

5129:24, 5131:13, 5135:14, 5139:3, 5164:14, 5184:12, 5286:15
potentially [2] - 5223:23, 5247:6
pound [2] - 5130:21, 5138:21
pounding [1] - 5214:15
powerful [1] - 5228:14
preclude [1] - 5211:7
precluded [1] - 5196:12
prejudice [5] - 5159:15, 5205:2, 5211:18, 5216:20, 5247:7
prejudicial [6] - 5199:24, 5204:14, 5205:12, 5209:12, 5214:21, 5216:7
prejudicing [1] - 5216:20
preliminary [2] - 5137:11, 5138:15
prelitigation [3] - 5195:3, 5195:4, 5195:15
Premiere [1] - 5230:21
premise [1] - 5137:15
prepaid [16] - 5221:19, 5222:11, 5222:12, 5222:22, 5222:23, 5223:2, 5223:9, 5223:10, 5223:12, 5224:24, 5225:12, 5229:13, 5229:18, 5229:21, 5229:22, 5230:17
preparation [1] - 5225:14
prepare [1] - 5219:24
prepared [3] - 5173:1, 5219:21, 5285:17
presence [3] - 5150:1, 5194:13, 5255:9
present [2] - 5104:1, 5134:16, 5161:4, 5181:22, 5182:21, 5194:9, 5201:6, 5218:6, 5238:9, 5258:1, 5258:19, 5259:9
presentation [2] - 5159:4, 5159:11, 5160:4
presented [2] - 5130:19, 5249:1
presently [2] - 5160:24, 5161:1
president [3] - 5189:25, 5190:23, 5234:1
pretending [1] - 5184:14
pretty [6] - 5187:19, 5191:19, 5234:6, 5254:25, 5261:19
previous [7] - 5114:8, 5121:6, 5129:20, 5130:11, 5138:14, 5221:25, 5223:16
previously [7] - 5103:21, 5121:5, 5130:19, 5138:24, 5152:10, 5216:6, 5258:16

primarily [2] - 5111:7, 5225:14
primary [4] - 5110:5, 5110:6, 5124:20, 5124:21
printing [2] - 5197:6, 5197:12
private [12] - 5099:6, 5099:22, 5101:19, 5105:2, 5105:9, 5106:15, 5106:21, 5123:13, 5123:21, 5157:14, 5157:19, 5158:6
Privitello [11] - 5194:20, 5208:3, 5250:21, 5251:20, 5252:5, 5256:23, 5257:2, 5257:15, 5258:13, 5258:19, 5258:25
Privitello's [1] - 5277:7
probable [1] - 5264:5
probative [6] - 5196:7, 5204:25, 5211:11, 5211:12, 5211:14, 5211:17
problem [4] - 5166:12, 5199:6, 5215:2, 5282:15
problematic [1] - 5282:17
proceed [1] - 5135:13
proceeding [14] - 5098:12, 5101:2, 5101:7, 5102:7, 5105:21, 5106:18, 5134:20, 5157:11, 5157:12, 5157:21, 5157:22, 5157:23, 5158:3, 5286:8
Proceedings [1] - 5095:25
PROCEEDINGS [1] - 5094:10
proceedings [12] - 5101:25, 5102:3, 5108:23, 5120:13, 5120:16, 5123:23, 5127:23, 5129:3, 5143:25, 5158:1, 5217:23, 5287:21
proceeds [1] - 5213:8
process [2] - 5193:4, 5226:2
produce [1] - 5268:2
produced [4] - 5095:25, 5264:25, 5265:2, 5265:4
product [3] - 5163:15, 5163:19, 5231:1
production [1] - 5265:6
products [2] - 5163:2, 5163:3
professional [1] - 5187:24
profile [1] - 5223:21
program [1] - 5221:10, 5222:7, 5224:21, 5226:10, 5226:18, 5227:15, 5227:18, 5229:2, 5229:14, 5250:22
programs [3] - 5227:3,

5229:5, 5230:25
project [19] - 5124:23, 5125:18, 5126:16, 5129:6, 5162:11, 5162:16, 5181:12, 5181:13, 5181:18, 5181:25, 5182:22, 5182:24, 5185:6, 5185:13, 5186:6, 5186:9, 5197:12, 5197:13, 5227:7
projects [9] - 5126:9, 5127:9, 5131:11, 5135:24, 5181:2, 5182:11, 5183:4, 5185:17, 5187:15
promise [1] - 5169:25
proper [4] - 5099:25, 5147:18, 5244:2, 5279:25
properly [1] - 5128:20
properties [1] - 5178:25
property [7] - 5178:21, 5179:8, 5179:21, 5181:21, 5186:7, 5186:8, 5264:5
proposal [3] - 5130:5, 5137:4, 5138:14
proposed [2] - 5125:1, 5137:17
proposition [1] - 5110:21
prosperous [2] - 5164:12, 5230:14
protect [1] - 5226:4
protected [1] - 5225:24
protecting [2] - 5225:5, 5225:25
protection [1] - 5232:1
proverbial [1] - 5100:8
provide [3] - 5096:21, 5096:24, 5131:22
provided [4] - 5150:14, 5194:6, 5208:10, 5252:15
providing [2] - 5132:9, 5190:17
provision [4] - 5232:6, 5232:8, 5233:19, 5241:24
provisions [4] - 5219:3, 5219:19, 5220:8, 5232:6
public [4] - 5203:3, 5203:4, 5266:14, 5266:17
publicly [1] - 5213:17, 5213:22, 5214:4
published [1] - 5261:8
pulled [1] - 5179:16
puppet [2] - 5108:3, 5108:8
purchase [14] - 5120:5, 5238:8, 5240:23, 5241:1, 5242:5, 5242:8, 5242:11, 5242:25, 5247:8, 5248:11, 5250:13, 5250:17, 5250:20, 5251:1
purchased [4] - 5240:18, 5241:23, 5247:9, 5247:16
purchaser [3] - 5247:6,

5248:6, 5250:11
**purportedly** [1] - 5151:25
**purports** [1] - 5184:5
**purpose** [7] - 5099:4, 5106:16, 5122:25, 5132:12, 5171:21, 5185:9, 5213:7
**Purpose** [1] - 5230:20
**purposes** [3] - 5097:2, 5143:9, 5164:6
**pursuant** [7] - 5118:18, 5122:3, 5139:1, 5153:11, 5154:23, 5156:12, 5176:11
**put** [30] - 5103:5, 5108:3, 5118:4, 5119:14, 5122:11, 5139:2, 5140:12, 5153:1, 5153:10, 5159:12, 5171:13, 5174:2, 5176:3, 5176:6, 5176:11, 5176:13, 5178:6, 5178:13, 5194:8, 5213:1, 5224:21, 5230:3, 5233:7, 5233:24, 5255:15, 5283:13, 5284:19, 5284:23, 5287:15
**putting** [5] - 5151:19, 5187:22, 5219:3, 5224:23, 5284:13

**Q**

**qualified** [1] - 5215:16
**questionable** [1] - 5216:18
**questioning** [2] - 5204:3, 5204:4
**questions** [39] - 5099:5, 5100:11, 5100:14, 5105:4, 5107:1, 5107:3, 5107:5, 5107:7, 5107:20, 5108:5, 5108:10, 5108:24, 5115:17, 5116:12, 5124:18, 5126:7, 5139:16, 5139:19, 5147:1, 5147:10, 5154:1, 5154:8, 5154:14, 5154:19, 5158:13, 5199:8, 5200:21, 5203:25, 5205:4, 5205:24, 5206:2, 5262:22, 5269:21, 5273:23, 5275:15, 5280:25, 5281:8, 5281:10, 5281:14
**quickly** [2] - 5144:21, 5221:6
**quite** [4] - 5125:5, 5127:7, 5127:18, 5205:25

