1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA
                                    13-CR-607 (JFB)


            -against-          :
                                    United States Courthouse
                                    Central Islip, New York

PHILLIP A. KENNER,
a/k/a "Philip Kenner"
        and
TOMMY C. CONSTANTINE,          TRANSCRIPT OF TRIAL
a/k/a "Tommy C. Hormovitis,
                                    May 4, 2015
        Defendants.       :    9:50 a.m.

- - - - - - - - - - - - - - - X
            BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:
For the Government:        LORETTA E. LYNCH
                           United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  JAMES M. MISKIEWICZ
                                SARITHA KOMATIREDDY
                           Assistant United States Attorneys


For the Defendant:         BY:  RICHARD HALEY, ESQ.
Kenner:                    1601 Veterans Highway Ste. 425
                           Islandia, New York 11749


For the Defendant
Constantine:               BY:  ROBERT LARUSSO, ESQ.
                                ANDREW OLIVERAS, ESQ.
                           300 Old Country Road
                           Mineola, New York 11572


Court Reporter:            Perry Auerbach
                           100 Federal Plaza
                           Central Islip, New York 11722
                           (631) 712-6103

        Proceedings recorded by mechanical stenography.
            Transcript produced by computer.

2

1       (Trial commences.)

2       THE COURT:  All right.

3       So we are still waiting for two jurors who I'm

4   not sure why they are not here yet.  We tried to reach out

5   to them and they didn't have a response.  Hopefully they

6   will arrive shortly.  I think we have some issues to

7   address while we are waiting.

8       First, I want to make sure you have had a chance

9   to review my preliminary instructions that I'm going to

10  read this morning.  Are there any objections to that from

11  the government?

12      MR. MISKIEWICZ:  No, your Honor.

13      THE COURT:  From the defense?

14      MR. LARUSSO:  No, your Honor.

15      MR. HALEY:  No, sir.

16      THE COURT:  The second item on my agenda is, I

17  did receive a sealed letter from the government regarding

18  a voice mail that was erroneously left by Mr. Haley on

19  Mr. Miskiewicz's machine.

20      I don't know if there are any issues we need to

21  discuss with respect to that.  Are there any issues on

22  that, Mr. Haley?

23      MR. HALEY:  Your Honor, apart from the slight

24  bit of embarrassment, my faux pas, I did discuss with my

25  client the content of that recording.  I played it for him

3

1   this morning.

2          And I believe he wishes me to continue

3   representing him in this matter.

4          THE COURT:  Okay.

5          Is that correct, Mr. Kenner?

6          DEFENDANT KENNER:  Yes, your Honor.

7          THE COURT:  Does the government have any issues

8   with that?

9          MR. MISKIEWICZ:  No, your Honor.

10          THE COURT:  So I'll place that letter under

11   seal.

12          With respect to sidebars, Mr. Constantine and

13   Mr. Kenner, I want to emphasize what I said during jury

14   selection, if at any point you wish to be present during a

15   sidebar, just let your attorneys know and I'll make

16   arrangements to have you present.

17          You understand that, Mr. Constantine?

18          DEFENDANT CONSTANTINE:  Yes, your Honor.

19          THE COURT:  Mr. Kenner?

20          DEFENDANT KENNER:  Yes, your Honor.

21          THE COURT:  Are there any issues the government

22   wants to address this morning?

23          MR. MISKIEWICZ:  A couple, your Honor.

24          I have one issue of an evidentiary kind which

25   I'd like to just raise so that we can kind of avoid a lot

4

1    of downtime with the jury in the box.

2              I anticipate a potential line of impeachment of

3    two witnesses that we'll be calling early in the case,

4    Michael Peca and Bryan Berard on allegations that both

5    were the subject of IRS as well as Canadian revenue agent

6    tax audits.  We have recently located -- both of those

7    were instigated by, we know, anonymous, quote-unquote,

8    tips to those agencies.

9              They resulted in no tax deficiencies being

10   found.  In fact, Mr. Peca will say that after four years

11   of being audited by the IRS and sustaining a lot of

12   personal expense, he ended up getting money back.  We have

13   located an anonymous letter from the defendant to Canadian

14   revenue agents.

15             THE COURT:  Which defendant?

16             MR. MISKIEWICZ:  I'm sorry, the defendant

17   Mr. Kenner, on his laptop attempting to instigate an audit

18   of Mr. Berard, who would also similarly say, yes, he was

19   the subject of an audit.

20             It resulted in no penalties or tax deficiencies.

21   Similarly he ended up being contacted by the DEA who said

22   they received an anonymous tip about his narcotics

23   trafficking, also a false allegation which we believe was

24   instigated by the defendant.

25             Since there is no valid basis for impeachment,

5

1    no reason to suggest that these individuals did anything

2    wrong, or curried favor with the government, we would ask

3    that any questions along those lines be precluded in the

4    defendant Kenner's cross-examination of both of those

5    witnesses.

6            THE COURT:  Mr. Haley, do you intend to inquire

7    about those tax audits?

8            MR. HALEY:  The answer is no, Judge, and I have

9    never had an intention to make that type of inquiry.

10           So I think that issue is easily resolved.

11           THE COURT:  Good.

12           The same thing, Mr. LaRusso?

13           MR. LARUSSO:  Your Honor, Mr. Miskiewicz was

14   kind enough to apprise me of this information before you

15   came out.

16           I have had an opportunity just very briefly to

17   discuss with my client, very, very briefly in these notes

18   and I thought through it as little as I can.  I'll be

19   candid with the court, Judge, I need to look at the

20   evidence because it dovetails into our defense.  The fact

21   that Mr. Kenner is making these false allegations, he does

22   the same to Mr. Constantine.  We were hoping to prevent

23   that from coming out.

24           But if I have evidence that's just been

25   presented to me that Mr. Kenner has been making false

6

1   accusations regarding several witnesses, it may be

2   significant to my client to let it be known to the jury

3   that he likewise was accused by Kenner of similar

4   misappropriations.  You are going to hear that during

5   trial, Judge.  It's not going to be something that will be

6   withheld to the jury.

7          We will actually bring out that Mr. Kenner was

8   accusing Mr. Constantine and I think Mr. Haley will agree

9   that's part of his consequence, that my client was this

10  sole person responsible for the money and the

11  disbursements and after the money had been taken allegedly

12  misappropriated, Mr. Kenner initiates an attack on my

13  client.

14         Well, Judge, this evidence is very helpful,

15  very, very on point.  I didn't have such evidence before

16  today that he does make up allegations to the point where

17  he harms individuals and we have the harm to these two

18  hockey players and our defense is my client's been harmed

19  likewise.  I apologize to the court, but I can't

20  articulate more than that because I haven't seen the

21  evidence and I'll ask for an opportunity to review it if I

22  can possibly do so.

23         THE COURT:  When you say the evidence, you mean

24  the letters that were written?

25         MR. LARUSSO:  Yes, so I can see the strength of

1   the evidence.

2           It may not be that strong.  I don't know, Judge.

3           THE COURT:  Why don't we do this, then,

4   obviously there should be no reference to that in the

5   opening statements and how quick are those witnesses, are

6   they today?

7           MR. MISKIEWICZ:  Mr. Peca will be on today, yes.

8           He's not the first witness, though.

9           THE COURT:  Okay.

10          I think we'll have time, if you can just direct

11  Mr. LaRusso to the particular letters so he can review

12  them.

13          MR. MISKIEWICZ:  Will do.

14          THE COURT:  All right.

15          MR. HALEY:  Your Honor --

16          MR. LARUSSO:  I'm sorry, Mr. Haley, may I finish

17  my remarks?  I apologize.

18          Your Honor, it may also be helpful to me in

19  terms of organization, Mr. Juneau I believe is the first

20  witness up, probably will take a good part of the day.

21  Before we begin with Mr. Peca, may I have that opportunity

22  to spend a little more time before he's called to the

23  stand?

24          That gives me a few hours not only to do that,

25  but also do all the other trial work that needs to be done

8

1     to get ready for the trial for the next day.  That would

2     be my request to the court.

3              THE COURT:  I want to see how long that first

4     witness takes, but I don't believe -- I won't let you

5     cross Mr. Peca until you have had at least overnight to

6     figure out if there is the ability to -- or I'll allow

7     cross-examination on this if you want to do that.

8              But I don't want to end at 2 o'clock today if

9     the witness is very quick.  I don't know how long that

10    first witness is.

11             MR. MISKIEWICZ:  I would estimate Mr. Peca to be

12    about an hour on direct.

13             THE COURT:  We won't have the cross of the

14    second witness.

15             MR. LARUSSO:  I'm sure Mr. Miskiewicz will help

16    me evaluate the evidence so we won't delay the proceedings

17    unnecessarily.

18             THE COURT:  All right.

19             Mr. Haley, the jurors are all here, so I do want

20    to get started.

21             MR. HALEY:  Yes, sir.

22             For purposes of the record, the letter in

23    question was written in good faith based upon information

24    available to my client that led him to believe in good

25    faith that that's what had been admitted.  I do not intend

9

1     on cross-examining the witness, as I testified previously.

2              Judge, there is another housekeeping matter.  It

3     involves the subpoena with reference to the Northern Trust

4     bank records.  The signed by your Honor was returnable

5     actually on Friday.  My office did not receive the records

6     and I think I know what may have occurred and it's no

7     one's fault.

8              In previous instances where I submitted a

9     subpoena to the court, and I'm CJA counsel, my experience

10    has been the court would sign the subpoena and the

11    subpoena would be delivered by the clerk to the marshal

12    service.  I'm CJA counsel.  The marshal service, as much

13    as I'd like to think they like me, will not necessarily

14    take anything from me for service.

15             What may have happened, Judge, I don't know if

16    this is the case, perhaps the subpoena was signed by your

17    Honor, a week or so ago, and perhaps it wasn't given to

18    the marshal service for service.

19             THE COURT:  We got a call from the marshal

20    service in Chicago on Friday, I think.

21             It was served by the marshals on Wednesday.

22             MR. HALEY:  Thank you.

23             But returnable on Friday, I haven't received

24    those records as yet.  I don't know if they were delivered

25    to the clerk's office.

1        THE COURT:  We'll check.

2        MR. HALEY:  Thank you, sir.

3        THE COURT:  All right.

4        We are ready for the opening statements?

5        MR. LARUSSO:  Your Honor, it won't take that

6   long, but one other matter and I apologize to the court.

7        The last time we were before you we talked about

8   Mr. Constantine's alias and the relevancy of the

9   government's offer regarding one of the press releases.  I

10  would like to be able to just put on the record, it's

11  going to take a little longer than I'm sure the court

12  would like, whether we take about ten minutes to lay out

13  our arguments, but we have copies and e-mails that I think

14  will show the court that all of the individuals who

15  donated or contributed to the Global Settlement Fund were

16  well aware of the media aspect of the moneys that were

17  being spent and these e-mails clearly show that all of

18  them were well aware of what was happening, that they were

19  apprized of articles being done.

20        I think it undercuts the government's need to

21  use this particular one which comes very late in the

22  process, Judge.  I think the e-mail they referred to is a

23  November 2009, e-mail, I have a whole bunch of e-mails,

24  Judge, going back and forth between Mr. Constantine and

25  the hockey players, very clearly describing what the

1   nature of the media was in relation to the Global

2   Settlement Fund.  I'm not asking the court to rule on it.

3            I'm asking the court permission to put my

4   argument on the record when we take a break and I ask the

5   court to look at these e-mails.  I'll give a copy to the

6   government and to the court and Mr. Haley.

7            THE COURT:  That's fine.

8            We'll go over that at some point later today.

9            MR. MISKIEWICZ:  Your Honor, in that regard,

10  whenever the court is ready, this relates back to the

11  Tommy Hormovitis and prior conviction.

12           Mr. Peca is one of those witnesses who heard

13  Mr. Constantine refer to himself as having a prior

14  conviction and turning his life around.  Whenever the

15  court is ready to make a determination on that, if I can

16  have sometime to remind or instruct the witness as to

17  whether or not he will be permitted to make reference to

18  that, I'd appreciate that time.

19           THE COURT:  Yes.

20           I will place that on the record once we complete

21  the opening statements.

22           MR. MISKIEWICZ:  Thank you.

23           THE COURT:  How long do you think your opening's

24  going to be?

25           MS. KOMATIREDDY:  Approximately 15 to 20

12

1    minutes, your Honor.

2          MR. LARUSSO:  Your Honor, mine's going to be

3    about a half hour to 40 minutes.

4          MR. HALEY:  I'm going to break my own rule,

5    Judge.

6          Mine will be in excess of 30 minutes, perhaps 40

7    minutes as well.

8          THE COURT:  Okay.

9          MR. HALEY:  Your Honor, May I step out into the

10   hall for a moment?

11         THE COURT:  Sure.

12         MR. HALEY:  Thank you.

13         (There was a pause in the proceedings.)

14         MR. LARUSSO:  Your Honor, I apologize.  I should

15   have done this before.

16         The original indictment contains approximately

17   19 hockey players as victims of the fraud and the

18   government over time brought superseding indictments

19   taking some of those hockey players out.

20         It occurred to me, and I should have brought

21   this up, some of the hockey players may be here today or I

22   was told they may come.  There is a chance we may be

23   calling them on our own case.  I don't want them to be

24   prejudiced by either the openings or any of the testimony.

25         Can I ask the court, I'll do it, if there are

13

1  any of the hockey players considering themselves a victim

2  of the case, if they are here I will ask they been

3  excused.

4         THE COURT:  Mr. Miskiewicz?

5         MR. MISKIEWICZ:  I don't believe there are, no.

6         I think everybody else who is here is either law

7  enforcement related or an intern from St. John's that

8  works in the US Attorney's Office.

9         THE COURT:  Let me just ask, are there any

10  alleged victims sitting in the gallery?

11         MR. LARUSSO:  One man is shaking his head in the

12  back, your Honor.

13         THE COURT:  Can you find out who that is.

14         MR. MISKIEWICZ:  It's Mr. Rizzi.

15         He invested in Eufora, but was not referenced in

16  the indictment.

17         THE COURT:  You have no intention of calling

18  him?

19         MR. MISKIEWICZ:  We have no intention of calling

20  him.

21         MR. LARUSSO:  Your Honor, Mr. Rizzi is one of

22  the two investors that were -- that consulted with

23  Mr. Kaiser and as a result of his conversations, Mr. Rizzi

24  gave money to Mr. Kaiser which was then in December of

25  2009 sent to Eufora as an investment.

14

1          The government in their indictment is only

2     talking about a different investor who gave money to

3     Mr. Kaiser himself, Mr. Privitello.  Mr. Rizzi was

4     actually a plaintiff in a suit against Mr. Constantine

5     and, Judge, he may be a witness in this case.  He is so

6     intimately involved in the matter being exposed, I really

7     don't think he should be sitting in the court.  I

8     apologize to him.  I wish I knew in advance.  I would have

9     discussed it with him.

10          But I have to be on the base of caution, Judge,

11     if something comes up I may have to call him as a witness

12     in my case and I'll tell you why.  They have not alleged

13     that Mr. Kaiser who put $200,000 in the same time

14     Mr. Privitello, who is a victim of this particular fraud,

15     the moneys Mr. Kaiser put in allegedly brought to

16     Mr. Rizzi and another police officer by the name of

17     Mr. Hughes, why that's not part of the fraud it will be

18     part of my case.

19          THE COURT:  You don't need to tell me any more.

20          Mr. Rizzi, I'll ask that you leave the

21     courtroom.  Anyone who is a potential witness can't sit in

22     the courtroom and hear the testimony.  I apologize.  If we

23     knew in advance, we would have notified you, so you

24     wouldn't have to come here for no reason, but I'll have to

25     ask you to leave.

**Court's Preliminary Instruction**

15

1            Thank you.

2            MR. HALEY:  Your Honor, for purposes of the

3    record that's a joint application.

4            THE COURT:  All right.

5            Let's bring in the jury.

6            (Jury enters the courtroom.)

7

8            THE COURT:  Everyone can be seated.

9            Good morning, members of the jury.  It's good to

10   see you all this morning.  Welcome back.  We are ready to

11   begin the trial.

12           The first order of business is for you to take

13   the oath as jurors in this case.  I'll ask that you all

14   please stand and raise your right hand.

15           (Jury sworn.)

16           THE COURT:  You can be seated.

17           Members of the jury, now that you have been

18   sworn, I will give you some preliminary instructions to

19   guide you in your participation in the trial.  This should

20   take about ten minutes or so.  My full instructions to you

21   will be at the end of the case before you begin your

22   deliberations, but these are some preliminary instructions

23   that will help guide you as jurors as you hear the

24   evidence.  Some of the things that I'm saying to you this

25   morning I said to you last week before you left, but I'm

Court's Preliminary Instruction

1   going to repeat them because they are all very important

2   instructions.

3           To begin with, you are here to administer

4   justice in this case, according to the law and the

5   evidence.  You are to perform this task with complete

6   fairness and impartiality, and without bias, prejudice or

7   sympathy for or against the government or the defendants.

8   It will be your duty to find from the evidence what the

9   facts are.  You and you alone will be the judges of the

10  facts.

11          You will then have to apply to those facts the

12  law as the court will give it to you.  You must follow

13  that law, whether you agree with it or not.  Nothing that

14  I may say or do during the course of the trial is intended

15  to indicate, or should be taken by you as indicating, what

16  your verdict should be.  That is entirely up to you.

17          The evidence from which you will find the facts

18  will consist of the testimony of witnesses, documents and

19  other things received in the record as exhibits, and any

20  facts that the lawyers agree to or stipulate to, or that

21  the court may instruct you to find.

22          Certain things are not evidence.  I will list

23  them for you now.  These things are not evidence:

24          1.  Statements, arguments and questions by

25  lawyers are not evidence.

Court's Preliminary Instruction

1     2.   Objections to questions are not evidence.

2 Lawyers have an obligation to their clients to make

3 objections when they believe evidence being offered is

4 improper under the rules of evidence.  You should not be

5 influenced by the court's ruling on it.

6          If the objection is sustained, then you ignore

7 the question.

8          If it is overruled, you treat the answer to the

9 question like any other answer.

10          If you are instructed that some item of evidence

11 is received for a limited purpose only, you must follow

12 that instruction.

13     3.   Testimony that the court excludes or tells

14 you to disregard is not evidence and must not be

15 considered.

16     4.   Anything you see or hear outside the

17 courtroom is not evidence, and must be disregarded.  You

18 are to decide the case solely on the evidence presented

19 here in the courtroom.

20          Now, there are two kinds of evidence, direct and

21 circumstantial.  Direct evidence is direct proof of a fact

22 such as testimony of an eyewitness.

23          Circumstantial evidence is proof of facts from

24 which you may infer or conclude that other facts exist.  I

25 will give you further instructions on these, as well as

## Court's Preliminary Instruction

1   other matters, at the end of the case, but keep in mind

2   that you may consider both kinds of evidence, direct and

3   circumstantial.

4         It will be up to you to decide which witnesses

5   to believe, which witnesses not to believe, and how much

6   of any witness's testimony to accept or reject.  I will

7   give you some guidelines for determining the credibility

8   of witnesses at the end of the case.

9         Now, as you know, this is a criminal case.

10  There are three basic rules about a criminal case that you

11  must keep in mind.

12        First, the defendants are presumed innocent

13  until proven guilty.  The indictment against the

14  defendants brought by the government is only an

15  accusation, nothing more.  It is not proof of guilt or

16  anything else.  The defendants, therefore, start out with

17  a clean slate.

18        Second, the burden of proof is on the government

19  at all times.  The defendants have no burden to prove

20  their innocence or to present any evidence or to testify.

21  Since the defendants have the right to remain silent, the

22  law prohibits you from arriving at your verdict by

23  considering that the defendants may not have testified.

24        Third, the government must prove the defendants'

25  guilt beyond a reasonable doubt.  I will give you further

Court's Preliminary Instruction

1    instructions on this point, again, at the end of the case.

2              Now a few words about your conduct as jurors.

3              First, I instruct you that during the trial you

4    are not to discuss this case among yourselves or with

5    anyone else, including during any recesses or breaks.

6    Even as among yourselves, you see, it is important that

7    each of you keep an open mind until you have heard all the

8    evidence, the attorneys' summations and my instructions on

9    the law.  Only then will you begin to exchange views among

10   yourselves and reach your verdict.

11             But until I tell you to actually begin

12   deliberating, which will be at the end of my instructions

13   on the law at the end of the case, please do not discuss

14   the case at all, among yourselves, with family members, or

15   with anyone else.  As I said last Monday, that includes

16   social media, no communication of any type, electronic or

17   otherwise.

18             Second, do not permit any other person to

19   discuss the case in your presence.  If someone does so,

20   despite your telling him or her not to, report that fact

21   to me.  Please do not, however, discuss with your fellow

22   jurors either that fact or any other fact that you feel

23   necessary to bring to my attention.  The reason is

24   obvious.  If something occurs that affects the ability of

25   a juror to continue to serve fairly and impartially and

Court's Preliminary Instruction

1   that juror communicates it to fellow jurors, more than one

2   of you may be affected.

3           Third, please do not, while you are serving as

4   jurors in this case, have any conversations with the

5   parties, the attorneys or any witnesses in this case,

6   whether in the courtroom, in the hallways, in the

7   elevator, outside or anywhere else.  By this I mean not

8   only to avoid talking about the case, do not talk at all,

9   even to say good morning, or acknowledge any of these

10  people.  Someone seeing a juror in conversation with a

11  party, lawyer, or witness, might think that something

12  improper was being discussed.  To avoid even the

13  appearance of impropriety, then, have no conversations or

14  acknowledgments, even a good morning, none whatsoever.

15          The lawyers, as officers of the court, are

16  particularly sensitive to this.  So I can tell you that

17  when they pass you in the halls without even acknowledging

18  your presence, they do not mean to be rude.  They are

19  simply following my instruction and you must follow that

20  instruction as well.

21          Fourth, do not read or listen to anything

22  touching on this case in any way.  Again, I want to remind

23  you what I said last week, for the entire trial I do not

24  want you to read Newsday.  I do not want you to read the

25  Daily News.  I do not want you to read the New York Post

Court's Preliminary Instruction

1    and I don't want you to watch News 12, and obviously if

2    you are watching any other news show or TV or listening to

3    the radio or reading any other newspapers or periodical

4    and you hear anything related to this case, you should

5    immediately turn it off, the TV or the radio, and if you

6    are reading something and you see something, a headline

7    that pertains to the case you should immediately turn the

8    page and not read it.  It's very important.

9            Fifth, do not try to do any research or make any

10   investigation about the case on your own.  Again, as I

11   said Monday, that would include any internet research, any

12   Googling of any subject matter involving the case or the

13   participants involved in the case, no outside research of

14   any kind is permitted.

15           Finally, do not form any opinion until all the

16   evidence is in.  Keep an open mind until you start your

17   deliberations at the end of the case.  Sometimes jurors

18   ask if they can take notes, and each of you have been

19   provided with a little notepad if you want to use it to

20   take notes.  I have no view of whether jurors should take

21   notes.  That's up to the individual juror.  But I do have

22   some instructions for those of you who do takes notes.

23           If you take notes, you should leave them in the

24   jury room when you leave at night.  Don't take them home.

25   They will be here in the morning when you come back.  I

Court's Preliminary Instruction

1    also want you to remember that they are for your own

2    personal use.  Also, the notes are simply to help your

3    memory.  I don't want you to place too much emphasis on

4    juror notes.  As you know, a person's notes could be

5    wrong.  At the conclusion of the case when you are

6    deliberating, notes which any juror may take may not be

7    given any greater weight or influence in the determination

8    of the case than the recollection or impression of other

9    jurors, whether from notes or memory with respect to the

10   evidence presented or what conclusions, if any, should be

11   drawn from such evidence.

12        When you deliberate at the end of the case, any

13   difference between a juror's recollection and another

14   juror's notes should be settled by asking that the court

15   reporter read back the transcript of that testimony, for

16   it is the court record, rather than any juror's notes,

17   upon which the jury must base its determination of the

18   facts and its verdict.  You can see we have the court

19   reporter here who's writing down every word that's being

20   said and at the end of the case you can have a readback of

21   any testimony that you wish.

22        Also, any exhibit that is received into the

23   record as evidence during the trial you can request to

24   have that during your deliberations as well, so if the

25   lawyers introduce an exhibit and they don't immediately

Court's Preliminary Instruction

23

1   show it to you, it's still going to be available to you

2   during your deliberations.

3           The trial will now begin.  I want to discuss the

4   order of the trial.

5           First, the government will make an opening

6   statement, which is simply an outline to help you

7   understand the evidence as it comes in.

8           Next, the defendants' attorneys may, but do not

9   have to, make an opening statement.  Opening statements

10  are not evidence.  Rather, you may consider the opening

11  statements as a preview of what each side expects the

12  evidence in this case will show.

13          The government will then present its evidence

14  including testimony from witnesses, counsel for the

15  defendants may, if they wish, cross-examine these

16  witnesses.  Evidence may also be in the form of physical

17  items, exhibits which are offered in evidence.

18          Following the government's case, the defendants

19  may, if they wish, present evidence, but neither of the

20  defendants is required to do so.  The burden is always on

21  the government to prove every element of the offense

22  charged beyond a reasonable doubt.  The law never imposes

23  on a defendant in a criminal case, the burden of calling

24  any witnesses or introducing any evidence.  If the

25  defendant's put on any evidence, the government may or may

Court's Preliminary Instruction

1   not wish to put further evidence before you to rebut what

2   the defense has set forth.

3          After all the evidence has been presented, the

4   attorneys will have the opportunity to present a closing

5   argument or a summation to you.  What is said in these

6   arguments is not evidence.  Each party is simply

7   presenting to you their view of what the evidence has

8   shown, and suggesting to you the inferences or conclusions

9   you should draw from the evidence.  You may find an

10  argument sound and persuasive, or you may not.

11         Because the government has the burden of proof

12  in the case, it has the right to argue first in the

13  closing argument, followed by counsel for each of the

14  defendants, after which the government may give a short

15  rebuttal summation.  After you have heard the closing

16  arguments, I will instruct you on the applicable law.  You

17  will then retire to the jury room to deliberate on your

18  verdict.

19         You have a tremendously important task as

20  jurors, it is to determine the facts.  Our constitution

21  gives a defendant a right to have you, who are members of

22  the community, find those facts.  You and not the court

23  are the sole judge of the facts.

24         Let me say to the alternate jurors that you

25  should listen just as carefully and as conscientiously as

**Court's Preliminary Instruction**

1   the other jurors.  You may very well be called upon prior

2   to the conclusion of the case to take the place of one of

3   the jurors and then you are to render a verdict.  So pay

4   close attention at all times.

5           That ends my preliminary instructions.  Just let

6   me discuss scheduling with you so you understand how the

7   trial day works.  We begin at 9:30 each morning.  Again, I

8   would just urge each of you to try to get here promptly so

9   we begin at 9:30, otherwise we have to wait.  If one

10  juror's late, everybody has to wait for that one juror, so

11  please be on time.

12          Halfway through the morning, usually around 11

13  o'clock or so, we'll take a 15 or 20-minute break and then

14  we go to the lunch break which is usually between 12:30

15  and 1 and it depends on other matters I have during the

16  lunch break, so depending on when those are scheduled and

17  how long they are you will receive either an hour or an

18  hour and 15 minutes for lunch, so that will be sometime

19  between 12:30 and 1, and the afternoon we take a

20  mid-afternoon break around 3 o'clock or so and we go until

21  4:30.

22          I know many of you have buses or trains you have

23  to catch, so we'll end promptly at 4:30 unless there is

24  some issue with a witness like there are two minutes left

25  and that witness can't come back, other than that we will

Opening - Ms. Komatireddy

1   end promptly.  So that's the schedule we will follow.

2          We are ready to begin now with the opening

3   statements starting with the attorney for the government.

4          Go ahead.

5          MS. KOMATIREDDY:  Michael Peca was just 17 when

6   he joined the National Hockey League.

7          Growing up, he didn't have much.  He came from a

8   rough neighborhood, a rough town, and hockey was his way

9   out.  So when all the other guys went to their

10  professional gyms and hired their professional trainers,

11  Michael went to the school yard, found an old tire, tied

12  it to his waist and ran, and worked, and at 17 he realized

13  his lifetime dream, when he got drafted by a professional

14  hockey team in the NHL.

15         With that success came money, and even at 17

16  Michael knew that he had to save that money, because

17  hockey is not a lifetime guarantee.  It only lasts as long

18  as you can last in a violent sport.  So Michael looked for

19  help.  He looked for someone who could do what he didn't

20  know how to, invest that money and keep it safe for the

21  future.

22         That's when the defendant, Phil Kenner, came

23  knocking on Michael's door.  Kenner came into Michael's

24  home, sat down with Michael in his living room and he said

25  all the right things.  Kenner came recommended from

1  Michael's agent.  Kenner told Michael that he was a former
2  hockey player, and now he was a professional investment
3  advisor, who advised and managed the money of famous
4  professional hockey players, people that Michael admired.
5  Kenner even brought one of those professional hockey
6  players with him to tell Michael that Kenner, unlike
7  others, could be trusted.
8       So Kenner got Michael's trust, and Kenner got
9  Michael's money, and then Kenner, with his accomplice,
10  Tommy Constantine, an opportunist who liked to hobnob with
11  the rich and famous, systematically stole more than
12  $10 million from Michael and multiple other investors.
13       The basic fraud was simple.  The defendants told
14  investors they would put their money in one place.
15  Instead, they put it in another.  The defendants told
16  investors they would put their money in a real estate
17  development project in Hawaii.  Instead, they put it in
18  their personal bank accounts.
19       The defendants told investors they would put
20  their money in a promising new company called Eufora.
21  Instead, they put it in their personal bank accounts.  The
22  defendants told investors they would put their money in a
23  legal defense fund to pay an attorney to sue some other
24  guy who had stolen from them.  Instead, they put that
25  money in their personal bank accounts.

Opening - Ms. Komatireddy

28

1          That's why we are here today.

2          Good morning.  My name is Saritha Komatireddy.

3    I'm an Assistant United States Attorney here on

4    Long Island.  With me is assistant US Attorney Jim

5    Miskiewicz and the investigators in this case, Special

6    Agent Matt Galioto of the FBI and Special Agent Josh Wayne

7    of the IRS.  Together we represent the United States, and

8    it's our responsibility to present to you the evidence in

9    this case.

10          Here's what the evidence will show.  Kenner was

11   the front man.  When he met the players, he held himself

12   out to be a professional financial advisor.  He had gone

13   through training, taken a series of exams and was licensed

14   as a financial advisor and took a regular fee for his

15   work.  Constantine was Kenner's undisclosed partner, a

16   businessman in his own right who dabbled in different

17   businesses, some successful, some failures, some, you will

18   see, created solely for his personal benefit.

19          Now, when Kenner started investing the players'

20   money, he started out by putting their money in

21   conservative investments, stocks, bonds, mutual funds,

22   things that brought back a stable return, and in that way,

23   over years, he built up trust.

24          Then, Kenner and Constantine decided to exploit

25   that trust.  The fraud had four parts.  First was the

Opening - Ms. Komatireddy

29

1   setup, the part where the defendants took control of the

2   players' money and began stealing it.  This is the Hawaii

3   firm.  After years of putting the defendants' money in

4   conservative investments, Kenner pitched to the players a

5   new kind of investment, a real estate development project

6   in Hawaii.  Kenner told the players that if they gave

7   their money, it would be used to buy land in Hawaii,

8   develop that land, and then sell it for a profit, which

9   would go back to the players.

10          But to get in on the deal, the players had to

11  take their money out of the bank that they knew and put it

12  in a new bank where Kenner could have full access to that

13  money and the ability to control it and move it around

14  without the players' knowledge.  Trusting their financial

15  advisor, the players agreed to move their money, millions

16  of dollars, to this new bank.  Once Kenner had that access

17  and control to the players' money, Kenner and Constantine

18  began stealing it.

19          Kenner cycled the money through several accounts

20  back to Constantine's bank account, where he used it for

21  himself, and then Kenner was a little bit more creative

22  about how he got the money back to himself.  Remember the

23  money was supposed to be used to buy land in Hawaii,

24  develop it and sell it for a profit that went back to the

25  players?  Well, Kenner bought land in Hawaii, sold it,

30

1    took the profit for himself.

2          But that wasn't enough.  Kenner decided to

3    commit a second fraud with the Hawaii accounts.  This is

4    the Sag Harbor fraud, happens right here on Long Island.

5    Kenner arranges to buy a property in Sag Harbor, and he

6    tells an investor, a friend of his here on Long Island,

7    that if the investor puts up half the money, Kenner will

8    put up the other half, but Kenner doesn't put up any of

9    his own money.

10         He takes money, hundreds of thousands of dollars

11   from Michael's account at that new bank, the account that

12   was supposed to be used for Hawaii.  Michael didn't give

13   Kenner permission.  Michael didn't even know.  He still

14   doesn't know.

15         But that still wasn't enough for these

16   defendants.  Kenner and Constantine decided to steal from

17   their investors again.  This time with a new scheme, the

18   Eufora scheme.  This was the part when Constantine comes

19   out of the shadows and is introduced to the investors for

20   the first time.

21         Kenner and Constantine tell the investors,

22   Constantine has a company called Eufora.  It's a company

23   that issues prepaid credit cards to people with bad

24   credit.  Now, it's a promising new company, they say, with

25   promising new patents, and it just needs some money to get

Opening - Ms. Komatireddy

31

1    going, money to be used for business expenses,

2    advertising, legal fees.

3         So the investors give more than $1 million,

4    which they are told will be used for Eufora, for those

5    business expenses, but Kenner and Constantine take that

6    money, and divert it back to themselves.  This not

7    little by little over time, they take all of it

8    immediately.

9         As time passes, the investors start to ask

10   questions and they are wondering where the money is going,

11   why they are not getting a return, and they start pointing

12   fingers at Kenner and Constantine.  This is when the

13   defendants think up their final fraud, the cover-up, they

14   call it the Global Settlement Fund.  This is the fraud

15   where the defendants lie to the investors about who's

16   stealing from them, and find a way to steal from them all

17   over again.

18        The defendants tell the investors that a guy in

19   Mexico named Ken Jowdy, stole their money and ran away

20   with it, and they tell investors that they are raising

21   money for a legal defense fund to pay an attorney to go

22   fight Jowdy.  Thinking that this is the last hope to get

23   their money back, the investors give more than a million

24   dollars to the defendants, which they are told will be

25   used to fight Jowdy.  But Kenner and Constantine take that

1    money and divert it back to themselves and their own

2    personal projects.

3              For their actions, the defendants are charged

4    with multiple federal crimes, for lying to investors to

5    steal their money, the defendants are charged with wire

6    fraud.  For being in on that fraud together, the

7    defendants are charged with conspiracy, and for moving

8    money around to conceal that fraud, the defendants are

9    charged with money laundering.

10             As the government, we have the burden of proving

11   the defendants guilty of those charges beyond a reasonable

12   doubt.  We will meet that burden by presenting you with

13   evidence in the form of witness testimony, documents, bank

14   records and the defendants' own statements.  You will hear

15   from the victims, Michael Peca, Joe Juneau, Bryan Berard,

16   and multiple other investors, people who were hockey stars

17   and in some cases even Olympians, but when they met

18   Kenner, they were just young men who had made it to the

19   NHL.

20             You will hear from them about what Kenner told

21   them, about where their money would go, and what it would

22   be used for.  Then you will see the bank records that will

23   show you in black and white where the money actually did

24   go, and you will hear from some of the people in the

25   middle, people that will tell you that Kenner and

Opening - Ms. Komatireddy

33

1    Constantine told them to move money from one place to

2    another, and not ask any questions.  Some of these people

3    will be testifying pursuant to an agreement with the

4    government, so you should scrutinize their testimony

5    carefully.  But when you do, you will see that it is

6    consistent with all of the other evidence that is

7    presented to you.

8              Finally, you will hear from the defendants' own

9    statements in e-mails, text messages and recorded calls

10   where they direct money to themselves and lie about it,

11   and you will see where all of that money went, to funding

12   their own lavish lifestyle and their own personal hobbies.

13             Kenner used the victims' money to pay for the

14   mortgage on his million dollar home in Scottsdale,

15   Arizona, for beach-front property in California, and to

16   fund a tequila company he was starting in Mexico.

17             Constantine used the victims' money to put up a

18   show as a race car driver, to buy cars, get them upgraded,

19   fly around to races and hire playboy models to come to

20   those races with him.

21             And after you see all of this evidence, you will

22   be asked to return the only verdict that is consistent

23   with that evidence, a verdict of guilty on all counts.

24             THE COURT:  Members of the jury, as I said

25   before, because the government has the burden of proof at

Opening - Mr. Haley

1   all times, the lawyers for the defendants need not give an

2   opening statement at all.

3           However, I have been advised that each of them

4   wish to give an opening statement.  I do want to instruct

5   you, this is very important, that obviously we have two

6   defendants who are on trial here, Mr. Constantine and

7   Mr. Kenner, and you need to consider them separately.  The

8   government must meet its burden of proof as to each

9   defendant separately and, therefore, you need to consider

10  them separately in connection with the case.

11          So we will now hear defense counsel openings

12  starting with Mr. Haley for Mr. Kenner.

13          MR. HALEY:  Thank you.

14          Power, a five-letter word that gives great

15  advantage to those who possess it and great disadvantage

16  to those who do not.  The United States of America versus

17  Phillip Kenner, my client.  The most powerful nation in

18  history with all of its resources, allied against one of

19  its citizens, and you will see those resources on full

20  display in this case.

21          You will hear that over a million documents were

22  acquired in connection with this investigation.  You will

23  hear that the investigation by the FBI, and in that

24  respect, ladies and gentlemen, when I say the FBI, there

25  is a lead agent on the case, his name is Agent Galioto,

Opening - Mr. Haley

1    he's present in court, he has every right to be here, but

2    rather than continually use his name, I'm going to say FBI

3    because it's his investigation, he led this investigation

4    for the last at least six years.  You will hear the

5    government with all its resources interviewed witnesses on

6    multiple occasions.

7           So, how do we level the playing field?  Or, I

8    guess, Zamboni the ice, smooth it out, so that no side has

9    an advantage?  Through you, the jury.  You became and are

10   the most important people in this courtroom when you took

11   that oath a moment ago, and you will remain the most

12   important people in this courtroom to the point in time

13   you render your verdict.

14          For you, not the FBI, and not the office of the

15   United States Attorney, determine whether or not Phil

16   Kenner is a criminal, deserving of the consequences that

17   come with a criminal conviction.  The government, having

18   just concluded their opening statement, I may have

19   disagreed with various representations made to you by the

20   government in terms of what the proof would show, or will

21   show, but they should have a full and fair opportunity in

22   their opening statement to say to you what they expect the

23   evidence to prove, and I know they will give me the same

24   courtesy, as I address you in terms of what I believe the

25   evidence will show.

1          Your Honor told you this a moment ago, ladies

2    and gentlemen, what I say is not evidence.  What the

3    government said is not evidence.  The evidence will come

4    from the witnesses on the witness stand, whatever

5    documentary evidence is introduced, any number of things

6    of that nature.

7          But, what I'm telling you is what I expect the

8    evidence to show, and that is based upon matters that

9    preceded today in terms of the investigation that the

10   defense conducted as distinct from the investigation that

11   the government conducted.  Your time is valuable, and I

12   usually do not speak more than 30 minutes in an opening

13   statement, but this unique case, ladies and gentlemen,

14   there are four separate allegations involving schemes to

15   defraud, and I'm going to beg your indulgence that you

16   stay with me as I try to address, or as I do address those

17   four separate alleged schemes to defraud.

18          It's a unique case also in this respect, ladies

19   and gentlemen.  In terms of many of the facts in this case

20   there's not going to be any dispute.  Bank records speak

21   for themselves, money going from one party to another,

22   there is going to be a lot of evidence of loans going back

23   and forth, they speak for themselves.  It is the

24   interpretation of that evidence, and whether or not that

25   evidence demonstrates the crimes as alleged in the

1  indictment.

2          Judge Bianco, in his preliminary instructions to

3  you, told you about the presumption of innocence.  We live

4  in a constitutional democracy, the presumption of

5  innocence, meaning, ladies and gentlemen of the jury, that

6  if you were asked today what is your verdict, today, at

7  this moment, it would have to be not guilty.  He told you

8  that the government has the burden of proof, as it should,

9  to prove the case beyond a reasonable doubt, and that

10  burden never shifts from the government.

11          He told you that the defendant does not, is not

12  required to testify, but may testify in his own behalf.

13  Ladies and gentlemen, Phil Kenner will be testifying in

14  this trial.  Phil Kenner will have the opportunity to

15  address you under oath, subject to the cross-examination

16  of the government witnesses, to refute allegations you are

17  going to hear from a myriad of witnesses that come before

18  you.

19          Now, with these constitutional principles in

20  mind, what does it mean?  Though Phil Kenner is the

21  accused, it is the government's case that is on trial

22  here.  Once Phil Kenner was arraigned on what was the

23  first indictment in this case, November 13th, 2013,

24  another constitutional right kicked in, and that is the

25  right to defend himself through the assistance of counsel,

Opening - Mr. Haley

1    that's me.

2           Now, the issues that will arise in this case as

3    part of the defense, ladies and gentlemen, will include:

4    how did the FBI come to target Phil Kenner for criminal

5    investigation in the first instance?  What was their

6    motive?  Did the FBI, during the course of this in excess

7    of six-year investigation, deliberately ignore evidence in

8    their possession, favorable evidence that may or would

9    demonstrate that Phil Kenner committed no crimes or that

10   Phil Kenner was not a coconspirator with anyone?

11          Did the FBI coach and control witnesses, to help

12   orchestrate these criminal charges?  Did the government

13   give sweetheart deals as alluded to in the opening

14   statement of the government?  Did the government give

15   sweetheart deals to government witnesses in return for

16   their testimony?  And that will be developed a little

17   further, ladies and gentlemen, during the course of trial.

18   And did the government ignore the crimes and misdeeds of

19   others in order to orchestrate the charges against Phil

20   Kenner?  Those are some of the issues.

21          With those issues in mind, let me tell you what

22   the government did not tell you.  Let me tell you proof

23   that we expect you will hear during the course of this

24   trial.

25          The grand jury that voted this indictment, the

Opening - Mr. Haley

1   indictment dated April 22nd, 2015, was not the first grand

2   jury to be impanelled to investigate Phil Kenner.  In

3   2009, a grand jury was impanelled in the Southern District

4   of New York.  They are separate judicial districts.  The

5   Southern District of New York, ladies and gentlemen, is

6   New York County, Manhattan, other counties as well, but

7   it's Manhattan.

8           And at that point in time, that grand jury heard

9   testimony from three government witnesses at that time --

10  or I shouldn't say that -- from three of the clients who

11  Phil provided financial advice and business management to.

12  One of them you heard in the government's opening

13  statement was Michael Peca.  Another one was Darryl Sydor,

14  whose name you will hear and the third was Turner

15  Stevenson.

16          Now, in this indictment, and this will in the

17  final analysis, ladies and gentlemen, be the charges that

18  you will consider when you deliberate, they charge an

19  allegation under a heading known as the Hawaii land

20  developments, and it reads, the allegation:

21          It was part of the scheme to defraud that the

22  defendant Kenner induced certain of the investors to wire

23  large amounts of money to one or more bank accounts

24  controlled by Kenner.  True.  That's true.

25          (Continued on next page.)

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Opening - Haley

40

1    MR. HALEY:  (Continuing.)

2         In return for their investment, they would

3    receive an ownership interest in Little Isle IV which

4    would purchase and own a percentage of each of the

5    acquired land parcels.  True, they did.  They invested and

6    they received an ownership interest in Little Isle IV,

7    an LLC, which is a limited liability company, with the

8    idea of purchasing hands in Hawaii, making a profit on the

9    land and the interest is reflected on the books and

10   records of Little Isle IV, in other words, their

11   percentage interest is reflected on the ownership records.

12   That was not fraudulent.  That's not fraudulent, ladies

13   and gentlemen.  Did it involve some level of speculation?

14   Absolutely.  But it was a considered risk by each one of

15   those investors who, God bless them, were wealthy people

16   and they saw an opportunity to make more money.

17        Perhaps not as conservative as other

18   investments, perhaps more speculative, but that means the

19   profit would be greater.

20        However, that part of indictment alleges the

21   defendant Kenner persuaded certain of the investors to

22   establish lines of credit, each line of credit was insured

23   by bonds and equities held in the investors names, that's

24   true.  Then this goes on to say Kenner made a variety of

25   misrepresentations to the investors regarding lines of

1    credit and their use.  That's not true.

2          And we know that it's not true because of prior

3    grand jury testimony.  From Mr. Peca in particular.  In

4    his testimony when he was asked about the circumstances

5    under which he made the decision to invest in Little

6    Isle IV, he testified, and I expect that he will testify

7    here, ladies and gentlemen, that on all of them through

8    all the times I made the final decision.  I may not have

9    done as much due diligence, that some may have done, it's

10   not like I had to say yes or forced, I made the decision

11   to say yes, I want to do that.  Based on my money I was

12   making at the time, it didn't bother me to invest those

13   kinds of dollars.

14         That's the same little boy money, Michael Peca,

15   that the government was talking about a little while ago.

16   That's not a little boy, ladies and gentlemen he's a

17   professional hockey player, he's indicated before the

18   grand jury that he has a mind of his, and he made that

19   decision to invest in Little Isle IV.

20         He was asked how much he put into Little Isle IV

21   that accurately describes to the grand jury that he put in

22   an initial hundred thousand dollars cash investment, and

23   then later allowed his line of credit to be accessed by

24   Phil Kenner to the tune of $1.7 million, which money again

25   was going to be used to purchase property in Hawaii.

1          There is a central part of this case and it

2     involves an authorization, a one paragraph letter, where

3     each one of the investors signed a document that was

4     provided to Northern Trust Bank that said quite simply and

5     says quite simply and clearly, Phil Kenner has my

6     authorization to access my line of credit.

7          And when asked about the authenticity of that

8     authorization in the grand jury in the Southern District

9     of New York, his answer was:  It was prepared by me, I

10    read it, and I signed it.

11         There is a claim in that part of the indictment

12    that the investors were not fully apprised of how their

13    monies would be used.  Indeed, the original idea was that

14    the investment in Little Isle IV would be used to purchase

15    property in Hawaii.  There came a point in time where Phil

16    Kenner along with a fellow by the name of John Kaiser, who

17    will be testifying, reached an agreement or decided hey,

18    Hawaii right now is under development.  At that point it

19    stalled a little bit about, wonder if there was any other

20    opportunities for our clients as relates to real estate

21    investment.  And there was an opportunity that they became

22    aware of.  It was development of property in Mexico.  One

23    known as Diamonte del Mar, another one known as Diamonte

24    Cabo San Lucas, and actually that development idea was

25    quite attractive.  The fellow that was spearheading of

Opening - Haley

1    that will become a central figure in this case is a fellow

2    named Ken Jowdy and the idea was let's purchase and

3    develop property in Baja Mexico to build and develop a

4    golf course for essentially the exclusive use of

5    professional athletes.  So that the hockey guys, the

6    baseball guys and the football guys who you don't have to

7    be a sports fan to know are well compensated these days,

8    ladies and gentlemen, to play golf together.

9         What then happens is money out of Little

10   Isle IV's account is then loaned to Ken Jowdy at 15

11   percent interest to help develop that property in Mexico.

12   Not, the clients of -- Phil's clients were not acquiring

13   through that transaction an ownership interest in Diamonte

14   Cabo San Lucas, but were acquiring the return that comes

15   from a loan at 15 percent interest.

16        So in the grand jury when Darryl Sydor was asked

17   about that, did you know in advance that it, Hawaii funds,

18   were going to be used, the Little Isle IV money to be used

19   to salvage Cabo investments Sydor, yes, it was to be used

20   to help with a short, short-term loan to the funding to

21   Cabo, and it was supposed to be paid back but that's,

22   question:  Paid back to you or paid back to Little

23   Isle IV?  Sydor paid back to Little Isle IV.  Question:

24   So? Sydor, back to Hawaii, not me personally, but that

25   didn't happen, that didn't happen.  We'll be talking about

Opening - Haley

1  why it didn't happen in a moment.  Turner Stevenson on

2  that very point, ladies and gentlemen, and I won't go

3  through all the testimony but I will read this:  When

4  Turner Stevenson was asked in the grand jury this

5  question:  So you are saying that you agreed to transfer

6  some of the money from the Hawaii project to the Cabo

7  project.  Stevenson, I would say that yes.  Who made that

8  decision?  Stevenson:  I think all of us as a group.

9  What do you mean as a group?  Who is the group?

10  Stevenson, all the guys who were investing in this.

11       Now, on that issue in addition to grand jury

12  testimony there is testimony from other government

13  witnesses in other legal proceedings.  There are by my

14  calculation, the proof will show this, approximately 12

15  other civil lawsuits, civil lawsuits by various parties

16  against each other, including Ken Jowdy, that underlie

17  many of the allegations in this criminal indictment if not

18  all of the allegations in this criminal indictment.  And

19  frankly, ladies and gentlemen, that's where this case

20  belongs.  In civil court not in criminal court.

21       But, Jason Wooley in what is known as the Nolan

22  arbitration when asked this question:  And did Mr. Kenner

23  show you any projects that he was interested in for

24  himself.

25       "Answer:  Yes.

Opening - Haley

45

1          "Question:  Were they in Mexico and Hawaii?

2          "Answer:  Yes.  They were.

3          "Question:  Did you also invest in the Cabo

4    project as well?

5          I sure did.

6          "Question:  Did you also invest in Hawaii

7    property?

8          "Answer:  I sure did.

9          "Question:  At any time did Kenner push these

10   investments on you?

11         No.  I'm a big boy.  I make my own decisions.

12   My wife and I are our own counsel.  I knew I had no chance

13   of getting it back, I was perfectly okay with that.

14         Do you blame in any way Kenner for this

15   investment going slower than was anticipated?

16         "Answer:  Not at all.

17         Critical question:  Did you -- did you feel that

18   you completely understood the risks when you made this

19   type of investment as far as what would satisfy you?

20         "Answer:  Absolutely."

21         I mentioned other lawsuits, ladies and

22   gentlemen, Owen Nolan filed a lawsuit against Phil and he

23   did say pursuant to the terms and conditions of what was

24   known as a standard advisory agreement, that was an

25   agreement that Phil had with all of his investor clients

Opening - Haley

46

1  and what it says is if there is a dispute between us, you

2  have a right to arbitrate.  It's actually beneficial,

3  ladies and gentlemen, for an investor, because it goes to

4  an arbitration panel rather than a more expensive --

5          MR. MISKIEWICZ:  Objection, this is not a civil

6  case.

7          MR. HALEY:  Judge, I'll rephrase the remark.

8  Nolan commenced an arbitration proceeding.

9          MR. MISKIEWICZ:  Objection.

10          THE COURT:  Members of the jury, I'm going to

11  instruct you as to what the charges are and the law is.

12  These are the opening statements by the attorneys of what

13  they expect evidence to show or not to show and you should

14  take them as such.  Okay.

15          MR. HALEY:  Thank you, Judge.

16          It has relevance in this respect, ladies and

17  gentlemen, when asked in that proceeding do you feel that

18  he, meaning Phil Kenner, misled you about these or they

19  just didn't explain them fully to you, meaning the

20  investments, his answer was:  I don't think he fully

21  explained to me about how things worked."

22          Not that he lied to me, I just don't think he

23  fully explained it.  And the government wants you to base

24  a criminal conviction on that type of statement.

25          All right.  So after the grand jury empanelled

Opening - Haley

47

1   in the Southern District of New York hears the evidence of

2   those three witnesses, they do not move to indict.

3           MR. MISKIEWICZ:  Objection.

4           Sidebar.

5           THE COURT:  Sustained.  Sustained.  The jury

6   will completely disregard that statement.  That is not

7   something the jury should consider.  You should not

8   speculate as to that.  You should disregard that

9   completely.

10          MR. HALEY:  Well, there does come a point in

11  time, ladies and gentlemen, on November 13, 2013, that

12  Phil Kenner is arraigned on an indictment, the first

13  indictment that resulted in his arrest and arraignment on

14  these charges.  As I said, at that point in time he

15  obtained the assistance of counsel to defend himself.  In

16  that indictment.

17          MR. MISKIEWICZ:  Objection, your Honor.  May we

18  approach.

19          THE COURT:  Yes.

20          Members of the jury, we're going to take the

21  morning break now.  Please don't discuss the case.

22          (Whereupon, the jury retired from the

23  courtroom.)

24          THE COURT:  Everyone can be seated.  Mr. Haley,

25  what made you think that you could refer to the Southern

48

1   District grand jury not returning an indictment?  What

2   made think that that was a proper thing to place before

3   this jury?

4          MR. HALEY:  Your Honor, I believe in

5   representing my client, as I indicated in my opening

6   statement --

7          THE COURT:  Mr. Haley, did the grand jury return

8   a no true bill in the Southern District?

9          MR. HALEY:  I don't know --

10         THE COURT:  I asked you did they present you

11  with the charges?  Because what you did was suggest to

12  this jury that they returned a no true bill.  You said

13  they declined to indict.  That was improper, that -- the

14  inference that you want the jury to draw is completely

15  improper.  As a matter of fact, I had in my notes to tell

16  you not to do that, and I forgot to tell you, because I

17  was concerned that you might do that.  In fact, you did

18  it.  It's completely improper.

19         MR. HALEY:  Your Honor, I don't know how to

20  respond because I understand your Honor's view of that.

21         THE COURT:  What's your view of it?

22         MR. HALEY:  What I said, your Honor, after that

23  was presented to the grand jury in the Southern District

24  of New York, it did not move to indict.  That's all I

25  said.  Now, Judge, there could be two inferences -- your

Opening - Haley

1    Honor may I just finish the record?

2           THE COURT:  No.  You can write the letter and

3    put it on the record.  It's done already.  I'm not going

4    to waste time.  It was completely improper, the inference

5    was that they returned a no true bill.  They heard the

6    evidence and they said there was no crime here and as far

7    as I know that's not what happened.  So --

8           MR. HALEY:  Judge.

9           THE COURT:  No, we're not going to waste time on

10   it.  That's my conclusion, if you want to make a record,

11   you can do it on your own time.  We're not doing it now.

12          MR. HALEY:  Okay.

13          MR. MISKIEWICZ:  Your Honor, may I request a --

14   some form of curative instruction given to the jury before

15   he continues that essentially the indictment is just what

16   it is, I think your Honor already referenced it, and not

17   only they should not speculate about other charges.  Also

18   I hear in Mr. Haley's opening that he's about to make

19   reference to the fact that there's an underlying

20   indictment and I think he's going to suggest that's also

21   improper and they should draw inferences on that.  I

22   suggest if he goes down that pike that he be precluded

23   from doing so.

24          He should be precluded from making reference to

25   an underlying indictment.  We have one indictment here

Opening - Haley

1    what the defendants are charged with and facing in this

2    trial.  2, that some sort of curative instruction be

3    given.  Otherwise, your Honor, he has so polluted this

4    jury right now, we have no choice but to ask for a

5    potential mistrial.  I haven't talked about this with

6    counsel, but he has really just screwed, pardon the

7    expression, the record here in the most unprofessional

8    and -- I have never seen anything like this.

9              THE COURT:  Mr. Haley.

10             MR. HALEY:  May I be heard, Judge?

11             THE COURT:  Yes.  First of all, Mr. Miskiewicz,

12   as you heard, I gave the jury an immediate instruction

13   with respect to the Southern District grand jury.  I don't

14   have anything else to say on that.  To the extent that

15   Mr. Haley is now going to start going through the various

16   iterations of the indictment I want to hear what he's

17   about to do.  I don't -- I don't know what other

18   instruction I can give other than I told them to disregard

19   it, it's irrelevant, they should not speculate.

20             MR. MISKIEWICZ:  Would the Court give an

21   instruction that there is no such thing as a true bill in

22   the Southern District?  Never happened.  In effect he

23   lied.  And I can't put it anymore simply than that.  He's

24   lied to this jury, and that is the basis for really the

25   prejudice that he's caused and I am asking for a form of a

1  curative instruction that would explain that to the jury.

2  Not necessarily that he lied, but that he's wrong.

3             MR. HALEY:  Judge, may I explain myself in that

4  regard?  I don't want to belabor the record, Judge, or we

5  move on?

6             THE COURT:  No.  I told you if you want to

7  explain yourself put it in a letter.  I don't need to hear

8  the explanation now.

9             MR. HALEY:  Your Honor, as relates to the next

10  body, let me say this, the November 13th -- actually it

11  was October 29, 2013 when that indictment was first

12  returned, the first indictment in this case and that the

13  indictment that Phil Kenner was arraigned on on November

14  13, 2013.

15             Within that indictment, Judge, there was a

16  specific allegation of criminal conduct that was

17  devastating in nature, because it referred to the transfer

18  of monies to an account controlled by Tommy Constantine to

19  the tune of $725,000 and then subsequently the transfer of

20  approximately 170,000 of that 725 from the bank account

21  controlled by Constantine from bank account controlled by

22  Kenner.  That appears, Judge, in paragraph 30 and 31 of

23  that indictment.

24             Once we commenced the Rule 16 discovery, it was

25  clear that that never occurred.  What the bank records

Opening - Haley

52

1    reflect, Judge, is there was a $25,000 deposit into the

2    bank account controlled by Tommy Constantine from Phil

3    Kenner and within a week or so thereafter $17,000 went out

4    from that account to Phil Kenner.  Judge, that was a

5    representation made to a grand jury in the course of this

6    investigation that was simply false.

7                THE COURT:  Okay.  I understand the issues,

8    Mr. Haley, I understand the issue.  My ruling is as

9    follows.  You're not to refer at this juncture to prior

10   versions of the indictment.  If in fact there is evidence

11   that someone gave that testimony, false testimony, that

12   led to that allegation being in the indictment and that

13   witness comes here and testifies in court, obviously you

14   can impeach them on whether that particular allegation is

15   true or false and whether someone committed perjury before

16   the grand jury.

17               But starting to bring before the jury that --

18   two versions of the indictment and start having them

19   compare and once again speculate as to why an allegation

20   was eliminated or not eliminated is not a proper avenue as

21   far as I'm concerned.

22               So at this point I'm precluding you from

23   referencing other prior indictments and allegations that

24   were in there versus allegations that are in this

25   indictment.  If you believe that that's proper, you can

Opening - Haley

53

1   show me the case law that suggests that, but I think the

2   proper way to do that would be to question any witnesses

3   who may have committed perjury in your view with respect

4   to those allegations, not just having the jury compare the

5   indictments and they can speculate as to why the

6   government made the decision as to eliminate a certain

7   allegation, that's not the way it works.

8           MR. HALEY:  Your Honor made a ruling.

9           THE COURT:  Yes.  That's my ruling.  Okay.

10          MR. LA RUSSO:  Your Honor, may I be heard.

11          THE COURT:  Yes.

12          MR. LA RUSSO:  Just briefly and I will likewise

13  ask for a little additional time because I'm going to

14  address some of the issues to the jury to comply with the

15  Court's order.  But we are going to be arguing, Judge and

16  I think the Court may be aware of this because I raised

17  this sometime before, is that Mr. Galioto was the case

18  agent and based upon his investigation we have a fact

19  allegation that was made in the indictment that turned out

20  to be incorrect, false, it was false because they didn't

21  do the proper investigation.

22          What happens is Mr. Miskiewicz recognizing that,

23  he then returns a Superseding Indictment removing that

24  specific allegation.

25          THE COURT:  Maybe you can question the agent

Opening - Haley

54

1    regarding that.

2         MR. LA RUSSO:  We intend to.

3         THE COURT:  But talking about the different

4    versions of the indictment at this point in opening

5    statement I think is confusing for a jury.  We have enough

6    to deal with the current version of the indictment, rather

7    than comparing with the prior version and speculating in

8    the opening statement why Mr. Miskiewicz took it out.

9         MR. LA RUSSO:  The point is we are asking this

10   jury to look at the conduct of the agent and based upon

11   that conduct, my client was indicted for an allegation, a

12   criminal charge that was false.  We then come, I'll give

13   you a specific example.  They allege that $250,000 was

14   stolen back in 2002 and the victim was a man by the name

15   of Owen Nolan, a former hockey player, when we

16   demonstrated that that was false, we then get a

17   Superseding Indictment and that's now removed, what do we

18   hear, the government tells us it's John Juneau.  I hate to

19   tell you, Judge, that's not true either.  They're getting

20   information that Mr. Galioto was presenting not just

21   allegations, they're false allegations and it's removing

22   that information from the indictment, how can you ask the

23   jury to focus on the misconduct of the agent not

24   necessarily intentionally, but either failing to do the

25   job he was supposed to, failing to examine the evidence he

Opening - Haley

1   was supposed to that led to the charges without at least

2   referring to the evidence.  I agree with the Court you

3   can't say that because the Southern District did not

4   return an indictment that that means that the defendants

5   are innocent.  I understand that.

6          THE COURT:  Maybe Mr. Miskiewicz removed

7   allegations in the indictment because he wanted to make

8   the case streamlined and easier to present to the jury.  I

9   don't know why they removed it.

10          MR. LA RUSSO:  He did.

11          THE COURT:  So you want to put Mr. Miskiewicz on

12  the stand and tell you why he removed something?  My

13  ruling is the same, at this point in the case, the opening

14  statement -- the only version of the indictment to be

15  referred to is the one that the defendants are on trial

16  enforcement anything else being done at this point would

17  be confusing, would require speculation and in my view is

18  improper at this point.

19          If you want to argue to me after you questioned

20  the agents or other witnesses who led to false allegations

21  being put in a prior indictment that in addition to

22  presenting to the jury that they provided false

23  information to the prosecutors, to the Southern District

24  grand jury, to whoever they provided the false information

25  to, we start examining the various iterations of the

Opening - Haley

1   indictment to the jury, I'll entertain that at that point.

2   Right now we have nothing.  We have the opening statements

3   and we're starting to talk to the jury about different

4   versions of the indictment.  I'm not going to allow it at

5   this point.  Okay.  If you want to revisit that, that's

6   fine.  I want to be clear, I'm not saying that you can't

7   cross the agent on the information provided to the

8   prosecutors and what may have turned out to be true or

9   false.  That's completely proper.  But the idea of parsing

10  through multiple versions of an indictment, I haven't seen

11  it before in a trial, if you want to point me to a judge

12  who has allowed the defense lawyers to put up all the

13  versions of the indictment and start telling the jury this

14  paragraph changed, and this paragraph changed, then they

15  want them to speculate that that is because they aren't

16  true, then we'll start entertaining that.  I don't have

17  any such case law in front of me.  If I'm sitting here

18  starting to hear that about other versions of the

19  indictment, the Southern District grand jury -- suggests

20  that the Southern District grand jury declined to

21  prosecute the case are so far afield I'm disturbed by

22  what's happened so far.  And you haven't even got up yet.

23          MR. LA RUSSO:  That's my concern.

24          THE COURT:  Let me make it clear, there should

25  be no reference, no reference -- it was fine Mr. Haley

Opening - Haley

57

1    referenced the case starting in the Southern District.

2    There should be no reference to the grand jury's -- any

3    suggestion that the grand jury made a decision not to

4    bring charges and there should be no reference to that or

5    suggestion that the Southern District of New York

6    prosecutors declined to bring charges, and that's why the

7    case was brought in the Eastern District of New York.

8    Okay.  Those matters are not in the record.  You're asking

9    the jury to speculate as to those things and there should

10   be no reference to the reason the case may have gone from

11   Southern to Eastern District of New York.  It's just

12   speculation.  Okay.

13        MR. MISKIEWICZ:  Your Honor, I have one more

14   application that has to do Mr. La Russo's opening, he has

15   in prior openings, referred to himself as a prior

16   Assistant US Attorney.  We've heard enough sort of

17   second-guessing of the government's strategy here.

18        MR. LA RUSSO:  I'm not going to, but that would

19   have been a good one.  I forgot about that one, Judge.

20   Thank you.

21        THE COURT:  Let's take our break.  All right.

22        MR. LA RUSSO:  Your Honor, may I ask for a

23   little more time.  I want to make sure I go through my

24   opening.  I don't want to have a skewer of the Court's

25   order.

Opening - Haley

58

1          THE COURT:  All right.

2          MR. LA RUSSO:  Thank you.

3          (Recess taken at this point.)

4          (After recess.)

5          MR. LA RUSSO:  Your Honor, thank you for the

6     time.  I cleared up some of the problems there.  Thank

7     you.

8          MR. MISKIEWICZ:  I am formally asking for a

9     mistrial.

10         THE COURT:  On what grounds?

11         MR. MISKIEWICZ:  The nature of the statement is

12    so prejudicial to the government's case and so outrageous,

13    that it makes it difficult even with a curative

14    instruction for any jury now to view this evidence

15    dispassionately.

16         THE COURT:  Mr. La Russo?

17         MR. LA RUSSO:  May I just have one moment,

18    Judge?  Thank you for your indulgence, your Honor.

19         MR. HALEY:  Your Honor, may address the Court?

20         THE COURT:  No.

21         MR. LA RUSSO:  Your Honor, I'm going to take the

22    middle road here and indicate to the Court like I did

23    before, I understand the government's position, I

24    understand the Court's concern, but much of our case is

25    going to hinge upon either deliberate or intentional

1    misconduct by the agent getting us where we are.  I don't

2    think I can take a position where based upon what we're

3    going to do based upon what happened in the courtroom

4    today.

5           I do want to indicate to the Court I had some

6    comments in my opening statement somewhat similar to

7    Mr. Haley's.  They've been removed, of course.  I'm not

8    talking about prior indictments and any inferences you may

9    draw from that.  But we will be either if this case goes

10   forward there has been from the government's point of view

11   a constant change of factual allegations, whether they

12   just bring in the indictment or the agent's point of view

13   where he keeps changing the theory to try and suit their

14   position.  I really can't take a position.

15          THE COURT:  There's two different things,

16   Mr. La Russo.  I want to emphasize I understand it's a

17   core part of the case to try and impeach the government's

18   investigation and their case agents handling of that

19   investigation, I'm going to let you do that.  The only

20   issue is whether or not -- there's two issues, first issue

21   is whether or not in opening statement a jury should be

22   exposed to different versions of the indictment and start

23   comparing the versions and essentially opening statements

24   they have to speculate as to why certain things were in

25   and removed and my ruling at this point in the case is

Opening - Haley

60

1    it's not proper to do that.  I'm willing to revisit that

2    issue of whether or not after you question the witnesses

3    whether or not in fact the issue of prior indictment

4    should come in, I'm not ruling that it's off grounds

5    forever, only for purposes of the opening statement.

6          But the separate issue is whether or not the

7    fact that Mr. Haley suggested to this jury that the grand

8    jury in the Southern District made a decision not to bring

9    charges, that's the issue that I'm focused on.

10         MR. LA RUSSO:  I understand, Judge, and

11   respectfully I'm not going take a position on the

12   government's application.

13         THE COURT:  Mr. Haley.

14         MR. HALEY:  Thank you, your Honor.  Your Honor,

15   I simply stated a fact and it was not my intention other

16   than to state that fact.  We have a jury that knows that

17   three government witnesses testified before a grand jury

18   in the Southern District of New York.  To simply leave

19   that up in the air, Judge, it was not my intention to

20   prejudice anyone.  It was simply my intention to lay out

21   what I believed to be a factual timeline.  Might I add,

22   Judge, in the course of this proceeding Rule 16 discovery

23   we were provided this information by the government as

24   information that may be helpful to the defense.

25         With all due respect, Judge, I think that what's

Opening - Haley

1   occurred here is we're making this more of an issue that

2   in the minds of the trier of the fact than it really is,

3   and I frankly, Judge, would oppose a mistrial based upon

4   what's transpired at this point in time.

5            Your Honor your Honor gave a curative

6   instruction.  The jury will disregard -- these are bright

7   people.  There's no question that they can follow the

8   Court's instruction.  I do apologize, Judge, so far as the

9   court found my conduct to be inappropriate.  It was not my

10  intention to do anything inappropriate.  It was my

11  intention to state a fact, and I don't know what more to

12  say as far as that's concerned, Judge.

13           THE COURT:  Okay.  I'm going to deny the motion

14  for a mistrial.  First of all, it was not a statement of

15  the timeline, I wasn't born yesterday -- I've been doing

16  this a long time -- that the intention was to suggest to

17  the jury that a decision was made by another grand jury

18  not to bring charges rather than a prosecutor not

19  presenting charges, the implication was that a conscious

20  decision was made by the Southern District grand jury not

21  to bring charges.  I don't believe that's the core of the

22  case and the government is representing to me that's not

23  what happened in the Southern District.

24           So that was a clear import of that statement of

25  the timeline that was established by Mr. Haley.  The

1    reference to the Southern District grand jury was fine.

2    This jury is going to hear people testifying in the

3    Southern District grand jury that was fine.  It was the

4    implication that the decision was made not to bring

5    charges which in my view is disturbing, inaccurate and was

6    inappropriate for the reasons I've already stated.

7    However, I did give the need to give an immediate curative

8    instruction and I don't think that there's a sufficient

9    basis to grant a mistrial.

10          I will entertain -- I'm not going to say

11   anything further now, but I will entertain some type of

12   further instruction being given to the jury at the end of

13   the case or at some later time.  I think that I covered it

14   in my instruction there, but I would entertain that, but

15   I'm not going to do anything further at this point,

16   because my response I thought was immediate and thorough.

17          Okay.  So we'll continue now.  I'll bring the

18   jury back in.

19          MR. MISKIEWICZ:  Your Honor, one last thing that

20   just came up, I anticipate the continue -- this may come

21   up with Mr. La Russo's opening, I made no objection when

22   Mr. Haley started reading from grand jury testimony of

23   people who are anticipated or that we anticipate either

24   will be our witnesses or their witnesses that they've

25   identified, to the extent that they start reading from

1    depositions or grand jury testimony that neither side

2    intends to call, I think that's inappropriate because

3    they're doing exactly what you told the jury you know, is

4    inappropriate, which is he's testifying.  And so I would

5    ask that they limit their comments to either witnesses

6    they intend to call or witnesses that are, that have been

7    identified through 3500 authorities.

8            This Turner Stevenson individual has appeared

9    nowhere in anybody's list and yet he's now read from his

10   testimony.  Again it's something that I've absolutely

11   never seen in years practiced.

12           MR. HALEY:  May I respond, Judge?

13           THE COURT:  Yes.

14           MR. HALEY:  Your Honor, I've always understood

15   opening statements to be exactly what they are, they're

16   not evidence, the jury is focused on evidence, Judge.  In

17   connection with witnesses that we intend on calling for

18   purposes of the defense, I have in my own mind listed

19   those witnesses, I envision we will absolutely be calling

20   witnesses, in large measure it depends upon the testimony

21   as adduced by the government's witnesses as to whether or

22   not we call a particular witness.  I dare say the

23   government make a representation to a jury in an opening

24   statement and they fail to introduce that evidence during

25   the course of the trial, there's no mistrial.  The

Opening - Haley

64

1    opponent may, if he or she wishes, point out to the jury

2    that there was an opening statement where a representation

3    was made and they didn't follow through with that

4    representation.  That's why they're called opening

5    statements, Judge.  But Judge, as I said before, this is a

6    complex case, I need to parse out the various allegations

7    in as best as I'm able to present what we see as the

8    viable defense to this matter.  That's what I believe I've

9    done, Judge, that's my obligation -- I don't mean to

10   interrupt the Court -- as I see it to my client.

11              THE COURT:  The way to do that in opening

12   statement Mr. Haley is to say I anticipate the testimony

13   of this witness to be X or to be Y.  I was quite surprised

14   myself to see you start pulling out grand jury transcripts

15   and reading from them, because first of all it's hearsay,

16   if the government started pulling out grand jury

17   transcript during their opening and reading from it I'm

18   sure I would have seen objections.  And the rules apply to

19   both sides in defending their clients.  There's no special

20   rules for defendants.  Taking the grand jury transcripts

21   you said, okay, here is the question, here is the answer,

22   because it's hearsay, we don't know whether those

23   transcripts are coming in.  The proper way do that is to

24   say I anticipate when this witness takes the stand, I'm

25   hoping that we're not going to hear more reading of the

Opening - Haley

1     grand jury transcript.  I hope you're not intending to

2     read any more readings of the grand jury transcripts.

3           MR. HALEY:  No, but what I anticipate in

4     connection with proof at trial if based upon prior sworn

5     testimony it's a pretty reliable argument for a defense

6     attorney to make.

7           THE COURT:  I understand that, that's why I

8     think the government didn't object.  But again, in an

9     opening statement you're telling the jury what you

10    anticipate the evidence to be.  I'm not going to give any

11    blanket instructions to the defense.  If they in good

12    faith believe that they call a witness in good faith to

13    testify, they will have to make such a statement in their

14    opening.  You said that name wasn't on the witness list

15    which concerns me, but I'm going to have to take it on a

16    case by case.

17          If you refer to another witness that is not on

18    the witness list, you can object at this point.

19          MR. MISKIEWICZ:  Thank you, your Honor.

20          THE COURT:  Okay.  Let's bring the jury in.

21    Everyone be seated for a minute.

22          THE COURT:  Juror number 3 says there's a Ms.

23    DeGray in the audience?

24          MR. MISKIEWICZ:  Doesn't sound like a name

25    that's familiar.

Opening - Haley

1    THE COURT:  Is there a Lisa DeGray?  Ms. DeGray?

2    MR. MISKIEWICZ:  I'm told that there was

3    somebody who works in the US Attorney's office, in the

4    civil division who was seated in the back that's

5    Ms. DeGray.

6    THE COURT:  She's not working on the case?

7    MR. MISKIEWICZ:  No.

8    THE COURT:  So do you want me to question him

9    regarding that?  Do you want me to --

10   MR. HALEY:  Your Honor, I see no need to

11   question the juror.

12   THE COURT:  I know, I don't want him to be

13   worried about it.  I don't want him to think she's

14   involved in the case.  Is she a paralegal or attorney?

15   MR. MISKIEWICZ:  I believe she's a support

16   staff, not an attorney.

17   MR. LA RUSSO:  It seems to me, Judge, I, like

18   Mr. Haley, don't think it's a major problem.  But normally

19   during the voir dire they say they know somebody in the

20   US Attorney's Office, I didn't hear that.

21   THE COURT:  Maybe she works in the US Attorney's

22   office.

23   MR. LA RUSSO:  That's probably true, too, if you

24   want, you can ask her first do you recognize, how do you

25   recognize and what do you know if that person does

Opening - Haley

67

1   anything to avoid any kind of inference that they maybe

2   employed by the US Attorney's Office.  Again, I don't have

3   a major objection.

4          THE COURT:  Why don't I bring him out and ask

5   him how he thinks he knows her.  Is there any objection to

6   that.

7          MR. MISKIEWICZ:  No, your Honor.

8          MR. HALEY:  No, sir.

9          MR. LA RUSSO:  No.

10          THE COURT:  Bring him out.

11          (Juror Number 3 enters the courtroom.)

12          THE COURT:  Hello, sir, you can sit in the first

13   chair there.  My law clerk told me that you believe that

14   you recognize someone in the audience?

15          JUROR NO. 3:  Yes.

16          THE COURT:  Can you tell me who that was and how

17   you know her.

18          JUROR NO. 3:  She's my friend's daughter, Lisa

19   DeGray.

20          THE COURT:  And what do you know about her in

21   terms of do you know where she works.

22          JUROR NO. 3:  I know she works in this building

23   for a contractor for the federal government.

24          THE COURT:  Okay.  Ms. DeGray is not involved in

25   any way in the prosecution of this case.  Obviously it's a

Opening - Haley

1   public courtroom.  Anyone can come in and watch.

2                   JUROR NO. 3:  Right.

3                   THE COURT:  I just wanted to make sure, this is

4   similar a question that I asked in the jury questions, is

5   there anything about her employment that would affect your

6   ability to be fair and impartial to both sides in the

7   case?

8                   JUROR NO. 3:  No.

9                   THE COURT:  Thank you.  You can go back.

10                  (Juror number 3 retires from the courtroom.)

11                  THE COURT:  Anyone have any issue?

12                  MR. LA RUSSO:  No, your Honor.

13                  MR. HALEY:  No, sir.

14                  MR. MISKIEWICZ:  No, your Honor.

15                  THE COURT:  Okay.  Let's bring them in.

16                  (Whereupon, the jury entered the courtroom.)

17                  THE COURT:  Everyone can be seated.  Okay,

18  members of the jury, I apologize for the delay.  We'll now

19  continued with Mr. Haley's opening statement.

20                  MR. HALEY:  Thank you, your Honor.

21                  I guess where we left off, ladies and gentlemen,

22  I had spoken to you about allegations in the indictment in

23  connection with what we expect the proof to show

24  concerning the knowledge of the client investors with

25  respect to their lines of credit and how those lines of

1    credit would be used to invest in Hawaii and indeed loan

2    money to a fellow by the name of Ken Jowdy.  Let's move on

3    to additional allegations in the indictment as relates to

4    the Hawaiian land development alleged scheme.  The proof

5    will show, ladies and gentlemen, that when the Hawaiian

6    land development investment came to an end and for a

7    variety of reasons, as the proof will show, during the

8    downturn in the real estate market and ultimately the

9    bankruptcy of the Lehman Brothers that had loaned some

10   money to the Hawaiian land development, that the investors

11   who had committed their lines of credit for purposes of

12   the Hawaiian investment did lose money.  As a matter of

13   fact, in the final analysis they only received about a

14   return of 40 percent back on their investment in the

15   Hawaiian land development project.

16         But for all the allegations of fraud as relates

17   to the Hawaiian land development, we would not be here

18   today, in my view, as the proof will show, if a fellow by

19   the name of Ken Jowdy -- who has a lot of money -- it's

20   other people's money, but he has a lot of it -- had made

21   good on the loan.  And what do I mean by that?

22         The proof will show as I told you before, that

23   there came a point in time where Phil Kenner as a managing

24   member of the LLC, Little Isle IV LLC, and we will

25   maintain along with the knowledge of a fellow by the name

70

1    of John Kaiser, decided that they'd use some of the money

2    against the loan to Ken Jowdy to develop a golf course

3    project in Baja, Mexico.  And he had a contractual

4    commitment to pay back that loan which exceeded $5.5

5    million, and at 15 percent interest, had he paid it back,

6    the proof will show that those investors had only received

7    about a 40 percent return on their investment, would have

8    been if not made whole, close to being made whole in terms

9    of their investment.

10          Now, initially that loan to Ken Jowdy was

11   without a written agreement.  In other words, money was

12   coming out of two accounts, Little Isle IV and Ula Makika

13   going to Ken Jowdy, and indeed what the bank records will

14   show is money was going back to Little Isle IV, not as

15   much as was being sent but money was going back, just like

16   a loan, you pay interest on a loan.

17          There comes a point in time, ladies and

18   gentlemen, that on December 7, 2004, a loan agreement, a

19   revolving line of credit agreement is executed between Ken

20   Jowdy and Phil Kenner, that loan agreement actually was

21   witnessed by another person, witness -- it says witness.

22   And his name is Robert Gaudet.

23          Now, John Kaiser knows that this loan existed,

24   John Kaiser knows that Ken Jowdy was receiving monies from

25   Little Isle IV to be paid back as a loan and John Kaiser

1    knows that, as the proof will show, because he met twice

2    in New York City with Ken Jowdy the second occasion while

3    in a bar they discussed the loan.

4           Whether John Kaiser will testify to that or not

5    today we don't know.  We know that that's what he told the

6    FBI, that that was conversations taking place, when I say

7    we don't know what John Kaiser will say today is because

8    John Kaiser is now employed by Ken Jowdy.

9           As the proof will show he is now director of

10   construction down at Diamonte Cabo San Lucas.  He'll

11   testify, I don't believe the proof will show, that he has

12   a degree in architecture.  I don't believe the proof will

13   show that he has a degree in civil engineering, but he is

14   now receiving compensation from Ken Jowdy as his director

15   of construction.

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

  
72

1      MR. HALEY:  It's important because John Kaiser

2   will be a witness that will be levying a myriad of

3   allegations against Phil Kenner when John Kaiser

4   testifies.

5      Another person that will be making accusations

6   against Phil Kenner when he testifies is a fellow by the

7   name of Bryan Berard.  Bryan Berard also is now employed

8   by Ken Jowdy in Diamante Cabo San Lucas.  That's what the

9   proof will show.

10      Well, there comes a point in time when Phil

11   Kenner, in pursuit of his claim against Ken Jowdy to pay

12   back the money that Jowdy loaned out to Little Isle IV at

13   15 percent interest, where they engage in negotiations as

14   you might imagine. There's a settlement agreement as the

15   proof will show wherein that loan is specifically

16   referenced.

17      Now, each parties have lawyers, each parties are

18   engaged in these negotiations, but it gets noted in a

19   settlement agreement.

20      At that point in time the calculation was $8.5

21   million loan to Little Isle IV, so there's that

22   understanding among the parties.

23      And here's where it gets really interesting,

24   ladies and gentlemen, if not disturbing from the defense

25   standpoint.

Mr. Haley - Opening

73

1    In or about 2008, Phil Kenner meets with Ken

2    Jowdy and he meets with a fellow by the name of William

3    Najurn, as the proof will show.  William Najurn is the

4    brother-in-law of Ken Jowdy, an attorney, and during the

5    course of the meeting Phil Kenner is pressing Jowdy for

6    the return of this money with respect to the loan.

7    And Jowdy says, in substance, I'm not paying it

8    back because I have the FBI on my side and I am going to

9    get a loan from Lehman Brothers to finance this

10   development, so I need no more money from you and I need

11   not acknowledge your loan.

12   Now, Phil Kenner, as I said, will testify in

13   this matter.  He's subject to cross-examination as I told

14   you a moment ago.

15   But whether or not Ken Jowdy had a buddy in the

16   FBI is indeed true, because the proof will show that in an

17   e-mail dated July 8, 2005, between Phil Kenner and Ken

18   Jowdy, Ken Jowdy referred and he used the term good buddy

19   in the FBI.

20   The proof will show, ladies and gentlemen, based

21   upon that e-mail and actually based upon testimony as

22   well, that that good buddy was at the time in the FBI and

23   his name is John Behnke.

24   John Behnke, as the proof will show, is no

25   longer employed by the FBI.  He is instead the director of

74

1    security at Diamante Cabo San Lucas, Ken Jowdy's golf

2    resort.

3            So we got Jowdy, we got Behnke as a security

4    director, we have John Kaiser as his director of

5    construction and we have Bryan Berard.

6            Well, Phil Kenner should have listened I guess

7    to Ken Jowdy.  He didn't.

8            In 2009, he files a lawsuit against Ken Jowdy

9    for the return of that money on loan.

10           And at some point after Phil Kenner files a

11   lawsuit against Ken Jowdy in the United States District

12   Court for the District of Arizona, Phil Kenner learns that

13   he's under investigation by the FBI.

14           He knows that because his bank records are

15   getting subpoenaed; and, indeed, there does come a point

16   in time as I referred to before that on October 29, 2013,

17   an indictment accusing Phil Kenner of a variety of frauds,

18   including the Hawaiian land development is handed up here

19   in the Eastern District of New York.

20           As I said before, ladies and gentlemen, had

21   Jowdy paid back that loan with interest, we probably

22   wouldn't be here today.

23           Why do I say that?  Because it's a little bit

24   for the government to convince a jury the crimes have been

25   crimes.  I'm not talking about the civil disputes when the

1   alleged victims have essentially not lost any money.  They

2   would not have lost any money of any significance had Ken

3   Jowdy paid back the loan.

4         Indeed, it has even further relevance when it

5   comes to the Global Settlement Fund because the Global

6   Settlement Fund was established primarily for the

7   investors to create a war chest where they could then sue

8   Jowdy to obtain the return of that money on loan.

9         I hope I haven't exhausted your patience at this

10  point, ladies and gentlemen, but if you could bear with me

11  only because of the nature of this indictment involves a

12  myriad of allegations, nine counts that you're ultimately

13  going to have to render a determination on.

14        Let's talk about the Global Settlement Fund

15  which is the second alleged scheme to defraud in this

16  indictment.

17        But before I go further, as I said before,

18  there's going to be bank records.  They speak for

19  themselves.  I will tell you this.

20        There's no question, as the proof will show,

21  that Phil Kenner and Tommy Constantine had business

22  relationships together.  No question about that.

23        You're going to see a lot of money going back

24  and forth between the two of them, loans into different

25  account.  None of that is disputed, ladies and gentlemen.

Mr. Haley  -  Opening

76

1   As I said at the beginning, the dispute is whether it's

2   evidence of criminal activity.

3           You'll see e-mails.  And, by the way, some of

4   these e-mails between the parties, they didn't know it

5   would ultimately be in front of you, ladies and gentlemen.

6   There's going to be language that is offensive, but we're

7   all adults here.  It's what guys do sometimes when we're

8   communicating in e-mails.

9           Let's get back to what the government did not

10  tell you in their opening statement.

11          The proof will show, ladies and gentlemen,

12  through Phil Kenner's testimony and his identification of

13  e-mails between himself and others, that a point in time

14  was reached where Phil Kenner saw that Tommy Constantine

15  was not using the money appropriately for the global

16  settlement purposes.

17          Once again, that Global Settlement Fund was set

18  up primarily for litigation purposes.  There were other

19  aspects of what was to be done with the money that we will

20  sift out throughout the trial.

21          But Phil Kenner's charged as a coconspirator by

22  the government saying he conspired with Tommy Constantine

23  to misappropriate funds.

24          Well, when Phil Kenner saw that Tommy had

25  misappropriated funds, he didn't remain silent as you

77

1    would expect a coconspirator to do, ladies and gentlemen.

2            In an e-mail dated April 19, 2011, to various

3    client/investors, Phil wrote:

4            As you are aware, Constantine has

5    misappropriated the lion's shares of GSF, Global

6    Settlement Fund, that would have been a great assistance

7    to us in the Mexican pursuit of Jowdy for his own benefit.

8            It has left me very little financial options

9    while trying not to quit our legal dispute.

10           And that e-mail was sent long before Phil Kenner

11   was charged with these offenses.

12           He didn't have a crystal ball saying I know I'm

13   going to be charged sometime in the future, so let me

14   formulate an e-mail where I now announce that Tommy

15   Constantine has misappropriated monies.  Tommy Constantine

16   misappropriated, Phil saw it, and he let his investors

17   know about it.

18           Now, as far as the allegations that Kenner was a

19   coconspirator with Constantine with reference to the

20   Eufora alleged fraud, let's parse out those allegations.

21           In the indictment it alleges that it was further

22   part of the scheme to defraud that between February 2008

23   and May 2009, the defendant Kenner convinced John Does two

24   through four, John Doe eight and John Doe nine to invest

25   money in Eufora, in exchange for an ownership interest in

Mr. Haley  -  Opening

1    the company, by representing to each of them that Eufora

2    was a promising company with potential for growth.

3            That's true.  He did represent that to his

4    investors, and it's true.  Eufora is and we maintain

5    was -- excuse me -- was and we maintain still is a

6    promising company with great potential for growth.

7            It holds a patent, ladies and gentlemen, for a

8    process involving prepaid debit cards where individuals

9    who subscribe to the Eufora debit card can restore his

10   credit or improve his credit rating and it's a patent,

11   it's a process.

12           You're going to hear testimony from one of the

13   government's own witnesses, Eric Edenholm, who will tell

14   you that in 2003 he invested $250,000 in Eufora by which

15   he then obtained an ownership interest in the company and

16   18 to 20 months later sold his shares, his ownership

17   interest in the company for 420 to $430,000. That's a nice

18   return on an investment.

19           The indictment goes on to say that Kenner and

20   Constantine then unlawfully diverted investor money for

21   their personal benefit.

22           There, ladies and gentlemen, is a fundamental

23   disagreement between the government and the defense as to

24   whether or not an individual who has an ownership interest

25   in a private company and decides to sell that ownership

Mr. Haley - Opening

79

1    interest, or a portion of that ownership interest to

2    another person, commits a crime when he uses that money

3    for personal purposes.  Let's say to pay the kids -- his

4    kid's tuition bill.  That's not what happened here.

5             The allegation is that Mr. Constantine used it

6    for various purposes, yes, and indeed, ladies and

7    gentlemen, what we have is we have the investor paying

8    money to a person that holds an investment in a privately

9    held company commonly known as a private placement, the

10   money goes into the individual owner, he then conveys a

11   percentage of his ownership interest to the investor and

12   the value of the investor gets his ownership interest. It

13   need not be used for specifically business purposes under

14   those circumstances.

15            However, when it came to the activities of Tommy

16   Constantine, there was the misuse of some of that money,

17   and indeed what transpired is an attorney by the name of

18   Michael Stolper, with Phil Kenner's assistance, conducted

19   an investigation on behalf of those investors in Eufora

20   into Tommy Constantine's activities.

21            One of the major parts of that investigation

22   involved Tommy Constantine's mismanagement of Eufora.

23            What do I mean by that?  What I mean by that is

24   those investors that were clearly sending money to Tommy

25   Constantine for a percentage interest in Eufora, part of

80

1   what he owned, Tommy was not reflecting that or causing

2   persons in Eufora to reflect the fact that his ownership

3   interest was now being diminished by way of the sale of

4   that interest to others.  It ought to be reflected on the

5   books and records.

6           There was concern about Tommy Constantine's use

7   of the corporate credit card that became part of the

8   Stolper investigation.

9           And as you'll see in e-mails where Phil Kenner

10  was copied, Stolper detailed the efforts he was making in

11  investigating Tommy Constantine to various individuals,

12  including William Ranford who will be testifying as a

13  government witness, Steve Rucchin who will be testifying

14  as a government witness.  Michael Peca who will be

15  testifying as a government witness, and Nick Privitello

16  who will be testifying as a government witness and others.

17          And indeed in an e-mail again where Phil Kenner

18  was copied because he was part of that investigation,

19  tough to be a coconspirator when you're involved in an

20  investigation of your alleged coconspirator before you're

21  even charged with a crime.  The Judge told you the

22  indictment is not proof of anything.

23          There's an e-mail from Stolper dated June 28,

24  2011, again a copy to Kenner, which updated the lawsuit

25  against Constantine in Arizona so all the investors knew

Mr. Haley  -  Opening

1  where they were in terms of that investigation of Tommy

2  Constantine.

3         But there's more.  Because Tommy Constantine

4  runs out of money at some point and the proof will show

5  that he files a petition in bankruptcy in Arizona, and

6  when he files that petition in bankruptcy, when you're

7  required to list the debtors who you owe money to, he

8  doesn't list any of the hockey player investor clients of

9  Phil Kenner and claims in that Arizona bankruptcy

10  proceeding that he never had an ownership interest in

11  Eufora.

12         Of course he did, ladies and gentlemen.  The

13  books and records which were ultimately reconstructed by

14  two people, C.R. Gentry and Timmy Gaarn, as you will hear

15  ultimately reflected everyone's owner interest, Rucchin

16  and all the others.

17         But when Tommy Constantine files a petition in

18  an effort to avoid those obligations, a bankruptcy

19  petition, Phil Kenner himself and assists other investors

20  file a claim challenging Tommy Constantine's disavow of

21  ever having an ownership interest in Eufora.

22         And within Phil's petition to the Court, as well

23  as others, including one specific investor client they say

24  as follows:

25         Under Constantine's fraudulent claim that he was

1    not a shareholder of Eufora since his alleged pledged

2    transfer to Sue Ellen Ferguson, trustee, 2002 trust in

3    April 2003, upon information and belief the undersigned

4    believes Constantine personally sold shares in Eufora as

5    follows:

6         Sergei Gonchar 2/29/2008, $100,000; Mattias

7    Norstrom on 3/19/2008, $100,000; Michael Peca on 4/7/2008,

8    $100,000; Tyson Nash on 4/24/2008, $100,000; Greg De Vries

9    on 6/2/2008, $75,000; Darryl Sydor on 7/7/2008, $50,000;

10   William Ranford on 7/7/2008, $200,000; Glen Murray on

11   7/21/2008, $50,000; and Vitali Yachmenev on 8/8/2008,

12   $25,000.

13        How is Phil Kenner a coconspirator with Tommy

14   Constantine with reference to either the Global Settlement

15   Fund or Eufora when he's taking these actions to protect

16   his investors long before he's charged with a criminal

17   offense.

18        Now, when I sit down, Mr. LaRusso, Constantine's

19   attorney, will have his opportunity to address you, ladies

20   and gentlemen.

21        There's reasons there's separate lawyers in this

22   case and you're going to have to decide this case as his

23   Honor told you with reference to the proof separately and

24   distinctly as against each defendant.  Even though the

25   government loves that word conspiracy and puts it into the

83

1   indictment, see if the proof bears out conspiratorial

2   conduct of a criminal nature.

3           Now, Mr. LaRusso may or may not accuse Phil

4   Kenner of crimes or misdeeds.  We have absolutely taken

5   the position that Mr. Constantine acted not entirely

6   appropriately I guess in terms of GSF or Eufora.  But

7   Tommy Constantine does have a predilection to be evasive.

8           And what do I mean by that?  In paragraph 14 of

9   the indictment it reads:

10          It was further part of the scheme to defraud

11  that between November 2009 and December 2009, the

12  defendants Kenner and Constantine convinced John Doe 11,

13  and that's Nick Privitello by the way, to invest money in

14  Eufora in exchange for an ownership interest in the

15  company.

16          The defendant Constantine then unlawfully

17  diverted certain monies for unauthorized purposes,

18  including for his personal benefit and disavowed John Doe

19  11's -- Privitello's -- ownership interest in Eufora.

20          That is hands-down true.  Nick Privitello, as

21  the proof will show, gave Tommy Constantine $200,000 on a

22  clear and explicit promise from Tommy Constantine that he,

23  Nick Privitello, would receive an ownership interest in

24  Eufora.

25          There's going to be a tape recording that you

84

1   will hear and I expect the proof to show where Nick

2   Privitello secretly records a conversation with Tommy

3   Constantine where he says, in substance, Tommy, I gave you

4   $200,000.  Where's the proof of my ownership interest?

5   Now, I'm paraphrasing.

6           And when Tommy Constantine says on that tape in

7   substance I don't know what Kenner and Kaiser are telling

8   you, but they're the culprits.

9           Well, Nick Privitello knew that evasive answer

10  from Tommy Constantine was untruthful, but he let Tommy

11  talked.

12          The government charges --

13          MR. MISKIEWICZ:  Your Honor, I'm sorry to do

14  this.  May we approach?

15          THE COURT:  Yes.

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

Mr. Haley - Opening

85

1    (The following takes place at sidebar.)

2    MR. MISKIEWICZ:  We have made very careful

3    redactions of all these recordings to exclude any

4    references by one defendant shifting blame to the other

5    consistent with Bruton.

6    Mr. Haley has just introduced exactly what

7    Bruton forbids and it's not even going to come into

8    evidence.

9    I know I hear him promising the defendant's

10   going to take the stand, and maybe at the end of the day

11   that will solve a lot of these issues, but I mean he's

12   running so close once again to creating grounds for a

13   mistrial that I'm just -- I'm sorry for not being able to

14   articulate anything clear than that, but it's outrageous.

15   MR. LA RUSSO:  I move for a severance of my

16   client.  When we first brought this up to the Court --

17   THE COURT:  Let's take the lunch break.

18   MR. LA RUSSO:  Okay.

19   MR. HALEY:  I know your Honor will give me the

20   opportunity to respond.

21   THE COURT:  How much more do you have on your

22   opening?

23   MR. HALEY:  Probably 15 minutes, Judge. I'm

24   reaching the end.

25   THE COURT:  Okay.

86

1          (The following takes place in open court.)

2          THE COURT:  Members of the jury, it's 12:35.

3    This will take a few minutes, so it makes sense for you to

4    take your lunch break now and we will reconvene at 1:45.

5          Don't discuss the case.  Have a good lunch.

6          (The jury is excused.)

7          THE COURT:  Be seated.

8          Go ahead, Mr. LaRusso.

9          MR. LA RUSSO:  Your Honor, I make my application

10   for a severance on two grounds.

11         As the Court heard from Mr. Miskiewicz, the

12   information that was coming off of that tape regarding

13   comments that my client made where my client is unable to

14   cross-examine the individual and is being castigated for

15   comments that were made by another individual.

16         In addition, judge, more importantly I think is

17   the fact that I had moved for a severance because we felt

18   the evidence was going to clearly show that one position

19   taken by one defendant is diametrically opposed to the

20   position taken by another and that the jury, if they

21   believe one, necessarily will then have to convict the

22   other party.

23         I think what Mr. Haley has done it in three

24   aspects; where he talks about Eufora and my client's

25   misuse of money, where he talks about the misuse of the

1  credit cards and goes in depth as to what the evidence

2  will show from his point of view, we are taking the

3  diametrically opposed position that he has just laid out

4  to this jury.

5       In addition, your Honor --

6       THE COURT:  When you say diametrically opposed

7  position, what's your client's position with respect to

8  those credit lines?

9       MR. LA RUSSO:  It was absolutely no misuse,

10  judge.  No misuse whatsoever.

11       THE COURT:  That's not inconsistent.  The jury

12  can believe that Mr. Kenner had nothing to do with those

13  diversions, but also believe your position that there was

14  no misuse, right?  Those aren't diametrically opposed.

15  They're consistent with each other potentially.

16       MR. LA RUSSO:  I find it hard to believe that

17  where one person gets up and says he stole the money, and

18  my client says he didn't steal the money, that the

19  positions aren't diametrically opposed.

20       And I assume that Mr. Haley in good faith made

21  an opening remark that he thinks he can prove.

22       What I'm saying to the Court is that when the

23  jury hears Mr. Haley's alleged proof, it's going to

24  necessarily mean my client is responsible.  Then they hear

25  my client's proof and they're not going to find it.  It's

Mr. Haley - Opening

88

1    going to be the opposite dovetail against Mr. Kenner's

2    false accusations he's making against my client.

3           Judge, I don't know how I can in good conscience

4    at this point get a fair trial, and this is what's very

5    disturbing.

6           Mr. Haley, and to his credit, told me many

7    months ago that he's going to be a second prosecutor.

8           I'm listening to his final remarks and I thought

9    that was a prosecutor's opening and instead it's the

10   codefendant who is accusing my client in graphic detail of

11   misuse and theft that the jury has to find upon and make

12   decisions.

13          I don't know how my client can get a fair trial

14   under those circumstances.  More so, they now heard about

15   information they may never even hear that violates Bruton.

16          Judge, I don't know how far this is going to go.

17   There are other tapes which are clearly inadmissible where

18   Mr. Kenner may be a party to them where he implicates my

19   client in all kinds of thefts, misappropriations and that

20   would violate Bruton.

21          Judge, I think under these circumstances I renew

22   my application for a severance under the prejudicial

23   aspects.

24          THE COURT:  Mr. Miskiewicz.

25          MR. MISKIEWICZ:  On the issue of severance, we

89

1     again oppose.

2          The fact is Mr. Haley made representations and

3     promises about the defendant taking the stand and I assume

4     that he is going to -- I assume that what he's relating to

5     is what he intends his client is going to say on the stand

6     and that would not be a violation of Bruton because the

7     codefendant would have the opportunity, as the government

8     would, to cross-examine him.

9          There were other items though that are clearly

10    from our perspective hearsay, the references to the e-mail

11    in which again Mr. Kenner is allegedly updating victims.

12          I don't know what Mr. Kenner is going to say.  I

13    didn't object to that specifically but it sounds like he

14    is both mixing a lot of what he anticipates Mr. Kenner is

15    going to say with things that are frankly just going to be

16    inadmissible hearsay, including the Home Depot tape,

17    including other things.

18          And the reason I got up at the moment I did was

19    he is almost promising what one of our witnesses is going

20    to say and I want the Court to understand and I want the

21    record to reflect we do not intend to offer any of this

22    Brutonized testimony.

23          And to the extent he's offering that as hearsay

24    in violation of Bruton, it seemed like an appropriate

25    moment to object to his opening.

Mr. Haley  -  Opening

90

1        Once again, his opening is what it is.  It's his

2   words and that's it and they've already been instructed

3   that it's not evidence.

4        But for him to continuously promise things and

5   almost shift that to the government, as if the government

6   is going to produce these things, I felt at that

7   particular moment I had to say something and halt it.

8        Beyond that, what's occurred does not prejudice

9   any specific trial right of Mr. Constantine or anybody

10  else because the government is not the one who is throwing

11  these monkey wrenches in as far as promising things that

12  frankly I'm sure the Court will deal with while the trial

13  is going on when we object to the introduction of material

14  that is frankly hearsay.

15       THE COURT:  You are going to introduce the

16  redacted version of that tape; is that your intention?

17       MR. MISKIEWICZ:  Yes.

18       And we already prepared what the redactions

19  would be and there's no references to one.  It goes both

20  ways.  There are tapes in which Mr. Constantine blames

21  Kenner for everything and there are other tapes where it's

22  vice versa.  We have sanitized or Brutonized, if you will,

23  statements so we have relatively short clips that

24  constitute from our view admissions of the defendants and

25  that's it.

Mr. Haley  -  Opening

91

 1          THE COURT:  Okay.  Mr. Haley.

 2          MR. HALEY:  Your Honor, I'm not bound by Bruton.

 3          My obligation is to present what I believe to be

 4   a viable defense on behalf of my client, and that defense

 5   includes distancing himself from allegations of being a

 6   coconspirator with Tommy Constantine with reference to

 7   specific allegations in the indictment.

 8          If the government says there's going to be a

 9   Bruton issue, your Honor, and they don't introduce that

10   part of the tape that I believe is of assistance to my

11   defense, then I will move to introduce that part of the

12   tape.

13          I might say, judge, I did -- I don't have a

14   transcript -- but I did very early in this proceeding,

15   maybe my first appearance based upon my review of the

16   evidence that I had seen to date, alerted the Court,

17   alerted the government and alerted Mr. LaRusso that I

18   was -- it was going to be part and parcel of this defense

19   based upon the evidence that I saw that would be

20   antagonistic to the position by Mr. Constantine.

21          So that's my position, judge, although I don't

22   believe the answer is that the defendant Constantine --

23   excuse me -- I don't believe the answer is that the

24   defendant Kenner is thereby shackled because of Bruton

25   issues.  That's clearly not the case.

Mr. Haley  -  Opening

92

1          Thank you, judge.

2          MR. MISKIEWICZ:  May I reply just briefly, your

3     Honor?

4          THE COURT:  Yes.

5          MR. MISKIEWICZ:  I'm not suggesting he be

6     shackled, but I'm suggesting that the rules of evidence

7     will control and if it's hearsay your Honor will rule on

8     it.  But to promise things that are obvious hearsay as if

9     they're going to come in here is inappropriate and that

10    was the basis of my objection most recently at sidebar.

11         MR. HALEY:  May I be heard, judge?

12         The alleged hearsay is a tape recorded

13    conversation between Nick Privitello and Tommy Constantine

14    that discusses a specific allegation as set forth in the

15    indictment.  It's an admission of a defendant.  It's not

16    hearsay, judge.

17         THE COURT:  Okay.

18         I'm denying the application for severance for

19    two reasons.

20         The first is again, and I'll write a written

21    decision on this, the case law is clear that because two

22    defendants are finger pointing at each other and blaming

23    each other for misappropriation, diversion of money, does

24    not itself warrant severance.

25         In this case I continue to conclude that the

93

1    jury can believe at the same time that Mr. Kenner had

2    nothing to do with the diversion of funds and

3    Mr. Constantine who was taking those funds and using them

4    in various ways, but at the same time conclude based upon

5    the evidence in the case that he was permitted to use them

6    pursuant to the agreements that he had with the investors

7    in the way that apparently the documents or the evidence

8    and testimony is going to suggest that he utilized it.

9    They're not inherently inconsistent.

10           And the fact that one defense lawyer may be

11   pointing the finger at another defendant in an opening

12   statement is not a sufficient basis for a severance.

13           The Bruton issue is a bigger concern and I have

14   not confronted a situation where a defense lawyer on his

15   own decided that the redactions for Bruton purposes didn't

16   apply to him.

17           But I do believe based upon your opening

18   statement that Mr. Kenner is going to testify and the

19   Bruton issue is going to be cured by that, Mr. LaRusso.

20           If Mr. Kenner in fact testifies -- I don't

21   understand -- doesn't that fully protect your ability to

22   question Mr. Kenner to the extent Mr. Kenner is pointing

23   the finger at you, you'll get a chance to cross-examine to

24   see if he has any evidence of that.

25           MR. LA RUSSO:  If that's the case, judge, then I

94

1    do have the opportunity.  That's correct.  It's only the

2    out-of-court statement if the witness did not testify.  I

3    put my concern on the record.

4              THE COURT:  All right.

5              Mr. Haley, in the future, if you're going to

6    make reference to any statements that have been redacted,

7    I want you to advice both the court and the government

8    that you're going to do that.

9              Despite your view these are going to come in,

10   they may have a different view.  Maybe I think it's

11   hearsay and it's not supposed to come in, and by you

12   referencing it, even if your client testifies, if it's

13   hearsay and shouldn't come in, you're creating a problem

14   in a five week trial because you make a determination it's

15   not hearsay or it falls within one of the exceptions to

16   the hearsay rule.

17             As we move forward in the case, if the

18   government has redacted something because there's a Bruton

19   issue, before you make reference to it either in opening

20   statement or to a witness, you should ask the Court for

21   permission to do that because you're creating a potential

22   mistrial to the fact it's hearsay and if your client

23   testifies and I'll rule it's hearsay --

24             MR. HALEY:  Judge, I don't know specifically

25   what the Government is referring to.  I'm aware of a

95

1    specific conversation between Nick Privitello and Tommy

2    Constantine and I paraphrased how the recording begins.

3            THE COURT:  You're referring to a different

4    thing.  You made reference to an e-mail where your client

5    blames Mr. Constantine.

6            MR. HALEY:  Yes, sir.

7            THE COURT:  That sounds like hearsay to me.

8            MR. HALEY:  Your Honor, if my client testifies,

9    as he will, and if look we made that determination a long

10   time ago.  If my client testifies, as he will, as to what

11   he uncovered when he determined there were

12   misappropriation of the goods, funds, and then took an

13   effort to alert his clients as to his view of that

14   misappropriation by way of an e-mail, that's not hearsay,

15   judge.

16           THE COURT:  Maybe it is and maybe it isn't.  If

17   he sent that e-mail yesterday that would be a problem,

18   wouldn't it?  It depends on the timing of the e-mail, the

19   circumstance of the e-mail.

20           All I'm saying is if the government started

21   introducing things that creates a potential problem for

22   your client, I'm sure you would not be happy either.

23           Obviously there's two defendants.  We have to

24   make an effort to protect the rights of both defendants.

25   I'm not saying that you're not going to be able to

Mr. Haley - Opening

96

1    introduce a particular e-mail or recording.

2           All I'm saying is I think it's fairly obvious

3    when you have constitutional rights of two defendants

4    involved, that the government gives you a piece of

5    evidence that has been redacted for Bruton purposes or

6    there's some other piece of evidence that would

7    potentially be hearsay, that before you blurt it out in

8    front of the jury, that you ask the Court's permission for

9    a ruling so that either Mr. LaRusso or the government has

10   time to object.  Obviously it could turn out to be wrong.

11   We would have a big problem, okay?

12          MR. HALEY:  One final comment.  And thank you.

13   I didn't take anything out of context.  That particular

14   statement I read is indeed not taken out of context.  It's

15   part of the search warrant that's already on record.

16          And with all due respect to the Court, Judge,

17   and I like to try to defend my client, but I also like to

18   defend myself, your Honor.

19          This is an opening statement.  This is what I

20   anticipate in good faith in my opinion the proof will

21   show.  If I'm wrong on that, I don't believe I will, your

22   Honor will make a determination.  If it goes in, then it

23   goes in.  If it doesn't go in, then we create an issue on

24   appeal if there's a conviction, Judge.

25          THE COURT:  Let me make clear what my direction

1   to you is.

2        My direction to you is as follows:

3        If you're about to blurt out statements that

4   your client made in e-mails on tapes about Tommy

5   Constantine, I'm telling you I want you to raise it with

6   me first because you may turn out to be wrong.

7        It isn't that Mr. Haley says whatever he wants

8   to the jury about what the evidence will be, whether it's

9   hearsay, whether it's a Bruton problem and then if you

10  turn out to be wrong, we will do the trial over again.

11       Other people in the courtroom have an

12  opportunity to object.  I hold the government to the same

13  standard.  If they were to do something like that, they

14  would be in a lot of trouble.

15       That's all I'm saying.  If you are going to make

16  reference to something your client said in the past that

17  implicates Mr. Constantine, I want you to highlight it to

18  the Court so I can give everybody a chance to object and

19  maybe I'll rule that it's not coming in, okay?  That's all

20  I'm asking you to do.  I don't think that's asking a lot

21  of an attorney in a criminal case.

22       MR. HALEY:  It's not, Judge, and I simply say we

23  did.  That specific e-mail has been a topic of

24  conversation for a long time.  So it's not like that was

25  hidden.  That's the only one I referred to.  There are

Mr. Haley - Opening

98

1    multiple others.  That's the only one I referred to.

2            THE COURT:  I remember last week, if it's the

3    same e-mail I'm remembering, last week we had a discussion

4    about it and Mr. LaRusso said, judge, I'm concerned about

5    this e-mail.

6            And I think, if my memory is correct, and we can

7    have the Court Reporter pull up the transcript, I said

8    it's not clear to me that's not coming in.  That sounds

9    like it could be hearsay.  We're speculating as to what's

10   coming in.

11           That should give you some clue that potentially

12   your position it's not hearsay would not necessarily be

13   one that I would reach when I said on the record last week

14   it sounds like it may be hearsay.

15           In the future I want to make sure you understand

16   in any statements that he's referring to Mr. Constantine,

17   I want a chance to rule on it, okay?

18           Let's take the lunch break.  Try to get back at

19   1:45.

20           Thank you.

21           MR. MISKIEWICZ:  Thank you, your Honor.

22           (A lunch recess is taken.)

23           (Continued on next page.)

24

25

Opening - Haley

1          A F T E R N O O N   S E S S I O N

2          THE COURT:  Please be seated.  Okay, we're ready

3     for the jury?

4          MR. MISKIEWICZ:  Yes, your Honor.

5          MR. LA RUSSO:  Yes, your Honor.

6          MR. HALEY:  Okay, bring in the jury.

7          THE CLERK:  All rise.

8          (Whereupon, the jury entered the courtroom.)

9          THE COURT:  Everyone can be seated.  Okay, I

10    hope everybody had a good lunch.  We'll continue now with

11    Mr. Haley's opening statement.

12         MR. HALEY:  Thank you, judge.

13         I am almost finished.  If I may, ladies and

14    gentlemen, as relates to Eufora, another allegation in the

15    indictment read as follows:

16             It was further part of the scheme to defraud

17    that between December 2008 and May 2009 the defendant

18    Kenner convinced -- actually I'll substitute the John Doe,

19    Steve Rucchin, Bill Ranford to invest money in Eufora in

20    exchange for an ownership interest in the company.  The

21    defendant Kenner directed Timothy Gaarn, an individual

22    whose identity is known to the grand jury, to convert

23    certain money for unauthorized purposes, including for

24    Kenner and Constantine's personal benefit.

25             The proof that we submit to you at trial, ladies

Opening - Haley

1   and gentlemen, is that the relationship that Phil Kenner

2   had with Tim Gaarn was one that went back for some period

3   of time.  And the proof that we maintain you'll see at

4   trial is that there were various occasions where

5   Mr. Kenner loaned Tim Gaarn money, and in return, Tim

6   Gaarn loaned Phil Kenner money.  Tim Gaarn did have an

7   ownership interest in Eufora, and indeed when he sold his

8   ownership interest in Eufora and acquired investor money

9   for that, he did use that money which at that point in

10  time was his money to pay back some of the monies that he

11  received from Phil Kenner as a loan.

12          Now, the government has given a cooperation

13  agreement to Tim Gaarn.  We submit to you, ladies and

14  gentlemen, the proof will show Tim Gaarn committed no

15  crime either individually, Tim Gaarn committed no crime

16  collectively for Phil Kenner or any other person and

17  without saying more you'll have an opportunity to

18  scrutinize that sweetheart deal that the government made

19  with Tim Gaarn to determine whether or not it was an

20  invitation for Tim Gaarn to say what the government wanted

21  to hear.  But that will be your determination.

22          And I say whatever the government wanted to

23  hear, correct or not correct.

24          In that respect, you will hear evidence that

25  there was a lengthy telephone conversation recorded

1    between my client Phil Kenner and Tim Gaarn where Tim

2    Gaarn had full and fair opportunity because it was

3    secretly recorded to talk to Phil Kenner about the crimes

4    they allegedly committed together.  And he didn't take an

5    opportunity to question Phil about the crimes that they

6    committed together because they didn't commit crimes

7    together.  But that will be something that you can weigh

8    at the conclusion of the case with reference to the

9    quality of the government's proof.

10            And let me just say this, ladies and gentlemen,

11   when it comes to the quality of the government's proof,

12   there are any number of secretly recorded conversations

13   between Mr. Kenner and other individuals and they are

14   legal.  Whether or not they're deceptive or not you can

15   make that determination.  And what do I mean by that?  If

16   you have a dispute with an individual, the individual

17   calls you up, you're unaware that they're calling you up

18   and recording the conversation, so that they might perhaps

19   lull you into a sense of security, who knows, my point is

20   simply this, as the proof will show, neither of these

21   persons who secretly recorded the conversations with Phil

22   Kenner said something like look Phil you know that

23   dispute, I'd like to talk to you about it, I will record

24   the conversation and I will be the person that keeps that

25   recording in my sole and exclusive possession.  Under

1  those circumstances you might say you know, I really don't

2  want to have this conversation right now, because you're

3  being set up.  But you'll make that determination.

4         There is a final allegation in the indictment as

5  relates to scheme to defraud.  The government calls it Sag

6  Harbor the Led Better, I make you this promise, ladies and

7  gentlemen, I will address that allegation as my first

8  point in summation.  You've indulged me at this point in

9  time, given me a great bit of your time to listen to what

10  I had to say, and I'm conscious of that indulgence.

11         So let me simply say this, we believe that at

12  the conclusion of the evidence here and the credible proof

13  as you believe it to be, Phil Kenner committed no crimes

14  as relates to Sag Harbor and Led Better.

15         I make you this promise in conclusion, I will do

16  all that I can to elicit all the information through the

17  questioning of witnesses, as well as present evidence to

18  you through the tell of my own client and others so that

19  you will have an opportunity to make a determination on a

20  full set of facts as relates to whether or not the

21  government has proven its case beyond a reasonable doubt

22  in terms of the alleged crimes as set forth in the

23  indictment.  But I do have one request.  And it's really a

24  request consist at that point with his Honor's

25  instructions to you, and that's that you withhold judgment

Opening - La Russo

1   until this case is completely concluded, which conclusion

2   involves the testimony of the defendant and his witnesses.

3   Thanks for listening to me.

4           THE COURT:  Members of the jury, you will now

5   hear the opening statement by counsel for Mr. Constantine,

6   Mr. La Russo.

7           MR. LA RUSSO:  Thank you, your Honor.  Good

8   afternoon, ladies and gentlemen.  There's an old saying

9   that I'm sure we're all very familiar with, that no good

10  deed goes unpunished.  And this case, ladies and

11  gentlemen, is a perfect example of that.

12          My client is sitting at that table because he

13  made a terrible decision of trying to break up a fight

14  between two business associates whose names you've heard

15  during these opening remarks by both the government and

16  Mr. Haley, and those two business associates were Phil

17  Kenner, and Ken Jowdy, but he didn't just decide to do

18  this on his own voluntarily.  He was asked to help by both

19  of them.  They asked him to get involved, to see if he

20  could negotiate a settlement between them and to basically

21  try to stop two friends from gouging each other's eyes

22  out.

23          The evidence will show, ladies and gentlemen,

24  that Kenner had invested and/or lent Jowdy almost $25

25  million of his clients' money.  And Jowdy it seemed wasn't

Opening - La Russo

1    performing as he promised.  Wasn't willing or able to pay

2    it back after eight years.

3            Mr. Constantine was asked to find a solution

4    that he -- that they could both agree upon and he spent

5    almost 18 months trying to find the solution, and what he

6    got in return was that both of his colleagues eventually

7    turned on him.

8            Again the two of them and their associates,

9    Mr. Constantine was sued over ten times in three states,

10   over a five-year period.  By the way, each and every one

11   of these lawsuits except for one which is still pending

12   was dismissed and in some instances they were even ordered

13   to pay legal fees.  But when the lawsuits failed, with the

14   help of a certain former New York police officer,

15   Mr. Kaiser, and an investor, they took this failed civil

16   case of theirs and tried to make it criminal case.

17           Ladies and gentlemen, you will also hear that my

18   client actually cooperated with the government in many

19   aspects of this investigation, even disclosing a fraud

20   that took years for them to finally agree occurred, when

21   Mr. Gaarn came forward under his grant of immunity and

22   disclosed the fraud that he was involved in with the

23   codefendant Mr. Kenner.

24           Our evidence will show that certain information

25   that proves Mr. Constantine's innocence unfortunately was

1  withheld from the prosecutor by Agent Galioto, I'm not

2  saying deliberately, but my negligence and by his

3  willfulness in not wanting to see where the truth would

4  have taken him.  As a result, Mr. Constantine stands

5  there, sits there, has been wrongfully accused of a crime

6  and has been publicly humiliated, ladies and gentlemen,

7  makes no mistake, he's fighting for his life.

8          The evidence will show while Mr. Constantine was

9  trying to find a solution for his two colleagues,

10  Mr. Kenner and Mr. Jowdy, he uncovered what he then

11  believed to be some very disturbing information,

12  information that suggested that while Mr. Jowdy and

13  Mr. Kenner were pointing fingers at each other, as far as

14  Mr. Constantine was concerned, neither of them had clean

15  hands.  And when he brought these facts to light,

16  including the hockey players, their attorneys and even

17  certain law enforcement agencies, he instantly became an

18  enemy to both Kenner and Jowdy.  What happens?  Jowdy was

19  accusing Constantine and Jowdy and Constantine was

20  accusing Jowdy and Kenner and his associates.  It was

21  nothing short of a fiasco.

22          You will hear like Jowdy, Constantine also

23  worked with Kenner for many years.  And he himself had

24  done multi-million dollar transactions with Kenner.  And

25  by that point the evidence will show that Mr. Constantine

1    had accomplished a lot, you've heard a little bit about

2    this.  For example, Mr. Constantine founded an award

3    winning prepaid card company named Eufora, and actually

4    secured six United States patents.  But the evidence will

5    show made this company very valuable and very desirable,

6    unlike Jowdy and literally everyone else with Mr. Kenner,

7    everyone with which Mr. Kenner had invested for that

8    matter, my client produced results.

9          But when they both attacked Mr. Constantine,

10   everything positive that he had ever done was either

11   destroyed or twisted something bad.

12         Now, you heard during the government's opening

13   they said that my client spent hockey players' money, I

14   think that I have this right, hockey players' money

15   portraying himself as a race car driver and that he hired

16   Playboy models.

17         Ladies and gentlemen, my client was sponsored by

18   several household named publicly traded companies and he

19   raised millions of dollars per year and one of those

20   companies was Playboy Enterprise.

21         A Hawaiian deal that you heard about both by the

22   government and Mr. Haley, Kenner, as it turns out and in

23   spite of many representations to the contrary, he was not

24   working alone or dealing with his own money.  He had

25   investors, the hockey players, investors that

1    Mr. Constantine only much later learned, I emphasize much

2    later learned had lines of credit that were used to make

3    these investments with Kenner.  We're talking about

4    investors in lines of credit that Mr. Constantine wasn't

5    even made aware of until the litigation started many years

6    later.  And the evidence will show that.  As you start to

7    see through the witnesses and the documents that are

8    introduced, the timeline when these lines of credit again

9    will be clear to you and the evidence will also be clear

10   as to when my client finds out about it, many, many years

11   later.  Let me make it very clear, the evidence will show

12   that Mr. Constantine did not knowingly participate in any

13   way in the creation or use of these lines of credit.

14          My client actually had a former police officer,

15   I mentioned earlier, John Kaiser, and he was a person he

16   had never met before, one of the investors in the Hawaiian

17   deal, knocking on his door one day and telling him that he

18   had invested a great deal of money in and now owned a

19   significant percentage of this prepaid card company.  What

20   a surprise.

21          Money which he claimed came from his investment

22   in the Hawaiian deal.  Nevertheless Mr. Constantine was

23   the only one of several actual consultants with Mr. Kenner

24   who was paying, who he was paying Mr. Constantine at the

25   time, that actually, this was proven through the evidence,

1   successfully provided financing for the Hawaiian project.

2   That's client.  Financing which actually saved the project

3   at that time from being lost.  Financing which ultimately

4   led to a company some of you may have heard, Lehman

5   Brothers, later investing and which paid down the lines of

6   credit and even generated a return of the hockey players'

7   money, that's what my client did.

8           Incidentally, this initial financing also led to

9   Mr. Kaiser, and I emphasize this, being repaid nearly 100

10  percent of his investment.  And you will hear him testify

11  about the millions that he lost.  But when he testifies,

12  the evidence is going to show that during these

13  transactions he got back from that Lehman loan almost his

14  entire investment.  An investment which he now claims was

15  lost as he stands shoulder to shoulder with the hockey

16  players who did ultimately lose their investments.  That

17  ladies and gentlemen is what I call a hypocrite.

18          But let's talk about why the players actually

19  did lose their investments in their lines of credit.

20  You've heard a little bit about it.  I'll try not to be

21  too into depth to lose you, I'll try to make it simple at

22  how is will be presented.  The evidence will show that it

23  was not Mr. Constantine's consulting fees that he received

24  that depleted these lines of credit to the detriment of

25  the hockey players but, rather, it was the millions of

Opening - La Russo

1    dollars in loans made to Jowdy by Mr. Kenner which

2    remained unpaid and ultimately depleted these lines of

3    credit.

4         You may ask where is Mr. Jowdy in all of this.

5    Good question.  Mr. Jowdy has been seemingly very crafty

6    about avoiding that seat right next to my client.  You see

7    Mr. Constantine doesn't have a former director of the FBI

8    for 12 years as a close permanent friend and his attorney,

9    he doesn't have 10 retired FBI agents working security in

10   his business.  He also doesn't have the ability to hire

11   and currently employ the government's two star witnesses,

12   Mr. Brian Berard and Mr. John Kaiser as employees and pay

13   them a hundred thousand dollar a year salary both of whom

14   will be testifying later this week for the government.

15        You see, that is what Mr. Jowdy and his friends

16   from the FBI have been able to do.  They've been able to

17   deflect all the facts in this case and have somehow

18   miraculously avoided sitting here today by shifting the

19   blame.  All this despite the fact Jowdy, not Constantine,

20   actually not Mr. Kenner, that received almost $25 million

21   of the hockey players money, it is Jowdy that has not

22   accounted for any of this money to his investors,

23   purported victims in the case, and let alone provided a

24   penny in return on their investments except of course to

25   Kaiser and Berard in the form of a salary.

Opening - La Russo

1          In fact, the government will try to convince you

2     that Mr. Jowdy is also a victim of what is referred to and

3     you've heard it mentioned, the global settlement fund.

4     And that it was somehow used as a mechanism to defraud the

5     hockey players.

6          The evidence is going to show, ladies and

7     gentlemen, and you're going to hear it from the testimony

8     of multiple witnesses, that this fund was not solely

9     create for the lawsuit against Mr. Jowdy.  I emphasize

10    that.  There were multiple purposes.  It was created to

11    preserve certain aspects in witness players had invested

12    utilizing various methods to pursue and defend various

13    legal actions, including Mr. Jowdy for his wrongdoings,

14    and that all the funds were used for their disclosed and

15    intended purpose.

16          None of the investors, ladies and gentlemen, in

17    this fund complained about how these funds were used at

18    the time.  And the evidence will show that a number of the

19    investors were actually praising the results of various

20    actions unrelated to any legal action against Jowdy and

21    the evidence will prove that.  But the government hasn't

22    told you and what the evidence will show is that 14 of the

23    19 hockey players who participated in the fund are still

24    suing Jowdy today, from the government's case as victims.

25    Let me explain that for a moment.  Approximately 15 hockey

Opening - La Russo

1   players contributed between 300,000 and -- I'm sorry,

2   50,000 and 300,000, each into his so-called global

3   settlement fund, yet the evidence will show that many of

4   these hockey investors not listed as victims in the

5   indictment.

6          You will hear testimony from at least one of the

7   hockey players who was an investor who does not agree with

8   the government's characterization of Mr. Constantine or

9   the government's version of what happened with this fund,

10  and in fact believes Agent Galioto is protecting Jowdy.

11         Let me be clear on that point, ladies and

12  gentlemen.  The evidence will show that the government's

13  own victim did not agree with their case.  The evidence

14  through witness testimony and e-mails is going to show you

15  this:  Each participant, the hockey player investors, was

16  well aware of the multiple purposes of the global

17  settlement fund and approved the uses of the fund in

18  advance and in writing or by way of e-mails.  Each

19  participant was invited and most of these hockey players

20  actually participated in scheduled monthly conference

21  calls for regular updates from Mr. Constantine.  Each and

22  every participant in the fund was sent regular e-mails

23  detailing updates and aspects of the strategy for which

24  the global settlement fund was initiated for.

25         Now, you heard from Mr. Haley say that Tommy

Opening - La Russo

1    Constantine misappropriated funds from the global

2    settlement fund.  The evidence is going to show that in

3    several instances in which Mr. Constantine was

4    scrutinizing the use of the funds, for example, the

5    evidence will show that in one instance Mr. Kenner

6    submitted an expense report which totaled 30,000, and it

7    was Mr. Constantine that e-mailed Mr. Kenner and pointed

8    out that he had dinners and nightclubs on the expense

9    report and that this was inappropriate.

10            Ladies and gentlemen, let me make that clear.

11   My client was protecting Mr. Kenner's clients, the NHL

12   players, from their on advisor.  The evidence will show

13   that as a result of Mr. Constantine's securitization of

14   Mr. Kenner's proposed use of the funds, that expense

15   report was reduced by several thousand dollars as a direct

16   result of my client's integrity in the matter.

17            Another instance.  Mr. Kenner, as the evidence

18   will show, wired $100,000 from one of the hockey player

19   investors, his name is Mr. Ranford  from Mr. Ranford's

20   account into the global settlement fund.  And when

21   Mr. Constantine noticed the inbound wire and realized that

22   neither he nor Mr. Kenner had prior written authorization

23   from Mr. Ranford to use the money, as he had received from

24   each and every other money player investor who

25   contributed, he told him, stating the proposed use of the

Opening - La Russo

1   funds, it was my client, Mr. Constantine, who insisted

2   that Mr. Kenner actually send the money back to

3   Mr. Ranford which the evidence will show it did go back,

4   solely because my client's integrity and his involvement.

5   So Mr. Constantine was taking particular care to ensure

6   that if any money is coming into that global settlement

7   fund, the individuals have to follow the protocol and be

8   sure that they let individuals know -- that they let

9   Mr. Constantine know that they are unaware of what the

10  money is being used for.

11          You know, in these types of cases ladies and

12  gentlemen we often hear, and I'm sure you're familiar with

13  this phrase follow the evidence, follow the money.  But

14  the evidence will show that if the government followed

15  these two things in this case it would not be

16  Mr. Constantine sitting here and the government would have

17  a whole lot of support for its unreported victims.  Our

18  evidence will show that it was Jowdy's misappropriation of

19  funds and his failed golf projects which has resulted in

20  tens of millions of dollars of losses to the NHL players

21  and it is Jowdy and the friends and family that have bee

22  the primary beneficiaries of the 12 -- $25 million

23  investments lost by the NHL players, not Mr. Constantine.

24          But the government doesn't want you to know is

25  that 14 of the NHL hockey players that have invested with

Opening - La Russo

1    Mr. Jowdy, continue to sue Mr. Jowdy as we sit here under

2    the pretense that the global settlement fund was created

3    even after the government made it clear its allegations

4    against Mr. Kenner and Mr. Constantine, in other words,

5    they're not arguing merits of the lawsuits, per se, ladies

6    and gentlemen.  What we are saying is that if the players

7    are still suing Jowdy, how could the government claim my

8    client fraudulently induced the players to sue Jowdy when

9    they are still doing it on their own.

10                I told you a little bit about the background and

11   how my client got here.  Let me tell you why.

12                The evidence will also show that this case was

13   ultimately brought against my client primarily due to

14   certain misconduct, including the withholding and

15   misconstruing of certain evidence and facts by Agent

16   Galioto, specifically, that Agent Galioto has continually

17   shown bias and has blatantly disregarded facts that he

18   either well was aware of or should certainly have been

19   aware of.  After all, it is his job.  He is an agent in

20   the complex crime division of the FBI.  But it appears the

21   hockey players are right about him protecting Jowdy and he

22   seemingly has it in for Mr. Constantine.  For example,

23   ladies and gentlemen, the government made specific

24   allegations when they indicted my client and even went so

25   far as painting so-called victims such as Mr. Kaiser in a

115

1    positive light.

2         You will hear a lot of testimony about what will

3    be referred to as a $700,000 Eufora fraud.  But in respect

4    to that particular fraud which occurred in 2009, the

5    government's own evidence will show that Mr. Kaiser

6    himself received 70,300 of the alleged 700,000 fraudulent

7    proceeds.  But at Kenner's direction, Kaiser immediately

8    sent the money back to Kenner.  Thus, attempting to

9    cleanse Mr. Kaiser of any wrongdoing.  What the government

10   didn't mention or what the evidence will show is that

11   Mr. Kaiser received an additional $105,000 of the $700,000

12   proceeds, which he kept.  And let me be clear ladies and

13   gentlemen, Mr. Constantine who at the time believed

14   wholeheartedly that a fraud had been committed was the

15   whistle-blower for this particular alleged fraud.

16        So when you hear of this $700,000 fraud, there's

17   a conspiracy ongoing and you will hear that from the

18   government's own case.  But what will the fraud actually

19   show you?  I don't believe anyone told you that what the

20   evidence will show, but that Kenner received from that

21   over $300,000.

22        The government witness, an admitted

23   co-conspirator Tim Gaarn, who, by the way, was granted

24   immunity as you know and is not facing criminal charges,

25   he received 60 for his end.  The government witness and

1   so-called victim John Kaiser he got the total 105 of the

2   175, and then he returned some of it.  And then there's

3   another government witness you're going to hear about,

4   Mr. CR Gentry, he was the former CEO of Eufora.  He

5   testified and quite a tale he spins.  A man

6   Mr. Constantine fired for this reason, because he himself

7   was involved in the fraud on Eufora.  And he was the one

8   that made it all happen.  All of this while

9   Mr. Constantine -- he did receive money -- two $500

10  payments directly and indirectly 20,000 which the evidence

11  will show was money owed to him by Mr. Kenner, not

12  diverted funds, but money owed by Mr. Kenner, without any

13  knowledge of the source of the funds.

14         Ladies and gentlemen, the evidence is also going

15  to show that my client was not really involved in an

16  elaborate criminal conspiracies you've been hearing.  He

17  was not in this with Mr. Kenner to steal millions of

18  dollars since 2002 as alleged.  The evidence will show

19  there was no big payday for Mr. Constantine from that

20  $700,000, certainly not the level the government alleges,

21  which would make him the number two in the scheme in the

22  waterfall money, the evidence will show that he did not

23  get nearly as much as Kaiser or Gaarn, as a matter of fact

24  the evidence will show that even former New York Islander

25  Michael Peca got $45,000 of it.

1          Let me give a little more information just to

2     you understand and to illustrate why my client had nothing

3     with this alleged scheme.  The evidence will show, and I

4     hope that I can simply present it to you as to the basis

5     of this $700,000 fraud.  The evidence will show that this

6     transaction actually started with a $250,000 investment in

7     2002 which was made by an investor, another hockey players

8     into Mr. Jowdy's Mexican development.

9          Now, the records will show that this money was

10    then transpired from Mr. Constantine's prepaid card

11    company by Mr. Jowdy.  At this point, ladies and

12    gentlemen, my client actually had unrestricted access to

13    this money as the company's CEO and could have paid him a

14    salary and taken it all, but you're going to find out he

15    didn't do.  Instead, and the records will show, that

16    Mr. Constantine in fact didn't take a penny of it at that

17    time.  But the government and apparently Mr. Haley would

18    like you to believe that he waited seven years as part of

19    this alleged conspiracy to receive two $500 payments and

20    the indirect payment that I mentioned earlier that

21    Mr. Kenner was obligated to pay on Mr. Constantine's

22    behalf.

23          The government is also alleging, ladies and

24    gentlemen, that Mr. Constantine unlawfully diverted, and I

25    know you probably don't remember this being spoken about,

1   $200,000 investment made by a man by the name of

2   Mr. Privitello, which was intended for Mr. Constantine's

3   prepaid card company, specifically that he unlawfully

4   diverted Mr. Privitello's money to another company of

5   Mr. Constantine's name, a company called AC Falcon, which

6   is unrelated to Eufora.  The government actually seized a

7   private jet which in fact belongs to one of the victims in

8   this case, who is our witness Serge Gonchar, he's actually

9   playing for Montreal in the playoffs right now.  As we

10  began scrutinizing the government's evidence, they moved

11  the goalpost, they moved the goalpost.

12        What does that mean?  They alleged something

13  different here.  For example, they allege that

14  Mr. Privitello was not given his shares in the company,

15  but the evidence will show, however, that Mr. Privitello

16  neither asked for his shares nor his money back over a 10

17  month period because -- and this the evidence will be

18  clear on he was secretly working behind the scenes with

19  Mr. Kenner and his associates to attempt a hostile

20  takeover of Mr. Constantine's company.  And Mr. Privitello

21  ignored repeated attempts by Mr. Constantine on behalf of

22  Eufora to accept a return on his investment in full.  It

23  was part and parcel of a group that was trying to take

24  over the company.  But the facts will show that this was

25  yet another instance where Agent Galioto either withheld

Opening - La Russo

1    or misconstrued the evidence which shows my client did

2    nothing wrong.  Ladies and gentlemen, the evidence will

3    show that Agent Galioto, I didn't understand this when we

4    first talked about it but I understand it now, ready,

5    fire, aimed, not ready, aimed and fired.  Regardless,

6    Mr. Constantine was indicted for this without the

7    government so much as looking at the very bank statements

8    they subpoenaed in this case to see if these wires were

9    even accurate, which the evidence will show was not.

10           Now, I'd like to also address something

11   Mr. Haley mentioned about Eufora my client's bankruptcy,

12   this is easy.  All the transactions Mr. Haley lists where

13   client sold his stock that occurred in 2008.

14   Mr. Constantine filed bankruptcy in 2012.  And when he

15   filed bankruptcy in 2012 he, in fact, did not own any of

16   Eufora.  And my client never stated that he at no point in

17   time owned a stake in Eufora.  That's fiction presented by

18   Mr. Haley.  The evidence will show my client simply stated

19   that at the time he filed bankruptcy he did not own any

20   shares, the truth.

21           Plain and simple, ladies and gentlemen, the

22   government, certainly Mr. Haley are wrong about this whole

23   case.  But rather than acknowledge my client has been

24   wrongfully accused they have chosen to pivot their

25   theories to something entirely new, as we say to move the

120

1    goalposts.  For example, it would be like saying it's

2    illegal to wear a red tie, I'm not wearing a red tie, well

3    then it's illegal to wear a green tie, I'm not wearing a

4    green tie, then it's illegal to wear whatever color tie

5    you're wearing.  They've moved the goalposts as they've

6    proven their facts are incorrect and false.

7            Ladies and gentlemen, the evidence is going to

8    show that they didn't get it wrong just once, you may

9    recall Mr. Haley claiming that Mr. Constantine unlawfully

10   used the proceeds from the sale of his Eufora shares.

11   Well, he's wrong again.  The evidence will show, and again

12   I repeat this multiple witnesses will testify, that it was

13   not stock which was owned by the company that was being

14   sold.  But rather, stock in the company which was owned by

15   Mr. Constantine, a very significant distinction.

16           In other words, if you own a hundred shares of

17   Apple stock and you decided to sell it, you should not be

18   indicted for not giving the proceeds of that sale to

19   Apple.  That's your stock to sell, and your money to spend

20   as you see fit.

21           (Continued on next page.)

22

23

24

25

Mr. LaRusso  -  Opening

1          MR. LA RUSSO:  The government is going to spend,

2     I imagine, a great deal of time and energy showing you how

3     my client spent his money.  But the evidence will show it

4     was his stock to sell and his money to spend, not the

5     company's.

6          Ladies and gentlemen, the evidence will clearly

7     show that this is a fundamentally flawed indictment.  By

8     the moving of the goalpost, the prosecution can only go so

9     far.

10          And during this trial the government will paint

11     Mr. Constantine with very broad strokes, generalities,

12     flawed allegations, and most importantly with less than

13     all the facts.

14          You know not surprisingly when you consider the

15     sources of the information of primarily unindicted

16     coconspirators are people on Jowdy's payroll.

17          Ladies and gentlemen, what the evidence will

18     show is that the ones that are pointing the finger at the

19     so-called bad guys, are in fact the bad guys.

20          But we will show you the truth with credible

21     witnesses that have not broken the law, cut deals with the

22     government or received any of the fraudulent proceeds and

23     we will do it in the finest detail under the hard evidence

24     to prove what is really going on here.

25          Ladies and gentlemen, you heard the Judge say

122

1    it.  The bottom line here is that the government carries

2    the burden of proof beyond a reasonable doubt that my

3    client knowingly and intentionally participated in these

4    alleged schemes and the fact is and the evidence will show

5    that he did not do such a thing.  In fact, quite the

6    opposite.

7           The evidence will show that Mr. Constantine did

8    everything in his power to preserve the people's

9    investment and the moment he was made aware of what he

10   believed was any wrongdoing, he disassociated himself from

11   those he then believed were responsible and bought it to

12   the attention of the investors and law enforcement.

13          Thank you.

14          THE COURT:  Members of the jury, that completes

15   the opening statements.

16          The government will now begin its presentation

17   of its evidence.  I'll ask them to call their first

18   witness.

19          MR. MISKIEWICZ:  The government calls Joe

20   Juneau.

21          THE COURT:  Please come up to the witness stand

22   over here and remain standing once you get there for the

23   oath.

24

25

123

1   JOE JUNEAU,

2            called as a witness, having been first

3            duly sworn, was examined and testified

4            as follows:

5

6            THE COURT:  Be seated.

7            Please state your name and spell it for the

8   record.

9            THE WITNESS:  First name Joe, last name Juneau,

10  J-U-N-E-A-U.

11           THE COURT:  Keep your voice up so we can all

12  hear you and stay close to the mike.

13           Mr. Miskiewicz.

14           MR. MISKIEWICZ:  Thank you, your Honor.

15

16  DIRECT EXAMINATION

17  BY MR. MISKIEWICZ:

18  Q.   Good afternoon, sir.

19           Mr. Juneau, what do you currently do for a

20  living?

21  A.   For the past nine years I work as director and

22  coordinator of a youth development program.

23  Q.   A youth development program in what capacity?

24           What do you do for that youth development

25  program?

124

1    A.    Pretty much using my experience and background in ice

2    hockey.

3    Q.    What kinds of kids do you work with?

4    A.    It's Inwood kids.  Where I work is the north region

5    of the province of Quebec, so it's 14 Inwood communities

6    all separated and just developing this youth program for

7    these kids that don't have much.

8    Q.    Prior to doing that, did you -- how long have you

9    been doing that?

10   A.    Nine years.

11   Q.    Prior to that, what have you done for a living?

12   A.    I played professional hockey for 13 seasons in the

13   NHL.

14   Q.    Okay.

15          When did you first join any team in professional

16   hockey, what year?

17   A.    It was in February '92.

18   Q.    And did you come out of some other league or did you

19   go to college prior to that?

20   A.    I went to college in the U.S.

21          I went to RPI from '87 to '91.

22          And following my college years I went to play

23   for the Canadian Olympic team and ended up playing at the

24   Olympics in '92 for France.

25   Q.    How did that work out?

125

1   A.   Pretty good.  It's so far my best experience in

2   hockey by far.

3   Q.   Did you win a metal?

4   A.   Yes, we did.

5        We got the silver metal.

6   Q.   You said you went to school in RPI.

7        Is that Rensselaer Polytechnic Institute?

8   A.   Yes, it is.

9   Q.   Is that in upstate New York?

10  A.   Troy, New York.

11  Q.   Do you have a degree from that school?

12  A.   Yes, I do.

13  Q.   A degree in what?

14  A.   Aeronautical engineering.

15  Q.   When you were at RPI, did you commute to the campus

16  or did you live on campus?

17  A.   As a freshman and sophomore we had to live on campus.

18  Q.   You lived in a dorm?

19  A.   Yes.

20  Q.   Do you know one of the defendants in this case

21  Phillip Kenner?

22  A.   Yes, I do.

23  Q.   How do you know him?

24  A.   Well, we came together at RPI as freshmen.

25  Q.   Were you roommates in the dorm?

126

1   A.   We did live in the same dorm the first year, and the

2   second year we lived in the same apartment.

3   Q.   How would you describe your relationship with

4   Mr. Kenner at that time?

5        Were you just passing acquaintances or friends

6   or social friends?

7   A.   Well, teammates and we became friends obviously.

8   Q.   You played hockey for RPI?

9   A.   Yes.

10  Q.   That was before you joined team Canada in the

11  Olympics?

12  A.   Yes.

13  Q.   After you graduated from RPI, and after the Olympics,

14  did you sign onto a professional hockey team with the NHL?

15  A.   Yeah.

16       I ended up signing my first professional

17  contract a few weeks following the Olympics.

18  Q.   Who did you play for?

19  A.   The Boston Bruins.

20  Q.   So you moved to Boston?

21  A.   Yes.

22  Q.   Between the time you left RPI and the time that you

23  joined the Boston Bruins, had you maintained contact with

24  the defendant Mr. Kenner?

25  A.   A little bit.

127

1          From what I remember it was not easy, it was

2     hard.  I was traveling a lot all over the world, training

3     very hard in Calgary and it was before all of the cell

4     phones and e-mails and all that stuff.

5     Q.   Just for the record, did you sign on with the Boston

6     Bruins in approximately 1993?

7     A.   I signed with Boston in I think it was in early March

8     if I'm right.  I'm pretty sure I started playing in March

9     '92, so that would be like about a week after the

10    Olympics.

11    Q.   Okay.

12         When you moved down to Boston and began playing,

13    did u reacquaint yourself with Mr. Kenner?

14    A.   Yes, at some point.

15         I forgot how it actually happened at first, but

16    yes we did.

17    Q.   Do you know what he was doing in Boston?

18    A.   He was not in Boston.

19         I think he was actually working and living in

20    Florida.

21    Q.   Do you know what he was doing for a living?

22    A.   Not really.

23         My understanding is he was at Arthur Anderson

24    and working what he studied in at RPI.

25    Q.   When you say Arthur Anderson, you mean the accounting

128

1    firm?

2    A.    I guess.

3    Q.    Did there ever come a time that you invited him to

4    help you in some manner?

5    A.    Well, yeah.  I guess we cut a deal a few times and it

6    was good to see each other again.

7             And then what happened is it was the first time

8    of my life I was starting making important money, income,

9    and I felt very uncomfortable and not knowledgeable in

10   doing the proper things with investments and stuff.

11   Q.    You said you got a degree, but you didn't get a

12   degree in any sort of financial field, correct?

13   A.    Not at all.

14   Q.    You didn't feel comfortable in terms of your own

15   financial knowledge as to how to do or what to do with the

16   money that you were earning at that stage?

17   A.    That's it.

18   Q.    So what, if anything, did you propose to Mr. Kenner?

19   A.    I had met people in Boston in my first year playing

20   there and I came about knowing this individual who worked

21   for a firm there and after a discussion, finding out that

22   they would be interested to start some kind of a business,

23   so I proposed to show Kenner back then if he would be

24   interested in something like that, that I could introduce

25   him to these people and see if things would work out.

129

1   Q.   Do you remember the name of the company?

2   A.   I think it was Boston Capital.

3   Q.   And the person you spoke to, was that the CEO of

4   Boston Capital?

5   A.   Eventually.  But the first person I spoke to was

6   Derek Sanderson.

7   Q.   Who is Derek Sanderson?

8   A.   He was the play-by-play for the Boston Bruins and was

9   also a representative of Boston Capital.

10  Q.   Is he a former NHL player?

11  A.   Yes.

12  Q.   From before or during the time you were playing?

13  A.   Before my time.

14  Q.   So do you know whether or not Mr. Kenner ever joined

15  Boston Capital?

16  A.   Yes, he did.

17       I introduced him to these people and they

18  connected pretty good and eventually started.

19  Q.   Did there ever come a time that you used Mr. Kenner

20  or Boston Capital to help guide you with respect to your

21  financial investments?

22  A.   Yes.

23       That was one of my points, giving him an

24  opportunity to find something that he would be interested

25  in doing.  It was obviously good as far as my interest.  I

130

1    just wanted to have someone helping me out, advising me

2    with the right things in respect to financial.

3    Q.    Did Mr. Kenner become your financial advisor at that

4    point?

5    A.    Yes.

6    Q.    Again, what year are we talking about?

7    A.    I think when all this was finally in place, if I'm

8    right, I think it started in the summer of '94 maybe.

9    Q.    How long did Mr. Kenner remain your financial

10   advisor?

11   A.    Until 2007, 2008 is like when we really disconnected

12   for good.

13   Q.    Did there come a time that you fired him essentially

14   as your financial advisor?

15   A.    Not by writing a letter or by him announcing.  That

16   was not my approach at all.

17   Q.    What was your approach?

18   A.    Well, it became a time where I was put into a

19   different chance of investment or private deals.

20           It was towards the end of my career and became

21   very uncomfortable with things and then it was very hard

22   for me to actually contact.  Besides e-mails it became

23   impossible to speak.  He never returned calls and stuff.

24           And so eventually it became evident that a lot

25   of money that I had invested towards the end of my hockey

131

1     career was lost in a way I guess.

2     Q.    During this period of time you say you were unable to

3     reach him, were you still friends?

4           In other words, social friends not business

5     partners, but friends?

6     A.    Well, there were times when an individual gains your

7     friendship and trust and you can't say in a short period

8     of time that this individual is not your friend anymore.

9           So, yeah, I can't say that it was one day, okay,

10    you're not my friend anymore.

11    Q.    Mr. Juneau, were you at Mr. Kenner's wedding?

12    A.    Yes, I was.

13    Q.    Who was the best man?

14    A.    I was.

15          We were pretty close.

16    Q.    Was he at your wedding?

17    A.    Yeah.

18    Q.    Who was your best man?

19    A.    He was.

20    Q.    At the time that you began investing through Boston

21    Capital and using Mr. Kenner as your financial advisor,

22    can you describe for the members of the jury what kind of

23    investments or stock portfolio did you invest with

24    Mr. Kenner's help?

25    A.    Well, what I wanted was to play my career and making

132

```
 1    money that was going to be invested in a smart way.

 2             So knowing your career can be short, depending

 3    how things go, injuries or whatever, I just wanted to be

 4    safe with whatever was going to happen.

 5             And so it was a mix of something like a

 6    percentage that was safer and a percentage that was a

 7    little more at risk.  But overall it was something

 8    pretty -- it was designed to be pretty safe so at the end

 9    of my career I could -- you retire at 35.  In my case I

10    ended up retiring at 36, so it's still a long way to go in

11    life.

12    Q.   Is it fair to say that your investments were

13    principally stocks and bonds and things like that?

14    A.   That's it, yeah.

15    Q.   And did there come a time that Mr. Kenner moved to a

16    different investment company?

17    A.   Yes, he did.  A few times over the years.

18    Q.   Did he move to a company called State Street

19    Investment?

20    A.   Yeah.  I'm not sure of the sequence.  I think it was

21    from Boston Capital to State Street and then to I think it

22    was Freedom Capital and then to Assante, and then

23    essentially to what the business that he started on his

24    own.

25    Q.   What was the name of the business that he started on
```

133

1   his own?

2   A.   I think it was called standard advisors.

3   Q.   When he moved from these various places, did you

4   remain with him?

5   A.   Yeah.

6   Q.   He continued to be your financial advisor?

7   A.   Yes, he did.

8   Q.   Do you recall approximately when he and you began a

9   relationship in a company called Standard Advisors?

10       When did he become your financial advisor at

11  this company?

12  A.   When Standard Advisors became?

13  Q.   Approximately?

14  A.   I think it was 2002 at some point.

15       MR. MISKIEWICZ:  Your Honor, may I approach the

16  witness?

17       THE COURT:  Yes.

18       The lawyers don't need to ask to approach the

19  witness, okay?

20       MR. MISKIEWICZ:  Thank you very much, your

21  Honor.

22       (Exhibit handed.)

23  BY MR. MISKIEWICZ:

24  Q.   Sir, I'm showing you what has been marked for

25  identification as Government's Exhibit 6016.

134

1      I would like you to take a moment and look at

2  that and eventually turn to the signature pages and just

3  wait for my next question.

4           (Pause in proceedings.)

5      Sir, have you had a chance to look at the

6  signature pages which I think is indicated here to be page

7  5 of this document?

8  A.   Yeah.

9  Q.   Does that appear to be your signature?  I realize

10  it's a copy.  Is that your signature?

11  A.   It appears to be, yes.

12  Q.   Do you recall signing a document like this?

13  A.   I can't say that I recall signing this one.  I mean

14  it's possible but...

15  Q.   Do you recall entering into any agreement with

16  Mr. Kenner and his company Standard Advisors to pay a fee

17  in exchange for the financial advisory services he was

18  providing?

19  A.   From the get-go I do remember.

20      Obviously when we did set up at Boston Capital

21  over the years they were moving to State Street and moving

22  on to the other one.  It was always presented as a better

23  place to be, a better percentage and all that stuff so I

24  just went along with it.

25  Q.   My question is, did you agree to pay Mr. Kenner a fee

Juneau  -  Direct/Miskiewicz

135

1  in exchange for his financial advice at some point?

2  A.   For me it was signing to be linked to a financial

3  bank.  There's a few for that, yeah.

4  Q.   Is this one of those agreements that you signed with

5  Standard Advisors and agreed to basically pay Mr. Kenner a

6  fee of some kind based on his consulting work for you?

7  A.   Well, my understanding at the time was that there was

8  no difference.  I was just signing with a different

9  company for the same kind of deal that again was presented

10  to me as a better place for me to have my investments.

11  Q.   Okay.

12       So is that one of the agreements?

13  A.   It looks like it.

14       MR. MISKIEWICZ:  The government moves for the

15  admission of exhibit 6016.

16       THE COURT:  Any objection?

17       MR. HALEY:  No, sir.

18       MR. LA RUSSO:  No, your Honor.

19       THE COURT:  Government's Exhibit 6016 is

20  admitted.

21       (Government Exhibit 6016 in evidence.)

22  BY MR. MISKIEWICZ:

23  Q.   And would you just look at the first paragraph.

24       When does this agreement become effective?

25  There's some handwriting in there, do you see that?

136

1    A.    It says April 2003.

2    Q.    Does that agree with your recollection about when he

3    went over to Standard Advisors?

4    A.    Yeah.  I guess, yeah.

5    Q.    Now --

6            THE COURT:  Is this a good point to take a

7    break?

8            MR. MISKIEWICZ:  Sure.

9            THE COURT:  Let's take our afternoon break.

10   Don't discuss the case.

11           (The jury is excused.)

12           (Recess taken.)

13           (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Juneau - Direct/Miskiewicz

137

1             (Following a recess.)

2

3             THE COURT:  Please be seated.

4             We are bringing in the jury.

5             THE CLERK:  All rise.

6             (Jury enters the courtroom.)

7             THE COURT:  Please be seated.

8             Go ahead, Mr. Miskiewicz.

9  BY MR. MISKIEWICZ:

10 Q.   Mr. Juneau, did there ever come a time that

11 Mr. Kenner told you about an investment opportunity in

12 land in the state of Hawaii?

13 A.   Yes.

14 Q.   Was that when he was now running his own company

15 called Standard Advisors?

16 A.   It was around that time, but I can't say for sure.

17 Q.   Did there ever come a time that you had agreed to

18 make a loan of some kind to assist in that developed

19 project?

20 A.   If I wanted to?

21 Q.   Yes.

22 A.   No.

23 Q.   Okay.

24             Did there come a time that you eventually did

25 make a loan?

Juneau - Direct/Miskiewicz

138

1  A.   Yeah, I guess I was told eventually that I was part

2  of it.

3        It was presented to me after I was already in

4  too many other private deals and by that time I was

5  already -- I think it was over $3.6 million invested in

6  different deals and I had no interest, not that I had in

7  the beginning, but...

8  Q.   Well, who convinced you to invest in Hawaii?

9  A.   Nobody convinced me 'cause, again, you know, it's --

10  I never wanted to be in these kind of deals.

11        So I ended up --

12  Q.   But who talked to you about the deal?

13  A.   It was Phil Kenner.

14  Q.   Did anybody else other than Mr. Kenner discuss land

15  development in Hawaii at this time, roughly in 2003, when

16  he was over at Standard Advisors?

17  A.   No.

18  Q.   Did a man by the name of Ken Jowdy propose to you to

19  make a loan to him for the development of property in

20  Hawaii?

21  A.   No.

22  Q.   What about a man by the name of John Kaiser, you ever

23  hear of a man by the name of John Kaiser?

24  A.   Well, in the paper recently, but that was about it.

25  Q.   Did there come a time that you -- or do you recall

Juneau - Direct/Miskiewicz

139

1   that there was a line of credit through a bank known as

2   Northern Trust that you had agreed to?

3   A.   Something came up, I think it was in sometime in

4   2006, around that time --

5   Q.   Well --

6   A.   -- asking -- yeah.

7   Q.   You are not sure?

8   A.   Well, it was around that time and it was about

9   signing for a renewal or whatever it was called for a line

10  of credit.

11  Q.   Do you remember when the original line of credit

12  document was signed?

13  A.   No.

14  Q.   I'm showing you what's been marked for identification

15  as Government Exhibit 2152.

16          Mr. Juneau, would you please look at

17  Government Exhibit No. 2152 and would you turn to the last

18  page.

19          (There was a pause in the proceedings.)

20  BY MR. MISKIEWICZ:

21  Q.   Mr. Juneau, any of the signatures on the last page

22  appear to be yours?

23  A.   Yeah, the top one is pretty similar to my signature,

24  could be mine.

25  Q.   Okay.

Juneau - Direct/Miskiewicz

140

1      What is the date that's indicated there, or

2  maybe it's on the first page?

3  A.   There's no date there --

4  Q.   The very top?

5  A.   December 18, 2003.

6  Q.   Was that about the time that you recall first

7  agreeing to open up a line of credit?

8  A.   No.

9      Again, I don't, I don't recall opening a line of

10  credit.  It's possible I did, but I do not remember

11  that --

12  Q.   Okay.

13  A.   -- whatsoever.

14  Q.   So during this period of time when you were with

15  Mr. Kenner, using Mr. Kenner as your financial advisor,

16  how frequently would you see each other face to face?

17  A.   Well, at first kind of often considering that I was

18  pretty busy playing professional hockey and that he was

19  also busy starting up his career in that business.

20  Q.   How often is often?

21      Is it once a week?  Once a day?  Once a month?

22  A.   I would say maybe once every three or four months,

23  maybe shorter than that.

24      And, yeah, he would come and visit, you know, as

25  a friend, but as a client, visited me as a client, and at

Juneau - Direct/Miskiewicz

141

1    that time trying to meet some of my teammates as potential

2    clients.

3    Q.    You were living in a different city than he was

4    living.

5         Correct?

6    A.    Yes.

7    Q.    And you were also traveling on the road playing for

8    the NHL for different teams, correct?

9    A.    Well, yeah.

10        I played for Boston two years, then went on to

11   play for Washington five years and shortly in Buffalo for

12   three months and then Ottawa one year, Phoenix one year

13   and Montreal for three years.

14   Q.    On or about the date that's indicated there, the year

15   anyway, 2003, who were you playing for?

16   A.    Montreal.

17   Q.    And at about that time were you still social friends

18   with Mr. Kenner?

19   A.    Yes.

20   Q.    Did you and your family visit him at his house?

21   A.    Well, no, we had no time.

22        We did visit him when I retired for

23   Christmastime, it was December 2004.

24   Q.    During the time that you were playing and he was your

25   financial advisor, did he ever ask you to sign documents

Juneau - Direct/Miskiewicz

142

1    as part of his work for you as a financial advisor?

2    A.   Yeah, at times for sure, yeah.

3    Q.   And would you see the whole document or would you see

4    portions of the document?

5              MR. HALEY:  Judge, I would object to the leading

6    nature -- I object.

7              THE COURT:  Overruled.

8              He can answer.

9              THE WITNESS:  Do I answer?

10             THE COURT:  Yes.

11   A.   Many times it was through a fax, it was seeing only

12   the page that I had to sign.

13             It was very rare that I would get to see an

14   entire document about something that was presented during

15   that period of time.

16   Q.   Now, Mr. Juneau, did you ever begin to ask questions

17   about a line of credit or loans to Hawaii that you may

18   have made?

19             In other words, would you ever ask questions

20   specially to Mr. Kenner?

21   A.   Well, yeah.

22             I did ask questions.

23   Q.   Okay.

24   A.   I asked questions about many different deals that I

25   was put in since it's not like I was getting a monthly

143

1    paper saying this is what's happening in this place, this

2    place and this place.

3            So...

4    Q.   Well, Mr. Juneau, did Mr. Kenner send you any kind of

5    statement of where your investments were on a monthly

6    basis?

7    A.   No, no.

8            When I got the information it was mostly through

9    quick e-mails and when we got to see each other spend a

10   little bit of time with each other or spoke on the phones.

11   Q.   Did you preserve e-mails that you sent or received

12   from Mr. Kenner during this period of time?

13   A.   Yeah.

14           I do it with -- pretty much with everybody that

15   I communicate with.

16   Q.   I'm going to show you what's been marked for

17   identification as Government Exhibit 728.

18           (There was a pause in the proceedings.)

19   BY MR. MISKIEWICZ:

20   Q.   Showing you what's been marked for identification as

21   Exhibit 728, would you just look at that for a moment,

22   Mr. Juneau.

23   A.   Okay.

24   Q.   Do you recognize what I just put in front of you?

25   A.   Yes, I do.

Juneau - Direct/Miskiewicz

144

1    Q.    What do you recognize it to be?

2    A.    Well, it's an e-mail exchange between Phil Kenner and

3    myself.

4    Q.    Is this one of the e-mails that you preserved some

5    period of time ago?

6    A.    Yes.

7              MR. MISKIEWICZ:  The government offers in

8    evidence Exhibit 728.

9              MR. HALEY:  No objection, your Honor.

10             MR. LARUSSO:  No objection, your Honor.

11             THE COURT:  728 is admitted.

12             (Whereupon, Government Exhibit 728 was received

13   in evidence, as of this date.)

14   BY MR. MISKIEWICZ:

15   Q.   Mr. Juneau, I'm going to zoom in on one part of the

16   exhibit.

17             THE COURT:  Is it on your screen in the witness

18   box?

19             THE WITNESS:  No.

20             (The above-mentioned exhibit was published to

21   the jury.)

22   BY MR. MISKIEWICZ:

23   Q.   Mr. Juneau, I'm going to focus you on the third page

24   of the document.

25             Is this part of your e-mail to Mr. Kenner?

145

1    A.    Yes.

2    Q.    Can you explain what you are trying -- what kind of

3    information are you trying to get from him in this e-mail?

4    A.    I was trying to find out from all the different

5    investments that he told me I was in.

6              So that was my questions about the Hawaii

7    project which I was informed through a discussion I guess

8    that I was in for $100,000.

9    Q.    And when you say you were informed, as you sit here

10   today, do you remember when Mr. Kenner, or anybody else,

11   told you you were invested in Hawaii?

12   A.    It was during the time I was, you know, all the same

13   time, like, I would say between 2002 and 2004 where all

14   these things came about.

15             The Hawaii deal came obviously later and from

16   what I remember, it was presented as many players, or

17   clients going in for a portion of $100,000.

18   Q.    At the top of this screen it says Hawaii and in

19   parentheses it says loan $100,000.

20             Why did you say $100,000?

21   A.    Well, that was the information that I got from him.

22   Q.    When you say him, who are you referring to?

23   A.    Oh, Phil Kenner.

24   Q.    Anybody else told you about Hawaii?

25   A.    No, never.

Juneau - Direct/Miskiewicz

146

1    Q.   If you look below there's something else there called

2    Scottsdale Airpark.

3    A.   Yes.

4    Q.   Would you read for the record, you can either do the

5    sheet of paper or read it from the screen, but can you

6    read what you are asking about there.

7    A.   What is it worth now?  Are we selling or building?

8         Again, I was not getting feedbacks on this

9    investment as well.

10   Q.   I think I cut off a little bit of it, but the end of

11   that sentence is, can I get out of it?

12   A.   Yeah, well, that's -- I had retired at that time,

13   and, again, found myself in a situation where over $3.6

14   million was thrown into these different deals and I was

15   not making money anymore at that time.

16        So it was, like, okay.  I was told that going

17   into these things would be brief, and that I would get

18   money back pretty quick and it never happened and I was

19   not getting much feedback and I just wanted to get the

20   money back into some investments that we previously had.

21   Q.   And when you say you were told that the investments

22   would be pretty brief, who told you that?

23   A.   Phil Kenner.

24   Q.   By the way, I'll put it up on the screen, the first

25   page of this exhibit, Exhibit 728, just for the record,

147

1  what is the date of this e-mail exchange with Mr. Kenner?

2  A.    It says May 18, 2005.

3  Q.    Directing your attention to page two of

4  Government Exhibit 728, there is some text there that is

5  highlighted.

6          MR. MISKIEWICZ:  Your Honor, may I read it into

7  the record?

8          THE COURT:  Yes.

9          MR. MISKIEWICZ:  Hawaii.  Your loan is well.

10 The final -- percent sign -- isn't known, but it should be

11 about 1.25 percent of the investment LLC.

12          We haven't done evaluation of the project.  We

13 are too busy working on it every day.

14 BY MR. MISKIEWICZ:

15 Q.    At this period of time, roughly 2005, is that in

16 answer to what's going on with the $100,000 that sentence

17 that we had up on the screen earlier?

18 A.    Well, that was the response to my questions in the

19 other e-mail, yes.

20 Q.    And the Airpark that you had here, the Scottsdale

21 Airpark, was that also known as Avalon or do you know?

22 A.    I guess, yes.

23          I think it was the same thing.

24 Q.    Okay.

25          MR. MISKIEWICZ:  I'll read into the record what

148

1    it says right above that.

2            It says Avalon period.  We are beginning the new

3    permit process and beginning construction shortly.  I'll

4    work to get your initial money back -- three dollar signs

5    in a row -- back if that's what you want, no specific

6    timeline.

7    Q.   Was that the sum and substance of the response that

8    you got from Mr. Kenner?

9    A.   Yes.

10   Q.   This Scottsdale Airpark and/or Avalon, what if

11   anything were you told about an Airpark or Avalon at this

12   time?

13           In other words, what was the investment about?

14   A.   Yeah, it was about something building hangars at

15   Scottsdale airport and, again, something that I would get

16   my money back very fast.

17           MR. LARUSSO:  Your Honor, I apologize.

18           May I just make sure who is telling him or

19   giving him this advice?  I don't believe that was part of

20   the question.

21           THE COURT:  Who are you speaking about, who is

22   telling you this?

23           THE WITNESS:  Phil Kenner.

24   BY MR. MISKIEWICZ:

25   Q.   Did he tell you who was in charge of this Avalon or

Juneau - Direct/Miskiewicz

149

1    Scottsdale Airpark project?

2    A.    Yeah.

3    Q.    Who?

4    A.    The name of Tommy Constantine was said to me for the

5    first time.

6    Q.    Had you ever met Mr. Constantine prior to this

7    investment?

8    A.    No.

9    Q.    Anybody other than Mr. Kenner tell you about an

10   Airpark project?

11   A.    No.

12   Q.    Okay.

13   A.    Actually, by that e-mail, not when I invested, by the

14   way, but at the date of that e-mail I had one day met

15   Tommy Constantine.

16   Q.    Okay.

17             The date of the e-mail is?

18   A.    The e-mail is May 18th, but that's a few years after

19   that investment.

20             But when the investment came about, I recall

21   having met Tommy Constantine at that time.

22   Q.    Who introduced you to Tommy Constantine, and was that

23   his name?

24             He went by the name of Tommy, he didn't use Tom?

25   A.    That's the name.

Juneau - Direct/Miskiewicz

150

1    Q.    Who introduced you to Tommy Constantine?

2    A.    Phil, Phil Kenner.

3    Q.    Do you remember approximately when did you invest in

4    this Airpark project that Mr. Constantine was running?

5    A.    Again, approximately -- it had to be between 2002 and

6    2004.

7    Q.    Okay.

8          Do you remember approximately how much you

9    invested?

10   A.    Half a million.

11   Q.    Is that what you say in your e-mail, at least

12   listing -- showing you page three of Exhibit 728, was that

13   your knowledge or recollection at that time in 2005 that

14   you had $500,000 invested in Scottsdale Airpark?

15   A.    Yes.

16   Q.    Okay.

17         Now, when you were solicited to invest half a

18   million dollars in the Scottsdale Airpark, for how long

19   was that investment supposed to take place?

20   A.    I can't say if it was a week, month, year.

21         Like, it was -- I know it was something short.

22   Q.    Were you investing in a company or were you making a

23   loan?

24   A.    I can't answer that.

25         I believe it was a company, but it was possibly

Juneau - Direct/Miskiewicz

151

1    something else.

2    Q.   Did Mr. Kenner produce for you an agreement that laid

3    out what the terms of this $500,000 investment would be?

4    A.   I don't remember seeing any paperwork or much

5    paperwork.

6         I remember at one point seeing sketches, but

7    it's very vague.

8    Q.   You mean drawings of the Airpark?

9    A.   Of -- yeah, the landing strip and the hangars or

10   whatever.

11   Q.   Did there come a time that you were asked to --

12        MR. MISKIEWICZ:  Withdrawn.

13   BY MR. MISKIEWICZ:

14   Q.   Let's stay in 2005.

15        Did there ever come a time after getting -- we

16   just saw those answers -- that you decided to seek through

17   the advice of some other financial consultant or tax

18   consultant or advisor?

19   A.   At one point, yes, when I started believing that this

20   was getting nowhere, yeah, I did started to look

21   elsewhere, find someone that would help, advise me.

22   Q.   Does the name or the word fiscalist,

23   F-I-S-C-A-L-I-S-T, fiscalist, does that have any

24   particular meaning in Canada?

25   A.   Yeah, it does.

Juneau - Direct/Miskiewicz

152

1          It's a specialized accountant, if I can say.

2    Q.    Okay.

3    A.    It's someone that I had confidence in.

4    Q.    Did you at some point indicate to Mr. Kenner that you

5    were going to attempt to get advice from such an

6    accountant?

7    A.    I believe I did at one point, yeah.

8    Q.    How did you communicate that to him?

9    A.    It was only by e-mail.

10          It became impossible to speak, to meet.  So it

11   was always e-mails.

12   Q.    I'm going to show you what's been marked for

13   identification as Government Exhibit 729.

14          (There was a pause in the proceedings.)

15   BY MR. MISKIEWICZ:

16   Q.    Mr. Juneau, showing you 729, do you recognize that

17   document?

18   A.    Yes.

19   Q.    What do you recognize it to be?

20   A.    Well, it's -- that was the e-mail that I had sent

21   Phil Kenner, trying to get some update, and letting him

22   know that I was seeking professional advising from someone

23   in respect to what I had remaining in this.

24   Q.    And you preserved that e-mail?

25   A.    Yes, like pretty much all the e-mails.

Juneau - Voir Dire/Haley

153

1        MR. MISKIEWICZ:  The government moves for the

2   admission of 729.

3        MR. HALEY:  Your Honor, may I conduct a brief

4   voir dire?

5        THE COURT:  Sure.

6        MR. HALEY:  Thank you.

7        THE COURT:  Let me explain to the jury what that

8   means.

9        If a party is seeking to offer a document into

10  evidence and the lawyer has some questions that relates to

11  the document itself before stating whether he objects or

12  not, he can interrupt the direct examination and just ask

13  some questions about the document.

14        Go ahead, Mr. Haley.

15        MR. HALEY:  Thank you, Judge.

16  VOIR DIRE EXAMINATION

17  BY MR. HALEY:

18  Q.   Mr. Juneau, good afternoon, sir.

19  A.   Good afternoon.

20  Q.   My name is Rick Haley.  I represent Phil Kenner.

21        When you answered that last question by the

22  government with respect to you preserved these e-mails, I

23  believe your answer was pretty much so.

24        Is that correct?  How did you preserve these

25  e-mails, sir?

154

1    A.   They are just with the software that I use, pretty

2    much all my e-mails are always saved.

3         Some e-mails that I would just drag onto

4    different files that I would create, just so I could find

5    myself more easily over time.

6    Q.   Well, with respect to that particular e-mail that you

7    are looking at now, when was the last time you saw that

8    particular e-mail before today?

9    A.   I received a bunch of e-mails about a couple of weeks

10   ago, and those were e-mails that couple years ago were

11   sent in a different case.

12        And that's -- so I have been looking at this a

13   couple times in the past two weeks.

14   Q.   Who sent you those e-mails, sir?

15   A.   I received this from I believe FBI people.

16   Q.   Well, before the FBI people sent you that e-mail,

17   when was the last time you saw that particular e-mail?

18   A.   At the other case which was, it was -- actually it

19   was when I did personal procedures, I don't know how you

20   call them, where I took a bunch of e-mails and sent it to

21   a lawyer.

22   Q.   And how long ago was that?

23   A.   I think it was in 2008, 2009, something like that.

24   Q.   Sir, do you know for a fact, as you sit here today,

25   that that particular e-mail that you are looking at now

Juneau - Direct/Miskiewicz

155

1    was part of the package of e-mails you sent to this

2    lawyer?

3            Yes or no?

4    A.   Well, I sent this e-mail to the other lawyer, so it's

5    possible that -- this e-mail was sent to my lawyer back in

6    whatever time it was.

7    Q.   And his or her name?

8    A.   What's that?

9    Q.   His or her name of the lawyer?

10   A.   The lawyer is Michael Meeks.

11   Q.   Was Michael Meeks, if you know --

12           MR. HALEY:  Judge, I apologize.

13           I'm going to withdraw my objection.

14           THE COURT:  Okay.

15           Any objection, Mr. LaRusso?

16           MR. LARUSSO:  No, your Honor.

17           THE COURT:  729 is admitted.

18           (Whereupon, Government Exhibit 729 was received

19   in evidence, as of this date.)

20   DIRECT EXAMINATION

21   BY MR. MISKIEWICZ:

22   Q.   Mr. Juneau, could you read the bottom portion of that

23   document, specifically your portion.

24           What are you writing to Mr. Kenner at this time?

25   A.   Well, where are you at these days?  Give me a buzz as

Juneau - Direct/Miskiewicz

156

1    soon as you can.  I will probably hire a fiscalist to look

2    over all my stuff and maximize my wealth.

3           I'd like to talk to you about it.

4    Q.   Okay.

5           And above that, is that the defendant's response

6    to you?

7    A.   Looks like it.

8           MR. MISKIEWICZ:  Again, may I read it into the

9    record, your Honor?

10          THE COURT:  Yes.

11   BY MR. MISKIEWICZ:

12   Q.   First of all, where it begins Joe, is that Mr. Kenner

13   writing back to you?

14   A.   Yes.

15          MR. MISKIEWICZ:  I'm not sure what a fiscalist

16   is, but I have a good guess.  Remember that I spent three

17   years at RPI.  Don't ask my opinion about it.

18          I will suggest that if you think there is anyone

19   on this planet that could put more money or energy --

20          THE COURT:  You misread it.

21          MR. HALEY:  Yes.

22          MR. MISKIEWICZ:  I'll do it again.

23          MR. HALEY:  Your Honor, may we not have the

24   inflection?

25          I have no objection.

Juneau - Direct/Miskiewicz

157

1          THE COURT:  Yes.

2          MR. HALEY:  The emphasis is obvious.

3          THE COURT:  Just read it in a neutral tone,

4     please.

5          MR. HALEY:  Thank you, sir.

6          MR. MISKIEWICZ:  I will suggest that if you

7     think there is anyone on this planet that could put more

8     energy or interest into maximizing your wealth through

9     cutting edge market strategies and creative property --

10    private opportunities, you should tell me now.

11          I am the most talented person you will find

12    anywhere.  So if you think there is another person who can

13    do it better, let me know ASAP, so I can stop caring about

14    your family and your -- expletive.  I am not -- expletive

15    -- kidding, either.  That comment is the ultimate insult

16    to me after 18 years.

17          Think about it and let me know.

18    BY MR. MISKIEWICZ:

19    Q.   When you received that e-mail, what if anything did

20    you decide to do with respect to your business

21    relationship and advisory relationship with the defendant?

22    A.   I didn't decide anything.

23          After reading this I was stunned, obviously.

24    Again, what I wanted was to have a discussion with

25    Phil Kenner and discuss my best interest in terms of what

158

1    I had left.

2    Q.   Did you continue to try to get answers about where

3    your investments were?

4    A.   With this date --

5    Q.   Well, after the date?

6    A.   Yeah, we were not talking.

7         I was trying to connect through phones, phone

8    calls and we never got to talk again after that.

9    Q.   Did there ever come a time that you received

10   documents asking you to sign for a renewal on a line of

11   credit?

12   A.   Yeah.

13   Q.   Do you remember approximately what year was that?

14   A.   It was after that.

15        MR. MISKIEWICZ:  May I approach?

16        THE COURT:  Yes.

17   BY MR. MISKIEWICZ:

18   Q.   Showing you Government Exhibit 730 for

19   identification.

20        (There was a pause in the proceedings.)

21   BY MR. MISKIEWICZ:

22   Q.   Mr. Juneau, I'm showing you this document, if you

23   would look at it for a moment and let me know, do you

24   recognize that document?

25   A.   That's another e-mail that I had sent to my former

Juneau - Direct/Miskiewicz

159

1    attorney.

2    Q.    I know Mr. Haley asked you about another attorney.

3          I'm asking you, did you send that e-mail and did

4    you get that reply on or about the date that's on the

5    e-mail?

6    A.    Well, yeah.

7          I have these e-mails in my computer.

8    Q.    Those are your e-mails?

9    A.    Yes.

10   Q.    You save them?

11   A.    Yes.

12         MR. MISKIEWICZ:  The government moves for the

13   admission of Exhibit 730.

14         MR. HALEY:  Brief voir dire, Judge.

15         My only question is this.

16   VOIR DIRE EXAMINATION

17   BY MR. HALEY:

18   Q.    Is that one of the e-mails you recently received from

19   the FBI as well?

20   A.    I believe so.

21   Q.    Thank you.

22         MR. HALEY:  No further questions.

23         THE COURT:  Any objection?

24         MR. HALEY:  No, sir.

25         MR. LARUSSO:  No, your Honor.

Juneau - Direct/Miskiewicz

160

1        THE COURT:  730 is admitted.

2        (Whereupon, Government Exhibit 730 was received

3    in evidence, as of this date.)

4    DIRECT EXAMINATION

5    BY MR. MISKIEWICZ:

6    Q.   Is it fair to say that the e-mails back and forth

7    begin at the bottom and go to the top, the e-mail string?

8    A.   Um-hmm.

9    Q.   Is this about the time that you were asked to sign

10   documents to renew a line of credit?

11   A.   Yeah.

12   Q.   And what is the date?

13   A.   June 6th is when I wrote to Phil Kenner about this

14   letter.

15   Q.   In your own words, what were you trying to find out

16   from Mr. Kenner?

17   A.   Well, where are you?

18        I need to get -- so this is what he wrote to

19   me -- I need to get the Northern Trust line of credit docs

20   for me to resign.

21        And a few days later explaining to me that there

22   was the renewal for the old LOC, line of credit.

23   Q.   Had you gotten something in the mail either from him

24   or from Northern Trust that was some sort of a renewal of

25   a line of credit?

Juneau - Direct/Miskiewicz

1   A.   I don't believe then.

2        I did at one point receive a letter from

3   Northern Trust, but --

4   Q.   Well, did you --

5        MR. MISKIEWICZ:  Withdrawn.

6   BY MR. MISKIEWICZ:

7   Q.   With respect to this particular e-mail where you say,

8   what is this anyway, NT LOC doc resigned, give me a buzz.

9        What are you referring to when you say that?

10  A.   Well, I was wondering what it was.

11  Q.   Did you get something in the mail or somehow in an

12  e-mail?

13  A.   I can't say.

14       I guess I did, or it's something that he sent by

15  e-mail.  I'm not too sure.

16  Q.   Okay.

17  A.   But it's obviously something that I did receive and I

18  did not understand.

19  Q.   Now, I show you another e-mail, Government Exhibit

20  732.

21       (There was a pause in the proceedings.)

22  BY MR. MISKIEWICZ:

23  Q.   Mr. Juneau, looking at Government Exhibit 732, do you

24  recognize that document?

25  A.   Well, that's another e-mail that I had saved.

Juneau - Direct/Miskiewicz

162

1  Q.   Is this an e-mail that you received -- or an e-mail

2  you sent or received from and to Mr. Kenner?

3  A.   Yes, it looks like an exchange between the both of

4  us.

5           MR. MISKIEWICZ:  The government moves for the

6  admission of 732.

7           MR. HALEY:  No objection, your Honor.

8           MR. LARUSSO:  No objection, your Honor.

9           THE COURT:  732 is admitted.

10          (Whereupon, Government Exhibit 732 was received

11  in evidence, as of this date.)

12  BY MR. MISKIEWICZ:

13  Q.   Mr. Juneau, could you just read your portion, what

14  are you asking Mr. Kenner at this stage?

15  A.   Phil, I just got the documents.  What is this

16  $750,000 extended credit amount?

17          I'm not borrowing that amount I hope.  Who else

18  is in there with us?  Why is there two of the same exact

19  document to sign?

20          I don't understand this whole deal.  What am I

21  signing here?  What do I get?  What do I have already?  We

22  need to talk.  I need to fully understand this.

23  Q.   Would you look at the top and read into the record

24  what was Mr. Kenner's response to you?

25  A.   These are the renewal docs for the LOC that just

Juneau - Direct/Miskiewicz

163

1    expired recently.

2             You, Owen and I are signed on this LOC.  Most of

3    it will be going away in the next few weeks as I finish

4    the development banking deal.  I am not sure why there are

5    two of the same document.

6             That is the signature package for you from the

7    bank.  I have the same package for Owen and I.  You

8    already have approximately 3 percent of the investment

9    LLC, Little Isle IV, LLC, in the Hawaii deal.  This is for

10   your participation through the LOC you have endorsed.

11   Q.    And it ends PK?

12   A.    PK, yeah.

13   Q.    Those are Phil Kenner's initials?

14   A.    Yes.

15   Q.    Did he frequently end the e-mails like that?

16   A.    Well, I can't remember.

17   Q.    Okay.

18   A.    If he signed Phil or PK, but...

19   Q.    Okay.

20            Is this a continuation of your earlier

21   conversation starting June 9th of '06, turning your

22   attention back to Government Exhibit 730?

23   A.    Yeah.

24            It seemed like it's a follow up on that.

25   Q.    Okay.

164

1          By the way, what you just read into the record,

2     Mr. Kenner's explanation to you, did any of that make any

3     sense to you?

4     A.    No.

5          I can't say that.

6     Q.    When he said to you, you have approximately 3 percent

7     of the investment LLC, Little Isle IV, LLC, what's he

8     talking about?

9     A.    3 percent of the -- I don't know, the Hawaii deal

10    that he had told me about.

11    Q.    Did you ever see a contract, a document, a loan

12    agreement, something that set forth what your percentage

13    ownership was in the Hawaii deal?

14    A.    I don't recall.

15         It's possible.

16    Q.    One other question.

17         The LOC, the line of credit, what if anything

18    did that have to do with the Hawaii deal as far as what

19    Mr. Kenner told you?

20    A.    I had no knowledge of line of credit, to be honest.

21         So -- anyway, all of this, when I received this

22    obviously by my questioning was pretty obvious.

23    Q.    Showing you Government Exhibit 733.

24         Mr. Juneau, if you would please, again, look at

25    733.

Juneau - Voir Dire/Haley

165

1           (There was a pause in the proceedings.)

2    BY MR. MISKIEWICZ:

3    Q.   Is that another e-mail that you preserved?

4    A.   Yes.

5    Q.   Is that an e-mail or an exchange of e-mails that you

6    sent or received from Mr. Kenner?

7    A.   Yeah, it looks like it.

8           MR. MISKIEWICZ:  The government --

9    BY MR. MISKIEWICZ:

10   Q.   Well, are you sure?

11   A.   Hmm?

12   Q.   Are you sure, or is there any doubt in your mind that

13   this is your e-mail?

14   A.   No, there is no doubt.

15           MR. MISKIEWICZ:  The government moves for the

16   admission of Exhibit 733.

17           MR. HALEY:  Brief voir dire, Judge.

18           THE COURT:  Go ahead.

19           MR. HALEY:  Thank you.

20   VOIR DIRE EXAMINATION

21   BY MR. HALEY:

22   Q.   Mr. Juneau, these e-mails that you are identifying as

23   being e-mails between yourself and Phil Kenner, are they

24   in sequence or are certain e-mails being skipped, like

25   there's e-mails between these various dates?

Juneau - Direct/Miskiewicz

166

1    A.   It's possible, but it seems like it's in the

2    sequence, the bottom one is the question.

3    Q.   Well, do you know if the FBI sent you --

4           MR. HALEY:  Withdrawn.

5    BY MR. HALEY:

6    Q.   Is that one of the e-mails that the FBI sent you?

7    A.   I think so.

8    Q.   And it's your testimony as you sit here today, you

9    can't say one way or another whether there was an

10   e-mail -- whether this is a complete sequence?

11          In other words, whether it's complete or whether

12   some e-mails are missing, is that true?

13   A.   It's possible that there is more exchange.

14          But, again, I'd have to look.

15   Q.   It's been a while.

16          MR. HALEY:  Thank you, your Honor.

17          I have no objection.

18          THE COURT:  Mr. LaRusso?

19          MR. LARUSSO:  No objection, your Honor.

20          THE COURT:  733 is admitted.

21          (Whereupon, Government Exhibit 733 was received

22   in evidence, as of this date.)

23   DIRECT EXAMINATION

24   BY MR. MISKIEWICZ:

25   Q.   For the record, Mr. Juneau, would you again, reading

Juneau - Direct/Miskiewicz

167

1   from the bottom to the top, would you read into the record

2   what are you asking Mr. Kenner at this stage?

3   A.   Can you tell me why it says $750,000 in the contract?

4   Didn't I initially sign for $100,000?

5          Is 3 percent of the investment in Little Isle

6   IV, LLC, also 3 percent in the whole Hawaii deal?

7   Q.   Would you read what Mr. Kenner responded to you?

8   A.   It says the $750,000 is the same as the original doc

9   you, Owen and I signed for.

10         The 100K is the cash you were supposed to also

11   put in the deal but you never did.  I didn't bother you

12   for it, even though every other investor had to invest the

13   cash in the deal, even with the LOC signatures.

14         The investment is 3 percent in the Little Isle

15   IV.  The whole Hawaii deal is worth, appraised land,

16   approximately $90 million -- 90M, I guess $90 million

17   right now.

18              (Continued on next page.)

19

20

21

22

23

24

25

168

1  BY MR. MISKIEWICZ:

2  Q.    And turning your attention back to Government Exhibit

3  728 in evidence, the e-mail dated May 15, 2005, this is

4  the one you testified about several minutes ago about your

5  hundred thousand dollar loan, do you recall that?  Do you

6  have that in front of you?

7  A.    Yep.

8  Q.    You made a hundred thousand dollar loan and you were

9  asking questions about it in 2005, do you remember?

10  A.    Yes.

11  Q.    And what did Mr. Kenner tell you then about your

12  hundred thousand dollars?

13  A.    Well, it's Hawaii your loan as well the final

14  percentage is unknown but it should be about 1, 125

15  percent of the investment in LLC, we haven't gotten on the

16  project, we are too busy working on it every day.

17  Q.    When he writes this to you in June of 2006, 750 is

18  the same as the original doc, you Owen and I signed for

19  100K is the cash that you were also supposed to put in the

20  deal what's he talking about?

21  A.    That's what I didn't understand, I guess.

22  Q.    Does it make any sense to you?

23  A.    It didn't.  It still -- well, today, yeah.  It did.

24  Q.    Mr. Juneau, I'm going to show you what's been marked

25  for identification as Government Exhibit 2155.

Juneau - Direct/Miskiewicz

169

1  Mr. Juneau, showing you exhibit 2155 there's a signature

2  on that document.  Is that your signature?  (Handing.)

3  A.   Yeah, it looks like it.

4         MR. MISKIEWICZ:  Government moves for the

5  admission of 2155.

6         MR. HALEY:  No objection.

7         MR. LA RUSSO:  No objection, your Honor.

8         THE COURT:  2155 is admitted.

9         (Government's Exhibit 2155 in evidence.)

10  Q.   Mr. Juneau, I'm just going to put it up on the

11  screen.  Mr. Juneau, I'm showing you 2155 now in evidence.

12  That's your signature, correct?

13  A.   Yep.

14  Q.   This is a statement regarding Northern Trust Bank,

15  correct?

16  A.   Yep.

17  Q.   And there's a middle section here that indicates part

18  one, to be completed by the borrower or borrowers, do you

19  see that?

20  A.   Yeah.

21  Q.   The question number one says what is the amount of

22  the credit being extended.  Do you see that?

23  A.   Um-hmm, yep.

24  Q.   Immediately thereafter there's a handwritten note of

25  $500,000.  Do you see that?

Juneau - Direct/Miskiewicz

170

1    A.    Yes.

2    Q.    Is that your handwriting?

3    A.    No.

4    Q.    Did you recognize the handwriting?

5    A.    Not sure, no.  Not sure.

6    Q.    Do you see there is two lines down it says if the

7    answer is no, describe the specific purpose of the credit.

8    Do you see that?

9    A.    Yes.

10   Q.    What does it say?

11   A.    Real estate investment.

12   Q.    Is that your handwriting?

13   A.    No.

14   Q.    Mr. Juneau, did Mr. Kenner ever tell you that you

15   were putting in $500,000 into the Hawaiian deal?

16   A.    No.  Never.

17   Q.    When you signed this document, did you go over how

18   much was being extended as part of this line of credit

19   with Mr. Kenner?

20   A.    I believe when I received this, you know, there was

21   something I received and I was asking a lot of questions

22   and some of the questions was about $750,000.

23   Q.    Well, but in 2005, when you were asking what happened

24   to your loan, in Hawaii what was the number that you

25   understood you had invested?

Juneau - Direct/Miskiewicz

171

1   A.   100,000.

2   Q.   Do you have any idea how that went from a hundred

3   thousand to 500,000?

4   A.   Obviously not.

5   Q.   Did you authorize Mr. Kenner to invest that amount of

6   money in Hawaii in your name?

7   A.   No.

8   Q.   Or borrow that amount of money?

9   A.   No.

10  Q.   Did you know it was happening when it happened?

11  A.   No.  No.  Obviously no.

12  Q.   Did you receive from Mr. Kenner any documents

13  indicating that this was happening when it happened?

14         MR. HALEY:  Judge, I have to object to the

15  leading nature of it.  What, if anything, did you receive.

16  It's a series of leading questions from the government's

17  own witness.

18         THE COURT:  The document's admissible.

19  Overruled.  That's permissible.  You can answer that.

20  A.   Can you ask it again, please.

21  Q.   Did you receive any documents at this time telling

22  you the moment money was borrowed if it was borrowed

23  advising you that that happened?

24  A.   I don't remember receiving such letters.

25  Q.   Show you what has been mashed as Government's Exhibit

Juneau - Direct/Miskiewicz

172

1    2158.

2         MR. MISKIEWICZ:  Your Honor, we have a

3    stipulation among the parties regarding this particular

4    document.  Do you wish me to read the entire stipulation

5    into the record, it's rather lengthy, or I can proffer

6    that the parties agree to stipulate this is a business

7    record.

8         MR. HALEY:  Judge, I so stipulate.

9         MR. LA RUSSO:  Likewise, your Honor.

10         THE COURT:  I just need the parties to agree

11    that this is a business record and there's no objection to

12    it coming into evidence.  I'll see what weight should be

13    given to the exhibit.  It's always up to the jury.  Okay.

14    So with that stipulation you're offering 2158.

15         MR. MISKIEWICZ:  Yes, your Honor.

16         THE COURT:  That is admitted.

17         (Government's Exhibit 2158 in evidence.)

18    Q.   Mr. Juneau, just first of all, it's fair to say you

19    have never seen this or this is not a document that you

20    received?

21    A.   No.  I don't think so, no.

22    Q.   Can you look at the line that's dated December 19,

23    2003.

24    A.   Yeah.  December 19, '03.

25    Q.   Does it indicate how much is being transferred or

Juneau - Direct/Miskiewicz

173

1    wired to a company at that point?

2    A.    Here it says 500,000.

3    Q.    Okay.  Thank you.  Also show you, Mr. Juneau,

4    Government Exhibit 2157?

5          MR. MISKIEWICZ:  Your Honor, this is a document

6    I proffer is also covered by stipulation between the

7    government and counsel and we would offer it now into

8    evidence as Government Exhibits 2157.

9          MR. HALEY:  That's correct, Judge, we do

10   stipulate.

11         MR. LA RUSSO:  Stipulate, your Honor.

12         THE COURT:  2157 is admitted.

13         (Government's Exhibit 2157 in evidence.)

14   Q.    Mr. Juneau, looking at Government's Exhibit 2157,

15   again at or about the time that the e-mails were, you

16   testified earlier, 2005, 2006, did you ever receive a

17   statement like that?

18   A.    I don't think I ever seen this document before.

19   Q.    On the upper left-hand corner there's the name of the

20   account is something called Little Isle IV, do you see

21   that?

22   A.    Yes, I do.

23   Q.    Do you know what Little Isle IV was?

24   A.    Well, from what you're looking at and what you told

25   me.

174

1   Q.    What was it?

2   A.    It was related to land purchased in Hawaii.

3   Q.    But did he ever show you that document?

4         MR. HALEY:  Object, your Honor.

5         THE COURT:  Sustained.  Asked and answered.

6         MR. HALEY:  Thank you.

7         MR. MISKIEWICZ:  Your Honor, I'm about to move

8   to a different area.

9         THE COURT:  Okay.  It's 4:27 so we'll stop for

10  the day.  We'll reconvene tomorrow morning at 9:30.  Don't

11  discuss the case.  Don't read anything or listen to

12  anything related to the case.  Have a good, safe trip

13  home.  See you tomorrow morning at 9:30.

14        (Whereupon, the jury retired from the

15  courtroom.)

16        THE COURT:  You can step down, Mr. Juneau.

17  Thank you.  Everyone can be seated.

18        Mr. La Russo, I have reviewed those e-mails with

19  regard to this issue regarding the newspaper article, the

20  Post.  Let me ask the government this.  First of all, my

21  ruling is with respect to the victims that are going to

22  testify and have some testimony related to

23  Mr. Constantine's self-disclosing his prior conviction

24  and/or his use of a prior name, I'm precluding that.  My

25  understanding is the government is offering that to allow

175

1    the witness to help explain how the relationship of trust

2    developed with respect to Mr. Constantine.  However, I

3    believe there will be a sufficient basis for him to

4    describe how the relationship began, what induced them to

5    rely on anything Mr. Constantine was saying independent of

6    any purported reliance on the fact that I told them he had

7    a prior conviction and he was turning his life around.

8           I believe that any probative value that would

9    have with respect to explaining the nature of the

10   relationship is substantially outweighed by a danger of

11   unfair prejudice for that fact to come out.

12          However, with respect to the second issue, my

13   question to the government -- I'll hear from Mr. La Russo

14   as to whether he has any objection to this -- to the

15   extent the government needs this Page Six to come out for

16   the witness to explain at least in part Mr. Constantine

17   was asking him to rehabilitate his image with respect to

18   this article, why the witness can't just testify, the

19   defense would open the door to further questions on it,

20   the first question is there was a negative article of Page

21   Six on the New York Post about Mr. Constantine and he

22   asked me to, whatever it is, develop plan to address that

23   or address his image, but why can't the article just be

24   referenced as a negative article about Mr. Constantine.  I

25   don't think it's important to explain what precisely was

Juneau - Direct/Miskiewicz

176

1    negative about it.  What's wrong with that?

2                MS. KOMATIREDDY:  I think we can tell the

3    witnesses to discuss it more generally, your Honor.  I

4    want to advise the Court, I think what we'll elicit is

5    this is a negative article about a personal matter -- the

6    reason that I say that is because the each of the

7    witnesses will say that he was given this article and

8    asked to respond to it in addition to also being asked to

9    do work for the hockey players, and there's a need for us

10   to distinguish between work done in the interest of the

11   hockey players and work done for Mr. Constantine

12   personally.

13               So if I may ask that we be permitted to elicit

14   testimony about a negative article about a personal

15   matter, something like that.

16               THE COURT:  I'll work on the phraseology.

17   Mr. La Russo.

18               MR. LA RUSSO:  I'm sorry your Honor.

19               THE COURT:  I said I want to come up with some

20   phraseology that's acceptable to both sides.  So the

21   government is suggesting the witness would say there is a

22   negative article on a personal matter.

23               MS. KOMATIREDDY:  Yes, a personal matter

24   unrelated to the victim's investments.  It's the central

25   point that we're trying to get across.

1          MR. LA RUSSO:  Your Honor, as Mr. Constantine

2    just reminded me, the whole purpose of this use by the

3    government is to show that this particular article was

4    directly related to his personal use.  They're trying to

5    show that the monies that were taken out of the global

6    settlement fund were used for his personal benefit.  And

7    as I tried to relate to all the e-mails that I showed you

8    that's not the case, that the monies that were spent with

9    regard to publicity was not really addressing a personal

10   issue.

11          I don't have any objection to characterizing it

12   as the Court indicated, but putting the word personal in

13   it you're directing now towards monies that are directly

14   going towards his person, which would be outside the

15   global settlement fund.

16          THE COURT:  I know.  But whether or not he had

17   conversations about other things that he wanted them do is

18   independent of the fact that apparently the witness is

19   going to testify that one of the things that he's going to

20   is this -- the government wants to elicit, am I accurate

21   that that's what the witness is going to say?

22          MS. KOMATIREDDY:  Yes, your Honor.

23          THE COURT:  So the fact that they may be another

24   thing Mr. Constantine is asking, is something that the

25   government should be able to elicit that from the witness.

Juneau - Direct/Miskiewicz

1          MR. LA RUSSO:  I understand, Judge, I think

2     there may be a factual difference here.  I think the

3     article that the witness is alluding to is a different

4     article other than this one.  And what I would suggest we

5     do, obviously I see with the Court is going, I understand

6     government's position, if the witness does say that in

7     fact this was being specifically addressed, then maybe my

8     argument would not be as strong.

9          So what I would suggest before we get into this,

10    can we have a proffer from the witness as to exactly what

11    this is so that we can address it better.  My

12    understanding is we're talking about an a different

13    article.

14         MS. KOMATIREDDY:  Your Honor, I can proffer to

15    the Court that in preparing HL group's witness in this

16    matter, we specifically identified the article marked as

17    3309, and the article that Mr. Constantine provided to him

18    when he was retained for public relation services and

19    asked to respond to.

20         THE COURT:  So in light of that proffer,

21    Mr. La Russo, the way I would handle it, Mr. La Russo, if

22    you want, if you believe there may be some mistake by the

23    witness regarding that, I will have the government mark

24    the article as an exhibit, show it to the witness, without

25    referencing what it is, to establish that is in fact

1    article whatever agreement on the language we agree to,

2    I'll let the government lead the witness, is that, in

3    effect an article, a negative article about a personal

4    matter on Mr. Constantine and the witness will answer yes

5    or no.  If you want the government will mark the exhibit,

6    show it to the witness, but they're fairly confident that

7    this is the article.

8              MR. LA RUSSO:  I think that's a fair solution,

9    Judge.

10             THE COURT:  So you can talk with the government,

11   what the exact phrasing will be, but that seems to be a

12   reasonable compromise to me.  Okay.

13             MR. LA RUSSO:  Thank you, Judge.

14             THE COURT:  Have a good night.

15             MR. MISKIEWICZ:  One last thing.  I want to put

16   on the record, Mr. La Russo asked for a copy or what the

17   sum total government's evidence is regarding the IRS being

18   contacted.  I have provided him the one article that we

19   have.  And that is the sum total of what we have.

20             THE COURT:  Mr. Haley.

21             MR. HALEY:  I'm returning to my office now, I

22   don't know the answer to that.

23             THE COURT:  Just remind me in the morning you

24   still haven't heard.  Okay.  Have a good night.

25             MR. LA RUSSO:  Good night.

1          MR. MISKIEWICZ:  Good night, your Honor.

2          MR. HALEY:  Good night.

3          (Whereupon, court recessed for the day in this

4     matter at 4:40 p.m. until Tuesday, April 5, 2015 at 9:30

5     a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

181

INDEX:

JOE JUNEAU                                        122

DIRECT EXAMINATION                               123

BY MR. MISKIEWICZ

VOIR DIRE EXAMINATION                            153

BY MR. HALEY

DIRECT EXAMINATION                               155

BY MR. MISKIEWICZ

VOIR DIRE EXAMINATION                            159

BY MR. HALEY

DIRECT EXAMINATION                               160

BY MR. MISKIEWICZ

VOIR DIRE EXAMINATION                            165

BY MR. HALEY

DIRECT EXAMINATION                               166

BY MR. MISKIEWICZ


EXHIBITS:

Government Exhibit 6016 in evidence              135

Government Exhibit 728 in evidence              144

Government Exhibit 729 in evidence              155

Government Exhibit 730 in evidence              160

Government Exhibit 732 in evidence              162

Government Exhibit 733 in evidence              166

Government's Exhibit 2155 in evidence           169

182

1       Government's Exhibit 2158 in evidence        172

2       Government's Exhibit 2157 in evidence        173

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**$**

**$10** [1] - 27:12
**$100,000** [11] -
82:6, 82:7, 82:8,
112:18, 145:8,
145:17, 145:19,
145:20, 147:16,
167:4
**$105,000** [1] -
115:11
**$17,000** [1] - 52:3
**$200,000** [5] -
14:13, 82:10,
83:21, 84:4,
118:1
**$25** [3] - 103:24,
109:20, 113:22
**$25,000** [2] -
52:1, 82:12
**$250,000** [3] -
54:13, 78:14,
117:6
**$300,000** [1] -
115:21
**$430,000** [1] -
78:17
**$45,000** [1] -
116:25
**$50,000** [2] -
82:9, 82:11
**$500** [2] - 116:9,
117:19
**$500,000** [4] -
150:14, 151:3,
169:25, 170:15
**$700,000** [5] -
115:3, 115:11,
115:16, 116:20,
117:5
**$725,000** [1] -
51:19
**$75,000** [1] - 82:9
**$750,000** [4] -
162:16, 167:3,
167:8, 170:22
**$90** [2] - 167:16

**'**

**'03** [1] - 172:24
**'06** [1] - 163:21
**'87** [1] - 124:21
**'91** [1] - 124:21
**'92** [3] - 124:17,
124:24, 127:9
**'94** [1] - 130:8

**1**

**1.25** [1] - 147:11
**1.7** [1] - 41:24
**100** [3] - 1:14,
1:23, 108:9
**100,000** [1] -
171:1
**100K** [2] - 167:10,
168:19
**105** [1] - 116:1
**11's** [1] - 83:19
**11572** [1] - 1:21
**11722** [2] - 1:15,
1:23
**11749** [1] - 1:18
**122** [1] - 181:2
**123** [1] - 181:3
**125** [1] - 168:14
**12:30** [2] - 25:14,
25:19
**12:35** [1] - 86:2
**13-CR-607** [1] -
1:4
**135** [1] - 181:19
**13th** [2] - 37:23,
51:10
**144** [1] - 181:20
**153** [1] - 181:5
**155** [2] - 181:7,
181:21
**159** [1] - 181:9
**160** [2] - 181:11,
181:22
**1601** [1] - 1:18
**162** [1] - 181:23
**165** [1] - 181:13
**166** [2] - 181:15,
181:24

**169** [1] - 181:25
**170,000** [1] -
51:20
**172** [1] - 182:1
**173** [1] - 182:2
**175** [1] - 116:2
**18** [5] - 78:16,
104:5, 140:5,
147:2, 157:16
**18th** [1] - 149:18
**19** [5] - 12:17,
77:2, 110:23,
172:22, 172:24
**1993** [1] - 127:6
**1:45** [2] - 86:4,
98:19

**2**

**2/29/2008** [1] -
82:6
**20** [2] - 11:25,
78:16
**20,000** [1] -
116:10
**20-minute** [1] -
25:13
**2002** [7] - 54:14,
82:2, 116:18,
117:7, 133:14,
145:13, 150:5
**2003** [7] - 78:14,
82:3, 136:1,
138:15, 140:5,
141:15, 172:23
**2004** [4] - 70:18,
141:23, 145:13,
150:6
**2005** [9] - 73:17,
147:2, 147:15,
150:13, 151:14,
168:3, 168:9,
170:23, 173:16
**2006** [3] - 139:4,
168:17, 173:16
**2007** [1] - 130:11
**2008** [6] - 73:1,
77:22, 99:17,

119:13, 130:11,
154:23
**2009** [10] - 10:23,
13:25, 39:3,
74:8, 77:23,
83:11, 99:17,
115:4, 154:23
**2011** [2] - 77:2,
80:24
**2012** [2] - 119:14,
119:15
**2013** [5] - 37:23,
47:11, 51:11,
51:14, 74:16
**2015** [3] - 1:9,
39:1, 180:4
**2152** [2] - 139:15,
139:17
**2155** [7] - 168:25,
169:1, 169:5,
169:8, 169:9,
169:11, 181:25
**2157** [6] - 173:4,
173:8, 173:12,
173:13, 173:14,
182:2
**2158** [4] - 172:1,
172:14, 172:17,
182:1
**22nd** [1] - 39:1
**28** [1] - 80:23
**29** [2] - 51:11,
74:16

**3**

**3.6** [2] - 138:5,
146:13
**3/19/2008** [1] -
82:7
**30** [3] - 12:6,
36:12, 51:22
**30,000** [1] - 112:6
**300** [1] - 1:21
**300,000** [2] -
111:1, 111:2
**31** [1] - 51:22
**3309** [1] - 178:17

2

**35** [1] - 132:9
**3500** [1] - 63:7
**36** [1] - 132:10

**4**

**4/24/2008** [1] - 82:8
**4/7/2008** [1] - 82:7
**40** [4] - 12:3, 12:6, 69:14, 70:7
**420** [1] - 78:17
**425** [1] - 1:18
**4:27** [1] - 174:9
**4:30** [2] - 25:21, 25:23
**4:40** [1] - 180:4

**5**

**5.5** [1] - 70:4
**50,000** [1] - 111:2
**500,000** [2] - 171:3, 173:2

**6**

**6/2/2008** [1] - 82:9
**60** [1] - 115:25
**6016** [5] - 133:25, 135:15, 135:19, 135:21, 181:19
**631** [1] - 1:24
**6th** [1] - 160:13

**7**

**7/21/2008** [1] - 82:11
**7/7/2008** [2] - 82:9, 82:10
**70,300** [1] - 115:6
**700,000** [1] - 115:6
**712-6103** [1] - 1:24
**725** [1] - 51:20
**728** [10] - 143:17, 143:21, 144:8, 144:11, 144:12,

146:25, 147:4, 150:12, 168:3, 181:20
**729** [6] - 152:13, 152:16, 153:2, 155:17, 155:18, 181:21
**730** [6] - 158:18, 159:13, 160:1, 160:2, 163:22, 181:22
**732** [6] - 161:20, 161:23, 162:6, 162:9, 162:10, 181:23
**733** [6] - 164:23, 164:25, 165:16, 166:20, 166:21, 181:24
**750** [1] - 168:17

**8**

**8.5** [1] - 72:20
**8/8/2008** [1] - 82:11

**9**

**90M** [1] - 167:16
**9:30** [5] - 25:7, 25:9, 174:10, 174:13, 180:4
**9:50** [1] - 1:10
**9th** [1] - 163:21

**A**

**a.m** [2] - 1:10, 180:5
**a/k/a** [2] - 1:7, 1:9
**ability** [6] - 8:6, 19:24, 29:13, 68:6, 93:21, 109:10
**able** [8] - 10:10, 64:7, 85:13, 95:25, 104:1, 109:16, 177:25

**above-mentioned** [1] - 144:20
**absolutely** [6] - 40:14, 45:20, 63:10, 63:19, 83:4, 87:9
**AC** [1] - 118:5
**accept** [2] - 18:6, 118:22
**acceptable** [1] - 176:20
**access** [4] - 29:12, 29:16, 42:6, 117:12
**accessed** [1] - 41:23
**accomplice** [1] - 27:9
**accomplished** [1] - 106:1
**according** [1] - 16:4
**account** [12] - 29:20, 30:11, 43:10, 51:18, 51:20, 51:21, 52:2, 52:4, 75:25, 112:20, 173:20
**accountant** [2] - 152:1, 152:6
**accounted** [1] - 109:22
**accounting** [1] - 127:25
**accounts** [7] - 27:18, 27:21, 27:25, 29:19, 30:3, 39:23, 70:12
**accurate** [2] - 119:9, 177:20
**accurately** [1] - 41:21
**accusation** [1] - 18:15
**accusations** [3] -

6:1, 72:5, 88:2
**accuse** [1] - 83:3
**accused** [4] - 6:3, 37:21, 105:5, 119:24
**accusing** [5] - 6:8, 74:17, 88:10, 105:19, 105:20
**acknowledge** [3] - 20:9, 73:11, 119:23
**acknowledging** [1] - 20:17
**acknowledgments** [1] - 20:14
**acquaintances** [1] - 126:5
**acquired** [3] - 34:22, 40:5, 100:8
**acquiring** [2] - 43:12, 43:14
**acted** [1] - 83:5
**action** [1] - 110:20
**actions** [4] - 32:3, 82:15, 110:13, 110:20
**activities** [2] - 79:15, 79:20
**activity** [1] - 76:2
**actual** [1] - 107:23
**add** [1] - 60:21
**addition** [5] - 44:11, 55:21, 86:16, 87:5, 176:8
**additional** [3] - 53:13, 69:3, 115:11
**address** [14] - 2:7, 3:22, 35:24, 36:16, 37:15, 53:14, 58:19, 82:19, 102:7, 119:10, 175:22, 175:23, 178:11

**addressed** [1] - 178:7

**addressing** [1] - 177:9

**adduced** [1] - 63:21

**administer** [1] - 16:3

**admired** [1] - 27:4

**admissible** [1] - 171:18

**admission** [7] - 92:15, 135:15, 153:2, 159:13, 162:6, 165:16, 169:5

**admissions** [1] - 90:24

**admitted** [11] - 8:25, 115:22, 135:20, 144:11, 155:17, 160:1, 162:9, 166:20, 169:8, 172:16, 173:12

**adults** [1] - 76:7

**advance** [4] - 14:8, 14:23, 43:17, 111:18

**advantage** [2] - 34:15, 35:9

**advertising** [1] - 31:2

**advice** [6] - 39:11, 94:7, 135:1, 148:19, 151:17, 152:5

**advise** [2] - 151:21, 176:4

**advised** [2] - 27:3, 34:3

**advising** [3] - 130:1, 152:22, 171:23

**advisor** [15] - 27:3, 28:12, 28:14, 29:15,

112:12, 130:3, 130:10, 130:14, 131:21, 133:6, 133:10, 140:15, 141:25, 142:1, 151:18

**advisors** [1] - 133:2

**Advisors** [7] - 133:9, 133:12, 134:16, 135:5, 136:3, 137:15, 138:16

**advisory** [3] - 45:24, 134:17, 157:21

**aeronautical** [1] - 125:14

**affect** [1] - 68:5

**affected** [1] - 20:2

**affects** [1] - 19:24

**afield** [1] - 56:21

**afternoon** [7] - 25:19, 25:20, 103:8, 123:18, 136:9, 153:18, 153:19

**agencies** [2] - 4:8, 105:17

**agenda** [1] - 2:16

**agent** [10] - 4:5, 27:1, 34:25, 53:18, 53:25, 54:10, 54:23, 56:7, 59:1, 114:19

**Agent** [9] - 28:6, 34:25, 105:1, 111:10, 114:15, 114:16, 118:25, 119:3

**agent's** [1] - 59:12

**agents** [4] - 4:14, 55:20, 59:18, 109:9

**ago** [12] - 9:17, 35:11, 36:1,

41:15, 73:14, 88:7, 95:10, 144:5, 154:10, 154:22, 168:4

**agree** [13] - 6:8, 16:13, 16:20, 55:2, 104:4, 104:20, 111:7, 111:13, 134:25, 136:2, 172:6, 172:10, 179:1

**agreed** [5] - 29:15, 44:5, 135:5, 137:17, 139:2

**agreeing** [1] - 140:7

**agreement** [16] - 33:3, 42:17, 45:24, 45:25, 70:11, 70:18, 70:19, 70:20, 72:14, 72:19, 100:13, 134:15, 135:24, 151:2, 164:12, 179:1

**agreements** [3] - 93:6, 135:4, 135:12

**ahead** [5] - 26:4, 86:8, 137:8, 153:14, 165:18

**aimed** [2] - 119:5

**air** [1] - 60:19

**Airpark** [11] - 146:2, 147:20, 147:21, 148:10, 148:11, 149:1, 149:10, 150:4, 150:14, 150:18, 151:8

**airport** [1] - 148:15

**alert** [1] - 95:13

**alerted** [3] - 91:16, 91:17

**alias** [1] - 10:8

**allegation** [16] - 4:23, 39:19, 39:20, 51:16, 52:12, 52:14, 52:19, 53:7, 53:19, 53:24, 54:11, 79:5, 92:14, 99:14, 102:4, 102:7

**allegations** [28] - 4:4, 5:21, 6:16, 36:14, 37:16, 44:17, 44:18, 52:23, 52:24, 53:4, 54:21, 55:7, 55:20, 59:11, 64:6, 68:22, 69:3, 69:16, 72:3, 75:12, 77:18, 77:20, 91:5, 91:7, 114:3, 114:24, 121:12

**allege** [2] - 54:13, 118:13

**alleged** [20] - 13:10, 14:12, 36:17, 36:25, 69:4, 75:1, 75:15, 77:20, 80:20, 82:1, 87:23, 92:12, 102:22, 115:6, 115:15, 116:18, 117:3, 117:19, 118:12, 122:4

**allegedly** [4] - 6:11, 14:15, 89:11, 101:4

**alleges** [3] - 40:20, 77:21, 116:20

**alleging** [1] - 117:23

**allied** [1] - 34:18

**allow** [3] - 8:6, 56:4, 174:25

4

allowed [2] - 41:23, 56:12
alluded [1] - 38:13
alluding [1] - 178:3
almost [7] - 89:19, 90:5, 99:13, 103:24, 104:5, 108:13, 109:20
alone [3] - 16:9, 106:24, 109:23
alternate [1] - 24:24
AMERICA [1] - 1:3
America [1] - 34:16
amount [5] - 162:16, 162:17, 169:21, 171:5, 171:8
amounts [1] - 39:23
analysis [2] - 39:17, 69:13
Anderson [2] - 127:23, 127:25
ANDREW [1] - 1:20
announce [1] - 77:14
announcing [1] - 130:15
anonymous [3] - 4:7, 4:13, 4:22
answered [2] - 153:21, 174:5
answers [2] - 151:16, 158:2
antagonistic [1] - 91:20
anticipate [8] - 4:2, 62:20, 62:23, 64:12, 64:24, 65:3, 65:10, 96:20
anticipated [2] -

anticipates [1] - 89:14
anyway [3] - 141:15, 161:8, 164:21
apart [1] - 2:23
apartment [1] - 126:2
apologize [10] - 6:19, 7:17, 10:6, 12:14, 14:8, 14:22, 61:8, 68:18, 148:17, 155:12
appeal [1] - 96:24
appear [2] - 134:9, 139:22
appearance [2] - 20:13, 91:15
APPEARANCES [1] - 1:13
appeared [1] - 63:8
Apple [2] - 120:17, 120:19
applicable [1] - 24:16
application [6] - 15:3, 57:14, 60:12, 86:9, 88:22, 92:18
apply [3] - 16:11, 64:18, 93:16
appraised [1] - 167:15
appreciate [1] - 11:18
apprise [1] - 5:14
apprised [1] - 42:12
apprized [1] - 10:19
approach [7] - 47:18, 84:14, 130:16, 130:17, 133:15, 133:18,

158:15
appropriate [1] - 89:24
appropriately [2] - 76:15, 83:6
approved [1] - 111:17
April [5] - 39:1, 77:2, 82:3, 136:1, 180:4
arbitrate [1] - 46:2
arbitration [3] - 44:22, 46:4, 46:8
architecture [1] - 71:12
area [1] - 174:8
argue [2] - 24:12, 55:19
arguing [2] - 53:15, 114:5
argument [6] - 11:4, 24:5, 24:10, 24:13, 65:5, 178:8
arguments [4] - 10:13, 16:24, 24:6, 24:16
arise [1] - 38:2
Arizona [5] - 33:15, 74:12, 80:25, 81:5, 81:9
arraigned [3] - 37:22, 47:12, 51:13
arraignment [1] - 47:13
arrangements [1] - 3:16
arranges [1] - 30:5
arrest [1] - 47:13
arrive [1] - 2:6
arriving [1] - 18:22
Arthur [2] - 127:23, 127:25

article [21] - 174:19, 175:18, 175:20, 175:23, 175:24, 176:5, 176:7, 176:14, 176:22, 177:3, 178:3, 178:4, 178:13, 178:16, 178:17, 178:24, 179:1, 179:3, 179:7, 179:18
articles [1] - 10:19
articulate [2] - 6:20, 85:14
ASAP [1] - 157:13
aspect [1] - 10:16
aspects [6] - 76:19, 86:24, 88:23, 104:19, 110:11, 111:23
Assante [1] - 132:22
assist [1] - 137:18
assistance [5] - 37:25, 47:15, 77:6, 79:18, 91:10
Assistant [3] - 1:16, 28:3, 57:16
assistant [1] - 28:4
assists [1] - 81:19
associates [5] - 103:14, 103:16, 104:8, 105:20, 118:19
assume [3] - 87:20, 89:3, 89:4
athletes [1] - 43:5
attack [1] - 6:12
attacked [1] - 106:9
attempt [2] - 118:19, 152:5
attempting [2] - 4:17, 115:8

5

**attempts** [1] - 118:21

**attention** [6] - 19:23, 25:4, 122:12, 147:3, 163:22, 168:2

**attorney** [13] - 26:3, 27:23, 31:21, 65:6, 66:14, 66:16, 73:4, 79:17, 82:19, 97:21, 109:8, 159:1, 159:2

**Attorney** [5] - 1:14, 28:3, 28:4, 35:15, 57:16

**Attorney's** [5] - 13:8, 66:3, 66:20, 66:21, 67:2

**Attorneys** [1] - 1:16

**attorneys** [6] - 3:15, 20:5, 23:8, 24:4, 46:12, 105:16

**attorneys'** [1] - 19:8

**attractive** [1] - 42:25

**audience** [2] - 65:23, 67:14

**audit** [2] - 4:17, 4:19

**audited** [1] - 4:11

**audits** [2] - 4:6, 5:7

**Auerbach** [1] - 1:22

**authenticity** [1] - 42:7

**authorities** [1] - 63:7

**authorization** [4] - 42:2, 42:6, 42:8, 112:22

**authorize** [1] - 171:5

**available** [2] - 8:24, 23:1

**Avalon** [5] - 147:21, 148:2, 148:10, 148:11, 148:25

**avenue** [1] - 52:20

**avoid** [5] - 3:25, 20:8, 20:12, 67:1, 81:18

**avoided** [1] - 109:18

**avoiding** [1] - 109:6

**award** [1] - 106:2

**aware** [11] - 10:16, 10:18, 42:22, 53:16, 77:4, 94:25, 107:5, 111:16, 114:18, 114:19, 122:9

**B**

**background** [2] - 114:10, 124:1

**bad** [4] - 30:23, 106:11, 121:19

**Baja** [2] - 43:3, 70:3

**ball** [1] - 77:12

**bank** [24] - 9:4, 27:18, 27:21, 27:25, 29:11, 29:12, 29:16, 29:20, 30:11, 32:13, 32:22, 36:20, 39:23, 51:20, 51:21, 51:25, 52:2, 70:13, 74:14, 75:18, 119:7, 135:3, 139:1, 163:7

**Bank** [2] - 42:4,

169:14

**banking** [1] - 163:4

**bankruptcy** [9] - 69:9, 81:5, 81:6, 81:9, 81:18, 119:11, 119:14, 119:15, 119:19

**bar** [1] - 71:3

**base** [3] - 14:10, 22:17, 46:23

**baseball** [1] - 43:6

**based** [16] - 8:23, 36:8, 41:11, 53:18, 54:10, 59:2, 59:3, 61:3, 65:4, 73:20, 73:21, 91:15, 91:19, 93:4, 93:17, 135:6

**basic** [2] - 18:10, 27:13

**basis** [8] - 4:25, 50:24, 62:9, 92:10, 93:12, 117:4, 143:6, 175:3

**beach** [1] - 33:15

**beach-front** [1] - 33:15

**bear** [1] - 75:10

**bears** [1] - 83:1

**became** [11] - 35:9, 42:21, 80:7, 105:17, 126:7, 130:18, 130:20, 130:22, 130:24, 133:12, 152:10

**become** [4] - 43:1, 130:3, 133:10, 135:24

**bee** [1] - 113:21

**BEFORE** [1] - 1:11

**beg** [1] - 36:15

**began** [7] - 29:2, 29:18, 118:10,

127:12, 131:20, 133:8, 175:4

**begin** [13] - 7:21, 15:11, 15:21, 16:3, 19:9, 19:11, 23:3, 25:7, 25:9, 26:2, 122:16, 142:16, 160:7

**beginning** [4] - 76:1, 138:7, 148:2, 148:3

**begins** [2] - 95:2, 156:12

**behalf** [5] - 37:12, 79:19, 91:4, 117:22, 118:21

**behind** [1] - 118:18

**Behnke** [3] - 73:23, 73:24, 74:3

**belabor** [1] - 51:4

**belief** [1] - 82:3

**believes** [2] - 82:4, 111:10

**belongs** [2] - 44:20, 118:7

**below** [1] - 146:1

**beneficial** [1] - 46:2

**beneficiaries** [1] - 113:22

**benefit** [6] - 28:18, 77:7, 78:21, 83:18, 99:24, 177:6

**Berard** [8] - 4:4, 4:18, 32:15, 72:7, 74:5, 109:12, 109:25

**best** [5] - 64:7, 125:1, 131:13, 131:18, 157:25

**better** [5] - 134:22, 134:23, 135:10, 157:13,

6

178:11
**Better** [2] - 102:6, 102:14
**between** [30] - 10:24, 22:13, 25:14, 25:19, 46:1, 70:19, 73:17, 75:24, 76:4, 76:13, 77:22, 78:23, 83:11, 92:13, 95:1, 99:17, 101:1, 101:13, 103:14, 103:20, 111:1, 126:22, 144:2, 145:13, 150:5, 162:3, 165:23, 165:25, 173:6, 176:10
**beyond** [7] - 18:25, 23:22, 32:11, 37:9, 90:8, 102:21, 122:2
**Bianco** [1] - 37:2
**BIANCO** [1] - 1:11
**bias** [2] - 16:6, 114:17
**big** [3] - 45:11, 96:11, 116:19
**bigger** [1] - 93:13
**Bill** [1] - 99:19
**bill** [5] - 48:8, 48:12, 49:5, 50:21, 79:4
**bit** [11] - 2:24, 29:21, 42:19, 74:23, 102:9, 106:1, 108:20, 114:10, 126:25, 143:10, 146:10
**black** [1] - 32:23
**blame** [3] - 45:14, 85:4, 109:19
**blames** [2] - 90:20, 95:5
**blaming** [1] -

92:22
**blanket** [1] - 65:11
**blatantly** [1] - 114:17
**bless** [1] - 40:15
**blower** [1] - 115:15
**blurt** [2] - 96:7, 97:3
**body** [1] - 51:10
**bonds** [3] - 28:21, 40:23, 132:13
**books** [3] - 40:9, 80:5, 81:13
**born** [1] - 61:15
**borrow** [1] - 171:8
**borrowed** [2] - 171:22
**borrower** [1] - 169:18
**borrowers** [1] - 169:18
**borrowing** [1] - 162:17
**Boston** [19] - 126:19, 126:20, 126:23, 127:5, 127:7, 127:12, 127:17, 127:18, 128:19, 129:2, 129:4, 129:8, 129:9, 129:15, 129:20, 131:20, 132:21, 134:20, 141:10
**bother** [2] - 41:12, 167:11
**bottom** [5] - 122:1, 155:22, 160:7, 166:2, 167:1
**bought** [2] - 29:25, 122:11
**bound** [1] - 91:2
**box** [2] - 4:1, 144:18

**boy** [3] - 41:14, 41:16, 45:11
**break** [14] - 11:4, 12:4, 25:13, 25:14, 25:16, 25:20, 47:21, 57:21, 85:17, 86:4, 98:18, 103:13, 136:7, 136:9
**breaks** [1] - 19:5
**Brian** [1] - 109:12
**brief** [5] - 146:17, 146:22, 153:3, 159:14, 165:17
**briefly** [4] - 5:16, 5:17, 53:12, 92:2
**bright** [1] - 61:6
**bring** [17] - 6:7, 15:5, 19:23, 52:17, 57:4, 57:6, 59:12, 60:8, 61:18, 61:21, 62:4, 62:17, 65:20, 67:4, 67:10, 68:15, 99:6
**bringing** [1] - 137:4
**broad** [1] - 121:11
**broken** [1] - 121:21
**brother** [1] - 73:4
**brother-in-law** [1] - 73:4
**Brothers** [3] - 69:9, 73:9, 108:5
**brought** [10] - 12:18, 12:20, 14:15, 18:14, 27:5, 28:22, 57:7, 85:16, 105:15, 114:13
**Bruins** [4] - 126:19, 126:23, 127:6, 129:8
**Bruton** [15] -

85:5, 85:7, 88:15, 88:20, 89:6, 89:24, 91:2, 91:9, 91:24, 93:13, 93:15, 93:19, 94:18, 96:5, 97:9
**Brutonized** [2] - 89:22, 90:22
**Bryan** [5] - 4:4, 32:15, 72:7, 74:5
**buddy** [3] - 73:15, 73:18, 73:22
**Buffalo** [1] - 141:11
**build** [1] - 43:3
**building** [3] - 67:22, 146:7, 148:14
**built** [1] - 28:23
**bunch** [3] - 10:23, 154:9, 154:20
**burden** [12] - 18:18, 18:19, 23:20, 23:23, 24:11, 32:10, 32:12, 33:25, 34:8, 37:8, 37:10, 122:2
**buses** [1] - 25:22
**business** [17] - 15:12, 31:1, 31:5, 39:11, 75:21, 79:13, 103:14, 103:16, 109:10, 128:22, 131:4, 132:23, 132:25, 140:19, 157:20, 172:6, 172:11
**businesses** [1] - 28:17
**businessman** [1] - 28:16
**busy** [4] - 140:18, 140:19, 147:13, 168:16

7

**but..** [3] - 134:14, 138:7, 163:18
**buy** [4] - 29:7, 29:23, 30:5, 33:18
**buzz** [2] - 155:25, 161:8
**BY** [39] - 1:15, 1:17, 1:20, 123:17, 133:23, 135:22, 137:9, 139:20, 143:19, 144:14, 144:22, 147:14, 148:24, 151:13, 152:15, 153:17, 155:21, 156:11, 157:18, 158:17, 158:21, 159:17, 160:5, 161:6, 161:22, 162:12, 165:2, 165:9, 165:21, 166:5, 166:24, 168:1, 181:4, 181:6, 181:8, 181:10, 181:12, 181:14, 181:16

**C**

**C.R** [1] - 81:14
**Cabo** [9] - 42:24, 43:14, 43:19, 43:21, 44:6, 45:3, 71:10, 72:8, 74:1
**calculation** [2] - 44:14, 72:20
**Calgary** [1] - 127:3
**California** [1] - 33:15
**campus** [3] - 125:15, 125:16, 125:17
**Canada** [2] - 126:10, 151:24
**Canadian** [3] -

4:5, 4:13, 124:23
**candid** [1] - 5:19
**capacity** [1] - 123:23
**Capital** [9] - 129:2, 129:4, 129:9, 129:15, 129:20, 131:21, 132:21, 132:22, 134:20
**car** [2] - 33:18, 106:15
**card** [6] - 78:9, 80:7, 106:3, 107:19, 117:10, 118:3
**cards** [3] - 30:23, 78:8, 87:1
**care** [1] - 113:5
**career** [6] - 130:20, 131:1, 131:25, 132:2, 132:9, 140:19
**careful** [1] - 85:2
**carefully** [2] - 24:25, 33:5
**caring** [1] - 157:13
**carries** [1] - 122:1
**cars** [1] - 33:18
**case** [115] - 4:3, 9:16, 12:23, 13:2, 14:5, 14:12, 14:18, 15:13, 15:21, 16:4, 17:18, 18:1, 18:8, 18:9, 18:10, 19:1, 19:4, 19:13, 19:14, 19:19, 20:4, 20:5, 20:8, 20:22, 21:4, 21:7, 21:10, 21:12, 21:13, 21:17, 22:5, 22:8, 22:12, 22:20, 23:12, 23:18, 23:23,

24:12, 25:2, 28:5, 28:9, 34:10, 34:20, 34:25, 36:13, 36:18, 36:19, 37:9, 37:21, 37:23, 38:2, 42:1, 43:1, 44:19, 46:6, 47:21, 51:12, 53:1, 53:17, 55:8, 55:13, 56:17, 56:21, 57:1, 57:7, 57:10, 58:12, 58:24, 59:9, 59:17, 59:18, 59:25, 61:22, 62:13, 64:6, 65:16, 66:6, 66:14, 67:25, 68:7, 82:22, 86:5, 91:25, 92:21, 92:25, 93:5, 93:25, 94:17, 97:21, 101:8, 102:21, 103:1, 103:10, 104:16, 109:17, 109:23, 110:24, 111:13, 113:15, 114:12, 115:18, 118:8, 119:8, 119:23, 125:20, 132:9, 136:10, 154:11, 154:18, 174:11, 174:12, 177:8
**cases** [2] - 32:17, 113:11
**cash** [4] - 41:22, 167:10, 167:13, 168:19
**castigated** [1] - 86:14
**catch** [1] - 25:23
**caused** [1] - 50:25

**causing** [1] - 80:1
**caution** [1] - 14:10
**cell** [1] - 127:3
**Central** [3] - 1:6, 1:15, 1:23
**central** [3] - 42:1, 43:1, 176:24
**CEO** [3] - 116:4, 117:13, 129:3
**certain** [14] - 16:22, 39:22, 40:21, 53:6, 59:24, 83:17, 99:23, 104:14, 104:24, 105:17, 110:11, 114:14, 114:15, 165:24
**certainly** [3] - 114:18, 116:20, 119:22
**chair** [1] - 67:13
**challenging** [1] - 81:20
**chance** [8] - 2:8, 12:22, 45:12, 93:23, 97:18, 98:17, 130:19, 134:5
**change** [1] - 59:11
**changed** [2] - 56:14
**changing** [1] - 59:13
**characterization** [1] - 111:8
**characterizing** [1] - 177:11
**charge** [3] - 39:18, 54:12, 148:25
**charged** [11] - 23:22, 32:3, 32:5, 32:7, 32:9, 50:1, 76:21, 77:11, 77:13, 80:21, 82:16

8

**charges** [18] - 32:11, 38:12, 38:19, 39:17, 46:11, 47:14, 48:11, 49:17, 55:1, 57:4, 57:6, 60:9, 61:18, 61:19, 61:21, 62:5, 84:12, 115:24
**check** [1] - 10:1
**chest** [1] - 75:7
**Chicago** [1] - 9:20
**choice** [1] - 50:4
**chosen** [1] - 119:24
**Christmastime** [1] - 141:23
**circumstance** [1] - 95:19
**circumstances** [5] - 41:4, 79:14, 88:14, 88:21, 102:1
**circumstantial** [3] - 17:21, 17:23, 18:3
**citizens** [1] - 34:19
**city** [1] - 141:3
**City** [1] - 71:2
**civil** [8] - 44:15, 44:20, 46:5, 66:4, 71:13, 74:25, 104:15
**CJA** [2] - 9:9, 9:12
**claim** [5] - 42:11, 72:11, 81:20, 81:25, 114:7
**claimed** [1] - 107:21
**claiming** [1] - 120:9
**claims** [2] - 81:9, 108:14
**clean** [2] - 18:17,

105:14
**cleanse** [1] - 115:9
**clear** [17] - 51:25, 56:6, 56:24, 61:24, 83:22, 85:14, 92:21, 96:25, 98:8, 107:9, 107:11, 111:11, 112:10, 114:3, 115:12, 118:18
**cleared** [1] - 58:6
**clearly** [9] - 10:17, 10:25, 42:5, 79:24, 86:18, 88:17, 89:9, 91:25, 121:6
**CLERK** [2] - 99:7, 137:5
**clerk** [2] - 9:11, 67:13
**clerk's** [1] - 9:25
**client** [62] - 2:25, 5:17, 6:2, 6:9, 6:13, 8:24, 34:17, 48:5, 54:11, 64:10, 68:24, 81:23, 85:16, 86:13, 87:18, 87:24, 88:2, 88:10, 88:13, 88:19, 89:5, 91:4, 94:12, 94:22, 95:4, 95:8, 95:10, 95:22, 96:17, 97:4, 97:16, 101:1, 102:18, 103:12, 104:18, 106:8, 106:13, 106:17, 107:10, 107:14, 108:2, 108:7, 109:6, 112:11, 113:1, 114:8,

114:11, 114:13, 114:24, 116:15, 117:2, 117:12, 119:1, 119:13, 119:16, 119:18, 119:23, 121:3, 122:3, 140:25
**client's** [7] - 6:18, 86:24, 87:7, 87:25, 112:16, 113:4, 119:11
**client/investors** [1] - 77:3
**clients** [12] - 17:2, 39:10, 42:20, 43:12, 45:25, 64:19, 81:8, 95:13, 112:11, 141:2, 145:17
**clients'** [1] - 103:25
**clips** [1] - 90:23
**close** [6] - 25:4, 70:8, 85:12, 109:8, 123:12, 131:15
**closing** [3] - 24:4, 24:13, 24:15
**clue** [1] - 98:11
**co** [1] - 115:23
**co-conspirator** [1] - 115:23
**coach** [1] - 38:11
**coconspirator** [8] - 38:10, 76:21, 77:1, 77:19, 80:19, 80:20, 82:13, 91:6
**coconspirators** [1] - 121:16
**codefendant** [3] - 88:10, 89:7, 104:23
**colleagues** [2] - 104:6, 105:9
**collectively** [1] -

100:16
**college** [3] - 124:19, 124:20, 124:22
**color** [1] - 120:4
**comfortable** [1] - 128:14
**coming** [9] - 5:23, 64:23, 70:12, 86:12, 97:19, 98:8, 98:10, 113:6, 172:12
**commenced** [2] - 46:8, 51:24
**commences** [1] - 2:1
**comment** [2] - 96:12, 157:15
**comments** [4] - 59:6, 63:5, 86:13, 86:15
**commit** [2] - 30:3, 101:6
**commitment** [1] - 70:4
**commits** [1] - 79:2
**committed** [10] - 38:9, 52:15, 53:3, 69:11, 100:14, 100:15, 101:4, 101:6, 102:13, 115:14
**commonly** [1] - 79:9
**communicate** [2] - 143:15, 152:8
**communicates** [1] - 20:1
**communicating** [1] - 76:8
**communication** [1] - 19:16
**communities** [1] - 124:5
**community** [1] - 24:22

9

**commute** [1] - 125:15

**companies** [2] - 106:18, 106:20

**company** [39] - 27:20, 30:22, 30:24, 33:16, 40:7, 78:1, 78:2, 78:6, 78:15, 78:17, 78:25, 79:9, 83:15, 99:20, 106:3, 106:5, 107:19, 108:4, 117:11, 118:3, 118:4, 118:5, 118:14, 118:20, 118:24, 120:13, 120:14, 129:1, 132:16, 132:18, 133:9, 133:11, 134:16, 135:9, 137:14, 150:22, 150:25, 173:1

**company's** [2] - 117:13, 121:5

**compare** [2] - 52:19, 53:4

**comparing** [2] - 54:7, 59:23

**compensated** [1] - 43:7

**compensation** [1] - 71:14

**complained** [1] - 110:17

**complete** [4] - 11:20, 16:5, 166:10, 166:11

**completed** [1] - 169:18

**completely** [8] - 45:18, 47:6, 47:9, 48:14, 48:18, 49:4, 56:9, 103:1

**completes** [1] -

122:14

**complex** [2] - 64:6, 114:20

**comply** [1] - 53:14

**compromise** [1] - 179:12

**computer** [2] - 1:25, 159:7

**conceal** [1] - 32:8

**concern** [5] - 56:23, 58:24, 80:6, 93:13, 94:3

**concerned** [5] - 48:17, 52:21, 61:12, 98:4, 105:14

**concerning** [1] - 68:24

**concerns** [1] - 65:15

**conclude** [3] - 17:24, 92:25, 93:4

**concluded** [2] - 35:18, 103:1

**conclusion** [7] - 22:5, 25:2, 49:10, 101:8, 102:12, 102:15, 103:1

**conclusions** [2] - 22:10, 24:8

**conditions** [1] - 45:23

**conduct** [7] - 19:2, 51:16, 54:10, 54:11, 61:9, 83:2, 153:3

**conducted** [3] - 36:10, 36:11, 79:18

**conference** [1] - 111:20

**confidence** [1] - 152:3

**confident** [1] - 179:6

**confronted** [1] - 93:14

**confusing** [2] - 54:5, 55:17

**connect** [1] - 158:7

**connected** [1] - 129:18

**connection** [5] - 34:10, 34:22, 63:17, 65:4, 68:23

**conscience** [1] - 88:3

**conscientiously** [1] - 24:25

**conscious** [2] - 61:19, 102:10

**consequence** [1] - 6:9

**consequences** [1] - 35:16

**conservative** [3] - 28:21, 29:4, 40:17

**consider** [7] - 18:2, 23:10, 34:7, 34:9, 39:18, 47:7, 121:14

**considered** [2] - 17:15, 40:14

**considering** [3] - 13:1, 18:23, 140:17

**consist** [2] - 16:18, 102:24

**consistent** [4] - 33:6, 33:22, 85:5, 87:15

**conspiracies** [1] - 116:16

**conspiracy** [4] - 32:7, 82:25, 115:17, 117:19

**conspirator** [1] - 115:23

**conspiratorial** [1] - 83:1

**conspired** [1] - 76:22

**constant** [1] - 59:11

**CONSTANTINE** [2] - 1:8, 3:18

**constantine** [2] - 114:4, 122:7

**Constantine** [124] - 1:20, 3:12, 3:17, 5:22, 6:8, 10:24, 11:13, 14:4, 27:10, 28:15, 28:24, 29:17, 30:16, 30:18, 30:21, 30:22, 31:5, 31:12, 31:25, 33:1, 33:17, 34:6, 51:18, 51:21, 52:2, 75:21, 76:14, 76:22, 77:4, 77:15, 77:19, 78:20, 79:5, 79:16, 79:25, 80:11, 80:25, 81:2, 81:3, 81:17, 82:4, 82:14, 83:5, 83:7, 83:12, 83:16, 83:21, 83:22, 84:3, 84:6, 84:10, 90:9, 90:20, 91:6, 91:20, 91:22, 92:13, 93:3, 95:2, 95:5, 97:5, 97:17, 98:16, 103:5, 104:3, 104:9, 105:4, 105:8, 105:14, 105:19, 105:22, 105:25, 106:2, 106:9,

10

107:1, 107:4, 107:12, 107:22, 107:24, 109:7, 109:19, 111:8, 111:21, 112:1, 112:3, 112:7, 112:21, 113:1, 113:5, 113:9, 113:16, 113:23, 114:22, 115:13, 116:6, 116:9, 116:19, 117:16, 117:24, 118:21, 119:6, 119:14, 120:9, 120:15, 121:11, 149:4, 149:6, 149:15, 149:21, 149:22, 150:1, 150:4, 175:2, 175:5, 175:16, 175:21, 175:24, 176:11, 177:1, 177:24, 178:17, 179:4

**Constantine's** [18] - 10:8, 29:20, 79:20, 79:22, 80:6, 81:20, 81:25, 82:18, 99:24, 104:25, 108:23, 112:13, 117:10, 117:21, 118:2, 118:5, 118:20, 174:23

**constitute** [1] - 90:24

**constitution** [1] - 24:20

**constitutional** [4] - 37:4, 37:19, 37:24, 96:3

**construction** [4] - 71:10, 71:15, 74:5, 148:3

**consultant** [2] - 151:17, 151:18

**consultants** [1] -

107:23

**consulted** [1] - 13:22

**consulting** [2] - 108:23, 135:6

**contact** [2] - 126:23, 130:22

**contacted** [2] - 4:21, 179:18

**contains** [1] - 12:16

**content** [1] - 2:25

**context** [2] - 96:13, 96:14

**continually** [2] - 35:2, 114:16

**continuation** [1] - 163:20

**continue** [8] - 3:2, 19:25, 62:17, 62:20, 92:25, 99:10, 114:1, 158:2

**continued** [6] - 68:19, 71:16, 98:23, 120:21, 133:6, 136:13

**Continued** [3] - 39:25, 84:16, 167:18

**continues** [1] - 49:15

**Continuing** [1] - 40:1

**continuously** [1] - 90:4

**contract** [3] - 126:17, 164:11, 167:3

**contractor** [1] - 67:23

**contractual** [1] - 70:3

**contrary** [1] - 106:23

**contributed** [3] - 10:15, 111:1,

112:25

**control** [5] - 29:1, 29:13, 29:17, 38:11, 92:7

**controlled** [5] - 39:24, 51:18, 51:21, 52:2

**conversation** [10] - 20:10, 84:2, 92:13, 95:1, 97:24, 100:25, 101:18, 101:24, 102:2, 163:21

**conversations** [7] - 13:23, 20:4, 20:13, 71:6, 101:12, 101:21, 177:17

**convert** [1] - 99:22

**conveys** [1] - 79:10

**convict** [1] - 86:21

**conviction** [7] - 11:11, 11:14, 35:17, 46:24, 96:24, 174:23, 175:7

**convince** [2] - 74:24, 110:1

**convinced** [5] - 77:23, 83:12, 99:18, 138:8, 138:9

**cooperated** [1] - 104:18

**cooperation** [1] - 100:12

**coordinator** [1] - 123:22

**copied** [2] - 80:10, 80:18

**copies** [1] - 10:13

**copy** [4] - 11:5, 80:24, 134:10, 179:16

**core** [2] - 59:17,

61:21

**corner** [1] - 173:19

**corporate** [1] - 80:7

**correct** [12] - 3:5, 94:1, 98:6, 100:23, 128:12, 141:5, 141:8, 153:24, 169:12, 169:15, 173:9

**counsel** [11] - 9:9, 9:12, 23:14, 24:13, 34:11, 37:25, 45:12, 47:15, 50:6, 103:5, 173:7

**counties** [1] - 39:6

**Country** [1] - 1:21

**counts** [2] - 33:23, 75:12

**County** [1] - 39:6

**couple** [4] - 3:23, 154:9, 154:10, 154:13

**course** [13] - 16:14, 38:6, 38:17, 38:23, 43:4, 52:5, 59:7, 60:22, 63:25, 70:2, 73:5, 81:12, 109:24

**Court** [24] - 1:22, 50:20, 53:16, 55:2, 58:19, 58:22, 59:5, 64:10, 74:12, 81:22, 85:16, 86:11, 87:22, 89:20, 90:12, 91:16, 94:20, 96:16, 97:18, 98:7, 176:4, 177:12, 178:5, 178:15

**court** [33] - 5:19, 6:19, 8:2, 9:9,

9:10, 10:6, 10:11, 10:14, 11:2, 11:3, 11:5, 11:6, 11:10, 11:15, 12:25, 14:7, 16:12, 16:21, 17:13, 20:15, 22:14, 22:16, 22:18, 24:22, 35:1, 44:20, 52:13, 61:9, 86:1, 94:2, 94:7, 180:3

**court's** [1] - 17:5

**Court's** [5] - 53:15, 57:24, 58:24, 61:8, 96:8

**courtesy** [1] - 35:24

**Courthouse** [1] - 1:6

**courtroom** [18] - 14:21, 14:22, 15:6, 17:17, 17:19, 20:6, 35:10, 35:12, 47:23, 59:3, 67:11, 68:1, 68:10, 68:16, 97:11, 99:8, 137:6, 174:15

**cover** [1] - 31:13

**cover-up** [1] - 31:13

**covered** [2] - 62:13, 173:6

**CR** [1] - 116:4

**crafty** [1] - 109:5

**create** [4] - 75:7, 96:23, 110:9, 154:4

**created** [3] - 28:18, 110:10, 114:2

**creates** [1] - 95:21

**creating** [3] - 85:12, 94:13,

94:21

**creation** [1] - 107:13

**creative** [2] - 29:21, 157:9

**credibility** [1] - 18:7

**credible** [2] - 102:12, 121:20

**credit** [42] - 30:23, 30:24, 40:22, 41:1, 41:23, 42:6, 68:25, 69:1, 69:11, 70:19, 78:10, 80:7, 87:1, 87:8, 88:6, 107:2, 107:4, 107:8, 107:13, 108:6, 108:19, 108:24, 109:3, 139:1, 139:10, 139:11, 140:7, 140:10, 142:17, 158:11, 160:10, 160:19, 160:22, 160:25, 162:16, 164:17, 164:20, 169:22, 170:7, 170:18

**crime** [7] - 49:6, 79:2, 80:21, 100:15, 105:5, 114:20

**crimes** [12] - 32:4, 36:25, 38:9, 38:18, 74:24, 74:25, 83:4, 101:3, 101:5, 101:6, 102:13, 102:22

**criminal** [20] - 18:9, 18:10, 23:23, 35:16, 35:17, 38:4, 38:12, 44:17, 44:18, 44:20,

46:24, 51:16, 54:12, 76:2, 82:16, 83:2, 97:21, 104:16, 115:24, 116:16

**critical** [1] - 45:17

**cross** [12] - 5:4, 8:5, 8:7, 8:13, 9:1, 23:15, 37:15, 56:7, 73:13, 86:14, 89:8, 93:23

**cross-examination** [4] - 5:4, 8:7, 37:15, 73:13

**cross-examine** [4] - 23:15, 86:14, 89:8, 93:23

**cross-examining** [1] - 9:1

**crystal** [1] - 77:12

**culprits** [1] - 84:8

**curative** [6] - 49:14, 50:2, 51:1, 58:13, 61:5, 62:7

**cured** [1] - 93:19

**current** [1] - 54:6

**curried** [1] - 5:2

**cut** [3] - 121:21, 128:5, 146:10

**cutting** [1] - 157:9

**cycled** [1] - 29:19

---

**D**

**dabbled** [1] - 28:16

**Daily** [1] - 20:25

**danger** [1] - 175:10

**dare** [1] - 63:22

**Darryl** [3] - 39:13, 43:16, 82:9

**date** [16] - 91:16, 140:1, 140:3, 141:14, 144:13, 147:1, 149:14,

149:17, 155:19, 158:4, 158:5, 159:4, 160:3, 160:12, 162:11, 166:22

**dated** [6] - 39:1, 73:17, 77:2, 80:23, 168:3, 172:22

**dates** [1] - 165:25

**daughter** [1] - 67:18

**days** [3] - 43:7, 155:25, 160:21

**De** [1] - 82:8

**DEA** [1] - 4:21

**deal** [25] - 29:10, 54:6, 90:12, 100:18, 106:21, 107:17, 107:18, 107:22, 121:2, 128:5, 135:9, 138:12, 145:15, 162:20, 163:4, 163:9, 164:9, 164:13, 164:18, 167:6, 167:11, 167:13, 167:15, 168:20, 170:15

**dealing** [1] - 106:24

**deals** [9] - 38:13, 38:15, 121:21, 130:19, 138:4, 138:6, 138:10, 142:24, 146:14

**debit** [2] - 78:8, 78:9

**debtors** [1] - 81:7

**December** [8] - 13:24, 70:18, 83:11, 99:17, 140:5, 141:23, 172:22, 172:24

**deceptive** [1] - 101:14

**decide** [6] -

17:18, 18:4,
82:22, 103:17,
157:20, 157:22

**decided** [8] -
28:24, 30:2,
30:16, 42:17,
70:1, 93:15,
120:17, 151:16

**decides** [1] -
78:25

**decision** [13] -
41:5, 41:8,
41:10, 41:19,
44:8, 53:6, 57:3,
60:8, 61:17,
61:20, 62:4,
92:21, 103:13

**decisions** [2] -
45:11, 88:12

**declined** [3] -
48:13, 56:20,
57:6

**deed** [1] - 103:10

**defend** [5] -
37:25, 47:15,
96:17, 96:18,
110:12

**Defendant** [2] -
1:17, 1:19

**defendant** [27] -
4:13, 4:15, 4:16,
4:24, 5:4, 23:23,
24:21, 26:22,
34:9, 37:11,
39:22, 40:21,
77:23, 82:24,
83:16, 85:4,
86:19, 89:3,
91:22, 91:24,
92:15, 93:11,
99:17, 99:21,
103:2, 126:24,
157:21

**DEFENDANT** [3] -
3:6, 3:18, 3:20

**defendant's** [3] -
23:25, 85:9,

156:5

**defendants** [39] -
16:7, 18:12,
18:14, 18:16,
18:19, 18:21,
18:23, 23:15,
23:18, 23:20,
24:14, 27:13,
27:15, 27:19,
27:22, 29:1,
30:16, 31:13,
31:15, 31:18,
31:24, 32:3,
32:5, 32:7, 32:8,
32:11, 34:1,
34:6, 50:1, 55:4,
55:15, 64:20,
83:12, 90:24,
92:22, 95:23,
95:24, 96:3,
125:20

**Defendants** [1] -
1:10

**defendants'** [5] -
18:24, 23:8,
29:3, 32:14, 33:8

**defending** [1] -
64:19

**defense** [24] -
2:13, 5:20, 6:18,
24:2, 27:23,
31:21, 34:11,
36:10, 38:3,
56:12, 60:24,
63:18, 64:8,
65:5, 65:11,
72:24, 78:23,
91:4, 91:11,
91:18, 93:10,
93:14, 175:19

**deficiencies** [2] -
4:9, 4:20

**deflect** [1] -
109:17

**defraud** [9] -
36:15, 36:17,
39:21, 75:15,

77:22, 83:10,
99:16, 102:5,
110:4

**DeGray** [6] -
65:23, 66:1,
66:5, 67:19,
67:24

**degree** [6] -
71:12, 71:13,
125:11, 125:13,
128:11, 128:12

**del** [1] - 42:23

**delay** [2] - 8:16,
68:18

**deliberate** [4] -
22:12, 24:17,
39:18, 58:25

**deliberately** [2] -
38:7, 105:2

**deliberating** [2] -
19:12, 22:6

**deliberations** [4] -
15:22, 21:17,
22:24, 23:2

**delivered** [2] -
9:11, 9:24

**democracy** [1] -
37:4

**demonstrate** [1] -
38:9

**demonstrated** [1]
- 54:16

**demonstrates** [1]
- 36:25

**deny** [1] - 61:13

**denying** [1] -
92:18

**depleted** [2] -
108:24, 109:2

**deposit** [1] - 52:1

**depositions** [1] -
63:1

**Depot** [1] - 89:16

**depth** [2] - 87:1,
108:21

**Derek** [2] - 129:6,
129:7

**describe** [4] -
126:3, 131:22,
170:7, 175:4

**describes** [1] -
41:21

**describing** [1] -
10:25

**deserving** [1] -
35:16

**designed** [1] -
132:8

**desirable** [1] -
106:5

**despite** [3] -
19:20, 94:9,
109:19

**destroyed** [1] -
106:11

**detail** [2] - 88:10,
121:23

**detailed** [1] -
80:10

**detailing** [1] -
111:23

**determination** [11]
- 11:15, 22:7,
22:17, 75:13,
94:14, 95:9,
96:22, 100:21,
101:15, 102:3,
102:19

**determine** [3] -
24:20, 35:15,
100:19

**determined** [1] -
95:11

**determining** [1] -
18:7

**detriment** [1] -
108:24

**devastating** [1] -
51:17

**develop** [7] -
29:8, 29:24,
43:3, 43:11,
70:2, 175:22

**developed** [3] -

13

38:16, 137:18, 175:2

**developing** [1] - 124:6

**development** [19] - 27:17, 29:5, 42:18, 42:22, 42:24, 69:4, 69:6, 69:10, 69:15, 69:17, 73:10, 74:18, 117:8, 123:22, 123:23, 123:24, 138:15, 138:19, 163:4

**developments** [1] - 39:20

**Diamante** [2] - 72:8, 74:1

**diametrically** [5] - 86:19, 87:3, 87:6, 87:14, 87:19

**Diamonte** [4] - 42:23, 43:13, 71:10

**did there come a time** [5] - 130:13, 132:15, 137:24, 138:25, 151:11

**difference** [3] - 22:13, 135:8, 178:2

**different** [24] - 14:2, 28:16, 54:3, 56:3, 59:15, 59:22, 75:24, 94:10, 95:3, 118:13, 130:19, 132:16, 135:8, 138:6, 141:3, 141:8, 142:24, 145:4, 146:14, 154:4, 154:11, 174:8, 178:3, 178:12

**difficult** [1] - 58:13

**diligence** [1] - 41:9

**diminished** [1] - 80:3

**dinners** [1] - 112:8

**dire** [4] - 66:19, 153:4, 159:14, 165:17

**DIRE** [6] - 153:16, 159:16, 165:20, 181:5, 181:9, 181:13

**direct** [9] - 7:10, 8:12, 17:20, 17:21, 18:2, 33:10, 112:15, 153:12

**DIRECT** [8] - 123:16, 155:20, 160:4, 166:23, 181:3, 181:7, 181:11, 181:15

**directed** [1] - 99:21

**directing** [2] - 147:3, 177:13

**direction** [3] - 96:25, 97:2, 115:7

**directly** [3] - 116:10, 177:4, 177:13

**director** [7] - 71:9, 71:14, 73:25, 74:4, 109:7, 123:21

**disadvantage** [1] - 34:15

**disagreed** [1] - 35:19

**disagreement** [1] - 78:23

**disassociated** [1] - 122:10

**disavow** [1] - 81:20

**disavowed** [1] - 83:18

**disbursements** [1] - 6:11

**disclosed** [2] - 104:22, 110:14

**disclosing** [2] - 104:19, 174:23

**disconnected** [1] - 130:11

**discovery** [2] - 51:24, 60:22

**discuss** [16] - 2:21, 2:24, 5:17, 19:4, 19:13, 19:19, 19:21, 23:3, 25:6, 47:21, 86:5, 136:10, 138:14, 157:25, 174:11, 176:3

**discussed** [3] - 14:9, 20:12, 71:3

**discusses** [1] - 92:14

**discussion** [4] - 98:3, 128:21, 145:7, 157:24

**dismissed** [1] - 104:12

**dispassionately** [1] - 58:15

**display** [1] - 34:20

**dispute** [6] - 36:20, 46:1, 76:1, 77:9, 101:16, 101:23

**disputed** [1] - 75:25

**disputes** [1] - 74:25

**disregard** [5] - 17:14, 47:6, 47:8, 50:18, 61:6

**disregarded** [2] -

17:17, 114:17

**distancing** [1] - 91:5

**distinct** [1] - 36:10

**distinction** [1] - 120:15

**distinctly** [1] - 82:24

**distinguish** [1] - 176:10

**District** [26] - 39:3, 39:5, 42:8, 47:1, 48:1, 48:8, 48:23, 50:13, 50:22, 55:3, 55:23, 56:19, 56:20, 57:1, 57:5, 57:7, 57:11, 60:8, 60:18, 61:20, 61:23, 62:1, 62:3, 74:11, 74:12, 74:19

**DISTRICT** [3] - 1:1, 1:1, 1:12

**districts** [1] - 39:4

**disturbed** [1] - 56:21

**disturbing** [4] - 62:5, 72:24, 88:5, 105:11

**diversion** [2] - 92:23, 93:2

**diversions** [1] - 87:13

**divert** [2] - 31:6, 32:1

**diverted** [5] - 78:20, 83:17, 116:12, 117:24, 118:4

**division** [2] - 66:4, 114:20

**doc** [3] - 161:8, 167:8, 168:18

**docs** [2] - 160:19,

162:25

**document** [26] - 42:3, 134:7, 134:12, 139:12, 142:3, 142:4, 142:14, 144:24, 152:17, 153:9, 153:11, 153:13, 155:23, 158:22, 158:24, 161:24, 162:19, 163:5, 164:11, 169:2, 170:17, 172:4, 172:19, 173:5, 173:18, 174:3

**document's** [1] - 171:18

**documentary** [1] - 36:5

**documents** [11] - 16:18, 32:13, 34:21, 93:7, 107:7, 141:25, 158:10, 160:10, 162:15, 171:12, 171:21

**Doe** [5] - 77:24, 83:12, 83:18, 99:18

**dollar** [6] - 33:14, 105:24, 109:13, 148:4, 168:5, 168:8

**dollars** [12] - 29:16, 30:10, 31:24, 41:13, 41:22, 106:19, 109:1, 112:15, 113:20, 116:18, 150:18, 168:12

**donated** [1] - 10:15

**done** [16] - 7:25, 10:19, 12:15, 41:9, 49:3, 55:16, 64:9, 76:19, 86:23,

105:24, 106:10, 124:11, 147:12, 176:10, 176:11

**door** [3] - 26:23, 107:17, 175:19

**dorm** [3] - 125:18, 125:25, 126:1

**doubt** [8] - 18:25, 23:22, 32:12, 37:9, 102:21, 122:2, 165:12, 165:14

**dovetail** [1] - 88:1

**dovetails** [1] - 5:20

**downtime** [1] - 4:1

**downturn** [1] - 69:8

**drafted** [1] - 26:13

**drag** [1] - 154:3

**draw** [4] - 24:9, 48:14, 49:21, 59:9

**drawings** [1] - 151:8

**drawn** [1] - 22:11

**dream** [1] - 26:13

**driver** [2] - 33:18, 106:15

**due** [4] - 41:9, 60:25, 96:16, 114:13

**duly** [1] - 123:3

**during** [29] - 3:13, 3:14, 6:4, 16:14, 19:3, 19:5, 22:23, 22:24, 23:2, 25:15, 38:6, 38:17, 38:23, 63:24, 64:17, 66:19, 69:7, 73:4, 103:15, 106:12, 108:12, 121:10, 129:12,

131:2, 140:14, 141:24, 142:14, 143:12, 145:12

**duty** [1] - 16:8

### E

**e-mail** [56] - 10:22, 10:23, 73:17, 73:21, 77:2, 77:10, 77:14, 80:17, 80:23, 89:10, 95:4, 95:14, 95:17, 95:18, 95:19, 96:1, 97:23, 98:3, 98:5, 144:2, 144:25, 145:3, 147:1, 147:19, 149:13, 149:14, 149:17, 149:18, 150:11, 152:9, 152:20, 152:24, 154:6, 154:8, 154:16, 154:17, 154:25, 155:4, 155:5, 157:19, 158:25, 159:3, 159:5, 160:7, 161:7, 161:12, 161:15, 161:19, 161:25, 162:1, 165:3, 165:5, 165:13, 166:10, 168:3

**e-mailed** [1] - 112:7

**e-mails** [45] - 10:13, 10:17, 10:23, 11:5, 33:9, 76:3, 76:4, 76:8, 76:13, 80:9, 97:4, 111:14, 111:18, 111:22, 127:4, 130:22, 143:9, 143:11, 144:4,

152:11, 152:25, 153:22, 153:25, 154:2, 154:3, 154:9, 154:10, 154:14, 154:20, 155:1, 159:7, 159:8, 159:18, 160:6, 163:15, 165:5, 165:22, 165:23, 165:24, 165:25, 166:6, 166:12, 173:15, 174:18, 177:7

**early** [3] - 4:3, 91:14, 127:7

**earning** [1] - 128:16

**easier** [1] - 55:8

**easily** [2] - 5:10, 154:5

**Eastern** [3] - 57:7, 57:11, 74:19

**EASTERN** [1] - 1:1

**easy** [2] - 119:12, 127:1

**Edenholm** [1] - 78:13

**edge** [1] - 157:9

**effect** [2] - 50:22, 179:3

**effective** [1] - 135:24

**effort** [3] - 81:18, 95:13, 95:24

**efforts** [1] - 80:10

**either** [21] - 12:24, 13:6, 19:22, 25:17, 54:19, 54:24, 58:25, 59:9, 62:23, 63:5, 82:14, 94:19, 95:22, 96:9, 100:15, 106:10, 114:18, 118:25, 146:4, 157:15,

160:23

**elaborate** [1] - 116:16

**electronic** [1] - 19:16

**element** [1] - 23:21

**elevator** [1] - 20:7

**elicit** [5] - 102:16, 176:4, 176:13, 177:20, 177:25

**eliminate** [1] - 53:6

**eliminated** [2] - 52:20

**Ellen** [1] - 82:2

**elsewhere** [1] - 151:21

**embarrassment** [1] - 2:24

**empanelled** [1] - 46:25

**emphasis** [2] - 22:3, 157:2

**emphasize** [5] - 3:13, 59:16, 107:1, 108:9, 110:9

**employ** [1] - 109:11

**employed** [4] - 67:2, 71:8, 72:7, 73:25

**employees** [1] - 109:12

**employment** [1] - 68:5

**end** [22] - 8:8, 15:21, 18:1, 18:8, 19:1, 19:12, 19:13, 21:17, 22:12, 22:20, 25:23, 26:1, 62:12, 69:6, 85:10, 85:24, 115:25, 130:20, 130:25,

132:8, 146:10, 163:15

**ended** [6] - 4:12, 4:21, 124:23, 126:16, 132:10, 138:11

**endorsed** [1] - 163:10

**ends** [2] - 25:5, 163:11

**enemy** [1] - 105:18

**energy** [3] - 121:2, 156:19, 157:8

**enforcement** [4] - 13:7, 55:16, 105:17, 122:12

**engage** [1] - 72:13

**engaged** [1] - 72:18

**engineering** [2] - 71:13, 125:14

**ensure** [1] - 113:5

**entered** [2] - 68:16, 99:8

**entering** [1] - 134:15

**Enterprise** [1] - 106:20

**enters** [3] - 15:6, 67:11, 137:6

**entertain** [4] - 56:1, 62:10, 62:11, 62:14

**entertaining** [1] - 56:16

**entire** [4] - 20:23, 108:14, 142:14, 172:4

**entirely** [3] - 16:16, 83:5, 119:25

**envision** [1] - 63:19

**equities** [1] - 40:23

**Eric** [1] - 78:13

**erroneously** [1] - 2:18

**ESQ** [3] - 1:17, 1:20, 1:20

**essentially** [6] - 43:4, 49:15, 59:23, 75:1, 130:13, 132:23

**establish** [2] - 40:22, 178:25

**established** [2] - 61:25, 75:6

**estate** [5] - 27:16, 29:5, 42:20, 69:8, 170:11

**estimate** [1] - 8:11

**Eufora** [40] - 13:15, 13:25, 27:20, 30:18, 30:22, 31:4, 77:20, 77:25, 78:1, 78:4, 78:9, 78:14, 79:19, 79:22, 79:25, 80:2, 81:11, 81:21, 82:1, 82:4, 82:15, 83:6, 83:14, 83:19, 83:24, 86:24, 99:14, 99:19, 100:7, 100:8, 106:3, 115:3, 116:4, 116:7, 118:6, 118:22, 119:11, 119:16, 119:17, 120:10

**evaluate** [1] - 8:16

**evaluation** [1] - 147:12

**evasive** [2] - 83:7, 84:9

**eventually** [7] - 104:6, 129:5,

129:18, 130:24, 134:2, 137:24, 138:1

**evidence** [171] - 5:20, 5:24, 6:14, 6:15, 6:21, 6:23, 7:1, 8:16, 15:24, 16:5, 16:8, 16:17, 16:22, 16:23, 16:25, 17:1, 17:3, 17:4, 17:10, 17:14, 17:17, 17:18, 17:20, 17:21, 17:23, 18:2, 18:20, 19:8, 21:16, 22:10, 22:11, 22:23, 23:7, 23:10, 23:12, 23:13, 23:16, 23:17, 23:19, 23:24, 23:25, 24:1, 24:3, 24:6, 24:7, 24:9, 28:8, 28:10, 32:13, 33:6, 33:21, 33:23, 35:23, 35:25, 36:2, 36:3, 36:5, 36:8, 36:22, 36:24, 36:25, 38:7, 38:8, 46:13, 47:1, 49:6, 52:10, 54:25, 55:2, 58:14, 63:16, 63:24, 65:10, 76:2, 85:8, 86:18, 87:1, 90:3, 91:16, 91:19, 92:6, 93:5, 93:7, 93:24, 96:5, 96:6, 97:8, 100:24, 102:12, 102:17, 103:23, 104:24, 105:8,

105:25, 106:4, 107:6, 107:9, 107:11, 107:25, 108:12, 108:22, 110:6, 110:18, 110:21, 110:22, 111:3, 111:12, 111:13, 112:2, 112:5, 112:12, 112:17, 113:3, 113:13, 113:14, 113:18, 114:12, 114:15, 115:5, 115:10, 115:20, 116:10, 116:14, 116:18, 116:22, 116:24, 117:3, 117:5, 118:10, 118:15, 118:17, 119:1, 119:2, 119:9, 119:18, 120:7, 120:11, 121:3, 121:6, 121:17, 121:23, 122:4, 122:7, 122:17, 135:21, 144:8, 144:13, 153:10, 155:19, 160:3, 162:11, 166:22, 168:3, 169:9, 169:11, 172:12, 172:17, 173:8, 173:13, 179:17, 181:19, 181:20, 181:21, 181:22, 181:23, 181:24, 181:25, 182:1, 182:2

**evident** [1] - 130:24

**evidentiary** [1] - 3:24

**exact** [2] - 162:18, 179:11

**exactly** [4] - 63:3, 63:15, 85:6, 178:10

**EXAMINATION** [14] - 123:16, 153:16, 155:20, 159:16, 160:4, 165:20, 166:23, 181:3, 181:5, 181:7, 181:9, 181:11, 181:13, 181:15

**examination** [5] - 5:4, 8:7, 37:15, 73:13, 153:12

**examine** [5] - 23:15, 54:25, 86:14, 89:8, 93:23

**examined** [1] - 123:3

**examining** [2] - 9:1, 55:25

**example** [7] - 54:13, 103:11, 106:2, 112:4, 114:22, 118:13, 120:1

**exams** [1] - 28:13

**exceeded** [1] - 70:4

**except** [2] - 104:11, 109:24

**exceptions** [1] - 94:15

**excess** [2] - 12:6, 38:6

**exchange** [11] - 19:9, 77:25, 83:14, 99:20, 134:17, 135:1, 144:2, 147:1, 162:3, 165:5, 166:13

**exclude** [1] - 85:3

**excludes** [1] - 17:13

**exclusive** [2] - 43:4, 101:25

**excuse** [2] - 78:5, 91:23

**excused** [3] - 13:3, 86:6, 136:11

**executed** [1] - 70:19

**exhausted** [1] - 75:9

**Exhibit** [42] - 133:22, 133:25, 135:19, 135:21, 139:15, 139:17, 143:17, 143:21, 144:8, 144:12, 146:25, 147:4, 150:12, 152:13, 155:18, 158:18, 159:13, 160:2, 161:19, 161:23, 162:10, 163:22, 164:23, 165:16, 166:21, 168:2, 168:25, 169:9, 171:25, 172:17, 173:4, 173:13, 173:14, 181:19, 181:20, 181:21, 181:22, 181:23, 181:24, 181:25, 182:1, 182:2

**exhibit** [10] - 22:22, 22:25, 135:15, 144:16, 144:20, 146:25, 169:1, 172:13, 178:24, 179:5

**Exhibits** [1] - 173:8

**EXHIBITS** [1] - 181:18

**exhibits** [2] - 16:19, 23:17

**exist** [1] - 17:24

**existed** [1] - 70:23

**expect** [8] - 35:22, 36:7, 38:23, 41:6, 46:13, 68:23,

77:1, 84:1

**expects** [1] - 23:11

**expense** [4] - 4:12, 112:6, 112:8, 112:14

**expenses** [2] - 31:1, 31:5

**expensive** [1] - 46:4

**experience** [3] - 9:9, 124:1, 125:1

**expired** [1] - 163:1

**explain** [10] - 46:19, 51:1, 51:3, 51:7, 110:25, 145:2, 153:7, 175:1, 175:16, 175:25

**explained** [2] - 46:21, 46:23

**explaining** [2] - 160:21, 175:9

**explanation** [2] - 51:8, 164:2

**expletive** [2] - 157:14

**explicit** [1] - 83:22

**exploit** [1] - 28:24

**exposed** [2] - 14:6, 59:22

**expression** [1] - 50:7

**extended** [3] - 162:16, 169:22, 170:18

**extent** [5] - 50:14, 62:25, 89:23, 93:22, 175:15

**eyes** [1] - 103:21

**eyewitness** [1] - 17:22

**F**

**face** [2] - 140:16

17

**facing** [2] - 50:1, 115:24

**fact** [41] - 4:10, 5:20, 17:21, 19:20, 19:22, 48:15, 48:17, 49:19, 52:10, 53:18, 60:3, 60:7, 60:15, 60:16, 61:2, 61:11, 69:13, 80:2, 86:17, 89:2, 93:10, 93:20, 94:22, 109:19, 110:1, 111:10, 116:23, 117:16, 118:7, 119:15, 121:19, 122:4, 122:5, 154:24, 175:6, 175:11, 177:18, 177:23, 178:7, 178:25

**facts** [20] - 16:9, 16:10, 16:11, 16:17, 16:20, 17:23, 17:24, 22:18, 24:20, 24:22, 24:23, 36:19, 102:20, 105:15, 109:17, 114:15, 114:17, 118:24, 120:6, 121:13

**factual** [3] - 59:11, 60:21, 178:2

**fail** [1] - 63:24

**failed** [3] - 104:13, 104:15, 113:19

**failing** [2] - 54:24, 54:25

**failures** [1] - 28:17

**fair** [9] - 35:21, 68:6, 88:4,

88:13, 101:2, 132:12, 160:6, 172:18, 179:8

**fairly** [3] - 19:25, 96:2, 179:6

**fairness** [1] - 16:6

**faith** [6] - 8:23, 8:25, 65:12, 87:20, 96:20

**Falcon** [1] - 118:5

**falls** [1] - 94:15

**false** [17] - 4:23, 5:21, 5:25, 52:6, 52:11, 52:15, 53:20, 54:12, 54:16, 54:21, 55:20, 55:22, 55:24, 56:9, 88:2, 120:6

**familiar** [3] - 65:25, 103:9, 113:12

**family** [4] - 19:14, 113:21, 141:20, 157:14

**famous** [2] - 27:3, 27:11

**fan** [1] - 43:7

**far** [17] - 45:19, 49:6, 52:21, 56:21, 56:22, 61:8, 61:12, 77:18, 88:16, 90:11, 105:13, 114:25, 121:9, 125:1, 125:2, 129:25, 164:18

**fast** [1] - 148:16

**fault** [1] - 9:7

**faux** [1] - 2:24

**favor** [1] - 5:2

**favorable** [1] - 38:8

**fax** [1] - 142:11

**FBI** [24] - 28:6, 34:23, 34:24, 35:2, 35:14,

38:4, 38:6, 38:11, 71:6, 73:8, 73:16, 73:19, 73:22, 73:25, 74:13, 109:7, 109:9, 109:16, 114:20, 154:15, 154:16, 159:19, 166:3, 166:6

**February** [2] - 77:22, 124:17

**Federal** [2] - 1:14, 1:23

**federal** [2] - 32:4, 67:23

**fee** [4] - 28:14, 134:16, 134:25, 135:6

**feedback** [1] - 146:19

**feedbacks** [1] - 146:8

**fees** [3] - 31:2, 104:13, 108:23

**fellow** [10] - 19:21, 20:1, 42:16, 42:25, 43:1, 69:2, 69:18, 69:25, 72:6, 73:2

**felt** [3] - 86:17, 90:6, 128:9

**Ferguson** [1] - 82:2

**few** [10] - 7:24, 19:2, 86:3, 126:17, 128:5, 132:17, 135:3, 149:18, 160:21, 163:3

**fiasco** [1] - 105:21

**fiction** [1] - 119:17

**field** [2] - 35:7, 128:12

**fifth** [1] - 21:9

**fight** [3] - 31:22,

31:25, 103:13

**fighting** [1] - 105:7

**figure** [2] - 8:6, 43:1

**file** [1] - 81:20

**filed** [4] - 45:22, 119:14, 119:15, 119:19

**files** [6] - 74:8, 74:10, 81:5, 81:6, 81:17, 154:4

**final** [9] - 31:13, 39:17, 41:8, 69:13, 88:8, 96:12, 102:4, 147:10, 168:13

**finally** [4] - 21:15, 33:8, 104:20, 130:7

**finance** [1] - 73:9

**financial** [22] - 28:12, 28:14, 29:14, 39:11, 77:8, 128:12, 128:15, 129:21, 130:2, 130:3, 130:9, 130:14, 131:21, 133:6, 133:10, 134:17, 135:1, 135:2, 140:15, 141:25, 142:1, 151:17

**financing** [4] - 108:1, 108:2, 108:3, 108:8

**fine** [5] - 11:7, 56:6, 56:25, 62:1, 62:3

**finest** [1] - 121:23

**finger** [4] - 92:22, 93:11, 93:23, 121:18

**fingers** [2] - 31:12, 105:13

**finish** [3] - 7:16,

18

49:1, 163:3
**finished** [1] - 99:13
**fire** [1] - 119:5
**fired** [3] - 116:6, 119:5, 130:13
**firm** [3] - 29:3, 128:1, 128:21
**first** [50] - 2:8, 7:8, 7:19, 8:3, 8:10, 15:12, 18:12, 19:3, 23:5, 24:12, 28:25, 30:20, 37:23, 38:5, 39:1, 47:12, 50:11, 51:11, 51:12, 59:20, 61:14, 64:15, 66:24, 67:12, 85:16, 91:15, 92:20, 97:6, 102:7, 119:4, 122:17, 123:2, 123:9, 124:15, 126:1, 126:16, 127:15, 128:7, 128:19, 129:5, 135:23, 140:2, 140:6, 140:17, 146:24, 149:5, 156:12, 172:18, 174:20, 175:20
**fiscalist** [4] - 151:22, 151:23, 156:1, 156:15
**FISCALIST** [1] - 151:23
**fit** [1] - 120:20
**five-letter** [1] - 34:14
**five-year** [1] - 104:10
**flawed** [2] - 121:7, 121:12
**Florida** [1] - 127:20

**fly** [1] - 33:19
**focus** [2] - 54:23, 144:23
**focused** [2] - 60:9, 63:16
**follow** [10] - 16:12, 17:11, 20:19, 26:1, 61:7, 64:3, 113:7, 113:13, 163:24
**followed** [2] - 24:13, 113:14
**following** [7] - 20:19, 23:18, 85:1, 86:1, 124:22, 126:17, 137:1
**follows** [6] - 52:9, 81:24, 82:5, 97:2, 99:15, 123:4
**football** [1] - 43:6
**forbids** [1] - 85:7
**forced** [1] - 41:10
**forever** [1] - 60:5
**forgot** [3] - 48:16, 57:19, 127:15
**form** [6] - 21:15, 23:16, 32:13, 49:14, 50:25, 109:25
**formally** [1] - 58:8
**former** [9] - 27:1, 54:15, 104:14, 107:14, 109:7, 116:4, 116:24, 129:10, 158:25
**formulate** [1] - 77:14
**forth** [8] - 10:24, 24:2, 36:23, 75:24, 92:14, 102:22, 160:6, 164:12
**forward** [3] - 59:10, 94:17,

104:21
**founded** [1] - 106:2
**fourth** [1] - 20:21
**France** [1] - 124:24
**frankly** [5] - 44:19, 61:3, 89:15, 90:12, 90:14
**fraud** [24] - 12:17, 14:14, 14:17, 27:13, 28:25, 30:3, 30:4, 31:13, 31:14, 32:6, 32:8, 69:16, 77:20, 104:19, 104:22, 115:3, 115:4, 115:14, 115:15, 115:16, 115:18, 116:7, 117:5
**frauds** [1] - 74:17
**fraudulent** [5] - 40:12, 81:25, 115:6, 121:22
**fraudulently** [1] - 114:8
**Freedom** [1] - 132:22
**frequently** [2] - 140:16, 163:15
**freshman** [1] - 125:17
**freshmen** [1] - 125:24
**Friday** [3] - 9:5, 9:20, 9:23
**friend** [5] - 30:6, 109:8, 131:8, 131:10, 140:25
**friend's** [1] - 67:18
**friends** [10] - 103:21, 109:15, 113:21, 126:5,

126:6, 126:7, 131:3, 131:4, 131:5, 141:17
**friendship** [1] - 131:7
**front** [7] - 28:11, 33:15, 56:17, 76:5, 96:8, 143:24, 168:6
**full** [7] - 15:20, 29:12, 34:19, 35:21, 101:2, 102:20, 118:22
**fully** [6] - 42:12, 46:19, 46:20, 46:23, 93:21, 162:22
**Fund** [9] - 10:15, 11:2, 31:14, 75:5, 75:6, 75:14, 76:17, 77:6, 82:15
**fund** [19] - 27:23, 31:21, 33:16, 110:3, 110:8, 110:17, 110:23, 111:3, 111:9, 111:17, 111:22, 111:24, 112:2, 112:20, 113:7, 114:2, 177:6, 177:15
**fundamental** [1] - 78:22
**fundamentally** [1] - 121:7
**funding** [2] - 33:11, 43:20
**funds** [16] - 28:21, 43:17, 76:23, 76:25, 93:2, 93:3, 95:12, 110:14, 110:17, 112:1, 112:4, 112:14, 113:1, 113:19, 116:12, 116:13

19

**future** [4] - 26:21, 77:13, 94:5, 98:15

**G**

**Gaarn** [16] - 81:14, 99:21, 100:2, 100:5, 100:6, 100:13, 100:14, 100:15, 100:19, 100:20, 101:1, 101:2, 104:21, 115:23, 116:23
**gains** [1] - 131:6
**Galioto** [10] - 28:6, 34:25, 53:17, 54:20, 105:1, 111:10, 114:16, 118:25, 119:3
**gallery** [1] - 13:10
**Gaudet** [1] - 70:22
**generalities** [1] - 121:11
**generally** [1] - 176:3
**generated** [1] - 108:6
**gentlemen** [65] - 34:24, 36:2, 36:13, 36:19, 37:5, 37:13, 38:3, 38:17, 39:5, 39:17, 40:13, 41:7, 41:16, 43:8, 44:2, 44:19, 45:22, 46:3, 46:17, 47:11, 68:21, 69:5, 70:18, 72:24, 73:20, 74:20, 75:10, 75:25, 76:5, 76:11, 77:1, 78:7, 78:22, 79:7,

81:12, 82:20, 99:14, 100:1, 100:14, 101:10, 102:7, 103:8, 103:11, 103:23, 104:17, 105:6, 106:17, 108:17, 110:7, 110:16, 111:12, 112:10, 113:12, 114:6, 114:23, 115:13, 116:14, 117:12, 117:24, 119:2, 119:21, 120:7, 121:6, 121:17, 121:25
**Gentry** [2] - 81:14, 116:4
**get-go** [1] - 134:19
**given** [10] - 9:17, 22:7, 49:14, 50:3, 62:12, 100:12, 102:9, 118:14, 172:13, 176:7
**Glen** [1] - 82:10
**global** [11] - 76:15, 110:3, 111:2, 111:16, 111:24, 112:1, 112:20, 113:6, 114:2, 177:5, 177:15
**Global** [9] - 10:15, 11:1, 31:14, 75:5, 75:14, 76:17, 77:5, 82:14
**goalpost** [3] - 118:11, 121:8
**goalposts** [2] - 120:1, 120:5
**God** [1] - 40:15
**golf** [5] - 43:4, 43:8, 70:2, 74:1, 113:19

**Gonchar** [2] - 82:6, 118:8
**goods** [1] - 95:12
**Googling** [1] - 21:12
**gouging** [1] - 103:21
**government** [128] - 2:11, 2:17, 3:7, 3:21, 5:2, 11:6, 12:18, 14:1, 16:7, 18:14, 18:18, 18:24, 23:5, 23:13, 23:21, 23:25, 24:11, 24:14, 26:3, 32:10, 33:4, 33:25, 34:8, 35:5, 35:17, 35:20, 36:3, 36:11, 37:8, 37:10, 37:16, 38:12, 38:14, 38:15, 38:18, 38:22, 39:9, 41:15, 44:12, 46:23, 53:6, 54:18, 60:17, 60:23, 61:22, 63:23, 64:16, 65:8, 67:23, 74:24, 76:9, 76:22, 78:23, 80:13, 80:14, 80:15, 80:16, 82:25, 84:12, 89:7, 90:5, 90:10, 91:8, 91:17, 94:7, 94:18, 95:20, 96:4, 96:9, 97:12, 100:12, 100:18, 100:20, 100:22, 102:5, 102:21, 103:15, 104:18, 106:22,

109:14, 110:1, 110:21, 113:14, 113:16, 113:24, 114:3, 114:7, 114:23, 115:9, 115:22, 115:25, 116:3, 116:20, 117:17, 117:23, 118:6, 119:7, 119:22, 121:1, 121:10, 121:22, 122:1, 122:16, 122:19, 135:14, 144:7, 153:1, 153:22, 159:12, 162:5, 165:8, 165:15, 169:4, 173:7, 174:20, 174:25, 175:13, 175:15, 176:21, 177:3, 177:20, 177:25, 178:23, 179:2, 179:5, 179:10
**Government** [28] - 1:13, 94:25, 135:21, 139:15, 139:17, 143:17, 144:12, 147:4, 152:13, 155:18, 158:18, 160:2, 161:19, 161:23, 162:10, 163:22, 164:23, 166:21, 168:2, 168:25, 173:4, 173:8, 181:19, 181:20, 181:21, 181:22, 181:23, 181:24
**government's** [27] - 10:9, 10:20, 23:18, 37:21, 39:12, 57:17, 58:12, 58:23, 59:10, 59:17, 60:12, 63:21, 78:13, 101:9,

20

101:11, 106:12,
109:11, 110:24,
111:8, 111:9,
111:12, 115:5,
115:18, 118:10,
171:16, 178:6,
179:17

**Government's** [10]
- 133:25, 135:19,
169:9, 171:25,
172:17, 173:13,
173:14, 181:25,
182:1, 182:2

**graduated** [1] -
126:13

**grand** [37] -
38:25, 39:1,
39:3, 39:8, 41:3,
41:18, 41:21,
42:8, 43:16,
44:4, 44:11,
46:25, 48:1,
48:7, 48:23,
50:13, 52:5,
52:16, 55:24,
56:19, 56:20,
57:2, 57:3, 60:7,
60:17, 61:17,
61:20, 62:1,
62:3, 62:22,
63:1, 64:14,
64:16, 64:20,
65:1, 65:2, 99:22

**grant** [2] - 62:9,
104:21

**granted** [1] -
115:23

**graphic** [1] -
88:10

**great** [7] - 34:14,
34:15, 77:6,
78:6, 102:9,
107:18, 121:2

**greater** [2] -
22:7, 40:19

**green** [2] - 120:3,
120:4

**Greg** [1] - 82:8

**grounds** [4] -
58:10, 60:4,
85:12, 86:10

**group** [4] - 44:8,
44:9, 118:23

**group's** [1] -
178:15

**growing** [1] - 26:7

**growth** [2] - 78:2,
78:6

**GSF** [2] - 77:5,
83:6

**guarantee** [1] -
26:17

**guess** [15] - 35:8,
68:21, 74:6,
83:6, 128:2,
128:5, 131:1,
136:4, 138:1,
145:7, 147:22,
156:16, 161:14,
167:16, 168:21

**guessing** [1] -
57:17

**guide** [3] - 15:19,
15:23, 129:20

**guidelines** [1] -
18:7

**guilt** [2] - 18:15,
18:25

**guilty** [4] - 18:13,
32:11, 33:23,
37:7

**guy** [2] - 27:24,
31:18

**guys** [8] - 26:9,
43:5, 43:6,
44:10, 76:7,
121:19

**gyms** [1] - 26:10

---

**H**

**HALEY** [82] -
1:17, 2:15, 2:23,
5:8, 7:15, 8:21,
9:22, 10:2, 12:4,

12:9, 12:12,
15:2, 34:13,
40:1, 46:7,
46:15, 47:10,
48:4, 48:9,
48:19, 48:22,
49:8, 49:12,
50:10, 51:3,
51:9, 53:8,
58:19, 60:14,
63:12, 63:14,
65:3, 66:10,
67:8, 68:13,
68:20, 72:1,
85:19, 85:23,
91:2, 92:11,
94:24, 95:6,
95:8, 96:12,
97:22, 99:6,
99:12, 135:17,
142:5, 144:9,
153:3, 153:6,
153:15, 153:17,
155:12, 156:21,
156:23, 157:2,
157:5, 159:14,
159:17, 159:22,
159:24, 162:7,
165:17, 165:19,
165:21, 166:4,
166:5, 166:16,
169:6, 171:14,
172:8, 173:9,
174:4, 174:6,
179:21, 180:2,
181:6, 181:10,
181:14

**Haley** [41] - 2:18,
2:22, 5:6, 6:8,
7:16, 8:19, 11:6,
34:12, 47:24,
48:7, 50:9,
50:15, 52:8,
56:25, 60:7,
60:13, 61:25,
62:22, 64:12,
66:18, 85:6,

86:23, 87:20,
88:6, 89:2, 91:1,
94:5, 97:7,
103:16, 106:22,
111:25, 117:17,
119:11, 119:12,
119:18, 119:22,
120:9, 153:14,
153:20, 159:2,
179:20

**Haley's** [5] -
49:18, 59:7,
68:19, 87:23,
99:11

**half** [5] - 12:3,
30:7, 30:8,
150:10, 150:17

**halfway** [1] -
25:12

**hall** [1] - 12:10

**halls** [1] - 20:17

**hallways** [1] -
20:6

**halt** [1] - 90:7

**hand** [2] - 15:14,
173:19

**handed** [2] -
74:18, 133:22

**handing** [1] -
169:2

**handle** [1] -
178:21

**handling** [1] -
59:18

**hands** [3] - 40:8,
83:20, 105:15

**hands-down** [1] -
83:20

**handwriting** [4] -
135:25, 170:2,
170:4, 170:12

**handwritten** [1] -
169:24

**hangars** [2] -
148:14, 151:9

**happy** [1] - 95:22

**Harbor** [4] - 30:4,

30:5, 102:6, 102:14

**hard** [5] - 87:16, 121:23, 127:2, 127:3, 130:21

**harm** [1] - 6:17

**harmed** [1] - 6:18

**harms** [1] - 6:17

**hate** [1] - 54:18

**Hawaii** [40] - 27:17, 29:2, 29:6, 29:7, 29:23, 29:25, 30:3, 30:12, 39:19, 40:8, 41:25, 42:15, 42:18, 43:17, 43:24, 44:6, 45:1, 45:6, 69:1, 137:12, 138:8, 138:15, 138:20, 142:17, 145:6, 145:11, 145:15, 145:18, 145:24, 147:9, 163:9, 164:9, 164:13, 164:18, 167:6, 167:15, 168:13, 170:24, 171:6, 174:2

**Hawaiian** [12] - 69:4, 69:5, 69:10, 69:12, 69:15, 69:17, 74:18, 106:21, 107:16, 107:22, 108:1, 170:15

**head** [1] - 13:11

**heading** [1] - 39:19

**headline** [1] - 21:6

**hear** [47] - 6:4, 14:22, 15:23, 17:16, 21:4, 32:14, 32:20, 32:24, 33:8,

34:11, 34:21, 34:23, 35:4, 37:17, 38:23, 39:14, 49:18, 50:16, 51:7, 54:18, 56:18, 62:2, 64:25, 66:20, 78:12, 81:14, 84:1, 85:9, 87:24, 88:15, 100:21, 100:23, 100:24, 103:5, 104:17, 105:22, 108:10, 110:7, 111:6, 113:12, 115:2, 115:16, 115:17, 116:3, 123:12, 138:23, 175:13

**heard** [23] - 11:12, 19:7, 24:15, 39:8, 39:12, 49:5, 50:10, 50:12, 53:10, 57:16, 86:11, 88:14, 92:11, 103:14, 106:1, 106:12, 106:21, 108:4, 108:20, 110:3, 111:25, 121:25, 179:24

**hearing** [1] - 116:16

**hears** [2] - 47:1, 87:23

**hearsay** [23] - 64:15, 64:22, 89:10, 89:16, 89:23, 90:14, 92:7, 92:8, 92:12, 92:16, 94:11, 94:13, 94:15, 94:16, 94:22, 94:23, 95:7, 95:14, 96:7, 97:9, 98:9,

98:12, 98:14

**held** [3] - 28:11, 40:23, 79:9

**hello** [1] - 67:12

**help** [15] - 8:15, 15:23, 22:2, 23:6, 26:19, 38:11, 43:11, 43:20, 103:18, 104:14, 128:4, 129:20, 131:24, 151:21, 175:1

**helpful** [3] - 6:14, 7:18, 60:24

**helping** [1] - 130:1

**hidden** [1] - 97:25

**highlight** [1] - 97:17

**highlighted** [1] - 147:5

**Highway** [1] - 1:18

**himself** [18] - 11:13, 14:3, 28:11, 29:21, 29:22, 30:1, 37:25, 44:24, 47:15, 57:15, 76:13, 81:19, 91:5, 105:23, 106:15, 115:6, 116:6, 122:10

**hinge** [1] - 58:25

**hire** [3] - 33:19, 109:10, 156:1

**hired** [2] - 26:10, 106:15

**history** [1] - 34:18

**HL** [1] - 178:15

**hmm** [3] - 160:8, 165:11, 169:23

**hobbies** [1] - 33:12

**hobnob** [1] - 27:10

**Hockey** [1] - 26:6

**hockey** [46] - 6:18, 10:25, 12:17, 12:19, 12:21, 13:1, 26:8, 26:14, 26:17, 27:2, 27:4, 27:5, 32:16, 41:17, 43:5, 54:15, 81:8, 105:16, 106:13, 106:14, 106:25, 108:6, 108:15, 108:25, 109:21, 110:5, 110:23, 110:25, 111:4, 111:7, 111:15, 111:19, 112:18, 113:25, 114:21, 117:7, 124:2, 124:12, 124:16, 125:2, 126:8, 126:14, 130:25, 140:18, 176:9, 176:11

**hold** [1] - 97:12

**holds** [2] - 78:7, 79:8

**home** [4] - 21:24, 26:24, 33:14, 174:13

**Home** [1] - 89:16

**honest** [1] - 164:20

**Honor** [99] - 2:12, 2:14, 2:23, 3:6, 3:9, 3:18, 3:20, 3:23, 5:13, 7:15, 7:18, 9:4, 9:17, 10:5, 11:9, 12:1, 12:2, 12:9, 12:14, 13:12, 13:21, 15:2, 36:1, 47:17, 48:4, 48:19, 48:22, 49:1, 49:13, 49:16, 50:3, 51:9, 53:8,

53:10, 57:13, 57:22, 58:5, 58:18, 58:19, 58:21, 60:14, 61:5, 62:19, 63:14, 65:19, 66:10, 67:7, 68:12, 68:14, 68:20, 82:23, 84:13, 85:19, 86:9, 87:5, 91:2, 91:9, 92:3, 92:7, 95:8, 96:18, 96:22, 98:21, 99:4, 99:5, 103:7, 123:14, 133:15, 133:21, 135:18, 144:9, 144:10, 147:6, 148:17, 153:3, 155:16, 156:9, 156:23, 159:25, 162:7, 162:8, 166:16, 166:19, 169:7, 172:2, 172:9, 172:15, 173:5, 173:11, 174:4, 174:7, 176:3, 176:18, 177:1, 177:22, 178:14, 180:1

**Honor's** [2] - 48:20, 102:24

**hope** [6] - 31:22, 65:1, 75:9, 99:10, 117:4, 162:17

**hopefully** [1] - 2:5

**hoping** [2] - 5:22, 64:25

**Hormovitis** [2] - 1:9, 11:11

**hostile** [1] - 118:19

**hour** [4] - 8:12, 12:3, 25:17, 25:18

**hours** [1] - 7:24

**house** [1] - 141:20

**household** [1] - 106:18

**housekeeping** [1] - 9:2

**Hughes** [1] - 14:17

**humiliated** [1] - 105:6

**hundred** [7] - 41:22, 109:13, 120:16, 168:5, 168:8, 168:12, 171:2

**hundreds** [1] - 30:10

**hypocrite** [1] - 108:17

---

**I**

**ice** [2] - 35:8, 124:1

**idea** [6] - 40:8, 42:13, 42:24, 43:2, 56:9, 171:2

**identification** [8] - 76:12, 133:25, 139:14, 143:17, 143:20, 152:13, 158:19, 168:25

**identified** [3] - 62:25, 63:7, 178:16

**identifying** [1] - 165:22

**identity** [1] - 99:22

**ignore** [3] - 17:6, 38:7, 38:18

**ignored** [1] - 118:21

**illegal** [3] - 120:2, 120:3, 120:4

**illustrate** [1] - 117:2

**image** [2] -

175:17, 175:23

**imagine** [2] - 72:14, 121:2

**immediate** [3] - 50:12, 62:7, 62:16

**immediately** [6] - 21:5, 21:7, 22:25, 31:8, 115:7, 169:24

**immunity** [2] - 104:21, 115:24

**impanelled** [2] - 39:2, 39:3

**impartial** [1] - 68:6

**impartiality** [1] - 16:6

**impartially** [1] - 19:25

**impeach** [2] - 52:14, 59:17

**impeachment** [2] - 4:2, 4:25

**implicates** [2] - 88:18, 97:17

**implication** [2] - 61:19, 62:4

**import** [1] - 61:24

**important** [10] - 16:1, 19:6, 21:8, 24:19, 34:5, 35:10, 35:12, 72:1, 128:8, 175:25

**importantly** [2] - 86:16, 121:12

**imposes** [1] - 23:22

**impossible** [2] - 130:23, 152:10

**impression** [1] - 22:8

**improper** [8] - 17:4, 20:12, 48:13, 48:15, 48:18, 49:4,

49:21, 55:18

**impropriety** [1] - 20:13

**improve** [1] - 78:10

**inaccurate** [1] - 62:5

**inadmissible** [2] - 88:17, 89:16

**inappropriate** [7] - 61:9, 61:10, 62:6, 63:2, 63:4, 92:9, 112:9

**inbound** [1] - 112:21

**incidentally** [1] - 108:8

**include** [2] - 21:11, 38:3

**includes** [2] - 19:15, 91:5

**including** [13] - 19:5, 23:14, 44:16, 74:18, 80:12, 81:23, 83:18, 89:16, 89:17, 99:23, 105:16, 110:13, 114:14

**income** [1] - 128:8

**inconsistent** [2] - 87:11, 93:9

**incorrect** [2] - 53:20, 120:6

**indeed** [11] - 42:13, 69:1, 70:13, 73:16, 74:15, 75:4, 79:6, 79:17, 80:17, 96:14, 100:7

**independent** [2] - 175:5, 177:18

**iNDEX** [1] - 181:1

**indicate** [5] - 16:15, 58:22, 59:5, 152:4,

172:25

**indicated** [6] - 41:17, 48:5, 134:6, 140:1, 141:14, 177:12

**indicates** [1] - 169:17

**indicating** [2] - 16:15, 171:13

**indict** [3] - 47:2, 48:13, 48:24

**indicted** [4] - 54:11, 114:24, 119:6, 120:18

**indictment** [64] - 12:16, 13:16, 14:1, 18:13, 37:1, 37:23, 38:25, 39:1, 39:16, 40:20, 42:11, 44:17, 44:18, 47:12, 47:13, 47:16, 48:1, 49:15, 49:20, 49:25, 50:16, 51:11, 51:12, 51:13, 51:15, 51:23, 52:10, 52:12, 52:18, 52:25, 53:19, 54:4, 54:6, 54:22, 55:4, 55:7, 55:14, 55:21, 56:1, 56:4, 56:10, 56:13, 56:19, 59:12, 59:22, 60:3, 68:22, 69:3, 74:17, 75:11, 75:16, 77:21, 78:19, 80:22, 83:1, 83:9, 91:7, 92:15, 99:15, 102:4, 102:23, 111:5, 121:7

**Indictment** [2] -

53:23, 54:17

**indictments** [4] - 12:18, 52:23, 53:5, 59:8

**indirect** [1] - 117:20

**indirectly** [1] - 116:10

**individual** [12] - 21:21, 63:8, 78:24, 79:10, 86:14, 86:15, 99:21, 101:16, 128:20, 131:6, 131:8

**individually** [1] - 100:15

**individuals** [8] - 5:1, 6:17, 10:14, 78:8, 80:11, 101:13, 113:7, 113:8

**induced** [3] - 39:22, 114:8, 175:4

**indulged** [1] - 102:8

**indulgence** [3] - 36:15, 58:18, 102:10

**infer** [1] - 17:24

**inference** [3] - 48:14, 49:4, 67:1

**inferences** [4] - 24:8, 48:25, 49:21, 59:8

**inflection** [1] - 156:24

**influence** [1] - 22:7

**influenced** [1] - 17:5

**information** [21] - 5:14, 8:23, 54:20, 54:22, 55:23, 55:24, 56:7, 60:23,

60:24, 82:3, 86:12, 88:15, 102:16, 104:24, 105:11, 105:12, 117:1, 121:15, 143:8, 145:3, 145:21

**informed** [2] - 145:7, 145:9

**inherently** [1] - 93:9

**initial** [3] - 41:22, 108:8, 148:4

**initials** [1] - 163:13

**initiated** [1] - 111:24

**initiates** [1] - 6:12

**injuries** [1] - 132:3

**innocence** [4] - 18:20, 37:3, 37:5, 104:25

**innocent** [2] - 18:12, 55:5

**inquire** [1] - 5:6

**inquiry** [1] - 5:9

**insisted** [1] - 113:1

**instance** [4] - 38:5, 112:5, 112:17, 118:25

**instances** [3] - 9:8, 104:12, 112:3

**instantly** [1] - 105:17

**instead** [7] - 27:15, 27:17, 27:21, 27:24, 73:25, 88:9, 117:15

**instigate** [1] - 4:17

**instigated** [2] - 4:7, 4:24

**Institute** [1] -

125:7

**instruct** [6] - 11:16, 16:21, 19:3, 24:16, 34:4, 46:11

**instructed** [2] - 17:10, 90:2

**instruction** [15] - 17:12, 20:19, 20:20, 49:14, 50:2, 50:12, 50:18, 50:21, 51:1, 58:14, 61:6, 61:8, 62:8, 62:12, 62:14

**instructions** [14] - 2:9, 15:18, 15:20, 15:22, 16:2, 17:25, 19:1, 19:8, 19:12, 21:22, 25:5, 37:2, 65:11, 102:25

**insult** [1] - 157:15

**insured** [1] - 40:22

**integrity** [2] - 112:16, 113:4

**intend** [6] - 5:6, 8:25, 54:2, 63:6, 63:17, 89:21

**intended** [3] - 16:14, 110:15, 118:2

**intending** [1] - 65:1

**intends** [2] - 63:2, 89:5

**intention** [10] - 5:9, 13:17, 13:19, 60:15, 60:19, 60:20, 61:10, 61:11, 61:16, 90:16

**intentional** [1] - 58:25

**intentionally** [2] -

24

54:24, 122:3

**interest** [37] -
40:3, 40:6, 40:9,
40:11, 43:11,
43:13, 43:15,
70:5, 70:16,
72:13, 74:21,
77:25, 78:15,
78:17, 78:24,
79:1, 79:11,
79:12, 79:25,
80:3, 80:4,
81:10, 81:15,
81:21, 83:14,
83:19, 83:23,
84:4, 99:20,
100:7, 100:8,
129:25, 138:6,
157:8, 157:25,
176:10

**interested** [4] -
44:23, 128:22,
128:24, 129:24

**interesting** [1] -
72:23

**intern** [1] - 13:7

**internet** [1] -
21:11

**interpretation** [1]
- 36:24

**interrupt** [2] -
64:10, 153:12

**interviewed** [1] -
35:5

**intimately** [1] -
14:6

**introduce** [7] -
22:25, 63:24,
90:15, 91:9,
91:11, 96:1,
128:24

**introduced** [7] -
30:19, 36:5,
85:6, 107:8,
129:17, 149:22,
150:1

**introducing** [2] -

23:24, 95:21

**introduction** [1] -
90:13

**invest** [16] -
26:20, 41:5,
41:12, 41:19,
45:3, 45:6, 69:1,
77:24, 83:13,
99:19, 131:23,
138:8, 150:3,
150:17, 167:12,
171:5

**invested** [16] -
13:15, 40:5,
78:14, 103:24,
106:7, 107:18,
110:11, 113:25,
130:25, 132:1,
138:5, 145:11,
149:13, 150:9,
150:14, 170:25

**investigate** [1] -
39:2

**investigating** [1] -
80:11

**investigation** [22]
- 21:10, 34:22,
34:23, 35:3,
36:9, 36:10,
38:5, 38:7, 52:6,
53:18, 53:21,
59:18, 59:19,
74:13, 79:19,
79:21, 80:8,
80:18, 80:20,
81:1, 104:19

**investigators** [1] -
28:5

**investing** [5] -
28:19, 44:10,
108:5, 131:20,
150:22

**Investment** [1] -
132:19

**investment** [41] -
13:25, 27:2,
29:5, 40:2,

41:22, 42:14,
42:21, 45:15,
45:19, 69:6,
69:12, 69:14,
70:7, 70:9,
78:18, 79:8,
107:21, 108:10,
108:14, 117:6,
118:1, 118:22,
122:9, 130:19,
132:16, 137:11,
146:9, 147:11,
148:13, 149:7,
149:19, 149:20,
150:19, 151:3,
163:8, 164:7,
167:5, 167:14,
168:15, 170:11

**investments** [22] -
28:21, 29:4,
40:18, 43:19,
45:10, 46:20,
107:3, 108:16,
108:19, 109:24,
113:23, 128:10,
129:21, 131:23,
132:12, 135:10,
143:5, 145:5,
146:20, 146:21,
158:3, 176:24

**investor** [17] -
14:2, 30:6, 30:7,
45:25, 46:3,
78:20, 79:7,
79:11, 79:12,
81:8, 81:23,
100:8, 104:15,
111:7, 112:24,
117:7, 167:12

**investors** [47] -
13:22, 27:12,
27:14, 27:16,
27:19, 27:22,
30:17, 30:19,
30:21, 31:3,
31:9, 31:15,
31:18, 31:20,

31:23, 32:4,
32:16, 39:22,
40:15, 40:21,
40:23, 40:25,
42:3, 42:12,
68:24, 69:10,
70:6, 75:7,
77:16, 78:4,
79:19, 79:24,
80:25, 81:19,
82:16, 93:6,
106:25, 107:4,
107:16, 109:22,
110:16, 110:19,
111:4, 111:15,
112:19, 122:12

**invitation** [1] -
100:20

**invited** [2] -
111:19, 128:3

**involve** [1] - 40:13

**involved** [11] -
14:6, 21:13,
66:14, 67:24,
79:22, 80:19,
96:4, 103:19,
104:22, 116:7,
116:15

**involvement** [1] -
113:4

**involves** [4] - 9:3,
42:2, 75:11,
103:2

**involving** [3] -
21:12, 36:14,
78:8

**Inwood** [2] -
124:4, 124:5

**irrelevant** [1] -
50:19

**IRS** [4] - 4:5,
4:11, 28:7,
179:17

**Island** [3] - 28:4,
30:4, 30:6

**Islander** [1] -
116:24

**Islandia** [1] - 1:18
**Isle** [23] - 40:3, 40:6, 40:10, 41:6, 41:19, 41:20, 42:14, 43:10, 43:18, 43:23, 69:24, 70:12, 70:14, 70:25, 72:12, 72:21, 163:9, 164:7, 167:5, 167:14, 173:20, 173:23
**Islip** [3] - 1:6, 1:15, 1:23
**issue** [22] - 3:24, 5:10, 25:24, 44:11, 52:8, 59:20, 60:2, 60:3, 60:6, 60:9, 61:1, 68:11, 88:25, 91:9, 93:13, 93:19, 94:19, 96:23, 174:19, 175:12, 177:10
**issues** [14] - 2:6, 2:20, 2:21, 3:7, 3:21, 30:23, 38:2, 38:20, 38:21, 52:7, 53:14, 59:20, 85:11, 91:25
**item** [2] - 2:16, 17:10
**items** [2] - 23:17, 89:9
**iterations** [2] - 50:16, 55:25
**itself** [2] - 92:24, 153:11
**IV** [22] - 40:3, 40:6, 40:10, 41:6, 41:19, 41:20, 42:14, 43:18, 43:23, 69:24, 70:12,

70:14, 70:25, 72:12, 72:21, 163:9, 164:7, 167:6, 167:15, 173:20, 173:23
**IV's** [1] - 43:10

**J**

**J-U-N-E-A-U** [1] - 123:10
**JAMES** [1] - 1:15
**Jason** [1] - 44:21
**jet** [1] - 118:7
**JFB** [1] - 1:4
**Jim** [1] - 28:4
**job** [2] - 54:25, 114:19
**JOE** [2] - 123:1, 181:2
**Joe** [4] - 32:15, 122:19, 123:9, 156:12
**John** [25] - 42:16, 54:18, 70:1, 70:23, 70:24, 70:25, 71:4, 71:7, 71:8, 72:1, 72:3, 73:23, 73:24, 74:4, 77:23, 77:24, 83:12, 83:18, 99:18, 107:15, 109:12, 116:1, 138:22, 138:23
**John's** [1] - 13:7
**join** [1] - 124:15
**joined** [4] - 26:6, 126:10, 126:23, 129:14
**joint** [1] - 15:3
**JOSEPH** [1] - 1:11
**Josh** [1] - 28:6
**Jowdy** [65] - 31:19, 31:22, 31:25, 43:2, 43:10, 44:16, 69:2, 69:19,

70:2, 70:10, 70:13, 70:20, 70:24, 71:2, 71:8, 71:14, 72:8, 72:11, 72:12, 73:2, 73:4, 73:5, 73:7, 73:15, 73:18, 74:3, 74:7, 74:8, 74:11, 74:21, 75:3, 75:8, 77:7, 103:17, 103:24, 103:25, 105:10, 105:12, 105:18, 105:19, 105:20, 105:22, 106:6, 109:1, 109:4, 109:5, 109:15, 109:19, 109:21, 110:2, 110:9, 110:13, 110:20, 110:24, 111:10, 113:21, 114:1, 114:7, 114:8, 114:21, 117:11, 138:18
**Jowdy's** [4] - 74:1, 113:18, 117:8, 121:16
**JUDGE** [1] - 1:12
**judge** [26] - 9:2, 24:23, 46:7, 49:8, 51:3, 52:4, 56:11, 86:16, 87:10, 88:3, 88:16, 88:21, 91:13, 91:21, 92:1, 92:11, 92:16, 93:25, 94:24, 95:15, 98:4, 99:12, 142:5, 155:12, 171:14, 172:8
**Judge** [49] - 5:8, 5:19, 6:5, 6:14, 7:2, 9:15, 10:22, 10:24, 12:5,

14:5, 14:10, 37:2, 46:15, 48:25, 50:10, 51:4, 51:15, 51:22, 52:1, 53:15, 54:19, 57:19, 58:18, 60:10, 60:19, 60:22, 60:25, 61:3, 61:8, 61:12, 63:12, 63:16, 64:5, 64:9, 66:17, 80:21, 85:23, 96:16, 96:24, 97:22, 121:25, 153:15, 159:14, 165:17, 173:9, 178:1, 179:9, 179:13
**judges** [1] - 16:9
**judgment** [1] - 102:25
**judicial** [1] - 39:4
**July** [1] - 73:17
**juncture** [1] - 52:9
**June** [4] - 80:23, 160:13, 163:21, 168:17
**Juneau** [33] - 7:19, 32:15, 54:18, 122:20, 123:9, 123:19, 131:11, 137:10, 139:16, 139:21, 142:16, 143:4, 143:22, 144:15, 144:23, 152:16, 153:18, 155:22, 158:22, 161:23, 162:13, 164:24, 165:22, 166:25, 168:24, 169:1, 169:10, 169:11, 170:14, 172:18, 173:3, 173:14, 174:16

**JUNEAU** [2] - 123:1, 181:2

**juror** [10] - 19:25, 20:1, 20:10, 21:21, 22:4, 22:6, 25:10, 65:22, 66:11, 68:10

**Juror** [1] - 67:11

**JUROR** [5] - 67:15, 67:18, 67:22, 68:2, 68:8

**juror's** [4] - 22:13, 22:14, 22:16, 25:10

**jurors** [15] - 2:3, 8:19, 15:13, 15:23, 19:2, 19:22, 20:1, 20:4, 21:17, 21:20, 22:9, 24:20, 24:24, 25:1, 25:3

**jury** [116] - 1:12, 3:13, 4:1, 6:2, 6:6, 15:5, 15:9, 15:17, 21:24, 22:17, 24:17, 33:24, 35:9, 37:5, 38:25, 39:2, 39:3, 39:8, 41:3, 41:18, 41:21, 42:8, 43:16, 44:4, 44:11, 46:10, 46:25, 47:5, 47:7, 47:20, 47:22, 48:1, 48:3, 48:7, 48:12, 48:14, 48:23, 49:14, 50:4, 50:12, 50:13, 50:24, 51:1, 52:5, 52:16, 52:17, 53:4, 53:14, 54:5, 54:10,

54:23, 55:8, 55:22, 55:24, 56:1, 56:3, 56:13, 56:19, 56:20, 57:3, 57:9, 58:14, 59:21, 60:7, 60:8, 60:16, 60:17, 61:6, 61:17, 61:20, 62:1, 62:2, 62:3, 62:12, 62:18, 62:22, 63:1, 63:3, 63:16, 63:23, 64:1, 64:14, 64:16, 64:20, 65:1, 65:2, 65:9, 65:20, 68:4, 68:16, 68:18, 74:24, 86:2, 86:6, 86:20, 87:4, 87:11, 87:23, 88:11, 93:1, 96:8, 97:8, 99:3, 99:6, 99:8, 99:22, 103:4, 122:14, 131:22, 136:11, 137:4, 144:21, 153:7, 172:13, 174:14

**Jury** [3] - 15:6, 15:15, 137:6

**jury's** [1] - 57:2

**justice** [1] - 16:4

**K**

**Kaiser** [31] - 13:23, 13:24, 14:3, 14:13, 14:15, 42:16, 70:1, 70:23, 70:24, 70:25, 71:4, 71:7, 71:8, 72:1, 72:3, 74:4, 84:7, 104:15, 107:15, 108:9,

109:12, 109:25, 114:25, 115:5, 115:7, 115:9, 115:11, 116:1, 116:23, 138:22, 138:23

**keep** [6] - 18:1, 18:11, 19:7, 21:16, 26:20, 123:11

**keeps** [2] - 59:13, 101:24

**Ken** [28] - 31:19, 43:2, 43:10, 44:16, 69:2, 69:19, 70:2, 70:10, 70:13, 70:19, 70:24, 71:2, 71:8, 71:14, 72:8, 72:11, 73:1, 73:4, 73:15, 73:17, 73:18, 74:1, 74:7, 74:8, 74:11, 75:2, 103:17, 138:18

**KENNER** [3] - 1:7, 3:6, 3:20

**Kenner** [212] - 1:7, 1:18, 3:5, 3:13, 3:19, 4:17, 5:21, 5:25, 6:3, 6:7, 6:12, 26:22, 26:23, 26:25, 27:1, 27:5, 27:6, 27:8, 27:9, 28:10, 28:19, 28:24, 29:4, 29:6, 29:12, 29:16, 29:17, 29:19, 29:21, 29:25, 30:2, 30:5, 30:7, 30:8, 30:13, 30:16, 30:21, 31:5, 31:12, 31:25, 32:18, 32:20,

32:25, 33:13, 34:7, 34:12, 34:17, 35:16, 37:13, 37:14, 37:20, 37:22, 38:4, 38:9, 38:10, 38:20, 39:2, 39:22, 39:24, 40:21, 40:24, 41:24, 42:5, 42:16, 44:22, 45:9, 45:14, 46:18, 47:12, 51:13, 51:22, 52:3, 52:4, 69:23, 70:20, 72:3, 72:6, 72:11, 73:1, 73:5, 73:12, 73:17, 74:6, 74:10, 74:12, 74:17, 75:21, 76:14, 76:24, 77:10, 77:18, 77:23, 78:19, 80:9, 80:17, 80:24, 81:9, 81:19, 82:13, 83:4, 83:12, 84:7, 87:12, 88:18, 89:11, 89:12, 89:14, 90:21, 91:24, 93:1, 93:18, 93:20, 93:22, 99:18, 99:21, 99:24, 100:1, 100:5, 100:6, 100:11, 100:16, 101:1, 101:3, 101:13, 101:22, 102:13, 103:17, 103:24, 104:23, 105:10, 105:13, 105:18, 105:20, 105:23, 105:24, 106:6,

27

106:7, 106:22,
107:3, 107:23,
109:1, 109:20,
112:5, 112:7,
112:17, 112:22,
113:2, 114:4,
115:8, 115:20,
116:11, 116:12,
116:17, 117:21,
118:19, 125:21,
126:4, 126:24,
127:13, 128:18,
128:23, 129:14,
129:19, 130:3,
130:9, 131:21,
132:15, 134:16,
134:25, 135:5,
137:11, 138:13,
138:14, 140:15,
141:18, 142:20,
143:4, 143:12,
144:2, 144:25,
145:10, 145:23,
146:23, 147:1,
148:8, 148:23,
149:9, 150:2,
151:2, 152:4,
152:21, 153:20,
155:24, 156:12,
157:25, 160:13,
160:16, 162:2,
162:14, 164:19,
165:6, 165:23,
167:2, 167:7,
168:11, 170:14,
170:19, 171:5,
171:12

**Kenner's** [14] -
5:4, 28:15,
76:12, 76:21,
79:18, 88:1,
112:11, 112:14,
115:7, 131:11,
131:24, 162:24,
163:13, 164:2
**kept** [1] - 115:12
**kicked** [1] - 37:24

**kid's** [1] - 79:4
**kidding** [1] -
157:15
**kids** [4] - 79:3,
124:3, 124:4,
124:7
**kind** [15] - 3:24,
3:25, 5:14,
21:14, 29:5,
67:1, 128:22,
131:22, 135:6,
135:9, 137:18,
138:10, 140:17,
143:4, 145:2
**kinds** [5] - 17:20,
18:2, 41:13,
88:19, 124:3
**knocking** [2] -
26:23, 107:17
**knowing** [2] -
128:20, 132:2
**knowingly** [2] -
107:12, 122:3
**knowledge** [7] -
29:14, 68:24,
69:25, 116:13,
128:15, 150:13,
164:20
**knowledgeable** [1]
- 128:9
**known** [11] - 6:2,
39:19, 42:23,
44:21, 45:24,
79:9, 99:22,
139:1, 147:10,
147:21
**knows** [7] -
60:16, 67:5,
70:23, 70:24,
71:1, 74:14,
101:19
**Komatireddy** [1] -
28:2
**KOMATIREDDY** [7]
- 1:16, 11:25,
26:5, 176:2,
176:23, 177:22,

178:14

## L

**LA** [36] - 53:10,
53:12, 54:2,
54:9, 55:10,
56:23, 57:18,
57:22, 58:2,
58:5, 58:17,
58:21, 60:10,
66:17, 66:23,
67:9, 68:12,
85:15, 85:18,
86:9, 87:9,
87:16, 93:25,
99:5, 103:7,
121:1, 135:18,
169:7, 172:9,
173:11, 176:18,
177:1, 178:1,
179:8, 179:13,
179:25
**ladies** [65] -
34:24, 36:1,
36:13, 36:18,
37:5, 37:13,
38:3, 38:17,
39:5, 39:17,
40:12, 41:7,
41:16, 43:8,
44:2, 44:19,
45:21, 46:3,
46:16, 47:11,
68:21, 69:5,
70:17, 72:24,
73:20, 74:20,
75:10, 75:25,
76:5, 76:11,
77:1, 78:7,
78:22, 79:6,
81:12, 82:19,
99:13, 99:25,
100:13, 101:10,
102:6, 103:8,
103:10, 103:23,
104:17, 105:6,
106:17, 108:17,

110:6, 110:16,
111:11, 112:10,
113:11, 114:5,
114:23, 115:12,
116:14, 117:11,
117:23, 119:2,
119:21, 120:7,
121:6, 121:17,
121:25
**laid** [2] - 87:3,
151:2
**land** [17] - 29:7,
29:8, 29:23,
29:25, 39:19,
40:5, 40:9, 69:4,
69:6, 69:10,
69:15, 69:17,
74:18, 137:12,
138:14, 167:15,
174:2
**landing** [1] -
151:9
**language** [2] -
76:6, 179:1
**laptop** [1] - 4:17
**large** [2] - 39:23,
63:20
**LARUSSO** [17] -
1:20, 2:14, 5:13,
6:25, 7:16, 8:15,
10:5, 12:2,
12:14, 13:11,
13:21, 144:10,
148:17, 155:16,
159:25, 162:8,
166:19
**LaRusso** [11] -
5:12, 7:11,
82:18, 83:3,
86:8, 91:17,
93:19, 96:9,
98:4, 155:15,
166:18
**last** [18] - 10:7,
15:25, 19:15,
20:23, 26:18,
31:22, 35:4,

62:19, 98:2, 98:3, 98:13, 123:9, 139:17, 139:21, 153:21, 154:7, 154:17, 179:15

**lasts** [1] - 26:17

**late** [2] - 10:21, 25:10

**laundering** [1] - 32:9

**lavish** [1] - 33:12

**law** [18] - 13:6, 16:4, 16:12, 16:13, 18:22, 19:9, 19:13, 23:22, 24:16, 46:11, 53:1, 56:17, 67:13, 73:4, 92:21, 105:17, 121:21, 122:12

**lawsuit** [5] - 45:22, 74:8, 74:11, 80:24, 110:9

**lawsuits** [6] - 44:15, 45:21, 104:11, 104:13, 114:5

**lawyer** [10] - 20:11, 93:10, 93:14, 153:10, 154:21, 155:2, 155:4, 155:5, 155:9, 155:10

**lawyers** [10] - 16:20, 16:25, 17:2, 20:15, 22:25, 34:1, 56:12, 72:17, 82:21, 133:18

**lay** [2] - 10:12, 60:20

**lead** [2] - 34:25, 179:2

**leading** [3] -

142:5, 171:15, 171:16

**League** [1] - 26:6

**league** [1] - 124:18

**learned** [2] - 107:1, 107:2

**learns** [1] - 74:12

**least** [6] - 8:5, 35:4, 55:1, 111:6, 150:11, 175:16

**leave** [5] - 14:20, 14:25, 21:23, 21:24, 60:18

**led** [7] - 8:24, 35:3, 52:12, 55:1, 55:20, 108:4, 108:8

**Led** [2] - 102:6, 102:14

**left** [8] - 2:18, 15:25, 25:24, 68:21, 77:8, 126:22, 158:1, 173:19

**left-hand** [1] - 173:19

**legal** [9] - 27:23, 31:2, 31:21, 44:13, 77:9, 101:14, 104:13, 110:13, 110:20

**Lehman** [4] - 69:9, 73:9, 108:4, 108:13

**lengthy** [2] - 100:25, 172:5

**lent** [1] - 103:24

**less** [1] - 121:12

**letter** [11] - 2:17, 3:10, 4:13, 8:22, 34:14, 42:2, 49:2, 51:7, 130:15, 160:14, 161:2

**letters** [3] - 6:24,

7:11, 171:24

**letting** [1] - 152:21

**level** [3] - 35:7, 40:13, 116:20

**levying** [1] - 72:2

**liability** [1] - 40:7

**licensed** [1] - 28:13

**lie** [2] - 31:15, 33:10

**lied** [4] - 46:22, 50:23, 50:24, 51:2

**life** [5] - 11:14, 105:7, 128:8, 132:11, 175:7

**lifestyle** [1] - 33:12

**lifetime** [2] - 26:13, 26:17

**light** [3] - 105:15, 115:1, 178:20

**likewise** [4] - 6:3, 6:19, 53:12, 172:9

**limit** [1] - 63:5

**limited** [2] - 17:11, 40:7

**line** [21] - 4:2, 40:22, 41:23, 42:6, 70:19, 122:1, 139:1, 139:9, 139:11, 140:7, 140:9, 142:17, 158:10, 160:10, 160:19, 160:22, 160:25, 164:17, 164:20, 170:18, 172:22

**lines** [16] - 5:3, 40:22, 40:25, 68:25, 69:11, 87:8, 107:2, 107:4, 107:8, 107:13, 108:5, 108:19, 108:24,

109:2, 170:6

**linked** [1] - 135:2

**lion's** [1] - 77:5

**Lisa** [2] - 66:1, 67:18

**list** [6] - 16:22, 63:9, 65:14, 65:18, 81:7, 81:8

**listed** [2] - 63:18, 111:4

**listen** [4] - 20:21, 24:25, 102:9, 174:11

**listened** [1] - 74:6

**listening** [3] - 21:2, 88:8, 103:3

**listing** [1] - 150:12

**lists** [1] - 119:12

**literally** [1] - 106:6

**litigation** [2] - 76:18, 107:5

**live** [4] - 37:3, 125:16, 125:17, 126:1

**lived** [2] - 125:18, 126:2

**living** [7] - 26:24, 123:20, 124:11, 127:19, 127:21, 141:3, 141:4

**LLC** [10] - 40:7, 69:24, 147:11, 163:9, 164:7, 167:6, 168:15

**loan** [36] - 43:15, 43:20, 69:1, 69:21, 70:2, 70:4, 70:10, 70:16, 70:18, 70:20, 70:23, 70:25, 71:3, 72:15, 72:21, 73:6, 73:9, 73:11, 74:9, 74:21, 75:3, 75:8, 100:11,

108:13, 137:18, 137:25, 138:19, 145:19, 147:9, 150:23, 164:11, 168:5, 168:8, 168:13, 170:24

**loaned** [5] - 43:10, 69:9, 72:12, 100:5, 100:6

**loans** [4] - 36:22, 75:24, 109:1, 142:17

**LOC** [7] - 160:22, 161:8, 162:25, 163:2, 163:10, 164:17, 167:13

**located** [2] - 4:6, 4:13

**look** [18] - 5:19, 11:5, 54:10, 95:9, 101:22, 134:1, 134:5, 135:23, 139:16, 143:21, 146:1, 151:20, 156:1, 158:23, 162:23, 164:24, 166:14, 172:22

**looked** [2] - 26:18, 26:19

**looking** [7] - 119:7, 154:7, 154:12, 154:25, 161:23, 173:14, 173:24

**looks** [5] - 135:13, 156:7, 162:3, 165:7, 169:3

**LORETTA** [1] - 1:13

**lose** [4] - 69:12, 108:16, 108:19, 108:21

**losses** [1] - 113:20

**lost** [7] - 75:1,

75:2, 108:3, 108:11, 108:15, 113:23, 131:1

**loves** [1] - 82:25

**Lucas** [5] - 42:24, 43:14, 71:10, 72:8, 74:1

**lull** [1] - 101:19

**lunch** [9] - 25:14, 25:16, 25:18, 85:17, 86:4, 86:5, 98:18, 98:22, 99:10

**lying** [1] - 32:4

**LYNCH** [1] - 1:13

**M**

**machine** [1] - 2:19

**mail** [59] - 2:18, 10:22, 10:23, 73:17, 73:21, 77:2, 77:10, 77:14, 80:17, 80:23, 89:10, 95:4, 95:14, 95:17, 95:18, 95:19, 96:1, 97:23, 98:3, 98:5, 144:2, 144:25, 145:3, 147:1, 147:19, 149:13, 149:14, 149:17, 149:18, 150:11, 152:9, 152:20, 152:24, 154:6, 154:8, 154:16, 154:17, 154:25, 155:4, 155:5, 157:19, 158:25, 159:3, 159:5, 160:7, 160:23, 161:7, 161:11, 161:12, 161:15, 161:19, 161:25, 162:1, 165:3, 165:5, 165:13, 166:10,

168:3

**mailed** [1] - 112:7

**mails** [45] - 10:13, 10:17, 10:23, 11:5, 33:9, 76:3, 76:4, 76:8, 76:13, 80:9, 97:4, 111:14, 111:18, 111:22, 127:4, 130:22, 143:9, 143:11, 144:4, 152:11, 152:25, 153:22, 153:25, 154:2, 154:3, 154:9, 154:10, 154:14, 154:20, 155:1, 159:7, 159:8, 159:18, 160:6, 163:15, 165:5, 165:22, 165:23, 165:24, 165:25, 166:6, 166:12, 173:15, 174:18, 177:7

**maintain** [4] - 69:25, 78:4, 78:5, 100:3

**maintained** [1] - 126:23

**major** [3] - 66:18, 67:3, 79:21

**Makika** [1] - 70:12

**man** [10] - 13:11, 28:11, 54:14, 116:5, 118:1, 131:13, 131:18, 138:18, 138:22, 138:23

**managed** [1] - 27:3

**management** [1] - 39:11

**managing** [1] - 69:23

**Manhattan** [2] - 39:6, 39:7

**manner** [1] - 128:4

**Mar** [1] - 42:23

**March** [2] - 127:7, 127:8

**mark** [2] - 178:23, 179:5

**marked** [7] - 133:24, 139:14, 143:16, 143:20, 152:12, 168:24, 178:16

**market** [2] - 69:8, 157:9

**marshal** [4] - 9:11, 9:12, 9:18, 9:19

**marshals** [1] - 9:21

**mashed** [1] - 171:25

**material** [1] - 90:13

**Matt** [1] - 28:6

**matter** [19] - 3:3, 9:2, 10:6, 14:6, 21:12, 48:15, 64:8, 69:12, 73:13, 106:8, 112:16, 116:23, 176:5, 176:15, 176:22, 176:23, 178:16, 179:4, 180:4

**matters** [4] - 18:1, 25:15, 36:8, 57:8

**Mattias** [1] - 82:6

**maximize** [1] - 156:2

**maximizing** [1] - 157:8

**mean** [17] - 6:23, 20:7, 20:18, 37:20, 44:9, 64:9, 69:21, 79:23, 83:8,

meaning [4] - 37:5, 46:18, 46:19, 151:24

meet [8] - 28:11, 32:17, 71:1, 107:16, 128:19, 149:6, 149:14, 149:21

millions [6] - 29:15, 106:19, 108:11, 108:25, 113:20, 116:17

mind [9] - 18:1, 18:11, 19:7, 21:16, 37:20, 38:21, 41:18, 63:18, 165:12

minds [1] - 61:2

mine [2] - 12:6, 139:24

mine's [1] - 12:2

Mineola [1] - 1:21

minute [1] - 65:21

minutes [12] - 10:12, 12:1, 12:3, 12:6, 12:7, 15:20, 25:18, 25:24, 36:12, 85:23, 86:3, 168:4

miraculously [1] - 109:18

misappropriate [1] - 76:23

misappropriated [6] - 6:12, 76:25, 77:5, 77:15, 77:16, 112:1

misappropriation [4] - 92:23, 95:12, 95:14, 113:18

misappropriations [2] - 6:4, 88:19

misconduct [3] - 54:23, 59:1, 114:14

misconstrued [1] - 119:1

misconstruing [1] - 114:15

---

meaning [4] - 37:5, 46:18, 46:19, 151:24

means [3] - 40:18, 55:4, 153:8

measure [1] - 63:20

mechanical [1] - 1:25

mechanism [1] - 110:4

media [3] - 10:16, 11:1, 19:16

Meeks [2] - 155:10, 155:11

meet [4] - 32:12, 34:8, 141:1, 152:10

meeting [1] - 73:5

meets [2] - 73:1, 73:2

member [1] - 69:24

members [12] - 15:9, 15:17, 19:14, 24:21, 33:24, 46:10, 47:20, 68:18, 86:2, 103:4, 122:14, 131:22

memory [3] - 22:3, 22:9, 98:6

men [1] - 32:18

mention [1] - 115:10

mentioned [6] - 45:21, 107:15, 110:3, 117:20, 119:11, 144:20

merits [1] - 114:5

messages [1] - 33:9

met [8] - 28:11, 32:17, 71:1, 107:16, 128:19, 149:6, 149:14, 149:21

metal [2] - 125:3, 125:5

methods [1] - 110:12

Mexican [2] - 77:7, 117:8

Mexico [7] - 31:19, 33:16, 42:22, 43:3, 43:11, 45:1, 70:3

Michael [21] - 4:4, 26:5, 26:11, 26:16, 26:18, 26:24, 27:1, 27:4, 27:6, 27:12, 30:12, 30:13, 32:15, 39:13, 41:14, 79:18, 80:14, 82:7, 116:25, 155:10, 155:11

Michael's [6] - 26:23, 27:1, 27:8, 27:9, 30:11

mid [1] - 25:20

mid-afternoon [1] - 25:20

middle [3] - 32:25, 58:22, 169:17

might [7] - 20:11, 48:17, 60:21, 72:14, 91:13, 101:18, 102:1

mike [1] - 123:12

million [18] - 27:12, 31:3, 31:23, 33:14, 34:21, 41:24, 70:5, 72:21, 103:25, 105:24, 109:20, 113:22,

misdeeds [2] - 38:18, 83:4

MISKIEWICZ [96] - 1:15, 2:12, 3:9, 3:23, 4:16, 7:7, 7:13, 8:11, 11:9, 11:22, 13:5, 13:14, 13:19, 46:5, 46:9, 47:3, 47:17, 49:13, 50:20, 57:13, 58:8, 58:11, 62:19, 65:19, 65:24, 66:2, 66:7, 66:15, 67:7, 68:14, 84:13, 85:2, 88:25, 90:17, 92:2, 92:5, 98:21, 99:4, 122:19, 123:14, 123:17, 133:15, 133:20, 133:23, 135:14, 135:22, 136:8, 137:9, 139:20, 143:19, 144:7, 144:14, 144:22, 147:6, 147:9, 147:14, 147:25, 148:24, 151:12, 151:13, 152:15, 153:1, 155:21, 156:8, 156:11, 156:15, 156:22, 157:6, 157:18, 158:15, 158:17, 158:21, 159:12, 160:5, 161:5, 161:6, 161:22, 162:5, 162:12, 165:2, 165:8, 165:9, 165:15, 166:24, 168:1, 169:4, 172:2, 172:15, 173:5, 174:7,

31

179:15, 180:1,
181:4, 181:8,
181:12, 181:16
**Miskiewicz** [13] -
5:13, 8:15, 13:4,
28:5, 50:11,
53:22, 54:8,
55:6, 55:11,
86:11, 88:24,
123:13, 137:8
**Miskiewicz's** [1] -
2:19
**misled** [1] - 46:18
**mismanagement**
[1] - 79:22
**misread** [1] -
156:20
**misrepresentations**
[1] - 40:25
**missing** [1] -
166:12
**mistake** [2] -
105:7, 178:22
**mistrial** [8] -
50:5, 58:9, 61:3,
61:14, 62:9,
63:25, 85:13,
94:22
**misuse** [7] -
79:16, 86:25,
87:9, 87:10,
87:14, 88:11
**mix** [1] - 132:5
**mixing** [1] - 89:14
**models** [2] -
33:19, 106:16
**moment** [16] -
12:10, 35:11,
36:1, 37:7, 44:1,
58:17, 73:14,
89:18, 89:25,
90:7, 110:25,
122:9, 134:1,
143:21, 158:23,
171:22
**Monday** [2] -
19:15, 21:11

**money** [137] -
4:12, 6:10, 6:11,
13:24, 14:2,
26:15, 26:16,
26:20, 27:3,
27:9, 27:14,
27:16, 27:20,
27:22, 27:25,
28:20, 29:2,
29:3, 29:7,
29:11, 29:13,
29:15, 29:17,
29:19, 29:22,
29:23, 30:7,
30:9, 30:10,
30:25, 31:1,
31:6, 31:10,
31:19, 31:21,
31:23, 32:1,
32:5, 32:8, 32:9,
32:21, 32:23,
33:1, 33:10,
33:11, 33:13,
33:17, 36:21,
39:23, 40:16,
41:11, 41:14,
41:24, 43:9,
43:18, 44:6,
69:2, 69:10,
69:12, 69:19,
69:20, 70:1,
70:11, 70:14,
70:15, 72:12,
73:6, 73:10,
74:9, 75:1, 75:2,
75:8, 75:23,
76:15, 76:19,
77:25, 78:20,
79:2, 79:8,
79:10, 79:16,
79:24, 81:4,
81:7, 83:13,
86:25, 87:17,
87:18, 92:23,
99:19, 99:23,
100:5, 100:6,
100:8, 100:9,

100:10, 103:25,
106:13, 106:14,
106:24, 107:18,
107:21, 108:7,
109:21, 109:22,
112:23, 112:24,
113:2, 113:6,
113:10, 113:13,
115:8, 116:9,
116:11, 116:12,
116:22, 117:9,
117:13, 118:4,
118:16, 120:19,
121:3, 121:4,
128:8, 128:16,
130:25, 132:1,
146:15, 146:18,
146:20, 148:4,
148:16, 156:19,
171:6, 171:8,
171:22
**moneys** [2] -
10:16, 14:15
**monies** [9] -
42:13, 51:18,
70:24, 77:15,
83:17, 100:10,
177:5, 177:8,
177:13
**monkey** [1] -
90:11
**month** [3] -
118:17, 140:21,
150:20
**monthly** [3] -
111:20, 142:25,
143:5
**months** [5] -
78:16, 88:7,
104:5, 140:22,
141:12
**Montreal** [3] -
118:9, 141:13,
141:16
**morning** [16] -
2:10, 3:1, 3:22,
15:9, 15:10,

15:25, 20:9,
20:14, 21:25,
25:7, 25:12,
28:2, 47:21,
174:10, 174:13,
179:23
**mortgage** [1] -
33:14
**most** [9] - 34:17,
35:10, 35:11,
50:7, 92:10,
111:19, 121:12,
157:11, 163:2
**mostly** [1] - 143:8
**motion** [1] - 61:13
**motive** [1] - 38:6
**move** [13] -
29:13, 29:15,
33:1, 47:2,
48:24, 51:5,
69:2, 85:15,
91:11, 94:17,
119:25, 132:18,
174:7
**moved** [8] -
86:17, 118:10,
118:11, 120:5,
126:20, 127:12,
132:15, 133:3
**moves** [6] -
135:14, 153:1,
159:12, 162:5,
165:15, 169:4
**moving** [4] - 32:7,
121:8, 134:21
**MR** [228] - 2:12,
2:14, 2:15, 2:23,
3:9, 3:23, 4:16,
5:8, 5:13, 6:25,
7:7, 7:13, 7:15,
7:16, 8:11, 8:15,
8:21, 9:22, 10:2,
10:5, 11:9,
11:22, 12:2,
12:4, 12:9,
12:12, 12:14,
13:5, 13:11,

32

13:14, 13:19,
13:21, 15:2,
34:13, 40:1,
46:5, 46:7, 46:9,
46:15, 47:3,
47:10, 47:17,
48:4, 48:9,
48:19, 48:22,
49:8, 49:12,
49:13, 50:10,
50:20, 51:3,
51:9, 53:8,
53:10, 53:12,
54:2, 54:9,
55:10, 56:23,
57:13, 57:18,
57:22, 58:2,
58:5, 58:8,
58:11, 58:17,
58:19, 58:21,
60:10, 60:14,
62:19, 63:12,
63:14, 65:3,
65:19, 65:24,
66:2, 66:7,
66:10, 66:15,
66:17, 66:23,
67:7, 67:8, 67:9,
68:12, 68:13,
68:14, 68:20,
72:1, 84:13,
85:2, 85:15,
85:18, 85:19,
85:23, 86:9,
87:9, 87:16,
88:25, 90:17,
91:2, 92:2, 92:5,
92:11, 93:25,
94:24, 95:6,
95:8, 96:12,
97:22, 98:21,
99:4, 99:5, 99:6,
99:12, 103:7,
121:1, 122:19,
123:14, 123:17,
133:15, 133:20,
133:23, 135:14,

135:17, 135:18,
135:22, 136:8,
137:9, 139:20,
142:5, 143:19,
144:7, 144:9,
144:10, 144:14,
144:22, 147:6,
147:9, 147:14,
147:25, 148:17,
148:24, 151:12,
151:13, 152:15,
153:1, 153:3,
153:6, 153:15,
153:17, 155:12,
155:16, 155:21,
156:8, 156:11,
156:15, 156:21,
156:22, 156:23,
157:2, 157:5,
157:6, 157:18,
158:15, 158:17,
158:21, 159:12,
159:14, 159:17,
159:22, 159:24,
159:25, 160:5,
161:5, 161:6,
161:22, 162:5,
162:7, 162:8,
162:12, 165:2,
165:8, 165:9,
165:15, 165:17,
165:19, 165:21,
166:4, 166:5,
166:16, 166:19,
166:24, 168:1,
169:4, 169:6,
169:7, 171:14,
172:2, 172:8,
172:9, 172:15,
173:5, 173:9,
173:11, 174:4,
174:6, 174:7,
176:18, 177:1,
178:1, 179:8,
179:13, 179:15,
179:21, 179:25,
180:1, 180:2,

181:4, 181:6,
181:8, 181:10,
181:12, 181:14,
181:16

**MS** [6] - 11:25,
26:5, 176:2,
176:23, 177:22,
178:14

**multi** [1] - 105:24

**multi-million** [1] -
105:24

**multiple** [10] -
27:12, 32:4,
32:16, 35:6,
56:10, 98:1,
110:8, 110:10,
111:16, 120:12

**Murray** [1] - 82:10

**must** [9] - 16:12,
17:11, 17:14,
17:17, 18:11,
18:24, 20:19,
22:17, 34:8

**mutual** [1] - 28:21

**myriad** [3] -
37:17, 72:2,
75:12


                N

**Najurn** [2] - 73:3

**name** [39] -
14:16, 28:2,
34:25, 35:2,
39:14, 42:16,
54:14, 65:14,
65:24, 69:2,
69:19, 69:25,
70:22, 72:7,
73:2, 73:23,
79:17, 112:19,
118:1, 118:5,
123:7, 123:9,
129:1, 132:25,
138:18, 138:22,
138:23, 149:4,
149:23, 149:24,
149:25, 151:22,

153:20, 155:7,
155:9, 171:6,
173:19, 174:24

**named** [4] -
31:19, 43:2,
106:3, 106:18

**names** [2] -
40:23, 103:14

**narcotics** [1] -
4:22

**Nash** [1] - 82:8

**nation** [1] - 34:17

**National** [1] - 26:6

**nature** [9] - 11:1,
36:6, 51:17,
58:11, 75:11,
83:2, 142:6,
171:15, 175:9

**nearly** [2] - 108:9,
116:23

**necessarily** [6] -
9:13, 51:2,
54:24, 86:21,
87:24, 98:12

**necessary** [1] -
19:23

**need** [21] - 2:20,
5:19, 10:20,
14:19, 34:1,
34:7, 34:9, 51:7,
62:7, 64:6,
66:10, 73:10,
79:13, 133:18,
160:18, 160:19,
162:22, 172:10,
176:9

**needs** [3] - 7:25,
30:25, 175:15

**negative** [7] -
175:20, 175:24,
176:1, 176:5,
176:14, 176:22,
179:3

**negligence** [1] -
105:2

**negotiate** [1] -
103:20

33

negotiations [2] - 72:13, 72:18

neighborhood [1] - 26:8

neutral [1] - 157:3

never [19] - 5:9, 23:22, 37:10, 50:8, 50:22, 51:25, 63:11, 81:10, 88:15, 107:16, 119:16, 130:23, 138:10, 145:25, 146:18, 158:8, 167:11, 170:16, 172:19

nevertheless [1] - 107:22

new [10] - 27:20, 29:5, 29:12, 29:16, 30:11, 30:17, 30:24, 30:25, 119:25, 148:2

NEW [1] - 1:1

New [23] - 1:6, 1:15, 1:18, 1:21, 1:23, 20:25, 39:4, 39:5, 39:6, 42:9, 47:1, 48:24, 57:5, 57:7, 57:11, 60:18, 71:2, 74:19, 104:14, 116:24, 125:9, 125:10, 175:21

news [1] - 21:2

News [2] - 20:25, 21:1

Newsday [1] - 20:24

newspaper [1] - 174:19

newspapers [1] - 21:3

next [13] - 8:1, 23:8, 39:25, 51:9, 71:16,

84:16, 98:23, 109:6, 120:21, 134:3, 136:13, 163:3, 167:18

NHL [10] - 26:14, 32:19, 112:11, 113:20, 113:23, 113:25, 124:13, 126:14, 129:10, 141:8

nice [1] - 78:17

nick [1] - 83:20

Nick [7] - 80:15, 83:13, 83:23, 84:1, 84:9, 92:13, 95:1

night [6] - 21:24, 179:14, 179:24, 179:25, 180:1, 180:2

nightclubs [1] - 112:8

NO [5] - 67:15, 67:18, 67:22, 68:2, 68:8

nobody [1] - 138:9

Nolan [4] - 44:21, 45:22, 46:8, 54:15

none [3] - 20:14, 75:25, 110:16

normally [1] - 66:18

Norstrom [1] - 82:7

north [1] - 124:4

Northern [7] - 9:3, 42:4, 139:2, 160:19, 160:24, 161:3, 169:14

note [1] - 169:24

noted [1] - 72:18

notepad [1] - 21:19

notes [14] - 5:17, 21:18, 21:20, 21:21, 21:22,

21:23, 22:2, 22:4, 22:6, 22:9, 22:14, 22:16, 48:15

nothing [8] - 16:13, 18:15, 56:2, 87:12, 93:2, 105:21, 117:2, 119:2

noticed [1] - 112:21

notified [1] - 14:23

November [6] - 10:23, 37:23, 47:11, 51:10, 51:13, 83:11

nowhere [2] - 63:9, 151:20

NT [1] - 161:8

number [8] - 36:5, 65:22, 68:10, 101:12, 110:18, 116:21, 169:21, 170:24

Number [1] - 67:11

**O**

o'clock [3] - 8:8, 25:13, 25:20

oath [4] - 15:13, 35:11, 37:15, 122:23

object [12] - 65:8, 65:18, 89:13, 89:25, 90:13, 96:10, 97:12, 97:18, 142:5, 142:6, 171:14, 174:4

objections [4] - 2:10, 17:1, 17:3, 64:18

objects [1] - 153:11

obligated [1] -

117:21

obligation [3] - 17:2, 64:9, 91:3

obligations [1] - 81:18

obtain [1] - 75:8

obtained [2] - 47:15, 78:15

obvious [5] - 19:24, 92:8, 96:2, 157:2, 164:22

obviously [17] - 7:4, 21:1, 34:5, 52:13, 67:25, 95:23, 96:10, 126:7, 129:25, 134:20, 145:15, 157:23, 161:17, 164:22, 171:4, 171:11, 178:5

occasion [1] - 71:2

occasions [2] - 35:6, 100:4

occurred [8] - 9:6, 12:20, 51:25, 61:1, 90:8, 104:20, 115:4, 119:13

occurs [1] - 19:24

October [2] - 51:11, 74:16

OF [3] - 1:1, 1:3, 1:8

offense [2] - 23:21, 82:17

offenses [1] - 77:11

offensive [1] - 76:6

offer [4] - 10:9, 89:21, 153:9, 173:7

offered [2] - 17:3, 23:17

offering [3] -

34

89:23, 172:14, 174:25
**offers** [1] - 144:7
**office** [6] - 9:5, 9:25, 35:14, 66:3, 66:22, 179:21
**Office** [3] - 13:8, 66:20, 67:2
**officer** [3] - 14:16, 104:14, 107:14
**officers** [1] - 20:15
**often** [4] - 113:12, 140:17, 140:20
**old** [3] - 26:11, 103:8, 160:22
**Old** [1] - 1:21
**OLIVERAS** [1] - 1:20
**Olympians** [1] - 32:17
**Olympic** [1] - 124:23
**Olympics** [5] - 124:24, 126:11, 126:13, 126:17, 127:10
**once** [14] - 11:20, 29:16, 37:22, 51:24, 52:19, 76:17, 85:12, 90:1, 120:8, 122:22, 140:21, 140:22
**one's** [1] - 9:7
**ones** [1] - 121:18
**ongoing** [1] - 115:17
**open** [5] - 19:7, 21:16, 86:1, 140:7, 175:19
**opening** [54] - 7:5, 10:4, 11:21, 23:5, 23:9,

23:10, 26:2, 34:2, 34:4, 35:18, 35:22, 36:12, 38:13, 39:12, 46:12, 48:5, 49:18, 54:4, 54:8, 55:13, 56:2, 57:14, 57:24, 59:6, 59:21, 59:23, 60:5, 62:21, 63:15, 63:23, 64:2, 64:4, 64:11, 64:17, 65:9, 65:14, 68:19, 76:10, 85:22, 87:21, 88:9, 89:25, 90:1, 93:11, 93:17, 94:19, 96:19, 99:11, 103:5, 103:15, 106:12, 122:15, 140:9
**opening's** [1] - 11:23
**openings** [3] - 12:24, 34:11, 57:15
**opinion** [3] - 21:15, 96:20, 156:17
**opponent** [1] - 64:1
**opportunist** [1] - 27:10
**opportunities** [2] - 42:20, 157:10
**opportunity** [19] - 5:16, 6:21, 7:21, 24:4, 35:21, 37:14, 40:16, 42:21, 82:19, 85:20, 89:7, 94:1, 97:12, 100:17, 101:2, 101:5, 102:19,

129:24, 137:11
**oppose** [2] - 61:3, 89:1
**opposed** [5] - 86:19, 87:3, 87:6, 87:14, 87:19
**opposite** [2] - 88:1, 122:6
**options** [1] - 77:8
**orchestrate** [2] - 38:12, 38:19
**order** [5] - 15:12, 23:4, 38:19, 53:15, 57:25
**ordered** [1] - 104:12
**organization** [1] - 7:19
**original** [5] - 12:16, 42:13, 139:11, 167:8, 168:18
**otherwise** [3] - 19:17, 25:9, 50:3
**Ottawa** [1] - 141:12
**ought** [1] - 80:4
**out-of-court** [1] - 94:2
**outline** [1] - 23:6
**outrageous** [2] - 58:12, 85:14
**outside** [4] - 17:16, 20:7, 21:13, 177:14
**outweighed** [1] - 175:10
**overall** [1] - 132:7
**overnight** [1] - 8:5
**Overruled** [1] - 142:7
**overruled** [2] - 17:8, 171:19
**owe** [1] - 81:7
**owed** [2] -

116:11, 116:12
**Owen** [6] - 45:22, 54:15, 163:2, 163:7, 167:9, 168:18
**own** [36] - 12:4, 12:23, 21:10, 22:1, 28:16, 30:9, 32:1, 32:14, 33:8, 33:12, 37:12, 40:4, 45:11, 45:12, 49:11, 63:18, 77:7, 78:13, 93:15, 102:18, 103:18, 106:24, 111:13, 114:9, 115:5, 115:18, 119:15, 119:19, 120:16, 128:14, 132:24, 133:1, 137:14, 160:15, 171:17
**owned** [5] - 80:1, 107:18, 119:17, 120:13, 120:14
**owner** [2] - 79:10, 81:15
**ownership** [23] - 40:3, 40:6, 40:11, 43:13, 77:25, 78:15, 78:16, 78:24, 78:25, 79:1, 79:11, 79:12, 80:2, 81:10, 81:21, 83:14, 83:19, 83:23, 84:4, 99:20, 100:7, 100:8, 164:13

---

**P**

**p.m** [1] - 180:4
**package** [3] - 155:1, 163:6, 163:7

35

**page** [17] - 21:8, 39:25, 71:16, 84:16, 98:23, 120:21, 134:6, 136:13, 139:18, 139:21, 140:2, 142:12, 144:23, 146:25, 147:3, 150:12, 167:18

**Page** [2] - 175:15, 175:20

**pages** [2] - 134:2, 134:6

**paid** [10] - 43:21, 43:22, 43:23, 70:5, 70:25, 74:21, 75:3, 108:5, 117:13

**paint** [1] - 121:10

**painting** [1] - 114:25

**panel** [1] - 46:4

**paper** [3] - 138:24, 143:1, 146:5

**paperwork** [2] - 151:4, 151:5

**paragraph** [6] - 42:2, 51:22, 56:14, 83:8, 135:23

**paralegal** [1] - 66:14

**paraphrased** [1] - 95:2

**paraphrasing** [1] - 84:5

**parcel** [2] - 91:18, 118:23

**parcels** [1] - 40:5

**pardon** [1] - 50:6

**parentheses** [1] - 145:19

**parse** [2] - 64:6, 77:20

**parsing** [1] - 56:9

**part** [33] - 6:9,

7:20, 14:17, 14:18, 29:1, 30:18, 38:3, 39:21, 40:20, 42:1, 42:11, 59:17, 77:22, 79:25, 80:7, 80:18, 83:10, 91:10, 91:11, 91:18, 96:15, 99:16, 117:18, 118:23, 138:1, 142:1, 144:15, 144:25, 148:19, 155:1, 169:17, 170:18, 175:16

**participant** [3] - 111:15, 111:19, 111:22

**participants** [1] - 21:13

**participate** [1] - 107:12

**participated** [3] - 110:23, 111:20, 122:3

**participation** [2] - 15:19, 163:10

**particular** [20] - 7:11, 10:21, 14:14, 41:3, 52:14, 63:22, 90:7, 96:1, 96:13, 113:5, 115:4, 115:15, 151:24, 154:6, 154:8, 154:17, 154:25, 161:7, 172:3, 177:3

**particularly** [1] - 20:16

**parties** [9] - 20:5, 44:15, 72:17, 72:22, 76:4, 172:3, 172:6, 172:10

**partner** [1] -

28:15

**partners** [1] - 131:5

**parts** [2] - 28:25, 79:21

**party** [6] - 20:11, 24:6, 36:21, 86:22, 88:18, 153:9

**pas** [1] - 2:24

**pass** [1] - 20:17

**passes** [1] - 31:9

**passing** [1] - 126:5

**past** [3] - 97:16, 123:21, 154:13

**patent** [2] - 78:7, 78:10

**patents** [2] - 30:25, 106:4

**patience** [1] - 75:9

**pause** [7] - 12:13, 139:19, 143:18, 152:14, 158:20, 161:21, 165:1

**Pause** [1] - 134:4

**pay** [16] - 25:3, 27:23, 31:21, 33:13, 70:4, 70:16, 72:11, 79:3, 100:10, 104:1, 104:13, 109:12, 117:21, 134:16, 134:25, 135:5

**payday** [1] - 116:19

**paying** [4] - 73:7, 79:7, 107:24

**payment** [1] - 117:20

**payments** [2] - 116:10, 117:19

**payroll** [1] - 121:16

**Peca** [15] - 4:4,

4:10, 7:7, 7:21, 8:5, 8:11, 11:12, 26:5, 32:15, 39:13, 41:3, 41:14, 80:14, 82:7, 116:25

**penalties** [1] - 4:20

**pending** [1] - 104:11

**penny** [2] - 109:24, 117:16

**people** [21] - 20:10, 27:4, 30:23, 32:16, 32:24, 32:25, 33:2, 35:10, 35:12, 40:15, 61:7, 62:2, 62:23, 81:14, 97:11, 121:16, 128:19, 128:25, 129:17, 154:15, 154:16

**people's** [2] - 69:20, 122:8

**per** [2] - 106:19, 114:5

**percent** [16] - 43:11, 43:15, 69:14, 70:5, 70:7, 72:13, 108:10, 147:10, 147:11, 163:8, 164:6, 164:9, 167:5, 167:6, 167:14, 168:15

**percentage** [10] - 40:4, 40:11, 79:11, 79:25, 107:19, 132:6, 134:23, 164:12, 168:14

**perfect** [1] - 103:11

**perfectly** [1] - 45:13

**perform** [1] - 16:5
**performing** [1] - 104:1
**perhaps** [6] - 9:16, 9:17, 12:6, 40:17, 40:18, 101:18
**period** [11] - 100:2, 104:10, 118:17, 131:2, 131:7, 140:14, 142:15, 143:12, 144:5, 147:15, 148:2
**periodical** [1] - 21:3
**perjury** [2] - 52:15, 53:3
**permanent** [1] - 109:8
**permissible** [1] - 171:19
**permission** [4] - 11:3, 30:13, 94:21, 96:8
**permit** [2] - 19:18, 148:3
**permitted** [4] - 11:17, 21:14, 93:5, 176:13
**Perry** [1] - 1:22
**person** [16] - 6:10, 19:18, 66:25, 70:21, 72:5, 79:2, 79:8, 87:17, 100:16, 101:24, 107:15, 129:3, 129:5, 157:11, 157:12, 177:14
**person's** [1] - 22:4
**personal** [22] - 4:12, 22:2, 27:18, 27:21, 27:25, 28:18, 32:2, 33:12,

78:21, 79:3, 83:18, 99:24, 154:19, 176:5, 176:14, 176:22, 176:23, 177:4, 177:6, 177:9, 177:12, 179:3
**personally** [3] - 43:24, 82:4, 176:12
**persons** [2] - 80:2, 101:21
**perspective** [1] - 89:10
**persuaded** [1] - 40:21
**persuasive** [1] - 24:10
**pertains** [1] - 21:7
**petition** [5] - 81:5, 81:6, 81:17, 81:19, 81:22
**Phil** [76] - 26:22, 35:15, 37:13, 37:14, 37:20, 37:22, 38:4, 38:9, 38:10, 38:19, 39:2, 39:11, 41:24, 42:5, 42:15, 45:22, 45:25, 46:18, 47:12, 51:13, 52:2, 52:4, 69:23, 70:20, 72:3, 72:6, 72:10, 73:1, 73:5, 73:12, 73:17, 74:6, 74:10, 74:12, 74:17, 75:21, 76:12, 76:14, 76:21, 76:24, 77:3, 77:10, 77:16, 79:18, 80:9, 80:17, 81:9,

81:19, 82:13, 83:3, 100:1, 100:6, 100:11, 100:16, 101:1, 101:3, 101:5, 101:21, 101:22, 102:13, 103:16, 138:13, 144:2, 145:23, 146:23, 148:23, 150:2, 152:21, 153:20, 157:25, 160:13, 162:15, 163:13, 163:18, 165:23
**Phil's** [2] - 43:12, 81:22
**Philip** [1] - 1:7
**Phillip** [2] - 34:17, 125:21
**PHILLIP** [1] - 1:7
**Phoenix** [1] - 141:12
**phone** [1] - 158:7
**phones** [3] - 127:4, 143:10, 158:7
**phrase** [1] - 113:13
**phraseology** [2] - 176:16, 176:20
**phrasing** [1] - 179:11
**physical** [1] - 23:16
**piece** [2] - 96:4, 96:6
**pike** [1] - 49:22
**pitched** [1] - 29:4
**pivot** [1] - 119:24
**PK** [3] - 163:11, 163:12, 163:18
**place** [17] - 3:10, 11:20, 22:3, 25:2, 27:14, 33:1, 48:2, 71:6, 85:1, 86:1, 130:7, 134:23,

135:10, 143:1, 143:2, 150:19
**placement** [1] - 79:9
**places** [1] - 133:3
**plain** [1] - 119:21
**plaintiff** [1] - 14:4
**plan** [1] - 175:22
**planet** [2] - 156:19, 157:7
**play** [7] - 43:8, 124:22, 126:18, 129:8, 131:25, 141:11
**play-by-play** [1] - 129:8
**Playboy** [2] - 106:16, 106:20
**playboy** [1] - 33:19
**played** [4] - 2:25, 124:12, 126:8, 141:10
**player** [8] - 27:2, 41:17, 54:15, 81:8, 111:15, 112:18, 112:24, 129:10
**players** [38] - 6:18, 10:25, 12:17, 12:19, 12:21, 13:1, 27:4, 27:6, 28:11, 29:4, 29:6, 29:9, 29:10, 29:15, 29:25, 105:16, 106:25, 108:16, 108:18, 108:25, 109:21, 110:5, 110:11, 110:23, 111:1, 111:7, 111:19, 112:12, 113:20, 113:23, 113:25, 114:6, 114:8, 114:21, 117:7, 145:16,

37

176:9, 176:11
**players'** [7] -
28:19, 29:2,
29:14, 29:17,
106:13, 106:14,
108:6
**playing** [11] -
35:7, 118:9,
124:23, 127:8,
127:12, 128:19,
129:12, 140:18,
141:7, 141:15,
141:24
**playoffs** [1] -
118:9
**Plaza** [2] - 1:14,
1:23
**pledged** [1] - 82:1
**point** [61] - 3:14,
6:15, 6:16, 11:8,
19:1, 35:12,
39:8, 42:15,
42:18, 44:2,
47:10, 47:14,
52:22, 54:4,
54:9, 55:13,
55:16, 55:18,
56:1, 56:5,
56:11, 58:3,
59:10, 59:12,
59:25, 61:4,
62:15, 64:1,
65:18, 69:23,
70:17, 72:10,
72:20, 74:10,
74:15, 75:10,
76:13, 81:4,
87:2, 88:4,
100:9, 101:19,
102:8, 102:24,
105:25, 111:11,
117:11, 119:16,
127:14, 130:4,
133:14, 135:1,
136:6, 151:6,
151:19, 152:4,
152:7, 161:2,

173:1, 176:25
**pointed** [1] -
112:7
**pointing** [6] -
31:11, 92:22,
93:11, 93:22,
105:13, 121:18
**points** [1] - 129:23
**police** [3] - 14:16,
104:14, 107:14
**polluted** [1] - 50:3
**Polytechnic** [1] -
125:7
**portfolio** [1] -
131:23
**portion** [5] - 79:1,
145:17, 155:22,
155:23, 162:13
**portions** [1] -
142:4
**portraying** [1] -
106:15
**position** [16] -
58:23, 59:2,
59:14, 60:11,
83:5, 86:18,
86:20, 87:3,
87:7, 87:13,
91:20, 91:21,
98:12, 178:6
**positions** [1] -
87:19
**positive** [2] -
106:10, 115:1
**possess** [1] -
34:15
**possession** [2] -
38:8, 101:25
**possible** [6] -
134:14, 140:10,
155:5, 164:15,
166:1, 166:13
**possibly** [2] -
6:22, 150:25
**Post** [3] - 20:25,
174:20, 175:21
**potential** [8] -

4:2, 14:21, 50:5,
78:2, 78:6,
94:21, 95:21,
141:1
**potentially** [3] -
87:15, 96:7,
98:11
**power** [2] - 34:14,
122:8
**powerful** [1] -
34:17
**practiced** [1] -
63:11
**praising** [1] -
110:19
**preceded** [1] -
36:9
**precisely** [1] -
175:25
**precluded** [3] -
5:3, 49:22, 49:24
**precluding** [2] -
52:22, 174:24
**predilection** [1] -
83:7
**prejudice** [5] -
16:6, 50:25,
60:20, 90:8,
175:11
**prejudiced** [1] -
12:24
**prejudicial** [2] -
58:12, 88:22
**preliminary** [5] -
2:9, 15:18,
15:22, 25:5, 37:2
**prepaid** [6] -
30:23, 78:8,
106:3, 107:19,
117:10, 118:3
**prepared** [2] -
42:9, 90:18
**preparing** [1] -
178:15
**presence** [2] -
19:19, 20:18
**present** [14] -

3:14, 3:16,
18:20, 23:13,
23:19, 24:4,
28:8, 35:1,
48:10, 55:8,
64:7, 91:3,
102:17, 117:4
**presentation** [1] -
122:16
**presented** [13] -
5:25, 17:18,
22:10, 24:3,
33:7, 48:23,
108:22, 119:17,
134:22, 135:9,
138:3, 142:14,
145:16
**presenting** [5] -
24:7, 32:12,
54:20, 55:22,
61:19
**preserve** [4] -
110:11, 122:8,
143:11, 153:24
**preserved** [4] -
144:4, 152:24,
153:22, 165:3
**press** [1] - 10:9
**pressing** [1] -
73:5
**presumed** [1] -
18:12
**presumption** [2] -
37:3, 37:4
**pretense** [1] -
114:2
**pretty** [17] - 65:5,
124:1, 125:1,
127:8, 129:18,
131:15, 132:8,
139:23, 140:18,
143:14, 146:18,
146:22, 152:25,
153:23, 154:1,
164:22
**prevent** [1] - 5:22
**preview** [1] -

38

23:11
**previous** [1] - 9:8
**previously** [2] -
9:1, 146:20
**primarily** [4] -
75:6, 76:18,
114:13, 121:15
**primary** [1] -
113:22
**principally** [1] -
132:13
**principles** [1] -
37:19
**private** [6] -
78:25, 79:9,
118:7, 130:19,
138:4, 157:10
**privately** [1] -
79:8
**Privitello** [14] -
14:3, 14:14,
80:15, 83:13,
83:20, 83:23,
84:2, 84:9,
92:13, 95:1,
118:2, 118:14,
118:15, 118:20
**Privitello's** [2] -
83:19, 118:4
**probative** [1] -
175:8
**problem** [6] -
66:18, 94:13,
95:17, 95:21,
96:11, 97:9
**problems** [1] -
58:6
**procedures** [1] -
154:19
**proceeding** [5] -
46:8, 46:17,
60:22, 81:10,
91:14
**Proceedings** [1] -
1:25
**proceedings** [10] -
8:16, 12:13,

44:13, 134:4,
139:19, 143:18,
152:14, 158:20,
161:21, 165:1
**proceeds** [5] -
115:7, 115:12,
120:10, 120:18,
121:22
**process** [4] -
10:22, 78:8,
78:11, 148:3
**produce** [2] -
90:6, 151:2
**produced** [2] -
1:25, 106:8
**professional** [15] -
26:10, 26:13,
27:2, 27:4, 27:5,
28:12, 41:17,
43:5, 124:12,
124:15, 126:14,
126:16, 140:18,
152:22
**proffer** [5] -
172:5, 173:6,
178:10, 178:14,
178:20
**profit** [5] - 29:8,
29:24, 30:1,
40:8, 40:19
**program** [4] -
123:22, 123:23,
123:25, 124:6
**prohibits** [1] -
18:22
**project** [16] -
27:17, 29:5,
44:6, 44:7, 45:4,
69:15, 70:3,
108:1, 108:2,
137:19, 145:7,
147:12, 149:1,
149:10, 150:4,
168:16
**projects** [3] -
32:2, 44:23,
113:19

**promise** [5] -
83:22, 90:4,
92:8, 102:6,
102:15
**promised** [1] -
104:1
**promises** [1] -
89:3
**promising** [8] -
27:20, 30:24,
30:25, 78:2,
78:6, 85:9,
89:19, 90:11
**promptly** [3] -
25:8, 25:23, 26:1
**proof** [48] -
17:21, 17:23,
18:15, 18:18,
24:11, 33:25,
34:8, 35:20,
37:8, 38:22,
44:14, 65:4,
68:23, 69:4,
69:7, 69:18,
69:22, 70:6,
71:1, 71:9,
71:11, 71:12,
72:9, 72:15,
73:3, 73:16,
73:20, 73:24,
75:20, 76:11,
80:22, 81:4,
82:23, 83:1,
83:21, 84:1,
84:4, 87:23,
87:25, 96:20,
99:25, 100:3,
100:14, 101:9,
101:11, 101:20,
102:12, 122:2
**proper** [9] - 48:2,
52:20, 52:25,
53:2, 53:21,
56:9, 60:1,
64:23, 128:10
**property** [10] -
30:5, 33:15,

41:25, 42:15,
42:22, 43:3,
43:11, 45:7,
138:19, 157:9
**propose** [2] -
128:18, 138:18
**proposed** [3] -
112:14, 112:25,
128:23
**prosecute** [1] -
56:21
**prosecution** [2] -
67:25, 121:8
**prosecutor** [3] -
61:18, 88:7,
105:1
**prosecutor's** [1] -
88:9
**prosecutors** [3] -
55:23, 56:8, 57:6
**protect** [3] -
82:15, 93:21,
95:24
**protecting** [3] -
111:10, 112:11,
114:21
**protocol** [1] -
113:7
**prove** [8] - 18:19,
18:24, 23:21,
35:23, 37:9,
87:21, 110:21,
121:24
**proven** [4] -
18:13, 102:21,
107:25, 120:6
**proves** [1] -
104:25
**provided** [11] -
21:19, 39:11,
42:4, 55:22,
55:24, 56:7,
60:23, 108:1,
109:23, 178:17,
179:18
**providing** [1] -
134:18

39

**province** [1] - 124:5

**proving** [1] - 32:10

**public** [2] - 68:1, 178:18

**publicity** [1] - 177:9

**publicly** [2] - 105:6, 106:18

**published** [1] - 144:20

**pull** [1] - 98:7

**pulling** [2] - 64:14, 64:16

**purchase** [4] - 40:4, 41:25, 42:14, 43:2

**purchased** [1] - 174:2

**purchasing** [1] - 40:8

**purported** [2] - 109:23, 175:6

**purpose** [4] - 17:11, 110:15, 170:7, 177:2

**purposes** [16] - 8:22, 15:2, 60:5, 63:18, 69:11, 76:16, 76:18, 79:3, 79:6, 79:13, 83:17, 93:15, 96:5, 99:23, 110:10, 111:16

**pursuant** [3] - 33:3, 45:23, 93:6

**pursue** [1] - 110:12

**pursuit** [2] - 72:11, 77:7

**push** [1] - 45:9

**put** [37] - 10:10, 11:3, 14:13, 14:15, 23:25, 24:1, 27:14,

27:15, 27:16, 27:17, 27:19, 27:21, 27:22, 27:24, 29:11, 30:8, 33:17, 41:20, 41:21, 49:3, 50:23, 51:7, 55:11, 55:21, 56:12, 94:3, 130:18, 142:25, 143:24, 146:24, 156:19, 157:7, 167:11, 168:19, 169:10, 179:15

**puts** [2] - 30:7, 82:25

**putting** [4] - 28:20, 29:3, 170:15, 177:12

**Q**

**quality** [2] - 101:9, 101:11

**Quebec** [1] - 124:5

**questioned** [1] - 55:19

**questioning** [2] - 102:17, 164:22

**quick** [4] - 7:5, 8:9, 143:9, 146:18

**quit** [1] - 77:9

**quite** [6] - 42:4, 42:5, 42:25, 64:13, 116:5, 122:5

**quote** [1] - 4:7

**quote-unquote** [1] - 4:7

**R**

**race** [2] - 33:18, 106:15

**races** [2] - 33:19, 33:20

**radio** [2] - 21:3, 21:5

**raise** [3] - 3:25, 15:14, 97:5

**raised** [2] - 53:16, 106:19

**raising** [1] - 31:20

**ran** [2] - 26:12, 31:19

**Ranford** [6] - 80:12, 82:10, 99:19, 112:19, 112:23, 113:3

**Ranford's** [1] - 112:19

**rare** [1] - 142:13

**rather** [10] - 22:16, 23:10, 35:2, 46:4, 54:6, 61:18, 108:25, 119:23, 120:14, 172:5

**rating** [1] - 78:10

**reach** [4] - 2:4, 19:10, 98:13, 131:3

**reached** [2] - 42:17, 76:14

**reaching** [1] - 85:24

**reacquaint** [1] - 127:13

**readback** [1] - 22:20

**readings** [1] - 65:2

**reads** [2] - 39:20, 83:9

**ready** [9] - 8:1, 10:4, 11:10, 11:15, 15:10, 26:2, 99:2, 119:4, 119:5

**real** [5] - 27:16, 29:5, 42:20, 69:8, 170:11

**realize** [1] - 134:9

**realized** [2] - 26:12, 112:21

**reason** [7] - 5:1, 14:24, 19:23, 57:10, 89:18, 116:6, 176:6

**reasonable** [7] - 18:25, 23:22, 32:11, 37:9, 102:21, 122:2, 179:12

**reasons** [4] - 62:6, 69:7, 82:21, 92:19

**rebut** [1] - 24:1

**rebuttal** [1] - 24:15

**receive** [13] - 2:17, 9:5, 25:17, 40:3, 83:23, 116:9, 117:19, 161:2, 161:17, 171:12, 171:15, 171:21, 173:16

**received** [35] - 4:22, 9:23, 16:19, 17:11, 22:22, 40:6, 69:13, 70:6, 100:11, 108:23, 109:20, 112:23, 115:6, 115:11, 115:20, 115:25, 121:22, 143:11, 144:12, 154:9, 154:15, 155:18, 157:19, 158:9, 159:18, 160:2, 162:1, 162:2, 162:10, 164:21, 165:6, 166:21, 170:20, 170:21, 172:20

**receiving** [3] - 70:24, 71:14, 171:24

**recently** [5] - 4:6,

40

92:10, 138:24,
159:18, 163:1
**Recess** [1] - 58:3
**recess** [4] - 58:4,
98:22, 136:12,
137:1
**recessed** [1] -
180:3
**recesses** [1] -
19:5
**recognize** [10] -
66:24, 66:25,
67:14, 143:24,
144:1, 152:16,
152:19, 158:24,
161:24, 170:4
**recognizing** [1] -
53:22
**recollection** [4] -
22:8, 22:13,
136:2, 150:13
**recommended** [1]
- 26:25
**reconstructed** [1]
- 81:13
**reconvene** [2] -
86:4, 174:10
**record** [34] -
8:22, 10:10,
11:4, 11:20,
15:3, 16:19,
22:16, 22:23,
49:1, 49:3,
49:10, 50:7,
51:4, 57:8,
89:21, 94:3,
96:15, 98:13,
101:23, 123:8,
127:5, 146:4,
146:25, 147:7,
147:25, 156:9,
162:23, 164:1,
166:25, 167:1,
172:5, 172:7,
172:11, 179:16
**recorded** [7] -
1:25, 33:9,

92:12, 100:25,
101:3, 101:12,
101:21
**recording** [6] -
2:25, 83:25,
95:2, 96:1,
101:18, 101:25
**recordings** [1] -
85:3
**records** [17] -
9:4, 9:5, 9:24,
32:14, 32:22,
36:20, 40:10,
40:11, 51:25,
70:13, 74:14,
75:18, 80:5,
81:13, 84:2,
117:9, 117:15
**red** [2] - 120:2
**redacted** [4] -
90:16, 94:6,
94:18, 96:5
**redactions** [3] -
85:3, 90:18,
93:15
**reduced** [1] -
112:15
**refer** [4] - 11:13,
47:25, 52:9,
65:17
**reference** [20] -
7:4, 9:3, 11:17,
49:19, 49:24,
56:25, 57:2,
57:4, 57:10,
62:1, 77:19,
82:14, 82:23,
91:6, 94:6,
94:19, 95:4,
97:16, 101:8
**referenced** [5] -
13:15, 49:16,
57:1, 72:16,
175:24
**references** [3] -
85:4, 89:10,
90:19

**referencing** [3] -
52:23, 94:12,
178:25
**referred** [10] -
10:22, 51:17,
55:15, 57:15,
73:18, 74:16,
97:25, 98:1,
110:2, 115:3
**referring** [6] -
55:2, 94:25,
95:3, 98:16,
145:22, 161:9
**reflect** [3] - 52:1,
80:2, 89:21
**reflected** [4] -
40:9, 40:11,
80:4, 81:15
**reflecting** [1] -
80:1
**refute** [1] - 37:16
**regard** [4] - 11:9,
51:4, 174:19,
177:9
**regarding** [12] -
2:17, 6:1, 10:9,
40:25, 54:1,
66:9, 86:12,
169:14, 172:3,
174:19, 178:23,
179:17
**regardless** [1] -
119:5
**region** [1] - 124:4
**regular** [3] -
28:14, 111:21,
111:22
**rehabilitate** [1] -
175:17
**reject** [1] - 18:6
**relate** [1] - 177:7
**related** [6] - 13:7,
21:4, 174:2,
174:12, 174:22,
177:4
**relates** [10] -
11:10, 42:20,

51:9, 69:3,
69:16, 99:14,
102:5, 102:14,
102:20, 153:10
**relating** [1] - 89:4
**relation** [2] -
11:1, 178:18
**relationship** [8] -
100:1, 126:3,
133:9, 157:21,
175:1, 175:4,
175:10
**relationships** [1] -
75:22
**relatively** [1] -
90:23
**releases** [1] - 10:9
**relevance** [2] -
46:16, 75:4
**relevancy** [1] -
10:8
**reliable** [1] - 65:5
**reliance** [1] -
175:6
**rely** [1] - 175:5
**remain** [5] -
18:21, 35:11,
76:25, 130:9,
133:4
**remain standing**
[1] - 122:22
**remained** [1] -
109:2
**remaining** [1] -
152:23
**remark** [2] - 46:7,
87:21
**remarks** [3] -
7:17, 88:8,
103:15
**remember** [20] -
22:1, 29:22,
98:2, 117:25,
127:1, 129:1,
134:19, 139:11,
140:10, 145:10,
145:16, 150:3,

41

150:8, 151:4, 151:6, 156:16, 158:13, 163:16, 168:9, 171:24

**remembering** [1] - 98:3

**remind** [3] - 11:16, 20:22, 179:23

**reminded** [1] - 177:2

**removed** [6] - 54:17, 55:6, 55:9, 55:12, 59:7, 59:25

**removing** [2] - 53:23, 54:21

**render** [3] - 25:3, 35:13, 75:13

**renew** [2] - 88:21, 160:10

**renewal** [5] - 139:9, 158:10, 160:22, 160:24, 162:25

**Rensselaer** [1] - 125:7

**repaid** [1] - 108:9

**repeat** [2] - 16:1, 120:12

**repeated** [1] - 118:21

**rephrase** [1] - 46:7

**reply** [2] - 92:2, 159:4

**report** [4] - 19:20, 112:6, 112:9, 112:15

**reporter** [2] - 22:15, 22:19

**Reporter** [2] - 1:22, 98:7

**represent** [3] - 28:7, 78:3, 153:20

**representation** [4]

- 52:5, 63:23, 64:2, 64:4

**representations** [3] - 35:19, 89:2, 106:23

**representative** [1] - 129:9

**representing** [4] - 3:3, 48:5, 61:22, 78:1

**request** [5] - 8:2, 22:23, 49:13, 102:23, 102:24

**require** [1] - 55:17

**required** [3] - 23:20, 37:12, 81:7

**research** [3] - 21:9, 21:11, 21:13

**resign** [1] - 160:20

**resigned** [1] - 161:8

**resolved** [1] - 5:10

**resort** [1] - 74:2

**resources** [3] - 34:18, 34:19, 35:5

**respect** [27] - 2:21, 3:12, 22:9, 34:24, 36:18, 46:16, 50:13, 53:3, 60:25, 68:25, 73:6, 87:7, 96:16, 100:24, 115:3, 129:20, 130:2, 152:23, 153:22, 154:6, 157:20, 161:7, 174:21, 175:2, 175:9, 175:12, 175:17

**respectfully** [1] - 60:11

**respond** [5] - 48:20, 63:12,

85:20, 176:8, 178:19

**responded** [1] - 167:7

**response** [6] - 2:5, 62:16, 147:18, 148:7, 156:5, 162:24

**responsibility** [1] - 28:8

**responsible** [3] - 6:10, 87:24, 122:11

**restore** [1] - 78:9

**result** [4] - 13:23, 105:4, 112:13, 112:16

**resulted** [4] - 4:9, 4:20, 47:13, 113:19

**results** [2] - 106:8, 110:19

**retained** [1] - 178:18

**retire** [2] - 24:17, 132:9

**retired** [5] - 47:22, 109:9, 141:22, 146:12, 174:14

**retires** [1] - 68:10

**retiring** [1] - 132:10

**return** [19] - 28:22, 31:11, 33:22, 38:15, 40:2, 43:14, 48:7, 55:4, 69:14, 70:7, 73:6, 74:9, 75:8, 78:18, 100:5, 104:6, 108:6, 109:24, 118:22

**returnable** [2] - 9:4, 9:23

**returned** [5] - 48:12, 49:5,

51:12, 116:2, 130:23

**returning** [2] - 48:1, 179:21

**returns** [1] - 53:23

**revenue** [2] - 4:5, 4:14

**review** [4] - 2:9, 6:21, 7:11, 91:15

**reviewed** [1] - 174:18

**revisit** [2] - 56:5, 60:1

**revolving** [1] - 70:19

**rich** [1] - 27:11

**RICHARD** [1] - 1:17

**Rick** [1] - 153:20

**rights** [2] - 95:24, 96:3

**rise** [2] - 99:7, 137:5

**risk** [2] - 40:14, 132:7

**risks** [1] - 45:18

**Rizzi** [6] - 13:14, 13:21, 13:23, 14:3, 14:16, 14:20

**road** [2] - 58:22, 141:7

**Road** [1] - 1:21

**Robert** [1] - 70:22

**ROBERT** [1] - 1:20

**room** [3] - 21:24, 24:17, 26:24

**roommates** [1] - 125:25

**rough** [2] - 26:8

**roughly** [2] - 138:15, 147:15

**row** [1] - 148:5

**RPI** [9] - 124:21, 125:6, 125:15, 125:24, 126:8, 126:13, 126:22,

42

127:24, 156:17
**Rucchin** [3] - 80:13, 81:15, 99:19
**rude** [1] - 20:18
**rule** [7] - 11:2, 12:4, 92:7, 94:16, 94:23, 97:19, 98:17
**Rule** [2] - 51:24, 60:22
**rules** [5] - 17:4, 18:10, 64:18, 64:20, 92:6
**ruling** [9] - 17:5, 52:8, 53:8, 53:9, 55:13, 59:25, 60:4, 96:9, 174:21
**running** [3] - 85:12, 137:14, 150:4
**runs** [1] - 81:4
**RUSSO** [36] - 53:10, 53:12, 54:2, 54:9, 55:10, 56:23, 57:18, 57:22, 58:2, 58:5, 58:17, 58:21, 60:10, 66:17, 66:23, 67:9, 68:12, 85:15, 85:18, 86:9, 87:9, 87:16, 93:25, 99:5, 103:7, 121:1, 135:18, 169:7, 172:9, 173:11, 176:18, 177:1, 178:1, 179:8, 179:13, 179:25
**Russo** [9] - 58:16, 59:16, 103:6, 174:18, 175:13, 176:17, 178:21, 179:16

**Russo's** [2] - 57:14, 62:21

**S**

**safe** [4] - 26:20, 132:4, 132:8, 174:12
**safer** [1] - 132:6
**Sag** [4] - 30:4, 30:5, 102:5, 102:14
**salary** [3] - 109:13, 109:25, 117:14
**sale** [3] - 80:3, 120:10, 120:18
**salvage** [1] - 43:19
**San** [5] - 42:24, 43:14, 71:10, 72:8, 74:1
**Sanderson** [2] - 129:6, 129:7
**sanitized** [1] - 90:22
**Saritha** [1] - 28:2
**SARITHA** [1] - 1:16
**sat** [1] - 26:24
**satisfy** [1] - 45:19
**save** [2] - 26:16, 159:10
**saved** [3] - 108:2, 154:2, 161:25
**scenes** [1] - 118:18
**schedule** [1] - 26:1
**scheduled** [2] - 25:16, 111:20
**scheduling** [1] - 25:6
**scheme** [11] - 30:17, 30:18, 39:21, 69:4, 75:15, 77:22, 83:10, 99:16,

102:5, 116:21, 117:3
**schemes** [3] - 36:14, 36:17, 122:4
**school** [3] - 26:11, 125:6, 125:11
**Scottsdale** [8] - 33:14, 146:2, 147:20, 148:10, 148:15, 149:1, 150:14, 150:18
**screen** [6] - 144:17, 145:18, 146:5, 146:24, 147:17, 169:11
**screwed** [1] - 50:6
**scrutinize** [2] - 33:4, 100:18
**scrutinizing** [2] - 112:4, 118:10
**se** [1] - 114:5
**seal** [1] - 3:11
**sealed** [1] - 2:17
**search** [1] - 96:15
**seasons** [1] - 124:12
**seat** [1] - 109:6
**seated** [13] - 15:8, 15:16, 47:24, 65:21, 66:4, 68:17, 86:7, 99:2, 99:9, 123:6, 137:3, 137:7, 174:17
**second** [11] - 2:16, 8:14, 18:18, 19:18, 30:3, 57:17, 71:2, 75:15, 88:7, 126:2, 175:12
**second-guessing** [1] - 57:17
**secretly** [5] - 84:2, 101:3,

101:12, 101:21, 118:18
**section** [1] - 169:17
**secured** [1] - 106:4
**securitization** [1] - 112:13
**security** [4] - 74:1, 74:3, 101:19, 109:9
**seeing** [4] - 20:10, 142:11, 151:4, 151:6
**seek** [1] - 151:16
**seeking** [2] - 152:22, 153:9
**seemingly** [2] - 109:5, 114:22
**seized** [1] - 118:6
**selection** [1] - 3:14
**self** [1] - 174:23
**self-disclosing** [1] - 174:23
**sell** [6] - 29:8, 29:24, 78:25, 120:17, 120:19, 121:4
**selling** [1] - 146:7
**send** [3] - 113:2, 143:4, 159:3
**sending** [1] - 79:24
**sense** [4] - 86:3, 101:19, 164:3, 168:22
**sensitive** [1] - 20:16
**sent** [21] - 13:25, 70:15, 77:10, 95:17, 111:22, 115:8, 143:11, 152:20, 154:11, 154:14, 154:16, 154:20, 155:1, 155:4, 155:5,

43

158:25, 161:14, 162:2, 165:6, 166:3, 166:6

**sentence** [2] - 146:11, 147:16

**separate** [5] - 36:14, 36:17, 39:4, 60:6, 82:21

**separated** [1] - 124:6

**separately** [4] - 34:7, 34:9, 34:10, 82:23

**sequence** [4] - 132:20, 165:24, 166:2, 166:10

**Serge** [1] - 118:8

**Sergei** [1] - 82:6

**series** [2] - 28:13, 171:16

**serve** [1] - 19:25

**served** [1] - 9:21

**service** [6] - 9:12, 9:14, 9:18, 9:20

**services** [2] - 134:17, 178:18

**serving** [1] - 20:3

**set** [8] - 24:2, 76:17, 92:14, 102:3, 102:20, 102:22, 134:20, 164:12

**settled** [1] - 22:14

**Settlement** [9] - 10:15, 11:2, 31:14, 75:5, 75:6, 75:14, 76:17, 77:6, 82:14

**settlement** [14] - 72:14, 72:19, 76:16, 103:20, 110:3, 111:3, 111:17, 111:24, 112:2, 112:20, 113:6, 114:2, 177:6, 177:15

**setup** [1] - 29:1

**several** [7] - 6:1, 29:19, 106:18, 107:23, 112:3, 112:15, 168:4

**severance** [8] - 85:15, 86:10, 86:17, 88:22, 88:25, 92:18, 92:24, 93:12

**shackled** [2] - 91:24, 92:6

**shadows** [1] - 30:19

**shaking** [1] - 13:11

**shareholder** [1] - 82:1

**shares** [8] - 77:5, 78:16, 82:4, 118:14, 118:16, 119:20, 120:10, 120:16

**sheet** [1] - 146:5

**shift** [1] - 90:5

**shifting** [2] - 85:4, 109:18

**shifts** [1] - 37:10

**short** [8] - 24:14, 43:20, 90:23, 105:21, 131:7, 132:2, 150:21

**short-term** [1] - 43:20

**shorter** [1] - 140:23

**shortly** [3] - 2:6, 141:11, 148:3

**shoulder** [2] - 108:15

**showed** [1] - 177:7

**showing** [11] - 121:2, 133:24, 139:14, 143:20, 150:12, 152:16, 158:18, 158:22,

164:23, 169:1, 169:11

**shown** [2] - 24:8, 114:17

**shows** [1] - 119:1

**side** [4] - 23:11, 35:8, 63:1, 73:8

**sidebars** [1] - 3:12

**sides** [3] - 64:19, 68:6, 176:20

**sift** [1] - 76:20

**sign** [10] - 9:10, 126:14, 127:5, 141:25, 142:12, 147:10, 158:10, 160:9, 162:19, 167:4

**signature** [9] - 134:2, 134:6, 134:9, 134:10, 139:23, 163:6, 169:1, 169:2, 169:12

**signatures** [2] - 139:21, 167:13

**signed** [12] - 9:4, 9:16, 42:3, 42:10, 127:7, 135:4, 139:12, 163:2, 163:18, 167:9, 168:18, 170:17

**significance** [1] - 75:2

**significant** [3] - 6:2, 107:19, 120:15

**signing** [7] - 126:16, 134:12, 134:13, 135:2, 135:8, 139:9, 162:21

**signs** [1] - 148:4

**silent** [2] - 18:21, 76:25

**silver** [1] - 125:5

**similar** [4] - 6:3, 59:6, 68:4, 139:23

**similarly** [2] - 4:18, 4:21

**simple** [3] - 27:13, 108:21, 119:21

**simply** [16] - 20:19, 22:2, 23:6, 24:6, 42:4, 42:5, 50:23, 52:6, 60:15, 60:18, 60:20, 97:22, 101:20, 102:11, 117:4, 119:18

**sits** [1] - 105:5

**situation** [2] - 93:14, 146:13

**six-year** [1] - 38:7

**sketches** [1] - 151:6

**skewer** [1] - 57:24

**skipped** [1] - 165:24

**slate** [1] - 18:17

**slight** [1] - 2:23

**slower** [1] - 45:15

**smart** [1] - 132:1

**smooth** [1] - 35:8

**so-called** [4] - 111:2, 114:25, 116:1, 121:19

**so..** [1] - 143:3

**social** [4] - 19:16, 126:6, 131:4, 141:17

**software** [1] - 154:1

**sold** [6] - 29:25, 78:16, 82:4, 100:7, 119:13, 120:14

**sole** [3] - 6:10, 24:23, 101:25

**solely** [4] - 17:18,

44

28:18, 110:8,
113:4
**solicited** [1] -
150:17
**solution** [4] -
104:3, 104:5,
105:9, 179:8
**solve** [1] - 85:11
**someone** [10] -
19:19, 20:10,
26:19, 52:11,
52:15, 67:14,
130:1, 151:21,
152:3, 152:22
**sometimes** [2] -
21:17, 76:7
**somewhat** [1] -
59:6
**soon** [1] - 156:1
**sophomore** [1] -
125:17
**sort** [4] - 50:2,
57:16, 128:12,
160:24
**sound** [2] - 24:10,
65:24
**sounds** [4] -
89:13, 95:7,
98:8, 98:14
**source** [1] -
116:13
**sources** [1] -
121:15
**Southern** [22] -
39:3, 39:5, 42:8,
47:1, 47:25,
48:8, 48:23,
50:13, 50:22,
55:3, 55:23,
56:19, 56:20,
57:1, 57:5,
57:11, 60:8,
60:18, 61:20,
61:23, 62:1, 62:3
**speaking** [1] -
148:21
**spearheading** [1] -

42:25
**Special** [2] - 28:5,
28:6
**special** [1] - 64:19
**specialized** [1] -
152:1
**specially** [1] -
142:20
**specific** [12] -
51:16, 53:24,
54:13, 81:23,
90:9, 91:7,
92:14, 95:1,
97:23, 114:23,
148:5, 170:7
**specifically** [9] -
72:15, 79:13,
89:13, 94:24,
114:16, 118:3,
155:23, 178:7,
178:16
**speculate** [8] -
47:8, 49:17,
50:19, 52:19,
53:5, 56:15,
57:9, 59:24
**speculating** [2] -
54:7, 98:9
**speculation** [3] -
40:13, 55:17,
57:12
**speculative** [1] -
40:18
**spell** [1] - 123:7
**spend** [5] - 7:22,
120:19, 121:1,
121:4, 143:9
**spent** [6] - 10:17,
104:4, 106:13,
121:3, 156:16,
177:8
**spins** [1] - 116:5
**spite** [1] - 106:23
**spoken** [2] -
68:22, 117:25
**sponsored** [1] -
106:17

**sport** [1] - 26:18
**sports** [1] - 43:7
**St** [1] - 13:7
**stable** [1] - 28:22
**staff** [1] - 66:16
**stage** [3] -
128:16, 162:14,
167:2
**stake** [1] - 119:17
**stalled** [1] - 42:19
**stand** [9] - 7:23,
15:14, 36:4,
55:12, 64:24,
85:10, 89:3,
89:5, 122:21
**Standard** [7] -
133:9, 133:12,
134:16, 135:5,
136:3, 137:15,
138:16
**standard** [3] -
45:24, 97:13,
133:2
**standpoint** [1] -
72:25
**stands** [2] -
105:4, 108:15
**star** [1] - 109:11
**stars** [1] - 32:16
**start** [14] - 18:16,
21:16, 31:9,
31:11, 50:15,
52:18, 55:25,
56:13, 56:16,
59:22, 62:25,
64:14, 107:6,
128:22
**started** [15] -
8:20, 28:19,
28:20, 62:22,
64:16, 95:20,
107:5, 117:6,
127:8, 129:18,
130:8, 132:23,
132:25, 151:19,
151:20
**starting** [10] -

26:3, 33:16,
34:12, 52:17,
56:3, 56:18,
57:1, 128:8,
140:19, 163:21
**state** [4] - 60:16,
61:11, 123:7,
137:12
**State** [3] -
132:18, 132:21,
134:21
**statements** [20] -
7:5, 10:4, 11:21,
16:24, 23:9,
23:11, 26:3,
32:14, 33:9,
46:12, 56:2,
59:23, 63:15,
64:5, 90:23,
94:6, 97:3,
98:16, 119:7,
122:15
**states** [1] - 104:9
**STATES** [3] - 1:1,
1:3, 1:12
**States** [9] - 1:6,
1:14, 1:16, 28:3,
28:7, 34:16,
35:15, 74:11,
106:4
**stating** [2] -
112:25, 153:11
**stay** [3] - 36:16,
123:12, 151:14
**Ste** [1] - 1:18
**steal** [5] - 30:16,
31:16, 32:5,
87:18, 116:17
**stealing** [3] -
29:2, 29:18,
31:16
**stenography** [1] -
1:25
**step** [2] - 12:9,
174:16
**Steve** [2] - 80:13,
99:19

**Stevenson** [7] - 39:15, 44:1, 44:4, 44:7, 44:8, 44:10, 63:8

**stipulate** [5] - 16:20, 172:6, 172:8, 173:10, 173:11

**stipulation** [4] - 172:3, 172:4, 172:14, 173:6

**stock** [7] - 119:13, 120:13, 120:14, 120:17, 120:19, 121:4, 131:23

**stocks** [2] - 28:21, 132:13

**stole** [3] - 27:11, 31:19, 87:17

**stolen** [2] - 27:24, 54:14

**Stolper** [4] - 79:18, 80:8, 80:10, 80:23

**stop** [3] - 103:21, 157:13, 174:9

**strategies** [1] - 157:9

**strategy** [2] - 57:17, 111:23

**streamlined** [1] - 55:8

**Street** [3] - 132:18, 132:21, 134:21

**strength** [1] - 6:25

**string** [1] - 160:7

**strip** [1] - 151:9

**strokes** [1] - 121:11

**strong** [2] - 7:2, 178:8

**studied** [1] - 127:24

**stuff** [5] - 127:4,

128:10, 130:23, 134:23, 156:2

**stunned** [1] - 157:23

**subject** [5] - 4:5, 4:19, 21:12, 37:15, 73:13

**submit** [2] - 99:25, 100:13

**submitted** [2] - 9:8, 112:6

**subpoena** [5] - 9:3, 9:9, 9:10, 9:11, 9:16

**subpoenaed** [2] - 74:15, 119:8

**subscribe** [1] - 78:9

**subsequently** [1] - 51:19

**substance** [4] - 73:7, 84:3, 84:7, 148:7

**substantially** [1] - 175:10

**substitute** [1] - 99:18

**success** [1] - 26:15

**successful** [1] - 28:17

**successfully** [1] - 108:1

**Sue** [1] - 82:2

**sue** [4] - 27:23, 75:7, 114:1, 114:8

**sued** [1] - 104:9

**sufficient** [3] - 62:8, 93:12, 175:3

**suggest** [10] - 5:1, 48:11, 49:20, 49:22, 61:16, 93:8, 156:18, 157:6, 178:4, 178:9

**suggested** [2] - 60:7, 105:12

**suggesting** [4] - 24:8, 92:5, 92:6, 176:21

**suggestion** [2] - 57:3, 57:5

**suggests** [2] - 53:1, 56:19

**suing** [2] - 110:24, 114:7

**suit** [2] - 14:4, 59:13

**sum** [3] - 148:7, 179:17, 179:19

**summation** [3] - 24:5, 24:15, 102:8

**summations** [1] - 19:8

**summer** [1] - 130:8

**Superseding** [2] - 53:23, 54:17

**superseding** [1] - 12:18

**support** [2] - 66:15, 113:17

**surprise** [1] - 107:20

**surprised** [1] - 64:13

**surprisingly** [1] - 121:14

**sustaining** [1] - 4:11

**sweetheart** [3] - 38:13, 38:15, 100:18

**sworn** [4] - 15:15, 15:18, 65:4, 123:3

**Sydor** [6] - 39:13, 43:16, 43:19, 43:23, 43:24, 82:9

**sympathy** [1] -

16:7

**systematically** [1] - 27:11

**T**

**table** [1] - 103:12

**takeover** [1] - 118:20

**tale** [1] - 116:5

**talented** [1] - 157:11

**talks** [2] - 86:24, 86:25

**tape** [8] - 83:25, 84:6, 86:12, 89:16, 90:16, 91:10, 91:12, 92:12

**tapes** [4] - 88:17, 90:20, 90:21, 97:4

**target** [1] - 38:4

**task** [2] - 16:5, 24:19

**tax** [5] - 4:6, 4:9, 4:20, 5:7, 151:17

**team** [5] - 26:14, 124:15, 124:23, 126:10, 126:14

**teammates** [2] - 126:7, 141:1

**teams** [1] - 141:8

**telephone** [1] - 100:25

**ten** [3] - 10:12, 15:20, 104:9

**tens** [1] - 113:20

**tequila** [1] - 33:16

**term** [2] - 43:20, 73:18

**terms** [14] - 7:19, 35:20, 35:24, 36:9, 36:19, 45:23, 67:21, 70:8, 81:1, 83:6, 102:22, 128:14,

46

151:3, 157:25

**terrible** [1] - 103:13

**testified** [8] - 9:1, 18:23, 41:6, 60:17, 116:5, 123:3, 168:4, 173:16

**testifies** [9] - 52:13, 72:4, 72:6, 93:20, 94:12, 94:23, 95:8, 95:10, 108:11

**testify** [15] - 18:20, 37:12, 41:6, 65:13, 71:4, 71:11, 73:12, 93:18, 94:2, 108:10, 120:12, 174:22, 175:18, 177:19

**testifying** [10] - 33:3, 37:13, 42:17, 62:2, 63:4, 80:12, 80:13, 80:15, 80:16, 109:14

**text** [2] - 33:9, 147:4

**theft** [1] - 88:11

**thefts** [1] - 88:19

**theirs** [1] - 104:16

**themselves** [7] - 13:1, 31:6, 32:1, 33:10, 36:21, 36:23, 75:19

**theories** [1] - 119:25

**theory** [1] - 59:13

**thereafter** [2] - 52:3, 169:24

**thereby** [1] - 91:24

**therefore** [2] - 18:16, 34:9

**they've** [6] - 59:7,

62:24, 90:2, 109:16, 120:5

**thinking** [1] - 31:22

**thinks** [2] - 67:5, 87:21

**third** [4] - 18:24, 20:3, 39:14, 144:23

**thorough** [1] - 62:16

**thousand** [7] - 41:22, 109:13, 112:15, 168:5, 168:8, 168:12, 171:3

**thousands** [1] - 30:10

**throughout** [1] - 76:20

**throwing** [1] - 90:10

**thrown** [1] - 146:14

**tie** [5] - 120:2, 120:3, 120:4

**tied** [1] - 26:11

**Tim** [12] - 100:2, 100:5, 100:6, 100:13, 100:14, 100:15, 100:19, 100:20, 101:1, 115:23

**timeline** [5] - 60:21, 61:15, 61:25, 107:8, 148:6

**timing** [1] - 95:18

**Timmy** [1] - 81:14

**Timothy** [1] - 99:21

**tip** [1] - 4:22

**tips** [1] - 4:8

**tire** [1] - 26:11

**today** [22] - 6:16, 7:6, 7:7, 8:8, 11:8, 12:21,

28:1, 36:9, 37:6, 59:4, 69:18, 71:5, 71:7, 74:22, 109:18, 110:24, 145:10, 154:8, 154:24, 166:8, 168:23

**together** [8] - 28:7, 32:6, 43:8, 75:22, 101:4, 101:6, 101:7, 125:24

**Tom** [1] - 149:24

**TOMMY** [1] - 1:8

**Tommy** [42] - 1:9, 11:11, 27:10, 51:18, 52:2, 75:21, 76:14, 76:22, 76:24, 77:14, 77:15, 79:15, 79:20, 79:22, 79:24, 80:1, 80:6, 80:11, 81:1, 81:3, 81:17, 81:20, 82:13, 83:7, 83:21, 83:22, 84:2, 84:3, 84:6, 84:10, 91:6, 92:13, 95:1, 97:4, 111:25, 149:4, 149:15, 149:21, 149:22, 149:24, 150:1

**tomorrow** [2] - 174:10, 174:13

**tone** [1] - 157:3

**top** [6] - 139:23, 140:4, 145:18, 160:7, 162:23, 167:1

**topic** [1] - 97:23

**total** [3] - 116:1, 179:17, 179:19

**totaled** [1] - 112:6

**touching** [1] -

20:22

**tough** [1] - 80:19

**towards** [4] - 130:20, 130:25, 177:13, 177:14

**town** [1] - 26:8

**traded** [1] - 106:18

**trafficking** [1] - 4:23

**trainers** [1] - 26:10

**training** [2] - 28:13, 127:2

**trains** [1] - 25:22

**transaction** [2] - 43:13, 117:6

**transactions** [3] - 105:24, 108:13, 119:12

**TRANSCRIPT** [1] - 1:8

**transcript** [6] - 1:25, 22:15, 64:17, 65:1, 91:14, 98:7

**transcripts** [4] - 64:14, 64:20, 64:23, 65:2

**transfer** [4] - 44:5, 51:17, 51:19, 82:2

**transferred** [1] - 172:25

**transpired** [3] - 61:4, 79:17, 117:10

**traveling** [2] - 127:2, 141:7

**treat** [1] - 17:8

**tremendously** [1] - 24:19

**TRIAL** [1] - 1:8

**trial** [33] - 2:1, 6:5, 7:25, 8:1, 15:11, 15:19, 16:14, 19:3,

47

20:23, 22:23, 23:3, 23:4, 25:7, 34:6, 37:14, 37:21, 38:17, 38:24, 50:2, 55:15, 56:11, 63:25, 65:4, 76:20, 88:4, 88:13, 90:9, 90:12, 94:14, 97:10, 99:25, 100:4, 121:10

**tried** [3] - 2:4, 104:16, 177:7

**trier** [1] - 61:2

**trip** [1] - 174:12

**trouble** [1] - 97:14

**Troy** [1] - 125:10

**true** [20] - 39:24, 40:5, 40:24, 41:1, 41:2, 48:8, 48:12, 49:5, 50:21, 52:15, 54:19, 56:8, 56:16, 66:23, 73:16, 78:3, 78:4, 83:20, 166:12

**Trust** [7] - 9:3, 42:4, 139:2, 160:19, 160:24, 161:3, 169:14

**trust** [6] - 27:8, 28:23, 28:25, 82:2, 131:7, 175:1

**trusted** [1] - 27:7

**trustee** [1] - 82:2

**trusting** [1] - 29:14

**truth** [3] - 105:3, 119:20, 121:20

**try** [12] - 21:9, 25:8, 36:16, 59:13, 59:17, 96:17, 98:18, 103:21, 108:20,

108:21, 110:1, 158:2

**trying** [14] - 77:9, 103:13, 104:5, 105:9, 118:23, 141:1, 145:2, 145:3, 145:4, 152:21, 158:7, 160:15, 176:25, 177:4

**Tuesday** [1] - 180:4

**tuition** [1] - 79:4

**tune** [2] - 41:24, 51:19

**turn** [7] - 21:5, 21:7, 96:10, 97:6, 97:10, 134:2, 139:17

**turned** [3] - 53:19, 56:8, 104:7

**Turner** [4] - 39:14, 44:1, 44:4, 63:8

**turning** [4] - 11:14, 163:21, 168:2, 175:7

**turns** [1] - 106:22

**TV** [2] - 21:2, 21:5

**twice** [1] - 71:1

**twisted** [1] - 106:11

**type** [5] - 5:9, 19:16, 45:19, 46:24, 62:11

**types** [1] - 113:11

**Tyson** [1] - 82:8

---

**U**

**U.S** [1] - 124:20

**Ula** [1] - 70:12

**ultimate** [1] - 157:15

**ultimately** [9] - 69:8, 75:12,

76:5, 81:13, 81:15, 108:3, 108:16, 109:2, 114:13

**Um-hmm** [1] - 169:23

**um-hmm** [1] - 160:8

**unable** [2] - 86:13, 131:2

**unauthorized** [2] - 83:17, 99:23

**unaware** [2] - 101:17, 113:9

**uncomfortable** [2] - 128:9, 130:21

**uncovered** [2] - 95:11, 105:10

**under** [16] - 3:10, 17:4, 37:15, 39:19, 41:5, 42:18, 74:13, 79:13, 81:25, 88:14, 88:21, 88:22, 101:25, 104:21, 114:1, 121:23

**undercuts** [1] - 10:20

**underlie** [1] - 44:16

**underlying** [2] - 49:19, 49:25

**undersigned** [1] - 82:3

**understood** [3] - 45:18, 63:14, 170:25

**undisclosed** [1] - 28:15

**unfair** [1] - 175:11

**unfortunately** [1] - 104:25

**unindicted** [1] - 121:15

**unique** [2] - 36:13, 36:18

**UNITED** [3] - 1:1, 1:3, 1:12

**unknown** [1] - 168:14

**unlawfully** [5] - 78:20, 83:16, 117:24, 118:3, 120:9

**unless** [1] - 25:23

**unlike** [2] - 27:6, 106:6

**unnecessarily** [1] - 8:17

**unpaid** [1] - 109:2

**unprofessional** [1] - 50:7

**unpunished** [1] - 103:10

**unquote** [1] - 4:7

**unrelated** [3] - 110:20, 118:6, 176:24

**unreported** [1] - 113:17

**unrestricted** [1] - 117:12

**untruthful** [1] - 84:10

**update** [1] - 152:21

**updated** [1] - 80:24

**updates** [2] - 111:21, 111:23

**updating** [1] - 89:11

**upgraded** [1] - 33:18

**upper** [1] - 173:19

**upstate** [1] - 125:9

**urge** [1] - 25:8

**US** [7] - 13:8, 28:4, 57:16, 66:3, 66:20, 66:21, 67:2

**uses** [2] - 79:2,

48

111:17
**utilized** [1] - 93:8
**utilizing** [1] - 110:12

**V**

**vague** [1] - 151:7
**valid** [1] - 4:25
**valuable** [2] - 36:11, 106:5
**value** [2] - 79:12, 175:8
**variety** [3] - 40:24, 69:7, 74:17
**various** [15] - 35:19, 44:15, 50:15, 55:25, 64:6, 77:2, 79:6, 80:11, 93:4, 100:4, 110:12, 110:19, 133:3, 165:25
**verdict** [10] - 16:16, 18:22, 19:10, 22:18, 24:18, 25:3, 33:22, 33:23, 35:13, 37:6
**versa** [1] - 90:22
**version** [5] - 54:6, 54:7, 55:14, 90:16, 111:9
**versions** [9] - 52:10, 52:18, 54:4, 56:4, 56:10, 56:13, 56:18, 59:22, 59:23
**versus** [2] - 34:16, 52:24
**Veterans** [1] - 1:18
**viable** [2] - 64:8, 91:4
**vice** [1] - 90:22
**victim** [6] - 13:1,

14:14, 54:14, 110:2, 111:13, 116:1
**victim's** [1] - 176:24
**victims** [12] - 12:17, 13:10, 32:15, 75:1, 89:11, 109:23, 110:24, 111:4, 113:17, 114:25, 118:7, 174:21
**victims'** [2] - 33:13, 33:17
**view** [16] - 21:20, 24:7, 48:20, 48:21, 53:3, 55:17, 58:14, 59:10, 59:12, 62:5, 69:18, 87:2, 90:24, 94:9, 94:10, 95:13
**views** [1] - 19:9
**violate** [1] - 88:20
**violates** [1] - 88:15
**violation** [2] - 89:6, 89:24
**violent** [1] - 26:18
**visit** [3] - 140:24, 141:20, 141:22
**visited** [1] - 140:25
**Vitali** [1] - 82:11
**voice** [2] - 2:18, 123:11
**voir** [4] - 66:19, 153:4, 159:14, 165:17
**VOIR** [6] - 153:16, 159:16, 165:20, 181:5, 181:9, 181:13
**voluntarily** [1] - 103:18
**voted** [1] - 38:25

**Vries** [1] - 82:8

**W**

**waist** [1] - 26:12
**wait** [3] - 25:9, 25:10, 134:3
**waited** [1] - 117:18
**waiting** [2] - 2:3, 2:7
**wants** [4] - 3:22, 46:23, 97:7, 177:20
**war** [1] - 75:7
**warrant** [2] - 92:24, 96:15
**Washington** [1] - 141:11
**waste** [2] - 49:4, 49:9
**watch** [2] - 21:1, 68:1
**watching** [1] - 21:2
**waterfall** [1] - 116:22
**Wayne** [1] - 28:6
**ways** [2] - 90:20, 93:4
**wealth** [2] - 156:2, 157:8
**wealthy** [1] - 40:15
**wear** [3] - 120:2, 120:3, 120:4
**wearing** [3] - 120:2, 120:3, 120:5
**wedding** [2] - 131:11, 131:16
**Wednesday** [1] - 9:21
**week** [12] - 9:17, 15:25, 20:23, 52:3, 94:14, 98:2, 98:3, 98:13, 109:14,

127:9, 140:21, 150:20
**weeks** [4] - 126:17, 154:9, 154:13, 163:3
**weigh** [1] - 101:7
**weight** [2] - 22:7, 172:12
**welcome** [1] - 15:10
**whatsoever** [3] - 20:14, 87:10, 140:13
**wherein** [1] - 72:15
**whistle** [1] - 115:15
**whistle-blower** [1] - 115:15
**white** [1] - 32:23
**whole** [10] - 10:23, 70:8, 113:17, 119:22, 142:3, 162:20, 167:6, 167:15, 177:2
**wholeheartedly** [1] - 115:14
**wife** [1] - 45:12
**willfulness** [1] - 105:3
**William** [4] - 73:2, 73:3, 80:12, 82:10
**willing** [2] - 60:1, 104:1
**win** [1] - 125:3
**winning** [1] - 106:3
**wire** [3] - 32:5, 39:22, 112:21
**wired** [2] - 112:18, 173:1
**wires** [1] - 119:8
**wish** [8] - 3:14, 14:8, 22:21, 23:15, 23:19,

**24:1**, 34:4, 172:4

**wishes** [2] - 3:2, 64:1

**withdraw** [1] - 155:13

**withdrawn** [3] - 151:12, 161:5, 166:4

**withheld** [3] - 6:6, 105:1, 118:25

**withhold** [1] - 102:25

**withholding** [1] - 114:14

**witness's** [1] - 18:6

**witnessed** [1] - 70:21

**wonder** [1] - 42:19

**wondering** [2] - 31:10, 161:10

**Wooley** [1] - 44:21

**word** [5] - 22:19, 34:14, 82:25, 151:22, 177:12

**words** [11] - 19:2, 40:10, 70:11, 90:2, 114:4, 120:16, 131:4, 142:19, 148:13, 160:15, 166:11

**works** [7] - 13:8, 25:7, 53:7, 66:3, 66:21, 67:21, 67:22

**world** [1] - 127:2

**worried** [1] - 66:13

**worth** [2] - 146:7, 167:15

**wrenches** [1] - 90:11

**write** [2] - 49:2, 92:20

**writes** [1] - 168:17

**writing** [5] - 22:19, 111:18, 130:15, 155:24, 156:13

**written** [5] - 6:24, 8:23, 70:11, 92:20, 112:22

**wrongdoing** [2] - 115:9, 122:10

**wrongdoings** [1] - 110:13

**wrongfully** [2] - 105:5, 119:24

**wrote** [3] - 77:3, 160:13, 160:18

**Y**

**Yachmenev** [1] - 82:11

**yard** [1] - 26:11

**yesterday** [2] - 61:15, 95:17

**YORK** [1] - 1:1

**York** [23] - 1:6, 1:15, 1:18, 1:21, 1:23, 20:25, 39:4, 39:5, 39:6, 42:9, 47:1, 48:24, 57:5, 57:7, 57:11, 60:18, 71:2, 74:19, 104:14, 116:24, 125:9, 125:10, 175:21

**young** [1] - 32:18

**yourself** [3] - 51:7, 127:13, 165:23

**yourselves** [4] - 19:4, 19:6, 19:10, 19:14

**youth** [4] - 123:22, 123:23, 123:24, 124:6

**Z**

**Zamboni** [1] - 35:8

**zoom** [1] - 144:15