183

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                           :
UNITED STATES OF AMERICA

                                13-CR-607 (JFB)


          -against-          :

                                United States Courthouse
                                Central Islip, New York

PHILLIP A. KENNER,
a/k/a "Philip Kenner"
       and
TOMMY C. CONSTANTINE,        TRANSCRIPT OF TRIAL
a/k/a "Tommy C. Hormovitis,

                                May 5, 2015
       Defendants.        :  9:50 a.m.

- - - - - - - - - - - - - - X
          BEFORE THE HONORABLE JOSEPH F. BIANCO
          UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:
For the Government:          LORETTA E. LYNCH
                             United States Attorney
                             100 Federal Plaza
                             Central Islip, New York 11722
                             BY:  JAMES M. MISKIEWICZ
                                  SARITHA KOMATIREDDY
                             Assistant United States Attorneys


For the Defendant:          BY:  RICHARD HALEY, ESQ.
Kenner:                     1601 Veterans Highway Ste. 425
                            Islandia, New York 11749


For the Defendant
Constantine:                BY:  ROBERT LARUSSO, ESQ.
                                 ANDREW OLIVERAS, ESQ.
                            300 Old Country Road
                            Mineola, New York 11572


Court Reporter:             Perry Auerbach
                            100 Federal Plaza
                            Central Islip, New York 11722
                            (631) 712-6103


          Proceedings recorded by mechanical stenography.
          Transcript produced by computer.

184

1          (Trial resumes.)

2          (Appearances stated for the record.)

3          THE COURT:  Good morning.  All right.  We're

4    still waiting for two jurors.  That's not good, it's 10 to

5    10.  But we did have an issue with one alternate juror.

6    Alternate juror number one indicated to my deputy that I

7    guess she contacted her employer and her employer told her

8    she's only getting paid for two weeks and that would be a

9    financial hardship on her.  She also indicated that she

10   has MS and apparently from all the sitting yesterday she

11   said her legs were killing her.  So obviously -- I would

12   consider it a hardship during the jury selection.  I don't

13   know why she didn't tell me that earlier during the jury

14   selection.  I'm thinking of bringing her out.

15          MR. HALEY:  Your Honor, the stenographer has

16   been kind enough to provide daily copy which I received.

17   I would ask for daily copy approval by the court.

18          THE COURT:  Yes.  That's granted.

19          MR. HALEY:  Thank you, sir.

20          THE COURT:  Okay, let's bring alternate juror

21   number one out.

22          (Alternate juror number one enters the

23   courtroom.)

24          THE COURT:  Good morning, ma'am.  You can have a

25   seat.  Good morning.

185

1          ALTERNATE JUROR NO. 1:  Good morning.

2          THE COURT:  Michele told me that there's some

3    issues you wanted to discuss with me.

4          ALTERNATE JUROR NO. 1:  Yes.  My job only pays

5    me two weeks for the jury and after that it's a burden to

6    me.  I also have MS.  My legs killed me yesterday sitting

7    here.

8          THE COURT:  On the second issue, it doesn't

9    matter to me if jurors stand in the courtroom.  You can

10   stand at any time.  That would solve that issue, right.

11         ALTERNATE JUROR NO. 1:  Yes.

12         THE COURT:  On the former issue, my question is

13   why didn't you raise that earlier?  Did they tell you

14   something different or you didn't ask?

15         ALTERNATE JUROR NO. 1:  I didn't ask.

16         THE COURT:  What type of business do you work

17   for?  A big business.

18         ALTERNATE JUROR NO. 1:  I work for South Oaks

19   hospital in Amityville.

20         THE COURT:  And you indicated that it would be a

21   financial hardship.  Can you explain to me why.  I

22   understand you're making less money, but explain to me.

23         ALTERNATE JUROR NO. 1:  I'm divorced, children.

24   If there's a problem, I can sit.

25         THE COURT:  Let me speak to the lawyers.  I'll

186

1    let you know.  Thank you.

2               ALTERNATE JUROR NO. 1:  Okay, thank you.

3               (Alternate juror No. 1 retires from the

4    courtroom.)

5               THE COURT:  What does everyone think.

6               MR. MISKIEWICZ:  The government has no objection

7    to releasing her, your Honor.

8               MR. HALEY:  Objection.

9               MR. LA RUSSO:  Your Honor, I would have no

10   objection.  If the court has any thoughts about possibly

11   calling the facility to see if they would allow her or

12   extend her that privilege, I thought South Oaks was a

13   public facility.  I might not be sure about that.  But

14   again, if the Court wishes, I have no objection to

15   excusing her.  It's just that this is going to be a long

16   trial.  I know we have six alternates.  I just express a

17   little bit of concern.  If the Court wishes, I have no

18   objection.

19              THE COURT:  I'm going to have Michele -- I may

20   have my law clerk call in the first instance at South Oaks

21   to see if they can make an exception.  I have known

22   situations where they can do that.  Is there any objection

23   to doing that?

24              MR. HALEY:  Your Honor, obviously I defer to the

25   Court's decision.  My only thought is she did express she

1    would be physically uncomfortable at times.  Your Honor

2    was very sensitive to that by saying stand up.  I don't

3    think anyone being distracted due to the physical

4    discomfort -- I defer to the Court's decision.

5                THE COURT:  Mr. La Russo, my inclination is to

6    let her go.  If you want me to call her out, I will.

7                MR. LA RUSSO:  No.  Not at all.

8                THE COURT:  We have five other alternates.  I do

9    have concern to see someone go and other people saying I

10   want to reconsider, too.  But we'll deal with that and

11   everything should be okay.  Why don't we bring her out.

12               (Alternate juror No. 1 enters the courtroom.)

13               THE COURT:  I'm going to excuse you from

14   service.  It sounds like a financial hardship to me.  It

15   would be better if I knew before, but I understand you're

16   not familiar with the practices of the court.  So you're

17   excused from service.  Thank you.  Don't discuss obviously

18   anything with anyone as you are going out.

19               ALTERNATE JUROR NO. 1:  I won't.  Thank you.

20               (Alternate juror No. 1 leaves the courtroom.)

21               THE COURT:  Are there any issues before we bring

22   the jury out?

23               MR. MISKIEWICZ:  Nothing from the government.

24               MR. LA RUSSO:  Nothing at this time.

25               MR. HALEY:  No, sir.

188

1          THE COURT:  Okay.

2          MR. MISKIEWICZ:  Your Honor, should we have the

3    witness on the stand?

4          THE COURT:  Yes.

5          (Witness enters the courtroom.)

6          THE COURT:  How much more do you have,

7    Mr. Miskiewicz?

8          MR. MISKIEWICZ:  Probably 20 more minutes.

9          MR. HALEY:  Your Honor, only because of the

10   sheer volume of material in this case, can I implore the

11   Court to have the courtroom secretary make a copy of these

12   documents?

13         THE COURT:  Sure.

14         MR. HALEY:  Thank you, sir.

15         THE COURT:  Just hand them to Michele when she

16   comes out.

17         THE CLERK:  All rise.

18         (Whereupon, the jury entered the courtroom.)

19         THE COURT:  If everyone can be seated.  Good

20   morning, members of the jury.

21         THE JURY:  Good morning.

22         THE COURT:  It's good to see you all again.

23   This morning there's just two things before we get

24   started.  The first thing I just want to emphasize again

25   to try to get here so we can start at 9:30.  We estimate

1    this is going to be a five week trial.  If we start late

2    every morning, it will add up.  I'm doing my best, the

3    lawyers are working with me to try to be efficient in

4    terms of the time that you are here.  I meet at the end of

5    the day, we meet during the lunch break.  So issues that

6    come up, legal issues that I need to resolve, I am trying

7    to do on our own time, not on your time.  But I ask you to

8    try to be here on time.  I know the LIE and other

9    transportation issues develop.  But try to budget extra

10   time.

11           The other thing is as you see, I had to excuse

12   alternate number one had a hardship that included a

13   medical hardship that required me to excuse here.  I'm

14   going to ask that the five alternates shift down a seat.

15   All right.  We'll now continue with the trial.

16           As you'll recall, Mr. Juneau was on direct

17   examination.  We'll continue from that point.

18           I remind you, sir, that you are still under

19   oath.  Do you understand?

20           THE WITNESS:  Yes.

21           THE COURT:  Go ahead, Mr. Miskiewicz.

22

23

24

25

190

1    **JOE JUNEAU**,

2              called as a witness, having been previously

3              duly sworn, was examined and testified further

4              as follows:

5              MR. MISKIEWICZ:  Thank you, your Honor.

6

7    DIRECT EXAMINATION (Continued.)

8    BY MR. MISKIEWICZ:

9    Q.   Mr. Juneau, yesterday you testified a little bit

10   about another investment in Air Park in Scottsdale.  Do

11   you recall?

12   A.   Yes.

13   Q.   And did there ever come a time that you saw any

14   profit or return of your money in that Air Park?

15   A.   Well, yeah, at one point with the Air Park after

16   the -- we filed a case against individuals and turned out

17   to making a deal to get out of the Air Park then.

18   Q.   And when you say you filed a case, who were you

19   suing?

20   A.   The two defendants were part of it, but there were a

21   list of other people and companies.

22   Q.   Okay.  When you say the two defendants, you mean

23   Mr. Kenner and Mr. Constantine?

24   A.   Yes.

25   Q.   Did you and Mr. Constantine at some point reach some

191

1  sort of settlement?

2  A.   Yes.

3  Q.   Now, again, how much money did you invest in

4  Mr. Constantine's Air Park?

5  A.   Half a million.

6  Q.   And what were you trying do when you say get out of

7  it?  Were you trying to get your half a million back or a

8  profit back?

9  A.   Yeah, what I wanted I had asked Phil  Kenner was to

10  get my money back out of the different deals and to get it

11  invested the way it was invested earlier in my hockey

12  career.

13  Q.   So you got your half a million back?

14  A.   I ended up making a deal and the deal was getting an

15  airplane.

16  Q.   An airplane?

17  A.   Yeah.

18  Q.   Why did you get an airplane not your money back?

19  A.   Well, I personally felt it was the only way to get

20  something out of it, to be honest.  And you know, not that

21  I needed an airplane, but I'm a pilot, I'm an airline

22  co-engineer and I figured that's better than nothing.

23  Q.   Did you have any idea what the value of this airplane

24  was when you got it back, in other words, it was a million

25  dollar aircraft?

Juneau - Direct/Miskiewicz

1   A.   Well, it was appraised and there were some numbers

2   threw at us, and you know, in a good market, I guess it

3   was close to the value of my investment in the Air Park.

4   But at the time it was more around 350, 350,000 for it.

5   Q.   So you put in $500,000 in approximately 2003, is that

6   accurate?

7   A.   Yeah, around that time.

8   Q.   And when did you settle for this airplane that was

9   worth approximately 300 something thousand?

10  A.   I think that it was, that case was in 2007.

11  Q.   Okay.  And was there ever any explanation from

12  Mr. Constantine for what happened to your money?

13  A.   No.

14  Q.   What did they use the money for?

15  A.   I don't believe we ever discussed that, again my main

16  objective was to get the money back out of it, and never

17  really got any explanations about what was going on with

18  about the whole thing.

19  Q.   And Mr. Juneau, about the hundred thousand dollar

20  loan that you testified about yesterday, did you ever get

21  any of that money back?

22  A.   The $100,000?

23  Q.   Let me -- I'll withdraw the question.  I'll rephrase

24  it.

25          You testified yesterday about some e-mails that

Juneau - Direct/Miskiewicz

193

1    you sent to Mr. Kenner, it was $100,000 that you indicated

2    in your e-mail was a loan?

3    A.    Yeah.  For Hawaii.

4    Q.    For Hawaii?

5    A.    Yeah.

6    Q.    Did you get that back?

7    A.    Well, how can I say that, I never received a check or

8    anything like that.  At some point in that's the same loan

9    that was threw at me at the time, I discovered that it was

10   not a loan for 100,000, it was a loan for half a million.

11   And I kind of found that out in the letter that I received

12   from Northern Trust later on.

13   Q.    Did you eventually close or insist on the closing of

14   your line of credit with morning entrust?

15   A.    Yeah, when I received that letter I did write

16   personally to someone at the Northern Trust to inquire

17   about this because I really didn't know what this was

18   about, and I also wrote to Phil Kenner asking what was

19   this about, and in the next few days the line of credit

20   got repaid and my, I believe that the explanations from

21   Northern Trust that was -- I had two of my three accounts

22   there that were pledged, and if it got three up, and then

23   following that I got my money out of there, remaining of

24   it.

25   Q.    You said you never got a check or you never got cash

Juneau - Direct/Miskiewicz

194

1   back from your hundred thousand dollar investment in

2   Hawaii.  I show you what I'm marking for identification as

3   Government's Exhibit JJ-1.  (Handing.)

4           Showing you JJ-1.  Does that in any way -- do

5   you remember getting any money from a company by the name

6   of Eufora?

7   A.   Yes.  I do.  Yeah.

8   Q.   And does that, do you recall getting a check from

9   Eufora for $100,000?

10  A.   I believe so, yeah.

11  Q.   Okay.  And as for the Hawaii investment whether it

12  was a hundred thousand or $500,000, do you recall getting

13  any money back?

14  A.   No.  Again, I never got any money from an Hawaii

15  company, you know, if you can say that getting --

16  Q.   I don't want to go beyond that.  My question is did

17  you get any money back from your Hawaii investment?

18  A.   Well, I guess not.  I mean --

19  Q.   All right.

20  A.   I --

21  Q.   Whenever you say --

22  A.   I never received any checks or anything like that,

23  that's how it was.

24          MR. MISKIEWICZ:  May I just have a moment,

25  your Honor?

Juneau - Direct/Miskiewicz

195

1  Q.  You said regarding the Air Park that you took this

2  airplane which was worth you testified was less than

3  $500,000, why -- were you offered cash instead?  --

4  A.  I was never offered cash but I remember the first

5  discussion we had.

6  Q.  You had with who?

7  A.  With Mr. Constantine.

8  Q.  What did Mr. Constantine tell you?

9  A.  That he was interested into making an arrangement,

10  making a deal for that Air Park investment.

11  Q.  And you mean when you say an arrangement, you mean to

12  get you out of the --

13  A.  Well, yeah, I mean that was my request, to get my

14  money out.

15  Q.  And at first did he offer you case, did he say that

16  he would pay you cash?

17  A.  I can't say that.  I can't remember exactly.  But I

18  know that it seemed to me after hanging up that there was

19  a possibility to get some of my money back of it.

20  Q.  And then the only money you got out of it was an

21  airplane?

22  A.  Well, yeah, the airplane was what I got out of the

23  Air Park deal.

24  Q.  Okay.  Thank you.

25          MR. MISKIEWICZ:  No further questions.

Juneau - Direct/Miskiewicz

196

1          THE COURT:  Thank you.  Cross-examination.  Did

2     you discuss who was going to go first?

3          MR. HALEY:  I believe that I was going first,

4     Judge, thank you.

5          THE COURT:  Would the lawyers approach?

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Juneau - Direct/Miskiewicz

197

1          (Whereupon, the following occurred at sidebar.)

2          THE COURT:  I don't know if I made an error

3     yesterday, I didn't have 2152 coming into evidence.  Did

4     it?

5          MR. HALEY:  It did not.  I'm going to be

6     offering it.  It did not.  You're right.

7          MR. LA RUSSO:  Judge, housekeeping,

8     Mr. Miskiewicz and I had a discussion about whether or not

9     a portion of my cross is going to be relevant.  So when

10    Mr. Haley finishes, can we just excuse the jury and have

11    it?  It's a pretty substantial question from my point of

12    view.

13         THE COURT:  All right.

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Juneau - Cross/Haley

198

1          (Whereupon, the following occurred in open

2     court.)

3

4     CROSS-EXAMINATION

5     BY MR. HALEY:

6     Q.    Mr. Juneau, good morning, sir.

7     A.    Good morning.

8     Q.    Mr. Juneau, though you did not have a degree in

9     finance, you did graduate with a degree in aeronautical

10    engineering, correct?

11    A.    Yes.

12    Q.    And I take it that the program that you were involved

13    in, the educational program was rigorous, you had to

14    review I can only imagine a lot of technical material, was

15    that correct?

16    A.    Yeah.  It was pretty tough at points.

17    Q.    And to your credit you were able to absorb the

18    material you read and obtain your degree; is that correct?

19    A.    Yeah.  Somehow I got through, yeah.

20    Q.    Now, the government showed you a standard advisory

21    agreement yesterday and that was the agreement that you

22    had with Phil Kenner with respect to his role as your

23    business manager, do you recall that document?

24    A.    Well, I seen it.  Again, I don't, it's pretty vague,

25    but I remember over the years seeing documents linking

1    Mr. Kenner and I through his advising work.

2    Q.   Sir, I'm going to show you the document introduced

3    into evidence as Government's Exhibit 6016, and just take

4    a look at it, it's not that lengthy, 3, 4 pages.

5              (Handing.)

6    A.   Yeah.

7    Q.   Is it your testimony that the content of that

8    document is pretty vague?

9    A.   Well, I don't remember when it was presented to me

10   exactly.  I don't remember the date that I seen this.  I'm

11   not saying that I never seen it.  I'm just saying --

12   Q.   I understand that, sir.  But as you read the document

13   itself.

14   A.   Yeah.

15   Q.   And you look at the words on those pages, is it your

16   testimony that the words on those pages are vague?  That's

17   my question.

18              MR. MISKIEWICZ:  Objection, relevance.

19              THE COURT:  No.  That's okay.  Overruled.

20   A.   Yeah, I'm not saying that the wording is vague.

21   That's not what I'm saying.  I'm just saying that my

22   memory of this, of seeing this document is vague.  That's

23   it.

24   Q.   We can agree, sir, as relates to the document itself,

25   there's a clause that says arbitration, second to last

Juneau - Cross/Haley

200

1    page.  Would you take a look at it.

2              MR. HALEY:  If I may approach, Judge?

3              THE COURT:  You don't have to ask to approach.

4              MR. HALEY:  Thank you, sir.

5    Q.   Actually, sir, page 4 of the document, just the

6    paragraph, arbitration.

7    A.   Yeah.

8    Q.   It's only two paragraphs.  Could you simply read that

9    to yourself while you're on the stand.  To yourself.

10             (Pause.)

11   A.   Okay.

12   Q.   Sir, can we agree that the import of that paragraph

13   is that should there be a dispute with between yourself

14   and Philip Kenner reference to your financial affairs,

15   you're entitled to take that dispute to arbitration, isn't

16   that the import of that paragraph?

17   A.   That's what it looks like.  I'm not a professional,

18   if making sense of this stuff, but that's what it looks

19   like, yeah.

20   Q.   That's what the words say, correct, sir?

21   A.   Yeah.

22   Q.   All right.  Other than the lawsuit you referred to a

23   moment ago, where you commenced a suit to obtain the

24   return of your investment or contribution, however you

25   want to characterize it not Avalon Air Park, other than

Juneau - Cross/Haley

201

1   that lawsuit, did you ever bring a lawsuit by way of that

2   arbitration provision in court with respect to any of the

3   disputes you are claiming you had with Phil Kenner as

4   relates to the management of your business affairs by him?

5               MR. MISKIEWICZ:  Objection, relevance.

6               THE COURT:  Overruled.

7   A.   The only lawsuit I think that you know that I

8   remember is the one that I referred to earlier.

9   Q.   And we can agree, sir, that as relates to the line of

10  credit, and dispute that you had where Phil about

11  conservative versus speculative investments, in the final

12  analysis, your line of credit was replenished, it was

13  closed, and you did not lose any of your collateral.

14  Isn't that true?

15  A.   Well, that was the outcome, yeah.  Yeah.

16  Q.   And we know the outcome with reference to at least

17  $100,000 where it went, why it went, where it went,

18  there's no question at some point as you told us a moment

19  ago you received a check for $100,000, is that true?

20              MR. MISKIEWICZ:  Objection, form.

21              THE COURT:  Yes.  Sustained as to form.

22  Q.   I know you testified to it, sir, but we can agree

23  that you did receive a check for $100,000, I know it was

24  drawn on the Eufora account, but that indeed did occur,

25  correct?

Juneau - Cross/Haley

202

1    A.    I did receive the check from Eufora.

2    Q.    Now, who is Jean Turpin?

3    A.    He's a good friend of mine.

4    Q.    And has he ever served as an investment advisor to

5    you?

6    A.    Yes, he did.

7    Q.    For how long?

8    A.    I believe it was, I got introduced to Jean in 1993,

9    around that time.

10   Q.    And did he ever recommend an investment to you where

11   you lost money?

12              MR. MISKIEWICZ:  Objection.

13              THE COURT:  Why don't you approach.

14              (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

203

1          (Whereupon, the following occurred at sidebar.)

2          THE COURT:  Is the objection relevance?

3          MR. MISKIEWICZ:  The objection is relevance,

4     403.  Also beyond the scope of the direct.

5          THE COURT:  What's the relevance.

6          MR. HALEY:  There's been an underlying theme,

7     I've looked at the prosecution's case, that the client is

8     making recommendations with respect to risky investments

9     and somehow when those investments don't work out, that's

10    some indication of criminal conduct or inappropriate

11    conduct.  As an offer of proof we know that Jean Turpin

12    represented that he invested in a Bahamian bank and based

13    upon prior testimony in the proceeding he indicated that

14    he did not receive a full return on that investment.

15          The point simply being, Judge, that these

16    investments he understood the risks, there's a situation

17    where he had another financial advisor, he followed his

18    advice, that investment didn't work out.

19          The jury ought to know, Judge, that there's

20    other instances where investment advisors can make advice,

21    the client loses money and that's not criminal conduct.

22          THE COURT:  I think that it's marginally

23    relevant.  I'll allow it.

24          MR. MISKIEWICZ:  Under 403, we are not here to

25    suggest that they lost money on a risky deal and

Juneau - Cross/Haley

204

1    complaining.

2          THE COURT:  This is very -- you went to this for

3    an hour.  The fact he invested money on other occasions

4    establishes his mindset, so I'm going to allow it.  Okay.

5          MR. HALEY:  It will be two questions.  Thank

6    you.

7          (Continued on next page.)

Juneau - Cross/Haley

205

1          (Whereupon, the following occurred in open

2    court.)

3    BY MR. HALEY:

4    Q.    So sir, my question is this, did Mr. Turpin recommend

5    that you invest in a Bahamian bank at some point in time?

6    A.    Yeah, I guess it was, it was something that was

7    discussed, something that was also discussed with Phil

8    Kenner and something that we decided to do.

9    Q.    When you say we decided do, Mr. Turpin's investment,

10   correct?

11          MR. MISKIEWICZ:  Objection.

12          THE COURT:  Overruled.  You can answer it.

13   A.    Yeah.  Jean was involved in opening bank accounts.  I

14   have bank accounts under his management.

15   Q.    And as a result of his involvement in that

16   recommended investment in the Bahamian bank, did you lose

17   money in that investment, yes or no?

18          MR. MISKIEWICZ:  Objection.

19          THE COURT:  Overruled.

20   A.    In, yeah, in some investments, yeah, I remember,

21   yeah, some of my different stocks I don't know if there

22   was one or two or whatever that did not make gains, yeah.

23   Q.    Based on Mr. Turpin's recommendation, correct, sir?

24   A.    Well, I don't know if you can call this

25   recommendations, I mean I did hire the services of Jean

206

1   Turpin, so I did hire his services as a financial advisor.

2   So I don't follow every investment that he does to

3   day-by-day.

4   Q.    Final question on that, sir.  Do you fault him,

5   Mr. Turpin for making that investment to you?

6            MR. MISKIEWICZ:  Objection.

7            THE COURT:  Sustained.  I'm going to sustain it.

8   A.    I can't --

9            THE COURT:  No.  When I sustain it, it means you

10  don't have to answer.

11           THE WITNESS:  Okay.

12  Q.    Now, yesterday you identified as an exhibit an e-mail

13  between yourself and Philip Kenner where Phil Kenner used

14  expletives, used vulgar language; is that correct?

15  A.    With reference to?

16  Q.    Well, do you recall an e-mail he said something about

17  I'm paraphrasing tired of this shit or words to that

18  effect.

19           Do you remember that e-mail?

20  A.    Yeah.

21  Q.    The content of that e-mail, it sounded like he was

22  angry, Phil Kenner?

23  A.    I was very surprised at the tone when I received that

24  e-mail, yeah.

25  Q.    But the expletives that he used, you heard those

Juneau - Cross/Haley

207

1  expletives before, correct, in your hockey career?

2  A.    Those expletives?

3  Q.    I'm sorry, sir.  I apologize.

4        The word shit was used in that e-mail, correct,

5  S-H-I-T?

6  A.    I saw that, yeah.

7  Q.    And the word begins with an F, letters following it,

8  was used in that e-mail, right?

9  A.    Yeah.

10 Q.    As a professional hockey player, that's not the first

11 time that you ever heard those words, right?

12 A.    Of course not.

13 Q.    Okay.

14       You were questioned yesterday by the government

15 and asked to recollect e-mails, events, conversations with

16 Phil Kenner that go back at least 12 years, correct, to

17 2003?

18 A.    At least, yeah.  I guess.

19 Q.    And you were trying to do your best, sir, to bring up

20 your recollection as to those events I'm sure, is that

21 true?

22 A.    Again, the collections of these e-mails, it's some

23 stuff that I -- that I found through e-mails that I had or

24 I had kept which I had sent when I, when we opened the

25 case back in 2007.

Juneau - Cross/Haley

208

1          So that was a bunch of e-mails sent to the

2   lawyer that I had hired.

3   Q.    Mr. Meeks?

4   A.    Yes.

5   Q.    And that was also the e-mails that were most recently

6   forwarded to you by the FBI?

7   A.    It looks like it, yeah.

8   Q.    Sir, would you kindly take a look at a document

9   marked Kenner Exhibit 4.  (Handing.)

10          And take your time.  (Pause.)

11          MR. MISKIEWICZ:  Your Honor, may we approach?

12          THE COURT:  Yes.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

**Juneau - Cross/Haley**

209

1          (Whereupon, the following occurred at sidebar.)

2          MR. MISKIEWICZ:  My objection is hearsay.  It's

3     irrelevant.

4          (Document handed to the Court.)

5          MR. HALEY:  Your Honor, as an offer of proof,

6     well, first of all, I haven't been able to even ask the

7     witness if he can identify the document.  But assuming

8     that he can identify the document, I authenticate this as

9     a document that was a communication between himself and

10    Phil Kenner that was testified to in the government's

11    direct case, I would suggest the relevance of this

12    document, Judge, is this is the e-mail which followed the

13    exhibit 729 that was introduced into evidence and it

14    completes the sequence.

15         THE COURT:  I got it.  I'm going to overrule the

16    objection.  This helps establish the nature of their

17    communications or relationship at the time.  It completes

18    the picture of the conversation that they had during that

19    time period.

20         So I'll allow it.

21         MR. HALEY:  Thank you, sir.

22         (Continued on next page.)

23

24

25

Juneau - Cross/Haley

210

1          (Whereupon, the following occurred in open

2    court.)

3    BY MR. HALEY:

4    Q.   Take your time if you want.  Do you recognize that

5    document, sir?

6    A.   I think that I do remember this e-mail exchange.

7    Q.   And it's an e-mail exchange between you, sir?

8    A.   Phil Kenner and I.

9    Q.   And with reference to the e-mails that were

10   introduced into evidence yesterday, that's part of the

11   sequence, is it not, sir?

12   A.   Well, it's, it's very similar.  I don't recall the

13   dates of the other e-mails from yesterday.

14   Q.   I can show you the exhibits, sir.  I'll show you

15   specifically exhibit 729.

16          Take a look at exhibit 729 and read that to

17   yourself.  (Handing.)

18   A.   It comes after the others.

19   Q.   It comes after 729, correct?

20   A.   From the dates, yeah.

21          MR. HALEY:  Judge, I'd offer that as Kenner

22   Exhibit 4.

23          THE COURT:  Pursuant to the discussion at

24   sidebar, Kenner 4 is admitted.

25          (Defendant's Exhibit Kenner 4 in evidence.)

Juneau - Cross/Haley

211

1   Q.   Now, may I see --

2           THE COURT:  Is that working?  I was told we had

3   a problem with it this morning.  Looks like it's working.

4           MR. HALEY:  It is, Judge.

5   Q.   Sir, I guess for purposes of the record --

6           MR. HALEY:  Your Honor, may I read into the

7   record the contents of the e-mail.

8           THE COURT:  Sure.

9           MR. HALEY:  It essentially appears to be from

10  Phil Kenner to you, RE, what's up, long days at this end.

11          THE COURT:  I don't think -- you can move the

12  document up if you want.

13          MR. HALEY:  I'm sorry.

14          THE COURT:  Keep going.

15          MR. HALEY:  Thank you.

16          Just for purposes of the record, long days at

17  this end.  I am working on the exit strategies for you

18  every day on the projects.  I am getting money out before

19  you're supposed to, so take sometime to replace with other

20  investors.  Be patient.  I will take care of it.  PK.  And

21  then the response:  I knew that, what else?  How are you?

22  How's your family?  How are the different projects going?

23  And then final response:  Not much, just working 20 hours

24  a day, PK.

25          Thank you, sir.

Juneau - Cross/Haley

212

1  Q.   Now, you were interviewed before today on two

2  occasions, sir, were you not, by the FBI?

3  A.   I don't know if we can call this an interview.  I had

4  two long discussions in March, I believe, and then we met

5  when I arrived here a couple of days ago.

6  Q.   Would you agree that your memory of events involving

7  your interaction with Phil Kenner was better in 2009 than

8  it is in 2015?

9  A.   That's normal, yeah, obviously the closer to all

10  these events the more that I remembered from all of that

11  for sure.

12  Q.   And on let's say October of 2009, in a telephone

13  interview, you told Agent Galioto at that point in time --

14          MR. MISKIEWICZ:  Objection.

15          MR. HALEY:  May I finish?

16          MR. MISKIEWICZ:  May we approach?

17          (Continued on next page.)

18

19

20

21

22

23

24

25

213

1    (Whereupon, the following occurred at sidebar.)

2    MR. MISKIEWICZ:  Your Honor, I don't object to

3    the attempted impeachment.  But this is an improper way of

4    using an agent's notes, which -- actually isn't even Agent

5    Galioto's notes, the notes are not his notes.

6    We give over 302s and we label them as 3500

7    material which is appropriate, but if he has a question he

8    should ask the question.

9    THE COURT:  He has notes from the FBI, his

10   suggests that he says something differently in a prior

11   interview is it a proper question to say didn't you

12   account on an earlier occasion why, I think that's

13   completely proper.  If he said he doesn't remember then

14   you can use it to refresh his memory.  I assuming he said

15   something different.

16   MR. HALEY:  He did.

17   MR. MISKIEWICZ:  My objection is that he hasn't

18   even gotten out what area it is that he's suggesting he's

19   going to impeach.  And he's simply testifying if you will,

20   you told the FBI X, Y and Z, I mean even if this was a

21   transcript, he would have the opportunity to look at it,

22   and use it to refresh his recollection perhaps.

23   But to simply say, you're saying something

24   completely different based on somebody else's handwriting,

25   that's improper.

Juneau - Cross/Haley

214

1          THE COURT:  I disagree.  We're having too many

2    sidebars, too.  Reframe the question.  You started out it

3    wasn't the form of a question.  You started out saying you

4    said to the FBI.  That's testifying.

5          MR. HALEY:  Rephrase it.

6          THE COURT:  Yes.

7          MR. HALEY:  Okay.

8          MR. MISKIEWICZ:  Thank you.

9          (Continued on next page.)

Juneau - Cross/Haley

215

1          (Whereupon, the following occurred in open

2     court.)

3     BY MR. HALEY:

4     Q.   Sir, in 2009 when you were interviewed by FBI agents,

5     telephonically, did you tell the FBI at that point in time

6     that your investments with Phil Kenner involved impact

7     equipment, Escher, E-S-C-H-E-R, B-S-D, Mexico, Avalon,

8     Eufora and Hawaii investment via L-O-C.  Did you tell the

9     FBI that?

10    A.   It's possible.  I can't say yes or no to this 2009,

11    it's possible.

12    Q.   I'm going to have you take a look at a document

13    that's marked Kenner Exhibit 7.  Take a look at the top of

14    the document.  (Handing.)

15          And I'm going to refer your attention to the

16    fourth page of that document, something pointing to the

17    bottom portion of the document, and simply read that to

18    yourself.  (Pause.)

19    A.   Okay.

20    Q.   Does that refresh your recollection, sir, whether in

21    2009 you had awareness of those investments as related to

22    your relationship with Phil Kenner?

23    A.   That --

24          MR. MISKIEWICZ:  Objection.  Withdrawn.

25          THE COURT:  Okay, you can answer.

216

1   A.   I don't have a -- I don't remember.

2   Q.   So it doesn't refresh your recollection, sir?  That's

3   my only question.

4   A.   No.

5   Q.   Would you kindly take a look at -- let me ask the

6   question first, sir.

7        In 2009 when you were telephonically interviewed

8   by the FBI, did you tell them that your line of credit was

9   being used for the Hawaii project.

10  A.   I --

11       MR. MISKIEWICZ:  Objection.

12       THE COURT:  Overruled.

13  A.   I don't remember, and I think that I asked someone

14  representing me possibly.  It's again, I don't remember.

15  Q.   Take a look at what's been marked Kenner Exhibit 7

16  and the bottom portion of the same document and just read

17  that to yourself.  (Handing.)

18       Does that refresh your recollection as to

19  whether or not you told the FBI in 2009 that the line of

20  credit was being used for the Hawaiian investment?

21  A.   I don't know.  Again, I don't remember for some

22  reason.

23  Q.   You don't remember for some reason?

24  A.   Well, I'm looking at this and if I didn't remember I

25  would know for sure.

Juneau - Cross/Haley

217

1  Q.   Do you remember, sir, being interviewed by the FBI in

2  September of 2012?

3  A.   No.  Again, what I think is at each time until March,

4  that for some reason someone from the FBI was interviewing

5  someone.  I was represented.  For the -- yeah, for the

6  longest time I just wanted to turn the page on what had

7  happened from many years, this stuff kept me awake at

8  night, and at some point I just wanted to turn the page

9  and move on.

10         By being personally affected, seeing my parents

11  and my family being affected, obviously, and when I had

12  heard that through my former lawyer that Michael Meeks,

13  that the FBI was trying to reach me.  I had asked my

14  financial advisor to represent me.  So this might be why I

15  don't remember.

16         For me this was a way to again not come back,

17  not being haunted by all of this stuff again.

18  Q.   The question I asked you, sir, is do you remember

19  being interviewed by the FBI in September of 2012?

20  A.   Well, that was a long explanation, but no, I don't.

21  Q.   It was a long time.  I apologize, I withdraw the

22  comment.

23  A.   What was that?

24  Q.   I withdraw the comment.

25         By the way, that e-mail that you identified a

218

1   moment ago, the Kenner Exhibit 4, that was not one of the

2   e-mails that was provided to you by the FBI before today

3   in preparation for your testimony, was it?

4   A.   I don't think so.

5               (Continued on next page.)

1   CONTINUED CROSS EXAMINATION

2   MR. HALEY:

3   Q    With respect to the e-mail, sir, did or did you not turn

4   over all e-mail correspondence with Kenner regarding your

5   investments through Mr. Kenner and your loans obtained from

6   Northern Trust to the FBI or the government?

7   A    So just to make sure, you're asking me if I --

8   Q    I'll rephrase the question.  I'll break it down.

9   A    Okay.

10  Q    All the e-mails in your possession concerning

11  communications between you and Phil Kenner that relate to the

12  time where he was recommending investments to you in return

13  for those recommendations were making investments, did you

14  turn all of those e-mails over to the FBI and the government

15  prior to today?

16  A    Well, this -- this is -- what I saw was all of the

17  e-mails -- well, kind of sent back to me, but from all the

18  e-mails that I previously sent to my former lawyer.

19  Q    When you say sent back, you're referring to the e-mails

20  that were sent back to you by the FBI?

21  A    Mm-hmm.

22  Q    My question is simply this, is there a body of e-mails

23  between yourself and Phil Kenner on computer, laptop,

24  downloaded hard copy, that comprise the e-mail correspondence

25  between you and Phil Kenner with respect to the investments he

1  recommended to you?

2  A    You're asking me if the FBI --

3  Q    No, no.  Does that exist someplace?

4  A    Possibly.  Possibly.

5  Q    On the possibly qualification, where possibly would that

6  be?

7  A    On my computer.  What I had done is get off it what I

8  could find and send it to my former lawyer.  And so that's

9  what I did back then.

10  Q    My question is this, sir, what you could find, is it, to

11  your knowledge, every communication between you and Phil

12  Kenner or did you just pick out certain communications and

13  send them over to your lawyer, as it relates to communications

14  between you and Phil Kenner concerning the investments he

15  recommend to you?

16  A    There's probably more stuff over a number of years, more

17  communication than what was sent.  I mean, it's the content

18  that was -- that was provided back then was stuff that could

19  help the lawyer to understand what was going on, I guess.

20  Q    So you made a selection of the e-mails.  There's nothing

21  wrong here.  You made a selection of e-mails that you thought

22  were relevant, and you sent those off to your lawyer, correct?

23  A    What I remember is saving some of this stuff that was --

24  okay.  Because I don't think I saved everything, but I know

25  that I was saving some stuff that could be useful.  At some

JUNEAU-CROSS-HALEY                                    221

1   point, the government was going forward.

2   Q    By the way, apart from e-mails, you would discuss with

3   Phillip Kenner on the phone your investments, would you not?

4   A    Early on we were connecting by phone a lot.

5   Q    During that period of time you were connecting with Phil

6   Kenner on the phone a lot, the subject of that conversation

7   was the investment that he was recommending, isn't that

8   correct?

9   A    Yeah.  It was about how he -- it was a mix of, you know,

10  personal stuff and business stuff.  You know, how he -- how

11  the investments were going and stuff like that.  It was

12  really, I saw this as a friendship relationship.

13  Q    I don't deny that, sir.  My question simply was, during

14  the course of those telephone conversations early on, in

15  addition to family matters, you and Phil discussed freely

16  his -- your investments and his recommendations, correct?

17  A    Yes.  And when I had questions, I probably asked.

18  Q    When you probably asked a question, did he answer the

19  question, yes or no?

20  A    Yeah, I believe so.

21  Q    Did Phillip Kenner, in either words or actions, ever

22  prohibit you from communicating with the officials at the

23  Northern Trust Bank?

24  A    No.  I can't say that, no.

25  Q    As a matter of fact, there did come a point in time where

1   you had a question about the status of your line of credit and

2   you communicated directly with Mr. Mascarella with Northern

3   Trust, isn't that true?

4   A    I think I first asked Phil Kenner about it, and then went

5   up to see the name of the Northern Trust person.  And it was

6   the first time I remember contacting someone at Northern

7   Trust.

8   Q    Does the name Aaron Mascarella, M-A-S-C-A-R-E-L-L-A, come

9   to mind?

10  A    Yes.

11  Q    Please take a look at this document marked Kenner

12  Exhibit 3.  In an effort to be complete, it is a 9-page

13  document.  Would you please take a look at this document, sir.

14          (Handing.)

15          (Pause in proceeding.)

16  Q    Do you recognize that document, sir?

17  A    Yes.

18  Q    What is it, just so we know?

19  A    It is e-mail exchanges, some between me and Phillip

20  Kenner and the other one was Mascarella from Northern Trust.

21  Q    As you sit here on the stand under oath, is that a

22  document that reflects e-mail communications between the

23  parties that are reflected on that document?

24  A    Yes.

25          MR. HALEY:  I would offer that, Your Honor, as

1  Defendant's Exhibit --

2            THE COURT:  3?

3            MR. HALEY:  -- 3.

4            MR. MISKIEWICZ:  No objection.

5            THE COURT:  Mr. LaRusso, is there any objection?

6            MR. LaRUSSO:  No, Your Honor.  I am sorry.

7            THE COURT:  Defense Exhibit Kenner Exhibit 3 is

8  admitted.

9            (So marked as Defendant Kenner Exhibit 3 in

10  evidence.)

11  Q    I am not going to read the entire document.  For the

12  purposes of the record, I'd simply like to read into evidence

13  from Aaron Mascarella to Joe Juneau.  Object -- Re:  Northern

14  Trust line of credit.

15            THE COURT:  I don't see more than one e-mail.  But

16  it may be that the e-mails are in reverse order.  Are you

17  going to read a series of e-mails or just one e-mail?

18            MR. HALEY:  Just that first paragraph, Judge.  It's

19  a series of e-mails.

20  Q    And again, just for the record (reading:)

21            "Mr. Juneau, thank you for your inquiry, period.

22  Yes, Phil is correct hat the Little Isle line of credit for

23  which your Northern Trust Investment Account, AMAS, was

24  pledged has been paid off and closed.  Your AMAS is now free

25  from any restrictions.  You're welcome to contact me at any

1    time if you have any other questions.  Respectfully, Aaron

2    Mascarella, 2nd Vice President Commercial Lending."

3              MR. HALEY:  May I have a moment, Your Honor?

4              THE COURT:  Yes.

5              MR. HALEY:  Thank you.

6    Q    So this was -- let's take a look at this document.  It

7    was actually presented to you yesterday.  Government's

8    Exhibit 2152.  And again, I want you to have a gross

9    familiarity with it; you don't have to read page by page.

10             Take a look at it.

11             (Handing.)

12   A    Yes.

13   Q    Specifically, sir, please take a look at the page, final

14   page, which I'm pointing to right now.

15   A    Yes.

16   Q    Is that your signature?  Is that your signature, sir?

17   A    It looks like it, yes.

18             MR. HALEY:  Your Honor, I now offer that into

19   evidence.

20             THE COURT:  Any objection?

21             MR. MISKIEWICZ:  May I have a voir dire?

22             THE COURT:  Yes.

23   VOIR DIRE EXAMINATION

24   BY MR. MISKIEWICZ:

25   Q    The signature, you testified, is yours.  Do you remember

1   seeing the entire document?

2   A    I don't recall this.

3   Q    The documents were dated --

4          MR. MISKIEWICZ:  May I approach, Your Honor?

5          THE COURT:  Yes.

6   Q    The documents were dated in or about 2003.  Do you

7   remember in or about 2003, early 2004, getting that document?

8   I don't mean the signature page.  I mean the whole document.

9   A    I don't.  Obviously, I don't.

10          MR. MISKIEWICZ:  We object.

11          THE COURT:  Overruled.  2152 is admitted.

12          Any objections, Mr. LaRusso?

13          MR. LaRUSSO:  No, I do not, Your Honor.

14          (So marked as Defendant Kenner Exhibit 2152 in

15   evidence.)

16   CONTINUED CROSS EXAMINATION

17   BY MR. HALEY:

18   Q    I'm going to show you a document marked Kenner Exhibit 1.

19   Admittedly, it is a lengthy document.  But if you'd simply

20   peruse it; you don't to have read word by word.  Just if you

21   are familiar with the content.

22          (Handing.)

23          Mr. Juneau, I am sorry to interrupt you.  I reached

24   a stipulation with the government with respect to that

25   document.

1          MR. HALEY:  Your Honor, I will be submitting this as

2     Kenner Exhibit 1 pursuant to stipulation.

3          THE COURT:  Any objection?

4          MR. LaRUSSO:  No, Your Honor.

5          THE COURT:  Kenner Exhibit 1 is admitted in

6     evidence.

7          (So marked as Defendant Kenner Exhibit 1 in

8     evidence.)

9          Is the government reviewing the document to be shown

10    to the witness?

11         MR. HALEY:  I'm sorry, Your Honor.  Exhibit 2.  I

12    don't know if we have a stipulation in connection with that

13    exhibit.

14         MR. MISKIEWICZ:  It is stipulated.

15         THE COURT:  Kenner Exhibit 2 is admitted.

16         (So marked as Defendant Kenner Exhibit 2 in

17    evidence.)

18         MR. HALEY:  Thank you, sir.

19         THE COURT:  Any objection, Mr. LaRusso?

20         MR. LaRUSSO:  I do not, Your Honor.

21    Q    Would you kindly take a look at Kenner Exhibit 5.  This

22    is a 1-page document.

23         THE COURT:  Okay.  Mr. Haley, he is ready.

24         MR. HALEY:  Thank you.

25    Q    Do you recognize that document, sir?

1  A    No.

2         THE COURT:  Mr. Haley, the document is sideways.

3         MR. HALEY:  I'm sorry, Judge.

4  Q    Sir, yesterday when you were answering questions about

5  whether you saw certain documents presented to you by the

6  government, and you would answer "I don't think so," that was

7  your best answer at the time yesterday, is that correct?

8         MR. MISKIEWICZ:  Objection to form.

9         THE COURT:  Do you understand the question?

10        THE WITNESS:  I think so.

11        THE COURT:  You can answer it.

12        THE WITNESS:  Yes, I was trying to answer the best

13  that I can.

14  Q    I know you were.  That's not my question, sir.  By that

15  answer, you're not saying under oath, are you, that I never

16  saw that document, are you?

17  A    I'm saying that I don't remember.  That's what I'm

18  saying, I don't remember seeing these documents.

19  Q    When you testified yesterday that you saw a document and,

20  at times, it didn't make sense to you, what, if any, efforts

21  did you make to consult with a colleague, another attorney,

22  another investment advisor, to assist you in your

23  understanding of that particular document?

24  A    Well, when I had Phil Kenner as a advisor, I obviously

25  would try to reach him.  And later on when I had someone else

1  doing -- you helping me with things, I'm trying to do this and

2  all that I can do.

3  Q    Well, is it your testimony, sir, though there may have

4  been delays in the communication between you and Phil, that he

5  would refuse to answer your questions?

6  A    At one point, I was trying to reach him by phone with no

7  answers.  At one point, one day he actually picked up the

8  phone and -- after, you know, I had blocked my number.  I

9  figured that's why the phone was picked up that day.  He said,

10  Can I call you back?  He never called back.  And I don't

11  believe we ever talked on the phone after that.

12  Q    And did that happen toward the end of your relationship

13  with Phil Kenner where you suggested, well within your rights,

14  that you no longer wanted to continue your investments with

15  Phil Kenner?  That happened at the end, did it not?

16  A    From what I remember, it happened -- I guess it was like

17  the summer of '05.  At that point, the way I felt was that for

18  some reason I was trying to, by e-mail communications or

19  trying to reach by phones, somehow that was everything that I

20  had put into this stuff.  I mean, it was -- I felt that if I

21  just cut out things, that money would stop for sure.

22  Q    But you didn't lose everything you put into this,

23  correct, sir?  You got back -- the LLC was refunded, the LLC

24  should -- the line of credit was refunded, the line of credit

25  was closed, and you didn't lose your collateral.  So you

1  didn't lose that line of credit, correct?

2  A    Well, the line of credit got repaid, yes.  But looking at

3  the different numbers and investments, if you call it

4  investments, I believe I lost over 2 million.

5  Q    Really?

6             MR. MISKIEWICZ:  Objection.

7             MR. HALEY:  I apologize.

8             THE COURT:  Sustained.  The jury will disregard.

9  Q    You told the government on direct that there was the

10  investment in the Avalon Air Park, correct?

11  A    Yes.

12  Q    That was a $500,000 investment, correct?

13  A    Yes.

14  Q    You received an airplane valued at approximately

15  $330,000?

16  A    Those were the numbers that were thrown at us by -- you

17  know, I tried to salvage my investments.  That's what they

18  were telling me it was worth.  That's why -- that's the figure

19  I was given.

20  Q    So when you say you loss in excess of 2 million, are you

21  calculating your view of what your investment would have made

22  had they come to fruition in connection with the projected

23  profitability and things of that nature?  Is that what you're

24  referring to?

25  A    Well, when I'm looking at it --

1  Q    Sir, it's a question, and it's a very simple question.

2  When you say you lost in excess of 2 million, are you talking

3  about the profit these various investments would have made for

4  you had they came to fruition, things of that nature?

5  A    I'm not looking at the eventual growth or whatever.  I'm

6  looking at what I believe was getting out of my portfolio for

7  different private deals that never came back.

8  Q    Because those deals did not work out, correct?

9  A    I'm not getting too many explanations.  That I was trying

10  to contact that one person that could explain things.  At that

11  one point what you saw in the e-mail, it was very limited.

12  Q    My question is, you invested a certain amount of money in

13  a variety of investments, including the Bahamian Bank

14  investment recommended by Mr. Kirkland.  And as a result of

15  those investments, a good number of them did not work out,

16  correct?

17        MR. MISKIEWICZ:  Objection.

18        THE COURT:  Yes, sustained.

19  Q    You testified in a previous proceeding known as the Nolan

20  arbitration, sir.  Do you remember that?

21  A    Yes.

22  Q    Do you remember being asked questions about your

23  understanding that there are risks in investments?

24  A    Yes, I do understand that there are risks in investments.

25  Q    As a matter of fact, sir, when you were asked, "When you

1  invest in the stock market, does the broker guarantee the

2  stock is going to go up?"  You answered, "Obviously not,"

3  correct?

4  A    (No audible response.)

5  Q    Mr. Kenner never represented to you that there would be a

6  guarantee of return on your investment, did he?

7           MR. MISKIEWICZ:  Objection.

8           THE COURT:  Overruled.  You can answer that.

9  A    Well, did he ever guarantee, no.  But it was presented

10  specifically by Kenner, You'll get your money back soon.  So I

11  can't say that he said it's guaranteed that you'll get it

12  back.  I don't remember anything like that.

13  Q    Well, we can agree, sir, that when asked the following

14  question you gave the following answer in the Nolan

15  arbitration (reading:)

16           "QUESTION:  I'm trying to focus you specifically.

17  Did Mr. Kenner guarantee that you would make money in that

18  investment?

19           ANSWER:  I just said no, right."

20           Do you remember giving that answer?

21  A    No. I don't.  But it's possible that, yes, I gave that

22  answer.

23           MR. HALEY:  May I have one moment, Judge?

24           THE COURT:  We'll take a break in a minute.  I just

25  want to finish with Mr. Haley first.

1           MR. HALEY:  Judge, I apologize.  I am collecting

2    exhibits.

3           Exhibit 2, Your Honor.

4           THE COURT:  That is already in evidence.

5           MR. HALEY:  Yes, sir.  I think it's up there with

6    the witness.  Thank you, sir.

7           (Document retrieved.)

8           Your Honor, I apologize.  There's one document I

9    need to copy to ask the witness a question.

10          THE COURT:  Why don't we take a break.

11          MR. HALEY:  Thank you.  I thank you for the

12   consideration.

13          THE COURT:  We will take the morning break.  Don't

14   discuss the case.

15          (Whereupon the jury leaves the courtroom at

16   11:20 a.m.)

17          We will take a break.  Mr. Juneau, you may step down

18   from the witness stand.

19          Before taking the break, Mr. LaRusso, do you want to

20   tell me what the issue is so we don't have to take another

21   break?

22          MR. LaRUSSO:  Yesterday I had turned over to the

23   government the exhibits that I was hoping to use on

24   cross-examination since that was the procedure we were hoping

25   to follow.

1           THE COURT:  It's a great procedure.

2           MR. LaRUSSO:  It is.  This morning, Mr. Miskiewicz

3    indicated that he is objecting to many of the bank records

4    that I was hoping to get stipulations on, and it relates

5    directly, we claim, to the issues that are in the indictment.

6    If I may explain, kind of like what we were talking about in

7    my opening where we're having this goal post constantly moving

8    on us.

9           In the original indictment, Your Honor,

10   Paragraph 31, the government alleged, in fact, Kenner had

11   acquired his ownership interest in Eufora using $250,000 that

12   Kenner had fraudulently obtained from John Doe Number 8, which

13   is Owen Nolan, by falsely representing -- and I'll insert Owen

14   Nolan, if I may, Your Honor -- that the 250,000 would be used

15   to invest in a real estate project in Mexico on John Doe

16   Number 8's behalf, Owen Nolan.

17          This is in reference to the sale of the stock that

18   takes place many years later in 2008 and 2009.  That's the

19   source of the stocks that the government is alleging that

20   Mr. Kenner sold and kept the proceeds, sold to the hockey

21   players and fraudulently didn't tell him that he was the

22   individual behind the sale.

23          So my point is, Judge, that is the original position

24   that they would take.  We filed a motion to dismiss for

25   prosecutorial misconduct.  We laid out the facts that it

1  couldn't have bee Owen Nolan.  What do we get?  We come to the

2  Court and we ask the Court for permission to get clarification

3  on this general indictment that they returned.  And

4  Mr. Miskiewicz did, on several correspondences give us

5  information a little built more specific.  And here's what he

6  says, Judge, about Paragraph 31 in a document 211 filed

7  April 23, 2015, on page 4 (reading):

8        "Questions regarding the superseding indictment.

9  The following summarizes the government's responses to your

10  request clarification arising from a return of a superceding

11  indictment."  And then he -- he then says, "The underlying

12  indictment specifics that" -- and he then quotes what I just

13  read to the Court, all right.

14        Then on the next page -- actually, it's highlighted

15  (reading):

16        "The John Doe referenced above is Joseph Joe Juneau,

17  currently John Doe Number 6.  The government will seek to

18  introduce wire transfer and bank records provided in the

19  discovery showing that a $250,000 wire from Juneau for an

20  investment in Mexico at Kenner's request was subsequently

21  rewired at Kenner's direction and used by Kenner to acquire

22  his ownership share in Eufora.  Juneau will testify that he

23  never authorized such transfer of his funds.  Juneau does not,

24  to date, know that Kenner used his money to buy a share of

25  Eufora using money stolen from Juneau's intended investment in

235

1    Mexico."

2            I opened to the jury, I indicated to the jury that

3    that was incorrect as well.  And what the evidence will show,

4    Your Honor, is that Mr. Juneau, in fact, invested in Diamanté

5    Del Mar two times; $250,000 on August 15, 2002, and

6    September 24, 2002.  Those monies were converted into a

7    $500,000 equity ownership the following year.  Our evidence is

8    going to show that Juneau's money could never have been

9    transferred as the government alleged first in the original

10   indictment and then in their letter just about a week and a

11   half ago.  And now, Judge, they're changing it completely and

12   they're saying everything relative back to August of 2002, and

13   Mr. Juneau's deposits that were taking place is not relevant.

14           So I lay out for the Court the fact that I was going

15   to do two things on cross.  I was going to highlight and refer

16   to the indictment, I was going to refer to the letter and I

17   was going to show Mr. Juneau's record showing his deposits.

18   Two other hockey players deposited at the same.  One,

19   actually, on the same day that he made it, and then another

20   hockey player a couple of days before.  And leave the jury

21   with the evidence, not a speculation that there were several

22   other hockey players that invested at the same time.  And the

23   government's theory and the government's representation, the

24   government's argument that they have been making is false.

25           That's part of our defense.  They're constantly

236

1   shifting the goal posts and constantly presenting additional

2   evidence, Judge.  Changing the theory when they're shown that

3   they're incorrect.

4        I think one of the most disturbing aspect of this,

5   Judge, these allegations were made, I believe, without a full

6   examination of all the records.  I believe the documents I

7   gave them, they may not have had them all.  And it shows

8   something different than what they're saying today.  I hope

9   I'm wrong, Judge.  If that's true, I'm sure Mr. Miskiewicz

10  will represent that to be accurate.  But if it isn't, I

11  apologize in advance.

12       Your Honor, two other individuals are Mr. Wooley,

13  another hockey player, and Mr. Khristich, both of whom are not

14  listed in the indictment.  Those are the other two investors

15  at the same time that I was referring to.

16       Judge, let me just tie this all in.  This is the

17  source of Kenner's ownership interest in Eufora that gets sold

18  in 2008 and 2009.  So if there is no victim in 2002, as the

19  government alleges, I don't know what the real answer is, at

20  this point, that the evidence is going to show.  We have a

21  right to show the basis upon which this entire theft the

22  government claims occurred.

23       THE COURT:  Okay.  Mr. Miskiewicz, do you want to

24  respond?

25       MR. MISKIEWICZ:  I'm not going to debate what the

237

1    prior indictment said or didn't.  We're not here trying the

2    underlying indictment.  We're here on the superseding

3    indictment.  Superseding indictment makes reference to this

4    transaction specifically because the government, as a

5    tactical -- for tactical reasons, realizes that the defendants

6    want to make this all about Mr. Jowdy and the investments in

7    Mexico and investments in condominiums, et cetera.  We didn't

8    elicit any of this information from Mr. Juneau, or contemplate

9    that Mr. Juneau had no relevant testimony about it.

10           Moreover, the documents that I was provided, which I

11   don't know where they came from, they appear to have --

12   they're so old that they're beyond the retention date of most

13   of the banks.  Much of what Mr. LaRusso just said is the

14   interpretation and testimony of the documents.  I have no idea

15   where he's getting them from.

16           I know this, Mr. Juneau can't say that a wire

17   transfer of his or a wire transfer of Mr. Wooley's or a wire

18   transfer of Mr. Khristich was ultimately used and stolen by

19   Defendant Kenner to buy his ownership interest in Eufora.

20           So we're going way out of what the jury is here to

21   decide, which is very clearly laid out in the existing

22   indictment.  And what I'm hearing here is that all of these

23   exhibits and this cross examination is essentially going to do

24   what both attorneys tried to do in their opening, which is to

25   say don't focus on this indictment, focus on the other

1  indictment, and by the way, look at changes that have been

2  made by -- allegedly made by the government.

3          That is, I submit, beyond the scope and it's not

4  relevant.  And it's certainly more prejudicial, unfairly

5  prejudicial, than probative because it's going to require us

6  to call in a number of additional witnesses who, similarly,

7  will also say they didn't know that their money was stolen by

8  Mr. Kenner in connection with Baja Development Company, a

9  portion of a number of frauds that are not part of this

10  indictment.

11          MR. LaRUSSO:  Judge, can I respond briefly?

12          THE COURT:  Before you respond, Mr. LaRusso is

13  suggesting to me that the government is walking away from a

14  theory in the case in the prior indictment.  He said there are

15  things in a letter a week and a half ago that he's saying is

16  no longer the case.  That's what I'm confused about.

17          MR. MISKIEWICZ:  No, I don't think I walked away

18  from it.

19          THE COURT:  You're saying that they're walking away

20  from something they told you a week and a half ago.

21          MR. LaRUSSO:  It appears to be, Judge.  This letter

22  relates to the present indictment.

23          THE COURT:  So I want you to respond to that.  Is

24  the government walking away from something that they wrote in

25  a letter a week and a half ago?

239

1          MR. MISKIEWICZ:  I'm not walking away from it, Your

2    Honor.  There were -- there were enough -- numerous wire

3    transfers simultaneously made from -- or to Baja Development

4    Company; Khristich, Wooley, Mr. Juneau.  The question in the

5    Bill of Particulars was who was referenced in the underlying

6    indictment.

7          THE COURT:  The underlying or the original?

8          MR. MISKIEWICZ:  Well, in the original indictment,

9    who were we referencing.  And I did reference Joe Juneau

10   because that's who it was.  The fact that there were

11   simultaneous wire transfers, money commingled.  And then

12   ultimately, some of that money being used to buy into Eufora.

13   Yes, it's our theory that, the argument is that Mr. Juneau,

14   you know, his cash ultimately, commingled with other victims,

15   ended up in Eufora.  And we decided -- but that's not --

16   that's not part of our theory of the case.  It has nothing to

17   do with the underlying fraud regarding either Eufora or Hawaii

18   or anything else.

19         THE COURT:  Then what do you argue to the jury with

20   respect to this victim?  What are you arguing with respect to

21   fraud as to this victim, wasn't it that some of his money

22   ultimately ended up in Eufora that he didn't know about?

23   Isn't that your argument?

24         MR. MISKIEWICZ:  No.  I didn't elicit anything from

25   this victim about Eufora.  This victim is here, basically, to

240

1   set up what will be shown to be a Ponzi Scheme portion of

2   Hawaii land -- letters of credit.  And also, later on, another

3   aspect of the fraud.  But I did not elicit from him that any

4   of his money went to Mexico.  He didn't know about Mexico.  I

5   didn't elicit it.  If I asked him the question, he doesn't

6   know anything about what some of these other transactions are.

7            THE COURT:  Okay.

8            MR. LaRUSSO:  Your Honor, you know, one of the major

9   concerns we have is knowing what we're defending.  Because

10  they went from a specific indictment to a general, the Court

11  asked us to try and get together to know exactly what we're

12  defending.  This letter is a week and a half before trial, and

13  they're alleging Mr. Juneau is a victim of a fraud.  Well, the

14  evidence is going to suggest the opposite.

15           Now, Mr. Miskiewicz seems to be tap dancing right

16  now.  He hasn't answered the Court's question directly.  Are

17  you alleging that Mr. Juneau was, in fact, a victim or wasn't

18  he a victim?  But the answer is because the documents I showed

19  him show that he's not, or at least it could have been

20  somebody else and not Mr. Juneau.  That's what those documents

21  are going to show.

22           And I wanted to put before this jury -- I don't want

23  to call Mr. Juneau back.  I don't think that's fair to him.  I

24  want to show him the documents that relate to his investments.

25  I want to show him the government's allegations.  I want to

241

1   show Mr. Juneau that he got his investments, he got his

2   ownership.  And therefore, it's for the jury to come to a

3   conclusion whether the money was stolen or not.

4          THE COURT:  Well, again, I have fundamental concerns

5   about you holding up an allegation that the government is not

6   seeking it as part of the case and start arguing with the

7   witness and with the government about whether that allegation

8   is true or not true.  That's going to hopelessly confuse the

9   jury, that the government is not even seeking to prove an

10  allegation that you introduced to the case, an allegation from

11  a prior indictment, and then try to disprove that when the

12  government is sitting here today saying that's not what we're

13  arguing to this jury anymore.  We made a decision not to try

14  to pursue that as a fraud.

15         Why would we do that?  Why would we put before the

16  jury a fraud that is in a prior allegation, a prior

17  indictment, that the government's saying we're not seeking to

18  prove at this point?

19         MR. LaRUSSO:  I guess, Judge, I didn't make myself

20  clear.

21         THE COURT:  You keep saying they shouldn't move the

22  goal posts.

23         MR. LaRUSSO:  I should make myself clear, Judge.

24  What they alleged in the original indictment and what they're

25  alleging in this letter, they said this is the basis for a

242

1   fraud in 2008 and 2009 because Kenner is selling his shares of

2   stock in Eufora to the hockey players.  This is where the

3   ownership interest comes in.  It comes in back in 2002 by

4   diverting the money of Diamanté Del Mar to Eufora.  That's

5   what they were alleging as of a week and a half before, that's

6   what they were saying.

7          I have a fundamental problem here, Judge.  I spent,

8   in terms of preparation an inordinate amount of time trying to

9   address what I thought were going to be the allegations in

10  this case.  That's number one.  But I understand the Court's

11  point.  I understand the Court's point.  If the Court allows

12  them to make a change in their theory, and I can't convince

13  the Court that I have a right to let this jury know, which is

14  part of our case, that they keep changing the facts because

15  they don't have all the evidence.  And I think the word is

16  goal posts.  If that's the Court's ruling, I'll live with

17  that.

18         The bottom line is, Judge, the basis of the fraud

19  that he's now claiming that he's going to present is still the

20  diverted shares which were not diverted.  So I have at least a

21  right to question Mr. Juneau about his investment to let the

22  jurors know later on that there was no fraud in regards to

23  sales of stock by Mr. Kenner.  That's my point.

24         THE COURT:  Okay.  Mr. Miskiewicz.

25         MR. MISKIEWICZ:  In brief, what Mr. LaRusso claims

243

1   to be our theory is really part of his defense.  It is not,

2   nor has it ever been, part of our theory.  The investors were

3   several years after Mr. Juneau disentangled himself from the

4   defendant, induced to buy shares of Eufora not knowing that at

5   the same time Mr. Kenner and Mr. Constantine were touting this

6   as the greatest company, they were dumping their shares.

7          Essentially, in essence, other than the fact that

8   it's not a publicly traded company, they were pumping and

9   dumping.  This has nothing to do with Mr. Juneau's -- whether

10  his money commingled with other people's money served as a

11  basis for Mr. Kenner to steal his way into Eufora is not part

12  of our case.

13         Moreover, the last point, regarding tap dancing.

14  Had I not explained the full -- what we believed to be the

15  full trafficking of money, we would be accused of, you know,

16  leading them down the primrose path and then eliciting and

17  sandbagging them.

18         I wanted Mr. LaRusso -- in all fairness, to explain

19  what we believe ultimately happened.  But that is not -- it's

20  not in the indictment.  The fact that I gave him more

21  information than I should have shouldn't be the reason to

22  hoist me on a petard, or the government, Your Honor.  Thank

23  you.

24         MR. LaRUSSO:  Your Honor, this was done specifically

25  to give us the information of what were in the charges.  We

244

1    wanted to know that.  And now the government is -- and I think

2    they're tap dancing because they're trying to back off of a

3    representation made a week and a half ago that this was the

4    victim of a fraud.

5            THE COURT:  Okay.  This is my ruling, Mr. LaRusso.

6    I have some concern that what Mr. Miskiewicz said is correct.

7    The government may have given you a very broad outline of the

8    details what they believe of what happened here.  It does not

9    necessarily then commit them to proving up every aspect of it

10   just because you asked a question about it.  You wanted as

11   many as details as possible.  They've responded.  And now

12   you're saying well, unless they're going to prove this

13   argument, they're changing their theory.  Just because you

14   asked a question does not mean that they then have to pursue

15   every potential avenue of fraud that they may have believed

16   they saw in connection with the investigation.

17           So my ruling is the same as it was yesterday, which

18   is, I'm not going -- I'm certainly not going to let you start

19   bringing up indictments or letters to this witness and start

20   showing him in order to do a mini summation to the jury.

21   Okay, let's take this allegation and try to disprove it with

22   the witness.

23           If you believe, if you believe that it's relevant to

24   your defense to go through.  If you think it's necessary to

25   complete the picture to show the jury there was no fraud in

245

1    some area of the transaction that the government is alleging

2    there is a fraud in before the jury, if you think that's

3    relevant to your defense, I'm going to let you do it, okay.

4    Assuming, obviously -- I don't think the witness will be able

5    to recognize the documents that you're going to show him.  So

6    I think he's the wrong witness to try to do that with.

7               MR. LaRUSSO:  No.  I think he will be able to

8    identify some of the documents.

9               THE COURT:  Okay.  I just want you and your client

10   to understand that you're introducing this into the case

11   because you believe it's relevant to the defense.  You heard

12   what the government has said.  I want you to understand that I

13   made no rule and I'm highly skeptical that somehow all these

14   letters or the indictment that the government has written to

15   you is going to come in.  I asked you for authority suggesting

16   that I should allow that, and I'm open to that, but I want you

17   to understand that you are asserting these other facts into

18   the case, you know, because you're telling me it's relevant to

19   your defense.  That's where we stand.  Okay?

20              MR. LaRUSSO:  Thank you, Your Honor.

21              THE COURT:  You can try to introduce any evidence

22   that you want.  I'm not precluding you from going into this

23   with the witness to see what he knows.  I'm continuing to

24   preclude any attempt through the witness to start introducing

25   other versions of the indictment or letters that Mr.

246

1   Miskiewicz sent you.  Okay?

2              MR. LaRUSSO:  It's going to sound like a broken

3   record.  I apologize.  I move for a severance.  I move to be

4   precluded from the case.  I was preparing this case based upon

5   an information that was provided by the government and charged

6   in the indictment.  I'm now face a pump/dump scheme.  I don't

7   know where this is coming from.  This is a totally different

8   theory.

9              THE COURT:  I heard him say he wasn't attempting to

10  do that.

11             Right, didn't you say that?  Maybe I didn't hear

12  that.

13             MR. MISKIEWICZ:  No.  That's exactly right.  He

14  posits that somehow the fraud regarding Eufora originates with

15  how Kenner got his ownership in Eufora.  That is not part of

16  our case.  We have not elicited anything.

17             He posits that somehow, I don't know, there was some

18  exchanging of shares.  I think that the evidence, when it

19  comes in through the other evidence, will show, in essence,

20  that at the moment people were being induced in 2008 and

21  2009 -- other witnesses, not Mr. Juneau -- to purchase shares

22  of stock in Eufora, the other defendants were selling out

23  and/or using the proceeds for reasons that had nothing to do

24  with Eufora.  That's in the indictments.  So we're not

25  changing that at all.

247

1        MR. LaRUSSO:  Judge, first of all, I disagree.  I

2   believe the record will be clear.  I thought he said pump and

3   dump, Judge, that that was going to be their theory what we're

4   talking about in terms of the diversion.

5        But what's amazing to me is that the government, in

6   this letter, says that Juneau was the victim of a fraud.  Not

7   Owen Nolan anymore.  It's Mr. Juneau.  That information was in

8   the original indictment to support the basis for the $700,000

9   in shares that were sold by Mr. Kenner in 2008 and 2009.  And

10  now what they're doing is they're coming in at the last

11  minute, because we showed them the records, and they're

12  cutting that off.  Saying no, Judge, this is the theory.  That

13  was only a letter I wrote to the defendant.

14       Well, you know what, he could have just saved the

15  defense spending all their time preparing a case.  I ask for a

16  mistrial or I ask for a severance, Judge, because I was

17  prepared to actually address the facts as presented by

18  Mr. Miskiewicz.

19       THE COURT:  In the letter you got a week and a half

20  ago they identified what you asked for with respect to

21  Mr. Juneau.

22       MR. LaRUSSO:  They're no longer doing that, Judge.

23  They're not even saying this anymore.  I don't know if I said

24  it directly.  I don't know if they said Juneau is the victim

25  of a fraud.  I think they hedged on that because they just

248

 1   don't know.  They just don't know what the source of the
 2   $700,000 of shares were that were sold in 2008 and 2009.
 3            THE COURT:  Okay.  Again, my ruling is you're not
 4   limited in any way in seeking any testimony from this witness
 5   that you believe is a defense to allegations from the
 6   government, either currently or you believe were prior
 7   allegations.  It's up to you to decide what you want to cover.
 8   Okay?
 9            MR. LaRUSSO:  Your Honor, may I?  I just have one
10   further point.  Just for the record, for future usage if need
11   be.  My client is charged with conspiracy for selling shares
12   that the government claims are stolen.  It's like -- it's like
13   they're changing -- they're charging.  I'm sorry.  They're
14   charging -- my client wants this on the record for future
15   purposes.  It's like someone charging a person with stealing
16   and selling a stolen car only to find out that the car is not
17   stolen at all.  That's our theory.  And that's what we'll be
18   presenting to the jury.
19            THE COURT:  All right.
20            MR. MISKIEWICZ:  Your Honor, dovetailing on this,
21   there were -- the specific exhibits, I don't know if counsel
22   gave you a copy.  I can give you these.  These are the only
23   copies that I have.  But the bank records for Baja Development
24   and Eufora, et cetera, they bear no Bates stamps that we
25   recognize.  We don't know where they came from.  This is not

249

1   as if it's something that we subpoenaed it, it came to us.

2   And therefore, why would we object to a stipulation?  Because

3   we have no idea where they came from.

4         Similarly, there are agreements, subscription

5   agreements.  Some of them are signed -- purported to be signed

6   by Ken Jowdy.  I know that I've also asked in that letter to

7   specifically identify forgeries.  This is not one of those

8   letters that we've ever seen before in the investigation.  So

9   I don't know if this is Ken Jowdy's signature or not.

10        I would prefer not to hold up the presentation of

11  cross-examination, and I really don't want to look like a jerk

12  in front of the jury objecting every five minutes to --

13  because I think we know, we can predict this witness is not

14  going to be able to lay a foundation to these.  So I would ask

15  that the Court take a standing objection to the exhibits to

16  the extent they are offered through this witness.

17        THE COURT:  Mr. LaRusso, it sounds to me, and I

18  would prefer it to save time, that we not do it document by

19  document.  It sounds to me that it's going to be very unlikely

20  that this witness is going to be able to authenticate any of

21  those documents.  Now, maybe you can do it through some other

22  witness or further discussion with the government about the

23  source of the documents.  I don't want to spend an hour going

24  document by document with a no response.  "I haven't seen

25  that.  I haven't see that."

250

1              You're trying to prove an entire defense through a

2      witness who's not going to be able to recognize documents.

3      Obviously he's signed documents.  If we have a signature on a

4      document, that would be different.  But from what

5      Mr. Miskiewicz is telling me, how are you possibly going to

6      get those documents in through this witness?

7              MR. LaRUSSO:  Judge, that's not quite accurate.  The

8      settlement agreement is signed by him.  The $100,000 check

9      that got returned has his signature on the back.  The e-mail.

10     I have another letter signed by him.  I have the promissory

11     note.  I have the Baja Management.

12             THE COURT:  Okay.  Those are all fine.

13             MR. LaRUSSO:  I also have the government account

14     where those checks were deposited, showing deposits by

15     Mr. Khristich and Mr. Wooley.  As a matter of fact, the

16     government's turned over to me as a certified record.  With

17     your ruling, I know where we're headed, the other documents

18     were bank records that don't have any kind of identifying

19     information on it other than maybe Mr. Juneau saying oh, yeah,

20     I wired the money.  Yeah, that looks like the wire transfer

21     authorization that I gave.

22             Other than those two, obviously, the Khristich, the

23     Wooley wire transfers, the witness will not be able to

24     identify them because they're not his.  But that's where I am

25     with based upon the Court's ruling.

251

1          THE COURT:  Okay.  Let's take a short break.

2          MR. LaRUSSO:  Judge, could you give me 15 minutes?

3          THE COURT:  Sure.

4          Mr. Haley, how much more do you have?

5          MR. HALEY:  Your Honor, maybe a minute.

6          THE COURT:  All right.

7          (Whereupon a recess was taken at 11:49 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

252

1          (After recess the following occurred.)

2          THE COURT:  So again I just want to ask

3   Mr. Miskiewicz to make sure that we're all on the same

4   page here.

5          Mr. LaRusso, I have a copy in front of me and

6   I'm reading it now.

7          The government will seek to introduce wire

8   transfer and bank records provided in discovery showing

9   that a $250,000 wire by Juneau for investing in Mexico at

10  Kenner's request was subsequently rewired at Kenner's

11  direction -- to acquire his ownership share in Eufora.

12          Is the government going to prove that or not?

13  Is that part of your case?

14          MR. MISKIEWICZ:  It is not part of the

15  government theory of the case.  And ultimately we decided

16  not to do that because of the commingling of the funds and

17  we have two other investments at the time.

18          THE COURT:   Mr. Constantine and Mr. Juneau -- I

19  want you to articulate it in two sentences whether or not,

20  whether the theory of the case is just Mr. Juneau -- or is

21  it Mr. Constantine in terms of --

22          MR. MISKIEWICZ:  Again, as I said earlier,

23  Mr. Juneau was geared to give a historical background

24  about how the other investors became involved with

25  Mr. Kenner, and indirectly with Mr. Constantine.

253

1              Mr. Juneau, it's not our position that

2     Mr. Juneau lost money in Eufora, although we're going to

3     have evidence about this airplane and how that was

4     acquired.  And ultimately it has to do with Eufora many

5     years later.  But we're not offering any evidence, and I

6     don't believe I elicited any evidence from him concerning

7     the -- development or anything else.

8              (There was a pause in the proceedings.)

9              I'm sorry, I misspoke.  Not Eufora.  It is for

10     the Global Settlement fund that that airplane would become

11     relevant.

12              THE COURT:  Okay.  I just want to make sure that

13     we're all on the same page.

14              You heard the government, they're not going to

15     make this argument to the jury.  Okay?

16              MR. LaRUSSO:  I understand.  I having heard it

17     now that they're now using it because they were given

18     documents the other day which showed a different set of

19     facts that now caused us to have spent a considerable

20     amount of time preparing the defense.  Their particular

21     allegations that they're going to introduce wire transfers

22     of bank records to show $250,000 was wired by Mr. Juneau.

23     I'm at a loss, judge.  I have never seen this.  This is

24     caught us by a complete surprise --

25              THE COURT:  Well there are other aspects in the

254

1   case that -- you're aware of other aspects of the case.

2            MR. LaRUSSO:  I'm aware of those, judge.  But

3   this relates to $700,000 that was primarily part of the --

4   fraud.  There is three essential aspects.  This was a

5   critical one where Mr. Kenner -- and they'll put testimony

6   on by a co-conspirator, that Mr. Gaarn and Mr. Kenner and

7   a few other took his ownership shares in Eufora and

8   created an account in New Jersey and put $700,000 of the

9   proceeds -- by the way the stock was sold to hockey

10  players -- and that Mr. Kenner got 300,000, Mr. Gaarn got

11  60,000.  This is the basis for those shares, judge.  That

12  is what this is all about.  That is why I was so

13  appreciative of the government finally laying out their

14  evidence to us, or at least told us what they were going

15  to do.

16            Now all of a sudden I have $700,000.  I don't

17  know what I'm addressing at this point.  Is it this?  What

18  other theory are we going to get to in the course of the

19  trial?  I'm at a loss, judge.

20            THE COURT:  If you're telling me that the theory

21  of the case, that the government is putting on a theory of

22  the case that you have not ever heard about, it is not in

23  indictment and you never heard about it, then I would

24  concerned.  But what I'm hearing is that there was an

25  aspect of their theory that they're not pursuing any more

255

1    because there was commingling of funds and they decided

2    not to pursue that, maybe because of the evidence you

3    presented to them assisted in that.

4           But the thing I'm concerned about is if there is

5    something, a new allegation of fraud that you're not aware

6    of.  These other aspects that they continue to pursue,

7    you're aware of.

8           MR. LaRUSSO:  This is the entire basis, this

9    letter, the original charge in the indictment.  It spells

10   it out that Mr. Kenner took 700,000.  Paragraph 31, judge.

11   It lays it out pretty clearly.  And here is the other

12   part, judge.

13          Is that, if that in fact is the government's

14   position in the indictment that the $700,000 fraud

15   emanated from this, Mr. Juneau's share which they now say

16   was commingled and they don't know who it is any more,

17   that I'm defending a theory that is now completely,

18   completely different.

19          Now I don't know, I actually don't even know

20   what I'm defending at this point.  This general notion

21   that this money was stolen.  Well how?  You tell me one

22   theory, and you provide evidence to me, you make

23   representations to me, you tell me this is what you got to

24   defend.  I spend a considerable amount of time and effort

25   in doing so.  We pull out documents that are not even

256

1    available to some people.  And they clearly are bank

2    records.  And I understand Mr. Miskiewicz, he hasn't seen

3    these documents before, before the case.  He has never got

4    them.  And that is part of the problem we have with this

5    case.  They never looked at all of the evidence.  And now

6    here I am, I'm standing here now saying, Okay, what am I

7    going to defend?  I'm just --

8            It's frustrating.  I think it's prejudicial.

9    Clearly my client, he doesn't understand it.  I'm trying

10   to explain it as best I can.

11           But we shouldn't be surprised.  That is the

12   notion here, judge.  We shouldn't have to at the last

13   minute be surprised as to what we're defending here.  And

14   I'm at a loss.  You know, I prepared cross at night.  I'm

15   trying to get ready and be ready at 9:30.  Now all of a

16   sudden they take one part of the case out and say, Hey,

17   hey, it's only a theory.  And you guys have to be able to

18   bounce the ball.  That's not fair.  That's not fair.

19           THE COURT:  Okay again, if you want to present

20   to me a position that they've articulated, as opposed to

21   taking apart one allegation away from the case and

22   deciding not to try to prove that up, of them adding

23   something to the indictment that is not in the indictment,

24   that you haven't had time prepare for; that is something

25   that I'll entertain.  But you have to put that before me,

1   because I'm not hearing that.

2          MR. LaRUSSO:  That is my point.  I don't know

3   how they're going to prove that those shares were -- well

4   this is what they told us.  This is what we prepared for

5   now.  Now what is the evidence going to show?  Do I need

6   to find out --

7          THE CLERK:  Mr. Miskiewicz, can you respond to

8   that?

9          MR. MISKIEWICZ:  I don't understand

10  Mr. LaRusso's statement that shares that were stolen were

11  stolen.  I can't respond.

12         He has a defense.  I'm trying to get into his

13  head what his defense is.  All I can do is say, we allege

14  very clearly in the indictment what the nature of the

15  scheme is.  And with respect to the Eufora fraud which is

16  what Mr. LaRusso is referring to, it is laid out in black

17  and white in paragraphs 12, 13, 14.  We provided the names

18  of the various John Does in that superseding indictment.

19  Nothing in that existing indictment which we're on trial

20  here about makes any reference to any of the documents

21  that he seeks to offer or transactions dating back to

22  2002, or 2003.  It is just not in there.

23         So for him to say, I prepared for something in

24  2002 and 2003, and it's not in there.  You know, I

25  understand their part of their contention is, Oh well, the

258

1  government has conspired against these people.  But that's

2  their defense.  And we did not change our theory.

3          MR. LaRUSSO:  Your Honor, I beg to differ.  I

4  think the facts are pretty clear what they were alleging

5  in this letter.  You can't read it any other way.

6          What they're now doing, and I don't know exactly

7  what it is they're going to say is the basis for the

8  fraud.  But this is what is they've been saying since they

9  indicted my client.  They first said it was Owen Nolan.

10  Then they tell me it's Joe Juneau.

11          We showed them documents that it is not Juneau

12  because it was commingled with other funds.  And now what

13  they're saying is, we're not even going to play it, we're

14  not even going to introduce it.

15          I mean you talk about a surprise, judge.  In

16  terms of how I'm going to respond, I don't know yet.  And

17  that is my concern, judge.

18          THE COURT:  Okay, well with Mr. Juneau here you

19  can cover anything you wish to cover with him.  Okay?  If

20  you want to cover the background of the transactions

21  you're free to do that.

22          MR. LaRUSSO:  I culled out documents that he

23  can't identify.  I'll try to keep it just to ones that he

24  can talk about.

25          And I think Mr. Miskiewicz has another objection

259

1    to another one of those documents.

2             MR. MISKIEWICZ:  Very briefly, when we get to it

3    we're going to object to the introduction of the defense

4    exhibit that is the settlement agreement between

5    Mr. Juneau and Mr. Constantine.

6             And I have said to Mr. LaRusso, I obviously

7    wouldn't object to portions of this, which document, which

8    is probably 20 pages long, that relates to his testimony.

9    What he said, was he got on the plane.  And the number

10   stated in the recital here of what the worth of the plane

11   is, is slightly different than what he recalls.

12            I have no objection to that.  I  have no

13   objection to the fact that there was a settlement I have

14   no objection to the fact that he and Mr. Constantine

15   settled this.

16            The problem is that this settlement agreement is

17   also chock full, and it goes on, and on, and on about how,

18   Mr. Constantine recites, and there is a section called

19   recitals here.  And he recites really non sequiturs,

20   things that have absolutely nothing to do with the

21   settlement.  How he is innocent of Hawaii. He is innocent

22   of having to do with anything with the Mexico settlement.

23   And how he has done nothing wrong and none of these

24   sources of funds are illegally obtained.

25            And under 408, Federal Rule of Evidence 408, I

260

1   submit that this is exactly the kind of settlement and

2   compromise offer and accepted compromise, those things

3   should not be admissible in this trial.

4          THE COURT:  Why is the rest of the agreement

5   admissible?

6          MR. LaRUSSO:  These are the records of the case

7   of Mr. Juneau and nobody else.  That is what is in here.

8   This is what he agreed to relative to the settlement as

9   far as he knew.

10         The other portions that Mr. Miskiewicz agrees to

11  kindly introduce deal with portions of his testimony.

12  That is how much was he agreeing to settle.

13         He said that the plane was worth, I think he

14  said 300,000, he may have said 350.  Well in the

15  settlement agreement he agrees that it was around 437.

16  And I'll pursue that later on with him.

17         But this is an entire document.  I'm just

18  offering what Mr. Juneau agreed to relative to the

19  settlement of his airplane.  And I think the jury has a

20  right know what the two parties concluded with regard to

21  what the government is trying to say was a bad deal.  That

22  is what they're saying to say.

23         And these paragraphs, judge, if you read them,

24  they clearly show that Mr. Juneau said -- I'm not going to

25  go through all of the paragraphs, just so the Court

261

1   understands.  I'm going to go through just the one dealing

2   with right now with the monies to show him that he signed

3   an agreement that is substantially more than what he

4   remembered.

5              I then will probably show him the letter that he

6   signed, which Mr. Miskiewicz has referred to that, and I'm

7   sure he will, that he signed regarding the settlement,

8   where he said, I'm satisfied, this is the kind of deal I

9   want.  It contradicts what he testified, testified to by

10  him.

11             So it is in the agreement.

12             THE COURT:  Well the agreement is the

13  confirmation of your client.  Why is that relevant?

14             MR. LaRUSSO:  If the court is disturbed by that

15  I'll take those protestations out.  I have no problem.

16  But Mr. Juneau's comments with regard to what he said

17  should be put in there.  That is what he understood the

18  settlement to be.  And it contradicts and gives a

19  different light than the way how he views the settlement

20  agreement.

21             THE COURT:  Can I see the agreement?

22             MR. LaRUSSO:  Yes.  Can I ask the government for

23  their version?  I unfortunately don't have it on a full

24  page.  They have a full one, judge, and it's easier to

25  read.

262

1          MR. MISKIEWICZ:  Your Honor, if I may, just so

2     we're not holding up the jury.  I won't, I would agree

3     that perhaps the Court should have an opportunity maybe

4     overnight to determine how much of this should be

5     redacted.  And then maybe we can, subject to the colloquy

6     here now, at least some redacted versus of it could come

7     in.

8          MR. LaRUSSO:  If the Court is concerned about

9     that, judge, I can highlight a few portions.  I think one

10    of them is where Mr. Juneau agrees that there was no basis

11    for his suit against Mr. Constantine.  That the money, the

12    first -- it's right at the bottom of, I think the second

13    page, where he talked about the value of the plane.

14          I think that is essentially the only two aspects

15    I'm looking to get out at this point.  The others will, I

16    would like to be able to present to the jury in closing to

17    give the jury an idea of what Mr. Juneau actually believed

18    when he settled.  It wasn't what he testified to here in

19    terms of, and it was a bad deal that I entered into.

20          That's my overall point, judge.  We can do that.

21          MR. MISKIEWICZ:  Also your Honor, it is not the

22    government's contention that it was a bad deal and that

23    therefore he should be charged with wire fraud.  We're

24    going to prove that the source of the funds and this plane

25    played a role later on with respect to the settlement.  It

263

1    has nothing to -- we're not -- there is nothing here

2    regarding Mr. Juneau's testimony that he was somehow

3    hoodwinked by accepting this plane in settlement.  The

4    plane, however, we will try to put it on, as to how

5    Mr. Constantine got the plane and was able to use it, we

6    think in violation of other aspects of the fraud clearly.

7                THE COURT:  It has nothing to do with this

8    witness now, nothing to do with him at that point, right?

9                MR. LaRUSSO:  Well your Honor, if I may.  I

10   think what Mr. Miskiewicz is arguing is not what he

11   brought out from this witness.  I mean he emphasized the

12   fact that the plane was less than what he had paid for it.

13   What was the purpose of that?  I mean obviously he was

14   trying to paint a picture that this man was forcing the

15   deal.

16               THE COURT:  -- have Mr. Miskiewicz stand up in

17   front of the jury that that was not --

18               MR. LaRUSSO:  I would love it to finally put on

19   the record exactly where we're going.  Are we going the

20   way he questioned the witness, or are we going based upon

21   what he is saying?

22               THE COURT:  Why don't we put something on the

23   record that the government is not alleging that the

24   transaction between Mr. Juneau and Mr. Constantine is part

25   of the fraudulent scheme?

264

```
 1              MR. MISKIEWICZ:  The settlement?

 2              THE COURT:  Yes.

 3              MR. MISKIEWICZ:  I have no objection.  I would

 4      rather the Court instruct the jury.  That is fine.

 5              THE COURT:  Okay.  Mr. LaRusso?

 6              MR. LaRUSSO:  The compromise ability -- judge

 7      I'm trying to analyze it quickly in terms of the overall

 8      case.  So just bear with me for one moment please.

 9              THE COURT:  Yes.

10              MR. MISKIEWICZ:  Your Honor, the settlement

11      itself, we're not saying that the settlement is

12      fraudulent.  I would hesitate to add, or I would not

13      hesitate to add.  That doesn't mean the plane itself, we

14      won't see evidence later on, is part of the fraud.

15              How Mr. Kenner acquires the plane and is able to

16      then flip it to get rid of one problem with Juneau.  That

17      will be part of the fraud later on with respect to -- it

18      is part of the overall fraud, or it is part of the money

19      laundering.  But you're absolutely -- it is absolutely

20      accurate that it is not our contention that the settlement

21      was fraudulent.

22              MR. LaRUSSO:  Your Honor, if I may.

23              Mr. Miskiewicz is correct.  They're going to try

24      and establish that the money that was used to buy the

25      plane came from the settlement fund.  We agree.  My client
```

265

1   was able to take the money from the settlement fund, buy

2   the airplane, and give it to Mr. Juneau.  However, what

3   Mr. Constantine was able to do by that is he saved the

4   Global Settlement fund approximately $100,000.

5           THE COURT:  That's a whole different argument.

6   That is obviously your contention.  But I want them to

7   understand that -- I just want to take any concern that

8   you have that they're going to think the settlement itself

9   is part of the fraud.  But it is not.  So --

10          MR. LaRUSSO:  I appreciate that.

11          THE COURT:  In terms of the settlement

12  agreement, my ruling at this point is that the portion

13  that deals with payment, that the money that he got for

14  the plane, whatever other aspect that you say --

15          MR. LaRUSSO:  Judge, right now that is all I

16  need.

17          THE COURT:  So it will be redacted.  And when we

18  have that in  and if Mr. LaRusso wants to try to explain

19  some other portion that is relevant, he can try to do that

20  at that time.  Okay?  Let's bring in the jury.

21          (The jury entered the courtroom.)

22          THE COURT:  Everyone be seated.

23          Members of the jury, before we continue with the

24  cross-examination, I just want to make sure there is no

25  confusion on this issue as far as Mr. Juneau's testimony.

266

1          The government is not alleging that the

2    settlement between Mr. Constantine and Mr. Juneau with

3    respect to the airplane is fraudulent.  They're not

4    alleging that that settlement was fraudulent in some way.

5    It is not part of the alleged fraud in the indictment.

6          The government is seeking to introduce that just

7    because they believe it supports other proof they're going

8    to offer in the course of the trial.  But there is no

9    allegation that the settlement agreement itself was

10   somehow fraudulent.  Okay?

11         So with.

12         So with that, Mr. Haley, do you want to

13   continue.

14         MR. HALEY:  Yes, your Honor, one minute.

15

16   CROSS-EXAMINATION  (Continued)

17   BY MR. HALEY:

18   Q    Mr. Juneau, kindly a take look at this document

19   marked Plaintiff Exhibit 2 already introduced into

20   evidence.  And kindly look at the full document, but I

21   draw your attention to the first paragraph. And I draw

22   your attention to the last page.

23         Mr. Juneau, on the last page of Exhibit 2, do

24   you recognize your signature?  There is no question that

25   that is your signature, correct?

Juneau - Cross/Mr. Haley

267

1   A    I don't believe so, no.  Well, it looks like my

2   signature.  Sorry.

3   Q    That's quite all right.

4        Sir, you testified I believe just before we

5   broke, that to the best of your memory the last

6   communication with Phil Kenner stopped sometime in 2005,

7   correct?

8   A    Yes.

9   Q    Now as relates to this document, that bears your

10  signature on the last page.  We can agree, can we not,

11  sir, that the first sentence reads.

12       To the members of Little Isle IV, LLC, I am

13  writing to tell you about very positive developments

14  concerning your Hawaiian real estate investment through

15  Little Isle IV, LLC, the company, close paren, period.]

16       That is what it says, does it not?

17  A    Yes.

18  Q    And that is dated when, sir?

19  A    July 21, 2006.

20  Q    And we can agree, sir, that the signature you just

21  testified a moment ago that says, response form, at the

22  top bears, that is your signature.

23       Is that true, sir?

24  A    Yes.

25       MR. HALEY:  I have no further questions.

Juneau - Cross/Mr. LaRusso

268

1        Thank you.

2            THE COURT:  Mr. LaRusso?

3            MR. LaRUSSO:  Thank you, your Honor.

4

5   CROSS-EXAMINATION

6   BY MR. LaRUSSO:

7   Q    Good afternoon, Mr. Juneau.

8   A    Good afternoon.

9   Q    I understand that your last three years in

10  professional hockey were with the Montreal Canadians?

11  A    Yes.

12  Q    How are you they doing?

13  A    Huh?

14  Q    How are they doing?

15  A    Not so well, I think right now.

16  Q    Mr. Juneau, you testified yesterday -- by the way, I

17  represent Mr. Constantine.

18        You testified yesterday that you had only met

19  Mr. Constantine once before.

20        Is that correct?

21  A    That's correct, yes.

22  Q    Okay, let me kind of ask you a couple of questions

23  around that if I could.

24        Do you remember when you met Mr. Constantine?

25  A    I think it was in Christmastime, December 2004, if I

Juneau - Cross/Mr. LaRusso

269

1    remember right when my family and I visited the Kenners.

2    Q    And where do you remember meeting Mr. Constantine?

3    A    I think it was at a restaurant having lunch.

4    Q    How long did you and Mr. Constantine engage in

5    conversation if you remember?

6    A    It wasn't long, probably an hour maybe.

7    Q    Any other parties participating in the conversation

8    as well?

9    A    Phil Kenner was there.

10   Q    It was a social occasion.  Is that right?

11   A    We discussed a little bit about -- but it was very

12   brief I guess, yes.

13   Q    And it was approximately ten years ago?

14   A    Yes.

15   Q    Your recollection of the conversation is less than

16   complete.

17            Is that correct?

18            You waved your head and moved your eyes meaning

19   that is correct, right?

20   A    I don't remember much from that conversation, that's

21   for sure.

22   Q    Did you ever visit the Avalon Airpark, or I believe

23   you called it the Scottsdale Airport?

24   A    I went there once, I think it was, with Phil Kenner.

25   I'm not sure when it was.  And I went there on my own

Juneau - Cross/Mr. LaRusso

270

1    maybe in 2005, 2006 when I made a trip to the Phoenix

2    area.  And I went there on my own just to see if something

3    was going on.

4    Q    And what did you see?

5    A    What did I see?  I saw the openings, but I wasn't

6    sure that's what it was.  You know, I was driving around

7    trying to figure it out.

8    Q    This was at an airport.

9              Is that correct?

10   A    Scottsdale Airport, that's where I went, yes.

11   Q    And you saw what you believed to be a building that

12   you had invested in.

13             Is that right?

14   A    Yes.

15   Q    And did that building also include a hanger for

16   airplanes?

17   A    It looked like it, yes.

18   Q    And the building as you understood it was a Eufora

19   building, is that right?  Did you go inside?  I'm sorry,

20   you didn't answer the question first.

21   A    Well I don't know what -- you know what, to me it was

22   the -- I don't know if it was a Eufora or -- it's all

23   confusing to me, so it was the airpark thing.

24   Q    Other than the conversation that you recall having

25   with Mr. Constantine, wouldn't it be true, or isn't it

Juneau - Cross/Mr. LaRusso

271

1   true that most or all of your conversations regarding your

2   investment articulated about Eufora and the airpark was

3   with Mr. Kenner?

4   A    Yes.

5   Q    You testified that you actually, you filed a lawsuit,

6   I believe your testimony yesterday was between 2008 or

7   2009.  Is that correct?

8   A    Yes.

9   Q    And that lawsuit was against Mr. Kenner, my client

10  Mr. Constantine, as well as Mr. Gaarn.

11            Is that correct?

12  A    There was a number of people in the lawsuit, yes.

13  Q    And in fact you were suing anyone or any entity that

14  Mr. Kenner had invested with on your behalf?

15  A    Yes.  Everything was included, every private deal

16  that I was included in was included in that lawsuit.

17  Q    Okay and including some 12 or 13 defendants, correct?

18  A    It was a lot of people, yes.

19  Q    And did you sue personally by yourself?

20  A    Excuse me?

21  Q    Did you sue personally by yourself, you were the only

22  plaintiff in the case?

23  A    Yes, I think so.

24  Q    But there were related hockey player investors also,

25  Mr. Nolan, Owen Nolan, Mr. Moreau?

272

1   A    Well I know of Owen Nolan's case because he asked me

2   to testify, I guess.

3   Q    And he, like you, if I can get the investments back

4   that you and he had invested through Mr. Kenner, correct?

5   A    Yes, my understanding.

6   Q    Now would it be fair to say, and maybe I will be

7   repeating myself so bear with me.  You were seeking to

8   recover your investments that you made with

9   Mr. Constantine through Mr. Kenner in Eufora and the

10  airpark?

11  A    I received a check forwarding a request by e-mail to

12  Mr. Kenner.  I eventually received a check through the

13  mail for $100,000 in Eufora.  And the airpark deal like I

14  said earlier, was not paid.

15  Q    You anticipated my question.  We have been here a

16  long time and I'm trying to get to the point as quickly as

17  I cane, so bear with me.

18       So in fact you not only asked for the $100,000

19  that you invested in Eufora, you actually received a

20  refund.

21       Is that correct, as you just testified?

22  A    Yes.

23  Q    A return on your investment?

24  A    Yes, for Eufora.

25  Q    So Eufora, I'm talking about Eufora at this point.

273

1    A    Yes.

2    Q    And that request was made to Mr. Kenner?

3    A    Correct.

4    Q    And the next thing you know there was an envelope

5    with a check for $100,000, I believe you testified in a

6    former proceeding?

7    A    Yes.

8    Q    In the mail?

9    A    Yes.

10   Q    Now, do you recall when you actually asked for the

11   money back from Mr. Kenner?  Do you remember when?

12   A    I asked a few times to get out of these deals and to

13   get my money back.  And some notes we went through

14   already, that I was asking to if possible to get my money

15   back.

16            MR. LaRUSSO:  Just bear with me.

17            (There was a pause in the proceedings.)

18   Q    You had a series of questions of Mr. Kenner and he

19   responded to those.  I just want to give you an

20   opportunity to look at it to see if you can be more

21   accurate with regard to the answer to that question

22            MR. LaRUSSO:  Your Honor, Government Exhibit

23   728.

24   BY MR. LaRUSSO:

25   Q    Mr. Juneau, can you see that?

Juneau - Cross/Mr. LaRusso

274

1    A    Yes, sir.

2    Q    And I'm going to just turn a few pages to give you an

3    opportunity to see the substance of your communications

4    with Mr. Kenner responding to you with regards to actually

5    questions you asked on a subsequent page.

6             Is that right?

7    A    Yes.

8    Q    And I believe, if I may on the third page of this

9    exhibit.  -- you see my finger pointing?

10   A    Yes.

11   Q    There is the Eufora investment you made for $100,000.

12            And your question is, Are you making money yet?

13   What are the latest developments?

14            Do you see that?

15            Now in the response by Mr. Kenner, this is on

16   page 2, do you see where I'm pointing?

17   A    Yes.

18   Q    Mr. Juneau, that would be his response to your

19   inquiry.

20            Is that correct?

21   A    Yes.

22   Q    I'll read it just quickly.

23            A lot of significant -- and then D-E-L-A-S is

24   the spelling -- I assume that is delays that have been

25   occurring.

Juneau - Cross/Mr. LaRusso

275

1    Did you say it that way as a delay as opposed to

2    delas?

3    A    Yes.

4    Q    I would like to look for outside interest in the

5    company as early as 2006?

6         Do you see that?

7    A    Yes.

8    Q    That was his response.

9         Now this is May.  I'm pointing to the top.  This

10   is May 18, 2005.

11        Do you remember when you actually got the check?

12   A    No.

13   Q    Do you know when approximately you made the request?

14   Because in here you're really asking questions.  Would it

15   have been sometime after this that you made the request of

16   him for the return of the $100,000 investment?

17   A    I don't recall asking a question.  If I had the check

18   already, the check must have came after.

19   Q    I'm sorry.

20        At some point after this you asked for the money

21   from Mr. Kenner and you got a check in the mail.  That is

22   what I'm saying.

23   A    Yes.

24   Q    We just don't have email that says, Mr. Kenner,

25   please give me my $100,000 back.  We have some questions

Juneau - Cross/Mr. LaRusso

276

1    for Eufora at this point, right?

2    A    Yes.

3    Q    I'm just going to try to make it easy.  I really

4    don't want to confuse you.

5         I'm asking if you remember when after this

6    e-mail you may have gotten the check back from Eufora?

7    A    I don't --

8    Q    All right, let me approach.

9         Defendant's Exhibit C-1A.  It's actually marked

10   as two separate pieces of paper, C-1A and C-1B.

11        I'll ask you to that a look at both of these.

12   Take your time.

13        Do you recognize that?

14   A    That could be the check I received.

15   Q    The signature I'm taking about, is that correct on

16   the reverse side of it, of the C-1B.

17        Do you see that?

18   A    This would be my signature?

19   Q    Can you take a look at it and can you tell me if that

20   appears to be your signature?

21   A    This is not my signature.

22   Q    You don't see that?

23   A    I mean right here?

24   Q    Yes.

25   A    No, that is obviously not my signature.

277

1   Q    Do you remember receiving the check?  Well, using

2   that, does it refresh your recollection approximately when

3   you got the check?

4   A    Right here it says July 7th filed.

5   Q    2007 or 2005?

6   A    7-7-05.

7   Q    Would you say that that would be approximately the

8   time that you received the check after you made a demand

9   back in May?

10  A    I mean it looks, yeah it looks like it.

11  Q    Now just for the record, this was a full return on

12  your investment that you had made?

13  A    Yes.

14  Q    Yesterday when this e-mail the government was

15  questioning you on, you were inquiring of Mr. Kenner about

16  your investment Eufora and Avalon.

17       Is that correct?

18  A    Yes.

19  Q    At this point we now know that you got a full return

20  on the Eufora investment, correct?

21  A    Yes.

22  Q    Now, jumping ahead.

23       You filed a suit against Mr. Constantine around

24  2008/2009, some three years later, correct?

25  A    Yes.

Juneau - Cross/Mr. LaRusso

278

1   Q    And I believe you also testified that you asked for

2   your investment back on Avalon Park, which was the second

3   investment you had with Mr. Constantine.

4          Is that correct?

5   A    Yes.

6   Q    And your request of Mr. Kenner for the return on that

7   investment would have been sometime after May 18, 2005.

8   It would be fair to say you made that request -- you're

9   shaking your head.  The reporter can't get that.

10  A    Yes, you know from that e-mail, yes.

11  Q    However, did you ever contact Mr. Constantine

12  directly about your investment in Avalon and your request

13  for the return of the money?

14  A    I don't think so.

15  Q    Your only requests were to Mr. Kenner?

16  A    Yes.

17  Q    And it was your hope that Mr. Kenner would in fact

18  communicate that information?

19  A    Of course.

20  Q    To Mr. Constantine, correct?

21  A    Yes.

22  Q    Now between the time that you met or were conversing

23  with Mr. Kenner back in May of 2005 until the time you

24  filed your suit, you had no contact with Mr. Constantine?

25  A    No.

Juneau - Cross/Mr. LaRusso

279

1    Q    Nothing?

2    A    No.

3    Q    No telephone calls?

4    A    I don't think I even had his phone number or e-mail

5    address.

6    Q    Did you ever ask for his phone number or contact

7    information?

8    A    I don't think so.  And I didn't feel the need to

9    having a financial advisor relationship.

10   Q    And you were going to Mr. Kenner?

11   A    Yes.

12   Q    So your testimony is that between the time that you

13   started to ask Mr. Kenner for the return on your

14   investments to the time you filed suit you never asked

15   Mr. Constantine about the return on the Avalon Park

16   investment?

17   A    If I did I guess it would have been, I would say when

18   we were together for that lunch in December of '04.  I

19   don't recall anything else.

20   Q    You have no recollection of having that kind of

21   conversation.  You're guessing at this point, right?

22   A    Well I you know, I'm trying to remember as much as

23   possible.  And I don't.  So I don't remember.

24   Q    My question is, that from time that you were asking

25   for your return on Avalon Park through Mr. Kenner you

280

1   never made direct contact Mr. Constantine?  You didn't?

2   You're shaking your head?

3   A    Yes.  Sorry.

4   Q    You didn't have his contact information, telephone

5   number, e-mail or any other information to contact him

6   directly?

7   A    No.  I don't think so.

8   Q    By the way, you testified on, actually direct to

9   having a number of e-mail communications with Mr. Kenner,

10  correct?

11  A    Yes.

12  Q    That was a method of communication that you had with

13  your financial advisor.  Am I right?

14  A    Yes.

15  Q    Did you ever have any e-mail communications with

16  Mr. Constantine?

17  A    I don't think so.

18  Q    As a matter of fact, did anyone ask you to go into

19  your computer to see if there were any e-mails from

20  Mr. Constantine?

21  A    No.

22  Q    So it's your recollection that from the time that you

23  were trying to get your money back to the time that you

24  filled, no e-mail communication with Mr. Constantine?

25  A    No.

Juneau - Cross/Mr. LaRusso

281

1   Q    You mentioned that you sued him and what you sued him

2   for.  What happened to that suit?

3   A    It was discarded.  I just decided to move on, decided

4   to turn a page on this whole thing.

5   Q    As a matter of fact it was dismissed.  Isn't that

6   correct?  Not on the merits, but it was dismissed because

7   there was a question of whether where the suit should

8   actually be brought.  Is that right -- withdraw the

9   question.

10             Your case was in California, correct?

11  A    Yes.

12  Q    And it was dismissed because -- are you aware that it

13  should have been brought someplace else?

14  A    Not really.  It's that the way I looked at it, enough

15  is enough.  I just moved on.

16  Q    Well in terms of the suit, enough was enough, and you

17  moved on.  But you continued your efforts to try and get

18  your money back from Avalon Park, correct?

19  A    Well because we had a discussion with, with Tom

20  Constantine.

21  Q    Correct.  That is what I'm driving at.

22             After your suit was dismissed, there was a

23  discussion that you were aware of that Mr. Constantine

24  actually offered you back a hundred percent of your

25  investment while the suit was pending.  Remember that?

282

```
1    A    There was, it was not after the fact, it was during
2    the process.
3    Q    I'm sorry, during the process of the suit when it was
4    pending?
5    A    I think it was during the process, yes.
6    Q    So while the case was spending, and in the process
7    there was an offer made to you to get a hundred percent of
8    your money.  Not by you but by your lawyer, right?
9              MR. MISKIEWICZ:  Objection.
10   Q    Do you know?  I apologize.
11             THE COURT:  Sustained to the form.
12   BY MR. HALEY:
13   Q    Do you have any information as to whether the offer
14   that was made to return the money was accepted or
15   rejected?
16   A    If you're talking, meaning the airplane?
17   Q    No.
18             I'm talking about during the process, you
19   testified that you were offered a hundred percent of
20   return to your investment.  And that didn't happen,
21   correct?
22   A    Well, we got in our first discussion where we pretty
23   much found out that there was, there were interests from
24   Tom Constantine to make a deal.  And in that first
25   conversation I had a feeling that I could get my money
```

Juneau - Cross/Mr. LaRusso

283

1   back.  Nothing material, but actually to get the cash

2   back.

3   Q    If I may just clarify a little bit if I could.

4        You say there were discussions.  Did you

5   participate in those discussions?

6   A    A couple, a couple of them for sure, yes.

7   Q    And was Mr. Constantine a party to those discussions?

8   A    Yes.

9   Q    And in those discussions you were made aware that

10  Mr. Constantine had offered a hundred percent return on

11  your investment early on in the discussions.

12       Is that correct?

13  A    Well, my impression after the first discussion was

14  that there was, what can I say, an opportunity for him to

15  buy me back.

16  Q    Okay,  your suit gets dismissed, correct?  Is that

17  correct?

18  A    Yes.

19  Q    Just for purposes of understanding the next couple of

20  questions.

21       The settlement discussions continued, right,

22  with Mr. Constantine?

23  A    I don't know -- yeah if it was after, during the

24  process.  I don't have a clear time there.

25  Q    Do you remember your lawyer actually refusing -- let

284

1    me back up.

2            Was there a parallel suit taking place with

3    yours in California, particularly Owen Nolan?

4            MR. MISKIEWICZ:  Objection.

5            THE COURT:  No, I'll allow if he knows.

6    A    There was a case for Owen Nolan.

7    BY MR. LaRUSSO:

8    Q    And are you aware his case was transferred to

9    Arizona?

10   A    Well that is what, where I went because he asked me

11   to, if I could testify in his case.  So yes, I went to

12   Arizona for that.

13   Q    And then at this point your case is dismissed.

14           Is that right?

15   A    It's possible.  I don't know when my case got

16   dismissed, if there was before that or after.  But it was

17   around the same time.

18           MR. LaRUSSO:  Your Honor, may this be a good

19   time to break?

20           THE COURT:  We'll take a lunch break and we'll

21   reconvene at two o'clock okay.

22           Have a good lunch.

23           Don't discuss the case.

24           MR. LaRUSSO:  Thank you, your Honor.

25           (The jury left the courtroom.)

285

1           THE COURT:  You may step down.

2           If you would all be seated.

3           So Mr. LaRusso, just to go back to your point

4    earlier.  I looked the at indictment.  And you all

5    obviously know a lot more about the case better than I do

6    in details.

7           But the government allegations as to what

8    Mr. Kenner and Mr. Constantine did with relation to what

9    they did with the Eufora investments, what their

10   quote/unquote theory of the case is, to me could not be

11   clearer when you read paragraphs 12 and 14.

12          I mean it's not complicated.  It's stated very

13   clearly what they're alleging happened.  They're alleging

14   that money was taken from the Eufora money and diverted

15   for unauthorized purposes for your client's benefit and

16   Mr. Kenner's benefit.  They further allege that you, your

17   client and Mr. Kenner convinced John Doe number 11.

18          Who is who is John Doe number 11?

19          MR. MISKIEWICZ:  Nicholas Privitello

20          THE COURT:  To invest money in Eufora and then

21   diverted his money for unauthorized purposes and disavowed

22   his ownership interest in Eufora.

23          There is nothing unclear about that.  There is

24   nothing mysterious about it.  There is nothing complicated

25   about it.

286

1          So when you stand up here and say to me, I don't

2     know what they're going to try to say with respect to

3     Eufora.  That is what the indictment says.  That is that

4     I'm going to have the government committed to.

5          So I just want there to be no question that I

6     understand there was another aspect of the case, that

7     there was an earlier indictment.  And the government's

8     reference in the -- and you prepared the defendant against

9     that aspect of the case.  But they're not pursuing that.

10    But to the extent that you're arguing there was an

11    entirely new theory of the case, I don't know what I'm

12    defending any more.  You know, I don't know what could be

13    clearer.  What more do you want than what is in those

14    paragraphs?

15         They took money.  The argument is that

16    Mr. Constantine took money that was supposed to be for

17    Eufora and used it for his personal benefit.  And

18    specifically took money from Mr. Privitello.

19         MR. LaRUSSO:   And if the Court remembers when

20    we were confronted with this general allegation of fraud,

21    I asked the Court for an opportunity to get more

22    specificity.  Because the original indictment, those three

23    paragraphs were clear.  And I don't think they really

24    changed, judge, other than to give the government the

25    opportunity to do what they have been doing here.

287

1          First paragraph is $700,000, what we talked

2     about.  The second one is $725,000 that the accused my

3     client of.  And the one is Mr. Privitello, $200,000.

4          I know what the end result is.  But what we were

5     doing was asking the evidence to support the charges.  And

6     that is what changed.  That is our point, judge.  And I'm

7     sorry for belaboring the point, I guess I didn't make it

8     clear enough.

9          THE COURT:  No, I understand.  The background of

10    where the investment was.  But the government is not

11    trying to prove that the initial transfer to the Eufora

12    fund was fraudulent.  They're not trying to prove that

13    because the money was co-mingled and they don't want to

14    prove that.

15          You know, to me that's a win for your client.

16    That is a win for your client.  That is another aspect of

17    the case they're not seeking to argue.  He didn't commit

18    any crime.  That is a good thing, not a bad thing.

19          The rest of the case is still clear.  You

20    haven't been surprised.  It's not complicated.  Did he or

21    did he not take money from Eufora for his own purposes?

22    That's not complicated.  That's not a surprise.  That's

23    what the case is about.  Okay?

24          MR. LaRUSSO:  The only point is -- I don't want

25    to belabor the point.  I know the Court is --

288

1           THE COURT:  You're not belaboring it.  I'm

2    belaboring it at this point.

3           MR. LaRUSSO:  Thank you, judge.

4           The point is, is that the government had

5    originally said that the basis of the facts that supported

6    them emanated from the 2002 diversion.  Now they're saying

7    the $700,000 was stolen in 2008 and 9.  And I'm going,

8    okay, where is the theft?  Where are the facts?  I asked

9    you for some help here with regard to understanding where

10   we're going, what we're defending.  And I still don't

11   know.

12          THE COURT:  Okay.  But again part of your case

13   is to try to show that the $700,000 in 2008 is not a

14   diversion.  It involves going back to what happened in

15   2000, you know, whatever year it was, 2002, 2003.  That is

16   fine.  You can do that, to try to show that's -- but it's

17   not -- that is the fraud.  You're free to try to show that

18   couldn't be a fraud because the money came from some

19   legitimate source, you know, years earlier.  That is fine.

20   That is up to you.  But I don't, I don't want you to be

21   suggesting on the record there is some surprise about what

22   is in the indictment, or it's, you know, a different

23   theory.  Okay?

24          But I think we both belabored this.

25          So all right.  So have a good lunch and I'll see

289

1    you at two o'clock.

2            MR. HALEY:  Judge, I'm told Mr. Mascarella will

3    be testifying this afternoon.  We have yet to receive the

4    Northern Trust records, I'm told.

5            MR. MISKIEWICZ:  Mr. Mascarella won't be

6    testifying

7                (A luncheon recess was taken.)

8                (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Juneau - Cross/La Russo

290

1       A F T E R N O O N    S E S S I O N

2              THE COURT:  Okay.  Are you ready?

3              MR. LA RUSSO:  Thank you, your Honor.

4              THE COURT:  Okay.  Let's bring in the jury.

5              THE CLERK:  All rise.

6              (Whereupon, the jury entered the courtroom.)

7              THE COURT:  Everyone be seated.  Go ahead,

8    Mr. La Russo.

9              MR. LA RUSSO:  Thank you, your Honor.

10

11   CROSS-EXAMINATION (Continued)

12   BY MR. LA RUSSO:

13   Q.   Mr. Juneau, didn't my client, Mr. Constantine,

14   actually present a settlement agreement to your attorney

15   for the full amount of your investment?

16   A.   I don't know if he presented it to my lawyer, but I

17   remember dealing with, personally with my financial

18   advisor.

19   Q.   And didn't Mr. Constantine actually complain to you

20   about your lawyer delaying the signing of that agreement

21   for the full amount?

22              MR. MISKIEWICZ:  Objection.

23              THE COURT:  Overruled.

24   A.   So I think there was something like this, but I never

25   personally had my lawyer involved.  That's something from

Juneau - Cross/La Russo

291

1   what I remember that I was dealing with outside of his

2   services.

3   Q.   And actually you dealt directly with Mr. Constantine

4   at one point.  Isn't that a fact?

5   A.   Yes, we did.  We talked on the phone.

6   Q.   In addition to talking on the phone, you also

7   exchanged e-mails during this time period, correct?

8   A.   It's highly possible, yeah.

9   Q.   Let me show you what's been marked for identification

10  as Defendant's Exhibit C-2.  Would you take a look at

11  that, please, Mr. Juneau.  (Handing.)

12         You can take your time, I know there's a couple

13  of pages, I just want to make sure that you've had an

14  opportunity to review all of it.  (Pause.)

15         Have you had an opportunity to review it

16  sufficiently to be able to tell us that that's an e-mail

17  exchange between you and Mr. Constantine during the

18  settlement discussions?

19  A.   Yes.

20  Q.   That is your e-mail address and what you knew to be

21  Mr. Constantine's, correct?

22  A.   Yes.

23         MR. LA RUSSO:  Your Honor, may ask that C-2 be

24  received testified.

25         THE COURT:  Any objection?

Juneau - Cross/La Russo

292

1    MR. LA RUSSO:  Judge, I don't need all of it.

2    MR. MISKIEWICZ:  Objection.

3    THE COURT:  Overruled.  Any objection?

4    MR. HALEY:  No, sir.

5    THE COURT:  C-2 is admitted.

6    MR. LA RUSSO:  Your Honor, it's three pages

7  long, I'll just read the first three paragraphs which take

8  us through the first page and the top of the second.

9    THE COURT:  Go ahead.

10  Q.   You see that, Mr. Juneau.

11  A.   Yes.

12  Q.   Tommy -- that's you -- correct, Mr. Juneau,

13  Mr. Constantine -- Tommy?

14  A.   Yes.

15  Q.   I just heard from Michael Meeks.

16       That's your lawyer?

17  A.   Yes.

18  Q.   That you will not authorize your attorney to send the

19  settlement agreement to him and unless you get to talk to

20  me first.  I am really wondering why you feel that we need

21  to spend more time discussing this issue between you and I

22  at this point.  Joe -- and this is Mr. Constantine

23  responding to you, correct?

24  A.   It looks like it.

25  Q.   Okay.  The reason that you and I need to discuss this

Juneau - Cross/La Russo

293

1    as opposed to sending paper back and forth between the

2    attorneys, is -- A -- is because, A, the primary reason

3    for these issues arising between us in the first place is

4    your lack of communication.  In brackets, (for example,

5    your attorney has had the settlement agreement which you

6    are asking me to now send for weeks) end brackets; B, you

7    have been taking blind legal action against me without so

8    much as making a single phone call to me during the entire

9    tenure of your investments with my related entities; C,

10   you have been grossly ill-advised by your attorneys and

11   their so-called experts, as well as by a couple of

12   disgruntled former colleagues of Phil's, who know

13   absolutely nothing about me or my business.  And; D, you

14   have been presumably spending hundreds of thousands of

15   dollars of your own money on an attorney, who in my

16   opinion and based on his actions with respect to handling

17   this settlement offer which was presented weeks ago is not

18   serving your best interest.  D, and continue going down

19   the path and take action which requires me to spend

20   similar large amounts of money on unnecessary legal

21   action.

22              And then there's a break.  New paragraph.

23              After our phone discussion from last

24   Wednesday -- that's you speaking, is that correct,

25   Mr. Juneau, assuming?

Juneau - Cross/La Russo

294

1   A.    Yeah.

2              THE COURT:  Can you move up the document up.

3              MR. LA RUSSO:  I apologize.

4   Q.    The last paragraph, correct?

5              After our phone discussion from last Wednesday,

6   we both agreed that I would look over your settlement

7   proposal with my attorney and that we would get back to

8   you ASAP, which I believe we did.  You also told me that

9   you have just found out for the first time that I wish to

10  get out of the Avalon deal and that you'd have paid me

11  back right away if you would have known that before.  I'll

12  just finish the paragraph.  Just to you know, this would

13  have never happened --

14             THE COURT:  Mr. La Russo, we can't see it.

15             MR. LA RUSSO:  That's me again, I apologize.  I

16  got too caught up in reading it, I apologize.  I'll go

17  back just a little bit to the page on the bottom so that

18  you can understand it.  Last sentence:

19             You also told me that you have just found out

20  for the first time that I wish to get out of the Avalon

21  deal and that you would have paid me -- I'm doing it

22  again -- the Avalon deal and that you would have paid me

23  back right away if you would have known that before.  Just

24  so you know, this would have never happened if Phil Kenner

25  would have told you.  So since he was the one representing

295

1    me and I had mentioned it to him many times since my

2    retirement from the NHL.

3              I read it correct that time?

4    A.   Yeah.

5    Q.   Now, this agreement that we're talking about at this

6    point, the original agreement was for the full amount of

7    your investment, correct?

8    A.   No.

9    Q.   Correct?

10   A.   Yes.

11   Q.   Now, it's your impression, I believe from your

12   testimony, that you had invested 500,000 in the Avalon Air

13   Park project; is that correct?

14   A.   Yep.

15   Q.   In fact didn't you invested $550,000?

16   A.   I thought it was 500, it might have been more.

17   But --

18   Q.   In fact you testified that you thought like today

19   that it was a half a million dollars?

20   A.   Right.

21   Q.   And the e-mail that we were alluding to earlier May

22   18th, 2005 with Mr. Kenner, you also mentioned 500,000; is

23   that correct?

24   A.   Yep.

25   Q.   Do you think back to these discussions, do you

Juneau - Cross/La Russo

296

1   remember Mr. Constantine being the person that brought to

2   your attention that the correct amount of your investment

3   was 550 thousand and not 500, isn't that correct?  If you

4   think back to those discussions.

5   A.   If I remember him telling me that it was 550?

6   Q.   Yes.

7   A.   I don't remember, but it's possible that he did.

8   Q.   Now, Mr. Juneau --

9        MR. LA RUSSO:  Judge, bear with me a moment.  I

10  thought that I had this premarked.  May I approach the

11  witness, Judge?

12  Q.   Mr. Juneau, would you take a look at defense C-21 for

13  identification.  (Handing.)

14       Can you recognize that?  I know it's a copy.

15  Let me ask you, does it like your signature on that?

16  A.   It does, that's probably --

17  Q.   Does it now refresh your recollection that on July

18  28, 2003 you sent $550,000 to Constantine Management

19  Group?

20  A.   I did, yeah.

21  Q.   I'm sorry, 550?

22  A.   550.

23  Q.   Now you testify today, you now look at this and know

24  you invested $550,000?

25  A.   Yes.

Juneau - Cross/La Russo

297

1  Q.   And it was my client that actually brought that to

2  your attention?

3              (Pause.)

4              THE COURT:  Did you answer the last question?  I

5  didn't hear the last answer.

6  A.   About $550,000.

7              THE COURT:  Perry, could you read the last

8  question.

9              (Question read by the court reporter.)

10  A.   Well, like I said it's possible that he did.  I don't

11  remember but it's possible that he did.  In those

12  conversations for the settlement, I guess.

13  Q.   Now, you ultimately accepted the airplane, correct,

14  to go with the $550,000 investment, right?

15  A.   Yes.

16  Q.   And do you remember actually asking that the airplane

17  that you were seeking to accept in lieu of the investment

18  be appraised?

19  A.   Yes.

20  Q.   And in fact my client provided with an appraisal for

21  that plane; is that right?

22  A.   Yes, he did provide some documents.

23  Q.   Do you remember how much the plane was appraised for?

24  A.   It was in, you know, around the same value, little

25  lower from the numbers we got from, if I remember right.

298

1   Q.   And the numbers you mean the investment that you made

2   in Eufora?

3   A.   I guess the 550.

4   Q.   Okay.  Who paid for the appraisal?

5   A.   What's that?

6   Q.   Who paid for the appraisal?  Mr. Constantine?

7   A.   I don't think I paid to it.

8   Q.   Let me ask you, do you remember or was there any

9   discussions as to who paid for the plane that you got and

10  would paid for the appraisal?

11  A.   I believe we, we asked, you know, to prove the plane

12  and then after that, ended up making that settlement.

13  Q.   But the monies that were used to pay for the

14  appraisal and for the plane that you ultimately accepted

15  were you aware that it came from a fund called the Global

16  Settlement Fund?

17  A.   No.

18  Q.   Would it be fair to say at the end of the day you

19  reached the settlement with Mr. Constantine with respect

20  to the Avalon investment that he was satisfied with?

21  A.   Well, considering the situation yeah, obviously if I

22  signed this it appears that I was satisfied, I just wanted

23  to move on, like I said.

24  Q.   How many years after you accepted the airplane did

25  you sell it, I think you mentioned that early this

Juneau - Cross/La Russo

299

1    morning?

2    A.    I put it on the market for the price that it was

3    supposed to be worth and never got a buyer.

4    Q.    What market did you do that with?

5    A.    We brought it to a place in Maine where there was a

6    company there flying this kind of plane, dealing also like

7    selling them, buying these kind of planes.

8    Q.    Did you hire a broker?

9    A.    Yep.

10   Q.    Did you have it appraised again?

11   A.    I'm not sure.  I, I'm not sure if it was a

12   professional appraisal or if it's -- if it was the broker

13   just advising me that the price actually had been lower

14   than what we were asking.

15   Q.    Do you have any idea today what that plane is worth?

16   A.    No.

17   Q.    What was the agreed upon amount in the settlement

18   agreement itself?  Do you remember?

19   A.    The amount?

20         MR. LA RUSSO:  I apologize.

21   Q.    You don't know the amount that was in the settlement

22   agreement that you finally signed?

23   A.    No.  The only thing about the settlement that I know

24   of is that I ended up with a plane.

25         MR. LA RUSSO:  Your Honor, I have the other copy

300

1    of the settlement agreement, it's a little difficult to

2    read.  I'm just wondering if we have a copy of what we

3    were discussing earlier.

4              THE COURT:  I thought I handed that back.

5              MR. LA RUSSO:  Bear with me one moment, Judge.

6              MR. MISKIEWICZ:  I have it.

7              THE COURT:  He's got it, Mr. La Russo.

8              MR. LA RUSSO:  Thank you very much.  May I

9    approach the witness?

10   Q.   Take a look at this document, particularly enough of

11   the paragraphs that you can understand what the purpose of

12   that document and its contents and look at the signature

13   page on the back.  (Handing.) (Pause.)

14             Have you had a chance to take a look at it?

15   A.   Yeah.

16   Q.   Do you recognize the signatures on the back of it?

17   A.   Yes.

18   Q.   Would it be fair to say that it that's a copy of the

19   settlement agreement that you reached in regard to your

20   investment in the Avalon Park?

21   A.   Yes.

22   Q.   Thank you.  Discuss so the record is clear, this is

23   date July 27, 2009; is that correct?

24   A.   Yes.

25   Q.   Thank you.

301

 1            MR. LA RUSSO:  Your Honor, with your permission,

 2    I'm just going to read the one paragraph we talked about.

 3            THE COURT:  Are you going to offer it?

 4            MR. LA RUSSO:  I offer it into evidence at this

 5    time and I'll be reading the one paragraph we discussed.

 6            THE COURT:  And subject to the discussion had

 7    earlier today, just the portion of it will be marked,

 8    correct.

 9            MR. LA RUSSO:  Yes, your Honor at this point.

10            MR. MISKIEWICZ:  No objection.

11            THE COURT:  Any objection, Mr. Haley.

12            MR. HALEY:  No, sir.

13            THE COURT:  What number is it?

14            MR. LA RUSSO:  I just wanted to show

15    Mr. Miskiewicz the portion that I'm reading.

16            THE COURT:  What's the number?

17            MR. LA RUSSO:  748, your Honor.

18            THE COURT:  748, a portion of 748 that we

19    discussed earlier today is admitted and will be read.

20            (Defendant Constantine's Exhibit 748 in

21    evidence.)

22            MR. LA RUSSO:  Your Honor, on page 2 looks like

23    paragraph I, it says payment.  By signing below

24    Constantine acknowledges and agrees that through AZ Falcon

25    Partners LLC he owns and has in his possession one 1980

Juneau - Cross/La Russo

302

1    Cessna 414 A airplane, serial number 0532, free and clear

2    of all liens and incumbrances, the Cessna, which is

3    available to sell, transfer and convey to Juneau or an

4    entity designated by Juneau in accordance with this

5    agreement.  The parties agree that the Cessna has a value

6    of at least $437,000.

7    Q.    When you -- you testified I believe that you've

8    spoken to the FBI on a number of occasion; is that

9    correct?

10   A.    Yeah.

11   Q.    Do you remember speaking to the FBI by telephone on

12   some of those occasions?

13   A.    Yes.  Yeah, I do.  Talked about the settlement.

14   Q.    And would it be fair to say that in discussing the

15   settlement agreement with the FBI as you said here today,

16   that the Cessna 414 airplane in your estimation was worth

17   about $500,000.

18         Do you remember saying that to the FBI?

19   A.    Well, I mean what I said in that this is how we

20   settled, I mean, we accepted that this was the same

21   ballpark, the same you know value, and made the deal.

22   Q.    And would it be also correct in those discussions you

23   remember telling them that the amount that you sold it for

24   was the approximate amount that you invested in the hangar

25   at Avalon Air Park, approximate amount?

303

1    A.    That I sold?

2    Q.    That's what you told the FBI.  Do you remember

3    telling them that?

4    A.    No.  Because I didn't sell it.

5    Q.    I'm sorry, the valve the airplane was the approximate

6    amount what you have invested in the hangar in Avalon Air

7    Park?

8    A.    Yeah.  What happened is that one day the pilot using

9    the plane slipped on the runway and crashed it and that

10   was the end of it.

11   Q.    When did that occur?

12   A.    I with say 2012, maybe something like that.

13   Q.    It was many years after the settlement agreement?

14   A.    A few years after, because, well, if you want to hear

15   the story?

16           THE COURT:  No.  No.

17           THE WITNESS:  It's a very interesting one.

18   Q.    And that kind of damage to the airplane, that reduced

19   the value substantially on the plane; is that correct?

20   A.    We declared the plane totaled, I guess.

21   Q.    In that case it was totaled?

22   A.    It was, yeah.

23   Q.    Now, how would you ultimately characterize your

24   dealings with Mr. Constantine with regard to your Avalon

25   investment?

Juneau - Cross/La Russo

304

1  A.   Well, again, one meeting and conversations with the

2  settlement at the end, that's pretty much all that I can

3  say.

4  Q.   And you got what you were hoping to get?

5  A.   He will, yeah, I got out of the Avalon.

6  Q.   And you testified that you had actually experienced

7  delays communicating with Mr. Kenner, correct, do you

8  remember testifying to that, Mr. Kenner, were you trying

9  to talk to him about your investments during that period

10  of time, there was a delay?

11  A.   Yeah, that's why I did hire Phil Kenner.

12  Q.   You didn't have that kind of delay with

13  Mr. Constantine when you were negotiating the settlement,

14  did you?

15  A.   No, to be honest, once we moved on on this, I mean

16  from my perspective it had happened quickly.

17  Q.   And would you agree he was straightforward and

18  forthright with you in reaching the settlement?

19          MR. MISKIEWICZ:  Objection.

20          THE COURT:  Overruled.

21  A.   Well, again, when we both decided on moving ahead

22  with this, you know, accepting that the plane would be

23  went out, it went pretty quick.

24  Q.   And would you say at that point it went

25  straightforward and forthright, Mr. Constantine's dealings

Juneau - Cross/La Russo

305

1    with you.

2    A.   I would think so.

3    Q.   You remember as part of settlement agreement actually

4    writing a letter to that effect, do you remember writing a

5    personal letter?

6    A.   I remember there was something, I don't know if it

7    was drafted or who wrote it, but I remember there was

8    something.

9          MR. LA RUSSO:  I have the document.

10   Q.   Mr. Juneau, let me show you C-3 for identification,

11   please.  (Handing.)

12          Do you recognize that document?

13   A.   I read it.

14   Q.   That's your signature on it?

15   A.   Yes, it is.

16   Q.   And is that the personal letter that you signed in

17   regards to the settlement agreement?

18   A.   It looks like it.

19   Q.   Okay.

20          MR. LA RUSSO:  Your Honor, may ask that

21   Defendant's Exhibit C-3 be received in evidence.

22          THE COURT:  Any objection?

23          MR. MISKIEWICZ:  Appears like irrelevant.

24          THE COURT:  Overruled.  Any objection to it.

25          MR. HALEY:  No, sir.  Thank you.

Juneau - Cross/La Russo

306

1          THE COURT:  C-3 is admitted.

2          (Defendant Constantine's Exhibit C-3 in

3     evidence.)

4     Q.   I hope to be more successful in reading this than

5     delaying it.

6          MR. LA RUSSO:  With your permission, your Honor.

7          THE COURT:  Sure.

8     Q.   Saint Raymond PQ, Mr. Juneau, do you know what PQ is?

9     A.   Province of Quebec.

10    Q.   Monday, July 27, 2009, REF R-E-F:  Settlement between

11    Joe Juneau and Tommy Constantine.  In the first

12    opportunity for Mr. Constantine and I, to directly discuss

13    my investment with him, Mr. Constantine agreed to refund

14    my entire investment.  Accordingly, we have agreed to an

15    amicable resolution of the issues raised in my lawsuit

16    against him.  I harbor no negative feelings towards

17    Mr. Constantine, or his companies, or how he ultimately

18    handled my investment, and I do not condone nor did I

19    participate in the attacks brought upon Mr. Constantine in

20    the media.

21          And then there's a signature, and the name

22    Joe Juneau.

23          Just a little aside here, you've heard some

24    discussions about lines of credit.  Before 2009, did you

25    ever have any discussions or e-mail communications with

Juneau - Cross/La Russo

307

1    Mr. Constantine about the lines of credit that you

2    testified to here?

3    A.    I don't think so.

4    Q.    Your discussions were with Mr. Kenner?

5    A.    Yeah.

6    Q.    Now, in addition to the settlement that we were

7    talking about for sometime, you also invested in a number

8    of other companies through Mr. Kenner, I think you

9    testified to some of them; is that correct?

10   A.    Yes.

11   Q.    And as a matter of fact the e-mail of May 18th, 2005,

12   lists quite a few of them, but one with Escher for a

13   hundred thousand?

14   A.    Um-hmm.

15   Q.    BSD for 200,000?

16   A.    Yes.

17   Q.    A company called Teknik, T-E-K-N-I-K?

18   A.    Yeah.

19   Q.    What was your investment in that?  Over a million

20   dollar; is that correct?

21   A.    Yeah.  It was I believe a little bit over 1.5

22   million.

23   Q.    You also invested in a company called Impact?

24   A.    Yes.

25   Q.    $100,000, I believe?

Juneau - Cross/La Russo

308

1    A.    Yes.

2    Q.    You invested $500,000 in Mr. Jowdy's Diamonte del

3    Mar, correct?

4    A.    Yes.

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CONTINUED CROSS EXAMINATION

2  BY MR. LaRUSSO.

3  Q    And there were others.  All those investments you made

4  through Mr. Kenner, is that correct?

5  A    Yes.

6  Q    Would it be fair to say that it was only Mr. Constantine

7  who made good on the investments that you had with him?

8  A    Well, there's also the Mexican deal that ended up getting

9  some kind of a settlement as well.  So it would be two -- two

10 people, two persons that we ended up dealing with to make an

11 agreement.

12 Q    But in spite of all of the others --

13 A    Yes.

14 Q    -- you say Mr. Constantine was the only one that made

15 good on the investments?

16 A    He's the only one who what?

17 Q    Made good on the investments you made?

18 A    Oh, there was no profits.  But I got -- you know, I

19 got...

20 Q    There was no profit?

21 A    Correct.

22 Q    Your investments were such that you were not guaranteed.

23 I believe Mr. Haley brought that out.  You were not guaranteed

24 any return on the investment such as interest or dividends or

25 anything like that.  There were no promise or guarantee made,

1  is that correct?

2  A    I mean, when all of this stuff is presented, it's like

3  this is obviously going to be a good move, a good thing.  But

4  at the end, there was no profits.

5  Q    But you got the money back that you invested?

6  A    I did, yes.

7  Q    I don't know, let me just phrase it this way:  Did you

8  invest with a man by the name of Mr. Jowdy $500,000?

9  A    Yes.

10 Q    That was through Mr. Kenner, again, is that correct?

11 A    Yes, it was.

12 Q    Do you remember when you made that investment with

13 Mr. Jowdy?

14 A    My guess would be 2002, 2003.

15 Q    The investment, did you send the money by wire transfer?

16 A    I think so, but I'm not too sure.

17 Q    It's a long time ago, 2002.  Your recollection is you

18 think it was a wire transfer, correct?

19 A    Yes.

20 Q    Do you remember whether you did it by single wire or two

21 separate wires or more?

22 A    No, I don't remember.

23 Q    Let me show you what's been marked --

24         (Handing to counsel.)

25         MR. LaRUSSO:  One moment, Your Honor.  I want to

JUNEAU-CROSS-LaRUSSO                                    311

1    make sure that it's properly marked.

2    Q    I am going to show you what has only been marked for

3    identification as C-7 and C-8.  Will you take a look at those,

4    please.

5              (Handing.)

6              Did you have a chance to look at those?

7    A    Yes.

8    Q    Does it refresh your recollection as to how you made your

9    investments with Mr. Dowdy in the Mexican project?

10   A    I don't remember.  I mean, if this is how it happened.

11   Q    Does it refresh your recollection you sent two separate

12   wires; $250,0001 on August 15, 2002, and the other on

13   December 27, 2002?

14             MR. MISKIEWICZ:  Objection.

15             THE COURT:  Overruled.

16   A    That is what I see here.  But my guess, it was done in

17   one piece.

18   Q    Looking at these, your recollection is you thought it was

19   one but it could have been two?

20   A    Yes.  I don't know if it ended up being one instead of

21   two.

22   Q    Do you remember what account the money was sent to?

23   A    (No audible response.)

24   Q    You're shaking your head?

25   A    No, I don't.

1    Q    I apologize for saying that.  Sometimes he can't get the

2    shaking of the head.

3          Looking at those documents, does it refresh your

4    recollection as to what account it was deposited into?

5    A    Well, I can see now by this.  I could have never told you

6    before seeing this that it went to these places.

7    Q    Have you ever heard of a company called Baja Development?

8    A    Yes, I did.

9    Q    Whose company is that?

10   A    It was something linked to Ken Dowdy.  I mean, that's

11   pretty much the only information that I got out of it.

12   Q    And your investment?

13   A    Excuse me?

14   Q    And connected to your investment in the project?

15   A    Yes.

16   Q    Did you get a promissory note for those investments?

17   A    I could have.

18   Q    You may have or may not have?

19   A    Yes.

20   Q    If I show you a document marked C-4.  Take a look at it.

21          (Handing.)

22          Tell me after you're done looking at that, does that

23   refresh your recollection that in fact you received a

24   promissory note for $500,000 in Mr. Jowdy's company.

25   A    Is my name on this?

1   Q     The document has only one page to it.

2   A     Okay.

3   Q     And I must ask you to take a look at it.

4   A     Yes.

5              MR. LaRUSSO:  If I may, Your Honor, to save some

6   time?

7              THE COURT:  Yes.

8   Q     Does that help refresh your recollection you got a

9   promissory note from Mr. Jowdy for the $500,000 that you

10  invested in the Mexican project?

11  A     I don't remember this document, to be honest.

12  Q     But would it be fair to say you do recall getting a

13  promissory note for that investment?

14  A     This is a -- no, I don't remember getting this document.

15  Q     Well, when you invested the money --

16  A     Yes.

17  Q     -- did you invest it as a loan?

18  A     It's a good question.

19  Q     That's why I asked it.

20  A     For me, it was investing in some land development

21  somewhere in Mexico.

22  Q     Well, let me ask you:  You know what a promissory note

23  is, right?

24  A     Yeah.  I've never seen this before.

25  Q     I'm not asking you since you don't recognize the

1    document.  I'm asking you:  You know what a promissory note

2    is?

3    A    What?

4    Q    Someone promises to pay you money.

5    A    Okay.

6    Q    It indicates that you lent the money; and that person

7    that is borrowing it from you agrees to pay it back, correct?

8    A    Yes.

9    Q    If your money was invested in the loan, you would have

10   gotten a promissory note to record that transaction, is that

11   right?

12   A    I guess.

13   Q    Would you agree with me?

14   A    Yes.

15   Q    I'm not good with finance either.  So I'm going to keep

16   it as simple as I can.

17   A    Good.

18   Q    Okay.  The promissory note -- if you're familiar with it

19   or not, just let me know and I'll move open -- it doesn't

20   state what the borrower can do with the loan proceeds,

21   correct?

22           MR. MISKIEWICZ:  Objection.

23           THE COURT:  Sustained.

24   Q    Well, in your recollection of the events, when you lent

25   the money to Mr. Jowdy, were you lending it as a loan or were

1    you lending it as an investment?

2            MR. MISKIEWICZ:  Objection.

3            THE COURT:  I think he answered this once already,

4    but I'll allow him to answer one more time.

5            Can you answer that again?

6            THE WITNESS:  I don't know if it was a loan or -- I

7    just know that I was going to lend for some project in Mexico.

8    So in the form of a loan or in the form of whatever it was.

9    Q    If it was a loan, that would be a promise by Mr. Jowdy to

10   pay you back the money, correct?

11   A    Correct.

12   Q    Mr. Jowdy could do what he wants with the loan proceeds

13   because his only obligation to you is just to repay the loan.

14           MR. MISKIEWICZ:  Objection.

15           THE COURT:  Sustained.

16   Q    Do you have any recollection of a document that can help

17   refresh your recollection whether the $250,000 was a loan or

18   an investment?  Do you recall any?

19   A    No.

20   Q    That may be inappropriate.  Let me tell you, I'm going to

21   show you a document marked for identification as C-5.  I'll

22   ask you to take a look at the signature pages on the back,

23   whatever portion of it you need to familiarize yourself with

24   this, and see if that refreshes your recollection that your

25   original investment of $500,000 was a loan and that it was

JUNEAU-CROSS-LaRUSSO                                     316

1    subsequently converted too ownership.

2              (Witness reviews the document.)

3              Have you had a chance to look through that?

4    A    Yes.

5    Q    Do you recognize the document?

6    A    Not really, but I might have seen it before.

7    Q    Do you recognize any writing on it?

8    A    All of this is not my handwriting.

9              MR. LaRUSSO:  The first page, Judge, there's the

10   word written "Joe Juneau."  He says that's not his

11   handwriting.

12   Q    Turning to page 9 there's handwriting.  Do you recognize

13   that?

14   A    I don't believe this is my handwriting either.

15   Q    Continue.

16             You're not sure, is that correct?

17   A    Well, one of my daughter's names, I always spell it with

18   the accent.  And this is not how I write my Js.

19             MR. LaRUSSO:  Now we're on page 10, Your Honor.

20             THE WITNESS:  This is not how I write my name.  And

21   this looks like my signature.

22   Q    Just so the record is clear, when you say "this is not

23   how I write my name, you're referring to the printed "Joe

24   Juneau," correct?

25   A    Yes.

1  Q    Above that is the signature, and that looks like your

2  signature, is that correct?

3  A    Yes.

4  Q    This document is also signed by?

5  A    It's right there.  I can't tell.

6  Q    This is titled a Baja Management LLC Subscription and

7  Membership Agreement, is that correct?

8  A    Yes.

9         MR. LaRUSSO:  Your Honor, may I offer Exhibit D at

10  this time?

11         MR. MISKIEWICZ:  May I have voir dire?

12         THE COURT:  Yes.

13  VOIR DIRE EXAMINATION

14  BY MR. MISKIEWICZ:

15  Q    Mr. Juneau, looking at the last page, have you ever seen

16  this document before, the one that has what appears to be your

17  signature?

18         THE COURT:  You said "last page."  Is that a

19  different page than he was just looking at or the same page?

20         MR. MISKIEWICZ:  Same page he was looking at.  This

21  is page 10.

22  A    No, I don't remember.

23  Q    Just speak up for the jury.

24  A    I said no, I don't remember.

25  Q    Have you had a chance to review this document just now to

1  familiarize yourself with what it purports to be, kind of what

2  that agreement is all about?

3  A    Yeah.  I was actually kind of getting interested in

4  reading it.  Just...

5  Q    Why do you find it interesting reading?

6  A    Well, because I see that it says that I purchased Class B

7  interest in becoming a Class B member of Baja Management.

8  So...

9  Q    Did you ever know that?

10  A    I can't -- I can't say that I knew that, no.

11  Q    Except for when Mr. LaRusso just showed you this

12  document, did you ever see -- had you ever seen this document

13  before?

14  A    I don't think so, but it's possible.  I don't believe so.

15  Q    What, if anything, does that document have to do with

16  Hawaii?  Do you know?

17  A    I don't think that it does.

18  Q    Do you know where that document has been -- is it an

19  original or a copy?  Can you tell?

20  A    Well, I think it looks like a copy.  Yes.  I would guess

21  it's -- I would say it's a copy.

22  Q    Do you know where that last page -- do you know if that

23  last page was connected to the remaining pages -- assuming you

24  did sign it.  Assuming that is your signature.  Do you know if

25  that page 10 was connected to the rest of the pages in that

document, if you signed it?
A Well --
Q Do you know?
A Well, the page says Diamanté Del Mar LLC and Baja Management LLC and the name of Ken Jowdy.
Q My question, Mr. Juneau, do you know if you signed that document, or if you signed that page 10, do you know whether or not you signed it being able to read everything else that preceded that signature?
A I don't understand what you're asking me. But looking at this with my signature, I can't tell. I only see this page alone.
Q As you sit here today, do you have an independent recollection of ever signing a document that gave you whatever this document claims to give you by way of agreement? Do you have a recollection of doing that?
A I don't.
Q Okay. The last signature there says -- there's some printed or handwritten indication of a Mr. Jowdy. Both or is it just printed?
A Ken Jowdy's name is written by the computer and there's his signature in two places.
Q Would you even know what Mr. Jowdy's signature looks like?
A No, not at all.

1        MR. MISKIEWICZ:  Objection.

2        THE COURT:  Any objection, Mr. Haley?

3        MR. HALEY:  No objection.

4        THE COURT:  The objection's overruled.  C-5 is

5   admitted.

6        (So marked as Defendant Exhibit C-5 in evidence.)

7   CONTINUED CROSS EXAMINATION

8   BY MR. LaRUSSO:

9   Q    That document that you told us about your recollection of

10  it, is for $500,000, is that correct?

11  A    Yes.

12  Q    It's a $500,000 interest in, it says, Baja Management, is

13  that right?

14  A    As a member of Baja Management LLC.

15  Q    You invested $500,000, there's no question in your mind,

16  through Mr. Kenner for a project that was being managed or run

17  by Mr. Jowdy, is that correct?

18  A    Correct.

19  Q    That's what this is, right?

20  A    Yes.

21  Q    This document also gives you an equity interest in this

22  company that the person, that signature appears there,

23  Mr. Jowdy, is giving to you?

24  A    Yes, it does.

25  Q    And a equity interest is an ownership interest, is that

1   correct?

2   A    Correct.

3   Q    As opposed to what we talked about earlier, a loan.

4   A    Yes.

5   Q    So looking at this document, would you agree with me that

6   your initial investment in '02 was for a loan and, according

7   to this document, are converted to ownership?

8            MR. MISKIEWICZ:  Objection.

9            THE COURT:  Sustained.  The document's in evidence.

10  You've already had him testify as to what his knowledge is.

11  Q    But just to be clear, you told us it was no more than

12  $500,000, is that correct, in this?

13  A    That was my understanding.  It was half a million.

14  Q    I don't have any other documents or I'd give it to you.

15           It was $500,000, correct?

16  A    Yes.

17  Q    Do you know -- did you ever receive the shares in

18  Diamanté Del Mar?

19  A    I don't think so.

20  Q    Do you know if a subscription membership agreement, which

21  is Defendant Exhibit C-5, takes the place of the shares and

22  gives you the ownership interest?  Do you know that?

23  A    No, I don't.

24  Q    Do you know the names Jason Wooley?

25  A    Yes.

1   Q    And Dimitri Khristich?

2   A    Yes.

3   Q    Who are they?

4   A    Former teammates.

5   Q    Which team?  I know you played on a lot of teams.

6   A    Jason Wooley, first played with him at the 1992 Olympics.

7   And I think it was in 1994.  I also played with him as part of

8   the '94 or '95 Washington Capitals.  And Dimitri Khristich, I

9   played with him with the Washington Capitals.

10  Q    Do you know if both Mr. Jason Wooley and Dimitri

11  Khristich also invested in Mr. Jowdy's project?

12  A    I can't say.

13  Q    Now, you mentioned a little while ago that Mr. Jowdy made

14  good, I believe is the word you said, on your investment?

15           MR. MISKIEWICZ:  Objection.

16           THE COURT:  Just ask the question.

17  Q    Did Mr. Jowdy make good on your investment?

18  A    I couldn't tell.

19  Q    Well, you testified earlier when we were talking about

20  whether you got the return on the investment that you began

21  talking about Mr. Jowdy, right?

22  A    Yes.

23  Q    All I'm asking you, did you -- you explain how he made

24  good, if he did, on the investment that you made of $500,000

25  in Diamanté Del Mar?

JUNEAU-CROSS-LaRUSSO                                    323

1    A     All I can say is that I ended up getting a percentage of

2    a development going on maybe -- maybe it's the business

3    eventually going on near Los Cabos.  But I've never seen the

4    development so I can't say that it was good or bad.

5    Q     Let me just clarify so I'm clear.  Your investment in

6    Diamanté Del Mar, that was a project in Northern Baja,

7    California, is that correct?

8    A     Yes.

9    Q     That particular project, if you know, built a runway and

10   nothing more.

11   A     Well, I mean, I went there once with Phil Kenner.  And

12   that's pretty much all I saw, was a runway and shoe sticks

13   marking different spots.

14   Q     What happened to the project in Diamanté Del Mar?

15   A     It fell apart, I guess.  I never found out really what

16   happened.

17   Q     You mentioned another project.  Would that be Cabo St.

18   Lucas?

19   A     Yes, that's it.

20   Q     Where is that located?

21   A     It's in California --

22   Q     In Southern Baja, is that fair?

23   A     Yes.

24   Q     So you can distinguish between the two projects.  Delmar

25   is in the north, which went nowhere, and Cabo is in the South,

1    is that correct?

2    A    Yes.

3    Q    Your investment in Del Mar, you said that you got some

4    interest in the southern project from Mr. Jowdy, is that

5    correct?

6    A    Yes, it is.

7    Q    Can you tell the ladies and gentlemen of the jury what

8    that is, if you recall it?

9    A    Well, it's a percentage of this project.  I'm not sure

10   what percentage it is.  But that was the agreement that we

11   made with Ken Jowdy.

12   Q    Would it be fair to say that the reason you came to that

13   agreement is because the project in Del Mar was going nowhere?

14   Would that be fair?

15   A    I wouldn't say that it was more because -- I believe his

16   name was on the -- also mentioned in the case, in the lawsuit

17   that I started.  You know, we somehow made contact with him

18   and came up with this kind of an agreement.  This thing we did

19   with Tom.

20   Q    Are you aware, were there any other hockey players that

21   invested in the Del Mar project?  I'll use that for purposes

22   of distinction, Northern Baja?

23            MR. MISKIEWICZ:  Objection.

24            THE COURT:  Overruled.

25   A    From discussions with Phil Kenner and information that I

1  got, there with other players also involved in that

2  investment.

3  Q    Did you know any of them?

4  A    I'm trying to remember.  I think Owen Nolan might have

5  been one.  Glen Murray might have been one.  Glen Murray, I

6  played with a little bit in Boston, but I can't say that I

7  really know him.

8  Q    Are you aware if any of those hockey players who invested

9  in Del Mar received the same deal that you got from Mr. Jowdy?

10  A    I don't know.

11  Q    So, you know, ultimately you lost all of your investment

12  in the northern project.  If you had -- would you have lost

13  that investment if you had stayed in the northern project,

14  Del Mar?

15  A    I think that's -- I don't know what would have happened.

16  Q    But you were fortunate enough to get Mr. Jowdy to

17  transfer your interest to Cabo, is that right?

18  A    Yeah.  I guess so, yes.

19  Q    Have you ever received any return on your investment for

20  the present project, the one in Cabo, South Baja, California?

21  A    Did I get money back?

22  Q    Yes.

23  A    No.

24  Q    I guess it would be -- in order to know if Mr. Jowdy made

25  good, you'd really have to wait and see.

1          MR. MISKIEWICZ:  Objection.

2          THE COURT:  Sustained.

3          MR. LaRUSSO:  Just a few more questions, if I may,

4   Your Honor.

5   Q    Earlier you testified that you actually didn't know if

6   you received your interest in Del Mar.  Do you remember that?

7   A    Yes.

8   Q    If you didn't receive your interest in Del Mar, how did

9   you trade it for your interest in Cabo?

10  A    How did I trade?

11  Q    How were you able to trade it if you didn't receive your

12  interest?

13  A    That was in the process of, like I mentioned, you know,

14  we just ended up communicating together.  And I'm not sure

15  exactly what led to this.  But I ended up accepting getting a

16  percentage in the Cabo project.  Being told, at that time,

17  that something would happen where nothing was happening in the

18  other project.

19  Q    Are you aware that the Diamanté Del Mar project has been

20  repossessed by the lender?

21         MR. MISKIEWICZ:  Objection.

22         THE COURT:  Sustained.

23         MR. LaRUSSO:  I have no further questions, Your

24  Honor.

25         THE COURT:  Anything further?

1          MR. MISKIEWICZ:  Yes, Your Honor.

2          THE COURT:  That being the case, when both sides

3    have questioned the witness, the side that called the witness

4    can ask very brief, very brief redirect questions to cover

5    anything that was covered in the cross.  So that's what's

6    happening now, okay.

7    REDIRECT EXAMINATION

8    BY MR. MISKIEWICZ:

9    Q    Mr. Juneau, you were shown by Mr. Haley earlier today

10   what is in evidence as, I believe, Defense Kenner 1.  Do you

11   remember seeing this document?  Do you remember Mr. Haley

12   showing you this document earlier today?

13   A    Yes.

14   Q    Do you see part of their document indicates, according to

15   this, that you received a percentage in the Little Isle IV

16   project.  And I'm pointing to your name, if I can find it.

17   You received 1.14 percent interest in this Hawaiian project.

18   A    Yes.

19   Q    What does Hawaii have to do with Mexico?  Does it?

20   A    I don't -- I mean, the only relation to me is that it's

21   the same financial advisor who advised me to go into both.

22   Q    Were they separate deals?

23   A    I think so, yeah.

24   Q    I'll show you this.  It's dated April 26, 2006.  Do you

25   see that's the agreement that's dated as of April 26, 2006?

1   A    Yes.

2   Q    Do you recall -- withdrawn.

3        June 17, 2006, Government Exhibit 733 in evidence,

4   this is one of those e-mails that you received from the

5   defendant, Kenner.  Correct me if I'm wrong, the last sentence

6   in that portion of the e-mail to you says (reading):

7        "The investment is 3 percent in Little Isle IV.  The

8   whole Hawaiian deal is worth (appraised land) approximately

9   90M right now."

10       You know what 90M means in dollars?

11  A    Well, 90 million.

12  Q    You asked for clarification at the end.  Can you read

13  what you say there, starting from the word "Is 3 percent"?

14  A    (Reading):

15       "Is 3 percent of my investment in Little Isle IV LLC

16  also 3 percent of the whole Hawaiian deal?"

17  Q    I'm sorry.  This precedes -- this line that you just read

18  at 6/17/06, 1:05 p.m., preceded this at 6:28 p.m..  In other

19  words, this is a response that you got from your question

20  about you have 3 percent investment in Little Isle IV.

21  A    It looks like the response.

22  Q    So why does the document -- if you actually saw this,

23  dated a couple of months earlier April 26, 2006, why would it

24  say that you say only 1.14 percent?

25  A    I couldn't tell you why.  I was presented with the

1  document.  I don't remember seeing this before.

2  Q    Well, would you have written in June of 2006 asking for

3  clarification about what you owned in Hawaii if you read this

4  document a couple of months earlier?

5  A    I don't think so.

6  Q    Now, there are many pages in this document that Mr. Haley

7  presented to you with what appear to be signatures of

8  different people, right?

9  A    Right.

10  Q    Now, come to the page with your signature.  I'm going to

11  ask you to compare it to the signature that appears in another

12  document in evidence, 2152.  Government's 2152.  Does it looks

13  like the same signature to you?

14  A    Not at all.  I mean, that's -- again, it was very

15  interesting to see this document earlier.

16  Q    For the record, the signature that appears on what is

17  supposedly page 9 of Defense Kenner 1, is that your signature?

18  A    This is not my signature.

19  Q    No?

20  A    Not at all.  It's obvious.

21  Q    Any doubt?

22  A    No doubt.

23  Q    No doubt it's not your signature?

24  A    No doubt.  One thing that I did a lot in my life is sign

25  my name on hockey cards and different things.  I never signed

1   that way.

2   Q    You were asked a series of questions by Mr. Haley about

3   e-mails and e-mails that you got from the FBI.  Do you recall

4   those questions this morning?

5   A    (No audible response.)

6   Q    Do you recall being asked those questions?

7   A    Yes.  I'm sorry.  Yes.

8   Q    Did you -- the e-mails that you were shown here, were

9   they your e-mails?

10  A    Yes, I believe so.  They really looked like my e-mails.

11  I would have to say they are.

12  Q    The e-mail that Mr. Haley showed you earlier, do you know

13  where he got that from?

14  A    No, I don't.

15  Q    You don't know?

16  A    No.

17  Q    Did Mr. Haley ever subpoena your e-mail, did he ever ask

18  you for all of your e-mails?

19  A    No.

20  Q    Would you be willing to give all of your e-mails to

21  Mr. Haley if he asked you?

22  A    If it helps the process, of course.  Why would I not?

23           MR. HALEY:  May we approach?

24           THE COURT:  I will sustain the objection.  I assume

25  that is an objection.

JUNEAU-REDIRECT-MISKIEWICZ                          331

1          MR. HALEY:  Yes, it is, Your Honor.

2    Q    Do you know if the FBI somehow took your e-mails and

3    deleted some of them?  Do you have any reason to believe that

4    happened?

5    A    Not at all.

6    Q    Mr. Haley went over this morning and asked you a series

7    of questions about what you knew about the line of credit when

8    you spoke to the FBI.  Do you remember being asked that series

9    of questions like that?

10   A    Yes.

11   Q    In 2009, do you remember what you told the FBI about your

12   comfort level regarding the lines of credit and what it was

13   being used for?

14   A    I don't remember it.

15          MR. MISKIEWICZ:  May I approach?

16          THE COURT:  Yes.

17   Q    I'm showing you what's been marked as 3500.

18          MR. HALEY:  Your Honor, the witness was not

19   permitted to finish the answer before the government said,

20   "May I approach."

21          THE COURT:  You may finish.

22   A    I don't remember the discussion of 2009 with the FBI.

23   Q    I'm showing you what's been marked as 3500 JJ-1.  Just

24   take a moment.  I'm going to point to it.  Read it to

25   yourself.  And then I'm going to ask you some questions.

1          (Handing.)

2          Does that refresh your recollection what you told

3    the FBI in 2009, what your feeling was about this line of

4    credit for Hawaii?

5    A    I'm sorry, it doesn't refresh.  I don't remember the

6    conversation that day.  I'm not sure what it was.

7    Q    All right.  Forget the FBI interview in 2009.  In 2004,

8    2005, 2006, when the line of credit was open, did you feel

9    comfortable with what Mr. Kenner was doing with it?

10   A    With what?

11   Q    With your line of credit in Hawaii?

12   A    I mean, I don't remember being aware of opening the line

13   of credit in relation to this loan, in relation to this.  In

14   the situation I was in at the time, I was just asking to get

15   out of whatever I was in.  I mean, I was not in a position to

16   go into something else.

17   Q    In 2009 you had learned what it was for, right?  About

18   the line of credit?

19   A    2006 or 2007 when I received the Northern Trust letter.

20   Q    What did you receive from Northern Trust?

21   A    I think I was away.  I don't know if I was away in Munich

22   for the kids up there.  Anyway, I end up getting a letter that

23   was past due and saying that I had a line of credit that was

24   deficient.  So that's -- from what I remember, that's the

25   e-mail that I saw.  Getting in touch by e-mail with Phil

1  Kenner asking about it.  And then decided to contact Northern

2  Trust directly.

3  Q    Why did that come as a surprise to you, that you had a

4  past due on your line of credit?

5  A    Well, I didn't recall having a line of credit in the

6  first place.  So the whole thing was very surprising.  I was

7  trying to figure out what this was.

8  Q    You testified eventually you got a communication from the

9  Northern Trust Bank saying that the line of credit had been

10  paid over, right?

11  A    Correct.

12  Q    Do you know where Mr. Kenner got the money to pay off

13  your $500,000 line of credit?

14  A    No.  No.

15  Q    You know Owen Nolan, you testified a moment ago you do.

16  A    Yes.  Well, I mean, I know him.  I played against him.  I

17  have met him that one time in Arizona.

18  Q    Did you ever borrow $500,000 from Mr. Owen Nolan?

19        MR. HALEY:  I would object at this point.  He's

20  going outside the scope of the direct.

21        THE COURT:  I think that question is okay.  You can

22  answer that.

23  A    So I never borrowed money from -- from anyone in that

24  amount.  I mean, I didn't borrow money from Owen Nolan.

25  Q    When Mr. Haley showed you an e-mail in which Mr. Kenner

1  said I paid your loan off --

2  A    Yes, I saw that.

3  Q    -- if there are bank records showing that the money came

4  from Owen Nolan to pay off your line of credit, why would he

5  do that?

6           MR. HALEY:  Objection.

7           THE COURT:  Sustained.  Let's finish up the

8  redirect.

9  Q    You were also shown by Mr. LaRusso a rather lengthy

10  e-mail.  I want to go over a couple of things on this e-mail,

11  the e-mail chain between yourself and Tony Constantine

12  regarding the settlement.  I highlighted a couple of portions

13  of the exhibit, which is the Defendant's Exhibit 13-607.

14  Mr. Constantine says, at one point, in response to your e-mail

15  (reading):

16           "You have been grossly ill advised by your attorneys

17  and their so-called experts, as well as by a couple of

18  disgruntled former employees/colleague of Phil's who know

19  absolutely nothing about me or my business."

20           Do you know if any of that is true?

21  A    That was someone's perception.

22  Q    Turning to the next page.  (Reading):

23           "As far as your accusation towards Phil, you can

24  blame him all you want for whatever has happened between all

25  of are us, but those three of you who are grown, intelligent

1  men, did not care enough to look into your own investment, not

2  even enough to make a phone call in several years, cannot

3  blame Phil when 15 to 20 other investor clients are in

4  constant communication with me and have no issues whatsoever

5  with their investments or their relationship with anyone

6  involved."

7          Other than what's in here, do you know if that's

8  true; 15 or 20 other investor clients are in constant

9  communication with me and have no issues whatsoever?

10  A    I couldn't say it is.

11  Q    Other than Mr. Constantine saying so in this e-mail, do

12  you know -- do you agree or disagree with the truth of this

13  statement?

14  A    Not at all.

15  Q    Lastly, on the third page, it says, at one point

16  (reading):

17          "Please also note" -- in the e-mail on May 5th, on

18  line 9 here, it states that -- "I have a very limited window

19  of opportunity to pay you.  And basically, if you or your

20  attorneys screw around, we will not be able to execute a

21  settlement."

22          Do you know why there was a limited window of

23  opportunity to pay you back for your $550,000 investment?

24  A    No.

25  Q    You said earlier, in this same e-mail that Mr. LaRusso

1   showed you, this is you speaking to -- or e-mailing

2   Mr. Constantine (reading):

3          "You informed during our phone discussion last

4   Wednesday that you really want to pay me back the $550,000."

5          Was that a conversation that you had directly with

6   Mr. Constantine?

7   A    I think so.

8   Q    Did he say to you that he was prepared to pay you cash,

9   $550,000?

10  A    Yes, it seemed like it.

11  Q    Did there come another time when he said he couldn't pay

12  you $550,000?

13  A    I believe the next conversation, because of money he had

14  to pay his lawyer or something, that it was not possible for

15  him to do that anymore.

16  Q    He got out of the deal?

17  A    Yes.

18          MR. MISKIEWICZ:  No further questions.

19          THE COURT:  Anything further, Mr. Haley?

20          MR. HALEY:  Very brief, Your Honor.

21  RECROSS-EXAMINATION

22  BY MR. HALEY:

23  Q    Sir, kindly take a look at Kenner Exhibit 1.  It relates

24  to page 9.  We can agree that's not your signature, is that

25  correct?

1    A    That's correct.

2    Q    That signature appears to be placed on the wrong line, is

3    that correct?

4    A    Well, it's on the line --

5              MR. MISKIEWICZ:  Objection.

6              THE COURT:  Stick to the point.

7    Q    Sir, are you familiar with the signature of Dimitri

8    Khristich?

9    A    No.

10             MR. HALEY:  Judge, I'm not going to conduct a

11   recross based on the redirect.  I'll rely on my previous

12   cross-examination.

13             THE COURT:  Mr. LaRusso?

14             MR. LaRUSSO:  A few questions.

15   RECROSS-EXAMINATION

16   BY MR. LaRUSSO:

17   Q    Is it fair to say in the situation with Mr. Constantine,

18   more time would equal more legal fees?

19   A    Well --

20   Q    More than you can spend negotiating, settling, more legal

21   fees would be piling up, is that correct?

22   A    Well, at that time there was no legal fees involved

23   because it was between us.  I mean, on my side, anyway.

24   Q    But if you didn't settle it would require more legal fees

25   to file a suit, hire a lawyer in order to pursue it, correct?

1   A     Probably, yes.

2   Q     You spent a lot of money on the initial suit, is that

3   correct?

4   A     Actually, yes.

5   Q     Mr. Constantine wanted to give you the opportunity,

6   instead of paying the lawyers.  That's what he did, right?

7              MR. MISKIEWICZ:  Objection.

8              THE COURT:  Sustained as to the form.

9              MR. LaRUSSO:  No questions.

10             THE COURT:  You can step down.  Thank you,

11  Mr. Juneau.

12             (Witness excused at 3:30 p.m.)

13             We will take our break.  I know it's late in coming,

14  but I appreciate your patience.  Then we will be calling the

15  next witness.  Don't discuss the case.

16             (Whereupon the jury leaves the courtroom at 3:30

17  p.m.)

18             A JUROR:  How much time?

19             THE COURT:  20 minutes.

20             Who's the next witness?

21             MR. MISKIEWICZ:  Michael Peca, P-E-C-A.

22             (Whereupon a recess was taken.)

23

24

25

Peca - Direct/Mr. Miskiewicz

339

1          (After recess)

2          THE COURT:  Members of the jury, I'm going to

3  ask the government to call its next witness

4          MR. MISKIEWICZ:  The government calls Michael

5  Peca.

6          THE COURT:  Mr. Peca.  If you would just step

7  over here next to the witness stand and remain standing

8  for the oath once you get there.

9

10  **MICHAEL PECA**

11          called as a witness, having been first duly sworn,

12          was examined and testified as follows:

13          THE CLERK:  Please state your name and spell it

14  for the record.

15          THE WITNESS:  Michael M-I-C-H-A-E-L, last name

16  Peca, P-E-C-A.

17          THE COURT:  Please be seated.  If you could just

18  pull your chair a little closer to the mic.  Thank you.

19          Go ahead, Mr. Miskiewicz.

20          MR. MISKIEWICZ:  Thank you, your Honor.

21

22  DIRECT EXAMINATION

23  BY MR. MISKIEWICZ:

24  Q    Good afternoon, sir.

25          Mr. Peca, is it correct, sir, that you're

340

1    currently retired?

2    A    Correct.

3    Q    And what are you retired from?  What did you used to

4    do for a living?

5    A    I was a professional hockey player.

6    Q    And when did you first become a professional hockey

7    player?

8    A    My first year in professional hockey was the '94/'95

9    season.

10   Q    Who did you play for in the '94/'95 season?

11   A    Vancouver Canucks.

12   Q    And what other teams, if any, did you play for in

13   your career with the NHL?

14   A    In order, Vancouver, Buffalo, New York Islanders,

15   Edmonton Oilers, Toronto Maple Leafs, Columbus.

16   Q    And when did you retire?

17   A    I retired in the 2008/2009 season.

18   Q    And where did you grow up?

19   A    I grew up just outside of Toronto in the suburb of

20   Northrup.  It's a suburb.

21   Q    And what kind of a town or what kind of area did you

22   grow up in?

23   A    Not the greatest neighborhoods.  I came from a family

24   that didn't have a lot of money.  So I don't remember

25   where we actually    lived.  We moved eight times in an

341

1    eleven period.

2    Q    So when did you begin playing hockey?

3    A    I started skating when I was two years old.  They

4    just decided to start me when they started my older

5    brother who is two years older than I am.  So I started

6    skating when I was two, and played until I was 16.

7    Q    Is it fair to say that this was a life's ambition to

8    play professional hockey?

9    A    Yes.  I know I think like any kid you grow up and you

10   love the game.  And you watch your favorite team on

11   television.  And you grow up wanting to be a national

12   hockey player.

13          But as I grew up for me hockey was the thing I

14   loved to do.  Again because my family background was, both

15   of my parents never graduated high school.  So for me, I

16   wanted to go college.  That was my ambition.

17   Q    What if anything did you do?  Well first of all, did

18   you go to college?

19   A    I did not.

20   Q    Did you decide to sign instead with the NHL?

21   A    No.  The process was, I verbally committed to

22   Michigan State.  But then decided the night before the OHL

23   draft, which is a major union league in Ontario, to enter

24   the graft for the OHL.

25          In doing so I received a four year school

Peca - Direct/Mr. Miskiewicz

342

1    package with the Sudbury Wolves.

2    Q    Is that S-U-D-B-U-R-Y?

3    A    Correct.

4    Q    What kind of things did you do to prepare yourself to

5    become a professional athlete in the NHL?

6    A    As a kid growing up, you know, you get to an age

7    where you start to realize what your dream is.  You know,

8    you see guys that help you ahead.  They make the

9    progression to junior hockey, and then they start to move

10   on.

11            So it starts to become a little more of a

12   reality.  So when that happens you realize that there is

13   going to be a lot more work involved.  It's, it goes

14   beyond just being on the ice and playing the game.  And it

15   involves now training away from home.

16            Given the fact that we grew up and we didn't

17   have a lot of the money, we had to improvise.  We had to

18   do pushups and pull ups.  And I remember being a kid and

19   hearing the you know a football player from the Dallas

20   Cowboys running back just did pushups and pull ups.  AND

21   that is what I was limited to because I couldn't join a

22   gym or hire a trainer.

23            I would run a lot.  I remember one time I was

24   running and somebody on the street had tires out front

25   that were going to be put in the garbage.  So I thought I

343

1    might as well take one of them.  And so occasionally I

2    would take a tire and go to track and just run the track

3    dragging a tire.

4    Q    Are you currently a resident of New York State?

5    A    I am.

6    Q    And what do you do now that you're retired, if

7    anything?

8    A    I am the director of hockey operations for a youth

9    hockey program in the Buffalo area, Buffalo --

10   Q    Mr. Peca, do you know the defendant, one of the

11   defendants in this case, a man by the name of Philip

12   Kenner?

13   A    Yes, I do.

14   Q    Do you see him in the courtroom today?

15   A    I do.

16   Q    Would you point to him and describe an article of

17   clothing he is wearing?

18   A    Right over here wearing a white button-down shirt and

19   longish hair.

20            MR. MISKIEWICZ:  May the record reflect that

21   Mr. Peca has identified the defendant?

22            MR. HALEY:  Yes, sir.

23            THE COURT:  Yes.

24            MR. MISKIEWICZ:  Thank you.

25

Peca - Direct/Mr. Miskiewicz

344

1   BY MR. MISKIEWICZ:

2   Q    When did you first meet Mr. Kenner?

3   A    I first met Phil, I think it was in -- my first year

4   in Buffalo was '95/'96.  So it was at the conclusion of

5   the '95/'96 season or the beginning of the '96/'97 season

6   while I was in Buffalo.

7   Q    And how did you come to meet him?

8   A    He was introduced to me from a player at the Anton

9   Thun.

10  Q    And was this just a social introduction, or was there

11  any other business purpose for this introduction?

12  A    The purpose was to kind of get me onto a path of

13  saving some money.  I played my rookie year in Vancouver

14  and at the conclusion of my rookie season I was traded to

15  the Buffalo Sabers.

16        And in doing so my interest at the time for tax

17  purposes I moved a lot of my financial stuff which

18  actually wasn't a whole lot in the United States.  And

19  while I was in the states for a little while, Phil Kenner

20  was the first guy that was introduced to me for that

21  reason.

22  Q    Did there come a time that you hired or engaged

23  Mr. Kenner to be your financial advisor?

24  A    Yes.  I can't remember if it was at the spa the first

25  meeting or if we had a second meeting.  I remember, you

345

1    know the presentation involved Derek Sanderson who was the

2    first NHL player to sign a million dollar contract from

3    Boston.  And I remember Phil telling a long touching story

4    about Derek Sanderson, where he was conned by his advisor

5    for a million dollars.  So I was sitting there listening

6    to him telling the story about Derek Sanderson who is also

7    in the room.  It was obviously a very compelling story.

8    Q    Do you know what, do you k now whether or not he was

9    still at that time working at a company called State

10   Street?

11   A    Well that was the firm that he was at the time when I

12   first started working with him.  It was a company called

13   State Street Capital.

14   Q    And this was approximately 1996, '97?

15   A    Correct, yes.

16   Q    How long did you continue using the services of

17   Mr. Kenner as a financial advisor?

18   A    The termination of the process wasn't a, you're fired

19   sort of thing.  It was a slow erosion of our business

20   relationship.  You know, which was kind of the two years

21   of '07 to '09.

22   Q    Now so between '96/'97 and '07 to '09, did Mr. Kenner

23   stay in one company or did he move to different companies?

24   A    There were several companies.

25   Q    Do you just recall any of the names?

Peca - Direct/Mr. Miskiewicz

346

1    A    Yes.  From State Street he moved over to Asante

2    Global Advisors.  And from there he started his own firm

3    called Standard Advisors.

4    Q    Now when he was your financial advisor at any of

5    these firms, did you pay a fee, or how was he compensated

6    for the work he would do for you?

7    A    The fees were usually based on a percentage of your

8    total investment dollars.

9    Q    So is it correct that you had some sort of portfolio

10   that had a total amount of money in it and he was getting

11   a fee that was equal to a percentage of that?

12   A    Correct.

13   Q    Do you remember how often he would get paid?

14   A    It would be billed quarterly out of our investment

15   account.

16   Q    And do you know how the draw down from your

17   investment account would occur?  In other words, how would

18   he get paid?  Would you write him a check every quarter?

19   A    It would be deducted or withdrawn from our investment

20   account.

21   Q    Deducted or withdrawn by whom?

22   A    By the institution that, or bank that the, where the

23   money was being held.

24   Q    And during this period of time, you were living in

25   various different states, correct?

Peca - Direct/Mr. Miskiewicz

347

1   A    Correct, and countries.

2   Q    Okay, I just want to just focus your attention now to

3   the period of let's say approximately 2002/2003.  Where

4   were you living?

5   A    2002/2003 I was living on Long Island, New York.

6   Q    Do you know where Mr. Kenner was living?

7   A    I believe Mr. Kenner was on Long Island.

8   Q    And did you communicate with Mr. Kenner during this

9   period of time?

10  A    Yes.

11  Q    How would you communicate with him?

12  A    There would be phone calls, e-mails, in person

13  meetings, various ways.

14  Q    Beginning in '96/'97 and up through the early 2000's,

15  could you describe what kinds of investment options did

16  Mr. Kenner place you in and was managing you in?

17  A    Well the program from the outset was that, exactly

18  what we were looking for.  You know, I came from mumble

19  beginnings, so I didn't live a frivolous lifestyle.  And

20  the way the program was basically set up is, you know, if

21  this is what I made but this is all I need to live on on a

22  monthly basis, I would basically get that stipend wired in

23  my account for State Street and the rest would remain as a

24  direct deposit in my investment account.

25  Q    What kind of investments were these?

Peca - Direct/Mr. Miskiewicz

348

1    A    At the time it was just limited to stock market which

2    he put in large cap and small cap US stocks and different

3    things like that.

4    Q    Bonds?

5    A    It might have been some bonds early on.  I wasn't

6    making, relatively a lot of money.  So I can't remember

7    exactly.

8    Q    Did there come a time -- moving forward to

9    approximately the year 2003.

10            Did there come a time that your investments or

11   the type of your investment expanded or changed to land

12   development properties?

13   A    Everything was fairly conservative up until I signed

14   a five year contract in 2001 with the New York Islanders.

15   Q    And okay, and was that a contract that was made you a

16   lot of money?

17   A    It did.

18   Q    And then from that moment on did your investments

19   change?

20   A    Yes.

21            You know that the conversation turned to

22   diversifying, which meant, you know, not just having

23   everything in the stock market, but now, you know, branch

24   out him into other options, whether it be real estate or

25   other sorts of companies.

Peca - Direct/Mr. Miskiewicz

349

1   Q     I want to focus your attention to one item.

2         Did you ever, were you ever talking to anyone

3   about a potential land development project in the state of

4   Hawaii?

5   A     I was.

6   Q     And who talked to you about that?

7   A     Phil Kenner.

8   Q     Can you tell the members of the jury, what was the

9   nature of this Hawaii project if you recall?

10  A     Well, it was going to be a land acquisition.  There

11  was tons of acres on, I can't remember if it was the

12  southeast or southwest shore of the big island of Hawaii.

13        At the time I was told it was mostly sugarcane

14  farms and coffee bean farms.  And the plan was to, you

15  know, develop it, build ranches for residential use.

16  There was talk about a commercial part of the property

17  that was on the inland side of an interstate road that ran

18  through the property.  So I mean it seemed interesting to

19  listen to.

20  Q     And when you say it was talked about, somebody said

21  something to you?  Who, who were you referring to?

22  A     Say that again?

23  Q     When you say you were told about this project, who

24  told you about the project?

25  A     Phil.

350

```
1   Q    In this period of time, 2003, anybody else other than
2   Mr. Kenner talk to you about this property?
3   A    No.
4   Q    By the way, by 2003 you had been in the NHL for five
5   or six years, I guess.  What kind of a relationship did
6   you have with the defendant?  Was it purely business or
7   ways it social or a mix?
8   A    I mean to draw a comparison if I could, I mean he was
9   in a lot of respects like Jerry Maguire in the sense that
10  he wasn't just my agent.  But the relationship was very
11  similar.  It was very personal.  And he had been at the
12  house.  I had been at his house in Scottsdale, Arizona, I
13  knew his family well.  I wouldn't consider this just a
14  business relationship.  I wouldn't even consider him as a
15  friend.  I would consider him as very good friend.
16  Q    When you say, mention Jerry Maguire, you're talking
17  about the movie character?
18  A    Correct.
19  Q    The land in Hawaii, do you know if the lands that
20  were to be acquired was it already developed, or was it
21  vacant land?
22  A    Like I said, I think that -- I don't know if there is
23  a lot of anything at all that I can remember from the
24  conversation.  It was mostly sugarcane farms and coffee
25  bean farms.
```

351

1    Q    Did you ever travel to Hawaii to look at the

2    property?

3    A    I never had an opportunity to get there, no.

4    Q    So your description of the property, it came from

5    Mr. Kenner?

6    A    Correct.

7    Q    So did there ever come a time that you decided

8    whether or not to invest in this project in Hawaii?

9    A    Yes.  After you know, talking about it a little bit I

10   did decide to make that investment.

11   Q    And how much money did you invest in the project?

12   A    The investment was in two pieces.  There was a

13   hundred thousand dollars cash portion that was invested.

14   And then there was going to be a line of credit for

15   $1.775 million that I had the ability to do.  That was

16   also going to be invested, which was going to be used, I

17   was told to expedite some of the vertical construction,

18   building some ranches, infrastructure, things like that.

19   And that was to give me roughly 12 to 13 percent of the

20   Little Isle IV, LLC.

21   Q    Now first of all, what is Little Isle IV?  Tell the

22   members of the jury what is the Little Isle IV?

23   A    Little Isle IV was the investment company group that

24   was going to be used to basically develop the land in

25   Hawaii.

Peca - Direct/Mr. Miskiewicz

352

1   Q    Do you know who created Little Isle IV?

2   A    I think Phil Kenner did.

3   Q    And your investments were going to go through Little

4   Isle IV, the cash, your line of credit was going do go

5   through Little Isle IV?

6   A    Correct.

7   Q    And you would have been given -- I'm sorry.  What

8   percentage of it?

9   A    The way Phil described it, he would give us 12 to 13

10  percent of roughly fifty percent of the project.

11  Q    Okay, your understanding was Mr. Kenner's Little Isle

12  IV was one of a few companies that had some sort of

13  involvement in the Hawaii project?

14  A    I wasn't aware of any others.

15  Q    So did you in fact wire transfer $100,000?

16  A    We did wire transfer a hundred thousand, correct.

17  Q    By the way, this is again roughly 2003.  Where you

18  were living?

19  A    Long Island, Huntington Bay, New York.

20  Q    And so you would have, is that where you were when

21  you executed the wire?

22  A    I believe so.  I mean if there was an off season we

23  would have been back home in Buffalo.  But I think it was

24  during the season to the best of my knowledge.

25  Q    Do you remember where you sent money, what bank?

353

1   A    No, I don't recall exactly.

2   Q    Now this line of credit that was for $1.775 million.

3   Where -- well, did you agree to enter into a line of

4   credit or take out a line of credit?

5   A    Did I agree to it?

6   Q    Yes.

7   A    Yes.

8   Q    And what was the collateral, or what was securing

9   that line of credit in the event that you did draw down on

10  it?

11  A    Well, the way it was described to us is, a lot of

12  money was going to Northern Trust.  So if it went to

13  Northern Trust, I was going to open a line of credit.  And

14  the way that Phil described it is a good faith gesture.

15  We're going to open and they will manage our bond account,

16  which at the time was a big thing for my wife and I,

17  because, you know, the market started to strain and we

18  wanted to make sure we were fifty-fifty in our portfolio

19  at the time.

20          So we agreed to move our bond portfolio from

21  Schwab over to Northern Trust so that they could manage it

22  at the time.

23  Q    Why Northern Trust?

24  A    I guess that's where the LLC was set up at the time.

25  Or that is just where the line of credit was.

Peca - Direct/Mr. Miskiewicz

354

1   Q    Who told you to move it to, or who told you to open a

2   line of credit -- I mean the line of credit I suppose

3   could have been opened anywhere.  Who directed you, if

4   anybody, to Northern Trust?

5   A    Phil did.

6   Q    And so you said you had a bond account in Schwab?

7   A    Correct.  That's, Schwab Bank is where our, was our

8   custodian at the time, where our investment portfolio was

9   set up.

10  Q    And you transferred what was in that bond account to

11  Northern Trust?

12  A    Correct.

13  Q    And then what was in there was going to be the

14  collateral for the line of credit?

15  A    It was, yeah.  You know the at the onset of the

16  decision to do this, which were told this is going to be a

17  six to nine month thing.  ]

18        Phil said it would be six to nine months, we are

19  going to get some vertical construction going.  We want to

20  get this thing moving forward.  And we want to get some

21  financing that will come through.  And we will take down

22  the line of credit.  And we'll move the bond account back

23  over to Schwab.

24  Q    This bond account, what did it represent to you, how

25  important was it?

Peca - Direct/Mr. Miskiewicz

355

1    A    It was, I think in all essence it represented our

2    safety net.  You know, when the stock market after 2011

3    became fairly unpredictable.  And it was our safety net.

4    It really was.

5    Q    Would you say this was your retirement account?

6    A    A large part of it, absolutely.

7    Q    Now you said Mr. Kenner never told you this was going

8    to be -- was it the line of credit that was only going to

9    be around for a few months, or was it the whole project

10   was going to be done in a few months?

11   A    The line of credit whatever it was going to be paid

12   back and our bond account would be getting moved back to

13   Schwab in six to nine months.

14   Q    From the time you opened it?

15   A    Correct.

16   Q    Did that happen?

17   A    It did not.

18   Q    Did Mr. Kenner make any other representations to you

19   about if the line of credit was drawn against, anything

20   having to do with -- how would you pay any interest or

21   anything like that, that accrued on the line of credit?

22   A    He said that he would be responsible for any interest

23   payments or any monies to be paid back into the account.

24   And I remember at one point he said there was $40,000 or

25   something from the project that did get put back into the

356

1   account.

2   Q    And did he ever indicate to you that, what the level

3   of risk was if you were getting yourself into by opening

4   up this line of credit?

5   A    No.  Just reassured that it was a short-term thing.

6   Q    When you opened up a line of credit with Northern

7   Trust, if -- you said the money would be used as

8   represented to you, the money would be used for vertical

9   construction?  What does that mean?

10  A    Well just the talk was there would be two to five

11  acre properties for residential purposes.  And they would

12  be building ranches and things like that.  And the plan

13  was to build a couple of model ranches, get some

14  prospective buyers in there and start selling off the

15  land.

16  Q    And did you have any other, did you at that point

17  when you first opened this line of credit, was the money

18  that would be available for your line of credit, was it to

19  be used for any other purposes other than Hawaii project?

20  A    Nothing indicated to me beforehand, no.

21  Q    Okay.  I want to just be very, very specific here.

22        Did Mr. Kenner tell you -- what if anything did

23  Mr. Kenner tell you about where the money from the line of

24  credit would go to, if it was going to be drawn against at

25  all?

Peca - Direct/Mr. Miskiewicz

357

1   A    I was told that the line of credit would be used

2   solely and only for the Hawaii project.

3   Q    Did you know whether or not, and did you authorize

4   Mr. Kenner to have access to your line of credit?

5   A    Yes, I did.

6   Q    I'm showing you what has been marked for

7   identification as Government Exhibit 2142.

8           Showing you government's 2142.  Mr. Peca, take a

9   moment and look at that.

10          Do you recognize that?

11  A    I do.

12  Q    Do you recognize the signature?

13  A    Yes.  It's my signature.

14  Q    And what is that document?

15  A    It's just allowing Phil access to the referenced line

16  of credit money to be deposited to Little Isle IV.

17          MR. MISKIEWICZ:  Government moves for the

18  admission of 2142.

19          MR. HALEY:  No objection, your Honor.

20          MR. LaRUSSO:  No objection, your Honor.

21          THE COURT:  Government Exhibit 2142 is admitted.

22          (Government Exhibit 2142 in evidence.)

23  BY MR. MISKIEWICZ:

24  Q    Just very briefly for the record.  What is the date.

25  You can see it on the screen or above you.

358

1    A    March 11, 2005.

2    Q    Is that at or about the time that the line of credit

3    went into effect?

4    A    It's about the right time, yes.

5    Q    And do you see where it says Northern Trust Bank line

6    of credit?  Could you read the account number?

7    A    289369.

8    Q    That was the line of credit opened in your name,

9    correct?

10   A    Correct.

11   Q    Now did you get monthly statements when you were, you

12   know, when you had your bond account, or whatever, your

13   stocks and bonds?  Did you get monthly statements from the

14   banks that were, for which your investments were being

15   traded?

16   A    Yes.  The only thing I received from Northern Trust

17   Bank was the activity reports on a monthly basis with

18   relation to the bond account.

19   Q    The bond account meaning what was, meaning

20   collateral?

21   A    Correct.

22   Q    And during this period of time, what do you recall,

23   what did those statements indicate?  Were you losing

24   money?  What was going on?  Was there anything unusual

25   about what you saw in those monthly accounts?

Peca - Direct/Mr. Miskiewicz

359

1    A    No.  The last time the bond account always seemed to

2    have pretty steady success in a positive way.

3    Q    Did you get any monthly or quarterly statements for

4    the line of credit account?

5    A    I did not.

6    Q    Do you know where they were mailed to?

7    A    I did not at the outset, no.

8    Q    I'm just talking about at that time.  Did you know

9    where they were mailed to?

10   A    I did not.

11        MR. MISKIEWICZ:  Your Honor, pursuant to

12   stipulation by the parties, the government moves for the

13   admission of Government Exhibit 2001.

14        THE COURT:  Is that correct?

15        MR. HALEY:  Yes sir.  I'm sorry.

16        MR. LaRUSSO:  Yes, your Honor.

17        THE COURT:  2001 is admitted.

18        (Government Exhibit 2001 in evidence.)

19   BY MR. MISKIEWICZ:

20   Q    Mr. Peca, looking at 2001.  Looking at the first page

21   of 2001.

22        Do you see your name at the very top left-hand

23   corner?

24   A    I do.

25   Q    And do you see that number 2889369?

Peca - Direct/Mr. Miskiewicz

360

1    A    I do.

2    Q    Is that your line of credit account number?  Is that

3    the same line of credit account number as 2042, if you

4    recall?

5    A    It is.

6    Q    If I can, I'm showing you 2142 right below it.  Do

7    you see that number 289369?

8    A    Yes.

9    Q    The same number as what is on the Government Exhibit

10   2001?

11   A    Yes.

12   Q    Have you ever seen -- not have you ever seen.

13            During the time you had this line of credit,

14   have you ever a document like this?

15   A    I have never seen a loan transaction history ever.

16   Q    For your line of credit?

17   A    Correct.

18   Q    I'm going to show you what has been marked for

19   identification purposes as Government Exhibit 2002.

20            MR. MISKIEWICZ:  Again, your Honor, pursuant to

21   stipulation between the parties the government now moves

22   for the admission of Government Exhibit 2002.

23            THE COURT:  Correct?

24            MR. HALEY:  Yes, sir.

25            MR. LaRUSSO:  No objection.

Peca - Direct/Mr. Miskiewicz

361

1          THE COURT:  2002 is admitted.

2          (Government Exhibit 2002 in evidence.)

3   BY MR. MISKIEWICZ:

4   Q    Mr. Peca, if you would look at 2002.  First of all,

5   at the time of any of the dates here, specifically 2003,

6   did you ever see this document back then in 2003?

7   A    I did not.

8   Q    Or this one, one line there?  On or about October 19,

9   do you see where it said description net proceeds?

10  A    I do.

11  Q    And this is under a heading called, deposits and

12  credits.  Do you see where the loan account number is

13  stated in the middle?

14  A    I do.

15  Q    Can you read the account number?

16  A    289369.

17  Q    Whose line of credit is that?

18  A    That would be mine.

19  Q    Do you see $395,000 being deposited or indicated

20  there being deposited?

21  A    I do.

22  Q    At the time that of this transaction, were you

23  advised that this was going on?

24  A    No.

25  Q    You never received this or anything like this that

Peca - Direct/Mr. Miskiewicz

362

1  would tell you that $395,000 of your line of credit went

2  somewhere?

3  A    I never received any transaction history from the

4  line of credit at all.

5           MR. MISKIEWICZ:  Your Honor?

6           THE COURT:  Yes, it's time to break.  It's 4:30,

7  so we'll reconvene tomorrow morning at 9:30.

8           Don't discuss the case.

9           Don't read or listen to anything regarding the

10  case.

11           Have a good night and safe trip home.

12           (The jury left the courtroom.)

13           (Continued on the following page.).

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  You can step down.  Everyone can be

2     seated.

3           I want to put a couple of rulings on the record

4     on the last witness to the government's objections.  The

5     government objected to one of the documents coming in

6     because the witness did not recall whether he had all the

7     pages of -- Mr. Juneau could not recall whether all the

8     pages of the document were together or he saw pages

9     together, and I concluded that should go to the weight of

10    the evidence once he identified that signature, that

11    particular document it appeared to be a signature, it

12    appeared to be his signature.  I thought it was a

13    sufficient basis for the defense to offer it.  Whether or

14    not he received the entire document goes to the weight of

15    the evidence based upon his other testimony or testimony

16    from any other witness.

17          There were a number of objections about the

18    e-mails with Mr. Constantine, it was a long e-mail about

19    Mr. Constantine and some objections with respect to some

20    of the airplane testimony and, I guess, documentation.  I

21    think the government opened the door by going into some

22    detail as to the settlement and the interaction between

23    Mr. Constantine and Mr. Juneau, they opened the door to

24    allowing Mr. La Russo to then put in other exchanges and

25    interactions to try to establish -- even though I did tell

364

1    the jury that there was no allegation that the settlement

2    itself was fraudulent because the government, as

3    Mr. La Russo did throw out, did throw out evaluations and

4    things like that, I allowed him to do that.  If the only

5    purpose for getting the airplane in was to show that

6    Mr. Constantine had an airplane, that was the purpose of

7    it, then I don't know why there was a level of detail with

8    respect to the valuation/, that wasn't the point of the

9    testimony.  But once that door was opened, that door --

10   and Mr. Haley with respect to the e-mails, too, I think

11   it's permissible to try to establish what the nature of

12   the relationship was in terms of the level of

13   communication, the nature of the communication, the

14   frequency of the communication, because that could be

15   relevant as relates to the allegations in the case.  So

16   that was the basis for the Court's ruling.

17            MR. MISKIEWICZ:  Thank you, your Honor.

18            THE COURT:  With respect to Mr. Peca, do you

19   expect any issues tomorrow with respect to any documents?

20   I'm hoping that we can streamline any documentary issues.

21   I see there were stipulations today.  But are there any

22   issues like Mr. La Russo, the point you raised to me, with

23   Mr. Juneau, I want to know if there are any issues like

24   that tomorrow with Mr. Peca?

25            MR. MISKIEWICZ:  With respect to the

365

1    government's direct I don't know of any issues, and I

2    think most of the bank records if not all the bank records

3    I'm going to be showing him are the subject of

4    stipulations.

5            What I would, what I will do overnight is I'll

6    assemble all of the exhibits that are part of one or other

7    stipulations and move them in en mass.

8            THE COURT:  That would be efficient.

9            MR. HALEY:  I have a few additions.  I echo the

10   Court, if Mr. Miskiewicz would, I know he will, I don't

11   represent these are all exclusively because he hasn't

12   finished testifying yet.

13           THE COURT:  Mr. La Russo, show the government

14   any exhibits that you claim need interpretation at trial

15   to cross, see if they have an objection, and the same

16   thing that he's proposing to do.  If the government has no

17   objection to a series of exhibits, I think it would be

18   efficient to offer the series of exhibits in the beginning

19   of cross en mass so we're not offering them one by one.

20   So you're in agreement.  I think it will save time.

21   You're all experienced lawyers, you know the jury will get

22   frustrated that I'm not using the time efficiently.  I

23   really want to start at 9:30 tomorrow morning.  If I tell

24   them 9:30 and we don't start 9:40 or 9:50 that's not a

25   good practice.

366

1        MR. HALEY:  The issue -- I will go back to my

2   office today, your Honor, make a phone call if I can, we

3   have not yet received them.  I don't know if

4   Mr. Mascarella is going to bring the records with him.  I

5   don't know what level of communication

6        MS. KOMATIREDDY:  Your Honor, Mr. Mascarella is

7   not a current employee of,.

8        THE COURT:  He's not a current employee?  Is he

9   a witness.

10        MS. KOMATIREDDY:  He is a witness in our case,

11   correct, your Honor, but the plaintiff stipulated to what

12   are original business records in the Northern Trust

13   production that the government has produced.  So as far as

14   the government's case, we're planning on calling

15   Mr. Mascarella with his personal knowledge --

16        THE COURT:  Do you have a representative of

17   Northern Trust currently.

18        MR. HALEY:  No, sir.  The answer is no and I

19   don't know that I need one, Judge.

20        THE COURT:  I want you to find out if they're

21   the records.

22        MR. HALEY:  I will, not, that's why I brought it

23   up.  When I leave here I will do that.  My view is the

24   records for the subpoena that was issued required they

25   provide a certification.   My view would be that they come

367

 1   in with a certification.  My hope would be with the

 2   certification there would be no objection from the

 3   government as to the authenticity of it.

 4          THE COURT:  I hope, too.  How do you know who

 5   are you going to call when you leave here today?  You

 6   don't have a contact person.

 7          MR. HALEY:  Judge, I don't want to take up the

 8   Court -- I believe speaking with your law clerk, was there

 9   a number on the letter?

10          THE COURT:  Let me ask my law clerk if she has a

11   contact person.  All we have, all we know is from the

12   marshals service, they served it last Wednesday and the

13   name on the docket sheet they served the subpoena on.

14          MR. HALEY:  I'll pull it off the docket.

15          THE COURT:  Let me know, I'll get someone from

16   Northern Trust on the phone if necessary.

17          MR. HALEY:  Thank you.

18          MR. LA RUSSO:  Your Honor, I know this doesn't

19   relate to Michael Peca but it will relate to the next

20   witness after, which is Kristin Peca, the wife.  We were

21   provided with taped conversations between Mr. Kenner and

22   Mr. Peca, and I anticipate this becoming an issue.  These

23   tapes were made I believe in 2012, well past the time of

24   the conspiracy.  These conversations allude to

25   Mr. Kenner's belief that my client was responsible for the

1   misappropriation -- I don't have my notes with me, Judge,

2   as to exactly what the references are and where they

3   appear on the tape.  But I know this was a bone of

4   contention earlier, on Monday, and I anticipate that if

5   the government uses it on their case or Mr. Haley intends

6   to use it on his, the question then comes down to whether

7   or not my application to preclude any reference to this

8   tape or any reference at least to Mr. Constantine, because

9   certainly they may be admissions as to Mr. Kenner, but

10  certainly would be a violation of Bruton I think under

11  these circumstances certainly wouldn't be admissible

12  against my client.

13            MS. KOMATIREDDY:  Your Honor, we can solve this

14  problem.  We've provided the defense with a list of

15  exhibits that contains four audio clips with respect to

16  Mr. Michael Peca, and four audio clips with respect to

17  Kristin Peca and also contains the company exhibits that

18  are transcripts of the audio clips, that are marked 505

19  one through four for Michael Peca, 506 one through four

20  for Kristin Peca, and we've been careful to redact and

21  remove any references that would be a violation of Bruton.

22  Counsel is free to review the clips.  They're short.  They

23  are collectively not more than five or 10 minutes.  And I

24  think after the review I doubt we'll have a problem in the

25  morning.

369

1          THE COURT:  I want to make sure Mr. Haley, you

2     made in comment in the opening.

3          MR. HALEY:  Your Honor, as relates to the tape

4     recorded conversations between Kristin Peca and my client,

5     it is not my intention to introduce any of those

6     recordings into evidence by way of cross-examination of

7     this witness.  I was referring specifically to an e-mail

8     in my opening statement that in my mind is an entirely

9     different issue.

10          So it's in the my intention to elicit that

11     information from the witness where my client accuses think

12     number of people, I believe that's inadmissible, Judge.  I

13     wouldn't press that.

14          But there is an issue, Judge, I might say with

15     respect to the tape recorded conversations from Kristin

16     Peca, and the issue is this, Judge.

17          There are six hours of recorded conversations

18     involving Kristin Peca and my client.  The government

19     takes excerpts of those recorded conversations and says we

20     want to listen to this part alone.  The issue I confront,

21     Judge, and it's not my intention to prolong this trial,

22     you take a conversation, an excerpt of a conversation

23     where there's a total of six hours of conversation, focus

24     on that, it's taken out of context, Judge, and I indeed

25     suggest to the jury at times I know my position will be

370

1   with reference to those conversations, often times before

2   you get to that excerpt there's a lot that preceded that

3   excerpt that may be relevant and material with respect to

4   putting that excerpt in context of what had transpired.

5   Not only at the beginning of the conversation, but what

6   transpired in previous conversations.

7            I just alert the Court to that particular issue.

8   I don't want to play six hours of conversations.  I

9   haven't formulated -- I just want your Honor to know that

10  when the government offers that recorded conversation into

11  evidence, we haven't reached stipulations as far as that's

12  concerned.  We've reached stipulations as far as bank

13  records, documents, things of that nature.

14           THE COURT:  The answer to your objection or

15  concern, if you believe there was some other portion of

16  the tape that provided additional context for the snippets

17  that the government was offering, the solution would be

18  you can offer those other snippets.  But that obviously

19  would be subject to talking about snippets that don't

20  include where your client is pointing a finger at --

21           MR. HALEY:  Correct.  The snippets that I'm

22  referring to will presumably -- the snippets that I'm

23  referring to will presumably be offered by the government

24  by way of what sort of admission by my client.  Is that

25  the government's theory?

1          THE COURT:  I'm talking about your snippets.  In

2     other words, the government is offering what they believe

3     are incriminating statements, admissions that your client

4     made.

5          MR. HALEY:  Yes.

6          THE COURT:  So if your intent is to stand up and

7     say I object, there's six hours and these are taken out of

8     context, my answer to the objection tomorrow would be if

9     there are other portions of the tape that you want to

10    play, that you believe provide context to that, I will

11    allow you to play those portions of it.  If you don't want

12    to play six hours and you want to play an hour's worth and

13    have them available to the jury, I would be sensitive to

14    that.  We have to be sensitive that they don't include

15    references to Mr. Constantine.

16         MR. HALEY:  It's not my intention, your Honor,

17    to seek to introduce recorded conversations between

18    Kristin Peca and my client with respect to the activities

19    of Mr. Constantine.

20         THE COURT:  Okay.  I'm saying if there's other

21    portions that you want to offer, other than those

22    portions, because you believe they provide context to what

23    your client was saying.

24         MR. HALEY:  Yes.  I understand your Honor's

25    ruling, okay.

372

1    MS. KOMATIREDDY:  Along those lines, your Honor,

2    given that the law provides a remedy in terms of the rule

3    of completeness, Mr. Haley should not be permitted to

4    cross-examine the witness on completeness grounds if he's

5    not actually going to offer or if he doesn't have a basis

6    for offering other portions under the rule of

7    completeness.

8         In other words, we do plan to introduce a

9    handful of clips.  We believe those clips fairly and

10   accurately depict certain admissions and are part of

11   lengthy conversations and we don't believe that the

12   defense should be permitted to cross-examine the witness

13   as to the fairness of that particular cut if they don't

14   have a ground under the rule of completeness to do so.

15        THE COURT:  He can establish how much taping

16   that she did.

17        MR. HALEY:  Yes.

18        THE COURT:  He can establish given six hours of

19   recordings, but so I don't know if I followed what are

20   you -- what do you not want him to do, not question the

21   witness on the scope of what the recordings were?  What

22   about the topics were discussed?  I'm not concerned about

23   what's the prejudice to the government by him doing that.

24        MS. KOMATIREDDY:  Your Honor, the prejudice is

25   that the defense's argument has been from opening

1   statements that Special Agent Galioto is part of a

2   conspiracy to misconstrue or misrepresent the evidence in

3   this case, and in terms of properly cut clips that are cut

4   in part because of constitutional concerns such as Bruton,

5   because the government's obligation and a desire to abide

6   by the rules, that should not be used against us as a

7   basis for saying that it has not been misleading or acting

8   improperly.

9         MR. HALEY:  Your Honor, I think we're talking

10  past each other.  Your Honor's comment a moment ago was

11  precisely along the line of inquiry that I was going to

12  make to that particular witness, I might as well do it now

13  as opposed to sidebar.  I do intend on asking Kristin Peca

14  as to how many conversations she had with Phil Kenner, how

15  many were recorded, how many hours of conversations she

16  made surreptitiously with Phil Kenner.  I do intend to

17  question her on that and I think that's relevant and

18  material.

19        THE COURT:  Yes.  I think that's admissible.

20  Again, if he goes beyond that, starts suggesting that

21  there's another portion of the tape, just question the

22  witness suggesting there's another portion of the tape so

23  that that is not taken out of context.  That would concern

24  me though if he was trying to question the witness on

25  that, but establishing the length, the lawyer is free to

374

1    get up before the jury and say that she recorded him for

2    six hours and the only quote/unquote admissions that the

3    government has with respect to these transactions is the

4    one they chose to may for you.

5          I think that's fair argument, to say that that

6    was the scope of what the government -- as this relates to

7    Mr. Constantine, it's not hurting the government by not

8    having access to that as it relates to Mr. Kenner.

9          MS. KOMATIREDDY:  Understood, Judge, we're just

10   concerned given the comments in opening statement in which

11   we've decided not to use and object to the introduction of

12   an e-mail because our obligations under Bruton again, and

13   to turn around and suggest that to the jury that we're not

14   presenting to the jury misleading, along those lines I

15   want to state for the record that I understand the

16   attorney on cross is permitted to solicit whole clips of

17   the recordings rather than going to show the snippets of

18   the recordings.  I understand that.  But your Honor has

19   already articulated --

20         THE COURT:  I think we're talking past each

21   other.  Mr. Haley understands, I think he understands what

22   the parameters are.

23         You keep mentioning government would be hampered

24   by that.  Mr. Haley, I won't go through what you did

25   yesterday, but one thing that he did say which is accurate

375

1    is that if there's something that he needs to get in for

2    purposes of his client that's admissible, the fact that

3    Bruton is creating an issue for him to do it, that's then

4    a problem for the Court.  What he said -- because it's

5    Bruton doesn't necessarily bind him.  He has to represent

6    his client.  If there's something admissible for his

7    client, the fact that it may or may not violate Bruton for

8    Mr. Constantine that's not his concern, and frankly that

9    would create issues for the case if that were.  Then we

10   have to address that.  This is not one of those situations

11   because there are other portions that are admissible for

12   Mr. Kenner, I think Mr. Haley is acknowledging he's not

13   trying no get in those portions because they're not

14   admissible.  But if he believed that there's an admissible

15   piece of evidence that benefits his client, if it creates

16   a Bruton issue that's what we have to address at that

17   point.

18            That's the issue of joint trials.  You conduct a

19   joint trial without a situation arising based upon what I

20   was hearing and so far so good.  All right.  Let's get

21   started 9:30 tomorrow morning.  Have a good night.

22            MS. KOMATIREDDY:  Thank you, Judge.

23            (Whereupon, court recessed for the day until

24   Wednesday, May 6, 2015 at 9:30 a.m.)

25

376

1                        WITNESSES:

2    JOE JUNEAU                                    190

3    DIRECT EXAMINATION (Continued.)              190

4    BY MR. MISKIEWICZ

5    CROSS-EXAMINATION                            198

6    BY MR. HALEY

7    VOIR DIRE EXAMINATION                        224

8    BY MR. MISKIEWICZ

9    CONTINUED CROSS EXAMINATION                  225

10   BY MR. HALEY

11   CROSS-EXAMINATION  (Continued)               266

12   BY MR. HALEY

13   CROSS-EXAMINATION                            268

14   BY MR. LaRUSSO

15   CROSS-EXAMINATION (Continued)                290

16   BY MR. LA RUSSO

17   VOIR DIRE EXAMINATION                        317

18   BY MR. MISKIEWICZ:

19   CONTINUED CROSS EXAMINATION                  320

20   BY MR. LaRUSSO

21   REDIRECT EXAMINATION                         327

22   BY MR. MISKIEWICZ:

23   RECROSS-EXAMINATION                          336

24   BY MR. HALEY

25

377

1    RECROSS-EXAMINATION                          337

2    BY MR. LaRUSSO

3    MICHAEL PECA                                 339

4    DIRECT EXAMINATION                           339

5    BY MR. MISKIEWICZ

6

7                    EXHIBITS:

8    Government Exhibit 2142 in evidence          357

9    Government Exhibit 2001 in evidence.         359

10   Government Exhibit 2002 in evidence.         361

11

12   Defendant's Exhibit Kenner 4 in evidence     210

13   Defendant Constantine's Exhibit 748 in       301

14   evidence

15   Defendant Constantine's Exhibit C-3 in       306

16   evidence

17   Defendant Kenner Exhibit 3                    223

18   Defendant Kenner Exhibit 2152                 225

19   Defendant Kenner Exhibit 1                    226

20   Defendant Kenner Exhibit 2                    226

21   Defendant Exhibit C-5                         320

22

23

24

25

## $

**$1.775** [2] - 351:15, 353:2

**$100,000** [16] - 192:22, 193:1, 194:9, 201:17, 201:19, 201:23, 250:8, 265:4, 272:13, 272:18, 273:5, 274:11, 275:16, 275:25, 307:25, 352:15

**$200,000** [1] - 287:3

**$250,000** [6] - 233:11, 234:19, 235:5, 252:9, 253:22, 315:17

**$250,0001** [1] - 311:12

**$330,000** [1] - 229:15

**$395,000** [2] - 361:19, 362:1

**$40,000** [1] - 355:24

**$437,000** [1] - 302:6

**$500,000** [19] - 192:5, 194:12, 195:3, 229:12, 235:7, 302:17, 308:2, 310:8, 312:24, 313:9,

315:25, 320:10, 320:12, 320:15, 321:12, 321:15, 322:24, 333:13, 333:18

**$550,000** [9] - 295:15, 296:18, 296:24, 297:6, 297:14, 335:23, 336:4, 336:9, 336:12

**$700,000** [9] - 247:8, 248:2, 254:3, 254:8, 254:16, 255:14, 287:1, 288:7, 288:13

**$725,000** [1] - 287:2

## '

**'02** [1] - 321:6

**'04** [1] - 279:18

**'05** [1] - 228:17

**'07** [2] - 345:21, 345:22

**'09** [2] - 345:21, 345:22

**'94** [1] - 322:8

**'94/'95** [2] - 340:8, 340:10

**'95** [1] - 322:8

**'95/'96** [2] - 344:4, 344:5

**'96/'97** [3] - 344:5, 345:22, 347:14

**'97** [1] - 345:14

## 0

**0532** [1] - 302:1

## 1

**1-page** [1] - 226:22

**1.14** [2] - 327:17, 328:24

**1.5** [1] - 307:21

**100** [2] - 183:14, 183:23

**100,000** [1] - 193:10

**11572** [1] - 183:21

**11722** [2] - 183:15, 183:23

**11749** [1] - 183:18

**11:20** [1] - 232:16

**11:49** [1] - 251:7

**13-607** [1] - 334:13

**13-CR-607** [1] - 183:4

**1601** [1] - 183:18

**18** [2] - 275:10, 278:7

**18th** [2] - 295:22, 307:11

**19** [1] - 361:8

**190** [2] - 376:2, 376:3

**198** [1] - 376:5

**1980** [1] - 301:25

**1992** [1] - 322:6

**1993** [1] - 202:8

**1994** [1] - 322:7

**1996** [1] - 345:14

**1:05** [1] - 328:18

## 2

**20** [6] - 188:8, 211:23, 259:8, 335:3, 335:8, 338:19

**200,000** [1] - 307:15

**2000** [1] - 288:15

**2000's** [1] - 347:14

**2001** [8] - 348:14, 359:13, 359:17, 359:18, 359:20, 359:21, 360:10, 377:9

**2002/2003** [2] - 347:3, 347:5

**2008/2009** [2] - 277:24, 340:17

**2015** [4] - 183:9, 212:8, 234:7, 375:24

**2042** [1] -

360:3

**20O2** [1] - 361:1

**21** [1] - 267:19

**210** [1] - 377:12

**211** [1] - 234:6

**2142** [7] - 357:7, 357:8, 357:18, 357:21, 357:22, 360:6, 377:8

**2152** [7] - 197:3, 224:8, 225:11, 225:14, 329:12, 377:18

**223** [1] - 377:17

**224** [1] - 376:7

**225** [2] - 376:9, 377:18

**226** [2] - 377:19, 377:20

**23** [1] - 234:7

**24** [1] - 235:6

**250,000** [1] - 233:14

**26** [3] - 327:24, 327:25, 328:23

**266** [1] - 376:11

**268** [1] - 376:13

**27** [3] - 300:23, 306:10, 311:13

**28** [1] - 296:18

**2889369** [1] - 359:25

**289369** [3] - 358:7, 360:7, 361:16

**290** [1] - 376:15

**2nd** [1] - 224:2

**3**

**300** [2] - 183:21, 192:9

**300,000** [2] - 254:10, 260:14

**301** [1] - 377:13

**302s** [1] - 213:6

**306** [1] - 377:15

**31** [3] - 233:10, 234:6, 255:10

**317** [1] - 376:17

**320** [2] - 376:19, 377:21

**327** [1] - 376:21

**336** [1] - 376:23

**337** [1] - 377:1

**339** [2] - 377:3, 377:4

**350** [2] - 192:4, 260:14

**350,000** [1] - 192:4

**3500** [3] - 213:6, 331:17, 331:23

**357** [1] - 377:8

**359** [1] - 377:9

**361** [1] - 377:10

**3:30** [2] - 338:12, 338:16

**4**

**403** [2] - 203:4, 203:24

**408** [2] - 259:25

**414** [2] - 302:1, 302:16

**425** [1] - 183:18

**437** [1] - 260:15

**4:30** [1] - 362:6

**5**

**500** [2] - 295:16, 296:3

**500,000** [2] - 295:12, 295:22

**505** [1] - 368:18

**506** [1] - 368:19

**550** [5] - 296:3, 296:5, 296:21, 296:22, 298:3

**5th** [1] - 335:17

**6**

**6/17/06** [1] - 328:18

**60,000** [1] - 254:11

**6016** [1] - 199:3

**631** [1] - 183:24

**6:28** [1] - 328:18

**7**

**7-7-05** [1] - 277:6

**700,000** [1] - 255:10

**712-6103** [1] - 183:24

**728** [1] - 273:23

**729** [4] - 209:13, 210:15, 210:16, 210:19

**733** [1] - 328:3

**748** [5] - 301:17, 301:18, 301:20, 377:13

**7th** [1] - 277:4

**8**

**8's** [1] - 233:16

**9**

**9-page** [1] - 222:12

**90** [1] - 328:11

**90M** [2] - 328:9, 328:10

**9:30** [7] - 188:25, 256:15, 362:7, 365:23, 365:24, 375:21, 375:24

**9:40** [1] - 365:24

**9:50** [2] - 183:10, 365:24

**A**

**a.m** [4] - 183:10, 232:16, 251:7, 375:24

**a/k/a** [2] - 183:7, 183:9

**Aaron** [3] - 222:8, 223:13, 224:1

**abide** [1] - 373:5

**ability** [2] - 264:6, 351:15

**able** [18] - 198:17, 209:6, 245:4, 245:7, 249:14, 249:20, 250:2, 250:23, 256:17, 262:16, 263:5, 264:15, 265:1, 265:3, 291:16, 319:8, 326:11, 335:20

**absolutely** [6] - 259:20, 264:19, 293:13, 334:19, 355:6

**absorb** [1] - 198:17

**accent** [1] - 316:18

**accept** [1] - 297:17

**accepted** [6] - 260:2,

**282:14**, 297:13, 298:14, 298:24, 302:20

**accepting** [3] - 263:3, 304:22, 326:15

**access** [3] - 357:4, 357:15, 374:8

**accordance** [1] - 302:4

**according** [2] - 321:6, 327:14

**accordingly** [1] - 306:14

**Account** [1] - 223:23

**account** [30] - 201:24, 213:12, 250:13, 254:8, 311:22, 312:4, 346:15, 346:17, 346:20, 347:23, 347:24, 353:15, 354:6, 354:10, 354:22, 354:24, 355:5, 355:12, 355:23, 356:1, 358:6, 358:12, 358:18, 358:19, 359:1, 359:4, 360:2, 360:3, 361:12,

361:15
**accounts** [4] - 193:21, 205:13, 205:14, 358:25
**accrued** [1] - 355:21
**accurate** [6] - 192:6, 236:10, 250:7, 264:20, 273:21, 374:25
**accurately** [1] - 372:10
**accusation** [1] - 334:23
**accused** [2] - 243:15, 287:2
**accuses** [1] - 369:11
**acknowledges** [1] - 301:24
**acknowledging** [1] - 375:12
**acquire** [2] - 234:21, 252:11
**acquired** [3] - 233:11, 253:4, 350:20
**acquires** [1] - 264:15
**acquisition** [1] - 349:10
**acre** [1] - 356:11
**acres** [1] - 349:11
**acting** [1] - 373:7
**action** [3] - 293:7, 293:19, 293:21
**actions** [2] -

221:21, 293:16
**activities** [1] - 371:18
**activity** [1] - 358:17
**add** [3] - 189:2, 264:12, 264:13
**adding** [1] - 256:22
**addition** [3] - 221:15, 291:6, 307:6
**additional** [3] - 236:1, 238:6, 370:16
**additions** [1] - 365:9
**address** [6] - 242:9, 247:17, 279:5, 291:20, 375:10, 375:16
**addressing** [1] - 254:17
**admissible** [9] - 260:3, 260:5, 368:11, 373:19, 375:2, 375:6, 375:11, 375:14
**admission** [4] - 357:18, 359:13, 360:22, 370:24
**admissions** [4] - 368:9, 371:3, 372:10, 374:2
**admitted** [12] - 210:24,

223:8, 225:11, 226:5, 226:15, 292:5, 301:19, 306:1, 320:5, 357:21, 359:17, 361:1
**admittedly** [1] - 225:19
**advance** [1] - 236:11
**advice** [2] - 203:18, 203:20
**advised** [4] - 293:10, 327:21, 334:16, 361:23
**advising** [2] - 199:1, 299:13
**advisor** [14] - 202:4, 203:17, 206:1, 217:14, 227:22, 227:24, 279:9, 280:13, 290:18, 327:21, 344:23, 345:4, 345:17, 346:4
**Advisors** [2] - 346:2, 346:3
**advisors** [1] - 203:20
**advisory** [1] - 198:20
**aeronautical** [1] - 198:9
**affairs** [2] - 200:14, 201:4
**affected** [2] -

217:10, 217:11
**afternoon** [4] - 268:7, 268:8, 289:3, 339:24
**age** [1] - 342:6
**Agent** [3] - 212:13, 213:4, 373:1
**agent** [1] - 350:10
**agent's** [1] - 213:4
**agents** [1] - 215:4
**ago** [17] - 200:23, 201:19, 212:5, 218:1, 235:11, 238:15, 238:20, 238:25, 244:3, 247:20, 267:21, 269:13, 293:17, 310:17, 322:13, 333:15, 373:10
**agree** [18] - 199:24, 200:12, 201:9, 201:22, 212:6, 231:13, 262:2, 264:25, 267:10, 267:20, 302:5, 304:17, 314:13,

321:5, 335:12, 336:24, 353:3, 353:5
**agreed** [7] - 260:8, 260:18, 294:6, 299:17, 306:13, 306:14, 353:20
**agreeing** [1] - 260:12
**Agreement** [1] - 317:7
**agreement** [38] - 198:21, 250:8, 259:4, 259:16, 260:4, 260:15, 261:3, 261:11, 261:12, 261:20, 261:21, 265:12, 266:9, 290:14, 290:20, 292:19, 293:5, 295:5, 295:6, 299:18, 299:22, 300:1, 300:19, 302:5, 302:15, 303:13, 305:3, 305:17, 309:11, 318:2, 319:15, 321:20,

324:10,
324:13,
324:18,
327:25,
365:20
**agreements**
[2] - 249:4,
249:5
**agrees** [5] -
260:10,
260:15,
262:10,
301:24, 314:7
**ahead** [7] -
189:21,
277:22,
290:7, 292:9,
304:21,
339:19, 342:8
**Air** [14] -
190:10,
190:14,
190:15,
190:17,
191:4, 192:3,
195:1,
195:10,
195:23,
200:25,
229:10,
295:12,
302:25, 303:6
**aircraft** [1] -
191:25
**airline** [1] -
191:21
**Airpark** [1] -
269:22
**airpark** [4] -
270:23,
271:2,
272:10,
272:13
**airplane** [26]
- 191:15,
191:16,
191:18,
191:21,

191:23,
192:8, 195:2,
195:21,
195:22,
229:14,
253:3,
253:10,
260:19,
265:2, 266:3,
282:16,
297:13,
297:16,
298:24,
302:1,
302:16,
303:5,
303:18,
363:20,
364:5, 364:6
**airplanes** [1]
- 270:16
**Airport** [2] -
269:23,
270:10
**airport** [1] -
270:8
**alert** [1] -
370:7
**allegation** [11]
- 241:5,
241:7,
241:10,
241:16,
244:21,
255:5,
256:21,
266:9,
286:20, 364:1
**allegations** [8]
- 236:5,
240:25,
242:9, 248:5,
248:7,
253:21,
285:7, 364:15
**allege** [2] -
257:13,
285:16

**alleged** [4] -
233:10,
235:9,
241:24, 266:5
**allegedly** [1] -
238:2
**alleges** [1] -
236:19
**alleging** [12] -
233:19,
240:13,
240:17,
241:25,
242:5, 245:1,
258:4,
263:23,
266:1, 266:4,
285:13
**allow** [8] -
186:11,
203:23,
204:4,
209:20,
245:16,
284:5, 315:4,
371:11
**allowed** [1] -
364:4
**allowing** [2] -
357:15,
363:24
**allows** [1] -
242:11
**allude** [1] -
367:24
**alluding** [1] -
295:21
**alone** [2] -
319:12,
369:20
**ALTERNATE**
[8] - 185:1,
185:4,
185:11,
185:15,
185:18,
185:23,
186:2, 187:19

**Alternate** [1]
- 187:20
**alternate** [7] -
184:5, 184:6,
184:20,
184:22,
186:3,
187:12,
189:12
**alternates** [3]
- 186:16,
187:8, 189:14
**AMAS** [2] -
223:23,
223:24
**amazing** [1] -
247:5
**ambition** [2] -
341:7, 341:16
**AMERICA** [1]
- 183:3
**amicable** [1] -
306:15
**Amityville** [1]
- 185:19
**amount** [17] -
230:12,
242:8,
253:20,
255:24,
290:15,
290:21,
295:6, 296:2,
299:17,
299:19,
299:21,
302:23,
302:24,
302:25,
303:6,
333:24,
346:10
**amounts** [1] -
293:20
**analysis** [1] -
201:12
**analyze** [1] -
264:7

**AND** [1] -
342:20
**ANDREW** [1] -
183:20
**angry** [1] -
206:22
**answered** [3]
- 231:2,
240:16, 315:3
**answering** [1]
- 227:4
**answers** [1] -
228:7
**anticipate** [2]
- 367:22,
368:4
**anticipated** [1]
- 272:15
**Anton** [1] -
344:8
**anyway** [2] -
332:22,
337:23
**apart** [3] -
221:2,
256:21,
323:15
**apologize** [13]
- 207:3,
217:21,
229:7, 232:1,
232:8,
236:11,
246:3,
282:10,
294:3,
294:15,
294:16,
299:20, 312:1
**appear** [3] -
237:11,
329:7, 368:3
**APPEARANCES**
[1] - 183:13
**appearances**
[1] - 184:2
**appeared** [2]
- 363:11,

363:12

**application** [1] - 368:7

**appraisal** [6] - 297:20, 298:4, 298:6, 298:10, 298:14, 299:12

**appraised** [5] - 192:1, 297:18, 297:23, 299:10, 328:8

**appreciate** [2] - 265:10, 338:14

**appreciative** [1] - 254:13

**approach** [13] - 196:5, 200:2, 200:3, 202:13, 208:11, 212:16, 225:4, 276:8, 296:10, 300:9, 330:23, 331:15, 331:20

**appropriate** [1] - 213:7

**approval** [1] - 184:17

**approximate** [3] - 302:24, 302:25, 303:5

**April** [4] - 234:7, 327:24, 327:25, 328:23

**arbitration** [6] - 199:25, 200:6, 200:15, 201:2,

230:20, 231:15

**area** [5] - 213:18, 245:1, 270:2, 340:21, 343:9

**argue** [2] - 239:19, 287:17

**arguing** [5] - 239:20, 241:6, 241:13, 263:10, 286:10

**argument** [9] - 235:24, 239:13, 239:23, 244:13, 253:15, 265:5, 286:15, 372:25, 374:5

**arising** [3] - 234:10, 293:3, 375:19

**Arizona** [4] - 284:9, 284:12, 333:17, 350:12

**arrangement** [2] - 195:9, 195:11

**arrived** [1] - 212:5

**article** [1] - 343:16

**articulate** [1] - 252:19

**articulated** [3] - 256:20, 271:2, 374:19

**Asante** [1] - 346:1

**ASAP** [1] - 294:8

**aside** [1] - 306:23

**aspect** [8] - 236:4, 240:3, 244:9, 254:25, 265:14, 286:6, 286:9, 287:16

**aspects** [6] - 253:25, 254:1, 254:4, 255:6, 262:14, 263:6

**assemble** [1] - 365:6

**asserting** [1] - 245:17

**assist** [1] - 227:22

**Assistant** [1] - 183:16

**assisted** [1] - 255:3

**assume** [2] - 274:24, 330:24

**assuming** [6] - 209:7, 213:14, 245:4, 293:25, 318:23, 318:24

**athlete** [1] - 342:5

**attacks** [1] - 306:19

**attempt** [1] - 245:24

**attempted** [1] - 213:3

**attempting** [1] - 246:9

**attention** [7] - 215:15, 266:21, 266:22,

296:2, 297:2, 347:2, 349:1

**attorney** [7] - 227:21, 290:14, 292:18, 293:5, 293:15, 294:7, 374:16

**Attorney** [1] - 183:14

**attorneys** [5] - 237:24, 293:2, 293:10, 334:16, 335:20

**Attorneys** [1] - 183:16

**audible** [3] - 231:4, 311:23, 330:5

**audio** [3] - 368:15, 368:16, 368:18

**Auerbach** [1] - 183:22

**August** [3] - 235:5, 235:12, 311:12

**authenticate** [2] - 209:8, 249:20

**authenticity** [1] - 367:3

**authority** [1] - 245:15

**authorization** [1] - 250:21

**authorize** [2] - 292:18, 357:3

**authorized** [1] - 234:23

**available** [4] - 256:1, 302:3,

356:18, 371:13

**Avalon** [20] - 200:25, 215:7, 229:10, 269:22, 277:16, 278:2, 278:12, 279:15, 279:25, 281:18, 294:10, 294:20, 294:22, 295:12, 298:20, 300:20, 302:25, 303:6, 303:24, 304:5

**avenue** [1] - 244:15

**awake** [1] - 217:7

**aware** [14] - 254:1, 254:2, 255:5, 255:7, 281:12, 281:23, 283:9, 284:8, 298:15, 324:20, 325:8, 326:19, 332:12, 352:14

**awareness** [1] - 215:21

**AZ** [1] - 301:24

---

**B**

**background** [4] - 252:23, 258:20, 287:9, 341:14

**bad** [5] - 260:21, 262:19, 262:22, 287:18, 323:4

**Bahamian** [4] - 203:12, 205:5, 205:16, 230:13

**Baja** [14] - 238:8, 239:3, 248:23, 250:11, 312:7, 317:6, 318:7, 319:4, 320:12, 320:14, 323:6, 323:22, 324:22, 325:20

**ball** [1] - 256:18

**ballpark** [1] - 302:21

**bank** [18] - 203:12, 205:5, 205:13, 205:14, 205:16, 233:3, 234:18, 248:23, 250:18, 252:8, 253:22, 256:1, 334:3, 346:22, 352:25, 365:2, 370:12

**Bank** [6] - 221:23, 230:13, 333:9, 354:7, 358:5, 358:17

**banks** [2] -

237:13, 358:14

**based** [11] - 203:12, 205:23, 213:24, 246:4, 250:25, 263:20, 293:16, 337:11, 346:7, 363:15, 375:19

**basis** [16] - 236:21, 241:25, 242:18, 243:11, 247:8, 254:11, 255:8, 258:7, 262:10, 288:5, 347:22, 358:17, 363:13, 364:16, 372:5, 373:7

**Bates** [1] - 248:24

**Bay** [1] - 352:19

**bean** [2] - 349:14, 350:25

**bear** [7] - 248:24, 264:8, 272:7, 272:17, 273:16, 296:9, 300:5

**bears** [2] - 267:9, 267:22

**became** [2] - 252:24, 355:3

**become** [4] - 253:10,

340:6, 342:5, 342:11

**becoming** [2] - 318:7, 367:22

**bee** [1] - 234:1

**BEFORE** [1] - 183:11

**beforehand** [1] - 356:20

**beg** [1] - 258:3

**began** [1] - 322:20

**begin** [1] - 341:2

**beginning** [4] - 344:5, 347:14, 365:18, 370:5

**beginnings** [1] - 347:19

**begins** [1] - 207:7

**behalf** [2] - 233:16, 271:14

**behind** [1] - 233:22

**belabor** [1] - 287:25

**belabored** [1] - 288:24

**belaboring** [3] - 287:7, 288:1, 288:2

**belief** [1] - 367:25

**below** [2] - 301:23, 360:6

**benefit** [3] - 285:15, 285:16, 286:17

**benefits** [1] - 375:15

**best** [8] -

189:2, 207:19, 227:7, 227:12, 256:10, 267:5, 293:18, 352:24

**better** [4] - 187:15, 191:22, 212:7, 285:5

**between** [33] - 200:13, 206:13, 209:9, 210:7, 219:11, 219:23, 219:25, 220:11, 220:14, 222:19, 222:22, 228:4, 259:4, 263:24, 266:2, 271:6, 278:22, 279:12, 291:17, 292:21, 293:1, 293:3, 306:10, 323:24, 334:11, 334:24, 337:23, 345:22, 360:21, 363:22, 367:21, 369:4, 371:17

**beyond** [6] - 194:16, 203:4, 237:12, 238:3, 342:14, 373:20

**BIANCO** [1] - 183:11

**big** [3] - 185:17, 349:12, 353:16

**Bill** [1] - 239:5

**billed** [1] - 346:14

**bind** [1] - 375:5

**bit** [8] - 186:17, 190:9, 269:11, 283:3, 294:17, 307:21, 325:6, 351:9

**black** [1] - 257:16

**blame** [2] - 334:24, 335:3

**blind** [1] - 293:7

**blocked** [1] - 228:8

**body** [1] - 219:22

**bond** [11] - 353:15, 353:20, 354:6, 354:10, 354:22, 354:24, 355:12, 358:12, 358:18, 358:19, 359:1

**bonds** [3] - 348:4, 348:5, 358:13

**bone** [1] - 368:3

**borrow** [2] - 333:18,

333:24

**borrowed** [1] - 333:23

**borrower** [1] - 314:20

**borrowing** [1] - 314:7

**Boston** [2] - 325:6, 345:3

**bottom** [5] - 215:17, 216:16, 242:18, 262:12, 294:17

**bounce** [1] - 256:18

**brackets** [2] - 293:4, 293:6

**branch** [1] - 348:23

**break** [14] - 189:5, 219:8, 231:24, 232:10, 232:13, 232:17, 232:19, 232:21, 251:1, 284:19, 284:20, 293:22, 338:13, 362:6

**brief** [5] - 242:25, 269:12, 327:4, 336:20

**briefly** [3] - 238:11, 259:2, 357:24

**bring** [8] - 184:20, 187:11, 187:21, 201:1, 207:19, 265:20,

290:4, 366:4

**bringing** [2] - 184:14, 244:19

**broad** [1] - 244:7

**broke** [1] - 267:5

**broken** [1] - 246:2

**broker** [3] - 231:1, 299:8, 299:12

**brother** [1] - 341:5

**brought** [9] - 263:11, 281:8, 281:13, 296:1, 297:1, 299:5, 306:19, 309:23, 366:22

**Bruton** [8] - 368:10, 368:21, 373:4, 374:12, 375:3, 375:5, 375:7, 375:16

**BSD** [2] - 215:7, 307:15

**budget** [1] - 189:9

**Buffalo** [7] - 340:14, 343:9, 344:4, 344:6, 344:15, 352:23

**build** [2] - 349:15, 356:13

**building** [6] - 270:11, 270:15, 270:18,

270:19, 351:18, 356:12

**built** [2] - 234:5, 323:9

**bunch** [1] - 208:1

**burden** [1] - 185:5

**business** [13] - 185:16, 185:17, 198:23, 201:4, 221:10, 293:13, 323:2, 334:19, 344:11, 345:19, 350:6, 350:14, 366:12

**button** [1] - 343:18

**button-down** [1] - 343:18

**buy** [7] - 234:24, 237:19, 239:12, 243:4, 264:24, 265:1, 283:15

**buyer** [1] - 299:3

**buyers** [1] - 356:14

**buying** [1] - 299:7

**BY** [38] - 183:15, 183:17, 183:20, 190:8, 198:5, 205:3, 210:3, 215:3, 224:24,

225:17, 266:17, 268:6, 273:24, 282:12, 284:7, 290:12, 309:2, 317:14, 320:8, 327:8, 337:16, 339:23, 344:1, 357:23, 359:19, 361:3, 376:4, 376:6, 376:8, 376:10, 376:12, 376:14, 376:16, 376:18, 376:20, 376:22, 377:2, 377:5

## C

**C-1A** [2] - 276:9, 276:10

**C-1B** [2] - 276:10, 276:16

**C-2** [3] - 291:10, 291:23, 292:5

**C-21** [1] - 296:12

**C-3** [5] - 305:10, 305:21, 306:1, 306:2, 377:15

**C-4** [1] - 312:20

**C-5** [5] - 315:21, 320:4, 320:6, 321:21,

377:21

**C-7** [1] - 311:3

**C-8** [1] - 311:3

**Cabo** [6] - 323:17, 323:25, 325:17, 325:20, 326:9, 326:16

**Cabos** [1] - 323:3

**calculating** [1] - 229:21

**California** [5] - 281:10, 284:3, 323:7, 323:21, 325:20

**Canadians** [1] - 268:10

**cane** [1] - 272:17

**cannot** [1] - 335:2

**Canucks** [1] - 340:11

**cap** [2] - 348:2

**Capital** [1] - 345:13

**Capitals** [2] - 322:8, 322:9

**car** [2] - 248:16

**cards** [1] - 329:25

**care** [2] - 211:20, 335:1

**career** [3] - 191:12, 207:1, 340:13

**careful** [1] - 368:20

**case** [68] - 188:10, 190:16,

190:18,
192:10,
195:15,
203:7,
207:25,
209:11,
232:14,
238:14,
238:16,
239:16,
241:6,
241:10,
242:10,
242:14,
243:12,
245:10,
245:18,
246:4,
246:16,
247:15,
252:13,
252:15,
252:20,
254:1,
254:21,
254:22,
256:3, 256:5,
256:16,
256:21,
260:6, 264:8,
271:22,
272:1,
281:10,
282:6, 284:6,
284:8,
284:11,
284:13,
284:15,
284:23,
285:5,
285:10,
286:6, 286:9,
286:11,
287:17,
287:19,
287:23,
288:12,
303:21,

324:16,
327:2,
338:15,
343:11,
362:8,
362:10,
364:15,
366:10,
366:14,
368:5, 373:3,
375:9
**cash** [9] -
193:25,
195:3, 195:4,
195:16,
239:14,
283:1, 336:8,
351:13, 352:4
**caught** [2] -
253:24,
294:16
**caused** [1] -
253:19
**Central** [3] -
183:6,
183:15,
183:23
**certain** [4] -
220:12,
227:5,
230:12,
372:10
**certainly** [5] -
238:4,
244:18,
368:9,
368:10,
368:11
**certification**
[3] - 366:25,
367:1, 367:2
**certified** [1] -
250:16
**Cessna** [4] -
302:1, 302:2,
302:5, 302:16
**cetera** [2] -
237:7, 248:24

**chain** [1] -
334:11
**chair** [1] -
339:18
**chance** [4] -
300:14,
311:6, 316:3,
317:25
**change** [3] -
242:12,
258:2, 348:19
**changed** [3] -
286:24,
287:6, 348:11
**changes** [1] -
238:1
**changing** [6] -
235:11,
236:2,
242:14,
244:13,
246:25,
248:13
**character** [1]
- 350:17
**characterize**
[2] - 200:25,
303:23
**charge** [1] -
255:9
**charged** [3] -
246:5,
248:11,
262:23
**charges** [2] -
243:25, 287:5
**charging** [3] -
248:13,
248:14,
248:15
**check** [20] -
193:7,
193:25,
194:8,
201:19,
201:23,
202:1, 250:8,
272:11,

272:12,
273:5,
275:11,
275:17,
275:18,
275:21,
276:6,
276:14,
277:1, 277:3,
277:8, 346:18
**checks** [2] -
194:22,
250:14
**children** [1] -
185:23
**chock** [1] -
259:17
**chose** [1] -
374:4
**Christmastime**
[1] - 268:25
**circumstances**
[1] - 368:11
**claim** [2] -
233:5, 365:14
**claiming** [2] -
201:3, 242:19
**claims** [4] -
236:22,
242:25,
248:12,
319:15
**clarification**
[4] - 234:2,
234:10,
328:12, 329:3
**clarify** [2] -
283:3, 323:5
**Class** [2] -
318:6, 318:7
**clause** [1] -
199:25
**clear** [13] -
241:20,
241:23,
247:2, 258:4,
283:24,
286:23,

287:8,
287:19,
300:22,
302:1,
316:22,
321:11, 323:5
**clearer** [2] -
285:11,
286:13
**clearly** [8] -
237:21,
255:11,
256:1, 256:9,
257:14,
260:24,
263:6, 285:13
**CLERK** [4] -
188:17,
257:7, 290:5,
339:13
**clerk** [3] -
186:20,
367:8, 367:10
**client** [31] -
203:7,
203:21,
245:9,
248:11,
248:14,
256:9, 258:9,
261:13,
264:25,
271:9,
285:17,
287:3,
287:15,
287:16,
290:13,
297:1,
297:20,
367:25,
368:12,
369:4,
369:11,
369:18,
370:20,
370:24,
371:3,

371:18, 371:23, 375:2, 375:6, 375:7, 375:15

**client's** [1] - 285:15

**clients** [2] - 335:3, 335:8

**clips** [8] - 368:15, 368:16, 368:18, 368:22, 372:9, 373:3, 374:16

**close** [3] - 192:3, 193:13, 267:15

**closed** [3] - 201:13, 223:24, 228:25

**closer** [2] - 212:9, 339:18

**closing** [2] - 193:13, 262:16

**clothing** [1] - 343:17

**co** [3] - 191:22, 254:6, 287:13

**co-conspirator** [1] - 254:6

**co-engineer** [1] - 191:22

**co-mingled** [1] - 287:13

**coffee** [2] - 349:14, 350:24

**collateral** [5] - 201:13, 228:25, 353:8, 354:14, 358:20

**colleague** [1] - 227:21

**colleagues** [1] - 293:12

**collecting** [1] - 232:1

**collections** [1] - 207:22

**collectively** [1] - 368:23

**college** [2] - 341:16, 341:18

**colloquy** [1] - 262:5

**Columbus** [1] - 340:15

**comfort** [1] - 331:12

**comfortable** [1] - 332:9

**coming** [5] - 197:3, 246:7, 247:10, 338:13, 363:5

**commenced** [1] - 200:23

**comment** [4] - 217:22, 217:24, 369:2, 373:10

**comments** [2] - 261:16, 374:10

**commercial** [1] - 349:16

**Commercial** [1] - 224:2

**commingled** [5] - 239:11, 239:14, 243:10, 255:16, 258:12

**commingling** [2] - 252:16, 255:1

**commit** [2] -

244:9, 287:17

**committed** [2] - 286:4, 341:21

**communicate** [3] - 278:18, 347:8, 347:11

**communicated** [1] - 222:2

**communicating** [3] - 221:22, 304:7, 326:14

**communication** [15] - 209:9, 220:11, 220:17, 228:4, 267:6, 280:12, 280:24, 293:4, 333:8, 335:4, 335:9, 364:13, 364:14, 366:5

**communications** [10] - 209:17, 219:11, 220:12, 220:13, 222:22, 228:18, 274:3, 280:9, 280:15, 306:25

**companies** [7] - 190:21, 306:17, 307:8, 345:23, 345:24, 348:25, 352:12

**Company** [2] - 238:8, 239:4

**company** [18] - 194:5, 194:15,

243:6, 243:8, 267:15, 275:5, 299:6, 307:17, 307:23, 312:7, 312:9, 312:24, 320:22, 345:9, 345:12, 345:23, 351:23, 368:17

**compare** [1] - 329:11

**comparison** [1] - 350:8

**compelling** [1] - 345:7

**compensated** [1] - 346:5

**complain** [1] - 290:19

**complaining** [1] - 204:1

**complete** [4] - 222:12, 244:25, 253:24, 269:16

**completely** [5] - 213:13, 213:24, 235:11, 255:17, 255:18

**completeness** [4] - 372:3, 372:4, 372:7, 372:14

**completes** [2] - 209:14, 209:17

**complicated** [4] - 285:12, 285:24, 287:20, 287:22

**comprise** [1] - 219:24

**compromise** [3] - 260:2, 264:6

**computer** [5] - 183:25, 219:23, 220:7, 280:19, 319:21

**concern** [8] - 186:17, 187:9, 244:6, 258:17, 265:7, 370:15, 373:23, 375:8

**concerned** [6] - 254:24, 255:4, 262:8, 370:12, 372:22, 374:10

**concerning** [4] - 219:10, 220:14, 253:6, 267:14

**concerns** [3] - 240:9, 241:4, 373:4

**concluded** [2] - 260:20, 363:9

**conclusion** [3] - 241:3, 344:4, 344:14

**condominiums** [1] - 237:7

**condone** [1] - 306:18

**conduct** [5] - 203:10, 203:11, 203:21, 337:10, 375:18

**confirmation**

[1] - 261:13
**confront** [1] - 369:20
**confronted** [1] - 286:20
**confuse** [2] - 241:8, 276:4
**confused** [1] - 238:16
**confusing** [1] - 270:23
**confusion** [1] - 265:25
**connected** [3] - 312:14, 318:23, 318:25
**connecting** [2] - 221:4, 221:5
**connection** [4] - 226:12, 229:22, 238:8, 244:16
**conned** [1] - 345:4
**conservative** [2] - 201:11, 348:13
**consider** [4] - 184:12, 350:13, 350:14, 350:15
**considerable** [2] - 253:19, 255:24
**consideration** [1] - 232:12
**considering** [1] - 298:21
**conspiracy** [3] - 248:11, 367:24, 373:2
**conspirator** [1] - 254:6
**conspired** [1] - 258:1

**constant** [2] - 335:4, 335:8
**constantine** [5] - 243:5, 252:18, 252:21, 309:6, 309:14
**CONSTANTINE** [1] - 183:8
**Constantine** [76] - 183:20, 190:23, 190:25, 192:12, 195:7, 195:8, 252:25, 259:5, 259:14, 259:18, 262:11, 263:5, 263:24, 265:3, 266:2, 268:17, 268:19, 268:24, 269:2, 269:4, 270:25, 271:10, 272:9, 277:23, 278:3, 278:11, 278:20, 278:24, 279:15, 280:1, 280:16, 280:20, 280:24, 281:20, 281:23, 282:24, 283:7, 283:10, 283:22, 285:8,

286:16, 290:13, 290:19, 291:3, 291:17, 292:13, 292:22, 296:1, 296:18, 298:6, 298:19, 301:24, 303:24, 304:13, 306:11, 306:12, 306:13, 306:17, 306:19, 307:1, 334:11, 334:14, 335:11, 336:2, 336:6, 337:17, 338:5, 363:18, 363:19, 363:23, 364:6, 368:8, 371:15, 371:19, 374:7, 375:8
**Constantine's** [7] - 191:4, 291:21, 301:20, 304:25, 306:2, 377:13, 377:15
**constantly** [3] - 233:7, 235:25, 236:1
**constitutional** [1] - 373:4
**construction** [3] - 351:17,

354:19, 356:9
**consult** [1] - 227:21
**contact** [12] - 223:25, 230:10, 278:11, 278:24, 279:6, 280:1, 280:4, 280:5, 324:17, 333:1, 367:6, 367:11
**contacted** [1] - 184:7
**contacting** [1] - 222:6
**contains** [2] - 368:15, 368:17
**contemplate** [1] - 237:8
**content** [4] - 199:7, 206:21, 220:17, 225:21
**contention** [5] - 257:25, 262:22, 264:20, 265:6, 368:4
**contents** [2] - 211:7, 300:12
**context** [7] - 369:24, 370:4, 370:16, 371:8, 371:10, 371:22, 373:23
**continue** [9] - 189:15, 189:17, 228:14, 255:6, 265:23,

266:13, 293:18, 316:15, 345:16
**continued** [4] - 218:5, 281:17, 283:21, 308:5
**Continued** [16] - 190:7, 196:6, 197:14, 202:14, 204:7, 208:13, 209:22, 212:17, 214:9, 266:16, 289:8, 290:11, 362:13, 376:3, 376:11, 376:15
**CONTINUED** [6] - 219:1, 225:16, 309:1, 320:7, 376:9, 376:19
**continuing** [1] - 245:23
**contract** [3] - 345:2, 348:14, 348:15
**contradicts** [2] - 261:9, 261:18
**contribution** [1] - 200:24
**conversation** [19] - 209:18, 221:6, 269:5, 269:7, 269:15, 269:20,

270:24,
279:21,
282:25,
332:6, 336:5,
336:13,
348:21,
350:24,
369:22,
369:23,
370:5, 370:10
**conversations**
[18] -
207:15,
221:14,
271:1,
297:12,
304:1,
367:21,
367:24,
369:4,
369:15,
369:17,
369:19,
370:1, 370:6,
370:8,
371:17,
372:11,
373:14,
373:15
**conversing** [1]
- 278:22
**converted** [3]
- 235:6,
316:1, 321:7
**convey** [1] -
302:3
**convince** [1] -
242:12
**convinced** [1]
- 285:17
**copies** [1] -
248:23
**copy** [14] -
184:16,
184:17,
188:11,
219:24,
232:9,

248:22,
252:5,
296:14,
299:25,
300:2,
300:18,
318:19,
318:20,
318:21
**corner** [1] -
359:23
**correct** [132]
- 198:10,
198:15,
198:18,
200:20,
201:25,
205:10,
205:23,
206:14,
207:1, 207:4,
207:16,
210:19,
220:22,
221:8,
221:16,
223:22,
227:7,
228:23,
229:1,
229:10,
229:12,
230:8,
230:16,
231:3, 244:6,
264:23,
266:25,
267:7,
268:20,
268:21,
269:17,
269:19,
270:9, 271:7,
271:11,
271:17,
272:4,
272:21,
273:3,

274:20,
276:15,
277:17,
277:20,
277:24,
278:4,
278:20,
280:10,
281:6,
281:10,
281:18,
281:21,
282:21,
283:12,
283:16,
283:17,
291:7,
291:21,
292:12,
292:23,
293:24,
294:4, 295:3,
295:7, 295:9,
295:13,
295:23,
296:2, 296:3,
297:13,
300:23,
301:8, 302:9,
302:22,
303:19,
304:7, 307:9,
307:20,
308:3, 309:4,
309:21,
310:1,
310:10,
310:18,
314:7,
314:21,
315:10,
315:11,
316:16,
316:24,
317:2, 317:7,
320:10,
320:17,
320:18,

321:1, 321:2,
321:12,
321:15,
323:7, 324:1,
324:5, 328:5,
333:11,
336:25,
337:1, 337:3,
337:21,
337:25,
338:3,
339:25,
340:2, 342:3,
345:15,
346:9,
346:12,
346:25,
347:1,
350:18,
351:6, 352:6,
352:16,
354:7,
354:12,
355:15,
358:9,
358:10,
358:21,
359:14,
360:17,
360:23,
366:11,
370:21
**correspondenc
e** [2] -
219:4, 219:24
**correspondenc
es** [1] -
234:4
**counsel** [3] -
248:21,
310:24,
368:22
**countries** [1]
- 347:1
**Country** [1] -
183:21
**couple** [15] -
212:5,

235:20,
268:22,
283:6,
283:19,
291:12,
293:11,
328:23,
329:4,
334:10,
334:12,
334:17,
356:13, 363:3
**course** [6] -
207:12,
221:14,
254:18,
266:8,
278:19,
330:22
**Court** [24] -
183:22,
186:14,
186:17,
188:11,
209:4, 234:2,
234:13,
235:14,
240:10,
242:11,
242:13,
249:15,
260:25,
262:3, 262:8,
264:4,
286:19,
286:21,
287:25,
365:10,
367:8, 370:7,
375:4
**court** [11] -
184:17,
186:10,
187:16,
198:2, 201:2,
205:2, 210:2,
215:2,
261:14,

297:9, 375:23
**Court's** [8] -
186:25,
187:4,
240:16,
242:10,
242:11,
242:16,
250:25,
364:16
**Courthouse**
[1] - 183:6
**courtroom**
[15] -
184:23,
185:9, 186:4,
187:12,
187:20,
188:5,
188:11,
188:18,
232:15,
265:21,
284:25,
290:6,
338:16,
343:14,
362:12
**cover** [5] -
248:7,
258:19,
258:20, 327:4
**covered** [1] -
327:5
**Cowboys** [1] -
342:20
**crashed** [1] -
303:9
**create** [1] -
375:9
**created** [2] -
254:8, 352:1
**creates** [1] -
375:15
**creating** [1] -
375:3
**credit** [65] -
193:14,

193:19,
198:17,
201:10,
201:12,
216:8,
216:20,
222:1,
223:14,
223:22,
228:24,
229:1, 229:2,
240:2,
306:24,
307:1, 331:7,
331:12,
332:4, 332:8,
332:11,
332:13,
332:18,
332:23,
333:4, 333:5,
333:9,
333:13,
334:4,
351:14,
352:4, 353:2,
353:4, 353:9,
353:13,
353:25,
354:2,
354:14,
354:22,
355:8,
355:11,
355:19,
355:21,
356:4, 356:6,
356:17,
356:18,
356:24,
357:1, 357:4,
357:16,
358:2, 358:6,
358:8, 359:4,
360:2, 360:3,
360:13,
360:16,
361:17,

362:1, 362:4
**credits** [1] -
361:12
**crime** [1] -
287:18
**criminal** [2] -
203:10,
203:21
**critical** [1] -
254:5
**cross** [16] -
196:1, 197:9,
232:24,
235:15,
237:23,
249:11,
256:14,
265:24,
327:5,
337:12,
365:11,
365:19,
369:6, 372:4,
372:12,
374:16
**CROSS** [14] -
198:4, 219:1,
225:16,
266:16,
268:5,
290:11,
309:1, 320:7,
376:5, 376:9,
376:11,
376:13,
376:15,
376:19
**cross-
examination**
[6] - 196:1,
232:24,
249:11,
265:24,
337:12, 369:6
**CROSS-
EXAMINATION**
[8] - 198:4,
266:16,

268:5,
290:11,
376:5,
376:11,
376:13,
376:15
**cross-examine**
[2] - 372:4,
372:12
**culled** [1] -
258:22
**current** [2] -
366:7, 366:8
**custodian** [1]
- 354:8
**cut** [4] -
228:21,
372:13, 373:3
**cutting** [1] -
247:12

**D**

**daily** [2] -
184:16,
184:17
**Dallas** [1] -
342:19
**damage** [1] -
303:18
**dancing** [3] -
240:15,
243:13, 244:2
**date** [5] -
199:10,
234:24,
237:12,
300:23,
357:24
**dated** [6] -
225:3, 225:6,
267:18,
327:24,
327:25,
328:23
**dates** [3] -
210:13,
210:20, 361:5
**dating** [1] -

257:21
**daughter's** [1]
- 316:17
**day-by-day** [1]
- 206:3
**days** [5] -
193:19,
211:10,
211:16,
212:5, 235:20
**deal** [25] -
187:10,
190:17,
191:14,
195:10,
195:23,
203:25,
260:11,
260:21,
261:8,
262:19,
262:22,
263:15,
271:15,
272:13,
282:24,
294:10,
294:21,
294:22,
302:21,
309:8, 325:9,
328:8,
328:16,
336:16
**dealing** [5] -
261:1,
290:17,
291:1, 299:6,
309:10
**dealings** [2] -
303:24,
304:25
**deals** [6] -
191:10,
230:7, 230:8,
265:13,
273:12,
327:22

**dealt** [1] - 291:3

**debate** [1] - 236:25

**December** [3] - 268:25, 279:18, 311:13

**decide** [4] - 237:21, 248:7, 341:20, 351:10

**decided** [13] - 205:8, 205:9, 239:15, 252:15, 255:1, 281:3, 304:21, 333:1, 341:4, 341:22, 351:7, 374:11

**deciding** [1] - 256:22

**decision** [4] - 186:25, 187:4, 241:13, 354:16

**declared** [1] - 303:20

**deducted** [2] - 346:19, 346:21

**defend** [2] - 255:24, 256:7

**Defendant** [18] - 183:17, 183:19, 223:9, 225:14, 226:7, 226:16, 237:19, 301:20, 306:2, 320:6, 321:21,

377:13, 377:15, 377:17, 377:18, 377:19, 377:20, 377:21

**defendant** [7] - 243:4, 247:13, 286:8, 328:5, 343:10, 343:21, 350:6

**Defendant's** [7] - 210:25, 223:1, 276:9, 291:10, 305:21, 334:13, 377:12

**Defendants** [1] - 183:10

**defendants** [6] - 190:20, 190:22, 237:5, 246:22, 271:17, 343:11

**defending** [7] - 240:9, 240:12, 255:17, 255:20, 256:13, 286:12, 288:10

**Defense** [2] - 327:10, 329:17

**defense** [19] - 223:7, 235:25, 243:1, 244:24, 245:3, 245:11, 245:19,

247:15, 248:5, 250:1, 253:20, 257:12, 257:13, 258:2, 259:3, 296:12, 363:13, 368:14, 372:12

**defense's** [1] - 372:25

**defer** [2] - 186:24, 187:4

**deficient** [1] - 332:24

**degree** [3] - 198:8, 198:9, 198:18

**del** [1] - 308:2

**Del** [15] - 235:5, 242:4, 319:4, 321:18, 322:25, 323:6, 323:14, 324:3, 324:13, 324:21, 325:9, 325:14, 326:6, 326:8, 326:19

**DELAS** [1] - 274:23

**delas** [1] - 275:2

**delay** [3] - 275:1, 304:10, 304:12

**delaying** [2] - 290:20, 306:5

**delays** [3] - 228:4, 274:24, 304:7

**deleted** [1] - 331:3

**Delmar** [1] - 323:24

**demand** [1] - 277:8

**deny** [1] - 221:13

**depict** [1] - 372:10

**deposit** [1] - 347:24

**deposited** [6] - 235:18, 250:14, 312:4, 357:16, 361:19, 361:20

**deposits** [4] - 235:13, 235:17, 250:14, 361:11

**deputy** [1] - 184:6

**Derek** [3] - 345:1, 345:4, 345:6

**describe** [2] - 343:16, 347:15

**described** [3] - 352:9, 353:11, 353:14

**description** [2] - 351:4, 361:9

**designated** [1] - 302:4

**desire** [1] - 373:5

**detail** [2] - 363:22, 364:7

**details** [3] - 244:8, 244:11, 285:6

**determine** [1] - 262:4

**develop** [3] - 189:9, 349:15, 351:24

**developed** [1] - 350:20

**development** [6] - 253:7, 313:20, 323:2, 323:4, 348:12, 349:3

**Development** [4] - 238:8, 239:3, 248:23, 312:7

**developments** [2] - 267:13, 274:13

**Diamanté** [8] - 235:4, 242:4, 319:4, 321:18, 322:25, 323:6, 323:14, 326:19

**Diamonte** [1] - 308:2

**did there come a time** [3] - 344:22, 348:8, 348:10

**differ** [1] - 258:3

**different** [25] - 185:14, 191:10, 205:21, 211:22, 213:15, 213:24, 229:3, 230:7, 236:8, 246:7, 250:4, 253:18, 255:18,

259:11,
261:19,
265:5,
288:22,
317:19,
323:13,
329:8,
329:25,
345:23,
346:25,
348:2, 369:9
**differently** [1]
- 213:10
**difficult** [1] -
300:1
**Dimitri** [4] -
322:1, 322:8,
322:10, 337:7
**dire** [2] -
224:21,
317:11
**DIRE** [4] -
224:23,
317:13,
376:7, 376:17
**direct** [9] -
189:16,
203:4,
209:11,
229:9, 280:1,
280:8,
333:20,
347:24, 365:1
**DIRECT** [4] -
190:7,
339:22,
376:3, 377:4
**directed** [1] -
354:3
**direction** [2] -
234:21,
252:11
**directly** [10] -
222:2, 233:5,
240:16,
247:24,
278:12,
280:6, 291:3,

306:12,
333:2, 336:5
**director** [1] -
343:8
**disagree** [3] -
214:1, 247:1,
335:12
**disavowed** [1]
- 285:21
**discarded** [1]
- 281:3
**discomfort** [1]
- 187:4
**discovered** [1]
- 193:9
**discovery** [2]
- 234:19,
252:8
**discuss** [11] -
185:3,
187:17,
196:2, 221:2,
232:14,
284:23,
292:25,
300:22,
306:12,
338:15, 362:8
**discussed** [8]
- 192:15,
205:7,
221:15,
269:11,
301:5,
301:19,
372:22
**discussing** [3]
- 292:21,
300:3, 302:14
**discussion**
[13] - 195:5,
197:8,
210:23,
249:22,
281:19,
281:23,
282:22,
283:13,

293:23,
294:5, 301:6,
331:22, 336:3
**discussions**
[16] - 212:4,
283:4, 283:5,
283:7, 283:9,
283:11,
283:21,
291:18,
295:25,
296:4, 298:9,
302:22,
306:24,
306:25,
307:4, 324:25
**disentangled**
[1] - 243:3
**disgruntled**
[2] - 293:12,
334:18
**dismiss** [1] -
233:24
**dismissed** [7]
- 281:5,
281:6,
281:12,
281:22,
283:16,
284:13,
284:16
**disprove** [2] -
241:11,
244:21
**dispute** [3] -
200:13,
200:15,
201:10
**disputes** [1] -
201:3
**disregard** [1]
- 229:8
**distinction** [1]
- 324:22
**distinguish** [1]
- 323:24
**distracted** [1]
- 187:3

**DISTRICT** [3]
- 183:1,
183:1, 183:12
**disturbed** [1]
- 261:14
**disturbing** [1]
- 236:4
**diversifying**
[1] - 348:22
**diversion** [3]
- 247:4,
288:6, 288:14
**diverted** [4] -
242:20,
285:14,
285:21
**diverting** [1] -
242:4
**dividends** [1]
- 309:24
**divorced** [1] -
185:23
**docket** [2] -
367:13,
367:14
**Document** [2]
- 209:4,
232:7
**document** [96]
- 198:23,
199:2, 199:8,
199:12,
199:22,
199:24,
200:5, 208:8,
209:7, 209:8,
209:9,
209:12,
210:5,
211:12,
215:12,
215:14,
215:16,
215:17,
216:16,
222:11,
222:13,
222:16,

222:22,
222:23,
223:11,
224:6, 225:1,
225:7, 225:8,
225:18,
225:19,
225:25,
226:9,
226:22,
226:25,
227:2,
227:16,
227:19,
227:23,
232:8, 234:6,
249:18,
249:19,
249:24,
250:4, 259:7,
260:17,
266:18,
266:20,
267:9, 294:2,
300:10,
300:12,
305:9,
305:12,
312:20,
313:1,
313:11,
313:14,
314:1,
315:16,
315:21,
316:2, 316:5,
317:4,
317:16,
317:25,
318:12,
318:15,
318:18,
319:1, 319:7,
319:14,
319:15,
320:9,
320:21,
321:5, 321:7,

327:11,
327:12,
327:14,
328:22,
329:1, 329:4,
329:6,
329:12,
329:15,
357:14,
360:14,
361:6, 363:8,
363:11,
363:14
**document's**
[1] - 321:9
**documentary**
[1] - 364:20
**documentation**
[1] - 363:20
**documents**
[33] -
188:12,
198:25,
225:3, 225:6,
227:5,
227:18,
236:6,
237:10,
237:14,
240:18,
240:20,
240:24,
245:5, 245:8,
249:21,
249:23,
250:2, 250:3,
250:6,
250:17,
253:18,
255:25,
256:3,
257:20,
258:11,
258:22,
259:1,
297:22,
312:3,
321:14,

363:5,
364:19,
370:13
**Doe** [6] -
233:12,
233:15,
234:16,
234:17,
285:17,
285:18
**dollar** [5] -
191:25,
192:19,
194:1,
307:20, 345:2
**dollars** [6] -
293:15,
295:19,
328:10,
345:5, 346:8,
351:13
**done** [6] -
220:7,
243:24,
259:23,
311:16,
312:22,
355:10
**door** [4] -
363:21,
363:23, 364:9
**doubt** [5] -
329:21,
329:22,
329:23,
329:24,
368:24
**dovetailing** [1]
- 248:20
**Dowdy** [2] -
311:9, 312:10
**downloaded**
[1] - 219:24
**draft** [1] -
341:23
**drafted** [1] -
305:7
**dragging** [1] -

343:3
**draw** [5] -
266:21,
346:16,
350:8, 353:9
**drawn** [3] -
201:24,
355:19,
356:24
**dream** [1] -
342:7
**driving** [2] -
270:6, 281:21
**due** [3] -
187:3,
332:23, 333:4
**duly** [2] -
190:3, 339:11
**dump** [1] -
247:3
**dumping** [2] -
243:6, 243:9
**during** [21] -
184:12,
184:13,
189:5,
209:18,
221:5,
221:13,
282:1, 282:3,
282:5,
282:18,
283:23,
291:7,
291:17,
293:8, 304:9,
336:3,
346:24,
347:8,
352:24,
358:22,
360:13

**E**

**e-mail** [53] -
193:2,
206:12,
206:16,

206:19,
206:21,
206:24,
207:4, 207:8,
209:12,
210:6, 210:7,
211:7,
217:25,
219:3, 219:4,
219:24,
222:19,
222:22,
223:15,
223:17,
228:18,
230:11,
250:9,
272:11,
276:6,
277:14,
278:10,
279:4, 280:5,
280:9,
280:15,
280:24,
291:16,
291:20,
295:21,
306:25,
307:11,
328:6,
330:12,
330:17,
332:25,
333:25,
334:10,
334:11,
334:14,
335:11,
335:17,
335:25,
363:18,
369:7, 374:12
**e-mailing** [1]
- 336:1
**e-mails** [35] -
192:25,
207:15,

207:22,
207:23,
208:1, 208:5,
210:9,
210:13,
218:2,
219:10,
219:14,
219:17,
219:18,
219:19,
219:22,
220:20,
220:21,
221:2,
223:16,
223:17,
223:19,
280:19,
291:7, 328:4,
330:3, 330:8,
330:9,
330:10,
330:18,
330:20,
331:2,
347:12,
363:18,
364:10
**early** [8] -
221:4,
221:14,
225:7, 275:5,
283:11,
298:25,
347:14, 348:5
**easier** [1] -
261:24
**EASTERN** [1]
- 183:1
**easy** [1] -
276:3
**echo** [1] -
365:9
**Edmonton** [1]
- 340:15
**educational**
[1] - 198:13

**effect** [3] - 206:18, 305:4, 358:3

**efficient** [3] - 189:3, 365:8, 365:18

**efficiently** [1] - 365:22

**effort** [2] - 222:12, 255:24

**efforts** [2] - 227:20, 281:17

**either** [5] - 221:21, 239:17, 248:6, 314:15, 316:14

**eleven** [1] - 341:1

**elicit** [5] - 237:8, 239:24, 240:3, 240:5, 369:10

**elicited** [2] - 246:16, 253:6

**eliciting** [1] - 243:16

**email** [1] - 275:24

**emanated** [2] - 255:15, 288:6

**emphasize** [1] - 188:24

**emphasized** [1] - 263:11

**employee** [2] - 366:7, 366:8

**employees/ colleague** [1] - 334:18

**employer** [2] - 184:7

**en** [2] - 365:7, 365:19

**end** [13] - 189:4, 211:10, 211:17, 228:12, 228:15, 287:4, 293:6, 298:18, 303:10, 304:2, 310:4, 328:12, 332:22

**ended** [11] - 191:14, 239:15, 239:22, 298:12, 299:24, 309:8, 309:10, 311:20, 323:1, 326:14, 326:15

**engage** [1] - 269:4

**engaged** [1] - 344:22

**engineer** [1] - 191:22

**engineering** [1] - 198:10

**enter** [2] - 341:23, 353:3

**entered** [4] - 188:18, 262:19, 265:21, 290:6

**enters** [3] - 184:22, 187:12, 188:5

**entertain** [1] - 256:25

**entire** [9] - 223:11, 225:1,

236:21, 250:1, 255:8, 260:17, 293:8, 306:14, 363:14

**entirely** [2] - 286:11, 369:8

**entities** [1] - 293:9

**entitled** [1] - 200:15

**entity** [2] - 271:13, 302:4

**entrust** [1] - 193:14

**envelope** [1] - 273:4

**equal** [2] - 337:18, 346:11

**equipment** [1] - 215:7

**equity** [3] - 235:7, 320:21, 320:25

**erosion** [1] - 345:19

**error** [1] - 197:2

**Escher** [2] - 215:7, 307:12

**ESCHER** [1] - 215:7

**ESQ** [3] - 183:17, 183:20, 183:20

**essence** [3] - 243:7, 246:19, 355:1

**essential** [1] - 254:4

**essentially** [4] - 211:9, 237:23, 243:7, 262:14

**establish** [6] - 209:16, 264:24, 363:25, 364:11, 372:15, 372:18

**establishes** [1] - 204:4

**establishing** [1] - 373:25

**estate** [3] - 233:15, 267:14, 348:24

**estimate** [1] - 188:25

**estimation** [1] - 302:16

**et** [2] - 237:7, 248:24

**Eufora** [53] - 194:6, 194:9, 201:24, 202:1, 215:8, 233:11, 234:22, 234:25, 236:17, 237:19, 239:12, 239:15, 239:17, 239:22, 239:25, 242:2, 242:4, 243:4, 243:11, 246:14, 246:15, 246:22, 246:24, 248:24, 252:11, 253:2, 253:4, 253:9, 254:7, 257:15, 270:18,

270:22, 271:2, 272:9, 272:13, 272:19, 272:24, 272:25, 274:11, 276:1, 276:6, 277:16, 277:20, 285:9, 285:14, 285:20, 285:22, 286:3, 286:17, 287:11, 287:21, 298:2

**evaluations** [1] - 364:3

**event** [1] - 353:9

**events** [5] - 207:15, 207:20, 212:6, 212:10, 314:24

**eventual** [1] - 230:5

**eventually** [4] - 193:13, 272:12, 323:3, 333:8

**Evidence** [1] - 259:25

**evidence** [58] - 197:3, 199:3, 209:13, 210:10, 210:25, 223:10, 223:12, 224:19, 225:15, 226:6, 226:8, 226:17,

232:4, 235:3, 235:7, 235:21, 236:2, 236:20, 240:14, 242:15, 245:21, 246:18, 246:19, 253:3, 253:5, 253:6, 254:14, 255:2, 255:22, 256:5, 257:5, 264:14, 266:20, 287:5, 301:4, 301:21, 305:21, 306:3, 320:6, 321:9, 327:10, 328:3, 329:12, 357:22, 359:18, 361:2, 363:10, 363:15, 369:6, 370:11, 373:2, 375:15, 377:8, 377:9, 377:10, 377:12, 377:14, 377:16

**exactly** [12] - 195:17, 199:10, 240:11, 246:13, 258:6, 260:1, 263:19, 326:15,

347:17, 348:7, 353:1, 368:2

**examination** [9] - 189:17, 196:1, 232:24, 236:6, 237:23, 249:11, 265:24, 337:12, 369:6

**EXAMINATION** [28] - 190:7, 198:4, 219:1, 224:23, 225:16, 266:16, 268:5, 290:11, 309:1, 317:13, 320:7, 327:7, 336:21, 337:15, 339:22, 376:3, 376:5, 376:7, 376:9, 376:11, 376:13, 376:15, 376:17, 376:19, 376:21, 376:23, 377:1, 377:4

**examine** [2] - 372:4, 372:12

**examined** [2] - 190:3, 339:12

**example** [1] - 293:4

**except** [1] - 318:11

**exception** [1] - 186:21

**excerpt** [4] -

369:22, 370:2, 370:3, 370:4

**excerpts** [1] - 369:19

**excess** [2] - 229:20, 230:2

**exchange** [3] - 210:6, 210:7, 291:17

**exchanged** [1] - 291:7

**exchanges** [2] - 222:19, 363:24

**exchanging** [1] - 246:18

**exclusively** [1] - 365:11

**excuse** [6] - 187:13, 189:11, 189:13, 197:10, 271:20, 312:13

**excused** [2] - 187:17, 338:12

**excusing** [1] - 186:15

**execute** [1] - 335:20

**executed** [1] - 352:21

**Exhibit** [58] - 194:3, 199:3, 208:9, 210:22, 210:25, 215:13, 216:15, 218:1, 222:12, 223:1, 223:7, 223:9, 224:8, 225:14, 225:18,

226:2, 226:5, 226:7, 226:11, 226:15, 226:16, 226:21, 232:3, 266:19, 266:23, 273:22, 276:9, 291:10, 301:20, 305:21, 306:2, 317:9, 320:6, 321:21, 328:3, 334:13, 336:23, 357:7, 357:21, 357:22, 359:13, 359:18, 360:9, 360:19, 360:22, 361:2, 377:8, 377:9, 377:10, 377:12, 377:13, 377:15, 377:17, 377:18, 377:19, 377:20, 377:21

**exhibit** [8] - 206:12, 209:13, 210:15, 210:16, 226:13, 259:4, 274:9, 334:13

**exhibits** [12] -

210:14, 232:2, 232:23, 237:23, 248:21, 249:15, 365:6, 365:14, 365:17, 365:18, 368:15, 368:17

**EXHIBITS** [1] - 377:7

**exist** [1] - 220:3

**existing** [2] - 237:21, 257:19

**exit** [1] - 211:17

**expanded** [1] - 348:11

**expect** [1] - 364:19

**expedite** [1] - 351:17

**experienced** [2] - 304:6, 365:21

**experts** [2] - 293:11, 334:17

**explain** [8] - 185:21, 185:22, 230:10, 233:6, 243:18, 256:10, 265:18, 322:23

**explained** [1] - 243:14

**explanation** [2] - 192:11, 217:20

**explanations**

[3] - 192:17, 193:20, 230:9

**expletives** [4] - 206:14, 206:25, 207:1, 207:2

**express** [2] - 186:16, 186:25

**extend** [1] - 186:12

**extent** [2] - 249:16, 286:10

**extra** [1] - 189:9

**eyes** [1] - 269:18

**F**

**face** [1] - 246:6

**facility** [2] - 186:11, 186:13

**fact** [31] - 204:3, 221:25, 230:25, 233:10, 235:4, 235:14, 239:10, 240:17, 243:7, 243:20, 250:15, 255:13, 259:13, 259:14, 263:12, 271:13, 272:18, 278:17, 280:18, 281:5, 282:1, 291:4, 295:15,

295:18, 297:20, 307:11, 312:23, 342:16, 352:15, 375:2, 375:7

**facts** [8] - 233:25, 242:14, 245:17, 247:17, 253:19, 258:4, 288:5, 288:8

**fair** [9] - 240:23, 256:18, 278:8, 323:22, 324:14, 337:17, 341:7, 374:5

**fairly** [3] - 348:13, 355:3, 372:9

**fairness** [2] - 243:18, 372:13

**faith** [1] - 353:14

**Falcon** [1] - 301:24

**false** [1] - 235:24

**falsely** [1] - 233:13

**familiar** [4] - 187:16, 225:21, 314:18, 337:7

**familiarity** [1] - 224:9

**familiarize** [2] - 315:23, 318:1

**family** [7] - 211:22,

217:11, 221:15, 269:1, 340:23, 341:14, 350:13

**far** [7] - 260:9, 265:25, 334:23, 366:13, 370:11, 370:12, 375:20

**farms** [4] - 349:14, 350:24, 350:25

**fault** [1] - 206:4

**favorite** [1] - 341:10

**FBI** [31] - 208:6, 212:2, 213:9, 213:20, 214:4, 215:4, 215:5, 215:9, 216:8, 216:19, 217:1, 217:4, 217:13, 217:19, 218:2, 219:6, 219:14, 219:20, 220:2, 302:8, 302:11, 302:15, 302:18, 303:2, 330:3, 331:2, 331:8, 331:11, 331:22, 332:3, 332:7

**Federal** [3] - 183:14, 183:23,

259:25

**fee** [2] - 346:5, 346:11

**feelings** [1] - 306:16

**fees** [5] - 337:18, 337:21, 337:22, 337:24, 346:7

**fell** [1] - 323:15

**felt** [3] - 191:19, 228:17, 228:20

**few** [13] - 193:19, 254:7, 262:9, 273:12, 274:2, 303:14, 307:12, 326:3, 337:14, 352:12, 355:9, 355:10, 365:9

**fifty** [3] - 352:10, 353:18

**fifty-fifty** [1] - 353:18

**figure** [3] - 229:18, 270:7, 333:7

**figured** [2] - 191:22, 228:9

**file** [1] - 337:25

**filed** [9] - 190:16, 190:18, 233:24, 234:6, 271:5, 277:4, 277:23, 278:24,

279:14

**filled** [1] - 280:24

**final** [4] - 201:11, 206:4, 211:23, 224:13

**finally** [3] - 254:13, 263:18, 299:22

**finance** [2] - 198:9, 314:15

**financial** [15] - 184:9, 185:21, 187:14, 200:14, 203:17, 206:1, 217:14, 279:9, 280:13, 290:17, 327:21, 344:17, 344:23, 345:17, 346:4

**financing** [1] - 354:21

**fine** [4] - 250:12, 264:4, 288:16, 288:19

**finger** [2] - 274:9, 370:20

**finish** [6] - 212:15, 231:25, 294:12, 331:19, 331:21, 334:7

**finished** [1] - 365:12

**finishes** [1] - 197:10

**fired** [1] - 345:18
**firm** [2] - 345:11, 346:2
**firms** [1] - 346:5
**first** [49] - 186:20, 188:24, 195:4, 195:15, 196:2, 196:3, 207:10, 209:6, 216:6, 222:4, 222:6, 223:18, 231:25, 235:9, 247:1, 258:9, 262:12, 266:21, 267:11, 270:20, 282:22, 282:24, 283:13, 287:1, 292:7, 292:8, 292:20, 293:3, 294:9, 294:20, 306:11, 316:9, 322:6, 333:6, 339:11, 340:6, 340:8, 341:17, 344:2, 344:3, 344:20, 344:24, 345:2, 345:12, 351:21, 356:17, 359:20, 361:4
**flip** [1] - 264:16
**flying** [1] -

299:6
**focus** [6] - 231:16, 237:25, 347:2, 349:1, 369:23
**follow** [2] - 206:2, 232:25
**followed** [3] - 203:17, 209:12, 372:19
**following** [17] - 193:23, 197:1, 198:1, 203:1, 205:1, 207:7, 209:1, 210:1, 213:1, 215:1, 231:13, 231:14, 234:9, 235:7, 252:1, 289:8, 362:13
**follows** [2] - 190:4, 339:12
**football** [1] - 342:19
**forcing** [1] - 263:14
**forgeries** [1] - 249:7
**forget** [1] - 332:7
**form** [9] - 201:20, 201:21, 214:3, 227:8, 267:21, 282:11, 315:8, 338:8
**former** [8] - 185:12, 217:12, 219:18, 220:8, 273:6, 293:12, 322:4, 334:18

**formulated** [1] - 370:9
**forth** [1] - 293:1
**forthright** [2] - 304:18, 304:25
**fortunate** [1] - 325:16
**forward** [3] - 221:1, 348:8, 354:20
**forwarded** [1] - 208:6
**forwarding** [1] - 272:11
**foundation** [1] - 249:14
**fourth** [1] - 215:16
**frankly** [1] - 375:8
**fraud** [31] - 239:17, 239:21, 240:3, 240:13, 241:14, 241:16, 242:1, 242:18, 242:22, 244:4, 244:15, 244:25, 245:2, 246:14, 247:6, 247:25, 254:4, 255:5, 255:14, 257:15, 258:8, 262:23, 263:6, 264:14, 264:17, 264:18,

265:9, 266:5, 286:20, 288:17, 288:18
**frauds** [1] - 238:9
**fraudulent** [8] - 263:25, 264:12, 264:21, 266:3, 266:4, 266:10, 287:12, 364:2
**fraudulently** [2] - 233:12, 233:21
**free** [6] - 223:24, 258:21, 288:17, 302:1, 368:22, 373:25
**freely** [1] - 221:15
**frequency** [1] - 364:14
**friend** [3] - 202:3, 350:15
**friendship** [1] - 221:12
**frivolous** [1] - 347:19
**front** [4] - 249:12, 252:5, 263:17, 342:24
**fruition** [2] - 229:22, 230:4
**frustrated** [1] - 365:22
**frustrating** [1] - 256:8
**full** [13] - 203:14, 236:5, 243:14,

243:15, 259:17, 261:23, 261:24, 266:20, 277:11, 277:19, 290:15, 290:21, 295:6
**Fund** [1] - 298:16
**fund** [6] - 253:10, 264:25, 265:1, 265:4, 287:12, 298:15
**fundamental** [2] - 241:4, 242:7
**funds** [6] - 234:23, 252:16, 255:1, 258:12, 259:24, 262:24
**future** [2] - 248:10, 248:14

**G**

**gaarn** [1] - 254:6
**Gaarn** [2] - 254:10, 271:10
**gains** [1] - 205:22
**Galioto** [2] - 212:13, 373:1
**Galioto's** [1] - 213:5
**game** [2] - 341:10, 342:14
**garbage** [1] - 342:25

**geared** [1] - 252:23

**general** [4] - 234:3, 240:10, 255:20, 286:20

**gentlemen** [1] - 324:7

**gesture** [1] - 353:14

**given** [8] - 229:19, 244:7, 253:17, 342:16, 352:7, 372:2, 372:18, 374:10

**Glen** [2] - 325:5

**Global** [4] - 253:10, 265:4, 298:15, 346:2

**goal** [4] - 233:7, 236:1, 241:22, 242:16

**got..** [1] - 309:19

**Government** [15] - 183:13, 273:22, 328:3, 357:7, 357:21, 357:22, 359:13, 359:18, 360:9, 360:19, 360:22, 361:2, 377:8, 377:9, 377:10

**government** [80] - 186:6, 187:23,

198:20, 207:14, 219:6, 219:14, 221:1, 225:24, 226:9, 227:6, 229:9, 232:23, 233:10, 233:19, 234:17, 235:9, 236:19, 236:22, 237:4, 238:2, 238:13, 238:24, 241:5, 241:7, 241:9, 241:12, 243:22, 244:1, 244:7, 245:1, 245:12, 245:14, 246:5, 247:5, 248:6, 248:12, 249:22, 250:13, 252:7, 252:12, 252:15, 253:14, 254:13, 254:21, 258:1, 260:21, 261:22, 263:23, 266:1, 266:6, 277:14, 285:7, 286:4, 286:24, 287:10, 288:4, 331:19,

339:3, 339:4, 357:17, 359:12, 360:21, 363:5, 363:21, 364:2, 365:13, 365:16, 366:13, 367:3, 368:5, 369:18, 370:10, 370:17, 370:23, 371:2, 372:23, 374:3, 374:6, 374:7, 374:23

**Government's** [4] - 194:3, 199:3, 224:7, 329:12

**government's** [17] - 209:10, 234:9, 235:23, 235:24, 240:25, 241:17, 250:16, 255:13, 262:22, 286:7, 357:8, 363:4, 365:1, 366:14, 370:25, 373:5

**graduate** [1] - 198:9

**graduated** [1] - 341:15

**graft** [1] - 341:24

**granted** [1] - 184:18

**great** [1] - 233:1

**greatest** [2] - 243:6, 340:23

**grew** [3] - 340:19, 341:13, 342:16

**gross** [1] - 224:8

**grossly** [2] - 293:10, 334:16

**ground** [1] - 372:14

**grounds** [1] - 372:4

**group** [1] - 351:23

**Group** [1] - 296:19

**grow** [4] - 340:18, 340:22, 341:9, 341:11

**growing** [1] - 342:6

**grown** [1] - 334:25

**growth** [1] - 230:5

**guarantee** [5] - 231:1, 231:6, 231:9, 231:17, 309:25

**guaranteed** [3] - 231:11, 309:22, 309:23

**guess** [26] - 184:7, 192:2, 194:18, 205:6, 207:18, 211:5, 220:19, 228:16, 241:19, 269:12,

272:2, 279:17, 287:7, 297:12, 298:3, 303:20, 310:14, 311:16, 314:12, 318:20, 323:15, 325:18, 325:24, 350:5, 353:24, 363:20

**guessing** [1] - 279:21

**guy** [1] - 344:20

**guys** [2] - 256:17, 342:8

**gym** [1] - 342:22

## H

**hair** [1] - 343:19

**haley** [4] - 227:2, 309:23, 327:11, 330:2

**Haley** [22] - 197:10, 226:23, 231:25, 251:4, 266:12, 301:11, 320:2, 327:9, 329:6, 330:12, 330:17, 330:21, 331:6, 333:25, 336:19, 364:10,

368:5, 369:1,
372:3,
374:21,
374:24,
375:12
**HALEY** [88] -
183:17,
184:15,
184:19,
186:8,
186:24,
187:25,
188:9,
188:14,
196:3, 197:5,
198:5, 200:2,
200:4, 203:6,
204:5, 205:3,
209:5,
209:21,
210:3,
210:21,
211:4, 211:6,
211:9,
211:13,
211:15,
212:15,
213:16,
214:5, 214:7,
215:3, 219:2,
222:25,
223:3,
223:18,
224:3, 224:5,
224:18,
225:17,
226:1,
226:11,
226:18,
226:24,
227:3, 229:7,
231:23,
232:1, 232:5,
232:11,
251:5,
266:14,
266:17,
267:25,

282:12,
289:2, 292:4,
301:12,
305:25,
320:3,
330:23,
331:1,
331:18,
333:19,
334:6,
336:20,
336:22,
337:10,
343:22,
357:19,
359:15,
360:24,
365:9, 366:1,
366:18,
366:22,
367:7,
367:14,
367:17,
369:3,
370:21,
371:5,
371:16,
371:24,
372:17,
373:9, 376:6,
376:10,
376:12,
376:24
**half** [14] -
191:5, 191:7,
191:13,
193:10,
235:11,
238:15,
238:20,
238:25,
240:12,
242:5, 244:3,
247:19,
295:19,
321:13
**hampered** [1]
- 374:23

**hand** [2] -
188:15,
359:22
**handed** [2] -
209:4, 300:4
**handful** [1] -
372:9
**Handing** [15]
- 194:3,
199:5, 208:9,
210:17,
215:14,
216:17,
222:14,
224:11,
225:22,
291:11,
300:13,
305:11,
310:24,
311:5, 332:1
**handing** [2] -
296:13,
312:21
**handled** [1] -
306:18
**handling** [1] -
293:16
**handwriting**
[5] - 213:24,
316:8,
316:11,
316:12,
316:14
**handwritten**
[1] - 319:19
**hangar** [2] -
302:24, 303:6
**hanger** [1] -
270:15
**hanging** [1] -
195:18
**harbor** [1] -
306:16
**hard** [1] -
219:24
**hardship** [6] -
184:9,

184:12,
185:21,
187:14,
189:12,
189:13
**hat** [1] -
223:22
**haunted** [1] -
217:17
**Hawaii** [26] -
193:3, 193:4,
194:2,
194:11,
194:14,
194:17,
215:8, 216:9,
239:17,
240:2,
259:21,
318:16,
327:19,
329:3, 332:4,
332:11,
349:4, 349:9,
349:12,
350:19,
351:1, 351:8,
351:25,
352:13,
356:19, 357:2
**Hawaiian** [5]
- 216:20,
267:14,
327:17,
328:8, 328:16
**head** [6] -
257:13,
269:18,
278:9, 280:2,
311:24, 312:2
**headed** [1] -
250:17
**heading** [1] -
361:11
**hear** [3] -
246:11,
297:5, 303:14
**heard** [12] -

206:25,
207:11,
217:12,
245:11,
246:9,
253:14,
253:16,
254:22,
254:23,
292:15,
306:23, 312:7
**hearing** [5] -
237:22,
254:24,
257:1,
342:19,
375:20
**hearsay** [1] -
209:2
**hedged** [1] -
247:25
**held** [1] -
346:23
**help** [5] -
220:19,
288:9, 313:8,
315:16, 342:8
**helping** [1] -
228:1
**helps** [2] -
209:16,
330:22
**hesitate** [2] -
264:12,
264:13
**high** [1] -
341:15
**highlight** [2] -
235:15, 262:9
**highlighted**
[2] - 234:14,
334:12
**highly** [2] -
245:13, 291:8
**Highway** [1] -
183:18
**himself** [2] -
209:9, 243:3

**hire** [6] - 205:25, 206:1, 299:8, 304:11, 337:25, 342:22

**hired** [2] - 208:2, 344:22

**historical** [1] - 252:23

**history** [2] - 360:15, 362:3

**hmm** [2] - 219:21, 307:14

**hockey** [25] - 191:11, 207:1, 207:10, 233:20, 235:18, 235:20, 235:22, 236:13, 242:2, 254:9, 268:10, 271:24, 324:20, 325:8, 329:25, 340:5, 340:6, 340:8, 341:2, 341:8, 341:12, 341:13, 342:9, 343:8, 343:9

**hoist** [1] - 243:22

**hold** [1] - 249:10

**holding** [2] - 241:5, 262:2

**home** [3] - 342:15, 352:23, 362:11

**honest** [3] -

191:20, 304:15, 313:11

**Honor** [89] - 184:15, 186:7, 186:9, 186:24, 187:1, 188:2, 188:9, 190:5, 194:25, 208:11, 209:5, 211:6, 213:2, 222:25, 223:6, 224:3, 224:18, 225:4, 225:13, 226:1, 226:4, 226:11, 226:20, 232:3, 232:8, 233:9, 233:14, 235:4, 236:12, 239:2, 240:8, 243:22, 243:24, 245:20, 248:9, 248:20, 251:5, 258:3, 262:1, 262:21, 263:9, 264:10, 264:22, 266:14, 268:3, 273:22, 284:18, 284:24, 290:3, 290:9, 291:23, 292:6, 299:25, 301:1, 301:9,

301:17, 301:22, 305:20, 306:6, 310:25, 313:5, 316:19, 317:9, 326:4, 326:24, 327:1, 331:1, 331:18, 336:20, 339:20, 357:19, 357:20, 359:11, 359:16, 360:20, 362:5, 364:17, 366:2, 366:6, 366:11, 367:18, 368:13, 369:3, 370:9, 371:16, 372:1, 372:24, 373:9, 374:18

**Honor's** [2] - 371:24, 373:10

**hoodwinked** [1] - 263:3

**hope** [5] - 236:8, 278:17, 306:4, 367:1, 367:4

**hopelessly** [1] - 241:8

**hoping** [5] - 232:23, 232:24, 233:4, 304:4, 364:20

**Hormovitis** [1] - 183:9

**hospital** [1] - 185:19

**hour** [3] - 204:3, 249:23, 269:6

**hour's** [1] - 371:12

**hours** [9] - 211:23, 369:17, 369:23, 370:8, 371:7, 371:12, 372:18, 373:15, 374:2

**house** [2] - 350:12

**housekeeping** [1] - 197:7

**hundred** [10] - 192:19, 194:1, 194:12, 281:24, 282:7, 282:19, 283:10, 307:13, 351:13, 352:16

**hundreds** [1] - 293:14

**Huntington** [1] - 352:19

**hurting** [1] - 374:7

**I**

**ice** [1] - 342:14

**idea** [5] - 191:23, 237:14, 249:3, 262:17, 299:15

**identification** [8] - 194:2,

291:9, 296:13, 305:10, 311:3, 315:21, 357:7, 360:19

**identified** [5] - 206:12, 217:25, 247:20, 343:21, 363:10

**identify** [6] - 209:7, 209:8, 245:8, 249:7, 250:24, 258:23

**identifying** [1] - 250:18

**ill** [2] - 293:10, 334:16

**ill-advised** [1] - 293:10

**illegally** [1] - 259:24

**imagine** [1] - 198:14

**Impact** [1] - 307:23

**impact** [1] - 215:6

**impeach** [1] - 213:19

**impeachment** [1] - 213:3

**implore** [1] - 188:10

**import** [2] - 200:12, 200:16

**important** [1] - 354:25

**impression** [2] - 283:13, 295:11

**improper** [2] - 213:3,

213:25

**improperly** [1] - 373:8

**improvise** [1] - 342:17

**inadmissible** [1] - 369:12

**inappropriate** [2] - 203:10, 315:20

**inclination** [1] - 187:5

**include** [3] - 270:15, 370:20, 371:14

**included** [4] - 189:12, 271:15, 271:16

**including** [2] - 230:13, 271:17

**incorrect** [2] - 235:3, 236:3

**incriminating** [1] - 371:3

**incumbrances** [1] - 302:2

**indeed** [2] - 201:24, 369:24

**independent** [1] - 319:13

**indicate** [2] - 356:2, 358:23

**indicated** [9] - 184:6, 184:9, 185:20, 193:1, 203:13, 233:3, 235:2, 356:20, 361:19

**indicates** [2] - 314:6, 327:14

**indication** [2]

- 203:10, 319:19

**indicted** [1] - 258:9

**indictment** [44] - 233:5, 233:9, 234:3, 234:8, 234:11, 234:12, 235:10, 235:16, 236:14, 237:1, 237:2, 237:3, 237:22, 237:25, 238:1, 238:10, 238:14, 238:22, 239:6, 239:8, 240:10, 241:11, 241:17, 241:24, 243:20, 245:14, 245:25, 246:6, 247:8, 254:23, 255:9, 255:14, 256:23, 257:14, 257:18, 257:19, 266:5, 285:4, 286:3, 286:7, 286:22, 288:22

**indictments** [2] - 244:19, 246:24

**indirectly** [1] - 252:25

**individual** [1] - 233:22

**individuals** [2] - 190:16, 236:12

**induced** [2] - 243:4, 246:20

**information** [15] - 234:5, 237:8, 243:21, 243:25, 246:5, 247:7, 250:19, 278:18, 279:7, 280:4, 280:5, 282:13, 312:11, 324:25, 369:11

**informed** [1] - 336:3

**infrastructure** [1] - 351:18

**initial** [3] - 287:11, 321:6, 338:2

**inland** [1] - 349:17

**innocent** [2] - 259:21

**inordinate** [1] - 242:8

**inquire** [1] - 193:16

**inquiring** [1] - 277:15

**inquiry** [3] - 223:21, 274:19, 373:11

**insert** [1] - 233:13

**inside** [1] - 270:19

**insist** [1] - 193:13

**instance** [1] - 186:20

**instances** [1] - 203:20

**instead** [4] - 195:3, 311:20, 338:6, 341:20

**institution** [1] - 346:22

**instruct** [1] - 264:4

**intelligent** [1] - 334:25

**intend** [2] - 373:13, 373:16

**intended** [1] - 234:25

**intends** [1] - 368:5

**intent** [1] - 371:6

**intention** [4] - 369:5, 369:10, 369:21, 371:16

**interaction** [2] - 212:7, 363:22

**interactions** [1] - 363:25

**interest** [24] - 233:11, 236:17, 237:19, 242:3, 275:4, 285:22, 293:18, 309:24, 318:7, 320:12, 320:21, 320:25, 321:22, 324:4, 325:17, 326:6, 326:8, 326:9,

326:12, 327:17, 344:16, 355:20, 355:22

**interested** [2] - 195:9, 318:3

**interesting** [4] - 303:17, 318:5, 329:15, 349:18

**interests** [1] - 282:23

**interpretation** [2] - 237:14, 365:14

**interrupt** [1] - 225:23

**interstate** [1] - 349:17

**interview** [4] - 212:3, 212:13, 213:11, 332:7

**interviewed** [5] - 212:1, 215:4, 216:7, 217:1, 217:19

**interviewing** [1] - 217:4

**introduce** [10] - 234:18, 245:21, 252:7, 253:21, 258:14, 260:11, 266:6, 369:5, 371:17, 372:8

**introduced** [8] - 199:2, 202:8, 209:13, 210:10, 241:10, 266:19,

344:8, 344:20
**introducing**
[2] - 245:10,
245:24
**introduction**
[4] - 259:3,
344:10,
344:11,
374:11
**invest** [9] -
191:3, 205:5,
231:1,
233:15,
285:20,
310:8,
313:17,
351:8, 351:11
**invested** [29]
- 191:11,
203:12,
204:3,
230:12,
235:4,
235:22,
270:12,
271:14,
272:4,
272:19,
295:12,
295:15,
296:24,
302:24,
303:6, 307:7,
307:23,
308:2, 310:5,
313:10,
313:15,
314:9,
320:15,
322:11,
324:21,
325:8,
351:13,
351:16
**investigation**
[2] - 244:16,
249:8
**investing** [2]

- 252:9,
313:20
**Investment**
[1] - 223:23
**investment**
[96] -
190:10,
192:3, 194:1,
194:11,
194:17,
195:10,
200:24,
202:4,
202:10,
203:14,
203:18,
203:20,
205:9,
205:16,
205:17,
206:2, 206:5,
215:8,
216:20,
221:7,
227:22,
229:10,
229:12,
229:21,
230:14,
231:6,
231:18,
234:20,
234:25,
242:21,
267:14,
271:2,
272:23,
274:11,
275:16,
277:12,
277:16,
277:20,
278:2, 278:3,
278:7,
278:12,
279:16,
281:25,
282:20,

283:11,
287:10,
290:15,
295:7, 296:2,
297:14,
297:17,
298:1,
298:20,
300:20,
303:25,
306:13,
306:14,
306:18,
307:19,
309:24,
310:12,
310:15,
312:12,
312:14,
313:13,
315:1,
315:18,
315:25,
321:6,
322:14,
322:17,
322:20,
322:24,
323:5, 324:3,
325:2,
325:11,
325:13,
325:19,
328:7,
328:15,
328:20,
335:1,
335:23,
346:8,
346:14,
346:17,
346:19,
347:15,
347:24,
348:11,
351:10,
351:12,
351:23, 354:8

**investments**
[48] -
201:11,
203:8, 203:9,
203:16,
205:20,
215:6,
215:21,
219:5,
219:12,
219:13,
219:25,
220:14,
221:3,
221:11,
221:16,
228:14,
229:3, 229:4,
229:17,
230:3,
230:13,
230:15,
230:23,
230:24,
237:6, 237:7,
240:24,
241:1,
252:17,
272:3, 272:8,
279:14,
285:9, 293:9,
304:9, 309:3,
309:7,
309:15,
309:17,
309:22,
311:9,
312:16,
335:5,
347:25,
348:10,
348:18,
352:3, 358:14
**investor** [2] -
335:3, 335:8
**investors** [5]
- 211:20,
236:14,

243:2,
252:24,
271:24
**involved** [10]
- 198:12,
205:13,
215:6,
252:24,
290:25,
325:1, 335:6,
337:22,
342:13, 345:1
**involvement**
[2] - 205:15,
352:13
**involves** [2] -
288:14,
342:15
**involving** [2] -
212:6, 369:18
**irrelevant** [2]
- 209:3,
305:23
**island** [1] -
349:12
**Island** [3] -
347:5, 347:7,
352:19
**Islanders** [2]
- 340:14,
348:14
**Islandia** [1] -
183:18
**Isle** [16] -
223:22,
267:12,
267:15,
327:15,
328:7,
328:15,
328:20,
351:20,
351:21,
351:22,
351:23,
352:1, 352:4,
352:5,
352:11,

357:16
**Islip** [3] -
183:6,
183:15,
183:23
**issue** [17] -
184:5, 185:8,
185:10,
185:12,
232:20,
265:25,
292:21,
366:1,
367:22,
369:9,
369:14,
369:16,
369:20,
370:7, 375:3,
375:16,
375:18
**issued** [1] -
366:24
**issues** [16] -
185:3,
187:21,
189:5, 189:6,
189:9, 233:5,
293:3,
306:15,
335:4, 335:9,
364:19,
364:20,
364:22,
364:23,
365:1, 375:9
**item** [1] -
349:1
**itself** [8] -
199:13,
199:24,
264:11,
264:13,
265:8, 266:9,
299:18, 364:2
**IV** [15] -
267:12,
267:15,

327:15,
328:7,
328:15,
328:20,
351:20,
351:21,
351:22,
351:23,
352:1, 352:4,
352:5,
352:12,
357:16

**J**

**JAMES** [1] -
183:15
**Jason** [3] -
321:24,
322:6, 322:10
**Jean** [5] -
202:2, 202:8,
203:11,
205:13,
205:25
**jerk** [1] -
249:11
**Jerry** [2] -
350:9, 350:16
**Jersey** [1] -
254:8
**JFB** [1] -
183:4
**JJ-1** [3] -
194:3, 194:4,
331:23
**job** [1] -
185:4
**Joe** [9] -
223:13,
234:16,
239:9,
258:10,
292:22,
306:11,
306:22,
316:10,
316:23
**JOE** [2] -

190:1, 376:2
**John** [7] -
233:12,
233:15,
234:16,
234:17,
257:18,
285:17,
285:18
**join** [1] -
342:21
**joint** [2] -
375:18,
375:19
**Joseph** [1] -
234:16
**JOSEPH** [1] -
183:11
**Jowdy** [20] -
237:6, 249:6,
310:8,
310:13,
313:9,
314:25,
315:9,
315:12,
319:5,
319:19,
320:17,
320:23,
322:13,
322:17,
322:21,
324:4,
324:11,
325:9,
325:16,
325:24
**Jowdy's** [6] -
249:9, 308:2,
312:24,
319:21,
319:23,
322:11
**Js** [1] -
316:18
**Judge** [39] -
196:4, 200:2,

203:15,
203:19,
209:12,
211:4,
223:18,
227:3,
231:23,
233:23,
234:6,
235:11,
236:2, 236:5,
236:9,
238:21,
241:19,
241:23,
242:7,
242:18,
247:3,
247:12,
247:16,
247:22,
265:15,
292:1,
296:11,
300:5, 316:9,
366:19,
367:7, 368:1,
369:12,
369:14,
369:16,
369:21,
369:24,
374:9, 375:22
**JUDGE** [1] -
183:12
**judge** [28] -
197:7,
210:21,
232:1,
236:16,
238:11,
247:1, 250:7,
251:2,
253:23,
254:2,
254:11,
254:19,
255:10,

255:12,
256:12,
258:15,
258:17,
260:23,
261:24,
262:9,
262:20,
264:6,
286:24,
287:6, 288:3,
289:2, 296:9,
337:10
**July** [5] -
267:19,
277:4,
296:17,
300:23,
306:10
**jumping** [1] -
277:22
**June** [2] -
328:3, 329:2
**juneau** [2] -
237:9, 237:16
**Juneau** [79] -
189:16,
190:9,
192:19,
198:6, 198:8,
223:13,
223:21,
225:23,
232:17,
234:16,
234:19,
234:22,
234:23,
235:4, 237:8,
239:4, 239:9,
239:13,
240:13,
240:17,
240:20,
240:23,
241:1,
242:21,
243:3,

246:21,
247:6, 247:7,
247:21,
247:24,
250:19,
252:9,
252:18,
252:20,
252:23,
253:1, 253:2,
253:22,
258:10,
258:11,
258:18,
259:5, 260:7,
260:18,
260:24,
262:10,
262:17,
263:24,
264:16,
265:2, 266:2,
266:18,
266:23,
268:7,
268:16,
273:25,
274:18,
290:13,
291:11,
292:10,
292:12,
293:25,
296:8,
296:12,
302:3, 302:4,
305:10,
306:8,
306:11,
306:22,
316:10,
316:24,
317:15,
319:6, 327:9,
338:11,
363:7,
363:23,
364:23

**JUNEAU** [2] -
190:1, 376:2
**Juneau's** [8] -
234:25,
235:8,
235:13,
243:9,
255:15,
261:16,
263:2, 265:25
**juneau's** [1] -
235:17
**junior** [1] -
342:9
**juror** [7] -
184:5, 184:6,
184:20,
184:22,
186:3,
187:12,
187:20
**JUROR** [9] -
185:1, 185:4,
185:11,
185:15,
185:18,
185:23,
186:2,
187:19,
338:18
**jurors** [3] -
184:4, 185:9,
242:22
**jury** [54] -
183:12,
184:12,
184:13,
185:5,
187:22,
188:18,
188:20,
197:10,
203:19,
229:8,
232:15,
235:2,
235:20,
237:20,

239:19,
240:22,
241:2, 241:9,
241:13,
241:16,
242:13,
244:20,
244:25,
245:2,
248:18,
249:12,
253:15,
260:19,
262:2,
262:16,
262:17,
263:17,
264:4,
265:20,
265:21,
265:23,
284:25,
290:4, 290:6,
317:23,
324:7,
338:16,
339:2, 349:8,
351:22,
362:12,
364:1,
365:21,
369:25,
371:13,
374:1,
374:13,
374:14
**JURY** [1] -
188:21
**just..** [1] -
318:4

**K**

**keep** [6] -
211:14,
241:21,
242:14,
258:23,
314:15,

374:23
**Ken** [5] -
249:6, 249:9,
312:10,
319:5, 324:11
**ken** [1] -
319:21
**kenner** [2] -
347:8, 355:7
**KENNER** [1] -
183:7
**Kenner** [151]
- 183:7,
183:18,
190:23,
191:9, 193:1,
193:18,
198:22,
199:1,
200:14,
201:3, 205:8,
206:13,
206:22,
207:16,
208:9,
209:10,
210:8,
210:21,
210:24,
210:25,
211:10,
212:7, 215:6,
215:13,
215:22,
216:15,
218:1, 219:4,
219:5,
219:11,
219:23,
219:25,
220:12,
220:14,
221:3, 221:6,
221:21,
222:4,
222:11,
222:20,
223:7, 223:9,

225:14,
225:18,
226:2, 226:5,
226:7,
226:15,
226:16,
226:21,
227:24,
228:13,
228:15,
231:5,
231:10,
231:17,
233:10,
233:12,
233:20,
234:21,
234:24,
237:19,
238:8, 242:1,
242:23,
243:5,
243:11,
246:15,
247:9,
252:25,
254:5, 254:6,
254:10,
255:10,
264:15,
267:6, 269:9,
269:24,
271:3, 271:9,
271:14,
272:4, 272:9,
272:12,
273:2,
273:11,
273:18,
274:4,
274:15,
275:21,
275:24,
277:15,
278:6,
278:15,
278:17,
278:23,

279:10,
279:13,
279:25,
280:9, 285:8,
285:17,
294:24,
295:22,
304:7, 304:8,
304:11,
307:4, 307:8,
309:4,
310:10,
320:16,
323:11,
324:25,
327:10,
328:5,
329:17,
332:9, 333:1,
333:12,
333:25,
336:23,
343:12,
344:2,
344:19,
344:23,
345:17,
345:22,
347:6, 347:7,
347:16,
349:7, 350:2,
351:5, 352:2,
355:18,
356:22,
356:23,
357:4,
367:21,
368:9,
373:14,
373:16,
374:8,
375:12,
377:12,
377:17,
377:18,
377:19,
377:20
**Kenner's** [8] -

234:20,
234:21,
236:17,
252:10,
285:16,
352:11,
367:25
**Kenners** [1] -
269:1
**kept** [3] -
207:24,
217:7, 233:20
**Khristich** [9] -
236:13,
237:18,
239:4,
250:15,
250:22,
322:1, 322:8,
322:11, 337:8
**kid** [3] -
341:9, 342:6,
342:18
**kids** [1] -
332:22
**killed** [1] -
185:6
**killing** [1] -
184:11
**kind** [24] -
184:16,
193:11,
219:17,
233:6,
250:18,
260:1, 261:8,
268:22,
279:20,
299:6, 299:7,
303:18,
304:12,
309:9, 318:1,
318:3,
324:18,
340:21,
342:4,
344:12,
345:20,

347:25, 350:5
**kindly** [7] -
208:8, 216:5,
226:21,
260:11,
266:18,
266:20,
336:23
**kinds** [1] -
347:15
**Kirkland** [1] -
230:14
**knowing** [2] -
240:9, 243:4
**knowledge** [4]
- 220:11,
321:10,
352:24,
366:15
**known** [4] -
186:21,
230:19,
294:11,
294:23
**knows** [2] -
245:23, 284:5
**KOMATIREDDY**
[8] - 183:16,
366:6,
366:10,
368:13,
372:1,
372:24,
374:9, 375:22
**Kristin** [8] -
367:20,
368:17,
368:20,
369:4,
369:15,
369:18,
371:18,
373:13

---

**L**

**L-O-C** [1] -
215:8
**LA** [28] -

186:9, 187:7,
187:24,
197:7, 290:3,
290:9,
290:12,
291:23,
292:1, 292:6,
294:3,
294:15,
296:9,
299:20,
299:25,
300:5, 300:8,
301:1, 301:4,
301:9,
301:14,
301:17,
301:22,
305:9,
305:20,
306:6,
367:18,
376:16
**label** [1] -
213:6
**lack** [1] -
293:4
**ladies** [1] -
324:7
**laid** [3] -
233:25,
237:21,
257:16
**land** [10] -
240:2,
313:20,
328:8,
348:11,
349:3,
349:10,
350:19,
350:21,
351:24,
356:15
**lands** [1] -
350:19
**language** [1]
- 206:14

**laptop** [1] -
219:23
**large** [3] -
293:20,
348:2, 355:6
**LARUSSO** [1]
- 183:20
**LaRusso** [85]
- 223:5,
223:6,
225:12,
225:13,
226:4,
226:20,
232:19,
232:22,
233:2,
237:13,
238:11,
238:12,
238:21,
240:8,
241:19,
241:23,
242:25,
243:18,
243:24,
244:5, 245:7,
245:20,
246:2, 247:1,
247:22,
248:9,
249:17,
250:7, 251:2,
252:5,
253:16,
254:2, 255:8,
257:2,
257:16,
258:3,
258:22,
259:6, 260:6,
261:14,
261:22,
262:8, 263:9,
263:18,
264:5, 264:6,
264:22,

265:10,
265:15,
265:18,
268:2, 268:3,
268:6,
273:16,
273:22,
273:24,
284:7,
284:18,
284:24,
285:3,
286:19,
287:24,
288:3, 309:2,
310:25,
313:5, 316:9,
316:19,
317:9,
318:11,
320:8, 326:3,
326:23,
334:9,
335:25,
337:13,
337:14,
337:16,
338:9,
357:20,
359:16,
360:25,
376:14,
376:20, 377:2
**laRusso** [2] -
226:19,
250:13
**LaRusso's** [1]
- 257:10
**last** [27] -
199:25,
243:13,
247:10,
256:12,
266:22,
266:23,
267:5,
267:10,
268:9,

293:23,
294:4, 294:5,
294:18,
297:4, 297:5,
297:7,
317:15,
317:18,
318:22,
318:23,
319:18,
328:5, 336:3,
339:15,
359:1, 363:4,
367:12
**lastly** [1] -
335:15
**late** [2] -
189:1, 338:13
**latest** [1] -
274:13
**laundering** [1]
- 264:19
**law** [4] -
186:20,
367:8,
367:10, 372:2
**lawsuit** [10] -
200:22,
201:1, 201:7,
271:5, 271:9,
271:12,
271:16,
306:15,
324:16
**lawyer** [16] -
208:2,
217:12,
219:18,
220:8,
220:13,
220:19,
220:22,
282:8,
283:25,
290:16,
290:20,
290:25,
292:16,

336:14,
337:25,
373:25
**lawyers** [5] -
185:25,
189:3, 196:5,
338:6, 365:21
**lay** [2] -
235:14,
249:14
**laying** [1] -
254:13
**lays** [1] -
255:11
**leading** [1] -
243:16
**Leafs** [1] -
340:15
**league** [1] -
341:23
**learned** [1] -
332:17
**least** [9] -
201:16,
207:16,
207:18,
240:19,
242:20,
254:14,
262:6, 302:6,
368:8
**leave** [3] -
235:20,
366:23, 367:5
**leaves** [3] -
187:20,
232:15,
338:16
**led** [1] -
326:15
**left** [3] -
284:25,
359:22,
362:12
**left-hand** [1]
- 359:22
**legal** [7] -
189:6, 293:7,

293:20,
337:18,
337:20,
337:22,
337:24
**legitimate** [1]
- 288:19
**legs** [2] -
184:11, 185:6
**lend** [1] -
315:7
**lender** [1] -
326:20
**Lending** [1] -
224:2
**lending** [2] -
314:25, 315:1
**length** [1] -
373:25
**lengthy** [4] -
199:4,
225:19,
334:9, 372:11
**lent** [2] -
314:6, 314:24
**less** [4] -
185:22,
195:2,
263:12,
269:15
**letter** [23] -
193:11,
193:15,
235:10,
235:16,
238:15,
238:21,
238:25,
240:12,
241:25,
247:6,
247:13,
247:19,
249:6,
250:10,
255:9, 258:5,
261:5, 305:4,
305:5,

305:16,
332:19,
332:22, 367:9
**letters** [6] -
207:7, 240:2,
244:19,
245:14,
245:25, 249:8
**level** [5] -
331:12,
356:2, 364:7,
364:12, 366:5
**LIE** [1] -
189:8
**liens** [1] -
302:2
**lieu** [1] -
297:17
**life** [1] -
329:24
**life's** [1] -
341:7
**lifestyle** [1] -
347:19
**light** [1] -
261:19
**limited** [6] -
230:11,
248:4,
335:18,
335:22,
342:21, 348:1
**line** [67] -
193:14,
193:19,
201:9,
201:12,
216:8,
216:19,
222:1,
223:14,
223:22,
228:24,
229:1, 229:2,
242:18,
328:17,
331:7, 332:3,
332:8,

332:11,
332:12,
332:18,
332:23,
333:4, 333:5,
333:9,
333:13,
334:4,
335:18,
337:2, 337:4,
351:14,
352:4, 353:2,
353:3, 353:4,
353:9,
353:13,
353:25,
354:2,
354:14,
354:22,
355:8,
355:11,
355:19,
355:21,
356:4, 356:6,
356:17,
356:18,
356:23,
357:1, 357:4,
357:15,
358:2, 358:5,
358:8, 359:4,
360:2, 360:3,
360:13,
360:16,
361:8,
361:17,
362:1, 362:4,
373:11
**lines** [5] -
306:24,
307:1,
331:12,
372:1, 374:14
**linked** [1] -
312:10
**linking** [1] -
198:25
**list** [2] -

190:21,
368:14
**listed** [1] -
236:14
**listen** [3] -
349:19,
362:9, 369:20
**listening** [1] -
345:5
**lists** [1] -
307:12
**live** [3] -
242:16,
347:19,
347:21
**lived** [1] -
340:25
**living** [6] -
340:4,
346:24,
347:4, 347:5,
347:6, 352:18
**LLC** [12] -
228:23,
267:12,
267:15,
301:25,
317:6, 319:4,
319:5,
320:14,
328:15,
351:20,
353:24
**loan** [22] -
192:20,
193:2, 193:8,
193:10,
313:17,
314:9,
314:20,
314:25,
315:6, 315:8,
315:9,
315:12,
315:13,
315:17,
315:25,
321:3, 321:6,

332:13,
334:1,
360:15,
361:12
**loans** [1] -
219:5
**located** [1] -
323:20
**longest** [1] -
217:6
**longish** [1] -
343:19
**look** [42] -
199:4,
199:15,
200:1, 208:8,
210:16,
213:21,
215:12,
215:13,
216:5,
216:15,
222:11,
222:13,
224:6,
224:10,
224:13,
226:21,
238:1,
249:11,
266:18,
266:20,
273:20,
275:4,
276:11,
276:19,
291:10,
294:6,
296:12,
296:23,
300:10,
300:12,
300:14,
311:3, 311:6,
312:20,
313:3,
315:22,
316:3, 335:1,

336:23,
351:1, 357:9,
361:4
**looked** [6] -
203:7, 256:5,
270:17,
281:14,
285:4, 330:10
**looking** [17] -
216:24,
229:2,
229:25,
230:5, 230:6,
262:15,
311:18,
312:3,
312:22,
317:15,
317:19,
317:20,
319:10,
321:5,
347:18,
359:20
**looks** [18] -
200:17,
200:18,
208:7, 211:3,
224:17,
250:20,
267:1,
277:10,
292:24,
301:22,
305:18,
316:21,
317:1,
318:20,
319:23,
328:21,
329:12
**LORETTA** [1] -
183:13
**Los** [1] -
323:3
**lose** [5] -
201:13,
205:16,

228:22,
228:25, 229:1
**loses** [1] -
203:21
**losing** [1] -
358:23
**loss** [4] -
229:20,
253:23,
254:19,
256:14
**lost** [7] -
202:11,
203:25,
229:4, 230:2,
253:2,
325:11,
325:12
**love** [2] -
263:18,
341:10
**loved** [1] -
341:14
**lower** [2] -
297:25,
299:13
**Lucas** [1] -
323:18
**lunch** [6] -
189:5, 269:3,
279:18,
284:20,
284:22,
288:25
**luncheon** [1] -
289:7
**LYNCH** [1] -
183:13

**M**

**ma'am** [1] -
184:24
**Maguire** [2] -
350:9, 350:16
**mail** [56] -
193:2,
206:12,
206:16,

206:19,
206:21,
206:24,
207:4, 207:8,
209:12,
210:6, 210:7,
211:7,
217:25,
219:3, 219:4,
219:24,
222:19,
222:22,
223:15,
223:17,
228:18,
230:11,
250:9,
272:11,
272:13,
273:8,
275:21,
276:6,
277:14,
278:10,
279:4, 280:5,
280:9,
280:15,
280:24,
291:16,
291:20,
295:21,
306:25,
307:11,
328:6,
330:12,
330:17,
332:25,
333:25,
334:10,
334:11,
334:14,
335:11,
335:17,
335:25,
363:18,
369:7, 374:12
**mailed** [2] -
359:6, 359:9

**mailing** [1] -
336:1
**mails** [35] -
192:25,
207:15,
207:22,
207:23,
208:1, 208:5,
210:9,
210:13,
218:2,
219:10,
219:14,
219:17,
219:18,
219:19,
219:22,
220:20,
220:21,
221:2,
223:16,
223:17,
223:19,
280:19,
291:7, 328:4,
330:3, 330:8,
330:9,
330:10,
330:18,
330:20,
331:2,
347:12,
363:18,
364:10
**main** [1] -
192:15
**Maine** [1] -
299:5
**major** [2] -
240:8, 341:23
**man** [3] -
263:14,
310:8, 343:11
**manage** [2] -
353:15,
353:21
**managed** [1]
- 320:16

**management**
[2] - 201:4,
205:14
**Management**
[7] - 250:11,
296:18,
317:6, 318:7,
319:5,
320:12,
320:14
**manager** [1] -
198:23
**managing** [1]
- 347:16
**Maple** [1] -
340:15
**Mar** [16] -
235:5, 242:4,
308:3, 319:4,
321:18,
322:25,
323:6,
323:14,
324:3,
324:13,
324:21,
325:9,
325:14,
326:6, 326:8,
326:19
**March** [3] -
212:4, 217:3,
358:1
**marginally** [1]
- 203:22
**marked** [24] -
208:9,
215:13,
216:15,
222:11,
223:9,
225:14,
225:18,
226:7,
226:16,
266:19,
276:9, 291:9,
301:7,

310:23,
311:1, 311:2,
312:20,
315:21,
320:6,
331:17,
331:23,
357:6,
360:18,
368:18
**market** [8] -
192:2, 231:1,
299:2, 299:4,
348:1,
348:23,
353:17, 355:2
**marking** [2] -
194:2, 323:13
**marshals** [1] -
367:12
**Mascarella**
[10] - 222:2,
222:8,
222:20,
223:13,
224:2, 289:2,
289:5, 366:4,
366:6, 366:15
**MASCARELLA**
[1] - 222:8
**mass** [2] -
365:7, 365:19
**material** [7] -
188:10,
198:14,
198:18,
213:7, 283:1,
370:3, 373:18
**matter** [7] -
185:9,
221:25,
230:25,
250:15,
280:18,
281:5, 307:11
**matters** [1] -
221:15
**mean** [40] -

190:22,
194:18,
195:11,
195:13,
205:25,
213:20,
220:17,
225:8,
228:20,
244:14,
258:15,
263:11,
263:13,
264:13,
276:23,
277:10,
285:12,
298:1,
302:19,
302:20,
304:15,
310:2,
311:10,
312:10,
323:11,
327:20,
329:14,
332:12,
332:15,
333:16,
333:24,
337:23,
349:18,
350:8,
352:22,
354:2, 356:9
**meaning** [4] -
269:18,
282:16,
358:19
**means** [2] -
206:9, 328:10
**meant** [1] -
348:22
**mechanical** [1]
- 183:25
**media** [1] -
306:20

medical [1] - 189:13

Meeks [3] - 208:3, 217:12, 292:15

meet [4] - 189:4, 189:5, 344:2, 344:7

meeting [4] - 269:2, 304:1, 344:25

meetings [1] - 347:13

member [2] - 318:7, 320:14

members [6] - 188:20, 265:23, 267:12, 339:2, 349:8, 351:22

Membership [1] - 317:7

membership [1] - 321:20

memory [4] - 199:22, 212:6, 213:14, 267:5

men [1] - 335:1

mention [1] - 350:16

mentioned [8] - 281:1, 295:1, 295:22, 298:25, 322:13, 323:17, 324:16, 326:13

mentioning [1] - 374:23

merits [1] - 281:6

met [6] -

212:4, 268:18, 268:24, 278:22, 333:17, 344:3

method [1] - 280:12

Mexican [3] - 309:8, 311:9, 313:10

Mexico [12] - 215:7, 233:15, 234:20, 235:1, 237:7, 240:4, 252:9, 259:22, 313:21, 315:7, 327:19

mic [1] - 339:18

Michael [8] - 217:12, 292:15, 338:21, 339:4, 339:15, 367:19, 368:16, 368:19

MICHAEL [3] - 339:10, 339:15, 377:3

Michele [3] - 185:2, 186:19, 188:15

Michigan [1] - 341:22

middle [1] - 361:13

might [10] - 186:13, 217:14, 295:16, 316:6, 325:4, 325:5, 343:1, 348:5,

369:14, 373:12

million [17] - 191:5, 191:7, 191:13, 191:24, 193:10, 229:4, 229:20, 230:2, 295:19, 307:19, 307:22, 321:13, 328:11, 345:2, 345:5, 351:15, 353:2

mind [3] - 222:9, 320:15, 369:8

mindset [1] - 204:4

mine [2] - 202:3, 361:18

Mineola [1] - 183:21

mingled [1] - 287:13

mini [1] - 244:20

minute [5] - 231:24, 247:11, 251:5, 256:13, 266:14

minutes [5] - 188:8, 249:12, 251:2, 338:19, 368:23

misappropriation [1] - 368:1

misconduct [1] - 233:25

misconstrue

[1] - 373:2

MISKIEWICZ [104] - 183:15, 186:6, 187:23, 188:2, 188:8, 190:5, 190:8, 194:24, 195:25, 199:18, 201:5, 201:20, 202:12, 203:3, 203:24, 205:11, 205:18, 206:6, 208:11, 209:2, 212:14, 212:16, 213:2, 213:17, 214:8, 215:24, 216:11, 223:4, 224:21, 224:24, 225:4, 225:10, 226:14, 227:8, 229:6, 230:17, 231:7, 236:25, 238:17, 239:1, 239:8, 239:24, 242:25, 246:13, 248:20, 252:14, 252:22, 257:9, 259:2, 262:1,

262:21, 264:1, 264:3, 264:10, 282:9, 284:4, 285:19, 289:5, 290:22, 292:2, 300:6, 301:10, 304:19, 305:23, 311:14, 314:22, 315:2, 315:14, 317:11, 317:14, 317:20, 320:1, 321:8, 322:15, 324:23, 326:1, 326:21, 327:1, 327:8, 331:15, 336:18, 337:5, 338:7, 338:21, 339:4, 339:20, 339:23, 343:20, 343:24, 344:1, 357:17, 357:23, 359:11, 359:19, 360:20, 361:3, 362:5, 364:17, 364:25, 376:4, 376:8, 376:18, 376:22, 377:5

Miskiewicz [25] - 188:7, 189:21,

197:8, 233:2,
234:4, 236:9,
236:23,
240:15,
242:24,
244:6, 246:1,
247:18,
250:5, 252:3,
256:2, 257:7,
258:25,
260:10,
261:6,
263:10,
263:16,
264:23,
301:15,
339:19,
365:10
**misleading** [2]
- 373:7,
374:14
**misrepresent**
[1] - 373:2
**misspoke** [1]
- 253:9
**mistrial** [1] -
247:16
**mix** [2] -
221:9, 350:7
**model** [1] -
356:13
**moment** [17]
- 194:24,
200:23,
201:18,
218:1, 224:3,
231:23,
246:20,
264:8,
267:21,
296:9, 300:5,
310:25,
331:24,
333:15,
348:18,
357:9, 373:10
**Monday** [2] -
306:10, 368:4

**money** [103] -
185:22,
190:14,
191:3,
191:10,
191:18,
192:12,
192:14,
192:16,
192:21,
193:23,
194:5,
194:13,
194:14,
194:17,
195:14,
195:19,
195:20,
202:11,
203:21,
203:25,
204:3,
205:17,
211:18,
228:21,
230:12,
231:10,
231:17,
234:24,
234:25,
235:8, 238:7,
239:11,
239:12,
239:21,
240:4, 241:3,
242:4,
243:10,
243:15,
250:20,
253:2,
255:21,
262:11,
264:18,
264:24,
265:1,
265:13,
273:11,
273:13,

273:14,
274:12,
275:20,
278:13,
280:23,
281:18,
282:8,
282:14,
282:25,
285:14,
285:20,
285:21,
286:15,
286:16,
286:18,
287:13,
287:21,
288:18,
293:15,
293:20,
310:5,
310:15,
311:22,
313:15,
314:4, 314:6,
314:9,
314:25,
315:10,
325:21,
333:12,
333:23,
333:24,
334:3,
336:13,
338:2,
340:24,
342:17,
344:13,
346:10,
346:23,
348:6,
348:16,
351:11,
352:25,
353:12,
356:7, 356:8,
356:17,
356:23,

357:16,
358:24
**monies** [4] -
235:6, 261:2,
298:13,
355:23
**month** [1] -
354:17
**monthly** [6] -
347:22,
358:11,
358:13,
358:17,
358:25, 359:3
**months** [6] -
328:23,
329:4,
354:18,
355:9,
355:10,
355:13
**Montreal** [1] -
268:10
**Moreau** [1] -
271:25
**moreover** [2]
- 237:10,
243:13
**morning** [21]
- 184:3,
184:24,
184:25,
185:1,
188:20,
188:21,
188:23,
189:2,
193:14,
198:6, 198:7,
211:3,
232:13,
233:2, 299:1,
330:4, 331:6,
362:7,
365:23,
368:25,
375:21
**most** [5] -

208:5, 236:4,
237:12,
271:1, 365:2
**mostly** [2] -
349:13,
350:24
**motion** [1] -
233:24
**move** [16] -
211:11,
217:9,
241:21,
246:3, 281:3,
294:2,
298:23,
310:3,
314:19,
342:9,
345:23,
353:20,
354:1,
354:22, 365:7
**moved** [8] -
269:18,
281:15,
281:17,
304:15,
340:25,
344:17,
346:1, 355:12
**moves** [3] -
357:17,
359:12,
360:21
**movie** [1] -
350:17
**moving** [4] -
233:7,
304:21,
348:8, 354:20
**MR** [283] -
184:15,
184:19,
186:6, 186:8,
186:9,
186:24,
187:7,
187:23,

| | | | | |
|---|---|---|---|---|
| 187:24, | 225:4, | 259:2, 260:6, | 301:22, | 344:1, |
| 187:25, | 225:10, | 261:14, | 304:19, | 357:17, |
| 188:2, 188:8, | 225:13, | 261:22, | 305:9, | 357:19, |
| 188:9, | 225:17, | 262:1, 262:8, | 305:20, | 357:20, |
| 188:14, | 226:1, 226:4, | 262:21, | 305:23, | 357:23, |
| 190:5, 190:8, | 226:11, | 263:9, | 305:25, | 359:11, |
| 194:24, | 226:14, | 263:18, | 306:6, 309:2, | 359:15, |
| 195:25, | 226:18, | 264:1, 264:3, | 310:25, | 359:16, |
| 196:3, 197:5, | 226:20, | 264:6, | 311:14, | 359:19, |
| 197:7, 198:5, | 226:24, | 264:10, | 313:5, | 360:20, |
| 199:18, | 227:3, 227:8, | 264:22, | 314:22, | 360:24, |
| 200:2, 200:4, | 229:6, 229:7, | 265:10, | 315:2, | 360:25, |
| 201:5, | 230:17, | 265:15, | 315:14, | 361:3, 362:5, |
| 201:20, | 231:7, | 266:14, | 316:9, | 364:17, |
| 202:12, | 231:23, | 266:17, | 316:19, | 364:25, |
| 203:3, 203:6, | 232:1, 232:5, | 267:25, | 317:9, | 365:9, 366:1, |
| 203:24, | 232:11, | 268:3, 268:6, | 317:11, | 366:18, |
| 204:5, 205:3, | 232:22, | 273:16, | 317:14, | 366:22, |
| 205:11, | 233:2, | 273:22, | 317:20, | 367:7, |
| 205:18, | 236:25, | 273:24, | 320:1, 320:3, | 367:14, |
| 206:6, | 238:11, | 282:9, | 320:8, 321:8, | 367:17, |
| 208:11, | 238:17, | 282:12, | 322:15, | 367:18, |
| 209:2, 209:5, | 238:21, | 284:4, 284:7, | 324:23, | 369:3, |
| 209:21, | 239:1, 239:8, | 284:18, | 326:1, 326:3, | 370:21, |
| 210:3, | 239:24, | 284:24, | 326:21, | 371:5, |
| 210:21, | 240:8, | 285:19, | 326:23, | 371:16, |
| 211:4, 211:6, | 241:19, | 286:19, | 327:1, 327:8, | 371:24, |
| 211:9, | 241:23, | 287:24, | 330:23, | 372:17, |
| 211:13, | 242:25, | 288:3, 289:2, | 331:1, | 373:9, 376:4, |
| 211:15, | 243:24, | 289:5, 290:3, | 331:15, | 376:6, 376:8, |
| 212:14, | 245:7, | 290:9, | 331:18, | 376:10, |
| 212:15, | 245:20, | 290:12, | 333:19, | 376:12, |
| 212:16, | 246:2, | 290:22, | 334:6, | 376:14, |
| 213:2, | 246:13, | 291:23, | 336:18, | 376:16, |
| 213:16, | 247:1, | 292:1, 292:2, | 336:20, | 376:18, |
| 213:17, | 247:22, | 292:4, 292:6, | 336:22, | 376:20, |
| 214:5, 214:7, | 248:9, | 294:3, | 337:5, | 376:22, |
| 214:8, 215:3, | 248:20, | 294:15, | 337:10, | 376:24, |
| 215:24, | 250:7, | 296:9, | 337:14, | 377:2, 377:5 |
| 216:11, | 250:13, | 299:20, | 337:16, | **MS** [9] - |
| 219:2, | 251:2, 251:5, | 299:25, | 338:7, 338:9, | 184:10, |
| 222:25, | 252:14, | 300:5, 300:6, | 338:21, | 185:6, 366:6, |
| 223:4, 223:6, | 252:22, | 300:8, 301:1, | 339:4, | 366:10, |
| 223:18, | 253:16, | 301:4, 301:9, | 339:20, | 368:13, |
| 224:3, 224:5, | 254:2, 255:8, | 301:10, | 339:23, | 372:1, |
| 224:18, | 257:2, 257:9, | 301:12, | 343:20, | 372:24, |
| 224:21, | 258:3, | 301:14, | 343:22, | 374:9, 375:22 |
| 224:24, | 258:22, | 301:17, | 343:24, | **mumble** [1] - |

347:18

**Munich** [1] - 332:21

**Murray** [2] - 325:5

**must** [2] - 275:18, 313:3

**mysterious** [1] - 285:24

**N**

**name** [19] - 194:5, 222:5, 222:8, 306:21, 310:8, 312:25, 316:20, 316:23, 319:5, 319:21, 324:16, 327:16, 329:25, 339:13, 339:15, 343:11, 358:8, 359:22, 367:13

**names** [4] - 257:17, 316:17, 321:24, 345:25

**national** [1] - 341:11

**nature** [8] - 209:16, 229:23, 230:4, 257:14, 349:9, 364:11, 364:13, 370:13

**near** [1] - 323:3

**necessarily** [2] - 244:9, 375:5

**necessary** [2] - 244:24, 367:16

**need** [13] - 189:6, 232:9, 248:10, 257:5, 265:16, 279:18, 292:1, 292:20, 292:25, 315:23, 347:21, 365:14, 366:19

**needed** [1] - 191:21

**needs** [1] - 375:1

**negative** [1] - 306:16

**negotiating** [2] - 304:13, 337:20

**neighborhoods** [1] - 340:23

**net** [3] - 355:2, 355:3, 361:9

**never** [36] - 192:16, 193:7, 193:25, 194:14, 194:22, 195:4, 199:11, 227:15, 228:10, 230:7, 231:5, 234:23, 235:8, 253:23, 254:23, 256:3, 256:5,

279:14, 280:1, 290:24, 294:13, 294:24, 299:3, 312:5, 313:24, 323:3, 323:15, 329:25, 333:23, 341:15, 351:3, 355:7, 360:15, 361:25, 362:3

**NEW** [1] - 183:1

**new** [3] - 255:5, 286:11, 293:22

**New** [11] - 183:6, 183:15, 183:18, 183:21, 183:23, 254:8, 340:14, 343:4, 347:5, 348:14, 352:19

**next** [21] - 193:19, 196:6, 197:14, 202:14, 204:7, 208:13, 209:22, 212:17, 214:9, 218:5, 234:14, 273:4, 283:19, 308:5, 334:22, 336:13,

338:15, 338:20, 339:3, 339:7, 367:19

**NHL** [6] - 295:2, 340:13, 341:20, 342:5, 345:2, 350:4

**Nicholas** [1] - 285:19

**night** [5] - 217:8, 256:14, 341:22, 362:11, 375:21

**NO** [8] - 185:1, 185:4, 185:11, 185:15, 185:18, 185:23, 186:2, 187:19

**nobody** [1] - 260:7

**Nolan** [17] - 230:19, 231:14, 233:13, 233:14, 233:16, 234:1, 247:7, 258:9, 271:25, 284:3, 284:6, 325:4, 333:15, 333:18, 333:24, 334:4

**Nolan's** [1] - 272:1

**non** [1] - 259:19

**none** [1] - 259:23

**normal** [1] -

212:9

**north** [1] - 323:25

**Northern** [30] - 193:12, 193:16, 193:21, 219:6, 221:23, 222:2, 222:5, 222:6, 222:20, 223:13, 223:23, 289:4, 323:6, 324:22, 332:19, 332:20, 333:1, 333:9, 353:12, 353:13, 353:21, 353:23, 354:4, 354:11, 356:6, 358:5, 358:16, 366:12, 366:17, 367:16

**northern** [2] - 325:12, 325:13

**Northrup** [1] - 340:20

**note** [10] - 250:11, 312:16, 312:24, 313:9, 313:13, 313:22, 314:1, 314:10, 314:18, 335:17

**notes** [7] - 213:4, 213:5,

213:9,
273:13, 368:1
**nothing** [24] -
187:23,
187:24,
191:22,
220:20,
239:16,
243:9,
246:23,
257:19,
259:20,
259:23,
263:1, 263:7,
263:8, 279:1,
283:1,
285:23,
285:24,
293:13,
323:10,
326:17,
334:19,
356:20
**notion** [2] -
255:20,
256:12
**nowhere** [2] -
323:25,
324:13
**number** [34] -
184:6,
184:21,
184:22,
189:12,
220:16,
228:8,
230:15,
238:6, 238:9,
242:10,
259:9,
271:12,
279:4, 279:6,
280:5, 280:9,
285:17,
285:18,
301:13,
301:16,
302:1, 302:8,

307:7, 358:6,
359:25,
360:2, 360:3,
360:7, 360:9,
361:12,
361:15,
363:17,
367:9, 369:12
**Number** [3] -
233:12,
233:16,
234:17
**numbers** [5] -
192:1, 229:3,
229:16,
297:25, 298:1
**numerous** [1]
- 239:2

## O

**o'clock** [2] -
284:21, 289:1
**Oaks** [3] -
185:18,
186:12,
186:20
**oath** [4] -
189:19,
222:21,
227:15, 339:8
**object** [9] -
213:2,
223:13,
225:10,
249:2, 259:3,
259:7,
333:19,
371:7, 374:11
**objected** [1] -
363:5
**objecting** [2]
- 233:3,
249:12
**objection's** [1]
- 320:4
**objections** [4]
- 225:12,
363:4,

363:17,
363:19
**objective** [1]
- 192:16
**obligation** [2]
- 315:13,
373:5
**obligations** [1]
- 374:12
**obtain** [2] -
198:18,
200:23
**obtained** [3] -
219:5,
233:12,
259:24
**obvious** [1] -
329:20
**obviously** [19]
- 184:11,
186:24,
187:17,
212:9,
217:11,
225:9,
227:24,
245:4, 250:3,
250:22,
259:6,
263:13,
265:6,
276:25,
285:5,
298:21,
310:3, 345:7,
370:18
**Obviously** [1]
- 231:2
**occasion** [3] -
213:12,
269:10, 302:8
**occasionally**
[1] - 343:1
**occasions** [3]
- 204:3,
212:2, 302:12
**occur** [3] -
201:24,

303:11,
346:17
**occurred** [10]
- 197:1,
198:1, 203:1,
205:1, 209:1,
210:1, 213:1,
215:1,
236:22, 252:1
**occurring** [1]
- 274:25
**October** [2] -
212:12, 361:8
**OF** [3] -
183:1, 183:3,
183:8
**of,** [1] - 366:7
**offer** [20] -
195:15,
203:11,
209:5,
210:21,
222:25,
224:18,
257:21,
260:2, 266:8,
282:7,
282:13,
293:17,
301:3, 301:4,
317:9,
363:13,
365:18,
370:18,
371:21, 372:5
**offered** [7] -
195:3, 195:4,
249:16,
281:24,
282:19,
283:10,
370:23
**offering** [7] -
197:6, 253:5,
260:18,
365:19,
370:17,
371:2, 372:6

**offers** [1] -
370:10
**office** [1] -
366:2
**officials** [1] -
221:22
**often** [2] -
346:13, 370:1
**OHL** [2] -
341:22,
341:24
**Oilers** [1] -
340:15
**old** [2] -
237:12, 341:3
**Old** [1] -
183:21
**older** [2] -
341:4, 341:5
**OLIVERAS** [1]
- 183:20
**Olympics** [1] -
322:6
**once** [8] -
268:19,
269:24,
304:15,
315:3,
323:11,
339:8,
363:10, 364:9
**ones** [1] -
258:23
**onset** [1] -
354:15
**Ontario** [1] -
341:23
**open** [10] -
198:1, 205:1,
210:1, 215:1,
245:16,
314:19,
332:8,
353:13,
353:15, 354:1
**opened** [10] -
207:24,
235:2, 354:3,

355:14,
356:6,
356:17,
358:8,
363:21,
363:23, 364:9
**opening** [9] -
205:13,
233:7,
237:24,
332:12,
356:3, 369:2,
369:8,
372:25,
374:10
**openings** [1] -
270:5
**operations** [1]
- 343:8
**opinion** [1] -
293:16
**opportunity**
[14] -
213:21,
262:3,
273:20,
274:3,
283:14,
286:21,
286:25,
291:14,
291:15,
306:12,
335:19,
335:23,
338:5, 351:3
**opposed** [5] -
256:20,
275:1, 293:1,
321:3, 373:13
**opposite** [1] -
240:14
**options** [2] -
347:15,
348:24
**order** [5] -
223:16,
244:20,

325:24,
337:25,
340:14
**original** [13] -
233:9,
233:23,
235:9, 239:7,
239:8,
241:24,
247:8, 255:9,
286:22,
295:6,
315:25,
318:19,
366:12
**originally** [1]
- 288:5
**originates** [1]
- 246:14
**ought** [1] -
203:19
**outcome** [2] -
201:15,
201:16
**outline** [1] -
244:7
**outset** [2] -
347:17, 359:7
**outside** [4] -
275:4, 291:1,
333:20,
340:19
**overall** [3] -
262:20,
264:7, 264:18
**overnight** [2]
- 262:4,
365:5
**overrule** [1] -
209:15
**overruled** [14]
- 199:19,
201:6,
205:12,
205:19,
216:12,
225:11,
231:8,

290:23,
292:3,
304:20,
305:24,
311:15,
320:4, 324:24
**Owen** [15] -
233:13,
233:16,
234:1, 247:7,
258:9,
271:25,
272:1, 284:3,
284:6, 325:4,
333:15,
333:18,
333:24, 334:4
**own** [7] -
189:7,
269:25,
270:2,
287:21,
293:15,
335:1, 346:2
**owned** [1] -
329:3
**ownership**
[15] -
233:11,
234:22,
235:7,
236:17,
237:19,
241:2, 242:3,
246:15,
252:11,
254:7,
285:22,
316:1,
320:25,
321:7, 321:22
**owns** [1] -
301:25

| **P** |
|---|

**P-E-C-A** [2] -
338:21,
339:16

**p.m** [3] -
328:18,
338:12,
338:17
**p.m.** [1] -
328:18
**package** [1] -
342:1
**page** [60] -
196:6,
197:14,
200:1, 200:5,
202:14,
204:7,
208:13,
209:22,
212:17,
214:9,
215:16,
217:6, 217:8,
218:5, 224:9,
224:13,
224:14,
225:8, 234:7,
234:14,
252:4,
253:13,
261:24,
262:13,
266:22,
266:23,
267:10,
274:5, 274:8,
274:16,
281:4, 289:8,
292:8,
294:17,
300:13,
301:22,
308:5, 313:1,
316:9,
316:12,
316:19,
317:15,
317:18,
317:19,
317:20,
317:21,

318:22,
318:23,
318:25,
319:4, 319:7,
319:11,
329:10,
329:17,
334:22,
335:15,
336:24,
359:20
**page.)** [1] -
362:13
**pages** [14] -
199:4,
199:15,
199:16,
259:8, 274:2,
291:13,
292:6,
315:22,
318:23,
318:25,
329:6, 363:7,
363:8
**paid** [18] -
184:8,
223:24,
263:12,
272:14,
294:10,
294:21,
294:22,
298:4, 298:6,
298:7, 298:9,
298:10,
333:10,
334:1,
346:13,
346:18,
355:11,
355:23
**paint** [1] -
263:14
**paper** [2] -
276:5, 293:1
**paragraph**
[13] - 200:6,

200:12,
200:16,
223:18,
255:10,
266:21,
287:1,
293:22,
294:4,
294:12,
301:2, 301:5,
301:23
**Paragraph** [2]
- 233:10,
234:6
**paragraphs**
[9] - 200:8,
257:17,
260:23,
260:25,
285:11,
286:14,
286:23,
292:7, 300:11
**parallel** [1] -
284:2
**parameters**
[1] - 374:22
**paraphrasing**
[1] - 206:17
**paren** [1] -
267:15
**parents** [2] -
217:10,
341:15
**Park** [19] -
190:10,
190:14,
190:15,
190:17,
191:4, 192:3,
195:1,
195:10,
195:23,
200:25,
229:10,
278:2,
279:15,
279:25,

281:18,
295:13,
300:20,
302:25, 303:7
**part** [36] -
190:20,
210:10,
235:25,
238:9,
239:16,
241:6,
242:14,
243:1, 243:2,
243:11,
246:15,
252:13,
252:14,
254:3,
255:12,
256:4,
256:16,
257:25,
263:24,
264:14,
264:17,
264:18,
265:9, 266:5,
288:12,
305:3, 322:7,
327:14,
349:16,
355:6, 365:6,
369:20,
372:10,
373:1, 373:4
**participate** [2]
- 283:5,
306:19
**participating**
[1] - 269:7
**particular** [7]
- 227:23,
253:20,
323:9,
363:11,
370:7,
372:13,
373:12

**particularly**
[2] - 284:3,
300:10
**Particulars** [1]
- 239:5
**parties** [6] -
222:23,
260:20,
269:7, 302:5,
359:12,
360:21
**Partners** [1] -
301:25
**party** [1] -
283:7
**past** [5] -
332:23,
333:4,
367:23,
373:10,
374:20
**path** [3] -
243:16,
293:19,
344:12
**patience** [1] -
338:14
**patient** [1] -
211:20
**Pause** [5] -
200:10,
208:10,
215:18,
291:14,
300:13
**pause** [4] -
222:15,
253:8,
273:17, 297:3
**pay** [15] -
195:16,
298:13,
314:4, 314:7,
315:10,
333:12,
334:4,
335:19,
335:23,

336:4, 336:8,
336:11,
336:14,
346:5, 355:20
**paying** [1] -
338:6
**payment** [2] -
265:13,
301:23
**payments** [1]
- 355:23
**pays** [1] -
185:4
**Peca** [24] -
338:21,
339:5, 339:6,
339:16,
339:25,
343:10,
343:21,
357:8,
359:20,
361:4,
364:18,
364:24,
367:19,
367:20,
367:22,
368:16,
368:17,
368:19,
368:20,
369:4,
369:16,
369:18,
371:18,
373:13
**PECA** [2] -
339:10, 377:3
**pending** [2] -
281:25, 282:4
**people** [10] -
187:9,
190:21,
246:20,
256:1, 258:1,
271:12,
271:18,

309:10,
329:8, 369:12
**people's** [1] -
243:10
**percent** [14] -
281:24,
282:7,
282:19,
283:10,
327:17,
328:7,
328:13,
328:15,
328:16,
328:20,
328:24,
351:19,
352:10
**percentage** [8]
- 323:1,
324:9,
324:10,
326:16,
327:15,
346:7,
346:11, 352:8
**perception** [1]
- 334:21
**perhaps** [2] -
213:22, 262:3
**period** [12] -
209:19,
221:5,
223:21,
267:15,
291:7, 304:9,
341:1,
346:24,
347:3, 347:9,
350:1, 358:22
**permissible**
[1] - 364:11
**permission** [3]
- 234:2,
301:1, 306:6
**permitted** [4]
- 331:19,
372:3,

372:12, 374:16
**Perry** [2] - 183:22, 297:7
**person** [9] - 222:5, 230:10, 248:15, 296:1, 314:6, 320:22, 347:12, 367:6, 367:11
**personal** [6] - 221:10, 286:17, 305:5, 305:16, 350:11, 366:15
**personally** [7] - 191:19, 193:16, 217:10, 271:19, 271:21, 290:17, 290:25
**persons** [1] - 309:10
**perspective** [1] - 304:16
**peruse** [1] - 225:20
**petard** [1] - 243:22
**Phil** [51] - 191:9, 193:18, 198:22, 201:3, 201:10, 205:7, 206:13, 206:22, 207:16, 209:10, 210:8, 211:10,

212:7, 215:6, 215:22, 219:11, 219:23, 219:25, 220:11, 220:14, 221:5, 221:15, 222:4, 223:22, 227:24, 228:4, 228:13, 228:15, 267:6, 269:9, 269:24, 294:24, 304:11, 323:11, 324:25, 332:25, 334:23, 335:3, 344:3, 344:19, 345:3, 349:7, 349:25, 352:2, 352:9, 353:14, 354:5, 354:18, 357:15, 373:14, 373:16
**Phil's** [2] - 293:12, 334:18
**Philip** [4] - 183:7, 200:14, 206:13, 343:11
**Phillip** [3] - 221:3, 221:21, 222:19
**PHILLIP** [1] - 183:7

**Phoenix** [1] - 270:1
**phone** [19] - 221:3, 221:4, 221:6, 228:6, 228:8, 228:9, 228:11, 279:4, 279:6, 291:5, 291:6, 293:8, 293:23, 294:5, 335:2, 336:3, 347:12, 366:2, 367:16
**phones** [1] - 228:19
**phrase** [1] - 310:7
**physical** [1] - 187:3
**physically** [1] - 187:1
**pick** [1] - 220:12
**picked** [2] - 228:7, 228:9
**piece** [2] - 311:17, 375:15
**pieces** [2] - 276:10, 351:12
**piling** [1] - 337:21
**pilot** [2] - 191:21, 303:8
**PK** [2] - 211:20, 211:24
**place** [8] - 233:18, 235:13, 284:2, 293:3, 299:5, 321:21, 333:6, 347:16
**placed** [1] -

337:2
**places** [2] - 312:6, 319:22
**plaintiff** [2] - 271:22, 366:11
**Plaintiff** [1] - 266:19
**plan** [3] - 349:14, 356:12, 372:8
**plane** [25] - 259:9, 259:10, 260:13, 262:13, 262:24, 263:3, 263:4, 263:5, 263:12, 264:13, 264:15, 264:25, 265:14, 297:21, 297:23, 298:9, 298:11, 298:14, 299:6, 299:15, 299:24, 303:9, 303:19, 303:20, 304:22
**planes** [1] - 299:7
**planning** [1] - 366:14
**play** [9] - 258:13, 340:10, 340:12, 341:8, 370:8, 371:10, 371:11, 371:12

**played** [9] - 262:25, 322:5, 322:6, 322:7, 322:9, 325:6, 333:16, 341:6, 344:13
**player** [10] - 207:10, 235:20, 236:13, 271:24, 340:5, 340:7, 341:12, 342:19, 344:8, 345:2
**players** [8] - 233:21, 235:18, 235:22, 242:2, 254:10, 324:20, 325:1, 325:8
**playing** [2] - 341:2, 342:14
**Plaza** [2] - 183:14, 183:23
**pledged** [2] - 193:22, 223:24
**point** [62] - 189:17, 190:15, 190:25, 193:8, 197:11, 201:18, 203:15, 205:5, 212:13, 215:5, 217:8, 221:1, 221:25, 228:6, 228:7, 228:17, 230:11,

233:23,
236:20,
241:18,
242:11,
242:23,
243:13,
248:10,
254:17,
255:20,
257:2,
262:15,
262:20,
263:8,
265:12,
272:16,
272:25,
275:20,
276:1,
277:19,
279:21,
284:13,
285:3, 287:6,
287:7,
287:24,
287:25,
288:2, 288:4,
291:4,
292:22,
295:6, 301:9,
304:24,
331:24,
333:19,
334:14,
335:15,
337:6,
343:16,
355:24,
356:16,
364:8,
364:22,
375:17
**pointing** [7] -
215:16,
224:14,
274:9,
274:16,
275:9,
327:16,

370:20
**points** [1] -
198:16
**Ponzi** [1] -
240:1
**portfolio** [5] -
230:6, 346:9,
353:18,
353:20, 354:8
**portion** [16] -
197:9,
215:17,
216:16,
238:9, 240:1,
265:12,
265:19,
301:7,
301:15,
301:18,
315:23,
328:6,
351:13,
370:15,
373:21,
373:22
**portions** [12]
- 259:7,
260:10,
260:11,
262:9,
334:12,
371:9,
371:11,
371:21,
371:22,
372:6,
375:11,
375:13
**position** [6] -
233:23,
253:1,
255:14,
256:20,
332:15,
369:25
**positive** [2] -
267:13, 359:2
**posits** [2] -

246:14,
246:17
**possession** [2]
- 219:10,
301:25
**possibility** [1]
- 195:19
**possible** [13]
- 215:10,
215:11,
231:21,
244:11,
273:14,
279:23,
284:15,
291:8, 296:7,
297:10,
297:11,
318:14,
336:14
**possibly** [7] -
186:10,
216:14,
220:4, 220:5,
250:5
**post** [1] -
233:7
**posts** [3] -
236:1,
241:22,
242:16
**potential** [2] -
244:15, 349:3
**PQ** [2] -
306:8
**practice** [1] -
365:25
**practices** [1] -
187:16
**preceded** [3]
- 319:9,
328:18, 370:2
**precedes** [1] -
328:17
**precisely** [1] -
373:11
**preclude** [2] -
245:24, 368:7

**precluded** [1]
- 246:4
**precluding** [1]
- 245:22
**predict** [1] -
249:13
**prefer** [2] -
249:10,
249:18
**prejudice** [2]
- 372:23,
372:24
**prejudicial** [3]
- 238:4,
238:5, 256:8
**premarked** [1]
- 296:10
**preparation**
[2] - 218:3,
242:8
**prepare** [2] -
256:24, 342:4
**prepared** [6] -
247:17,
256:14,
257:4,
257:23,
286:8, 336:8
**preparing** [3]
- 246:4,
247:15,
253:20
**present** [6] -
238:22,
242:19,
256:19,
262:16,
290:14,
325:20
**presentation**
[2] - 249:10,
345:1
**presented** [11]
- 199:9,
224:7, 227:5,
231:9,
247:17,
255:3,

290:16,
293:17,
310:2,
328:25, 329:7
**presenting** [3]
- 236:1,
248:18,
374:14
**President** [1]
- 224:2
**press** [1] -
369:13
**presumably**
[3] - 293:14,
370:22,
370:23
**pretty** [12] -
197:11,
198:16,
198:24,
199:8,
255:11,
258:4,
282:22,
304:2,
304:23,
312:11,
323:12, 359:2
**previous** [3] -
230:19,
337:11, 370:6
**previously** [2]
- 190:2,
219:18
**price** [2] -
299:2, 299:13
**primarily** [1] -
254:3
**primary** [1] -
293:2
**primrose** [1] -
243:16
**printed** [3] -
316:23,
319:19,
319:20
**private** [2] -
230:7, 271:15

privilege [1] - 186:12

Privitello [3] - 285:19, 286:18, 287:3

probative [1] - 238:5

problem [10] - 185:24, 211:3, 242:7, 256:4, 259:16, 261:15, 264:16, 368:14, 368:24, 375:4

procedure [2] - 232:24, 233:1

proceeding [4] - 203:13, 222:15, 230:19, 273:6

Proceedings [1] - 183:25

proceedings [2] - 253:8, 273:17

proceeds [6] - 233:20, 246:23, 254:9, 314:20, 315:12, 361:9

process [10] - 282:2, 282:3, 282:5, 282:6, 282:18, 283:24, 326:13, 330:22, 341:21, 345:18

produced [2] - 183:25, 366:13

production [1] - 366:13

professional [9] - 200:17, 207:10, 268:10, 299:12, 340:5, 340:6, 340:8, 341:8, 342:5

profit [4] - 190:14, 191:8, 230:3, 309:20

profitability [1] - 229:23

profits [2] - 309:18, 310:4

program [5] - 198:12, 198:13, 343:9, 347:17, 347:20

progression [1] - 342:9

prohibit [1] - 221:22

project [37] - 216:9, 233:15, 295:13, 311:9, 312:14, 313:10, 315:7, 320:16, 322:11, 323:6, 323:9, 323:14, 323:17, 324:4, 324:9, 324:13, 324:21, 325:12, 325:13, 325:20, 326:16, 326:18, 326:19,

327:16, 327:17, 349:3, 349:9, 349:23, 349:24, 351:8, 351:11, 352:10, 352:13, 355:9, 355:25, 356:19, 357:2

projected [1] - 229:22

projects [3] - 211:18, 211:22, 323:24

prolong [1] - 369:21

promise [2] - 309:25, 315:9

promises [1] - 314:4

promissory [9] - 250:10, 312:16, 312:24, 313:9, 313:13, 313:22, 314:1, 314:10, 314:18

proof [3] - 203:11, 209:5, 266:7

proper [2] - 213:11, 213:13

properly [2] - 311:1, 373:3

properties [2] - 348:12, 356:11

property [5] - 349:16, 349:18,

350:2, 351:2, 351:4

proposal [1] - 294:7

proposing [1] - 365:16

prosecution's [1] - 203:7

prosecutorial [1] - 233:25

prospective [1] - 356:14

protestations [1] - 261:15

prove [12] - 241:9, 241:18, 244:12, 250:1, 252:12, 256:22, 257:3, 262:24, 287:11, 287:12, 287:14, 298:11

provide [6] - 184:16, 255:22, 297:22, 366:25, 371:10, 371:22

provided [11] - 218:2, 220:18, 234:18, 237:10, 246:5, 252:8, 257:17, 297:20, 367:21, 368:14, 370:16

provides [1] - 372:2

province [1] -

306:9

proving [1] - 244:9

provision [1] - 201:2

public [1] - 186:13

publicly [1] - 243:8

pull [5] - 255:25, 339:18, 342:18, 342:20, 367:14

pump [1] - 247:2

pump/dump [1] - 246:6

pumping [1] - 243:8

purchase [1] - 246:21

purchased [1] - 318:6

purely [1] - 350:6

purported [1] - 249:5

purports [1] - 318:1

purpose [6] - 263:13, 300:11, 344:11, 344:12, 364:5, 364:6

purposes [14] - 211:5, 211:16, 223:12, 248:15, 283:19, 285:15, 285:21, 287:21, 324:21, 344:17,

356:11,
356:19,
360:19, 375:2

**pursuant** [4] -
210:23,
226:2,
359:11,
360:20

**pursue** [6] -
241:14,
244:14,
255:2, 255:6,
260:16,
337:25

**pursuing** [2] -
254:25, 286:9

**pushups** [2] -
342:18,
342:20

**put** [18] -
192:5,
228:20,
228:22,
240:22,
241:15,
254:5, 254:8,
256:25,
261:17,
263:4,
263:18,
263:22,
299:2,
342:25,
348:2,
355:25,
363:3, 363:24

**putting** [2] -
254:21, 370:4

## Q

**qualification**
[1] - 220:5

**quarter** [1] -
346:18

**quarterly** [2]
- 346:14,
359:3

**Quebec** [1] -

306:9

**questioned** [3]
- 207:14,
263:20, 327:3

**quick** [1] -
304:23

**quickly** [4] -
264:7,
272:16,
274:22,
304:16

**quite** [3] -
250:7, 267:3,
307:12

**quote/unquote**
[2] - 285:10,
374:2

**quotes** [1] -
234:12

## R

**raise** [1] -
185:13

**raised** [2] -
306:15,
364:22

**ran** [1] -
349:17

**ranches** [4] -
349:15,
351:18,
356:12,
356:13

**rather** [3] -
264:4, 334:9,
374:17

**Raymond** [1]
- 306:8

**Re** [1] -
223:13

**RE** [1] -
211:10

**reach** [5] -
190:25,
217:13,
227:25,
228:6, 228:19

**reached** [5] -

225:23,
298:19,
300:19,
370:11,
370:12

**reaching** [1] -
304:18

**reads** [1] -
267:11

**ready** [4] -
226:23,
256:15, 290:2

**real** [4] -
233:15,
236:19,
267:14,
348:24

**reality** [1] -
342:12

**realize** [2] -
342:7, 342:12

**realizes** [1] -
237:5

**reason** [10] -
216:22,
216:23,
217:4,
228:18,
243:21,
292:25,
293:2,
324:12,
331:3, 344:21

**reasons** [2] -
237:5, 246:23

**reassured** [1]
- 356:5

**receive** [8] -
201:23,
202:1,
203:14,
289:3,
321:17,
326:8,
326:11,
332:20

**received** [29]
- 184:16,

193:7,
193:11,
193:15,
194:22,
201:19,
206:23,
229:14,
272:11,
272:12,
272:19,
276:14,
277:8,
291:24,
305:21,
312:23,
325:9,
325:19,
326:6,
327:15,
327:17,
328:4,
332:19,
341:25,
358:16,
361:25,
362:3,
363:14, 366:3

**receiving** [1]
- 277:1

**recently** [1] -
208:5

**recess** [5] -
251:7, 252:1,
289:7,
338:22, 339:1

**recessed** [1] -
375:23

**recital** [1] -
259:10

**recitals** [1] -
259:19

**recites** [2] -
259:18,
259:19

**recognize** [17]
- 210:4,
222:16,
226:25,

245:5,
248:25,
250:2,
266:24,
276:13,
296:14,
300:16,
305:12,
313:25,
316:5, 316:7,
316:12,
357:10,
357:12

**recollect** [1] -
207:15

**recollection**
[25] -
207:20,
213:22,
215:20,
216:2,
216:18,
269:15,
277:2,
279:20,
280:22,
296:17,
310:17,
311:8,
311:11,
311:18,
312:4,
312:23,
313:8,
314:24,
315:16,
315:17,
315:24,
319:14,
319:16,
320:9, 332:2

**recommend**
[3] - 202:10,
205:4, 220:15

**recommendati
on** [1] -
205:23

**recommendati**

ons [4] -
203:8,
205:25,
219:13,
221:16
recommended
[3] - 205:16,
220:1, 230:14
recommending
[2] - 219:12,
221:7
reconsider [1]
- 187:10
reconvene [2]
- 284:21,
362:7
recorded [9] -
183:25,
369:4,
369:15,
369:17,
369:19,
370:10,
371:17,
373:15, 374:1
recordings [5]
- 369:6,
372:19,
372:21,
374:17,
374:18
records [19] -
233:3,
234:18,
236:6,
247:11,
248:23,
250:18,
252:8,
253:22,
256:2, 260:6,
289:4, 334:3,
365:2, 366:4,
366:12,
366:21,
366:24,
370:13
recover [1] -

272:8
RECROSS [4]
- 336:21,
337:15,
376:23, 377:1
recross [1] -
337:11
RECROSS-
EXAMINATION
[4] - 336:21,
337:15,
376:23, 377:1
redact [1] -
368:20
redacted [3] -
262:5, 262:6,
265:17
redirect [4] -
327:4, 327:7,
334:8, 337:11
REDIRECT [1]
- 376:21
reduced [1] -
303:18
REF [2] -
306:10
refer [3] -
215:15,
235:15,
235:16
reference [12]
- 200:14,
201:16,
206:15,
210:9,
233:17,
237:3, 239:9,
257:20,
286:8, 368:7,
368:8, 370:1
referenced [3]
- 234:16,
239:5, 357:15
references [3]
- 368:2,
368:21,
371:15
referencing

[1] - 239:9
referred [3] -
200:22,
201:8, 261:6
referring [9] -
219:19,
229:24,
236:15,
257:16,
316:23,
349:21,
369:7,
370:22,
370:23
reflect [1] -
343:20
reflected [1] -
222:23
reflects [1] -
222:22
reframe [1] -
214:2
refresh [15] -
213:14,
213:22,
215:20,
216:2,
216:18,
277:2,
296:17,
311:8,
311:11,
312:3,
312:23,
313:8,
315:17,
332:2, 332:5
refreshes [1]
- 315:24
refund [2] -
272:20,
306:13
refunded [2] -
228:23,
228:24
refuse [1] -
228:5
refusing [1] -

283:25
regard [6] -
260:20,
261:16,
273:21,
288:9,
300:19,
303:24
regarding [12]
- 195:1,
219:4, 234:8,
239:17,
243:13,
246:14,
261:7, 263:2,
271:1,
331:12,
334:12, 362:9
regards [3] -
242:22,
274:4, 305:17
rejected [1] -
282:15
relate [4] -
219:11,
240:24,
367:19
related [3] -
215:21,
271:24, 293:9
relates [14] -
199:24,
201:4, 201:9,
220:13,
233:4,
238:22,
254:3, 259:8,
267:9,
336:23,
364:15,
369:3, 374:6,
374:8
relation [5] -
285:8,
327:20,
332:13,
358:18
relationship

[11] -
209:17,
215:22,
221:12,
228:12,
279:9, 335:5,
345:20,
350:5,
350:10,
350:14,
364:12
relative [3] -
235:12,
260:8, 260:18
relatively [1]
- 348:6
releasing [1]
- 186:7
relevance [6]
- 199:18,
201:5, 203:2,
203:3, 203:5,
209:11
relevant [16]
- 197:9,
203:23,
220:22,
235:13,
237:9, 238:4,
244:23,
245:3,
245:11,
245:18,
253:11,
261:13,
265:19,
364:15,
370:3, 373:17
rely [1] -
337:11
remain [1] -
347:23
remain
standing [1]
- 339:7
remaining [2]
- 193:23,
318:23

**remedy** [1] - 372:2

**remember** [97] - 194:5, 195:4, 195:17, 198:25, 199:9, 199:10, 201:8, 205:20, 206:19, 210:6, 213:13, 216:1, 216:13, 216:14, 216:21, 216:23, 216:24, 217:1, 217:15, 217:18, 220:23, 222:6, 224:25, 225:7, 227:17, 227:18, 228:16, 230:20, 230:22, 231:12, 231:20, 268:24, 269:1, 269:2, 269:5, 269:20, 273:11, 275:11, 276:5, 277:1, 279:22, 279:23, 281:25, 283:25, 290:17, 291:1, 296:1, 296:5, 296:7,

297:11, 297:16, 297:23, 297:25, 298:8, 299:18, 302:11, 302:18, 302:23, 303:2, 304:8, 305:3, 305:4, 305:6, 305:7, 310:12, 310:20, 310:22, 311:10, 311:22, 313:11, 313:14, 317:22, 317:24, 325:4, 326:6, 327:11, 329:1, 331:8, 331:11, 331:14, 331:22, 332:5, 332:12, 332:24, 340:24, 342:18, 342:23, 344:24, 344:25, 345:3, 346:13, 348:6, 349:11, 350:23, 352:25, 355:24
**remembered** [2] - 212:10, 261:4
**remembers** [1] - 286:19
**remind** [1] -

189:18
**remove** [1] - 368:21
**repaid** [2] - 193:20, 229:2
**repay** [1] - 315:13
**repeating** [1] - 272:7
**rephrase** [3] - 192:23, 214:5, 219:8
**replace** [1] - 211:19
**replenished** [1] - 201:12
**Reporter** [1] - 183:22
**reporter** [2] - 278:9, 297:9
**reports** [1] - 358:17
**repossessed** [1] - 326:20
**represent** [6] - 217:14, 236:10, 268:17, 354:24, 365:11, 375:5
**representation** [2] - 235:23, 244:3
**representations** [2] - 255:23, 355:18
**representative** [1] - 366:16
**represented** [5] - 203:12, 217:5, 231:5, 355:1, 356:8
**representing** [3] - 216:14, 233:13, 294:25
**request** [11] -

195:13, 234:10, 234:20, 252:10, 272:11, 273:2, 275:13, 275:15, 278:6, 278:8, 278:12
**requests** [1] - 278:15
**require** [2] - 238:5, 337:24
**required** [2] - 189:13, 366:24
**requires** [1] - 293:19
**resident** [1] - 343:4
**residential** [2] - 349:15, 356:11
**resolution** [1] - 306:15
**resolve** [1] - 189:6
**respect** [28] - 198:22, 201:2, 203:8, 219:3, 219:25, 225:24, 239:20, 247:20, 257:15, 262:25, 264:17, 266:3, 286:2, 293:16, 298:19, 363:19, 364:8, 364:10, 364:18, 364:19, 364:25,

368:15, 368:16, 369:15, 370:3, 371:18, 374:3
**respectfully** [1] - 224:1
**respects** [1] - 350:9
**respond** [7] - 236:24, 238:11, 238:12, 238:23, 257:7, 257:11, 258:16
**responded** [2] - 244:11, 273:19
**responding** [2] - 274:4, 292:23
**response** [13] - 211:21, 211:23, 231:4, 249:24, 267:21, 274:15, 274:18, 275:8, 311:23, 328:19, 328:21, 330:5, 334:14
**responses** [1] - 234:9
**responsible** [2] - 355:22, 367:25
**rest** [4] - 260:4, 287:19, 318:25, 347:23
**restaurant** [1] - 269:3

**restrictions** [1] - 223:25
**result** [3] - 205:15, 230:14, 287:4
**resumes** [1] - 184:1
**retention** [1] - 237:12
**retire** [1] - 340:16
**retired** [4] - 340:1, 340:3, 340:17, 343:6
**retirement** [2] - 295:2, 355:5
**retires** [1] - 186:3
**retrieved** [1] - 232:7
**return** [21] - 190:14, 200:24, 203:14, 219:12, 231:6, 234:10, 272:23, 275:16, 277:11, 277:19, 278:6, 278:13, 279:13, 279:15, 279:25, 282:14, 282:20, 283:10, 309:24, 322:20, 325:19
**returned** [2] - 234:3, 250:9
**reverse** [2] - 223:16, 276:16

**review** [6] - 198:14, 291:14, 291:15, 317:25, 368:22, 368:24
**reviewing** [1] - 226:9
**reviews** [1] - 316:2
**rewired** [2] - 234:21, 252:10
**RICHARD** [1] - 183:17
**rid** [1] - 264:16
**rights** [1] - 228:13
**rigorous** [1] - 198:13
**rise** [2] - 188:17, 290:5
**risk** [1] - 356:3
**risks** [3] - 203:16, 230:23, 230:24
**risky** [2] - 203:8, 203:25
**road** [1] - 349:17
**Road** [1] - 183:21
**ROBERT** [1] - 183:20
**role** [2] - 198:22, 262:25
**rookie** [2] - 344:13, 344:14
**room** [1] - 345:7
**roughly** [3] - 351:19,

352:10, 352:17
**Rule** [1] - 259:25
**rule** [4] - 245:13, 372:2, 372:6, 372:14
**rules** [1] - 373:6
**ruling** [9] - 242:16, 244:5, 244:17, 248:3, 250:17, 250:25, 265:12, 364:16, 371:25
**rulings** [1] - 363:3
**run** [3] - 320:16, 342:23, 343:2
**running** [2] - 342:20, 342:24
**runway** [3] - 303:9, 323:9, 323:12
**Russo** [8] - 187:5, 290:8, 294:14, 300:7, 363:24, 364:3, 364:22, 365:13

## S

**Sabers** [1] - 344:15
**safe** [1] - 362:11
**safety** [2] - 355:2, 355:3
**saint** [1] -

306:8
**sale** [2] - 233:17, 233:22
**sales** [1] - 242:23
**salvage** [1] - 229:17
**sandbagging** [1] - 243:17
**Sanderson** [3] - 345:1, 345:4, 345:6
**SARITHA** [1] - 183:16
**satisfied** [3] - 261:8, 298:20, 298:22
**save** [3] - 249:18, 313:5, 365:20
**saved** [3] - 220:24, 247:14, 265:3
**saving** [3] - 220:23, 220:25, 344:13
**Scheme** [1] - 240:1
**scheme** [3] - 246:6, 257:15, 263:25
**school** [2] - 341:15, 341:25
**Schwab** [5] - 353:21, 354:6, 354:7, 354:23, 355:13
**scope** [5] - 203:4, 238:3, 333:20, 372:21, 374:6
**Scottsdale** [4]

- 190:10, 269:23, 270:10, 350:12
**screen** [1] - 357:25
**screw** [1] - 335:20
**season** [8] - 340:9, 340:10, 340:17, 344:5, 344:14, 352:22, 352:24
**seat** [2] - 184:25, 189:14
**seated** [6] - 188:19, 265:22, 285:2, 290:7, 339:17, 363:2
**second** [7] - 185:8, 199:25, 262:12, 278:2, 287:2, 292:8, 344:25
**secretary** [1] - 188:11
**section** [1] - 259:18
**securing** [1] - 353:8
**seeing** [8] - 198:25, 199:22, 217:10, 225:1, 227:18, 312:6, 327:11, 329:1
**seek** [3] - 234:17, 252:7, 371:17
**seeking** [8] -

241:6, 241:9, 241:17, 248:4, 266:6, 272:7, 287:17, 297:17

**seeks** [1] - 257:21

**selection** [4] - 184:12, 184:14, 220:20, 220:21

**sell** [3] - 298:25, 302:3, 303:4

**selling** [6] - 242:1, 246:22, 248:11, 248:16, 299:7, 356:14

**send** [5] - 220:8, 220:13, 292:18, 293:6, 310:15

**sending** [1] - 293:1

**sense** [3] - 200:18, 227:20, 350:9

**sensitive** [3] - 187:2, 371:13, 371:14

**sent** [14] - 193:1, 207:24, 208:1, 219:17, 219:18, 219:19, 219:20, 220:17, 220:22, 246:1, 296:18,

311:11, 311:22, 352:25

**sentence** [3] - 267:11, 294:18, 328:5

**sentences** [1] - 252:19

**separate** [4] - 276:10, 310:21, 311:11, 327:22

**September** [3] - 217:2, 217:19, 235:6

**sequence** [2] - 209:14, 210:11

**sequiturs** [1] - 259:19

**serial** [1] - 302:1

**series** [8] - 223:17, 223:19, 273:18, 330:2, 331:6, 331:8, 365:17, 365:18

**served** [4] - 202:4, 243:10, 367:12, 367:13

**service** [3] - 187:14, 187:17, 367:12

**services** [4] - 205:25, 206:1, 291:2, 345:16

**serving** [1] - 293:18

**set** [5] - 240:1,

253:18, 347:20, 353:24, 354:9

**settle** [3] - 192:8, 260:12, 337:24

**settled** [3] - 259:15, 262:18, 302:20

**settlement** [57] - 191:1, 250:8, 259:4, 259:13, 259:16, 259:21, 259:22, 260:1, 260:8, 260:15, 260:19, 261:7, 261:18, 261:19, 262:25, 263:3, 264:1, 264:10, 264:11, 264:20, 264:25, 265:1, 265:8, 265:11, 266:2, 266:4, 266:9, 283:21, 290:14, 291:18, 292:19, 293:5, 293:17, 294:6, 297:12, 298:12, 298:19, 299:17, 299:21, 299:23, 300:1,

300:19, 302:13, 302:15, 303:13, 304:2, 304:13, 304:18, 305:3, 305:17, 306:10, 307:6, 309:9, 334:12, 335:21, 363:22, 364:1

**Settlement** [3] - 253:10, 265:4, 298:16

**settling** [1] - 337:20

**several** [5] - 234:4, 235:21, 243:3, 335:2, 345:24

**severance** [2] - 246:3, 247:16

**shaking** [4] - 278:9, 280:2, 311:24, 312:2

**share** [4] - 234:22, 234:24, 252:11, 255:15

**shares** [15] - 242:1, 242:20, 243:4, 243:6, 246:18, 246:21, 247:9, 248:2, 248:11, 254:7, 254:11, 257:3, 257:10, 321:17,

321:21

**sheer** [1] - 188:10

**sheet** [1] - 367:13

**shift** [1] - 189:14

**shifting** [1] - 236:1

**shirt** [1] - 343:18

**shit** [2] - 206:17, 207:4

**SHIT** [1] - 207:5

**shoe** [1] - 323:12

**shore** [1] - 349:12

**short** [3] - 251:1, 356:5, 368:22

**short-term** [1] - 356:5

**showed** [9] - 198:20, 240:18, 247:11, 253:18, 258:11, 318:11, 330:12, 333:25, 336:1

**shown** [6] - 226:9, 236:2, 240:1, 327:9, 330:8, 334:9

**shows** [1] - 236:7

**side** [4] - 276:16, 327:3, 337:23, 349:17

**sidebars** [1] - 214:2

**sides** [1] - 327:2

**sideways** [1] - 227:2
**sign** [4] - 318:24, 329:24, 341:20, 345:2
**signature** [49] - 224:16, 224:25, 225:8, 249:9, 250:3, 250:9, 266:24, 266:25, 267:2, 267:10, 267:20, 267:22, 276:15, 276:18, 276:20, 276:21, 276:25, 296:15, 300:12, 305:14, 306:21, 315:22, 316:21, 317:1, 317:2, 317:17, 318:24, 319:9, 319:11, 319:18, 319:22, 319:23, 320:22, 329:10, 329:11, 329:13, 329:16, 329:17, 329:18, 329:23, 336:24, 337:2, 337:7, 357:12, 357:13,

363:10, 363:11, 363:12
**signatures** [2] - 300:16, 329:7
**signed** [18] - 249:5, 250:3, 250:8, 250:10, 261:2, 261:6, 261:7, 298:22, 299:22, 305:16, 317:4, 319:1, 319:6, 319:7, 319:8, 329:25, 348:13
**significant** [1] - 274:23
**signing** [3] - 290:20, 301:23, 319:14
**similar** [3] - 210:12, 293:20, 350:11
**similarly** [2] - 238:6, 249:4
**simple** [2] - 230:1, 314:16
**simply** [9] - 200:8, 203:15, 213:19, 213:23, 215:17, 219:22, 221:13, 223:12, 225:19
**simultaneous** [1] - 239:14
**simultaneously** [1] - 239:3

**single** [2] - 293:8, 310:20
**situation** [5] - 203:16, 298:21, 332:14, 337:17, 375:19
**situations** [2] - 186:22, 375:10
**skating** [2] - 341:3, 341:6
**skeptical** [1] - 245:13
**slightly** [1] - 259:11
**slipped** [1] - 303:9
**slow** [1] - 345:19
**small** [1] - 348:2
**snippets** [7] - 370:16, 370:18, 370:19, 370:21, 370:22, 371:1, 374:17
**so-called** [2] - 293:11, 334:17
**so..** [1] - 318:8
**social** [3] - 269:10, 344:10, 350:7
**sold** [8] - 233:20, 236:17, 247:9, 248:2, 254:9, 302:23, 303:1
**solely** [1] - 357:2
**solicit** [1] - 374:16

**solution** [1] - 370:17
**solve** [2] - 185:10, 368:13
**someone** [10] - 187:9, 193:16, 216:13, 217:4, 217:5, 222:6, 227:25, 248:15, 314:4, 367:15
**someplace** [2] - 220:3, 281:13
**sometimes** [1] - 312:1
**somewhere** [2] - 313:21, 362:2
**soon** [1] - 231:10
**sort** [5] - 191:1, 345:19, 346:9, 352:12, 370:24
**sorts** [1] - 348:25
**sound** [1] - 246:2
**sounded** [1] - 206:21
**sounds** [3] - 187:14, 249:17, 249:19
**source** [6] - 233:19, 236:17, 248:1, 249:23, 262:24, 288:19
**sources** [1] -

259:24
**South** [5] - 185:18, 186:12, 186:20, 323:25, 325:20
**southeast** [1] - 349:12
**Southern** [1] - 323:22
**southern** [1] - 324:4
**southwest** [1] - 349:12
**spa** [1] - 344:24
**speaking** [4] - 293:24, 302:11, 336:1, 367:8
**Special** [1] - 373:1
**specific** [4] - 234:5, 240:10, 248:21, 356:21
**specifically** [10] - 210:15, 224:13, 231:10, 231:16, 237:4, 243:24, 249:7, 286:18, 361:5, 369:7
**specificity** [1] - 286:22
**specifics** [1] - 234:12
**speculation** [1] - 235:21
**speculative** [1] - 201:11
**spell** [2] -

316:17, 339:13

**spelling** [1] - 274:24

**spells** [1] - 255:9

**spend** [5] - 249:23, 255:24, 292:21, 293:19, 337:20

**spending** [3] - 247:15, 282:6, 293:14

**spent** [3] - 242:7, 253:19, 338:2

**spite** [1] - 309:12

**spoken** [1] - 302:8

**spots** [1] - 323:13

**St** [1] - 323:17

**stamps** [1] - 248:24

**stand** [12] - 185:9, 185:10, 187:2, 188:3, 200:9, 222:21, 232:18, 245:19, 263:16, 286:1, 339:7, 371:6

**Standard** [1] - 346:3

**standard** [1] - 198:20

**standing** [2] - 249:15, 256:6

**start** [12] - 188:25, 189:1, 241:6,

244:18, 244:19, 245:24, 341:4, 342:7, 342:9, 356:14, 365:23, 365:24

**started** [12] - 188:24, 214:2, 214:3, 279:13, 324:17, 341:3, 341:4, 341:5, 345:12, 346:2, 353:17, 375:21

**starting** [1] - 328:13

**starts** [2] - 342:11, 373:20

**statements** [6] - 358:11, 358:13, 358:23, 359:3, 371:3, 373:1

**STATES** [3] - 183:1, 183:3, 183:12

**states** [3] - 335:18, 344:19, 346:25

**States** [4] - 183:6, 183:14, 183:16, 342:18

**status** [1] - 222:1

**stay** [1] - 345:23

**stayed** [1] - 325:13

**Ste** [1] - 183:18

**steady** [1] - 359:2

**steal** [1] - 243:11

**stealing** [1] - 248:15

**stenographer** [1] - 184:15

**stenography** [1] - 183:25

**step** [5] - 232:17, 285:1, 338:10, 339:6, 363:1

**stick** [1] - 337:6

**sticks** [1] - 323:12

**stipend** [1] - 347:22

**stipulated** [2] - 226:14, 366:11

**stipulation** [6] - 225:24, 226:2, 226:12, 249:2, 359:12, 360:21

**stipulations** [6] - 233:4, 364:21, 365:4, 365:7, 370:11, 370:12

**stock** [10] - 231:1, 231:2, 233:17, 242:2, 242:23, 246:22, 254:9, 348:1, 348:23, 355:2

**stocks** [4] -

205:21, 233:19, 348:2, 358:13

**stolen** [11] - 234:25, 237:18, 238:7, 241:3, 248:12, 248:16, 248:17, 255:21, 257:10, 257:11, 288:7

**stop** [1] - 228:21

**stopped** [1] - 267:6

**story** [4] - 303:15, 345:3, 345:6, 345:7

**straightforward** [2] - 304:17, 304:25

**strain** [1] - 353:17

**strategies** [1] - 211:17

**streamline** [1] - 364:20

**street** [1] - 342:24

**Street** [4] - 345:10, 345:13, 346:1, 347:23

**stuff** [14] - 200:18, 207:23, 217:7, 217:17, 220:16, 220:18, 220:23, 220:25, 221:10, 221:11,

228:20, 310:2, 344:17

**subject** [5] - 221:6, 262:5, 301:6, 365:3, 370:19

**submit** [2] - 238:3, 260:1

**submitting** [1] - 226:1

**subpoena** [3] - 330:17, 366:24, 367:13

**subpoenaed** [1] - 249:1

**Subscription** [1] - 317:6

**subscription** [2] - 249:4, 321:20

**subsequent** [1] - 274:5

**subsequently** [3] - 234:20, 252:10, 316:1

**substance** [1] - 274:3

**substantial** [1] - 197:11

**substantially** [2] - 261:3, 303:19

**suburb** [2] - 340:19, 340:20

**success** [1] - 359:2

**successful** [1] - 306:4

**Sudbury** [1] - 342:1

**SUDBURY** [1] - 342:2

**sudden** [2] - 254:16, 256:16

**sue** [2] -

271:19, 271:21
**sued** [2] - 281:1
**sufficient** [1] - 363:13
**sufficiently** [1] - 291:16
**sugarcane** [2] - 349:13, 350:24
**suggest** [5] - 203:25, 209:11, 240:14, 369:25, 374:13
**suggested** [1] - 228:13
**suggesting** [6] - 213:18, 238:13, 245:15, 288:21, 373:20, 373:22
**suggests** [1] - 213:10
**suing** [2] - 190:19, 271:13
**suit** [15] - 200:23, 262:11, 277:23, 278:24, 279:14, 281:2, 281:7, 281:16, 281:22, 281:25, 282:3, 283:16, 284:2, 337:25, 338:2
**summarizes** [1] - 234:9
**summation** [1]

- 244:20
**summer** [1] - 228:17
**superceding** [1] - 234:10
**superseding** [4] - 234:8, 237:2, 237:3, 257:18
**support** [2] - 247:8, 287:5
**supported** [1] - 288:5
**supports** [1] - 266:7
**supposedly** [1] - 329:17
**surprise** [5] - 253:24, 258:15, 287:22, 288:21, 333:3
**surprised** [4] - 206:23, 256:11, 256:13, 287:20
**surprising** [1] - 333:6
**surreptitiously** [1] - 373:16
**sworn** [2] - 190:3, 339:11

---

## T

**tactical** [2] - 237:5
**tap** [3] - 240:15, 243:13, 244:2
**tape** [8] - 368:3, 368:8, 369:3, 369:15, 370:16, 371:9, 373:21, 373:22

**taped** [1] - 367:21
**tapes** [1] - 367:23
**taping** [1] - 372:15
**tax** [1] - 344:16
**team** [2] - 322:5, 341:10
**teammates** [1] - 322:4
**teams** [2] - 322:5, 340:12
**technical** [1] - 198:14
**Teknik** [1] - 307:17
**TEKNIK** [1] - 307:17
**telephone** [5] - 212:12, 221:14, 279:3, 280:4, 302:11
**telephonically** [2] - 215:5, 216:7
**television** [1] - 341:11
**ten** [1] - 269:13
**tenure** [1] - 293:9
**term** [1] - 356:5
**termination** [1] - 345:18
**terms** [12] - 189:4, 242:8, 247:4, 252:21, 258:16, 262:19, 264:7, 265:11, 281:16, 364:12,

372:2, 373:3
**testified** [34] - 190:3, 190:9, 192:20, 192:25, 195:2, 201:22, 209:10, 224:25, 227:19, 230:19, 261:9, 262:18, 267:4, 267:21, 268:16, 268:18, 271:5, 272:21, 273:5, 278:1, 280:8, 282:19, 291:24, 295:18, 302:7, 304:6, 307:2, 307:9, 322:19, 326:5, 333:8, 333:15, 339:12
**testify** [5] - 234:22, 272:2, 284:11, 296:23, 321:10
**testifying** [6] - 213:19, 214:4, 289:3, 289:6, 304:8, 365:12
**theft** [2] - 236:21, 288:8
**theme** [1] - 203:6
**theory** [27] - 235:23,

236:2, 238:14, 239:13, 239:16, 242:12, 243:1, 243:2, 244:13, 246:8, 247:3, 247:12, 248:17, 252:15, 252:20, 254:18, 254:20, 254:21, 254:25, 255:17, 255:22, 256:17, 258:2, 285:10, 286:11, 288:23, 370:25
**therefore** [3] - 241:2, 249:2, 262:23
**they've** [3] - 244:11, 256:20, 258:8
**thinking** [1] - 184:14
**third** [2] - 274:8, 335:15
**thoughts** [1] - 186:10
**thousand** [8] - 192:9, 192:19, 194:1, 194:12, 296:3, 307:13, 351:13, 352:16
**thousands** [1] - 293:14
**threw** [2] -

192:2, 193:9

**throw** [2] - 364:3

**thrown** [1] - 229:16

**Thun** [1] - 344:9

**tie** [1] - 236:16

**tire** [2] - 343:2, 343:3

**tired** [1] - 206:17

**tires** [1] - 342:24

**titled** [1] - 317:6

**today** [18] - 212:1, 218:2, 219:15, 236:8, 241:12, 295:18, 296:23, 299:15, 301:7, 301:19, 302:15, 319:13, 327:9, 327:12, 343:14, 364:21, 366:2, 367:5

**together** [5] - 240:11, 279:18, 326:14, 363:8, 363:9

**Tom** [3] - 281:19, 282:24, 324:19

**TOMMY** [1] - 183:8

**Tommy** [4] - 183:9, 292:12,

292:13, 306:11

**tomorrow** [6] - 362:7, 364:19, 364:24, 365:23, 371:8, 375:21

**tone** [1] - 206:23

**tons** [1] - 349:11

**Tony** [1] - 334:11

**top** [5] - 215:13, 267:22, 275:9, 292:8, 359:22

**topics** [1] - 372:22

**Toronto** [2] - 340:15, 340:19

**total** [3] - 346:8, 346:10, 369:23

**totaled** [2] - 303:20, 303:21

**totally** [1] - 246:7

**touch** [1] - 332:25

**touching** [1] - 345:3

**tough** [1] - 198:16

**touting** [1] - 243:5

**toward** [1] - 228:12

**towards** [2] - 306:16, 334:23

**town** [1] - 340:21

**track** [2] - 343:2

**trade** [3] - 326:9, 326:10, 326:11

**traded** [3] - 243:8, 344:14, 358:15

**trafficking** [1] - 243:15

**trainer** [1] - 342:22

**training** [1] - 342:15

**transaction** [7] - 237:4, 245:1, 263:24, 314:10, 360:15, 361:22, 362:3

**transactions** [4] - 240:6, 257:21, 258:20, 374:3

**TRANSCRIPT** [1] - 183:8

**transcript** [2] - 183:25, 213:21

**transcripts** [1] - 368:18

**transfer** [14] - 234:18, 234:23, 237:17, 237:18, 250:20, 252:8, 287:11, 302:3, 310:15, 310:18, 325:17, 352:15, 352:16

**transferred** [3] - 235:9, 284:8, 354:10

**transfers** [4] - 239:3, 239:11, 250:23, 253:21

**transpired** [2] - 370:4, 370:6

**transportation** [1] - 189:9

**travel** [1] - 351:1

**TRIAL** [1] - 183:8

**trial** [12] - 184:1, 186:16, 189:1, 189:15, 240:12, 254:19, 257:19, 260:3, 266:8, 365:14, 369:21, 375:19

**trials** [1] - 375:18

**tried** [2] - 229:17, 237:24

**trip** [2] - 270:1, 362:11

**true** [12] - 201:14, 201:19, 207:21, 222:3, 236:9, 241:8, 267:23, 270:25, 271:1, 334:20, 335:8

**Trust** [28] - 193:12,

193:16, 193:21, 219:6, 221:23, 222:3, 222:5, 222:7, 222:20, 223:14, 223:23, 289:4, 332:19, 332:20, 333:2, 333:9, 353:12, 353:13, 353:21, 353:23, 354:4, 354:11, 356:7, 358:5, 358:16, 366:12, 366:17, 367:16

**truth** [1] - 335:12

**try** [25] - 188:25, 189:3, 189:8, 189:9, 227:25, 240:11, 241:11, 241:13, 244:21, 245:6, 245:21, 256:22, 258:23, 263:4, 264:23, 265:18, 265:19, 276:3, 281:17, 286:2, 288:13, 288:16,

288:17, 363:25, 364:11

**trying** [33] - 189:6, 191:6, 191:7, 207:19, 217:13, 227:12, 228:1, 228:6, 228:18, 228:19, 230:9, 231:16, 237:1, 242:8, 244:2, 250:1, 256:9, 256:15, 257:12, 260:21, 263:14, 264:7, 270:7, 272:16, 279:22, 280:23, 287:11, 287:12, 304:8, 325:4, 333:7, 373:24, 375:13

**turn** [7] - 217:6, 217:8, 219:3, 219:14, 274:2, 281:4, 374:13

**turned** [4] - 190:16, 232:22, 250:16, 348:21

**turning** [2] - 316:12, 334:22

**Turpin** [5] - 202:2, 203:11,

205:4, 206:1, 206:5

**Turpin's** [2] - 205:9, 205:23

**type** [2] - 185:16, 348:11

---

**U**

**ultimately** [12] - 237:18, 239:12, 239:14, 239:22, 243:19, 252:15, 253:4, 297:13, 298:14, 303:23, 306:17, 325:11

**Um-hmm** [1] - 307:14

**unauthorized** [2] - 285:15, 285:21

**unclear** [1] - 285:23

**uncomfortable** [1] - 187:1

**under** [11] - 189:18, 203:24, 205:14, 222:21, 227:15, 259:25, 361:11, 368:10, 372:6, 372:14, 374:12

**underlying** [6] - 203:6, 234:11, 237:2, 239:5, 239:7, 239:17

**understood** [4] - 203:16, 261:17, 270:18, 374:9

**unfairly** [1] - 238:4

**unfortunately** [1] - 261:23

**union** [1] - 341:23

**UNITED** [3] - 183:1, 183:3, 183:12

**unless** [2] - 244:12, 292:19

**unlikely** [1] - 249:19

**unnecessary** [1] - 293:20

**unpredictable** [1] - 355:3

**unusual** [1] - 358:24

**ups** [2] - 342:18, 342:20

**US** [1] - 348:2

**usage** [1] - 248:10

**useful** [1] - 220:25

**uses** [1] - 368:5

---

**V**

**vacant** [1] - 350:21

**vague** [5] - 198:24, 199:8, 199:16, 199:20, 199:22

**valuation** [1] - 364:8

**value** [7] - 191:23,

192:3, 262:13, 297:24, 302:5, 302:21, 303:19

**valued** [1] - 229:14

**valve** [1] - 303:5

**Vancouver** [3] - 340:11, 340:14, 344:13

**variety** [1] - 230:13

**various** [4] - 230:3, 257:18, 346:25, 347:13

**verbally** [1] - 341:21

**version** [1] - 261:23

**versions** [1] - 245:25

**versus** [2] - 201:11, 262:6

**vertical** [3] - 351:17, 354:19, 356:8

**Veterans** [1] - 183:18

**via** [1] - 215:8

**Vice** [1] - 224:2

**victim** [11] - 236:18, 239:20, 239:21, 239:25, 240:13, 240:17, 240:18, 244:4, 247:6, 247:24

**victims** [1] - 239:14

**view** [4] - 197:12, 229:21, 366:23, 366:25

**views** [1] - 261:19

**violate** [1] - 375:7

**violation** [3] - 263:6, 368:10, 368:21

**visit** [1] - 269:22

**visited** [1] - 269:1

**voir** [2] - 224:21, 317:11

**VOIR** [4] - 224:23, 317:13, 376:7, 376:17

**volume** [1] - 188:10

**vulgar** [1] - 206:14

---

**W**

**wait** [1] - 325:25

**waiting** [1] - 184:4

**walked** [1] - 238:17

**walking** [4] - 238:13, 238:19, 238:24, 239:1

**wants** [3] - 248:14, 265:18, 315:12

**Washington** [2] - 322:8,

322:9

**watch** [1] - 341:10

**waved** [1] - 269:18

**ways** [2] - 347:13, 350:7

**wearing** [2] - 343:17, 343:18

**Wednesday** [5] - 293:24, 294:5, 336:4, 367:12, 375:24

**week** [9] - 189:1, 235:10, 238:15, 238:20, 238:25, 240:12, 242:5, 244:3, 247:19

**weeks** [4] - 184:8, 185:5, 293:6, 293:17

**weight** [2] - 363:9, 363:14

**welcome** [1] - 223:25

**whatsoever** [2] - 335:4, 335:9

**white** [2] - 257:17, 343:18

**whole** [10] - 192:18, 225:8, 265:5, 281:4, 328:8, 328:16, 333:6, 344:18, 355:9, 374:16

**wife** [2] - 353:16, 367:20

**willing** [1] - 330:20

**win** [2] - 287:15, 287:16

**wire** [19] - 234:18, 234:19, 237:16, 237:17, 239:2, 239:11, 250:20, 250:23, 252:7, 252:9, 253:21, 262:23, 310:15, 310:18, 310:20, 352:15, 352:16, 352:21

**wired** [3] - 250:20, 253:22, 347:22

**wires** [2] - 310:21, 311:12

**wish** [3] - 258:19, 294:9, 294:20

**wishes** [2] - 186:14, 186:17

**withdraw** [4] - 192:23, 217:21, 217:24, 281:8

**withdrawn** [4] - 215:24, 328:2, 346:19, 346:21

**WITNESSES** [1] - 376:1

**Wolves** [1] -

342:1

**wondering** [2] - 292:20, 300:2

**wooley** [1] - 250:15

**Wooley** [6] - 236:12, 239:4, 250:23, 321:24, 322:6, 322:10

**wooley's** [1] - 237:17

**word** [8] - 207:4, 207:7, 225:20, 242:15, 316:10, 322:14, 328:13

**wording** [1] - 199:20

**words** [11] - 191:24, 199:15, 199:16, 200:20, 206:17, 207:11, 221:21, 328:19, 346:17, 371:2, 372:8

**worth** [10] - 192:9, 195:2, 229:18, 259:10, 260:13, 299:3, 299:15, 302:16, 328:8, 371:12

**would it be fair to say** [7] - 272:6, 298:18, 300:18,

302:14, 309:6, 313:12, 324:12

**write** [5] - 193:15, 316:18, 316:20, 316:23, 346:18

**writing** [4] - 267:13, 305:4, 316:7

**written** [4] - 245:14, 316:10, 319:21, 329:2

**wrote** [4] - 193:18, 238:24, 247:13, 305:7

## Y

**yesterday** [22] - 184:10, 185:6, 190:9, 192:20, 192:25, 197:3, 198:21, 206:12, 207:14, 210:10, 210:13, 224:7, 227:4, 227:7, 227:19, 232:22, 244:17, 268:16, 268:18, 271:6, 277:14, 374:25

**YORK** [1] - 183:1

**York** [10] - 183:6,

183:15, 183:18, 183:21, 183:23, 340:14, 343:4, 347:5, 348:14, 352:19

**yourself** [16] - 200:9, 200:13, 206:13, 210:17, 215:18, 216:17, 219:23, 271:19, 271:21, 315:23, 318:1, 331:25, 334:11, 342:4, 356:3

**youth** [1] - 343:8