378

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                            :
UNITED STATES OF AMERICA

                                    13-CR-607 (JFB)


            -against-              :

                                    United States Courthouse
                                    Central Islip, New York

PHILLIP A. KENNER,
a/k/a "Philip Kenner"
        and
TOMMY C. CONSTANTINE,              TRANSCRIPT OF TRIAL
a/k/a "Tommy C. Hormovitis,
                                    May 6, 2015
        Defendants.        :       9:50 a.m.

- - - - - - - - - - - - - - X
            BEFORE THE HONORABLE JOSEPH F. BIANCO
         UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:
For the Government:         LORETTA E. LYNCH
                            United States Attorney
                            100 Federal Plaza
                            Central Islip, New York 11722
                            BY:   JAMES M. MISKIEWICZ
                                  SARITHA KOMATIREDDY
                            Assistant United States Attorneys


For the Defendant:         BY:  RICHARD HALEY, ESQ.
Kenner:                    1601 Veterans Highway Ste. 425
                           Islandia, New York 11749


For the Defendant
Constantine:               BY:  ROBERT LARUSSO, ESQ.
                                ANDREW OLIVERAS, ESQ.
                           300 Old Country Road
                           Mineola, New York 11572


Court Reporter:            Perry Auerbach
                           100 Federal Plaza
                           Central Islip, New York 11722
                           (631) 712-6103


        Proceedings recorded by mechanical stenography.
            Transcript produced by computer.

1          (Case called.)

2          (Appearances stated for the record.)

3          THE COURT:  Okay, all the jurors are here.  Are

4    you ready to bring them in?

5          MS. KOMATIREDDY:  No, your Honor.  We want to

6    read -- move a number of bank records into evidence and a

7    stipulation entered into by the party.  There are

8    approximately 15 stipulations.  Rather than read each one

9    verbatim, if it's okay with the Court I would propose that

10   I summarize and read the exhibit numbers into evidence,

11   into the transcript.

12         THE COURT:  Summarize the stipulations?

13         MS. KOMATIREDDY:  Yes, summarize the bank

14   records that the parties have agreed to, and move the

15   exhibits and stipulations into evidence.

16         THE COURT:  Is there any objection to that?

17         MR. HALEY:  Absolutely none.

18         MR. LA RUSSO:  No.

19         MR. HALEY:  We don't read the whole stipulation

20   into record.

21         THE COURT:  That's what she said.

22         I have to leave a little early today.  I was

23   thinking that we would after the lunch break, go straight

24   through without a recess to 3:30.  Does that work for

25   everybody?

1           MR. LA RUSSO:  That works fine with me.

2           THE COURT:  All right.  Let's bring in the jury.

3           MR. HALEY:  Your Honor, with the Court's

4    permission I moved the lectern.  I think that it was

5    obstructing the view of the jurors.  But it's your

6    courtroom.

7           THE COURT:  No, that's fine.  That's a good

8    idea.

9           THE CLERK:  All rise.

10          (Whereupon, the jury entered the courtroom.)

11          THE COURT:  Please be seated.  Good morning,

12   members of the jury.

13          THE JURY:  Good morning.

14          THE COURT:  It's good to see everyone again this

15   morning.  Just one scheduling matter today.  I have to

16   leave a little bit early today.  What we're going to do

17   this afternoon, after the lunch break we'll go to 3:30.

18   We won't take an afternoon break, we'll just go to 3:15,

19   3:30.

20          As you'll recall yesterday when we ended,

21   Mr. Peca was on direct examination so we'll continue from

22   that point.  Mr. Peca, I remind you that you are still

23   under oath, do you understand.

24          THE WITNESS:  I do.

25

M. Peca - Direct/Miskiewicz

381

1    **MICHAEL PECA**,

2            called as a witness, having been previously

3            duly sworn, was examined and testified further

4            as follows:

5            THE COURT:  Go ahead.

6            MR. MISKIEWICZ:  Thank you, your Honor.  May we

7    now read the stipulations.

8            MS. KOMATIREDDY:  Thank you, your Honor.

9            The parties have agreed to stipulate to the

10   admission of various exhibits as bank records.

11           It is hereby stipulated and agreed by and been

12   the United States of America and the defendants Phillip A.

13   Kenner and Tommy C. Constantine through their attorneys,

14   that the following exhibits are bank records, including

15   true and accurate copies of monthly account statements,

16   checks drawn, checks deposited, wire transfers of money

17   and other internal deposit documents for accounts at

18   various banks as follows.

19           Government Exhibit 1101 through 1105 are bank

20   records from First Century Bank.

21           Government Exhibits 1200 through 1203 and 1209

22   through 1234 are bank records from Alliance Bank of

23   Arizona.

24           Government Exhibits 1301 through 1309 are bank

25   records from the Bank of Arizona.

M. Peca - Direct/Miskiewicz

382

1          Government's Exhibit 1401 through 1424, 1427,

2    1428, 1430, 1432, 1433 and 1490 A through O are bank

3    records from with Wells Fargo bank.

4          Government's Exhibits 1602 is a bank record from

5    Commerce Bank.

6          Government Exhibits 1603 and 1604 are bank

7    records from TD Bank.

8          Government Exhibits 1701 through 1737, 1751

9    through 1759 and 1771 through 1775 are bank records from

10   the Bank of America.

11         Government Exhibits 2200 through 2216 are bank

12   records from Johnson Bank.

13         Government Exhibits 2300 through 2306 are bank

14   records from Wachovia Bank.

15         Government Exhibits 3001 through 3010, 3051 and

16   3053 through 3062 are bank records from Citibank.

17         Government Exhibits 3101 through 3112 are bank

18   records from American Express.

19         Government Exhibits 3201, 3202, 3207 and 3208

20   are bank records from Chase Bank.

21         Government's Exhibit 3203 through 3206 are also

22   bank records from Chase Bank.

23         Government Exhibits 3251 through 3263 are also

24   bank records from Chase Bank.

25         And Government Exhibits 3301 and 3302 are bank

M. Peca - Direct/Miskiewicz

383

1    records from Fidelity Investments.

2           Government Exhibits 3304 through 3306 are bank

3    records from Citizens Bank.

4           And the following government exhibits are bank

5    records from Northern Trust Bank:  Government Exhibits

6    2001 through 2020, 2101 through 2111, 2133 through 2145,

7    2158, 2081 A through C, 2082 A and B, 2082 A and B, 2083 A

8    and B, 2084 A, 2086 A and B, 2087 A and B, 2088 A and B,

9    2089 A and B, 2090 A through C and 2091 A and B.  As well

10   as 2158.

11          The government moves the foregoing exhibits as

12   well as marked exhibits marked stipulation, stip one

13   through stip 15 into evidence.

14          THE COURT:  Okay.  So any objection to the

15   stipulations one through 15 and all the records referenced

16   in those stipulations coming into evidence.  Any

17   objection.

18          MR. LA RUSSO:  No, your Honor.

19          MR. HALEY:  No, sir.

20          (Government's Exhibits 1-15 and above referenced

21   documents were in evidence.)

22          THE COURT:  So as you heard, members of the

23   jury, the prosecutor summarized those stipulations,

24   they're evidence in evidence.  If you want to read them

25   individually you just look at the information contained in

M. Peca - Direct/Miskiewicz

384

1    those and although we'll proceed now.

2           The lawyers are working together to try to save

3    time, as you'll see.  And we'll now proceed about the

4    testimony.  Go ahead, Mr. Miskiewicz.

5           MR. MISKIEWICZ:  Thank you, your Honor.

6

7    DIRECT EXAMINATION (Continues.)

8    BY MR. MISKIEWICZ:

9    Q.    Good morning, Mr. Peca.

10   A.    Good morning.

11   Q.    Mr. Peca, before we ended yesterday I was showing you

12   a series of documents regarding Northern Trust Bank bank

13   account and line of credit specifically and did you

14   testify that you had a line of credit with the numbers

15   289369 that was your line of credit at Northern Trust.

16          Now, I believe you also testified, the record

17   will reflect, that you did not get statements indicating,

18   contemporaneous statements about what was going on with

19   that line of credit, is that accurate?

20   A.    Correct.

21   Q.    I show you -- and again, do you recall approximately

22   what year your line of credit was opened?

23   A.    I believe it was '05.

24   Q.    And I'm showing you Government's Exhibit 2002, which

25   is now in evidence.  (Handing.)

M. Peca - Direct/Miskiewicz

385

1    Could you just read what the date of that is?

2   A.   The date.

3   Q.   What's the date of the actual statement?

4   A.   The statement date looks like October 1, 2006 through

5   October 31, 2006.

6   Q.   And have you ever seen that statement during the

7   period of time that your line of credit was opened?

8   A.   I have not.

9   Q.   I want to direct your attention to, there's a -- do

10   you see the box at the bottom which says deposits and

11   credits?

12   A.   I do.

13   Q.   First of all, I'm sorry, what is the name of the

14   account in whose name is this particular Northern Trust

15   bank account statement in.

16   A.   Little Isle IV LLC.

17   Q.   And where it says deposits and credits, that means

18   money coming in.  Do you see that?

19   A.   I do.

20   Q.   And I directing your attention to the date 10/19.

21   A.   Okay.

22   Q.   Do you see $395,000 wire?

23   A.   Yes.

24   Q.   Deposited in there?

25   A.   I do.

M. Peca - Direct/Miskiewicz

386

1   Q.   Does it say what account number that $395,000 wire is

2   arriving from?

3   A.   Yes, it does.

4   Q.   And what is the account number if you can read it for

5   the jury?

6   A.   The loan account number 289369.

7   Q.   Whose account number is that?

8   A.   I think that's my account number.

9   Q.   All right.  Now, what was the Little Isle IV LLC if

10  you recall?

11  A.   Little Isle IV LLC was -- were myself and other

12  players had invested money for the sole purpose of a real

13  estate investment in the Little Isle of Hawaii.

14  Q.   And who controlled that account?

15  A.   Philip Kenner.

16  Q.   I'll show you now what's been marked and received in

17  evidence as Government's Exhibit 2003 and ask you to take

18  a look at that.  (Handing.)

19       Looking at 2003, actually, I'm sorry, let's go

20  back to 2002 just for a second.  What's on the screen now,

21  is that what you were reading from while I was fumbling

22  with the computer.

23  A.   Yes.

24  Q.   All right.  And this 10/19 transaction, this is the

25  395 that you were talking about?

M. Peca - Direct/Miskiewicz

387

1   A.    Correct.

2   Q.    And that is your line of credit account number that

3   I'm pointing to there?

4   A.    Yes, it is.

5   Q.    And the date of this advertise 10/19/2006; is that

6   correct?

7   A.    That is correct.

8   Q.    If you look at the box right above it, other items

9   paid, do you see that?

10  A.    Yes.

11  Q.    Do you see on essentially -- not essentially -- do

12  you see on 10/19, $395,000 going out?

13  A.    I do.

14  Q.    So 395 came in and then it went out on the same day,

15  is that, for the record, correct?

16  A.    It is.

17  Q.    Showing you now if you turn to, I think that you have

18  it in your hands, Government's Exhibit 2003.  What

19  account, in whose name is this Northern Trust account?

20  A.    Ula Makika LLC.

21  Q.    And also on October 19, 2006, can you see if any

22  deposits hit that account?  Where it says deposits and

23  credits?

24  A.    395,000.

25  Q.    Okay.  And then on that same day, I'm going upward,

M. Peca - Direct/Miskiewicz

388

1   where it says other items paid, do you see $395,000 being

2   paid out?

3   A.   I do.

4   Q.   Same day, right, 10/19?

5   A.   10/19, correct.

6   Q.   That's also the same day as on Government's Exhibit

7   2002, 10/19, the other document?

8   A.   Yes.

9   Q.   Okay.  So all this is happening, you would agree, on

10  one day, correct?

11  A.   Correct.

12  Q.   Now, this 10/19 transfer or paid to Led Better

13  Development Company LLC, 395,000, on this, during this

14  period of time when you have your line of credit open, had

15  you ever heard of a Led Better Development Company?

16  A.   Never.

17  Q.   Did you authorize Mr. Kenner to transfer $395,000

18  from your line of credit first to one bank account and

19  then ultimately to another bank account in the name of or

20  paid out to Led Better?

21  A.   No.

22  Q.   Did you authorize that?

23  A.   I did not.

24  Q.   On or about October 19, 2006?

25  A.   No.

M. Peca - Direct/Miskiewicz

389

1    Q.    Did you ever even know about it?

2    A.    I did not.

3    Q.    Now, Mr. Peca, you testified yesterday that the line

4    of credit was to be used, I believe you testified, pardon

5    me if I'm wrong, but the line of credit was to be used

6    solely for the purpose of helping I think you said

7    vertical construction in Hawaii?

8    A.    Correct.

9    Q.    And I'm going to ask you now when you were speaking

10   to Mr. Kenner about this line of credit in or about you

11   2003 or -- I'm sorry -- when it was first opened, was that

12   your understanding, that it was to be used for Hawaii?

13   A.    Sole purpose, yes.

14   Q.    Now, you testified, did you not, sir, before a grand

15   jury in Manhattan in or about March of 2011, didn't you?

16   A.    I did.

17   Q.    Okay.  Were you represented by an attorney prior to

18   your appearance before the grand jury in Manhattan?

19   A.    I was.

20   Q.    Did you pay for that lawyer?

21   A.    I did.

22   Q.    Who was that lawyer?

23   A.    Ronald Richards.

24   Q.    Where did you get that lawyer from?

25   A.    Phil Kenner.

M. Peca - Direct/Miskiewicz

390

1    Q.    I'm going to get to this later on, but you're

2    familiar with something called Global Settlement Fund?

3    A.    Yes, sir.

4    Q.    What is the Global Settlement Fund?

5    A.    The Global Settlement Fund was a legal fund designed

6    for a civil action against Ken Jowdy, with the hopes of

7    the end game being acquiring the northwestern parcel of

8    beach front property in the Cabo development, that was

9    already a buyer in place in order to make everybody whole

10   on their investment.

11   Q.    When does that occur, approximately, what year?

12   A.    That meeting occurred in May of 2009.

13   Q.    So several years after this $395,000?

14   A.    Correct.

15   Q.    When you appeared before the grand jury, had you seen

16   this document?

17   A.    I had not.

18   Q.    Did your lawyer at that time, Mr. Richards, show you

19   that document?

20   A.    He did not.

21   Q.    Did Mr. Kenner show you that document?

22   A.    He did not.

23   Q.    Or any of the documents that you've seen so far this

24   morning?

25   A.    The first I've seen them.

391

1  Q.   And did Mr. Kenner tell you what the purpose of this

2  grand jury investigation was?

3  A.   It was the grand jury convened for pending

4  prosecution of Ken Jowdy.

5  Q.   But with -- who told you that?

6  A.   Both Phil Kenner Ron Richards.

7  Q.   Back very briefly to the Global Settlement Fund.

8  When you, did you ever contribute to this Global

9  Settlement Fund?

10  A.   I did.

11  Q.   How much money?

12  A.   It was $250,000.

13  Q.   It was to fight Ken Jowdy?

14  A.   Correct.

15  Q.   Where did the money go to?

16  A.   It went into Ronald Richards' trust account.

17  Q.   Do you know what happened to it after that?

18  A.   I do not.

19  Q.   And that was about 2009?

20  A.   Correct.

21  Q.   In the grand jury 2011 Ron Richards is your lawyer

22  who you found through Mr. Kenner, is his payment through

23  the Global Settlement Fund?

24  A.   It is.

25  Q.   Your money, did you pay Mr. Richards to represent you

M. Peca - Direct/Miskiewicz

392

1    in the grand jury or --

2    A.    I had to pay him separately because there was no more

3    funds in the Global Settlement Fund.

4    Q.    Do you know what happened to that money?

5    A.    I do not.

6    Q.    Now, you testified yesterday and you agreed this

7    morning that your understanding was that the sole purpose

8    of the cash that you invested in Hawaii and this $1.7

9    million loan per the line of credit was to be used for

10   Little Isle IV solely for what?  Do you remember what the

11   told the grand jury?

12   A.    I do.

13   Q.    Do you remember what you told the grand jury on or

14   about March 29, 2011, about where the money went?

15   A.    Just for that purpose, for Hawaii.

16   Q.    Okay.  I show you what's been marked as Government's

17   Exhibit 3500 MP-5, I'm going to ask you to just take a

18   look at it.  Specifically I direct your attention to page

19   30.

20           MR. HALEY:  Is that grand jury testimony, I

21   don't know what that is, MP-5?

22           MR. MISKIEWICZ:  I'll show you.  This is 3500.

23           (Showing to Mr. Haley.)

24   Q.    I'm just going to ask you to just read to yourself

25   and specifically for the record drawing your attention to

M. Peca - Direct/Miskiewicz

393

1    the question and answer beginning at line seven and read

2    through to approximately line 20.

3              MR. HALEY:  I'm sorry, what page?

4              THE WITNESS:  30.

5              MR. HALEY:  Thank you.

6              (Pause.)

7    Q.   Now, does that refresh your recollection as to what

8    you said in 2011 about where the money was going meaning

9    the money from your line of credit?

10   A.   Yes.

11   Q.   What did you tell them?

12   A.   I basically told them that the Hawaii investment

13   started with both the cash investment of a hundred

14   thousand and the line of credit for 1.775 used for Hawaii.

15   Q.   And did you indicate or did you say that you knew

16   something about a Ken Jowdy getting some of that money at

17   some point in the form of a loan?

18   A.   It was never in the outset I never knew when the loan

19   was made to Ken Jowdy or notified when the loan was made

20   to Ken Jowdy.  We were told well after the fact that the

21   loan was made to Ken Jowdy.  There were so many parts of

22   the moving investments that it just became part of the

23   conversation.

24   Q.   In 2011 you'll agree with me, did say that some of

25   that money was a loan to Ken Jowdy?

M. Peca - Direct/Miskiewicz

394

1   A.   Correct.  At that point I learned that some of the

2   money was used for a loan to Ken Jowdy.

3   Q.   Who told you that the money in you line of credit

4   went to Ken Jowdy?

5   A.   Phil Kenner did but it didn't start out that money

6   from Little Isle IV which belonged to Ken Jowdy.  It

7   started out that we made a loan to Ken Jowdy.

8   Q.   When did he tell you that?

9   A.   I couldn't tell you exactly, it started 2010 onward.

10  Q.   Were there a number of lawsuits pending that you were

11  aware of?

12  A.   There were, a friend of mine Glenn Murphy was in

13  civil litigation, a dispute with Ken Jowdy.  So there

14  seemed to be a lot of loans out there.  So when he said we

15  made a loan, he never said the Little Isle IV account was

16  used for the loan to Ken Jowdy.  In fact we had a

17  mediation in California in 2010, the first time I meet him

18  prior was before getting into a car going back to the

19  airport, where I confronted him and said did Phil use our

20  money from Little Isle to buy the home equity in Cabo with

21  Ken Jowdy and I never got an answer.

22  Q.   Let me go back to that episode, you were in a car

23  with Mr. Constantine?

24  A.   We were actually standing out on the sidewalk, we

25  hadn't had been in the car yet.

M. Peca - Direct/Miskiewicz

395

1  Q.    Face-to-face thought?

2  A.    Correct.

3  Q.    And you posed that question to him you said you never

4  got an answer, but I'm not asking you at that particular

5  moment when you asked him that very direct question, what,

6  if anything, did Mr. Constantine respond?

7  A.    I don't recall the response.  I don't feel he

8  stonewalled me at all to be quite honest.  It's just I

9  didn't get an answer.

10  Q.    All right.  In 2011 though when you were in the grand

11  jury, to the extent that you knew at that time that money

12  went to Ken Jowdy, what was the source of that

13  information, in other words, who told you loans for Little

14  Isle IV were made to Ken Jowdy?

15  A.    Phil Kenner.

16  Q.    Other than Phil Kenner telling you that, did you know

17  any of that to be true?

18  A.    I did not.

19  Q.    Prior to the day in the grand jury, were you prepared

20  by Mr. Ron Richards for questioning in the grand jury?

21  A.    I was.

22  Q.    Who else was present during the preparation by your

23  lawyer?

24  A.    That preparation occurred in Ron Richards hotel room

25  in New York City.  Myself, another player by the name of

M. Peca - Direct/Miskiewicz

396

1    Turner Stevenson and Darryl Sydor were present and then

2    Ron Richards proceeded to get Phil Kenner on the phone,.

3    Q.    Prior to your meeting with Ron Richards and being

4    prepared for the grand jury, did Mr. Kenner communicate to

5    you about the importance of this grand jury appearance?

6    A.    He did.  You know, his words were this is going to be

7    the most important business day of your life.

8    Q.    And did, were there times during your preparation

9    that you had difficulty remembering events on your own?

10   A.    Absolutely.

11        MR. HALEY:  Judge, can I just object to leading

12   nature of the question.  That's my only objection.

13        THE COURT:  Sustained.

14        MR. HALEY:  Thank you.

15   Q.    What kinds of things did you talk about in

16   preparation for your grand jury appearance?

17   A.    The main theme in that preparation was being we're

18   all here, this whole thing is because a loan is made to

19   Ken Jowdy and we have to pay it back.  That was basically

20   the crux of it.

21   Q.    By this time in 2011, again, had you seen any records

22   substantiating that?

23   A.    I did not.

24   Q.    And other than what you were told during this prep

25   session did you have any independent knowledge about the

M. Peca - Direct/Miskiewicz

397

1    truth of that?

2    A.    I did not.

3    Q.    So I'll just ask you one more time, as you sit here

4    today, back when the line of credit was first opened, what

5    was the purpose of the line of credit?

6    A.    It was solely to be used for vertical development

7    infrastructure and acquisition of the property.

8    Q.    Who told you that?

9    A.    Phil Kenner.

10   Q.    Now, I'll show you another series of exhibits now in

11   evidence.  Showing you what's been marked and received in

12   evidence as government's 2013.  (Handing.)

13             Having shown you Government's Exhibit 2013 now

14   on the screen also.  Just for the record, what is the name

15   on the account at this Northern Trust document?

16   A.    Little Isle IV LLC.

17   Q.    What is the date period or date range?

18   A.    July 7th to July 19th of 2005.

19   Q.    Turning your attention to page 2 under the box that

20   says deposits and credits, do you see that?

21   A.    I do.

22   Q.    Do you see a line there date 07-15?

23   A.    Yes.

24   Q.    And a description that says note proceeds?

25   A.    Yes.

M. Peca - Direct/Miskiewicz

398

1    Q.    And it's for $25,000?

2    A.    Correct.

3    Q.    And where according to the description there, where

4    is in money coming from?

5    A.    My line of credit account.

6    Q.    The 289369 account number?

7    A.    Correct.

8    Q.    Again on or about this date or date range, roughly

9    July of '05, had you ever seen this document before?

10   A.    I had not.

11   Q.    Or I should say did you see that document shortly

12   thereafter?

13   A.    No, I did not.

14   Q.    July of '05 or any time thereafter?

15   A.    No.

16   Q.    Do you know where that money went?

17   A.    I do not.

18   Q.    On that particular day, did you authorize or do you

19   have any recollection of authorizing a $25,000 drawdown be

20   made from your line of credit and sent to Little Isle IV?

21   A.    No.

22   Q.    I think that I showed you yesterday Government's

23   Exhibit 2001, also in evidence.  2001.  This says

24   something about transaction history at the very beginning

25   and has your name at the top and your account number, do

M. Peca - Direct/Miskiewicz

399

1  you see that?

2  A.  I do.

3  Q.  We looked at that yesterday?

4  A.  Yes.

5  Q.  We're going to turn to the second page of that

6  transaction history focusing you on that same date we were

7  talking about a little bit earlier, 10/19/2006.  There's a

8  line that says note increase for $395,000.  Again, had you

9  ever seen this document before?

10  A.  Never have, no.

11  Q.  Prior to your preparation for trial here today, had

12  you ever seen it?

13  A.  I don't recall seeing this document.

14  Q.  And the last column here is balance part or fee.

15  Continues into the second page.  On that day, when that

16  395,000 note increase occurs, do you see what your balance

17  was?

18  A.  I do.

19  Q.  Your balance goes a couple of months earlier is $1.2

20  million, $1,218,486.05 and then went when the $395,000

21  comes out of your line of credit what's the now balance

22  that's been borrowed against your line of credit?

23  A.  $1,613,486.05.

24  Q.  During this period of time of October of '06 did you

25  get any statement whether from the bank or Mr. Kenner or

M. Peca - Direct/Miskiewicz

400

1    anybody, saying that you have drawn down $1.6 million on

2    your line of credit?

3    A.    No.

4    Q.    Other than you testified about the bonds statements,

5    did you get anything indicating how much was borrowed?

6    A.    I did not.

7    Q.    And again, for clarity, when the bond, when you got

8    your bond statements, did they come in monthly, quarterly?

9    A.    They came monthly.

10   Q.    Di they make any reference to the fact here is your

11   balance, here is how much you earned for the last 30 days

12   minus your loan, something like that?

13   A.    No, it was just strictly a bond recorded, nothing

14   about the line of credit.

15   Q.    Now I showed you a document yesterday in which you,

16   you authorized Mr. Kenner to have access to your line of

17   credit, correct?

18   A.    Correct.

19   Q.    I think that I showed you this document, Government's

20   Exhibit 2142, this is where you did that, correct?

21   A.    Correct.

22   Q.    And it's dated March 11, 2005?

23   A.    Correct.

24   Q.    And is this about the time that the line of credit

25   was opened?

M. Peca - Direct/Miskiewicz

401

1    A.    It was.

2    Q.    Going back to Government's Exhibit 2001, I want to

3    focus your attention to one of the earliest transactions.

4    April 4, 2005.  That's, would you agree is three, three

5    and a half weeks after what's on Government's Exhibit

6    2142?

7    A.    Yes.

8    Q.    March 11th?

9    A.    Yes.

10   Q.    Do you see where there's a note increase, April 4,

11   2005, do you see where I'm pointing to?

12   A.    I do.

13   Q.    How much is drawn down from your line of credit on

14   that day about three and a half weeks after the line of

15   credit is opened?

16   A.    $1,250,000.

17   Q.    Did Mr. Kenner tell you that happened right after you

18   opened the line of credit?

19   A.    He did not.

20   Q.    Did you have any documents provided to you that

21   substantiated that your line of credit was in that amount?

22   A.    No.

23   Q.    I want to ask you a question, do you know Owen Nolan?

24   A.    I do.

25   Q.    Who is he?

M. Peca - Direct/Miskiewicz

402

1   A.   Owen Nolan was a professional hockey player, I was a

2   teammate of his at the 2002 Olympics, in fact, we were

3   roommates at the 2002 Olympics.

4   Q.   On or about this time, April 4, 2005, did you owe

5   Mr. Nolan $1,250,000?

6   A.   No, I did not.

7   Q.   Did you intend to make a loan to Mr. Nolan of

8   $1,250,000?

9   A.   No, I did not.

10  Q.   Did you ever authorize Mr. Kenner to use your line of

11  credit to pay $1,250,000 to Owen Nolan?

12  A.   No, I did not.

13  Q.   When was the first time that you even knew that that

14  happened?

15  A.   Just now.

16  Q.   Very briefly, a couple of days later, April 12, 2005,

17  another note increase for looks like $350,000, did you

18  know that occurred?

19  A.   I did not.

20  Q.   At this stage your balance is $1.6 million.  What was

21  the masks your line of credit?

22  A.   1.775 million.

23  Q.   So virtually I mean all but about $175,000 has

24  already been borrowed against your line of credit,

25  correct?

M. Peca - Direct/Miskiewicz

403

1   A.    Correct.

2   Q.    Did you know that within approximately a month of

3   opening the line of credit that virtually all of your line

4   of credit was already committed?

5   A.    I didn't know that.

6   Q.    And I won't go through every single one here, but

7   anywhere there was a note increase, meaning more money

8   borrowed down, specifically for instance July 7, 2005,

9   there seems to be another line here, another 120,000, now

10  your balance is almost right at the red line.  Did you

11  know that was happening?

12  A.    No.

13  Q.    Are there any note increases here on this exhibit,

14  2001, did you ever know that any of that happened?

15  A.    I did not.

16  Q.    And I guess I assume that means you don't know where

17  the money went?

18  A.    Apparently not.

19  Q.    Now, on this line of credit, were you ever notified

20  or did you ever get a notice regarding the status of the

21  line of credit sent directly to you?

22  A.    First one I received was when I was living in

23  Columbus in 2008, 2009, I received a letter saying that

24  the account was close to being in default.

25  Q.    Okay.  I show you what's now in evidence as

M. Peca - Direct/Miskiewicz

404

1    government's -- I'm sorry.

2            Showing you with what's been marked for

3    identification as Exhibit 716.  (Handing.)

4            Showing you 716.  Do you recognize that

5    document?

6    A.   I do.

7    Q.   What do you recognize it to be?

8    A.   A very shocking one.

9            MR. HALEY:  I withdraw it.

10   Q.   Just what do you recognize the document to be?

11   A.   It's a letter from Northern Trust stating that

12   basically my line of credit is close to being in default.

13           MR. MISKIEWICZ:  Do you have any objection?

14           MR. HALEY:  No objection.

15           MR. MISKIEWICZ:  The government moves for the

16   admission of Government Exhibit 716.  Mr. La Russo?

17           MR. LA RUSSO:  No objection.

18           THE COURT:  716 is admitted.

19           (Government's Exhibit 716 in evidence.)

20   Q.   I'm not going to ask you to read the whole letter,

21   but just so we generally see what is on here, could you

22   read the date?

23   A.   February 9, 2009.

24   Q.   And what loan number is being referenced here?

25   A.   289369.

M. Peca - Direct/Miskiewicz

405

1   Q.   And that's same account number that we've been

2   talking about, your line of credit account?

3   A.   Yes.

4   Q.   And who is it sent from if you can tell?

5   A.   Aaron Mascarella, second vice president, Northern

6   Trust.

7   Q.   Okay.  When you got this letter, did you contact

8   anybody?

9   A.   I immediately contacted Phil Kenner.

10  Q.   And what, if anything, did he tell you about the

11  letter?

12  A.   He just reassured me that not to worry about it.  He

13  went on about Northern Trust started to behave badly and

14  he'd take care of it.  And he already made calls to the

15  Bank of America to move my bond account to Bank of

16  America.

17  Q.   Did Northern Trust actually default or call you in

18  default?

19  A.   They did.

20  Q.   And as a result, what, if anything, happened to your

21  bond account that was the security, the collateral for

22  that line of credit?

23  A.   That bond account which essentially was our safety

24  net was pretty much completely wiped out.

25  Q.   How much money did you lose?

M. Peca - Direct/Miskiewicz

406

1    A.    It was just over 1.8 million.

2    Q.    Now, there was another lawsuit, some sort of

3    settlement with Northern Trust later on; is that correct?

4    A.    Correct.

5    Q.    And did you get some of that money back?

6    A.    A portion of it, yes.

7    Q.    But beyond what Mr. Kenner told you that morning when

8    you called him, did you ever get any other explanation

9    about why your line of credit was put into default in

10   2009?

11   A.    Never got an explanation to why it got to that point.

12   The only explanation I got is he reassured me that the

13   money was safe in the investment.

14   Q.    But did he tell you in all these years, 2005, 2006,

15   2007, 2000, where your money was going from your line of

16   credit?

17   A.    He did not.  I assumed it was going to Hawaii, but I

18   had no documentation to substantiate that.

19   Q.    Other than him telling you it's safe, do you know

20   what happened to your money?

21   A.    I didn't, and it didn't make me feel any better.

22   Q.    Now, I'm going to show you what's been also marked as

23   Government's Exhibit 719 for identification.  I'll just

24   ask you to look at that.  (Handing.)

25         Do you recognize that document?

M. Peca - Direct/Miskiewicz

407

1   A.    I do.

2   Q.    What do you recognize it to be?

3   A.    It's authorizing Northern Trust to send all records

4   to Phil Kenner's address.

5   Q.    And who signed it?

6   A.    I did.

7   Q.    Why are you --

8         MR. MISKIEWICZ:  The government moves for the

9   admission of 719.

10        MR. LA RUSSO:  I have no objection.

11        MR. HALEY:  No objection, your Honor.

12        THE COURT:  719 is admitted.

13        MR. MISKIEWICZ:  Thank you.

14        (Government's Exhibit 719 in evidence.)

15  Q.    Showing you 719.  This is -- is this before or after

16  the letter that you just were discussing where you were

17  told that you were about to be put into default, August

18  2009?

19  A.    I never checked the date on the last letter, sorry.

20  Q.    Do you still have it in front of you?

21  A.    I don't.

22  Q.    Showing you 716.  Is this a letter where you're

23  notified that --

24  A.    Yes.

25  Q.    Your line of credit payments are overdue and you're

M. Peca - Direct/Miskiewicz

408

1    in danger of being put in default?

2    A.    Yes.

3    Q.    What's the date of that?

4    A.    February 9, 2009.

5    Q.    And then is this about the time that you contacted

6    Mr. Kenner?

7    A.    It is, yes.

8    Q.    And then subsequent to this letter you were actually

9    put into default?

10   A.    Correct.

11   Q.    And you lost a portion of your savings?

12   A.    Yes.

13   Q.    And now in August of 2009, several months later, why

14   are you -- well --

15          MR. MISKIEWICZ:  If I may read it into the

16   record, your Honor?

17          THE COURT:  Okay.

18          MR. MISKIEWICZ:  Please forward, I'll start from

19   the beginning, August 10, 2009, Re:  Michael Peca LOC

20   number 289369, Dear Northern Trust, please forward all

21   bank custody records for my LOC since its inception to the

22   closing in early 2009.  I had been a valuable client on

23   the investment management side of your business, as well

24   as the lending side for approximately five years, so I

25   anticipate that you will deal about this request

M. Peca - Direct/Miskiewicz

409

1    appropriately.  Please have these records sent.  One,

2    electronically to Phil at Standardadvisors.com or by

3    mail -- or 2, by mail to Standard Advisors, 10705 East

4    Cactus Road, Scottsdale, Arizona.

5    Q.    Who is Phil at Standardadvisors.com?

6    A.    Phil Kenner.

7    Q.    What was this address, 10705 East Cactus Road?

8    A.    That's his personal residence.

9    Q.    Is that also where he ran Standard Advisors out of?

10   A.    I believe so.

11   Q.    Why are you asking that your line of credit documents

12   be sent to Mr. Kenner?  This is August of 2009.

13   A.    Because at that point I had no idea what transaction

14   took place in the account, I had never seen any

15   transaction reports from the account so this is a way for

16   him to get them so that I could possibly see them in the

17   future.

18   Q.    Did you know whether or not he had them?

19   A.    I assumed that he did get them from there.  I didn't

20   know that he was getting them during the time the life of

21   the account.

22   Q.    Do you recall whether or not he ever said anything to

23   you about whether or not he had the line of credit

24   transaction accounts, the things that we looked at earlier

25   today?

M. Peca - Direct/Miskiewicz

410

1  A.   He did not.  He did not tell me that he was getting

2  them through the period.

3  Q.   I'm sorry, I didn't hear the answer, I was talking

4  over.  Can I repeat that?

5            THE COURT:  Sure.

6  Q.   Can you repeat, did he tell you if he had the records

7  in his possession or not?

8  A.   I never got confirmation that he did.

9  Q.   What, if anything, did he tell you?

10  A.   Whenever I tried to see any documents, the only

11  answer I ever got is that somebody broke into his house

12  and stole them.

13  Q.   And was that before or after you sent this letter

14  August 2009?

15  A.   Afterward.

16  Q.   And prior to this, though, during that, from the

17  moment you get that letter saying you're in danger of

18  default through the default and the loss of money to the

19  time that you send this letter in August of 2009, did you

20  have any discussions with Mr. Kenner about whether or not

21  he at that point possessed these lines of credit

22  transaction records, the ones that you saw earlier today?

23  A.   No.

24  Q.   And I'm going to show you two documents, Government's

25  Exhibit 717 and 718.

M. Peca - Direct/Miskiewicz

411

1      MR. LA RUSSO:  I have no objection.

2      MR. HALEY:  Thank you.

3      MR. MISKIEWICZ:  Do you have any objection?

4      MR. HALEY:  No.

5      MR. MISKIEWICZ:  Your Honor, the government

6   moves for admission of government's 717 and 718 with the

7   stipulation of both counsel.

8      MR. LA RUSSO:  That's correct, your Honor.

9      THE COURT:  Is that correct, Mr. Haley?

10      MR. HALEY:  Yes, your Honor.

11      THE COURT:  717 and 718 are admitted.

12      (Government's Exhibits 717 and 718 in evidence.)

13   Q.   Very briefly, are those the letters that you got when

14   you were told that you were finally in default?

15   A.   Yes.

16   Q.   Now, I'll move on to a different subject.  Mr. Peca,

17   are you familiar with a company known as Eufora?

18   A.   Yes.

19   Q.   Tell the members of the jury how did you first hear

20   about Eufora?

21   A.    I first heard of Eufora around 2004 from Phil Kenner,

22   Eufora was a prepaid credit card company which strength

23   lied within their credit builder patent program which

24   essentially allowed people to rebuild their credit through

25   prepaid credit card.

412

1   Q.   Had you known who the owner of Eufora was?

2   A.   I can't remember exactly if I was informed at the

3   time, no.

4   Q.   And did there ever come a time that you met a man by

5   the name of Tommy Constantine?

6   A.   Yes.

7   Q.   How many times did you meet Mr. Constantine?

8   A.   I've only met Mr. Constantine twice in person.

9   Q.   Would you recognize him if you saw him again?

10  A.   I would.

11  Q.   Do you see him in the courtroom today?

12  A.   Yes, he's sitting here about the blue suit and the

13  light blue and nave blue tie.

14          MR. LA RUSSO:  We'll stipulate to the

15  identification.

16          MR. MISKIEWICZ:  Thank you, your Honor.

17          THE COURT:  The record will so note.

18  Q.   Did there come a time that you decided to invest in

19  Eufora?

20  A.   Yes, sir.

21  Q.   And what was, how much did you decide to invest in

22  total over whatever period of time?

23  A.   In total --

24          MR. LA RUSSO:  I total apologize, Judge, may I

25  ask one question or two to the witness?  That's all I ask.

M. Peca - Direct/Miskiewicz

413

1  Q.   Can you put a time frame as to when did you first

2  hear about Eufora from Mr. Kenner?

3  A.   The first time was around 2004, where the initial was

4  made in for 162,000 and then again in 2008 it was the

5  initial $200,000 investment, for a total of $366,000.

6  Q.   And did you -- how did the money get transferred to

7  Eufora?

8       MR. LA RUSSO:  Judge, I apologize, I know I

9  shouldn't do this.  I was just asking, he said he met him

10  two times.  I just wanted to know when those occurred.  I

11  wasn't so interested -- I'm sorry.

12       THE WITNESS:  First time I meet Mr. Constantine

13  was in my living room in May of 2009 and then the second

14  time was the mediation in California in 2009.

15       MR. LA RUSSO:  Thank you.  I apologize for

16  interrupting.

17  Q.   So at the time that you made your investments in

18  Eufora, you had not personally met him?

19  A.   Correct.

20  Q.   How did you send money to Eufora for investment?

21  A.   Money was wired from my Schwab account into Eufora.

22  Q.   And who executed those wires, if you know?

23  A.   Phil Kenner.

24  Q.   I'll show you what's been marked for identification

25  as Government's Exhibit 753.  (Handing.)

M. Peca - Direct/Miskiewicz

414

1          Showing you what's been marked as 753.  Just

2    take a moment to look at that.  (Pause.)

3          MR. LA RUSSO:  No objection.

4          MR. MISKIEWICZ:  With the stipulation of the

5    parties, the government moves for the admission of

6    Exhibit 753.

7          THE COURT:  Correct?

8          MR. LA RUSSO:  That's correct, your Honor.

9          THE COURT:  Mr. Haley, is that correct?  You're

10   okay with the Exhibit 753 coming into evidence.

11         MR. HALEY:  If offered by the government, yes,

12   your Honor, no objection.

13         THE COURT:  753 is admitted.

14         (Government's Exhibit 753 in evidence.)

15   Q.   Showing you on screen now 753, begins:  Please wire

16   on margin if necessary.  Do you know what that means?

17   A.   Say it again.

18   Q.   It begins the very top of the page, it says:  Please

19   wire on margin if necessary.

20         Do you know what that means?

21   A.   I don't.

22   Q.   April 4, 2008 is the date and do you see the where

23   it's being sent to, Charles Schwab.  Does that make any

24   reference to your account at Charles Schwab?

25   A.   Yes.  That was the custodian account.

M. Peca - Direct/Miskiewicz

415

1    Q.    And then the body of this letter instructions say

2    dear Charles Schwab please wire $100,000 using the

3    following instructions.  And it says Constantine

4    Management Group, limited or Ltd, with a routing number,

5    account number, and then a recipient I guess, Bank of

6    America and an address in Phoenix, Arizona.  Do you see

7    all of that?

8    A.    I do.

9    Q.    And then at the bottom here, who sent that letter?

10   A.    Phil Kenner.

11   Q.    And did you read what it says regarding after it says

12   thank you for your assistance comma, what does it say, if

13   you can read it?

14   A.    Phil Kenner as attorney in fact for Michael Peca or

15   below that?

16   Q.    That's it.  Okay.

17         Now, at this time, 2008, did you authorize --

18   did you have an agreement or an authorization with

19   Mr. Kenner to wire transfer money in your behalf as part

20   of his consulting or advisory position?

21   A.    Yes.

22   Q.    And where the money is going, the $100,000, at this

23   time April 4, 2008, you were investing in Eufora?

24   A.    Correct.

25   Q.    You said that there were a series of wire transfers.

M. Peca - Direct/Miskiewicz

416

1   Do you know why there's $100,000 of your money going to a

2   company by the name of Constantine Management Group Ltd.?

3   A.   I do not know that.

4   Q.   Do you know what that is?

5   A.   I do not know what it was.

6   Q.   Do you know if it had any connection to Eufora?

7   A.   I have no reason to think that it had any association

8   with Eufora.  I didn't even know that it was sent to

9   Constantine Management Group at the time, so I couldn't

10  draw that opinion.

11  Q.   In this period, April 4, 2008 are any of the months

12  thereafter in 2008, had you seen a copy of this wire

13  transfer instructions?

14  A.   No.

15       The first time that I had seen a copy of this

16  wire instruction was when I finally had come to the

17  conclusion that I had to start looking into stuff, and I

18  requested my advisors to look into Schwab and get me all

19  of my wire transfers from as early back as they can get

20  them from the landlord, and when I noticed this I asked

21  Phil Kenner right away why this went to Constantine

22  Management Group.

23  Q.   What did he tell you?

24  A.   He wondered why I was asking.

25  Q.   Did he ever tell you or make any explanation?

M. Peca - Direct/Miskiewicz

417

1  A.   He did not.

2  Q.   Showing you what's been marked as Government's

3  Exhibit 755 for identification.

4         MR. LA RUSSO:  Your Honor, I apologize, could we

5  just get a time frame when that conversation occurred.

6         THE COURT:  Sure.

7         THE WITNESS:  That conversation with Mr. Kenner?

8         MR. LA RUSSO:  Yes, please.

9         THE WITNESS:  I'm guessing it was around 2011,

10  2012, in around there.  Maybe a little later.

11  Q.   Showing you what's been marked as Government's

12  Exhibit 755 for identification.  (Handing.)

13         Do you recognize 755?

14  A.   I do.

15  Q.   Do you recognize the signature there?

16  A.   Yes.  That's my signature.

17  Q.   Did you send that letter?

18  A.   I did.

19         MR. MISKIEWICZ:  The government moves for the

20  admission of 755.

21         MR. LA RUSSO:  No objection, your Honor.

22         MR. HALEY:  No objection.

23         THE COURT:  755 is admitted.

24         (Government's Exhibit 755 in evidence.)

25         MR. HALEY:  I'm sorry.  Can we have the date on

M. Peca - Direct/Miskiewicz

418

1    that?  Thank you.

2    Q.    Showing you government's 755, could you just read --

3    first of all, who are you sending this -- withdrawn.

4    What's the date on this letter?

5    A.    The date is May 12, 2009.

6    Q.    Who are you sending the letter to?

7    A.    Charles Schwab and Company.

8    Q.    And just read the body of the letter, what are you

9    asking Charles Schwab, the company, to do?

10   A.    Please remove Philip Kenner as attorney in fact from

11   the above referenced account.

12   Q.    And that's your signature?

13   A.    It is.

14   Q.    So you said you guessed you asked to have him cut off

15   I think you said in response to a question a little

16   earlier, you guessed it was 2011.  Is this what you're

17   referring to, the 2009, is that when you asked that he be

18   cut off?

19   A.    It was.

20   Q.    So it was a little bit earlier than 2011?

21   A.    2011 I started to inquire about some of the wire

22   transfers made over the years and requested a copy from

23   Phil.

24   Q.    But you asked that Mr. Kenner no longer be given a

25   power of attorney or attorney in fact?

M. Peca - Direct/Miskiewicz

419

1    A.    Correct.

2    Q.    By the way, this is from you, correct?

3    A.    It is.  At the same time he was also removed as my

4    trustee of my life insurance trust, things of that nature.

5    Q.    During this period of time 2009 and on -- what is

6    your relationship -- withdrawn.

7          How frequently are you meeting Mr. Kenner

8    face-to-face?

9    A.    In what time frame?

10   Q.    Let's say from 2008 on for the 2000 -- let's say the

11   year that you were in the grand jury, 2011?

12   A.    The last time I seen Phil in 2010, prior to

13   yesterday.

14   Q.    Okay.  And are you in communication with Mr. Kenner

15   during that period of time?

16   A.    There were periodic correspondences.

17   Q.    Okay.  And is this also a period of time in which you

18   are either part of or advised of litigation going on?

19   A.    No, I don't think so.

20          (Continued on next page.)

21

22

23

24

25

M. Peca - Direct/Miskiewicz

420

1   Q    It was latter?

2   A    It was.

3        MR. MISKIEWICZ:  Your Honor, I know it's a

4   little early.  May we take a break.

5        THE COURT:  Sure.  It's a little early but we'll

6   take a 20-minute break.

7        (Whereupon, at this time the jury exits the

8   courtroom.)

9        THE COURT:  Be seated.  Step down, Mr. Peca.

10       THE WITNESS:  Thank you.

11       THE COURT:  How much longer do you have on

12  direct?

13       MR. MISKIEWICZ:  Just about an hour.

14       THE COURT:  Okay.

15       (Whereupon, a recess was taken.)

16       THE COURT:  Please be seated.  Bring in the

17  jury.

18       (Whereupon, the jury at this time enters the

19  courtroom.)

20       THE COURT:  Continue, Mr. Miskiewicz.

21       MR. MISKIEWICZ:  Thank you, your Honor.

22  Q    Mr. Peca, I'm going to show you two more exhibits and

23  I will ask you briefly to identify what those are.

24       Showing you Government's Exhibit 751 and 752 for

25  identification.

M. Peca - Direct/Miskiewicz

421

1    MR. MISKIEWICZ:  Your Honor, the Government

2    moves for the admission of 751 and 752 with the consent of

3    the defendants.

4    MR. LARUSSO:  That's correct, your Honor.

5    MR. HALEY:  Yes, sir.

6    THE COURT:  751 and 752 are admitted as

7    Governments' Exhibit.

8    (Whereupon, Government Exhibits 751 and 752 were

9    received in evidence.)

10   Q    Very briefly, Mr. Peca, the number, the monies

11   reflected in those two exhibits are how much?

12   A    One is for 166,000, the other is for 100,000.

13   Q    Does that comport with at least part of your

14   investment in Eufora?

15   A    Yes, it does.

16   Q    And the dates of those wire transfer instructions,

17   was that about the time you were investing in Eufora?

18   A    Yes, I did.

19   Q    How much in total did you invest?

20   A    366,000.

21   Q    And these two exhibits, 751 and 752, that's $266,000?

22   A    That's correct.

23   Q    Where is that money going to?

24   A    Eufora, LLC.

25   Q    Okay.  And before the break you were looking at

OWEN WICKER, RPR
OFFICIAL COURT REPORTER

422

1    something called Government's Exhibit 753.  Where did that

2    go?

3    A    Constantine Management Group.

4    Q    Was that I guess the third portion of your total

5    investment that you intended to send to Eufora?

6    A    Yes.

7    Q    Did Mr. Kenner explain to you 100,000 out of what you

8    said was a $366,000 investment, went to not Eufora, but

9    some other company?

10   A    I did not receive an explanation.

11   Q    I'd like to turn your attention to now something

12   called the Global Settlement Fund which you spoke about

13   briefly in the morning.

14        In or about 2009, did you have a meeting with

15   the two defendants in this case, Mr. Constantine and

16   Mr. Kenner?

17   A    Yes, I did.

18   Q    Where was that meeting?

19   A    It was in our living room in a suburb of Columbus

20   called Dublin, Ohio.

21   Q    What was the purpose of that meeting?

22   A    The purpose of the meeting was basically to lay out

23   the strategy, moving forward on litigation against Ken

24   Jowdy.

25   Q    And at or about this time, now, have you already been

423

1   notified of the default on your line of credit?

2   A    I have been, yes.

3   Q    And so for at least up until this time, had you

4   received any return of your investment from the Hawaii

5   deal?

6   A    I have not.

7   Q    And had you received any explanation about where the

8   money went?

9   A    I did not.

10  Q    Why -- withdrawn.

11        So, what, if anything, did the defendant say to

12  you at this meeting in your living room about going

13  forward and suing or attacking or doing whatever,

14  Mr. Jowdy?

15  A    Well the conversation was basically carried by

16  Mr. Constantine.  Phil introduced Tommy and Phil had a

17  very disheveled look as if he hadn't slept in weeks.  So

18  Tommy carried the conversation, first introduced himself,

19  and gave us a bit of a background story on himself.  It

20  was the first time my wife and I met him, and that the

21  main reason he was getting involved is because of an

22  article that he was dragged into, an article about Phil

23  Kenner which they also made mention of Tommy Constantine

24  and some things in his part, and he felt some vengeance

25  toward that, and felt he wanted to contribute to what we

424

1   were not doing.

2   Q     Did the name Global Settlement Fund come up?

3   A     It did.  Not initially.  It kind of went out with,

4   you know, laying the groundwork for it, explaining that

5   Phil had to run his course for legal battles, and the

6   basic premise rather than Phil continuing to go to people

7   for 5,000 here, 10,000 there to help with some legal fees,

8   it would be best if we had kind of put together a legal

9   fund, Global Settlement Fund, which would then be used as

10  a legal fund and the goal was to initiate litigation

11  against Ken Jowdy.

12          We had a pending mediation in California about

13  six or seven months after the date we met.  But the whole

14  purpose of it was and the thing that seemed intriguing to

15  us especially after having just been notified of the

16  default of our bond account, was there was going to be

17  litigation against Ken Jowdy, we would file a civil

18  lawsuit in California against Ken Jowdy.  Hopefully that

19  would provide enough leverage in mediation to get a

20  settlement to our liking which was, I don't know the exact

21  acreage, but it was the north western beach parcel of the

22  Cabo Diamonte project.

23          What made it also more intriguing was Tommy had

24  gotten on the phone with what he said was a guy all ready

25  to purchase that parcel having been successful in

425

1   mediation.

2   Q    Let me ask you, when you say "Tommy," you mean the

3   defendant Mr. Constantine?

4   A    Correct.

5   Q    He gets on the phone in front of you?

6   A    Yes, in our living room.  He gets on the cell phone

7   and I guess it was about an 8 to 15 minute phone call,

8   hard to remember how long it was exactly, but the purpose

9   was to assure was there was going to be certain monies on

10  the front end of the sale that had we acquired this

11  property.  And this gets to what made the whole thing

12  interesting was this money coming up front, 15 to 20

13  million dollars.  He said to us that he was going to make

14  us whole in every investment we ever made to Phil Kenner

15  and himself.

16  Q    He meaning who?

17  A    Tommy Constantine.

18  Q    Who was he talking to on the phone?

19  A    I remember him saying the name.  I don't recall who

20  it was.

21  Q    Did you hear the other end of the call?

22  A    I didn't.

23  Q    Do you know if he was even talking to anybody on the

24  phone?

25  A    I couldn't tell one way of the other.

M. Peca - Direct/Miskiewicz

426

1    Q    But this person that he was talking to on the phone,

2    what, if anything, did he have to do with this -- with you

3    getting any of your money back, what Mr. Constantine told?

4    A    Apparently he was a big time real estate developer

5    and he already agreed to if we were able to acquire that

6    parcel of land through mediation with Mr. Jowdy, that this

7    guy was already placing the purchase for an awful lot of

8    money, and like I said in the front end, we were going to

9    be made whole on all of our investments so you can imagine

10   my kind of thoughts at the time, kind of realized that

11   almost 2 million dollars was taken from our bank account.

12   Q    After this meeting, at any point up until today, did

13   you ever find out who this supposed real estate developer

14   was who was ready to buy, you know, buy into this property

15   and make you whole?

16   A    No, I did not.

17   Q    Anybody ever come along like that?

18   A    No.

19   Q    And, again, what, if anything, do you know, not

20   because you were told by anybody, but that you know based

21   on things that you saw or investigated on your own, what

22   do you know Ken Jowdy has to do with your losses in

23   Hawaii?

24        MR. HALEY:  Objection, your Honor.

25        THE COURT:  Sustained as to the form.

M. Peca - Direct/Miskiewicz

427

1    Q    Just based on your personal knowledge, what, if

2    anything, did Mr. Jowdy have to do with your losses in

3    Hawaii?

4    A    Zero.  I had never been told that he had any

5    connections to Hawaii whatsoever.

6    Q    But you are now being asked to contribute to a fund

7    to sue Mr. Jowdy by the defendants?

8    A    Correct.

9    Q    And did they offer any explanation as to how Jowdy is

10   somehow connected with your loss of almost $2 million in

11   your bond fund?

12   A    No.

13   Q    Had you been trying to find out that answer?

14   A    Yeah, we had.

15   Q    And when you tried to find out, who did you ask?

16   A    We asked Phil.

17   Q    Did you get any answer?

18   A    No, sir.

19   Q    So did you agree to participate in this Global

20   Settlement Fund?

21   A    We did.

22         I mean like I said with the end result being

23   we'd be paid back in full but the other part that you now

24   kind of played on us they said it would take every player

25   to be involved or we weren't going to go through with it.

M. Peca - Direct/Miskiewicz

428

1   Everybody single player had to be involved and

2   Mr. Constantine said they just gone from Sergei Gonchar's

3   house who was living in Pittsburgh at the time.  I don't

4   know if they met him in Pittsburgh or someplace else.

5           Tommy told the story how they made a spiritual

6   bound because of the orthodox religion, Sergei was on

7   board and wanted to know what to do, and other players

8   were on board, and having that team's mind-set and our

9   DNA, obviously didn't want to be the one person not to do

10  it and we don't want to lose money so we agreed to go

11  along with it.

12  Q    How much did you contribute to this Global Settlement

13  fund?

14  A    $250,000.

15  Q    Showing you what has been marked for identification

16  as Government's Exhibit 754.

17          MR. MISKIEWICZ:  The Government moves for the

18  admission of Government's Exhibit 754.

19          MR. LARUSSO:  No objection.

20          MR. HALEY:  No objection.

21          THE COURT:  754, in evidence.

22          (Whereupon, Government Exhibit 754 was received

23  in evidence.)

24  Q    In fact showing you Government's Exhibit 754 now in

25  evidence, could you tell us what is the date of this piece

M. Peca - Direct/Miskiewicz

429

1    of correspondence?

2    A    May 8, 2009.

3    Q    And where is it being sent to?

4    A    It is being sent from Charles Schwab account to First

5    Century Bank.

6    Q    How much is being sent?

7    A    $250,000.

8    Q    Who is the beneficiary in that First Century Bank

9    account?

10   A    The law offices of Ronald Richards and Associates.

11   Q    Is that the same lawyer that represented you in the

12   grand jury testimony you spoke about earlier today?

13   A    Yes, it was.

14   Q    At this point had you even met Mr. Richards?

15   A    No.

16   Q    Other than Mr. Kenner, did you know anything about

17   Mr. Richards?

18   A    No, I did not.

19   Q    And who is actually signing the authority to send

20   this?

21   A    Phil Kenner.

22   Q    And now, first of all, other than what the defendants

23   told you did you know whether or not other people

24   contributed to this fund, other players?

25   A    Not at the time, no.  I had no confirmation.

M. Peca - Direct/Miskiewicz

430

1   Q    And as you sit here today, do you know whatever

2   happened to that money?

3   A    I have ideas but I don't know for certain.

4   Q    And have you been made whole by some sort of lawsuit

5   or something like that?

6   A    No, sir.

7   Q    And you appeared in the grand jury, this is 2009, you

8   appeared in the grand jury in 2011.

9           Again, did the money that was paid Mr. Richards,

10  Attorney Richards in 2011 for your grand jury appearance,

11  did that come out of this fund or did it come out of your

12  pocket?

13  A    Came out of my pocket.

14          When I called Mr. Richards prior to the grand

15  jury when he requested $8,000 to make the trip to New

16  York, I asked him why he can't pull it from the Global

17  Settlement Fund and he indicated to me there is no more

18  money in the Global Settlement Fund.

19  Q    Now, shortly after the wire transfer, did you receive

20  an e-mail from either of the defendants about your

21  $250,000?

22  A    Yes.

23  Q    I show you what is marked for identification as 757.

24          Showing you for identification 757, do you

25  recognize that document?

M. Peca - Direct/Miskiewicz

431

1    A    I do.

2    Q    What do you recognize it to be?

3    A    Just a confirmation on --

4    Q    Just what kind of a document is it?

5    A    It's an e-mail.

6    Q    Who is the recipient?

7    A    Sent to myself and my wife from Phil Kenner.

8    Q    And do you recall getting this e-mail?

9    A    I do.

10   Q    And do you recall either saving it or seeing it

11   later?

12   A    Yes.

13   Q    Printing it out?

14   A    Yes.

15           MR. MISKIEWICZ:  Government moves for the

16   admission of 757.

17           MR. LARUSSO:  No objection, your Honor.

18           MR. HALEY:  Very brief voir dire, Judge.

19   VIOR DIRE EXAMINATION

20   BY MR. HALEY:

21   Q    Mr. Peca's e-mail address, KMPGP@aol.com, that is

22   your e-mail address?

23   A    My wife's e-mail address.

24   Q    I see.  Do you share that e-mail address with your

25   wife?

M. Peca - Direct/Miskiewicz

432

1    A    No, sir.

2         MR. HALEY:  May I have one quick moment, Judge?

3    Q    KMPGP@aol.com, as you indicated a moment ago was your

4    wife's e-mail address?

5    A    Primarily her e-mail address, correct.

6    Q    Do you know if an e-mail was sent to small

7    kmpgp@aol.com that was also received by him?

8    A    It's the same e-mail.

9    Q    This is all caps.  If it wasn't all capped, would she

10   get it?

11   A    I don't know if it is case sensitive or not.  When we

12   send them or get them they are not capitalized.

13   Q    Sir, did you ever receive at any point in time an

14   e-mail from Michael Stolper, to the best of your

15   knowledge?

16   A    Yes.

17        MR. HALEY:  I have no further questions and no

18   objections.

19        THE COURT:  757 is admitted.

20        MR. MISKIEWICZ:  Thank you.

21        (Whereupon, Government Exhibit 757 was received

22   in evidence.)

23   BY MR. MISKIEWICZ:

24   Q    Showing you 757 on the screen now.

25        First of all what is the date of this e-mail?

M. Peca - Direct/Miskiewicz

433

1   A    Monday, May 18, 2009.

2   Q    And who it is from?

3   A    From Phil Kenner.

4   Q    This e-mail address, kenner33@gmail, do you recall

5   communicating with Mr. Kenner using that e-mail during the

6   years you were associated with him?

7   A    One of them, yes.  Primarily the e-mail address.

8   Q    Is this addressed to Michael and Kristin, obviously

9   you are Michael.

10       Kristin is who?

11  A    My wife.

12  Q    Can you just read into the record -- well, did you

13  agree the first sentence has to do with the fact that

14  $250,000 is being sent to Attorney Ron Richards, correct?

15  A    Yes.

16  Q    That is a wire transfer that you just looked at a

17  little while ago, correct?

18  A    Correct.

19  Q    That was a wire transfer that was sent May 8, 2009?

20  A    Correct.

21  Q    Here ten days later, could you read "in addition,"

22  from that point on?  Can you just read from "in addition"

23  for the record?

24  A    In addition to the fund paying for various legal

25  fees, PR Agency fees, as well as other protective advances

M. Peca - Direct/Miskiewicz

434

1    and settlement costs, you will be receiving transfer of

2    membership agreements from Tommy for your acquisition of

3    additional interest in Eufora, LLC, as well as your new

4    LLC and operating agreements reflecting your ownership

5    interest in the Avalon Airpark Real Estate project, the

6    Falcon 10 aircraft, and the two Palms Place condominium

7    units.  You may not recall Tommy or I mentioning the Palms

8    units in our conversation.

9              In any case, because Moreau and Tommy settled

10   that case as part of the Global Settlement, he has

11   graciously elected to include you as a beneficiary in the

12   settlement equity [sic]--

13             THE COURT:  You said settlement equity.

14             THE WITNESS:  I'm sorry -- significant equity

15   that exists in those two units as part of this

16   transaction.  As we discussed rather than throwing money

17   away only on legal fees this strategy which effectively

18   acquires significant assets, while providing a legal

19   remedy, is by far our best solution."

20   Q    And then it asks for you to acknowledge and approve

21   something?

22   A    Yes.

23   Q    And you did, correct?

24   A    Correct.

25   Q    And in fact the money was already sent before you got

M. Peca - Direct/Miskiewicz

435

1    this?

2    A    Correct.

3    Q    During that meeting -- withdrawn.

4         This appears to be saying that in addition to

5    hiring this lawyer to fight Ken Jowdy, you are also going

6    to get additional interest in Eufora.

7         Did you want additional interest in Eufora?

8    A    We had just recently I think acquired interest the

9    year before in Eufora.  The whole discussion with a lot of

10   this stuff, was maybe two minutes of an hour-long

11   conversation.  It was presented as more of an incentive

12   that money actually being paid towards settling other

13   peoples' claims.

14   Q    Okay.  When you say you had already acquired an

15   interest a year earlier in Eufora that is the $366,000 you

16   were talking about earlier?

17   A    Correct, the additional 200,000.

18   Q    The meeting in your living room did Mr. Constantine

19   explain to you why -- withdrawn.

20        In that meeting in your living room did either

21   Mr. Constantine or Mr. Kenner explain why $100,000 out of

22   your $366,000 investment in Eufora went to something

23   called Constantine Management Group?

24        MR. HALEY:  Your Honor, I object to the leading

25   nature.  I object to the leading nature.

M. Peca - Direct/Miskiewicz

436

1      THE COURT:  You can't ask that question in a

2   non-leading way, so I'll allow that.

3   A    Repeat the question.

4   Q    In that meeting in your living room with Mr. Kenner

5   and Mr. Constantine, did either one of them explain or

6   tell you why 100,000 out of your 366,000 investment in

7   Eufora, went to a company called Constantine Management

8   Group?

9   A    No, at that point I still had no knowledge that it

10  was the Constantine Management Group.

11  Q    This letter or e-mail letter, Government's

12  Exhibit 757, also says you will also be getting ownership

13  interest in the Avalon Airpark Real Estate Project.

14      Did you want ownership interest in something

15  called Avalon Airpark Real Estate Project?

16  A    As an incentive to do it, it didn't bother me but our

17  money -- we weren't told our money was going to be used to

18  do that, to acquire an airpark.

19  Q    Well, okay.

20      So ten days earlier you sent a quarter of a

21  million dollars to a lawyer.  What, if anything, did

22  you -- how much of that $250,000 did you want to be split

23  off to go to, I don't know, this Avalon Airpark when you

24  sent the money ten days earlier?

25  A    The Global Settlement Fund was built as a legal fund.

437

1   That was the main premise of the Global Settlement Fund.

2   Q    But did you want anything to do with this Avalon

3   Airpark?

4   A    No, because it was proposed out of the $250,000,

5   $30,000 of your money will go to this, $20,000 would go to

6   anything else, we wouldn't have done it.  It was proposed

7   as a legal fund.

8   Q    By the way, at this point did you even know what

9   Avalon Airpark was?

10  A    He had first made mention of it that day.

11  Q    But had you looked at it?  Did he show you books and

12  records, show you a prospectus, anything, something about

13  the nature of this business?

14  A    No.

15  Q    When I say "he," I mean Mr. Constantine?

16  A    Correct.

17  Q    Is it fair to say Mr. Constantine did most of the

18  talking during this meeting?

19  A    He did all the talking.

20  Q    And continuing in this e-mail letter, it says you

21  will also be getting ownership interest in the Falcon 10

22  aircraft.

23          Did you want an aircraft?

24  A    I had no need for an aircraft, no.

25  Q    And the two Palms Place condominium units, did you

438

1    have any desire to have condominiums units in someplace

2    called Palms?

3    A    That was never discussed in the meeting those units.

4    The only thing regarding the Palms was discussed Tommy

5    made mention that he was my partner in the penthouse in

6    the Palms and that was the first I had known of it because

7    Phil claimed he was the partner at the penthouse at the

8    Palms.  It was an entertaining moment for me at the time

9    but the only mention of the Palms.

10   Q    Aside from Hawaii, you had made other investments and

11   one was them was condominiums in the Palms?

12   A    Yes.

13   Q    The Palms is where?

14   A    In Las Vegas.

15   Q    You made those investments through Mr. Kenner?

16   A    Correct.

17   Q    Do you know if he's talking here, Mr. Kenner, about

18   the condominium units that you've already purchased or is

19   he talking about two more units?

20   A    He's talking about units that involved a different

21   player, not myself.

22   Q    So at this time, May 18, 2009, did you already, you

23   and your wife already have an investment in this penthouse

24   condominium unit in the Palms, the Palms Hotel in Las

25   Vegas?

M. Peca - Direct/Miskiewicz

439

1  A    Yes.

2  Q    That was a bad question.

3        Did you on or about this date already have an

4  ownership interest in some condominium units?

5  A    We did.  It was a penthouse in the Palms Place in Las

6  Vegas.

7  Q    When he's talking about the two condominium units,

8  you said a moment ago, this was with other people.  Did

9  you have any desire to buy two more units?

10  A    No, like I said it was never discussed at the meeting

11  that these units were even discussed.

12  Q    And just to make sure it is absolutely clear.  When

13  you sent your quarter of a million dollars ten days prior

14  to this to Ron Richards, did you have any expectation or

15  desire to have some portion of that quarter of a million

16  split off to go to condo units in Las Vegas?

17  A    No, sir.

18  Q    Would you have made that wire transfer of a quarter

19  of a million dollars if you thought some of your money

20  would end up buying some condo unit?

21  A    I would not have.

22  Q    Would you have sent a quarter of a million dollars if

23  you knew some of your percentage would end up giving you

24  some sort of a Falcon 10 aircraft?

25  A    I would not have.

M. Peca - Direct/Miskiewicz

440

1    Q    And would your answer be the same if you thought part

2    of your quarter of a million dollars would get you more of

3    an equity interest in Eufora?

4    A    I mean it was proposed that way.  I mean the way it

5    was for 250,000 there will be a legal fund and things were

6    going to get settled and Juneau was settled, Moreau was

7    settled, they never mentioned that this money would be

8    used to settle these claims, that as an incentive we would

9    acquire their percentages.

10   Q    By the way, I think you testified earlier that you

11   don't know what happened to any litigation.  If the

12   litigation, if there was any litigation, did it result in

13   you're being made whole or part whole in your investments

14   in Hawaii?

15              MR. HALEY:  Objection, your Honor.  That calls

16   for a yes or no answer, not the introduction of hearsay as

17   the outcome of previous lawsuits.  That's my objection.

18              THE COURT:  Sustained.

19   Q    More to the point though, did you ever see any refund

20   or return on investments in Eufora, the Airpark, the

21   Falcon 10 or the Palms units that were discussed in this

22   letter?

23   A    Nos, for all of them.

24   Q    And did you get any explanation from either

25   Mr. Kenner or Mr. Constantine about where your quarter of

441

1    a million dollars went?

2    A    We did not.

3    Q    You identified earlier, and it's in the record, that

4    you sent Schwab a letter, Government's Exhibit 755, on

5    May 12, 2009, asking that Mr. Kenner be removed as

6    attorney-in-fact from your Schwab account, correct?

7    A    Correct.

8    Q    I'll put a couple different dates here together.

9              May 8th, that's when you put the quarter of a

10   million dollars or sent a quarter of a million dollars or

11   authorized a quarter of a million dollars to be sent to

12   Ron Richards, correct?

13   A    Yes.

14   Q    A few days later, May 12th, you are stopping

15   Mr. Kenner to be attorney-in-fact, correct?

16   A    Correct.

17   Q    And on May 18th, you are nevertheless acknowledging

18   that you got this letter and you are going along with the

19   fact that your monies are already gone, really.  Why did

20   you do it?

21   A    I mean the plan itself, I mean at this point there's

22   so much money missing.  And for us to have an opportunity

23   to recover some of that money, there's an element of

24   desperation --

25   Q    And --

M. Peca - Direct/Miskiewicz

442

1           MR. HALEY:  He's not finished, your Honor.

2           THE COURT:  Let him finish.

3           MR. HALEY:  Continue.

4    A       -- To have earned that much money and to have an

5    opportunity to recover, as Tommy phrased it, we be made

6    whole in everything, was enough for us to agree to it.

7    Q    Did Mr. Kenner do anything, say anything to you to

8    make you feel desperate?

9    A    I don't think anything was said to make us feel

10   desperate, necessarily, but, you know, having a lot of

11   investments with no paper trail, no documentation, nothing

12   in writing, and to know he's the singular source to know

13   where all those investments went, all the money went, he's

14   the only one that had the answers.

15   Q    Did he ever say anything to you along those lines?

16   A    Yes, several times.

17   Q    What did he say to you?

18   A    He would just say if he decided at any point that he

19   stopped fighting for our cause, then nobody would ever get

20   their money back.

21   Q    Did you feel like you really had any option other

22   than to contribute a quarter of a million dollars at this

23   stage?

24           MR. HALEY:  Objection, your Honor.

25           THE COURT:  Sustained.

443

1    Q    Going to the last topic.

2         Did there ever come a time you began to tape

3    record conversations with Mr. Kenner?

4    A    Yes.

5    Q    Why did you do that?

6    A    Because I wanted to get answers and as often as I

7    tried it was difficult to get answers, so if there was any

8    way that I could get him to admit to something that I

9    could have for my own satisfaction, I guess, I was trying

10   to do that.

11   Q    All right.

12        And let me show you what has been marked for

13   identification as Government's Exhibit 505, a compact

14   disk.  I'll show you this.

15        Do you recognize that disk?

16   A    I do.

17   Q    How do you recognize it?

18   A    I have initialed and dated it.

19   Q    Do you know what is inside or what is recorded on

20   that disk?

21   A    Yes, a couple conversations on it.

22   Q    Was that couple conversations, conversations you

23   reported with one of the defendants?

24   A    Conversations between myself and Phil Kenner.

25   Q    And were you able to listen to all of the

M. Peca - Direct/Miskiewicz

444

1    conversations that you recorded?

2    A    Yes.

3    Q    In fact have you listened to those conversations over

4    many hours?

5    A    Yes.

6    Q    Okay.  And did you do anything or change, edit in any

7    way, the conversations?

8    A    I did not.

9    Q    Okay.  Now what is on that compact disk.  Is that the

10   total of many hours of conversations or are those

11   selections?

12   A    Just selections.

13           MR. MISKIEWICZ:  Government moves for the

14   admission of 505.

15           THE COURT:  Any objection?

16           MR. LARUSSO:  No, your Honor.

17           MR. HALEY:  Brief voir dire, Judge?

18           THE COURT:  Yes.

19   VIOR DIRE EXAMINATION.

20   BY MR. HALEY:

21   Q    Sir, how many hours of conversation did you and/or

22   your wife record between yourself and Phil Kenner?

23   A    Best guess, four to seven hours worth of

24   conversation.

25   Q    If I would suggest six hours, would that be about

M. Peca - Direct/Miskiewicz

445

1    right?

2    A    Seems like the median.

3    Q    And this disk represents, just so we know, what

4    portion of those conversations in terms of time:  Ten

5    minutes, two hours, this particular disk?

6    A    This particular disk is anywhere from 30 seconds to a

7    minute.

8    Q    So before your appearance here today you listened to

9    this disk; is that correct?

10   A    Correct.

11   Q    Before your testimony today, did you listen to all

12   six hours of conversations, approximately?

13   A    I've listened to the extent of it for years.

14            MR. HALEY:  At least it's clear, Judge.  I have

15   no objection to the admissibility of that disk.

16            THE COURT:  505 is admitted.

17            (Whereupon, Government Exhibit 505 was received

18   in evidence.)

19   BY MR. MISKIEWICZ:

20   Q    I would like to show you what has been marked for

21   identification as Exhibits 505.1.2.3.4-T.

22            Have you seen those four exhibits before?

23   A    I have.

24   Q    What are they?

25   A    They are the excerpts of the conversations on the

M. Peca - Direct/Miskiewicz

446

1   disk.

2   Q    When you say "excerpts," you mean excerpts of the

3   conversations or transcripts?

4   A    Transcripts.

5   Q    And did you have an opportunity to listen to the

6   transcripts, follow the transcripts and listen to the

7   audio at the same time?

8   A    I did.

9   Q    And are you satisfied that what is on the transcripts

10  is correct and accurate transcriptions of what the audio

11  is?

12  A    They were.

13          MR. MISKIEWICZ:  Your Honor, for the limited

14  purpose of what is permitted under the rules, we would ask

15  to publish now the audio as well as the transcription.

16          THE COURT:  Repeat those numbers again?

17          MR. MISKIEWICZ:  The disk is 505 and the

18  transcripts are 505.1-T, 501.2-T, 505.3-T, 505.4-T.

19          THE COURT:  Any objections to those exhibits

20  being utilized?

21          MR. LARUSSO:  No, your Honor.

22          MR. HALEY:  No, but a brief voir dire on that.

23          THE COURT:  Yes.

24          (Whereupon, Government Exhibit 505, 505.1-T,

25  501.2-T, 505.3-T, 505.4-T was received in evidence.)

M. Peca - Direct/Miskiewicz

447

1    VIOR DIRE EXAMINATION

2    BY MR. HALEY:

3    Q    Mr. Peca, who recorded those conversations?

4         Did you record these conversations or did your

5    wife record them?

6    A    My conversations with Phil Kenner, I recorded the

7    conversations.

8    Q    And these only involve your conversations with Phil

9    Kenner, correct?

10   A    Correct.

11        MR. HALEY:  Fine, your Honor.  Thank you.

12        THE COURT:  Let me give an instruction to the

13   jury to explain the limited purposes of these

14   transcriptions being utilized.

15        The transcripts themselves are not being

16   admitted into evidence, they are simply an aid that the

17   Government is allowing to utilize to provide to the jury

18   as you are listening to a recording, but the instruction I

19   want to give you is that they are just an aid to the jury

20   and you're listening to the recording, it's obviously in

21   English, and if you hear something different than what is

22   on the transcript, it is what you hear that controls, not

23   what is on the transcripts.

24        It's just an aid.  Okay.

25   BY MR. MISKIEWICZ:

448

1   Q    Mr. Peca, do you recall the date you recorded this?

2   A    It was July.

3   Q    I will show you Exhibit 505.  Would that refresh your

4   recollection of the date you made this recording?

5   A    Yes, July 12th of 2012.

6   Q    Okay.  Now that portion of the recording corresponds

7   to the 505.1-T.

8        (Audio clip played.)

9        The very beginning, who is speaking?

10  A    Myself.

11  Q    And the second voice, who responded to you?

12  A    Phil Kenner.

13  Q    And on or about this date, in July of 2012, had you

14  seen that $395,000 wire that we talked about earlier this

15  morning to something called Led Better?

16  A    I had not.

17  Q    Did you have any knowledge of it?

18  A    I do not.

19  Q    I'll play for you what corresponds to 505.2-T.

20       (Audio clip played.)

21  Q    Again, in July of 2012, at about the time of this

22  recording, did Mr. Kenner ever detail to you where your

23  money went?

24  A    He did not.

25       MR. HALEY:  Judge --

M. Peca - Direct/Miskiewicz

449

1    MR. MISKIEWICZ:  I'll play for you now an audio

2    clip that corresponds to the 505.3.

3    (Audio clip played.)

4    Q    Now this is after your appearance in the grand jury,

5    correct?

6    A    Yes, correct.

7    Q    By that time in 2011 you had already -- at that point

8    you had learned that some money supposedly went to Ken

9    Jowdy in Mexico, correct?

10   A    I had no confirmation but I was led to believe so,

11   yes.

12   Q    All right.

13   And lastly I'll play the audio clip that

14   pertains or corresponds to 505.4.

15   (Audio clip played.)

16   MR. MISKIEWICZ:  May I have a moment, your

17   Honor?

18   THE COURT:  Yes.

19   MR. MISKIEWICZ:  No further questions.

20   THE COURT:  Okay.  Cross-examination.

21   MR. HALEY:  Yes, sir.

22

23

24

25

450

1    CROSS-EXAMINATION

2    BY MR. HALEY:

3    Q    Mr. Peca, my name is Rick Haley.  I represent Phil

4    Kenner.

5          I would like to begin, sir, with the last

6    exhibit that the Government was showing you, Exhibit 757,

7    which is involving that e-mail between Kenner and yourself

8    on May 18, 2009.

9          You certainly recall that exhibit?

10   A    I have it in front of me.

11   Q    I'm sure you recall the series of questions from

12   Mr. Miskiewicz regarding whether or not you would have

13   made the decision to contribute $250,000 to the Global

14   Settlement Fund if you were aware of all those other

15   representations as set forth in that e-mail.  Do you

16   recall those series of questions?

17   A    I do.

18   Q    Now, $250,000 was sent how many days prior to that

19   May 18th e-mail?

20   A    I think it was ten days, maybe.  I don't remember

21   exactly.  It was around ten days, I think.

22   Q    And I take it, sir, by your testimony based upon when

23   you had been previously told by Phil Kenner and/or Tommy

24   Constantine, as to the use of your 250, you were

25   surprised, upset, disturbed by that e-mail; is that

451

1    correct?

2    A    I wouldn't say disturbed or upset.  I would classify

3    it more as they were going over the things that we had

4    talked about in a different way like I said in the meeting

5    itself, this represented maybe three minutes of the

6    conversation which took over an hour.

7    Q    I understand that, sir, but now that three minutes is

8    encapsulated in this paragraph.  So now you are faced with

9    specific representations in writing as to what was going

10   to happen with your 250, correct?

11   A    Correct.

12   Q    And what if any actions did you take having received

13   that e-mail to recover that $250,000 that you had

14   previously contributed to the Global Settlement Fund by

15   deposit into Ron Richards' account.  What did you do?

16   A    We didn't do nothing [sic.

17   Q    Well, did you contact Phil Kenner after you received

18   that e-mail from him and have a conversation with him in

19   substance, hey, Phil, whoa, whoa, whoa, I gave you a

20   quarter of a million dollars which Mr. Miskiewicz

21   highlighted and I'm looking at this e-mail and you know

22   that is not really my idea based upon what you told me as

23   to what this money was going to be used for.

24           Did you have that kind of conversation?  Yes or

25   no?

M. Peca - Cross/Haley

452

1    A    Yes.

2    Q    And when did that occur?

3    A    Absolutely after when we seen this e-mail we had a

4    follow-up, I can't remember if it was an e-mail or a

5    conversation, saying we didn't remember some of this stuff

6    as it was explained in the e-mail.

7    Q    I see.  That e-mail hasn't been introduced in

8    evidence yet, right?

9            MR. MISKIEWICZ:  Objection.

10           MR. HALEY:  I withdraw the question.

11   Q    Was that a conversation, sir, or was that an e-mail?

12   A    I don't recall.

13   Q    But I take it whatever you say he told you in

14   response to that e-mail and that conversation, assuaged

15   you.  Correct, sir?

16   A    I guess so.

17   Q    You testified on direct that there came a point in

18   time where you had a telephone conversation with Phil

19   Kenner concerning the line of credit records that you

20   claimed that you had not been receiving over the years,

21   correct?

22   A    I never had a conversation with him about the line of

23   credit detailed documents.  I never had a conversation

24   with him about those.

25   Q    Well, did you testify, sir, on direct that there came

M. Peca - Cross/Haley

453

1    a point in time where you were concerned about what

2    happened with your line of credit in terms of the

3    transaction history, you contacted Phil Kenner to obtain

4    those records?  Do you remember testifying to that on

5    direct?

6    A    I never contacted Phil Kenner about the details of

7    that.  I sent an e-mail authorizing or I signed off on him

8    getting authorization to get those documents.

9    Q    Did you or did you not testify on direct that there

10   came a point in time where you contacted Phil Kenner to

11   obtain the line of credit records in his possession and he

12   told you somebody broke into my house and stole them.

13         Do you remember that conversation?

14   A    Now you rang a bell.  Yes, I do remember that.

15   Q    Time-frame that for us.  When do you say that that

16   conversation took place?

17   A    I can't remember exactly.

18   Q    Well, 2005, 2006, 2007?

19         Give us a time frame, sir?

20   A    I would say between 2008 and 2011.

21   Q    Three years span.  All right.

22         Did you believe him when Phil said someone broke

23   into my house and stole your LLC records.  Did you believe

24   him?

25         MR. MISKIEWICZ:  Objection.

M. Peca - Cross/Haley

454

1       MR. HALEY:  This is cross-examination.

2       I apologize, Judge.

3       THE COURT:  I'll allow that.  Go ahead.

4  A     Phil had a way of being very persuasive in the things

5  he was saying.  He made it seem like he had a lot of

6  enemies at the time.  There was a lot of people whether it

7  was business associates that were out to get him, so to

8  speak.  So he says that documents that I had wanted, he

9  said somebody broke into his house and stole them.

10 Q     So your answer is when he said somebody broke into my

11 house and stole your line of credit transaction history

12 records, you believed him?

13 A     I don't think it is as much that I believed him,

14 rather that I knew I wasn't going to get an answer, a

15 proper answer.

16 Q     Well, armed with that knowledge that you were not now

17 going to get a proper answer from Phil Kenner, your

18 business manager, whatever you want to characterize it, I

19 take it at that point in time you had no further contact

20 with him.  Is that true?

21 A     No, we did.

22 Q     Well, did you continue to authorize the monthly

23 payment that was going to come out of your account for the

24 business management services he was providing to you after

25 that conversation?

M. Peca - Cross/Haley

455

1   A    I don't believe I did.

2   Q    But you are not sure, are you?

3   A    Correct.

4   Q    Okay.  You were interviewed by the FBI prior to your

5   testimony today, correct?

6   A    Correct.

7   Q    Do you recall on how many occasions?

8   A    Uhm, two, I believe.

9   Q    Let me see if I can refresh your recollection.

10         MR. MISKIEWICZ:  Objection.  He didn't say he

11   needed his reduction refreshed.

12         MR. HALEY:  I believe so, Judge.

13         THE COURT:  Go ahead.

14   Q    Do you recall being interviewed by the FBI on three

15   occasions?

16   A    Well, two for sure.  Possibly three.

17   Q    All right.

18         MR. HALEY:  May we have these documents marked

19   simply for identification, Judge?

20         THE COURT:  Yes.

21         MR. HALEY:  Your Honor, I apologize.  You don't

22   know sometimes what document you'll be needing.

23         THE COURT:  Okay.

24         MR. HALEY:  Thank you.

25   Q    Sir, would you kindly take a look, and take your

456

1    time, we'll put them in sequence, what is marked Kenner

2    Exhibit 8, 9 and 10, only for identification, and take

3    your time.

4            MR. MISKIEWICZ:  Counsel, may I see your

5    exhibits.  We have different numbers.

6            (Counsel confer.)

7    Q    Sir, did you have a chance to look at those three

8    documents?

9    A    Yes, sir.

10   Q    Does that serve to refresh your recollection as to

11   the number of times you were interviewed by the FBI?

12   A    Yes, it does.

13   Q    Does that serve to refresh your recollection as to

14   the dates those interviews took place?

15   A    Yes.

16   Q    What were those dates?

17   A    The first one would be September 30, 2009.  The

18   second one would be February 22, 2012.  The third one

19   would be September 6, 2013.

20   Q    During the course of those three interviews with the

21   FBI, at any point in time did you ever tell the FBI that

22   Phil Kenner once told you that your line of credit records

23   were stolen from his home?

24   A    I don't believe I did.

25   Q    Now, your initial relationship with Phil Kenner began

457

1    when, sir?

2    A    Approximately '96, '97.

3    Q    Did there come a point in time, sir, that there was a

4    document executed between you and Phil Kenner known as the

5    Standard Advisory Agreement?

6    A    There might have been.  I don't recall.  Maybe.

7         MR. HALEY:  Your Honor, that is a Government's

8    Exhibit already introduced in evidence.  If I could see

9    it, the Standard Advisory Agreement.

10        (Counsel confer.)

11   Q    Well, do you recall, sir, executing a document known

12   as a Standard Advisory Agreement that set forth the

13   relationship between you and Phil Kenner as it relates to

14   the business management of your affairs?

15   A    I don't remember the day it happened but I'm sure it

16   did.

17   Q    Wasn't that the agreement by which there would be the

18   monthly compensation for Phil Kenner in connection with

19   managing your portfolio, your assets, correct?

20   A    Possibly, yes.

21   Q    Do you remember in that agreement whether or not

22   there was a provision that would permit you, should there

23   be a dispute between yourself and Phil Kenner as relates

24   to the management of your business affairs by him, where

25   you could proceed to arbitration?

M. Peca - Cross/Haley

458

1   A    Correct, in the state of Arizona.

2   Q    And did you ever throughout any of these disputes

3   with Phil Kenner, seek to utilize that arbitration

4   provision?  Yes or no?

5   A    No.

6   Q    Now, you say that the erosion of your business

7   relationship began about 2007-2009; is that correct?

8   A    It sounds accurate.

9   Q    And prior to that point in time you and Phil Kenner

10  and your wife had a very close relationship?

11  A    Very much so.

12  Q    You would visit with he and his wife or girlfriend?

13  A    Only one time.

14  Q    And that was in Arizona?

15  A    Correct.

16  Q    Did they ever visit you, sir, in your home?

17  A    The family, no.

18  Q    I see.  Did Phil?

19  A    Phil did, yes.

20  Q    At any point in time, sir, did you know Phil Kenner

21  to forge your signature?

22           MR. MISKIEWICZ:  Objection.

23           THE COURT:  That's okay.  Overruled.

24  A    I wouldn't know.

25  Q    Well, did you ever see Phil Kenner in your presence

M. Peca - Cross/Haley

459

1    practicing forging another person's signature?  Yes or no?

2    A    No.

3    Q    Did Phil Kenner ever ask you to simply sign a blank

4    piece of paper that -- for your name?

5    A    Not that I recall.

6    Q    Now, sir, you said that in your initial involvement

7    with Phil Kenner, the program that he was proposing to

8    you, was exactly what you wanted, that is to say -- when I

9    say "program," the financial portfolio, it would be stocks

10   and bonds; is that correct?

11   A    And I wouldn't classify it exactly what I wanted

12   because I didn't know exactly what was best suited for me.

13   It seemed the logical first step for me investing.

14   Q    And you had an understanding that stocks and bonds

15   returned a particular rate of interest?

16   A    One way or the other, correct.

17   Q    Now, there came a point in time you signed with the

18   New York Islanders, true?

19   A    Correct.

20   Q    Sir, you said as I recall on your direct testimony

21   that when you signed the five-year contract with the New

22   York Islanders, "I made a lot of money."  Correct?

23   A    Yes.

24   Q    How much?

25   A    It was a five-year, $20 million contract.

M. Peca - Cross/Haley

460

1   Q    And you went to the New York Islanders presumably as

2   a result of that financial incentive?

3   A    No.  They traded for my rights.  I was traded to the

4   New York Islanders.

5   Q    Was it a better team in terms of the players than the

6   team you had previously been playing for?

7   A    No, I hadn't made the playoffs in many years.  They

8   were not very good.

9          MR. HALEY:  I don't want to prejudice anyone's

10  performance.

11         THE WITNESS:  That's all right.  I don't expect

12  to play next year.

13         MR. HALEY:  There you go.

14  Q    Now you testified on direct that it was within that

15  time frame where you now had a five-year contract with

16  essentially $20 million contractually coming your way,

17  that there were discussions between yourself and Phil

18  Kenner about maybe changing your investment plan?

19  A    Just diversifying it a little bit.

20  Q    And the diversity involved discussions between you

21  and Phil Kenner in connection with discussions about land

22  development, is that true?

23  A    Not immediately.  There were others before that but

24  eventually got to that, yes.

25  Q    And it reached a point where we talked about land

M. Peca - Cross/Haley

461

1    acquisition in Big Isle, Hawaii; is that correct?

2    A    Correct.

3    Q    Now, I don't mean -- did you have an understanding,

4    sir, that investment in real estate could be particularly

5    profitable?

6    A    It can be, but it's not a certainty.

7              MR. MISKIEWICZ:  Objection.

8              THE COURT:  Sustained.

9    Q    You did have an understanding he was talking to you

10   about investing in Hawaii.  I don't mean to denigrate

11   another country.  He wasn't talking to you about

12   investments in Nepal, correct?

13   A    Correct.

14   Q    And the investments that he was suggesting to you by

15   your own testimony would involve acquisition of land in

16   Hawaii.  I believe you testified that it's your

17   understanding this would be investments in sugar cane

18   fields, correct?

19   A    I was told that was there at the current time,

20   correct.

21   Q    Upon purchase of the land, the building of an

22   infrastructure, buildings, roads, water lines, things of

23   that nature, correct?

24   A    Yes.

25   Q    And then after this investment was complete, the sale

462

1   of that property, improved property, was for a return on

2   your investment?

3   A    And incremental throughout the process, not

4   necessarily at the very end.

5   Q    But you understood this to be an incremental process;

6   is that correct?

7   A    Correct.

8   Q    And yet within this proposal it was also your belief

9   that commitment of your line of credit for purposes of

10  that investment would be really a short term type of

11  commitment?

12  A    I was told that, yes.  Not the end -- the short term

13  part of the investment was the risk of my line of credit,

14  that that would be paid back in six to nine months and my

15  bond account would be moved back to Schwab and retain the

16  same equity position in Little Isle IV.

17  Q    You had an understanding, did you not, that once you

18  committed your line of credit, it was likely to be or

19  would be used almost immediately for the Hawaiian project;

20  is that correct?

21  A    Sure.

22  Q    And you testified on direct that to the best of your

23  memory, Phil told you that there was going to be

24  approximately a few hundred acres purchased in Hawaii?

25  A    Yeah, I couldn't remember the exact number so long

463

1    ago when we discussed it.

2    Q    Well, could it have been maybe as many as -- maybe as

3    much as 6,000 acres?

4    A    Could have been.

5    Q    Now, I know you never saw the Hawaiian property; is

6    that correct?

7    A    That's correct.

8    Q    But you had every opportunity, should you so desire,

9    to go through, go over there to see the Hawaiian property;

10   is that correct?

11   A    Of course.

12   Q    Did you at any point in time, sir, have any reason to

13   believe that Phil Kenner never took any steps to fulfill

14   his promise to you that in return for your line of credit

15   there would be this Hawaiian land development project?

16            MR. MISKIEWICZ:  Objection.

17            THE COURT:  Sustained as to form.

18            MR. HALEY:  All right.

19   Q    Indeed, sir, you became aware that in connection with

20   the recommended investment to you, an LLC called Little

21   Isle IV was established, correct?

22   A    Yes.

23   Q    Did you understand what LLC meant?

24   A    Yes.

25   Q    And it means limited liability company, correct?

M. Peca - Cross/Haley

464

1   A    Correct.

2   Q    Indeed did you have an understanding that is a

3   particularly useful vehicle to use by way of a legal

4   construct, if you are going to invest in real estate?

5   A    I did not.

6           MR. MISKIEWICZ:  Objection.

7           THE COURT:  Overruled.

8   Q    As you sit here today, sir, do you have any reason to

9   believe that having committed your line of credit to

10  Little Isle IV, that an ownership interest in Little Isle

11  IV on your part was not reflected in the books and

12  records?

13          MR. MISKIEWICZ:  Objection.

14          THE COURT:  You can answer that.

15  A    I have never seen books and records.

16  Q    Do you have any reason to believe today, sir, that

17  your ownership interest -- I'll withdraw the question.

18  Okay.

19          When Little Isle IV was established -- and you

20  agree it was established, correct?

21  A    I saw documents that went into my accounts, so I

22  would say yes.

23  Q    Well, did you ever request to see the operating

24  agreement for Little Isle IV?

25  A    I did not.

465

1  Q    Did anyone ever tell you that an operating agreement

2  for Little Isle IV was never created?

3  A    I never heard that, no.

4  Q    As a matter of fact, sir, if I recall your testimony

5  on direct, that you had an understanding that Little Isle

6  IV would be an LLC that would own 50 percent of this land

7  to be acquired in Hawaii and then you would have a

8  percentage of that 50 percent interest, correct?

9  A    Yeah, the numbers were out there again.  It was way

10 back when, but that's kind of how I remember it breaking

11 down.

12 Q    Now, when you had this conversation with Phil Kenner

13 about collateralizing your line of credit with your bonds,

14 do you recall what, if anything, he told you about the

15 value of doing it in that fashion?

16 A    He did not.

17 Q    Well, I take it you do not recall him telling you

18 that by collateralizing the line of credit with the bonds,

19 your bonds would continue to earn interest.  Do you

20 remember that conversation?

21 A    I do not.

22 Q    Now, you testified on direct, and I believe

23 repeatedly, that the LLC money was only to be used for the

24 Hawaii project and nothing else, correct?

25 A    To be clear, the line of credit money that we were

M. Peca - Cross/Haley

466

1   putting up for the project was only to be used for the

2   Hawaii project.  To assume Little Isle IV, yes, because

3   that's where the money was going and we were told that's

4   what the money was being used for.

5   Q    But having never seen the operating agreement, you do

6   not know there were any provisions by virtue of the

7   operating agreement, money could be loaned for other

8   agreements other than say real estate?

9   A    He was my advisor at the time and never notified me

10  of any such provision.

11  Q    Well, you were certainly aware that the line of

12  credit committed to Little Isle IV would be or did become

13  the source of a loan to Ken Jowdy with respect to a

14  project Ken Jowdy was developing in Baja Mexico, correct?

15  A    Incorrect.

16          MR. MISKIEWICZ:  Objection to the form.

17          THE COURT:  Overruled.  Your answer is?

18          THE WITNESS:  Incorrect.

19  Q    Well, that's not what you told the grand jury?

20          MR. MISKIEWICZ:  Objection.

21          THE COURT:  Sustained as to form.

22  Q    Well, sir, in March, specifically March 29, 2011, you

23  testified before a grand jury in the Southern District of

24  New York, correct?

25  A    I did, yes.

467

1  Q    And at that point in time did you give the following

2  answer to this question.

3         Question:  How much money did you put into

4  Little Isle IV?

5         Answer:  $100,000 cash investment that was going

6  to go towards that.  Then we had lines of credit.  I had

7  one out for $1.7 million that was going to be used at the

8  time.  Here's where a lot of the cross starts to happen.

9  A short term loan to Mr. Jowdy, because at the time Cabo,

10  we hadn't gotten the lender from Lehman Brothers yet, we

11  made a short term loan until the lending came in.

12         Once the lending came through, they were to pay

13  back the loan, I think in the neighborhood of

14  five-and-a-half million dollars, on the closing.  It was

15  never paid back.  And then communication basically seized

16  [sic] at that point in time from him.  That was kind of a

17  whole sticking point as far as me and the other guys with

18  Mr. Jowdy."

19         Now, when Mr. Miskiewicz asked you about that

20  testimony, I believe, you simply stopped after the first

21  three sentences --

22         MR. MISKIEWICZ:  Objection.

23         MR. HALEY:  I'll rephrase the question.

24  Q    Did you not characterize that answer that you gave

25  before the grand jury as the fabric of the conversation.

M. Peca - Cross/Haley

468

1    Wasn't that your phraseology?

2    A    What do you mean "fabric of the conversation"?

3    Q    I don't know, sir, that's the word you used.

4         MR. MISKIEWICZ:  Objection.

5         THE COURT:  Sustained.

6    Q    All right.

7         Well, at that point in time, sir, when you

8    testified before the grand jury in the Southern District

9    of New York, the answer that you gave to that question was

10   truthful, was it not?

11   A    Yes, it was.

12   Q    And when Mr. Miskiewicz asked you about having been

13   represented by Ron Richards, you were represented by

14   Mr. Richards; is that correct?

15   A    We never had a retainer agreement but he was there on

16   my behalf.

17   Q    When you went into the grand jury to testify,

18   Mr. Richards was not seated in that grand jury with you,

19   was he?

20   A    No, sir.

21   Q    As a matter of fact, before you testified, you were

22   told that this was a secret proceeding and that anything

23   that you testified in the grand jury without your consent

24   would not be made known to another person, correct?

25   A    Correct.

M. Peca - Cross/Haley

469

1    Q    It's not your testimony, is it, sir, that Mr. Ronald

2    Richards coerced you -- I withdraw that question.

3              All right.  Before the grand jury in the

4    Southern District of New York, did you give the following

5    answer to this question:

6              Question:  Were you consulted in advance about

7    whether to use the money in Little Isle IV's capital

8    account to loan the money to the Mexico project?

9              Answer:  I knew the short term loan was made to

10   Mr. Jowdy.

11             Question:  Did you know in advance of it being

12   made?

13             Answer:  I probably did.  I mean at the time if

14   I was told about it, I would probably say okay, sounds

15   good.  It was probably explained to me.  I can't tell you

16   definitely right now that you knew the day or time of the

17   conversation, as it was happening, I wasn't like what

18   happened to that, I didn't know it would happen, I kind of

19   knew what we were doing."

20             Is that the answer you gave to that question.

21   A    If it's in that document, yes.

22   Q    Do you recall giving this answer to this question as

23   follows:

24             Question:  Then, you were getting --

25             MR. MISKIEWICZ:  Your Honor, may we approach?

M. Peca - Cross/Haley

470

1           THE COURT:  Yes.

2               (Whereupon, at this time the following took

3      place at the sidebar.)

4               (Continued.)

M. Peca - Cross/Haley

471

1      MR. HALEY:  Judge, I can provide you the

2  transcript.

3      MR. MISKIEWICZ:  The objection, he's not

4  impeaching the witness, he's reading the transcript into

5  the record.  He hasn't even show the witness an

6  opportunity, shown the witness any portion of this, so

7  he's just reading it into the record and that is not

8  impeachment, not proper, I submit, for impeachment.  And I

9  didn't object to the last portion but I'm not even sure

10  there is anything in what he read that contradicts what

11  the witness said.

12      THE COURT:  Whether it is inconsistent or not is

13  up to the jury, but I'll allow him to continue.

14      MR. HALEY:  Thank you, sir.

15      (End of sidebar conference.)

16      (Continued.)

17

18

19

20

21

22

23

24

25

472

1       MR. HALEY:  Okay, sir.

2       Question:  Then you were getting into this

3  before so that the money was loaned to Ken Jowdy because

4  they were waiting for some kind of financing to come in?

5       Answer:  Correct.

6       Question:  And then it never came back?

7       Answer:  Correct."

8  Q    You testified, sir, on direct that you certainly had

9  an understanding that if the line of credit was not paid

10  back, that your bonds, the collateral would be in

11  jeopardy, correct?

12  A    Correct.

13  Q    And ultimately that is what occurred as indicated by

14  the default letters you received, true?

15  A    Correct.

16  Q    Those default letters, do you know who they were

17  addressed to?

18  A    Myself, I believe.

19  Q    Not to the care of Phil Kenner, correct?

20  A    I didn't see that on the document so --

21  Q    Did you ever see -- withdrawn.

22       I have some additional exhibits, Judge, to be

23  marked to be shown to the witness.  It may take a little

24  bit of time with counsel to go through the witness.

25       THE COURT:  We'll reconvene at 1:45.  Have a

473

```
1    good lunch and don't discuss the case.

2              (Whereupon, at this time the jury exits the

3    courtroom.)

4              THE COURT:  Okay.  If everyone will be seated.

5              So are there any issues we need to discuss or

6    are we okay?

7              MR. HALEY:  Judge, I think we're okay.  My only

8    quick thought as they indicated yesterday, it's already

9    been introduced in evidence -- I'll withhold that.

10             There are no other issues, Judge.

11             THE COURT:  All right.  Let's try to be prompt

12   again at 1:45.  Thank you.

13             (Whereupon, an afternoon recess was taken.)

14             (Continued.)

15

16

17

18

19

20

21

22

23

24

25
```

M. Peca - Cross/Haley

474

1          AFTERNOON SESSION

2

3          THE COURT:  Please be seated.

4          Let's bring in the jury.

5          (Witness resumes the stand.)

6          THE CLERK:  All rise.

7          (Jury enters the courtroom.)

8          THE COURT:  Please be seated.

9          Mr. Haley, go ahead.

10          MR. HALEY:  Thank you, sir.

11   BY MR. HALEY:

12   Q.   Now, Mr. Peca, when you testified on several

13   occasions on direct examination that you never received

14   any activity reports regarding your line of credit from --

15   the uses of your line of credit from Northern Trust, did

16   you ever request such records from Northern Trust at any

17   point in time?

18   A.   No.

19   Q.   Well, after Phil Kenner, as you say, told you that

20   those records were stolen from his home, did you then make

21   efforts to request those records from Northern Trust?

22          Yes or no?

23   A.   No.

24   Q.   Now, when the government was asking you questions

25   about whether you met with attorney Ron Richards before

M. Peca - Cross/Haley

475

1    your grand jury testimony, you recall those questions,

2    correct?

3    A.    Correct.

4    Q.    Prior to today, did you meet with the government and

5    the agents in preparation of your testimony before this

6    jury?

7    A.    Yes, sir.

8    Q.    On how many occasions?

9    A.    At least a couple.

10   Q.    Do you recall the last occasion?

11   A.    It would have been Sunday.

12   Q.    Could you give us some idea as to the amount of time

13   you spent preparing for your testimony for this jury with

14   the US Attorneys and/or the agents?

15   A.    Total, or just that day?

16   Q.    Total.

17   A.    Maybe three, four hours.

18   Q.    Now, when you received Government Exhibit 716, the

19   default letter regarding your line of credit, your

20   testimony I believe was it was very shocking to get that.

21         Is that correct?

22   A.    Yes, sir.

23   Q.    That document was addressed to you, was it not?

24   A.    I believe so.

25   Q.    Sir, isn't it true that you signed any number of

M. Peca - Cross/Haley

476

1    documents for Northern Trust that bear your signature with

2    your address on those documents?

3            True?

4    A.   Yes.

5    Q.   You testified on direct that as a result of the

6    events involving Phil Kenner, Northern Trust, the use of

7    your line of credit, there came a point in time you

8    received a portion of your money back from the line of

9    credit from Northern Trust.

10           Is that correct?

11   A.   It wasn't money from my line of credit.

12           It was money that remained in my bank account.

13   Q.   I understand the distinction.

14           How much back did you receive?

15   A.   It was just over $600,000.

16   Q.   And I take it that at least helped replenish this

17   retirement account that you have been testifying to, is

18   that true?

19   A.   I didn't consider it that way.

20   Q.   So it's untrue?

21           MR. HALEY:  I withdraw that.

22   A.   Subject to opinion.

23   Q.   You also testified on direct that when you asked

24   Phil Kenner why the $100,000 went to Constantine

25   Management Group, his answer was, I believe you said, why

M. Peca - Cross/Haley

477

1    are you asking?

2    A.   Correct.

3    Q.   And when he said that, what did you say to him?

4    A.   I don't remember exactly how the conversation went,

5    but it was along the lines of we need to stay focused on

6    what we are doing.

7              And I should have put more attention into

8    fighting Jowdy than worrying about this stuff now.

9    Q.   Do you have a specific recollection that that was his

10   response or are you just kind of paraphrasing?

11   A.   Paraphrasing, but it's pretty close.

12   Q.   And you were satisfied with that response, sir?

13   A.   Of course not.

14   Q.   What did you say in return?

15   A.   Nothing.

16   Q.   How long have you been playing in the National Hockey

17   League?

18   A.   I have been retired for six years, but I played for

19   15.

20   Q.   You wouldn't consider yourself easily intimidated

21   would you, sir?

22   A.   No.

23              MR. MISKIEWICZ:  Objection.

24              THE COURT:  Overruled.

25

478

1    BY MR. HALEY:

2    Q.    That conversation that you say you had with

3    Phil Kenner, when he said why are you asking and then the

4    conversation that followed, is that conversation recorded?

5    A.    That was prior to me recording conversations.

6    Q.    When did you start recording conversations?

7    A.    I don't remember.

8    Q.    Who suggested you start recording conversations?

9    A.    I did.

10   Q.    I'm sorry?

11   A.    Myself.

12   Q.    Perhaps I'm stating the obvious, these were

13   secretly-recorded conversations.

14         Correct?

15   A.    Correct.

16   Q.    After you finished recording these conversations with

17   Phil Kenner, they were maintained on a computer?

18   A.    For a while they just remained on apps and on our

19   phone or on small cassette players.

20   Q.    And then at some point they were transferred to a CD

21   disk?

22   A.    Correct.

23   Q.    And armed with that information, did you then seek

24   out law enforcement?

25   A.    No.

M. Peca - Cross/Haley

479

1    Q.    Armed with that information, did you then contact

2    counsel to commence civil proceedings against Phil Kenner?

3    A.    I didn't view civil action as a viable option.

4    Q.    So when was the first time you delivered those

5    secretly-recorded conversations to anyone other than your

6    wife?

7    A.    I don't remember.

8    Q.    Well, in the three interviews with the FBI that you

9    recall and testified to previously, did you turn those

10   secretly-recorded conversations over to the FBI agent

11   during any of those meetings?

12   A.    No.

13   Q.    Well, do you recall the first time you turned over

14   these secretly-recorded conversations to any person

15   associated with law enforcement?

16   A.    I don't remember.

17   Q.    There came a point in time that you met Ken Jowdy?

18   A.    I never met him.

19         I have seen him in a room.  I have never spoken

20   with him.  He was introduced in a room full of people, but

21   I didn't say hey, my name's Michael, or, how are you.

22         He was introduced and that was it.

23   Q.    And that occurred, if you recall, in February of 2010

24   in Los Angeles?

25   A.    Correct.

M. Peca - Cross/Haley

480

1    Q.    You know if Ken Jowdy was there with his attorneys?

2    A.    I believe he did have two attorneys present with him.

3    Q.    Do you remember the names of those attorneys?

4    A.    I can't recall the female lawyer, but I believe the

5    male lawyer's name was Tom Harvey.

6    Q.    And Phil Kenner was present during this meeting,

7    correct?

8    A.    Correct.

9          He was sitting at the end of a board room table.

10   Q.    And Tommy Constantine, is that true?

11   A.    Yes, sir.

12   Q.    And were there other people you knew, hockey player

13   investors at this meeting?

14   A.    Yes.

15   Q.    Who else was there, to your recollection?

16   A.    Greg DeVries may have been there, Steve Rucchin may

17   have been there, I think Tyson Nash's wife was there.

18         There were a couple other guys I can't remember,

19   exactly.

20   Q.    Do you know if during the course of that meeting,

21   that meeting followed the filing of a lawsuit by

22   Little Isle IV against Ken Jowdy for his alleged failure

23   to pay back money loaned by Little Isle IV and Makika to

24   Ken Jowdy?

25   A.    I remember hearing something along those lines, but I

M. Peca - Cross/Haley

481

1     don't remember the specifics.

2     Q.    But you remember hearing within the settlement

3     conference discussions about a claim that Ken Jowdy owed

4     Little Isle IV a sum of money.

5             Is that correct?

6             MR. MISKIEWICZ:  Objection.

7             THE COURT:  Overruled.

8             You can answer that.

9     A.    I don't recall.

10    Q.    What do you recall about the meeting?

11    A.    I recall mostly about that meeting a mediator going

12    from room to room, trying to solve our differences to see

13    if we can come to some sort of agreement.

14    Q.    Do you remember, sir, the subject matter of that

15    mediation and attempt to resolve differences?

16            What differences?

17    A.    I'm not sure, long time ago.

18            I don't remember the conversation.

19    Q.    But it certainly involved Jowdy and his attorneys,

20    correct?

21    A.    Correct.

22    Q.    Sir, would you kindly take a look at a document

23    already introduced into evidence as Kenner Exhibit 1.

24            You can certainly look at the entire document,

25    but I'll refer you at least to the page ultimately that

M. Peca - Cross/Haley

482

1    has this blue tag in it.  But I'd like you to look at the

2    first several pages of the document.

3              You don't have to study them, just have an

4    understanding as to the content of the document.

5              (There was a pause in the proceedings.)

6    A.    Okay.

7    Q.    Anywhere on that document do you see your signature?

8    A.    Yes.

9              I saw it in the back.

10   Q.    Do you have any reason to believe, sir, that you did

11   not receive that document?

12   A.    I remember signing a page that was e-mailed to me

13   with all these names.

14             I don't remember seeing this whole packet.  I'm

15   not saying I didn't receive it.  I'm saying I don't

16   remember receiving this entire packet.

17             I remember more of the page that had all the

18   names with the blank spaces.

19   Q.    Well, would you look at the page that you signed, and

20   just read to yourself, I guess the first paragraph.

21   A.    Okay.

22   Q.    In or about that time, in 2006, sir, would you read

23   documents that are just one page in length before you

24   signed them?

25   A.    A lot of times Phil would just send me the signature

M. Peca - Cross/Haley

483

1    page.

2    Q.   Is it your testimony that as relates to Kenner

3    Exhibit 1, which bears your signature, that you did not

4    receive this entire document?

5             Is that your testimony?

6    A.   I stated that I don't recall seeing the entire

7    document.

8    Q.   So you may or may not have received it?

9    A.   Correct.

10   Q.   When you say Phil would send you just a single

11   document to sign, what, if any, communication would you

12   have with Phil under those circumstances?

13   A.   I got something for you to sign.

14            I'm going to e-mail it or fax it.  Sign it and

15   send it back.

16   Q.   But if what you were receiving was only a signature

17   page, what, if any, communication would you have with

18   Phil Kenner under those circumstances?

19   A.   I would sign the document and send it back.

20   Q.   Without further communication with Phil?

21   A.   I'm sure we had communication leading up to me

22   getting the document, and then follow up afterwards,

23   comfortable enough that I would probably sign the

24   document.

25   Q.   So preceding that type of event, it's your testimony,

M. Peca - Cross/Haley

484

1    your best recollection that you and Phil would talk about

2    the content of the document he was sending you, so you had

3    some idea before you signed it from Phil, as to the nature

4    of the document.

5            Correct?

6    A.    For the most part, yes.

7    Q.    And if you received that document from Phil Kenner,

8    and it was inconsistent with what he told you, what if any

9    conversation would you then have with Phil Kenner?

10   A.    I wouldn't see the document.

11           I would just believe what I was told the

12   document would entail.  I'd sign the signature page and

13   send it back.

14   Q.    Sir, would you kindly take a look at a document

15   marked Kenner Exhibit 16, a July 21st, 2006 document, and

16   I'll ask you to take a look at -- if you have a gross

17   understanding of the pages one through six, and then I'd

18   ask you to take a look again at the page with the blue

19   mark.

20           (There was a pause in the proceedings.)

21   A.    Okay.

22   Q.    Do you recognize your signature on that document?

23   A.    I do.

24   Q.    Now, that document that you are looking at now

25   containing a signature, there is a few paragraphs above

485

1    your signature.

2              Is that correct?

3    A.    Yeah, there are six to be exact.

4    Q.    Just read the first paragraph to yourself.

5    A.    Okay.

6    Q.    Is it fair to state, sir, that based upon your review

7    of that document bearing your signature, that the first

8    part of the document was, indeed, received by you?

9              Is that correct?

10   A.    I only recognize this page with the signature on it.

11   Q.    Well, does that first paragraph, sir, read as

12   follows:

13             I acknowledge receipt of the letter dated July

14   21, 2006, of Phillip A. Kenner, the lender, to each of the

15   members of Little Isle IV, LLC, the company, specifically

16   referencing the first page, July 21, 2006?

17             Is that what it refers to?

18   A.    I'm sure it does.

19   Q.    Well, under those circumstances, is it your testimony

20   that you did or did not receive, along with that signature

21   page, the first seven pages of this document?

22   A.    I don't remember seeing these pages.

23   Q.    So you may or may not have received it, you just

24   don't have a recollection.

25   A.    I remember seeing the page that was signed.

M. Peca - Cross/Haley

486

1   Q.   Well, if that first paragraph references the first

2   page, July 21, 2006, to the members of Little Isle IV,

3   LLC, and that was not given to you as part of the package

4   sent to you by Phil Kenner, would you kindly tell us what

5   if any conversations you had with Phil Kenner regarding

6   the missing parts of the document you were signing?

7   A.   Things like this were just kind of part of the

8   relationship.

9          I'd probably be notified that there's, you know,

10  forms that need to be signed in order to get this thing

11  going and I'm going to send you a page that needs your

12  signature, and I would sign it and send it back.

13         That's how the relationship worked.

14  Q.   Can we agree, sir, that with the exception of all the

15  other signature pages, we are only talking about another

16  six pages with reference to July 21, 2006.

17         Is that correct?  Count them yourself.

18  A.   I trust you.

19  Q.   Is or is it not your testimony that at some point in

20  July of 2006 you received a letter dated July 21, 2006,

21  seven pages in length, along with an attachment that

22  required your signature?

23         MR. MISKIEWICZ:  Asked and answered.

24         THE COURT:  Sustained, asked and answered.

25

M. Peca - Cross/Haley

487

1   BY MR. HALEY:

2   Q.   Sir, is it your testimony that every time Phil Kenner

3   sent you a document, whether it was by the way of mail or

4   by way of fax, he would only send you the signature page?

5   A.   Most often, yes.

6   Q.   And you never, under any of those circumstances,

7   communicated with Phil and said, hey, Phil, could you send

8   me the rest of the document?

9        That never happened?

10  A.   The reasons I didn't do that --

11  Q.   Sir, I'm not asking you reasons.

12       My question is, did it ever happen that when, as

13  you say, Phil would send you only signature pages, you

14  would communicate with him in some fashion and say, in

15  substance, hey, thanks, Phil.  I got the signature page,

16  but can you send me the rest of the document for my

17  records, to review, to put in my file at home, did

18  anything like that occur?

19       Yes or no?

20  A.   I believe it did from time to time.

21       I don't remember which documents, but he was my

22  main advisor and I trusted that everything was in order.

23  Q.   I know, sir, you testified to that on direct

24  examination.

25       It's a really simple question and I think you

M. Peca - Cross/Haley

488

1    answered it and I hate to belabor -- I don't want to

2    belabor the point, but it's the best of your recollection,

3    this was one of the occasions, the July 21, 2006, where

4    you didn't receive the whole document.

5         Correct?

6    A.   I don't recall.

7    Q.   Okay.

8         Sir, would you kindly take a look at Kenner

9    Exhibit 11, and particularly, the last page.

10        (There was a pause in the proceedings.)

11   A.   I recognize that.

12   Q.   You do?

13   A.   Yes.

14   Q.   That bears your signature?

15   A.   It does.

16        MR. HALEY:  I offer that as Kenner Exhibit 11,

17   your Honor.

18        THE COURT:  Any objection?

19        MR. MISKIEWICZ:  No objection.

20        MR. LARUSSO:  Can I just see it for a second?

21        MR. HALEY:  I'm sorry.

22        MR. LARUSSO:  That's okay.

23        THE COURT:  Any objection, Mr. LaRusso?

24        MR. LARUSSO:  No, I don't, your Honor.

25        MR. HALEY:  I'm sorry.

M. Peca - Cross/Haley

489

1            THE COURT:  Kenner 11 is admitted.

2            (Whereupon, Defense Exhibit Kenner 11 was

3    received in evidence as of this date.)

4    BY MR. HALEY:

5    Q.   Sir, would you kindly take a look at Kenner Exhibit

6    12.

7    A.   I recognize it.

8    Q.   That bears your signature, correct?

9    A.   It does, but it wasn't notarized in my presence.

10   Q.   Okay.

11           MR. HALEY:  I'd offer that as Kenner Exhibit 12.

12           MR. LARUSSO:  Let me take a quick look.

13           MR. MISKIEWICZ:  No objection, your Honor.

14           THE COURT:  Any objection, Mr. LaRusso?

15           MR. LARUSSO:  No, I don't, your Honor.

16           THE COURT:  Kenner 12 is admitted.

17           (Whereupon, Defense Exhibit Kenner 12 was

18   received in evidence as of this date.)

19   BY MR. HALEY:

20   Q.   Sir, would you kindly take a look at Kenner Exhibit

21   13.

22   A.   That does look familiar.

23   Q.   Is that your signature?

24   A.   Yes, sir.

25           MR. HALEY:  I offer Kenner Exhibit 13, your

M. Peca - Cross/Haley

490

1   Honor.

2            MR. MISKIEWICZ:  No objection.

3            MR. LARUSSO:  No objection.

4            THE COURT:  Kenner 13 is admitted.

5            (Whereupon, Defense Exhibit Kenner 13 was

6   received in evidence as of this date.)

7   BY MR. HALEY:

8   Q.   Take a look at a document marked Kenner Exhibit 15.

9            Do you recognize that document?

10  A.   I think so, yeah, looks familiar.

11  Q.   Okay.

12           MR. LARUSSO:  No objection, your Honor.

13           THE COURT:  Any objection from the government?

14           MR. MISKIEWICZ:  No objection, your Honor.

15           THE COURT:  15 is admitted, Kenner 15.

16           (Whereupon, Defense Exhibit Kenner 15 was

17  received in evidence as of this date.)

18  BY MR. HALEY:

19  Q.   Would you kindly take a look at Kenner Exhibit 17.

20  A.   Okay.

21  Q.   Do you recognize that document?

22  A.   I don't recognize the document as much as the other

23  ones, but...

24  Q.   Do you recognize your signature on the document?

25  A.   I wouldn't contest my signature at all.

M. Peca - Cross/Haley

491

1  Q.   By the way, are you familiar with your wife's

2  signature?

3  A.   Yes.

4  Q.   Do you see her signature on the document?

5  A.   I did.

6  Q.   That is her signature, correct?

7  A.   I couldn't say for certain.

8       It looks like it.

9  Q.   Okay.

10      MR. HALEY:  I'd offer this as Kenner Exhibit 17.

11      MR. MISKIEWICZ:  No objection.

12      MR. LARUSSO:  No objection, your Honor.

13      THE COURT:  Kenner 17 is admitted.

14      (Whereupon, Defense Exhibit Kenner 17 was

15  received in evidence as of this date.)

16  BY MR. HALEY:

17  Q.   Sir, would you kindly take a look at Kenner Exhibit

18  18, and take your time looking at that document.

19      (There was a pause in the proceedings.)

20  BY MR. HALEY:

21  Q.   Do you see your e-mail address on that document, sir?

22      Perhaps I could help.

23  A.   I'll find it.

24      I see my name, yes, next to my wife's e-mail.

25  Q.   Do you have a memory of receiving -- well, do you

M. Peca - Cross/Haley

492

1    have a memory of receiving that document from Michael

2    Stolper, either delivered to you or your wife and she then

3    showed you the e-mail?

4    A.    It does look fairly familiar, yes.

5    Q.    In June of 2011, do you know if Phil Kenner had an

6    e-mail address, kenner33@gmail.com?

7    A.    He may have.

8    Q.    Now, does the entity known as Naalehu Ventures,

9    N-A-A-L-E-H-U, Ventures, 2006, LLC mean anything to you?

10   A.    Not necessarily the LLC, but I have heard Naalehu

11   before.

12   Q.    Well, do you have a memory, sir, of receiving a

13   transfer to your account 289369 of $580,026, on August

14   25th, 2006, from Naalehu Ventures which maintained an

15   account at Northern Trust?

16   A.    What was the question?

17   Q.    Do you recall, sir, receiving a transfer to your

18   account, account No. 289369, from Naalehu Ventures as

19   relates to the Northern Trust account, sir?

20   A.    I don't recall that because I had no documents for

21   that line of credit account.

22   Q.    Your answer is I don't recall?

23   A.    Meaning I don't -- I have no knowledge of that, is my

24   correct -- is what my answer is.

25   Q.    Did you become aware that there came a point in time

M. Peca - Cross/Haley

493

1   where a loan was obtained from Lehman Brothers to help the

2   continued financing of the Hawaiian land development

3   project?

4   A.   I know there was a discussion of that being a

5   possibility.

6        I wasn't aware of when exactly it took place.

7   Q.   Well, do you have any memory of after the closing of

8   that loan you receiving a transfer to your account at

9   Northern Trust in the amount of $580,026?

10       MR. MISKIEWICZ:  Objection, asked and answered.

11       THE COURT:  I'll let him answer again.

12       Go ahead.

13  A.   It was a line of credit, again, I had no knowledge of

14  the transaction details of that account.

15  Q.   Did there ever come a point in time, sir, before your

16  testimony today that you sat down and examined, you

17  personally, the money coming in and going out to your line

18  of credit at Northern Trust from the opening of the

19  account at Northern Trust through 2006 to the point in

20  time where, as indicated by a letter, it was closed?

21  A.   No, not in great detail, no.

22       MR. HALEY:  One moment, Judge.

23       (There was a pause in the proceedings.)

24  BY MR. HALEY:

25  Q.   Thank you, sir.

M. Peca - Cross/LaRusso

494

1          THE COURT:  Okay.

2          Mr. LaRusso.

3          MR. LARUSSO:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. LARUSSO:

6    Q.   Good afternoon, Mr. Peca.

7    A.   Hello.

8    Q.   My name is Robert LaRusso.  I represent

9    Mr. Constantine.

10         You testified that -- and excuse my voice, I

11   have a little bit of a cold -- the first time you met

12   Mr. Constantine was in your home in Dublin, Ohio, I

13   believe you said?

14   A.   Correct.

15   Q.   You had -- he was with Mr. Kenner?

16   A.   Yes, he was.

17   Q.   And your wife was present --

18   A.   Correct.

19   Q.   -- throughout your meeting with him.

20   A.   Yes.

21   Q.   I believe this is in evidence, Government Exhibit

22   757.

23         This is the e-mail the government showed to you

24   during your direct examination, correct?

25   A.   Yes, sir.

M. Peca - Cross/LaRusso

495

1    Q.    And this is from Mr. Phil Kenner to you and your wife

2    at the e-mail address KMPGP here, correct?

3    A.    Correct.

4    Q.    You discussed certain portions of this with

5    Mr. Miskiewicz, and you said that ten days prior to this

6    you actually sent the money to the Global Settlement Fund,

7    I believe it was to the Ron Richards account.

8          Is that right?

9    A.    Correct.

10   Q.    Would it be fair to say that before you met --

11         MR. LARUSSO:  Withdrawn.

12   BY MR. LARUSSO:

13   Q.    I'll direct your attention to the highlighted

14   portion, and I'll read it, this is Mr. Kenner to you:

15         You may not recall Tommy and I --

16         THE COURT:  Or.

17   BY MR. LARUSSO:

18   Q.    Or I mentioning the Palms unit in our conversation.

19         When you read that, you understood that to mean

20   the meeting that you had with Mr. Constantine and

21   Mr. Kenner.

22         Is that correct?

23   A.    Correct.

24   Q.    Would it be fair to say that this first meeting that

25   you had would have been sometime either on May 8th, the

M. Peca - Cross/LaRusso

496

1    date of the wire transfer, or before?

2    A.    Yes.

3    Q.    Do you recall how long before the May 8th transfer,

4    if you do?

5    A.    I don't.

6    Q.    Between the time that you first met Mr. Constantine

7    and the time you received this e-mail, did you have any

8    communications with Mr. Constantine, either in person or

9    on the telephone, or all of it with Mr. Kenner, if any?

10   A.    Not that I recall.

11         I didn't have many conversations, if any, with

12   Mr. Constantine.

13   Q.    You testified, and correct me if I'm mistaken, that

14   Mr. Constantine was on the phone eight to 12 minutes at

15   some point during the visit with you and your wife?

16   A.    Yeah.

17         I mean, it may not have been that long.  It's

18   hard to judge exactly how long the call was.  It seemed

19   like it was that long.

20   Q.    Could have been longer?

21   A.    Could have been longer or shorter, hard to say.

22   Q.    Or shorter.

23         Do you remember at any time Mr. Constantine

24   asking to be excused to go outside to speak to the person

25   that he was on the telephone with?

M. Peca - Cross/LaRusso

497

1   A.   I don't recall.

2   Q.   Now, this telephone conversation that Mr. Constantine

3   had, you remember overhearing his portion of the

4   conversation.

5            Is that correct?

6   A.   We could hear him speaking, yes.

7   Q.   So he was -- was he in the same room where you were

8   or was he a distance away, but enough for you to hear

9   parts of the conversation?

10  A.   I don't think ever as far as you and I are right now.

11  Q.   Now, you testified I believe in answer to

12  Mr. Miskiewicz's question whether or not you knew if, in

13  fact, he was speaking to somebody.

14           Do you remember that?

15  A.   Yes.

16  Q.   And would it be fair to say that you would not know

17  one way or another other than the fact that it appeared to

18  you when he was speaking on the telephone with somebody.

19           Is that correct?

20  A.   Correct.

21  Q.   But you do remember in his telephone conversation

22  discussing --

23           MR. LARUSSO:  Withdrawn.

24  BY MR. LARUSSO:

25  Q.   Tell us what you said on direct.

498

1              What do you remember him discussing at that

2    point?

3    A.    The phone conversation?

4    Q.    Yes.

5    A.    I don't remember much of the phone conversation.

6              It just seemed like two guys were having a

7    conversation that they may have had before.

8    Q.    Do you remember saying that it had to do with

9    substantial funding, a lot of money?

10             Remember you were talking about -- you were

11   relating it to the reason he was there.

12   A.    I just remembered the phone call -- I don't remember

13   the context -- content of what he was discussing on the

14   phone.

15             I just recall that he said that it was a

16   gentleman who was going to be -- have interest in

17   purchasing this property in Cabo, or a portion of it,

18   sorry.

19   Q.    And I think you said on direct examination somewhere

20   in the neighborhood of $15 to $20 million?

21   A.    That was not the purchase price.

22             That was the part after the sale that would be

23   fronted after the sale to fund everybody's investments.

24   Q.    It would be returned back on some of the money that

25   was allegedly lost.

M. Peca - Cross/LaRusso

499

1        Is that correct?

2    A.   Correct.

3    Q.   Did you ever hear him mention in that first meeting

4    an individual by the name of Mr. Sonnenblick,

5    S-O-N-N-E-N-B-L-I-C-K?

6    A.   That does sound familiar, yes.

7    Q.   Let me show you what has been marked for

8    identification as Defense Exhibit --

9        MR. LARUSSO:  One moment, your Honor.

10       Your Honor, I apologize.  Some of the exhibits I

11   didn't make copies, so I may have to take a few minutes to

12   make sure they had an opportunity to look at this one.

13   BY MR. LARUSSO:

14   Q.   I'm not going to forget you.

15       This is for identification.  It's

16   Defense Exhibit Constantine C 24.

17       Take a look at the whole thing, please, if you

18   would.

19       (There was a pause in the proceedings.)

20   A.   Okay.

21   Q.   Do you recognize this?

22   A.   Vaguely.

23       I'm not -- yeah.

24   Q.   Let me ask --

25       MR. LARUSSO:  If I may stay here for a few

M. Peca - Cross/LaRusso

500

1    preliminary questions?

2              THE COURT:  Yes.

3    BY MR. LARUSSO:

4    Q.   This is a group e-mail.

5    A.   Yes, our e-mail is on that.

6    Q.   And your e-mail address is on there?

7    A.   Yes.

8    Q.   And there are a whole bunch of other e-mails.

9              Do you recognize any of those?

10   A.   I recognize Jay McKee, that was his ex-wife's e-mail.

11             I mean, I recognize the names which makes me

12   identify their e-mail addresses.

13   Q.   After you had met Mr. Constantine, he had

14   communicated with you and your wife and other individuals

15   that you have identified, via group e-mails.

16             Is that correct?

17   A.   Correct.

18   Q.   And this is one of the e-mails that you recall

19   receiving during the course of those communications with

20   Mr. Constantine?

21   A.   Sure.

22             MR. LARUSSO:  Your Honor, may I ask that this be

23   received in evidence at this time?

24             MR. MISKIEWICZ:  May we approach, your Honor?

25             THE COURT:  Yes.

M. Peca - Cross/LaRusso

501

1              MR. MISKIEWICZ:  Thank you.

2              THE COURT:  Please approach.

3              (Continued on next page.)

M. Peca - Cross/LaRusso

502

1          (Sidebar.)

2          MR. MISKIEWICZ:  Generally, just we object on

3    hearsay grounds.

4          Even if the e-mail, itself, were admissible and

5    I understand the court's ruling regarding a similar one

6    yesterday, but even if that were to come in, what is

7    attached, this letter from potentially entirely fictitious

8    character, Sonnenblick, should not ever be admitted and

9    this is total hearsay.

10         THE COURT:  Overruled.

11         I'll explain later.

12         MR. LARUSSO:  Thank you, your Honor.

13         (Sidebar concluded.)

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

M. Peca - Cross/LaRusso

503

1           (In open court.)

2           MR. LARUSSO:  Your Honor, at this time I'd like

3    to display the exhibit to the jury.

4           THE COURT:  Yes.

5           C 24 is admitted.

6           (Whereupon, Defense Exhibit C 24 was received in

7    evidence as of this date.)

8           (The above-mentioned exhibit was published to

9    the jury.)

10   BY MR. LARUSSO:

11   Q.   Mr. Peca, we were talking about a group e-mail,

12   that's the first part of it, all the people that

13   Mr. Constantine was e-mailing that information.

14           Is that correct?

15   A.   Yes.

16   Q.   And I'm going to note the date, November 9, 2009.

17           Is that correct?

18   A.   Yes, it is.

19   Q.   There came a point in time sometime after --

20           MR. LARUSSO:  Withdrawn.

21   BY MR. LARUSSO:

22   Q.   Let me read the first paragraph:

23           All, I am happy to report that we have executed

24   the memorandum of understanding, see attached document,

25   with the buyer that I have been working with for almost a

M. Peca - Cross/LaRusso

504

1    year.  Specifically, here we have executed an agreement

2    for him to purchase the Cabo loan from the bank, invest

3    further in and fully develop the Cabo project, as well as

4    provide the $15 million, quote, cash out, end quote, of

5    the deal for our settlement costs.

6           Is that correct?

7    A.   That's what it says, yes.

8    Q.   And that -- and this information that Mr. Constantine

9    is providing to you here in November of 2009 was

10   consistent with some of the comments that were made to you

11   regarding the purposes of the Global Settlement Fund.

12          Is that correct?

13   A.   Yes, instead of the term settlement costs it was just

14   make you whole on investments that he made.

15   Q.   But this was consistent with what you felt the

16   purposes of the contribution that you made were.

17          Right?

18   A.   Sure.

19   Q.   I'm just going to read a few more and I may have

20   questions.  I want to finish this up:

21          The fact that we were able to negotiate a

22   cash-out scenario for our settlement costs, in any market

23   let alone this one, is a huge win for us.  This will allow

24   us to make good on all Jowdy Mexico related investments,

25   any personal loans made to Jowdy, including Hawaii, by any

M. Peca - Cross/LaRusso

505

1   of you and our legal fees, while -- in brackets -- all of

2   us retaining an equity share --

3            THE COURT:  Stake.

4            MR. LARUSSO:  I'm sorry, Judge?

5            THE COURT:  You said share, it's stake.

6   BY MR. LARUSSO:

7   Q.   I'm sorry, stake in the new project in Cabo, with a

8   capable and well-funded developer.

9            Again, this is consistent with your reason for

10  making the contribution.

11           Is that right?

12  A.   Yes.

13  Q.   Now, interestingly, this group e-mail also talks

14  about an attachment.

15           Correct?

16  A.   I --

17  Q.   Down at the bottom?

18  A.   Okay.

19  Q.   You see it, now you see it?

20  A.   Okay, yes.

21  Q.   And you actually got the document, with the following

22  pages and I'll show the first page which is -- actually,

23  it's the second page of the document, it's the first page

24  of the attachment, November 4th, 2009 from a Robert

25  Sonnenblick.

M. Peca - Cross/LaRusso

506

1        You see that?

2   A.   I do see that.

3   Q.   And then without going through all the terms at this

4   point I'm just going to refer now to the fourth page of

5   the document, which is the signature page, and it has

6   there Mr. Constantine's signature and Mr. Sonnenblick's as

7   well.

8        Is that correct?

9   A.   It appears to, yes.

10  Q.   So there appears to be a memorandum of understanding

11  in place, and if you remember to provide the funding and

12  hopefully secure the $15 million that Mr. Constantine told

13  you he was working on for the purposes of Global

14  Settlement Fund.

15       Is that correct?

16  A.   Sure.

17  Q.   Now, we know that this particular loan never went

18  through.

19       Is that correct?

20  A.   That is correct.

21  Q.   Do you know --

22       MR. LARUSSO:  Let me withdraw that.

23  BY MR. LARUSSO:

24  Q.   Do you know if this deal ever was consummated?

25  A.   To my knowledge, it was not.

M. Peca - Cross/LaRusso

507

1   Q.   Though the deal was supposed to allocate the proceeds

2   to each of the hockey players, not just select few,

3   everyone was going to share in the benefits of this

4   agreement if it was successful.

5           Is that right?

6   A.   For those that contributed to the Global Settlement

7   Fund, yes.

8   Q.   And are you aware, as you are testifying here today,

9   that Mr. Jowdy sued this investor, which caused him to

10  withdraw from the deal?

11  A.   I wasn't aware of that.

12  Q.   Just a few points.

13          In regards to the meeting with Mr. Kenner and

14  Mr. Constantine and your wife, and just really a point of

15  clarification, you testified that Mr. Constantine did all

16  the talking.

17          Would it be fair to say that's not really

18  accurate, I mean, he may have done most of the talking,

19  but Mr. Kenner did make some comments and did participate

20  in the conversation?

21  A.   Yes.

22          I think I testified that Mr. Kenner introduced

23  Mr. Constantine, but, you know, Tommy did carry the

24  conversation for the most part.

25  Q.   Right.

M. Peca - Cross/LaRusso

508

1          The majority of the conversation, as you

2     recall --

3     A.    Yes.

4     Q.    -- was Mr. Constantine.

5     A.    Yes.

6     Q.    But do you recall also when you first -- excuse me --

7     when you spoke to the FBI and I believe Mr. Haley was able

8     to establish that on one occasion you spoke with them on

9     February 22nd of 2012, I don't know if he asked you this,

10    at the Marriott here in -- in Uniondale, New York?

11    A.    Yes.

12    Q.    Home of the Islanders, or ex-home of the Islanders, I

13    guess, correct?

14    A.    Yes.

15    Q.    And do you remember in that meeting telling them that

16    Mr. Constantine was acting sick.

17          He didn't speak much at the meeting --

18    A.    Mr. Kenner, you mean.

19    Q.    Mr. Kenner, I apologize.  Thank you for correcting

20    me.

21          But Mr. Kenner did say he needed money to fight

22    Ken Jowdy?

23    A.    Yes.

24    Q.    That Phil Kenner had exhausted all funds for the

25    legal expenses to fight him?

M. Peca - Cross/LaRusso

509

1   A.   Correct.

2   Q.   He said he can't give up the fight, he'll lose all

3   the money if I stop.

4   A.   That was the fear, it all hinged on Phil.

5   Q.   And that he can't keep coming to you guys for money?

6   A.   Correct.

7   Q.   So minor point, Mr. Kenner did participate in some

8   respects with the substance of the conversation.

9   A.   Yes.

10  Q.   At the time of the meeting, and thereafter, were you

11  able to form an opinion as to who was in charge of the

12  Global Settlement Fund around the time you first became

13  aware of it and agreed to participate?

14  A.   Well, around the time from inception, our belief is

15  it was going to the attorney Ron Richards account, that he

16  would kind of oversee given it was a legal fund.

17       But I do remember a conversation that I had with

18  Phil regarding litigation in Mexico and he said he

19  couldn't do it because he didn't have money and I remember

20  calling Tommy to ask him why we couldn't use money from

21  the global settlement for Phil and the answer was Mexico

22  was too much of a crap shot and unpredictable legally.

23       So there's no money to go towards the Mexican

24  part of it.

25  Q.   So from your perspective, who would you say was the

M. Peca - Cross/LaRusso

510

1   one that was primarily responsible, if more than one,

2   answer that as well.

3   A.    From my understanding Tommy was in charge of Global

4   Settlement Fund.

5   Q.    And that came from whom?

6   A.    That came from both Phil Kenner and Ron Richards.

7   Q.    And when did you learn that?

8   A.    After the money had already been gone.

9   Q.    Before the money went, before the money had been

10  spent, before you were apprised of that, what was your

11  belief as to who was in charge of the Global Settlement

12  Fund?

13  A.    Initially Ron Richards and, as it was ongoing,

14  Tommy Constantine.

15  Q.    And what was Phil Kenner's participation in that, as

16  you recall?

17  A.    He didn't seem to have one.

18  Q.    Just a few more questions on this.

19          You also said that there was a portion of the

20  conversation dealing with Eufora, is that correct?

21  A.    Small portion, there was a small portion that dealt

22  with things other than the loan and the Jowdy thing, all

23  that stuff.

24  Q.    But that conversation related to your investments

25  through Mr. Kenner that took place back in, I believe you

M. Peca - Cross/LaRusso

511

1   said, 2004.

2          Is that correct?

3   A.   Say that again.

4   Q.   The Eufora, your investments in Eufora took place

5   about 2004, I think it was your testimony.

6   A.   '04 and '08.

7   Q.   '04 and '08?

8   A.   Yes.

9   Q.   One of your investments was the $166,000 that you

10  invested through Mr. Kenner in Eufora.

11         Is that correct?

12  A.   That is correct.

13  Q.   And that investment, was that an option to buy?

14         Do you remember?

15  A.   I don't recall.

16  Q.   What you actually purchased, if you recall, was an

17  option to buy an interest in Eufora, if you decided to

18  exercise an option.

19         Do you remember that?

20  A.   I don't.

21  Q.   Mr. Peca, I'm going to show you what's been marked

22  for identification as Mr. Constantine's exhibit C 25.

23         Would you take a look at that, please.  There

24  are two pages.  I actually removed one.  We can always

25  insert it if it's necessary.

M. Peca - Cross/LaRusso

512

1  A.    I think I remember that document.

2  Q.    The second one is a document bearing your signature?

3  A.    Yes.

4        It's messed up because it had one of those old

5  roller faxes.

6  Q.    I'm sorry.

7        You have to speak up.

8  A.    I said I recognize the signature going over it twice,

9  it was one of those old roller faxes in '04.

10 Q.    I didn't notice that until you pointed that out.

11       Thank you.

12       MR. LARUSSO:  Your Honor, I may I ask that this

13 be admitted in evidence as Exhibit C 25?

14       MR. MISKIEWICZ:  No objection.

15       MR. HALEY:  May I?

16       MR. LARUSSO:  Sure.

17       (There was a pause in the proceedings.)

18       MR. HALEY:  No objection.

19       THE COURT:  C 25 is admitted.

20       (Whereupon, Defense Exhibit C 25 was received in

21 evidence as of this date.)

22       MR. LARUSSO:  I'd like to display it to the jury

23 at this time, if I could.

24       (The above-mentioned exhibit was published to

25 the jury.)

M. Peca - Cross/LaRusso

513

1    BY MR. LARUSSO:

2    Q.   This is a facsimile cover page, facsimile

3    transmittal, correct, Mr. Peca?

4    A.   Correct.

5    Q.   And it's to you, Mike Peca?

6    A.   Yes, it is.

7    Q.   With your fax number over on the right?

8    A.   Yes.

9    Q.   And it says Phil Kenner, and it's dated July 10,

10   2004.

11        Is that right?

12   A.   Yes, it is.

13   Q.   It's referencing Eufora option.

14   A.   Okay.

15   Q.   I took off the third page, but I'll insert it if it's

16   necessary later.

17        It says three pages, correct?

18   A.   Correct.

19   Q.   I'm going to read and hopefully accurately this time:

20        Michael, attached are, the wire instructions for

21   the payment to Eufora, the option agreement for Eufora.

22   Please sign the two documents and return them to me via

23   fax at 949-673-3812.  I'm leaving Sunday at 6 a.m. for

24   Europe, so if you could return them today I would

25   appreciate it.  I would like to handle it for you and

M. Peca - Cross/LaRusso

514

1    Eufora before I leave.

2              Please call me today with any questions.  Speak

3    with you soon.  Thanks, Phil.

4              And the second page is the option to purchase.

5    You see that?

6    A.    Yes.

7    Q.    And it's a one-page document with your signature at

8    the bottom?

9    A.    Yes.

10   Q.    So the jurors understand your testimony, because of

11   the fax you had to write over, is that correct, is that

12   the way your testimony is in regards to the signature --

13   A.    Correct.

14   Q.    -- had to write over, is that fair?

15   A.    Yes.

16   Q.    So you saw this document, correct?

17   A.    I saw -- yes.

18   Q.    And would it be fair to say that you read the

19   document?

20   A.    Yeah, I probably did at the time.

21   Q.    And what was your understanding of an option to

22   purchase membership interest in Eufora?

23   A.    That I was investing in Eufora and that's where my

24   money was going.

25   Q.    What was the option?

M. Peca - Cross/LaRusso

515

1    A.    I wasn't sure what the option was.

2    Q.    Did you have a chance to read over the paragraphs

3    which talk about the terms of the option and the

4    alternative option?

5    A.    I'm sure I did at the time.

6          I wouldn't have understood a lot of that stuff

7    and would have had to have a conversation with my advisor

8    about it.

9          MR. LARUSSO:  If I may, your Honor, reading just

10   the portions -- I'm not going to read the securities act

11   down at the bottom.

12         I'll read the ones relating to the option.

13   BY MR. LARUSSO:

14   Q.    Point No. 1, payment for option:

15         Optionee hereby agrees to pay to optionor the

16   sum of $166,000 as consideration for the option granted

17   herein.

18         Not to get too technical, but you are the

19   optionee, right?  You are the one that is being granted

20   the option for your contribution of $166,000, correct?

21   A.    Correct.

22   Q.    Terms of the option.

23         Optionee may exercise the option to purchase at

24   any time beginning on the date -- excuse me -- on the date

25   first above given, up to and including the day which is

M. Peca - Cross/LaRusso

516

1    exactly six months from the above date.  The purchase

2    price shall be $1.

3             Optionee shall exercise the option by giving

4    written notice to the optionor of optionee's decision to

5    exercise the option.  Optionor shall complete the transfer

6    of 1 percent membership interest in Eufora, with adequate

7    documentation within 30 days of the date of the notice

8    given by optionee, including all documentation necessary

9    to provide free and clear ownership to optionee, including

10   optionee's right to vote the 1 percent interest.

11            Knowing there is a lot of legalese in there and

12   that's what lawyers get paid for, what did you understand

13   that to mean?

14   A.   Really not much.

15   Q.   Okay.

16            So it had something to do with you give your

17   money, you have an option if you want, you pay $1 in six

18   months and you are going to get your shares in Eufora.

19            Is that a fair statement?

20   A.   Sure.

21   Q.   And if I'm wrong, please correct me.

22   A.   Yes.

23   Q.   Thank you.

24            And the second alternative or alternatively,

25   optionee may elect to cancel this option in return for a

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

M. Peca - Cross/LaRusso

517

1    payment of optionor to the optionee in the sum of

2    $185,000.  The election to cancel this option may be made

3    by the optionee given written notice of such to optionor

4    within a period of time commencing two months from the

5    date of this option and ending six months from the date of

6    this option.

7           Upon receiving written notice of cancellation

8    from the optionee, optionor shall pay the $185,000 to

9    optionee within 30 days.

10          Fair to say the second option says if you don't

11   want the equity interest they are going to give you your

12   money back plus interest on the $180,000?

13   A.    Sounds like that, yes.

14   Q.    Did you exercise either option?

15   A.    That would have been my advisor's role to exercise

16   that option on my behalf.

17   Q.    As you are sitting here today, do you know that that

18   option wasn't exercised?

19   A.    I did not know that.

20   Q.    As you sit here today, do you know that even though

21   the option wasn't exercised at the time, Mr. Constantine

22   decided to treat that option as if it was exercised for

23   your own benefit?

24          Did you know that?

25   A.    I didn't know that that was the case.

M. Peca - Cross/LaRusso

518

1      I do know that it was reflected in a document I

2   received of my equity position in Eufora.

3   Q.   So you can't say if it wasn't exercised properly at

4   the time, but you do know at some point you got the equity

5   interest.

6          Is that correct?

7   A.   I do, yes.

8   Q.   Thank you.

9          Do you currently hold an interest in Eufora, AZ

10  Eufora I, LLC?

11  A.   That's a great question.

12  Q.   You don't know, do you?

13  A.   No idea.

14  Q.   Would it also hold true for the other hockey players

15  as well?

16  A.   I imagine so.

17  Q.   By the way, when Mr. Constantine was on that

18  telephone, he was talking to somebody about raising money,

19  some seven months later, if my math is off, six months

20  later an agreement was provided to you to review hopefully

21  to provide the funds.

22          Is that correct?

23  A.   For what funds, for what?

24  Q.   In compliance with the settlement -- Global

25  Settlement Fund.

M. Peca - Cross/LaRusso

519

1    A.    Oh, yes.

2    Q.    Okay.

3          This e-mail, which was introduced as

4    Government Exhibit 757, I want to refer back to this for a

5    few minutes, you received that at 1:14 in the morning,

6    correct?

7    A.    That's when the e-mail would have come through our

8    server.

9          But we probably didn't get to it until the

10   following morning.

11   Q.    And in sum that e-mail indicates that they are

12   looking for written authorization regarding the use of the

13   Global Settlement Fund.

14   A.    Correct.

15   Q.    Would it also be fair that you and your wife read

16   this e-mail?

17   A.    We did.

18   Q.    Or any other e-mails relative to this, correct?

19   A.    Yes.

20   Q.    Did you and/or your wife respond to that e-mail?

21   A.    Yes.

22         I initialled and e-mailed it back, or scanned

23   and faxed it back.

24   Q.    Do you remember who you scanned it back to?

25   A.    Phil Kenner.

M. Peca - Cross/LaRusso

520

1    Q.    You did not have Mr. Constantine's e-mail address?

2    A.    We may have.

3          I just -- I think I remember sending it to Phil,

4    not Tommy.

5    Q.    But he was your financial advisor, so --

6    A.    Correct.

7    Q.    -- since he had asked for the written authorization

8    in this e-mail, you sent it back to him?

9    A.    Correct.

10   Q.    Okay.

11         You didn't sign it on May 18th, did you?

12   A.    I don't remember.

13   Q.    Do you recall taking any time between the receipt of

14   that e-mail and discussing it for a number of days with

15   your wife before you actually agreed to sign this

16   agreement?

17   A.    I remember we were looking for clarification on some

18   of these things that were in this e-mail.

19   Q.    So as a result, prudent of you and your wife took the

20   opportunity to review thoroughly what you were

21   contributing the money to the Global Settlement Fund for?

22   A.    Correct.

23   Q.    As a matter of fact, do you remember writing back to

24   Mr. Kenner the same day seeking that clarification before

25   you signed the approval letter?

M. Peca - Cross/LaRusso

521

1   A.   I'm not sure if I did.

2        My wife may have done that.

3   Q.   Mr. Peca, let me show you what has been marked for

4   identification as C 26, and ask you to take a look at

5   that.

6        Do you recognize that?

7   A.   I do.

8   Q.   Would it be fair to say, if I may, that contains the

9   first e-mail that we were talking about, correct?

10       That's the one that's up on the board --

11  A.   Here?

12  Q.   Down at the bottom, almost two thirds of this exhibit

13  contains the e-mail that's up on display.

14       I don't have the exhibit number.

15       MR. LARUSSO:  Let me for the record make sure I

16  get it accurate, Government Exhibit 757.

17  BY MR. LARUSSO:

18  Q.   So this exhibit has reproduced, correct, 757?

19  A.   Yes.

20  Q.   But there's also another portion of this.  There is a

21  reply to that e-mail.

22       Is that right?

23  A.   There is.

24       MR. LARUSSO:  Your Honor, may I ask that that be

25  received at this time?

M. Peca - Cross/LaRusso

522

1    MR. MISKIEWICZ:  No objection.

2    THE COURT:  Mr. Haley, any objection?

3    MR. HALEY:  No, your Honor.

4    I'm sorry.

5    THE COURT:  C 26 is admitted.

6    (Whereupon, Defense Exhibit C 26 was received in

7    evidence as of this date.)

8    BY MR. LARUSSO:

9    Q.    Just so the jurors understand the earlier questioning

10   that I talked with you about, Mr. Peca, this portion where

11   my finger is, it says May 18, 2009, 1:14 a.m.

12   That was the earlier exhibit, Government Exhibit

13   757, is that correct?

14   A.    Correct.

15   Q.    All right.

16   We go up to the top, this is a reply by your

17   wife to Mr. Kenner, correct?

18   A.    Yes, it is.

19   Q.    You were aware of this, am I right?

20   A.    Yes.

21   Q.    And the reply occurs on the same day at

22   approximately -- or 6:10 and 43 seconds a.m.

23   Is that correct?

24   A.    Yes.

25   Q.    PDT, do you know what that is?

M. Peca - Cross/LaRusso

523

1   A.    I don't either.

2   Q.    I'm sure somebody will help us out.

3          In any event, it's referencing the global

4   settlement, is that right?

5   A.    It seems to, yes.

6   Q.    I'm going read a few lines:

7          Hey, before we sign off on an, in quotes,

8   approved, end quote, letter, can we please have the

9   written documentation as to exactly how much percentage,

10  is in brackets, we obtained with our contribution?

11  Michael mentioned last Monday that you told him we'd have

12  it by last Wednesday, but we still haven't received it.

13  We want to be diligent about our record keeping.

14          I read that correctly?

15  A.    Yes.

16  Q.    What was your wife referring regarding we haven't

17  received it?

18  A.    We were looking for clarification on the original

19  e-mail.

20          Based on our conversation that the incentive

21  would be acquiring percentages and things, so we wanted to

22  know exactly how much before we got involved.

23  Q.    Correct.

24          MR. LARUSSO:  I'm sorry.  That's an

25  inappropriate comment.

M. Peca - Cross/LaRusso

524

1          I apologize.

2    BY MR. LARUSSO:

3    Q.    So your e-mail was, and your wife's e-mail which you

4    were aware of, was an attempt to clarify the percentage

5    that you would be receiving in a number of companies and

6    entities that either exist or may be acquired.

7          Is that correct?

8    A.    Just to have a better understanding of it, yes.

9    Q.    Now, this occurs, it's early in the morning, but we

10   can seem you read it and your wife read it, right?

11   A.    Yes.

12   Q.    And there are a whole bunch of phrases in here, but

13   the only portion that you asked for clarification was the

14   percentage of the shares you would get for your

15   contribution.

16         Is that correct?

17   A.    Correct.

18   Q.    Let me just review with you, if I could, what's in

19   the e-mail that was originally sent to you:

20         Per our conversation -- and I'm reading --

21   please acknowledge your approval and authorization for me

22   to have wire transferred $250,000 to attorney Ron

23   Richards' trust account for your proportionate

24   contribution to the Global Settlement Fund.

25         Now, we know you already transmitted it.  This

M. Peca - Cross/LaRusso

525

1    is kind of an effort to memorialize what you had already

2    orally agreed to and contributed to.  Correct?

3    A.    Yeah, more of what we understood.

4    Q.    Okay.

5            But it is after the fact?

6    A.    Correct.

7    Q.    You didn't think anything untoward was being done by

8    signing -- doing this on the 18th, even though you

9    contributed earlier, did you?

10   A.    No.

11           MR. MISKIEWICZ:  Objection.

12           THE COURT:  Overruled.

13   BY MR. LARUSSO:

14   Q.    I believe the answer is no, is that correct?

15   A.    Correct.

16   Q.    Second sentence:

17           In addition to the fund paying for various legal

18   fees.  I'm going to stop there.

19           That was part of the first discussion at the

20   meeting with Mr. Constantine, is that right?

21   A.    That was involved in the conversation, yes.

22   Q.    That's where you knew at this point that a lot of the

23   money that had been invested in Hawaii, yours included,

24   had been sent to Mr. Jowdy down to his Mexican project.

25           Is that correct?

526

1   A.   I wasn't aware of that money being given to Jowdy at

2   that time, no.

3   Q.   Do you know what the purpose of suing Jowdy was?

4   A.   I knew it had to do with the loan.

5        I just wasn't aware at the time that it was my

6   money that was used for the loan.

7   Q.   Did you ask?

8   A.   No.

9   Q.   Did you inquire what legal fees?

10  A.   Well, the legal fees were going to be for Ron

11  Richards and our litigation as a group.

12  Q.   But to do what?

13  A.   To sue Ken Jowdy.

14  Q.   For what?

15  A.   For a loan.

16  Q.   The loan that he got for his Mexican project?

17  A.   Correct.

18  Q.   And what was your involvement in that loan that was

19  made to Mr. Jowdy?

20  A.   I'm not sure because I wasn't told that I was going

21  to actually be a part of the lawsuit at that time.

22  Q.   But you are agreeing to pay money into it?

23        I'm sorry.  I'm --

24  A.   A lot of --

25  Q.   Just to clarify?

527

1    A.    That was a lot of contributing to the Global

2    Settlement Fund that had nothing to do with Cabo or

3    Hawaii, it was a group effort and team thing because in

4    the end of it everyone was going to be made whole.

5              From our conversation in the house we were all

6    going to be made whole from all of our investments from

7    Tommy and --

8    Q.    But, in any event, you are contributing to a legal

9    fund to sue Jowdy and you didn't know why he was being

10   sued?

11   A.    That was the most important part of the conversation,

12   to make the decision.

13   Q.    Mr. Peca, I can see the position and I think you told

14   the jury on a number of occasions that it was an effort

15   and a hope to be able to recover what you lost.

16             Isn't that what it was?

17   A.    That's all we really had for a lot of years, is

18   clinging to that hope.

19   Q.    So you didn't question this one further in your first

20   response about five hours later, did you?

21   A.    Correct.

22   Q.    The next one is PR agency fees.

23             Do you know what that is?

24   A.    Yes, that was discussed.

25             You know, like I said earlier, Tommy had been

M. Peca - Cross/LaRusso

528

1    upset about an article that involved Phil, but also

2    included him in the article, and it was just going to be

3    used for if we wanted to get a favorable article in the

4    newspaper that a PR firm can help put together on our

5    behalf.

6              That's how we understood it.

7    Q.   So it was okay for you because they disclosed the

8    fact that there may be expenses from the Global Settlement

9    Fund to do just that?

10   A.   Correct.

11   Q.   Now, it also says, as well as other protective

12   advances and settlement costs.

13             Let me take protective advances.  Did you ask

14   for clarification of those words?

15   A.   I did not.

16   Q.   Did you know what those words meant at the time?

17   A.   The first time those words came to my attention was

18   through a friend of mine, Jay McKee, who was also involved

19   in the Global Settlement Fund.

20   Q.   So you learned from Mr. McKee what the words were?

21   A.   Not --

22   Q.   Sometime later -- I'll give you a chance, Mr. Peca, I

23   apologize.  I want -- my train of thought goes one way.

24             You learned later from Mr. McKee what those

25   words meant?

M. Peca - Cross/LaRusso

529

1    A.   Not necessarily what they meant, but what they

2    represented for Mr. Constantine.

3    Q.   But at this time you didn't ask for clarification?

4    A.   No, I didn't.

5         I didn't know what it meant.

6    Q.   Did you ask for any clarification when you were --

7    did this come up at the meeting?

8    A.   No.

9    Q.   Well, if it didn't come up at the meeting and you see

10   it in this letter, didn't you --

11        MR. LARUSSO:  Withdrawn.

12   BY MR. LARUSSO:

13   Q.   You didn't ask for clarification, even though it

14   didn't come up in the meeting, but it's coming up in this

15   authorization.

16        Is that correct?

17   A.   Yeah I -- correct.

18   Q.   Thank you.

19        And settlement costs, what did you understand

20   that to mean?

21   A.   Other legal fees.

22   Q.   Again, relating to Mr. Jowdy, is that correct?

23   A.   Correct.

24   Q.   Is it possible that there were other suits

25   contemplated as well by the investors?

M. Peca - Cross/LaRusso

530

1    A.    There may have been.

2    Q.    It then says:

3              You will be receiving transfers of membership

4    agreements from Tommy for your acquisition of additional

5    interest in Eufora, LLC, as well as your new LLC and

6    operating agreements -- bear with me -- reflecting your

7    ownership interest in the Avalon Airpark real estate

8    project, the Falcon Ten aircraft and the two Palms Place

9    condominium units.

10             You see that?

11   A.    I do see, yes.

12   Q.    You saw that when you reviewed it?

13   A.    Yes.

14   Q.    Did you ask for clarification on that?

15   A.    We didn't ask for clarification.

16             We were just asking what the percentages were

17   as, again, I stated the incentive of doing the global

18   settlement, we were told that our money was going to be

19   used to settle outside lawsuits in order to acquire those

20   percentages.

21   Q.    But it's saying here that you may be acquiring as a

22   result of this Global Settlement Fund an interest in these

23   entities.

24             Is that correct?

25   A.    Correct.

M. Peca - Cross/LaRusso

531

1   Q.   When you read this, you didn't ask for clarification,

2   correct?

3   A.   We did.

4           We asked for --

5   Q.   I'm sorry.

6           On the e-mail --

7           MR. MISKIEWICZ:  Objection.

8   BY MR. LARUSSO:

9   Q.   I meant --

10          MR. MISKIEWICZ:  Objection.

11  BY MR. LARUSSO:

12  Q.   Go ahead.

13          Answer the question.

14          MR. LARUSSO:  I'll let him answer, Judge, and

15  I'll rephrase.

16  A.   Can you repeat the question?

17  Q.   I apologize, Mr. Peca.  It's been a long day and I'm

18  not feeling well, so please bear with me.

19          On May 18th, 2009, when you wrote the response

20  back, or your wife did, I apologize, you did not ask for

21  clarification of the percentages you were going to be

22  obtaining, correct?

23  A.   Correct.

24  Q.   All you asked was the percentage, you wanted to know

25  what it was?

M. Peca - Cross/LaRusso

532

1   A.   Correct, just to have a better understanding of it.

2   Q.   In any case, because Moreau and Tommy settled that

3   case as part of the Global Settlement Fund, we had

4   graciously elected to include you as a beneficiary with

5   significant equity that exists in those two units as part

6   of this transaction.

7        What did you understand that to mean?

8   A.   That one in particular, that wasn't mentioned in the

9   conversation we had at the house.

10  Q.   Again, I won't belabor it, you didn't ask for

11  clarification?

12  A.   No.

13  Q.   Do you know a person by the name of Moreau?

14  A.   I do.

15       I played with him.

16  Q.   And first name?

17  A.   Ethan Moreau, I played with him in Edmonton.

18  Q.   I'm sorry.

19       I didn't get his first name?

20  A.   Ethan.

21  Q.   Were you aware at the time you entered into this

22  settlement agreement that he had been suing Kenner and

23  Jowdy and Mr. Constantine, along with Owen Nolan and a

24  third individual escapes me, I believe it was Mr. Juneau?

25  A.   I knew some lawsuits.

M. Peca - Cross/LaRusso

533

1    I didn't know the extent of the lawsuits.

2    Q.   And in looking at this, the agreement or this

3    authorization request indicates that a settlement had been

4    reached with Mr. Moreau.

5         Correct?

6    A.   That's what it said, yes.

7    Q.   And that's part of what was discussed in regards to

8    the Global Settlement Fund.

9         Is that correct, to buy out their interests?

10   A.   Not that I was aware of, no.

11        Not that I understood it.

12   Q.   How did you understand it?

13   A.   That we were supporting the legal fund and, as so,

14   the incentive was that we would get percentages of those

15   following companies.

16   Q.   And then, lastly, as we discussed, rather than

17   throwing money away only on legal fees, the strategy which

18   effectively acquires significant assets while providing a

19   legal remedy is by far our best solution.

20        You remember reading that?

21   A.   I do.

22   Q.   And then, of course, the last sentence is that

23   Mr. Constantine -- I'm sorry -- Tommy has requested from

24   all of us and will provide to us written documentation of

25   every element of this transaction.  Please respond,

M. Peca - Cross/LaRusso

534

1    acknowledged and approved to this e-mail accordingly ASAP.

2              When did you send back your acknowledgment and

3    approval for this --

4    A.   I don't remember.

5    Q.   -- Global Settlement Fund, best recollection, four

6    days, five days, a week, two weeks?

7    A.   I don't remember.

8              MR. LARUSSO:  May I approach, your Honor?

9              THE COURT:  Yes.

10   BY MR. LARUSSO:

11   Q.   Mr. Peca, Mr. Constantine Exhibit C 28.

12             Would you take a look at that.

13   A.   Okay.

14   Q.   Does that appear to be the e-mail response that we

15   have been talking about?

16   A.   Yes, looks like it came four days later.

17   Q.   And you recognize it as one sent by your wife?

18   A.   Actually, I'm the one who typed it, but, yes.

19   Q.   I'm sorry.

20             That's your response in regards to the request

21   to authorize the Global Settlement Fund and approve it?

22   A.   Yes.

23             MR. LARUSSO:  May I ask that C 28 be received,

24   your Honor?

25             MR. MISKIEWICZ:  No objection.

M. Peca - Cross/LaRusso

535

1        THE COURT:  Mr. Haley, any objection?

2        MR. HALEY:  Your Honor, may I just see it for a

3  moment?

4        THE COURT:  Yes.

5        (There was a pause in the proceedings.)

6        MR. HALEY:  No, sir, thank you.

7        THE COURT:  C 28 is admitted.

8        (Whereupon, Defense Exhibit C 28 was received in

9  evidence as of this date.)

10  BY MR. LARUSSO:

11  Q.   I'll display it to the jury.

12        (The above-mentioned exhibit was published to

13  the jury.)

14  BY MR. LARUSSO:

15  Q.   E-mail from -- that's your e-mail address at the top,

16  Mr. Peca?

17  A.   Yes, that's my wife's e-mail.

18  Q.   May 22, 2009, to Mr. Kenner, re: global settlement,

19  and I understand and accept the terms of this settlement

20  plan, thanks.

21        Between the time that you asked for

22  clarification of the settlement agreement where you sought

23  only information on your percentage, were there any other

24  e-mails between the one on May 18th at 6:13, I believe, in

25  the morning, to the time that you send a reply here on May

M. Peca - Cross/LaRusso

536

1    22nd?

2    A.    I can't remember.

3    Q.    But it would be fair to say that you had four days to

4    consider that agreement?

5    A.    Correct.

6    Q.    Four days to consult with your wife?

7    A.    Correct.

8    Q.    Four days to speak to your financial advisor?

9    A.    Correct.

10   Q.    And speak to anyone you felt necessary before you

11   executed an agreement and committed $250,000?

12   A.    Yes.

13   Q.    Now, I know that you told us the first time that you

14   met Mr. Constantine was at your home.

15         Did you ever correspond with him by e-mail

16   before that?

17   A.    I don't recall.

18         That was the first time I had met him.

19   Q.    But would it be fair to say that after you met him,

20   you and he exchanged numerous e-mails for a number of

21   years regarding many of the topics we have been

22   discussing?

23   A.    Absolutely.

24         MR. LARUSSO:  Judge, if it's all right with you,

25   this may be the last exhibit.

M. Peca - Cross/LaRusso

537

1          It will probably take us about five minutes and

2     I could actually use a break.

3     BY MR. LARUSSO:

4     Q.    Let me show you what's been marked, Mr. Constantine,

5     as Exhibit C 27.

6          There are two pages.  I'm focusing in on the

7     first one, if I may.

8     A.    Okay.

9     Q.    Do you recognize this?

10    A.    I do, yes, I have seen this.

11    Q.    That is an e-mail from Mr. Constantine to you, if I

12    can get the date, May 18th, 2009.

13         Is that correct?

14    A.    Correct.

15    Q.    Do you need an opportunity to take a look at it?

16    A.    No.

17    Q.    Do you know what it contains?

18    A.    I have seen it, yes, I read it.

19    Q.    Just tell the ladies and gentlemen, briefly, what

20    Mr. Constantine is reporting to you at this time.

21    A.    He is further describing some of the companies that

22    were mentioned in the Global Settlement Fund.

23    Q.    So Mr. Constantine was providing more information

24    about what was the purpose of the Global Settlement Fund

25    and what it was going to do.

538

```
1            Is that correct?
2    A.   He was.
3            MR. LARUSSO:  Your Honor, may I ask at this
4    time -- because I'll be going into a new area --
5            THE COURT:  You want to admit the document
6    first?
7            MR. LARUSSO:  Yes, I'm sorry.
8            I'd like to admit it as C 27.
9            MR. MISKIEWICZ:  No objection.
10           MR. HALEY:  No, sir.
11           THE COURT:  C 27 is admitted.
12           (Whereupon, Defense Exhibit C 27 was received in
13   evidence as of this date.)
14           THE COURT:  We are going to break for the day.
15           We will reconvene tomorrow at 9:30.  Don't
16   discuss the case.  Don't read anything or listen to
17   anything regarding the case and have a good night.
18           (Jury leaves the courtroom.)
19           THE COURT:  You can step down, Mr. Peca.
20           (Witness steps down.)
21           THE COURT:  Everyone can be seated.
22           How much more do you have, Mr. LaRusso?
23           MR. LARUSSO:  Probably a half to 45 minutes,
24   your Honor.
25           THE COURT:  Okay.
```

539

1        Then the next witness is Kristin Peca?

2        MR. MISKIEWICZ:  Yes.

3        THE COURT:  Is she relatively short?

4        MR. MISKIEWICZ:  We may have one very short

5   witness, a Shimon Betesh, who will be testifying about a

6   portion of where Mr. Peca's money went and then Ms. Peca.

7        I don't think she'll be that brief, but she

8   shouldn't be that long.

9        THE COURT:  Who's after that?

10       MR. MISKIEWICZ:  Aaron Mascarella from Northern

11  Trust and we told this to the defendants and after that

12  Bryan Berard and after that I have given them a number of

13  other names, the Kaisers and that probably gets us into

14  next week.

15       THE COURT:  Any issue with any of those

16  witnesses we expect for tomorrow?

17       MR. LARUSSO:  I don't anticipate any that I know

18  of at this point, Judge.

19       THE COURT:  Okay.

20       Mr. Haley, you anticipate any issues?

21       MR. HALEY:  I don't anticipate any issues.

22       THE COURT:  Okay.

23       Have a good night.  See you tomorrow.

24       MR. LARUSSO:  Thank you, your Honor.

25       MR. HALEY:  Thank you, your Honor.

540

1          MR. MISKIEWICZ:  Thank you, your Honor.

2          (The trial was adjourned until Thursday, May

3    7th, at 9:30 a.m.)

541

1                    INDEX:

2    MICHAEL PECA                              381

3    DIRECT EXAMINATION (Continues.)           384

4    BY MR. MISKIEWICZ

5    CROSS-EXAMINATION                         450

6    BY MR. HALEY

7    CROSS-EXAMINATION                         494

8    BY MR. LARUSSO

9

10                   EXHIBITS:

11   Government's Exhibits 1-15 and above       383

12   referenced documents were in evidence

13   Government's Exhibit 716 in evidence       404

14   Government's Exhibit 719 in evidence       407

15   Government's Exhibits 717 and 718 in evidence  411

16   Government's Exhibit 753 in evidence       414

17   Government's Exhibit 755 in evidence       417

18

19   Defense Exhibit Kenner 11 in evidence      489

20   Defense Exhibit Kenner 12 in evidence      489

21   Defense Exhibit Kenner 13 in evidence      490

22   Defense Exhibit Kenner 15 in evidence      490

23   Defense Exhibit Kenner 17 in evidence      491

24   Defense Exhibit C 24 in evidence           503

25   Defense Exhibit C 25 in evidence           512

542

| | |
|---|---|
| Defense Exhibit C 26 in evidence | 522 |
| Defense Exhibit C 28 in evidence | 535 |
| Defense Exhibit C 27 in evidence | 538 |
| | |
| Government Exhibits 751 and 752 in evidence | 421 |
| Government Exhibit 754 in evidence | 428 |
| Government Exhibit 757 in evidence | 432 |
| Government Exhibit 505 in evidence | 445 |
| Government Exhibit 505, 505.1-T, 501.2-T, 505.3-T, 505.4-T in evidence | 446 |

**$**

**$1** [1] - 516:2

**$1,218,486.05** [1] - 399:20

**$1,250,000** [4] - 401:16, 402:5, 402:8, 402:11

**$1,613,486.05** [1] - 399:23

**$100,000** [6] - 415:2, 415:22, 416:1, 435:21, 435:15, 467:5, 476:24

**$15** [3] - 498:20, 504:4, 506:12

**$166,000** [3] - 511:9, 515:16, 515:20

**$175,000** [1] - 402:23

**$180,000** [1] - 517:12

**$185,000** [2] - 517:2, 517:8

**$20** [3] - 459:25, 460:16, 498:20

**$20,000** [1] - 437:5

**$200,000** [1] - 413:5

**$25,000** [2] - 398:1, 398:19

**$250,000** [12] - 391:12, 428:14, 429:7, 430:21, 433:14, 436:22, 437:4, 450:13, 450:18, 451:13, 524:22, 536:11

**$266,000** [1] - 421:21

**$30,000** [1] - 437:5

**$350,000** [1] - 402:17

**$366,000** [4] - 413:5, 422:8, 435:15, 435:22

**$395,000** [9] - 385:22, 386:1, 387:12, 388:1, 388:17, 390:13, 399:8, 399:20, 448:14

**$580,026** [2] - 492:13, 493:9

**$600,000** [1] - 476:15

**$8,000** [1] - 430:15

**'**

**'04** [3] - 511:6, 511:7, 512:9

**'05** [3] - 384:23, 398:9, 398:14

**'06** [1] - 399:24

**'08** [2] - 511:6, 511:7

**'96** [1] - 457:2

**'97** [1] - 457:2

**0**

**07-15** [1] - 397:22

**1**

**1-15** [2] - 383:20, 541:11

**1.2** [1] - 399:19

**1.6** [2] - 400:1, 402:20

**1.7** [2] - 392:8, 467:7

**1.775** [2] - 393:14, 402:22

**1.8** [1] - 406:1

**10,000** [1] - 424:7

**10/19** [7] - 385:20, 386:24, 387:12, 388:4, 388:5, 388:7, 388:12

**10/19/2006** [2] - 387:5, 399:7

**100** [2] - 378:14, 378:23

**100,000** [3] - 421:12, 422:7, 436:6

**10705** [2] - 409:3, 409:7

**1101** [1] - 381:19

**1105** [1] - 381:19

**11572** [1] - 378:21

**11722** [2] -

**378:15**, 378:23

**11749** [1] - 378:18

**11th** [1] - 401:8

**120,000** [1] - 403:9

**1200** [1] - 381:21

**1203** [1] - 381:21

**1209** [1] - 381:21

**1234** [1] - 381:22

**12th** [2] - 441:14, 448:5

**13-CR-607** [1] - 378:4

**1301** [1] - 381:24

**1309** [1] - 381:24

**1401** [1] - 382:1

**1424** [1] - 382:1

**1427** [1] - 382:1

**1428** [1] - 382:2

**1430** [1] - 382:2

**1432** [1] - 382:2

**1433** [1] - 382:2

**1490** [1] - 382:2

**1601** [1] - 378:18

**1602** [1] - 382:4

**1603** [1] - 382:6

**1604** [1] - 382:6

**162,000** [1] - 413:4

**166,000** [1] - 421:12

**1701** [1] - 382:8

**1737** [1] - 382:8

**1751** [1] - 382:8

**1759** [1] - 382:9

**1771** [1] - 382:9

**1775** [1] - 382:9

**18** [5] - 433:1, 438:22, 450:8, 491:18, 522:11

**18th** [7] - 441:17, 450:19, 520:11, 525:8, 531:19, 535:24, 537:12

**19** [2] - 387:21, 388:24

**19th** [1] - 397:18

**1:14** [2] - 519:5, 522:11

**1:45** [2] - 472:25, 473:12

**2**

**20** [2] - 393:2, 425:12

**20-minute** [1] - 420:6

**200,000** [1] - 435:17

**2000** [2] - 406:15, 419:10

**2001** [5] - 383:6, 398:23, 401:2, 403:14

**2007-2009** [1] - 458:7

**2013** [3] - 397:12, 397:13, 456:19

**2015** [1] - 378:9

**2020** [1] - 383:6

**2081** [1] - 383:7

**2082** [2] - 383:7

**2083** [1] - 383:7

**2084** [1] - 383:8

**2086** [1] - 383:8

**2087** [1] - 383:8

**2088** [1] - 383:8

**2089** [1] - 383:9

**2090** [1] - 383:9

**2091** [1] - 383:9

**21** [6] - 485:14, 485:16, 486:2, 486:16, 486:20, 488:3

**2101** [1] - 383:6

**2111** [1] - 383:6

**2133** [1] -

383:6

**2142** [2] - 400:20, 401:6

**2145** [1] - 383:6

**2158** [2] - 383:7, 383:10

**21st** [1] - 484:15

**22** [2] - 456:18, 535:18

**2200** [1] - 382:11

**2216** [1] - 382:11

**22nd** [2] - 508:9, 536:1

**2300** [1] - 382:13

**2306** [1] - 382:13

**24** [4] - 499:16, 503:5, 503:6, 541:24

**25** [5] - 511:22, 512:13, 512:19, 512:20, 541:25

**250** [2] - 450:24, 451:10

**250,000** [1] - 440:5

**25th** [1] - 492:14

**26** [4] - 521:4, 522:5, 522:6, 542:1

**27** [5] - 537:5, 538:8, 538:11, 538:12, 542:3

**28** [5] - 534:11,

534:23, 535:7, 535:8, 542:2

**2142** [2] - 400:20, 401:6

**289369** [7] - 384:15, 386:6, 398:6, 404:25, 408:20, 492:13, 492:18

**29** [2] - 392:14, 466:22

---

## 3

**30** [7] - 392:19, 393:4, 400:11, 445:6, 456:17, 516:7, 517:9

**300** [1] - 378:21

**3001** [1] - 382:15

**3010** [1] - 382:15

**3051** [1] - 382:15

**3053** [1] - 382:16

**3062** [1] - 382:16

**31** [1] - 385:5

**3101** [1] - 382:17

**3112** [1] - 382:17

**3201** [1] - 382:19

**3202** [1] - 382:19

**3203** [1] - 382:21

**3206** [1] - 382:21

**3207** [1] -

382:19

**3208** [1] - 382:19

**3251** [1] - 382:23

**3263** [1] - 382:23

**3301** [1] - 382:25

**3302** [1] - 382:25

**3304** [1] - 383:2

**3306** [1] - 383:2

**3500** [2] - 392:17, 392:22

**366,000** [2] - 421:20, 436:6

**381** [1] - 541:2

**383** [1] - 541:11

**384** [1] - 541:3

**395** [2] - 386:25, 387:14

**395,000** [3] - 387:24, 388:13, 399:16

**3:15** [1] - 380:18

**3:30** [3] - 379:24, 380:17, 380:19

---

## 4

**404** [1] - 541:13

**407** [1] - 541:14

**411** [1] - 541:15

**414** [1] -

541:16

**417** [1] - 541:17

**421** [1] - 542:5

**425** [1] - 378:18

**428** [1] - 542:6

**43** [1] - 522:22

**432** [1] - 542:7

**445** [1] - 542:8

**446** [1] - 542:9

**45** [1] - 538:23

**450** [1] - 541:5

**489** [2] - 541:19, 541:20

**490** [2] - 541:21, 541:22

**491** [1] - 541:23

**494** [1] - 541:7

**4th** [1] - 505:24

---

## 5

**5,000** [1] - 424:7

**50** [2] - 465:6, 465:8

**501.2-T** [3] - 446:18, 446:25, 542:9

**503** [1] - 541:24

**505** [9] - 443:13, 444:14, 445:16,

445:17,
446:17,
446:24,
448:3, 542:8,
542:9
**505.1-T** [4] -
446:18,
446:24,
448:7, 542:9
**505.1.2.3.4-T**
[1] - 445:21
**505.2-T** [1] -
448:19
**505.3** [1] -
449:2
**505.3-T** [3] -
446:18,
446:25,
542:10
**505.4** [1] -
449:14
**505.4-T** [3] -
446:18,
446:25,
542:10
**512** [1] -
541:25
**522** [1] -
542:1
**535** [1] -
542:2
**538** [1] -
542:3

**6**

**6,000** [1] -
463:3
**631** [1] -
378:24
**6:10** [1] -
522:22
**6:13** [1] -
535:24

**7**

**712-6103** [1]
- 378:24
**716** [8] -

404:3, 404:4,
404:16,
404:18,
404:19,
407:22,
475:18,
541:13
**717** [5] -
410:25,
411:6,
411:11,
411:12,
541:15
**718** [5] -
410:25,
411:6,
411:11,
411:12,
541:15
**719** [6] -
406:23,
407:9,
407:12,
407:14,
407:15,
541:14
**751** [6] -
420:24,
421:2, 421:6,
421:8,
421:21, 542:5
**752** [6] -
420:24,
421:2, 421:6,
421:8,
421:21, 542:5
**753** [9] -
413:25,
414:1, 414:6,
414:10,
414:13,
414:14,
414:15,
422:1, 541:16
**754** [6] -
428:16,
428:18,
428:21,

428:22,
428:24, 542:6
**755** [9] -
417:3,
417:12,
417:13,
417:20,
417:23,
417:24,
418:2, 441:4,
541:17
**757** [14] -
430:23,
430:24,
431:16,
432:19,
432:21,
432:24,
436:12,
450:6,
494:22,
519:4,
521:16,
521:18,
522:13, 542:7
**7th** [2] -
397:18, 540:3

**8**

**8th** [3] -
441:9,
495:25, 496:3

**9**

**949-673-3812**
[1] - 513:23
**9:30** [2] -
538:15, 540:3
**9:50** [1] -
378:10

**A**

**a.m** [5] -
378:10,
513:23,
522:11,
522:22, 540:3
**a/k/a** [2] -

378:7, 378:9
**Aaron** [2] -
405:5, 539:10
**able** [6] -
426:5,
443:25,
504:21,
508:7,
509:11,
527:15
**above-
mentioned**
[3] - 503:8,
512:24,
535:12
**absolutely** [5]
- 379:17,
396:10,
439:12,
452:3, 536:23
**accept** [1] -
535:19
**access** [1] -
400:16
**according** [1]
- 398:3
**accordingly**
[1] - 534:1
**account** [59] -
381:15,
384:13,
385:14,
385:15,
386:1, 386:4,
386:6, 386:7,
386:8,
386:14,
387:2,
387:19,
387:22,
388:18,
388:19,
391:16,
394:15,
397:15,
398:5, 398:6,
398:25,
403:24,

405:1, 405:2,
405:15,
405:21,
405:23,
409:14,
409:15,
409:21,
413:21,
414:24,
414:25,
415:5,
418:11,
424:16,
426:11,
429:4, 429:9,
441:6,
451:15,
454:23,
462:15,
469:8,
476:12,
476:17,
492:13,
492:15,
492:18,
492:19,
492:21,
493:8,
493:14,
493:19,
495:7,
509:15,
524:23
**accounts** [3] -
381:17,
409:24,
464:21
**accurate** [6] -
381:15,
384:19,
446:10,
458:8,
507:18,
521:16
**accurately** [1]
- 513:19
**acknowledge**
[3] - 434:20,

485:13, 524:21

**acknowledged** [1] - 534:1

**acknowledging** [1] - 441:17

**acknowledgment** [1] - 534:2

**acquire** [4] - 426:5, 436:18, 440:9, 530:19

**acquired** [5] - 425:10, 435:8, 435:14, 465:7, 524:6

**acquires** [2] - 434:18, 533:18

**acquiring** [3] - 390:7, 523:21, 530:21

**acquisition** [5] - 397:7, 434:2, 461:1, 461:15, 530:4

**acreage** [1] - 424:21

**acres** [2] - 462:24, 463:3

**act** [1] - 515:10

**acting** [1] - 508:16

**action** [2] - 390:6, 479:3

**actions** [1] - 451:12

**activity** [1] - 474:14

**actual** [1] - 385:3

**addition** [5] - 433:21, 433:22,

433:24, 435:4, 525:17

**additional** [6] - 434:3, 435:6, 435:7, 435:17, 472:22, 530:4

**address** [18] - 407:4, 409:7, 415:6, 431:21, 431:22, 431:23, 431:24, 432:4, 432:5, 433:4, 433:7, 476:2, 491:21, 492:6, 495:2, 500:6, 520:1, 535:15

**addressed** [3] - 433:8, 472:17, 475:23

**addresses** [1] - 500:12

**adequate** [1] - 516:6

**adjourned** [1] - 540:2

**admissibility** [1] - 445:15

**admissible** [1] - 502:4

**admission** [10] - 381:10, 404:16, 407:9, 411:6, 414:5, 417:20, 421:2, 428:18, 431:16, 444:14

**admit** [3] - 443:8, 538:5, 538:8

**admitted** [21] - 404:18, 407:12, 411:11, 414:13, 417:23, 421:6, 432:19, 445:16, 447:16, 489:1, 489:16, 490:4, 490:15, 491:13, 502:8, 503:5, 512:13, 512:19, 522:5, 535:7, 538:11

**advance** [2] - 469:6, 469:11

**advances** [3] - 433:25, 528:12, 528:13

**advertise** [1] - 387:5

**advised** [1] - 419:18

**advisor** [5] - 466:9, 487:22, 515:7, 520:5, 536:8

**advisor's** [1] - 517:15

**advisors** [1] - 416:18

**Advisors** [2] - 409:3, 409:9

**Advisory** [3] - 457:5, 457:9, 457:12

**advisory** [1] - 415:20

**affairs** [2] - 457:14,

457:24

**afternoon** [4] - 380:17, 380:18, 473:13, 494:6

**AFTERNOON** [1] - 474:1

**afterwards** [1] - 483:22

**agency** [1] - 527:22

**Agency** [1] - 433:25

**agent** [1] - 479:10

**agents** [2] - 475:5, 475:14

**ago** [5] - 432:3, 433:17, 439:8, 463:1, 481:17

**agree** [8] - 388:9, 393:24, 401:4, 427:19, 433:13, 442:6, 464:20, 486:14

**agreed** [9] - 379:14, 381:9, 381:11, 392:6, 426:5, 428:10, 509:13, 520:15, 525:2

**agreeing** [1] - 526:22

**Agreement** [3] - 457:5, 457:9, 457:12

**agreement** [19] - 415:18, 457:17,

457:21, 464:24, 465:1, 466:5, 466:7, 468:15, 481:13, 504:1, 507:4, 513:21, 518:20, 520:16, 532:22, 533:2, 535:22, 536:4, 536:11

**agreements** [5] - 434:2, 434:4, 466:8, 530:4, 530:6

**agrees** [1] - 515:15

**ahead** [7] - 381:5, 384:4, 454:3, 455:13, 474:9, 493:12, 531:12

**aid** [3] - 447:16, 447:19, 447:24

**aircraft** [6] - 434:6, 437:22, 437:23, 437:24, 439:24, 530:8

**airpark** [1] - 436:18

**Airpark** [8] - 434:5, 436:13, 436:15, 436:23, 437:3, 437:9, 440:20, 530:7

**airport** [1] - 394:19

alleged [1] - 480:22

allegedly [1] - 498:25

Alliance [1] - 381:22

allocate [1] - 507:1

allow [4] - 436:2, 454:3, 471:13, 504:23

allowed [1] - 411:24

allowing [1] - 447:17

almost [6] - 403:10, 426:11, 427:10, 462:19, 503:25, 521:12

alone [1] - 504:23

alternative [2] - 515:4, 516:24

alternatively [1] - 516:24

AMERICA [1] - 378:3

America [5] - 381:12, 382:10, 405:15, 405:16, 415:6

American [1] - 382:18

amount [3] - 401:21, 475:12, 493:9

ANDREW [1] - 378:20

Angeles [1] - 479:24

answered [4] - 486:23,

486:24, 488:1, 493:10

answers [3] - 442:14, 443:6, 443:7

anticipate [4] - 408:25, 539:17, 539:20, 539:21

apologize [12] - 412:24, 413:8, 413:15, 417:4, 454:2, 455:21, 499:10, 508:19, 524:1, 528:23, 531:17, 531:20

appear [1] - 534:14

appearance [6] - 389:18, 396:5, 396:16, 430:10, 445:8, 449:4

APPEARANCES [1] - 378:13

appearances [1] - 379:2

appeared [4] - 390:15, 430:7, 430:8, 497:17

appreciate [1] - 513:25

apprised [1] - 510:10

approach [4] - 469:25, 500:24, 501:2, 534:8

appropriately [1] - 409:1

approval [3] - 520:25, 524:21, 534:3

approve [2] - 434:20, 534:21

approved [2] - 523:8, 534:1

apps [1] - 478:18

April [7] - 401:4, 401:10, 402:4, 402:16, 414:22, 415:23, 416:11

arbitration [2] - 457:25, 458:3

area [1] - 538:4

Arizona [6] - 381:23, 381:25, 409:4, 415:6, 458:1, 458:14

armed [3] - 454:16, 478:23, 479:1

arriving [1] - 386:2

article [5] - 423:22, 528:1, 528:2, 528:3

ASAP [1] - 534:1

aside [1] - 438:10

assets [3] - 434:18, 457:19, 533:18

assistance [1] - 415:12

Assistant [1] - 378:16

associated [2] - 433:6, 479:15

associates [1] - 454:7

Associates [1] - 429:10

association [1] - 416:7

assuaged [1] - 452:14

assume [2] - 403:16, 466:2

assumed [2] - 406:17, 409:19

assure [1] - 425:9

attached [3] - 502:7, 503:24, 513:20

attachment [3] - 486:21, 505:14, 505:24

attacking [1] - 423:13

attempt [2] - 481:15, 524:4

attention [10] - 385:9, 385:20, 392:18, 392:25, 397:19, 401:3, 422:11, 477:7, 495:13, 528:17

attorney [10] - 389:17, 415:14, 418:10, 418:25,

441:6, 441:15, 474:25, 509:15, 524:22

Attorney [3] - 378:14, 430:10, 433:14

attorney-in-fact [2] - 441:15, 441:15

Attorneys [2] - 378:16, 475:14

attorneys [5] - 381:13, 480:1, 480:2, 480:3, 481:19

audio [9] - 446:7, 446:10, 446:15, 448:8, 448:20, 449:1, 449:3, 449:13, 449:15

Auerbach [1] - 378:22

August [7] - 407:17, 408:13, 408:19, 409:12, 410:14, 410:19, 492:13

authority [1] - 429:19

authorization [7] - 415:18, 453:8, 519:12, 520:7, 524:21, 529:15, 533:3

authorize [7]

- 388:17, 388:22, 398:18, 402:10, 415:17, 454:22, 534:21

**authorized** [2] - 400:16, 441:11

**authorizing** [3] - 398:19, 407:3, 453:7

**Avalon** [7] - 434:5, 436:13, 436:15, 436:23, 437:2, 437:9, 530:7

**aware** [15] - 394:11, 450:14, 463:19, 466:11, 492:25, 493:6, 507:8, 507:11, 509:13, 522:19, 524:4, 526:1, 526:5, 532:21, 533:10

**awful** [1] - 426:7

**AZ** [1] - 518:9

**B**

**background** [1] - 423:19

**bad** [1] - 439:2

**badly** [1] - 405:13

**Baja** [1] - 466:14

**balance** [7] -

399:14, 399:16, 399:19, 399:21, 400:11, 402:20, 403:10

**bank** [31] - 379:6, 379:13, 381:10, 381:14, 381:19, 381:22, 381:24, 382:2, 382:3, 382:4, 382:6, 382:9, 382:11, 382:13, 382:16, 382:17, 382:20, 382:22, 382:24, 382:25, 383:2, 383:4, 384:12, 385:15, 388:18, 388:19, 399:25, 408:21, 426:11, 476:12, 504:2

**Bank** [19] - 381:20, 381:22, 381:25, 382:5, 382:7, 382:10, 382:12, 382:14, 382:20, 382:22, 382:24, 383:3, 383:5, 384:12,

405:15, 415:5, 429:5, 429:8

**banks** [1] - 381:18

**based** [6] - 426:20, 427:1, 450:22, 451:22, 485:6, 523:20

**basic** [1] - 424:6

**battles** [1] - 424:5

**beach** [2] - 390:8, 424:21

**bear** [3] - 476:1, 530:6, 531:18

**bearing** [2] - 485:7, 512:2

**bears** [3] - 483:3, 488:14, 489:8

**became** [3] - 393:22, 463:19, 509:12

**become** [2] - 466:12, 492:25

**BEFORE** [1] - 378:11

**began** [3] - 443:2, 456:25, 458:7

**begin** [1] - 450:5

**beginning** [5] - 393:1, 398:24, 408:19, 448:9, 515:24

**begins** [2] - 414:15, 414:18

**behalf** [4] -

415:19, 468:16, 517:16, 528:5

**behave** [1] - 405:13

**belabor** [3] - 488:1, 488:2, 532:10

**belief** [3] - 462:8, 509:14, 510:11

**bell** [1] - 453:14

**belonged** [1] - 394:6

**below** [1] - 415:15

**beneficiary** [3] - 429:8, 434:11, 532:4

**benefit** [1] - 517:23

**benefits** [1] - 507:3

**Berard** [1] - 539:12

**best** [10] - 424:8, 432:14, 434:19, 444:23, 459:12, 462:22, 484:1, 488:2, 533:19, 534:5

**Betesh** [1] - 539:5

**better** [4] - 406:21, 460:5, 524:8, 532:1

**Better** [4] - 388:12, 388:15, 388:20, 448:15

**between** [13]

- 443:24, 444:22, 450:7, 453:20, 457:4, 457:13, 457:23, 460:17, 460:20, 496:6, 520:13, 535:21, 535:24

**beyond** [1] - 406:7

**BIANCO** [1] - 378:11

**Big** [1] - 461:1

**big** [1] - 426:4

**bit** [7] - 380:16, 399:7, 418:20, 423:19, 460:19, 472:24, 494:11

**blank** [2] - 459:3, 482:18

**blue** [5] - 412:12, 412:13, 482:1, 484:18

**board** [4] - 428:7, 428:8, 480:9, 521:10

**body** [2] - 415:1, 418:8

**bond** [9] - 400:7, 400:8, 400:13, 405:15, 405:21, 405:23, 424:16, 427:11,

462:15
**bonds** [7] -
400:4,
459:10,
459:14,
465:13,
465:18,
465:19,
472:10
**books** [3] -
437:11,
464:11,
464:15
**borrowed** [4]
- 399:22,
400:5,
402:24, 403:3
**bother** [1] -
436:16
**bottom** [6] -
385:10,
415:9,
505:17,
514:8,
515:11,
521:12
**bound** [1] -
428:6
**box** [3] -
385:10,
387:8, 397:19
**brackets** [2] -
505:1, 523:10
**break** [8] -
379:23,
380:17,
380:18,
420:4, 420:6,
421:25,
537:2, 538:14
**breaking** [1] -
465:10
**brief** [4] -
431:18,
444:17,
446:22, 539:7
**briefly** [7] -
391:7,

402:16,
411:13,
420:23,
421:10,
422:13,
537:19
**bring** [4] -
379:4, 380:2,
420:16, 474:4
**broke** [5] -
410:11,
453:12,
453:22,
454:9, 454:10
**Brothers** [2] -
467:10, 493:1
**Bryan** [1] -
539:12
**builder** [1] -
411:23
**building** [1] -
461:21
**buildings** [1] -
461:22
**built** [1] -
436:25
**bunch** [2] -
500:8, 524:12
**business** [9] -
396:7,
408:23,
437:13,
454:7,
454:18,
454:24,
457:14,
457:24, 458:6
**but..** [1] -
490:23
**buy** [7] -
394:20,
426:14,
439:9,
511:13,
511:17, 533:9
**buyer** [2] -
390:9, 503:25
**buying** [1] -

439:20
**BY** [47] -
378:15,
378:17,
378:20,
384:8,
431:20,
432:23,
444:20,
445:19,
447:2,
447:25,
450:2,
474:11,
478:1, 487:1,
489:4,
489:19,
490:7,
490:18,
491:16,
491:20,
493:24,
494:5,
495:12,
495:17,
497:24,
499:13,
500:3,
503:10,
503:21,
505:6,
506:23,
513:1,
515:13,
521:17,
522:8, 524:2,
525:13,
529:12,
531:8,
531:11,
534:10,
535:10,
535:14,
537:3, 541:4,
541:6, 541:8

---
**C**
---

**Cabo** [9] -

390:8,
394:20,
424:22,
467:9,
498:17,
504:2, 504:3,
505:7, 527:2
**Cactus** [2] -
409:4, 409:7
**California** [4]
- 394:17,
413:14,
424:12,
424:18
**cancel** [2] -
516:25, 517:2
**cancellation**
[1] - 517:7
**cane** [1] -
461:17
**capable** [1] -
505:8
**capital** [1] -
469:7
**capitalized** [1]
- 432:12
**capped** [1] -
432:9
**caps** [1] -
432:9
**car** [3] -
394:18,
394:22,
394:25
**card** [2] -
411:22,
411:25
**care** [2] -
405:14,
472:19
**carried** [2] -
423:15,
423:18
**carry** [1] -
507:23
**case** [11] -
379:1,
422:15,

432:11,
434:9,
434:10,
473:1,
517:25,
532:2, 532:3,
538:16,
538:17
**cash** [5] -
392:8,
393:13,
467:5, 504:4,
504:22
**cash-out** [1] -
504:22
**cassette** [1] -
478:19
**caused** [1] -
507:9
**CD** [1] -
478:20
**cell** [1] -
425:6
**Central** [3] -
378:6,
378:15,
378:23
**Century** [3] -
381:20,
429:5, 429:8
**certain** [4] -
425:9, 430:3,
491:7, 495:4
**certainly** [5] -
450:9,
466:11,
472:8,
481:19,
481:24
**certainty** [1] -
461:6
**chance** [3] -
456:7, 515:2,
528:22
**change** [1] -
444:6
**changing** [1] -
460:18

character [1] - 502:8

characterize [2] - 454:18, 467:24

charge [3] - 509:11, 510:3, 510:11

Charles [6] - 414:23, 414:24, 415:2, 418:7, 418:9, 429:4

Chase [3] - 382:20, 382:22, 382:24

checked [1] - 407:19

checks [2] - 381:16

circumstances [4] - 483:12, 483:18, 485:19, 487:6

Citibank [1] - 382:16

Citizens [1] - 383:3

City [1] - 395:25

civil [5] - 390:6, 394:13, 424:17, 479:2, 479:3

claim [1] - 481:3

claimed [2] - 438:7, 452:20

claims [2] - 435:13, 440:8

clarification [15] - 507:15, 520:17, 520:24, 523:18,

524:13, 528:14, 529:3, 529:6, 529:13, 530:14, 530:15, 531:1, 531:21, 532:11, 535:22

clarify [2] - 524:4, 526:25

clarity [1] - 400:7

classify [2] - 451:2, 459:11

clear [4] - 439:12, 445:14, 465:25, 516:9

CLERK [2] - 380:9, 474:6

client [1] - 408:22

clinging [1] - 527:18

clip [6] - 448:8, 448:20, 449:2, 449:3, 449:13, 449:15

close [4] - 403:24, 404:12, 458:10, 477:11

closed [1] - 493:20

closing [3] - 408:22, 467:14, 493:7

coerced [1] - 469:2

cold [1] - 494:11

collateral [2] - 405:21,

472:10

collateralizing [2] - 465:13, 465:18

Columbus [2] - 403:23, 422:19

column [1] - 399:14

comfortable [1] - 483:23

coming [9] - 383:16, 385:18, 398:4, 414:10, 425:12, 460:16, 493:17, 509:5, 529:14

comma [1] - 415:12

commence [1] - 479:2

commencing [1] - 517:4

comment [1] - 523:25

comments [2] - 504:10, 507:19

Commerce [1] - 382:5

commitment [2] - 462:9, 462:11

committed [5] - 403:4, 462:18, 464:9, 466:12, 536:11

communicate [2] - 396:4, 487:14

communicated [2] - 487:7, 500:14

communicating [1] - 433:5

communication [6] - 419:14, 467:15, 483:11, 483:17, 483:20, 483:21

communications [2] - 496:8, 500:19

compact [2] - 443:13, 444:9

companies [3] - 524:5, 533:15, 537:21

company [8] - 411:17, 411:22, 416:2, 418:9, 422:9, 436:7, 463:25, 485:15

Company [3] - 388:13, 388:15, 418:7

compensation [1] - 457:18

complete [2] - 461:25, 516:5

completely [1] - 405:24

compliance [1] - 518:24

comport [1] - 421:13

computer [3] - 378:25, 386:22, 478:17

concerned [1] - 453:1

concerning [1] - 452:19

concluded [1]

- 502:13

conclusion [1] - 416:17

condo [2] - 439:16, 439:20

condominium [7] - 434:6, 437:25, 438:18, 438:24, 439:4, 439:7, 530:9

condominiums [2] - 438:1, 438:11

confer [2] - 456:6, 457:10

conference [2] - 471:15, 481:3

confirmation [4] - 410:8, 429:25, 431:3, 449:10

confronted [1] - 394:19

connected [1] - 427:10

connection [4] - 416:6, 457:18, 460:21, 463:19

connections [1] - 427:5

consent [2] - 421:2, 468:23

consider [3] - 476:19, 477:20, 536:4

consideration [1] - 515:16

consistent [3] - 504:10, 504:15, 505:9

CONSTANTINE [1] - 378:8

**Constantine**
[65] -
378:20,
381:13,
394:23,
395:6, 412:5,
412:7, 412:8,
413:12,
415:3, 416:2,
416:9,
416:21,
422:3,
422:15,
423:16,
423:23,
425:3,
425:17,
426:3, 428:2,
435:18,
435:21,
435:23,
436:5, 436:7,
436:10,
437:15,
437:17,
440:25,
450:24,
476:24,
480:10,
494:9,
494:12,
495:20,
496:6, 496:8,
496:12,
496:14,
496:23,
497:2,
499:16,
500:13,
500:20,
503:13,
504:8,
506:12,
507:14,
507:15,
507:23,
508:4,
508:16,

510:14,
517:21,
518:17,
525:20,
529:2,
532:23,
533:23,
534:11,
536:14,
537:4,
537:11,
537:20,
537:23
**Constantine's**
[3] - 506:6,
511:22, 520:1
**construct** [1]
- 464:4
**construction**
[1] - 389:7
**consult** [1] -
536:6
**consulted** [1]
- 469:6
**consulting** [1]
- 415:20
**consummated**
[1] - 506:24
**contact** [4] -
405:7,
451:17,
454:19, 479:1
**contacted** [5]
- 405:9,
408:5, 453:3,
453:6, 453:10
**contained** [1]
- 383:25
**containing** [1]
- 484:25
**contains** [3] -
521:8,
521:13,
537:17
**contemplated**
[1] - 529:25
**contemporane
ous** [1] -

384:18
**content** [3] -
482:4, 484:2,
498:13
**contest** [1] -
490:25
**context** [1] -
498:13
**continue** [6] -
380:21,
420:20,
442:3,
454:22,
465:19,
471:13
**Continued** [5]
- 470:4,
471:16,
473:14,
501:3, 502:14
**continued** [2]
- 419:20,
493:2
**continues** [1]
- 399:15
**Continues** [2]
- 384:7,
541:3
**continuing** [2]
- 424:6,
437:20
**contract** [3] -
459:21,
459:25,
460:15
**contractually**
[1] - 460:16
**contradicts** [1]
- 471:10
**contribute** [6]
- 391:8,
423:25,
427:6,
428:12,
442:22,
450:13
**contributed**
[5] - 429:24,

451:14,
507:6, 525:2,
525:9
**contributing**
[3] - 520:21,
527:1, 527:8
**contribution**
[6] - 504:16,
505:10,
515:20,
523:10,
524:15,
524:24
**controlled** [1]
- 386:14
**controls** [1] -
447:22
**convened** [1]
- 391:3
**conversation**
[54] -
393:23,
417:5, 417:7,
423:15,
423:18,
434:8,
435:11,
444:21,
444:24,
451:6,
451:18,
451:24,
452:5,
452:11,
452:14,
452:18,
452:22,
452:23,
453:13,
453:16,
454:25,
465:12,
465:20,
467:25,
468:2,
469:17,
477:4, 478:2,
478:4,

481:18,
484:9,
495:18,
497:2, 497:4,
497:9,
497:21,
498:3, 498:5,
498:7,
507:20,
507:24,
508:1, 509:8,
509:17,
510:20,
510:24,
515:7,
523:20,
524:20,
525:21,
527:5,
527:11, 532:9
**conversations**
[28] - 443:3,
443:21,
443:22,
443:24,
444:1, 444:3,
444:7,
444:10,
445:4,
445:12,
445:25,
446:3, 447:3,
447:4, 447:6,
447:7, 447:8,
478:5, 478:6,
478:8,
478:13,
478:16,
479:5,
479:10,
479:14,
486:5, 496:11
**copies** [2] -
381:15,
499:11
**copy** [3] -
416:12,
416:15,

418:22
**correct** [218]
 - 384:20,
387:1, 387:6,
387:7,
387:15,
388:5,
388:10,
388:11,
389:8,
390:14,
391:14,
391:20,
394:1, 395:2,
398:2, 398:7,
400:17,
400:18,
400:20,
400:21,
400:23,
402:25,
403:1, 406:3,
406:4,
408:10,
411:8, 411:9,
413:19,
414:7, 414:8,
414:9,
415:24,
419:1, 419:2,
421:4,
421:22,
425:4, 427:8,
432:5,
433:14,
433:17,
433:18,
433:20,
434:23,
434:24,
435:2,
435:17,
437:16,
438:16,
441:6, 441:7,
441:12,
441:15,
441:16,

445:9,
445:10,
446:10,
447:9,
447:10,
449:5, 449:6,
449:9, 451:1,
451:10,
451:11,
452:15,
452:21,
455:3, 455:5,
455:6,
457:19,
458:1, 458:7,
458:15,
459:10,
459:16,
459:19,
459:22,
461:1, 461:2,
461:12,
461:13,
461:18,
461:20,
461:23,
462:6, 462:7,
462:20,
463:6, 463:7,
463:10,
463:21,
463:25,
464:1,
464:20,
465:8,
465:24,
466:14,
466:24,
468:14,
468:24,
468:25,
472:5, 472:7,
472:11,
472:12,
472:15,
472:19,
475:2, 475:3,
475:21,

476:10,
477:2,
478:14,
478:15,
478:22,
479:25,
480:7, 480:8,
481:5,
481:20,
481:21,
483:9, 484:5,
485:2, 485:9,
486:17,
488:5, 489:8,
491:6,
492:24,
494:14,
494:18,
494:24,
495:2, 495:3,
495:9,
495:22,
495:23,
496:13,
497:5,
497:19,
497:20,
499:1, 499:2,
500:16,
500:17,
503:14,
503:17,
504:6,
504:12,
505:15,
506:8,
506:15,
506:19,
506:20,
508:13,
509:1, 509:6,
510:20,
511:2,
511:11,
511:12,
513:3, 513:4,
513:17,
513:18,

514:11,
514:13,
514:16,
515:20,
515:21,
516:21,
518:6,
518:22,
519:6,
519:14,
519:18,
520:6, 520:9,
520:22,
521:9,
521:18,
522:13,
522:14,
522:17,
522:23,
523:23,
524:7,
524:16,
524:17,
525:2, 525:6,
525:14,
525:15,
525:25,
526:17,
527:21,
528:10,
529:16,
529:17,
529:22,
529:23,
530:24,
530:25,
531:2,
531:22,
531:23,
532:1, 533:5,
533:9, 536:5,
536:7, 536:9,
537:13,
537:14, 538:1
**correcting** [1]
 - 508:19
**correctly** [1] -
523:14

**correspond** [1]
 - 536:15
**correspondenc
e** [1] - 429:1
**correspondenc
es** [1] -
419:16
**corresponds**
[4] - 448:6,
448:19,
449:2, 449:14
**costs** [6] -
434:1, 504:5,
504:13,
504:22,
528:12,
529:19
**counsel** [6] -
411:7, 456:4,
456:6,
457:10,
472:24, 479:2
**count** [1] -
486:17
**country** [1] -
461:11
**Country** [1] -
378:21
**couple** [7] -
399:19,
402:16,
441:8,
443:21,
443:22,
475:9, 480:18
**course** [7] -
424:5,
456:20,
463:11,
477:13,
480:20,
500:19,
533:22
**court** [1] -
503:1
**Court** [2] -
378:22, 379:9
**Court's** [1] -

380:3
court's [1] - 502:5
Courthouse [1] - 378:6
courtroom [8] - 380:6, 380:10, 412:11, 420:8, 420:19, 473:3, 474:7, 538:18
cover [1] - 513:2
crap [1] - 509:22
created [1] - 465:2
credit [77] - 384:13, 384:14, 384:15, 384:19, 384:22, 385:7, 387:2, 388:14, 388:18, 389:4, 389:5, 389:10, 392:9, 393:9, 393:14, 394:3, 397:4, 397:5, 398:5, 398:20, 399:21, 399:22, 400:2, 400:14, 400:17, 400:24, 401:13, 401:15, 401:18, 401:21, 402:11, 402:21, 402:24,

403:3, 403:4, 403:19, 403:21, 404:12, 405:2, 405:22, 406:9, 406:16, 407:25, 409:11, 409:23, 410:21, 411:22, 411:23, 411:24, 411:25, 423:1, 452:19, 452:23, 453:2, 453:11, 454:11, 456:22, 462:9, 462:13, 462:18, 463:14, 464:9, 465:13, 465:18, 465:25, 466:12, 467:6, 472:9, 474:14, 474:15, 475:19, 476:7, 476:9, 476:11, 492:21, 493:13, 493:18
credits [4] - 385:11, 385:17, 387:23, 397:20
cross [3] - 449:20,

454:1, 467:8
CROSS [4] - 450:1, 494:4, 541:5, 541:7
cross-examination [2] - 449:20, 454:1
CROSS-EXAMINATION [4] - 450:1, 494:4, 541:5, 541:7
crux [1] - 396:20
current [1] - 461:19
custodian [1] - 414:25
custody [1] - 408:21
cut [2] - 418:14, 418:18

## D

danger [2] - 408:1, 410:17
Darryl [1] - 396:1
date [45] - 385:1, 385:2, 385:3, 385:4, 385:20, 387:5, 397:17, 397:22, 398:8, 399:6, 404:22, 407:19, 408:3, 414:22, 417:25, 418:4, 418:5, 424:13, 428:25, 432:25, 439:3, 448:1,

448:4, 448:13, 489:3, 489:18, 490:6, 490:17, 491:15, 496:1, 503:7, 503:16, 512:21, 515:24, 516:1, 516:7, 517:5, 522:7, 535:9, 537:12, 538:13
dated [5] - 400:22, 443:18, 485:13, 486:20, 513:9
dates [4] - 421:16, 441:8, 456:14, 456:16
days [20] - 400:11, 402:16, 433:21, 436:20, 436:24, 439:13, 441:14, 450:18, 450:20, 450:21, 495:5, 516:7, 517:9, 520:14, 534:6, 534:16, 536:3, 536:6, 536:8
deal [6] - 408:25, 423:5, 504:5, 506:24,

507:1, 507:10
dealing [1] - 510:20
dealt [1] - 510:21
dear [1] - 415:2
Dear [1] - 408:20
decide [1] - 412:21
decided [4] - 412:18, 442:18, 511:17, 517:22
decision [3] - 450:13, 516:4, 527:12
default [16] - 403:24, 404:12, 405:17, 405:18, 406:9, 407:17, 408:1, 408:9, 410:18, 411:14, 423:1, 424:16, 472:14, 472:16, 475:19
defendant [2] - 423:11, 425:3
Defendant [2] - 378:17, 378:19
defendants [8] - 381:12, 421:3, 422:15, 427:7, 429:22, 430:20, 443:23,

539:11

**Defendants** [1] - 378:10

**Defense** [22] - 489:2, 489:17, 490:5, 490:16, 491:14, 499:8, 499:16, 503:6, 512:20, 522:6, 535:8, 538:12, 541:19, 541:20, 541:21, 541:22, 541:23, 541:24, 541:25, 542:1, 542:2, 542:3

**definitely** [1] - 469:16

**delivered** [2] - 479:4, 492:2

**denigrate** [1] - 461:10

**deposit** [2] - 381:17, 451:15

**deposited** [2] - 381:16, 385:24

**deposits** [5] - 385:10, 385:17, 387:22, 397:20

**describing** [1] - 537:21

**description** [2] - 397:24, 398:3

**designed** [1] -

390:5

**desire** [4] - 438:1, 439:9, 439:15, 463:8

**desperate** [2] - 442:8, 442:10

**desperation** [1] - 441:24

**detail** [2] - 448:22, 493:21

**detailed** [1] - 452:23

**details** [2] - 453:6, 493:14

**develop** [1] - 504:3

**developer** [3] - 426:4, 426:13, 505:8

**developing** [1] - 466:14

**Development** [2] - 388:13, 388:15

**development** [5] - 390:8, 397:6, 460:22, 463:15, 493:2

**DeVries** [1] - 480:16

**di** [1] - 400:10

**Diamonte** [1] - 424:22

**did there come a time** [1] - 412:18

**differences** [3] - 481:12, 481:15, 481:16

**different** [6] - 411:16, 438:20, 441:8,

447:21, 451:4, 456:5

**difficult** [1] - 443:7

**difficulty** [1] - 396:9

**diligent** [1] - 523:13

**dire** [3] - 431:18, 444:17, 446:22

**DIRE** [3] - 431:19, 444:19, 447:1

**direct** [23] - 380:21, 385:9, 392:18, 395:5, 420:12, 452:17, 452:25, 453:5, 453:9, 459:20, 460:14, 462:22, 465:5, 465:22, 472:8, 474:13, 476:5, 476:23, 487:23, 494:24, 495:13, 497:25, 498:19

**DIRECT** [2] - 384:7, 541:3

**directing** [1] - 385:20

**directly** [1] - 403:21

**disclosed** [1] - 528:7

**discuss** [3] - 473:1, 473:5,

538:16

**discussed** [11] - 434:16, 438:3, 438:4, 439:10, 439:11, 440:21, 463:1, 495:4, 527:24, 533:7, 533:16

**discussing** [6] - 407:16, 497:22, 498:1, 498:13, 520:14, 536:22

**discussion** [3] - 435:9, 493:4, 525:19

**discussions** [5] - 410:20, 460:17, 460:20, 460:21, 481:3

**disheveled** [1] - 423:17

**disk** [12] - 443:14, 443:15, 443:20, 444:9, 445:3, 445:5, 445:6, 445:9, 445:15, 446:1, 446:17, 478:21

**display** [4] - 503:3, 512:22, 521:13, 535:11

**dispute** [2] - 394:13, 457:23

**disputes** [1] - 458:2

**distance** [1] - 497:8

**distinction** [1] - 476:13

**DISTRICT** [3] - 378:1, 378:1, 378:12

**District** [3] - 466:23, 468:8, 469:4

**disturbed** [2] - 450:25, 451:2

**diversifying** [1] - 460:19

**diversity** [1] - 460:20

**DNA** [1] - 428:9

**document** [71] - 388:7, 390:16, 390:19, 390:21, 397:15, 398:9, 398:11, 399:9, 399:13, 400:15, 400:19, 404:5, 404:10, 406:25, 430:25, 431:4, 455:22, 457:4, 457:11, 469:21, 472:20, 475:23, 481:22, 481:24, 482:2, 482:4, 482:7, 482:11, 483:4, 483:7,

483:11,
483:19,
483:22,
483:24,
484:2, 484:4,
484:7,
484:10,
484:12,
484:14,
484:15,
484:22,
484:24,
485:7, 485:8,
485:21,
486:6, 487:3,
487:8,
487:16,
488:4, 490:8,
490:9,
490:21,
490:22,
490:24,
491:4,
491:18,
491:21,
492:1,
503:24,
505:21,
505:23,
506:5, 512:1,
512:2, 514:7,
514:16,
514:19,
518:1, 538:5
**documentation**
[6] - 406:18,
442:11,
516:7, 516:8,
523:9, 533:24
**documents**
[21] -
381:17,
383:21,
384:12,
390:23,
401:20,
409:11,
410:10,

410:24,
452:23,
453:8, 454:8,
455:18,
456:8,
464:21,
476:1, 476:2,
482:23,
487:21,
492:20,
513:22,
541:12
**dollars** [14] -
425:13,
426:11,
436:21,
439:13,
439:19,
439:22,
440:2, 441:1,
441:10,
441:11,
442:22,
451:20,
467:14
**done** [4] -
437:6,
507:18,
521:2, 525:7
**dragged** [1] -
423:22
**draw** [1] -
416:10
**drawdown** [1]
- 398:19
**drawing** [1] -
392:25
**drawn** [3] -
381:16,
400:1, 401:13
**Dublin** [2] -
422:20,
494:12
**duly** [1] -
381:3
**during** [20] -
385:6,
388:13,

395:22,
396:8,
396:24,
399:24,
409:20,
410:16,
419:5,
419:15,
433:5, 435:3,
437:18,
456:20,
479:11,
480:6,
480:20,
494:24,
496:15,
500:19

---

### E

**e-mail** [72] -
430:20,
431:5, 431:8,
431:21,
431:22,
431:23,
431:24,
432:4, 432:5,
432:6, 432:8,
432:14,
432:25,
433:4, 433:5,
433:7,
436:11,
437:20,
450:7,
450:15,
450:19,
450:25,
451:13,
451:18,
451:21,
452:3, 452:4,
452:6, 452:7,
452:11,
452:14,
453:7,
483:14,
491:21,

491:24,
492:3, 492:6,
494:23,
495:2, 496:7,
500:4, 500:5,
500:6,
500:10,
500:12,
502:4,
503:11,
505:13,
519:3, 519:7,
519:11,
519:16,
519:20,
520:1, 520:8,
520:14,
520:18,
521:9,
521:13,
521:21,
523:19,
524:3,
524:19,
531:6, 534:1,
534:14,
535:15,
535:17,
536:15,
537:11
**e-mailed** [2] -
482:12,
519:22
**e-mailing** [1]
- 503:13
**e-mails** [6] -
500:8,
500:15,
500:18,
519:18,
535:24,
536:20
**earliest** [1] -
401:3
**early** [7] -
379:22,
380:16,
408:22,

416:19,
420:4, 420:5,
524:9
**earn** [1] -
465:19
**earned** [2] -
400:11, 442:4
**easily** [1] -
477:20
**East** [2] -
409:3, 409:7
**EASTERN** [1]
- 378:1
**edit** [1] -
444:6
**Edmonton** [1]
- 532:17
**effectively** [2]
- 434:17,
533:18
**effort** [3] -
525:1, 527:3,
527:14
**efforts** [1] -
474:21
**either** [12] -
419:18,
430:20,
431:10,
435:20,
436:5,
440:24,
492:2,
495:25,
496:8,
517:14,
523:1, 524:6
**elect** [1] -
516:25
**elected** [2] -
434:11, 532:4
**election** [1] -
517:2
**electronically**
[1] - 409:2
**element** [2] -
441:23,
533:25

**encapsulated** [1] - 451:8
**end** [13] - 390:7, 425:10, 425:21, 426:8, 427:22, 439:20, 439:23, 462:4, 462:12, 480:9, 504:4, 523:8, 527:4
**End** [1] - 471:15
**ended** [2] - 380:20, 384:11
**ending** [1] - 517:5
**enemies** [1] - 454:6
**enforcement** [2] - 478:24, 479:15
**English** [1] - 447:21
**entail** [1] - 484:12
**entered** [3] - 379:7, 380:10, 532:21
**enters** [2] - 420:18, 474:7
**entertaining** [1] - 438:8
**entire** [4] - 481:24, 482:16, 483:4, 483:6
**entirely** [1] - 502:7
**entities** [2] - 524:6, 530:23
**entity** [1] - 492:8

**episode** [1] - 394:22
**equity** [11] - 394:20, 434:12, 434:13, 434:14, 440:3, 462:16, 505:2, 517:11, 518:2, 518:4, 532:5
**erosion** [1] - 458:6
**escapes** [1] - 532:24
**especially** [1] - 424:15
**ESQ** [3] - 378:17, 378:20, 378:20
**essentially** [5] - 387:11, 405:23, 411:24, 460:16
**establish** [1] - 508:8
**established** [3] - 463:21, 464:19, 464:20
**estate** [7] - 386:13, 426:4, 426:13, 461:4, 464:4, 466:8, 530:7
**Estate** [3] - 434:5, 436:13, 436:15
**ethan** [2] - 532:17, 532:20
**Eufora** [45] -

411:17, 411:20, 411:21, 411:22, 412:1, 412:19, 413:2, 413:7, 413:18, 413:20, 413:21, 415:23, 416:6, 416:8, 421:14, 421:17, 421:24, 422:5, 422:8, 434:3, 435:6, 435:7, 435:9, 435:15, 435:22, 436:7, 440:3, 440:20, 510:20, 511:4, 511:10, 511:17, 513:13, 513:21, 514:1, 514:22, 514:23, 516:6, 516:18, 518:2, 518:9, 518:10, 530:5
**Europe** [1] - 513:24
**event** [3] - 483:25, 523:3, 527:8
**events** [2] - 396:9, 476:6
**eventually** [1] - 460:24
**evidence** [66] - 379:6, 379:10, 379:15,

383:13, 383:16, 383:21, 383:24, 384:25, 386:17, 397:11, 397:12, 398:23, 403:25, 404:19, 407:14, 411:12, 414:10, 414:14, 417:24, 421:9, 428:21, 428:23, 428:25, 432:22, 445:18, 446:25, 447:16, 452:8, 457:8, 473:9, 481:23, 489:3, 489:18, 490:6, 490:17, 491:15, 494:21, 500:23, 503:7, 512:13, 512:21, 522:7, 535:9, 538:13, 541:12, 541:13, 541:14, 541:15, 541:16, 541:17, 541:19, 541:20, 541:21,

541:22, 541:23, 541:24, 541:25, 542:1, 542:2, 542:3, 542:5, 542:6, 542:7, 542:8, 542:10
**ex** [2] - 500:10, 508:12
**ex-home** [1] - 508:12
**ex-wife's** [1] - 500:10
**exact** [3] - 424:20, 462:25, 485:3
**exactly** [15] - 394:9, 412:2, 425:8, 450:21, 453:17, 459:8, 459:11, 459:12, 477:4, 480:19, 493:6, 496:18, 516:1, 523:9, 523:22
**examination** [7] - 380:21, 449:20, 454:1, 474:13, 487:24, 494:24, 498:19
**EXAMINATION** [9] - 384:7, 431:19, 444:19, 447:1, 450:1, 494:4, 541:3, 541:5, 541:7
**examined** [2]

- 381:3, 493:16

**exception** [1] - 486:14

**excerpts** [3] - 445:25, 446:2

**exchanged** [1] - 536:20

**excuse** [3] - 494:10, 508:6, 515:24

**excused** [1] - 496:24

**executed** [5] - 413:22, 457:4, 503:23, 504:1, 536:11

**executing** [1] - 457:11

**exercise** [6] - 511:18, 515:23, 516:3, 516:5, 517:14, 517:15

**exercised** [4] - 517:18, 517:21, 517:22, 518:3

**exhausted** [1] - 508:24

**Exhibit** [94] - 381:19, 382:1, 382:21, 384:24, 386:17, 387:18, 388:6, 392:17, 397:13, 398:23, 400:20, 401:2, 401:5, 404:3, 404:16, 404:19,

406:23, 407:14, 410:25, 413:25, 414:6, 414:10, 414:14, 417:3, 417:12, 417:24, 420:24, 421:7, 422:1, 428:16, 428:18, 428:22, 428:24, 432:21, 436:12, 441:4, 443:13, 445:17, 446:24, 448:3, 450:6, 456:2, 457:8, 475:18, 481:23, 483:3, 484:15, 488:9, 488:16, 489:2, 489:5, 489:11, 489:17, 489:20, 489:25, 490:5, 490:8, 490:16, 490:19, 491:10, 491:14, 491:17, 494:21, 499:8, 499:16, 503:6, 512:13, 512:20, 519:4,

521:16, 522:6, 522:12, 534:11, 535:8, 537:5, 538:12, 541:13, 541:14, 541:16, 541:17, 541:19, 541:20, 541:21, 541:22, 541:23, 541:24, 541:25, 542:1, 542:2, 542:3, 542:6, 542:7, 542:8, 542:9

**exhibit** [14] - 379:10, 403:13, 450:6, 450:9, 503:3, 503:8, 511:22, 512:24, 521:12, 521:14, 521:18, 522:12, 535:12, 536:25

**EXHIBITS** [1] - 541:10

**Exhibits** [21] - 381:21, 381:24, 382:4, 382:6, 382:8, 382:11, 382:13, 382:15, 382:17, 382:19, 382:23, 382:25,

383:2, 383:5, 383:20, 411:12, 421:8, 445:21, 541:11, 541:15, 542:5

**exhibits** [15] - 379:15, 381:10, 381:14, 383:4, 383:11, 383:12, 397:10, 420:22, 421:11, 421:21, 445:22, 446:19, 456:5, 472:22, 499:10

**exist** [1] - 524:6

**exists** [2] - 434:15, 532:5

**exits** [2] - 420:7, 473:2

**expect** [2] - 460:11, 539:16

**expectation** [1] - 439:14

**expenses** [2] - 508:25, 528:8

**explain** [6] - 422:7, 435:19, 435:21, 436:5, 447:13, 502:11

**explained** [2] - 452:6, 469:15

**explaining** [1]

- 424:4

**explanation** [8] - 406:8, 406:11, 406:12, 416:25, 422:10, 423:7, 427:9, 440:24

**Express** [1] - 382:18

**extent** [3] - 395:11, 445:13, 533:1

### F

**fabric** [2] - 467:25, 468:2

**face** [4] - 395:1, 419:8

**face-to-face** [2] - 395:1, 419:8

**faced** [1] - 451:8

**facsimile** [2] - 513:2

**fact** [22] - 393:20, 394:16, 400:10, 402:2, 415:14, 418:10, 418:25, 428:24, 433:13, 434:25, 441:6, 441:15, 441:19, 444:3, 465:4, 468:21, 497:13, 497:17, 504:21, 520:23, 525:5, 528:8

**failure** [1] - 480:22

**fair** [7] - 437:17, 485:6, 514:14, 516:19, 517:10, 519:15, 536:3

**fairly** [1] - 492:4

**Falcon** [5] - 434:6, 437:21, 439:24, 440:21, 530:8

**familiar** [7] - 390:2, 411:17, 489:22, 490:10, 491:1, 492:4, 499:6

**family** [1] - 458:17

**far** [5] - 390:23, 434:19, 467:17, 497:10, 533:19

**Fargo** [1] - 382:3

**fashion** [2] - 465:15, 487:14

**favorable** [1] - 528:3

**fax** [5] - 483:14, 487:4, 513:7, 513:23, 514:11

**faxed** [1] - 519:23

**faxes** [2] - 512:5, 512:9

**FBI** [8] -

455:4, 455:14, 456:11, 456:21, 479:8, 479:10, 508:7

**fear** [1] - 509:4

**February** [5] - 404:23, 408:4, 456:18, 479:23, 508:9

**Federal** [2] - 378:14, 378:23

**fee** [1] - 399:14

**fees** [11] - 424:7, 433:25, 434:17, 505:1, 525:18, 526:9, 526:10, 527:22, 529:21, 533:17

**felt** [4] - 423:24, 423:25, 504:15, 536:10

**female** [1] - 480:4

**few** [11] - 441:14, 462:24, 484:25, 499:11, 499:25, 504:19, 507:2, 507:12, 510:18, 519:5, 523:6

**fictitious** [1] -

502:7

**Fidelity** [1] - 383:1

**fields** [1] - 461:18

**fight** [5] - 391:13, 435:5, 508:21, 508:25, 509:2

**fighting** [2] - 442:19, 477:8

**file** [2] - 424:17, 487:17

**filing** [1] - 480:21

**finally** [2] - 411:14, 416:16

**financial** [4] - 459:9, 460:2, 520:5, 536:8

**financing** [2] - 472:4, 493:2

**fine** [3] - 380:1, 380:7, 447:11

**finger** [1] - 522:11

**finish** [2] - 442:2, 504:20

**finished** [2] - 442:1, 478:16

**firm** [1] - 528:4

**First** [3] - 381:20, 429:4, 429:8

**first** [57] - 385:13, 388:18, 389:11, 390:25, 394:17, 397:4, 402:13,

403:22, 411:19, 411:21, 413:1, 413:3, 413:12, 416:15, 418:3, 423:18, 423:20, 429:22, 432:25, 433:13, 437:10, 438:6, 456:17, 459:13, 467:20, 479:4, 479:13, 482:2, 482:20, 485:4, 485:7, 485:11, 485:16, 485:21, 486:1, 494:11, 495:24, 496:6, 499:3, 503:12, 503:22, 505:22, 505:23, 508:6, 509:12, 515:25, 521:9, 525:19, 527:19, 528:17, 532:16, 532:19, 536:13, 536:18, 537:7, 538:6

**five-and-a-half** [1] - 467:14

**five-year** [3] -

459:21, 459:25, 460:15

**focus** [1] - 401:3

**focused** [1] - 477:5

**focusing** [2] - 399:6, 537:6

**follow** [3] - 446:6, 452:4, 483:22

**follow-up** [1] - 452:4

**followed** [2] - 478:4, 480:21

**following** [9] - 381:14, 383:4, 415:3, 467:1, 469:4, 470:2, 505:21, 519:10, 533:15

**follows** [4] - 381:4, 381:18, 469:23, 485:12

**foregoing** [1] - 383:11

**forge** [1] - 458:21

**forget** [1] - 499:14

**forging** [1] - 459:1

**form** [6] - 393:17, 426:25, 463:17, 466:16, 466:21, 509:11

**forms** [1] - 486:10

**forth** [2] - 450:15,

457:12
**forward** [4] -
408:18,
408:20,
422:23,
423:13
**fourth** [1] -
506:4
**frame** [6] -
413:1, 417:5,
419:9,
453:15,
453:19,
460:15
**free** [1] -
516:9
**frequently** [1]
- 419:7
**friend** [2] -
394:12,
528:18
**front** [7] -
390:8,
407:20,
425:5,
425:10,
425:12,
426:8, 450:10
**fronted** [1] -
498:23
**fulfill** [1] -
463:13
**full** [2] -
427:23,
479:20
**fully** [1] -
504:3
**fumbling** [1] -
386:21
**Fund** [38] -
390:2, 390:4,
390:5, 391:7,
391:9,
391:23,
392:3,
422:12,
424:2, 424:9,
427:20,

430:17,
430:18,
436:25,
437:1,
450:14,
451:14,
495:6,
504:11,
506:14,
507:7,
509:12,
510:4,
510:12,
518:25,
519:13,
520:21,
524:24,
527:2, 528:9,
528:19,
530:22,
532:3, 533:8,
534:5,
534:21,
537:22,
537:24
**fund** [17] -
390:5, 424:9,
424:10,
427:6,
427:11,
428:13,
429:24,
430:11,
433:24,
436:25,
437:7, 440:5,
498:23,
509:16,
525:17,
527:9, 533:13
**funded** [1] -
505:8
**funding** [2] -
498:9, 506:11
**funds** [4] -
392:3,
508:24,
518:21,

518:23
**future** [1] -
409:17

## G

**game** [1] -
390:7
**generally** [2]
- 404:21,
502:2
**gentleman** [1]
- 498:16
**gentlemen** [1]
- 537:19
**girlfriend** [1]
- 458:12
**given** [8] -
418:24,
486:3,
509:16,
515:25,
516:8, 517:3,
526:1, 539:12
**Glenn** [1] -
394:12
**global** [4] -
509:21,
523:3,
530:17,
535:18
**Global** [40] -
390:2, 390:4,
390:5, 391:7,
391:8,
391:23,
392:3,
422:12,
424:2, 424:9,
427:19,
428:12,
430:16,
430:18,
434:10,
436:25,
437:1,
450:13,
451:14,
495:6,

504:11,
506:13,
507:6,
509:12,
510:3,
510:11,
518:24,
519:13,
520:21,
524:24,
527:1, 528:8,
528:19,
530:22,
532:3, 533:8,
534:5,
534:21,
537:22,
537:24
**goal** [1] -
424:10
**Gonchar's** [1]
- 428:2
**Government**
[35] -
378:13,
381:19,
381:21,
381:24,
382:6, 382:8,
382:11,
382:13,
382:15,
382:17,
382:19,
382:23,
382:25,
383:2, 383:5,
404:16,
421:1, 421:8,
428:17,
428:22,
432:21,
445:17,
446:24,
447:17,
450:6,
475:18,
494:21,

519:4,
521:16,
522:12,
542:5, 542:6,
542:7, 542:8,
542:9
**government**
[14] - 383:4,
383:11,
404:15,
407:8, 411:5,
414:5,
414:11,
417:19,
431:15,
444:13,
474:24,
475:4,
490:13,
494:23
**government's**
[4] - 397:12,
404:1, 411:6,
418:2
**Government's**
[39] - 382:1,
382:4,
382:21,
383:20,
384:24,
386:17,
387:18,
388:6,
392:16,
397:13,
398:22,
400:19,
401:2, 401:5,
404:19,
406:23,
407:14,
410:24,
411:12,
413:25,
414:14,
417:2,
417:11,
417:24,

420:24,
422:1,
428:16,
428:18,
428:24,
436:11,
441:4,
443:13,
457:7,
541:11,
541:13,
541:14,
541:15,
541:16,
541:17
**Governments'**
[1] - 421:7
**graciously** [2]
- 434:11,
532:4
**grand** [32] -
389:14,
389:18,
390:15,
391:2, 391:3,
391:21,
392:1,
392:11,
392:13,
392:20,
395:10,
395:19,
395:20,
396:4, 396:5,
396:16,
419:11,
429:12,
430:7, 430:8,
430:10,
430:14,
449:4,
466:19,
466:23,
467:25,
468:8,
468:17,
468:18,
468:23,

469:3, 475:1
**granted** [2] -
515:16,
515:19
**great** [2] -
493:21,
518:11
**Greg** [1] -
480:16
**gross** [1] -
484:16
**grounds** [1] -
502:3
**groundwork**
[1] - 424:4
**Group** [9] -
415:4, 416:2,
416:9,
416:22,
422:3,
435:23,
436:8,
436:10,
476:25
**group** [6] -
500:4,
500:15,
503:11,
505:13,
526:11, 527:3
**guess** [9] -
403:16,
415:5, 422:4,
425:7, 443:9,
444:23,
452:16,
482:20,
508:13
**guessed** [2] -
418:14,
418:16
**guessing** [1] -
417:9
**guy** [2] -
424:24, 426:7
**guys** [4] -
467:17,
480:18,

498:6, 509:5

## H

**Haley** [9] -
392:23,
411:9, 414:9,
450:3, 474:9,
508:7, 522:2,
535:1, 539:20
**HALEY** [83] -
378:17,
379:17,
379:19,
380:3,
383:19,
392:20,
393:3, 393:5,
396:11,
396:14,
404:9,
404:14,
407:11,
411:2, 411:4,
411:10,
414:11,
417:22,
417:25,
421:5,
426:24,
428:20,
431:18,
431:20,
432:2,
432:17,
435:24,
440:15,
442:1, 442:3,
442:24,
444:17,
444:20,
445:14,
446:22,
447:2,
447:11,
448:25,
449:21,
450:2,
452:10,

454:1,
455:12,
455:18,
455:21,
455:24,
457:7, 460:9,
460:13,
463:18,
467:23,
471:1,
471:14,
472:1, 473:7,
474:10,
474:11,
476:21,
478:1, 487:1,
488:16,
488:21,
488:25,
489:4,
489:11,
489:19,
489:25,
490:7,
490:18,
491:10,
491:16,
491:20,
493:22,
493:24,
512:15,
512:18,
522:3, 535:2,
535:6,
538:10,
539:21,
539:25, 541:6
**half** [4] -
401:5,
401:14,
467:14,
538:23
**handing** [3] -
384:25,
404:3, 413:25
**Handing** [4] -
386:18,
397:12,

406:24,
417:12
**handle** [1] -
513:25
**hands** [1] -
387:18
**happy** [1] -
503:23
**hard** [3] -
425:8,
496:18,
496:21
**Harvey** [1] -
480:5
**hate** [1] -
488:1
**Hawaii** [24] -
386:13,
389:7,
389:12,
392:8,
392:15,
393:12,
393:14,
406:17,
423:4,
426:23,
427:3, 427:5,
438:10,
440:14,
461:1,
461:10,
461:16,
462:24,
465:7,
465:24,
466:2,
504:25,
525:23, 527:3
**Hawaiian** [5]
- 462:19,
463:5, 463:9,
463:15, 493:2
**hear** [9] -
410:3,
411:19,
413:2,
425:21,

447:21,
447:22,
497:6, 497:8,
499:3
**heard** [5] -
383:22,
388:15,
411:21,
465:3, 492:10
**hearing** [2] -
480:25, 481:2
**hearsay** [3] -
440:16,
502:3, 502:9
**hello** [1] -
494:7
**help** [5] -
424:7,
491:22,
493:1, 523:2,
528:4
**helped** [1] -
476:16
**helping** [1] -
389:6
**hereby** [2] -
381:11,
515:15
**herein** [1] -
515:17
**highlighted**
[2] - 451:21,
495:13
**Highway** [1] -
378:18
**himself** [3] -
423:18,
423:19,
425:15
**hinged** [1] -
509:4
**hiring** [1] -
435:5
**history** [4] -
398:24,
399:6, 453:3,
454:11
**hit** [1] -

387:22
**hockey** [4] -
402:1,
480:12,
507:2, 518:14
**Hockey** [1] -
477:16
**hold** [2] -
518:9, 518:14
**home** [9] -
394:20,
456:23,
458:16,
474:20,
487:17,
494:12,
508:12,
536:14
**honest** [1] -
395:8
**Honor** [61] -
379:5, 380:3,
381:6, 381:8,
383:18,
384:5,
407:11,
408:16,
411:5, 411:8,
411:10,
412:16,
414:8,
414:12,
417:4,
417:21,
420:3,
420:21,
421:1, 421:4,
426:24,
431:17,
435:24,
440:15,
442:1,
442:24,
444:16,
446:13,
446:21,
447:11,
449:17,

455:21,
457:7,
469:25,
488:17,
488:24,
489:13,
489:15,
490:1,
490:12,
490:14,
491:12,
494:3, 499:9,
499:10,
500:22,
500:24,
502:12,
503:2,
512:12,
515:9,
521:24,
522:3, 534:8,
534:24,
535:2, 538:3,
538:24,
539:24,
539:25, 540:1
**hope** [2] -
527:15,
527:18
**hopefully** [4]
- 424:18,
506:12,
513:19,
518:20
**hopes** [1] -
390:6
**Hormovitis** [1]
- 378:9
**Hotel** [1] -
438:24
**hotel** [1] -
395:24
**hour** [3] -
420:13,
435:10, 451:6
**hour-long** [1]
- 435:10
**hours** [9] -

444:4,
444:10,
444:21,
444:23,
444:25,
445:5,
445:12,
475:17,
527:20
**house** [8] -
410:11,
428:3,
453:12,
453:23,
454:9,
454:11,
527:5, 532:9
**huge** [1] -
504:23
**hundred** [2] -
393:13,
462:24

## I

**idea** [6] -
380:8,
409:13,
451:22,
475:12,
484:3, 518:13
**ideas** [1] -
430:3
**identification**
[18] - 404:3,
406:23,
412:15,
413:24,
417:3,
417:12,
420:25,
428:15,
430:23,
430:24,
443:13,
445:21,
455:19,
456:2, 499:8,
499:15,

511:22, 521:4
**identified** [2]
- 441:3,
500:15
**identify** [2] -
420:23,
500:12
**imagine** [2] -
426:9, 518:16
**immediately**
[3] - 405:9,
460:23,
462:19
**impeaching**
[1] - 471:4
**impeachment**
[2] - 471:8
**importance**
[1] - 396:5
**important** [2]
- 396:7,
527:11
**improved** [1]
- 462:1
**inappropriate**
[1] - 523:25
**incentive** [7] -
435:11,
436:16,
440:8, 460:2,
523:20,
530:17,
533:14
**inception** [2]
- 408:21,
509:14
**include** [2] -
434:11, 532:4
**included** [2] -
525:23, 528:2
**including** [5] -
381:14,
504:25,
515:25,
516:8, 516:9
**inconsistent**
[2] - 471:12,
484:8

incorrect [2] - 466:15, 466:18

increase [5] - 399:8, 399:16, 401:10, 402:17, 403:7

increases [1] - 403:13

incremental [2] - 462:3, 462:5

indeed [3] - 463:19, 464:2, 485:8

independent [1] - 396:25

INDEX [1] - 541:1

indicate [1] - 393:15

indicated [5] - 430:17, 432:3, 472:13, 473:8, 493:20

indicates [2] - 519:11, 533:3

indicating [2] - 384:17, 400:5

individual [2] - 499:4, 532:24

individually [1] - 383:25

individuals [1] - 500:14

information [8] - 383:25, 395:13, 478:23, 479:1, 503:13, 504:8, 535:23, 537:23

informed [1] - 412:2

infrastructure [2] - 397:7, 461:22

initial [4] - 413:3, 413:5, 456:25, 459:6

initialed [1] - 443:18

initialled [1] - 519:22

initiate [1] - 424:10

inquire [2] - 418:21, 526:9

insert [2] - 511:25, 513:15

inside [1] - 443:19

instance [1] - 403:8

instead [1] - 504:13

instruction [3] - 416:16, 447:12, 447:18

instructions [5] - 415:1, 415:3, 416:13, 421:16, 513:20

insurance [1] - 419:4

intend [1] - 402:7

intended [1] - 422:5

interest [28] - 434:3, 434:5, 435:6, 435:7, 435:8, 435:15, 436:13, 436:14,

437:21, 439:4, 440:3, 459:15, 464:10, 464:17, 465:8, 465:19, 498:16, 511:17, 514:22, 516:6, 516:10, 517:11, 517:12, 518:5, 518:9, 530:5, 530:7, 530:22

interested [1] - 413:11

interesting [1] - 425:12

interestingly [1] - 505:13

interests [1] - 533:9

internal [1] - 381:17

interrupting [1] - 413:16

interviewed [3] - 455:4, 455:14, 456:11

interviews [3] - 456:14, 456:20, 479:8

intimidated [1] - 477:20

intriguing [2] - 424:14, 424:23

introduced [10] - 423:16, 423:18, 452:7, 457:8, 473:9, 479:20,

479:22, 481:23, 507:22, 519:3

introduction [1] - 440:16

invest [5] - 412:18, 412:21, 421:19, 464:4, 504:2

invested [4] - 386:12, 392:8, 511:10, 525:23

investigated [1] - 426:21

investigation [1] - 391:2

investing [5] - 415:23, 421:17, 459:13, 461:10, 514:23

investment [25] - 386:13, 390:10, 393:12, 393:13, 406:13, 408:23, 413:5, 413:20, 421:14, 422:5, 422:8, 423:4, 425:14, 435:22, 436:6, 438:23, 460:18, 461:4, 461:25, 462:2, 462:10, 462:13,

463:20, 467:5, 511:13

investments [19] - 393:22, 413:17, 426:9, 438:10, 438:15, 440:13, 440:20, 442:11, 442:13, 461:12, 461:14, 461:17, 498:23, 504:14, 504:24, 510:24, 511:4, 511:9, 527:6

Investments [1] - 383:1

investor [1] - 507:9

investors [2] - 480:13, 529:25

involve [2] - 447:8, 461:15

involved [10] - 423:21, 427:25, 428:1, 438:20, 460:20, 481:19, 523:22, 525:21, 528:1, 528:18

involvement [2] - 459:6, 526:18

involving [2] - 450:7, 476:6

Islanders [6] - 459:18,

459:22,
460:1, 460:4,
508:12
**Islandia** [1] -
378:18
**Isle** [29] -
385:16,
386:9,
386:11,
386:13,
392:10,
394:6,
394:15,
394:20,
395:14,
397:16,
398:20,
461:1,
462:16,
463:21,
464:10,
464:19,
464:24,
465:2, 465:5,
466:2,
466:12,
467:4, 469:7,
480:22,
480:23,
481:4,
485:15, 486:2
**Islip** [3] -
378:6,
378:15,
378:23
**issue** [1] -
539:15
**issues** [4] -
473:5,
473:10,
539:20,
539:21
**items** [2] -
387:8, 388:1
**itself** [3] -
441:21,
451:5, 502:4
**IV** [25] -

385:16,
386:9,
386:11,
392:10,
394:6,
394:15,
395:14,
397:16,
398:20,
462:16,
463:21,
464:10,
464:11,
464:19,
464:24,
465:2, 465:6,
466:2,
466:12,
467:4,
480:22,
480:23,
481:4,
485:15, 486:2
**IV's** [1] -
469:7

# J

**JAMES** [1] -
378:15
**Jay** [2] -
500:10,
528:18
**jeopardy** [1] -
472:11
**JFB** [1] -
378:4
**Johnson** [1] -
382:12
**JOSEPH** [1] -
378:11
**Jowdy** [56] -
390:6, 391:4,
391:13,
393:16,
393:19,
393:20,
393:21,
393:25,

394:2, 394:4,
394:6, 394:7,
394:13,
394:16,
394:21,
395:12,
395:14,
396:19,
422:24,
423:14,
424:11,
424:17,
424:18,
426:6,
426:22,
427:2, 427:7,
427:9, 435:5,
449:9,
466:13,
466:14,
467:9,
467:18,
469:10,
472:3, 477:8,
479:17,
480:1,
480:22,
480:24,
481:3,
481:19,
504:24,
504:25,
507:9,
508:22,
510:22,
525:24,
526:1, 526:3,
526:13,
526:19,
527:9,
529:22,
532:23
**Judge** [16] -
412:24,
431:18,
432:2,
444:17,
445:14,

454:2,
455:12,
455:19,
471:1,
472:22,
473:7,
473:10,
493:22,
505:4,
531:14,
539:18
**JUDGE** [1] -
378:12
**judge** [5] -
396:11,
413:8,
448:25,
496:18,
536:24
**July** [18] -
397:18,
398:9,
398:14,
403:8, 448:2,
448:5,
448:13,
448:21,
484:15,
485:13,
485:16,
486:2,
486:16,
486:20,
488:3, 513:9
**June** [1] -
492:5
**Juneau** [2] -
440:6, 532:24
**jurors** [4] -
379:3, 380:5,
514:10, 522:9
**Jury** [2] -
474:7, 538:18
**JURY** [1] -
380:13
**jury** [57] -
378:12,
380:2,

380:10,
380:12,
383:23,
386:5,
389:15,
389:18,
390:15,
391:2, 391:3,
391:21,
392:1,
392:11,
392:13,
392:20,
395:11,
395:19,
395:20,
396:4, 396:5,
396:16,
411:19,
419:11,
420:7,
420:17,
420:18,
429:12,
430:7, 430:8,
430:10,
430:15,
447:13,
447:17,
447:19,
449:4,
466:19,
466:23,
467:25,
468:8,
468:17,
468:18,
468:23,
469:3,
471:13,
473:2, 474:4,
475:1, 475:6,
475:13,
503:3, 503:9,
512:22,
512:25,
527:14,
535:11,

535:13

**K**

**Kaisers** [1] -
539:13
**keep** [1] -
509:5
**keeping** [1] -
523:13
**Ken** [35] -
390:6, 391:4,
391:13,
393:16,
393:19,
393:20,
393:21,
393:25,
394:2, 394:4,
394:6, 394:7,
394:13,
394:16,
394:21,
395:12,
395:14,
396:19,
422:23,
424:11,
424:17,
424:18,
426:22,
435:5, 449:8,
466:13,
466:14,
472:3,
479:17,
480:1,
480:22,
480:24,
481:3,
508:22,
526:13
**KENNER** [1] -
378:7
**Kenner** [155]
- 378:7,
378:18,
381:13,
386:15,

388:17,
389:10,
389:25,
390:21,
391:1, 391:6,
391:22,
394:5,
395:15,
395:16,
396:2, 396:4,
397:9,
399:25,
400:16,
401:17,
402:10,
405:9, 406:7,
408:6, 409:6,
409:12,
410:20,
411:21,
413:2,
413:23,
415:10,
415:14,
415:19,
416:21,
417:7,
418:10,
418:24,
419:7,
419:14,
422:7,
422:16,
423:23,
425:14,
429:16,
429:21,
431:7, 433:3,
433:5,
435:21,
436:4,
438:15,
438:17,
440:25,
441:5,
441:15,
442:7, 443:3,
443:24,

444:22,
447:6, 447:9,
448:12,
448:22,
450:4, 450:7,
450:23,
451:17,
452:19,
453:3, 453:6,
453:10,
454:17,
456:1,
456:22,
456:25,
457:4,
457:13,
457:18,
457:23,
458:3, 458:9,
458:20,
458:25,
459:3, 459:7,
460:18,
460:21,
463:13,
465:12,
472:19,
474:19,
476:6,
476:24,
478:3,
478:17,
479:2, 480:6,
481:23,
483:2,
483:18,
484:7, 484:9,
484:15,
485:14,
486:4, 486:5,
487:2, 488:8,
488:16,
489:1, 489:2,
489:5,
489:11,
489:16,
489:17,
489:20,

489:25,
490:4, 490:5,
490:8,
490:15,
490:16,
490:19,
491:10,
491:13,
491:14,
491:17,
492:5,
494:15,
495:1,
495:14,
495:21,
496:9,
507:13,
507:19,
507:22,
508:18,
508:19,
508:21,
508:24,
509:7, 510:6,
510:25,
511:10,
513:9,
519:25,
520:24,
522:17,
532:22,
535:18,
541:19,
541:20,
541:21,
541:22,
541:23
**Kenner's** [2] -
407:4, 510:15
**kenner33@
gmail** [1] -
433:4
**kenner33@
gmail.com**
[1] - 492:6
**kind** [15] -
424:3, 424:8,
426:10,

427:24,
431:4,
451:24,
465:10,
467:16,
469:18,
472:4,
477:10,
486:7,
509:16, 525:1
**kindly** [9] -
455:25,
481:22,
484:14,
486:4, 488:8,
489:5,
489:20,
490:19,
491:17
**kinds** [1] -
396:15
**KMPGP** [1] -
495:2
**KMPGP@aol.
com** [2] -
431:21, 432:3
**kmpgp@aol.
com** [1] -
432:7
**knowing** [1] -
516:11
**knowledge** [9]
- 396:25,
427:1,
432:15,
436:9,
448:17,
454:16,
492:23,
493:13,
506:25
**known** [7] -
411:17,
412:1, 438:6,
457:4,
457:11,
468:24, 492:8
**KOMATIREDDY**

[4] - 378:16,
379:5,
379:13, 381:8
**Kristin** [3] -
433:8,
433:10, 539:1

**L**

**LA** [16] -
379:18,
380:1,
383:18,
404:17,
407:10,
411:1, 411:8,
412:14,
412:24,
413:8,
413:15,
414:3, 414:8,
417:4, 417:8,
417:21
**ladies** [1] -
537:19
**land** [8] -
426:6,
460:21,
460:25,
461:15,
461:21,
463:15,
465:6, 493:2
**landlord** [1] -
416:20
**LARUSSO** [66]
- 378:20,
421:4,
428:19,
431:17,
444:16,
446:21,
488:20,
488:22,
488:24,
489:12,
489:15,
490:3,
490:12,

491:12,
494:3, 494:5,
495:11,
495:12,
495:17,
497:23,
497:24,
499:9,
499:13,
499:25,
500:3,
500:22,
502:12,
503:2,
503:10,
503:20,
503:21,
505:4, 505:6,
506:22,
506:23,
512:12,
512:16,
512:22,
513:1, 515:9,
515:13,
521:15,
521:17,
521:24,
522:8,
523:24,
524:2,
525:13,
529:11,
529:12,
531:8,
531:11,
531:14,
534:8,
534:10,
534:23,
535:10,
535:14,
536:24,
537:3, 538:3,
538:7,
538:23,
539:17,
539:24, 541:8

**LaRusso** [5] -
488:23,
489:14,
494:2, 494:8,
538:22
**Las** [4] -
438:14,
438:24,
439:5, 439:16
**last** [13] -
399:14,
400:11,
407:19,
419:12,
443:1, 450:5,
471:9,
475:10,
488:9,
523:11,
523:12,
533:22,
536:25
**lastly** [2] -
449:13,
533:16
**latter** [1] -
420:1
**law** [3] -
429:10,
478:24,
479:15
**lawsuit** [5] -
406:2,
424:18,
430:4,
480:21,
526:21
**lawsuits** [5] -
394:10,
440:17,
530:19,
532:25, 533:1
**lawyer** [10] -
389:20,
389:22,
389:24,
390:18,
391:21,

395:23,
429:11,
435:5,
436:21, 480:4
**lawyer's** [1] -
480:5
**lawyers** [2] -
384:2, 516:12
**lay** [1] -
422:22
**laying** [1] -
424:4
**leading** [5] -
396:11,
435:24,
435:25,
436:2, 483:21
**League** [1] -
477:17
**learn** [1] -
510:7
**learned** [4] -
394:1, 449:8,
528:20,
528:24
**least** [6] -
421:13,
423:3,
445:14,
475:9,
476:16,
481:25
**leave** [3] -
379:22,
380:16, 514:1
**leaves** [1] -
538:18
**leaving** [1] -
513:23
**lectern** [1] -
380:4
**led** [1] -
449:10
**Led** [4] -
388:12,
388:15,
388:20,
448:15

**legal** [23] -
390:5, 424:5,
424:7, 424:8,
424:10,
433:24,
434:17,
434:18,
436:25,
437:7, 440:5,
464:3, 505:1,
508:25,
509:16,
525:17,
526:9,
526:10,
527:8,
529:21,
533:13,
533:17,
533:19
**legalese** [1] -
516:11
**legally** [1] -
509:22
**Lehman** [2] -
467:10, 493:1
**lender** [2] -
467:10,
485:14
**lending** [3] -
408:24,
467:11,
467:12
**length** [2] -
482:23,
486:21
**letter** [32] -
403:23,
404:11,
404:20,
405:7,
405:11,
407:16,
407:19,
407:22,
408:8,
410:13,
410:17,

410:19,
415:1, 415:9,
417:17,
418:4, 418:6,
418:8,
436:11,
437:20,
440:22,
441:4,
441:18,
475:19,
485:13,
486:20,
493:20,
502:7,
520:25,
523:8, 529:10
**letters** [3] -
411:13,
472:14,
472:16
**leverage** [1] -
424:19
**liability** [1] -
463:25
**lied** [1] -
411:23
**life** [3] -
396:7,
409:20, 419:4
**light** [1] -
412:13
**likely** [1] -
462:18
**limited** [4] -
415:4,
446:13,
447:13,
463:25
**line** [77] -
384:13,
384:14,
384:15,
384:19,
384:22,
385:7, 387:2,
388:14,
388:18,

389:3, 389:5,
389:10,
392:9, 393:1,
393:2, 393:9,
393:14,
394:3, 397:4,
397:5,
397:22,
398:5,
398:20,
399:8,
399:21,
399:22,
400:2,
400:14,
400:16,
400:24,
401:13,
401:14,
401:18,
401:21,
402:10,
402:21,
402:24,
403:3, 403:9,
403:10,
403:19,
403:21,
404:12,
405:2,
405:22,
406:9,
406:15,
407:25,
409:11,
409:23,
423:1,
452:19,
452:22,
453:2,
453:11,
454:11,
456:22,
462:9,
462:13,
462:18,
463:14,
464:9,

465:13,
465:18,
465:25,
466:11,
472:9,
474:14,
474:15,
475:19,
476:7, 476:8,
476:11,
492:21,
493:13,
493:17
**lines** [7] -
410:21,
442:15,
461:22,
467:6, 477:5,
480:25, 523:6
**listen** [5] -
443:25,
445:11,
446:5, 446:6,
538:16
**listened** [3] -
444:3, 445:8,
445:13
**listening** [2] -
447:18,
447:20
**litigation** [10]
- 394:13,
419:18,
422:23,
424:10,
424:17,
440:11,
440:12,
509:18,
526:11
**living** [9] -
403:22,
413:13,
422:19,
423:12,
425:6, 428:3,
435:18,
435:20, 436:4

**LLC** [21] -
385:16,
386:9,
386:11,
387:20,
388:13,
397:16,
421:24,
434:3, 434:4,
453:23,
463:20,
463:23,
465:6,
465:23,
485:15,
486:3, 492:9,
492:10,
518:10, 530:5
**loan** [31] -
386:6, 392:9,
393:17,
393:18,
393:19,
393:21,
393:25,
394:2, 394:7,
394:15,
394:16,
396:18,
400:12,
402:7,
404:24,
466:13,
467:9,
467:11,
467:13,
469:8, 469:9,
493:1, 493:8,
504:2,
506:17,
510:22,
526:4, 526:6,
526:15,
526:16,
526:18
**loaned** [3] -
466:7, 472:3,
480:23

**loans** [3] -
394:14,
395:13,
504:25
**LOC** [2] -
408:19,
408:21
**logical** [1] -
459:13
**look** [32] -
383:25,
386:18,
387:8,
392:18,
406:24,
414:2,
416:18,
423:17,
455:25,
456:7,
481:22,
481:24,
482:1,
482:19,
484:14,
484:16,
484:18,
488:8, 489:5,
489:12,
489:20,
489:22,
490:8,
490:19,
491:17,
492:4,
499:12,
499:17,
511:23,
521:4,
534:12,
537:15
**looked** [4] -
399:3,
409:24,
433:16,
437:11
**looking** [10] -
386:19,

416:17,
421:25,
451:21,
484:24,
491:18,
519:12,
520:17,
523:18, 533:2
**looks** [5] -
385:4,
402:17,
490:10,
491:8, 534:16
**LORETTA** [1] -
378:13
**Los** [1] -
479:24
**lose** [3] -
405:25,
428:10, 509:2
**loss** [2] -
410:18,
427:10
**losses** [2] -
426:22, 427:2
**lost** [3] -
408:11,
498:25,
527:15
**Ltd** [2] -
415:4, 416:2
**lunch** [3] -
379:23,
380:17, 473:1
**LYNCH** [1] -
378:13

**M**

**mail** [75] -
409:3,
430:20,
431:5, 431:8,
431:21,
431:22,
431:23,
431:24,
432:4, 432:5,
432:6, 432:8,

432:14,
432:25,
433:4, 433:5,
433:7,
436:11,
437:20,
450:7,
450:15,
450:19,
450:25,
451:13,
451:18,
451:21,
452:3, 452:4,
452:6, 452:7,
452:11,
452:14,
453:7,
483:14,
487:3,
491:21,
491:24,
492:3, 492:6,
494:23,
495:2, 496:7,
500:4, 500:5,
500:6,
500:10,
500:12,
502:4,
503:11,
505:13,
519:3, 519:7,
519:11,
519:16,
519:20,
520:1, 520:8,
520:14,
520:18,
521:9,
521:13,
521:21,
523:19,
524:3,
524:19,
531:6, 534:1,
534:14,
535:15,

535:17,
536:15,
537:11
**mailed** [2] -
482:12,
519:22
**mailing** [1] -
503:13
**mails** [6] -
500:8,
500:15,
500:18,
519:18,
535:24,
536:20
**main** [4] -
396:17,
423:21,
437:1, 487:22
**maintained** [2]
- 478:17,
492:14
**majority** [1] -
508:1
**Makika** [2] -
387:20,
480:23
**male** [1] -
480:5
**man** [1] -
412:4
**management**
[4] - 408:23,
454:24,
457:14,
457:24
**Management**
[9] - 415:4,
416:2, 416:9,
416:22,
422:3,
435:23,
436:7,
436:10,
476:25
**manager** [1] -
454:18
**managing** [1]

- 457:19
**Manhattan** [2]
- 389:15,
389:18
**March** [6] -
389:15,
392:14,
400:22,
401:8, 466:22
**margin** [2] -
414:16,
414:19
**mark** [1] -
484:19
**marked** [24] -
383:12,
386:16,
392:16,
397:11,
404:2,
406:22,
413:24,
414:1, 417:2,
417:11,
428:15,
430:23,
443:12,
445:20,
455:18,
456:1,
472:23,
484:15,
490:8, 499:7,
511:21,
521:3, 537:4
**market** [1] -
504:22
**Marriott** [1] -
508:10
**Mascarella** [2]
- 405:5,
539:10
**masks** [1] -
402:21
**math** [1] -
518:19
**matter** [5] -
380:15,

465:4,
468:21,
481:14,
520:23
**McKee** [4] -
500:10,
528:18,
528:20,
528:24
**mean** [22] -
402:23,
425:2,
427:22,
437:15,
440:4,
441:21,
446:2, 461:3,
461:10,
468:2,
469:13,
492:9,
495:19,
496:17,
500:11,
507:18,
508:18,
516:13,
529:20, 532:7
**meaning** [4] -
393:8, 403:7,
425:16,
492:23
**means** [5] -
385:17,
403:16,
414:16,
414:20,
463:25
**meant** [6] -
463:23,
528:16,
528:25,
529:1, 529:5,
531:9
**mechanical** [1]
- 378:25
**median** [1] -
445:2

**mediation** [7] - 394:17, 413:14, 424:12, 424:19, 425:1, 426:6, 481:15

**mediator** [1] - 481:11

**meet** [4] - 394:17, 412:7, 413:12, 475:4

**meeting** [35] - 390:12, 396:3, 419:7, 422:14, 422:18, 422:21, 422:22, 423:12, 426:12, 435:3, 435:18, 435:20, 436:4, 437:18, 438:3, 439:10, 451:4, 480:6, 480:13, 480:20, 480:21, 481:10, 481:11, 494:19, 495:20, 495:24, 499:3, 507:13, 508:15, 508:17, 509:10, 525:20, 529:7, 529:9, 529:14

**meetings** [1] - 479:11

**members** [5] - 380:12, 383:22, 411:19, 485:15, 486:2

**membership** [4] - 434:2, 514:22, 516:6, 530:3

**memorandum** [2] - 503:24, 506:10

**memorialize** [1] - 525:1

**memory** [5] - 462:23, 491:25, 492:1, 492:12, 493:7

**mention** [5] - 423:23, 437:10, 438:5, 438:9, 499:3

**mentioned** [7] - 440:7, 503:8, 512:24, 523:11, 532:8, 535:12, 537:22

**mentioning** [2] - 434:7, 495:18

**messed** [1] - 512:4

**met** [18] - 412:4, 412:8, 413:9, 413:18, 423:20, 424:13, 428:4, 429:14, 474:25, 479:17, 479:18,

494:11, 495:10, 496:6, 500:13, 536:14, 536:18, 536:19

**Mexican** [3] - 509:23, 525:24, 526:16

**Mexico** [6] - 449:9, 466:14, 469:8, 504:24, 509:18, 509:21

**MICHAEL** [2] - 381:1, 541:2

**Michael** [9] - 408:19, 415:14, 432:14, 433:8, 433:9, 479:21, 492:1, 513:20, 523:11

**might** [1] - 457:6

**Mike** [1] - 513:5

**million** [28] - 392:9, 399:20, 400:1, 402:20, 402:22, 406:1, 425:13, 426:10, 427:10, 436:21, 439:13, 439:15, 439:19, 439:22,

440:2, 441:1, 441:10, 441:11, 442:22, 451:22, 459:25, 460:16, 467:7, 467:14, 498:20, 504:4, 506:12

**mind** [1] - 428:8

**mind-set** [1] - 428:8

**mine** [2] - 394:12, 528:18

**Mineola** [1] - 378:21

**minor** [1] - 509:7

**minus** [1] - 400:12

**minute** [2] - 425:7, 445:7

**minutes** [9] - 435:10, 445:5, 451:5, 451:7, 496:14, 499:11, 519:5, 537:1, 538:23

**MISKIEWICZ** [71] - 378:15, 381:6, 384:5, 384:8, 392:22, 404:13, 404:15, 407:8, 407:13, 408:15, 408:18, 411:3, 411:5, 412:16,

414:4, 417:19, 420:3, 420:13, 420:21, 421:1, 428:17, 431:15, 432:20, 432:23, 444:13, 445:19, 446:13, 446:17, 447:25, 449:1, 449:16, 449:19, 452:9, 453:25, 455:10, 456:4, 458:22, 461:7, 463:16, 464:6, 464:13, 466:16, 466:20, 467:22, 468:4, 469:25, 471:3, 477:23, 481:6, 486:23, 488:19, 489:13, 490:2, 490:14, 491:11, 493:10, 500:24, 501:1, 502:2, 512:14, 522:1, 525:11, 531:7,

531:10,
534:25,
538:9, 539:2,
539:4,
539:10,
540:1, 541:4
**Miskiewicz** [7]
- 384:4,
420:20,
450:12,
451:20,
467:19,
468:12, 495:5
**Miskiewicz's**
[1] - 497:12
**missing** [2] -
441:22, 486:6
**mistaken** [1]
- 496:13
**moment** [11]
- 395:5,
410:17,
414:2, 432:2,
432:3, 438:8,
439:8,
449:16,
493:22,
499:9, 535:3
**Monday** [2] -
433:1, 523:11
**money** [99] -
381:16,
385:18,
386:12,
391:11,
391:15,
391:25,
392:4,
392:14,
393:8, 393:9,
393:16,
393:25,
394:2, 394:3,
394:5,
394:20,
395:11,
398:4,
398:16,

403:7,
403:17,
405:25,
406:5,
406:13,
406:15,
406:20,
410:18,
413:6,
413:20,
413:21,
415:19,
415:22,
416:1,
421:23,
423:8,
425:12,
426:3, 426:8,
428:10,
430:2, 430:9,
430:18,
434:16,
434:25,
435:12,
436:17,
436:24,
437:5,
439:19,
440:7,
441:22,
441:23,
442:4,
442:13,
442:20,
448:23,
449:8,
451:23,
459:22,
465:23,
465:25,
466:3, 466:4,
466:7, 467:3,
469:7, 469:8,
472:3, 476:8,
476:11,
476:12,
480:23,
481:4,

493:17,
495:6, 498:9,
498:24,
508:21,
509:3, 509:5,
509:19,
509:20,
509:23,
510:8, 510:9,
514:24,
516:17,
517:12,
518:18,
520:21,
525:23,
526:1, 526:6,
526:22,
530:18,
533:17, 539:6
**monies** [3] -
421:10,
425:9, 441:19
**month** [1] -
403:2
**monthly** [5] -
381:15,
400:8, 400:9,
454:22,
457:18
**months** [11] -
399:19,
408:13,
416:11,
424:13,
462:14,
516:1,
516:18,
517:4, 517:5,
518:19
**Moreau** [6] -
434:9, 440:6,
532:2,
532:13,
532:17, 533:4
**morning** [14]
- 380:11,
380:13,
380:15,

384:9,
384:10,
390:24,
392:7, 406:7,
422:13,
448:15,
519:5,
519:10,
524:9, 535:25
**most** [7] -
396:7,
437:17,
484:6, 487:5,
507:18,
507:24,
527:11
**mostly** [1] -
481:11
**move** [4] -
379:6,
379:14,
405:15,
411:16
**moved** [2] -
380:4, 462:15
**moves** [10] -
383:11,
404:15,
407:8, 411:6,
414:5,
417:19,
421:2,
428:17,
431:15,
444:13
**moving** [2] -
393:22,
422:23
**MP-5** [2] -
392:17,
392:21
**MR** [233] -
379:17,
379:18,
379:19,
380:1, 380:3,
381:6,
383:18,

383:19,
384:5, 384:8,
392:20,
392:22,
393:3, 393:5,
396:11,
396:14,
404:9,
404:13,
404:14,
404:15,
404:17,
407:8,
407:10,
407:11,
407:13,
408:15,
408:18,
411:1, 411:2,
411:3, 411:4,
411:5, 411:8,
411:10,
412:14,
412:16,
412:24,
413:8,
413:15,
414:3, 414:4,
414:8,
414:11,
417:4, 417:8,
417:19,
417:21,
417:22,
417:25,
420:3,
420:13,
420:21,
421:1, 421:4,
421:5,
426:24,
428:17,
428:19,
428:20,
431:15,
431:17,
431:18,
431:20,

432:2,
432:17,
432:20,
432:23,
435:24,
440:15,
442:1, 442:3,
442:24,
444:13,
444:16,
444:17,
444:20,
445:14,
445:19,
446:13,
446:17,
446:21,
446:22,
447:2,
447:11,
447:25,
448:25,
449:1,
449:16,
449:19,
449:21,
450:2, 452:9,
452:10,
453:25,
454:1,
455:10,
455:12,
455:18,
455:21,
455:24,
456:4, 457:7,
458:22,
460:9,
460:13,
461:7,
463:16,
463:18,
464:6,
464:13,
466:16,
466:20,
467:22,
467:23,

468:4,
469:25,
471:1, 471:3,
471:14,
472:1, 473:7,
474:10,
474:11,
476:21,
477:23,
478:1, 481:6,
486:23,
487:1,
488:16,
488:19,
488:20,
488:21,
488:22,
488:24,
488:25,
489:4,
489:11,
489:12,
489:13,
489:15,
489:19,
489:25,
490:2, 490:3,
490:7,
490:12,
490:14,
490:18,
491:10,
491:11,
491:12,
491:16,
491:20,
493:10,
493:22,
493:24,
494:3, 494:5,
495:11,
495:12,
495:17,
497:23,
497:24,
499:9,
499:13,
499:25,

500:3,
500:22,
500:24,
501:1, 502:2,
502:12,
503:2,
503:10,
503:20,
503:21,
505:4, 505:6,
506:22,
506:23,
512:12,
512:14,
512:15,
512:16,
512:18,
512:22,
513:1, 515:9,
515:13,
521:15,
521:17,
521:24,
522:1, 522:3,
522:8,
523:24,
524:2,
525:11,
525:13,
529:11,
529:12,
531:7, 531:8,
531:10,
531:11,
531:14,
534:8,
534:10,
534:23,
534:25,
535:2, 535:6,
535:10,
535:14,
536:24,
537:3, 538:3,
538:7, 538:9,
538:10,
538:23,
539:2, 539:4,

539:10,
539:17,
539:21,
539:24,
539:25,
540:1, 541:4,
541:6, 541:8,
**MS** [3] -
379:5,
379:13, 381:8
**Murphy** [1] -
394:12

**N**

**Naalehu** [4] -
492:8,
492:10,
492:14,
492:18
**NAALEHU** [1]
- 492:9
**name** [20] -
385:13,
385:14,
387:19,
388:19,
395:25,
397:14,
398:25,
412:5, 416:2,
424:2,
425:19,
450:3, 459:4,
480:5,
491:24,
494:8, 499:4,
532:13,
532:16,
532:19
**name's** [1] -
479:21
**names** [5] -
480:3,
482:13,
482:18,
500:11,
539:13
**Nash's** [1] -

480:17
**National** [1] -
477:16
**nature** [7] -
396:12,
419:4,
435:25,
437:13,
461:23, 484:3
**nave** [1] -
412:13
**necessarily** [4]
- 442:10,
462:4,
492:10, 529:1
**necessary** [6]
- 414:16,
414:19,
511:25,
513:16,
516:8, 536:10
**need** [5] -
437:24,
473:5, 477:5,
486:10,
537:15
**needed** [2] -
455:11,
508:21
**needing** [1] -
455:22
**needs** [1] -
486:11
**negotiate** [1]
- 504:21
**neighborhood**
[2] - 467:13,
498:20
**Nepal** [1] -
461:12
**net** [1] -
405:24
**never** [34] -
388:16,
393:18,
394:15,
394:21,
395:3,

399:10,
406:11,
407:19,
409:14,
410:8, 427:4,
438:3,
439:10,
440:7,
452:22,
452:23,
453:6, 463:5,
463:13,
464:15,
465:2, 465:3,
466:5, 466:9,
467:15,
468:15,
472:6,
474:13,
479:18,
479:19,
487:6, 487:9,
506:17
**nevertheless**
[1] - 441:17
**NEW** [1] -
378:1
**new** [4] -
434:3, 505:7,
530:5, 538:4
**New** [15] -
378:6,
378:15,
378:18,
378:21,
378:23,
395:25,
430:15,
459:18,
459:21,
460:1, 460:4,
466:24,
468:9, 469:4,
508:10
**newspaper** [1]
- 528:4
**next** [8] -
419:20,

460:12,
491:24,
501:3,
502:14,
527:22,
539:1, 539:14
**night** [2] -
538:17,
539:23
**nobody** [1] -
442:19
**Nolan** [6] -
401:23,
402:1, 402:5,
402:7,
402:11,
532:23
**non** [1] -
436:2
**non-leading**
[1] - 436:2
**none** [1] -
379:17
**north** [1] -
424:21
**Northern** [25]
- 383:5,
384:12,
384:15,
385:14,
387:19,
397:15,
404:11,
405:5,
405:13,
405:17,
406:3, 407:3,
408:20,
474:15,
474:16,
474:21,
476:1, 476:6,
476:9,
492:15,
492:19,
493:9,
493:18,
493:19,

539:10
**northwestern**
[1] - 390:7
**nos** [1] -
440:23
**notarized** [1]
- 489:9
**note** [9] -
397:24,
399:8,
399:16,
401:10,
402:17,
403:7,
403:13,
412:17,
503:16
**nothing** [6] -
400:13,
442:11,
451:16,
465:24,
477:15, 527:2
**notice** [6] -
403:20,
512:10,
516:4, 516:7,
517:3, 517:7
**noticed** [1] -
416:20
**notified** [7] -
393:19,
403:19,
407:23,
423:1,
424:15,
466:9, 486:9
**November** [3]
- 503:16,
504:9, 505:24
**number** [26] -
379:6, 386:1,
386:4, 386:6,
386:7, 386:8,
387:2,
394:10,
398:6,
398:25,

404:24,
405:1,
408:20,
415:4, 415:5,
421:10,
456:11,
462:25,
475:25,
513:7,
520:14,
521:14,
524:5,
527:14,
536:20,
539:12
**numbers** [5] -
379:10,
384:14,
446:16,
456:5, 465:9
**numerous** [1]
- 536:20

## O

**oath** [1] -
380:23
**object** [5] -
396:11,
435:24,
435:25,
471:9, 502:2
**objections** [2]
- 432:18,
446:19
**obstructing**
[1] - 380:5
**obtain** [2] -
453:3, 453:11
**obtained** [2] -
493:1, 523:10
**obtaining** [1]
- 531:22
**obvious** [1] -
478:12
**obviously** [3]
- 428:9,
433:8, 447:20
**occasion** [2] -

475:10, 508:8
**occasions** [6]
- 455:7,
455:15,
474:13,
475:8, 488:3,
527:14
**occur** [3] -
390:11,
452:2, 487:18
**occurred** [7] -
390:12,
395:24,
402:18,
413:10,
417:5,
472:13,
479:23
**occurs** [3] -
399:16,
522:21, 524:9
**October** [5] -
385:4, 385:5,
387:21,
388:24,
399:24
**OF** [3] -
378:1, 378:3,
378:8
**offer** [5] -
427:9,
488:16,
489:11,
489:25,
491:10
**offered** [1] -
414:11
**offices** [1] -
429:10
**often** [2] -
443:6, 487:5
**Ohio** [2] -
422:20,
494:12
**old** [2] -
512:4, 512:9
**Old** [1] -
378:21

**OLIVERAS** [1] - 378:20
**Olympics** [2] - 402:2, 402:3
**once** [3] - 456:22, 462:17, 467:12
**one-page** [1] - 514:7
**ones** [3] - 410:22, 490:23, 515:12
**ongoing** [1] - 510:13
**onward** [1] - 394:9
**open** [2] - 388:14, 503:1
**opened** [7] - 384:22, 385:7, 389:11, 397:4, 400:25, 401:15, 401:18
**opening** [2] - 403:3, 493:18
**operating** [6] - 434:4, 464:23, 465:1, 466:5, 466:7, 530:6
**opinion** [3] - 416:10, 476:22, 509:11
**opportunity** [8] - 441:22, 442:5, 446:5, 463:8, 471:6, 499:12, 520:20, 537:15
**option** [32] - 442:21,

479:3, 511:13, 511:17, 511:18, 513:13, 513:21, 514:4, 514:21, 514:25, 515:1, 515:3, 515:4, 515:12, 515:14, 515:16, 515:20, 515:22, 515:23, 516:3, 516:5, 516:17, 516:25, 517:2, 517:5, 517:6, 517:10, 517:14, 517:16, 517:18, 517:21, 517:22
**optionee** [11] - 515:15, 515:19, 515:23, 516:3, 516:8, 516:9, 516:25, 517:1, 517:3, 517:8, 517:9
**optionee's** [2] - 516:4, 516:10
**optionor** [6] - 515:15, 516:4, 516:5, 517:1, 517:3, 517:8
**orally** [1] - 525:2
**order** [4] -

390:9, 486:10, 487:22, 530:19
**original** [1] - 523:18
**originally** [1] - 524:19
**orthodox** [1] - 428:6
**outcome** [1] - 440:17
**outset** [1] - 393:18
**outside** [2] - 496:24, 530:19
**overdue** [1] - 407:25
**overhearing** [1] - 497:3
**Overruled** [4] - 477:24, 481:7, 502:10, 525:12
**overruled** [3] - 458:23, 464:7, 466:17
**oversee** [1] - 509:16
**owe** [1] - 402:4
**owed** [1] - 481:3
**Owen** [4] - 401:23, 402:1, 402:11, 532:23
**own** [6] - 396:9, 426:21, 443:9, 461:15, 465:6, 517:23
**owner** [1] - 412:1

**ownership** [9] - 434:4, 436:12, 436:14, 437:21, 439:4, 464:10, 464:17, 516:9, 530:7

**P**

**package** [1] - 486:3
**packet** [2] - 482:14, 482:16
**page** [36] - 392:18, 393:3, 397:19, 399:5, 399:15, 414:18, 419:20, 481:25, 482:12, 482:17, 482:19, 482:23, 483:1, 483:17, 484:12, 484:18, 485:10, 485:16, 485:21, 485:25, 486:2, 486:11, 487:4, 487:15, 488:9, 501:3, 502:14, 505:22, 505:23, 506:4, 506:5, 513:2, 513:15,

514:4, 514:7
**pages** [12] - 482:2, 484:17, 485:21, 485:22, 486:15, 486:16, 486:21, 487:13, 505:22, 511:24, 513:17, 537:6
**paid** [12] - 387:9, 388:1, 388:2, 388:12, 388:20, 427:23, 430:9, 435:12, 462:14, 467:15, 472:9, 516:12
**Palms** [16] - 434:6, 434:7, 437:25, 438:2, 438:4, 438:6, 438:8, 438:9, 438:11, 438:13, 438:24, 439:5, 440:21, 495:18, 530:8
**paper** [2] - 442:11, 459:4
**paragraph** [6] - 451:8, 482:20, 485:4, 485:11, 486:1, 503:22
**paragraphs** [2] - 484:25, 515:2
**paraphrasing**

[2] - 477:10, 477:11

**parcel** [4] - 390:7, 424:21, 424:25, 426:6

**pardon** [1] - 389:4

**part** [27] - 393:22, 399:14, 415:19, 419:18, 421:13, 423:24, 427:23, 434:10, 434:15, 440:1, 440:13, 462:13, 464:11, 484:6, 485:8, 486:3, 486:7, 498:22, 503:12, 507:24, 509:24, 525:19, 526:21, 527:11, 532:3, 532:5, 533:7

**participate** [4] - 427:19, 507:19, 509:7, 509:13

**participation** [1] - 510:15

**particular** [8] - 385:14, 395:4, 398:18, 445:5, 445:6, 459:15, 506:17, 532:8

**particularly** [3] - 461:4,

464:3, 488:9

**parties** [3] - 379:14, 381:9, 414:5

**partner** [2] - 438:5, 438:7

**parts** [3] - 393:21, 486:6, 497:9

**party** [1] - 379:7

**patent** [1] - 411:23

**pause** [8] - 482:5, 484:20, 488:10, 491:19, 493:23, 499:19, 512:17, 535:5

**Pause** [2] - 393:6, 414:2

**pay** [11] - 389:20, 391:25, 392:2, 396:19, 402:11, 467:12, 480:23, 515:15, 516:17, 517:8, 526:22

**paying** [2] - 433:24, 525:17

**payment** [5] - 391:22, 454:23, 513:21, 515:14, 517:1

**payments** [1] - 407:25

**PDT** [1] - 522:25

**Peca** [30] - 380:21,

380:22, 384:9, 384:11, 389:3, 408:19, 411:16, 415:14, 420:9, 420:22, 421:10, 447:3, 448:1, 450:3, 474:12, 494:6, 503:11, 511:21, 513:3, 513:5, 521:3, 522:10, 527:13, 528:22, 531:17, 534:11, 535:16, 538:19, 539:1, 539:6

**PECA** [2] - 381:1, 541:2

**Peca's** [2] - 431:21, 539:6

**pending** [3] - 391:3, 394:10, 424:12

**penthouse** [4] - 438:5, 438:7, 438:23, 439:5

**people** [8] - 411:24, 424:6, 429:23, 439:8, 454:6, 479:20, 480:12, 503:12

**peoples'** [1] - 435:13

**per** [2] - 392:9, 524:20

**percent** [4] - 465:6, 465:8, 516:6, 516:10

**percentage** [7] - 439:23, 465:8, 523:9, 524:4, 524:14, 531:24, 535:23

**percentages** [6] - 440:9, 523:21, 530:16, 530:20, 531:21, 533:14

**performance** [1] - 460:10

**perhaps** [2] - 478:12, 491:22

**period** [11] - 385:7, 388:14, 397:17, 399:24, 410:2, 412:22, 416:11, 419:5, 419:15, 419:17, 517:4

**periodic** [1] - 419:16

**permission** [1] - 380:4

**permit** [1] - 457:22

**permitted** [1] - 446:14

**Perry** [1] - 378:22

**person** [8] - 412:8, 426:1, 428:9,

468:24, 479:14, 496:8, 496:24, 532:13

**person's** [1] - 459:1

**personal** [3] - 409:8, 427:1, 504:25

**personally** [2] - 413:18, 493:17

**perspective** [1] - 509:25

**persuasive** [1] - 454:4

**pertains** [1] - 449:14

**Phil** [103] - 389:25, 391:6, 394:5, 394:19, 395:15, 395:16, 396:2, 397:9, 405:9, 407:4, 409:2, 409:5, 409:6, 411:21, 413:23, 415:10, 415:14, 416:21, 418:23, 419:12, 423:16, 423:22, 424:5, 424:6, 425:14, 427:16, 429:21, 431:7, 433:3, 438:7, 443:24, 444:22, 447:6, 447:8, 448:12,

450:3,
450:23,
451:17,
451:19,
452:18,
453:3, 453:6,
453:10,
453:22,
454:4,
454:17,
456:22,
456:25,
457:4,
457:13,
457:18,
457:23,
458:3, 458:9,
458:18,
458:19,
458:20,
458:25,
459:3, 459:7,
460:17,
460:21,
462:23,
463:13,
465:12,
472:19,
474:19,
476:6,
476:24,
478:3,
478:17,
479:2, 480:6,
482:25,
483:10,
483:12,
483:18,
483:20,
484:1, 484:3,
484:7, 484:9,
486:4, 486:5,
487:2, 487:7,
487:13,
487:15,
492:5, 495:1,
508:24,
509:4,

509:18,
509:21,
510:6,
510:15,
513:9, 514:3,
519:25,
520:3, 528:1
**Philip** [3] -
378:7,
386:15,
418:10
**Phillip** [2] -
381:12,
485:14
**PHILLIP** [1] -
378:7
**Phoenix** [1] -
415:6
**phone** [13] -
424:24,
425:5, 425:6,
425:7,
425:18,
425:24,
426:1,
478:19,
496:14,
498:3, 498:5,
498:12,
498:14
**phone,** [1] -
396:2
**phrased** [1] -
442:5
**phraseology**
[1] - 468:1
**phrases** [1] -
524:12
**piece** [2] -
428:25, 459:4
**Pittsburgh** [2]
- 428:3,
428:4
**place** [9] -
390:9,
409:14,
453:16,
456:14,

470:3, 493:6,
506:11,
510:25, 511:4
**Place** [4] -
434:6,
437:25,
439:5, 530:8
**placing** [1] -
426:7
**plan** [3] -
441:21,
460:18,
535:20
**play** [4] -
448:19,
449:1,
449:13,
460:12
**played** [8] -
427:24,
448:8,
448:20,
449:3,
449:15,
477:18,
532:15,
532:17
**player** [6] -
395:25,
402:1,
427:24,
428:1,
438:21,
480:12
**players** [7] -
386:12,
428:7,
429:24,
460:5,
478:19,
507:2, 518:14
**playing** [2] -
460:6, 477:16
**playoffs** [1] -
460:7
**Plaza** [2] -
378:14,
378:23

**plus** [1] -
517:12
**pocket** [2] -
430:12,
430:13
**point** [50] -
380:22,
393:17,
394:1,
406:11,
409:13,
410:21,
426:12,
429:14,
432:13,
433:22,
436:9, 437:8,
440:19,
441:21,
442:18,
449:7,
452:17,
453:1,
453:10,
454:19,
456:21,
457:3, 458:9,
458:20,
459:17,
460:25,
463:12,
467:1,
467:16,
467:17,
468:7,
474:17,
476:7,
478:20,
479:17,
486:19,
488:2,
492:25,
493:15,
493:19,
496:15,
498:2,
503:19,
506:4,

507:14,
509:7,
515:14,
518:4,
525:22,
539:18
**pointed** [1] -
512:10
**pointing** [2] -
387:3, 401:11
**points** [1] -
507:12
**portfolio** [2] -
457:19, 459:9
**portion** [19] -
406:6,
408:11,
422:4,
439:15,
445:4, 448:6,
471:6, 471:9,
476:8,
495:14,
497:3,
498:17,
510:19,
510:21,
521:20,
522:10,
524:13, 539:6
**portions** [2] -
495:4, 515:10
**posed** [1] -
395:3
**position** [4] -
415:20,
462:16,
518:2, 527:13
**possessed** [1]
- 410:21
**possession** [2]
- 410:7,
453:11
**possibility** [1]
- 493:5
**possible** [1] -
529:24
**possibly** [3] -

409:16, 455:16, 457:20

**potentially** [1] - 502:7

**power** [1] - 418:25

**PR** [3] - 433:25, 527:22, 528:4

**practicing** [1] - 459:1

**preceding** [1] - 483:25

**prejudice** [1] - 460:9

**preliminary** [1] - 500:1

**premise** [2] - 424:6, 437:1

**prep** [1] - 396:24

**prepaid** [2] - 411:22, 411:25

**preparation** [7] - 395:22, 395:24, 396:8, 396:16, 396:17, 399:11, 475:5

**prepared** [2] - 395:19, 396:4

**preparing** [1] - 475:13

**presence** [2] - 458:25, 489:9

**present** [5] - 395:22, 396:1, 480:2, 480:6, 494:17

**presented** [1] - 435:11

**president** [1] - 405:5

**presumably** [1] - 460:1

**pretty** [2] - 405:24, 477:11

**previous** [1] - 440:17

**previously** [5] - 381:2, 450:23, 451:14, 460:6, 479:9

**price** [2] - 498:21, 516:2

**primarily** [3] - 432:5, 433:7, 510:1

**printing** [1] - 431:13

**proceed** [3] - 384:1, 384:3, 457:25

**proceeded** [1] - 396:2

**proceeding** [1] - 468:22

**Proceedings** [1] - 378:25

**proceedings** [9] - 479:2, 482:5, 484:20, 488:10, 491:19, 493:23, 499:19, 512:17, 535:5

**proceeds** [2] - 397:24, 507:1

**process** [2] - 462:3, 462:5

**produced** [1] - 378:25

**professional** [1] - 402:1

**profitable** [1] - 461:5

**program** [3] - 411:23, 459:7, 459:9

**project** [15] - 424:22, 434:5, 462:19, 463:15, 465:24, 466:1, 466:2, 466:14, 469:8, 493:3, 504:3, 505:7, 525:24, 526:16, 530:8

**Project** [2] - 436:13, 436:15

**promise** [1] - 463:14

**prompt** [1] - 473:11

**proper** [3] - 454:15, 454:17, 471:8

**properly** [1] - 518:3

**property** [9] - 390:8, 397:7, 425:11, 426:14, 462:1, 463:5, 463:9, 498:17

**proportionate** [1] - 524:23

**proposal** [1] - 462:8

**propose** [1] - 379:9

**proposed** [3] - 437:4, 437:6, 440:4

**proposing** [1] - 459:7

**prosecution** [1] - 391:4

**prosecutor** [1] - 383:23

**prospectus** [1] - 437:12

**protective** [3]

- 433:25, 528:11, 528:13

**provide** [8] - 424:19, 447:17, 471:1, 504:4, 506:11, 516:9, 518:21, 533:24

**provided** [2] - 401:20, 518:20

**providing** [5] - 434:18, 454:24, 504:9, 533:18, 537:23

**provision** [3] - 457:22, 458:4, 466:10

**provisions** [1] - 466:6

**prudent** [1] - 520:19

**publish** [1] - 446:15

**published** [3] - 503:8, 512:24, 535:12

**pull** [1] - 430:16

**purchase** [9] - 424:25, 426:7, 461:21, 498:21, 504:2, 514:4, 514:22, 515:23, 516:1

**purchased** [3] - 438:18, 462:24, 511:16

**purchasing** [1]

- 498:17

**purpose** [14] - 386:12, 389:6, 389:13, 391:1, 392:7, 392:15, 397:5, 422:21, 422:22, 424:14, 425:8, 446:14, 526:3, 537:24

**purposes** [5] - 447:13, 462:9, 504:11, 504:16, 506:13

**put** [13] - 406:9, 407:17, 408:1, 408:9, 413:1, 424:8, 441:8, 441:9, 456:1, 467:3, 477:7, 487:17, 528:4

**putting** [1] - 466:1

## Q

**quarter** [12] - 436:20, 439:13, 439:15, 439:18, 439:22, 440:2, 440:25, 441:9, 441:10, 441:11, 442:22, 451:20

**quarterly** [1] - 400:8

**quick** [3] - 432:2, 473:8, 489:12
**quite** [1] - 395:8
**quote** [3] - 504:4, 523:8
**quotes** [1] - 523:7

**R**

**raising** [1] - 518:18
**ran** [1] - 409:9
**rang** [1] - 453:14
**range** [2] - 397:17, 398:8
**rate** [1] - 459:15
**rather** [5] - 379:8, 424:6, 434:16, 454:14, 533:16
**re** [1] - 535:18
**Re** [1] - 408:19
**reached** [2] - 460:25, 533:4
**ready** [3] - 379:4, 424:24, 426:14
**real** [7] - 386:12, 426:4, 426:13, 461:4, 464:4, 466:8, 530:7
**Real** [3] - 434:5, 436:13, 436:15
**realized** [1] - 426:10

**reason** [8] - 416:7, 423:21, 463:12, 464:8, 464:16, 482:10, 498:11, 505:9
**reasons** [2] - 487:10, 487:11
**reassured** [2] - 405:12, 406:12
**rebuild** [1] - 411:24
**receipt** [2] - 485:13, 520:13
**receive** [9] - 422:10, 430:19, 432:13, 476:14, 482:11, 482:15, 483:4, 485:20, 488:4
**received** [41] - 386:16, 397:11, 403:22, 403:23, 421:9, 423:4, 423:7, 428:22, 432:7, 432:21, 445:17, 446:25, 451:12, 451:17, 472:14, 474:13, 475:18, 476:8, 483:8, 484:7, 485:8, 485:23,

486:20, 489:3, 489:18, 490:6, 490:17, 491:15, 496:7, 500:23, 503:6, 512:20, 518:2, 519:5, 521:25, 522:6, 523:12, 523:17, 534:23, 535:8, 538:12
**receiving** [13] - 434:1, 452:20, 482:16, 483:16, 491:25, 492:1, 492:12, 492:17, 493:8, 500:19, 517:7, 524:5, 530:3
**recently** [1] - 435:8
**recess** [3] - 379:24, 420:15, 473:13
**recipient** [2] - 415:5, 431:6
**recognize** [28] - 404:4, 404:7, 404:10, 406:25, 407:2, 412:9, 417:13, 417:15, 430:25, 431:2,

443:15, 443:17, 484:22, 485:10, 488:11, 489:7, 490:9, 490:21, 490:22, 490:24, 499:21, 500:9, 500:10, 500:11, 512:8, 521:6, 534:17, 537:9
**recollection** [12] - 393:7, 398:19, 448:4, 455:9, 456:10, 456:13, 477:9, 480:15, 484:1, 485:24, 488:2, 534:5
**recommended** [1] - 463:20
**reconvene** [2] - 472:25, 538:15
**recorded** [12] - 378:25, 400:13, 443:19, 444:1, 447:3, 447:6, 448:1, 478:4, 478:13, 479:5, 479:10, 479:14
**recording** [9] - 447:18, 447:20, 448:4, 448:6, 448:22, 478:5, 478:6,

478:8, 478:16
**records** [40] - 379:6, 379:14, 381:10, 381:14, 381:20, 381:22, 381:25, 382:3, 382:7, 382:9, 382:12, 382:14, 382:16, 382:18, 382:20, 382:22, 382:24, 383:1, 383:3, 383:5, 383:15, 396:21, 407:3, 408:21, 409:1, 410:6, 410:22, 437:12, 452:19, 453:4, 453:11, 453:23, 454:12, 456:22, 464:12, 464:15, 474:16, 474:20, 474:21, 487:17
**recover** [4] - 441:23, 442:5, 451:13, 527:15
**red** [1] - 403:10
**reduction** [1] - 455:11

**refer** [3] - 481:25, 506:4, 519:4
**reference** [3] - 400:10, 414:24, 486:16
**referenced** [5] - 383:15, 383:20, 404:24, 418:11, 541:12
**references** [1] - 486:1
**referencing** [3] - 485:16, 513:13, 523:3
**referring** [2] - 418:17, 523:16
**refers** [1] - 485:17
**reflect** [1] - 384:17
**reflected** [3] - 421:11, 464:11, 518:1
**reflecting** [2] - 434:4, 530:6
**refresh** [5] - 393:7, 448:3, 455:9, 456:10, 456:13
**refreshed** [1] - 455:11
**refund** [1] - 440:19
**regarding** [15] - 384:12, 403:20, 415:11, 438:4, 450:12, 474:14, 475:19,

486:5, 502:5, 504:11, 509:18, 519:12, 523:16, 536:21, 538:17
**regards** [4] - 507:13, 514:12, 533:7, 534:20
**related** [2] - 504:24, 510:24
**relates** [4] - 457:13, 457:23, 483:2, 492:19
**relating** [3] - 498:11, 515:12, 529:22
**relationship** [7] - 419:6, 456:25, 457:13, 458:7, 458:10, 486:8, 486:13
**relative** [1] - 519:18
**relatively** [1] - 539:3
**religion** [1] - 428:6
**remained** [2] - 476:12, 478:18
**remedy** [2] - 434:19, 533:19
**remember** [60] - 392:10, 392:13, 412:2, 425:8, 425:19, 450:20,

452:4, 452:5, 453:4, 453:13, 453:14, 453:17, 457:15, 457:21, 462:25, 465:10, 465:20, 477:4, 478:7, 479:7, 479:16, 480:3, 480:18, 480:25, 481:1, 481:2, 481:14, 481:18, 482:12, 482:14, 482:16, 482:17, 485:22, 485:25, 487:21, 496:23, 497:3, 497:14, 497:21, 498:1, 498:5, 498:8, 498:10, 498:12, 506:11, 508:15, 509:17, 509:19, 511:14, 511:19, 512:1, 519:24, 520:3, 520:12, 520:17, 520:23, 533:20, 534:4, 534:7,

536:2
**remembered** [1] - 498:12
**remembering** [1] - 396:9
**remind** [1] - 380:22
**remove** [1] - 418:10
**removed** [3] - 419:3, 441:5, 511:24
**repeat** [5] - 410:4, 410:6, 436:3, 446:16, 531:16
**repeatedly** [1] - 465:23
**rephrase** [2] - 467:23, 531:15
**replenish** [1] - 476:16
**reply** [4] - 521:21, 522:16, 522:21, 535:25
**report** [1] - 503:23
**reported** [1] - 443:23
**Reporter** [1] - 378:22
**reporting** [1] - 537:20
**reports** [2] - 409:15, 474:14
**represent** [3] - 391:25, 450:3, 494:8
**representations** [2] - 450:15, 451:9
**represented** [6] - 389:17,

429:11, 451:5, 468:13, 529:2
**represents** [1] - 445:3
**reproduced** [1] - 521:18
**request** [6] - 408:25, 464:23, 474:16, 474:21, 533:3, 534:20
**requested** [4] - 416:18, 418:22, 430:15, 533:23
**required** [1] - 486:22
**residence** [1] - 409:8
**resolve** [1] - 481:15
**respect** [1] - 466:13
**respects** [1] - 509:8
**respond** [3] - 395:6, 519:20, 533:25
**responded** [1] - 448:11
**response** [9] - 395:7, 418:15, 452:14, 477:10, 477:12, 527:20, 531:19, 534:14, 534:20
**responsible** [1] - 510:1
**rest** [2] - 487:8, 487:16

**result** [7] - 405:20, 427:22, 440:12, 460:2, 476:5, 520:19, 530:22

**resumes** [1] - 474:5

**retain** [1] - 462:15

**retainer** [1] - 468:15

**retaining** [1] - 505:2

**retired** [1] - 477:18

**retirement** [1] - 476:17

**return** [8] - 423:4, 440:20, 462:1, 463:14, 477:14, 513:22, 513:24, 516:25

**returned** [2] - 459:15, 498:24

**review** [5] - 485:6, 487:17, 518:20, 520:20, 524:18

**reviewed** [1] - 530:12

**RICHARD** [1] - 378:17

**Richards** [28] - 389:23, 390:18, 391:6, 391:21, 391:25, 395:20,

395:24, 396:2, 396:3, 429:10, 429:14, 429:17, 430:9, 430:10, 430:14, 433:14, 439:14, 441:12, 468:13, 468:14, 468:18, 469:2, 474:25, 495:7, 509:15, 510:6, 510:13, 526:11

**Richards'** [3] - 391:16, 451:15, 524:23

**Rick** [1] - 450:3

**rights** [1] - 460:3

**rise** [2] - 380:9, 474:6

**risk** [1] - 462:13

**Road** [3] - 378:21, 409:4, 409:7

**roads** [1] - 461:22

**Robert** [2] - 494:8, 505:24

**ROBERT** [1] - 378:20

**role** [1] - 517:15

**roller** [2] - 512:5, 512:9

**Ron** [18] - 391:6,

391:21, 395:20, 395:24, 396:2, 396:3, 433:14, 439:14, 441:12, 451:15, 468:13, 474:25, 495:7, 509:15, 510:6, 510:13, 524:22, 526:10

**Ronald** [4] - 389:23, 391:16, 429:10, 469:1

**room** [14] - 395:24, 413:13, 422:19, 423:12, 425:6, 435:18, 435:20, 436:4, 479:19, 479:20, 480:9, 481:12, 497:7

**roommates** [1] - 402:3

**roughly** [1] - 398:8

**routing** [1] - 415:4

**Rucchin** [1] - 480:16

**rules** [1] - 446:14

**ruling** [1] - 502:5

**run** [1] - 424:5

**Russo** [1] -

404:16

# S

**safe** [2] - 406:13, 406:19

**safety** [1] - 405:23

**sale** [4] - 425:10, 461:25, 498:22, 498:23

**SARITHA** [1] - 378:16

**sat** [1] - 493:16

**satisfaction** [1] - 443:9

**satisfied** [2] - 446:9, 477:12

**save** [1] - 384:2

**saving** [1] - 431:10

**savings** [1] - 408:11

**scanned** [2] - 519:22, 519:24

**scenario** [1] - 504:22

**scheduling** [1] - 380:15

**Schwab** [11] - 413:21, 414:23, 414:24, 415:2, 416:18, 418:7, 418:9, 429:4, 441:4, 441:6, 462:15

**Scottsdale** [1] - 409:4

**screen** [4] - 386:20, 397:14,

414:15, 432:24

**seated** [8] - 380:11, 420:9, 420:16, 468:18, 473:4, 474:3, 474:8, 538:21

**second** [14] - 386:20, 399:5, 399:15, 405:5, 413:13, 448:11, 456:18, 488:20, 505:23, 512:2, 514:4, 516:24, 517:10, 525:16

**seconds** [2] - 445:6, 522:22

**secret** [1] - 468:22

**secretly** [4] - 478:13, 479:5, 479:10, 479:14

**secretly-recorded** [4] - 478:13, 479:5, 479:10, 479:14

**secure** [1] - 506:12

**securities** [1] - 515:10

**security** [1] - 405:21

**seeing** [6] - 399:13, 431:10, 482:14,

483:6,
485:22,
485:25
**seek** [2] -
458:3, 478:23
**seeking** [1] -
520:24
**seem** [3] -
454:5,
510:17,
524:10
**seized** [1] -
467:15
**select** [1] -
507:2
**selections** [2]
- 444:11,
444:12
**send** [20] -
407:3,
410:19,
413:20,
417:17,
422:5,
429:19,
432:12,
482:25,
483:10,
483:15,
483:19,
484:13,
486:11,
486:12,
487:4, 487:7,
487:13,
487:16,
534:2, 535:25
**sending** [4] -
418:3, 418:6,
484:2, 520:3
**sensitive** [1] -
432:11
**sent** [33] -
398:20,
403:21,
405:4, 409:1,
409:12,
410:13,

414:23,
415:9, 416:8,
429:3, 429:4,
429:6, 431:7,
432:6,
433:14,
433:19,
434:25,
436:20,
436:24,
439:13,
439:22,
441:4,
441:10,
441:11,
450:18,
453:7, 486:4,
487:3, 495:6,
520:8,
524:19,
525:24,
534:17
**sentence** [3] -
433:13,
525:16,
533:22
**sentences** [1]
- 467:21
**separately** [1]
- 392:2
**September** [2]
- 456:17,
456:19
**sequence** [1]
- 456:1
**Sergei** [2] -
428:2, 428:6
**series** [5] -
384:12,
397:10,
415:25,
450:11,
450:16
**serve** [2] -
456:10,
456:13
**server** [1] -
519:8

**services** [1] -
454:24
**SESSION** [1] -
474:1
**session** [1] -
396:25
**set** [3] -
428:8,
450:15,
457:12
**settle** [2] -
440:8, 530:19
**settled** [5] -
434:9, 440:6,
440:7, 532:2
**settlement**
[20] - 406:3,
424:20,
434:1,
434:12,
434:13,
481:2, 504:5,
504:13,
504:22,
509:21,
518:24,
523:4,
528:12,
529:19,
530:18,
532:22,
533:3,
535:18,
535:19,
535:22
**Settlement**
[40] - 390:2,
390:4, 390:5,
391:7, 391:9,
391:23,
392:3,
422:12,
424:2, 424:9,
427:20,
428:12,
430:17,
430:18,
434:10,

436:25,
437:1,
450:14,
451:14,
495:6,
504:11,
506:14,
507:6,
509:12,
510:4,
510:11,
518:25,
519:13,
520:21,
524:24,
527:2, 528:8,
528:19,
530:22,
532:3, 533:8,
534:5,
534:21,
537:22,
537:24
**settling** [1] -
435:12
**several** [5] -
390:13,
408:13,
442:16,
474:12, 482:2
**shall** [4] -
516:2, 516:3,
516:5, 517:8
**share** [4] -
431:24,
505:2, 505:5,
507:3
**shares** [2] -
516:18,
524:14
**Shimon** [1] -
539:5
**shocking** [2] -
404:8, 475:20
**short** [7] -
462:10,
462:12,
467:9,

467:11,
469:9, 539:3,
539:4
**shorter** [2] -
496:21,
496:22
**shortly** [2] -
398:11,
430:19
**shot** [1] -
509:22
**showed** [5] -
398:22,
400:15,
400:19,
492:3, 494:23
**shown** [3] -
397:13,
471:6, 472:23
**sic** [3] -
434:12,
451:16,
467:16
**sick** [1] -
508:16
**side** [2] -
408:23,
408:24
**sidewalk** [1] -
394:24
**sign** [12] -
459:3,
483:11,
483:13,
483:14,
483:19,
483:23,
484:12,
486:12,
513:22,
520:11,
520:15, 523:7
**signature** [37]
- 417:15,
417:16,
418:12,
458:21,
459:1, 476:1,

482:7, 482:25, 483:3, 483:16, 484:12, 484:22, 484:25, 485:1, 485:7, 485:10, 485:20, 486:12, 486:15, 486:22, 487:4, 487:13, 487:15, 488:14, 489:8, 489:23, 490:24, 490:25, 491:2, 491:4, 491:6, 506:5, 506:6, 512:2, 512:8, 514:7, 514:12

**signed** [11] - 407:5, 453:7, 459:17, 459:21, 475:25, 482:19, 482:24, 484:3, 485:25, 486:10, 520:25

**significant** [4] - 434:14, 434:18, 532:5, 533:18

**signing** [4] - 429:19, 482:12, 486:6, 525:8

**similar** [1] - 502:5

**simple** [1] -

487:25

**simply** [4] - 447:16, 455:19, 459:3, 467:20

**single** [3] - 403:6, 428:1, 483:10

**singular** [1] - 442:12

**slept** [1] - 423:17

**small** [4] - 432:6, 478:19, 510:21

**sole** [3] - 386:12, 389:13, 392:7

**solely** [3] - 389:6, 392:10, 397:6

**solution** [2] - 434:19, 533:19

**solve** [1] - 481:12

**someone** [1] - 453:22

**someplace** [2] - 428:4, 438:1

**sometimes** [1] - 455:22

**somewhere** [1] - 498:19

**Sonnenblick** [3] - 499:4, 502:8, 505:25

**SONNENBLICK** [1] - 499:5

**Sonnenblick's** [1] - 506:6

**soon** [1] - 514:3

**sort** [4] - 406:2, 430:4, 439:24,

481:13

**sought** [1] - 535:22

**sound** [1] - 499:6

**sounds** [3] - 458:8, 469:14, 517:13

**source** [3] - 395:12, 442:12, 466:13

**Southern** [3] - 466:23, 468:8, 469:4

**spaces** [1] - 482:18

**span** [1] - 453:21

**speaking** [5] - 389:9, 448:9, 497:6, 497:13, 497:18

**specific** [2] - 451:9, 477:9

**specifically** [7] - 384:13, 392:18, 392:25, 403:8, 466:22, 485:15, 504:1

**specifics** [1] - 481:1

**spent** [2] - 475:13, 510:10

**spiritual** [1] - 428:5

**split** [2] - 436:22, 439:16

**spoken** [1] - 479:19

**stage** [2] - 402:20,

442:23

**stake** [3] - 505:3, 505:5, 505:7

**stand** [1] - 474:5

**Standard** [5] - 409:3, 409:9, 457:5, 457:9, 457:12

**Standardadviso rs.com** [2] - 409:2, 409:5

**standing** [1] - 394:24

**start** [5] - 394:5, 408:18, 416:17, 478:6, 478:8

**started** [5] - 393:13, 394:7, 394:9, 405:13, 418:21

**starts** [1] - 467:8

**statements** [5] - 381:15, 384:17, 384:18, 400:4, 400:8

**STATES** [3] - 378:1, 378:3, 378:12

**States** [4] - 378:6, 378:14, 378:16, 381:12

**stating** [2] - 404:11, 478:12

**status** [1] - 403:20

**stay** [2] - 477:5, 499:25

**Ste** [1] -

378:18

**stenography** [1] - 378:25

**step** [3] - 420:9, 459:13, 538:19

**steps** [2] - 463:13, 538:20

**Steve** [1] - 480:16

**Stevenson** [1] - 396:1

**sticking** [1] - 467:17

**stip** [2] - 383:12, 383:13

**stipulate** [2] - 381:9, 412:14

**stipulated** [1] - 381:11

**stipulation** [5] - 379:7, 379:19, 383:12, 411:7, 414:4

**stipulations** [7] - 379:8, 379:12, 379:15, 381:7, 383:15, 383:16, 383:23

**stocks** [2] - 459:9, 459:14

**stole** [5] - 410:12, 453:12, 453:23, 454:9, 454:11

**stolen** [2] - 456:23, 474:20

**Stolper** [2] - 432:14, 492:2

**stonewalled**
[1] - 395:8
**stop** [2] -
509:3, 525:18
**stopped** [2] -
442:19,
467:20
**stopping** [1] -
441:14
**story** [2] -
423:19, 428:5
**straight** [1] -
379:23
**strategy** [3] -
422:23,
434:17,
533:17
**strength** [1] -
411:22
**strictly** [1] -
400:13
**study** [1] -
482:3
**stuff** [6] -
416:17,
435:10,
452:5, 477:8,
510:23, 515:6
**subject** [3] -
411:16,
476:22,
481:14
**submit** [1] -
471:8
**subsequent**
[1] - 408:8
**substance** [3]
- 451:19,
487:15, 509:8
**substantial** [1]
- 498:9
**substantiate**
[1] - 406:18
**substantiated**
[1] - 401:21
**substantiating**
[1] - 396:22
**suburb** [1] -

422:19
**successful** [2]
- 424:25,
507:4
**sue** [3] -
427:7,
526:13, 527:9
**sued** [2] -
507:9, 527:10
**sugar** [1] -
461:17
**suggest** [1] -
444:25
**suggested** [1]
- 478:8
**suggesting** [1]
- 461:14
**suing** [3] -
423:13,
526:3, 532:22
**suit** [1] -
412:12
**suited** [1] -
459:12
**suits** [1] -
529:24
**sum** [4] -
481:4,
515:16,
517:1, 519:11
**summarize** [3]
- 379:10,
379:12,
379:13
**summarized**
[1] - 383:23
**Sunday** [2] -
475:11,
513:23
**supporting** [1]
- 533:13
**supposedly** [1]
- 449:8
**surprised** [1]
- 450:25
**sworn** [1] -
381:3
**Sydor** [1] -

396:1

**T**

**table** [1] -
480:9
**tag** [1] -
482:1
**talks** [1] -
505:13
**tape** [1] -
443:2
**TD** [1] - 382:7
**team** [3] -
460:5, 460:6,
527:3
**team's** [1] -
428:8
**teammate** [1]
- 402:2
**technical** [1] -
515:18
**telephone** [7]
- 452:18,
496:9,
496:25,
497:2,
497:18,
497:21,
518:18
**ten** [8] -
433:21,
436:20,
436:24,
439:13,
445:4,
450:20,
450:21, 495:5
**Ten** [1] -
530:8
**term** [6] -
462:10,
462:12,
467:9,
467:11,
469:9, 504:13
**terms** [7] -
445:4, 453:2,
460:5, 506:3,

515:3,
515:22,
535:19
**testified** [28]
- 381:3,
384:16,
389:3, 389:4,
389:14,
392:6, 400:4,
440:10,
452:17,
460:14,
461:16,
462:22,
465:22,
466:23,
468:8,
468:21,
468:23,
472:8,
474:12,
476:5,
476:23,
479:9,
487:23,
494:10,
496:13,
497:11,
507:15,
507:22
**testify** [4] -
384:14,
452:25,
453:9, 468:17
**testifying** [4]
- 453:4,
476:17,
507:8, 539:5
**theme** [1] -
396:17
**themselves**
[1] - 447:15
**thereafter** [4]
- 398:12,
398:14,
416:12,
509:10
**thinking** [1] -

379:23
**third** [4] -
422:4,
456:18,
513:15,
532:24
**thirds** [1] -
521:12
**thoroughly** [1]
- 520:20
**thoughts** [1] -
426:10
**thousand** [1]
- 393:14
**throughout** [3]
- 458:2,
462:3, 494:19
**throwing** [2] -
434:16,
533:17
**Thursday** [1]
- 540:2
**tie** [1] -
412:13
**time-frame** [1]
- 453:15
**today** [23] -
379:22,
380:15,
380:16,
397:4,
399:11,
400:25,
410:22,
412:11,
426:12,
429:12,
430:1, 445:8,
445:11,
455:5, 464:8,
464:16,
475:4,
493:16,
507:8,
513:24,
514:2,
517:17,
517:20

40

**together** [4] - 384:2, 424:8, 441:8, 528:4
**Tom** [1] - 480:5
**TOMMY** [1] - 378:8
**Tommy** [28] - 378:9, 381:13, 412:5, 423:16, 423:18, 423:23, 424:23, 425:2, 425:17, 428:5, 434:2, 434:7, 434:9, 438:4, 442:5, 450:23, 480:10, 495:15, 507:23, 509:20, 510:3, 510:14, 520:4, 527:7, 527:25, 530:4, 532:2, 533:23
**tomorrow** [3] - 538:15, 539:16, 539:23
**top** [4] - 398:25, 414:18, 522:16, 535:15
**topic** [1] - 443:1
**topics** [1] - 536:21
**total** [10] - 412:22, 412:23, 412:24,

413:5, 421:19, 422:4, 444:10, 475:15, 475:16, 502:9
**toward** [1] - 423:25
**towards** [3] - 435:12, 467:6, 509:23
**traded** [2] - 460:3
**trail** [1] - 442:11
**train** [1] - 528:23
**transaction** [13] - 386:24, 398:24, 399:6, 409:13, 409:15, 409:24, 410:22, 434:16, 453:3, 454:11, 493:14, 532:6, 533:25
**transactions** [1] - 401:3
**transcript** [5] - 378:25, 379:11, 447:22, 471:2, 471:4
**TRANSCRIPT** [1] - 378:8
**transcription** [1] - 446:15
**transcriptions** [2] - 446:10, 447:14
**transcripts** [8] - 446:3, 446:4, 446:6,

446:9, 446:18, 447:15, 447:23
**transfer** [16] - 388:12, 388:17, 415:19, 416:13, 421:16, 430:19, 433:16, 433:19, 434:1, 439:18, 492:13, 492:17, 493:8, 496:1, 496:3, 516:5
**transferred** [3] - 413:6, 478:20, 524:22
**transfers** [5] - 381:16, 415:25, 416:19, 418:22, 530:3
**transmittal** [1] - 513:3
**transmitted** [1] - 524:25
**treat** [1] - 517:22
**trial** [2] - 399:11, 540:2
**TRIAL** [1] - 378:8
**tried** [3] - 410:10, 427:15, 443:7
**trip** [1] - 430:15
**true** [11] - 381:15, 395:17, 454:20, 459:18,

460:22, 472:14, 475:25, 476:3, 476:18, 480:10, 518:14
**trust** [4] - 391:16, 419:4, 486:18, 524:23
**Trust** [25] - 383:5, 384:12, 384:15, 385:14, 387:19, 397:15, 404:11, 405:6, 405:13, 405:17, 406:3, 407:3, 408:20, 474:15, 474:16, 474:21, 476:1, 476:6, 476:9, 492:15, 492:19, 493:9, 493:18, 493:19, 539:11
**trusted** [1] - 487:22
**trustee** [1] - 419:4
**truth** [1] - 397:1
**truthful** [1] - 468:10
**try** [2] - 384:2, 473:11
**trying** [3] - 427:13,

443:9, 481:12
**turn** [4] - 387:17, 399:5, 422:11, 479:9
**turned** [1] - 479:13
**Turner** [1] - 396:1
**turning** [1] - 397:19
**twice** [2] - 412:8, 512:8
**type** [2] - 462:10, 483:25
**typed** [1] - 534:18
**Tyson** [1] - 480:17

## U

**Ula** [1] - 387:20
**ultimately** [3] - 388:19, 472:13, 481:25
**under** [7] - 380:23, 397:19, 446:14, 483:12, 483:18, 485:19, 487:6
**understood** [6] - 462:5, 495:19, 515:6, 525:3, 528:6, 533:11
**Uniondale** [1] - 508:10
**unit** [3] - 438:24, 439:20, 495:18
**UNITED** [3] - 378:1, 378:3,

378:12

**units** [17] - 434:7, 434:8, 434:15, 437:25, 438:1, 438:3, 438:18, 438:19, 438:20, 439:4, 439:7, 439:9, 439:11, 439:16, 440:21, 530:9, 532:5

**unpredictable** [1] - 509:22

**untoward** [1] - 525:7

**untrue** [1] - 476:20

**upset** [3] - 450:25, 451:2, 528:1

**upward** [1] - 387:25

**US** [1] - 475:14

**useful** [1] - 464:3

**uses** [1] - 474:15

**utilize** [2] - 447:17, 458:3

**utilized** [2] - 446:20, 447:14

**V**

**vaguely** [1] - 499:22

**valuable** [1] - 408:22

**value** [1] - 465:15

**various** [4] - 381:10, 381:18,

433:24, 525:17

**Vegas** [4] - 438:14, 438:25, 439:6, 439:16

**vehicle** [1] - 464:3

**vengeance** [1] - 423:24

**Ventures** [4] - 492:8, 492:9, 492:14, 492:18

**verbatim** [1] - 379:9

**vertical** [2] - 389:7, 397:6

**Veterans** [1] - 378:18

**via** [2] - 500:15, 513:22

**viable** [1] - 479:3

**vice** [1] - 405:5

**view** [2] - 380:5, 479:3

**VIOR** [3] - 431:19, 444:19, 447:1

**virtually** [2] - 402:23, 403:3

**virtue** [1] - 466:6

**visit** [3] - 458:12, 458:16, 496:15

**voice** [2] - 448:11, 494:10

**voir** [3] - 431:18, 444:17, 446:22

**vote** [1] -

516:10

**W**

**Wachovia** [1] - 382:14

**waiting** [1] - 472:4

**water** [1] - 461:22

**Wednesday** [1] - 523:12

**week** [2] - 534:6, 539:14

**weeks** [4] - 401:5, 401:14, 423:17, 534:6

**well-funded** [1] - 505:8

**Wells** [1] - 382:3

**western** [1] - 424:21

**whatsoever** [1] - 427:5

**whoa** [3] - 451:19

**whole** [23] - 379:19, 390:9, 396:18, 404:20, 424:13, 425:11, 425:14, 426:9, 426:15, 430:4, 435:9, 440:13, 442:6, 467:17, 482:14, 488:4, 499:17, 500:8, 504:14, 524:12, 527:4, 527:6

**wife** [28] - 423:20, 431:7, 431:25, 433:11, 438:23, 444:22, 447:5, 458:10, 458:12, 479:6, 480:17, 492:2, 494:17, 495:1, 496:15, 500:14, 507:14, 519:15, 519:20, 520:15, 520:19, 521:2, 522:17, 523:16, 524:10, 531:20, 534:17, 536:6

**wife's** [7] - 431:23, 432:4, 491:1, 491:24, 500:10, 524:3, 535:10

**win** [1] - 504:23

**wiped** [1] - 405:24

**wire** [21] - 381:16, 385:22, 386:1, 414:15, 414:19, 415:2, 415:19, 415:25, 416:12,

416:16, 416:19, 418:21, 421:16, 430:19, 433:16, 433:19, 439:18, 448:14, 496:1, 513:20, 524:22

**wired** [1] - 413:21

**wires** [1] - 413:22

**withdraw** [7] - 404:9, 452:10, 464:17, 469:2, 476:21, 506:22, 507:10

**withdrawn** [10] - 418:3, 419:6, 423:10, 435:3, 435:19, 472:21, 495:11, 497:23, 503:20, 529:11

**withhold** [1] - 473:9

**wondered** [1] - 416:24

**word** [1] - 468:3

**words** [7] - 395:13, 396:6, 528:14, 528:16, 528:17, 528:20,

528:25

**works** [1] - 380:1

**worry** [1] - 405:12

**worrying** [1] - 477:8

**worth** [1] - 444:23

**would it be fair to say** [7] - 495:10, 495:24, 497:16, 507:17, 514:18, 521:8, 536:19

**write** [2] - 514:11, 514:14

**writing** [3] - 442:12, 451:9, 520:23

**written** [7] - 516:4, 517:3, 517:7, 519:12, 520:7, 523:9, 533:24

**wrote** [1] - 531:19

## Y

**yesterday** [10] - 380:20, 384:11, 389:3, 392:6, 398:22, 399:3, 400:15, 419:13, 473:8, 502:6

**YORK** [1] - 378:1

**York** [15] - 378:6, 378:15, 378:18,

378:21, 378:23, 395:25, 430:16, 459:18, 459:22, 460:1, 460:4, 466:24, 468:9, 469:4, 508:10

**yourself** [9] - 392:24, 444:22, 450:7, 457:23, 460:17, 477:20, 482:20, 485:4, 486:17

## Z

**zero** [1] - 427:4