573

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                           :
UNITED STATES OF AMERICA

                             13-CR-607 (JFB)


        -against-         :

                             United States Courthouse
                             Central Islip, New York

PHILLIP A. KENNER,
a/k/a "Philip Kenner"
        and
TOMMY C. CONSTANTINE,         TRANSCRIPT OF TRIAL
a/k/a "Tommy C. Hormovitis,
                             May 7, 2015
        Defendants.      :   9:50 a.m.

- - - - - - - - - - - - - - X
        BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:
For the Government:        LORETTA E. LYNCH
                          United States Attorney
                          100 Federal Plaza
                          Central Islip, New York 11722
                          BY:  JAMES M. MISKIEWICZ
                               SARITHA KOMATIREDDY
                          Assistant United States Attorneys


For the Defendant:        BY:  RICHARD HALEY, ESQ.
Kenner:                   1601 Veterans Highway Ste. 425
                          Islandia, New York 11749


For the Defendant
Constantine:              BY:  ROBERT LARUSSO, ESQ.
                               ANDREW OLIVERAS, ESQ.
                          300 Old Country Road
                          Mineola, New York 11572


Court Reporter:           Perry Auerbach
                          100 Federal Plaza
                          Central Islip, New York 11722
                          (631) 712-6103


        Proceedings recorded by mechanical stenography.
           Transcript produced by computer.

574

```
 1                 THE CLERK:  All rise.

 2                 THE COURT:  Please be seated.

 3                 (Case called, appearances noted.)

 4                 THE COURT:  All the jurors are here.  Are there

 5      any issues before they come out?

 6                 MR. MISKIEWICZ:  Not from the government.

 7                 MR. LA RUSSO:  No, your Honor, not from

 8      Mr. Constantine.

 9                 MR. HALEY:  No, sir.

10                 THE COURT:  How are you feeling, Mr. LaRusso?

11      You still sound congested.

12                 MR. LA RUSSO:  I can make the day.

13                 THE COURT:  You have three days to recover.

14                 MR. LA RUSSO:  Unfortunately I won't be able to

15      put this down.

16                 THE COURT:  All right.  Let's bring in the jury.

17                 THE CLERK:  All rise.

18                 (The jury is present.)

19                 THE COURT:  Please be seated.

20                 Good morning, members of the jury.  I hope

21      everyone is doing well this morning.

22                 I just want to mention to you, it's my practice

23      at the end of each week to tell the jury where we stand in

24      terms of my estimate.

25                 I'll speak to the lawyers at the end of the day
```

575

1    today.  I think we're on track in terms of my estimate of

2    five weeks, but I like to give the jury an update at the

3    end of each week.

4              We will continue now.  As you'll recall,

5    Mr. Peca is on cross-examination by Mr. La Russo.

6              Mr. Peca, I remind you that you're still under

7    oath; do you understand?

8              THE WITNESS:  I do.

9

10   MICHAEL PECA,

11              called as a witness, having been previously

12              duly sworn, was examined and testified further

13              as follows:

14

15   CROSS-EXAMINATION

16   BY MR. LA RUSSO:

17   Q.   Good morning, Mr. Peca.  How are you?

18   A.   Good morning.

19   Q.   Mr. Peca, I'm just going to ask you a few questions

20   if I may.

21              This is Government's Exhibit 757.  We talked

22   about other aspects of the settlement fund.  I'm not going

23   to review any of those.

24              I'm going to refer you to this action where it

25   says PR agency fees.

M. Peca - Cross/LaRusso

576

1    A.    Okay.

2    Q.    You also mentioned yesterday that there was some

3    interest in encountering some adverse publicity that was

4    part of the overall purpose of the settlement fund; do you

5    recall that?

6    A.    I do.

7    Q.    Do you remember, after you had agreed to contribute

8    to the settlement fund, actually corresponding with

9    Mr. Constantine regarding some positive and negative

10   articles that were appearing in the paper?

11   A.    I don't recall.

12         (Pause in proceedings.)

13   Q.    I'm going to show you what's been marked

14   Mr. Constantine Exhibit C-29, and three separate pages I

15   have marked C-29-A.  Could you take a look at those.

16         (Pause in proceedings.)

17   A.    Okay.

18   Q.    Directing your attention first to C-29, do you

19   recognize that as an e-mail you received from

20   Mr. Constantine regarding the area of publicity we have

21   been discussing?

22   A.    I do see the e-mail, yes.

23   Q.    This is a group e-mail.  You're part of the group

24   e-mail; is that correct?

25   A.    Correct.

M. Peca  -  Cross/LaRusso

577

1    Q.    That's dated June 18, 2009?

2    A.    Yes, it is.

3    Q.    That would be approximately a month after the meeting

4    that you had with Mr. Constantine and Mr. Kenner?

5    A.    Correct.

6    Q.    C-29-A, do you recognize that?

7    A.    I may have read it years ago.  I don't.

8    Q.    You don't recognize anything about the article?

9    A.    I remember reading several articles.  I imagine this

10   could possibly be one.

11   Q.    In this particular e-mail, which I'll show the jury

12   in a few minutes, do you recall this e-mail referencing a

13   particular article?

14   A.    Yes.

15   Q.    Looking at 29-C, does that appear to be the article

16   that was referenced?

17              THE COURT:  29-A.

18              MR. LA RUSSO:  29-A.

19   Q.    Does that appear to be the article that was

20   referenced in the e-mail Constantine Exhibit 29?

21   A.    Sure.

22              MR. LA RUSSO:  Your Honor, I'm just going to

23   introduce C-29.

24              THE COURT:  Any objection?

25              MR. MISKIEWICZ:  No objection.

M. Peca  -  Cross/LaRusso

578

1          MR. HALEY:  May I just see it, your Honor?

2          THE COURT:  Show it to Mr. Haley.

3          MR. LA RUSSO:  I'm sorry, Mr. Haley.

4          (Pause in proceedings.)

5          MR. HALEY:  No objection, Judge.

6          THE COURT:  So C-29 is admitted, not C-29-A.

7          MR. LA RUSSO:  That's correct, your Honor, at

8     this time.

9          (Defense Exhibit C-29 in evidence.)

10          MR. LA RUSSO:  Your Honor, I'm displaying it to

11    the jury at this time.

12    Q.   For the record, Mr. Peca, this is the group e-mail we

13    were referring to?

14    A.   Yes, it was.

15    Q.   And your e-mail address is contained in there?

16    A.   Yes, correct.

17    Q.   This is the e-mail from Mr. Constantine to the group

18    regarding this particular article that's linked; is that

19    correct?

20    A.   Yes.

21    Q.   It's June 18, 2009?

22    A.   Correct.

23    Q.   Now, this wasn't the only communication you got from

24    Mr. Constantine regarding aspects of the case regarding

25    publicity, media attention?

M. Peca  -  Cross/LaRusso

579

1   A.   Probably not.

2   Q.   I show you Mr. Constantine's Exhibit C-30.

3        Do you recognize that?

4   A.   Yes.

5   Q.   Is this an e-mail that you actually sent to

6   Mr. Constantine?

7   A.   My wife and I might have.

8   Q.   And you're familiar with this?

9   A.   Yes.

10  Q.   This is one of the e-mail communications that you and

11  Mr. Constantine had regarding publicity?

12  A.   I remember having correspondence with Mr. Constantine

13  regarding articles about what was going on.

14  Q.   In regards to what?

15  A.   In regards to any social or verbal dispute.

16       MR. LA RUSSO:  Your Honor, may I ask that C-30

17  be received at this time?

18       MR. MISKIEWICZ:  No objection.

19       MR. HALEY:  No objection.

20       THE COURT:  C-30 is admitted.

21       (Defense Exhibit C-30 in evidence.)

22  BY MR. LA RUSSO:

23  Q.   The subject of this e-mail is good question by Rem

24  Murray.

25       Do you know who Rem Murray is?

M. Peca  -  Cross/LaRusso

580

1    A.    I do.

2    Q.    Do you know what the good question was by Rem Murray

3    when you think back?

4    A.    I don't recall.

5    Q.    This e-mail is February 21st, 2010; is that correct?

6    A.    Yes, it is.

7    Q.    It's from you to Mr. Constantine?

8    A.    It is.

9    Q.    I'll read the first line.

10          Two things in response to that.

11          Did our response get published yet in W Post or

12   other credible sources/media outlets, and what about the

13   point that he said publicly he'd pay us back?

14          Can't we somehow legally hold him to that?

15          I read that correctly?

16   A.    You did.

17   Q.    Could you explain what you understood, what you were

18   trying to communicate to Mr. Constantine in this e-mail?

19   A.    I believe in an article Mr. Jowdy made reference to

20   some of the hockey players in dispute with him.

21   Q.    When you say two things in response to that, that

22   meaning the article that appeared in the paper; is that

23   correct?

24   A.    Either that or Rem's good questions.  I can't recall.

25   Q.    You then say:

M. Peca  -  Cross/LaRusso

581

1    Did our response get published in the W Post or

2    other credible sources/media outlets.

3        What were you referring to?  What were you

4    trying to communicate to Mr. Constantine?

5    A.    Any response where Mr. Jowdy indicated possibly

6    paying some of the players back.

7    Q.    And this particular word, our response, meaning the

8    media response to that, that would be favorable to the

9    side that you and Mr. Constantine were advocating?

10   A.    And the other players.

11   Q.    And the other players, that is correct.

12       Now, we've been talking about Mr. Jowdy.  Let me

13   ask a couple of questions.

14       As part of the Global Settlement Fund, do you

15   recall two lawsuits being filed against Mr. Jowdy?

16   A.    From what I remember, there were several lawsuits

17   from various different people against Mr. Jowdy.

18   Q.    And, of course, those were legal fees that you knew

19   were part of the proper expenses of the Global Settlement

20   Fund; is that correct?

21   A.    There was one that I think that I was going to be a

22   part of which is the only one I was aware of.

23   Q.    You did testify yesterday, if I'm not mistaken, that

24   you attended a mediation in California?

25   A.    Correct.

M. Peca  -  Cross/LaRusso

582

1   Q.   I'm trying to clarify.

2          Is that mediation related to one of the suits

3   that was filed against Mr. Jowdy?

4   A.   I believe so.

5   Q.   You also told us it was at that mediation you met

6   Mr. Constantine for the second time?

7   A.   Correct.

8   Q.   And had a brief personal conversation with him which

9   you told us about, correct?

10  A.   Correct.

11  Q.   This was a Court ordered mediation, right, with

12  regards to the dispute with Mr. Jowdy?

13  A.   I imagine.  I don't remember that.

14  Q.   It was all day?

15  A.   It was pretty much most of the day, yes.

16  Q.   You were attending with a number of other hockey

17  players?

18  A.   And one of the lawyers, yes.

19  Q.   Mr. Constantine was there?

20  A.   He was.

21  Q.   And was Mr. Ron Richards there as well?

22  A.   He was.

23  Q.   He was the lawyer for you and the other hockey

24  players; is that correct?

25  A.   That's what we were told, yes.

M. Peca  -  Cross/LaRusso

583

1    Q.    And Mr. Constantine, he was not a plaintiff in the

2    suit, was he?

3    A.    He was not.

4    Q.    He was there, as you say, to help expedite or to

5    bring about the settlement?

6    A.    That's what he said he was there for, yes.

7    Q.    If I ask you to repeat it, I'm not trying to

8    embarrass you.  I want to make sure the record is clear on

9    it, okay?

10   A.    Okay.

11   Q.    Thank you, sir.

12         Did the meeting result in a settlement, if you

13   recall?

14   A.    No.

15   Q.    Did there come a time after that meeting that a

16   settlement was tentatively reached?

17   A.    Not that I'm aware of.

18   Q.    Do you remember at all discussions about a potential

19   settlement with Mr. Jowdy?

20   A.    I do not.

21   Q.    Do you recall any discussions amongst you and any

22   other participants that a settlement was rejected because

23   a player did not want to publicly acknowledge Mr. Jowdy

24   did nothing wrong, do you have any recollection of that?

25   A.    I don't recall that.

M. Peca  -  Cross/LaRusso

584

1   Q.   Now, do you have any specific recollection today

2   about the Global Settlement Fund's involvement in

3   resolving issues with Mr. Jowdy's aviation company called

4   Diamante Air?

5   A.   No.

6   Q.   Mr. Peca, C-31 for identification, please take the

7   opportunity just to review that for us, please.

8            (Pause in proceedings.)

9   A.   Okay.

10  Q.   Do you recognize that as a group e-mail which

11  includes you?

12  A.   It does include me, yes.

13  Q.   This was July 27 of 2009?

14  A.   Correct.

15  Q.   Do you have a recollection -- is this one of the

16  e-mails that Mr. Constantine would send to the group in

17  regards to updates on the global settlement?

18  A.   It appears to be, yes.

19            MR. LA RUSSO:  Your Honor, may I ask this be

20  received as Mr. Constantine's 31?

21            MR. MISKIEWICZ:  May we approach?

22            THE COURT:  Yes.

23            (Continued on next page.)

24

25

M. Peca  -  Cross/LaRusso

585

1    (The following takes place at sidebar.)

2    MR. MISKIEWICZ:  I object to hearsay.

3    THE COURT:  This is the same issue as yesterday.

4    In a fraud case the state of mind of the

5    defendant is obviously a relevant issue in the case, so

6    what information Mr. Constantine was providing to his

7    victims in the case, as well as for purposes of showing

8    what representation he was making to them, whether he was

9    giving complete information or incomplete information, is

10   all something that the jury is entitled to see and

11   Mr. Constantine is entitled to argue.  So if the

12   government believes that any representations in here are

13   inaccurate, you can prove that to the jury.  He's entitled

14   to put forth what his communications were back and forth

15   with the victims, okay?

16   MR. MISKIEWICZ:  Understood.  Thank you.

17   MR. LA RUSSO:  Thank you, your Honor.

18   (Continued on next page.)

19

20

21

22

23

24

25

M. Peca  -  Cross/LaRusso

586

1            (The following takes place in open court.)

2            THE COURT:  Mr. Haley, do you have any

3    objection?

4            MR. HALEY:  No, sir.

5            THE COURT:  C-31 is admitted.

6            (Defense Exhibit C-31 in evidence.)

7    BY MR. LA RUSSO:

8    Q.   Mr. Peca, again, this is a group e-mail.

9            The first paragraph contains your e-mail

10   address; is that correct?

11   A.   Yes.

12   Q.   It's from Mr. Constantine?

13   A.   Yes.

14   Q.   And it's date July 27, 2009?

15   A.   It is.

16   Q.   If I may, it says all underneath the group e-mail.

17           As you may recall through our discussions, one

18   of the issues that was recently resolved as part of our

19   global settlement effort was Diamante Air, which involved

20   several airplanes and a lawsuit which was filed by the

21   bank against Phil and those of you who invested in the

22   company.

23           We have reacquired the airplane and refurbished

24   it to the highest standards and all is well with respect

25   to this entity.

M. Peca  -  Cross/LaRusso

587

1    It is the same solution that we hope to provide

2  with all the other investments made by Mr. Jowdy.

3    You were not --

4    THE COURT:  It says made with not by.

5    MR. LA RUSSO: With Mr. Jowdy.

6  Q.    Were you part of Diamante Air?

7  A.    I was not.

8  Q.    But this particular part of the e-mail is referencing

9  acquiring assets; is that right?

10 A.    It appears so.

11 Q.    That was part of what was discussed in the original

12 global settlement approval e-mail that we talked about

13 acquiring and securing and preserving assets; is that

14 correct?

15 A.    Yes, but not us investing in the stuff, no.

16 Q.    But in this particular case he's referencing this as

17 part of the global settlement at least in this e-mail?

18 A.    He is, yes.

19 Q.    Just a few other points.

20    As I said -- I'm reading in the second

21 paragraph -- some of you invested and were involved in

22 this entity and some of you were not.

23    Therefore, this solution may not mean much to

24 some of you.  But to those of you who were involved, it is

25 obviously very important and a great victory for our team.

588

1     In any case, as we discussed, all of us who

2   invested in the Global Settlement Fund are all banding

3   together and solving everyone's related investment issues

4   collectively and, therefore, everyone will be a

5   beneficiary of the various solutions that we accomplish,

6   regardless of whether or not one was originally involved

7   in that particular investment.

8     You were one that was not involved in that

9   particular investment; is that correct?

10  A.   Correct.

11  Q.   He then continues.

12    You may also recall me saying that the airplane

13  issue was obviously not nearly as important as say the

14  Cabo deal or the Del Mar deal.

15    And that's the deal you were in; is that

16  correct?

17  A.   Correct.

18  Q.   So this would be a paragraph you would have paid

19  particular attention to; is that right?

20  A.   Yes.

21  Q.   The Cabo deal or the Del Mar deal, and that this deal

22  should be considered more of a luxury than a business

23  endeavor.

24    In any case, for those of you that were on the

25  hook on this one, you are no longer on the hook.  And for

M. Peca  -  Cross/LaRusso

589

1   those of you that had nothing to do with this company, or

2   the problems that arose as a result of Jowdy's

3   mismanagement, you now also own a small interest in a very

4   nice jet along with the rest of us.

5          That's what Mr. Constantine is reporting to

6   those of you who were not involved as owners in the

7   Diamante Air; is that correct?

8   A.   That's what it says, yes.

9   Q.   He's saying you're now going to get a percentage of

10  the interest in these jets that are being acquired in the

11  Global Settlement Fund?

12  A.   He did say that.  We never received any.

13  Q.   Let me ask you.

14         Did you ever write or e-mail back to

15  Mr. Constantine any comments regarding what he's reporting

16  to you?

17  A.   We might have.  It's so long ago I don't recall.  I

18  imagine we did.

19  Q.   If you had something like that, you would have

20  provided it to the government -- withdrawn.

21         Did the government ask you to provide that?

22  A.   No.

23  Q.   Lastly, there are two key points to consider here.

24         (A) because some of you live in an area where it

25  is logistically impossible to take advantage of your

590

1    ownership interest in the airplane, you may not care about

2    this particular asset very much.

3          But the good news for all of you is that

4    regardless of where you live, your involvement in this

5    entity will cost you absolutely nothing unless you elect

6    to use the airplane, in which case you will pay the

7    standard fuel costs, pilot fees, et cetera.  There will be

8    no cost for the use of the airplane itself, because you

9    already own it.

10          If any of you want to use it, just call me and I

11   will make the arrangements.

12          I will also be providing you with a website,

13   user name and password, so you can track where the

14   airplane is 24/7/365.

15          Again, unless you use it, it will cost you

16   nothing.  I am responsible for the maintenance, insurance,

17   storage, et cetera.

18          (B) at some point I am planning on buying some

19   or all of you out of the airplane, and at that point you

20   will recoup some or all of this investment.

21          Do you remember that, Mr. Peca?

22   A.   I do.

23   Q.   Did you ever take advantage of the opportunities to

24   use the jet?

25   A.   No, sir.

M. Peca  -  Cross/LaRusso

591

1   Q.   For those of you that invested in Diamante Air

2   originally, this solution and your current ownership of

3   this airplane, does not alleviate Jowdy's and Thalmann's

4   responsibility for their mismanagement of the original

5   deal, and we intend to pursue every legal and financial

6   remedy to recover your losses along with our current

7   efforts against Jowdy.

8            This is the last lawsuit that is to be filed.

9   This solution simply got the airplane itself and the bank

10  issues (loan/personal guarantees/lawsuit) sorted out.

11           Did you know what Mr. Constantine was referring

12  to at that point?

13  A.   No.

14  Q.   Finally, this is just one of the investment

15  acquisitions and business solutions that overlaid over the

16  legal strategy that we presented as part of the global

17  settlement plan.

18           I have attached the documentation for all of you

19  to sign for your respective share of the ownership in the

20  airplane company.

21           It is a very basic operating agreement, but you

22  should definitely read it, sign it and send it back to me

23  at your convenience.

24           Please do not hesitate to call me if you have

25  any questions.

M. Peca  -  Cross/LaRusso

592

1      You will be receiving a similar agreement for

2  the ownership interest that we acquire from the bad guys

3  for their Eufora shares as well as the Avalon hangar

4  building which is actually where the plane is kept and

5  where Eufora is headquartered.

6           I have also attached some photos of the plane.

7           Thank you all for your continued support and I

8  look forward to knocking out the next two solutions which

9  are obviously more significant issues for all of us.

10          You have no recollection of specifically

11  responding to anything that was in this e-mail; do you?

12  A.   No.

13  Q.   When I say responding, sending an e-mail to

14  Mr. Constantine to further explain or provide additional

15  information?

16  A.   No.

17  Q.   To stay on the subject of the Global Settlement Fund,

18  if I could, during the period after your meeting with

19  Mr. Constantine and Mr. Kenner, did Mr. Constantine

20  arrange for conference calls for all of the investors in

21  the Global Settlement Fund to participate in a group

22  discussion regarding the status of the Global Settlement

23  Fund, the issues that had to be dealt with?

24  A.   I don't remember.

25  Q.   I'm going to show you collectively if I could try and

M. Peca  -  Cross/LaRusso

593

1    save some time, four documents, and I'm trying to stay

2    away from you as much as I can, C-33 for identification,

3    C-34 for identification, C-35 and C-36.

4              Could you take a look at those four documents

5    for me, please.

6              (Pause in proceedings.)

7    A.    Okay.

8    Q.    Do you recognize these as group e-mails from

9    Mr. Constantine to the participants of the Global

10   Settlement Fund which includes you?

11   A.    Yes, sir.

12   Q.    Do you remember, are these four notices of conference

13   calls that took place during the period of time after you

14   first agreed to participate in the settlement fund?

15   A.    That's what they look like, yes.

16   Q.    Actually they reference a conference call 1,

17   conference call 2, conference call 3, conference call 4;

18   is that correct?

19   A.    They do.

20   Q.    And then Defendant's Exhibit C-32, do you recognize

21   that group e-mail?

22   A.    I don't recall that, no.

23   Q.    Do you recognize it as an e-mail you received along

24   with conference call e-mails discussing issues relative to

25   the settlement fund referencing the names down at the

M. Peca  -  Cross/LaRusso

594

1    bottom?

2    A.    It's so long ago I can't recall.

3    Q.    Could that possibly be one of the ones you recall

4    receiving?

5    A.    I guess it could be possible.

6              MR. LA RUSSO:  At this time, your Honor, may I

7    ask that exhibits C-33 -- C-32 through C-36 be received?

8              MR. MISKIEWICZ:  No objection.

9              MR. HALEY:  No objection.

10             THE COURT:  C-32 through C-36 are admitted.

11             (Defense Exhibits C-32 through C-36 in

12   evidence.)

13             MR. LA RUSSO:  Your Honor, I will display

14   quickly the first one which is C-33.

15             It's captioned conference call, dated June 10,

16   2009.

17   Q.    Mr. Peca, that's your highlighted e-mail address?

18   A.    Yes.

19   Q.    It says:

20             All:  Our call is scheduled for Sunday at 11

21   a.m. PST, Los Angeles time.

22             Please read all four steps below.

23             And then directions are given how to participate

24   in the call; is that correct?

25   A.    That is correct.

M. Peca  -  Cross/LaRusso

595

1  Q.    Did you participate in any of these four calls?

2  A.    I think I did.  I'm not sure it was all of them.  I

3  know I did at least one.

4  Q.    C-34 is conference call number 2?

5  A.    Yes.

6  Q.    This is an e-mail from Mr. Constantine to the group

7  which includes you; is that correct, Mr. Peca?

8  A.    Correct.

9  Q.    June 25, 2009, correct?

10  A.    Correct.

11  Q.    And this one says:

12         All:

13         We have a call scheduled for today at 4 p.m.

14  PST, Los Angeles time, to discuss the progress of all of

15  the cases.

16         This is about the Global Settlement Fund; is

17  that right?

18  A.    I think so.

19  Q.    Again, directions on how to participate in the call?

20  A.    Correct.

21  Q.    C-35, this is conference call 3, and again from

22  Mr. Constantine to the group who are part of the Global

23  Settlement Fund, including yourself; is that right?

24  A.    Correct.

25  Q.    And it's dated August 19, 2009, correct?

M. Peca  -  Cross/LaRusso

596

1   A.   Yes, sir.

2   Q.   And again it reads similarly all, we have a call

3   scheduled for tomorrow at 4 p.m. PST, Los Angeles time, to

4   discuss the progress of all of the cases.  Please try to

5   make this call.  We have a lot of progress to discuss,

6   correct?

7   A.   That's what it says, yes.

8   Q.   And again instructions on how to participate.

9        And then conference call 4, this is dated

10  October 22, 2009.

11       Actually this one starts off with a response

12  from your e-mail address; is that correct?

13  A.   Yes, it does.

14  Q.   It says to Mr. Constantine, we understand?

15  A.   Correct.

16  Q.   Do you remember this one in particular?

17  A.   No.

18  Q.   But it follows an e-mail from Mr. Constantine to you.

19  It states, on October 22nd, 2009, subject, conference call

20  4.

21       I am just waiting for a few more guys to respond

22  and I will let you know.

23       If possible, I will move the call to accommodate

24  your schedule.  You can probably imagine what it's like

25  rounding up 20 guys in multiple time zones globally.

M. Peca  -  Cross/LaRusso

597

1          Keep you posted.

2          Tommy Constantine.

3          Do you see that?

4     A.    Yes.

5     Q.    Do you have a recollection now of engaging in

6     conversation so you participated in one of those

7     conference calls?

8     A.    Yeah.  It was a long time ago.  I vaguely remember.

9     Q.    And there's some additional aspects.  This is in

10    evidence.  It can be reviewed later.

11               MR. LA RUSSO:  One second, if I may, your Honor.

12               (Pause in proceedings.)

13    BY MR. LA RUSSO:

14    Q.    The last exhibit that was introduced, this is C-32 in

15    evidence.  It's from Tommy Constantine.  There are several

16    e-mail addresses and it says all.  Down at the bottom it

17    lists all of the individuals; do you see that?

18    A.    Yes.

19    Q.    You're listed the fourth name down; is that correct?

20    A.    Correct.

21    Q.    All:

22          I am arranging a very important conference call

23    with all of you (and your significant others ) to explain

24    in detail the next steps in the strategy to recover all

25    investments (plus interest) made by you into Ken Jowdy's

M. Peca  -  Cross/LaRusso

598

1  owned and controlled entities.

2           There is a legal aspect and a media aspect which

3  you all need to be very aware of and approve before we can

4  execute.  We want to take these steps no later than

5  Monday, so time is of the essence.

6           For the sake of being efficient, I would like to

7  use the call primarily to give you guys all the pertinent

8  information.  You may want to take notes.  Then any or all

9  of you can reach out to me with any questions

10  independently if you wish.

11           I am hoping to do the call Saturday or Sunday.

12  It will take 15 minutes at the most.

13           Please respond to this e-mail either today in

14  the afternoon is okay and I will provide the exact time

15  and a call-in number in a subsequent e-mail.

16           FYI, here is a list of everyone that will be on

17  the call.

18           Thank you all very much for your support.

19           This particular e-mail by Mr. Constantine is

20  offering the opportunity for anyone to communicate with

21  him any concerns they had; is that correct?

22  A.   Correct.

23  Q.   And that was offered to you on a number of occasions;

24  is that correct?

25  A.   Yes, sir.

599

1  Q.   And if you did take advantage, you would have

2  e-mailed him; is that correct?

3  A.   Yes.

4  Q.   Did you do that?

5  A.   I may have.  I don't remember.  It's six years ago.

6  Q.   By the way, there were other assets that were

7  mentioned.

8       Do you recall Avalon Air Park?

9  A.   I remember it being mentioned, yes.

10 Q.   You, yourself, was invested in Eufora?

11 A.   Yes.

12 Q.   Did you ever take the opportunity to go visit the air

13 park and/or the Eufora facilities?

14 A.   I did not.

15 Q.   I would like to just go on to another subject for a

16 few minutes.

17      You testified I know with regards to the grand

18 jury appearance in the Southern District of New York?

19 A.   Correct.

20 Q.   Before you made that appearance, you were served with

21 a grand jury subpoena personally; is that correct?

22 A.   Yes, sir.

23 Q.   And would it be fair to say that that would have been

24 sometime in March 2011?

25 A.   I imagine so.

600

1   Q.   As you said, there were two others who likewise

2   received subpoenas to testify in the Southern District of

3   New York?

4   A.   There were.

5   Q.   A Turner Stevenson and a Darryl Sydor, correct?

6   A.   Yes.

7   Q.   You told us that you hired Mr. Richards and paid him

8   $8,000; is that correct?

9   A.   Correct.

10  Q.   And you also told us, I believe this was on direct

11  examination, that the day prior to your appearance

12  Mr. Richards prepared you over the telephone; is that

13  correct?

14  A.   The day before the grand jury?

15  Q.   I'm sorry, yes.

16  A.   It was in his hotel room.

17  Q.   In whose hotel room?

18  A.   Ron Richards'.

19  Q.   Was he present at the time?

20  A.   Yes.

21  Q.   Were there two other players that received subpoenas

22  who were also present?

23  A.   Yes, they were.

24  Q.   And Mr. Kenner was on the telephone?

25  A.   Correct.

M. Peca  -  Cross/LaRusso

601

1   Q.   And he was participating by that means; is that

2   correct?

3   A.   Correct.

4   Q.   I'm not going to go through the whole thing, just

5   highlighting some aspects of it.

6        The main focus of the meeting was to reinforce I

7   believe you said the need to all be on kind of the same

8   page?

9   A.   So much time had gone by that so many things were

10  going on, that there were just -- it's hard to remember

11  everything, so it was to help kind of maybe clear up some

12  of the blurred areas.

13  Q.   You were then provided with some information,

14  correct?

15  A.   Correct.

16  Q.   To try and refresh your recollection?

17  A.   Correct.

18  Q.   And isn't it true that when you first described this

19  to the FBI, this meeting, you felt -- you told them you

20  felt uncomfortable answering questions about the Jowdy

21  loan during the grand jury; do you remember that?

22  A.   I do.

23  Q.   And you were uncomfortable why?

24  A.   Because it was an uncomfortable subject.

25  Q.   Was it the subject itself or the answers you were

M. Peca - Cross/LaRusso

602

1    giving?

2    A.    The answers I gave were truthful, but they were

3    uncomfortable all the same.

4    Q.    Just so I can try and understand your being

5    uncomfortable, it was uncomfortable because you had no

6    specific knowledge of where the money went, that is the

7    money to Jowdy, money you invested in Hawaii, but there

8    were discussions by the parties present that it went to

9    him?

10   A.    Correct.

11   Q.    You were uncomfortable because of what you knew and

12   what people were telling you happened; is that right?

13   A.    Correct.

14   Q.    Now, did Mr. Constantine have anything to do with

15   your participation in that grand jury?

16   A.    No, he did not.

17   Q.    Did Mr. Constantine have anything to do with your

18   decision to hire Ron Richards for the grand jury?

19   A.    No, he did not.

20   Q.    Isn't it true that at the time you were asked to

21   appear before the grand jury, you were not even

22   communicating with Mr. Constantine; is that correct?

23   A.    That is correct.

24   Q.    You kind of had a falling out I believe, is that

25   right?

M. Peca - Cross/LaRusso

603

1    A.    Yes, sir.

2    Q.    Actually, you had sued Mr. Constantine?

3    A.    That is not correct.

4    Q.    Were you part of a group that sued Mr. Constantine?

5    A.    It may have been. I think there was a thing

6    involving Mr. Stolper. I didn't know how far it had

7    gotten.

8    Q.    Could you tell us, when you say involving

9    Mr. Stolper, what do you mean by that?

10   A.    Mr. Stolper was an attorney in New York City.

11   Q.    Did you meet with Mr. Stolper?

12   A.    Not about the lawsuit, no.

13   Q.    Who were the parties that were -- withdrawn.

14         You say you did not hire him; is that correct?

15   A.    Correct.

16   Q.    Do you know of any group who did in fact hire him?

17   A.    Mr. Kenner is the one that found the lawyer.

18   Q.    Do you remember any of the other individuals

19   involved?

20   A.    There were several people involved.

21   Q.    Mr. Gaarn?

22   A.    I believe so, but I wasn't 100 percent sure if

23   Mr. Gaarn was involved.

24   Q.    C.R. Gentry?

25   A.    I heard the name, yes.

M. Peca  -  Cross/LaRusso

604

1   Q.   Mr. John Kaiser?

2   A.   Yes.

3   Q.   Former police officer?

4   A.   Yes.

5   Q.   A man by the name of Nick Privitello?

6   A.   I heard that name, yes, but I don't know for sure.

7   Q.   An individual by the name of Theodore Hughes?

8   A.   I don't recognize the name.

9   Q.   Ethel Kaiser?

10  A.   I don't recognize that name.

11  Q.   Robert Rizzi?

12  A.   I remember that name.

13  Q.   In your involvement, and I know you did not hire him,

14  you did participate in discussion regarding a potential

15  suit; is that correct, against Mr. Constantine?

16  A.   Correct.

17  Q.   And were you asked to participate in a suit by one or

18  more of those individuals?

19  A.   By Mr. Kenner.

20  Q.   Was it your understanding that this suit was to buy a

21  loan and take over the assets of Eufora?

22  A.   I know it had to do with Eufora.  I wasn't sure of

23  all of the details of it.

24  Q.   Do you know if in fact a lawsuit was filed?

25  A.   I believe one was, yes.

M. Peca   -   Cross/LaRusso

605

1   Q.   And you know Mr. Stolper was hired by this group; is

2   that correct?

3   A.   Correct.

4   Q.   Do you know what he was asking for a fee and what he

5   got as a fee?

6   A.   I believe it was on contingency.

7   Q.   He was asking for a contingency; is that correct?

8   A.   From what I remember.

9   Q.   That means -- did you understand that to mean that

10  whatever recovery is made from the suit, he will get a

11  percentage of that recovery?

12  A.   That is what that means, yes.

13  Q.   Do you know what the percentage was that he was

14  seeking?

15  A.   I was not aware of that.

16  Q.   And at this point in time Eufora had, as you recall,

17  a valid -- the parties were interested in acquiring Eufora

18  and the loan that Eufora had; is that right?

19  A.   I believe so.

20  Q.   You also know that this lawsuit failed; are you aware

21  of that?

22  A.   I'm aware of that.

23  Q.   Do you know the objective in that lawsuit?

24  A.   No.

25  Q.   Did you ever hear the word hostile takeover?

606

1   A.   Yes.

2   Q.   Acquiring the assets of the company?

3   A.   I've heard of that, yeah.

4   Q.   And discharging the present management, takeover,

5   right?

6   A.   Okay.

7   Q.   In effect, that's what you were being asked to join

8   in this suit, to takeover Eufora from Mr. Constantine; is

9   that correct?

10  A.   Yeah, but it wasn't described to me that way.

11  Q.   When you say it wasn't described, your conversations

12  were with whom?

13  A.   Mr. Kenner.

14  Q.   And the part that you remember is that there was a

15  loan that Eufora had; is that right, and they wanted to

16  take it over?

17  A.   From what I remember, it was -- the way it was

18  described to me is Tommy was using Eufora as his own bank

19  account and they wanted to remove him and takeover the

20  company.

21  Q.   That was the allegations that were being made by

22  other people who filed a suit; is that correct?

23  A.   Correct.

24  Q.   And did you ever talk to Mr. Constantine about this?

25  A.   No.

607

1   Q.    You had no discussions with him about the suit and

2   what the suit was about?

3   A.    Even if I did, I don't know if there would be any

4   answers given.  There was a suit.

5   Q.    You know there was a breakdown in communications

6   between you and Mr. Constantine, correct?

7   A.    Correct.

8   Q.    And we know that from the e-mail communication

9   regarding the Global Settlement Fund, it was a pretty open

10  communication going on; is that right?

11  A.    There was early on, yes.

12  Q.    Would it be fair to say that this particular suit

13  brought an end to those communications?

14  A.    It wasn't involving the suit.  The suit had nothing

15  to do with it.

16  Q.    Was it a personal reason between you and him?

17  A.    Yes, it was.

18  Q.    In regards to this particular suit, did

19  Mr. Constantine explain that you were aligned with these

20  individuals trying to takeover the company and he wasn't

21  going to have any further discussions with you?

22  A.    That probably would be accurate.

23  Q.    Did Mr. Constantine ever tell you that the people who

24  were involved in this suit, or some involved in the suit,

25  had actually misappropriated money from Eufora and from

M. Peca  -  Cross/LaRusso

608

1   some of the investors?

2   A.   I wasn't told that, no.

3   Q.   Did he ever discuss with you, Mr. Gaarn and

4   Mr. Gentry and others, selling shares of stock for their

5   own personal benefit to the detriment of the hockey

6   players?

7   A.   I do recall.  Something along those lines, yes.

8   Q.   And was that in a telephone call or in a face-to-face

9   meeting with Mr. Constantine?

10  A.   I don't recall.

11  Q.   And what you do remember is that Mr. Constantine was

12  telling you that there are a group of individuals,

13  including Mr. Gaarn and Mr. Gentry, that had committed

14  those crimes and he was not going to have anything to do

15  with that; is that correct?

16  A.   Yeah, I believe that may have been during a

17  conference call that was held with shareholders in July I

18  think of 2010 or '11.

19  Q.   Was it August 21st, 2010?

20  A.   I remember a conference call with shareholders in a

21  car ride before July 4th.  I don't recall another

22  conversation.

23  Q.   Mr. Constantine spoke to and engaged all of the

24  Eufora, or as many as he could get together, and gave them

25  an update on what was happening?

M. Peca  -  Cross/LaRusso

609

1    A.    Yes.

2    Q.    You participated in that?

3    A.    Yes.

4    Q.    And in that you learned from Mr. Constantine the

5    activities of the individuals I just described?

6    A.    Allegations were made, correct.

7    Q.    And amongst them were Mr. Gaarn and Mr. Gentry; is

8    that correct?

9    A.    Correct.

10   Q.    Mr. Kenner?

11   A.    Yes, sir.

12   Q.    At that point in time would it be fair to say that

13   you were aligned with these individuals?

14   A.    Fair to say.

15   Q.    These are the same individuals that were behind the

16   efforts to takeover Eufora?

17   A.    Apparently.

18   Q.    Do you have a recollection, back around December of

19   2009, somewhere around October 2010, these same

20   individuals, with your knowledge, being aware, secretly,

21   without Mr. Constantine's awareness, try and contact

22   Eufora's lenders to try and buy the loan before they

23   publicly sought to do so?

24   A.    I wasn't aware of that.

25   Q.    You know that some of the assets of Eufora were the

M. Peca  -  Cross/LaRusso

610

1   patents, correct?

2   A.   Correct.

3   Q.   And that those patents were pledged as collateral for

4   the loans, correct?

5   A.   They were?

6   Q.   Did you know?

7   A.   I did not.

8   Q.   Were you aware that this group was secretly trying to

9   purchase the loan, foreclose on the company, and thus

10  strip control away from Mr. Constantine and the assets

11  from some of the other shareholders?

12  A.   I know it was a battle.  All of the intricate details

13  I'm not very familiar with.

14  Q.   Before you were advised, before the troubles between

15  you and Mr. Constantine and the fallout of ceased

16  communications, you really had no difficulty in reaching

17  out to Mr. Constantine if you wished to; is that correct?

18  A.   Not at all.

19  Q.   Quite candidly, he was keeping you and the other

20  investors apprised of what was happening?

21  A.   Yes.

22  Q.   Through the group e-mails?

23       MR. MISKIEWICZ:  No objection.

24       MR. LA RUSSO:  Your Honor, just a few moments.

25       (Pause in proceedings.)

M. Peca  -  Cross/LaRusso

611

1      MR. LA RUSSO:  Your Honor, I have one other area

2  while Mr. Haley has a chance to look at those.

3  BY MR. LA RUSSO:

4  Q.   Mr. Peca, just a couple more questions if I could.

5      Did you invest in Mr. Jowdy's Diamante Del Mar

6  project?

7  A.   Yes, sir.

8  Q.   How much did you invest in Mr. Jowdy's Del Mar

9  project?

10  A.   $500,000.

11  Q.   And you are aware that there were other hockey

12  players that invested in Del Mar as well?

13  A.   Yes, sir.

14  Q.   Do you know what the total investment you and the

15  hockey players made to that Del Mar project?

16  A.   I'm not aware of that number.

17  Q.   Do you still own those shares?

18  A.   Good question.

19  Q.   You're not sure whether you do or you don't?

20  A.   Correct.

21  Q.   Well, let's assume you do own shares.

22      Are you aware of what actually happened to that

23  Del Mar project?

24  A.   I'm not.

25  Q.   Is that still a viable project?

M. Peca  -  Cross/LaRusso

612

1   A.   I'm not sure.

2   Q.   Do you have any knowledge that the project itself was

3   repossessed by a lender for over $7 million that was owed?

4   A.   I think I remember hearing something along those

5   lines.

6   Q.   Did you, yourself, ever do any kind of investigation

7   to see what happened with the money you and the other

8   investors put into Diamante Del Mar?

9   A.   We did not.

10  Q.   Do you know or were you told that Mr. Jowdy took $3

11  million loan against that property after your investments?

12  A.   I vaguely remember Mr. Kenner mentioning something

13  along those lines, but not that specific.

14  Q.   And prior to that loan it was actually the property

15  was owned by the investors and the company free and clear?

16  A.   I didn't know that.

17  Q.   Do you know what the value of that property was?

18       MR. MISKIEWICZ:  Objection, scope.

19       MR. LA RUSSO:  As an investor.

20       THE COURT:  Overruled.

21  A.   I don't know what the overall value was.

22  Q.   Did you have any conversation with the FBI?  Did they

23  tell you what happened?

24  A.   I don't recall.

25  Q.   Did you ask the FBI to look into it?

M. Peca - Cross/LaRusso

613

1   A.   No, sir.

2            MR. MISKIEWICZ:  Objection.

3            THE COURT:  Overruled.

4            MR. LA RUSSO:  Mr. Haley, do you have any

5   objections?

6            MR. HALEY:  So the Court can appreciate my

7   hesitation, it's no one's fault in that regard --

8            MR. MISKIEWICZ:  Your Honor --

9            MR. HALEY:  May we approach, Judge?

10            THE COURT:  Yes.

11            (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M. Peca  -  Cross/LaRusso

614

1          (The following takes place at sidebar.)

2          MR. LA RUSSO:  Judge, I believe these are in

3     evidence but I didn't get a chance to check.

4          MR. HALEY:  Here's my hesitation.

5          There have been any number of stipulations

6     regarding bank records.  I certainly don't have any

7     problem of properly authenticated bank records being

8     produced.  If these were part of a stipulation, I have

9     zero problem.  I'm getting a sense it wasn't part of the

10    stipulation.  Do you know, Mr. Miskiewicz, were these part

11    of the stipulation?

12         MR. MISKIEWICZ:  I believe the Gaarn statements

13    are part of the stipulation and we were going to offer our

14    own copy in.  I'm not sure about the rest.  We have no

15    objection.

16         MR. HALEY:  My only point is if I'm given bank

17    records that I haven't had a chance to be satisfied as

18    part of the stipulation --

19         MR. LA RUSSO:  I can do this.  I can show them

20    for identification and ask him to look, do you remember

21    any monies coming from an account, and leave it like that.

22         MR. HALEY:  Perfect.

23         MR. LA RUSSO:  He gets a chance to look at it

24    and if they're admissible, fine.

25         MR. MISKIEWICZ:  Your Honor, then I can't

615

1    redirect and this is a very important piece of redirect

2    because of the source of those funds.

3            MR. LA RUSSO:  We want it too.

4            MS. KOMATIREDDY:  I can check in a minute.

5            THE COURT:  If I give you 15 minutes or so?

6            MR. HALEY:  Yes.

7            MR. LA RUSSO:  This is part of the indictment.

8            THE COURT:  Okay.  Are you almost done?

9            MR. LA RUSSO:  This is it.  I am done, Judge.

10           MR. HALEY:  Thank you, Judge.

11           (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M. Peca  -  Cross/LaRusso

616

1              (The following takes place in open court.)

2              THE COURT:  Members of the jury, the lawyers

3    just need a couple of minutes to review those documents

4    before they're offered into evidence, so why don't we take

5    the morning break a little bit early and we will reconvene

6    at 10 of 11.  Don't discuss the case.

7              (The jury is excused.)

8              (Recess taken.)

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M. Peca - Cross/La Russo

617

1          (After recess.)

2          MR. LA RUSSO:  Your Honor, as the Court knows,

3    we reached an agreement on the exhibit, actually the

4    government's exhibits, portions of the government's

5    exhibits that are already in.  I just have one other

6    matter I'm trying try to refresh his recollection.  I

7    found a document to see if I can refresh his recollection.

8          MR. HALEY:  So the adjournment was constructive.

9          MS. KOMATIREDDY:  Given that the defense has now

10   moved in C-29 which is the e-mail the subject line media

11   counter punch, the content is all please see the link

12   below TC and then a link to an article.  This related to

13   the prior discussion the parties had regarding whether

14   Mr. Constantine used the GSF funds for personal benefit

15   versus press related to the hockey players.  The defense

16   has now put squarely at issue what is the content of the

17   article that HL group was hired to respond to.

18          Given that this is now an issue clearly in

19   dispute we ask that the court permit admissibility of

20   government exhibit 3309, which is the article we submit we

21   showed proof,  the witness will testify that he was the

22   article that he was presented with to respond to and so

23   now that it's come out the probative value would increase

24   greatly because we actually have in evidence the defense's

25   proposition for what they believe the purpose of the funds

M. Peca - Cross/La Russo

618

1    was.

2                MR. LA RUSSO:  Your Honor, I don't believe I

3    opened the door.  That was part of agreement, it's one

4    article.  If the government in that case that it feels it

5    becomes relevant, we've already had a discussion and we're

6    arguing it isn't.  If it is --

7                THE COURT:  The article referenced in the e-mail

8    is a different article.

9                MR. LA RUSSO:  Correct, totally different.  And

10   we didn't see it was personal.  We said it related to

11   Global Settlement Fund of Mr. Jowdy.

12               THE COURT:  Again, whatever probative value that

13   article has, to the extent I'm going to let the witness

14   testify that it was a negative article about

15   Mr. Constantine personally, I don't see any additional

16   probative value if the jury knows what the negative aspect

17   was.

18               The government doesn't need to try to argue to

19   the jury that that was the not appropriate use of the

20   funds, although I think the witness testified that it was

21   a negative article about Mr. Constantine, so if this

22   witness seems to know there were an article about

23   Mr. Constantine I thought that is what I heard him say.

24   So I agree with Mr. La Russo, I don't think he's opened

25   the door to any additional proof on that.

M. Peca - Cross/La Russo

619

1           Let's bring in the jury.

2           MR. MISKIEWICZ:  Your Honor, I have one more

3    request.  There was an answer that Mr. Peca gave regarding

4    a break between him and Mr. Constantine, he said it was

5    personal.  I would like to have an opportunity just to

6    confirm what he means by that and it's not a way by which

7    we're going to get into what we just discussed, his prior

8    conviction.  I just don't know.  I didn't know what he

9    meant by that.  I want to pursue it in redirect.  I'd like

10   to have an opportunity to just confirm what he's going to

11   say between cross and -- the end of cross and redirect if

12   I can have a brief moment.

13          MR. LA RUSSO:  I think it's got to do with

14   penthouse, we're trying to leave some issues out, we

15   weren't going to talk about other investments that my

16   client and Mr. Peca had.  It had to do with penthouse.

17          THE COURT:  Another negative article?

18          MR. LA RUSSO:  No.  We can have a talk right now

19   to find out what it was.

20          MR. MISKIEWICZ:  No.  I want to make sure --

21          MR. LA RUSSO:  I'm sorry.  We can take two

22   minutes and ask him about that.

23          THE COURT:  We'll do it right here in open

24   court.  Let's bring him in.

25          (Witness enters the courtroom.)

M. Peca - Voir Dire/Miskiewicz

620

1        THE COURT:  Mr. Peca, before the jury comes back

2   Mr. Miskiewicz wants to ask you one question, we want to

3   make sure we know what your answer is.

4        THE COURT:  Go ahead..

5   BY MR. MISKIEWICZ:

6   Q.   Mr. Peca before the break, during the

7   cross-examination you indicated there was a break between

8   you and Mr. Constantine.  Could you elaborate on what you

9   meant by personal reason?

10  A.   It has to do with motivation in penthouse that these

11  two here gentlemen got me involved and that turned out to

12  be a great nightmare in my life.

13       MR. MISKIEWICZ:  All right.

14       THE COURT:  Mr. La Russo.

15       MR. LA RUSSO:  Yes, that's fine.  That's what we

16  assumed it was.

17       MR. HALEY:  Your Honor, I apologize.  Is that

18  question going to be asked.

19       THE COURT:  I'm going to allow it.

20       MR. HALEY:  That part of it said that was great

21  nightmare.  It's not going to open up, Judge, I apologize.

22       THE COURT:  I think, again Mr. La Russo has

23  asked him why the relationship ended.  I don't want it to

24  be characterized that it was a nightmare.  It related to

25  something else.  The jury should understand it to do with

M. Peca - Cross/La Russo

621

1  what we're describing here.  Not that it was a nightmare.

2  Okay?

3           THE WITNESS:  Okay.

4           THE COURT:  Okay.

5           THE CLERK:  All rise.

6           (Whereupon, the jury entered the courtroom.)

7           THE COURT:  If everyone would be seated.

8  Okay, go ahead, Mr. La Russo.

9           MR. LA RUSSO:  Thank you, your Honor.

10  Your Honor, there's been a stipulation of both the

11  government, the defendant and Mr. Haley, the Government

12  Exhibit 1724, this is a portion of that exhibit, it's the

13  statement, the bank statement of Phil Kenner for the

14  period February 20, 2009 through March 23, 2009 and

15  turning to the third page.

16           THE COURT:  Let me make sure.  Are you

17  separately using this?

18           MR. LA RUSSO:  It's already in evidence.  I

19  believe it's received during the government, when we put

20  in all those numbers in, Judge, this is a portion of that,

21  the Government Exhibit, I'll read it.  1724.

22           THE COURT:  Okay, Go ahead, Mr. La Russo.

23

24  BY MR. LA RUSSO:

25  Q.   I highlighted portion, Mr. Peca, if you can read it

M. Peca - Cross/La Russo

622

1    so the jurors -- can you read what that says, the

2    highlighted portion?

3    A.    Deposit CORR/ADJ fee image, wire type, wire out,

4    date, 090223.

5    Q.    There's a series of numbers?

6    A.    Where.

7    Q.    Would you agree with me that's the beneficiary of

8    this wire?

9    A.    Yes.

10   Q.    Michael A. Peca, that's you, correct?

11   A.    Correct.

12   Q.    And it says March 23, 2009 for 12,400?

13   A.    Right.

14   Q.    Do you have any recollection of receiving that money

15   from Mr. Kenner?

16   A.    I do not.

17   Q.    Do you remember, in your relationship with him,

18   receiving money, is that correct?

19   A.    Possibly.

20   Q.    Do you know the source of any of this money that you

21   were receiving at this point?

22   A.    I don't.

23          MR. LA RUSSO:  Your Honor, likewise, Government

24   Exhibit 1725 Mr. Kenner's statement for March 24, 2009

25   through April 22, 2009, again a portion of that exhibit,

M. Peca - Cross/La Russo

623

1    turning to this page and maybe I can summarize it quickly,

2    a wire out from Mr. Kenner's account beneficiary

3    Michael A. Peca, $2,196.67, do you have any recollection

4    of receiving this money from him on March 4, 2009.

5    A.    No, sir.

6    Q.    It does not mean anything to you?

7    A.    It does not.

8    Q.    Again, Government Exhibit 1726, this is a portion of

9    it, this is Mr. Kenner's statement from April 23, 2009

10   through May 20, 2009 the Government Exhibit 1726.  And

11   I'll summarize on page 3, the highlighted portion it's a

12   wire out again on May 5, 2009 to Michael A. Peca and the

13   amount is $14,587.67.  Do you have recollection of what

14   that is for?

15   A.    I do not.

16   Q.    Do you have any recollection of receiving any of the

17   amounts of money on the date described?

18   A.    No, I do not.

19   Q.    And lastly, this is the bank records of Timothy R.

20   Gaarn, G-A-A-R-N for the period January 14, 2009 through

21   February 11, 2009.  This is Government's Exhibit 2302,

22   this is a portion of it, this is page two of four.

23   Highlighted portion is $13,901.59, funds transferred from

24   Mr. Gaarn's account to Michael Peca.

25             Do you have any recollection of that?

M. Peca - Cross/La Russo

624

1    A.    No, sir.  None.

2    Q.    By the way, who is Mr. Gaarn?

3    A.    Tim Gaarn was a gentleman that I met in Long Island

4    back in 2003.

5    Q.    Did you meet him through anybody?

6    A.    I met him through a life insurance salesman in the

7    Long Island area.

8    Q.    Did you maintain a relationship with him after that?

9    A.    This was the first and last time that I had seen him.

10   Q.    Do you have any recollection of why you're getting

11   this money?

12   A.    I have no idea.

13   Q.    You never spoke to him about any money being

14   transferred into your account?

15   A.    No idea.

16         MR. LA RUSSO:  Last series of questions, if I

17   may, your Honor.

18   Q.    You said that -- and I'm not going to rehash all the

19   testimony, regarding the lawsuit that was brought against

20   Mr. Constantine, the lawyer, Stolber, people that were

21   aligned with him, let me show you with what was marked for

22   identification as C-37, I'm going to turn to a number of

23   pages inside, I'm going to draw your attention to them,

24   look at them, please, make sure that you've seen them so

25   you're satisfied.  Then I'm going to ask a couple of

M. Peca - Cross/La Russo

625

1   questions. It will be the first four pages, and then turn

2   to the another one after that.

3   A.   Okay.

4   Q.   I'm going to direct your attention to a couple of

5   pages so you'll be answering some additional questions.

6   A.   That's my signature.

7   Q.   Do you recognize this?

8   A.   I do.

9   Q.   And it refreshes your recollection as to Mr. Stolber

10  and the other hockey players?

11  A.   Yeah, he was representing the LLC with the other

12  investor players.

13  Q.   And you were a member of the LLC?

14  A.   Correct.

15  Q.   So he was representing the LLC that you were a member

16  of?

17  A.   Correct.

18  Q.   And you didn't have a personal relationship

19  lawyer/client relationship, he was the lawyer for the

20  group of hockey players, the LLC that you were part of?

21  A.   Correct.

22  Q.   And this document reflects your signature authorizing

23  him to represent you; is that correct?

24  A.   Yes.

25           MR. LA RUSSO:  Your Honor, I don't want to

M. Peca - Redirect/Miskiewicz

626

1    introduce the whole document but just the relevant pages.

2    I'll go over it with the government and we'll go through

3    it later.

4              THE COURT:  Okay.

5              MR. LA RUSSO:  I have no further with questions.

6              THE COURT:  Redirect.

7

8    REDIRECT EXAMINATION

9    BY MR. MISKIEWICZ:

10   Q.   Mr. Peca, I want to do this in order of

11   cross-examinations first.  Just a few questions about

12   cross-examination questions that you received from

13   Mr. Haley yesterday.  You were asked a series of questions

14   about your grand jury testimony?

15   A.   Yes.

16   Q.   And I think you said you did answer truthfully,

17   correct?

18   A.   Yes, sir.

19   Q.   And you answered it truthfully based upon whose

20   information?

21   A.   I based it mostly on my information and what I wasn't

22   sure of Phil Kenner helped and cleared the picture a

23   little bit.

24   Q.   And specifically the whole portion of your testimony

25   about Hawaii assets or Hawaii investments being loaned to

M. Peca - Redirect/Miskiewicz

627

1   Ken Jowdy, is that something that you specifically recall

2   or independently recall?  Was that one of those things

3   that Mr. Kenner or Mr. Richards helped you with?

4   A.    More so Mr. Kenner, it was a big topic of

5   conversation.  You know, the whole theme was I believe I

6   even said this in the grand jury testimony, it was clear

7   there because the loan that was made to Ken Jowdy was

8   never paid back.

9         When the loan was made to Ken Jowdy I was never

10  informed that the loan was made to Ken Jowdy in my mind,

11  but I was made aware and that's what I testified to.

12  Q.    You did make investments, you were asked by

13  Mr. La Russo and perhaps yesterday, you did make think you

14  said a half a million dollar investment to a Diamonte del

15  Mar Mexico project?

16  A.    Correct.

17  Q.    When you made those investments, you knew that

18  Mr. Jowdy was running that operation?

19  A.    I knew that he was involved, yes.

20  Q.    You did have an independent recollection of making

21  that investment, correct?

22  A.    Correct.

23  Q.    And were you also simultaneously making an investment

24  or you had investments in the Hawaii project?

25  A.    Yes.

M. Peca - Redirect/Miskiewicz

628

1    Q.    I think -- last question.

2          I think there was a reference to whether or not

3    you felt coerced at any point in Mr. Haley's

4    cross-examination.  Do you recall taking a break or asking

5    for a recess during the grand jury proceedings?

6    A.    I do.

7    Q.    Why did you do that?

8    A.    The night before and leading up to, I was led to

9    believe that this was a grand jury convened for

10   prosecution regarding Ken Jowdy.  Slowly as the questions

11   were being answered, I was becoming increasingly

12   uncomfortable based upon what I had testified the night

13   before, and when I took a break I came back in I said this

14   is not the two lawyers for Ken Jowdy and it was about Phil

15   Kenner, and I was growing increasingly uncomfortable.

16   Q.    Turning to the questions you received from

17   Mr. La Russo both yesterday and today, actually we'll take

18   one of the last series of questions first.  You were shown

19   a series of accounts, Government Exhibits 724, 25, 26, and

20   you indicated that you had no recollection of getting

21   money that seemed to be indicated that you were getting in

22   these accounts?

23   A.    Correct.

24   Q.    Showing you the third page of Government's Exhibit

25   1724, this is a Phil Kenner account dated or for the

M. Peca - Redirect/Miskiewicz

629

1   period 2/20/09 through 3/23/09.

2           At or about this time in addition to the

3   investments in Hawaii and other investments that you

4   testified about, did you also, through Mr. Kenner, also

5   invest in a penthouse with some kind of unit condominium

6   unit at the Palms hotel?

7   A.    Yes.

8   Q.    When you invested there in that, what if any was the

9   agreement that you reached with Mr. Kenner about who would

10  cover the mortgage payments on that condominium?  What was

11  your agreement?

12          MR. HALEY:  I object.

13          THE COURT:  Why don't you approach.

14          MR. HALEY:  Thank you

15          (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Official Court Reporter

M. Peca - Redirect/Miskiewicz

630

1          (Whereupon, the following occurred at sidebar.)

2          THE COURT:  What's the objection?

3          MR. HALEY:  Your Honor, it is -- in my view it

4    would clearly constitute 404(b) material and there was

5    representation made sometime ago that the government was

6    not introducing 404(b) material.  If this line of inquiry

7    actually was the Palms unit in of itself it would be a two

8    day trial, involved instances where there were contracts

9    between the various parties, our client's position is that

10   Mr. Peca breached the contract.  It's a dispute that is

11   entirely a complete distraction to this jury.

12          THE COURT:  What's the relevance to this case?

13          MR. MISKIEWICZ:  I didn't introduce it.

14          MR. LA RUSSO:  I can tell you my theory, this is

15   $45,000 that came out of the sales of stock that

16   Mr. Kenner and Mr. Gaarn conspired.

17          THE COURT:  Keep your voice down.

18          MR. LA RUSSO:  Sorry.

19          MR. MISKIEWICZ:  So in essence, part of the

20   withdrawal of money from Eufora and/or other aspects of

21   the Global Settlement Fund, Mr. Kenner is diverting to

22   keep him quiet as long as he can be paying off the

23   mortgages on those condos.  The condo may or may not be

24   fraudulent.  So this money represents the defendant wiring

25   into Mr. Peca's account.

M. Peca - Redirect/Miskiewicz

631

1    THE COURT:  Eufora money?

2    MR. MISKIEWICZ:  Was it money that was --

3    MR. LA RUSSO:  That's going to be our argument.

4    MS. KOMATIREDDY:  Every single one of these

5  payments is because Mr. Kenner owes Mr. Peca money.  It's

6  not that Mr. Peca is getting proceeds.  It's an -- I think

7  we need to establish that there's a separate investment in

8  which Mr. Peca is supposed to get payments from Mr. Kenner

9  because this particular Waterstone account is solely for

10  the purpose of the mortgage on the condo.

11    THE COURT:  I think some explanation of his

12  receiving the money, the jury should know whether it's

13  based on something we're talking about here or not.

14    MR. HALEY:  He said you know if we leave the

15  Palms, he breached the agreement between myself -- we end

16  up going down a path.

17    THE COURT:  I want to know -- you suggest

18  there's some fraud with respect to that.

19    MR. HALEY:  Thank you.

20    MR. MISKIEWICZ:  Thank you, Judge.

21    (Continued on next page.)

22

23

24

25

M. Peca - Redirect/Miskiewicz

632

1          (Whereupon, the following occurred in open
2     court.)
3               THE COURT:  Go ahead, Mr. Miskiewicz.
4               MR. MISKIEWICZ:  Thank you, your Honor.
5     BY MR. MISKIEWICZ:
6     Q.   At or about this time, Mr. Peca, did you have some
7     agreement by which the defendant Mr. Kenner agreed to pay
8     the mortgage on those condominiums?
9     A.   That was it was a penthouse and he was responsible
10    for all carrying costs.
11    Q.   And again I'll show you the date and pages on the
12    various time frame of these transactions, at least on the
13    Kenner accounts.
14               Showing you 724, 25, 26, does that refresh your
15    recollection now that these represented wire transfers
16    into your account from Mr. Kenner for the mortgages on
17    those -- on that penthouse?
18    A.   Yes, quite possible.
19    Q.   Being quite possible, do you have any reason to doubt
20    that that's what the wire transfers were going for?
21               MR. HALEY:  I object.
22               THE COURT:  Sustained.  Sustained.
23    Q.   Also with respect to the Palms, you were asked by
24    Mr. La Russo I think yesterday about an e-mail that you
25    received in which you were notified that you would be

M. Peca - Redirect/Miskiewicz

633

1    getting an additional interest in some Palms units.  Are

2    those different from, assuming those represent your

3    condominium mortgage payments for the penthouse, are these

4    different units or are you talking about different units?

5    A.    Separate units.

6    Q.    Also said to Mr. La Russo there came a time that you

7    and Mr. Constantine had a parting of the ways that was

8    permanent.  What was the reason for that?

9    A.    It was with respect to the same Palms penthouse unit.

10   Q.    Can you explain that to the jury?  What about the

11   Palms units was it that you, that upset you?

12   A.    It was one unit, when I first got involved with the

13   unit it was strictly with Phil Kenner.  He indicated that

14   he was my sole partner at the unit.  And at the time of

15   the Global Settlement Fund pitch, Tommy mentioned I'm also

16   your partner in the penthouse which is the first time I

17   ever heard it in my life.  Phil didn't say anything.  I

18   questioned him about it later, his comment was I told him

19   about it.  I told him it might perceive that way.  That I

20   don't need to apologize.  But then it's just a series of

21   you know times are real, closing cost, I'm just covering

22   the cost, if it turns over I'll could end up getting all

23   the costs, and keep my mouth shut.  But then it was just a

24   series of trying to figure out what was going on, who was

25   covering the cost, because it turned out I had to up

M. Peca - Redirect/Miskiewicz

634

1    covering all the cost, everything was in my name and to

2    this day It's still costing me a lot of money.

3         MR. HALEY:  Judge, I object, I ask that that

4    last portion be stricken.

5         THE COURT:  Yes.  Sustained.  The last portion

6    will be stricken, that transaction is not relevant for

7    purposes of this case.

8         MR. HALEY:  Thank you, sir.

9    Q.   Yesterday you were shown by Mr. Constantine's lawyer

10   Mr. La Russo Defendant's Exhibit C-24.

11        Just so we can show what you're talk about, what

12   you were being shown by Mr. La Russo, this e-mail

13   yesterday that begins:  I'm happy to report that we have

14   executed the memorandum of understanding?

15   A.   I remember that, yes.

16   Q.   I'm going to show you the actual exhibit, if you

17   would follow along, please.  (Handing.)

18        There was attached to that e-mail a letter, do

19   you see it on the second page of that exhibit?

20   A.   Yes.

21   Q.   Do you have an independent recollection of actually

22   seeing this memo, I'm sorry, the letter at the time of

23   this e-mail?

24   A.   I might have looked at it, yeah.

25   Q.   Would you read, I'll read out loud, the first line of

M. Peca - Redirect/Miskiewicz

635

1    the sentence.

2            THE COURT:  Okay.

3    Q.   This letter and the term sheet attached here to as

4    Exhibit A set forth the terms, Tommy Constantine and his

5    associated existing settlement, that is TC and A are

6    willing to enter into negotiations to attempt to agree on

7    the definitive form of agreements, that is agreements, for

8    Sonenglick Industries LLC or its approved, assigns and TC

9    and A to enter into a joint venture, J V, to acquire the

10   existing mortgage debt encumbering the project followed by

11   the acquisition by JV of the ownership of the more project

12   that's more particularly expressed below.

13           What does that mean?

14   A.   I don't know.

15   Q.   And if I asked you to read paragraph one and asked

16   you whether or not it basically said that there is a loan

17   outstanding, and that Mr. Sonenglick is going buy up the

18   loan on this Cabo San Lucas dial, do you want to take a

19   minute to see if you agree that that's in sum and

20   substance what it says?

21   A.   It looks like that's what it says.

22   Q.   And then in paragraph 2 it says acquisition of the

23   project, take a minute, take as long as you need, would

24   you agree in essence it says after Mr. Sonenglick buys out

25   this $125 million loan then the joint venture, the JV, is

M. Peca - Redirect/Miskiewicz

636

1    going to take over the Cabo San Lucas project, foreclose I

2    think is one of the words he uses.

3    A.    Okay.

4    Q.    Is that in sum and substance what it says?

5    A.    Yes.

6    Q.    I'll leave it there for now.  Also paragraph nine

7    which I think is 4 pages into Mr. La Russo's exhibit it

8    says binding effect, would you agree with me that the

9    purpose of that paragraph, take a moment to read, is

10   basically saying nothing in this agreement is binding on

11   anybody?

12   A.    Yes.

13   Q.    Insofar as you recall or now having read more fully

14   if necessary the memorandum of understanding, when you got

15   this e-mail from Mr. Constantine with this attachment,

16   what, if anything, did you win as a result of these, all

17   the settlement fund investments?

18   A.    I'm not sure.

19   Q.    Other than we're hoping, we're promising, maybe we'll

20   take over Mr. Jowdy or Cabo San Lucas, is there anything

21   here that you got, tangibly got as a result of this?

22   A.    No.

23   Q.    You got the keys to Cabo San Lucas?

24   A.    No, sir.

25   Q.    Do you have a key to the condominium, I don't mean

M. Peca - Redirect/Miskiewicz

637

1    the penthouse, the other one that you were going to get an

2    increased percentage of?

3    A.    No.

4    Q.    Did you ever see the airplane?

5    A.    No.

6    Q.    By the way, you'll agree with me that the original,

7    you have the original or the exhibit original, it's pretty

8    clear typewritten, would you for the record agree that the

9    typewritten copy of the letter which goes on for a number

10   of pages here is looks like it's come right out of a

11   printer?

12   A.    I suppose so, yes.

13   Q.    Would you look at the last page, signature page?

14   A.    Okay.

15   Q.    See any difference between that signature page and

16   everything that preceded it, in terms of the quality of

17   the print?

18   A.    It's much more faded.

19   Q.    All right.  I'll put up on the screen what you're

20   looking at.  Page immediately before what I was referring

21   to was term sheet, appears to be printed off a printer,

22   correct?

23   A.    Yes.

24   Q.    And it goes the last page of the letter, this is the,

25   for the record would you agree that this is appears to be

M. Peca - Redirect/Miskiewicz

638

1  essentially printed right off of a printer?

2  A.    Yes.

3  Q.    And then the signature line on the next page is

4  blurred?

5  A.    It's significantly blurred, yes.

6  Q.    And the signature line for Mr. Sonenglick doesn't

7  even match up with the signature line for Tommy

8  Constantine?

9  A.    It looks that way, yes.

10  Q.    The only thing that appears on that last pages we

11  look forward to working with you on this transaction,

12  sincerely and then signed Tommy Constantine, correct?

13  A.    Correct.

14  Q.    Do you have any independent knowledge as to whether

15  or not that signature line ever really accompanied any of

16  the previous pages in this exhibit?

17  A.    No.

18  Q.    Did you ever meet Mr. Sonenglick?

19  A.    I have not met him, no.

20  Q.    Do you know he exists?

21  A.    I do not.

22  Q.    Yesterday you were asked a series of questions about

23  Defendant's Exhibit C-25, this is a fax that you received

24  to purchase or an option agreement to purchase an interest

25  in Eufora, do you recall that?

M. Peca - Redirect/Miskiewicz

639

1    A.    Yes.

2    Q.    And this pertained to your original investment of

3    $166,000 in the year in July 2004, is that accurate?

4    A.    Correct.

5    Q.    With respect to the other wire transfers that you

6    made for a hundred thousand and for two other wire

7    transfers that you made for a hundred thousand, one of

8    which went to Constantine Management Group, did you ever

9    get anything like that?

10   A.    I did not.

11   Q.    And Mr. La Russo asked you isn't it a fact that you

12   did in fact get a percentage share our got an interest in

13   Eufora, do you recall that question?

14   A.    I do.

15   Q.    As you sit here today, what do you have, a bank

16   account in your pocket, in your asset and liability

17   statement to show that you have actually an interest in

18   Eufora?

19   A.    Nothing.

20   Q.    Mr. Peca, you were also asked by Mr. La Russo a

21   series of questions about lawsuits initiated against Ken

22   Jowdy.  Do you recall that?

23   A.    Yes.

24   Q.    I think that you were also asked about a mediation

25   that you attended?

M. Peca - Redirect/Miskiewicz

640

1   A.   Correct.

2   Q.   Show you what I'm marking now as Government's

3   Exhibit -- may I have a moment, your Honor -- I show you

4   what I'm marking for identification now as MP-1.

5            (Handing.)

6            Take a moment and look at that.  (Pause.)

7            MR. MISKIEWICZ:  Your Honor, may just confer

8   with counsel for a second about something?

9            (Counsel confer.)

10           MR. MISKIEWICZ:  Your Honor --

11           MR. LA RUSSO:  Your Honor, may we have just a

12   brief sidebar.

13           (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

M. Peca - Redirect/Miskiewicz

641

1           (Whereupon, the following occurred at sidebar.)

2           MR. MISKIEWICZ:  There was a missing page.  So

3    this is an e-mail to Mr. Peca among a number of the other

4    players who were part of a lawsuit instituted by Ronald

5    Richards ostensibly for the Global Settlement Fund and

6    directly relates to this memorandum of understanding,

7    basically Mr. La Russo raised, he characterized it as did

8    Mr. Jowdy sue.  There was an offer of compromise or

9    explanation he offered to sue, I mean he challenged,

10   basically he left it to the jury to make it sound as if

11   because Mr. Jowdy sued the deal fell through.  In fact,

12   what happens is Mr. Kenner and Mr. Constantine do not want

13   any of the players to post in California and by this

14   letter from Mr. Richards he's advising them basically the

15   time has run out.  If they don't withdraw the lawsuit

16   without prejudice, the lawsuit's going to probably be

17   dismissed with prejudice.  We believe he would remember

18   getting this letter from actually his attorney since he is

19   a member of the Global Settlement Fund, and/or moving,

20   we'd move to have it introduced simply to complete the

21   picture that it wasn't that the deal somehow is rejected

22   in negotiation in bad faith but rather again -- once

23   again, the defendants engineered this effort to keep the

24   players in the dark as much as possible.  All of which

25   falls by the wayside when about a year later he went into

M. Peca - Redirect/Miskiewicz

642

1    the grand jury.

2            MR. HALEY:  I have no objection, Judge.

3            MR. LA RUSSO:  First of all, it's Mr. Richard's

4    letter, so it's hearsay.

5            THE COURT:  I know, but you opened the door to

6    this.

7            MR. LA RUSSO:  Judge, my objection is hearsay,

8    but if he wants to refresh this witness' recollection by

9    showing it to him and clarify it personally, that would be

10   improper.  That's the only reason.

11           THE COURT:  Let we do it that way.  See if you

12   can refresh his recollection by this without actually

13   putting it in.

14           MR. MISKIEWICZ:  Thank you.

15           MR. LA RUSSO:  Thank you.

16           (Continued on next page.)

17           (Whereupon, the following occurred in open

18   court.)

19

20

21

22

23

24

25

Peca - Direct/Mr. Miskiewicz

643

1   REDIRECT EXAMINATION (Continued)

2   BY MR. MISKIEWICZ:

3   Q.   Mr. Peca, to yourself, could you just read the

4   letter, the attachment to the first page of what is now

5   marked for identification purposes as Government Exhibit

6   MP1.

7   A.   I am referring to that.

8   Q.   There is an attachment.  Just read the letter --

9   there is also a first page, Mr. Peca.

10  A.   Okay.  The first page is here.

11           DeVries versus Kenneth H Jowdy it says.

12  Q.   To yourself.

13  A.   I'm sorry.  Okay.

14  Q.   Does that in any way help refresh your recollection

15  as to what happened to the lawsuit that you were asked

16  about on cross-examination regarding Mr. Jowdy and his

17  attempts to get back some of your funds from Mexico?

18  A.   Yes.

19  Q.   Tell the members of the jury what happened to that

20  lawsuit.

21  A.   That lawsuit was dismissed without prejudice.

22  Q.   By who?

23  A.   By the court.

24  Q.   And other than that lawsuit, did your global

25  settlement funds money, did you ever get an accounting of

Peca - Direct/Mr. Miskiewicz

644

1   how those legal fees were spent?

2   A.   How they were being spent, no.

3   Q.   To this day do you know how they were spent?

4   A.   Not exactly, no.

5   Q.   And other than that one lawsuit, which was dismissed

6   without prejudice, do you know if any money was spent in

7   the litigation?

8   A.   No.

9   Q.   Did you get your money back?

10  A.   Not to my knowledge.

11  Q.   By the way, what if anything did that litigation that

12  Mr. LaRusso asked you about regarding Mexico have to do

13  with the millions or $1.775 million in your line of credit

14  that you authorized for the Hawaii investment?  What if

15  anything?

16  A.   Nothing.

17  Q.   One more question.  Who moved to dismiss that

18  lawsuit?

19  A.   I'm not sure.

20  Q.   Does reading that letter refresh your recollection as

21  to who --

22           MR. HALEY:  Objection.

23  BY MR. MISKIEWICZ:

24  Q.   I will ask you again read the letter to yourself.

25  Don't comment on it.  I ask you if it refreshes your

Peca - Direct/Mr. Miskiewicz

645

1    recollection as to who moved to dismiss the lawsuit

2    against Mr. Jowdy.

3              MR. HALEY:  Objection, your Honor.

4              THE COURT:  No.  That is okay.

5    BY MR. MISKIEWICZ:

6    Q.   More specifically, was it Mr. Richards, in your

7    behalf and the players behalf, or was it Mr. Jowdy?

8              MR. HALEY:  I object to the leading nature of

9    it.  I object.

10              THE COURT:  Overruled.

11   A.   Mr. Richards.  I remember at the time he told us we

12   may possibly be put in a position where, you know, some

13   players may be required to give depositions during the

14   Olympics and during the season, which obviously would have

15   proved difficult for us to participate in.

16   Q.   Well, this is a, correct me if I'm wrong.  What year

17   is this happening?  2009?

18   A.   Yes.

19   Q.   No.  2010.  Right?

20   A.   2010.

21   Q.   You were in the Olympics in 2010?

22   A.   No.  I was tired.

23   Q.   You didn't have any problem being deposed, did you?

24   A.   No.

25   Q.   Did anybody ever tell you that there was a request to

Peca - Direct/Mr. Miskiewicz

646

1    have your deposition taken?

2    A.    No.

3    Q.    Did Mr. Richards, your lawyer hired through

4    Mr. Kenner, tell you that?

5    A.    No, he did not.

6    Q.    Did Mr. Kenner tell you there was a deposition

7    requested?

8    A.    No.

9    Q.    Were you given any information about the status of

10   the lawsuit?

11   A.    Not until it was dismissed.

12   Q.    And that Mr. Richards is the same Mr. Richards who

13   appeared with you just before you went into the grand jury

14   in Manhattan?

15   A.    Yes, it is.

16   Q.    A year later.

17   A.    Correct.

18   Q.    And got prepped by Mr. Richards and the defendant.

19   A.    Correct.

20   Q.    Just one last question.

21          Do you remember this Mr. Sonenglick letter?

22   A.    Yes.

23   Q.    That Mr. LaRusso asked you about?

24   A.    Yes.

25   Q.    There is a page here that says -- I will get it for

Peca - Recross/Mr. Haley

647

1   you in a minute.  See where it says SI?  I will read it

2   into the record.

3        *SI, Sonenglick Industries, will recognize the*

4   *11.3 plus-minus M* -- that must mean millions -- *of cash*

5   *equity contributed by TC&A* -- that's you guys -- *to the*

6   *current owner.*

7        Where was that 11.3 million going to come from?

8   A.   No idea.

9   Q.   So when you were given this congratulatory email from

10  Mr. Constantine, were your troubles over regarding all the

11  millions you had lost?

12  A.   No, they weren't.

13  Q.   To this day do you have any accounting of where they

14  went?

15  A.   None.

16       MR. MISKIEWICZ:  No further questions.

17       THE COURT:  Mr. LaRusso, anything further?

18       MR. LaRUSSO:  I do.  But Mr. Haley needs to go

19  first, judge.

20       THE COURT:  All right.

21       MR. HALEY:  Thank you.

22

23  RECROSS-EXAMINATION

24  BY MR. HALEY:

25  Q.   Mr. Peca, the very first question that Mr. Miskiewicz

Case 2:13-cr-00607-JFB-AYS  Document 294-4  Filed 07/02/15  Page 76 of 258 PageID #: 4652

648

1  asked you on redirect concerned your claim that you felt

2  uncomfortable testifying before the grand jury in the

3  Southern District of New York.

4  　　　　Do you recall that testimony?

5  A.　It grew uncomfortable.  Yes.

6  Q.　And I believe Mr. Miskiewicz asked you a question

7  about whether there came a point in time you asked to

8  consult with your attorney.  Is that correct?

9  A.　Correct.

10  Q.　And you then left the grand jury room.

11  A.　Yes, sir.

12  Q.　And then spoke with Mr. Richards.  Is that correct?

13  A.　Yes.

14  Q.　Did you then return?  You then returned to the grand

15  jury room.  Is that true?

16  A.　Yes.

17  Q.　I'm going to show you a document marked Kenner

18  Exhibit 20 for identification.  And it is somewhat lengthy

19  but I will simply request that you look at the document,

20  every page, in a gross sense, and then I'm going to ask

21  you some questions.  Okay?

22  　　　　Mr. Peca, if I may.  As relates to that

23  document, if you can perhaps just look through it more

24  quickly, my question is, sir, does that appear to be the

25  transcript of your testimony before the grand jury in the

649

1   Southern District of New York?  That is my question.

2   A.    Yes.

3   Q.    Now I'm going to show you a specific page in this

4   document, sir.  Specifically, page 35.

5   A.    Okay.

6   Q.    Does that appear to be the point in the grand jury

7   testimony where the questioning of you continued after you

8   had consulted with Mr. Ronald Richards?

9   A.    Yes.  One of the two times.

10  Q.    And from that point on, to the end of that grand jury

11  testimony and questioning, did you ever say to the grand

12  jury outside of the presence of Mr. Richards, who was not

13  inside the grand jury room, that you felt uncomfortable

14  about answering any of the questions posed to you?

15  A.    I did not.

16  Q.    I believe you testified that the reason you felt

17  uncomfortable was because you were under the impression it

18  was a grand jury investigation of Jowdy, and then through

19  the questioning you surmised that it was a grand jury

20  investigation of Phil Kenner.  Is that correct?

21  A.    That would be correct.

22  Q.    Well, after you consulted with Mr. Richards, you were

23  asked this specific question, were you not, sir?

24         Question:  Let me show you Grand Jury Exhibit

25  107, starting with the signature.  Is that your signature?

Peca - Recross/Mr. Haley

650

1      Answer:  It is.

2      Question:  This letter is dated March 11, 2005.

3      *Gentlemen, this letter is your authorization to*

4  *allow Philip A Kenner to access my above-referenced line*

5  *of credit*, it says for line of credit, *for direct deposit*

6  *to Aisle IV account at Northern Trust, he is authorized to*

7  *sign for the release of funds relating to the line.*

8      *Do you remember signing this?*

9      *Answer:  I do.*

10     That's what you testified to.  Correct?

11  A.   That's what it says.

12  Q.   And that was truthful testimony.  Correct?

13  A.   Correct.

14  Q.   It goes on to say:

15     *Did you write this or was it written and given*

16  *to you?*

17     *Answer:  It was prepared for me.  I read it and*

18  *signed it.*

19     *Question:  Who prepared it for you?*

20     *Answer:  I'm not sure.*

21     *Question:  Who gave it to you?*

22     *Answer:  Phil.*

23     Do you recall that testimony senior?

24     MR. MISKIEWICZ:  Objection.

25     THE COURT:  Yes.  Sustained.

Peca - Recross/Mr. Haley

651

1    You have to approach.  I don't understand where

2    we are going with there as relates to his --

3         MR. HALEY:  I will withdraw the question.

4    BY MR. HALEY:

5    Q.   Sir, is it not a fact that after you consulted with

6    attorney Ronald Richards and based upon your testimony

7    today and yesterday you were now uncomfortable about

8    answering questions, you nevertheless answered 51

9    questions thereafter in front of that grand jury?

10        Isn't that true?

11   A.   Yes, sir.

12   Q.   At any point in time before your testimony in front

13   of the grand jury in the Southern District of New York,

14   did Phil Kenner tell you that you had to consult or be

15   represented only by Ronald Richards as relates to this

16   proceeding?

17        Yes or no?

18   A.   It seemed so.  It seems that way, yes.

19   Q.   When you say it seemed that way, sir, at no point in

20   time did you, at any point in time when Phil Kenner

21   suggested it only must be Ron Richards who represents you,

22   did you at any point in time inquire as to why that needed

23   to be?

24   A.   Because he knew Ken Jowdy better than he knew himself

25   and that he went to the depositions and Ron knew the case.

Peca - Recross/Mr. Haley

652

1    Q.    And you were comfortable with that, were you not?

2    A.    I was.

3    Q.    As a matter of fact, that comfort level actually was

4    one that developed back a year earlier in 2010 when you

5    were in Los Angeles for the mediated settlement

6    discussions.  Correct?

7    A.    I suppose so.

8    Q.    From that point in time in 2010 up to the grand jury

9    testimony in 2011, was there anything prohibiting you from

10   consulting any other attorney as relates to these matters?

11   A.    No.

12   Q.    Now, you were asked a question by Mr. Miskiewicz as

13   to whether you ever had an understanding or knowledge as

14   to where the monies that were devoted to the global

15   settlement fund, where they went.

16         Do you recall that question?

17   A.    Yes, I do.

18   Q.    And I believe you testified a moment ago, to this day

19   you have no idea.  Is that right?

20   A.    I have seen like a bank spreadsheet but I don't know

21   what any of it meant.

22   Q.    Correct, sir.  As a matter of fact, when you were

23   interviewed by the FBI on February 22, 2012, you told the

24   FBI that you had seen this spreadsheet regarding the

25   disbursement of the global settlement fund.  Correct?

Peca - Recross/Mr. Haley

653

1    A.    Correct.  I received it from a friend of mine who

2    received it.  It didn't explain much.

3    Q.    But there were numbers on it.  Correct?

4    A.    There were.  There was no way to authenticate it so I

5    wasn't sure --

6    Q.    That's not my question, sir.  I wasn't asking you

7    whether or not there was a way to authenticate it.  My

8    question to you is as relates to the interview of you by

9    the FBI in February of 2012.

10          Prior to that interview you had received, now

11   you tell us through this friend, a spreadsheet that

12   reflects where the money went with reference to the global

13   settlement fund.  Correct?

14   A.    That's correct.

15   Q.    That had numbers on it.  Is that correct?

16   A.    Yes, it did.

17   Q.    You were able to visualize those numbers?

18   A.    To some extent, yes.

19   Q.    Okay.  Finally, sir.

20          During the course of the communications either,

21   during the course of the communications between you and

22   Phil Kenner with respect to a line, the line of credit,

23   Mexico, things of that nature, in addition to personal and

24   telephone conversations, I believe you testified to the

25   other day, there were also exchanges of text messages,

Peca - Recross/Mr. Haley

654

1    were there not?

2    A.    Oh, yes.  Several I'm sure.

3    Q.    Sir, would you kindly take a look at that document.

4    A.    Okay.

5    Q.    Do you recall a text message of that substance that

6    occurred between yourself and Phil Kenner on or about

7    December 9, 2000?

8    A.    Sure.

9    Q.    Excuse me.  It is cut off.

10          It is 2009.  I apologize.

11          And in that text message from you to Phil, you

12   respond:  Oh, yah.  Thanks.  Cleaning up my file today.

13          MR. MISKIEWICZ:  Objection.  It has not been

14   moved into evidence.

15          THE COURT:  Are you offering it?

16          MR. HALEY:  I am offering it into evidence.  I

17   apologize.

18          THE COURT:  Any objection?

19          MR. MISKIEWICZ:  May I have a voir dire?

20          I will withdraw it.

21          We have no objection.

22          THE COURT:  Any objection?

23          MR. LaRUSSO:  No, your Honor.

24          THE COURT:  What is the number?

25          MR. HALEY:  This is going to be number 21.

Peca - Recross/Mr. LaRusso

655

1    THE COURT:  21 is admitted.  Go ahead.  You can

2    ride it.

3    (Defense Exhibit 21 in evidence.)

4    BY MR. HALEY:

5    Q.  Sir, that text exchange between yourself and Phil, it

6    reads, for the record:

7    *Oh, Yah.  Thanks.  Cleaning up my files today.*

8    *We never did get the docs on the Mexico stuff.  I have*

9    *ashtload of Hawaii* -- a what?  I think you were going to

10   say a shitload of Hawaii -- *docs but no Mexico.  Would*

11   *like them.  Thanks.*

12   Is that what it says?

13   A.  Yes, it does it.

14   MR. HALEY:  Thank you, sir.

15   THE COURT:  Mr. LaRusso.

16   MR. LaRUSSO:  I will try and be brief, judge.

17

18   RECROSS-EXAMINATION

19   BY MR. LaRUSSO:

20   Q.  Mr. Peca, when Mr. Miskiewicz was questioning you,

21   you said that you were never given the status of the

22   lawsuit.

23   Do you remember that testimony?

24   A.  Yes.

25   Q.  Would you take a look at that.

Peca - Recross/Mr. LaRusso

656

1    Would you be prepared to stay that that is a

2  communication to you and the other hockey players

3  regarding the status of the lawsuit?

4  A.   Yes.

5  Q.   So when you testified you were never given the status

6  of the lawsuit, that wasn't completely accurate in

7  response to Mr. Miskiewicz when asked a question on

8  redirect.  Right?

9  A.   This was the first we got of it.

10 Q.   The first time?

11 A.   This one.

12 Q.   Well, let me show you what has been marked for

13 identification as C39.

14    By the way I will direct your attention to your

15 testimony earlier that you had no idea that you were being

16 deposed during the Jowdy case, and your answer was:

17 *That's correct.*  Correct?

18 A.   I had no idea that I was being asked to be deposed.

19 Correct.

20 Q.   I'm going to show you this marked for identification

21 C39.  Does that refresh your recollection that there were

22 communications to you and to the other hockey players

23 regarding the status of the Jowdy lawsuit?

24 A.   Yes.

25 Q.   Okay.  So that is the second communication we have

**Peca - Recross/Mr. LaRusso**

657

1    looked at where you have gotten communications from

2    Mr. Richards regarding the status of the lawsuit.  Is that

3    correct?

4    A.    Correct.  This is a generalized note.  Yes.

5    Q.    But your testimony earlier was that you never, when

6    Mr. Miskiewicz asked you, you said you never got a status

7    update.

8          We now know at least two.  Correct?

9    A.    Correct.

10   Q.    Okay.  Looking at the document, does it refresh your

11   recollection that you are being advised by Mr. Richards

12   that the court has ordered depositions in the early part

13   of 2010?

14   A.    We were told that that's when they would like to do

15   them, but I was never asked to schedule one.

16   Q.    But Mr. Richards is advising you that is what is what

17   is going on in the Jowdy suit.  Is that correct?

18   A.    Correct.

19   Q.    And he's also telling you, do you remember, that it

20   is imperative that people be available for these

21   depositions?

22          MR. MISKIEWICZ:  Objection.

23   BY MR. LaRUSSO:

24   Q.    Do you recall that?

25          MR. MISKIEWICZ:  Objection.

Peca - Recross/Mr. LaRusso

658

1     THE COURT:  Overruled.

2  A.    I don't.

3  BY MR. LaRUSSO:

4  Q.    You testified on redirect that you were told that the

5  case was dismissed because hockey players weren't

6  available.

7     Do you recall that?

8  A.    I do.

9     MR. MISKIEWICZ:  Objection.

10     THE COURT:  Overruled.

11  BY MR. LaRUSSO:

12  Q.    And isn't it a fact that hockey players were not

13  available for depositions?

14  A.    To what extent I don't know.

15  Q.    So you are only speaking from your own personal

16  experience.  You were available but the other hockey

17  players may have been engaged in other activities and

18  could not be made available.

19     Is that your recollection?

20  A.    I don't know for sure if they were or not.

21  Q.    Does this also refresh your recollection that

22  Mr. Richards is advising you that even though it is

23  critical that we get these depositions done, we may be

24  able to pursue a resolution, a different resolution, of

25  the case?

659

1    MR. MISKIEWICZ:  Objection.

2    THE COURT:  Overruled.

3    BY MR. LaRUSSO:

4    Q.   Is that correct?

5    A.   He did talk about that.

6    Q.   And the resolution was the possible settlement.

7    There were lengthy discussions.  We are hoping to resolve

8    there.  That is what he is advising you.  Is that correct?

9    A.   The only discussions I had with Mr. Richards was

10   after I gave the grand jury testimony and I had private

11   emails with him regarding his conversations with Mr. Jowdy

12   and the lawyer.

13   Q.   Thank you.  I'm going to switch over to this

14   penthouse deal just for a few minutes.

15        Did you ever speak to Mr. Constantine before you

16   entered into that penthouse deal with Mr. Kenner?

17   A.   No.

18   Q.   And at the time that you entered into those

19   conversations with Kenner, you were an investor in Eufora.

20   Is that correct?

21        MR. HALEY:  Judge.  I object on behalf of my

22   client I object.

23        THE COURT:  Yes.

24        I have already ruled on this whole issue

25   regarding the condominiums, that it is not related to this

660

1   case, so I'm sustaining that objection.

2   BY MR. LaRUSSO:

3   Q.   One more question, judge.  One more area, if I may.

4        Mr. Miskiewicz, on his redirect, showed you

5   Government Exhibit -- excuse me Mr. Constantine Exhibit

6   24, and he pointed out that the signature page had what

7   appears to be a blue signature of Mr. Constantine and kind

8   of a xeroxed signature of Mr. Sonenglick.  Is that

9   correct?

10  A.   I don't believe that was part of the conversation.

11  Q.   Do you recall testifying in answer to questions by

12  Mr. Miskiewicz that this original document appears to have

13  clear type but when you get to the last portion there is

14  an unclear portion, or a faded portion, indicating that it

15  wasn't port of the original.

16  A.   The font looks a little more faded.  Yes.

17  Q.   By the way, you testified -- a long time ago, it

18  seems like -- that part of your relationship with

19  Mr. Kenner was signing signature pages without getting the

20  document and sending the signature page back.

21       Do you remember that?

22  A.   Yes.

23  Q.   And by doing so, that might alter the context of the

24  document sent back to Mr. Kenner.  Is that correct?  The

25  clarity.

Peca - Recross/Mr. LaRusso

661

1   A.   I suppose, if it were the same document.

2   Q.   We have an example earlier today, if I may, marked

3   for identification as C37.

4        Do you remember the AZ Eufora agreement that you

5   identified?

6   A.   Yes --

7   Q.   Said that you were a member of that LLC?

8   A.   -- correct.

9   Q.   And that was the LLC that hired Mr. Stolper to

10  represent you in a civil suit?

11  A.   Yes.

12  Q.   And you looked at the three pages, and I'm showing

13  you with all the lists, the fourth pages, with a list of

14  all the members of that LLC.  Correct?

15  A.   Yes.

16  Q.   But there is no signature on the document on the

17  third page.  Right?

18  A.   Correct.

19  Q.   But you identified the fact that you signed your

20  signature.  And that is on the sixth page.  Right?

21  A.   Correct.

22  Q.   That page is not as clear as the document, itself.

23  Is that right?

24  A.   That's correct.

25  Q.   Because are signed the signature page, it looks

Peca - Further Redirect/Mr. Miskiewicz

662

1    fuzzy, faxed it back, and it was added to the original.

2    Correct?

3    A.   It looks like that.  Yes.

4    Q.   That doesn't make the original a forgery.  It doesn't

5    makes the original an illegal agreement.  You did it by

6    way of sending a faxed signature page back to be added to

7    the original document.  Is that right?

8    A.   That's what I did.  Yes.

9    Q.   And with regard to what Mr. Miskiewicz was showing

10   you with regard to the Sonenglick, it is the same things.

11            MR. MISKIEWICZ:  Objection.

12            THE COURT:  Sustained as to form.

13            MR. LaRUSSO:  Your Honor, those pages that I

14   have just identified, I think we have introduced them.  We

15   may have a discussion regarding its administratively.  So

16   I'm finished with my examination.

17            THE COURT:  Are you done?

18            MR. LaRUSSO:  Yes, I am.

19            THE COURT:  Ms. Miskiewicz?

20            MR. MISKIEWICZ:  Two very focused questions.

21            Thank you, your Honor.

22

23   FURTHER REDIRECT EXAMINATION

24   BY MR. MISKIEWICZ:

25   Q.   You were just shown by Mr. LaRusso another email

663

1    about communications regarding your lawsuit and its

2    dismissal.

3              When were you told bu Mr. Richards, first of

4    all, what is the date of that email that you were told

5    about potential depositions?

6              What is the date of this email that you were

7    just shown?

8    A.   This one?

9    Q.   No.  C39.

10   A.   January 27, 2010.

11   Q.   And when did you get -- does that refresh your

12   recollection as to when you got a letter from Mr. Richards

13   saying whatever he said about the dismissal?

14   A.   Yes.  It is dated February 15, 2010.

15   Q.   So you got this email after he already told you that

16   the lawsuit was being dismissed.  Right?

17   A.   Yes.

18             MR. MISKIEWICZ:  No further questions.

19             THE COURT:  You can step down, Mr. Peca.  Thank

20   you.

21             (The witness was excused.)

22             THE COURT:  We are going to go another 15

23   minutes before the lunch break.

24             Please call the next witness.

25             MS. KOMATIREDDY:  The government calls Shimon

Betesh - Direct/Ms. Komatireddy

664

1   Betesh.

2

3   **SHIMON BETESH**

4          called by the Government, having been first duly

5          sworn/affirmed, was examined and testified as

6          follows:

7

8   DIRECT EXAMINATION

9   BY MS. KOMATIREDDY:

10  Q.    Mr. Betesh, what do you do for a living?

11  A.    I'm a real estate attorney.

12  Q.    Where do you live?

13  A.    Jamaica Estates, Queens.

14  Q.    Is that here in New York?

15  A.    Yes.

16  Q.    Are you familiar with the New York area, Suffolk

17  County, Nassau County?

18  A.    Yes.

19  Q.    You said you are a real estate attorney.

20          Can you explain to us what do you do as part of

21  your job in real estate transactions?

22  A.    I represent buyers, sellers, developers, as well as

23  financial institutions in residence real estate

24  transactions.

25  Q.    Does your role as a real estate attorney sometimes

Betesh - Direct/Ms. Komatireddy

665

1    involve the handling of money in real estate transactions?

2    A.   Yes, it does.

3    Q.   Can you explain that.  How do you handle money in

4    those transactions?

5    A.   Sometimes if I represent the seller, a seller will

6    send money to my escrow account to hold as a down payment.

7         If I represent the buyer, sometimes a buyer

8    would wire monies as needed by the closing.

9         If I represent the lender, the lender would wire

10   me money to my account to distribute at the closing.

11   Q.   So in other words you serve as a middleman sometimes

12   in real estate transactions where money passes through.

13   A.   Correct.

14   Q.   Now, were you involved in a transaction relating to

15   the Led Better Development Company?

16   A.   Yes.  I was the purchaser's attorney.

17   Q.   Before you came to court today, did you have a chance

18   to review your file?

19   A.   Yes, I did.

20   Q.   Approximately what trial frame did the Led Better

21   Development Corporation transaction that you were involved

22   with occur?

23   A.   October of 2007.

24   Q.   How did you get involved with it?

25   A.   I was retained by Phil Kenner who was a member of Led

Betesh - Direct/Ms. Komatireddy

666

1    Better.

2    Q.    How did you come to know Mr. Kenner?

3    A.    I was introduced to Mr. Kenner when he worked at

4    Assante by a mutual friend of ours.

5    Q.    Did you meet with Mr. Kenner in person?

6    A.    Yes, I did.

7    Q.    Would you recognize him if you saw him again?

8    A.    Yes, I would.

9    Q.    Would you please look around the courtroom and

10   identify anyone that you recognize as Mr. Kenner.

11   A.    That's him.

12        MS. KOMATIREDDY:  May the record reflect that

13   the witness has identified the defendant Kenner.

14        MR. HALEY:  He certainly has, judge.

15        THE COURT:  Okay.

16   BY MS. KOMATIREDDY:

17   Q.    What did Mr. Kenner tell you about himself?

18        MR. HALEY:  I object.

19        THE COURT:  Yes.  Sustained as to the form.

20   BY MS. KOMATIREDDY:

21   Q.    What did Mr. Kenner tell you about the Led Better

22   transaction?

23        MR. HALEY:  Object?

24        THE COURT:  No, that's okay.

25        Go ahead.  You can answer it.

Betesh - Direct/Ms. Komatireddy

667

1   A.   Just that they were buying land to develop property

2   on.

3   Q.   What did he say if anything -- what did he ask you to

4   do in connection with that transaction, if anything?

5   A.   To represent Led Better in the transaction.  To

6   review the contract.  As I would normally do for any

7   purchaser.

8   Q.   What was your role in the transaction in terms of the

9   money that was changing hands?

10  A.   Led Better had wired me $769,000 in my account to be

11  used to purchase the transaction and to pay for closing

12  costs.

13  Q.   I'm going to show you what has been marked as Exibit

14  1401 in evidence.

15       Just looking at the top of this document, is it

16  fair to say this is a bank statement?

17  A.   Yes, it is.

18  Q.   Who is the account holder?

19  A.   Led Better Development Corporation LLC.

20  Q.   What is the statement end date?

21  A.   10/31/2006.

22  Q.   I'm just going down to the section entitled, you see

23  *Withdrawals and Debits* on page two?  It is also on your

24  screen.

25  A.   Yes.

Betesh - Direct/Ms. Komatireddy

668

1    Q.    Under withdrawal and debits, there appears a debit

2    October 25 in the amount of $769,000.

3            Do you see that?

4    A.    Yes, I do.

5    Q.    It says Shimon Betesh.  Is that you?

6    A.    Yes, it is.

7    Q.    It also says Washington Mutual.  Did you have a bank

8    account at Washington Mutual Bank in 2007?

9    A.    My attorney escrow account was at Washington Mutual.

10   Q.    What was the purpose of your attorney escrow account?

11   A.    That is an account where I receive wires for, again,

12   lending institutions or purchasers to facilitate the

13   purchase of the transaction.

14   Q.    What was the purpose of receiving this wire in the

15   amount of $769,000?

16   A.    It was monies to be used for the closing with Led

17   Better.

18   Q.    I'm now going to show you what has been marked as

19   Government Exhibit 701C.

20           Your Honor, this is a certified copy of a public

21   record.  We move it into evidence as such.

22           THE COURT:  As what number?

23           MS. KOMATIREDDY:  701C-A.  The document, itself,

24   the certificate, is 701C, if the court would like to

25   review it.

Betesh - Direct/Ms. Komatireddy

669

1            THE COURT:  Any objection?

2            MR. LaRUSSO:  No.

3            MR. HALEY:  May I have a moment, Judge.

4            (There was a pause in the proceedings.)

5            MR. HALEY:  Your Honor, I need to approach

6    briefly.  Thank you.

7            (Continued on the following page.)

Betesh - Direct/Ms. Komatireddy

670

1    (Discussion at sidebar ensued as follows.)

2         MR. HALEY:  Our Honor, the exhibit that is being

3    offered, my only objection is this.

4         Yesterday afternoon we were provided this

5    package, which does include everything there, and includes

6    the Led Better, this was provided by the government, the

7    Led Better operating agreement along with these other

8    aspects of the closing.

9         My question is, it just seems to be incomplete.

10        MS. KOMATIREDDY:  Let me clarify.

11        There are four attachments to that email.  We

12   will move each one in pursuant to the rules.

13        This is a certified public record, and we are

14   moving it in separately as such.

15        That is a copy.  A copy of the deal was provided

16   with connection with the email is a certified copy.

17        THE COURT:  He is looking for the rest of the

18   copy.

19        MS. KOMATIREDDY:  I will put these all in in a

20   few moments.

21        MR. HALEY:  And I will have no objection.

22        (Discussion at sidebar was concluded.)

23        (Continued on the following page.)

24

25

Betesh - Direct/Ms. Komatireddy

671

1        (The following ensued in open court.)

2        THE COURT:  701C and 701C-A are admitted.

3        (Government Exhibit 701C and 701C-A in

4   evidence.)

5        MS. KOMATIREDDY:  Thank you, judge.

6   BY MS. KOMATIREDDY:

7   Q.   Looking at your screen, can you recognize this?

8   A.   Yes.

9   Q.   What is it?

10  A.   This a copy of a recorded deed from the transaction.

11  Q.   When you say the transaction, what transaction are

12  you referring to?

13  A.   This was the purchase of the property in Sag Harbor

14  by Led Better Development.

15  Q.   I'm going to go to page two of the document.

16       THE COURT:  Is there a document 701 or is this

17  701C?

18       MS. KOMATIREDDY:  It is 701C.  The digital

19  version is 701.  That is all.

20  BY MS. KOMATIREDDY:

21  Q.   The second page of the document.  I'm just going to

22  zoom in on what is marked as box six.

23       Is that your name there?

24  A.   Yes, it is.

25  Q.   Were you the recording -- you had this deal returned

Betesh - Direct/Ms. Komatireddy

672

1   to you after it was recorded.  Is that fair?

2   A.   Yes, I did.

3   Q.   And above that, there is a date.  What does that date

4   signify?

5   A.   That is usually the closing date.

6   Q.   Below that is a consideration amount:  $750,000.

7        Do you see that?

8   A.   Yes, I do.

9   Q.   What does that amount signify?

10  A.   The purchase price of the transaction.

11  Q.   Just looking at the parties to this transaction.  Who

12  is the seller?  Who is the buyer?

13  A.   The seller was the North Point Properties Inc.

14       The buyer was Led Better Development Company

15  LLC.

16  Q.   Now I'm going to hand you four documents.  They are

17  marked 702, 703, 704, and 705.

18       Do you recognize those?

19  A.   Yes, I do.

20  Q.   What do you recognize those things to be?

21  A.   When representing an LLC, as an attorney I request to

22  get a copy of the organizational documents.

23       So this would be an operating agreement.  This

24  would be a proof of certificate of formation Led Better

25  Development Company.

Betesh - Direct/Ms. Komatireddy

673

1        Also, at the closing we would need a consent to

2    the transaction, so these are consents signed by the

3    managing members of the LLC.

4    Q.   Who gave you those documents?

5    A.   The certificate of formation and the operating

6    agreement was provided, I believe, by Philip, by Phil

7    Kenner.

8        The consent I prepared.

9    Q.   The signed version of the consent letter before you,

10   who gave you the signed version of those documents?

11   A.   It must have been from Phil Kenner and Lauren

12   Gilmore.

13   Q.   Approximately when did you receive those documents?

14   A.   It would have to be before the closing, so before

15   October 25.

16   Q.   Of 2006?

17   A.   Of 2006.

18        MS. KOMATIREDDY:  Government moves 702, 703,

19   704, and 705 into evidence.

20        MR. HALEY:  I am pretty certain what these are.

21   May I just approach the witness?

22        Thank you.

23        THE COURT:  Sure.

24        MR. HALEY:  No objection.

25        MR. LaRUSSO:  No objection, your Honor.

Betesh - Direct/Ms. Komatireddy

674

1          THE COURT:  702, 703, 704, 705 are admitted.

2          (Government Exhibit 702, 703, 704, 705 in

3    evidence.)

4    BY MS. KOMATIREDDY:

5    Q.   Turning your attention to Government Exhibit 702.

6    Can you just describe for us what is this.

7    A.   That's proof of the formation of Led Better

8    Development Company LLC.

9    Q.   When does it indicate that it was filed with the

10   State (sic) of Delaware?

11   A.   October 10, 2006.

12   Q.   This is a document showing that Led Better

13   Development Company LLC was formed, and this formation was

14   filed, you say, in Delaware in October 2006?

15   A.   Yes.

16   Q.   Turning your attention to Government Exhibit 703.

17   What is this?

18   A.   This is the operating agreement for Led Better

19   Development Company LLC.

20   Q.   You received this from Phil Kenner.  Correct?

21   A.   I believe so.

22   Q.   Turning your attention to Article 3.

23          What is the title of Article 3?

24   A.   Managing Members and Members.

25   Q.   Who are the managing members of Led Better

Betesh - Direct/Ms. Komatireddy

675

1    Development Company LLC?

2    A.    Phillip A Kenner, 99 percent.   Lauren Gilmore, one

3    percent.

4    Q.    Are there any other managing members listed in this

5    operating agreement as a managing member of Led Better

6    LLC?

7    A.    No.

8    Q.    Is Michael Peca a managing member?

9    A.    Not according to this document.

10   Q.    Turning your attention to Article 5:

11   Confidentiality.

12          Do you see that?

13   A.    Yes, I do.

14   Q.    Would you please read the first sentence in that

15   section of Article 5.

16   A.    *"This agreement to acquire North Point Properties,*

17   *Inc, and the subsequent acquisition of the underlying*

18   *property are thereof is highly sensitive and shall be*

19   *strictly confidential between and amongst all of the LLC*

20   *members."*

21   Q.    Just for the record.   The only LLC members are Phil

22   Kenner and Lauren Gilmore.   Correct?

23          MR. HALEY:  Objection.

24          THE COURT:  Sustained as to leading.

25          MR. HALEY:  Well --

Betesh - Direct/Ms. Komatireddy

676

1           THE COURT:  You have your objection.

2           MR. HALEY:  Judge, there is a second page to

3    this document, I believe.

4           Perhaps the USA misspoke.  If you look at the

5    document entirely.  I would more than pleased to show the

6    court the document in its entirety.

7           MS. KOMATIREDDY:  We will go to the second page

8    next, your Honor.

9    BY MS. KOMATIREDDY:

10   Q.   Just to --

11          MR. HALEY:  I objected, your Honor, and I

12   believe the objection was sustained.

13   MS. KOMATIREDDY:

14   Q.   Just to make sure were on the same page.

15          In terms of members of the LLC, who were the

16   members, managing members the LLC?

17          MR. HALEY:  I have no objection to that specific

18   question.  I withdraw the objection.

19   MS. KOMATIREDDY:

20   Q.   Who were the managing members of the LLC?

21   A.   Philip Kenner and Lauren Gilmore.

22   Q.   There is a section called *Equity Ownership and*

23   *Dividends*.  Right?

24   A.   Yes.

25   Q.   The section on Equity Ownership and Dividends.

Betesh - Direct/Ms. Komatireddy

677

1      Can you read the last sentence there in the

2  list.

3  A.    *Equity ownership rights as of the date herein as is*

4  *(sic) follows.*

5  Q.    Go ahead.

6  A.    Philip A Kenner, 25 percent.

7          Brian Berard, 25 percent.

8          John Kaiser, 25 percent.

9          Vincent J. Tosoriero, 25 percent.

10  Q.    Is Michael Peca an equity owner of this agreement?

11  A.    No.

12  Q.    Does Michael Peca appear anywhere in this operating

13  agreement?

14  A.    Not that I see.

15  Q.    And just, for the record, this Article 6, Equity

16  Ownership, does that list any additional managing members

17  of this LLC?

18  A.    No, it does not.

19  Q.    The previous page talks about confidentiality.  Who

20  is it, according to this agreement, that the agreement

21  shall be confidential between and among?

22  A.    The LLC members.

23  Q.    And that is, according to this agreement, Philip

24  Kenner and Laura Gilmore?

25  A.    Yes.

Betesh - Direct/Ms. Komatireddy

678

1          MR. HALEY:  I would object.  I object, your

2    Honor.

3          THE COURT:  You can cover it on cross.

4          MR. HALEY:  Thank you, sir.

5    BY MR. MISKIEWICZ:

6    Q.   Finally, what is the date of this operating

7    agreement?

8    A.   October 11, 2006.

9    Q.   And you see a signature there at the top?

10   A.   Yes.

11   Q.   It says Philip A Kenner underneath the signature?

12   A.   Yes, it does.

13   Q.   Turning to Government Exhibit 704.  You said you

14   prepared this document.

15          What was the purpose of this documented?

16   A.   This is a consent of the managing members authorizing

17   the signer of the LLC and the purchase of the property.

18   Q.   Can you just read the first paragraph for us, under

19   *Signatory for LLC*, for the record.

20   A.   *"Resolved, that Limited Liability Company is hereby*

21   *authorized to purchase that certain area known as 18 North*

22   *Haven Way, Sag Harbor, New York 11963 for a purchase price*

23   *of $750,000 and zero cents?"*

24   Q.   You were talking about being the real estate attorney

25   facilitating the Led Better Development Company

Betesh - Direct/Ms. Komatireddy

679

1    transaction.

2            Was the property involved in that transaction

3    this property that you have written here?

4    A.   It must be.

5    Q.   18 North Haven Way, Sag Harbor, New York 11963?

6    A.   Yes.

7            MS. KOMATIREDDY:  The government moves two maps

8    into evidence, they have been marked 941 and 940, with the

9    consent of the defendant Kenner.

10           THE COURT:  Correct?

11           MR. HALEY:  Yes, your Honor.

12           MR. LaRUSSO:  Yes, your Honor.

13           THE COURT:  941 and 942 are admitted.

14           (Government Exhibit 941 and 942 in evidence.)

15   BY MS. KOMATIREDDY:

16   Q.   Government Exhibit 940.  Just read the address at the

17   top of this Google Map printout.

18   A.   18 North Haven Way, Sag Harbor, New York 11963.

19   Q.   Mr. Betesh, what state was this property in?

20   A.   New York.

21   Q.   Not Hawaii?

22   A.   No.

23           MS. KOMATIREDDY:  No further questions.

24           THE COURT:  Cross-examination.

25

Betesh - Cross/Mr. Haley

680

1  CROSS-EXAMINATION

2  BY MR. HALEY:

3  Q.  Mr. Betesh, sir, good afternoon.

4  A.  Good afternoon.

5  Q.  The closing that took place with reference to the

6  transaction between North Point Properties and Led Better

7  Development Company LLC, where did the closing physically

8  take place?

9  A.  At the seller's attorney's office.

10  Q.  Do you remember the name of that seller, the seller's

11  attorney?

12  A.  Mr. Connor.  Maybe Andrew Connor.

13  Q.  And who was present at the closing?

14  A.  I do not recall.

15  Q.  Well, do you recall if Mr. Kenner was present?

16  A.  I do not recall.

17  Q.  Well, do you recall, sir, if John Kaiser was present?

18  A.  After reviewing my file, I saw a copy of his ID in

19  the file.

20       I do not recall if he was there, but there was a

21  copy of his ID in my file.

22  Q.  Well, was a power of attorney from John Kaiser

23  utilized to execute transfer documents on his behalf in

24  the course of that closing?

25  A.  No, because it is a corporation, but sometimes

681

1    documents are presigned.

2    Q.    So Mr. Kaiser may or may not have been present during

3    the closing.  Is that your testimony?

4    A.    Correct.

5    Q.    But we can agree, can we not, sir, that at least

6    Mr. Kaiser's attorney would have received all the exhibits

7    and documents that you have identified as being part and

8    parcel of the closing documents?

9              Is that true?

10             MS. KOMATIREDDY:  Objection.

11             THE COURT:  Overruled.

12             You can answer if you know.

13   A.    Can you repeat the question, please.

14   BY MR. HALEY:

15   Q.    Sure.  Whether Mr. Kaiser was there or not, can we

16   agree that at least Mr. Kaiser's attorney would have

17   received a copy of these closing documents or had access

18   to these closing documents?

19             Is that correct?

20   A.    He would have access.

21   Q.    And I take it that would mean unfettered access.  You

22   won't hide a particular document from him, would you, sir?

23   A.    No.

24   Q.    And specifically, he would have had access to the

25   operating agreement that sets forth the percentage of

Betesh - Cross/Mr. Haley

682

1   equity interest.  Is that true?

2   A.    That operating agreement would be given to the title

3   company at the closing, so he would have access to it.

4   Q.    Incidentally, would the operating agreement, itself,

5   be recorded by the title company, if you know?

6   A.    No, it wouldn't.

7   Q.    You don't know?  Or it would not?

8   A.    It would not.

9   Q.    Sir, is or is it not customary during the course of a

10  closing to make a copy of all of the closing documents and

11  provide it to either the seller's or purchaser's attorney,

12  depending upon who you represent?

13          MS. KOMATIREDDY:  Objection.

14          THE COURT:  Overruled.  You can answer.

15  A.    Yes, it is.

16          As an attorney I always request copies of LLC

17  documents whether it is a purchaser or seller.

18  Q.    Do you have any reason to believe that Mr. Kaiser's

19  attorney that day did not request a copy of those

20  documents?

21          MS. KOMATIREDDY:  Objection.

22          THE COURT:  Overruled.  You can answer.

23  A.    I do not recall.  I have no idea.

24  Q.    No.  But it would be customary for an attorney to do

25  so.  Correct?

683

1   A.   I would, as an attorney.

2   Q.   I'm sorry, sir?

3   A.   I would, as an attorney, request copies of documents.

4   Q.   Sir, how often have you been handling real estate

5   transactions involving the transfer -- well, the transfer

6   of real estate?

7   A.   Approximately 17 years.

8   Q.   And within your 17 years of experience, is or is it

9   not customary for the attorneys that are representing the

10  parties to request a copy of the closing documents?

11  A.   Yes, it is.

12        MR. HALEY:  May I have a moment, judge?

13        (Counsel and client confer.)

14        MR. HALEY:  Mr. Betesh, thank you for your

15  testimony, sir.

16        THE WITNESS:  You are welcome.

17        THE COURT:  Mr. LaRusso, any questions?

18        MR. LaRUSSO:  No.

19        THE COURT:  Redirect?

20        MS. KOMATIREDDY:  No, judge.

21        THE COURT:  You can step down.

22        (The witness was excused.)

23

24        THE COURT:  We will take the lunch break and we

25  will reconvene at 2 o'clock.  Don't discuss the case.

684

1  Have a good lunch.

2          (The following ensued in the absence of the jury

3  at 12:55 pm.)

4          THE COURT:  Everyone can be seated.

5          Mr. Miskiewicz, I didn't mean to be impatient

6  with you on the redirect, but the first redirect was too

7  long.  It is a five-week trial.  If redirects are too

8  long, then the recrosses are long and we end up, he was on

9  the stand, I don't know, I didn't keep track, it seemed

10 like 45 minutes from the time they sat down on the cross.

11         And the whole thing of comparing the page was a

12 classic example.  I don't know why a witness who had no

13 familiarity with the document is comparing fonts on

14 signature pages.  That causes Mr. LaRusso to get up and do

15 that.

16         You have to be more economical on the redirects

17 because if you start getting into tangential issues or

18 covering issues that are covered on direct, it extends the

19 trial for long periods of time.  Okay?

20         MR. MISKIEWICZ:  I understand, judge.

21         Because these documents are coming in, I feel

22 compelled.  I understand your ruling, to go over it with

23 him.  He can't say anything about the truth or accuracy.

24         THE COURT:  I know.  I think you could have done

25 that this with one or two questions instead of going

685

1   through the terms of the document.  I let that in

2   yesterday.  I think I said I would explain further and

3   then I had to leave early.  But when the suggestion was

4   made that the only reference to this individual was Mr.

5   Constantine potentially talking on the phone to nobody,

6   which was the suggestion that you made in the questioning,

7   I think it is fair for them to show that there was

8   supplemental communications with Mr. Peca regarding this

9   individual and what was being proposed.

10          And I understand once I let that in you do need

11   to establish that he still never met that guy.  But it has

12   to be done in a more economical way because I have seen it

13   many times, the redirect is longer than the recrosses are.

14   If it was a short trial it wouldn't make that much of a

15   difference but I don't want to get off schedule.

16          MR. MISKIEWICZ:  Understood.

17          THE COURT:  Let's resume at 2 o'clock.

18          (Lunch recess taken at 1 pm.)

19          (Continued on next page.)

20

21

22

23

24

25

686

1        A F T E R N O O N   S E S S I O N

2        THE COURT:  All right.  Ready for the jury?

3        MR. MISKIEWICZ:  Yes, your Honor.  Just briefly,

4   we just discussed with counsel who we intend to call for

5   the rest of the day.  There is one witness who is Dolores

6   Kaiser, who is 80 years old, we do have her sitting in

7   court all day.  I'm not sure, depending upon whether or

8   not Ms.  Peca is quick or not we can slip her in.  On the

9   other hand, we may be if Ms. Peca is ending at 4:00, we

10  may be short.  We'll have her here.

11       MR. HALEY:  Joint application.

12       THE COURT:  So we'll just end with Ms. Peca

13  then.

14       MR. MISKIEWICZ:  I think so.

15       THE COURT:  Can I truthfully represent to the

16  jury that we're still on track for five weeks?

17       MR. MISKIEWICZ:  Yes, I had a real optimistic

18  three week plan that I think we've blown, but it's on

19  track for five weeks.

20       MR. HALEY:  Your Honor, I'm sure the Court

21  recognizes that I'm keeping my remarks to a minimum.

22       THE COURT:  I got a little frustrated with the

23  redirect, and I know Mr. Peca was on the stand for a long

24  time, but I think both sides are doing very well than

25  trying to be efficient and minimize the sidebars.  So I'm

687

1    overall pleased.  But let's try to keep that up, because

2    the jury will stay happy as long as we continue to operate

3    in that fashion.  All right.  Let's bring them in.  Is

4    someone getting Mrs. Peca?

5              MR. HALEY:  Is it your intent to introduce this?

6              MS. KOMATIREDDY:  Either introduce it,

7    your Honor, this is about --

8              MR. HALEY:  Judge, we might need a sidebar, it

9    involves the issue that is becoming a recurrent issue.

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

688

1          (Whereupon, the following occurred at sidebar.)

2          (Document handed to the Court.)

3          MS. KOMATIREDDY:  Your Honor, this relates to

4     the issue of Mr. Peca receiving from Mr. Kenner as we

5     previously explained, the government, without getting into

6     separate frauds, desires to simply provide the benign

7     explanation just an explanation for why Mr. Peca is

8     receiving payments from Mr. Kenner.  He didn't identify

9     Waterstone bank as the bank loan associated with that

10    condo, Kristin Peca would be able to do that.  I wanted to

11    tie up the record.

12          THE COURT:  That's okay.  But again Mr. Haley

13    objected, I don't want her explaining about what the

14    dispute was.

15          MS. KOMATIREDDY:  Understood.

16          THE COURT:  The only relevance is that money

17    went to the condominium and not to something else.

18          MR. HALEY:  Perhaps your Honor can give a

19    curative instruction that the Palms dispute is not part of

20    this indictment.

21          THE COURT:  Sure.

22          I'll say it again, just remind me.

23          MR. HALEY:  Thank you.

24          (Continued on next page.)

25

689

1          (Whereupon, the following occurred in open

2     court.)

3          THE CLERK:  All rise.

4          (Whereupon, the jury entered the courtroom.)

5          THE COURT:  Everyone can be seated.  The

6     government please call its next witness.

7          MS. KOMATIREDDY:  Yes, your Honor, the

8     government calls Kristin Peca.

9          THE COURT:  Mrs. Peca, if you can come up to the

10    witness stand over here and remain standing until the oath

11    is administered.

12

13    **KRISTIN PECA**,

14          called as a witness, having been first

15          duly sworn, was examined and testified

16          as follows:

17          THE CLERK:  Please state your name and spell it

18    for the record.

19          THE WITNESS:  Kristin Peca, K-R-I-S-T-I-N,

20    P-E-C-A.

21          THE COURT:  You can be seated, Ms. Peca.  If you

22    can just pull your chair close to the mike and keep your

23    voice up.  Thank you.

24          Okay, Ms. Komatireddy.

25

K. Peca - Direct/Komatireddy

690

1    DIRECT EXAMINATION

2    BY MS. KOMATIREDDY:

3    Q.    Good afternoon.

4    A.    Good afternoon

5    Q.    Mrs. Peca, where do you live?

6    A.    We live in Clarence, New York.

7    Q.    We is who?

8    A.    My husband and two kids.

9    Q.    Please identify your husband?

10   A.    Michael Peca and the kids are Trevor and Emily.

11   Q.    When did you meet Michael, around what time?

12   A.    Around 1995.

13   Q.    When you met Michael, did he have a financial

14   advisor?

15   A.    He was just getting introduced to one.

16   Q.    Who was he getting introduced to?

17   A.    Phil Kenner.

18   Q.    Were you present in any conversation involving

19   Michael and Mr. Kenner?

20   A.    Yes.

21   Q.    Did you meet with Mr. Kenner?

22   A.    Yes.

23   Q.    Would you recognize him if you saw him again?

24   A.    Yes.

25   Q.    Would you please look around the courtroom and let us

K. Peca - Direct/Komatireddy

691

1   know, do you recognize anyone as Mr. Kenner?

2   A.    Yes.

3           THE COURT:  Can you just indicate for the record

4   what he's wearing.

5           THE WITNESS:  White shirt, brown olive pants.

6           THE COURT:  The witness has identified

7   Mr. Kenner.

8   Q.    When you met with Mr. Kenner and Michael, what did

9   Mr. Kenner tell you about himself?

10  A.    He mentioned how he played hockey in college at RPI,

11  he had a financial background, that's what he was majoring

12  in, and that he was currently working with a company

13  called Stage Street Financial Advisors.

14  Q.    When you say that he mentioned his financial

15  background, what did he tell you about his financial

16  background?

17  A.    That he went to school for that, that he was working

18  at this firm now, Stage Street.

19  Q.    Did he say anything about whether he was licensed?

20  A.    I can't remember.  He did say that he was working for

21  a financial firm.  So I think it would go along with being

22  licensed.

23  Q.    Did Kenner in fact become your and Michael's

24  financial advisor?

25  A.    He did.

K. Peca - Direct/Komatireddy

692

1  Q.   Now, just so we have a bit of understanding about the

2  background, are both of you and Michael involved in the

3  financial decisions in you are family?

4  A.   Yes.

5  Q.   What kind role do you play?

6  A.   Well, basically I take care of our monthly bills, the

7  utilities, gas, water, that sort of thing.  When the mail

8  comes in, usually his mail, so to speak, that he gets, he

9  goes over the investment stuff, but when it comes to

10  decisions on how we want to invest and save for the

11  future, that is something that we talk about together.

12  Q.   In terms of your financial role what, did you have in

13  mind when you began investing in terms of what your goals

14  were?

15  A.   Our goals were on the same page in terms of having

16  enough money for him to retire comfortably and not have to

17  be forced to work after playing hockey.

18  Q.   What formed your goals, anything about your

19  background or your upbringing?

20  A.   Yes.  I was a saver.  I still am a saver.  I grew up

21  in a household where we're definitely middle, pretty well

22  off, I would say.  My father was a dentist.  And then my

23  parents went through there long, drawn out divorce, and I

24  saw us from going to being pretty comfortable to having

25  nothing.  The lawyers took it all.

K. Peca - Direct/Komatireddy

693

1        So that was kind of just engrained in my memory.

2  You can do well for a moment and everything is great and

3  all of a sudden you're penny pitching and cutting back.

4  For me, I had a strong sense to save and save and save.

5  Q.    So when you and Michael began investing, give us a

6  timeframe.  Approximately what year did you start thinking

7  about investing savings?

8  A.    I met Phil in it was about '96, '97.  From the

9  beginning he actually made a good point in saying Michael

10  had first had no money put away despite his first year in

11  the NHL, even though he was on the low end he had an entry

12  level NHL contract it was still a good amount of money for

13  a kid, aim to be make, a hundred, 125 thousand.  But after

14  taxes and agent fees and all of that, and supporting his

15  family as well, he, at the end of the day, had no money in

16  the bank.

17        So Phil said if you were to get injured tomorrow

18  you wouldn't have enough money sufficient for college,

19  basically saying you'd be screwed.  So that was good

20  advice, and that also hit home with Michael and he

21  definitely took on what he said and started saving as

22  well.  So it was from the beginning, if that's what you're

23  asking when did you start saving, in the beginning

24  immediately before we started dating for college, when we

25  didn't have any money.

K. Peca - Direct/Komatireddy

694

1   Q.   What kind of investments did you make with

2   Mr. Kenner?

3   A.   In the beginning it was all like stocks, bonds, I

4   think what would be known as a typical investment

5   portfolio.

6   Q.   How did those investments do in the first few years?

7   A.   Everything seemed to do well and was growing at a

8   normal, steady pace.

9   Q.   And what was your view in that first, those first few

10  years when Mr. Kenner was your financial advisor, what was

11  your view of what kind of job that he was doing?

12  A.   In the beginning, it seemed good.  He was delivering

13  as he said he would.  He was helping us start to save

14  money, put money away for the future.

15  Q.   How often did he communicate you about your

16  investments?

17  A.   Often, in the beginning he talked quite a bit.  He

18  was reachable then.  And we had at least a handful of

19  face-to-face meetings every year, too.

20  Q.   When you say you talked quite a bit, phone, e-mail?

21  A.   Yes, both.

22  Q.   Did there come a time when Mr. Kenner proposed

23  different kinds of investments to you, things other than

24  stocks and bonds?

25  A.   Yes.

K. Peca - Direct/Komatireddy

695

1    Q.    Did he explain why?

2    A.    Yes.  I actually remember this story well because the

3    metaphor he used.  He said you are now at the point in

4    Michael's career where you guys need to start

5    diversifying, the metaphor was you can't have all your

6    eggs in one basket, too dangerous, you have to spread it

7    out in other investments, whether it's real estate or what

8    have you.

9    Q.    What was happening in Michael's life at that time?

10   A.    That was when he was just signed his first big

11   long-term contract in the NHL, that was here with the

12   Islanders.

13   Q.    Do you remember what was happening with Mr. Kenner

14   and his job at the time?

15   A.    He had at least one or two firm switches by then.  I

16   think that he was still with the Side Street by then.  I

17   can't tell what you firm it he was with or he started

18   going on his own at that point.  Because at some point he

19   did start his own thing.

20   Q.    You said that the point came when he proposed

21   different kinds of investments.  Generally speaking what

22   kinds of investments did he begin to propose under the

23   theory that you not put all your eggs in one basket.

24   A.    Outside of stocks and bonds, different businesses,

25   companies that were starting up but looked promising,

K. Peca - Direct/Komatireddy

696

1    land.

2    Q.   I'm going to focus your attention on a real estate

3    development project in Hawaii.  Does that ring a bell?

4    A.   Yes.

5    Q.   What did Mr. Kenner tell you about investment

6    opportunities in real estate in Hawaii?

7    A.   He had mentioned that there was this amazing

8    opportunity to purchase some land for an incredible price,

9    that it was, he'd be able to get it a lot lower than its

10   value and he was going to put a group of guys together

11   from his clients to invest.

12   Q.   Who did he tell you his clients were, who were the

13   guys?

14   A.   He was referring to other players.

15   Q.   What kind of, you mean hockey players?

16   A.   Yes.

17   Q.   Professional hockey players?

18   A.   Yes.

19   Q.   Did he indicate specific people that you and Michael

20   knew?

21   A.   He did.

22   Q.   And what did he say that you had to do to invest in

23   this project?

24   A.   Well, the main part of investment was $100,000 and

25   that was supposed to get us 12 to 13 percent of 35 percent

K. Peca - Direct/Komatireddy

697

1 which was what this company or group he was putting

2 together would own the land.

3 Q.   And was there another part of the investment?

4 A.   Yes.  The other part that he mentioned was -- and

5 this is going to be a little more difficult to explain,

6 but our line of credit, he needed to gather -- he said he

7 needed to get a line of credit -- I'll explain what that

8 is in a moment -- would help with the development in --

9 vertical development, infrastructure, construction to get

10 the land going, and the land and/or Lehman Brothers would

11 come in with their funding that he was looking into and we

12 would get the money paid off that would be done.  The

13 alternative was a loan from the bank but you'd have to put

14 up collateral, that we had to put up collateral up to get

15 the loan, but your collateral would never be used, he

16 assured us our collateral was our bond account and he said

17 a penny would never ever go missing, I remember that

18 clearly, there was a line of credit, the money for the

19 loan, the line of credit was established and so we needed

20 a month to think about it, a month of payments for 6

21 months which was the length he said the line of credit he

22 asked.

23 Q.   You said the collateral for this line of credit was

24 your bond account?

25 A.   Correct, the bond portion of the portfolio, the bond

K. Peca - Direct/Komatireddy

698

1  and the stock market.

2  Q.    So in terms of what you had saved up, up to that

3  point, what was the significance of the bond?

4  A.    That so to speak was my baby, because back in Long

5  Island, again I mentioned before I'm a saver and after one

6  of our meetings with Phil we were noticing how our bonds

7  were about 30 percent of the account and the majority was

8  stocks, again, what I did with my parents divorce, I

9  wanted to break it down and get back to 70 percent of the

10  portfolio.  So I had the idea to have Phil change that 30

11  to 50 percent, it would make my feel safer.  And even

12  though Phil said you want to make money more quickly,

13  better, faster, I was okay with that, being the security,

14  the safety of knowing it was safer with the bond, if

15  anything happened with the stock market.

16            So we went ahead and did that.  To me that was

17  my peace of mind, our safety net.

18  Q.    When Mr. Kenner first proposed to you to move the

19  safety net and make it collateral for the line of credit,

20  were you able to do that?

21  A.    No.  I said right away, no, no, no, no, no, not

22  touching that, that's my baby.  I put that together.

23  That's our safety net, I don't like that.  And he

24  reassured us over and over no, no, no, this not the money

25  account, the line of credit, that's collateral, nothing is

K. Peca - Direct/Komatireddy

699

1  going to happen to it, not a penny will go missing,

2  Kristin it's okay, this is only six months, he kept

3  reassuring me, nothing will happen to it.  The bank needs

4  to hold on to it in order for us to get the money for the

5  project.

6  Q.    Did you ultimately decide to invest and move your

7  bond account?

8  A.    Yeah, we did.

9  Q.    Why did you do that, even though you were reluctant?

10 A.    Well, ultimately he was our financial advisor so he's

11 supposed to be looking out for our best interest and we

12 hired him to secure our future, to help us invest and help

13 us get the right amount of money into the retirement

14 account and ultimately put your trust in him.  We were

15 paying him as our advisor to advise us.

16 Q.    At the time that you invested your monies and moved

17 your bond accounts for this Hawaii project, what it

18 Mr. Kenner tell you about how the hundred thousand dollars

19 and the line of credit would be used?

20 A.    It was all to be used in the investment the project,

21 and the stuff that he stressed to mainly again was

22 vertical development, construction, infrastructure.

23 Q.    You say vertical development, construction and

24 infrastructure.  Where was that all supposed to take

25 place?

K. Peca - Direct/Komatireddy

700

1    A.    In Hawaii, in the land that he purchased.

2    Q.    At the time that you invested your money and moved

3    your bond account, did Mr. Kenner tell you that your money

4    or line of credit would be used for land in Sag Harbor?

5    A.    Sag Harbor?

6    Q.    New York?

7    A.    No.  This was the first I'm hearing of that, no.

8    Q.    You said that the line of credit was supposed to last

9    six months.  And then do you recall what happened, what

10   was supposed to happen after six months?

11   A.    By then he said the funding would have come through

12   from Lehman Brothers which would have been more than

13   enough to pay off everybody's line of credit and

14   everybody's collateral would be released.  But in exchange

15   for that that way, doing the line of credit we were

16   supposed to gain an extra percentage in the investment.

17   Q.    So after six months did you get your money back from

18   the line of credit?

19   A.    We did not.

20   Q.    Did you move your bond account back?

21   A.    We couldn't.  It was stuck.

22   Q.    So this investment happened, do you remember

23   approximately what time you invested the money in Hawaii?

24   A.    2005, 2006.  We were in Edmonton.

25   Q.    We'll get back to Hawaii.

K. Peca - Direct/Komatireddy

701

1      Let's talk about another part of your

2  investments.  Do you recall a company named Eufora?

3  A.   I do.

4  Q.   Did there come a time where, when Mr. Kenner spoke to

5  you about investing in Eufora?

6  A.   Yes.

7  Q.   When you first had that conversation what did he tell

8  you about Eufora?

9  A.   Eufora was the name of this amazing concept that has

10  never been introduced in the banking world, and that his

11  business associate friend Tommy Constantine was I guess

12  CEO, the head of it, and he held these two exclusive

13  patents on this technology, the technology which it

14  basically said it allowed people, it allowed lower income

15  people or people with poor credit to earn back their

16  credit, to build better credit through this credit card

17  technology.  Every time they used the credit card and make

18  payments, their credit would improve.  And he had the

19  patents on that.

20      He was told we were very interested in those

21  patents, and once they signed contracts with Eufora and

22  started issuing cards that Eufora would be getting a

23  percentage of what the bank earned, their contract with

24  the credit cards were.

25  Q.   You invested several times in Eufora, right?

K. Peca - Direct/Komatireddy

702

1    A.    Twice.

2    Q.    Twice.  Okay so the first time you're discussing that

3    project you're just describing, when did that happen, the

4    first time or the second time?

5    A.    That was, the first time, that was 2004.

6    Q.    Around when was the second time?

7    A.    2008.

8    Q.    And when you invested the second time, what were the

9    circumstances in which you invested then?

10   A.    Phil came back to us and he explained that this is

11   about to explode, they finally started marketing, he

12   didn't tell me about the commercial that had started

13   airing, marketing the technology, the people saying if you

14   don't have credit, here is a way to earn credit, that type

15   of thing, and basically he presented it as almost he was

16   doing us a favor.  He said the company doesn't need that

17   much money right now, just enough to get us over the last

18   little legal bit, getting some paperwork done, contracts

19   and things, so I'm only extending this offer to my most

20   loyal and long-term clients, and Michael was one of them.

21   We were one.

22          So he was presenting it as a favor, great

23   opportunity, you know, you should almost feel lucky to be

24   doing it.  It's going to be to be huge.  About to explode.

25   Q.    Now, did he tell you what the money that he was

703

1    raising would be used for?

2    A.    Just like said those last, the little, little

3    hurdles, people were getting the last few things done to

4    get the business doing.

5    Q.    All for the business of Eufora?

6    A.    Yes.

7    Q.    You mentioned Mr. Kenner told you that Eufora was a

8    valuable account?

9    A.    Yes.

10   Q.    Did he tell you at the time you invested those in

11   Eufora whether those patents held were as collateral for a

12   loan?

13   A.    If they were held as collateral?  No.  No.  Never.

14   Q.    Would that have been important to you in deciding

15   whether to invest money?

16   A.    Yeah, of course.

17   Q.    Why?

18   A.    They were being held as collateral that would show

19   that the company is in some sort of debt or owe money and

20   is not doing as well and isn't ready to explode as they

21   said it was.

22   Q.    Did you and Michael ultimately invest in Eufora a

23   second time in 2008?

24   A.    Yes.

25   Q.    Now, at the time that you and Michael invested in

K. Peca - Direct/Komatireddy

704

1  Eufora, did he show you the actual wire request that he

2  submitted in order to make that investment?

3  A.    I've seen them, yes, he must have shown me after.

4  Q.    Did you see it at the time in 2008?

5  A.    The actual wire request at the time, I can't, I'm not

6  sure.

7  Q.    I'm going show you what's in evidence as Government

8  Exhibit 753.  Take a look at that.  Looking at that, does

9  either you or Michael sign that wire credit?

10 A.    No, no.  That's Phil, Phil signed.

11 Q.    Did he have authority to sign for you at that time?

12 A.    He still had power of attorney from us to sign.

13 Q.    By the way, Michael I gave him power of attorney to

14 sign for him as an attorney in fact, right?

15 A.    Um-hmm.

16 Q.    Did he ever -- did Kenner have your authority or

17 Michael's authority to sign Michael's name as Michael's

18 name, as Michael Peca?

19 A.    Well, I'm kind of confused by the question, but the

20 power of attorney was signing --

21 Q.    Fair enough.  Let me rephrase it.

22         We'll go back to the document.  Looking at this

23 document, it appears that Mr. Kenner signed on your

24 behalf, is that fair?

25 A.    Yes.

K. Peca - Direct/Komatireddy

705

1    Q.   At the time invested in Eufora did Mr. Kenner tell

2    you that your money was to be going to an entity called

3    Constantine Management Group?

4    A.   No, no.

5    Q.   Did you know what Constantine Management Group was in

6    2008?

7    A.   No.

8    Q.   Do you know what it is now?

9    A.   No.

10   Q.   Did you authorize your money going to an entity

11   called Constantine Management Group?

12   A.   No.

13   Q.   I'm going to hand you what's in evidence as

14   Government Exhibit 1706.  Just go ahead and review it.

15          (Handing.)  (Pause.)

16          Have you ever seen that document before,

17   Mrs. Peca.

18   A.   I have not.

19   Q.   Just looking at this, what does it appear to be?

20   A.   It appears to be some sort bank account for Tommy

21   Constantine.

22   Q.   Let's focus on the first page.  Just looking at the

23   top, who is, what is the entity that this bank account is

24   for?

25   A.   Constantine Management Group.

K. Peca - Direct/Komatireddy

706

1  Q.  Do you see the statement period in the top right?

2  A.  I do.  Yes.

3  Q.  April 2008?

4  A.  Um-hmm.

5  Q.  Same month that you and Michael invested in Eufora,

6  correct?

7  A.  Yes, that's correct.

8  Q.  And looking at the account number, does that account

9  number match the account number on your wire, receipt your

10  investment in Eufora?

11  A.  Let me find that.

12  Q.  It's also on the screen.

13  A.  Okay.  Yes.

14  Q.  Going to page 2, I'm going to zoom in April 7th.  Do

15  you see that, Mrs. Peca?

16  A.  Yes.

17  Q.  Can you read that for the record, what does that

18  appear to be?

19  A.  That is a wire for $100,000.

20  Q.  From by whom to whom?

21  A.  From Michael Peca at our old address or listing our

22  address from our old bank account going into Tommy's bank

23  account, Tommy Constantine's account.

24  Q.  Going into the account of Constantine Management

25  Group, right?

K. Peca - Direct/Komatireddy

707

1   A.   Yes.

2   Q.   And the date on this transfer, can you read that for

3   the record as well?

4   A.   The 4/7 or the 4/2?

5   Q.   The date associated with your transfer?

6   A.   Okay, 4/7.

7   Q.   4/7/2008?

8   A.   Yeah.  Yes.

9   Q.   Go to the withdrawals and debits.  Looking at again

10   an entry for 4/7, that's the same day, right?

11   A.   Correct.

12   Q.   Do you see a wire on 4/7, that I'm highlighting for

13   you.  Can you tell us what that appears to be?

14   A.   It's a wire of the same amount going to Phil Kenner.

15   Q.   A wire for $100,000 was going to Phil Kenner on the

16   same day, correct?

17   A.   Uh-huh.

18   Q.   Did you authorize your money that you invested in

19   Eufora to go to Phil Kenner?

20   A.   No, never, never.

21   Q.   Did Mr. Kenner ever tell you that the money that you

22   invested in Eufora was going to him?

23   A.   No, absolutely not.

24   Q.   After you did money in Eufora did you receive any

25   documentation reflect an interest in Eufora reflecting

K. Peca - Direct/Komatireddy

708

1    that investment?

2    A.    Nothing as official as we would have liked, no.

3    Q.    Did you ever receive an executed operating agreement

4    your name on it?

5    A.    No.

6    Q.    Did you receive any stock certificates?

7    A.    No.

8    Q.    Did you receive any transfer of share documents?

9    A.    We did not.  We tried the hardest to get more

10   official paperwork but never received any.

11   Q.    Did you receive any tax forms to file your taxes as

12   shareholder?

13   A.    No.

14   Q.    Do you have any record in your current possession

15   that you have a shareholder?

16   A.    Other than an e-mail from Tommy Constantine and Phil

17   mentioning that we have it.  Tommy Constantine had sent us

18   some sort of spreadsheet that represented percentages that

19   we owned, but it looked like something you can do on a

20   spreadsheet your computer.  It wasn't on official

21   letterhead or anything.

22            (Continued on next page.)

23

24

25

709

1    BY MS. KOMATIREDDY:

2    Q.    You have nothing signed, executed, final?

3    A.    No, nothing as official as we would have liked.

4    Q.    Did you receive anything back from your investment in

5    Eufora?

6    A.    We had not received a penny.

7    Q.    Any dividends?

8    A.    Nothing.

9    Q.    Did you receive any information after 2008 about your

10   investment in Hawaii?

11   A.    Do you want me to get into the line of credit

12   situation?

13   Q.    What was happening with the line of credit in 2008,

14   2009, that you remember?

15   A.    In 2008 and 2009 -- well, we were kept relatively in

16   the dark because Phil had all the mail going to his home

17   address because he was to be taking care of the monthly

18   payments on the line of credit, so we did not know that he

19   was missing payments and that the loan -- basically what

20   happened was one day I got mail that I had to sign for.

21           I was home alone at the time.  Michael wasn't

22   home yet from practice.  And I opened it up and the first

23   thing I see in big bold letters was the word default.

24           My eyes were scanning through it.  Realizing it

25   had to do with the line of credit, it felt like everything

K. Peca  -  Direct/Komatireddy

710

1    went blank around me.

2              All I could think of was, oh my gosh, that was

3    our safety net.  He guaranteed that wouldn't be touched.

4              The letter talked about taking the money out of

5    our bond account, and I can't even describe how I felt.

6    Q.    I'm going to bring you Government's Exhibit 717 also

7    in evidence.

8              Is that the letter you're referring to?

9    A.    Yes.

10   Q.    Did you talk to Mr. Kenner after receiving this

11   letter?

12   A.    I think I stood there holding that letter and didn't

13   really move much until Michael got home.  I was pretty

14   much in shock.

15             When Michael got home, I just handed it to him

16   and I started crying immediately.

17             And he called Phil right then and there and just

18   started laying into him, how could this happen, you

19   guaranteed this wouldn't happen, and used all sorts of

20   choice language.

21             And Phil, when we heard back from him, he

22   basically said, don't worry, buddy, it's safe in the

23   investment.  And he was trying to diffuse the situation

24   and downplay it.

25             We didn't understand, A, not only how this could

K. Peca  -  Direct/Komatireddy

711

1  happen, but how he didn't have the decency to give us a

2  heads-up and let us know we were about to get such a

3  shocking notice in the mail.

4  Q.   When he told you that it was safe in the investment,

5  what investment did you think?

6  A.   Well, Hawaii.  If it was safe in Hawaii, it was safe

7  in the investment.

8  Q.   Did you fire him right then?

9  A.   We did not.

10 Q.   Why not?

11 A.   This is going to take a minute to explain here.

12      For starters, we knew right then and there we

13 had to take any protective measure that we could.  We felt

14 we were scared.

15      We took away power of attorney, we stopped

16 forwarding checks for him to deposit and invest.

17      But at that time, when you're looking back at

18 this stuff, we didn't have proper documentation for

19 Hawaii, for Eufora and other things.

20      So our main goal was to get proper documentation

21 of everything and then we could sever ties, because how do

22 you prove your money is in this stuff until you have

23 proper documentation.

24      So we did what we could to protect ourselves at

25 that time.

712

1    Like I said, took away power of attorney, he no

2    longer received any of our paychecks, we cut that part

3    off.

4    Then we just tried our hardest in chasing him

5    down with e-mails and calls and texts trying to get proper

6    documentation of the investments from that point forward.

7    Q.   Now, earlier you testified that at the beginning of

8    your relationship you met with Mr. Kenner pretty often,

9    communicated with him pretty often.

10   Around this time in 2009, what was your

11   communication with Mr. Kenner like?

12   A.   It had changed dramatically.

13   He was no longer answering our calls.  He also

14   no longer got back to us that same day.  In fact, it often

15   took weeks and there were stretches where we didn't hear

16   from him in months.  He was not responding to e-mails in a

17   timely manner.

18   It was very, very difficult to track him down.

19   It leaves you with a sense of desperation when you're

20   financial advisor is avoiding you like that.

21   And I vividly remember him telling me when I was

22   questioning why I can't get a hold at him, at one point he

23   said he was hiding in a cave in Mexico because someone was

24   trying to kill him.

25   It was just scary hearing all these stories he

K. Peca  -  Direct/Komatireddy

713

1  had and the finger pointing, blaming others, all these

2  elaborate conspiracies.  Everything was really scary at

3  that point.

4           And, you know, he even said to me at one point

5  if I were to go down in a plane tomorrow, there would be

6  no way to get your money.  I'm the only one who knows

7  where your money is.  That is like having a string holding

8  over you.  It's a scary position to be in.

9  Q.   Now, a few months later in that year, 2009, was there

10  a time when Mr. Kenner and Mr. Constantine came to your

11  home?

12  A.   Yes.

13           It was May.

14  Q.   Was that the first time that you met Mr. Constantine?

15  A.   First time I met him, yeah.

16  Q.   How did he introduce himself to you?

17  A.   He was very charismatic.  Hi, I'm Tommy Constantine,

18  business partner of Phil's, head honcho at Eufora.

19           And mentioned that he was partners with us in

20  the Vegas Palms units that we were invested with in Phil,

21  or so I thought, and that's how he introduced himself.

22           And he was here to help, he needed to talk to us

23  with Phil and speaking on Phil's behalf that day because

24  Phil was ill.

25  Q.   What did Mr. Constantine and Mr. Kenner say about why

714

1    they were there at your home that day?

2    A.    The main reason they were there, the reason they were

3    there is they started explaining and they came up with a

4    new plan on how to get this money back that we were so

5    upset about.

6         And Tommy did all the explaining, even though I

7    was just meeting him for the first time, because he said

8    Phil was, A, not feeling well; but that it was because he

9    was so rundown, he's at his wits end financially,

10   physically and emotionally trying to fight to get our

11   money back, and that he can't do it anymore, and that's

12   the reason they're here was to help come up with a

13   solution that would work to get our money back.

14   Q.    What solution did they propose?

15   A.    It was called the Global Settlement Fund, GSF for

16   short.

17        And do you want me to explain it now?

18   Q.    How did the defendants explain it to you?

19   A.    Tommy was explaining that this Global Settlement Fund

20   would be everybody who was involved in this Hawaii

21   investment would contribute legally to the fund to get the

22   money back because -- and this really relates back to the

23   line of credit so if I can go back to that.

24        Phil had said that that line of credit money was

25   loaned to a fellow named Ken Jowdy, and we need to get

K. Peca  -  Direct/Komatireddy

715

1    that money back.

2           So he said the only way to do is to sue to get

3    that money back, and it's his fault that the line of

4    credit defaulted because he didn't pay it back.

5           So now he's saying, Phil is saying, he spent all

6    his own personal money on this lawsuit in trying to get

7    the money back and he couldn't do it anymore.

8           And rather than going to each guy who lost money

9    with the line of credit and saying, hey, we have a legal

10   bill for 5,000 or 10,000, and if everybody would put up

11   250,000 for the legal battle, we have a big enough pot

12   that the lawyer can use this money, go after Jowdy for the

13   money that was loaned to him, and that we all would be

14   made whole again.

15   Q.   Now, just two months earlier when you got this letter

16   and you asked Mr. Kenner about your line of credit, you

17   said he told you it was safe in the investment, right?

18   A.   Yes, he did, but the story changed.

19   Q.   So the plan was to create this fund.

20          Did he specify who else was going to be part of

21   the fund?

22   A.   They said it was going to be everybody who lost money

23   with their lines of credits.

24   Q.   Are these people that you knew?

25   A.   Michael would know better the hockey players, yeah.

K. Peca  -  Direct/Komatireddy

716

1    Q.    So there are other hockey players?

2    A.    Yeah.

3    Q.    Did he tell you how much that you had to invest?

4    A.    Yes.

5          He said it had to be 250,000 and everybody had

6    to do it, everybody had to pledge the same amount or else

7    it wouldn't work.  They kept on saying that.

8    Q.    And where was the money supposed to be sent?  Did

9    they tell you that?

10   A.    They did.

11   Q.    What did they say?

12   A.    This is one of the things that Tommy sold to kind of

13   legitimize it.

14         He said it was going to be kept at attorney

15   Ronald Richards' escrow account at his law offices, and

16   that was the exact attorney we were using to sue Jowdy.

17         So that from that aspect made sense, it was held

18   safe in a lawyer's escrow account.  It wasn't an

19   investment, it was for a lawsuit for a legal fund.

20   Q.    You said it wasn't an investment.

21         Did the defendants discuss various investments

22   with you in that conversation in your home in May 2009?

23   A.    Well, again, Tommy was doing 95 percent of the

24   talking so that's who I'm referring to.  Phil wasn't

25   saying much.  He knew how mad we were with him and he was,

717

1  just like now, very little eye contact.

2          MR. HALEY:  I object, your Honor.

3          THE COURT:  Sustained.  The jury will disregard

4  that.

5          Don't comment on his demeanor in the courtroom,

6  okay?

7          THE WITNESS:  Okay.  Sorry.

8          MR. HALEY:  Thank you, Judge.

9  BY MS. KOMATIREDDY:

10  Q.   Let's focus on what Mr. Constantine told you.

11          What did he tell you about the purpose of the

12  funds in the Global Settlement Fund?

13  A.   The main purpose was that it was a legal fight, it

14  was to be used for a lawsuit to get the money back from

15  Ken Jowdy.

16          At one point, like you were saying there, he did

17  start mentioning some other minor items as incentives if

18  we were willing to put this large money upfront instead of

19  waiting until the legal bills came in.  He was mentioning

20  like you would be getting one percent share in an airplane

21  or something else.

22          And I quickly interjected and said we're not

23  interested in anymore investments or we're done with them.

24  That letter you were just showing that was up here, that

25  was it for us.  We were done with investments.

K. Peca - Direct/Komatireddy

718

1    So then he quickly knew that didn't hold much

2  weight to us and he focused on the legal aspect of it

3  again.

4    He did mention Eufora quickly too when he

5  brought up the airplane.

6  Q.   So how long was this conversation?

7  A.   They were there for the afternoon.  There were there

8  for at least a couple of hours.

9  Q.   At the end of the conversation, what did you believe

10  the money that was going to the Global Settlement Fund was

11  to be used for?

12  A.   It was to be used for the legal fight to get our

13  money back from Jowdy, and that's why it was being sent to

14  the attorney's escrow account, for that very attorney to

15  lead the legal fight.

16  Q.   Did Mr. Constantine tell you, at that time, when you

17  were deciding whether to invest, that he would be in

18  control of the money in that account?

19  A.   No.

20    We were just meeting him.

21  Q.   Would that have been important to you in deciding

22  whether to invest?

23  A.   Yes.

24    Considering we were just meeting him, yes.

25  Q.   I used the word invest. You testified it wasn't an

719

1  investment.

2  Would that have been important to you in

3  deciding whether to contribute to this legal defense fund?

4  A.  Yes.

5  Q.  Did you and Michael in fact contribute to this legal

6  invest fund?

7  A.  We did.

8  Q.  Now, a few months earlier you just found out that

9  your bond account was in default?

10  A.  Correct.

11  Q.  And you're meeting Mr. Constantine for the first time

12  in your home?

13  A.  Yes.

14  Q.  Why did you contribute to this new idea?

15  A.  For a couple different reasons.

16  Even though I was still hesitant all along, one

17  is because, again, it's that same sense of this is it, you

18  have to do it, this is to get your money back.

19  So it was being sold as this is part of a legal

20  fight.  This is not an investment.  This is how you're

21  going to get your money back.

22  So it places that whole thing and it was

23  legitimized by saying it was going and being wired to that

24  attorney's account.

25  But then it also came down to the fact -- and

K. Peca  -  Direct/Komatireddy

720

1  this is where I trust my husband's judgment a lot -- but

2  he's always been a team player and I don't know if that's

3  the hockey aspect or not, but they said everybody does it

4  or it doesn't work.

5          So even if we decided, no, we're not doing it,

6  we're not potentially ruining our own chance of getting

7  our money back, we would be hurting everybody else and

8  Michael is too much of a team player to do that to other

9  people.

10  Q.  Now, turning your attention to Government's Exhibit

11  754 in evidence. It's a wire transfer request.

12          Does that reflect yours and Michael's investment

13  in the Global Settlement Fund in May 2009?

14  A.  Yes, it does.

15  Q.  Did either Mr. Constantine or Mr. Kenner follow-up

16  with you by phone or e-mail about the use of the funds in

17  the Global Settlement Fund?

18  A.  Yes, by phone and e-mail.

19  Q.  I'm going to show you what's already in evidence as

20  Government's Exhibit 757, and take a minute to read it.

21          (Pause in proceedings.)

22          Do you recognize this e-mail?

23  A.  I do.

24  Q.  Do you remember getting it?

25  A.  Yes.

K. Peca  -  Direct/Komatireddy

721

1   Q.   I'm going to focus your attention on a sentence in

2   the middle that says you may not recall Tommy or I

3   mentioning the Palms units in our conversation.

4         Do you see that?

5   A.   I do.

6   Q.   Did I read it accurately?

7   A.   Yes.

8   Q.   Now, earlier, you testified that when Mr. Kenner and

9   Mr. Constantine were in your home, they spoke to you about

10  the legal defense fund and a couple of investments.

11        Did they mention any further investment in Palms

12  units in that conversation?

13  A.   Never.

14  Q.   Is it possible they mentioned it and you just forgot?

15  A.   No, I would definitely remember that.

16  Q.   Why?

17  A.   Because we were already -- I think I touched on it

18  before -- already invested in the Palms.

19  Q.   Well, in terms of the e-mail then, at the time that

20  you gave money to this fund, did you want to get more

21  units at the Palms?

22  A.   No.

23  Q.   Would you have authorized any of the money that you

24  gave to be used for units at the Palms?

25  A.   No.

K. Peca  -  Direct/Komatireddy

722

1  Q.   I'm going to turn your attention back to Government's

2  Exhibit 754. It's the wire transfer again.

3        I'm also going to show you what's in evidence as

4  Government's Exhibit 1105.

5        Looking at the date of your wire transfer

6  request here, it's May 8, 2009, correct?

7  A.   Yes.

8  Q.   You testified that the money for the Global

9  Settlement Fund went to an attorney's escrow account,

10  correct?

11  A.   Yes.

12  Q.   Looking at Government's Exhibit 1105, at the top it

13  says First Century Bank funds transfer request, correct?

14  A.   Yes.

15  Q.   I'm going to go to page 4 of the exhibit.

16        This funds transfer request or page 4 is labeled

17  wire transfer request, correct?

18  A.   Yes.

19  Q.   What's the date of that wire that's being sent or

20  requested that date?

21  A.   May 12th.

22  Q.   That's four days after your investment in the Global

23  Settlement Fund?

24  A.   Yes.

25  Q.   What was the account that wire is coming from?

K. Peca  -  Direct/Komatireddy

723

1   A.   It's coming from the Ronald Richards' account we had

2   deposited the Global Settlement Fund into.

3   Q.   So on May 8 you deposit the money you're putting into

4   the Global Settlement Fund into the Ron Richards' account,

5   right?

6   A.   Correct.

7   Q.   On May 12, the Ron Richards' account is making an

8   outgoing wire, correct?

9   A.   Yes.

10  Q.   What's the amount of that wire?

11  A.   45,000.

12  Q.   Who is that wire to?

13  A.   Gilmarten -- I can't understand the middle name --

14  and Ross.

15  Q.   Do you know who that is?

16  A.   No.

17  Q.   Do you know the purpose of that payment?

18  A.   I do not, no.

19  Q.   When you gave money to the defendants to be

20  contributed to the Global Settlement Fund, did you

21  authorize any payments to Gilmarten Magence & Ross?

22  A.   This is the first -- I don't even know who that is.

23  Q.   And that wire transfer was May 12, right?

24  A.   Correct.

25  Q.   What's the date of the e-mail that references the

724

1    Palms for the first time?

2    A.    May 18th.

3    Q.    The first time you're hearing that the money in the

4    Global Settlement Fund is going to be used for the Palms

5    or may be used for the Palms is May 18th?

6    A.    Correct.

7          It even says in there you may not recall,

8    because it wasn't mentioned.

9    Q.    This e-mail mentions a number of things.  I want you

10   to read it carefully.  Take your time.

11   A.    Okay.

12         (Pause in proceedings.)

13   Q.    And tell me when you're finished.

14   A.    Okay.

15         (Pause in proceedings.)

16   A.    I'm done.

17   Q.    Now, when the defendants first came to your home and

18   told you about the Global Settlement Fund in May 2009, did

19   they say anything about the money in that fund being used

20   to pay Mr. Constantine's rent?

21   A.    No, never.

22   Q.    After reading that e-mail carefully, Government's

23   Exhibit 757, is there anything in there about funds in the

24   Global Settlement Fund being used to pay Mr. Constantine's

25   rent?

725

1    A.    Nothing.

2    Q.    Did the defendants, when they were in your home at

3    the time you made the decision to invest in the Global

4    Settlement Fund, say anything about using the fund's money

5    to pay for race cars for Mr. Constantine?

6    A.    No.

7    Q.    Does that e-mail, Government's Exhibit 757, say

8    anything about using Global Settlement Fund money for race

9    cars for Mr. Constantine?

10   A.    Nope, no mention of it.

11   Q.    When they were in your home talking to you about the

12   Global Settlement Fund, did they say anything about using

13   the money for a personal lawsuit involving car racing for

14   Mr. Constantine?

15   A.    No, not at all.

16   Q.    How about that e-mail?

17   A.    No, no mention of it.

18   Q.    What about to help facilitate the purchase of

19   Mr. Constantine's home, did they mention that in your home

20   in May 2009?

21   A.    No.

22          We would not be helping someone else purchase

23   their home.

24   Q.    Is that mentioned in that e-mail in Government's

25   Exhibit 757?

726

1   A.    No, it's not.

2   Q.    Would you have authorized your money to be used for

3   any of the purposes I just mentioned?

4   A.    No, 100 percent not, of course not.

5   Q.    Would it have altered your decision on whether or not

6   to invest in the Global Settlement Fund if they had told

7   you those things at the time you made the decision to

8   invest?

9   A.    Of course it would have, yes.

10  Q.    When Mr. Kenner and Mr. Constantine were in your home

11  in May 2009, did they tell you anything about using the

12  money in the Global Settlement Fund to pay Mr. Kenner's

13  credit card bills?

14  A.    No, that was not mentioned either.

15  Q.    How about in that e-mail, is that in that e-mail?

16  A.    No.

17  Q.    Did they say anything about using the money in the

18  Global Settlement Fund to pay for a Tequila company that

19  Mr. Kenner was starting in Mexico?

20          MR. HALEY:  Judge, I object.

21          These are a litany of leading questions.  I

22  didn't object up to this point in time.  I don't mind a

23  non-leading question about what was discussed.

24          Secondarily, they're suggesting matters that are

25  not in evidence and may not ever be in evidence in this

K. Peca  -  Direct/Komatireddy

727

1    case.

2          THE COURT:  I'll overrule the objection on

3    leading.

4          She's asking her about particular items.  Again,

5    there's a non-leading way to ask about particular items.

6          So I'll overrule the objection, but I will

7    remind the jury that a lawyer's question is not evidence.

8    She's permitted to ask that question, but the question in

9    and of itself is not evidence.

10          MR. HALEY:  Thank you, sir.

11          MS. KOMATIREDDY:  Thank you, Judge.

12    BY MS. KOMATIREDDY:

13    Q.    Did there come a time that Mr. Kenner ever tell you

14    what happened to the money in the Global Settlement Fund,

15    did he tell you whether there was any left?

16    A.    Eventually we were told it was all used up.

17    Q.    Did there come a time when you recorded conversations

18    you had with Mr. Kenner?

19    A.    Yes.

20    Q.    What led you to do that?

21    A.    The growing number of red flags and the situation

22    such as those that had been mentioned so far, it gave me a

23    feeling of obviously nervousness and fear and I felt the

24    need to take some protected measures.

25          If we're missing all these official documents,

K. Peca  -  Direct/Komatireddy

728

1    maybe we can at least get it on tape and use it in court

2    some day and hopefully get our money back.

3    Q.    I'm going to hand you a CD that's been marked

4    Government's Exhibit 506 and four exhibits 506.1, 2, 3 and

5    4-T.

6          Take a look at those.  Let me know if you

7    recognize them.

8    A.    I do.

9    Q.    What is Government's Exhibit 506?

10   A.    What is what?

11   Q.    What is on Government's Exhibit 506?

12   A.    My initials.  I initialed these for you.

13   Q.    That's right.

14         What's on the CD?

15   A.    Oh, taped record conversations I recorded with Phil.

16   Q.    Now, in total, do you remember approximately how many

17   hours of conversation you recorded with Mr. Kenner?

18   A.    Several.

19   Q.    Those are just excerpts of those conversations,

20   correct?

21   A.    Yes.

22   Q.    Are those true and accurate excerpts of longer

23   conversations you had with Mr. Kenner?

24   A.    Yes, they are.

25   Q.    Looking at Government's Exhibit 506.1, 2, 3 and 4-T,

729

1   do you see your initials and dates on those as well?

2   A.   Yes.

3   Q.   Are those -- have you reviewed those transcripts

4   before coming into court today?

5   A.   I did.

6   Q.   Do they correspond in your view?  Are you satisfied

7   that they accurately reflect the conversation on the

8   clips, 506.1 --

9   A.   Yes.

10           MS. KOMATIREDDY:  The government moves the CD

11   506 into evidence and transcripts 506.1, 2, 3 and 4-T as

12   aids to the jury.

13           THE COURT:  Any objection?

14           MR. LA RUSSO:  No, your Honor.

15           MR. HALEY:  Very brief voir dire, Judge.

16

17   VOIR DIRE EXAMINATION

18   BY MR. HALEY:

19   Q.   Good afternoon.

20   A.   Hi.

21   Q.   The disk you have on the witness bench, did you put

22   that disk together?  Who put that disk together?

23   A.   I taped the calls on my phone.

24   Q.   No.  But that particular disk does not contain all

25   the telephone conversations you had with Phil Kenner, does

730

1   it?

2   A.   No, it does not contain all of them I don't believe.

3   Q.   Well, what's contained on that disk is excerpts of

4   these conversations you had with Phil Kenner over an

5   extended period of time?

6   A.   Yes.

7   Q.   What was the duration of time that occurred where you

8   began to secretly record the conversations with Phil

9   Kenner up to the point in time you stopped?

10  A.   Well, it was approximately July 2012, around there.

11  Q.   That's when it began?

12  A.   That was around the time frame that it happened, yes.

13  Q.   And do you recall approximately how many hours of

14  tape recorded conversations you had with Phil Kenner?

15  A.   No, just several.

16  Q.   You can't put a time frame as to the amount of time?

17  A.   Four or five hours.

18  Q.   Do you know how much --

19        MR. HALEY:  I'm almost finished, Judge.

20  BY MR. HALEY:

21  Q.   Do you know how much time is captured on this

22  particular disk with reference to those four, five hours

23  of conversations?

24  A.   I do not.

25        MR. HALEY:  I have no objection, Judge.

K. Peca  -  Direct/Komatireddy

731

1       THE COURT:  506 is admitted and the transcripts,

2   again, are just aids.  And with the same instruction I

3   gave you yesterday applying today, they're just an aid to

4   the jury, they're not evidence.  And if you hear something

5   different on the tape from what's on the transcript, what

6   you hear controls.

7       How long are the tapes?  Should we take the

8   break first?

9       MS. KOMATIREDDY:  They're short, but we can take

10  the break.

11      THE COURT:  Let's take our afternoon break.

12  Let's try to keep it to 15 minutes.  Thank you.  Don't

13  discuss the case.

14      THE WITNESS:  Do I have to stay here?

15      THE COURT:  No, you can step down.

16      (The jury is excused.)

17      (Government Exhibit 506 in evidence.)

18      (Recess taken.)

19      (After recess.)

20      THE CLERK:  All rise.

21      THE COURT:  Please be seated.  Let's bring in

22  the jury.

23      (The witness resumes the stand.)

24      THE COURT:  How much longer do you have on

25  direct?

K. Peca  -  Direct/Komatireddy

732

1    MS. KOMATIREDDY:  Your Honor, approximately 30

2    minutes.  We're trying to do it quickly.

3    THE CLERK:  All rise.

4    (The jury is present.)

5    THE COURT:  Please be seated.

6    Go ahead, Ms. Komatireddy.

7    MS. KOMATIREDDY:  Thank you, your Honor.

8    BY MS. KOMATIREDDY:

9    Q.   Before we get to the recordings, I'm going to ask you

10   a quick question.

11   Take a look at that.  You mentioned -- I want to

12   very briefly go over this.

13   Do you recognize the bank and the bank account

14   on that document?

15   A.   Yes.

16   Q.   It's Waterstone Bank.

17   Did you and Michael have an account in Michael's

18   name at Waterstone Bank?

19   A.   Not an account, a mortgage.  That's where the

20   mortgage was held for the Palms unit.

21   Q.   To the extent that -- I think that's all we need to

22   go over.

23   Going back to the recorded phone calls, I'm

24   going to go play Government's Exhibit 506.1.

25   (Tape played.)

K. Peca  -  Direct/Komatireddy

733

1          (Tape stopped.)

2          The first voice on that recording, who is that?

3     A.   That's me.

4     Q.   Who is it that responds?

5     A.   Phil Kenner.

6     Q.   When he says it went to the project, what is your

7     understanding of what project he's referring to?

8     A.   The Hawaii project that we have been talking about,

9     the line of credit.

10    Q.   When he says that the money in your line of credit,

11    Michael's line of credit, went to the Hawaii project, is

12    that consistent with what he told you when you first

13    agreed to set up that line of credit?

14    A.   Yes, it is.

15          MR. HALEY:  Objection, your Honor.

16          Withdrawn.

17    BY MS. KOMATIREDDY:

18    Q.   I'm going to keep going.

19          (Tape played.)

20          (Tape stopped.)

21          Now, when you say I thought you said it got

22    loaned, did Mr. Kenner tell you that he would loan the

23    money and line of credit out at the time you set it up?

24    A.   No, he did not.

25    Q.   When do you remember hearing that?

K. Peca  -  Direct/Komatireddy

734

1    A.    This story had changed.  I can't remember exactly how

2    long after, but that was the next version we heard.

3    Q.    Would that have been important to you to know at the

4    time you agreed to set up that line of credit, if it was

5    going to be used or loaned, that money was going to be

6    loaned to someone else?

7    A.    Absolutely.

8    Q.    Why?

9    A.    Because this money was supposed to be for the project

10   and only for the project.

11        We would have never agreed to loan money,

12   especially that large amount of money, to somebody we

13   never even met in person, or I haven't.

14   Q.    Just remind us, the line of credit, what is securing

15   that line of credit?

16   A.    My safety net.  It was our safety net, our bond

17   account from our portfolio.

18   Q.    Let's continue playing.

19        (Tape played.)

20        (Tape stopped.)

21        He says, I don't have anything.

22        At that point did you have any sort of

23   transaction history documents showing what happened to

24   yours and Michael's line of credit?

25   A.    No, we did not.

K. Peca  -  Direct/Komatireddy

735

1   Q.   I'm going to hand you what's been marked and admitted

2   into evidence as Government's Exhibit 2001.

3          Take a minute to look at it.

4          Have you ever seen that document before?

5   A.   No, I have not.

6   Q.   Look at the top.

7   A.   Loan transaction history.

8   Q.   What does it say on the left side?

9   A.   Michael.

10  Q.   What does that appear to be?

11  A.   It appears to be records of the line of credit and

12  monthly transactions I should say.

13  Q.   Is that the kind of information you were looking for?

14  A.   This would have been nice to have, yes, absolutely.

15  Q.   Did Mr. Kenner ever give you that document?

16  A.   He did not.

17  Q.   Did he give you that document after you asked for it

18  in this phone call?

19  A.   No.

20          He said he had nothing.

21  Q.   When you go through that document now for the first

22  time, does it raise any questions in your mind?

23  A.   Can I take a minute to look at it?

24  Q.   Go ahead.

25          (Pause in proceedings.)

736

1    A.    The note increases, rate changes.

2    Q.    Did you know about those specific note increases and

3    rate changes at the time they were happening?

4    A.    I never heard anything about a rate change

5    whatsoever.

6    Q.    Would it have been important to you to receive that

7    information at the time that this happened?

8    A.    Yes, it would have been very nice to have any

9    information relating to this.

10   Q.    What would you have done if you saw a note increase

11   or a rate change in the amounts that you're seeing on the

12   document?

13   A.    Well, obviously, we would have had some conversations

14   and figured out what exactly was going on.

15   Q.    When you say conversations, conversations with who?

16   A.    Phil Kenner.

17   Q.    I'm going to hand you what's been marked for

18   identification only as Government's Exhibit 5103L-A.

19          Have you ever seen that document before?

20   A.    No, I haven't seen this either.

21   Q.    Just looking at the document, at the top of it, is

22   there a loan number on that document?

23   A.    Yeah, account number.

24   Q.    It's the same account number as in Government's

25   Exhibit 2001?

737

1    A.    Correct.

2    Q.    Did Mr. Kenner ever give you that document?

3    A.    He did not.

4    Q.    Did he give you that document in response to your

5    question on this phone call when you asked for

6    documentation?

7    A.    No.

8          He said he had absolutely nothing.

9    Q.    All right.  We're going to keep playing the call.

10         (Tape played.)

11         (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

738

1               (Audio playing.)

2               (Audio stopped.)

3    DIRECT EXAMINATION (Continued)

4    BY MS. KOMATIREDDY:

5    Q.   For the record, the $40,000 that Mr. Kenner tells you

6    he paid on the lines of credit, do you know for a fact if

7    he actually spent his own $40,000 to pay make those

8    payments?

9    A.   No.  I have no way of knowing that.

10              (Audio playing.)

11              (Audio stopped.)

12   BY MS. KOMATIREDDY:

13   Q.   Now I'm going to play what has been marked into

14   evidence as Government Exhibit.

15              (Audio playing.)

16              (Audio stopped.)

17   BY MS. KOMATIREDDY:

18   Q.   Now, at that point.  At any point did Mr. Kenner tell

19   you about the specific transactions that you see in

20   Government Exhibit 2001, the transaction history?

21   A.   He did not.

22   Q.   Did he tell you, if you look in October 2006, that he

23   took $395,000 from the line of credit?

24   A.   No.

25   Q.   At that point did he actual tell you, or at any

739

1   point, that the money from the line of credit was used for

2   a property in Sag Harbor, New York?

3   A.   No.  Not at all.

4   Q.   Finally, the government plays 506.2.  It is in

5   evidence.

6           (Audio playing.)

7           (Audio stopped.)

8   BY MS. KOMATIREDDY:

9   Q.   Do you know whether that's true, whether Mr.  Kenner

10  got any money from the global settlement fund?

11  A.   He said he didn't gets anything from it.  I don't

12  know whether that's true or not.

13  Q.   Remind us again, what was the account associated with

14  that global settlement fund?

15  A.   It was for a legal fight to sue Jowdy.

16  Q.   And what was the money, what account name were the

17  monies going into?

18  A.   It was being held at the law offices of Ronald

19  Richards in California in an escrow account.  He is the

20  attorney that was leading the fight against Jowdy.

21  Q.   I'm going to show you what has been marked as

22  Government Exhibit 1102 and is in evidence.

23          Do you see this?

24  A.   Yes.

25  Q.   Bank statement for account of law office, of Ronald

K. Peca - Direct/Ms. Komatireddy

740

1   Richards.  Is that correct?

2   A.    Yes.

3   Q.    Just compare it to the wires reported with the same

4   account number.

5   A.    Yes.

6         It is.

7         It is small too to see.

8         No, that's a different number.

9   Q.    All right.  Let me try it again.

10  A.    I'm looking at the wrong thing.  I looked at --

11  Q.    Let's try that --

12  A.    Okay.

13  Q.    The wire, Government Exhibit 754, on the left?

14  A.    Yes.

15  Q.    702 is on the right.  Are those the same account

16  numbers?

17  A.    Yes.  Sorry.  I was looking at our account number,

18  not the Richards one.

19  Q.    All right.  So looking at the account statements for

20  the Ron Richards account.  Look at the first page.

21        In fact, see there on May 8, is that your

22  investment?

23  A.    Yes.

24  Q.    I'm sorry, not *investment.*  Contribution to the legal

25  defense fund.

K. Peca - Direct/Ms. Komatireddy

741

1   A.    Correct.

2   Q.    Is that a wire from you and Michael to the Ron

3   Richards account $250,000?

4   A.    Yes.  To the attorney's account.

5   Q.    And the date of that transfer corresponds with the

6   date of the wire request that we were looking at before?

7   A.    It does.

8   Q.    Going to page 10 of this exhibit.  I'm going to draw

9   your attention to an entry on July 30.

10          Can you tell us what the highlighted portion

11  indicates.

12  A.    Eufora LLR value load.

13  Q.    All right.  What's right after that?

14  A.    Wire transfer to Phil Kenner.

15  Q.    What is the date of that?

16  A.    July 30.

17  Q.    Did you know --

18  A.    For 22,425.02.

19  Q.    No, we didn't know.  As you just heard, he was saying

20  he got nothing.

21          MR. HALEY:  Well, your Honor, I would object

22  to -- I withdraw the objection.

23          I apologize.  I withdraw the objection.

24          MS. KOMATIREDDY:  No further questions, your

25  Honor.

K. Peca - Cross/Mr. Haley

742

1      THE COURT:  Cross-examination.

2      MR. HALEY:  Yes, sir.

3

4  CROSS-EXAMINATION

5  BY MR. HALEY:

6  Q.    Can see Government Exhibit 2001.  I think it is the

7  long transaction history.

8          Mrs. Peca, good afternoon.

9  A.    Hello.

10  Q.    Mrs. Peca, my name is Rick Haley and I represent Phil

11  Kenner.

12          You testified a moment ago that as relates to

13  this document, the loan transaction history for the line

14  of credit for you and your husband.  Just several minutes

15  ago was the first time you ever saw that document?

16  A.    Was it the first time?

17  Q.    Yes, ma'am.

18  A.    Just now.  Yes.  Well --

19  Q.    You received the Northern Trust default letter

20  approximately six years ago from Northern Trust?

21  A.    Yes.

22  Q.    We agree that the Northern Trust default letter, and

23  I know you testified clearly on direct it upset you so

24  much, you received on or about March 19, 2009.  Is that

25  correct?

743

1    A.    Yes.

2    Q.    And having received that letter, what if any steps

3    did you take to contact Northern Trust officials directly

4    to find out what occurred with respect to your line of

5    credit?

6    A.    Well, what we did, the action we took started with

7    Phil Kenner, who was our advisor who should have been

8    supplying us with the answers we needed.  So our efforts

9    were going toward asking him and getting information from

10   him.  At this point I felt as though we had the

11   information the banks could supply, that it defaulted.

12         They can't say where the money went or why,

13   what's going on with the project.  That information could

14   only be gotten from Phil.

15   Q.    Well, when do you say he told you he was living in a

16   cave in Mexico?

17   A.    When did he tell me that?

18   Q.    Yes.

19   A.    I don't know the date.  It was during the period

20   where he became more evasive and extremely difficult to

21   get ahold of.

22   Q.    Well, let's time frame that comment that you say he

23   said to you that I'm living in a cave in Mexico as relates

24   to --

25   A.    Not living.  He was hiding there for two weeks.

744

1  Q.   Correct.  I apologize.  Your testimony was he told

2  you he was hiding in a cave in Mexico.

3       My question is, can we time-frame that comment

4  that you say he made to you with reference to the date you

5  learned for the first time, by your testimony, that the

6  bonds that constituted your nest egg were being seized?

7  And that's specifically on or about March 19, 2009.

8  A.   No, I don't think I would be able to accurately do

9  that.  That is not something I wrote a date down on.  It's

10 just another example of, again, one of the comments that I

11 remember from him being hard to get ahold of.

12 Q.   Were you alarmed when he told you that I'm hiding in

13 a cave in Mexico?

14      Did that alarm you?  Yes or no?

15 A.   Yes.

16 Q.   Did you believe him when he said I'm hiding in a cave

17 in Mexico?

18 A.   No.

19 Q.   All right.  So now, armed with this information from

20 your financial advisor that I'm hiding in a cave in

21 Mexico, what if any steps did you take independent of your

22 relationship with your financial advisor to contact

23 Northern Trust directly to obtain what is that loan

24 transaction history report that you say you just saw or

25 that you told us you just saw a moment ago?

K. Peca - Cross/Mr. Haley

745

1   A.    Our most immediate action was to take away the power

2   of attorney so nothing else could be done.

3   Q.    Okay.  Take away the power of attorney.

4   A.    Not forward any more pay checks to him so he can't

5   have any more control of our money.

6   Q.    Very well.  And the next step was?  Withdrawn.

7           You certainly at that point in time knew how to

8   communicate with Northern Trust, because you just told us

9   you contacted Northern Trust directly to have his power of

10  attorney invalidated.  Correct?

11  A.    No.  I didn't say we did it through Northern Trust.

12  We did that through Phil.

13  Q.    I see.

14  A.    Michael asked for him to remove himself as power of

15  attorney from anything related to us and our accounts.

16          It was not a Northern Trust thing.  It was that

17  we didn't trust him with anything any more.

18  Q.    And as a result of that request of Phil, he followed

19  your directions, I take it.  Correct?

20  A.    He did.

21  Q.    Do you know if that occurred before or after he told

22  be you he was hiding in a cave in Mexico?

23  A.    Again, I don't remember exactly when he told me he

24  was hiding in a cave in Mexico.

25  Q.    Did you testify on direct that he, did at any point

K. Peca - Cross/Mr. Haley

746

1   in time you request of Phil Kenner that he provide you the

2   line of credit documents with respect to your line of

3   credit directly to you from him?

4   A.   Michael at this point was dealing with him and he was

5   asking for any and all information we can get from him.

6   Q.   And what was Phil's response?

7   A.   Well, first of all, it was very hard to get ahold of

8   him.  Again, he was extremely evasive.  But when we did,

9   he said he had nothing.  His documents were stolen.

10  Q.   Really.

11  A.   Yes.

12  Q.   I'm sorry.  He told you that his documents these,

13  line of credit documents, were stolen?

14  A.   I didn't specifically say the line of credit, but

15  when we asked for them he said:  As you recall, my house

16  was broken into and all my documents were stolen.  And he

17  was assuming it was from the people that were suing him,

18  Kristie Myrick or would be of the those people.

19  Q.   And could you time frame that statement that you say

20  he made with reference to the statement that he made

21  regarding hiding in a cave in Mexico?

22  A.   I can't.  But we do have that in at least one email

23  so I'm sure it can be looked up.

24  Q.   Did you provide all of the emails in your possession

25  with reference to communications between yourself and Phil

K. Peca - Cross/Mr. Haley

747

1   Kenner to the investigating agents in this case?

2   A.   Did I, personally, provide them?

3   Q.   Yes.

4   A.   I did forward them, yes.

5   Q.   All of them?

6   A.   As many as I can could find.  Yes.

7   Q.   I apologize if I asked the question.  Did you believe

8   him when he told you that he could not provide the

9   Northern Trust line of credit documents because they were

10  stolen in a burglary of his home?

11  A.   To be honest, no.  It just seemed like another one of

12  his conspiracy theory stories.

13  Q.   Does the name Aaron Mascarella mean anything to you?

14  A.   It is familiar.  Yes.

15  Q.   If I were to tell you he is the official or became

16  the account representative at some point in time with

17  reference to your line of credit at Northern Trust bank,

18  would that refresh your recollection?

19  A.   Okay.  Yes.

20  Q.   Between the time you received the notice of default

21  dated March 19, 2009, up until today's date, would you

22  describe for the jury the content.  The level of

23  communication you had with Mr. Mascarella to obtain copies

24  of your line of credit statements from Northern Trust.

25  A.   Me, personally?  None.

K. Peca - Cross/Mr. Haley

748

1   Q.   Well, in your household, you are the one that really

2   takes the initiative to pay attention to the finances.

3            Isn't that correct?

4            MS. KOMATIREDDY:  Objection.

5            THE COURT:  You can answer that.

6   A.   Answer that?

7            THE COURT:  Yes.

8   A.   I take care of all the monthly bills, the utilities,

9   that sort of thing.  Yes.

10  Q.   But you are also, are you not, Mrs. Peca, intimately

11  involved in your husband's assets:  Where they are --

12  A.   Yes, we talk about it.  Yes.

13  Q.   Well, when you say we talk about it, you also,

14  correct me if I'm wrong, are hands on when it comes to

15  that.  You pay attention to what's going on in connection

16  with your financial records, as you told us on direct.

17           Isn't that true?

18  A.   I'm hands on to an extent of, as I explained earlier,

19  he handles all the mail that comes in with regards to

20  portfolio statements, investments.  I handle all the

21  utilities, that sort of thing.

22  Q.   Well, prior to today you and your husband had

23  received a great deal of information, documents and

24  material, from Phil Kenner regarding the Hawaii project.

25  Correct?

K. Peca - Cross/Mr. Haley

749

1    A.    We got a bundle of paperwork that refers to the LLC.

2    Q.    Which LLC?

3    A.    The Little Aisle, the group that was invested

4    together for that 12 to 13 percent of the 35 percent.

5    That group.

6    Q.    Did that include the operating agreement for the LLC?

7    A.    I can't say for sure.  It was a big book.  There is a

8    lot.

9    Q.    Well, ma'am, only because we have to create a record.

10          You said there is a lot and you kind of put your

11    hand up.  Could you give us -- so I would say maybe, your

12    words, 6 to 7 inches in depth of material relating to

13    Little Aisle IV.

14          Is that your best memory?

15    A.    We were handed a thick packet.  Yes.

16    Q.    Who gave you that thick packet of material regarding

17    Little Isle IV?

18    A.    Phil Kenner did.

19    Q.    I'm sorry?

20    A.    Phil Kenner.

21    Q.    And to the best of your memory, there may or may not

22    have been the operation agreement in that document, the

23    Little Isle IV?

24    A.    We told that it had to do with the LLC.  It was all

25    general.  Our names weren't even on it.

K. Peca - Cross/Mr. Haley

750

1   Q.    Well, we you say it all has to do with the LLC, we

2   are talking about Little Aisle IV LLC.  Correct?

3   A.    Yes.

4   Q.    Did you read the information that was provided in

5   that perhaps 6, 7-inch stack of documents?

6   A.    No.  That was my husband's job.  He looked over that

7   sort of thing.

8   Q.    When he looked over that sort of thing, do you recall

9   whether or not you and he had any discussion as to whether

10  he comprehended what he was reading?

11          MS. KOMATIREDDY:  Objection, hearsay.

12          THE COURT:  No.  That is okay.

13          You can answer that.

14  A.    He started going through the first few pages and said

15  this is very generic.  This is not what I asked for.  I

16  asked for documentation specific to our investment.

17          And I remember him telling Phil saying this is

18  not what I requested.  I want documentation on our hundred

19  thousand dollars in the investment.  And then the line of

20  credit aspect as well.

21  Q.    Do you know where that 7-inch packet of documents is

22  today?

23  A.    It is somewhere in our den.  We have since moved from

24  the house that we used to live in when he gave us that

25  document, so it is piled in boxes right now.

K. Peca - Cross/Mr. Haley

751

1   Q.   Do you think you can locate it?

2   A.   Michael probably could.

3   Q.   But you have no idea or belief that you destroyed it.

4   Correct?

5   A.   No.  We wouldn't have destroyed it.  I remember

6   having a conversation with Phil about it, saying this is

7   not what we wanted.  We wanted proof, documentation of our

8   investment and our percentage, our interest in the

9   project.

10  Q.   Ma'am.  My question is simply did you destroy it?

11  That was my question.

12        Did you destroy it to the best of your

13  knowledge?  Yes or no?

14  A.   I did not destroy it.

15  Q.   All right.  Kindly take a look at what has been

16  marked Kenner Exhibit 21.  Just read it to yourself.

17        Having read that, ma'am, do you have any

18  familiarity with who that text message may be from and

19  between?

20  A.   No, I don't.

21  Q.   Well --

22  A.   But I can see that you have his name, if you are

23  asking if I have familiarity with that.

24  Q.   Let me ask you this.  Does this appear to be a

25  telephone number?  Is that telephone number familiar to

K. Peca - Cross/Mr. Haley

752

1    you?

2    A.    Yes, sir.

3    Q.    Whose telephone number is that?

4    A.    It's my husband's.

5    Q.    Well, seeing your husband's telephone number on this

6    document along with his name, is it fair to state that

7    this appears to be a text message from your husband to at

8    least someone else?  Is that right?

9              MS. KOMATIREDDY:  Objection, foundation.

10             MR. HALEY:  Judge, this has been admitted into

11   evidence.

12             MS. KOMATIREDDY:  Not to the document.  Just to

13   the testimony.

14             THE COURT:  If she is familiar with it, I will

15   let her answer.

16   A.    I'm not familiar with it.  I have never been seen it

17   before.

18             THE COURT:  The objection is sustained.

19             MR. HALEY:  Thank you.

20   BY MR. HALEY:

21   Q.    Ma'am, are you familiar with the telephone number

22   716-316-7227?

23   A.    Yes.  That's mine.

24   Q.    Kindly take a look at this document marked Kenner

25   Exhibit 22.  And take your time.

753

1    Is that a text message you sent to Phil Kenner?

2    A.    It could have been.  I don't recall.

3          This is six years ago.  I can't recall who or

4    what exactly I texted.

5    Q.    Well, throughout the years that you had a

6    relationship with Phil Kenner, were there times that he

7    would send you documents by way of a FedEx and you would

8    acknowledge receipt of those documents by way of a text

9    message to him?

10   A.    Yes.  That's fair.

11   Q.    And were there times when you would receive the

12   documents from Phil Kenner via a FedEx and you would

13   respond:  I'm busy, in substance.  I don't have time to

14   read it now but I'll get back to?

15         You did things like that occur?

16   A.    It could have.  I don't remember that specifically.

17   Q.    Well, were there instances where Phil Kenner would

18   send you documents via FedEx, and for whatever reason you

19   simply chose not to read the documents?

20   A.    No.  They would all be attended to eventually.

21         But if, for instance, the one you are speaking

22   of is referencing that thicker Hawaii package, if I were

23   leaving town the next day or whatever, I wouldn't have

24   time to go through that right away.

25   Q.    But at some point in time you returned to your

754

1    household and then you would have time to go through it.

2    Correct?

3    A.    Most likely Michael would, but if not I would.

4    Q.    Well, did Michael ever prohibit you from reading any

5    documents that he received from Phil Kevin?  Yes or no?

6    A.    No.

7    Q.    You testified in your direct examination that your

8    first interaction with Phil Kenner was one where your

9    husband was receiving compensation, but at that point in

10   time his big contract money had not yet come in, so the

11   conversations you were having with Phil involved very

12   conservative investments.  Is that true?

13   A.    In the beginning, yes.

14   Q.    But there came a point in time where, to his credit,

15   he did get big contract money.  Correct?

16   A.    Yes.

17   Q.    And that started -- or did it start with the New York

18   Islanders?

19   A.    That was his biggest.

20   Q.    And how big was that?

21   A.    It was a four or five-year contract.

22   Q.    For how much?

23   A.    $20 million, I believe.  But the one year was a lot

24   that year, so $5 million came off, I believe.

25   Q.    And when he now had a contract worth $20 million,

K. Peca - Cross/Mr. Haley

755

1   there were discussions between yourself and Phil regarding

2   perhaps a change in the investment strategy.  Is that

3   correct?

4   A.    Yes.

5   Q.    And I believe you told us that what was discussed was

6   investments in, let's say, real estate.  Is that true?

7   A.    Yes.

8   Q.    When Phil Kenner recommended investments to you and

9   your husband in real estate, did that strike you as

10  reasonable?

11  A.    It did.

12  Q.    When Phil Kenner suggested to you investments in real

13  estate, let's say in the State of Hawaii, did that strike

14  you as reasonable?

15  A.    Yes.

16  Q.    And it struck you as reasonable because you saw a

17  great potential for significant profit.  Isn't that

18  correct?

19  A.    It was another way to invest our money but in a

20  diversified way as he was recommending.  Yes.

21  Q.    Well, did you have an understanding that an

22  investment of that nature could provide a return far in

23  excess of what you would have earned through, let's say,

24  interest on bonds or stocks?

25  A.    Yes.  That's what he was saying.

K. Peca - Cross/Mr. Haley

756

1    Q.    But that made sense to you, did it not?

2    A.    Yes.

3    Q.    When you had these discussions with him regarding

4    that recommendation, did you at that point in time believe

5    Phil Kenner was being deceitful?

6    A.    No.

7    Q.    And when he proposed to you or suggested to you that

8    not having all your eggs in one basket may be advisable,

9    did you find that to be reasonable?

10   A.    Yes.

11   Q.    Now, when he mentioned that the other NHL players

12   were interested in this investment as well -- that is to

13   say, the land investment in Hawaii -- did he mention the

14   names of some of those other players?

15   A.    He did.  Yes.

16   Q.    Do you recall any particular name?

17   A.    I'm bad with the names.  Michael is better at that.

18   He knows them.  He works with them.

19   Q.    Do you know if the name Owen Nolan was mentioned?

20   A.    It could have been.  Yes.

21   Q.    What about Joe Juneau?

22   A.    I'm not sure if his was mentioned that time but I

23   know he was one of Phil's clients and has been brought up

24   in some situations.

25   Q.    Incidentally, do you know the Nolans?

K. Peca - Cross/Mr. Haley

757

1   A.    I believe he played on the gold medal team with

2   Michael.  The Canadian gold medal team.  I think I met him

3   then.

4   Q.    You said the gold medal.  You are talking about

5   Olympic Gold Medal.  Correct?

6   A.    Yes.

7   Q.    So to the best of your knowledge and memory, both

8   Owen Nolan and your husband were on that same Olympic

9   team.  Correct?

10  A.    I think so.  I can't say 100 percent.  It was a very

11  quick and busy time for me.  But he would know all his

12  teammates by heart.  He would be a better person to ask.

13  Q.    Now, with respect to the Hawaii Project, we will call

14  it, the idea was that there would be open line of credit

15  that would be your family's commitment, your and Michael's

16  commitment to the Hawaii investment project.  Correct?

17  A.    Can you say that again?

18  Q.    Sure.  When you discussed the line of credit at

19  Northern Trust with Phil, the idea would be that the line

20  of credit at Northern Trust would be open so that Phil

21  could access it for use of the Little Aisle IV Hawaii

22  Development Project, and that would be your investment in

23  that project.  Correct?

24  A.    Yes.

25        It was solely for the investment.  Yes, the

K. Peca - Cross/Mr. Haley

758

1   project.

2   Q.   And in return for that, you would be receiving a

3   percentage interest in that ownership under Little Aisle

4   IV LLC.  Correct?

5   A.   We were supposed to get an increased percentage.

6   Correct.

7   Q.   Now, when it came to the bond that would

8   collateralize that loan -- excuse me, that line of credit,

9   Phil suggested to you that by utilizing the bond as

10  collateral, the bond would continue to earn interest.

11  Isn't that true?

12  A.   The bond would, yes, continue to earn.  Yes that's

13  fair.

14  Q.   They would collateralize a line of credit.  Correct?

15  A.   Correct.

16  Q.   Thank you understand, ma'am, what the word

17  *collateralize* meant?  Yes or no?

18  A.   That's hard to answer with a yes or no.

19  Q.   Well, you did understand or did not understand?

20  A.   Can I explain my answer?

21  Q.   Well, do you understand the word, ma'am?  Do you

22  understand the word *collateral*?

23  A.   I do.

24  Q.   Now moving to the Eufora matter.

25           Did you at some point learn that Tommy

759

1    Constantine held an ownership interest in a company known

2    as Eufora?

3    A.    Yes.  He was the founder.

4    Q.    Did you understand, ma'am, that was a privately-held

5    company, as oppose to a publicly-held company, like

6    Microsoft?

7    A.    Yes.

8    Q.    And Phil was proposing that you invest in Eufora to

9    obtain a percentage of Tommy Constantine's ownership

10   interest in that company.  Correct?

11   A.    It wasn't worded that way.  It was never -- I see

12   what you are saying.  But it was worded as you should

13   invest in this.  It wasn't how you described it, a percent

14   of his percentage, or however you just explained that.

15        Do you see what I'm saying?

16        No?  Okay.  I'm sorry.

17   Q.    I will rephrase the question.

18   A.    Okay.

19   Q.    Did you believe that somehow a person by the name of

20   Tommy Constantine had a role in terms of you acquiring an

21   ownership interest in Eufora?

22   A.    He was the owner, so yes.

23   Q.    When you were asked questions about your money going

24   to Constantine Management Group, did that seem to have

25   some similarity to the word Tommy Constantine?

K. Peca - Cross/Mr. Haley

760

1    A.    Yes.

2    Q.    Now as relates to Eufora.

3          You were asked questions on direct concerning

4    $100,000 that went from your account to Constantine

5    Management Group, and then on the same day $100,000 payout

6    from that same account to Phil Kenner.

7          Do you recall those questions?

8    A.    I do.

9    Q.    Were you aware, ma'am, that on April 2, 2008, five

10   days before the transfer of $100,000 out of Constantine

11   Management Group, that Phil Kenner had deposited $100,000

12   into the same account?

13   A.    I'm not.  Not aware.

14   Q.    We can agree that money is fungible.  Correct?

15   A.    Is what?

16   Q.    We can agree that you have an account that has an

17   account balance and there may be a source of funds that go

18   in and out of that account from various sources.  Correct?

19   A.    Yes.

20   Q.    So that $100,000, when you were asked questions by

21   the government to suggest that it was your money that was

22   then being used to pay Phil Kenner back that same day, you

23   don't knows that to be true at all, do you?

24          MS. KOMATIREDDY:  Objection to form.

25          THE COURT:  Sustained.

K. Peca - Cross/Mr. Haley

761

1  BY MR. HALEY:

2  Q.  Well, if I were to suggest to you, ma'am, the

3  $100,000 payment to Phil Kenner occurred on the same day

4  that your money came into Constantine Management Group,

5  that that $100,000 payout to Phil Kenner was actually a

6  return of the $100,000 that he had paid in five days

7  earlier, you wouldn't be able to dispute that, would you?

8        MS. KOMATIREDDY:  Objection to form.

9        THE COURT:  Yes.  Sustained.  This is just

10  argument.

11  BY MR. HALEY:

12  Q.  The conversations that you began recording secretly,

13  that was your idea or your husband's idea or a joint idea?

14  A.  My idea.

15  Q.  And the excerpts that we listened to, do you know if

16  that excerpt of the conversation occurred at the beginning

17  of that conversation, middle of the conversation, toward

18  the end of the conversation?

19        Do you have any idea?

20  A.  I would have to listen to the tape again.

21  Q.  Well, I take it when you started the conversation,

22  the excerpt of which we have now in evidence, would you

23  start out in an accusatory manner when you spoke to Phil,

24  or would you start out in a more pleasant, familiar

25  manner?

K. Peca - Cross/Mr. Haley

762

1  A.    There is always an exchange of:  *Hi.  How are you?*

2  So it wasn't the first thing out of my mouth, if that is

3  what you are asking.

4  Q.    For whatever reason, ma'am, I take it you decided not

5  to say in substance to Phil Kenner before you commenced

6  recorded the conversation:  *Phil, there are some matters I*

7  *want to talk to you about.  So there is no*

8  *misunderstanding between what I have to say and what you*

9  *have to say, I'm going to record or conversation.*

10         You didn't say that, did you?

11 A.    No, I did not.

12         (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

K. Peca - Cross/Haley

763

1    BY MR. HALEY:

2    Q.    Did you retain all of the recorded conversations with

3    between yourself and Phil Kenner from the moment that you

4    began recording the conversations to the moment that you

5    stopped recording the conversations?

6    A.    I did.  I accidentally erased one or two.  Other than

7    that, I saved them.

8    Q.    Would you tell us how you recorded the conversations,

9    what device you used, what your protocol was?

10   A.    I used my phone for most of them.  I also had a

11   little -- an old-fashioned microcassette thing, mini-tape.

12   Q.    And you utilized the minicassette recorder.  How do

13   you set that up?

14   A.    I set the phone on speakerphone and I had it up

15   against it.

16   Q.    I take it you would turn it on before you called

17   Phil.  Did you hear the dialing be made or once you

18   connected you'd turn it on?

19   A.    I can't remember.  That was years ago.

20   Q.    Where are those cassettes today?

21   A.    They are either in my den or they have been forwarded

22   to the government by now.  Because I was making copies of

23   them, so I don't know if I forward copies or the actual

24   tape.

25   Q.    While you were making copies of them on to what type

764

1    of medium?

2    A.    A computer disk.

3    Q.    Is or is it not your testimony that there's a disk

4    that contains all of your recorded conversations involving

5    yourself and Phil Kenner?

6    A.    I can't remember if I was able to fit it all on one

7    disk, so I can't answer that.

8    Q.    The ones that you inadvertently erased, how did that

9    happen?

10   A.    It happened because I'm poor with technology.  As I'm

11   trying to transfer things, I erase them.

12   Q.    The ones that you erased, was the content of those

13   recordings significant?

14   A.    Very similar to the stuff I already had.  More of the

15   same I should say.

16   Q.    When you say more of the same, more conversations of

17   the type that we listened to or conversations that didn't

18   have anything to do with the Hawaii project or Mexico or

19   Eufora or anything of that nature?

20   A.    Yea, it had to do with outside investment that he got

21   us involved in.

22   Q.    So it's your testimony that each time you recorded a

23   conversation with Phil Kenner, your intent, though he was

24   unaware of it being secretly recorded was to talk

25   specifically with him about these investments which, your

K. Peca - Cross/Haley

765

1   mind at that point in time, you had a dispute with him,

2   correct?

3   A.   Correct.  I was trying to get evidence any way that I

4   could.  We had no official paperwork, so ...

5   Q.   Now, you testified on direct you and your husband

6   committed $250,000 to the Global Settlement Fund, correct?

7   A.   Yes.

8   Q.   And then days later you received from Phil Kenner

9   that e-mail that detailed the use of the global settlement

10  funds and for the first time you noticed the reference to

11  the Palms units, correct?

12  A.   Yes.

13  Q.   And you told us on direct quite emphatically that had

14  you known any of that $250,000 was going to be utilized as

15  relates to these Palms units, you would not have sent that

16  250, correct?

17  A.   We were expecting to be in being involved in the

18  Palms.  We already were.

19  Q.   Ma'am, my question is this, did you say on direct,

20  that had we known that part of our $250,000 would be

21  utilized in any way in the Palms, we would not have

22  invested that 250, correct?

23  A.   Correct.

24  Q.   After you saw that e-mail and were so emphatic on

25  that position, what in any steps did you take through Phil

K. Peca - Cross/Haley

766

1   Kenner or any other source, Tommy Constantine, to obtain a

2   return of that $20,000 that you had wired some days

3   previously?

4   A.   My husband had made some phone calls and it was

5   explained that don't worry about it, those are just

6   incentives anyway, it wasn't explained that you get a

7   certain amount back because of that if you don't want to

8   be in it.  It's out of the goodness of Tommy's heart.

9   He's including us as benefactor of us get money or

10  something.

11  Q.   So the steps you took was placing a phone call?

12  A.   My husband was taking care of it, yes, he called.

13  Q.   Who did he call?

14  A.   I believe he called both.

15  Q.   Both?

16  A.   Both Phil Kenner and Tommy Constantine.

17  Q.   Did they answer the call?

18  A.   I don't think they did in any, much them, no.

19  Q.   How much time went by between the time that you say

20  you made the phone call to Phil Kenner and the time that

21  he got back to you.

22  A.   You'd have to ask my husband that.

23  Q.   Well, did your husband tell you I called Phil and he

24  got back to me with reference to my question?  Did he tell

25  you that?

K. Peca - Cross/Haley

767

1          MS. KOMATIREDDY:  Objection, hearsay.

2          THE COURT:  Overruled.  You can answer.

3     A.   Okay.  He got an explanation and right now I can't

4     tell you if it was from Tommy or Phil, but that the Palms

5     unit, don't worry about it, it was just an extra that was

6     being thrown in there anyway.  The money itself was for

7     the legal fight.

8     Q.   And your understanding from conversations with your

9     husband, these were telephone calls; is that correct?

10    A.   Correct.

11    Q.   Do you know if there was any e-mail communication

12    between your husband and Tommy Constantine following that

13    e-mail letter from Phil Kenner regarding the use of the

14    GSL?

15    A.   Can't say for sure, but I know he tried.

16    Q.   When say you know he tried, you don't know one way or

17    the other whether he got a response?

18    A.   Correct.

19    Q.   You were interviewed by the FBI before today; is that

20    correct?

21    A.   Yes.

22    Q.   And that interview took place on September 6, 2013 if

23    you know?

24    A.   I don't remember the date.

25    Q.   Did there come a point in time that you also provided

K. Peca - Cross/Haley

768

1   to the FBI, the investigating agents, handwritten notes

2   that you had taken?

3   A.   Yes.  I forwarded any information that I could find.

4   Q.   And I take it the handwritten notes that you made

5   were contemporaneous with events or not?

6   A.   They coincided either, yes, phone meetings, yes.

7   Q.   Well, do you recall --

8        MR. HALEY:  Can we have this document marked?

9   Q.   Ma'am, would you take a look at Kenner exhibit number

10  23, and take your time.  (Handing.)

11  A.   Was there a question?

12  Q.   Just if you can take a look at the document.  Did you

13  take a look at all pages?

14  A.   No, I didn't hear.

15  Q.   I'm sorry, please take a look at all pages.  (Pause.)

16  A.   Yes.

17  Q.   I know it's a photocopy, Mrs. Peca, but do you

18  recognize those notes?

19  A.   I do.

20  Q.   And who made those notes?

21  A.   I did.

22  Q.   Now, each page of the pages seem to have dates on

23  them; is that correct?

24  A.   From what I can see, yeah, yes.  Not every page, but

25  yeah.

K. Peca - Cross/Haley

769

1    Q.   Just by way of reference, the first page, meeting

2    about Phil 2/12/08, do you see that?

3    A.   Yes.

4    Q.   And then the next page was the date 8/19/08, what

5    would that reflect?  A meeting or a telephone call with

6    Phil on that date?  What would that reflect?

7    A.   I'm not sure.  It doesn't say.  Probably a phone

8    call.

9    Q.   I see.  And with reference to that second page,

10   8/19/08, that is your handwriting; is that correct?

11   A.   It is my handwriting, correct.

12   Q.   And do you see at the bottom of the page where you

13   wrote Northern Trust docs FedEx to us send back to Phil

14   regular mail?

15   A.   Yes.

16   Q.   Do you have a memory of the package of Northern Trust

17   documents that were Fed Ex'd to you?

18   A.   No.  That's why there's a question mark after it.

19   Q.   Are you saying that you did not receive those

20   documents, ma'am?

21   A.   Yes.  Because I don't know for sure, but there's a

22   question mark next to it and it ended with a question.

23   Q.   Where it says send back to Phil regular mail, what do

24   you mean by that note?

25   A.   When we got the Northern Trust docs, that he was

770

1  going to be FedEx'ing us, send them back to him regular

2  mail.

3  Q.   Well, did you do that, did you send it back to him

4  regular mail or not?

5  A.   I don't know what this is, refers to, to be honest

6  with you.

7  Q.   So you may or might not have received those Northern

8  Trust documents, correct?

9  A.   Yes, I'm not sure if these are the ones you're

10  referring to.

11  Q.   But as you sit here today Mrs. Peca, on that witness

12  stand, under oath, is it your testimony that at no point

13  in time, though you requested Northern Trust documents be

14  Fed Ex'd to you, that Phil Kenner ever sent you those

15  documents?  Is that your testimony?

16          MS. KOMATIREDDY:  Objection.

17          THE COURT:  The objection?

18          MS. KOMATIREDDY:  Overbroad.

19          THE COURT:  You can answer.

20  A.   Can you repeat it.

21  Q.   Sure.

22          Is it your testimony on this witness stand under

23  oath that at no point in time Phil Kenner ever sent you

24  Northern Trust documents that may have been in his

25  possession?

K. Peca - Cross/Haley

771

1   A.    Not the kind that we were looking for.

2   Q.    Well, to the best of your memory, what kind of

3   Northern Trust documents did he send to you?

4   A.    I can't recall.

5          THE COURT:  Okay.  Why don't we break for the

6   day, it's 4:30.  No court tomorrow, so we'll be starting

7   again on Monday at 9:30.  On Monday we are going to be

8   sitting until lunchtime, until about 12:30.  So it will be

9   a half day on Monday.  In terms of the estimate of the

10  case, I did speak to the lawyers and we are still on track

11  with the five week estimate that I gave you during jury

12  selection.  That estimate -- if it's off the estimate I'll

13  let you know.  Just so you are not worried, I knew that we

14  were going to have a half day when I made the estimate.

15  So enjoy the weekend, don't read or listen to anything

16  regarding the case.  Don't discuss the case among

17  yourselves or with anyone.  Have a good weekend.  I'll see

18  you all on Monday.

19          (Whereupon, the jury retired from the

20  courtroom.)

21          THE COURT:  Everyone be seated.  You can step

22  down, Mrs. Kenner.  Thank you.

23          (Witness excused at this point.)

24          THE COURT:  Just let me place a ruling on the

25  record with respect to the government's objection to the

1    hearsay, her describing what the husband's conversation

2    was.  When -- the issue is what information was provided

3    to what the government is alleging are two victims of

4    fraud, what information she had, whether it was directed

5    to her or hearsay, supplied to her husband, goes to the

6    fact she had knowledge of certain facts that may or may

7    not have been material.  So what information she had

8    regarding those investments overall, no matter who the

9    source was, in other words, if it's -- something important

10   about the investment was disclosed to her, if she learned

11   about it even not from Mr. Kenner, but it was through her

12   husband, that could be a defense, any argument by the

13   government, that's why I overruled the objection, her

14   state of mind related to the representations that were

15   made to either her directly or made sure her husband

16   communicated to her.

17            MS. KOMATIREDDY:  Understood, thank you, your

18   Honor.

19            THE COURT:  My deputy mentioned to me one of the

20   jurors told her that he has a graduation May 17th and

21   18th, bottom line is he's going to have to miss a day for

22   travel, which disturbs me in terms of jury selection, so

23   I'll try to find out more detail.  Obviously he will be

24   coming back Monday, but we'll look into it on Monday.

25            MR. HALEY:  It's really a moot point,

773

1    your Honor, but when I had as relates to conversations --

2            THE COURT:  Let me ask my deputy about this

3    juror issue.  (Pause.)

4            It's juror number five, he's in the jury room

5    but apparently it's juror number five, his brother is

6    graduating and he's traveling for that graduation on May

7    18th and May 19th.  So the Monday and Tuesday.  So he's

8    coming back the morning of Tuesday so he's going to be

9    unavailable on Tuesday, and he's requesting that we just

10   not sit those days, which is not a good suggestion the

11   18th and the 19th, Monday and Tuesday, not next week, the

12   following week.

13           What I was thinking we can do is I can tell

14   him -- I mean I can just hold him for next week and see if

15   there's any other jurors and deal with it at the end of

16   next week and if we haven't lost any more jurors, I can do

17   it then.

18           MS. KOMATIREDDY:  We agree.

19           MR. LA RUSSO:  That's fine.

20           THE COURT:  Should I bring him out, I don't want

21   him to be worried about it all next week, I'm going to

22   tell him we're going to deal with the situation when it

23   arrives, that he's going to be able to go.

24           (Juror No. 5 enters the courtroom.)

25           THE COURT:  Hi.  So I think Michele explained to

774

1   you, let make sure I understand, your brother is

2   graduating and therefore you're going to be out of town on

3   May 18th, Monday, you're returning Tuesday morning the

4   19th.

5           A JUROR:  Tuesday late morning early afternoon.

6           THE COURT:  So you'll be unavailable Tuesday as

7   well.

8           A JUROR:  Yes.

9           THE COURT:  And you didn't realize it during

10  jury selection?

11          A JUROR:  Yeah, my college was on trimester so

12  my graduation was in June, so my parents bought our

13  tickets for my sister and myself so I didn't think of it.

14          THE COURT:  I'm not going to make miss the

15  graduation, so we'll address the situation at the end of

16  next week, so you're going to get to go.  We'll see how

17  things are going.

18          A JUROR:  Thank you, your Honor.

19          (Juror No. 5 leaves the courtroom.)

20          THE COURT:  Okay, Mr. Haley, you have an issue?

21          MR. HALEY:  Well, your Honor, perhaps it's moot,

22  but I do like to learn, meaning your Honor, I objected to

23  when the government asked questions of Mr. Betesh

24  concerning conversations that he had between my client and

25  himself preceding the closing.  I thought there may have

775

1   been privileged communication.  I know he's representing

2   the LLC.  I know your Honor overruled on the objection.

3   Perhaps because he was representing the LLC he wasn't

4   truly representing Mr. Kenner in an individual capacity.

5               THE COURT:  Yes.

6               MR. HALEY:  I just wanted your Honor to

7   understand that was the basis of my thought process.

8               THE COURT:  I didn't understand him to be

9   representing him personally.  In any event, what came out

10  wasn't privileged any way, it was just transactions.

11              MR. HALEY:  Thank you, Judge.  I want the Court

12  to understand the basis of my objection.

13              THE COURT:  All right.  So do we have any issues

14  for Monday?  We only have a half day.  How much longer do

15  you have with her?

16              MR. HALEY:  Not that much longer.

17              MR. LA RUSSO:  Judge, probably about an hour.

18              THE COURT:  And then who's next then?

19              MS. KOMATIREDDY:  Next your Honor is Aaron

20  Mascarella.

21              THE COURT:  Does that cover the rest of Monday.

22              MS. KOMATIREDDY:  It would.

23              THE COURT:  What about the elderly woman, she's

24  not going on Monday.

25              MR. MISKIEWICZ:  No.  She's go on right after

776

1    that.

2         THE COURT:  What do you mean she'll go on on

3    Tuesday.

4         MR. MISKIEWICZ:  Tuesday, yes, after

5    Mr. Mascarella, in fact I doubt that Mr. Mascarella will

6    be done on Monday.  Mrs. Kaiser, Mr. Kaiser probably Bryan

7    Berard after that.  I'll inform counsel.

8         THE COURT:  Have a good weekend.

9         MR. HALEY:  Judge, the Northern Trust bank

10   records, I did contact Northern Trust, I spoke, left a

11   voicemail message for the paralegal that accepted the

12   subpoena.  And I know I mentioned that to your law clerk.

13   I don't what I did with that contact number, it may

14   require the Court's intercession.

15        THE COURT:  If you give the contact number to my

16   clerk I'll have her call.  If they don't respond, I'll

17   issue an order that someone be available for a conference

18   call on Tuesday.

19        MR. HALEY:  Thank you, sir.

20        THE COURT:  All right.

21        (Whereupon, court recessed for the day until

22   Monday, May 11, 2015 at 9:30 a.m.)

23

24

25

777

1                        INDEX:

2     MICHAEL PECA                               575

3     CROSS-EXAMINATION                          575

4     BY MR. LA RUSSO

5     REDIRECT EXAMINATION                       626

6     BY MR. MISKIEWICZ

7     RECROSS-EXAMINATION                        647

8     BY MR. HALEY

9     RECROSS-EXAMINATION                        655

10    BY MR. LaRUSSO

11    FURTHER REDIRECT EXAMINATION               662

12    BY MR. MISKIEWICZ

13

14    SHIMON BETESH                              664

15    DIRECT EXAMINATION                         664

16    BY MS. KOMATIREDDY

17    CROSS-EXAMINATION                          680

18    BY MR. HALEY

19

20    KRISTIN PECA                               689

21    DIRECT EXAMINATION                         690

22    BY MS. KOMATIREDDY

23    VOIR DIRE EXAMINATION                      729

24    BY MR. HALEY:

25

778

1    CROSS-EXAMINATION                                     742

2    BY MR. HALEY

3

4                        EXHIBITS:

5    Government Exhibit 701C and 701C-A in                 671

6    evidence

7    Government Exhibit 702, 703, 704, 705 in              674

8    evidence

9    Government Exhibit 941 and 942 in evidence            679

10   Government Exhibit 506 in evidence                    731

11

12   Defense Exhibit C-29 in evidence                      578

13   Defense Exhibit C-30 in evidence                      579

14   Defense Exhibit C-31 in evidence                      586

15   Defense Exhibits C-32 through C-36 in                 594

16   evidence

17   Defense Exhibit 21 in evidence                        655

18

19

20

21

22

23

24

25

**$**

**$1.775** [1] - 644:13

**$100,000** [11] - 696:24, 706:19, 707:15, 760:4, 760:5, 760:10, 760:11, 760:20, 761:3, 761:5, 761:6

**$125** [1] - 635:25

**$13,901.59** [1] - 623:23

**$14,587.67** [1] - 623:13

**$166,000** [1] - 639:3

**$2,196.67** [1] - 623:3

**$20** [2] - 754:23, 754:25

**$20,000** [1] - 766:2

**$250,000** [4] - 741:3, 765:6, 765:14, 765:20

**$395,000** [1] - 738:23

**$40,000** [2] - 738:5, 738:7

**$45,000** [1] - 630:15

**$500,000** [1] - 611:10

**$750,000** [2] - 672:6, 678:23

**$769,000** [3] - 667:10, 668:2, 668:15

**$8,000** [1] - 600:8

**'**

**'11** [1] - 608:18

**'96** [1] - 693:8

**'97** [1] - 693:8

**0**

**090223** [1] - 622:4

**1**

**10,000** [1] - 715:10

**10/31/2006** [1] - 667:21

**100** [5] - 573:14, 573:23, 603:22, 726:4, 757:10

**107** [1] - 649:25

**11.3** [2] - 647:4, 647:7

**1102** [1] - 739:22

**1105** [2] - 722:4, 722:12

**11572** [1] - 573:21

**11722** [2] - 573:15, 573:23

**11749** [1] - 573:18

**11963** [3] - 678:22, 679:5, 679:18

**12,400** [1] - 622:12

**125** [1] - 693:13

**12:30** [1] -

**771:8**

**12:55** [1] - 684:3

**12th** [1] - 722:21

**13-CR-607** [1] - 573:4

**1401** [1] - 667:14

**1601** [1] - 573:18

**1706** [1] - 705:14

**1724** [3] - 621:12, 621:21, 628:25

**1725** [1] - 622:24

**1726** [2] - 623:8, 623:10

**17th** [1] - 772:20

**18** [5] - 577:1, 578:21, 678:21, 679:5, 679:18

**18th** [6] - 724:2, 724:5, 772:21, 773:7, 773:11, 774:3

**19** [4] - 595:25, 742:24, 744:7, 747:21

**1995** [1] - 690:12

**19th** [3] - 773:7, 773:11, 774:4

**2**

**2/12/08** [1] - 769:2

**2/20/09** [1] - 629:1

**20** [4] - 596:25, 621:14, 623:10, 648:18

**2000** [1] - 654:7

**2001** [4] - 735:2, 736:25, 738:20, 742:6

**2013** [1] - 767:22

**2015** [2] - 573:9, 776:22

**21** [5] - 654:25, 655:1, 655:3, 751:16, 778:17

**21st** [2] - 580:5, 608:19

**22** [4] - 596:10, 622:25, 652:23, 752:25

**22,425.02** [1] - 741:18

**22nd** [1] - 596:19

**23** [4] - 621:14, 622:12, 623:9, 768:10

**2302** [1] - 623:21

**24** [2] - 622:24, 660:6

**24/7/365** [1] - 590:14

**25** [9] - 595:9, 628:19, 632:14, 668:2, 673:15, 677:6, 677:7,

**677:8, 677:9**

**250** [2] - 765:16, 765:22

**250,000** [2] - 715:11, 716:5

**26** [2] - 628:19, 632:14

**27** [3] - 584:13, 586:14, 663:10

**29** [1] - 577:20

**29-A** [2] - 577:17, 577:18

**29-C** [1] - 577:15

**3**

**3/23/09** [1] - 629:1

**30** [5] - 698:7, 698:10, 732:1, 741:9, 741:16

**300** [1] - 573:21

**31** [1] - 584:20

**3309** [1] - 617:20

**35** [3] - 649:4, 696:25, 749:4

**4**

**4-T** [3] - 728:5, 728:25, 729:11

**4/2** [1] - 707:4

**4/7** [4] - 707:4, 707:6,

707:10, 707:12

**4/7/2008** [1] - 707:7

**404(b** [2] - 630:4, 630:6

**425** [1] - 573:18

**45** [1] - 684:10

**45,000** [1] - 723:11

**4:00** [1] - 686:9

**4:30** [1] - 771:6

**4th** [1] - 608:21

---

**5**

**5,000** [1] - 715:10

**50** [1] - 698:11

**506** [7] - 728:4, 728:9, 728:11, 729:11, 731:1, 731:17, 778:10

**506.1** [5] - 728:4, 728:25, 729:8, 729:11, 732:24

**506.2** [1] - 739:4

**51** [1] - 651:8

**5103L** [1] - 736:18

**5103L-A** [1] - 736:18

**575** [2] - 777:2, 777:3

**578** [1] - 778:12

---

**579** [1] - 778:13

**586** [1] - 778:14

**594** [1] - 778:15

---

**6**

**626** [1] - 777:5

**631** [1] - 573:24

**647** [1] - 777:7

**655** [2] - 777:9, 778:17

**662** [1] - 777:11

**664** [2] - 777:14, 777:15

**671** [1] - 778:5

**674** [1] - 778:7

**679** [1] - 778:9

**680** [1] - 777:17

**689** [1] - 777:20

**690** [1] - 777:21

---

**7**

**7-inch** [2] - 750:5, 750:21

**70** [1] - 698:9

**701** [2] - 671:16, 671:19

**701C** [11] - 668:19, 668:23, 668:24, 671:2, 671:3, 671:17, 671:18, 778:5

---

**701C-A** [4] - 668:23, 671:2, 671:3, 778:5

**702** [7] - 672:17, 673:18, 674:1, 674:2, 674:5, 740:15, 778:7

**703** [6] - 672:17, 673:18, 674:1, 674:2, 674:16, 778:7

**704** [6] - 672:17, 673:19, 674:1, 674:2, 678:13, 778:7

**705** [5] - 672:17, 673:19, 674:1, 674:2, 778:7

**712-6103** [1] - 573:24

**716-316-7227** [1] - 752:22

**717** [1] - 710:6

**724** [2] - 628:19, 632:14

**729** [1] - 777:23

**731** [1] - 778:10

**742** [1] - 778:1

**753** [1] - 704:8

**754** [3] - 720:11, 722:2, 740:13

**757** [5] - 575:21, 720:20,

---

724:23, 725:7, 725:25

**7th** [1] - 706:14

---

**8**

**8/19/08** [2] - 769:4, 769:10

**80** [1] - 686:6

---

**9**

**940** [2] - 679:8, 679:16

**941** [4] - 679:8, 679:13, 679:14, 778:9

**942** [3] - 679:13, 679:14, 778:9

**95** [1] - 716:23

**99** [1] - 675:2

**9:30** [2] - 771:7, 776:22

**9:50** [1] - 573:10

---

**A**

**a.m** [3] - 573:10, 594:21, 776:22

**a/k/a** [2] - 573:7, 573:9

**Aaron** [2] - 747:13, 775:19

**able** [10] - 574:14, 653:17, 658:24, 688:10, 696:9, 698:20, 744:8, 761:7, 764:6, 773:23

**above-**

---

**referenced** [1] - 650:4

**absence** [1] - 684:2

**absolutely** [5] - 590:5, 707:23, 734:7, 735:14, 737:8

**accepted** [1] - 776:11

**access** [7] - 650:4, 681:17, 681:20, 681:21, 681:24, 682:3, 757:21

**accidentally** [1] - 763:6

**accommodate** [1] - 596:23

**accompanied** [1] - 638:15

**accomplish** [1] - 588:5

**according** [3] - 675:9, 677:20, 677:23

**account** [73] - 606:19, 614:21, 623:2, 623:24, 624:14, 628:25, 630:25, 631:9, 632:16, 639:16, 650:6, 665:6, 665:10, 667:10, 667:18, 668:8, 668:9, 668:10, 668:11,

697:16, 697:24, 698:7, 698:25, 699:7, 699:14, 700:3, 700:20, 703:8, 705:20, 705:23, 706:8, 706:9, 706:22, 706:23, 706:24, 710:5, 716:15, 716:18, 718:14, 718:18, 719:9, 719:24, 722:9, 722:25, 723:1, 723:4, 723:7, 732:13, 732:17, 732:19, 734:17, 736:23, 736:24, 739:13, 739:16, 739:19, 739:25, 740:4, 740:15, 740:17, 740:19, 740:20, 741:3, 741:4, 747:16, 760:4, 760:6, 760:12, 760:16, 760:17, 760:18

**accounting** [2] - 643:25, 647:13

**accounts** [5] - 628:19, 628:22, 632:13, 699:17, 745:15

**accuracy** [1] - 684:23

**accurate** [4] - 607:22, 639:3, 656:6, 728:22

**accurately** [3] - 721:6, 729:7, 744:8

**accusatory** [1] - 761:23

**acknowledge** [2] - 583:23, 753:8

**acquire** [3] - 592:2, 635:9, 675:16

**acquired** [1] - 589:10

**acquiring** [5] - 587:9, 587:13, 605:17, 606:2, 759:20

**acquisition** [3] - 635:11, 635:22, 675:17

**acquisitions** [1] - 591:15

**action** [3] - 575:24, 743:6, 745:1

**activities** [2] - 609:5, 658:17

**actual** [5] - 634:16, 704:1, 704:5, 738:25,

763:23

**added** [2] - 662:1, 662:6

**addition** [2] - 629:2, 653:23

**additional** [7] - 592:14, 597:9, 618:15, 618:25, 625:5, 633:1, 677:16

**address** [9] - 578:15, 586:10, 594:17, 596:12, 679:16, 706:21, 706:22, 709:17, 774:15

**addresses** [1] - 597:16

**adjournment** [1] - 617:8

**administered** [1] - 689:11

**administratively** [1] - 662:15

**admissibility** [1] - 617:19

**admissible** [1] - 614:24

**admitted** [11] - 578:6, 579:20, 586:5, 594:10, 655:1, 671:2, 674:1, 679:13, 731:1, 735:1, 752:10

**advantage** [3] - 589:25, 590:23, 599:1

**adverse** [1] - 576:3

**advice** [1] - 693:20

**advisable** [1] - 756:8

**advise** [1] - 699:15

**advised** [2] - 610:14, 657:11

**advising** [4] - 641:14, 657:16, 658:22, 659:8

**advisor** [9] - 690:14, 691:24, 694:10, 699:10, 699:15, 712:20, 743:7, 744:20, 744:22

**Advisors** [1] - 691:13

**advocating** [1] - 581:9

**afternoon** [11] - 598:14, 670:4, 680:3, 680:4, 690:3, 690:4, 718:7, 729:19, 731:11, 742:8, 774:5

**agency** [1] - 575:25

**agent** [1] - 693:14

**agents** [2] - 747:1, 768:1

**ago** [14] - 577:7, 589:17, 594:2, 597:8, 599:5, 630:5,

652:18, 660:17, 742:12, 742:15, 742:20, 744:25, 753:3, 763:19

**agree** [15] - 618:24, 622:7, 635:6, 635:19, 635:24, 636:8, 637:6, 637:8, 637:25, 681:5, 681:16, 742:22, 760:14, 760:16, 773:18

**agreed** [6] - 576:7, 593:14, 632:7, 733:13, 734:4, 734:11

**agreement** [30] - 591:21, 592:1, 617:3, 618:3, 629:9, 629:11, 631:15, 632:7, 636:10, 638:24, 661:4, 662:5, 670:7, 672:23, 673:6, 674:18, 675:5, 675:16, 677:10, 677:13, 677:20, 677:23,

678:7, 681:25, 682:2, 682:4, 708:3, 749:6, 749:22

**agreements** [2] - 635:7

**ahead** [10] - 621:8, 621:22, 632:3, 655:1, 666:25, 677:5, 698:16, 705:14, 732:6, 735:24

**ahead.** [1] - 620:4

**ahold** [3] - 743:21, 744:11, 746:7

**aid** [1] - 731:3

**aids** [2] - 729:12, 731:2

**aim** [1] - 693:13

**air** [1] - 599:12

**Air** [6] - 584:4, 586:19, 587:6, 589:7, 591:1, 599:8

**airing** [1] - 702:13

**airplane** [13] - 586:23, 588:12, 590:1, 590:6, 590:8, 590:14, 590:19, 591:3, 591:9, 591:20, 637:4, 717:20, 718:5

**airplanes** [1]

- 586:20

**Aisle** [6] - 650:6, 749:3, 749:13, 750:2, 757:21, 758:3

**alarm** [1] - 744:14

**alarmed** [1] - 744:12

**aligned** [3] - 607:19, 609:13, 624:21

**allegations** [2] - 606:21, 609:6

**alleging** [1] - 772:3

**alleviate** [1] - 591:3

**allow** [2] - 620:19, 650:4

**allowed** [2] - 701:14

**almost** [4] - 615:8, 702:15, 702:23, 730:19

**alone** [1] - 709:21

**alter** [1] - 660:23

**altered** [1] - 726:5

**alternative** [1] - 697:13

**amazing** [2] - 696:7, 701:9

**AMERICA** [1] - 573:3

**amount** [13] - 623:13, 668:2, 668:15, 672:6, 672:9, 693:12,

699:13, 707:14, 716:6, 723:10, 730:16, 734:12, 766:7

**amounts** [2] - 623:17, 736:11

**ANDREW** [1] - 573:20

**Andrew** [1] - 680:12

**Angeles** [4] - 594:21, 595:14, 596:3, 652:5

**answered** [3] - 626:19, 628:11, 651:8

**answering** [5] - 601:20, 625:5, 649:14, 651:8, 712:13

**answers** [4] - 601:25, 602:2, 607:4, 743:8

**anyway** [2] - 766:6, 767:6

**apologize** [8] - 620:17, 620:21, 633:20, 654:10, 654:17, 741:23, 744:1, 747:7

**appear** [10] - 577:15, 577:19, 602:21, 648:24, 649:6, 677:12, 705:19, 706:18,

735:10, 751:24

**appearance** [3] - 599:18, 599:20, 600:11

**APPEARANCES** [1] - 573:13

**appearances** [1] - 574:3

**appeared** [2] - 580:22, 646:13

**appearing** [1] - 576:10

**application** [1] - 686:11

**applying** [1] - 731:3

**appreciate** [1] - 613:6

**apprised** [1] - 610:20

**approach** [6] - 584:21, 613:9, 629:13, 651:1, 669:5, 673:21

**appropriate** [1] - 618:19

**approval** [1] - 587:12

**approve** [1] - 598:3

**approved** [1] - 635:8

**April** [5] - 622:25, 623:9, 706:3, 706:14, 760:9

**area** [7] - 576:20, 589:24, 611:1, 624:7, 660:3, 664:16, 678:21

**areas** [1] - 601:12

**argue** [2] - 585:11, 618:18

**arguing** [1] - 618:6

**argument** [3] - 631:3, 761:10, 772:12

**armed** [1] - 744:19

**arose** [1] - 589:2

**arrange** [1] - 592:20

**arrangements** [1] - 590:11

**arranging** [1] - 597:22

**arrives** [1] - 773:23

**Article** [5] - 674:22, 674:23, 675:10, 675:15, 677:15

**article** [19] - 577:8, 577:13, 577:15, 577:19, 578:18, 580:19, 580:22, 617:12, 617:17, 617:20, 617:22, 618:4, 618:7, 618:8, 618:13, 618:14, 618:21, 618:22, 619:17

**articles** [3] - 576:10, 577:9, 579:13

**ashtload** [1] - 655:9

**aspect** [7] - 598:2, 618:16, 716:17, 718:2, 720:3, 750:20

**aspects** [6] - 575:22, 578:24, 597:9, 601:5, 630:20, 670:8

**Assante** [1] - 666:4

**asset** [2] - 590:2, 639:16

**assets** [9] - 587:9, 587:13, 599:6, 604:21, 606:2, 609:25, 610:10, 626:25, 748:11

**assigns** [1] - 635:8

**Assistant** [1] - 573:16

**associate** [1] - 701:11

**associated** [4] - 635:5, 688:9, 707:5, 739:13

**assume** [1] - 611:21

**assumed** [1] - 620:16

**assuming** [2] - 633:2, 746:17

**assured** [1] -

697:16

**attached** [4] - 591:18, 592:6, 634:18, 635:3

**attachment** [3] - 636:15, 643:4, 643:8

**attachments** [1] - 670:11

**attempt** [1] - 635:6

**attempts** [1] - 643:17

**attended** [3] - 581:24, 639:25, 753:20

**attending** [1] - 582:16

**attention** [17] - 576:18, 578:25, 588:19, 624:23, 625:4, 656:14, 674:5, 674:16, 674:22, 675:10, 696:2, 720:10, 721:1, 722:1, 741:9, 748:2, 748:15

**Attorney** [1] - 573:14

**attorney** [37] - 603:10, 641:18, 648:8, 651:6, 652:10, 664:11, 664:19, 664:25, 665:16, 668:9,

668:10, 672:21, 678:24, 680:11, 680:22, 681:6, 681:16, 682:11, 682:16, 682:19, 682:24, 683:1, 683:3, 704:12, 704:13, 704:14, 704:20, 711:15, 712:1, 716:14, 716:16, 718:14, 739:20, 745:2, 745:3, 745:10, 745:15

**attorney's** [5] - 680:9, 718:14, 719:24, 722:9, 741:4

**Attorneys** [1] - 573:16

**attorneys** [1] - 683:9

**audio** [7] - 738:1, 738:2, 738:10, 738:11, 738:15, 738:16, 739:6

**Audio** [1] - 739:7

**Auerbach** [1] - 573:22

**August** [2] - 595:25, 608:19

**authenticate**

[2] - 653:4, 653:7

**authenticated** [1] - 614:7

**authority** [3] - 704:11, 704:16, 704:17

**authorization** [1] - 650:3

**authorize** [3] - 705:10, 707:18, 723:21

**authorized** [5] - 644:14, 650:6, 678:21, 721:23, 726:2

**authorizing** [2] - 625:22, 678:16

**available** [6] - 657:20, 658:6, 658:13, 658:16, 658:18, 776:17

**Avalon** [2] - 592:3, 599:8

**aviation** [1] - 584:3

**avoiding** [1] - 712:20

**aware** [15] - 581:22, 583:17, 598:3, 605:15, 605:20, 605:22, 609:20, 609:24, 610:8, 611:11, 611:16, 611:22,

627:11, 760:9, 760:13

**awareness** [1] - 609:21

**AZ** [1] - 661:4

---

**B**

---

**baby** [2] - 698:4, 698:22

**background** [5] - 691:11, 691:15, 691:16, 692:2, 692:19

**bad** [3] - 592:2, 641:22, 756:17

**balance** [1] - 760:17

**banding** [1] - 588:2

**Bank** [4] - 668:8, 722:13, 732:16, 732:18

**bank** [27] - 586:21, 591:9, 606:18, 614:6, 614:7, 614:16, 621:13, 623:19, 639:15, 652:20, 667:16, 668:7, 688:9, 693:16, 697:13, 699:3, 701:23, 705:20, 705:23, 706:22, 732:13, 739:25,

747:17, 776:9

**banking** [1] - 701:10

**banks** [1] - 743:11

**based** [5] - 626:19, 626:21, 628:12, 631:13, 651:6

**basic** [1] - 591:21

**basis** [2] - 775:7, 775:12

**basket** [3] - 695:6, 695:23, 756:8

**battle** [2] - 610:12, 715:11

**became** [2] - 743:20, 747:15

**become** [1] - 691:23

**becomes** [1] - 618:5

**becoming** [2] - 628:11, 687:9

**BEFORE** [1] - 573:11

**began** [6] - 692:13, 693:5, 730:8, 730:11, 761:12, 763:4

**begin** [1] - 695:22

**beginning** [9] - 693:9, 693:22, 693:23, 694:3, 694:12, 694:17, 712:7, 754:13,

761:16

**begins** [1] - 634:13

**behalf** [6] - 645:7, 659:21, 680:23, 704:24, 713:23

**behind** [1] - 609:15

**belief** [1] - 751:3

**believes** [1] - 585:12

**bell** [1] - 696:3

**below** [4] - 594:22, 617:12, 635:12, 672:6

**bench** [1] - 729:21

**benefactor** [1] - 766:9

**beneficiary** [3] - 588:5, 622:7, 623:2

**benefit** [2] - 608:5, 617:14

**benign** [1] - 688:6

**Berard** [2] - 677:7, 776:7

**best** [6] - 699:11, 749:14, 749:21, 751:12, 757:7, 771:2

**Betesh** [7] - 664:1, 664:10, 668:5, 679:19, 680:3, 683:14, 774:23

**BETESH** [2] - 664:3, 777:14

**better** [6] - 651:24, 698:13, 701:16, 715:25, 756:17, 757:12

**Better** [20] - 665:15, 665:20, 666:1, 666:21, 667:5, 667:10, 667:19, 668:17, 670:6, 670:7, 671:14, 672:14, 672:24, 674:7, 674:12, 674:18, 674:25, 675:5, 678:25, 680:6

**between** [24] - 607:6, 607:16, 610:14, 619:4, 619:11, 620:7, 630:9, 631:15, 637:15, 653:21, 654:6, 655:5, 675:19, 677:21, 680:6, 746:25, 747:20, 751:19, 755:1, 762:8, 763:3, 766:19,

767:12, 774:24

**BIANCO** [1] - 573:11

**big** [8] - 627:4, 695:10, 709:23, 715:11, 749:7, 754:10, 754:15, 754:20

**biggest** [1] - 754:19

**bill** [1] - 715:10

**bills** [4] - 692:6, 717:19, 726:13, 748:8

**binding** [2] - 636:8, 636:10

**bit** [6] - 616:5, 626:23, 692:1, 694:17, 694:20, 702:18

**blaming** [1] - 713:1

**blank** [1] - 710:1

**blown** [1] - 686:18

**blue** [1] - 660:7

**blurred** [3] - 601:12, 638:4, 638:5

**bold** [1] - 709:23

**bond** [17] - 697:16, 697:24, 697:25, 698:3,

698:14, 699:7, 699:17, 700:3, 700:20, 710:5, 719:9, 734:16, 758:7, 758:9, 758:10, 758:12

**bonds** [6] - 694:3, 694:24, 695:24, 698:6, 744:6, 755:24

**book** [1] - 749:7

**bottom** [4] - 594:1, 597:16, 769:12, 772:21

**bought** [1] - 774:12

**box** [1] - 671:22

**boxes** [1] - 750:25

**breached** [2] - 630:10, 631:15

**break** [13] - 616:5, 619:4, 620:6, 620:7, 628:4, 628:13, 663:23, 683:24, 698:9, 731:8, 731:10, 731:11, 771:5

**breakdown** [1] - 607:5

**Brian** [1] - 677:7

**brief** [5] - 582:8,

619:12, 640:12, 655:16, 729:15

**briefly** [3] - 669:6, 686:3, 732:12

**bring** [8] - 574:16, 583:5, 619:1, 619:24, 687:3, 710:6, 731:21, 773:20

**broken** [1] - 746:16

**brother** [2] - 773:5, 774:1

**Brothers** [2] - 697:10, 700:12

**brought** [4] - 607:13, 624:19, 718:5, 756:23

**brown** [1] - 691:5

**Bryan** [1] - 776:6

**bu** [1] - 663:3

**buddy** [1] - 710:22

**build** [1] - 701:16

**building** [1] - 592:4

**bundle** [1] - 749:1

**burglary** [1] - 747:10

**business** [6] - 588:22, 591:15, 701:11, 703:4, 703:5, 713:18

**businesses** [1] - 695:24

**busy** [2] - 753:13, 757:11

**buy** [3] - 604:20, 609:22, 635:17

**buyer** [4] - 665:7, 672:12, 672:14

**buyers** [1] - 664:22

**buying** [2] - 590:18, 667:1

**buys** [1] - 635:24

**BY** [63] - 573:15, 573:17, 573:20, 575:16, 579:22, 586:7, 597:13, 611:3, 620:5, 621:24, 626:9, 632:5, 643:2, 644:23, 645:5, 647:24, 651:4, 655:4, 655:19, 657:23, 658:3, 658:11, 659:3, 660:2, 662:24, 664:9, 666:16, 666:20, 671:6, 671:20, 674:4, 676:9, 678:5, 679:15, 680:2,

681:14, 690:2, 709:1, 717:9, 727:12, 729:18, 730:20, 732:8, 733:17, 738:4, 738:12, 738:17, 739:8, 742:5, 752:20, 761:1, 761:11, 763:1, 777:4, 777:6, 777:8, 777:10, 777:12, 777:16, 777:18, 777:22, 777:24, 778:2

---

**C**

**C-24** [1] - 634:10

**C-25** [1] - 638:23

**C-29** [7] - 576:14, 576:18, 577:23, 578:6, 578:9, 617:10, 778:12

**C-29-A** [3] - 576:15, 577:6, 578:6

**C-30** [5] - 579:2, 579:16, 579:20, 579:21, 778:13

**C-31** [4] - 584:6, 586:5, 586:6, 778:14

**C-32** [6] - 593:20, 594:7, 594:10, 594:11, 597:14, 778:15

**C-33** [3] - 593:2, 594:7, 594:14

**C-34** [2] - 593:3, 595:4

**C-35** [2] - 593:3, 595:21

**C-36** [5] - 593:3, 594:7, 594:10, 594:11, 778:15

**C-37** [1] - 624:22

**C.R** [1] - 603:24

**C37** [1] - 661:3

**C39** [3] - 656:13, 656:21, 663:9

**Cabo** [6] - 588:14, 588:21, 635:18, 636:1, 636:20, 636:23

**California** [3] - 581:24, 641:13, 739:19

**call-in** [1] - 598:15

**Canadian** [1] - 757:2

**candidly** [1] - 610:19

**capacity** [1] - 775:4

**captioned** [1]

- 594:15

**captured** [1] - 730:21

**car** [2] - 608:21, 725:13

**card** [3] - 701:16, 701:17, 726:13

**cards** [2] - 701:22, 701:24

**care** [5] - 590:1, 692:6, 709:17, 748:8, 766:12

**career** [1] - 695:4

**carefully** [2] - 724:10, 724:22

**carrying** [1] - 632:10

**cars** [2] - 725:5, 725:9

**case** [25] - 574:3, 578:24, 585:4, 585:5, 585:7, 587:16, 588:1, 588:24, 590:6, 616:6, 618:4, 630:12, 634:7, 651:25, 656:16, 658:5, 658:25, 660:1, 683:25, 727:1, 731:13, 747:1, 771:10,

771:16
**cases** [2] - 595:15, 596:4
**cash** [1] - 647:4
**cassettes** [1] - 763:20
**causes** [1] - 684:14
**cave** [10] - 712:23, 743:16, 743:23, 744:2, 744:13, 744:16, 744:20, 745:22, 745:24, 746:21
**CD** [3] - 728:3, 728:14, 729:10
**ceased** [1] - 610:15
**Central** [3] - 573:6, 573:15, 573:23
**cents** [1] - 678:23
**Century** [1] - 722:13
**CEO** [1] - 701:12
**certain** [4] - 673:20, 678:21, 766:7, 772:6
**certainly** [3] - 614:6, 666:14, 745:7
**certificate** [3] - 668:24, 672:24, 673:5
**certificates** [1] - 708:6

**certified** [3] - 668:20, 670:13, 670:16
**cetera** [2] - 590:7, 590:17
**chair** [1] - 689:22
**challenged** [1] - 641:9
**chance** [6] - 611:2, 614:3, 614:17, 614:23, 665:17, 720:6
**change** [4] - 698:10, 736:4, 736:11, 755:2
**changed** [3] - 712:12, 715:18, 734:1
**changes** [2] - 736:1, 736:3
**changing** [1] - 667:9
**characterized** [2] - 620:24, 641:7
**charismatic** [1] - 713:17
**chasing** [1] - 712:4
**check** [2] - 614:3, 615:4
**checks** [2] - 711:16, 745:4
**choice** [1] - 710:20
**chose** [1] - 753:19
**circumstances** [1] - 702:9
**City** [1] - 603:10
**civil** [1] - 661:10
**claim** [1] -

648:1
**Clarence** [1] - 690:6
**clarify** [3] - 582:1, 642:9, 670:10
**clarity** [1] - 660:25
**classic** [1] - 684:12
**cleaning** [2] - 654:12, 655:7
**clear** [7] - 583:8, 601:11, 612:15, 627:6, 637:8, 660:13, 661:22
**cleared** [1] - 626:22
**clearly** [4] - 617:18, 630:4, 697:18, 742:23
**clerk** [2] - 776:12, 776:16
**CLERK** [7] - 574:1, 574:17, 621:5, 689:3, 689:17, 731:20, 732:3
**client** [4] - 619:16, 659:22, 683:13, 774:24
**client's** [1] - 630:9
**clients** [4] - 696:11, 696:12, 702:20, 756:23
**clips** [1] -

729:8
**close** [1] - 689:22
**closing** [22] - 633:21, 665:8, 665:10, 667:11, 668:16, 670:8, 672:5, 673:1, 673:14, 680:5, 680:7, 680:13, 680:24, 681:3, 681:8, 681:17, 681:18, 682:3, 682:10, 683:10, 774:25
**coerced** [1] - 628:3
**coincided** [1] - 768:6
**collateral** [14] - 610:3, 697:14, 697:15, 697:16, 697:23, 698:19, 698:25, 700:14, 703:11, 703:13, 703:18, 758:10, 758:22
**collateralize** [3] - 758:8, 758:14, 758:17
**collectively** [2] - 588:4, 592:25
**college** [4] -

691:10, 693:18, 693:24, 774:11
**comfort** [1] - 652:3
**comfortable** [2] - 652:1, 692:24
**comfortably** [1] - 692:16
**coming** [7] - 614:21, 684:21, 722:25, 723:1, 729:4, 772:24, 773:8
**commenced** [1] - 762:5
**comment** [5] - 633:18, 644:25, 717:5, 743:22, 744:3
**comments** [2] - 589:15, 744:10
**commercial** [1] - 702:12
**commitment** [2] - 757:15, 757:16
**committed** [2] - 608:13, 765:6
**communicate** [5] - 580:18, 581:4, 598:20, 694:15, 745:8
**communicated** [2] - 712:9, 772:16
**communicating** [1] - 602:22
**communication** [9] - 578:23, 607:8,

607:10, 656:2, 656:25, 712:11, 747:23, 767:11, 775:1

**communications** [12] - 579:10, 585:14, 607:5, 607:13, 610:16, 653:20, 653:21, 656:22, 657:1, 663:1, 685:8, 746:25

**companies** [1] - 695:25

**Company** [10] - 665:15, 672:14, 672:25, 674:8, 674:13, 674:19, 675:1, 678:20, 678:25, 680:7

**company** [21] - 584:3, 586:22, 589:1, 591:20, 606:2, 606:20, 607:20, 610:9, 612:15, 682:3, 682:5, 691:12, 697:1, 701:2, 702:16, 703:19, 726:18, 759:1, 759:5, 759:10

**compare** [1] - 740:3

**comparing** [2] - 684:11, 684:13

**compelled** [1] - 684:22

**compensation** [1] - 754:9

**complete** [3] - 585:9, 630:11, 641:20

**completely** [1] - 656:6

**comprehended** [1] - 750:10

**compromise** [1] - 641:8

**computer** [3] - 573:25, 708:20, 764:2

**concept** [1] - 701:9

**concerned** [1] - 648:1

**concerning** [2] - 760:3, 774:24

**concerns** [1] - 598:21

**concluded** [1] - 670:22

**condo** [3] - 630:23, 631:10, 688:10

**condominium** [5] - 629:5, 629:10, 633:3, 636:25, 688:17

**condominiums** [2] - 632:8, 659:25

**condos** [1] - 630:23

**confer** [3] - 640:7, 640:9, 683:13

**conference** [17] - 592:20, 593:12, 593:16, 593:17, 593:24, 594:15, 595:4, 595:21, 596:9, 596:19, 597:7, 597:22, 608:17, 608:20, 776:17

**confidential** [2] - 675:19, 677:21

**Confidentiality** [1] - 675:11

**confidentiality** [1] - 677:19

**confirm** [2] - 619:6, 619:10

**confused** [1] - 704:19

**congested** [1] - 574:11

**congratulatory** [1] - 647:9

**connected** [1] - 763:18

**connection** [3] - 667:4, 670:16, 748:15

**Connor** [2] - 680:12

**consent** [5] - 673:1, 673:8, 673:9, 678:16, 679:9

**consents** [1] -

673:2

**conservative** [1] - 754:12

**consider** [1] - 589:23

**consideration** [1] - 672:6

**considered** [1] - 588:22

**considering** [1] - 718:24

**consistent** [1] - 733:12

**conspiracies** [1] - 713:2

**conspiracy** [1] - 747:12

**conspired** [1] - 630:16

**CONSTANTINE** [1] - 573:8

**Constantine** [106] - 573:20, 574:8, 576:9, 576:14, 576:20, 577:4, 577:20, 578:17, 578:24, 579:6, 579:11, 579:12, 580:7, 580:18, 581:4, 581:9, 582:6, 582:19, 583:1, 584:16, 585:6, 585:11, 586:12, 589:5, 589:15, 591:11, 592:14,

592:19, 593:9, 595:6, 595:22, 596:14, 596:18, 597:2, 597:15, 598:19, 602:14, 602:17, 602:22, 603:2, 603:4, 604:15, 606:8, 606:24, 607:6, 607:19, 607:23, 608:9, 608:11, 608:23, 609:4, 610:10, 610:15, 610:17, 617:14, 618:15, 618:21, 618:23, 619:4, 620:8, 624:20, 633:7, 635:4, 636:15, 638:8, 638:12, 639:8, 641:12, 647:10, 659:15, 660:5, 660:7, 685:5, 701:11, 705:3, 705:5, 705:11, 705:21, 705:25, 706:24, 708:16,

708:17, 713:10, 713:14, 713:17, 713:25, 717:10, 718:16, 719:11, 720:15, 721:9, 725:5, 725:9, 725:14, 726:10, 759:1, 759:20, 759:24, 759:25, 760:4, 760:10, 761:4, 766:1, 766:16, 767:12

**constantine's** [1] - 724:24

**Constantine's** [8] - 579:2, 584:20, 609:21, 634:9, 706:23, 724:20, 725:19, 759:9

**constitute** [1] - 630:4

**constituted** [1] - 744:6

**construction** [3] - 697:9, 699:22, 699:23

**constructive** [1] - 617:8

**consult** [2] - 648:8, 651:14

**consulted** [3] - 649:8, 649:22, 651:5

**consulting** [1]

- 652:10

**contact** [7] - 609:21, 717:1, 743:3, 744:22, 776:10, 776:13, 776:15

**contacted** [1] - 745:9

**contain** [2] - 729:24, 730:2

**contained** [2] - 578:15, 730:3

**contains** [2] - 586:9, 764:4

**contemporaneous** [1] - 768:5

**content** [4] - 617:11, 617:16, 747:22, 764:12

**context** [1] - 660:23

**contingency** [2] - 605:6, 605:7

**continue** [5] - 575:4, 687:2, 734:18, 758:10, 758:12

**continued** [5] - 592:7, 616:9, 649:7, 708:22, 762:12

**Continued** [16] - 584:23, 585:18, 613:11, 615:11, 629:15, 631:21, 640:13,

642:16, 643:1, 669:7, 670:23, 685:19, 687:10, 688:24, 737:11, 738:3

**continues** [1] - 588:11

**contract** [9] - 630:10, 667:6, 693:12, 695:11, 701:23, 754:10, 754:15, 754:21, 754:25

**contracts** [3] - 630:8, 701:21, 702:18

**contribute** [5] - 576:7, 714:21, 719:3, 719:5, 719:14

**contributed** [2] - 647:5, 723:20

**contribution** [1] - 740:24

**control** [3] - 610:10, 718:18, 745:5

**controlled** [1] - 598:1

**controls** [1] - 731:6

**convened** [1] - 628:9

**convenience** [1] - 591:23

**conversation** [25] - 582:8, 597:6, 608:22,

612:22, 627:5, 660:10, 690:18, 701:7, 716:22, 718:6, 718:9, 721:3, 721:12, 728:17, 729:7, 751:6, 761:16, 761:17, 761:18, 761:21, 762:6, 762:9, 764:23, 772:1

**conversations** [28] - 606:11, 653:24, 659:11, 659:19, 727:17, 728:15, 728:19, 728:23, 729:25, 730:4, 730:8, 730:14, 730:23, 736:13, 736:15, 754:11, 761:12, 763:2, 763:4, 763:5, 763:8, 764:4, 764:16, 764:17, 767:8, 773:1, 774:24

**conviction** [1] - 619:8

**copies** [6] - 682:16, 683:3, 747:23,

763:22, 763:23, 763:25

**copy** [15] - 614:14, 637:9, 668:20, 670:15, 670:16, 670:18, 671:10, 672:22, 680:18, 680:21, 681:17, 682:10, 682:19, 683:10

**Corporation** [2] - 665:21, 667:19

**corporation** [1] - 680:25

**CORR/ADJ** [1] - 622:3

**correct** [202] - 576:24, 576:25, 577:5, 578:7, 578:16, 578:19, 578:22, 580:5, 580:23, 581:11, 581:20, 581:25, 582:7, 582:9, 582:10, 582:24, 584:14, 586:10, 587:14, 588:9, 588:10, 588:16, 588:17, 589:7,

593:18,
594:24,
594:25,
595:7, 595:8,
595:9,
595:10,
595:20,
595:24,
595:25,
596:6,
596:12,
596:15,
597:19,
597:20,
598:21,
598:22,
598:24,
599:2,
599:19,
599:21,
600:5, 600:8,
600:9,
600:13,
600:25,
601:2, 601:3,
601:14,
601:15,
601:17,
602:10,
602:13,
602:22,
602:23,
603:3,
603:14,
603:15,
604:15,
604:16,
605:2, 605:3,
605:7, 606:9,
606:22,
606:23,
607:6, 607:7,
608:15,
609:6, 609:8,
609:9, 610:1,
610:2, 610:4,
610:17,
611:20,

618:9,
622:10,
622:11,
622:18,
625:14,
625:17,
625:21,
625:23,
626:17,
627:16,
627:21,
627:22,
628:23,
637:22,
638:12,
638:13,
639:4, 640:1,
645:16,
646:17,
646:19,
648:8, 648:9,
648:12,
649:20,
649:21,
650:10,
650:12,
650:13,
652:6,
652:22,
652:25,
653:1, 653:3,
653:13,
653:14,
653:15,
656:17,
656:19,
657:3, 657:4,
657:8, 657:9,
657:17,
657:18,
659:4, 659:8,
659:20,
660:9,
660:24,
661:8,
661:14,
661:18,
661:21,

661:24,
662:2,
665:13,
674:20,
675:22,
679:10,
681:4,
681:19,
682:25,
697:25,
706:6, 706:7,
707:11,
707:16,
719:10,
722:6,
722:10,
722:13,
722:17,
723:6, 723:8,
723:24,
724:6,
728:20,
737:1, 740:1,
741:1,
742:25,
744:1,
745:10,
745:19,
748:3,
748:14,
748:25,
750:2, 751:4,
754:2,
754:15,
755:3,
755:18,
757:5, 757:9,
757:16,
757:23,
758:4, 758:6,
758:14,
758:15,
759:10,
760:14,
760:18,
765:2, 765:3,
765:6,
765:11,

765:16,
765:22,
765:23,
767:9,
767:10,
767:18,
767:20,
768:23,
769:10,
769:11, 770:8
**correctly** [1] -
580:15
**correspond** [1]
- 729:6
**correspondenc
e** [1] -
579:12
**corresponding**
[1] - 576:8
**corresponds**
[1] - 741:5
**cost** [7] -
590:5, 590:8,
590:15,
633:21,
633:22,
633:25, 634:1
**costing** [1] -
634:2
**costs** [4] -
590:7,
632:10,
633:23,
667:12
**counsel** [4] -
640:8, 640:9,
686:4, 776:7
**Counsel** [1] -
683:13
**counter** [1] -
617:11
**Country** [1] -
573:21
**County** [2] -
664:17
**couple** [8] -
581:13,
611:4, 616:3,

624:25,
625:4, 718:8,
719:15,
721:10
**course** [8] -
581:18,
653:20,
653:21,
680:24,
682:9,
703:16,
726:4, 726:9
**court** [18] -
586:1, 616:1,
617:19,
619:24,
632:2,
642:18,
643:23,
657:12,
665:17,
668:24,
671:1, 676:6,
686:7, 689:2,
728:1, 729:4,
771:6, 776:21
**Court** [7] -
573:22,
582:11,
613:6, 617:2,
686:20,
688:2, 775:11
**Court's** [1] -
776:14
**Courthouse**
[1] - 573:6
**courtroom** [9]
- 619:25,
621:6, 666:9,
689:4,
690:25,
717:5,
771:20,
773:24,
774:19
**cover** [3] -
629:10,
678:3, 775:21

**covered** [1] - 684:18

**covering** [4] - 633:21, 633:25, 634:1, 684:18

**create** [2] - 715:19, 749:9

**credible** [2] - 580:12, 581:2

**credit** [67] - 644:13, 650:5, 653:22, 697:6, 697:7, 697:18, 697:19, 697:21, 697:23, 698:19, 698:25, 699:19, 700:4, 700:8, 700:13, 700:15, 700:18, 701:15, 701:16, 701:17, 701:18, 701:24, 702:14, 704:9, 709:11, 709:13, 709:18, 709:25, 714:23, 714:24, 715:4, 715:9, 715:16, 726:13, 733:9, 733:10, 733:11, 733:13, 733:23, 734:4,

734:14, 734:15, 734:24, 735:11, 738:6, 738:23, 739:1, 742:14, 743:5, 746:2, 746:3, 746:13, 746:14, 747:9, 747:17, 747:24, 750:20, 754:14, 757:14, 757:18, 757:20, 758:8, 758:14

**credits** [1] - 715:23

**crimes** [1] - 608:14

**critical** [1] - 658:23

**CROSS** [6] - 575:15, 680:1, 742:4, 777:3, 777:17, 778:1

**cross** [12] - 575:5, 619:11, 620:7, 626:11, 626:12, 628:4, 643:16, 678:3, 679:24, 684:10, 742:1

**CROSS-EXAMINATION** [6] - 575:15, 680:1, 742:4, 777:3,

777:17, 778:1

**cross-examination** [7] - 575:5, 620:7, 626:12, 628:4, 643:16, 679:24, 742:1

**cross-examinations** [1] - 626:11

**crying** [1] - 710:16

**curative** [1] - 688:19

**current** [4] - 591:2, 591:6, 647:6, 708:14

**customary** [3] - 682:9, 682:24, 683:9

**cut** [2] - 654:9, 712:2

**cutting** [1] - 693:3

## D

**dangerous** [1] - 695:6

**dark** [2] - 641:24, 709:16

**Darryl** [1] - 600:5

**date** [28] - 586:14, 622:4, 623:17, 632:11, 663:4, 663:6, 667:20, 672:3, 672:5, 677:3, 678:6, 707:2, 707:5, 722:5, 722:19, 722:20,

723:25, 741:5, 741:6, 741:15, 743:19, 744:4, 744:9, 747:21, 767:24, 769:4, 769:6

**dated** [8] - 577:1, 594:15, 595:25, 596:9, 628:25, 650:2, 663:14, 747:21

**dates** [2] - 729:1, 768:22

**dating** [1] - 693:24

**days** [7] - 574:13, 722:22, 760:10, 761:6, 765:8, 766:2, 773:10

**deal** [16] - 588:14, 588:15, 588:21, 591:5, 641:11, 641:21, 659:14, 659:16, 670:15, 671:25, 748:23, 773:15, 773:22

**dealing** [1] - 746:4

**dealt** [1] - 592:23

**debit** [1] - 668:1

**Debits** [1] -

667:23

**debits** [2] - 668:1, 707:9

**debt** [2] - 635:10, 703:19

**deceitful** [1] - 756:5

**December** [2] - 609:18, 654:7

**decency** [1] - 711:1

**decide** [1] - 699:6

**decided** [2] - 720:5, 762:4

**deciding** [4] - 703:14, 718:17, 718:21, 719:3

**decision** [4] - 602:18, 725:3, 726:5, 726:7

**decisions** [2] - 692:3, 692:10

**deed** [1] - 671:10

**default** [5] - 709:23, 719:9, 742:19, 742:22, 747:20

**defaulted** [2] - 715:4, 743:11

**Defendant** [2] - 573:17, 573:19

**defendant** [7] - 585:5, 621:11, 630:24, 632:7, 646:18,

666:13, 679:9

**Defendant's** [3] - 593:20, 634:10, 638:23

**defendants** [6] - 641:23, 714:18, 716:21, 723:19, 724:17, 725:2

**Defendants** [1] - 573:10

**defense** [6] - 617:9, 617:15, 719:3, 721:10, 740:25, 772:12

**Defense** [10] - 578:9, 579:21, 586:6, 594:11, 655:3, 778:12, 778:13, 778:14, 778:15, 778:17

**defense's** [1] - 617:24

**definitely** [4] - 591:22, 692:21, 693:21, 721:15

**definitive** [1] - 635:7

**Del** [8] - 588:14, 588:21, 611:5, 611:8, 611:12, 611:15, 611:23, 612:8

**del** [1] -

627:14

**Delaware** [2] - 674:10, 674:14

**delivering** [1] - 694:12

**demeanor** [1] - 717:5

**den** [2] - 750:23, 763:21

**dentist** [1] - 692:22

**deposed** [3] - 645:23, 656:16, 656:18

**deposit** [4] - 622:3, 650:5, 711:16, 723:3

**deposited** [2] - 723:2, 760:11

**deposition** [2] - 646:1, 646:6

**depositions** [7] - 645:13, 651:25, 657:12, 657:21, 658:13, 658:23, 663:5

**depth** [1] - 749:12

**deputy** [2] - 772:19, 773:2

**describe** [3] - 674:6, 710:5, 747:22

**described** [7] - 601:18, 606:10, 606:11, 606:18, 609:5, 623:17, 759:13

**describing** [3] - 621:1, 702:3, 772:1

**desires** [1] - 688:6

**desperation** [1] - 712:19

**despite** [1] - 693:10

**destroy** [3] - 751:10, 751:12, 751:14

**destroyed** [2] - 751:3, 751:5

**detail** [2] - 597:24, 772:23

**detailed** [1] - 765:9

**details** [2] - 604:23, 610:12

**detriment** [1] - 608:5

**develop** [1] - 667:1

**developed** [1] - 652:4

**developers** [1] - 664:22

**development** [5] - 696:3, 697:8, 697:9, 699:22, 699:23

**Development** [13] - 665:15, 665:21, 667:19, 671:14, 672:14, 672:25, 674:8, 674:13, 674:19,

675:1, 678:25, 680:7, 757:22

**device** [1] - 763:9

**devoted** [1] - 652:14

**DeVries** [1] - 643:11

**dial** [1] - 635:18

**dialing** [1] - 763:17

**Diamante** [7] - 584:4, 586:19, 587:6, 589:7, 591:1, 611:5, 612:8

**Diamonte** [1] - 627:14

**did there come a time** [5] - 583:15, 694:22, 701:4, 727:13, 727:17

**difference** [2] - 637:15, 685:15

**different** [13] - 581:17, 618:8, 618:9, 633:2, 633:4, 658:24, 694:23, 695:21, 695:24, 719:15, 731:5, 740:8

**difficult** [4] - 645:15, 697:5, 712:18, 743:20

**difficulty** [1] - 610:16

**diffuse** [1] - 710:23

**digital** [1] - 671:18

**DIRE** [2] - 729:17, 777:23

**dire** [2] - 654:19, 729:15

**DIRECT** [5] - 664:8, 690:1, 738:3, 777:15, 777:21

**direct** [14] - 600:10, 625:4, 650:5, 656:14, 684:18, 731:25, 742:23, 745:25, 748:16, 754:7, 760:3, 765:5, 765:13, 765:19

**directed** [1] - 772:4

**directing** [1] - 576:18

**directions** [3] - 594:23, 595:19, 745:19

**directly** [6] - 641:6, 743:3, 744:23, 745:9, 746:3, 772:15

**disbursement** [1] - 652:25

**discharging** [1] - 606:4

**disclosed** [1] - 772:10

**discuss** [9] -

595:14, 596:4, 596:5, 608:3, 616:6, 683:25, 716:21, 731:13, 771:16

**discussed** [7] - 587:11, 588:1, 619:7, 686:4, 726:23, 755:5, 757:18

**discussing** [3] - 576:21, 593:24, 702:2

**discussion** [6] - 592:22, 604:14, 617:13, 618:5, 662:15, 750:9

**Discussion** [2] - 670:1, 670:22

**discussions** [11] - 583:18, 583:21, 586:17, 602:8, 607:1, 607:21, 652:6, 659:7, 659:9, 755:1, 756:3

**disk** [9] - 729:21, 729:22, 729:24, 730:3, 730:22, 764:2, 764:3, 764:7

**dismiss** [2] - 644:17, 645:1

**dismissal** [2] - 663:2, 663:13

**dismissed** [6] - 641:17, 643:21, 644:5, 646:11, 658:5, 663:16

**display** [1] - 594:13

**displaying** [1] - 578:10

**dispute** [9] - 579:15, 580:20, 582:12, 617:19, 630:10, 688:14, 688:19, 761:7, 765:1

**disregard** [1] - 717:3

**distraction** [1] - 630:11

**distribute** [1] - 665:10

**DISTRICT** [3] - 573:1, 573:1, 573:12

**District** [5] - 599:18, 600:2, 648:3, 649:1, 651:13

**disturbs** [1] - 772:22

**diversified** [1] - 755:20

**diversifying** [1] - 695:5

**diverting** [1] - 630:21

**Dividends** [2] - 676:23, 676:25

**dividends** [1] - 709:7

**divorce** [2] - 692:23, 698:8

**docs** [4] -

655:8, 655:10, 769:13, 769:25

**Document** [1] - 688:2

**document** [53] - 617:7, 625:22, 626:1, 648:17, 648:19, 648:23, 649:4, 654:3, 657:10, 660:12, 660:20, 660:24, 661:1, 661:16, 661:22, 662:7, 667:15, 668:23, 671:15, 671:16, 671:21, 674:12, 675:9, 676:3, 676:5, 676:6, 678:14, 681:22, 684:13, 685:1, 704:22, 704:23, 705:16, 732:14, 735:4, 735:15, 735:17, 735:21, 736:12, 736:19, 736:21, 736:22, 737:2, 737:4, 742:13,

742:15, 749:22, 750:25, 752:6, 752:12, 752:24, 768:8, 768:12

**documentation** [10] - 591:18, 707:25, 711:18, 711:20, 711:23, 712:6, 737:6, 750:16, 750:18, 751:7

**documented** [1] - 678:15

**documents** [45] - 593:1, 593:4, 616:3, 672:16, 672:22, 673:4, 673:10, 673:13, 680:23, 681:1, 681:7, 681:8, 681:17, 681:18, 682:10, 682:17, 682:20, 683:3, 683:10, 684:21, 708:8, 727:25, 734:23, 746:2, 746:9, 746:12, 746:13, 746:16, 747:9, 748:23, 750:5,

750:21, 753:7, 753:8, 753:12, 753:18, 753:19, 754:5, 769:17, 769:20, 770:8, 770:13, 770:15, 770:24, 771:3

**dollar** [1] - 627:14

**dollars** [2] - 699:18, 750:19

**Dolores** [1] - 686:5

**done** [15] - 615:8, 615:9, 658:23, 662:17, 684:24, 685:12, 697:12, 702:18, 703:3, 717:23, 717:25, 724:16, 736:10, 745:2, 776:6

**door** [3] - 618:3, 618:25, 642:5

**doubt** [2] - 632:19, 776:5

**downplay** [1] - 710:24

**dramatically** [1] - 712:12

**draw** [2] - 624:23, 741:8

**drawn** [1] - 692:23

**duly** [3] - 575:12,

664:4, 689:15
**duration** [1] - 730:7
**during** [17] - 592:18, 593:13, 601:21, 608:16, 620:6, 621:19, 628:5, 645:13, 645:14, 653:20, 653:21, 656:16, 681:2, 682:9, 743:19, 771:11, 774:9

**E**

**e-mail** [62] - 576:19, 576:22, 576:23, 576:24, 577:11, 577:12, 577:20, 578:12, 578:15, 578:17, 579:5, 579:10, 579:23, 580:5, 580:18, 584:10, 586:8, 586:9, 586:16, 587:8, 587:12, 587:17, 589:14, 592:11, 592:13, 593:21, 593:23,

594:17, 595:6, 596:12, 596:18, 597:16, 598:13, 598:15, 598:19, 607:8, 617:10, 618:7, 632:24, 634:12, 634:18, 634:23, 636:15, 641:3, 694:20, 708:16, 720:16, 720:18, 720:22, 721:19, 723:25, 724:9, 724:22, 725:7, 725:16, 725:24, 726:15, 765:9, 765:24, 767:11, 767:13
**e-mailed** [1] - 599:2
**e-mails** [6] - 584:16, 593:8, 593:24, 610:22, 712:5, 712:16
**early** [5] - 607:11, 616:5, 657:12, 685:3, 774:5
**earn** [4] -

701:15, 702:14, 758:10, 758:12
**earned** [2] - 701:23, 755:23
**EASTERN** [1] - 573:1
**economical** [2] - 684:16, 685:12
**Edmonton** [1] - 700:24
**effect** [2] - 606:7, 636:8
**efficient** [2] - 598:6, 686:25
**effort** [2] - 586:19, 641:23
**efforts** [3] - 591:7, 609:16, 743:8
**egg** [1] - 744:6
**eggs** [3] - 695:6, 695:23, 756:8
**either** [12] - 580:24, 598:13, 653:20, 682:11, 687:6, 704:9, 720:15, 726:14, 736:20, 763:21, 768:6, 772:15
**elaborate** [2] - 620:8, 713:2
**elderly** [1] - 775:23
**elect** [1] - 590:5
**email** [8] -

647:9, 662:25, 663:4, 663:6, 663:15, 670:11, 670:16, 746:22
**emails** [2] - 659:11, 746:24
**embarrass** [1] - 583:8
**Emily** [1] - 690:10
**emotionally** [1] - 714:10
**emphatic** [1] - 765:24
**emphatically** [1] - 765:13
**encountering** [1] - 576:3
**encumbering** [1] - 635:10
**end** [18] - 574:23, 574:25, 575:3, 607:13, 619:11, 631:15, 633:22, 649:10, 667:20, 684:8, 686:12, 693:11, 693:15, 714:9, 718:9, 761:18, 773:15, 774:15
**endeavor** [1] - 588:23
**ended** [2] - 620:23, 769:22
**ending** [1] -

686:9
**engaged** [2] - 608:23, 658:17
**engaging** [1] - 597:5
**engineered** [1] - 641:23
**engrained** [1] - 693:1
**enjoy** [1] - 771:15
**ensued** [3] - 670:1, 671:1, 684:2
**enter** [2] - 635:6, 635:9
**entered** [4] - 621:6, 659:16, 659:18, 689:4
**enters** [2] - 619:25, 773:24
**entirely** [2] - 630:11, 676:5
**entirety** [1] - 676:6
**entities** [1] - 598:1
**entitled** [4] - 585:10, 585:11, 585:13, 667:22
**entity** [6] - 586:25, 587:22, 590:5, 705:2, 705:10, 705:23
**entry** [3] - 693:11, 707:10, 741:9
**equity** [4] - 647:5, 677:3, 677:10, 682:1
**Equity** [3] -

676:22,
676:25,
677:15
**erase** [1] -
764:11
**erased** [3] -
763:6, 764:8,
764:12
**escrow** [8] -
665:6, 668:9,
668:10,
716:15,
716:18,
718:14,
722:9, 739:19
**especially** [1]
- 734:12
**ESQ** [3] -
573:17,
573:20,
573:20
**essence** [3] -
598:5,
630:19,
635:24
**essentially** [1]
- 638:1
**establish** [2] -
631:7, 685:11
**established**
[1] - 697:19
**estate** [16] -
664:11,
664:19,
664:21,
664:23,
664:25,
665:1,
665:12,
678:24,
683:4, 683:6,
695:7, 696:2,
696:6, 755:6,
755:9, 755:13
**Estates** [1] -
664:13
**estimate** [7] -
574:24,

575:1, 771:9,
771:11,
771:12,
771:14
**et** [2] -
590:7, 590:17
**Ethel** [1] -
604:9
**Eufora** [53] -
592:3, 592:5,
599:10,
599:13,
604:21,
604:22,
605:16,
605:17,
605:18,
606:8,
606:15,
606:18,
607:25,
608:24,
609:16,
609:25,
630:20,
631:1,
638:25,
639:13,
639:18,
659:19,
661:4, 701:2,
701:5, 701:8,
701:9,
701:21,
701:22,
701:25,
703:5, 703:7,
703:11,
703:22,
704:1, 705:1,
706:5,
706:10,
707:19,
707:22,
707:24,
707:25,
709:5,
711:19,

713:18,
718:4,
741:12,
758:24,
759:2, 759:8,
759:21,
760:2, 764:19
**Eufora's** [1] -
609:22
**evasive** [2] -
743:20, 746:8
**event** [1] -
775:9
**events** [1] -
768:5
**eventually** [2]
- 727:16,
753:20
**evidence** [49]
- 578:9,
579:21,
586:6,
594:12,
597:10,
597:15,
614:3, 616:4,
617:24,
621:18,
654:14,
654:16,
655:3,
667:14,
668:21,
671:4,
673:19,
674:3, 679:8,
679:14,
704:7,
705:13,
710:7,
720:11,
720:19,
722:3,
726:25,
727:7, 727:9,
729:11,
731:4,
731:17,

735:2,
738:14,
739:5,
739:22,
752:11,
761:22,
765:3, 778:6,
778:8, 778:9,
778:10,
778:12,
778:13,
778:14,
778:16,
778:17
**Ex'd** [2] -
769:17,
770:14
**exact** [2] -
598:14,
716:16
**exactly** [5] -
644:4, 734:1,
736:14,
745:23, 753:4
**examination**
[10] - 575:5,
600:11,
620:7,
626:12,
628:4,
643:16,
662:16,
679:24,
742:1, 754:7
**EXAMINATION**
[22] -
575:15,
626:8, 643:1,
647:23,
655:18,
662:23,
664:8, 680:1,
690:1,
729:17,
738:3, 742:4,
777:3, 777:5,
777:7, 777:9,
777:11,

777:15,
777:17,
777:21,
777:23, 778:1
**examinations**
[1] - 626:11
**examined** [3]
- 575:12,
664:5, 689:15
**example** [3] -
661:2,
684:12,
744:10
**excerpt** [2] -
761:16,
761:22
**excerpts** [4] -
728:19,
728:22,
730:3, 761:15
**excess** [1] -
755:23
**exchange** [3]
- 655:5,
700:14, 762:1
**exchanges** [1]
- 653:25
**exclusive** [1]
- 701:12
**excuse** [3] -
654:9, 660:5,
758:8
**excused** [5] -
616:7,
663:21,
683:22,
731:16,
771:23
**execute** [2] -
598:4, 680:23
**executed** [3] -
634:14,
708:3, 709:2
**exhibit** [14] -
597:14,
617:3,
617:20,
621:12,

622:25,
634:16,
634:19,
636:7, 637:7,
638:16,
670:2,
722:15,
741:8, 768:9
**Exhibit** [68] -
575:21,
576:14,
577:20,
578:9, 579:2,
579:21,
586:6,
593:20,
621:12,
621:21,
622:24,
623:8,
623:10,
623:21,
628:24,
634:10,
635:4,
638:23,
640:3, 643:5,
648:18,
649:24,
655:3, 660:5,
668:19,
671:3, 674:2,
674:5,
674:16,
678:13,
679:14,
679:16,
704:8,
705:14,
710:6,
720:10,
720:20,
722:2, 722:4,
722:12,
724:23,
725:7,
725:25,
728:4, 728:9,

728:11,
728:25,
731:17,
732:24,
735:2,
736:18,
736:25,
738:14,
738:20,
739:22,
740:13,
742:6,
751:16,
752:25,
778:5, 778:7,
778:9,
778:10,
778:12,
778:13,
778:14,
778:17
**EXHIBITS** [1]
- 778:4
**exhibits** [5] -
594:7, 617:4,
617:5, 681:6,
728:4
**Exhibits** [3] -
594:11,
628:19,
778:15
**Exibit** [1] -
667:13
**existing** [2] -
635:5, 635:10
**exists** [1] -
638:20
**expecting** [1]
- 765:17
**expedite** [1] -
583:4
**expenses** [1]
- 581:19
**experience** [2]
- 658:16,
683:8
**explain** [16] -
580:17,

592:14,
597:23,
607:19,
633:10,
653:2,
664:20,
665:3, 685:2,
695:1, 697:5,
697:7,
711:11,
714:17,
714:18,
758:20
**explained** [7]
- 688:5,
702:10,
748:18,
759:14,
766:5, 766:6,
773:25
**explaining** [4]
- 688:13,
714:3, 714:6,
714:19
**explanation**
[5] - 631:11,
641:9, 688:7,
767:3
**explode** [3] -
702:11,
702:24,
703:20
**expressed** [1]
- 635:12
**extended** [1]
- 730:5
**extending** [1]
- 702:19
**extends** [1] -
684:18
**extent** [5] -
618:13,
653:18,
658:14,
732:21,
748:18
**extra** [2] -
700:16, 767:5

**extremely** [2]
- 743:20,
746:8
**eye** [1] -
717:1
**eyes** [1] -
709:24

**F**

**face** [4] -
608:8, 694:19
**face-to-face**
[2] - 608:8,
694:19
**facilitate** [2] -
668:12,
725:18
**facilitating** [1]
- 678:25
**facilities** [1] -
599:13
**fact** [19] -
603:16,
604:24,
639:11,
639:12,
641:11,
651:5, 652:3,
652:22,
658:12,
661:19,
691:23,
704:14,
712:14,
719:5,
719:25,
738:6,
740:21,
772:6, 776:5
**facts** [1] -
772:6
**faded** [3] -
637:18,
660:14,
660:16
**failed** [1] -
605:20
**fair** [9] -

609:14,
667:16,
672:1, 685:7,
704:21,
704:24,
752:6,
753:10,
758:13
**faith** [1] -
641:22
**falling** [1] -
602:24
**fallout** [1] -
610:15
**falls** [1] -
641:25
**familiar** [9] -
579:8,
610:13,
664:14,
747:14,
751:25,
752:14,
752:16,
752:21,
761:24
**familiarity** [3]
- 684:13,
751:18,
751:23
**family** [2] -
692:3, 693:15
**family's** [1] -
757:15
**far** [3] -
603:6,
727:22,
755:22
**fashion** [1] -
687:3
**fashioned** [1]
- 763:11
**faster** [1] -
698:13
**father** [1] -
692:22
**fault** [2] -
613:7, 715:3

**favor** [2] - 702:16, 702:22

**favorable** [1] - 581:8

**fax** [1] - 638:23

**faxed** [2] - 662:1, 662:6

**FBI** [8] - 601:19, 612:22, 612:25, 652:23, 652:24, 653:9, 767:19, 768:1

**fear** [1] - 727:23

**February** [6] - 580:5, 621:14, 623:21, 652:23, 653:9, 663:14

**Fed** [2] - 769:17, 770:14

**Federal** [2] - 573:14, 573:23

**FedEx** [4] - 753:7, 753:12, 753:18, 769:13

**FedEx'ing** [1] - 770:1

**fee** [3] - 605:4, 605:5, 622:3

**fees** [5] - 575:25, 581:18, 590:7, 644:1, 693:14

**fell** [1] - 641:11

**fellow** [1] - 714:25

**felt** [11] - 601:19, 601:20, 628:3, 648:1, 649:13, 649:16, 709:25, 710:5, 711:13, 727:23, 743:10

**few** [15] - 575:19, 577:12, 587:19, 596:21, 599:16, 610:24, 626:11, 659:14, 670:20, 694:6, 694:9, 703:3, 713:9, 719:8, 750:14

**fight** [8] - 714:10, 717:13, 718:12, 718:15, 719:20, 739:15, 739:20, 767:7

**figure** [1] - 633:24

**figured** [1] - 736:14

**file** [6] - 654:12, 665:18, 680:18, 680:19, 680:21, 708:11

**filed** [8] - 581:15, 582:3,

586:20, 591:8, 604:24, 606:22, 674:9, 674:14

**files** [1] - 655:7

**final** [1] - 709:2

**finally** [5] - 591:14, 653:19, 678:6, 702:11, 739:4

**finances** [1] - 748:2

**financial** [16] - 591:5, 664:23, 690:13, 691:11, 691:14, 691:15, 691:21, 691:24, 692:3, 692:12, 694:10, 699:10, 712:20, 744:20, 744:22, 748:16

**Financial** [1] - 691:13

**financially** [1] - 714:9

**fine** [3] - 614:24, 620:15, 773:19

**finger** [1] - 713:1

**finished** [3] - 662:16, 724:13, 730:19

**fire** [1] -

711:8

**firm** [4] - 691:18, 691:21, 695:15, 695:17

**First** [1] - 722:13

**first** [63] - 576:18, 580:9, 586:9, 593:14, 594:14, 601:18, 624:9, 625:1, 626:11, 628:18, 633:12, 633:16, 634:25, 642:3, 643:4, 643:9, 643:10, 647:19, 647:25, 656:9, 656:10, 663:3, 664:4, 675:14, 678:18, 684:6, 689:14, 693:10, 694:6, 694:9, 695:10, 698:18, 700:7, 701:7, 702:2, 702:4, 702:5, 705:22, 709:22, 713:14, 713:15, 714:7, 719:11, 723:22, 724:1, 724:3, 724:17,

731:8, 733:2, 733:12, 735:21, 740:20, 742:15, 742:16, 744:5, 746:7, 750:14, 754:8, 762:2, 765:10, 769:1

**fit** [1] - 764:6

**five-week** [1] - 684:7

**five-year** [1] - 754:21

**flags** [1] - 727:21

**focus** [5] - 601:6, 696:2, 705:22, 717:10, 721:1

**focused** [2] - 662:20, 718:2

**follow** [2] - 634:17, 720:15

**follow-up** [1] - 720:15

**followed** [2] - 635:10, 745:18

**following** [17] - 585:1, 586:1, 614:1, 616:1, 630:1, 632:1, 641:1, 642:17, 669:7, 670:23, 671:1, 684:2, 688:1, 689:1, 762:12, 767:12, 773:12

**follows** [6] - 575:13, 596:18, 664:6, 670:1,

677:4, 689:16

**font** [1] - 660:16

**fonts** [1] - 684:13

**forced** [1] - 692:17

**foreclose** [2] - 610:9, 636:1

**forgery** [1] - 662:4

**forgot** [1] - 721:14

**form** [5] - 635:7, 662:12, 666:19, 760:24, 761:8

**formation** [4] - 672:24, 673:5, 674:7, 674:13

**formed** [2] - 674:13, 692:18

**former** [1] - 604:3

**forms** [1] - 708:11

**forth** [4] - 585:14, 635:4, 681:25

**forward** [6] - 592:8, 638:11, 712:6, 745:4, 747:4, 763:23

**forwarded** [2] - 763:21, 768:3

**forwarding** [1] - 711:16

**foundation** [1] - 752:9

**founder** [1] - 759:3

**fourth** [2] -

597:19, 661:13

**frame** [7] - 632:12, 665:20, 730:12, 730:16, 743:22, 744:3, 746:19

**fraud** [3] - 585:4, 631:18, 772:4

**frauds** [1] - 688:6

**fraudulent** [1] - 630:24

**free** [1] - 612:15

**friend** [4] - 653:1, 653:11, 666:4, 701:11

**front** [2] - 651:9, 651:12

**frustrated** [1] - 686:22

**fuel** [1] - 590:7

**fully** [1] - 636:13

**Fund** [38] - 581:14, 581:20, 588:2, 589:11, 592:17, 592:21, 592:23, 593:10, 595:16, 595:23, 607:9, 618:11, 630:21, 633:15, 641:5, 641:19, 714:15,

714:19, 717:12, 718:10, 720:13, 720:17, 722:9, 722:23, 723:2, 723:4, 723:20, 724:4, 724:18, 724:24, 725:4, 725:8, 725:12, 726:6, 726:12, 726:18, 727:14, 765:6

**fund** [21] - 575:22, 576:4, 576:8, 593:14, 593:25, 636:17, 652:15, 652:25, 653:13, 714:21, 715:19, 715:21, 716:19, 719:3, 719:6, 721:10, 721:20, 724:19, 739:10, 739:14, 740:25

**fund's** [1] - 725:4

**Fund's** [1] - 584:2

**funding** [2] - 697:11, 700:11

**funds** [15] - 615:2, 617:14,

617:25, 618:20, 623:23, 643:17, 643:25, 650:7, 717:12, 720:16, 722:13, 722:16, 724:23, 760:17, 765:10

**fungible** [1] - 760:14

**FURTHER** [2] - 662:23, 777:11

**future** [3] - 692:11, 694:14, 699:12

**fuzzy** [1] - 662:1

**FYI** [1] - 598:16

## G

**Gaarn** [10] - 603:21, 603:23, 608:3, 608:13, 609:7, 614:12, 623:20, 624:2, 624:3, 630:16

**GAARN** [1] - 623:20

**Gaarn's** [1] - 623:24

**gain** [1] - 700:16

**gas** [1] - 692:7

**gather** [1] - 697:6

**general** [1] - 749:25

**generalized** [1] - 657:4

**generally** [1] - 695:21

**generic** [1] - 750:15

**gentleman** [1] - 624:3

**gentlemen** [2] - 620:11, 650:3

**Gentry** [4] - 603:24, 608:4, 608:13, 609:7

**Gilmarten** [2] - 723:13, 723:21

**Gilmore** [5] - 673:12, 675:2, 675:22, 676:21, 677:24

**given** [11] - 594:23, 607:4, 614:16, 617:9, 617:18, 646:9, 647:9, 650:15, 655:21, 656:5, 682:2

**global** [12] - 584:17, 586:19, 587:12, 587:17, 591:16, 643:24, 652:14, 652:25, 653:12, 739:10, 739:14, 765:9

**Global** [39] -
581:14,
581:19,
584:2, 588:2,
589:11,
592:17,
592:21,
592:22,
593:9,
595:16,
595:22,
607:9,
618:11,
630:21,
633:15,
641:5,
641:19,
714:15,
714:19,
717:12,
718:10,
720:13,
720:17,
722:8,
722:22,
723:2, 723:4,
723:20,
724:4,
724:18,
724:24,
725:3, 725:8,
725:12,
726:6,
726:12,
726:18,
727:14, 765:6
**globally** [1] -
596:25
**goal** [1] -
711:20
**goals** [3] -
692:13,
692:15,
692:18
**gold** [3] -
757:1, 757:2,
757:4
**Gold** [1] -

757:5
**goodness** [1]
- 766:8
**Google** [1] -
679:17
**gosh** [1] -
710:2
**Government**
[30] -
573:13,
621:11,
621:21,
622:23,
623:8,
623:10,
628:19,
643:5, 660:5,
664:4,
668:19,
671:3, 674:2,
674:5,
674:16,
678:13,
679:14,
679:16,
704:7,
705:14,
731:17,
738:14,
738:20,
739:22,
740:13,
742:6, 778:5,
778:7, 778:9,
778:10
**government**
[25] - 574:6,
585:12,
589:20,
589:21,
617:20,
618:4,
618:18,
621:11,
621:19,
626:2, 630:5,
663:25,
670:6,

673:18,
679:7, 688:5,
689:6, 689:8,
729:10,
739:4,
760:21,
763:22,
772:3,
772:13,
774:23
**Government's**
[21] -
575:21,
623:21,
628:24,
640:2, 710:6,
720:10,
720:20,
722:1, 722:4,
722:12,
724:22,
725:7,
725:24,
728:4, 728:9,
728:11,
728:25,
732:24,
735:2,
736:18,
736:24
**government's**
[3] - 617:4,
771:25
**graduating** [2]
- 773:6,
774:2
**graduation** [4]
- 772:20,
773:6,
774:12,
774:15
**grand** [27] -
599:17,
599:21,
600:14,
601:21,
602:15,
602:18,

602:21,
626:14,
627:6, 628:5,
628:9, 642:1,
646:13,
648:2,
648:10,
648:14,
648:25,
649:6,
649:10,
649:11,
649:13,
649:18,
649:19,
651:9,
651:13,
652:8, 659:10
**Grand** [1] -
649:24
**great** [7] -
587:25,
620:12,
620:20,
693:2,
702:22,
748:23,
755:17
**greatly** [1] -
617:24
**grew** [2] -
648:5, 692:20
**gross** [1] -
648:20
**Group** [10] -
639:8, 705:3,
705:5,
705:11,
705:25,
706:25,
759:24,
760:5,
760:11, 761:4
**group** [25] -
576:23,
578:12,
578:17,
584:10,

584:16,
586:8,
586:16,
592:21,
593:8,
593:21,
595:6,
595:22,
603:4,
603:16,
605:1,
608:12,
610:8,
610:22,
617:17,
625:20,
696:10,
697:1, 749:3,
749:5
**growing** [3] -
628:15,
694:7, 727:21
**GSF** [2] -
617:14,
714:15
**GSL** [1] -
767:14
**guaranteed**
[2] - 710:3,
710:19
**guarantees/
lawsuit** [1] -
591:10
**guess** [2] -
594:5, 701:11
**guy** [2] -
685:11, 715:8
**guys** [8] -
592:2,
596:21,
596:25,
598:7, 647:5,
695:4,
696:10,
696:13

**H**

**Haley** [11] -

578:2, 578:3, 586:2, 611:2, 613:4, 621:11, 626:13, 647:18, 688:12, 742:10, 774:20

**HALEY** [96] - 573:17, 574:9, 578:1, 578:5, 579:19, 586:4, 594:9, 613:6, 613:9, 614:4, 614:16, 614:22, 615:6, 615:10, 617:8, 620:17, 620:20, 629:12, 629:14, 630:3, 631:14, 631:19, 632:21, 634:3, 634:8, 642:2, 644:22, 645:3, 645:8, 647:21, 647:24, 651:3, 651:4, 654:16, 654:25, 655:4, 655:14, 659:21, 666:14, 666:18, 666:23, 669:3, 669:5, 670:2, 670:21,

673:20, 673:24, 675:23, 675:25, 676:2, 676:11, 676:17, 678:1, 678:4, 679:11, 680:2, 681:14, 683:12, 683:14, 686:11, 686:20, 687:5, 687:8, 688:18, 688:23, 717:2, 717:8, 726:20, 727:10, 729:15, 729:18, 730:19, 730:20, 730:25, 733:15, 741:21, 742:2, 742:5, 752:10, 752:19, 752:20, 761:1, 761:11, 763:1, 768:8, 772:25, 774:21, 775:6, 775:11, 775:16, 776:9, 776:19, 777:8, 777:18, 777:24, 778:2

**Haley's** [1] - 628:3

**half** [4] -

627:14, 771:9, 771:14, 775:14

**hand** [7] - 672:16, 686:9, 705:13, 728:3, 735:1, 736:17, 749:11

**handed** [3] - 688:2, 710:15, 749:15

**handful** [1] - 694:18

**Handing** [4] - 634:17, 640:5, 705:15, 768:10

**handle** [2] - 665:3, 748:20

**handles** [1] - 748:19

**handling** [2] - 665:1, 683:4

**hands** [3] - 667:9, 748:14, 748:18

**handwriting** [2] - 769:10, 769:11

**handwritten** [2] - 768:1, 768:4

**hangar** [1] - 592:3

**happy** [2] - 634:13, 687:2

**Harbor** [7] - 671:13, 678:22, 679:5, 679:18, 700:4, 700:5,

739:2

**hard** [4] - 601:10, 744:11, 746:7, 758:18

**hardest** [2] - 708:9, 712:4

**Haven** [3] - 678:22, 679:5, 679:18

**Hawaii** [30] - 602:7, 626:25, 627:24, 629:3, 644:14, 655:9, 655:10, 679:21, 696:3, 696:6, 699:17, 700:1, 700:23, 700:25, 709:10, 711:6, 711:19, 714:20, 733:8, 733:11, 748:24, 753:22, 755:13, 756:13, 757:13, 757:16, 757:21, 764:18

**head** [2] - 701:12, 713:18

**headquartered** [1] - 592:5

**heads** [1] - 711:2

**heads-up** [1] - 711:2

**hear** [6] -

605:25, 712:15, 731:4, 731:6, 763:17, 768:14

**heard** [9] - 603:25, 604:6, 606:3, 618:23, 633:17, 710:21, 734:2, 736:4, 741:19

**hearing** [5] - 612:4, 700:7, 712:25, 724:3, 733:25

**hearsay** [7] - 585:2, 642:4, 642:7, 750:11, 767:1, 772:1, 772:5

**heart** [2] - 757:12, 766:8

**held** [11] - 608:17, 701:12, 703:11, 703:13, 703:18, 716:17, 732:20, 739:18, 759:1, 759:4, 759:5

**hello** [1] - 742:9

**help** [9] - 583:4, 601:11, 643:14, 697:8, 699:12, 713:22, 714:12, 725:18

**helped** [2] -

626:22, 627:3
**helping** [2] -
694:13,
725:22
**hereby** [1] -
678:20
**herein** [1] -
677:3
**hesitant** [1] -
719:16
**hesitate** [1] -
591:24
**hesitation** [2]
- 613:7,
614:4
**hi** [4] -
713:17,
729:20,
762:1, 773:25
**hide** [1] -
681:22
**hiding** [9] -
712:23,
743:25,
744:2,
744:12,
744:16,
744:20,
745:22,
745:24,
746:21
**highest** [1] -
586:24
**highlighted**
[6] - 594:17,
621:25,
622:2,
623:11,
623:23,
741:10
**highlighting**
[2] - 601:5,
707:12
**highly** [1] -
675:18
**Highway** [1] -
573:18
**himself** [7] -

651:24,
666:17,
691:9,
713:16,
713:21,
745:14,
774:25
**hire** [4] -
602:18,
603:14,
603:16,
604:13
**hired** [6] -
600:7, 605:1,
617:17,
646:3, 661:9,
699:12
**history** [6] -
734:23,
735:7,
738:20,
742:7,
742:13,
744:24
**hit** [1] -
693:20
**HL** [1] -
617:17
**hmm** [2] -
704:15, 706:4
**hockey** [21] -
580:20,
582:16,
582:23,
608:5,
611:11,
611:15,
617:15,
625:10,
625:20,
656:2,
656:22,
658:5,
658:12,
658:16,
691:10,
692:17,
696:15,

696:17,
715:25,
716:1, 720:3
**hold** [6] -
580:14,
665:6, 699:4,
712:22,
718:1, 773:14
**holder** [1] -
667:18
**holding** [2] -
710:12, 713:7
**home** [19] -
693:20,
709:16,
709:21,
709:22,
710:13,
710:15,
713:11,
714:1,
716:22,
719:12,
721:9,
724:17,
725:2,
725:11,
725:19,
725:23,
726:10,
747:10
**honcho** [1] -
713:18
**honest** [2] -
747:11, 770:5
**Honor** [64] -
574:7,
577:22,
578:1, 578:7,
578:10,
579:16,
584:19,
585:17,
594:6,
594:13,
597:11,
610:24,
611:1, 613:8,

614:25,
617:2, 618:2,
619:2,
620:17,
621:9,
621:10,
622:23,
624:17,
625:25,
630:3, 632:4,
640:3, 640:7,
640:10,
640:11,
645:3,
654:23,
662:13,
662:21,
668:20,
669:5, 670:2,
673:25,
676:8,
676:11,
678:2,
679:11,
679:12,
686:3,
686:20,
687:7, 688:3,
688:18,
689:7, 717:2,
729:14,
732:1, 732:7,
733:15,
741:21,
741:25,
772:18,
773:1,
774:18,
774:21,
774:22,
775:2, 775:6,
775:19
**hook** [2] -
588:25
**hope** [2] -
574:20, 587:1
**hopefully** [1]
- 728:2

**hoping** [3] -
598:11,
636:19, 659:7
**Hormovitis** [1]
- 573:9
**hostile** [1] -
605:25
**hotel** [3] -
600:16,
600:17, 629:6
**hour** [1] -
775:17
**hours** [5] -
718:8,
728:17,
730:13,
730:17,
730:22
**house** [2] -
746:15,
750:24
**household** [3]
- 692:21,
748:1, 754:1
**huge** [1] -
702:24
**Hughes** [1] -
604:7
**hundred** [5] -
639:6, 639:7,
693:13,
699:18,
750:18
**hurdles** [1] -
703:3
**hurting** [1] -
720:7
**husband** [18]
- 690:8,
690:9,
742:14,
748:22,
752:7, 754:9,
755:9, 757:8,
765:5, 766:4,
766:12,
766:22,
766:23,

767:9,
767:12,
772:5,
772:12,
772:15
**husband's** [7]
- 720:1,
748:11,
750:6, 752:4,
752:5,
761:13, 772:1

**I**

**ID** [2] -
680:18,
680:21
**idea** [17] -
624:12,
624:15,
647:8,
652:19,
656:15,
656:18,
682:23,
698:10,
719:14,
751:3,
757:14,
757:19,
761:13,
761:14,
761:19
**identification**
[12] - 584:6,
593:2, 593:3,
614:20,
624:22,
640:4, 643:5,
648:18,
656:13,
656:20,
661:3, 736:18
**identified** [6]
- 661:5,
661:19,
662:14,
666:13,
681:7, 691:6

**identify** [3] -
666:10,
688:8, 690:9
**ill** [1] -
713:24
**illegal** [1] -
662:5
**image** [1] -
622:3
**imagine** [5] -
577:9,
582:13,
589:18,
596:24,
599:25
**immediate** [1]
- 745:1
**immediately**
[3] - 637:20,
693:24,
710:16
**impatient** [1]
- 684:5
**imperative** [1]
- 657:20
**important** [10]
- 587:25,
588:13,
597:22,
615:1,
703:14,
718:21,
719:2, 734:3,
736:6, 772:9
**impossible** [1]
- 589:25
**impression** [1]
- 649:17
**improper** [1]
- 642:10
**improve** [1] -
701:18
**inaccurate** [1]
- 585:13
**inadvertently**
[1] - 764:8
**Inc** [2] -
672:13,

675:17
**incentives** [2]
- 717:17,
766:6
**inches** [1] -
749:12
**incidentally**
[2] - 682:4,
756:25
**include** [3] -
584:12,
670:5, 749:6
**includes** [4] -
584:11,
593:10,
595:7, 670:5
**including** [3] -
595:23,
608:13, 766:9
**income** [1] -
701:14
**incomplete** [2]
- 585:9,
670:9
**increase** [2] -
617:23,
736:10
**increased** [2]
- 637:2,
758:5
**increases** [2]
- 736:1,
736:2
**increasingly**
[2] - 628:11,
628:15
**incredible** [1]
- 696:8
**independent**
[4] - 627:20,
634:21,
638:14,
744:21
**independently**
[2] - 598:10,
627:2
**INDEX** [1] -
777:1

**indicate** [3] -
674:9, 691:3,
696:19
**indicated** [5]
- 581:5,
620:7,
628:20,
628:21,
633:13
**indicates** [1] -
741:11
**indicating** [1]
- 660:14
**indictment** [2]
- 615:7,
688:20
**individual** [4]
- 604:7,
685:4, 685:9,
775:4
**individuals** [9]
- 597:17,
603:18,
604:18,
607:20,
608:12,
609:5,
609:13,
609:15,
609:20
**Industries** [2]
- 635:8,
647:3
**inform** [1] -
776:7
**information**
[24] - 585:6,
585:9,
592:15,
598:8,
601:13,
626:20,
626:21,
646:9, 709:9,
735:13,
736:7, 736:9,
743:9,
743:11,

743:13,
744:19,
746:5,
748:23,
750:4, 768:3,
772:2, 772:4,
772:7
**informed** [1] -
627:10
**infrastructure**
[3] - 697:9,
699:22,
699:24
**initialed** [1] -
728:12
**initials** [2] -
728:12, 729:1
**initiated** [1] -
639:21
**initiative** [1] -
748:2
**injured** [1] -
693:17
**inquire** [1] -
651:22
**inquiry** [1] -
630:6
**inside** [2] -
624:23,
649:13
**insofar** [1] -
636:13
**instance** [1] -
753:21
**instances** [2]
- 630:8,
753:17
**instead** [2] -
684:25,
717:18
**instituted** [1]
- 641:4
**institutions**
[2] - 664:23,
668:12
**instruction** [2]
- 688:19,
731:2

**instructions** [1] - 596:8
**insurance** [2] - 590:16, 624:6
**intend** [2] - 591:5, 686:4
**intent** [2] - 687:5, 764:23
**interaction** [1] - 754:8
**intercession** [1] - 776:14
**interest** [20] - 576:3, 589:3, 589:10, 590:1, 592:2, 597:25, 633:1, 638:24, 639:12, 639:17, 682:1, 699:11, 707:25, 751:8, 755:24, 758:3, 758:10, 759:1, 759:10, 759:21
**interested** [4] - 605:17, 701:20, 717:23, 756:12
**interjected** [1] - 717:22
**interview** [3] - 653:8, 653:10, 767:22
**interviewed** [2] - 652:23, 767:19
**intimately** [1] - 748:10

**intricate** [1] - 610:12
**introduce** [6] - 577:23, 626:1, 630:13, 687:5, 687:6, 713:16
**introduced** [8] - 597:14, 641:20, 662:14, 666:3, 690:15, 690:16, 701:10, 713:21
**introducing** [1] - 630:6
**invalidated** [1] - 745:10
**invest** [22] - 611:5, 611:8, 629:5, 692:10, 696:11, 696:22, 699:6, 699:12, 703:15, 703:22, 711:16, 716:3, 718:17, 718:22, 718:25, 719:6, 725:3, 726:6, 726:8, 755:19, 759:8, 759:13
**invested** [24] - 586:21, 587:21, 588:2, 591:1, 599:10, 602:7, 611:12, 629:8,

699:16, 700:2, 700:23, 701:25, 702:8, 702:9, 703:10, 703:25, 705:1, 706:5, 707:18, 707:22, 713:20, 721:18, 749:3, 765:22
**investigating** [2] - 747:1, 768:1
**investigation** [3] - 612:6, 649:18, 649:20
**investing** [5] - 587:15, 692:13, 693:5, 693:7, 701:5
**investment** [52] - 588:3, 588:7, 588:9, 590:20, 591:14, 611:14, 627:14, 627:21, 627:23, 631:7, 639:2, 644:14, 692:9, 694:4, 696:5, 696:24, 697:3, 699:20, 700:16, 700:22, 704:2, 706:10, 708:1, 709:4, 709:10, 710:23,

711:4, 711:5, 711:7, 714:21, 715:17, 716:19, 716:20, 719:1, 719:20, 720:12, 721:11, 722:22, 740:22, 740:24, 750:16, 750:19, 751:8, 755:2, 755:22, 756:12, 756:13, 757:16, 757:22, 757:25, 764:20, 772:10
**investments** [31] - 587:2, 597:25, 612:11, 619:15, 626:25, 627:12, 627:17, 627:24, 629:3, 636:17, 694:1, 694:6, 694:16, 694:23, 695:7, 695:21, 695:22, 701:2, 712:6, 716:21, 717:23, 717:25, 721:10, 748:20, 754:12,

755:6, 755:8, 755:12, 764:25, 772:8
**investor** [3] - 612:19, 625:12, 659:19
**investors** [5] - 592:20, 608:1, 610:20, 612:8, 612:15
**involve** [1] - 665:1
**involved** [25] - 586:19, 587:21, 587:24, 588:6, 588:8, 589:6, 603:19, 603:20, 603:23, 607:24, 620:11, 627:19, 630:8, 633:12, 665:14, 665:21, 665:24, 679:2, 692:2, 714:20, 748:11, 754:11, 764:21, 765:17
**involvement** [3] - 584:2, 590:4, 604:13
**involves** [1] - 687:9
**involving** [7] - 603:6, 603:8, 607:14, 683:5, 690:18, 725:13, 764:4

**Island** [3] - 624:3, 624:7, 698:5

**Islanders** [2] - 695:12, 754:18

**Islandia** [1] - 573:18

**Isle** [2] - 749:17, 749:23

**Islip** [3] - 573:6, 573:15, 573:23

**issue** [13] - 585:3, 585:5, 588:13, 617:16, 617:18, 659:24, 687:9, 688:4, 772:2, 773:3, 774:20, 776:17

**issues** [12] - 574:5, 584:3, 586:18, 588:3, 591:10, 592:9, 592:23, 593:24, 619:14, 684:17, 684:18, 775:13

**issuing** [1] - 701:22

**items** [3] - 717:17, 727:4, 727:5

**itself** [10] - 590:8, 591:9, 601:25, 612:2, 630:7, 661:22, 668:23,

682:4, 727:9, 767:6

**IV** [7] - 650:6, 749:13, 749:17, 749:23, 750:2, 757:21, 758:4

---

**J**

**Jamaica** [1] - 664:13

**JAMES** [1] - 573:15

**January** [2] - 623:20, 663:10

**jet** [2] - 589:4, 590:24

**jets** [1] - 589:10

**JFB** [1] - 573:4

**job** [4] - 664:21, 694:11, 695:14, 750:6

**Joe** [1] - 756:21

**John** [4] - 604:1, 677:8, 680:17, 680:22

**join** [1] - 606:7

**joint** [4] - 635:9, 635:25, 686:11, 761:13

**JOSEPH** [1] - 573:11

**Jowdy** [44] - 580:19, 581:5, 581:12, 581:15,

581:17, 582:3, 582:12, 583:19, 583:23, 587:2, 587:5, 591:7, 601:20, 602:7, 612:10, 618:11, 627:1, 627:7, 627:9, 627:10, 627:18, 628:10, 628:14, 636:20, 639:22, 641:8, 641:11, 643:11, 643:16, 645:2, 645:7, 649:18, 651:24, 656:16, 656:23, 657:17, 659:11, 714:25, 715:12, 716:16, 717:15, 718:13, 739:15, 739:20

**Jowdy's** [6] - 584:3, 589:2, 591:3, 597:25, 611:5, 611:8

**Judge** [15] - 578:5, 613:9, 615:9, 615:10, 620:21, 621:20,

631:20, 642:2, 669:3, 717:8, 727:11, 729:15, 730:19, 730:25, 775:11

**JUDGE** [1] - 573:12

**judge** [18] - 614:2, 634:3, 642:7, 647:19, 655:16, 659:21, 660:3, 666:14, 671:5, 676:2, 683:12, 683:20, 684:20, 687:8, 726:20, 752:10, 775:17, 776:9

**judgment** [1] - 720:1

**July** [8] - 584:13, 586:14, 608:17, 608:21, 639:3, 730:10, 741:9, 741:16

**June** [5] - 577:1, 578:21, 594:15, 595:9, 774:12

**Juneau** [1] - 756:21

**juror** [4] - 773:3, 773:4, 773:5, 773:24

**JUROR** [4] - 774:5, 774:8,

774:11, 774:18

**Juror** [1] - 774:19

**jurors** [5] - 574:4, 622:1, 772:20, 773:15, 773:16

**Jury** [1] - 649:24

**jury** [68] - 573:12, 574:16, 574:18, 574:20, 574:23, 575:2, 577:11, 578:11, 585:10, 585:13, 599:18, 599:21, 600:14, 601:21, 602:15, 602:18, 602:21, 616:2, 616:7, 618:16, 618:19, 619:1, 620:1, 620:25, 621:6, 626:14, 627:6, 628:5, 628:9, 630:11, 631:12, 633:10, 641:10, 642:1, 643:19, 646:13, 648:2, 648:10, 648:15,

648:25,
649:6,
649:10,
649:12,
649:13,
649:18,
649:19,
651:9,
651:13,
652:8,
659:10,
684:2, 686:2,
686:16,
687:2, 689:4,
717:3, 727:7,
729:12,
731:4,
731:16,
731:22,
732:4,
747:22,
771:11,
771:19,
772:22,
773:4, 774:10
**JV** [2] -
635:11,
635:25

**K**

**Kaiser** [10] -
604:1, 604:9,
677:8,
680:17,
680:22,
681:2,
681:15,
686:6, 776:6
**Kaiser's** [3] -
681:6,
681:16,
682:18
**keep** [11] -
597:1,
630:17,
630:22,
633:23,
641:23,

684:9, 687:1,
689:22,
731:12,
733:18, 737:9
**keeping** [2] -
610:19,
686:21
**Ken** [11] -
597:25,
627:1, 627:7,
627:9,
627:10,
628:10,
628:14,
639:21,
651:24,
714:25,
717:15
**KENNER** [1] -
573:7
**Kenner** [151]
- 573:7,
573:18,
577:4,
592:19,
600:24,
603:17,
604:19,
606:13,
609:10,
612:12,
621:13,
622:15,
626:22,
627:3, 627:4,
628:15,
628:25,
629:4, 629:9,
630:16,
630:21,
631:5, 631:8,
632:7,
632:13,
632:16,
633:13,
641:12,
646:4, 646:6,
648:17,

649:20,
650:4,
651:14,
651:20,
653:22,
654:6,
659:16,
659:19,
660:19,
660:24,
665:25,
666:2, 666:3,
666:5,
666:10,
666:13,
666:17,
666:21,
673:7,
673:11,
674:20,
675:2,
675:22,
676:21,
677:6,
677:24,
678:11,
679:9,
680:15,
688:4, 688:8,
690:17,
690:19,
690:21,
691:1, 691:7,
691:8, 691:9,
691:23,
694:2,
694:10,
694:22,
695:13,
696:5,
698:18,
699:18,
700:3, 701:4,
703:7,
704:16,
704:23,
705:1,
707:14,

707:15,
707:19,
707:21,
710:10,
712:8,
712:11,
713:10,
713:25,
715:16,
720:15,
721:8,
726:10,
726:19,
727:13,
727:18,
728:17,
728:23,
729:25,
730:4, 730:9,
730:14,
733:5,
733:22,
735:15,
736:16,
737:2, 738:5,
738:18,
739:9,
741:14,
742:11,
743:7, 746:1,
747:1,
748:24,
749:18,
749:20,
751:16,
752:24,
753:1, 753:6,
753:12,
753:17,
754:8, 755:8,
755:12,
756:5, 760:6,
760:11,
760:22,
761:3, 761:5,
762:5, 763:3,
764:5,
764:23,

765:8, 766:1,
766:16,
766:20,
767:13,
768:9,
770:14,
770:23,
771:22,
772:11, 775:4
**Kenner's** [4] -
622:24,
623:2, 623:9,
726:12
**Kenneth** [1] -
643:11
**kept** [5] -
592:4, 699:2,
709:15,
716:7, 716:14
**Kevin** [1] -
754:5
**key** [2] -
589:23,
636:25
**keys** [1] -
636:23
**kid** [1] -
693:13
**kids** [2] -
690:8, 690:10
**kill** [1] -
712:24
**kind** [17] -
601:7,
601:11,
602:24,
612:6, 629:5,
660:7, 692:5,
693:1, 694:1,
694:11,
696:15,
704:19,
716:12,
735:13,
749:10,
771:1, 771:2
**kindly** [3] -
654:3,

751:15,
752:24
**kinds** [3] -
694:23,
695:21,
695:22
**knocking** [1] -
592:8
**knowing** [2] -
698:14, 738:9
**knowledge** [9]
- 602:6,
609:20,
612:2,
638:14,
644:10,
652:13,
751:13,
757:7, 772:6
**known** [5] -
678:21,
694:4, 759:1,
765:14,
765:20
**knows** [5] -
617:2,
618:16,
713:6,
756:18,
760:23
**Komatireddy**
[2] - 689:24,
732:6
**KOMATIREDDY**
[64] -
573:16,
615:4, 617:9,
631:4,
663:25,
664:9,
666:12,
666:16,
666:20,
668:23,
670:10,
670:19,
671:5, 671:6,
671:18,

671:20,
673:18,
674:4, 676:7,
676:9,
676:13,
676:19,
679:7,
679:15,
679:23,
681:10,
682:13,
682:21,
683:20,
687:6, 688:3,
688:15,
689:7, 690:2,
709:1, 717:9,
727:11,
727:12,
729:10,
731:9, 732:1,
732:7, 732:8,
733:17,
738:4,
738:12,
738:17,
739:8,
741:24,
748:4,
750:11,
752:9,
752:12,
760:24,
761:8, 767:1,
770:16,
770:18,
772:17,
773:18,
775:19,
775:22,
777:16,
777:22
**Kristie** [1] -
746:18
**Kristin** [4] -
688:10,
689:8,
689:19, 699:2

**KRISTIN** [3] -
689:13,
689:19,
777:20

# L

**LA** [55] -
574:7,
574:12,
574:14,
575:16,
577:18,
577:22,
578:3, 578:7,
578:10,
579:16,
579:22,
584:19,
585:17,
586:7, 587:5,
594:6,
594:13,
597:11,
597:13,
610:24,
611:1, 611:3,
612:19,
613:4, 614:2,
614:19,
614:23,
615:3, 615:7,
615:9, 617:2,
618:2, 618:9,
619:13,
619:18,
619:21,
620:15,
621:9,
621:18,
621:24,
622:23,
624:16,
625:25,
626:5,
630:14,
630:18,
631:3,
640:11,

642:3, 642:7,
642:15,
729:14,
773:19,
775:17, 777:4
**labeled** [1] -
722:16
**land** [9] -
667:1, 696:1,
696:8, 697:2,
697:10,
700:1, 700:4,
756:13
**language** [1]
- 710:20
**large** [2] -
717:18,
734:12
**LARUSSO** [1]
- 573:20
**LaRusso** [24]
- 574:10,
644:12,
646:23,
647:17,
647:18,
654:23,
655:15,
655:16,
655:19,
657:23,
658:3,
658:11,
659:3, 660:2,
662:13,
662:18,
662:25,
669:2,
673:25,
679:12,
683:17,
683:18,
684:14,
777:10
**last** [18] -
591:8,
597:14,
624:9,

624:16,
628:1,
628:18,
634:4, 634:5,
637:13,
637:24,
638:10,
646:20,
660:13,
677:1, 700:8,
702:17,
703:2, 703:3
**lastly** [2] -
589:23,
623:19
**late** [1] -
774:5
**Laura** [1] -
677:24
**Lauren** [4] -
673:11,
675:2,
675:22,
676:21
**law** [4] -
716:15,
739:18,
739:25,
776:12
**lawsuit** [28] -
586:20,
591:8,
603:12,
604:24,
605:20,
605:23,
624:19,
641:4,
641:15,
643:15,
643:20,
643:21,
643:24,
644:5,
644:18,
645:1,
646:10,
655:22,

656:3, 656:6,
656:23,
657:2, 663:1,
663:16,
715:6,
716:19,
717:14,
725:13
**lawsuit's** [1] -
641:16
**lawsuits** [3] -
581:15,
581:16,
639:21
**lawyer** [8] -
582:23,
603:17,
624:20,
625:19,
634:9, 646:3,
659:12,
715:12
**lawyer's** [2] -
716:18, 727:7
**lawyer/client**
[1] - 625:19
**lawyers** [6] -
574:25,
582:18,
616:2,
628:14,
692:25,
771:10
**laying** [1] -
710:18
**lead** [1] -
718:15
**leading** [8] -
628:8, 645:8,
675:24,
726:21,
726:23,
727:3, 727:5,
739:20
**learn** [2] -
758:25,
774:22
**learned** [3] -

609:4, 744:5,
772:10
**least** [12] -
587:17,
595:3,
632:12,
657:8, 681:5,
681:16,
694:18,
695:15,
718:8, 728:1,
746:22, 752:8
**leave** [5] -
614:21,
619:14,
631:14,
636:6, 685:3
**leaves** [2] -
712:19,
774:19
**leaving** [1] -
753:23
**Led** [20] -
665:15,
665:20,
665:25,
666:21,
667:5,
667:10,
667:19,
668:16,
670:6, 670:7,
671:14,
672:14,
672:24,
674:7,
674:12,
674:18,
674:25,
675:5,
678:25, 680:6
**led** [2] -
628:8, 727:20
**left** [6] -
641:10,
648:10,
727:15,
735:8,

740:13,
776:10
**legal** [21] -
581:18,
591:5,
591:16,
598:2, 644:1,
702:18,
715:9,
715:11,
716:19,
717:13,
717:19,
718:2,
718:12,
718:15,
719:3, 719:5,
719:19,
721:10,
739:15,
740:24, 767:1
**legally** [2] -
580:14,
714:21
**legitimize** [1]
- 716:13
**legitimized** [1]
- 719:23
**Lehman** [2] -
697:10,
700:12
**lender** [3] -
612:3, 665:9
**lenders** [1] -
609:22
**lending** [1] -
668:12
**length** [1] -
697:21
**lengthy** [2] -
648:18, 659:7
**letter** [27] -
634:18,
634:22,
635:3, 637:9,
637:24,
641:14,
641:18,

642:4, 643:4,
643:8,
644:20,
644:24,
646:21,
650:2, 650:3,
663:12,
673:9, 710:4,
710:8,
710:11,
710:12,
715:15,
717:24,
742:19,
742:22,
743:2, 767:13
**letterhead** [1]
- 708:21
**letters** [1] -
709:23
**level** [3] -
652:3,
693:12,
747:22
**liability** [1] -
639:16
**Liability** [1] -
678:20
**licensed** [2] -
691:19,
691:22
**life** [4] -
620:12,
624:6,
633:17, 695:9
**likely** [1] -
754:3
**likewise** [2] -
600:1, 622:23
**Limited** [1] -
678:20
**line** [65] -
580:9,
617:10,
630:6,
634:25,
638:3, 638:6,
638:7,

638:15,
644:13,
650:4, 650:5,
650:7,
653:22,
697:6, 697:7,
697:18,
697:19,
697:21,
697:23,
698:19,
698:25,
699:19,
700:4, 700:8,
700:13,
700:15,
700:18,
709:11,
709:13,
709:18,
709:25,
714:23,
714:24,
715:3, 715:9,
715:16,
733:9,
733:10,
733:11,
733:13,
733:23,
734:4,
734:14,
734:15,
734:24,
735:11,
738:23,
739:1,
742:13,
743:4, 746:2,
746:13,
746:14,
747:9,
747:17,
747:24,
750:19,
757:14,
757:18,
757:19,

758:8,
758:14,
772:21
**lines** [5] -
608:7, 612:5,
612:13,
715:23, 738:6
**link** [2] -
617:11,
617:12
**linked** [1] -
578:18
**list** [4] -
598:16,
661:13,
677:2, 677:16
**listed** [2] -
597:19, 675:4
**listen** [2] -
761:20,
771:15
**listened** [2] -
761:15,
764:17
**listing** [1] -
706:21
**lists** [2] -
597:17,
661:13
**litany** [1] -
726:21
**litigation** [2] -
644:7, 644:11
**live** [6] -
589:24,
590:4,
664:12,
690:5, 690:6,
750:24
**living** [4] -
664:10,
743:15,
743:23,
743:25
**LLC** [37] -
625:11,
625:13,
625:15,

625:20,
635:8, 661:7,
661:9,
661:14,
667:19,
672:15,
672:21,
673:3, 674:8,
674:13,
674:19,
675:1, 675:6,
675:19,
675:21,
676:15,
676:16,
676:20,
677:17,
677:22,
678:17,
678:19,
680:7,
682:16,
749:1, 749:2,
749:6,
749:24,
750:1, 750:2,
758:4, 775:2,
775:3
**LLR** [1] -
741:12
**load** [1] -
741:12
**loan** [27] -
601:21,
604:21,
605:18,
606:15,
609:22,
610:9,
612:11,
612:14,
627:7, 627:9,
627:10,
635:16,
635:18,
635:25,
688:9,
697:13,

697:15,
697:19,
703:12,
709:19,
733:22,
734:11,
735:7,
736:22,
742:13,
744:23, 758:8
**loan/personal**
[1] - 591:10
**loaned** [6] -
626:25,
714:25,
715:13,
733:22,
734:5, 734:6
**loans** [1] -
610:4
**locate** [1] -
751:1
**logistically** [1]
- 589:25
**long-term** [2]
- 695:11,
702:20
**look** [34] -
576:14,
592:8, 593:4,
593:15,
611:2,
612:25,
614:20,
614:23,
624:24,
637:13,
638:11,
640:6,
648:19,
648:23,
654:3,
655:25,
666:9, 676:4,
690:25,
704:8, 728:6,
732:11,
735:3, 735:6,

735:23,
738:22,
740:20,
751:15,
752:24,
768:9,
768:12,
768:13,
768:15,
772:24
**looked** [9] -
634:24,
657:1,
661:12,
695:25,
708:19,
740:10,
746:23,
750:6, 750:8
**looking** [26] -
577:15,
637:20,
657:10,
667:15,
670:17,
671:7,
672:11,
697:11,
699:11,
704:8,
704:22,
705:19,
705:22,
706:8, 707:9,
711:17,
722:5,
722:12,
728:25,
735:13,
736:21,
740:10,
740:17,
740:19,
741:6, 771:1
**looks** [6] -
635:21,
637:10,
638:9,

660:16,
661:25, 662:3
**LORETTA** [1] -
573:13
**Los** [4] -
594:21,
595:14,
596:3, 652:5
**losses** [1] -
591:6
**lost** [4] -
647:11,
715:8,
715:22,
773:16
**loud** [1] -
634:25
**low** [1] -
693:11
**lower** [2] -
696:9, 701:14
**loyal** [1] -
702:20
**Lucas** [4] -
635:18,
636:1,
636:20,
636:23
**lucky** [1] -
702:23
**lunch** [4] -
663:23,
683:24,
684:1, 685:18
**lunchtime** [1]
- 771:8
**luxury** [1] -
588:22
**LYNCH** [1] -
573:13

---

### M

**ma'am** [14] -
742:17,
749:9,
751:10,
751:17,
752:21,

758:16,
758:21,
759:4, 760:9,
761:2, 762:4,
765:19,
768:9, 769:20
**mad** [1] -
716:25
**Magence** [1] -
723:21
**mail** [72] -
576:19,
576:22,
576:23,
576:24,
577:11,
577:12,
577:20,
578:12,
578:15,
578:17,
579:5,
579:10,
579:23,
580:5,
580:18,
584:10,
586:8, 586:9,
586:16,
587:8,
587:12,
587:17,
589:14,
592:11,
592:13,
593:21,
593:23,
594:17,
595:6,
596:12,
596:18,
597:16,
598:13,
598:15,
598:19,
607:8,
617:10,
618:7,

632:24,
634:12,
634:18,
634:23,
636:15,
641:3, 692:7,
692:8,
694:20,
708:16,
709:16,
709:20,
711:3,
720:16,
720:18,
720:22,
721:19,
723:25,
724:9,
724:22,
725:7,
725:16,
725:24,
726:15,
748:19,
765:9,
765:24,
767:11,
767:13,
769:14,
769:23,
770:2, 770:4
**mailed** [1] -
599:2
**mails** [6] -
584:16,
593:8,
593:24,
610:22,
712:5, 712:16
**main** [5] -
601:6,
696:24,
711:20,
714:2, 717:13
**maintain** [1] -
624:8
**maintenance**
[1] - 590:16

**majoring** [1] -
691:11
**majority** [1] -
698:7
**man** [1] -
604:5
**Management**
[10] - 639:8,
705:3, 705:5,
705:11,
705:25,
706:24,
759:24,
760:5,
760:11, 761:4
**management**
[1] - 606:4
**managing** [10]
- 673:3,
674:24,
674:25,
675:4, 675:5,
675:8,
676:16,
676:20,
677:16,
678:16
**Manhattan** [1]
- 646:14
**manner** [3] -
712:17,
761:23,
761:25
**Map** [1] -
679:17
**maps** [1] -
679:7
**Mar** [9] -
588:14,
588:21,
611:5, 611:8,
611:12,
611:15,
611:23,
612:8, 627:15
**March** [9] -
599:24,
621:14,

622:12,
622:24,
623:4, 650:2,
742:24,
744:7, 747:21
**mark** [2] -
769:18,
769:22
**marked** [21] -
576:13,
576:15,
624:21,
643:5,
648:17,
656:12,
656:20,
661:2,
667:13,
668:18,
671:22,
672:17,
679:8, 728:3,
735:1,
736:17,
738:13,
739:21,
751:16,
752:24, 768:8
**market** [2] -
698:1, 698:15
**marketing** [2]
- 702:11,
702:13
**marking** [2] -
640:2, 640:4
**Mascarella** [5]
- 747:13,
747:23,
775:20, 776:5
**match** [2] -
638:7, 706:9
**material** [6] -
630:4, 630:6,
748:24,
749:12,
749:16, 772:7
**matter** [5] -
617:6, 652:3,

652:22,
758:24, 772:8
**matters** [3] -
652:10,
726:24, 762:6
**mean** [15] -
587:23,
603:9, 605:9,
623:6,
635:13,
636:25,
641:9, 647:4,
681:21,
684:5,
696:15,
747:13,
769:24,
773:14, 776:2
**meaning** [3] -
580:22,
581:7, 774:22
**means** [4] -
601:1, 605:9,
605:12, 619:6
**meant** [4] -
619:9, 620:9,
652:21,
758:17
**measure** [1] -
711:13
**measures** [1]
- 727:24
**mechanical** [1]
- 573:25
**medal** [3] -
757:1, 757:2,
757:4
**Medal** [1] -
757:5
**media** [4] -
578:25,
581:8, 598:2,
617:10
**mediated** [1]
- 652:5
**mediation** [5]
- 581:24,
582:2, 582:5,

582:11,
639:24
**medium** [1] - 764:1
**meet** [6] - 603:11,
624:5,
638:18,
666:5,
690:11,
690:21
**meeting** [13] - 577:3,
583:12,
583:15,
592:18,
601:6,
601:19,
608:9, 714:7,
718:20,
718:24,
719:11,
769:1, 769:5
**meetings** [3] - 694:19,
698:6, 768:6
**member** [7] - 625:13,
625:15,
641:19,
661:7,
665:25,
675:5, 675:8
**Members** [2] - 674:24
**members** [16] - 574:20,
616:2,
643:19,
661:14,
673:3,
674:25,
675:4,
675:20,
675:21,
676:15,
676:16,
676:20,

677:16,
677:22,
678:16
**memo** [1] - 634:22
**memorandum** [3] - 634:14,
636:14, 641:6
**memory** [6] - 693:1,
749:14,
749:21,
757:7,
769:16, 771:2
**mention** [7] - 574:22,
718:4,
721:11,
725:10,
725:17,
725:19,
756:13
**mentioned** [23] - 576:2,
599:7, 599:9,
633:15,
691:10,
691:14,
696:7, 697:4,
698:5, 703:7,
713:19,
721:14,
724:8,
725:24,
726:3,
726:14,
727:22,
732:11,
756:11,
756:19,
756:22,
772:19,
776:12
**mentioning** [5] - 612:12,
708:17,
717:17,
717:19, 721:3

**mentions** [1] - 724:9
**message** [7] - 654:5,
654:11,
751:18,
752:7, 753:1,
753:9, 776:11
**messages** [1] - 653:25
**met** [13] - 582:5, 624:3,
624:6,
638:19,
685:11,
690:13,
691:8, 693:8,
712:8,
713:14,
713:15,
734:13, 757:2
**metaphor** [2] - 695:3,
695:5
**Mexico** [18] - 627:15,
643:17,
644:12,
653:23,
655:8,
655:10,
712:23,
726:19,
743:16,
743:23,
744:2,
744:13,
744:17,
744:21,
745:22,
745:24,
746:21,
764:18
**Michael** [41] - 622:10,
623:3,
623:12,
623:24,

675:8,
677:10,
677:12,
690:10,
690:11,
690:13,
690:19,
691:8, 692:2,
693:5, 693:9,
693:20,
696:19,
702:20,
703:22,
703:25,
704:9,
704:13,
704:18,
706:5,
706:21,
709:21,
710:13,
710:15,
715:25,
719:5, 720:8,
732:17,
735:9, 741:2,
745:14,
746:4, 751:2,
754:3, 754:4,
756:17, 757:2
**MICHAEL** [2] - 575:10, 777:2
**Michael's** [11] - 691:23,
695:4, 695:9,
704:17,
720:12,
732:17,
733:11,
734:24,
757:15
**Michele** [1] - 773:25
**microcassette** [1] - 763:11
**Microsoft** [1] - 759:6
**middle** [4] -

692:21,
721:2,
723:13,
761:17
**middleman** [1] - 665:11
**might** [7] - 579:7,
589:17,
633:19,
634:24,
660:23,
687:8, 770:7
**mike** [1] - 689:22
**million** [9] - 612:3,
612:11,
627:14,
635:25,
644:13,
647:7,
754:23,
754:24,
754:25
**millions** [3] - 644:13,
647:4, 647:11
**mind** [8] - 585:4,
627:10,
692:13,
698:17,
726:22,
735:22,
765:1, 772:14
**mine** [2] - 653:1, 752:23
**Mineola** [1] - 573:21
**mini** [1] - 763:11
**mini-tape** [1] - 763:11
**minicassette** [1] - 763:12
**minimize** [1] - 686:25

**minimum** [1] - 686:21

**minor** [1] - 717:17

**minus** [1] - 647:4

**minute** [8] - 615:4, 635:19, 635:23, 647:1, 711:11, 720:20, 735:3, 735:23

**minutes** [12] - 577:12, 598:12, 599:16, 615:5, 616:3, 619:22, 659:14, 663:23, 684:10, 731:12, 732:2, 742:14

**misappropriate d** [1] - 607:25

**Miskiewicz** [14] - 614:10, 620:2, 632:3, 647:25, 648:6, 652:12, 655:20, 656:7, 657:6, 660:4, 660:12, 662:9, 662:19, 684:5

**MISKIEWICZ** [54] - 573:15, 574:6, 577:25, 579:18, 584:21,

585:2, 585:16, 594:8, 610:23, 612:18, 613:2, 613:8, 614:12, 614:25, 619:2, 619:20, 620:5, 620:13, 626:9, 630:13, 630:19, 631:2, 631:20, 632:4, 632:5, 640:7, 640:10, 641:2, 642:14, 643:2, 644:23, 645:5, 647:16, 650:24, 654:13, 654:19, 657:22, 657:25, 658:9, 659:1, 662:11, 662:20, 662:24, 663:18, 678:5, 684:20, 685:16, 686:3, 686:14, 686:17, 775:25, 776:4, 777:6, 777:12

**mismanageme nt** [2] - 589:3, 591:4

**miss** [2] - 772:21, 774:14

**missing** [5] - 641:2, 697:17, 699:1, 709:19, 727:25

**misspoke** [1] - 676:4

**mistaken** [1] - 581:23

**misunderstandi ng** [1] - 762:8

**moment** [13] - 619:12, 636:9, 640:3, 640:6, 652:18, 669:3, 683:12, 693:2, 697:8, 742:12, 744:25, 763:3, 763:4

**moments** [2] - 610:24, 670:20

**Monday** [15] - 598:5, 771:7, 771:9, 771:18, 772:24, 773:7, 773:11, 774:3, 775:14, 775:21, 775:24, 776:6, 776:22

**money** [119] - 602:6, 602:7, 607:25, 612:7, 622:14, 622:18,

622:20, 623:4, 623:17, 624:11, 624:13, 628:21, 630:20, 630:24, 631:1, 631:2, 631:5, 631:12, 634:2, 643:25, 644:6, 644:9, 653:12, 665:1, 665:3, 665:6, 665:10, 665:12, 667:9, 688:16, 692:16, 693:10, 693:12, 693:15, 693:18, 693:25, 694:14, 697:12, 697:18, 698:12, 698:24, 699:4, 699:13, 700:2, 700:3, 700:17, 700:23, 702:17, 702:25, 703:15, 703:19, 705:2, 705:10, 707:18, 707:21, 707:24, 710:4, 711:22,

713:6, 713:7, 714:4, 714:11, 714:13, 714:22, 714:24, 715:1, 715:3, 715:6, 715:7, 715:8, 715:12, 715:13, 715:22, 716:8, 717:14, 717:18, 718:10, 718:13, 718:18, 719:18, 719:21, 720:7, 721:20, 721:23, 722:8, 723:3, 723:19, 724:3, 724:19, 725:4, 725:8, 725:13, 726:2, 726:12, 726:17, 727:14, 728:2, 733:10, 733:23, 734:5, 734:9, 734:11, 734:12, 739:1, 739:10, 739:16, 743:12, 745:5, 754:10, 754:15, 755:19, 759:23,

760:14,
760:21,
761:4, 766:9,
767:6

**monies** [6] -
614:21,
652:14,
665:8,
668:16,
699:16,
739:17

**month** [4] -
577:3,
697:20, 706:5

**monthly** [4] -
692:6,
709:17,
735:12, 748:8

**months** [9] -
697:21,
699:2, 700:9,
700:10,
700:17,
712:16,
713:9,
715:15, 719:8

**moot** [2] -
772:25,
774:21

**morning** [8] -
574:20,
574:21,
575:17,
575:18,
616:5, 773:8,
774:3, 774:5

**mortgage** [7]
- 629:10,
631:10,
632:8, 633:3,
635:10,
732:19,
732:20

**mortgages** [2]
- 630:23,
632:16

**most** [6] -
582:15,

598:12,
702:19,
745:1, 754:3,
763:10

**mostly** [1] -
626:21

**motivation** [1]
- 620:10

**mouth** [2] -
633:23, 762:2

**move** [8] -
596:23,
641:20,
668:21,
670:12,
698:18,
699:6,
700:20,
710:13

**moved** [7] -
617:10,
644:17,
645:1,
654:14,
699:16,
700:2, 750:23

**moves** [3] -
673:18,
679:7, 729:10

**moving** [3] -
641:19,
670:14,
758:24

**MP-1** [1] -
640:4

**MP1** [1] -
643:6

**MR** [219] -
574:6, 574:7,
574:9,
574:12,
574:14,
575:16,
577:18,
577:22,
577:25,
578:1, 578:3,
578:5, 578:7,

578:10,
579:16,
579:18,
579:19,
579:22,
584:19,
584:21,
585:2,
585:16,
585:17,
586:4, 586:7,
587:5, 594:6,
594:8, 594:9,
594:13,
597:11,
597:13,
610:23,
610:24,
611:1, 611:3,
612:18,
612:19,
613:2, 613:4,
613:6, 613:8,
613:9, 614:2,
614:4,
614:12,
614:16,
614:19,
614:22,
614:23,
614:25,
615:3, 615:6,
615:7, 615:9,
615:10,
617:2, 617:8,
618:2, 618:9,
619:2,
619:13,
619:18,
619:20,
619:21,
620:5,
620:13,
620:15,
620:17,
620:20,
621:9,
621:18,

621:24,
622:23,
624:16,
625:25,
626:5, 626:9,
629:12,
629:14,
630:3,
630:13,
630:14,
630:18,
630:19,
631:2, 631:3,
631:14,
631:19,
631:20,
632:4, 632:5,
632:21,
634:3, 634:8,
640:7,
640:10,
640:11,
641:2, 642:2,
642:3, 642:7,
642:14,
642:15,
643:2,
644:22,
644:23,
645:3, 645:5,
645:8,
647:16,
647:18,
647:21,
647:24,
650:24,
651:3, 651:4,
654:13,
654:16,
654:19,
654:23,
654:25,
655:4,
655:14,
655:16,
655:19,
657:22,
657:23,

657:25,
658:3, 658:9,
658:11,
659:1, 659:3,
659:21,
660:2,
662:11,
662:13,
662:18,
662:20,
662:24,
663:18,
666:14,
666:18,
666:23,
669:2, 669:3,
669:5, 670:2,
670:21,
673:20,
673:24,
673:25,
675:23,
675:25,
676:2,
676:11,
676:17,
678:1, 678:4,
678:5,
679:11,
679:12,
680:2,
681:14,
683:12,
683:14,
683:18,
684:20,
685:16,
686:3,
686:11,
686:14,
686:17,
686:20,
687:5, 687:8,
688:18,
688:23,
717:2, 717:8,
726:20,
727:10,

729:14,
729:15,
729:18,
730:19,
730:20,
730:25,
733:15,
741:21,
742:2, 742:5,
752:10,
752:19,
752:20,
761:1,
761:11,
763:1, 768:8,
772:25,
773:19,
774:21,
775:6,
775:11,
775:16,
775:17,
775:25,
776:4, 776:9,
776:19,
777:4, 777:6,
777:8,
777:10,
777:12,
777:18,
777:24, 778:2
**MS** [63] -
615:4, 617:9,
631:4,
663:25,
664:9,
666:12,
666:16,
666:20,
668:23,
670:10,
670:19,
671:5, 671:6,
671:18,
671:20,
673:18,
674:4, 676:7,
676:9,

676:13,
676:19,
679:7,
679:15,
679:23,
681:10,
682:13,
682:21,
683:20,
687:6, 688:3,
688:15,
689:7, 690:2,
709:1, 717:9,
727:11,
727:12,
729:10,
731:9, 732:1,
732:7, 732:8,
733:17,
738:4,
738:12,
738:17,
739:8,
741:24,
748:4,
750:11,
752:9,
752:12,
760:24,
761:8, 767:1,
770:16,
770:18,
772:17,
773:18,
775:19,
775:22,
777:16,
777:22
**multiple** [1] -
596:25
**Murray** [3] -
579:24,
579:25, 580:2
**must** [5] -
647:4,
651:21,
673:11,
679:4, 704:3

**mutual** [1] -
666:4
**Mutual** [3] -
668:7, 668:8,
668:9
**Myrick** [1] -
746:18

## N

**name** [27] -
590:13,
597:19,
603:25,
604:5, 604:6,
604:7, 604:8,
604:10,
604:12,
634:1,
671:23,
680:10,
689:17,
701:9,
704:17,
704:18,
708:4,
723:13,
732:18,
739:16,
742:10,
747:13,
751:22,
752:6,
756:16,
756:19,
759:19
**named** [2] -
701:2, 714:25
**names** [4] -
593:25,
749:25,
756:14,
756:17
**Nassau** [1] -
664:17
**nature** [4] -
645:8,
653:23,
755:22,

764:19
**nearly** [1] -
588:13
**necessary** [1]
- 636:14
**need** [16] -
598:3, 601:7,
616:3,
618:18,
631:7,
633:20,
635:23,
669:5, 673:1,
685:10,
687:8, 695:4,
702:16,
714:25,
727:24,
732:21
**needed** [7] -
651:22,
665:8, 697:6,
697:7,
697:19,
713:22, 743:8
**needs** [2] -
647:18, 699:3
**negative** [5] -
576:9,
618:14,
618:16,
618:21,
619:17
**negotiation**
[1] - 641:22
**negotiations**
[1] - 635:6
**nervousness**
[1] - 727:23
**nest** [1] -
744:6
**net** [6] -
698:17,
698:19,
698:23,
710:3, 734:16
**never** [25] -
589:12,

624:13,
627:8, 627:9,
655:8,
655:21,
656:5, 657:5,
657:6,
657:15,
685:11,
697:15,
697:17,
701:10,
703:13,
707:20,
708:10,
721:13,
724:21,
734:11,
734:13,
736:4,
752:16,
759:11
**nevertheless**
[1] - 651:8
**new** [2] -
714:4, 719:14
**NEW** [1] -
573:1
**New** [21] -
573:6,
573:15,
573:18,
573:21,
573:23,
599:18,
600:3,
603:10,
648:3, 649:1,
651:13,
664:14,
664:16,
678:22,
679:5,
679:18,
679:20,
690:6, 700:6,
739:2, 754:17
**news** [1] -
590:3

**next** [32] - 584:23, 585:18, 592:8, 597:24, 613:11, 615:11, 616:9, 629:15, 631:21, 638:3, 640:13, 642:16, 663:24, 676:8, 685:19, 687:10, 688:24, 689:6, 708:22, 734:2, 737:11, 745:6, 753:23, 769:4, 769:22, 773:11, 773:14, 773:16, 773:21, 774:16, 775:18, 775:19

**NHL** [4] - 693:11, 693:12, 695:11, 756:11

**nice** [3] - 589:4, 735:14, 736:8

**Nick** [1] - 604:5

**night** [2] - 628:8, 628:12

**nightmare** [4] - 620:12, 620:21,

620:24, 621:1

**nobody** [1] - 685:5

**Nolan** [2] - 756:19, 757:8

**Nolans** [1] - 756:25

**non** [2] - 726:23, 727:5

**non-leading** [2] - 726:23, 727:5

**none** [3] - 624:1, 647:15, 747:25

**normal** [1] - 694:8

**normally** [1] - 667:6

**North** [6] - 672:13, 675:16, 678:21, 679:5, 679:18, 680:6

**Northern** [24] - 650:6, 742:19, 742:20, 742:22, 743:3, 744:23, 745:8, 745:9, 745:11, 745:16, 747:9, 747:17, 747:24, 757:19, 757:20, 769:13, 769:16, 769:25, 770:7, 770:13, 770:24, 771:3, 776:9,

**note** [5] - 657:4, 736:1, 736:2, 736:10, 769:24

**noted** [1] - 574:3

**notes** [5] - 598:8, 768:1, 768:4, 768:18, 768:20

**nothing** [21] - 583:24, 589:1, 590:5, 590:16, 607:14, 636:10, 639:19, 644:16, 692:25, 698:25, 699:3, 708:2, 709:2, 709:3, 709:8, 725:1, 735:20, 737:8, 741:20, 745:2, 746:9

**notice** [2] - 711:3, 747:20

**noticed** [1] - 765:10

**notices** [1] - 593:12

**noticing** [1] - 698:6

**notified** [1] - 632:25

**number** [33] - 582:16, 595:4, 598:15, 598:23, 611:16, 614:5, 624:22,

776:10

637:9, 641:3, 654:24, 654:25, 668:22, 706:8, 706:9, 724:9, 727:21, 736:22, 736:23, 736:24, 740:4, 740:8, 740:17, 751:25, 752:3, 752:5, 752:21, 768:9, 773:4, 773:5, 776:13, 776:15

**numbers** [6] - 621:20, 622:5, 653:3, 653:15, 653:17, 740:16

**O**

**o'clock** [2] - 683:25, 685:17

**oath** [4] - 575:7, 689:10, 770:12, 770:23

**object** [16] - 585:2, 629:12, 632:21, 634:3, 645:8, 645:9, 659:21, 659:22, 666:18, 666:23, 678:1, 717:2, 726:20, 726:22,

741:21

**objected** [3] - 676:11, 688:13, 774:22

**objections** [1] - 613:5

**objective** [1] - 605:23

**obtain** [4] - 744:23, 747:23, 759:9, 766:1

**obviously** [8] - 585:5, 587:25, 588:13, 592:9, 645:14, 727:23, 736:13, 772:23

**occasions** [1] - 598:23

**occur** [2] - 665:22, 753:15

**occurred** [12] - 630:1, 632:1, 641:1, 642:17, 654:6, 688:1, 689:1, 730:7, 743:4, 745:21, 761:3, 761:16

**October** [10] - 596:10, 596:19, 609:19, 665:23, 668:2, 673:15, 674:11, 674:14, 678:8, 738:22

**OF** [3] - 573:1, 573:3,

573:8

**offer** [3] - 614:13, 641:8, 702:19

**offered** [4] - 598:23, 616:4, 641:9, 670:3

**offering** [3] - 598:20, 654:15, 654:16

**office** [2] - 680:9, 739:25

**officer** [1] - 604:3

**offices** [2] - 716:15, 739:18

**official** [7] - 708:2, 708:10, 708:20, 709:3, 727:25, 747:15, 765:4

**officials** [1] - 743:3

**often** [6] - 683:4, 694:15, 694:17, 712:8, 712:9, 712:14

**old** [4] - 686:6, 706:21, 706:22, 763:11

**Old** [1] - 573:21

**old-fashioned** [1] - 763:11

**olive** [1] - 691:5

**OLIVERAS** [1] - 573:20

**Olympic** [2] -

757:5, 757:8

**Olympics** [2] - 645:14, 645:21

**once** [4] - 641:22, 685:10, 701:21, 763:17

**one's** [1] - 613:7

**ones** [4] - 594:3, 764:8, 764:12, 770:9

**open** [11] - 586:1, 607:9, 616:1, 619:23, 620:21, 632:1, 642:17, 671:1, 689:1, 757:14, 757:20

**opened** [4] - 618:3, 618:24, 642:5, 709:22

**operate** [1] - 687:2

**operating** [13] - 591:21, 670:7, 672:23, 673:5, 674:18, 675:5, 677:12, 678:6, 681:25, 682:2, 682:4, 708:3, 749:6

**operation** [2] - 627:18, 749:22

**opportunities** [2] - 590:23, 696:6

**opportunity** [7] - 584:7, 598:20, 599:12, 619:5, 619:10, 696:8, 702:23

**oppose** [1] - 759:5

**optimistic** [1] - 686:17

**option** [1] - 638:24

**order** [4] - 626:10, 699:4, 704:2, 776:17

**ordered** [2] - 582:11, 657:12

**organizational** [1] - 672:22

**original** [12] - 587:11, 591:4, 637:6, 637:7, 639:2, 660:12, 660:15, 662:1, 662:4, 662:5, 662:7

**originally** [2] - 588:6, 591:2

**ostensibly** [1] - 641:5

**ourselves** [1] - 711:24

**outgoing** [1] - 723:8

**outlets** [2] - 580:12, 581:2

**outside** [3] - 649:12, 695:24, 764:20

**outstanding** [1] - 635:17

**overall** [4] -

576:4, 612:21, 687:1, 772:8

**overbroad** [1] - 770:18

**overlaid** [1] - 591:15

**overrule** [2] - 727:2, 726:6

**overruled** [12] - 612:20, 613:3, 645:10, 658:1, 658:10, 659:2, 681:11, 682:14, 682:22, 767:2, 772:13, 775:2

**owe** [1] - 703:19

**owed** [1] - 612:3

**Owen** [2] - 756:19, 757:8

**owes** [1] - 631:5

**own** [14] - 589:3, 590:9, 606:18, 608:5, 611:17, 611:21, 614:14, 658:15, 695:18, 695:19, 697:2, 715:6, 720:6, 738:7

**owned** [3] - 598:1, 612:15, 708:19

**owner** [3] - 647:6, 677:10,

759:22

**owners** [1] - 589:6

**Ownership** [3] - 676:22, 676:25, 677:16

**ownership** [10] - 590:1, 591:2, 591:19, 592:2, 635:11, 677:3, 758:3, 759:1, 759:9, 759:21

## P

**P-E-C-A** [1] - 689:20

**p.m** [2] - 595:13, 596:3

**pace** [1] - 694:8

**package** [3] - 670:5, 753:22, 769:16

**packet** [3] - 749:15, 749:16, 750:21

**page** [66] - 584:23, 585:18, 601:8, 613:11, 615:11, 616:9, 621:15, 623:1, 623:11, 623:22, 628:24, 629:15, 631:21, 634:19, 637:13,

637:15,
637:20,
637:24,
638:3,
640:13,
641:2,
642:16,
643:4, 643:9,
643:10,
646:25,
648:20,
649:3, 649:4,
660:6,
660:20,
661:17,
661:20,
661:22,
661:25,
662:6,
667:23,
669:7,
670:23,
671:15,
671:21,
676:2, 676:7,
676:14,
677:19,
684:11,
685:19,
687:10,
688:24,
692:15,
705:22,
706:14,
708:22,
722:15,
722:16,
737:11,
740:20,
741:8,
762:12,
768:22,
768:24,
769:1, 769:4,
769:9, 769:12
**pages** [19] -
576:14,
624:23,

625:1, 625:5,
626:1,
632:11,
636:7,
637:10,
638:10,
638:16,
660:19,
661:12,
661:13,
662:13,
684:14,
750:14,
768:13,
768:15,
768:22
**paid** [6] -
588:18,
600:7, 627:8,
697:12,
738:6, 761:6
**Palms** [23] -
629:6, 630:7,
631:15,
632:23,
633:1, 633:9,
633:11,
688:19,
713:20,
721:3,
721:11,
721:18,
721:21,
721:24,
724:1, 724:4,
724:5,
732:20,
765:11,
765:15,
765:18,
765:21, 767:4
**pants** [1] -
691:5
**paper** [2] -
576:10,
580:22
**paperwork** [4]
- 702:18,

708:10,
749:1, 765:4
**paragraph** [8]
- 586:9,
587:21,
588:18,
635:15,
635:22,
636:6, 636:9,
678:18
**paralegal** [1]
- 776:11
**parcel** [1] -
681:8
**parents** [3] -
692:23,
698:8, 774:12
**Park** [1] -
599:8
**park** [1] -
599:13
**part** [39] -
576:4,
576:23,
581:14,
581:19,
581:22,
586:18,
587:6, 587:8,
587:11,
587:17,
591:16,
595:22,
603:4,
606:14,
614:8, 614:9,
614:10,
614:13,
614:18,
615:7, 618:3,
620:20,
625:20,
630:19,
641:4,
657:12,
660:10,
660:18,
664:20,

681:7,
688:19,
696:24,
697:3, 697:4,
701:1, 712:2,
715:20,
719:19,
765:20
**participants**
[2] - 583:22,
593:9
**participate** [9]
- 592:21,
593:14,
594:23,
595:1,
595:19,
596:8,
604:14,
604:17,
645:15
**participated**
[2] - 597:6,
609:2
**participating**
[1] - 601:1
**participation**
[1] - 602:15
**particular** [21]
- 577:11,
577:13,
578:18,
581:7, 587:8,
587:16,
588:7, 588:9,
588:19,
590:2,
596:16,
598:19,
607:12,
607:18,
631:9,
681:22,
727:4, 727:5,
729:24,
730:22,
756:16
**particularly**

[1] - 635:12
**parties** [7] -
602:8,
603:13,
605:17,
617:13,
630:9,
672:11,
683:10
**parting** [1] -
633:7
**partner** [3] -
633:14,
633:16,
713:18
**partners** [1] -
713:19
**passes** [1] -
665:12
**password** [1]
- 590:13
**patents** [6] -
610:1, 610:3,
701:13,
701:19,
701:21,
703:11
**path** [1] -
631:16
**pause** [3] -
576:12,
669:4, 724:12
**Pause** [13] -
576:16,
578:4, 584:8,
593:6,
597:12,
610:25,
640:6,
705:15,
720:21,
724:15,
735:25,
768:15, 773:3
**pay** [16] -
580:13,
590:6, 632:7,
667:11,

700:13,
715:4,
724:20,
724:24,
725:5,
726:12,
726:18,
738:7, 745:4,
748:2,
748:15,
760:22
**paychecks** [1]
- 712:2
**paying** [3] -
581:6,
630:22,
699:15
**payment** [3] -
665:6,
723:17, 761:3
**payments** [11]
- 629:10,
631:5, 631:8,
633:3, 688:8,
697:20,
701:18,
709:18,
709:19,
723:21, 738:8
**payout** [2] -
760:5, 761:5
**peace** [1] -
698:17
**Peca** [61] -
575:5, 575:6,
575:17,
575:19,
578:12,
584:6, 586:8,
590:21,
594:17,
595:7, 611:4,
619:3,
619:16,
620:1, 620:6,
621:25,
622:10,
623:3,

623:12,
623:24,
626:10,
630:10,
631:5, 631:6,
631:8, 632:6,
639:20,
641:3, 643:3,
643:9,
647:25,
648:22,
655:20,
663:19,
675:8,
677:10,
677:12,
685:8, 686:8,
686:9,
686:12,
686:23,
687:4, 688:4,
688:7,
688:10,
689:8, 689:9,
689:19,
689:21,
690:5,
690:10,
704:18,
705:17,
706:15,
706:21,
742:8,
742:10,
748:10,
768:17,
770:11
**PECA** [4] -
575:10,
689:13,
777:2, 777:20
**Peca's** [1] -
630:25
**penny** [4] -
693:3,
697:17,
699:1, 709:6
**penthouse**

[12] -
619:14,
619:16,
620:10,
629:5, 632:9,
632:17,
633:3, 633:9,
633:16,
637:1,
659:14,
659:16
**people** [17] -
581:17,
602:12,
603:20,
606:22,
607:23,
624:20,
657:20,
696:19,
701:14,
701:15,
702:13,
703:3,
715:24,
720:9,
746:17,
746:18
**perceive** [1] -
633:19
**percent** [19] -
603:22,
675:2, 675:3,
677:6, 677:7,
677:8, 677:9,
696:25,
698:7, 698:9,
698:11,
716:23,
717:20,
726:4, 749:4,
757:10,
759:13
**percentage**
[13] - 589:9,
605:11,
605:13,
637:2,

639:12,
681:25,
700:16,
701:23,
751:8, 758:3,
758:5, 759:9,
759:14
**percentages**
[1] - 708:18
**perfect** [1] -
614:22
**perhaps** [8] -
627:13,
648:23,
676:4,
688:18,
750:5, 755:2,
774:21, 775:3
**period** [8] -
592:18,
593:13,
621:14,
623:20,
629:1, 706:1,
730:5, 743:19
**periods** [1] -
684:19
**permanent** [1]
- 633:8
**permit** [1] -
617:19
**permitted** [1]
- 727:8
**Perry** [1] -
573:22
**person** [4] -
666:5,
734:13,
757:12,
759:19
**personal** [12]
- 582:8,
607:16,
608:5,
617:14,
618:10,
619:5, 620:9,
625:18,

653:23,
658:15,
715:6, 725:13
**personally** [6]
- 599:21,
618:15,
642:9, 747:2,
747:25, 775:9
**pertained** [1]
- 639:2
**pertinent** [1]
- 598:7
**Phil** [103] -
586:21,
621:13,
626:22,
628:14,
628:25,
633:13,
633:17,
649:20,
650:22,
651:14,
651:20,
653:22,
654:6,
654:11,
655:5,
665:25,
673:6,
673:11,
674:20,
675:21,
690:17,
693:8,
693:17,
698:6,
698:10,
698:12,
702:10,
704:10,
707:14,
707:15,
707:19,
708:16,
709:16,
710:17,
710:21,

713:20,
713:23,
713:24,
714:8,
714:24,
715:5,
716:24,
728:15,
729:25,
730:4, 730:8,
730:14,
733:5,
736:16,
741:14,
742:10,
743:7,
743:14,
745:12,
745:18,
746:1,
746:25,
748:24,
749:18,
749:20,
750:17,
751:6, 753:1,
753:6,
753:12,
753:17,
754:5, 754:8,
754:11,
755:1, 755:8,
755:12,
756:5,
757:19,
757:20,
758:9, 759:8,
760:6,
760:11,
760:22,
761:3, 761:5,
761:23,
762:5, 762:6,
763:3,
763:17,
764:5,
764:23,
765:8,

765:25,
766:16,
766:20,
766:23,
767:4,
767:13,
769:2, 769:6,
769:13,
769:23,
770:14,
770:23
**Phil's** [4] -
713:18,
713:23,
746:6, 756:23
**Philip** [7] -
573:7, 650:4,
673:6,
676:21,
677:6,
677:23,
678:11
**Phillip** [1] -
675:2
**PHILLIP** [1] -
573:7
**phone** [15] -
685:5,
694:20,
720:16,
720:18,
729:23,
732:23,
735:18,
737:5,
763:10,
763:14,
766:4,
766:11,
766:20,
768:6, 769:7
**photocopy** [1]
- 768:17
**photos** [1] -
592:6
**physically** [2]
- 680:7,
714:10

**piece** [1] -
615:1
**piled** [1] -
750:25
**pilot** [1] -
590:7
**pitch** [1] -
633:15
**pitching** [1] -
693:3
**place** [10] -
585:1, 586:1,
593:13,
614:1, 616:1,
680:5, 680:8,
699:21,
767:22,
771:24
**places** [1] -
719:22
**placing** [1] -
766:11
**plaintiff** [1] -
583:1
**plan** [4] -
591:17,
686:18,
714:4, 715:19
**plane** [3] -
592:4, 592:6,
713:5
**planning** [1] -
590:18
**play** [3] -
692:5,
732:24,
738:13
**played** [6] -
691:10,
732:25,
733:19,
734:19,
737:10, 757:1
**player** [3] -
583:23,
720:2, 720:8
**players** [31] -
580:20,

581:6,
581:10,
581:11,
582:17,
582:24,
600:21,
608:6,
611:12,
611:15,
617:15,
625:10,
625:12,
625:20,
641:4,
641:13,
641:24,
645:7,
645:13,
656:2,
656:22,
658:5,
658:12,
658:17,
696:14,
696:15,
696:17,
715:25,
716:1,
756:11,
756:14
**playing** [7] -
692:17,
734:18,
737:9, 738:1,
738:10,
738:15, 739:6
**plays** [1] -
739:4
**Plaza** [2] -
573:14,
573:23
**pleasant** [1] -
761:24
**pleased** [2] -
676:5, 687:1
**pledge** [1] -
716:6
**pledged** [1] -

610:3
**plus** [2] -
597:25, 647:4
**plus-minus** [1]
- 647:4
**pm** [2] -
684:3, 685:18
**pocket** [1] -
639:16
**point** [51] -
580:13,
590:18,
590:19,
591:12,
605:16,
609:12,
614:16,
622:21,
628:3, 648:7,
649:6,
649:10,
651:12,
651:19,
651:20,
651:22,
652:8, 693:9,
695:3,
695:18,
695:20,
698:3, 712:6,
712:22,
713:3, 713:4,
717:16,
726:22,
730:9,
734:22,
738:18,
738:25,
739:1,
743:10,
745:7,
745:25,
746:4,
747:16,
753:25,
754:9,
754:14,
756:4,

758:25,
765:1,
767:25,
770:12,
770:23,
771:23,
772:25
**Point** [3] -
672:13,
675:16, 680:6
**pointed** [1] -
660:6
**pointing** [1] -
713:1
**points** [2] -
587:19,
589:23
**police** [1] -
604:3
**poor** [2] -
701:15,
764:10
**port** [1] -
660:15
**portfolio** [5] -
694:5,
697:25,
698:10,
734:17,
748:20
**portion** [17] -
621:12,
621:20,
621:25,
622:2,
622:25,
623:8,
623:11,
623:22,
623:23,
626:24,
634:4, 634:5,
660:13,
660:14,
697:25,
741:10
**portions** [1] -
617:4

**posed** [1] -
649:14
**position** [4] -
630:9,
645:12,
713:8, 765:25
**positive** [1] -
576:9
**possession** [3]
- 708:14,
746:24,
770:25
**possible** [7] -
594:5,
596:23,
632:18,
632:19,
641:24,
659:6, 721:14
**possibly** [5] -
577:10,
581:5, 594:3,
622:19,
645:12
**post** [1] -
641:13
**Post** [2] -
580:11, 581:1
**posted** [1] -
597:1
**pot** [1] -
715:11
**potential** [4] -
583:18,
604:14,
663:5, 755:17
**potentially** [2]
- 685:5,
720:6
**power** [10] -
680:22,
704:12,
704:13,
704:20,
711:15,
712:1, 745:1,
745:3, 745:9,
745:14

**PR** [1] -
575:25
**practice** [2] -
574:22,
709:22
**preceded** [1]
- 637:16
**preceding** [1]
- 774:25
**prejudice** [4]
- 641:16,
641:17,
643:21, 644:6
**prepared** [6] -
600:12,
650:17,
650:19,
656:1, 673:8,
678:14
**prepped** [1] -
646:18
**presence** [1] -
649:12
**present** [11] -
574:18,
600:19,
600:22,
602:8, 606:4,
680:13,
680:15,
680:17,
681:2,
690:18, 732:4
**presented** [3]
- 591:16,
617:22,
702:15
**presenting** [1]
- 702:22
**preserving** [1]
- 587:13
**presigned** [1]
- 681:1
**press** [1] -
617:15
**pretty** [9] -
582:15,
607:9, 637:7,

673:20,
692:21,
692:24,
710:13,
712:8, 712:9
**previous** [2] -
638:16,
677:19
**previously** [3]
- 575:11,
688:5, 766:3
**price** [3] -
672:10,
678:22, 696:8
**primarily** [1] -
598:7
**print** [1] -
637:17
**printed** [2] -
637:21, 638:1
**printer** [3] -
637:11,
637:21, 638:1
**printout** [1] -
679:17
**private** [1] -
659:10
**privately** [1] -
759:4
**privately-held**
[1] - 759:4
**privileged** [2]
- 775:1,
775:10
**Privitello** [1] -
604:5
**probative** [3]
- 617:23,
618:12,
618:16
**problem** [3] -
614:7, 614:9,
645:23
**problems** [1]
- 589:2
**proceeding** [1]
- 651:16
**Proceedings**

[1] - 573:25
**proceedings**
[13] -
576:12,
576:16,
578:4, 584:8,
593:6,
597:12,
610:25,
628:5, 669:4,
720:21,
724:12,
724:15,
735:25
**proceeds** [1] -
631:6
**process** [1] -
775:7
**produced** [2]
- 573:25,
614:8
**professional**
[1] - 696:17
**profit** [1] -
755:17
**progress** [3] -
595:14,
596:4, 596:5
**prohibit** [1] -
754:4
**prohibiting** [1]
- 652:9
**project** [31] -
611:6, 611:9,
611:15,
611:23,
611:25,
612:2,
627:15,
627:24,
635:10,
635:11,
635:23,
636:1, 696:3,
696:23,
699:5,
699:17,
699:20,

702:3, 733:6, 733:7, 733:8, 733:11, 734:9, 734:10, 743:13, 748:24, 751:9, 757:16, 757:23, 758:1, 764:18

**Project** [2] - 757:13, 757:22

**promising** [2] - 636:19, 695:25

**proof** [5] - 617:21, 618:25, 672:24, 674:7, 751:7

**proper** [5] - 581:19, 711:18, 711:20, 711:23, 712:5

**properly** [1] - 614:7

**Properties** [3] - 672:13, 675:16, 680:6

**property** [11] - 612:11, 612:14, 612:17, 667:1, 671:13, 675:18, 678:17, 679:2, 679:3, 679:19, 739:2

**propose** [2] - 695:22, 714:14

**proposed** [5] - 685:9, 694:22,

695:20, 698:18, 756:7

**proposing** [1] - 759:8

**proposition** [1] - 617:25

**prosecution** [1] - 628:10

**protect** [1] - 711:24

**protected** [1] - 727:24

**protective** [1] - 711:13

**protocol** [1] - 763:9

**prove** [2] - 585:13, 711:22

**proved** [1] - 645:15

**provide** [11] - 587:1, 589:21, 592:14, 598:14, 682:11, 688:6, 746:1, 746:24, 747:2, 747:8, 755:22

**provided** [9] - 589:20, 601:13, 670:4, 670:6, 670:15, 673:6, 750:4, 767:25, 772:2

**providing** [2] - 585:6, 590:12

**PST** [3] - 594:21, 595:14, 596:3

**public** [2] - 668:20, 670:13

**publicity** [4] -

576:3, 576:20, 578:25, 579:11

**publicly** [4] - 580:13, 583:23, 609:23, 759:5

**publicly-held** [1] - 759:5

**published** [2] - 580:11, 581:1

**pull** [1] - 689:22

**punch** [1] - 617:11

**purchase** [13] - 610:9, 638:24, 667:11, 668:13, 671:13, 672:10, 678:17, 678:21, 678:22, 696:8, 725:18, 725:22

**purchased** [1] - 700:1

**purchaser** [2] - 667:7, 682:17

**purchaser's** [2] - 665:16, 682:11

**purchasers** [1] - 668:12

**purpose** [10] - 576:4, 617:25, 631:10, 636:9, 668:10, 668:14, 678:15,

717:11, 717:13, 723:17

**purposes** [4] - 585:7, 634:7, 643:5, 726:3

**pursuant** [1] - 670:12

**pursue** [3] - 591:5, 619:9, 658:24

**put** [22] - 574:15, 585:14, 612:8, 617:16, 621:19, 637:19, 645:12, 670:19, 693:10, 694:14, 695:23, 696:10, 697:13, 697:14, 698:22, 699:14, 715:10, 717:18, 729:21, 729:22, 730:16, 749:10

**putting** [3] - 642:13, 697:1, 723:3

---

## Q

**quality** [1] - 637:16

**Queens** [1] - 664:13

**questioned** [1] - 633:18

**questioning** [6] - 649:7, 649:11,

649:19, 655:20, 685:6, 712:22

**quick** [3] - 686:8, 732:10, 757:11

**quickly** [8] - 594:14, 623:1, 648:24, 698:12, 717:22, 718:1, 718:4, 732:2

**quiet** [1] - 630:22

**quite** [6] - 610:19, 632:18, 632:19, 694:17, 694:20, 765:13

---

## R

**race** [2] - 725:5, 725:8

**racing** [1] - 725:13

**raise** [1] - 735:22

**raised** [1] - 641:7

**raising** [1] - 703:1

**rate** [4] - 736:1, 736:3, 736:4, 736:11

**rather** [2] - 641:22, 715:8

**reach** [1] - 598:9

**reachable** [1] - 694:18

**reached** [3] - 583:16, 617:3, 629:9

**reaching** [1] - 610:16

**reacquired** [1] - 586:23

**reads** [2] - 596:2, 655:6

**ready** [2] - 686:2, 703:20

**real** [18] - 633:21, 664:11, 664:19, 664:21, 664:23, 664:25, 665:1, 665:12, 678:24, 683:4, 683:6, 686:17, 695:7, 696:2, 696:6, 755:6, 755:9, 755:12

**realize** [1] - 774:9

**realizing** [1] - 709:24

**reason** [12] - 607:16, 620:9, 632:19, 633:8, 642:10, 649:16, 682:18, 714:2, 714:12, 753:18, 762:4

**reasonable** [4] - 755:10, 755:14, 755:16, 756:9

**reasons** [1] - 719:15

**reassured** [1] - 698:24

**reassuring** [1] - 699:3

**receipt** [2] - 706:9, 753:8

**receive** [12] - 668:11, 673:13, 707:24, 708:3, 708:6, 708:8, 708:11, 709:4, 709:9, 736:6, 753:11, 769:19

**received** [30] - 576:19, 579:17, 584:20, 589:12, 593:23, 594:7, 600:2, 600:21, 621:19, 626:12, 628:16, 632:25, 638:23, 653:1, 653:2, 653:10, 674:20, 681:6, 681:17, 708:10, 709:6, 712:2, 742:19, 742:24, 743:2, 747:20, 748:23, 754:5, 765:8, 770:7

**receiving** [14] - 592:1, 594:4, 622:14, 622:18, 622:21, 623:4, 623:16,

631:12, 668:14, 688:4, 688:8, 710:10, 754:9, 758:2

**recently** [1] - 586:18

**recess** [6] - 616:8, 617:1, 628:5, 685:18, 731:18, 731:19

**recessed** [1] - 776:21

**recognize** [23] - 576:19, 577:6, 577:8, 579:3, 584:10, 593:8, 593:20, 593:23, 604:8, 604:10, 625:7, 647:3, 666:7, 666:10, 671:7, 672:18, 672:20, 690:23, 691:1, 720:22, 728:7, 732:13, 768:18

**recognizes** [1] - 686:21

**recollection** [31] - 583:24, 584:1, 584:15, 592:10, 597:5, 601:16, 609:18,

617:6, 617:7, 622:14, 623:3, 623:13, 623:16, 623:25, 624:10, 625:9, 627:20, 628:20, 632:15, 634:21, 642:8, 642:12, 643:14, 644:20, 645:1, 656:21, 657:11, 658:19, 658:21, 663:12, 747:18

**recommendation** [1] - 756:4

**recommended** [1] - 755:8

**recommending** [1] - 755:20

**reconvene** [2] - 616:5, 683:25

**record** [24] - 578:12, 583:8, 637:8, 637:25, 647:2, 655:6, 666:12, 668:21, 670:13, 675:21, 677:15, 678:19, 688:11, 689:18, 691:3, 706:17,

707:3, 708:14, 728:15, 730:8, 738:5, 749:9, 762:9, 771:25

**recorded** [15] - 573:25, 671:10, 672:1, 682:5, 727:17, 728:15, 728:17, 730:14, 732:23, 762:6, 763:2, 763:8, 764:4, 764:22, 764:24

**recorder** [1] - 763:12

**recording** [5] - 671:25, 733:2, 761:12, 763:4, 763:5

**recordings** [2] - 732:9, 764:13

**records** [7] - 614:6, 614:7, 614:17, 623:19, 735:11, 748:16, 776:10

**recoup** [1] - 590:20

**recover** [3] - 574:13, 591:6, 597:24

**recovery** [2] - 605:10, 605:11

**RECROSS** [4] - 647:23, 655:18, 777:7, 777:9

**RECROSS-EXAMINATION** [4] - 647:23, 655:18, 777:7, 777:9

**recrosses** [2] - 684:8, 685:13

**recurrent** [1] - 687:9

**red** [1] - 727:21

**redirect** [14] - 615:1, 619:9, 619:11, 626:6, 648:1, 656:8, 658:4, 660:4, 683:19, 684:6, 685:13, 686:23

**REDIRECT** [5] - 626:8, 643:1, 662:23, 777:5, 777:11

**redirects** [2] - 684:7, 684:16

**refer** [1] - 575:24

**reference** [15] - 580:19, 593:16, 628:2, 653:12, 680:5, 685:4, 730:22, 744:4, 746:20, 746:25, 747:17, 765:10, 766:24, 769:1, 769:9

**referenced** [4] - 577:16, 577:20,

618:7, 650:4

**references** [1] - 723:25

**referencing** [5] - 577:12, 587:8, 587:16, 593:25, 753:22

**referring** [11] - 578:13, 581:3, 591:11, 637:20, 643:7, 671:12, 696:14, 710:8, 716:24, 733:7, 770:10

**refers** [2] - 749:1, 770:5

**reflect** [6] - 666:12, 707:25, 720:12, 729:7, 769:5, 769:6

**reflecting** [1] - 707:25

**reflects** [2] - 625:22, 653:12

**refresh** [13] - 601:16, 617:6, 617:7, 632:14, 642:8, 642:12, 643:14, 644:20, 656:21, 657:10, 658:21, 663:11, 747:18

**refreshes** [2] - 625:9,

644:25

**refurbished** [1] - 586:23

**regard** [3] - 613:7, 662:9, 662:10

**regarding** [36] - 576:9, 576:20, 578:18, 578:24, 579:11, 579:13, 589:15, 592:22, 604:14, 607:9, 614:6, 617:13, 619:3, 624:19, 628:10, 643:16, 644:12, 647:10, 652:24, 656:3, 656:23, 657:2, 659:11, 659:25, 662:15, 663:1, 685:8, 746:21, 748:24, 749:16, 755:1, 756:3, 767:13, 771:16, 772:8

**regardless** [2] - 588:6, 590:4

**regards** [7] - 579:14, 579:15, 582:12, 584:17, 599:17, 607:18,

748:19

**regular** [4] - 769:14, 769:23, 770:1, 770:4

**rehash** [1] - 624:18

**reinforce** [1] - 601:6

**rejected** [2] - 583:22, 641:21

**related** [9] - 582:2, 588:3, 617:12, 617:15, 618:10, 620:24, 659:25, 745:15, 772:14

**relates** [13] - 641:6, 648:22, 651:2, 651:15, 652:10, 653:8, 688:3, 714:22, 742:12, 743:23, 760:2, 765:15, 773:1

**relating** [4] - 650:7, 665:14, 736:9, 749:12

**relationship** [9] - 620:23, 622:17, 624:8, 625:18, 625:19, 660:18, 712:8, 744:22, 753:6

**relative** [1] - 593:24

**relatively** [1] - 709:15

**release** [1] - 650:7

**released** [1] - 700:14

**relevance** [2] - 630:12, 688:16

**relevant** [4] - 585:5, 618:5, 626:1, 634:6

**reluctant** [1] - 699:9

**Rem** [3] - 579:23, 579:25, 580:2

**Rem's** [1] - 580:24

**remain standing** [1] - 689:10

**remarks** [1] - 686:21

**remedy** [1] - 591:6

**remember** [56] - 576:7, 577:9, 579:12, 581:16, 582:13, 583:18, 590:21, 592:24, 593:12, 596:16, 597:8, 599:5, 599:9, 601:10, 601:21, 603:18, 604:12, 605:8, 606:14, 606:17, 608:11, 608:20,

612:4,
612:12,
614:20,
622:17,
634:15,
641:17,
645:11,
646:21,
650:8,
655:23,
657:19,
660:21,
661:4,
680:10,
691:20,
695:2,
695:13,
697:17,
700:22,
709:14,
712:21,
720:24,
721:15,
728:16,
733:25,
734:1,
744:11,
745:23,
750:17,
751:5,
753:16,
763:19,
764:6, 767:24
**remind** [5] -
575:6,
688:22,
727:7,
734:14,
739:13
**remove** [2] -
606:19,
745:14
**rent** [2] -
724:20,
724:25
**repeat** [3] -
583:7,
681:13,

770:20
**rephrase** [2] -
704:21,
759:17
**report** [2] -
634:13,
744:24
**reported** [1] -
740:3
**Reporter** [1] -
573:22
**reporting** [2]
- 589:5,
589:15
**repossessed**
[1] - 612:3
**represent** [11]
- 625:23,
633:2,
661:10,
664:22,
665:5, 665:7,
665:9, 667:5,
682:12,
686:15,
742:10
**representation**
[2] - 585:8,
630:5
**representation
s** [2] -
585:12,
772:14
**representative**
[1] - 747:16
**represented**
[3] - 632:15,
651:15,
708:18
**representing**
[8] - 625:11,
625:15,
672:21,
683:9, 775:1,
775:3, 775:4,
775:9
**represents** [2]
- 630:24,

651:21
**request** [18] -
619:3,
645:25,
648:19,
672:21,
682:16,
682:19,
683:3,
683:10,
704:1, 704:5,
720:11,
722:6,
722:13,
722:16,
722:17,
741:6,
745:18, 746:1
**requested** [4]
- 646:7,
722:20,
750:18,
770:13
**requesting** [1]
- 773:9
**require** [1] -
776:14
**required** [1] -
645:13
**residence** [1]
- 664:23
**resolution** [3]
- 658:24,
659:6
**resolve** [1] -
659:7
**resolved** [2] -
586:18,
678:20
**resolving** [1]
- 584:3
**respect** [10] -
586:24,
631:18,
632:23,
633:9, 639:5,
653:22,
743:4, 746:2,

757:13,
771:25
**respective** [1]
- 591:19
**respond** [7] -
596:21,
598:13,
617:17,
617:22,
654:12,
753:13,
776:16
**responding** [3]
- 592:11,
592:13,
712:16
**responds** [1] -
733:4
**response** [12]
- 580:10,
580:11,
580:21,
581:1, 581:5,
581:7, 581:8,
596:11,
656:7, 737:4,
746:6, 767:17
**responsibility**
[1] - 591:4
**responsible**
[2] - 590:16,
632:9
**rest** [5] -
589:4,
614:14,
670:17,
686:5, 775:21
**result** [5] -
583:12,
589:2,
636:16,
636:21,
745:18
**resume** [1] -
685:17
**resumes** [1] -
731:23
**retain** [1] -

763:2
**retained** [1] -
665:25
**retire** [1] -
692:16
**retired** [1] -
771:19
**retirement** [1]
- 699:13
**return** [5] -
648:14,
755:22,
758:2, 761:6,
766:2
**returned** [3] -
648:14,
671:25,
753:25
**returning** [1]
- 774:3
**review** [7] -
575:23,
584:7, 616:3,
665:18,
667:6,
668:25,
705:14
**reviewed** [2]
- 597:10,
729:3
**reviewing** [1]
- 680:18
**RICHARD** [1]
- 573:17
**Richard's** [1]
- 642:3
**Richards** [30]
- 582:21,
600:12,
602:18,
627:3, 641:5,
641:14,
645:6,
645:11,
646:3,
646:12,
646:18,
648:12,

649:8,
649:12,
649:22,
651:6,
651:15,
651:21,
657:2,
657:11,
657:16,
658:22,
663:3,
663:12,
739:19,
740:1,
740:18,
740:20, 741:3
**richards** [2] -
600:7, 659:9
**Richards'** [5]
- 600:18,
716:15,
723:1, 723:4,
723:7
**Rick** [1] -
742:10
**ride** [2] -
608:21, 655:2
**rights** [1] -
677:3
**ring** [1] -
696:3
**rise** [6] -
574:1,
574:17,
621:5, 689:3,
731:20, 732:3
**Rizzi** [1] -
604:11
**Road** [1] -
573:21
**Robert** [1] -
604:11
**ROBERT** [1] -
573:20
**role** [5] -
664:25,
667:8, 692:5,
692:12,

759:20
**Ron** [9] -
582:21,
600:18,
602:18,
651:21,
651:25,
723:4, 723:7,
740:20, 741:2
**Ronald** [8] -
641:4, 649:8,
651:6,
651:15,
716:15,
723:1,
739:18,
739:25
**room** [6] -
600:16,
600:17,
648:10,
648:15,
649:13, 773:4
**Ross** [2] -
723:14,
723:21
**rounding** [1] -
596:25
**RPI** [1] -
691:10
**ruining** [1] -
720:6
**ruled** [1] -
659:24
**rules** [1] -
670:12
**ruling** [2] -
684:22,
771:24
**run** [1] -
641:15
**rundown** [1] -
714:9
**running** [1] -
627:18
**Russo** [15] -
575:5,
618:24,

620:14,
620:22,
621:8,
621:22,
627:13,
628:17,
632:24,
633:6,
634:10,
634:12,
639:11,
639:20, 641:7
**Russo's** [1] -
636:7

## S

**safe** [6] -
710:22,
711:4, 711:6,
715:17,
716:18
**safer** [2] -
698:11,
698:14
**safety** [7] -
698:14,
698:17,
698:19,
698:23,
710:3, 734:16
**Sag** [7] -
671:13,
678:22,
679:5,
679:18,
700:4, 700:5,
739:2
**sake** [1] -
598:6
**sales** [1] -
630:15
**salesman** [1]
- 624:6
**San** [4] -
635:18,
636:1,
636:20,
636:23

**SARITHA** [1] -
573:16
**sat** [1] -
684:10
**satisfied** [3] -
614:17,
624:25, 729:6
**Saturday** [1] -
598:11
**save** [6] -
593:1,
692:10,
693:4, 694:13
**saved** [2] -
698:2, 763:7
**saver** [3] -
692:20, 698:5
**saving** [2] -
693:21,
693:23
**savings** [1] -
693:7
**scanning** [1] -
709:24
**scared** [1] -
711:14
**scary** [3] -
712:25,
713:2, 713:8
**schedule** [3] -
596:24,
657:15,
685:15
**scheduled** [3]
- 594:20,
595:13, 596:3
**school** [1] -
691:17
**scope** [1] -
612:18
**screen** [4] -
637:19,
667:24,
671:7, 706:12
**screwed** [1] -
693:19
**season** [1] -
645:14

**seated** [9] -
574:2,
574:19,
621:7, 684:4,
689:5,
689:21,
731:21,
732:5, 771:21
**second** [14] -
582:6,
587:20,
597:11,
634:19,
640:8,
656:25,
671:21,
676:2, 676:7,
702:4, 702:6,
702:8,
703:23, 769:9
**secondarily**
[1] - 726:24
**secretly** [5] -
609:20,
610:8, 730:8,
761:12,
764:24
**section** [4] -
667:22,
675:15,
676:22,
676:25
**secure** [1] -
699:12
**securing** [2] -
587:13,
734:14
**security** [1] -
698:13
**seeing** [3] -
634:22,
736:11, 752:5
**seeking** [1] -
605:14
**seem** [2] -
759:24,
768:22
**seized** [1] -

744:6
**selection** [3] -
771:12,
772:22,
774:10
**seller** [6] -
665:5,
672:12,
672:13,
680:10,
682:17
**seller's** [3] -
680:9,
680:10,
682:11
**sellers** [1] -
664:22
**selling** [1] -
608:4
**send** [10] -
584:16,
591:22,
665:6, 753:7,
753:18,
769:13,
769:23,
770:1, 770:3,
771:3
**sending** [3] -
592:13,
660:20, 662:6
**senior** [1] -
650:23
**sense** [7] -
614:9,
648:20,
693:4,
712:19,
716:17,
719:17, 756:1
**sensitive** [1] -
675:18
**sent** [10] -
579:5,
660:24,
708:17,
716:8,
718:13,

722:19,
753:1,
765:15,
770:14,
770:23
**sentence** [4] -
635:1,
675:14,
677:1, 721:1
**separate** [4] -
576:14,
631:7, 633:5,
688:6
**separately** [2]
- 621:17,
670:14
**September** [1]
- 767:22
**series** [9] -
622:5,
624:16,
626:13,
628:18,
628:19,
633:20,
633:24,
638:22,
639:21
**serve** [1] -
665:11
**served** [1] -
599:20
**set** [6] -
635:4,
733:13,
733:23,
734:4,
763:13,
763:14
**sets** [1] -
681:25
**Settlement**
[39] -
581:14,
581:19,
584:2, 588:2,
589:11,
592:17,

592:21,
592:22,
593:10,
595:16,
595:23,
607:9,
618:11,
630:21,
633:15,
641:5,
641:19,
714:15,
714:19,
717:12,
718:10,
720:13,
720:17,
722:9,
722:23,
723:2, 723:4,
723:20,
724:4,
724:18,
724:24,
725:4, 725:8,
725:12,
726:6,
726:12,
726:18,
727:14, 765:6
**settlement**
[26] -
575:22,
576:4, 576:8,
583:5,
583:12,
583:16,
583:19,
583:22,
584:17,
586:19,
587:12,
587:17,
591:17,
593:14,
593:25,
635:5,
636:17,

643:25,
652:5,
652:15,
652:25,
653:13,
659:6,
739:10,
739:14, 765:9
**sever** [1] -
711:21
**several** [10] -
577:9,
581:16,
586:20,
597:15,
603:20,
654:2,
701:25,
728:18,
730:15,
742:14
**shall** [2] -
675:18,
677:21
**share** [4] -
591:19,
639:12,
708:8, 717:20
**shareholder**
[2] - 708:12,
708:15
**shareholders**
[3] - 608:17,
608:20,
610:11
**shares** [4] -
592:3, 608:4,
611:17,
611:21
**sheet** [2] -
635:3, 637:21
**Shimon** [2] -
663:25, 668:5
**SHIMON** [2] -
664:3, 777:14
**shirt** [1] -
691:5
**shitload** [1] -

655:10
**shock** [1] -
710:14
**shocking** [1] -
711:3
**short** [4] -
685:14,
686:10,
714:16, 731:9
**showed** [2] -
617:21, 660:4
**showing** [9] -
585:7,
628:24,
632:14,
642:9,
661:12,
662:9,
674:12,
717:24,
734:23
**shown** [6] -
628:18,
634:9,
634:12,
662:25,
663:7, 704:3
**shut** [1] -
633:23
**SI** [2] -
647:1, 647:3
**sic** [2] -
674:10, 677:4
**Side** [1] -
695:16
**side** [2] -
581:9, 735:8
**sidebars** [1] -
686:25
**sides** [1] -
686:24
**sign** [9] -
591:19,
591:22,
650:7, 704:9,
704:11,
704:12,
704:14,

704:17, 709:20

**Signatory** [1] - 678:19

**signature** [22] - 625:6, 625:22, 637:13, 637:15, 638:3, 638:6, 638:7, 638:15, 649:25, 660:6, 660:7, 660:8, 660:19, 660:20, 661:16, 661:20, 661:25, 662:6, 678:9, 678:11, 684:14

**signed** [12] - 638:12, 650:18, 661:19, 661:25, 673:2, 673:9, 673:10, 695:10, 701:21, 704:10, 704:23, 709:2

**signer** [1] - 678:17

**significance** [1] - 698:3

**significant** [4] - 592:9, 597:23, 755:17, 764:13

**significantly** [1] - 638:5

**signify** [2] - 672:4, 672:9

**signing** [3] -

650:8, 660:19, 704:20

**similar** [2] - 592:1, 764:14

**similarity** [1] - 759:25

**similarly** [1] - 596:2

**simply** [6] - 591:9, 641:20, 648:19, 688:6, 751:10, 753:19

**simultaneously** [1] - 627:23

**sincerely** [1] - 638:12

**single** [1] - 631:4

**sister** [1] - 774:13

**situation** [5] - 709:12, 710:23, 727:21, 773:22, 774:15

**situations** [1] - 756:24

**sixth** [1] - 661:20

**slip** [1] - 686:8

**slowly** [1] - 628:10

**small** [2] - 589:3, 740:7

**social** [1] - 579:15

**sold** [2] - 716:12, 719:19

**sole** [1] - 633:14

**solely** [2] -

631:9, 757:25

**solution** [6] - 587:1, 587:23, 591:2, 591:9, 714:13, 714:14

**solutions** [3] - 588:5, 591:15, 592:8

**solving** [1] - 588:3

**someone** [6] - 687:4, 712:23, 725:22, 734:6, 752:8, 776:17

**sometimes** [5] - 664:25, 665:5, 665:7, 665:11, 680:25

**somewhat** [1] - 648:18

**somewhere** [2] - 609:19, 750:23

**Sonenglick** [9] - 635:8, 635:17, 635:24, 638:6, 638:18, 646:21, 647:3, 660:8, 662:10

**sort** [9] - 692:7, 703:19, 705:20, 708:18, 734:22, 748:9, 748:21, 750:7, 750:8

**sorted** [1] - 591:10

**sorts** [1] - 710:19

**sought** [1] - 609:23

**sound** [2] - 574:11, 641:10

**source** [5] - 615:2, 622:20, 760:17, 766:1, 772:9

**sources** [1] - 760:18

**sources/media** [2] - 580:12, 581:2

**Southern** [5] - 599:18, 600:2, 648:3, 649:1, 651:13

**speakerphone** [1] - 763:14

**speaking** [4] - 658:15, 695:21, 713:23, 753:21

**specific** [10] - 584:1, 602:6, 612:13, 649:3, 649:23, 676:17, 696:19, 736:2, 738:19, 750:16

**specifically** [10] - 592:10, 626:24, 627:1, 645:6, 649:4, 681:24, 744:7, 746:14, 753:16,

764:25

**specify** [1] - 715:20

**spell** [1] - 689:17

**spent** [6] - 644:1, 644:2, 644:3, 644:6, 715:5, 738:7

**spread** [1] - 695:6

**spreadsheet** [5] - 652:20, 652:24, 653:11, 708:18, 708:20

**squarely** [1] - 617:16

**stack** [1] - 750:5

**Stage** [2] - 691:13, 691:18

**stand** [7] - 574:23, 684:9, 686:23, 689:10, 731:23, 770:12, 770:22

**standard** [1] - 590:7

**standards** [1] - 586:24

**start** [10] - 684:17, 693:6, 693:23, 694:13, 695:4, 695:19, 717:17, 754:17, 761:23, 761:24

**started** [13] -

693:21,
693:24,
695:17,
701:22,
702:11,
702:12,
710:16,
710:18,
714:3, 743:6,
750:14,
754:17,
761:21
**starters** [1] -
711:12
**starting** [4] -
649:25,
695:25,
726:19, 771:6
**starts** [1] -
596:11
**state** [5] -
585:4,
679:19,
689:17,
752:6, 772:14
**State** [2] -
674:10,
755:13
**statements** [4]
- 614:12,
740:19,
747:24,
748:20
**STATES** [3] -
573:1, 573:3,
573:12
**states** [1] -
596:19
**States** [3] -
573:6,
573:14,
573:16
**status** [8] -
592:22,
646:9,
655:21,
656:3, 656:5,
656:23,

657:2, 657:6
**stay** [5] -
592:17,
593:1, 656:1,
687:2, 731:14
**Ste** [1] -
573:18
**steady** [1] -
694:8
**stenography**
[1] - 573:25
**step** [5] -
663:19,
683:21,
731:15,
745:6, 771:21
**steps** [7] -
594:22,
597:24,
598:4, 743:2,
744:21,
765:25,
766:11
**Stevenson** [1]
- 600:5
**stipulation** [6]
- 614:8,
614:10,
614:11,
614:13,
614:18,
621:10
**stipulations**
[1] - 614:5
**stock** [5] -
608:4,
630:15,
698:1,
698:15, 708:6
**stocks** [5] -
694:3,
694:24,
695:24,
698:8, 755:24
**Stolber** [2] -
624:20, 625:9
**stolen** [4] -
746:9,

746:13,
746:16,
747:10
**Stolper** [6] -
603:6, 603:9,
603:10,
603:11,
605:1, 661:9
**stood** [1] -
710:12
**stopped** [10] -
711:15,
730:9, 733:1,
733:20,
734:20,
738:2,
738:11,
738:16,
739:7, 763:5
**storage** [1] -
590:17
**stories** [2] -
712:25,
747:12
**story** [3] -
695:2,
715:18, 734:1
**strategy** [3] -
591:16,
597:24, 755:2
**Street** [3] -
691:13,
691:18,
695:16
**stressed** [1] -
699:21
**stretches** [1]
- 712:15
**stricken** [2] -
634:4, 634:6
**strictly** [2] -
633:13,
675:19
**strike** [2] -
755:9, 755:13
**string** [1] -
713:7
**strip** [1] -

610:10
**strong** [1] -
693:4
**struck** [1] -
755:16
**stuck** [1] -
700:21
**stuff** [7] -
587:15,
655:8, 692:9,
699:21,
711:18,
711:22,
764:14
**subject** [7] -
579:23,
592:17,
596:19,
599:15,
601:24,
601:25,
617:10
**submit** [1] -
617:20
**submitted** [1]
- 704:2
**subpoena** [2]
- 599:21,
776:12
**subpoenas** [2]
- 600:2,
600:21
**subsequent**
[2] - 598:15,
675:17
**substance** [5]
- 635:20,
636:4, 654:5,
753:13, 762:5
**sudden** [1] -
693:3
**sue** [5] -
641:8, 641:9,
715:2,
716:16,
739:15
**sued** [3] -
603:2, 603:4,

641:11
**sufficient** [1]
- 693:18
**Suffolk** [1] -
664:16
**suggest** [3] -
631:17,
760:21, 761:2
**suggested** [4]
- 651:21,
755:12,
756:7, 758:9
**suggesting** [1]
- 726:24
**suggestion** [3]
- 685:3,
685:6, 773:10
**suing** [1] -
746:17
**suit** [18] -
583:2,
604:15,
604:17,
604:20,
605:10,
606:8,
606:22,
607:1, 607:2,
607:4,
607:12,
607:14,
607:18,
607:24,
657:17,
661:10
**suits** [1] -
582:2
**sum** [2] -
635:19, 636:4
**summarize** [2]
- 623:1,
623:11
**Sunday** [2] -
594:20,
598:11
**supplemental**
[1] - 685:8
**supplied** [1] -

772:5
**supply** [1] - 743:11
**supplying** [1] - 743:8
**support** [2] - 592:7, 598:18
**supporting** [1] - 693:14
**suppose** [3] - 637:12, 652:7, 661:1
**surmised** [1] - 649:19
**sustaining** [1] - 660:1
**switch** [1] - 659:13
**switches** [1] - 695:15
**sworn** [2] - 575:12, 689:15
**sworn/ affirmed** [1] - 664:5
**Sydor** [1] - 600:5

**T**

**takeover** [6] - 605:25, 606:4, 606:8, 606:19, 607:20, 609:16
**talks** [1] - 677:19
**tangential** [1] - 684:17
**tangibly** [1] - 636:21
**tape** [8] - 728:1, 730:14, 731:5, 733:20, 734:20,

761:20, 763:11, 763:24
**Tape** [5] - 732:25, 733:1, 733:19, 734:19, 737:10
**taped** [2] - 728:15, 729:23
**tapes** [1] - 731:7
**tax** [1] - 708:11
**taxes** [2] - 693:14, 708:11
**TC** [3] - 617:12, 635:5, 635:8
**TC&A** [1] - 647:5
**team** [6] - 587:25, 720:2, 720:8, 757:1, 757:2, 757:9
**teammates** [1] - 757:12
**technology** [5] - 701:13, 701:17, 702:13, 764:10
**telephone** [12] - 600:12, 600:24, 608:8, 653:24, 729:25, 751:25, 752:3, 752:5, 752:21, 767:9, 769:5
**tentatively** [1] - 583:16

**Tequila** [1] - 726:18
**term** [4] - 635:3, 637:21, 695:11, 702:20
**terms** [15] - 574:24, 575:1, 635:4, 637:16, 667:8, 676:15, 685:1, 692:12, 692:13, 692:15, 698:2, 721:19, 759:20, 771:9, 772:22
**testified** [23] - 575:12, 599:17, 618:20, 627:11, 628:12, 629:4, 649:16, 650:10, 652:18, 653:24, 656:5, 658:4, 660:17, 664:5, 689:15, 712:7, 718:25, 721:8, 722:8, 742:12, 742:23, 754:7, 765:5
**testify** [5] - 581:23, 600:2, 617:21, 618:14, 745:25

**testifying** [2] - 648:2, 660:11
**text** [8] - 653:25, 654:5, 654:11, 655:5, 751:18, 752:7, 753:1, 753:8
**texted** [1] - 753:4
**texts** [1] - 712:5
**Thalmann's** [1] - 591:3
**theme** [1] - 627:5
**Theodore** [1] - 604:7
**theory** [3] - 630:14, 695:23, 747:12
**thereafter** [1] - 651:9
**therefore** [3] - 587:23, 588:4, 774:2
**thereof** [1] - 675:18
**thick** [2] - 749:15, 749:16
**thicker** [1] - 753:22
**thinking** [2] - 693:6, 773:13
**third** [3] - 621:15, 628:24, 661:17
**thousand** [5] - 639:6, 639:7, 693:13, 699:18,

750:19
**throughout** [1] - 753:5
**thrown** [1] - 767:6
**tickets** [1] - 774:13
**tie** [1] - 688:11
**ties** [1] - 711:21
**Tim** [1] - 624:3
**time-frame** [1] - 744:3
**timeframe** [1] - 693:6
**timely** [1] - 712:17
**Timothy** [1] - 623:19
**tired** [1] - 645:22
**title** [3] - 674:23, 682:2, 682:5
**today** [18] - 575:1, 584:1, 595:13, 598:13, 628:17, 639:15, 651:7, 654:12, 655:7, 661:2, 665:17, 729:4, 731:3, 748:22, 750:22, 763:20, 767:19, 770:11
**today's** [1] - 747:21
**together** [9] - 588:3, 608:24, 692:11,

696:10,
697:2,
698:22,
729:22, 749:4
**TOMMY** [1] -
573:8
**Tommy** [27] -
573:9, 597:2,
597:15,
606:18,
633:15,
635:4, 638:7,
638:12,
701:11,
705:20,
706:23,
708:16,
708:17,
713:17,
714:6,
714:19,
716:12,
716:23,
721:2,
758:25,
759:9,
759:20,
759:25,
766:1,
766:16,
767:4, 767:12
**Tommy's** [2] -
706:22, 766:8
**tomorrow** [4]
- 596:3,
693:17,
713:5, 771:6
**top** [8] -
667:15,
678:9,
679:17,
705:23,
706:1,
722:12,
735:6, 736:21
**topic** [1] -
627:4
**Tosoriero** [1]

- 677:9
**total** [2] -
611:14,
728:16
**totally** [1] -
618:9
**touched** [2] -
710:3, 721:17
**touching** [1] -
698:22
**toward** [2] -
743:9, 761:17
**town** [2] -
753:23, 774:2
**track** [7] -
575:1,
590:13,
684:9,
686:16,
686:19,
712:18,
771:10
**transaction**
[25] - 634:6,
638:11,
665:14,
665:21,
666:22,
667:4, 667:5,
667:8,
667:11,
668:13,
671:10,
671:11,
672:10,
672:11,
673:2, 679:1,
679:2, 680:6,
734:23,
735:7,
738:20,
742:7,
742:13,
744:24
**transactions**
[10] -
632:12,
664:21,

664:24,
665:1, 665:4,
665:12,
683:5,
735:12,
738:19,
775:10
**TRANSCRIPT**
[1] - 573:8
**transcript** [3]
- 573:25,
648:21, 731:5
**transcripts** [3]
- 729:3,
729:11, 731:1
**transfer** [17] -
680:23,
683:5, 707:2,
707:5, 708:8,
720:11,
722:2, 722:5,
722:13,
722:16,
722:17,
723:23,
741:5,
741:14,
760:10,
764:11
**transferred**
[2] - 623:23,
624:14
**transfers** [4] -
632:15,
632:20,
639:5, 639:7
**travel** [1] -
772:22
**traveling** [1] -
773:6
**Trevor** [1] -
690:10
**TRIAL** [1] -
573:8
**trial** [5] -
630:8,
665:20,
684:7,

684:19,
685:14
**tried** [4] -
708:9, 712:4,
767:15,
767:16
**trimester** [1]
- 774:11
**troubles** [2] -
610:14,
647:10
**true** [14] -
601:18,
602:20,
648:15,
651:10,
681:9, 682:1,
728:22,
739:9,
739:12,
748:17,
754:12,
755:6,
758:11,
760:23
**truly** [1] -
775:4
**trust** [3] -
699:14,
720:1, 745:17
**Trust** [24] -
650:6,
742:19,
742:20,
742:22,
743:3,
744:23,
745:8, 745:9,
745:11,
745:16,
747:9,
747:17,
747:24,
757:19,
757:20,
769:13,
769:16,
769:25,

770:8,
770:13,
770:24,
771:3, 776:9,
776:10
**truth** [1] -
684:23
**truthful** [2] -
602:2, 650:12
**truthfully** [3]
- 626:16,
626:19,
686:15
**try** [14] -
592:25,
596:4,
601:16,
602:4,
609:21,
609:22,
617:6,
618:18,
655:16,
687:1,
731:12,
740:9,
740:11,
772:23
**trying** [19] -
580:18,
581:4, 582:1,
583:7, 593:1,
607:20,
610:8, 617:6,
619:14,
633:24,
686:25,
710:23,
712:5,
712:24,
714:10,
715:6, 732:2,
764:11, 765:3
**Tuesday** [10]
- 773:7,
773:8, 773:9,
773:11,
774:3, 774:5,

774:6, 776:3, 776:4, 776:18

**turn** [5] - 624:22, 625:1, 722:1, 763:16, 763:18

**turned** [2] - 620:11, 633:25

**Turner** [1] - 600:5

**turning** [9] - 621:15, 623:1, 628:16, 674:5, 674:16, 674:22, 675:10, 678:13, 720:10

**turns** [1] - 633:22

**twice** [2] - 702:1, 702:2

**type** [5] - 622:3, 660:13, 702:14, 763:25, 764:17

**typewritten** [2] - 637:8, 637:9

**typical** [1] - 694:4

## U

**ultimately** [4] - 699:6, 699:10, 699:14, 703:22

**Um-hmm** [2] - 704:15, 706:4

**unavailable**

[2] - 773:9, 774:6

**unaware** [1] - 764:24

**unclear** [1] - 660:14

**uncomfortable** [14] - 601:20, 601:23, 601:24, 602:3, 602:5, 602:11, 628:12, 628:15, 648:2, 648:5, 649:13, 649:17, 651:7

**under** [8] - 575:6, 649:17, 668:1, 678:18, 695:22, 758:3, 770:12, 770:22

**underlying** [1] - 675:17

**underneath** [2] - 586:16, 678:11

**understood** [5] - 580:17, 585:16, 685:16, 688:15, 772:17

**unfettered** [1] - 681:21

**unfortunately** [1] - 574:14

**unit** [9] - 629:5, 629:6, 630:7, 633:9, 633:12, 633:13, 633:14,

732:20, 767:5

**UNITED** [3] - 573:1, 573:3, 573:12

**units** [12] - 633:1, 633:4, 633:5, 633:11, 713:20, 721:3, 721:12, 721:21, 721:24, 765:11, 765:15

**unless** [2] - 590:5, 590:15

**upbringing** [1] - 692:19

**update** [3] - 575:2, 608:25, 657:7

**updates** [1] - 584:17

**upfront** [1] - 717:18

**upset** [3] - 633:11, 714:5, 742:23

**USA** [1] - 676:4

**user** [1] - 590:13

**uses** [1] - 636:2

**utilities** [3] - 692:7, 748:8, 748:21

**utilized** [4] - 680:23, 763:12, 765:14, 765:21

**utilizing** [1] - 758:9

## V

**vaguely** [2] -

597:8, 612:12

**valid** [1] - 605:17

**valuable** [1] - 703:8

**value** [7] - 612:17, 612:21, 617:23, 618:12, 618:16, 696:10, 741:12

**various** [6] - 581:17, 588:5, 630:9, 632:12, 716:21, 760:18

**Vegas** [1] - 713:20

**venture** [2] - 635:9, 635:25

**verbal** [1] - 579:15

**version** [4] - 671:19, 673:9, 673:10, 734:2

**versus** [2] - 617:15, 643:11

**vertical** [3] - 697:9, 699:22, 699:23

**Veterans** [1] - 573:18

**via** [2] - 753:12, 753:18

**viable** [1] - 611:25

**victims** [3] - 585:7, 585:15, 772:3

**victory** [1] - 587:25

**view** [4] - 630:3, 694:9, 694:11, 729:6

**Vincent** [1] - 677:9

**visit** [1] - 599:12

**visualize** [1] - 653:17

**vividly** [1] - 712:21

**voice** [3] - 630:17, 689:23, 733:2

**voicemail** [1] - 776:11

**VOIR** [2] - 729:17, 777:23

**voir** [2] - 654:19, 729:15

## W

**waiting** [2] - 596:21, 717:19

**wants** [2] - 620:2, 642:8

**Washington** [3] - 668:7, 668:8, 668:9

**water** [1] - 692:7

**Waterstone** [4] - 631:9, 688:9, 732:16, 732:18

**ways** [1] - 633:7

**wayside** [1] - 641:25

**wearing** [1] - 691:4

**website** [1] - 590:12

**week** [11] -

574:23, 575:3, 684:7, 686:18, 771:11, 773:11, 773:12, 773:14, 773:16, 773:21, 774:16

**weekend** [3] - 771:15, 771:17, 776:8

**weeks** [5] - 575:2, 686:16, 686:19, 712:15, 743:25

**weight** [1] - 718:2

**welcome** [1] - 683:16

**whatsoever** [1] - 736:5

**white** [1] - 691:5

**whole** [8] - 601:4, 626:1, 626:24, 627:5, 659:24, 684:11, 715:14, 719:22

**wife** [1] - 579:7

**willing** [2] - 635:6, 717:18

**win** [1] - 636:16

**wire** [34] - 622:3, 622:8, 623:2, 623:12, 632:15, 632:20, 639:5, 639:6,

665:8, 665:9, 668:14, 704:1, 704:5, 704:9, 706:9, 706:19, 707:12, 707:14, 707:15, 720:11, 722:2, 722:5, 722:17, 722:19, 722:25, 723:8, 723:10, 723:12, 723:23, 740:13, 741:2, 741:6, 741:14

**wired** [3] - 667:10, 719:23, 766:2

**wires** [2] - 668:11, 740:3

**wiring** [1] - 630:24

**wish** [1] - 598:10

**wished** [1] - 610:17

**withdraw** [6] - 641:15, 651:3, 654:20, 676:18, 741:22, 741:23

**withdrawal** [2] - 630:20, 668:1

**withdrawals** [1] - 707:9

**Withdrawals** [1] - 667:23

**withdrawn** [4] - 589:20, 603:13,

733:16, 745:6

**witness'** [1] - 642:8

**wits** [1] - 714:9

**woman** [1] - 775:23

**word** [8] - 581:7, 605:25, 709:23, 718:25, 758:16, 758:21, 758:22, 759:25

**worded** [2] - 759:11, 759:12

**words** [4] - 636:2, 665:11, 749:12, 772:9

**works** [1] - 756:18

**world** [1] - 701:10

**worried** [2] - 771:13, 773:21

**worry** [3] - 710:22, 766:5, 767:5

**worth** [1] - 754:25

**would it be fair to say** [3] - 599:23, 607:12, 609:12

**write** [2] - 589:14, 650:15

**written** [2] - 650:15, 679:3

**wrote** [2] - 744:9, 769:13

## X

**xeroxed** [1] - 660:8

## Y

**yah** [1] - 654:12

**Yah** [1] - 655:7

**yesterday** [14] - 576:2, 581:23, 585:3, 626:13, 627:13, 628:17, 632:24, 634:9, 634:13, 638:22, 651:7, 670:4, 685:2, 731:3

**YORK** [1] - 573:1

**York** [21] - 573:6, 573:15, 573:18, 573:21, 573:23, 599:18, 600:3, 603:10, 648:3, 649:1, 651:13, 664:14, 664:16, 678:22, 679:5, 679:18, 679:20, 690:6, 700:6, 739:2, 754:17

**yourself** [13] - 595:23, 599:10, 612:6, 643:3, 643:12,

644:24, 654:6, 655:5, 746:25, 751:16, 755:1, 763:3, 764:5

**yourselves** [1] - 771:17

## Z

**zero** [2] - 614:9, 678:23

**zones** [1] - 596:25

**zoom** [2] - 671:22, 706:14