4238

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA

                                    CR-13-607


            -against-        :

                                  United States Courthouse
                                  Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

      Defendants.            :
                                  June 18, 2015
- - - - - - - - - - - - - - - X   9:30 a.m.

                TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JOSEPH F. BIANCO
         UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:

For the Government:       KELLY T. CURRIE
                          Acting United States Attorney
                          100 Federal Plaza
                          Central Islip, New York 11722
                          BY:  JAMES MISKIEWICZ, ESQ.
                               SARITHA KOMATIREDDY, ESQ.
                          Assistant United States Attorney




For the Defendants:       HALEY, WEINBLATT & CALCAGNI
                          One Suffolk Square
                          1601 Veterans Memorial Highway
                          Islandia, NY  11749
                          BY: RICHARD HALEY, ESQ.
                          For Mr. Kenner

4239

For the Defendants:

                           LARUSSO & CONWAY
                           300 Old Country Road
                           Mineola, NY  11501
                           BY: ROBERT LARUSSO, ESQ.
                           For Mr. Constantine


                           ANDREW L. OLIVERAS, ESQ.
                           26 Strangford Court
                           Oceanside, NY  11572
                           For Mr. Constantine

Court Reporter:            Mary Ann Steiger
                           100 Federal Plaza
                           Central Islip, New York 11722
                           (631) 712-6101

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

4240

1           THE CLERK:  All rise.

2           THE COURT:  Please be seated.

3           (Case called, appearances noted.)

4           THE COURT:  Are we ready to go?

5           MR. HALEY:  Yes, sir.

6           THE COURT:  Mr. Kenner, you can come up to the

7    witness stand.  We will bring in the jury.

8           THE CLERK:  All rise.

9           (The jury is present.)

10          THE COURT:  Please be seated.

11          Good morning, members of the jury.

12          ALL JURORS:  Good morning.

13          THE COURT:  Welcome back.

14          As you know, when we ended yesterday, Mr. Kenner

15   was on direct examination by Mr. Haley so we will continue

16   from that point.

17          Mr. Kenner, I'll remind you that you're still

18   under oath; do you understand?

19          THE WITNESS:  Yes, sir.

20

21   PHIL ANDREW KENNER,

22          called as a witness, having been previously

23          duly sworn, was examined and testified further

24          as follows:

25

4241

1          THE COURT:  Go ahead, Mr. Haley.

2          MR. HALEY:  Thank you, Judge.

3

4    DIRECT EXAMINATION

5    BY MR. HALEY:

6    Q.   Phil, I believe we concluded yesterday as I was

7    asking you questions concerning Owen Nolan, his testimony

8    and his knowledge of the lines of credit and what was

9    occurring or had occurred in the lines of credit.

10          Is that where we finished?  Do you remember?

11   A.   Yes, sir.

12   Q.   Now, I'm going to ask you to take a look at two

13   documents, 202 and 213.

14          (Exhibit handed.)

15   A.   Yes, sir.

16   Q.   Do you recognize those documents?

17   A.   Yes, I do.

18   Q.   What are they?

19   A.   Kenner Exhibit 202 is a text message I received from

20   Owen Nolan on December 23rd, 2007, about 6:40 in the

21   evening.

22          And Kenner Exhibit 213 is a series of four text

23   messages I received from Owen Nolan, three of them on

24   December 28, which would be five days later, and then the

25   fourth text message was on December 29, 2007, which would

4242

1  have been six days later.

2  Q.    How did you acquire those two documents, sir?

3  A.    They were turned over by the U.S. Government to you

4  in pretrial, and subsequently you turned them over to me

5  for review.

6  Q.    Do those documents accurately depict a text message

7  sent to you by Mr. Nolan on the dates and times indicated?

8  A.    All five of them do, yes.

9          MR. HALEY:  Your Honor, I offer those Kenner

10  Exhibits 212 and 213.

11          MR. MISKIEWICZ:  No objection.

12          MR. LARUSSO:  No objection, your Honor.

13          THE COURT:  212 and 213 are admitted.

14          (Defense Exhibit Kenner 212 and 213 in

15  evidence.)

16  BY MR. HALEY:

17  Q.    Sir, with reference to 202, do you see a text message

18  from Owen Nolan and it reads:

19          What R the papers for?

20          What was your understanding as to the question

21  he was asking you with reference to that e-mail?

22  A.    I had contact Mr. Nolan and told him that we needed

23  to renew the line of credit for Northern Trust for the

24  Hawaiian investment.

25          And I had asked him prior to this where he was

4243

1   so I could send, by Federal Express, the documents that

2   Northern Trust bank wanted to wrap up with all of the line

3   of credit lines before the end of the year if possible.

4   Q.    Did that occur?

5         Did you send those documents via FedEx?

6   A.    Yes, sir.

7   Q.    Is there any documentation in your possession

8   reflecting that Federal Express transfer?

9   A.    Yes, sir.

10  Q.    With reference to Kenner Exhibit 213, we have a

11  series of text messages.

12        And as relates to the first text message bearing

13  the designation 46, would you kindly explain your

14  understanding of the request from Mr. Nolan as set forth

15  in block 46?

16  A.    After our communication on the 23rd, which was the

17  previous exhibit, Mr. Nolan had returned back to his home

18  in Toronto, Canada, where I sent the FedEx at the time,

19  and he was asking me where the package was.

20        Apparently, he hadn't seen it when he returned

21  back to his home yet.

22        He's also referring to the fact that at the end

23  of the year we were wrapping up some tax business where he

24  owed his sports agent, J.P. Barry, $200,000 for his $5

25  million insurance settlement that I was handling the tax

Kenner  -  Direct/Haley

4244

1    work on at the time.

2            He also wanted to know here we were going to get

3    the $200,000 from, as he references where are we gonna get

4    that money since everything is tied up, because he knew

5    his collateral at Northern Trust was pledged at the time,

6    and he had already gone through and spent all of his

7    liquid cash in the previous two years at that point.

8    Q.   As relates to the next block, block 47, what was your

9    understanding of the meaning of that?

10   A.   Block 47 specifically refers to his agent payment to

11   J.P. Barry of the $200,000.

12           It was typical at the end of every calendar year

13   for agents, sports agents, to put pressure on the players

14   to send their final payments so they can get a tax

15   write-off for that business expense.

16   Q.   Going to block 48, when he says, call me, need to

17   discuss this, what is the this, to the best of your

18   understanding?

19   A.   In block 48 that is referencing J.P. Barry.

20           And if you look at the two time stamps, you can

21   see they're actually one minute apart.

22           So it was just a second thought I believe he had

23   after he had sent regarding the business payment to J.P.

24   Barry for 200,000.

25   Q.   Finally, sir, block 49 is a reference to papers.

4245

1    What was your understanding as to what he meant

2  by papers?

3  A.   Block 49 on the 29th, which was the day after we

4  spoke on the phone regarding the block 46 text message, he

5  said, can you call me back, I have a question about

6  papers.

7    He was asking if we could have a follow-up

8  conversation regarding the Northern Trust line of credit

9  papers before he sent them back to Northern Trust via

10  FedEx.

11  Q.   To the best of your memory, those questions posed by

12  him to you, did they get -- was there some response by you

13  in some form or fashion?  And, if so, what form or

14  fashion?

15  A.   After that text message in the afternoon on the 29th,

16  excuse me, the morning of the 29th, Mr. Nolan and I spoke

17  regarding the need to get the paperwork back to Northern

18  Trust.

19    And we also spoke at length about the status of

20  the Hawaii project and the milestone payments we were

21  expecting to receive in short order from Alan Worden and

22  Windwalker, the $4 million we discussed yesterday.

23    And subsequent to the conversation with

24  Mr. Nolan, he utilized my Federal Express account and

25  signed and FedEx'd all the documents back to Northern

4246

1    Trust within 24 hours of that.

2    Q.    Incidentally, do your fed -- do you have Federal

3    Express records that have relevance to that mailing you

4    just referred to?

5    A.    Yes.

6              In fact, it's referenced on my American Express

7    records that most of the line of credit holders at the

8    time it references FedEx charges from me directly to each

9    one of those clients, and then within five or six days it

10   references each of those clients using my Federal Express

11   account to send the paperwork after whatever discussions I

12   had back to Northern Trust bank for each one of them,

13   including Mr. Nolan.

14   Q.    Now, Mr. Kenner, you were present when Glen Murray

15   testified in this proceeding; is that correct?

16   A.    Yes, sir.

17   Q.    As relates to his testimony, sir, do you recall an

18   instance where he was shown by the government his loan

19   transaction history on direct examination of him?

20   A.    Yes, I recall.

21   Q.    And do you have a recollection that when shown his

22   loan transaction history, his response, in substance, was

23   this is the first time I became aware that my line of

24   credit had actually been utilized or closed out.

25             I don't know, I don't want to put words in your

4247

1    mouth or repeat what he said, but do you have a

2    recollection of what he said now?

3    A.   Yes, I do.

4    Q.   What is your recollection of what his testimony was?

5    A.   At first, I believe Mr. Murray stated that in this

6    courtroom, or shortly before his appearance here, was the

7    first time that he had realized that his million dollars

8    of collateral was seized by Northern Trust bank.

9    Q.   Now, I'm going to show you exhibits 101 and 100 that

10   were previously introduced into evidence.

11              (Exhibits handed.)

12              And perhaps you can follow it on the screen.

13              Mr. Kenner, given your background as a business

14   manager for your clients and indeed a financial advisor,

15   and we will talk about your qualifications a little later,

16   but do you have an understanding as to what that document

17   is, sir?

18   A.   Yes, I do.

19   Q.   What is it?

20   A.   This was a monthly account statement for Mr. Murray

21   from Northern Trust bank representing the time period,

22   April 1st, 2009, to April 30, 2009, mailed to his home

23   address in Manhattan Beach, California.

24              This would be representative of a statement that

25   each one of the clients would have received on a monthly

4248

1    basis.

2          In addition, I would receive a copy of these

3    statements as well at my home office.

4    Q.   In or about April of 2009, to the best of your

5    knowledge, where did Mr. Murray reside?

6    A.   In Manhattan Beach, California.

7    Q.   Now, take a look at page 2 of that exhibit.

8          Would you explain to us, sir, the meaning of the

9    highlighted portion as relates to the numbers, not the

10   date.

11   A.   Okay.

12         First, in the bottom right of the statement

13   where the chart is, you could see from March there was a

14   large negative withdrawal in the account which was

15   approximately the million dollars we had previously

16   discussed -- excuse me -- Mr. Murray had discussed while

17   he was on the stand.

18         Referencing the highlighted section under the

19   change column it shows a change of negative $495,000 which

20   was the transfer that Mr. Murray made in the month

21   following the seizure of the million dollars of collateral

22   that he had pledged against his line of credit, leaving a

23   value as of April 30, 2009, of $2.18.

24         In order for the $495,000 to be transferred out

25   of that account, Mr. Murray had to be present during a

4249

1  conference call with not just Aaron Mascarella from

2  Northern Trust bank, but also a representative from Schwab

3  who had discussed the entire transaction with him so he

4  could signoff on it.

5  Q.   Now, I'm going to have you take a look at Kenner

6  Exhibit 101.

7          And what does that document represent, sir?

8  A.   This appears to be the Glen Murray Northern Trust

9  statement for May 1st, 2009, to May 8, 2009, which would

10  have been on or about the day Mr. Murray's account was

11  closed at Northern Trust bank after the final transfer

12  back to Charles Schwab for the remaining underlying

13  securities.

14  Q.   With reference to page 2 of that document, just

15  interpret the meaning of the information on that page,

16  sir, just interpret the meaning of the information.

17  That's all I'm asking you.

18  A.   Under the change column, the $2.18 was the residual

19  balance that was in the account after the $495,000 was

20  transferred back to Charles Schwab with the -- following

21  the conference between Mr. Murray, Aaron Mascarella from

22  Northern Trust bank, and the representative from Charles

23  Schwab.

24          And thus on May 8 it shows a residual balance of

25  zero dollars zeroing out the account and closing it at

4250

1  Northern Trust bank.

2  Q.   Going to page 5 of that document, and particularly

3  the two line items at the end, total disbursement and

4  closing balance, would you kindly interpret those columns

5  and figures for us?

6        Simply interpret what's on the document, sir, to

7  the best of your knowledge.

8  A.   I believe the total disbursement column shows the

9  total amount of funds that had been liquidated out of

10  Mr. Murray's account during the calendar year 2009, and

11  closing balance of zero dollars at the end.

12  Q.   In May of 2009, were you aware of any impediment as

13  relates to any communication either Mr. Murray could have

14  with you or you could have with him?

15  A.   No, sir.

16  Q.   From the point in time that Mr. Murray invested in

17  the Hawaiian real estate project, and we all know what

18  that is, and to whatever point in time the relationship at

19  all between the two of you ceased, would you kindly

20  describe to the jury the level of communication you and he

21  would have?

22  A.   By 2009, I was -- I had been -- I had known Glen

23  Murray for approximately 18 years and our relationship

24  continued up until the day before I was arrested on

25  November 13, 2013.

4251

1           Our communication was very frequent.  I would

2    see Mr. Murray during that period of time anywhere from 6

3    to 10 times a year face-to-face in whatever city he was in

4    at the time, and I would speak to Mr. Murray on the phone

5    no less than two to three times a month during that entire

6    period of time.

7    Q.   How would you describe, sir, during that period of

8    time and up until the point you were arrested, the nature

9    of your relationship with Glen Murray?

10   A.   Very good.

11   Q.   Mr. Kenner, you are familiar, are you not, sir, with

12   the allegations contained in the indictment for which you

13   stand trial; is that true?

14   A.   Yes, sir.

15   Q.   I'm going to show you, sir --

16           THE COURT:  Hold on one second.  Before you put

17   that up, why don't you approach.

18           (Continued on next page.)

19

20

21

22

23

24

25

Kenner  -  Direct/Haley

4252

1              (The following takes place at sidebar.)

2              MS. KOMATIREDDY:  Judge, there's the name issue.

3              MR. HALEY:  I apologize.  I didn't even think of

4      that.  I don't think it focused.

5              MR. MISKIEWICZ:  But it's throughout.

6              MS. KOMATIREDDY:  I can go through and redact a

7      version over lunch or I could step out and do it now.

8              THE COURT:  Can you read from it then without

9      showing it?

10             MR. HALEY:  Yes, I can do that.

11             MS. KOMATIREDDY:  And I'll create a redacted

12     version.

13             MR. HALEY:  It was unintentionally.

14             THE COURT:  All right.

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Kenner  -  Direct/Haley

4253

1      (The following takes place in open court.)

2    BY MR. HALEY:

3    Q.   Mr. Kenner, you testified that you're familiar with

4    the content of the indictment; is that correct?

5    A.   Yes, sir.

6    Q.   I'm going to read, sir, portions of the indictment

7    for purposes of simply an organizational presentation from

8    my standpoint.

9           Are you okay with that?

10   A.   Yes, sir.

11   Q.   It begins, sir, by saying or reading:

12           The defendant, Phill A. Kenner, also known as

13   Phil A. Kenner, meaning one L rather than two Ls, was a

14   financial advisor whose clients included, among other

15   individuals, current and former professional hockey

16   players in the National Hockey League, (NHL) hereinafter

17   the player/clients.

18           Is that allegation in the complaint true, sir?

19   A.   Yes, sir.

20   Q.   And could you give us some idea as to the

21   professional hockey players that you were representing as

22   a financial advisor over any period of time.

23   A.   I started my business practice in sports and

24   entertainment in or about 1992, in Boston, Massachusetts,

25   and it was a concept that had not been started yet

4254

1   anywhere in the sports and entertainment arena.

2            And over the following 10 years, I built,

3   through approximately 2002, 2003, perhaps the largest

4   sports and entertainment business management practice in

5   the world, peaking at about 135 sports and entertainment

6   clients.

7            In 2003, after a dispute with my firm at the

8   time, I filed a lawsuit against them to protect --

9   Q.   Sir, my question was -- I am going to interrupt you,

10  Mr. Kenner.

11           My question was, would you identify the hockey

12  player clients that you represented.  That's really my

13  question.

14  A.   Would you like the ones that are involved in this

15  case?

16  Q.   Yes.

17  A.   I apologize.

18  Q.   Let me be more specific.

19           As relates to the hockey player clients that you

20  have represented, would you identify those that have

21  relevance and materiality to these charges?

22  A.   I apologize again.  I misunderstood the question.

23           I believe so far we've, as witnesses in this

24  case, we've seen Owen Nolan, Joe Juneau, Michael Peca,

25  Bryan Berard, Jay McKee, Steve Rucchin, William Ranford,

4255

1    Tyson Nash, Darryl Sydor.

2           I'm not sure if that's a comprehensive list, but

3    I believe that's most of them.

4    Q.   Now the indictment, as you read, refers to John Does.

5           Are those individuals the John Does we're

6    speaking of in the indictment, to your knowledge?

7    A.   Yes, sir.

8    Q.   Second paragraph reads:

9           That since approximately -- second sentence

10   reads:

11          Since approximately mid-1990s, Kenner advised

12   the player/clients on their financial affairs, managed

13   their accounts at various financial institutions, and

14   recommended various investments to them, including

15   investments in real estate development projects and small

16   privately held companies.

17          Is that sentence in sum and substance true,

18   Mr. Kenner?

19   A.   Yes, sir.

20   Q.   In addition to advising them as relates to their

21   financial affairs, did you also have a business manager

22   relationship with your clients?

23   A.   Yes, each one of them.

24   Q.   Would you just give us a brief recitation of what you

25   did as relates to your role as business manager?

4256

1    A.    In general I operated a family office which would be

2    understood in the financial community as someone who would

3    manage the day-to-day business affairs of an individual or

4    their family.

5          I would work on every financial aspect of their

6    life, other than the sports agents who deal in negotiating

7    contracts, so I would help them with the receipt of their

8    funds, purchases of their homes, placement of their

9    insurances, hiring of attorneys, finding investment

10   managers for them, and dealing with any other

11   financial-related aspect of their lives.

12         For some of the clients it got into the details

13   of scheduling vacations for them, booking airplanes as we

14   heard from Mr. Sydor, et cetera.

15   Q.    What business relationship did you have with the

16   player/clients, hockey player clients, in terms of

17   compensation, sir?

18   A.    From 2003 until the end of my engagement with each

19   one of them, some of them right through November 13, 2013,

20   I was compensated approximately one half of a percent of

21   assets under management which would include all equity

22   that I represented them on.

23   Q.    Did you see introduced into evidence, sir, a document

24   that reflected payments made to you pursuant to that

25   business relationship?

4257

1   A.   Yes, sir.

2   Q.   And do you recall what client that referred to?

3   A.   I believe we saw it for Joe Juneau, the Standard

4   Advisors agreement.

5   Q.   I'm talking, sir, about a statement introduced into

6   evidence that reflected payments to you pursuant to that

7   percentage arrangement as relates to their portfolio.

8        Do you remember seeing such a document like that

9   in evidence?  If not --

10  A.   Not that I recall at the moment.

11  Q.   With reference to the Standard Advisors agreement,

12  who created that agreement?

13  A.   My attorney at the time.

14  Q.   And what was the purpose in having that agreement in

15  place between you and your hockey player clients?

16  A.   It was for the purpose of representing and defining

17  the relationship between myself, my company and my

18  individual clients.

19  Q.   Did it address, sir, a circumstance should a dispute

20  develop between you and your hockey player clients

21  regarding, let's say, the management of their business

22  affairs or even the role you performed as their financial

23  advisor?

24  A.   Yes, sir, there was.

25  Q.   As relates to the hockey player clients that are

4258

1  relevant to this indictment, did one of them at a point in

2  time exercise his rights under that Standard Advisor

3  agreement in a litigation context?

4  A.   Yes, sir.

5        Mr. Nolan initiated an arbitration in the State

6  of Arizona in or about 2008.

7  Q.   And he obtained, sir, did he not, a partial award

8  from the arbitration panel as relates to the dispute

9  between you and he; isn't that correct?

10 A.   That is correct.

11 Q.   And as a result of obtaining that partial award from

12 the arbitration panel, do you recall whether or not he was

13 awarded reasonable attorney's fees as well?

14 A.   Yes, I believe he was.

15 Q.   Now, without getting, sir, involved in any

16 discussions from your perspective as to the merit of that

17 award, does that award against you still remain

18 outstanding?

19 A.   Yes, it does.

20 Q.   Meaning that you have not, to this day, made payment

21 as relates to the monies that were acquired through that

22 award; is that true?

23 A.   That's correct.

24 Q.   Next sentence in the superseding indictment reads:

25        Kenner was a licensed financial advisor between

4259

1    approximately July 1994 to November 2004.

2            Was that true or is that true?

3    A.    That sounds correct.

4    Q.    We heard testimony, sir, from an individual whose

5    name escapes me right now, regarding your licensing,

6    Series 7 licensing; is that correct?

7    A.    Yes.

8            Mr. Melley referenced a Series 7, a Series 63

9    and Series 65 license I held during that period of time.

10   Q.    To your knowledge, was his testimony accurate in that

11   respect; yes or no?

12   A.    I believe it was.

13   Q.    Next sentence reads:

14           Between approximately August 2002 and 2007,

15   Kenner held the position of a secretary at Eufora

16   (Eufora), an Arizona registered limited liability company

17   that held itself out to be a seller of prepaid consumer

18   debit cards.

19           Now, there's really two parts to that.

20           Were, or were you not, a secretary at Eufora

21   during that period of time?

22   A.    I believe I was a secretary at Eufora up until the

23   beginning of 2005.

24   Q.    When the indictment reads, an Arizona registered

25   limited liability company that held itself out to be a

4260

1    seller of prepaid consumer debit cards; is that true?

2    A.    I believe that is true.

3    Q.    I'm going to move on, sir, to the next paragraph and

4    I'm skipping a paragraph because I want to stay focused in

5    connection with your testimony.

6           3.    Between 2003 and 2005, the defendant,

7    Kenner, created a series of Delaware limited liability

8    companies for the purpose of purchasing real property in

9    Hawaii, Kenner was the managing member of each entity,

10   which included Little Isle IV, LLC, (Little Isle IV); Big

11   Isle IV Ventures, LLC, (Big Isle IV); Big Isle V Ventures,

12   LLC, (Big Isle V); Big Isle VI Ventures, LLC, (Big Isle

13   VI); Kau Holding Company, LLC, (Kau Holding); and Ula

14   Makika, LLC, (Ula Makika), collectively referred to herein

15   as the holding companies.

16           Is that statement true or false?

17   A.    That is true.

18   Q.    Next sentence:

19           Several of Kenner's investment clients,

20   including several of the player/clients, were members of

21   Little Isle IV and invested money in Little Isle IV to be

22   used to purchase real property; is that true?

23   A.    That is correct.

24   Q.    Sir, on page 3, there's a heading, the Hawaii land

25   developments, and there are two paragraphs -- actually six

4261

1   paragraphs that follow.

2          And you're familiar with those allegations; is

3   that correct?

4   A.   Yes, sir.

5   Q.   Let's talk, sir, about the Hawaii land developments.

6          I don't want to get involved in any repetition

7   of testimony because I know yesterday you told us how you

8   came to first meet John Kaiser in Hawaii with Chris

9   Manfredi.

10         Do you recall that testimony?

11  A.   Yes, I do.

12  Q.   And I believe you told us about a meeting that took

13  place in their hotel room at that time; is that correct?

14  A.   Yes.

15         It was a cabana that they had rented.

16  Q.   Could you, for purposes of clarity of the record,

17  when did that occur, what time of the year, and what year,

18  if you recall?

19  A.   I believe it was in the middle of 2003.

20  Q.   And in substance, sir, would you describe to the

21  Court and jury what, if any, agreement was reached at that

22  time following your meeting with Mr. Kaiser and

23  Mr. Manfredi and yourself?

24  A.   After viewing the property and meeting at their

25  cabana that evening, they discussed doing a partnership

4262

1   with myself and any investor clients I had at the time for

2   the first 258 acres which was the only land we had

3   discussed at the time.

4           I believe the land was under contract by

5   Mr. Kaiser and Mr. Manfredi individually for $720,000 at

6   the time.

7           I believe they had deposited $10,000 on the land

8   approximately a year earlier.

9           They let me know they were unable to come up

10  with the residual balance and that the sugarcane company,

11  the seller, was looking to close on the property in the

12  subsequent four to six months, and they offered a 50

13  percent stake in the project and they offered the balance

14  payment at the time of closing, and they also had

15  requested that when the time came to create vertical

16  construction to build homes and infrastructure on the

17  land, that I would also be the funding source for those

18  construction dollars.

19  Q.   Why you, Mr. Kenner?  How did it come to be that you

20  were meeting with them that day?

21  A.   A mutual friend of ours named James Milana had

22  introduced myself to Mr. Manfredi at the time and knew

23  that I was in the business of real estate development

24  through my dealings in Mexico, and Mr. Milana thought it

25  would be a good meeting for us to have, so I took his

4263

1   advice and after one phone call I believe with

2   Mr. Manfredi, I flew to Hawaii to have the meeting

3   face-to-face and view the subjected property.

4   Q.   Did that particular parcel of property have any

5   specific names?

6            There's been a lot of names mentioned about the

7   property in Hawaii.

8   A.   Yes, sir.

9            It's been referred to as 258, which represented

10  the number of acres that the property was, it's been

11  referred to as Little Honu'Apo.

12  Q.   I don't want to repeat evidence, sir, already viewed

13  by the jury, but is there a photograph in evidence of that

14  particular parcel that you saw?

15  A.   Yes, sir.

16  Q.   What then occurred, Mr. Kenner, as relates to a

17  significant event with reference to the Hawaii land

18  developments after that meeting?

19  A.   Between that meeting and the end of December, I had

20  spoken to both Mr. Juneau and Mr. Nolan about my trip to

21  Hawaii.

22           Those were two individuals that I spoke to on a

23  daily basis back in 2002-2003-2004 time frame, so both of

24  them knew I was going over to look at some real estate and

25  individually they were both very interested real estate

4264

1    buyers.  Both of them had purchased on their own,

2    independent from myself or any other clients, millions of

3    dollars in personal real estate as well.

4              After the meeting with Mr. Kaiser and

5    Mr. Manfredi, I did have subsequent conversations with

6    Mr. Juneau and Mr. Nolan who agreed to be part of that

7    land development purchase in Hawaii.

8              And we dealt with Northern Trust bank at that

9    time to secure some lines of credit in order to put the

10   collateral together to purchase the land before the end of

11   calendar year in 2003.

12   Q.   Well, you say some lines of credit.

13             Whose lines of credit?

14   A.   Both Mr. Juneau and Mr. Nolan agreed to set up lines

15   of credit to raise the capital necessary for the closing

16   before the end of the year 2003.

17   Q.   Were those pledged lines of credit?

18   A.   Yes, sir, they were.

19             He transferred bonds that were held at Charles

20   Schwab for each one of them to Northern Trust bank and

21   went through a series of about five or six signings and

22   transactions in order to facilitate the creation of the

23   lines of credit through Northern Trust bank, and then have

24   the collateral available to be transferred to the title

25   company prior to closing at the end of December 2003.

4265

1   Q.   Would you describe to us, sir, the substance of the

2   conversations that you had with Mr. Juneau and Mr. Nolan

3   in that regard with respect to the use of their lines of

4   credit, the reason why he was being pledged a line of

5   credit, the advantage or disadvantage of doing so, tell us

6   what you're talking about.

7   A.   It would have been similar to the conversations I had

8   with each one of the individuals who set up lines of

9   credit through 2005.

10          I effectively told them that with the purchase

11   of the land, much like the other Mexican investments we

12   did, we could simply invest cash into the property.

13          But one suggestion that had come out of the

14   meeting I had with the president of Northern Trust bank in

15   Arizona is he suggested if my clients had collateral, we

16   could keep their bond accounts at Northern Trust bank

17   under their management and create lines of credit using

18   bonds as collateral.

19          The advantage to that, which I thought was a

20   very good idea by Mr. Highmark at Northern Trust bank, was

21   the individual bond accounts would then continue to

22   receive 4 to 5 percent interest annually on their

23   underlying securities while we utilized Northern Trust's

24   loan capital for the investment in Hawaii.

25   Q.   Now, Mr. Kenner, there's been testimony that with

4266

1    each one of your hockey player clients, your initial

2    advice to them as relates to investments were investments

3    in stocks and bonds.

4            Do you recall that kind of testimony?

5    A.    Yes, sir.

6    Q.    Was that testimony true, that initially when you

7    began to represent those hockey player clients, it was

8    investments of that nature; is that correct?

9    A.    That is correct.

10   Q.    How would you characterize those type of investments?

11   A.    They would run the gamut from fairly safe in a cash

12   or bond portfolio, to safe on the stock side, all the way

13   up to very risky on the stock side.

14   Q.    What would be the risky stock side exposure?

15   A.    If we had an investment portfolio investing in

16   Southeast Asian small cap stocks, they would be very

17   volatile considering in a calendar year for that portion

18   of the portfolio we could see as high as 50, 60 or 70

19   percent return, but under normal historical returns we

20   could also see a negative 30, 40, 50 percent return

21   portion of that portfolio.

22   Q.    Did you ever recommend those high risk type of stocks

23   to your clients?

24   A.    Yes, sir, as part and parcel to the overall

25   portfolio.

4267

1   Q.   Now, what about what is referenced here in the

2   indictment in connection with investing in real estate,

3   what advantages, disadvantages, risks, risk analysis are

4   associated with those types of investments?

5   A.   I believe the due diligence would be fairly similar

6   to what I would do to look at the different stock

7   portfolios around the world that I invested in for my

8   clients over a 10-year period of time in 2002, 2003.

9          So when I would take a look at different real

10  estate projects, I was looking for built-in value to see

11  if we could buy land at far reduced rates to other

12  appraised lands were in the relative areas.

13  Q.   As relates to risk analysis versus return on the

14  investment, could you give us some idea as to those

15  issues?

16  A.   As an example, just for the underlying land itself,

17  over the three year period of time that we put some of the

18  parcels of land in Hawaii under contract that we saw on

19  the board when Mr. Manfredi was identifying the different

20  major parcels, I believe the total land sale purchase

21  contract values were about $13 million.

22          And by the time we had secured the funding with

23  Lehman Brothers in August 2006, which was effectively a

24  little less than three years later, KPMG had appraised the

25  land for around approximately $100 million.

4268

1      So for an underlying value perspective, we had

2   hit a home run as far as land values went.  At that point

3   we hadn't begun to even break-up the 6,000 acres of

4   developable land.

5   Q.   Well, sir, in connection with your conversations that

6   you had with let's say Owen Nolan and Joe Juneau for

7   purposes of the Hawaii land development, you said that you

8   had similar conversations with all your clients that

9   ultimately became investors in the Hawaiian real estate;

10  is that correct?

11  A.   That's correct.

12  Q.   You just told us, as relates to real estate

13  investments, did or did that not become part of your

14  conversations with your clients when they questioned you

15  about the advisability of the advice?

16  A.   Absolutely.

17  Q.   There's been testimony, sir, that at least from

18  perhaps one witness that you gave assurances that the

19  Hawaiian land investment project in terms of commitment of

20  their lines of credit pledged collateral was without risk;

21  is that true?

22  A.   That never occurred.

23       I recall Mr. Rucchin mentioning that the term

24  risk-free was never used.  I do recall that.

25  Q.   Well, what, if any, conversation did you have with

4269

1    your hockey player clients concerning the risks associated

2    with the investment in Hawaiian real estate and the

3    potential for a great return if successful on that?

4              Do you understand my question?

5    A.    No, if you don't mind rephrasing it please.

6    Q.    All right.

7              Well, we go from stocks, as you told us a moment

8    ago, stocks and bonds, when you initially were advising

9    your clients; is that correct?

10   A.    Yes, sir.

11   Q.    To a point in time where you're beginning to discuss

12   with them the Hawaiian real estate investment, correct?

13   A.    Yes, sir.

14   Q.    My question simply is this.

15             What, if any, discussion did you have with your

16   hockey player clients concerning risks associated with

17   investing in real estate and potential for profit, things

18   of that nature?

19   A.    As my client base had continued to become more well

20   established financially, they had put together significant

21   stock portfolios, and each of my clients at that point in

22   time, with the growth in salary in the NHL, became more

23   stable as far as their ability to invest in other asset

24   classes which I would consider directly investing into one

25   of those asset classes in addition to other private equity

4270

1    investments at the time.

2              As a result of their cash positions, based on

3    their multimillion dollar a year contracts, we had risk

4    discussion about filling out other asset classes at that

5    point in time and real estate was one of them, including

6    the Hawaii real estate venture.

7    Q.   Why real estate?

8    A.   There is a finite group of asset classes you can

9    invest in, and real estate is one of the larger asset

10   classes around the world that you can diversify your

11   portfolio.

12             So by sometimes investing in what could be

13   deemed a riskier investment, it actually lowers your

14   exposure in your portfolio because of your diversification

15   of asset classes.

16   Q.   Does real estate have any particular value as an

17   investment in terms of, let's say, return on the

18   investment?

19   A.   Yes, sir.

20             Much similar to as I described earlier,

21   investing in Southeast Asian basket of stocks, you would

22   see anywhere from a minus 50 percent to a plus 70 percent

23   return, but it rounded out your portfolio of stock

24   investments.

25             A real estate investment, if we had done our due

4271

1    diligence properly, which I believe we did as represented

2    by the funding in 2006 by Lehman Brothers, we created an

3    incredible intrinsic value to the underlying investors and

4    that was approximately $80-plus million of value by the

5    time Lehman Brothers had done their analysis and brought

6    in a development partner like Alan Worden and Windwalker.

7    Q.    So staying, sir, with the initial investment by Joe

8    Juneau and Owen Nolan, please continue with what happened

9    chronologically as relates to their investments as we

10   continue to discuss that aspect of the indictment that

11   alleges the Hawaiian land developments as being part of a

12   scheme to defraud.  That's where I want to go, okay?

13   A.    Okay.

14         After the close -- excuse me -- just prior to

15   the close of the first 258 acres of Little Honu'apo in

16   December 2003, a number of my other investors had become

17   aware and clients had become aware that I was traveling to

18   and from Hawaii quite often in the latter half of 2003 to

19   prepare for the closing of that first parcel, and several

20   of them had asked who was involved, if they could become

21   involved, and to understand more about the real estate

22   project.

23         At that point I believe I had spoken perhaps to

24   Mattias Norstrom, perhaps Darryl Sydor, and perhaps one

25   other client/investor who ultimately became an investor in

4272

1    the Hawaii project.

2          Prior to the closing in 2003, I believe each of

3    them had initiated their investments in Hawaii by

4    transferring $100,000 to the Little Isle bank accounts on

5    behalf of their investment, and each of them had begun the

6    process of transferring bonds and setting up lines of

7    credit for subsequent purchases in Hawaii.

8          In or around the time we closed on the 258

9    acres, I was in Hawaii and I had spoken to some of the

10   principals.

11         I believe Senator Avery Chumbley, who was the

12   main principal in the sugarcane company, he had told me

13   that they were selling off about 70,000 acres of land on

14   the big island of Hawaii that their company had owned for

15   approximately 150 years.

16         And I asked Mr. Chumbley if -- Senator Chumbley,

17   if he would have somebody show me around the other parcels

18   of land for sale at the time.

19         And on that trip I recall looking at the

20   adjacent parcel to the 258 which Mr. Manfredi referred to

21   as Honu'apo which was 1500 acre parcel of land.

22         I was also shown the Waikapuna parcel, 215 acres

23   of land with about a mile and a half of coastline and its

24   own private black and white sand beach, and we had looked

25   at the parcel that Mr. Manfredi referenced as Honu'apo

4273

1    which was above the town of Pahala, which is about a 2100

2    acre parcel.

3           After that visit I began discussing with Senator

4    Chumbley and some of the other principals of the C. Brewer

5    Sugarcane Company the ability to put those under

6    agreement.

7           And at the time we were able to put the

8    Waikapuna and the 1500 acres of Honu'apo and we began our

9    lengthy due diligence process through 2004 and 2005 to get

10   those two parcels closed.

11   Q.   Mr. Kenner, as you engaged in all these efforts, were

12   these efforts part of some scheme or artifice to defraud

13   Joe Juneau or Owen Nolan?

14   A.   No, sir.

15   Q.   As you engaged in these efforts and further efforts

16   as relates to the Hawaii land development, were they part

17   of some scheme or artifice to defraud subsequent

18   investors?

19   A.   No, sir.

20   Q.   There comes a point in time, does there not, sir, to

21   move along in our timeline, Joe Juneau leaves the fold,

22   for lack of a better term; is that true?

23   A.   Yes, sir.

24   Q.   Would you tell us, in a summary fashion, Mr. Kenner,

25   what transpired as relates to Mr. Juneau, his decision in

4274

1   that regard, what happened, just tell us what happened?

2   A.   Sure.

3        In or about 2004, Mr. Juneau called me and told

4   me that he was going to retire from professional hockey.

5        And, at that time, he had invested in a series

6   of private equity deals, real estate deals, in addition to

7   stock and bond portfolios through me.

8        He told me that now that he was retired, he had

9   become personally uncomfortable with the private equity

10  deals because now that he was thinking about his finite

11  hockey career, and his post-hockey career life, he asked

12  me if he could get all of his money back from each and

13  every one of the private real estate deals and other

14  private equity deals at the time.

15  Q.   The other private equity deal, as we know, was a

16  percentage of ownership interest in Eufora; is that

17  correct?

18  A.   That is correct.

19  Q.   So please continue.

20       What, in summary fashion, what then transpired

21  as relates to investments that Joe Juneau had made in

22  Hawaiian land development, then Eufora.  Please continue.

23  What occurred?

24  A.   So in or about 2005, when these daily and weekly

25  conversations were going on with Mr. Juneau, I told him I

4275

1    would do my best to find other investors to take him out

2    of the private deals he requested to be out of.

3              I told Mr. Juneau he needed to be patient with

4    me because it was an unusual request to say the least to

5    ask for his money back.

6              So I contacted Mr. Constantine at Eufora and

7    asked him if he knew of any other investors who may be

8    interested in buying out Mr. Juneau's interest, which is

9    $100,000 at the time.

10             And Mr. Constantine told me he would make every

11   effort to make that possible.

12             And sometime in 2005 we were able to return,

13   shortly after Mr. Juneau's request, his $100,000

14   investment in Eufora and he no longer had an investment

15   nor did he have any financial interest in the company.

16             With respect to the Hawaiian land project which

17   Mr. Juneau had secured a partial interest in the $500,000

18   line of credit at the time which I believe was increased

19   to somewhere in the neighborhood of 638,000 at one point

20   in time, he had also requested that we close out that

21   pledge so he could have that money free and clear if he so

22   chose to take it back to Quebec, Canada, where he was

23   moving upon retirement.

24             I told him to be patient, that as in 2005 and

25   2006, we were working on larger funding deals which

4276

1   ultimately occurred with the introduction of Lehman

2   Brothers and the inclusion of that $500 million deal in

3   August 2006, and in early 2007, when the dust settled from

4   that deal, I had a conversation with Mr. Nolan at the time

5   who was informed that Mr. Juneau wanted to be bought out

6   of the deal and that his four percent interest in Eufora

7   at the time would be available -- excuse me -- in the

8   Hawaiian land project would be available to him if he

9   bought him out.

10          Mr. Nolan agreed to do so, and at the time we

11  covered Mr. Juneau's pledge with additional funds from

12  Mr. Nolan's account at Northern Trust bank and Mr. Juneau

13  was released from his pledge and released from his

14  ownership in Little Isle.

15  Q.   Why did you say it was highly unusual, sir?

16  A.   If you could imagine for a moment you and I started a

17  restaurant together and each put $100,000 into it, and a

18  year after the restaurant was up and running, I came to

19  you and said, Mr. Haley, I no longer want to be a partner

20  in this restaurant, can you give me my $100,000 back.

21          You would say, well, I'm not sure we're going to

22  get it because the money has been invested in the project

23  and the business is up and running.

24  Q.   As relates to the establishment, sir, of the Hawaiian

25  land development projects, I read to you before a

4277

1    statement in the indictment regarding your position as

2    managing member of various LLCs.

3              Do you recall that?

4    A.    Yes, sir.

5    Q.    What is an LLC?

6    A.    A limited liability company established to protect

7    the gross liability or risk factors of the underlying

8    investors.

9    Q.    Now, as managing member, who is then responsible for

10   the operations of the LLC?

11   A.    I was.

12   Q.    And could you give us some idea as to the nature and

13   extent of your responsibility as managing member of the

14   LLC?

15   A.    A managing member is identical to in operations as a

16   president of a company as you would imagine.

17             So I was in charge of all of the operations of

18   the company, the bank accounts of the company, the funding

19   of the company, business and investment decisions of the

20   company, securing employees, hiring and firing of

21   employees, and in the daily welfare of business.

22   Q.    You mentioned a moment ago the discussion you had

23   with Owen Nolan concerning acquiring Joe Juneau's

24   percentage interest.

25             Well, could you help us understand, Mr. Kenner,

4278

1  in return for the commitment that they were making either

2  in cash or by giving their lines of credit as a

3  commitment, how were they compensated?  What were they

4  getting for that?

5  A.    They were getting an ownership interest in the Little

6  Isle IV, LLC, which, after August 2006, became a rollup

7  partner inside Na'alehu Ventures which was established to

8  take all of the LLCs that I had created in 2003 to 2006 to

9  hold the individual land parcels.

10         We put them altogether inside Na'alehu Ventures

11  and then contributed that to the joint venture with

12  Windwalker under the funding arrangements with Lehman

13  Brothers.

14  Q.    Perhaps it's obvious, but what advantage do they

15  obtain by having an ownership interest in the LLCs that

16  have title to Hawaii real estate?

17  A.    There's several advantages in general.

18         One is if there were any issues or risk factors

19  related to the investment in general, the individuals

20  would be protected from that by what's known as the

21  corporate veil, so other issues we had, outside people

22  couldn't sue the individual members as opposed to owning

23  these in your own individual names.

24         And, second, the purpose and intent of the

25  investment was to capitalize on the upside growth of the

4279

1  real estate market certainly in the early 2000s and any

2  return of capital from sales of subsequent deals our

3  investors would end up receiving a percentage of the

4  profits going forward.

5  Q.   And as I understand, sir, the structure that the more

6  you committed by way of cash or line of credit, the

7  greater your percentage interest, correct?

8  A.   That is correct.

9  Q.   You said something a moment ago about the real estate

10  market in early 2000.

11  A.   Yes, sir.

12  Q.   This goes back sometime, sir, but what was it like

13  back then?

14  A.   Well, in the early 2000s, and I guess it's easy to

15  forget where we are today from where the real estate

16  markets had been in 2008 and 2009, and we have fought hard

17  to recover since.

18         But in the early 2000s, the real estate markets

19  were very embryonic in their dynamic growth as evidenced

20  by the fact that I was able to put the Waikapuna parcel,

21  the 258 parcel, the 1500 acres in Honu'apo, and later the

22  2100 acres at Moanalua under contract for about $13

23  million and by the time we got our funding deal done with

24  Lehman Brothers just a few years later the land was

25  appraised by KPMG for in the neighborhood of $100 million.

4280

1   Q.   Now, the establishment of Little Isle IV and other

2   holding companies as set forth in the indictment involved

3   various operating agreements; is that correct?

4   A.   Each one of the LLCs was governed by their own

5   operating agreement and each one of those were set up

6   particularly to separate the individual land parcels so in

7   the event there was an issue with any one of those

8   individual land parcels, we wouldn't put at risk the rest

9   of the land investments we had mated.  It's very normal

10  standard approved business practice.

11  Q.   That was not some part or artifice or scheme to

12  defraud your hockey player clients in terms of

13  establishing separate LLCs, was it sir?

14  A.   Not at all.

15  Q.   Let's move forward, Mr. Kenner, to your use and

16  access of the various lines of credit by the specific

17  hockey player clients identified in this indictment.

18          Would you tell us what transpired as relates to

19  an individual's line of credit once he gave you the

20  authority to access his line of credit as set forth in any

21  number of documents, what occurred?

22  A.   During the establishment of the line of credit,

23  Northern Trust required that the individual client sign a

24  letter that they had prepared which I think we have seen

25  several of them in evidence, but they sent it to the

4281

1    clients directly and the clients sign and return it to

2    them acknowledging I could access their lines of credit

3    toward the business purpose of Little Isle IV.

4         Once those lines were open and established, each

5    one of the individuals understood, through our

6    discussions, that whatever amount of money they

7    contributed and made available to the line of credit, they

8    would be given a full capital account for them.

9         That meant if Mr. Peca contributed $1.6 million

10   through his line of credit, his ownership interest would

11   be based on a $1.6 million investment as if it was cash at

12   any point in time.

13        So we, as the expenses of the company were

14   incurred through architect fees, land planning fees, legal

15   fees, archeology fees, travel and entertainment fees,

16   payroll, et cetera, I would draw down on the different

17   lines of credit on a monthly basis to cover the general

18   expenses of the company.

19        And each of the investors, I would let them know

20   what was going on as I would meet with them face-to-face

21   and on a regular basis.

22   Q.   Well, we have multiple lines of credit as has been

23   established through testimony in this case; is that

24   correct?

25   A.   That is correct.

4282

1  Q.    And they, as demonstrated by bank records, end up in

2  bank accounts associated with Little Isle IV; is that

3  true?

4  A.    Yes, sir.

5  Q.    When that happens, what's the nature of those monies

6  that have been deposited in those accounts, how would you

7  characterize that?

8  A.    I would characterize them all as pooled funds for the

9  benefit of the company.

10  Q.    Well, sir, there's been testimony that with reference

11  to those pooled funds, funds would be utilized from that

12  pool, let's say, to pay the interest on someone else's

13  line of credit.

14        Do you recall that?

15  A.    Yes, sir, I do.

16  Q.    And did that occur?

17  A.    Yes, it did.

18  Q.    And what is the purpose of doing that for purposes as

19  relates to the general goal of achieving the objectives of

20  the Little Isle IV investment, tell us about that, why did

21  you do that?

22  A.    Well, each of the investors understood that in order

23  to create these lines of credit, they would continue to

24  maintain their underlying bond portfolios.

25        So from two perspectives, as an example for

Kenner  -  Direct/Haley

4283

1   Mr. Peca who had $2 million in his bond portfolio, he

2   would end up with $100,000 of income out of that portfolio

3   every year for the utilization of his bond portfolio's

4   collateral to the line of credit.

5            Now in return for that, Mr. Peca, and all of the

6   line of credit holders, were made aware that the company,

7   Little Isle IV, would end up paying the monthly payments

8   on their lines of credit as a general expense of Little

9   Isle IV and the Hawaiian partners.

10            (Continued on next page.)

Kenner - Direct/Haley

4284

1   BY MR. HALEY (Cont'd):

2   Q.    So all those charts showing the use of one person's

3   line of credit, let's say to obtain interest on it would

4   be the bond?

5   A.    Interest on the line of credits.

6   Q.    Interest on the line of credit for another hockey

7   player client, was that part of some artifice or scheme to

8   defraud, sir?

9   A.    No, sir.

10  Q.    Did there come a time, sir, that you personally paid

11  interest on one or more lines of credit that we are

12  referring to?

13  A.    Yes, sir.

14        In May of 2009 -- excuse me -- in May of 2008,

15  after Mr. Constantine and I had spent approximately 18

16  months negotiating with Mr. Jowdy on terms of repayment of

17  the open loan that he had with myself and the Hawaiian

18  investors, Mr. Jowdy through his attorney Mr. Harvey

19  terminated the negotiations with us and all of our

20  partners at that point in time.

21        We had been extended about 18 months and about

22  $750,000 of additional interest payments during that

23  period of time when Mr. Jowdy, through his lawyers, had

24  continued to promise Mr. Constantine that he was going to

25  settle with us.

4285

1          So starting in June of 2008 we still ended up

2     with a $40,000 a month line of credit payments that were

3     due.  From June of 2008 until December of 2008, I

4     continued personally to make those payments for the lines

5     of credit and I believe the total sum in the neighborhood

6     of $267,000, and that's when our discussions began with

7     our need to sue Mr. Jowdy and make a decision with each of

8     the line of credit holders on how we wanted to continue to

9     either maintain those lines of credit at a cost to all of

10    us as a group of $500,000 a year or utilize that money to

11    begin to sue Mr. Jowdy in the various jurisdictions that

12    would allow us to try and recapture the money he owed us

13    at the time.

14    Q.    So, sir, when you were at that point in time

15    continuing payment on the interest on the lines of credit

16    from your personal funds, was that part of some artifice

17    or scheme to defraud your hockey player clients?

18    A.    No, sir.

19    Q.    Moving ahead, Mr. Kenner.

20          We know that Joe Juneau, as you testified, was

21    ultimately paid back in full, sir, his investment in the

22    Hawaii real estate project as well as Eufora.

23          Is that correct?

24    A.    Yes, sir, he was 100 percent paid back in both

25    investments.

Kenner - Direct/Haley

4286

1    Q.    Is he listed as one of the victims in this

2    indictment?

3    A.    Yes, sir, he is.

4    Q.    Now, after his departure, as we know from the

5    evidence, other persons that testified in this trial

6    became investors in the Hawaii real estate project, is

7    that correct?

8    A.    That's correct.

9    Q.    The original operating agreement, as relates to

10   Little Isle IV specified that the purpose of the LLC was

11   to invest in Hawaiian real estate, did it not?

12   A.    The 2003 operating agreement noted the purpose to

13   invest in Hawaiian real estate.

14         That's correct.

15   Q.    But there came a point in time, sir, as we know you

16   have testified to and has been reduced in evidence in this

17   court that money that was coming in to the Little Isle IV

18   bank accounts or the other accounts, at some point in time

19   was utilized for purposes of making a loan to Kenner

20   Jowdy.

21         Correct?

22   A.    That is correct.

23   Q.    Tell us about how that decision was made and who was

24   present when that decision was made, that is to say to not

25   simply utilize the line of credit money for purposes of

Kenner - Direct/Haley

4287

1    Hawaiian real estate, but also then to use portions of

2    that money to loan out to Mr. Jowdy.

3              What occurred?

4    A.   In the middle of 2004, about six months after we had

5    already closed on the 258 acres, we had a pending closing

6    on both Waikapuna on the ocean and the Honu'Apo 1,500

7    acres.

8              During that period of time we learned through

9    our real estate attorneys at Carlsmith Ball, who was the

10   largest law firm in Hawaii who we hired to handle the

11   transaction, that our due diligence period prior to

12   closing was going to take a significantly longer period of

13   time than we had expected.

14             Through conversations I had with Chris Manfredi

15   and John Kaiser at the time initially, we -- I told them

16   that I had been requested by Mr. Jowdy who they were aware

17   of as my Mexican real estate partner, to lend money to him

18   on a short-term basis with a number of repayment plans

19   that Mr. Jowdy had proposed to me.

20             They both thought that it was a good idea, and

21   under Mr. Jowdy's proposal to pay us 15 percent interest

22   on any money that we loaned to him, we thought it would be

23   a good idea for cash that we had sitting around to do so.

24   During that period of time, the summer of 2004, I began to

25   speak with my other individual investors from Hawaii, many

4288

1    of which were the line of credit investors, and we

2    discussed the proposal by Mr. Jowdy to borrow money from

3    us at 15 percent.

4           Each one of them was in agreement that that

5    would be a good idea, and specifically because each one of

6    those line of credit holders were also investors in the

7    first Diamante del Mar project with Mr. Jowdy, and

8    subsequently the -- most of them were also investors in

9    the Diamante Cabo San Lucas project.

10          I think perhaps as Mr. Peca had referenced we

11   all kind of felt like a big family at that time.  And by

12   the end of the summer in 2004, John Kaiser and I signed a

13   new operating agreement for Little Isle IV which

14   specifically extended the purpose of the company to allow

15   us to lend -- be a lender on behalf of the company.

16          So Mr. Kaiser and I signed a new operating

17   agreement in or about September of 2004, and we began to

18   lend money to Mr. Jowdy in or about November of 2004.

19   Q.   What if any level of knowledge or awareness did the

20   other members of Little Isle IV have as relates to the

21   decision now to utilize sitting cash to loan to Jowdy?

22   A.   Complete knowledge.

23   Q.   And how did they acquire that?

24   A.   It occurred at that time in two separate ways.

25          As I signed new operating agreements on behalf

4289

1   of the companies that I represented, I would disseminate

2   or deliver those operating agreements to each of the

3   individual investors when I would see them face to face

4   and would leave them with a copy of the operating

5   agreements, and during that period of time we discussed

6   why there was a new operating agreement, other progresses

7   in the Hawaii development project, and our intended desire

8   to lend some short-term money to Mr. Jowdy and the terms

9   of our agreement.

10  Q.   Now, when that commenced --

11       MR. HALEY:  Withdrawn.

12  BY MR. HALEY:

13  Q.   By the way, Mr. Kaiser was part and parcel of that

14  decision making process?

15  A.   Yes, sir.

16  Q.   Now, when that decision was made, sir, money began to

17  then flow out of Little Isle IV accounts, accounts

18  controlled by Little Isle IV or accounts in which lines of

19  credit were being utilized to go to Mr. Jowdy as relates

20  to this loan.

21       Is that true?

22  A.   That is correct, in or about November 2004.

23  Q.   Bank records reflect that, sir?

24  A.   Yes, sir, they do.

25  Q.   And as it began to go out, was there any repayment of

4290

1   the interest or principal on that loan by Mr. Jowdy?

2   A.   Yes.

3        On a regular basis, Mr. Jowdy would repay

4   certain amounts of money to Little Isle IV and then

5   subsequently to Ula Makika when that LLC was established.

6   Q.   Did there come a time, sir, that the loan agreement

7   involving these loans with Mr. Jowdy was reduced to a

8   written document?

9   A.   Yes, sir.

10        In fact, we began loaning money to Mr. Jowdy,

11   which was intended to be a couple hundred thousand dollars

12   pursuant to conversations I had with John Kaiser and some

13   of the other investors through 2004.

14        By the end of November, Mr. Jowdy seemed to have

15   in his plans a larger scale repayment opportunities to

16   present itself to himself personally, so Mr. Jowdy asked

17   if we would continue to extend loans to him in December

18   and onwards.  As I talked about that with Mr. Kaiser, he

19   asked me, if we are going to extend the loans to Mr. Jowdy

20   beyond a few hundred thousand dollars knowing we are all

21   partners in the other projects, he recommended that we put

22   a written agreement in place, which I did with Mr. Jowdy

23   in early -- excuse me -- early December of 2004.

24   Q.   Would you tell us when or where did that occur, who

25   was present and describe to us how it came to be signed?

4291

1   A.   In early December 2004 we had a hospitality event in

2   Cabo San Lucas with a number of the investors that we were

3   hoping to secure for our Cabo San Lucas project and it was

4   a five-day event and about 125 people were coming.

5        So as a result I told Mr. Jowdy that John Kaiser

6   had requested that we put the loan agreement to writing,

7   and I told him I would bring a loan agreement with me to

8   be signed while I was with him during that event.

9        On the Friday or Saturday night of that event, I

10  traveled from my hotel to his house and presented the loan

11  agreement to Mr. Jowdy.  He was excited to see it because

12  he knew it was going to afford him the opportunity to

13  receive much more funds from us under the loan agreement

14  and when Mr. Jowdy signed the agreement, we had our future

15  golf pro, Mr. Robert Gaudet, was present, who I didn't

16  really know much at the time, Mr. Jowdy had called him

17  over to ask to deal with us and sign the document.

18       We signed the document and I left the home that

19  night before the party began and returned to my hotel that

20  night to drop off the document in my bag that I had

21  carried the loan agreement with.

22  Q.   Who retained the original of that document?

23  A.   Mr. Jowdy did.

24  Q.   So what did you leave with?

25  A.   I left with a copy of the agreement.

Kenner - Direct/Haley

4292

1   Q.   Mr. Kenner, I'm going to ask you to take a look at a

2   document marked Kenner Exhibit 214.

3            Do you recognize that?

4   A.   Yes, sir, I do.

5   Q.   What is it?

6   A.   This is the revolving line of credit loan agreement

7   that I had -- I wrote and authored and memorialized the

8   loan agreement with Mr. Jowdy and the Hawaii entities.

9            MR. MISKIEWICZ:  The government stipulates to

10  its admissibility.

11           MR. LARUSSO:  No objection, your Honor.

12           THE COURT:  What number is it?

13           MR. HALEY:  214.

14           THE COURT:  214 is admitted.

15           MR. HALEY:  I was going to offer it at the

16  conclusion of my client's testimony, Judge, but I'll take

17  the government's offer at this point, Judge.

18           Thank you.

19           (Whereupon, Defense Exhibit Kenner 214 was

20  received in evidence as of this date.)

21           THE COURT:  Did you finish this topic,

22  Mr. Haley?

23           MR. HALEY:  The Hawaiian land development,

24  Judge?

25           THE COURT:  Just this particular area?

4293

1          MR. HALEY:  Yes, sir.

2          THE COURT:  All right.

3          We'll take the morning break.  Don't discuss the

4     case.

5          (Jury leaves the courtroom.)

6          (Recess.)

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner - Direct/Haley

4294

1          (Following a recess.)

2          THE COURT:  Let's bring in the jury.

3          THE CLERK:  All rise.

4          (Jury enters the courtroom.)

5          THE COURT:  Everyone can be seated.

6          Go ahead, Mr. Haley.

7          MR. HALEY:  Thank you, your Honor.

8     BY MR. HALEY:

9     Q.    Now, Mr. Kenner, the Hawaii land development project

10    commenced in 2003, correct?

11    A.    Yes, sir.

12    Q.    And then there came a point in time where for all

13    intents and purposes activities ceased.

14          Is that true?

15    A.    Yes.

16          In or about September 2008, when Lehman Brothers

17    went bankrupt.

18    Q.    Sir, I'm not going to ask you questions about what

19    transpired in detail from 2003 to 2008 in terms of every

20    transaction with reference to that project.

21          So let me get a little focused here, and I say

22    that only for purposes of organization and so that we can

23    address the issues that may be pertinent to the

24    indictment.

25          MR. HALEY:  Sorry to make a speech, Judge.

4295

1    I'm trying to let the court and jury know why

2    I'm jumping around a little bit.

3    BY MR. HALEY:

4    Q.    Sir, did there come a point in time that a document

5    which has been introduced into evidence as

6    Government Exhibit 5104, known as a funding consulting

7    agreement, was signed?

8    A.    I believe there were two funding consulting

9    agreements.

10   Q.    That's correct.

11   And what were the two dates regarding both

12   agreements, if you recall?

13   A.    I believe the original 2004 agreement was dated in or

14   about December of 2004, about the same time as the

15   revolving line of credit with Mr. Jowdy.

16   And the second funding consulting agreement was

17   in or about June of 2005.

18   Q.    And would you explain to the court and jury the

19   circumstances under which the funding consulting

20   agreements came into existence.

21   A.    Well, one of the things we discovered in Hawaii

22   considering we were buying some very significant parcels

23   of land was that the development of the infrastructure and

24   vertical construction was going to become incredibly

25   expensive, and far beyond the financial means of myself

Kenner - Direct/Haley

4296

1    and my clients.

2            So I began to engage a number of outside

3    individuals, including Mr. Constantine as referenced in

4    those funding consulting agreements, to go source funds

5    for both infrastructure development and vertical

6    construction ultimately, and starting in about 2004,

7    through other business dealings I had with Mr. Constantine

8    and other individuals, we signed a number -- I signed a

9    number of consulting agreements for people to help look

10   for those lenders.

11           They actually became my only option after

12   meeting with several banks, including the Bank of Hawaii

13   in Hawaii who, frankly, were not interested in what they

14   deemed angel investment or angel development money which

15   is the very first infrastructure, when most banks told me

16   in the state of Hawaii in particular was that at the point

17   that I was able to get some hard money or money through

18   lenders like the gentleman at Centrum and ultimately

19   Mr. Constantine through the Urban Expansion loan, that the

20   banks would be glad to come in after I began to spend

21   other moneys on the property, take out the initial loans,

22   like Lehman Brothers did, and then give us subsequent

23   development money.

24   Q.   Why Mr. Constantine, or what if any relationship did

25   you have with Mr. Constantine at that point in time when

4297

1    the funding consulting agreements came into existence?

2    A.    That was near the beginning of my relationship with

3    Mr. Constantine.

4              But what I recall at the moment in 2003 and 2004

5    was that he was a very prominent businessman in Arizona,

6    had been introduced to me by a mutual acquaintance in the

7    sports and entertainment business who I respected quite a

8    bit at the time.

9              And after several meetings with Mr. Constantine

10   and some preliminary phone calls where he spoke to

11   potential lenders, you know, I felt very comfortable that

12   the initial, I believe it was $10 million I was seeking

13   for infrastructure development, it would be very

14   attainable through Mr. Constantine and his extensive

15   contacts.

16   Q.    Was there any outward manifestations of his wealth at

17   that time?

18   A.    When I met him, I think either on the first or second

19   meeting after lunch he took me on a tour of Scottsdale in

20   one of his two helicopters.

21             I remember flying over his property at the time

22   which was a 40-acre home site, I believe it was the second

23   largest home site in Scottsdale, Arizona.  It possessed

24   I -- excuse me -- on the property, the 40-acre site, he

25   had constructed which was very impressive an 8 to 10-foot

4298

1    wall around 37 acres of the property.

2           On the property itself was the beginnings of a

3    22,000 square foot facility and on the property itself

4    there was I think what's called a shifter car track or a

5    race car track which was what I learned later was one of

6    the highest rated shifter car tracks in North America on

7    his own personal property.

8           So it was very impressive, what I had seen at

9    that time.

10   Q.   Do you know if at the time he had a very competent

11   land use attorney working for him?

12   A.   What --

13   Q.   Do you know if at the time he had a very competent

14   land use attorney working for him?

15          MR. MISKIEWICZ:  Objection to form.

16          THE COURT:  Sustained as to form.

17   BY MR. HALEY:

18   Q.   So continuing, sir, with the funding consulting

19   agreement.

20   A.   After I had spoken to Mr. Constantine about my land

21   development in Hawaii, and also told him what I was doing

22   in Mexico where he said he would put out some feelers as

23   well, thought that would be a more difficult route for him

24   at the time, again, Hawaii was a very sexy and appealing

25   development area, certainly in the early 2000s.

1    So Mr. Constantine told me that he had done work

2    in the past for others to raise money, and in the hard

3    money arena you really have to spend an awful lot of time

4    meeting with lenders, sharing development plans, much more

5    intensive than you would during normal bank loan per se

6    through Bank of Hawaii.

7    So Mr. Constantine told me that he had been

8    burned by other people in the past who he had done

9    extensive work for and at the 11th hour, the people he had

10    attempted to raise money for just frankly chose to use

11    somebody else who had perhaps found a better deal or a

12    cheaper deal at the time.

13    So Mr. Constantine told me he'd love to help.

14    He was very confident in his ability to go raise funding

15    for me and for our project, but he told me that he

16    wouldn't do it unless he had an agreement in place to

17    guarantee that he would be receiving advance fees or

18    guaranteed fees against potential payouts that he would

19    receive upon final funding.

20    Q.    What is a hard money loan?

21    A.    A hard money loan is in simple terms would be much

22    like dealing with a loan shark, but when you are in large

23    land development deals, or you are seeking other

24    construction money, a lot of times regular banks won't

25    deal with you in the early funding phases.

Kenner - Direct/Haley

4300

1        So it's very common in the real estate world,

2   certainly very common from my experience that you would go

3   out and on a $3 million loan you may pay anywhere from 2

4   to 10 percentage points on the front end of that loan as a

5   fee to the lender.  You may pay anywhere from 8 to 15

6   percent annual interest rate on the loan.

7        And when you pay the loan off at the end, you

8   would also be subject to buyout fees at the end.  So it's

9   very, very expensive money, but it's a means to an end to

10  get to a more conventional loan.

11  Q.    The terms and conditions of the funding consulting

12  agreement, Mr. Kenner, it's in evidence.  So I'm not going

13  to have you recite the meaning of that document.  The jury

14  will have the opportunity to review it at the appropriate

15  time.

16        But my question to you is this, sir, what if any

17  discussions did you have with John Kaiser as relates to

18  the funding consulting agreement?

19  A.    Prior to signing the funding consulting agreements,

20  Mr. Kaiser and Mr. Manfredi were involved in all of the

21  day-to-day operations that were going on in Hawaii and

22  certainly they were primarily due diligence with

23  archaeologists, infrastructure, engineers, land plan,

24  surveyors, certainly our attorneys at Carlsmith Ball who

25  were paid a lot of money for their work.

4301

1          They came to realize that when the time came for

2     us to begin infrastructure, certainly on the original 258

3     acres and subsequent 1,500 acres, we were going to have

4     miles of infrastructure.  So they knew that those funding

5     requirements were far outside the scope of what myself and

6     my investors could provide at the time.

7          After meetings with the local banks, they knew

8     that we were going to have to find some outside sources.

9     Mr. Manfredi had moved on a semi permanent -- into a

10    semipermanent position in Hawaii and was living there

11    probably 80 percent of the time and was charged by me with

12    the responsibility of learning and understanding all of

13    the due diligence and working with all of our on-site

14    people, and Mr. Kaiser was doing his best to work with the

15    land planning individuals to be prepared for

16    infrastructure development.

17         So at that point in time, they understood we

18    were going to have to go outside of our original

19    partnership to begin this funding in a nonconventional

20    way.  They were very aware with where we were on the

21    project, where we were on the timeline to close on the

22    different parcels and what our capital requirements were

23    going to be.

24    Q.   With reference, sir, to the funding consulting

25    agreement between Constantine -- Tommy Constantine and --

Kenner - Direct/Haley

4302

1    what was the entity?

2           Was it -- what entity was involved, sir, between

3    I guess it was -- it was a funding consulting agreement

4    between Little Isle IV, LLC, and Constantine Management

5    Group, those were the cooperate entities.

6           Is that correct?

7    A.   I believe that's correct.

8    Q.   And the terms and conditions, sir, in these two

9    documents, again, they speak for themselves.

10          But my question to you is this, who had the

11   authority at that point in time to execute this document

12   on behalf of Little Isle IV?

13   A.   Only me.

14   Q.   And there came a point in time that you executed this

15   document.

16          Is that correct?

17   A.   Yes, sir, several times.

18   Q.   Well, two times as reflected in this exhibit, at two

19   different occasions.

20          Is that correct?

21   A.   That is correct.

22   Q.   Now, in addition to your signature, there is a

23   signature, sir, on both documents that says John Kaiser.

24          Is that correct?

25   A.   Yes, sir.

4303

1    Q.    There?

2    A.    Yes, sir.

3    Q.    Did you forge his signature on those documents,

4    Mr. Kenner?

5    A.    No, sir.

6    Q.    Well, it wasn't necessary for John Kaiser to sign

7    either one of those documents by your own testimony,

8    correct?

9    A.    That is correct, it was unnecessary.

10   Q.    So how was it that he came to sign the document?

11         Describe to the court and jury the circumstances

12   under which that occurred.

13   A.    Mr. Kaiser at that point in time when we were having

14   the funding discussions and the need for infrastructure

15   and development money, he told me that he wanted to be as

16   involved as he possibly could be with all the decisions

17   that were being made and wanted to be more involved in the

18   papering of the detail itself.

19         I believe he felt at that point in time and

20   expressed to me that Mr. Manfredi was carrying on a very

21   significant day-to-day operational role, and was actually

22   negotiating alongside me a lot of the different land sale

23   contracts and purchases that we were doing, and I believe

24   even in fact with respect to the discovery harbor lots and

25   the Mark Twain lots that were discussed during earlier

Kenner - Direct/Haley

4304

1    testimony, Mr. Manfredi may have even signed the purchase

2    contracts on those lots.

3    Q.    Now, let's look specifically, sir, at this document.

4          Do you see your signature on the document?

5    A.    Yes, sir, I do.

6    Q.    Do you see the signature of Tommy Constantine on the

7    document?

8    A.    Yes, sir.

9    Q.    It's dated 15 December '04, is that correct, near

10   your signature?

11   A.    Yes.

12   Q.    And then it's dated 12/5/04 next to

13   Tommy Constantine's signature.

14         Is that correct?

15   A.    That is correct.

16   Q.    It's dated 12/5/04 next to John Kaiser's signature?

17   A.    12/15/04.

18   Q.    Excuse me, 12/15/04, is that correct?

19   A.    Yes, sir.

20   Q.    Did John Kaiser sign his name on 12/15/04 on that

21   document?

22   A.    No, sir, he did not.

23   Q.    When did that happen?

24   A.    Well, as I mentioned earlier there were two signings

25   that actually occurred on each one of these documents.

Kenner - Direct/Haley

4305

1          The original consulting agreement that

2    Mr. Constantine had drafted for Little Isle to sign, he

3    had signed it in or about December 15th of '04.  He had

4    called me to his office at the time which I picked up the

5    document, told Mr. Kaiser I was going to visit with him in

6    the state of Hawaii shortly thereafter, on one of our next

7    due diligence trips.

8          And at that point in time I took the document

9    with me to Hawaii and Mr. Kaiser and I both signed it the

10   next time we were together, and I returned that original

11   document back to Mr. Constantine I believe in early 2005.

12   Q.   But even though it says 15 December '04, that's not

13   the actual day that either you or John Kaiser signed the

14   document or affixed the signature, is that your testimony?

15   A.   That's correct.  Above it there is a line that says

16   effective this 15th day of December, 2004.

17         So we signed the document and dated it according

18   to the date on the agreement.

19   Q.   With reference to the second funding consulting

20   agreement, see the signature Phillip A. Kenner?

21   A.   Yes, sir.

22   Q.   Whose signature is that?

23   A.   That is my signature.

24   Q.   It says 1, June, 2005, is that correct?

25   A.   Yes, sir, that's how I date most of my documents.

Kenner - Direct/Haley

4306

1    Q.    John Kaiser, 6/1/05, is that correct?

2    A.    Yes, sir.

3    Q.    And Tommy Constantine 6/1/05, is that correct?

4    A.    Yes, sir.

5    Q.    When did Tommy Constantine affix his signature to

6    this document?

7    A.    The original document that Mr. Constantine provided

8    for the '05 consulting agreement he signed on or about

9    June 1st of 2005 and delivered the document to me in

10   person in Scottsdale, Arizona.

11            And the same routine occurred.  I took the

12   document with me until the next time I saw Mr. Kaiser in

13   Hawaii on one of our due diligence trips.

14   Q.    Are you able, Mr. Kenner, to recollect the day that

15   occurred?

16   A.    No, I am not.

17   Q.    Was the execution of the funding consulting agreement

18   as represented by Government Exhibit 5104 part and parcel

19   of an artifice or scheme to defraud your hockey player

20   clients?

21   A.    Neither of them were.

22   Q.    And pursuant to the contractual obligations as set

23   forth in that funding consulting agreement, moneys flowed

24   to Tommy Constantine from accounts controlled by

25   Little Isle IV.

Kenner - Direct/Haley

4307

1        Is that correct?

2   A.   Yes, I believe which included transfers from Ula

3   Makika as well.

4   Q.   And those accounts, they were funded by moneys put

5   into the project by your hockey player clients that have

6   been identified.

7        Is that true?

8   A.   I believe in addition to moneys that both John Kaiser

9   and I also subsequently put into the project.

10  Q.   There's been testimony, sir, about the Urban

11  Expansion loan.

12       Do you recall that?

13  A.   Yes, sir, I do.

14  Q.   Tell us about the Urban Expansion loan, how it came

15  into existence, what occurred?

16  A.   In or about the summer of 2005, when Mr. Constantine

17  was working on vertical construction and infrastructure

18  development money which we were seeking in the

19  neighborhood of $15 to $30 million at the time, and I was

20  also negotiating in 2005 with Lehman Brothers to come in

21  and become my funding source, which would have frankly

22  taken Mr. Constantine's need out of the way.

23       By about early July 2005, to my surprise, I had

24  struck a deal that seemed to be very favorable with

25  Lehman Brothers to fund I believe somewhere in the

Kenner - Direct/Haley

4308

1   neighborhood of $10 million -- $20 million on the front

2   end and then subsequent funding as the development in the

3   infrastructure was put in place.  Within about 30 days

4   during the final legal preparation for that loan to be

5   signed, Lehman Brothers changed their deal requirements

6   with me significantly.

7            At that point in time, I was in a very

8   precarious position because I had already closed on the

9   258 acres parcel in December of '03.  I believe we closed

10  on the 1,500 acre Hanu'Apo parcel in December of 2004, and

11  we had a summer closing which was I believe end of July on

12  the Waikapuna parcel.

13           Now, the Waikapuna parcel became the most

14  important for me and for our group with respect to getting

15  traditional bank lending as represented to me by the Bank

16  of Hawaii and other Hawaiian banks, primarily because the

17  258 acres and the 1,500 acres, although they had

18  magnificent coastal views as we have seen from some of the

19  photos, we did not have beach access.

20           The Waikapuna parcel had a mile and a half beach

21  frontage in the state of Hawaii which was a remarkable

22  piece of land to have under contract.  Prior to the

23  closing with Lehman Brothers, the proposed closing, I

24  believe we had the Waikapuna parcel appraised by KPMG and

25  they appraised it I believe for $35,750,000, which was

4309

 1   great for our group considering I had the Waikapuna parcel

 2   under agreement for approximately $4.2 million.

 3            At the time of the proposed Lehman closing in

 4   the summer of '05 we had approximately $420,000 hard money

 5   deposit down, but the terms of the agreement with

 6   Lehman Brothers became just too difficult for myself, John

 7   Kaiser and Chris Manfredi to accept at that time and,

 8   frankly, we took a risk with that piece of property.

 9            At the 11th hour I told Lehman Brothers we were

10   not going to be able to complete the loan deal and they

11   were very upset with me at that point in time after a few

12   months of due diligence and a month's worth of legal

13   preparation, but I felt it was in the best interest of our

14   project not to close with Lehman Brothers at the time

15   which frankly would have been all the development money we

16   needed although it would have been a very expensive and

17   diluting event for our partnership.

18            I flew over to Maui, one of the other islands in

19   Hawaii, to meet again with Senator Avery Chumbley and I

20   expressed my apologies for us not being able to close the

21   Waikapuna parcel in that time, but in the meeting I

22   negotiated with Senator Chumbley an eight-week extension

23   on the Waikapuna project but, again, it was very costly.

24   Q.    In what respect was it very costly?

25   A.    Senator Chumbley was not happy that we weren't going

Kenner - Direct/Haley

4310

1   to close at that point in time because the Waikapuna

2   parcel was very heavily sought after by other investors at

3   the time.

4          But frankly I begged him because we had already

5   purchased about $5 million worth of land from him and we

6   had proposed to be partners on additional parcel after

7   Waikapuna, I asked him if he would grant us that extension

8   and he did, at a 1 and a half percent per week penalty fee

9   on the purchase contract, which equated to $64,440 of

10  penalties weekly.

11         I was responsible for making sure that their

12  bank account receive the $64,440 wire transfer on the

13  Monday of each week, which would then allow me the

14  following seven days to get the deal closed and at the

15  time I had in the neighborhood of two to three different

16  hard money lenders in addition to what Mr. Constantine was

17  working on at the time working diligently to do so,

18  including negotiating with the gentlemen who originally

19  introduced me to Lehman Brothers, Mr. Keswing.

20         On a weekly basis for the following seven weeks

21  I wire transferred $64,440 to Senator Avery Chumbley's

22  company, and we at that point had about $750,000 of hard

23  money in the deal which meant if I didn't close by the end

24  of week eight, we were going to lose the entire $750,000.

25         So what I did was I spoke -- Mr. Constantine was

4311

1    aware of what I was doing with the other lenders, but

2    probably around week five or six I told Mr. Constantine

3    that I was in a very difficult position, and asked him if

4    there was anybody he could speak to in his lending circle

5    that would allow us to close on this very valuable piece

6    of land without losing this wonderful opportunity for our

7    investment group, and at that point he spoke to

8    Mr. Grdina, who I didn't know at the time, and they came

9    back to me in about week six and said, we can do it, but

10   here are the terms that Mr. Grdina would sign off on this

11   deal.

12   Q.    Did Mr. Manfredi testify as relates to this Urban

13   Expansion loan in this case?

14   A.    I believe he did.

15   Q.    And who mentioned the word, the urgency of making

16   this happen, if you recall --

17            MR. HALEY:  Withdrawn.

18            I withdraw the question.

19   BY MR. HALEY:

20   Q.    Based upon what you told us, Mr. Kenner, was there an

21   urgency to obtain money real quick to not only stop those

22   weekly interest payments to make sure the property was not

23   completely lost?

24   A.    Yes.

25            By the time we closed the Urban Expansion loan I

4312

1   had about ten days left before we defaulted on the

2   $750,000, approximately, deposited already with C. Brewer,

3   Senator Avery Chumbley's company.

4   Q.   So who came through with the money to make sure that

5   you didn't lose that property?

6   A.   Mr. Constantine did.

7   Q.   And how much cash did you need to forestall the loss

8   of the property and stop these weekly interest payments?

9   A.   At that point we needed approximately $3.621 million.

10       And Mr. Constantine raised $3.5 million for us.

11  I deposited another $100,000 myself and the remaining

12  balance was funded by residual moneys in the Little Isle

13  bank accounts.

14  Q.   But following the closing, the Lehman closing, more

15  than $3.6 million was paid back to Urban Expansion.

16       Is that correct?

17  A.   Yes, sir.

18       I believe in the neighborhood of $6.8 million

19  was paid by Lehman Brothers at the closing.

20  Q.   So can you explain that for us?

21  A.   During the negotiations with Mr. Constantine and

22  Mr. Grdina and their attorneys at the time, in order to

23  document the deal there were a couple of elements that

24  they were interested in and primarily it was told to me by

25  Mr. Constantine that Mr. Grdina was concerned that if he

Kenner - Direct/Haley

4313

1   put up the $3.5 million, knowing that we were looking for

2   other development and infrastructure money, that he wasn't

3   going to disrupt some of his other investments and have me

4   take him out 30 days later or 60 days later to put him

5   through the inconvenience for him to make virtually no

6   money on the deal, and only to our benefit.

7           So as part of the arrangement that they made,

8   which was very common in all the hard money lending deals,

9   there were prepayment penalties, and as an example in the

10  Diamante Cabo San Lucas deal with Lehman Brothers, our

11  initial funding was $125 million that I had arranged six

12  months prior to the Hawaii deal --

13          MR. MISKIEWICZ:  Objection.

14          Not responsive.

15          THE COURT:  Sustained.

16          Stay focused on this.

17          MR. HALEY:  Thank you, Judge.

18  BY MR. HALEY:

19  Q.   Mr. Kenner, did you hear the instruction, the court

20  said stay focused on this question as relates to the money

21  that got paid back in excess of the $3.5 million for the

22  Urban Expansion.

23  A.   Yes, sir.

24          THE WITNESS:  Thank you, your Honor.

25  A.   With respect to the $6.8 million that Urban Expansion

4314

1   received at the closing from Lehman Brothers, it was the

2   original $3.5 million deposit, plus accrued interest on

3   the loan at that time which I believe was at 15 percent

4   interest, plus a couple million dollars that

5   Lehman Brothers and Windwalker had negotiated with Urban

6   Expansion through Mr. Constantine and Mr. Grdina to buy

7   them out of the two contracts that I believe they also had

8   with us, one of which was a business management contract

9   whereas on the Waikapuna parcel Mr. Constantine and

10  Mr. Grdina, through their extensive rolodex of high net

11  wealth individuals, they believed that they could be very

12  helpful in the sale of some of those ocean front parcels

13  when we eventually subdivided the land.

14  Q.   You mentioned something a moment ago in connection

15  with the Urban Expansion loan that had to deal with

16  prepayment penalties?

17  A.   Yes, sir.

18  Q.   Did that become part of that $6.8 million payment,

19  sir?

20  A.   Yes.

21       I believe somewhere in the neighborhood of

22  $1 million was a prepayment penalty, and approximately

23  $1 million was an agreed settlement amount between

24  Lehman Brothers, Windwalker and Urban Expansion to buy

25  them out of the future management agreement.

1    Q.    The bank records, Mr. Kenner, speak for themselves.

2          My question to you is this, sir, was the Urban

3    Expansion loan and the payments that ultimately flowed to

4    various individuals following the Lehman closing as a

5    consequence of the Urban Expansion loan, part of an

6    artifice or a scheme to defraud your hockey player

7    clients?

8    A.    No, sir.

9    Q.    Did some money flow to you after the Lehman closing

10   that went to Tommy Constantine pursuant to the terms and

11   conditions of the Urban Expansion loan?

12   A.    Yes, sir, it did.

13   Q.    And how did that come to be?

14   A.    Leading up to those -- the closing with

15   Lehman Brothers, I told Mr. Constantine that I was getting

16   divorced at the time, and I was looking to buy a new home

17   for my ex-wife and our children.

18         Mr. Constantine told me he had a number of deals

19   that were getting ready to close and fund, in addition to

20   the Urban Expansion or the Lehman Brothers closing, which

21   we were still at that time working very diligently to

22   close.  It was frankly no surety that it was going to

23   close until we finally signed the documents.

24         So Mr. Constantine told me if we stayed focused

25   on the closing with Lehman Brothers, he would take care of

4316

1    any short-term loans that I would require to help my

2    ex-wife and our situation at the time.

3              (Continued on next page.)

4317

1   Q    And that arrangement with Mr. Constantine was a

2   preexisting arrangement before the Lehman closing; is that

3   right?

4   A    Yes, sir, it was.

5   Q    Mr. Kenner, during the course of the Government's

6   case there was an excerpt of a clause that the Government

7   claimed would prohibit such payments, do you know what I'm

8   speaking of, to you?

9   A    That clause was in the Urban Expansion settlement

10  agreement that was signed at the closing with Lehman

11  Brothers.

12  A    Yes.

13  Q    And is there another document that exists, sir, that

14  would address those payments to you?

15          MR. MISKIEWICZ:  Objection to form.

16          THE COURT:  Overruled.  You may answer that.

17          THE WITNESS:  Thank you, your Honor.

18  Q    The agreement that we've seen in evidence so far was

19  the Urban Expansion settlement agreement and the

20  representations and warranty section that they showed us

21  governed what Urban Expansion's representations and

22  warranties were and did not reflect my responsibility to

23  that Urban Expansion settlement agreement.

24          In the closing documents that were provided to

25  all my clients and previously were sent out by e-mail, the

4318

1    representation warranty section for our joint venture,

2    they were sent out to John Kaiser and Chris Manfredi for

3    their sign-off in the summer of 2006.

4            Inside our joint venture agreement it clearly

5    represents that there are other business dealings between

6    myself and the Urban Expansion partners, in addition, it

7    also governs any previously existing business

8    relationships I had with the gentleman from Centrum, when

9    we heard from Mr. Bruce Berreth.

10   Q    Mr. Kenner, I'm going to show you or give you

11   Government's Exhibit 770, and ask you to take a look at

12   the documents contained in this exhibit, and, sir, please,

13   do not read every document.

14           But prior to me showing you this document, did

15   you look at this document?

16   A    Yes, I did.

17   Q    Or these documents, these four binders?

18   A    Yes, sir.

19   Q    Would you kindly identify that provision that you

20   believe is applicable to the payments that you received,

21   the payments that ultimately came to you as relates to

22   moneys concerning your wife and those other aspects?

23   A    Yes, sir.  I don't believe that the monies that went

24   to my ex-wife's home actually were covered by the Urban

25   Expansion residual funds, but I believe it was just the

4319

1    incremental, I believe, $419,000.

2    Q    Okay.

3    A    There were four documents that we produced at the

4    closing through our approximate ten law firms that dealt

5    with the closing, and in here these documents were sent,

6    as Mr. Sydor sent back, to each one of the members of

7    Little Isle IV after the closing.  I received all of the

8    documents from our closing attorney, Mr. Larry Markowitz,

9    who handled the transaction primarily on our side for our

10   joint venture partners, volume 2 of 2 titled Acquisition,

11   Joint Venture in Loan Documentation with respect to

12   Windwalker Hawaii, LLC's investment on the Big Island of

13   Hawaii.  Closing date:  August 14, 2006, volume 2 of 2,

14   under the representations and warranty section which is

15   recognized in the table of contents on 361 under

16   subsection VII [sic] for 17, following the first portion

17   of the paragraph it actually reads, notwithstanding the

18   foregoing, Windwalker acknowledges that JV partner, which

19   is our side of the partnership, may be involved in

20   business transactions unrelated to the property with the

21   holders of parcel 2, which is Centrum, and parcel 3 debt,

22   which was the Urban Expansion lending.

23        This section in its entirety was forwarded to

24   Chris Manfredi and John Kaiser long before the closing and

25   long before their signatures on the acknowledgment consent

4320

1    letter on July or August of 2006 for their approval

2    knowing what the previous relationships were.

3    Q    But notwithstanding their knowledge as relates to

4    your understanding of that provision, did you have a

5    good-faith belief that then permitted the payments that

6    came to you that we're talking about?

7    A    The loan agreements, yes.  In fact that issue was

8    raised in the preliminary term sheet that was signed

9    between Lehman Brothers, myself on behalf of our entities

10   and Alan Warden, at the very beginning of the negotiations

11   long before any of these documents were commenced, the

12   same not withstanding language.

13   Q    The Government's exhibits you have in front of you,

14   is there anything fraudulent or fictitious about those

15   documents?

16   A    No, sir.

17   Q    Other than Government's Exhibit 5104, wherein

18   Mr. Kaiser claims that someone, purportedly you or

19   Mr. Constantine forged his signature on the document,

20   Mr. Kaiser's signature appears on a multitude of other

21   documents as relates to the Hawaiian land investment, is

22   that true, sir?

23   A    Yes.

24   Q    Does his signature appear on a funding consultant

25   agreement -- excuse me, on an environmental indemnity

4321

1    agreement?

2    A    Yes, sir.  It does.

3    Q    Does it appear on an equity transfer agreement?

4    A    Yes, sir.  It does.

5    Q    Does it appear on some other loan agreement?

6    A    There are as you said a multitude of documents that

7    Mr. Kaiser signed in or around the closing but the ones

8    you mentioned previously I recall specifically.

9    Q    Okay.

10           Did you forge his signature on any of those

11   documents, Mr. Kenner?

12   A    No, sir.

13   Q    Based upon your testimony to this point in time,

14   Mr. Kenner, I will show you a chart.  I'll put it up on

15   the screen.

16           MR. HALEY:  Excuse me.  Let me mark it, Judge.

17           Your Honor, I believe I've stipulated with

18   counsel, Kenner Exhibit 215 will be offered as a chart on

19   behalf of the defendant.

20           MR. MISKIEWICZ:  So stipulated by the

21   Government.

22           MR. LARUSSO:  May I see it?

23           Thank you.

24           No objection, your Honor.

25           THE COURT:  Kenner 215 is admitted.

4322

```
1          (Whereupon, Defendant's Exhibit K 215 was
2    received in evidence.)
3    Q    I will ask you to take a look at it in a moment.
4          Little Isle IV Partners, sir --
5    A    Yes, sir.
6    Q    And it speaks for itself, but as an aid to the jury,
7    does that accurately reflect Hawaiian Partners capital
8    distributions at least as you know them to be, sir?
9    A    Yes, sir.
10   Q    And would you just give us a summary, Mr. Kenner, of
11   the meaning of that document?
12   A    The Little Isle IV was the general LLC that was our
13   pool of investor funds.  So whether the line of credit
14   funds came from Mr. Murray, Mr. Norstrom, Mr. Peca,
15   Mr. Sydor, Mr. Rucchin, Mr. Nolan, myself, John Kaiser or
16   any of the other approximately 20 cash investors that
17   ranged from 25,000 to 100,000.  Little Aisle IV is where
18   we gathered approximately $13 million in capital
19   contributions and that's how we, with respect to everybody
20   myself and John Kaiser, determined how much equity or
21   ownership each individual had in Little Isle.
22          Once the funds, whether they were taken out for
23   line of credit or not at the time, were used on a monthly
24   basis on some of those expenses, and that is not an
25   all-encompassing list.  Land planners, Hawaiian and other
```

4323

1    attorneys, architects, archeologists --

2              MR. HALEY:  Mr. Kenner, we can read the

3    document.

4              THE WITNESS:  Okay.

5    Q    That gives up some sense, does it not, of the

6    expenses that would be paid by virtue of the pool accounts

7    that came into Little Isle IV; is that correct?

8    A    Yes, sir, that is correct.

9    Q    That includes LOC monthly fees?

10   A    Line of credit monthly fees that would go back to the

11   different investor lines of credit.

12   Q    But not necessarily related to a specific --

13   withdrawn.

14             Now, did you create, Mr. Kenner, based upon bank

15   records, and indeed based upon your personal knowledge of

16   payments that are traceable to, for example, Michael

17   Peca's line of credit, a chart?

18   A    Yes, sir, I did.

19   Q    And when I say "personal knowledge" you know of these

20   transactions, sir, because you were personally involved,

21   is that true?

22   A    Yes, sir.

23   Q    I'm going to show you, and I'll ask you to take a

24   look at Kenner Exhibit 216.

25   A    Yes, sir.

4324

1   Q    And what is this, sir?

2   A    That was the chart I put together to demonstrate the

3   cash flow that was utilized out of Mr. Peca's line of

4   credit.

5   Q    And how were you able to create this document,

6   Mr. Kenner?

7   A    It was created by documents that the U.S. Government

8   had provided to you during discovery that you had

9   subsequently forwarded to me for review.

10  Q    In addition to that, what level of knowledge do you

11  have with reference to each one of these transactions?

12  A    Complete.

13  Q    How so?

14  A    I was in charge of the transactions.

15          MR. HALEY:  Your Honor, I believe by stipulation

16  it is admitted as 216.

17          MR. LARUSSO:  May I see it?

18          MR. MISKIEWICZ:  The Government has no

19  objection.

20          MR. LARUSSO:  Thank you.

21          No objection, your Honor.

22          THE COURT:  K 216 is in evidence.

23          (Whereupon, Defendant's Exhibit K 216 was

24  received in evidence.)

25  Q    Mr. Kenner, taking a look at K 216, Peca LOC

4325

1   distributions, what do you mean by Peca LOC distributions?

2   A    Could you focus that please a little better.

3        MR. HALEY:  Sure.

4   A    Peca line of credit distributions.

5   Q    So we see 4-4-05.  That figure, what does that

6   represent in the block?

7   A    Shortly after Michael Peca established his line of

8   credit for the Northern Trust Bank and pursuant to

9   conversations I had with Mr. Peca about his initial

10  contribution, we established the $1.6 million line of

11  credit and immediately upon availability I withdrew under

12  my discretion $1.25 million from Mr. Peca's line of credit

13  and I forwarded it to Mr. Nolan's line of credit, being

14  that Mr. Nolan carried a substantial financial burden from

15  his line of credit at that point in time.

16  Q    Going to the next page, can you explain to us what

17  that represents, sir?

18  A    On the 12th of April, 2005 we had more commitments

19  and more dealings with respect to Little Isle IV.  I

20  withdrew 350,000 from Mr. Peca's line of credit, had it

21  deposited into the Little Isle IV bank account and

22  pursuant to our 2004 operating agreement, I advanced

23  $240,000 to the 15 percent Ken Jowdy loan.

24       We also owed Mr. Constantine $37,500 under his

25  consulting agreement at the time.  And in addition I paid

4326

1    several other hard money lenders advance fees who were

2    hard money lenders acting very similar as Mr. Constantine

3    was working on our behalf to look for additional funding

4    for our Hawaii partners.

5    Q    Those hard money advance fees are not detailed on

6    that sheet, are they, sir?

7    A    They are not, but represented on either the Little

8    Isle IV or the Ula Makika bank statements.

9    Q    The next page.  What does that mean?

10   A    On July 7, 2005, I withdrew from Michael Peca's line

11   of credit $120,000 and transferred it to the Little Isle

12   IV bank account pursuant to our authorization letter

13   signed by Mr. Peca.  Once in Little Isle IV, I distributed

14   $25,000 to an escrow account with respect to our Hawaiian

15   land development project.  I also advanced more fees to

16   other hard money lenders at the time and then as an

17   internal transfer, I asked Northern Trust bank to transfer

18   $26,000 to Big Isle IV to cover expenses with relation to

19   Big Isle IV operations which included expenses to me,

20   archaeological consultant fees, land planning consulting

21   fees and several property tax payments.

22            Out of the Big Isle IV expenses, those were

23   about $18,000 of the $26,000 transferred were actually

24   used for those purposes.

25   Q    Now, when we see Kenner expenses -- one second.  What

4327

1    does that mean when we see "Kenner expenses"?

2    A    Throughout the Little Aisle IV or Ula Makika

3    expenses, either expenses I paid for on my credit cards

4    with respect to travel and entertainment in relation to

5    the project or a $2,000 a month consulting fee paid to one

6    of my entities which also incurred expenses on behalf of

7    the Hawaiian projects.

8    Q    As it relates to those records regarding Kenner

9    expenses, where are those records located?

10   A    The $2,000 a month consulting payment and the

11   reflection of the actual expenses distributions would be

12   on the banking statements, but the underlying expense

13   reports are no longer in my possession, but the other

14   expenses related to the underlying reports would be

15   reflected on any of my credit card bills at the time.

16   Q    How is it that the underlying expense records are no

17   longer in your possession?

18   A    In or about February, March of 2007, I had terminated

19   a former office manager per my standard advisor's practice

20   who was in possession of my corporate hard drives and

21   backup hard drives, and she took them and kept them in her

22   possession after termination.

23   Q    What is the name of the person?

24   A    Kristin Myrick.

25   Q    Is that the same Kristy Myrick that is or was a

4328

1   defendant in a lawsuit that you commenced against her,

2   sir?

3   A    Yes, sir, it is.

4   Q    Were those records obtained through the discovery

5   process in that lawsuit?

6   A    We sought to obtain them, but at a certain point in

7   time in discussions with my attorneys, we chose not to

8   further pursue it because it became very costly through

9   motion practice to do so.

10  Q    Let's go to the next page.

11       Would you explain to us what that is?

12  A    On July 14, 2005, I requested two advances, excuse

13  me, requested one advance of $30,000 from Mr. Peca's line

14  of credit from Northern Trust bank to be forwarded to

15  Little Isle IV's operating bank account.  Of that, $30,000

16  I used $15,000 as an advance to Mr. Jowdy pursuant to the

17  15 percent loan agreement that we had, and I also advanced

18  more hard money fees to other hard money lenders who were

19  seeking development money and infrastructure money for us

20  in our Hawaii partners.

21       On the 15th of July, 2005 I requested another

22  advance of $25,000, which traveled through Little Isle

23  IV's bank account, and that 25,000 became a portion of

24  $110,000 that at the time I transferred to Ula Makika

25  which was established in or around the summer of 2005;

4329

1    $50,000 at the time that was in Ula Makika's bank account

2    went to Diamante del Mar's portion of Mr. Jowdy 15 percent

3    loan agreement, $50,000 was forwarded to Mr. Jowdy's

4    personal company, Baja Development, pursuant to the

5    15 percent loan agreement and in fact $50,000 of those

6    funds were forwarded to Lehman Brothers at the time

7    pursuant to prepayment advance fees on that 2005 loan that

8    we agreed to and then subsequently walked away from.

9    Q    Mr. Kenner, I do not want you to be repetitive in

10   your testimony but we've seen a couple instances where it

11   says hard money advance fees.  How does that benefit the

12   project, the Hawaiian project when you pay out for hard

13   money advance fees in a very summary fashion?

14   A    In the hard money lending arena, which I learned as I

15   was going through the process, many hard money lenders,

16   much like Mr. Constantine's hard money funding arrangement

17   with us, would not begin to put together loans for our

18   company or for anyone unless you paid them a due diligence

19   fee up front, and those fees in my experience had ranged

20   anywhere from $10,000 to $975,000.

21   Q    Okay.  Going to the next page, we see 395,000 to

22   Kaiser Ledbetter?

23   A    Yes, sir.

24        MR. HALEY:  I'll hold off questioning at this

25   point in time that relates to the transfer.  We'll be

4330

1    covering that at some later point for purposes of

2    continuity and organization.

3            MR. MISKIEWICZ:  Objection.

4            MR. HALEY:  I'll withdraw that comment, Judge.

5    Q    I'll not ask you questions, Mr. Kenner at this point

6    in time with reference to that 395, but we can agree that

7    $395,000 of Michael Peca's money went out with reference

8    to the Kaiser-Ledbetter event is that correct?

9    A    Yes, on October 19, 2006.

10   Q    And finally, sir, what DOES that payment reflect?

11   A    On April 23, 2007, while we were not in receipt of

12   Mr. Jowdy's loan repayment to us, we continued to be faced

13   with monthly line of credit fee obligations for Little

14   Isle IV, so I requested $60,000 from Mr. Peca's line of

15   credit, deposited into the pool corporate account for

16   Little Isle IV and asked Mr. Mascarella at Northern Trust

17   bank to pay the lines of credit that had outstanding

18   monthly fees on them.

19   Q    And finally, sir, with reference to the last page of

20   the document, what does that reflect?

21   A    On April 23, '07, I did the same thing.  I asked for

22   a $101,345 advance from Mr. Peca's line of credit through

23   Mr. Mascarella to be forwarded to the Little Isle IV bank

24   account and then pursuant to representations from

25   Mr. Mascarella what was due on each of the lines of credit

4331

1  I asked him to disseminate the money appropriately to pay

2  down the monthly line of credit fees on the Little Isle IV

3  investors.

4  Q    Now, when you first established the lines of credit

5  through consultations with your clients, did you provide

6  them this level of detail in connection with the use of

7  the line of credit, Mr. Kenner?

8  A    Not to this detail.

9  Q    Why not?

10  A    Our discussions were -- the information I had, I

11  transmitted to my clients, was based on verbal

12  communication I would have at their house.

13       I think we saw some of Mrs. Peca's handwritten

14  notes, that was similar to the notes I would provide for

15  the clients while we would sit and go through the details.

16  So verbally I would explain what had gone on and what we

17  were doing with the corporate accounts and the cash flows

18  coming in and out of the different accounts and I would

19  make notes like that and hand them to the clients at the

20  end of the meeting for their records.

21  Q    Well, in connection with the establishments of the

22  line of credit accounts, did or did they not have an

23  understanding that their lines of credit and the moneys

24  that were taken from the lines of credit were going to be

25  pooled?

4332

1              MR. MISKIEWICZ:  Objection.

2              THE COURT:  When you say "they," who are you

3     referring to?

4              MR. HALEY:  Excuse me, Judge.  The specific

5     hockey player clients that are alleged to be victims in

6     the indictment.

7              THE COURT:  Overruled.  You may answer that.

8     A    Yes, sir, they were aware.

9     Q    So, what happened to the Hawaiian land development

10    project?

11    A    After August of 2006, we were sent $6.9 million at

12    the Lehman Brothers closing which we had disseminated to

13    the different investors that the time and held back just

14    under a million dollars for ongoing expenses for the

15    company which in effect became the line of credit monthly

16    fees primarily.

17             Over the following two years, Alan Warden and

18    Windwalker, prior to the bankruptcy by Lehman Brothers in

19    or about September of 2008, was in charge of the monthly

20    budgets and the operations of the company.

21             Mr. Warden --

22             MR. HALEY:  Sir, let me interrupt you --

23             THE WITNESS:  Yes, sir.

24    Q    -- Only for this purpose.

25             Lehman Brothers was the entity that gave the

4333

1   funding for further development of the Hawaiian land

2   development property; is that correct?

3   A    Yes, sir.

4   Q    What happened with Lehman Brothers?

5   A    In or about September 2008, Lehman Brothers

6   commercial banking division filed for bankruptcy and

7   ceased any future lending to projects they had on the

8   books, one of which was our Hawaii development project.

9   Q    You testified that in the early 2000s period land

10  development in Hawaii, you used the word was embryonic or

11  angel?

12  A    Embryonic in its current phase.

13  Q    Was that a good or bad thing, embryonic in its growth

14  phase?

15  A    It was very fortunate for us to be involved at the

16  time.

17  Q    But something happened thereafter with respect to the

18  real estate market; is that correct?

19  A    Yes, in or about 2008, the same time that the Lehman

20  Brothers bankruptcy took place, the real estate markets

21  both in Hawaii and on the mainland U.S.A. were severely

22  devastated.

23  Q    I'll use the term, Hawaii project land development,

24  is that -- today, what corporate entity exists as it

25  relates to your hockey player clients' investments in the

4334

1   Hawaii land development project that are reflected in

2   those hockey players clients named as alleged victims in

3   this matter?

4   A    Na'alehu Ventures 2006 LLC, is still in existence

5   today, managed by John Kaiser, and one of the partners of

6   Na'alehu 2006 is still Little Isle IV LLC.

7          The only true remaining assets that I believe is

8   held by the company is the loan arrangements to Mr. Jowdy.

9   Q    Which remains unpaid.

10  A    Which remains unpaid today.

11  Q    With respect to the corporate entity and the interest

12  that your hockey players have in that entity has some

13  value; is that correct?

14  A    Yes, I believe it is in the neighborhood of

15  $19 million today.

16  Q    How do you calculate that?

17  A    The initial transfers that went to Mr. Jowdy from

18  November 2004 through March of 2006 and then calculated at

19  15 percent interest rate compounded until nine years later

20  today.

21  Q    Well, there's testimony, sir, that lawsuits as

22  relates to Mr. Jowdy were dismissed without prejudice.  Do

23  you recall that testimony?

24  A    Yes, sir.  I do.

25  Q    I know you are not a lawyer but do you have an

4335

1    understanding what the term "without prejudice" means?

2    A    Yes, sir.

3         My understanding is that it means that any time

4    in the future we can file lawsuits against Mr. Jowdy

5    without any adverse cause by us dismissing the lawsuit at

6    the time.

7    Q    And I know there was testimony, sir, from

8    Mr. Richards that it was his opinion at a particular point

9    in time due to the fact that Mr. Jowdy assets was in

10   Mexico, at least at that point in time, he felt

11   comfortable in recommending the dismissal of the lawsuit

12   without prejudice.

13        Do you recall that testimony?

14   A    Yes, I do.  I believe that was one of the reasons.

15   Q    But that was Mr. Richards' opinion at that time, is

16   that true?

17   A    Yes, sir, it was.

18   Q    And you haven't -- have you had the opportunity, sir,

19   to let's say within the last 20 months, consult another

20   attorney in connection with the viability of such a

21   lawsuit and the ability to obtain judgment here in the

22   United States, or pursue actions in Mexico for recovery of

23   that loan?

24   A    I have but it has been very difficult.

25   Q    By the way, have you been to Diamante Cabo San Lucas?

4336

1    A    I've not been allowed on the property since on or

2    about 2008 when our negotiations broke down.

3    Q    Prior to that point in time had you seen the

4    property?

5    A    Yes, sir, on a very regular basis.

6    Q    And there was some testimony regarding the property

7    and the apparent value of that property.  Can you describe

8    it, Diamante Cabo San Lucas, to the jury?  What does it

9    look like?

10             MR. MISKIEWICZ:  Objection.

11             THE COURT:  Overruled.  Briefly describe it.

12             THE WITNESS:  Thank you, your Honor.

13   A    The project itself sits on 1500 acres of land, just

14   to the west of downtown Cabo San Lucas, one of the largest

15   development parcels in South Baja where Cabo San Lucas is

16   located.  The property now possesses two championship golf

17   courses and a number of vertical construction buildings

18   are used in a hotel-like fashion in addition to a number

19   of amenities that have been developed over the years,

20   specifically since the majority have been developed since

21   2010 when our negotiations broke down and we dismissed the

22   case through Mr. Richards.

23   Q    To your knowledge, does the Diamante Cabo San Lucas

24   cater to a particular clientele?

25   A    Originally our goal was to initiate our membership

4337

1    drive with professional athletes and entertainers, but

2    certainly subject to the litigation that ensued with

3    Mr. Jowdy, you know, that has changed some of the

4    marketing direction with my dismissal.

5    Q    Now, I'm going to ask you to take a look at a chart

6    that has already been admitted in evidence as Government's

7    Exhibit 21.  Do you see it or not?

8            THE COURT:  You have to zoom in.

9            MR. HALEY:  Thank you, Judge.

10           THE WITNESS:  Okay.  Thank you.

11           MR. HALEY:  Does that help?

12           THE WITNESS:  Yes, sir.

13   A    Okay.

14   Q    Does that chart have any meaning to you, Mr. Kenner?

15   A    Yes, sir, it does.

16   Q    In what respect?

17   A    This appears to be the distribution from the funding

18   closing with Lehman Brothers where they forwarded

19   approximately $6.8 million to us at the close of escrow in

20   August of 2006 into our newly formed bank account for

21   Na'alehu Ventures 2006.

22   Q    For my edification, at that closing there are also

23   repeated payments in the amount of $42,500 to Schwab.  Do

24   you recall that?

25   A    There were for the cash investors?

Kenner - Direct/Haley

4338

1   Q    Yes.

2   A    That had deposited originally 100,000 investments.

3   Q    Right.

4   A    They each received a wire transfer $42,553.  I

5   believe the majority of those deposits were sent back to

6   the original investors' Schwab bank account.

7   Q    Does this chart reflect those payments to the

8   individual hockey player's investments?

9   A    I believe it does, as a portion of line 4 in the box

10  on the bottom left where it represents other distributions

11  during the period of $2.9 million.

12          I believe those $42,000 payments, in addition to

13  smaller payments that were made to smaller investors, are

14  a subset of that approximate $2.9 million.

15  Q    Well, Mr. Kenner, do you recall on occasion during

16  the direct testimony of one or more government witnesses,

17  whether the question was asked of one or more government

18  witnesses whether they ever received a penny back from

19  their line of credit or for their cash investment?  Do you

20  recall that?

21  A    I recall several witnesses testifying to that.

22  Q    Do you recall their answers initially?

23  A    I believe they all said they received nothing back.

24  Q    But they were in error, were they not, sir, when they

25  gave that answer?

Kenner - Direct/Haley

4339

1   A    I believe they were.

2   Q    Because this chart reflects at least what they did

3   get back by your own testimony, true?

4   A    Yes, sir.  That is correct.

5   Q    Now it's not full recovery, as indicated, isn't that

6   true?

7   A    That's correct.  There was not a full recovery.

8   Q    At least not today, correct?

9   A    Not as of yet.

10           MR. HALEY:  Your Honor, I'm ready to move into

11  another area.  Perhaps this would be --

12           THE COURT:  Okay.  We'll take the break.  Why

13  don't we say 1:50, an hour from now.

14           Don't discuss the case.

15           (Whereupon, at this time the jury exits the

16  courtroom.)

17           (Afternoon recess taken.)

18

19

20

21

22

23

24

25

4340

```
1              A F T E R N O O N   S E S S I O N

2

3              THE CLERK:  All rise.

4              THE COURT:  Please be seated.

5              All right, let's bring in the jury.

6              Mr. Kenner, please return to the stand.

7              (The witness resumes the stand.)

8              THE COURT:  At the end of the day today the

9    juror who has the scheduling issues, I will leave him out

10   here.

11             My thinking is to accommodate him next week as

12   long as he doesn't have vacation, but I'm concerned about

13   the timing.  We're on day two and we're in sphere two.

14             I have to have a discussion with you before I do

15   that because I'm concerned.

16             MR. HALEY:  Not all the spheres are of the same

17   dimension.

18             THE COURT:  I was hoping that would be your

19   answer.

20             MR. HALEY:  It's true, sir.

21             Your Honor, if I may, in my own defense, I'm

22   trying to keep my client's testimony within the context of

23   the allegations in the indictment and there's multiple

24   allegations.

25             THE COURT:  As you can see, I haven't said
```

4341

1   anything yet because I agree with you and you have been

2   efficient but I'm anticipating there's going to be overlap

3   in the different spheres, so just be cognizant of that.

4           MR. HALEY:  I'll do my best, Judge.

5           THE CLERK:  All rise.

6           (The jury is present.)

7           THE COURT:  Please be seated.

8           Go ahead, Mr. Haley.

9

10  BY MR. HALEY:

11  Q.   Mr. Kenner, finishing up on the Hawaiian land

12  development aspects of the indictment, there was some

13  testimony throughout the government's direct case that

14  suggested that the prepayment penalties with reference to

15  the Urban loan were excessive.

16          Do you recall a suggestion made in that regard?

17  A.   Yes, I do.

18  Q.   Is that the first time you had encountered prepayment

19  penalties as relates to, let's say, loans associated with

20  the Hawaiian land development or had there been other

21  instances where you saw similar such prepayment penalties?

22  A.   There have been others.

23  Q.   Could you just give us one example, sir.

24  A.   In March of 2006, approximately five months earlier

25  when I closed on the $125 million development loan in Cabo

4342

1    San Lucas, Lehman Brothers had a $125 million prepayment

2    penalty.

3    Q.   Now, Mr. Kenner, I'm going to read to you just a

4    paragraph in the indictment that falls under what is

5    characterized as the Eufora investments.  It reads as

6    follows:

7         There was a further part of the scheme to

8    defraud that between February 2008 and May 2009, the

9    defendant Kenner convinced -- and at this point I'm going

10   to substitute the names rather than the John Does -- Peca,

11   Sydor, Rucchin, Ranford and Nash to invest money in

12   Eufora, in exchange for an ownership interest in the

13   company, by representing to each of them that Eufora was a

14   promising company with great potential for growth.

15        Is that sentence essentially accurate, sir?

16   A.   The portions of the sentence that represent those

17   individuals did invest in Eufora for a portion of the

18   company and Eufora was an up and coming I believe was the

19   term?

20   Q.   Was a promising company with great potential for

21   growth.

22   A.   Yes, that is correct.

23   Q.   Staying, sir, with that aspect of the indictment.

24        When you made the -- withdrawn.

25        When you had conversations with those hockey

4343

1   player clients, specifically Peca, Sydor, Rucchin, Nash

2   and Ranford regarding Eufora, what was Eufora at that

3   point in time in the nature of its corporate structure,

4   sir?

5   A.   Although I hadn't been an active member of Eufora

6   since about 2005, my understanding from the different

7   corporate officers was that Eufora was an Arizona LLC and

8   held the ownership of a number of my investment clients at

9   that time.

10  Q.   And as relates to Eufora in and of itself, was it a

11  publicly traded company or privately held company?

12  A.   At all times that I'm aware Eufora has been a private

13  company.

14  Q.   Given your background and experience as a financial

15  advisor, and given the licenses you hold, sir, would you

16  simply explain the similarities, differences, if any,

17  between a publicly held corporation and a privately held

18  corporation?

19  A.   In a simple version a publicly held company, the

20  shares that trade on a daily basis are shares that trade

21  from one investor to another investor and they go through

22  a public medium typically known as a clearing house.

23       Private companies in general, if you're not part

24  of the initial stock purchase or offering of the company,

25  as Mr. Constantine released in 2002, every other share

Kenner  -  Direct/Haley

4344

1    from that point forward is typically going to be a

2    repurchase of somebody else's ownership in that company

3    unless the corporation by design decides to offer

4    additional stock and actually dilutes the current

5    ownership base of the company.

6            I don't believe Eufora had done a delusion

7    offering at any point that I'm aware of.

8    Q.    So, by way of example, let's say Microsoft or

9    Facebook, as they exist today, are publicly traded

10   companies; is that correct?

11   A.    Yes, sir.

12   Q.    And if I am purchasing shares from an individual who

13   owns shares in let's say Microsoft or Facebook, what

14   occurs?

15   A.    You would typically have a brokerage account at a

16   company anywhere around the world, and that brokerage firm

17   would place your shares available to be sold, somebody on

18   the other end of the transaction who you would never meet

19   would also be at a brokerage firm typically and ask for a

20   certain number of shares to be purchased.

21           Both the purchase and the sale offers would be

22   matched up typically by a clearing house associated with

23   that stock exchange that Microsoft or Facebook were

24   trading on, and the transaction would complete itself in

25   an anonymous way.

Kenner  -  Direct/Haley

4345

1    The seller would receive cash that they would

2    then be in possession of and the buyer would receive the

3    stock pursuant to that transaction.

4    Q.   So I as a seller receive this cash?

5    A.   Yes, sir.

6    Q.   What restrictions, if any, do I have in terms of the

7    cash I receive?

8    A.   None.  That's your cash.

9    Q.   Let's get specific now, sir, in terms of Eufora.

10   At the point in time you were recommending to

11   your clients that they obtain an ownership interest in

12   Eufora, how were they acquiring that ownership interest in

13   Eufora at that point in time?

14   A.   During the time frame reflected in the indictment,

15   the ownership in 2008, with exception of Mr. Murray's

16   December 31st, 2008 transaction, were all private

17   purchases from stock that Mr. Constantine had controlled

18   either personally or through one of his own entities.

19   Q.   So when Mr. Constantine received cash from your

20   clients, what restriction, if any, did he have on the use

21   of that cash?

22   MR. MISKIEWICZ:  Objection.

23   THE COURT:  Sustained as to form.

24   BY MR. HALEY:

25   Q.   Well, when you were having discussions with your

Kenner  -  Direct/Haley

4346

1   hockey player clients, specifically Mr. Peca, Mr. Sydor,

2   Mr. Rucchin, Mr. Nash and Mr. Ranford in reference to

3   paragraph 12 of the indictment, would you describe to the

4   Court and jury the nature of those discussions that you

5   had with those individuals in terms of how they were

6   acquiring an interest, ownership interest, in Eufora and

7   the means by which they would acquire an ownership

8   interest?

9   A.    After a brief summary with each of those individuals

10  about the status of Eufora and the potential for growth

11  that was apparent at the time, I represented to each one

12  of them that one of the members of Eufora, specifically

13  Mr. Constantine at the time, was looking to sell some of

14  his stock to raise money for personal issues, and it was

15  only a very small portion of his ownership at the time,

16  and if they were interested, there would be an opportunity

17  to purchase Mr. Constantine's private stock in exchange

18  for a trade of ownership for cash.

19  Q.    Well, in connection with that conversation,

20  Mr. Kenner, did or did you not make any specific

21  recommendation or representation that the cash that would

22  be going to Mr. Constantine would in turn be put

23  immediately or subsequently into Eufora for any particular

24  purpose?

25  A.    No, sir.

4347

1  Q.    Who was the account holder on the account known as

2  Constantine Management Group?

3  A.    To the best of my understanding it's

4  Mr. Constantine's account.

5  Q.    Well, based upon the conversations you had with your

6  clients as you told us, your hockey player clients, was it

7  part of a scheme or artifice to defraud when that money,

8  for purposes of acquiring a percentage of

9  Mr. Constantine's ownership interest in the company, was

10  sent to Constantine Management Group?

11  A.    No, it was not.

12  Q.    In what sense, sir, and in what way did you feel

13  comfortable in making those recommendations to those

14  specific individuals concerning acquiring an ownership

15  interest in Eufora?

16         MR. MISKIEWICZ:  Objection.

17         THE COURT:  No, that's okay.  You can answer

18  that.

19  A.    In 2008, to the best of my recollection, there were

20  too many elements that were important to my

21  recommendation.

22         It was a good time to invest in Eufora.  One of

23  which was I knew that Mr. Constantine and members of the

24  company had been working diligently on acquiring a

25  multimillion dollar operating capital loan which will

Kenner   -   Direct/Haley

4348

1    allow the company to go out and further invest in some of

2    their marketing strategies which I believed at the time

3    were very cutting edge and unique in the marketplace for

4    both the credit card and the prepaid card world.

5           And, second, I knew, based on conversations with

6    some of the same principals at Eufora, that they were

7    about to be given or granted their final patents on

8    several of the very critical patents that they were

9    seeking and were pending for the prior five or six years.

10   Q.   Can you give us an example, Phil, of a company, a

11   privately held company, where an individual -- where

12   individuals had an ownership in that privately held

13   company and the company was thereafter transformed into a

14   publicly held company by way of what's called an IPO, is

15   that it?

16   A.   Yes, sir.

17          MR. MISKIEWICZ:  Objection.

18          THE COURT:  Sustained.

19          I don't think we need to get other examples

20   unrelated to the case.

21          MR. HALEY:  Okay.

22   BY MR. HALEY:

23   Q.   The conversations you had with Mr. Sydor,

24   Mr. Rucchin, Mr. Nash and Mr. Ranford concerning Tommy

25   Constantine's desire to obtain cash by way of selling a

4349

1  percentage of his ownership interest in Eufora, where did

2  those conversations take place?

3  A.  To the best of my recollection, those conversations

4  would have taken place over the phone at that point in

5  time.

6       I don't recall any specific face-to-face

7  meetings, but it's entirely possible, because at that

8  point in time I was probably traveling between 200 and 250

9  days a year to see my clients.

10  Q.  Well, at least one of the hockey player clients

11  testified that he had a recollection of a conversation

12  that took place I think in his car in his driveway; do you

13  remember who that was?

14  A.  I don't recall as I sit here.  I do recall somebody

15  mentioning that, but I don't recall which specific

16  investor that was.

17  Q.  Okay.

18       Now, when one of your hockey player clients

19  purchased a percentage of Mr. Constantine's ownership

20  interest in Eufora, what should then occur as relates to

21  the books and records of Eufora?

22  A.  I believe --

23       MR. MISKIEWICZ:  Objection.

24       THE COURT:  I'll let him testify as to what was

25  going to occur, but not what should occur.

4350

1      MR. HALEY:  Thank you, your Honor.

2  BY MR. HALEY:

3  Q.    What was your understanding, sir, as to what would

4  occur when the individual hockey player client purchased a

5  portion of Mr. Constantine's share in Eufora?

6  A.    My understanding was as soon as our transaction had

7  complete, and by that I mean wire transfer from the

8  investor's account into Mr. Constantine's direct account

9  that one of the officers of Eufora, who I believe was C.R.

10  Gentry at the time was in charge of documenting that

11  transaction, to transfer stock from Mr. Constantine's

12  holdings to the new individual which was held in

13  Mr. Gaarn's controlled LLC, AZ Eufora Partners I, and on

14  the books and records of the company would then reflect

15  that change in ownership.

16  Q.    Now, we can agree, can we not, Mr. Kenner, that at

17  various points in time when your individual hockey player

18  client would purchase a portion of Mr. Constantine's

19  ownership interest in Eufora, which may then perhaps go to

20  Constantine Management Group's account, there subsequently

21  were transfers out of that account to you, did that occur?

22  A.    I believe we saw in this courtroom two transactions

23  that may have occurred subsequent to investor capital

24  going to Mr. Constantine for his private stock.

25  Q.    Which two are those?

4351

1    A.    If I recall, on April 7 there was a transaction, of

2    2008, there was a transaction by which Peca acquired a

3    portion of Mr. Constantine's private stock and

4    Mr. Constantine wired those funds to me after his receipt

5    of funds as repayment of a loan I paid to him

6    approximately five days earlier on April 2.

7              Second, I believe there was a transaction that

8    the date escapes me for the moment, but it was I believe

9    with Mr. Tyson Nash.

10             Subsequent to his investment of $100,000

11   purchasing Mr. Constantine's private stock,

12   Mr. Constantine was refunding me $17,000 and I believe we

13   saw some of the bubble text messages that reflected a text

14   message conversation between Mr. Constantine and I in and

15   around the dates that he refunded $17,000 to me.

16   Q.    When you say refunded 17,000 to you, what do you mean

17   by that?

18   A.    There was a transaction that we saw on one of the

19   government's exhibits.

20             There was a spreadsheet documenting some of the

21   Constantine Management Group cash flow by which I had

22   transferred $25,000 to Mr. Constantine a few days prior to

23   the Nash transaction.

24             I believe that I actually asked Mr. Constantine

25   if he could refund the $25,000 at that time and based on

Kenner  -  Direct/Haley

4352

1    our text message conversations, he told me he had some

2    other needs for some of the funds and asked if $17,000

3    would be okay.  And I believe I responded okay, cool, and

4    then forwarded him my bank wiring instructions.

5    Q.   With reference to those two particular transactions,

6    Peca and the second one.

7    A.    Mr. Nash.

8    Q.    Mr. Nash.

9            When you had the conversation with both Mr. Peca

10   and Mr. Nash, did you get into that level of detail with

11   reference to let's say money that Tommy Constantine may or

12   may not have loaned you, sir?

13   A.    I believe I did.

14   Q.   As relates to those two transactions, was it part of

15   an artifice or scheme to defraud both Mr. Peca and

16   Mr. Nash when you had those conversations, sir?

17   A.    No, sir.

18   Q.   What is your understanding today regarding Eufora as

19   a privately held company, the potential for growth and

20   perhaps return to the owners should the company, let's

21   say, be sold publicly?

22           MR. MISKIEWICZ:  Objection.

23           THE COURT:  I'll allow that briefly.

24   A.   My understanding at the moment is that the company is

25   valued somewhere between at a minimum two and three times

4353

1    the original valuation when the 2008, 2009, transactions

2    occurred.

3            That would place the company somewhere in the

4    neighborhood of 50 to $75 million worth of value to an

5    outside publicly traded company.

6    Q.    Mr. Kenner, I'm going to read the next paragraph in

7    the indictment:

8            It was further part of the scheme to defraud

9    that between December 2008 and May 2009, the defendant

10   Kenner convinced Mr. Rucchin and Mr. Ranford to invest

11   money in Eufora in exchange for an ownership interest in

12   the company.

13           As relates to that aspect of the indictment,

14   both Mr. Rucchin and Mr. Ranford testified in this

15   courtroom, correct?

16   A.    Yes, sir.

17   Q.    And would you explain to the best of your memory the

18   nature of the conversations you had with Mr. Rucchin and

19   Mr. Ranford concerning that aspect of the indictment?

20   A.    In or about the times of their investments, the dates

21   of their investments, I recall speaking with both of them

22   on the phone about a subsequent opportunity to purchase

23   stock from one of the principals at Eufora, named Timothy

24   Gaarn, who also testified here during this trial.

25   Q.    Now, as relates to Timothy Gaarn, at that point in

4354

1    time what information did you have available to you

2    regarding his ownership interest in Eufora?

3    A.   I was aware, based on the books and records of Eufora

4    that I had seen, that Mr. Gaarn owned a little bit more

5    than five percent of Eufora.

6    Q.   And preceding the conversations you had with

7    Mr. Rucchin and Mr. Ranford, what if any conversations did

8    you have with Mr. Gaarn concerning his ownership interest

9    and whether or not he had a desire to sell a portion of

10   that?

11   A.   My conversations with Mr. Gaarn began somewhere

12   around November of 2008 with respect to his ownership

13   interest in Eufora.

14          Mr. Gaarn, at that time, had owed me north of

15   $150,000 for loans that I had personally given to him

16   between -- the majority of which I loaned to him between

17   2007 and 2008.

18          And based on the $267,000 I paid towards the

19   Hawaiian lines of credit in the latter half of 2008, and

20   the legal fees that continued to incur based on litigation

21   efforts versus Mr. Jowdy, I told Mr. Gaarn I really could

22   use repayment of those funds or as much as he could.

23          Mr. Gaarn, he told me that at the time he really

24   did not have any assets other than his ownership in Eufora

25   that had any liquid value or sellable value at that time.

4355

1      And I told him that I could help him sell some

2   of the Eufora stock similar to the stock Mr. Constantine

3   had sold earlier in 2008, and Mr. Gaarn agreed that he

4   would be willing to sell a portion of his stock to satisfy

5   the loans initially to me.

6   Q.   To your knowledge, what was his financial state at

7   that point in time, if you know?

8   A.   At that point in time I know that Mr. Gaarn had just

9   finished going through a tougher period of financial

10  stability for himself and his family, and that was the

11  basis for the loans that I had provided to him, to help

12  him with different troubling times, whether it was pending

13  foreclosure on his home that I bought him out of and

14  assisted his family, and/or I believe some of the private

15  school expenses that he had that were critical to his

16  children at the time.

17      But by the end of 2008 Mr. Gaarn, on his behalf

18  and my behalf, had begun to work on a series of other very

19  promising private deals in China and he was working very

20  diligently on those with the expectation it would be a

21  significant windfall of income to both Mr. Gaarn and

22  myself in 2009, 2010.

23  Q.   At that point in time with respect to Mr. Gaarn, was

24  there an understanding as to the process and protocol by

25  which persons who were purchasing his interest in Eufora

4356

1    would acquire that interest in terms of how the money

2    would be conveyed?

3    A.   Yes, sir.

4    Q.   Would you describe that?

5    A.   Yes.

6         Starting in 2008, when members of Eufora had --

7    excuse me -- when principals of Eufora had hired

8    Mr. Gentry to restructure the books and accounting records

9    of the company in order to pursue outside lending sources

10   which Mr. Constantine had brought to the table for the

11   company, Mr. Gentry had been tracking on a realtime basis

12   the sales of Mr. Constantine's stock.

13        And I recall near the end, I believe it was the

14   last two investors in Mr. Constantine's -- excuse me --

15   the last two investors who purchased private stock in

16   Mr. Constantine, Mr. Gentry had instructed us to have

17   those funds sent through Eufora's bank account prior to

18   arriving in Mr. Constantine's bank account to make the

19   tracking mechanism much easier for him for the books and

20   records of the company.

21        In December of 2008, when we informed Mr. Gentry

22   that Mr. Gaarn was going to be selling some of his private

23   stock at that time, he instructed Mr. Gaarn and I to

24   follow the same protocol he had set up for the last two

25   investors in Mr. Constantine's private stock.

Kenner  -  Direct/Haley

4357

1          So each of the transactions that occurred from

2     December 31st, '08, through I believe May 24 of 2009,

3     those transactions ran through Eufora's bank account for

4     accounting and tracking purposes so Mr. Gentry could make

5     sure, on the books and records of Eufora, that the proper

6     individuals were granted and recorded as the new owners of

7     Eufora.

8     Q.    That's different than what occurred when

9     Mr. Constantine was previously selling stock, right,

10    because those monies went directly to Constantine

11    Management Group; is that true?

12    A.    If I recall correctly, there may have been seven

13    transactions to purchase Mr. Constantine's private stock

14    and I believe the first five transactions, if my

15    recollection serves me proper, the first five transactions

16    did go directly to Mr. Constantine's Constantine

17    Management Group account.

18          And at that point Mr. Gentry just told us, based

19    on the fact that he was working quite diligently to make

20    sure the accounting was proper at the company, it would be

21    much easier for tracking purposes if the last two

22    transactions that actually took place went through Eufora

23    and then to Constantine Management Group.

24    Q.    So as we saw, Mr. Kenner, in bank records, transfers

25    of money from accounts belonging to Mr. Rucchin and

4358

1    Mr. Ranford to Eufora, and then from Eufora accounts to

2    Mr. Gaarn's account, and then from Mr. Gaarn's account to

3    accounts you controlled, we saw that in the transfers as

4    reflected in the banking records; is that correct?

5    A.    Yes, sir.

6    Q.    Do you have an understanding that when that occurred,

7    when Mr. Rucchin and Mr. Ranford or when money from

8    Mr. Rucchin and Mr. Ranford's account went first to

9    Eufora, that the ownership interest was then reflected on

10   the books and records in terms of Mr. Gaarn's ownership

11   interest being diminished because he's selling it and

12   their interest enhanced because they're purchasing part of

13   his interest?

14   A.    That's exactly what happened.

15   Q.    Would you describe, Mr. Kenner, the substance of the

16   conversation you had with Mr. Rucchin and Mr. Ranford

17   regarding those transactions?

18   A.    I believe with each of the individuals, Mr. Rucchin

19   and Mr. Ranford, I let them know that based on their

20   familiarity with Eufora, as I believe they were both

21   previous investors prior to 2008 in Eufora -- excuse me,

22   they were investors prior to the Gaarn sales at that point

23   in time, I let them know that Mr. Gaarn, who is a board

24   member and as they were aware the managing member of AZ

25   Eufora Partners I, was liquidating a portion of his

4359

1   private holdings or private ownership in the company and

2   that the opportunity presented itself as Mr. Gaarn was

3   looking to raise capital, one, to satisfy some obligations

4   he had with me, and also because personally he needed to

5   take care of personal obligations.

6          I do recall that at each time, whether it was

7   Mr. Constantine's stock or Mr. Gaarn's stock, I do recall

8   in all of the conversations the individuals asking is

9   there a reason that the board members or principals of the

10  company were selling at that time, is there something we

11  should be aware of that may be adverse?

12         And I told them no.  In fact, I think they both

13  regretted the fact they needed to sell some stock at that

14  time to raise personal capital, but both of them still

15  retained a significant portion of their original stock

16  after the sale.

17  Q.   When you spoke to Mr. Rucchin and Mr. Ranford and

18  told them that it would also result in payment to you in

19  terms of obligations that Gaarn had to you, how detailed

20  did you get in that respect?

21  A.   I recall specifically with?  It was a little

22  different for both.

23         With Mr. Rucchin, I made him aware that from

24  June of 2008, after the termination of the negotiations

25  with Ken Jowdy to satisfy the loan he owed us for the

Kenner  -  Direct/Haley

4360

1    Hawaii group, to until my last payment towards their line

2    of credit in December 2008, I did let Mr. Rucchin know I

3    had personally deposited approximately $267,000 and it was

4    a significant amount of my liquid cash.

5                So the fact that Mr. Gaarn was selling some of

6    his stock and he was going to be able to satisfy some loan

7    obligations he had with me, it would be very helpful for

8    me as I continue to front litigation expenses on behalf of

9    the Hawaii partners through the end of 2008 and into 2009.

10               Now, with Mr. Ranford, the details, it wasn't so

11   detailed as Mr. Ranford would not have been interested in

12   what happened in Hawaii as he was not a member at the

13   time.

14   Q.   Mr. Kenner, we saw some bank documents introduced

15   into evidence wherein $100,000 transfers were made in

16   February and May 2009.

17               Whose account, sir?

18   A.   Do you recall.

19   A.   I believe in February 2009 and May 2009, Mr. Ranford

20   made two individual purchases of Mr. Gaarn's stock for

21   $100,000 and $100,000.

22   Q.   Do you recall, sir, seeing in evidence bank records

23   that show those $100,000 payments coming out of his

24   account during those period of times?

25   A.   I believe we saw two documents if I recall correctly.

4361

1       One was his Charles Schwab bank accounts that

2   reflected the $100,000 withdrawals in each of those

3   months, if I remember correctly, and I specifically recall

4   the trade confirmations that were mailed by Charles Schwab

5   to his Bellingham, Washington, address in February and May

6   2009 reflecting the $100,000 and $100,000 withdrawals.

7   Q.   At any point in time did you interfere with the

8   delivery of those documents from the banking institutions

9   to his address?

10  A.   No, sir.

11  Q.   Do you recall, as relates to that exhibit, the bottom

12  portion of that exhibit, indicating in writing that if you

13  have any questions concerning this transaction in sum and

14  substance, contact the bank.

15       Do you remember that?

16  A.   Yes, sir, I do.

17  Q.   Subsequent to those transfers in February and May,

18  did Mr. Ranford have any communication with you with

19  respect to those documents that he presumably received?

20  A.   No, sir.

21  Q.   I'm going to read another paragraph to you, sir, out

22  of the indictment:

23       14.   It was a further part of the scheme to

24  defraud that between November 2009 and December 2009, the

25  defendants Kenner and Constantine convinced -- and I'll

Kenner  -  Direct/Haley

4362

1  substitute the John Doe -- Privitello to invest money in

2  Eufora in exchange for an ownership interest in the

3  company.

4          The defendant Constantine then unlawfully

5  converted certain money for unauthorized purposes,

6  including for his personal benefit, and disavowed

7  Privitello's ownership interest in Eufora.

8          Would you kindly relate to the Court and jury

9  your knowledge, understanding and involvement with

10 reference to that allegation in the indictment.

11 A.    It's false.

12 Q.    In what respect, sir?

13 A.    I had no communication with Nick Privitello at all in

14 December 2009 with respect to his investment in Eufora,

15 nor was I aware of his investment sometime in early 2010.

16 Q.    Were you aware that there came a point in time where

17 a civil lawsuit was filed actually in this very courthouse

18 concerning that allegation and the claim against various

19 defendants made by Mr. Privitello?

20 A.    Yes, sir, I am.

21 Q.    Were you named as a defendant in that action, sir?

22 A.    No, sir, I was not.

23 Q.    So, Mr. Kenner, at any point in time did you conspire

24 with Mr. Constantine to defraud Mr. Privitello with

25 reference to money that he may have conveyed to

4363

1   Mr. Constantine for purposes of acquiring an ownership

2   interest in Eufora?

3   A.    No, sir.

4   Q.    There's no question that you had developed, if you

5   will, a relationship with Mr. Constantine where you would

6   send him money and he would send you money.

7         There would be any number of instances between

8   the time you first met him to the time where you may have

9   had a falling out where accounts reflect an exchange of

10  monies; is that true?

11  A.    Yes, sir.

12  Q.    Will you give us some idea as to the nature of those

13  exchange of monies between the two of you during that

14  period of time, the time you met him and the time there

15  was the falling out, what was the nature of those

16  transactions?

17  A.    Between Mr. Constantine and I we had a number of

18  business ventures independent of one another and each one

19  of them from time-to-time would require cash infusions.

20        And just like I would go to Mr. Constantine from

21  time-to-time and ask if he could help with short-term

22  lending, I would go to other individuals as well.

23        I know that Mr. Constantine had come to me on a

24  number of occasions requesting short-term loans to satisfy

25  other business obligation he had.

4364

1        In fact, at times he would ask me if I can

2    infuse cash into Eufora when Eufora needed some short-term

3    cash.

4        There were certain periods of times prior to the

5    Neptune loan being signed and over the period of time from

6    approximately 2005, 2006, until about 2010, when we were

7    no longer dealing with one another on a regular basis, the

8    exchange of cash happened on quite a regular basis.

9        (Continued on next page.)

Kenner - Direct/Haley

4365

1   Q    What happened in 2010 between yourself and

2   Mr. Constantine?

3   A    We had a falling out based on a number of different

4   business dealings that we had and at that point in time I

5   believe it was in my best interest that I no longer

6   communicate with Mr. Constantine.

7   Q    At any point in time, sir, did is there develop a

8   dispute between you and Mr. Constantine concerning

9   Eufora's reflection of an ownership interest in Eufora and

10  other matters related to Eufora?

11       Yes or no?

12  A    Yes.

13  Q    Who is Michael Stolper?

14  A    Michael Stolper is a New York attorney that was hired

15  by Tim Gaarn and CR Gentry with respect to an

16  investigation they wanted to begin regarding Eufora and

17  its activities.

18  Q    So he was initially by your testimony contacted by CR

19  Gentry and Tim Gaarn for purposes of legal representation

20  and/or investigations; is that correct?

21  A    Specifically Tim Gaarn had an existing relationship

22  in New York with an individual who introduced him to

23  Mr. Stolper, Mr. Hatsamos and Mr. Oliver.  And subsequent

24  to Mr. Gaarn's first communication with those three

25  gentlemen, he introduced CR Gentry to them as well in or

4366

1    about March of 2010.

2    Q    Did there come a point in time that you became

3    involved in some sense with what Attorney Stolper was

4    doing with respect to his engagement by Gaarn and CR

5    Gentry?

6    A    Yes, sir.

7    Q    And would you describe what was the nature of your

8    involvement and the circumstances under which you became

9    involved?

10   A    The communication initially came through Mr. Gaarn

11   who told me that Mr. Gentry and Mr. Gaarn had initiated an

12   investigation into the business dealings at Eufora.  They

13   let me know they hired on a consulting basis Mr. Stolper,

14   Mr. Hatsamos and Mr. Oliver at that time, and they asked

15   if I would help participate in the exchange of information

16   which was 100 percent on my behalf by e-mail between the

17   point of their engagement and approximately June 26th of

18   2010.

19   Q    In what respect, if any, was your assistance provided

20   to Mr. Stolper beneficial to your hockey player clients?

21   A    My participation was specifically for the benefit of

22   the clients.

23         One of the questions that was trying to be

24   resolved at that point in time was to make sure that there

25   was an accurate reflection of ownership interest on the

4367

1  books and record of Eufora, and based on representations

2  by Mr. Gentry to me, I proceeded to assist them in any way

3  I could to make sure any of the prior business

4  transactions that occurred between my clients and Eufora

5  were documented through banking transactions so the books

6  and record as a result of the investigation could properly

7  reflect what we believed were the investment amounts and

8  ownership interest in Eufora.

9  Q    There's been repeated reference to an e-mail, an

10 e-mail string wherein Mr. Stolper updated various hockey

11 player clients and you are cc'd in that e-mail in

12 connection with the status of that matter and indeed a

13 lawsuit that was filed.

14        Are you familiar with that e-mail?

15 A    Yes, sir, I've seen that in evidence.

16 Q    To your knowledge and understanding, was a lawsuit

17 filed?

18 A    Yes, sir, I believe there was a lawsuit in Arizona

19 filed in late 2010.

20 Q    And what is your understanding of the nature of the

21 lawsuit that was filed?

22 A    I believe one of the claims in the lawsuit was based

23 on trying to make sure that there was an accurate

24 reflection of the books and records ownership for my

25 clients in Eufora.

Kenner - Direct/Haley

4368

1    Q    Do you know what happened with that lawsuit that was

2    filed in Arizona initially?

3    A    It was initially dismissed by the judge based on some

4    inefficiencies in the original filings.

5    Q    There's been allegations, sir, as relates to the

6    Stolper investigation/lawsuit of what was characterized as

7    a hostile takeover.

8            Well, is that wholly false, is it true, or what

9    would be your response to that?

10   A    There was an effort on behalf of the group led by

11   Mr. Stolper, Mr. Hatsamos, Mr. Oliver, Mr. Gentry,

12   Mr. Gaarn, Mr. Kaiser, and Mr. Berard with my assistance

13   to acquire the loan if it were deemed a hostile takeover.

14   Yes, in fact it did happen.

15   Q    Tell us about acquiring a loan and what you mean by

16   those efforts.  What are we talking about?

17   A    Prior to June 26th of 2010, the effort led by

18   Mr. Stolper's team were trying to come up with a solution

19   as to how they would wrangle control of Eufora on a day to

20   day operation basis away from Mr. Constantine and his

21   management team.

22           As a result, my participation was frankly to

23   give them as much information I had or I possessed to help

24   in their investigation knowing my allegiance was to my

25   clients at that time.

4369

1    During that process, one of the recommendations

2   was that the outstanding loan that Mr. Constantine had put

3   together with Neptune Capital for operating capital at the

4   company, one of the ways to take control of the company

5   would be to buy that lien from Mr. Nerguzian who I

6   mentioned earlier.

7          At that point I believe Mr. Gentry and perhaps

8   Mr. Stolper had contacted Mr. Nerguzian and his attorneys

9   with respect to buying that loan from his company which I

10  believe was somewhere in the neighborhood of $3 million at

11  that point in time.

12         Mr. Stolper and the group of people that were

13  working with him prior to June 26th, believed that if they

14  had made based on representations by Mr. Nerguzian and his

15  attorney, an initial investment of $250,000, he would sign

16  an agreement to allow Mr. Stolper's group to acquire the

17  principal interest in that loan with the payment schedule

18  to buy out the rest of it in short order.

19         On or about June 26th, I spoke to Mr. Stolper

20  for the first time after a call that Mr. Gaarn had set up,

21  and at that point in time Mr. Stolper informed me that

22  they were in fact trying to buy the loan and would like to

23  talk to the rest of the AZ Eufora members which was a

24  group of about 15 individuals, plus or minus.

25  Q    What was the concern?  Why did you need to buy the

4370

1    loan?  What was the concern in connection with the

2    ownership interest held by your hockey player clients?

3    A    I think the biggest issue that was told to me

4    specifically by CR Gentry, was that the company was not

5    being managed properly and that contracts and agreements

6    with potential banks such as MetaBank, I think we had

7    mentioned earlier in this trial, were not being followed

8    through on a proper basis.

9         I certainly don't recall conversation about the

10   patents and issues related to the patents that Bill had

11   alluded to before, that I was the first I heard it in the

12   courtroom, but, moreover, the ability to process those

13   licensing deals based on the patents that Eufora held that

14   Mr. Stolper and his group wanted to acquire that loan from

15   Mr. Nerguzian so they could in fact control the company.

16   Q    As you sit here today, Mr. Kenner, what is your

17   understanding as to the books and record of Eufora with

18   respect to the ownership interests in Eufora as acquired

19   by your hockey player clients?

20        MR. MISKIEWICZ:  Objection.  May we approach?

21        THE COURT:  No.  Again, I'll give the

22   instruction:  This goes to Mr. Kenner's state of mind, not

23   for the truth, whether it is true or not, what his

24   understanding is, his state of mind.  I'll allow it with

25   that instruction.

Kenner - Direct/Haley

4371

1      Go ahead, Mr. Kenner.

2    A    As I sit here today, my understanding is that books

3    and records, spreadsheets that had been provided to me by

4    Mr. Gentry as a result of his work at Eufora in 2009 and

5    2010 reflected what I believed were accurate ownership

6    interests in the company based on his work in 2009 through

7    the end of his investigation with Mr. Stolper's group in

8    2010.

9          And ultimately during the mediations,

10   negotiations and discussions with Mr. Constantine and his

11   lawyer, I think they were seeking to just have a final

12   verification of that and I'm not sure what happened at

13   that point in time.

14   Q    Have you seen those books and records and

15   spreadsheets, sir, as created by CR Gentry?

16   A    Yes, sir, I have.

17   Q    How did you acquire those documents initially?

18         MR. MISKIEWICZ:  Objection.  May we approach?

19         THE COURT:  Yes.

20         (Whereupon, at this time the following took

21   place at the sidebar.)

22         (Continued.)

23

24

25

4372

1           MR. HALEY:  If I can make an offer of proof.  I

2   expect that CR Gentry provided me those books and records,

3   I assume he will say, not to have him introduce or lay a

4   foundation for the introduction of those books and records

5   because I don't believe I'd be able to do it through this

6   witness, but I think it is relevant material that I let

7   this jury know this was not some sort of event where there

8   was not some substantiation from his point of view, his

9   state of mind as to his client's ownership interest in

10  Eufora.

11          That's my offer.

12          MR. MISKIEWICZ:  Then I withdraw the objection.

13          THE COURT:  All right.

14          (End of sidebar conference.)

15          (Continued.)

Kenner - Direct/Haley

4373

1          (Open court.)

2          THE COURT:  The Government will withdraw its

3    objection.

4          THE COURT:  Go ahead.

5    Q    Mr. Kenner, as relates to the books, records and

6    spreadsheets created by CR Gentry, did there come a point

7    in time that you were provided those documents?  Yes or

8    no?

9    A    Yes, sir.

10   Q    Who provided them to you initially?

11   A    Mr. Gentry.

12   Q    At the point in time he provided you those documents,

13   what was your understanding as to his position at Eufora?

14   A    By the time he had given me the spreadsheets

15   reflecting the books and records, I believe Mr. Gentry had

16   been terminated from Eufora.

17   Q    Prior to his termination, what was your understanding

18   of his position at Eufora?

19   A    I believe he was the Chief Executive Officer.

20   Q    With reference, sir, to your hockey player clients'

21   purchases in Eufora, you told us that through Stolper, the

22   lawsuit was commenced ultimately and was later dismissed,

23   is that true?

24   A    Yes, sir.

25   Q    Do you know if the lawsuit was then refiled or

Kenner - Direct/Haley

4374

1    whether any is pending, if you know?

2    A    The Arizona lawsuit from the plaintiffs' prospective

3    was never refiled, but I know subsequent to that

4    Mr. Stolper and some of the investors which I believe

5    included Mr. Privitello decided to refile or file a new

6    lawsuit in New York here in this building with Judge

7    Feuerstein.

8    Q    Do you know the status of that lawsuit?

9    A    I believe that lawsuit was stayed or stopped at one

10   point in time when Mr. Constantine filed for bankruptcy.

11   Q    Now, when Mr. Constantine filed for bankruptcy, what,

12   if any, assistance did you provide to your hockey player

13   clients to protect their interests in that bankruptcy

14   proceeding?

15   A    After I had received notification of

16   Mr. Constantine's original bankruptcy filing, I began to

17   do a lot of legal research on my own as to what could be

18   done to make sure that investments my clients had made in

19   Eufora through Mr. Constantine had been properly

20   documented so as not to allow anything to happen through

21   this bankruptcy that could adversely affect my clients'

22   ownership.

23         I actually drafted, I believe, ten lawsuits

24   known as adverse proceedings for, I believe, ten of my

25   clients and then one additional one for myself and filed

Kenner - Direct/Haley

4375

1    them against Mr. Constantine's bankruptcy in Arizona, and

2    placed on the record notification of our desire to be

3    involved in the bankruptcy proceedings.

4    Q    And in so doing, did you leave out any of your hockey

5    player clients who had an interest in Eufora?

6    A    I don't believe that any of them that I was still in

7    contact with were left out of those adverse proceedings.

8    Q    Well, within each of those adverse proceedings, was

9    there a list of your hockey player clients and their

10   respective contributions to Eufora detailed within that

11   adverse proceeding pleading?

12   A    Yes, sir, in each one of them.

13   Q    What level of communication did you have with each of

14   those hockey player clients concerning that particular

15   pleading?

16         Was it telephonic, in person?

17         Just give us some level of understanding as to

18   the nature of discussions you had as it relates to that

19   particular pleading?

20   A    I don't believe any of the communications were in

21   person at that time because it became a full-time job of

22   mine to file those adverse proceedings prior to a

23   deadline.  I believe each one of those adverse proceedings

24   included 24 exhibits and represented about a one-inch

25   thick legal document, including exhibits that had to be

Kenner - Direct/Haley

4376

1  filed by certain deadlines.  All communications were on

2  the phone with my clients.

3  Q    Sir, I'll ask you to take a look at Kenner Exhibit

4  102 for identification.

5         Do you recognize that document?

6  A    Yes, sir.  I do.

7  Q    And would you simply state what this document is?

8  A    This is the adverse proceeding that I filed on behalf

9  of Glen Murray versus Tommy Constantine's bankruptcy in

10  Arizona, March 21, 2013.

11         MR. HALEY:  Thank you.

12  Q    Kindly take a look at documents that have been marked

13  as Kenner 72.  Do you recognize that document?

14  A    Yes, I do.

15  Q    What is that?

16  A    This is a similarly filed adverse proceeding in

17  Mr. Constantine's bankruptcy on behalf of Darryl Sydor on

18  March 21, 2015.

19  Q    I'm backing up a little bit, Mr. Kenner, but with

20  reference to Kenner Exhibit 27, would you simply tell us

21  what this document is?

22         I think just by looking at the first page you'd

23  be able to tell.

24  A    I believe this is the lawsuit that Mr. Stolper filed

25  on behalf of Theodore Hughes, Ethel Kaiser, Nick

4377

1   Privitello and Robert Rizzi versus Mr. Constantine here in

2   the Eastern District of New York on June 3, 2011, in Judge

3   Feuerstein's.

4   Q    And is that the civil lawsuit that I questioned you

5   about concerning the allegations in paragraph 14 of the

6   indictment which alleged that you and Constantine

7   convinced Privitello to convince him to invest in Eufora?

8   A    Yes, that's the lawsuit you were referring to.

9   Q    Mr. Kenner, I'm going to read you a paragraph in the

10  indictment with the heading "The Global Settlement Fund."

11       " It was further part of the scheme to defraud

12  between May of 2009 and February 2010, the defendants

13  Kenner and Constantine defrauded certain of the investors

14  to contribute to an entity know as GSF, which Kenner and

15  Constantine represented to be a legal defense fund.

16       The defendants Kenner and Constantine unlawfully

17  diverted certain money for unlawful purposes, including

18  for their personal benefit."

19       You are familiar, are you not, Mr. Kenner, with

20  the Global Settlement Fund?

21  A    Yes, sir, I am.

22  Q    Would you tell us how the Global Settlement Fund came

23  to be created?

24       What occurred early that led -- I'll call it the

25  creation of the Global Settlement Fund?

Kenner - Direct/Haley

4378

1    A    By mid 2008 when Mr. Harvey and Mr. Jowdy had

2    terminated all of Mr. Constantine's negotiating rights as

3    a mediator between the parties that Mr. Jowdy owed tens of

4    million dollars of dollars at the time, I began to

5    commence litigation against Mr. Jowdy in multiple

6    jurisdictions on behalf of myself, my investors and my

7    clients.

8              By the spring of 2009, I had engaged a law firm

9    in Washington, D.C., named Akin Gump.  At that point in

10   time they required a $100,000 retainer just to look into

11   the matter.

12             After 30 days of work, the law firm told me that

13   they were ready to engage against Mr. Constantine --

14   excuse me, Mr. Jowdy, I apologize -- against Mr. Jowdy in

15   the multiple U.S. jurisdictions and then assist in

16   acquiring Mexican legal counsel to pursue Mr. Jowdy in

17   Mexico.

18             They told me at the time they would need a

19   $1 million retainer to begin that work, and when they told

20   me that, I asked would that be all-encompassing to handle

21   all of the litigation?  They said no, that million dollar

22   retainer would be the initial deposit necessary and on a

23   monthly basis whatever they drew down at that time which

24   they anticipated to be $100,000 and $200,000 a month for

25   the multiple litigation efforts and they would need it to

4379

1   be replenished on a month over month basis.

2          I told Mr. Constantine because he had been

3   intimately involved with Mr. Jowdy's negotiations for

4   almost two years at that time, and he told me he thought

5   those numbers were outrageous, which I didn't disagree

6   with at the time, and he asked me if he could just have a

7   few days to consider what other options may be available

8   to our group of investors that he had been helping to

9   fight for.

10  Q    That conversation you had with Mr. Constantine, where

11  did that take place, if you recall?

12  A    I believe originally I had called him on the phone to

13  let him know following the text message I sent him that

14  when he was waiting to hear how much Akin Gump had

15  required as an ongoing retainer, I had got Akin Gump to

16  first agree to reduce their initial retainer to $750,000

17  which didn't seem like much of a discount at the moment

18  but again it was simply just a retainer, it wasn't the

19  full fee.

20         So I sent that text message to Mr. Constantine,

21  and either he called me or I followed up with a phone call

22  just to confirm he understood what I was texting him and I

23  believe I met with him face-to-face at that point in time,

24  most likely at whatever office he was working out of at

25  the time.

Kenner - Direct/Haley

4380

1    Q     So decisions were made then to hire.

2          What is the name of the law firm?

3    A     Akin, A-k-i-n second word Gump, G-u-m-p.

4          THE COURT:  Mr. Haley, do you want to take a

5    break?

6          MR. HALEY:  Yes, sir.

7          THE COURT:  We'll take an afternoon break.

8    Don't discuss the case.

9          (Whereupon, at this time the jury exits the

10   courtroom.)

11         THE COURT:  If everyone will be seated.

12         I want to give the jury at the end of the day

13   today a projection of where we stand so, Mr. Haley, give

14   me a realistic estimate how much more you have with

15   Mr. Kenner?

16         MR. HALEY:  A well-deserved comment, Judge.

17         I don't envision, your Honor, we'll finish

18   Mr. Kenner's testimony this afternoon, and there is,

19   Judge, a matter that counsel did want to discuss with the

20   Court.

21         There's a tape-recording that was, I know your

22   Honor is familiar with, created by Mr. Kenner where he had

23   a conversation with Mr. Constantine with reference to any

24   number of issues.  I would represent to the Court that my

25   client has listened to that tape-recording this morning

4381

1   and would be able to authenticate that tape-recording

2   insofar as being able to testify that, having listened to

3   the recording, it is as best we recall a true and accurate

4   reproduction of the conversation had between himself and

5   Mr. Constantine on the date indicated.

6            That recording does end at some point in time

7   and I'll leave it up to Mr. LaRusso to address any issues

8   that may be from his perspective obstacles to its

9   introduction, but it is my intention to lay the foundation

10  to introduce it in evidence as a defense exhibit.

11           THE COURT:  So you will play it?

12           MR. HALEY:  Yes, sir.

13           THE COURT:  Do you think you'll be half the day

14  on Monday?

15           What do you think?

16           MR. HALEY:  I don't imagine, Judge, it will be

17  more than half a day on Monday.

18           THE COURT:  So can I confidently tell the jury

19  Mr. Kenner intends on resting his portion of the case

20  sometime on Tuesday?  Obviously Mr. LaRusso and the

21  Government goes.  It is possible that it will go into

22  Tuesday then, right?

23           MR. HALEY:  Yes.

24           THE COURT:  So you are comfortable with that?

25           MR. HALEY:  Yes.

4382

1        THE COURT:  And the Government anticipates you

2   have a week --

3        MR. LARUSSO:  Your Honor, we have witnesses

4   coming in on Monday.

5        THE COURT:  Well, that will not happen.

6        MR. LARUSSO:  I'm overly optimistic, Judge.

7   I'll have to make the arrangements.

8        THE COURT:  But in terms of the estimate, a

9   week?

10        MR. LARUSSO:  I still am hoping to finish within

11   a week, Judge.  There are two witnesses and they will not

12   be as long as Mr. Kenner, but the others are relatively

13   short.

14        I have two other issues we can address now or we

15   can address at the end of the day.

16        THE COURT:  Why don't we address it at the end

17   of the day.

18        MR. LARUSSO:  Definitely will take up the rest

19   of the week concerning his schedule.

20        THE COURT:  Well, I'll say after we finish on

21   Tuesday, you will take a week.

22        MR. LARUSSO:  Yes.

23        MR. HALEY:  Your Honor, if I may, I've literally

24   tried to refrain to interrupt my client's narrative with

25   the introduction of exhibits.

Kenner - Direct/Haley

4383

1            I spoke with Mr. Miskiewicz.  I'm going to give

2    him exhibits that I would then frankly at the conclusion

3    of Mr. Kenner's testimony seek to introduce.

4    Mr. Miskiewicz may speak with me over the weekend -- I'll

5    not go over exhibit after exhibit and use select areas for

6    my summation, but I think that might truncate my client's

7    defense yet preserving his defense.

8            THE COURT:  When you go through the charts,

9    again he's already described generally what led to the

10   chart.  Please don't have him repeat for each chart.

11   There's 20 charts, so if he's already described what

12   happened there, he can just say this chart relates to

13   whatever I testified to.  I don't want him to repeat.

14           MR. HALEY:  I will not.  Thank you, your Honor,

15   I'm sensitive to that, but those charts as your Honor well

16   knows came in at the eleventh hour but we'll deal with it.

17   If it relates to a specific item I may say what relevance

18   does that have, and he may say the equity transfer

19   agreement.

20           I will not have him restate that.

21           MR. LARUSSO:  The only issue I envision, since

22   Mr. Haley has chosen to introduce the tape, he told me

23   during our luncheon recess that that was probably what he

24   was going to do.  I anticipate it coming out during the

25   Government's cross.  I would like to address the Court

4384

1    regarding a hearing outside the presence of the jury

2    regarding that tape.  We've listened to it.  As the Court

3    knows a portion of it was cut off, but that only deals

4    with the question of completeness, not alteration.

5            We've listened to it but believe there may have

6    been or one or two portions that are altered or edited and

7    wouldn't take more than 20 minutes to address that issue

8    with the witness before it is addressed with the jury.

9            THE COURT:  Let's try to take a short break so

10   we can have as much time as we can.

11           MR. LARUSSO:  Thank you, your Honor.

12           (Continued.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner - Direct/Haley

4385

1          (Following a recess.)

2          THE COURT:  Please be seated.

3          Let's bring in the jury.

4          (Witness resumes the stand.)

5          (Jury enters the courtroom.)

6          THE COURT:  Everyone can be seated.

7          Go ahead, Mr. Haley.

8          MR. HALEY:  Thank you.

9   BY MR. HALEY (Cont'd):

10  Q.   Now, Phil, after that conversation you had with

11  Tommy Constantine where a decision was made not to hire

12  the attorneys in Washington as you testified to,

13  discussions were had between the two of you as to an

14  alternative.

15          Is that what occurred?

16  A.   Yes, sir.

17  Q.   And these were jointly held conversations between

18  yourself and Mr. Constantine, is that correct?

19  A.   The conversation occurred between just

20  Mr. Constantine and I about 36 hours after I had informed

21  him about the request for the $750,000 retainer from Akin

22  Gump.

23  Q.   Now, we have seen in evidence, Phil, a letter,

24  e-mail, I believe, wherein any number of hockey player

25  clients responded to that e-mail with the phrase,

4386

1    acknowledged and agreed.

2            Do you know the e-mail I'm referring to?

3    A.    Yes, sir.

4            I believe most of them were acknowledged and

5    approved.

6    Q.    Excuse me, correct.

7            Now, would you describe -- now, you created that

8    e-mail, isn't that true?

9    A.    I created it in concert with Mr. Constantine.

10   Q.    Preceding that e-mail, what if any conversations were

11   had between one or more persons that chose to ultimately

12   contribute to the Global Settlement Fund?

13   A.    Each and every one of the Global Settlement Fund

14   contributors were spoken to either collectively or in part

15   by myself and/or Mr. Constantine.

16           Each one of the conversations lasted at a

17   minimum several hours, as there were a myriad of topics to

18   discuss at that point this time.  Although it's been

19   referenced that Jowdy's litigation was the single and/or

20   majority purpose for the fund, it certainly was a big

21   portion of it.

22           But there were a number of other outstanding

23   issues that were affecting the group as a whole that chose

24   to contribute to the Global Settlement Fund that we

25   addressed during those multiple hour conversations either

Kenner - Direct/Haley

4387

1     on the phone or in person with the individuals.

2     Q.    When you say we, who are you referring to?

3     A.    Mr. Constantine and myself.

4     Q.    And if it was a telephone call rather than an

5     in-person call, it would be a conference call.

6           Is that correct?

7     A.    No.

8           In fact, I believe the only phone call that

9     occurred was actually the very first meeting that we had,

10    Mr. Constantine and I got together in Los Angeles as a

11    result of different business purposes and had met with Ron

12    Richards in or about the first evening and at a house we

13    were visiting that evening Mr. Constantine got on the

14    phone with Mattias Norstrom and went through the

15    presentation to him one-on-one.

16          Although I was present outside walking around

17    with him as he was talking to Mr. Norstrom --

18    Q.    Let me stop you in that regard, Mr. Kenner.

19          Mr. Norstrom is not one of the identified

20    persons in this indictment, correct?

21    A.    He is not.

22    Q.    And Mr. Norstrom has not testified in this

23    proceeding, has he?

24    A.    No, sir.

25    Q.    Could you confine your answers, sir, to the

4388

1   conversations with respect to those persons that are

2   listed in the indictment as relates to those persons

3   listed in the indictment who actually contributed to GSF.

4           Okay?

5   A.    Yes, sir, I apologize.

6   Q.    Apology not necessary.  I asked the question, it was

7   very broad based.

8           With reference to those particular individuals

9   that testified in this court regarding the contribution

10  they made to the Global Settlement Fund, those

11  conversations with those people, were they in person or

12  telephone?

13  A.    Each one of them were in person.

14  Q.    Where did those conversations take place?

15          Always on a phone, in a different location, if

16  you can give us any idea?

17  A.    Sure, it was various.

18          As an example, Mr. Peca's meeting was in his

19  home in Columbus, Ohio, Mr. McKee's meeting was in a

20  restaurant called Chef's in Buffalo, New York, Mr. Sydor's

21  meeting with me initially was in Dallas, Texas and

22  subsequently met with Mr. Constantine later on in

23  Scottsdale, Arizona, Mr. Nash's meeting was in his living

24  room in Scottsdale, Arizona, Mr. Rucchin flew into

25  Phoenix, Arizona to meet with us after oversleeping the

Kenner - Direct/Haley

4389

1    initial meeting in Toronto, Canada.

2            Mr. Murray, we met with at Manhattan Beach at

3    Hennessy's restaurant for lunch.  Mr. Ranford I met with

4    in Hermosa Beach, California.

5    Q.   And it's your testimony that these meetings took

6    place with each of these individuals at the locations you

7    identified for a duration of maybe -- how long, sir?

8    A.   I would say a minimum the conversations lasted two

9    hours, and for some of them it was between three and four

10   hours.

11   Q.   During these conversations, other than the hockey

12   player clients, whoever that may have been, yourself and

13   Mr. Constantine, was anyone else present that you recall?

14   A.   Several of their wives were present at these

15   meetings.

16           But there were no other individuals.

17   Q.   At that point in time, had any of these hockey player

18   clients met Mr. Constantine, if you recall?

19   A.   I don't recall specifically.

20   Q.   With reference to the retention of lawyers,

21   Mr. Kenner, there's been testimony as to whether or not

22   one or more persons had an understanding that lawyers

23   would be engaged through use of Global Settlement Fund

24   with reference to litigation involving yourself and

25   Kristie Myrick.

4390

1        Do you recall testimony in that regard?

2    A.   Yes, sir.

3    Q.   Was that litigation, potential litigation --

4         MR. HALEY:  Withdrawn.

5    BY MR. HALEY:

6    Q.   By the way, was it existing at that point in time,

7    that litigation?

8    A.   Yes, sir, it was.

9    Q.   And was that existing litigation mentioned during the

10   course of this several-hour conversation, if you recall?

11   A.   Absolutely, it was paramount to the conversation.

12   Q.   One of the witnesses in this trial recalled her name

13   being mentioned as a person that -- were litigation that

14   indeed involved the use of GSF funds, is that right?

15   A.   At least one, yes.

16   Q.   Do you remember who that was?

17   A.   Specially Tyson Nash mentioned that and I believe

18   there were several more times that I heard it.

19   Q.   And at least when Tyson Nash recalled that part of

20   the meeting, that's consistent with your recollection.

21        Is that correct?

22   A.   Yes, sir, in each and every one of the meetings.

23   Q.   The e-mail that we are referring to, the acknowledged

24   and approved e-mail, who drafted that e-mail?

25   A.   It was primarily drafted by Mr. Constantine.

Kenner - Direct/Haley

4391

1    Q.   But you were aware of its contents, correct?

2    A.   Yes, sir, I was.

3              I was in agreement with it.

4    Q.   And who sent the e-mail out to your hockey player

5    clients as listed on the e-mail itself?

6    A.   I sent out each and every one of them.

7    Q.   You received the acknowledge and approved response?

8    A.   Yes, from each and every one of them.

9    Q.   Did there come a time that Mr. Constantine also

10   received that e-mail?

11             Did he receive it contemporaneously with your

12   receipt or sometime thereafter, do you know?

13   A.   To the best of my recollection, Mr. Constantine had

14   required of me to forward each and every one of those

15   acknowledged and approved e-mail responses from my clients

16   prior to his utilization of the funds and the Global

17   Settlement Fund.

18   Q.   Now, we know, Phil, that following the e-mail that we

19   were referring to, in relatively short order moneys

20   started flowing to the GSF fund from those particular

21   player clients.

22             Is that true?

23   A.   Yes, sir.

24             The order of events was typically we would have

25   the meeting with the individual and/or his wife.  They

Kenner - Direct/Haley

4392

1   would give me permission to wire transfer the funds to the

2   law office of Ronald Richards' trust account and

3   immediately following the receipt of funds, I would

4   forward a copy of that acknowledgment and approved e-mail

5   to each one of them and receive a receipt shortly

6   thereafter.

7   Q.    Between the time that the e-mail was sent out, as

8   reflected on the documents already introduced in evidence

9   and the time that the accepted and approved response was

10  received, do you have a recollection of any of your hockey

11  player clients as relates to that e-mail contacting you

12  for further clarification?

13  A.    No, sir.

14  Q.    Were you available during that period of time,

15  Mr. Kenner, for consultation or communication between

16  those specific hockey player clients or were you in some

17  way incommunicado?

18  A.    I was available 24 hours a day for them.

19  Q.    By the way, throughout these events, from the

20  Hawaiian land development, through Eufora, now into GSF,

21  what was your lifestyle like in terms of your availability

22  to your clients?

23  A.    I was available 24 hours a day for them.

24  Q.    Were there times that there were communications made

25  between you and your clients that were -- that occurred,

Kenner - Direct/Haley

4393

1    let's say, at 1 a.m. or 2 a.m.?

2    A.    On a regular basis.

3    Q.    And why was that that we have such late hour

4    communications?

5    A.    There were several reasons, one of which would be

6    that my clients were professional athletes traveling at

7    all odd hours of the day.

8          So as an example, if one of their teams finished

9    playing a game or 11 o'clock or 11:30 at night, they may

10   head to the airport and catch a 1:30 charter plane back to

11   the next destination.  So between 11:30 at night and 1:30

12   in the morning that would be awake traveling on a bus to

13   the airport and it was a time that it was easier for me to

14   contact them.

15         That would be referenced in evidence I have seen

16   through text message communication between us where we

17   would alert one another at certain points in time when we

18   would be available to catch up and speak.

19   Q.    So we have the approved and accepted response to the

20   e-mail that you sent out.

21         What then transpired as relates to the deposits

22   into an account and from that point on what occurred with

23   reference to those deposits into that account, to your

24   personal knowledge?

25   A.    After the receipt of the acknowledged and approved

Kenner - Direct/Haley

4394

1    e-mails, I let each of the clients know by phone that

2    Mr. Constantine had begun to work on the respective

3    efforts.

4            Effectively at that point in time,

5    Mr. Constantine took control of the operations of the

6    Global Settlement Fund.  I think we have seen the

7    representation of multiple conference calls of which I

8    participated in each and every one of those for legal

9    updates, media updates and investment updates relating to

10   not just Mr. Jowdy, but Ms. Myrick, Mr. Nolan, Mr. Juneau,

11   Mr. Moreau at the time.

12   Q.   There was some testimony, Phil, about a $22,000 --

13   $22,500 expense that went into Ron Richards for payment

14   through GSF and some dispute between you and

15   Tommy Constantine concerning that expense.

16   A.   Yes, sir.

17           I remember that testimony.

18   Q.   Would you just tell us in a summary fashion, sir,

19   what that was all about.

20   A.   After I had traveled with Mr. Constantine and by

21   myself across the country on multiple occasions to meet

22   with each and every one of the global settlement

23   contributors face to face at least once or if not on

24   multiple times prior to the contributions, I incurred a

25   significant number of expenses.

Kenner - Direct/Haley

4395

1          In particular, I believe I incurred

2     approximately $27,000 in expenses for travel and

3     entertainment during the four to six weeks that I had

4     traveled for each and every one of those meetings

5     including traveling expenses for Mr. Constantine as well.

6          After about two months of the Global Settlement

7     Fund making disbursements, I told Mr. Constantine that I

8     had received my credit card statements in the mail.  I was

9     able to reconcile the expenses that I believed were

10    appropriate with respect to the consummation of the Global

11    Settlement Fund.

12          At that point in time, I put together a

13    spreadsheet for him and forwarded it on to Mr. Constantine

14    for his approval, and there were several expenses on there

15    that he didn't deem were appropriate, one of which was our

16    initial meeting I think that we had at a restaurant called

17    Mr. Chows with two of our lawyers, Mr. Richards and with

18    Mr. Augustine, but he didn't feel that was appropriate.

19    Q.   So you and he did not agree on your expense account

20    with reference to what you submitted and what was

21    ultimately paid out, correct?

22    A.   To the tune of about $5,000, plus or minus.

23    Q.   And because he had the control over the

24    disbursements, you only got paid what he determined you

25    should get paid.

4396

1              Isn't that true?

2    A.   Yes, sir, that's correct.

3    Q.   You were present when Mr. Ronald Richards testified

4    in this courtroom, sir?

5    A.   Yes, sir, I was present.

6    Q.   He had testified as relates to -- it's already in

7    evidence, Mr. Kenner -- but as relates to RR 1 in

8    connection with specific payments as related to litigation

9    involving you and others.

10             Do you recall that, RR 1?

11   A.   Yes, sir, I do.

12   Q.   And to your knowledge does that accurately reflect

13   your understanding of the payments coming out of the

14   Global Settlement Fund with reference to the litigation

15   and how he describe it in his testimony?

16   A.   Yes.

17             When I received a copy of the expenditures after

18   these dates, they seemed to be appropriate for what the

19   litigation had taken place relative the representation of

20   the Global Settlement Fund.

21   Q.   Now, there came a point in time, did there not, where

22   you actually received a spreadsheet indicating the

23   incoming contributions to GSF and the outgoing

24   expenditures.

25             Is that true?

Kenner - Direct/Haley

4397

1    A.    Yes, sir.

2    Q.    Did you ever withhold that information or document

3    from any of your hockey player clients upon a request?

4    A.    No, sir.

5          In fact, I distributed that to global

6    settlement's spreadsheet to each of the contributors to

7    the Global Settlement Fund.

8    Q.    And it's fair to state that one or more witnesses in

9    this trial acknowledged receiving it from you.

10         Is that correct?

11   A.    That is correct, and, in fact, I held meetings with

12   several of them about the use of funds and any questions

13   they had.

14         I believe Tyson Nash testified to one of our

15   meetings at AJ's food store outside to discuss the

16   contents of the global settlement expenditures.

17   Q.    Mr. Kenner, did there come a point in time where you

18   were of the view that Tommy Constantine had

19   misappropriated or misallocated GSF funds?

20   A.    Yes, sir.

21   Q.    Do you recall approximately when that occurred?

22   A.    I believe there are two occurrences that frustrated

23   me with respect to the distribution of Global Settlement

24   Fund.

25   Q.    Could you tell us what you are referring to.

Kenner - Direct/Haley

4398

1   A.   The first occurrence was in or about November 6th of

2   2009, when I had an ongoing litigation with Mr. Jowdy in

3   Mexico to recover not just the outstanding loans that we

4   had granted him from our Hawaii partners, but all the

5   other monumental efforts Mr. Constantine had tried to

6   overcome with respect to mediation and litigation in the

7   United States at that time.

8           I had requested I believe $85,000 be sent to one

9   of our lawyers involved in the case, and when I spoke to

10  Mr. Constantine on the phone, he told me that those funds

11  were not available to be sent to Mexico, and if I recall

12  correctly, either myself alone or myself with John Kaiser

13  went to Mr. Constantine in person to discuss what had

14  occurred or what had happened to the Global Settlement

15  Funds with respect to his inability or his lack of desire

16  to send the funds to Mexico.

17          I remember a heated conversation about how the

18  litigation in Mexico was part and parcel to the overall

19  efforts of the Global Settlement Fund.

20  Q.   When you say heated conversation, would you be more

21  specific?

22          In what sense was it heated?

23  A.   Well, I was very frustrated that I had been

24  shouldering the financial burden in Mexico for quite some

25  time against Mr. Jowdy.

Kenner - Direct/Haley

4399

1          Starting in or about the summer of 2008, when

2     Mr. Jowdy, Mr. Harvey and his other legal counsel

3     terminated both my employment at Diamante and

4     Mr. Constantine's ongoing negotiations on behalf of our

5     group, approximately 15 months later, when I had

6     approached Mr. Constantine about a second wire transfer to

7     Mexico to continue making payments to the lawyers to

8     complement what I had been paying them, Mr. Constantine

9     told me that he disagreed with our efforts in Mexico.

10          He believed there was too much corruption in

11    Mexico for legal efforts to really hold, and we had a firm

12    disagreement over that, and ultimately at the end he told

13    me that although Global Settlement Funds were incredibly

14    tight at that time, he did eventually agree to wire

15    transfer the $85,000 to one of our lawyers with respect to

16    that ongoing effort in Mexico.

17    Q.   You said there was a second instance where there was

18    a dispute between the two of you concerning the use of GSF

19    funds.

20          Is that correct?

21    A.   Yes, sir.

22    Q.   What was that about?

23    A.   Sometime after March of 2010, when the lawsuits with

24    Mr. Jowdy had been terminated in California by

25    Mr. Richards for a myriad of reasons, we -- I had been

Kenner - Direct/Haley

4400

1    spending more time and communication with C.R. Gentry with

2    respect to the Stolper issues we discussed previously.

3              Mr. Gentry during the global settlement issue

4    although he was an officer at Eufora was asked by

5    Mr. Constantine to prepare all of the new operating

6    agreements for the airplane, for the hangars, for the

7    newly acquired Eufora shares, and for the two Palms units

8    that I had funded and decided to contribute to the global

9    settlement for the benefit of the overall group in

10   consultation with Mr. Constantine.

11             Mr. Gentry represented to me that those

12   operating agreements of which I had not seen, that my

13   contributions were not reflected in those operating

14   agreements, that he believed that all the capital accounts

15   that were reflected in those different operating

16   agreements were inaccurate and not to my favor, or the

17   favor of my clients.

18   Q.   When you say or the favor of your clients, meaning

19   that such entries were being recorded or not being

20   recorded?

21   A.   From what I understood from Mr. Gentry they were not

22   being recorded when he represented to me what the

23   operating agreements reflected for capital account

24   contributions.

25   Q.   That was at least your understanding in connection

4401

1  with what was transpired vis-à-vis the use of Global

2  Settlement Funds at that time.

3          Is that true?

4  A.   Yes, sir.

5  Q.   Did you keep that knowledge to yourself?

6  A.   No, sir.

7  Q.   What did you do?

8  A.   At that point in time I was very frustrated because

9  the ongoing legal efforts in Mexico continued.

10          I was still working on the criminal cases in

11  Mexico against Mr. Jowdy, and had to then again shoulder

12  the financial burden of pursuing Mr. Jowdy both in civil

13  and criminal litigation in Mexico.

14          I contacted each of the clients who had invested

15  and contributed money to the Global Settlement Fund and

16  let them know that the Global Settlement Funds had

17  effectively dried up, and I was now again shouldering the

18  burden of the financial commitments to the lawyers in

19  Mexico to pursue Mr. Jowdy.

20          I told them that for two reasons, one was

21  certainly for notification, and at that point I was

22  waiting for the -- in or about that time I was waiting for

23  the spreadsheet from Mr. Richards that I had requested so

24  I could disseminate it amongst the group.

25          Second, I let them know because there was a real

Kenner - Direct/Haley

4402

1    possibility in order to conclude my civil and criminal

2    actions against Mr. Jowdy on to -- to the collective

3    benefit of the group, I was going to need to ask them for

4    additional funds if I couldn't shoulder the hundred

5    percent financial burden.

6    Q.    And though the Global Settlement Fund has a myriad of

7    purposes, there was a primary purpose, was there not?

8    A.    One of the major purposes, not necessarily one I'd

9    designate as the primary purpose, but one of the major

10   purposes was to pursue all litigation efforts against

11   Mr. Jowdy and clean up some of the surrounding business

12   issues that had been created because of the dissension he

13   caused amongst the group.

14   Q.    When you finally received the spreadsheet reflecting

15   the disbursements out of the Global Settlement Fund, you

16   reviewed those disbursements.

17          Is that correct?

18   A.    Yes, sir, I did.

19   Q.    The e-mail that you wrote to your clients expressing

20   your view that Tommy Constantine had misappropriated GSF

21   funds, that went out actually before you received the

22   detailed list of the disbursements.

23          Is that your testimony?

24   A.    I believe in and about that time I had sent out a

25   number of e-mail updates to my clients to let them know

Kenner - Direct/Haley

4403

1    the status of what was going on and that probably

2    continued through sometime in 2011.

3              THE COURT:  It's 4:30.

4              Did you finish that topic?

5              MR. HALEY:  Very close, we are going to finish

6    it real quick Monday morning, Judge, but, yes.

7              I'm very close.

8              THE COURT:  Okay.

9              MR. HALEY:  But I think it's a good time to

10   break, Judge.

11             Thank you.

12             THE COURT:  In terms of where we stand, I have

13   spoken to the lawyers, I know my estimates have been off,

14   but I'm doing the best I can.

15             I believe Mr. Haley will finish completing his

16   presentation of evidence on behalf of Mr. Kenner by

17   Tuesday morning, it's my best estimate at this point, and

18   I anticipate Mr. LaRusso is going to take approximately

19   one week to present his case.

20             So I said the defense case would be one to two

21   weeks.  It looks like we are closer to the two weeks than

22   the one week.  I know there is one juror that has an issue

23   next week, juror No. 3, so why don't you stay for a minute

24   so I can understand that a little more.  I want to try to

25   accommodate that.

4404

1          Again, don't read or listen to anything

2   regarding the case.  Don't discuss the case and we will

3   reconvene Monday morning at 9:30.

4          Have a good weekend.

5          (Jury leaves the courtroom.)

6          (Juror No. 3 enters the courtroom.)

7          THE COURT:  Everyone can be seated.

8          Juror No. 3, you can have a seat.  I want to

9   make sure I understand because obviously you spent a lot

10  of time on the case I want to try to accommodate you as

11  best I can.

12          The graduation is next Wednesday in the morning?

13          A JUROR:  Yes.

14          THE COURT:  You wouldn't be able to start until

15  2?

16          A JUROR:  Yes.

17          THE COURT:  She also mentioned this other issue

18  you have a vacation scheduled for late June.

19          Tell me a little more about that.

20          A JUROR:  I have flight plans on the 29th of

21  June.

22          THE COURT:  How long were you expecting to go

23  away for?

24          A JUROR:  About a month.

25          THE COURT:  Okay.

4405

1          I know you discussed with her possibly trying to

2  rearrange that trip.

3          Is that possible, not possible, do you want to

4  do that?  Do you not want to do that?  Tell me.

5          A JUROR:  Because I have invested time, this is

6  obviously important to see this through, but I'm

7  willing --

8          THE COURT:  Speak a little louder so they can

9  hear you.

10          A JUROR:  I will incur some expense to change

11  the tickets.

12          I'm willing to do that, I don't know how much

13  more time --

14          THE COURT:  What's the time frame with which if

15  you wanted to reschedule, is there a certain time you have

16  to reschedule on?

17          A JUROR:  I could push the plans back by another

18  week.

19          THE COURT:  A week?

20          A JUROR:  Yes.

21          THE COURT:  Okay.

22          A JUROR:  I don't want to make things more

23  difficult than they need to be.

24          THE COURT:  As you said, you invested a lot of

25  time in the case, especially at this point in the case.

4406

1          In my view as a judge I should make every

2    accommodation I can to allow a juror to continue to serve

3    obviously unless it creates other problems for everyone

4    else.

5          Why don't you hang around for a minute and let

6    me speak to the lawyers and I'll bring you back in.

7          A JUROR:  Okay.

8          THE COURT:  Thank you.

9          (Juror No. 3 steps outside.)

10         THE COURT:  I didn't understand he's going away

11   for a month.

12         MR. LARUSSO:  I didn't either.

13         THE COURT:  I don't think my deputy knew that

14   either.

15         She was accurate that I guess because he's going

16   away for a month he's a teacher that he -- if he's going

17   to reschedule and incur the expense he said July 3rd, my

18   inclination is to tell him I'm not going to make a

19   decision now.  I guess I'll tell him he's not going to

20   miss the graduation.

21         In terms of the vacation plans I'll make an

22   assessment next week, but I can tell you right now given

23   what I'm hearing and given the history of this case what I

24   said yesterday would apply that I'm not going to have a

25   juror who has a time limit in the best case scenario there

4407

1    might be two days of deliberations, three days of

2    deliberations before he has to take his flight and that's

3    not sufficient given the length of this case.

4            I'll hear from anybody.  I don't think we should

5    excuse him now, but I'm projecting that I'm going to end

6    up excusing him on Wednesday or Tuesday.

7            MR. HALEY:  I'll take his tickets if he doesn't

8    use them, Judge.

9            MR. LARUSSO:  Judge, when do -- based upon I

10   guess a lot of uncertainty, when do you think we'll be

11   giving the case to the jury?

12           I'm trying to figure out how that impacts on his

13   vacation.

14           THE COURT:  If you took a week, if Mr. Haley was

15   done Tuesday morning and you took a week, that would put

16   us right there to June 30th where you would be resting

17   your case.

18           If there was no rebuttal case, there might be

19   summations on Wednesday, possibly into Thursday, July 1st,

20   July 2nd, again, this is a best case scenario and they

21   would begin deliberating on July 2nd, July 3rd is a

22   Friday.

23           (There was a pause in the proceedings.)

24           THE COURT:  I guess other jurors knowing that

25   I'm dealing with that juror volunteered to Michele I guess

4408

1    one juror's going away July 12th, one juror's going away

2    July 16th, another juror has some day around July 13th

3    they have an issue.

4           Those dates better be okay, but, again, it

5    highlights the fact that we have to try to get this case

6    done.  I think we'll bring him in and tell him I don't

7    want to make a decision today.  He's not going to miss the

8    graduation next week.

9           But I am -- given his availability is only July

10   3rd, I want to see where we stand next Tuesday and I'll

11   make a decision.

12          How's that?

13          MR. LARUSSO:  That's fine, Judge.

14          MR. MISKIEWICZ:  Yes.

15          MR. HALEY:  Yes, Judge.

16          Thank you.

17          THE COURT:  Let's bring him in.

18          (Juror No. 3 enters the courtroom.)

19          THE COURT:  The bottom line is I'm not going to

20   make a decision now.  I want to wait until next Tuesday

21   and see where we stand.

22          You are definitely not going to miss the

23   graduation next Wednesday.  Given how much time you spent

24   on the case, I would certainly accommodate a half a day

25   request of a juror for that type of event.  I'm more

1    concerned about the July 3rd date being the cut-off date.

2            I want to see where we stand on Tuesday and I'll

3    make a decision regarding that, but I want to emphasize to

4    you I'm going to be using you as an example for years to

5    come as a juror because not only have you extended your

6    jury service beyond my estimate, but the fact you were

7    willing to incur an expense to move it to July 3rd I think

8    is exemplary of someone's effort to continue to serve.

9            I want to thank you for your continuing

10   willingness to serve and I'll let you know Tuesday, but I

11   want you to know you are not going to miss the graduation.

12           A JUROR:  Thank you.

13           I appreciate it.

14           THE COURT:  Sure.

15           Have a good weekend.

16           A JUROR:  There are a lot of moving parts here,

17   so thank you.

18           THE COURT:  You are welcome.

19           (Juror No. 3 leaves the courtroom.)

20           THE COURT:  On this issue regarding the

21   recording, Mr. LaRusso, I'm okay with you questioning

22   Mr. Kenner briefly outside the presence of the jury to

23   address authentication issues.

24           I'm not sure when you should do that, but you

25   mentioned there's two portions of the tape that you are

4410

1    focused on, is that what you said to me?

2              MR. LARUSSO:  I believe all sides agree that the

3    tape ends after 27 minutes according to estimates.

4              So the conversation clearly continued.  I don't

5    have an answer for you as to how long it continued, but

6    apparently it was some period of time, and I don't know

7    the reason why it was terminated.  That's issue No. 1.

8              Issue No. 2 is I can't point to one or two of

9    the portions of the tape that may not be really part of

10   the recording that should have been on it.  Somebody may

11   have altered it or doctored it and I wanted to ask

12   Mr. Kenner about those questions.  Those are the two areas

13   I was going to inquire into.

14             And then if there is a problem with his

15   recollection having listened to the tape and maybe there

16   may have been some alterations or deletions done to it,

17   find out what happened to the original recording, who he

18   may have given it to and see how we end up getting it back

19   on his phone that -- that's where the tape is actually

20   coming from I believe according to Mr. Miskiewicz's

21   proffer made to us the other day.

22             Those are the areas I was going to go into,

23   Judge.

24             THE COURT:  I'm not sure that needs to be

25   outside the presence of the jury.

4411

1      I guess depending on what his answers will be, I

2  don't know if Mr. Haley has discussed this with Mr. Kenner

3  yet.  Are you going to isolate the one or two portions,

4  otherwise how is Mr. Kenner going to know what you are

5  referring to?

6      MR. LARUSSO:  Generally, Judge, and I think I

7  can.

8      THE COURT:  You don't have a transcript.

9      You would have to cue up whatever portions you

10 believed were altered for Mr. Kenner to listen to

11 otherwise it's not going to be productive.

12     MR. LARUSSO:  Again, Judge, I don't think it's

13 going to take too long.

14     I'm going to go right to the point and ask

15 him -- I guess the first question is listening to the tape

16 and after having listened to the tape does he believe

17 there are any alterations or editions to that tape.

18     THE COURT:  I thought Mr. Haley said earlier

19 today his client has listened to the tape and he's

20 prepared to authenticate it.

21     I don't remember if he addressed whether or not

22 he would say there were any alterations of that tape, and

23 also Mr. Haley did say that his client said there was an

24 additional conversation.  I don't think there is a dispute

25 that it ended.

4412

1          MR. HALEY:  Your Honor, sorry to interrupt the

2     court.

3          Your Honor, I think there is an issue in

4     connection with whether or not that -- there is an issue,

5     Judge, as to whether or not that tape recording is a

6     completely unedited recording of that conversation.  There

7     is an issue as relates to that, and I think the only way

8     to fully address it, your Honor, from everyone's

9     perspective is through the testimony of Phil Kenner

10    outside the presence of the jury.

11         THE COURT:  Is he prepared to do that right now?

12         MR. HALEY:  I think we are.

13         He listened to it this morning, Judge, yes.

14         THE COURT:  Just take the witness stand again,

15    Mr. Kenner.

16         You understand you are still under oath,

17    Mr. Kenner.

18         THE WITNESS:  Yes, sir.

19    **PHILIP KENNER**,

20         having been previously sworn, resumed the stand

21         and testified further as follows:

22         THE COURT:  You can question, Mr. LaRusso, but

23    he knows what the issue is.

24         Just have him explain it.

25         MR. LARUSSO:  I think that's correct, Judge.

4413

1  There is no need for a full-blown examination.

2          THE COURT:  Explain any editing done to the tape

3  and I'll let Mr. LaRusso follow up.

4          THE WITNESS:  Very simply the original recording

5  of the tape was of the conversation was 56 minutes and 33

6  seconds long.

7          After I finished the recording I contacted

8  Mr. Kaiser and let him know that I had communicated with

9  Mr. Constantine on a spur of the moment encounter at

10  Home Depot that day, and shortly thereafter I had given

11  the phone to Mr. Kaiser so he could listen to it and tell

12  me what he thought of the conversation.

13          Mr. Kaiser assisted in putting that recording on

14  to a CD and that was probably the last time that I had

15  listened to the recording until some time or about early

16  October 2013, about a month before my arrest when I was

17  with -- I played around the first eight or nine minutes of

18  it to Greg DeVries.

19          When we were traveling to Mexico.

20          THE COURT:  Off the phone or off the disk?

21          THE WITNESS:  Off the phone and at that point I

22  noticed that the recording length was 26 minutes and

23  change.

24          THE COURT:  So on your phone -- that's the

25  length of it, there is no 56-minute version on your phone?

Kenner - Direct/LaRusso

4414

1      THE WITNESS:  No, sir.

2      And it was originally recorded on the phone.

3      THE COURT:  You want to follow up, Mr. LaRusso?

4      MR. LARUSSO:  That takes care of one aspect of

5  it, Judge, but there is the other one I was mentioning.

6      THE COURT:  Sure.

7  DIRECT EXAMINATION

8  BY MR. LARUSSO:

9  Q.   Now mentioned actually before you testified you heard

10  discussions about the fact that when you listened to the

11  tape recently, you noticed or determined that there may

12  have been some alterations or deletions or editing to the

13  portion you actually heard, we are talking about the 27

14  minutes that's on the tape.

15      Is that correct?  You understand my question?

16  A.   I will try and answer it.

17      I'm not sure that I represented that in any

18  conversation that there was a portion that seemed to be

19  edited from what I could hear on the 27-minute recording

20  or slightly less than 27 minutes.  But what I do recall,

21  again I only listened to it one time after that until I

22  had the shorter version of the recording which Greg

23  DeVries and I listened to about eight minutes when we were

24  together in Mexico.

25      But from what I recall, there were many more

4415

1    references to Mr. Jowdy in the recording originally that

2    when I listened to it this morning I don't know if I even

3    heard any references to Mr. Jowdy in the recording.

4    Q.    So in the portion that's on the tape you listened to,

5    it's your recollection that there were -- permit me to say

6    this -- references to Mr. Jowdy that you remembered being

7    there but are not on there now that you have listened to

8    it.

9            Is that correct?

10   A.    Yes.

11           In addition there were several references to

12   Mr. Free and his connection to the FBI as well on the

13   portion of the tape that I listened to this morning that I

14   don't recall hearing when I listened to it again this

15   morning.

16   Q.    So those portions that you do not recall hearing

17   should have been in the selected portion that you heard,

18   you did not hear them when you listened to it this

19   morning?

20   A.    To the best of my recollection, yes.

21   Q.    You recorded this on your iPhone, is that correct?

22   A.    Yes, sir.

23   Q.    After you recorded it, you just told us you contacted

24   Mr. Kaiser and you then provided your iPhone to

25   Mr. Kaiser.

Kenner - Direct/LaRusso

4416

1           Is that right?

2   A.    Yes, so he could listen to it.

3   Q.    Are you familiar with the operation of the iPhone in

4   recording conversations?

5   A.    Not in particular.

6   Q.    You knew how to record the conversation?

7   A.    I hit the record button.

8   Q.    Are you aware of the fact you can alter the recording

9   by deleting portions manually on the phone?

10  A.    I'm not aware of that.

11  Q.    But you are aware of the fact that when you got the

12  phone back, there was approximately 30 minutes missing

13  that you remember having been recorded.

14          Is that correct?

15  A.    Yes, but it didn't -- I wasn't aware of that right

16  away.

17          I think the next time I went to that audio

18  recording file and I may have found it by just dumb luck

19  when I was with Mr. DeVries in Mexico in and about early

20  October 2013.

21  Q.    By the way, who returned the phone to you?

22  A.    Mr. Kaiser.

23  Q.    From the time he returned it to you to the time you

24  are now saying you listened to it with Mr. DeVries, you

25  didn't, yourself, do anything to that recording nor did

Kenner - Direct/LaRusso

4417

1   you turn the phone over for somebody else to do anything

2   to that recording.

3          Is that correct?

4   A.   That is correct.

5   Q.   So that the portions that were removed had to have

6   been done from the time you gave the phone to Mr. Kaiser

7   to the time it was returned to you.

8          Is that a fair statement?

9   A.   All I know is that when I gave it to Mr. Kaiser to

10  listen to it was a 56 minute and 33 second recording.

11         The next time I really referenced that voice

12  message -- excuse me -- that recording was when I was with

13  Mr. DeVries in Mexico.  We listened to about seven or

14  eight minutes of it and then we had to leave to go meet

15  with our attorneys in Mexico.

16  Q.   Do you remember when this recording was made?

17  A.   It would have been made in or around August of 2010.

18  Q.   That would have been just prior to the -- I guess it

19  would be the conference that was being called for the four

20  shareholders.

21         Is that correct?

22  A.   Yes, because I think I recall this morning hearing

23  Mr. Constantine reference that we should have a meeting of

24  all the shareholders in that recording I listened to this

25  morning.

Kenner - Direct/LaRusso

4418

1  Q.    I'm going to ask you just to tell us at this time

2  when you were making the recording, who was -- what was

3  your relationship with Mr. Constantine and Mr. Kaiser?

4        We had been hearing how people changed sides

5  over the course of years, what was it at or about the time

6  of this recording?

7        MR. MISKIEWICZ:  Objection.

8        THE COURT:  I don't want to get into that now.

9        This is really just to --

10       MR. LARUSSO:  There is one other question,

11  Judge, the other relevancy, so you know, I believe

12  Mr. Kenner may be aware of other efforts that Mr. Kaiser

13  has done to doctor evidence.

14       I want to see if he was aware of it.

15       THE COURT:  Go ahead.

16       You can answer that question.  Are you aware of

17  any other evidence by Mr. Kaiser to doctor evidence?

18       THE WITNESS:  Yes, sir.

19       THE COURT:  What would that be?

20       THE WITNESS:  After I was arrested I received

21  documents that I am aware that Mr. Kaiser either forged or

22  copied my names on to agreements allegedly between

23  Mr. Kaiser and I.

24  BY MR. LARUSSO:

25  Q.    What was the substance of the document that he forged

Kenner - Cross/Miskiewicz

4419

1   your name on?

2   A.   There were two documents actually.

3        One was dated in I believe July 2006 and the

4   second was dated in February of 2008.  They were allegedly

5   loan guarantee agreements that Mr. Kaiser then was seeking

6   to acquire my $100 million equity interest in the

7   Cabo San Lucas property for loans that -- and guarantees

8   that never existed.

9   Q.   And you knew nothing about these documents at all?

10  A.   Not until after I was arrested.

11  Q.   Have you seen those documents?

12  A.   Yes, sir, I have.

13  Q.   If we need to we can produce those if the court finds

14  it necessary.

15  A.   Yes, sir.

16  Q.   Thank you.

17       THE COURT:  Do you have any questions?

18       MR. MISKIEWICZ:  Just want to clarify make sure

19  I understand.

20  CROSS-EXAMINATION

21  BY MR. MISKIEWICZ:

22  Q.   Within the 26 or 27 minute period of time, you are

23  saying you don't recall hearing references to Jowdy or

24  Louie Free.

25       Do you know whether or not those references

Kenner - Cross/Miskiewicz

4420

1   occurred in the first 26 or 27 minutes of your

2   conversation with Mr. Kaiser or could it have happened

3   after the 26 or 27 minutes when the tape cuts off?

4   A.   My conversation was with Mr. Constantine, not

5   Mr. Kaiser.

6   Q.   Okay.

7          Thank you.

8   A.   Just for the record, and we -- I am a hundred percent

9   sure that there was references to Mr. Jowdy and Mr. Free

10  during those portions.

11         THE COURT:  His question was whether or not you

12  know as you sit here today from your memory whether or not

13  the references to Mr. Free and Mr. Jowdy were in the 26 or

14  27 minutes that you heard today or were they part of the

15  30 minutes that no longer exist?

16         Do you know where those discussions took place

17  in the recording?  You understand the question?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Okay.

20         THE WITNESS:  I'm a hundred percent certain that

21  the references that I did not hear this morning in the 26

22  minutes and change were referencing Mr. Free and

23  Mr. Jowdy.

24         The recording appears to be the first half of

25  our conversation.  I'm not sure why the second half isn't

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Kenner - Cross/Haley

4421

1   present, but we certainly discussed Mr. Jowdy -- excuse

2   me -- Mr. Constantine certainly discussed Mr. Jowdy and

3   Mr. Free at --

4           THE COURT:  You misunderstood his question and

5   my attempt to clarify his question --

6           MR. HALEY:  May I?

7           THE COURT:  Go ahead.

8           THE WITNESS:  I'm sorry, your Honor.

9           THE COURT:  That's okay.

10  CROSS-EXAMINATION

11  BY MR. HALEY:

12  Q.   The question of the 27 minutes we are speaking of,

13  you heard that conversation this morning, is that correct?

14  A.   That is correct.

15  Q.   And with reference to mentioning either Ken Jowdy

16  and/or Louis free, was that made within that 26-minute

17  portion of the conversation, 27-minute portion of the

18  conversation you listened to this morning?

19  A.   Originally, yes, it was.

20  Q.   Okay.

21          THE WITNESS:  Sorry, I misunderstood your Honor

22  originally.

23          THE COURT:  Your recollection you believe it

24  should have been within that 26-minute portion rather than

25  in the later portion that we no longer have?

Kenner - Cross/Miskiewicz

4422

1      THE WITNESS:  Yes, sir.

2   CROSS-EXAMINATION

3   BY MR. MISKIEWICZ:

4   Q.   If we were to play the tape now and hear, as I'm

5   going to for this hypothetical suggest to you that at one

6   minute and 39 seconds you do -- or actually

7   Mr. Constantine does, in fact, talk about Jowdy and you at

8   the time stamp one minute 39 seconds.

9        Did you just not hear it?

10  A.   No, I would believe that to be true.

11       What I was referring to and I apologize was I

12  believe there were many more references to Mr. Jowdy and

13  to Mr. Free in the first half of our conversation that I

14  did not hear on that tape this morning.

15  Q.   Is there a particular location in the conversation

16  where you feel like the conversation cuts in and out?

17       In other words, logically what you say and what

18  Mr. Constantine says doesn't match, did you hear something

19  like that?

20  A.   Well, I recalled -- the reason I recalled it was

21  because my son was with me that morning when we were at

22  Home Depot and I had to sent my eight year old away from

23  us to kind of wander the halls of Home Depot and after 30

24  minutes or so my son came back and I recall prior to him

25  coming back to make sure I was still there I was very

Kenner - Cross/Miskiewicz

4423

1   uneasy about the representations about Mr. Free's

2   involvement and what could happen with Mr. Free

3   representing Mr. Jowdy.

4          And I did not hear that this morning, but I know

5   it occurred prior to my son coming back halfway through

6   the conversation.

7   Q.   So your testimony under oath is you believe that the

8   26 minutes that exists is incomplete, that pieces have

9   been cut out of it.

10         Is that what you are saying?

11  A.   I'm saying I believe it's incomplete, yes, sir.

12  Q.   It's incomplete?

13  A.   Yes, sir.

14  Q.   When you say incomplete, not because your memory is

15  faulty, but because you are certain that those 26 minutes

16  had been altered.

17         Is that your testimony?

18  A.   I believe it's not the accurate conversation I had --

19  Q.   That's not my question.

20         THE COURT:  We all know it's incomplete because

21  there are 30 minutes missing.

22         His question is whether or not you are certain

23  that the 26 minutes that we do have has material missing

24  from that 26 minutes, that's the question.

25         THE WITNESS:  Yes, sir.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Kenner - Redirect/LaRusso

4424

1        THE COURT:  Okay.

2        MR. LARUSSO:  Judge, may I ask one more

3   question, this may be some help.

4   REDIRECT-EXAMINATION

5   BY MR. LARUSSO:

6   Q.   There is in the tape reference to the getaway driver

7   and the bank robber.

8        Remember that portion?

9   A.   Yes, sir, I do.

10  Q.   And there is some preliminary remarks before those

11  comments are made.

12       In your recollection of this conversation, would

13  the removal of words such as Mr. Jowdy change the meaning

14  of those words in the conversation?

15       MR. MISKIEWICZ:  Objection.

16       MR. LARUSSO:  Maybe I'll rephrase it.

17       MR. HALEY:  I would object as well, I guess.

18  BY MR. LARUSSO:

19  Q.   You say that there were the names Mr. Jowdy, Mr. Free

20  were removed or as far as you recall from this portion the

21  27 minutes, is that correct?

22  A.   Yes.

23  Q.   And you recall the conversation where there was a

24  discussion about the getaway driver?

25  A.   Yes, sir, I do.

Kenner - Redirect/LaRusso

4425

1    Q.    Could any of those -- that portion be where

2    Mr. Jowdy's name may have been removed, to your

3    recollection of the conversation?

4    A.    Yes, sir.

5    Q.    Explain.

6    A.    Well, I remember the reference to the bank robber and

7    the getaway car and Mr. Constantine was trying to make a

8    reference to Mr. Jowdy, either being the bank robber or

9    driving the getaway car.

10          And I couldn't follow his analogy at the time,

11   which was somewhat common when Mr. Constantine was trying

12   to make analogies for me to try to explain situations that

13   may be similar.

14   Q.    I know what you mean.

15   A.    I recall him trying to reference a bank robber and a

16   getaway car and Mr. Jowdy and the money we had been

17   seeking when we were working together, and that's not what

18   I heard this morning.

19   Q.    Had Mr. Constantine ever used those phrases before in

20   conversations with you?

21   A.    About Mr. Jowdy on a regular basis.

22   Q.    How would he describe Mr. Jowdy in other occasions

23   other than this one?

24   A.    Certainly with respect to the frauds related to our

25   airplanes, the loans he had taken from our clients, the

4426

1    $3 million loan he took against the property in North

2    Baja, the embezzlement of the funds out of the Diamante

3    Cabo San Lucas project for the first three and a half

4    years.

5              He referred to all of those events as Jowdy

6    being a bank robber and he referred to that phrase on many

7    of the global settlement conference calls prior to the

8    filing of the litigation against Mr. Jowdy in California

9    and certainly subsequent to the filing of the litigation.

10   Q.   And in this context, did he ever refer to you in any

11   way?

12   A.   As a bank robber?

13   Q.   Yes.

14   A.   Not that I know of.

15   Q.   How about the getaway car?

16   A.   Not that I'm aware of.

17             MR. MISKIEWICZ:  Do you have any questions?

18             MR. LARUSSO:  Go ahead.

19   RECROSS-EXAMINATION

20   BY MR. MISKIEWICZ:

21   Q.   When did you give this iPhone to Mr. Kaiser to

22   record?

23   A.   It was some period of time shortly after I made the

24   Home Depot recording.

25   Q.   And when was that?

4427

1    A.    I don't recall, specifically.

2    Q.    You were asked some questions about the Stolper

3    lawsuit, with respect to the Stolper lawsuit when was it,

4    using the Stolper lawsuit as a reference point, was it

5    before, was it after?

6    A.    It was from my best recollection, it was before the

7    Stolper lawsuit was filed.

8    Q.    Was it in 2009, 2010, 2011?

9          When was it?

10   A.    It would have been in 2010, and I believe it was

11   prior to the shareholder meeting.

12   Q.    Which shareholder meeting?

13   A.    The shareholder meeting that Mr. Constantine had

14   e-mailed the people from Eufora and I believe there was

15   testimony that Mr. Nash and Mr. Berard were present at

16   that shareholder meeting and Mr. Constantine had hired

17   some private security to refused to allow myself and

18   Mr. Kaiser in the building that day.

19   Q.    Was that -- I think there was testimony about that

20   being sometime -- or maybe there was a reference to that

21   being in July of 2010?

22   A.    I don't recall.

23   Q.    So was it before or after that?

24   A.    I believe it was before that, to the best of my

25   recollection.

4428

1    Q.   So whatever the testimony was, you are saying that

2    you are pretty sure that this occurred or you gave the

3    phone to Mr. Kaiser prior to that shareholder meeting or

4    you made the recording prior to that shareholder meeting?

5    A.   I don't recall the order of events as I sit here

6    today.

7              MR. MISKIEWICZ:  All right.

8              Thank you.

9              MR. LARUSSO:  Your Honor, this may be of some

10   help, if I could.

11             My client gave this to me the other day when we

12   were discussing it that's where why I raised the issue.

13   It's an e-mail he received from a reporter her name is

14   Katie Benner, it was received March 15, 2012, and I can

15   read it into the record.

16             What it says is she had listened to the tape, I

17   don't know what tape she listened to and she was alluding

18   to those two phrases, bank robber and getaway and she

19   actually says that Mr. Constantine used to use those

20   phrases in the past when referring to Jowdy and Kenner.

21             This is not a doctored e-mail.  This kind of

22   shows you that the use of the phrases getaway driver and

23   bank robber were in reference in part to Mr. Jowdy, and

24   that's what raised my concern.

25             May I hand this up to the court and I'll get a

4429

1    copy to the government?

2              THE COURT:  That's fine.

3              MR. LARUSSO:  I have not spoken to Katie Benner,

4    Judge.

5              THE COURT:  Let me ask you this last question.

6              On the recording itself, are you able to point

7    to particular instances -- forget about what phrases he

8    uses, but in listening to the recording yourself, in other

9    words if I were to listen to the recording can you tell me

10   which portions you think just from listening to the

11   recording sound like Mr. Miskiewicz suggested that there

12   is a cut off or something missing or the conversation

13   doesn't flow?

14             Or there is nothing specifically that you would

15   point to?

16             MR. LARUSSO:  I personally, Judge, and I have

17   listened to it a long time back, I cannot.

18             THE COURT:  I'm wondering whether I should

19   listen to the tape or not, but that sounds useless.

20             MR. OLIVERAS:  Early on I heard something that

21   was hard to delineate if it was the beeps from the store

22   or if it was just -- seemed like an unnatural break at

23   times, but it was so close but that was my issue and I

24   think I put that in an affidavit for this motion.

25             THE COURT:  Okay.

4430

1      MR. MISKIEWICZ:  Your Honor, we do have a copy

2  if the court wants --

3      THE COURT:  Give me a copy, so I can listen to

4  it.

5      Does the government have anything further to say

6  on this issue at this point?

7      MR. MISKIEWICZ:  No.

8      MR. LARUSSO:  Your Honor, do you want me to

9  contact that reporter to learn a little bit more about

10  what she is referring to?

11      THE COURT:  No.

12      MR. LARUSSO:  Okay.

13      THE COURT:  On that issue, that really doesn't

14  go directly to authenticity.

15      It's pretty attenuated.  I understand why you

16  may think it's important and why that may have raised your

17  concern that there was a deletion, but that would be

18  really up to the jury on that sole point.  To the extent

19  the government's going to authenticate it from Mr. Kenner,

20  Mr. Kenner is expressing the view he believes it's

21  doctored.

22      What's your response to that?

23      MR. MISKIEWICZ:  We will offer it on rebuttal

24  through an expert witness who will evaluate it and testify

25  as to its authenticity.

4431

1        That's the best we can do right now.

2        THE COURT:  Okay.

3        And, Mr. Haley, you said you were going to play

4    it in direct, but if your --

5        MR. HALEY:  No, I will not, your Honor.

6        THE COURT:  Okay.

7        MR. HALEY:  We flushed out the issues and I

8    think they needed to be flushed out.

9        And the record speaks for itself.

10        THE COURT:  All right.

11        It will be part of the government's rebuttal

12    case potentially, then.

13        MR. LARUSSO:  Thank you, very much.

14        THE COURT:  I'll see you Monday morning.

15        Have a good weekend.

16        (The trial was adjourned until Monday, June

17    22nd, at 9:30 a.m.)

18

19

20

21

22

23

24

25

4432

1                          WITNESSES

2

3     PHIL ANDREW KENNER                          4240

4     DIRECT EXAMINATION                          4241

5     BY MR. HALEY

6     PHILIP KENNER                               4412

7     DIRECT EXAMINATION                          4414

8     BY MR. LARUSSO

9     CROSS-EXAMINATION                           4419

10    BY MR. MISKIEWICZ

11    CROSS-EXAMINATION                           4421

12    BY MR. HALEY

13    CROSS-EXAMINATION                           4422

14    BY MR. MISKIEWICZ

15    REDIRECT-EXAMINATION                        4424

16    BY MR. LARUSSO

17    RECROSS-EXAMINATION                         4426

18    BY MR. MISKIEWICZ

19

20                          EXHIBITS

21    Defense Exhibit Kenner 212 and 213 in       4242

22    evidence

23    Defense Exhibit Kenner 214 was received in  4292

24    evidence

25    Defendant's Exhibit K 215 was received in   4322

4433

1    evidence

2    Defendant's Exhibit K 216 was received in          4324

3    evidence

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1.25** [1] - 4325:12
**$10** [2] - 4297:12, 4308:1
**$10,000** [2] - 4262:7, 4329:20
**$100** [3] - 4267:25, 4279:25, 4419:6
**$100,000** [17] - 4272:4, 4275:9, 4275:13, 4276:17, 4276:20, 4283:2, 4312:11, 4351:10, 4360:15, 4360:21, 4360:23, 4361:2, 4361:6, 4378:10, 4378:24
**$101,345** [1] - 4330:22
**$110,000** [1] - 4328:24
**$120,000** [1] - 4326:11
**$125** [3] - 4313:11, 4341:25, 4342:1
**$13** [3] - 4267:21, 4279:22, 4322:18
**$15** [1] - 4307:19
**$15,000** [1] - 4328:16
**$150,000** [1] - 4354:15
**$17,000** [3] - 4351:12, 4351:15, 4352:2
**$18,000** [1] - 4326:23
**$19** [1] - 4334:15
**$2,000** [2] - 4327:5, 4327:10
**$2.18** [2] - 4248:23, 4249:18
**$20** [1] - 4308:1
**$200,000** [4] - 4243:24, 4244:3, 4244:11, 4378:24
**$22,000** [1] - 4394:12
**$22,500** [1] - 4394:13
**$240,000** [1] - 4325:23
**$25,000** [4] - 4326:14, 4328:22, 4351:22, 4351:25
**$250,000** [1] - 4369:15
**$26,000** [2] - 4326:18, 4326:23
**$267,000** [3] - 4285:6, 4354:18, 4360:3
**$27,000** [1] - 4395:2
**$3.621** [1] - 4312:9
**$30** [1] - 4307:19
**$30,000** [2] - 4328:13, 4328:15
**$35,750,000** [1] - 4308:25
**$37,500** [1] - 4325:24
**$395,000** [1] - 4330:7
**$40,000** [1] - 4285:2
**$419,000** [1] - 4319:1
**$42,000** [1] - 4338:12
**$42,500** [1] - 4337:23
**$42,553** [1] - 4338:4
**$420,000** [1] - 4309:4

**$495,000** [3] - 4248:19, 4248:24, 4249:19
**$5,000** [1] - 4395:22
**$50,000** [3] - 4329:1, 4329:3, 4329:5
**$500** [1] - 4276:2
**$500,000** [2] - 4275:17, 4285:10
**$60,000** [1] - 4330:14
**$64,440** [3] - 4310:9, 4310:12, 4310:21
**$720,000** [1] - 4262:5
**$75** [1] - 4353:4
**$750,000** [6] - 4284:22, 4310:22, 4310:24, 4312:2, 4379:16, 4385:21
**$85,000** [2] - 4398:8, 4399:15
**$975,000** [1] - 4329:20

**'03** [1] - 4308:9
**'04** [3] - 4304:9, 4305:3, 4305:12
**'05** [2] - 4306:8, 4309:4
**'07** [1] - 4330:21
**'O8** [1] - 4357:2

**1**

**1** [9] - 4305:24, 4310:8, 4314:22, 4314:23, 4378:19, 4393:1, 4396:7, 4396:10, 4410:7
**1,500** [4] - 4287:6, 4301:3, 4308:10, 4308:17
**1.6** [3] - 4281:9, 4281:11, 4325:10
**10** [3] - 4251:3, 4254:2, 4300:4
**10-foot** [1] - 4297:25
**10-year** [1] - 4267:8
**100** [5] - 4238:15, 4239:20, 4247:9, 4285:24, 4366:16
**100,000** [2] - 4322:17, 4338:2
**101** [2] - 4247:9, 4249:6
**102** [1] - 4376:4
**11** [1] - 4393:9
**11501** [1] - 4239:3
**11572** [1] - 4239:7
**11722** [2] - 4238:15, 4239:21
**11749** [1] - 4238:22
**11:30** [2] - 4393:9, 4393:11
**11th** [2] - 4299:9, 4309:9
**12** [1] - 4346:3

**12/15/04** [3] - 4304:17, 4304:18, 4304:20
**12/5/04** [2] - 4304:12, 4304:16
**125** [1] - 4291:4
**12th** [2] - 4328:18, 4408:1
**13** [2] - 4250:25, 4256:19
**135** [1] - 4254:5
**13th** [1] - 4408:2
**14** [4] - 4319:13, 4328:12, 4361:23, 4377:5
**15** [14] - 4287:21, 4288:3, 4300:5, 4304:9, 4305:12, 4314:3, 4325:23, 4328:17, 4329:2, 4329:5, 4334:19, 4369:24, 4399:5, 4428:14
**150** [1] - 4272:15
**1500** [4] - 4272:21, 4273:8, 4279:21, 4336:13
**15th** [3] - 4305:3, 4305:16, 4328:21
**1601** [1] - 4238:21
**16th** [1] - 4408:2
**17** [1] - 4319:16
**17,000** [1] - 4351:16
**18** [4] - 4238:9, 4250:23, 4284:15, 4284:21
**19** [1] - 4330:9
**1992** [1] - 4253:24
**1994** [1] - 4259:1
**1:30** [2] - 4393:10, 4393:11
**1:50** [1] - 4339:13
**1st** [4] - 4247:22, 4249:9, 4306:9, 4407:19

**2**

**2** [13] - 4248:7, 4249:14, 4283:1, 4300:3, 4319:10, 4319:13, 4319:21, 4351:6, 4393:1, 4404:15, 4410:8
**2.9** [2] - 4338:11, 4338:14
**20** [4] - 4322:16, 4335:19, 4383:11, 4384:7
**200** [1] - 4349:8
**200,000** [1] - 4244:24
**2000** [1] - 4279:10
**2000s** [5] - 4279:1, 4279:14, 4279:18, 4298:25, 4333:9
**2002** [4] - 4254:3, 4259:14, 4267:8, 4343:25
**2002-2003-2004** [1] - 4263:23
**2003** [7] - 4254:3, 4254:7, 4256:18, 4260:6, 4261:19, 4264:11, 4264:16, 4264:25, 4267:8, 4271:16, 4271:18, 4272:2, 4278:8,

4286:12, 4294:10, 4294:19, 4297:4
**2004** [20] - 4259:1, 4273:9, 4274:3, 4287:4, 4287:24, 4288:12, 4288:17, 4288:18, 4289:22, 4290:13, 4290:23, 4291:1, 4295:13, 4295:14, 4296:6, 4297:4, 4305:16, 4308:10, 4325:22, 4334:18
**2005** [22] - 4259:23, 4260:6, 4265:9, 4273:9, 4274:24, 4275:12, 4275:24, 4295:17, 4305:11, 4305:24, 4306:9, 4307:16, 4307:20, 4307:23, 4325:18, 4326:10, 4328:12, 4328:21, 4328:25, 4329:7, 4343:6, 4364:6
**2006** [19] - 4267:23, 4271:2, 4275:25, 4276:3, 4278:6, 4278:8, 4318:3, 4319:13, 4320:1, 4330:9, 4332:11, 4334:4, 4334:6, 4334:18, 4337:20, 4337:21, 4341:24, 4364:6, 4419:3
**2007** [7] - 4241:20, 4241:25, 4259:14, 4276:3, 4327:18, 4330:11, 4354:17
**2008** [33] - 4258:6, 4279:16, 4284:14, 4285:1, 4285:3, 4294:16, 4294:19, 4332:19, 4333:5, 4333:19, 4336:2, 4342:8, 4345:15, 4345:16, 4347:19, 4351:2, 4353:1, 4353:9, 4354:12, 4354:17, 4354:19, 4355:3, 4355:17, 4356:6, 4356:21, 4358:21, 4359:24, 4360:2, 4360:9, 4378:1, 4399:1, 4419:4
**2009** [30] - 4247:22, 4248:4, 4248:23, 4249:9, 4250:10, 4250:12, 4250:22, 4279:16, 4284:14, 4342:8, 4353:1, 4353:9, 4355:22, 4357:2, 4360:9, 4360:16, 4360:19, 4361:6, 4361:24, 4362:14, 4371:4, 4371:6, 4377:12, 4378:8, 4398:2, 4427:8
**2010** [17] - 4336:21, 4355:22, 4362:15, 4364:6, 4365:1, 4366:1, 4366:18, 4367:19, 4368:17, 4371:5, 4371:8, 4377:12, 4399:23, 4417:17, 4427:8, 4427:10, 4427:21

**1**

2

**2011** [3] - 4377:2, 4403:2, 4427:8
**2012** [1] - 4428:14
**2013** [5] - 4250:25, 4256:19, 4376:10, 4413:16, 4416:20
**2015** [2] - 4238:9, 4376:18
**202** [3] - 4241:13, 4241:19, 4242:17
**21** [3] - 4337:7, 4376:10, 4376:18
**2100** [2] - 4273:1, 4279:22
**212** [4] - 4242:10, 4242:13, 4242:14, 4432:21
**213** [7] - 4241:13, 4241:22, 4242:10, 4242:13, 4242:14, 4243:10, 4432:21
**214** [5] - 4292:2, 4292:13, 4292:14, 4292:19, 4432:23
**215** [5] - 4272:22, 4321:18, 4321:25, 4322:1, 4432:21
**216** [6] - 4323:24, 4324:16, 4324:22, 4324:23, 4324:25, 4433:2
**22,000** [1] - 4298:3
**22nd** [1] - 4431:17
**23** [2] - 4330:11, 4330:21
**23rd** [2] - 4241:20, 4243:16
**24** [5] - 4246:1, 4357:2, 4375:24, 4392:18, 4392:23
**25,000** [2] - 4322:17, 4328:23
**250** [1] - 4349:8
**258** [10] - 4262:2, 4263:9, 4271:15, 4272:8, 4272:20, 4279:21, 4287:5, 4301:2, 4308:9, 4308:17
**26** [11] - 4239:7, 4413:22, 4419:22, 4420:1, 4420:3, 4420:13, 4420:21, 4423:8, 4423:15, 4423:23, 4423:24
**26-minute** [2] - 4421:16, 4421:24
**26th** [4] - 4366:17, 4368:17, 4369:13, 4369:19
**27** [10] - 4376:20, 4410:3, 4414:13, 4414:20, 4419:22, 4420:1, 4420:3, 4420:14, 4421:12, 4424:21
**27-minute** [2] - 4414:19, 4421:17
**28** [1] - 4241:24
**29** [1] - 4241:25
**29th** [4] - 4245:3, 4245:15, 4245:16, 4404:20
**2nd** [2] - 4407:20, 4407:21

## 3

**3** [13] - 4260:6, 4260:24, 4300:3, 4319:21, 4369:10, 4377:2, 4403:23, 4404:6, 4404:8, 4406:9, 4408:18, 4409:19, 4426:1
**3.5** [4] - 4312:10, 4313:1, 4313:21, 4314:2
**3.6** [1] - 4312:15
**30** [10] - 4247:22, 4248:23, 4266:20, 4308:3, 4313:4, 4378:12, 4416:12, 4420:15, 4422:23, 4423:21
**300** [1] - 4239:3
**30th** [1] - 4407:16
**31st** [2] - 4345:16, 4357:2
**33** [2] - 4413:5, 4417:10
**350,000** [1] - 4325:20
**36** [1] - 4385:20
**361** [1] - 4319:15
**37** [1] - 4298:1
**39** [2] - 4422:6, 4422:8
**395** [1] - 4330:6
**395,000** [1] - 4329:21
**3rd** [5] - 4406:17, 4407:21, 4408:10, 4409:1, 4409:7

## 4

**4** [3] - 4245:22, 4265:22, 4338:9
**4-4-05** [1] - 4325:5
**4.2** [1] - 4309:2
**40** [1] - 4266:20
**40-acre** [2] - 4297:22, 4297:24
**4240** [1] - 4432:3
**4241** [1] - 4432:4
**4242** [1] - 4432:21
**4292** [1] - 4432:23
**4322** [1] - 4432:25
**4324** [1] - 4433:2
**4412** [1] - 4432:6
**4414** [1] - 4432:7
**4419** [1] - 4432:9
**4421** [1] - 4432:11
**4422** [1] - 4432:13
**4424** [1] - 4432:15
**4426** [1] - 4432:17
**46** [3] - 4243:13, 4243:15, 4245:4
**47** [2] - 4244:8, 4244:10
**48** [2] - 4244:16, 4244:19
**49** [2] - 4244:25, 4245:3
**4:30** [1] - 4403:3

## 5

**5** [4] - 4243:24, 4250:2, 4265:22, 4310:5
**50** [5] - 4262:12, 4266:18, 4266:20, 4270:22, 4353:4
**5104** [3] - 4295:6, 4306:18, 4320:17
**56** [2] - 4413:5, 4417:10
**56-minute** [1] - 4413:25

## 6

**6** [1] - 4251:2
**6,000** [1] - 4268:3
**6.8** [4] - 4312:18, 4313:25, 4314:18, 4337:19
**6.9** [1] - 4332:11
**6/1/05** [2] - 4306:1, 4306:3
**60** [2] - 4266:18, 4313:14
**63** [1] - 4259:8
**631** [1] - 4239:21
**638,000** [1] - 4275:19
**65** [1] - 4259:9
**6:40** [1] - 4241:20
**6th** [1] - 4398:1

## 7

**7** [4] - 4259:6, 4259:8, 4326:10, 4351:1
**70** [2] - 4266:18, 4270:22
**70,000** [1] - 4272:13
**712-6101** [1] - 4239:21
**72** [1] - 4376:13
**770** [1] - 4318:11

## 8

**8** [4] - 4249:9, 4249:24, 4297:25, 4300:5
**80** [1] - 4301:11
**80-plus** [1] - 4271:4

## 9

**9:30** [3] - 4238:9, 4404:3, 4431:17

## A

**a.m** [4] - 4238:9, 4393:1, 4431:17
**Aaron** [2] - 4249:1, 4249:21
**ability** [5] - 4269:23,

4273:5, 4299:14, 4335:21, 4370:12
**able** [16] - 4273:7, 4275:12, 4279:20, 4296:17, 4306:14, 4309:10, 4309:20, 4324:5, 4360:6, 4372:5, 4376:23, 4381:1, 4381:2, 4395:9, 4404:14, 4429:6
**absolutely** [2] - 4268:16, 4390:11
**accept** [1] - 4309:7
**accepted** [2] - 4392:9, 4393:19
**access** [4] - 4280:16, 4280:20, 4281:2, 4308:19
**accommodate** [4] - 4340:11, 4403:25, 4404:10, 4408:24
**accommodation** [1] - 4406:2
**according** [3] - 4305:17, 4410:3, 4410:20
**account** [44] - 4245:24, 4246:11, 4247:20, 4248:14, 4248:25, 4249:10, 4249:19, 4249:25, 4250:10, 4276:12, 4281:8, 4310:12, 4325:21, 4326:12, 4326:14, 4328:15, 4328:23, 4329:1, 4330:15, 4330:24, 4337:20, 4338:6, 4344:15, 4347:1, 4347:4, 4350:8, 4350:20, 4350:21, 4356:17, 4356:18, 4357:3, 4357:17, 4358:2, 4358:8, 4360:17, 4360:24, 4392:2, 4393:22, 4393:23, 4395:19, 4400:23
**accounting** [3] - 4356:8, 4357:4, 4357:20
**accounts** [25] - 4255:13, 4265:16, 4265:21, 4272:4, 4277:18, 4282:2, 4282:6, 4286:18, 4289:17, 4289:18, 4306:24, 4307:4, 4312:13, 4323:6, 4331:17, 4331:18, 4331:22, 4357:25, 4358:1, 4358:3, 4361:1, 4363:9, 4400:14
**accrued** [1] - 4314:2
**accurate** [8] - 4259:10, 4342:15, 4366:25, 4367:23, 4371:5, 4381:3, 4406:15, 4423:18
**accurately** [3] - 4242:6, 4322:7, 4396:12
**achieving** [1] - 4282:19
**acknowledge** [1] - 4391:7

3

**acknowledged** [6] - 4386:1, 4386:4, 4390:23, 4391:15, 4393:25, 4397:9
**acknowledges** [1] - 4319:18
**acknowledging** [1] - 4281:2
**acknowledgment** [2] - 4319:25, 4392:4
**acquaintance** [1] - 4297:6
**acquire** [9] - 4242:2, 4288:23, 4346:7, 4356:1, 4368:13, 4369:16, 4370:14, 4371:17, 4419:6
**acquired** [4] - 4258:21, 4351:2, 4370:18, 4400:7
**acquiring** [9] - 4277:23, 4345:12, 4346:6, 4347:8, 4347:14, 4347:24, 4363:1, 4368:15, 4378:16
**Acquisition** [1] - 4319:10
**acre** [3] - 4272:21, 4273:2, 4308:10
**acres** [19] - 4262:2, 4263:10, 4268:3, 4271:15, 4272:9, 4272:13, 4272:22, 4273:8, 4279:21, 4279:22, 4287:5, 4287:7, 4298:1, 4301:3, 4308:9, 4308:17, 4336:13
**Acting** [1] - 4238:14
**acting** [1] - 4326:2
**action** [1] - 4362:21
**actions** [2] - 4335:22, 4402:2
**active** [1] - 4343:5
**activities** [2] - 4294:13, 4365:17
**actual** [2] - 4305:13, 4327:11
**addition** [14] - 4248:2, 4255:20, 4269:25, 4274:6, 4302:22, 4307:8, 4310:16, 4315:19, 4318:6, 4324:10, 4325:25, 4336:18, 4338:12, 4415:11
**additional** [8] - 4276:11, 4284:22, 4310:6, 4326:3, 4344:4, 4374:25, 4402:4, 4411:24
**address** [14] - 4247:23, 4257:19, 4294:23, 4317:14, 4361:5, 4361:9, 4381:7, 4382:14, 4382:15, 4382:16, 4383:25, 4384:7, 4409:23, 4412:8
**addressed** [3] - 4384:8, 4386:25, 4411:21
**adjacent** [1] - 4272:20
**adjourned** [1] - 4431:16

**admissibility** [1] - 4292:10
**admitted** [5] - 4242:13, 4292:14, 4321:25, 4324:16, 4337:6
**advance** [10] - 4299:17, 4326:1, 4326:5, 4328:13, 4328:16, 4328:22, 4329:7, 4329:11, 4329:13, 4330:22
**advanced** [3] - 4325:22, 4326:15, 4328:17
**advances** [1] - 4328:12
**advantage** [3] - 4265:5, 4265:19, 4278:14
**advantages** [2] - 4267:3, 4278:17
**adverse** [10] - 4335:5, 4359:11, 4374:24, 4375:7, 4375:8, 4375:11, 4375:22, 4375:23, 4376:8, 4376:16
**adversely** [1] - 4374:21
**advice** [3] - 4263:1, 4266:2, 4268:15
**advisability** [1] - 4268:15
**advised** [1] - 4255:11
**advising** [2] - 4255:20, 4269:8
**Advisor** [1] - 4258:2
**advisor** [6] - 4247:14, 4253:14, 4253:22, 4257:23, 4258:25, 4343:15
**advisor's** [1] - 4327:19
**Advisors** [4] - 4257:4, 4257:11
**affairs** [4] - 4255:12, 4255:21, 4256:3, 4257:22
**affect** [1] - 4374:21
**affecting** [1] - 4386:23
**affidavit** [1] - 4429:24
**affix** [1] - 4306:5
**affixed** [1] - 4305:14
**afford** [1] - 4291:12
**afternoon** [3] - 4245:15, 4380:7, 4380:18
**Afternoon** [1] - 4339:17
**agent** [2] - 4243:24, 4244:10
**agents** [3] - 4244:13, 4256:6
**ago** [4] - 4269:8, 4277:22, 4279:9, 4314:14
**agree** [7] - 4330:6, 4341:1, 4350:16, 4379:16, 4395:19, 4399:14, 4410:2
**agreed** [7] - 4264:6, 4264:14, 4276:10, 4314:23, 4329:8, 4355:3, 4386:1
**agreement** [61] - 4257:4, 4257:11, 4257:12, 4257:14, 4258:3, 4261:21,

4273:6, 4280:5, 4286:9, 4286:12, 4288:4, 4288:13, 4288:17, 4289:6, 4289:9, 4290:6, 4290:22, 4291:6, 4291:7, 4291:11, 4291:13, 4291:14, 4291:21, 4291:25, 4292:6, 4292:8, 4295:7, 4295:13, 4295:16, 4298:19, 4299:16, 4300:12, 4300:18, 4301:25, 4302:3, 4305:1, 4305:18, 4305:20, 4306:8, 4306:17, 4306:23, 4309:2, 4309:5, 4314:25, 4317:10, 4317:18, 4317:19, 4317:23, 4318:4, 4320:25, 4321:1, 4321:3, 4321:5, 4325:22, 4325:25, 4328:17, 4329:3, 4329:5, 4369:16, 4383:19, 4391:3
**agreements** [20] - 4280:3, 4288:25, 4289:2, 4289:5, 4295:9, 4295:12, 4295:20, 4296:4, 4296:9, 4297:1, 4300:19, 4320:7, 4370:5, 4400:6, 4400:12, 4400:14, 4400:16, 4400:23, 4418:22, 4419:5
**ahead** [10] - 4241:1, 4285:19, 4294:6, 4341:8, 4371:1, 4373:4, 4385:7, 4418:15, 4421:7, 4426:18
**aid** [1] - 4322:6
**airplane** [1] - 4400:6
**airplanes** [2] - 4256:13, 4425:25
**airport** [2] - 4393:10, 4393:13
**Aisle** [2] - 4322:17, 4327:2
**AJ's** [1] - 4397:15
**AKIN** [1] - 4380:3
**Akin** [5] - 4378:9, 4379:14, 4379:15, 4380:3, 4385:21
**Alan** [4] - 4245:21, 4271:6, 4320:10, 4332:17
**alert** [1] - 4393:17
**ALL** [1] - 4240:12
**all-encompassing** [2] - 4322:25, 4378:20
**allegation** [3] - 4253:18, 4362:10, 4362:18
**allegations** [6] - 4251:12, 4261:2, 4340:23, 4340:24, 4368:5, 4377:5
**alleged** [3] - 4332:5, 4334:2, 4377:6
**allegedly** [2] - 4418:22, 4419:4
**alleges** [1] - 4271:11
**allegiance** [1] - 4368:24

**allow** [11] - 4285:12, 4288:14, 4310:13, 4311:5, 4348:1, 4352:23, 4369:16, 4370:24, 4374:20, 4406:2, 4427:17
**allowed** [1] - 4336:1
**alluded** [1] - 4370:11
**alluding** [1] - 4428:17
**almost** [1] - 4379:4
**alone** [1] - 4398:12
**alongside** [1] - 4303:22
**alter** [1] - 4416:8
**alteration** [1] - 4384:4
**alterations** [4] - 4410:16, 4411:17, 4411:22, 4414:12
**altered** [4] - 4384:6, 4410:11, 4411:10, 4423:16
**alternative** [1] - 4385:14
**altogether** [1] - 4278:10
**amenities** [1] - 4336:19
**America** [1] - 4298:6
**AMERICA** [1] - 4238:3
**American** [1] - 4246:6
**amount** [5] - 4250:9, 4281:6, 4314:23, 4337:23, 4360:4
**amounts** [2] - 4290:4, 4367:7
**analogies** [1] - 4425:12
**analogy** [1] - 4425:10
**analysis** [4] - 4267:3, 4267:13, 4271:5
**ANDREW** [3] - 4239:6, 4240:21, 4432:3
**angel** [3] - 4296:14, 4333:11
**Angeles** [1] - 4387:10
**Ann** [1] - 4239:20
**annual** [1] - 4300:6
**annually** [1] - 4265:22
**anonymous** [1] - 4344:25
**answer** [8] - 4317:16, 4332:7, 4338:25, 4340:19, 4347:17, 4410:5, 4414:16, 4418:16
**answers** [4] - 4338:22, 4387:25, 4411:1
**anticipate** [2] - 4383:24, 4403:18
**anticipated** [1] - 4378:24
**anticipates** [1] - 4382:1
**anticipating** [1] - 4341:2
**apart** [1] - 4244:21
**apologies** [1] - 4309:20
**apologize** [6] - 4252:3, 4254:17, 4254:22, 4378:14, 4388:5, 4422:11
**apology** [1] - 4388:6
**apparent** [2] - 4336:7, 4346:11

4

**appealing** [1] - 4298:24
**appear** [3] - 4320:24, 4321:3, 4321:5
**appearance** [1] - 4247:6
**APPEARANCES** [1] - 4238:13
**appearances** [1] - 4240:3
**applicable** [1] - 4318:20
**apply** [1] - 4406:24
**appraised** [5] - 4267:12, 4267:24, 4279:25, 4308:24, 4308:25
**appreciate** [1] - 4409:13
**approach** [3] - 4251:17, 4370:20, 4371:18
**approached** [1] - 4399:6
**appropriate** [5] - 4300:14, 4395:10, 4395:15, 4395:18, 4396:18
**appropriately** [1] - 4331:1
**approval** [2] - 4320:1, 4395:14
**approved** [9] - 4280:10, 4386:5, 4390:24, 4391:7, 4391:15, 4392:4, 4392:9, 4393:19, 4393:25
**approximate** [2] - 4319:4, 4338:14
**April** [9] - 4247:22, 4248:4, 4248:23, 4325:18, 4330:11, 4330:21, 4351:1, 4351:6
**arbitration** [3] - 4258:5, 4258:8, 4258:12
**archaeological** [1] - 4326:20
**archaeologists** [1] - 4300:23
**archeologists** [1] - 4323:1
**archeology** [1] - 4281:15
**architect** [1] - 4281:14
**architects** [1] - 4323:1
**area** [3] - 4292:25, 4298:25, 4339:11
**areas** [4] - 4267:12, 4383:5, 4410:12, 4410:22
**arena** [3] - 4254:1, 4299:3, 4329:14
**Arizona** [16] - 4258:6, 4259:16, 4259:24, 4265:15, 4297:5, 4297:23, 4306:10, 4343:7, 4367:18, 4368:2, 4374:2, 4375:1, 4376:10, 4388:23, 4388:24, 4388:25
**arranged** [1] - 4313:11
**arrangement** [5] - 4257:7, 4313:7, 4317:1, 4317:2, 4329:16
**arrangements** [3] -

**arrest** [1] - 4413:16
**arrested** [4] - 4250:24, 4251:8, 4418:20, 4419:10
**arriving** [1] - 4356:18
**artifice** [9] - 4273:12, 4273:17, 4280:11, 4284:7, 4285:16, 4306:19, 4315:6, 4347:7, 4352:15
**Asian** [2] - 4266:16, 4270:21
**aspect** [7] - 4256:5, 4256:11, 4271:10, 4342:23, 4353:13, 4353:19, 4414:4
**aspects** [2] - 4318:22, 4341:12
**assessment** [1] - 4406:22
**asset** [6] - 4269:23, 4269:25, 4270:4, 4270:8, 4270:9, 4270:15
**assets** [4] - 4256:21, 4334:7, 4335:9, 4354:24
**assist** [4] - 4367:2, 4378:15
**assistance** [3] - 4366:19, 4368:12, 4374:12
**Assistant** [1] - 4238:17
**assisted** [2] - 4355:14, 4413:13
**associated** [6] - 4267:4, 4269:1, 4269:16, 4282:2, 4341:19, 4344:22
**assume** [1] - 4372:3
**assurances** [1] - 4268:18
**athletes** [2] - 4337:1, 4393:6
**attainable** [1] - 4297:14
**attempt** [1] - 4421:5
**attempted** [1] - 4299:10
**attenuated** [1] - 4430:15
**attorney** [8] - 4257:13, 4284:18, 4298:11, 4298:14, 4319:8, 4335:20, 4365:14, 4369:15
**Attorney** [3] - 4238:14, 4238:17, 4366:3
**attorney's** [1] - 4258:13
**attorneys** [9] - 4256:9, 4287:9, 4300:24, 4312:22, 4323:1, 4328:7, 4369:8, 4385:12, 4417:15
**audio** [1] - 4416:17
**August** [9] - 4259:14, 4267:23, 4276:3, 4278:6, 4319:13, 4320:1, 4332:11, 4337:20, 4417:17
**Augustine** [1] - 4395:18
**authenticate** [3] - 4381:1, 4411:20, 4430:19
**authentication** [1] -

4409:23
**authenticity** [2] - 4430:14, 4430:25
**authored** [1] - 4292:7
**authority** [2] - 4280:20, 4302:11
**authorization** [1] - 4326:12
**availability** [3] - 4325:11, 4392:21, 4408:9
**available** [12] - 4264:24, 4276:7, 4276:8, 4281:7, 4344:17, 4354:1, 4379:7, 4392:14, 4392:18, 4392:23, 4393:18, 4398:11
**Avery** [4] - 4272:11, 4309:19, 4310:21, 4312:3
**awake** [1] - 4393:12
**award** [5] - 4258:7, 4258:11, 4258:17, 4258:22
**awarded** [1] - 4258:13
**aware** [27] - 4246:23, 4250:12, 4271:17, 4283:6, 4287:16, 4301:20, 4311:1, 4332:8, 4343:12, 4344:7, 4354:3, 4358:24, 4359:11, 4359:23, 4362:15, 4362:16, 4391:1, 4416:8, 4416:10, 4416:11, 4416:15, 4418:12, 4418:14, 4418:16, 4418:21, 4426:16
**awareness** [1] - 4288:19
**awful** [1] - 4299:3
**AZ** [3] - 4350:13, 4358:24, 4369:23

# B

**background** [2] - 4247:13, 4343:14
**backing** [1] - 4376:19
**backup** [1] - 4327:21
**bad** [1] - 4333:13
**bag** [1] - 4291:20
**Baja** [3] - 4329:4, 4336:15, 4426:2
**balance** [7] - 4249:19, 4249:24, 4250:4, 4250:11, 4262:10, 4262:13, 4312:12
**Ball** [2] - 4287:9, 4300:24
**bank** [56] - 4243:2, 4246:12, 4247:8, 4247:21, 4249:2, 4249:11, 4249:22, 4250:1, 4264:8, 4264:20, 4264:23, 4265:14, 4265:16, 4265:20, 4272:4, 4276:12, 4277:18, 4282:1, 4282:2, 4286:18, 4289:23, 4299:5, 4308:15, 4310:12,

4312:13, 4315:1, 4323:14, 4325:21, 4326:8, 4326:12, 4326:17, 4328:14, 4328:15, 4328:23, 4329:1, 4330:17, 4330:23, 4337:20, 4338:6, 4352:4, 4356:17, 4356:18, 4357:3, 4357:24, 4360:14, 4360:22, 4361:1, 4361:14, 4424:7, 4425:6, 4425:8, 4425:15, 4426:6, 4426:12, 4428:18, 4428:23
**Bank** [4] - 4296:12, 4299:6, 4308:15, 4325:8
**banking** [5] - 4327:12, 4333:6, 4358:4, 4361:8, 4367:5
**bankrupt** [1] - 4294:17
**bankruptcy** [12] - 4332:18, 4333:6, 4333:20, 4374:10, 4374:11, 4374:13, 4374:16, 4374:21, 4375:1, 4375:3, 4376:9, 4376:17
**banks** [7] - 4296:12, 4296:15, 4296:20, 4299:24, 4301:7, 4308:16, 4370:6
**Barry** [4] - 4243:24, 4244:11, 4244:19, 4244:24
**base** [2] - 4269:19, 4344:5
**based** [24] - 4270:2, 4281:11, 4311:20, 4321:13, 4323:14, 4323:15, 4331:11, 4347:5, 4348:5, 4351:25, 4354:3, 4354:18, 4354:20, 4357:18, 4358:19, 4365:3, 4367:1, 4367:22, 4368:3, 4369:14, 4370:13, 4371:6, 4388:7, 4407:9
**basis** [21] - 4248:1, 4263:23, 4281:17, 4281:21, 4287:18, 4290:3, 4310:20, 4322:24, 4336:5, 4343:20, 4355:11, 4356:11, 4364:7, 4364:8, 4366:13, 4368:20, 4370:8, 4378:23, 4379:1, 4393:2, 4425:21
**basket** [1] - 4270:21
**beach** [3] - 4272:24, 4308:19, 4308:20
**Beach** [4] - 4247:23, 4248:6, 4389:2, 4389:4
**bearing** [1] - 4243:12
**became** [15] - 4246:23, 4268:9, 4269:22, 4271:25, 4278:6, 4286:6, 4296:11, 4308:13, 4309:6, 4328:8, 4328:23, 4332:15, 4366:2,

5

4366:8, 4375:21
**become** [9] - 4268:13, 4269:19, 4271:16, 4271:17, 4271:20, 4274:9, 4295:24, 4307:21, 4314:18
**beeps** [1] - 4429:21
**BEFORE** [1] - 4238:11
**began** [15] - 4266:7, 4273:3, 4273:8, 4285:6, 4287:24, 4288:17, 4289:16, 4289:25, 4290:10, 4291:19, 4296:2, 4296:20, 4354:1, 4374:16, 4378:4
**begged** [1] - 4310:4
**begin** [7] - 4285:11, 4301:2, 4301:19, 4329:17, 4365:16, 4378:19, 4407:21
**beginning** [4] - 4259:23, 4269:11, 4297:2, 4320:10
**beginnings** [1] - 4292:8
**begins** [1] - 4253:11
**begun** [4] - 4268:3, 4272:5, 4355:18, 4394:2
**behalf** [19] - 4272:5, 4288:15, 4288:25, 4302:12, 4320:9, 4321:19, 4326:3, 4327:6, 4355:17, 4355:18, 4360:8, 4366:16, 4368:10, 4376:8, 4376:17, 4376:25, 4378:6, 4399:4, 4403:16
**belief** [1] - 4320:5
**believes** [1] - 4430:20
**Bellingham** [1] - 4361:5
**belonging** [1] - 4357:25
**beneficial** [1] - 4366:20
**benefit** [8] - 4282:9, 4313:6, 4329:11, 4362:6, 4366:21, 4377:18, 4400:9, 4402:3
**Benner** [2] - 4428:14, 4429:3
**Berard** [3] - 4254:25, 4368:12, 4427:15
**Berreth** [1] - 4318:9
**best** [24] - 4244:17, 4245:11, 4248:4, 4250:7, 4275:1, 4301:14, 4309:13, 4341:4, 4347:3, 4347:19, 4349:3, 4353:17, 4365:5, 4381:3, 4391:13, 4403:14, 4403:17, 4404:11, 4406:25, 4407:20, 4415:20, 4427:6, 4427:24, 4431:1
**better** [4] - 4273:22, 4299:11, 4325:2, 4408:4
**between** [48] - 4249:21, 4250:19, 4257:15,

4257:17, 4257:20, 4258:9, 4258:25, 4259:14, 4260:6, 4263:19, 4301:25, 4302:2, 4302:4, 4314:23, 4318:5, 4320:9, 4342:8, 4343:17, 4349:8, 4351:14, 4352:25, 4353:9, 4354:16, 4361:24, 4363:7, 4363:13, 4363:17, 4365:1, 4365:8, 4366:16, 4367:4, 4377:12, 4378:3, 4381:4, 4385:13, 4387:17, 4385:19, 4386:11, 4389:9, 4392:7, 4392:15, 4392:25, 4393:11, 4393:16, 4394:14, 4399:18, 4418:22
**beyond** [3] - 4290:20, 4295:25, 4409:6
**BIANCO** [1] - 4238:11
**Big** [10] - 4260:10, 4260:11, 4260:12, 4319:12, 4326:18, 4326:19, 4326:22
**big** [3] - 4272:14, 4288:11, 4386:20
**biggest** [1] - 4370:3
**Bill** [1] - 4370:10
**bills** [1] - 4327:15
**binders** [1] - 4318:17
**bit** [5] - 4295:2, 4297:8, 4354:4, 4376:19, 4430:9
**black** [1] - 4272:24
**block** [10] - 4243:15, 4244:8, 4244:10, 4244:16, 4244:19, 4244:25, 4245:3, 4245:4, 4325:6
**blown** [1] - 4413:1
**board** [3] - 4267:19, 4358:23, 4359:9
**bond** [8] - 4265:16, 4265:21, 4266:12, 4274:7, 4282:24, 4283:1, 4283:3, 4284:4
**bonds** [5] - 4264:19, 4265:18, 4266:3, 4269:8, 4272:6
**booking** [1] - 4256:13
**books** [18] - 4333:8, 4349:21, 4350:14, 4354:3, 4356:8, 4356:19, 4357:5, 4358:10, 4367:1, 4367:5, 4367:24, 4370:17, 4371:2, 4371:14, 4372:2, 4372:4, 4373:5, 4373:15
**borrow** [1] - 4288:2
**Boston** [1] - 4253:24
**bottom** [4] - 4248:12, 4338:10, 4361:11, 4408:19
**bought** [3] - 4276:5, 4276:9, 4355:13
**box** [1] - 4338:9

**break** [8] - 4268:3, 4293:3, 4339:12, 4380:5, 4380:7, 4384:9, 4403:10, 4429:22
**break-up** [1] - 4268:3
**Brewer** [2] - 4273:4, 4312:2
**brief** [2] - 4255:24, 4346:9
**briefly** [3] - 4336:11, 4352:23, 4409:22
**bring** [8] - 4240:7, 4291:7, 4294:2, 4340:5, 4385:3, 4406:6, 4408:6, 4408:17
**broad** [1] - 4388:7
**broke** [2] - 4336:2, 4336:21
**brokerage** [3] - 4344:15, 4344:16, 4344:19
**Brothers** [35] - 4267:23, 4271:2, 4271:5, 4276:2, 4278:13, 4279:24, 4294:16, 4296:22, 4307:20, 4307:25, 4308:5, 4308:23, 4309:6, 4309:9, 4309:14, 4310:19, 4312:19, 4313:10, 4314:1, 4314:5, 4314:24, 4315:15, 4315:20, 4315:25, 4317:11, 4320:9, 4329:6, 4332:12, 4332:18, 4332:25, 4333:4, 4333:5, 4333:20, 4337:18, 4342:1
**brought** [2] - 4271:5, 4356:10
**Bruce** [1] - 4318:9
**Bryan** [1] - 4254:25
**bubble** [1] - 4351:13
**budgets** [1] - 4332:20
**Buffalo** [1] - 4388:20
**build** [1] - 4262:16
**building** [2] - 4374:6, 4427:18
**buildings** [1] - 4336:17
**built** [2] - 4254:2, 4267:10
**built-in** [1] - 4267:10
**burden** [5] - 4325:14, 4398:24, 4401:12, 4401:18, 4402:5
**burned** [1] - 4299:8
**bus** [1] - 4393:12
**business** [31] - 4243:23, 4244:15, 4244:23, 4247:13, 4253:23, 4254:4, 4255:21, 4255:25, 4256:3, 4256:15, 4256:25, 4257:21, 4262:23, 4276:23, 4277:19, 4277:21, 4280:10, 4281:3, 4296:7, 4297:7, 4314:8, 4318:5, 4318:7, 4319:20, 4363:18, 4363:25, 4365:4, 4366:12, 4367:3, 4387:11, 4402:11

**businessman** [1] - 4297:5
**button** [1] - 4416:7
**buy** [8] - 4267:11, 4314:6, 4314:24, 4315:16, 4369:5, 4369:18, 4369:22, 4369:25
**buyer** [1] - 4345:2
**buyers** [1] - 4264:1
**buying** [3] - 4275:8, 4295:22, 4369:9
**buyout** [1] - 4300:8
**BY** [34] - 4238:16, 4238:22, 4239:4, 4241:5, 4242:16, 4253:2, 4284:1, 4289:12, 4294:8, 4295:3, 4298:17, 4311:19, 4313:18, 4341:10, 4345:24, 4348:22, 4350:2, 4385:9, 4390:5, 4414:8, 4418:24, 4419:21, 4421:11, 4422:3, 4424:5, 4424:18, 4426:20, 4432:5, 4432:8, 4432:10, 4432:12, 4432:14, 4432:16, 4432:18

## C

**C.R** [2] - 4350:9, 4400:1
**cabana** [2] - 4261:15, 4261:25
**Cabo** [12] - 4288:9, 4291:2, 4291:3, 4313:10, 4335:25, 4336:8, 4336:14, 4336:15, 4336:23, 4341:25, 4419:7, 4426:3
**CALCAGNI** [1] - 4238:20
**calculate** [1] - 4334:16
**calculated** [1] - 4334:18
**calendar** [4] - 4244:12, 4250:10, 4264:11, 4266:17
**California** [5] - 4247:23, 4248:6, 4389:4, 4399:24, 4426:8
**Canada** [3] - 4243:18, 4275:22, 4389:1
**cannot** [1] - 4429:17
**cap** [1] - 4266:16
**Capital** [1] - 4369:3
**capital** [14] - 4264:15, 4265:24, 4279:2, 4281:8, 4301:22, 4322:7, 4322:18, 4347:25, 4350:23, 4359:3, 4359:14, 4369:3, 4400:14, 4400:23
**capitalize** [1] - 4278:25
**car** [8] - 4298:4, 4298:5, 4298:6, 4349:12, 4425:7, 4425:9, 4425:16, 4426:15
**card** [4] - 4327:15, 4348:4, 4395:8

6

cards [3] - 4259:18, 4260:1, 4327:3
care [3] - 4315:25, 4359:5, 4414:4
career [2] - 4274:11
Carlsmith [2] - 4287:9, 4300:24
carried [2] - 4291:21, 4325:14
carrying [1] - 4303:20
case [31] - 4240:3, 4254:15, 4254:24, 4281:23, 4293:4, 4311:13, 4317:6, 4336:22, 4339:14, 4341:13, 4348:20, 4380:8, 4381:19, 4398:9, 4403:19, 4403:20, 4404:2, 4404:10, 4405:25, 4406:23, 4406:25, 4407:3, 4407:11, 4407:17, 4407:18, 4407:20, 4408:5, 4408:24, 4431:12
cases [1] - 4401:10
cash [30] - 4244:7, 4265:12, 4266:11, 4270:2, 4278:2, 4279:6, 4281:11, 4287:23, 4288:21, 4312:7, 4322:16, 4324:3, 4331:17, 4337:25, 4338:19, 4345:1, 4345:4, 4345:7, 4345:8, 4345:19, 4345:21, 4346:18, 4346:21, 4348:25, 4351:21, 4360:4, 4363:19, 4364:2, 4364:3, 4364:8
catch [2] - 4393:10, 4393:18
cater [1] - 4336:24
caused [1] - 4402:13
cc'd [1] - 4367:11
CD [1] - 4413:14
ceased [3] - 4250:19, 4294:13, 4333:7
Central [3] - 4238:6, 4238:15, 4239:21
Centrum [3] - 4296:18, 4318:8, 4319:21
certain [13] - 4290:4, 4328:6, 4344:20, 4362:5, 4364:4, 4376:1, 4377:13, 4377:17, 4393:17, 4405:15, 4420:20, 4423:15, 4423:22
certainly [15] - 4279:1, 4298:25, 4300:2, 4300:22, 4300:24, 4301:2, 4337:2, 4370:9, 4386:20, 4401:21, 4408:24, 4421:1, 4421:2, 4425:24, 4426:9
cetera [2] - 4256:14,

4281:16
championship [1] - 4336:16
change [8] - 4248:19, 4249:18, 4350:15, 4405:10, 4413:23, 4420:22, 4424:13
changed [3] - 4308:5, 4337:3, 4418:4
characterize [3] - 4266:10, 4282:7, 4282:8
characterized [2] - 4342:5, 4368:6
charge [4] - 4277:17, 4324:14, 4332:19, 4350:10
charged [1] - 4301:11
charges [2] - 4246:8, 4254:21
Charles [6] - 4249:12, 4249:20, 4249:22, 4264:19, 4361:1, 4361:4
chart [12] - 4248:13, 4321:14, 4321:18, 4323:17, 4324:2, 4337:5, 4337:14, 4338:7, 4339:2, 4383:10, 4383:12
charter [1] - 4393:10
charts [4] - 4284:2, 4383:8, 4383:11, 4383:15
cheaper [1] - 4299:12
Chef's [1] - 4388:20
Chief [1] - 4373:19
children [2] - 4315:17, 4355:16
China [1] - 4355:19
chose [5] - 4275:22, 4299:10, 4328:7, 4386:11, 4386:23
chosen [1] - 4383:22
chows [1] - 4395:17
Chris [5] - 4261:8, 4287:14, 4309:7, 4318:2, 4319:24
chronologically [1] - 4271:9
Chumbley [7] - 4272:11, 4272:16, 4273:4, 4309:19, 4309:22, 4309:25
Chumbley's [2] - 4310:21, 4312:3
circle [1] - 4311:4
circumstance [1] - 4257:19
circumstances [3] - 4295:19, 4303:11, 4366:8
city [1] - 4251:3
civil [4] - 4362:17, 4377:4, 4401:12, 4402:1
claim [1] - 4362:18
claimed [1] - 4317:7
claims [2] - 4320:18,

4367:22
clarification [1] - 4392:12
clarify [2] - 4419:18, 4421:5
clarity [1] - 4261:16
classes [6] - 4269:24, 4269:25, 4270:4, 4270:8, 4270:10, 4270:15
clause [4] - 4317:6, 4317:9
clean [1] - 4402:11
clear [1] - 4275:21
clearing [2] - 4343:22, 4344:22
clearly [2] - 4318:4, 4410:4
CLERK [5] - 4240:1, 4240:8, 4294:3, 4340:3, 4341:5
client [1] - 4257:2, 4269:19, 4280:23, 4284:7, 4350:4, 4350:18, 4380:25, 4411:19, 4411:23, 4428:11
client's [5] - 4292:16, 4340:22, 4372:9, 4382:24, 4383:6
client/investor [1] - 4271:25
clientele [1] - 4336:24
clients [91] - 4246:9, 4246:10, 4247:14, 4247:25, 4253:14, 4254:6, 4254:12, 4254:19, 4255:22, 4256:12, 4256:16, 4257:15, 4257:18, 4257:20, 4257:25, 4260:19, 4262:1, 4264:2, 4265:15, 4266:1, 4266:7, 4266:23, 4267:8, 4268:8, 4268:14, 4269:1, 4269:9, 4269:16, 4269:21, 4271:17, 4280:12, 4280:17, 4281:1, 4285:17, 4296:1, 4306:20, 4307:5, 4315:7, 4317:25, 4331:5, 4331:11, 4331:15, 4331:19, 4332:5, 4334:2, 4343:1, 4343:8, 4345:11, 4345:20, 4346:1, 4347:6, 4349:9, 4349:10, 4349:18, 4366:20, 4366:22, 4367:4, 4367:11, 4367:25, 4368:25, 4370:2, 4370:19, 4374:13, 4374:18, 4374:25, 4375:5, 4375:9, 4375:14, 4376:2, 4378:7, 4385:25, 4389:12, 4389:18, 4391:5, 4391:15, 4391:21, 4392:11, 4392:16, 4392:22, 4392:25, 4393:6, 4394:1, 4397:3, 4400:17, 4400:18,

4401:14, 4402:19, 4402:25, 4425:25
clients' [3] - 4333:25, 4373:20, 4374:21
close [17] - 4262:11, 4271:14, 4271:15, 4275:20, 4301:21, 4309:14, 4309:20, 4310:1, 4310:23, 4311:5, 4315:19, 4315:22, 4315:23, 4337:19, 4403:5, 4403:7, 4429:23
closed [10] - 4246:24, 4249:11, 4272:8, 4273:10, 4287:5, 4308:8, 4308:9, 4310:14, 4311:25, 4341:25
closer [1] - 4403:21
closing [36] - 4249:25, 4250:4, 4250:11, 4262:14, 4264:15, 4264:25, 4271:19, 4272:2, 4287:5, 4287:12, 4308:11, 4308:23, 4309:3, 4312:14, 4312:19, 4314:1, 4315:4, 4315:9, 4315:14, 4315:20, 4315:25, 4317:2, 4317:10, 4317:24, 4319:4, 4319:5, 4319:7, 4319:8, 4319:13, 4319:24, 4321:7, 4332:12, 4337:18, 4337:22
coastal [1] - 4308:18
coastline [1] - 4272:23
cognizant [1] - 4341:3
collateral [9] - 4244:5, 4247:8, 4248:21, 4264:10, 4264:24, 4265:15, 4265:18, 4268:20, 4283:4
collective [1] - 4402:2
collectively [2] - 4260:14, 4386:14
Columbus [1] - 4388:19
column [3] - 4248:19, 4249:18, 4250:8
columns [1] - 4250:4
comfortable [4] - 4297:11, 4335:11, 4347:13, 4381:24
coming [11] - 4286:17, 4291:4, 4331:18, 4342:18, 4360:23, 4382:4, 4383:24, 4396:13, 4410:20, 4422:25, 4423:5
commence [1] - 4378:5
commenced [5] - 4289:10, 4294:10, 4320:11, 4328:1, 4373:22
comment [2] - 4330:4, 4380:16
comments [1] - 4424:11
commercial [1] - 4333:6
commitment [3] - 4268:19,

7

4278:1, 4278:3
**commitments** [2] - 4325:18, 4401:18
**committed** [1] - 4279:6
**common** [4] - 4300:1, 4300:2, 4313:8, 4425:11
**communicate** [1] - 4365:6
**communicated** [1] - 4413:8
**communication** [13] - 4243:16, 4250:13, 4250:20, 4251:1, 4331:12, 4361:18, 4362:13, 4365:24, 4366:10, 4375:13, 4392:15, 4393:16, 4400:1
**communications** [4] - 4375:20, 4376:1, 4392:24, 4393:4
**community** [1] - 4256:2
**companies** [7] - 4255:16, 4260:8, 4260:15, 4280:2, 4289:1, 4343:23, 4344:10
**company** [67] - 4257:17, 4259:16, 4259:25, 4262:10, 4264:25, 4272:12, 4272:14, 4275:15, 4277:6, 4277:16, 4277:18, 4277:19, 4277:20, 4281:13, 4281:18, 4282:9, 4283:6, 4288:14, 4288:15, 4310:22, 4312:3, 4329:4, 4329:18, 4332:15, 4332:20, 4334:8, 4342:13, 4342:14, 4342:18, 4342:20, 4343:11, 4343:13, 4343:19, 4343:24, 4344:2, 4344:5, 4344:16, 4347:9, 4347:24, 4348:1, 4348:10, 4348:11, 4348:13, 4348:14, 4350:14, 4352:19, 4352:20, 4352:24, 4353:3, 4353:5, 4353:12, 4356:9, 4356:11, 4356:20, 4357:20, 4359:1, 4359:10, 4362:3, 4369:4, 4369:9, 4370:4, 4370:15, 4371:6
**Company** [2] - 4260:13, 4273:5
**compensated** [2] - 4256:20, 4278:3
**compensation** [1] - 4256:17
**competent** [2] - 4298:10, 4298:13
**complaint** [1] - 4253:18
**complement** [1] - 4399:8
**complete** [5] - 4288:22,

4309:10, 4324:12, 4344:24, 4350:7
**completely** [2] - 4311:23, 4412:6
**completeness** [1] - 4384:4
**completing** [1] - 4403:15
**compounded** [1] - 4334:19
**comprehensive** [1] - 4255:2
**computer** [1] - 4239:25
**concept** [1] - 4253:25
**concern** [4] - 4369:25, 4370:1, 4428:24, 4430:17
**concerned** [4] - 4312:25, 4340:12, 4340:15, 4409:1
**concerning** [17] - 4241:7, 4269:1, 4269:16, 4277:23, 4318:22, 4347:14, 4348:24, 4353:19, 4354:8, 4361:13, 4362:18, 4365:8, 4375:14, 4377:5, 4382:19, 4394:15, 4399:18
**concert** [1] - 4386:9
**conclude** [1] - 4402:1
**concluded** [1] - 4241:6
**conclusion** [2] - 4292:16, 4383:2
**conditions** [3] - 4300:11, 4302:8, 4315:11
**conference** [7] - 4249:1, 4249:21, 4372:14, 4387:5, 4394:7, 4417:19, 4426:7
**confident** [1] - 4299:14
**confidently** [1] - 4381:18
**confine** [1] - 4387:25
**confirm** [1] - 4379:22
**confirmations** [1] - 4361:4
**connection** [14] - 4260:5, 4267:2, 4268:5, 4314:14, 4331:6, 4331:21, 4335:20, 4346:19, 4367:12, 4370:1, 4396:8, 4400:25, 4412:4, 4415:12
**consent** [1] - 4319:25
**consequence** [1] - 4315:5
**consider** [2] - 4269:24, 4379:7
**considering** [3] - 4266:17, 4295:22, 4309:1
**consistent** [1] - 4390:20
**conspire** [1] - 4362:23
**CONSTANTINE** [1] - 4238:7
**Constantine** [140] - 4239:4, 4239:8, 4275:6, 4275:10, 4284:15, 4284:24, 4296:3, 4296:7, 4296:19, 4296:24, 4296:25, 4297:3, 4297:9, 4297:14, 4298:20, 4299:1, 4299:7, 4299:13, 4301:25,

4302:4, 4304:6, 4305:2, 4305:11, 4306:3, 4306:5, 4306:7, 4306:24, 4307:16, 4310:16, 4310:25, 4311:2, 4312:6, 4312:10, 4312:21, 4312:25, 4314:6, 4314:9, 4315:10, 4315:15, 4315:18, 4315:24, 4317:1, 4320:19, 4325:24, 4326:2, 4343:25, 4345:17, 4345:19, 4346:13, 4346:22, 4347:2, 4347:10, 4347:23, 4350:20, 4350:24, 4351:4, 4351:12, 4351:14, 4351:21, 4351:22, 4351:24, 4352:11, 4355:2, 4356:10, 4356:16, 4357:9, 4357:10, 4357:16, 4357:23, 4361:25, 4362:4, 4362:24, 4363:1, 4363:5, 4363:17, 4363:20, 4363:23, 4365:2, 4365:6, 4365:8, 4368:20, 4369:2, 4371:10, 4374:10, 4374:11, 4374:19, 4377:1, 4377:6, 4377:13, 4377:15, 4377:16, 4378:13, 4379:2, 4379:10, 4379:20, 4380:23, 4381:5, 4385:11, 4385:18, 4385:20, 4386:9, 4386:15, 4387:3, 4387:10, 4387:13, 4388:22, 4389:13, 4389:18, 4390:25, 4391:9, 4391:13, 4394:2, 4394:5, 4394:15, 4394:20, 4395:5, 4395:7, 4395:13, 4397:18, 4398:5, 4398:10, 4398:13, 4399:6, 4399:8, 4400:10, 4402:20, 4413:9, 4417:23, 4418:3, 4420:4, 4421:2, 4422:7, 4422:18, 4425:7, 4425:11, 4425:19, 4427:13, 4427:16, 4428:19
**constantine** [1] - 4400:5
**Constantine's** [27] - 4304:13, 4307:22, 4329:16, 4346:17, 4347:4, 4347:9, 4348:25, 4349:19, 4350:5, 4350:8, 4350:11, 4350:18, 4351:3, 4351:11, 4356:12, 4356:14, 4356:18, 4356:25, 4357:13, 4357:16, 4359:7, 4374:16, 4375:1, 4376:9, 4376:17, 4378:2, 4399:4
**constructed** [1] - 4297:25
**construction** [7] - 4262:16, 4262:18, 4295:24, 4296:6, 4299:24, 4307:17, 4336:17

**consult** [1] - 4335:19
**consultant** [2] - 4320:24, 4326:20
**consultation** [2] - 4392:15, 4400:10
**consultations** [1] - 4331:5
**consulting** [23] - 4295:6, 4295:8, 4295:16, 4295:19, 4296:4, 4296:9, 4297:1, 4298:18, 4300:11, 4300:18, 4300:19, 4301:24, 4302:3, 4305:1, 4305:19, 4306:8, 4306:17, 4306:23, 4325:25, 4326:20, 4327:5, 4327:10, 4366:13
**consumer** [2] - 4259:17, 4260:1
**consummation** [1] - 4395:10
**Cont'd** [2] - 4284:1, 4385:9
**contact** [5] - 4242:22, 4361:14, 4375:7, 4393:14, 4430:9
**contacted** [6] - 4275:6, 4365:18, 4369:8, 4401:14, 4413:7, 4415:23
**contacting** [1] - 4392:11
**contacts** [1] - 4297:15
**contained** [2] - 4251:12, 4318:12
**contemporaneously** [1] - 4391:11
**content** [1] - 4253:4
**contents** [3] - 4319:15, 4391:1, 4397:16
**context** [3] - 4258:3, 4340:22, 4426:10
**continue** [13] - 4240:15, 4265:21, 4271:8, 4271:10, 4274:19, 4274:22, 4282:23, 4285:8, 4290:17, 4360:8, 4399:7, 4406:2, 4409:8
**continued** [12] - 4250:24, 4269:19, 4283:10, 4284:24, 4285:4, 4330:12, 4354:20, 4364:9, 4401:9, 4403:2, 4410:4, 4410:5
**Continued** [7] - 4251:18, 4252:15, 4293:7, 4316:3, 4371:22, 4372:15, 4384:12
**continuing** [3] - 4285:15, 4298:18, 4409:9
**continuity** [1] - 4330:2
**contract** [7] - 4262:4, 4267:18, 4267:21, 4279:22, 4308:22, 4310:9, 4314:8
**contracts** [6] - 4256:7,

8

cool [1] - 4352:3
cooperate [1] - 4302:5
copied [1] - 4418:22
copy [8] - 4248:2, 4289:4, 4291:25, 4392:4, 4396:17, 4429:1, 4430:1, 4430:3
corporate [8] - 4278:21, 4327:20, 4330:15, 4331:17, 4333:24, 4334:11, 4343:3, 4343:7
corporation [3] - 4343:17, 4343:18, 4344:3
correct [87] - 4246:15, 4253:4, 4258:9, 4258:10, 4258:23, 4259:3, 4259:6, 4260:23, 4261:3, 4261:13, 4266:8, 4266:9, 4268:10, 4268:11, 4269:9, 4269:12, 4274:17, 4274:18, 4279:7, 4279:8, 4280:3, 4281:24, 4281:25, 4285:23, 4286:7, 4286:8, 4286:14, 4286:21, 4286:22, 4289:22, 4294:10, 4295:10, 4302:6, 4302:7, 4302:16, 4302:20, 4302:21, 4302:24, 4303:8, 4303:9, 4304:9, 4304:14, 4304:15, 4304:18, 4305:15, 4305:24, 4306:1, 4306:3, 4307:1, 4312:16, 4323:7, 4323:8, 4330:8, 4333:2, 4333:18, 4334:13, 4339:4, 4339:7, 4339:8, 4342:22, 4344:10, 4353:15, 4358:4, 4365:20, 4385:18, 4386:6, 4387:6, 4387:20, 4390:21, 4391:1, 4395:21, 4396:2, 4397:10, 4397:11, 4399:20, 4402:17, 4412:25, 4414:15, 4415:9, 4415:21, 4416:14, 4417:3, 4417:4, 4417:21, 4421:13, 4421:14, 4424:21
correctly [4] - 4357:12, 4360:25, 4361:3, 4398:12
corruption [1] - 4399:10
cost [1] - 4285:9
costly [3] - 4309:23, 4309:24, 4328:8
counsel [4] - 4321:18, 4378:16, 4380:19, 4399:2
country [1] - 4394:21
Country [1] - 4239:3
couple [4] - 4290:11, 4312:23, 4314:4, 4329:10
course [3] - 4317:5, 4390:10, 4418:5
courses [1] - 4336:17
Court [9] - 4239:7,

4239:20, 4261:21, 4346:4, 4362:8, 4380:20, 4380:24, 4383:25, 4384:2
court [12] - 4253:1, 4286:17, 4295:1, 4295:18, 4303:11, 4313:19, 4373:1, 4388:9, 4412:2, 4419:13, 4428:25, 4430:2
COURT [116] - 4238:1, 4240:2, 4240:4, 4240:6, 4240:10, 4240:13, 4241:1, 4242:13, 4251:16, 4252:8, 4252:14, 4292:12, 4292:14, 4292:21, 4292:25, 4293:2, 4294:2, 4294:5, 4298:16, 4313:15, 4317:16, 4321:25, 4324:22, 4332:2, 4332:7, 4336:11, 4337:8, 4339:12, 4340:4, 4340:8, 4340:18, 4341:25, 4341:7, 4345:23, 4347:17, 4348:18, 4349:24, 4352:23, 4370:21, 4371:19, 4372:13, 4373:2, 4373:4, 4380:4, 4380:7, 4380:11, 4381:11, 4381:13, 4381:18, 4381:24, 4382:1, 4382:5, 4382:8, 4382:16, 4382:20, 4383:8, 4384:9, 4385:2, 4385:6, 4403:3, 4403:8, 4403:12, 4404:7, 4404:14, 4404:17, 4404:22, 4404:25, 4405:8, 4405:14, 4405:19, 4405:21, 4405:24, 4406:8, 4406:10, 4406:13, 4407:14, 4407:24, 4408:17, 4408:19, 4409:14, 4409:18, 4409:20, 4410:24, 4411:8, 4411:18, 4412:11, 4412:14, 4412:22, 4413:2, 4413:20, 4413:24, 4414:3, 4414:6, 4418:8, 4418:15, 4418:19, 4419:17, 4420:11, 4420:19, 4421:4, 4421:7, 4421:9, 4421:23, 4423:20, 4424:1, 4429:2, 4429:5, 4429:18, 4429:25, 4430:3, 4430:11, 4430:13, 4431:2, 4431:6, 4431:10, 4431:14
courthouse [1] - 4362:17
Courthouse [1] - 4238:6
courtroom [14] - 4247:6, 4293:5, 4294:4, 4339:16, 4350:22, 4353:15, 4370:12, 4380:10, 4385:5, 4396:4, 4404:5, 4404:6,

4408:18, 4409:19
cover [2] - 4281:17, 4326:18
covered [2] - 4276:11, 4318:24
covering [1] - 4330:1
CR [8] - 4365:15, 4365:18, 4365:25, 4366:4, 4370:4, 4371:15, 4372:2, 4373:6
CR-13-607 [1] - 4238:4
create [6] - 4252:11, 4262:15, 4265:17, 4282:23, 4323:14, 4324:5
created [12] - 4257:12, 4260:7, 4271:2, 4278:8, 4324:7, 4371:15, 4373:6, 4377:23, 4380:22, 4386:7, 4386:9, 4402:12
creates [1] - 4406:3
creation [2] - 4264:22, 4377:25
credit [85] - 4241:8, 4241:9, 4242:23, 4243:3, 4245:8, 4246:7, 4246:24, 4248:22, 4264:9, 4264:12, 4264:13, 4264:15, 4264:17, 4264:23, 4265:4, 4265:5, 4265:9, 4265:17, 4268:20, 4272:7, 4275:18, 4278:2, 4279:6, 4280:16, 4280:19, 4280:20, 4280:22, 4281:2, 4281:7, 4281:10, 4281:17, 4281:22, 4282:13, 4282:23, 4283:4, 4283:6, 4283:8, 4284:3, 4284:6, 4284:11, 4285:2, 4285:5, 4285:8, 4285:9, 4285:13, 4286:25, 4288:1, 4288:6, 4289:19, 4292:6, 4295:15, 4322:13, 4322:23, 4323:10, 4323:11, 4323:17, 4324:4, 4325:4, 4325:8, 4325:11, 4325:12, 4325:13, 4325:15, 4325:20, 4326:11, 4327:3, 4327:15, 4328:14, 4330:13, 4330:15, 4330:17, 4330:22, 4330:25, 4331:2, 4331:4, 4331:7, 4331:22, 4331:23, 4331:24, 4332:15, 4338:19, 4348:4, 4354:19, 4360:2, 4395:8
credits [1] - 4284:5
criminal [3] - 4401:10, 4401:13, 4402:1
critical [2] - 4348:8, 4355:15
cross [2] - 4383:25,

4270:3, 4303:23, 4304:2, 4314:7, 4370:5
contractual [1] - 4306:22
contribute [4] - 4377:14, 4386:12, 4386:24, 4400:8
contributed [5] - 4278:11, 4281:7, 4281:9, 4388:3, 4401:15
contribution [2] - 4325:10, 4388:9
contributions [6] - 4322:19, 4375:10, 4394:24, 4396:23, 4400:13, 4400:24
contributors [3] - 4386:14, 4394:23, 4397:6
control [5] - 4368:19, 4369:4, 4370:15, 4394:5, 4395:23
controlled [5] - 4289:18, 4306:24, 4345:17, 4350:13, 4358:3
conventional [1] - 4300:10
conversation [42] - 4245:8, 4245:23, 4268:25, 4276:4, 4346:19, 4349:11, 4351:14, 4352:9, 4358:16, 4370:9, 4379:10, 4380:23, 4381:4, 4385:10, 4385:19, 4390:10, 4390:11, 4398:17, 4398:20, 4410:4, 4411:24, 4412:6, 4413:5, 4413:12, 4414:18, 4416:6, 4420:2, 4420:4, 4420:25, 4421:13, 4421:17, 4421:18, 4422:13, 4422:15, 4422:16, 4423:6, 4423:18, 4424:12, 4424:14, 4424:23, 4425:3, 4429:12
conversations [34] - 4264:5, 4265:2, 4265:7, 4268:5, 4268:8, 4268:14, 4274:25, 4287:14, 4290:12, 4325:9, 4342:25, 4347:5, 4348:5, 4348:23, 4349:2, 4349:3, 4352:1, 4352:16, 4353:18, 4354:6, 4354:7, 4354:11, 4359:8, 4385:17, 4386:10, 4386:16, 4386:25, 4388:1, 4388:11, 4388:14, 4389:8, 4389:11, 4416:4, 4425:20
converted [1] - 4362:5
conveyed [2] - 4356:2, 4362:25
convince [1] - 4377:7
convinced [4] - 4342:9, 4353:10, 4361:25, 4377:7
CONWAY [1] - 4239:2

9

4421:10
**CROSS** [5] - 4419:20, 4422:2, 4432:9, 4432:11, 4432:13
**CROSS-EXAMINATION** [5] - 4419:20, 4422:2, 4432:9, 4432:11, 4432:13
**cROSS-EXAMINATION** [1] - 4421:10
**cue** [1] - 4411:9
**current** [3] - 4253:15, 4333:12, 4344:4
**CURRIE** [1] - 4238:14
**cut** [4] - 4384:3, 4409:1, 4423:9, 4429:12
**cut-off** [1] - 4409:1
**cuts** [2] - 4420:3, 4422:16
**cutting** [1] - 4348:3

**D**

**D.C** [1] - 4378:9
**daily** [4] - 4263:23, 4274:24, 4277:21, 4343:20
**Dallas** [1] - 4388:21
**Darryl** [3] - 4255:1, 4271:24, 4376:17
**date** [9] - 4248:10, 4292:20, 4305:18, 4305:25, 4319:13, 4351:8, 4381:5, 4409:1
**dated** [7] - 4295:13, 4304:9, 4304:12, 4304:16, 4305:17, 4419:3, 4419:4
**dates** [6] - 4242:7, 4295:11, 4351:15, 4353:20, 4396:18, 4408:4
**day-to-day** [3] - 4256:3, 4300:21, 4303:21
**days** [15] - 4241:24, 4242:1, 4246:9, 4308:3, 4310:14, 4312:1, 4313:4, 4349:9, 4351:6, 4351:22, 4378:12, 4379:7, 4407:1
**deadline** [1] - 4375:23
**deadlines** [1] - 4376:1
**deal** [22] - 4256:6, 4274:15, 4276:2, 4276:4, 4276:6, 4279:23, 4291:17, 4299:11, 4299:12, 4299:25, 4307:24, 4308:5, 4309:10, 4310:14, 4310:23, 4311:11, 4312:23, 4313:6, 4313:10, 4313:12, 4314:15, 4383:16
**dealing** [4] - 4256:10, 4299:22, 4364:7, 4407:25
**dealings** [6] - 4262:24, 4296:7, 4318:5, 4325:19,

**deals** [14] - 4274:6, 4274:10, 4274:13, 4274:14, 4275:2, 4275:25, 4279:2, 4299:23, 4313:8, 4315:18, 4355:19, 4370:13, 4384:3
**dealt** [2] - 4264:8, 4319:4
**debit** [2] - 4259:18, 4260:1
**debt** [1] - 4319:21
**December** [24] - 4241:20, 4241:24, 4241:25, 4263:19, 4264:25, 4271:16, 4285:3, 4290:17, 4290:23, 4291:1, 4295:14, 4304:9, 4305:3, 4305:12, 4305:16, 4308:9, 4308:10, 4345:16, 4353:9, 4356:21, 4357:2, 4360:2, 4361:24, 4362:14
**decided** [2] - 4374:5, 4400:8
**decides** [1] - 4344:3
**decision** [13] - 4273:25, 4285:7, 4286:23, 4286:24, 4288:21, 4289:14, 4289:16, 4385:11, 4406:19, 4408:7, 4408:11, 4408:20, 4409:3
**decisions** [3] - 4277:19, 4303:16, 4380:1
**deem** [1] - 4395:15
**deemed** [3] - 4270:13, 4296:14, 4368:13
**defaulted** [1] - 4312:1
**defendant** [8] - 4253:12, 4260:6, 4321:19, 4328:1, 4342:9, 4353:9, 4362:4, 4362:21
**Defendant's** [4] - 4322:1, 4324:23, 4432:25, 4433:2
**defendants** [4] - 4361:25, 4362:19, 4377:12, 4377:16
**Defendants** [3] - 4238:8, 4238:20, 4239:1
**Defense** [4] - 4242:14, 4292:19, 4432:21, 4432:23
**defense** [6] - 4340:21, 4377:15, 4381:10, 4383:7, 4403:20
**defining** [1] - 4257:16
**definitely** [2] - 4382:18, 4408:22
**defraud** [15] - 4271:12, 4273:12, 4273:17, 4280:12, 4284:8, 4285:17, 4306:19, 4315:6, 4342:8, 4347:7, 4352:15, 4353:8, 4361:24, 4362:24, 4377:11
**defrauded** [1] - 4377:13

**del** [2] - 4288:7, 4329:2
**Delaware** [1] - 4260:7
**deleting** [1] - 4416:9
**deletion** [1] - 4430:17
**deletions** [2] - 4410:16, 4414:12
**deliberating** [1] - 4407:21
**deliberations** [2] - 4407:1, 4407:2
**delineate** [1] - 4429:21
**deliver** [1] - 4289:2
**delivered** [1] - 4306:9
**delivery** [1] - 4361:8
**delusion** [1] - 4344:6
**demonstrate** [1] - 4324:2
**demonstrated** [1] - 4282:1
**departure** [1] - 4286:4
**depict** [1] - 4242:6
**deposit** [3] - 4309:5, 4314:2, 4378:22
**deposited** [8] - 4262:7, 4282:6, 4312:2, 4312:11, 4325:21, 4330:15, 4338:2, 4360:3
**deposits** [3] - 4338:5, 4393:21, 4393:23
**Depot** [4] - 4413:10, 4422:22, 4422:23, 4426:24
**deputy** [1] - 4406:13
**describe** [15] - 4250:20, 4251:7, 4261:20, 4265:1, 4290:25, 4303:11, 4336:7, 4336:11, 4346:3, 4356:4, 4358:15, 4366:7, 4386:7, 4396:15, 4425:22
**described** [3] - 4270:20, 4383:9, 4383:11
**deserved** [1] - 4380:16
**design** [1] - 4344:3
**designate** [1] - 4402:9
**designation** [1] - 4243:13
**desire** [5] - 4289:7, 4348:25, 4354:9, 4375:2, 4398:15
**destination** [1] - 4393:11
**detail** [5] - 4294:19, 4303:18, 4331:6, 4331:8, 4352:10
**detailed** [5] - 4326:5, 4359:19, 4360:11, 4375:10, 4402:22
**details** [3] - 4256:12, 4331:15, 4360:10
**determined** [3] - 4322:20, 4395:24, 4414:11
**devastated** [1] - 4333:22
**develop** [2] - 4257:20, 4365:7
**developable** [1] - 4268:4
**developed** [3] - 4336:19,

**4336:20, 4363:4
development** [40] - 4255:15, 4262:23, 4264:7, 4268:7, 4271:6, 4273:16, 4274:22, 4276:25, 4289:7, 4292:23, 4294:9, 4295:23, 4296:5, 4296:14, 4296:23, 4297:13, 4298:21, 4298:25, 4299:4, 4299:23, 4301:16, 4303:15, 4307:18, 4308:2, 4309:15, 4313:2, 4326:15, 4328:19, 4332:9, 4333:1, 4333:2, 4333:8, 4333:10, 4333:23, 4334:1, 4336:15, 4341:12, 4341:20, 4341:25, 4392:20
**Development** [1] - 4329:4
**developments** [4] - 4260:25, 4261:5, 4263:18, 4271:11
**DeVries** [5] - 4413:18, 4414:23, 4416:19, 4416:24, 4417:13
**Diamante** [9] - 4288:7, 4288:9, 4313:10, 4329:2, 4335:25, 4336:8, 4336:23, 4399:3, 4426:2
**differences** [1] - 4343:16
**different** [20] - 4267:6, 4267:9, 4267:19, 4281:16, 4301:22, 4302:19, 4303:22, 4310:15, 4323:11, 4331:18, 4332:13, 4341:3, 4343:6, 4355:12, 4357:8, 4359:22, 4365:3, 4387:11, 4388:15, 4400:15
**difficult** [5] - 4298:23, 4309:6, 4311:3, 4335:24, 4405:23
**diligence** [10] - 4267:5, 4271:1, 4273:9, 4287:11, 4300:22, 4301:13, 4305:7, 4306:13, 4309:12, 4329:18
**diligently** [5] - 4310:17, 4315:21, 4347:24, 4355:20, 4357:19
**dilutes** [1] - 4344:4
**diluting** [1] - 4309:17
**dimension** [1] - 4340:17
**diminished** [1] - 4358:11
**direct** [6] - 4240:15, 4246:19, 4338:16, 4341:13, 4350:8, 4431:4
**DIRECT** [4] - 4241:4, 4414:7, 4432:4, 4432:7
**direction** [1] - 4337:4
**directly** [6] - 4246:8, 4269:24, 4281:1, 4357:10, 4357:16, 4430:14

10

**disadvantage** [1] - 4265:5
**disadvantages** [1] - 4267:3
**disagree** [1] - 4379:5
**disagreed** [1] - 4399:9
**disagreement** [1] - 4399:12
**disavowed** [1] - 4362:6
**disbursement** [2] - 4250:3, 4250:8
**disbursements** [5] - 4395:7, 4395:24, 4402:15, 4402:16, 4402:22
**discount** [1] - 4379:17
**discovered** [1] - 4295:21
**discovery** [3] - 4303:24, 4324:8, 4328:4
**discretion** [1] - 4325:12
**discuss** [11] - 4244:17, 4269:11, 4271:10, 4293:3, 4339:14, 4380:8, 4380:19, 4386:18, 4397:15, 4398:13, 4404:2
**discussed** [14] - 4245:22, 4248:16, 4249:3, 4261:25, 4262:3, 4288:2, 4289:5, 4303:25, 4400:2, 4405:1, 4411:2, 4421:1, 4421:2
**discussing** [2] - 4273:3, 4428:12
**discussion** [5] - 4269:15, 4270:4, 4277:22, 4340:14, 4424:24
**discussions** [15] - 4246:11, 4258:16, 4281:6, 4285:6, 4300:17, 4303:14, 4328:7, 4331:10, 4345:25, 4346:4, 4371:10, 4375:18, 4385:13, 4414:10, 4420:16
**disk** [1] - 4413:20
**dismissal** [2] - 4335:11, 4337:4
**dismissed** [4] - 4334:22, 4336:21, 4368:3, 4373:22
**dismissing** [1] - 4335:5
**dispute** [7] - 4254:7, 4257:19, 4258:8, 4365:8, 4394:14, 4399:18, 4411:24
**disrupt** [1] - 4313:3
**disseminate** [3] - 4289:1, 4331:1, 4401:24
**disseminated** [1] - 4332:12
**dissension** [1] - 4402:12
**distributed** [2] - 4326:13, 4397:5
**distribution** [2] - 4337:17, 4397:23
**distributions** [6] - 4322:8, 4325:1, 4325:4, 4327:11, 4338:10
**DISTRICT** [3] - 4238:1,

4238:1, 4238:11
**District** [1] - 4377:2
**diversification** [1] - 4270:14
**diversify** [1] - 4270:10
**diverted** [1] - 4377:17
**division** [4] - 4333:6
**divorced** [1] - 4315:16
**doctor** [2] - 4418:13, 4418:17
**doctored** [3] - 4410:11, 4428:21, 4430:21
**document** [48] - 4247:16, 4249:7, 4249:14, 4250:2, 4250:6, 4256:23, 4257:8, 4290:8, 4291:17, 4291:18, 4291:20, 4291:22, 4292:2, 4295:4, 4300:13, 4302:11, 4302:15, 4303:10, 4304:3, 4304:4, 4304:7, 4304:21, 4305:5, 4305:8, 4305:11, 4305:14, 4305:17, 4306:6, 4306:7, 4306:9, 4306:12, 4312:23, 4317:13, 4318:13, 4318:14, 4318:15, 4320:19, 4322:11, 4323:3, 4324:5, 4330:20, 4375:25, 4376:5, 4376:7, 4376:13, 4376:21, 4397:2, 4418:25
**documentation** [1] - 4243:7
**Documentation** [1] - 4319:11
**documented** [2] - 4367:5, 4374:20
**documenting** [2] - 4350:10, 4351:20
**documents** [40] - 4241:13, 4241:16, 4242:2, 4242:6, 4243:1, 4243:5, 4245:25, 4280:21, 4302:9, 4302:23, 4303:3, 4303:7, 4304:25, 4305:25, 4315:23, 4317:24, 4318:12, 4318:17, 4319:3, 4319:5, 4319:8, 4320:11, 4320:15, 4320:21, 4321:6, 4321:11, 4324:7, 4360:14, 4360:25, 4361:8, 4361:19, 4371:17, 4373:7, 4373:12, 4376:12, 4392:8, 4418:21, 4419:2, 4419:9, 4419:11
**Doe** [1] - 4362:1
**DOES** [1] - 4330:10
**dollar** [3] - 4270:3, 4347:25, 4378:21
**dollars** [3] - 4247:7, 4248:15, 4248:21, 4249:25, 4250:11,

4262:18, 4264:3, 4290:11, 4290:20, 4314:4, 4332:14, 4378:4
**done** [13] - 4270:25, 4271:5, 4279:23, 4299:1, 4299:8, 4344:6, 4374:18, 4407:15, 4408:6, 4410:16, 4413:2, 4417:6, 4418:13
**down** [6] - 4281:16, 4309:5, 4331:2, 4336:2, 4336:21, 4378:23
**downtown** [1] - 4336:14
**drafted** [4] - 4305:2, 4374:23, 4390:24, 4390:25
**draw** [1] - 4281:16
**drew** [1] - 4378:23
**dried** [1] - 4401:17
**drive** [1] - 4337:1
**driver** [3] - 4424:6, 4424:24, 4428:22
**drives** [2] - 4327:20, 4327:21
**driveway** [1] - 4349:12
**driving** [1] - 4425:9
**drop** [1] - 4291:20
**due** [13] - 4267:5, 4270:25, 4273:9, 4285:3, 4287:11, 4300:22, 4301:13, 4305:7, 4306:13, 4309:12, 4329:18, 4330:25, 4335:9
**duly** [1] - 4240:23
**dumb** [1] - 4416:18
**duration** [1] - 4389:7
**during** [36] - 4248:25, 4250:10, 4251:2, 4251:5, 4251:7, 4259:9, 4259:21, 4280:22, 4284:22, 4287:8, 4287:24, 4289:5, 4291:8, 4299:5, 4303:25, 4308:4, 4312:21, 4317:5, 4324:8, 4338:11, 4338:15, 4345:14, 4353:24, 4360:24, 4363:13, 4369:1, 4371:9, 4383:23, 4383:24, 4386:25, 4389:11, 4390:9, 4392:14, 4395:3, 4400:3, 4420:10
**dust** [1] - 4276:3
**dynamic** [1] - 4279:19

# E

**e-mail** [28] - 4242:21, 4317:25, 4366:16, 4367:9, 4367:10, 4367:11, 4367:14, 4385:24, 4385:25, 4386:2, 4386:8, 4386:10, 4390:23, 4390:24, 4391:4, 4391:5,

4391:10, 4391:15, 4391:18, 4392:4, 4392:7, 4392:11, 4393:20, 4402:19, 4402:25, 4428:13, 4428:21
**e-mailed** [1] - 4427:14
**e-mails** [1] - 4394:1
**early** [18] - 4276:3, 4279:1, 4279:10, 4279:14, 4279:18, 4290:23, 4291:1, 4298:25, 4299:25, 4305:11, 4307:23, 4333:9, 4362:15, 4377:24, 4413:15, 4416:19, 4429:20
**easier** [3] - 4356:19, 4357:21, 4393:13
**EASTERN** [1] - 4238:1
**Eastern** [1] - 4377:2
**easy** [1] - 4279:14
**edge** [1] - 4348:3
**edification** [1] - 4337:22
**edited** [2] - 4384:6, 4414:19
**editing** [2] - 4413:2, 4414:12
**editions** [1] - 4411:17
**effect** [1] - 4332:15
**effective** [1] - 4305:16
**effectively** [4] - 4265:10, 4267:23, 4394:4, 4401:17
**efficient** [1] - 4341:2
**effort** [5] - 4275:11, 4368:10, 4368:17, 4399:16, 4409:8
**efforts** [15] - 4273:11, 4273:12, 4273:15, 4354:21, 4368:16, 4378:25, 4394:3, 4398:5, 4398:19, 4399:9, 4399:11, 4401:9, 4402:10, 4418:12
**eight** [6] - 4309:22, 4310:24, 4413:17, 4414:23, 4417:14, 4422:22
**eight-week** [1] - 4309:22
**either** [18] - 4250:13, 4278:1, 4285:9, 4297:18, 4303:7, 4305:13, 4326:7, 4327:3, 4345:18, 4379:21, 4386:14, 4386:25, 4398:12, 4406:12, 4406:14, 4418:21, 4421:15, 4425:8
**elements** [2] - 4312:23, 4347:20
**eleventh** [1] - 4383:16
**embezzlement** [1] - 4426:2
**embryonic** [4] - 4279:19, 4333:10, 4333:12, 4333:13
**emphasize** [1] - 4409:3
**employees** [2] - 4277:20,

error [1] - 4338:24
**employment** [1] - 4399:3
**encompassing** [2] - 4322:25, 4378:20
**encounter** [1] - 4413:9
**encountered** [1] - 4341:18
**End** [1] - 4372:14
**end** [37] - 4243:3, 4243:22, 4244:12, 4250:3, 4250:11, 4256:18, 4263:19, 4264:10, 4264:16, 4264:25, 4279:3, 4282:1, 4283:2, 4283:7, 4288:12, 4290:14, 4300:4, 4300:7, 4300:8, 4300:9, 4308:2, 4308:11, 4310:23, 4331:20, 4340:8, 4344:18, 4355:17, 4356:13, 4360:9, 4371:7, 4380:12, 4381:6, 4382:15, 4382:16, 4399:12, 4407:5, 4410:18
**ended** [3] - 4240:14, 4285:1, 4411:25
**ends** [1] - 4410:3
**engage** [2] - 4296:2, 4378:13
**engaged** [4] - 4273:11, 4273:15, 4378:8, 4389:23
**engagement** [3] - 4256:18, 4366:4, 4366:17
**engineers** [1] - 4300:23
**enhanced** [1] - 4358:12
**ensued** [1] - 4337:2
**enters** [4] - 4294:4, 4385:5, 4404:6, 4408:18
**entertainers** [1] - 4337:1
**entertainment** [8] - 4253:24, 4254:1, 4254:4, 4254:5, 4281:15, 4297:7, 4327:4, 4395:3
**entire** [3] - 4249:3, 4251:5, 4310:24
**entirely** [1] - 4349:7
**entirety** [1] - 4319:23
**entities** [5] - 4292:8, 4302:5, 4320:9, 4327:6, 4345:18
**entity** [8] - 4260:9, 4302:1, 4302:2, 4332:25, 4333:24, 4334:11, 4334:12, 4377:14
**entries** [1] - 4400:19
**environmental** [1] - 4320:25
**envision** [2] - 4380:17, 4383:21
**equated** [1] - 4310:9
**equity** [10] - 4256:21, 4269:25, 4274:6, 4274:9, 4274:14, 4274:15, 4321:3, 4322:20, 4383:18, 4419:6

**escapes** [2] - 4259:5, 4351:8
**escrow** [2] - 4326:14, 4337:19
**especially** [1] - 4405:25
**ESQ** [5] - 4238:16, 4238:16, 4238:22, 4239:4, 4239:6
**essentially** [1] - 4342:15
**established** [4] - 4269:20, 4277:6, 4278:7, 4281:4, 4281:23, 4290:5, 4325:7, 4325:10, 4328:25, 4331:4
**establishing** [1] - 4280:13
**establishment** [3] - 4276:24, 4280:1, 4280:22
**establishments** [1] - 4331:21
**estate** [37] - 4250:17, 4255:15, 4262:23, 4263:24, 4263:25, 4264:3, 4267:2, 4267:10, 4268:9, 4268:12, 4269:2, 4269:12, 4269:17, 4270:5, 4270:6, 4270:7, 4270:9, 4270:16, 4270:25, 4271:21, 4274:6, 4274:13, 4278:16, 4279:1, 4279:9, 4279:15, 4279:18, 4285:22, 4286:6, 4286:11, 4286:13, 4287:1, 4287:9, 4287:17, 4300:1, 4333:18, 4333:20
**estimate** [4] - 4380:14, 4382:8, 4403:17, 4409:6
**estimates** [2] - 4403:13, 4410:3
**et** [2] - 4256:14, 4281:16
**Ethel** [1] - 4376:25
**Eufora** [93] - 4259:15, 4259:16, 4259:20, 4259:22, 4274:16, 4274:22, 4275:6, 4275:14, 4276:6, 4285:22, 4342:5, 4342:12, 4342:13, 4342:17, 4342:18, 4343:2, 4343:5, 4343:7, 4343:10, 4343:12, 4344:6, 4345:9, 4345:12, 4345:13, 4346:6, 4346:10, 4346:12, 4346:23, 4347:15, 4347:22, 4348:6, 4349:1, 4349:20, 4349:21, 4350:5, 4350:9, 4350:13, 4350:19, 4352:18, 4353:11, 4353:23, 4354:2, 4354:3, 4354:5, 4354:13, 4354:24, 4355:2, 4355:25, 4356:6, 4356:7, 4357:5, 4357:7, 4357:22, 4358:1, 4358:9,

4358:20, 4358:21, 4358:25, 4362:2, 4362:7, 4362:14, 4363:2, 4364:2, 4365:9, 4365:10, 4365:16, 4366:12, 4367:1, 4367:4, 4367:8, 4367:25, 4368:19, 4369:23, 4370:13, 4370:17, 4370:18, 4371:4, 4372:10, 4373:13, 4373:16, 4373:18, 4373:21, 4374:19, 4375:5, 4375:10, 4377:7, 4392:20, 4400:4, 4400:7, 4427:14
**Eufora's** [3] - 4356:17, 4357:3, 4365:9
**evaluate** [1] - 4430:24
**evening** [4] - 4241:21, 4261:25, 4387:12, 4387:13
**event** [10] - 4263:17, 4280:7, 4291:1, 4291:4, 4291:8, 4291:9, 4309:17, 4330:8, 4372:7, 4408:25
**events** [4] - 4391:24, 4392:19, 4426:5, 4428:5
**eventually** [2] - 4314:13, 4399:14
**evidence** [34] - 4242:15, 4247:10, 4256:23, 4257:6, 4257:9, 4263:12, 4263:13, 4280:25, 4286:5, 4286:16, 4292:20, 4295:5, 4300:12, 4317:18, 4322:2, 4324:22, 4324:24, 4337:6, 4360:15, 4360:22, 4367:15, 4381:10, 4385:23, 4392:8, 4393:15, 4396:7, 4403:16, 4418:13, 4418:17, 4432:22, 4432:24, 4433:1, 4433:3
**evidenced** [1] - 4279:19
**ex** [3] - 4315:17, 4316:2, 4318:24
**ex-wife** [2] - 4315:17, 4316:2
**ex-wife's** [1] - 4318:24
**exactly** [1] - 4358:14
**examination** [3] - 4240:15, 4246:19, 4413:1
**EXAMINATION** [14] - 4241:4, 4414:7, 4419:20, 4421:10, 4422:2, 4424:4, 4426:19, 4432:4, 4432:7, 4432:9, 4432:11, 4432:13, 4432:15, 4432:17
**examined** [1] - 4240:23
**example** [10] - 4267:16, 4282:25, 4313:9, 4323:16, 4341:23, 4344:8, 4348:10, 4388:18, 4393:8, 4409:4
**examples** [1] - 4348:19

**exception** [1] - 4345:15
**excerpt** [1] - 4317:6
**excess** [1] - 4313:21
**excessive** [1] - 4341:15
**exchange** [9] - 4342:12, 4344:23, 4346:17, 4353:11, 4362:2, 4363:9, 4363:13, 4364:8, 4366:15
**excited** [1] - 4291:11
**excuse** [20] - 4245:16, 4248:16, 4271:14, 4276:7, 4284:14, 4290:23, 4297:24, 4304:18, 4320:25, 4321:16, 4328:12, 4332:4, 4356:7, 4356:14, 4358:21, 4378:14, 4386:6, 4407:5, 4417:12, 4421:1
**excusing** [1] - 4407:6
**execute** [1] - 4302:11
**executed** [1] - 4302:14
**execution** [1] - 4306:17
**Executive** [1] - 4373:19
**exemplary** [1] - 4409:8
**exercise** [1] - 4258:2
**exhibit** [10] - 4241:14, 4243:17, 4248:7, 4302:18, 4318:12, 4361:11, 4361:12, 4381:10, 4383:5
**Exhibit** [22] - 4241:19, 4241:22, 4242:14, 4243:10, 4249:6, 4292:2, 4292:19, 4295:6, 4306:18, 4318:11, 4320:17, 4321:18, 4322:1, 4323:24, 4324:23, 4337:7, 4376:3, 4376:20, 4432:21, 4432:23, 4422:25, 4433:2
**exhibits** [8] - 4247:9, 4247:11, 4320:13, 4351:19, 4375:24, 4375:25, 4382:25, 4383:2
**EXHIBITS** [1] - 4432:20
**Exhibits** [1] - 4242:10
**exist** [2] - 4344:9, 4420:15
**existed** [1] - 4419:8
**existence** [4] - 4295:20, 4297:1, 4307:15, 4334:4
**existing** [4] - 4318:7, 4365:21, 4390:6, 4390:9
**exists** [3] - 4317:13, 4333:24, 4423:8
**exits** [2] - 4339:15, 4380:9
**Expansion** [21] - 4296:19, 4307:11, 4307:14, 4311:13, 4311:25, 4312:15, 4313:22, 4313:25, 4314:6, 4314:15, 4314:24, 4315:3, 4315:5, 4315:11, 4315:20, 4317:9,

12

4317:19, 4317:23, 4318:6, 4318:25, 4319:22
**Expansion's** [1] - 4317:21
**expect** [1] - 4372:2
**expectation** [1] - 4355:20
**expected** [1] - 4287:13
**expecting** [2] - 4245:21, 4404:22
**expenditures** [3] - 4396:17, 4396:24, 4397:16
**expense** [10] - 4244:15, 4283:8, 4327:12, 4327:16, 4394:13, 4394:15, 4395:19, 4405:10, 4406:17, 4409:7
**expenses** [23] - 4281:13, 4281:18, 4322:24, 4323:6, 4326:18, 4326:19, 4326:22, 4326:25, 4327:1, 4327:3, 4327:6, 4327:9, 4327:11, 4327:14, 4332:14, 4355:15, 4360:8, 4394:25, 4395:2, 4395:5, 4395:9, 4395:14
**expensive** [3] - 4295:25, 4300:9, 4309:16
**experience** [3] - 4300:2, 4329:19, 4343:14
**expert** [1] - 4430:24
**explain** [13] - 4243:13, 4248:8, 4295:18, 4312:20, 4325:16, 4328:11, 4331:16, 4343:16, 4353:17, 4412:24, 4413:2, 4425:5, 4425:12
**exposure** [2] - 4266:14, 4270:14
**Express** [6] - 4243:1, 4243:8, 4245:24, 4246:3, 4246:6, 4246:10
**expressed** [2] - 4303:20, 4309:20
**expressing** [1] - 4402:19, 4430:20
**extend** [2] - 4290:17, 4290:19
**extended** [3] - 4284:21, 4288:14, 4409:5
**extension** [2] - 4309:22, 4310:7
**extensive** [3] - 4297:14, 4299:9, 4314:10
**extent** [2] - 4277:13, 4430:18

# F

**face** [14] - 4251:3, 4263:3, 4281:20, 4289:3, 4349:6,

4379:23, 4394:23
**face-to-face** [5] - 4251:3, 4263:3, 4281:20, 4349:6, 4379:23
**Facebook** [3] - 4344:9, 4344:13, 4344:23
**faced** [1] - 4330:12
**facilitate** [1] - 4264:22
**facility** [1] - 4298:3
**fact** [25] - 4243:22, 4246:6, 4279:20, 4290:10, 4303:24, 4320:7, 4329:5, 4335:9, 4357:19, 4359:12, 4359:13, 4360:5, 4364:1, 4368:14, 4369:22, 4370:15, 4387:8, 4397:5, 4397:11, 4408:5, 4409:6, 4414:10, 4416:8, 4416:11, 4422:7
**factors** [2] - 4277:7, 4278:18
**fair** [2] - 4397:8, 4417:8
**fairly** [2] - 4266:11, 4267:5
**faith** [1] - 4320:5
**falling** [3] - 4363:9, 4363:15, 4365:3
**falls** [1] - 4342:4
**false** [3] - 4260:16, 4362:11, 4368:8
**familiar** [7] - 4251:11, 4253:3, 4261:2, 4367:14, 4377:19, 4380:22, 4416:3
**familiarity** [1] - 4358:20
**family** [4] - 4256:1, 4256:4, 4288:11, 4355:10, 4355:14
**far** [8] - 4254:23, 4267:11, 4268:2, 4269:23, 4295:25, 4301:5, 4317:18, 4424:20
**fashion** [7] - 4245:13, 4245:14, 4273:24, 4274:20, 4329:13, 4336:18, 4394:18
**faulty** [1] - 4423:15
**favor** [3] - 4400:16, 4400:17, 4400:18
**favorable** [1] - 4307:24
**FBI** [1] - 4415:12
**February** [8] - 4327:18, 4342:8, 4360:16, 4360:19, 4361:5, 4361:17, 4377:12, 4419:4
**fed** [1] - 4246:2
**Federal** [7] - 4238:15, 4239:20, 4243:1, 4243:8, 4245:24, 4246:2, 4246:10
**FedEx** [4] - 4243:5, 4243:18, 4245:10, 4246:8
**FedEx'd** [1] - 4245:25
**fee** [6] - 4300:5, 4310:8, 4327:5, 4329:19, 4330:13,

4379:19
**feelers** [1] - 4298:22
**fees** [25] - 4258:13, 4281:14, 4281:15, 4299:17, 4299:18, 4300:8, 4323:9, 4323:10, 4326:1, 4326:5, 4326:15, 4326:20, 4326:21, 4328:18, 4329:7, 4329:11, 4329:13, 4329:19, 4330:18, 4331:2, 4332:16, 4354:20
**felt** [5] - 4288:11, 4297:11, 4303:19, 4309:13, 4335:10
**Feuerstein** [1] - 4374:7
**Feuerstein's** [1] - 4377:3
**few** [5] - 4279:24, 4290:20, 4309:11, 4351:22, 4379:7
**fictitious** [1] - 4320:14
**fight** [1] - 4379:9
**figure** [2] - 4325:5, 4407:12
**figures** [1] - 4250:5
**file** [4] - 4335:4, 4374:5, 4375:22, 4416:18
**filed** [16] - 4254:8, 4333:6, 4362:17, 4367:13, 4367:17, 4367:19, 4367:21, 4368:2, 4374:10, 4374:11, 4374:25, 4376:1, 4376:8, 4376:16, 4376:24, 4427:7
**filing** [3] - 4374:16, 4426:8, 4426:9
**filings** [1] - 4368:4
**filling** [1] - 4270:4
**final** [6] - 4244:14, 4249:11, 4299:19, 4308:4, 4348:7, 4371:11
**finally** [5] - 4244:25, 4315:23, 4330:10, 4330:19, 4402:14
**financial** [21] - 4247:14, 4253:14, 4253:22, 4255:12, 4255:13, 4255:21, 4256:2, 4256:5, 4256:11, 4257:22, 4258:25, 4275:15, 4295:25, 4325:14, 4343:14, 4355:6, 4355:9, 4398:24, 4401:12, 4401:18, 4402:5
**financial-related** [1] - 4256:11
**financially** [1] - 4269:20
**fine** [2] - 4408:13, 4429:2
**finish** [7] - 4292:21, 4380:17, 4382:10, 4382:20, 4403:4, 4403:5, 4403:15
**finished** [4] - 4241:10, 4355:9, 4393:8, 4413:7

**finishing** [1] - 4341:11
**finite** [2] - 4270:8, 4274:10
**firing** [1] - 4277:20
**firm** [8] - 4254:7, 4287:10, 4344:16, 4344:19, 4378:8, 4378:12, 4380:2, 4399:11
**firms** [1] - 4319:4
**first** [33] - 4243:12, 4246:23, 4247:5, 4247:7, 4248:12, 4261:8, 4262:2, 4271:15, 4271:19, 4288:7, 4296:15, 4297:18, 4319:16, 4331:4, 4341:18, 4357:14, 4357:15, 4358:8, 4363:8, 4365:24, 4369:20, 4370:11, 4376:22, 4379:16, 4387:9, 4387:12, 4398:1, 4411:15, 4413:17, 4420:1, 4420:24, 4422:13, 4426:3
**five** [12] - 4241:24, 4242:8, 4246:9, 4264:21, 4291:4, 4311:2, 4341:24, 4348:9, 4351:6, 4354:5, 4357:14, 4357:15
**five-day** [1] - 4291:4
**flew** [3] - 4263:2, 4309:18, 4388:24
**flight** [2] - 4404:20, 4407:2
**flow** [5] - 4289:17, 4315:9, 4324:3, 4351:21, 4429:13
**flowed** [2] - 4306:23, 4315:3
**flowing** [1] - 4391:20
**flows** [1] - 4331:17
**flushed** [2] - 4431:7, 4431:8
**flying** [1] - 4297:21
**focus** [1] - 4325:2
**focused** [7] - 4252:4, 4260:4, 4294:21, 4313:16, 4313:20, 4315:24, 4410:1
**fold** [1] - 4273:21
**follow** [7] - 4245:7, 4247:12, 4261:1, 4356:24, 4413:3, 4414:3, 4425:10
**follow-up** [1] - 4245:7
**followed** [2] - 4370:7, 4379:21
**following** [18] - 4248:21, 4249:20, 4252:1, 4253:1, 4254:2, 4261:22, 4294:1, 4310:14, 4310:20, 4312:14, 4315:4, 4319:16, 4332:17, 4371:20, 4379:13, 4385:1, 4391:18, 4392:3
**follows** [3] - 4240:24, 4342:6, 4412:21
**food** [1] - 4397:15

13

**foot** [1] - 4298:3
**foreclosure** [1] - 4355:13
**foregoing** [1] - 4319:18
**forestall** [1] - 4312:7
**forge** [2] - 4303:3, 4321:10
**forged** [3] - 4320:19, 4418:21, 4418:25
**forget** [2] - 4279:15, 4429:7
**form** [6] - 4245:13, 4298:15, 4298:16, 4317:15, 4345:23
**formed** [1] - 4337:20
**former** [2] - 4253:15, 4327:19
**forth** [4] - 4243:14, 4280:2, 4280:20, 4306:23
**fortunate** [1] - 4333:15
**forward** [5] - 4279:4, 4280:15, 4344:1, 4391:14, 4392:4
**forwarded** [10] - 4319:23, 4324:9, 4325:13, 4328:14, 4329:3, 4329:6, 4333:23, 4337:18, 4352:4, 4395:13
**fought** [1] - 4279:16
**foundation** [2] - 4372:4, 4381:9
**four** [8] - 4241:22, 4262:12, 4276:6, 4318:17, 4319:3, 4389:9, 4395:3, 4417:19
**fourth** [1] - 4241:25
**frame** [3] - 4263:23, 4345:14, 4405:14
**frankly** [9] - 4296:13, 4299:10, 4307:21, 4309:8, 4309:15, 4310:4, 4315:22, 4368:22, 4383:2
**frauds** [1] - 4425:24
**fraudulent** [1] - 4320:14
**free** [11] - 4268:24, 4275:21, 4415:12, 4420:9, 4420:13, 4420:22, 4421:3, 4421:16, 4422:13, 4423:2, 4424:19
**Free** [1] - 4419:24
**free's** [1] - 4423:1
**frequent** [1] - 4251:1
**Friday** [2] - 4291:9, 4407:22
**friend** [1] - 4262:21
**front** [6] - 4300:4, 4308:1, 4314:12, 4320:13, 4329:19, 4360:8
**frontage** [1] - 4308:21
**frustrated** [3] - 4397:22, 4398:23, 4401:8
**full** [7] - 4281:8, 4285:21, 4339:5, 4339:7, 4375:21, 4379:19, 4413:1
**full-blown** [1] - 4413:1

**full-time** [1] - 4375:21
**fully** [1] - 4412:8
**fund** [5] - 4307:25, 4315:19, 4377:15, 4386:20, 4391:20
**Fund** [21] - 4377:10, 4377:20, 4377:22, 4377:25, 4386:12, 4386:13, 4386:24, 4388:10, 4389:23, 4391:17, 4394:6, 4395:7, 4395:11, 4396:14, 4396:20, 4397:7, 4397:24, 4398:19, 4401:15, 4402:6, 4402:15
**funded** [3] - 4307:4, 4312:12, 4400:8
**funding** [36] - 4262:17, 4267:22, 4271:2, 4275:25, 4277:18, 4278:12, 4279:23, 4295:6, 4295:8, 4295:16, 4295:19, 4296:4, 4297:1, 4298:18, 4299:14, 4299:19, 4299:25, 4300:11, 4300:18, 4300:19, 4301:4, 4301:19, 4301:24, 4302:3, 4303:14, 4305:19, 4306:17, 4306:23, 4307:21, 4308:2, 4313:11, 4320:24, 4326:3, 4329:16, 4333:1, 4337:17
**funds** [31] - 4250:9, 4256:8, 4276:11, 4282:8, 4282:11, 4285:16, 4291:13, 4296:4, 4318:25, 4322:13, 4322:14, 4322:22, 4329:6, 4351:4, 4351:5, 4352:2, 4354:22, 4356:17, 4390:14, 4391:16, 4392:1, 4392:3, 4397:12, 4397:19, 4398:10, 4398:16, 4399:19, 4402:4, 4402:21, 4426:2
**Funds** [4] - 4398:15, 4399:13, 4401:2, 4401:16
**future** [4] - 4291:14, 4314:25, 4333:7, 4335:4

## G

**G-u-m-p** [1] - 4380:3
**Gaarn** [28] - 4353:24, 4353:25, 4354:4, 4354:8, 4354:11, 4354:14, 4354:21, 4354:23, 4355:3, 4355:8, 4355:17, 4355:21, 4355:23, 4356:22, 4356:23, 4358:22, 4358:23, 4359:2, 4359:19,

4360:5, 4365:15, 4365:19, 4365:21, 4366:4, 4366:10, 4366:11, 4368:12, 4369:20
**Gaarn's** [7] - 4350:13, 4358:2, 4358:10, 4359:7, 4360:20, 4365:24
**game** [1] - 4393:9
**gamut** [1] - 4266:11
**gathered** [1] - 4322:18
**Gaudet** [1] - 4291:15
**general** [8] - 4256:1, 4278:17, 4278:19, 4281:17, 4282:19, 4283:8, 4322:12, 4343:23
**generally** [2] - 4383:9, 4411:6
**gentleman** [2] - 4296:18, 4318:8
**gentlemen** [2] - 4310:18, 4365:25
**Gentry** [26] - 4350:10, 4356:8, 4356:11, 4356:16, 4356:21, 4357:4, 4357:18, 4365:15, 4365:19, 4365:25, 4366:5, 4366:11, 4367:2, 4368:11, 4369:7, 4370:4, 4371:4, 4371:15, 4372:2, 4373:6, 4373:11, 4373:15, 4400:1, 4400:3, 4400:11, 4400:21
**getaway** [8] - 4424:6, 4424:24, 4425:7, 4425:9, 4425:16, 4426:15, 4428:18, 4428:22
**given** [14] - 4247:13, 4281:8, 4343:14, 4343:15, 4348:7, 4354:15, 4373:14, 4406:22, 4406:23, 4407:3, 4408:9, 4408:23, 4410:18, 4413:10
**glad** [1] - 4296:20
**Glen** [5] - 4246:14, 4249:8, 4250:22, 4251:9, 4376:9
**global** [6] - 4394:22, 4397:5, 4397:16, 4400:3, 4400:8, 4426:7
**Global** [25] - 4377:10, 4377:20, 4377:22, 4377:25, 4386:12, 4386:13, 4386:24, 4388:10, 4389:23, 4391:16, 4394:6, 4395:6, 4395:10, 4396:14, 4396:20, 4397:7, 4397:23, 4398:14, 4398:19, 4399:13, 4401:1, 4401:15, 4401:16, 4402:6, 4402:15
**goal** [2] - 4282:19, 4336:25
**golf** [2] - 4291:15, 4336:16
**gonna** [1] - 4244:3

**good-faith** [1] - 4320:5
**governed** [2] - 4280:4, 4317:21
**Government** [11] - 4238:14, 4242:3, 4295:6, 4306:18, 4317:6, 4321:21, 4324:7, 4324:18, 4373:2, 4381:21, 4382:1
**government** [6] - 4246:18, 4292:9, 4338:16, 4338:17, 4429:1, 4430:5
**government's** [5] - 4292:17, 4341:13, 4351:19, 4430:19, 4431:11
**Government's** [6] - 4317:5, 4318:11, 4320:13, 4320:17, 4337:6, 4383:25
**governs** [1] - 4318:7
**graduation** [5] - 4404:12, 4406:20, 4408:8, 4408:23, 4409:11
**grant** [1] - 4310:7
**granted** [3] - 4348:7, 4357:6, 4398:4
**Grdina** [6] - 4311:8, 4311:10, 4312:22, 4312:25, 4314:6, 4314:10
**great** [4] - 4269:3, 4309:1, 4342:14, 4342:20
**greater** [1] - 4279:7
**Greg** [2] - 4413:18, 4414:22
**gross** [1] - 4277:7
**group** [19] - 4270:8, 4285:10, 4308:14, 4309:1, 4311:7, 4360:1, 4368:10, 4369:12, 4369:16, 4369:24, 4370:14, 4371:7, 4379:8, 4386:23, 4399:5, 4400:9, 4401:24, 4402:3, 4402:13
**Group** [7] - 4302:5, 4347:2, 4347:10, 4351:21, 4357:11, 4357:17, 4357:23
**Group's** [1] - 4350:20
**growth** [8] - 4269:22, 4278:25, 4279:19, 4333:13, 4342:14, 4342:21, 4346:10, 4352:19
**GSF** [10] - 4377:14, 4388:3, 4390:14, 4391:20, 4392:20, 4394:14, 4396:23, 4397:19, 4399:18, 4402:20
**guarantee** [2] - 4299:17, 4419:5
**guaranteed** [1] - 4299:18
**guarantees** [1] - 4419:7
**guess** [11] - 4279:14, 4302:3, 4406:15, 4406:19,

14

hangars [1] - 4400:6
Hanu'Apo [1] - 4308:10
happy [1] - 4309:25
harbor [1] - 4303:24
hard [23] - 4279:16,
4296:17, 4299:2, 4299:20,
4299:21, 4309:4, 4310:16,
4310:22, 4313:8, 4326:1,
4326:2, 4326:5, 4326:16,
4327:20, 4327:21,
4328:18, 4329:11,
4329:12, 4329:14,
4329:15, 4329:16, 4429:21
Harvey [3] - 4284:18,
4378:1, 4399:2
Hatsamos [3] - 4365:23,
4366:14, 4368:11
Hawaii [58] - 4245:20,
4260:9, 4260:24, 4261:5,
4261:8, 4263:2, 4263:7,
4263:17, 4263:21, 4264:7,
4265:24, 4267:18, 4268:7,
4270:6, 4271:18, 4272:1,
4272:3, 4272:7, 4272:9,
4272:14, 4273:16,
4278:16, 4285:22, 4286:6,
4287:10, 4287:25, 4289:7,
4292:8, 4294:9, 4295:21,
4296:12, 4296:13,
4296:16, 4298:21,
4298:24, 4299:6, 4300:21,
4301:10, 4305:6, 4305:9,
4306:13, 4308:16,
4308:21, 4309:19,
4313:12, 4319:12,
4319:13, 4326:4, 4328:20,
4333:8, 4333:10, 4333:21,
4333:23, 4334:1, 4360:1,
4360:9, 4360:12, 4398:4
Hawaiian [30] - 4242:24,
4250:17, 4268:9, 4268:19,
4269:2, 4269:12, 4271:11,
4274:22, 4275:16, 4276:8,
4276:24, 4283:9, 4284:17,
4286:11, 4286:13, 4287:1,
4292:23, 4308:16,
4320:21, 4322:7, 4322:25,
4326:14, 4327:7, 4329:12,
4332:9, 4333:1, 4341:11,
4341:20, 4354:19, 4392:20
head [1] - 4393:10
heading [2] - 4260:24,
4377:10
hear [12] - 4313:19,
4379:14, 4405:9, 4407:4,
4414:19, 4415:18,
4420:21, 4422:4, 4422:9,
4422:14, 4422:18, 4423:4
heard [13] - 4256:14,
4259:4, 4318:9, 4370:11,

4390:18, 4414:9, 4414:13,
4415:3, 4415:17, 4420:14,
4421:13, 4425:18, 4429:20
hearing [7] - 4384:1,
4406:23, 4415:14,
4415:16, 4417:22, 4418:4,
4419:23
heated [3] - 4398:17,
4398:20, 4398:22
heavily [1] - 4310:2
held [22] - 4255:16, 4259:9,
4259:15, 4259:17,
4259:25, 4264:19,
4332:13, 4334:8, 4343:8,
4343:11, 4343:17,
4343:19, 4348:11,
4348:12, 4348:14,
4350:12, 4352:19, 4370:2,
4370:13, 4385:17, 4397:11
helicopters [1] - 4297:20
help [3] - 4256:7, 4277:25,
4296:9, 4299:13, 4316:1,
4337:11, 4355:1, 4355:11,
4363:21, 4366:15,
4368:23, 4424:3, 4428:10
helpful [2] - 4314:12,
4360:7
helping [1] - 4379:8
Hennessy's [1] - 4389:3
herein [1] - 4260:14
hereinafter [1] - 4253:16
Hermosa [1] - 4389:4
high [3] - 4266:18,
4266:22, 4314:10
highest [1] - 4298:6
highlighted [2] - 4248:9,
4248:18
highlights [1] - 4408:5
highly [1] - 4276:15
highmark [1] - 4265:20
Highway [1] - 4238:21
himself [3] - 4290:16,
4355:10, 4381:4
hire [2] - 4380:1, 4385:11
hired [5] - 4287:10, 4356:7,
4365:14, 4366:13, 4427:16
hiring [2] - 4256:9, 4277:20
historical [1] - 4266:19
history [3] - 4246:19,
4246:22, 4406:23
hit [2] - 4268:2, 4416:7
hockey [50] - 4253:15,
4253:21, 4254:11,
4254:19, 4256:16,
4257:15, 4257:20,
4257:25, 4266:1, 4266:7,
4269:1, 4269:16, 4274:4,
4274:11, 4280:12,
4280:17, 4284:6, 4285:17,
4306:19, 4307:5, 4315:6,

4332:5, 4333:25, 4334:2,
4334:12, 4338:8, 4342:25,
4346:1, 4347:6, 4349:10,
4349:18, 4350:4, 4350:17,
4366:20, 4367:10, 4370:2,
4370:19, 4373:20,
4374:12, 4375:4, 4375:9,
4375:14, 4385:24,
4389:11, 4389:17, 4391:4,
4392:10, 4392:16, 4397:3
Hockey [1] - 4253:16
hold [5] - 4251:16, 4278:9,
4329:24, 4343:15, 4399:11
holder [1] - 4347:1
holders [5] - 4246:7,
4283:6, 4285:8, 4288:6,
4319:21
Holding [2] - 4260:13
holding [2] - 4260:15,
4280:2
holdings [2] - 4350:12,
4359:1
Home [4] - 4413:10,
4422:22, 4422:23, 4426:24
home [12] - 4243:17,
4243:21, 4247:22, 4248:3,
4268:2, 4291:18, 4297:22,
4297:23, 4315:16,
4318:24, 4355:13, 4388:19
homes [2] - 4256:8,
4262:16
Honor [30] - 4242:9,
4242:12, 4292:11, 4294:7,
4313:24, 4317:17,
4321:17, 4321:24,
4324:15, 4324:21,
4336:12, 4339:10,
4340:21, 4350:1, 4380:17,
4380:22, 4382:3, 4382:23,
4383:14, 4383:15,
4384:11, 4412:1, 4412:3,
4412:8, 4421:8, 4421:21,
4428:9, 4430:1, 4430:8,
4431:5
HONORABLE [1] - 4238:11
Honu'apo [7] - 4263:11,
4271:15, 4272:21,
4272:25, 4273:8, 4279:21,
4287:6
hoping [3] - 4291:3,
4340:18, 4382:10
hospitality [1] - 4291:1
hostile [2] - 4368:7,
4368:13
hotel [4] - 4261:13,
4291:10, 4291:19, 4336:18
hotel-like [1] - 4336:18
hour [7] - 4299:9, 4309:9,
4339:13, 4383:16,
4386:25, 4390:10, 4393:3

4407:10, 4407:24,
4407:25, 4411:1, 4411:15,
4417:18, 4424:17
Gump [5] - 4378:9,
4379:14, 4379:15, 4380:3,
4385:22

# H

HALEY [74] - 4238:20,
4238:22, 4240:5, 4241:2,
4241:5, 4242:9, 4242:16,
4252:3, 4252:10, 4252:13,
4253:2, 4284:1, 4289:11,
4289:12, 4292:13,
4292:15, 4292:23, 4293:1,
4294:7, 4294:8, 4294:25,
4295:3, 4298:17, 4311:17,
4311:19, 4313:17,
4313:18, 4321:16, 4323:2,
4324:15, 4325:3, 4329:24,
4330:4, 4332:4, 4332:22,
4337:9, 4337:11, 4339:10,
4340:16, 4340:20, 4341:4,
4341:10, 4345:24,
4348:21, 4348:22, 4350:1,
4350:2, 4372:1, 4376:11,
4380:6, 4380:16, 4381:12,
4381:16, 4381:23,
4381:25, 4382:23,
4383:14, 4385:8, 4385:9,
4390:4, 4390:5, 4403:5,
4403:9, 4407:7, 4408:15,
4412:1, 4412:12, 4421:6,
4421:11, 4424:17, 4431:5,
4431:7, 4432:5, 4432:12
Haley [16] - 4240:15,
4241:1, 4276:19, 4292:22,
4294:6, 4341:8, 4380:4,
4380:13, 4383:22, 4385:7,
4403:15, 4407:14, 4411:2,
4411:18, 4411:23, 4431:3
half [13] - 4256:20,
4271:18, 4272:23,
4308:20, 4310:8, 4354:19,
4381:13, 4381:17,
4408:24, 4420:24,
4420:25, 4422:13, 4426:3
halfway [1] - 4423:5
halls [1] - 4422:23
hand [2] - 4331:19,
4428:25
handed [2] - 4241:14,
4247:11
handle [2] - 4287:10,
4378:20
handled [1] - 4319:9
handling [1] - 4243:25
handwritten [1] - 4331:13
hang [1] - 4406:5

15

**hours** [8] - 4246:1, 4385:20, 4386:17, 4389:9, 4389:10, 4392:18, 4392:23, 4393:7
**house** [5] - 4291:10, 4331:12, 4343:22, 4344:22, 4387:12
**Hughes** [1] - 4376:25
**hundred** [5] - 4290:11, 4290:20, 4402:4, 4420:8, 4420:20
**hypothetical** [1] - 4422:5

**I**

**idea** [9] - 4253:20, 4265:20, 4267:14, 4277:12, 4287:20, 4287:23, 4288:5, 4363:12, 4388:16
**identical** [1] - 4277:15
**identification** [1] - 4376:4
**identified** [4] - 4280:17, 4307:6, 4387:19, 4389:7
**identify** [3] - 4254:11, 4254:20, 4318:19
**identifying** [1] - 4267:19
**imagine** [3] - 4276:16, 4277:16, 4381:16
**immediately** [3] - 4325:11, 4346:23, 4392:3
**impacts** [1] - 4407:12
**impediment** [1] - 4250:12
**important** [4] - 4308:14, 4347:20, 4405:6, 4430:16
**impressive** [2] - 4297:25, 4298:8
**in-person** [1] - 4387:5
**inability** [1] - 4398:15
**inaccurate** [1] - 4400:16
**inch** [1] - 4375:24
**incidentally** [1] - 4246:2
**inclination** [1] - 4406:18
**include** [1] - 4256:21
**included** [6] - 4253:14, 4260:10, 4307:2, 4326:19, 4374:5, 4375:24
**includes** [1] - 4323:9
**including** [11] - 4246:13, 4255:14, 4260:20, 4270:5, 4296:3, 4296:12, 4310:18, 4362:6, 4375:25, 4377:17, 4395:5
**inclusion** [1] - 4276:2
**income** [2] - 4283:2, 4355:21
**incoming** [1] - 4396:23
**incommunicado** [1] - 4392:17

**incomplete** [5] - 4423:8, 4423:11, 4423:12, 4423:14, 4423:20
**inconvenience** [1] - 4313:5
**increased** [1] - 4275:18
**incredible** [1] - 4271:3
**incredibly** [2] - 4295:24, 4399:13
**incremental** [1] - 4319:1
**incur** [4] - 4354:20, 4405:10, 4406:17, 4409:7
**incurred** [4] - 4281:14, 4327:6, 4394:24, 4395:1
**indeed** [4] - 4247:14, 4323:15, 4367:12, 4390:14
**indemnity** [1] - 4320:25
**independent** [2] - 4264:2, 4363:18
**indicated** [3] - 4242:7, 4339:5, 4381:5
**indicating** [2] - 4361:12, 4396:22
**indictment** [32] - 4251:12, 4253:4, 4253:6, 4255:4, 4255:6, 4258:1, 4258:24, 4259:24, 4267:2, 4271:10, 4277:1, 4280:2, 4280:17, 4286:2, 4294:24, 4332:6, 4340:23, 4341:12, 4342:4, 4342:23, 4345:14, 4346:3, 4353:7, 4353:13, 4353:19, 4361:22, 4362:10, 4377:6, 4377:10, 4387:20, 4388:2, 4388:3
**individual** [22] - 4256:3, 4257:18, 4259:4, 4265:21, 4278:9, 4278:22, 4278:23, 4280:6, 4280:8, 4280:23, 4287:25, 4289:3, 4322:21, 4338:8, 4344:12, 4348:11, 4350:4, 4350:12, 4350:17, 4360:20, 4365:22, 4391:25
**individual's** [1] - 4262:5, 4263:25
**individually** [2] - 4262:5, 4263:25
**individuals** [25] - 4253:15, 4255:5, 4263:22, 4265:8, 4278:19, 4281:5, 4296:3, 4296:8, 4301:15, 4314:11, 4315:4, 4342:17, 4346:5, 4346:9, 4347:14, 4348:12, 4357:6, 4358:18, 4359:8, 4363:22, 4369:24, 4387:1, 4388:8, 4389:6, 4389:16
**inefficiencies** [1] - 4368:4
**information** [7] - 4249:15, 4249:16, 4331:10, 4354:1, 4366:15, 4368:23, 4397:2
**informed** [4] - 4276:5, 4356:21, 4369:21, 4385:20

**infrastructure** [14] - 4262:16, 4295:23, 4296:5, 4296:15, 4297:13, 4300:23, 4301:2, 4301:4, 4301:16, 4303:14, 4307:17, 4308:3, 4313:2, 4328:19
**infuse** [1] - 4364:2
**infusions** [1] - 4363:19
**initial** [13] - 4266:1, 4271:7, 4296:21, 4297:12, 4313:11, 4325:9, 4334:17, 4343:24, 4369:15, 4378:22, 4379:16, 4389:1, 4395:16
**initiate** [1] - 4336:25
**initiated** [3] - 4258:5, 4272:3, 4366:11
**inquire** [1] - 4410:13
**inside** [3] - 4278:7, 4278:10, 4318:4
**insofar** [1] - 4381:2
**instance** [2] - 4246:18, 4399:17
**instances** [4] - 4329:10, 4341:21, 4363:7, 4429:7
**institutions** [2] - 4255:13, 4361:8
**instructed** [2] - 4356:16, 4356:23
**instruction** [3] - 4313:19, 4370:22, 4370:25
**instructions** [1] - 4352:4
**insurance** [1] - 4243:25
**insurances** [1] - 4256:9
**intended** [2] - 4289:7, 4290:11
**intends** [1] - 4381:19
**intensive** [1] - 4299:5
**intent** [1] - 4278:24
**intention** [1] - 4381:9
**intents** [1] - 4294:13
**interest** [61] - 4265:22, 4274:16, 4275:8, 4275:15, 4275:17, 4276:6, 4277:24, 4278:5, 4278:15, 4279:7, 4281:10, 4282:12, 4284:3, 4284:5, 4284:6, 4284:11, 4284:22, 4285:15, 4287:21, 4290:1, 4300:6, 4309:13, 4311:22, 4312:8, 4314:2, 4314:4, 4334:11, 4334:19, 4342:12, 4345:11, 4345:12, 4346:6, 4346:8, 4347:9, 4347:15, 4349:1, 4349:20, 4350:19, 4353:11, 4354:2, 4354:8, 4354:13, 4355:25, 4356:1, 4358:9, 4358:11, 4358:12, 4358:13, 4362:2, 4362:7,

**4363:2, 4365:5, 4365:9,** 4366:25, 4367:8, 4369:17, 4370:2, 4372:9, 4375:5, 4419:6
**interested** [6] - 4263:25, 4275:8, 4296:13, 4312:24, 4346:16, 4360:11
**interests** [3] - 4370:18, 4371:6, 4374:13
**interfere** [1] - 4361:7
**internal** [1] - 4326:17
**interpret** [4] - 4249:15, 4249:16, 4250:4, 4250:6
**interrupt** [4] - 4254:9, 4332:22, 4382:24, 4412:1
**intimately** [1] - 4379:3
**intrinsic** [1] - 4271:3
**introduce** [4] - 4372:3, 4381:10, 4383:3, 4383:22
**introduced** [11] - 4247:10, 4256:23, 4257:5, 4262:22, 4295:5, 4297:6, 4310:19, 4360:14, 4365:22, 4365:25, 4392:8
**introduction** [4] - 4276:1, 4372:4, 4381:9, 4382:25
**invest** [12] - 4265:12, 4269:23, 4270:9, 4286:11, 4286:13, 4342:11, 4342:17, 4347:22, 4348:1, 4353:10, 4362:1, 4377:7
**invested** [8] - 4250:16, 4260:21, 4267:7, 4274:5, 4276:22, 4401:14, 4405:5, 4405:24
**investigation** [5] - 4365:16, 4366:12, 4367:6, 4368:24, 4371:7
**investigation/lawsuit** [1] - 4368:6
**investigations** [1] - 4365:20
**investing** [6] - 4266:15, 4267:2, 4269:17, 4269:24, 4270:12, 4270:21
**investment** [35] - 4242:24, 4256:9, 4260:19, 4265:24, 4266:15, 4267:14, 4268:19, 4269:2, 4269:12, 4270:13, 4270:17, 4270:18, 4270:25, 4271:7, 4272:5, 4275:14, 4277:19, 4278:19, 4278:25, 4281:11, 4282:20, 4285:21, 4296:14, 4311:7, 4319:12, 4320:21, 4338:19, 4343:8, 4351:10, 4362:14, 4362:15, 4367:7, 4369:15, 4394:9
**investments** [24] -

16

4255:14, 4255:15, 4265:11, 4266:2, 4266:8, 4266:10, 4267:4, 4268:13, 4270:1, 4270:24, 4271:9, 4272:3, 4274:21, 4280:9, 4285:25, 4313:3, 4333:25, 4338:2, 4338:8, 4342:5, 4353:20, 4353:21, 4374:18
**investor** [8] - 4262:1, 4271:25, 4322:13, 4323:11, 4343:21, 4349:16, 4350:23
**investor's** [1] - 4350:8
**investors** [35] - 4268:9, 4271:3, 4271:16, 4273:18, 4275:1, 4275:7, 4277:8, 4279:3, 4281:19, 4282:22, 4284:18, 4286:8, 4287:25, 4288:1, 4288:6, 4288:8, 4289:3, 4290:13, 4291:2, 4301:6, 4310:2, 4322:16, 4331:3, 4332:13, 4337:25, 4338:13, 4356:14, 4356:15, 4356:25, 4358:21, 4358:22, 4374:4, 4377:13, 4378:6, 4379:8
**investors'** [1] - 4338:6
**involved** [19] - 4254:14, 4258:15, 4261:6, 4271:20, 4271:21, 4280:2, 4300:20, 4302:2, 4303:16, 4303:17, 4319:19, 4323:20, 4333:15, 4366:3, 4366:9, 4375:3, 4379:3, 4390:14, 4398:9
**involvement** [3] - 4362:9, 4366:8, 4423:2
**involving** [3] - 4290:7, 4389:24, 4396:9
**iPhone** [4] - 4415:21, 4415:24, 4416:3, 4426:21
**IPO** [1] - 4348:14
**Island** [1] - 4319:12
**island** [1] - 4272:14
**Islandia** [1] - 4238:22
**islands** [1] - 4309:18
**Isle** [51] - 4260:10, 4260:11, 4260:12, 4260:21, 4272:4, 4276:14, 4278:6, 4280:1, 4281:3, 4282:2, 4282:20, 4283:7, 4283:9, 4286:10, 4286:17, 4288:13, 4288:20, 4289:17, 4289:18, 4290:4, 4302:4, 4302:12, 4305:2, 4306:25, 4312:12, 4319:7, 4322:4, 4322:12, 4322:21, 4323:7, 4325:19, 4325:21, 4326:8, 4326:11, 4326:13, 4326:18, 4326:19,

4326:22, 4328:15, 4328:22, 4330:14, 4330:16, 4330:23, 4331:2, 4334:6
**Islip** [3] - 4238:6, 4238:15, 4239:21
**isolate** [1] - 4411:3
**issue** [21] - 4252:2, 4280:7, 4320:7, 4370:3, 4383:21, 4384:7, 4400:3, 4403:22, 4404:17, 4408:3, 4409:20, 4410:7, 4410:8, 4412:3, 4412:4, 4412:7, 4412:23, 4428:12, 4429:23, 4430:6, 4430:13
**issues** [15] - 4267:15, 4278:18, 4278:21, 4294:23, 4340:9, 4346:14, 4370:10, 4380:24, 4381:7, 4382:14, 4386:23, 4400:2, 4402:12, 4409:23, 4431:7
**item** [1] - 4383:17
**items** [1] - 4250:3
**itself** [15] - 4259:17, 4259:25, 4267:16, 4290:16, 4298:2, 4298:3, 4303:18, 4322:6, 4336:13, 4343:10, 4344:24, 4359:2, 4391:5, 4429:6, 4431:9
**IV** [42] - 4260:10, 4260:11, 4260:21, 4278:6, 4280:1, 4281:3, 4282:2, 4282:20, 4283:7, 4283:9, 4286:10, 4286:17, 4288:13, 4288:20, 4289:17, 4289:18, 4290:4, 4302:4, 4302:12, 4306:25, 4319:7, 4322:4, 4322:12, 4322:17, 4323:7, 4325:19, 4325:21, 4326:8, 4326:12, 4326:13, 4326:18, 4326:19, 4326:22, 4327:2, 4330:14, 4330:16, 4330:23, 4331:2, 4334:6
**IV's** [2] - 4328:15, 4328:23

---

## J

**J.P** [4] - 4243:24, 4244:11, 4244:19, 4244:23
**James** [1] - 4262:21
**JAMES** [1] - 4238:16
**Jay** [1] - 4254:25
**job** [1] - 4375:21
**Joe** [9] - 4254:24, 4257:3, 4268:6, 4271:7, 4273:13, 4273:21, 4274:21, 4277:23, 4285:20
**John** [24] - 4255:4, 4255:5, 4261:8, 4287:15, 4288:12,

4290:12, 4291:5, 4300:17, 4302:23, 4303:6, 4304:16, 4304:20, 4305:13, 4306:1, 4307:8, 4309:6, 4318:2, 4319:24, 4322:15, 4322:20, 4334:5, 4342:10, 4362:1, 4398:12
**joint** [4] - 4278:11, 4318:1, 4318:4, 4319:10
**Joint** [1] - 4319:11
**jointly** [1] - 4385:17
**JOSEPH** [1] - 4238:11
**Jowdy** [80] - 4284:16, 4284:18, 4284:23, 4285:7, 4285:11, 4286:20, 4287:2, 4287:16, 4287:19, 4288:2, 4288:7, 4288:18, 4288:21, 4289:8, 4289:19, 4290:1, 4290:3, 4290:7, 4290:10, 4290:14, 4290:16, 4290:19, 4290:22, 4291:5, 4291:11, 4291:14, 4291:16, 4291:23, 4292:8, 4295:15, 4325:23, 4328:16, 4329:2, 4334:8, 4334:17, 4334:22, 4335:4, 4335:9, 4337:3, 4354:21, 4359:25, 4378:1, 4378:3, 4378:5, 4378:14, 4378:16, 4394:10, 4398:2, 4398:25, 4399:2, 4399:24, 4401:11, 4401:12, 4401:19, 4402:2, 4402:11, 4415:1, 4415:3, 4415:6, 4419:23, 4420:9, 4420:13, 4420:23, 4421:1, 4421:2, 4421:15, 4422:7, 4422:12, 4423:3, 4424:13, 4424:19, 4425:8, 4425:16, 4425:21, 4425:22, 4426:5, 4426:8, 4428:20, 4428:23
**Jowdy's** [6] - 4287:21, 4329:3, 4330:12, 4379:3, 4386:19, 4425:2
**judge** [5] - 4252:2, 4368:3, 4406:1, 4407:9, 4424:2
**Judge** [33] - 4241:2, 4292:16, 4292:17, 4292:24, 4294:25, 4313:17, 4321:16, 4330:4, 4332:4, 4337:9, 4341:4, 4374:6, 4377:2, 4380:16, 4380:19, 4381:16, 4382:6, 4382:11, 4403:6, 4403:10, 4407:8, 4408:13, 4408:15, 4410:23, 4411:6, 4411:12, 4412:5, 4412:13, 4412:25, 4414:5, 4418:11, 4429:4, 4429:16
**JUDGE** [1] - 4238:11
**judgment** [1] - 4335:21

**July** [20] - 4259:1, 4307:23, 4308:11, 4320:1, 4326:10, 4328:12, 4328:21, 4406:17, 4407:19, 4407:20, 4407:21, 4408:1, 4408:2, 4408:9, 4409:1, 4409:7, 4419:3, 4427:21
**jumping** [1] - 4295:2
**June** [16] - 4238:9, 4285:1, 4285:3, 4295:17, 4305:24, 4306:9, 4359:24, 4366:17, 4368:17, 4369:13, 4369:19, 4377:2, 4404:18, 4404:21, 4407:16, 4431:16
**Juneau** [20] - 4254:24, 4257:3, 4263:20, 4264:6, 4264:14, 4265:2, 4268:6, 4271:8, 4273:13, 4273:21, 4273:25, 4274:3, 4274:21, 4274:25, 4275:3, 4275:17, 4276:5, 4276:12, 4285:20, 4394:10
**Juneau's** [4] - 4275:8, 4275:13, 4276:11, 4277:23
**jurisdictions** [3] - 4285:11, 4378:6, 4378:15
**juror** [13] - 4340:9, 4403:22, 4403:23, 4404:8, 4406:2, 4406:9, 4406:25, 4407:25, 4408:2, 4408:18, 4408:25, 4409:5, 4409:19
**Juror** [1] - 4404:6
**JUROR** [12] - 4404:13, 4404:16, 4404:20, 4404:24, 4405:5, 4405:10, 4405:17, 4405:20, 4405:22, 4406:7, 4409:12, 4409:16
**juror's** [2] - 4408:1
**JURORS** [1] - 4240:12
**jurors** [1] - 4407:24
**Jury** [4] - 4293:5, 4294:4, 4385:5, 4404:5
**jury** [32] - 4238:11, 4240:7, 4240:9, 4240:11, 4250:20, 4261:21, 4263:13, 4294:2, 4295:1, 4295:18, 4300:13, 4303:11, 4322:6, 4336:8, 4339:15, 4340:5, 4341:6, 4346:4, 4362:8, 4372:7, 4380:9, 4380:12, 4381:18, 4384:1, 4384:8, 4385:3, 4407:11, 4409:6, 4409:22, 4410:25, 4412:10, 4430:18
**JV** [1] - 4319:18

---

## K

**Kaiser** [56] - 4261:8, 4261:22, 4262:5, 4264:4,

17

4287:15, 4288:12,
4288:16, 4289:13,
4290:12, 4290:18, 4291:5,
4300:17, 4300:20,
4301:14, 4302:23, 4303:6,
4303:13, 4304:20, 4305:5,
4305:9, 4305:13, 4306:1,
4306:12, 4307:8, 4309:7,
4318:2, 4319:24, 4320:18,
4321:7, 4322:15, 4322:20,
4329:22, 4330:8, 4334:5,
4368:12, 4376:25,
4398:12, 4413:8, 4413:11,
4413:13, 4415:24,
4415:25, 4416:22, 4417:6,
4417:9, 4418:3, 4418:12,
4418:17, 4418:21,
4418:23, 4419:5, 4420:2,
4420:5, 4426:21, 4427:18,
4428:3
**Kaiser's** [2] - 4304:16,
4320:20
**Kaiser-Ledbetter** [1] -
4330:8
**Katie** [2] - 4428:14, 4429:3
**Kau** [2] - 4260:13
**keep** [3] - 4265:16,
4340:22, 4401:5
**KELLY** [1] - 4238:14
**Ken** [3] - 4325:23, 4359:25,
4421:15
**Kenner** [112] - 4238:23,
4240:6, 4240:14, 4240:17,
4241:19, 4241:22, 4242:9,
4242:14, 4243:10,
4246:14, 4247:13, 4249:5,
4251:11, 4253:3, 4253:12,
4253:13, 4254:10,
4255:11, 4255:18,
4258:25, 4259:15, 4260:7,
4260:9, 4262:19, 4263:16,
4265:25, 4273:11,
4273:24, 4277:25,
4280:15, 4285:19,
4286:19, 4292:1, 4292:2,
4292:19, 4294:9, 4300:12,
4303:4, 4305:20, 4306:14,
4311:20, 4313:19, 4315:1,
4317:5, 4318:10, 4321:11,
4321:14, 4321:18,
4321:25, 4322:10, 4323:2,
4323:14, 4323:24, 4324:6,
4324:25, 4326:25, 4327:1,
4327:8, 4329:9, 4330:5,
4331:7, 4337:14, 4338:15,
4340:6, 4341:11, 4342:3,
4342:9, 4346:20, 4350:16,
4353:6, 4353:10, 4357:24,
4358:15, 4360:14,
4361:25, 4362:23,

4370:16, 4371:1, 4373:5,
4376:3, 4376:13, 4376:19,
4376:20, 4377:9, 4377:13,
4377:14, 4377:16,
4377:19, 4380:15,
4380:22, 4381:19,
4382:12, 4387:18,
4389:21, 4392:15, 4396:7,
4397:17, 4403:16,
4409:22, 4410:12, 4411:2,
4411:4, 4411:10, 4412:9,
4412:15, 4412:17,
4418:12, 4428:20,
4430:19, 4430:20,
4432:21, 4432:23
**KENNER** [5] - 4238:7,
4240:21, 4412:19, 4432:3,
4432:6
**Kenner's** [4] - 4260:19,
4370:22, 4380:18, 4383:3
**kept** [1] - 4327:21
**Keswing** [1] - 4310:19
**kind** [4] - 4266:4, 4288:11,
4422:23, 4428:21
**kindly** [6] - 4243:13,
4250:4, 4250:19, 4318:19,
4362:8, 4376:12
**knowing** [5] - 4290:20,
4313:1, 4320:2, 4368:24,
4407:24
**knowledge** [18] - 4241:8,
4248:5, 4250:7, 4255:6,
4259:10, 4288:19,
4288:22, 4320:3, 4323:15,
4323:19, 4324:10,
4336:23, 4355:6, 4362:9,
4367:16, 4393:24,
4396:12, 4401:5
**known** [7] - 4250:22,
4253:12, 4278:20, 4295:6,
4343:22, 4347:1, 4374:24
**knows** [3] - 4383:16,
4384:3, 4412:23
**KOMATIREDDY** [4] -
4238:16, 4252:2, 4252:6,
4252:11
**KPMG** [3] - 4267:24,
4279:25, 4308:24
**Kristie** [1] - 4389:25
**Kristin** [1] - 4327:24
**Kristy** [1] - 4327:25

## L

**lack** [2] - 4273:22, 4398:15
**land** [62] - 4260:24, 4261:5,
4262:2, 4262:4, 4262:7,
4262:17, 4263:17, 4264:7,
4264:10, 4265:11,

4267:11, 4267:16,
4267:18, 4267:20,
4267:25, 4268:2, 4268:4,
4268:7, 4268:19, 4271:1,
4272:13, 4272:18,
4272:21, 4272:23,
4273:16, 4274:22,
4275:16, 4276:8, 4276:25,
4278:9, 4279:24, 4280:6,
4280:8, 4280:9, 4281:14,
4292:23, 4294:9, 4295:23,
4298:11, 4298:14,
4298:20, 4299:23,
4300:23, 4301:15,
4303:22, 4308:22, 4310:5,
4311:6, 4314:13, 4320:21,
4322:25, 4326:15,
4326:20, 4332:9, 4333:1,
4333:9, 4333:23, 4334:1,
4336:13, 4341:11,
4341:20, 4392:20
**lands** [1] - 4267:12
**language** [1] - 4320:12
**large** [2] - 4248:14,
4299:22
**larger** [3] - 4270:9,
4275:25, 4290:15
**largest** [1] - 4343:3,
4287:10, 4297:23, 4336:14
**Larry** [1] - 4319:8
**LARUSSO** [38] - 4239:2,
4239:4, 4242:12, 4292:11,
4321:22, 4324:17,
4324:20, 4382:3, 4382:6,
4382:10, 4382:18,
4382:22, 4383:21,
4384:11, 4406:12, 4407:9,
4408:13, 4410:2, 4411:6,
4411:12, 4412:25, 4414:4,
4414:8, 4418:10, 4418:24,
4424:2, 4424:5, 4424:16,
4424:18, 4426:18, 4428:9,
4429:3, 4429:16, 4430:8,
4430:12, 4431:13, 4432:8,
4432:16
**LaRusso** [7] - 4381:7,
4381:20, 4403:18,
4409:21, 4412:22, 4413:3,
4414:3
**last** [9] - 4330:19, 4335:19,
4356:14, 4356:15,
4356:24, 4357:21, 4360:1,
4413:14, 4429:5
**lasted** [2] - 4386:16,
4389:8
**late** [3] - 4367:19, 4393:3,
4404:18
**latter** [2] - 4271:18,
4354:19
**law** [6] - 4287:10, 4319:4,

4378:8, 4378:12, 4380:2,
4392:2
**lawsuit** [26] - 4254:8,
4328:1, 4328:5, 4335:5,
4335:11, 4335:21,
4362:17, 4367:13,
4367:16, 4367:18,
4367:21, 4367:22, 4368:1,
4373:22, 4373:25, 4374:2,
4374:6, 4374:8, 4374:9,
4376:24, 4377:4, 4377:8,
4427:3, 4427:4, 4427:7
**lawsuits** [4] - 4334:21,
4335:4, 4374:23, 4399:23
**lawyer** [2] - 4334:25,
4371:11
**lawyers** [10] - 4284:23,
4389:20, 4389:22,
4395:17, 4398:9, 4399:7,
4399:15, 4401:18,
4403:13, 4406:6
**lay** [4] - 4372:3, 4381:9
**leading** [1] - 4315:14
**League** [1] - 4253:16
**learn** [1] - 4430:9
**learned** [3] - 4287:8,
4298:5, 4329:14
**learning** [1] - 4301:12
**least** [11] - 4268:17,
4275:4, 4322:8, 4335:10,
4339:2, 4339:8, 4349:10,
4390:15, 4390:19,
4394:23, 4400:25
**leave** [6] - 4289:4, 4291:24,
4340:9, 4375:4, 4381:7,
4417:14
**leaves** [4] - 4273:21,
4293:5, 4404:5, 4409:19
**leaving** [1] - 4248:22
**led** [4] - 4368:10, 4368:17,
4377:24, 4383:9
**Ledbetter** [2] - 4329:22,
4330:8
**left** [5] - 4291:18, 4291:25,
4312:1, 4338:10, 4375:7
**legal** [13] - 4281:14,
4308:4, 4309:12, 4354:20,
4365:19, 4374:17,
4375:25, 4377:15,
4378:16, 4394:8, 4399:2,
4399:11, 4401:9
**Lehman** [40] - 4267:23,
4271:2, 4271:5, 4276:1,
4278:12, 4279:24,
4294:16, 4296:22,
4307:20, 4307:25, 4308:5,
4308:23, 4309:3, 4309:6,
4309:9, 4309:14, 4310:19,
4312:14, 4312:19,
4313:10, 4314:1, 4314:5,

18

4314:24, 4315:4, 4315:9,
4315:15, 4315:20,
4315:25, 4317:2, 4317:10,
4320:9, 4329:6, 4332:12,
4332:18, 4332:25, 4333:4,
4333:5, 4333:19, 4337:18,
4342:1
**lend** [4] - 4287:17,
4288:15, 4288:18, 4289:8
**lender** [2] - 4288:15,
4300:5
**lenders** [11] - 4296:10,
4296:18, 4297:11, 4299:4,
4310:16, 4311:1, 4326:1,
4326:2, 4326:16, 4328:18,
4329:15
**lending** [8] - 4308:15,
4311:4, 4313:8, 4319:22,
4329:14, 4333:7, 4356:9,
4363:22
**length** [4] - 4245:19,
4407:3, 4413:22, 4413:25
**lengthy** [1] - 4273:9
**less** [3] - 4251:5, 4267:24,
4414:20
**letter** [4] - 4280:24, 4320:1,
4326:12, 4385:23
**level** [7] - 4250:20,
4288:19, 4324:10, 4331:6,
4352:10, 4375:13, 4375:17
**liability** [5] - 4259:16,
4259:25, 4260:7, 4277:6,
4277:7
**license** [1] - 4259:9
**licensed** [1] - 4258:25
**licenses** [1] - 4343:15
**licensing** [3] - 4259:5,
4259:6, 4370:13
**lien** [1] - 4369:5
**life** [2] - 4256:6, 4274:11
**lifestyle** [1] - 4392:21
**likely** [1] - 4379:24
**limit** [1] - 4406:25
**limited** [4] - 4259:16,
4259:25, 4260:7, 4277:6
**line** [54] - 4242:23, 4243:2,
4245:8, 4246:7, 4246:23,
4248:22, 4250:3, 4265:4,
4275:18, 4279:6, 4280:19,
4280:20, 4280:22, 4281:7,
4281:10, 4282:13, 4283:4,
4283:6, 4284:3, 4284:5,
4284:6, 4285:2, 4285:8,
4286:25, 4288:1, 4288:6,
4292:6, 4295:15, 4305:15,
4322:13, 4322:23,
4323:10, 4323:17, 4324:3,
4325:4, 4325:7, 4325:10,
4325:12, 4325:13,
4325:15, 4325:20,

4326:10, 4328:13,
4330:13, 4330:14,
4330:22, 4331:2, 4331:7,
4331:22, 4332:15, 4338:9,
4338:19, 4360:1, 4408:19
**lines** [34] - 4241:8, 4241:9,
4243:3, 4264:9, 4264:12,
4264:13, 4264:14,
4264:17, 4264:23, 4265:3,
4265:8, 4265:17, 4268:20,
4272:6, 4278:2, 4280:16,
4281:2, 4281:4, 4281:17,
4281:22, 4282:23, 4283:8,
4284:11, 4285:4, 4285:9,
4285:15, 4289:18,
4323:11, 4330:17,
4330:25, 4331:4, 4331:23,
4331:24, 4354:19
**liquid** [3] - 4244:7,
4354:25, 4360:4
**liquidated** [1] - 4250:9
**liquidating** [1] - 4358:25
**list** [4] - 4255:2, 4322:25,
4375:9, 4402:22
**listed** [4] - 4286:1, 4388:2,
4388:3, 4391:5
**listen** [8] - 4404:1,
4411:10, 4413:11, 4416:2,
4417:10, 4429:9, 4429:19,
4430:3
**listened** [25] - 4380:25,
4381:2, 4384:2, 4384:5,
4410:15, 4411:16,
4411:19, 4412:13,
4413:15, 4414:10,
4414:21, 4414:23, 4415:2,
4415:4, 4415:7, 4415:13,
4415:14, 4415:18,
4416:24, 4417:13,
4417:24, 4421:18,
4428:16, 4428:17, 4429:17
**listening** [3] - 4411:15,
4429:8, 4429:10
**literally** [1] - 4382:23
**litigation** [24] - 4258:3,
4337:2, 4354:20, 4360:8,
4378:5, 4378:21, 4378:25,
4386:19, 4389:24, 4390:3,
4390:7, 4390:9, 4390:13,
4396:8, 4396:14, 4396:19,
4398:2, 4398:6, 4398:18,
4401:13, 4402:10, 4426:8,
4426:9
**lives** [1] - 4256:11
**living** [2] - 4301:10,
4388:23
**LLC** [18] - 4260:10,
4260:11, 4260:12,
4260:13, 4260:14, 4277:5,
4277:10, 4277:14, 4278:6,

4286:10, 4290:5, 4302:4,
4322:12, 4334:4, 4334:6,
4343:7, 4350:13
**LLC's** [1] - 4319:12
**LLCs** [5] - 4277:2, 4278:8,
4278:15, 4280:4, 4280:13
**loan** [65] - 4246:18,
4246:22, 4265:24,
4284:17, 4286:19, 4287:2,
4288:21, 4289:20, 4290:1,
4290:6, 4291:6, 4291:7,
4291:10, 4291:13,
4291:21, 4292:6, 4292:8,
4296:19, 4299:5, 4299:20,
4299:21, 4299:22, 4300:3,
4300:4, 4300:6, 4300:7,
4300:10, 4307:11,
4307:14, 4308:4, 4309:10,
4311:13, 4311:25, 4314:3,
4314:15, 4315:3, 4315:5,
4315:11, 4320:7, 4321:5,
4325:23, 4328:17, 4329:3,
4329:5, 4329:7, 4330:12,
4334:8, 4335:23, 4341:15,
4341:25, 4347:25, 4351:5,
4359:25, 4360:6, 4364:5,
4368:13, 4368:15, 4369:2,
4369:9, 4369:17, 4369:22,
4370:1, 4370:14, 4419:5,
4426:1
**Loan** [1] - 4319:11
**loaned** [3] - 4287:22,
4352:12, 4354:16
**loaning** [1] - 4290:10
**loans** [14] - 4290:7,
4290:17, 4290:19,
4296:21, 4316:1, 4329:17,
4341:19, 4354:15, 4355:5,
4355:11, 4363:24, 4398:3,
4419:7, 4425:25
**LOC** [3] - 4323:9, 4324:25,
4325:1
**local** [1] - 4301:7
**located** [2] - 4327:9,
4336:16
**location** [2] - 4388:15,
4422:15
**locations** [1] - 4389:6
**logically** [1] - 4422:17
**look** [21] - 4241:12,
4244:20, 4248:7, 4249:5,
4263:24, 4267:6, 4267:9,
4292:1, 4296:9, 4304:3,
4318:11, 4318:15, 4322:3,
4323:24, 4324:25, 4326:3,
4336:9, 4337:5, 4376:3,
4376:12, 4378:10
**looked** [1] - 4272:24
**looking** [8] - 4262:11,
4267:10, 4272:19, 4313:1,

4315:16, 4346:13, 4359:3,
4376:22
**looks** [1] - 4403:21
**Los** [1] - 4387:10
**lose** [2] - 4310:24, 4312:5
**losing** [1] - 4311:6
**loss** [1] - 4312:7
**lost** [1] - 4311:23
**louder** [1] - 4405:8
**Louie** [1] - 4419:24
**Louis** [1] - 4421:16
**love** [1] - 4299:13
**lowers** [1] - 4270:13
**Ls** [1] - 4253:13
**Lucas** [12] - 4288:9,
4291:2, 4291:3, 4313:10,
4335:25, 4336:8, 4336:14,
4336:15, 4336:23, 4342:1,
4419:7, 4426:3
**luck** [1] - 4416:18
**lunch** [3] - 4252:7,
4297:19, 4389:3
**luncheon** [1] - 4383:23

---

## M

**magnificent** [1] - 4308:18
**mail** [29] - 4242:21,
4317:25, 4366:16, 4367:9,
4367:10, 4367:11,
4367:14, 4385:24,
4385:25, 4386:2, 4386:8,
4386:10, 4390:23,
4390:24, 4391:4, 4391:5,
4391:10, 4391:15,
4391:18, 4392:4, 4392:7,
4392:11, 4393:20, 4395:8,
4402:19, 4402:25,
4428:13, 4428:21
**mailed** [3] - 4247:22,
4361:4, 4427:14
**mailing** [1] - 4246:3
**mails** [1] - 4394:1
**main** [1] - 4272:12
**mainland** [1] - 4333:21
**maintain** [2] - 4282:24,
4285:9
**major** [3] - 4267:20,
4402:8, 4402:9
**majority** [4] - 4336:20,
4338:5, 4354:16, 4386:20
**Makika** [7] - 4260:14,
4290:5, 4307:3, 4326:8,
4327:2, 4328:24
**Makika's** [1] - 4329:1
**manage** [1] - 4256:3
**managed** [3] - 4255:12,
4334:5, 4370:5
**management** [7] - 4254:4,

19

4256:21, 4257:21,
4265:17, 4314:8, 4314:25,
4368:21
**Management** [8] - 4302:4,
4347:2, 4347:10, 4350:20,
4351:21, 4357:11,
4357:17, 4357:23
**manager** [4] - 4247:14,
4255:21, 4255:25, 4327:19
**managers** [1] - 4256:10
**managing** [6] - 4260:9,
4277:2, 4277:9, 4277:13,
4277:15, 4358:24
**Manfredi** [18] - 4261:9,
4261:23, 4262:5, 4262:22,
4263:2, 4264:5, 4267:19,
4272:20, 4272:25,
4287:14, 4300:20, 4301:9,
4303:20, 4304:1, 4309:7,
4311:12, 4318:2, 4319:24
**Manhattan** [1] - 4247:23,
4248:6, 4389:2
**manifestations** [1] -
4297:16
**manually** [1] - 4416:9
**Mar** [1] - 4288:7
**Mar's** [1] - 4329:2
**March** [9] - 4248:13,
4327:18, 4334:18,
4341:24, 4366:1, 4376:10,
4376:18, 4399:23, 4428:14
**mark** [1] - 4321:16
**Mark** [1] - 4303:25
**marked** [2] - 4292:2,
4376:12
**market** [3] - 4279:1,
4279:10, 4333:18
**marketing** [2] - 4337:4,
4348:2
**marketplace** [1] - 4348:3
**markets** [3] - 4279:16,
4279:18, 4333:20
**Markowitz** [1] - 4319:8
**Mary** [1] - 4239:20
**Mascarella** [5] - 4249:1,
4249:21, 4330:16,
4330:23, 4330:25
**Massachusetts** [1] -
4253:24
**match** [1] - 4422:18
**matched** [1] - 4344:22
**mated** [1] - 4280:9
**material** [4] - 4372:6,
4423:23
**materiality** [1] - 4254:21
**matter** [4] - 4334:3,
4367:12, 4378:11, 4380:19
**matters** [1] - 4365:10
**Mattias** [2] - 4271:24,
4387:14

**Maui** [1] - 4309:18
**McKee** [1] - 4254:25
**McKee's** [1] - 4388:19
**mean** [7] - 4325:1, 4326:9,
4327:1, 4350:7, 4351:16,
4368:15, 4425:14
**meaning** [11] - 4244:9,
4248:8, 4249:15, 4249:16,
4253:13, 4258:20,
4300:13, 4322:11,
4337:14, 4400:18, 4424:13
**means** [5] - 4295:25,
4300:9, 4335:1, 4335:3,
4346:7
**meant** [3] - 4245:1, 4281:9,
4310:23
**mechanical** [1] - 4239:25
**mechanism** [1] - 4356:19
**media** [1] - 4394:9
**mediation** [1] - 4398:6
**mediations** [1] - 4371:9
**mediator** [1] - 4378:3
**medium** [1] - 4343:22
**meet** [7] - 4261:8, 4281:20,
4309:19, 4344:18,
4388:25, 4394:21, 4417:14
**meeting** [31] - 4261:12,
4261:22, 4261:24,
4262:20, 4262:25, 4263:2,
4263:18, 4263:19, 4264:4,
4265:14, 4296:12,
4297:19, 4299:4, 4309:21,
4331:20, 4387:9, 4388:18,
4388:19, 4388:21,
4388:23, 4389:1, 4390:20,
4391:25, 4395:16,
4417:23, 4427:11,
4427:12, 4427:13,
4427:16, 4428:3, 4428:4
**meetings** [9] - 4297:9,
4301:7, 4349:7, 4389:5,
4389:15, 4390:22, 4395:4,
4397:11, 4397:15
**Melley** [1] - 4259:8
**member** [9] - 4260:9,
4277:2, 4277:9, 4277:13,
4277:15, 4343:5, 4358:24,
4360:12
**members** [10] - 4240:11,
4260:20, 4278:22,
4288:20, 4319:6, 4346:12,
4347:23, 4356:6, 4359:9,
4369:23
**membership** [1] - 4336:25
**Memorial** [1] - 4238:21
**memorialized** [1] - 4292:7
**memory** [4] - 4245:11,
4353:17, 4420:12, 4423:14
**mentioned** [14] - 4263:6,
4277:22, 4304:24,

4311:15, 4314:14, 4321:8,
4369:6, 4370:7, 4390:9,
4390:13, 4390:17,
4404:17, 4409:25, 4414:9
**mentioning** [4] - 4268:23,
4349:15, 4414:5, 4421:15
**merit** [1] - 4258:16
**message** [13] - 4241:19,
4241:25, 4242:6, 4242:17,
4243:12, 4245:4, 4245:15,
4351:14, 4352:1, 4379:13,
4379:20, 4393:16, 4417:12
**messages** [3] - 4241:23,
4243:11, 4351:13
**met** [9] - 4297:18, 4363:8,
4363:14, 4379:23,
4387:11, 4388:22, 4389:2,
4389:3, 4389:18
**MetaBank** [1] - 4370:6
**Mexican** [3] - 4265:11,
4287:17, 4378:16
**Mexico** [23] - 4262:24,
4298:22, 4335:10,
4335:22, 4338:17, 4398:3,
4398:11, 4398:16,
4398:18, 4398:24, 4399:7,
4399:9, 4399:11, 4399:16,
4401:9, 4401:11, 4401:13,
4401:19, 4413:19,
4414:24, 4416:19,
4417:13, 4417:15
**Michael** [7] - 4254:24,
4323:16, 4325:7, 4326:10,
4330:7, 4365:13, 4365:14
**Michele** [1] - 4407:25
**Microsoft** [3] - 4344:8,
4344:13, 4344:23
**mid** [1] - 4378:1
**mid-1990s** [1] - 4255:11
**middle** [2] - 4261:19,
4287:4
**might** [3] - 4383:6, 4407:1,
4407:18
**Milana** [2] - 4262:21,
4262:24
**mile** [2] - 4272:23, 4308:20
**miles** [1] - 4301:4
**milestone** [1] - 4245:20
**million** [52] - 4243:25,
4245:22, 4247:7, 4248:15,
4248:21, 4267:21,
4267:25, 4271:4, 4276:2,
4279:23, 4279:25, 4281:9,
4281:11, 4283:1, 4297:12,
4300:3, 4307:19, 4308:1,
4309:2, 4310:5, 4312:9,
4312:10, 4312:15,
4312:18, 4313:1, 4313:11,
4313:21, 4313:25, 4314:2,
4314:4, 4314:18, 4314:22,

4314:23, 4322:18,
4325:10, 4325:12,
4332:11, 4332:14,
4334:15, 4337:19,
4338:11, 4338:14,
4341:25, 4342:1, 4353:4,
4369:10, 4378:4, 4378:19,
4378:21, 4419:6, 4426:1
**millions** [1] - 4264:2
**mind** [4] - 4269:5, 4370:22,
4370:24, 4372:9
**mine** [1] - 4375:22
**Mineola** [1] - 4239:3
**minimum** [3] - 4352:25,
4386:17, 4389:8
**minus** [3] - 4270:22,
4369:24, 4395:22
**minute** [7] - 4244:21,
4403:23, 4406:5, 4417:10,
4419:22, 4422:6, 4422:8
**minutes** [23] - 4384:7,
4410:3, 4413:5, 4413:17,
4413:22, 4414:14,
4414:20, 4414:23,
4416:12, 4417:14, 4420:1,
4420:3, 4420:14, 4420:15,
4420:22, 4421:12,
4422:24, 4423:8, 4423:15,
4423:21, 4423:23,
4423:24, 4424:21
**misallocated** [1] - 4397:19
**misappropriated** [2] -
4397:19, 4402:20
**Miskiewicz** [3] - 4383:1,
4383:4, 4429:11
**MISKIEWICZ** [35] -
4238:16, 4242:11, 4252:5,
4292:9, 4298:15, 4313:13,
4317:15, 4321:20,
4324:18, 4330:3, 4332:1,
4336:10, 4345:22,
4347:16, 4348:17,
4349:23, 4352:22,
4370:20, 4371:18,
4372:12, 4408:14, 4418:7,
4419:18, 4419:21, 4422:3,
4424:15, 4426:17,
4426:20, 4428:7, 4430:1,
4430:7, 4430:23, 4432:10,
4432:14, 4432:18
**Miskiewicz's** [1] - 4410:20
**miss** [4] - 4406:20, 4408:7,
4408:22, 4409:11
**missing** [4] - 4416:12,
4423:21, 4423:23, 4429:12
**misunderstood** [3] -
4254:22, 4421:4, 4421:21
**Moanalua** [1] - 4279:22
**moment** [12] - 4257:10,
4269:7, 4276:16, 4277:22,

20

4279:9, 4297:4, 4314:14, 4322:3, 4351:8, 4352:24, 4379:17, 4413:9
**Monday** [8] - 4310:13, 4381:14, 4381:17, 4382:4, 4403:6, 4404:3, 4431:14, 4431:16
**money** [76] - 4244:4, 4260:21, 4274:12, 4275:5, 4275:21, 4276:22, 4281:6, 4285:10, 4285:12, 4286:17, 4286:25, 4287:2, 4287:17, 4287:22, 4288:2, 4288:18, 4289:8, 4289:16, 4290:4, 4290:10, 4296:14, 4296:17, 4296:23, 4299:2, 4299:3, 4299:10, 4299:20, 4299:21, 4299:24, 4300:9, 4300:25, 4303:15, 4307:18, 4309:4, 4309:15, 4310:16, 4310:23, 4311:21, 4312:4, 4313:2, 4313:6, 4313:8, 4313:20, 4315:9, 4326:1, 4326:2, 4326:5, 4326:16, 4328:18, 4328:19, 4329:11, 4329:13, 4329:14, 4329:15, 4329:16, 4330:7, 4331:1, 4342:11, 4346:14, 4347:7, 4352:11, 4353:11, 4356:1, 4357:25, 4358:7, 4362:1, 4362:5, 4362:25, 4363:6, 4377:17, 4401:15, 4425:16
**moneys** [8] - 4296:21, 4306:23, 4307:4, 4307:8, 4312:12, 4318:22, 4331:23, 4391:19
**monies** [6] - 4258:21, 4282:5, 4318:23, 4357:10, 4363:10, 4363:13
**month** [12] - 4248:20, 4251:5, 4285:2, 4327:5, 4327:10, 4378:24, 4379:1, 4404:24, 4406:11, 4406:16, 4413:16
**month's** [1] - 4309:12
**monthly** [13] - 4247:20, 4247:25, 4281:17, 4283:7, 4322:23, 4323:9, 4323:10, 4330:13, 4330:18, 4331:2, 4332:15, 4332:19, 4378:23
**months** [11] - 4262:12, 4284:16, 4284:21, 4287:4, 4309:12, 4313:12, 4335:19, 4341:24, 4361:3, 4395:6, 4399:5
**monumental** [1] - 4398:5
**Moreau** [1] - 4394:11
**moreover** [1] - 4370:12

**morning** [26] - 4240:11, 4240:12, 4245:16, 4293:3, 4380:25, 4393:12, 4403:6, 4403:17, 4404:3, 4404:12, 4407:15, 4412:13, 4415:2, 4415:13, 4415:15, 4415:19, 4417:22, 4417:25, 4420:21, 4421:13, 4421:18, 4422:14, 4422:21, 4423:4, 4425:18, 4431:14
**most** [8] - 4246:7, 4255:3, 4288:8, 4296:15, 4305:25, 4308:13, 4379:24, 4386:4
**motion** [2] - 4328:9, 4429:24
**mouth** [1] - 4247:1
**move** [5] - 4260:3, 4273:21, 4280:15, 4339:10, 4409:7
**moved** [1] - 4301:9
**moving** [3] - 4275:23, 4285:19, 4409:16
**MR** [143] - 4240:5, 4241:2, 4241:5, 4242:9, 4242:11, 4242:12, 4242:16, 4252:3, 4252:5, 4252:10, 4252:13, 4253:2, 4284:1, 4289:11, 4289:12, 4292:9, 4292:11, 4292:13, 4292:15, 4292:23, 4293:1, 4294:7, 4294:8, 4294:25, 4295:3, 4298:15, 4298:17, 4311:17, 4311:19, 4313:13, 4313:17, 4313:18, 4317:15, 4321:16, 4321:20, 4321:22, 4323:2, 4324:15, 4324:17, 4324:18, 4324:20, 4325:3, 4329:24, 4330:3, 4330:4, 4332:1, 4332:4, 4332:22, 4336:10, 4337:9, 4337:11, 4339:10, 4340:16, 4340:20, 4341:4, 4341:10, 4345:22, 4345:24, 4347:16, 4348:17, 4348:21, 4348:22, 4349:23, 4350:1, 4350:2, 4352:22, 4370:20, 4371:18, 4372:1, 4372:12, 4376:11, 4380:6, 4380:16, 4381:12, 4381:16, 4381:23, 4381:25, 4382:3, 4382:6, 4382:10, 4382:18, 4382:22, 4382:23, 4383:14, 4383:21, 4384:11, 4385:8, 4385:9, 4390:4, 4390:5, 4403:5, 4403:9, 4406:12, 4407:7, 4407:9, 4408:13, 4408:14,

4408:15, 4410:2, 4411:6, 4411:12, 4412:1, 4412:12, 4412:25, 4414:4, 4414:8, 4418:7, 4418:10, 4418:24, 4419:18, 4419:21, 4421:6, 4421:11, 4422:3, 4424:2, 4424:5, 4424:15, 4424:16, 4424:17, 4424:18, 4426:17, 4426:18, 4426:20, 4428:7, 4428:9, 4429:3, 4429:16, 4429:20, 4430:1, 4430:7, 4430:8, 4430:12, 4430:23, 4431:5, 4431:7, 4431:13, 4432:5, 4432:8, 4432:10, 4432:12, 4432:14, 4432:16, 4432:18
**MS** [3] - 4252:2, 4252:6, 4252:11
**multimillion** [2] - 4270:3, 4347:25
**multiple** [9] - 4281:22, 4340:23, 4378:5, 4378:15, 4378:25, 4386:25, 4394:7, 4394:21, 4394:24
**multitude** [2] - 4320:20, 4321:6
**Murray** [18] - 4246:14, 4247:5, 4247:20, 4248:5, 4248:16, 4248:20, 4248:25, 4249:8, 4249:21, 4250:13, 4250:16, 4250:23, 4251:2, 4251:4, 4251:9, 4322:14, 4376:9, 4389:2
**Murray's** [3] - 4249:10, 4250:10, 4345:15
**mutual** [2] - 4262:21, 4297:6
**myriad** [3] - 4386:17, 4399:25, 4402:6
**Myrick** [4] - 4327:24, 4327:25, 4389:25, 4394:10

---

# N

**Na'alehu** [5] - 4278:7, 4278:10, 4334:4, 4334:6, 4337:21
**name** [9] - 4252:2, 4259:5, 4304:20, 4327:23, 4380:2, 4390:12, 4419:1, 4425:2, 4428:13
**named** [5] - 4262:21, 4334:2, 4353:23, 4362:21, 4378:9
**names** [6] - 4263:5, 4263:6, 4278:23, 4342:10, 4418:22, 4424:19
**narrative** [1] - 4382:24
**Nash** [15] - 4255:1,

4342:11, 4343:1, 4346:2, 4348:24, 4351:9, 4351:23, 4352:7, 4352:8, 4352:10, 4352:16, 4390:17, 4390:19, 4397:14, 4427:15
**Nash's** [1] - 4388:23
**National** [1] - 4253:16
**nature** [13] - 4251:8, 4266:8, 4269:18, 4277:12, 4282:5, 4343:3, 4346:4, 4353:18, 4363:12, 4363:15, 4366:7, 4367:20, 4375:18
**near** [3] - 4297:2, 4304:9, 4356:13
**necessarily** [2] - 4323:12, 4402:8
**necessary** [5] - 4264:15, 4303:6, 4378:22, 4388:6, 4419:14
**need** [14] - 4244:16, 4245:17, 4285:7, 4303:14, 4307:22, 4312:7, 4348:19, 4369:25, 4378:18, 4378:25, 4402:3, 4405:23, 4413:1, 4419:13
**needed** [8] - 4242:22, 4275:3, 4309:16, 4312:9, 4359:4, 4359:13, 4364:2, 4431:8
**needs** [2] - 4352:2, 4410:24
**negative** [3] - 4248:14, 4248:19, 4266:20
**negotiated** [2] - 4309:22, 4314:5
**negotiating** [6] - 4256:6, 4284:16, 4303:22, 4307:20, 4310:18, 4378:2
**negotiations** [9] - 4284:19, 4312:21, 4320:10, 4336:2, 4336:21, 4359:24, 4371:10, 4379:3, 4399:4
**neighborhood** [11] - 4275:19, 4279:25, 4285:5, 4307:19, 4308:1, 4310:15, 4312:18, 4314:21, 4334:14, 4353:4, 4369:10
**Neptune** [2] - 4364:5, 4369:3
**Nerguzian** [4] - 4369:5, 4369:8, 4369:14, 4370:15
**net** [1] - 4314:10
**never** [5] - 4268:22, 4268:24, 4344:18, 4374:3, 4419:8
**new** [9] - 4288:13, 4288:16, 4288:25, 4289:6, 4315:16, 4350:12, 4357:6, 4374:5, 4400:5

**NEW** [1] - 4238:1
**New** [8] - 4238:6, 4238:15, 4239:21, 4365:14, 4365:22, 4374:6, 4377:2, 4388:20
**newly** [2] - 4337:20, 4400:7
**next** [32] - 4244:8, 4251:18, 4252:15, 4258:24, 4259:13, 4260:3, 4260:18, 4283:10, 4293:7, 4304:12, 4304:16, 4305:6, 4305:10, 4306:12, 4316:3, 4325:16, 4326:9, 4328:10, 4329:21, 4340:11, 4353:6, 4364:9, 4393:11, 4403:23, 4404:12, 4406:22, 4408:8, 4408:10, 4408:20, 4408:23, 4416:11, 4417:11
**NHL** [2] - 4253:16, 4269:22
**Nick** [2] - 4362:13, 4376:25
**night** [5] - 4291:9, 4291:19, 4291:20, 4393:9, 4393:11
**nine** [2] - 4334:19, 4413:17
**Nolan** [26] - 4241:7, 4241:20, 4241:23, 4242:7, 4242:18, 4242:22, 4243:14, 4243:17, 4245:16, 4245:24, 4246:13, 4254:24, 4258:5, 4263:20, 4264:6, 4264:14, 4265:2, 4268:6, 4271:8, 4273:13, 4276:4, 4276:10, 4277:23, 4322:15, 4325:14, 4394:10
**Nolan's** [2] - 4276:12, 4325:13
**nonconventional** [1] - 4301:19
**none** [1] - 4345:8
**normal** [3] - 4266:19, 4280:9, 4299:5
**Norstrom** [6] - 4271:24, 4322:14, 4387:14, 4387:17, 4387:19, 4387:22
**north** [1] - 4354:14
**North** [2] - 4298:6, 4426:1
**Northern** [28] - 4242:23, 4243:2, 4244:5, 4245:8, 4245:9, 4245:17, 4245:25, 4246:12, 4247:8, 4247:21, 4249:2, 4249:8, 4249:11, 4249:22, 4250:1, 4264:8, 4264:20, 4264:23, 4265:14, 4265:16, 4265:20, 4265:23, 4276:12, 4280:23, 4325:8, 4326:17, 4328:14, 4330:16
**noted** [2] - 4240:3, 4286:12
**notes** [1] - 4331:14, 4331:19

**nothing** [1] - 4338:23, 4419:9, 4429:14
**noticed** [2] - 4413:22, 4414:11
**notification** [3] - 4374:15, 4375:2, 4401:21
**notwithstanding** [2] - 4319:17, 4320:3
**November** [10] - 4250:25, 4256:19, 4259:1, 4288:18, 4289:22, 4290:14, 4334:18, 4354:12, 4361:24, 4398:1
**number** [23] - 4263:10, 4271:16, 4280:21, 4287:18, 4291:2, 4292:12, 4296:2, 4296:8, 4296:9, 4315:18, 4336:17, 4336:18, 4343:8, 4344:20, 4363:7, 4363:17, 4363:24, 4365:3, 4380:24, 4385:24, 4386:22, 4394:25, 4402:25
**numbers** [2] - 4248:9, 4379:5
**NY** [3] - 4238:22, 4239:3, 4239:7

# O

**o'clock** [1] - 4393:9
**oath** [3] - 4240:18, 4412:16, 4423:7
**object** [1] - 4424:17
**objection** [23] - 4242:11, 4242:12, 4292:11, 4298:15, 4313:13, 4317:15, 4321:24, 4324:19, 4324:21, 4330:3, 4332:1, 4336:10, 4345:22, 4347:16, 4348:17, 4349:23, 4352:22, 4370:20, 4371:18, 4372:12, 4373:3, 4418:7, 4424:15
**objectives** [1] - 4282:19
**obligation** [1] - 4363:25
**obligations** [6] - 4306:22, 4330:13, 4359:3, 4359:5, 4359:19, 4360:7
**obstacles** [1] - 4381:8
**obtain** [7] - 4278:15, 4284:3, 4311:21, 4328:6, 4335:21, 4345:11, 4348:25
**obtained** [2] - 4258:7, 4328:4
**obtaining** [1] - 4258:11
**obvious** [1] - 4278:14
**obviously** [4] - 4381:20, 4404:9, 4405:6, 4406:3

**occasion** [1] - 4338:15
**occasions** [4] - 4302:19, 4363:24, 4394:21, 4425:22
**occur** [9] - 4243:4, 4261:17, 4282:16, 4290:24, 4349:20, 4349:25, 4350:4, 4350:21
**occurred** [30] - 4241:9, 4263:16, 4268:22, 4274:23, 4276:1, 4280:21, 4287:3, 4288:24, 4303:12, 4304:25, 4306:11, 4306:15, 4307:15, 4350:23, 4353:2, 4357:1, 4357:8, 4358:6, 4367:4, 4377:24, 4385:15, 4385:19, 4387:9, 4392:25, 4393:22, 4397:21, 4398:14, 4420:1, 4423:5, 4428:2
**occurrence** [1] - 4398:1
**occurrences** [1] - 4397:22
**occurring** [1] - 4241:9
**occurs** [1] - 4344:14
**ocean** [1] - 4287:6, 4314:12
**Oceanside** [1] - 4239:7
**October** [3] - 4330:9, 4413:16, 4416:20
**odd** [1] - 4393:7
**OF** [3] - 4238:1, 4238:3, 4238:10
**offer** [4] - 4242:9, 4292:15, 4292:17, 4344:3, 4372:1, 4372:11, 4430:23
**offered** [3] - 4262:12, 4262:13, 4321:18
**offering** [2] - 4343:24, 4344:7
**offers** [1] - 4344:21
**office** [6] - 4248:3, 4256:1, 4305:4, 4327:19, 4379:24, 4392:2
**Officer** [1] - 4373:19
**officer** [1] - 4400:4
**officers** [2] - 4343:7, 4350:9
**often** [1] - 4271:18
**Ohio** [1] - 4388:19
**old** [1] - 4422:22
**Old** [1] - 4239:3
**Oliver** [3] - 4365:23, 4366:14, 4368:11
**OLIVERAS** [2] - 4239:6, 4429:20
**on-site** [1] - 4301:13
**once** [5] - 4280:19, 4281:4, 4322:22, 4326:13, 4394:23
**one** [127] - 4244:21, 4246:9, 4246:12, 4247:25,

4251:16, 4253:13, 4255:23, 4256:19, 4256:20, 4258:1, 4263:1, 4264:20, 4265:8, 4265:13, 4266:1, 4268:18, 4269:24, 4270:5, 4270:9, 4271:24, 4274:13, 4275:19, 4278:18, 4280:4, 4280:5, 4280:7, 4281:5, 4284:2, 4284:11, 4286:1, 4288:4, 4288:5, 4295:21, 4297:20, 4298:5, 4303:7, 4304:25, 4305:6, 4306:13, 4309:18, 4314:8, 4319:6, 4324:11, 4326:25, 4327:5, 4328:13, 4333:8, 4334:5, 4335:14, 4336:14, 4338:16, 4338:17, 4341:23, 4343:21, 4345:18, 4346:11, 4346:12, 4347:22, 4349:10, 4349:18, 4350:9, 4351:18, 4352:6, 4353:23, 4359:3, 4361:1, 4363:18, 4364:7, 4366:23, 4367:22, 4369:1, 4369:4, 4374:9, 4374:25, 4375:12, 4375:23, 4375:24, 4384:6, 4386:11, 4386:13, 4386:16, 4387:15, 4387:19, 4388:13, 4389:22, 4390:12, 4390:15, 4390:22, 4391:6, 4391:8, 4391:14, 4392:5, 4393:5, 4393:8, 4393:17, 4394:8, 4394:22, 4395:4, 4395:15, 4397:8, 4397:14, 4398:8, 4399:15, 4401:20, 4402:8, 4402:9, 4403:19, 4403:20, 4403:22, 4408:1, 4410:8, 4411:3, 4414:4, 4414:5, 4414:21, 4418:10, 4419:3, 4422:5, 4422:8, 4424:2, 4425:23
**One** [1] - 4238:21
**one-inch** [1] - 4375:24
**one-on-one** [1] - 4387:15
**ones** [2] - 4254:14, 4321:7
**ongoing** [6] - 4332:14, 4379:15, 4398:2, 4399:4, 4399:16, 4401:9
**onwards** [1] - 4290:18
**open** [3] - 4253:1, 4281:4, 4284:17
**Open** [1] - 4373:1
**operated** [1] - 4256:1
**operating** [19] - 4280:3, 4280:5, 4286:9, 4286:12, 4288:13, 4288:16, 4288:25, 4289:2, 4289:4,

4289:6, 4325:22, 4328:15, 4347:25, 4369:3, 4400:5, 4400:12, 4400:13, 4400:15, 4400:23
**operation** [2] - 4368:20, 4416:3
**operational** [1] - 4303:21
**operations** [7] - 4277:10, 4277:15, 4277:17, 4300:21, 4326:19, 4332:20, 4394:5
**opinion** [2] - 4335:8, 4335:15
**opportunities** [1] - 4290:15
**opportunity** [7] - 4291:12, 4300:14, 4311:6, 4335:18, 4346:16, 4353:22, 4359:2
**opposed** [1] - 4278:22
**optimistic** [1] - 4382:6
**option** [1] - 4296:11
**options** [1] - 4379:7
**order** [12] - 4245:21, 4248:24, 4264:9, 4264:22, 4282:22, 4312:22, 4356:9, 4369:18, 4391:19, 4391:24, 4402:1, 4428:5
**organization** [2] - 4294:22, 4330:2
**organizational** [1] - 4253:7
**original** [16] - 4286:9, 4291:22, 4295:13, 4301:2, 4301:18, 4305:1, 4305:10, 4306:7, 4314:2, 4338:6, 4353:1, 4359:15, 4368:4, 4374:16, 4410:17, 4413:4
**originally** [8] - 4310:18, 4336:25, 4338:2, 4379:12, 4414:2, 4415:1, 4421:19, 4421:22
**otherwise** [2] - 4411:4, 4411:11
**outgoing** [1] - 4396:23
**outrageous** [1] - 4379:5
**outside** [14] - 4278:21, 4296:2, 4301:5, 4301:8, 4301:18, 4353:5, 4356:9, 4384:1, 4387:16, 4397:15, 4406:9, 4409:22, 4410:25, 4412:10
**outstanding** [5] - 4258:18, 4330:17, 4369:2, 4386:22, 4398:3
**outward** [1] - 4297:16
**overall** [3] - 4266:24, 4398:18, 4400:9
**overcome** [1] - 4398:6
**overlap** [1] - 4341:2
**overly** [1] - 4382:6
**overruled** [3] - 4317:16, 4332:7, 4336:11

**oversleeping** [1] - 4388:25
**owed** [6] - 4243:24, 4285:12, 4325:24, 4354:14, 4359:25, 4378:3
**Owen** [9] - 4241:7, 4241:20, 4241:23, 4242:18, 4254:24, 4268:6, 4271:8, 4273:13, 4277:23
**own** [10] - 4264:1, 4272:24, 4278:23, 4280:4, 4298:7, 4303:7, 4339:3, 4340:21, 4345:18, 4374:17
**owned** [4] - 4272:14, 4354:4
**owners** [2] - 4352:20, 4357:6
**ownership** [44] - 4274:16, 4276:14, 4278:5, 4278:15, 4281:10, 4322:21, 4342:12, 4343:8, 4344:2, 4344:5, 4345:11, 4345:12, 4345:15, 4346:6, 4346:7, 4346:15, 4346:18, 4347:9, 4347:14, 4348:12, 4349:1, 4349:19, 4350:15, 4350:19, 4353:11, 4354:2, 4354:8, 4354:12, 4354:24, 4358:9, 4358:10, 4359:1, 4362:2, 4362:7, 4363:1, 4365:9, 4366:25, 4367:8, 4367:24, 4370:2, 4370:18, 4371:5, 4372:9, 4374:22
**owning** [1] - 4278:22
**owns** [1] - 4344:13

## P

**package** [1] - 4243:19
**page** [17] - 4248:7, 4249:14, 4249:15, 4250:2, 4251:18, 4252:15, 4260:24, 4283:10, 4293:7, 4316:3, 4325:16, 4326:9, 4328:10, 4329:23, 4330:19, 4364:9, 4376:22
**Pahala** [1] - 4273:1
**paid** [17] - 4284:10, 4285:21, 4285:24, 4300:25, 4312:15, 4312:19, 4313:21, 4323:6, 4325:25, 4327:3, 4327:5, 4329:18, 4351:5, 4354:18, 4395:21, 4395:24, 4395:25
**Palms** [1] - 4400:7
**panel** [2] - 4258:8, 4258:12
**papering** [1] - 4303:18
**papers** [5] - 4242:19, 4244:25, 4245:2, 4245:6, 4245:9

**paperwork** [2] - 4245:17, 4246:11
**paragraph** [10] - 4255:8, 4260:3, 4260:4, 4319:17, 4342:4, 4346:3, 4353:6, 4361:21, 4377:5, 4377:9
**paragraphs** [2] - 4260:25, 4261:1
**paramount** [1] - 4390:11
**parcel** [27] - 4263:4, 4263:14, 4266:24, 4271:19, 4272:20, 4272:21, 4272:22, 4272:25, 4273:2, 4279:20, 4279:21, 4289:13, 4306:18, 4308:9, 4308:10, 4308:12, 4308:13, 4308:20, 4308:24, 4309:1, 4309:21, 4310:2, 4310:6, 4314:9, 4319:21, 4398:18
**parcels** [11] - 4267:18, 4267:20, 4272:17, 4273:10, 4278:9, 4280:6, 4280:8, 4295:22, 4301:22, 4314:12, 4336:15
**part** [29] - 4264:6, 4266:24, 4268:13, 4271:11, 4273:12, 4273:16, 4280:11, 4284:7, 4285:16, 4289:13, 4306:18, 4313:7, 4314:18, 4315:5, 4342:7, 4343:23, 4347:7, 4352:14, 4353:8, 4358:12, 4361:23, 4377:11, 4386:14, 4390:19, 4398:18, 4410:9, 4420:14, 4428:23, 4431:11
**partial** [3] - 4258:7, 4258:11, 4275:17
**participate** [1] - 4366:15
**participated** [1] - 4394:8
**participation** [2] - 4366:21, 4368:22
**particular** [17] - 4263:4, 4263:14, 4270:16, 4292:25, 4296:16, 4335:8, 4336:24, 4346:23, 4352:5, 4375:14, 4375:19, 4388:8, 4391:20, 4395:1, 4416:5, 4422:15, 4429:7
**particularly** [2] - 4250:2, 4280:6
**parties** [1] - 4378:3
**partner** [5] - 4271:6, 4276:19, 4278:7, 4287:17, 4319:18
**partners** [11] - 4283:9, 4284:20, 4290:21, 4310:6, 4318:6, 4319:10, 4326:4, 4328:20, 4334:5, 4360:9, 4398:4

**Partners** [4] - 4322:4, 4322:7, 4350:13, 4358:25
**partnership** [4] - 4261:25, 4301:19, 4309:17, 4319:19
**parts** [2] - 4259:19, 4409:16
**party** [1] - 4291:19
**past** [3] - 4299:2, 4299:8, 4428:20
**patents** [5] - 4348:7, 4348:8, 4370:10, 4370:13
**patient** [2] - 4275:3, 4275:24
**pause** [1] - 4407:23
**pay** [8] - 4282:12, 4287:21, 4300:3, 4300:5, 4300:7, 4329:12, 4330:17, 4331:1
**paying** [2] - 4283:7, 4399:8
**payment** [12] - 4244:10, 4244:23, 4258:20, 4262:14, 4285:15, 4314:18, 4327:10, 4330:10, 4359:18, 4360:1, 4369:17, 4394:13
**payments** [26] - 4244:14, 4245:20, 4256:24, 4257:6, 4283:7, 4284:22, 4285:2, 4285:4, 4311:22, 4312:8, 4315:3, 4317:7, 4317:14, 4318:20, 4318:21, 4320:5, 4323:16, 4326:21, 4337:23, 4338:7, 4338:12, 4338:13, 4360:23, 4396:8, 4396:13, 4399:7
**payouts** [1] - 4299:18
**payroll** [1] - 4281:16
**peaking** [1] - 4254:5
**Peca** [19] - 4254:24, 4281:9, 4283:1, 4283:5, 4288:10, 4322:14, 4324:25, 4325:1, 4325:4, 4325:7, 4325:9, 4326:13, 4342:10, 4343:1, 4346:1, 4351:2, 4352:6, 4352:9, 4352:15
**Peca's** [11] - 4323:17, 4324:3, 4325:12, 4325:20, 4326:10, 4328:13, 4330:7, 4330:14, 4330:22, 4331:13, 4388:18
**penalties** [6] - 4310:10, 4313:9, 4314:16, 4341:14, 4341:19, 4341:21
**penalty** [3] - 4310:8, 4314:22, 4342:2
**pending** [4] - 4287:5, 4348:9, 4355:12, 4374:1
**penny** [1] - 4338:18
**people** [10] - 4278:21, 4291:4, 4296:9, 4299:8,

23

4299:9, 4301:14, 4369:12, 4388:11, 4418:4, 4427:14
**per** [3] - 4299:5, 4310:8, 4327:19
**percent** [25] - 4256:20, 4262:13, 4265:22, 4266:19, 4266:20, 4270:22, 4276:6, 4285:24, 4287:21, 4288:3, 4300:6, 4301:11, 4310:8, 4314:3, 4325:23, 4328:17, 4329:2, 4329:5, 4334:19, 4354:5, 4366:16, 4402:5, 4420:8, 4420:20
**percentage** [9] - 4257:7, 4274:16, 4277:24, 4279:3, 4279:7, 4300:4, 4347:8, 4349:1, 4349:19
**performed** [1] - 4257:22
**perhaps** [13] - 4247:12, 4254:3, 4268:18, 4271:23, 4271:24, 4278:14, 4288:10, 4299:11, 4339:11, 4350:19, 4352:20, 4369:7
**period** [25] - 4247:21, 4251:2, 4251:6, 4251:7, 4253:22, 4259:9, 4259:21, 4267:8, 4267:17, 4284:23, 4287:8, 4287:11, 4287:12, 4287:24, 4289:5, 4333:9, 4338:11, 4355:9, 4360:24, 4363:14, 4364:5, 4392:14, 4410:6, 4419:22, 4426:23
**periods** [1] - 4364:4
**permanent** [1] - 4301:9
**permission** [1] - 4392:1
**permit** [1] - 4415:5
**permitted** [1] - 4320:5
**person** [10] - 4306:10, 4327:23, 4375:16, 4375:21, 4387:1, 4387:5, 4388:11, 4388:13, 4390:13, 4398:13
**person's** [1] - 4284:2
**personal** [12] - 4264:3, 4285:16, 4298:7, 4323:15, 4323:19, 4329:4, 4346:14, 4359:5, 4359:14, 4362:6, 4377:18, 4393:24
**personally** [10] - 4274:9, 4284:10, 4285:4, 4290:16, 4323:20, 4345:18, 4354:15, 4359:4, 4360:3, 4429:16
**persons** [7] - 4286:5, 4355:25, 4386:11, 4387:20, 4388:1, 4388:2, 4389:22
**perspective** [1] - 4258:16,

4268:1, 4381:8, 4412:9
**perspectives** [1] - 4282:25
**pertinent** [1] - 4294:23
**phase** [2] - 4333:12, 4333:14
**phases** [1] - 4299:25
**PHIL** [2] - 4240:21, 4432:3
**Phil** [8] - 4241:6, 4253:13, 4348:10, 4385:10, 4385:23, 4391:18, 4394:12, 4412:9
**PHILIP** [2] - 4412:19, 4432:6
**Phill** [1] - 4253:12
**PHILLIP** [1] - 4238:7
**Phillip** [1] - 4305:20
**Phoenix** [1] - 4388:25
**phone** [28] - 4245:4, 4251:4, 4263:1, 4297:10, 4349:4, 4353:22, 4376:2, 4379:12, 4379:21, 4387:1, 4387:8, 4387:14, 4388:15, 4394:1, 4398:10, 4410:19, 4413:11, 4413:20, 4413:21, 4413:24, 4413:25, 4414:2, 4416:9, 4416:12, 4416:21, 4417:1, 4417:6, 4428:3
**photograph** [1] - 4263:13
**photos** [1] - 4308:19
**phrase** [2] - 4385:25, 4426:6
**phrases** [5] - 4425:19, 4428:18, 4428:20, 4428:22, 4429:7
**picked** [1] - 4305:4
**piece** [3] - 4308:22, 4309:8, 4311:5
**pieces** [1] - 4423:8
**place** [20] - 4252:1, 4253:1, 4257:15, 4261:13, 4290:22, 4299:16, 4308:3, 4333:20, 4344:17, 4349:2, 4349:4, 4349:12, 4353:3, 4357:22, 4371:21, 4379:11, 4388:14, 4389:6, 4396:19, 4420:16
**placed** [1] - 4375:2
**placement** [1] - 4256:8
**plaintiffs'** [1] - 4374:2
**plan** [1] - 4300:23
**plane** [1] - 4393:10
**planners** [1] - 4322:25
**planning** [3] - 4281:14, 4301:15, 4326:20
**plans** [6] - 4287:18, 4290:15, 4299:4, 4404:20, 4405:17, 4406:21
**play** [3] - 4381:11, 4422:4, 4431:3

**played** [1] - 4413:17
**player** [43] - 4254:12, 4254:19, 4256:16, 4257:15, 4257:20, 4257:25, 4266:1, 4266:7, 4269:1, 4269:16, 4280:12, 4280:17, 4284:7, 4285:17, 4306:19, 4307:5, 4315:6, 4332:5, 4333:25, 4343:1, 4346:1, 4347:6, 4349:10, 4349:18, 4350:4, 4350:17, 4366:20, 4367:11, 4370:2, 4370:19, 4373:20, 4374:12, 4375:5, 4375:9, 4375:14, 4385:24, 4389:12, 4389:17, 4391:4, 4391:21, 4392:11, 4392:16, 4397:3
**player's** [1] - 4338:8
**player/clients** [4] - 4253:17, 4255:12, 4256:16, 4260:20
**players** [5] - 4244:13, 4253:16, 4253:21, 4334:2, 4334:12
**playing** [1] - 4393:9
**Plaza** [2] - 4238:15, 4239:20
**pleading** [3] - 4375:11, 4375:15, 4375:19
**pledge** [3] - 4275:21, 4276:11, 4276:13
**pledged** [5] - 4244:5, 4248:22, 4264:17, 4265:4, 4268:20
**plus** [5] - 4270:22, 4314:2, 4314:4, 4369:24, 4395:22
**point** [97] - 4240:16, 4244:7, 4250:16, 4250:18, 4251:8, 4258:1, 4268:2, 4269:11, 4269:21, 4270:5, 4271:23, 4273:20, 4275:19, 4281:12, 4284:20, 4285:14, 4286:15, 4286:18, 4292:17, 4294:12, 4295:4, 4296:16, 4296:25, 4301:17, 4302:11, 4302:14, 4303:13, 4303:19, 4305:8, 4308:7, 4309:11, 4310:1, 4310:22, 4311:7, 4312:9, 4321:13, 4325:15, 4328:6, 4329:25, 4330:1, 4330:5, 4335:8, 4335:10, 4336:3, 4342:9, 4343:3, 4344:1, 4344:7, 4345:10, 4345:13, 4349:4, 4349:8, 4353:25, 4355:7, 4355:8, 4355:23, 4357:18, 4358:22, 4361:7, 4362:16,

4362:23, 4365:4, 4365:7, 4366:2, 4366:17, 4366:24, 4369:7, 4369:11, 4369:21, 4371:13, 4372:8, 4373:6, 4373:12, 4374:10, 4378:9, 4379:23, 4381:6, 4386:18, 4389:17, 4390:6, 4393:22, 4394:4, 4395:12, 4396:21, 4397:17, 4401:8, 4401:21, 4403:17, 4405:25, 4410:8, 4411:14, 4413:21, 4427:4, 4429:6, 4429:15, 4430:6, 4430:18
**points** [3] - 4300:4, 4350:17, 4393:17
**pool** [4] - 4282:12, 4322:13, 4323:6, 4330:15
**pooled** [3] - 4282:8, 4282:11, 4331:25
**portfolio** [11] - 4257:7, 4266:12, 4266:15, 4266:18, 4266:21, 4266:25, 4270:11, 4270:14, 4270:23, 4283:1, 4283:2
**portfolio's** [1] - 4283:3
**portfolios** [4] - 4267:7, 4269:21, 4274:7, 4282:24
**portion** [32] - 4248:9, 4266:17, 4266:21, 4319:16, 4328:23, 4329:2, 4338:9, 4342:17, 4346:15, 4350:5, 4350:18, 4351:3, 4354:9, 4355:4, 4358:25, 4359:15, 4361:12, 4381:19, 4384:3, 4386:21, 4414:13, 4414:18, 4415:4, 4415:13, 4415:17, 4421:17, 4421:24, 4421:25, 4424:8, 4424:20, 4425:1
**portions** [13] - 4253:6, 4287:1, 4342:16, 4384:6, 4409:25, 4410:9, 4411:3, 4411:9, 4415:16, 4416:9, 4417:5, 4420:10, 4429:10
**posed** [1] - 4245:11
**position** [7] - 4259:15, 4277:1, 4301:10, 4308:8, 4311:3, 4373:13, 4373:18
**positions** [1] - 4270:2
**possessed** [2] - 4297:23, 4368:23
**possesses** [1] - 4336:16
**possession** [6] - 4243:7, 4327:13, 4327:17, 4327:20, 4327:22, 4345:2
**possibility** [1] - 4402:1
**possible** [6] - 4243:3, 4275:11, 4349:7, 4381:21,

24

4405:3
**possibly** [3] - 4303:16, 4405:1, 4407:19
**post** [1] - 4274:11
**post-hockey** [1] - 4274:11
**potential** [10] - 4269:3, 4269:17, 4297:11, 4299:18, 4342:14, 4342:20, 4346:10, 4352:19, 4370:6, 4390:3
**potentially** [1] - 4431:12
**practice** [5] - 4253:23, 4254:4, 4280:10, 4327:19, 4328:9
**precarious** [1] - 4308:8
**preceding** [2] - 4354:6, 4386:10
**preexisting** [1] - 4317:2
**prejudice** [3] - 4334:22, 4335:1, 4335:12
**preliminary** [1] - 4297:10, 4320:8, 4424:10
**prepaid** [3] - 4259:17, 4260:1, 4348:4
**preparation** [2] - 4308:4, 4309:13
**prepare** [2] - 4271:19, 4400:5
**prepared** [4] - 4280:24, 4301:15, 4411:20, 4412:11
**prepayment** [8] - 4313:9, 4314:16, 4314:22, 4329:7, 4341:14, 4341:18, 4341:21, 4342:1
**presence** [4] - 4384:1, 4409:22, 4410:25, 4412:10
**present** [16] - 4240:9, 4246:14, 4248:25, 4286:24, 4290:16, 4290:25, 4291:15, 4341:6, 4387:16, 4389:13, 4389:14, 4396:3, 4396:5, 4403:19, 4421:1, 4427:15
**presentation** [3] - 4253:7, 4387:15, 4403:16
**presented** [2] - 4291:10, 4359:2
**preserving** [1] - 4383:7
**president** [2] - 4265:14, 4277:16
**pressure** [1] - 4244:13
**presumably** [1] - 4361:19
**pretrial** [1] - 4242:4
**pretty** [2] - 4428:2, 4430:15
**previous** [4] - 4243:17, 4244:7, 4320:2, 4358:21
**previously** [9] - 4240:22, 4247:10, 4248:15, 4317:25, 4318:7, 4321:8, 4357:9, 4400:2, 4412:20

**primarily** [6] - 4300:22, 4308:16, 4312:24, 4319:9, 4332:16, 4390:25
**primary** [2] - 4402:7, 4402:9
**principal** [3] - 4272:12, 4290:1, 4369:17
**principals** [6] - 4272:10, 4273:4, 4348:6, 4353:23, 4356:7, 4359:9
**private** [24] - 4269:25, 4272:24, 4274:6, 4274:9, 4274:13, 4274:14, 4274:15, 4275:2, 4343:12, 4343:23, 4345:16, 4346:17, 4350:24, 4351:3, 4351:11, 4355:14, 4355:19, 4356:15, 4356:22, 4356:25, 4357:13, 4359:1, 4427:17
**privately** [6] - 4255:16, 4343:11, 4343:17, 4348:11, 4348:12, 4352:19
**Privitello** [7] - 4362:1, 4362:13, 4362:19, 4362:24, 4374:5, 4377:1, 4377:7
**Privitello's** [1] - 4362:7
**pro** [1] - 4291:15
**problem** [1] - 4410:14
**problems** [1] - 4406:3
**proceeded** [1] - 4367:2
**proceeding** [6] - 4246:15, 4374:14, 4375:11, 4376:8, 4376:16, 4387:23
**PROCEEDINGS** [1] - 4238:10
**Proceedings** [1] - 4239:25
**proceedings** [7] - 4374:24, 4375:3, 4375:7, 4375:8, 4375:22, 4375:23, 4407:23
**process** [8] - 4272:6, 4273:9, 4289:14, 4328:5, 4329:15, 4355:24, 4369:1, 4370:12
**produce** [1] - 4419:13
**produced** [2] - 4239:25, 4319:3
**productive** [1] - 4411:11
**professional** [5] - 4253:15, 4253:21, 4274:4, 4337:1, 4393:6
**proffer** [1] - 4410:21
**profit** [1] - 4269:17
**profits** [1] - 4279:4
**progresses** [1] - 4289:6
**prohibit** [1] - 4317:7
**project** [33] - 4245:20, 4250:17, 4262:13, 4268:19, 4271:22, 4272:1,

4275:16, 4276:8, 4276:22, 4285:22, 4286:6, 4288:7, 4288:9, 4289:7, 4291:3, 4294:9, 4294:20, 4299:15, 4301:21, 4307:5, 4307:9, 4309:14, 4309:23, 4326:15, 4327:5, 4329:12, 4332:10, 4333:8, 4333:23, 4334:1, 4336:13, 4426:3
**projecting** [1] - 4407:5
**projection** [1] - 4380:13
**projects** [6] - 4255:15, 4267:10, 4276:25, 4290:21, 4327:7, 4333:7
**prominent** [1] - 4297:5
**promise** [1] - 4284:24
**promising** [3] - 4342:14, 4342:20, 4355:19
**proof** [1] - 4372:1
**proper** [4] - 4357:5, 4357:15, 4357:20, 4370:8
**properly** [4] - 4271:1, 4367:6, 4370:5, 4374:19
**property** [30] - 4260:8, 4260:22, 4261:24, 4262:11, 4263:3, 4263:4, 4263:7, 4263:10, 4265:12, 4296:21, 4297:21, 4297:24, 4298:1, 4298:2, 4298:3, 4298:7, 4309:8, 4311:22, 4312:5, 4312:8, 4319:20, 4326:21, 4333:2, 4336:1, 4336:4, 4336:6, 4336:7, 4336:16, 4419:7, 4426:1
**proposal** [2] - 4287:21, 4288:2
**proposed** [4] - 4287:19, 4308:23, 4309:3, 4310:6
**prospective** [1] - 4374:2
**protect** [3] - 4254:8, 4277:6, 4374:13
**protected** [1] - 4278:20
**protocol** [2] - 4355:24, 4356:24
**provide** [4] - 4301:6, 4331:5, 4331:14, 4374:12
**provided** [11] - 4306:7, 4317:24, 4324:8, 4355:11, 4366:19, 4371:3, 4372:2, 4373:7, 4373:10, 4373:12, 4415:24
**provision** [2] - 4318:19, 4320:4
**public** [1] - 4343:22
**publicly** [7] - 4343:11, 4343:17, 4343:19, 4344:9, 4348:14, 4352:21, 4353:5
**purchase** [13] - 4260:22, 4264:7, 4264:10, 4265:10,

4267:20, 4304:1, 4310:9, 4343:24, 4344:21, 4346:17, 4350:18, 4353:22, 4357:13
**purchased** [6] - 4264:1, 4310:5, 4344:20, 4349:19, 4350:4, 4356:15
**purchases** [6] - 4256:8, 4272:7, 4303:23, 4345:17, 4360:20, 4373:21
**purchasing** [5] - 4260:8, 4344:12, 4351:11, 4355:25, 4358:12
**purportedly** [1] - 4320:18
**purpose** [14] - 4257:14, 4257:16, 4260:8, 4278:24, 4281:3, 4282:18, 4286:10, 4286:12, 4288:14, 4332:24, 4346:24, 4386:20, 4402:7, 4402:9
**purposes** [21] - 4253:7, 4261:16, 4268:7, 4282:18, 4286:19, 4286:25, 4294:13, 4294:22, 4326:24, 4330:1, 4347:8, 4357:4, 4357:21, 4362:5, 4363:1, 4365:19, 4377:17, 4387:11, 4402:7, 4402:8, 4402:10
**pursuant** [13] - 4256:24, 4257:6, 4290:12, 4306:22, 4315:10, 4325:8, 4325:22, 4326:12, 4328:16, 4329:4, 4329:7, 4330:24, 4345:3
**pursue** [6] - 4328:8, 4335:22, 4356:9, 4378:16, 4401:19, 4402:10
**pursuing** [1] - 4401:12
**push** [1] - 4405:17
**put** [28] - 4244:13, 4246:25, 4251:16, 4264:9, 4267:17, 4269:20, 4273:5, 4273:7, 4276:17, 4278:10, 4279:20, 4280:8, 4290:21, 4291:6, 4298:22, 4307:4, 4307:9, 4308:3, 4313:1, 4313:4, 4321:14, 4324:2, 4329:17, 4346:22, 4369:2, 4395:12, 4407:15, 4429:24
**putting** [1] - 4413:13

## Q

**qualifications** [1] - 4247:15
**Quebec** [1] - 4275:22
**questioned** [2] - 4268:14, 4377:4
**questioning** [2] - 4329:24, 4409:21

questions [11] - 4241:7, 4245:11, 4294:18, 4330:5, 4361:13, 4366:23, 4397:12, 4410:12, 4419:17, 4426:17, 4427:2
quick [2] - 4311:21, 4403:6
quite [5] - 4271:18, 4297:7, 4357:19, 4364:8, 4398:24

**R**

race [1] - 4298:5
raise [7] - 4264:15, 4299:2, 4299:10, 4299:14, 4346:14, 4359:3, 4359:14
raised [5] - 4312:10, 4320:8, 4428:12, 4428:24, 4430:16
ran [1] - 4357:3
ranford [1] - 4346:2
Ranford [18] - 4254:25, 4342:11, 4343:2, 4348:24, 4353:10, 4353:14, 4353:19, 4354:7, 4358:1, 4358:7, 4358:16, 4358:19, 4359:17, 4360:10, 4360:11, 4360:19, 4361:18, 4389:3
Ranford's [1] - 4358:8
ranged [2] - 4322:17, 4329:19
rate [2] - 4300:6, 4334:19
rated [1] - 4298:6
rates [1] - 4267:11
rather [4] - 4253:13, 4342:10, 4387:4, 4421:24
reached [1] - 4261:21
read [12] - 4252:8, 4253:6, 4255:4, 4276:25, 4318:13, 4323:2, 4342:3, 4353:6, 4361:21, 4377:9, 4404:1, 4428:15
reading [1] - 4253:11
reads [8] - 4242:18, 4255:8, 4255:10, 4258:24, 4259:13, 4259:24, 4319:17, 4342:5
ready [4] - 4240:4, 4315:19, 4339:10, 4378:13
real [42] - 4250:17, 4255:15, 4260:8, 4260:22, 4262:23, 4263:24, 4263:25, 4264:3, 4267:2, 4267:9, 4268:9, 4268:12, 4269:2, 4269:12, 4269:17, 4270:5, 4270:6, 4270:7, 4270:9, 4270:16, 4270:25, 4271:21, 4274:6, 4274:13, 4278:16, 4279:1, 4279:9,

4279:15, 4279:18, 4285:22, 4286:6, 4286:11, 4286:13, 4287:1, 4287:9, 4287:17, 4300:1, 4311:21, 4333:18, 4333:20, 4401:25, 4403:6
realistic [1] - 4380:14
realize [1] - 4301:1
realized [1] - 4247:7
really [12] - 4254:12, 4259:19, 4291:16, 4299:3, 4354:21, 4354:23, 4399:11, 4410:9, 4417:11, 4418:9, 4430:13, 4430:18
realtime [1] - 4356:11
rearrange [1] - 4405:2
reason [4] - 4265:4, 4359:9, 4410:7, 4422:20
reasonable [1] - 4258:13
reasons [4] - 4335:14, 4393:5, 4399:25, 4401:20
rebuttal [4] - 4407:18, 4430:23, 4431:11
recalled [2] - 4390:12, 4390:19, 4422:20
recapture [1] - 4285:12
receipt [7] - 4256:7, 4330:11, 4341:4, 4391:12, 4392:3, 4392:5, 4393:25
receive [12] - 4245:21, 4248:2, 4265:22, 4291:13, 4299:19, 4310:12, 4345:1, 4345:2, 4345:4, 4345:7, 4391:11, 4392:5
received [29] - 4241:19, 4241:23, 4247:25, 4292:20, 4314:1, 4318:20, 4319:7, 4322:2, 4324:24, 4338:4, 4338:18, 4338:23, 4345:19, 4361:19, 4374:15, 4391:7, 4391:10, 4392:10, 4395:8, 4396:17, 4396:22, 4402:14, 4402:21, 4418:20, 4428:13, 4428:14, 4432:23, 4432:25, 4433:2
receiving [3] - 4279:3, 4299:17, 4397:9
recently [1] - 4414:11
Recess [1] - 4293:6
recess [4] - 4294:1, 4339:17, 4383:23, 4385:1
recitation [1] - 4255:24
recite [1] - 4300:13
recognize [4] - 4241:16, 4292:3, 4376:5, 4376:13
recognized [1] - 4319:15
recollect [1] - 4306:14
recollection [18] - 4246:21, 4247:2, 4247:4, 4347:19,

4349:3, 4349:11, 4357:15, 4390:20, 4391:13, 4392:10, 4410:15, 4415:5, 4415:20, 4421:23, 4424:12, 4425:3, 4427:6, 4427:25
recommend [1] - 4266:22
recommendation [2] - 4346:21, 4347:21
recommendations [2] - 4347:13, 4369:1
recommended [2] - 4255:14, 4290:21
recommending [2] - 4335:11, 4345:10
reconcile [1] - 4395:9
reconvene [1] - 4404:3
record [9] - 4261:16, 4367:1, 4367:6, 4370:17, 4375:2, 4416:6, 4416:7, 4420:8, 4426:22, 4428:15, 4431:9
recorded [9] - 4239:25, 4357:6, 4400:19, 4400:20, 4400:22, 4414:2, 4415:21, 4415:23, 4416:13
recording [38] - 4380:21, 4380:25, 4381:1, 4381:3, 4381:6, 4409:21, 4410:10, 4410:17, 4412:5, 4412:6, 4413:4, 4413:7, 4413:13, 4413:15, 4413:22, 4414:19, 4414:22, 4415:1, 4415:3, 4416:4, 4416:8, 4416:18, 4416:25, 4417:2, 4417:10, 4417:12, 4417:16, 4417:24, 4418:2, 4418:6, 4420:17, 4420:24, 4426:24, 4428:4, 4429:6, 4429:8, 4429:9, 4429:11
records [28] - 4246:3, 4246:7, 4282:1, 4289:23, 4315:1, 4323:15, 4327:8, 4327:9, 4327:16, 4328:4, 4331:20, 4349:21, 4350:14, 4354:3, 4356:8, 4356:20, 4357:5, 4357:24, 4358:4, 4358:10, 4360:22, 4367:24, 4371:3, 4371:14, 4372:2, 4372:4, 4373:5, 4373:15
recover [2] - 4279:17, 4398:3
recovery [3] - 4335:22, 4339:5, 4339:7
RECROSS [2] - 4426:19, 4432:17
RECROSS- EXAMINATION [2] - 4426:19, 4432:17

redact [1] - 4252:6
redacted [1] - 4252:11
REDIRECT [2] - 4424:4, 4432:15
REDIRECT- EXAMINATION [2] - 4424:4, 4432:15
reduce [1] - 4379:16
reduced [3] - 4267:11, 4286:16, 4290:7
refer [1] - 4426:10
reference [40] - 4242:17, 4242:21, 4243:10, 4244:25, 4249:14, 4257:11, 4263:17, 4282:10, 4294:20, 4301:24, 4305:19, 4324:11, 4330:6, 4330:7, 4330:19, 4341:14, 4346:2, 4352:5, 4352:11, 4362:10, 4362:25, 4367:9, 4373:20, 4376:20, 4380:23, 4388:8, 4389:20, 4389:24, 4393:23, 4395:20, 4396:14, 4417:23, 4421:15, 4424:6, 4425:6, 4425:8, 4425:15, 4427:4, 4427:20, 4428:23
referenced [9] - 4246:6, 4259:8, 4267:1, 4272:25, 4288:10, 4296:3, 4386:19, 4393:15, 4417:11
references [13] - 4244:3, 4246:8, 4246:10, 4415:1, 4415:3, 4415:6, 4415:11, 4419:23, 4419:25, 4420:9, 4420:13, 4420:21, 4422:12
referencing [3] - 4244:19, 4248:18, 4420:22
referred [8] - 4246:4, 4257:2, 4260:14, 4263:9, 4263:11, 4272:20, 4426:5, 4426:6
referring [13] - 4243:22, 4284:12, 4332:3, 4377:8, 4386:2, 4387:2, 4390:23, 4391:19, 4397:25, 4411:5, 4422:11, 4428:20, 4430:10
refers [2] - 4244:10, 4255:4
refile [1] - 4374:5
refiled [2] - 4373:25, 4374:3
reflect [10] - 4289:23, 4317:22, 4322:7, 4330:10, 4330:20, 4338:7, 4350:14, 4363:9, 4367:7, 4396:12
reflected [15] - 4256:24, 4257:6, 4302:18, 4327:15, 4334:1, 4345:14, 4351:13, 4358:4, 4358:9, 4361:2,

26

4371:5, 4392:8, 4400:13, 4400:15, 4400:23
**reflecting** [4] - 4243:8, 4361:6, 4373:15, 4402:14
**reflection** [4] - 4327:11, 4365:9, 4366:25, 4367:24
**reflects** [1] - 4339:2
**refrain** [1] - 4382:24
**refund** [1] - 4351:25
**refunded** [2] - 4351:15, 4351:16
**refunding** [1] - 4351:12
**refused** [1] - 4427:17
**regard** [5] - 4265:3, 4274:1, 4341:16, 4387:18, 4390:1
**regarding** [21] - 4244:23, 4245:4, 4245:8, 4245:17, 4257:21, 4259:5, 4277:1, 4295:11, 4327:8, 4336:6, 4343:2, 4352:18, 4354:2, 4358:17, 4365:16, 4384:1, 4384:2, 4388:9, 4404:2, 4409:3, 4409:20
**registered** [2] - 4259:16, 4259:24
**regretted** [1] - 4359:13
**regular** [8] - 4281:21, 4290:3, 4299:24, 4336:5, 4364:7, 4364:8, 4393:2, 4425:21
**relate** [1] - 4362:8
**related** [8] - 4256:11, 4278:19, 4323:12, 4327:14, 4365:10, 4370:10, 4396:8, 4425:24
**relates** [54] - 4243:12, 4244:8, 4246:17, 4248:9, 4250:13, 4254:19, 4255:20, 4255:25, 4257:7, 4257:25, 4258:8, 4258:21, 4263:16, 4266:2, 4267:13, 4268:12, 4271:9, 4273:16, 4273:25, 4274:21, 4276:24, 4280:18, 4282:19, 4286:9, 4288:20, 4289:19, 4300:17, 4311:12, 4313:20, 4318:21, 4320:3, 4320:21, 4327:8, 4329:25, 4333:25, 4334:22, 4341:19, 4343:10, 4349:20, 4352:14, 4353:13, 4353:25, 4361:11, 4368:5, 4373:5, 4375:18, 4383:12, 4383:17, 4388:2, 4392:11, 4393:21, 4396:6, 4396:7, 4412:7
**relating** [1] - 4394:9
**relation** [2] - 4326:18, 4327:4

**relationship** [12] - 4250:18, 4250:23, 4251:9, 4255:22, 4256:15, 4256:25, 4257:17, 4296:24, 4297:2, 4363:5, 4365:21, 4418:3
**relationships** [2] - 4318:8, 4320:2
**relative** [2] - 4267:12, 4396:19
**relatively** [2] - 4382:12, 4391:19
**released** [3] - 4276:13, 4343:25
**relevance** [3] - 4246:3, 4254:21, 4383:17
**relevancy** [1] - 4418:11
**relevant** [2] - 4258:1, 4372:6
**remain** [1] - 4258:17
**remaining** [3] - 4249:12, 4312:11, 4334:7
**remains** [2] - 4334:9, 4334:10
**remarkable** [1] - 4308:21
**remarks** [1] - 4424:10
**remember** [14] - 4241:10, 4257:8, 4297:21, 4349:13, 4361:3, 4361:15, 4390:16, 4394:17, 4398:17, 4411:21, 4416:13, 4417:16, 4424:8, 4425:6
**remembered** [1] - 4415:6
**remind** [1] - 4240:17
**removal** [1] - 4424:13
**removed** [3] - 4417:5, 4424:20, 4425:2
**renew** [1] - 4242:23
**rented** [1] - 4261:15
**repay** [1] - 4290:3
**repayment** [7] - 4284:16, 4287:18, 4289:25, 4290:15, 4330:12, 4351:5, 4354:22
**repeat** [4] - 4247:1, 4263:12, 4383:10, 4383:13
**repeated** [2] - 4337:23, 4367:9
**repetition** [1] - 4261:6
**repetitive** [1] - 4329:9
**rephrase** [1] - 4424:16
**rephrasing** [1] - 4269:5
**replenished** [1] - 4379:1
**Reporter** [1] - 4239:20
**reporter** [2] - 4428:13, 4430:9
**reports** [2] - 4327:13, 4327:14
**represent** [5] - 4249:7, 4266:7, 4325:6, 4342:16, 4380:24

**representation** [5] - 4318:1, 4346:21, 4365:19, 4394:7, 4396:19
**representations** [7] - 4317:20, 4317:21, 4319:14, 4330:24, 4367:1, 4369:14, 4423:1
**representative** [3] - 4247:24, 4249:2, 4249:22
**represented** [15] - 4254:12, 4254:20, 4256:22, 4263:9, 4271:1, 4289:1, 4306:18, 4308:15, 4326:7, 4346:11, 4375:24, 4377:15, 4400:11, 4400:22, 4414:17
**representing** [5] - 4247:21, 4253:21, 4257:16, 4342:13, 4423:3
**represents** [3] - 4318:5, 4325:17, 4338:10
**reproduction** [1] - 4381:4
**repurchase** [1] - 4344:2
**request** [6] - 4243:14, 4275:4, 4275:13, 4385:21, 4397:3, 4408:25
**requested** [7] - 4262:15, 4275:2, 4275:20, 4287:16, 4291:6, 4328:12, 4328:13, 4328:21, 4330:14, 4398:8, 4401:23
**requesting** [1] - 4363:24
**require** [2] - 4316:1, 4363:19
**required** [4] - 4280:23, 4378:10, 4379:15, 4391:14
**requirements** [3] - 4301:5, 4301:22, 4308:5
**reschedule** [3] - 4405:15, 4405:16, 4406:17
**research** [1] - 4374:17
**reside** [1] - 4248:5
**residual** [5] - 4249:18, 4249:24, 4262:10, 4312:12, 4318:25
**resolved** [1] - 4366:24
**respect** [35] - 4259:11, 4265:3, 4275:16, 4303:24, 4308:14, 4309:24, 4313:25, 4319:11, 4322:19, 4325:19, 4326:14, 4327:4, 4333:17, 4334:11, 4337:16, 4354:12, 4355:23, 4359:20, 4361:19, 4362:12, 4362:14, 4365:15, 4366:4, 4366:19, 4369:9, 4370:18, 4388:1, 4395:10, 4397:23, 4398:6, 4398:15, 4399:15, 4400:2, 4425:24, 4427:3

**respected** [1] - 4297:7
**respective** [2] - 4375:10, 4394:2
**responded** [2] - 4352:3, 4385:25
**response** [7] - 4245:12, 4246:22, 4368:9, 4391:7, 4392:9, 4393:19, 4430:22
**responses** [1] - 4391:15
**responsibility** [3] - 4277:13, 4301:12, 4317:22
**responsible** [2] - 4277:9, 4310:11
**responsive** [1] - 4313:14
**rest** [4] - 4280:8, 4369:18, 4369:23, 4382:18
**restate** [1] - 4383:20
**restaurant** [6] - 4276:17, 4276:18, 4276:20, 4388:20, 4389:3, 4395:16
**resting** [2] - 4381:19, 4407:16
**restriction** [1] - 4345:20
**restrictions** [1] - 4345:6
**restructure** [1] - 4356:8
**result** [8] - 4258:11, 4270:2, 4291:5, 4359:18, 4367:6, 4368:22, 4371:4, 4387:11
**resumed** [1] - 4412:20
**resumes** [2] - 4340:7, 4385:4
**retained** [2] - 4291:22, 4359:15
**retainer** [7] - 4378:10, 4378:19, 4378:22, 4379:15, 4379:16, 4379:18, 4385:21
**retention** [1] - 4389:20
**retire** [1] - 4274:4
**retired** [1] - 4274:8
**retirement** [1] - 4275:23
**return** [13] - 4266:19, 4266:20, 4267:13, 4269:3, 4270:17, 4270:23, 4275:12, 4278:1, 4279:2, 4281:1, 4283:5, 4340:6, 4352:20
**returned** [5] - 4243:17, 4243:20, 4291:19, 4305:10, 4416:21, 4416:23, 4417:7
**returns** [1] - 4266:19
**review** [3] - 4242:5, 4300:14, 4324:9
**reviewed** [1] - 4402:16
**revolving** [2] - 4292:6, 4295:15
**RICHARD** [1] - 4238:22
**Richards** [8] - 4335:8,

27

4336:22, 4387:12, 4394:13, 4395:17, 4396:3, 4399:25, 4401:23
**Richards'** [2] - 4335:15, 4392:2
**rights** [2] - 4258:2, 4378:2
**rise** [5] - 4240:1, 4240:8, 4294:3, 4340:3, 4341:5
**risk** [10] - 4266:22, 4267:3, 4267:13, 4268:20, 4268:24, 4270:3, 4277:7, 4278:18, 4280:8, 4309:8
**risk-free** [1] - 4268:24
**riskier** [1] - 4270:13
**risks** [3] - 4267:3, 4269:1, 4269:16
**risky** [2] - 4266:13, 4266:14
**Rizzi** [1] - 4377:1
**Road** [1] - 4239:3
**robber** [8] - 4424:7, 4425:6, 4425:8, 4425:15, 4426:6, 4426:12, 4428:18, 4428:23
**Robert** [2] - 4291:15, 4377:1
**ROBERT** [1] - 4239:4
**role** [3] - 4255:25, 4257:22, 4303:21
**rollup** [1] - 4278:6
**rolodex** [1] - 4314:10
**Ron** [2] - 4387:11, 4394:13
**Ronald** [2] - 4392:2, 4396:3
**room** [2] - 4261:13, 4388:24
**rounded** [1] - 4270:23
**route** [1] - 4298:23
**routine** [1] - 4306:11
**RR** [2] - 4396:7, 4396:10
**Rucchin** [20] - 4254:25, 4268:23, 4322:15, 4342:11, 4343:1, 4346:2, 4348:24, 4353:10, 4353:14, 4353:18, 4354:7, 4357:25, 4358:7, 4358:8, 4358:16, 4358:18, 4359:17, 4359:23, 4360:2, 4388:24
**run** [2] - 4266:11, 4268:2
**running** [2] - 4276:18, 4276:23

# S

**safe** [2] - 4266:11, 4266:12
**salary** [1] - 4269:22
**sale** [6] - 4267:20, 4272:18, 4303:22, 4314:12,

4344:21, 4359:16
**sales** [3] - 4279:2, 4356:12, 4358:22
**San** [12] - 4288:9, 4291:2, 4291:3, 4313:10, 4335:25, 4336:8, 4336:14, 4336:15, 4336:23, 4342:1, 4419:7, 4426:3
**sand** [1] - 4272:24
**SARITHA** [1] - 4238:16
**satisfy** [5] - 4355:4, 4359:3, 4359:25, 4360:6, 4363:24
**Saturday** [1] - 4291:9
**saw** [13] - 4257:3, 4263:14, 4267:18, 4306:12, 4331:13, 4341:21, 4350:22, 4351:13, 4351:18, 4357:24, 4358:3, 4360:14, 4360:25
**scale** [1] - 4290:15
**scenario** [2] - 4406:25, 4407:20
**schedule** [2] - 4369:17, 4382:19
**scheduled** [1] - 4404:18
**scheduling** [2] - 4256:13, 4340:9
**scheme** [14] - 4271:12, 4273:12, 4273:17, 4280:11, 4284:7, 4285:17, 4306:19, 4315:6, 4342:7, 4347:7, 4352:15, 4353:8, 4361:23, 4377:11
**school** [1] - 4355:15
**Schwab** [9] - 4249:2, 4249:12, 4249:20, 4249:23, 4264:20, 4337:23, 4338:6, 4361:1, 4361:4
**scope** [1] - 4301:5
**Scottsdale** [5] - 4297:19, 4297:23, 4306:10, 4388:23, 4388:24
**screen** [2] - 4247:12, 4321:15
**se** [1] - 4299:5
**seat** [1] - 4404:8
**seated** [9] - 4240:2, 4240:10, 4294:5, 4340:4, 4341:7, 4380:11, 4385:2, 4385:6, 4404:7
**second** [20] - 4244:22, 4251:16, 4255:8, 4255:9, 4278:24, 4295:16, 4297:18, 4297:22, 4305:19, 4326:25, 4348:5, 4351:7, 4352:6, 4380:3, 4399:6, 4399:17, 4401:25, 4417:10, 4419:4, 4420:25

**seconds** [3] - 4413:6, 4422:6, 4422:8
**secretary** [3] - 4259:15, 4259:20, 4259:22
**section** [5] - 4248:18, 4317:20, 4318:1, 4319:14, 4319:23
**secure** [2] - 4264:9, 4291:3
**secured** [2] - 4267:22, 4275:17
**securing** [1] - 4277:20
**securities** [2] - 4249:13, 4265:23
**security** [1] - 4427:17
**see** [30] - 4242:17, 4244:21, 4248:13, 4251:2, 4256:23, 4266:18, 4266:20, 4267:10, 4270:22, 4289:3, 4291:11, 4304:4, 4304:6, 4305:20, 4321:22, 4324:17, 4325:5, 4326:25, 4327:1, 4329:21, 4337:7, 4340:25, 4349:9, 4405:6, 4408:10, 4408:21, 4409:2, 4410:18, 4418:14, 4431:14
**seeing** [2] - 4257:8, 4360:22
**seek** [1] - 4383:3
**seeking** [8] - 4297:12, 4299:23, 4307:18, 4328:19, 4348:9, 4371:11, 4419:5, 4425:17
**seem** [1] - 4379:17
**seized** [1] - 4247:8
**seizure** [1] - 4248:21
**select** [1] - 4383:5
**selected** [1] - 4415:17
**sell** [5] - 4346:13, 4354:9, 4355:1, 4355:4, 4359:13
**sellable** [1] - 4354:25
**seller** [5] - 4259:17, 4260:1, 4262:11, 4345:1, 4345:4
**selling** [7] - 4272:13, 4348:25, 4356:22, 4357:9, 4358:11, 4359:10, 4360:5
**semi** [1] - 4301:9
**semipermanent** [1] - 4301:10
**Senator** [8] - 4272:11, 4272:16, 4273:3, 4309:19, 4309:22, 4309:25, 4310:21, 4312:3
**send** [7] - 4243:1, 4243:5, 4244:14, 4246:11, 4363:6, 4398:16
**sense** [4] - 4323:5, 4347:12, 4366:3, 4398:22
**sensitive** [1] - 4383:15

**sent** [23] - 4242:7, 4243:18, 4244:23, 4245:9, 4280:25, 4317:25, 4318:2, 4319:5, 4319:6, 4332:11, 4338:5, 4347:10, 4356:17, 4379:13, 4379:20, 4391:4, 4391:6, 4392:7, 4393:20, 4398:8, 4398:11, 4402:24, 4422:22
**sentence** [7] - 4255:9, 4255:17, 4258:24, 4259:13, 4260:18, 4342:15, 4342:16
**separate** [3] - 4280:6, 4280:13, 4288:24
**September** [4] - 4288:17, 4294:16, 4332:19, 4333:5
**Series** [4] - 4259:6, 4259:8, 4259:9
**series** [6] - 4241:22, 4243:11, 4260:7, 4264:21, 4274:5, 4355:18
**serve** [3] - 4406:2, 4409:8, 4409:10
**serves** [1] - 4357:15
**service** [1] - 4409:6
**set** [9] - 4243:14, 4264:14, 4265:8, 4280:2, 4280:5, 4280:20, 4306:22, 4356:24, 4369:20
**setting** [1] - 4272:6
**settle** [1] - 4284:25
**settled** [1] - 4276:3
**settlement** [10] - 4243:25, 4314:23, 4317:9, 4317:19, 4317:23, 4394:22, 4397:16, 4400:3, 4400:9, 4426:7
**Settlement** [25] - 4377:10, 4377:20, 4377:22, 4377:25, 4386:12, 4386:13, 4386:24, 4388:10, 4389:23, 4391:17, 4394:6, 4395:6, 4395:11, 4396:14, 4396:20, 4397:7, 4397:23, 4398:14, 4398:19, 4399:13, 4401:2, 4401:15, 4401:16, 4402:6, 4402:15
**settlement's** [1] - 4397:6
**seven** [4] - 4310:14, 4310:20, 4357:12, 4417:13
**several** [20] - 4260:19, 4260:20, 4271:19, 4278:17, 4280:25, 4296:12, 4297:9, 4302:17, 4326:1, 4326:21, 4338:21, 4348:8, 4386:17, 4389:14, 4390:10, 4390:18, 4393:5, 4395:14, 4397:12, 4415:11

28

**several-hour** [1] - 4390:10
**severely** [1] - 4333:21
**sexy** [1] - 4298:24
**share** [2] - 4343:25, 4350:5
**shareholder** [6] - 4427:11, 4427:12, 4427:13, 4427:16, 4428:3, 4428:4
**shareholders** [2] - 4417:20, 4417:24
**shares** [7] - 4343:20, 4344:12, 4344:13, 4344:17, 4344:20, 4400:7
**sharing** [1] - 4299:4
**shark** [1] - 4299:22
**sheet** [2] - 4320:8, 4326:6
**shifter** [2] - 4298:4, 4298:6
**short** [6] - 4245:21, 4287:18, 4289:8, 4316:1, 4363:21, 4363:24, 4364:2, 4369:18, 4382:13, 4384:9, 4391:19
**short-term** [6] - 4287:18, 4289:8, 4316:1, 4363:21, 4363:24, 4364:2
**shorter** [1] - 4414:22
**shortly** [7] - 4247:6, 4275:13, 4305:6, 4325:7, 4392:5, 4413:10, 4426:23
**shoulder** [2] - 4401:11, 4402:4
**shouldering** [2] - 4398:24, 4401:17
**show** [7] - 4247:9, 4251:15, 4272:17, 4318:10, 4321:14, 4323:23, 4360:23
**showed** [1] - 4317:20
**showing** [3] - 4252:9, 4284:2, 4318:14
**shown** [3] - 4246:18, 4246:21, 4272:22
**shows** [4] - 4248:19, 4249:24, 4250:8, 4428:22
**sic** [1] - 4319:16
**side** [5] - 4266:12, 4266:13, 4266:14, 4319:9, 4319:19
**sidebar** [3] - 4252:1, 4371:21, 4372:14
**sides** [2] - 4410:2, 4418:4
**sign** [10] - 4280:23, 4281:1, 4291:17, 4303:6, 4303:10, 4304:20, 4305:2, 4311:10, 4318:3, 4369:15
**sign-off** [1] - 4318:3
**signature** [17] - 4302:22, 4302:23, 4303:3, 4304:4, 4304:6, 4304:10, 4304:13, 4304:16, 4305:14, 4305:20, 4305:22,

4305:23, 4306:5, 4320:19, 4320:20, 4320:24, 4321:10
**signatures** [1] - 4319:25
**signed** [24] - 4245:25, 4288:12, 4288:16, 4288:25, 4290:25, 4291:8, 4291:14, 4291:18, 4295:7, 4296:8, 4304:1, 4305:3, 4305:9, 4305:13, 4305:17, 4306:8, 4308:5, 4315:23, 4317:10, 4320:8, 4321:7, 4326:13, 4364:5
**significant** [8] - 4263:17, 4269:20, 4295:22, 4303:21, 4355:21, 4359:15, 4360:4, 4394:25
**significantly** [2] - 4287:12, 4308:6
**signing** [1] - 4300:19
**signings** [2] - 4264:21, 4304:24
**signoff** [1] - 4249:4
**similar** [9] - 4265:7, 4267:5, 4268:8, 4270:20, 4326:2, 4331:14, 4341:21, 4355:2, 4425:13
**similarities** [1] - 4343:16
**similarly** [1] - 4376:16
**simple** [2] - 4299:21, 4343:19
**simply** [10] - 4250:6, 4253:7, 4265:12, 4269:14, 4286:25, 4343:16, 4376:7, 4376:20, 4379:18, 4413:4
**single** [1] - 4386:19
**sit** [6] - 4331:15, 4349:14, 4370:16, 4371:2, 4420:12, 4428:5
**site** [4] - 4297:22, 4297:23, 4297:24, 4301:13
**sits** [1] - 4336:13
**sitting** [2] - 4287:23, 4288:21
**situation** [1] - 4316:2
**situations** [1] - 4425:12
**six** [11] - 4242:1, 4246:9, 4260:25, 4262:12, 4264:21, 4287:4, 4311:2, 4311:9, 4313:11, 4348:9, 4395:3
**skipping** [1] - 4260:4
**slightly** [1] - 4414:20
**small** [3] - 4255:15, 4266:16, 4346:15
**smaller** [2] - 4338:13
**sold** [3] - 4344:17, 4352:21, 4355:3
**sole** [1] - 4430:18
**solution** [1] - 4368:18
**someone** [2] - 4256:2,

4282:12, 4320:18
**sometime** [8] - 4275:12, 4279:12, 4362:15, 4381:20, 4391:12, 4399:23, 4403:2, 4427:20
**sometimes** [1] - 4270:12
**somewhat** [1] - 4425:11
**somewhere** [7] - 4275:19, 4307:25, 4314:21, 4352:25, 4353:3, 4354:11, 4369:10
**son** [3] - 4422:21, 4422:24, 4423:5
**soon** [1] - 4350:6
**sorry** [4] - 4294:25, 4412:1, 4421:8, 4421:21
**sort** [1] - 4372:7
**sought** [2] - 4310:2, 4328:6
**sound** [1] - 4429:11
**sounds** [2] - 4259:3, 4429:19
**source** [3] - 4262:17, 4296:4, 4307:21
**sources** [2] - 4301:8, 4356:9
**South** [1] - 4336:15
**Southeast** [2] - 4266:16, 4270:21
**speaking** [4] - 4255:6, 4317:8, 4353:21, 4421:12
**speaks** [2] - 4322:6, 4431:9
**specially** [1] - 4390:17
**specific** [14] - 4254:18, 4263:5, 4280:16, 4323:12, 4332:4, 4345:9, 4346:20, 4347:14, 4349:6, 4349:15, 4383:17, 4392:16, 4396:8, 4398:21
**specifically** [17] - 4244:10, 4288:5, 4288:14, 4304:3, 4321:8, 4336:20, 4343:1, 4346:1, 4346:12, 4359:21, 4361:3, 4365:21, 4366:21, 4370:4, 4389:19, 4427:1, 4429:14
**specified** [1] - 4286:10
**speech** [1] - 4294:25
**spend** [2] - 4296:20, 4299:3
**spending** [1] - 4400:1
**spent** [4] - 4244:6, 4284:15, 4404:9, 4408:23
**sphere** [1] - 4340:13
**spheres** [2] - 4340:16, 4341:3
**spoken** [7] - 4263:20, 4271:23, 4272:9, 4298:20, 4386:14, 4403:13, 4429:3
**sports** [3] - 4243:24, 4244:13, 4253:23, 4254:1,

4254:4, 4254:5, 4256:6, 4297:7
**spreadsheet** [6] - 4351:20, 4395:13, 4396:22, 4397:6, 4401:23, 4402:14
**spreadsheets** [4] - 4371:3, 4371:15, 4373:6, 4373:14
**spring** [1] - 4378:8
**spur** [1] - 4413:9
**Square** [1] - 4238:21
**square** [1] - 4298:3
**stability** [1] - 4355:10
**stable** [1] - 4269:23
**stake** [1] - 4262:13
**stamp** [1] - 4422:8
**stamps** [1] - 4244:20
**stand** [13] - 4240:7, 4248:17, 4251:13, 4340:6, 4340:7, 4380:13, 4385:4, 4403:12, 4408:10, 4408:21, 4409:2, 4412:14, 4412:20
**standard** [2] - 4280:10, 4327:19
**Standard** [3] - 4257:3, 4257:11, 4258:2
**standpoint** [1] - 4253:8
**start** [1] - 4404:14
**started** [3] - 4253:23, 4253:25, 4276:16, 4391:20
**starting** [4] - 4285:1, 4296:6, 4356:6, 4399:1
**State** [1] - 4258:5
**state** [9] - 4296:16, 4305:6, 4308:21, 4355:6, 4370:22, 4370:24, 4372:9, 4376:7, 4397:8
**statement** [8] - 4247:20, 4247:24, 4248:12, 4249:9, 4257:5, 4260:16, 4277:1, 4417:8
**statements** [4] - 4248:3, 4326:8, 4327:12, 4395:8
**STATES** [3] - 4238:1, 4238:3, 4238:11
**States** [5] - 4238:6, 4238:14, 4238:17, 4335:22, 4398:7
**status** [5] - 4245:19, 4346:10, 4367:12, 4374:8, 4403:1
**stay** [4] - 4260:4, 4313:16, 4313:20, 4403:23
**stayed** [2] - 4315:24, 4374:9
**staying** [2] - 4271:7, 4342:23
**Steiger** [1] - 4239:20
**stenography** [1] - 4239:25
**step** [1] - 4252:7

29

steps [1] - 4406:9
**Steve** [1] - 4254:25
**still** [12] - 4240:17,
4258:17, 4285:1, 4315:21,
4334:4, 4334:6, 4359:14,
4375:6, 4382:10, 4401:10,
4412:16, 4422:25
**stipulated** [2] - 4321:17,
4321:20
**stipulates** [1] - 4292:9
**stipulation** [1] - 4324:15
**stock** [34] - 4266:12,
4266:13, 4266:14, 4267:6,
4269:21, 4270:23, 4274:7,
4343:24, 4344:4, 4344:23,
4345:3, 4345:17, 4346:14,
4346:17, 4350:11,
4350:24, 4351:3, 4351:11,
4353:23, 4355:2, 4355:4,
4356:12, 4356:15,
4356:23, 4356:25, 4357:9,
4357:13, 4359:7, 4359:13,
4359:15, 4360:6, 4360:20
**stocks** [6] - 4266:3,
4266:16, 4266:22, 4269:7,
4269:8, 4270:21
**Stolper** [22] - 4365:13,
4365:14, 4365:23, 4366:3,
4366:13, 4366:20,
4367:10, 4368:6, 4368:11,
4369:8, 4369:12, 4369:19,
4369:21, 4370:14,
4373:21, 4374:4, 4376:24,
4400:2, 4427:2, 4427:3,
4427:4, 4427:7
**Stolper's** [3] - 4368:18,
4369:16, 4371:7
**stop** [3] - 4311:21, 4312:8,
4387:18
**stopped** [1] - 4374:9
**store** [2] - 4397:15,
4429:21
**Strangford** [1] - 4239:7
**strategies** [1] - 4348:2
**string** [1] - 4367:10
**struck** [1] - 4307:24
**structure** [2] - 4279:5,
4343:3
**subdivided** [1] - 4314:13
**subject** [2] - 4300:8,
4337:2
**subjected** [1] - 4263:3
**submitted** [1] - 4395:20
**subsection** [1] - 4319:16
**subsequent** [1] - 4245:23,
4262:12, 4264:5, 4272:7,
4273:17, 4279:2, 4296:22,
4301:3, 4308:2, 4350:23,
4351:10, 4353:22,
4361:17, 4365:23, 4374:3,

4426:9
**subsequently** [9] - 4242:4,
4288:8, 4290:5, 4307:9,
4324:9, 4329:8, 4346:23,
4350:20, 4388:22
**subset** [1] - 4338:14
**substance** [7] - 4246:22,
4255:17, 4261:20, 4265:1,
4358:15, 4361:14, 4418:25
**substantial** [1] - 4325:14
**substantiation** [1] - 4372:8
**substitute** [2] - 4342:10,
4362:1
**successful** [1] - 4269:3
**sue** [3] - 4278:22, 4285:7,
4285:11
**sufficient** [1] - 4407:3
**Suffolk** [1] - 4238:21
**Sugarcane** [1] - 4273:5
**sugarcane** [2] - 4262:10,
4272:12
**suggest** [1] - 4422:5
**suggested** [3] - 4265:15,
4341:14, 4429:11
**suggestion** [2] - 4265:13,
4341:16
**sum** [3] - 4255:17, 4285:5,
4361:13
**summary** [6] - 4273:24,
4274:20, 4322:10,
4329:13, 4346:9, 4394:18
**summation** [1] - 4383:6
**summations** [1] - 4407:19
**summer** [8] - 4287:24,
4288:12, 4307:16,
4308:11, 4309:4, 4318:3,
4328:25, 4399:1
**superseding** [1] - 4258:24
**surety** [1] - 4315:22
**surprise** [1] - 4307:23
**surrounding** [1] - 4402:11
**surveyors** [1] - 4300:24
**sustained** [2] - 4345:23,
4348:18
**Sustained** [2] - 4298:16,
4313:15
**sworn** [2] - 4240:23,
4412:20
**Sydor** [10] - 4255:1,
4256:14, 4271:24, 4319:6,
4322:15, 4342:11, 4343:1,
4346:1, 4348:23, 4376:17
**Sydor's** [1] - 4388:20

---

## T

**table** [2] - 4319:15,
4356:10
**takeover** [2] - 4368:7,

4368:13
**tape** [29] - 4380:21,
4380:25, 4381:1, 4383:22,
4384:2, 4409:25, 4410:3,
4410:9, 4410:15, 4410:19,
4411:15, 4411:16,
4411:17, 4411:19,
4411:22, 4412:5, 4413:2,
4413:5, 4414:11, 4414:14,
4415:4, 4415:13, 4420:3,
4422:4, 4422:14, 4424:6,
4428:16, 4428:17, 4429:19
**tape-recording** [3] -
4380:21, 4380:25, 4381:1
**tax** [4] - 4243:23, 4243:25,
4244:14, 4326:21
**teacher** [1] - 4406:16
**team** [2] - 4368:18,
4368:21
**teams** [1] - 4393:8
**telephone** [2] - 4387:4,
4388:12
**telephonic** [1] - 4375:16
**ten** [4] - 4312:1, 4319:4,
4374:23, 4374:24
**tens** [1] - 4378:3
**term** [12] - 4268:23,
4273:22, 4287:18, 4289:8,
4316:1, 4320:8, 4333:23,
4335:1, 4342:19, 4363:21,
4363:24, 4364:2
**terminated** [7] - 4284:19,
4327:18, 4373:16, 4378:2,
4399:3, 4399:24, 4410:7
**termination** [1] - 4327:22,
4359:24, 4373:17
**terms** [23] - 4256:16,
4268:19, 4270:17,
4280:12, 4284:16, 4289:8,
4294:19, 4299:21,
4300:11, 4302:8, 4309:5,
4311:10, 4315:10, 4345:6,
4345:9, 4346:5, 4356:1,
4358:10, 4359:19, 4382:8,
4392:21, 4403:12, 4406:21
**testified** [19] - 4240:23,
4246:15, 4253:3, 4285:20,
4286:5, 4286:16, 4333:9,
4349:11, 4353:14,
4353:24, 4383:13,
4385:12, 4387:22, 4388:9,
4396:3, 4396:6, 4397:14,
4412:21, 4414:9
**testify** [4] - 4311:12,
4349:24, 4381:2, 4430:24
**testifying** [1] - 4338:21
**testimony** [46] - 4241:7,
4246:17, 4247:4, 4259:4,
4259:10, 4260:5, 4261:7,
4261:10, 4265:25, 4266:4,

4266:6, 4268:17, 4281:23,
4282:10, 4292:16, 4303:7,
4304:1, 4305:14, 4307:10,
4321:13, 4329:10,
4334:21, 4334:23, 4335:7,
4335:13, 4336:6, 4338:16,
4339:3, 4340:22, 4341:13,
4365:18, 4380:18, 4383:3,
4389:5, 4389:21, 4390:1,
4394:12, 4394:17,
4396:15, 4402:23, 4412:9,
4423:7, 4423:17, 4427:15,
4427:19, 4428:1
**Texas** [1] - 4388:21
**text** [15] - 4241:19,
4241:22, 4241:25, 4242:6,
4242:17, 4243:11,
4243:12, 4245:4, 4245:15,
4351:13, 4352:1, 4379:13,
4379:20, 4393:16
**texting** [1] - 4379:22
**THE** [141] - 4238:11,
4240:1, 4240:2, 4240:4,
4240:6, 4240:8, 4240:10,
4240:13, 4240:19, 4241:1,
4242:13, 4251:16, 4252:8,
4252:14, 4292:12,
4292:14, 4292:21,
4292:25, 4293:2, 4294:2,
4294:3, 4294:5, 4298:16,
4313:15, 4313:24,
4317:16, 4317:17,
4321:25, 4323:4, 4324:22,
4332:2, 4332:7, 4332:23,
4336:11, 4336:12, 4337:8,
4337:10, 4337:12,
4339:12, 4340:3, 4340:4,
4340:8, 4340:18, 4340:25,
4341:5, 4341:7, 4345:23,
4347:17, 4348:18,
4349:24, 4352:23,
4370:21, 4371:19,
4372:13, 4373:2, 4373:4,
4380:4, 4380:7, 4380:11,
4381:11, 4381:13,
4381:18, 4381:24, 4382:1,
4382:5, 4382:8, 4382:16,
4382:20, 4383:8, 4384:9,
4385:2, 4385:6, 4403:3,
4403:8, 4403:12, 4404:7,
4404:14, 4404:17,
4404:22, 4404:25, 4405:8,
4405:14, 4405:19,
4405:21, 4405:24, 4406:8,
4406:10, 4406:13,
4407:14, 4407:24,
4408:17, 4408:19,
4409:14, 4409:18,
4409:20, 4410:24, 4411:8,
4411:18, 4412:11,
4412:14, 4412:18,

30

4412:22, 4413:2, 4413:4,
4413:20, 4413:21,
4413:24, 4414:1, 4414:3,
4414:6, 4418:8, 4418:15,
4418:18, 4418:19,
4418:20, 4419:17,
4420:11, 4420:18,
4420:19, 4420:20, 4421:4,
4421:7, 4421:8, 4421:9,
4421:21, 4421:23, 4422:1,
4423:20, 4423:25, 4424:1,
4429:2, 4429:5, 4429:18,
4429:25, 4430:3, 4430:11,
4430:13, 4431:2, 4431:6,
4431:10, 4431:14
**themselves** [2] - 4302:9,
4315:1
**Theodore** [1] - 4376:25
**thereafter** [6] - 4305:6,
4333:17, 4348:13,
4391:12, 4392:6, 4413:10
**thick** [1] - 4375:25
**thinking** [2] - 4274:10,
4340:11
**thousand** [2] - 4290:11,
4290:20
**three** [10] - 4241:23,
4251:5, 4267:17, 4267:24,
4310:15, 4352:25,
4365:24, 4389:9, 4407:1,
4426:3
**throughout** [4] - 4252:5,
4327:2, 4341:13, 4392:19
**Thursday** [1] - 4407:19
**tickets** [2] - 4405:11,
4407:7
**tied** [1] - 4244:4
**tight** [1] - 4399:14
**Tim** [3] - 4365:15, 4365:19,
4365:21
**time-to-time** [2] - 4363:19,
4363:21
**timeline** [2] - 4273:21,
4301:21
**timing** [1] - 4340:13
**Timothy** [2] - 4353:23,
4353:25
**title** [2] - 4264:24, 4278:16
**titled** [1] - 4319:10
**today** [18] - 4279:15,
4333:24, 4334:5, 4334:10,
4334:15, 4334:20, 4339:8,
4340:8, 4344:9, 4352:18,
4370:16, 4371:2, 4380:13,
4408:7, 4411:19, 4420:12,
4420:14, 4428:6
**together** [11] - 4264:10,
4269:20, 4276:17,
4305:10, 4324:2, 4329:17,
4369:3, 4387:10, 4395:12,

4414:24, 4425:17
**Tommy** [14] - 4301:25,
4304:6, 4304:13, 4306:3,
4306:5, 4306:24, 4315:10,
4348:24, 4352:11, 4376:9,
4385:11, 4394:15,
4397:18, 4402:20
**TOMMY** [1] - 4238:7
**took** [17] - 4261:12,
4262:25, 4297:19, 4305:8,
4306:11, 4309:8, 4327:21,
4333:20, 4349:12,
4357:22, 4371:20, 4389:5,
4394:5, 4407:14, 4407:15,
4420:16, 4426:1
**topic** [2] - 4292:21, 4403:4
**topics** [1] - 4386:17
**Toronto** [2] - 4243:18,
4389:1
**total** [5] - 4250:3, 4250:8,
4250:9, 4267:20, 4285:5
**tougher** [1] - 4355:9
**tour** [1] - 4297:19
**toward** [1] - 4281:3
**towards** [2] - 4354:18,
4360:1
**town** [1] - 4273:1
**traceable** [1] - 4323:16
**track** [2] - 4298:4, 4298:5
**tracking** [4] - 4356:11,
4356:19, 4357:4, 4357:21
**tracks** [1] - 4298:6
**trade** [4] - 4343:20,
4346:18, 4361:4
**traded** [3] - 4343:11,
4344:9, 4353:5
**trading** [1] - 4344:24
**traditional** [1] - 4308:15
**transaction** [18] - 4246:19,
4246:22, 4249:3, 4287:11,
4294:20, 4319:9, 4344:18,
4344:24, 4345:3, 4345:16,
4350:6, 4350:11, 4351:1,
4351:2, 4351:7, 4351:18,
4351:23, 4361:13
**transactions** [19] -
4264:22, 4319:20,
4323:20, 4324:11,
4324:14, 4350:22, 4352:5,
4352:14, 4353:1, 4357:1,
4357:3, 4357:13, 4357:14,
4357:15, 4357:22,
4358:17, 4363:16, 4367:4,
4367:5
**transcript** [2] - 4239:25,
4411:8
**TRANSCRIPT** [1] - 4238:10
**transfer** [15] - 4243:8,
4248:20, 4249:11,
4310:12, 4321:3, 4326:17,

4329:25, 4338:4, 4350:7,
4350:11, 4383:18, 4392:1,
4399:6, 4399:15
**transferred** [9] - 4248:24,
4249:20, 4264:19,
4264:24, 4310:21,
4326:11, 4326:23,
4328:24, 4351:22
**transferring** [2] - 4272:4,
4272:6
**transfers** [7] - 4307:2,
4334:17, 4350:21,
4357:24, 4358:3, 4360:15,
4361:17
**transformed** [1] - 4348:13
**transmitted** [1] - 4331:11
**transpired** [6] - 4273:25,
4274:20, 4280:18,
4294:19, 4393:21, 4401:1
**travel** [3] - 4281:15,
4327:4, 4395:2
**traveled** [4] - 4291:10,
4328:22, 4394:20, 4395:4
**traveling** [4] - 4271:17,
4349:8, 4393:6, 4393:12,
4395:5, 4413:19
**trial** [7] - 4251:13, 4286:5,
4353:24, 4370:7, 4390:12,
4397:9, 4431:16
**tried** [2] - 4382:24, 4398:5
**trip** [2] - 4263:20, 4272:19,
4405:2
**trips** [2] - 4305:7, 4306:13
**troubling** [1] - 4355:12
**true** [37] - 4251:13,
4253:18, 4255:17,
4258:22, 4259:2, 4260:1,
4260:2, 4260:16, 4260:17,
4260:22, 4266:6, 4268:21,
4273:22, 4282:3, 4289:21,
4294:14, 4307:7, 4320:22,
4323:21, 4334:7, 4335:16,
4339:3, 4339:6, 4340:20,
4357:11, 4363:10, 4368:8,
4370:23, 4373:23, 4381:3,
4386:8, 4391:22, 4396:1,
4396:25, 4401:3, 4422:10
**truncate** [1] - 4383:6
**trust** [1] - 4392:2
**Trust** [27] - 4242:23,
4243:2, 4244:5, 4245:8,
4245:9, 4245:18, 4246:1,
4246:12, 4247:8, 4247:21,
4249:2, 4249:8, 4249:11,
4249:22, 4250:1, 4264:8,
4264:20, 4264:23,
4265:14, 4265:16,
4265:20, 4276:12,
4280:23, 4325:8, 4326:17,
4328:14, 4330:16

**Trust's** [1] - 4265:23
**truth** [1] - 4370:23
**try** [7] - 4285:12, 4384:9,
4403:24, 4404:10, 4408:5,
4414:16, 4425:12
**trying** [11] - 4295:1,
4340:22, 4366:23,
4367:23, 4368:18,
4369:22, 4405:1, 4407:12,
4425:7, 4425:11, 4425:15
**Tuesday** [10] - 4381:20,
4381:22, 4382:21,
4403:17, 4407:6, 4407:15,
4408:10, 4408:20, 4409:2,
4409:10
**tune** [1] - 4395:22
**turn** [2] - 4346:22, 4417:1
**turned** [2] - 4242:3, 4242:4
**Twain** [1] - 4303:25
**two** [61] - 4241:12, 4242:2,
4244:7, 4244:20, 4250:3,
4250:19, 4251:5, 4253:13,
4259:19, 4260:25,
4263:22, 4273:10,
4282:25, 4288:24, 4295:8,
4295:11, 4297:20, 4302:8,
4302:18, 4304:24,
4310:15, 4314:7, 4328:12,
4332:17, 4336:16,
4340:13, 4350:22,
4350:25, 4352:5, 4352:14,
4352:25, 4356:14,
4356:15, 4356:24,
4357:21, 4360:20,
4360:25, 4363:13, 4379:4,
4382:11, 4382:14, 4384:6,
4385:13, 4389:8, 4395:6,
4395:17, 4397:22,
4399:18, 4400:7, 4401:20,
4403:20, 4403:21, 4407:1,
4409:25, 4410:8, 4410:12,
4411:3, 4419:2, 4428:18
**type** [3] - 4266:10,
4266:22, 4408:25
**types** [1] - 4267:4
**typical** [1] - 4244:12
**typically** [6] - 4343:22,
4344:1, 4344:15, 4344:19,
4344:22, 4391:24
**Tyson** [5] - 4255:1, 4351:9,
4390:17, 4390:19, 4397:14

## U

**U.S** [3] - 4242:3, 4324:7,
4378:15
**U.S.A** [1] - 4333:21
**Ula** [5] - 4260:13, 4260:14,
4290:5, 4307:2, 4326:8,

4327:2, 4328:24, 4329:1
**ultimately** [13] - 4268:9,
4271:25, 4276:1, 4285:21,
4296:6, 4296:18, 4315:3,
4318:21, 4371:9, 4373:22,
4386:11, 4395:21, 4399:12
**unable** [1] - 4262:9
**unauthorized** [1] - 4362:5
**uncertainty** [1] - 4407:10
**uncomfortable** [1] - 4274:9
**under** [27] - 4240:18,
4248:18, 4249:18,
4256:21, 4258:2, 4262:4,
4265:17, 4266:19,
4267:18, 4273:5, 4278:12,
4279:22, 4287:21,
4291:13, 4295:19,
4303:12, 4308:22, 4309:2,
4319:14, 4319:15,
4325:11, 4325:24,
4332:14, 4342:4, 4366:8,
4412:16, 4423:7
**underlying** [10] - 4249:12,
4265:23, 4267:16, 4268:1,
4271:3, 4277:7, 4282:24,
4327:12, 4327:14, 4327:16
**understood** [6] - 4256:2,
4281:5, 4282:22, 4301:17,
4379:22, 4400:21
**uneasy** [1] - 4423:1
**unedited** [1] - 4412:6
**unintentionally** [1] -
4252:13
**unique** [1] - 4348:3
**UNITED** [3] - 4238:1,
4238:3, 4238:11
**United** [5] - 4238:6,
4238:14, 4238:17,
4335:22, 4398:7
**units** [1] - 4400:7
**unlawful** [1] - 4377:17
**unlawfully** [2] - 4362:4,
4377:16
**unless** [4] - 4299:16,
4329:18, 4344:3, 4406:3
**unnatural** [1] - 4429:22
**unnecessary** [1] - 4303:9
**unpaid** [2] - 4334:9,
4334:10
**unrelated** [2] - 4319:20,
4348:20
**unusual** [2] - 4275:4,
4276:15
**up** [49] - 4240:6, 4243:2,
4243:23, 4244:4, 4245:7,
4250:24, 4251:8, 4251:17,
4259:22, 4262:9, 4264:14,
4265:8, 4266:13, 4268:3,
4272:6, 4276:18, 4276:23,
4279:3, 4280:5, 4282:1,

4283:2, 4283:7, 4285:1,
4305:4, 4313:1, 4315:14,
4321:14, 4323:5, 4329:19,
4341:11, 4342:18,
4344:22, 4356:24,
4368:18, 4369:20,
4376:19, 4379:21, 4381:7,
4382:18, 4393:18,
4401:17, 4402:11, 4407:6,
4410:18, 4411:9, 4413:3,
4414:3, 4428:25, 4430:18
**updated** [1] - 4367:10
**updates** [4] - 4394:9,
4402:25
**upset** [1] - 4309:11
**upside** [1] - 4278:25
**Urban** [23] - 4296:19,
4307:10, 4307:14,
4311:12, 4311:25,
4312:15, 4313:22,
4313:25, 4314:5, 4314:15,
4314:24, 4315:2, 4315:5,
4315:11, 4315:20, 4317:9,
4317:19, 4317:21,
4317:23, 4318:6, 4318:24,
4319:22, 4341:15
**urgency** [2] - 4311:15,
4311:21
**useless** [1] - 4429:19
**uses** [1] - 4429:8
**utilization** [2] - 4283:3,
4391:16
**utilize** [3] - 4285:10,
4286:25, 4288:21
**utilized** [7] - 4245:24,
4246:24, 4265:23,
4282:11, 4286:19,
4289:19, 4324:3

## V

**vacation** [4] - 4340:12,
4404:18, 4406:21, 4407:13
**vacations** [1] - 4256:13
**valuable** [1] - 4311:5
**valuation** [1] - 4353:1
**value** [11] - 4248:23,
4267:10, 4268:1, 4270:16,
4271:3, 4271:4, 4334:13,
4336:7, 4353:4, 4354:25
**valued** [1] - 4352:25
**values** [2] - 4267:21,
4268:2
**various** [11] - 4255:13,
4255:14, 4277:2, 4280:3,
4280:16, 4285:11, 4315:4,
4350:17, 4362:18,
4367:10, 4388:17
**veil** [1] - 4278:21

**venture** [5] - 4270:6,
4278:11, 4318:1, 4318:4,
4319:10
**Venture** [1] - 4319:11
**ventures** [1] - 4363:18
**Ventures** [7] - 4260:11,
4260:12, 4278:7, 4278:10,
4334:4, 4337:21
**verbal** [1] - 4331:11
**verbally** [1] - 4331:16
**verification** [1] - 4371:12
**version** [5] - 4252:7,
4252:12, 4343:19,
4413:25, 4414:22
**versus** [4] - 4267:13,
4354:21, 4376:9, 4377:1
**vertical** [5] - 4262:15,
4295:24, 4296:5, 4307:17,
4336:17
**Veterans** [1] - 4238:21
**VI** [2] - 4260:12, 4260:13
**via** [2] - 4243:5, 4245:9
**viability** [1] - 4335:20
**victims** [3] - 4286:1,
4332:5, 4334:2
**view** [6] - 4263:3, 4372:8,
4397:18, 4402:20, 4406:1,
4430:20
**viewed** [1] - 4263:12
**viewing** [1] - 4261:24
**views** [1] - 4308:18
**VII** [1] - 4319:16
**virtually** [1] - 4313:5
**virtue** [1] - 4323:6
**vis-à-vis** [1] - 4401:1
**visit** [2] - 4273:3, 4305:5
**visiting** [1] - 4387:13
**voice** [1] - 4417:11
**volatile** [1] - 4266:17
**volume** [2] - 4319:10,
4319:13
**volunteered** [1] - 4407:25

## W

**Waikapuna** [14] - 4272:22,
4273:8, 4279:20, 4287:6,
4308:12, 4308:13,
4308:20, 4308:24, 4309:1,
4309:21, 4309:23, 4310:1,
4310:7, 4314:9
**wait** [1] - 4408:20
**waiting** [3] - 4379:14,
4401:22
**walked** [1] - 4329:8
**walking** [1] - 4387:16
**wall** [1] - 4298:1
**wander** [1] - 4422:23
**wants** [1] - 4430:2

**Warden** [2] - 4320:10,
4332:17
**warden** [1] - 4332:21
**warranties** [1] - 4317:22
**warranty** [3] - 4317:20,
4318:1, 4319:14
**Washington** [3] - 4361:5,
4378:9, 4385:12
**ways** [2] - 4288:24, 4369:4
**wealth** [2] - 4297:16,
4314:11
**Wednesday** [4] - 4404:12,
4407:6, 4407:19, 4408:23
**week** [21] - 4309:22,
4310:8, 4310:13, 4310:24,
4311:2, 4311:9, 4340:11,
4382:2, 4382:9, 4382:11,
4382:19, 4382:21,
4403:19, 4403:22,
4403:23, 4405:18,
4405:19, 4406:22,
4407:14, 4407:15, 4408:8
**weekend** [4] - 4383:4,
4404:4, 4409:15, 4431:15
**weekly** [5] - 4274:24,
4310:10, 4310:20,
4311:22, 4312:8
**weeks** [4] - 4310:20,
4395:3, 4403:21
**WEINBLATT** [1] - 4238:20
**welcome** [2] - 4240:13,
4409:18
**welfare** [1] - 4277:21
**well-deserved** [1] -
4380:16
**west** [1] - 4336:14
**whereas** [1] - 4314:9
**wherein** [4] - 4320:17,
4360:15, 4367:10, 4385:24
**white** [1] - 4272:24
**whole** [1] - 4386:23
**wholly** [1] - 4368:8
**wife** [4] - 4315:17, 4316:2,
4318:22, 4391:25
**wife's** [1] - 4318:24
**William** [1] - 4254:25
**willing** [4] - 4355:4,
4405:7, 4405:12, 4409:7
**willingness** [1] - 4409:10
**windfall** [1] - 4355:21
**Windwalker** [8] - 4245:22,
4271:6, 4278:12, 4314:5,
4314:24, 4319:12,
4319:18, 4332:18
**wire** [7] - 4310:12,
4310:21, 4338:4, 4350:7,
4392:1, 4399:6, 4399:14
**wired** [1] - 4351:4
**wiring** [1] - 4352:4
**withdraw** [4] - 4311:18,

4330:4, 4372:12, 4373:2
**withdrawal** [1] - 4248:14
**withdrawals** [2] - 4361:2, 4361:6
**withdrawn** [5] - 4289:11, 4311:17, 4323:13, 4342:24, 4390:4
**withdrew** [3] - 4325:11, 4325:20, 4326:10
**withhold** [1] - 4397:2
**withstanding** [1] - 4320:12
**witness** [8] - 4240:7, 4240:22, 4268:18, 4340:7, 4372:6, 4384:8, 4412:14, 4430:24
**Witness** [1] - 4385:4
**WITNESS** [20] - 4240:19, 4313:24, 4317:17, 4323:4, 4332:23, 4336:12, 4337:10, 4337:12, 4412:18, 4413:4, 4413:21, 4414:1, 4418:18, 4418:20, 4420:18, 4420:20, 4421:8, 4421:21, 4422:1, 4423:25
**WITNESSES** [1] - 4432:1
**witnesses** [8] - 4254:23, 4338:16, 4338:18, 4338:21, 4382:3, 4382:11, 4390:12, 4397:8
**wives** [1] - 4389:14
**wonderful** [1] - 4311:6
**wondering** [1] - 4429:18
**word** [3] - 4311:15, 4333:10, 4380:3
**Worden** [2] - 4245:21, 4271:6
**words** [5] - 4246:25, 4422:17, 4424:13, 4424:14, 4429:9
**world** [6] - 4254:5, 4267:7, 4270:10, 4300:1, 4344:16, 4348:4
**worth** [3] - 4309:12, 4310:5, 4353:4
**wrangle** [1] - 4368:19
**wrap** [1] - 4243:2
**wrapping** [1] - 4243:23
**write** [1] - 4244:15
**write-off** [1] - 4244:15
**writing** [2] - 4291:6, 4361:12
**written** [2] - 4290:8, 4290:22
**wrote** [2] - 4292:7, 4402:19

## Y

**year** [18] - 4243:3, 4243:23, 4244:12, 4250:10, 4251:3,

4261:17, 4262:8, 4264:11, 4264:16, 4266:17, 4267:17, 4270:3, 4276:18, 4283:3, 4285:10, 4349:9, 4422:22
**years** [14] - 4244:7, 4250:23, 4254:2, 4267:24, 4272:15, 4279:24, 4332:17, 4334:19, 4336:19, 4348:9, 4379:4, 4409:4, 4418:5, 4426:4
**yesterday** [5] - 4240:14, 4241:6, 4245:22, 4261:7, 4406:24
**YORK** [1] - 4238:1
**York** [8] - 4238:6, 4238:15, 4239:21, 4365:14, 4365:22, 4374:6, 4377:2, 4388:20
**yourself** [8] - 4261:23, 4365:1, 4385:18, 4389:12, 4389:24, 4401:5, 4416:25, 4429:8

## Z

**zero** [2] - 4249:25, 4250:11
**zeroing** [1] - 4249:25
**zoom** [1] - 4337:8