829

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA        :      13-CR-607 (JFB)
4
      -against-                        U.S. Courthouse
5                                 :
                                       Central Islip, New York
6  PHILLIP A. KENNER
   a/k/a "Philip A. Kenner",
7         and                     :
   TOMMY C. CONSTANTINE
8  a/k/a "Tommy C. Hormovitis"

9               Defendants    :
                                       May 12, 2015
10 - - - - - - - - - - - - - - - X      9:30 a.m.

11
   BEFORE:
12          HONORABLE JOSEPH F. BIANCO
            United States District Judge
13          and a jury

14
   APPEARANCES:
15
   For the Government:      KELLY T. CURRIE
16                          Acting United States Attorney
                            Federal Plaza
17                          Central Islip, New York 11722
                            BY:  JAMES M. MISKIEWICZ
18                               SARITHA KOMATIREDDY
                                 Assistant U.S. Attorneys
19

20

21 For the Defendant:       HALEY, WEINBLATT & CALCAGNI LLP
   Phillip A. Kenner        One Suffolk Square
22                          1601 Veterans Memorial Highway
                            Suite 425
23                          Islandia, New York 11749
                            BY:  RICHARD HALEY
24

25

830

```
 1   For the Defendant:        LaRUSSO & CONWAY LLP
     Tommy C. Constantine      300 Old Coutry Road
 2                             Suite 341
                               Mineola, New York 11501
 3                             BY:  ROBERT P. LaRUSSO
                                         and
 4                                  ANDREW L. OLIVERAS
                                    26 Strangford Court
 5                                  Oceanside, New York 11572

 6

 7   Court Reporter:           RONALD E. TOLKIN, RPR, RMR, CRR
                               100 Federal Plaza
 8                             Central Islip, New York 11722
                               631-712-6105
 9                             ronald_tolkin@nyed.uscourts.gov

10                                  ***

11             THE CLERK:  All rise.

12             Calling case 13-CR-607, USA versus Kenner and

13   Constantine.

14             Counsel, please state your appearance for the

15   record.

16             MR. MISKIEWICZ:  Good morning, Your Honor.

17             James Miskiewicz for the government.

18             THE COURT:  Good morning.

19             MS. KOMATIREDDY:  Good morning, Your Honor.

20             Saritha Komatireddy for the United States.

21             THE COURT:  Good morning.

22             MR. LaRUSSO:  Thomas LaRusso for Mr. Constantine.

23   Mr. Constantine is present.

24             Good morning, Your Honor.

25             DEFENDANT CONSTANTINE:  Good morning, Your Honor.
```

1          THE COURT:  Good morning.

2          MR. HALEY:  Good morning, Your Honor.

3          Richard Haley for the defendant, Phil Kenner.

4          DEFENDANT KENNER:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          Okay.  We have all of the jurors here.  So we're

7   ready to go.

8          MR. HALEY:  Your Honor, a very minor issue, from my

9   perspective.  In a moment Aaron Mascarella will be called to

10  the witness stand to testify.  The government has a chart that

11  will presumably be used by Mr. Mascarella to identify various

12  corporate entities.  I have no objection to the chart itself.

13  I know and have every reason to believe that Mr. Mascarella's

14  going to be able to identify my client, Phil Kenner.

15         My objection, Judge, is to the photograph that's put

16  on the document, the exhibit itself.  I find it wholly

17  unnecessary in terms of there's no evidentiary issue that

18  relates to the identity of my client.  My request would be,

19  Judge, that I simply allow that photograph to be covered up on

20  the exhibit.  I have a piece of white paper here.  I don't

21  think it's necessary.  I think it involves some unnecessary

22  prejudice to my client when Mr. Mascarella should be able to

23  point to him and say that's Phil Kenner.

24         THE COURT:  I agree.

25         MS. KOMATIREDDY:  Your Honor, may I be heard?

1          THE COURT:  No.  There's no need for the photo on

2    there.  We know who Mr. Kenner is.  And for future exhibits, I

3    just want the government to know you don't need to add stuff

4    like that.  It's fine for a list of companies, but there's no

5    reason to stick Mr. Kenner's photo when we know who Mr. Kenner

6    is.  He's sitting right there.

7          MS. KOMATIREDDY:  Understood, Your Honor.  I need to

8    ask the Court's permission with respect to one thing.  We

9    showed this to Mr. Haley yesterday; he had no objection at

10   that time.  He didn't bring it up.  There have appeared other

11   graphics that have Mr. Kenner's face on them, and there is a

12   connection; does he still look like that?  The witness will

13   identify him.  There's already in evidence bank records

14   showing signature cards.  Every single one of those accounts

15   shows the signatory is Phil Kenner.

16         At this point, to raise the objection at this point,

17   it basically interrupts half of our presentation of

18   Mr. Mascarella.  I'll have to go back and redo all of those

19   exhibits.

20         THE COURT:  There are other exhibits that have that

21   same photo on it?

22         MS. KOMATIREDDY:  Yes, sir.  They're small.  They're

23   not blown up in that way, but they part of the electronic

24   summary.  And Mr. Kenner, that particular photo is a small

25   part of it.

1          MR. HALEY:  Your Honor, may I show you what my

2    suggestion would be?

3          THE COURT:  Sure.  You should have raised it

4    earlier.

5          MR. HALEY:  Well, Your Honor, yes, I guess in that

6    respect.  The exhibits yesterday, I was seated there.  The

7    prosecutor brought it up, put it here.  I didn't want it here

8    because it obstructs my view of the witness.  It was then

9    moved over here.  I did look at.  It was then turned and put

10   against the wall, Judge, the back of it.  I didn't look at it

11   thereafter.

12         THE COURT:  What's your suggestion?

13         MR. HALEY:  My suggestion is simply this, Judge.  So

14   simple.

15         THE COURT:  What about the other exhibits?

16         MR. HALEY:  Judge, I haven't even seen the other

17   exhibits.  When they speak in terms of other exhibits, I don't

18   know.  You mean the ones you presented to me this morning?

19         MS. KOMATIREDDY:  They were given to you this

20   morning.

21         MR. HALEY:  This morning, probably five minutes ago,

22   I was presented with -- you know, actually, I was presented

23   with these exhibits.

24         THE COURT:  Let me see those.

25         MR. HALEY:  And quite frankly, I may not have an

U.S.A. v. KENNER and CONSTANTINE                              834

1   objection to these.  It's the big photograph I objected to.

2              MS. KOMATIREDDY:  If Mr. Haley has no objection to

3   those, we have no objection to the covering.  I can't redo all

4   of those exhibits.

5              THE COURT:  I understand that.

6              MR. HALEY:  I just need a moment, Your Honor.

7              THE COURT:  Yes.

8              MR. HALEY:  I just want to make sure there are no

9   mug shots.  I don't have any objection to those exhibits.

10  Thank you.

11             THE COURT:  All right.  Let's bring in the jury.

12             Just so the record is clear, Mr. Haley covered up --

13  what exhibit number is that?

14             MS. KOMATIREDDY:  It's marked as Board 1.

15             THE COURT:  Board 1, the right-hand corner has been

16  covered up so Mr. Kenner's picture is not showing.

17             MR. HALEY:  Thank you, Your Honor.

18             MS. KOMATIREDDY:  I prepared a binder with exhibits

19  for Mr. Mascarella so I don't have to go back and forth.  If

20  there's no objection to that, they're already in evidence.

21             THE COURT:  That's fine.

22             THE CLERK:  All rise.

23             (Whereupon the jurors enter the courtroom.)

24             THE COURT:  Please be seated.

25             Good morning, members of the jury.

835

1          ALL JURORS:  Good morning.

2          THE COURT:  Michelle mentioned to me this morning

3     that you'd like to rearrange the table in the jury room to

4     create more space.  That's fine with me.  I know it's a little

5     tight back there with 17 people.  We will have maintenance

6     people rearrange it by tomorrow morning according to your

7     diagram.  As long as you don't put up wallpaper.

8          All right.  We'll start with where we left off

9     yesterday.  The government will call its next witness.

10          MS. KOMATIREDDY:  Thank you, Your Honor.

11          The government calls Aaron Mascarella.

12          THE COURT:  Mr. Mascarella, if you'll step up to the

13     witness stand, and remain standing for the oath once you get

14     there.

15          Please raise your right hand.

16          (Witness sworn.)

17          THE WITNESS:  Yes.

18          A A R O N   M A S C A R E L L A,

19          called as a witness, having been first

20          duly sworn, was examined and testified

21          as follows:

22          THE COURT:  Please be seated.  Please state your

23     name and spell it for the record.

24          THE WITNESS:  Aaron Mascarella.

25          A-A-R-O-N, M-A-S-C-A-R-E-L-L-A.

1          THE COURT:  Mr. Mascarella, I'm just going to ask

2    you to pull your chair a little closer to the microphone and

3    keep your voice up so everyone can hear you.  Okay.

4          THE WITNESS:  Yes, Judge.

5          THE COURT:  Go ahead.

6          MS. KOMATIREDDY:  I think the upper screen is on.

7          THE COURT:  I'm not sure we need this today.

8          MS. KOMATIREDDY:  That's fine.

9    DIRECT EXAMINATION

10   BY MS. KOMATIREDDY:

11   Q    Mr. Mascarella, good morning.

12   A    Good morning.

13   Q    Where do you live?

14   A    In Scottsdale, Arizona.

15   Q    What do you do living?

16   A    I am a lender for a bank.

17   Q    How long you been in the banking business?

18   A    Since I was 18 years old; for the last 27 years.

19   Q    Where did you start out?

20   A    I started out in a small community bank in the Western

21   suburbs of Chicago.

22   Q    What did you do next, then?

23   A    I move to Arizona to attend Arizona State University.

24   Taught tennis for a couple of years.  Decided it was too hot

25   to be outside and got back into banking.

1   Q    Where did you work in Arizona?

2   A    I worked -- I started out for a credit union in Arizona,

3   transitioned into a job with another small community bank in

4   Phoenix, Arizona, for a couple of years.  And then in 1994,

5   when I was 24 years old, I started working for Northern Trust.

6   Q    Which office of Northern Trust do you work in?

7   A    The Scottsdale office.

8   Q    How long have you worked for Northern Trust Bank?

9   A    My total career, 17 years.

10  Q    When did you start and when did you end?

11  A    I started in 1994 and I ended in 2011.

12  Q    Can you walk us through the different roles that you

13  played at Northern Trust Bank.

14  A    When I first started at Northern Trust, I started off as

15  an assistant banker.  I basically assisted the other ladies

16  who worked in the bank that operated as bankers.

17  Q    Were you part of a banking group?

18  A    The banking division, yes.

19  Q    What kind of things does the banking division do?

20  A    All the normal stuff that you see inside of a bank lobby.

21  I sat at a desk.  I did everything from opening accounts to

22  collecting deposits to just day-to-day maintenance,

23  transferring money between folks' accounts and doing wires and

24  things like that.

25  Q    Approximately what year were you in this banking

1    division?

2    A    I was in the banking division from 1994 to approximately

3    2005.

4    Q    What division did you go to after that?

5    A    I transitioned into the lending division of Northern

6    Trust.

7    Q    Can you describe, in general, your duties and

8    responsibility as part of the lending division?

9    A    Yes.  I started off for the first couple years as a

10   credit analyst.  I was responsible analyzing tax returns and

11   financial statements for borrowers in the bank.  After being a

12   credit analyst for a couple of years, I was promoted and

13   become a lending officer.

14   Q    Approximately what years were you in the lending

15   division?

16   A    Approximately 2007 to the end of my career, which ended

17   in 2011.

18   Q    As a lending officer, can you tell us what kinds of

19   accounts you handled, what kind of loans you handled?

20   A    Yes.  I did everything but residential mortgages.  I did

21   business lines of credit, I did commercial real estate loans.

22   That was, primarily, the majority of what I did.

23   Q    Did there come a time you met an individual named Phil

24   Kenner?

25   A    Yes.

1  Q      Approximately, when was that?

2  A      That was 2003.

3  Q      Can you look around the room, and do you recognize anyone

4  in the courtroom today as Mr. Kenner.

5  A      I do.  That's Mr. Kenner (indicating).

6           MS. KOMATIREDDY:  Would the record please reflect

7  the witness identified Defendant Kenner.

8           MR. HALEY:  It most certainly has, Judge.  Thank

9  you.

10          THE COURT:  Yes.

11  Q      How did you come to meet Mr. Kenner?

12  A      An existing client of mine at Northern Trust said he knew

13  this guy who had -- he was a financial advisor and knew and

14  worked with several professional athletes; mostly professional

15  hockey players.

16  Q      Did you, in fact, meet Mr. Kenner in person?

17  A      Yes.

18  Q      Can you describe the circumstances of your meeting?

19  A      Yes.  We had lunch.  And Phil came in, and I met -- or I

20  set up, coordinated a meeting between myself and a couple of

21  business people at Northern Trust to meet Phil.

22  Q      During that lunch, what did Mr. Kenner tell you about

23  himself?

24  A      He said that he had experience in the financial

25  management, investment management.  And he told us that he was

1   interested in developing a project in Hawaii and that he was

2   seeking financing.

3   Q    What did he tell you, if anything, about his clientele?

4   A    His clientele assisted, primarily, of professional hockey

5   players.

6   Q    Did he explain to you the relationship between him and

7   those professional hockey players?

8   A    Yes.  He said that he was their financial agent.

9   Q    When you said "financial agent," did he -- financial

10  agent, in your view -- when you use that term, do you mean

11  that to also mean financial advisor?

12        MR. HALEY:  Objection.

13  A    Financial advisor is better.

14        MR. HALEY:  I withdraw the objection.

15  Q    Did he tell you anything about himself personally,

16  anything else that you can remember?

17  A    No.  That was pretty much it.

18  Q    Okay.  So you said Mr. Kenner told you he was looking for

19  financing.  What did he propose to you and the other members

20  of the bank at that lunch?

21  A    We definitely were interested in a speculative real

22  estate investment financing.  So Phil proposed that he move

23  over several of his clients' investment accounts to Northern

24  Trust and use them as collateral for a loan.

25  Q    And we're going to get to those loans in a minute.

1          You testified that at this time in your career in

2     the bank, you were in the banking division, correct?

3     A    I was the third man down on the totem pole.  I was a

4     banker in the bank, yes.

5     Q    Did Mr. Kenner set up any bank accounts at Northern

6     Trust?

7     A    Yes.

8     Q    What, if any, role did you play in setting up those

9     accounts?

10    A    I collected the information; the entity names, the tax ID

11    numbers, and identification for Phil Kenner to open those

12    accounts.

13    Q    Are you familiar with an account in the name of

14    Little Isle IV?

15    A    Yes.

16    Q    What, if anything, did Mr. Kenner tell you about the

17    account he was setting up in the name of Little Isle IV?

18    A    The main purpose of the account was for business

19    activities related to the project that he talked about in

20    Hawaii.

21    Q    I'm going to show you what's in evidence as 2081-A.

22    Please take a look at it on your screen.  To your right.

23    There you go.

24    A    This screen is off.

25    Q    Do you recognize this?

1   A    Yes.

2   Q    What is it?

3   A    It is an account opening signature card for Little Isle

4   IV Ventures.

5   Q    Who opened this account in the name of Little Isle IV

6   Ventures LLC?

7   A    Phil Kenner.

8   Q    Is that the name you see as the signatory there?

9   A    Yes.

10  Q    What is the significance of a signatory on an account?

11  A    It's the person who owns the account, that's authorized

12  to make withdrawals, transfer money, and those type of things.

13  Q    I'm going to turn your attention to what's in evidence as

14  2081-B.  Do you recognize this?

15  A    Yes.

16  Q    What is this?

17  A    It's also a signature card.  This one is for Little Isle

18  IV LLC.

19  Q    And just looking at the signature cards that you have in

20  front of now, 2081-B and the previous one, 2081-A, can you

21  tell us how the account numbers compare on those?

22  A    It's exactly the same account number.

23  Q    So what's going on?

24  A    There was a name change.  It appears -- well, it doesn't

25  appear.  He dropped the Ventures from the entity name.  It

1  went from being called Little Isle IV Ventures LLC to Little

2  Isle IV LLC.

3  Q    I'm going to turn your attention to 2081-C, also in

4  evidence.  Do you recognize this?

5  A    Yes.

6  Q    Did you have a chance to review the exhibit before you

7  came into court today?

8  A    Yes, I did.

9  Q    It's a multiple page exhibit, right?

10  A    Yes.

11  Q    Can you explain, first of all, who creates this document?

12  A    The bank.

13  Q    What's the purpose of this document?

14  A    To identify all the members of a particular entity for a

15  bank account.

16  Q    When you go through the document and you see there's

17  writing, where did the bank get the information that was

18  entered into this document?

19  A    The information is provided from -- normally it's

20  Articles of Organization.  When an owner of an account wants

21  to open an account, we have to provide certain documents that

22  outline who the owners and managers of the entity are.

23  Q    And who does -- in terms -- so just to be clear, it's

24  Mr. Kenner providing you with this information when he's

25  opening the account?

1   A    Yes.

2   Q    What does Mr. Kenner's put down as manager or member of

3   Little Isle IV LLC?

4   A    He is the sole member and manager of Little Isle IV.

5   Q    By virtue of this document, who is authorized to transfer

6   money into and out of the Little Isle IV account that was set

7   up at Northern Trust?

8   A    Phil Kenner.

9   Q    Is anyone else authorized to do that?

10  A    No.

11  Q    Are you familiar with an account in the name Big Isle IV

12  Ventures LLC?

13  A    Yes.

14  Q    I will turn your attention to 2086-A in evidence.  Is

15  this the signature card for Big Isle IV?

16  A    Yes.

17  Q    Who opened this account?

18  A    Phil Kenner.

19  Q    That's as signatory?

20  A    Yes.

21  Q    Turning your attention to what's in evidence as 2086-B.

22  Once again, we have banking authorization, correct?

23  A    Yes.

24  Q    This time for Big Isle IV?

25  A    Yes.

1    Q    Who is listed as the authorized member on this account?

2    A    Phil Kenner.

3    Q    Who had the authority to transfer money into and out of

4    Big Isle IV Ventures LLC, the bank account at Northern Trust

5    Bank?

6    A    Phil Kenner.

7    Q    Did anyone else have that authority?

8    A    No.

9    Q    I'm going to turn your attention to what's in evidence as

10   2087-A.  Are you familiar with a entity name Big Isle V

11   Ventures LLC?

12   A    Yes.

13   Q    Is this a signature card for Big Isle V Ventures LLC bank

14   account?

15   A    Yes.

16   Q    Who opened that account?

17   A    Phil Kenner.

18   Q    I'm going to turn your attention to what's in evidence as

19   2087-B.  What is this?

20   A    The bank authorization for that account.

21   Q    For Big Isle V Ventures LLC account?

22   A    Yes.

23   Q    And just looking at the information on these bank

24   authorizations, who was the authorized member of Big Isle V

25   Ventures LLC?

1    A     Phil Kenner.

2    Q     So who had the authority to transfer money into and out

3    of the bank account Big Isle V Ventures LLC bank account?

4    A     Phil Kenner.

5    Q     Anyone else?

6    A     No.

7    Q     I'm going to turn your attention to what's in evidence as

8    2088-A.  Are you familiar with Big Isle VI Ventures LLC?

9    A     Yes.

10   Q     Who opened -- is that another account at Northern Trust

11   Bank?

12   A     Yes.

13   Q     Who opened that account?

14   A     Phil Kenner.

15   Q     I'm going to turn your attention to 2088-B, which is in

16   evidence.  What's this?

17   A     That is, again, a banking authorization form for the

18   account Big Isle VI Ventures LLC.

19   Q     Going to the authorized members here, who are the

20   authorized members of the account Big Isle VI Ventures LLC at

21   Northern Trust Bank?

22   A     Phil Kenner.

23   Q     So who had the authority to transfer money into and out

24   of the bank account for Big Isle VI Ventures LLC bank account

25   at Northern Trust Bank?

1   A    Phil Kenner.

2   Q    Anyone else?

3   A    No.

4   Q    I'm going to turn your attention to what's in evidence as

5   2089-A.  Are you familiar with an account in the name of Kau

6   Holding Company LLC?

7   A    Yes.

8   Q    Who opened that account?

9   A    Phil Kenner.

10  Q    Turning your attention to 2089-B in evidence.  What is

11  this?

12  A    The banking authorization for that LLC.

13  Q    Kau Holding Company?

14  A    Yes.

15  Q    Turning to the last page, who was the authorized member

16  for bank account Kau Holding Company LLC at Northern Trust

17  Bank?

18  A    Phil Kenner.

19  Q    Who had the authority to transfer money into and out of

20  the bank account for Kau Holding Company LLC at Northern Trust

21  Bank?

22  A    Phil Kenner.

23  Q    Anyone else?

24  A    No.

25  Q    I'm going to turn your attention to what's in evidence as

1  2082-A.  Are you familiar with an account in the name of Ula

2  Makika?

3  A     Yes.

4  Q     Who opened that account?

5  A     Phil Kenner.

6  Q     Turning your attention to Government's Exhibit 2082-B in

7  evidence.  What is this?

8  A     The banking authorization form for Ula Makika.

9  Q     And turning to the last page of the banking authorization

10  form, who was the authorized member for the bank account in

11  the name of Ula Makika LLC in Northern Trust Bank?

12  A     Phil Kenner.

13  Q     Who had the authority to transfer money into and out of

14  the bank account for Ula Makika LLC in Northern Trust Bank?

15  A     Phil Kenner.

16  Q     Anyone else?

17  A     No.

18  Q     Finally, I'm going to turn your attention to Government

19  Exhibit 2083-A.  Are you familiar with a bank account in the

20  name of Na'alehu Ventures 2006 LLC?

21  A     Yes.

22  Q     Who opened that account?

23  A     Phil Kenner.

24  Q     Turning your attention to Government Exhibit 2083-B, what

25  is this?

1   A    The banking authorization form for that same entity.

2   Q    And going to the last page of the banking authorization

3   form, who is the authorized member?

4   A    Phil Kenner.

5   Q    Who had the authority to transfer money into and out of

6   Na'alehu Ventures 2006 LLC at Northern Trust Bank?

7   A    Phil Kenner.

8   Q    Anyone else?

9   A    No.

10  Q    Now, for each of the accounts we just went over -- first,

11  can you turn to your right.  Do you see that board?

12  A    Yes.

13  Q    It's identified as Government Exhibit Board 1.  Under the

14  bold heading The Hawaii Entities, that's a fair and accurate

15  list of all of the accounts that we just reviewed?

16  A    Yes, it is.

17  Q    For each of those accounts listed as under The Hawaii

18  Entities on Board 1, who opened those accounts?

19  A    Phil Kenner.

20  Q    Who directed every transfer of money into and out of

21  those accounts?

22  A    Phil Kenner.

23  Q    Anyone else?

24  A    No.

25  Q    Now, Mr. Mascarella, you testified that at a certain

1  point in your career you went over to the lending division of

2  the bank, right?

3  A    Yes.

4  Q    Did there come a time when you came to manage loans that

5  Mr. Kenner has set up at the bank?

6  A    Yes.

7  Q    Can you first describe for us what was the nature of the

8  loans?

9  A    The loans were lines of credit.

10  Q    What is a line of credit?

11  A    A line of credit is a particular type of loan.  It's

12  structured very similar to a credit card, in that it's got a

13  credit limit.  The line of credit itself is meant to fluctuate

14  up and down.  You can draw it up, you can pay it down just

15  like a credit card.

16  Q    At Northern Trust Bank when you were managing lines of

17  credit, were you managing lines of credit that Mr. Kenner had

18  set up?

19  A    Yes.

20  Q    Can you explain to us how those specific lines of credit

21  worked?

22  A    Those lines of credit were -- unlike a credit card that

23  is unsecured, these lines of credit were collateralized or

24  secured by individual investment accounts.

25  Q    These individual investment accounts, what kind of things

1  were in those individual investment accounts?

2  A    They were conservatively invested stocks -- I'm sorry --

3  not stocks, bond and cash.

4  Q    Conservatively invested bonds and cash.

5         MR. HALEY:  Judge, is that a question or is she

6  simply repeating the witness' answer.

7         THE COURT:  You got the answer.  Ask the next

8  question.

9  Q    Why did the bank take those conservatively invested bonds

10 ad cash as collateral for the line of credit?

11 A    Because the Northern Trust wasn't going to finance or

12 provide a loan to Phil Kenner without collateral.

13 Q    So what was the purpose of that collateral, as far as the

14 bank was concerned?

15 A    The -- I'm sorry.  What was the question again.

16 Q    What's the purpose -- when you're setting up a line of

17 credit, what's the purpose of that collateral?

18 A    It was to secure the line of credit.

19 Q    Now, when you draw on a line of credit, what does that

20 mean in simple terms?  What happens?

21 A    The loan amount increases.

22 Q    What payments are due when you draw on a line of credit?

23 A    Interest only payments are due monthly.

24 Q    What happens if you don't pay interest?

25 A    You get a late notice.

1   Q     Are there fees associated with that?

2   A     Yes.

3   Q     What happens if you continued not to pay the interest?

4   A     The bank sends out a Notice of Default.

5   Q     What happens after that?

6   A     If the Notice of Default is not cured or if there isn't a

7   payment made, the line of credit go into an Event of Default.

8   Q     What happens after that?

9   A     The collateral used to secure the line of credit is

10  liquidated or sold and used to pay off the loan.

11  Q     What does it mean in simple terms if you say the

12  collateral is liquidated?

13  A     The investment accounts -- the bonds held within the

14  investment account would have been sold to generate cash.  And

15  once that cash is generated, it is transferred from the

16  investment division of the bank to pay down or pay off the

17  loan.

18  Q     So it goes from the players' accounts to the bank?

19  A     Yes.

20  Q     How many lines of credit did Northern Trust set up at

21  Mr. Kenner's request?

22  A     Eight or nine.

23  Q     I'm going to turn your attention to the binder in front

24  of you.  Take a look at the section labeled Transaction

25  History.  It includes Government Exhibit 2158, 2001, and 2133

1   to 2139, all in evidence.  Would you take a moment to look

2   through them?

3   A    What were the numbers again?

4   Q    There's a tab that says "Transaction History."

5   A    I got it.  Yes.

6   Q    Now, what are these transaction history?  Can you explain

7   to us the document.  I'm going to put 2001 on the screen for

8   reference.

9   A    It's a transaction history for a specific line of credit.

10  In this case, it's for Michael Peca.  It shows, literally,

11  each one of the transactions in detail since the line of

12  credit was first opened.  It shows no increases, which are

13  loan advances.  And it also documents each one of the payments

14  that were made.

15  Q    Before we go into detail on the transaction history, I

16  want you to just flip through the exhibits that are there.

17  And tell us the name of each line of credit that Mr. Kenner

18  set up at Northern Trust Bank?

19  A    Okay.  Michael Peca.  Owen Nolan.  Bryan Berard.  Darryl

20  Sydor.  Steven Rucchin.  Glenn Murray.  Mattias Norstrom.

21  Sergei Gonchar.

22  Q    Did he also set up a corporate line of credit?

23  A    Yes.

24  Q    What was the name of that line of credit?

25  A    The initial line of credit that the bank provided was in

1    the name of Little Isle IV.

2    Q    You talked about lines of credit being secured by

3    investment management accounts.  Whose investment management

4    accounts was the Little Isle IV line of credit secured by?

5    A    It was secured by Owen Nolan's and Joe Juneau's

6    investment accounts.

7    Q    And with respect to each of the other names of the lines

8    of credit that you have read out, whose investment management

9    account secured each of those lines of credits?

10   A    Each one of the individual athletes, their investment

11   accounts were used as collateral for individual lines of

12   credit that were set up with the names.

13   Q    Now, let's focus in on one of these transaction

14   histories.  So looking at Government Exhibit 2001 that is in

15   evidence.  Can you explain to us what is the information that

16   is in each column in this transaction history?

17   A    Yes.  It starts off with the date of each one of the

18   transactions.  There's a description of the type of

19   transaction that it was, the details.  The dollar amounts of

20   each transaction.  It includes the principal amounts, the

21   interest amounts.  And then kind of summarizes the balance of

22   the line of credit on that particular date.

23   Q    When it details the principal amount and the interest

24   amount -- for example, on April 4, 2015, it says $1,250,000

25   principal, what does that signify?

Case 2:13-cr-00607-JFB-AYS  Document 299  Filed 07/07/15  Page 27 of 228 PageID #: 5176

1   A     That's an increase in the loan amount.

2   Q     On May 26, 2005, when it says 5,927.78 in interest, what

3   does that signify?

4   A     I'm sorry.  What was the date again?

5   Q     The transaction on May 26, 2005.  It reads under

6   Type 610:  Regular payment.  Amount:  5,927.78.  And under the

7   Interest column, 5,927.78.  Would you explain to us what that

8   means?

9   A     Yes.  That is a interest payment made on that particular

10  line of credit.

11  Q     And you see the Code 610?

12  A     Yes.

13  Q     What is the significance of codes in the 600 series?

14  A     They signify that a payment is being made.

15  Q     How can you tell when -- on this transaction history, how

16  can you tell when a line of credit is being drawn up; a

17  further loan is being taken?

18  A     On the far right column, the balance of the loan

19  increases.

20  Q     Are there also, similar to that, in the type and amount

21  columns?

22  A     Yes.  So a 700 series transaction would signify an

23  advance for a particular line of credit.

24  Q     Now, you testified that Mr. Kenner set up each of the

25  lines of credit for Northern Trust Bank, correct?

1  A    Yes.

2  Q    Did he set up any others?

3  A    No.

4  Q    For each of these lines of credit, who directed every

5  transfer of money into and out of these lines of credit?

6  A    Phil Kenner.

7  Q    Anyone else?

8  A    No.

9  Q    Can you describe for us how a transfer of money into and

10 out of these lines of credit with Mr. Kenner would work?

11 A    Sure.  Do you want me to detail how an advance would

12 work?

13 Q    Yes.  Walk us through the steps of how Mr. Kenner would

14 initiate an advance.

15 A    Okay.  He would -- I acted as relationship manager on the

16 banking side.  He would either call me, e-mail me, communicate

17 with me that he wanted to seek an advance off one of the lines

18 of credit.  I would take his request and forward it to the

19 lending division of the bank, where the request would be

20 approved by the lender who was assigned to that particular

21 relationship at the time.  And the money would then be

22 advanced, with the loan officer's authorization for

23 permission, and the money was credited or deposited to the

24 Little Isle IV checking account.

25 Q    So an advance would start out at Mr. Kenner's request by

1   phone or e-mail?

2   A    Yes.

3   Q    In terms of when that advance went to the Little Isle IV

4   account, how would a further wiring or transfer of money occur

5   out of that account?

6   A    Once the -- it was common for Phil to instruct me to do a

7   loan advance and, at the same time, provide me with wire

8   instructions so that the money could be wired out of the bank

9   as soon as it went into Little Isle IV checking account.

10  Q    You would then do that at his instruction?

11  A    Yes.  I would prepare the necessary forms, get the proper

12  authorization, approvals from other people in the bank to do

13  that, yes.

14  Q    Just a side note, are you familiar with an IOL system at

15  the bank?

16  A    Yes.

17  Q    What is the IOL system?

18  A    IOL stands for Inquiry Online.  It was a system the bank

19  used so that it could track individual maintenance requests,

20  transactions for each of their accounts.

21  Q    I'm going to show you what is in evidence as Government

22  Exhibit 2020.  It's on your screen as well.  If you can just

23  take a minute and look at it.

24  A    Yes, I can't see that.

25  Q    Try that.

1    A    Here we go.

2    Q    What is this?  There's several pages.  Just flip them

3    through.  First of all, are you familiar with what's called

4    Final Archive Reports.

5    A    Yes.

6    Q    What is that?

7    A    It's a record of a particular transaction that went

8    through the IOL system.

9    Q    I'm going to focus your attention on page 2.  Can you

10   explain to us what transaction this record reflects?

11   A    Yes.  It's a transfer from a loan number.  And it's

12   highlighted below that the account owner was Bryan Berard.

13   And there was a dollar transfer into Big Isle VI Ventures LLC.

14   Q    When you look at that loan number, is that Mr. Berard's

15   line of credit, compared to the transaction history from

16   page 1?

17   A    Yes.  I reviewed it already.  It is.

18   Q    What was the amount of that transfer?

19   A    $265,000.

20   Q    Was that a transfer of money that Mr. Kenner directed?

21   A    Yes.

22   Q    Now, in his conversations with you, did Mr. Kenner say

23   anything about who you should communicate with in connection

24   with these lines of credit?

25   A    I'm sorry.  Can you repeat the question?

1  Q    In his conversations with you, did Mr. Kenner say

2  anything about who you should communicate with in connection

3  with these lines of credit?

4  A    Yes.  He wanted us to only communicate with him.

5  Q    Did he explain why?

6  A    Yes.  He said he was their financial advisor and that

7  these guys didn't want to be bothered.  That they were

8  constantly travelling and busy, that he would make all of the

9  investment decisions and business transactions within those

10 lines of credit.

11 Q    What, if anything, did Mr. Kenner instruct you about

12 where the monthly statements for the lines of credit would go?

13 A    He wanted them sent to his personal residence.

14 Q    Did you ever speak directly with any of the individual

15 players listed in those lines of credit at the time they were

16 set up?

17 A    No.

18 Q    Did there come a time you spoke directly with one of the

19 players?

20 A    Yes.

21 Q    Who did you speak with?

22 A    I don't know -- I'm sorry.  I should say I don't know

23 that I actually talked to any of the players.  I did

24 communicate with one of the players via e-mail.

25 Q    I'm going to turn your attention to what's in evidence as

1    Kenner-3.  Do you recognize this?

2    A    Yes.

3    Q    Do you remember receiving the e-mail here?  I'm going to

4    turn to the second page.  It starts, "Mr. Mascarella" and

5    signed "Joe Juneau."  Do you remember receiving that e-mail?

6    A    Yes.

7    Q    What do you remember about receiving that e-mail?

8    A    There was a question that Joe Juneau was confused or

9    wanted a clarification of whether or not his investment

10   account was -- had been pledged as collateral for a line of

11   credit.

12   Q    Let's look at the bottom of this e-mail, which is in

13   evidence.  It's an e-mail from Joe Juneau to

14   phil@standardadvisors.com, correct?

15   A    Yes.

16   Q    It's dated March 23, 2007, right?

17   A    Yes.

18   Q    I'll just read it into the record.  "Phil, what is this

19   Northern Trust letter we just received?  It says that my line

20   of credit (secured by my personal NTIMAS) matured on

21   January 15th and is now 53 days late!!  It says, quote, "Event

22   of Default."  What is this?  Please explain..."

23           And the e-mail continues, correct?

24   A    Yes.

25   Q    What is an NTIMAS?

1   A     It's a Northern Trust Investment Account -- Investment

2   Management Account.

3   Q     What role was that investment management account that's

4   referred to in this e-mail with respect to the lines of credit

5   at Northern Trust Bank?

6   A     It was securing, or it was being used or pledged as

7   collateral for this line of credit.

8   Q     When you say "this line of credit," what are you

9   referring to?

10  A     I believe this was the Little Isle IV line of credit.

11  Q     I'm sorry.  What's the date of this e-mail?

12  A     March 23rd.

13  Q     2007, right?

14  A     2007, yes.

15  Q     Looking quickly at Mr. Kenner's response, what's the date

16  of that response?

17  A     Looks like March 24, 2007.

18  Q     Can you read Mr. Kenner's response?

19  A     "I paid off of the line of credit the other day, so your

20  funds have been released from pledge.  It is all good."

21  Q     I'm going to turn your attention to Government

22  Exhibit 2158, which is in evidence.  Do you recognize this?

23  That's also in your binder, Mr. Mascarella.

24  A     Yeah.  What's the number?

25  Q     2158.  First one behind Transaction History.

1            Let me help you find it.

2   A    Thanks.

3   Q    Did you have a chance to review it before you came to

4   court today?

5   A    Yes.

6   Q    What is it?

7   A    It is the loan history for the line of credit for Little

8   Isle IV LLC.

9   Q    Let's turn to page 2, and turn to March 23rd, 2007.  What

10  occurs for the Little Isle IV line of credit on March 23rd,

11  2007?

12  A    There's a $636,000 pay down.

13  Q    Is that pay down, as you say, 636,603.63, correct?

14  A    Yes.

15  Q    Who directed that pay down?

16  A    Phil Kenner.

17  Q    I'm going to turn your attention to what's in evidence as

18  Government Exhibit 2101.  I'm looking at the March 2007

19  account statement.  This is the March 2007 account statement

20  for Little Isle IV, is that correct?

21  A    Yes.

22  Q    Going to Other Items Paid, what is the significance of

23  the entry on March 23rd, 2007?

24  A    There was a loan payment from that account to the Little

25  Isle IV loan for $638,488.76.

1  Q    Turning your attention to Deposits and Credits for

2  March 2007, what is the significance of the entry on

3  March 23rd, 2007?

4  A    It is a loan advance going into the Little Isle IV

5  checking account for $638,488.76.

6  Q    Finally, turning your attention to Government

7  Exhibit 2133 in evidence, can you tell us what this is?

8  A    That is Owen Nolan's individual line of credit.

9  Q    Turning to March 2007, what happens on March 23rd, 2007,

10  in the Owen Nolan line of credit?

11  A    There is a loan advance for a loan increase of

12  $638,488.76.

13  Q    Mr. Mascarella, in simple terms, what does this series of

14  transactions signify?

15  A    There was a $638,000 advance off Owen Nolan's line of

16  credit.  The money was moved into the Little Isle IV checking

17  account.  From there, it was used to pay down the Little Isle

18  IV line of credit.

19  Q    That was secured by Joe Juneau?

20  A    Secured by Joe Juneau.

21  Q    Who directed that series of transfers?

22  A    Phil Kenner.

23  Q    Now let's turn to Government Exhibit 2001 again.  Turning

24  your attention to April 2007 -- actually, you know what, we'll

25  move on.  Go to the next page.

864

1           So in terms of the lines of credit and your

2     management of the lines of credit, tell us again, what are the

3     types of payments that were due?

4     A    Monthly statements would be sent out indicating how much

5     interest was due, and just the interest payments were

6     required.

7     Q    What was your role in managing the relationship with

8     respect to the line of credit?

9     A    One of my duties was to make sure those payments were

10    made.

11    Q    How would you go about doing that?

12    A    If Phil Kenner didn't take care of the payments himself,

13    once the payments became past due, I would remind Phil the

14    payments were due.  Typically he would respond back and ask me

15    how much was due.  I would detail the amounts for each one of

16    the lines of credit that had become past due.  He would then

17    reply back to me and ask for the availability of all of the

18    lines of credit.  And I would provide a breakdown for each one

19    of the lines of credit, how much was available.

20          From there, he would instruct me or direct me to

21    advance off of any one of those lines of credit that had

22    availability left, and directed me to advance that money or to

23    draw on the lines of credit and credit the Little Isle IV

24    checking account so that the payments could be taken out of

25    that account.

MASCARELLA-DIRECT-KOMATIREDDY                    865

1  Q    Now, before coming into court today, did you have a

2  chance to review the bank records for the Little Isle IV bank

3  account?

4  A    Yes, I did.

5  Q    I'm going to hand you a series of exhibits marked

6  Government Exhibit 22 through 40 and Government Exhibit 20.

7  Did you have a chance to review those exhibits?

8  A    Yes.

9  Q    Do Government Exhibit 22 through Government Exhibit 40

10  and Government Exhibit 20 fairly and accurately depict some of

11  the payments that were made out of the Little Isle IV checking

12  account?

13  A    Yes.

14         MS. KOMATIREDDY:  The government moves 22 through

15  40, and 20, into evidence.

16         MR. HALEY:  Judge, may I see them first?

17         THE COURT:  Yes.

18         MR. HALEY:  I'm sorry.  I saw these previously.  I

19  have no objection.

20         THE COURT:  Any objection?

21         MR. LaRUSSO:  No, Your Honor.

22         THE COURT:  Government's Exhibit 22 to 40 and

23  Government Exhibit 20 are admitted.

24         (So marked as Government Exhibit 22 to 40 and

25  Government Exhibit 20 in evidence.)

1   Q    Now, Mr. Mascarella, let's just step back for a minute

2   and go back to Mr. Michael Peca's line of credit.  I'm going

3   to draw your attention to a transaction here in October of

4   2006.  Do you see that?  You see the note increase on

5   October 19, 2006?

6   A    Yes.

7   Q    What's the amount of that note increase?

8   A    $395,000.

9   Q    Now, when a note increase happens like that one, would

10  the bank send Mr. Michael Peca a letter about it?

11  A    No.

12  Q    After a note increase, what happens if there's no

13  interest payment made on the line of credit?  Then what

14  happens?

15  A    The owner or the borrower or the person taking care of

16  the line of credit, in this case it was Phil, would receive a

17  past due notice.

18  Q    Would there come a point, I think you testified earlier

19  that you actually would send another type of letter?

20  A    Yes.  After 30 days we would send out a Notice of

21  Default.

22  Q    But as long as the interest payment's being made, then

23  the bank doesn't send out letters.

24  A    No.

25  Q    So let's look at some of the interest payments.  I'm

1   going to turn your attention to Government Exhibit 22, which

2   is now in evidence.  What is the transaction period listed for

3   Government Exhibit 22?

4   A    April 23rd, 2007.

5   Q    Can you explain to us what this graphic depicts?

6   A    Yes.  It pictures a loan advance or a line of credit draw

7   on Michael Peca's Northern Trust line of credit.  In this

8   example it was $60,000.  That money was moved from Michael

9   Peca's line of credit into Little Isle IV Ventures LLC

10  account.

11  Q    Ad then what happened?

12  A    From there, I was directed by Phil to make the payments

13  on each one -- the interest payments on each one of the lines

14  of credit that were due.

15  Q    What do the numbers in black signify?

16  A    The amounts indicate the interest payment that were made.

17  Q    What do the numbers in red signify?

18  A    The balance or the amount that was owed for each one of

19  the lines of credit.

20  Q    So on April 23rd, 2007, there was $60,000 further loans

21  taken out from Michael Peca's line of credit?

22  A    Yes.

23  Q    And that same money was then used to pay $11,000 and

24  change back to Michael Peca's -- the interest payment on

25  Michael Peca's line of credit?

1  A    Yes.

2  Q    And then it was also used to pay the interest payment on

3  several other lines of credit, right?

4  A    Yes.

5  Q    Who directed each one of these transfers?

6  A    Phil Kenner.

7  Q    Let's go to the next interest payment, Government

8  Exhibit 23.  What happens here?

9  A    Michael Peca's account, there was an advance made -- or a

10 line of credit draw for $101,345.  The money was transferred

11 from Michael Peca's line of credit into Little Isle IV

12 checking account.

13 Q    And then what happens next?

14 A    Several interest payments are made against each one of

15 the hockey player lines of credit.

16 Q    Let's go to the next exhibit, Government Exhibit 24, for

17 June 2007.  What happens to the interest payments this month?

18 A    At this time, Sergei Gonchar's line of credit was used.

19 And $70,000 was advanced from Sergei Gonchar's line of credit

20 and credited to the Little Isle IV checking account.

21 Q    What happens next?

22 A    Several interest payments for each one of the hockey

23 players was made that month.

24 Q    Who directed each one of those transfers?

25 A    Phil Kenner.

1   Q    And on the previous, Government Exhibit 23, who directed

2   each one of those transfers?

3   A    Phil Kenner.

4   Q    Let's go to the next month, July 2007.  Government

5   Exhibit 25 now on the screen.  What happens with the interest

6   payments this month?

7   A    Again, Sergei Gonchar's line of credit was used to

8   advance $75,000, and those funds were credited to the Little

9   Isle IV checking account.

10  Q    What happened after that?

11  A    From the Little Isle IV checking account, all of the

12  interest payments were made for each one of the hockey player

13  lines of credit.

14  Q    Who directed each one of those transfers?

15  A    Phil Kenner.

16  Q    Despite these interest payments, what is the remaining

17  balance of the loans that Michael Peca still owes at this

18  point to Northern Trust Bank?

19  A    Michael Peca's loan balance at that time was $1,774,831.

20  Q    There's no letters going out to Michael Peca at this

21  point, right?

22  A    No.

23  Q    Why not?

24  A    Because the interest payments were being kept current.

25  Q    Let's go to the next month.  Government Exhibits 26,

1    August 2007.  What happens to the interest payments this

2    month?

3    A    Sergei Gonchar's line of credit is used again, and

4    $74,258 was advanced into the Little Isle IV checking account.

5    Q    What happened after that?

6    A    All the interest payments were made for each one of the

7    hockey player lines of credit.

8    Q    What's that Northern Trust PP transfer?

9    A    That is a -- it's called Private Passport.  It's for

10   bank's online banking system.

11   Q    Another transfer occurs?

12   A    Yes.

13   Q    Who directed each of the transfers in this month, in

14   Government Exhibit 26?

15   A    Phil Kenner.

16   Q    Let's go to the next one, Government Exhibit 27.  What

17   happens to interest payments on October 2nd, 2007?

18   A    $70,000 was drawn on the Mattias Norstrom's Northern

19   Trust line of credit.  Those funds were advanced into the

20   Little Isle IV checking account.

21   Q    What happens next?

22   A    All of the interest payments were made for each one of

23   the lines of credit.

24   Q    Who directed each of the transfers in this exhibit?

25   A    Phil Kenner.

1   Q    Going to Government Exhibit 28, what happens in the next

2   month for the interest payments on November 7, 2007?

3   A    Glenn Murray's Northern Trust line of credit was used to

4   advance $100,000 into the Little Isle IV checking account.

5   Q    What happens next?

6   A    All of the interest payments are made once again in the

7   lines of credit.

8   Q    Who directed each of the transfers this month?

9   A    Phil Kenner.

10  Q    Turning to Government Exhibit 29, what happens with the

11  interest payment on November 30, 2007?

12  A    This month they were all made using the Glenn Murray line

13  of credit.

14  Q    Who directed each one of the transfers in Government

15  Exhibit 29?

16  A    Phil Kenner.

17  Q    Turning to Government Exhibit 30 for the period

18  December 31st, 2007, to January 4th, 2008, what happens to the

19  interest payments during this period?

20  A    The interest payments are made used using the Glenn

21  Murray line of credit.

22  Q    Let's just focus for a minute, who is putting the money

23  into the accounts?  Let me withdraw that.

24       Who directed the transfers in this exhibit?

25  A    Phil Kenner.

1   Q    Whose loan is being used to put money into the Little

2   Isle IV account?

3   A    Glenn Murray's.

4   Q    Whose interest payments are then being made from that

5   money?

6   A    All of the lines of credit that were set up, secured by

7   the hockey players.

8   Q    Including Glenn Murray?

9   A    Yes.

10  Q    So just so I understand this:  There is an increase in

11  principal on Glenn Murray's account to pay interest on Glenn

12  Murray's account, is that right?

13  A    Yes.

14        MR. HALEY:  I object to the form.

15        THE COURT:  It's a clarification.  You can answer

16  that.  What is your answer?

17  A    Yes.

18  Q    Moving to the next exhibit, Government Exhibit 31.

19  February 2008, what happened to the interest payments this

20  month?

21  A    Glenn Murray's line of credit is used.  There is a

22  $55,000 transfer that goes into Little Isle IV checking

23  account.

24  Q    What happens then?

25  A    All the interest payments are made.

1  Q     Including on the Glenn Murray loan account?

2  A     Yes.

3  Q     Who directed each of the transfers in this instance?

4  A     Phil Kenner.

5  Q     Going to Government Exhibit 32.  March 2008, what happens

6  then?

7  A     Glenn Murray's line of credit is used to advance $44,000

8  into Little Isle IV checking account.

9  Q     What happens next?

10 A     All the interest payments that are due that month are

11 made.

12 Q     Who directed each of the transfers in this instance?

13 A     Phil Kenner.

14 Q     Turning to Government Exhibit 33.  This is for April 7,

15 2008, correct?

16 A     Yes.

17 Q     What is going on in terms of the money going into the

18 Little Isle IV account?

19 A     This represents several lines of credit.  By then, the

20 availability dwindled and each one of the lines of credit only

21 had, you know, $10,000 or so available?  So he used

22 multiple -- Phil Kenner used multiple lines of credit that

23 month to make payments into the Little Isle IV checking

24 account.

25 Q     When you say "the lines of credit availability had

1    dwindled," what do you mean by that?

2    A    They had just about reached their maximum, that they were

3    maxed out.

4    Q    Turning to Government Exhibit 34, May 2008.  What happens

5    with the interest payment on that loan?

6    A    Two of the lines of credit were used, Mattias Norstrom's

7    and Bryan Berard's, to advance about $42,000 into Little Isle

8    IV checking account.

9              (Matter continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

875

1    DIRECT EXAMINATION (Cont'd)

2    BY MS. KOMATIREDDY

3    Q    And what happens after that?

4    A    The interest payments are made out on each one of the

5    the lines of credit.

6    Q    Including the ties to Norstrom and Bryan Berard's

7    lines of credit?

8    A    Yes.

9    Q    Who directed each of the transfers depicted in the

10   Exhibit 34.

11   A    Phil Kenner.

12   Q    Turning to Government's 35, how were interest

13   payments made in this exhibit for the period June 6, 2008

14   to June 9, 2008?

15   A    Again, several lines of credit were used to kind of

16   scrape together a few thousand dollars and the rest was

17   taken from the Ula Makika Northern Trust checking account.

18   Q    How was that money used?

19   A    Used once again to pay the interest that was due on

20   each one of the lines of credit.

21   Q    When you say that the money was scraped together who

22   directed each of the transfers on this exhibit?

23   A    Phil Kenner.

24   Q    Did you have any conversations with Mr. Kenner in

25   2008 about these lines of credit?

876

1   A    Yeah, Phil asked for a meeting.  He wanted to come in

2   and talk about getting some sort of an increase for these

3   lines of credit and wanted to know if we'd be open to

4   talking about that.

5   Q    How did you respond?

6   A    I set up a meeting.  I set up a meeting that included

7   myself, a senior loan officer and Phil Kenner came in in

8   person.  We met in a conference room and he made the

9   request.

10          He was interested in whether or not we were open

11  to providing an increase for these lines of credit.

12  Q    Were any hockey players in that room?

13  A    No.

14  Q    Did you or anyone else at the bank at that time talk

15  to any of Mr. Kenner's clients?

16  A    No.

17  Q    Did you talk to anybody whose names those lines of

18  credits were in?

19  A    No.

20  Q    Did you talk to anybody whose bonds were pledged as

21  collateral for those lines of credit?

22  A    No.

23  Q    Did you send out any letters to those people saying

24  that those lines of credits were maxed out?

25          MR. HALEY:  I object to the leading nature of

877

1    what they talked about.

2              It's her witness.

3              THE COURT:  No, not in that area.  That is

4    permissible.  Okay.

5    Q    Did you send any letters to any of those individuals

6    whose names and accounts were associated with the lines of

7    credit telling them that the lines of credit were maxed

8    out?

9    A    No.

10   Q    When Mr. Kenner requested further line of credit, how

11   did the bank respond?

12   A    We met with him in person and my senior lender at

13   that time told Mr. Kenner before we would even consider

14   something like that we wanted to see an accounting for all

15   of the advances that he had made.

16             We wanted to see tax returns for the entities

17   that were involved that we set up, checking accounts for.

18   Q    Did Mr. Kenner provide you with an accounting?

19   A    He said he would.

20   Q    Did he?

21   A    No.

22   Q    Did he provide you with tax returns?

23   A    No.

24   Q    Turning to the next interest payment, Government's

25   Exhibit 36, how did the interest start coming in starting

878

1   in July of 2008?

2   A    They started coming in from other checking accounts

3   at Northern Trust.

4   Q    And here specifically were the accounts used?

5   A    Ula Makika, Northern Trust checking account.

6   Q    Who requested each transfer in this exhibit?

7   A    Phil Kenner.

8   Q    Turning to Government's Exhibit 38, October 16, 2008,

9   where did the interest payments -- how were they made?

10  A    Exhibit 38?

11  Q    Yes.

12  A    Once again the amounts transferred from the Ula

13  Makika Northern Trust checking account.

14  Q    Now at this point what is the status of each of the

15  lines of credit in terms of their balance?

16  A    They are fully drawn.

17  Q    So in other words is there any money available in the

18  lines of credit to make interest payments?

19  A    There is nothing available, no.

20  Q    I'm going to show you two more exhibits, Government's

21  Exhibit 39 for the period of November 2008, November 20th

22  to 21st 2008.

23        How were interest payments made this time?

24  A    Money is transferred from the Ula Makika checking

25  account into Little Isle IV checking account.

879

1    Q    And Government's Exhibit 40, for the period

2    December 2008 to January 1, 2009, how were interest

3    payments made during this time period?

4    A    There was a wire transfer made from Wells Fargo Bank,

5    it was from Phil Kenner's personal account, and it was

6    credited to the Little Isle IV checking account at

7    Northern Trust.

8    Q    And with respect to these last two exhibits, 39 and

9    40, who directed each of the transfers in these exhibits?

10   A    Phil Kenner.

11   Q    I will now show you what has been marked as

12   Government's Exhibit 6504, do you have it there in your

13   binder.

14        Do you recognize this?

15   A    Yes.

16   Q    What is it?

17   A    An e-mail from Phil Kenner.

18   Q    Does it involve several e-mails?

19   A    Yes, we have a bit of a string here.

20   Q    And who were the two participants of the e-mail

21   chain?

22   A    Myself and Phil.

23   Q    Is that a true and accurate copy of an e-mail

24   conversation that you had with Mr. Kenner?

25   A    Yes.

880

```
 1              MS. KOMATIREDDY:  The Government moves GX 6504

 2    in evidence.

 3              MR. HALEY:  No objection, your Honor.

 4              THE COURT:  Mr. LaRusso.

 5              MR. LARUSSO:  Just one moment, your Honor.

 6              No objection, your Honor.

 7              THE COURT:  6504 is admitted.

 8              (Whereupon, Government Exhibit 6504 was received

 9    in evidence.)

10    Q    Looking at Government's Exhibit 6504, I will go to

11    the bottom.

12              Is it fair to say this is the first e-mail in

13    the conversation, Mr. Mascarella?

14    A    Yes.

15    Q    What is Mr. Kenner requesting there?

16    A    Requesting the totals for the month which meant he

17    wanted to know how much was due in interest on each one of

18    the lines of credit.

19    Q    This was November of 2008?

20    A    Correct.

21    Q    And do you respond?

22              I will show you both parts here.

23    A    Yes, I responded with a dollar amount that was due.

24    Q    Approximately 43,000, correct?

25    A    Yes.
```

881

1   Q    Turning your attention back to Government's

2   Exhibit 39.  What is the approximate amount of interest

3   payments in November of 2008?

4   A    43,000.

5   Q    Going back to 6504, the conversation continues in

6   December with respect to the December interest payment,

7   correct?

8   A    Yes.

9   Q    And how much do you inform Mr. Kenner is due on

10  interest payments in December of 2008?

11  A    Just over $35,000.

12  Q    Turning back to Government's Exhibit 40, what is the

13  payment that Mr. Kenner makes with respect to the interest

14  payment in December, the beginning of January?

15  A    35,000.

16  Q    Is that reflective of the type of conversation you

17  would have back and forth with Mr. Ken on how interest

18  payments needed to be made?

19  A    Yes.

20  Q    Did there come a point where interest payments were

21  no longer made?

22  A    Yes.

23  Q    I want to turn your attention to Government's

24  Exhibit 20, around when was that?

25  A    In March of 2009.

Mascarella - Direct/Komatireddy

882

1   Q    And in simple terms, what happens when no more

2   payments were made?

3   A    Late notices are generated and mailed out and sent to

4   the same place where the monthly statements are being

5   sent.  When that late notice doesn't work, no payments are

6   made.  The lines of credit enter into default.

7   Q    Did these lines of credit enter into default?

8   A    Yes, they did.

9   Q    Jumping ahead for a minute, Mr. Mascarella, after all

10  this, did you still end up working at Northern Trust Bank?

11  A    After all of this?

12  Q    Yes.

13  A    You mean these transactions or --

14  Q    After 2011, did you still work at Northern Trust

15  Bank?

16  A    No.

17  Q    What happened?

18  A    The bank received a demand letter from Owen Nolan and

19  I was brought into a meeting to talk about the hockey

20  player relationship.

21       My manager made it clear to me that my job was

22  dependent on working with the bank and helping the bank

23  because there were several people inside the bank that had

24  always thought that mistakes --

25       MR. HALEY:  Objection, your Honor.

883

```
 1              THE COURT:  Sustained.
 2              MR. HALEY:  Thank you.
 3   Q    Just focus on what happened that resulted in you're
 4   not working at the bank anymore.
 5   A    I had a meeting with my -- the CEO of the bank Tony
 6   Bollanzena (ph), he pressed me to answer questions about
 7   the hockey player relationship.  When I answered those
 8   questions he didn't like my answers, told me I was
 9   entering a world I would not like a whole lot, told we had
10   to sue the bank if I wanted to; that they had all the
11   financial resources on plant earth, shortly thereafter the
12   meeting I was sent home and eventually fired.
13   Q    After you were fired, did you enter into negotiations
14   with the bank about -- concerning wrongful termination?
15   A    Yes.
16   Q    Did you receive any money as a result of those
17   negotiations?
18   A    I got a small settlement --
19              MR. HALEY:  Objection, relevance.
20              THE COURT:  Sustained.  Jury disregard that.
21   Q    Let's go back to Government's Exhibit 20.
22              You testified these lines of credit went into
23   default.  Were you involved in the default process?
24   A    Yes.
25   Q    And you mentioned that there are several steps in the
```

884

```
1   process in notifying individuals about the default before

2   the collateral seized?

3   A    Yes.

4   Q    During that process did Mr. Kenner ever ask you for

5   documentation regarding lines of credit?

6   A    No.

7   Q    Either by e-mail or by phone?

8   A    Not that I recall, no.

9   Q    I will hand you something that may refresh your

10  memory, 5031 L, Government's Exhibit.

11            Do you recognize that?

12            Take your time.

13  A    Yes.  Yeah, they are loan histories for each one of

14  the individual lines of credit.

15  Q    And just can you describe for us the format of those

16  loan histories?

17  A    These came from my personal computer.

18  Q    How do you know that?

19  A    Because of the format.  Monthly statements are

20  generated by the bank using a third party company that

21  takes the information, makes them into fancy looking bank

22  statements.  These are literally the snapshots of the

23  screen prints of my computer.

24  Q    What were the dates of those screens prints that were

25  printed?
```

885

1    A    January 21, 2009.

2    Q    Around that time did you send these to Mr. Kenner?

3    A    I believe I did.

4    Q    And just for the record, there are a few Post-It

5    notes and highlighting on that particular exhibit.  Do you

6    see that?

7    A    Yes.

8    Q    And did you add those Post-It notes and highlighting?

9    A    That's not my writing.

10    Q    So you would have sent the information underlined.

11    Is it fair to say, that what you sent Mr. Kenner was a

12    version of that without the highlights and Post-It notes?

13    A    Yes.

14    Q    The Government moves GX 5103 L into evidence?

15         MR. HALEY:  May I see them, your Honor?

16         MS. KOMATIREDDY:  Sorry, the original notes.

17         MR. HALEY:  May I still see them?  I will not

18    modify the original.

19         No objection, your Honor.

20         THE COURT:  6504?

21         MS. KOMATIREDDY:  No, 5103 L, your Honor.

22         THE COURT:  5103 L is admitted.

23         (Whereupon, Government Exhibit 5103 L was

24    received in evidence.)

25    Q    You testified during the default process there were

886

1   several letters that were sent out?

2   A    Yes.

3   Q    I will turn your attention to the binders.  Looking

4   at the first set of letters dated in or about February of

5   2009.  Can you review those?

6           For the record those are Government's

7   Exhibit 2112, 2115, 2118, 2121, 2124, 2127 and 2130.

8           Have you reviewed those before?

9   A    Yes.

10  Q    At the bottom of each one is that your signature?

11  A    Yes, it is.

12  Q    Are those true and accurate copies of letters you

13  sent out in February of 2009?

14  A    Yes.

15          MS. KOMATIREDDY:  The Government moves 2112,

16  2115 -- actually, your Honor, let me do this as a set in

17  the minutes.

18  Q    Can you look at the next tab, the second round of

19  letters dated in March of 2009.  Do you recognize those?

20  A    Yes.

21  Q    Do each of those letters contain your signature at

22  the bottom?

23  A    Yes, they do.

24  Q    And are those true and accurate copies of letters you

25  sent out in March of 2009?

887

1   A    Yes.

2   Q    Finally behind the third tab do you recognize those?

3   A    Yes.

4   Q    Do each of those letters contain your signature as

5   well?

6   A    Yes, they do.

7   Q    Are those true and accurate copies of letters you

8   sent out in March of 2009?

9   A    Yes.  To be clear they were prepared by the bank's

10  attorneys but I did send them out, yes.

11           MS. KOMATIREDDY:  For the record, the witness

12  has just reviewed Government's Exhibit 2112 through 2132,

13  the Government moves all of those in evidence.

14           MR. HALEY:  As usual, Judge, no objection.

15           MR. LARUSSO:  No objection, your Honor.

16           THE COURT:  Okay.  Those exhibits are admitted.

17           (Whereupon, Government Exhibit 2112 through 2132

18  were received in evidence.)

19  Q    Now, looking at Government's Exhibit 2116 which is in

20  evidence, can you explain the purpose of this letter?

21  A    Yes, it's to notify the borrower that a payment has

22  not been made and that the particular line of credit is

23  now past due and its pertinent terms of the loan agreement

24  or promissory note is with the bank for default.

25  Q    That letter at the top says via Federal Express and

888

1  certified mail, return receipt requested, right?

2  A    Yes.

3  Q    Did you ever send out a letter to any of the hockey

4  players via Federal Express or certified mail before?

5  A    No.

6  Q    After these letters were delivered were there any

7  interest payments made on the lines of credit?

8  A    No.

9  Q    So what happened to the players' bond accounts?

10  A    Once they entered into default, the bank's lending

11  division notified the bank's investment division that it

12  is seizing control of the investment accounts and

13  immediately upon seizing control of those accounts, they

14  instruct the investment department to sell the investments

15  held within those managed accounts.

16  Q    Earlier you testified that the kinds of investment in

17  the accounts were bonds and cash, correct?

18  A    Yes.

19  Q    Did that change over time?

20  A    It did.

21  Q    How?

22  A    When the investment accounts were initially opened,

23  they were invested in bonds with a little bit of cash,

24  conservatively invested and over time those bonds mature.

25  It is typical for the investment division of a bank to

Mascarella - Direct/Komatireddy

889

1   notify the account owner that those bonds were maturing

2   and give their consent to reinvest the money once the bond

3   matures into other bonds or other investments that were

4   appropriate.

5   Q    What happened with these bond accounts?

6   A    As the bonds mature, the money was just left in cash.

7   Q    Why?

8   A    Because the various investment managers at Northern

9   Trust never had permission, never contacted any of the

10  account owners to give their consent to reinvest the

11  money.

12          MS. KOMATIREDDY:  At this time I'll read into

13  evidence a stipulation between the parties.  Stipulation

14  is marked 16.

15          THE COURT:  Hold on.  Is that in evidence.

16          MS. KOMATIREDDY:  Not yet, sir.

17          THE COURT:  Why don't you offer it?

18          MS. KOMATIREDDY:  I will offer Stip 16 in

19  evidence.

20          MR. HALEY:  May I see stipulate 16.  There's

21  been a lot of stipulates.

22          MR. HALEY:  Thank you, yes, your Honor.  I will

23  consent to the reading into the record the stipulation.

24          MR. LARUSSO:  No objection.

25          THE COURT:  Government's Exhibit 16, the

890

1    stipulation, is admitted and may be admitted.

2          (Whereupon, Government Exhibit 16 was received

3    in evidence.)

4          MS. KOMATIREDDY:  It is hereby stipulated and

5    agreed by and between the United States of America and the

6    defendants Phillip A. Kenner and Tommy C. Constantine

7    through their attorneys that Government's Exhibits 2162

8    through 2184 and 21045 are bank records, and that those

9    exhibits are true and accurate copies of the monthly

10   account statements for accounts at Northern Trust Bank.

11   This stipulating and Government's Exhibits 2162 through

12   2184 and 21045 are admissible in evidence at trial, dated

13   May 11, 2015.

14         THE COURT:  Why don't we take a break now.

15         MS. KOMATIREDDY:  Okay.

16         THE COURT:  We'll take our morning break.  Don't

17   discuss the case.

18         (Jury exits.)

19         (Whereupon, a recess was taken.)

20         THE COURT:  How much more on direct?

21         MS. KOMATIREDDY:  About ten minutes, your Honor.

22         THE COURT:  Okay.  Bring in the jury.

23         THE CLERK:  All rise.

24         (Whereupon, the jury at this time enters the

25   courtroom.)

891

```
1          THE COURT:  Be seated.

2          Ms.  Komatireddy.

3          MS. KOMATIREDDY:  Thank you.  The Government

4   moves the Exhibits 2162 through 2182 and 21045.

5          MR. HALEY:  Yes, sir.

6          MR. LARUSSO:  Yes, your Honor.

7          THE COURT:  They are admitted pursuant to the

8   stipulation.

9          (Whereupon, Government Exhibit 2162 through 2182

10  and 21045 was received in evidence.)

11  Q    You testified after the lines of credit went into

12  default eventually the bank seized the collateral that was

13  pledged for them, is that fair?

14  A    Yes.

15  Q    I will turn your attention to Government's

16  Exhibit 2162, which is in evidence.  Can you describe what

17  this is an account statement for?

18  A    This is Michael Peca's investment managed account at

19  Northern Trust.

20  Q    It says here that the pledged account in the upper

21  left.  What does that mean?

22  A    It means that it was -- it is being used at

23  collateral for a line of credit.

24  Q    And what is the time period that this account

25  statement is for?
```

892

1   A    This is for the month of March, 2009.

2   Q    If you look at the screen, I will turn to page 15 of

3   the account statement.

4        Look the a the entry, March 31, 2009, do you see

5   a deduction on that date?

6   A    Yes.

7   Q    What is going on there?

8   A    $1,794,392 was used to pay off the loan number, and I

9   can't read the loan number, but it is Michael Peca's lines

10  of credit.

11       MS. KOMATIREDDY:  289369 for the record.  You

12  have a paper copy if you want to confirm.

13       THE WITNESS:  I don't think I have --

14       MS. KOMATIREDDY:  Here, I'll just load it up.

15  Here you go.

16       THE WITNESS:  Yes, that's clear.  289369.  So

17  the investment managed account was used to pay off the

18  loan number 289369 which is the Michael Peca line of

19  credit.

20  Q    And in turning to page 3 of this exhibit, in relation

21  to what the status of this account was before, up until

22  that date, what was the value of this account?

23  A    A little over $1,800,000.

24  Q    And someone getting the monthly account statements

25  for this bond account would see up until March 2009, just

893

1   those green bars, right?

2   A    Yes.

3   Q    That the value of their account was a little over

4   $1.8 million, correct?

5   A    Yes.

6   Q    And that black bar, what does it represent?

7   A    A withdrawal.

8   Q    What contributed to that withdrawal?

9   A    The paying off of the line of credit.

10  Q    Let's turn to Government's Exhibit 2165 which is now

11  in evidence.  What is this account statement for?

12  A    That's the investment management accounts for Bryan

13  Berard.

14  Q    Is this the account that was held as collateral for

15  Bryan Berard's line of credit?

16  A    Yes.

17  Q    Turning to 2165, page 14, March 31, 2009, what

18  happened to Bryan Berard's account of bond and cash on

19  March 31, 2009?

20  A    $595,000 of that investment account was used to pay

21  down loan number 252996 which was Bryan Berard's

22  investment secured line of credit.

23  Q    Turning to Government's Exhibit 2173, what is this

24  account statement for?

25  A    It is a Steven Rucchin's investment management

Case 2:13-cr-00607-JFB-AYS   Document 299   Filed 07/07/15   Page 66 of 228 PageID #: 5215

894

1    account at Northern Trust.

2    Q    Is this the account that was being held as collateral

3    for Steve Rucchin's line of credit at Northern Trust?

4    A    Yes, it was pledged.

5    Q    Turning to page 17 of 2173, March 31, 2009, what

6    happened in this account on March 31, 2009?

7    A    $1,010,645 was withdrawn from that investment account

8    to pay off loan number 279806 which was Mr. Rucchin's line

9    of credit.

10   Q    That chart, the black bar represents the sale?

11   A    It represents the withdrawal from the investment

12   account, yes.

13   Q    Finally, Mr. Mascarella, I will show you what is in

14   evidence as Government's Exhibit 732.

15           Before I do that, you testified that there were

16   various investment management accounts held in collateral

17   for the line of credit, correct?

18   A    Yes.

19   Q    When each line of credit went into default, the bank

20   seized the bonds and cash in those investment management

21   accounts, correct?

22   A    Yes.

23   Q    Did Mr. Kenner have any investment account in his

24   name held in collateral for his lines of credit?

25   A    Never.

895

```
 1   Q    Government's Exhibit 732, an e-mail dated June 16,
 2   2006, from Mr. Kenner to Mr. Juneau, when Mr. Kenner
 3   states, you, Owen and I are signed on this LOC.  Is that
 4   true?
 5   A    No.
 6              MS. KOMATIREDDY:  No further questions.
 7              THE COURT:  Cross-examination.
 8              MR. HALEY:  Yes, sir.
 9   CROSS-EXAMINATION
10   BY MR. HALEY:
11   Q    Mr. Mascarella, my name is Rick Haley, I represent
12   Phil Kenner.
13              Sir, take a look at part of that rather thick
14   binder that you have, that reflects Government's Exhibits
15   2112, 2115, 2118, 2121, 2124, 2127, 2130, 2113, 2116,
16   2119, 2122, 2125, 2128, 2131, 2114, 2117, 2120, 2123,
17   2126, 2129, and 2132, these documents here, sir.
18              You can collate them with what you have.
19   A    Yes.
20   Q    Now, these are the notice of default letters sent to
21   each individual as indicated on the address of each
22   letter; is that correct?
23   A    Yes.
24   Q    And they reflect that this letter shall serve as
25   written notification regarding a line of credit with
```

Mascarella - Cross/Haley

896

1    Northern Trust, correct?

2    A    Yes.

3    Q    The line of reference above, secured by your personal

4    living trust IMAS is 33 days late and constitutes an

5    "Event of Default" as indicated by the master note.

6              Each one of those letters as reflects to the

7    specific individual investor with their home address says

8    the same thing, does it not?

9    A    Yes.

10   Q    Now, is it fair to state, sir, that the address as

11   indicated in each one of these documents would have been

12   an address on file for each one of these investors from

13   the moment those lines of credit were established; is that

14   correct?

15   A    Not necessarily from the time that they were

16   established but they were the last known addresses that we

17   had on record.

18   Q    Well, I take it, sir, when a line of credit is opened

19   to Northern Trust with respect to any individuals, they

20   ask for their home address at the time; is that correct?

21   A    Yes.

22   Q    You wouldn't ask for the address of their legal

23   advisor or business manager or agent, you would ask for

24   their address, isn't that true?

25   A    Yes.

897

1    Q    So I understand your point.

2          The address may or may not have changed from the

3    moment the account was opened to the moment this letter

4    was generated.  I understand that, sir.  But wouldn't it

5    be a practice and custom of Northern Trust to update their

6    records to maintain current addresses?

7    A    Yes.

8    Q    Now, when these letters went out as indicated on the

9    dates of these letters, we have a February letter

10   indicating that you are about to go into default?

11   A    Yes.

12   Q    February of 2009, is that true?

13   A    Yes.

14   Q    When that letter went out as indicated by the

15   addresses on those letters, and I believe you testified

16   they went out Federal Express, is that correct, return

17   receipt requested?

18   A    (Perusing.)  No, only the notice of default.

19   Q    Okay.

20   A    The letters in March were sent Federal Express and

21   certified mail.

22   Q    I see.

23          But is it fair to state, sir, that on each one

24   of the letters there's a heading, Northern Trust, NA, 2398

25   East Camelback Road, suite 400, Phoenix, Arizona, 85016

898

```
1   (602) 468-1650.  Is that correct?

2   A    Yes.

3   Q    Each one of those letters contains that same address

4   and telephone number, true?

5   A    Yes.

6   Q    After these letters were sent out, February 9, 2009,

7   the letters indicating you are about to go into default,

8   what if any communication did you or anyone at Northern

9   Trust receive from any one of these account holders with

10  reference to that notice of default letter?

11  A    No notice from any one of those letters --

12  Q    Sir --

13           MS. KOMATIREDDY:  Objection, your Honor, let the

14  witness finish.

15           THE COURT:  Have you answered the question, sir?

16           THE WITNESS:  I'm sorry?

17           I didn't hear you.

18           THE COURT:  Have you answered the question or do

19  you have something to add?

20           THE WITNESS:  I have something to add.  These

21  letters were mailed out but not all of them reached their

22  intended destination.

23  Q    How is that?

24  A    Addresses changed, we got some of the letters back.

25  They were returned mail.
```

899

1  Q    Let's stay with some of these letters that come back

2  to Northern Trust as undeliverable; is that correct?

3  A    Yes.

4  Q    Specifically what letters, sir, came back as

5  undeliverable in that package?

6  A    I don't have those records available to me.

7  Q    More than one, more than two, all of them?

8  A    I would say two.

9  Q    Two.

10         And with reference to those two letters that

11  came back as undeliverable when Northern Trust is sending

12  out a notice of default on a flex account, what, if any,

13  effort did Northern Trust make to require a correct

14  address so that individual was given notice that his flex

15  account was about to go into default?

16         What did they do?

17  A    Nothing.

18  Q    What did you do?

19  A    Nothing.

20  Q    Okay.

21         So after the February 9, 2009, letter was sent

22  out, we now have over a month that past as I understand it

23  with no communication from any one of these account

24  holders either to you or Northern Trust with reference to

25  the letter they received?

900

```
1    A    Correct.

2    Q    On March 19, 2009, the default letters go out; is

3    that correct?

4    A    Yes.

5    Q    Did some of those get returned, sir?

6    A    I can't remember.

7    Q    So if one or more of those were returned, what if any

8    efforts did you or someone else at Northern Trust make to

9    ensure that that particular investor-client of Northern

10   Trust received notice of that letter?

11              MS. KOMATIREDDY:  Objection.

12              THE COURT:  That's okay.  Overruled.

13   A    Nothing that I'm aware of.

14   Q    Well, after the letters that were or were not

15   received by the individuals as listed with their name and

16   home address on the letter, indicating that their loan was

17   now in default, what, if any, communication did you or

18   anyone else from Northern Trust receive from those account

19   holders with reference to that default letter?

20   A    Nothing.

21   Q    Sir, do you have the exhibits with my client's

22   pictures on them, the exhibits in front of you?

23   A    Yes.

24   Q    I don't mean to be rude.  May you hand them to me?

25   A    Absolutely.
```

Mascarella - Cross/Haley

901

```
 1   Q    Now, you testified at great length as to the
 2   transactions reflected in these documents, and these are
 3   all the ones with my client's pictures on them; is that
 4   correct?
 5   A    Yes.
 6   Q    Just a point of reference.
 7        You had been in the banking industry for how
 8   long prior to handling, when did you the lines of
 9   reference with reference to Phil Kenner and his clients?
10   How long had you been in the banking industry?
11   A    When I inherited the relationship?
12   Q    Yes, sir.
13   A    Approximately 20 years.
14   Q    And when you saw these transactions, you didn't find
15   it unusual, did you, to draw down one client's line of
16   credit to pay someone else's line of credit, correct?
17             MS. KOMATIREDDY:  Objection, relevance.
18             THE COURT:  Sustained.
19   Q    Well --
20             THE COURT:  Sustained as to form.
21             MR. HALEY:  Thank you, sir.
22   Q    When you saw someone else's line of credit to be used
23   to pay off another person's line of credit, that event in
24   and of itself did not cause you alarm, did it?
25   A    As long as we had consent to do that, it was okay.
```

902

1   Q    You didn't know, did you, sir, at that the point in

2   time the business relationship Phil Kenner had with any of

3   those line of credit clients, did you?

4   A    No, I didn't.

5   Q    Kindly take a look at a document called Defendant's

6   Exhibit 25 and just read it yourself.

7   A    Okay.

8   Q    Sir, did you ever see that document prior to a moment

9   ago when I handed it to you?

10  A    I don't remember.

11  Q    Well, I'll not ask you to interpret the import of the

12  words in this document, but it does, does it not, sir, at

13  least purport to be the document for the Little Isle IV,

14  LLC?

15  A    Yes.

16  Q    At least as far as that document, sir, who is the

17  managing director of Little Isle IV, LLC?

18  A    Mr. Kenner.

19  Q    When you were questioned right at the beginning of

20  your examination, the Government showed you Exhibit

21  2081 C.

22  A    May I see that exhibit, please?

23       MS. KOMATIREDDY:  Which one.

24       MR. HALEY:  2081 C.

25       MR. HALEY:  I'm at a huge technological

903

1   disadvantage.  If I can have a paper copy.

2              THE COURT:  Do you want to assist him on the

3   computer or give him a paper copy?

4              MS. KOMATIREDDY:  I'll use the computer, Judge.

5   Q    Sir, we can agree as far as that document is

6   concerned, just above the line signatures of all managers

7   and members, it says, does it not, genuine signatures of

8   those above authorized to sign for this company also

9   appear on the accompanying signature cards.

10             Do you see that?

11  A    Yes.

12  Q    Well, as you sit here today, do you have any reason

13  to believe that the business relationship that Phil Kenner

14  had with the individual line of credit investors did not

15  authorize him as a managing member to sign solely in his

16  name?

17             MS. KOMATIREDDY:  Objection.  Foundation

18             THE COURT:  Sustained as to the form of the

19  question.

20  Q    Well, when that document was signed, sir, I take it

21  you had no reason at least at that point in time to

22  suspect that Phil Kenner didn't have the authority to

23  sign; is that correct?

24             MS. KOMATIREDDY:  Objection.

25             THE COURT:  Please approach.

904

1          (Whereupon, at this time the following took

2     place at the sidebar.)

3               (Continued.)

Mascarella - Cross/Haley

905

1           THE COURT:  You just don't like saying no reason

2      to believe or suspect.  If you want to ask him did you

3      have any documentation that suggested there was no consent

4      nor did anyone tell you there was no consent, that's fine.

5      I don't want him to speculate, okay.

6           MR. HALEY:  Thank you, your Honor.

7           (End of sidebar conference.)

8           (Continued.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

906

1  BY MR. HALEY:

2  Q    Sir, when that document was signed by Phil Kenner as

3  indicated by the Government's exhibit, did anyone tell you

4  at that point in time that Phil Kenner had no authority to

5  sign on behalf of Little Isle IV?

6  A    No.

7  Q    At that point in time when you received that document

8  with his signature on it, did you have any documentation

9  in your possession indicating that Phil Kenner had no

10  authority to sign solely as the managing member on that

11  document?

12  A    No.

13  Q    Now, you testified on direct that Phil Kenner, as you

14  say, instructed you, a representative of Northern Trust,

15  to communicate only with him, only with him with reference

16  to the lines of credits for his clients; isn't that

17  correct?

18  A    Yes.

19  Q    And when did he give that you instruction, you say?

20  A    He did not give me that instruction personally.  The

21  lenders who were involved initially with the relationship

22  were told that the loan documents should be given directly

23  to Phil.

24  Q    I thought sir, correct me if I'm wrong, I thought you

25  testified on direct that Phil Kenner directly gave you

907

1    those instructions.  Didn't you testify to that on direct

2    or not?

3    A     No.

4    Q     So it's your testimony that someone else told you

5    that they were instructed to send the loan LOC documents

6    only to Phil Kenner, is that your testimony?

7    A     Their original meeting when we met for lunch, he said

8    that he wanted to be the intermediary between the hockey

9    players and that he did not need the bank to provide any

10   kind of investment management or fiduciary help, that he

11   would do it all, and he said that he wanted everything to

12   run through him.

13   Q     I'm sorry.  He did not want the bank acting in a

14   fiduciary capacity with reference to his clients, correct?

15   A     No, the bank acted in a fiduciary capacity but all of

16   the loan documents, the day-to-day stuff, he wanted to go

17   through him.

18   Q     Well, is it your testimony that you were present at

19   that meeting and heard Phil Kenner say that?  Is that your

20   testimony?

21   A     Yes.

22   Q     And you just said a moment ago the bank was also in a

23   fiduciary capacity with the clients, isn't that true?

24   A     Yes, they had a fiduciary obligation.

25   Q     So when Phil Kenner told you not to send these

908

1   documents to the clients with whom the bank had a

2   fiduciary capacity, you guys said okay.  Is that your

3   testimony?

4            MS. KOMATIREDDY:  Objection, argumentative.

5            THE COURT:  No, overruled.  You can answer that.

6   A    It wasn't my decision.

7   Q    Well, sir, what, if anything, when Phil Kenner said

8   that you said, said that in your presence and the other

9   loan officials, what, if anything, did you say given your

10  knowledge that there was a fiduciary obligation that

11  existed between the bank and these investor clients.  What

12  did you say?

13  A    I said nothing.  I was part of the meeting but I was

14  just there.  I wasn't making any of the decisions on

15  behalf of the bank.

16  Q    And is it your testimony then after that meeting you

17  were then instructed by your superiors not to send the

18  loan documents or the transaction history reports to the

19  clients but send them only to Phil Kenner?

20  A    That was the lender's role and I was not a lender.

21            (Continued.)

22

23

24

25

Mascarella - Cross/Haley

909

1   BY MR. HALEY (Cont'd):

2   Q.   My question is then, sir, did anyone instruct you by

3   way of the lender, to follow that request of

4   Phil Kenner's, as you said?

5   A.   In what regard?

6   Q.   In terms of why only you would communicate with him

7   with reference to the loan transaction histories, the

8   monthly statements.

9   A.   I did not control -- when the relationship initially

10   started, I was a banker.  I was not a lender.

11          I had no control over where the bank -- where

12   the loan statements went.

13   Q.   But there came a point in time where you did,

14   correct?

15   A.   Yes.

16   Q.   And at the point in time when you did have control

17   over where the bank statements went, who if anyone

18   instructed you that you should honor the request demand of

19   Phil Kenner, as you say, when he said send them only to

20   me, in sum and substance?

21   A.   I continued the relationship the way it had initially

22   started.

23          I was told not to do anything differently.

24   Q.   Who told you that?

25   A.   My manager.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Mascarella - Cross/Haley

910

1    Q.    What's his name or her name?

2            MS. KOMATIREDDY:  Objection, relevance.

3            THE COURT:  Overruled.

4            You can answer that.

5    A.    I had several people in the loan department that

6    instructed me to do that.

7            I had so many different bosses during the

8    relationship, it would be tough for me to say who exactly

9    told me to do that, but I was always told, or instructed

10   to continue the relationship that -- not to make any

11   changes, to continue the way it had always been operating.

12   Q.    And when you were told that you, I take it, expressed

13   no resistance, objection to that directive, correct?

14   A.    Yeah, I had no power to change it, no.

15   Q.    Are you familiar with the concept, sir, given your

16   training and background in the banking field, as you

17   described in your direct, with the concept of know your

18   client?

19           MS. KOMATIREDDY:  Objection, vague.

20           THE COURT:  Do you understand the term?

21           THE WITNESS:  Yes.

22           THE COURT:  Go ahead.

23           You can answer.

24   BY MR. HALEY:

25   Q.    What is your understanding of where that phrase

Mascarella - Cross/Haley

911

1   originates?

2   A.    We did not have know your client procedures at the

3   time this relationship started.

4   Q.    That doesn't originate, sir, from the 2001 Patriot

5   Act?

6          Yes or no?

7   A.    That's my recollection, yes.

8   Q.    Well, when did your relationship with Phil Kenner and

9   his hockey player clients commence?

10  A.    Late 2003.

11         But, again --

12  Q.    Sir, you answered the question.

13  A.    In 2003 I was not a lender --

14  Q.    Sir, there is no question, there is no question in

15  front of you right now, sir.

16         I asked you a question about the Patriot Act in

17  2001.  I asked you a question about when the relationship

18  with Phil Kenner commenced you said 2003.  You answered

19  the question.

20  A.    Okay.

21  Q.    So it's your testimony that the monthly statements

22  with reference to the lines of credit and how they were

23  being utilized were being sent by you directly to

24  Phil Kenner.

25         Is that correct?

912

1   A.   By me?

2        At what period of time?

3   Q.   At the period of time when you became involved in the

4   accounts.

5   A.   The banking accounts?

6   Q.   Correct.

7   A.   So I was in charge of sending Little Isle IV checking

8   account statements.

9        I wasn't part of the lending relationship.  I

10  had no control over where those loan statements went and

11  who they went to.

12  Q.   Sir, and I have to apologize.  The mistake was mine.

13       I thought you testified on direct that the

14  monthly loan statements regarding lines of credit were

15  sent by you exclusively to Phil Kenner pursuant to his

16  request.

17  A.   By the bank, not by me.

18  Q.   But you, I guess, had an understanding that the

19  loan -- monthly loan statements regarding the use of the

20  LOCs were being sent only to Phil Kenner.

21       That was your understanding, correct?

22  A.   I knew a copy was going to Phil Kenner, and I would

23  have assumed, I know it doesn't help you today right now,

24  but that a copy was also sent to each one of the

25  borrowers.

Mascarella - Cross/Haley

913

1   Q.   It doesn't hurt me, sir.

2          MS. KOMATIREDDY:  Objection.

3          THE COURT:  Sustained.

4          The jury will disregard that.

5   BY MR. HALEY:

6   Q.   Now, there came a point in time that --

7          MR. HALEY:  Withdrawn.

8   BY MR. HALEY:

9   Q.   You testified on direct, sir, that you did develop

10  some sort of business/personal relationship with

11  Phil Kenner.

12          Is that true?

13  A.   Definitely not a personal relationship, no.

14  Q.   Then I apologize.

15          But you were certainly civil to each other,

16  correct?

17  A.   Yes.

18  Q.   And, by the way, he was always civil to you, was he

19  not?

20  A.   Not always.

21  Q.   Okay.

22          Were you always civil to him?

23  A.   Yes.

24  Q.   I see.

25          Was there a time that you were invited to a

914

1    charity event by Phil in California where many of his

2    investor clients were present at the charity event?

3    A.    Yes.

4    Q.    Do you recall who was there of the investor clients?

5    A.    The only clients I knew of Phil Kenner that were

6    there were Jason Allison.

7    Q.    Did you during that event communicate with Jason

8    Allison or others that may have been present?

9    A.    No.

10   Q.    Was Phil civil to you at that event, sir?

11   A.    I never even saw him.

12   Q.    Okay.

13          You went for what purpose?

14   A.    It was a bowling fundraiser.

15   Q.    You bowl?

16   A.    I don't bowl, but we finished second.

17   Q.    As a novice, you did well.

18          Now, the interest payments that were being made

19   on the line of credit that you testified to, that

20   fulfilled, did it not, the obligation to keep those lines

21   of credit current and not go in default.

22          Is that true?

23   A.    Yes.

24   Q.    You didn't find, sir, at least that activity in terms

25   of keeping lines of credit current by way of paying the

Mascarella - Cross/Haley

915

1    interest payments to be unusual.

2            True?

3            MS. KOMATIREDDY:  Objection; form.

4            THE COURT:  Sustained as to form.

5    BY MR. HALEY:

6    Q.   Well, other than, let's say, the lines of credit

7    involving Phil Kenner and his clients, over the years did

8    you see similar circumstances where lines of credit

9    pursuant to the obligations were maintained by virtue of

10   the payment of the interest?

11           Is that true?

12   A.   I'm confused by your question.

13   Q.   Maybe I am as well.  I'm going to rephrase it.

14           The payment of the interest on the lines of

15   credit, as reflect in the bank records, speak for

16   themselves.

17           That event, itself, was not out of the ordinary,

18   was it, in your banking experience?

19           MS. KOMATIREDDY:  Objection.

20           THE COURT:  I changed my mind.  I'll let it go.

21           You can answer that.

22   A.   One more time, please.

23   Q.   Sure.

24           MR. HALEY:  I'll withdraw the question because I

25   don't think I'll be able to formulate it correctly.

916

1   BY MR. HALEY:

2   Q.   At any point in time when you were present with

3   Phil Kenner, did you observe him, sir, forge another

4   person's signature?

5              MS. KOMATIREDDY:  Objection, scope.

6              THE COURT:  Overruled.

7              You can answer that.

8   A.   I never saw him forge a signature.

9   Q.   Did you ever while he was in your presence observe

10  Phil Kenner practicing forging a signature by, let's say,

11  using his nondominant hand?

12  A.   Nope.

13  Q.   Now, you were interviewed by the FBI at some point.

14             Is that true, sir?

15  A.   Yes.

16  Q.   Did that occur on October 15, 2010, if you know?

17  A.   Sounds about right.

18  Q.   Sir, would you kindly take a look at this document,

19  take your time, and it's not that lengthy.

20             THE COURT:  Does that have a number?

21             MR. HALEY:  I'm sorry.

22             Kenner Exhibit 26 for identification, your

23  Honor.

24             (There was a pause in the proceedings.)

25  A.   Okay.

917

1   Q.   Mr. Mascarella, do those notes appear to be

2   handwritten notes reflecting your interview by the FBI on

3   October 15, 2010?

4   A.   Yes.

5   Q.   At any point during that interview on October 15th,

6   2010, did you tell the FBI about this meeting with the

7   lenders where Phil Kenner instructed you only to send the

8   monthly line of credit statements to his address?

9   A.   It never came up.

10  Q.   Now, it's true, is it not, that Phil Kenner's line of

11  credit clients certainly knew how to get in touch with

12  you, true?

13          MS. KOMATIREDDY:  Objection.

14          THE COURT:  Sustained as to form.

15  BY MR. HALEY:

16  Q.   Well, over the course of your handling of what we are

17  talking about, the line of credit accounts involving

18  Phil Kenner and his clients, there were at least one or

19  two occasions where an investor client called you and

20  spoke with you directly over the telephone regarding his

21  account.

22          Isn't that true?

23  A.   Yes.

24          It was rare, but, yes.

25  Q.   All right.

Mascarella - Cross/Haley

918

1          You didn't tell him, I take it, that you were

2     prohibited from speaking with him pursuant to the

3     directions of Phil Kenner, true?

4     A.   Right.

5     Q.   And I assume when that person called, you would

6     answer his questions.

7          Is that true?

8     A.   Absolutely.

9     Q.   And I assume you would do so truthfully, is that

10    correct?

11    A.   Yes.

12    Q.   And, sir, I guess to state the obvious, we know the

13    accounts were established -- when I say the accounts, the

14    pledged line of credit accounts -- were established long

15    before your involvement in these matters.

16         Is that true?

17              MS. KOMATIREDDY:  Objection.

18              THE COURT:  You understand the question?

19              THE WITNESS:  Yeah.

20              THE COURT:  You can answer.

21    A.   Please repeat the question.

22    Q.   Sure.

23         The pledged accounts, the opening documents and

24    the paperwork that went with the opening documents to

25    establish these pledged line of credit accounts, that

919

1  occurred sometime before you became involved in

2  administering this account.

3          Is that correct?

4  A.   Before I started administering the lines of credit,

5  yes.

6  Q.   And how many years was that, sir, to your knowledge?

7  A.   I'd say about three years, three and a half years.

8  Q.   When you took over handling the account, was there a

9  memo in the file that instructed you and directed you to

10 only forward the annual monthly statements to Phil Kenner?

11         Yes or no?

12 A.   Annually monthly?

13 Q.   Excuse me, Judge -- excuse me -- monthly statements,

14 sir.

15 A.   There was nothing in there to indicate to send the

16 statements only to Phil Kenner.

17 Q.   Did you ever surreptitiously record a conversation

18 between yourself and Phil Kenner?

19 A.   Never.

20 Q.   But you were instructed to surreptitiously record

21 conversations between yourself and some coworkers,

22 correct?

23         MS. KOMATIREDDY:  Objection; no good faith

24 basis.

25         THE COURT:  Overruled.

Mascarella - Cross/Haley

920

1          You can answer that.  Again, an attorney's

2   question is not evidence in and of itself, but you can

3   answer that.   Did you hear the question?

4   A.    Please repeat the question.

5              THE COURT:  Go ahead.

6   BY MR. HALEY:

7   Q.    Sure.

8          Before I do so, does the name Scott Romonowski,

9   R-O-M-O-N-O-W-S-K-I mean anything to you?

10  A.    Yes.

11  Q.    In what way does it mean something to you?

12  A.    He interviewed me when I was an employee at Northern

13  Trust.

14  Q.    And after that interview, did you stay with Northern

15  Trust or did he go into some other profession?

16  A.    Did Scott?

17  Q.    Scott?

18  A.    Romonowski, I don't know.

19  Q.    The establishment of the lines of credit with

20  Northern Trust with reference to Phil Kenner's clients

21  resulted in a return, a profit to Northern Trust.

22          Did it not?

23              MS. KOMATIREDDY:  Objection.

24              THE COURT:  Overruled.

25          You can answer that.

Mascarella - Cross/Haley

921

1    A.    It was a profitable relationship.

2    Q.    To the tune of maybe $750,000 a year?

3    A.    That might seem a little high.

4          I have never done the math, so I don't know.

5    Q.    Okay.

6          Before you took the witness stand today, sir,

7    did you see or review the entire file maintained by

8    Northern Trust with respect to the lines of credit

9    involving Phil Kenner and his hockey player clients?

10   A.    One more time, please.

11         I'm sorry.

12   Q.    Sure.

13         Before you testified today, did you see or

14   review the entire file maintained by Northern Trust

15   concerning the lines of credit involving Phil Kenner and

16   his investor clients?

17   A.    Every page of every statement, everything that was in

18   the files?

19   Q.    Yes, sir.

20   A.    Not after I was terminated from Northern Trust.

21         I was very familiar with the files before I

22   left.

23   Q.    My question is, sir, did the government show you

24   before your testimony today the entire Northern Trust file

25   as relates to Phil Kenner and his hockey player clients?

Mascarella - Cross/LaRusso

922

1   A.   They didn't show me every page of every file, no.

2   Q.   What they did show you, I take it, is reflected in

3   that binder they gave you.

4        Is that true?

5   A.   Yes.

6        MR. HALEY:  May I have a moment, Judge?

7        THE COURT:  Sure.

8        (There was a pause in the proceedings.)

9        MR. HALEY:  Thank you for your testimony, sir.

10        MR. LARUSSO:  Your Honor, just a few questions.

11   CROSS-EXAMINATION

12   BY MR. LARUSSO:

13   Q.   Good afternoon, Mr. Mascarella, how are you?

14   A.   Good, thanks.

15   Q.   My name is Robert LaRusso.  I represent

16   Mr. Constantine who is over here to my right.

17        Before today, have you ever met my client,

18   Mr. Constantine?

19   A.   No.

20   Q.   Have you ever spoken with him on the phone?

21   A.   No.

22   Q.   Have you ever communicated with him via e-mail?

23   A.   No.

24   Q.   Isn't it a fact, Mr. Mascarella, that Mr. Constantine

25   had nothing to do with the creation and the use of the

923

1    accounts that are listed on the government's Exhibit board

2    No. 1 under the Hawaiian entities over there to your

3    right?

4    A.    No, not to my knowledge.

5    Q.    And, in fact, in regards to Government Exhibits 22

6    through 40, the wire transfer transactions that you

7    testified to, Mr. Constantine had nothing to do with these

8    as well.

9         Is that correct?

10   A.    Not to my knowledge.

11        MR. LARUSSO:  No further questions, your Honor.

12        THE COURT:  Redirect.

13        MS. KOMATIREDDY:  Very brief, your Honor.

14   REDIRECT EXAMINATION

15   BY MS. KOMATIREDDY:

16   Q.    Mr. Mascarella, you were asked on cross about the

17   default letters that you sent out and how there were

18   several stages of default letters.  Let me just make sure

19   this is very clear in the record.

20        I ask you to turn your attention to the February

21   letters and, specifically, Government Exhibit 2112, which

22   is in evidence.

23        Just so we understand the status of the letters,

24   what is the first letter due and it's up on your screen as

25   well, what is the purpose of the first letter?

924

1   A.    The purpose of the first letter is to notify that the

2   lines of credit are past due and it is an Event of

3   Default.

4   Q.    And looking at the contents of the letter it

5   basically in sum and substance states if the default is

6   not cured, then the collateral will be seized, right?

7   A.    Right.

8   Q.    And these letters went out in February of 2009,

9   correct, this one particularly February 9, 2009, correct?

10  A.    Yes.

11  Q.    And then your second round of letters, turning to

12  2113, what's the purpose of this letter?

13  A.    It's to notify the individuals that their accounts

14  are, indeed, in default and that we are -- that Northern

15  Trust intended to liquidate the investment accounts, or

16  sell the investments held as collateral.

17  Q.    So, in other words, this letter tells the receiver

18  that the default back in February that you told them about

19  was not cured in March and now the collateral will be

20  seized.

21        Correct?

22  A.    Yes.

23  Q.    Between February and March of 2009, did you speak

24  directly with any of the player clients of Mr. Kenner,

25  that you remember?

Mascarella - Redirect/Komatireddy

925

1   A.   Not that I remember, no.

2   Q.   I'm going to hand you what's been marked as

3   Government Exhibit 6514.

4            Take a minute to review it.

5            (There was a pause in the proceedings.)

6   BY MS. KOMATIREDDY:

7   Q.   Have you had a chance to read that before you came in

8   today?

9   A.   Yes.

10  Q.   What is it?

11  A.   It's an e-mail between Phil and myself.

12  Q.   What's the date?

13  A.   It is February 18th, 2009.

14  Q.   Is that a true and accurate copy of an e-mail

15  conversation between you and Mr. Kenner February 18, 2009?

16  A.   Yes.

17           MS. KOMATIREDDY:  The government moves 6514 into

18  evidence.

19           MR. LARUSSO:  No objection, your Honor.

20           THE COURT:  You said 6514?

21           MS. KOMATIREDDY:  Yes, sir.

22           THE COURT:  That exhibit is admitted.

23           (Whereupon, Government Exhibit 6514 was received

24  in evidence, as of this date.)

25

**Mascarella - Redirect/Komatireddy**

926

1    BY MS. KOMATIREDDY:

2    Q.   So after that first round of letters goes out, you

3    get this e-mail from Mr. Kenner.

4            Correct?

5    A.   Yes.

6    Q.   And the subject line is default letters, correct?

7    A.   Yes.

8    Q.   And it says that he received the letters today,

9    correct?

10   A.   Yes.

11   Q.   And he asks you to send a breakdown for all the

12   individual line of credit payments that are due.

13           Correct?

14   A.   Yes.

15   Q.   And he says he's going to make arrangements by Friday

16   to pay the late fees, correct?

17   A.   Yes.

18   Q.   And he asks for a little bit more time, right?

19   A.   Right.

20   Q.   And you respond and there's a number of numbers

21   there.

22           What is it that you are responding with?

23   A.   It's too hard to read.

24           Can I --

25   Q.   I'll give you the paper copy.

Mascarella - Redirect/Komatireddy

927

1   A.   Thank you.

2   Q.   Just reading it for the record it says:

3        Phil, the payments due to date are, correct?

4   A.   Yes.

5   Q.   Then it has the names and numbers, correct?

6   A.   Yes.

7   Q.   What did those names and numbers represent?

8   A.   The names of the -- in which the lines of credit were

9   titled and then the interest amounts that were past due

10  for each one of those individual lines of credit.

11  Q.   So after you notified -- you sent out those notices

12  that there was an Event of Default and before the bank

13  actually decided to seize all the collateral, you got this

14  e-mail from Mr. Kenner and you responded.

15       Right?

16  A.   Yes, I did.

17  Q.   And he said he was going to pay, right?

18  A.   Yes.

19  Q.   Did he?

20  A.   No.

21       MS. KOMATIREDDY:  No further questions.

22       THE COURT:  Anything further?

23       MR. HALEY:  Very briefly, Judge.

24

25

Mascarella - Recross/Haley

928

1   RECROSS-EXAMINATION

2   BY MR. HALEY:

3   Q.   Sir, with reference to the February 19th -- excuse

4   me -- with reference to the February 9th default letters,

5   as well as the -- excuse me -- I'll call them pending

6   default letters, and the March 19th, 2009 default letters

7   that bear the address of each individual account holder,

8   these were also sent via cc to Phil Kenner.

9            Is that correct?

10  A.   Yes.

11  Q.   So receiving an e-mail, as just introduced into

12  evidence where Phil indicates that he has received the

13  default letters, that wasn't a surprise to you, was it?

14           MS. KOMATIREDDY:  Objection.

15           THE COURT:  Overruled.

16           You can answer that.

17  A.   I'm sorry.

18           What was the question again?

19  Q.   Sure.

20           When you -- in view of the cc -- by the way, cc

21  we know what that means, don't we, sir?  I sometimes ask

22  confusing questions, but that's not a confusing question,

23  is it?

24  A.   No, it's not.

25  Q.   Reference to the cc designation on this, when you

Mascarella - Recross/Haley

929

1    then received an e-mail communication from Phil Kenner

2    that reads he received the default letters regarding

3    default letters, the fact that you received that

4    communication from him was not a surprise, was it?

5    A.    No.

6              MR. HALEY:  I have no further questions.

7              THE COURT:  You can step down, sir.

8              Thank you.

9              (Witness steps down.)

10             THE COURT:  We'll take the lunch break and we'll

11   reconvene at 1:45.

12             Don't discuss the case.  Have a nice lunch.

13             (Jury leaves the courtroom.)

14             (Luncheon recess.)

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

930

1          **A F T E R N O O N   S E S S I O N**

2          THE CLERK:  All rise.

3          THE COURT:  You may be seated.

4          Are you ready for the jury?

5          MR. LaRUSSO:  Yes, Your Honor.

6          THE COURT:  Bring them in.

7          THE CLERK:  All rise.

8          (Whereupon the jury enters the courtroom at 2:10

9   p.m.)

10          THE COURT:  Please be seated.

11          The government, please call your next witness.

12          MR. MISKIEWICZ:  The government calls Dolores Ethel

13   Kaiser.

14          THE COURT:  Mrs. Kaiser, if you'd come to the

15   witness stand, and remain standing once you get there for the

16   oath.

17          THE CLERK:  Please raise your right hand.

18          (Witness sworn.)

19          E T H E L   D O L O R E S   K A I S E R

20          called as a witness, having been first

21          duly sworn, was examined and testified

22          as follows:

23          THE WITNESS:  I do.

24          THE CLERK:  Please state your name, and spell it for

25   the record.

1          THE WITNESS:  Ethel Dolores Kaiser.

2          THE COURT:  Spell it.

3          THE WITNESS:  E-T-H-E-L, D-O-L-O-R-E-S, K-A-I-S-E-R.

4          THE COURT:  Be seated, Mrs. Kaiser.  If you could

5   pull your chair up and keep your voice up near the microphone,

6   that would be good.

7          THE WITNESS:  Yes.

8          THE COURT:  The government may proceed.

9          MR. MISKIEWICZ:  Thank you, Your Honor.

10  DIRECT EXAMINATION

11  BY MR. MISKIEWICZ:

12  Q    Good afternoon, Ms. Kaiser.

13  A    Good afternoon.

14  Q    Ms. Kaiser, are you currently employed?

15  A    I'm sorry?

16  Q    Are you currently employed?

17  A    No, I'm not.

18  Q    When did you retire?

19  A    Well, a couple of years ago.  But I'm still kind of

20  working.  I really didn't retire altogether.

21  Q    What business or profession were you in when you retired?

22  A    I took care of the elderly in a nursing home.

23  Q    What do you do now that your semi-retired?

24  A    I still kind of take care of the elderly, when people ask

25  me.

E. KAISER-DIRECT-MISKIEWICZ                                932

1   Q    Do you have any children?

2   A    I have eight children.

3   Q    Is one of your children a man by the name of John or

4   Johnny Kaiser?

5   A    Yes.

6   Q    Through your son John Kaiser, did you come to know one of

7   the defendants in this case, Phil Kenner?

8   A    Yes.

9   Q    Do you see Mr. Kenner anywhere in the courtroom today?

10  A    Yes.

11  Q    Can you just describe what kind of clothing he's wearing?

12  A    A white shirt.

13          MR. MISKIEWICZ:  We ask that the record reflect that

14  Ms. Kaiser has identified the defendant.

15          MR. HALEY:  Yes, sir.

16          THE COURT:  Yes.

17  Q    How did you meet Mr. Kenner?

18  A    I met him through my son John.

19  Q    In what capacity?  What were -- how was it that he was

20  introduced?  Was it business, was it social, or what?

21  A    Business.

22  Q    I want to direct your attention to the project that was

23  going on in Hawaii.  Have you ever of a project that your son

24  and others were involved in regarding Hawaii?

25  A    Yes.

1  Q    Did this ever come a time that you were asked to make a

2  loan to the defendant.

3  A    Yes.

4  Q    Who actually asked you?  Did the defendant ask you or did

5  someone else ask you on his behalf?

6  A    Phil Kenner and my son John.

7  Q    Would this have been in or around 2003 or 2004?

8  A    I think it was 2005.

9  Q    How much of a loan was that supposed to be?

10 A    390,000.

11 Q    You put in 390,000?

12 A    Yes.

13 Q    Do you know if anybody else put in more?

14 A    Yes, they did; but I couldn't tell you the amount.

15 Q    Where did you get that 390,000 from?

16 A    From my savings.

17 Q    How long was this note supposed to be extended for?

18 A    30 days.

19 Q    What, if anything, were you going to get out of it after

20 30 days?

21 A    I was getting my money back plus about 12 percent

22 interest.

23 Q    Did you get your money back after 30 days?

24 A    No, I didn't.

25 Q    Did you get interest back after 30 days?

1   A    No.

2   Q    Do you know what happened to the money?

3   A    No, I don't.

4   Q    Were you eventually repaid by anybody?

5   A    Down the line, from my son.

6   Q    I'm going to fast forward -- by the way, in or about this

7   period of time, did you meet Mr. Kenner at any family

8   functions or social events?

9   A    Yes, I did.

10  Q    I'm showing you what has been marked for identification

11  as Government 942.  Do you recognize who is depicted in that

12  photograph?

13  A    Yes; Phil Kenner, my son John, and his baby.

14  Q    Which baby is that?

15  A    A grandchild that John had just had.

16       MR. MISKIEWICZ:  The government moves for the

17  admission of 942.

18       MR. HALEY:  May I see it?

19       No objection.

20       MR. LaRUSSO:  No objection, Your Honor.

21       THE COURT:  942 is admitted.

22       (So marked as Government Exhibit 942 in evidence.)

23  Q    Now, Mrs. Kaiser, are you familiar with a company by the

24  name of Eufora?

25  A    Yes, I am.

E. KAISER-DIRECT-MISKIEWICZ                    935

1    Q    Did you ever invest in a company by the name of Eufora?

2    A    Yes, I did.

3    Q    Who, if anybody, did you talk to prior to that

4    investment?

5    A    Tommy Constantino.

6    Q    Did you ever meet this person?

7    A    Yes, I did.

8    Q    Would you recognize him if you saw him again?

9    A    Yes.

10   Q    Do you see him anywhere in the courtroom today?

11   A    I believe he's that gentleman right there in the blue

12   suit (indicating).

13   Q    I'm sorry.  I couldn't hear what you said.

14   A    I'm not sure.  I think it's this man in the blue suit.

15   Q    This man (indicating)?

16   A    No.

17   Q    The man sitting next to him (indicating)?

18   A    Yes.

19        MR. MISKIEWICZ:  May the court reflect the witness

20   has identified Mr. Constantine.

21        THE COURT:  Yes.

22   Q    Mrs. Kaiser, when you invested in Eufora, do you recall

23   how much money you invested?

24   A    Around $70,000.

25   Q    Where did that money come from?

E. KAISER-CROSS-HALEY                              936

1    A    Where did it come from?  Again, my savings.

2    Q    Why did you invest in Eufora?

3    A    Well, I was told that it was going to be very, very big

4    and I was able to make a lot of money.

5    Q    Who told you that?

6    A    Tommy.  And also, my son thought it would be a good idea

7    also.

8    Q    Did you make any profit on that?

9    A    Not at all.

10   Q    Did you ever see the $70,000 again?

11   A    It went fast, no.

12   Q    Did you get any explanation what happened to the money?

13   A    No.

14         MR. MISKIEWICZ:  No further questions.

15         THE COURT:  Cross-examination.

16         MR. HALEY:  I have a few questions, Your Honor.

17   Thank you.

18   CROSS EXAMINATION

19   BY MR. HALEY:

20   Q    Mrs. Kaiser.

21   A    Yes.

22   Q    Good afternoon, ma'am.

23   A    Good afternoon.

24   Q    Eight children.

25   A    Eight children in ten years, yes.

1  Q    We know of one grandchild.  Any other grandchildren?

2  A    Yes.

3  Q    How many?

4  A    Fourteen.

5  Q    God bless you.

6  A    Thank you; he has.

7  Q    The meeting that you had with Phil Kenner.

8  A    Yes.

9  Q    You say it was a meeting involving yourself and your son

10 as well, is that true?

11 A    That's right.

12 Q    Where did that take place?

13 A    Well, that took place at his 40th birthday party.

14 Q    Whose 40th birthday party?

15 A    My son John.

16 Q    During that 40th birthday party, who mentioned your

17 potential investment in Hawaii, John, Phil, both of them?  Who

18 mentioned that?

19 A    Phil.  We were talking about it.  We were at a party, so

20 it was...

21 Q    Was John part of that conversation?

22 A    No, he wasn't.

23 Q    Well, did there come a point in time where you asked

24 John, your son John, about the advisability of this investment

25 in Hawaii?  John, do you think it's a good idea?  You spoke to

1  Phil about it?  Something like that happened?

2  A    Yes.

3  Q    What did John say to you?  Bad idea, good idea, what did

4  John say?

5  A    He thought, at the time, that it was a very good idea.

6  Q    Ma'am, are you aware that your son John was the one that

7  actually originated the idea of investing in Hawaiian real

8  estate?  Are you aware of that?

9  A    No, he never did.

10 Q    He didn't originate that idea?

11 A    No.

12 Q    Do you know if after the tragic events of 2001 -- and

13 what I mean by that is the World Trade Center bombing -- that

14 your son went to Hawaii with another fellow by the name of

15 Chris Manfredi?  Are you aware of that?

16 A    No, I'm not.

17 Q    Do you know whether or not after the tragic events of

18 2001 -- again, I mean the World Trade Center bombing --

19 whether or not your son went to Hawaii after that event?

20 A    I'm sure he was right there on 9/11, helping out.

21 Q    I have no doubt, but that's not my question.

22 A    I'm sorry.

23 Q    My question simply is, do you know whether or not your

24 son -- again, after the tragic event of 2001, the World Trade

25 Center bombing -- ending up vacationing in Hawaii shortly

1    thereafter?

2    A    No.  I'm not aware.  I don't recall that, no.

3    Q    Do you know a person by the name of Chris Manfredi?

4    A    No.

5    Q    Now, the monies that you invested in Eufora --

6    A    Yes.

7    Q    -- the 390,000.  I know you told us a moment ago the idea

8    came up with Phil Kenner.  But did your son John know that you

9    were investing $390,000 in Eufora?

10   A    Yes, he did.

11   Q    He approved of that, is that true?

12   A    Yes.

13   Q    Now, you say there came a point in time that your son

14   John paid back that money to you, is that true?

15   A    That's right.

16   Q    Do you know if your son John was a member of a company

17   called Little Isle IV LLC?

18   A    No.

19   Q    By the way, when he paid you back the $390,000, did he

20   pay you that back with the 12 percent interest?

21   A    Yes, he did.

22   Q    Other than the $390,000, over the years, let's say from

23   2005 up to even the current time, has your son John asked you

24   for money over and above 390,000?

25   A    To make investments, yes.

940

1  Q    And when he asked you for the money would you honor his

2  request in all instances, or not?

3  A    Yes.

4  Q    When he asked you for the money, would you be -- would he

5  be receiving that money by way of a gift, would you gift it to

6  him, or was it in the nature of a loan where he requested the

7  money of you with the idea or the commitment that he would pay

8  you back that money?

9  A    It wasn't a loan.  It was an investment that he thought I

10  should go into.

11  Q    We're talking about the money other than the $390,000,

12  correct?

13  A    Mm-hmm.

14  Q    Do you know a person by the name of Bryan Berard?

15  A    Yes.

16  Q    How do you know Bryan Berard?

17  A    I met him on an occasion.

18  Q    Where did you meet Bryan Berard?

19  A    They were doing a fundraiser for my son who has MS and is

20  in a wheelchair, and I happened to meet him there.

21  Q    Was that the first and only time you met Bryan Berard?

22  A    Yes.

23  Q    At any point in time, ma'am, did you have discussions

24  where you discussed with your son John a matter where he would

25  borrow money from you and then, in turn, loan that money to

941

1    Bryan Berard?

2            MR. MISKIEWICZ:  Objection.  Scope.

3            THE COURT:  Overruled.  You can answer.

4    A    No, that didn't happen.

5    Q    Now, do you have an investment account?  In other words,

6    do you have an account where your money is under the control

7    of an investment firm?

8    A    I have stock.

9    Q    Does the name Abraham Lerner -- does the name Abraham

10   Lerner & Arnold LLP mean anything to you?

11   A    No, it doesn't.

12   Q    That's not an investment firm in which you might have

13   some of your investment, or all of your investments?

14   A    No, I don't think so.

15   Q    I'm going to show you a document.  I'm going to approach

16   where you're seated.  Okay?

17   A    Okay.

18   Q    Are you okay with that?

19   A    Fine.

20           MR. HALEY:  Let me show it to counsel.

21           MR. MISKIEWICZ:  May we approach, Your Honor.

22           (Whereupon a side-bar conference was conducted.)

23           (Matter continued on the next page.)

24

25

942

1          (Side-bar conference.)

2          MR. HALEY:  It is not my intention to introduce it,

3    Judge, but I do have some questions.

4          MR. MISKIEWICZ:  I can't object to the questions

5    yet.  But that exhibit has, among other things, Tommy

6    Hormovitis, the alias.

7          MR. HALEY:  I know it does, and I'm not introducing

8    it.  You won't hear me introduce it into evidence.

9          THE COURT:  Okay.

10          (Whereupon the side-bar conference was concluded.)

11          (Matter continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Matter continued in Open Court.)

2  CONTINUED CROSS EXAMINATION

3  BY MR. HALEY:

4  Q    I'm going to approach you.  Okay?

5  A    Fine.

6  Q    I want you to take a look at the first page of this

7  document.  Can you read what is on the page, yes or no?

8  A    Yes.

9  Q    Does your name appear on that document, ma'am?

10  A    I see it right here.

11  Q    When you say "right here"?

12  A    I see my name right here.

13  Q    Do you see Phil Kenner's name on that document, yes or

14  no?

15  A    No, I don't.  I don't see it here.

16  Q    Do you recognize that document, Mrs. Kaiser, yes or no?

17  A    No, no.

18       MR. HALEY:  May I have a moment, Your Honor?

19       THE COURT:  Yes.

20       MR. HALEY:  Thank you for your patience.

21  Q    Finally, with reference to the Eufora investment that was

22  recommended by your son John, do you recall that question?

23  A    The one that was also recommended by Tommy also.

24  Q    I believe that you have told us on direct that your son

25  John thought the Eufora -- did you say on direct examination

1   that your son John thought the investment would be a good

2   idea, the one with Eufora?

3   A    That's right.

4   Q    You had no conversations with Phil Kenner with respect to

5   the Eufora investment, isn't that correct?

6   A    Not at that time, no.  Not at this time.

7   Q    When your son recommend to you the Eufora investment, did

8   he explain to you that in return for your investment you would

9   be obtaining an ownership equity interest in what he perceived

10  to be a growing company?  Did he tell you that?

11  A    They said it was going to be a very, very big thing.  I

12  was very impressed because I'd never heard of a charge card

13  making that much money.

14  Q    So you had an understanding that the nature of this

15  business was one that would involve a process for the use of

16  credit cards, is that correct?

17  A    That's right.

18  Q    Did you have an understanding that it involved the

19  process of prepaid debit cards where one could then

20  reestablish their credit?

21  A    I didn't really go into all those details.  I just

22  thought it was going to be a very, very good investment.  And

23  I was impressed.  I was moved by it.

24  Q    It was your son that was selling that investment to you,

25  as well --

E. KAISER-CROSS-LaRUSSO                                945

1  A    No, he wasn't.

2  Q    Well, both Mr. Constantine as well as John recommend

3  this, is that correct?

4  A    Yes.

5  Q    I assume when your son was recommending that investment

6  to you, and I understand Mr. Constantine as well, you trusted

7  what he was telling you, isn't that true?

8  A    Of course.

9  Q    Did you ever request of your son documentation reflecting

10 you're ownership interest in Eufora based upon your

11 investment?

12 A    No, I didn't.

13 Q    As you sit here today, do you know whether or not your

14 investment in Eufora is reflected on its books and records?

15 A    Say that again, please.

16 Q    I don't want to confuse you.  And actually, ma'am, I

17 withdraw the question.

18        MR. HALEY:  I thank you for your testimony.

19 CROSS EXAMINATION

20 BY MR. MR. LaRUSSO:

21 Q    Good afternoon, Mrs. Kaiser.

22 A    Good afternoon.

23 Q    My name is Robert LaRusso.  I represent Mr. Constantine.

24 A    Okay.

25 Q    Do you know Tommy as Constantino?

E. KAISER-CROSS-LaRUSSO                    946

1    A    I'm always pronouncing his last name wrong.  Sorry.

2    Q    It's your testimony that you met him?

3    A    Yes.

4    Q    And spoke to him directly, is that correct?

5    A    Yes.

6    Q    Do you remember when you spoke with Mr. Constantino?

7    A    Yes.  It was in Mexico.  I think it was in -- I'm not

8    sure of the year.  I think it was 2009.

9    Q    You know what part of 2009?

10   A    I don't recall that, no.

11   Q    Where in Mexico with you?

12   A    We were at a beautiful home that I'm sure was owned by

13   Phil Kenner.  That's where we stayed.  That's where I met

14   Tommy and his girlfriend.

15   Q    Who is "we"?  When you say you were down there?

16   A    Well, my son John took me there.

17   Q    I assume that was on vacation?

18   A    I guess you could call it that.

19   Q    Was there other reasons for travelling down to Mexico

20   with your son?

21   A    Yes.  I thought we were going to be meeting Phil there,

22   but that didn't happen.

23   Q    Were you going down there for other than social reasons?

24   A    No.

25   Q    You weren't going down there to look at any Mexican

E. KAISER-CROSS-LaRUSSO                                    947

1   investments, were you?

2   A    No.

3   Q    Do you know if your son -- by the way, did you, through

4   your son, invest in any Mexican real estate projects that you

5   know of?

6   A    No.

7   Q    Can you tell me, the individual that you met that you

8   identified as Tommy, how long were you with him?  Do you

9   recall?

10  A    Only a matter of a few hours.

11  Q    Was it at that location --

12  A    Yes.

13  Q    -- that you described earlier?

14  A    Yes.

15  Q    You were there -- you believed, you said, he was there

16  with his girlfriend, is that correct?

17  A    Yes.

18  Q    Other than yourself and you son, my client and his

19  girlfriend, was their anybody else present?

20  A    No.

21  Q    Would it be fair to say that during that meeting they

22  discussed with you Eufora, is that correct?

23  A    No.  We spoke about that, but not at that time when I met

24  him.

25  Q    So the time that you met him in Mexico had nothing to do

1   with the investment you made in Eufora, is that correct?

2   A    That's right.

3   Q    But it was the only time that you met Mr. Constantine, is

4   that correct?

5   A    That's correct.

6   Q    You say that you spoke on the phone with Mr. Constantine

7   about the investment, is that right?

8   A    Yes.

9   Q    Was that after you met with him in Mexico or before?

10  A    I don't really recall that much.  It might have been

11  before I met him.

12  Q    Do you remember who else was -- was there anyone else on

13  the telephone conversation that you had with Mr. Constantino?

14  A    No.  Just Constantino and my son.

15  Q    And your son?

16  A    Yes, my son.

17  Q    Who initiated the call?

18  A    I don't really recall that.

19  Q    Where were you at the time you were -- that you and

20  Mr. Constantino was speaking on the phone?

21  A    I was at home.

22  Q    Your son was with you?

23  A    No.  My son, at the time, was with Tommy talking to me on

24  the phone.

25  Q    Where were they?

E. KAISER-CROSS-LaRUSSO                    949

1   A    They were in Mexico.

2   Q    Who talked to you, both of them talked to you on the

3   phone?

4   A    Yes.  Well, no.  I think it was just John, and it was an

5   opened conversation.

6   Q    When you say "opened conversation" --

7   A    Well --

8   Q    -- you knew Mr. Constantino was there?

9   A    That's right.

10  Q    But your son did all the talking?

11  A    Yes.

12  Q    And he was the one that discussed with you the investment

13  in Eufora, is that correct?

14  A    That's right.

15  Q    What did your son tell you?

16  A    I don't -- all I knew is that I was very impressed and I

17  thought it was a very good idea that they were telling me

18  this.

19  Q    I think you mentioned during the examination with

20  Mr. Haley that after speaking with your son, you felt it was a

21  good enough investment to place $70,000 for an interest in the

22  company, is that correct?

23  A    Yes.

24  Q    Do you remember when in 2009 you made the investment?

25  A    The exact date?

E. KAISER-CROSS-LaRUSSO                              950

1   Q    A time period; winter time, spring, summer?

2   A    No.  I would only be guessing.  No.  I'm sorry.

3   Q    So it was at least sometime in 2009.  But you don't know

4   if it was the spring, summer or winter, is that correct?

5   A    If I had to guess -- if you want me to guess, I'll

6   guess --

7              THE COURT:  No.

8   Q    Just your best recollection, that's all.

9   A    I think it was spring.

10  Q    The money that you invested, where did that come from?  I

11  know you told us about $390,000, but you didn't tell us about

12  the $70,000.  Where did that money come from?

13  A    I've worked all my life, and I saved.  I had almost a

14  million dollars.

15  Q    Good for you.

16  A    I worked very hard for it.

17  Q    When you gave the money, how did you give the money?  Did

18  you send it to your son?

19  A    I wired it to him, yes.

20  Q    And you wired it from your bank account, is that correct?

21  A    Yes.

22  Q    The bank you were using for your savings?

23  A    Roslyn Savings.  They were one of my banks.  I have a few

24  banks.

25  Q    Well, I'll just stick with the bank where the money came

E. KAISER-CROSS-LaRUSSO                                951

1   from for Eufora.

2   A    Roslyn Savings.

3   Q    Where did you send the money to?

4   A    I don't recall where.

5   Q    Do you know if your son bought the interest in Eufora in

6   your name, his name, or somebody else's name?

7   A    I don't really know.  I assume that -- I don't know.  I

8   trusted him, and that was it.

9   Q    So your involvement with this investment in Eufora relied

10  upon your son for it's completion, is that correct?

11  A    Yes.  And my other son had advised me, yes.

12  Q    Now, do you remember, after you invested in Eufora,

13  participating in any effort to take over the company?

14  A    No, I didn't.

15  Q    From Mr. Constantino?

16  A    No.

17  Q    Do you know if your son participated in efforts to take

18  over Eufora from Mr. Constantino?

19  A    Never.

20  Q    Never he did or never he didn't?

21  A    No, he wouldn't.

22  Q    He wouldn't do that.  He's a good son.  He wouldn't take

23  it from somebody, is that correct?

24  A    I have all good sons, yes.

25  Q    You know that your son wouldn't try and take over this

1   company from somebody else?

2   A    No way.

3   Q    Do you remember -- do you know what the word "derivative

4   suit" means?  You ever heard that phrase before?

5   A    No, I'm sorry, I didn't.

6   Q    You ever heard of the words "hostile take over"?

7   A    No.

8   Q    Do you know whether or not you participated in a civil

9   suit to take over the company from Mr. Constantino?

10  A    No.  I doubt it.

11  Q    You know that didn't happen, is that correct?

12  A    That's right.

13  Q    So your name wouldn't appear on a civil document suing

14  Mr. Constantino to take over his company?

15  A    No.

16          MR. LaRUSSO:  Just one moment, Your Honor, please.

17          Thank you very much, Judge.  I have no further

18  questions.

19          THE COURT:  Any redirect?

20          MR. MISKIEWICZ:  Nothing further.

21          MR. HALEY:  Judge, I just have one question.

22  RECROSS EXAMINATION

23  BY MR. HALEY:

24  Q    Ma'am, what is the name of the other son that recommended

25  investments to you, other than John?

1   A     My son Keith.

2   Q     Your son Keith.

3            MR. HALEY:  That's all.  Thank you.

4            MR. LaRUSSO:  I forgot to ask one question.

5   RECROSS EXAMINATION

6   BY MR. LaRUSSO:

7   Q     When you met Mr. Constantino down in Mexico, do you

8   remember when you met him?

9   A     You asked me that before, when you asked me if it was

10  summer or winter.

11  Q     I was actually asking you about the investment.  But the

12  meeting was, you said to the best of your recollection it was

13  spring?

14  A     It was warm.  So it had to be spring or summer.

15  Q     And when you made your investment, when you put the

16  $70,000 in, when did that happen?

17  A     That I can't recall.

18  Q     Would it have come before the meeting in Mexico or after

19  the meeting in Mexico?

20  A     I think it came before I met him.

21  Q     So it would sometime before the spring of 2009?

22  A     I think so.

23            MR. LaRUSSO:  Okay.  Thank you.  No further

24  questions.

25            THE COURT:  Thank you.  You may step down.

R. KAISER-DIRECT-MISKIEWICZ                954

1          THE WITNESS:  Thank you.

2          (Witness excused at 2:45 p.m.)

3          MR. MISKIEWICZ:  The government calls John Kaiser.

4          THE COURT:  Mr. Kaiser, come up to the witness

5   stand.  And remain standing for the oath.

6          Please raise your right hand.

7          R O B E R T   K A I S E R

8          called as a witness, having been first

9          duly sworn, was examined and testified

10         as follows:

11         THE WITNESS:  Yes, I do.

12         THE COURT:  Please be seated.  Please state your

13  name, and spell it for the record.

14         THE WITNESS:  Sure.  My first name is John.  Middle

15  name is Robert, R-O-B-E-R-T.  Last name Kaiser, K-A-I-S-E-R.

16         THE COURT:  Stay close to the mike and keep your

17  voice up.

18         Go ahead, Mr. Miskiewicz.

19         MR. MISKIEWICZ:  Thank you, Your Honor.

20  DIRECT EXAMINATION

21  BY MR. MISKIEWICZ:

22  Q    Sir, what were you doing on 9/11?

23  A    I was actually a police officer in Suffolk County, 2nd

24  Precinct.

25  Q    On that day, what did you do?

R. KAISER-DIRECT-MISKIEWICZ                     955

1  A    After the call at the second tower, I started to escort

2  doctors and nurses to the site.

3  Q    Did you work in or around the Trade Center site in the

4  weeks that followed?

5  A    Yes; for approximately two months.

6  Q    Did you do that as part of your duties as a Suffolk

7  County police officer or on your own time?

8  A    That was on my own time.

9  Q    Did there come a time in or about 2002 that you had an

10  opportunity to leave the city, or take a break from the city?

11  A    Yes.  I believe it was in early '03.  Early 2003.

12  Q    Where did you go?

13  A    I took a trip to the big island of Hawaii.

14  Q    Did you go with -- was this a family vacation?

15  A    No.  I went with a friend of mine.

16  Q    Who was that?

17  A    His first name is Chris.  His last name is Manfredi.

18  That's M-A-N-F-R-E-D-I.

19  Q    What connection did Mr. Manfredi have with Hawaii, where

20  you were going?

21  A    He had a place we could stay for about a week to ten

22  days, and pretty much get away.

23  Q    Was it a timeshare or a house?

24  A    I believe it was a condo, a condominium.

25  Q    Had you ever been there before?

R. KAISER-DIRECT-MISKIEWICZ                    956

1   A    No, I hadn't.

2   Q    When you were there, I take it this was for R & R, a

3   vacation?

4   A    Yes.  This was kind of a little break.

5   Q    Did you do any business while you were in the big island

6   of Hawaii?

7   A    Well, just toward the end of the trip we stopped in a

8   small real estate office to see what land values were and what

9   the market was over there, what it's like.

10  Q    Did you find any properties that you liked?

11  A    Yes; one.

12  Q    What was it?

13  A    It was approximately 250 acres.

14  Q    How many houses, or what kind of property was it?

15  A    It was just land.  Just vacant land.

16  Q    Can you describe the land?

17  A    It was rolling grass.  My guess, about maybe about a

18  quarter of mile off the Pacific.

19  Q    Was there ocean views on this land?

20  A    Yes.

21  Q    For the 258 acres, what was the asking price?

22  A    The asking price was approximately $750,000.

23  Q    $750,000?

24  A    Yes.

25  Q    Not exactly Long Island prices?

R. KAISER-DIRECT-MISKIEWICZ                957

1   A    No, definitely not.

2   Q    What did you do?

3   A    We were going to put money down on it.

4   Q    When you say "we"?

5   A    Myself and Chris Manfredi.

6   Q    How much money of your own did you put down on it?

7   A    I believe it was approximately $10,000.

8   Q    Do you know what Mr. Manfredi put down?

9   A    Yeah, I don't recall the exact number.

10  Q    What was your intend, or what did you intend to do with

11  this land when you put this down payment on it?

12  A    Basically try to subdivide it and actually build it out.

13  Q    When you say "build it out," what does that mean?

14  A    Subdivide it into lots and build homes on it, home sites.

15  Q    You were a Suffolk County police officer at this time,

16  correct?

17  A    Yes, that's correct.

18  Q    What do you know about subdividing and building lots?

19  A    Well, my dad was a builder.  He taught myself and the

20  rest of my brothers at a young age.  So I did carpentry around

21  nine or ten years old.

22  Q    Did you learn any particular trade?

23  A    Yes.  I had a friend who did home building and also

24  masonry; block, flat work.

25  Q    How old were you when you started working as a mason?

1   A    I was approximately 14 years old.

2   Q    You worked for your dad or somebody else?

3   A    No, it was somebody else.

4   Q    Have you apprenticed as a mason?

5   A    Yes, I did.  I started out as a laborer and worked my way

6   up to a mechanic or skilled mason when I was around 15 or 16.

7   Q    Did there come a time that you worked on -- in the

8   construction industry?

9   A    Yes; from that point forward.

10  Q    Were you doing that when you were a cop?

11  A    Yes, I was.

12  Q    Back at Hawaii, after you put down this down payment, you

13  and Mr. Manfredi, did you start building immediately

14  thereafter?

15  A    No, I didn't.

16  Q    Why not?

17  A    Building in Hawaii is a long process along, it's a long

18  due diligence process.  You have to make sure that you have

19  everything lined up.  It can be very political.  So as far as

20  the permit process, you have to do the archeology, there could

21  be ancient burials.  There's a lot of things that come before

22  you start putting a shovel to the ground.

23  Q    Well, during this period of time where you put the down

24  payment down, you and Mr. Manfredi, were you doing any of the

25  due diligence trying to the get the project going?

R. KAISER-DIRECT-MISKIEWICZ                959

1   A    Yes.

2   Q    Who was doing that work?

3   A    Myself and Mr. Manfredi.

4   Q    So did you go back -- where were you living at the time?

5   A    I was living in Smithtown here on Long Island, in Suffolk

6   County.

7   Q    What about Mr. Manfredi?

8   A    I believe he was in Stony Brook, also in Suffolk County.

9   Q    Did you fly back and forth?

10  A    Yes, that's correct.

11  Q    I want to turn your attention to -- withdrawn.

12          As you were doing the due diligence, I think you

13  said you had an archeologist, where did you intend to come up

14  with the money that would be necessary to do the actual

15  building on these plots of land, the 250 acres?

16  A    I was also going to be selling other property that I had

17  that I was going to put towards it.  At the time, I didn't

18  know if I was going to subdivide and see what the values were,

19  see if we could just split it after the subdivision was done,

20  or if it was going to be worth it to actually do a whole build

21  out.  I was working through those.

22  Q    At this stage -- what year, approximately, are we talking

23  about?

24  A    We're talking about '02 and '03.  2002 and 2003.

25  Q    I thought you said you went to Hawaii in 2003.

R. KAISER-DIRECT-MISKIEWICZ                    960

1   A     No.  No.  It was actually in 2002.

2   Q     If you said March 2003 you went to Hawaii for the first

3   time, is that correct?

4   A     No, that's not correct.

5   Q     When did you first go to Hawaii?

6   A     I believe it was sometime in March of 2002.

7   Q     All right.  So for how long -- withdrawn.

8         You were going to either subdivide the land and then

9   sell it or build on it, was that what you were thinking?

10  A     Yes.  Those were the two options we were looking at.

11  Q     When you say subdivide, you mean with permission for

12  whatever local --

13  A     That's going through the local ordinance and going

14  through local counsel and getting it subdivided, we're looking

15  at approximately 20-acre lots.

16  Q     Did there come a time in or about 2003 that you met a man

17  by the name of Phil Kenner?

18  A     Yes.

19  Q     Where did you meet him?

20  A     On the big island of Hawaii.

21  Q     Thereafter, did you meet him on several other occasions?

22  A     Yes.

23  Q     Do you see him in the courtroom today?

24  A     Yes.

25  Q     Will you point to him, and describe an article of

R. KAISER-DIRECT-MISKIEWICZ                    961

1    clothing he's wearing.

2    A    He's standing up.

3         MR. HALEY:  Judge, I concede he's pointing my

4    client.

5    A    He's wearing a white shirt.

6         THE COURT:  Yes, he identified Mr. Kenner.

7    Q    When you met him on the big island of Hawaii, this was

8    approximately when?

9    A    Approximately in the year 2003.

10   Q    Were you still doing the due diligence in trying to get

11   the permitting going for the land?

12   A    Yes.

13   Q    Who introduced you to Mr. Kenner?

14   A    Actually came through a friend of Chris Manfredi.  His

15   first name is James.  His last name is Milana, M-I-L-A-N-A.

16   Q    What was the purpose of the meeting?

17   A    The purpose of the meeting with Phil Kenner?

18   Q    Yes.

19   A    So James had told Chris that he was interested, and that

20   he would actually meet us on the big island of Hawaii.  He was

21   interested in actually looking at the property.  And that was

22   the -- that's why we met him.

23   Q    What, if anything, did he say to you at this meeting on

24   the property in Hawaii?  Talking about the defendant, Mr.

25   Kenner.

R. KAISER-DIRECT-MISKIEWICZ                    962

1  A    Yes.  We had a meeting.  We met him.  He said he was a

2  financial advisor to a lot of different celebrities, Tom

3  Cruise, I think, and a bunch of hockey players.

4  Q    What else, if anything, did he say?

5  A    He said he really liked the property and he'd like to

6  actually get involved and see if we can purchase more of it

7  besides the 250 acres.

8  Q    Who was going to come up with the money to buy more than

9  your 250 acres?

10 A    Well, he actually said he could write a check himself,

11 but he wanted to give the opportunity to his clients to put up

12 the money for the purchase of the property.

13 Q    He could write a check for the property?

14 A    Yes.  He told us he was worth approximately $500 million,

15 that he could cut a check today.

16 Q    Now, this land that you purchased or had a down payment

17 on, this 250 acres, was there other land in that immediate

18 vicinity that was available to sell?

19 A    Yes.  There was a large parcel of land that came on the

20 market from a company called C. Brewer, which was a big sugar

21 cane company on the big island of Hawaii.  So there were

22 thousands of acres available.

23 Q    So in addition to your 250 acres, additional acreage was

24 available for sale?

25 A    Yes.

1    Q    Is that what the defendant was referring to when he said

2    he could write a check today?

3    A    Yes.

4    Q    Was he talking about buying your 250 acres?

5    A    No.  At that point we were actually driving around and

6    looking at other lots that were for sale.  Other large lots.

7    Q    Did there ever come a time that he showed you any sort of

8    article or any kind of information about himself to

9    substantiate that he was worth half a billion dollars?

10   A    Yes.  I believe it was in some type of money magazine.  I

11   don't recall the name of it.

12   Q    I'm showing you what's been marked for identification as

13   Government Exhibit 726-L as in Lucy.  Do you recognize that?

14   Also, there's a page that's tabbed.  Do you recognize what's

15   tabbed?

16   A    Yes.

17   Q    What do you recognize it to be?

18   A    It's a picture of Phil Kenner.

19   Q    What do you recognize the entire exhibit to be?

20   A    This is the money imagine that he showed us, that he said

21   he was in.  And through it, it says he was involved in -- in

22   representing hockey players and a couple other celebrities.

23   Q    Did you believe him?

24   A    Yes.

25              MR. MISKIEWICZ:  The government moves for the

R. KAISER-DIRECT-MISKIEWICZ                         964

1   admission of 726-L.

2            MR. HALEY:  May I have a voir dire, Judge?

3            THE COURT:  Yes.

4            (Matter continued on the next page.)

J. Kaiser - Direct/Miskiewicz

965

1    VIOR DIRE EXAMINATION

2    BY MR. HALEY:

3    Q    Mr. Kaiser, I think you know who I am so I will not

4    introduce myself.

5          Sir, is this the actual magazine that he showed

6    you back in 2003?

7    A    Oh, I couldn't tell you if this was the actual one,

8    but it certainly looks like it.  If this physical magazine

9    was the one he had with him I wouldn't know that, no.

10   Q    Well, after 2003, when was the next time you actually

11   saw this Government's Exhibit?

12   A    After 2003 when did I?

13   Q    Yes.  You say in 2003, to the best of your memory,

14   this was the actual magazine you saw as you say that was

15   given to you by Phil Kenner, that's your testimony,

16   correct?

17          MR. MISKIEWICZ:  Objection.

18          THE COURT:  Sustained as to form.

19   BY MR. HALEY:

20   Q    With reference to this specific exhibit, sir, when

21   was the first time you saw this specific exhibit, this

22   document itself?

23   A    This physical one right here was just when you put it

24   in my hand.

25   Q    By the Government?

J. Kaiser - Direct/Miskiewicz

966

1    A    That's correct.

2    Q    But this, not this particular one, but it was another

3    copy I would assume unless you got that from your client.

4    A    I don't know where this came from.  What I'm saying I

5    don't know where this particular copy came from.

6    Q    And I believe you just testified a moment ago you

7    assume this is the magazine, copy of the magazine that was

8    shown to you back in 2003, that's your assumption,

9    correct?

10   A    Yes, this is the cover, what it looked like, and this

11   is what the article looked like (indicating).

12   Q    And this is based upon your assumption that is the

13   same magazine you just said a moment ago, correct?

14              MR. MISKIEWICZ:  Objection.

15              THE COURT:  Overruled.

16   A    Yes.

17              MR. HALEY:  Judge, I object to its

18   admissibility.

19              THE COURT:  Why don't you approach.

20              (Whereupon, at this time the following took

21   place at the sidebar.)

22              (Continued.)

23

24

25

J. Kaiser - Direct/Miskiewicz

967

1    MR. HALEY:  I don't want to waste time.  He's

2    testified twice that he assumes this is the article he saw

3    with reference to the 2003 encounter with Phil Kenner.  I

4    respectfully suggest he testifies this is the document, I

5    assume this is the one I saw, does not lay a proper

6    foundation.

7        THE COURT:  I don't think it was clear.  When he

8    said he assumed he was talking about the physical copy, he

9    wasn't assuming this was the article.  When he said this

10   was the cover of the magazine, I don't think he was

11   suggesting, he's assuming.  The only assumption was

12   whether it was the actual physical copy or another copy of

13   the same exact magazine, but --

14       MR. HALEY:  Your Honor, I defer to the Court's

15   analysis.  I'll withdraw my voir dire, and I made my

16   record.

17       THE COURT:  I haven't read the article.  Is

18   there anything else you are concerned about in the

19   article?

20       MR. HALEY:  Thank you.

21       Well, first of all might we hold this for a

22   later ruling.  I appreciate your Honor's comment.

23       MR. MISKIEWICZ:  The answer is simple.  It says

24   that he's a financial advisor to celebrities, to hockey

25   players, nothing prejudicial about it, a very nice

J. Kaiser - Direct/Miskiewicz

968

1  article, but we're offering it for the effect it had on

2  this witness and other witnesses -- let me please finish

3  my statement.

4           MR. HALEY:  Sorry.

5           MR. MISKIEWICZ:  And it being offered not to

6  prove the truth of anything there but the affect the

7  article had.  He believes he's dealing with a man who is

8  worth a lot of money.

9           THE COURT:  I'll reserve on it.

10          MR. HALEY:  Thank you.

11          THE COURT:  You don't have an authentication

12  issue in terms of this witness.  If you want to clarify

13  what I just said I'll let you do that, but he's

14  identifying that this is an article he saw.

15          MR. HALEY:  I just want the opportunity to read

16  it.

17          THE COURT:  Sure.

18          MR. HALEY:  Do you need this physically to go on

19  with the witness?

20          MR. MISKIEWICZ:  No.

21          (End of sidebar conference.)

22          (Continued.)

23

24

25

J. Kaiser - Direct/Miskiewicz

969

1     MR. MISKIEWICZ:  May I continue, your Honor.

2     THE COURT:  Yes.

3  DIRECT EXAMINATION (Cont'd)

4  BY MR. MISKIEWICZ

5  Q    So after this meeting or during this meeting, did

6  Mr. Kenner propose anything to you about joining your

7  efforts to develop land in Hawaii?

8  A    Yes, he did.

9  Q    What was the proposal?

10  A    The plan was to try to acquire more pieces of

11  property from Seabrook as soon as possible.

12  Q    Okay.  And do what with that?

13  A    And actually to develop it.

14  Q    You mean build?

15  A    Meaning build on it, roadways, homes.

16  Q    Okay.  So moving from that point on, approximately

17  March 2003 forward, what, if anything, did you do with

18  respect or with the defendant to either acquire or prepare

19  and develop any additional acreage in Hawaii?

20  A    Yes, we continued to look for more acreage in Hawaii

21  which we ended up finding and acquiring it?

22  Q    Okay.  What were you physically doing, if anything,

23  during this period of time with these properties?

24  A    At the time I was laying out for the home sites on

25  the existing, on the first property, 258 acres.

J. Kaiser - Direct/Miskiewicz

970

1   Q    What do you mean by "laying out"?  Explain that to

2   the jury.

3   A    Laying out all the proposed sites, what we would

4   build on the proposed sites, roadways, infrastructure,

5   etcetera, the grade, the slope, it had to be a switchback

6   on the roadway where we would get our water from, if there

7   was going to be a catchment system, build as green as

8   possible.

9   Q    Now, I know you said -- you are still a police

10  officer at this time?

11  A    That's correct.

12  Q    And you had been working in construction since --

13  A    I was a kid.

14  Q    A young kid?

15  A    Yes.

16  Q    Have you had any experience in infrastructure

17  development up to this time?

18  A    Yes.

19  Q    Tell us what you did?

20  A    I was building future commercial buildings in Suffolk

21  County.  I did the infrastructure at White Castle.  I did

22  drainage.  I brought in all the utilities, roadway paving,

23  stuff like that.

24  Q    During this period of time did you have your own

25  business or work for other people?

J. Kaiser - Direct/Miskiewicz

971

1    A    It was both.  Usually if I did on my own, it was my

2    own property that I had bought and I was trying to work on

3    or if I was working for somebody else, but a lot of times

4    I just worked with my brother.

5    Q    Okay.

6              Now, did you have a company that you operated

7    under with respect to attempting to develop the land in

8    Hawaii?

9    A    Yes.

10             Myself and Chris Manfredi, and that was called

11   M-o-u-a-n-o Estates.  It means ocean view.

12   Q    Were you aware of any companies that Mr. Kenner

13   operated during this period of time in Hawaii or with

14   respect to the Hawaii development?

15   A    At what year are we talking about right now?

16   Q    Well, let's start with 2003 or 2004, whenever he

17   began getting involved in Hawaii?

18   A    Yes, he actually started forming LLCs which is a

19   limited liability company.  I believe they were out of the

20   state of Delaware.

21             Just to name a few, the first one was Big Isle

22   Ventures.  I believe there were III, IV and V.

23             Another one was Little Isle Ventures.

24             Do you want me to continue going through all of

25   them?

J. Kaiser - Direct/Miskiewicz

972

1    Another one was actually called Kau Holding

2    Company.  Another one was Ula Makika.

3    Q    Mr. Kaiser, I don't know if you can see where you are

4    sitting but right next to you is a board, it's called

5    Government's Exhibit board number 1.

6         Are you familiar with any of the companies that

7    are listed here?

8    A    Yes.

9    Q    I think you mentioned Ula Makika?

10   A    Correct.

11   Q    And Kau Holding?

12   A    Yes.

13   Q    You also said Big Aisle and you said there were

14   several numbers after that?

15   A    Yes.

16   Q    What about Little Isle IV.

17        Do you know anything about Little Isle IV or did

18   you know back in 2003 or '04?

19   A    Maybe in 2004 or '05 I did.

20   Q    Okay.  But at the very beginning you had not heard of

21   Little Isle IV?

22   A    No, like I said the first one was Big Isle Ventures.

23   I don't know if it had a Roman numeral after it.

24   Q    There is one more here, that is Na'alehu Ventures?

25   A    Correct.

J. Kaiser - Direct/Miskiewicz

973

1   Q    Whose companies were those?

2   A    Those were all Phil Kenner's companies.

3   Q    Did you have any ownership interest in any of these

4   companies?

5   A    No, not at that point.  No.

6   Q    Did there come a time when you were given some

7   ownership interest in that company or any companies?

8   A    Yes.

9   Q    When was that?

10  A    That was actually right before the closing when

11  Lehman Brothers was introduced as the lender and that was

12  in 2006.

13  Q    Okay.  Between 2003, I think when you said you met

14  the defendant in Hawaii and 2006, what were you doing,

15  either you personally or Mr. Manfredi, with respect to

16  developing that property?

17  A    Again, we were still doing the due diligence.  I

18  believe we had closed on the first 258 acres and that was

19  in Honuapo, and that was in 2003.  Again we were still in

20  the same due diligence period dealing with the governments

21  or the townships, meetings, also laying out with GPS the

22  home sites, the viability, what we were going to use, each

23  particular subdivisions, whether it would be farming or

24  land for homes.

25  Q    You mentioned the closing with Lehman Brothers?

J. Kaiser - Direct/Miskiewicz

974

1   A    Yes.

2   Q    What was Lehman Brothers doing with respect to this

3   venture you were involved with the defendant?

4   A    They were coming in as the lender, as the lender.

5   They were going to lend the money to actually develop the

6   land.

7   Q    Was there ever an actual agreement that Lehman

8   entered into to lend the particular sum of money?

9   A    Yes, there was.  That was in August of 2006,

10  approximately $105 million.

11  Q    Did that money get paid out all at once?

12  A    No, it did not.

13  Q    How was it supposed to be structured?

14  A    On the initial closing there was somewhere, I

15  believe, they laid out about 14 to $16 million, and after

16  that there were milestones that needed to be met as far as

17  the permit process, infrastructure, also sales on

18  different homes, and then future monies would be released.

19  Q    Did you or Mr. Manfredi get Lehman Brothers involved

20  in financing this project?

21  A    No.

22  Q    What happened to writing a check for the entire

23  property?

24            MR. HALEY:  I object.

25            MR. MISKIEWICZ:  I'll withdraw it and rephrase

J. Kaiser - Direct/Miskiewicz

975

1  the question.

2  Q    I thought you said Mr. Kenner said he would be able

3  to write a check to buy all the property.  How is it that

4  Lehman got involved, the loan money?

5  A    Yes, he did say that but he said he was giving his

6  investors opportunities and the money was very cheap that

7  Lehman was supplying at the time that it was bringing to

8  the table.

9  Q    We'll come back to that.  During this period of time,

10  let's call it the development or due diligence period of

11  time in Hawaii, did you ever get involved in other

12  financial transactions with the defendant Mr. Kenner?

13  A    Yes, I did.

14  Q    I want to direct your attention to approximately June

15  or July of 2005.  Do you know whether or not you got

16  involved in an any kind of financial transaction with

17  Mr. Kenner?

18  A    Yes, I did.

19  Q    Tell the members of the jury what kind of financial

20  transaction did you involve yourself in at that time?

21  A    It was a $1 million loan to the Hawaii property.

22  Q    Who asked you for a loan?

23  A    Mr. Phil Kenner.

24  Q    Where were you when he asked?

25  A    I was home in Suffolk County.

976

1   Q    And did he come to your house?

2   A    No, he called me.

3   Q    And why was he asking you for a loan, if you know?

4   A    Excuse me?

5   Q    Do you know?

6   A    He was giving me an opportunity.  I was actually home

7   at the time because in June my wife and I had lost a baby

8   so I was home.  He had called to say he was sorry for what

9   happened, but that he had an opportunity for me to make

10  or -- you know, to make some good interest on a loan that

11  was approximately 30 days.

12  Q    And what was the total that you were asked to loan

13  him?

14  A    The total was $1 million.

15  Q    Did he tell you what the money was going to be used

16  for?

17  A    Yes, it was going to be used for Hawaii.

18  Q    The Hawaii project he was talking about?

19  A    Yes, that's correct.

20  Q    Did you have $1 million cash to lend him?

21  A    No, I didn't have $1 million.  I didn't have a

22  million personally.

23  Q    Did you make a loan?

24  A    Yes.

25  Q    Where did you get the money?

J. Kaiser - Direct/Miskiewicz

977

1    A    From some family and friends and myself.

2    Q    Who in your family?

3    A    My mom, my brother Keith Kaiser.

4    Q    Who else?

5    A    A friend Bob Rizzi, another friend Frank Sconzo,

6    S-c-o-n-z-o.

7    Q    And did you put in any money on your own?

8    A    Yes.

9    Q    Do you remember how much?

10   A    Approximately 180,000.

11   Q    Did you collect all this money or did these various

12   people send monies on their own to Mr. Kenner?

13   A    I collected approximately 700,000 of it.  And then

14   two other friends, I believe, did a wire directly to a

15   holding company which was directed from Phil Kenner, the

16   wire.

17   Q    You said this would be for a short term loan, 30-day?

18   A    Yes.

19   Q    In total $1 million?

20   A    That's correct.

21   Q    And do you know what the interest rate was?

22   A    Approximately ten percent.

23   Q    So at the end of 30 days what were you anticipating

24   you would be getting back -- withdrawn.

25        What did the defendant tell you you would get

978

1   back on this 30-day loan?

2   A    $1,100,000.

3   Q    And do you know what company did you send your wires

4   to, or the wire?

5   A    That was Kau Holding Company.

6   Q    And who told you to send it there?

7   A    Mr. Phil Kenner.

8   Q    So, do you remember what month in 2005 was this that

9   you sent the money?

10  A    I believe it was in August, end of July or August.

11  Q    So after the 30 days expired, did you get your money

12  back and your $100,000 interest?

13  A    No, I did not.

14  Q    What about 60 days later?

15  A    No, I did not.

16  Q    Did you ask Mr. Kenner for the money back?

17  A    Yes.

18  Q    And how soon after the 30 days expired did you ask

19  for the money?

20  A    I probably asked for about 32, 33, day 32 or day 33 I

21  asked about it because I had everyone asking me about it.

22  Q    When you say you had everyone asking you about it,

23  who do you mean?

24  A    Meaning my family and friends were saying when is the

25  money coming back for the 30 days?

J. Kaiser - Direct/Miskiewicz

979

```
1   Q    And did you speak to Mr. Kenner about getting the

2   money back?

3   A    Yes.

4   Q    What did he tell you?

5   A    He said it's taking longer than he thought.

6   Q    What did that mean?

7   A    That means the money wasn't coming back at that point

8   when I was asking him.

9   Q    Did you have subsequent conversations with him or

10  phone calls with him about getting the money back and/or

11  your interest?

12  A    Yes.

13  Q    How frequently?

14  A    I guess a phone call every couple of days after it

15  went beyond the 30 days.

16  Q    What did he tell you when you made those subsequent

17  phone calls?

18  A    Said I just have to wait.  Just tell everyone has to

19  wait.

20  Q    And was your family still anxious in getting the

21  money back?

22  A    Yes, both my friends and family were anxious.

23  Q    Did there come a time that Mr. Kenner gave you the

24  funds that you loaned him, plus interest?

25  A    No.
```

J. Kaiser - Direct/Miskiewicz

980

1    Q    What, if anything, did you do regarding the money

2    that you had assembled and borrowed and subsequently lent

3    out to Mr. Kenner from the money you collected from your

4    family and friends?

5    A    Well, it wasn't coming back from him and at the time

6    I decided to put my house -- I was living -- on the market

7    because my wife and I we had built a nursery so it was

8    best just to move on, so I put the house on the market.

9    And somewhere in September I put house I was living in on

10   the market.

11   Q    Did you sell that house?

12   A    It sold relatively quickly.  Approximately within two

13   weeks.

14   Q    And what were the proceeds from the sale of that

15   house?

16   A    Approximately $1.2 million.

17   Q    What did you do with the $1.2 million, the proceeds

18   from the sale of your house?

19   A    I paid back my family members and friends with

20   interest.

21   Q    And did you buy a new house?

22   A    Yes, I already had money down on a new house so I was

23   waiting to close.  I was closing the following month on

24   that.

25   Q    Did you have cash to pay for that on that house?

J. Kaiser - Direct/Miskiewicz

981

```
 1   A    No, I was still waiting for the 1.1 million to come

 2   back from Mr. Kenner.

 3   Q    And how did you finance the purchase of this new

 4   house?

 5   A    I ended up taking a pretty big loan out for it.

 6   Q    When you say loan, you mean a mortgage?

 7   A    Yes.

 8            THE COURT:  Why don't we take the afternoon

 9   break.

10            Don't discuss the case.  Don't form an opinion.

11            (Whereupon, at this time the jury exits the

12   courtroom.)

13            MR. HALEY:  Your Honor, I thank you for the

14   time.  We have no objection to the Money magazine article.

15            THE COURT:  Okay.

16            MR. LARUSSO:  That is correct, your Honor.  No

17   objection.

18            THE COURT:  So the Government will offer that

19   when the jury comes in.

20            Please be seated, Mr. Kaiser.

21            (Whereupon, the jury at this time enters the

22   courtroom.)

23            THE COURT:  Members of the jury, I reserved

24   decision on an exhibit the Government was offering before

25   the break which will now be admitted in evidence as 726 --
```

J. Kaiser - Direct/Miskiewicz

982

1      MR. MISKIEWICZ: -L.

2      THE COURT:  That will be admitted, the magazine

3   articles.

4      MR. MISKIEWICZ:  Thank you, your Honor.

5      (Whereupon, Government Exhibit 726 L was

6   received in evidence.)

7   BY MR. MISKIEWICZ:

8   Q   Mr. Kaiser, just before the break we were talking

9   about this $1 million loan that you and others made to the

10  defendant.  Did THERE ever come a time that you learned

11  about where the money went?

12  A   Yes, there was.

13  Q   Directing your attention to in or about April 2006,

14  did you have a meeting concerning the development of the

15  Hawaii property?

16  A   Yes, I did.

17  Q   Who was at that meeting?

18  A   Myself, Phil Kenner and also Chris Manfredi.

19  Q   Where was that meeting held?

20  A   I believe it was held at a hotel in the big island of

21  Hawaii.

22  Q   What was the purpose of the meeting?

23  A   Just a status update everything that was going on

24  that surrounded Hawaii.

25  Q   At this stage in or about the spring of 2006, were

983

1    you anticipating a loan eventually being approved by

2    Lehman Brothers?

3    A    Yes, that's correct.

4    Q    Were you still in negotiations for that?

5    A    Yes.

6    Q    And tell the members of the jury what you -- what, if

7    anything, occurred that led to your discovery of what

8    happened to the $1 million?

9    A    At that meeting Chris Manfredi actually confronted

10   Phil Kenner and he stated to him that the money that I

11   sent, that was sent in '05, didn't go to Hawaii.

12   Q    What else did he say?

13   A    And then he stated that he went down to a development

14   right in Cabo San Lucas in Mexico.

15   Q    Was Mr. Kenner in the room then?

16   A    Yes, he was.

17   Q    And what, if anything, did Mr. Kenner say when he was

18   accused of sending the money to Mexico?

19   A    He said so what?  What if it went down to Mexico.

20   It's all in the same bucket.

21   Q    Was there a discussion about any of the other moneys

22   that had been spent up until this point in trying to get

23   Hawaii developed?

24   A    Yes.  Chris Manfredi also stated that he was lying to

25   both of us, referenced some hard money lenders over in

J. Kaiser - Direct/Miskiewicz

984

1    Europe where I believe $1 million went on hard money

2    lenders and never came back, and also confronted Phil

3    Kenner on the same issue, and he stated he really didn't

4    have an answer.  He said it didn't work out in reference

5    to that money, and then Chris kept on going at it with him

6    referencing that, that he was lying to both of us.

7    Q    Well, regarding your million dollars which you were

8    now told so what, it went to Mexico, had you ever been

9    told by Mr. Kenner up to that point that your money didn't

10   go to Hawaii, it went to Mexico?

11   A    No, the first time I learned of it was at that

12   meeting.

13   Q    And do you understand or did somebody tell you in

14   that meeting where in Mexico your million dollars went?

15   A    Yes, it was Phil Kenner that told me.

16   Q    What did he say?

17   A    After, Chris, he pretty much stormed out of the

18   meeting.  Phil Kenner said it went down to Cabo for the

19   project down there and he was trying to calm me down, said

20   not to worry about it, said what if we were partners on

21   the Cabo deal?

22          There was still a lot of information going on

23   and that was the first time I learned about it.

24   Q    When you say he was trying to calm you down, were you

25   upset?

985

1  A    Yes.  Yes, because when Chris told me he was supposed

2  to be in Hawaii and I didn't have an interest, and

3  actually prior to that meeting I didn't have any interest

4  in Cabo at the time.  So, yeah, I was upset that it went

5  down there.

6  Q    Now, you originally were told you were going to lend

7  money for 30 days, $1 million.  How is that loan now --

8  did he explain, I should say, how that loan now somehow

9  turned into you being a partner in Mexico?  What did that

10  mean?

11              MR. HALEY:  I just object to the form.

12              THE COURT:  Sustained as to the form.

13  BY MR. MISKIEWICZ:

14  Q    Did Mr. Kenner explain to you how the loan turned

15  into an investment in which you were now going to get an

16  interest in Cabo San Lucas?

17  A    Yes, he said there really wasn't a choice, that's

18  where the money went, I or at least a portion of the funds

19  went down to Cabo San Lucas, so that I really didn't have

20  a choice in the matter.

21  Q    So when you say Cabo San Lucas, was there a

22  particular project or development you knew of down there

23  that he was referring to?

24  A    Yes.

25  Q    What was that?

J. Kaiser - Direct/Miskiewicz

986

1    A    Actually called Diamonte.  I don't know if that name

2    was derived by then, I'm not sure.  I knew it was land of

3    approximately 1500 acres in Cabo San Lucas.

4    Q    Do you know who was developing his land?

5    A    Yes, his first name was Ken.  Last name is Jowdy.

6    Q    Had you ever been there?  Roughly we're talking about

7    April of 2006.

8    A    Yes.  I don't know if I was there.  After that

9    meeting I believe I went there.  I had seen pictures, a

10   bunch of -- Phil was always talking about it so I knew

11   what the property looked like.

12   Q    So just for clarity, when he said your money went to

13   Mexico or Cabo San Lucas, you understood it went to this

14   particular property you discussed?

15   A    Yes.

16   Q    Being developed by Mr. Jowdy?

17   A    Yes.

18   Q    Now, I think you said earlier before the break that

19   Lehman, that you closed or the project closed with Lehman

20   in August of 2006; is that right?

21   A    Yes, that's correct.

22   Q    And again how much approximately did Lehman pay or

23   what portion of the loan, the overall loan, $105 million

24   loan did they pay out at that time?

25   A    I believe it was approximately anywhere between 14

J. Kaiser - Direct/Miskiewicz

987

1   and 16 million.

2   Q    Do you know or were you involved at any point with

3   the distribution of those proceeds?

4   A    Yes.

5   Q    Now, did you receive any portion of those proceeds?

6   A    Yes, I did.

7   Q    Do you recall approximately how much in total you

8   received?

9   A    I guess between 700,000 and 800,000.

10  Q    And why did you get between 700,000 and $800,000?

11  A    Well, actually right before that closing, Phil stated

12  that he needed $100,000 to actually bring the Lehman deal

13  to the finish line and I believe that was approximately a

14  month before, and he said he would pay out approximately

15  ten percent on that.  So I sent the $100,000 from my

16  account.

17  Q    Did you get that back somehow as a result of the

18  Lehman deal?

19  A    Yes, at the closing.

20  Q    And did you get it back, approximately 100 or more

21  than $100,000?

22  A    Yes, approximately 110,000.

23  Q    Did you get back any other money in addition to that

24  $100,000?

25  A    Yes.

J. Kaiser - Direct/Miskiewicz

988

1   Q    800,000, I think you said?

2   A    Yes.

3   Q    What was that for?

4   A    For three years of pay, I received, that was

5   approximately 195,000.  I also got all the money that I

6   put into the project, all the funding prior to 2006, I

7   also got back.

8   Q    And when you say you got it back, who distributed

9   that money to you from the Lehman loan?

10  A    That was Phil Kenner.

11  Q    Did you have to provide any documentation when you

12  received reimbursement for expenses, etcetera?

13  A    Yes, I gave Phil receipts of everything for the past

14  couple years, everything that I laid out.

15  Q    And then you received money in return from

16  Mr. Kenner?

17  A    Yes, that's correct.

18  Q    Do you remember what company account that came out

19  of?

20  A    No, I don't.

21  Q    At this time, August of 2006, did you know a man by

22  the name of Tommy Constantine?

23  A    No, I did not.

24  Q    When approximately did you know, did you first hear

25  of Tommy Constantine?

J. Kaiser - Direct/Miskiewicz

989

```
1    A    I heard about him after the closing and that was from
2    Chris Manfredi.
3    Q    Okay.
4         Do you know if Mr. Constantine did anything with
5    respect to the acquisition of this property with the
6    Lehman loan?
7    A    No, I was unaware of anything that he had done.
8    Q    You had been working on the Hawaii property for how
9    many years at this point?
10   A    Approximately four.
11   Q    And how many years had you been involved with
12   Mr. Kenner?
13   A    Since to '03, 2003.
14   Q    Now almost over three years, correct?
15   A    That's correct.
16   Q    When the Lehman money comes through?
17   A    Yes.
18   Q    Did you ever see Mr. Constantine on the property?
19   A    No.
20   Q    Did you ever see any services provided by him?
21   A    None.
22   Q    Did you see any vouchers or purchase orders or
23   anything, any business that he submitted?
24   A    None.
25         MR. HALEY:  I would object just to the leading
```

J. Kaiser - Direct/Miskiewicz

990

1   nature of it.  Describe -- why doesn't he use the word

2   "describe," what he saw or heard.  Just the leading nature

3   of it, Judge.

4           I object.

5           THE COURT:  Overruled.  Again he's asking him

6   about particular documents, okay, but outside of those

7   specific areas, I'll sustain the objection.

8           MR. MISKIEWICZ:  Your Honor, I'll approach the

9   witness and I have Government's Exhibit 5104.  I believe

10  we have a stipulation with counsel.  If I could just refer

11  to what it is.

12          Both counsel for the defendants would stipulate

13  that the documents contained herein within 5104 that are

14  headed "Funding Consulting Agreements, were seized from

15  the defendant Phil Kenner's house in Scottsdale, Arizona,

16  on or about November 13, 2014.

17          THE COURT:  Is that correct?

18          MR. HALEY:  No.  November 13, 2013, your Honor.

19          MR. MISKIEWICZ:  Correct.

20          THE COURT:  Okay.  So you are offering that?

21          MR. MISKIEWICZ:  We are offering it into

22  evidence now.

23          THE COURT:  Any objections?

24          MR. HALEY:  No, sir.

25          MR. LARUSSO:  No, your Honor.

J. Kaiser - Direct/Miskiewicz

991

1        THE COURT:  Okay.  What is the number again?

2        MR. MISKIEWICZ:  Government's Exhibit 5104.

3        THE COURT:  5104 is admitted.

4        (Whereupon, Government Exhibit 5104 was received

5    in evidence.)

6    BY MR. MISKIEWICZ:

7    Q    Mr. Kaiser, I'm showing you a series of pages.  If

8    you would just flip through that and turn to the final

9    page on the agreements there.

10        Do you see a signature line there?

11   A    Yes, I do.

12   Q    Do you see your name?

13   A    Yes.

14   Q    Do you believe that is your signature?

15   A    No, it's definitely not.

16   Q    And I believe there is a second agreement there also.

17   Would you keep flipping through there.  Do you see your

18   signature there?

19   A    Yes.

20   Q    Do you believe that is your signature?

21   A    No, that is not my signature.

22        (Continued.)

23

24

25

992

1    BY MR. MISKIEWICZ (Cont'd):

2    Q.   Showing you what's the first page of

3    Government Exhibit 5104.

4         Just for the record, could you read the heading.

5    A.   Funding consulting agreement.

6    Q.   Would you just read who the parties are to this

7    agreement.

8    A.   This keeps on --

9    Q.   Just read where it says this consulting agreement.

10   A.   It just keeps on flickering on and off.

11        This consulting agreement is entered into

12   effective as of this 15th day of December 2004 between

13   Little Isle IV, LLC or assignee, hereinafter the client,

14   and Constantine Management Group, hereinafter CMG, who is

15   located at 14648 Scottsdale Road, Suite 170, Scottsdale

16   Arizona 85254.

17   Q.   Now, the signature line of that agreement, the

18   signature page, I should say, to that agreement has some

19   dates in there.

20        You see your -- what purports to be your

21   signature?

22   A.   Yes, 12/15/04.

23   Q.   And in December of 2004, had you ever heard of

24   Mr. Constantine?

25   A.   No, I had not.

J. Kaiser - Direct/Miskiewicz

993

1    Q.   Had you ever heard of a company by the name of

2    Constantine Management Group?

3    A.   No.

4    Q.   Is that signature there, is that the signature that I

5    showed you a little while ago?

6    A.   Yes.

7    Q.   Is that your signature?

8    A.   No, it's not my signature.

9    Q.   Does it look like your signature?

10   A.   The name is spelled the same, my spelling.

11        It doesn't look like my signature.

12   Q.   The second funding agreement --

13        MR. MISKIEWICZ:  Sorry, your Honor.

14        The camera seems to be frozen.

15   Q.   Now showing you the second document that has the same

16   heading, funding consulting agreement?

17   A.   Yes.

18   Q.   And again would you read, if you can, the first

19   paragraph, the one that starts this consulting agreement.

20   A.   Sure.  It states:

21        This consulting agreement is entered into and

22   effective as of this 1st day of June 2005, between

23   Little Isle IV, LLC or assignee, hereinafter the client,

24   and Constantine Management Group, hereinafter CMG, who is

25   located at 14648 Scottsdale Road, Suite 170, Scottsdale,

J. Kaiser - Direct/Miskiewicz

994

1   Arizona 85254.

2   Q.   And turning to the signature page, is that your --

3   what's the date next to your signature?

4   A.   6/1/2005.

5   Q.   June of '05, do you recall where you were in or about

6   June of 2005?

7   A.   Yes.

8          I was at home.  My wife was having some

9   difficulties with her pregnancy.

10  Q.   And you ultimately lost the child, is that correct?

11  A.   That's correct.

12  Q.   Were you anywhere in Hawaii at that time?

13  A.   No.

14  Q.   Or Scottsdale, Arizona?

15  A.   No.

16  Q.   The companies that are referred to in the first

17  paragraph of both of these agreements, Little Isle IV,

18  LLC, in or about December of '04, were you a member of

19  Little Isle IV, LLC?

20  A.   No.

21  Q.   What about Constantine Management Group, were you a

22  member of that?

23  A.   No, I was not.

24  Q.   With respect to Little Isle IV, did you ever control

25  any of the money that flowed through Little Isle IV?

J. Kaiser - Direct/Miskiewicz

995

1    A.    No.

2    Q.    Did you have access to bank accounts for Little Isle

3    IV?

4    A.    No, never.

5    Q.    Who did you understand controlled Little Isle IV?

6    A.    That was controlled by Phil Kenner.

7    Q.    Do you have a recollection of approximately when you

8    actually did meet Mr. Constantine, if you met him?

9    A.    Yes.

10         It was the end of '07, beginning of '08.

11   Q.    I show you what's been marked for identification as

12   Government Exhibit 943.

13         Looking at Government Exhibit 943, does that

14   help refresh your recollection as to exactly when you did

15   meet Mr. Constantine -- or, actually, have any

16   communication with Mr. Constantine?

17   A.    Yes.

18         I had met him just prior to this at

19   Phil Kenner's house.  But this is the first I actually got

20   his phone number from Phil Kenner, this is the first text

21   message, first phone call, first anything ever -- the

22   contact I had with Mr. Constantine.

23   Q.    Is that a series of text messages that involve you?

24   A.    Yes.

25   Q.    Did you preserve that text message?

J. Kaiser - Direct/Miskiewicz

996

1    A.   Yes, I did.

2    Q.   You got that on a cell phone?

3    A.   Yes, that's correct.

4    Q.   Did you do anything to the text message to change it

5    or edit it in any way?

6    A.   No, I did not.

7    Q.   Is that exactly the way you got it?

8    A.   Exactly the way I got it.

9            MR. MISKIEWICZ:  The government offers 943.

10           MR. HALEY:  The answer is no objection, Judge.

11           MR. LARUSSO:  No objection, your Honor.

12           THE COURT:  943 is admitted.

13           (Whereupon, Government Exhibit 943 was received

14   in evidence, as of this date.)

15   BY MR. MISKIEWICZ:

16   Q.   So just for the record, what is the date on that --

17   in that series of text messages?

18   A.   The date is March 22, 2008, 5:21 p.m.

19   Q.   And how many days or hours or months prior to that

20   had you met Tommy Constantine?

21   A.   I met him a few months prior to that.

22   Q.   Would it have been late 2007 or would it have been in

23   the beginning of 2008?

24   A.   That was late 2007.

25   Q.   And who introduced you to him?

997

1    A.    Introduced to him by Phil Kenner.

2    Q.    Going back to the Lehman loan and closing with

3    respect to Hawaii, in that year, later in that year,

4    approximately October of 2006, did you -- were you

5    involved in the purchase or the sale of a piece of

6    property here on Long Island?

7    A.    Yes, I was.

8    Q.    Could you describe where this property was located?

9    A.    It was located in Sag Harbor.

10          It was a vacant lot approximately 3.7 acres.

11   Q.    When did you first buy that or get involved in that

12   property, I should say?

13   A.    First got involved it was -- I believe it was around

14   2005.

15   Q.    Did you buy it or sell it or what in 2005?

16   A.    Actually purchased it in 2005.

17   Q.    You purchased it by yourself or with anybody?

18   A.    No, with three other people.

19   Q.    Who were they?

20   A.    First name is Thomas, the last name is Milana,

21   myself, also Chris Manfredi, and Vincent, last name is

22   Tesoriero.

23   Q.    Can you spell Tesoriero?

24   A.    That's going to be a tough one, T-E-S-I-O-R-I-O, I

25   believe.

J. Kaiser - Direct/Miskiewicz

998

1   Q.   When you purchased this property with these other

2   gentlemen, what was your plan?

3   A.   The plan was to build a house on it.

4   Q.   And do what with it?

5   A.   And sell it.

6   Q.   At a profit?

7   A.   That's correct.

8   Q.   Did you purchase it in your own name or did you

9   purchase it under the name of a company?

10  A.   We purchased it under the name of a company.

11  Q.   What was the name of the company?

12  A.   North Point Properties.

13  Q.   Were you a member or a shareholder of that company?

14  A.   Yes, I was.

15  Q.   With those other gentlemen that you just mentioned?

16  A.   Yes, that's correct.

17  Q.   Fast forward to 2006, did there come a time when one

18  of your partners wanted to get out of that property?

19  A.   Yes.

20  Q.   Who was that?

21  A.   That was Thomas Milana.

22  Q.   And just tell the members of the jury what happened

23  when he wanted --

24  A.   He wanted to use his funds for something else, and it

25  was taking longer than he anticipated.

J. Kaiser - Direct/Miskiewicz

999

1           So he wanted to be bought out.

2    Q.    What was taking longer?

3    A.    The period to set up -- to actually do a build.

4           We had some issues with the property.  There was

5    an easement issue that we were working through.

6    Q.    Could you explain what an easement issue is.

7    A.    An easement between actually two properties.

8           There was some wetlands, so there were actually

9    a few issues with the property itself.  I was working with

10   the town.  I was trying to work through that to see

11   exactly what size home we could build, if we could put a

12   tennis court on it.

13   Q.    Was this going to be sort of like a mansion or --

14   A.    Yes, yes.

15   Q.    So did you have any discussions with anyone about the

16   fact that Mr. Milana now wanted to sell out of his

17   interest in the property?

18   A.    Yes, I did.

19   Q.    Who?

20   A.    With Phil Kenner.

21   Q.    And where did you have those discussions?

22   A.    I don't recall whether they were in person or on the

23   phone.

24   Q.    And what if anything was agreed to?

25   A.    Phil Kenner was interested in getting involved.

J. Kaiser - Direct/Miskiewicz

1000

1  Q.    How was he interested in getting involved?

2  A.    He wanted to actually -- he wanted me to sell the

3  property and he would purchase it in another company's

4  name.

5  Q.    Did he say what the name of the company was or --

6  A.    No.

7          MR. MISKIEWICZ:  Withdrawn.

8  BY MR. MISKIEWICZ:

9  Q.    Did you eventually learn what the name of the company

10  was that you were going to sell it to?

11  A.    Yes.

12  Q.    What was the name of the company?

13  A.    Led Better.

14  Q.    Was that another LLC?

15  A.    That's correct.

16  Q.    Did you think this was a good idea to get Mr. Kenner

17  involved by selling it to a different LLC?

18  A.    No.

19          I actually just told him, just buy out -- just

20  buy out Tommy so we don't have to get hit with another --

21  a tax which is a Peconic state tax which was somewhere

22  around $15 to $18,000.

23  Q.    Were you going to stay involved in this development

24  of the property?

25  A.    Yes.

J. Kaiser - Direct/Miskiewicz

1001

1    Q.   And what about the other gentleman, Mr. Tesoriero?

2    A.   Yes, Mr. Vincent Tesoriero and myself.

3    Q.   So you were only -- and was there any other partners

4    that were going to stay involved --

5    A.   No.

6    Q.   -- in this partnership?

7    A.   No, it was just us two.

8    Q.   What did Mr. Kenner, if anything, say to you when you

9    suggested that he just simply buy out Mr. Milana?

10   A.   He said no, he didn't want to do it like that.

11        If he was getting involved he had to control it

12   and that wasn't going to work for him.  He wanted to start

13   with a new company.

14   Q.   Was there ultimately a closing of the sale of this

15   property to the new company?

16   A.   Yes, there was.

17   Q.   Were you present at the closing?

18   A.   Yes.

19   Q.   What did Mr. Kenner tell you as to -- was he going to

20   be buying into this property or was he investing somebody

21   else's money?

22        What if anything did he say?

23   A.   No, he was going to purchase the property.

24   Q.   And what percentage ownership would he then have in

25   the property?

J. Kaiser - Direct/Miskiewicz

1002

1    A.    He would have 50 percent.

2    Q.    What was the price of the property?

3    A.    I believe approximately $750,000.

4    Q.    And where was he going to get the money from to put

5    up his 50 percent of this sale or 50 percent of his

6    partnership, really?

7    A.    He had it from his bank, I assume.

8    Q.    Do you know where he got it from?

9    A.    No.

10   Q.    Were you present at the closing?

11   A.    Yes, I was.

12   Q.    Then did the ownership of the property go from your

13   company to Led Better?

14   A.    Yes, that's correct.

15   Q.    Now, did you get money out of -- at the closing, did

16   you or Mr. Tesoriero get money out of the closing?

17   A.    Yes.

18   Q.    What did you get?

19   A.    I believe somewhere around $750,000.

20   Q.    Did you keep that money in your pocket?

21   A.    No.

22   Q.    What happened to it?

23   A.    I wrote a check to Thomas Milana for somewhere around

24   370 or 75, somewhere around there, $375,000, and the other

25   $380,000 Phil Kenner told us to send it to an account

J. Kaiser - Direct/Miskiewicz

1003

1   after it closed.

2   Q.   I show you what's been received in evidence as

3   Government Exhibit 1602.

4           (The above-mentioned exhibit was published to

5   the jury.)

6   BY MR. MISKIEWICZ:

7   Q.   You see it on the screen in front of you.

8   A.   It's not on this one.

9   Q.   Whose account is this?

10  A.   It looks like my account.

11  Q.   For what statement period is this?

12  A.   11/29/2006 it looks like.

13  Q.   Was this after the closing of Led Better?

14  A.   Yes, I believe.

15  Q.   I'll highlight a portion of the statement.

16          You see where it says 11/01, wire transfer?

17  A.   Yes.

18  Q.   There is a sum of money, $380,000?

19  A.   Yes.

20  Q.   Where are you sending that $380,000?

21  A.   Phil Kenner instructed me to wire it to a company --

22  an account called Ula Makika.

23  Q.   And did you?

24  A.   Yes, I did.

25  Q.   And is that what that $380,000 represents?

J. Kaiser - Direct/Miskiewicz

1004

1    A.    Yes.

2    Q.    Did there ever come a time that you had a discussion

3    about the ownership of Led Better with any other person

4    other than Mr. Kenner?

5    A.    Yes.

6    Q.    Who was that?

7    A.    I also talked about it with Vincent Tesoriero.

8    Q.    I mean other than your partner and Mr. Kenner and

9    Led Better, who did you discuss this with?

10             MR. HALEY:  Judge, I apologize.

11             Discussed what?

12             MR. MISKIEWICZ:  I'll rephrase.

13   BY MR. MISKIEWICZ:

14   Q.    Did you ever talk about your ownership in Led Better

15   with anyone else other than Tesoriero and Kenner?

16   A.    At that point in time or after that?

17   Q.    At any point in time.

18   A.    Yes, I did.

19   Q.    And who was that?

20   A.    His first name is Brian and his last name is Berard.

21   Q.    I'm going to show you what's also in evidence as 703.

22             (The above-mentioned exhibit was published to

23   the jury.)

24   BY MR. MISKIEWICZ:

25   Q.    Highlighting the very top of that, see where it says

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

J. Kaiser - Direct/Miskiewicz

1005

1    Led Better Development Company, LLC?

2    A.    Yes.

3    Q.    Did you see this operating agreement at any point

4    during the closing when you transferred the Sag Harbor

5    property from your old company to Led Better?

6    A.    No.

7          I actually -- it was sold, so, no.  I didn't see

8    this document at that closing.

9          MR. MISKIEWICZ:  Your Honor, may we approach?

10         (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Kaiser - Direct/Miskiewicz

1            (Sidebar.)

2            MR. MISKIEWICZ:  I'm really sorry to do this,

3    but all of the snickering and gesticulating, whatever

4    Mr. Haley is doing, I don't know if he's doing it

5    intentionally, maybe it's not, but the witness during the

6    break already indicated to me that it's very distracting.

7    I think it's very unfair.

8            I'll leave it at that.

9            MR. HALEY:  I deny that I'm snickering.

10           I thought you were up here because his last

11   answer was that he never saw that operating agreement,

12   even though the attorney testified that he was present at

13   the closing and was given it to his attorney.

14           I thought the reason was my client did what he

15   testified a moment ago, make a remark, he went --

16           THE COURT:  I heard it and I think it came from

17   your client.

18           So just instruct him that you can't snicker or

19   react to testimony.

20           MR. HALEY:  I agree.

21           THE COURT:  Just in terms of your gesturing, I

22   did notice that sometimes you gesture with your hands.  I

23   want the record to be clear, I think you are just

24   listening, but don't gesture.

25           I didn't take it the wrong way, but I think it

J. Kaiser - Direct/Miskiewicz

1007

1    can be distracting.

2            MR. HALEY:  Thank you, sir.

3            And that is my intent.  Sometimes I listen to an

4    answer that has multiple components to a question.  I do

5    this in my own mind.  I will refrain from doing so.

6            MR. LARUSSO:  Judge, before we leave can I ask

7    the judge to instruct the jury that my client has nothing

8    to do with the Led Better transaction?

9            I was going to do it with the other witness,

10   which I should have done, but I would ask the court to

11   fashion an instruction --

12           THE COURT:  You mean I'll refer to Sag Harbor?

13           MR. LARUSSO:  That's fine.

14           MR. HALEY:  Sure.

15           MR. LARUSSO:  Thank you, your Honor.

16           (Sidebar concluded.)

17           (Continued on next page.)

18

19

20

21

22

23

24

25

J. Kaiser - Direct/Miskiewicz

1008

1          (In open court.)

2          THE COURT:  Members of the jury, before we go

3     back to the questioning, I want to emphasize something

4     related to the Sag Harbor evidence.

5          I said this way back in the beginning of the

6     case during jury selection, I gave you a summary of the

7     indictment.  You may or may not remember that, because it

8     was a long time ago, but I want to emphasize that the

9     Sag Harbor transaction that you are hearing about, the

10    charge in the indictment related to that is only as

11    against Mr. Kenner.

12          Mr. Constantine is not charged in connection

13    with the Sag Harbor property in any respect and obviously

14    I instructed you in the beginning of the case and I will

15    instruct you again, you have to consider each charge

16    separately and each defendant separately.  It's very

17    important.

18          Go ahead.

19          MR. MISKIEWICZ:  Thank you, your Honor.

20    BY MR. MISKIEWICZ:

21    Q.   Showing you page two of Government Exhibit 703.

22          At the time of the closing on the Sag Harbor

23    Led Better property, did you see what I'm showing you here

24    on the screen?

25    A.   No, I did not.

J. Kaiser - Direct/Miskiewicz

1009

1    Q.   And how does that compare with what you understood

2    the relative ownership interest would be in that property

3    once it was sold to Led Better?

4    A.   It was just Phil Kenner as 50 percent and myself and

5    Vincent as 25 percent each.

6    Q.   What about Mr. Berard?

7    A.   He wasn't -- to my knowledge he wasn't involved in

8    the property at that time.

9    Q.   Did Mr. Kenner tell you that Mr. Berard was involved

10   in the ownership of this Led Better house, talking about

11   at the time of the closing?

12   A.   No, not at the time of the closing.

13   Q.   I'm not going to ask you what he said or what you

14   said to him, but did there come a time that you and

15   Mr. Berard had a discussion about this agreement?

16   A.   Yes, there did.

17   Q.   Approximately when was that?

18   A.   The first discussion, I believe, was approximately

19   2008 or 2009.

20   Q.   Was that the first time you had ever discussed with

21   Mr. Berard this particular agreement?

22           MR. HALEY:  Objection.

23           Didn't he just say that?  I withdraw the

24   objection.

25           THE COURT:  Go ahead.

J. Kaiser - Direct/Miskiewicz

1010

1     You can answer.

2   BY MR. MISKIEWICZ:

3   Q.   Was that the first time?

4   A.   Yes.

5        Brian said he was involved --

6   Q.   I'm not asking you what Mr. Berard --

7   A.   I apologize.

8   Q.   I'm going to move on to a different topic.

9        Are you familiar with a company by the name of

10  Eufora?

11  A.   Yes.

12  Q.   How did you learn about Eufora?

13  A.   Through Phil, through Phil Kenner.

14  Q.   And what if anything did Mr. Kenner tell you about

15  Eufora?

16  A.   That it was a credit card company, it had some

17  patents, that it was going to be worth a lot of money at

18  some time.

19  Q.   Is that all he said, or did he describe anything

20  further about the company?

21  A.   No.

22       He said it was going to explode.  It was going

23  to be a huge company making millions and millions of

24  dollars.

25  Q.   And did he explain to you why of all the credit card

J. Kaiser - Direct/Miskiewicz

1011

1    companies in the world this one was going to explode?

2    A.    Yes.

3    Q.    Why?

4    A.    Because Mr. Constantine owned a patent which was

5    called the credit builder.

6              So if you had, you know, bad credit and your

7    history was bad you could actually take out this card and

8    it would actually build your credit over time and he had

9    the one and only patent to it.

10   Q.    How was that going to be financially -- or did he

11   explain how that would be financially beneficial to

12   anybody associated with Eufora?

13   A.    Yes.

14             He said other companies like Amex or Visa would

15   actually buy the licensing from it and the company would

16   be worth, you know, millions and millions of dollars.

17   Q.    Approximately when did you have this conversation

18   with Mr. Kenner?

19   A.    Approximately 2007.

20   Q.    Were you a still a police officer at this time?

21   A.    No.

22   Q.    Had you retired?

23   A.    Yes, I did.

24   Q.    You did your full 20 years in the PD?

25   A.    No.

J. Kaiser - Direct/Miskiewicz

1012

1    I did 18 and a half.

2    Q.   What happened?

3         Why did you leave early?

4    A.   I had an injury.

5    Q.   Did you go out on disability?

6    A.   Yes.

7    Q.   What was the nature of the injury?

8    A.   Neck and back.

9    Q.   Did you continue working, though, in the field of

10   construction and buying and selling and flipping houses?

11   A.   Yes.

12   Q.   How do you do that if you have a neck and back

13   injury?

14   A.   Oh, I don't do the physical work.

15        I manage it, fund it.

16   Q.   You have workers under you?

17   A.   Yes.

18   Q.   During this period of time, after you were told about

19   Eufora, did there ever come a time that you met anybody

20   who was associated with the ownership of Eufora?

21   A.   Yes.

22   Q.   Who was that?

23   A.   That was Tommy Constantine.

24   Q.   Approximately -- well, do you remember where you were

25   when you met Constantine?

J. Kaiser - Direct/Miskiewicz

1013

1   A.   Yes.

2         I was at Phil Kenner's residence in Arizona.

3   Q.   What were you doing at the residence?

4   A.   We were actually doing a renovation on his home

5   there.

6   Q.   By the way, during this period of time, were you --

7   in addition to having a business relationship with

8   Mr. Kenner, what if any social relationship did you have?

9   A.   Yes, we were friends.

10  Q.   Did you socialize, in other words, did you go places

11  together?

12  A.   Yes.

13  Q.   Did you invite him to family functions?

14  A.   Yes.

15  Q.   Showing you what's been now received in evidence as

16  Government Exhibit 942.

17        Who's depicted in that photograph?

18  A.   Myself, Phil Kenner and my daughter.

19  Q.   What was the occasion here?

20  A.   It was a christening.

21  Q.   When was that?

22  A.   April 15th, 2007.

23  Q.   And you invited Mr. Kenner to the christening?

24  A.   Yes.

25  Q.   The christening was here on Long Island?

J. Kaiser - Direct/Miskiewicz

1014

1    A.    Yes, that's correct.

2    Q.    And you then -- there came a time that you met

3    Mr. Constantine at the defendant's home, defendant

4    Kenner's home, where was that?

5    A.    That was in Arizona, Scottsdale.

6    Q.    What was the purpose of that meeting with

7    Mr. Constantine the first time you met him?

8    A.    He was talking about Eufora.

9    Q.    And what if anything did Mr. Constantine tell you

10   about Eufora?

11   A.    Again, that it was on the verge of exploding.

12         It was going to be the biggest thing and make a

13   ton of money for everyone, that I should get involved.

14   Q.    Did he tell you anything about these patents or

15   anything?

16   A.    Yes.

17   Q.    What did he say?

18   A.    That he had the credit builder patent and I think --

19   I believe actually two other patents to it.

20         I don't recall, exactly, what they were, but he

21   was in the business since, I believe, 2002.

22   Q.    What about this -- you said that Mr. Kenner said that

23   other companies like American Express, et cetera, would

24   buy licensing.

25         What if anything did Mr. Constantine tell you

J. Kaiser - Direct/Miskiewicz

1015

1    about this licensing and the profitability of licensing

2    the patent?

3    A.    Yeah, he uttered the same sentiments, that it was --

4    Q.    What did he say?

5    A.    -- was going to be huge, that he was the only one

6    that had the patent on the credit builder and all these

7    other big companies like Amex, Visa and a few others, that

8    they would actually, you know, buy the license and would

9    actually be a steady stream of income, every month, you

10   know, everybody would get payouts.

11   Q.    Did you ever --

12            MR. MISKIEWICZ:  Withdrawn.

13   Q.    What was the purpose of him telling you about this

14   business?

15   A.    Looking for funding, looking for investors.

16   Q.    Were they looking for you to be an investor?

17   A.    Yes.

18   Q.    Did you agree to invest?

19   A.    Yes.

20   Q.    When did you agree to invest in Eufora?

21   A.    At that time period, the end of '07.

22   Q.    Do you remember how much you invested in Eufora?

23   A.    I believe it was a couple hundred thousand dollars.

24   Q.    Where did that money come from?

25   A.    That money came from a build I had just done recently

J. Kaiser - Direct/Miskiewicz

1016

1   from Hermosa Beach, California.

2   Q.   And that Hermosa Beach, California property, that

3   build, did you do that on your own or did you have

4   partners?

5   A.   My partner on it was Mr. Phil Kenner.

6   Q.   Tell us about the property in Hermosa Beach,

7   California.

8   A.   Sure.

9        It was on the strand, which is right on the

10  beach in Hermosa Beach, California.  Phil Kenner told me

11  about it, and I flew out there to look at it.

12       It needed a lot of work.  It needed a big

13  renovation.  He asked for my expertise on it.  I went down

14  there.  I said we could probably turn it around between $5

15  and $650,000 worth of work.

16  Q.   How much was the purchase price of the house?

17  A.   I believe it was $5 million.

18  Q.   And did you invest any money in that?

19  A.   Yes.

20  Q.   How much?

21  A.   Approximately $1.6 million.

22  Q.   So about 20 percent of the purchase price?

23  A.   Yeah, that's correct.

24       He said we needed that for the down payment.

25  Q.   Where did you come up with the money for that?

J. Kaiser - Direct/Miskiewicz

1017

1    A.    From myself, again family members and friends.

2    Q.    Did you close on the purchase of that property?

3    A.    Yes.

4    Q.    Who came up with the remaining balance of the $5

5    million purchase price?

6    A.    The loan was taken by Phil Kenner, I believe.

7    Q.    Did you work on that property?

8    A.    Yes, I did the design and managed it.

9          I had my brothers down there, a few friends.

10   Q.    And how long did the renovation take?

11   A.    Approximately six months.

12   Q.    Did you sell it?

13   A.    Yes.

14   Q.    Did you sell it at a profit?

15   A.    Yes.

16   Q.    What was the profit --

17         MR. MISKIEWICZ:  Withdrawn.

18   BY MR. MISKIEWICZ:

19   Q.    What was the sale price when you resold it?

20   A.    $8.5 million.

21   Q.    So what was your percentage profit that you were

22   expecting to get out of that?

23   A.    Approximately $1.5 million, plus my initial

24   investment.

25   Q.    Which was $1.1 million?

J. Kaiser - Direct/Miskiewicz

1018

1    A.    No, approximately $1.6 million.

2    Q.    When you say $1.6 million, did that include -- I

3    thought you said it was just a million or $1.1 million

4    down payment.

5              Where is the rest of the money coming from?

6    A.    I believe it was $4 million which Mr. Kenner took out

7    the loan.

8              So I put the down payment down, which was

9    $1 million and also paid for the renovation.

10   Q.    And how much was that?

11   A.    Approximately $500,000.

12   Q.    So did you walk away with that profit from that

13   Hermosa Beach --

14              MR. HALEY:  I object, your Honor.

15              May we approach?

16              THE COURT:  Why don't we stop for the day.

17              MR. HALEY:  Thank you.

18              THE COURT:  We'll end for the day and reconvene

19   tomorrow at 9:30.

20              Don't read or listen to anything regarding the

21   case.  Don't discuss the case.  Have a safe trip home and

22   good night.

23              (Jury leaves the courtroom.)

24              THE COURT:  You can step down, Mr. Kaiser.

25              THE WITNESS:  Thank you.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

1019

1          (Witness steps down.)

2

3          THE COURT:  Everyone can be seated.

4          Mr. Miskiewicz, before I forget, can you have

5    someone from your office from your tech department figure

6    out what's wrong with that screen because it's hard for

7    the witnesses to turn around?

8          MR. MISKIEWICZ:  Yes.

9          THE COURT:  Also if there is something wrong

10   with that screen you can use this one.

11         MR. MISKIEWICZ:  Okay.

12         THE COURT:  Go ahead, Mr. Haley.

13         MR. HALEY:  Your Honor, my objection as to the

14   last question asked and I apologize, I thought

15   Mr. Miskiewicz and I had some understanding and I might be

16   wrong on that, there is a dispute regarding not so much

17   the profit made on that sale, the profit is crystal clear

18   in the questions and answers, there is no dispute as far

19   as what they recovered after the sale.

20         There is a huge dispute about what he received

21   after that sale of that property.  I think he was about to

22   say I never received a return of the profit that was

23   entitled to me.  We dispute that.  There is a matter of

24   correspondence, bank records, things of that nature that

25   go back to whether or not he did or did not receive his

1020

1    return on that profit.  We believe he did.

2            I respectfully suggest to the court that's

3    exactly the type of information that is not part of the

4    indictment.  It would be 404(b).  We were not given notice

5    of it and that's why I objected, Judge.

6            THE COURT:  Mr. Miskiewicz, I guess it started

7    out like you were trying to establish where he got the

8    money for Eufora and then he started going into a lot of

9    detail.

10           Why do we need all that detail?

11           MR. MISKIEWICZ:  He will testify that upon the

12   sale -- he didn't get the proceeds, he got a small, I

13   think he will say he got about $300,000, and the reason

14   it's relevant here is because later when the defendant,

15   Mr. Kenner and Mr. Constantine, get everyone involved in

16   Eufora, there are wire transfers that are coming through

17   at the direction of the defendant for various other

18   accounts.

19           The reason some of those wire transfers go to

20   Mr. Kaiser and some of these are the substantive wire

21   fraud counts two, three, four, the reason they go to

22   Mr. Kaiser is because he has no money to complete a

23   subsequent project.  He's still owed money from this

24   Hermosa Beach project and, again, Mr. Kenner is

25   controlling the funds.

1021

1          So to complete the picture and explain why he's

2    getting wire transfers of $40,000 or $30,000 as alleged in

3    the various counts, this sort of sets it up.

4          THE COURT:  You are alleging the money that he's

5    getting you are saying was diverted from other uses that

6    was other people's money?

7          MR. MISKIEWICZ:  Yes.

8          So money is taken out of Eufora, in one instance

9    it flows through Timothy Gaarn, who at some point becomes

10   the managing member of Mr. Kenner's LLC that owns a

11   substantial chunk of Eufora and --

12         THE COURT:  Okay. I understand.

13         So, Mr. Haley, it's not -- I guess I don't see

14   it as 404(b).  They are trying to explain why money that

15   they say was unlawfully diverted from Eufora, why was it

16   going to Mr. Kaiser.  Mr. Kaiser has to explain why he was

17   getting that money, right?

18         MR. HALEY:  He does, Judge.

19         We know the answer to that.  We believe that it

20   has nothing to do with Hermosa Beach, whatsoever.  But may

21   I have a moment, Judge?

22         THE COURT:  Sure.

23         (There was a pause in the proceedings.)

24         MR. HALEY:  Judge, we'll litigate Hermosa.

25         We are not fearful of litigating an allegation

1022

1  as relates to Mr. Kaiser --

2              THE COURT:  Let me ask you this.

3              What's your position as to what the money wired

4  to him, what it related to if it didn't relate to Hermosa?

5              MR. HALEY:  The only reason -- I'm not laughing

6  at the court, Judge, it kind of reveals cross-examination

7  material in advance of my cross-examination.

8              THE COURT:  Okay.

9              MR. HALEY:  Let me have a moment.

10             (There was a pause in the proceedings.)

11             MR. HALEY:  Judge, if I may, and I didn't mean

12  to be cute and I do apologize.

13             THE COURT:  That's okay.

14             MR. HALEY:  When I said we'll litigate Hermosa

15  that was a flippant remark and I apologize.

16             The government's made a proffer as relates to

17  what they believe is relevant.  I will defer to the

18  court's -- I withdraw my objection, Judge.

19             THE COURT:  Okay.

20             Again, as far as the government's concerned and

21  obviously you and your client, if you think the details of

22  Hermosa are important, I guess you can cross-examine him,

23  but it sounds to me like what the government needs to

24  elicit is that he was still owed money on Hermosa is

25  basically the relevance and that's why the money was being

1023

1 | wired to him by Mr. Kenner.

2 |     Is that the bottom line?

3 |     MR. MISKIEWICZ:  He's owed money from Hermosa.

4 |     He subsequently does another project with the

5 | defendant at that time in Scottsdale, Arizona, and it's

6 | during that period of time that the defendant is diverting

7 | funds out of Eufora to pay Mr. Kaiser on this subsequent

8 | build.

9 |     THE COURT:  But for your purposes whether or not

10 | there was a dispute on what he was owed for Hermosa, it's

11 | not important whether or not there was a dispute.

12 |     It's just important whether the witness believed

13 | he was still owed money on Hermosa, correct?

14 |     MR. MISKIEWICZ:  Yes.

15 |     THE COURT:  Mr. Haley, I don't know if that

16 | helps you or not.

17 |     If you want me to give an instruction to the

18 | jury that the government is not alleging fraud with

19 | respect to the Hermosa property, I'm happy to do that and

20 | I'm happy to limit the government to just summarizing with

21 | Mr. Kaiser tomorrow that he believed that he was still

22 | owed money with respect to Hermosa.

23 |     MR. HALEY:  Your Honor, I do appreciate the

24 | court's thought in that regard and sentiment.

25 |     I believe that we'll be able as part of the

1024

1  defense to keep that issue encapsulated and answer the

2  issue as part of the defense.

3              THE COURT:  Do you want me to tell the jury the

4  government is not alleging fraud with respect to Hermosa?

5              MR. HALEY:  Actually, no, sir.

6              Thank you for that offer.

7              THE COURT:  Okay.

8              So then obviously how much more do you have with

9  Mr. Kaiser on direct?

10             MR. MISKIEWICZ:  Maybe a half an hour, 45

11  minutes, tops.

12             THE COURT:  And then.

13             MR. MISKIEWICZ:  Then I also told counsel this,

14  we have Nicholas Privitello and Mr. Gaarn, who is the

15  attorney coming in from out of town.

16             He's a relatively brief witness.

17             THE COURT:  You want to do him first to make

18  sure we get him done tomorrow?

19             MR. MISKIEWICZ:  I would ask permission if it

20  looks like the cross-examination of Mr. Kaiser is going

21  pretty long if we could take him out of turn.

22             Mr. Kaiser is here local, Mr. Gaarn is not.

23  Actually, Mr. Gaarn said he would be here as well on

24  Thursday, the following week he has a trial he has to get

25  back for.

1025

1    THE COURT:  Okay.

2    MR. HALEY:  Judge, may I make this suggestion --

3  well, if we could finish with the testimony of Mr. Kaiser,

4  the direct, we could then, I guess, put the government's

5  witness on, that gentleman you just mentioned.

6    He's going to be relatively short and then I

7  could commence my cross-examination of Mr. Kaiser.

8    THE COURT:  Okay.

9    MR. HALEY:  I'll do whatever the court directs.

10    MR. MISKIEWICZ:  He's coming in tomorrow

11  morning, so I don't know when he will be here.

12    THE COURT:  Let's play it by ear.

13    You see how long you think Mr. Kaiser's cross is

14  going.

15    MR. HALEY:  It might be a while, Judge.

16    THE COURT:  Yes.

17    Why don't you see if -- you think his flight

18  might not be early enough, is that what you are worried

19  about?

20    MR. MISKIEWICZ:  That's my concern.

21    THE COURT:  If you think he's going to be here

22  by the time you finish your direct, I think Mr. Haley's

23  suggestion would be good just to make sure we get him in,

24  just to get him in before we do the cross of Mr. Kaiser.

25    Okay?

1026

1    MR. MISKIEWICZ:  Yes, sir.

2    THE COURT:  Okay.

3    Are there any issues for tomorrow with respect

4  to I guess Mr. Privitello would be the one I would be

5  focusing on, is there anything we anticipate with him that

6  we should discuss today?

7    No?

8    MR. HALEY:  No, sir.

9    THE COURT:  All right.

10    Have a good night.  See you at 9:30.

11    (The trial was adjourned until Wednesday, May

12  13th, at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

W I T N E S S E S                                    1027

1

2      A A R O N   M A S C A R E L L A              835

3      DIRECT EXAMINATION                            836

4      BY MS. KOMATIREDDY:

5      DIRECT EXAMINATION (CONT'D)                   875

6      BY MS. KOMATIREDDY

7      CROSS-EXAMINATION                             895

8      BY MR. HALEY

9      CROSS-EXAMINATION                             922

10     BY MR. LARUSSO

11     REDIRECT EXAMINATION                          923

12     BY MS. KOMATIREDDY

13     RECROSS-EXAMINATION                           928

14     BY MR. HALEY

15

16     E T H E L   D O L O R E S   K A I S E R      930

17     DIRECT EXAMINATION                            931

18     BY MR. MISKIEWICZ:

19     CROSS EXAMINATION                             936

20     BY MR. HALEY

21     CROSS EXAMINATION                             945

22     BY MR. MR. LARUSSO:

23     RECROSS EXAMINATION                           952

24     BY MR. HALEY

25

W I T N E S S E S                                      1028

1    E T H E L   D O L O R E S   K A I S E R

2    RECROSS EXAMINATION                              953

3    BY MR. LARUSSO:

4

5    R O B E R T   K A I S E R                        954

6    DIRECT EXAMINATION                               954

7    BY MR. MISKIEWICZ

8    DIRECT EXAMINATION (CONT'D)                      969

9    BY MR. MISKIEWICZ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E X H I B I T S                                    1029

1

2      GOVERNMENT EXHIBIT 22 TO 40                    865

3      GOVERNMENT EXHIBIT 20                          865

4      GOVERNMENT EXHIBIT 6504 WAS RECEIVED IN        880

5      EVIDENCE

6      GOVERNMENT EXHIBIT 5103 L WAS RECEIVED IN      885

7      EVIDENCE

8      GOVERNMENT EXHIBIT 2112 THROUGH 2132 WERE      887

9      RECEIVED IN EVIDENCE

10     GOVERNMENT EXHIBIT 16 WAS RECEIVED IN          890

11     EVIDENCE

12     GOVERNMENT EXHIBIT 2162 THROUGH 2182 AND       891

13     21045 WAS RECEIVED IN EVIDENCE

14     GOVERNMENT EXHIBIT 6514 WAS RECEIVED IN        925

15     EVIDENCE

16     GOVERNMENT EXHIBIT 942                         934

17     GOVERNMENT EXHIBIT 726 L WAS RECEIVED IN       982

18     EVIDENCE

19     GOVERNMENT EXHIBIT 5104 WAS RECEIVED IN        991

20     EVIDENCE

21     GOVERNMENT EXHIBIT 943 WAS RECEIVED IN         996

22     EVIDENCE

23

24

25

U.S.A. v. KENNER and CONSTANTINE                                    1

## $

**$1,010,645** [1] - 894:7
**$1,100,000** [1] - 978:2
**$1,250,000** [1] - 854:24
**$1,774,831** [1] - 869:19
**$1,794,392** [1] - 892:8
**$1,800,000** [1] - 892:23
**$10,000** [2] - 873:21, 957:7
**$100,000** [6] - 871:4, 978:12, 987:12, 987:15, 987:21, 987:24
**$101,345** [1] - 868:10
**$105** [2] - 974:10, 986:23
**$11,000** [1] - 867:23
**$15** [1] - 1000:22
**$16** [1] - 974:15
**$18,000** [1] - 1000:22
**$265,000** [1] - 858:19
**$30,000** [1] - 1021:2
**$300,000** [1] - 1020:13
**$35,000** [1] - 881:1
**$375,000** [1] - 1002:24
**$380,000** [4] - 1002:25, 1003:18, 1003:20, 1003:25
**$390,000** [5] - 939:9, 939:19, 939:22, 940:11, 950:11
**$395,000** [1] - 866:8
**$40,000** [1] - 1021:2
**$42,000** [1] - 874:7
**$44,000** [1] - 873:7
**$500** [1] - 962:14
**$500,000** [1] - 1018:11
**$55,000** [1] - 872:22
**$595,000** [1] - 893:20
**$60,000** [2] - 867:8, 867:20
**$636,000** [1] - 862:12
**$638,000** [1] - 863:15
**$638,488.76** [3] - 862:25, 863:5, 863:12
**$650,000** [1] - 1016:15
**$70,000** [7] - 868:19, 870:18, 935:24, 936:10, 949:21, 950:12, 953:16
**$74,258** [1] - 870:4
**$75,000** [1] - 869:8
**$750,000** [5] - 921:2, 956:22, 956:23,

1002:3, 1002:19
**$800,000** [1] - 987:10

## '

**'02** [1] - 959:24
**'03** [3] - 955:11, 959:24, 989:13
**'04** [2] - 972:18, 994:18
**'05** [3] - 972:19, 983:11, 994:5
**'07** [2] - 995:10, 1015:21
**'08** [1] - 995:10

## 1

**1** [18] - 834:14, 834:15, 849:13, 849:18, 858:16, 879:2, 923:2, 972:5, 975:21, 976:14, 976:20, 976:21, 977:19, 982:9, 983:8, 984:1, 985:7, 1018:9
**1.1** [3] - 981:1, 1017:25, 1018:3
**1.2** [2] - 980:16, 980:17
**1.5** [1] - 1017:23
**1.6** [3] - 1016:21, 1018:1, 1018:2
**1.8** [1] - 893:4
**100** [2] - 830:7, 987:20
**11** [1] - 890:13
**11/01** [1] - 1003:16
**11/29/2006** [1] - 1003:12
**110,000** [1] - 987:22
**11501** [1] - 830:2
**11572** [1] - 830:5
**11722** [2] - 829:17, 830:8
**11749** [1] - 829:23
**12** [3] - 829:9, 933:21, 939:20
**12/15/04** [1] - 992:22
**13** [2] - 990:16, 990:18
**13-CR-607** [2] - 829:3, 830:12
**13th** [1] - 1026:12
**14** [4] - 893:17, 958:1, 974:15, 986:25
**14648** [2] - 992:15, 993:25
**15** [4] - 892:2, 916:16, 917:3, 958:6
**1500** [1] - 986:3

**15th** [4] - 860:21, 917:5, 992:12, 1013:22
**16** [10] - 878:8, 889:14, 889:18, 889:20, 889:25, 890:2, 895:1, 958:6, 987:1, 1029:10
**1601** [1] - 829:22
**1602** [1] - 1003:3
**17** [3] - 835:5, 837:9, 894:5
**170** [2] - 992:15, 993:25
**18** [3] - 836:18, 925:15, 1012:1
**180,000** [1] - 977:10
**18th** [1] - 925:13
**19** [2] - 866:5, 900:2
**195,000** [1] - 988:5
**1994** [3] - 837:4, 837:11, 838:2
**19th** [2] - 928:3, 928:6
**1:45** [1] - 929:11
**1st** [1] - 993:22

## 2

**2** [2] - 858:9, 862:9
**20** [11] - 865:6, 865:10, 865:15, 865:23, 865:25, 881:24, 883:21, 901:13, 1011:24, 1016:22, 1029:3
**20-acre** [1] - 960:15
**2001** [9] - 852:25, 853:7, 854:14, 863:23, 911:4, 911:17, 938:12, 938:18, 938:24
**2002** [5] - 955:9, 959:24, 960:1, 960:6, 1014:21
**2003** [23] - 839:2, 911:10, 911:13, 911:18, 933:7, 955:11, 959:24, 959:25, 960:2, 960:16, 961:9, 965:6, 965:10, 965:12, 965:13, 966:8, 967:3, 969:17, 971:16, 972:18, 973:13, 973:19, 989:13
**2004** [5] - 933:7, 971:16, 972:19, 992:12, 992:23
**2005** [12] - 838:3,

855:2, 855:5, 933:8, 939:23, 975:15, 978:8, 993:22, 994:6, 997:14, 997:15, 997:16
**2006** [16] - 848:20, 849:6, 866:4, 866:5, 895:2, 973:12, 973:14, 974:9, 982:13, 982:25, 986:7, 986:20, 988:6, 988:21, 997:4, 998:17
**2007** [28] - 838:16, 860:16, 861:13, 861:14, 861:17, 862:9, 862:11, 862:18, 862:19, 862:23, 863:2, 863:3, 863:9, 863:24, 867:4, 867:20, 868:17, 869:4, 870:1, 870:17, 871:2, 871:11, 871:18, 996:22, 996:24, 1011:19, 1013:22
**2008** [19] - 871:18, 872:19, 873:5, 873:15, 874:4, 875:13, 875:14, 875:25, 878:1, 878:8, 878:21, 878:22, 879:2, 880:19, 881:3, 881:10, 996:18, 996:23, 1009:19
**2009** [31] - 879:2, 881:25, 885:1, 886:5, 886:13, 886:19, 886:25, 887:8, 892:1, 892:4, 892:25, 893:17, 893:19, 894:5, 894:6, 897:12, 898:6, 899:21, 900:2, 924:8, 924:9, 924:23, 925:13, 925:15, 928:6, 946:8, 946:9, 949:24, 950:3, 953:21, 1009:19
**2010** [3] - 916:16, 917:3, 917:6
**2011** [3] - 837:11, 838:17, 882:14
**2013** [1] - 990:18
**2014** [1] - 990:16
**2015** [3] - 829:9, 854:24, 890:13

**2020** [1] - 857:22
**2081** [2] - 902:21, 902:24
**2081-A** [2] - 841:21, 842:20
**2081-B** [2] - 842:14, 842:20
**2081-C** [1] - 843:3
**2082-A** [1] - 848:1
**2082-B** [1] - 848:6
**2083-A** [1] - 848:19
**2083-B** [1] - 848:24
**2086-A** [1] - 844:14
**2086-B** [1] - 844:21
**2087-A** [1] - 845:10
**2087-B** [1] - 845:19
**2088-A** [1] - 846:8
**2088-B** [1] - 846:15
**2089-A** [1] - 847:5
**2089-B** [1] - 847:10
**20th** [1] - 878:21
**21** [1] - 885:1
**2101** [1] - 862:18
**21045** [5] - 890:8, 890:12, 891:4, 891:10, 1029:13
**2112** [7] - 886:7, 886:15, 887:12, 887:17, 895:15, 923:21, 1029:8
**2113** [2] - 895:15, 924:12
**2114** [1] - 895:16
**2115** [3] - 886:7, 886:16, 895:15
**2116** [2] - 887:19, 895:15
**2117** [1] - 895:16
**2118** [2] - 886:7, 895:15
**2119** [1] - 895:16
**2120** [1] - 895:16
**2121** [2] - 886:7, 895:15
**2122** [1] - 895:16
**2123** [1] - 895:16
**2124** [2] - 886:7, 895:15
**2125** [1] - 895:16
**2126** [1] - 895:17
**2127** [2] - 886:7, 895:15
**2128** [1] - 895:16
**2129** [1] - 895:17
**2130** [2] - 886:7, 895:15
**2131** [1] - 895:16
**2132** [4] - 887:12, 887:17, 895:17,

1029:8
**2133** [2] - 852:25, 863:7
**2139** [1] - 853:1
**2158** [3] - 852:25, 861:22, 861:25
**2162** [6] - 890:7, 890:11, 891:4, 891:9, 891:16, 1029:12
**2165** [2] - 893:10, 893:17
**2173** [2] - 893:23, 894:5
**2182** [3] - 891:4, 891:9, 1029:12
**2184** [2] - 890:8, 890:12
**21st** [1] - 878:22
**22** [10] - 865:6, 865:9, 865:14, 865:22, 865:24, 867:1, 867:3, 923:5, 996:18, 1029:2
**23** [3] - 860:16, 868:8, 869:1
**2398** [1] - 897:24
**23rd** [8] - 861:12, 862:9, 862:10, 862:23, 863:3, 863:9, 867:4, 867:20
**24** [3] - 837:5, 861:17, 868:16
**25** [3] - 869:5, 902:6, 1009:5
**250** [7] - 956:13, 959:15, 962:7, 962:9, 962:17, 962:23, 963:4
**252996** [1] - 893:21
**258** [3] - 956:21, 969:25, 973:18
**26** [6] - 830:4, 855:2, 855:5, 869:25, 870:14, 916:22
**27** [2] - 836:18, 870:16
**279806** [1] - 894:8
**28** [1] - 871:1
**289369** [3] - 892:11, 892:16, 892:18
**29** [2] - 871:10, 871:15
**2:10** [1] - 930:8
**2:45** [1] - 954:2
**2nd** [2] - 870:17, 954:23

### 3

**3** [1] - 892:20
**3.7** [1] - 997:10

**30** [14] - 866:20, 871:11, 871:17, 933:18, 933:20, 933:23, 933:25, 976:11, 977:23, 978:11, 978:18, 978:25, 979:15, 985:7
**30-day** [2] - 977:17, 978:1
**300** [1] - 830:1
**31** [6] - 872:18, 892:4, 893:17, 893:19, 894:5, 894:6
**31st** [1] - 871:18
**32** [3] - 873:5, 978:20
**33** [4] - 873:14, 896:4, 978:20
**34** [2] - 874:4, 875:10
**341** [1] - 830:2
**35** [1] - 875:12
**35,000** [1] - 881:15
**36** [1] - 877:25
**370** [1] - 1002:24
**38** [2] - 878:8, 878:10
**39** [3] - 878:21, 879:8, 881:2
**390,000** [5] - 933:10, 933:11, 933:15, 939:7, 939:24

### 4

**4** [3] - 854:24, 898:1, 1018:6
**40** [10] - 865:6, 865:9, 865:15, 865:22, 865:24, 879:1, 879:9, 881:12, 923:6, 1029:2
**400** [1] - 897:25
**404(b)** [2] - 1020:4, 1021:14
**40th** [3] - 937:13, 937:14, 937:16
**425** [1] - 829:22
**43,000** [2] - 880:24, 881:4
**45** [1] - 1024:10
**4th** [1] - 871:18

### 5

**5** [3] - 1016:14, 1016:17, 1017:4
**5,927.78** [3] - 855:2, 855:6, 855:7
**50** [4] - 1002:1, 1002:5, 1009:4
**5031** [1] - 884:10

**5103** [5] - 885:14, 885:21, 885:22, 885:23, 1029:6
**5104** [7] - 990:9, 990:13, 991:2, 991:3, 991:4, 992:3, 1029:19
**53** [1] - 860:21
**5:21** [1] - 996:18

### 6

**6** [1] - 875:13
**6/1/2005** [1] - 994:4
**60** [1] - 978:14
**600** [1] - 855:13
**602** [1] - 898:1
**610** [2] - 855:6, 855:11
**631-712-6105** [1] - 830:8
**636,603.63** [1] - 862:13
**6504** [8] - 879:12, 880:1, 880:7, 880:8, 880:10, 881:5, 885:20, 1029:4
**6514** [5] - 925:3, 925:17, 925:20, 925:23, 1029:14

### 7

**7** [2] - 871:2, 873:14
**700** [1] - 855:22
**700,000** [3] - 977:13, 987:9, 987:10
**703** [2] - 1004:21, 1008:21
**726** [3] - 981:25, 982:5, 1029:17
**726-L** [2] - 963:13, 964:1
**732** [2] - 894:14, 895:1
**75** [1] - 1002:24

### 8

**8.5** [1] - 1017:20
**800,000** [2] - 987:9, 988:1
**835** [1] - 1027:2
**836** [1] - 1027:3
**85016** [1] - 897:25
**85254** [2] - 992:16, 994:1
**865** [2] - 1029:2, 1029:3
**875** [1] - 1027:5
**880** [1] - 1029:4
**885** [1] - 1029:6

**887** [1] - 1029:8
**890** [1] - 1029:10
**891** [1] - 1029:12
**895** [1] - 1027:7

### 9

**9** [4] - 875:14, 898:6, 899:21, 924:9
**9/11** [2] - 938:20, 954:22
**922** [1] - 1027:9
**923** [1] - 1027:11
**925** [1] - 1029:14
**928** [1] - 1027:13
**930** [1] - 1027:16
**931** [1] - 1027:17
**934** [1] - 1029:16
**936** [1] - 1027:19
**942** [6] - 934:11, 934:17, 934:21, 934:22, 1013:16, 1029:16
**943** [5] - 995:12, 995:13, 996:9, 996:12, 996:13, 1029:21
**945** [1] - 1027:21
**952** [1] - 1027:23
**953** [1] - 1028:2
**954** [2] - 1028:5, 1028:6
**969** [1] - 1028:8
**982** [1] - 1029:17
**991** [1] - 1029:19
**996** [1] - 1029:21
**9:30** [4] - 829:10, 1018:19, 1026:10, 1026:12
**9th** [1] - 928:4

### A

**a.m** [2] - 829:10, 1026:12
**a/k/a** [2] - 829:6, 829:8
**AARON** [1] - 835:25
**Aaron** [3] - 831:9, 835:11, 835:24
**able** [6] - 831:14, 831:22, 915:25, 936:4, 975:2, 1023:25
**above-mentioned** [2] - 1003:4, 1004:22
**Abraham** [2] - 941:9
**absolutely** [2] - 900:25, 918:8
**access** [1] - 995:2
**accompanying** [1] -

903:9
**according** [1] - 835:6
**Account** [2] - 861:1, 861:2
**account** [128] - 841:13, 841:17, 841:18, 842:3, 842:5, 842:10, 842:11, 842:21, 842:22, 843:15, 843:20, 843:21, 843:25, 844:6, 844:11, 844:17, 845:1, 845:4, 845:14, 845:16, 845:20, 845:21, 846:3, 846:10, 846:13, 846:18, 846:20, 846:24, 847:5, 847:8, 847:16, 847:20, 848:1, 848:4, 848:10, 848:14, 848:19, 848:22, 852:14, 854:9, 856:24, 857:4, 857:5, 857:9, 858:12, 860:10, 861:3, 862:19, 862:24, 863:5, 863:17, 864:24, 864:25, 865:3, 865:12, 867:10, 868:9, 868:12, 868:20, 869:9, 869:11, 870:4, 870:20, 871:4, 872:2, 872:11, 872:12, 872:23, 873:1, 873:8, 873:18, 873:24, 874:8, 875:17, 878:5, 878:13, 878:25, 879:5, 879:6, 889:1, 889:10, 890:10, 891:17, 891:18, 891:20, 891:24, 892:3, 892:17, 892:21, 892:22, 892:24, 892:25, 893:3, 893:11, 893:14, 893:18, 893:20, 893:24, 894:1, 894:2, 894:6, 894:7, 894:12, 894:23, 897:3, 898:9, 899:12, 899:15, 899:23, 900:18, 912:8, 917:21, 919:2,

919:8, 928:7, 941:5, 941:6, 950:20, 987:16, 988:18, 1002:25, 1003:9, 1003:10, 1003:22

**accounting** [2] - 877:14, 877:18

**accounts** [52] - 832:14, 837:21, 837:23, 838:19, 840:23, 841:5, 841:9, 841:12, 849:10, 849:15, 849:17, 849:18, 849:21, 850:24, 850:25, 851:1, 852:13, 852:18, 854:3, 854:4, 854:6, 854:11, 857:20, 871:23, 877:6, 877:17, 878:2, 878:4, 888:9, 888:12, 888:13, 888:15, 888:17, 888:22, 889:5, 890:10, 893:12, 894:16, 894:21, 912:4, 912:5, 917:17, 918:13, 918:14, 918:23, 918:25, 923:1, 924:13, 924:15, 995:2, 1020:18

**accurate** [7] - 849:14, 879:23, 886:12, 886:24, 887:7, 890:9, 925:14

**accurately** [1] - 865:10

**accused** [1] - 983:18

**acquire** [2] - 969:10, 969:18

**acquiring** [1] - 969:21

**acquisition** [1] - 989:5

**acreage** [3] - 962:23, 969:19, 969:20

**acres** [13] - 956:13, 956:21, 959:15, 962:7, 962:9, 962:17, 962:22, 962:23, 963:4, 969:25, 973:18, 986:3, 997:10

**Act** [2] - 911:5, 911:16

**acted** [2] - 856:15, 907:15

**acting** [2] - 829:16, 907:13

**activities** [1] - 841:19

**activity** [1] - 914:24

**actual** [6] - 959:14, 965:5, 965:7, 965:14, 967:12, 974:7

**ad** [2] - 851:10, 867:11

**add** [4] - 832:3, 885:8, 898:19, 898:20

**addition** [3] - 962:23, 987:23, 1013:7

**additional** [2] - 962:23, 969:19

**address** [13] - 895:21, 896:7, 896:10, 896:12, 896:20, 896:22, 896:24, 897:2, 898:3, 899:14, 900:16, 917:8, 928:7

**addresses** [4] - 896:16, 897:6, 897:15, 898:24

**adjourned** [1] - 1026:11

**administering** [2] - 919:2, 919:4

**admissibility** [1] - 966:18

**admissible** [1] - 890:12

**admission** [2] - 934:17, 964:1

**admitted** [13] - 865:23, 880:7, 885:22, 887:16, 890:1, 891:7, 925:22, 934:21, 981:25, 982:2, 991:3, 996:12

**advance** [19] - 855:23, 856:11, 856:14, 856:17, 856:25, 857:3, 857:7, 863:4, 863:11, 863:15, 864:21, 864:22, 867:6, 868:9, 869:8, 871:4, 873:7, 874:7, 1022:7

**advanced** [4] - 856:22, 868:19, 870:4, 870:19

**advances** [2] - 853:13, 877:15

**advisability** [1] - 937:24

**advised** [1] - 951:11

**advisor** [7] - 839:13, 840:11, 840:13, 859:6, 896:23, 962:2, 967:24

**affect** [1] - 968:6

**afternoon** [8] -

922:13, 931:12, 931:13, 936:22, 936:23, 945:21, 945:22, 981:8

**age** [1] - 957:20

**agent** [4] - 840:8, 840:9, 840:10, 896:23

**ago** [10] - 833:21, 902:9, 907:22, 931:19, 939:7, 966:6, 966:13, 993:5, 1006:15, 1008:8

**agree** [5] - 831:24, 903:5, 1006:20, 1015:18, 1015:20

**agreed** [2] - 890:5, 999:24

**agreement** [17] - 887:23, 974:7, 991:16, 992:5, 992:7, 992:9, 992:11, 992:17, 992:18, 993:12, 993:16, 993:19, 993:21, 1005:3, 1006:11, 1009:15, 1009:21

**Agreements** [1] - 990:14

**agreements** [2] - 991:9, 994:17

**ahead** [8] - 836:5, 882:9, 910:22, 920:5, 954:18, 1008:18, 1009:25, 1019:12

**Aisle** [1] - 972:13

**alarm** [1] - 901:24

**alias** [1] - 942:6

**ALL** [1] - 835:1

**allegation** [1] - 1021:25

**alleged** [1] - 1021:2

**alleging** [3] - 1021:4, 1023:18, 1024:4

**Allison** [2] - 914:6, 914:8

**allow** [1] - 831:19

**almost** [2] - 950:13, 989:14

**altogether** [1] - 931:20

**America** [1] - 890:5

**AMERICA** [1] - 829:3

**American** [1] - 1014:23

**Amex** [2] - 1011:14, 1015:7

**amount** [12] - 851:21,

854:23, 854:24, 855:1, 855:6, 855:20, 858:18, 866:7, 867:18, 880:23, 881:2, 933:14

**amounts** [7] - 854:19, 854:20, 854:21, 864:15, 867:16, 878:12, 927:9

**analysis** [1] - 967:15

**analyst** [2] - 838:10, 838:12

**analyzing** [1] - 838:10

**ancient** [1] - 958:21

**AND** [1] - 1029:12

**ANDREW** [1] - 830:4

**annual** [1] - 919:10

**annually** [1] - 919:12

**answer** [25] - 851:6, 851:7, 872:15, 872:16, 883:6, 908:5, 910:4, 910:23, 915:21, 916:7, 918:6, 918:20, 920:1, 920:3, 920:25, 928:16, 941:3, 967:23, 984:4, 996:10, 1006:11, 1007:4, 1010:1, 1021:19, 1024:1

**answered** [5] - 883:7, 898:15, 898:18, 911:12, 911:18

**answers** [2] - 883:8, 1019:18

**anticipate** [1] - 1026:5

**anticipated** [1] - 998:25

**anticipating** [2] - 977:23, 983:1

**anxious** [2] - 979:20, 979:22

**apologize** [7] - 912:12, 913:14, 1004:10, 1010:7, 1019:14, 1022:12, 1022:15

**appear** [5] - 842:25, 903:9, 917:1, 943:9, 952:13

**appearance** [1] - 830:14

**APPEARANCES** [1] - 829:14

**appeared** [1] - 832:10

**appreciate** [2] - 967:22, 1023:23

**apprenticed** [1] -

958:4

**approach** [8] - 903:25, 941:15, 941:21, 943:4, 966:19, 990:8, 1005:9, 1018:15

**appropriate** [1] - 889:4

**approvals** [1] - 857:12

**approved** [3] - 856:20, 939:11, 983:1

**approximate** [1] - 881:2

**April** [8] - 854:24, 863:24, 867:4, 867:20, 873:14, 982:13, 986:7, 1013:22

**archeologist** [1] - 959:13

**archeology** [1] - 958:20

**Archive** [1] - 858:4

**area** [1] - 877:3

**areas** [1] - 990:7

**argumentative** [1] - 908:4

**Arizona** [14] - 836:14, 836:23, 837:1, 837:2, 837:4, 897:25, 990:15, 992:16, 994:1, 994:14, 1013:2, 1014:5, 1023:5

**Arnold** [1] - 941:10

**arrangements** [1] - 926:15

**article** [1] - 960:25, 963:8, 966:11, 967:2, 967:9, 967:17, 967:19, 968:1, 968:7, 968:14, 981:14

**articles** [1] - 982:3

**Articles** [1] - 843:20

**assembled** [1] - 980:2

**assigned** [1] - 856:20

**assignee** [2] - 992:13, 993:23

**assist** [1] - 903:2

**assistant** [1] - 837:15

**Assistant** [1] - 829:18

**assisted** [2] - 837:15, 840:4

**associated** [4] - 852:1, 877:6, 1011:12, 1012:20

**assume** [9] - 918:5, 918:9, 945:5, 946:17, 951:7,

966:3, 966:7, 967:5,
1002:7
**assumed** [2] - 912:23,
967:8
**assumes** [1] - 967:2
**assuming** [2] - 967:9,
967:11
**assumption** [3] -
966:8, 966:12,
967:11
**athletes** [2] - 839:14,
854:10
**attempting** [1] - 971:7
**attend** [1] - 836:23
**attention** [33] -
842:13, 843:3,
844:14, 844:21,
845:9, 845:18,
846:7, 846:15,
847:4, 847:10,
847:25, 848:6,
848:18, 848:24,
852:23, 858:9,
859:25, 861:21,
862:17, 863:1,
863:6, 863:24,
866:3, 867:1, 881:1,
881:23, 886:3,
891:15, 923:20,
932:22, 959:11,
975:14, 982:13
**Attorney** [1] - 829:16
**attorney** [3] - 1006:12,
1006:13, 1024:15
**attorney's** [1] - 920:1
**attorneys** [2] - 887:10,
890:7
**Attorneys** [1] - 829:18
**August** [6] - 870:1,
974:9, 978:10,
986:20, 988:21
**authentication** [1] -
968:11
**authority** [10] - 845:3,
845:7, 846:2,
846:23, 847:19,
848:13, 849:5,
903:22, 906:4,
906:10
**authorization** [10] -
844:22, 845:20,
846:17, 847:12,
848:8, 848:9, 849:1,
849:2, 856:22,
857:12
**authorizations** [1] -
845:24
**authorize** [1] - 903:15
**authorized** [11] -
842:11, 844:5,

844:9, 845:1,
845:24, 846:19,
846:20, 847:15,
848:10, 849:3, 903:8
**availability** [4] -
864:17, 864:22,
873:20, 873:25
**available** [8] - 864:19,
873:21, 878:17,
878:19, 899:6,
962:18, 962:22,
962:24
**aware** [6] - 900:13,
938:6, 938:8,
938:15, 939:2,
971:12

## B

**baby** [3] - 934:13,
934:14, 976:7
**background** [1] -
910:16
**bad** [3] - 938:3,
1011:6, 1011:7
**balance** [7] - 854:21,
855:18, 867:18,
869:17, 869:19,
878:15, 1017:4
**bank** [79] - 832:13,
836:16, 836:20,
837:3, 837:16,
837:20, 838:11,
840:20, 841:2,
841:4, 841:5,
843:12, 843:15,
843:17, 845:4,
845:13, 845:20,
845:23, 846:3,
846:24, 847:16,
847:20, 848:10,
848:14, 848:19,
850:2, 850:5, 851:9,
851:14, 852:4,
852:16, 852:18,
853:25, 856:19,
857:8, 857:12,
857:15, 857:18,
865:2, 866:10,
866:23, 876:14,
877:11, 882:18,
882:22, 882:23,
883:4, 883:5,
883:10, 883:14,
884:20, 884:21,
887:24, 888:25,
890:8, 891:12,
894:19, 907:9,
907:13, 907:15,
907:22, 908:1,
908:11, 908:15,

909:11, 909:17,
912:17, 915:15,
927:12, 950:20,
950:22, 950:25,
995:2, 1002:7,
1019:24
**Bank** [20] - 837:8,
837:13, 845:5,
846:11, 846:21,
846:25, 847:17,
847:21, 848:11,
848:14, 849:6,
850:16, 853:18,
855:25, 861:5,
869:18, 879:4,
882:10, 882:15,
890:10
**bank's** [4] - 870:10,
887:9, 888:10,
888:11
**banker** [1] - 837:15,
841:4, 909:10
**bankers** [1] - 837:16
**banking** [22] - 836:17,
836:25, 837:17,
837:18, 837:19,
837:25, 838:2,
841:2, 844:22,
846:17, 847:12,
848:8, 848:9, 849:1,
849:2, 856:16,
870:10, 901:7,
901:10, 910:16,
912:5, 915:18
**banks** [2] - 950:23,
950:24
**bar** [5] - 893:6,
894:10, 941:22,
942:1, 942:10
**bars** [1] - 893:1
**based** [2] - 945:10,
966:12
**basis** [1] - 919:24
**Beach** [7] - 1016:1,
1016:2, 1016:6,
1016:10, 1018:13,
1020:24, 1021:20
**beach** [1] - 1016:10
**bear** [1] - 928:7
**beautiful** [1] - 946:12
**became** [3] - 864:13,
912:3, 919:1
**become** [2] - 838:13,
864:16
**becomes** [1] - 1021:9
**BEFORE** [1] - 829:11
**began** [1] - 971:17
**beginning** [7] -
881:14, 902:19,
972:20, 995:10,

996:23, 1008:5,
1008:14
**behalf** [3] - 906:5,
908:15, 933:5
**behind** [2] - 861:25,
887:2
**believes** [1] - 968:7
**below** [1] - 858:12
**beneficial** [1] -
1011:11
**Berard** [14] - 853:19,
858:12, 893:13,
940:14, 940:16,
940:18, 940:21,
941:1, 1004:20,
1009:6, 1009:9,
1009:15, 1009:21,
1010:6
**Berard's** [6] - 858:14,
874:7, 875:6,
893:15, 893:18,
893:21
**best** [4] - 950:8,
953:12, 965:13,
980:8
**Better** [12] - 1000:13,
1002:13, 1003:13,
1004:3, 1004:9,
1004:14, 1005:1,
1005:5, 1007:8,
1008:23, 1009:3,
1009:10
**better** [1] - 840:13
**between** [20] - 837:23,
839:20, 840:6,
889:13, 890:5,
907:8, 908:11,
919:18, 919:21,
924:23, 925:11,
925:15, 973:13,
986:25, 987:9,
987:10, 992:12,
993:22, 999:7,
1016:14
**beyond** [1] - 979:15
**BIANCO** [1] - 829:12
**big** [14] - 834:1, 936:3,
944:11, 955:13,
956:5, 960:20,
961:7, 961:20,
962:20, 962:21,
981:5, 982:20,
1015:7, 1016:12
**Big** [17] - 844:11,
844:15, 844:24,
845:4, 845:10,
845:13, 845:21,
845:24, 846:3,
846:8, 846:18,
846:20, 846:24,

858:13, 971:21,
972:13, 972:22
**biggest** [1] - 1014:12
**billion** [1] - 963:9
**binder** [6] - 834:18,
852:23, 861:23,
879:13, 895:14,
922:3
**binders** [1] - 886:3
**birthday** [3] - 937:13,
937:14, 937:16
**bit** [3] - 879:19,
888:23, 926:18
**black** [3] - 867:15,
893:6, 894:10
**bless** [1] - 937:5
**block** [1] - 957:24
**blown** [1] - 832:23
**blue** [2] - 935:11,
935:14
**board** [4] - 849:11,
923:1, 972:4, 972:5
**Board** [4] - 834:14,
834:15, 849:13,
849:18
**Bob** [1] - 977:5
**bold** [1] - 849:14
**Bollanzena** [1] - 883:6
**bombing** [3] - 938:13,
938:18, 938:25
**bond** [6] - 851:3,
888:9, 889:2, 889:5,
892:25, 893:18
**bonds** [11] - 851:4,
851:9, 852:13,
876:20, 888:17,
888:23, 888:24,
889:1, 889:3, 889:6,
894:20
**books** [1] - 945:14
**borrow** [1] - 940:25
**borrowed** [1] - 980:2
**borrower** [2] - 866:15,
887:21
**borrowers** [2] -
838:11, 912:25
**bosses** [1] - 910:7
**bothered** [1] - 859:7
**bottom** [5] - 860:12,
880:11, 886:10,
886:22, 1023:2
**bought** [3] - 951:5,
971:2, 999:1
**bowl** [2] - 914:15,
914:16
**bowling** [1] - 914:14
**break** [10] - 890:14,
890:16, 929:10,
955:10, 956:4,
981:9, 981:25,

982:8, 986:18, 1006:6
**breakdown** [2] - 864:18, 926:11
**Brewer** [1] - 962:20
**Brian** [2] - 1004:20, 1010:5
**brief** [2] - 923:13, 1024:16
**briefly** [1] - 927:23
**bring** [5] - 832:10, 834:11, 890:22, 930:6, 987:12
**bringing** [1] - 975:7
**Brook** [1] - 959:8
**brother** [2] - 971:4, 977:3
**brothers** [2] - 957:20, 1017:9
**Brothers** [5] - 973:11, 973:25, 974:2, 974:19, 983:2
**brought** [3] - 833:7, 882:19, 970:22
**Bryan** [13] - 853:19, 858:12, 874:7, 875:6, 893:12, 893:15, 893:18, 893:21, 940:14, 940:16, 940:18, 940:21, 941:1
**bucket** [1] - 983:20
**build** [16] - 957:12, 957:13, 957:14, 959:20, 960:9, 969:14, 969:15, 970:4, 970:7, 998:3, 999:3, 999:11, 1011:8, 1015:25, 1016:3, 1023:8
**builder** [4] - 957:19, 1011:5, 1014:18, 1015:6
**building** [6] - 957:18, 957:23, 958:13, 958:17, 959:15, 970:20
**buildings** [1] - 970:20
**built** [1] - 980:7
**bunch** [2] - 962:3, 986:10
**burials** [1] - 958:21
**business** [18] - 836:17, 838:21, 839:21, 841:18, 859:9, 896:23, 902:2, 903:13, 931:21, 932:20, 932:21, 944:15, 956:5, 970:25,

989:23, 1013:7, 1014:21, 1015:14
**business/personal** [1] - 913:10
**busy** [1] - 859:8
**buy** [11] - 962:8, 975:3, 980:21, 997:11, 997:15, 1000:19, 1000:20, 1001:9, 1011:15, 1014:24, 1015:8
**buying** [3] - 963:4, 1001:20, 1012:10
**BY** [54] - 829:17, 829:23, 836:10, 875:2, 895:10, 906:1, 909:1, 910:24, 913:5, 913:8, 915:5, 916:1, 917:15, 920:6, 922:12, 923:15, 925:6, 926:1, 928:2, 931:11, 936:19, 943:3, 945:20, 952:23, 953:6, 954:21, 965:2, 965:19, 969:4, 982:7, 985:13, 991:6, 992:1, 996:15, 1000:8, 1003:6, 1004:13, 1004:24, 1008:20, 1010:2, 1017:18, 1027:4, 1027:6, 1027:8, 1027:10, 1027:12, 1027:14, 1027:18, 1027:20, 1027:22, 1027:24, 1028:3, 1028:7, 1028:9

---

## C

**Cabo** [1] - 983:14, 984:18, 984:21, 985:4, 985:16, 985:19, 985:21, 986:3, 986:13
**CALCAGNI** [1] - 829:21
**California** [5] - 914:1, 1016:1, 1016:2, 1016:7, 1016:10
**calm** [2] - 984:19, 984:24
**Camelback** [1] - 897:25
**camera** [1] - 993:14
**cane** [1] - 962:21
**capacity** [5] - 907:14,

907:15, 907:23, 908:2, 932:19
**card** [11] - 842:3, 842:17, 844:15, 845:13, 850:12, 850:15, 850:22, 944:12, 1010:16, 1010:25, 1011:7
**cards** [5] - 832:14, 842:19, 903:9, 944:16, 944:19
**care** [4] - 864:12, 866:15, 931:22, 931:24
**career** [4] - 837:9, 838:16, 841:1, 850:1
**carpentry** [1] - 957:20
**case** [11] - 830:12, 853:10, 866:16, 890:17, 929:12, 932:7, 981:10, 1008:6, 1008:14, 1018:21
**cash** [12] - 851:3, 851:4, 851:10, 852:14, 852:15, 888:17, 888:23, 889:6, 893:18, 894:20, 976:20, 980:25
**Castle** [1] - 970:21
**catchment** [1] - 970:7
**cc** [4] - 928:8, 928:20, 928:25
**celebrities** [3] - 962:2, 963:22, 967:24
**cell** [1] - 996:2
**Center** [4] - 938:13, 938:18, 938:25, 955:3
**Central** [3] - 829:5, 829:17, 830:8
**CEO** [1] - 883:5
**certain** [2] - 843:21, 849:25
**certainly** [4] - 839:8, 913:15, 917:11, 965:8
**certified** [3] - 888:1, 888:4, 897:21
**cetera** [1] - 1014:23
**chain** [1] - 879:21
**chair** [2] - 836:2, 931:5
**chance** [5] - 843:6, 862:3, 865:2, 865:7, 925:7
**change** [5] - 842:24, 867:24, 888:19, 910:14, 996:4

**changed** [3] - 897:2, 898:24, 915:20
**changes** [1] - 910:11
**charge** [4] - 912:7, 944:12, 1008:10, 1008:15
**charged** [1] - 1008:12
**charity** [2] - 914:1, 914:2
**chart** [3] - 831:10, 831:12, 884:10
**cheap** [1] - 975:6
**check** [7] - 962:10, 962:13, 962:15, 963:2, 974:22, 975:3, 1002:23
**checking** [26] - 856:24, 857:9, 863:5, 863:16, 864:24, 865:11, 868:12, 868:20, 869:9, 869:11, 870:4, 870:20, 871:4, 872:22, 873:8, 873:23, 874:8, 875:17, 877:17, 878:2, 878:5, 878:13, 878:24, 878:25, 879:6, 912:7
**Chicago** [1] - 836:21
**child** [1] - 994:10
**children** [5] - 932:1, 932:2, 932:3, 936:24, 936:25
**choice** [2] - 985:17, 985:20
**Chris** [15] - 938:15, 939:3, 955:17, 957:5, 961:14, 961:19, 971:10, 982:18, 983:9, 983:24, 984:5, 984:17, 985:1, 989:2, 997:21
**christening** [3] - 1013:20, 1013:23, 1013:25
**chunk** [1] - 1021:11
**circumstances** [2] - 839:18, 915:8
**city** [2] - 955:10
**civil** [6] - 913:15, 913:18, 913:22, 914:10, 952:8, 952:13
**clarification** [2] - 860:9, 872:15
**clarify** [1] - 968:12
**clarity** [1] - 986:12

**clear** [9] - 834:12, 843:23, 882:21, 887:9, 892:16, 923:19, 967:7, 1006:23, 1019:17
**CLERK** [7] - 830:11, 834:22, 890:23, 930:2, 930:7, 930:17, 930:24
**client** [18] - 831:14, 831:18, 831:22, 839:12, 900:9, 910:18, 911:2, 917:19, 922:17, 947:18, 961:4, 966:3, 992:13, 993:23, 1006:14, 1006:17, 1007:7, 1022:21
**client's** [3] - 900:21, 901:3, 901:15
**clientele** [2] - 840:3, 840:4
**clients** [22] - 876:15, 901:9, 902:3, 906:16, 907:14, 907:23, 908:1, 908:11, 908:19, 911:9, 914:2, 914:4, 914:5, 915:7, 917:11, 917:18, 920:20, 921:9, 921:16, 921:25, 924:24, 962:11
**clients'** [1] - 840:23
**close** [3] - 954:16, 980:23, 1017:2
**closed** [4] - 973:18, 986:19, 1003:1
**closer** [1] - 836:2
**closing** [20] - 973:10, 973:25, 974:14, 980:23, 987:11, 987:19, 989:1, 997:2, 1001:14, 1001:17, 1002:10, 1002:15, 1002:16, 1003:13, 1005:4, 1005:8, 1006:13, 1008:22, 1009:11, 1009:12
**clothing** [2] - 932:11, 961:1
**CMG** [2] - 992:14, 993:24
**Code** [1] - 855:11
**codes** [1] - 855:13
**collate** [1] - 895:18
**collateral** [22] - 840:24, 851:10,

851:12, 851:13, 851:17, 852:9, 852:12, 854:11, 860:10, 861:7, 876:21, 884:2, 891:12, 891:23, 893:14, 894:2, 894:16, 894:24, 924:6, 924:16, 924:19, 927:13

**collateralized** [1] - 850:23

**collect** [1] - 977:11

**collected** [3] - 841:10, 977:13, 980:3

**collecting** [1] - 837:22

**column** [3] - 854:16, 855:7, 855:18

**columns** [1] - 855:21

**coming** [11] - 865:1, 877:25, 878:2, 974:4, 978:25, 979:7, 980:5, 1018:5, 1020:16, 1024:15, 1025:10

**commence** [2] - 911:9, 1025:7

**commenced** [1] - 911:18

**comment** [1] - 967:22

**commercial** [2] - 838:21, 970:20

**commitment** [1] - 940:7

**common** [1] - 857:6

**communicate** [8] - 856:16, 858:23, 859:2, 859:4, 859:24, 906:15, 909:6, 914:7

**communicated** [1] - 922:22

**communication** [6] - 898:8, 899:23, 900:17, 929:1, 929:4, 995:16

**community** [2] - 836:20, 837:3

**companies** [12] - 832:4, 971:12, 972:6, 973:1, 973:2, 973:4, 973:7, 994:16, 1011:1, 1011:14, 1014:23, 1015:7

**Company** [7] - 847:6, 847:13, 847:16, 847:20, 972:2, 978:5, 1005:1

**company** [37] -

884:20, 903:8, 934:23, 935:1, 939:16, 944:10, 949:22, 951:13, 952:1, 952:9, 952:14, 962:20, 962:21, 971:6, 971:19, 973:7, 977:15, 978:3, 988:18, 993:1, 998:9, 998:10, 998:11, 998:13, 1000:5, 1000:9, 1000:12, 1001:13, 1001:15, 1002:13, 1003:21, 1005:5, 1010:9, 1010:16, 1010:20, 1010:23, 1011:15

**company's** [1] - 1000:3

**compare** [2] - 842:21, 1009:1

**compared** [1] - 858:15

**complete** [2] - 1020:22, 1021:1

**completion** [1] - 951:10

**components** [1] - 1007:4

**computer** [4] - 884:17, 884:23, 903:3, 903:4

**concede** [1] - 961:3

**concept** [2] - 910:15, 910:17

**concern** [1] - 1025:20

**concerned** [4] - 851:14, 903:6, 967:18, 1022:20

**concerning** [3] - 883:14, 921:15, 982:14

**concluded** [2] - 942:10, 1007:16

**condo** [1] - 955:24

**condominium** [1] - 955:24

**conducted** [1] - 941:22

**conference** [6] - 876:8, 905:7, 941:22, 942:1, 942:10, 968:21

**confirm** [1] - 892:12

**confronted** [2] - 983:9, 984:2

**confuse** [1] - 945:16

**confused** [2] - 860:8, 915:12

**confusing** [2] - 928:22

**connection** [5] - 832:12, 858:23, 859:2, 955:19, 1008:12

**consent** [6] - 889:2, 889:10, 889:23, 901:25, 905:3, 905:4

**conservatively** [4] - 851:2, 851:4, 851:9, 888:24

**consider** [2] - 877:13, 1008:15

**Constantine** [33] - 830:1, 830:13, 830:22, 830:23, 890:6, 922:16, 922:18, 922:24, 923:7, 935:20, 988:22, 988:25, 989:4, 989:18, 992:14, 992:24, 993:2, 993:24, 994:21, 995:8, 995:15, 995:16, 995:22, 996:20, 1008:12, 1011:4, 1012:23, 1012:25, 1014:3, 1014:7, 1014:9, 1014:25, 1020:15

**CONSTANTINE** [2] - 829:7, 830:25

**constantine** [5] - 945:2, 945:6, 945:23, 948:3, 948:6

**Constantino** [10] - 935:5, 945:25, 946:6, 948:14, 948:20, 949:8, 951:15, 951:18, 952:9, 953:7

**constantino** [2] - 948:13, 952:14

**constantly** [1] - 859:8

**constitutes** [1] - 896:4

**construction** [3] - 958:8, 970:12, 1012:10

**Consulting** [1] - 990:14

**consulting** [6] - 992:5, 992:9, 992:11, 993:16, 993:19, 993:21

**Cont'd** [4] - 875:1, 909:1, 969:3, 992:1

**CONT'D** [1] - 1027:5, 1028:8

**contact** [1] - 995:22

**contacted** [1] - 889:9

**contain** [2] - 886:21, 887:4

**contained** [1] - 990:13

**contains** [1] - 898:3

**contents** [1] - 924:4

**continue** [5] - 910:10, 910:11, 969:1, 971:24, 1012:9

**CONTINUED** [1] - 943:2

**continued** [8] - 852:3, 874:9, 909:21, 941:23, 942:11, 943:1, 964:4, 969:20

**Continued** [9] - 904:3, 905:8, 908:21, 929:15, 966:22, 968:22, 991:22, 1005:10, 1007:17

**continues** [2] - 860:23, 881:5

**contributed** [1] - 893:8

**control** [9] - 888:12, 888:13, 909:9, 909:11, 909:16, 912:10, 941:6, 994:24, 1001:11

**controlled** [2] - 995:5, 995:6

**controlling** [1] - 1020:25

**conversation** [11] - 879:24, 880:13, 881:5, 881:16, 919:17, 925:15, 937:21, 948:13, 949:5, 949:6, 1011:17

**conversations** [6] - 858:22, 859:1, 875:24, 919:21, 944:4, 979:9

**CONWAY** [1] - 830:1

**coordinated** [1] - 839:20

**cop** [1] - 958:10

**copies** [4] - 886:12, 886:24, 887:7, 890:9

**copy** [14] - 879:23, 892:12, 903:1, 903:3, 912:22, 912:24, 925:14, 926:25, 966:3, 966:5, 966:7, 967:8, 967:12

**corner** [1] - 834:15

**corporate** [2] - 831:12, 853:22

**correct** [101] - 841:2,

844:22, 855:25, 860:14, 860:23, 862:13, 862:20, 873:15, 880:20, 880:24, 881:7, 888:17, 893:4, 894:17, 894:21, 895:22, 896:1, 896:14, 896:20, 897:16, 898:1, 899:2, 899:13, 900:1, 900:3, 901:4, 901:16, 903:23, 906:17, 906:24, 907:14, 909:14, 910:13, 911:25, 912:6, 912:21, 913:16, 918:10, 919:3, 919:22, 923:9, 924:9, 924:21, 926:4, 926:6, 926:9, 926:13, 926:16, 927:3, 927:5, 928:9, 940:12, 944:5, 944:16, 945:3, 946:4, 947:16, 947:22, 948:1, 948:4, 948:5, 949:13, 949:22, 950:4, 950:20, 951:10, 951:23, 952:11, 957:16, 957:17, 959:10, 960:3, 960:4, 965:16, 966:1, 966:9, 966:13, 970:11, 972:10, 972:25, 976:19, 977:20, 981:16, 983:3, 986:21, 988:17, 989:14, 989:15, 990:17, 990:19, 994:10, 994:11, 996:3, 998:7, 998:16, 1000:15, 1002:14, 1014:1, 1016:23, 1023:13

**correctly** [1] - 915:25

**correspondence** [1] - 1019:24

**counsel** [6] - 830:14, 941:20, 960:14, 990:10, 990:12, 1024:13

**counts** [2] - 1020:21, 1021:3

**County** [7] - 954:23, 955:7, 957:15,

959:6, 959:8, 970:21, 975:25
**couple** [10] - 836:24, 837:4, 838:9, 838:12, 839:20, 931:19, 963:22, 979:14, 988:14, 1015:23
**course** [2] - 917:16, 945:8
**Court** [3] - 830:4, 830:7, 943:1
**court** [10] - 843:7, 862:4, 865:1, 935:19, 999:12, 1007:10, 1008:1, 1020:2, 1022:6, 1025:9
**COURT** [156] - 829:1, 830:18, 830:21, 831:1, 831:5, 831:24, 832:1, 832:20, 833:3, 833:12, 833:15, 833:24, 834:5, 834:7, 834:11, 834:15, 834:21, 834:24, 835:2, 835:12, 835:22, 836:1, 836:5, 836:7, 839:10, 851:7, 865:17, 865:20, 865:22, 872:15, 877:3, 880:4, 880:7, 883:1, 883:20, 885:20, 885:22, 887:16, 889:15, 889:17, 889:25, 890:14, 890:16, 890:20, 890:22, 891:1, 891:7, 895:7, 898:15, 898:18, 900:12, 901:18, 901:20, 903:2, 903:18, 903:25, 905:1, 908:5, 910:3, 910:20, 910:22, 913:3, 915:4, 915:20, 916:6, 916:20, 917:14, 918:18, 918:20, 919:25, 920:5, 920:24, 922:7, 923:12, 925:20, 925:22, 927:22, 928:15, 929:7, 929:10, 930:3, 930:6, 930:10, 930:14, 931:2, 931:4, 931:8,

932:16, 934:21, 935:21, 936:15, 941:3, 942:9, 943:19, 950:7, 952:19, 953:25, 954:4, 954:12, 954:16, 961:6, 964:3, 965:18, 966:15, 966:19, 967:7, 967:17, 968:9, 968:11, 968:17, 969:2, 981:8, 981:15, 981:18, 981:23, 982:2, 985:12, 990:5, 990:17, 990:20, 990:23, 991:1, 991:3, 996:12, 1006:16, 1006:21, 1007:12, 1008:2, 1009:25, 1018:16, 1018:18, 1018:24, 1019:3, 1019:9, 1019:12, 1020:6, 1021:4, 1021:12, 1021:22, 1022:2, 1022:8, 1022:13, 1022:19, 1023:9, 1023:15, 1024:3, 1024:7, 1024:12, 1024:17, 1025:1, 1025:8, 1025:12, 1025:16, 1025:21, 1026:2, 1026:9
**Court's** [2] - 832:8, 967:14
**court's** [2] - 1022:18, 1023:24
**Courthouse** [1] - 829:4
**courtroom** [11] - 834:23, 839:4, 890:25, 929:13, 930:8, 932:9, 935:10, 960:23, 981:12, 981:22, 1018:23
**Coutry** [1] - 830:1
**cover** [2] - 966:10, 967:10
**covered** [3] - 831:19, 834:12, 834:16
**covering** [1] - 834:3
**coworkers** [1] - 919:21
**create** [1] - 835:4
**creates** [1] - 843:11
**creation** [1] - 922:25
**credit** [178] - 837:2,

838:10, 838:12, 838:21, 850:9, 850:10, 850:11, 850:12, 850:13, 850:15, 850:17, 850:20, 850:22, 850:23, 851:10, 851:17, 851:18, 851:19, 851:22, 852:7, 852:9, 852:20, 853:9, 853:12, 853:17, 853:22, 853:24, 853:25, 854:2, 854:4, 854:8, 854:12, 854:22, 855:10, 855:16, 855:23, 855:25, 856:4, 856:5, 856:10, 856:18, 858:15, 858:24, 859:3, 859:10, 859:12, 859:15, 860:11, 860:20, 861:4, 861:7, 861:8, 861:10, 861:19, 862:7, 862:10, 863:8, 863:10, 863:16, 863:18, 864:1, 864:2, 864:8, 864:16, 864:18, 864:19, 864:21, 864:23, 866:2, 866:13, 866:16, 867:6, 867:7, 867:9, 867:14, 867:19, 867:21, 867:25, 868:3, 868:10, 868:11, 868:15, 868:18, 868:19, 869:7, 869:13, 870:3, 870:7, 870:19, 870:23, 871:3, 871:7, 871:13, 871:21, 872:6, 872:21, 873:7, 873:19, 873:20, 873:22, 873:25, 874:6, 875:5, 875:7, 875:15, 875:20, 875:25, 876:3, 876:11, 876:21, 877:7, 877:10, 878:15, 878:18, 880:18, 882:6, 882:7, 883:22, 884:5, 884:14, 887:22, 888:7, 891:11, 891:23, 892:10, 892:19,

893:9, 893:15, 893:22, 894:3, 894:9, 894:17, 894:19, 894:24, 895:25, 896:13, 896:18, 901:16, 901:22, 901:23, 902:3, 903:14, 911:22, 912:14, 914:19, 914:21, 914:25, 915:6, 915:8, 915:15, 917:8, 917:11, 917:17, 918:14, 918:25, 919:4, 920:19, 921:8, 921:15, 924:2, 926:12, 927:8, 927:10, 944:16, 944:20, 1010:16, 1010:25, 1011:5, 1011:6, 1011:8, 1014:18, 1015:6
**credited** [4] - 856:23, 868:20, 869:8, 879:6
**credits** [4] - 854:9, 876:18, 876:24, 906:16
**Credits** [1] - 863:1
**cross** [10] - 895:7, 923:16, 936:15, 1022:6, 1022:7, 1022:22, 1024:20, 1025:7, 1025:13, 1025:24
**CROSS** [9] - 895:9, 922:11, 936:18, 943:2, 945:19, 1027:7, 1027:9, 1027:19, 1027:21
**cross-examination** [6] - 895:7, 936:15, 1022:6, 1022:7, 1024:20, 1025:7
**CROSS-EXAMINATION** [4] - 895:9, 922:11, 1027:7, 1027:9
**cross-examine** [1] - 1022:22
**CRR** [1] - 830:7
**Cruise** [1] - 962:3
**crystal** [1] - 1019:17
**cured** [3] - 852:6, 924:6, 924:19
**current** [5] - 869:24, 897:6, 914:21, 914:25, 939:23
**CURRIE** [1] - 829:15
**custom** [1] - 897:5

**cut** [1] - 962:15
**cute** [1] - 1022:12

## D

**dad** [2] - 957:19, 958:2
**Darryl** [1] - 853:19
**date** [15] - 854:17, 854:22, 855:4, 861:11, 861:15, 892:5, 892:22, 925:12, 925:24, 927:3, 949:25, 994:3, 996:14, 996:16, 996:18
**dated** [5] - 860:16, 886:4, 886:19, 890:12, 895:1
**dates** [3] - 884:24, 897:9, 992:19
**daughter** [1] - 1013:18
**day-to-day** [2] - 837:22, 907:16
**days** [18] - 860:21, 866:20, 896:4, 933:18, 933:20, 933:23, 933:25, 955:22, 976:11, 977:23, 978:11, 978:14, 978:18, 978:25, 979:14, 979:15, 985:7, 996:19
**deal** [3] - 984:21, 987:12, 987:18
**dealing** [2] - 968:7, 973:20
**debit** [1] - 944:19
**December** [9] - 871:18, 879:2, 881:6, 881:10, 881:14, 992:12, 992:23, 994:18
**decided** [3] - 836:24, 927:13, 980:6
**decision** [2] - 908:6, 981:24
**decisions** [2] - 859:9, 908:14
**deduction** [1] - 892:5
**default** [33] - 882:6, 882:7, 883:23, 884:1, 885:25, 887:24, 888:10, 891:12, 894:19, 895:20, 897:10, 897:18, 898:7, 898:10, 899:12, 899:15, 900:2, 900:17, 900:19,

914:21, 923:17, 923:18, 924:5, 924:14, 924:18, 926:6, 928:4, 928:6, 928:13, 929:2, 929:3

**Default** [8] - 852:4, 852:6, 852:7, 860:22, 866:21, 896:5, 924:3, 927:12

**DEFENDANT** [2] - 830:25, 831:4

**Defendant** [3] - 829:21, 830:1, 839:7

**defendant** [19] - 831:3, 932:14, 933:2, 933:4, 961:24, 963:1, 969:18, 973:14, 974:3, 975:12, 977:25, 982:10, 990:15, 1008:16, 1014:3, 1020:14, 1020:17, 1023:5, 1023:6

**Defendant's** [1] - 902:5

**defendant's** [1] - 1014:3

**defendants** [3] - 890:6, 932:7, 990:12

**Defendants** [1] - 829:9

**defense** [2] - 1024:1, 1024:2

**defer** [2] - 967:14, 1022:17

**definitely** [4] - 840:21, 913:13, 957:1, 991:15

**Delaware** [1] - 971:20

**delivered** [1] - 888:6

**demand** [2] - 882:18, 909:18

**deny** [1] - 1006:9

**department** [3] - 888:14, 910:5, 1019:5

**dependent** [1] - 882:22

**depict** [1] - 865:10

**depicted** [3] - 875:9, 934:11, 1013:17

**depicts** [1] - 867:5

**deposited** [1] - 856:23

**Deposits** [1] - 863:1

**deposits** [1] - 837:22

**derivative** [1] - 952:3

**derived** [1] - 986:2

**describe** [13] - 838:7, 839:18, 850:7,

856:9, 884:15, 891:16, 932:11, 956:16, 960:25, 990:1, 990:2, 997:8, 1010:19

**described** [2] - 910:17, 947:13

**description** [1] - 854:18

**design** [1] - 1017:8

**designation** [1] - 928:25

**desk** [1] - 837:21

**despite** [1] - 869:16

**destination** [1] - 898:22

**detail** [6] - 853:11, 853:15, 856:11, 864:15, 1020:9, 1020:10

**details** [4] - 854:19, 854:23, 944:21, 1022:21

**develop** [6] - 913:9, 969:7, 969:13, 969:19, 971:7, 974:5

**developed** [2] - 983:23, 986:16

**developing** [3] - 840:1, 973:16, 986:4

**Development** [1] - 1005:1

**development** [7] - 970:17, 971:14, 975:10, 982:14, 983:13, 985:22, 1000:23

**diagram** [1] - 835:7

**Diamonte** [1] - 986:1

**different** [6] - 837:12, 910:7, 962:2, 974:18, 1000:17, 1010:8

**differently** [1] - 909:23

**difficulties** [1] - 994:9

**diligence** [7] - 958:18, 958:25, 959:12, 961:10, 973:17, 973:20, 975:10

**dire** [2] - 964:2, 967:15

**DIRE** [1] - 965:1

**direct** [15] - 864:20, 890:20, 906:13, 906:25, 907:1, 910:17, 912:13, 913:9, 932:22, 943:24, 943:25, 975:14, 1024:9, 1025:4, 1025:22

**DIRECT** [10] - 836:9, 875:1, 931:10, 954:20, 969:3, 1027:3, 1027:5, 1027:17, 1028:6, 1028:8

**directed** [23] - 849:20, 856:4, 858:20, 862:15, 863:21, 864:22, 867:12, 868:5, 868:24, 869:1, 869:14, 870:13, 870:24, 871:8, 871:14, 871:24, 873:3, 873:12, 875:9, 875:22, 879:9, 919:9, 977:15

**directing** [1] - 982:13

**direction** [1] - 1020:17

**directions** [1] - 918:3

**directive** [1] - 910:13

**directly** [9] - 859:14, 859:18, 906:22, 906:25, 911:23, 917:20, 924:24, 946:4, 977:14

**director** [1] - 902:17

**directs** [1] - 1025:9

**disability** [1] - 1012:5

**disadvantage** [1] - 903:1

**discovery** [1] - 983:7

**discuss** [6] - 890:17, 929:12, 981:10, 1004:9, 1018:21, 1026:6

**discussed** [6] - 940:24, 947:22, 949:12, 986:14, 1004:11, 1009:20

**discussion** [4] - 983:21, 1004:2, 1009:15, 1009:18

**discussions** [3] - 940:23, 999:15, 999:21

**dispute** [6] - 1019:16, 1019:18, 1019:20, 1019:23, 1023:10, 1023:11

**disregard** [2] - 883:20, 913:4

**distracting** [2] - 1006:6, 1007:1

**distributed** [1] - 988:8

**distribution** [1] - 987:3

**DISTRICT** [2] - 829:1, 829:1

**District** [1] - 829:12

**diverted** [2] - 1021:5, 1021:15

**diverting** [1] - 1023:6

**division** [15] - 837:18, 837:19, 838:11, 838:2, 838:4, 838:5, 838:8, 838:15, 841:2, 850:1, 852:16, 856:19, 888:11, 888:25

**doctors** [1] - 955:2

**document** [28] - 831:16, 843:11, 843:13, 843:16, 843:18, 844:5, 853:7, 902:5, 902:8, 902:12, 902:13, 902:16, 903:5, 903:20, 906:2, 906:7, 906:11, 916:18, 941:15, 943:7, 943:9, 943:13, 943:16, 952:13, 965:22, 967:4, 993:15, 1005:8

**documentation** [5] - 884:5, 905:3, 906:8, 945:9, 988:11

**documents** [14] - 843:21, 853:13, 895:17, 896:11, 901:2, 906:22, 907:5, 907:16, 908:1, 908:18, 918:23, 918:24, 990:6, 990:13

**dollar** [3] - 854:19, 858:13, 880:23

**dollars** [8] - 875:16, 950:14, 963:9, 984:7, 984:14, 1010:24, 1011:16, 1015:23

**Dolores** [2] - 930:12, 931:1

**DOLORES** [1] - 931:3

**done** [6] - 921:4, 959:19, 989:7, 1007:10, 1015:25, 1024:18

**doubt** [2] - 938:21, 952:10

**down** [47] - 841:3, 844:2, 850:14, 852:16, 862:12, 862:13, 862:15, 863:17, 893:21, 901:15, 929:7,

929:9, 934:5, 946:15, 946:19, 946:23, 946:25, 953:7, 953:25, 957:3, 957:6, 957:8, 957:11, 958:12, 958:23, 958:24, 962:16, 980:22, 983:13, 983:19, 984:18, 984:19, 984:24, 985:5, 985:19, 985:22, 1016:13, 1016:24, 1017:9, 1018:4, 1018:8, 1018:24, 1019:1

**drainage** [1] - 970:22

**draw** [8] - 850:14, 851:19, 851:22, 864:23, 866:3, 867:6, 868:10, 901:15

**drawn** [3] - 855:16, 870:18, 878:16

**driving** [1] - 963:5

**dropped** [1] - 842:25

**due** [28] - 851:22, 851:23, 864:3, 864:5, 864:13, 864:14, 864:15, 864:16, 866:17, 867:14, 873:10, 875:19, 880:17, 880:23, 881:9, 887:23, 923:24, 924:2, 926:12, 927:3, 927:9, 958:18, 958:25, 959:12, 961:10, 973:17, 973:20, 975:10

**duly** [3] - 835:20, 930:21, 954:9

**during** [23] - 839:22, 871:19, 879:3, 884:4, 885:25, 910:7, 914:7, 917:5, 937:16, 947:21, 949:19, 958:23, 969:5, 969:23, 970:24, 971:13, 975:9, 1005:4, 1006:5, 1008:6, 1012:18, 1013:6, 1023:6

**duties** [3] - 838:7, 864:9, 955:6

**dwindled** [2] - 873:20, 874:1

# E

**e-mail** [24] - 856:16, 857:1, 859:24, 860:3, 860:5, 860:7, 860:12, 860:13, 860:23, 861:4, 861:11, 879:17, 879:20, 879:23, 880:12, 884:7, 895:1, 922:22, 925:11, 925:14, 926:3, 927:14, 928:11, 929:1
**e-mails** [1] - 879:18
**ear** [1] - 1025:12
**early** [4] - 955:11, 1012:3, 1025:18
**earth** [1] - 883:11
**easement** [3] - 999:5, 999:6, 999:7
**East** [1] - 897:25
**EASTERN** [1] - 829:1
**edit** [1] - 996:5
**effect** [1] - 968:1
**effective** [2] - 962:12, 993:22
**effort** [2] - 899:13, 951:13
**efforts** [3] - 900:8, 951:17, 969:7
**eight** [4] - 852:22, 932:2, 936:24, 936:25
**either** [6] - 856:16, 884:7, 899:24, 960:8, 969:18, 973:15
**elderly** [2] - 931:22, 931:24
**electronic** [1] - 832:23
**elicit** [1] - 1022:24
**emphasize** [2] - 1008:3, 1008:8
**employed** [2] - 931:14, 931:16
**employee** [1] - 920:12
**encapsulated** [1] - 1024:1
**encounter** [1] - 967:3
**End** [2] - 905:7, 968:21
**end** [9] - 837:10, 838:16, 882:10, 956:7, 977:23, 978:10, 995:10, 1015:21, 1018:18
**ended** [4] - 837:11, 838:16, 969:21, 981:5

**ending** [1] - 938:25
**ensure** [1] - 900:9
**enter** [4] - 834:23, 882:6, 882:7, 883:13
**entered** [5] - 843:18, 888:10, 974:8, 992:11, 993:21
**entering** [1] - 883:9
**enters** [3] - 890:24, 930:8, 981:21
**entire** [5] - 921:7, 921:14, 921:24, 963:19, 974:22
**Entities** [2] - 849:14, 849:18
**entities** [3] - 831:12, 877:16, 923:2
**entitled** [1] - 1019:23
**entity** [6] - 841:10, 842:25, 843:14, 843:22, 845:10, 849:1
**entry** [3] - 862:23, 863:2, 892:4
**equity** [1] - 944:9
**escort** [1] - 955:1
**establish** [2] - 918:25, 1020:7
**established** [4] - 896:13, 896:16, 918:13, 918:14
**establishment** [1] - 920:19
**estate** [5] - 838:21, 840:22, 938:8, 947:4, 956:8
**Estates** [1] - 971:11
**et** [1] - 1014:23
**etcetera** [2] - 970:5, 988:12
**Ethel** [2] - 930:12, 931:1
**ETHEL** [1] - 931:3
**Eufora** [37] - 934:24, 935:1, 935:22, 936:2, 939:5, 939:9, 943:21, 943:25, 944:2, 944:5, 944:7, 945:10, 945:14, 947:22, 948:1, 949:13, 951:1, 951:5, 951:9, 951:12, 951:18, 1010:10, 1010:12, 1010:15, 1011:12, 1012:19, 1012:20, 1014:8, 1014:10, 1015:20, 1015:22, 1020:8, 1020:16, 1021:8, 1021:11,

1021:15, 1023:7
**Europe** [1] - 984:1
**Event** [5] - 852:7, 860:21, 896:5, 924:2, 927:12
**event** [8] - 901:23, 914:1, 914:2, 914:7, 914:10, 915:17, 938:19, 938:24
**events** [3] - 934:8, 938:12, 938:17
**eventually** [5] - 883:12, 891:12, 934:4, 983:1, 1000:9
**evidence** [58] - 832:13, 834:20, 841:21, 842:13, 843:4, 844:14, 844:21, 845:9, 845:18, 846:7, 846:16, 847:4, 847:10, 847:25, 848:7, 853:1, 854:15, 857:21, 859:25, 860:13, 861:22, 862:17, 863:7, 865:15, 865:25, 867:2, 880:2, 880:9, 885:14, 885:24, 887:13, 887:18, 887:20, 889:13, 889:15, 889:19, 890:3, 890:12, 891:10, 891:16, 893:11, 894:14, 920:2, 923:22, 925:18, 925:24, 928:12, 934:22, 942:8, 981:25, 982:6, 990:22, 991:5, 996:14, 1003:2, 1004:21, 1008:4, 1013:15
**EVIDENCE** [9] - 1029:5, 1029:7, 1029:9, 1029:11, 1029:13, 1029:15, 1029:18, 1029:20, 1029:22
**evidentiary** [1] - 831:17
**exact** [3] - 949:25, 957:9, 967:13
**exactly** [9] - 842:22, 910:8, 956:25, 995:14, 996:7, 996:8, 999:11, 1014:20, 1020:3
**EXAMINATION** [28] -

836:9, 875:1, 895:9, 922:11, 923:14, 928:1, 931:10, 936:18, 943:2, 945:19, 952:22, 953:5, 954:20, 965:1, 969:3, 1027:3, 1027:5, 1027:7, 1027:9, 1027:11, 1027:13, 1027:17, 1027:19, 1027:21, 1027:23, 1028:2, 1028:6, 1028:8
**examination** [9] - 895:7, 902:20, 936:15, 943:25, 949:19, 1022:6, 1022:7, 1024:20, 1025:7
**examine** [1] - 1022:22
**examined** [3] - 835:20, 930:21, 954:9
**example** [2] - 854:24, 867:8
**exclusively** [1] - 912:15
**excuse** [5] - 919:13, 928:3, 928:5, 976:4
**excused** [1] - 954:2
**EXHIBIT** [12] - 1029:2, 1029:3, 1029:4, 1029:6, 1029:8, 1029:10, 1029:12, 1029:14, 1029:16, 1029:17, 1029:19, 1029:21
**exhibit** [24] - 831:16, 831:20, 834:13, 843:6, 843:9, 868:16, 870:24, 871:24, 872:18, 875:13, 875:22, 878:6, 885:5, 892:20, 902:22, 906:3, 925:22, 942:5, 963:19, 965:20, 965:21, 981:24, 1003:4, 1004:22
**Exhibit** [85] - 848:6, 848:19, 848:24, 849:13, 852:25, 854:14, 857:22, 861:22, 862:18, 863:7, 863:23, 865:6, 865:9, 865:10, 865:22, 865:23, 865:24,

865:25, 867:1, 867:3, 868:8, 868:16, 869:1, 869:5, 870:14, 870:16, 871:1, 871:10, 871:15, 871:17, 872:18, 873:5, 873:14, 874:4, 875:10, 877:25, 878:8, 878:10, 878:21, 879:1, 879:12, 880:8, 880:10, 881:2, 881:12, 881:24, 883:21, 884:10, 885:23, 886:7, 887:12, 887:17, 887:19, 889:25, 890:2, 891:9, 891:16, 893:10, 893:23, 894:14, 895:1, 902:6, 902:20, 916:22, 923:1, 923:21, 925:3, 925:23, 934:22, 963:13, 965:11, 972:5, 982:5, 990:9, 991:2, 991:4, 992:3, 995:12, 995:13, 996:13, 1003:3, 1008:21, 1013:16
**exhibits** [21] - 832:2, 832:19, 832:20, 833:6, 833:15, 833:17, 833:23, 834:4, 834:9, 834:18, 853:16, 865:5, 865:7, 878:20, 879:8, 879:9, 887:16, 890:9, 900:21, 900:22
**Exhibits** [6] - 869:25, 890:7, 890:11, 891:4, 895:14, 923:5
**existed** [1] - 908:11
**existing** [2] - 839:12, 969:25
**exits** [2] - 890:18, 981:11
**expecting** [1] - 1017:22
**expenses** [1] - 988:12
**experience** [3] - 839:24, 915:18, 970:16
**expertise** [1] - 1016:13
**expired** [2] - 978:11,

978:18
**explain** [20] - 840:6, 843:11, 850:20, 853:6, 854:15, 855:7, 858:10, 859:5, 867:5, 887:20, 944:8, 970:1, 985:8, 985:14, 999:6, 1010:25, 1011:11, 1021:1, 1021:14, 1021:16
**explain..** [1] - 860:22
**explanation** [1] - 936:12
**explode** [2] - 1010:22, 1011:1
**exploding** [1] - 1014:11
**Express** [5] - 887:25, 888:4, 897:16, 897:20, 1014:23
**expressed** [1] - 910:12
**extended** [1] - 933:17

## F

**face** [1] - 832:11
**fact** [5] - 839:16, 922:24, 923:5, 929:3, 999:16
**fair** [7] - 849:14, 880:12, 885:11, 891:13, 896:10, 897:23, 947:21
**fairly** [1] - 865:10
**faith** [1] - 919:23
**familiar** [14] - 841:13, 844:11, 845:10, 846:8, 847:5, 848:1, 848:19, 857:14, 858:3, 910:15, 921:21, 934:23, 972:6, 1010:9
**family** [11] - 934:7, 955:14, 977:1, 977:2, 978:24, 979:20, 979:22, 980:4, 980:19, 1013:13, 1017:1
**fancy** [1] - 884:21
**far** [8] - 851:13, 855:18, 902:16, 903:5, 958:19, 974:16, 1019:18, 1022:20
**Fargo** [1] - 879:4
**farming** [1] - 973:23
**fashion** [1] - 1007:11

**fast** [3] - 934:6, 936:11, 998:17
**FBI** [3] - 916:13, 917:2, 917:6
**fearful** [1] - 1021:25
**February** [16] - 872:19, 886:4, 886:13, 897:9, 897:12, 898:6, 899:21, 923:20, 924:8, 924:9, 924:18, 924:23, 925:13, 925:15, 928:3, 928:4
**Federal** [6] - 829:16, 830:7, 887:25, 888:4, 897:16, 897:20
**fees** [2] - 852:1, 926:16
**fellow** [1] - 938:14
**felt** [1] - 949:20
**few** [11] - 875:16, 885:4, 922:10, 936:16, 947:10, 950:23, 971:21, 996:21, 999:9, 1015:7, 1017:9
**fiduciary** [7] - 907:10, 907:14, 907:15, 907:23, 907:24, 908:2, 908:10
**field** [2] - 910:16, 1012:9
**figure** [1] - 1019:5
**file** [6] - 896:12, 919:9, 921:7, 921:14, 921:24, 922:1
**files** [2] - 921:18, 921:21
**Final** [1] - 858:4
**final** [1] - 991:8
**finally** [5] - 848:18, 863:6, 887:2, 894:13, 943:21
**finance** [2] - 851:11, 981:3
**financial** [15] - 838:11, 839:13, 839:24, 840:8, 840:9, 840:11, 840:13, 859:6, 883:11, 962:2, 967:24, 975:12, 975:16, 975:19
**financially** [2] - 1011:10, 1011:11
**financing** [4] - 840:2, 840:19, 840:22, 974:20

**fine** [8] - 832:4, 834:21, 835:4, 836:8, 905:4, 941:19, 943:5, 1007:13
**finish** [5] - 898:14, 968:2, 987:13, 1025:3, 1025:22
**finished** [1] - 914:16
**fired** [2] - 883:12, 883:13
**firm** [2] - 941:7, 941:12
**first** [51] - 835:19, 837:14, 838:9, 843:11, 849:10, 850:7, 853:12, 858:3, 861:25, 865:16, 880:12, 886:4, 923:24, 923:25, 924:1, 926:2, 930:20, 940:21, 943:6, 954:8, 954:14, 955:17, 960:2, 960:5, 961:15, 965:21, 967:21, 969:25, 971:21, 972:22, 973:18, 984:11, 984:23, 986:5, 988:24, 992:2, 993:18, 994:16, 995:19, 995:20, 995:21, 997:11, 997:13, 997:20, 1004:20, 1009:18, 1009:20, 1010:3, 1014:7, 1024:17
**five** [1] - 833:21
**flat** [1] - 957:24
**flew** [1] - 1016:11
**flex** [2] - 899:12, 899:14
**flickering** [1] - 992:10
**flight** [1] - 1025:17
**flip** [3] - 853:16, 858:2, 991:8
**flippant** [1] - 1022:15
**flipping** [1] - 991:17, 1012:10
**flowed** [1] - 994:25
**flows** [1] - 1021:9
**fluctuate** [1] - 850:13
**fly** [1] - 959:9
**focus** [4] - 854:13, 858:9, 871:22, 883:3
**focusing** [1] - 1026:5
**folks'** [1] - 837:23
**follow** [1] - 909:3

**followed** [1] - 955:4
**following** [4] - 904:1, 966:20, 980:23, 1024:24
**follows** [3] - 835:21, 930:22, 954:10
**forge** [2] - 916:3, 916:8
**forget** [1] - 1019:4
**forging** [1] - 916:10
**forgot** [1] - 953:4
**form** [15] - 846:17, 848:8, 848:10, 849:1, 849:3, 872:14, 901:20, 903:18, 915:3, 915:4, 917:14, 965:18, 981:10, 985:11, 985:12
**format** [2] - 884:15, 884:19
**forming** [1] - 971:18
**forms** [1] - 857:11
**formulate** [1] - 915:25
**forth** [3] - 834:19, 881:17, 959:9
**forward** [6] - 856:18, 919:10, 934:6, 958:9, 969:17, 998:17
**Foundation** [1] - 903:17
**foundation** [1] - 967:6
**four** [2] - 989:10, 1020:21
**fourteen** [1] - 937:4
**Frank** [1] - 977:5
**frankly** [1] - 833:25
**fraud** [3] - 1020:21, 1023:18, 1024:4
**frequently** [1] - 979:13
**Friday** [1] - 926:15
**friend** [5] - 955:15, 957:23, 961:14, 977:5
**friends** [9] - 977:1, 977:14, 978:24, 979:22, 980:4, 980:19, 1013:9, 1017:1, 1017:9
**front** [5] - 842:20, 852:23, 900:22, 911:15, 1003:7
**frozen** [1] - 993:14
**fulfilled** [1] - 914:20
**full** [1] - 1011:24
**fully** [1] - 878:16
**functions** [2] - 934:8, 1013:13
**fund** [1] - 1012:15

**funding** [5] - 988:6, 992:5, 993:12, 993:16, 1015:15
**Funding** [1] - 990:14
**fundraiser** [2] - 914:14, 940:19
**funds** [8] - 861:20, 869:8, 870:19, 979:24, 985:18, 998:24, 1020:25, 1023:7
**future** [3] - 832:2, 970:20, 974:18

## G

**Gaarn** [4] - 1021:9, 1024:14, 1024:22, 1024:23
**general** [1] - 838:7
**generate** [1] - 852:14
**generated** [4] - 852:15, 882:3, 884:20, 897:4
**gentleman** [3] - 935:11, 1001:1, 1025:5
**gentlemen** [2] - 998:2, 998:15
**genuine** [1] - 903:7
**gesticulating** [1] - 1006:3
**gesture** [2] - 1006:22, 1006:24
**gesturing** [1] - 1006:21
**gift** [2] - 940:5
**girlfriend** [3] - 946:14, 947:16, 947:19
**given** [9] - 833:19, 899:14, 906:22, 908:9, 910:15, 965:15, 973:6, 1006:13, 1020:4
**Glenn** [11] - 853:20, 871:3, 871:12, 871:20, 872:3, 872:8, 872:11, 872:21, 873:1, 873:7
**God** [1] - 937:5
**Gonchar** [1] - 853:21
**Gonchar's** [4] - 868:18, 868:19, 869:7, 870:3
**government** [19] - 830:17, 831:10, 832:3, 835:9, 835:11, 865:14, 921:23, 925:17, 930:11, 930:12,

931:8, 934:16, 954:3, 963:25, 996:9, 1022:23, 1023:18, 1023:20, 1024:4

**Government** [66] - 829:15, 848:18, 848:24, 849:13, 852:25, 854:14, 857:21, 861:21, 862:18, 863:6, 863:23, 865:6, 865:9, 865:10, 865:23, 865:24, 865:25, 867:1, 867:3, 868:7, 868:16, 869:1, 869:4, 869:25, 870:14, 870:16, 871:1, 871:10, 871:14, 871:17, 872:18, 873:5, 873:14, 874:4, 880:1, 880:8, 885:14, 885:23, 886:15, 887:13, 887:17, 890:2, 891:3, 891:9, 902:20, 923:5, 923:21, 925:3, 925:23, 934:11, 934:22, 963:13, 965:25, 981:18, 981:24, 982:5, 991:4, 992:3, 995:12, 995:13, 996:13, 1003:3, 1008:21, 1013:16

**GOVERNMENT** [12] - 1029:2, 1029:3, 1029:4, 1029:6, 1029:8, 1029:10, 1029:12, 1029:14, 1029:16, 1029:17, 1029:19, 1029:21

**Government's** [30] - 848:6, 875:12, 877:24, 878:8, 878:20, 879:1, 879:12, 880:10, 881:1, 881:12, 881:23, 883:21, 884:10, 886:6, 887:12, 887:19, 889:25, 890:7, 890:11, 891:15, 893:10, 893:23, 894:14, 895:1, 895:14, 906:3, 965:11, 972:5, 990:9, 991:2

**government's** [5] - 865:22, 923:1, 1022:16, 1022:20, 1025:4

**governments** [1] - 973:20

**GPS** [1] - 973:21

**grade** [1] - 970:5

**grandchild** [2] - 934:15, 937:1

**grandchildren** [1] - 937:1

**graphic** [1] - 867:5

**graphics** [1] - 832:11

**grass** [1] - 956:17

**great** [1] - 901:1

**green** [2] - 893:1, 970:7

**ground** [1] - 958:22

**group** [1] - 837:17

**Group** [4] - 992:14, 993:2, 993:24, 994:21

**growing** [1] - 944:10

**guess** [15] - 833:5, 912:18, 918:12, 946:18, 950:5, 950:6, 956:17, 979:14, 987:9, 1020:6, 1021:13, 1022:22, 1025:4, 1026:4

**guessing** [1] - 950:2

**guy** [1] - 839:13

**guys** [2] - 859:7, 908:2

**GX** [2] - 880:1, 885:14

---

# H

**Haley** [9] - 831:3, 832:9, 834:2, 834:12, 895:11, 1006:4, 1019:12, 1021:13, 1023:15

**haley** [1] - 949:20

**HALEY** [112] - 829:21, 829:23, 831:2, 831:8, 833:1, 833:5, 833:13, 833:16, 833:21, 833:25, 834:6, 834:8, 834:17, 839:8, 840:12, 840:14, 851:5, 865:16, 865:18, 872:14, 876:25, 880:3, 882:25, 883:2, 883:19, 885:15, 885:17, 887:14, 889:20, 889:22,

891:5, 895:8, 895:10, 901:21, 902:24, 902:25, 905:6, 906:1, 909:1, 910:24, 913:5, 913:7, 913:8, 915:5, 915:24, 916:1, 916:21, 917:15, 920:6, 922:6, 922:9, 927:23, 928:2, 929:6, 932:15, 934:18, 936:16, 936:19, 941:20, 942:2, 942:7, 943:3, 943:18, 943:20, 945:18, 952:21, 952:23, 953:3, 961:3, 964:2, 965:2, 965:19, 966:17, 967:1, 967:14, 967:20, 968:4, 968:10, 968:15, 968:18, 974:24, 981:13, 985:11, 989:25, 990:18, 990:24, 996:10, 1004:10, 1006:9, 1006:20, 1007:2, 1007:14, 1009:22, 1018:14, 1018:17, 1019:13, 1021:18, 1021:24, 1022:5, 1022:9, 1022:11, 1022:14, 1023:23, 1024:5, 1025:2, 1025:9, 1025:15, 1026:8, 1027:8, 1027:14, 1027:20, 1027:24

**Haley's** [1] - 1025:22

**half** [5] - 832:17, 919:7, 963:9, 1012:1, 1024:10

**hand** [10] - 834:15, 835:15, 865:5, 884:9, 900:24, 916:11, 925:2, 930:17, 954:6, 965:24

**handed** [1] - 902:9

**handled** [2] - 838:19

**handling** [3] - 901:8, 917:16, 919:8

**hands** [1] - 1006:22

**handwritten** [1] - 917:2

**happy** [2] - 1023:19, 1023:20

**Harbor** [7] - 997:9, 1005:4, 1007:12,

1008:4, 1008:9, 1008:13, 1008:22

**hard** [5] - 926:23, 950:16, 983:25, 984:1, 1019:6

**Hawaii** [46] - 840:1, 841:20, 849:14, 849:17, 932:23, 932:24, 937:17, 937:25, 938:14, 938:19, 938:25, 955:13, 955:19, 956:6, 958:12, 958:17, 959:25, 960:2, 960:5, 960:20, 961:7, 961:20, 961:24, 962:21, 969:7, 969:19, 969:20, 971:8, 971:13, 971:14, 971:17, 973:14, 975:11, 975:21, 976:17, 976:18, 982:15, 982:21, 982:24, 983:11, 983:23, 984:10, 985:2, 989:8, 994:12, 997:3

**Hawaiian** [2] - 923:2, 938:7

**headed** [1] - 990:14

**heading** [4] - 849:14, 897:24, 992:4, 993:16

**hear** [6] - 836:3, 898:17, 920:3, 935:13, 942:8, 988:24

**heard** [11] - 831:25, 907:19, 944:12, 952:4, 952:6, 972:20, 989:1, 990:2, 992:23, 993:1, 1006:16

**hearing** [1] - 1008:9

**held** [9] - 852:13, 888:15, 893:14, 894:2, 894:16, 894:24, 924:16, 982:19, 982:20

**help** [4] - 862:1, 907:10, 912:23, 995:14

**helping** [2] - 882:22, 938:20

**helps** [1] - 1023:16

**hereby** [1] - 890:4

**herein** [1] - 990:13

**hereinafter** [4] - 992:13, 992:14,

993:23, 993:24

**Hermosa** [18] - 1016:1, 1016:2, 1016:6, 1016:10, 1018:13, 1020:24, 1021:20, 1021:24, 1022:4, 1022:14, 1022:22, 1022:24, 1023:3, 1023:10, 1023:13, 1023:19, 1023:22, 1024:4

**high** [1] - 921:3

**highlight** [1] - 1003:15

**highlighted** [1] - 858:12

**highlighting** [3] - 885:5, 885:8, 1004:25

**highlights** [1] - 885:12

**Highway** [1] - 829:22

**himself** [3] - 839:23, 840:15, 864:12, 962:10, 963:8

**histories** [4] - 854:14, 884:13, 884:16, 909:7

**History** [3] - 852:25, 853:4, 861:25

**history** [9] - 853:6, 853:9, 853:15, 854:16, 855:15, 858:15, 862:7, 908:18, 1011:7

**hit** [1] - 1000:20

**hmm** [1] - 940:13

**hockey** [19] - 839:15, 840:4, 840:7, 868:15, 868:22, 869:12, 870:7, 872:7, 876:12, 882:19, 883:7, 888:3, 907:8, 911:9, 921:9, 921:25, 962:3, 963:22, 967:24

**hold** [2] - 889:15, 967:21

**holder** [1] - 928:7

**holders** [3] - 898:9, 899:24, 900:19

**Holding** [7] - 847:6, 847:13, 847:16, 847:20, 972:1, 972:11, 978:5

**holding** [1] - 977:15

**home** [20] - 883:12, 896:7, 896:20, 900:16, 931:22, 946:12, 948:21, 957:14, 957:23,

969:24, 973:22, 975:25, 976:6, 976:8, 994:8, 999:11, 1013:4, 1014:3, 1014:4, 1018:21
**homes** [4] - 957:14, 969:15, 973:24, 974:18
**Honor** [58] - 830:16, 830:19, 830:24, 830:25, 831:2, 831:4, 831:8, 831:25, 832:7, 833:1, 833:5, 834:6, 834:17, 835:10, 865:21, 880:3, 880:5, 880:6, 882:25, 885:15, 885:19, 885:21, 886:16, 887:15, 889:22, 890:21, 891:6, 898:13, 905:6, 916:23, 922:10, 923:11, 923:13, 925:19, 930:5, 931:9, 934:20, 936:16, 941:21, 943:18, 952:16, 954:19, 967:14, 969:1, 981:13, 981:16, 982:4, 990:8, 990:18, 990:25, 993:13, 996:11, 1005:9, 1007:15, 1008:19, 1018:14, 1019:13, 1023:23
**honor** [2] - 909:18, 940:1
**Honor's** [1] - 967:22
**HONORABLE** [1] - 829:12
**Honuapo** [1] - 973:19
**Hormovitis** [2] - 829:8, 942:6
**hostile** - 952:6
**hot** [1] - 836:24
**hotel** [1] - 982:20
**hour** [1] - 1024:10
**hours** [2] - 947:10, 996:19
**house** [17] - 955:23, 976:1, 980:6, 980:8, 980:9, 980:11, 980:15, 980:18, 980:21, 980:22, 980:25, 981:4, 990:15, 995:19, 998:3, 1009:10,

1016:16
**houses** [2] - 956:14, 1012:10
**huge** [4] - 902:25, 1010:23, 1015:5, 1019:20
**hundred** [1] - 1015:23
**hurt** [1] - 913:1

**I**

**ID** [1] - 841:10
**idea** [12] - 936:6, 937:25, 938:3, 938:5, 938:7, 938:10, 939:7, 940:7, 944:2, 949:17, 1000:16
**identification** [5] - 841:11, 916:22, 934:10, 963:12, 995:11
**identified** [6] - 839:7, 849:13, 932:14, 935:20, 947:8, 961:6
**identify** [4] - 831:11, 831:14, 832:13, 843:14
**identifying** [1] - 968:14
**identity** [1] - 831:18
**III** [1] - 971:22
**imagine** [1] - 963:20
**IMAS** [1] - 896:4
**immediate** [1] - 962:17
**immediately** [2] - 888:13, 958:13
**import** [1] - 902:11
**important** [4] - 1008:17, 1022:22, 1023:11, 1023:12
**impressed** [3] - 944:12, 944:23, 949:16
**IN** [9] - 1029:4, 1029:6, 1029:9, 1029:10, 1029:13, 1029:14, 1029:17, 1029:19, 1029:21
**include** [1] - 1018:2
**included** [1] - 876:6
**includes** [2] - 852:25, 854:20
**including** [3] - 872:8, 873:1, 875:6
**income** [1] - 1015:9
**increase** [9] - 855:1, 863:11, 866:4, 866:7, 866:9,

866:12, 872:10, 876:2, 876:11
**increases** [3] - 851:21, 853:12, 855:19
**indeed** [1] - 924:14
**indicate** [2] - 867:16, 919:15
**indicated** [7] - 895:21, 896:5, 896:11, 897:8, 897:14, 906:3, 1006:6
**indicates** [1] - 928:12
**indicating** [7] - 864:4, 897:10, 898:7, 900:16, 906:9, 935:15, 935:17
**indicating)** [3] - 839:5, 935:12, 966:11
**indictment** [3] - 1008:7, 1008:10, 1020:4
**individual** [18] - 838:23, 850:24, 850:25, 851:1, 854:10, 854:11, 857:19, 859:14, 863:8, 884:14, 895:21, 896:7, 899:14, 903:14, 926:12, 927:10, 928:7, 947:7
**individuals** [5] - 877:5, 884:1, 896:19, 900:15, 924:13
**industry** [3] - 901:7, 901:10, 958:8
**inform** [1] - 881:9
**information** [11] - 841:10, 843:17, 843:19, 843:24, 845:23, 854:15, 884:21, 885:10, 963:8, 984:22, 1020:3
**infrastructure** [4] - 970:4, 970:16, 970:21, 974:17
**inherited** [1] - 901:11
**initial** [3] - 853:25, 974:14, 1017:23
**initiate** [1] - 856:14
**initiated** [1] - 948:17
**injury** [3] - 1012:4, 1012:7, 1012:13
**Inquiry** [1] - 857:18
**inside** [2] - 837:20, 882:23
**instance** [3] - 873:3, 873:12, 1021:8

**instances** [1] - 940:2
**instruct** [8] - 857:6, 859:11, 864:20, 888:14, 909:2, 1006:18, 1007:7, 1008:15
**instructed** [11] - 906:14, 907:5, 908:17, 909:18, 910:6, 910:9, 917:7, 919:9, 919:20, 1003:21, 1008:14
**instruction** [5] - 857:10, 906:19, 906:20, 1007:11, 1023:17
**instructions** [2] - 857:8, 907:1
**intend** [3] - 957:10, 959:13
**intended** [2] - 898:22, 924:15
**intent** [1] - 1007:3
**intention** [1] - 942:2
**intentionally** [1] - 1006:5
**Interest** [1] - 855:7
**interest** [81] - 851:23, 851:24, 852:3, 854:21, 854:23, 855:2, 855:9, 864:5, 866:13, 866:22, 866:25, 867:13, 867:16, 867:24, 868:2, 868:7, 868:14, 868:17, 868:22, 869:5, 869:12, 869:16, 869:24, 870:1, 870:6, 870:17, 870:22, 871:2, 871:6, 871:11, 871:19, 871:20, 872:4, 872:11, 872:19, 872:25, 873:10, 874:5, 875:4, 875:12, 875:19, 877:24, 877:25, 878:9, 878:18, 878:23, 879:2, 880:17, 881:2, 881:6, 881:10, 881:13, 881:17, 881:20, 888:7, 914:18, 915:1, 915:10, 915:14, 927:9, 933:22, 933:25, 939:20, 944:9, 945:10, 949:21,

951:5, 973:3, 973:7, 976:10, 977:21, 978:12, 979:11, 979:24, 980:20, 985:2, 985:3, 985:16, 999:17, 1009:2
**interested** [7] - 840:1, 840:21, 876:10, 961:19, 961:21, 999:25, 1000:1
**intermediary** [1] - 907:8
**interpret** [1] - 902:11
**interrupts** [1] - 832:17
**interview** [3] - 917:2, 917:5, 920:14
**interviewed** [2] - 916:13, 920:12
**introduce** [3] - 942:2, 942:8, 965:4
**introduced** [6] - 928:11, 932:20, 961:13, 973:11, 996:25, 997:1
**introducing** [1] - 942:7
**invest** [4] - 935:1, 936:2, 947:4, 1015:18, 1015:20, 1016:18
**invested** [11] - 851:2, 851:4, 851:9, 888:23, 888:24, 935:22, 935:23, 939:5, 950:10, 951:12, 1015:22
**investing** [3] - 938:7, 939:9, 1001:20
**Investment** [2] - 861:1
**investment** [65] - 839:25, 840:22, 840:23, 850:24, 850:25, 851:1, 852:13, 852:14, 852:16, 854:3, 854:6, 854:8, 854:10, 859:9, 860:9, 861:3, 888:11, 888:12, 888:14, 888:16, 888:22, 888:25, 889:8, 891:18, 892:17, 893:12, 893:20, 893:22, 893:25, 894:7, 894:11, 894:16, 894:20, 894:23, 907:10, 924:15, 935:4, 937:17,

937:24, 940:9,
941:5, 941:7,
941:12, 941:13,
943:21, 944:1,
944:5, 944:7, 944:8,
944:22, 944:24,
945:5, 945:11,
945:14, 948:1,
948:7, 949:12,
949:21, 949:24,
951:9, 953:11,
953:15, 985:15,
1017:24
**investments** [7] -
888:14, 889:3,
924:16, 939:25,
941:13, 947:1,
952:25
**investor** [8] - 896:7,
900:9, 908:11,
914:2, 914:4,
917:19, 921:16,
1015:16
**investor-client** [1] -
900:9
**investors** [4] - 896:12,
903:14, 975:6,
1015:15
**invite** [1] - 1013:13
**invited** [2] - 913:25,
1013:23
**involve** [4] - 879:18,
944:15, 975:20,
995:23
**involved** [31] - 877:17,
883:23, 906:21,
912:3, 919:1,
932:24, 944:18,
962:6, 963:21,
971:17, 974:3,
974:19, 975:4,
975:11, 975:16,
987:2, 989:11,
997:5, 997:11,
997:13, 999:25,
1000:1, 1000:17,
1000:23, 1001:4,
1001:11, 1009:7,
1009:9, 1010:5,
1014:13, 1020:15
**involvement** [2] -
918:15, 951:9
**involves** [1] - 831:21
**involving** [5] - 915:7,
917:17, 921:9,
921:15, 937:9
**IOL** [4] - 857:14,
857:17, 857:18,
858:8
**island** [7] - 955:13,

956:5, 960:20,
961:7, 961:20,
962:21, 982:20
**Island** [4] - 956:25,
959:5, 997:6,
1013:25
**Islandia** [1] - 829:23
**Isle** [75] - 841:14,
841:17, 842:3,
842:5, 842:17,
843:1, 843:2, 844:3,
844:4, 844:6,
844:11, 844:15,
844:24, 845:4,
845:10, 845:13,
845:21, 845:24,
846:3, 846:8,
846:18, 846:20,
846:24, 854:1,
854:4, 856:24,
857:3, 857:9,
858:13, 861:10,
862:8, 862:10,
862:20, 862:25,
863:4, 863:16,
863:17, 864:23,
865:2, 865:11,
867:9, 868:11,
868:20, 869:9,
869:11, 870:4,
870:20, 871:4,
872:2, 872:22,
873:8, 873:18,
873:23, 874:7,
878:25, 879:6,
902:13, 902:17,
906:5, 912:7,
939:17, 971:21,
971:23, 972:16,
972:17, 972:21,
972:22, 992:13,
993:23, 994:17,
994:19, 994:24,
994:25, 995:2, 995:5
**Islip** [3] - 829:5,
829:17, 830:8
**issue** [8] - 831:8,
831:17, 968:12,
984:3, 999:5, 999:6,
1024:1, 1024:2
**issues** [3] - 999:4,
999:9, 1026:3
**Items** [1] - 862:22
**itself** [8] - 831:12,
831:16, 850:13,
901:24, 915:17,
920:2, 965:22, 999:9
**IV** [63] - 841:14,
841:17, 842:4,
842:5, 842:18,

843:1, 843:2, 844:3,
844:4, 844:6,
844:11, 844:15,
844:24, 845:4,
854:1, 854:4,
856:24, 857:3,
857:9, 861:10,
862:8, 862:10,
862:20, 862:25,
863:4, 863:16,
863:18, 864:23,
865:2, 865:11,
867:9, 868:11,
868:20, 869:9,
869:11, 870:4,
870:20, 871:4,
872:2, 872:22,
873:8, 873:18,
873:23, 874:7,
878:25, 879:6,
902:13, 902:17,
906:5, 912:7,
939:17, 971:22,
972:16, 972:17,
972:21, 992:13,
993:23, 994:17,
994:19, 994:24,
994:25, 995:3, 995:5

---

**J**

**James** [3] - 830:17,
961:15, 961:19
**JAMES** [1] - 829:17
**January** [5] - 860:21,
871:18, 879:2,
881:14, 885:1
**Jason** [2] - 914:6,
914:7
**JFB** [1] - 829:3
**job** [2] - 837:3, 882:21
**Joe** [6] - 854:5, 860:5,
860:8, 860:13,
863:19, 863:20
**John** [29] - 932:3,
932:6, 932:18,
933:6, 934:13,
934:15, 937:15,
937:17, 937:21,
937:24, 937:25,
938:3, 938:4, 938:6,
939:8, 939:14,
939:16, 939:23,
940:24, 943:22,
943:25, 944:1,
945:2, 946:16,
949:4, 952:25,
954:3, 954:14
**Johnny** [1] - 932:4
**joining** [1] - 969:6

**JOSEPH** [1] - 829:12
**Jowdy** [2] - 986:5,
986:16
**judge** [10] - 833:16,
865:16, 952:21,
961:3, 1004:10,
1007:6, 1007:7,
1021:24, 1022:11,
1025:2
**Judge** [25] - 829:12,
831:15, 831:19,
833:10, 833:13,
836:4, 839:8, 851:5,
887:14, 903:4,
919:13, 922:6,
927:23, 942:3,
952:17, 964:2,
966:17, 990:3,
996:10, 1020:5,
1021:18, 1021:21,
1022:6, 1022:18,
1025:15
**July** [4] - 869:4, 878:1,
975:15, 978:10
**jumping** [1] - 882:9
**June** [9] - 868:17,
875:13, 875:14,
895:1, 975:14,
976:7, 993:22,
994:5, 994:6
**Juneau** [6] - 860:5,
860:8, 860:13,
863:19, 863:20,
895:2
**Juneau's** [1] - 854:5
**JURORS** [1] - 835:1
**jurors** [2] - 831:6,
834:23
**Jury** [3] - 890:18,
929:13, 1018:23
**jury** [25] - 829:13,
834:11, 834:25,
835:3, 883:20,
890:22, 890:24,
913:4, 930:4, 930:8,
970:2, 975:19,
981:11, 981:19,
981:21, 981:23,
983:6, 998:22,
1003:5, 1004:23,
1007:7, 1008:2,
1008:6, 1023:18,
1024:3

---

**K**

**K-A-I-S-E-R** [2] -
931:3, 954:15
**Kaiser** [37] - 930:13,
930:14, 931:1,

931:4, 931:12,
931:14, 932:4,
932:6, 932:14,
934:23, 935:22,
936:20, 943:16,
945:21, 954:3,
954:4, 954:15,
965:3, 972:3, 977:3,
981:20, 982:8,
991:7, 1018:24,
1020:20, 1020:22,
1021:16, 1022:1,
1023:7, 1023:21,
1024:9, 1024:20,
1024:22, 1025:3,
1025:7, 1025:24
**Kaiser's** [1] - 1025:13
**Kau** [7] - 847:5,
847:13, 847:16,
847:20, 972:1,
972:11, 978:5
**keep** [7] - 836:3,
914:20, 931:5,
954:16, 991:17,
1002:20, 1024:1
**keeping** [1] - 914:25
**keeps** [2] - 992:8,
992:10
**Keith** [3] - 953:1,
953:2, 977:3
**kELLY** [1] - 829:15
**Ken** [2] - 881:17,
986:5
**KENNER** [2] - 829:6,
831:4
**Kenner** [210] - 829:6,
829:21, 830:12,
831:3, 831:14,
831:23, 832:2,
832:5, 832:15,
832:24, 838:24,
839:4, 839:5, 839:7,
839:11, 839:16,
839:22, 840:18,
841:5, 841:11,
841:16, 842:7,
843:24, 844:8,
844:18, 845:2,
845:6, 845:17,
846:1, 846:4,
846:14, 846:22,
847:1, 847:9,
847:18, 847:22,
848:5, 848:12,
848:15, 848:23,
849:4, 849:7,
849:19, 849:22,
850:5, 850:17,
851:12, 853:17,
855:24, 856:6,

856:10, 856:13, 858:20, 858:22, 859:1, 859:11, 862:16, 863:22, 864:12, 868:6, 868:25, 869:3, 869:15, 870:15, 870:25, 871:9, 871:16, 871:25, 873:4, 873:13, 873:22, 875:11, 875:23, 875:24, 876:7, 877:10, 877:13, 877:18, 878:7, 879:10, 879:17, 879:24, 880:15, 881:9, 881:13, 884:4, 885:2, 885:11, 890:6, 894:23, 895:2, 895:12, 901:9, 902:2, 902:18, 903:13, 903:22, 906:2, 906:4, 906:9, 906:13, 906:25, 907:6, 907:19, 907:25, 908:7, 908:19, 909:19, 911:8, 911:18, 911:24, 912:15, 912:20, 912:22, 913:11, 914:5, 915:7, 916:3, 916:10, 916:22, 917:7, 917:18, 918:3, 919:10, 919:16, 919:18, 921:9, 921:15, 921:25, 924:24, 925:15, 926:3, 927:14, 928:8, 929:1, 932:7, 932:9, 932:17, 933:6, 934:7, 934:13, 937:7, 939:8, 944:4, 946:13, 960:17, 961:6, 961:13, 961:17, 961:25, 963:18, 965:15, 967:3, 969:6, 971:12, 975:2, 975:12, 975:17, 975:23, 977:12, 977:15, 978:7, 978:16, 979:1, 979:23, 980:3, 981:2, 982:18, 983:10, 983:15, 983:17, 984:3, 984:9, 984:15,

984:18, 985:14, 988:10, 988:16, 989:12, 995:6, 995:20, 997:1, 999:20, 999:25, 1000:16, 1001:8, 1001:19, 1002:25, 1003:21, 1004:4, 1004:8, 1004:15, 1008:11, 1009:4, 1009:9, 1010:13, 1010:14, 1011:18, 1013:8, 1013:18, 1013:23, 1014:22, 1016:5, 1016:10, 1017:6, 1018:6, 1020:15, 1020:24, 1023:1
**Kenner's** [20] - 832:5, 832:11, 834:16, 844:2, 852:21, 856:25, 861:15, 861:18, 876:15, 879:5, 909:4, 917:10, 920:20, 943:13, 973:2, 990:15, 995:19, 1013:2, 1014:4, 1021:10
**Kenner-3** [1] - 860:1
**kept** [2] - 869:24, 984:5
**kid** [2] - 970:13, 970:14
**kind** [15] - 837:19, 838:19, 850:25, 854:21, 875:15, 907:10, 931:19, 931:24, 932:11, 956:4, 956:14, 963:8, 975:16, 975:19, 1022:6
**kindly** [2] - 902:5, 916:18
**kinds** [2] - 838:18, 888:16
**knowledge** [5] - 908:10, 919:6, 923:4, 923:10, 1009:7
**known** [1] - 896:16
**Komatireddy** [2] - 830:20, 891:2
**KOMATIREDDY** [60] - 829:18, 830:19, 831:25, 832:7, 832:22, 833:19, 834:2, 834:14, 834:18, 835:10, 836:6, 836:8,

836:10, 839:6, 865:14, 875:2, 880:1, 885:16, 885:21, 886:15, 887:11, 889:12, 889:16, 889:18, 890:4, 890:15, 890:21, 891:3, 892:11, 892:14, 895:6, 898:13, 900:11, 901:17, 902:23, 903:4, 903:17, 903:24, 908:4, 910:2, 910:19, 913:2, 915:3, 915:19, 916:5, 917:13, 918:17, 919:23, 920:23, 923:13, 923:15, 925:6, 925:17, 925:21, 926:1, 927:21, 928:14, 1027:4, 1027:6, 1027:12

**L**

**labeled** [1] - 852:24
**laborer** [1] - 958:5
**ladies** [1] - 837:15
**laid** [2] - 974:15, 988:14
**land** [18] - 956:8, 956:15, 956:16, 956:19, 957:11, 959:15, 960:8, 961:11, 962:16, 962:17, 962:19, 969:7, 971:7, 973:24, 974:6, 986:2, 986:4
**large** [2] - 962:19, 963:6
**LARUSSO** [17] - 880:5, 887:15, 889:24, 891:6, 922:10, 922:12, 923:11, 925:19, 981:16, 990:25, 996:11, 1007:6, 1007:13, 1007:15, 1027:10, 1027:22, 1028:3
**laRUSSO** [1] - 830:1
**LaRusso** [14] - 830:3, 830:22, 865:21, 880:4, 922:15, 930:5, 934:20, 945:20, 945:23, 952:16, 953:4,

953:6, 953:23
**last** [16] - 836:18, 847:15, 848:9, 849:2, 879:8, 896:16, 946:1, 954:15, 955:17, 961:15, 986:5, 997:20, 997:21, 1004:20, 1006:10, 1019:14
**late** [9] - 851:25, 860:21, 882:3, 882:5, 896:4, 911:10, 926:16, 996:22, 996:24
**laughing** [1] - 1022:5
**lay** [1] - 967:5
**laying** [4] - 969:24, 970:1, 970:3, 973:21
**leading** [3] - 876:25, 989:25, 990:2
**learn** [3] - 957:22, 1000:9, 1010:12
**learned** [3] - 982:10, 984:11, 984:23
**least** [7] - 902:13, 902:16, 903:21, 914:24, 917:18, 950:3, 985:18
**leave** [4] - 955:10, 1006:8, 1007:6, 1012:3
**leaves** [2] - 929:13, 1018:23
**Led** [12] - 1000:13, 1002:13, 1003:13, 1004:3, 1004:9, 1004:14, 1005:1, 1005:5, 1007:8, 1008:23, 1009:3, 1009:10
**led** [1] - 983:7
**left** [5] - 835:8, 864:22, 889:6, 891:21, 921:22
**legal** [1] - 896:22
**Lehman** [17] - 973:11, 973:25, 974:2, 974:7, 974:19, 975:4, 975:7, 983:2, 986:19, 986:22, 987:12, 987:18, 988:9, 989:6, 989:16, 997:2
**lend** [4] - 974:5, 974:8, 976:20, 985:6
**lender** [10] - 836:16, 856:20, 877:12, 908:20, 909:3, 909:10, 911:13,

973:11, 974:4
**lender's** [1] - 908:20
**lenders** [4] - 906:21, 917:7, 983:25, 984:2
**lending** [9] - 838:5, 838:8, 838:13, 838:14, 838:18, 850:1, 856:19, 888:10, 912:9
**length** [1] - 901:1
**lengthy** [1] - 916:19
**lent** [1] - 980:2
**Lerner** [2] - 941:9, 941:10
**letter** [24] - 860:19, 866:10, 866:19, 882:18, 887:20, 887:25, 888:3, 895:22, 895:24, 897:3, 897:9, 897:14, 898:10, 899:21, 899:25, 900:10, 900:16, 900:19, 923:24, 923:25, 924:1, 924:4, 924:12, 924:17
**letters** [46] - 866:23, 869:20, 876:23, 877:5, 886:1, 886:4, 886:12, 886:19, 886:21, 886:24, 887:4, 887:7, 888:6, 895:20, 896:6, 897:8, 897:9, 897:15, 897:20, 897:24, 898:3, 898:6, 898:7, 898:11, 898:21, 898:24, 899:1, 899:4, 899:10, 900:2, 900:14, 923:17, 923:18, 923:21, 923:23, 924:8, 924:11, 926:2, 926:6, 926:8, 928:4, 928:6, 928:13, 929:2, 929:3
**liability** [1] - 971:19
**license** [1] - 1015:8
**licensing** [4] - 1011:15, 1014:24, 1015:1
**life** [1] - 950:13
**limit** [2] - 850:13, 1023:20
**limited** [1] - 971:19
**line** [89] - 850:10, 850:11, 850:13, 851:10, 851:16,

851:18, 851:19,
851:22, 852:7,
852:9, 853:9,
853:11, 853:17,
853:22, 853:24,
853:25, 854:4,
854:22, 855:10,
855:16, 855:23,
858:15, 860:10,
860:19, 861:7,
861:8, 861:10,
861:19, 862:7,
862:10, 863:8,
863:10, 863:15,
863:18, 864:8,
866:2, 866:13,
866:16, 867:6,
867:7, 867:9,
867:21, 867:25,
868:10, 868:11,
868:18, 868:19,
869:7, 870:3,
870:19, 871:3,
871:12, 871:21,
872:21, 873:7,
877:10, 887:22,
891:23, 892:18,
893:9, 893:15,
893:22, 894:3,
894:8, 894:17,
894:19, 895:25,
896:3, 896:18,
901:15, 901:16,
901:22, 901:23,
902:3, 903:6,
903:14, 914:19,
917:8, 917:10,
917:17, 918:14,
918:25, 926:6,
926:12, 934:5,
987:13, 991:10,
992:17, 1023:2
**lined** [1] - 958:19
**lines** [85] - 838:21,
850:9, 850:16,
850:17, 850:20,
850:22, 850:23,
852:20, 854:2,
854:7, 854:9,
854:11, 855:25,
856:4, 856:5,
856:10, 856:17,
858:24, 859:3,
859:10, 859:12,
859:15, 861:4,
864:1, 864:2,
864:16, 864:18,
864:19, 864:21,
864:23, 867:13,
867:19, 868:3,
868:15, 869:13,

870:7, 870:23,
871:7, 872:6,
873:19, 873:20,
873:22, 873:25,
874:6, 875:5, 875:7,
875:15, 875:20,
875:25, 876:3,
876:11, 876:17,
876:21, 876:24,
877:6, 877:7,
878:15, 878:18,
880:18, 882:6,
882:7, 883:22,
884:5, 884:14,
888:7, 891:11,
892:9, 894:24,
896:13, 901:8,
906:16, 911:22,
912:14, 914:20,
914:25, 915:6,
915:8, 915:14,
919:4, 920:19,
921:8, 921:15,
924:2, 927:8, 927:10
**liquidate** [1] - 924:15
**liquidated** [2] -
852:10, 852:12
**list** [2] - 832:4, 849:15
**listed** [7] - 845:1,
849:17, 859:15,
867:2, 900:15,
923:1, 972:7
**listen** [2] - 1007:3,
1018:20
**listening** [1] - 1006:24
**literally** [2] - 853:10,
884:22
**litigate** [2] - 1021:24,
1022:14
**litigating** [1] - 1021:25
**live** [1] - 836:13
**living** [6] - 836:15,
896:4, 959:4, 959:5,
980:6, 980:9
**LLC** [38] - 842:6,
842:18, 843:1,
843:2, 844:3,
844:12, 845:4,
845:11, 845:13,
845:21, 845:25,
846:3, 846:8,
846:18, 846:20,
846:24, 847:6,
847:12, 847:16,
847:20, 848:11,
848:14, 848:20,
849:6, 858:13,
862:8, 867:9,
902:14, 902:17,
939:17, 992:13,

993:23, 994:18,
994:19, 1000:14,
1000:17, 1005:1,
1021:10
**LLCs** [1] - 971:18
**LLP** [3] - 829:21,
830:1, 941:10
**load** [1] - 892:14
**loan** [76] - 840:24,
850:11, 851:12,
851:21, 852:10,
852:17, 853:13,
855:1, 855:17,
855:18, 856:22,
857:7, 858:11,
858:14, 862:7,
862:24, 862:25,
863:4, 863:11,
867:6, 869:19,
872:1, 873:1, 874:5,
876:7, 884:13,
884:16, 887:23,
892:8, 892:9,
892:18, 893:21,
894:8, 900:16,
906:22, 907:5,
907:16, 908:9,
908:18, 909:7,
909:12, 910:5,
912:10, 912:14,
912:19, 933:2,
933:9, 940:6, 940:9,
940:25, 975:4,
975:21, 975:22,
976:3, 976:10,
976:12, 976:23,
977:17, 978:1,
981:5, 981:6, 982:9,
983:1, 985:7, 985:8,
985:14, 986:23,
986:24, 988:9,
989:6, 997:2,
1017:6, 1018:7
**loaned** [1] - 979:24
**loans** [8] - 838:19,
838:21, 840:25,
850:4, 850:8, 850:9,
867:20, 869:17
**lobby** [1] - 837:20
**LOC** [2] - 895:3, 907:5
**local** [4] - 960:12,
960:13, 960:14,
1024:22
**located** [4] - 992:15,
993:25, 997:8, 997:9
**location** [1] - 947:11
**LOCs** [1] - 912:20
**look** [23] - 832:12,
833:9, 833:10,
839:3, 841:22,

852:24, 853:1,
857:23, 858:14,
860:12, 866:25,
886:18, 892:2,
892:4, 895:13,
902:5, 916:18,
943:6, 946:25,
969:20, 993:9,
993:11, 1016:11
**looked** [3] - 966:10,
966:11, 986:11
**looking** [19] - 840:18,
842:19, 845:23,
854:14, 861:15,
862:18, 880:10,
884:21, 886:3,
887:19, 924:4,
960:10, 960:14,
961:21, 963:6,
995:13, 1015:15,
1015:16
**looks** [5] - 861:17,
965:8, 1003:10,
1003:12, 1024:20
**lost** [2] - 976:7, 994:10
**Lucas** [6] - 983:14,
985:16, 985:19,
985:21, 986:3,
986:13
**Lucy** [1] - 963:13
**lunch** [6] - 839:19,
839:22, 840:20,
907:7, 929:10,
929:12
**Luncheon** [1] - 929:14
**lying** [2] - 983:24,
984:6

## M

**M-A-N-F-R-E-D-I** [1] -
955:18
**M-A-S-C-A-R-E-L-L-
A** [1] - 835:25
**M-I-L-A-N-A** [1] -
961:15
**ma'am** [6] - 936:22,
938:6, 940:23,
943:9, 945:16,
952:24
**magazine** [11] -
963:10, 965:5,
965:8, 965:14,
966:7, 966:13,
967:10, 967:13,
981:14, 982:2
**mail** [26] - 856:16,
857:1, 859:24,
860:3, 860:5, 860:7,
860:12, 860:13,

860:23, 861:4,
861:11, 879:17,
879:20, 879:23,
880:12, 884:7,
888:1, 888:4, 895:1,
897:21, 898:25,
922:22, 925:11,
925:14, 926:3,
927:14, 928:11,
929:1
**mailed** [2] - 882:3,
898:21
**mails** [1] - 879:18
**main** [1] - 841:18
**maintain** [1] - 897:6
**maintained** [3] -
915:9, 921:7, 921:14
**maintenance** [3] -
835:5, 837:22,
857:19
**majority** [1] - 838:22
**Makika** [11] - 848:2,
848:8, 848:11,
848:14, 875:17,
878:5, 878:13,
878:24, 972:2,
972:9, 1003:22
**man** [8] - 841:3, 932:3,
935:14, 935:15,
935:17, 960:16,
968:7, 988:21
**manage** [2] - 850:4,
1012:15
**managed** [4] - 888:15,
891:18, 892:17,
1017:8
**Management** [5] -
861:2, 992:14,
993:2, 993:24,
994:21
**management** [12] -
839:25, 854:3,
854:8, 861:3, 864:2,
893:12, 893:25,
894:16, 894:20,
907:10
**manager** [6] - 844:2,
844:4, 856:15,
882:21, 896:23,
909:25
**managers** [3] -
843:22, 889:8, 903:6
**managing** [7] -
850:16, 850:17,
864:7, 902:17,
903:15, 906:10,
1021:10
**Manfredi** [19] - 938:15,
939:3, 955:17,
955:19, 957:5,

957:8, 958:13, 958:24, 959:3, 959:7, 961:14, 971:10, 973:15, 974:19, 982:18, 983:9, 983:24, 989:2, 997:21
**mansion** [1] - 999:13
**March** [33] - 860:16, 861:12, 861:17, 862:9, 862:10, 862:18, 862:19, 862:23, 863:2, 863:3, 863:9, 873:5, 881:25, 886:19, 886:25, 887:8, 892:1, 892:4, 892:25, 893:17, 893:19, 894:5, 894:6, 897:20, 900:2, 924:19, 924:23, 928:6, 960:2, 960:6, 969:17, 996:18
**marked** [10] - 834:14, 865:5, 865:24, 879:11, 889:14, 925:2, 934:10, 934:22, 963:12, 995:11
**market** [5] - 956:9, 962:20, 980:6, 980:8, 980:10
**Mascarella** [20] - 831:9, 831:22, 832:18, 834:19, 835:11, 835:24, 836:1, 836:11, 849:25, 860:4, 863:13, 866:1, 880:13, 882:9, 894:13, 895:11, 917:1, 922:13, 922:24, 923:16
**mascarella** [3] - 831:11, 835:12, 861:23
**Mascarella's** [1] - 831:13
**mason** [3] - 957:25, 958:4, 958:6
**masonry** [1] - 957:24
**master** [1] - 896:5
**material** [1] - 1022:7
**math** [1] - 921:4
**Matter** [4] - 874:9, 941:23, 942:11, 943:1
**matter** [5] - 940:24, 947:10, 964:4,

985:20, 1019:23
**matters** [1] - 918:15
**Mattias** [3] - 853:20, 870:18, 874:6
**mature** [2] - 888:24, 889:6
**matured** [1] - 860:20
**matures** [1] - 889:3
**maturing** [1] - 889:1
**maxed** [3] - 874:3, 876:24, 877:7
**maximum** [1] - 874:2
**mean** [25] - 833:18, 840:10, 840:11, 851:20, 852:11, 874:1, 882:13, 891:21, 900:24, 920:9, 920:11, 938:13, 938:18, 941:10, 957:13, 960:11, 969:14, 970:1, 978:23, 979:6, 981:6, 985:10, 1004:8, 1007:12, 1022:11
**meaning** [2] - 969:15, 978:24
**means** [6] - 855:8, 891:22, 928:21, 952:4, 971:11, 979:7
**meant** [2] - 850:13, 880:16
**mechanic** [1] - 958:6
**meet** [13] - 839:11, 839:16, 839:21, 932:17, 934:7, 935:6, 940:18, 940:20, 960:19, 960:21, 961:20, 995:8, 995:15
**meeting** [37] - 839:18, 839:20, 876:1, 876:6, 882:19, 883:5, 883:12, 907:7, 907:19, 908:13, 908:16, 917:6, 937:7, 937:9, 946:21, 947:21, 953:12, 953:18, 953:19, 961:16, 961:17, 961:23, 962:1, 969:5, 982:14, 982:17, 982:19, 982:22, 983:9, 984:12, 984:14, 984:18, 985:3, 986:9, 1014:6
**meetings** [1] - 973:21
**member** [14] - 844:2, 844:4, 845:1,

845:24, 847:15, 848:10, 849:3, 903:15, 906:10, 939:16, 994:18, 994:22, 998:13, 1021:10
**members** [13] - 834:25, 840:19, 843:14, 846:19, 846:20, 903:7, 975:19, 980:19, 981:23, 983:6, 998:22, 1008:2, 1017:1
**memo** [1] - 919:9
**Memorial** [1] - 829:22
**memory** [2] - 884:10, 965:13
**mentioned** [11] - 835:2, 883:25, 937:16, 937:18, 949:19, 972:9, 973:25, 998:15, 1003:4, 1004:22, 1025:5
**message** [3] - 995:21, 995:25, 996:4
**messages** [2] - 995:23, 996:17
**met** [34] - 838:23, 839:19, 876:8, 877:12, 907:7, 922:17, 932:18, 940:17, 940:21, 946:2, 946:13, 947:7, 947:23, 947:25, 948:3, 948:9, 948:11, 953:7, 953:8, 953:20, 960:16, 961:7, 961:22, 962:1, 973:13, 974:16, 995:8, 995:18, 996:20, 996:21, 1012:19, 1012:25, 1014:2, 1014:7
**Mexican** [2] - 946:25, 947:4
**Mexico** [17] - 946:7, 946:11, 946:19, 947:25, 948:9, 949:1, 953:7, 953:18, 953:19, 983:14, 983:18, 983:19, 984:8, 984:10, 984:14, 985:9, 986:13
**Michael** [17] - 853:10, 853:19, 866:2,

866:10, 867:7, 867:8, 867:21, 867:24, 867:25, 868:9, 868:11, 869:17, 869:19, 869:20, 891:18, 892:9, 892:18
**michelle** [1] - 835:2
**microphone** [2] - 836:2, 931:5
**Middle** [1] - 954:14
**might** [7] - 921:3, 941:12, 948:10, 967:21, 1019:15, 1025:15, 1025:18
**mike** [1] - 954:16
**Milana** [6] - 961:15, 997:20, 998:21, 999:16, 1001:9, 1002:23
**mile** [1] - 956:18
**milestones** [1] - 974:16
**million** [34] - 893:4, 950:14, 962:14, 974:10, 974:15, 975:21, 976:14, 976:20, 976:21, 976:22, 977:19, 980:16, 980:17, 981:1, 982:9, 983:8, 984:1, 984:7, 984:14, 985:7, 986:23, 987:1, 1016:17, 1016:21, 1017:5, 1017:20, 1017:23, 1017:25, 1018:1, 1018:2, 1018:3, 1018:6, 1018:9
**millions** [4] - 1010:23, 1011:16
**mind** [2] - 915:20, 1007:5
**mine** [3] - 839:12, 912:12, 955:15
**Mineola** [1] - 830:2
**minor** [1] - 831:8
**minute** [6] - 840:25, 857:23, 866:1, 871:22, 882:9, 925:4
**minutes** [4] - 833:21, 886:17, 890:21, 1024:11
**MISKIEWICZ** [67] - 829:17, 830:16, 930:12, 931:9, 931:11, 932:13, 934:16, 935:19, 936:14, 941:2,

941:21, 942:4, 952:20, 954:3, 954:19, 954:21, 963:25, 965:17, 966:14, 967:23, 968:5, 968:20, 969:1, 969:4, 974:25, 982:1, 982:4, 982:7, 985:13, 990:8, 990:19, 990:21, 991:2, 991:6, 992:1, 993:13, 996:9, 996:15, 1000:7, 1000:8, 1003:6, 1004:12, 1004:13, 1004:24, 1005:9, 1006:2, 1008:19, 1008:20, 1010:2, 1015:12, 1017:17, 1017:18, 1019:8, 1019:11, 1020:11, 1021:7, 1023:3, 1023:14, 1024:10, 1024:13, 1024:19, 1025:10, 1025:20, 1026:1, 1027:18, 1028:7, 1028:9
**Miskiewicz** [5] - 830:17, 954:18, 1019:4, 1019:15, 1020:6
**mistake** [1] - 912:12
**mistakes** [1] - 882:24
**modify** [1] - 885:18
**mom** [1] - 977:3
**moment** [18] - 831:9, 834:6, 853:1, 880:5, 896:13, 897:3, 902:8, 907:22, 922:6, 939:7, 943:18, 952:16, 966:6, 966:13, 1006:15, 1021:21, 1022:9
**money** [131] - 837:23, 842:12, 844:6, 845:3, 846:2, 846:23, 847:19, 848:13, 849:5, 849:20, 856:5, 856:9, 856:21, 856:23, 857:4, 857:8, 858:20, 863:16, 864:22, 867:8, 867:23, 868:10, 871:22, 872:1, 872:5, 873:17, 875:18, 875:21, 878:17,

878:24, 883:16, 889:2, 889:6, 889:11, 933:21, 933:23, 934:2, 935:23, 935:25, 936:4, 936:12, 939:14, 939:24, 940:1, 940:4, 940:5, 940:7, 940:8, 940:11, 940:25, 941:6, 944:13, 950:10, 950:12, 950:17, 950:25, 951:3, 957:3, 957:6, 959:14, 962:8, 962:12, 963:10, 963:20, 968:8, 974:5, 974:8, 974:11, 975:4, 975:6, 976:15, 976:25, 977:7, 977:11, 978:9, 978:11, 978:16, 978:19, 978:25, 979:2, 979:7, 979:10, 979:21, 980:1, 980:3, 980:22, 982:11, 983:10, 983:18, 983:25, 984:1, 984:5, 984:9, 985:7, 985:18, 986:12, 987:23, 988:5, 988:9, 988:15, 989:16, 994:25, 1001:21, 1002:4, 1002:15, 1002:16, 1002:20, 1003:18, 1010:17, 1014:13, 1015:24, 1015:25, 1016:18, 1016:25, 1018:5, 1020:8, 1020:22, 1020:23, 1021:4, 1021:6, 1021:8, 1021:14, 1021:17, 1022:3, 1022:24, 1022:25, 1023:3, 1023:13, 1023:22

**Money** [1] - 981:14
**moneys** [1] - 983:21
**monies** [3] - 939:5, 974:18, 977:12
**month** [20] - 868:17, 868:23, 869:4, 869:6, 869:25, 870:2, 870:13, 871:2, 871:8, 871:12, 872:20, 873:10, 873:23, 880:16, 892:1,

899:22, 978:8, 980:23, 987:14, 1015:9
**monthly** [15] - 851:23, 859:12, 864:4, 882:4, 884:19, 890:9, 892:24, 909:8, 911:21, 912:14, 912:19, 917:8, 919:10, 919:12, 919:13
**months** [4] - 955:5, 996:19, 996:21, 1017:11
**morning** [21] - 830:16, 830:18, 830:19, 830:21, 830:24, 830:25, 831:1, 831:2, 831:4, 831:5, 833:18, 833:20, 833:21, 834:25, 835:1, 835:2, 835:6, 836:11, 836:12, 890:16, 1025:11
**mortgage** [1] - 981:6
**mortgages** [1] - 838:20
**most** [1] - 839:8
**mostly** [1] - 839:14
**MOUANO** [1] - 971:11
**move** [5] - 836:23, 840:22, 863:25, 980:8, 1010:8
**moved** [4] - 833:9, 863:16, 867:8, 944:23
**moves** [9] - 865:14, 880:1, 885:14, 886:15, 887:13, 891:4, 925:17, 934:16, 963:25
**moving** [2] - 872:18, 969:16
**MR** [204] - 830:16, 830:22, 831:2, 831:8, 833:1, 833:5, 833:13, 833:16, 833:21, 833:25, 834:6, 834:8, 834:17, 839:8, 840:12, 840:14, 851:5, 865:16, 865:18, 865:21, 872:14, 876:25, 880:3, 880:5, 882:25, 883:2, 883:19, 885:15, 885:17, 887:14, 887:15, 889:20, 889:22, 889:24,

891:5, 891:6, 895:8, 895:10, 901:21, 902:24, 902:25, 905:6, 906:1, 909:1, 910:24, 913:5, 913:7, 913:8, 915:5, 915:24, 916:1, 916:21, 917:15, 920:6, 922:6, 922:9, 922:10, 922:12, 923:11, 925:19, 927:23, 928:2, 929:6, 930:5, 930:12, 931:9, 931:11, 932:13, 932:15, 934:16, 934:18, 934:20, 935:19, 936:14, 936:16, 936:19, 941:2, 941:20, 941:21, 942:2, 942:4, 942:7, 943:3, 943:18, 943:20, 945:18, 945:20, 952:16, 952:20, 952:21, 952:23, 953:3, 953:4, 953:6, 953:23, 954:3, 954:19, 954:21, 961:3, 963:25, 964:2, 965:2, 965:17, 965:19, 966:14, 966:17, 967:1, 967:14, 967:20, 967:23, 968:4, 968:5, 968:10, 968:15, 968:18, 968:20, 969:1, 969:4, 974:24, 974:25, 981:13, 981:16, 982:1, 982:4, 982:7, 985:11, 985:13, 989:25, 990:8, 990:18, 990:19, 990:21, 990:24, 990:25, 991:2, 991:6, 992:1, 993:13, 996:9, 996:10, 996:11, 996:15, 1000:7, 1000:8, 1003:6, 1004:10, 1004:12, 1004:13, 1004:24, 1005:9, 1006:2, 1006:9, 1006:20, 1007:2, 1007:6, 1007:13, 1007:14, 1007:15, 1008:19, 1008:20, 1009:22, 1010:2, 1015:12,

1017:17, 1017:18, 1018:14, 1018:17, 1019:8, 1019:11, 1019:13, 1020:11, 1021:7, 1021:18, 1021:24, 1022:5, 1022:9, 1022:11, 1022:14, 1023:3, 1023:14, 1023:23, 1024:5, 1024:10, 1024:13, 1024:19, 1025:2, 1025:9, 1025:10, 1025:15, 1025:20, 1026:1, 1026:8, 1027:8, 1027:10, 1027:14, 1027:18, 1027:20, 1027:22, 1027:24, 1028:3, 1028:7, 1028:9
**MS** [60] - 830:19, 831:25, 832:7, 832:22, 833:19, 834:2, 834:14, 834:18, 835:10, 836:6, 836:8, 836:10, 839:6, 865:14, 875:2, 880:1, 885:16, 885:21, 886:15, 887:11, 889:12, 889:16, 889:18, 890:4, 890:15, 890:21, 891:3, 892:11, 892:14, 895:6, 898:13, 900:11, 901:17, 902:23, 903:4, 903:17, 903:24, 908:4, 910:2, 910:19, 913:2, 915:3, 915:19, 916:5, 917:13, 918:17, 919:23, 920:23, 923:13, 923:15, 925:6, 925:17, 925:21, 926:1, 927:21, 928:14, 940:19, 1027:4, 1027:6, 1027:12
**mug** [1] - 834:9
**multiple** [4] - 843:9, 873:22, 1007:4
**Murray** [5] - 853:20, 871:12, 871:21, 872:8, 873:1
**Murray's** [6] - 871:3, 872:3, 872:11, 872:12, 872:21,

873:7

## N

**NA** [1] - 897:24
**Na'alehu** [3] - 848:20, 849:6, 972:24
**name** [75] - 835:23, 841:13, 841:17, 842:5, 842:8, 842:24, 842:25, 844:11, 845:10, 847:5, 848:1, 848:11, 848:20, 853:17, 853:24, 854:1, 894:24, 895:11, 900:15, 903:16, 910:1, 920:8, 922:15, 930:24, 932:3, 934:24, 935:1, 938:14, 939:3, 940:14, 941:9, 943:9, 943:12, 943:13, 945:23, 946:1, 951:6, 952:13, 952:24, 954:13, 954:14, 954:15, 955:17, 960:17, 961:15, 963:11, 971:21, 986:1, 986:5, 988:22, 991:12, 993:1, 993:10, 997:20, 997:21, 998:8, 998:9, 998:10, 998:11, 1000:4, 1000:5, 1000:9, 1000:12, 1004:20, 1010:9
**named** [1] - 838:23
**names** [8] - 841:10, 854:7, 854:12, 876:17, 877:6, 927:5, 927:7, 927:8
**nature** [8] - 850:7, 876:25, 940:6, 944:14, 990:1, 990:2, 1012:7, 1019:24
**near** [1] - 931:5
**necessarily** [1] - 896:15
**necessary** [3] - 831:21, 857:11, 959:14
**neck** [2] - 1012:8, 1012:12
**need** [8] - 832:1, 832:3, 832:7, 834:6,

836:7, 907:9, 968:18, 1020:10
**needed** [6] - 881:18, 974:16, 987:12, 1016:12, 1016:24
**needs** [1] - 1022:23
**negotiations** [3] - 883:13, 883:17, 983:4
**never** [17] - 889:9, 894:25, 914:11, 916:8, 917:9, 919:19, 921:4, 938:9, 944:12, 951:19, 951:20, 984:2, 995:4, 1006:11, 1019:22
**NEW** [1] - 829:1
**new** [5] - 980:21, 980:22, 981:3, 1001:13, 1001:15
**New** [6] - 829:5, 829:17, 829:23, 830:2, 830:5, 830:8
**next** [30] - 835:9, 836:22, 851:7, 863:25, 868:7, 868:13, 868:16, 868:21, 869:4, 869:25, 870:16, 870:21, 871:1, 871:5, 872:18, 873:9, 874:9, 877:24, 886:18, 929:15, 930:11, 935:17, 941:23, 942:11, 964:4, 965:10, 972:4, 994:3, 1005:10, 1007:17
**nice** [2] - 929:12, 967:25
**Nicholas** [1] - 1024:14
**night** [2] - 1018:22, 1026:10
**nine** [2] - 852:22, 957:21
**Nolan** [3] - 853:19, 863:10, 882:18
**Nolan's** [3] - 854:5, 863:8, 863:15
**nondominant** [1] - 916:11
**none** [2] - 989:21, 989:24
**normal** [1] - 837:20
**normally** [1] - 843:19
**Norstrom** [2] - 853:20, 875:6
**Norstrom's** [2] -

870:18, 874:6
**north** [1] - 998:12
**Northern** [67] - 837:5, 837:6, 837:8, 837:13, 837:14, 838:5, 839:12, 839:21, 840:23, 841:5, 844:7, 845:4, 846:10, 846:21, 846:25, 847:16, 847:20, 848:11, 848:14, 849:6, 850:16, 851:11, 852:20, 853:18, 855:25, 860:19, 861:1, 861:5, 867:7, 869:18, 870:8, 870:18, 871:3, 875:17, 878:3, 878:5, 878:13, 879:7, 882:10, 882:14, 889:8, 890:10, 891:19, 894:1, 894:3, 896:1, 896:19, 897:5, 897:24, 898:8, 899:2, 899:11, 899:13, 899:24, 900:8, 900:9, 900:18, 906:14, 920:12, 920:14, 920:20, 920:21, 921:8, 921:14, 921:20, 921:24, 924:14
**note** [8] - 857:14, 866:4, 866:7, 866:9, 866:12, 887:24, 896:5, 933:17
**notes** [6] - 885:5, 885:8, 885:12, 885:16, 917:1, 917:2
**nothing** [14] - 878:19, 899:17, 899:19, 900:13, 900:20, 908:13, 919:15, 922:25, 923:7, 947:25, 952:20, 967:25, 1007:7, 1021:20
**notice** [12] - 851:25, 866:17, 882:5, 895:20, 897:18, 898:10, 898:11, 899:12, 899:14, 900:10, 1006:22, 1020:4
**Notice** [3] - 852:4, 852:6, 866:20
**notices** [2] - 882:3,

927:11
**notification** [1] - 895:25
**notified** [2] - 888:11, 927:11
**notify** [4] - 887:21, 889:1, 924:1, 924:13
**notifying** [1] - 884:1
**November** [8] - 871:2, 871:11, 878:21, 880:19, 881:3, 990:16, 990:18
**novice** [1] - 914:17
**NTIMAS** [2] - 860:20, 860:25
**number** [17] - 834:13, 842:22, 858:11, 858:14, 861:24, 892:8, 892:9, 892:18, 893:21, 894:8, 898:4, 916:20, 926:20, 957:9, 972:5, 991:1, 995:20
**numbers** [9] - 841:11, 842:21, 853:3, 867:15, 867:17, 926:20, 927:5, 927:7, 972:14
**numeral** [1] - 972:23
**nursery** [1] - 980:7
**nurses** [1] - 955:2
**nursing** [1] - 931:22

# O

**oath** [3] - 835:13, 930:16, 954:5
**object** [9] - 872:14, 876:25, 942:4, 966:17, 974:24, 985:11, 989:25, 990:4, 1018:14
**objected** [2] - 834:1, 1020:5
**objection** [54] - 831:12, 831:15, 832:9, 832:16, 834:1, 834:2, 834:3, 834:9, 834:20, 840:12, 840:14, 865:19, 865:20, 880:3, 880:6, 882:25, 883:19, 885:19, 887:14, 887:15, 889:24, 898:13, 900:11, 901:17, 903:17, 903:24, 908:4, 910:2, 910:13,

910:19, 913:2, 915:3, 915:19, 916:5, 917:13, 918:17, 919:23, 920:23, 925:19, 928:14, 934:19, 934:20, 941:2, 965:17, 966:14, 981:14, 981:17, 990:7, 996:10, 996:11, 1009:22, 1009:24, 1019:13, 1022:18
**objections** [1] - 990:23
**obligation** [3] - 907:24, 908:10, 914:20
**obligations** [1] - 915:9
**observe** [2] - 916:3, 916:9
**obstructs** [1] - 833:8
**obtaining** [1] - 944:9
**obvious** [1] - 918:12
**obviously** [3] - 1008:13, 1022:21, 1024:8
**occasion** [2] - 940:17, 1013:19
**occasions** [2] - 917:19, 960:21
**occur** [2] - 857:4, 916:16
**occurred** [2] - 919:1, 983:7
**occurs** [2] - 862:10, 870:11
**ocean** [2] - 956:19, 971:11
**Oceanside** [1] - 830:5
**October** [8] - 866:3, 866:5, 870:17, 878:8, 916:16, 917:3, 917:5, 997:4
**OF** [2] - 829:1, 829:3
**offer** [4] - 889:17, 889:18, 981:18, 1024:6
**offered** [1] - 968:5
**offering** [4] - 968:1, 981:24, 990:20, 990:21
**offers** [1] - 996:9
**office** [4] - 837:6, 837:7, 956:8, 1019:5
**officer** [8] - 838:13, 838:18, 876:7, 954:23, 955:7, 957:15, 970:10, 1011:20

**officer's** [1] - 856:22
**officials** [1] - 908:9
**Old** [1] - 830:1
**old** [6] - 836:18, 837:5, 957:21, 957:25, 958:1, 1005:5
**OLIVERAS** [1] - 830:4
**once** [13] - 835:13, 844:22, 852:15, 857:6, 864:13, 871:6, 875:19, 878:12, 888:10, 889:2, 930:15, 974:11, 1009:3
**one** [92] - 832:8, 832:14, 842:17, 842:20, 853:11, 853:13, 854:10, 854:13, 854:17, 856:17, 859:18, 859:24, 861:25, 864:9, 864:15, 864:18, 864:21, 866:9, 867:13, 867:18, 868:5, 868:14, 868:22, 868:24, 869:2, 869:12, 869:14, 870:6, 870:16, 870:22, 871:14, 873:20, 875:4, 875:20, 880:5, 880:17, 884:13, 886:10, 896:6, 896:11, 896:12, 897:23, 898:3, 898:9, 898:11, 899:7, 899:23, 900:7, 901:15, 902:23, 912:24, 915:22, 917:18, 921:10, 924:9, 927:10, 932:3, 932:6, 937:1, 938:6, 943:23, 944:2, 944:15, 944:19, 949:12, 950:23, 952:16, 952:21, 953:4, 956:11, 965:7, 965:9, 965:23, 966:2, 967:5, 971:21, 971:23, 972:1, 972:2, 972:22, 972:24, 993:19, 997:24, 998:17, 1003:8, 1011:1, 1011:9, 1015:5, 1019:10, 1021:8, 1026:4

**One** [1] - 829:21
**ones** [2] - 833:18, 901:3
**online** [1] - 870:10
**Online** [1] - 857:18
**open** [5] - 841:11, 843:21, 876:3, 876:10, 1008:1
**Open** [1] - 943:1
**opened** [15] - 842:5, 844:17, 845:16, 846:10, 846:13, 847:8, 848:4, 848:22, 849:18, 853:12, 888:22, 896:18, 897:3, 949:5, 949:6
**opening** [5] - 837:21, 842:3, 843:25, 918:23, 918:24
**operated** [3] - 837:16, 971:6, 971:13
**operating** [3] - 910:11, 1005:3, 1006:11
**opinion** [1] - 981:10
**opportunities** [1] - 975:6
**opportunity** [5] - 955:10, 962:11, 968:15, 976:6, 976:9
**options** [1] - 960:10
**orders** [1] - 989:22
**ordinance** [1] - 960:13
**ordinary** [1] - 915:17
**Organization** [1] - 843:20
**original** [3] - 885:16, 885:18, 907:7
**originally** [1] - 985:6
**originate** [2] - 911:4, 938:10
**originated** [1] - 938:7
**originates** [1] - 911:1
**outline** [1] - 843:22
**outside** [2] - 836:25, 990:6
**overall** [1] - 986:23
**overruled** [5] - 900:12, 908:5, 941:3, 966:15, 990:5
**Overruled** [5] - 910:3, 916:6, 919:25, 920:24, 928:15
**owed** [7] - 867:18, 1020:23, 1022:24, 1023:3, 1023:10, 1023:13, 1023:22
**Owen** [7] - 853:19, 854:5, 863:8, 863:10, 863:15,

882:18, 895:3
**owes** [1] - 869:17
**own** [11] - 955:7, 955:8, 957:6, 970:24, 971:1, 971:2, 977:7, 977:12, 998:8, 1007:5, 1016:3
**owned** [2] - 946:12, 1011:4
**owner** [4] - 843:20, 858:12, 866:15, 889:1
**owners** [1] - 843:22, 889:10
**ownership** [11] - 944:9, 945:10, 973:3, 973:7, 1001:24, 1002:12, 1004:3, 1004:14, 1009:2, 1009:10, 1012:20
**owns** [2] - 842:11, 1021:10

## P

**p.m** [3] - 930:9, 954:2, 996:18
**Pacific** [1] - 956:18
**package** [1] - 899:5
**page** [30] - 843:9, 847:15, 848:9, 849:2, 858:9, 858:16, 860:4, 862:9, 863:25, 874:9, 892:2, 892:20, 893:17, 894:5, 921:17, 922:1, 929:15, 941:23, 942:11, 943:6, 943:7, 963:14, 964:4, 991:9, 992:2, 992:18, 994:2, 1005:10, 1007:17, 1008:21
**pages** [2] - 858:2, 991:7
**paid** [6] - 861:19, 939:14, 939:19, 974:11, 980:19, 1018:9
**Paid** [1] - 862:22
**paper** [5] - 831:20, 892:12, 903:1, 903:3, 926:25
**paperwork** [1] - 918:24
**paragraph** [2] -

993:19, 994:17
**parcel** [1] - 962:19
**part** [13] - 832:23, 832:25, 837:17, 838:8, 895:13, 908:13, 912:9, 937:21, 946:9, 955:6, 1020:3, 1023:25, 1024:2
**participants** [1] - 879:20
**participated** [2] - 951:17, 952:8
**participating** [1] - 951:13
**particular** [20] - 832:24, 843:14, 850:11, 854:22, 855:9, 855:23, 856:20, 858:7, 885:5, 887:22, 900:9, 957:22, 966:2, 966:5, 973:23, 974:8, 985:22, 986:14, 990:6, 1009:21
**particularly** [1] - 924:9
**parties** [2] - 889:13, 992:6
**partner** [3] - 985:9, 1004:8, 1016:5
**partners** [4] - 984:20, 998:18, 1001:3, 1016:4
**partnership** [2] - 1001:6, 1002:6
**parts** [1] - 880:22
**party** [5] - 884:20, 937:13, 937:14, 937:16, 937:19
**Passport** [1] - 870:9
**past** [8] - 864:13, 864:16, 866:17, 887:23, 899:22, 924:2, 927:9, 988:13
**patent** [5] - 1011:4, 1011:9, 1014:18, 1015:2, 1015:6
**patents** [3] - 1010:17, 1014:14, 1014:19
**patience** [1] - 943:20
**Patriot** [2] - 911:4, 911:16
**pause** [5] - 916:24, 922:8, 925:5, 1021:23, 1022:10
**paving** [1] - 970:22
**pay** [30] - 850:14, 851:24, 852:3, 852:10, 852:16,

862:12, 862:13, 862:15, 863:17, 867:23, 868:2, 872:11, 875:19, 892:8, 892:17, 893:20, 894:8, 901:16, 901:23, 926:16, 927:17, 939:20, 940:7, 980:25, 986:22, 986:24, 987:14, 988:4, 1023:7
**paying** [2] - 893:9, 914:25
**payment** [26] - 852:7, 855:6, 855:9, 855:14, 862:24, 866:13, 867:16, 867:24, 868:2, 868:7, 871:11, 874:5, 877:24, 881:6, 881:13, 881:14, 887:21, 915:10, 915:14, 957:11, 958:12, 958:24, 962:16, 1016:24, 1018:4, 1018:8
**payment's** [1] - 866:22
**payments** [51] - 851:22, 851:23, 853:13, 864:3, 864:5, 864:9, 864:12, 864:13, 864:14, 864:24, 865:11, 866:25, 867:12, 867:13, 868:14, 868:17, 868:22, 869:6, 869:12, 869:16, 869:24, 870:1, 870:6, 870:17, 870:22, 871:2, 871:6, 871:19, 871:20, 872:4, 872:19, 872:25, 873:10, 873:23, 875:4, 875:13, 878:9, 878:18, 878:23, 879:3, 881:3, 881:10, 881:18, 881:20, 882:2, 882:5, 888:7, 914:18, 915:1, 926:12, 927:3
**payouts** [1] - 1015:10
**PD** [1] - 1011:24
**Peca** [6] - 853:10, 853:19, 866:10, 869:17, 869:20,

892:18
**Peca's** [11] - 866:2, 867:7, 867:9, 867:21, 867:24, 867:25, 868:9, 868:11, 869:19, 891:18, 892:9
**Peconic** [1] - 1000:21
**pending** [1] - 928:5
**people** [11] - 835:5, 835:6, 839:21, 857:12, 876:23, 882:23, 910:5, 931:24, 970:25, 977:12, 997:18
**people's** [1] - 1021:6
**perceived** [1] - 944:9
**percent** [10] - 933:21, 939:20, 977:22, 987:15, 1002:1, 1002:5, 1009:4, 1009:5, 1016:22
**percentage** [2] - 1001:24, 1017:21
**period** [25] - 867:2, 871:17, 871:19, 875:13, 878:21, 879:1, 879:3, 891:24, 912:2, 912:3, 934:7, 950:1, 958:23, 969:23, 970:24, 971:13, 973:20, 975:9, 975:10, 999:3, 1003:11, 1012:18, 1013:6, 1015:21, 1023:6
**permissible** [1] - 877:4
**permission** [5] - 832:8, 856:23, 889:9, 960:11, 1024:19
**permit** [2] - 958:20, 974:17
**permitting** [1] - 961:11
**person** [11] - 839:16, 842:11, 866:15, 876:8, 877:12, 918:5, 935:6, 939:3, 940:14, 999:22, 1004:3
**person's** [2] - 901:23, 916:4
**personal** [6] - 859:13, 860:20, 879:5, 884:17, 896:3, 913:13
**personally** [4] -

840:15, 906:20, 973:15, 976:22
**perspective** [1] - 831:9
**pertinent** [1] - 887:23
**Perusing** [1] - 897:18
**ph** [1] - 883:6
**Phil** [156] - 831:3, 831:14, 831:23, 832:15, 838:23, 839:19, 839:21, 840:22, 841:11, 842:7, 844:8, 844:18, 845:2, 845:6, 845:17, 846:1, 846:4, 846:14, 846:22, 847:1, 847:9, 847:18, 847:22, 848:5, 848:12, 848:15, 848:23, 849:4, 849:7, 849:19, 849:22, 851:12, 856:6, 857:6, 860:18, 862:16, 863:22, 864:12, 864:13, 866:16, 867:12, 868:6, 868:25, 869:3, 869:15, 870:15, 870:25, 871:9, 871:16, 871:25, 873:4, 873:13, 873:22, 875:11, 875:23, 876:1, 876:7, 878:7, 879:5, 879:10, 879:17, 879:22, 895:12, 901:9, 902:2, 903:13, 903:22, 906:2, 906:4, 906:9, 906:13, 906:23, 906:25, 907:6, 907:19, 907:25, 908:7, 908:19, 909:4, 909:19, 911:8, 911:18, 911:24, 912:15, 912:20, 912:22, 913:11, 914:1, 914:5, 914:10, 915:7, 916:3, 916:10, 917:7, 917:10, 917:18, 918:3, 919:10, 919:16, 919:18, 920:20, 921:9, 921:15, 921:25, 925:11, 927:3,

928:8, 928:12, 929:1, 932:7, 933:6, 934:13, 937:7, 937:17, 937:19, 938:1, 939:8, 943:13, 944:4, 946:13, 946:21, 960:17, 961:17, 963:18, 965:15, 967:3, 973:2, 975:23, 977:15, 978:7, 982:18, 983:10, 984:2, 984:15, 984:18, 986:10, 987:11, 988:10, 988:13, 990:15, 995:6, 995:19, 995:20, 997:1, 999:20, 999:25, 1002:25, 1003:21, 1009:4, 1010:13, 1013:2, 1013:18, 1016:5, 1016:10, 1017:6
**phil@ standardadvisors. com** [1] - 860:14
**Philip** [1] - 829:6
**PHILLIP** [1] - 829:6
**Phillip** [2] - 829:21, 890:6
**Phoenix** [2] - 837:4, 897:25
**phone** [14] - 857:1, 884:7, 922:20, 948:6, 948:20, 948:24, 949:3, 979:10, 979:14, 979:17, 995:20, 995:21, 996:2, 999:23
**photo** [4] - 832:1, 832:5, 832:21, 832:24
**photograph** [5] - 831:15, 831:19, 834:1, 934:12, 1013:17
**phrase** [2] - 910:25, 952:4
**physical** [5] - 965:8, 965:23, 967:8, 967:12, 1012:14
**physically** [2] - 968:18, 969:22
**picture** [3] - 834:16, 963:18, 1021:1
**pictures** [4] - 867:6, 900:22, 901:3, 986:9
**piece** [2] - 831:20,

997:5
**pieces** [1] - 969:10
**place** [7] - 882:4, 904:2, 937:12, 937:13, 949:21, 955:21, 966:21
**places** [1] - 1013:10
**plan** [3] - 969:10, 998:2, 998:3
**plant** [1] - 883:11
**play** [2] - 841:8, 1025:12
**played** [1] - 837:13
**player** [9] - 868:15, 869:12, 870:7, 882:20, 883:7, 911:9, 921:9, 921:25, 924:24
**players** [15] - 839:15, 840:5, 840:7, 859:15, 859:19, 859:23, 859:24, 868:23, 872:7, 876:12, 888:4, 907:9, 962:3, 963:22, 967:25
**players'** [2] - 852:18, 888:9
**Plaza** [2] - 829:16, 830:7
**pledge** [1] - 861:20
**pledged** [9] - 860:10, 861:6, 876:20, 891:13, 891:20, 894:4, 918:14, 918:23, 918:25
**plots** [1] - 959:15
**plus** [3] - 933:21, 979:24, 1017:23
**pocket** [1] - 1002:20
**point** [38] - 831:23, 832:16, 850:1, 866:18, 869:18, 869:21, 878:14, 881:20, 897:1, 901:6, 902:1, 903:21, 906:4, 906:7, 909:13, 909:16, 913:6, 916:2, 916:13, 917:5, 937:23, 939:13, 940:23, 958:9, 960:25, 963:5, 969:16, 973:5, 979:7, 983:22, 984:9, 987:2, 989:9, 1004:16, 1004:17, 1005:3, 1021:9
**Point** [1] - 998:12

**pointing** [1] - 961:3
**pole** [1] - 841:3
**police** [5] - 954:23, 955:7, 957:15, 970:9, 1011:20
**political** [1] - 958:19
**portion** [4] - 985:18, 986:23, 987:5, 1003:15
**position** [1] - 1022:3
**possession** [1] - 906:9
**possible** [3] - 969:11, 970:8
**Post** [3] - 885:4, 885:8, 885:12
**Post-It** [3] - 885:4, 885:8, 885:12
**potential** [1] - 937:17
**power** [1] - 910:14
**PP** [1] - 870:8
**practice** [1] - 897:5
**practicing** [1] - 916:10
**Precinct** [1] - 954:24
**pregnancy** [1] - 994:9
**prejudice** [1] - 831:22
**prejudicial** [1] - 967:25
**prepaid** [1] - 944:19
**prepare** [2] - 857:11, 969:18
**prepared** [2] - 834:18, 887:9
**presence** [2] - 908:8, 916:9
**present** [9] - 830:23, 907:18, 914:2, 914:8, 916:2, 947:19, 1001:17, 1002:10, 1006:12
**presentation** [1] - 832:17
**presented** [3] - 833:18, 833:22
**preserve** [1] - 995:25
**pressed** [1] - 883:6
**presumably** [1] - 831:11
**pretty** [5] - 840:17, 955:22, 981:5, 984:17, 1024:21
**previous** [2] - 842:20, 869:1
**previously** [1] - 865:18
**price** [7] - 956:21, 956:22, 1002:2, 1016:16, 1016:22, 1017:5, 1017:19
**prices** [1] - 956:25

**primarily** [2] - 838:22, 840:4
**principal** [4] - 854:20, 854:23, 854:25, 872:11
**printed** [1] - 884:25
**prints** [2] - 884:23, 884:24
**Private** [1] - 870:9
**Privitello** [2] - 1024:14, 1026:4
**procedures** [1] - 911:2
**proceed** [1] - 931:8
**proceedings** [5] - 916:24, 922:8, 925:5, 1021:23, 1022:10
**proceeds** [6] - 980:14, 980:17, 987:3, 987:5, 1020:12
**process** [10] - 883:23, 884:1, 884:4, 885:25, 944:15, 944:19, 958:17, 958:18, 958:20, 974:17
**profession** [2] - 920:15, 931:21
**professional** [4] - 839:14, 840:4, 840:7
**proffer** [1] - 1022:16
**profit** [11] - 920:21, 936:8, 998:6, 1017:14, 1017:16, 1017:21, 1018:12, 1019:17, 1019:22, 1020:1
**profitability** [1] - 1015:1
**profitable** [1] - 921:1
**prohibited** [1] - 918:2
**project** [14] - 840:1, 841:19, 932:22, 932:23, 958:25, 974:20, 976:18, 984:19, 985:22, 986:19, 988:6, 1020:23, 1020:24, 1023:4
**projects** [1] - 947:4
**promissory** [1] - 887:24
**promoted** [1] - 838:12
**pronouncing** [1] - 946:1
**proper** [2] - 857:11, 967:5
**properties** [2] - 956:10, 969:23, 999:7

**Properties** [1] - 998:12
**property** [47] - 956:14, 959:16, 961:21, 961:24, 962:5, 962:12, 962:13, 969:11, 969:25, 971:2, 973:16, 974:23, 975:3, 975:21, 982:15, 986:11, 986:14, 989:5, 989:8, 989:18, 997:6, 997:8, 997:12, 998:1, 998:18, 999:4, 999:9, 999:17, 1000:3, 1000:24, 1001:15, 1001:20, 1001:23, 1001:25, 1002:2, 1002:12, 1005:5, 1008:13, 1008:23, 1009:2, 1009:8, 1016:2, 1016:6, 1017:2, 1017:7, 1019:21, 1023:19
**proposal** [1] - 969:9
**propose** [2] - 840:19, 969:6
**proposed** [3] - 840:22, 970:3, 970:4
**prosecutor** [1] - 833:7
**prove** [1] - 968:6
**provide** [8] - 843:21, 851:12, 857:7, 864:18, 877:18, 877:22, 907:9, 988:11
**provided** [3] - 843:19, 853:25, 989:20
**providing** [2] - 843:24, 876:11
**published** [2] - 1003:4, 1004:22
**pull** [2] - 836:2, 931:5
**purchase** [13] - 962:6, 962:12, 981:3, 989:22, 997:5, 998:8, 998:9, 1000:3, 1001:23, 1016:16, 1016:22, 1017:2, 1017:5
**purchased** [5] - 962:16, 997:16, 997:17, 998:1, 998:10
**purport** [1] - 902:13
**purports** [1] - 992:20
**purpose** [15] - 841:18, 843:13, 851:13,

851:16, 851:17, 887:20, 914:13, 923:25, 924:1, 924:12, 961:16, 961:17, 982:22, 1014:6, 1015:13
**purposes** [1] - 1023:9
**pursuant** [4] - 891:7, 912:15, 915:9, 918:2
**put** [28] - 831:15, 833:7, 833:9, 835:7, 844:2, 853:7, 872:1, 933:11, 933:13, 953:15, 957:3, 957:6, 957:8, 957:11, 958:12, 958:23, 959:17, 962:11, 965:23, 977:7, 980:6, 980:8, 980:9, 988:6, 999:11, 1002:4, 1018:8, 1025:4
**putting** [2] - 871:22, 958:22

## Q

**quarter** [1] - 956:18
**questioned** [1] - 902:19
**questioning** [1] - 1008:3
**questions** [16] - 883:6, 883:8, 895:6, 918:6, 922:10, 923:11, 927:21, 928:22, 929:6, 936:14, 936:16, 942:3, 942:4, 952:18, 953:24, 1019:18
**quickly** [2] - 861:15, 980:12
**quite** [1] - 833:25
**quote** [1] - 860:21

## R

**R-O-B-E-R-T** [1] - 954:15
**raise** [4] - 832:16, 835:15, 930:17, 954:6
**raised** [1] - 833:3
**rare** [1] - 917:24
**rate** [1] - 977:21
**rather** [1] - 895:13
**reached** [2] - 874:2, 898:21
**react** [1] - 1006:19
**read** [16] - 854:8,

860:18, 861:18, 889:12, 892:9, 902:6, 925:7, 926:23, 943:7, 967:17, 968:15, 992:4, 992:6, 992:9, 993:18, 1018:20
**reading** [2] - 889:23, 927:2
**reads** [2] - 855:5, 929:2
**ready** [2] - 831:7, 930:4
**real** [5] - 838:21, 840:21, 938:7, 947:4, 956:8
**really** [11] - 931:20, 944:21, 948:10, 948:18, 951:7, 962:5, 984:3, 985:17, 985:19, 1002:6, 1006:2
**rearrange** [2] - 835:3, 835:6
**reason** [10] - 831:13, 832:5, 903:12, 903:21, 905:1, 1006:14, 1020:13, 1020:19, 1020:21, 1022:5
**reasons** [2] - 946:19, 946:23
**receipt** [2] - 888:1, 897:17
**receipts** [1] - 988:13
**receive** [6] - 866:16, 883:16, 898:9, 900:18, 987:5, 1019:25
**RECEIVED** [9] - 1029:4, 1029:6, 1029:9, 1029:10, 1029:13, 1029:14, 1029:17, 1029:19, 1029:21
**received** [28] - 860:19, 880:8, 882:18, 885:24, 887:18, 890:2, 891:10, 899:25, 900:10, 900:15, 906:7, 925:23, 926:8, 928:12, 929:1, 929:2, 929:3, 982:6, 987:8, 988:4, 988:12, 988:15, 991:4, 996:13, 1003:2, 1013:15, 1019:20, 1019:22
**receiver** [1] - 924:17

**receiving** [5] - 860:3, 860:5, 860:7, 928:11, 940:5
**recently** [1] - 1015:25
**recess** [2] - 890:19, 929:14
**recognize** [17] - 839:3, 841:25, 842:14, 843:4, 860:1, 861:22, 879:14, 884:11, 886:19, 887:2, 934:11, 935:8, 943:16, 963:13, 963:14, 963:17, 963:19
**recollection** [5] - 911:7, 950:8, 953:12, 995:7, 995:14
**recommend** [2] - 944:7, 945:2
**recommended** [3] - 943:22, 943:23, 952:24
**recommending** [1] - 945:5
**reconvene** [2] - 929:11, 1018:18
**record** [24] - 830:15, 834:12, 835:23, 839:6, 858:7, 858:10, 860:18, 885:4, 886:6, 887:11, 889:23, 892:11, 896:17, 919:17, 919:20, 923:19, 927:2, 930:25, 932:13, 954:13, 967:16, 992:4, 996:16, 1006:23
**records** [8] - 832:13, 865:2, 890:8, 897:6, 899:6, 915:15, 945:14, 1019:24
**recovered** [1] - 1019:19
**RECROSS** [6] - 928:1, 952:22, 953:5, 1027:13, 1027:23, 1028:2
**RECROSS-EXAMINATION** [2] - 928:1, 1027:13
**red** [1] - 867:17
**redirect** [2] - 923:12, 952:19
**REDIRECT** [2] - 923:14, 1027:11
**redo** [2] - 832:18,

834:3
**reestablish** [1] - 944:20
**refer** [2] - 990:10, 1007:12
**reference** [21] - 853:8, 896:3, 898:10, 899:10, 899:24, 900:19, 901:6, 901:9, 906:15, 907:14, 909:7, 911:22, 920:20, 928:3, 928:4, 928:25, 943:21, 965:20, 967:3, 984:4
**referenced** [1] - 983:25
**referencing** [1] - 984:6
**referred** [2] - 861:4, 994:16
**referring** [3] - 861:9, 963:1, 985:23
**reflect** [5] - 839:6, 895:24, 915:15, 932:13, 935:19
**reflected** [3] - 901:2, 922:2, 945:14
**reflecting** [2] - 917:2, 945:9
**reflective** [1] - 881:16
**reflects** [3] - 858:10, 895:14, 896:6
**refrain** [1] - 1007:5
**refresh** [2] - 884:9, 995:14
**regard** [2] - 909:5, 1023:24
**regarding** [11] - 884:5, 895:25, 912:14, 912:19, 917:20, 929:2, 932:24, 980:1, 984:7, 1018:20, 1019:16
**regards** [1] - 923:5
**regular** [1] - 855:6
**reimbursement** [1] - 988:12
**reinvest** [2] - 889:2, 889:10
**relate** [1] - 1022:4
**related** [4] - 841:19, 1008:4, 1008:10, 1022:4
**relates** [4] - 831:18, 921:25, 1022:1, 1022:16
**relation** [1] - 892:20
**relationship** [23] - 840:6, 856:15, 856:21, 864:7,

882:20, 883:7, 901:11, 902:2, 903:13, 906:21, 909:9, 909:21, 910:8, 910:10, 911:3, 911:8, 911:17, 912:9, 913:10, 913:13, 921:1, 1013:7, 1013:8
**relative** [1] - 1009:2
**relatively** [3] - 980:12, 1024:16, 1025:6
**released** [2] - 861:20, 974:18
**relevance** [4] - 883:19, 901:17, 910:2, 1022:25
**relevant** [2] - 1020:14, 1022:17
**relied** [1] - 951:9
**remain** [3] - 835:13, 930:15, 954:5
**remaining** [2] - 869:16, 1017:4
**remark** [2] - 1006:15, 1022:15
**remember** [20] - 840:16, 860:3, 860:5, 860:7, 900:6, 902:10, 924:25, 925:1, 946:6, 948:12, 949:24, 951:12, 952:3, 953:8, 977:9, 978:8, 988:18, 1008:7, 1012:24, 1015:22
**remind** [1] - 864:17
**renovation** [4] - 1013:4, 1016:11, 1017:10, 1018:9
**repaid** [1] - 934:4
**repeat** [3] - 858:25, 918:21, 920:4
**repeating** [1] - 851:6
**rephrase** [3] - 915:13, 974:25, 1004:12
**reply** [1] - 864:17
**Reporter** [1] - 830:7
**Reports** [1] - 858:4
**reports** [1] - 908:18
**represent** [5] - 893:6, 895:11, 922:15, 927:7, 945:23
**representative** [1] - 906:14
**representing** [1] - 963:22
**represents** [4] - 873:19, 894:10,

894:11, 1003:25
**request** [11] - 831:18, 852:21, 856:18, 856:19, 856:25, 876:9, 909:3, 909:18, 912:16, 940:2, 945:9
**requested** [5] - 877:10, 878:6, 888:1, 897:17, 940:6
**requesting** [2] - 880:15, 880:16
**requests** [1] - 857:19
**require** [1] - 899:13
**required** [1] - 864:6
**reserve** [1] - 968:9
**reserved** [1] - 981:23
**residence** [3] - 859:13, 1013:2, 1013:3
**residential** [1] - 838:20
**resistance** [1] - 910:13
**resold** [1] - 1017:19
**resources** [1] - 883:11
**respect** [24] - 832:8, 833:6, 854:7, 861:4, 864:8, 879:8, 881:6, 881:13, 896:19, 921:8, 944:4, 969:18, 971:7, 971:14, 973:15, 974:2, 989:5, 994:24, 997:3, 1008:13, 1023:19, 1023:22, 1024:4, 1026:3
**respectfully** [2] - 967:4, 1020:2
**respond** [5] - 864:14, 876:5, 877:11, 880:21, 926:20
**responded** [2] - 880:23, 927:14
**responding** [1] - 926:22
**response** [3] - 861:15, 861:16, 861:18
**responsibility** [1] - 838:8
**responsible** [1] - 838:10
**rest** [3] - 875:16, 957:20, 1018:5
**result** [2] - 883:16, 987:17
**resulted** [2] - 883:3, 920:21
**retire** [2] - 931:18,

931:20
**retired** [3] - 931:21, 931:23, 1011:22
**return** [7] - 888:1, 897:16, 920:21, 944:8, 988:15, 1019:22, 1020:1
**returned** [2] - 898:25, 900:5, 900:7
**returns** [3] - 838:10, 877:16, 877:22
**reveals** [1] - 1022:6
**review** [8] - 843:6, 862:3, 865:2, 865:7, 886:5, 921:7, 921:14, 925:4
**reviewed** [4] - 849:15, 858:17, 886:8, 887:12
**RICHARD** [1] - 829:23
**Richard** [1] - 831:3
**Rick** [1] - 895:11
**right-hand** [1] - 834:15
**rise** [5] - 830:11, 834:22, 890:23, 930:2, 930:7
**Rizzi** [1] - 977:5
**RMR** [1] - 830:7
**Road** [4] - 830:1, 897:25, 992:15, 993:25
**roadway** [2] - 970:6, 970:22
**roadways** [2] - 969:15, 970:4
**ROBERT** [1] - 830:3
**Robert** [3] - 922:15, 945:23, 954:15
**role** [4] - 841:8, 861:3, 864:7, 908:20
**roles** [1] - 837:12
**rolling** [1] - 956:17
**Roman** [1] - 972:23
**Romonowski** [2] - 920:8, 920:18
**ROMONOWSKI** [1] - 920:9
**RONALD** [1] - 830:7
**ronald_tolkin@nyed .uscourts.gov** [1] - 830:9
**room** [5] - 835:3, 839:3, 876:8, 876:12, 983:15
**Roslyn** [2] - 950:23, 951:2
**roughly** [1] - 986:6
**round** [3] - 886:18, 924:11, 926:2

**RPR** [1] - 830:7
**Rucchin** [1] - 853:20
**Rucchin's** [3] - 893:25, 894:3, 894:8
**rude** [1] - 900:24
**ruling** [1] - 967:22
**run** [1] - 907:12

**S**

**S-c-o-n-z-o** [1] - 977:6
**safe** [1] - 1018:21
**Sag** [7] - 997:9, 1005:4, 1007:12, 1008:4, 1008:9, 1008:13, 1008:22
**sale** [13] - 894:10, 962:24, 963:6, 980:14, 980:18, 997:5, 1001:14, 1002:5, 1017:19, 1019:17, 1019:19, 1019:21, 1020:12
**sales** [1] - 974:17
**San** [6] - 983:14, 985:16, 985:19, 985:21, 986:3, 986:13
**SARITHA** [1] - 829:18
**Saritha** [1] - 830:20
**sat** [1] - 837:21
**saved** [1] - 950:13
**savings** [3] - 933:16, 936:1, 950:22
**Savings** [2] - 950:23, 951:2
**saw** [14] - 865:18, 901:14, 901:22, 914:11, 916:8, 935:8, 965:11, 965:14, 965:21, 967:2, 967:5, 968:14, 990:2, 1006:11
**Sconzo** [1] - 977:5
**scope** [2] - 916:5, 941:2
**Scott** [3] - 920:8, 920:16, 920:17
**Scottsdale** [10] - 836:14, 837:7, 990:15, 992:15, 993:25, 994:14, 1014:5, 1023:5
**scrape** [1] - 875:16
**scraped** [1] - 875:21
**screen** [13] - 836:6, 841:22, 841:24, 853:7, 857:22, 869:5, 884:23,

892:2, 923:24, 1003:7, 1008:24, 1019:6, 1019:10
**screens** [1] - 884:24
**Seabrook** [1] - 969:11
**seated** [11] - 833:6, 834:24, 835:22, 891:1, 930:3, 930:10, 931:4, 941:16, 954:12, 981:20, 1019:3
**second** [8] - 860:4, 886:18, 914:16, 924:11, 955:1, 991:16, 993:12, 993:15
**section** [1] - 852:24
**secure** [2] - 851:18, 852:9
**secured** [11] - 850:24, 854:2, 854:4, 854:5, 854:9, 860:20, 863:19, 863:20, 872:6, 893:22, 896:3
**securing** [1] - 861:6
**see** [68] - 833:24, 837:20, 842:8, 843:16, 849:11, 855:11, 857:24, 865:16, 866:4, 877:14, 877:16, 885:6, 885:15, 885:17, 889:20, 892:4, 892:25, 897:22, 902:8, 902:22, 903:10, 913:24, 915:8, 921:7, 921:13, 932:9, 934:18, 935:10, 936:10, 943:10, 943:12, 943:13, 943:15, 956:8, 959:18, 959:19, 960:23, 962:6, 972:3, 989:18, 989:20, 989:22, 991:10, 991:12, 991:17, 992:20, 999:10, 1003:7, 1003:16, 1004:25, 1005:3, 1005:7, 1008:23, 1021:13, 1025:13, 1025:17, 1026:10
**seek** [1] - 856:17
**seeking** [1] - 840:2
**seem** [1] - 921:3
**seize** [1] - 927:13
**seized** [6] - 884:2, 891:12, 894:20,

924:6, 924:20, 990:14

**seizing** [2] - 888:12, 888:13

**selection** [1] - 1008:6

**sell** [12] - 888:14, 924:16, 960:9, 962:18, 980:11, 997:15, 998:5, 999:16, 1000:2, 1000:10, 1017:12, 1017:14

**selling** [4] - 944:24, 959:16, 1000:17, 1012:10

**semi** [1] - 931:23

**semi-retired** [1] - 931:23

**send** [23] - 866:10, 866:19, 866:20, 866:23, 876:23, 877:5, 885:2, 887:10, 888:3, 907:5, 907:25, 908:17, 908:19, 909:19, 917:7, 919:15, 926:11, 950:18, 951:3, 977:12, 978:3, 978:6, 1002:25

**sending** [4] - 899:11, 912:7, 983:18, 1003:20

**sends** [1] - 852:4

**senior** [2] - 876:7, 877:12

**sent** [26] - 859:13, 864:4, 882:3, 882:5, 883:12, 885:10, 885:11, 886:1, 886:13, 886:25, 887:8, 895:20, 897:20, 898:6, 899:21, 911:23, 912:15, 912:20, 912:24, 923:17, 927:11, 928:8, 978:9, 983:11, 987:15

**sentiment** [1] - 1023:24

**sentiments** [1] - 1015:3

**separately** [2] - 1008:16

**September** [1] - 980:9

**Sergei** [5] - 853:21, 868:18, 868:19, 869:7, 870:3

**series** [8] - 855:13,

855:22, 863:13, 863:21, 865:5, 991:7, 995:23, 996:17

**serve** [1] - 895:24

**services** [1] - 989:20

**set** [19] - 839:20, 841:5, 844:6, 850:5, 850:18, 852:20, 853:18, 853:22, 854:12, 855:24, 856:2, 859:16, 872:6, 876:6, 877:17, 886:4, 886:16, 999:3

**sets** [1] - 1021:3

**setting** [3] - 841:8, 841:17, 851:16

**settlement** [1] - 883:18

**several** [16] - 839:14, 840:23, 858:2, 868:3, 868:14, 868:22, 873:19, 875:15, 879:18, 882:23, 883:25, 886:1, 910:5, 923:18, 960:21, 972:14

**shall** [1] - 895:24

**shareholder** [1] - 998:13

**shirt** [2] - 932:12, 961:5

**short** [2] - 977:17, 1025:6

**shortly** [2] - 883:11, 938:25

**shots** [1] - 834:9

**shovel** [1] - 958:22

**show** [15] - 833:1, 841:21, 857:21, 878:20, 879:11, 880:22, 894:13, 921:23, 922:1, 922:2, 941:15, 941:20, 995:11, 1003:2, 1004:21

**showed** [6] - 832:9, 902:20, 963:7, 963:20, 965:5, 993:5

**showing** [10] - 832:14, 834:16, 934:10, 963:12, 991:7, 992:2, 993:15, 1008:21, 1008:23, 1013:15

**shown** [1] - 966:8

**shows** [3] - 832:15, 853:10, 853:12

**Side** [1] - 942:1

**side** [4] - 856:16, 857:14, 941:22, 942:10

**side-bar** [2] - 941:22, 942:10

**Side-bar** [1] - 942:1

**Sidebar** [2] - 1006:1, 1007:16

**sidebar** [4] - 904:2, 905:7, 966:21, 968:21

**sign** [5] - 903:8, 903:15, 903:23, 906:5, 906:10

**signatory** [4] - 832:15, 842:8, 842:10, 844:19

**signature** [30] - 832:14, 842:3, 842:17, 842:19, 844:15, 845:13, 886:10, 886:21, 887:4, 903:9, 906:8, 916:4, 916:8, 916:10, 991:10, 991:14, 991:18, 991:20, 991:21, 992:17, 992:18, 992:21, 993:4, 993:7, 993:8, 993:9, 993:11, 994:2, 994:3

**signatures** [2] - 903:6, 903:7

**signed** [4] - 860:5, 895:3, 903:20, 906:2

**significance** [4] - 842:10, 855:13, 862:22, 863:2

**signify** [7] - 854:25, 855:3, 855:14, 855:22, 863:14, 867:15, 867:17

**similar** [3] - 850:12, 855:20, 915:8

**simple** [6] - 833:14, 851:20, 852:11, 863:13, 882:1, 967:23

**simply** [5] - 831:19, 833:13, 851:6, 938:23, 1001:9

**single** [1] - 832:14

**sit** [2] - 903:12, 945:13

**site** [2] - 955:2, 955:3

**sites** [5] - 957:14, 969:24, 970:3, 970:4, 973:22

**sitting** [3] - 832:6, 935:17, 972:4

**six** [1] - 1017:11

**size** [1] - 999:11

**skilled** [1] - 958:6

**slope** [1] - 970:5

**small** [7] - 832:22, 832:24, 836:20, 837:3, 883:18, 956:8, 1020:12

**Smithtown** [1] - 959:5

**snapshots** [1] - 884:22

**snicker** [1] - 1006:18

**snickering** [2] - 1006:3, 1006:9

**social** [4] - 932:20, 934:8, 946:23, 1013:8

**socialize** [1] - 1013:10

**sold** [5] - 852:10, 852:14, 980:12, 1005:7, 1009:3

**sole** [1] - 844:4

**solely** [2] - 903:15, 906:10

**someone** [7] - 892:24, 900:8, 901:16, 901:22, 907:4, 933:5, 1019:5

**sometime** [4] - 919:1, 950:3, 953:21, 960:6

**sometimes** [3] - 928:21, 1006:22, 1007:3

**somewhere** [6] - 974:14, 980:9, 1000:21, 1002:19, 1002:23, 1002:24

**son** [50] - 932:6, 932:18, 932:23, 933:6, 934:5, 934:13, 936:6, 937:9, 937:15, 937:24, 938:6, 938:14, 938:19, 938:24, 939:8, 939:13, 939:16, 939:23, 940:19, 940:24, 943:22, 943:24, 944:1, 944:7, 944:24, 945:5, 945:9, 946:16, 946:20, 947:3, 947:4, 947:18, 948:14, 948:15, 948:16, 948:22, 948:23, 949:10, 949:15, 949:20, 950:18, 951:5, 951:10, 951:11, 951:17,

951:22, 951:25, 952:24, 953:1, 953:2

**sons** [1] - 951:24

**soon** [3] - 857:9, 969:11, 978:18

**sorry** [23] - 851:2, 851:15, 855:4, 858:25, 859:22, 861:11, 865:18, 885:16, 898:16, 907:13, 916:21, 921:11, 928:17, 931:15, 935:13, 938:22, 946:1, 950:2, 952:5, 968:4, 976:8, 993:13, 1006:2

**sort** [5] - 876:2, 913:10, 963:7, 999:13, 1021:3

**sounds** [2] - 916:17, 1022:23

**space** [1] - 835:4

**speaking** [3] - 918:2, 948:20, 949:20

**specific** [6] - 850:20, 853:9, 896:7, 965:20, 965:21, 990:7

**specifically** [3] - 878:4, 899:4, 923:21

**speculate** [1] - 905:5

**speculative** [1] - 840:21

**spell** [5] - 835:23, 930:24, 931:2, 954:13, 997:23

**spelled** [1] - 993:10

**spelling** [1] - 993:10

**spent** [1] - 983:22

**split** [1] - 959:19

**spoken** [1] - 922:20

**spring** [7] - 950:1, 950:4, 950:9, 953:13, 953:14, 953:21, 982:25

**Square** [1] - 829:21

**stage** [2] - 959:22, 982:25

**stages** [1] - 923:18

**stand** [5] - 831:10, 835:13, 921:6, 930:15, 954:5

**standing** [4] - 835:13, 930:15, 954:5, 961:2

**stands** [1] - 857:18

**start** [9] - 835:8, 836:19, 837:10, 856:25, 877:25, 958:13, 958:22,

971:16, 1001:12
**started** [18] - 836:20, 837:2, 837:5, 837:11, 837:14, 838:9, 878:2, 909:10, 909:22, 911:3, 919:4, 955:1, 957:25, 958:5, 971:18, 1020:6, 1020:8
**starting** [1] - 877:25
**starts** [3] - 854:17, 860:4, 993:19
**State** [1] - 836:23
**state** [9] - 830:14, 835:22, 896:10, 897:23, 918:12, 930:24, 954:12, 971:20, 1000:21
**statement** [11] - 862:19, 891:17, 891:25, 892:3, 893:11, 893:24, 921:17, 968:3, 1003:11, 1003:15
**statements** [20] - 838:11, 859:12, 864:4, 882:4, 884:19, 884:22, 890:10, 892:24, 909:8, 909:12, 909:17, 911:21, 912:8, 912:10, 912:14, 912:19, 917:8, 919:10, 919:13, 919:16
**states** [3] - 895:3, 924:5, 993:20
**STATES** [2] - 829:1, 829:3
**States** [4] - 829:12, 829:16, 830:20, 890:5
**status** [4] - 878:14, 892:21, 923:23, 982:23
**stay** [6] - 899:1, 920:14, 954:16, 955:21, 1000:23, 1001:4
**stayed** [1] - 946:13
**steady** [1] - 1015:9
**step** [5] - 835:12, 866:1, 929:7, 953:25, 1018:24
**steps** [4] - 856:13, 883:25, 929:9, 1019:1
**Steve** [1] - 894:3
**Steven** [2] - 853:20,

893:25
**stick** [2] - 832:5, 950:25
**still** [20] - 832:12, 869:17, 882:10, 882:14, 885:17, 931:19, 931:24, 961:10, 970:9, 973:17, 973:19, 979:20, 981:1, 983:4, 984:22, 1011:20, 1020:23, 1022:24, 1023:13, 1023:21
**Stip** [1] - 889:18
**stipulate** [2] - 889:20, 990:12
**stipulated** [1] - 890:4
**stipulates** [1] - 889:21
**stipulating** [1] - 890:11
**stipulation** [6] - 889:13, 889:23, 890:1, 891:8, 990:10
**stock** [1] - 941:8
**stocks** [2] - 851:2, 851:3
**Stony** [1] - 959:8
**stop** [1] - 1018:16
**stopped** [1] - 956:7
**stormed** [1] - 984:17
**strand** [1] - 1016:9
**Strangford** [1] - 830:4
**stream** [1] - 1015:9
**string** [1] - 879:19
**structured** [2] - 850:12, 974:13
**stuff** [4] - 832:3, 837:20, 907:16, 970:23
**subdivide** [5] - 957:12, 957:14, 959:18, 960:8, 960:11
**subdivided** [1] - 960:14
**subdividing** [1] - 957:18
**subdivision** [1] - 959:19
**subdivisions** [1] - 973:23
**subject** [1] - 926:6
**submitted** [1] - 989:23
**subsequent** [4] - 979:9, 979:16, 1020:23, 1023:7
**subsequently** [2] - 980:2, 1023:4
**substance** [2] -

909:20, 924:5
**substantial** [1] - 1021:11
**substantiate** [1] - 963:9
**substantive** [1] - 1020:20
**suburbs** [1] - 836:21
**sue** [1] - 883:10
**Suffolk** [8] - 829:21, 954:23, 955:6, 957:15, 959:5, 959:8, 970:20, 975:25
**sugar** [1] - 962:20
**suggest** [2] - 967:4, 1020:2
**suggested** [2] - 905:3, 1001:9
**suggesting** [1] - 967:11
**suggestion** [5] - 833:2, 833:12, 833:13, 1025:2, 1025:23
**suing** [1] - 952:13
**suit** [4] - 935:12, 935:14, 952:4, 952:9
**Suite** [4] - 829:22, 830:2, 992:15, 993:25
**suite** [1] - 897:25
**sum** [4] - 909:20, 924:5, 974:8, 1003:18
**summarizes** [1] - 854:21
**summarizing** [1] - 1023:20
**summary** [2] - 832:24, 1008:6
**summer** [4] - 950:1, 950:4, 953:10, 953:14
**superiors** [1] - 908:17
**supplying** [1] - 975:7
**supposed** [4] - 933:9, 933:17, 974:13, 985:1
**surprise** [2] - 928:13, 929:4
**surreptitiously** [2] - 919:17, 919:20
**surrounded** [1] - 982:24
**suspect** [2] - 903:22, 905:2
**sustain** [1] - 990:7
**sustained** [7] - 883:1, 883:20, 901:18,

901:20, 903:18, 965:18, 985:12
**Sustained** [3] - 913:3, 915:4, 917:14
**switchback** [1] - 970:5
**sworn** [5] - 835:16, 835:20, 930:18, 930:21, 954:9
**Sydor** [1] - 853:20
**system** [6] - 857:14, 857:17, 857:18, 858:8, 870:10, 970:7

---

**T**

**tab** [3] - 853:4, 886:18, 887:2
**tabbed** [2] - 963:14, 963:15
**table** [2] - 835:3, 975:8
**taught** [2] - 836:24, 957:19
**tax** [6] - 838:10, 841:10, 877:16, 877:22, 1000:21
**tech** [1] - 1019:5
**technological** [1] - 902:25
**telephone** [3] - 898:4, 917:20, 948:13
**ten** [6] - 890:21, 936:25, 955:21, 957:21, 977:22, 987:15
**tennis** [2] - 836:24, 999:12
**term** [3] - 840:10, 910:20, 977:17
**terminated** [1] - 921:20
**termination** [1] - 883:14
**terms** [16] - 831:17, 833:17, 843:23, 851:20, 852:11, 857:3, 863:13, 864:1, 873:17, 878:15, 882:1, 887:23, 909:6, 914:24, 968:12, 1006:21
**TESIORIO** [1] - 997:24
**Tesoriero** [7] - 997:22, 997:23, 1001:1, 1001:2, 1002:16, 1004:7, 1004:15
**testified** [25] - 835:20, 841:1, 849:25, 855:24, 866:18, 883:22, 885:25,

888:16, 891:11, 894:15, 897:15, 901:1, 906:13, 906:25, 912:13, 913:9, 914:19, 921:13, 923:7, 930:21, 954:9, 966:6, 967:2, 1006:12, 1006:15
**testifies** [1] - 967:4
**testify** [3] - 831:10, 907:1, 1020:11
**testimony** [14] - 907:4, 907:6, 907:18, 907:20, 908:3, 908:16, 911:21, 921:24, 922:9, 945:18, 946:2, 965:15, 1006:19, 1025:3
**text** [5] - 995:20, 995:23, 995:25, 996:4, 996:17
**THE** [179] - 830:11, 830:18, 830:21, 831:1, 831:15, 831:24, 832:1, 832:20, 833:3, 833:12, 833:15, 833:24, 834:5, 834:7, 834:11, 834:15, 834:21, 834:22, 834:24, 835:2, 835:12, 835:17, 835:22, 835:24, 836:1, 836:4, 836:5, 836:7, 839:10, 851:7, 865:17, 865:20, 865:22, 872:15, 877:3, 880:4, 880:7, 883:1, 883:20, 885:20, 885:22, 887:16, 889:15, 889:17, 889:25, 890:14, 890:16, 890:20, 890:22, 890:23, 891:1, 891:7, 892:13, 892:16, 895:7, 898:15, 898:16, 898:18, 898:20, 900:12, 901:18, 901:20, 903:2, 903:18, 903:25, 905:1, 908:5, 910:3, 910:20, 910:21, 910:22, 913:3, 915:4, 915:20, 916:6, 916:20,

917:14, 918:18, 918:19, 918:20, 919:25, 920:5, 920:24, 922:7, 923:12, 925:20, 925:22, 927:22, 928:15, 929:7, 929:10, 930:2, 930:3, 930:6, 930:7, 930:10, 930:14, 930:17, 930:23, 930:24, 931:1, 931:2, 931:3, 931:4, 931:7, 931:8, 932:16, 934:21, 935:21, 936:15, 941:3, 942:9, 943:19, 950:7, 952:19, 953:25, 954:1, 954:4, 954:11, 954:12, 954:14, 954:16, 961:6, 964:3, 965:18, 966:15, 966:19, 967:7, 967:17, 968:9, 968:11, 968:17, 969:2, 981:8, 981:15, 981:18, 981:23, 982:2, 985:12, 990:5, 990:17, 990:20, 990:23, 991:1, 991:3, 996:12, 1006:16, 1006:21, 1007:12, 1008:2, 1009:25, 1018:16, 1018:18, 1018:24, 1018:25, 1019:3, 1019:9, 1019:12, 1020:6, 1021:4, 1021:12, 1021:22, 1022:2, 1022:8, 1022:13, 1022:19, 1023:9, 1023:15, 1024:3, 1024:7, 1024:12, 1024:17, 1025:1, 1025:8, 1025:12, 1025:16, 1025:21, 1026:2, 1026:9
**themselves** [1] - 915:16
**THERE** [1] - 982:10
**thereafter** [1] - 833:11, 883:11, 939:1, 958:14, 960:21
**thick** [1] - 895:13
**thinking** [1] - 960:9
**third** [3] - 841:3,

884:20, 887:2
**Thomas** [4] - 830:22, 997:20, 998:21, 1002:23
**thousand** [2] - 875:16, 1015:23
**thousands** [1] - 962:22
**three** [6] - 919:7, 988:4, 989:14, 997:18, 1020:21
**THROUGH** [2] - 1029:8, 1029:12
**Thursday** [1] - 1024:24
**ties** [1] - 875:6
**tight** [1] - 835:5
**timeshare** [1] - 955:23
**Timothy** [1] - 1021:9
**titled** [1] - 927:9
**TO** [1] - 1029:2
**today** [20] - 836:7, 839:4, 843:7, 862:4, 865:1, 903:12, 912:23, 921:6, 921:13, 921:24, 922:17, 925:8, 926:8, 932:9, 935:10, 945:13, 960:23, 962:15, 963:2, 1026:6
**together** [3] - 875:16, 875:21, 1013:11
**TOLKIN** [1] - 830:7
**Tom** [1] - 962:2
**TOMMY** [1] - 829:7
**Tommy** [16] - 829:8, 830:1, 890:6, 935:5, 936:6, 942:5, 943:23, 945:25, 946:14, 947:8, 948:23, 988:22, 988:25, 996:20, 1000:20, 1012:23
**tomorrow** [6] - 835:6, 1018:19, 1023:21, 1024:18, 1025:10, 1026:3
**ton** [1] - 1014:13
**Tony** [1] - 883:5
**took** [9] - 904:1, 919:8, 921:6, 931:22, 937:13, 946:16, 955:13, 966:20, 1018:6
**top** [2] - 887:25, 1004:25
**topic** [1] - 1010:8
**tops** [1] - 1024:11
**total** [5] - 837:9,

976:12, 976:14, 977:19, 987:7
**totals** [1] - 880:16
**totem** [1] - 841:3
**touch** [1] - 917:11
**tough** [2] - 910:8, 997:24
**toward** [1] - 956:7
**towards** [1] - 959:17
**tower** [1] - 955:1
**town** [2] - 999:10, 1024:15
**townships** [1] - 973:21
**track** [1] - 857:19
**trade** [1] - 957:22
**Trade** [4] - 938:13, 938:18, 938:24, 955:3
**tragic** [3] - 938:12, 938:17, 938:24
**training** [1] - 910:16
**Transaction** [3] - 852:24, 853:4, 861:25
**transaction** [21] - 853:6, 853:9, 853:15, 854:13, 854:16, 854:19, 854:20, 855:5, 855:15, 855:22, 858:7, 858:10, 858:15, 866:3, 867:2, 908:18, 909:7, 975:16, 975:20, 1007:8, 1008:9
**transactions** [10] - 853:11, 854:18, 857:20, 859:9, 863:14, 882:13, 901:2, 901:14, 923:6, 975:12
**transfer** [23] - 842:12, 844:5, 845:3, 846:2, 846:23, 847:19, 848:13, 849:5, 849:20, 856:5, 856:9, 857:4, 858:11, 858:13, 858:18, 858:20, 870:8, 870:11, 872:22, 878:6, 879:4, 923:6, 1003:16
**transferred** [5] - 852:15, 868:10, 878:12, 878:24, 1005:4
**transferring** [1] -

837:23
**transfers** [18] - 863:21, 868:5, 868:24, 869:2, 869:14, 870:13, 870:24, 871:8, 871:14, 871:24, 873:3, 873:12, 875:9, 875:22, 879:9, 1020:16, 1020:19, 1021:2
**transitioned** [2] - 837:3, 838:5
**travelling** [2] - 859:8, 946:19
**trial** [3] - 890:12, 1024:24, 1026:11
**trip** [3] - 955:13, 956:7, 1018:21
**true** [27] - 879:23, 886:12, 886:24, 887:7, 890:9, 895:4, 896:24, 897:12, 898:4, 907:23, 913:12, 914:22, 915:2, 915:11, 916:14, 917:10, 917:12, 917:22, 918:3, 918:7, 918:16, 922:4, 925:14, 937:10, 939:11, 939:14, 945:7
**Trust** [67] - 837:5, 837:6, 837:8, 837:13, 837:14, 838:6, 839:12, 839:21, 840:24, 841:6, 844:7, 845:4, 846:10, 846:21, 846:25, 847:16, 847:20, 848:11, 848:14, 849:6, 850:16, 851:11, 852:20, 853:18, 855:25, 860:19, 861:1, 861:5, 867:7, 869:18, 870:8, 870:19, 871:3, 875:17, 878:3, 878:5, 878:13, 879:7, 882:10, 882:14, 889:9, 890:10, 891:19, 894:1, 894:3, 896:1, 896:19, 897:5, 897:24, 898:9, 899:2, 899:11, 899:13, 899:24, 900:8, 900:10,

900:18, 906:14, 920:13, 920:15, 920:20, 920:21, 921:8, 921:14, 921:20, 921:24, 924:15
**trust** [1] - 896:4
**trusted** [2] - 945:6, 951:8
**truth** [1] - 968:6
**truthfully** [1] - 918:9
**try** [4] - 857:25, 951:25, 957:12, 969:10
**trying** [9] - 958:25, 961:10, 971:2, 983:22, 984:19, 984:24, 999:10, 1020:7, 1021:14
**tune** [1] - 921:2
**turn** [32] - 842:13, 843:3, 844:14, 845:9, 845:18, 846:7, 846:15, 847:4, 847:25, 848:18, 849:11, 852:23, 859:25, 860:4, 861:21, 862:9, 862:17, 863:23, 867:1, 881:23, 886:3, 891:15, 892:2, 893:10, 923:20, 940:25, 959:11, 991:8, 1016:14, 1019:7, 1024:21
**turned** [3] - 833:9, 985:9, 985:14
**turning** [25] - 844:21, 847:10, 847:15, 848:6, 848:9, 848:24, 863:1, 863:6, 863:9, 863:23, 871:10, 871:17, 873:14, 874:4, 875:12, 877:24, 878:8, 881:1, 881:12, 892:20, 893:17, 893:23, 894:5, 924:11, 994:2
**twice** [1] - 967:2
**two** [18] - 874:6, 878:20, 879:8, 879:20, 899:7, 899:8, 899:9, 899:10, 917:19, 955:5, 960:10, 977:14, 980:12, 999:7, 1001:7,

1008:21, 1014:19, 1020:21
**type** [8] - 842:12, 850:11, 854:18, 855:20, 866:19, 881:16, 963:10, 1020:3
**Type** [1] - 855:6
**types** [1] - 864:3
**typical** [1] - 888:25
**typically** [1] - 864:14

## U

**U.S** [2] - 829:4, 829:18
**Ula** [11] - 848:1, 848:8, 848:11, 848:14, 875:17, 878:5, 878:12, 878:24, 972:2, 972:9, 1003:22
**ultimately** [2] - 994:10, 1001:14
**unaware** [1] - 989:7
**undeliverable** [3] - 899:2, 899:5, 899:11
**under** [10] - 849:13, 849:17, 855:5, 855:6, 923:2, 941:6, 971:7, 998:9, 998:10, 1012:16
**underlined** [1] - 885:10
**understood** [3] - 832:7, 986:13, 1009:1
**unfair** [1] - 1006:7
**union** [1] - 837:2
**UNITED** [2] - 829:1, 829:3
**united** [1] - 829:12
**United** [3] - 829:16, 830:20, 890:5
**University** [1] - 836:23
**unlawfully** [1] - 1021:15
**unless** [1] - 966:3
**unlike** [1] - 850:22
**unnecessary** [2] - 831:17, 831:21
**unsecured** [1] - 850:23
**unusual** [2] - 901:15, 915:1
**up** [61] - 831:19, 832:10, 832:23, 833:7, 834:12, 834:16, 835:7, 835:12, 836:3, 839:20, 841:5,

841:8, 841:17, 844:7, 850:5, 850:14, 850:18, 851:16, 852:20, 853:18, 853:22, 854:12, 855:16, 855:24, 856:2, 859:16, 872:6, 876:6, 877:17, 882:10, 892:14, 892:21, 892:25, 917:9, 923:24, 931:5, 938:25, 939:8, 939:23, 954:4, 954:17, 958:6, 958:19, 959:13, 961:2, 962:8, 962:11, 969:21, 970:17, 981:5, 983:22, 984:9, 999:3, 1002:5, 1006:10, 1016:25, 1017:4, 1021:3
**update** [2] - 897:5, 982:23
**upper** [2] - 836:6, 891:20
**upset** [2] - 984:25, 985:4
**USA** [1] - 830:12
**uses** [1] - 1021:5
**usual** [1] - 887:14
**utilities** [1] - 970:22
**utilized** [1] - 911:23
**uttered** [1] - 1015:3

## V

**vacant** [2] - 956:15, 997:10
**vacation** [3] - 946:17, 955:14, 956:3
**vacationing** [1] - 938:25
**vague** [1] - 910:19
**value** [2] - 892:22, 893:3
**values** [2] - 956:8, 959:18
**various** [6] - 831:11, 889:8, 894:16, 977:11, 1020:17, 1021:3
**venture** [1] - 974:3
**Ventures** [23] - 842:4, 842:6, 842:25, 843:1, 844:12, 845:4, 845:11, 845:13, 845:21,

845:25, 846:3, 846:8, 846:18, 846:20, 846:24, 848:20, 849:6, 858:13, 867:9, 971:22, 971:23, 972:22, 972:24
**verge** [1] - 1014:11
**version** [1] - 885:12
**versus** [1] - 830:12
**Veterans** [1] - 829:22
**VI** [5] - 846:8, 846:18, 846:20, 846:24, 858:13
**via** [5] - 859:24, 887:25, 888:4, 922:22, 928:8
**viability** [1] - 973:22
**vicinity** [1] - 962:18
**view** [4] - 833:8, 840:10, 928:20, 971:11
**views** [1] - 956:19
**Vincent** [4] - 997:21, 1001:2, 1004:7, 1009:5
**VIOR** [1] - 965:1
**virtue** [2] - 844:5, 915:9
**Visa** [2] - 1011:14, 1015:7
**voice** [3] - 836:3, 931:5, 954:17
**voir** [2] - 964:2, 967:15
**vouchers** [1] - 989:22

## W

**wait** [2] - 979:18, 979:19
**waiting** [2] - 980:23, 981:1
**walk** [3] - 837:12, 856:13, 1018:12
**wall** [1] - 833:10
**wallpaper** [1] - 835:7
**wants** [1] - 843:20
**warm** [1] - 953:14
**WAS** [8] - 1029:4, 1029:6, 1029:10, 1029:13, 1029:14, 1029:17, 1029:19, 1029:21
**was..** [1] - 937:20
**waste** [1] - 967:1
**water** [1] - 970:6
**wearing** [3] - 932:11, 961:1, 961:5
**Wednesday** [1] - 1026:11

**week** [2] - 955:21, 1024:24
**weeks** [2] - 955:4, 980:13
**WEINBLATT** [1] - 829:21
**Wells** [1] - 879:4
**WERE** [1] - 1029:8
**Western** [1] - 836:20
**wetlands** [1] - 999:8
**whatsoever** [1] - 1021:20
**wheelchair** [1] - 940:20
**White** [1] - 970:21
**white** [3] - 831:20, 932:12, 961:5
**whole** [2] - 883:9, 959:20
**wholly** [1] - 831:16
**wife** [3] - 976:7, 980:7, 994:8
**winter** [3] - 950:1, 950:4, 953:10
**wire** [12] - 857:7, 879:4, 923:6, 977:14, 977:16, 978:4, 1003:16, 1003:21, 1020:16, 1020:19, 1020:20, 1021:2
**wired** [5] - 857:8, 950:19, 950:20, 1022:3, 1023:1
**wires** [2] - 837:23, 978:3
**wiring** [1] - 857:4
**withdraw** [8] - 840:14, 871:23, 915:24, 945:17, 967:15, 974:25, 1009:23, 1022:18
**withdrawal** [3] - 893:7, 893:8, 894:11
**withdrawals** [1] - 842:12
**withdrawn** [8] - 894:7, 913:7, 959:11, 960:7, 977:24, 1000:7, 1015:12, 1017:17
**witness** [28] - 831:10, 832:12, 833:8, 835:9, 835:13, 835:16, 835:19, 839:7, 877:2, 887:11, 898:14, 921:6, 930:11, 930:15, 930:18, 930:20, 935:19,

954:4, 954:8, 968:2, 968:12, 968:19, 990:9, 1006:5, 1007:9, 1023:12, 1024:16, 1025:5
**WITNESS** [17] - 835:17, 835:24, 836:4, 892:13, 892:16, 898:16, 898:20, 910:21, 918:19, 930:23, 931:1, 931:3, 931:7, 954:1, 954:11, 954:14, 1018:25
**Witness** [3] - 929:9, 954:2, 1019:1
**witness'** [1] - 851:6
**witnesses** [2] - 968:2, 1019:7
**word** [2] - 952:3, 990:1
**words** [6] - 878:17, 902:12, 924:17, 941:5, 952:6, 1013:10
**workers** [1] - 1012:16
**world** [2] - 883:9, 1011:1
**World** [3] - 938:13, 938:18, 938:24
**worried** [1] - 1025:18
**worry** [1] - 984:20
**worth** [7] - 959:20, 962:14, 963:9, 968:8, 1010:17, 1011:16, 1016:15
**write** [4] - 962:10, 962:13, 963:2, 975:3
**writing** [3] - 843:17, 885:9, 974:22
**written** [1] - 895:25
**wrongful** [1] - 883:14
**wrote** [1] - 1002:23

## Y

**year** [8] - 837:25, 921:2, 946:8, 959:22, 961:9, 971:15, 997:3
**years** [25] - 836:18, 836:24, 837:4, 837:5, 837:9, 838:9, 838:12, 838:14, 901:13, 915:7, 919:6, 919:7, 931:19, 936:25, 939:22, 957:21, 958:1, 988:4, 988:14, 989:9,

989:11, 989:14,
1011:24
**yesterday** [3] - 832:9,
833:6, 835:9
**YORK** [1] - 829:1
**York** [6] - 829:5,
829:17, 829:23,
830:2, 830:5, 830:8
**young** [2] - 957:20,
970:14
**yourself** [7] - 902:6,
919:18, 919:21,
937:9, 947:18,
975:20, 997:17