1030

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA      :      13-CR-607 (JFB)
4
         -against-                       U.S. Courthouse
5                                 :
                                         Central Islip, New York
6   Phil Kenner
    a/k/a "Philip A. Kenner",
7         and                     :
    TOMMY C. CONSTANTINE
8   a/k/a "Tommy C. Hormovitis"

9               Defendants   :
                                         May 13, 2015
10  - - - - - - - - - - - - - - - X      9:30 a.m.

11
    BEFORE:
12          HONORABLE JOSEPH F. BIANCO
            United States District Judge
13          and a jury

14
    APPEARANCES:
15
    For the Government:       KELLY T. CURRIE
16                            Acting United States Attorney
                              Federal Plaza
17                            Central Islip, New York 11722
                              BY:  JAMES M. MISKIEWICZ
18                                 SARITHA KOMATIREDDY
                                   Assistant U.S. Attorneys
19

20

21  For the Defendant:        HALEY, WEINBLATT & CALCAGNI LLP
    Phil Kenner          One Suffolk Square
22                            1601 Veterans Memorial Highway
                              Suite 425
23                            Islandia, New York 11749
                              BY:  RICHARD HALEY
24

25

```
 1  For the Defendant:         LaRUSSO & CONWAY LLP
    Tommy C. Constantine       300 Old Country Road
 2                             Suite 341
                               Mineola, New York 11501
 3                             BY:  ROBERT P. LaRUSSO
                                        and
 4                                  ANDREW L. OLIVERAS
                                    26 Strangford Court
 5                                  Oceanside, New York 11572

 6

 7  Court Reporter:            RONALD E. TOLKIN, RPR, RMR, CRR
                               100 Federal Plaza
 8                             Central Islip, New York 11722
                               631-712-6105
 9                             ronald_tolkin@nyed.uscourts.gov

10                                  ***

11

12          THE CLERK:  Calling case 13-CR-607, U.S.A. versus

13  Kenner and Constantine.

14          Counsel, please state your appearance for the

15  record.

16          MR. MISKIEWICZ:  Good morning, Your Honor.

17          James Miskiewicz for the United States.

18          THE COURT:  Good morning, Mr. Miskiewicz.

19          MS. KOMATIREDDY:  Good morning, Your Honor.

20          Saritha Komatireddy, for the United States.

21          THE COURT:  Good morning, Ms. Komatireddy.

22          MR. LaRUSSO:  Good morning, Your Honor.

23          Bob LaRusso appearing for Mr. Constantine.

24          THE COURT:  Good morning, Mr. LaRusso.

25          MR. OLIVERAS:  Good morning, Your Honor.
```

1   Andrew Oliveras appearing for Mr. Constantine.

2   THE COURT:  Good morning, Mr. Oliveras.

3   MR. HALEY:  Good morning, Your Honor.

4   Richard Haley appearing for Mr. Kenner.

5   THE COURT:  Good morning, Mr. Haley.

6   The jurors are all here.  Are we ready to go?

7   MR. MISKIEWICZ:  We have one issue we wanted to

8   raise.  We've raised it with counsel.  Towards the end of

9   Mr. Kaiser's testimony, he's going to testify that he was

10  eventually interviewed by the FBI.  I'm not going to elicit

11  what was said in that interview at all.  As background, he

12  suggested that the FBI interview Phil Kenner.  I will not

13  elicit that.  However, we will say that after the interview

14  was over -- and I said it was the FBI.  I guess it was a

15  Southern District of New York investigator.

16  When they left the house, he made a call to Kenner

17  and told Mr. Kenner, in sum and substance, the FBI was here.

18  You should talk to them.  He will testify, I'm quoting what he

19  has said -- he has a very clear recollection of how Mr. Kenner

20  reacted -- he said, "Are you fucking crazy?  Did you talk to

21  them?"  And he berated him for talking to him.

22  I am offering this as evidence of consciousness of

23  guilt.  As I explained to Mr. Haley, particularly, what my

24  view is, I raised it just in case he felt there were any Fifth

25  Amendment issues.  I thought we would raise them with Your

1   Honor to avoid any lengthy side-bar in the middle of it.

2          That's what he's going to testify to.  I'm giving

3   Mr. Haley, I'm giving the Court a preview of what I anticipate

4   the testimony will be.

5          MR. HALEY:  I do have a position, Your Honor.

6          THE COURT:  Okay.

7          MR. HALEY:  If I understand what transpired is there

8   comes a point in time where Special Agent Galioto as well as

9   Scott Romanowski meet with John Kaiser.  And before that

10  meeting's over they say to John Kaiser, in substance, Do you

11  think that Phil Kenner would speak with us?  Then comes, as a

12  result of that inquiry by the FBI, a circumstance in which

13  John Kaiser called Phil Kenner.

14         And as I understand it, then will be testifying, if

15  the Court allows it, that when he advises him that he's been

16  speaking with the FBI, and the FBI wishes to speak to Phil

17  Kenner, Phil then responds, I guess Kaiser will say, "No

18  fucking way," berated Mr. Kaiser.

19         My view is this, Judge.  I think from day one, when

20  I became counsel for Phil Kenner, one of my first requests

21  were any and all statements that the government may be

22  utilizing at trial in its case in chief, statements from my

23  client.  And indeed, I repeated that request throughout

24  multiple discovery demands.  Indeed, I think it was August of

25  2014 when I put in a very detailed Rule 16 request.  This is

1   the first I'm hearing of this alleged statement by Phil Kenner

2   from Mr. Kaiser.  It did not appear in any of the 3500

3   material; and there's been a lot of 3500 material.

4          My point is simply this, Judge.  To the extent that

5   the FBI meets with John Kaiser, and then conveys to

6   Mr. Kaiser, in substance, Do you think that Phil Kenner will

7   speak with us?  It's reasonable to assume that Mr. Kaiser may

8   very well then knew that.  And making, if you will, Mr. Kaiser

9   then an arm of the law enforcement, an agent of law

10  enforcement in the context of that circumstance, I

11  respectfully suggest to the Court, ought to be a statement

12  made known to the defense in advance of trial, and not at a

13  point in time when we are two weeks into trial where defense

14  strategy, in large measure, has been formulated upon what the

15  defense has been made aware of in connection with statements

16  made by -- allegedly made by my client.  So I would object,

17  Judge, on that basis.

18         THE COURT:  Okay.  I'm going to sustain the

19  objection on a different basis.  I appreciate Mr. Miskiewicz

20  fronting the issue.  It's what I expect and I commend him for

21  doing that.

22         I don't think it's a disclosure problem.  It's not a

23  statement by the defendant to law enforcement.  The fact that

24  it's not in the 3500 material, I don't know if Mr. Kaiser

25  mentioned it before or not.  I am concerned about the Fifth

1   Amendment issue, the context of the issue where it involves

2   interviewing and then Mr. Kenner's suggestion that -- a

3   general suggestion of having spoken to the FBI.  I am

4   concerned.

5           I might give an instruction to the jury that people

6   have no obligation to speak to the FBI.  If it was more

7   substantive of the conversation where he not only berated him

8   for speaking to them, but commented on particular things that

9   he said.  "Why did you tell them that?"  "You should never

10  have told them that."  Or something along those lines, then I

11  think it would have more probative value than simply yelling

12  at him for speaking to the FBI.

13          I don't think it has sufficient probative value on

14  consciousness of guilt.  My suggestion was crazy to speak to

15  law enforcement without a lawyer.  So I don't know how

16  probative that is of consciousness of guilt without more

17  detail regarding the conversation.

18          So under 403, I find that any probative value of

19  that berating is substantially outweighed by a danger of

20  unfair prejudice by a jury concluding that his failure to

21  speak to the FBI or his berating another individual for doing

22  so, you know, I find that prejudice with respect to the

23  confusion about the Fifth Amendment right to remain silent.

24  Okay?

25          MR. MISKIEWICZ:  May I advise him?

1    MR. HALEY:  Your Honor, at the conclusion of

2    yesterday's proceeding Your Honor made inquiry of me if I

3    would desire an instruction to the jury with reference to the

4    Hermosa Beach property.  I didn't take that invitation.

5    I relent.  I would like to take that invitation,

6    Judge.  And the reason I say that, there's multiple

7    transactions referred to, there's multiple LLCs.  I do think

8    it would create confusion for the jurors to try to stay within

9    the four corners of the charges in the indictment.  So I would

10   appreciate that instruction.

11   THE COURT:  Okay.  Hold on a second.

12   What I was going to say to the jury then, something

13   along the lines that there is no allegation of fraud with

14   respect to the Hermosa Beach property; and the government's

15   simply offering the testimony related to that as background to

16   other evidence that they wish to establish in connection with

17   the charged crimes.

18   MR. MISKIEWICZ:  That's fine, Your Honor.  Two --

19   two suggestions.  It's going to be Hermosa, and there's

20   another property which is known generically as the Paradise

21   Valley or PV house.  I'm not going to even ask about the name

22   of the house.  He can testify generically that he was also

23   involved in another property, it was in the context of that

24   second property in Scottsdale because of the Hermosa Beach

25   failure to pay, lack of repayment, however you want to phrase

U.S.A. v. KENNER and CONSTANTINE                    1037

1    it.  That's why he was asking for money from Mr. Kenner, and

2    that's why the wire transfers that are reflected in Count 2

3    and 4 occur.

4         I would ask the Court to consider that it's not

5    these other real estate ventures that are subject of the

6    fraud.  Rather, by way of background, because they represent,

7    in the government's view, the proceeds of one of the frauds.

8    Specifically, the Eufora --

9         THE COURT:  I'm not going to get into that much

10   detail.  The background to the charge of the indictment, you

11   can explain it to them.

12        What's the name of the other property?  How should I

13   refer to it?

14        MR. MISKIEWICZ:  PV or Paradise Valley, which was, I

15   guess, a subdivision in Scottsdale.

16        THE COURT:  Are you okay with me also telling them

17   now that they're going to hear testimony related to these

18   properties, and the same instruction applies?

19        MR. HALEY:  Yes, Your Honor.  I know in great detail

20   about the Paradise Valley property.  I know in great detail

21   allegations that Mr. Kaiser has made in reference to the

22   Paradise Valley property.  Indeed, in that particular

23   instance, at one point, he referenced to various promissory

24   notes that he signed.  In at least two instances he claims

25   that his signature was forged on those promissory notes.

1    THE COURT:  Again, it sounds like the government is

2  not going to get into that.  I think Mr. Miskiewicz -- it's

3  basically the same purposes as to Hermosa Beach, to establish

4  that he believes he was owed money in connection with that

5  property.

6    MR. MISKIEWICZ:  Correct.

7    THE COURT:  So you're not going to get into any

8  details about forged documents or anything like that?

9    MR. MISKIEWICZ:  No.

10    MR. HALEY:  He's not going to claim, Judge, in sum

11  and substance, that he was cheated in connection with the

12  Paradise Valley project.

13    THE COURT:  I don't want there to be testimony that

14  he was cheated.  He can elicit from him that he was owed money

15  in connection with the Paradise Valley property.  I think

16  that's the way it should be framed, rather than he was

17  cheated.

18    MR. MISKIEWICZ:  Yes.

19    THE COURT:  Does he know that?

20    MR. MISKIEWICZ:  We've been over it.  I will remind

21  him one more time before the jury comes in.

22    MR. HALEY:  The instruction will include Paradise

23  Valley and Hermosa?

24    THE COURT:  Yes.

25    Bring in the jury.

1    THE CLERK:  All rise.

2    (Whereupon the jury enters the courtroom at 10:05

3  a.m.)

4    (Witness John Kaiser resumes the stand.)

5    THE COURT:  Please be seated.

6    Good morning, members of the jury.  Good to see

7  everyone in this morning.

8    Before we continue with the testimony by Mr. Kaiser,

9  I want to give you another limiting instruction that you need

10 to listen to.  You heard some testimony yesterday, and you may

11 hear additional testimony today, regarding a property, a

12 Hermosa Beach property.  You also may hear some testimony

13 today about another piece of property called the Paradise

14 Valley property.

15    I just want to emphasize to you, make clear to you

16 that there are no allegations of fraud with respect to the

17 Hermosa Beach property or with respect to the Paradise Valley

18 property.  There are no allegations of fraud by the government

19 in connection with the properties.  They are being offered by

20 the government because they are background to the charges that

21 are in the indictment with respect to other properties and

22 investments.

23    Okay.  With that instruction, we will continue with

24 Mr. Kaiser's direct testimony.

25    Mr. Kaiser, I remind you that you're still under

1    oath.  Do you understand?

2              THE WITNESS:  Yes, I do.

3              J O H N     K A I S E R,

4              called as a witness, having been previously duly

5              sworn, was examined and testified as follows:

6    CONTINUED DIRECT EXAMINATION

7    BY MR. MISKIEWICZ:

8    Q    Mr. Kaiser, remind us approximately when did you and

9    Mr. Kenner close --

10             THE COURT:  Hold on a second.  I didn't realize.  I

11   didn't notice that Alternate No. 3 was missing.  So let me

12   give that instruction again so you can hear it as well.

13   Alternate No. 3 just walked into the room.

14             I just told the rest of the jury, and I'll just

15   repeat what I just said.  You heard some testimony yesterday

16   regarding a property known as Hermosa Beach, and you may hear

17   some additional testimony regarding that property today; and

18   you may also hear some testimony regarding another piece of

19   property called the Paradise Valley property.

20             I want to emphasize there are no allegations of

21   fraud by the government with respect to either of those

22   properties, the Hermosa Beach property or the Paradise Valley

23   property.  They are simply offered by the government as

24   background to the crimes that are charged in the indictment.

25             Okay.  Mr. Kaiser, you're still under oath.  You

1   understand?

2            THE WITNESS:  Yes.

3            THE COURT:  Go ahead, Mr. Miskiewicz.

4   Q    Mr. Kaiser, when did you and Mr. Kenner close on the

5   Hermosa Beach property?

6   A    I believe it was December of 2006.

7   Q    So this was shortly after the Sag Harbor property, Led

8   Better, that you discussed earlier in your testimony?

9   A    Yes, that's correct.

10  Q    When was that, that the Sag Harbor property closed?

11  A    I believe that was October of '06.

12  Q    Just to remind the jurors, how much was the -- how much

13  did you -- by "you," you and Mr. Kenner -- spend to buy the

14  Hermosa Beach property?

15  A    I believe it was $5 million.

16  Q    Do you have any doubt that it was $5 million?

17  A    No.

18  Q    You sure?

19  A    Yes, I'm sure.

20  Q    How much, approximately, did you put down, the down

21  payment?

22  A    I believe that was $1 million that we needed to put down

23  as the down payment.

24  Q    What, if anything, was Mr. Kenner's role with respect to

25  any of the financing of this property?

1   A    Mr. Kenner was going to take the loan for the remainder,
2   which was $4 million.
3   Q    What about financing the work for the actual
4   construction?
5   A    That was actually coming from me.
6   Q    How much money did you put in?
7   A    It was a total of approximately $1.6 million.
8   Q    1.6 million in addition to the million dollar down
9   payment?
10  A    No.  The additional was $600,000.
11  Q    In or about 2007, did the construction get finished, was
12  the house done?
13  A    Yes, it was.
14  Q    Did you resell it at that time?
15  A    Yes, in 2007.
16  Q    For what price?
17  A    For 8.5 million.
18  Q    Did you get any of the proceeds of the sale?
19  A    No.
20  Q    So you bought it at 5 million, plus expenses to fix the
21  property.  What, if anything, did you get out of the closing
22  when you resold it to Mr. Kenner?
23  A    Excuse me.  I got approximately $300,000 back from my
24  initial investment.
25  Q    Now, who controlled the money at the second -- the

1043

1   resale?

2   A    That was Mr. Kenner.

3   Q    In what name or company name was this project

4   accomplished?

5   A    Hermosa Ventures LLC.

6   Q    Who was the managing member of Hermosa Ventures?

7   A    That was Phil Kenner.

8   Q    Did Mr. Kenner say -- withdrawn.

9           Given how much you put down and how much you fronted

10  to accomplish the renovation, what did you expect under the

11  terms of the agreement that you had with Mr. Kenner that you

12  would get?

13          MR. HALEY:  Your Honor, I object at this point.

14          THE COURT:  Yes, sustained.

15  Q    Did Mr. Kenner tell you anything about why you were only

16  getting $300,000?

17  A    Yes.

18  Q    At the closing?

19  A    Yes.

20          MR. HALEY:  The same objection.

21          THE COURT:  Approach.

22          (Whereupon a side-bar conference was conducted.)

23          (Matter continued on the next page.)

24

25

1           (Side-bar conference.)

2           THE COURT:  I sustained the objection because I

3   don't want to get into a dispute when you asked him what he

4   expected.  I was concerned that then we would get what he

5   expected versus what he got.  He does need to establish that

6   he believed he was owed money.  Is this a question that he

7   owed him money?

8           MR. MISKIEWICZ:  He's going to say that it's coming,

9   but he spent the money elsewhere.  He bought a house in

10  Mexico.  That's what he was about to say.

11          MR. HALEY:  That would suggest that Mr. Kenner is

12  being deceitful, Judge, by was of eliciting that proffering

13  answer.  I thought the government's objective was to establish

14  that they sold the property, as he's established; that he had

15  put in a certain amount of money into the property, as he

16  established; and he only got back 300K.  So we've established

17  that he's still owed more.

18          THE COURT:  You can refer to the fact that he was

19  owed money on that project.  But the details of that, that it

20  was coming or it went to here, went to there...

21          MR. MISKIEWICZ:  If I may lead him just to say is it

22  your testimony that you believe you were still owed additional

23  sums of money as a result of the Hermosa Beach property?

24          MR. HALEY:  That's acceptable.

25          (Matter continued on the next page.)

J. KAISER-DIRECT-MISKIEWICZ                           1045

1            (Matter continued in Open Court.)
2    CONTINUED DIRECT EXAMINATION
3    BY MR. MISKIEWICZ:
4    Q    Mr. Kaiser, is it your testimony that you believed you
5    were still owed additional monies as a result of the Hermosa
6    Beach property?
7    A    Yes, that's correct.
8    Q    Afterwards, after the Hermosa Beach -- by the way,
9    Hermosa Beach is in what state?
10   A    That's in the state of California.
11   Q    After Hermosa Beach, did there also come a time that you
12   did other similar types of projects with Mr. Kenner?
13   A    Yes.
14   Q    Sort of renovation with the intent of fixing it and
15   flipping and selling at a profit?
16   A    Yes.
17   Q    Was one of those, were they known as the Paradise Valley
18   house?
19   A    Yes.
20   Q    Where's Paradise Valley?
21   A    That's in the state of Arizona.
22   Q    I will show you what has been marked and also received in
23   evidence as Government Exhibit 2303.  I'm showing you -- this
24   was received in evidence as the first page of Government
25   Exhibit 2303.  Do you see it on the screen in front of you?

J. KAISER-DIRECT-MISKIEWICZ                          1046

1   A    No, it's not on the screen.
2            THE COURT:  He tried to fix it but it didn't work.
3   Q    Do you see it above you?  I will hand you a copy.
4            (Handing.)
5   Q    I'm showing you 2303.  Do you know who Timothy Gaarn is?
6   A    Yes.
7   Q    Who is he?
8   A    He's involved with the company Eufora.
9   Q    How did you come to know him?
10  A    I met him through Phil Kenner.
11  Q    How often did you meet him?
12  A    I probably met him approximately three or four times.
13  Q    When Mr. Kenner introduced you to Mr. Gaarn, what, if
14  anything, did he say to you about what Mr. Gaarn's
15  relationship was with Eufora?
16  A    I believe he's part of the management, or a member.
17  Q    Based on what Mr. Kenner told you?
18  A    Yes, that's correct.
19  Q    I'm showing you the third page.  That's page 3 of 8 of
20  that exhibit, 2303.  Do you see a line there, it says,
21  "February 12."  There's a $30,000 transfer of funds?
22  A    Yes.
23  Q    Do you see who it's being sent to, the beneficiary?
24  A    Yes.
25  Q    BNF.

1        Who is it?  Who received the $30,000?

2   A    I am, John Kaiser.

3   Q    Why are you getting $30,000, do you recall, from Timothy

4   Gaarn, manager at Eufora at this juncture?

5   A    Because I was in the process of a build for the Arizona

6   home; and Phil Kenner said that Tim Gaarn owed him money and

7   he would send it to me.

8   Q    Why did you need money for that particular home?  Were

9   you developing the Arizona home?

10  A    Because it was under construction.  I was getting the

11  materials and labor.

12  Q    I'm going to show you another exhibit, Government Exhibit

13  1603.  Do you have a copy of that in front of you?

14  A    1603.  No, I don't believe that I do.  Yes, I do.

15  Q    This is a bank account statement for TD Bank?

16  A    Yes.

17  Q    Is that where you were living at the time?

18  A    Yes.

19  Q    If you can read the first line, what does it say?

20  A    "This letter serves as a notification of the following

21  outgoing wire transfer which is debited to your account number

22  9990 on 2/12/2009.  If you have any questions, please contact

23  your nearest TD Bank branch."

24  Q    Now, 2/12, that is the same date -- or around the same

25  date -- no.  I'm sorry.  Precedes the date of the wire

1  transfer we just saw.  Why were you sending -- I'm sorry.  It

2  is the same date.  Why are you now sending money out, the same

3  sum of money, $30,000, to Phil Kenner on that day?

4  A    Phil Kenner said it was a mistake, that he needed that

5  money.  It should have been sent to him directly.

6  Q    Can you explain to the jurors, he told you that you were

7  getting money from Mr. Gaarn because Mr. Gaarn owed him money;

8  and then you were sending the same amount of money back to

9  him?

10            MR. HALEY:  I object.  He just testified to that.

11            THE COURT:  Sustained.

12            You don't have to answer that.

13  Q    Very briefly, I'm showing you what's admitted in evidence

14  as Government Exhibit 1721.  It's a bank statement from

15  Standard Advisors, the second page of that.

16  A    Yes.

17  Q    You see where it says "Depositing Credit"?

18  A    Yes.

19  Q    What does that reflect?

20  A    That's the $30,000 that was going back to Phil Kenner's

21  account.

22  Q    From who?

23  A    From myself, John Kaiser.

24  Q    I'm going to show you another series of documents.  I'm

25  showing you what's been admitted in evidence as Government's

1    1724.  I'm showing you a copy of 1724.

2            Mr. Kaiser, look at the second page of Government

3    Exhibit 1724.

4    A    Okay.

5    Q    Now, why, in this instance -- this is -- what's the date,

6    the period, if you can read it from the very top?

7    A    The statement's from 2/20/09.

8    Q    Okay.  The very last transaction of that second page,

9    what is the date?

10   A    The last transaction is 2/26.

11   Q    For how much money?

12   A    For $40,300.

13   Q    This is Phil Kenner's account, correct?

14   A    Yes, that's correct.

15   Q    Who is depositing $40,000 -- $40,300 in the account?

16   A    I am, John Kaiser.

17   Q    Why?

18   A    Because I was directed from Phil Kenner that was -- those

19   funds weren't supposed to be used for the PV house.  It was an

20   incorrect wire from Timothy Gaarn.

21   Q    Government 1604, also in evidence, this is your TD Bank

22   statement.  Does that refer back to the same transaction you

23   just saw in the Kenner bank statement?

24   A    Yes, that's correct.

25   Q    Prior to this you had gotten another transfer of money

1  from Mr. Gaarn?

2  A    Yes.

3  Q    Again, why did you -- why were you, again, asking for and

4  receiving money from Mr. Kenner at period of time?

5  A    For the PV build, and those were the funds originating

6  from Hermosa Beach.

7  Q    I'm showing you what's in evidence as Government Exhibit

8  1724.  Government Exhibit 1724, Mr. Kaiser, you'll have to

9  look at the screen behind you on this one.  I'm sorry, 1727.

10         Whose account statement is this?

11 A    Phil Kenner.

12 Q    I'll direct your attention to the third page of that

13 exhibit.  Specifically, the first transaction under where it

14 says "Other Subtractions."  You see where it says 05-22?  Do

15 you see that?

16 A    Yes.

17 Q    What amount of money is being transacted on that

18 particular date?

19 A    $25,000.

20 Q    Can you tell from this where that money is going?

21 A    It's going to Phil Kenner.

22 Q    Let me focus on here.  Who is the BNF?

23 A    That's me, John Kaiser.

24 Q    Is this a transfer that you're sending or receiving?  Let

25 me show you the statement.  Look at the first page and look at

1051

1   the transaction itself.  Whose account statement is that?

2        MR. HALEY:  Judge, I'll stipulate that BNF means

3   benefit of.

4        THE COURT:  Mr. Haley stipulated that that money

5   went to Mr. Kaiser.

6   Q    You testified earlier Hermosa Beach.  Did Mr. Kenner ever

7   talk to you about how you received additional funds or

8   additional benefits after reselling Hermosa Beach, after --

9   after the closing, after you received $300,000 in cash?

10       MR. HALEY:  Objection.

11       THE COURT:  You have to approach on this.

12       (Whereupon a side-bar conference was conducted.)

13       (Matter continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1052

1    (Side-bar conference.)

2    MR. MISKIEWICZ:  I expect that the witness will say

3    that, subsequently, whenever the topic of additional funding

4    came up, one of the things that Mr. Kenner told him was that

5    he had invested in his behalf approximately 200 -- over

6    $200,000, I think $275,000 in Eufora; and that was in or about

7    2007.  That predated Mr. Kaiser's knowing wire transfer, which

8    happened later in 2008.

9    Again, it's just filling out where, you know, the

10   fact that he doesn't get money back, but he has these

11   representations in which Mr. Kenner's saying he put in money

12   for this witness.

13   MR. HALEY:  Into what?

14   MR. MISKIEWICZ:  Into Eufora.

15   MR. HALEY:  The claim is, I take it, from the

16   government's perspective, these are false representations.

17   MR. MISKIEWICZ:  I'm not trying to elicit that.  I

18   think there is a moment when we will -- you know, I'm not

19   going to elicit any of this, but there is a moment when

20   Mr. Kenner makes all kinds of other representations about how

21   much money Mr. Constantine has actually gotten from

22   Mr. Kaiser.  I think that would run afoul of Bruton.  I'm not

23   seeking that at all.

24   Basically, to answer your question, I'm not trying

25   to elicit that is a false representation.  I'm merely saying

1    that Mr. Kaiser and Mr. Constantine are working hand in hand

2    with respect to Eufora and that he claims that he has this

3    ability to grant him this benefit.

4              MR. HALEY:  I don't understand, frankly, how that

5    relates to the question you're now asking this particular

6    witness.  Again, I think, for purpose of your proffer, you've

7    establish, as you represented to the Court, that you wanted to

8    get the background material so that the allegation that he was

9    paying off the money owed to Mr. Kaiser from Hermosa through

10   these transfers from Gaarn was the background material you

11   wanted to elicit.  This question has no relevant or

12   materiality with reference to that.

13             MR. MISKIEWICZ:  There's one other issue, too, which

14   I think it's going to come up with Mr. Constantine's

15   cross-examination.  And that is, during this supposed takeover

16   or derivative lawsuit, he's going to be asked questions about

17   when did he first became a beneficiary or shareholder.  And he

18   gave an affidavit saying that by 2007 he had already a certain

19   amount of money invested.  Now, he didn't invest that money

20   himself.  He was told he was invested in Eufora by Mr. Kenner.

21             THE COURT:  I think the way to handle this is, I

22   think it's okay for him to establish -- I don't think your

23   client is disputing that $275,000 went into Eufora on

24   Mr. Kaiser's behalf, or is he disputing that?

25             MR. HALEY:  Oh, I think we are disputing that.

1054

1    MR. LaRUSSO:  We are as well, Judge.  To let you

2  know that.  The $275,000 will be part of our cross-examination

3  because Mr. Kaiser's telling us his interest in Eufora began

4  with these contributions Mr. Kenner allegedly made on his

5  behalf.  He then made a demand of my client, wanted 25 percent

6  of his company.  It was a real contentious series of

7  transactions discussed between Mr. Kaiser and my client.

8  We're going to show that the transactions had nothing to do

9  with the 275 Mr. Kaiser will testify that he had an interest

10 in.

11   MR. MISKIEWICZ:  Again, I'm not disputing that

12 they're going to do that on cross-examination, try to impeach

13 him.  One of the reasons I think this is important is this is

14 what his understanding is.  Again, it relates back to the

15 money that is missing from Hermosa Beach.  He continues to say

16 well, where is the rest of the money.  Don't worry, don't

17 worry.  I got you.  You don't have cash, but I bought you

18 $275,000 worth of interest in Eufora.

19   THE COURT:  Again, I don't think we have to go into

20 the details.  I think it is intertwined with the charges here

21 with respect to Eufora, that he be able to establish with this

22 witness when he believed he first received an investment in

23 Eufora based upon what Mr. Kenner was telling him.  So I will

24 allow it to that extent.

25   MR. MISKIEWICZ:  If Your Honor permits, I'll ask

1055

1    when did he actually invest money out of his pocket into

2    Eufora.  And then ask him, prior to that, did Mr. Kenner tell

3    you anything about any interest you had in Eufora?  Maybe that

4    will prompt him to say, yeah, he was told sometime in 2007 he

5    was given a $275,000 benefit.

6              MR. HALEY:  While you're here, are we going to be

7    back.  Are there any other questions of that line, by way of

8    proffer, that may bring us back here?

9              MR. MISKIEWICZ:  No.  Again -- I will admit, there's

10   a whole series of land mines here because at some point he's

11   told a whole bunch of stuff by Mr. Kenner about

12   Mr. Constantine, and vice-versa.  We have been very careful to

13   tell him to stay away from that.

14             MR. HALEY:  Thank you.

15             (Whereupon the side-bar conference was concluded.)

16             (Matter continued on the next page.)

17

18

19

20

21

22

23

24

25

1    (Matter continued in Open Court.)

2  CONTINUED DIRECT EXAMINATION

3  BY MR. MISKIEWICZ:

4  Q    Shifting your attention back to Eufora, when did you

5  first take money out of your pocket or bank account and invest

6  in Eufora?  What year?

7  A    Around 2007.

8  Q    Prior to putting money out of your pocket, did you ever

9  have a conversation with Mr. Kenner about receiving some

10  interest in Eufora?

11  A    Yes, I did.

12  Q    When was that?

13  A    That was in 2007.

14  Q    Which came first, taking money out of your pocket and

15  putting money into Eufora or Mr. Kenner telling you you were

16  already invested?

17  A    The money used to invest came from Hermosa Beach.

18  Q    Did that happen first or second?  Let me rephrase the

19  question.  I'm talking about when did you first put your own

20  money?  You wrote a check, a wire transfer, when did you first

21  put money into Eufora?

22  A    Well, the first funds didn't come from me directly.

23  Q    That's not what I'm asking.  I'm asking when did you,

24  yourself, John Kaiser, put money into Eufora.  When was the

25  first time?  When was the first time?

1  A    The first wire was sent in 2009.

2  Q    To Eufora?

3  A    No.  It wasn't sent to Eufora.  It was sent to the Ron

4  Richard account.

5  Q    Why was it sent to Ron Richards account?

6  A    Mr. Constantine said to send it to the Ron Richards

7  account.

8  Q    That's the first time you personally sent a wire transfer

9  with the intent of investing in Eufora?

10  A    Yes.

11  Q    Prior to that, what happened in 2007, you mentioned a

12  minute ago?

13  A    Mr. Kenner sent a wire from his account.

14  Q    How did you know that?

15  A    I was told by Mr. Kenner.

16  Q    Did you ever see the wire?

17  A    No.

18  Q    Why did he tell you that he sent money in your behalf?

19  A    He said it was a great deal and I should get involved in

20  it, and he took the Hermosa Beach funds and sent them to

21  Mr. Constantine.

22  Q    This was still a carry over from the Hermosa Beach

23  project?

24  A    Yes.

25  Q    How much was supposedly sent in your name?

1  A    Approximately $275,000.

2  Q    Jumping ahead to 2009, about the time that you first

3  invested out of your own bank account, did you ever have a

4  conversation with Mr. Constantine about an institution called

5  Metabank?

6  A    Yes.

7  Q    What, if anything, did Mr. Constantine tell you about

8  Metabank?

9  A    I told me that Metabank was going to being a huge deal.

10 Q    You told him?

11 A    No, he told me.

12 Q    I'm sorry.  Continue.

13 A    Mr. Constantine told me that Metabank was going to be a

14 huge deal, it was going to big.  It was going to pay millions

15 of dollars per month for the licensing, for the patent.

16 Q    I take it you believed him?

17 A    Oh, yeah.  He showed me the documentation that said the

18 deal was imminent.  It was working -- going through some red

19 money.

20 Q    What is red money?

21 A    Just some deals he wanted for Metabank.  He was working

22 on that.

23 Q    As a result of that -- well, how much did you invest in

24 Eufora yourself?

25 A    Well, the 200,000 that was sent, wasn't -- it was sent

1   from me, but the investment was all me.  It was three other

2   individuals.

3   Q    I'm going to show you what -- actually, I'll put it on

4   the screen, what's admitted into evidence as Government's

5   Exhibit 1101.

6           First of all, let me get the year.  In the upper

7   right corner, just for the record, Mr. Kaiser, tell us what

8   statement period this is covering.

9   A    12/01/09.

10  Q    Through the end of December '09?

11  A    Yes.

12  Q    Whose account statement is this?

13  A    Law Office of Ronald Richards.

14  Q    If you look at the transaction, there are actually two

15  transactions that appear toward the bottom; 12/16 and 12/29.

16  A    Yes.

17  Q    Do you see those?

18  A    Yes.

19  Q    Whose wire transfers are reflected on that?

20  A    The wire transfers from me, John Kaiser.  $150,000, and

21  another $50,000 wire.

22  Q    Whose money are you transferring?  Is that all yours or

23  is there other people's money that you're transferring?

24  A    No, none of this is mine.  I'm just doing the transfer

25  for my mom, whose name is Dolores Kaiser, and also Bob Rizzi,

1   and another gentleman named TR Hughes.

2   Q    Did you do that with their permission?

3   A    Yes.

4   Q    How did those people, your mother, Rizzi, Hughes, how did

5   they find out about Eufora?

6   A    I told them.

7   Q    What did you tell them?

8   A    I actually called them from Eufora offices, and I told

9   them that this deal was going to be great, it was imminent, it

10  was going to start within a month or two, and the payoff was

11  going to being a great opportunity.

12  Q    Who were you relying on to make those representations?

13  A    I was relying on Tommy Constantine who was in the office

14  while I was on the phone.

15  Q    Was it this speakerphone?

16  A    On speakerphone.

17  Q    Do you know whether or not Mr. Constantine spoke?

18  A    Yes, he did.

19  Q    Who did he speak to this phone call?

20  A    All three individuals.

21  Q    You overheard what he said?

22  A    Yes.

23  Q    In sum and substance, what, if anything, did he say when

24  he was on the speakerphone?

25  A    It was a great opportunity, the only reason you're

1  getting the opportunity was because of my relationship with

2  Mr. Constantine, and he needed the funds ASAP.

3  Q    Now, what were they going to get, according to

4  Mr. Constantine, as a result of this total 200,000?

5  A    Shares in Eufora; 1.5 percent of Eufora.

6  Q    I'm showing you what I'm marking as Government Exhibit

7  JK-1 for identification.

8            (Handing.)

9  Q    Mr. Kaiser, I'm showing you JK-1.  Do you recognize that?

10 A    Yes.

11 Q    Don't quote from it yet, but what do you recognize the

12 document to be?

13 A    The document is my wiring instructions.

14 Q    Where did you getting those wiring instructions from?

15 A    Mr. Constantine.

16 Q    Did you keep a copy?

17 A    Yes.

18 Q    That, by the way, is the original or a duplicate that you

19 have in your hand?

20 A    I'm not sure.  I think it's an original.

21 Q    There's some handwriting on the bottom.  Whose

22 handwriting is that?

23 A    That's mine.

24 Q    You made those notes referring to the material that's

25 also referenced in this document?

1   A     Yes.

2   Q     Did you do anything to this document, change it in any

3   fashion?

4   A     No, I did not.

5   Q     Is this document the same as when you first received it?

6   A     Yes.

7           MR. MISKIEWICZ:  The government offers JK-1.

8           MR. HALEY:  No objection.

9           MR. LaRUSSO:  I have a few questions, Judge, on voir

10  dire.

11  VOIR DIRE EXAMINATION

12  BY MR. LaRUSSO:

13  Q     Mr. Kaiser, when did you receive the wire instruction

14  that appear on this exhibit?

15  A     I believe in December of '09.

16  Q     From whom did you receive it?

17  A     From Mr. Constantine.

18  Q     Did you get it from him personally?

19  A     I believe it was an e-mail transmission.

20  Q     Is this document the e-mail itself or is this a document

21  that was attached to the e-mail?

22  A     I'm not sure.

23  Q     When did you make a note that Mr. Miskiewicz said you

24  placed on this?

25  A     In December of '09.

1   Q    Would it have been at the time you received this wire
2   transfer instruction?
3   A    Approximately.
4   Q    How long after you received this did you put the
5   handwriting on here?
6   A    Probably around that same time.
7   Q    Where did you get the information that you put on here,
8   that is, the handwritten information?
9   A    I just put it was for my mom, TR, and Bob.
10  Q    All of the writing on here belongs to you?
11  A    Yes.
12        MR. LaRUSSO:  I have no further questions.
13        No objection.
14        THE COURT:  JK-1 is admitted.
15        (So marked as Government Exhibit JK-1 in evidence.)
16        MR. MISKIEWICZ:  I will retrieve the original.
17        May I have permission to publish the original to the
18  jury?
19        THE COURT:  Sure.
20  CONTINUED DIRECT EXAMINATION
21  BY MR. MISKIEWICZ:
22  Q    Mr. Kaiser, at the top of the letter, it says, "Wiring
23  Instruction.  And right above your e-mail address, who is the
24  sender?  Can you read it?
25  A    The sender is Mr. Constantine, Tommy Constantine.

1  Q    Did you rely on this in any way in knowing where to send

2  the $200,000 that you had collected from your mother and

3  Mr. Rizzi and Mr. Hughes?

4  A    Yes.  I asked Mr. Constantine about it.

5  Q    What did you ask him?

6  A    I asked him for the wiring instructions for Eufora.  He

7  said no, I don't want you to send it to Eufora.  It has to go

8  to Ron Richards, and he was pretty adamant about it.  And he

9  got kind of pissed off at me.  He was yelling about it.  It

10 said it had to go through Ron Richards account, which I just

11 didn't understand.  He said, Don't worry, it's for Eufora.

12 Q    Did you know who Mr. Richards was at this point?

13 A    Yes.

14 Q    After that $200,000, the two wires totaling $200,000,

15 were you continuing to visit from time-to-time with

16 Mr. Constantine's offices at Eufora?

17 A    Yes, I did.

18 Q    By the way, where were the offices located?  What kind of

19 a building?

20 A    In Arizona, they were in a hanger.

21 Q    Where in Arizona?

22 A    In Scottsdale, Arizona.

23 Q    When you -- withdrawn.

24      After you sent your $200,000 -- I say "you," I mean

25 your mother's, Mr. Rizzi's, and Mr. Hughes -- were you present

1  during any other discussions that Mr. Constantine had

2  regarding other investors in Eufora?

3  A    Yes, I was.

4  Q    How were you present, where were you?

5  A    I was physically in Mr. Constantine's office in the

6  hanger in Scottsdale.

7  Q    Were there other people present or did you observe them

8  on the phone?

9  A    Yes, I observed them on the phone.

10  Q    Prior to getting on the phone, did you have a

11  conversation with Mr. Constantine about the people that he was

12  about to call?

13  A    Yes.

14  Q    What, if anything, did he say?

15  A    He was talking about getting rid of some of the hockey

16  players from Eufora, that they were -- that the majority of

17  them were broke and they were desperate for money.

18  Q    Did he say or mention who?

19  A    Yes.

20  Q    Who?

21  A    First was Bryan Berard.  The second one was Greg DeVries.

22  The third one was Jason Woolley.

23  Q    Had you met these gentlemen before?

24  A    Yes.

25  Q    When he said he wanted to get rid of them, what, if

1   anything, did he say he was going to do to get rid of them?

2   A    He said they were broke and he said he would buy them out

3   for 50 cents on the dollar.

4   Q    Did you observe whether or not he spoke to anybody on the

5   phone?

6   A    Well, first I said, Why the hell would you do that?

7   Q    Why did you ask him that?

8   A    Because I said the company's just about to make it.  And

9   he said, I have more investors, I need money.

10  Q    What made you think that it just about to make it?

11  A    Because I'd just seen all the documentation with the

12  other bank for the deal, the pending deal with Metabank.

13  Q    Is this before or after you sent the $200,000?

14  A    This is after.

15  Q    Did he call -- or did you know whether he called these

16  other players?

17  A    Yes.  He said, Watch this, and then he proceeded to call

18  these guys on the speakerphone.

19  Q    What, if anything, did you hear Mr. Constantine say?

20  A    He called up all three individuals and he asked them if

21  they were interested in selling their Eufora shares for half

22  of what they paid for them.

23  Q    What, if anything, did they respond, that you heard?

24  A    They said yes, for sure, I'll sell it.

25  Q    What did you do afterwards?

1   A    After he hung up the phone, I said a few curse words, I

2   guess.  And then I proceeded to call all three individuals up,

3   Bryan, Jason, and Greg and said, Don't sell your shares.  This

4   is up hill.

5   Q    Why did you do that?

6   A    Because he had patents, I'd seen the documentation, and

7   it was about to go big, and they deserved to know.

8   Q    Were you still invested in Eufora at that point?

9   A    Yes.

10  Q    Did this event in any way cause you to be concerned about

11  your investment in Eufora?

12  A    Yes, it did.

13          (Matter continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:13-cr-00607-JFB-AYS   Document 300   Filed 07/07/15   Page 39 of 172 PageID #: 5416

1068

1  DIRECT EXAMINATION (Continued)

2  BY MR. MISKIEWICZ:

3  Q.   How so?

4  A.   Because I still didn't have the documentation.  He

5  still didn't give my friends and family the documentation

6  on their investment for Eufora.

7          So, yes, I had some concerns, to say the least.

8  Q.   What do you mean documentation?  What documentation

9  are you referring too?

10  A.   Ownership documentation.  Shares.  Stock ownership.

11  In writing.

12  Q.   You didn't get any shares?

13  A.   No.  He said he couldn't do it yet.  He was

14  reshuffling the deck and doing a role-up.

15  Q.   What did that mean?

16  A.   That he was going to start rolling up the old entity

17  and create a new one, Eufora.

18  Q.   And did there come a time that you spoke --

19  withdrawn.

20          Did there come a time that you had further

21  conversations with Mr. Constantine about what the role-up

22  or reshuffling the deck meant?

23  A.   He said he had to do it because he also wanted to get

24  rid of some members that were causing problems.

25  Q.   Who were those members?

1069

1   A.   Own Nolan and Ethan Moreau, hockey players.

2   Q.   What?  Sorry?

3   A.   They were other hockey players.

4   Q.   And do you know whether or not they were investors in

5   Eufora?

6   A.   I believe they were.  Yes.

7   Q.   And did he say what kind of problems they were

8   causing?

9   A.   They were involved in other lawsuits with himself and

10  Mr. Kenner.

11  Q.   Now, did there come a time that you participated in

12  or helped organize a lawsuit regarding Eufora?

13  A.   Yes.

14  Q.   Why did you do that?

15  A.   Like I said, we didn't have documentation.

16       He was also saying that we would have to sign a

17  release for him and Mr. Kenner, a blanket release that

18  they weren't, you know, to absolve them from any kind of,

19  I guess, misbehavior you would call it.

20  Q.   Who asked you to sign such a release?

21  A.   Mr. Constantine.

22  Q.   And were you aware of what misbehavior he was talking

23  about that he wanted you to sign a waiver for?

24  A.   I was.

25  Q.   At that time?

1070

1   A.   At that time?  No.

2        I was starting to become a little aware of some

3   of the inner workings.  After what I saw firsthand in his

4   office, I was suspect.

5   Q.   Did you sign such a release?

6   A.   No.

7   Q.   This lawsuit, were you trying to get control of

8   Eufora; in other words, take it over?

9   A.   No.

10  Q.   What were you trying to do?

11  A.   Get the membership interests for everyone that

12  deserved it, that paid for it.

13  Q.   When you say membership interest, you mean shares or

14  something else?

15  A.   Shares.  Shares in Eufora.

16  Q.   To your knowledge the $200,000 which you collected

17  and invested, or wire-transferred, I should say, from your

18  mom and Hughes and Rizzi, do you know whether or not they

19  ever got their money back?

20  A.   No, they didn't.

21  Q.   Do you know whether or not they ever got shares in

22  Eufora?

23  A.   No, they didn't.

24  Q.   All right.  Last couple of questions.

25        Going back to the Sag Harbor property and Led

1071

1   Better.  Did you ever redevelop that and renovate it into

2   what you had originally intended to do with that property?

3   A.    No, I did not.

4   Q.    And why not?

5   A.    There were some issues with the property, itself.

6   Q.    What were the issues?

7   A.    As far as the easement.  The wetlands.  The buildable

8   part was less than I anticipated.

9   Q.    During this period of time, who was paying taxes and

10   any other fees associated with maintaining the property?

11   A.    I had sent funds actually to Mr. Kenner to make sure

12   those things were paid.

13   Q.    Did there come a time that you decided as to sell the

14   property?

15   A.    Yes.

16   Q.    When was that?

17   A.    Approximately, I believe it was, 2010.

18   Q.    And was this as a result of any conversations you had

19   with other people?

20   A.    Yes.

21   Q.    Who?

22   A.    Mr. Brian Berard.

23   Q.    Now, who did the leg work to get the property onto

24   the market to sell?

25   A.    Myself.

Kaiser - Direct/Mr. Miskiewicz

1072

1   Q.   And when you did, what did you learn?

2   A.   I learned that we no longer owned the property.

3   Q.   What happened?

4   A.   The taxes were never paid, HOA fees were never paid,

5   and Suffolk County repossessed the land.

6   Q.   Who was supposed to be paying those taxes?

7            And when you say HOA, is that homeowners

8   association?

9   A.   Yes.

10  Q.   Who was supposed to be paying those?

11  A.   Mr. Kenner.

12  Q.   Who told you that you no longer owned the property?

13  A.   I was on the phone with the realtor, and he told me I

14  didn't own the property.

15  Q.   What did you do --

16  A.   That Suffolk County owned it.

17  Q.   What did you do when you found out?

18  A.   I was in Arizona at the time and I went straight to

19  Mr. Kenner.

20  Q.   Why were you in Arizona?

21  A.   I was working on the PV project.

22  Q.   When you went to Mr. Kenner, what if anything did he

23  say?

24  A.   He said it must be a mistake.

25  Q.   Did you ever -- well, how did it get resolved?  What

1073

1    if anything happened to resolve this issue?  Or was it a

2    mistake?

3    A.    No, it wasn't a mistake.

4    Q.    So what did you do?

5    A.    I was screaming.  And he was telling me:  Don't worry

6    about it.  It's not a big deal.  I said -- at that time I

7    found out, the same time I found out that he had zero

8    money in it, that the only one that had the money was

9    Brian Berard, so of course he didn't really care about it.

10   But I certainly did and so did Mr. Berard, and so did

11   Vincent Tesoriero.

12   Q.    What happened?

13   A.    I said you had better come up with the money to pay

14   the back taxes.

15   Q.    Did he?

16   A.    Yes.

17   Q.    And then how were the taxes paid?  Did he pay or did

18   you pay it?

19   A.    No.  He wired me the money.

20   Q.    And did you pay it?

21   A.    Yes, I did.

22   Q.    And did you get the tax lien, or whatever it was,

23   removed?

24   A.    Yes, I did.  After the lien and the hearing, yes.

25   And I ended up reacquiring the property.

1074

1    Q.    What hearing?

2    A.    It was a small; I had to go to town hall over in

3    Hauppauge and just deal with the issues of the tax lien.

4    Q.    Okay.  And then eventually did you sell the property?

5    A.    Yes.

6    Q.    You said yesterday that you had at one point a fairly

7    close relationship with the defendant?

8    A.    Yes.

9    Q.    I think you saw a photograph.  In addition to the

10   various projects that you talked about here, I want to

11   show you what has been marked as Government Exhibit 304.

12              (There was a pause in the proceedings.)

13              MR. HALEY:  Your Honor, I think we are going to

14   have to approach.

15              THE COURT:  Why don't we take the morning break.

16              Don't discuss the case.

17              (The following ensued in the absence of the

18   jury.)

19              THE COURT:  Mr. Kaiser, you can take a break.

20              (The witness leaves the courtroom.)

21              THE COURT:  Everyone can be seated.

22              MR. MISKIEWICZ:  Your Honor, Government Exhibit

23   304 is an email from Mr. Kenner to John Kaiser.  The

24   subject matter says MosquitoRojoTequila.  It is dated

25   August 6, 2008.

1        There is a certificate from Mexico that

2   represents that Mr. Kenner is the owner, or at least a

3   representative, of this company.  And we are going to

4   later on trace that he bought this company, it was a

5   tequila company, using his funds from the global

6   settlement fund.

7        And Mr. Kaiser will also say that he was given

8   this because Mr. Kenner was seeking additional investors

9   in this tequila company and Mr. Kaiser knew someone who

10  might have been interested.  Ultimately, it didn't go

11  anywhere.

12       We are mostly looking to just get from him Mr.

13  Kenner's admission that he was the owner of this company

14  at the time.

15       MR. HALEY:  May I have a moment, judge.  I'm

16  trying to make sure.

17       I am led to believe that there is an allegation

18  that some of the GSF funds that went through the Ron

19  Richards account went to Phil Kenner.  I believe that is

20  an allegation.

21       THE COURT:  I think the allegation is, it went

22  to the tequila company.  Right?

23       MR. MISKIEWICZ:  Yes.

24       MR. HALEY:  Is the government's proffer that the

25  money was wired directly into the tequila company account?

1076

1    MR. MISKIEWICZ:  Mr. Richards was handling all
2  the disbursements out of the Ron Richards escrow account.
3    THE COURT:  So it went from the Ron Richards
4  account to another?
5    MR. MISKIEWICZ:  To the tequila company account.
6    MR. HALEY:  May I have a moment, judge?
7    Thank you.
8    MR. MISKIEWICZ:  More specifically, to a company
9  who is representing the tequila company.  But that is
10  going to be the connection.
11    (Mr. Haley confers with client.)
12    MR. HALEY:  Your Honor, I understand the
13  government's allegation.  I guess my question is, or my
14  objection would be, they seek to show this to John Kaiser
15  on a claim that Kaiser alleged he authenticated the emails
16  and establish that -- well, establish what?
17    THE COURT:  Establish that Mr. Kenner
18  represented to Mr. Kaiser that he had some interest in
19  this tequila company and was seeking investors for the
20  company.
21    Is that what you just said?
22    MR. MISKIEWICZ:  Correct.  And, more
23  specifically, that the GSF fund was, or a portion of the
24  GSF fund was, converted to buy --
25    THE COURT:  But that is not coming out through

1077

1    the witness.

2              MR. HALEY:  That is my point.

3              MR. MISKIEWICZ:  No.

4              MR. HALEY:  Okay.  Then sure, I have no

5    objection.

6              THE COURT:  Okay.

7              MR. HALEY:  And there was an issue, judge, in

8    connection with the translation.  I did not previously

9    stipulate to that.

10             Frankly, I did not have an opportunity to have

11   an expert review the translation, but, judge, I'm going to

12   accept the translation as being offered by the government

13   of the United States.  I will accept it as being, at least

14   as far as the translation is concerned, accurate.

15             THE COURT:  That witness that we talked about

16   yesterday, is he here?

17             MR. MISKIEWICZ:  He is not here yet.  No, your

18   Honor.

19             THE COURT:  Is this the end of your direct?

20             MR. MISKIEWICZ:  Yes.  We will have about 5 or

21   10 minutes and then I'm done.

22             THE COURT:  Okay.

23             MR. HALEY:  I do have, judge, and this will

24   perhaps be an opportune time, I have a number of exhibits

25   that I am going to be utilizing for purposes of the

1078

1    cross-examination of Mr. Kaiser.  So with Mr. Miskiewicz's

2    presence I think we might be able to deal with that right

3    now.

4              THE COURT:  So why don't you do that now.

5              And Mr. Miskiewicz, I know you had some problems

6    this morning with that screen, but call someone to take

7    another look at it.  I thought it was working.

8              MR. MISKIEWICZ:  When I saw it, it wasn't

9    working.

10             MR. HALEY:  I saw it work.  It was working.

11             MR. MISKIEWICZ:  Briefly, yes, it did work.

12             MR. LaRUSSO:  Your Honor, just to finish up on

13   Mr. Gonya, the witness who we were hoping to be able to

14   put on somewhere between the examination of Mr. Kaiser.

15             I received from the government this morning a

16   redacted transcript that relates to his testimony, his

17   representation of Mr. Constantine in Florida.

18             I really haven't had a chance to look at it

19   thoroughly but we have agreed that we will probably not

20   call him until the afternoon, so I will have a chance

21   during the lunch hour to look at it.  That was agreed to

22   by the government.

23             THE COURT:  Okay.

24             (Recess taken from 11:10 am until 11:45 am.)

25             (The following ensued in the absence of the

Kaiser - Direct/Mr. Miskiewicz

1079

1      jury.)

2                    THE COURT:  Are we ready to go?

3                    MR. HALEY:  We are.  And thank you.  We got a

4      lot accomplished during the break.

5                    THE COURT:  Good.

6                    (The following ensued in the presence of the

7      jury.)

8                    THE COURT:  The government offers 304?

9                    MR. MISKIEWICZ:  Yes, your Honor.

10                    THE COURT:  Any objection?

11                    MR. HALEY:  No, sir.

12                    MR. LaRUSSO:  No, your Honor.

13                    THE COURT:  Government Exhibit 304 is admitted.

14                    (Government Exhibit 304 in evidence.)

15                    MR. MISKIEWICZ:  Thank you.

16                    The parties also now stipulate to the admission

17      of an accompanying translation which is marked as

18      Government Exhibit 304T.2.

19                    THE COURT:  Any objection?

20                    MR. HALEY:  No, sir.

21                    MR. LaRUSSO:  No, your Honor.

22                    THE COURT:  So the translation of 304, 304T.2,

23      is admitted.

24                    MR. MISKIEWICZ:  Thank you, your Honor.

25                    (Government Exhibit 304T.2 in evidence.)

1080

1    MR. MISKIEWICZ:  Thank you, your Honor.

2    BY MR. MISKIEWICZ:

3    Q.   Mr. Kaiser, looking on the screen in front of you,

4    what are we looking at, for the record?

5    A.   It looks like an email from Mr. Kenner to me.

6    Q.   Do you recall getting this email?

7    A.   Yes.  I've gotten emails referencing

8    MosquitoRojoTequila.

9    Q.   Did Mr. Kenner ever tell you about

10   this MosquitoRojoTequila company?

11   A.   Yes.  It is a company that he owns.

12   Q.   Did he tell that in or about the date that is on this

13   cover page, this text cover page?

14   A.   Yes.

15   Q.   What if anything did he tell you about -- or why was

16   he sending you material that is attached to the email?

17            MR. HALEY:  I wouldn't have objected to the

18   first question, judge.  I will object to the second.

19            THE COURT:  Yes.  Sustained as to form.

20   BY MR. MISKIEWICZ:

21   Q.   I will start again.

22            Did Mr. Kenner tell you whether or not he owned

23   this company?

24            MR. HALEY:  Judge, I object to the leading

25   nature of the question.  What did he say?

1081

1    I object to the leading nature of the question.

2    THE COURT:  Sustained.

3  BY MR. MISKIEWICZ:

4  Q.   What if anything did Mr. Kenner tell you about

5  MosquitoRojoTequila company?

6  A.   Mr. Kenner told me that it was a tequila company that

7  he owned and he was looking to distribute in Eastern

8  Europe, over in Russia.

9       And I had a friend of a friend who was a

10  distributor in Russia so he asked me to make the contact

11  and introduce him.

12  Q.   And did you ask for any documentation or paperwork

13  from him?

14  A.   Yes.  I believed the individual who distributed

15  needed some documentation on the company.

16  Q.   What kind of documentation?

17  A.   Certification.

18  Q.   Of what kind?

19  A.   Just to verify I believe where it was coming from,

20  that it was a company, where it was formed.

21  Q.   Okay.

22  A.   In order for him to distribute in Russia.

23  Q.   Looking at the next page.  Actually, why don't I also

24  give you the copy.

25       Is this the second page that is attached to that

1082

1   email?

2   A.    Yes.

3   Q.    And looking at the third page.  There is a line there

4   that says what the name of the company is.  Can you read

5   that for the record?

6   A.    Yes.  Mosquito Rojo Tequila SA de CV.

7   Q.    And *in the person of*.  Can you read that?

8   A.    It says Phil Kenner.

9   Q.    There is what appears to be Cyrillic or some other

10  language printed there.

11          Do you know what that is?

12  A.    Over the address?  The second line?

13  Q.    No.  I'm asking you, in the preprinted area, what is

14  the, do you see the Cyrillic lettering?

15  A.    Yes.

16  Q.    And you were sending this to somebody where?

17  A.    I was sending it to a person named Fred.  He was a

18  distributor in Russia.

19  Q.    Did you get this certification --

20  A.    Yes, sir.

21  Q.    -- directly from Mr. Kenner?

22  A.    Yes.

23  Q.    Were you able to, I don't know, broker any sort of

24  arrangement with this individual Fred, distributor?

25          MR. HALEY:  Your Honor, I would object at this

1083

1    point in time.  Relevance.

2              MR. MISKIEWICZ:  I will withdraw it.

3    BY MR. MISKIEWICZ:

4    Q.   Showing you Government Exhibit 905 very briefly.

5              Did you ever see this before?

6    A.   Yes.

7    Q.   What is it?

8    A.   It is tequila bottles.

9    Q.   And what period of time did you see it, these

10   depictions?

11   A.   The same period of time where I sent the certif --

12   where I formed the certification.

13   Q.   What if anything does that have to do with the

14   company you were just talking about?

15   A.   It's related.  This is where the tequila -- these are

16   the bottles, the design of what the bottles were, you

17   know, for distributing purposes.

18             MR. MISKIEWICZ:  The government moves for the

19   admission of 905.

20             MR. HALEY:  No objection.

21             MR. LaRUSSO:  No objection.

22             THE COURT:  905 is admitted.

23             (Government Exhibit 905 in evidence.)

24   BY MR. MISKIEWICZ:

25   Q.   Is that the depiction -- is that an advertisement of

1084

1   some kind?  Or do you know?

2   A.   It looks like some type of advertising.  But those

3   are the, I guess the bottles that he designed.

4   Q.   Okay.  Did you ever see those bottles in real life?

5   A.   Actually, I saw similar ones.  They were a little bit

6   different.

7   Q.   Where did you see them?

8            MR. HALEY:  Your Honor, I object.

9            THE COURT:  Overruled.

10           You can answer that.

11  A.   He actually sent two or three of them actually to my

12  residence.

13  BY MR. MISKIEWICZ:

14  Q.   Where?

15           THE COURT:  Who is *he*?

16           THE WITNESS:  Sorry.

17  A.   Mr. Kenner.

18           Actually, he UPSed them or FedExed them to my

19  residence in Suffolk County.

20  Q.   Okay.  Last series of questions, Mr. Kaiser.

21           Again, did you ever visit Mr. Kenner at his

22  residence?

23  A.   Yes.

24  Q.   And that was where?

25  A.   In Arizona.  Scottsdale.

Kaiser - Direct/Mr. Miskiewicz

1085

1   Q.   Did you ever visit him anywhere else at any other

2   residence?

3   A.   Yes.

4   Q.   Where?

5   A.   Also in Cabo, Mexico.

6   Q.   And did you ever go to a place called Pedregal?

7   A.   Yes.

8   Q.   Where is that?

9   A.   From Cabo San Lucas, Mexico.

10  Q.   When you went there, who were you visiting?

11  A.   Mr. Kenner had a house there.

12  Q.   Did you ever have a discussion with Mr. Kenner

13  about the Pedregal house and Hermosa Beach sale?

14  A.   Yes.

15  Q.   What if anything did he say?

16           MR. HALEY:  Objection.

17           THE COURT:  Why don't you approach.

18           (Continued on the following page.)

19

20

21

22

23

24

25

1086

1    (Discussion at sidebar ensued as follows.)

2    THE COURT:  Let me hear what the proof is.

3    MR. MISKIEWICZ:  Through other witnesses and

4    other documents, we are going to establish that part of

5    the fraud, part of the Eufora fraud proceeds go to

6    purchase the Pedregal house.

7         Mr. Kaiser is simply going to explain that he

8    claimed that he purchased the Pedregal house, and we want

9    to establish that he acknowledged to this witness that he

10   owned the Pedregal house.

11   MR. HALEY:  The Pedregal?  Can you spell that

12   for me?  It's the first time I've heard it.

13   MR. MISKIEWICZ:  P-e-d-e-g-r-a-l.

14   MR. HALEY:  The only reason I hesitate, judge, I

15   didn't see this in any of the 3500 material, so I'm

16   mystified as to where this is coming from.

17        I guess, if that is part of the government's

18   theory, then go ahead.

19   THE COURT:  All right.

20   (Discussion at sidebar was concluded.)

21   (Continued on the following page.)

22

23

24

25

Kaiser - Direct/Mr. Miskiewicz

1087

1   (The following ensued in open court.)

2   BY MR. MISKIEWICZ:

3   Q.   Mr. Kaiser, what if anything did Mr. Kenner tell you

4   about the Pedregal house with respect to the other

5   project, the Hermosa Beach?

6   A.   Mr. Kenner stated that some of my funds from Hermosa

7   Beach were actually used to purchase that house in

8   Pedregal in Cabo San Lucas, Mexico.

9   Q.   Do you know when approximately that purchase took

10  place?

11  A.   I believe it was at the end of '07.

12  Q.   Did there come a time that your relationship changed

13  with Mr. Kenner?

14  A.   Yes.

15  Q.   Is it fair to say that you were no longer friendly or

16  social?

17  A.   Yes.

18  Q.   Did you have a discussion about the various

19  projects -- withdrawn.

20          Toward the end of your relationship, did

21  Mr. Kenner ever tell you anything about any of the issues

22  he was having with various hockey players that he

23  represented?

24  A.   Yes, he did.

25  Q.   What did he say?

1088

1   A.   He had stated that he spoke to a few of the hockey

2   guys about all the investments, and he posed a question to

3   the hockey guys stating:  *What if all the investments were*

4   *gone; if all your money was gone?*  And some of the hockey

5   guys stated:  Oh, you know, I think it would be just a big

6   relief to just move on and they could focus more on their

7   family.

8   Q.   That is what he told you?

9   A.   That's what he told me.

10  Q.   And did the conversation continue?  Did he say --

11  A.   Yes, it did.

12  Q.   How did it continue?  What did he say?

13  A.   Well, he tried posing that question to me, the same

14  question.

15  Q.   What was your response?

16  A.   I said:  *Are you insane?*

17  Q.   Where are you working now?

18  A.   I works in Diamante, which is a golf course in Cabo

19  San Lucas.

20  Q.   And can you describe what kind of company it is.  In

21  other words, is it just a golf course?

22  A.   A golf course with homes, condos, a few towers on it.

23  Q.   What is your role in that?

24  A.   I oversee all the construction, vertical and

25  construction.  I work with the architect, structural

1089

1    engineers.  I do the budgeting, planning, design.

2    Q.    Why are you doing that?

3    A.    That's the only investment I have left.

4             MR. MISKIEWICZ:  No further questions.

5             THE COURT:  Okay.  Cross-examination.

6

7    CROSS-EXAMINATION

8    BY MR. HALEY:

9    Q.    Mr. Kaiser, the second-to-the-last question asked of

10   you by the government was to describe your relationship

11   with Phil Kenner today.

12             Do you recall that question?

13   A.    Yes, I do.

14   Q.    As a result of what you claim are the financial

15   losses you suffered, as well as your mother, family

16   members and friends, through the investments through Phil

17   Kenner, you have a deep-seated hatred for him today.

18   Correct?

19   A.    Yes.  You can say that.  He ruined my life.

20   Q.    As a matter of fact, you are not hesitant to describe

21   in press commentary in the Daily News that Phil Kenner is

22   a scumbag.  That's your word, is that correct?

23   A.    That's true.  That's correct.

24   Q.    Now, you have a personal interest in whether or not

25   Phil Kenner gets convicted.  Don't you?

1090

1   A.   I hope he does.

2   Q.   And your personal interest is premised on the fact

3   that Phil Kenner has filed two separate lawsuits against

4   you, alleging breach of contract and fraud on your part.

5   Isn't that true?

6   A.   Yes, he has filed civil lawsuits against me.

7   Q.   One of them involving the Paradise House project.

8   Correct?

9   A.   Yes.

10  Q.   And one of them actually involving the Sag Harbor

11  property.  Correct?

12  A.   Yes.

13  Q.   And sir, you are aware that the Sag Harbor property

14  lawsuit was dismissed for lack of activity after Phil

15  Kenner was indicted and arrested on November 13, 2013, for

16  this offense.  Correct?

17          MR. MISKIEWICZ:  Objection.

18          THE COURT:  Overruled.

19          You can answer that if you know.

20  A.   No I don't know the status of that case.

21  BY MR. HALEY:

22  Q.   Well, can we agree, sir, that it would be difficult

23  if not impossible for Phil Kevin to pursue those civil

24  lawsuits against you if he were convicted of these federal

25  offenses?

1091

1    MR. MISKIEWICZ:  Objection.

2    THE COURT:  Sustained.

3  BY MR. HALEY:

4  Q.   How long have you been employed at Diamante Cabo San

5  Lucas?

6  A.   Approximately three years.

7  Q.   And who hired you?

8  A.   I was hired by Mr. Kenner Jowdy.

9  Q.   How would you describe your relationship with

10  Mr. Kenner Jowdy?

11  A.   It's okay.

12  Q.   Who else works there that you know?

13    MR. MISKIEWICZ:  Object.

14  BY MR. HALEY:

15  Q.   At Diamante Cabo San Lucas?  I'll rephrase the

16  question.

17    Does Brian Berard also work at Diamante Cabo San

18  Lucas?

19  A.   He works for a sales company.

20  Q.   Associated with Diamante Cabo San Lucas, sir?

21  A.   Yes.

22  Q.   With how would you describe your relationship with

23  Brian Berard?

24  A.   It's good.

25  Q.   Do you know a person by the name of John Behnke?

Kaiser - Cross/Mr. Haley

1092

1   A.   Yes.

2   Q.   What is his position at Diamante Cabo San Lucas?

3   A.   He is head of security, I believe.

4   Q.   How would you describe your relationship with him?

5   A.   Good.

6   Q.   As a matter of fact, you and he share a common

7   background, did you not, sir?

8   A.   Yes, we do.

9   Q.   You are a former Suffolk County police officer,

10  former New York City police officer, and he's a former FBI

11  agent.  Is that correct?

12  A.   That's correct.

13  Q.   And to your knowledge, prior to his employment as the

14  director of security at Diamante Cabo San Lucas he held a

15  high-level position with the FBI, did he not?

16  A.   I believe he was just an agent.

17       Not just.  What's what he did.

18  Q.   Have you seen any part of his resume as posted on the

19  internet, sir?  Yes or no?

20  A.   No.

21  Q.   Do you know who Louis Freeh is, sir?

22       MR. MISKIEWICZ:  Objection.

23       THE COURT:  No.  I will allow it.  Overruled.

24  BY MR. HALEY:

25  Q.   Do you know who Louis Freeh is?

Kaiser - Cross/Mr. Haley

1093

1    A.    Yes.

2    Q.    Who is he?

3    A.    I believe he used to be the director of the FBI.

4              (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1094

1    BY MR. HALEY:  (Cont'd)

2    Q    Have you met Mr. Freeh?

3    A    Yes.

4    Q    Did you meet Mr. Freeh in the presence of Kenner

5    Jowdy?

6    A    No.

7    Q    Do you know if there is any relationship between

8    Kenner Jowdy and Mr. Freeh?

9              MR. MISKIEWICZ:  Objection.

10             THE COURT:  Overruled.  You can answer that.

11   A    I believe that he represented him.

12   Q    In what capacity, sir?

13   A    I believe as a lawyer.

14   Q    Now, let's start in the beginning in connection with

15   the relationship that initially developed between yourself

16   and Phil Kenner.

17             I believe you testified on direct, sir, that

18   following the tragic events of 9/11, you were in Hawaii

19   with Chris Manfredi free?

20   A    That's correct.

21   Q    While there, you as well as Chris Manfredi saw some

22   property that you viewed as perhaps a potential real

23   estate investment, is that true?

24   A    Yes, that's true.

25   Q    I believe you testified on direct that in order to

1095

1   develop this property, you realized that you would be in

2   need of financing, is that true?

3   A     Repeat that question.

4   Q     Sure.

5           Did you testify on direct, sir, that you

6   realized that in order to develop this property, which you

7   wanted to do by way of developing the property for a

8   return on profit, you would need financing?

9               MR. MISKIEWICZ:  Objection; time frame.

10              MR. HALEY:  I will rephrase the question.

11  Q     At some point in time after you saw the property in

12  Hawaii, did you come to a realization that you would

13  require financing to develop that property?

14  A     Well, approximately for the first year we were

15  working through, we didn't know if we were going to

16  subdivide and flip the property and we were working

17  through those issues and costs.

18  Q     As you worked through those issues and costs, did

19  there come a point in time you realized you would need

20  financing to continue the project?

21  A     The next step was I was going to sell a property and

22  I was going to finance another property.

23  Q     Did you do that?

24  A     Excuse me?

25  Q     Did you do that?

1096

1    A    No.

2    Q    So what did you then do in connection with the

3    project?

4    A    What year?

5    Q    Sequentially, sir, after you decided that or realized

6    you could not sell the property to obtain the funds,

7    sequentially what was the next step you did in order to

8    pursue this project?

9              MR. MISKIEWICZ:  Objection; form.

10             THE COURT:  Did you understand the question?

11             THE WITNESS:  Yes; I just wanted to confirm.

12             THE COURT:  Then you can answer.

13   A    One of the next steps, I was introduced through a

14   mutual friend to Mr. Kenner.

15   Q    I wasn't there, sir.  What time was that

16   approximately, time of year?

17   A    Approximately it was in '03, 2003, I believe March,

18   April.

19   Q    The name of that friend is James Milan, is that

20   correct?

21   A    That's correct.

22   Q    How did you know James Milan?

23   A    He was a friend of Chris Manfredi's.

24   Q    What did you know of James Milan in terms of his

25   background?

1097

1    A    I believe he owned some type of I think it was a

2    telecommunications of some sorts.

3    Q    When you met Phil Kenner for the first time after

4    being introduced to him as you testified, where did that

5    meeting take place?

6    A    On the big island of Hawaii.

7    Q    It's a big island, sir.  Let me ask you this

8    question:  Did it take place in a restaurant?  Did it take

9    place in a hotel?  Where did it take place?

10   A    It was on a parcel of land on the big island in an

11   area called -- it was actually on 250 acres called

12   Honu'Apu.

13   Q    How did Phil Kenner arrive at that location?

14   A    In a vehicle he rented.

15   Q    It was a rental vehicle?

16   A    I believe so.

17   Q    What type of rental vehicle?

18   A    I don't recall.

19   Q    He didn't arrive by private helicopter I take it,

20   correct?

21   A    No; not at that time, no.

22   Q    Well, when did you have this discussion with Phil and

23   where did this discussion take place with reference to the

24   Money Magazine article?

25   A    That took place back at a house we were renting.

1098

1  Q     Who was renting?

2  A     Myself and Mr. Manfredi.

3  Q     How did Phil arrive at the house that day?

4  A     I believe he followed us back in his rental car.

5  Q     Did he have that Money Magazine article with him in

6  his possession at that time?

7  A     It was back at the house.  I assume he had it in his

8  luggage; I'm not sure.

9  Q     So you are going back to his rental house, as I

10  understand it?

11  A     No; the house myself and Chris Manfredi rented, a

12  place called Discovery Harbor.

13  Q     At this point in time you say Phil kind of produced

14  the Money Magazine article for your review, is that

15  correct?

16  A     Yes; I don't think for review, just to show after he

17  finished explaining to us about his client base when we

18  were on the property.

19  Q     Was it at this point in time that you say Phil Kenner

20  told you he was worth one-half billion dollars?

21  A     He said approximately $500 million.  That's the way

22  he worded it.

23  Q     We can agree, sir, that $500 million is one-half

24  billion dollars?

25  A     Just telling you he didn't say a half a billion.  He

1099

1    worded it as $500 million which we know is the same for

2    the record.

3    Q    They asked the question.

4            Now, the person on the face of that Money

5    Magazine was Michael Jordan, correct?

6    A    That's correct.

7    Q    Did you have an understanding at that point in time

8    that Michael Jordan had a net worth of approximately $1

9    billion?

10   A    I didn't know what he was worth at that time.

11   Q    When you say Phil Kenner told you that he was worth

12   $500 million, I believe you said on direct you accepted

13   that as true, correct?

14   A    Yes.

15   Q    From that point in time up until the point in time

16   that the relationship between you and Phil Kenner

17   deteriorated, did you ever see anything as relates to Phil

18   Kenner's property, vehicles, investments, anything that

19   would suggest to you that he was worth a half billion

20   dollars?

21   A    Yes.  I believe he had produced a document for his

22   net worth, his ownership in various different companies,

23   real estate ventures.

24   Q    He provided that to you?

25   A    On the Lehman -- around the Lehman closing.

Kaiser - Cross/Haley

1100

1    Q    Do you have that in your possession, sir?

2    A    No, I don't.

3    Q    Is it your testimony that you saw such a document

4    that says that, is that your testimony?

5    A    I said I saw a document that showed large numbers of

6    his net worth.  I don't know exactly what it was.  I don't

7    have the document in my possession.

8    Q    Is it your testimony to the best of your memory that

9    Net Worth Statement that you saw at the Lehman Brothers

10   closing indicated he had a net worth of $500 million?

11              MR. MISKIEWICZ:  Objection; asked and answered.

12   A    No.

13              THE COURT:  Overruled.

14   Q    Well, when you say that Phil Kenner at one point in

15   time called you and said in substance:  John, I need a

16   million dollars in order to invest or loan others, did you

17   bring up during that conversation your belief that he

18   personally was worth $500 million?

19   A    No, because he called me up and said he had an

20   opportunity for me to make money.

21   Q    Well, was there ever a point in time during your

22   relationship with Phil Kenner that he sought to borrow

23   money from you?

24   A    Repeat the question.

25   Q    Sure.

1101

1       Was there ever a point in time in your

2   relationship with Phil Kenner before it deteriorated that

3   he sought to borrow money from you?

4   A    Yes.

5   Q    When he sought to borrow money from you, what was

6   your response?

7   A    Well, that was years later from the initial -- since

8   I initially met him.

9   Q    Years later when he sought to borrow money from you,

10  what was your response?

11  A    I lent it to him.

12  Q    Now, we can agree, can we not, sir, that a little

13  while before the Hawaiian Land Development Project, I'm

14  going to abbreviate it and call it the Hawaii Project for

15  purposes of the stenographer, that existed, did it not,

16  there was real land, there was a real entity established

17  by way of an LLC to pursue that project, isn't that true?

18  A    Yes.

19  Q    Take a look at a document that's been marked Kenner

20  Exhibit 36.  Does that appear, sir, to be a Google Earth

21  photograph?

22  A    Yes.

23  Q    Do you recognize the parcels depicted on that Google

24  Earth photograph?

25  A    Yes.

1102

```
 1              THE COURT:  Is this document in evidence?
 2              MR. HALEY:  No.  I would move Kenner Exhibit 36
 3   in evidence.
 4              MR. MISKIEWICZ:  No objection.
 5              MR. LaRUSSO:  No objection.
 6              THE COURT:  36 is admitted.
 7              (Kenner Exhibit 36 received in evidence.)
 8   Q    Sir, taking a look at the exhibit, there are thumb
 9   tacks on this exhibit, is that correct?
10   A    Yes.
11   Q    Does the property identified as Moaula Farm & Ranch
12   mean anything to you?
13   A    Yes.
14   Q    In what sense?  What does that mean?
15   A    That's part of the Hawaii property.
16   Q    When we go to a thumb tack that has the wording
17   H-O-N-U-apostrophe-A-P-U 1500, does that mean anything to
18   you?
19   A    Yes.
20   Q    In what way?
21   A    That's Honu'Apu; part of the Hawaii property.
22   Q    When you go to a thumb tack that identifies
23   W-A-I-K-A-P-U-N-A, does that mean anything to you?
24   A    Yes; that's Waikapuna.
25   Q    Was that part of the Hawaii Project?
```

1103

1    A    That's correct.

2    Q    Now, it's fair to state, sir, that as relates to the

3    Hawaii Project, limited liability corporations were

4    established to further the objectives of the project, is

5    that correct?

6    A    I can't state why those LLCs were created. I didn't

7    create them.

8    Q    You have been involved in the building industry,

9    correct?

10   A    Correct.

11   Q    Have you seen, based upon your experience, have you

12   seen in the past property, real property, where there are

13   multiple investors held in the name of an LLC?

14   A    Yes.

15   Q    As a matter of fact, Northport Properties was an LLC,

16   isn't that true?

17   A    No.

18   Q    What was Northport Property in terms of your

19   understanding as to its legal --

20   A    I believe it was an S Corp.

21   Q    Did you have an understanding, sir, that an LLC with

22   reference to the creation -- excuse me, did you have an

23   understanding or do you have an understanding that an LLC,

24   limited liability corporation, with respect to investing

25   and developing real property has a particularly useful

Kaiser - Cross/Haley

1104

1  legal significance?

2  A    Yes.

3  Q    What is your understanding of that?

4  A    An LLC creates -- I won't state corporate veil,

5  offers you some protection, liability protection, and also

6  you can bring in different partners, different

7  shareholders.

8  Q    It gives protection to the investors so that the only

9  assets at risk are the assets of the LLC as opposed to the

10 personal assets, correct?

11 A    That's correct.

12 Q    And it also allows for further investors to come into

13 the LLC, isn't that true?

14 A    Yes.

15 Q    And it also allows for other investors to get out of

16 the LLC through the operating agreement, isn't that true?

17 A    Yes.

18 Q    Now, did there come a point in time where the Hawaii

19 Project was still in existence and ongoing that you had

20 discussions with Phil Kenner in terms of lending money

21 specifically to Kenner Jowdy in return for a 15 percent

22 return on that loan?

23          MR. MISKIEWICZ:  Objection as to the form.  I

24 request a time frame.

25          MR. HALEY:  I asked --

Kaiser - Cross/Haley

1105

1    THE COURT:  Overruled.  You can answer that.

2    A    Yes, that was.

3    Q    As a matter of fact, sir, you agreed during the

4    course of the discussion with Phil Kenner that that type

5    of financial arrangement with Kenner Jowdy, which involved

6    a15 percent return on investment, was a good idea,

7    correct?

8    A    Yes; that was in 2006.

9    Q    When you testified on direct that the million dollars

10   that you had loaned or sent to Phil Kenner was misused,

11   surprised it was used for a loan, what did you mean by

12   that?

13   A    Because I was -- it was supposed to be for the Hawaii

14   Project.  The money was supposed to come back in 30 days.

15   It was a loan.

16   Q    Well, to your knowledge, did Kenner Jowdy ever make

17   good on that loan?

18        MR. MISKIEWICZ:  Objection.

19        THE COURT:  Sustained as to form.

20   Q    Did there ever come a point in time to your

21   knowledge, that Kenner Jowdy paid back the money loaned to

22   him at 15 percent interest?

23   A    I believe we are still talking about the million

24   dollars that came from me in August of 2005, is that what

25   you were talking about?

1106

1    Q    No, sir; the question was different.

2          The question is did you ever -- was there ever a

3    point where Kenner Jowdy paid back at 15 percent interest

4    that loan that was given to him through Little Isle IV and

5    Ula Makika?

6    A    I believe what you are trying to say was brought out

7    in a civil case and I believe it was due to a forgery of

8    Kenner Jowdy's name.

9    Q    Let me show you something.  Kindly take a look at

10   this document, sir, and if you are unfamiliar with it, I

11   would have you read the document to yourself.

12          MR. MISKIEWICZ:  May I see it, counsel?

13          MR. HALEY:  Yes; I'm sorry.

14   Q    Read it to yourself.

15          THE COURT:  What document number is that?

16          MR. HALEY:  I'm sorry, Judge.  It's Kenner

17   Exhibit 39.

18   A    Okay.

19   Q    Is that document familiar to you?

20   A    Excuse me?

21   Q    Is that document familiar to you?

22   A    Yes; this is the Owen Nolan arbitration.

23   Q    Whose testimony is reflected in that document?

24   A    Mine.

25   Q    Is it fair to state, sir, during the course of that

1107

1    Owen Nolan arbitration while you were under oath you

2    truthfully answered the questions presented to you, is

3    that correct?

4    A    Yes; as I knew it at that time, correct.

5    Q    When you say as you knew it at that time, now that

6    you are working for Kenner Jowdy, you have a different

7    view of what you testified to in that proceeding, is that

8    your testimony?

9              MR. MISKIEWICZ:  Objection.

10             THE COURT:  Sustained as to form.

11   Q    Well, you know, sir, for a fact, do you not, that

12   Kenner Jowdy requested and received a loan that at some

13   point reached approximately $5 million from Little Isle IV

14   and Ula Makika where he was to repay that loan with 50

15   percent interest, correct?

16             MR. MISKIEWICZ:  Objection; time frame.

17             MR. HALEY:  At some point in time.

18             THE COURT:  Overruled.  You can answer.

19   A    When I testified at Owen Nolan, that's what I

20   believed when I testified because as of 2006, Mr. Kenner

21   had told me that when -- the same time he told me my money

22   went to Mexico so post that I learned that.  And then

23   after this, I learned that the civil litigation against

24   Kenner Jowdy got thrown out because of a forgery by

25   Mr. Kenner.

1108

```
1    Q    Who told you that sir, Kenner Jowdy?

2    A    No, Mr. Kenner.

3    Q    Is it your testimony that Mr. Kenner told you:  The

4    lawsuit I filed against Kenner Jowdy got thrown out

5    because I forged his signature?  Is that your testimony?

6    A    They are saying that's what the judge was saying and

7    that's why he didn't pursue it and he didn't have the

8    original document.

9    Q    Sir, you were interviewed by agents of the Federal

10   Bureau of Investigation, were you not?

11   A    Yes, I was.

12   Q    Those interviews took place on October 19, 2010,

13   correct, and September 9, 2013, is that true?

14   A    Probably somewhere around there.  I don't have the

15   exact dates written down.

16   Q    As a former law enforcement officer, sir, you

17   understood, I take it, when you were interviewed by agents

18   of the Federal Bureau of Investigation that you ought to

19   be truthful and complete in your answers, isn't that true?

20            MR. MISKIEWICZ:  Objection.

21            THE COURT:  Overruled.  You can answer that.

22   A    Yes.

23            MR. HALEY:  Judge, I apologize.  May I have a

24   moment?

25            THE COURT:  Yes.
```

1109

```
1        MR. HALEY:  Your Honor, I thought I premarked

2   this as --

3        THE COURT:  Give it a number.

4        MR. HALEY:  Defendant's Exhibit -- Judge, I

5   will.  It may be duplicating another number but we can

6   resolve that.

7   Q    Sir, when you take a look at this particular

8   document, and take your time marked, Kenner Exhibit 43 for

9   identification --

10        MR. MISKIEWICZ:  Your Honor, may we approach in

11   the meantime?

12        THE COURT:  Yes.

13        (Sidebar.)

14        MR. MISKIEWICZ:  Your Honor, I'm going to again

15   renew my request on redirect to introduce this evidence

16   about his conversation immediately after this interview

17   because I think it goes to putting into context.  I assume

18   what Mr. Haley is going to do is say, well, there is

19   nothing in this report that indicates certain things.  And

20   I think that it's fair for the jury to understand during

21   this period of time he is still of two minds; he realizes

22   he lost a lot of money but he has not come to the

23   conclusion that Mr. Kenner has stolen it from him.  And if

24   we are going to be impeaching the witness on this, I think

25   it's fair they hear that he actually told them that, you
```

1110

1    know, that the FBI is asking questions.

2            MR. HALEY:  May I make an offer of proof, Judge?

3    I don't have the exhibit with me because the witness is

4    looking at it.

5            What I intend on showing him is portions of that

6    interview between himself and Agent Galioto where he

7    describes meeting Kenner Jowdy in New York City on two

8    occasions and on a second occasion I believe he says in a

9    restaurant or bar discussing with Kenner Jowdy

10   specifically the loan money that had gone from Little Isle

11   IV to Ula Makika.

12           THE COURT:  I don't think any cross-examination

13   about inconsistencies that Mr. Haley thinks exists between

14   his testimony here and what he told the FBI opens the door

15   to what he discussed later with Mr. Kenner, after or what

16   Mr. Kenner's reaction was, two totally separate things.

17           Go ahead, Mr. Haley.

18   Q    Mr. Kaiser, does that document appear to be notes

19   taken by the FBI of your interview that occurred on

20   October 19, 2010?

21   A    I can't state that for a fact.  This is the first

22   time I'm seeing this.

23   Q    Well, is there information in this document that

24   reflects that this was not an interview of you that

25   occurred on October 19, 2010 given the content of the

1111

1    document?

2    A    Some of the content looks familiar, also a lot of

3    scribble, so I wouldn't know where it was derived from.

4    Q    Well, referring, sir, to what would be the second

5    page of this document, would you simply read the

6    highlighted portions here to yourself as well as the

7    following page?

8    A    (Complying)

9           MR. MISKIEWICZ:  May I approach?

10          MR. HALEY:  Sure.

11          MR. MISKIEWICZ:  Okay.

12   Q    Does that appear to be scribble, sir, or can you read

13   the handwriting?

14   A    Some of it I can read.

15   Q    The part that you can read, doesn't that refer to a

16   discussion that you had with Kenner Jowdy concerning the

17   loan that he received from the Hawaii Project?  That's

18   what you told the FBI, correct?

19   A    No; I don't recall everything, even if this came to

20   me from the FBI, you are saying it is but, like I said, I

21   didn't see those notes when I first sat with the FBI, sir.

22   Q    I understand, sir, you are seeing them for the first

23   time today.

24   A    No, I have never seen them.  I have never seen these.

25   Q    But the information contained on this document,

1112

 1    identified as Government Exhibit 3500 JK 1, does the

 2    information contained on this document appear to be

 3    information within your knowledge?

 4    A    Some of the information seems to be correct.  Some of

 5    the information seems to be wrong.

 6    Q    What's wrong?

 7                  MR. MISKIEWICZ:  Objection.

 8                  THE COURT:  Sustained.

 9                  Why don't we take the lunch break and discuss

10    this with the lawyers.

11                  We will take a lunch break to 1:45.  Don't

12    discuss the case.  Have a good lunch.

13                  Mr. Kaiser, you can step down for lunch.

14                  (The jury leaves the courtroom.)

15                  THE COURT:  Everyone can be seated.

16                  Mr. Haley, let me go first.

17                  This is not a correct use of a 302.  If he said

18    something inconsistent to the FBI, you believe he said

19    something inconsistent based upon interview notes, you

20    shouldn't be referencing the notes themselves, what they

21    are.  You just ask him:  Isn't it a fact you said to the

22    FBI on a prior occasion you had a meeting with Kenner

23    Jowdy on X day, whatever it is.  If he says he doesn't

24    recall saying that, you can try to refresh his

25    recollection with the notes without referencing what they

1113

1    are; let me put a document in front of you, see if this

2    helps you remember what you told the FBI.  And that will

3    either refresh his recollection or not.  But to start

4    reading the report into the record, asking him to -- we

5    were getting so far afield from the proper use of that

6    document, we kind of got lost on that.

7                MR. HALEY:  Thank you, your Honor.  I will do

8    just that.

9                THE COURT:  I understand what you are trying to

10   do.  I think it's fair to point out if you think he told

11   the FBI on a prior occasion that he learned about the loan

12   from Mr. Jowdy himself in a restaurant, that's fine.  But

13   to ask him that, isn't it a fact you told the FBI on a

14   prior occasion, if he says no to that, then you are stuck

15   with that answer; you can't start trying to get in that

16   document through him.

17               MR. HALEY:  Your Honor, my only -- personal

18   thank you.  Secondarily, Judge, only because the testimony

19   has at least at this point in time reached the point where

20   I have asked those questions at least this point without

21   objection, I will follow your Honor's direction, again,

22   it's appreciated.  This was a document that was provided

23   to us by way of 3500 material specifically related to this

24   particular witness John Kaiser.

25               Now, the document we were provided with blacks

1114

1    out the person who is being interviewed so it does give

2    the impression, I guess, that I don't know what this

3    document is because he doesn't see his name on it.  I can

4    ask the government produce the original document.  To the

5    extent we reach the point where he says I don't recall,

6    then I wish to use it to refresh his recollection.

7              THE COURT:  Whether or not his name is on it or

8    not, again, he still can't get in that document for you to

9    authenticate that document.  Whether it has his name or

10   not doesn't do those things for you.

11             Understand what I'm saying?

12             MR. HALEY:  I do, Judge.

13             THE COURT:  If you are thinking -- if he is

14   trying to refresh his memory, I guess you can get the

15   government to -- if you want to refresh his memory with

16   the unredacted version, I will tell the government to give

17   you that, to try to refresh his memory.  Again, you can't

18   ask:  Isn't your name on that document?  Isn't that the

19   interview?

20             MR. HALEY:  For the record, 3500 JK 1, I shall

21   hand you another copy now, does not blackout John Kaiser's

22   name.  It blacks out his personal home address and

23   personal telephone numbers.

24             MR. LaRUSSO:  I don't want to chime in, make the

25   argument worse; I will be using this on cross as well.

1115

1    And what Mr. Kaiser has created is an impression he

2    doesn't recognize this, he basically disowns this as a

3    possibility of being notes of his interview.  When you

4    look at it and show him his address, his telephone number,

5    his name and in the corner agent's name, that's going to

6    get him to say, okay, I did have the interview on that

7    day, that's my personal information.  He is a cop, Judge.

8    His background, he knows what this is; trying to lead the

9    jury to believe, that's what bothers me, deceiving the

10   jury these aren't the notes so I can answer the questions

11   asked in the manner I'm doing, not to give the answers to

12   Mr. Haley's questioning.  That's the problem I have.

13            THE COURT:  I also have a problem with what I

14   think was about to happen here, to try to get in the

15   report itself and what the report says through the

16   witness, which you are not allowed to do either.

17            MR. LaRUSSO:  Judge, never do that.  Difference

18   between showing him a document, when he looks at it, goes:

19   That may not be the interview I had with them so I can

20   fudge his answers.

21            THE COURT:  Again, you shouldn't be referring to

22   what the document is.  Proper use of that document, for

23   refreshing a recollection.  You shouldn't tell the jury or

24   be asking him out loud does this appear to be your notes

25   of the interview, doesn't this look like a 302; you are

1116

1    law enforcement.

2          All those questions are not proper questions for

3    refreshing recollection.  For refreshing recollection you

4    are to stick to the document in front, ask him to review

5    it; not advise him I received this from the government,

6    this is a copy.  You can't do that.  You stick the

7    document in front of him.  If you want an unredacted

8    version, you think it will help, I will tell the

9    government to give you an unredacted version.

10         The idea is that if he, for whatever reason, Mr.

11   LaRusso, says "I don't know what this is," then you can't

12   say "you are law enforcement, don't you know this is an

13   interview?"  You can't do that.  That's not proper use of

14   a document that's not in evidence.  That can only be used

15   for refreshing recollection, no other purpose.

16         If you think after he gives a statement that's

17   inconsistent with the document itself and you impeach him,

18   ask him "didn't you say on a prior occasion to the FBI

19   something else," if he says "no," then whoever, the FBI,

20   proper rules of evidence, that would have to be done

21   through the author of the report, not through this

22   witness.  He could never get in that report for you.

23         MR. HALEY:  May I complete the record?

24         THE COURT:  Sure.

25         MR. HALEY:  No one's fault, what I have does not

1117

1  black out John Kaiser's name.  What the government has is

2  his name without address.

3      THE COURT:  Use that one.  No discussion that

4  the jury is hearing about what the report is, who authored

5  it, don't you see the agent's names on the bottom.  That's

6  an attempt to get in the report and that's not proper.

7      MR. HALEY:  I will honor the Court's ruling in

8  that regard.  But for purposes of the record, I would like

9  to state the following.

10     THE COURT:  I don't think you asked him before

11 you started putting the report in front of him, I don't

12 think you asked did he ever tell the FBI he had a meeting

13 with Mr. Jowdy.  I don't recall that question coming out.

14     MR. HALEY:  Hadn't reached that point, Judge.

15 You are right, the only thing -- I know your Honor -- I

16 believe the notes are really quite clear.  He talks about

17 J.K. met Jowdy in New York City.  And the government has

18 it, if I miss something, I'm sure they will correct me.

19 Second time, another time, at a bar in New York City bar,

20 discussed Hawaii, lending dollars from Hawaii to Mexico

21 with the initial J.K. and K.J., Kenner Jowdy, John Kaiser.

22 Those are the FBI's notes.  K.J. again discussed K.J.

23 wanted to borrow money from Hawaii to Mexico pay back

24 after closing.  K.J. brought up borrowing money from

25 Hawaii Project borrowed millions, arrow, 5 to 6 million

1118

1   from Hawaii Project.

2           I don't know what could be clearer in terms of

3   those notes.  The only reason I say that, Judge, is this

4   witness has testified, frankly, by way of volunteered

5   testimony, it wasn't responsive to my question now put

6   before the jury, that the loan never existed and it was a

7   result of a forged loan document between Phil Kenner and

8   Kenner Jowdy.  He did so when the government is sitting at

9   that table knowing that it's been inconsistent what he

10  told them in October 9, 2010.  I just want the record to

11  be clear what is occurring here, that's all, Judge.

12          THE COURT:  Again, we haven't heard the answer.

13  If he denies it, the proper way, to the extent you are

14  troubled by it and think that's what he said to the FBI,

15  then the way to get it in is if the government doesn't

16  stipulate that's what he said to the FBI, would be to call

17  the agent who took the notes.

18          MR. HALEY:  Thank you.

19          THE COURT:  I will see you at 1:45.  Thank you.

20          MR. LaRUSSO:  Your Honor, sorry to interrupt, I

21  know the Court has a busy schedule, I don't know the

22  status of the witness in Florida.

23          THE COURT:  Is that witness here now?

24          MR. MISKIEWICZ:  We will call him tomorrow.  He

25  is available tomorrow.

Kaiser - Cross/Haley

1119

1          MR. LaRUSSO:  There is a transcript that the

2   government would like to introduce that's redacted.  It

3   will be an issue for discussion.  We can do it tomorrow.

4          THE COURT:  Good.

5          (At this time, a luncheon recess was taken.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1120

1          A F T E R N O O N    S E S S I O N

2

3              THE COURT:  Let's bring in the jury.

4              (The jury enters the courtroom.)

5              THE COURT:  Please be seated.

6              We will continue now with the cross-examination

7     by Mr. Haley.

8              MR. HALEY:  Thank you, your Honor.

9     CROSS EXAMINATION

10    MR. HALEY:  (Cont'd)

11    Q    Mr. Kaiser, isn't it true that when you were

12    interviewed by Special Agent Scott Romanowski and Special

13    Agent Matt Galioto of the FBI on October 19, 2010, at

14    11:00 a.m., you told the agents that you met Jowdy twice

15    in New York City and at the second meeting at a bar in New

16    York City you discussed with him Hawaii and the lending of

17    money from Hawaii to Mexico, isn't that true?

18    A    No.

19    Q    You did not tell the FBI agents what I just related?

20    A    That's correct.

21    Q    Isn't it true, Mr. Kaiser, during an interview with

22    the FBI on October 19, 2010, 11:00 a.m. specifically Scott

23    Romanowski and Matt Galioto, that you told them that you

24    saw Kenner Jowdy in Mexico a couple of times and discussed

25    that Kenner Jowdy wanted to borrow money from Hawaii to

1121

1    Mexico and would pay it back after the closing?

2    A    No.

3    Q    Isn't it true, sir, on October 19 at 11:00 a.m. in an

4    interview conducted by Scott Romanowski and Matt Galioto

5    of the Federal Bureau of Investigation you told them that

6    Kenner Jowdy brought up money -- Kenner Jowdy brought up

7    borrowing money from the Hawaii Project, borrowed

8    millions, 5 to 6 million from Hawaii Project, that it was

9    first going to be hundred thousands not millions and that

10   Kenner Jowdy was not happy that the money amount started

11   to grow to millions after money to Mexico?

12   A    No.

13   Q    How many times, to your knowledge, were you

14   interviewed by the FBI prior to your appearance here

15   today?

16   A    Probably over a dozen.

17   Q    During the course of the interviews by the FBI

18   approximately a dozen times, they would ask you questions

19   and you would answer their questions, true, sir?

20   A    Yes.

21   Q    And when you answered the questions of the FBI, did

22   you observe them taking notes of the answers that you were

23   giving to their questions?

24   A    No.

25   Q    You didn't observe them doing that?

Kaiser - Cross/Haley

1122

1   A    No.

2   Q    Well, were you interviewed by the FBI in person on

3   occasions and telephonically on occasions?

4   A    Yes; both.

5   Q    Do you recall how many times of the dozen you were

6   interviewed telephonically as opposed to the times that

7   you are interviewed in person?

8   A    I don't recall the exact -- the difference.

9   Q    When was the last time before your testimony today

10  that you met with either the FBI or the prosecutors in

11  this case?

12  A    It was a few days ago.

13  Q    During the course of that meeting, did you observe

14  the FBI taking notes of your answers to their questions,

15  whether it was the AUSA's question?

16  A    No.

17  Q    You did not observe them or they did not?

18  A    That's correct; I did not observe them taking any

19  notes.

20  Q    Now, you met also with the FBI and agents of the

21  Federal Bureau of Investigation in the latter part of

22  April, isn't that correct, in this very courthouse?

23  A    I'm not sure at that time what day or month it was.

24  Q    April of 2015, sir, the latter part of April 2015, do

25  you remember meeting in this very courthouse with agents

1123

1    of the FBI and U.S. Attorney's office?

2    A    Like I said, I couldn't give you the exact date or

3    month.

4    Q    Does that seem about right?

5    A    Like I said, I met with them approximately a dozen

6    times and I couldn't give you the exact day or month.  I

7    don't keep a log of it every time I spoke to the FBI or

8    prosecutor.

9    Q    Well, was there not a meeting before your testimony

10   today and I say "meeting," involving the FBI and the

11   prosecutors in this case, concerning that document that

12   you identified as containing a forged signature?

13   A    Which document?

14   Q    The one, sir, on direct where it was shown to you on

15   the big screen and you said that is definitely not my

16   signature, that document.

17   A    There was more than one document that I said wasn't

18   my signature and was a forgery.  Which one are you

19   referring to?

20   Q    I'm referring, sir, to the one on direct -- may I

21   have the exhibit?

22              MR. MISKIEWICZ:  (Handing)

23   Q    This document, sir, the Funding Consulting Agreement,

24   Government Exhibit 5104.

25   A    Okay.

1124

1    Q    As relates to that particular document, sir, when was

2    the first time you were shown that particular document?

3    A    I believe it was probably about 15 days ago, 20 days

4    ago.

5    Q    Maybe in the latter part of April of this year?

6    A    It could be.

7    Q    When you were shown that document, you discussed with

8    the FBI and the prosecutors presumably the content of that

9    document, true?

10   A    Yes.

11   Q    And at that point in time as you were discussing with

12   the FBI and the prosecutor the content of that document,

13   as you were answering their questions, were they taking

14   notes, either the prosecutor or the FBI?

15   A    I don't believe -- neither one was taking notes.

16   Q    Well, at any point in time when you saw that

17   document, I'm referring to Government's Exhibit 5104, did

18   you ever express in the presence of the prosecutor as well

19   as the FBI uncertainty as to whether or not that was or

20   was not your signature?

21   A    Yes; I said it wasn't my signature.

22   Q    Did you say at that time it is definitely not my

23   signature?  Is that what you said during that meeting?

24   A    I said it wasn't my signature.

25   Q    So you didn't use the word "definitely not my

1125

1   signature" as you did on direct, correct?  Is that

2   correct, sir?

3   A    I don't recall whether I said "definitely."  I said

4   it's not my signature.  Whether I used the word

5   "definitely" or just said "not," I don't recall at this

6   time.

7   Q    Did you acquire knowledge -- I withdraw that.

8         Now, going back, sir, to the issue concerning

9   the Jowdy loan, kindly take a look at what is marked as

10  Kenner Exhibit 39.  I believe you identified that

11  previously in the record as your deposition transcript in

12  the Nolan arbitration.  Specifically I refer your

13  attention to page 88.

14        MR. HALEY:  I have to put my glasses on, Judge.

15  I apologize.

16  Q    83, beginning with line 7.

17        Sir, isn't it true that you were asked the

18  following question and gave the following answer by Mr.

19  Richards:

20        Question:  Okay.  And at some point you were

21  made aware as an investor that this money was going to be

22  lent on a short-term basis to Mr. Jowdy?

23        Answer:  Yes.

24        Correct?

25  A    Correct.

1126

1   Q    Question:   And what was your understanding of how it

2   was supposed to get paid back?

3          Answer:   Well, the first -- my first concern

4   was to make sure that he had some collateral so it could

5   get paid back which he did.  It was a parcel in Mexico, on

6   -- not Hawaii and that was his collateral.  I think he had

7   a 70 percent interest and I think the property was

8   appraised at maybe 30-35 million.

9          Question:   Was Mr. Jowdy at that time someone

10  that appeared credible to you?

11         Answer:   Yes.

12         Question:   Why is that?

13         Answer:   Well, the first thing Mr. Kenner told

14  me was, and I met him a couple of times, it seemed a big

15  thing, it was 15 percent interest rate, and I thought it

16  was a good move.

17         That's the answer you gave to that question,

18  correct?

19  A    Yes.

20  Q    Did Mr. Jowdy have anything to do with bringing

21  Lehman Brothers to your Hawaii Project?

22         Answer:   Yes.

23         Those were your answers to those questions on

24  that day, is that true, sir, yes or no?

25  A    Yes.

Kaiser - Cross/Haley

1127

1  Q    And as you are aware, he hasn't paid the money back,
2  right?
3           Answer:   Correct.
4           Question:   Do you blame Mr. Kenner for him not
5  paying the money back?
6           Answer:   No.
7           Those are the answers that you gave to the
8  questions under oath during the Nolan arbitration
9  proceeding, correct?
10 A    Correct.
11 Q    Now, is the name Robert Gaudet familiar to you?
12 A    Yes.
13 Q    Did you ever have a conversation with Robert Gaudet
14 concerning the fact that he signed as a witness to the
15 revolving line of credit document dated December 12, 2004
16 involving Kenner Jowdy and the Hawaii Project?
17 A    Yes.
18 Q    Where did that conversation take place?
19 A    I don't recall.
20 Q    Did you ever see, sir, a document entitled Revolving
21 Line of Credit Loans December 7, 2004 which purports to be
22 or is a written loan agreement between Kenner Jowdy and
23 the Hawaii Project?
24 A    Yes; Mr. Kenner sent it to my residence.
25 Q    Did Mr. Kenner send that to your residence as part of

1128

1   a large package of material involving Hawaii?

2   A    No.

3   Q    Well, there came a point in time, sir, where, as you

4   told us earlier, you and Phil stopped speaking because of

5   the dispute that developed between the two of you, is that

6   true?

7   A    Which dispute?

8   Q    The series of disputes.

9   A    Yes.

10  Q    There came a point when all communication stopped

11  between the two of you, is that true?

12  A    That's true.

13  Q    Did you at some point communicate with Phil Kenner,

14  accuse him of misdeeds and he in turn responded by sending

15  you a package of Hawaii documents?

16  A    No.

17  Q    You have given interviews to the Daily News on two

18  occasions, isn't that correct?

19  A    I don't recall how many interviews I gave to the

20  Daily News.

21        MR. MISKIEWICZ:  May we approach?

22        THE COURT:  Yes.

23

24

25

Kaiser - Cross/Haley

1129

1    (Sidebar)

2    MR. MISKIEWICZ:  I'm not sure what area of the

3    article he is going to be asking about but to invite this

4    jury to -- I know they will do their best not to consult

5    the media or whatever but this seems to be almost inviting

6    them to do so and impeaching them with quotes from a

7    reporter, even if there are -- even if they are

8    inconsistent I think is inappropriate.

9    THE COURT:  I don't think it's inappropriate if

10   he has a good faith basis for believing he said something

11   inconsistent to the Daily News; he is permitted to do

12   that.

13   The fact that it appeared in a newspaper as

14   opposed to some other document doesn't make it any less a

15   proper basis for an inconsistency if there is one.  I want

16   to emphasize it needs to be done in the same way you did

17   the report; you can ask him whether he said X or Y to the

18   Daily News.  If he doesn't recall, you can try and refresh

19   his recollection.

20   MR. HALEY:  I agree.  I appreciate the

21   instruction.

22   (Sidebar concluded.)

23   (In open court.)

24   BY MR. HALEY:  (Cont'd)

25   Q    Kindly take a look at Kenner Exhibit 44.  Take a look

Kaiser - Cross/Haley

1130

1   at that document.

2   A    Okay.

3   Q    Do you recognize it?

4   A    Yes.

5   Q    What is it?

6   A    I believe it's a copy of a Daily News article.

7   Q    An article involving interviews of both you and Bryan

8   Berard, is that correct?

9   A    It's an article of Phil Kenner and Tommy Constantine

10   getting arrested for fraud.

11   Q    Let me ask you this, sir, does your picture appear on

12   the front of that document?

13   A    Yes.

14   Q    Isn't it a fact, sir, that when interviewed by the

15   Daily News, you told them:  I tried to ask Phil where is

16   all the money going?, Kaiser said.  He said it's gone.  He

17   would send me a copy of documents that I left sitting in a

18   corner of my office.

19        Do you remember saying that?

20   A    Yes.

21   Q    Did you receive that box of documents?

22   A    I believe I received that box of documents in the

23   year 2010, before I knew he was defrauding me.

24   Q    I see.

25        And my question is, as relates to that box of

Kaiser - Cross/Haley

**1131**

1  documents that you received from Phil Kenner, did it

2  include the Revolving Line of Credit?  Is that when you

3  received it?

4  A    No.

5  Q    Well, the documents that you did receive from Phil

6  Kenner, please describe to us the type of documents

7  received.  It involved Little Isle IV?

8  A    It was a large box of a lot of different documents

9  related to the hockey players, to the Hawaii Project.

10  Q    Included things like lines of credit, correct?

11  A    No; I don't believe so.

12  Q    You didn't tell the Daily News or did you or did you

13  not tell the Daily News that when you reviewed that

14  document or those documents, it was a treasure trove of

15  information demonstrative of his fraud?

16  A    Of those forgeries in there that I found.

17  Q    Were you asked in or about October of last year by

18  either the FBI or agents of the Federal Bureau of

19  Investigation to identify all documents that you claimed

20  were forged for presentation in this proceeding before

21  trial?

22  A    No; I don't believe I was asked that.  I turned over

23  whatever I thought and anything I found or anything I had

24  that was -- that I knew not to be my signature.  I don't

25  remember that date they said we had a conversation was

Kaiser - Cross/Haley

1132

1   strictly forgeries.  There was a lot more involved.

2   Q    Well, the only documents, sir, that you have ever

3   claimed through your conversations with the prosecutors or

4   the FBI was forged is that Funding Consulting Agreement,

5   isn't that true?

6   A    No; there is more than that.

7   Q    Sir, kindly take a look at Kenner Exhibit 28.  Do you

8   recognize that document, sir?

9   A    It looks familiar.

10  Q    Does it contain your signature?

11  A    Yes; this is a copy.

12  Q    But that signature is not forged on that document, is

13  that correct?

14  A    That looks similar.  I can't give it a definitive

15  answer.  It looks close to my signature.

16  Q    Well --

17  A    This isn't the original.  I need to see the original.

18  It's a photocopy.

19  Q    Well, did or did you not receive this document which

20  bears the heading Little Isle IV, LLC dated July 21, 2006

21  addressed to John Kaiser, 7 Holly Lane, Setauket, New York

22  11733 and Mr. Christopher A. Manfredi 95-4968

23  M-A-M-A-L-A-H-O-A Highway, Na'alehu, Hawaii, 96772.

24  A    Yes, it was a document like this that I received

25  prior to the closing which would be around the time of

Kaiser - Cross/Haley

1133

1    July 2006.  I didn't read through this document.  I can't

2    verify it's authentic or not but certainly looks like

3    that.  It was the roll up for Na'alehu Ventures, the

4    closing in 2006 of August.

5    Q    Do you ever remember receiving a letter prior to

6    closing as you testified a moment ago that began with:

7    Gentleman, as you know, I have sent a nearly identical

8    version of this letter to the investors in Little Isle IV,

9    LLC to tell them about the very positive developments

10   concerning our Hawaiian real estate investments.

11              Do you remember receiving a letter of that type

12   in or about or shortly before the Lehman closing?

13   A    Yes; I believe I testified to that.

14   Q    But you are uncertain whether this is the letter you

15   actually received?

16   A    Like I said, I didn't read the rest of that.  That

17   actual document, I didn't go through.  I received

18   something like that, with the heading like that, starting

19   like that.  I didn't read through the whole document.

20   Q    Well, do you ever remember signing a document shortly

21   before the closing --

22   A    Yes; I said I did.

23   Q    Do you ever remember signing a document, sir, shortly

24   before the Lehman closing entitled Response Form and it

25   began:  I acknowledge receipt of the letter dated July 21,

Kaiser - Cross/Haley

1134

1    2006 of Phil Kenner, the letter, to John Kaiser and

2    Christopher A. Manfredi regarding proposed joint venture

3    and financing transactions involving my transactions in

4    Hawaii real estate, paren, transactions.

5              Do you remember receiving a letter of that type?

6    A    Yes; like I said, yes.

7    Q    But it's your testimony today you don't know if this

8    is the actual letter that you received?  That's your

9    testimony?

10   A    That's correct.  I didn't read through the whole

11   document.

12   Q    How many pages is this document, sir, just tell us?

13   A    Seven.

14   Q    Sir, when you perform your duties as the business

15   construction manager for Diamante Cabo San Lucas, let's

16   say architectural plans are given to you for the building,

17   do you read the architectural plans or not?

18   A    I read them.

19   Q    Because it's important to read them, isn't that true?

20   A    Yes; otherwise the building could be built wrong and

21   you could miss something, correct.

22   Q    Did you think it would be important, sir, to read a

23   letter addressed to you regarding your Hawaiian

24   investments that detailed the percentage of interest each

25   person had before the closing, Lehman closing?  Would that

Kaiser - Cross/Haley

1135

```
 1    be important to you in connection with your finances and

 2    interests, yes or no?

 3    A    Yes.

 4    Q    Sir, would you kindly take a look at Exhibit 31.

 5    Take your time to read that to yourself.

 6    A    No; I don't remember seeing this document.

 7    Q    Sir, before you took the witness stand after our

 8    break, did you meet with the prosecutor where he showed

 9    you a series of documents wherein your signature appears

10    to appear on the document and identify those documents

11    that you say contained your signature as opposed to those

12    documents that you say do not contain your signature?  Do

13    you remember that meeting?

14    A    Yes.

15    Q    And isn't it a fact, sir, that at that point in time

16    you told the prosecutor as relates to that particular

17    document that does contain your signature?

18                MR. MISKIEWICZ:  Objection.

19                THE COURT:  Overruled.  You can answer that.

20    A    No.

21    Q    Sir, kindly take a look at a document marked Kenner

22    Exhibit 32.

23    A    Yes.

24    Q    Do you recognize that document?

25    A    Yes.
```

Kaiser - Cross/Haley

1136

1  Q    Do you recognize your signature on that document?

2  A    Again, it's a photocopy so I can't.

3  Q    Sir, is it not true that there became -- there came a

4  point in time where you became the managing member of

5  Na'alehu Management, LLC, that happened, right?

6  A    Yes.

7  Q    And isn't this the document by which you became the

8  managing member of Na'alehu Management LLC which bears the

9  signature of both Phil Kenner as well as yourself?

10  A    I said it looks like that.  I can't determine that.

11  I have had my name forged more than once so I don't look

12  at things just arbitrarily, say it's legit.

13  Q    Do you believe you answered my question when I said

14  -- when I asked you whether or not that was your

15  signature?  Do you believe that answer you gave was

16  responsive to my question, sir?

17          MR. MISKIEWICZ:  Objection.

18          THE COURT:  Sustained.

19  Q    Well, can we agree, sir, that this document that

20  gives you managing authority, that this is a document that

21  gives you managing authority over Na'alehu Management, LLC

22  is that true?

23  A    Yes.

24  Q    Was there any other document in your memory that you

25  signed other than this document that gave you that

Kaiser - Cross/Haley

1137

1    authority to be managing member of Na'alehu Management,

2    LLC?

3    A    No.

4                 (Continued on next page.)

Kaiser - Cross/Mr. Haley

1138

1    CROSS-EXAMINATION (Continued)

2    BY MR. HALEY:

3    Q.    Who is Darryl Sydor?

4    A.    He's a hockey player.

5    Q.    Was there a lawsuit that you were involved in where

6    he brought suit against you as relates to a promissory

7    note?

8    A.    I believe it was Phil Kenner that brought the suit.

9    Q.    Well, didn't Darryl Sydor come in as an intervenor in

10   that suit, sir?

11   A.    Yes.

12   Q.    And ultimately you settled the suit and paid him.

13   Isn't that true?

14   A.    No.

15   Q.    Well, was any part of that suit involving the

16   intervenors settled, or has it been settled as of today's

17   date?

18   A.    Yes.

19   Q.    Who did you settle with?

20   A.    First name is Tyson and the last name Nash.

21   Q.    And the settlement with him was the full value of the

22   promissory note plus interest.  Is that correct?

23   A.    Yes, I believe so.

24   Q.    Now, following the Lehman closing, you did receive

25   funds that were then paid directly to you.  Correct, sir?

1139

1   A.   That was paid by who?

2   Q.   After Lehman closing, Na'alehu Ventures distributed,

3   made various payments to various individuals, and those

4   payments included payments directly to you.  Correct?

5   A.   Yes.

6   Q.   I am going to show you a document actually marked as

7   Kenner Exhibit 19 but already in evidence as a government

8   exhibit.

9        Do you see that document?

10  A.   Yes.

11  Q.   Do you recognize it?

12  A.   It's a Northern Trust bank statement.

13  Q.   Does it reflect payments from Na'alehu banks to you

14  following the Lehman closing?

15  A.   Yes.

16  Q.   You testified on direct that part of that payment to

17  you following the Lehman closing involved repayment of

18  salary.  Do you recall that?

19  A.   Yes.

20       MR. MISKIEWICZ:  Your Honor, may the record

21  reflect that he is being shown Government Exhibit 2103.

22       THE COURT:  Yes.

23       MR. HALEY:  Thank you.

24  BY MR. HALEY:

25  Q.   Do you recall that?

Kaiser - Cross/Mr. Haley

1140

1    A.    Yes.

2    Q.    How much do you say it was repayment for wages?  Or

3    payment for wages?  Did you say $193,000 on direct?

4    A.    I thought I said 195.

5    Q.    I take it, sir, that that year or the following year

6    you reported that income on your taxes.  Is that true?

7    A.    Yes.  I gave it to my accountant.

8    Q.    And when you signed the return that your accountant

9    prepared, that was reflected as income on that return.

10   Correct?

11   A.    I don't know if it was capital gains.  I'm not an

12   accountant.  I don't know how it was.

13   Q.    Well, the instructions that you gave to your

14   accountant in order that he might properly prepare your

15   taxes, you advised him that these were, this $195,000 was

16   payment for, wages.  Correct?

17   A.    I believe I did.  Yes.

18   Q.    So your answer a moment ago about you might have been

19   confused about capital gains, you are pretty sure you told

20   him it was wages.

21   A.    I don't know.  Like every year, I go to my

22   accountant, I tell him what I have made, what I have lost,

23   I guess, you know, like I said I'm not an accountant.

24   Q.    No.  But when you meet with your accountant for

25   purposes of preparing your federal tax returns, you are

Kaiser - Cross/Mr. Haley

1141

1   truthful with your accountant.  Correct?

2   A.    Yes.

3   Q.    Now, North Point Properties.  How did you acquire

4   that property in Sag Harbor, sir?  What did you do?

5   A.    You usually wrote up a contract; put I believe 10

6   percent down.

7   Q.    And as relates to the contract, what entity was

8   purchased?

9   A.    North Point Properties.  Or it could have been me, as

10  an individual, at first.  I'm not sure.

11  Q.    All right.  But it is clear when the property was

12  purchased, sir, apart from the contract, itself, it is

13  clear when the property was purchased, the closing

14  documents would reflect North Point Properties as the

15  purchaser?

16  A.    Repeat the question.

17  Q.    Sure.  When you actually closed and purchased the Sag

18  Harbor property, is it not a fact that the closing

19  documents would reflect North Point Properties as the

20  purchaser?

21  A.    Yes.

22  Q.    And who were the members of North Point Properties at

23  that point in time?

24  A.    That was myself.  Vincent Tesoriero.  Chris Manfredi.

25  And Thomas Milan.

Kaiser - Cross/Mr. Haley

1142

1  Q.   Now, in order to effectuate that purchase, you
2  putting in some of your own money.  Is that correct?
3  A.   That's correct.
4  Q.   Did Vincent Tesoriero put in some money?
5  A.   Yes.
6  Q.   Did Chris Manfredi put in some of his own money?
7  A.   No.
8  Q.   How was it that he was acquiring an ownership
9  interest in North Point Properties if he wasn't making a
10  capital contribution?
11  A.   Because he owned a building with Thomas Gephart.  So
12  they had their arrangement.  I didn't get into it with
13  them.
14  Q.   Well --
15  A.   They were partners in a building.
16  Q.   Weren't they acquiring their ownership interest in
17  North Point Properties because, though you were putting in
18  the capital, they were then going to do the sweat work,
19  the sweat equity, in terms of managing the property,
20  obtaining a loan for the property, things of that nature?
21  A.   No.
22  Q.   How was the ownership interest divided North Point
23  Properties?  What was your percentage and what was the
24  percentage of the others?
25  A.   Everyone had 25 percent.

1143

1   Q.   And you acquired 25 percent by making what capital
2   contribution?
3   A.   My initial capital contribution was $70,000.
4   Q.   And Vincent Tesoriero acquired a 25 percent interest
5   in the property by making what capital contribution?
6   A.   I believe in the high 200s, I believe.
7   Q.   And Chris Manfredi acquired a 25 percent interest by
8   making no capital contributions, as I understand it?
9   A.   Like I said, he was partners with Tom Milan, and they
10  were partners on the building and a business.  So they
11  came to the table with, I believe it was 350, somewhere
12  around there.
13  Q.   Well, are you saying that they made a capital
14  contribution of $350,000 at that point?
15  A.   I'm saying it came from Thomas.  But Thomas and Chris
16  Manfredi were involved in a business venture of some -- of
17  I believe the building that he had his car company with.
18           And that was their business, of how they worked
19  that out; not mine.
20  Q.   You were friendly with Chris Manfredi at this point
21  in time.  Is that correct?
22  A.   Yes.
23  Q.   There came a point in time that that friendship
24  dissolved, didn't it?
25  A.   No.

Kaiser - Cross/Mr. Haley

1144

1    Q.    Well, was there any argument between you and him with

2    respect to the Lehman closing, how he wanted to be fully

3    paid in connection with his investment before he would

4    sign off on any of the closing documents?

5          Do you remember that?

6    A.    No.  He wanted to separate from Phil Kenner because

7    he said he was a crook.

8    Q.    Okay.  The transaction involving the sale of the

9    property, the Sag Harbor property, from North Point

10   Properties to Led Better, was Chris Manfredi aware of that

11   transaction?

12   A.    Yes.

13   Q.    Was he aware that Phil Kenner had an ownership

14   interest in Led Better?

15   A.    No.  He was aware that it was being sold.

16   Q.    But you were aware that Phil Kenner had an ownership

17   interest in Led Better.  Correct?

18   A.    After the closing.

19   Q.    Well, at the time of the closing you became aware of

20   it, did you not?

21   A.    Yes.  I became aware of Led Better, the company, at

22   the closing.

23   Q.    And you became aware that Phil Kenner had an

24   ownership I except in Led Better, at the closing?

25   Correct?

Kaiser - Cross/Mr. Haley

1145

1    A.    That's correct.

2    Q.    And that's because it was reflected in the Led Better

3    operating agreement that was part of the closing package

4    which was presented to your attorney in your presence

5    where you then had the opportunity to see that.  Is that

6    correct?

7    A.    No.  I was unaware.  I didn't look at the operating

8    agreement or the closing documents.  That's why we have an

9    attorney.

10   Q.    Well, may I have a moment, Judge?

11              (There was a pause in the proceedings.)

12   BY MR. HALEY:

13   Q.    I'm going to have you take a look at a document

14   Government Exhibit 701 in evidence.  Take your time.

15   A.    Okay.

16   Q.    Does that appear to be the documents associated with

17   the closing of the transaction involving North Point

18   Properties and Led Better?

19   A.    No.

20              This is the deed that I requested.  And this is

21   after Suffolk County took over.  After Suffolk County took

22   over the property, I requested this information from

23   Shimon to actually reacquire the property.

24   Q.    Is it your testimony, sir, that these documents --

25   and I refer to the recording page, the Suffolk County

Kaiser - Cross/Mr. Haley

1146

1    document -- withdrawn.

2            Is it your testimony, sir, that these

3    documents -- the copy of the deed, Schedule A, the legal

4    description, as well as the operating agreement involving

5    Led Better, the document signed by Lauren Gilmore, and the

6    written consent of managing member signed by Lauren

7    Gilmore, were not part of the closing documents that you

8    had available for your inspection when the transaction

9    occurred?

10           Is that your testimony?

11   A.    Yes.  I didn't look at these.  If they were

12   available, I certainly didn't see them.  If you are saying

13   their were available --

14   Q.    Sir, I don't testify.  There has been testimony in

15   this case but I won't repeat that testimony.  It is a

16   matter of record.

17   A.    Okay.

18   Q.    We are talking, are we not, sir, about nine documents

19   I just identified?  Is that true?

20   A.    If you say so.

21   Q.    Sir, I'm not trying to trick you.  Is it nine

22   documents or is it not?  You can count them here.

23           Nine, is it not?

24   A.    Right.

25   Q.    Yes or no?

1147

1    A.    Yes.

2    Q.    Sir, the closing of North Point and Led Better, this

3    was a somewhat of a significant financial event for you?

4    A.    Yes.

5    Q.    And you had an attorney there, is that correct?

6    A.    I believe so.

7    Q.    Do you remember how people were seated at the

8    closing?  Was it an oval table:  You were seated next to

9    your attorney, and Phil Kenner was seated next to his

10   attorney, and papers were then presented for signature and

11   things of that nature?

12         Do you recall that?

13   A.    No.  I don't remember what table we were sitting at.

14   Q.    But you were there, correct?  And you were in the

15   room.  Is that true?

16   A.    I was there.  I don't believe Mr. Kenner was.

17   Q.    All right.  So you say you did receive these

18   documents at some point from Shimon Betesh.  Is that your

19   testimony?

20   A.    After the property was taken, sir, by Suffolk County

21   in 2010.

22   Q.    Well, why did you contact Shimon Betesh and not your

23   own attorney to complain about the closings documents?

24   A.    Because I was in front of Mr. Kenner and I said this

25   property needs to get back, and you need to do it, you

Kaiser - Cross/Mr. Haley

1148

1    need to come up with the money that was allocated to pay

2    for the taxes and get it back.

3            So if it is Shimon, you call whoever the hell

4    you need to call so I can get the property back.

5    Q.    And those were your words:  You can call whoever you

6    have need to call so I get the property back.  Is that

7    correct?

8    A.    And a few curse words.  Probably.  Yes.

9    Q.    Um-hmm.

10            MR. MISKIEWICZ:  Objection.

11            THE COURT:  Sustained.

12   BY MR. HALEY:

13   Q.    Who represented you during the North Point to Led

14   Better closing?

15   A.    I don't recall at this time.

16   Q.    Well, in or about that time, did you have a

17   particular law firm that you utilized for purposes of your

18   legal affairs?

19   A.    No.  I used different ones.  Different attorneys.

20   Different closings.  Different projects.  I didn't use one

21   specific attorney.

22   Q.    Do you remember having to sign documents at the

23   closing?  You, personally?

24   A.    I'm sure I signed some documents at the closing.

25   That's correct.

Kaiser - Cross/Mr. Haley

1149

1    Q.    Those documents were definitely your signatures.   Is

2    that correct?

3    A.    I'm sure they were.  I was at the closing.

4    Q.    Before you signed these documents, did you read those

5    documents?

6    A.    No.  I was with an attorney that would go through the

7    documents.

8    Q.    When you say would go through the documents:  Your

9    attorney would say something like:  This is a TP584.  This

10   reflects the tax transfer.  Here is where you sign.  Here

11   is where they sign.

12          But he explains it to you, does he it not?

13   A.    Usually, they do.  They go through it:  This is the

14   signature page.  They go through pretty quick, you sign,

15   and usually you are out of there pretty quick.

16   Q.    And again, sir, a little off topic, but at the North

17   Point Led Better closing, at no point did you see or ask

18   to see the operating agreement by which Led Better would

19   be able to effectuate this legal transfer.

20   A.    That's correct.

21   Q.    Now, there came a point in time, sir, that a lawsuit

22   was filed involving Nick Privitello and others against

23   Tommy Constantine.  You testified to that on direct.  Do

24   you recall?

25   A.    Yes.

Kaiser - Cross/Mr. Haley

1150

1   Q.   Phil Kenner, as I recall your testimony on direct,

2   assisted and helped organized the filing of that lawsuit.

3   Isn't that true?

4            MR. MISKIEWICZ:  Objection.

5   A.   I didn't testify to that.

6            THE COURT:  Overruled.

7   BY MR. HALEY:

8   Q.   Well, Phil Kenner -- can I have a moment, judge.

9            (There was a pause in the proceedings.)

10  BY MR. HALEY:

11  Q.   Do you know who Michael Stolper is?

12  A.   Yes.

13  Q.   Who is Michael Stolper?

14  A.   He is an attorney.

15  Q.   And did you ever have any interaction with Michael

16  Stolper?

17  A.   Yes.

18            MR. MISKIEWICZ:  May we approach, your Honor?

19            THE COURT:  Yes.

20            (Continued on the following page.)

21

22

23

24

25

Kaiser - Cross/Mr. Haley

1151

1    (Discussion at sidebar ensued as follows.)

2    MR. MISKIEWICZ:  I'm just raising the issue.

3    This is very close to the Brutin line concern.

4    I understand what Mr. Kenner would testify

5    about, but this is also an area where this witness was

6    told many things by Mr. Kenner blaming the other defendant

7    here.

8    I don't know that he has any direct knowledge of

9    what communications he had with, Mr. Kenner had with,

10   Mr. Stolper.  And I think that it also goes beyond the

11   direct.

12   MR. HALEY:  I wasn't going to ask him about

13   conversations Mr. Stolper had with Phil Kenner, judge.

14   THE COURT:  Okay.

15   MR. HALEY:  This has been marked already for

16   identification.  And the reason that it is important is,

17   from the defense standpoint, and it is crystal clear,

18   there came a point in time where the dispute between Phil

19   Kenner and Constantine materialized, and Phil Kenner saw

20   that Tommy Constantine had been mismanaging Eufora.  And

21   indeed, there were issues about the use of a credit card

22   itself.

23   When that occurred, as testified actually by

24   Kristin Peca on direct, when that occurred, what occurred

25   is, Phil Kenner assisted in the filing of that lawsuit,

Kaiser - Cross/Mr. Haley

1152

1   assisted Mr. Stolper in providing information.  And

2   indeed, that is why Phil Kenner was cc'd on this.

3          THE COURT:  You can question him whether or not

4   Phil Kenner assisted in the lawsuit.  But this email is

5   similar to an email you attempted to, if you are

6   attempting to introduce this --

7          MR. HALEY:  No, I am not.

8          Can I say this, your Honor.  What occurred the

9   other day when the government came up and raised the

10  objection as relates to that email, at that point in time

11  I had not made a decision whether I was going to introduce

12  it or not.  They then objected to the introduction.  I

13  then did offer it.  Your Honor made a ruling.  And we left

14  it at that.

15         So every time I mark something, it is not

16  necessarily my intention to do so.  There is a myriad of

17  documents I marked for identification that I am not going

18  to move to introduce.

19         THE COURT:  Okay.  But I don't went you to

20  elicit from him what Mr. Stolper told him about the

21  allegations.

22         MR. HALEY:  No.  And I will recheck my notes.

23  We don't have daily copy.  I wrote it down.  I thought he

24  testified on direct.  I will go back to my notes that Phil

25  Kenner assisted us on the filing of the lawsuit.

Kaiser - Cross/Mr. Haley

1153

1    THE COURT:  Okay.  That is fine.

2    MR. HALEY:  He said I didn't say that.

3    (Discussion at sidebar was concluded.)

4    (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kaiser - Cross/Mr. Haley

1154

1    (The following ensued in open court.)

2    MR. HALEY:  May I have a moment, judge?

3    THE COURT:  Yes.

4  BY MR. HALEY:

5  Q.   As relates to the lawsuit that was filed where

6  Mr. Stolper, Attorney Stolper, represented Nick Privitello

7  and others, were you aware that Phil Kenner assisted in

8  the filing of that lawsuit?  Yes or no?

9  A.   Yes.

10 Q.   Now, the tequila email and the picture of the tequila

11 bottles.  Do you recall answering questions as relates to

12 those items?

13 A.   Yes.

14 Q.   And was it your testimony that at some point in time

15 you received, via FedEx or PS, these tequila bottles?

16 A.   I believe it was two bottles.

17 Q.   Were they empty or was there tequila in the bottles?

18 A.   No, there was tequila in them.

19 Q.   When you received them, did or did they not contain

20 the appropriate import stamp?  If you recall.

21 A.   I gave them to the guy, Fred, who was the

22 distributor.

23       I don't know if they contained the import stamp.

24 I don't know.  I didn't -- I didn't go through the

25 bottles.  I'm not a distributor.  I know nothing about

1155

1   tequila.

2   Q.    Well, do you know if it is -- do you know if UPS or

3   FedEx would accept bottles filled with tequila for mailing

4   to Europe?

5            MR. MISKIEWICZ:  objection.

6            THE COURT:  Sustained.

7   A.    I'm sure you probably have to ship --

8            THE COURT:  Wait.  If I say sustained, you don't

9   have to answer.

10           THE WITNESS:  Sorry.

11  BY MR. HALEY:

12  Q.    Incidentally, sir, just for purposes of the record,

13  with reference to the lawsuit where Mr. Stolper

14  represented various individuals including your mother.

15           Will you kindly take a look at this document

16  here, Kenner Exhibit 27.

17  A.    Okay.

18  Q.    Do you recognize that document?

19  A.    Yes.

20  Q.    Does that appear to be a copy of the lawsuit that was

21  filed?

22  A.    Yes.

23  Q.    Thank you.  Sir, I'm going show you a document marked

24  Kenner Exhibit 33.  And I acknowledge it is a photocopy

25  but please look at this document.

Kaiser - Cross/Mr. Haley

1156

1    Do you recognize the signature on that document?

2  A.    No.

3  Q.    Well, will you kindly take a look -- I'm sorry, sir?

4  A.    It's some woman.  I don't recognize her signature.

5  Q.    Okay.  Did you ever witness Lauren Gilmore sign her

6  name?

7  A.    No.

8  Q.    Who is Lauren Gilmore?

9  A.    I believe it is a friend of Phil Kenner's.

10 Q.    What relationship does Lauren Gilmore have to Led

11 Better Development Company LLC?

12 A.    I believe she was a managing member or something.

13 Q.    Well, at the closing that you attended, wasn't her

14 signature on one of the documents as the managing member?

15 A.    I didn't see the documents.  I said that before.

16 Q.    Well, was there ever an instance, sir, where, with

17 reference to Led Better Development Company LLC, you held

18 a 50 percent interest, Brian Berard held a 25 percent

19 interest, and Vincent Tesoriero held a 25 percent

20 interest?

21         MR. MISKIEWICZ:  Objection.  The document is not

22 in evidence.

23         COURT:  You can ask him the question without

24 reference to the document.

25 A.    No.

Kaiser - Cross/Mr. Haley

1157

1  BY MR. HALEY:

2  Q.   Would you kindly take a look at Kenner Exhibit 34.

3       Do you recognize that document?

4  A.   Yes.

5  Q.   What is it?

6  A.   It is a document.  Has the dates voting John Kaiser a

7  majority of members to become a new managing member of Led

8  Better.

9  Q.   And did you at some point becomes the new managing

10  member of Led Better?

11  A.   Yes.

12  Q.   This is a photocopy, sir, but there does appear to be

13  a signature.  Do you recognize that signature?

14  A.   Like I said, it is a photocopy.  It looks like mine.

15  Q.   So this photocopy does look like your signature.  Is

16  that correct?  Is that -- what you just said.

17  A.   Yes.

18  Q.   Do you remember recognize the signature that appears

19  underneath that?

20  A.   It says Brian Berard.

21       I wouldn't know it.  I don't know Brian's

22  signature, no.

23  Q.   Well, did Brian Berard sign that document in your

24  presence?

25  A.   I believe it is missing Vincent Tesoriero.

Kaiser - Cross/Mr. Haley

1158

1    Q.    My question is, sir, did Brian Berard sign that

2    document in your presence?

3    A.    I don't recall.

4    Q.    Now, Mr. Kaiser, was there ever an instance where you

5    received -- withdrawn.

6          Does the name Abraham Lerner and Arnold LLP mean

7    anything to you?

8    A.    No.

9    Q.    Did your mother, to your knowledge, ever have an

10   investment account at Abraham Lerner and Arnold LLP?

11   A.    I don't recall.

12   Q.    Well, I'm going to show you a document, sir, already

13   marked in evidence as Kenner Exhibit 41, and point to a

14   receipt of funds into a TD bank account with your name and

15   address as the account holder, reflecting on June 11,

16   2010, a wire transfer, outgoing, Abraham Lerner and Arnold

17   LLP, a deposit there in the amount of $149,000.

18         Do you see that?

19   A.    Yes.

20   Q.    And then an outgoing wire for $50,000.  Do you see

21   that?

22   A.    Yes.

23         MR. MISKIEWICZ:  Your Honor, counsel hasn't

24   offered this into evidence.

25         THE COURT:  I thought he said it was in

Kaiser - Cross/Mr. Haley

1159

```
1    evidence.

2              MR. HALEY:  It is in evidence.

3              This is the bank record, Jim.  I believe we

4    stipulated to these.

5              MR. MISKIEWICZ:  Yes, you haven't offered it.

6              THE COURT:  What number is it?

7              MR. HALEY:  Counsel is correct, Judge.  I

8    apologize.

9              Pursuant to stipulation, judge, I am offering

10   into evidence Kenner Exhibit 41 and Kenner Exhibit 42.

11             THE COURT:  Correct?

12             MR. MISKIEWICZ:  Yes.

13             THE COURT:  Any objection?

14             MR. LaRUSSO:  No, your Honor.

15             THE COURT:  Kenner 41 and 42 are admitted.

16             (Kenner Exhibit 41 in evidence.)

17             (Kenner Exhibit 42 in evidence.)

18   BY MR. HALEY:

19   Q.   Actually, sir, let me go first to Kenner Exhibit 42.

20             Again, sir, Kenner Exhibit 42 now marked in

21   evidence.  TD Bank.  John Kaiser.  7 Holly Lane.

22   Setauket.

23             Do you see that?

24   A.   Yes.

25   Q.   This appears to be, or this is your checking account.
```

Kaiser - Cross/Mr. Haley

1160

1   Is that true?

2   A.    Yes.

3   Q.    Now, the document reflects that on August 20, 2010,

4   there was an incoming wire transfer of $147,000.  The

5   source of that was Abraham Lerner and Arnold LLP.

6         Do you see that?

7   A.    Yes.

8   Q.    As you sit here today, would you describe to us your

9   knowledge and understanding of that $147,000 deposit into

10  your account.  Where did it come from?

11  A.    As I'm sitting here, I don't recall.  I don't know

12  who Abraham Lerner and Arnold are.

13  Q.    Did your mother ever lend you or provide to you a sum

14  in the amount of $147,000 at any point in time?

15  A.    Yes.

16  Q.    When she did that, the specific $147,000, by what

17  means was that deposit made into your account?

18  A.    I don't recall.

19  Q.    Well, we can agree, sir, that after receiving that

20  $147,000 on August 20, you then --

21        MR. MISKIEWICZ:  May I approach?  I don't have

22  those pages.

23        MR. LaRUSSO:  I'm sorry.

24        MR. MISKIEWICZ:  I can just look over his

25  shoulder.

Kaiser - Cross/Mr. Haley

1161

1    BY MR. HALEY:

2    Q.    We can agree, sir, that after receiving on August 20,

3    2010, a wire transfer in the amount of $147,000, you

4    transferred out $95,000 by way of a wire transfer to Brian

5    Berard on August 23, 2010.  Correct?

6    A.    That's what it looks like.

7    Q.    Do you recall the purpose for which you transferred

8    $95,000 to Brian Berard on August 23, 2010?

9    A.    I'm going to say something to do with the PVLs.

10             THE COURT:  Is this a good point for the break?

11             MR. HALEY:  It is, sir.  Thank you.

12             THE COURT:  We will take our afternoon break.

13   Don't discuss the case.

14             (Recess taken at 3:20 pm.)

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

J. KAISER-CROSS-HALEY                                    1162

1              THE CLERK:  All rise.

2              THE COURT:  You may be seated.

3              All right.  Can we bring the jury in.

4              MR. LaRUSSO:  Before the jury comes out, one

5     particular matter.  I spoke to the government, I spoke to

6     Mr. Haley, subject to your approval.  Mr. Haley will probably

7     go about another 10, 15 minutes, depending.  My client and I

8     discussed it, we have a few issues.  I'd like to try to

9     resolve before I start cross.  Would you mind if we break a

10    little early today?

11             THE COURT:  Sure.

12             (Whereupon the jury enters the courtroom at 3:50

13    p.m.)

14             THE COURT:  You may be seated.

15             Proceed, Mr. Haley.

16    CONTINUED CROSS EXAMINATION

17    BY MR. HALEY:

18    Q    Mr. Kaiser, I'm going to show you a document marked as

19    Kenner 45 for identification.  You can look at the entire

20    document, but I'd ask you to look at the signature page as

21    well.

22             (Handing.)

23    A    Okay.

24    Q    Do you recognize your signature on that document, sir?

25    A    Yes.

1  Q    On which page, sir?

2  A    11.

3  Q    Is that an affidavit that you signed in connection with

4  the lawsuit as indicated on the front page of the document?

5  A    Yes.

6  Q    Sir, kindly take a look at the document marked Kenner

7  Exhibit 37.

8  A    Yes.

9  Q    The photocopy, do you recognize the handwriting on that

10 document?

11 A    Yes.

12 Q    Whose handwriting is it?

13 A    It looks like mine.

14 Q    Sir, kindly, take a look at Kenner Exhibit 38.  You are

15 entitled to read the entire document, but I'd focus you on

16 reading the top portion of that document.

17        (Handing. )

18 A    Okay.

19 Q    To the best of your knowledge, sir, is that an e-mail

20 sent to you by Phil Kenner on Wednesday, July 12th, 2006, at

21 3:06 p.m.?

22 A    It's not my e-mail account.

23 Q    I understand.  It's to Chris Manfredi and John Kaiser.

24 My question simply is, is that or is that not an e-mail sent

25 to you on that date?

J. KAISER-CROSS-HALEY                              1164

1    A    My e-mail is not on here.

2    Q    You can't --

3    A    No, I can't.  Not from this document.

4    Q    Incidentally, the closing documents in connection with

5    the Lehman closing did contain various representations and

6    warranties in the body of the closing documents themselves, is

7    that true?

8    A    I didn't read the Lehman closing documents.

9    Q    Did you have any interest, sir, before the closing, in

10   knowing what representations and warranties were going to be

11   made between the various business entities as relates to the

12   closing?

13   A    No.  His attorney was working on it.  Like I said, I did

14   not read the Lehman closing docs related to Hawaii.

15   Q    Now, when you said the Lehman closing, as a result of

16   that closing you became, as we learned a moment ago, the

17   managing member of Na'alehu Ventures, right?

18   A    No.  No, that's not correct.

19   Q    Following the closing you became the managing member of

20   Na'alehu Management, is that correct?

21   A    No.

22   Q    Well, at some point did you become the managing member of

23   Na'alehu Management?

24   A    That was in 2008.

25   Q    I see.  And was that before or after the Lehman closing?

1  A    I believe it was roughly, almost -- approximately two

2  years after the Lehman closing.

3  Q    When you became the managing member of that entity, had

4  the milestone payments been made by Lehman at that point in

5  time?  By the "milestone payments," we're talking about the

6  $4 million in milestone payments that were to be made pursuant

7  to the joint venture agreement.  Do you know what I'm

8  referring to?

9  A    Yes.  The milestones weren't met.  There was no payments

10  ever made.

11  Q    Did there come a time -- withdrawn.

12        Would you kindly take a look at Kenner Exhibit 35.

13        (Handing.)

14  Q    Just read it yourself.

15  A    Yes.

16  Q    Does the name Alan Worden mean anything to you?

17  A    Yes.

18  Q    Who is Alan Worden?

19  A    Alan Worden is the managing member of Windwalker, which

20  did the day-to-day work for the Hawaii.

21  Q    Is this a letter, sir -- I understand it's a copy.  A

22  copy of a letter, that no one signed, that you wrote to Alan

23  Worden?

24  A    No.  This was a letter typed on my computer by Phil

25  Kenner and sent to Alan Worden.

1   Q    Well, did there come a point in time, sir, that you, as

2   well as Phil Kenner, became concerned that Windalker was not

3   fulfilling its obligations under the joint venture agreement

4   in terms of making the milestone payments?

5   A    The milestones were not met.

6   Q    From your perspective, which entity was at fault for not

7   making the milestone, Na'alehu Ventures or Windwalker?

8   A    I believe Windwalker.

9   Q    And based on your understanding of the joint venture

10  agreement, weren't they in default for not doing so?

11  A    I don't believe that actually created a default.

12  Q    In your capacity as the managing member of Na'alehu

13  Ventures, did you ever take any action, by way of a letter

14  like that or otherwise, to insist that Windwalker met the

15  milestones?

16  A    No.  That was 2008 and the whole country was in a free

17  fall.  No milestones would be met at that time.

18  Q    So the answer is no, you did not make any effort at that

19  point in time, by way of letter or other actions, to insist

20  the meet the milestones, is that correct?

21  A    Excuse me?

22  Q    Is the answer no, sir, I did not?

23  A    No.  I actually reached out to Alan via the phone.

24  Q    When you reached out to Alan via the phone, did you then

25  make the same type of complaint that's set forth in this

J. KAISER-CROSS-HALEY                                    1167

1  letter as to the failure of them to fulfill the milestone on

2  the joint venture agreement?

3  A    No.

4  Q    Did you believe, sir, that you had a fiduciary obligation

5  to do so, yes or no?

6  A    Yes.  That's why I called him up.

7  Q    Did this letter that you say was generated on Phil

8  Kenner's computer, once again, does it also express the

9  dissatisfaction with the failure to meet the milestones, yes

10  or no?

11  A    I never said it was generated on Phil's computer.

12  Q    I'm sorry.  Whose computer -- you're right.  Is was

13  generated on your computer, is that correct?

14  A    Phil typed it on my computer and sent it to Alan Worden.

15  Q    With or without your knowledge?

16  A    Without my knowledge.

17  Q    But the content of this document does contain, I take it,

18  the same issues of dispute that you raised in the telephone

19  conversation you had with Alan Worden, correct?

20  A    Relative to the milestones, I asked Alan whether we could

21  change the milestones so they could met due to the

22  environment -- economic environment in the U.S. at that time.

23  Q    Does this letter also, sir, express dissatisfaction with

24  the milestones not having been met, yes or no?

25            MR. MISKIEWICZ:  Objection.

1168

1        THE COURT:  Sustained.  The letter's not in

2   evidence.

3   Q    I apologize for jumping around.  It's sometimes

4   necessary.  Returning to -- here's your deposition transcript

5   testimony again.

6        (Handing.)

7   Q    Please turn to page 925, line 1.  Let's stay on the same

8   page.  At that point in time, sir, is it not a fact that you

9   give the following answer to this question --

10       MR. MISKIEWICZ:  Objection.  It's not in evidence.

11  There hasn't been an opportunity to challenge it.

12       THE COURT:  Approach.

13       (Whereupon a side-bar conference was conducted.)

14       (Matter continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1169

1     (Side-bar conference.)

2     MR. HALEY:  Page 925, line 1, and the answer to

3  that.  Then, Your Honor, the next reading on page 924, line 8,

4  simply this question and this answer to that question.  For

5  the record, this is, as indicated, I believe it's identified

6  as sworn testimony in connection with the Nolan arbitration.

7  I respectfully submit that to the extent that it's our claim

8  there are inconsistencies between the testimony that he has

9  given before this Court and the testimony he gave in the Nolan

10  arbitration, I have a right to ask him those questions.

11     THE COURT:  I agree.

12     (Whereupon the side-bar conference was concluded.)

13     (Matter continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1170

1      (Matter continued in Open Court.)

2  CONTINUED CROSS EXAMINATION

3  BY MR. HALEY:

4  Q    Sir, Defendant Exhibit 39, the deposition testimony of

5  Nolan arbitration.  Is it not a fact, sir, when asked the

6  following question you gave the following answer (reading):

7          "QUESTION:  So at the time, was there any

8  representation about getting back this money when the Cabo

9  deal closed?

10          ANSWER:  It was to supposed to be a short-term loan.

11  I thought it was three to six months, because I had also

12  raised some other funds from family and friends that were

13  getting a little antsy about it."

14          Do you recall that testimony and that answer?

15  A    Yeah.  That's what Phil Kenner told me.

16  Q    Well, were your -- Phil Kenner told you that your friends

17  were getting a little antsy about it?

18  A    No.  He told me about the loan coming back.  In 2006.

19  Q    I'll try to ask the question again.

20  A    Sure.

21  Q    My question is simply this, did you or did you not,

22  during the course of that deposition, give this answer to this

23  question (reading):

24          "QUESTION:  So at the time, was there any

25  representation about getting paid back this money when the

1171

1    Cabo deal closed?

2            ANSWER:  It was supposed to be a short-term loan.  I

3    thought it was three to six months, because I also had raised

4    some other funds from family and friends that were getting a

5    little antsy about it."

6            Is that the answer that you gave to the question,

7    yes or no?

8    A    Yes.

9    Q    Now, I'm almost finished.  I'm going to ask you to take a

10   look at page 927 of this deposition.  Specifically, beginning

11   at line 8.  Did you or did you not give these answer to the

12   question as indicated (reading):

13           "QUESTION:  When you made the decision -- or when

14   you were made aware that some of this money was going to be

15   lent out rather than sitting idle in the account, that

16   15 percent, did you know there was some risk?

17           ANSWER:  That the 15 percent -- actually, the loans,

18   I didn't think they were going to be, to me, it wasn't a risky

19   loan.  Now, some of the land purchases were a risk.  It was a

20   few miles away from a volcano.  It was a tough sale period.

21   But the loans, even investors that I brought in, I said,

22   listen, this guy, I gave him a whole story about Kenner Jowdy

23   backed by land.  It's good.  Better than your money sitting

24   somewhere."

25           Is that the answer that you gave to that question,

1172

1    yes or no?

2    A    Yes.

3              MR. HALEY:  May I have a moment, Judge?

4              THE COURT:  Yes.

5              (Pause in the proceeding.)

6              MR. HALEY:  Your Honor, I have no further questions.

7              THE COURT:  I talked to Mr. LaRusso earlier, and

8    he's not going to be able to do his cross-examination in the

9    next 15 minutes.  So I'll let you go for today.  We'll

10   reconvene tomorrow morning at 9:30 with Mr. LaRusso's cross of

11   Mr. Kaiser.

12             Don't read or listen to anything regarding the case,

13   don't discuss the case among yourselves or with anyone else.

14   Have a good night and we'll see you tomorrow morning at 9:30.

15             (Whereupon the jury leaves the courtroom at 4:10

16   p.m.)

17             THE COURT:  You can all be seated.

18             Mr. Kaiser, you may step down.  See you tomorrow

19   morning at 9:30.

20             THE WITNESS:  Thank you.

21             (Witness excused at 4:10 p.m.)

22             THE COURT:  Two things I want to place on the

23   record.  One was from today.  It came up more than once.  It

24   came up yesterday in terms of leading questions.  The

25   government's objections to the questioning regarding the

1173

1 relationship with Mr. Freeh and the FBI. Obviously, as you
2 know from the opening statements, it's part of the defense
3 theory of the case. So I'm not going to preclude them from
4 trying to set forth evidence of what relationship was between
5 people that have prior -- pointing at the FBI in some way. So
6 that was the reason for that ruling.
7        I overruled some of the objections. It's happened a
8 couple of times where the government asks a very broad
9 question to which they receive no answer, and then they
10 divided up into more specific questions, sort of covering
11 everything that would have been contained within the broad
12 answer.
13        So for example, like Mr. and Ms. Peca, they were
14 asked a question like did you authorize any of your money
15 going to anything else other than Hawaii, and the answer would
16 be no. And then they would embark on a series of questions
17 that were leading in the sense that they were asking well, did
18 you ever authorize it to go to X or did you ever authorize it
19 to go to Y.
20        They're doing that, obviously, because they intend,
21 I believe, I assume, to offer proof that monies went to other
22 things that they did not authorize. And to avoid any question
23 in summation or in the jury's mind as to whether or not the
24 witness may have forgotten they had authorized some other use
25 of the money, the government's entitled to focus them specific

1174

1    ally on a particular transaction and say did you authorize

2    this.  Yesterday it had to do with documentation.  The

3    government asked a very broad question.  Did you have any

4    documents -- did you have any documents?  And then the answer

5    is no.  And then there were some examples given.  Did you have

6    any receipts?  No.  Did you have any of this.  No.  That was

7    the objection.

8              Those are leading questions.  There's no other way

9    to ask those questions in a non-leading way, in the

10   Government's effort to exclude certain possible arguments with

11   respect to a witness' knowledge or lack of knowledge with

12   respect to a particular document or a particular transaction.

13             So that why, in those particular areas, I will

14   allow, I will permit a leading questions.  But on other

15   occasions they have been leading and I have sustained the

16   objection.  Okay?

17             MR. HALEY:  Thank you.

18             THE COURT:  Do you want to raise something with the

19   court?

20             MS. KOMATIREDDY:  Just one thing, Your Honor.  In

21   anticipation of tomorrow, during Mr. Gonya's testimony we

22   anticipate using a certified copy of certain excerpts of a

23   prior deposition transcript.  We disclosed that to counsel

24   earlier today.  Defense counsel indicated that he would object

25   on the basis of relevance.  Just to head off that issue, I

1175

1  want to hand up to the Court the actual excerpts we plan to

2  introduce, use as well as a letter to explain the relevance of

3  each of the excerpts.

4          THE COURT:  These are excerpts of the witness' prior

5  testimony?

6          MS. KOMATIREDDY:  They are excerpts of

7  Mr. Constantine's prior testimony that was given approximately

8  two weeks before the initiation of the GSF fraud.  I thought

9  the letter may help you instead of a bunch of exhibits.  I

10  wanted the Court to have a chance to review.

11          MR. LaRUSSO:  Your Honor, I didn't have an

12  opportunity to provide a written position.

13          THE COURT:  Why don't you tell me.  I'll read this

14  tonight.  Why don't you just tell me why you --

15          MR. LaRUSSO:  I'll just tell you generally.  What I

16  indicated was that I had a chance over the lunch hour to read

17  about two-thirds of it.  In my view, most of it does not

18  relate to any of the issues in this particular case.  It talks

19  about Mr. Constantine's background.  It talks about some other

20  accounts, other investments.  There are some references to his

21  occupation in racing cars, the time period.

22          For the most part, I feel much of it has nothing to

23  do with what the government is offering in this case.  That

24  is, the Global Settlement Fund monies were paid for

25  non-purposeful items that the witness has so far testified to.

1176

1 I think it goes far beyond the scope and there are some

2 prejudicial matters in there that clearly don't relate to this

3 case.

4          In my review, Judge, that's what I see.  I haven't

5 seen all of the pages.  There may be one or two that may have

6 some relevance.  I've indicated that to the government.  But

7 right now, that's my view.  That's where I am.

8          I apologize, I think this particular one, this

9 deposition deals with my client's assets.  I think the suit

10 that was being brought against him at this point was trying to

11 determine whether or not they were able to collect if they

12 successful in that suit.  That seems to be the overall theme

13 of this deposition.

14 THE COURT:  Okay.  Are we going to break for

15 Mr. Gonya or finish with Mr. Kaiser?

16          MS. KOMATIREDDY:  We can finish in the morning with

17 Mr. Kaiser.  We can deal with Mr. Gonya in the afternoon.

18          MR. LaRUSSO:  We start at 9:30.  I should be done by

19 12:30, 1 o'clock.

20          MS. KOMATIREDDY:  I don't anticipate Mr. Gonya being

21 more than 30 minutes, Your Honor.

22 THE COURT:  Then who is after Mr. Gonya?

23          MS. KOMATIREDDY:  Mr. Privitello.

24          MR. OLIVERAS:  Your Honor, Mr. Constantine would

25 like to have his bail movement adjusted so he can move around

1177

1    over the weekend.  His family is in town.  Between 7:00 p.m.

2    and 10:00 p.m., with your approval.

3              THE COURT:  That's fine.

4              I'll see you tomorrow morning at 9:30.

5              (Whereupon the matter was adjourned to May 14, 2015

6    at 9:30 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

W I T N E S S E S                                           1178

J O H N     K A I S E R                                    **1040**

**CONTINUED DIRECT EXAMINATION**                           **1040**

BY MR. MISKIEWICZ

**VOIR DIRE EXAMINATION**                                  **1062**

BY MR. LARUSSO:

**CONTINUED DIRECT EXAMINATION**                           **1063**

BY MR. MISKIEWICZ

**CROSS-EXAMINATION**                                      **1089**

BY MR. HALEY

```
                    E X H I B I T S                         1179

 1

 2    KENNER EXHIBIT 41 IN EVIDENCE                      1159

 3    KENNER EXHIBIT 42 IN EVIDENCE                      1159

 4    KENNER EXHIBIT 36 IN EVIDENCE                      1102

 5

 6

 7    GOVERNMENT EXHIBIT JK-1                            1063

 8    GOVERNMENT EXHIBIT 304                             1079

 9    GOVERNMENT EXHIBIT 304 IN EVIDENCE.               1079

10    GOVERNMENT EXHIBIT 304 T.2 IN EVIDENCE            1079

11    GOVERNMENT EXHIBIT 905 IN EVIDENCE                1083

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

U.S.A. v. KENNER and CONSTANTINE                                    1

## $

**$147,000** [6] - 1160:4, 1160:9, 1160:14, 1160:16, 1160:20, 1161:3
**$149,000** [1] - 1158:17
**$150,000** [1] - 1059:20
**$193,000** [1] - 1140:3
**$195,000** [1] - 1140:15
**$200,000** [7] - 1052:6, 1064:2, 1064:14, 1064:24, 1066:13, 1070:16
**$25,000** [1] - 1050:19
**$275,000** [6] - 1052:6, 1053:23, 1054:2, 1054:18, 1055:5, 1058:1
**$30,000** [5] - 1046:21, 1047:1, 1047:3, 1048:3, 1048:20
**$300,000** [1] - 1042:23, 1043:16, 1051:9
**$350,000** [1] - 1143:14
**$40,000** [1] - 1049:15
**$40,300** [2] - 1049:12, 1049:15
**$50,000** [2] - 1059:21, 1158:20
**$500** [6] - 1098:21, 1098:23, 1099:1, 1099:12, 1100:10, 1100:18
**$600,000** [1] - 1042:10
**$70,000** [1] - 1143:3
**$95,000** [2] - 1161:4, 1161:8

## '

**'03** [1] - 1096:17
**'06** [1] - 1041:11
**'07** [1] - 1087:11
**'09** [3] - 1059:10, 1062:15, 1062:25

## 0

**05-22** [1] - 1050:14

## 1

**1** [7] - 1041:22, 1099:8, 1112:1, 1114:20, 1168:7, 1169:2, 1176:19
**1.5** [1] - 1061:5
**1.6** [2] - 1042:7,

1042:8
**10** [3] - 1077:21, 1141:5, 1162:7
**100** [1] - 1031:7
**1040** [2] - 1178:2, 1178:3
**1062** [1] - 1178:5
**1063** [2] - 1178:7, 1179:7
**1079** [3] - 1179:8, 1179:9, 1179:10
**1083** [1] - 1179:11
**1089** [1] - 1178:9
**10:00** [1] - 1177:2
**10:05** [1] - 1039:2
**11** [2] - 1158:15, 1163:2
**1101** [1] - 1059:5
**1102** [1] - 1179:4
**11501** [1] - 1031:2
**11572** [1] - 1031:5
**1159** [2] - 1179:2, 1179:3
**11722** [2] - 1030:17, 1031:8
**11733** [1] - 1132:22
**11749** [1] - 1030:23
**11:00** [3] - 1120:14, 1120:22, 1121:3
**11:10** [1] - 1078:24
**11:45** [1] - 1078:24
**12** [2] - 1046:21, 1127:15
**12/01/09** [1] - 1059:9
**12/16** [1] - 1059:15
**12/29** [1] - 1059:15
**12:30** [1] - 1176:19
**12th** [1] - 1163:20
**13** [2] - 1030:9, 1090:15
**13-CR-607** [2] - 1030:3, 1031:12
**14** [1] - 1177:5
**15** [9] - 1104:21, 1105:22, 1106:3, 1124:3, 1126:15, 1162:7, 1171:16, 1171:17, 1172:9
**1500** [1] - 1102:17
**16** [1] - 1033:25
**1601** [1] - 1030:22
**1603** [2] - 1047:13, 1047:14
**1604** [1] - 1049:21
**1721** [1] - 1048:14
**1724** [5] - 1049:1, 1049:3, 1050:8
**1727** [1] - 1050:9
**19** [7] - 1108:12,

1110:20, 1110:25, 1120:13, 1120:22, 1121:3, 1139:7
**195** [1] - 1140:4
**1:45** [2] - 1112:11, 1118:19

## 2

**2** [1] - 1037:2
**2/12** [1] - 1047:24
**2/12/2009** [1] - 1047:22
**2/20/09** [1] - 1049:7
**2/26** [1] - 1049:10
**20** [4] - 1124:3, 1160:3, 1160:20, 1161:2
**200** [1] - 1052:5
**200,000** [2] - 1058:25, 1061:4
**2003** [1] - 1096:17
**2004** [2] - 1127:15, 1127:21
**2005** [1] - 1105:24
**2006** [9] - 1041:6, 1105:8, 1107:20, 1132:20, 1133:1, 1133:4, 1134:1, 1163:20, 1170:18
**2007** [8] - 1042:11, 1042:15, 1052:7, 1053:18, 1055:4, 1056:7, 1056:13, 1057:11
**2008** [4] - 1052:8, 1074:25, 1164:24, 1166:16
**2009** [2] - 1057:1, 1058:2
**200s** [1] - 1143:6
**2010** [14] - 1071:17, 1108:12, 1110:20, 1110:25, 1118:10, 1120:13, 1120:22, 1130:23, 1147:21, 1158:16, 1160:3, 1161:3, 1161:5, 1161:8
**2013** [2] - 1090:15, 1108:13
**2014** [1] - 1033:25
**2015** [4] - 1030:9, 1122:24, 1177:5
**21** [2] - 1132:20, 1133:25
**2103** [1] - 1139:21
**23** [2] - 1161:5, 1161:8
**2303** [4] - 1045:23, 1045:25, 1046:5,

1046:20
**25** [7] - 1054:5, 1142:25, 1143:1, 1143:4, 1143:7, 1156:18, 1156:19
**250** [1] - 1097:11
**26** [1] - 1031:4
**27** [1] - 1155:16
**275** [1] - 1054:9
**28** [1] - 1132:7

## 3

**3** [3] - 1040:11, 1040:13, 1046:19
**30** [2] - 1105:14, 1176:21
**30-35** [1] - 1126:8
**300** [1] - 1031:1
**300K** [1] - 1044:16
**302** [2] - 1112:17, 1115:25
**304** [9] - 1074:11, 1074:23, 1079:8, 1079:13, 1079:14, 1079:22, 1179:8, 1179:9, 1179:10
**304T.2** [3] - 1079:18, 1079:22, 1079:25
**31** [1] - 1135:4
**32** [1] - 1135:22
**33** [1] - 1155:24
**34** [1] - 1157:2
**341** [1] - 1031:2
**35** [1] - 1165:12
**350** [1] - 1143:11
**3500** [7] - 1034:2, 1034:3, 1034:24, 1086:15, 1112:1, 1113:23, 1114:20
**36** [5] - 1101:20, 1102:2, 1102:6, 1102:7, 1179:4
**37** [1] - 1163:7
**38** [1] - 1163:14
**39** [3] - 1106:17, 1125:10, 1170:4
**3:06** [1] - 1163:21
**3:20** [1] - 1161:14
**3:50** [1] - 1162:12

## 4

**4** [3] - 1037:3, 1042:2, 1165:6
**403** [1] - 1035:18
**41** [5] - 1158:13, 1159:10, 1159:15, 1159:16, 1179:2
**42** [6] - 1159:10,

1159:15, 1159:17, 1159:19, 1159:20, 1179:3
**425** [1] - 1030:22
**43** [1] - 1109:8
**44** [1] - 1129:25
**45** [1] - 1162:19
**4:10** [2] - 1172:15, 1172:21

## 5

**5** [7] - 1041:15, 1041:16, 1042:20, 1077:20, 1107:13, 1117:25, 1121:8
**50** [3] - 1066:3, 1107:14, 1156:18
**5104** [2] - 1123:24, 1124:17

## 6

**6** [3] - 1074:25, 1117:25, 1121:8
**631-712-6105** [1] - 1031:8

## 7

**7** [4] - 1125:16, 1127:21, 1132:21, 1159:21
**70** [1] - 1126:7
**701** [1] - 1145:14
**7:00** [1] - 1177:1

## 8

**8** [3] - 1046:19, 1169:3, 1171:11
**8.5** [1] - 1042:17
**83** [1] - 1125:16
**88** [1] - 1125:13

## 9

**9** [2] - 1108:13, 1118:10
**9/11** [1] - 1094:18
**905** [5] - 1083:4, 1083:19, 1083:22, 1083:23, 1179:11
**924** [1] - 1169:3
**925** [2] - 1168:7, 1169:2
**927** [1] - 1171:10
**95-4968** [1] - 1132:22
**96772** [1] - 1132:23
**9990** [1] - 1047:22

**9:30** [7] - 1030:10, 1172:10, 1172:14, 1172:19, 1176:18, 1177:4, 1177:6

**A**

**a.m** [6] - 1030:10, 1039:3, 1120:14, 1120:22, 1121:3, 1177:6
**a/k/a** [2] - 1030:6, 1030:8
**a15** [1] - 1105:6
**abbreviate** [1] - 1101:14
**ability** [1] - 1053:3
**able** [7] - 1054:21, 1078:2, 1078:13, 1082:23, 1149:19, 1172:8, 1176:11
**Abraham** [5] - 1158:6, 1158:10, 1158:16, 1160:5, 1160:12
**absence** [2] - 1074:17, 1078:25
**absolve** [1] - 1069:18
**accept** [3] - 1077:12, 1077:13, 1155:3
**acceptable** [1] - 1044:24
**accepted** [1] - 1099:12
**accompanying** [1] - 1079:17
**accomplish** [1] - 1043:10
**accomplished** [2] - 1043:4, 1079:4
**according** [1] - 1061:3
**account** [28] - 1047:15, 1047:21, 1048:21, 1049:13, 1049:15, 1050:10, 1051:1, 1056:5, 1057:4, 1057:5, 1057:7, 1057:13, 1058:3, 1059:12, 1064:10, 1075:19, 1075:25, 1076:2, 1076:4, 1076:5, 1158:10, 1158:14, 1158:15, 1159:25, 1160:10, 1160:17, 1163:22, 1171:15
**accountant** [8] - 1140:7, 1140:8, 1140:12, 1140:14, 1140:22, 1140:23, 1140:24, 1141:1
**accounts** [1] -

1175:20
**accurate** [1] - 1077:14
**accuse** [1] - 1128:14
**acknowledge** [2] - 1133:25, 1155:24
**acknowledged** [1] - 1086:9
**acquire** [2] - 1125:7, 1141:3
**acquired** [3] - 1143:1, 1143:4, 1143:7
**acquiring** [2] - 1142:8, 1142:16
**acres** [1] - 1097:11
**acting** [1] - 1030:16
**action** [1] - 1166:13
**actions** [1] - 1166:19
**activity** [1] - 1090:14
**actual** [4] - 1042:3, 1133:17, 1134:8, 1175:1
**adamant** [1] - 1064:8
**addition** [2] - 1042:8, 1074:9
**additional** [9] - 1039:11, 1040:17, 1042:10, 1044:22, 1045:5, 1051:7, 1051:8, 1052:3, 1075:8
**address** [6] - 1063:23, 1082:12, 1114:22, 1115:4, 1117:2, 1158:15
**addressed** [2] - 1132:21, 1134:23
**adjourned** [1] - 1177:5
**adjusted** [1] - 1176:25
**admission** [3] - 1075:13, 1079:16, 1083:19
**admit** [1] - 1055:9
**admitted** [9] - 1048:13, 1048:25, 1059:4, 1063:14, 1079:13, 1079:23, 1083:22, 1102:6, 1159:15
**advance** [1] - 1034:12
**advertisement** [1] - 1083:25
**advertising** [1] - 1084:2
**advise** [2] - 1035:25, 1116:5
**advised** [1] - 1140:15
**advises** [1] - 1033:15
**Advisors** [1] - 1048:15
**affairs** [1] - 1148:18
**affidavit** [2] - 1053:18,

1163:3
**afield** [1] - 1113:5
**afoul** [1] - 1052:22
**afternoon** [3] - 1078:20, 1161:12, 1176:17
**afterwards** [2] - 1045:8, 1066:25
**agent** [4] - 1034:9, 1092:11, 1092:16, 1118:17
**Agent** [4] - 1033:8, 1110:6, 1120:12, 1120:13
**agent's** [2] - 1115:5, 1117:5
**agents** [7] - 1108:9, 1108:17, 1120:14, 1120:19, 1122:20, 1122:25, 1131:18
**ago** [7] - 1057:12, 1122:12, 1124:3, 1124:4, 1133:6, 1140:18, 1164:16
**agree** [8] - 1090:22, 1098:23, 1101:12, 1129:20, 1136:19, 1160:19, 1161:2, 1169:11
**agreed** [3] - 1078:19, 1078:21, 1105:3
**Agreement** [2] - 1123:23, 1132:4
**agreement** [11] - 1043:11, 1104:16, 1127:22, 1145:3, 1145:8, 1146:4, 1149:18, 1165:7, 1166:3, 1166:10, 1167:2
**ahead** [4] - 1041:3, 1058:2, 1086:18, 1110:17
**Alan** [10] - 1165:16, 1165:18, 1165:19, 1165:22, 1165:25, 1166:23, 1166:24, 1167:14, 1167:19, 1167:20
**allegation** [6] - 1036:13, 1053:8, 1075:17, 1075:20, 1075:21, 1076:13
**allegations** [5] - 1037:21, 1039:16, 1039:18, 1040:20, 1152:21
**alleged** [2] - 1034:1, 1076:15
**allegedly** [3] -

1034:16, 1054:4
**alleging** [1] - 1090:4
**allocated** [1] - 1148:1
**allow** [3] - 1054:24, 1092:23, 1174:14
**allowed** [1] - 1115:16
**allows** [3] - 1033:15, 1104:12, 1104:15
**ally** [1] - 1174:1
**almost** [3] - 1129:5, 1165:1, 1171:9
**Alternate** [1] - 1040:11
**alternate** [1] - 1040:13
**Amendment** [3] - 1032:25, 1035:1, 1035:23
**AMERICA** [1] - 1030:3
**amount** [8] - 1044:15, 1048:8, 1050:17, 1053:19, 1121:10, 1158:17, 1160:14, 1161:3
**ANDREW** [1] - 1031:4
**Andrew** [1] - 1032:1
**ANSWER** [3] - 1170:10, 1171:2, 1171:17
**answer** [36] - 1044:13, 1048:12, 1052:24, 1084:10, 1090:19, 1094:10, 1096:12, 1105:1, 1107:18, 1108:21, 1113:15, 1115:10, 1118:12, 1121:19, 1125:18, 1126:17, 1132:15, 1135:19, 1136:15, 1140:18, 1155:9, 1166:18, 1166:22, 1168:9, 1169:2, 1169:4, 1170:6, 1170:14, 1170:22, 1171:6, 1171:11, 1171:25, 1173:9, 1173:12, 1173:15, 1174:4
**Answer** [7] - 1125:23, 1126:3, 1126:11, 1126:13, 1126:22, 1127:3, 1127:6
**answered** [4] - 1100:11, 1107:2, 1121:21, 1136:13
**answering** [2] - 1124:13, 1154:11
**answers** [7] - 1108:19, 1115:11, 1115:20, 1121:22, 1122:14, 1126:23, 1127:7
**anticipate** [3] -

1033:3, 1174:22, 1176:20
**anticipated** [1] - 1071:8
**anticipation** [1] - 1174:21
**antsy** [3] - 1170:13, 1170:17, 1171:5
**apart** [1] - 1141:12
**apologize** [5] - 1108:23, 1125:15, 1159:8, 1168:3, 1176:8
**apostrophe** [1] - 1102:17
**appear** [13] - 1034:2, 1059:15, 1062:14, 1101:20, 1110:18, 1111:12, 1112:2, 1115:24, 1130:11, 1135:10, 1145:16, 1155:20, 1157:12
**appearance** [2] - 1031:14, 1121:14
**APPEARANCES** [1] - 1030:14
**appeared** [2] - 1126:10, 1129:13
**appearing** [3] - 1031:23, 1032:1, 1032:4
**applies** [1] - 1037:18
**appraised** [1] - 1126:8
**appreciate** [3] - 1034:19, 1036:10, 1129:20
**appreciated** [1] - 1113:22
**approach** [10] - 1043:21, 1051:11, 1074:14, 1085:17, 1109:10, 1111:9, 1128:21, 1150:18, 1160:21, 1168:12
**appropriate** [1] - 1154:20
**approval** [2] - 1162:6, 1177:2
**April** [5] - 1096:18, 1122:22, 1122:24, 1124:5
**arbitrarily** [1] - 1136:12
**arbitration** [7] - 1106:22, 1107:1, 1125:12, 1127:8, 1169:6, 1169:10, 1170:5
**architect** [1] - 1088:25
**architectural** [2] -

1134:16, 1134:17
**area** [4] - 1082:13, 1097:11, 1129:2, 1151:5
**areas** [1] - 1174:13
**argument** [2] - 1114:25, 1144:1
**arguments** [1] - 1174:10
**Arizona** [9] - 1045:21, 1047:5, 1047:9, 1064:20, 1064:21, 1064:22, 1072:18, 1072:20, 1084:25
**arm** [1] - 1034:9
**Arnold** [5] - 1158:6, 1158:10, 1158:16, 1160:5, 1160:12
**arrangement** [3] - 1082:24, 1105:5, 1142:12
**arrested** [2] - 1090:15, 1130:10
**arrive** [3] - 1097:13, 1097:19, 1098:3
**arrow** [1] - 1117:25
**article** [7] - 1097:24, 1098:5, 1098:14, 1129:3, 1130:6, 1130:7, 1130:9
**ASAP** [1] - 1061:2
**assets** [4] - 1104:9, 1104:10, 1176:9
**Assistant** [1] - 1030:18
**assisted** [6] - 1150:2, 1151:25, 1152:1, 1152:4, 1152:25, 1154:7
**associated** [3] - 1071:10, 1091:20, 1145:16
**association** [1] - 1072:8
**assume** [4] - 1034:7, 1098:7, 1109:17, 1173:21
**attached** [3] - 1062:21, 1080:16, 1081:25
**attempt** [1] - 1117:6
**attempted** [1] - 1152:5
**attempting** [1] - 1152:6
**attended** [1] - 1156:13
**attention** [3] - 1050:12, 1056:4, 1125:13
**attorney** [11] - 1145:4, 1145:9, 1147:5,

1147:9, 1147:10, 1147:23, 1148:21, 1149:6, 1149:9, 1150:14, 1164:13
**Attorney** [2] - 1030:16, 1154:6
**Attorney's** [1] - 1123:1
**Attorneys** [1] - 1030:18
**attorneys** [1] - 1148:19
**August** [9] - 1033:24, 1074:25, 1105:24, 1133:4, 1160:3, 1160:20, 1161:2, 1161:5, 1161:8
**AUSA's** [1] - 1122:15
**authentic** [1] - 1133:2
**authenticate** [1] - 1114:9
**authenticated** [1] - 1076:15
**author** [1] - 1116:21
**authored** [1] - 1117:4
**authority** [3] - 1136:20, 1136:21, 1137:1
**authorize** [5] - 1173:14, 1173:18, 1173:22, 1174:1
**authorized** [1] - 1173:24
**available** [4] - 1118:25, 1146:8, 1146:12, 1146:13
**avoid** [2] - 1033:1, 1173:22
**aware** [13] - 1034:15, 1069:22, 1070:2, 1090:13, 1125:21, 1127:1, 1144:10, 1144:13, 1144:15, 1144:16, 1144:19, 1144:21, 1144:23, 1154:7, 1171:14

## B

**backed** [1] - 1171:23
**background** [12] - 1032:11, 1036:15, 1037:6, 1037:10, 1039:20, 1040:24, 1053:8, 1053:10, 1092:7, 1096:25, 1115:8, 1175:19
**bail** [1] - 1176:25
**bank** [9] - 1047:15, 1048:14, 1049:23, 1056:5, 1058:3,

1066:12, 1139:12, 1158:14, 1159:3
**Bank** [4] - 1047:15, 1047:23, 1049:21, 1159:21
**banks** [1] - 1139:13
**bar** [13] - 1033:1, 1043:22, 1044:1, 1051:12, 1052:1, 1055:15, 1110:9, 1117:19, 1120:15, 1168:13, 1169:1, 1169:12
**base** [1] - 1098:17
**based** [5] - 1046:17, 1054:23, 1103:11, 1112:19, 1166:9
**basis** [6] - 1034:17, 1034:19, 1125:22, 1129:10, 1129:15, 1174:25
**Beach** [25] - 1036:4, 1036:14, 1036:24, 1038:3, 1039:12, 1039:17, 1040:16, 1040:22, 1041:5, 1041:14, 1044:23, 1045:6, 1045:8, 1045:9, 1045:11, 1050:6, 1051:6, 1051:8, 1054:15, 1056:17, 1057:20, 1057:22, 1085:13, 1087:5, 1087:7
**bears** [2] - 1132:20, 1136:8
**became** [12] - 1033:20, 1053:17, 1136:3, 1136:4, 1136:7, 1144:19, 1144:21, 1144:23, 1164:16, 1164:19, 1165:3, 1166:2
**become** [3] - 1070:2, 1157:7, 1164:22
**becomes** [1] - 1157:9
**BEFORE** [1] - 1030:11
**began** [3] - 1054:3, 1133:6, 1133:25
**beginning** [3] - 1094:14, 1125:16, 1171:10
**behalf** [4] - 1052:5, 1053:24, 1054:5, 1057:18
**behind** [1] - 1050:9
**Behnke** [1] - 1091:25
**belief** [1] - 1100:17
**believes** [1] - 1038:4
**belongs** [1] - 1063:10

**beneficiary** [2] - 1046:23, 1053:17
**benefit** [3] - 1051:3, 1053:3, 1055:5
**benefits** [1] - 1051:8
**Berard** [13] - 1065:21, 1071:22, 1073:9, 1073:10, 1091:17, 1091:23, 1130:8, 1156:18, 1157:20, 1157:23, 1158:1, 1161:5, 1161:8
**berated** [3] - 1032:21, 1033:18, 1035:7
**berating** [2] - 1035:19, 1035:21
**best** [3] - 1100:8, 1129:4, 1163:19
**Betesh** [2] - 1147:18, 1147:22
**Better** [18] - 1041:8, 1071:1, 1144:10, 1144:14, 1144:17, 1144:21, 1144:24, 1145:2, 1145:18, 1146:5, 1147:2, 1148:14, 1149:17, 1149:18, 1156:11, 1156:17, 1157:8, 1157:10
**better** [2] - 1073:13, 1171:23
**between** [18] - 1054:7, 1078:14, 1094:7, 1094:15, 1099:16, 1110:6, 1110:13, 1115:18, 1118:7, 1127:22, 1128:5, 1128:11, 1144:1, 1151:18, 1164:11, 1169:8, 1173:4, 1177:1
**beyond** [2] - 1151:10, 1176:1
**BIANCO** [1] - 1030:12
**big** [9] - 1058:14, 1067:7, 1073:6, 1088:5, 1097:6, 1097:7, 1097:10, 1123:15, 1126:14
**billion** [5] - 1098:20, 1098:24, 1098:25, 1099:9, 1099:19
**bit** [1] - 1084:5
**black** [1] - 1117:1
**blackout** [1] - 1114:21
**blacks** [2] - 1113:25, 1114:22
**blame** [1] - 1127:4
**blaming** [1] - 1151:6

**blanket** [1] - 1069:17
**BNF** [3] - 1046:25, 1050:22, 1051:2
**Bob** [3] - 1031:23, 1059:25, 1063:9
**body** [1] - 1164:6
**borrow** [6] - 1100:22, 1101:3, 1101:5, 1101:9, 1117:23, 1120:25
**borrowed** [2] - 1117:25, 1121:7
**borrowing** [2] - 1117:24, 1121:7
**bothers** [1] - 1115:9
**bottles** [1] - 1083:8, 1083:16, 1084:3, 1084:4, 1154:11, 1154:15, 1154:16, 1154:17, 1154:25, 1155:3
**bottom** [5] - 1059:15, 1061:21, 1117:5
**bought** [4] - 1042:20, 1044:9, 1054:17, 1075:4
**box** [4] - 1130:21, 1130:22, 1130:25, 1131:8
**branch** [1] - 1047:23
**breach** [1] - 1090:4
**break** [10] - 1074:15, 1074:19, 1079:4, 1112:9, 1112:11, 1135:8, 1161:10, 1161:12, 1162:9, 1176:14
**Brian** [10] - 1071:22, 1073:9, 1091:17, 1091:23, 1156:18, 1157:20, 1157:23, 1158:1, 1161:4, 1161:8
**Brian's** [1] - 1157:21
**briefly** [3] - 1048:13, 1078:11, 1083:4
**bring** [6] - 1038:25, 1055:8, 1100:17, 1104:6, 1120:3, 1162:3
**bringing** [1] - 1126:20
**broad** [3] - 1173:8, 1173:11, 1174:3
**broke** [2] - 1065:17, 1066:2
**broker** [1] - 1082:23
**Brothers** [2] - 1100:9, 1126:21
**brought** [8] - 1106:6, 1117:24, 1121:6,

1138:6, 1138:8, 1171:21, 1176:10
**Brutin** [1] - 1151:3
**Bruton** [1] - 1052:22
**Bryan** [3] - 1065:21, 1067:3, 1130:7
**budgeting** [1] - 1089:1
**build** [2] - 1047:5, 1050:5
**buildable** [1] - 1071:7
**building** [8] - 1064:19, 1103:8, 1134:16, 1134:20, 1142:11, 1142:15, 1143:10, 1143:17
**built** [1] - 1134:20
**bunch** [2] - 1055:11, 1175:9
**Bureau** [5] - 1108:10, 1108:18, 1121:5, 1122:21, 1131:18
**business** [5] - 1134:14, 1143:10, 1143:16, 1143:18, 1164:11
**busy** [1] - 1118:21
**buy** [3] - 1041:13, 1066:2, 1076:24
**BY** [39] - 1030:17, 1030:23, 1040:7, 1045:3, 1056:3, 1062:12, 1063:21, 1068:2, 1080:2, 1080:20, 1081:3, 1083:3, 1083:24, 1084:13, 1087:2, 1089:8, 1090:21, 1091:3, 1091:14, 1092:24, 1094:1, 1129:24, 1138:2, 1139:24, 1145:12, 1148:12, 1150:7, 1150:10, 1154:4, 1155:11, 1157:1, 1159:18, 1161:1, 1162:17, 1170:3, 1178:4, 1178:6, 1178:8, 1178:10

---

**C**

**Cabo** [13] - 1085:5, 1085:9, 1087:8, 1088:18, 1091:4, 1091:15, 1091:17, 1091:20, 1092:2, 1092:14, 1134:15, 1170:8, 1171:1
**CALCAGNI** [1] - 1030:21

**California** [1] - 1045:10
**capacity** [2] - 1094:12, 1166:12
**capital** [9] - 1140:11, 1140:19, 1142:10, 1142:18, 1143:1, 1143:3, 1143:5, 1143:8, 1143:13
**car** [2] - 1098:4, 1143:17
**card** [1] - 1151:21
**care** [1] - 1073:9
**careful** [1] - 1055:12
**carry** [1] - 1057:22
**cars** [1] - 1175:21
**case** [17] - 1031:12, 1032:24, 1033:22, 1074:16, 1090:20, 1106:7, 1112:12, 1122:11, 1123:11, 1146:15, 1161:13, 1172:12, 1172:13, 1173:3, 1175:18, 1175:23, 1176:3
**cash** [2] - 1051:9, 1054:17
**causing** [2] - 1068:24, 1069:8
**cc'd** [1] - 1152:2
**Central** [3] - 1030:5, 1030:17, 1031:8
**cents** [1] - 1066:3
**certain** [5] - 1044:15, 1053:18, 1109:19, 1174:10, 1174:22
**certainly** [3] - 1073:10, 1133:2, 1146:12
**certif** [1] - 1083:11
**certificate** [1] - 1075:1
**certification** [3] - 1081:17, 1082:19, 1083:12
**certified** [1] - 1174:22
**challenge** [1] - 1168:11
**chance** [4] - 1078:18, 1078:20, 1175:10, 1175:16
**change** [2] - 1062:2, 1167:21
**changed** [1] - 1087:12
**charge** [1] - 1037:10
**charged** [2] - 1036:17, 1040:24
**charges** [3] - 1036:9, 1039:20, 1054:20
**cheated** [3] - 1038:11, 1038:14, 1038:17

**check** [1] - 1056:20
**checking** [1] - 1159:25
**chief** [1] - 1033:22
**chime** [1] - 1114:24
**Chris** [11] - 1094:19, 1094:21, 1096:23, 1098:11, 1141:24, 1142:6, 1143:7, 1143:15, 1143:20, 1144:10, 1163:23
**Christopher** [2] - 1132:22, 1134:2
**circumstance** [2] - 1033:12, 1034:10
**City** [6] - 1092:10, 1110:7, 1117:17, 1117:19, 1120:15, 1120:16
**civil** [4] - 1090:6, 1090:23, 1106:7, 1107:23
**claim** [5] - 1038:10, 1052:15, 1076:15, 1089:14, 1169:7
**claimed** [3] - 1086:8, 1131:19, 1132:3
**claims** [2] - 1037:24, 1053:2
**clear** [7] - 1032:19, 1039:15, 1117:16, 1118:11, 1141:11, 1141:13, 1151:17
**clearer** [1] - 1118:2
**clearly** [1] - 1176:2
**CLERK** [3] - 1031:12, 1039:1, 1162:1
**client** [8] - 1033:23, 1034:16, 1053:23, 1054:5, 1054:7, 1076:11, 1098:17, 1162:7
**client's** [1] - 1176:9
**close** [5] - 1040:9, 1041:4, 1074:7, 1132:15, 1151:3
**closed** [4] - 1041:10, 1141:17, 1170:9, 1171:1
**closing** [51] - 1042:21, 1043:18, 1051:9, 1099:25, 1100:10, 1117:24, 1121:1, 1132:25, 1133:4, 1133:6, 1133:12, 1133:21, 1133:24, 1134:25, 1138:24, 1139:2, 1139:14, 1139:17, 1141:13, 1141:18, 1144:2,

1144:4, 1144:18, 1144:19, 1144:22, 1144:24, 1145:3, 1145:8, 1145:17, 1146:7, 1147:2, 1147:8, 1148:14, 1148:23, 1148:24, 1149:3, 1149:17, 1156:13, 1164:4, 1164:5, 1164:6, 1164:8, 1164:9, 1164:12, 1164:14, 1164:15, 1164:16, 1164:19, 1164:25, 1165:2
**closings** [2] - 1147:23, 1148:20
**collateral** [2] - 1126:4, 1126:6
**collect** [1] - 1176:11
**collected** [2] - 1064:2, 1070:16
**coming** [8] - 1042:5, 1044:8, 1044:20, 1076:25, 1081:19, 1086:16, 1117:13, 1170:18
**commend** [1] - 1034:20
**commentary** [1] - 1089:21
**commented** [1] - 1035:8
**common** [1] - 1092:6
**communicate** [1] - 1128:13
**communication** [1] - 1128:10
**communications** [1] - 1151:9
**companies** [1] - 1099:22
**Company** [2] - 1156:11, 1156:17
**company** [28] - 1043:3, 1046:8, 1054:6, 1075:3, 1075:4, 1075:5, 1075:9, 1075:13, 1075:22, 1075:25, 1076:5, 1076:8, 1076:9, 1076:19, 1076:20, 1080:10, 1080:11, 1080:23, 1081:5, 1081:6, 1081:15, 1081:20, 1082:4, 1083:14, 1088:20, 1091:19, 1143:17, 1144:21
**company's** [1] -

1066:8
**complain** [1] - 1147:23
**complaint** [1] - 1166:25
**complete** [2] - 1108:19, 1116:23
**complying** [1] - 1111:8
**computer** [6] - 1165:24, 1167:8, 1167:11, 1167:12, 1167:13, 1167:14
**concern** [2] - 1126:3, 1151:3
**concerned** [6] - 1034:25, 1035:4, 1044:4, 1067:10, 1077:14, 1166:2
**concerning** [5] - 1111:16, 1123:11, 1125:8, 1127:14, 1133:10
**concerns** [1] - 1068:7
**concluded** [5] - 1055:15, 1086:20, 1129:22, 1153:3, 1169:12
**concluding** [1] - 1035:20
**conclusion** [2] - 1036:1, 1109:23
**condos** [1] - 1088:22
**conducted** [4] - 1043:22, 1051:12, 1121:4, 1168:13
**conference** [8] - 1043:22, 1044:1, 1051:12, 1052:1, 1055:15, 1168:13, 1169:1, 1169:12
**confers** [1] - 1076:11
**confirm** [1] - 1096:11
**confused** [1] - 1140:19
**confusion** [2] - 1035:23, 1036:8
**connection** [9] - 1034:15, 1036:16, 1038:4, 1038:11, 1038:15, 1039:19, 1076:10, 1077:8, 1094:14, 1096:2, 1135:1, 1144:3, 1163:3, 1164:4, 1169:6
**consciousness** [3] - 1032:22, 1035:14, 1035:16
**consent** [1] - 1146:6

consider [1] - 1037:4
CONSTANTINE [1] - 1030:7
Constantine [29] - 1031:1, 1031:13, 1031:23, 1032:1, 1052:21, 1053:1, 1055:12, 1057:6, 1057:21, 1058:4, 1058:7, 1060:13, 1061:2, 1061:4, 1061:15, 1062:17, 1063:25, 1064:4, 1065:1, 1065:11, 1068:21, 1069:21, 1078:17, 1130:9, 1149:23, 1151:19, 1151:20, 1176:24
constantine [3] - 1058:13, 1060:17, 1066:19
constantine's [1] - 1064:16
Constantine's [4] - 1053:14, 1065:5, 1175:7, 1175:19
construction [6] - 1042:4, 1042:11, 1047:10, 1088:24, 1088:25, 1134:15
consult [1] - 1129:4
Consulting [2] - 1123:23, 1132:4
cont'd [2] - 1094:1, 1129:24
Cont'd [1] - 1120:10
contact [3] - 1047:22, 1081:10, 1147:22
contain [6] - 1132:10, 1135:12, 1135:17, 1154:19, 1164:5, 1167:17
contained [5] - 1111:25, 1112:2, 1135:11, 1154:23, 1173:11
containing [1] - 1123:12
content [5] - 1110:25, 1111:2, 1124:8, 1124:12, 1167:17
contentious [1] - 1054:6
context [4] - 1034:10, 1035:1, 1036:23, 1109:17
continue [7] - 1039:8, 1039:23, 1058:12, 1088:10, 1088:12, 1095:20, 1120:6

Continued [7] - 1068:1, 1085:18, 1086:21, 1137:4, 1138:1, 1150:20, 1153:4
CONTINUED [8] - 1040:6, 1045:2, 1056:2, 1063:20, 1162:16, 1170:2, 1178:3, 1178:7
continued [12] - 1043:23, 1044:25, 1045:1, 1051:13, 1055:16, 1056:1, 1067:13, 1093:4, 1161:15, 1168:14, 1169:13, 1170:1
continues [1] - 1054:15
continuing [1] - 1064:15
contract [4] - 1090:4, 1141:5, 1141:7, 1141:12
contribution [5] - 1142:10, 1143:2, 1143:3, 1143:5, 1143:14
contributions [2] - 1054:4, 1143:8
control [1] - 1070:7
controlled [1] - 1042:25
conversation [12] - 1035:7, 1035:17, 1056:9, 1058:4, 1065:11, 1088:10, 1100:17, 1109:16, 1127:13, 1127:18, 1131:25, 1167:19
conversations [4] - 1068:21, 1071:18, 1132:3, 1151:13
converted [1] - 1076:24
conveys [1] - 1034:5
convicted [2] - 1089:25, 1090:24
CONWAY [1] - 1031:1
cop [1] - 1115:7
copy [16] - 1046:3, 1047:13, 1049:1, 1061:16, 1081:24, 1114:21, 1116:6, 1130:6, 1130:17, 1132:11, 1146:3, 1152:23, 1155:20, 1165:21, 1165:22, 1174:22
corner [3] - 1059:7,

1115:5, 1130:18
corners [1] - 1036:9
Corp [1] - 1103:20
corporate [1] - 1104:4
corporation [1] - 1103:24
corporations [1] - 1103:3
correct [85] - 1038:6, 1041:9, 1045:7, 1046:18, 1049:13, 1049:14, 1049:24, 1076:22, 1089:18, 1089:22, 1089:23, 1090:8, 1090:11, 1090:16, 1092:11, 1092:12, 1094:20, 1096:20, 1096:21, 1097:20, 1098:15, 1099:5, 1099:6, 1099:13, 1102:9, 1103:1, 1103:5, 1103:9, 1103:10, 1104:10, 1104:11, 1105:7, 1107:3, 1107:4, 1107:15, 1108:13, 1111:18, 1112:4, 1112:17, 1117:18, 1120:20, 1122:18, 1122:22, 1125:1, 1125:2, 1125:24, 1125:25, 1126:18, 1127:3, 1127:9, 1127:10, 1128:18, 1130:8, 1131:10, 1132:13, 1134:10, 1134:21, 1138:22, 1138:25, 1139:4, 1140:10, 1140:16, 1141:1, 1142:2, 1142:3, 1143:21, 1144:17, 1144:25, 1145:1, 1145:6, 1147:5, 1147:14, 1148:7, 1148:25, 1149:2, 1149:20, 1157:16, 1159:7, 1159:11, 1161:5, 1164:18, 1164:20, 1166:20, 1167:13, 1167:19
costs [2] - 1095:17, 1095:18
counsel [8] - 1031:14, 1032:8, 1033:20, 1106:12, 1158:23, 1159:7, 1174:23, 1174:24
Count [1] - 1037:2
count [1] - 1146:22

country [1] - 1166:16
Country [1] - 1031:1
County [8] - 1072:5, 1072:16, 1084:19, 1092:9, 1145:21, 1145:25, 1147:20
couple [4] - 1070:24, 1120:24, 1126:14, 1173:8
course [9] - 1073:9, 1088:18, 1088:21, 1088:22, 1105:4, 1106:25, 1121:17, 1122:13, 1170:22
COURT [134] - 1030:1, 1031:18, 1031:21, 1031:24, 1032:2, 1032:5, 1033:6, 1034:18, 1036:11, 1037:9, 1037:16, 1038:1, 1038:7, 1038:13, 1038:19, 1038:24, 1039:5, 1040:10, 1041:3, 1043:14, 1043:21, 1044:2, 1044:18, 1046:2, 1048:11, 1051:4, 1051:11, 1053:21, 1054:19, 1063:14, 1063:19, 1074:15, 1074:19, 1074:21, 1075:21, 1076:3, 1076:17, 1076:25, 1077:6, 1077:15, 1077:19, 1077:22, 1078:4, 1078:23, 1079:2, 1079:5, 1079:8, 1079:10, 1079:13, 1079:19, 1079:22, 1080:19, 1081:2, 1083:22, 1084:9, 1084:15, 1085:17, 1086:2, 1086:19, 1089:5, 1090:18, 1091:2, 1092:23, 1094:10, 1096:10, 1096:12, 1100:13, 1102:1, 1102:6, 1105:1, 1105:19, 1106:15, 1107:10, 1107:18, 1108:21, 1108:25, 1109:3, 1109:12, 1110:12, 1112:8, 1112:15, 1113:9, 1114:7, 1114:13, 1115:13, 1115:21, 1116:24, 1117:3, 1117:10, 1118:12, 1118:19,

1118:23, 1119:4, 1120:3, 1120:5, 1128:22, 1129:9, 1135:19, 1136:18, 1139:22, 1148:11, 1150:6, 1150:19, 1151:14, 1152:3, 1152:19, 1153:1, 1154:3, 1155:6, 1155:8, 1156:23, 1158:25, 1159:6, 1159:11, 1159:13, 1159:15, 1161:10, 1161:12, 1162:2, 1162:11, 1162:14, 1168:1, 1168:12, 1169:11, 1172:4, 1172:7, 1172:17, 1172:22, 1174:18, 1175:4, 1175:13, 1176:14, 1176:22, 1177:3
court [4] - 1087:1, 1129:23, 1154:1, 1174:19
Court [14] - 1031:4, 1031:7, 1033:3, 1033:15, 1034:11, 1037:4, 1045:1, 1053:7, 1056:1, 1118:21, 1169:9, 1170:1, 1175:1, 1175:10
Court's [1] - 1117:7
Courthouse [1] - 1030:4
courthouse [2] - 1122:22, 1122:25
courtroom [6] - 1039:2, 1074:20, 1112:14, 1120:4, 1162:12, 1172:15
cover [2] - 1080:13
covering [2] - 1059:8, 1173:10
crazy [2] - 1032:20, 1035:14
create [3] - 1036:8, 1068:17, 1103:7
created [3] - 1103:6, 1115:1, 1166:11
creates [1] - 1104:4
creation [1] - 1103:22
credible [1] - 1126:10
Credit [3] - 1048:17, 1127:21, 1131:2
credit [3] - 1127:15, 1131:10, 1151:21
crimes [2] - 1036:17, 1040:24

**crook** [1] - 1144:7
**cross** [11] - 1053:15, 1054:2, 1054:12, 1078:1, 1089:5, 1110:12, 1114:25, 1120:6, 1162:9, 1172:8, 1172:10
**CROSS** [6] - 1089:7, 1120:9, 1138:1, 1162:16, 1170:2, 1178:9
**cross-examination** [8] - 1053:15, 1054:2, 1054:12, 1078:1, 1089:5, 1110:12, 1120:6, 1172:8
**CROSS-EXAMINATION** [3] - 1089:7, 1138:1, 1178:9
**CRR** [1] - 1031:7
**crystal** [1] - 1151:17
**CURRIE** [1] - 1030:15
**curse** [2] - 1067:1, 1148:8
**CV** [1] - 1082:6
**Cyrillic** [2] - 1082:9, 1082:14

# D

**daily** [1] - 1152:23
**Daily** [9] - 1089:21, 1128:17, 1128:20, 1129:11, 1129:18, 1130:6, 1130:15, 1131:12, 1131:13
**danger** [1] - 1035:19
**Darryl** [2] - 1138:3, 1138:9
**date** [12] - 1047:24, 1047:25, 1048:2, 1049:5, 1049:9, 1050:18, 1080:12, 1123:2, 1131:25, 1138:17, 1163:25
**dated** [4] - 1074:24, 1127:15, 1132:20, 1133:25
**dates** [2] - 1108:15, 1157:6
**day-to-day** [1] - 1165:20
**days** [4] - 1105:14, 1122:12, 1124:3
**de** [1] - 1082:6
**deal** [13] - 1057:19, 1058:9, 1058:14, 1058:18, 1060:9, 1066:12, 1073:6,

1074:3, 1078:2, 1170:9, 1171:1, 1176:17
**deals** [2] - 1058:21, 1176:9
**debited** [1] - 1047:21
**deceitful** [1] - 1044:12
**deceiving** [1] - 1115:9
**December** [6] - 1041:6, 1059:10, 1062:15, 1062:25, 1127:15, 1127:21
**decided** [2] - 1071:13, 1096:5
**decision** [2] - 1152:11, 1171:13
**deck** [2] - 1068:14, 1068:22
**deed** [2] - 1145:20, 1146:3
**deep** [1] - 1089:17
**deep-seated** [1] - 1089:17
**default** [2] - 1166:10, 1166:11
**defendant** [3] - 1034:23, 1074:7, 1151:6
**Defendant** [3] - 1030:21, 1031:1, 1170:4
**Defendant's** [1] - 1109:4
**Defendants** [1] - 1030:9
**defense** [6] - 1034:12, 1034:13, 1034:15, 1151:17, 1173:2, 1174:24
**definitely** [6] - 1123:15, 1124:22, 1124:25, 1125:3, 1125:5, 1149:1
**definitive** [1] - 1132:14
**defrauding** [1] - 1130:23
**demand** [1] - 1054:5
**demands** [1] - 1033:24
**demonstrative** [1] - 1131:15
**denies** [1] - 1118:13
**depicted** [1] - 1101:23
**depiction** [1] - 1083:25
**depictions** [1] - 1083:10
**deposit** [3] - 1158:17, 1160:9, 1160:17

**depositing** [1] - 1049:15
**Depositing** [1] - 1048:17
**deposition** [8] - 1125:11, 1168:4, 1170:4, 1170:22, 1171:10, 1174:23, 1176:9, 1176:13
**derivative** [1] - 1053:16
**derived** [1] - 1111:3
**describe** [8] - 1088:20, 1089:10, 1089:20, 1091:9, 1091:22, 1092:4, 1131:6, 1160:8
**describes** [1] - 1110:7
**description** [1] - 1146:4
**deserved** [2] - 1067:7, 1070:12
**design** [2] - 1083:16, 1089:1
**designed** [1] - 1084:3
**desire** [1] - 1036:3
**desperate** [1] - 1065:17
**detail** [4] - 1035:17, 1037:10, 1037:19, 1037:20
**detailed** [2] - 1033:25, 1134:24
**details** [3] - 1038:8, 1044:19, 1054:20
**deteriorated** [2] - 1099:17, 1101:2
**determine** [2] - 1136:10, 1176:11
**develop** [3] - 1095:1, 1095:6, 1095:13
**developed** [2] - 1094:15, 1128:5
**developing** [3] - 1047:9, 1095:7, 1103:25
**Development** [3] - 1101:13, 1156:11, 1156:17
**developments** [1] - 1133:9
**DeVries** [1] - 1065:21
**Diamante** [8] - 1088:18, 1091:4, 1091:15, 1091:17, 1091:20, 1092:2, 1092:14, 1134:15
**difference** [2] - 1115:17, 1122:8
**different** [12] -

1034:19, 1084:6, 1099:22, 1104:6, 1106:1, 1107:6, 1131:8, 1148:19, 1148:20
**difficult** [1] - 1090:22
**dire** [1] - 1062:10
**DIRE** [2] - 1062:11, 1178:5
**direct** [19] - 1039:24, 1050:12, 1077:19, 1094:17, 1094:25, 1095:5, 1099:12, 1105:9, 1123:14, 1123:20, 1125:1, 1139:16, 1140:3, 1149:23, 1150:1, 1151:8, 1151:11, 1151:24, 1152:24
**DIRECT** [7] - 1040:6, 1045:2, 1056:2, 1063:20, 1068:1, 1178:3, 1178:7
**directed** [1] - 1049:18
**direction** [1] - 1113:21
**directly** [6] - 1048:5, 1056:22, 1075:25, 1082:21, 1138:25, 1139:4
**director** [2] - 1092:14, 1093:3
**disbursements** [1] - 1076:2
**disclosed** [1] - 1174:23
**disclosure** [1] - 1034:22
**Discovery** [1] - 1098:12
**discovery** [1] - 1033:24
**discuss** [5] - 1074:16, 1112:9, 1112:12, 1161:13, 1172:13
**discussed** [9] - 1041:8, 1054:7, 1110:15, 1117:20, 1117:22, 1120:16, 1120:24, 1124:7, 1162:8
**discussing** [2] - 1110:9, 1124:11
**discussion** [8] - 1085:12, 1087:18, 1097:22, 1097:23, 1105:4, 1111:16, 1117:3, 1119:3
**Discussion** [4] - 1086:1, 1086:20, 1151:1, 1153:3

**discussions** [2] - 1065:1, 1104:20
**dismissed** [1] - 1090:14
**disowns** [1] - 1115:2
**dispute** [5] - 1044:3, 1128:5, 1128:7, 1151:18, 1167:18
**disputes** [1] - 1128:8
**disputing** [4] - 1053:23, 1053:24, 1053:25, 1054:11
**dissatisfaction** [2] - 1167:9, 1167:23
**dissolved** [1] - 1143:24
**distribute** [2] - 1081:7, 1081:22
**distributed** [2] - 1081:14, 1139:2
**distributing** [1] - 1083:17
**distribution** [5] - 1081:10, 1082:18, 1082:24, 1154:22, 1154:25
**DISTRICT** [2] - 1030:1, 1030:1
**District** [2] - 1030:12, 1032:15
**divided** [2] - 1142:22, 1173:10
**docs** [1] - 1164:14
**document** [113] - 1061:12, 1061:13, 1061:25, 1062:2, 1062:5, 1062:20, 1099:21, 1100:3, 1100:5, 1100:7, 1101:19, 1102:1, 1106:10, 1106:11, 1106:15, 1106:19, 1106:21, 1106:23, 1108:8, 1109:8, 1110:18, 1110:23, 1111:1, 1111:5, 1111:25, 1112:2, 1113:1, 1113:6, 1113:16, 1113:22, 1113:25, 1114:3, 1114:4, 1114:8, 1114:9, 1114:18, 1115:18, 1115:22, 1116:4, 1116:7, 1116:14, 1116:17, 1118:7, 1123:11, 1123:13, 1123:16, 1123:17, 1123:23, 1124:1, 1124:2, 1124:7, 1124:9,

U.S.A. v. KENNER and CONSTANTINE                                    7

1124:12, 1124:17, 1127:15, 1127:20, 1129:14, 1130:1, 1130:12, 1131:14, 1132:8, 1132:12, 1132:19, 1132:24, 1133:1, 1133:17, 1133:19, 1133:20, 1133:23, 1134:11, 1134:12, 1135:6, 1135:10, 1135:17, 1135:21, 1135:24, 1136:1, 1136:7, 1136:19, 1136:20, 1136:24, 1136:25, 1139:6, 1139:9, 1145:13, 1146:1, 1146:5, 1155:15, 1155:18, 1155:23, 1155:25, 1156:1, 1156:21, 1156:24, 1157:3, 1157:6, 1157:23, 1158:2, 1158:12, 1160:3, 1162:18, 1162:20, 1162:24, 1163:4, 1163:6, 1163:10, 1163:15, 1163:16, 1164:3, 1167:17, 1174:12

**documentation** [13] - 1058:17, 1066:11, 1067:6, 1068:4, 1068:5, 1068:8, 1068:10, 1069:15, 1081:12, 1081:15, 1081:16, 1174:2

**documents** [44] - 1038:8, 1048:24, 1086:4, 1128:15, 1130:17, 1130:21, 1130:22, 1131:1, 1131:5, 1131:6, 1131:8, 1131:14, 1131:19, 1132:2, 1135:9, 1135:10, 1135:12, 1141:14, 1141:19, 1144:4, 1145:8, 1145:16, 1145:24, 1146:3, 1146:7, 1146:18, 1146:22, 1147:18, 1147:23, 1148:22, 1148:24, 1149:1, 1149:4, 1149:5, 1149:7, 1149:8, 1152:17, 1156:14, 1156:15, 1164:4, 1164:6, 1164:8, 1174:4

**dollar** [2] - 1042:8,

1066:3
**dollars** [8] - 1058:15, 1098:20, 1098:24, 1099:20, 1100:16, 1105:9, 1105:24, 1117:20
**Dolores** [1] - 1059:25
**done** [5] - 1042:12, 1077:21, 1116:20, 1129:16, 1176:18
**door** [1] - 1110:14
**doubt** [1] - 1041:16
**down** [11] - 1041:20, 1041:22, 1041:23, 1042:8, 1043:9, 1108:15, 1112:13, 1141:6, 1152:23, 1172:18
**dozen** [4] - 1121:16, 1121:18, 1122:5, 1123:5
**due** [2] - 1106:7, 1167:21
**duly** [1] - 1040:4
**duplicate** [1] - 1061:18
**duplicating** [1] - 1109:5
**during** [18] - 1053:15, 1065:1, 1071:9, 1078:21, 1079:4, 1100:17, 1100:21, 1105:3, 1106:25, 1109:20, 1120:21, 1121:17, 1122:13, 1124:23, 1127:8, 1148:13, 1170:22, 1174:21
**duties** [1] - 1134:14

## E

**e-mail** [8] - 1062:19, 1062:20, 1062:21, 1063:23, 1163:19, 1163:22, 1163:24, 1164:1
**early** [1] - 1162:10
**Earth** [2] - 1101:20, 1101:24
**easement** [1] - 1071:7
**Eastern** [1] - 1081:7
**EASTERN** [1] - 1030:1
**economic** [1] - 1167:22
**effectuate** [2] - 1142:1, 1149:19
**effort** [2] - 1166:18, 1174:10
**either** [6] - 1040:21,

1113:3, 1115:16, 1122:10, 1124:14, 1131:18
**elicit** [8] - 1032:10, 1032:13, 1038:14, 1052:17, 1052:19, 1052:25, 1053:11, 1152:20
**eliciting** [1] - 1044:12
**elsewhere** [1] - 1044:9
**email** [9] - 1074:23, 1080:5, 1080:6, 1080:16, 1082:1, 1152:4, 1152:5, 1152:10, 1154:10
**emails** [2] - 1076:15, 1080:7
**embark** [1] - 1173:16
**emphasize** [3] - 1039:15, 1040:20, 1129:16
**employed** [1] - 1091:4
**employment** [1] - 1092:13
**empty** [1] - 1154:17
**end** [5] - 1032:8, 1059:10, 1077:19, 1087:11, 1087:20
**ended** [1] - 1073:25
**enforcement** [7] - 1034:9, 1034:10, 1034:23, 1035:15, 1108:16, 1116:1, 1116:12
**engineers** [1] - 1089:1
**ensued** [7] - 1074:17, 1078:25, 1079:6, 1086:1, 1087:1, 1151:1, 1154:1
**enters** [3] - 1039:2, 1120:4, 1162:12
**entire** [2] - 1162:19, 1163:15
**entities** [1] - 1164:11
**entitled** [4] - 1127:20, 1133:24, 1163:15, 1173:25
**entity** [5] - 1068:16, 1101:16, 1141:7, 1165:3, 1166:6
**environment** [1] - 1167:22
**equity** [1] - 1142:19
**escrow** [1] - 1076:2
**establish** [12] - 1036:16, 1038:3, 1044:5, 1044:13, 1053:7, 1053:22, 1054:21, 1076:16, 1076:17, 1086:4,

1086:9
**established** [5] - 1044:14, 1044:16, 1101:16, 1103:4
**estate** [5] - 1037:5, 1094:23, 1099:23, 1133:10, 1134:4
**Ethan** [1] - 1069:1
**Eufora** [47] - 1037:8, 1046:8, 1046:15, 1047:4, 1052:6, 1052:14, 1053:2, 1053:20, 1053:23, 1054:3, 1054:18, 1054:21, 1054:23, 1055:2, 1055:3, 1056:4, 1056:6, 1056:10, 1056:15, 1056:21, 1056:24, 1057:2, 1057:3, 1057:9, 1058:24, 1060:5, 1060:8, 1061:5, 1064:6, 1064:7, 1064:11, 1064:16, 1065:2, 1065:16, 1066:21, 1067:8, 1067:11, 1068:6, 1068:17, 1069:5, 1069:12, 1070:8, 1070:15, 1070:22, 1086:5, 1151:20
**Europe** [2] - 1081:8, 1155:4
**event** [2] - 1067:10, 1147:3
**events** [1] - 1094:18
**eventually** [2] - 1032:10, 1074:4
**EVIDENCE** [6] - 1179:2, 1179:3, 1179:4, 1179:9, 1179:10, 1179:11
**evidence** [33] - 1032:22, 1036:16, 1045:23, 1045:24, 1048:13, 1048:25, 1049:21, 1050:7, 1059:4, 1063:15, 1079:14, 1079:25, 1083:23, 1102:1, 1102:3, 1102:7, 1109:15, 1116:14, 1116:20, 1139:7, 1145:14, 1156:22, 1158:13, 1158:24, 1159:1, 1159:2, 1159:10, 1159:16, 1159:17, 1159:21, 1168:2, 1168:10,

1173:4
**exact** [4] - 1108:15, 1122:8, 1123:2, 1123:6
**exactly** [1] - 1100:6
**examination** [9] - 1053:15, 1054:2, 1054:12, 1078:1, 1078:14, 1089:5, 1110:12, 1120:6, 1172:8
**EXAMINATION** [15] - 1040:6, 1045:2, 1056:2, 1062:11, 1063:20, 1068:1, 1089:7, 1120:9, 1138:1, 1162:16, 1170:2, 1178:3, 1178:5, 1178:7, 1178:9
**examined** [1] - 1040:5
**example** [1] - 1173:13
**examples** [1] - 1174:5
**except** [1] - 1144:24
**excerpts** [5] - 1174:22, 1175:1, 1175:3, 1175:4, 1175:6
**exclude** [1] - 1174:10
**excuse** [5] - 1042:23, 1095:24, 1103:22, 1106:20, 1166:21
**excused** [1] - 1172:21
**Exhibit** [49] - 1045:23, 1045:25, 1047:12, 1048:14, 1049:3, 1050:7, 1050:8, 1059:5, 1061:6, 1063:15, 1074:11, 1074:22, 1079:13, 1079:14, 1079:18, 1079:25, 1083:4, 1083:23, 1101:20, 1102:2, 1102:7, 1106:17, 1109:4, 1109:8, 1112:1, 1123:24, 1124:17, 1125:10, 1129:25, 1132:7, 1135:4, 1135:22, 1139:7, 1139:21, 1145:14, 1155:16, 1155:24, 1157:2, 1158:13, 1159:10, 1159:16, 1159:17, 1159:19, 1159:20, 1163:7, 1163:14, 1165:12, 1170:4
**exhibit** [9] - 1046:20, 1047:12, 1050:13,

1062:14, 1102:8, 1102:9, 1110:3, 1123:21, 1139:8
**EXHIBIT** [8] - 1179:2, 1179:3, 1179:4, 1179:7, 1179:8, 1179:9, 1179:10, 1179:11
**exhibits** [2] - 1077:24, 1175:9
**existed** [2] - 1101:15, 1118:6
**existence** [1] - 1104:19
**exists** [1] - 1110:13
**expect** [3] - 1034:20, 1043:10, 1052:2
**expected** [2] - 1044:4, 1044:5
**expenses** [1] - 1042:20
**experience** [1] - 1103:11
**expert** [1] - 1077:11
**explain** [4] - 1037:11, 1048:6, 1086:7, 1175:2
**explained** [1] - 1032:23
**explaining** [1] - 1098:17
**explains** [1] - 1149:12
**express** [3] - 1124:18, 1167:8, 1167:23
**extent** [5] - 1034:4, 1054:24, 1114:5, 1118:13, 1169:7

**F**

**face** [1] - 1099:4
**fact** [19] - 1034:23, 1044:18, 1052:10, 1089:20, 1090:2, 1092:6, 1103:15, 1105:3, 1107:11, 1110:21, 1112:21, 1113:13, 1127:14, 1129:13, 1130:14, 1135:15, 1141:18, 1168:8, 1170:5
**failure** [4] - 1035:20, 1036:25, 1167:1, 1167:9
**fair** [6] - 1087:15, 1103:2, 1106:25, 1109:20, 1109:25, 1113:10
**fairly** [1] - 1074:6
**faith** [1] - 1129:10

**fall** [1] - 1166:17
**false** [2] - 1052:16, 1052:25
**familiar** [5] - 1106:19, 1106:21, 1111:2, 1127:11, 1132:9
**family** [6] - 1068:5, 1088:7, 1089:15, 1170:12, 1171:4, 1177:1
**far** [5] - 1071:7, 1077:14, 1113:5, 1175:25, 1176:1
**Farm** [1] - 1102:11
**fashion** [1] - 1062:3
**fault** [2] - 1116:25, 1166:6
**FBI** [52] - 1032:10, 1032:12, 1032:14, 1032:17, 1033:12, 1033:16, 1034:5, 1035:3, 1035:6, 1035:12, 1035:21, 1092:10, 1092:15, 1093:3, 1110:1, 1110:14, 1110:19, 1111:18, 1111:20, 1111:21, 1112:18, 1112:22, 1113:2, 1113:11, 1113:13, 1116:18, 1116:19, 1117:12, 1118:14, 1118:16, 1120:13, 1120:19, 1120:22, 1121:14, 1121:17, 1121:21, 1122:2, 1122:10, 1122:14, 1122:20, 1123:1, 1123:7, 1123:10, 1124:8, 1124:12, 1124:14, 1124:19, 1131:18, 1132:4, 1173:1, 1173:5
**FBI's** [1] - 1117:22
**February** [1] - 1046:21
**Federal** [7] - 1030:16, 1031:7, 1108:9, 1108:18, 1121:5, 1122:21, 1131:18
**federal** [2] - 1090:24, 1140:25
**FedEx** [2] - 1154:15, 1155:3
**FedExed** [1] - 1084:18
**fees** [2] - 1071:10, 1072:4
**felt** [1] - 1032:24
**few** [8] - 1062:9, 1067:1, 1088:1, 1088:22, 1122:12,

1148:8, 1162:8, 1171:20
**fiduciary** [1] - 1167:4
**Fifth** [3] - 1032:24, 1034:25, 1035:23
**filed** [6] - 1090:3, 1090:6, 1108:4, 1149:22, 1154:5, 1155:21
**filing** [4] - 1150:2, 1151:25, 1152:25, 1154:8
**filled** [1] - 1155:3
**filling** [1] - 1052:9
**finance** [1] - 1095:22
**finances** [1] - 1135:1
**financial** [3] - 1089:14, 1105:5, 1147:3
**financing** [7] - 1041:25, 1042:3, 1095:2, 1095:8, 1095:13, 1095:20, 1134:3
**fine** [4] - 1036:18, 1113:12, 1153:1, 1177:3
**finish** [3] - 1078:12, 1176:15, 1176:16
**finished** [3] - 1042:11, 1098:17, 1171:9
**firm** [1] - 1148:17
**first** [39] - 1033:20, 1034:1, 1045:24, 1047:19, 1050:13, 1050:25, 1053:17, 1054:22, 1056:5, 1056:14, 1056:18, 1056:19, 1056:20, 1056:22, 1056:25, 1057:1, 1057:8, 1058:2, 1059:6, 1062:5, 1065:21, 1066:6, 1080:18, 1086:12, 1095:14, 1097:3, 1110:21, 1111:21, 1111:22, 1112:16, 1121:9, 1124:2, 1126:3, 1126:13, 1138:20, 1141:10, 1159:19
**firsthand** [1] - 1070:3
**fix** [2] - 1042:20, 1046:2
**fixing** [1] - 1045:14
**flip** [1] - 1095:16
**flipping** [1] - 1045:15
**Florida** [2] - 1078:17, 1118:22
**focus** [4] - 1050:22,

1088:6, 1163:15, 1173:25
**follow** [1] - 1113:21
**followed** [1] - 1098:4
**following** [25] - 1047:20, 1074:17, 1078:25, 1079:6, 1085:18, 1086:21, 1087:1, 1093:4, 1094:18, 1111:7, 1117:9, 1125:18, 1138:24, 1139:14, 1139:17, 1140:5, 1150:20, 1153:4, 1154:1, 1161:15, 1164:19, 1168:9, 1170:6
**follows** [3] - 1040:5, 1086:1, 1151:1
**forged** [9] - 1037:25, 1038:8, 1108:5, 1118:7, 1123:12, 1131:20, 1132:4, 1132:12, 1136:11
**forgeries** [2] - 1131:16, 1132:1
**forgery** [3] - 1106:7, 1107:24, 1123:18
**forgotten** [1] - 1173:24
**form** [5] - 1080:19, 1096:9, 1104:23, 1105:19, 1107:10
**Form** [1] - 1133:24
**formed** [2] - 1081:20, 1083:12
**former** [4] - 1092:9, 1092:10, 1108:16
**formulated** [1] - 1034:14
**forth** [2] - 1166:25, 1173:4
**four** [2] - 1036:9, 1046:12
**frame** [3] - 1095:9, 1104:24, 1107:16
**framed** [1] - 1038:16
**frankly** [3] - 1053:4, 1077:10, 1118:4
**fraud** [11] - 1036:13, 1037:6, 1039:16, 1039:18, 1040:21, 1086:5, 1090:4, 1130:10, 1131:15, 1175:8
**frauds** [1] - 1037:7
**Fred** [3] - 1082:17, 1082:24, 1154:21
**free** [2] - 1094:19, 1166:16

**Freeh** [3] - 1092:21, 1092:25, 1173:1
**friend** [6] - 1081:9, 1096:14, 1096:19, 1096:23, 1156:9
**friendly** [2] - 1087:15, 1143:20
**friends** [5] - 1068:5, 1089:16, 1170:12, 1170:16, 1171:4
**friendship** [1] - 1143:23
**front** [5] - 1045:25, 1047:13, 1080:3, 1113:1, 1116:4, 1116:7, 1117:11, 1130:12, 1147:24, 1163:4
**fronted** [1] - 1043:9
**fronting** [1] - 1034:20
**fucking** [2] - 1032:20, 1033:18
**fudge** [1] - 1115:20
**fulfill** [1] - 1167:1
**fulfilling** [1] - 1166:3
**full** [1] - 1138:21
**fully** [1] - 1144:2
**Fund** [1] - 1175:24
**fund** [3] - 1075:6, 1076:23, 1076:24
**funding** [1] - 1052:3
**Funding** [2] - 1123:23, 1132:4
**funds** [16] - 1046:21, 1049:19, 1050:5, 1051:7, 1056:22, 1057:20, 1061:2, 1071:11, 1075:5, 1075:18, 1087:6, 1096:6, 1138:25, 1158:14, 1170:12, 1171:4

**G**

**Gaarn** [9] - 1046:5, 1046:13, 1047:4, 1047:6, 1048:7, 1049:20, 1050:1, 1053:10
**Gaarn's** [1] - 1046:14
**gains** [2] - 1140:11, 1140:19
**Galioto** [5] - 1033:8, 1110:6, 1120:13, 1120:23, 1121:4
**Gaudet** [2] - 1127:11, 1127:13
**general** [1] - 1035:3
**generally** [1] -

1175:15
**generated** [3] -
1167:7, 1167:11,
1167:13
**generically** [2] -
1036:20, 1036:22
**gentleman** [2] -
1060:1, 1133:7
**gentlemen** [1] -
1065:23
**Gephart** [1] - 1142:11
**Gilmore** [5] - 1146:5,
1146:7, 1156:5,
1156:8, 1156:10
**given** [10] - 1043:9,
1055:5, 1075:7,
1106:4, 1110:25,
1128:17, 1134:16,
1169:9, 1174:5,
1175:7
**glasses** [1] - 1125:14
**global** [1] - 1075:5
**Global** [1] - 1175:24
**golf** [3] - 1088:18,
1088:21, 1088:22
**Gonya** [5] - 1078:13,
1176:15, 1176:17,
1176:20, 1176:22
**Gonya's** [1] - 1174:21
**Google** [2] - 1101:20,
1101:23
**Government** [23] -
1030:15, 1045:23,
1045:24, 1047:12,
1048:14, 1049:2,
1049:21, 1050:7,
1050:8, 1061:6,
1063:15, 1074:11,
1074:22, 1079:13,
1079:14, 1079:18,
1079:25, 1083:4,
1083:23, 1112:1,
1123:24, 1139:21,
1145:14
**government** [30] -
1033:21, 1038:1,
1039:18, 1039:20,
1040:21, 1040:23,
1062:7, 1077:12,
1078:15, 1078:22,
1079:8, 1083:18,
1089:10, 1114:4,
1114:15, 1114:16,
1116:5, 1116:9,
1117:1, 1117:17,
1118:8, 1118:15,
1119:2, 1139:7,
1152:9, 1162:5,
1173:8, 1174:3,
1175:23, 1176:6

**GOVERNMENT** [5] -
1179:7, 1179:8,
1179:9, 1179:10,
1179:11
**Government's** [4] -
1048:25, 1059:4,
1124:17, 1174:10
**government's** [9] -
1036:14, 1037:7,
1044:13, 1052:16,
1075:24, 1076:13,
1086:17, 1172:25,
1173:25
**grant** [1] - 1053:3
**great** [6] - 1037:19,
1037:20, 1057:19,
1060:9, 1060:11,
1060:25
**Greg** [2] - 1065:21,
1067:3
**grow** [1] - 1121:11
**GSF** [4] - 1075:18,
1076:23, 1076:24,
1175:8
**guess** [11] - 1032:14,
1033:17, 1037:15,
1067:2, 1069:19,
1076:13, 1084:3,
1086:17, 1114:2,
1114:14, 1140:23
**guilt** [3] - 1032:23,
1035:14, 1035:16
**guy** [2] - 1154:21,
1171:22
**guys** [4] - 1066:18,
1088:2, 1088:3,
1088:5

---

# H

**H-O-N-U-apostrophe
-A-P-U** [1] - 1102:17
**HALEY** [103] -
1030:21, 1030:23,
1032:3, 1033:5,
1033:7, 1036:1,
1037:19, 1038:10,
1038:22, 1043:13,
1043:20, 1044:11,
1044:24, 1048:10,
1051:2, 1051:10,
1052:13, 1052:15,
1053:4, 1053:25,
1055:6, 1055:14,
1062:8, 1074:13,
1075:15, 1075:24,
1076:6, 1076:12,
1077:2, 1077:4,
1077:7, 1077:23,
1078:10, 1079:3,

1079:11, 1079:20,
1080:17, 1080:24,
1082:25, 1083:20,
1084:8, 1085:16,
1086:11, 1086:14,
1089:8, 1090:21,
1091:3, 1091:14,
1092:24, 1094:1,
1095:10, 1102:2,
1104:25, 1106:13,
1106:16, 1107:17,
1108:23, 1109:1,
1109:4, 1110:2,
1111:10, 1113:7,
1113:17, 1114:12,
1114:20, 1116:23,
1116:25, 1117:7,
1117:14, 1118:18,
1120:8, 1120:10,
1125:14, 1129:20,
1129:24, 1138:2,
1139:23, 1139:24,
1145:12, 1148:12,
1150:7, 1150:10,
1151:12, 1151:15,
1152:7, 1152:22,
1153:2, 1154:2,
1154:4, 1155:11,
1157:1, 1159:2,
1159:7, 1159:18,
1161:1, 1161:11,
1162:17, 1169:2,
1170:3, 1172:3,
1172:6, 1174:17,
1178:10
**Haley** [14] - 1032:4,
1032:5, 1032:23,
1033:3, 1051:4,
1076:11, 1109:18,
1110:13, 1110:17,
1112:16, 1120:7,
1162:6, 1162:15
**Haley's** [1] - 1115:12
**half** [5] - 1066:21,
1098:20, 1098:23,
1098:25, 1099:19
**hall** [1] - 1074:2
**hand** [6] - 1046:3,
1053:1, 1061:19,
1114:21, 1175:1
**handing** [3] - 1123:22,
1165:13, 1168:6
**Handing** [4] - 1046:4,
1061:8, 1162:22,
1163:17
**handle** [1] - 1053:21
**handling** [1] - 1076:1
**handwriting** [6] -
1061:21, 1061:22,
1063:5, 1111:13,

1163:9, 1163:12
**handwritten** [1] -
1063:8
**hanger** [1] - 1064:20,
1065:6
**happy** [1] - 1121:10
**Harbor** [9] - 1041:7,
1041:10, 1070:25,
1090:10, 1090:13,
1098:12, 1141:4,
1141:18, 1144:9
**hatred** [1] - 1089:17
**Hauppauge** [1] -
1074:3
**Hawaii** [33] - 1094:18,
1095:12, 1097:6,
1101:14, 1102:15,
1102:21, 1102:25,
1103:3, 1104:18,
1105:13, 1111:17,
1117:20, 1117:23,
1117:25, 1118:1,
1120:16, 1120:17,
1120:25, 1121:7,
1121:8, 1126:6,
1126:21, 1127:16,
1127:23, 1128:1,
1128:15, 1131:9,
1132:23, 1134:4,
1164:14, 1165:20,
1173:15
**Hawaiian** [3] -
1101:13, 1133:10,
1134:23
**head** [2] - 1092:3,
1174:25
**heading** [2] - 1132:20,
1133:18
**hear** [9] - 1037:17,
1039:11, 1039:12,
1040:12, 1040:16,
1040:18, 1066:19,
1086:2, 1109:25
**heard** [5] - 1039:10,
1040:15, 1066:23,
1086:12, 1118:12
**hearing** [4] - 1034:1,
1073:24, 1074:1,
1117:4
**held** [5] - 1092:14,
1103:13, 1156:17,
1156:18, 1156:19
**helicopter** [1] -
1097:19
**hell** [2] - 1066:6,
1148:3
**help** [2] - 1116:8,
1175:9
**helped** [2] - 1069:12,
1150:2

**helps** [1] - 1113:2
**Hermosa** [30] -
1036:4, 1036:14,
1036:19, 1036:24,
1038:3, 1038:23,
1039:12, 1039:17,
1040:16, 1040:22,
1041:5, 1041:14,
1043:5, 1043:6,
1044:23, 1045:5,
1045:8, 1045:9,
1045:11, 1050:6,
1051:6, 1051:8,
1053:9, 1054:15,
1056:17, 1057:20,
1057:22, 1085:13,
1087:5, 1087:6
**hesitant** [1] - 1089:20
**hesitate** [1] - 1086:14
**high** [2] - 1092:15,
1143:6
**high-level** [1] -
1092:15
**highlighted** [1] -
1111:6
**Highway** [2] -
1030:22, 1132:23
**hill** [1] - 1067:4
**himself** [4] - 1053:20,
1069:9, 1110:6,
1113:12
**hired** [2] - 1091:7,
1091:8
**hmm** [1] - 1148:9
**HOA** [2] - 1072:4,
1072:7
**hockey** [9] - 1065:15,
1069:1, 1069:3,
1087:22, 1088:1,
1088:3, 1088:4,
1131:9, 1138:4
**hold** [2] - 1036:11,
1040:10
**holder** [1] - 1158:15
**Holly** [2] - 1132:21,
1159:21
**home** [4] - 1047:6,
1047:8, 1047:9,
1114:22
**homeowners** [1] -
1072:7
**homes** [1] - 1088:22
**honor** [1] - 1117:7
**Honor** [45] - 1031:16,
1031:19, 1031:22,
1031:25, 1032:3,
1033:1, 1033:5,
1036:1, 1036:2,
1036:18, 1037:19,
1043:13, 1054:25,

identifies [1] - 1102:22
identify [2] - 1131:19, 1135:10
idle [1] - 1171:15
immediately [1] - 1109:16
imminent [2] - 1058:18, 1060:9
impeach [2] - 1054:12, 1116:17
impeaching [2] - 1109:24, 1129:6
import [2] - 1154:20, 1154:23
important [5] - 1054:13, 1134:19, 1134:22, 1135:1, 1151:16
impossible [1] - 1090:23
impression [2] - 1114:2, 1115:13
IN [6] - 1179:2, 1179:3, 1179:4, 1179:9, 1179:10, 1179:11
inappropriate [2] - 1129:8, 1129:9
incidentally [2] - 1155:12, 1164:4
include [2] - 1038:22, 1131:2
included [2] - 1131:10, 1139:4
including [1] - 1155:14
income [2] - 1140:6, 1140:9
incoming [1] - 1160:4
inconsistencies [2] - 1110:13, 1169:8
inconsistency [1] - 1129:15
inconsistent [6] - 1112:18, 1112:19, 1116:17, 1118:9, 1129:8, 1129:11
incorrect [1] - 1049:20
indeed [4] - 1033:23, 1037:22, 1151:21, 1152:2
Indeed [1] - 1033:24
indicated [7] - 1100:10, 1163:4, 1169:5, 1171:12, 1174:24, 1175:16, 1176:6
indicates [1] - 1109:19

indicted [1] - 1090:15
indictment [4] - 1036:9, 1037:10, 1039:21, 1040:24
individual [4] - 1035:21, 1081:14, 1082:24, 1141:10
individuals [6] - 1059:2, 1060:20, 1066:20, 1067:2, 1139:3, 1155:14
industry [1] - 1103:8
information [12] - 1063:7, 1063:8, 1110:23, 1111:25, 1112:2, 1112:3, 1112:4, 1112:5, 1115:7, 1131:15, 1145:22, 1152:1
initial [4] - 1042:24, 1101:7, 1117:21, 1143:3
initiation [1] - 1175:8
inner [1] - 1070:3
inquiry [2] - 1033:12, 1036:2
insane [1] - 1088:16
insist [2] - 1166:14, 1166:19
inspection [1] - 1146:8
instance [4] - 1037:23, 1049:5, 1156:16, 1158:4
instances [1] - 1037:24
instead [1] - 1175:9
institution [1] - 1058:4
instruction [11] - 1035:5, 1036:3, 1036:10, 1037:18, 1038:22, 1039:9, 1039:23, 1040:12, 1062:13, 1063:2, 1129:21
Instruction [1] - 1063:23
instructions [4] - 1061:13, 1061:14, 1064:6, 1140:13
intend [2] - 1110:5, 1173:20
intended [1] - 1071:2
intent [2] - 1045:14, 1057:9
intention [1] - 1152:16
interaction [1] - 1150:15
interest [27] - 1054:3, 1054:9, 1054:18,

1055:3, 1056:10, 1070:13, 1076:18, 1089:24, 1090:2, 1105:22, 1106:3, 1107:15, 1126:7, 1126:15, 1134:24, 1138:22, 1142:9, 1142:16, 1142:22, 1143:4, 1143:7, 1144:14, 1144:17, 1156:18, 1156:19, 1156:20, 1164:9
interested [2] - 1066:21, 1075:10
interests [2] - 1070:11, 1135:2
internet [1] - 1092:19
interrupt [1] - 1118:20
intertwined [1] - 1054:20
intervenor [1] - 1138:9
intervenors [1] - 1138:16
interview [16] - 1032:11, 1032:12, 1032:13, 1109:16, 1110:6, 1110:19, 1110:24, 1112:19, 1114:19, 1115:3, 1115:6, 1115:19, 1115:25, 1116:13, 1120:21, 1121:4
interviewed [1] - 1032:10, 1108:9, 1108:17, 1114:1, 1120:12, 1121:14, 1122:2, 1122:6, 1122:7, 1130:14
interviewing [1] - 1035:2
interviews [5] - 1108:12, 1121:17, 1128:17, 1128:19, 1130:7
introduce [7] - 1081:11, 1109:15, 1119:2, 1152:6, 1152:11, 1152:18, 1175:2
introduced [3] - 1046:13, 1096:13, 1097:4
introduction [1] - 1152:12
invest [1] - 1053:19, 1055:1, 1056:5, 1056:17, 1058:23, 1100:16
invested [7] - 1052:5, 1053:19, 1053:20,

1056:16, 1058:3, 1067:8, 1070:17
Investigation [5] - 1108:10, 1108:18, 1121:5, 1122:21, 1131:19
investigator [1] - 1032:15
investing [1] - 1057:9, 1103:24
investment [10] - 1042:24, 1054:22, 1059:1, 1067:11, 1068:6, 1089:3, 1094:23, 1105:6, 1144:3, 1158:10
investments [8] - 1039:22, 1088:2, 1088:3, 1089:16, 1099:18, 1133:10, 1134:24, 1175:20
investor [1] - 1125:21
investors [11] - 1065:2, 1066:9, 1069:4, 1075:8, 1076:19, 1103:13, 1104:8, 1104:12, 1104:15, 1133:8, 1171:21
invitation [2] - 1036:4, 1036:5
invite [1] - 1129:3
inviting [1] - 1129:5
involved [11] - 1036:23, 1046:8, 1057:19, 1069:9, 1103:8, 1105:5, 1131:7, 1132:1, 1138:5, 1139:17, 1143:16
involves [1] - 1035:1
involving [12] - 1090:7, 1090:10, 1123:10, 1127:16, 1128:1, 1130:7, 1134:3, 1138:15, 1144:8, 1145:17, 1146:4, 1149:22
island [3] - 1097:6, 1097:7, 1097:10
Islandia [1] - 1030:23
Isle [6] - 1106:4, 1107:13, 1110:10, 1131:7, 1132:20, 1133:8
Islip [3] - 1030:5, 1030:17, 1031:8
issue [11] - 1032:7, 1034:20, 1035:1, 1053:13, 1073:1,

Honor's [1] - 1113:21
HONORABLE [1] - 1030:12
Honu'Apu [2] - 1097:12, 1102:21
hope [1] - 1090:1
hoping [1] - 1078:13
Hormovitis [1] - 1030:8
hotel [1] - 1097:9
hour [2] - 1078:21, 1175:16
house [19] - 1032:16, 1036:21, 1036:22, 1042:12, 1044:9, 1045:18, 1049:19, 1085:11, 1085:13, 1086:6, 1086:8, 1086:10, 1087:4, 1087:7, 1097:25, 1098:3, 1098:7, 1098:9, 1098:11
House [1] - 1090:7
huge [2] - 1058:9, 1058:14
Hughes [5] - 1060:1, 1060:4, 1064:3, 1064:25, 1070:18
hundred [1] - 1121:9
hung [1] - 1067:1

## I

idea [2] - 1105:6, 1116:10
identical [1] - 1133:7
identification [5] - 1061:7, 1109:9, 1151:16, 1152:17, 1162:19
identified [6] - 1102:11, 1112:1, 1123:12, 1125:10, 1146:19, 1169:5

1074:13, 1074:22, 1076:12, 1077:18, 1078:12, 1079:9, 1079:12, 1079:21, 1079:24, 1080:1, 1082:25, 1084:8, 1109:1, 1109:10, 1109:14, 1113:7, 1113:17, 1117:15, 1118:20, 1120:8, 1139:20, 1150:18, 1152:8, 1152:13, 1158:23, 1159:14, 1169:3, 1172:6, 1174:20, 1175:11, 1176:21, 1176:24

1077:7, 1119:3,
1125:8, 1151:2,
1174:25
**issues** [11] - 1032:25,
1071:5, 1071:6,
1074:3, 1087:21,
1095:17, 1095:18,
1151:21, 1162:8,
1167:18, 1175:18
**items** [2] - 1154:12,
1175:25
**itself** [7] - 1051:1,
1062:20, 1071:5,
1115:15, 1116:17,
1141:12, 1151:22
**IV** [6] - 1106:4,
1107:13, 1110:11,
1131:7, 1132:20,
1133:8

## J

**J.K** [2] - 1117:17,
1117:21
**James** [4] - 1031:17,
1096:19, 1096:22,
1096:24
**JAMES** [1] - 1030:17
**Jason** [2] - 1065:22,
1067:3
**JFB** [1] - 1030:3
**Jim** [1] - 1159:3
**JK** [2] - 1112:1,
1114:20
**JK-1** [6] - 1061:7,
1061:9, 1062:7,
1063:14, 1063:15,
1179:7
**John** [24] - 1033:9,
1033:10, 1033:13,
1034:5, 1039:4,
1047:2, 1048:23,
1049:16, 1050:23,
1056:24, 1059:20,
1074:23, 1076:14,
1091:25, 1100:15,
1113:24, 1114:21,
1117:1, 1117:21,
1132:21, 1134:1,
1157:6, 1159:21,
1163:23
**joint** [5] - 1134:2,
1165:7, 1166:3,
1166:9, 1167:2
**Jordan** [2] - 1099:5,
1099:8
**JOSEPH** [1] - 1030:12
**Jowdy** [36] - 1091:8,
1091:10, 1094:5,
1094:8, 1104:21,

1105:5, 1105:16,
1105:21, 1106:3,
1107:6, 1107:12,
1107:24, 1108:1,
1108:4, 1110:7,
1110:9, 1111:16,
1112:23, 1113:12,
1117:13, 1117:17,
1117:21, 1118:8,
1120:14, 1120:24,
1120:25, 1121:6,
1121:10, 1125:9,
1125:22, 1126:9,
1126:20, 1127:16,
1127:22, 1171:22
**Jowdy's** [1] - 1106:8
**judge** [15] - 1051:2,
1075:15, 1076:6,
1077:7, 1077:11,
1077:23, 1080:18,
1086:14, 1108:6,
1108:23, 1115:17,
1150:8, 1151:13,
1154:2, 1159:9
**Judge** [24] - 1030:12,
1033:19, 1034:4,
1034:17, 1036:6,
1038:10, 1044:12,
1054:1, 1062:9,
1080:24, 1106:16,
1109:4, 1110:2,
1113:18, 1114:12,
1115:7, 1117:14,
1118:3, 1118:11,
1125:14, 1145:10,
1159:7, 1172:3,
1176:4
**July** [4] - 1132:20,
1133:1, 1133:25,
1163:20
**jumping** [2] - 1058:2,
1168:3
**juncture** [1] - 1047:4
**June** [1] - 1158:15
**jurors** [4] - 1032:6,
1036:8, 1041:12,
1048:6
**jury** [28] - 1030:13,
1035:5, 1035:20,
1036:3, 1036:12,
1038:21, 1038:25,
1039:2, 1039:6,
1040:14, 1063:18,
1074:18, 1079:1,
1079:7, 1109:20,
1112:14, 1115:9,
1115:10, 1115:23,
1117:4, 1118:6,
1120:3, 1120:4,
1129:4, 1162:3,

1162:4, 1162:12,
1172:15
**jury's** [1] - 1173:23

## K

**K.J** [4] - 1117:21,
1117:22, 1117:24
**Kaiser** [71] - 1033:9,
1033:10, 1033:13,
1033:17, 1033:18,
1034:2, 1034:5,
1034:6, 1034:7,
1034:8, 1034:24,
1037:21, 1039:4,
1039:8, 1039:25,
1040:8, 1040:25,
1041:4, 1045:4,
1047:2, 1048:23,
1049:2, 1049:16,
1050:8, 1050:23,
1051:5, 1052:22,
1053:1, 1053:9,
1054:7, 1054:9,
1056:24, 1059:7,
1059:20, 1059:25,
1061:9, 1062:13,
1063:22, 1074:19,
1074:23, 1075:7,
1075:9, 1076:14,
1076:15, 1076:18,
1078:1, 1078:14,
1080:3, 1084:20,
1086:7, 1087:3,
1089:9, 1110:18,
1112:13, 1113:24,
1115:1, 1117:21,
1120:11, 1120:21,
1130:16, 1132:21,
1134:1, 1157:6,
1158:4, 1159:21,
1162:18, 1163:23,
1172:11, 1172:18,
1176:15, 1176:17
**Kaiser's** [7] - 1032:9,
1039:24, 1052:7,
1053:24, 1054:3,
1114:21, 1117:1
**keep** [2] - 1061:16,
1123:7
**kELLY** [1] - 1030:15
**kenner** [1] - 1054:4
**KENNER** [3] - 1179:2,
1179:3, 1179:4
**Kenner** [192] - 1030:6,
1030:6, 1030:21,
1031:13, 1032:4,
1032:12, 1032:16,
1032:17, 1032:19,
1033:11, 1033:13,

1033:17, 1033:20,
1034:1, 1034:6,
1037:1, 1040:9,
1041:4, 1041:13,
1042:1, 1042:22,
1043:2, 1043:7,
1043:8, 1043:11,
1043:15, 1044:11,
1045:12, 1046:10,
1046:13, 1046:17,
1047:6, 1048:3,
1048:4, 1049:18,
1049:23, 1050:4,
1050:11, 1050:21,
1051:6, 1052:4,
1052:20, 1053:20,
1054:23, 1055:2,
1055:11, 1056:9,
1056:15, 1057:13,
1057:15, 1069:10,
1069:17, 1071:11,
1072:11, 1072:19,
1072:22, 1074:23,
1075:2, 1075:8,
1075:19, 1076:17,
1080:5, 1080:9,
1080:22, 1081:4,
1081:6, 1082:8,
1082:21, 1084:17,
1084:21, 1085:11,
1085:12, 1087:3,
1087:6, 1087:13,
1087:21, 1089:11,
1089:17, 1089:21,
1089:25, 1090:3,
1090:15, 1091:8,
1091:10, 1094:4,
1094:8, 1094:16,
1096:14, 1097:3,
1097:13, 1098:19,
1099:11, 1099:16,
1100:14, 1100:22,
1101:2, 1101:19,
1102:2, 1102:7,
1104:20, 1104:21,
1105:4, 1105:5,
1105:10, 1105:16,
1105:21, 1106:3,
1106:8, 1106:16,
1107:6, 1107:12,
1107:20, 1107:24,
1107:25, 1108:1,
1108:2, 1108:3,
1108:4, 1109:8,
1109:23, 1110:7,
1110:9, 1110:15,
1111:16, 1112:22,
1117:21, 1118:7,
1118:8, 1120:24,
1120:25, 1121:6,
1121:10, 1125:10,

1126:13, 1127:4,
1127:16, 1127:22,
1127:24, 1127:25,
1128:13, 1129:25,
1130:9, 1131:1,
1131:6, 1132:7,
1134:1, 1135:21,
1136:9, 1138:8,
1139:7, 1144:6,
1144:13, 1144:16,
1144:23, 1147:9,
1147:16, 1147:24,
1150:1, 1150:8,
1151:4, 1151:6,
1151:9, 1151:13,
1151:19, 1151:25,
1152:2, 1152:4,
1152:25, 1154:7,
1155:16, 1155:24,
1157:2, 1158:13,
1159:10, 1159:15,
1159:16, 1159:17,
1159:19, 1159:20,
1162:19, 1163:6,
1163:14, 1163:20,
1165:12, 1165:25,
1166:2, 1170:15,
1170:16, 1171:22
**Kenner's** [10] -
1035:2, 1041:24,
1048:20, 1049:13,
1052:11, 1075:13,
1099:18, 1110:16,
1156:9, 1167:8
**Kevin** [1] - 1090:23
**kind** [10] - 1064:9,
1064:18, 1069:7,
1069:18, 1081:16,
1081:18, 1084:1,
1088:20, 1098:13,
1113:6
**kindly** [12] - 1106:9,
1125:9, 1129:25,
1132:7, 1135:4,
1135:21, 1155:15,
1156:3, 1157:2,
1163:6, 1163:14,
1165:12
**kinds** [1] - 1052:20
**knowing** [4] - 1052:7,
1064:1, 1118:9,
1164:10
**knowledge** [15] -
1070:16, 1092:13,
1105:16, 1105:21,
1112:3, 1121:13,
1125:7, 1151:8,
1158:9, 1160:9,
1163:19, 1167:15,
1167:16, 1174:11

**known** [4] - 1034:12, 1036:20, 1040:16, 1045:17
**knows** [1] - 1115:8
**KOMATIREDDY** [7] - 1030:18, 1031:19, 1174:20, 1175:6, 1176:16, 1176:20, 1176:23
**Komatireddy** [2] - 1031:20, 1031:21
**Kristin** [1] - 1151:24

## L

**labor** [1] - 1047:11
**lack** [3] - 1036:25, 1090:14, 1174:11
**Land** [1] - 1101:13
**land** [6] - 1055:10, 1072:5, 1097:10, 1101:16, 1171:19, 1171:23
**Lane** [2] - 1132:21, 1159:21
**language** [1] - 1082:10
**large** [4] - 1034:14, 1100:5, 1128:1, 1131:8
**LARUSSO** [1] - 1178:6
**laRUSSO** [1] - 1031:1
**LaRusso** [25] - 1031:3, 1031:22, 1031:23, 1031:24, 1054:1, 1062:9, 1062:12, 1063:12, 1078:12, 1079:12, 1079:21, 1083:21, 1102:5, 1114:24, 1115:17, 1116:11, 1118:20, 1119:1, 1159:14, 1160:23, 1162:4, 1172:7, 1175:11, 1175:15, 1176:18
**LaRusso's** [1] - 1172:10
**last** [8] - 1049:8, 1049:10, 1070:24, 1084:20, 1089:9, 1122:9, 1131:17, 1138:20
**latter** [3] - 1122:21, 1122:24, 1124:5
**Lauren** [5] - 1146:5, 1146:6, 1156:5, 1156:8, 1156:10
**law** [9] - 1034:9, 1034:23, 1035:15,

1059:13, 1108:16, 1116:1, 1116:12, 1148:17
**lawsuit** [16] - 1053:16, 1069:12, 1070:7, 1090:14, 1108:4, 1138:5, 1149:21, 1150:2, 1151:25, 1152:4, 1152:25, 1154:5, 1154:8, 1155:13, 1155:20, 1163:4
**lawsuits** [4] - 1069:9, 1090:3, 1090:6, 1090:24
**lawyer** [2] - 1035:15, 1094:13
**lawyers** [1] - 1112:10
**lead** [2] - 1044:21, 1115:8
**leading** [6] - 1080:24, 1081:1, 1172:24, 1173:17, 1174:8, 1174:9, 1174:14, 1174:15
**learn** [1] - 1072:1
**learned** [5] - 1072:2, 1107:22, 1107:23, 1113:11, 1164:16
**least** [6] - 1037:24, 1068:7, 1075:2, 1077:13, 1113:19, 1113:20
**leaves** [3] - 1074:20, 1172:14, 1172:15
**Led** [1] - 1041:7, 1070:25, 1144:10, 1144:14, 1144:17, 1144:21, 1144:24, 1145:2, 1145:18, 1146:5, 1147:2, 1148:13, 1149:17, 1149:18, 1156:10, 1156:17, 1157:7, 1157:10
**led** [1] - 1075:17
**left** [4] - 1032:16, 1089:3, 1130:17, 1152:13
**leg** [1] - 1071:23
**legal** [5] - 1103:19, 1104:1, 1146:3, 1148:18, 1149:19
**legit** [1] - 1136:12
**Lehman** [19] - 1099:25, 1100:9, 1126:21, 1133:12, 1133:24, 1134:25, 1138:24, 1139:2, 1139:14, 1139:17,

1144:2, 1164:5, 1164:8, 1164:14, 1164:15, 1164:25, 1165:2, 1165:4
**lend** [1] - 1160:13
**lending** [1] - 1104:20, 1117:20, 1120:16
**lengthy** [1] - 1033:1
**lent** [3] - 1101:11, 1125:22, 1171:15
**Lerner** [5] - 1158:6, 1158:10, 1158:16, 1160:5, 1160:12
**less** [2] - 1071:8, 1129:14
**letter** [21] - 1047:20, 1063:22, 1133:5, 1133:8, 1133:11, 1133:14, 1133:25, 1134:1, 1134:5, 1134:8, 1134:23, 1165:21, 1165:22, 1165:24, 1166:13, 1166:19, 1167:1, 1167:7, 1167:23, 1175:2, 1175:9
**letter's** [1] - 1168:1
**lettering** [1] - 1082:14
**level** [1] - 1092:15
**liability** [3] - 1103:3, 1103:24, 1104:5
**licensing** [1] - 1058:15
**lien** [3] - 1073:22, 1073:24, 1074:3
**life** [2] - 1084:4, 1089:19
**limited** [2] - 1103:3, 1103:24
**limiting** [1] - 1039:9
**Line** [2] - 1127:21, 1131:2
**line** [12] - 1046:20, 1047:19, 1055:7, 1082:3, 1082:12, 1125:16, 1127:15, 1151:3, 1168:7, 1169:2, 1169:3, 1171:11
**lines** [3] - 1035:10, 1036:13, 1131:10
**listen** [3] - 1039:10, 1171:22, 1172:12
**litigation** [1] - 1107:23
**living** [1] - 1047:17
**LLC** [18] - 1043:5, 1101:17, 1103:13, 1103:15, 1103:21, 1103:23, 1104:4, 1104:9, 1104:13,

1104:16, 1132:20, 1133:9, 1136:5, 1136:8, 1136:21, 1137:2, 1156:11, 1156:17
**LLCs** [2] - 1036:7, 1103:6
**LLP** [6] - 1030:21, 1031:1, 1158:6, 1158:10, 1158:17, 1160:5
**loan** [21] - 1042:1, 1100:16, 1104:22, 1105:11, 1105:15, 1105:17, 1106:4, 1107:12, 1107:14, 1110:10, 1111:17, 1113:11, 1118:6, 1118:7, 1125:9, 1127:22, 1142:20, 1170:10, 1170:18, 1171:2, 1171:19
**loaned** [2] - 1105:10, 1105:21
**Loans** [1] - 1127:21
**loans** [2] - 1171:17, 1171:21
**located** [1] - 1064:18
**location** [1] - 1097:13
**log** [1] - 1123:7
**look** [36] - 1049:2, 1050:9, 1050:25, 1059:14, 1078:7, 1078:18, 1078:21, 1101:19, 1102:8, 1106:9, 1109:7, 1115:4, 1115:25, 1125:9, 1129:25, 1132:7, 1135:4, 1135:21, 1136:11, 1145:7, 1145:13, 1146:11, 1155:15, 1155:25, 1156:3, 1157:2, 1157:15, 1160:24, 1162:19, 1162:20, 1163:6, 1163:14, 1165:12, 1163:13
**looking** [7] - 1075:12, 1080:3, 1080:4, 1081:7, 1081:23, 1082:3, 1110:4
**looks** [12] - 1080:5, 1084:2, 1111:2, 1115:18, 1132:9, 1132:14, 1132:15, 1133:2, 1136:10, 1157:14, 1161:6, 1163:13
**losses** [1] - 1089:15

**lost** [3] - 1109:22, 1113:6, 1140:22
**loud** [1] - 1115:24
**Louis** [2] - 1092:21, 1092:25
**Lucas** [10] - 1085:9, 1087:8, 1088:19, 1091:5, 1091:15, 1091:18, 1091:20, 1092:2, 1092:14, 1134:15
**luggage** [1] - 1098:8
**lunch** [6] - 1078:21, 1112:9, 1112:11, 1112:12, 1112:13, 1175:16
**luncheon** [1] - 1119:5

## M

**Magazine** [4] - 1097:24, 1098:5, 1098:14, 1099:5
**mail** [8] - 1062:19, 1062:20, 1062:21, 1063:23, 1163:19, 1163:22, 1163:24, 1164:1
**mailing** [1] - 1155:3
**maintaining** [1] - 1071:10
**majority** [2] - 1065:16, 1157:7
**Makika** [3] - 1106:5, 1107:14, 1110:11
**MAMALAHOA** [1] - 1132:23
**management** [1] - 1046:16
**Management** [6] - 1136:5, 1136:8, 1136:21, 1137:1, 1164:20, 1164:23
**manager** [2] - 1047:4, 1134:15
**managing** [18] - 1043:6, 1136:4, 1136:8, 1136:20, 1136:21, 1137:1, 1142:19, 1146:6, 1156:12, 1156:14, 1157:7, 1157:9, 1164:17, 1164:19, 1164:22, 1165:3, 1165:19, 1166:12
**Manfredi** [16] - 1094:2, 1094:4, 1094:8, 1094:19, 1094:21, 1098:2, 1098:11, 1132:22, 1134:2,

1141:24, 1142:6, 1143:7, 1143:16, 1143:20, 1144:10, 1163:23
**Manfredi's** [1] - 1096:23
**manner** [1] - 1115:11
**March** [1] - 1096:17
**mark** [1] - 1152:15
**marked** [16] - 1045:22, 1063:15, 1074:11, 1079:17, 1101:19, 1109:8, 1125:9, 1135:21, 1139:6, 1151:15, 1152:17, 1155:23, 1158:13, 1159:20, 1162:18, 1163:6
**market** [1] - 1071:24
**marking** [1] - 1061:6
**material** [10] - 1034:3, 1034:24, 1053:8, 1053:10, 1061:24, 1080:16, 1086:15, 1113:23, 1128:1
**materiality** [1] - 1053:12
**materialized** [1] - 1151:19
**materials** [1] - 1047:11
**Matt** [3] - 1120:13, 1120:23, 1121:4
**matter** [9] - 1067:13, 1074:24, 1089:20, 1092:6, 1103:15, 1105:3, 1146:16, 1162:5, 1177:5
**Matter** [9] - 1043:23, 1044:25, 1045:1, 1051:13, 1055:16, 1056:1, 1168:14, 1169:13, 1170:1
**matters** [1] - 1176:2
**mean** [11] - 1064:24, 1068:8, 1068:15, 1070:13, 1102:12, 1102:14, 1102:17, 1102:23, 1105:11, 1158:6, 1165:16
**means** [2] - 1051:2, 1160:17
**meant** [1] - 1068:22
**meantime** [1] - 1109:11
**measure** [1] - 1034:14
**media** [1] - 1129:5
**meet** [7] - 1033:9, 1046:11, 1094:4, 1135:8, 1140:24,

1166:20, 1167:9
**meeting** [11] - 1097:5, 1110:7, 1112:22, 1117:12, 1120:15, 1122:13, 1122:25, 1123:9, 1123:10, 1124:23, 1135:13
**meeting's** [1] - 1033:10
**meets** [1] - 1034:5
**member** [1] - 1043:6, 1046:16, 1136:4, 1136:8, 1137:1, 1146:6, 1156:12, 1156:14, 1157:7, 1157:10, 1164:17, 1164:19, 1164:22, 1165:3, 1165:19, 1166:12
**members** [6] - 1039:6, 1068:24, 1068:25, 1089:16, 1141:22, 1157:7
**membership** [2] - 1070:11, 1070:13
**Memorial** [1] - 1030:22
**memory** [5] - 1100:8, 1114:14, 1114:15, 1114:17, 1136:24
**mention** [1] - 1065:18
**mentioned** [2] - 1034:25, 1057:11
**merely** [1] - 1052:25
**met** [18] - 1046:10, 1046:12, 1065:23, 1094:2, 1097:3, 1101:8, 1117:17, 1120:14, 1122:10, 1122:20, 1123:5, 1126:14, 1165:9, 1166:5, 1166:14, 1166:17, 1167:21, 1167:24
**Metabank** [6] - 1058:5, 1058:8, 1058:9, 1058:13, 1058:21, 1066:12
**Mexico** [13] - 1044:10, 1075:1, 1085:5, 1085:9, 1087:8, 1107:22, 1117:20, 1117:23, 1120:17, 1120:24, 1121:1, 1121:11, 1126:5
**Michael** [1] - 1099:5, 1099:8, 1150:11, 1150:13, 1150:15
**middle** [1] - 1033:1
**might** [5] - 1035:5,

1075:10, 1078:2, 1140:14, 1140:18
**Milan** [5] - 1096:19, 1096:22, 1096:24, 1141:25, 1143:9
**miles** [1] - 1171:20
**milestone** [6] - 1165:4, 1165:5, 1165:6, 1166:4, 1166:7, 1167:1
**milestones** [9] - 1165:9, 1166:5, 1166:15, 1166:17, 1166:20, 1167:9, 1167:20, 1167:21, 1167:24
**million** [23] - 1041:15, 1041:16, 1041:22, 1042:2, 1042:7, 1042:8, 1042:17, 1042:20, 1098:21, 1098:23, 1099:1, 1099:12, 1100:10, 1100:16, 1100:18, 1105:9, 1105:23, 1107:13, 1117:25, 1121:8, 1126:8, 1165:6
**millions** [5] - 1058:14, 1117:25, 1121:8, 1121:9, 1121:11
**mind** [2] - 1162:9, 1173:23
**minds** [1] - 1109:21
**mine** [6] - 1059:24, 1061:23, 1106:24, 1143:19, 1157:14, 1163:13
**Mineola** [1] - 1031:2
**mines** [1] - 1055:10
**minute** [1] - 1057:12
**minutes** [4] - 1077:21, 1162:7, 1172:9, 1176:21
**misbehavior** [2] - 1069:19, 1069:22
**misdeeds** [1] - 1128:14
**MISKIEWICZ** [95] - 1030:17, 1031:16, 1032:7, 1035:25, 1036:18, 1037:14, 1038:6, 1038:9, 1038:18, 1038:20, 1040:7, 1044:8, 1044:21, 1045:3, 1052:2, 1052:14, 1052:17, 1053:13, 1054:11, 1054:25, 1055:9, 1056:3,

1062:7, 1063:16, 1063:21, 1068:2, 1074:22, 1075:23, 1076:1, 1076:5, 1076:8, 1076:22, 1077:3, 1077:17, 1077:20, 1078:8, 1078:11, 1079:9, 1079:15, 1079:24, 1080:1, 1080:2, 1080:20, 1081:3, 1083:2, 1083:3, 1083:18, 1083:24, 1084:13, 1086:3, 1086:13, 1087:2, 1089:4, 1090:17, 1091:1, 1091:13, 1092:22, 1094:9, 1095:9, 1096:9, 1100:11, 1102:4, 1104:23, 1105:18, 1106:12, 1107:9, 1107:16, 1108:20, 1109:10, 1109:14, 1111:9, 1111:11, 1112:7, 1118:24, 1123:22, 1128:21, 1129:2, 1135:18, 1136:17, 1139:20, 1148:10, 1150:4, 1150:18, 1151:2, 1155:5, 1156:21, 1158:23, 1159:5, 1159:12, 1160:21, 1160:24, 1167:25, 1168:10, 1178:4, 1178:8
**Miskiewicz** [7] - 1031:17, 1031:18, 1034:19, 1038:2, 1041:3, 1062:23, 1078:5
**Miskiewicz's** [1] - 1078:1
**mismanaging** [1] - 1151:20
**miss** [2] - 1117:18, 1134:21
**missing** [3] - 1040:11, 1054:15, 1157:25
**mistake** [4] - 1048:4, 1072:24, 1073:2, 1073:3
**misused** [1] - 1105:10
**Moaula** [1] - 1102:11
**mom** [3] - 1059:25, 1063:9, 1070:18
**moment** [12] - 1052:18, 1052:19, 1075:15, 1076:6,

1108:24, 1133:6, 1140:18, 1145:10, 1150:8, 1154:2, 1164:16, 1172:3
**Money** [4] - 1097:24, 1098:5, 1098:14, 1099:4
**money** [89] - 1037:1, 1038:4, 1038:14, 1042:6, 1042:25, 1044:6, 1044:7, 1044:9, 1044:15, 1044:19, 1044:23, 1047:6, 1047:8, 1048:2, 1048:3, 1048:5, 1048:7, 1048:8, 1049:11, 1049:25, 1050:4, 1050:17, 1050:20, 1051:4, 1052:10, 1052:11, 1052:21, 1053:9, 1053:19, 1054:15, 1054:16, 1055:1, 1056:5, 1056:8, 1056:14, 1056:15, 1056:17, 1056:20, 1056:21, 1056:24, 1057:18, 1058:19, 1058:20, 1059:22, 1059:23, 1065:17, 1066:9, 1070:19, 1073:8, 1073:13, 1073:19, 1075:25, 1088:4, 1100:20, 1100:23, 1101:3, 1101:5, 1101:9, 1104:20, 1105:14, 1105:21, 1107:21, 1109:22, 1110:10, 1117:23, 1117:24, 1120:17, 1120:25, 1121:6, 1121:7, 1121:10, 1121:11, 1125:21, 1127:1, 1127:5, 1130:16, 1142:2, 1142:4, 1142:6, 1148:1, 1170:8, 1170:25, 1171:14, 1171:23, 1173:14, 1173:25
**monies** [3] - 1045:5, 1173:21, 1175:24
**month** [5] - 1058:15, 1060:10, 1122:23, 1123:3, 1123:6
**months** [2] - 1170:11, 1171:3
**Moreau** [1] - 1069:1
**morning** [20] -

1031:16, 1031:18, 1031:19, 1031:21, 1031:22, 1031:24, 1031:25, 1032:2, 1032:3, 1032:5, 1039:6, 1039:7, 1074:15, 1078:6, 1078:15, 1172:10, 1172:14, 1172:19, 1176:16, 1177:4
**Mosquito** [1] - 1082:6
**MosquitoRojoTequil a** [4] - 1074:24, 1080:8, 1080:10, 1081:5
**most** [2] - 1175:17, 1175:22
**mostly** [1] - 1075:12
**mother** [6] - 1060:4, 1064:2, 1089:15, 1155:14, 1158:9, 1160:13
**mother's** [1] - 1064:25
**move** [5] - 1088:6, 1102:2, 1126:16, 1152:18, 1176:25
**movement** [1] - 1176:25
**moves** [1] - 1083:18
**MR** [218] - 1031:16, 1031:22, 1031:25, 1032:3, 1032:7, 1033:5, 1033:7, 1035:25, 1036:1, 1036:18, 1037:14, 1037:19, 1038:6, 1038:9, 1038:10, 1038:18, 1038:20, 1038:22, 1040:7, 1043:13, 1043:20, 1044:8, 1044:11, 1044:21, 1044:24, 1045:3, 1048:10, 1051:2, 1051:10, 1052:2, 1052:13, 1052:14, 1052:15, 1052:17, 1053:4, 1053:13, 1053:25, 1054:1, 1054:11, 1054:25, 1055:6, 1055:9, 1055:14, 1056:3, 1062:7, 1062:8, 1062:9, 1062:12, 1063:12, 1063:16, 1063:21, 1068:2, 1074:13, 1074:22, 1075:15, 1075:23, 1075:24, 1076:1, 1076:5, 1076:6, 1076:8,

1076:12, 1076:22, 1077:2, 1077:3, 1077:4, 1077:7, 1077:17, 1077:20, 1077:23, 1078:8, 1078:10, 1078:11, 1078:12, 1079:3, 1079:9, 1079:11, 1079:12, 1079:15, 1079:20, 1079:21, 1079:24, 1080:1, 1080:2, 1080:17, 1080:20, 1080:24, 1081:3, 1082:25, 1083:2, 1083:3, 1083:18, 1083:20, 1083:21, 1083:24, 1084:8, 1084:13, 1085:16, 1086:3, 1086:11, 1086:13, 1086:14, 1087:2, 1089:4, 1089:8, 1090:17, 1090:21, 1091:1, 1091:3, 1091:13, 1091:14, 1092:22, 1092:24, 1094:1, 1094:9, 1095:9, 1095:10, 1096:9, 1100:11, 1102:2, 1102:4, 1102:5, 1104:23, 1104:25, 1105:18, 1106:12, 1106:13, 1106:16, 1107:9, 1107:16, 1107:17, 1108:20, 1108:23, 1109:1, 1109:4, 1109:10, 1109:14, 1110:2, 1111:9, 1111:10, 1111:11, 1112:7, 1113:7, 1113:17, 1114:12, 1114:20, 1114:24, 1115:17, 1116:23, 1116:25, 1117:7, 1117:14, 1118:18, 1118:20, 1118:24, 1119:1, 1120:8, 1120:10, 1123:22, 1125:14, 1128:21, 1129:2, 1129:20, 1129:24, 1135:18, 1136:17, 1138:2, 1139:20, 1139:23, 1139:24, 1145:12, 1148:10, 1148:12, 1150:4, 1150:7, 1150:10, 1150:18, 1151:2, 1151:12, 1151:15, 1152:7, 1152:22, 1153:2,

1154:2, 1154:4, 1155:5, 1155:11, 1156:21, 1157:1, 1158:23, 1159:2, 1159:5, 1159:7, 1159:12, 1159:14, 1159:18, 1160:21, 1160:23, 1160:24, 1161:1, 1161:11, 1162:4, 1162:17, 1167:25, 1168:10, 1169:2, 1170:3, 1172:3, 1172:6, 1174:17, 1175:11, 1175:15, 1176:18, 1176:24, 1178:4, 1178:6, 1178:8, 1178:10
**MS** [1] - 1031:19, 1174:20, 1175:6, 1176:16, 1176:20, 1176:23
**multiple** [4] - 1033:24, 1036:6, 1036:7, 1103:13
**must** [1] - 1072:24
**mutual** [1] - 1096:14
**myriad** [1] - 1152:16
**mystified** [1] - 1086:16

### N

**Na'alehu** [13] - 1132:23, 1133:3, 1136:5, 1136:8, 1136:21, 1137:1, 1139:2, 1139:13, 1164:17, 1164:20, 1164:23, 1166:7, 1166:12
**name** [28] - 1036:21, 1037:12, 1043:3, 1057:25, 1059:25, 1082:4, 1091:25, 1096:19, 1103:13, 1106:8, 1114:3, 1114:7, 1114:9, 1114:18, 1114:22, 1115:5, 1117:1, 1117:2, 1127:11, 1136:11, 1138:20, 1156:6, 1158:6, 1158:14, 1165:16
**named** [2] - 1060:1, 1082:17
**names** [1] - 1117:5
**Nash** [1] - 1138:20
**nature** [4] - 1080:25, 1081:1, 1142:20,

1147:11
**nearest** [1] - 1047:23
**nearly** [1] - 1133:7
**necessarily** [1] - 1152:16
**necessary** [1] - 1168:4
**need** [13] - 1039:9, 1044:5, 1047:8, 1066:9, 1095:2, 1095:8, 1095:19, 1100:15, 1132:17, 1147:25, 1148:1, 1148:4, 1148:6
**needed** [4] - 1041:22, 1048:4, 1061:2, 1081:15
**needs** [2] - 1129:16, 1147:25
**net** [4] - 1099:8, 1099:22, 1100:6, 1100:10
**Net** [1] - 1100:9
**never** [9] - 1059:9, 1072:4, 1111:24, 1115:17, 1116:22, 1118:6, 1167:11
**NEW** [1] - 1030:1
**new** [3] - 1068:17, 1157:7, 1157:9
**New** [14] - 1030:5, 1030:17, 1030:23, 1031:2, 1031:5, 1031:8, 1032:15, 1092:10, 1110:7, 1117:17, 1117:19, 1120:15, 1132:21
**News** [9] - 1089:21, 1128:17, 1128:20, 1129:11, 1129:18, 1130:6, 1130:15, 1131:12, 1131:13
**newspaper** [1] - 1129:13
**next** [16] - 1043:23, 1044:25, 1051:13, 1055:16, 1067:13, 1081:23, 1095:21, 1096:7, 1096:13, 1137:4, 1147:8, 1147:9, 1168:14, 1169:3, 1169:13, 1172:9
**Nick** [2] - 1149:22, 1154:6
**night** [1] - 1172:14
**nine** [3] - 1146:18, 1146:21, 1146:23
**Nolan** [9] - 1069:1, 1106:22, 1107:1, 1107:19, 1125:12,

1127:8, 1169:6, 1169:9, 1170:5
**non** [2] - 1174:9, 1175:25
**non-leading** [1] - 1174:9
**non-purposeful** [1] - 1175:25
**none** [1] - 1059:24
**North** [13] - 1141:3, 1141:9, 1141:14, 1141:19, 1141:22, 1142:9, 1142:17, 1142:22, 1144:9, 1145:17, 1147:2, 1148:13, 1149:16
**Northern** [1] - 1139:12
**Northport** [2] - 1103:15, 1103:18
**note** [3] - 1062:23, 1138:7, 1138:22
**notes** [22] - 1037:24, 1037:25, 1061:24, 1110:18, 1111:21, 1112:19, 1112:20, 1112:25, 1115:3, 1115:10, 1115:24, 1117:16, 1117:22, 1118:3, 1118:17, 1121:22, 1122:14, 1122:19, 1124:14, 1124:15, 1152:22, 1152:24
**nothing** [4] - 1054:8, 1109:19, 1154:25, 1175:22
**notice** [1] - 1040:11
**notification** [1] - 1047:20
**November** [1] - 1090:15
**number** [7] - 1047:21, 1077:24, 1106:15, 1109:3, 1109:5, 1115:4, 1159:6
**numbers** [2] - 1100:5, 1114:23

### O

**o'clock** [1] - 1176:19
**oath** [4] - 1040:1, 1040:25, 1107:1, 1127:8
**object** [10] - 1034:16, 1043:13, 1048:10, 1080:18, 1080:24, 1081:1, 1082:25, 1084:8, 1091:13, 1174:24

**objected** [2] - 1080:17, 1152:12
**objection** [40] - 1034:19, 1043:20, 1044:2, 1051:10, 1062:8, 1063:13, 1076:14, 1077:5, 1079:10, 1079:19, 1083:20, 1083:21, 1085:16, 1090:17, 1091:1, 1092:22, 1094:9, 1095:9, 1096:9, 1102:4, 1102:5, 1104:23, 1105:18, 1107:9, 1107:16, 1108:20, 1112:7, 1113:21, 1135:18, 1136:17, 1148:10, 1150:4, 1152:10, 1155:5, 1156:21, 1159:13, 1167:25, 1168:10, 1174:7, 1174:16
**Objection** [1] - 1100:11
**objections** [2] - 1172:25, 1173:7
**objective** [1] - 1044:13
**objectives** [1] - 1103:4
**obligation** [2] - 1035:6, 1167:4
**obligations** [1] - 1166:3
**observe** [7] - 1065:7, 1066:4, 1121:22, 1121:25, 1122:13, 1122:17, 1122:18
**observed** [1] - 1065:9
**obtain** [1] - 1096:6
**obtaining** [1] - 1142:20
**obviously** [2] - 1173:1, 1173:20
**occasion** [5] - 1110:8, 1112:22, 1113:11, 1113:14, 1116:18
**occasions** [5] - 1110:8, 1122:3, 1128:18, 1174:15
**occupation** [1] - 1175:21
**occur** [1] - 1037:3
**occurred** [7] - 1110:19, 1110:25, 1146:9, 1151:23, 1151:24, 1152:8
**occurring** [1] - 1118:11
**Oceanside** [1] - 1031:5

**October** [9] - 1041:11, 1108:12, 1110:20, 1110:25, 1118:10, 1120:13, 1120:22, 1121:3, 1131:17
**OF** [2] - 1030:1, 1030:3
**offense** [1] - 1090:16
**offenses** [1] - 1090:25
**offer** [3] - 1110:2, 1152:13, 1173:21
**offered** [5] - 1039:19, 1040:23, 1077:12, 1158:24, 1159:5
**offering** [4] - 1032:22, 1036:15, 1159:9, 1175:23
**offers** [3] - 1062:7, 1079:8, 1104:5
**Office** [1] - 1059:13
**office** [5] - 1060:13, 1065:5, 1070:4, 1123:1, 1130:18
**officer** [3] - 1092:9, 1092:10, 1108:16
**offices** [3] - 1060:8, 1064:16, 1064:18
**often** [1] - 1069:12
**oil** [1] - 1068:16
**Old** [1] - 1031:1
**OLIVERAS** [3] - 1031:4, 1031:25, 1176:24
**Oliveras** [2] - 1032:1, 1032:2
**once** [3] - 1136:11, 1167:8, 1172:23
**one** [37] - 1032:7, 1033:19, 1033:20, 1037:7, 1037:23, 1038:21, 1045:17, 1050:9, 1052:4, 1053:13, 1054:13, 1065:21, 1065:22, 1068:17, 1073:8, 1074:6, 1090:7, 1090:10, 1096:13, 1098:20, 1098:23, 1100:14, 1117:3, 1123:14, 1123:17, 1123:18, 1123:20, 1124:15, 1129:15, 1148:20, 1156:14, 1162:4, 1165:22, 1172:23, 1174:20, 1176:5, 1176:8
**One** [1] - 1030:21
**one's** [1] - 1116:25
**one-half** [2] - 1098:20, 1098:23

**ones** [2] - 1084:5, 1148:19
**ongoing** [1] - 1104:19
**Open** [3] - 1045:1, 1056:1, 1170:1
**open** [3] - 1087:1, 1129:23, 1154:1
**opening** [1] - 1173:2
**opens** [1] - 1110:14
**operating** [5] - 1104:16, 1145:3, 1145:7, 1146:4, 1149:18
**opportune** [1] - 1077:24
**opportunity** [8] - 1060:11, 1060:25, 1061:1, 1077:10, 1100:20, 1145:5, 1168:11, 1175:12
**opposed** [4] - 1104:9, 1122:6, 1129:14, 1135:11
**order** [7] - 1081:22, 1094:25, 1095:6, 1096:7, 1100:16, 1140:14, 1142:1
**organize** [1] - 1069:12
**organized** [1] - 1150:2
**original** [8] - 1061:18, 1061:20, 1063:16, 1063:17, 1108:8, 1114:4, 1132:17
**originally** [1] - 1071:2
**originating** [1] - 1050:5
**otherwise** [2] - 1134:20, 1166:14
**ought** [2] - 1034:11, 1108:18
**outgoing** [3] - 1047:21, 1158:16, 1158:20
**outweighed** [1] - 1035:19
**oval** [1] - 1147:8
**overall** [1] - 1176:12
**overheard** [1] - 1060:21
**overruled** [11] - 1084:9, 1090:18, 1092:23, 1094:10, 1100:13, 1105:1, 1107:18, 1108:21, 1135:19, 1150:6, 1173:7
**oversee** [1] - 1088:24
**owed** [11] - 1038:4, 1038:14, 1044:6, 1044:7, 1044:17,

1044:19, 1044:22, 1045:5, 1047:6, 1048:7, 1053:9
**Owen** [3] - 1106:22, 1107:1, 1107:19
**own** [7] - 1056:19, 1058:3, 1069:1, 1072:14, 1142:2, 1142:6, 1147:23
**owned** [8] - 1072:2, 1072:12, 1072:16, 1080:22, 1081:7, 1086:10, 1097:1, 1142:11
**owner** [2] - 1075:2, 1075:13
**ownership** [9] - 1068:10, 1099:22, 1142:8, 1142:16, 1142:22, 1144:13, 1144:16, 1144:24
**owns** [1] - 1080:11

## P

**P-e-d-e-g-r-a-l** [1] - 1086:13
**p.m** [6] - 1162:13, 1163:21, 1172:16, 1172:21, 1177:1, 1177:2
**package** [3] - 1128:1, 1128:15, 1145:3
**page** [40] - 1043:23, 1044:25, 1045:24, 1046:19, 1048:15, 1049:2, 1049:8, 1050:12, 1050:25, 1051:13, 1055:16, 1067:13, 1080:13, 1081:23, 1081:25, 1082:3, 1085:18, 1086:21, 1093:4, 1111:5, 1111:7, 1125:13, 1137:4, 1145:25, 1149:14, 1150:20, 1153:4, 1161:15, 1162:20, 1163:1, 1163:4, 1168:7, 1168:8, 1168:14, 1169:2, 1169:3, 1169:13, 1171:10
**pages** [3] - 1134:12, 1160:22, 1176:5
**paid** [17] - 1066:22, 1070:12, 1071:12, 1072:4, 1073:17, 1105:21, 1106:3, 1126:2, 1126:5,

1127:1, 1138:12, 1138:25, 1139:1, 1144:3, 1170:25, 1175:24
**papers** [1] - 1147:10
**paperwork** [1] - 1081:12
**Paradise** [14] - 1036:20, 1037:14, 1037:20, 1037:22, 1038:12, 1038:15, 1038:22, 1039:13, 1039:17, 1040:19, 1040:22, 1045:17, 1045:20, 1090:7
**parcel** [2] - 1097:10, 1126:5
**parcels** [1] - 1101:23
**paren** [1] - 1134:4
**part** [22] - 1046:16, 1054:2, 1071:8, 1086:4, 1086:5, 1086:17, 1090:4, 1092:18, 1102:15, 1102:21, 1102:25, 1111:15, 1122:21, 1122:24, 1124:5, 1127:25, 1138:15, 1139:16, 1145:3, 1146:7, 1173:2, 1175:22
**participated** [1] - 1069:11
**particular** [18] - 1035:8, 1037:22, 1047:8, 1050:18, 1053:5, 1109:7, 1113:24, 1124:1, 1124:2, 1135:16, 1148:17, 1162:5, 1174:1, 1174:12, 1174:13, 1175:18, 1176:8
**particularly** [2] - 1032:23, 1103:25
**parties** [1] - 1079:16
**partners** [4] - 1104:6, 1142:15, 1143:9, 1143:10
**past** [1] - 1103:12
**patent** [1] - 1058:15
**patents** [1] - 1067:6
**pause** [4] - 1074:12, 1145:11, 1150:9, 1172:5
**pay** [9] - 1036:25, 1058:14, 1073:13, 1073:17, 1073:18, 1073:20, 1117:23, 1121:1, 1148:1

paying [5] - 1053:9, 1071:9, 1072:6, 1072:10, 1127:5
payment [6] - 1041:21, 1041:23, 1042:9, 1139:16, 1140:3, 1140:16
payments [9] - 1139:3, 1139:4, 1139:13, 1165:4, 1165:5, 1165:6, 1165:9, 1166:4
payoff [1] - 1060:10
Peca [2] - 1151:24, 1173:13
Pedregal [8] - 1085:6, 1085:13, 1086:6, 1086:8, 1086:10, 1086:11, 1087:4, 1087:8
pending [1] - 1066:12
people [7] - 1035:5, 1060:4, 1065:7, 1065:11, 1071:19, 1147:7, 1173:5
people's [1] - 1059:23
per [1] - 1058:15
percent [19] - 1054:5, 1061:5, 1104:21, 1105:6, 1105:22, 1106:3, 1107:15, 1126:7, 1126:15, 1141:6, 1142:25, 1143:1, 1143:4, 1143:7, 1156:18, 1156:19, 1171:16, 1171:17
percentage [3] - 1134:24, 1142:23, 1142:24
perform [1] - 1134:14
perhaps [2] - 1077:24, 1094:22
period [9] - 1049:6, 1050:4, 1059:8, 1071:9, 1083:9, 1083:11, 1109:21, 1171:20, 1175:21
permission [2] - 1060:2, 1063:17
permit [1] - 1174:12
permits [1] - 1054:25
permitted [1] - 1129:11
person [8] - 1082:7, 1082:17, 1091:25, 1099:4, 1114:1, 1122:2, 1122:7, 1134:25
personal [7] -

1089:24, 1090:2, 1104:10, 1113:17, 1114:22, 1114:23, 1115:7
personally [4] - 1057:8, 1062:18, 1100:18, 1148:23
perspective [2] - 1052:16, 1166:6
Phil [78] - 1030:6, 1030:21, 1032:12, 1033:11, 1033:13, 1033:16, 1033:17, 1033:20, 1034:1, 1034:6, 1043:7, 1046:10, 1047:6, 1048:3, 1048:4, 1048:20, 1049:13, 1049:18, 1050:11, 1050:21, 1075:19, 1082:8, 1089:11, 1089:16, 1089:21, 1089:25, 1090:3, 1090:14, 1090:23, 1094:16, 1097:3, 1097:13, 1097:22, 1098:3, 1098:13, 1098:19, 1099:11, 1099:16, 1099:17, 1100:14, 1100:22, 1101:2, 1104:20, 1105:4, 1105:10, 1118:7, 1128:4, 1128:13, 1130:9, 1130:15, 1131:1, 1131:5, 1134:1, 1136:9, 1138:8, 1144:6, 1144:13, 1144:16, 1144:23, 1147:9, 1150:1, 1150:8, 1151:13, 1151:18, 1151:19, 1151:25, 1152:2, 1152:4, 1152:24, 1154:7, 1156:9, 1163:20, 1165:24, 1166:2, 1167:7, 1167:14, 1170:15, 1170:16
Phil's [1] - 1167:11
Philip [1] - 1030:6
phone [10] - 1060:14, 1060:19, 1065:8, 1065:9, 1065:10, 1066:5, 1067:1, 1072:13, 1166:23, 1166:24
photocopy [7] - 1132:18, 1136:2, 1155:24, 1157:12,

1157:14, 1157:15, 1163:9
photograph [3] - 1074:9, 1101:21, 1101:24
phrase [1] - 1036:25
physically [1] - 1065:5
picture [2] - 1130:11, 1154:10
piece [2] - 1039:13, 1040:18
pissed [1] - 1064:9
place [12] - 1085:6, 1087:10, 1097:5, 1097:8, 1097:9, 1097:23, 1097:25, 1098:12, 1108:12, 1127:18, 1172:22
placed [1] - 1062:24
plan [1] - 1175:1
planning [1] - 1089:1
plans [2] - 1134:16, 1134:17
player [1] - 1138:4
players [6] - 1065:16, 1066:16, 1069:1, 1069:3, 1087:22, 1131:9
Plaza [2] - 1030:16, 1031:7
plus [2] - 1042:20, 1138:22
pm [1] - 1161:14
pocket [4] - 1055:1, 1056:5, 1056:8, 1056:14
point [60] - 1033:8, 1034:4, 1034:13, 1037:23, 1043:13, 1055:10, 1064:12, 1067:8, 1074:6, 1077:2, 1083:1, 1095:11, 1095:19, 1098:13, 1098:19, 1099:7, 1099:15, 1100:14, 1100:21, 1101:1, 1104:18, 1105:20, 1106:3, 1107:13, 1107:17, 1113:10, 1113:19, 1113:20, 1114:5, 1117:14, 1124:11, 1124:16, 1125:20, 1128:3, 1128:10, 1128:13, 1135:15, 1136:4, 1141:23, 1143:14, 1143:20, 1143:23, 1147:18, 1149:17, 1149:21, 1151:18, 1152:10,

1154:14, 1157:9, 1158:13, 1160:14, 1161:10, 1164:22, 1165:4, 1166:1, 1166:19, 1168:8, 1176:10
Point [13] - 1141:3, 1141:9, 1141:14, 1141:19, 1141:22, 1142:9, 1142:17, 1142:22, 1144:9, 1145:17, 1147:2, 1148:13, 1149:17
pointing [1] - 1173:5
police [2] - 1092:9, 1092:10
portion [2] - 1076:23, 1163:16
portions [2] - 1110:5, 1111:6
posed [1] - 1088:2
posing [1] - 1088:13
position [4] - 1033:5, 1092:2, 1092:15, 1175:12
positive [1] - 1133:9
possession [3] - 1098:6, 1100:1, 1100:7
possibility [1] - 1115:3
possible [1] - 1174:10
post [1] - 1107:22
posted [1] - 1092:18
potential [1] - 1094:22
precedes [1] - 1047:25
preclude [1] - 1173:3
predated [1] - 1052:7
prejudice [2] - 1035:20, 1035:22
prejudicial [1] - 1176:2
premarked [1] - 1109:1
premised [1] - 1090:2
prepare [1] - 1140:14
prepared [1] - 1140:9
preparing [1] - 1140:25
preprinted [1] - 1082:13
presence [7] - 1078:2, 1079:6, 1094:4, 1124:18, 1145:4, 1157:24, 1158:2
present [3] - 1064:25, 1065:4, 1065:7
presentation [1] - 1131:20

presented [3] - 1107:2, 1145:4, 1147:10
press [1] - 1089:21
presumably [1] - 1124:8
pretty [4] - 1064:8, 1140:19, 1149:14, 1149:15
preview [1] - 1033:3
previously [3] - 1040:4, 1077:8, 1125:11
price [1] - 1042:16
printed [1] - 1082:10
private [1] - 1097:19
Privitello [3] - 1149:22, 1154:6, 1176:23
probative [4] - 1035:11, 1035:13, 1035:16, 1035:18
problem [2] - 1034:22, 1115:12, 1115:13
problems [3] - 1068:24, 1069:7, 1078:5
proceed [1] - 1162:15
proceeded [2] - 1066:17, 1067:2
proceeding [5] - 1036:2, 1107:7, 1127:9, 1131:20, 1172:5
proceedings [3] - 1074:12, 1145:11, 1150:9
proceeds [3] - 1037:7, 1042:18, 1086:5
process [1] - 1047:5
produce [1] - 1114:4
produced [2] - 1098:13, 1099:21
proffer [3] - 1053:6, 1055:8, 1075:24
proffering [1] - 1044:12
profit [2] - 1045:15, 1095:8
project [12] - 1038:12, 1043:3, 1044:19, 1057:23, 1072:21, 1087:5, 1090:7, 1095:20, 1096:3, 1096:8, 1101:17, 1103:4
Project [15] - 1101:13, 1101:14, 1102:25, 1103:3, 1104:19, 1105:14, 1111:17,

1117:25, 1118:1,
1121:7, 1121:8,
1126:21, 1127:16,
1127:23, 1131:9
**projects** [4] - 1045:12,
1074:10, 1087:19,
1148:20
**promissory** [4] -
1037:23, 1037:25,
1138:6, 1138:22
**prompt** [1] - 1055:4
**proof** [3] - 1086:2,
1110:2, 1173:21
**proper** [8] - 1113:5,
1115:22, 1116:2,
1116:13, 1116:20,
1117:6, 1118:13,
1129:15
**properly** [1] - 1140:14
**Properties** [11] -
1103:15, 1141:3,
1141:9, 1141:14,
1141:19, 1141:22,
1142:9, 1142:17,
1142:23, 1144:10,
1145:18
**properties** [4] -
1037:18, 1039:19,
1039:21, 1040:22
**property** [79] - 1036:4,
1036:14, 1036:20,
1036:23, 1036:24,
1037:12, 1037:20,
1037:22, 1038:5,
1038:15, 1039:11,
1039:12, 1039:13,
1039:14, 1039:17,
1039:18, 1040:16,
1040:17, 1040:19,
1040:22, 1040:23,
1041:5, 1041:7,
1041:10, 1041:14,
1041:25, 1042:21,
1044:14, 1044:15,
1044:23, 1045:6,
1070:25, 1071:2,
1071:5, 1071:10,
1071:14, 1071:23,
1072:2, 1072:12,
1072:14, 1073:25,
1074:4, 1090:11,
1090:13, 1094:22,
1095:1, 1095:6,
1095:7, 1095:11,
1095:13, 1095:16,
1095:21, 1095:22,
1096:6, 1098:18,
1099:18, 1102:11,
1102:15, 1102:21,
1103:12, 1103:25,

1126:7, 1141:4,
1141:11, 1141:13,
1141:18, 1142:19,
1142:20, 1143:5,
1144:9, 1145:22,
1145:23, 1147:20,
1147:25, 1148:4,
1148:6
**Property** [1] - 1103:18
**proposed** [1] - 1134:2
**prosecutor** [6] -
1123:8, 1124:12,
1124:14, 1124:18,
1135:8, 1135:16
**prosecutors** [4] -
1122:10, 1123:11,
1124:8, 1132:3
**protection** [3] -
1104:5, 1104:8
**provide** [2] - 1160:13,
1175:12
**provided** [3] -
1099:24, 1113:22,
1113:25
**providing** [1] - 1152:1
**PS** [1] - 1154:15
**publish** [1] - 1063:17
**purchase** [4] - 1086:6,
1087:7, 1087:9,
1142:1
**purchased** [5] -
1086:8, 1141:8,
1141:12, 1141:13,
1141:17
**purchaser** [2] -
1141:15, 1141:20
**purchases** [1] -
1171:19
**purports** [1] - 1127:21
**purpose** [3] - 1053:6,
1116:15, 1161:7
**purposeful** [1] -
1175:25
**purposes** [8] - 1038:3,
1077:25, 1083:17,
1101:15, 1117:8,
1140:25, 1148:17,
1155:12
**pursuant** [2] - 1159:9,
1165:6
**pursue** [4] - 1090:23,
1096:8, 1101:17,
1108:7
**put** [21] - 1033:25,
1041:20, 1041:22,
1042:6, 1043:9,
1044:15, 1052:11,
1056:19, 1056:21,
1056:24, 1059:3,
1063:4, 1063:7,

1063:9, 1078:14,
1113:1, 1118:5,
1125:14, 1141:5,
1142:4, 1142:6
**putting** [6] - 1056:8,
1056:15, 1109:17,
1117:11, 1142:2,
1142:17
**PV** [5] - 1036:21,
1037:14, 1049:19,
1050:5, 1072:21
**PVLs** [1] - 1161:9

## Q

**QUESTION** [3] -
1170:7, 1170:24,
1171:13
**questioning** [2] -
1115:12, 1172:25
**questions** [31] -
1047:22, 1053:16,
1055:7, 1062:9,
1063:12, 1070:24,
1084:20, 1089:4,
1107:2, 1110:1,
1113:20, 1115:10,
1116:2, 1121:18,
1121:19, 1121:21,
1121:23, 1122:14,
1124:13, 1126:23,
1127:8, 1154:11,
1169:10, 1172:6,
1172:24, 1173:10,
1173:16, 1174:8,
1174:9, 1174:14
**quick** [2] - 1149:14,
1149:15
**quite** [1] - 1117:16
**quote** [1] - 1061:11
**quotes** [1] - 1129:6
**quoting** [1] - 1032:18

## R

**racing** [1] - 1175:21
**raise** [3] - 1032:8,
1032:25, 1174:18
**raised** [6] - 1032:8,
1032:24, 1152:9,
1167:18, 1170:12,
1171:3
**raising** [1] - 1151:2
**Ranch** [1] - 1102:11
**rate** [1] - 1126:15
**rather** [3] - 1037:6,
1038:16, 1171:15
**reach** [1] - 1114:5
**reached** [5] - 1107:13,
1113:19, 1117:14,

1166:23, 1166:24
**reacquire** [1] -
1145:23
**reacquiring** [1] -
1073:25
**reacted** [1] - 1032:20
**reaction** [1] - 1110:16
**read** [28] - 1047:19,
1049:6, 1063:24,
1082:4, 1082:7,
1106:11, 1106:14,
1111:5, 1111:12,
1111:14, 1111:15,
1133:1, 1133:16,
1133:19, 1134:10,
1134:17, 1134:18,
1134:19, 1134:22,
1135:5, 1149:4,
1163:15, 1164:8,
1164:14, 1165:14,
1172:12, 1175:13,
1175:16
**reading** [6] - 1113:4,
1163:16, 1169:3,
1170:6, 1170:23,
1171:12
**ready** [2] - 1032:6,
1079:2
**real** [11] - 1037:5,
1054:6, 1084:4,
1094:22, 1099:23,
1101:16, 1103:12,
1103:25, 1133:10,
1134:4
**realization** [1] -
1095:12
**realize** [1] - 1040:10
**realized** [4] - 1095:1,
1095:6, 1095:19,
1096:5
**realizes** [1] - 1109:21
**really** [3] - 1073:9,
1078:18, 1117:16
**realtor** [1] - 1072:13
**reason** [7] - 1036:6,
1060:25, 1086:14,
1116:10, 1118:3,
1151:16, 1173:6
**reasonable** [1] -
1034:7
**reasons** [1] - 1054:13
**receipt** [2] - 1133:25,
1158:14
**receipts** [1] - 1174:6
**receive** [8] - 1062:13,
1062:16, 1130:21,
1131:5, 1132:19,
1138:24, 1147:17,
1173:9
**received** [25] -

1045:22, 1045:24,
1047:1, 1051:7,
1051:9, 1054:22,
1062:5, 1063:1,
1063:4, 1078:15,
1102:7, 1107:12,
1111:17, 1116:5,
1130:22, 1131:1,
1131:3, 1131:7,
1132:24, 1133:15,
1133:17, 1134:8,
1154:15, 1154:19,
1158:5
**receiving** [8] - 1050:4,
1050:24, 1056:9,
1133:5, 1133:11,
1134:5, 1160:19,
1161:2
**recess** [1] - 1119:5
**Recess** [1] - 1078:24,
1161:14
**recheck** [1] - 1152:22
**recognize** [17] -
1061:9, 1061:11,
1101:23, 1115:2,
1130:3, 1132:8,
1135:24, 1136:1,
1139:11, 1155:18,
1156:1, 1156:4,
1157:3, 1157:13,
1157:18, 1162:24,
1163:9
**recollection** [9] -
1032:19, 1112:25,
1113:3, 1114:6,
1115:23, 1116:3,
1116:15, 1129:19
**reconvene** [1] -
1172:10
**record** [17] - 1031:15,
1059:7, 1080:4,
1082:5, 1099:2,
1113:4, 1114:20,
1116:23, 1117:8,
1118:10, 1125:11,
1139:20, 1146:16,
1155:12, 1159:3,
1169:5, 1172:23
**recording** [1] -
1145:25
**red** [2] - 1058:18,
1058:20
**redacted** [2] -
1078:16, 1119:2
**redevelop** [1] - 1071:1
**redirect** [1] - 1109:15
**refer** [6] - 1037:13,
1044:18, 1049:22,
1111:15, 1125:12,
1145:25

**reference** [8] - 1036:3, 1037:21, 1053:12, 1097:23, 1103:22, 1155:13, 1156:17, 1156:24
**referenced** [2] - 1037:23, 1061:25
**references** [1] - 1175:20
**referencing** [3] - 1080:7, 1112:20, 1112:25
**referred** [1] - 1036:7
**referring** [8] - 1061:24, 1068:9, 1111:4, 1115:21, 1123:19, 1123:20, 1124:17, 1165:8
**reflect** [5] - 1048:19, 1139:13, 1139:21, 1141:14, 1141:19
**reflected** [5] - 1037:2, 1059:19, 1106:23, 1140:9, 1145:2
**reflecting** [1] - 1158:15
**reflects** [3] - 1110:24, 1149:10, 1160:3
**refresh** [7] - 1112:24, 1113:3, 1114:6, 1114:14, 1114:15, 1114:17, 1129:18
**refreshing** [4] - 1115:23, 1116:3, 1116:15
**regard** [1] - 1117:8
**regarding** [11] - 1035:17, 1039:11, 1040:16, 1040:17, 1040:18, 1065:2, 1069:12, 1134:2, 1134:23, 1172:12, 1172:25
**relate** [2] - 1175:18, 1176:2
**related** [7] - 1036:15, 1037:17, 1083:15, 1113:23, 1120:19, 1131:9, 1164:14
**relates** [14] - 1053:5, 1054:14, 1078:16, 1099:17, 1103:2, 1124:1, 1130:25, 1135:16, 1138:6, 1141:7, 1152:10, 1154:5, 1154:11, 1164:11
**relationship** [17] - 1046:15, 1061:1, 1074:7, 1087:12,

1087:20, 1089:10, 1091:9, 1091:22, 1092:4, 1094:7, 1094:15, 1099:16, 1100:22, 1101:2, 1156:10, 1173:1, 1173:4
**relative** [1] - 1167:20
**release** [4] - 1069:17, 1069:20, 1070:5
**relent** [1] - 1036:5
**relevance** [4] - 1083:1, 1174:25, 1175:2, 1176:6
**relevant** [1] - 1053:11
**relief** [1] - 1048:6
**rely** [1] - 1064:1
**relying** [2] - 1060:12, 1060:13
**remain** [1] - 1035:23
**remainder** [1] - 1042:1
**remember** [16] - 1113:2, 1122:25, 1130:19, 1131:25, 1133:5, 1133:11, 1133:20, 1133:23, 1134:5, 1135:6, 1135:13, 1144:5, 1147:7, 1147:13, 1148:22, 1157:18
**remind** [4] - 1038:20, 1039:25, 1040:8, 1041:12
**removed** [1] - 1073:23
**renew** [1] - 1109:15
**renovate** [1] - 1071:1
**renovation** [2] - 1043:10, 1045:14
**rental** [4] - 1097:15, 1097:17, 1098:4, 1098:9
**rented** [2] - 1097:14, 1098:11
**renting** [2] - 1097:25, 1098:1
**repay** [1] - 1107:14
**repayment** [3] - 1036:25, 1139:17, 1140:2
**repeat** [5] - 1040:15, 1095:3, 1100:24, 1141:16, 1146:15
**repeated** [1] - 1033:23
**rephrase** [3] - 1056:18, 1091:15, 1095:10
**report** [10] - 1109:19, 1113:4, 1115:15, 1116:21, 1116:22, 1117:4, 1117:6,

1117:11, 1129:17
**reported** [1] - 1140:6
**reporter** [1] - 1129:7
**Reporter** [1] - 1031:7
**repossessed** [1] - 1072:5
**represent** [1] - 1037:6
**representation** [4] - 1052:25, 1078:17, 1170:8, 1170:25
**representations** [6] - 1052:11, 1052:16, 1052:20, 1060:12, 1164:5, 1164:10
**representative** [1] - 1075:3
**represented** [7] - 1053:7, 1076:18, 1087:23, 1094:11, 1148:13, 1154:6, 1155:14
**representing** [1] - 1076:9
**represents** [1] - 1075:2
**request** [4] - 1033:23, 1033:25, 1104:24, 1109:15
**requested** [3] - 1107:12, 1145:20, 1145:22
**requests** [1] - 1033:20
**require** [1] - 1095:13
**resale** [1] - 1043:1
**resell** [1] - 1042:14
**reselling** [1] - 1051:8
**reshuffling** [2] - 1068:14, 1068:22
**residence** [6] - 1084:12, 1084:19, 1084:22, 1085:2, 1127:24, 1127:25
**resold** [1] - 1042:22
**resolve** [3] - 1073:1, 1109:6, 1162:9
**resolved** [1] - 1072:25
**respect** [14] - 1035:22, 1036:14, 1039:16, 1039:17, 1039:21, 1040:21, 1041:24, 1053:2, 1054:21, 1087:4, 1103:24, 1144:2, 1174:11, 1174:12
**respectfully** [2] - 1034:11, 1169:7
**respond** [1] - 1066:23
**responded** [1] - 1128:14
**responds** [1] -

1033:17
**response** [3] - 1088:15, 1101:6, 1101:10
**Response** [1] - 1133:24
**responsive** [2] - 1118:5, 1136:16
**rest** [3] - 1040:14, 1054:16, 1133:16
**restaurant** [3] - 1097:8, 1110:9, 1113:12
**result** [9] - 1033:12, 1044:23, 1045:5, 1058:23, 1061:4, 1071:18, 1089:14, 1118:7, 1164:15
**resume** [1] - 1092:18
**resumes** [1] - 1039:4
**retrieve** [1] - 1063:16
**return** [6] - 1095:8, 1104:21, 1104:22, 1105:6, 1140:8, 1140:9
**returning** [1] - 1168:4
**returns** [1] - 1140:25
**review** [6] - 1077:11, 1098:14, 1098:16, 1116:4, 1175:10, 1176:4
**reviewed** [1] - 1131:13
**revolving** [1] - 1127:15
**Revolving** [2] - 1127:20, 1131:2
**RICHARD** [1] - 1030:23
**Richard** [2] - 1032:4, 1057:4
**Richards** [11] - 1057:5, 1057:6, 1059:13, 1064:8, 1064:10, 1064:12, 1075:19, 1076:1, 1076:2, 1076:3, 1125:19
**rid** [4] - 1065:15, 1065:25, 1066:1, 1068:24
**rise** [2] - 1039:1, 1162:1
**risk** [3] - 1104:9, 1171:16, 1171:19
**risky** [1] - 1171:18
**Rizzi** [4] - 1059:25, 1060:4, 1064:3, 1070:18
**Rizzi's** [1] - 1064:25
**RMR** [1] - 1031:7

**Road** [1] - 1031:1
**Robert** [2] - 1127:11, 1127:13
**ROBERT** [1] - 1031:3
**Rojo** [1] - 1082:6
**role** [4] - 1041:24, 1068:14, 1068:21, 1088:23
**role-up** [2] - 1068:14, 1068:21
**roll** [1] - 1133:3
**rolling** [1] - 1068:16
**Romanowski** [4] - 1033:9, 1120:12, 1120:23, 1121:4
**Ron** [8] - 1057:3, 1057:5, 1057:6, 1064:8, 1064:10, 1075:18, 1076:2, 1076:3
**RONALD** [1] - 1031:7
**Ronald** [1] - 1059:13
**ronald_tolkin@nyed .uscourts.gov** [1] - 1031:9
**room** [2] - 1040:13, 1147:15
**roughly** [1] - 1165:1
**RPR** [1] - 1031:7
**ruined** [1] - 1089:19
**Rule** [1] - 1033:25
**rules** [1] - 1116:20
**ruling** [3] - 1117:7, 1152:13, 1173:6
**run** [1] - 1052:22
**Russia** [4] - 1081:8, 1081:10, 1081:22, 1082:18

**S**

**SA** [1] - 1082:6
**Sag** [8] - 1041:7, 1041:10, 1070:25, 1090:10, 1090:13, 1141:4, 1141:17, 1144:9
**salary** [1] - 1139:18
**sale** [4] - 1042:18, 1085:13, 1144:8, 1171:20
**sales** [1] - 1091:19
**San** [10] - 1085:9, 1087:8, 1088:19, 1091:4, 1091:15, 1091:17, 1091:20, 1092:2, 1092:14, 1134:15
**Saritha** [1] - 1031:20
**SARITHA** [1] -

1030:18
**sat** [1] - 1111:21
**saw** [15] - 1048:1, 1049:23, 1070:3, 1074:9, 1078:8, 1078:10, 1084:5, 1094:21, 1095:11, 1100:3, 1100:5, 1100:9, 1120:24, 1124:16, 1151:19
**Schedule** [1] - 1146:3
**schedule** [1] - 1118:21
**scope** [1] - 1176:1
**Scott** [4] - 1033:9, 1120:12, 1120:22, 1121:4
**Scottsdale** [5] - 1036:24, 1037:15, 1064:22, 1065:6, 1084:25
**screaming** [1] - 1073:5
**screen** [7] - 1045:25, 1046:1, 1050:9, 1059:4, 1078:6, 1080:3, 1123:15
**scribble** [2] - 1111:3, 1111:12
**scumbag** [1] - 1089:22
**seated** [11] - 1039:5, 1074:21, 1089:17, 1112:15, 1120:5, 1147:7, 1147:8, 1147:9, 1162:2, 1162:14, 1172:17
**second** [17] - 1036:11, 1036:24, 1040:10, 1042:25, 1048:15, 1049:2, 1049:8, 1056:18, 1065:21, 1080:18, 1081:25, 1082:12, 1089:9, 1110:8, 1111:4, 1117:19, 1120:15
**second-to-the-last** [1] - 1089:9
**secondarily** [1] - 1113:18
**security** [2] - 1092:3, 1092:14
**see** [41] - 1039:6, 1045:25, 1046:3, 1046:20, 1046:23, 1048:17, 1050:14, 1050:15, 1057:16, 1059:17, 1082:14, 1083:5, 1083:9, 1084:4, 1084:7,

1086:15, 1099:17, 1106:12, 1111:21, 1113:1, 1114:3, 1117:5, 1118:19, 1127:20, 1130:24, 1132:17, 1139:9, 1145:5, 1146:12, 1149:17, 1149:18, 1156:15, 1158:18, 1158:20, 1159:23, 1160:6, 1164:25, 1172:14, 1172:18, 1176:4, 1177:4
**seeing** [3] - 1110:22, 1111:22, 1135:6
**seek** [1] - 1076:14
**seeking** [3] - 1052:23, 1075:8, 1076:19
**seem** [1] - 1123:4
**sell** [7] - 1066:24, 1067:3, 1071:13, 1071:24, 1074:4, 1075:21, 1096:6
**selling** [2] - 1045:15, 1066:21
**send** [6] - 1047:7, 1057:6, 1064:1, 1064:7, 1127:25, 1130:17
**sender** [2] - 1063:24, 1063:25
**sending** [8] - 1048:1, 1048:2, 1048:8, 1050:24, 1080:16, 1082:16, 1082:17, 1128:14
**sense** [2] - 1102:14, 1173:17
**sent** [25] - 1046:23, 1048:5, 1057:1, 1057:3, 1057:5, 1057:8, 1057:13, 1057:18, 1057:20, 1057:25, 1058:25, 1064:24, 1066:13, 1071:11, 1083:11, 1084:11, 1105:10, 1127:24, 1133:7, 1163:20, 1163:24, 1165:25, 1167:14
**separate** [3] - 1090:3, 1110:16, 1144:6
**September** [1] - 1108:13
**sequentially** [2] - 1096:5, 1096:7
**series** [7] - 1048:24, 1054:6, 1055:10, 1084:20, 1128:8, 1135:9, 1173:16

**serves** [1] - 1047:20
**set** [2] - 1166:25, 1173:4
**Setauket** [2] - 1132:21, 1159:22
**settle** [1] - 1138:19
**settled** [3] - 1138:12, 1138:16
**Settlement** [1] - 1175:24
**settlement** [2] - 1075:6, 1138:21
**seven** [1] - 1134:13
**shall** [1] - 1114:20
**share** [1] - 1092:6
**shareholder** [1] - 1053:17
**shareholders** [1] - 1104:7
**shares** [9] - 1061:5, 1066:21, 1067:3, 1068:10, 1068:12, 1070:13, 1070:15, 1070:21
**shifting** [1] - 1056:4
**Shimon** [4] - 1145:23, 1147:18, 1147:22, 1148:3
**ship** [1] - 1155:7
**short** [3] - 1125:22, 1170:10, 1171:2
**short-term** [3] - 1125:22, 1170:10, 1171:2
**shortly** [4] - 1041:7, 1133:12, 1133:20, 1133:23
**shoulder** [1] - 1160:25
**show** [15] - 1045:22, 1047:12, 1048:24, 1050:25, 1054:8, 1059:3, 1074:11, 1076:14, 1098:16, 1106:9, 1115:4, 1139:6, 1155:23, 1158:12, 1162:18
**showed** [3] - 1058:17, 1100:5, 1135:8
**showing** [12] - 1045:23, 1046:5, 1046:19, 1048:13, 1048:25, 1049:1, 1050:7, 1061:6, 1061:9, 1083:4, 1110:5, 1115:18
**shown** [4] - 1123:14, 1124:2, 1124:7, 1139:21
**side** [6] - 1033:1, 1043:22, 1051:12,

1055:15, 1168:13, 1169:12
**Side** [3] - 1044:1, 1052:1, 1169:1
**side-bar** [6] - 1033:1, 1043:22, 1051:12, 1055:15, 1168:13, 1169:12
**Side-bar** [3] - 1044:1, 1052:1, 1169:1
**Sidebar** [2] - 1129:1, 1129:22
**sidebar** [5] - 1086:1, 1086:20, 1109:13, 1151:1, 1153:3
**sign** [12] - 1069:16, 1069:20, 1069:23, 1070:5, 1144:4, 1148:22, 1149:10, 1149:11, 1149:14, 1156:5, 1157:23, 1158:1
**signature** [34] - 1037:25, 1108:5, 1123:12, 1123:16, 1123:18, 1124:20, 1124:21, 1124:23, 1124:24, 1125:1, 1125:4, 1131:24, 1132:10, 1132:12, 1132:15, 1135:9, 1135:11, 1135:12, 1135:17, 1136:1, 1136:9, 1136:15, 1147:10, 1149:14, 1156:1, 1156:4, 1156:14, 1157:13, 1157:15, 1157:18, 1157:22, 1162:20, 1162:24
**signatures** [1] - 1149:1
**signed** [10] - 1037:24, 1127:14, 1136:25, 1140:8, 1146:5, 1146:6, 1148:24, 1149:4, 1163:3, 1165:22
**significance** [1] - 1104:1
**significant** [1] - 1147:3
**signing** [2] - 1133:20, 1133:23
**silent** [1] - 1035:23
**similar** [4] - 1045:12, 1084:5, 1132:14, 1152:5
**simply** [9] - 1034:4, 1035:11, 1036:15,

1040:23, 1086:7, 1111:5, 1163:24, 1169:4, 1170:21
**sit** [1] - 1160:8
**sitting** [6] - 1118:8, 1130:17, 1147:13, 1160:11, 1171:15, 1171:23
**six** [2] - 1170:11, 1171:3
**small** [1] - 1074:2
**social** [1] - 1087:16
**sold** [2] - 1044:14, 1144:15
**someone** [3] - 1075:9, 1078:6, 1126:9
**sometime** [1] - 1055:4
**sometimes** [1] - 1168:3
**somewhat** [1] - 1147:3
**somewhere** [4] - 1078:14, 1108:14, 1143:11, 1171:24
**sorry** [13] - 1047:25, 1048:1, 1050:9, 1058:12, 1069:2, 1084:16, 1106:13, 1106:16, 1118:20, 1155:10, 1156:3, 1160:23, 1167:12
**sort** [3] - 1045:14, 1082:23, 1173:10
**sorts** [1] - 1097:2
**sought** [4] - 1100:22, 1101:3, 1101:5, 1101:9
**sounds** [1] - 1038:1
**source** [1] - 1160:5
**Southern** [1] - 1032:15
**speakerphone** [4] - 1060:15, 1060:16, 1060:24, 1066:18
**speaking** [4] - 1033:16, 1035:8, 1035:12, 1128:4
**Special** [3] - 1033:8, 1120:12
**specific** [4] - 1148:21, 1160:16, 1173:10, 1173:25
**specifically** [10] - 1037:8, 1050:13, 1076:8, 1076:23, 1104:21, 1110:10, 1113:23, 1120:22, 1125:12, 1171:10
**spell** [1] - 1086:11
**spend** [1] - 1041:13

**spent** [1] - 1044:9
**spoken** [1] - 1035:3
**Square** [1] - 1030:21
**stamp** [2] - 1154:20, 1154:23
**stand** [2] - 1039:4, 1135:7
**Standard** [1] - 1048:15
**standpoint** [1] - 1151:17
**start** [8] - 1060:10, 1068:16, 1080:21, 1094:14, 1113:3, 1113:15, 1162:9, 1176:18
**started** [2] - 1117:11, 1121:10
**starting** [2] - 1070:2, 1133:18
**state** [10] - 1031:14, 1045:9, 1045:10, 1045:21, 1103:2, 1103:6, 1104:4, 1106:25, 1110:21, 1117:9
**Statement** [1] - 1100:9
**statement** [14] - 1034:1, 1034:11, 1034:23, 1047:15, 1048:14, 1049:22, 1049:23, 1050:10, 1050:25, 1051:1, 1059:8, 1059:12, 1116:16, 1139:12
**statement's** [1] - 1049:7
**statements** [4] - 1033:21, 1033:22, 1034:15, 1173:2
**STATES** [2] - 1030:1, 1030:3
**States** [5] - 1030:12, 1030:16, 1031:17, 1031:20, 1077:13
**stating** [1] - 1088:3
**status** [2] - 1090:20, 1118:22
**stay** [3] - 1036:8, 1055:13, 1168:7
**stenographer** [1] - 1101:15
**step** [4] - 1095:21, 1096:7, 1112:13, 1172:18
**steps** [1] - 1096:13
**stick** [2] - 1116:4, 1116:6
**still** [13] - 1039:25, 1040:25, 1044:17, 1044:22, 1045:5,

1057:22, 1067:8, 1068:4, 1068:5, 1104:19, 1105:23, 1109:21, 1114:8
**stipulate** [4] - 1051:2, 1077:9, 1079:16, 1118:16
**stipulated** [2] - 1051:4, 1159:4
**stipulation** [1] - 1159:9
**stock** [1] - 1068:10
**stolen** [1] - 1109:23
**Stolper** [10] - 1150:11, 1150:13, 1150:16, 1151:10, 1151:13, 1152:1, 1152:20, 1154:6, 1155:13
**stopped** [2] - 1128:4, 1128:10
**story** [1] - 1171:22
**straight** [1] - 1072:18
**Strangford** [1] - 1031:4
**strategy** [1] - 1034:14
**strictly** [1] - 1132:1
**structural** [1] - 1088:25
**stuck** [1] - 1113:14
**stuff** [1] - 1055:11
**subdivide** [1] - 1095:16
**subdivision** [1] - 1037:15
**subject** [3] - 1037:5, 1074:24, 1162:6
**submit** [1] - 1169:7
**subsequently** [1] - 1052:3
**substance** [6] - 1032:17, 1033:10, 1034:6, 1038:11, 1060:23, 1100:15
**substantially** [1] - 1035:19
**substantive** [1] - 1035:7
**Subtractions** [1] - 1050:14
**successful** [1] - 1176:12
**suffered** [1] - 1089:15
**sufficient** [1] - 1035:13
**Suffolk** [9] - 1030:21, 1072:5, 1072:16, 1084:19, 1092:9, 1145:21, 1145:25, 1147:20
**suggest** [3] - 1034:11,

1044:11, 1099:19
**suggested** [1] - 1032:12
**suggestion** [3] - 1035:2, 1035:3, 1035:14
**suggestions** [1] - 1036:19
**suit** [7] - 1138:6, 1138:8, 1138:10, 1138:12, 1138:15, 1176:9, 1176:12
**Suite** [2] - 1030:22, 1031:2
**sum** [5] - 1032:17, 1038:10, 1048:3, 1060:23, 1160:13
**summation** [1] - 1173:23
**sums** [1] - 1044:23
**supposed** [9] - 1049:19, 1053:15, 1072:6, 1072:10, 1105:13, 1105:14, 1126:2, 1170:10, 1171:2
**supposedly** [1] - 1057:25
**surprised** [1] - 1105:11
**suspect** [1] - 1070:4
**sustain** [1] - 1034:18
**sustained** [15] - 1043:14, 1044:2, 1048:11, 1080:19, 1081:2, 1091:2, 1105:19, 1107:10, 1112:8, 1136:18, 1148:11, 1155:6, 1155:8, 1168:1, 1174:15
**sweat** [2] - 1142:18, 1142:19
**sworn** [2] - 1040:5, 1169:6
**Sydor** [2] - 1138:3, 1138:9

## T

**T.2** [1] - 1179:10
**table** [4] - 1118:9, 1143:11, 1147:8, 1147:13
**tack** [2] - 1102:16, 1102:22
**tacks** [1] - 1102:9
**takeover** [1] - 1053:15
**talks** [2] - 1117:16, 1175:18, 1175:19

**tax** [4] - 1073:22, 1074:3, 1140:25, 1149:10
**taxes** [8] - 1071:9, 1072:4, 1072:6, 1073:14, 1073:17, 1140:6, 1140:15, 1148:2
**TD** [5] - 1047:15, 1047:23, 1049:21, 1158:14, 1159:21
**telecommunications** [1] - 1097:2
**telephone** [3] - 1114:23, 1115:4, 1167:18
**telephonically** [2] - 1122:3, 1122:6
**Tequila** [1] - 1082:6
**tequila** [17] - 1075:5, 1075:9, 1075:22, 1075:25, 1076:5, 1076:9, 1076:19, 1081:6, 1083:8, 1083:15, 1154:10, 1154:15, 1154:17, 1154:18, 1155:1, 1155:3
**term** [3] - 1125:22, 1170:10, 1171:2
**terms** [8] - 1043:11, 1096:24, 1103:18, 1104:20, 1118:2, 1142:19, 1166:4, 1172:24
**Tesoriero** [6] - 1073:11, 1141:24, 1142:4, 1143:4, 1156:19, 1157:25
**testified** [18] - 1040:5, 1048:10, 1051:6, 1094:17, 1094:25, 1097:4, 1105:9, 1107:7, 1107:19, 1107:20, 1118:4, 1133:6, 1133:13, 1139:16, 1149:23, 1151:23, 1152:24, 1175:25
**testify** [9] - 1032:9, 1032:18, 1033:2, 1036:22, 1054:9, 1095:5, 1146:14, 1150:5, 1151:4
**testifying** [1] - 1033:14
**testimony** [48] - 1032:9, 1033:4, 1036:15, 1037:17, 1038:13, 1039:8,

1039:10, 1039:11, 1039:12, 1039:24, 1040:15, 1040:17, 1040:18, 1041:8, 1044:22, 1045:4, 1078:16, 1100:3, 1100:4, 1100:8, 1106:23, 1107:8, 1108:3, 1108:5, 1110:14, 1113:18, 1118:5, 1122:9, 1123:9, 1134:7, 1134:9, 1145:24, 1146:2, 1146:10, 1146:14, 1146:15, 1147:19, 1150:1, 1154:14, 1168:5, 1169:8, 1169:9, 1170:4, 1170:14, 1174:21, 1175:5, 1175:7
**text** [1] - 1080:13
**THE** [141] - 1031:12, 1031:18, 1031:21, 1031:24, 1032:2, 1032:5, 1033:6, 1034:18, 1036:11, 1037:9, 1037:16, 1038:1, 1038:7, 1038:13, 1038:19, 1038:24, 1039:1, 1039:5, 1040:2, 1040:10, 1041:2, 1041:3, 1043:14, 1043:21, 1044:2, 1044:18, 1046:2, 1048:11, 1051:4, 1051:11, 1053:21, 1054:19, 1063:14, 1063:19, 1074:15, 1074:19, 1074:21, 1075:21, 1076:3, 1076:17, 1076:25, 1077:6, 1077:15, 1077:19, 1077:22, 1078:4, 1078:23, 1079:2, 1079:5, 1079:8, 1079:10, 1079:13, 1079:19, 1079:22, 1080:19, 1081:2, 1083:22, 1084:9, 1084:15, 1084:16, 1085:17, 1086:2, 1086:19, 1089:5, 1090:18, 1091:2, 1092:23, 1094:10, 1096:10, 1096:11, 1096:12, 1100:13, 1102:1, 1102:6, 1105:1, 1105:19, 1106:15,

1107:10, 1107:18, 1108:21, 1108:25, 1109:3, 1109:12, 1110:12, 1112:8, 1112:15, 1113:9, 1114:7, 1114:13, 1115:13, 1115:21, 1116:24, 1117:3, 1117:10, 1118:12, 1118:19, 1118:23, 1119:4, 1120:3, 1120:5, 1128:22, 1129:9, 1135:19, 1136:18, 1139:22, 1148:11, 1150:6, 1150:19, 1151:14, 1152:3, 1152:19, 1153:1, 1154:3, 1155:6, 1155:8, 1155:10, 1158:25, 1159:6, 1159:11, 1159:13, 1159:15, 1161:10, 1161:12, 1162:1, 1162:2, 1162:11, 1162:14, 1168:1, 1168:12, 1169:11, 1172:4, 1172:7, 1172:17, 1172:20, 1172:22, 1174:18, 1175:4, 1175:13, 1176:14, 1176:22, 1177:3
**theme** [1] - 1176:12
**themselves** [2] - 1112:20, 1164:6
**theory** [2] - 1086:18, 1173:3
**there..** [1] - 1044:20
**thinking** [1] - 1114:13
**thinks** [1] - 1110:13
**third** [4] - 1046:19, 1050:12, 1065:22, 1082:3
**thirds** [1] - 1175:17
**Thomas** [4] - 1141:25, 1142:11, 1143:15
**thoroughly** [1] - 1078:19
**thousands** [1] - 1121:9
**three** [9] - 1046:12, 1059:1, 1060:20, 1066:20, 1067:2, 1084:11, 1091:6, 1170:11, 1171:3
**throughout** [1] - 1033:23
**thrown** [2] - 1107:24, 1108:4
**thumb** [3] - 1102:8,

1102:16, 1102:22
**Tim** [1] - 1047:6
**time-to-time** [1] - 1064:15
**Timothy** [3] - 1046:5, 1047:3, 1049:20
**today** [15] - 1039:11, 1039:13, 1040:17, 1089:11, 1089:17, 1111:23, 1121:15, 1122:9, 1123:10, 1134:7, 1160:8, 1162:10, 1172:9, 1172:23, 1174:24
**today's** [1] - 1138:16
**TOLKIN** [1] - 1031:7
**Tom** [1] - 1143:9
**TOMMY** [1] - 1030:7
**Tommy** [7] - 1030:8, 1031:1, 1060:13, 1063:25, 1130:9, 1149:23, 1151:20
**tomorrow** [8] - 1118:24, 1118:25, 1119:3, 1172:10, 1172:14, 1172:18, 1174:21, 1177:4
**tonight** [1] - 1175:14
**took** [8] - 1057:20, 1087:9, 1097:25, 1108:12, 1118:17, 1135:7, 1145:21
**top** [3] - 1049:6, 1063:22, 1163:16
**topic** [2] - 1052:3, 1149:16
**total** [2] - 1042:7, 1061:4
**totaling** [1] - 1064:14
**totally** [1] - 1110:16
**tough** [1] - 1171:20
**toward** [2] - 1059:15, 1087:20
**towards** [1] - 1032:8
**towers** [1] - 1088:22
**town** [2] - 1074:2, 1177:1
**TP584** [1] - 1149:9
**TR** [2] - 1060:1, 1063:9
**trace** [1] - 1075:4
**tragic** [1] - 1094:18
**transacted** [1] - 1050:17
**transaction** [12] - 1049:8, 1049:10, 1049:22, 1050:13, 1051:1, 1059:14, 1144:8, 1144:11, 1145:17, 1146:8,

1174:1, 1174:12
**transactions** [7] - 1036:7, 1054:7, 1054:8, 1059:15, 1134:3, 1134:4
**transcript** [5] - 1078:16, 1119:1, 1125:11, 1168:4, 1174:23
**transfer** [16] - 1046:21, 1047:21, 1048:1, 1049:25, 1050:24, 1052:7, 1056:20, 1057:8, 1059:24, 1063:2, 1149:10, 1149:19, 1158:16, 1160:4, 1161:3, 1161:4
**transferred** [3] - 1070:17, 1161:4, 1161:7
**transferring** [2] - 1059:22, 1059:23
**transfers** [4] - 1037:2, 1053:10, 1059:19, 1059:20
**translation** [6] - 1077:8, 1077:11, 1077:12, 1077:14, 1079:17, 1079:22
**transmission** [1] - 1062:19
**transpired** [1] - 1033:7
**treasure** [1] - 1131:14
**trial** [4] - 1033:22, 1034:12, 1034:13, 1131:21
**trick** [1] - 1146:21
**tried** [3] - 1046:2, 1088:13, 1130:15
**troubled** [1] - 1118:14
**trove** [1] - 1131:14
**true** [34] - 1089:23, 1090:5, 1094:23, 1094:24, 1095:2, 1099:13, 1101:17, 1103:16, 1104:13, 1104:16, 1108:13, 1108:19, 1120:11, 1120:17, 1120:21, 1121:3, 1121:19, 1124:9, 1125:17, 1126:24, 1128:6, 1128:11, 1128:12, 1132:5, 1134:19, 1136:3, 1136:22, 1138:13, 1140:6, 1146:19, 1147:15, 1150:3, 1160:1, 1164:7

**Trust** [1] - 1139:12
**truthful** [2] - 1108:19, 1141:1
**truthfully** [1] - 1107:2
**try** [8] - 1036:8, 1054:12, 1112:24, 1114:17, 1115:14, 1129:18, 1162:8, 1170:19
**trying** [13] - 1052:17, 1052:24, 1070:7, 1070:10, 1075:16, 1106:6, 1113:9, 1113:15, 1114:14, 1115:8, 1146:21, 1173:4, 1176:10
**turn** [2] - 1128:14, 1168:7
**turned** [1] - 1131:22
**twice** [1] - 1120:14
**two** [21] - 1034:13, 1036:18, 1036:19, 1037:24, 1059:14, 1060:10, 1064:14, 1084:11, 1090:3, 1109:21, 1110:7, 1110:16, 1128:5, 1128:11, 1128:17, 1154:16, 1165:1, 1172:22, 1175:8, 1175:17, 1176:5
**two-thirds** [1] - 1175:17
**type** [8] - 1084:2, 1097:1, 1097:17, 1105:4, 1131:6, 1133:11, 1134:5, 1166:25
**typed** [2] - 1165:24, 1167:14
**types** [1] - 1045:12
**Tyson** [1] - 1138:20

---

**U**

**U.S** [4] - 1030:4, 1030:18, 1123:1, 1167:22
**U.S.A** [1] - 1031:12
**Ula** [3] - 1106:5, 1107:14, 1110:11
**ultimately** [2] - 1075:10, 1138:12
**um-hmm** [1] - 1148:9
**unaware** [1] - 1145:7
**uncertain** [1] - 1133:14
**uncertainty** [1] - 1124:19
**under** [9] - 1035:18,

1039:25, 1040:25, 1043:10, 1047:10, 1050:13, 1107:1, 1127:8, 1166:3
**underneath** [1] - 1157:19
**understood** [1] - 1108:17
**unfair** [1] - 1035:20
**unfamiliar** [1] - 1106:10
**UNITED** [2] - 1030:1, 1030:3
**united** [1] - 1030:12
**United** [4] - 1030:16, 1031:17, 1031:20, 1077:13
**unredacted** [1] - 1114:16, 1116:7, 1116:9
**up** [27] - 1052:4, 1053:14, 1066:20, 1067:1, 1067:2, 1067:4, 1068:14, 1068:16, 1068:21, 1073:13, 1073:25, 1078:12, 1099:15, 1100:17, 1100:19, 1117:24, 1121:6, 1133:3, 1141:5, 1148:1, 1152:9, 1167:6, 1172:23, 1172:24, 1173:10, 1175:1
**upper** [1] - 1059:6
**UPS** [1] - 1155:2
**UPSed** [1] - 1084:18
**useful** [1] - 1103:25
**utilized** [1] - 1148:17
**utilizing** [2] - 1033:22, 1077:25

---

**V**

**Valley** [13] - 1036:21, 1037:14, 1037:20, 1037:22, 1038:12, 1038:15, 1038:23, 1039:14, 1039:17, 1040:19, 1040:22, 1045:17, 1045:20
**value** [4] - 1035:11, 1035:13, 1035:18, 1138:21
**various** [10] - 1037:23, 1074:10, 1087:18, 1087:22, 1099:22, 1139:3, 1155:14, 1164:5, 1164:11
**vehicle** [3] - 1097:14,

U.S.A. v. KENNER and CONSTANTINE

22

1097:15, 1097:17
**vehicles** [1] - 1099:18
**veil** [1] - 1104:4
**venture** [6] - 1134:2, 1143:16, 1165:7, 1166:3, 1166:9, 1167:2
**Ventures** [7] - 1043:5, 1043:6, 1133:3, 1139:2, 1164:17, 1166:7, 1166:13
**ventures** [2] - 1037:5, 1099:23
**verify** [2] - 1081:19, 1133:2
**versa** [1] - 1055:12
**version** [4] - 1114:16, 1116:8, 1116:9, 1133:8
**versus** [2] - 1031:12, 1044:5
**vertical** [1] - 1088:24
**Veterans** [1] - 1030:22
**via** [3] - 1154:15, 1166:23, 1166:24
**vice** [1] - 1055:12
**vice-versa** [1] - 1055:12
**view** [6] - 1032:24, 1033:19, 1037:7, 1107:7, 1175:17, 1176:7
**viewed** [1] - 1094:22
**Vincent** [6] - 1073:11, 1141:24, 1142:4, 1143:4, 1156:19, 1157:25
**visit** [3] - 1064:15, 1084:21, 1085:1
**visiting** [1] - 1085:10
**voir** [1] - 1062:9
**VOIR** [2] - 1062:11, 1178:5
**volcano** [1] - 1171:20
**volunteered** [1] - 1118:4
**voting** [1] - 1157:6

## W

**wages** [4] - 1140:2, 1140:3, 1140:16, 1140:20
**WAIKAPUNA** [1] - 1102:23
**Waikapuna** [1] - 1102:24
**wait** [1] - 1155:8
**waiver** [1] - 1069:23
**walked** [1] - 1040:13

**warranties** [2] - 1164:6, 1164:10
**Watch** [1] - 1066:17
**Wednesday** [1] - 1163:20
**weekend** [1] - 1177:1
**weeks** [2] - 1034:13, 1175:8
**WEINBLATT** [1] - 1030:21
**wetlands** [1] - 1071:7
**wherein** [1] - 1135:9
**whole** [6] - 1055:10, 1055:11, 1133:19, 1134:10, 1166:16, 1171:22
**Windalker** [1] - 1166:2
**Windwalker** [4] - 1165:19, 1166:7, 1166:8, 1166:14
**wire** [21] - 1037:2, 1047:21, 1047:25, 1049:20, 1052:7, 1056:20, 1057:1, 1057:8, 1057:13, 1057:16, 1059:19, 1059:20, 1059:21, 1062:13, 1063:1, 1070:17, 1158:16, 1158:20, 1160:4, 1161:3, 1161:4
**wire-transferred** [1] - 1070:17
**wired** [2] - 1073:19, 1075:25
**wires** [1] - 1064:14
**wiring** [3] - 1061:13, 1061:14, 1064:6
**Wiring** [1] - 1063:22
**wish** [2] - 1036:16, 1114:6
**wishes** [1] - 1033:16
**withdraw** [2] - 1083:2, 1125:7
**withdrawn** [7] - 1043:8, 1064:23, 1068:19, 1087:19, 1146:1, 1158:5, 1165:11
**Witness** [1] - 1039:4
**WITNESS** [6] - 1040:2, 1041:2, 1084:16, 1096:11, 1155:10, 1172:20
**witness** [25] - 1040:4, 1052:2, 1052:12, 1053:6, 1054:22, 1074:20, 1077:1, 1077:15, 1078:13, 1086:9, 1109:24,

1110:3, 1113:24, 1115:16, 1116:22, 1118:4, 1118:22, 1118:23, 1127:14, 1135:7, 1151:5, 1156:5, 1172:21, 1173:24, 1175:25
**witness'** [2] - 1174:11, 1175:4
**witnesses** [1] - 1086:3
**woman** [1] - 1156:4
**Woolley** [1] - 1065:22
**word** [3] - 1089:22, 1124:25, 1125:4
**worded** [2] - 1098:22, 1099:1
**Worden** [7] - 1165:16, 1165:18, 1165:19, 1165:23, 1165:25, 1167:14, 1167:19
**wording** [1] - 1102:16
**words** [5] - 1067:1, 1070:8, 1088:21, 1148:5, 1148:8
**workings** [1] - 1070:3
**works** [3] - 1088:18, 1091:12, 1091:19
**worry** [4] - 1054:16, 1054:17, 1064:11, 1073:5
**worse** [1] - 1114:25
**Worth** [1] - 1100:9
**worth** [10] - 1054:18, 1098:20, 1099:8, 1099:10, 1099:11, 1099:19, 1099:22, 1100:6, 1100:10, 1100:18
**writing** [1] - 1063:10, 1068:11
**written** [4] - 1108:15, 1127:22, 1146:6, 1175:12
**wrote** [4] - 1056:20, 1141:5, 1152:23, 1165:22

## Y

**year** [11] - 1056:6, 1059:6, 1095:14, 1096:4, 1096:16, 1124:5, 1130:23, 1131:17, 1140:5, 1140:21
**years** [4] - 1091:6, 1101:7, 1101:9, 1165:2
**yelling** [2] - 1035:11, 1064:9

**yesterday** [6] - 1039:10, 1040:15, 1074:6, 1077:16, 1172:24, 1174:2
**yesterday's** [1] - 1036:2
**YORK** [1] - 1030:1
**York** [14] - 1030:5, 1030:17, 1030:23, 1031:2, 1031:5, 1031:8, 1032:15, 1092:10, 1110:7, 1117:17, 1117:19, 1120:15, 1120:16, 1132:21
**yourself** [9] - 1056:24, 1058:24, 1094:15, 1106:11, 1106:14, 1111:6, 1135:5, 1136:9, 1165:14
**yourselves** [1] - 1172:13

## Z

**zero** [1] - 1073:7