**R**

**R-A-T** [1] - 5156:19
**race** [1] - 5161:24
**racing** [10] - 5162:13,

5162:14, 5179:24, 5190:5, 5190:20, 5190:22, 5221:25, 5223:16, 5232:11, 5232:14
**raindrops** [1] - 5153:21
**raise** [7] - 5160:9, 5182:22, 5189:7, 5189:16, 5190:15, 5199:5, 5250:20
**raised** [8] - 5099:5, 5161:3, 5184:7, 5209:8, 5266:14, 5266:17, 5266:19, 5266:20
**raising** [12] - 5182:11, 5182:24, 5184:6, 5185:13, 5185:16, 5188:15, 5189:11, 5189:17, 5189:20, 5203:10, 5218:13, 5241:1
**ran** [2] - 5140:10, 5201:7
**Ranford** [4] - 5122:5, 5124:18, 5125:5, 5125:13
**Ranford's** [2] - 5125:24, 5126:5
**range** [1] - 5225:10
**rarest** [1] - 5216:2
**RAT** [1] - 5156:17
**rat** [7] - 5110:24, 5111:11, 5111:12, 5112:14, 5156:17, 5156:21, 5157:2
**rate** [1] - 5232:2
**rather** [3] - 5096:9, 5099:8, 5255:13
**re** [5] - 5097:3, 5099:25, 5141:20, 5230:15, 5235:8
**re-create** [1] - 5230:15
**re-listened** [1] - 5141:20
**re-numerated** [1] - 5235:8
**re-recross** [1] - 5099:25
**re-redirect** [1] - 5097:3
**reached** [1] - 5241:9
**reaction** [1] - 5286:7
**read** [19] - 5098:23, 5099:21, 5105:13, 5106:13, 5122:15, 5123:6, 5124:6, 5133:9, 5135:3, 5140:13, 5140:14, 5145:11, 5146:8, 5146:24, 5155:9, 5168:12, 5174:14, 5195:9, 5220:4
**reading** [1] - 5123:6
**ready** [4] - 5134:4, 5142:3, 5218:8, 5284:14
**real** [2] - 5125:1, 5228:4
**realize** [3] - 5142:11, 5142:14, 5228:4
**realized** [5] - 5142:16, 5142:22, 5222:16, 5223:8, 5286:23
**really** [14] - 5110:4, 4163:15, 5164:14, 5170:20, 5181:15, 5190:3,

5190:6, 5190:7, 5196:25, 5201:16, 5214:10, 5225:3, 5231:23, 5282:14
**reason** [20] - 5192:14, 5199:19, 5200:1, 5202:23, 5203:3, 5204:22, 5208:3, 5210:21, 5215:2, 5222:24, 5223:11, 5223:20, 5229:10, 5230:6, 5230:14, 5234:2, 5234:24, 5261:5, 5268:2, 5274:11
**reasons** [20] - 5185:20, 5199:12, 5200:12, 5200:13, 5201:2, 5202:21, 5203:3, 5203:7, 5204:8, 5204:20, 5204:23, 5205:5, 5210:2, 5217:19, 5234:19, 5234:23, 5235:3, 5235:8, 5236:21, 5284:13
**rebut** [1] - 5245:1
**rebuttal** [2] - 5099:5, 5286:12
**recap** [1] - 5244:13
**receipt** [1] - 5174:17
**receive** [5] - 5102:17, 5122:11, 5180:19, 5218:22, 5228:8
**received** [4] - 5096:17, 5118:25, 5120:7, 5120:10, 5120:22, 5122:15, 5139:18, 5145:17, 5147:17, 5154:15, 5155:3, 5155:5, 5167:10, 5167:18, 5173:4, 5174:11, 5180:15, 5197:17, 5204:6, 5225:1, 5230:5, 5236:3, 5243:9, 5248:16, 5249:23, 5252:22, 5257:7, 5260:16, 5264:10, 5264:15, 5266:4, 5269:13, 5269:20, 5282:13, 5289:15, 5289:16, 5289:18, 5289:20, 5289:23, 5289:25, 5290:2
**receiving** [4] - 5130:15, 5213:8, 5214:3, 5221:24
**recent** [1] - 5216:3
**recently** [5] - 5221:5, 5225:22, 5255:2
**recess** [4] - 5153:23, 5198:5, 5255:8, 5256:14
**recognize** [17] - 5128:7, 5128:17, 5145:1, 5145:14, 5166:20, 5167:6, 5172:10, 5172:12, 5235:14, 5235:16, 5242:3, 5248:3, 5259:14, 5259:16, 5259:20, 5260:1, 5263:19
**recognized** [1] - 5186:18
**recollection** [10] - 5118:8,

5118:17, 5123:5, 5123:7, 5123:24, 5124:12, 5133:24, 5236:12, 5240:4, 5240:7
**reconvene** [2] - 5193:17, 5277:16
**record** [14] - 5128:11, 5160:15, 5168:12, 5203:4, 5203:20, 5204:14, 5207:12, 5210:16, 5216:13, 5218:1, 5272:25, 5279:17, 5282:24, 5282:25
**recorded** [10] - 5095:25, 5110:25, 5111:18, 5141:9, 5141:13, 5142:15, 5143:9, 5143:10, 5207:24, 5228:9
**recording** [20] - 5107:21, 5108:16, 5113:21, 5114:1, 5114:3, 5115:2, 5141:9, 5141:16, 5141:21, 5142:4, 5142:11, 5142:17, 5143:3, 5155:18, 5194:1, 5194:6, 5208:12, 5278:6, 5278:10
**recordings** [3] - 5112:25, 5113:5, 5113:9
**records** [11] - 5111:5, 5148:21, 5205:14, 5205:17, 5210:12, 5249:3, 5254:12, 5254:25, 5255:1, 5273:18, 5273:19
**recover** [1] - 5186:19
**recross** [7] - 5096:15, 5097:5, 5099:25, 5104:12, 5104:14, 5110:4
**RECROSS** [6] - 5104:22, 5115:21, 5154:11, 5288:4, 5288:6, 5288:8
**RECROSS-EXAMINATION** [6] - 5104:22, 5115:21, 5154:11, 5288:4, 5288:6, 5288:8
**red** [2] - 5165:5, 5265:12
**redact** [2] - 5111:14, 5282:15
**redacted** [2] - 5112:4, 5287:15
**redacting** [1] - 5111:3
**redirect** [7] - 5097:3, 5098:2, 5098:4, 5104:15, 5110:4, 5159:9, 5282:8
**refer** [5] - 5138:18, 5167:20, 5179:19, 5257:13, 5278:17
**reference** [15] - 5102:6, 5106:14, 5111:3, 5111:10, 5111:12, 5119:13, 5133:25, 5137:21, 5147:10, 5157:9, 5157:17, 5157:19, 5185:14, 5207:5,

**24**

5215:21

**referenced** [5] - 5106:23, 5107:14, 5107:16, 5256:4, 5278:3
**references** [4] - 5107:23, 5137:10, 5255:16, 5255:23
**referencing** [3] - 5106:12, 5108:7, 5140:23
**referral** [4] - 5221:10, 5222:4, 5226:10
**referred** [6] - 5097:4, 5119:17, 5137:24, 5138:2, 5140:25, 5179:18
**referring** [12] - 5111:7, 5121:2, 5121:17, 5135:22, 5136:14, 5138:23, 5196:24, 5201:10, 5202:20, 5241:18, 5253:18, 5270:21
**refers** [3] - 5110:6, 5120:24, 5136:5
**reflect** [5] - 5153:6, 5169:16, 5248:5, 5248:12, 5250:1
**reflected** [2] - 5116:14, 5139:21
**reflecting** [2] - 5114:5, 5281:11
**reflects** [5] - 5153:6, 5168:9, 5175:3, 5249:2, 5250:8
**refresh** [3] - 5123:24, 5124:12, 5240:7
**refreshes** [2] - 5123:7, 5240:3
**refreshing** [1] - 5123:5
**refusing** [1] - 5110:12
**regard** [1] - 5208:22
**regarding** [30] - 5097:19, 5097:21, 5102:17, 5112:11, 5116:10, 5120:5, 5120:8, 5123:7, 5125:10, 5138:21, 5139:17, 5139:20, 5152:25, 5155:12, 5155:15, 5157:10, 5179:4, 5184:16, 5193:25, 5194:21, 5196:22, 5200:4, 5205:9, 5213:13, 5231:14, 5237:23, 5240:23, 5265:5, 5281:8, 5284:23
**regards** [21] - 5116:3, 5119:22, 5124:21, 5127:13, 5129:9, 5148:8, 5169:2, 5169:4, 5183:14, 5188:25, 5195:10, 5199:17, 5199:25, 5200:2, 5203:5, 5203:6, 5212:5, 5220:15, 5235:6, 5239:19, 5257:1

**regular** [1] - 5223:11
**regularly** [1] - 5236:19
**reject** [1] - 5279:23
**related** [7] - 5108:10, 5128:14, 5151:1, 5155:6, 5197:20, 5204:22, 5205:4
**relates** [5] - 5132:20, 5159:3, 5203:21, 5204:10, 5229:7
**relating** [1] - 5139:12
**relation** [1] - 5253:21
**relationship** [9] - 5162:20, 5187:12, 5187:18, 5188:19, 5191:3, 5223:16, 5237:6, 5238:21, 5239:1
**relationships** [2] - 5156:5, 5236:19
**relative** [1] - 5098:16
**relatively** [1] - 5144:21
**relaying** [1] - 5185:4
**released** [4] - 5201:7, 5201:10, 5201:13, 5278:4
**relevance** [12] - 5110:11, 5110:18, 5152:11, 5152:16, 5152:18, 5152:23, 5194:16, 5216:6, 5231:10, 5244:4, 5262:18
**relevancy** [1] - 5098:16
**relevant** [5] - 5112:3, 5202:3, 5209:10, 5214:19, 5215:7
**remain** [1] - 5170:18
**remaining** [2] - 5131:24, 5172:25
**remember** [36] - 5107:8, 5113:8, 5120:3, 5123:1, 5123:8, 5124:7, 5125:8, 5126:14, 5130:15, 5140:6, 5147:6, 5169:6, 5173:14, 5173:18, 5180:13, 5180:16, 5207:4, 5232:22, 5258:10, 5258:11, 5259:1, 5259:4, 5269:25, 5272:6, 5275:19, 5275:22, 5276:2, 5276:6, 5276:14, 5277:2, 5277:6, 5277:12, 5281:6, 5281:9, 5281:13
**remembers** [1] - 5151:18
**remind** [2] - 5104:16, 5285:7
**removal** [1] - 5235:15
**remove** [2] - 5234:16, 5282:21
**removed** [9] - 5234:1, 5234:5, 5234:7, 5234:9, 5234:17, 5236:21, 5238:7, 5273:24, 5274:1
**removing** [2] - 5275:12, 5275:14
**removing/adding** [1] -

5275:6

**rent** [2] - 5191:21, 5253:14
**reopen** [1] - 5159:16
**reopening** [1] - 5107:1
**reorganization** [1] - 5240:25
**repeat** [2] - 5276:13, 5281:15
**repeated** [1] - 5099:17
**repeatedly** [1] - 5203:25
**rephrase** [1] - 5192:3
**replace** [1] - 5256:9
**replaced** [1] - 5271:16
**replete** [2] - 5203:20, 5216:13
**report** [2] - 5223:9, 5224:14
**Reporter** [1] - 5095:20
**reporting** [2] - 5195:19, 5230:9
**reports** [1] - 5223:6
**represent** [2] - 5250:18, 5260:7
**representation** [1] - 5249:18
**representations** [2] - 5184:2, 5206:5
**represented** [2] - 5122:23, 5158:9
**representing** [1] - 5144:14
**request** [5] - 5112:11, 5112:12, 5112:13, 5118:24, 5119:1
**requested** [3] - 5107:24, 5116:18, 5218:20
**requests** [2] - 5099:17, 5107:25
**require** [1] - 5268:1
**required** [4] - 5177:14, 5177:18, 5220:18, 5247:4
**requirement** [2] - 5177:13, 5251:24
**requirements** [1] - 5134:23
**requires** [1] - 5266:11
**rescinding** [1] - 5154:17
**reserve** [2] - 5129:12, 5236:6
**reserves** [2] - 5166:2, 5166:5
**reside** [1] - 5160:24
**resided** [2] - 5161:1, 5192:1
**resistant** [1] - 5111:4
**resolved** [1] - 5102:15
**resort** [1] - 5142:1
**resources** [1] - 5170:22
**respect** [24] - 5100:9, 5101:4, 5101:10, 5107:1, 5113:19, 5120:22, 5130:5, 5134:7, 5135:9, 5135:20,

5138:25, 5156:7, 5156:24, 5163:22, 5190:12, 5196:8, 5196:14, 5203:8, 5204:25, 5210:13, 5211:23, 5216:4, 5217:11, 5217:16
**respectable** [1] - 5139:3
**responding** [1] - 5134:9
**response** [5] - 5112:13, 5122:13, 5145:2, 5146:7, 5281:1
**responsibilities** [1] - 5185:14
**responsibility** [1] - 5156:11
**responsible** [5] - 5169:23, 5213:12, 5225:14, 5275:6, 5275:12
**rest** [7] - 5101:17, 5134:5, 5156:14, 5158:15, 5159:2, 5159:15, 5233:15
**rests** [1] - 5160:1
**result** [3] - 5159:11, 5204:3, 5205:24
**resumes** [1] - 5217:24
**resumption** [1] - 5105:12
**retain** [1] - 5233:12
**retained** [1] - 5170:25
**retaining** [1] - 5225:15
**retake** [1] - 5103:16
**rethinking** [1] - 5199:16
**retrieve** [1] - 5137:20
**return** [6] - 5118:12, 5119:7, 5169:25, 5225:12, 5251:16, 5257:5
**returned** [3] - 5119:8, 5232:17, 5233:2
**returning** [3] - 5194:18, 5195:11, 5258:12
**rev** [2] - 5233:6, 5241:21
**revenue** [3] - 5223:24, 5233:8
**reverse** [1] - 5201:3
**review** [10] - 5096:8, 5096:9, 5105:16, 5112:24, 5117:14, 5119:21, 5123:5, 5201:18, 5219:19, 5249:3
**reviewed** [3] - 5118:6, 5133:22
**reviewing** [1] - 5113:9
**reviews** [1] - 5096:11
**revolving** [1] - 5225:2
**reward** [1] - 5227:3
**RICHARD** [1] - 5094:22
**Richards** [1] - 5097:17
**ridiculous** [1] - 5280:9
**right-hand** [1] - 5250:16
**rise** [4] - 5096:1, 5103:25, 5199:3, 5218:5
**Rizzi** [6] - 5194:7, 5194:18, 5195:15, 5250:21,

5258:19, 5258:25
**Rizzi's** [1] - 5194:13
**Road** [1] - 5095:3
**ROBERT** [1] - 5095:4
**Rodd** [3] - 5130:4, 5136:23, 5137:7
**Rodriguez** [9] - 5254:6, 5265:17, 5269:4, 5270:6, 5276:4, 5276:7, 5276:15, 5277:3, 5277:8
**role** [4] - 5107:11, 5107:14, 5182:14, 5182:16
**Ron** [1] - 5097:17
**royalty** [1] - 5230:16
**Rucchin** [1] - 5122:6
**rule** [2] - 5100:15, 5211:4
**Rule** [1] - 5096:24
**rules** [1] - 5268:1
**ruling** [1] - 5152:10
**rulings** [1] - 5195:10
**run** [4] - 5178:24, 5232:2, 5242:17, 5242:18
**running** [2] - 5161:5, 5165:5
**rush** [1] - 5263:5
**rushed** [1] - 5284:25

## S

**Sag** [1] - 5256:6
**salary** [5] - 5180:11, 5180:12, 5180:18, 5192:12, 5192:14
**sale** [11] - 5099:6, 5099:22, 5105:1, 5106:15, 5106:21, 5175:16, 5175:19, 5179:3, 5179:5, 5199:17
**sales** [6] - 5105:10, 5157:14, 5157:19, 5158:6, 5213:13, 5229:23
**San** [1] - 5131:5
**SARITHA** [1] - 5094:16
**satisfy** [1] - 5144:4
**save** [3] - 5096:11, 5102:4, 5127:21
**saved** [2] - 5152:10, 5180:1
**saw** [7] - 5159:3, 5163:12, 5174:4, 5187:17, 5209:24, 5259:17, 5265:16
**schedule** [2] - 5134:3, 5284:18
**scheme** [2] - 5147:21, 5147:24
**Schneider** [1] - 5130:4
**scope** [3] - 5110:4, 5226:3, 5231:12
**score** [2] - 5110:19, 5166:13
**Scottsdale** [6] - 5160:25,

5161:1, 5188:13, 5189:2, 5257:25, 5263:22
**scratch** [1] - 5166:9
**screaming** [2] - 5238:8, 5238:12
**screen** [4] - 5114:4, 5118:2, 5167:24, 5250:4
**scrupulously** [1] - 5203:15
**seal** [5] - 5266:14, 5266:17, 5266:19, 5266:20
**seated** [10] - 5096:2, 5104:2, 5150:2, 5153:24, 5154:7, 5193:20, 5199:4, 5218:7, 5256:15, 5256:19
**second** [12] - 5102:2, 5118:5, 5118:24, 5122:18, 5136:5, 5170:20, 5171:23, 5216:25, 5226:17, 5265:20, 5277:24
**seconds** [1] - 5122:17
**secret** [1] - 5199:14
**secretly** [2] - 5217:1, 5235:1
**sections** [1] - 5098:23
**sector** [1] - 5165:25
**secure** [4] - 5126:8, 5127:13, 5178:12, 5178:16, 5230:11, 5251:10
**secured** [6] - 5151:18, 5166:9, 5166:11, 5223:2, 5223:4, 5223:5
**securing** [1] - 5251:12
**see** [35] - 5101:20, 5104:5, 5110:11, 5110:18, 5116:4, 5118:12, 5119:11, 5122:15, 5127:8, 5127:9, 5134:7, 5136:25, 5147:8, 5147:9, 5147:13, 5147:16, 5151:17, 5161:13, 5172:20, 5187:5, 5189:6, 5190:6, 5190:8, 5227:2, 5235:21, 5236:4, 5240:3, 5244:8, 5244:22, 5252:24, 5254:1, 5260:17, 5265:11, 5271:6
**seeing** [2] - 5261:14, 5264:18
**seeking** [5] - 5100:5, 5124:9, 5141:25, 5158:7, 5214:16
**sees** [1] - 5280:12
**segway** [1] - 5223:10
**seizure** [1] - 5156:4
**self** [2] - 5195:17, 5196:2
**self-serving** [2] - 5195:17, 5196:2
**sell** [8] - 5163:14, 5171:12, 5178:20, 5179:6, 5223:22, 5232:3, 5237:10
**selling** [4] - 5105:8,

5123:21, 5190:3, 5222:20
**Semple** [8] - 5102:25, 5205:15, 5205:24, 5210:11, 5283:10, 5283:16, 5283:19, 5284:3
**send** [3] - 5118:24, 5226:12, 5254:19
**sense** [1] - 5201:21
**sent** [14] - 5097:22, 5120:4, 5129:14, 5136:11, 5136:17, 5141:17, 5155:15, 5186:14, 5197:11, 5208:24, 5209:2, 5254:6, 5257:16, 5258:18
**separate** [1] - 5119:15
**September** [2] - 5141:23, 5165:9
**sequence** [1] - 5114:16
**Sergei** [5] - 5107:2, 5150:14, 5157:8, 5159:5, 5251:7
**series** [12] - 5106:25, 5107:3, 5107:20, 5108:25, 5112:10, 5128:12, 5128:25, 5153:2, 5156:13, 5183:5, 5262:22, 5275:15
**serve** [1] - 5102:16
**service** [2] - 5097:19, 5165:2
**serving** [2] - 5195:17, 5196:2
**set** [2] - 5201:8, 5201:15
**Settlement** [2] - 5119:17, 5125:15
**settlement** [2] - 5126:6, 5206:4
**seven** [3] - 5142:5, 5197:4, 5281:8
**share** [2] - 5135:10, 5233:6, 5241:21
**shared** [1] - 5223:18
**shareholder** [1] - 5142:20
**shareholders** [12] - 5166:22, 5193:6, 5195:5, 5239:17, 5241:9, 5247:18, 5249:18, 5250:14, 5257:23, 5258:20, 5258:24, 5262:7
**shares** [19] - 5105:1, 5105:8, 5170:6, 5171:13, 5171:20, 5172:1, 5172:3, 5172:6, 5172:7, 5172:16, 5199:17, 5206:25, 5207:1, 5207:3, 5207:6, 5207:10, 5208:25, 5241:12, 5247:21
**shaved** [1] - 5193:3
**shit** [4] - 5140:2, 5140:11, 5140:12
**shop** [1] - 5161:25
**short** [7] - 5098:25,

5153:22, 5257:10, 5257:12, 5257:17, 5257:20, 5286:7
**short-term** [4] - 5257:10, 5257:12, 5257:17, 5257:20
**shortly** [3] - 5188:17, 5250:25, 5252:8
**shovels** [1] - 5212:20
**show** [28] - 5108:20, 5116:22, 5118:10, 5120:17, 5127:24, 5128:4, 5132:13, 5144:23, 5148:23, 5150:5, 5152:3, 5155:8, 5162:3, 5166:19, 5172:8, 5213:4, 5213:6, 5220:24, 5235:13, 5240:1, 5242:1, 5252:22, 5257:7, 5259:12, 5263:17, 5265:10, 5281:6, 5281:12
**showed** [5] - 5121:19, 5174:2, 5249:17, 5258:7, 5271:7
**showing** [4] - 5099:4, 5248:2, 5265:25, 5281:7
**shown** [5] - 5139:23, 5139:24, 5156:16, 5255:3, 5270:3
**shows** [2] - 5253:23, 5253:24
**shut** [1] - 5171:25
**side** [6] - 5214:15, 5215:5, 5215:7, 5244:25, 5245:2, 5250:16
**sidebar** [12] - 5110:1, 5131:23, 5132:1, 5158:18, 5159:19, 5183:20, 5183:22, 5184:20, 5244:1, 5266:22, 5267:1, 5268:12
**sign** [4] - 5165:8, 5210:19, 5242:16, 5275:9
**signature** [13] - 5167:3, 5168:20, 5168:21, 5173:8, 5175:1, 5235:19, 5266:12, 5266:13, 5275:11, 5282:8, 5282:13, 5282:14, 5282:18
**signatures** [5] - 5167:1, 5235:21, 5235:25, 5242:20, 5282:22
**signed** [27] - 5106:20, 5130:10, 5138:12, 5151:25, 5167:7, 5173:10, 5173:14, 5173:15, 5173:19, 5174:5, 5176:2, 5199:11, 5218:24, 5219:10, 5219:17, 5220:3, 5220:9, 5222:5, 5226:20, 5244:15, 5247:2, 5247:4, 5247:5, 5266:10, 5266:11, 5282:8
**significance** [1] - 5125:10

**significant** [3] - 5125:6, 5126:4, 5132:13
**signing** [1] - 5165:6
**signs** [2] - 5195:6, 5282:10
**similar** [1] - 5116:8
**simply** [5] - 5097:3, 5101:11, 5110:13, 5132:2, 5280:21
**simultaneously** [1] - 5097:10
**single** [2] - 5131:10, 5183:5
**sit** [4] - 5108:9, 5126:20, 5183:16, 5209:20
**sitting** [6] - 5121:6, 5122:20, 5122:24, 5151:6, 5164:1, 5166:3
**situation** [7] - 5098:21, 5102:15, 5104:8, 5140:22, 5192:9, 5204:19, 5211:23
**six** [4] - 5195:23, 5222:11, 5227:14, 5281:8
**sleep** [1] - 5284:17
**sliced** [2] - 5192:19, 5193:7
**small** [3] - 5098:4, 5162:11, 5162:15
**so..** [1] - 5212:2
**Software** [1] - 5161:5
**software** [4] - 5161:9, 5169:24, 5170:1, 5170:24
**sold** [5] - 5123:13, 5123:16, 5175:5, 5175:15, 5178:23
**sole** [1] - 5144:20
**solicitations** [1] - 5222:20
**solicited** [1] - 5226:13
**Solutions** [1] - 5265:21
**someone** [6] - 5164:24, 5190:20, 5202:8, 5211:7, 5226:12, 5228:8
**sometime** [1] - 5260:21
**sometimes** [1] - 5192:15
**somewhere** [3] - 5103:8, 5119:2, 5255:1
**soon** [4] - 5188:16, 5225:1, 5230:10, 5251:2
**sooner** [1] - 5219:2
**Sorry** [1] - 5155:21
**sorry** [19] - 5105:24, 5142:25, 5143:2, 5155:21, 5160:19, 5167:15, 5167:25, 5169:12, 5170:13, 5172:15, 5207:11, 5207:12, 5229:25, 5235:11, 5241:1, 5242:18, 5253:23, 5286:11, 5287:18
**sort** [3] - 5099:22, 5182:17, 5222:8

**sought** [2] - 5231:5, 5251:20
**sound** [1] - 5285:9
**sounds** [2] - 5145:11, 5215:4
**Source** [1] - 5150:15
**source** [5] - 5131:9, 5131:10, 5132:9, 5135:23, 5223:24
**sources** [1] - 5127:20
**Southern** [2] - 5096:17, 5097:10
**space** [1] - 5166:17
**span** [1] - 5275:8
**speaking** [2] - 5115:15, 5254:13
**speaks** [1] - 5141:4
**specific** [3] - 5106:17, 5157:24, 5218:18
**specifically** [13] - 5105:7, 5106:4, 5106:7, 5107:8, 5107:22, 5108:19, 5125:13, 5129:23, 5147:7, 5259:4, 5278:15, 5278:16, 5278:23
**spell** [1] - 5160:14
**spelled** [1] - 5203:2
**spend** [2] - 5125:23, 5186:22, 5218:15, 5224:3, 5224:4, 5224:9, 5227:1, 5227:21, 5228:6, 5229:3, 5277:2, 5277:7
**spending** [8] - 5185:15, 5197:22, 5224:1, 5227:11, 5228:5, 5254:13, 5254:16, 5254:17
**spent** [5] - 5163:3, 5180:25, 5218:21, 5227:19, 5244:16
**spite** [1] - 5120:9
**spoken** [1] - 5284:22
**sponsors** [3] - 5179:24, 5180:1, 5180:5
**sponsorship** [4] - 5162:3, 5164:25, 5180:4, 5221:25
**spoon** [1] - 5208:17
**spoons** [1] - 5222:21
**sports** [1] - 5163:1
**spread** [1] - 5163:21
**spreadsheet** [2] - 5286:20, 5286:25
**spy** [2] - 5110:24
**Square** [1] - 5094:21
**stack** [2] - 5197:11, 5198:3
**stage** [1] - 5110:21
**stamp** [1] - 5264:4
**stand** [5] - 5096:10, 5103:17, 5159:13, 5207:17, 5217:24
**standing** [1] - 5273:1

**standpoint** [1] - 5217:6
**stands** [1] - 5110:20
**start** [3] - 5165:1, 5197:6, 5250:19
**started** [13] - 5160:3, 5163:8, 5164:14, 5164:18, 5165:4, 5180:24, 5181:10, 5181:11, 5181:12, 5188:22, 5225:4, 5241:5, 5272:8
**starting** [3] - 5166:8, 5178:18
**starts** [1] - 5139:25
**state** [13] - 5132:16, 5160:14, 5184:3, 5184:12, 5185:8, 5194:25, 5196:5, 5196:8, 5211:1, 5211:2, 5211:13, 5211:15, 5213:18
**statement** [16] - 5113:2, 5116:13, 5116:19, 5117:20, 5117:25, 5118:8, 5118:13, 5119:21, 5150:6, 5150:14, 5151:11, 5151:13, 5153:6, 5184:4, 5195:17, 5195:25
**statements** [8] - 5108:5, 5150:19, 5151:20, 5184:1, 5185:6, 5197:17, 5197:20
**STATES** [3] - 5094:1, 5094:3, 5094:11
**States** [5] - 5094:6, 5094:14, 5094:17, 5097:17, 5105:14
**stating** [1] - 5256:11
**statutes** [1] - 5287:17
**stay** [4] - 5191:16, 5191:18, 5192:10, 5222:7
**stayed** [1] - 5110:14
**steal** [2] - 5195:1, 5214:23
**Steiger** [1] - 5095:20
**stenography** [1] - 5095:25
**step** [1] - 5158:14
**steps** [1] - 5138:15
**sticking** [1] - 5137:14
**still** [21] - 5104:16, 5116:3, 5139:7, 5142:4, 5145:11, 5148:21, 5152:16, 5152:18, 5170:25, 5171:23, 5176:9, 5176:20, 5190:20, 5196:21, 5197:12, 5202:21, 5228:17, 5229:22, 5241:5, 5241:20
**stipulate** [1] - 5113:23
**stipulation** [2] - 5113:18, 5200:4
**stock** [21] - 5099:6, 5099:23, 5100:24, 5101:19, 5105:3, 5105:11, 5106:15, 5106:21,

5123:14, 5123:16, 5123:20, 5123:21, 5157:14, 5157:19, 5158:6, 5200:5, 5200:14, 5203:21, 5203:23, 5204:2
**stolen** [2] - 5195:23, 5215:23
**Stolper** [15] - 5107:4, 5107:24, 5110:9, 5110:22, 5110:25, 5120:12, 5122:3, 5122:23, 5141:14, 5141:15, 5141:17, 5142:8, 5143:10, 5195:5, 5215:20
**Stolper's** [5] - 5107:17, 5124:17, 5156:24, 5157:3, 5252:10
**stood** [1] - 5102:23
**stop** [3] - 5107:24, 5140:4, 5151:5
**stored** [1] - 5161:24
**storm** [1] - 5140:11
**straightened** [1] - 5144:21
**Strangford** [1] - 5095:7
**strapped** [1] - 5254:14
**stream** [1] - 5153:21
**stress** [1] - 5280:23
**string** [3] - 5110:20, 5130:1, 5130:13
**strip** [5] - 5236:24, 5237:3, 5237:5, 5237:13, 5239:10
**stripped** [1] - 5244:10
**struggling** [2] - 5192:15, 5199:25
**study** [4] - 5223:18, 5223:19, 5223:20, 5223:25
**stuff** [1] - 5140:2
**stumbled** [1] - 5229:16
**subject** [2] - 5133:21, 5208:25
**submit** [2] - 5208:19, 5255:20
**subpoena** [12] - 5096:16, 5096:18, 5096:21, 5096:22, 5097:9, 5097:16, 5097:19, 5097:22, 5154:15, 5154:17, 5155:5, 5155:11
**subpoenaed** [1] - 5254:12
**subprime** [2] - 5164:10, 5166:1
**subsequent** [1] - 5123:14
**subsidized** [1] - 5192:18
**substance** [3] - 5107:11, 5116:11, 5120:4
**substantial** [1] - 5126:24
**substantially** [2] - 5205:1, 5211:17
**substitute** [1] - 5103:10
**success** [2] - 5163:13, 5189:10

27

**successful** [9] - 5178:19, 5189:17, 5189:19, 5190:19, 5221:24, 5227:8, 5237:19, 5237:20, 5239:20
**sued** [2] - 5239:6, 5254:11
**Suffolk** [1] - 5094:21
**suggest** [3] - 5110:12, 5134:11, 5282:7
**suggested** [2] - 5131:7, 5240:15
**suggesting** [1] - 5119:4
**suggestion** [2] - 5159:14, 5217:9
**suggests** [2] - 5120:25, 5200:25
**suit** [12] - 5239:19, 5239:23, 5240:4, 5240:8, 5240:12, 5240:19, 5260:22, 5261:1, 5261:4, 5261:5, 5261:10, 5262:14
**sum** [3] - 5107:10, 5116:11, 5120:3
**summation** [4] - 5213:15, 5279:18, 5279:19, 5286:19
**summations** [2] - 5284:15, 5284:19
**sums** [1] - 5106:6
**superimpose** [1] - 5162:1
**superprime** [1] - 5166:13
**supplement** [1] - 5215:10
**supposed** [4] - 5119:7, 5153:1, 5170:7, 5253:14
**supposedly** [1] - 5207:1
**surprise** [3] - 5202:15, 5207:8, 5207:14
**suspect** [1] - 5268:2
**sustained** [3] - 5175:12, 5231:11, 5262:19
**sweepstake** [2] - 5226:18, 5228:1
**sweepstakes** [6] - 5221:11, 5227:4, 5227:18, 5227:20, 5229:2, 5229:8
**switch** [1] - 5225:20
**sworn** [2] - 5103:22, 5160:12
**system** [2] - 5163:16, 5222:4

**T**

**table** [2] - 5127:12, 5214:15
**takeover** [1] - 5236:15
**talks** [3] - 5110:14, 5230:16, 5230:19
**tangential** [1] - 5152:12
**tangentially** [1] - 5151:1
**Tape** [2] - 5115:3, 5115:11

**tape** [17] - 5107:21, 5108:6, 5114:19, 5115:4, 5115:12, 5139:17, 5141:6, 5143:1, 5143:15, 5155:18, 5207:4, 5215:22, 5217:5, 5217:17, 5260:1, 5260:4, 5260:8
**tape-recording** [1] - 5155:18
**taped** [1] - 5142:23
**Taser** [1] - 5180:8
**tax** [1] - 5225:12
**TC** [1] - 5137:21
**team** [2] - 5170:23, 5263:5
**technically** [3] - 5209:11, 5210:14, 5210:15
**technology** [4] - 5169:23, 5170:21, 5171:11, 5171:25
**telephone** [3] - 5194:8, 5194:10, 5259:10
**ten** [1] - 5155:15
**tenacious** [1] - 5181:10
**tens** [2] - 5186:24, 5228:6
**tenure** [1] - 5189:19
**term** [8] - 5135:15, 5222:12, 5233:16, 5233:18, 5257:10, 5257:12, 5257:17, 5257:20
**terminate** [1] - 5204:21
**terms** [11] - 5161:8, 5164:11, 5184:11, 5207:13, 5209:13, 5212:3, 5212:6, 5219:12, 5233:5, 5233:10, 5282:2
**terrorist** [1] - 5166:4
**Tesoiero** [1] - 5256:8
**testified** [25] - 5100:25, 5103:22, 5104:25, 5108:13, 5111:18, 5112:20, 5112:23, 5120:15, 5120:23, 5133:18, 5138:24, 5148:9, 5160:12, 5203:23, 5204:1, 5212:13, 5232:4, 5232:11, 5252:3, 5270:5, 5270:9, 5270:12, 5270:13, 5270:16, 5271:1
**testify** [10] - 5152:21, 5155:6, 5155:12, 5184:9, 5205:18, 5209:4, 5209:14, 5210:8, 5221:7, 5249:4
**testifying** [14] - 5113:13, 5120:3, 5154:16, 5178:10, 5197:18, 5208:9, 5208:17, 5211:8, 5216:9, 5253:1, 5273:17, 5273:20, 5274:2
**testimony** [30] - 5096:18, 5101:6, 5101:10, 5105:12, 5107:13, 5108:14, 5111:19, 5113:8, 5113:10, 5116:2, 5116:10, 5120:9,

5121:17, 5124:7, 5137:21, 5141:8, 5150:4, 5152:24, 5164:6, 5175:23, 5185:3, 5196:15, 5196:18, 5209:6, 5215:3, 5220:22, 5280:4, 5280:5, 5284:24, 5286:21
**text** [5] - 5120:4, 5120:7, 5120:10, 5120:21, 5121:16
**texting** [3] - 5121:21, 5121:25, 5122:1
**texts** [1] - 5197:1
**THE** [188] - 5094:11, 5096:1, 5096:2, 5097:6, 5097:13, 5097:25, 5098:5, 5099:11, 5100:2, 5101:17, 5101:21, 5101:24, 5102:2, 5102:11, 5102:13, 5102:25, 5103:7, 5103:10, 5103:15, 5103:18, 5103:25, 5104:2, 5104:5, 5104:18, 5104:19, 5109:6, 5110:2, 5111:10, 5111:14, 5111:20, 5112:2, 5113:25, 5114:5, 5114:14, 5114:18, 5114:21, 5114:23, 5115:18, 5117:7, 5117:17, 5120:1, 5121:12, 5125:4, 5125:22, 5126:2, 5131:25, 5132:11, 5132:19, 5132:22, 5133:2, 5145:21, 5147:23, 5149:1, 5150:2, 5151:3, 5151:6, 5151:22, 5152:1, 5152:5, 5152:14, 5152:23, 5153:12, 5153:18, 5153:22, 5153:24, 5154:4, 5154:7, 5154:9, 5154:23, 5158:14, 5159:14, 5160:3, 5160:8, 5160:14, 5160:16, 5160:18, 5160:19, 5160:20, 5161:19, 5161:21, 5167:13, 5167:16, 5171:3, 5174:9, 5175:12, 5175:24, 5184:9, 5184:19, 5185:1, 5187:8, 5193:16, 5193:20, 5193:22, 5193:23, 5194:12, 5194:16, 5195:3, 5195:8, 5196:3, 5196:19, 5196:25, 5197:14, 5198:1, 5198:4, 5199:3, 5199:4, 5200:20, 5201:24, 5203:7, 5204:18, 5205:18, 5209:14, 5210:5, 5211:11, 5212:3, 5212:6, 5217:9, 5217:22, 5217:25, 5218:4, 5218:5, 5218:7, 5231:11, 5236:8, 5243:12, 5244:12, 5244:20, 5244:24, 5246:2, 5248:18, 5248:23, 5249:21, 5255:4, 5255:10,

5255:20, 5255:23, 5256:6, 5256:10, 5256:15, 5256:19, 5256:21, 5260:13, 5262:19, 5264:13, 5266:5, 5266:7, 5266:24, 5268:9, 5269:16, 5269:18, 5269:22, 5272:23, 5273:4, 5273:9, 5276:17, 5276:25, 5277:1, 5277:15, 5277:24, 5278:9, 5278:12, 5278:14, 5279:5, 5279:15, 5279:18, 5281:18, 5281:24, 5282:6, 5282:17, 5282:23, 5283:15, 5283:17, 5283:23, 5284:1, 5284:5, 5285:4, 5285:17, 5285:20, 5285:22, 5286:6, 5286:11, 5286:17, 5286:24, 5287:2, 5287:8, 5287:12, 5287:14, 5287:20
**themselves** [3] - 5184:4, 5214:18, 5269:10
**theory** [3] - 5101:12, 5207:7, 5212:22
**therefore** [2] - 5209:18, 5211:16
**thereof** [1] - 5261:18
**thinking** [4] - 5200:3, 5216:19, 5217:3, 5285:2
**third** [7] - 5106:5, 5165:5, 5199:15, 5199:18, 5217:2, 5221:18, 5225:11
**third-party** [3] - 5106:5, 5221:18, 5225:11
**thousands** [1] - 5228:6
**threat** [2] - 5195:18, 5205:25
**threatened** [1] - 5195:16
**three** [22] - 5119:2, 5162:18, 5180:20, 5191:6, 5191:11, 5191:19, 5192:13, 5192:17, 5195:21, 5221:12, 5227:22, 5227:23, 5230:17, 5231:18, 5238:24, 5265:3, 5271:3, 5274:13, 5274:19, 5274:25, 5275:3, 5276:9
**threefold** [1] - 5199:13
**thrilled** [1] - 5139:7
**throughout** [2] - 5203:15, 5275:7
**throwing** [1] - 5209:16
**Thursday** [3] - 5154:13, 5197:4, 5284:16
**Tim** [10] - 5235:15, 5236:21, 5237:1, 5251:1, 5256:3, 5271:16, 5274:1, 5276:6, 5276:14, 5277:2

**title** [1] - 5174:19
**Title** [1] - 5147:12
**today** [21] - 5108:9, 5128:5, 5161:13, 5166:23, 5174:3, 5176:12, 5176:20, 5177:22, 5178:10, 5180:10, 5221:8, 5228:17, 5228:22, 5230:2, 5250:2, 5253:1, 5273:17, 5273:20, 5274:22, 5278:6, 5280:16
**Todd** [1] - 5145:7
**together** [5] - 5141:24, 5151:15, 5224:21, 5224:22, 5284:23
**Tommy** [77] - 5100:19, 5146:9, 5159:4, 5161:10, 5161:23, 5162:8, 5163:1, 5163:4, 5164:8, 5164:10, 5164:24, 5167:3, 5168:6, 5168:13, 5169:17, 5171:11, 5172:1, 5172:16, 5172:17, 5172:24, 5178:1, 5178:2, 5178:18, 5179:6, 5180:3, 5181:17, 5182:2, 5182:5, 5182:9, 5183:3, 5183:16, 5186:12, 5187:11, 5187:14, 5190:5, 5190:9, 5190:19, 5190:20, 5190:22, 5191:5, 5193:8, 5193:9, 5203:22, 5204:1, 5204:17, 5207:16, 5207:18, 5207:20, 5221:23, 5223:13, 5225:4, 5225:17, 5226:7, 5227:5, 5228:2, 5235:24, 5238:4, 5238:8, 5238:12, 5238:15, 5239:6, 5242:24, 5243:4, 5254:10, 5254:11, 5254:13, 5254:22, 5258:15, 5262:1, 5265:2, 5269:6, 5270:16, 5272:21, 5275:17, 5276:11, 5277:12
**TOMMY** [1] - 5094:7
**Tommy's** [11] - 5164:1, 5170:6, 5172:4, 5172:7, 5175:17, 5181:18, 5189:12, 5236:19, 5238:2, 5238:24, 5249:12
**tomorrow** [14] - 5103:2, 5210:8, 5255:20, 5278:5, 5278:8, 5278:11, 5281:3, 5281:15, 5282:8, 5282:20, 5283:5, 5284:1, 5284:4, 5285:5
**tonight** [7] - 5102:22, 5103:2, 5103:4, 5205:21, 5278:11, 5283:12, 5286:15
**took** [11] - 5126:23, 5134:13, 5140:10, 5158:17, 5172:1, 5172:16,

5183:21, 5185:18, 5200:19, 5205:19, 5266:25
**top** [6] - 5135:4, 5137:10, 5146:6, 5169:21, 5230:17
**total** [10] - 5178:8, 5191:11, 5220:13, 5221:11, 5252:11, 5252:12, 5257:12, 5265:3, 5269:6
**totally** [1] - 5273:2
**totals** [1] - 5153:14
**towards** [6] - 5096:14, 5112:20, 5130:25, 5135:13, 5169:13, 5227:12
**tracked** [1] - 5207:3
**traditionally** [1] - 5222:18
**trailer** [1] - 5162:2
**transaction** [9] - 5106:23, 5119:22, 5200:5, 5206:21, 5209:21, 5210:7, 5212:5, 5213:2, 5244:11
**transactions** [13] - 5105:1, 5116:14, 5148:8, 5153:2, 5203:12, 5212:8, 5213:9, 5213:17, 5213:21, 5213:22, 5214:2, 5214:3, 5215:12
**transcript** [17] - 5095:25, 5113:20, 5113:25, 5114:3, 5114:4, 5114:6, 5114:7, 5114:11, 5114:22, 5115:9, 5139:18, 5201:4, 5259:18, 5259:21, 5259:23, 5260:5, 5260:14
**TRANSCRIPT** [1] - 5094:10
**transfer** [11] - 5118:22, 5119:1, 5153:4, 5174:15, 5200:14, 5202:25, 5204:24, 5205:5, 5205:7, 5205:12, 5220:12
**transferors'** [1] - 5174:19
**transferred** [2] - 5200:22, 5200:23
**transfers** [14] - 5100:24, 5171:20, 5173:20, 5173:21, 5173:22, 5173:24, 5174:18, 5203:17, 5203:22, 5203:23, 5204:2, 5204:10, 5204:11, 5205:9
**transparent** [1] - 5135:21
**TransUnion** [3] - 5223:15, 5223:17, 5223:20
**travel** [2] - 5191:24, 5229:19
**traveling** [1] - 5191:13
**treated** [1] - 5194:22
**trial** [11] - 5100:19, 5104:10, 5129:15, 5196:10, 5203:15, 5204:12, 5220:23,

5244:12, 5278:16, 5278:23
**tried** [1] - 5261:4
**triggered** [1] - 5217:4
**trip** [6] - 5134:10, 5134:13, 5134:15, 5134:16, 5134:19, 5134:24
**trouble** [1] - 5140:17
**troubled** [1] - 5208:8
**true** [8] - 5106:14, 5112:12, 5124:20, 5125:24, 5201:20, 5201:21, 5213:18, 5272:10
**trust** [1] - 5122:24
**Trust** [3] - 5156:4, 5206:5
**truth** [7] - 5132:17, 5184:2, 5184:6, 5185:6, 5210:18, 5211:19, 5272:13
**truthful** [1] - 5274:24
**try** [11] - 5126:15, 5127:22, 5132:10, 5132:14, 5172:14, 5218:2, 5230:11, 5237:2, 5237:3, 5237:12, 5285:10
**trying** [26] - 5110:23, 5124:2, 5140:4, 5151:6, 5151:8, 5151:11, 5153:8, 5181:20, 5182:21, 5194:1, 5194:3, 5197:24, 5203:15, 5210:6, 5211:5, 5211:9, 5214:17, 5215:2, 5235:1, 5236:23, 5239:10, 5240:3, 5251:1, 5280:6, 5284:17, 5284:18
**Tuesday** [2] - 5284:15, 5287:22
**turn** [4] - 5179:17, 5197:23, 5202:3, 5202:18
**turnaround** [2] - 5179:11, 5179:15
**turned** [6] - 5164:1, 5164:4, 5164:12, 5197:9, 5198:3, 5206:13
**turning** [3] - 5111:5, 5168:5, 5202:11
**twice** [1] - 5231:3
**two** [48] - 5098:22, 5119:16, 5120:21, 5122:16, 5134:15, 5142:17, 5147:13, 5148:10, 5163:24, 5170:11, 5170:13, 5171:17, 5171:19, 5180:15, 5185:22, 5191:12, 5192:6, 5192:24, 5193:1, 5193:3, 5195:21, 5199:13, 5204:20, 5216:24, 5217:19, 5224:11, 5226:16, 5231:7, 5234:22, 5236:18, 5242:1, 5242:3, 5242:10, 5244:7,

5247:2, 5251:8, 5251:9, 5255:23, 5257:11, 5258:7, 5259:14, 5265:4, 5271:3, 5271:12, 5271:15, 5271:16, 5271:19, 5285:6
**two-and-a-half** [3] - 5199:13, 5216:24, 5234:22
**type** [4] - 5100:3, 5225:10, 5231:25, 5238:7
**typed** [1] - 5174:25
**Tyson** [3] - 5108:12, 5108:25, 5156:17, 5156:22
**Tysts** [1] - 5230:20

## U

**U.S** [2] - 5155:5, 5155:11
**Ula** [2] - 5116:15, 5118:13
**ulterior** [1] - 5194:24
**ultimate** [11] - 5199:20, 5200:15, 5204:15, 5209:9, 5209:18, 5210:25, 5211:8, 5213:13, 5214:21, 5215:5, 5215:6
**ultimately** [6] - 5119:8, 5119:16, 5137:16, 5137:19, 5225:6, 5260:22
**unable** [3] - 5127:9, 5137:20, 5168:25
**unacceptable** [1] - 5278:17
**uncovered** [4] - 5193:10, 5199:16, 5206:22, 5236:20
**uncovering** [1] - 5203:12
**uncovers** [1] - 5213:17
**under** [14] - 5100:14, 5104:16, 5105:13, 5131:20, 5133:4, 5135:9, 5137:15, 5143:10, 5144:19, 5155:25, 5159:1, 5208:19, 5211:8, 5215:13
**underneath** [1] - 5250:17
**undersigned** [1] - 5174:16
**understood** [1] - 5146:12
**unfair** [2] - 5205:2, 5211:18
**unfortunately** [6] - 5127:15, 5178:20, 5188:11, 5190:5, 5233:3, 5261:8
**unhappy** [1] - 5196:25
**Uniden** [1] - 5180:7
**unit** [3] - 5148:9, 5151:20, 5153:13
**UNITED** [3] - 5094:1, 5094:3, 5094:11
**United** [5] - 5094:6, 5094:14, 5094:17, 5097:17, 5105:14
**units** [4] - 5119:16, 5148:15, 5150:6, 5153:5

**29**

**unless** [3] - 5173:24, 5274:6, 5281:6
**unpaid** [1] - 5148:21
**unsigned** [3] - 5132:3, 5132:5, 5132:12
**unsuccessful** [1] - 5239:2
**unusual** [1] - 5127:14
**up** [54] - 5096:19, 5096:25, 5111:11, 5111:12, 5118:1, 5118:5, 5122:11, 5122:16, 5122:22, 5127:9, 5129:5, 5136:4, 5156:14, 5159:16, 5160:8, 5160:21, 5163:5, 5163:6, 5163:18, 5163:19, 5164:19, 5170:22, 5172:14, 5175:3, 5178:22, 5180:10, 5189:11, 5192:3, 5195:6, 5204:11, 5210:22, 5210:24, 5214:24, 5216:18, 5222:6, 5222:24, 5223:14, 5224:19, 5226:25, 5227:6, 5227:17, 5230:6, 5238:23, 5238:24, 5241:13, 5253:23, 5254:11, 5258:7, 5258:12, 5265:4, 5270:12, 5276:22, 5278:7, 5283:8
**upfront** [1] - 5224:20
**upper** [2] - 5121:21, 5165:3
**upset** [3] - 5121:3, 5185:19, 5236:22
**Urban** [8] - 5144:2, 5144:3, 5144:6, 5144:8, 5145:9, 5146:13, 5150:8, 5153:1
**useful** [1] - 5154:2
**uses** [2] - 5140:18, 5163:19

## V

**vacation** [2] - 5103:3, 5283:10
**valuable** [2] - 5174:16, 5229:9
**value** [12] - 5182:17, 5196:8, 5204:25, 5211:11, 5211:13, 5211:15, 5211:17, 5228:21, 5230:1, 5230:3, 5231:14, 5231:15
**various** [6] - 5099:19, 5100:22, 5101:6, 5105:9, 5108:17, 5249:2
**vehemently** [1] - 5156:25
**vehicle** [2] - 5227:12, 5229:3
**venture** [7] - 5130:5, 5130:9, 5131:13, 5138:13, 5139:4, 5139:14
**Ventures** [2] - 5136:7, 5146:18

**verified** [1] - 5205:16
**version** [3] - 5165:5, 5283:2, 5287:15
**versus** [1] - 5158:1
**Veterans** [1] - 5094:21
**VI** [2] - 5248:24, 5288:17
**via** [1] - 5108:17
**view** [8] - 5100:11, 5101:11, 5185:11, 5204:9, 5204:24, 5208:20, 5211:12, 5215:6
**Visa** [2] - 5228:25, 5229:5
**visit** [1] - 5134:3
**visited** [1] - 5265:9
**voice** [7] - 5115:6, 5115:14, 5160:21, 5172:14, 5194:8, 5194:13, 5259:7
**void** [1] - 5229:18
**VOIR** [4] - 5173:6, 5266:8, 5288:13, 5288:21
**voir** [2] - 5248:21, 5266:6
**Volpe** [4] - 5242:23, 5243:6, 5251:7, 5271:19
**Vonage** [1] - 5180:7
**VP** [3] - 5188:20, 5188:21, 5235:23

## W

**wait** [1] - 5192:16
**waiting** [2] - 5148:16, 5263:12
**waiving** [1] - 5286:3
**walk** [1] - 5125:19
**walkaway** [1] - 5127:11
**walked** [5] - 5174:2, 5174:4, 5181:16, 5262:13, 5264:5
**walking** [2] - 5261:23, 5261:24
**wants** [4] - 5111:8, 5196:9, 5208:21, 5284:14
**warned** [1] - 5278:19
**warrant** [1] - 5141:25
**waste** [1] - 5278:5
**wasting** [1] - 5190:9
**watch** [1] - 5173:10
**watching** [2] - 5173:14, 5173:18
**ways** [1] - 5286:13
**Web** [1] - 5161:5
**web** [1] - 5161:9
**Wednesday** [2] - 5284:11, 5285:6
**week** [12] - 5112:21, 5134:10, 5146:21, 5146:23, 5160:4, 5192:5, 5192:10, 5278:19, 5283:1, 5284:20, 5285:14, 5285:18

**weekend** [2] - 5104:6, 5286:19
**weeks** [6] - 5142:17, 5183:12, 5192:6, 5202:14, 5217:14, 5285:13
**weight** [1] - 5196:4
**WEINBLATT** [1] - 5094:20
**western** [1] - 5127:9
**wheel** [1] - 5230:15
**whereas** [1] - 5282:3
**whole** [9] - 5135:3, 5165:9, 5186:23, 5189:19, 5197:18, 5201:15, 5206:21, 5226:21, 5261:20
**wide** [1] - 5225:10
**wife** [2] - 5156:12, 5192:1
**William** [3] - 5174:25, 5270:22, 5271:20
**willing** [6] - 5103:4, 5121:22, 5125:19, 5163:21, 5223:20, 5284:20
**willingness** [1] - 5120:8
**window** [1] - 5182:19
**wire** [1] - 5258:16
**wired** [3] - 5119:5, 5253:11, 5253:16
**wiring** [1] - 5259:7
**wishes** [1] - 5189:12
**withdraw** [5] - 5102:10, 5141:3, 5143:17, 5235:12, 5252:21
**withdrawing** [1] - 5096:22
**withdrawn** [2] - 5096:18, 5249:7
**wither** [1] - 5226:12
**witness** [45] - 5096:10, 5102:19, 5102:20, 5102:23, 5103:21, 5117:15, 5159:7, 5160:5, 5160:11, 5194:2, 5199:7, 5200:11, 5201:6, 5202:9, 5203:2, 5204:7, 5204:19, 5208:8, 5208:21, 5209:4, 5210:7, 5215:16, 5217:13, 5217:24, 5273:5, 5277:21, 5278:13, 5278:17, 5279:12, 5279:13, 5279:24, 5280:7, 5280:11, 5280:13, 5280:14, 5280:15, 5280:17, 5280:18, 5280:20, 5280:25, 5281:4, 5283:18, 5284:6, 5286:15
**WITNESS** [6] - 5104:18, 5160:16, 5160:19, 5193:22, 5276:25, 5278:12
**witness's** [3] - 5272:24, 5279:19, 5280:2
**witness)** [1] - 5277:25
**witnessed** [1] - 5216:12

**witnesses** [8] - 5108:12, 5147:5, 5159:4, 5201:19, 5202:7, 5245:2, 5283:6, 5284:5
**WITNESSES** [1] - 5288:1
**wives** [1] - 5156:6
**won** [1] - 5228:10
**word** [12] - 5140:1, 5140:18, 5140:21, 5141:1, 5144:16, 5156:17, 5156:19, 5156:20, 5163:21, 5238:15, 5241:17, 5265:21
**words** [1] - 5110:23
**works** [2] - 5195:23, 5276:23
**world** [1] - 5222:21
**worry** [1] - 5238:16
**worth** [4] - 5125:6, 5165:21, 5221:24, 5222:1
**wrap** [1] - 5241:10
**wrapped** [1] - 5254:11
**wrestled** [1] - 5210:22
**writing** [3] - 5138:18, 5147:4, 5285:14
**written** [5] - 5146:18, 5235:5, 5235:9, 5254:23, 5271:9
**wrote** [4] - 5112:13, 5112:16, 5112:18, 5146:4

## Y

**year** [12] - 5123:18, 5142:18, 5166:10, 5170:20, 5221:5, 5224:3, 5224:17, 5227:23, 5228:6, 5231:21, 5233:11
**years** [15] - 5141:22, 5162:19, 5163:24, 5191:11, 5191:19, 5192:13, 5192:17, 5202:9, 5222:11, 5227:23, 5228:16, 5232:1, 5232:2, 5271:4, 5274:6
**yes,it** [1] - 5136:8
**yesterday** [3] - 5137:3, 5197:10, 5259:23
**YORK** [1] - 5094:1
**York** [5] - 5094:6, 5094:15, 5095:21, 5096:17, 5097:18
**yourself** [3] - 5123:6, 5139:12, 5155:19

## Z

**zero** [1] - 5191:22