1180

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
 2
   - - - - - - - - - - - - - - - X
 3
   UNITED STATES OF AMERICA     :     13-CR-607 (JFB)
 4
        -against-                     U.S. Courthouse
 5
                                :     Central Islip, New York
 6  PHILLIP A. KENNER
   a/k/a "Philip A. Kenner",
 7       and                    :
   TOMMY C. CONSTANTINE
 8  a/k/a "Tommy C. Hormovitis"

 9             Defendants    :
                                      May 14, 2015
10  - - - - - - - - - - - - - - - X   9:30 a.m.

11
   BEFORE:
12          HONORABLE JOSEPH F. BIANCO
            United States District Judge
13          and a jury

14
   APPEARANCES:
15
   For the Government:       KELLY T. CURRIE
16                           Acting United States Attorney
                             Federal Plaza
17                           Central Islip, New York 11722
                             BY:  JAMES M. MISKIEWICZ
18                                SARITHA KOMATIREDDY
                                  Assistant U.S. Attorneys
19

20

21  For the Defendant:       HALEY, WEINBLATT & CALCAGNI LLP
   Phillip A. Kenner         One Suffolk Square
22                           1601 Veterans Memorial Highway
                             Suite 425
23                           Islandia, New York 11749
                             BY:  RICHARD HALEY
24

25
```

1181

```
 1   For the Defendant:        LaRUSSO & CONWAY LLP
     Tommy C. Constantine      300 Old Country Road
 2                             Suite 341
                               Mineola, New York 11501
 3                             BY:  ROBERT P. LaRUSSO
                                         and
 4                                 ANDREW L. OLIVERAS
                                   26 Strangford Court
 5                                 Oceanside, New York 11572

 6

 7   Court Reporter:           RONALD E. TOLKIN, RPR, RMR, CRR
                               100 Federal Plaza
 8                             Central Islip, New York 11722
                               631-712-6105
 9                             ronald_tolkin@nyed.uscourts.gov

10                     ***

11

12            (Time noted:  9:55 a.m.)

13            THE CLERK:  All rise.

14            THE COURT:  Please be seated.

15            THE CLERK:  Calling case 13-CR-607, United States

16   versus Kenner and Constantine.

17            Counsel, please state your appearance for the

18   record.

19            MR. MISKIEWICZ:  Good morning, Your Honor.

20            James Miskiewicz for the United States.

21            THE COURT:  Good morning.

22            MS. KOMATIREDDY:  Good morning, Your Honor.

23            Saritha Komatireddy for the United States.

24            THE COURT:  Good morning.

25            MR. HALEY:  Good morning, Your Honor.
```

1182

1       Richard Haley for Mr. Kenner.

2       THE COURT:  Good morning.

3       MR. LaRUSSO:  Good morning, Your Honor.

4       Robert LaRusso for Mr. Constantine.

5       THE COURT:  Good morning.

6       MR. OLIVERAS:  Good morning, Your Honor.

7       Andrew Oliveras for Mr. Constantine.

8       MR. LaRUSSO:  May I ask your permission, may I have

9   a brief side-bar with counsel on an issue?

10       THE COURT:  Sure.

11       (Whereupon a side-bar conference was conducted.)

12       (Matter continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25



1184

1          (Sidebar conference conducted.)

2          THE COURT:  This part can be public.

3          One of the alternates apparently has a stomach

4     virus.  He's okay, but --

5          MR. LaRUSSO:  He's not going to come near me today,

6     is he, Judge?

7          MR. MISKIEWICZ:  I will.

8          THE COURT:  But hopefully he'll be fine.

9          I also have to do the naturalization ceremony this

10    morning.  It takes about 25 minutes.  So we may have to break

11    around 10:45.

12         MR. LaRUSSO:  Thank you, Your Honor.

13         (Whereupon the side-bar conference was concluded.)

14         (Matter continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1185

 1              (Matter continued in Open Court.)

 2              THE COURT:  We will get the jury.  Mr. Kaiser can

 3    retake the witness stand.

 4              (Witness John Kaiser resumes the stand.)

 5              THE CLERK:  All rise.

 6              (Whereupon the jury enters the courtroom.)

 7              THE COURT:  You may be seated.

 8              Good morning, members of the jury.

 9              ALL JURORS:  Good morning.

10              THE COURT:  We're ready to continue with

11    Mr. Kaiser's cross-examination.  As you will recall,

12    Mr. LaRusso is about to begin.  That's where we'll start.  I

13    do have to do the naturalization ceremony this morning.  It's

14    an exciting event.  So they're going to tell me when that's

15    ready.  It's usually ready about 10:30.  It takes about 20

16    minutes.  We'll take our break early and then go to lunch.

17              Let's proceed.  Mr. Kaiser, you're still under oath.

18    You understand?

19              THE WITNESS:  Yes.

20              J O H N    K A I S E R,

21              called as a witness, having been previously duly

22              sworn, was examined and testified as follows:

23              THE COURT:  You may commence.

24              MR. LaRUSSO:  Thank you, Your Honor.

25

1    CROSS EXAMINATION

2    BY MR. LaRUSSO:

3    Q    Good morning, Mr. Kaiser.

4    A    Good morning.

5    Q    Mr. Kaiser, I'd like to direct your attention to the

6    Hawaiian investment you testified to.  Particularly, during

7    the period about 2004 up to the Lehman loan, which I believe

8    you testified was August of 2006, is that correct?

9    A    That's correct.

10   Q    Were you or any other members affiliated with the

11   Hawaiian project looking for funding for the development of

12   the land?

13   A    No, not me.  I wasn't.  That's not what I was doing.

14   Q    Who was affiliated with the project that was looking for

15   funding during that period of time?

16   A    That is Mr. Kenner.

17   Q    Was Mr. Kenner, to your knowledge, utilizing other

18   individuals to help him find funding for the Hawaiian project?

19   A    I believe so.

20   Q    Do you know -- again, during this time period --

21   approximately how much money you and your partners or

22   associates were trying to raise in order to develop the

23   Hawaiian project that you were involved in?

24   A    No, I don't.

25   Q    Would 15 to $20 million be within the range that you

1  remember being what was sought for to develop the project?

2  A    No.  That wouldn't -- certainly wouldn't be enough to

3  build the project.

4  Q    Would that particular amount of money, 15 to 20 million,

5  possibly fall within the range of funds needed to purchase or

6  complete the purchase of the property that was part of the

7  Hawaiian project?

8  A    Yes, I believe so.

9  Q    Now, looking back at that time frame -- I guess I can ask

10  the obvious, Mr. Kaiser.  Without that funding, you would not

11  be able to develop the property, is that correct?

12  A    Without which funding?

13  Q    The funding needed to do the development that Mr. Kenner

14  was spearheading for the project?

15  A    Just repeat that question, please.

16  Q    Obviously -- I think it's obvious.  If it doesn't turn

17  out to be, I apologize.  In order to realize your dream, in

18  order to do the development, you needed the funding.  That was

19  necessary.  You had to do the funding, is that correct?

20  A    Yes.  To purchase the remaining parcels, yes.

21  Q    After purchasing the remaining parcels, then to fund the

22  actual development itself?

23  A    Yes.

24  Q    Now, between 2003, I believe is when you testified that

25  you first met Mr. Kenner, particularly up until the Lehman

J. KAISER-CROSS-LaRUSSO                    1188

1   loan in August of 2006, were you aware of any particular

2   individuals engaged or hired to find funding for the Hawaiian

3   project other than Mr. Kenner?

4   A    No.

5   Q    Do you remember a man by the name of Donnie Rae, R-A-E?

6   A    Yes, I know who he is.

7   Q    Who is he?  Tell us who he is.

8   A    He's a hockey player, I believe.  He played in Europe.

9   Q    I'm sorry.  If I interrupt you, please tell me because

10  you have a right to finish your answer.

11  A    No, that was it.

12  Q    At the time that money was being sought for the Hawaiian

13  project, was he a hockey player?

14  A    I have no idea.  I met Donne Rae in 2008.

15  Q    During this particular period of time, do you know

16  whether he was actually engaged in try and find funding for

17  the Hawaiian project?

18  A    No.  I never heard of him until 2008.

19  Q    After meeting Mr. Rae, did you come to learn that he, in

20  fact, performed services in trying to secure funding for the

21  Hawaiian project?

22  A    No.  He was a mattress salesman.

23  Q    Well, do you know that he received $550,000 for

24  consulting fees trying to find funding for the Hawaiian

25  project?

1   A     No.

2   Q     Hopefully it will save me a couple of steps.  What I did

3   was put a few documents next to you.  I believe one of them is

4   marked for identification as JK-1.  That was the document that

5   you spoke yesterday about in your examination by Mr. Haley.

6   Take a look at it, just make sure we're talking about the same

7   document.

8   A     Yes, it looks like the one I was looking at yesterday.

9   Q     Well, just turn to page 4.  Again, if you need to hook at

10  any of the pages both before or after the page that I

11  reference you to, please feel free to do so.

12          I'll direct your attention down about two-thirds of

13  the way.  Do you remember back around October of 2010 meeting

14  with the FBI and providing information to them?

15  A     I answered some questions.

16  Q     Particularly, to Agent Galioto, and I believe the other

17  gentleman was Scott Romanowski.  If I pronounce the name

18  correctly.

19  A     Yes.

20  Q     Do you remember telling them in an interview around 2010

21  that Donnie Rae, ex-hockey player, lives in Arizona bringing

22  investors into Hawaii?  Do you remember telling those two

23  agents that in or around October of 2010?

24  A     No.

25  Q     Does this document that I showed you, page 4, refresh

1190

1  your recollection, Mr. Kaiser, with regard to what you told

2  the agents about Donnie Rae and his involvement in the

3  Hawaiian project?

4  A    No.

5  Q    Well, Mr. Kaiser, you were a police officer for about

6  15 years, is that correct?

7  A    18.

8  Q    Thank you.

9        And during that period of time, I assume you

10  interviewed a lot of witnesses.

11  A    That's correct.

12  Q    When you interview a witness, you make notes, is that

13  correct, on occasion?

14  A    On occasion.

15  Q    The reason for taking the notes is to record important

16  information coming from those witnesses, is that correct?

17  A    Yes.

18  Q    The reason you record that information, because it's

19  important, you may have to, at some future time, testify about

20  it or put it in a report, is that correct?

21  A    Yes.

22  Q    So you rely upon on your notes, when you interview a

23  witness, for future proceedings, is that accurate?

24  A    That would be accurate.

25  Q    Looking at this document, looking at page 4, does that

1  refresh your recollection that you told the agents that Donnie

2  Rae was one of the individuals who was trying to bring money

3  into the Hawaiian project?

4  A    No.

5  Q    Do you know an individual by the name of Robert Gaudet,

6  G-A-U-D-E-T?

7  A    Yes.

8  Q    Can you tell me -- or tell us, please, how you know him,

9  and what you know about him?

10  A    I met him through Mr. Kenner.  And Rob Gaudet is a golf

11  pro.

12  Q    Approximately, when did you meet him?

13  A    I believe in -- somewhere between '06, '07.

14  Q    Was he a golf pro here in the United States or golf pro

15  in Mexico?

16  A    I believe he was a golf pro in Mexico.

17  Q    Did Mr. Gaudet have any other occupation or any other

18  employment around the time that you met him?

19  A    At the time that I met him he was a golf pro, and he was

20  working with Diamanté.

21  Q    When you say he was working for Diamanté, I assume in his

22  capacity as a golf pro?

23  A    Yes, he's a golf pro.  But there was no golf course at

24  the time.

25  Q    Well, Mr. Kaiser, do you remember or do you know that

J. KAISER-CROSS-LaRUSSO                    1192

1  Mr. Gaudet was, likewise, engaged to find funding for the

2  Hawaiian project?

3  A    No.

4  Q    Did you ever learn that, in fact, he was paid for his

5  services to find funding for the Hawaiian project?

6  A    I learned that in 2011.

7  Q    Would it be fair to say that you also learned that he

8  received approximately $840,000 to try and find funding for

9  the Hawaiian project?  Is that correct?

10 A    No, that's not correct.  I'm not aware of that.

11 Q    Am I overstating the amount or overstating the amount?

12 A    I believe you're overstating the amount that I'm aware

13 of.

14 Q    But you did come to learn that he was retained and

15 engaged to find funding for the Hawaiian project, is that

16 correct, and he was paid a sum of money?

17 A    I saw a -- in 2011, I saw another phony agreement,

18 consulting agreement.

19 Q    Who showed you this so-called phony agreement?

20 A    I believe it was in some of the documents that Mr. Kenner

21 sent to my house.

22 Q    That was never presented during your direct examination,

23 was it, Mr. Kaiser?

24            MR. MISKIEWICZ:  Objection.

25            THE COURT:  Sustained.

J. KAISER-CROSS-LaRUSSO                                    1193

1  Q    Let me ask you, did you ever tell the agents, in that

2  same interview around October of 2010, that Mr. Gaudet was

3  getting paid or getting money from the Hawaiian project?

4  A    No, because I didn't know that.

5  Q    So it's your testimony that you met with the agents in

6  October of 2010 and you never told them that Robert Gaudet was

7  getting money for finding funding for the Hawaiian project.

8  Is that your testimony?

9  A    Yes.

10 Q    Would it refresh your recollection, take a look again at

11 JK-1 for identification.

12         MR. HALEY:  Your Honor, for purposes of the record,

13 that was introduced as Kenner Exhibit 43, just so we're not

14 confusing.

15         THE COURT:  I don't think this document's been

16 introduced into evidence.

17         MR. HALEY:  No, it hasn't.  Just for identification,

18 Judge.  I apologize if I said in evidence.  It's only for

19 identification purposes.

20         THE COURT:  Thank you, Mr. Haley.

21 Q    Mr. Kaiser, if you take a look at page 5, I'll direct

22 your attention to the middle of the page.  And if you would

23 review with me the middle to about two-thirds of the way down,

24 I'll ask you a series of questions after you've had a chance

25 to look at it.

1    Do you recognize that?  Before that, did you have a
2  chance to review it?
3  A    Yes.  I don't recognize it, though.
4  Q    Does that refresh your recollection that in your meeting
5  with Agent Galioto and Agent Romanowksi, you told them that
6  you met Robert Gaudet, golf pro, and that he tried to get
7  money for Hawaii?
8  A    No.  Again, I'm going to say it one more time.  I can't
9  verify this.  I don't know where these notes came from.  So
10 this is the first time I'm seeing them.  I didn't sit with
11 agents and go through notes.  And they weren't writing down
12 when we were talking.  So...
13 Q    Mr. Kaiser, I know that's what your present position is.
14 But the question is, looking at that document, and the
15 portions that I asked you to review, does it refresh your
16 recollection whether you told the agents that?  That's the
17 only question.  If you can say it does, it does, fine, and
18 tell me what it does to refresh your recollection.  If it
19 doesn't, tell me it doesn't.
20 A    No, it doesn't.
21 Q    Thank you.
22    Does the document help refresh your recollection
23 that Mr. Gaudet was one of several individuals that was hired
24 and engaged to find funding for the Hawaiian project?
25 A    No.

1  Q    Did you come to learn later that Mr. Gaudet got $840,000

2  for trying to find funding?

3  A    No.

4  Q    Do you know a man by the name of Tim Garner?

5  A    Yes.

6  Q    Who is Mr. Garner?

7  A    He was introduced to me by Mr. Peca; a friend of his.

8  Q    At the time the funding was being sought for the Hawaiian

9  project, did you know that he was engaged to find funding for

10 the Hawaiian project?

11 A    Repeat the question.

12 Q    During the period of 2004 up until the Lehman loan, did

13 you learn that he, likewise, was engaged to find funding for

14 the Hawaiian project?

15 A    No.

16 Q    What was Mr. Garner's occupation at the time you first

17 met him?

18 A    I believe he was working for a trucking company or

19 something.

20 Q    What capacity was he working for a trucking company?

21 A    I believe he was driving a truck.

22 Q    Do you know, as you sit here today, whether he was paid

23 for attempting to find funding for the Hawaiian project?

24 A    Yes.

25 Q    Would it be fair to say that he received approximately

J. KAISER-CROSS-LaRUSSO                                    1196

1  $60,000?

2  A    No.  I don't know what he received.

3  Q    You know he was paid?

4  A    I know he was paid something.

5  Q    Do you know a man by the name of Nick James?

6  A    Yes.

7  Q    Who is he?

8  A    He was -- he lives in California.  He is a friend of -- I

9  met him through Mr. Kenner.

10 Q    Approximately, when?

11 A    In 2007.

12 Q    Do you know, after meeting with Mr. Nick James, whether

13 or not he was engaged or hired to find funding for the

14 Hawaiian project?

15 A    No.

16 Q    Did you ever come to learn that he received $221,000 to

17 find funding for the Hawaiian project?

18 A    No.

19 Q    Do you know a person by the name of Richard Salgato?

20 A    NO.

21 Q    S-A-L-G-A-T-O?

22 A    No.

23 Q    Again, I ask the obvious, that if you don't know, you

24 would not have any -- do you have any -- withdraw that.

25        Do you have any information in regards to an

J. KAISER-CROSS-LaRUSSO                    1197

1   individual by the name of Richard Salgato who may have been

2   involve in trying to find funding for the Hawaiian project?

3   A    No.

4   Q    Was there ever anyone affiliated with the Hawaiian

5   project that was a retired pro footballer selling insurance?

6   Does that refresh your recollection?

7   A    No.

8   Q    So it's your testimony that there were a number of -- a

9   couple of people that may have been paid to find funding, is

10  that correct?

11            MR. MISKIEWICZ:  Objection to form.

12            MR. LaRUSSO:  I'll withdraw that, Judge.

13  Q    As you sit here today, do you know how much money was

14  paid to the individuals that you identified in your earlier

15  testimony, or any other individuals -- I'll withdraw the

16  question.

17            Do you remember telling the agents back in October

18  of 2010, that Timothy Garner, one of the names we just talked

19  about, was trying to find funding for the Hawaiian project?

20  A    No.

21  Q    You paused for a second.  Is it possible?

22  A    No.  I heard he was trying to find funding for Mexico.

23  Q    Now, in addition to these individuals -- I'll withdraw

24  that.

25            You told us that you have a close friend, and if I

1  can use the word "partner," and you can agree with it, in the

2  Hawaiian project by the name Chris Manfredi, is that correct?

3  A    Yes.

4  Q    Mr. Manfredi was -- withdrawn.

5          I used the word "partner."  He was a partner with

6  you and others in the development of the Hawaiian project, is

7  that correct?

8  A    That's correct.

9  Q    Just for the record, how much did he invest in the

10 Hawaiian project, do you know?

11 A    I don't know.  Whatever he did, he invested in '02 to

12 '03.  I don't know what that came out to be.

13 Q    Did you ever ask him?

14 A    No.

15 Q    As you testified today, he invested, you believe, some

16 money into the project, is that right?

17 A    Yes.

18 Q    You seem to hesitate.  I'm sorry, I'm just trying to

19 clarify what your knowledge of Mr. Manfredi's investment in

20 the Hawaiian project and what you know.

21 A    Like I said, I don't know the amount.  I believe he

22 invested some of his own money in the beginning of the

23 Hawaiian project.

24 Q    Before you met Mr. Kenner?

25 A    Yes.

1  Q    Would that be the extent of his investment, as far as you

2  can recall, or you just don't know?

3  A    I just don't know.

4  Q    He could have invested more money.  You're not aware of

5  it as you're testifying to it today?

6  A    Yes, that I'm aware.

7  Q    What role did Mr. Manfredi play in the development of the

8  Hawaiian project during the period 2004 through 2000- -- I

9  guess up until the Lehman loan.  I'm sorry.  Bad question.

10        He was involved early on, and I believe you

11  testified sometime around 2002 he became involved in it?

12  A    That's correct.

13  Q    So sometime between 2002 up until the Lehman loan, can

14  you tell us what role he played in the actual development of

15  the Hawaiian project?

16  A    From what year?

17  Q    From the time you and he first became involved until the

18  Lehman loan in August of 2006.

19  A    Starting from 2002, again, we were just seeing if the

20  property was viable; he and I were doing that together.  And

21  then as far as dealing with potential lenders, he would do the

22  outlines, he would do the spreadsheets, the performers on the

23  various different parcels.  And he'd be pretty much collecting

24  all the data to actually secure funding for the loan.

25  Q    Did Mr. Manfredi have a title, as you know?

1   A    I don't know what his title was.  I didn't call him

2   anything.

3   Q    Do you know the acronym COO?

4   A    Yes.

5   Q    Would that fairly describe his role in the Hawaiian

6   project; meaning chief operating officer?

7   A    I don't know if it would correctly depict him at that

8   time, no.

9   Q    It would be a high ranking or a higher position than just

10  an employee, correct?

11  A    Yes.

12  Q    He was in management, correct?

13  A    That's right.

14  Q    You said, I believe, that Mr. Manfredi was involved in

15  trying to secure funding, is that correct?

16  A    No, I didn't say that.

17  Q    I thought I heard the word "funding."  Just explain it to

18  me.

19  A    He was collecting all the data and working on performers,

20  and he would give that to Mr. Kenner, who was trying to secure

21  the funding.

22  Q    You mentioned Mr. Manfredi was collecting information

23  necessary to try to secure the funding, is that correct?

24  A    Yes, I believe so.

25  Q    You were aware of his activities, is that right?

J. KAISER-CROSS-LaRUSSO                           1201

1    A    What do you mean by that?

2    Q    In regards to collecting the information and providing it

3    to Mr. Kenner so that he could secure the funding, is that

4    right?

5    A    Yes.

6    Q    Would it be fair to say that during this time period, you

7    had a very close working relationship with Mr. Manfredi?

8    A    Yes.

9    Q    You spoke with him on a weekly and monthly basis

10   discussing the Hawaiian project?

11   A    Yes, I would say so.

12   Q    You would call him.  He would call you.  He would e-mail

13   you.  You would e-mail him.  Just kind of giving each other an

14   update on the status of the Hawaiian project.  Is that fair?

15   A    No.  I wasn't in on the e-mail.

16   Q    You picked up the phone and talked to him man-to-man,

17   face-to-face -- person-to-person?

18   A    That is correct.

19   Q    How often would you do that to get information on the

20   Hawaiian project?

21   A    It depends what time period we're talking about.

22   Q    Well, do you remember any conversations or were you ever

23   told that Mr. Manfredi was actually working trying to secure

24   the funding at one point for the Hawaiian project?

25   A    No.  Like I said, he was creating all the data and the

1  backup and support so it would make a lender...

2  Q    Would it refresh your recollection to know that

3  Mr. Manfredi was in contact with Mr. Tommy Constantine trying

4  to find funding for the Hawaiian project?

5            MR. MISKIEWICZ:  Objection.

6            THE COURT:  Sustained as to form.

7  Q    Did there come a time, Mr. Kaiser, that you learned that

8  Mr. Constantine was trying to secure funding and had been in

9  touch with your partner, Mr. Manfredi?

10            MR. MISKIEWICZ:  Objection.  Withdrawn.

11  A    No.

12            THE COURT:  They just told me the naturalization is

13  ready.  We'll reconvene at 10:50.  Don't discuss the case.

14  I'll see you at 10:50.

15            (Whereupon a recess was taken at 10:25 a.m.)

16            (Matter continued on the next page.)

17

18

19

20

21

22

23

24

25

1          THE COURT:  Are you ready to go?

2          MR. LaRUSSO:  Yes, Your Honor.

3          THE COURT:  Mr. Constantine, Mr. LaRusso mentioned

4    you're not feeling great today.  At any point you need a

5    break, let me know.

6          MR. CONSTANTINE:  I appreciate that, Your Honor.

7          THE COURT:  Let's bring in the jury.

8          Please get Mr. Kaiser.

9          (Witness Mr. Kaiser resumes the witness stand.)

10          (Whereupon the jury enters the courtroom at 11:00

11   a.m.)

12          THE CLERK:  All rise.

13          THE COURT:  You can be seated.

14          All right.  I appreciate your patience.  We are

15   ready to continue.

16          Mr. LaRusso.

17   CONTINUED CROSS EXAMINATION

18   BY MR. LaRUSSO:

19   Q    Mr. Kaiser, I believe we were talking about Mr. Manfredi

20   and his role in trying to find funding for the Hawaiian

21   project.  You told us, I believe -- and I'm sorry for

22   repeating, I'm just trying to get a point of reference -- he

23   was working with Mr. Kenner, providing information for

24   Mr. Kenner, is that correct?

25   A    Yes.

1  Q    If I mispronounce, please correct me.  Part of the

2  Hawaiian project included a location Waikapuna?

3  A    Yes.

4  Q    Is that the correct pronunciation?

5  A    Yes.

6  Q    Just so that we can identify it properly.  I believe

7  yesterday Mr. Kenner's Exhibit 36 in evidence showed a number

8  of identified locations in that exhibit, is that correct?

9  A    Yes.

10 Q    One of them is the Waikapuna area on this island, is that

11 correct?

12 A    That's correct.

13 Q    Waikapuna is one of four areas that we can properly call

14 the Hawaiian project?

15 A    Correct.

16 Q    Do you remember during the period of 2004 up until the

17 Lehman loan in 2006, if your partner, Mr. Manfredi, was

18 involved in negotiating and discussing funding from a company

19 called Investors Mortgage of Arizona?

20 A    No.

21 Q    Have you heard of that name before?

22 A    No.

23 Q    Have you ever, during that same time period, heard that

24 there was a company looking to fund for the Waikapuna project

25 approximately $15 million?

1   A    No.

2   Q    Then we can logically conclude that you don't recall

3   having a conversation with Mr. Manfredi with a company seeking

4   to fund that project for 15 million?

5   A    That's correct.

6   Q    Let me show you what has been marked C-58.  Will you take

7   a look at that.

8              MR. LaRUSSO:  May I, Your Honor?

9              THE COURT:  Yes.

10             (Handing.)

11  Q    This is a refreshing document.  I'm just going to ask you

12  some questions and see if this document refreshes your

13  recollection regarding what you may have known about the

14  funding on this particular Waikapuna project.

15  A    No.  I'm not on this e-mail.

16  Q    In looking at this, my question is, does it refresh your

17  recollection at all that in November of 2005 your partner was

18  engaged with Mr. Constantine in trying to secure funding from

19  a company called Investors Mortgage of Arizona for $15 million

20  for the Waikapuna project?

21  A    No.

22  Q    You were in touch with Mr. Manfredi on a regular basis,

23  is that correct?

24             MR. MISKIEWICZ:  Object.

25             THE COURT:  Asked and answered.  Sustained.

1   Q    Now, point of reference, I think you testified, and I'm

2   pretty sure you testified that the Lehman loan occurred in

3   August 2006 and it entailed the funding agreement for about

4   $105 million, is that correct?

5   A    That's correct.

6   Q    I believe that you also testified that there was a payout

7   somewhere in the neighborhood of 14 to 16 million?

8   A    Yes.

9   Q    And from that, you received a portion of the money.

10  We'll get into that later?

11       Correct, that occurred August of 2006?

12  A    Yes.

13  Q    Before the Lehman loan, before August of 2006, other than

14  your testimony about your records on the project with

15  Mr. Manfredi --

16       MR. MISKIEWICZ:  Objection.

17  Q    -- was there any other funding secured --

18       MR. LaRUSSO:  I'll finish the question, Judge.

19  Q    Was there any other funding secured before the Lehman

20  loan that helped the Hawaiian project?

21       THE COURT:  Overruled.

22  A    I don't recall that in this time period.

23  Q    Was there actually a closing for the Waikapuna project?

24  A    I believe the closing of Waikapuna happened in...

25  Q    You're not sure?

1   A    This was a difficult time in my life.  When you show me

2   the statements, I wasn't in communication with the events.

3   Q    In terms of the events, there was a closing for

4   Waikapuna, is that correct?

5   A    I believe that it closed.

6   Q    When I say "the Waikapuna closing," it was for the

7   purchase of the property, is that correct?

8   A    Repeat the question, please.

9   Q    The closing for Waikapuna was for the purchase of the

10  property, is that correct?

11  A    I believe Waikapuna closed at the Lehman closing in

12  August of '06.

13  Q    Would it refresh your recollection that it occurred

14  October 14, 2005?

15  A    If you're saying that's what it is.

16  Q    So you don't dispute it might have occurred at an earlier

17  date.  You don't recall.  Is that a fair statement?

18  A    You can say that, yes.

19  Q    We can agree, can we not, that there was a closing and

20  the property was secured for the Hawaiian project?  Not giving

21  you a time frame, but you bought the property?

22  A    Yes.

23  Q    Where did the funding come from to buy the property?

24  A    You asked if I knew where the funding came from...

25  Q    To buy the Waikapuna property.

1  A    At the time?

2  Q    At the time.

3  A    At the time, I believe someone was coming from the

4  funding that I had sent, the loan.

5  Q    You're not sure of that, is that correct?

6  A    That's correct.

7  Q    Would you agree with me that the funding for the

8  Waikapuna project was necessary in order to secure the

9  property?

10 A    No, I don't know that for a fact.

11 Q    Do you know how much was put up as earnest money for a

12 deposit for the purchase of the property at Waikapuna?

13 A    No.

14 Q    Do you recall a million dollars being deposited to buy

15 that piece of property?

16 A    No.

17 Q    Do you have any recollection that funding was necessary

18 to save that million deposit so that the property could be

19 purchased for the Hawaiian project?

20       MR. MISKIEWICZ:  Objection.

21       THE COURT:  Sustained.

22 Q    Are you aware, as you are testifying here today, that, in

23 fact, the funding for the Waikapuna closing came from

24 Mr. Constantine and a friend of his by the name of Mr. Grdina?

25 A    As I sit here today, yes.

1  Q    Would it be fair to say that Mr. Grdina put up

2  approximately $3.5 million to be able to secure the purchase

3  of the Waikapuna property?

4  A    I don't recall that amount.

5  Q    Well, looking at JK-1 that we were discussing earlier,

6  it's off to your left.  Page 5, take a look at it.  Just above

7  the middle portion.  Actually, if I may, it's the second

8  bracketed area.  Please read that to yourself.

9  A    Yes.

10 Q    Now, do you remember, in talking to the agent in 2010, in

11 October, telling them that the money for the Waikapuna closing

12 came from a friend of Tommy Constantine to the tune of

13 $4 million?

14 A    Yes.  I probably said something like that.

15 Q    So it does refresh your recollection that you told the

16 agents that funding came from a friend of Tommy Constantine,

17 is that correct?

18 A    Yes.  That's what I knew in 2010, that's correct.

19 Q    By the way, and I know you looked at that same portion of

20 the JK-1, did you also tell the agents that Mr. Constantine

21 was trying to fund money for Hawaii with his own funds?  Do

22 you remember telling them that?

23 A    No.

24 Q    If you look at that document, the same section you just

25 reviewed, does it refresh your recollection that that's what

1  you told the agents, that Mr. Constantine was trying to fund

2  money for Hawaii with his own funds?  Does it refresh your

3  recollection?

4  A    No.

5  Q    Mr. Kaiser, I would just like to talk about the

6  information that occurred around the time of the Lehman

7  closing, which I believe is August of 2006.

8            By the time that the Lehman closing occurred, how

9  much had you actually invested in the Hawaiian project?

10 A    Well, if you go back to my -- the initial funds that I

11 sent were among them.

12 Q    What was the amount?

13 A    $1 million.

14 Q    If I recall your testimony, correct me if I'm wrong, that

15 you had given that to Mr. Kenner, is that correct?

16 A    No, I didn't say that.

17 Q    In regards to your funding in Hawaii, what did you say?

18 A    That Mr. Kenner instructed me to wire it to a bank

19 account.

20 Q    How much were you supposed to wire?

21 A    $1 million.

22 Q    What was the deal?

23 A    For 30 days.

24 Q    You were supposed to receive 10 percent?

25 A    Correct.

1    Q    Is it possible it wasn't a 30-day loan, it might have

2    been a little longer?

3    A    No.

4    Q    Because you testified, if I'm not mistaken, that after

5    the 32nd day, two days after the money was due, you got on the

6    phone and called Mr. Kenner and asked him what is going on, is

7    that correct?

8    A    I believe I said a few days after.

9    Q    Two or three days?

10   A    Something like that.

11   Q    You weren't very pleasant in that conversation, is that

12   correct?

13            MR. MISKIEWICZ:  Objection.

14            THE COURT:  Overruled.

15            MR. LaRUSSO:  I'll withdraw that, Judge.  I'm sorry.

16   Q    Mr. Kaiser, is it possible that it might have been a 30

17   to 60-day loan and not a 30-day loan?

18   A    No.

19   Q    Is it possible you didn't call him a few days after 30

20   days, it might have been after 60 days?

21   A    No.

22   Q    You testified that it was for 10 percent, is that

23   correct?

24   A    I believe it was between eight and 10 percent, yes.

25   Q    So it might not have been ten.  You're now thinking back,

1   it could have been 8 percent, is that correct?

2   A    I believe I said between eight and 10 percent.

3   Q    Mr. Kaiser, please take a look, I believe it's to the

4   left of you, it's called JK-3.

5             MR. MISKIEWICZ:  Objection.

6             MR. LaRUSSO:  Refreshing his recollection, Judge.

7             MR. MISKIEWICZ:  He didn't say he needs his

8   recollection refreshed.

9             THE COURT:  Sustained.

10  Q    Take a look at JK-3.  Mr. Kaiser, is it possible that you

11  are mistaken as to the 30-day loan?

12  A    No.

13  Q    Mr. Kaiser, do you remember being interviewed about --

14  not about, on September 4th, 2013, by Agent Galioto?

15  A    I don't recall the date, but I was interviewed.

16  Q    Do you recall at or about the time frame that I

17  mentioned, that you told Mr. Galioto that the loan that was

18  needed -- that Mr. Kenner told you he needed, was a 30 to

19  60-day bridge loan.  Do you remember telling him that?

20  A    No.  I believe I told him 30 days.

21  Q    So if the agent recorded 30 to 60, he would be mistaken,

22  is that correct?

23            MR. MISKIEWICZ:  Objection.

24            THE COURT:  Sustained.

25  Q    Mr. Kaiser, do you recall telling the agent at anytime

1  during that interview around September of 2013, that after

2  more than 90 days had passed, Kenner did not repay the

3  $1 million and your friends and family started to get antsy?

4  Do you remember telling them that?

5  A    We talked about the loan.  I don't remember exactly what

6  I said.

7  Q    Well, is it possible that when you talked to Mr. Galioto

8  you told him that it was 60 -- I'm sorry -- 90 days and not 30

9  when you began to get information -- withdrawn.  That you then

10 contacted Mr. Kenner?

11        MR. MISKIEWICZ:  Objection.

12        THE COURT:  That's okay.  He can answer that.

13 A    No.

14 Q    It does not refresh your recollection?

15 A    No, it does not.

16 Q    It does not refresh your recollection it was 90 days when

17 you called Mr. Kenner and asked about the money that you

18 invested?

19        MR. MISKIEWICZ:  Objection.

20        THE COURT:  Now I will sustain the objection.

21 Q    By the way, this million dollars, I believe that you

22 testified that some of it was also yours, is that correct?

23 A    That's correct.

24 Q    You testified that your contribution to the $1 million

25 was $180,000.

1  A    Somewhere around there, correct.

2  Q    Who gave you the remainder of the money, and how much?

3  A    I believe that I testified it was family members and

4  friends.

5  Q    Which family members and friends?

6  A    My mother, my brother Keith, Bob Rizzi, Vincent

7  Tesoriero, who sent his own funds in.  A friend of his name

8  James, James Cody.

9  Q    I'm sorry.  I missed the last name.

10 A    I believe his name is James Cody.

11 Q    Anyone else that you can recall?

12 A    No.

13 Q    The monies that you received and transmitted to

14 Mr. Kenner, was that something that you did by way of a wire

15 transfer?

16 A    No.

17 Q    How did the money get to Mr. Kenner?

18 A    I believe Vincent and James sent their own wires to them.

19 Q    To what company?

20 A    To Kau Holding Company.

21 Q    Other than those two, how did the rest of the money get

22 to Mr. Kenner?

23 A    I believe it was wired through -- through my mother's

24 bank.

25 Q    So you collected the money the other individuals,

J. KAISER-CROSS-LaRUSSO                              1215

1   deposited into your mother's account and then sent it --

2   A     Yes.

3   Q     -- to the account?

4   A     Kau Holding.

5   Q     By the way, did you produce any of the documentation

6   regarding the monies received and sent?

7   A     I don't recall.

8   Q     If you did, you would have provided it to the government,

9   is that correct?

10  A     Yes.

11  Q     By the time the closing came around, you, in your mind,

12  were owed approximately $1.1 million, is that right?

13  A     Prior to the closing the terms had changed in reference

14  be to the loan.

15  Q     They changed meaning that you had a conversation with

16  Mr. Kenner and you changed the terms of the loan?

17  A     No.  It was no longer a loan.  It turned into an

18  investment.

19  Q     I believe that you told us that you sold your house to

20  pay back the investors.  And so you then held the entire

21  amount that was given to Mr. Kenner, in effect, is that

22  correct?

23  A     Yes, that's correct.

24  Q     Were you at the Lehman closing?

25  A     No, I was not.

1  Q    Did you have an opportunity to review any of the

2  documents before the Lehman closing?

3  A    Just once.  That one document that we reviewed yesterday

4  that was sent to my residence.

5  Q    You did have advance knowledge that the closing was

6  taking place, is that correct?

7  A    I don't recall.

8  Q    You did know that you were going to be repaid some of

9  your money from the Lehman closing before it occurred, is that

10  correct?

11  A    Yes, but that changed.

12  Q    What was the total amount that you were now owed as a

13  result of the money that you had given to Mr. Kenner?

14  A    Repeat the question.

15        MR. LaRUSSO:  Can you.

16        (The record was read by the reporter.)

17  A    At the time I was still unaware how that was going to

18  work out since the terms had changed.

19  Q    So at the time of the Lehman closing, how much did you

20  expect to get?

21  A    I was unsure what I was going receive.

22  Q    You were expecting something for the Lehman closing, is

23  that correct?

24  A    Yes, I was hoping to get something.

25  Q    You were hoping to get all the money that Mr. Kenner,

1    according to your testimony, was given by you and the other

2    investors?

3    A    Say that again.

4    Q    You were trying to get all of your money back, either by

5    way of cash or investment, is that correct?

6    A    Yes.

7    Q    Now, is it your testimony that you received somewhere in

8    the neighborhood of 700- to $800,000 after the Lehman closing,

9    is that correct?

10   A    Yes.

11   Q    How did you receive that money?

12   A    I believe they were wires.

13              MR. LaRUSSO:  If I may have just a minute, Your

14   Honor.

15   Q    Do you know from what entity or what bank you received

16   the monies?

17   A    No.

18   Q    I will display a few exhibits in evidence, and I have a

19   few questions about them.  This is the document introduced.

20   Down at the bottom, I'll display it, is Government's Exhibit

21   2103.

22              Is that screen working, Mr. Kaiser?

23   A    No.

24   Q    I apologize.  Bear with us a moment, and take a look at

25   the exhibit behind you.  This is in evidence as 2103.  This is

1  a Na'alehu Ventures account.  Is that the account from which

2  you received your money from the Lehman closing?

3  A    Yes, I believe so.

4  Q    It actually shows the beginning balance on August 9, 2006

5  of zero, is that correct?  Do you agree with me that I read

6  that correctly?

7           Do you see that?  Can you see that now, Mr. Kaiser?

8  A    I can't see the balance.

9  Q    The beginning balance is zero?

10  A    Yes.

11  Q    It appears this account was created at or about the time

12  of the Lehman closing, is that right?

13  A    Yes.

14  Q    It says, "Credit" -- let me see if I can reduce it a

15  little more, then we may not have to move it around.

16           Okay.  Do you see "Credits and Other Items Paid,"

17  and in brackets, 6 million.

18  A    Yes.

19  Q    Underneath it, it says, "Deposits and Credits:

20  6,834,287.29."  Is that the approximate amount of money that

21  you know was part of the paid out amount from the Lehman loan?

22  A    It seems like it would be part of it.

23  Q    Now I'm going to go down to the portion called "Other

24  Items Paid."  Do you see the second one -- I'm going to reduce

25  it more, hopefully we can get the date.

J. KAISER-CROSS-LaRUSSO                         1219

1          Are you able to see that, Mr. Kaiser?

2    A    Yes.

3    Q    So there was two earlier items paid, 85.70 and $3,000.

4    The third one, August 17, is a domestic wire to Chris Manfredi

5    for $12,268, or is that 88?

6    A    Looks like 88.

7    Q    Thank you.

8          Do you know what that was for?

9    A    No.

10   Q    Thereafter, there's a domestic wire August 17 to you from

11   Mr. Kenner for $34,513.  Do you know what that's for?

12   A    No.

13   Q    The next one, same day, Mr. Kenner for 45,410, do you

14   know what that's for?

15   A    No.

16   Q    Then there's three wire transfers on the same day to you,

17   is that correct?

18   A    Yes.

19   Q    69,400, 82,915, and $110,000.  Do you see that?

20   A    Yes.

21   Q    That's part of the funds that you received from the

22   Lehman closing, is that correct?

23   A    Yes.

24   Q    Do you know what accounts those were deposited into?

25   A    I'm sure they were deposited into my account.

1  Q    You don't know that for a fact as you're testifying here

2  today, is that correct?

3  A    I don't know what account of mine it was deposited in,

4  correct.

5  Q    And then if we go down a little bit further, August 18,

6  to Chris Manfredi for $172,000.

7  A    Yes.

8  Q    Do you know what that was for?

9  A    No.

10  Q    The second page, so the record is clear, is page 2 of 3

11  of this account.  The first item appearing under Other Items

12  Paid is August 18, domestic wire to you for $195,000.  Do you

13  see that?

14  A    Yes.

15  Q    Mr. Kaiser, is it your testimony that from this account

16  you received somewhere in the neighborhood of 700- to

17  $800,000, is that correct?

18  A    Yes.

19  Q    In addition to the monies that came from this account,

20  did you receive any other monies?

21  A    In reference to what.

22  Q    In regard to the money that was owed to you for your

23  investments in the Hawaiian project that you gave to

24  Mr. Kenner?

25  A    No.

1   Q    If my math is correct and you got between 700- and

2   800,000, you were owed in the neighborhood of about 300 plus,

3   maybe 350 for your Hawaiian investment, is that correct?

4            MR. MISKIEWICZ:  Objection.

5            THE COURT:  Overruled.  You can answer that.

6   A    Yes.  At that time the investment changed.  It went to

7   Mexico.  So it wasn't in Hawaii.

8   Q    Let's try and explain that.  You're still owed money from

9   your Hawaiian investment, correct?  You got back 700 to 800 --

10           MR. MISKIEWICZ:  Objection.

11           THE COURT:  Sustained.

12  Q    You're still owed some money.  You testified it went to

13  the Mexican project.  How much went to the Mexican project?

14  A    I don't know how much went to the Mexican project.  I

15  never saw the transfers of the bank.

16  Q    Well, was it $1 or was it $305 that you were owed, or all

17  of the money went down there?

18           MR. MISKIEWICZ:  Objection.

19           THE COURT:  Overruled.

20  A    I still don't know the final amount of what was actually

21  sent down there.

22  Q    My question is, you are still owed money after you

23  received the cash from the Lehman closing totaling 700- to

24  $800,000.  I'm asking you what happens to the remainder of the

25  money owed to you.  I'm trying to account for the rest of the

1   money.

2   A    I believe it's sitting down in Mexico.

3   Q    So all of the monies that were still due and owing to you

4   went down to the Mexican project, is that correct?

5   A    I don't know -- out of the 1 million, I don't know how

6   much was sent down there.  I know it was a large amount.  I

7   haven't seen the bank record.  As of today, I still don't know

8   what it is.

9   Q    Would it be fair to say that at least around this period

10  of time, you had gotten all of your investments back, either

11  by way of cash or some other contribution by way of investment

12  in the Mexican project?

13              MR. MISKIEWICZ:  Objection.

14              THE COURT:  Sustained as to form.

15  Q    At the time that you received the cash -- I'll withdraw

16  that.

17              Did you receive, in your mind, all the monies you

18  invested after the Lehman closing either in cash or by way of

19  investments?

20  A    There was more money that I still sent down there prior

21  to the closing.

22  Q    So my question is, would you agree, that you some form,

23  you got all the money that you invested in Hawaii?

24  A    At that point, I had invested in Cabo.  It was an

25  investment.

J. KAISER-CROSS-LaRUSSO                                1223

1    Q    So the money that was not paid to you in cash, as far as

2    you knew, was being invested down in Cabo San Lucas?

3    A    That's correct.

4    Q    So either in cash or investment, you got all of the money

5    that you invested in the Hawaiian project?

6    A    Yes.

7    Q    I'm going to show you, on the same page as the Na'alehu

8    Ventures account, an entry on August 25th.  It says, "Loan

9    Payment."  Do you see that?  I'll try to point to it so we can

10   follow.  August 25th loan payment.

11   A    Okay.

12   Q    Here it is.  It's to the loan account 289369 for

13   $580,026.  Do you see that?

14   A    Yes.

15              (Matter continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1224

1    BY MR. LARUSSO:

2    Q.    Do you know what that was, that payment was?

3    A.    No idea.

4    Q.    Do you know a person by the name of Michael Peca?

5    A.    Yes.

6    Q.    A hockey player?

7    A.    That's correct.

8    Q.    One of the investors that you came to meet and know?

9    A.    Yes.

10   Q.    And do you know if this payment was made to his

11   Northern Trust line of credit?

12   A.    I have no idea.

13   Q.    Let me show you what's in evidence as Government's

14   Exhibit 2001.

15         Up in the upper left-hand corner, it says Peca,

16   Michael, and it has the 289369; do you know see that?

17   A.    Yes.

18   Q.    That's the loan transaction account for his line of

19   credit.

20         And that same number appears in this transaction

21   for August 25th showing that his loan account has over

22   580,000; is that right?

23         MR. MISKIEWICZ:  Objection.

24         THE COURT:  I'll allow it.  You can answer it.

25         Is it the same account number?

1225

1    THE WITNESS:  Yeah.  I have no idea.  It's the

2  first time I'm seeing an account number.

3    THE COURT:  He's just asking you if it's the

4  same account number or not.

5    THE WITNESS:  It seems to be.

6    THE COURT:  You can move on.

7    MR. LARUSSO:  Thank you, your Honor.

8  BY MR. LARUSSO:

9  Q.   You weren't the only investor in the Northern

10  projects; is that correct?

11  A.   That's correct.

12  Q.   You knew that there were many hockey players that had

13  been introduced to the project through Mr. Kenner; is that

14  correct?

15  A.   I believe so, yes.

16  Q.   Do you know, at the time of the Lehman closing, if

17  any of the hockey players got all of their money back?

18  A.   I didn't believe they did.

19  Q.   You believe they did?

20  A.   I do not believe they did.

21  Q.   So your recollection of the events is that they did

22  not get, that account that we just showed you that's got

23  about 500-plus thousand dollars, do you know if he got all

24  his money back?

25  A.   I don't know what he invested.

J. Kaiser  -  Cross/LaRusso

1226

1   Q.   By the way, and just to be fair, you had nothing to

2   do with the disbursement of the money out of that account;

3   is that correct?

4   A.   That's correct.

5   Q.   By the way, did you know about these lines of credit

6   from the hockey players?

7   A.   No.

8   Q.   At that time?

9   A.   Not that time, no.

10   Q.   You came to learn later.  But, at that time, you did

11   not know about it?

12   A.   That's correct.

13   Q.   By the way, again just changing the subject a little

14   bit, have you ever heard of the Global Settlement Fund?

15   A.   Yes.

16   Q.   Did you ever contribute to the Global Settlement

17   Fund?

18   A.   No.

19   Q.   You were aware though that monies from the Global

20   Settlement Fund actually funded two lawsuits against

21   Mr. Jowdy; is that correct?

22          MR. MISKIEWICZ:  Objection.

23          THE COURT:  Sustained.

24   BY MR. LARUSSO:

25   Q.   Mr. Kaiser, were you involved in lawsuits against

J. Kaiser   -   Cross/LaRusso

1227

1   Mr. Jowdy?

2   A.   No.

3   Q.   Were you aware of lawsuits against Mr. Jowdy?

4            MR. MISKIEWICZ:  Objection.

5            THE COURT:  This is all calling for hearsay.  He

6   wasn't involved.  If he was aware of it, it would only be

7   through hearsay.

8            MR. LARUSSO:  Let me see if I can lay the

9   background for it, if I may.

10  BY MR. LARUSSO:

11  Q.   Did you participate in any meetings regarding

12  lawsuits against Mr. Jowdy?

13  A.   I was at a mediation once in California.

14  Q.   And that mediation was in California?

15  A.   I believe so, yes.

16  Q.   Who was present at that mediation?

17  A.   A bunch of the hockey players, attorney Ron Richards,

18  Mr. Kenner, Mr. Constantine.

19  Q.   And yourself?

20  A.   Yes, I was.  I said I was there, yes.

21  Q.   And this mediation lasted most of the day; is that

22  correct?

23  A.   I don't recall how long it lasted.

24  Q.   Would it be fair to say it was more than five hours,

25  more than six hours?

J. Kaiser  -  Cross/LaRusso

1228

1   A.   I thought it was a few hours.

2   Q.   That's your recollection?

3   A.   Yes.

4   Q.   And Mr. Constantine, you say, was present at that?

5   A.   Yes.

6   Q.   And was he, while you were there, advocating for the

7   hockey players at this mediation?

8   A.   No.

9   Q.   Did you take an active part in this mediation?

10  A.   I said a few words to the judge who was mediating.

11  Q.   And what were those few words that you said to the

12  judge at this mediation?

13  A.   Well, the judge just finished browbeating

14  Mr. Constantine.

15  Q.   I'm sorry?

16  A.   The judge had just finished browbeating

17  Mr. Constantine and yelling and screaming at him.

18  Q.   So what did you say?

19  A.   I stood up and said, I am not Mr. Constantine.  I

20  told him about my background, and I'm certainly not like

21  him, and that we're here just to try to figure it out and

22  the last thing anyone needed was a lawsuit.

23  Q.   So you took an active role, correct?

24  A.   Yeah.

25        The other side wasn't there.  It was just, like

1229

1   I said, the judge, the hockey players, Mr. Kenner

2   Mr. Constantine.

3   Q.   Tell us the sides.  There's Jowdy and his people, and

4   there's you, Mr. Constantine, Mr. Kenner and all of the

5   hockey players; is that correct?

6   A.   Yes.

7   Q.   So there's two sides to this mediation.  You are on

8   the side of the hockey players, the same side

9   Mr. Constantine was on; is that right?

10   A.   No.

11        I told the judge I'm not -- I have nothing to do

12   with Mr. Constantine.

13   Q.   Well, were you there in any capacity to insure that

14   Mr. Jowdy accounted for the monies that everybody had

15   believed he had taken?

16        MR. MISKIEWICZ:  Objection.

17        THE COURT:  Sustained as to form.

18   BY MR. LARUSSO:

19   Q.   Mr. Kaiser, were you there because you felt that

20   Mr. Kaiser had stolen money?

21   A.   I didn't steal money.

22   Q.   I'm sorry.

23        Mr. Jowdy had stolen money?

24   A.   No.

25   Q.   What were you there for?

1230

1   A.   I was there to try to work out the Cabo project where

2   it didn't go into a default situation or get caught up in

3   legal lawsuits for the next 10 years.

4   Q.   At any point in time did you ever accuse Mr. Jowdy of

5   being a thief?

6            MR. MISKIEWICZ:  Objection.

7            THE COURT:  Overruled.  You can answer that.

8   A.   Yes, after Mr. Kenner had told me some things about

9   Mr. Jowdy.

10  Q.   That was before the mediation?

11  A.   Yes.  Just before, yeah.

12  Q.   So when you're told this information, you believed

13  that Mr. Jowdy had stolen money?

14  A.   No.

15  Q.   Did you believe that Mr. Jowdy had misappropriated

16  money?

17  A.   I believed that the project wasn't being run right

18  and it had a lot of value.

19  Q.   It's actually two projects, correct, that Mr. Jowdy

20  was involved in?

21  A.   Yes.

22  Q.   There are actually two lawsuits against Mr. Jowdy; is

23  that correct?

24            MR. MISKIEWICZ:  Objection.

25

1231

1  BY MR. LARUSSO:

2  Q.   That you knew of?

3         MR. MISKIEWICZ:  Objection.

4         THE COURT:  If he knows I'll let him answer.

5  A.   No, I knew of one civil lawsuit.

6  Q.   Let me ask you this.

7         Mr. Jowdy was involved in two projects in

8  Mexico, the Cabo project and the Del Mar project; is that

9  correct?

10  A.   Yes.

11  Q.   And at the time of this mediation, what was the

12  status of the Diamante Del Mar project?

13  A.   I had no idea. I didn't have an interest in that.

14  Q.   Had anything developed from the Del Mar project, as

15  far as you knew?

16  A.   Like I said, I didn't have an interest in it.  It

17  wasn't on my radar.

18  Q.   Would it be fair to say that you never accused

19  Mr. Jowdy of being a thief?

20  A.   I told you --

21         MR. MISKIEWICZ:  Objection.

22         THE COURT:  He can answer that.  Go ahead,

23  Mr. Kaiser.

24  A.   Ask the question again.

25  Q.   Did you ever accuse Mr. Jowdy of being a thief?

J. Kaiser  -  Cross/LaRusso

1232

1  A.   Not in those words.

2  Q.   What words would you describe -- withdrawn.

3       It's your testimony you never used the word

4  thief in describing Mr. Jowdy?

5  A.   That's correct.

6  Q.   Would it be fair to say -- withdraw that.

7       Do you recall at any time speaking with

8  Mr. Constantine where he expressed to you a doubt as to

9  the accusations being made against Mr. Jowdy?

10 A.   Yes.

11 Q.   When did that occur?

12 A.   I believe around 2010.

13 Q.   And do you have a recollection that it was

14 Mr. Constantine who was talking to you about whether or

15 not the allegations that were being made against Mr. Jowdy

16 had any validity; do you recall that?

17 A.   Yes.

18       MR. MISKIEWICZ:  Objection.

19       May we approach?

20       THE COURT:  Yes.

21       (Continued on next page.)

22

23

24

25

1       (The following takes place at sidebar.)

2          MR. MISKIEWICZ:  It calls for hearsay.  And more

3   to the point, there's no effective way that the government

4   can redirect this without running afoul of Bruton, so I'm

5   objecting and I would ask that these questions be

6   stricken.

7          THE COURT:  What's the relevance of this?

8          MR. LARUSSO:  He did accuse Mr. Jowdy of being a

9   thief.  He's lying.  He's tailored his testimony.  That's

10  our position.

11         THE COURT:  What does it have to do with

12  Mr. Constantine?

13         MR. LARUSSO:  We have a tape where he accuses

14  Mr. Jowdy of being a thief in conversation with

15  Mr. Constantine who is expressing concerns about whether

16  the allegations against Mr. Jowdy are true.

17         This gentleman has flipped the testimony from

18  the jury as if he was making these accusations, making it

19  look like my client may have been, when he was the one

20  doing it.

21         This goes to my client's state of mind.  Clearly

22  what was his state of mind in regards to whether it be the

23  Global Settlement Fund or the Hawaiian investment.

24         THE COURT:  What's the issue?

25         MR. MISKIEWICZ:  The issue is that this is where

1234

1     the conspirators are blaming each other.

2              They have polluted the witness with their own

3     version of their own false exculpatories.  Mr. Kenner told

4     Mr. Kaiser certain things at this point.  Mr. Kaiser is

5     still believing in Mr. Kenner.  He changes that view.

6              THE COURT:  You're getting far afield.  This is

7     a very narrow question.  He asked him a question about

8     whether he accused Jowdy of any wrongdoing.  He said no.

9     They have a tape where this is the context.  For that

10    limited --

11             MR. LARUSSO:  So there's no mistake as to what

12    we're doing, I have no problem playing it outside the

13    presence of the jury so you can hear it if you wish.

14    There's no reference to Mr. Kenner.

15             MR. MISKIEWICZ:  That's the issue, to flesh out

16    why he says this.  He's aware that he was recorded.  To

17    flesh this out we would have --

18             THE COURT:  You have to worry about that later.

19    He's entitled to do this based upon the answers to the

20    questions.  So worry about your redirect later, but he's

21    entitled to cross him on what he said to Mr. Constantine

22    and what Mr. Constantine said back.  I assume

23    Mr. Constantine is not going to be making any reference to

24    Mr. Kenner.

25             MR. LARUSSO:  He was taken out of this clip.

1235

1    There's two things, Judge.

2            THE COURT:  You should lead him through this.

3    You just asked an open-ended question.

4            MR. LARUSSO:  It's a very difficult issue and

5    I'm wrestling with how to do it knowing the reluctance I'm

6    going to get from him.  He's going to give me a hard time

7    I can have the tape played to him and he has to admit -- I

8    don't know which way I'm going.  Depending on the answer

9    the Court will have to rule if the foundation was --

10           MR. MISKIEWICZ:  The authenticity of the tape.

11           MR. LARUSSO:  He may gave the authenticity.

12           THE COURT:  Skip this for now and we will deal

13   with it during the lunch break.

14           MR. LARUSSO:  I would like to do it in the

15   presence of the Court.

16           THE COURT:  Okay.  Move on to another area and

17   we will come back to this.

18           MR. LARUSSO:  Okay.  I have another area I can

19   go into.

20           (Continued on next page.)

21

22

23

24

25

1236

1    (The following takes place in open court.)

2    THE COURT:  Members of the jury, I don't want to

3    waste time right now so I asked Mr. LaRusso to go to a

4    different area and I'll address this after you have left

5    for your lunch break.

6    Go ahead, Mr. LaRusso.

7    MR. LARUSSO:  Thank you, your Honor.

8    BY MR. LARUSSO:

9    Q.   One last question on this area before I move on,

10   Mr. Kaiser.

11   Would it be your testimony that the only reason

12   you thought Mr. Jowdy had stolen or misappropriated money

13   was because Mr. Kenner told you?

14   A.   Yes.

15   Q.   Now, I'm going to turn to Eufora if I could for the

16   moment.

17   Now, your testimony is that you first met

18   Mr. Constantine I believe you testified at the end of 2007

19   or early 2008; is that correct?

20   A.   That's correct.

21   Q.   That's the first meeting you had with him, correct?

22   A.   Correct.

23   Q.   At that meeting you had a discussion about his

24   company Eufora; is that right?

25   A.   Yes.

1237

1  Q.    In essence, you were told that it was a company and I

2  believe you said valuable patents, and it was on the verge

3  of unparalleled success, but needed additional funding; is

4  that fair?

5  A.    I don't know if -- yeah, the company was great.

6          I heard about the company prior to the

7  face-to-face meeting with Mr. Constantine.

8  Q.    And you heard of that from Mr. Kenner; is that right?

9  A.    That's right.

10  Q.    In the meeting with Mr. Constantine, he told you more

11  about his company; is that correct?

12  A.    Yes.

13  Q.    What stood out I believe in your testimony was the

14  patents that he had secured and the possibility of

15  licensing that patent and making money; is that fair?

16  A.    He said a lot of things at the meeting.  I don't

17  recall exactly what was said.

18  Q.    But would that be one of the ones?

19  A.    Yeah.

20  Q.    And in addition there was funding needed for the

21  company?

22  A.    Yes.

23  Q.    Now, did you invest any money in Eufora?

24  A.    Yes.

25  Q.    When did you invest the money?

J. Kaiser  -  Cross/LaRusso

1238

1   A.   In '07.

2   Q.   Would it have been after you met Mr. Constantine?

3   A.   No.

4   Q.   How long before you met Mr. Constantine did you

5   invest the money?

6   A.   A few months before.

7   Q.   So it's your testimony that before you met with him,

8   sometime around the end of 2007, you made investments in

9   the same year, but you're not sure when in 2007; is that

10  correct?

11  A.   The investment was made through Mr. Kenner.  He sent

12  my money to Eufora.

13  Q.   I believe you testified Mr. Kenner owed you some

14  money, approximately $275,000, and you were told that that

15  money was being invested in Eufora; is that correct?

16  A.   No.

17       I said he owed me approximately $3 million and

18  that he was investing $275,000.

19  Q.   In Eufora?

20  A.   That's correct.

21  Q.   And when were you told that your $275,000 was going

22  to be invested in Eufora?

23  A.   After it was invested.

24  Q.   So the obvious is you did not wire the money?

25  A.   That's correct.

J. Kaiser  -  Cross/LaRusso

1239

1  Q.   And that as far as you knew, Mr. Kenner was taking

2  the responsibility for wiring that money; is that correct?

3  A.   Yes.

4  Q.   Now, this money that Mr. Kenner was investing was

5  your money; is that correct?

6  A.   Yes.

7  Q.   I believe you testified that the money came from a

8  project that you were involved with Mr. Kenner called the

9  Hermosa project?

10  A.   Hermosa Beach, yes.

11  Q.   So I'm not going to review your testimony regarding

12  it, but you were owed money after that property was sold

13  and this is a portion of the money that you were owed; is

14  that right?

15  A.   Yes.

16  Q.   This money was your money, it did not belong to

17  anyone else; is that correct?

18  A.   That's correct.

19  Q.   Did you make any additional investments in Eufora?

20  A.   It was all through Mr. Kenner.

21  Q.   And when you say it's all through Mr. Kenner --

22  A.   Excuse me.

23  Q.   Normally you have to answer the question but I'll

24  allow you to go ahead.

25  A.   I didn't know if you were jumping to 2009 referencing

1240

1   the funds that came --

2   Q.   I'm sorry, could you repeat that?

3   A.   I didn't know if you were jumping to 2009 referencing

4   the funds that came from my mother and T.R. Hughes.

5   Q.   Good question.  Let's exclude the December 2009

6   transactions that involved your mother.  I believe it's

7   Mr. Hughes, Mr. Rizzi, and I believe there was another

8   investment by Mr. Privitello around the same period of

9   time, okay?

10  A.   Yes.

11  Q.   Excluding that, did you invest any other monies in

12  Eufora?

13  A.   All the money I invested through Eufora went through

14  Mr. Kenner's accounts.  That was my money.

15  Q.   In addition to the $275,000 that we talked about, how

16  much more money do you say was invested in Eufora through

17  Mr. Kenner?

18  A.   I believe approximately another 1.7 million,

19  something like that.

20  Q.   You didn't testify to that on direct, did you?

21       MR. MISKIEWICZ:  Objection.

22       THE COURT:  Overruled.  You can answer.

23  A.   I don't believe that was asked of me.

24  Q.   This 1.7 million that you say Mr. Kenner invested for

25  you came after the $275,000; is that correct?

J. Kaiser  -  Cross/LaRusso

1241

1   A.   Yes.

2   Q.   And is it a fact that when you claim that monies were

3   invested in Eufora, it's because Mr. Kenner told you it

4   was invested in Eufora; is that correct?

5   A.   Yes, that's correct.

6   Q.   You didn't see any documentation showing the monies

7   going to Eufora on your behalf?

8   A.   He wrote down a bunch of wire transfers that he

9   stated were on my behalf.

10  Q.   So there came a point in time when you were provided

11  documentary evidence of what Mr. Kenner said were your

12  investments in Eufora; is that right?

13  A.   Yes.

14       MR. MISKIEWICZ:  Objection.

15       THE COURT:  Overruled.

16  BY MR. LARUSSO:

17  Q.   Is that correct?

18  A.   Yes.

19  Q.   Did you provide that documentary evidence to the

20  government?

21  A.   Yes.

22  Q.   And in essence that documentary evidence are wire

23  transfers; is that right?

24  A.   No.

25  Q.   What was the documentary evidence that you provided?

1242

1   A.   A list that Mr. Kenner wrote out.

2   Q.   I'm sorry?

3   A.   A list.  It was handwritten from Mr. Kenner, a list.

4   Q.   So it was a piece of paper?

5   A.   Of the wires.  That's correct.

6   Q.   And on the piece of paper, if I'm not mistaken, would

7   be a date and an amount and where the money went to?

8   A.   Yes.

9   Q.   As a matter of fact, what you were told about your

10   additional monies was that it was sent to a company called

11   Constantine Management Group; is that correct?

12   A.   I believe it was sent to various accounts that

13   Mr. Kenner said it was directed from Mr. Constantine.

14   Q.   Well, do you remember preparing an affidavit and

15   signing it under penalties of perjury in a case called AZ

16   Eufora Partners, Theodore Hughes and Robert Rizzi vs.

17   Tommy Constantine and others?

18   A.   Yes, sir.  My attorney prepared it.

19   Q.   You reviewed that affidavit, didn't you?

20   A.   Yes.

21   Q.   And you swore to the accuracy of that information?

22   A.   I signed it, yes.

23   Q.   That's not my question.

24   A.   Yes.

25   Q.   At the time you signed it you realized -- withdraw

1243

1    that.

2           Do you remember in that affidavit that we're

3    talking about indicating that you in fact had invested

4    approximately 275,000 by April of 2007 in exchange for a

5    membership interest in Eufora?

6    A.   Yes, I was told through Mr. Kenner that's what

7    happened.

8    Q.   So you didn't in the affidavit say that's what you

9    were told from Mr. Kenner, you represented that I invested

10   in by April of 2007, 275,000?

11   A.   Yes, that's what I believed.

12   Q.   Have you had an opportunity to look at the affidavit

13   before appearing here today?

14   A.   Yes.

15   Q.   How often did you take a look at it?

16   A.   Just once.

17   Q.   Who showed you the affidavit?

18   A.   I have it.

19   Q.   Nobody showed it to you?

20   A.   No.

21   Q.   Did anybody ever discuss before your testimony here

22   the contents of that affidavit?

23   A.   No.

24   Q.   Now it's your testimony that in regards to the

25   275,000, Mr. Kenner was going to do this on your behalf;

J. Kaiser  -  Cross/LaRusso

1244

1    is that correct?

2    A.    Yes.

3    Q.    Did you talk to Mr. Constantine before you made that

4    investment?

5    A.    No.

6    Q.    Can you take a look at C-64 which is before you.

7          Do you recognize that as your affidavit?

8    A.    Yes.

9    Q.    Would you take a look at the second paragraph which

10   goes on to the second page.

11   A.    Yes.

12   Q.    I'll ask you do you remember --

13         MR. MISKIEWICZ:  Objection.

14         THE COURT:  What grounds?

15         MR. MISKIEWICZ:  He didn't deny signing this,

16   there isn't any grounds for impeachment or to read the

17   grounds into evidence.

18         MR. LARUSSO:  There are two grounds for

19   impeachment.

20         THE COURT:  Overruled.

21   BY MR. LARUSSO:

22   Q.    Mr. Kaiser, you testified Mr. Kenner took care of

23   this $275,000 for you; is that correct?

24   A.    Yes.

25   Q.    And that he wired it and you don't know where at this

1245

1    time, correct?

2    A.    Repeat that question.

3    Q.    He took care of the wiring of the money, you did not?

4    A.    Yes.

5    Q.    Do you recall, and am I reading correctly -- withdraw

6    that.

7          Do you recall in that affidavit saying that

8    Constantine described Eufora as a viable company with

9    excellent prospects that were currently in need of cash.

10          That was true, correct?

11    A.    Yes.

12    Q.    And do you remember saying this:

13          Based on his representations I invested

14    approximately 275,000 by April of 2007 in exchange for a

15    membership interest; do you remember that?

16    A.    Yes.

17    Q.    Is that statement that you make true, yes or no?

18          MR. MISKIEWICZ:  Time frame.  Objection.

19          THE COURT:  Overruled.  You can answer it,

20    Mr. Kaiser.

21    A.    At the time when this was written was in 2010.

22    That's how I remembered it.

23    Q.    As you remembered it in 2010, it was based upon

24    Mr. Constantine's representations, not Mr. Kenner's; is

25    that correct?

J. Kaiser  -  Cross/LaRusso

1246

1   A.   Yes.

2   Q.   So --

3   A.   It was both.

4   Q.   So is your testimony at this trial accurate or is the

5   information in the affidavit not correct?

6   A.   Repeat the question.

7   Q.   Mr. Kaiser, you testified to this jury that it was

8   Mr. Kenner that talked to you about the $275,000

9   investment.

10          In this affidavit you say it was based upon the

11   representations of Mr. Constantine.

12          My question is, were you lying in this affidavit

13   as to where the money was sent, who directed you to send

14   it?

15   A.   No.

16          When this was written in 2010, I believed when

17   this was written that it was accurate and those were the

18   dates.

19   Q.   You believed?

20   A.   Yes.

21   Q.   And so then fast forward five years and now all of a

22   sudden you say to yourself I'm going to put it on Kenner.

23   So you say it's Mr. Kenner?

24          MR. MISKIEWICZ:  Objection.

25          THE COURT:  Sustained.

1247

1    BY MR. LARUSSO:

2    Q.    You testified that Mr. Kenner sent the 275,000?

3    A.    Yes.

4    Q.    Well, let's continue the affidavit.

5          After you say based on his representations I

6    invested approximately 275,000 by April of 2007 in

7    exchange for a membership interest.  Constantine directed

8    that my funds be wired to his entity, Constantine

9    Management Group, Ltd, in brackets CMG, so that he can

10   place the funds in the appropriate Eufora account.

11         Was that statement false?  Were you accusing

12   Mr. Constantine falsely in this affidavit?

13   A.    No.

14   Q.    You testified at trial that it was Mr. Kenner and in

15   the affidavit in 2010 you said it was Mr. Constantine.

16         Are you lying in this affidavit, Mr. Kaiser?

17   A.    In 2010 I was -- in '07 from that April I was first

18   notified about Eufora from Mr. Kenner, and then I had a

19   meeting with Mr. Constantine.  So when this was being

20   written out, that's how I recalled it.  So I was obviously

21   off a few months.

22   Q.    Well, Mr. Kaiser, when you say it's how you recall

23   it, you're accusing Mr. Constantine in this affidavit of

24   being the one who directed the funds when you're now

25   saying it was Mr. Kenner.  Withdraw that.

1248

1    Isn't that what you're doing here?

2    A.   No.

3    Q.   By the way, you just told this jury about these

4    additional investments we haven't heard about before.

5         MR. MISKIEWICZ:  Objection.

6         THE COURT:  Sustained.  Just ask the question.

7    BY MR. LARUSSO:

8    Q.   Aside from the $275,000, you said that Mr. Kenner

9    also put in more money for you; is that correct?

10   A.   Yes.

11   Q.   And it totaled well in excess of another million

12   dollars; is that right?

13   A.   Yes.

14   Q.   And all of those investments that were made on your

15   behalf went through Mr. Kenner; is that right?

16   A.   Yes.

17   Q.   Take a look at paragraph 4 of your affidavit.  I'll

18   read it and see if this refreshes your recollection.

19        Fearful that I would lose my initial investment,

20   and yet optimistic after hearing Mr. Constantine's

21   repeated representation about the company's anticipated

22   near term success, I made a series of additional

23   investments in the company each time at his direction

24   through a Constantine controlled entity, CMG.

25        That's wrong.  Mr. Constantine didn't do this.

1249

1    You say Mr. Kenner did it on your behalf; is that correct?

2    A.   No, because after -- in 2008 I'm talking to

3    Mr. Constantine and he's saying he's in dire straights and

4    he needs money in Eufora.

5    Q.   So it's your testimony now --

6              MR. MISKIEWICZ:  He hasn't finished his answer.

7              THE COURT:  Mr. Kaiser, did you finish?

8              THE WITNESS: Yes.

9    Q.   Did you finish the answer?

10             THE COURT:  He said yes.

11             THE WITNESS:  Yes.

12             MR. LARUSSO:  Thank you, your Honor.  I didn't

13   hear that.

14   BY MR. LARUSSO:

15   Q.   You testified -- withdraw that.

16             Is it your testimony that after your initial

17   series of investments, you met Mr. Constantine on a number

18   of occasions; is that correct?

19   A.   Yes.

20   Q.   And that thereafter he directed your investments into

21   his company, is that correct?  Is that what you're saying?

22   A.   Thereafter we had those conversations and he directed

23   Mr. Kenner who he knew those funds to be mine.

24   Q.   Mr. Kaiser, when you testified about 15 minutes ago,

25   you said all these additional investments went through

J. Kaiser  -  Cross/LaRusso

1250

1   Mr. Kenner to Eufora, correct?

2   A.   Correct.

3   Q.   And now you're telling us, well some of them went

4   through Mr. Kenner, but others were directed by

5   Mr. Constantine.

6           Is that what you're saying now?

7   A.   Yes.

8           MR. MISKIEWICZ:  Objection.

9           THE COURT:  Overruled.

10  BY MR. LARUSSO:

11  Q.   Fair to say you changed your testimony again?

12  A.   No, I didn't.

13  Q.   Mr. Kaiser, in those two portions of this affidavit,

14  are you falsely accusing Mr. Constantine?

15  A.   No.

16  Q.   Of things that didn't occur?

17  A.   No.

18  Q.   Mr. Kaiser, I think you alluded to it a few moments

19  ago, do you recall sometime in the middle of 2009 meeting

20  with Mr. Constantine at the Eufora offices?

21  A.   Yes.

22  Q.   Do you recall in that meeting, sometime in the middle

23  of 2009, that you presented proof of your over $2 million

24  investment in Eufora; is that correct?

25  A.   Yes.

1251

1   Q.   And you presented it to him -- by the way, what was

2   the proof?  Do you remember what you showed him?

3   A.   Yes.

4   Q.   What did you show him?

5   A.   It was a document with amounts and dates of the wire

6   transfers.

7   Q.   Handwritten dates, handwritten amounts; is that

8   correct?

9   A.   That's correct.

10   Q.   It was a piece of paper, correct?

11   A.   That's correct.

12   Q.   And that piece of paper allegedly reflected wire

13   transfers; is that correct?

14   A.   Yes.

15   Q.   Into his company, Constantine Management Group?

16   A.   I believe it was into various companies.

17   Q.   In any event, it was your understanding that this

18   proof -- withdraw that.

19       The proof that you were presenting came from

20   Mr. Kenner; is that correct?

21   A.   Yes.

22   Q.   And he went over with you detailed transactions that

23   you wrote down -- did you write them down?  Was the

24   writing on that document your handwriting?

25   A.   Which document are you looking at?

1252

1   Q.   The piece of paper you showed Mr. Constantine as

2   proof of your investments?

3   A.   That's my handwriting.

4   Q.   And that handwriting on that document is based upon

5   information that Mr. Kenner had provided to you before you

6   met with Mr. Constantine; is that correct?

7   A.   Yes, some of it.

8   Q.   Would it be fair to say that at this meeting you took

9   the opportunity to actually go through these investments

10  with Mr. Constantine?

11  A.   Yes.

12  Q.   And you told him that this is what you were told by

13  Mr. Kenner, correct?

14  A.   Yes.

15  Q.   And at that meeting you said to Mr. Constantine, I

16  want 20 percent of Eufora; is that correct?

17  A.   No.

18  Q.   Did you ask for a percentage of interest in Eufora at

19  that time?

20  A.   Through the period leading up I assumed that I had

21  that 20 percent.

22  Q.   And that came from Mr. Kenner?

23  A.   Yes.

24        He had stated that he had conversations with

25  Mr. Constantine, and Mr. Constantine told him that it

1253

1  actually should be worth a lot more than that.

2  Q.   Would it be fair to say that at that meeting you

3  discussed with Mr. Constantine that you had a 20 percent

4  interest based upon what you had been told?

5  A.   Yes.

6  Q.   Now you discussed this meeting with Mr. Constantine

7  in your affidavit; is that correct?

8  A.   Repeat the question.

9  Q.   Take a look at paragraph 8 in your affidavit.  I'm

10  trying to save some questions if I could.

11          Directing your attention to the second line

12  where you say I went to the office with proof of my then

13  2.2 million in wire transfers to Eufora through CMG and

14  other Constantine controlled entities, do you see that?

15  A.   Yes.

16  Q.   That's true, correct?

17  A.   Yes.

18  Q.   What was the proof?

19  A.   The proof was what I told you, dates and amounts of

20  transfers.

21  Q.   Let me ask you, did you, after this meeting, continue

22  to insist on 20 percent interest in Eufora?

23  A.   Myself and Mr. Constantine had a few meetings

24  referencing it.

25  Q.   Would you also have e-mail communications with

1254

1    Mr. Constantine regarding your interest in Eufora?

2    A.    Yes.

3            MR. LARUSSO:  Just one moment, your Honor.

4            Your Honor, this may be a good opportunity.  I

5    may take a few minutes on this one.  I realize something

6    has to be done with the document.  May we take care of the

7    other matter, if I can ask the Court's permission.

8            THE COURT:  Why don't you approach.

9            (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1255

1      (The following takes place at sidebar.)

2      MR. LARUSSO:  This is what I'm going to be

3  showing him, Judge.  This is the original e-mail.  I took

4  out references to Mr. Kenner so we didn't run afoul of the

5  Court's --

6      THE COURT:  That's fine.  Why do you need a

7  break then?  I have something at 1:30.

8      MR. LARUSSO:  I have a few more questions in

9  regards to this one, Judge.

10      MR. OLIVERAS:  He didn't realize the redactions

11  had been done.

12      (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Kaiser  -  Cross/LaRusso

1256

1           (The following takes place in open court.)

2    BY MR. LARUSSO:

3    Q.   Mr. Kaiser, I show you what's been marked for

4    identification as 70-A, C-70-A.

5           Have you had a chance to take a look at that?

6    A.   Yes.

7    Q.   You told us you had e-mail communications with

8    Mr. Constantine?

9    A.   Yes.

10   Q.   Is that one of the e-mail communications you had with

11   Mr. Constantine?

12   A.   Yes.

13   Q.   On January 3rd 2010; is that correct?

14   A.   Yes.

15           MR. LARUSSO:  Your Honor, I offer Defendant's

16   Exhibit C-70-A.

17           MR. MISKIEWICZ:  Objection.  Hearsay.

18           THE COURT:  Any objection?

19           MR. HALEY:  Your Honor, may I see the redacted

20   part?

21           THE COURT:  Yes.

22           (Pause in proceedings.)

23           MR. MISKIEWICZ:  May we approach, your Honor?

24           THE COURT:  Yes.

25           (Continued on next page.)

J. Kaiser  -  Cross/LaRusso

1257

1    (The following takes place at sidebar.)

2    MR. MISKIEWICZ:  I want to supplement that this

3    statement is made well after the money has been stolen.

4    It's a false exculpatory and it's being offered really to

5    prove the truth of the matter asserted and there isn't

6    anything here from which a jury could find what

7    representations were made prior to the fact that the money

8    was stolen.  This is pure hearsay.

9    THE COURT:  Do you have any objection?

10    MR. HALEY:  May I have a moment, Judge?

11    (Pause in proceedings.)

12    MR. HALEY:  Yes, your Honor, we do object.

13    THE COURT:  Let's take the lunch break.

14    MR. LARUSSO:  I'm sorry, Judge.

15    (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

J. Kaiser - Cross/La Russo

1258

1          (Whereupon, the following occurred in open

2     court.)

3          THE COURT:  We'll take the lunch break now and

4     reconvene at 1:30.  Don't discuss the case.  Have a good

5     lunch.

6          (Whereupon, the jury retired from the

7     courtroom.)

8          THE COURT:  If everyone would be seated.  Before

9     we let Mr. Kaiser go to lunch, though, I just want to --

10    what you do you want to do?  Play a portion to the tape to

11    him?

12         MR. LA RUSSO:  If the Court has the time now, I

13    have it.  It's being placed in the computer now.  I'll

14    hand the Court and the government the portion we are

15    playing.  I thought we had copies.  May I, your Honor?  If

16    I may, your Honor?

17         THE COURT:  Yes.

18         (Tape played.)

19         (Tape stopped.)

20         THE COURT:  Okay.  Why don't you step outside

21    for moment, Mr. Kaiser.  Don't go to lunch.  I want to

22    question Mr. La Russo about what he wants to question you

23    about the statement.  All right.

24         (Witness steps out of courtroom.)

25         THE COURT:  Mr. La Russo, what do you say, you

1259

1  want it impeach him on whether or not he called Ken Jowdy

2  a thief?

3         MR. LA RUSSO:  That and the continued

4  representations supporting that, Judge.  We've made it

5  pretty clear in the testimony that that's not what he said

6  and he's leaving the jurors that he was not taking an

7  active role in accusing Mr. Jowdy.  This certainly

8  contradicts his testimony.  And we've played only that

9  portion dealing with his allegations against Mr. Jowdy.

10        THE COURT:  Okay.  So when the jury comes back,

11 you want to ask him have you reviewed a recording, does

12 that refresh your recollection that you called Ken Jowdy a

13 thief?

14        MR. LA RUSSO:  Hopefully we can get him to admit

15 -- I don't know what know he's going to admit because I

16 haven't spoken in him.  If he says this is fair and

17 accurate representation, recording, of the conversation

18 that I had, I'm going to introduce the part.

19        THE COURT:  Why should all the conversation with

20 Mr. Constantine comes in?

21        MR. LA RUSSO:  Because it adds background to

22 Mr. Kaiser where it validates the fact that Mr. Kaiser is

23 a thief when he answers yes, and the validation regarding

24 Mr. Jowdy when he talks about I've known him for all this

25 period of time and then he goes on and he's a manipulator.

1260

1   It's part of, of his denial of the fact that Mr. Jowdy was

2   a thief and Mr. Jowdy had done nothing wrong.

3          He's the one that's make the accusation, not my

4   client.  That's the purpose of this, to impeach him.

5          THE COURT:  You're trying to use extrinsic

6   evidence to impeach him when -- first of all, the rules

7   really don't permit that.  But if he acknowledges that he

8   said this on the tape, I don't know why the tape should be

9   introduced itself?  Why if it refreshes his recollection

10  that he called him a thief, why would you need the --

11         MR. LA RUSSO:  If he says I said that in

12  response to what is on the tape, I don't need to introduce

13  the tape -- you're right but I've got to get him to make

14  the admission.  I don't know.

15         THE COURT:  I'm going to bring him back in.

16         MR. MISKIEWICZ:  Your Honor, before he comes

17  back in, we don't have a copy of the entire tape, and it

18  seems to be mid conversation, and we don't know whether

19  this is sort of -- this is the entire context of this area

20  of the tape regarding the potential impeachment or if

21  there's more to it, and I'd like to have the entire

22  recording.

23         MR. LA RUSSO:  We have the entire recording,

24  I'll give it to the government and they can look at it

25  during the recess.  Clearly what's becoming a critical

J. Kaiser - Cross/La Russo

1261

1   issue is whether or not my client intended to steal money.

2   We're not denying many of the transactions that the

3   government is going to place before the jury as to money

4   being paid to the lawyer, or his racing activities, but

5   what we're going to be arguing is that there was no

6   intent.  Part of that deal was the fact that he was

7   questioning whether or not Jowdy had anything to do with

8   this.  The entire suit that was being filed and funded by

9   the Global Settlement Fund.  So if my client had the

10  intention to steal money from the Global Settlement Fund

11  he wouldn't be making these representations that elicited

12  the responses from Mr. Kaiser.  So it bears directly on

13  that as well, your Honor.

14           THE COURT:  I guess I don't follow.  What is

15  whether or not your client diverted money, what does that

16  have do with these statements?  How do these statements

17  bear on whether or not your client diverted money?  I

18  don't understand the relevance of what he thinks.  What

19  your client thinks, actually not what your client thinks,

20  what Mr. Kaiser thinks about Mr. Jowdy, how does that bear

21  on your client's state of mind as to whether or not your

22  client diverted money for his own purposes.  I don't

23  understand the connection?

24           MR. LA RUSSO:  Your Honor I kind of anticipated

25  that and my client and I tried to put it in writing to so

1262

1    that we can understand it.  This is what it is, Judge, one

2    of the allegations that the government has been clear

3    about from the beginning is that Mr. Kenner and

4    Mr. Constantine created the Global Settlement Fund as a

5    mechanism to defraud the players by bringing false

6    allegations against Mr. Jowdy to induce the players to

7    participate in fraud.  That's that they're argue, that's

8    what they're presenting to the jury.  It's clear.  This

9    recording shows that Mr. Constantine is questioning the

10   actions that were taken against Mr. Jowdy by him and

11   others involved in the Global Settlement Fund, including

12   Mr. Kenner and Mr. Kaiser, both of them.  And it clearly

13   shows that Mr. Constantine was acting in good faith when

14   he participated in the attack on Mr. Jowdy with the Global

15   Settlement Fund and based upon the information that he was

16   provided at the time.  It bears directly on what he was

17   thinking in regards to what the government claims was an

18   outright theft.  How can Mr. Constantine be a

19   co-conspirator as the government alleged during the Global

20   Settlement Fund, when he is now questioning the validity

21   of the information provided to him during that time.

22          If he was a co-conspirator as the government

23   alleged he would obviously know that the allegations were

24   false and there would be nothing for him to question

25   later.  Ironically, it also demonstrates that Mr. Kaiser

1  was validating the merits of the Global Settlement Fund as

2  it relates to the allegations against Mr. Jowdy.  Judge, I

3  appreciate the Court's giving me the opportunity to read

4  it.  That's what we worked on and tried to explain it as

5  best as we possibly can.  And I think it tells it quite

6  accurately why it shouldn't be admitted.

7          MR. MISKIEWICZ:  It doesn't really matter

8  whether Jowdy was a thief or involved in another matter in

9  Mexico.  What matters is the representations that these

10  two defendants made to the victims here.  So this is

11  entirely irrelevant.

12          THE COURT:  I'm a little bit surprised that the

13  centerpiece, your defense arguments, if that's what the

14  allegations are.  I don't understand that's what the

15  allegation is.  This case is about representations made to

16  the investors about what their money was going to be used

17  for and whether or not it was used for and whether or not

18  it was used for other purposes that were unauthorized.  I

19  don't understand how the merits of the allegation against

20  Mr. Jowdy or your client's belief as to the merits of the

21  allegations against of Mr. Jowdy in 2010 relate to whether

22  or not he took money that was supposed to be used in the

23  lawsuit against Mr. Jowdy to purchase things related to

24  racing cars.  I don't understand that -- why -- what he

25  believes about the merits of the allegations against

J. Kaiser - Cross/La Russo

1264

1  Mr. Jowdy and the merits of the lawsuit has nothing to do

2  with whether or not he used money for things he wasn't

3  supposed to use it for, it had nothing to do with it.

4         MR. LA RUSSO:  As I mentioned the government in

5  one of the government's letter to the court and us,

6  actually indicated, this is in 11:  While evidence at

7  trial will show that some of the funds raised by Kenner

8  were in fact used by Jowdy for the real estate projects,

9  Kenner and Constantine also fraudulently, for millions of

10  funds raised to themselves, the $2 million diversion

11  summarized above is one example of the diversions that

12  only personally benefited the defendant.  Other diversions

13  amounted to favors to persons the defendant chose to share

14  in the proceeds of their crimes.  For instance, Kenner

15  arranged for approximately $500,000 raised from three of

16  the victims to be used to pay an American Express card in

17  the name of his then-wife

18         And lastly, Judge:  Despite this, Kenner and

19  Constantine have sought, long before the current

20  indictment, to shift blame for the losses sustained by the

21  victims to their former associate, Jowdy.  What is more,

22  as alleged in the indictment, the defendants used Jowdy to

23  further victimize some of the same investors they had

24  similarly defrauded.

25         So they had tied it directly into what we're

1  hoping to present by way of this evidence that it negates

2  that position that they've taken, Judge.  And yes, it is

3  the cornerstone of our defense, and my client did not

4  intend to steal it and he's questioning Mr. Jowdy more

5  proper and accurate to begin with.

6         THE COURT:  Your position is you want to be able

7  to show the jury that Mr. Constantine didn't think

8  Mr. Jowdy did anything wrong.  That's what you're trying

9  do?

10        MR. LA RUSSO:  No, judge.  The major

11 component --

12        THE COURT:  I don't understand.

13        MR. LA RUSSO:  What we're trying to say, Judge,

14 is --

15        THE COURT:  You're saying the government's

16 position is that Mr. Constantine and Kenner are making

17 false allegations pointing the finger at Mr. Jowdy for

18 their own benefit as relates to the victims.  Are you

19 trying to prove that that -- I don't understand what --

20 why are you trying to undermine that position of the

21 government, that he wasn't claiming that Mr. Jowdy had

22 done something wrong.

23        MR. LA RUSSO:  No.  That's what this shows,

24 Judge.  The government is claiming that the moneys were

25 taken from the Global Settlement Fund because they were

J. Kaiser - Cross/La Russo

1266

1  shifting blame for the monies losses to Mr. Jowdy.  What

2  Mr. Constantine is doing in his conversations with

3  Mr. Kaiser is questioning the government's theory and

4  Mr. Kaiser is the one that's taking the more bold position

5  saying he's a thief, he's a thief.  And it goes directly

6  to what our defense is, what his intent was, whether or

7  not there was this plan and conspiracy to steal the money.

8           THE COURT:  Okay.  Let me bring Mr. Kaiser in so

9  that he can go to lunch.  I just want to ask him about the

10  tape.

11           (Witness enters the courtroom.)

12           THE COURT:  Mr. Kaiser, I just want to ask you

13  about the tape.  Having heard that tape, is that your

14  voice on that tape?

15           THE WITNESS:  It doesn't sound like it is.

16           THE COURT:  It doesn't sound your voice?

17           THE WITNESS:  No.  The tape sounds like it's cut

18  off.

19           THE COURT:  Okay.  So if Mr. La Russo had asked

20  you does that refresh your recollection whether or not you

21  called Ken Jowdy a thief or not, what is your answer to

22  that?  Does that refresh your recollection or not?

23           THE WITNESS:  It doesn't, but if it is actually

24  my voice.

25           THE COURT:  Okay.  Do you recognize that as your

J. Kaiser - Cross/La Russo

1267

1    voice or you don't know?

2             THE WITNESS:  I'm unsure.  Like I said, it

3    seemed a little cut up to me.

4             THE COURT:  Okay.  Thank you.

5             MR. LA RUSSO:  Your Honor, I apologize, if it's

6    possible with your permission I'd give the entire tape to

7    the government and let Mr. Kaiser listen to it, because I

8    may have him to listen to the whole tape because it would

9    probably -- and he would admit that it would be his, after

10   listening to all of it.

11            THE COURT:  If -- you don't have to listen to

12   the whole tape.  How long is the whole tape?

13            MR. LA RUSSO:  About 15 minutes.

14            THE COURT:  They have the whole tape.  Maybe if

15   you hear the context of the conversation it would help.

16            THE WITNESS:  Yes.

17            THE COURT:  If the government would give that to

18   Mr. Kaiser during the break.  Thank you.  You can take the

19   lunch break now.

20            (Witness leaves the courtroom.)

21            THE COURT:  Okay.  Everyone be seated.

22   Mr. Haley tell me what your objection is to the e-mail?

23            MR. HALEY:  Your Honor, probably one of the few

24   occasions at this trial I'm going to agree with the

25   government.  I believe that it's hearsay, and inadmissible

J. Kaiser - Cross/La Russo

1268

 1  absent let's say foundation laid by I guess

 2  Mr. Constantine himself subject to cross-examination.

 3              MR. LA RUSSO:  Judge, I apologize.  I believe

 4  Mr. Kaiser identified that as an e-mail exchange between

 5  himself and Mr. Constantine.  He's identified it.

 6              MR. HALEY:  I understand that.

 7              THE COURT:  I know, it's still hearsay.  The

 8  e-mail is hearsay, right.

 9              MR. LA RUSSO:  It has to have relevance, I

10  understand that.

11              THE COURT:  I didn't say relevancy, it has to

12  overcome the hearsay objection, too, right?

13              MR. LA RUSSO:  Yes.

14              THE COURT:  Can I see the unredacted version,

15  too?  The government can remind me of the dates of the

16  alleged diversions of money.  When are the alleged

17  diversions of the money with respect to --

18              MS. KOMATIREDDY:  With respect to the GSF,

19  your Honor, May of 2009 to March of 2010.

20              THE COURT:  No.  This is, this e-mails about

21  Eufora, right.

22              MS. KOMATIREDDY:  Yes, your Honor, with respect

23  to Eufora there is a diversion February 2008 to July of

24  2008, is one Eufora fraud.  Then another one that goes the

25  second stage of the fraud is December 2008 to May, June

J. Kaiser - Cross/La Russo

1269

1   2009, and lastly with respect to Mr. Privitello only who

2   is John Doe 11, there is another instance of fraud in

3   December of 2009.

4          MR. LA RUSSO:  Your Honor, I think the

5   indictment actually says to 2013.  I don't have the

6   indictment with me.

7          MS. KOMATIREDDY:  With respect to the diversion,

8   those are dates of the diversion.  I also want to note

9   with respect to the Eufora frauds Mr. Kaiser is not an

10  alleged victim of the Eufora fraud.

11         MR. LA RUSSO:  Your Honor, I don't think they

12  can take it in a vacuum.  Their conspiracy expands to

13  2013.  I'm going to represent to the court we are going to

14  argue there are separate frauds later on at trial and

15  they're just trying to piecemeal it at this point.

16          This aspect of the case where they claim

17  Mr. Constantine and Kenner were trying to shift the blame,

18  this conversation comes right within that entire period of

19  the conspiracy.  I don't know how you can claim by one

20  transaction it doesn't relate to the entire indictment.  I

21  think it comes within the scope of the charged period,

22  Judge.

23         THE COURT:  Let me see the unredacted version.

24         MR. HALEY:  Judge, I have it.

25         MR. LA RUSSO:  Judge, do you have the

J. Kaiser - Cross/La Russo

1270

1    unredacted?

2              MR. HALEY:  He has the redacted.

3              THE COURT:  I'll look at that time during the

4    lunch break.  Okay.  I'll see you at 1:30.

5              MR. LA RUSSO:  I can break and start him after

6    lunch.  I know defense attorneys don't like doing it but I

7    have no problems with it, none.

8              MS. KOMATIREDDY:  That's fine.  Your Honor, we

9    can do that.  May we have a ruling?

10             THE COURT:  Yes.  The only question I had on

11   page 17.

12             MR. HALEY:  I apologize, what are we referring

13   to?

14             THE COURT:  This is the deposition of

15   Mr. Constantine, portions that the government wishes to

16   offer through the witness.

17             MR. HALEY:  Thank you.

18             THE COURT:  I don't think government described

19   for me what the relevance of that that is.

20             MS. KOMATIREDDY:  Sure, your Honor.  Steve

21   Silver is an attorney with Silver Law.  Silver Law

22   received approximately $110,000 from the GSF in 2009

23   starting two weeks after his deposition.

24             THE COURT:  And then you made reference to

25   something on page 55 being about Mr. Ricardo's money but I

1271

1    think that was actually on page 61.

2         MS. KOMATIREDDY:  I pool apologize, your Honor.

3         THE COURT:  So I understand the relevance of

4    Mr. Ricardo's -- what's the relevance of 55, page 55?  The

5    sponsorship agreements, what's the relevance of those?

6         MS. KOMATIREDDY:  Your Honor, on page 55 it is

7    offered to show that Mr. Constantine's race car

8    business -- he calls himself a professional race car

9    driver.  However, he actually does not make any money or

10   receive any cash from his sponsorship deals.  It goes to

11   show motive for why it is during the Eufora fraud that he

12   -- his motive for taking the investors money and diverting

13   it for his personal business.  He does not have the cash

14   generating business for either Eufora or his race car

15   drivers.

16        THE COURT:  Mr. La Russo, I'll give you a chance

17   to be heard on this.  I heard you yesterday, but now I've

18   gone back and reviewed the transcript last night, and I

19   reviewed the government's letter where they described the

20   relevance and all these portions relate to several things,

21   one is they're alleging obviously money was diverted to

22   some of the individuals from the fund.  That's certainly

23   relevant for the government to be able to show that your

24   client had a connection to each these various entities or

25   individuals they're saying that the diversions occurred

J. Kaiser - Cross/La Russo

1272

1   to, and certainly to establish motive, they should be able

2   to establish that he lacked the funds with respect to all

3   these debts that they're alleging that he paid with the

4   monies.  It's clearly relevant.  It's not just relevant,

5   it's central to the government's ability to prove the

6   case.

7           So I'm kind of at a loss for how these would not

8   be relevant to show why he diverted the money and in fact,

9   did divert the money because he has a relationship with

10  all of these entities that they're claiming his money went

11  to.

12          MR. LA RUSSO:  Judge, I agree with the Court in

13  the sense that each one of these particular subject

14  matters relates to a particular wire transfer or check

15  coming out of the global settlement, and our burden to

16  show that it was not related to the monies put in by the

17  hockey players who would have a difficult time regarding

18  it.

19          So what concerns me, Judge, is the overall

20  impression that it created in regards to the jury that I

21  think is prejudicial to my client.  The government doesn't

22  need this evidence to establish the improprieties.  They

23  have the monies going out, they have witnesses testifying

24  to the fact that they were unauthorized and it's still our

25  burden, all this does is paint a bad picture of my client.

1273

1    THE COURT:  Bad picture in what way?  When it

2  paints a bad picture it just says that he's desperate for

3  money.  Is that what you're referring to?

4    MR. LA RUSSO:  Judge, if they can address each

5  one of these particular subject matters?  I haven't had a

6  chance to look at it in that depth.  Then obviously I

7  would not have as strong an argument with regards to its

8  admissibility.  I'm just hoping that each one of those do,

9  I just don't know.

10    THE COURT:  The government did a good job in the

11  letter, showing how each one related to a particular

12  aspect of their case in terms of the diversion.  So I have

13  reviewed the government's letter, and I have reviewed the

14  transcript, I believe it is most definitely relevant on

15  the issues of motive, in terms of Mr. Constantine needing

16  the money to pay for other debt, having financial issues

17  during this time.  It establishes the connection between

18  him and various individuals and entities that the money

19  went to, which is a critical part of proving that he was

20  the one responsible for the diversion, and there are

21  certain snippets that relate to the description of Eufora

22  which obviously his intent with respect to Eufora or

23  whatever representation was made regarding that to the

24  investors versus what he says in the transcript again is

25  relevant whether or not he believed that it was a good

1274

1   investment and it was taking off or about to explode or
2   whether he can believe that.
3          So it clearly has relevance to the central issue
4   of the case.
5          I've analyzed it under 403 and it has high
6   probative value for reasons I've indicated, and it is not
7   substantially outweighed by any prejudice to
8   Mr. Constantine.  It doesn't suggest criminal activity
9   with respect in and of itself or individuals or racing so
10  there's no inflammatory material in there.
11         With respect to any other alleged bad acts, just
12  basically it tries to demonstrate that he had no money
13  available to pay various things that he needed to the need
14  to pay, and I don't believe that's unfair prejudice to the
15  defendant, who is accused of stealing the money.
16         So I'm going to allow the government to utilize
17  those portions.  If there are other portions that you want
18  in for completeness obviously I'll allow to you do that.
19         MR. LA RUSSO:  I'll look at that again.
20         THE COURT:  Okay.  I'll see you at 1:30.
21         MR. LA RUSSO:  Thank you, your Honor.
22         (Whereupon, a luncheon recess was taken at this
23  point.)
24         (Continued on next page.)
25

1275

1          A-F-T-E-R-N-O-O-N   S-E-S-S-I-O-N

2          (Time noted:  1:45 p.m.)

3          THE CLERK:  All rise.

4          THE COURT:  Everyone be seated.

5          How long is the next witness going to be?

6          MS. KOMATIREDDY:  Approximately 20 minutes, Your

7     Honor.

8          THE COURT:  Why don't we bring in Mr. Kaiser now,

9     just so we don't have to take another break then.

10          Okay, not here.

11          Let's bring in the jury.

12          MR. MISKIEWICZ:  Your Honor, will you advise the

13     jury that we are taking a witness out of turn.

14          THE COURT:  Yes.

15          THE CLERK:  All rise.

16          (Whereupon the jury enters the courtroom at 1:50

17     p.m.)

18          THE COURT:  Please be seated.

19          Members of the jury, we are going to take a witness

20     out of order who is an out of town witness and not available

21     next week.  I think he will be relatively brief.  I want to

22     make sure we get him in today.  We will call him in and then

23     we will reconvene with Mr. Kaiser's cross with Mr. LaRusso.

24     The order of witnesses is not important.  So we'll proceed in

25     that fashion.

1          Who is the next witness?

2          MS. KOMATIREDDY:  The government calls Patrick

3    Gonya.

4          THE CLERK:  Please raise your right hand.

5          (Witness sworn.)

6          THE WITNESS:  I do.

7          P A T R I C K    G O N Y A

8          called as a witness, having been first

9          duly sworn, was examined and testified

10         as follows:

11         THE CLERK:  State your name.

12         THE WITNESS:  Patrick Gonya, G-O-N-Y-A.

13         THE COURT:  Be seated, Mr. Gonya.  Keep your voice

14   up.

15   DIRECT EXAMINATION

16   BY MS. KOMATIREDDY:

17   Q    Good afternoon.

18   A    Good afternoon.

19   Q    What do you do for a living?

20   A    I'm an attorney.

21   Q    Where do you work?

22   A    I practice in Miami, Florida.

23   Q    What's the name of your firm?

24   A    Carey Rodriguez O'Keefe Milian & Gonya.

25   Q    Is that previously named Carey Rodriguez Greenberg &

1    Hall?

2    A    It was.

3    Q    During the year 2009 that was the name of the firm?

4    A    Yes.

5    Q    Did you work there at the time?

6    A    Yes.

7    Q    Where was the firm's office located?

8    A    1395 Brickell Avenue in Miami, Florida.

9    Q    How long have you worked as a part of this firm?

10   A    I've been a partner there since 2009.

11   Q    What is the nature of your practice?

12   A    Civil or commercial litigation.

13   Q    Was there a time you represented an individual named

14   Tommy Constantine?

15   A    Yes.

16   Q    Do you see that person in the courtroom today?

17   A    Yes.

18   Q    Please point him out, and identify him by an article of

19   clothing?

20   A    Mr. Constantine is right there (indicating).

21        MR. LaRUSSO:  We agree to the identification, Your

22   Honor.

23        THE COURT:  Okay.

24   Q    Approximately what time frame did you represent Mr.

25   Constantine?

GONYA-DIRECT-KOMATIREDDY                1278

1   A    It would have been March of 2009 until, I believe, June

2   of 2010.

3   Q    How did you come to represent him?

4   A    He was referred to me by a friend.

5   Q    I'll show you what is marked as Government Exhibit 3397.

6   Do you recognize this?

7   A    Yes.

8   Q    What is that?

9   A    This is a copy of my firm's engagement letter with

10  Mr. Constantine and a company called Tommy Constantine Racing

11  LLC.

12  Q    What is its date?

13  A    The date of the letter is February 20, 2009.

14  Q    Just turning to the last page, is this document signed by

15  Mr. Constantine?

16  A    It is signed.  And I believe that is his signature, yes.

17  Q    Did you receive this document from Mr. Constantine?

18  A    I did.

19  Q    In what form?

20  A    By e-mail.

21  Q    What's the date of the signature?

22  A    March 6, 2009.

23       MS. KOMATIREDDY:  The government moves Government

24  Exhibit 3397 into evidence.

25       MR. LaRUSSO:  No objection, Your Honor.

1279

1      MR. HALEY:  No objection.

2      THE COURT:  3397 is admitted.

3      (So marked as Government Exhibit 3397 in evidence.)

4      MS. KOMATIREDDY:  Displaying on the screen for the

5   jury.

6   Q    Can you describe for us the purpose of this document?

7   A    This document reflects the terms of my firm's engagement

8   to represent Tommy Constantine Racing LLC and Tommy

9   Constantine personally in a commercial litigation matter.

10  Q    When did the representation begin?

11  A    I would have had discussions with Mr. Constantine

12  sometime prior to February 20, 2009.  But the actual

13  representation would have commenced when he signed the

14  engagement letter on March 6, 2009.

15  Q    Now, based on public information, can you describe the

16  nature of the dispute that was the center of the

17  representation?

18  A    This was a lawsuit brought by a company called Pruitt --

19     MR. LaRUSSO:  Your Honor, may I have a side-bar on

20  this, please?

21     MS. KOMATIREDDY:  I can rephrase.

22     MR. LaRUSSO:  Just a minute.

23     (Whereupon a side-bar conference was conducted.)

24     (Matter continued on the next page.)

25

1280

1       (Side-bar conference.)

2       MR. LaRUSSO:  That was an allegation made before

3  this case.  I want to make sure that that doesn't come out at

4  all during this.  And if you want to lead to avoid it, I'm

5  fine with that.

6       MS. KOMATIREDDY:  I instructed the witness not to

7  use the word "fraud."

8       THE COURT:  Why don't you lead him enthusiastically.

9       MS. KOMATIREDDY:  Sure.

10      (Whereupon the side-bar conference was concluded.)

11      (Matter continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GONYA-DIRECT-KOMATIREDDY                    1281

1           (Matter continued in Open Court.)

2   CONTINUED DIRECT EXAMINATION

3   BY MS. KOMATIREDDY:

4   Q    Mr. Gonya, the dispute at the center of this lawsuit

5   involve Mr. Constantine's racing team.  Is that fair?

6   A    That is correct.

7   Q    And Mr. Constantine personally?

8   A    Yes.

9   Q    The other side of the lawsuit, Pruitt Enterprises,

10  represented another race entity.  Is that fair?

11  A    I wouldn't describe it quite like that.  It was a

12  sponsorship agreement.

13  Q    Sponsorship agreement?

14  A    Yes.

15  Q    So the dispute involved a sponsorship agreement involving

16  the racing cars?

17  A    Yes.

18  Q    Let's just walk through the document.  Turning your

19  attention to the first paragraph.  Just to be clear, who are

20  you representing in connection with this lawsuit?

21  A    Tommy Constantine Racing LLC and Tommy Constantine

22  personally.

23  Q    The next paragraph, please read that.

24  A    Yes.

25  Q    Now, turning to the third paragraph, could you read the

1  first line for us?

2  A    "Our only clients in this matter are Tommy Constantine

3  Racing LLC and you personally."

4  Q    Read the rest of the paragraph?

5  A    "We are not representing any of Tommy Constantine Racing

6  LLC's current or future affiliates in this matter, nor are we

7  representing any other individual partners, members, managers,

8  shareholders, principals, officers, or directors of Tommy

9  Constantine Racing LLC in this matter."

10        Do you want me to continue?

11  Q    Please do.

12  A    "As you know, we are not precluded from representing any

13  of the other individual partners, shareholders, principals,

14  officers, directors, current affiliates or future affiliates

15  of Tommy Constantine Racing LLC assuming there is no conflict

16  of interest, but any such representation requires a separate

17  engagement letter."

18  Q    Did Mr. Constantine every execute a separate engagement

19  agreement with you or your firm?

20  A    No.

21  Q    So it's fair to say that any legal services you were

22  providing to Mr. Constantine pertained to this engagement

23  involving the dispute with Pruitt Enterprises?

24  A    That is correct.

25  Q    Did you ever represent any professional hockey players in

GONYA-DIRECT-KOMATIREDDY                               1283

1    connection with this matter or Mr. Constantine?

2    A     No.

3    Q     As part of your representation, did you do any legal work

4    pertaining to real estate development projects in Hawaii?

5    A     No.

6    Q     As part of your representation, did you do any legal work

7    on behalf of the company Eufora?

8    A     No.

9    Q     As part of your representation, did you do any legal work

10   to help sue or to sue an individual named Ken Jowdy?

11   A     No.

12   Q     As part of your representation, did you do any legal work

13   pertaining to the real estate development project in Mexico?

14   A     No.

15   Q     Were you paid for the work you did do?

16   A     Most of the work we did, yes.

17   Q     I'm going to hand you what's been marked Government

18   Exhibit 3321.  Take a look at that.

19             (Handing.)

20   Q     Do you recognize that?

21   A     I do.

22   Q     What is it?

23   A     This is a copy of a trust ledger from my firm.

24   Q     What kind of information is contained on that?

25   A     It contains information with respect to the Tommy

1284

1  Constantine Racing LLC matter, showing the dates that we

2  received payments.

3  Q     What is the information that this record created?

4  A     Well, we use a -- we use a software, accounting software.

5  So the information is inputted contemporaneous with the

6  transactions that are identified on the document.

7  Q     Is that information that's recorded in the ordinary

8  course of business?

9  A     Yes.

10  Q     Is it kept in the ordinary course of business?

11  A     Yes.

12           MS. KOMATIREDDY:  The government moves 3321 into

13  evidence.

14           MR. LaRUSSO:  I apologize.  May we have a brief

15  side-bar.

16           (Whereupon a side-bar conference was conducted.)

17           (Matter continued on the next page.)

18

19

20

21

22

23

24

25

1285

1          (Side-bar conference.)

2          MR. LaRUSSO:  I will object if some of these

3   payments had nothing to do with monies coming from the Global

4   Settlement Fund.  I think these payments, many of them don't

5   come from it.  Possibly only one.

6          THE COURT:  What's the relevance of the payments?

7          MS. KOMATIREDDY:  Those three payments, they come

8   from Ron Richards' account and they come from Eufora.  If this

9   helps resolve the issues, I can create a redacted version.

10         THE COURT:  Clear it from the screen.  Have him read

11  it from the redacted version.

12         MR. LaRUSSO:  I should have done it before.  I

13  apologize.  I didn't even think about it until now.  I

14  apologize.

15         MS. KOMATIREDDY:  Yes, Your Honor.

16         (Whereupon the side-bar conference was concluded.)

17         (Matter continued on the next page.)

18

19

20

21

22

23

24

25

GONYA-DIRECT-KOMATIREDDY                    1286

1           (Matter continued in Open Court.)

2           THE COURT:  Mr. Haley, any objection?

3           MR. HALEY:  No objection.

4           THE COURT:  3321 is admitted, although it's going to

5    be redacted.

6           (So marked as Government Exhibit 3321 in evidence.)

7           THE COURT:  I'll explain what redaction is.

8    Redaction is when a certain portion of the document is blocked

9    out because we made a determination that the other portion are

10   not relevant to the case.  The jury is not allowed to

11   speculate about whatever is blocked out.  It has nothing to do

12   with the case.  So I've asked the prosecutor, rather than put

13   it up on the screen with everything blocked out, to just have

14   the witness read the entries that are relevant for purposes of

15   the case.

16          MS. KOMATIREDDY:  Thank you, Your Honor.

17   CONTINUED DIRECT EXAMINATION

18   BY MS. KOMATIREDDY:

19   Q    I'm going to have you read from the document.

20   A    Okay.

21   Q    Starting with May 12th, 2009, how much did your firm

22   receive from Mr. Constantine on that date?

23   A    The letter reflects $8,000.

24   Q    Do you know where that payment came from?

25   A    I don't remember off the top of my head.

GONYA-DIRECT-KOMATIREDDY                    1287

1  Q    Is there anything that would refresh your recollection?

2  A    Yeah, bank accounts.

3  Q    I'm handing you what's been marked as 3322, 3323, and

4  3324.  Looking at May 2009, does that refresh your

5  recollection?

6  A    May 12th, 2009.

7  Q    Correct.  May 12th, 2009, where did the payment made on

8  Mr. Constantine's behalf come from?

9  A    From the Law Office of Ronald Richards.

10 Q    Looking back at the ledger, 3321, how much did your firm

11 receive on Mr. Constantine's behalf on October 13th, 2009?

12 A    $15,000.

13 Q    Where did that payment come from?

14 A    I don't remember off the top of my head.

15 Q    I'm going to direct your attention to 3223.

16 A    Law Offices of Ronald Richards.

17 Q    Back to the ledger.  On October 28th, 2009, how much did

18 your firm receive on behalf of Mr. Constantine?

19 A    $3,677.40.

20 Q    If you look back at 3323, where did that payment come

21 from?

22 A    The Law Office of Ronald Richards.

23 Q    Lastly, looking at December of 2009 on your ledger, how

24 much did your firm receive on Mr. Constantine's behalf on

25 December 12, 2009?

GONYA-DIRECT-KOMATIREDDY                                    1288

1   A    $13,377.57.

2   Q    Directing your attention to what is identified as 3324-A,

3   where did that payment come from?

4   A    From Alliance Bank on behalf of Eufora LLC.

5   Q    Lastly, back to the ledger, how much did your firm

6   receive on Mr. Constantine's behalf on December 15th, 2009?

7   A    $15,000.

8   Q    Where did that payment come from?

9   A    From Alliance --

10           THE COURT:  Just so the record is clear, the witness

11  is now referring to the document.  Yes?

12           THE WITNESS:  Yes, Your Honor.  3324-A.

13  A    From Alliance Bank on behalf of Eufora LLC.

14  Q    What was the purpose of each of the payments that we just

15  reviewed?

16  A    To pay for my firm's invoices.

17  Q    Were you present -- during your engagement, your

18  representation of Mr. Constantine, were you present for any

19  depositions?

20  A    Yes.

21           MS. KOMATIREDDY:  I'm going to hand you what has

22  been marked as Government's Exhibit 8021-R.

23           (Handing.)

24  Q    Did you have a chance to review that before you came to

25  court today?

1    A    Yes.

2    Q    What is that document?

3    A    This is a portion of some of the certified transcript of

4    Mr. Constantine.

5    Q    What date is that deposition heard on?

6    A    April 23rd, 2009.

7    Q    Were you present for the deposition?

8    A    Yes.

9         MS. KOMATIREDDY:  Government moves 8021-R into

10   evidence.  We have 8021-C, the full certified copy available

11   for the Court.

12        THE COURT:  Other than what we already discussed, is

13   there any objection?

14        MR. LaRUSSO:  No, Your Honor, other than what was

15   discussed.

16        MR. HALEY:  No objection.

17        THE COURT:  Per the reasons previously set forth,

18   the portions contained in 8021-R are admitted into evidence.

19        (So marked as Government's Exhibit 8021-R in

20   evidence.)

21   Q    I'm going to turn just to page -- the bottom of page 1.

22   It says Carey Rodriguez.  Is that the firm you were working

23   with at the time?

24   A    Yes.

25   Q    Patrick E. Gonya, Esquire?

GONYA-DIRECT-KOMATIREDDY                                    1290

1  A    Yes.

2  Q    When this deposition was taken, was Mr. Constantine under

3  oath?

4  A    Yes.

5  Q    I'm going to ask you to help me read some of these

6  portions into the record.  Starting on deposition page

7  Number 3, when asked the question, "Tell us your name," how

8  did Mr. Constantine respond?

9  A    "Tommy Constantine."

10 Q    "And where do you live?"

11 A    "In Scottsdale, Arizona.  I am about to move out of the

12 house that I'm in.  So I can give you that address, but it

13 won't be valid in a few days."

14 Q    "Do you have an address that will be valid in the

15 foreseeable future?"

16 A    "Frankly, no, not yet."

17 Q    "What is your address now?"

18 A    "18290 North 93rd Place, Scottsdale, 85255."

19 Q    "Okay.  Is that a house or apartment?"

20 A    "It's a house."

21 Q    "Who owns it?"

22 A    "The bank.  Literally the bank."

23 Q    "Literally the bank?"

24 A    "Yeah."

25 Q    "Is it a house that you purchased at one time?"

1   A    "Yes.  Yes."

2   Q    "And where are you moving to?"

3   A    "I don't know yet."

4   Q    And again, this deposition takes place on April 23rd,

5   2009, right?

6   A    Correct.

7   Q    Starting at the bottom of page 4, line 25 (reading):

8         "QUESTION:  What in the last five years -- what have

9   you done for employment?"

10        How does Mr. Constantine respond?

11  A    "Well, I bought and sold real estate.  And I created

12  sponsorship and racing programs that sometimes allowed me to

13  have spending money, so to speak.  Travel money.  Racing was

14  never a profitable endeavor for me, so...  And then I created

15  a couple of businesses, but they have not made a profit as of

16  yet."

17  Q    "What are the businesses that you presently have?

18  A    "Eufora, which is a prepaid Mastercard."

19  Q    "Spell it."

20  A    "E-U-F-O-R-A."

21  Q    "Do you own that?"

22  A    "I own part of it, yes."

23  Q    "Is that an LLC or an Inc. or?"

24  A    "It's an LLC.  But it's unfortunately not..."

25  Q    "Not what?"

GONYA-DIRECT-KOMATIREDDY                    1292

1   A    "Really, I mean, I was going to say it's not worth

2   mentioning.  But I mean that in the sense that it's not a

3   profitable endeavor."

4   Q    "Was it at sometime?"

5   A    "No.  It never has been to date."

6   Q    Turning to what's marked as page 7 of the deposition

7   transcript.  (Reading:)

8             "And in the last him five years then, you've had

9   Tommy Constantine Racing LLC and Eufora LLC, and those are the

10  only two business you had."

11            How does Mr. Constantine respond?

12  A    "I may have -- I may have tried to start other

13  businesses.  So I don't recall, like, what LLCs are formed.

14  But nothing of substance."

15  Q    I'm going to turn to what is marked as page 172 of the

16  deposition transcript.  At the bottom, line 22, when asked

17  (reading):

18            "This says that -- well, do you have a business

19  associate named Phillip Kenner?"

20  A    "He's a friend and a guy that's not involved in any of my

21  businesses, although this says that he is.  But he's not, no."

22  Q    Turning to page 8 of the -- what's marked on the

23  deposition as page 8.  At line 11 Mr. Constantine is asked

24  (reading):

25            "And does Constantine Management Group LLC presently

GONYA-DIRECT-KOMATIREDDY                      1293

1   have assets in it?"

2        How did he respond?

3   A   "It used to."

4   Q   "Well, let's talk about presently, today?"

5   A   "No."

6   Q   And just for the record, "today" is April 23rd, 2009,

7   right?

8   A   That's my understanding.

9   Q   (Reading):

10        "QUESTION:  It holds nothing?"

11  A   "No."

12        Line 16?

13  Q   Line 16 and line 17.  (Reading):

14        "QUESTION:  It holds nothing?"

15  A   "They've all been basically foreclosed on."

16  Q   Moving on to line 18 onward (reading):

17        "Okay.  Do you have -- I saw something.  There was

18  two condos.  I think in Miami Beach."

19  A   "One.  There was one.  And then I sold it and bought

20  another one.  And that's in corporation."

21  Q   "Was that in your name or Constantine Management, or do

22  you know?"

23  A   "I don't remember.  I could probably make this simple for

24  you and tell that basically, any piece of real estate that

25  I've owned is now either in foreclosure or repossessed by the

GONYA-DIRECT-KOMATIREDDY                        1294

1    bank.  I own nothing anymore."

2    Q    Turning to what is marked as page 15 of the deposition

3    transcript, at line 3, the question is posed (reading):

4         "What bank accounts did you have from October 1,

5    2006, through March 31, 2007?"

6         How does Mr. Constantine respond?

7    A    "I have a personal account -- personal bank account at

8    Bank of America."

9    Q    "In Scottsdale?"

10   A    "Yes."

11   Q    "And just your name, Tommy Constantine?"

12   A    "Yes."

13   Q    "Okay.  Any other bank accounts?"

14   A    "I had a Constantine Management Group bank account."

15   Q    "Just one?"

16   A    "I think there might have been a construction account

17   that was a sub account, but I don't really use that."

18   Q    I didn't really use that?

19   A    "But I didn't really use that."

20   Q    (Reading):

21        "QUESTION:  And Constantine Management Group's

22   accounts, where were they held?"

23   A    "The same bank."

24   Q    "Bank of America in Scottsdale?"

25   A    "Yes."

1  Q    On page 83 of the deposition transcript there appears to

2  be another reference to Constantine Management Group, is that

3  correct?

4  A    Yes.

5  Q    Line 18 (reading):

6          "QUESTION:  Did you also use that bank account for

7  your personal business and personal needs, paying your

8  mortgage payment, paying your car payment, groceries?"

9          How did Mr. Constantine respond about the various

10 bank accounts?

11 A    "No.  I think I separated my personal use.  Things like

12 that, car payments, mortgages, I think that was paid out of

13 Con- -- Constantine Management Group so as to separate my

14 personal finances from the racing program."

15 Q    Now, Mr. Gonya, you testified that you were owed money as

16 a result of working in a legal capacity on behalf of

17 Mr. Constantine, correct?

18 A    Yes.

19 Q    I'm going to turn to page 199 of the deposition, line 5,

20 when asked (reading):

21          "QUESTION:  How much have you paid to Patrick?"

22          Is that in reference to you, Mr. Gonya?

23 A    Yes.

24 Q    How does Mr. Constantine respond?

25 A    "I believe 15,000 so far."

GONYA-CROSS-LaRUSSO                                              1296

1    Q      (Reading):

2             "QUESTION:  What's his hourly rate?"

3    A      "I don't know."

4    Q      "Are you paying him by the hour or flat fee?"

5    A      "I believe I'm paying him by the hour."

6    Q      "And from what business did you get the money to pay

7    Patrick, from one of your businesses or personal account?"

8    A      "Well, earlier you suggested that how could I take a trip

9    to Aman, Jordan, or something if I was broke.  So clearly I

10   borrowed the money.  I think I already said that, which is the

11   only reason I'm answering it now."

12   Q      Mr. Gonya, did you end up getting paid -- all the

13   payments that you reviewed, there were the five payments that

14   we reviewed during your testimony, did all of the payments

15   come after this deposition?  In May and December of 2009?

16   A      Yes.  The first payment was May 12th, 2009.

17             MS. KOMATIREDDY:  No further questions.

18             THE COURT:  Any cross-examination?

19             MR. HALEY:  I have no questions, Your Honor.

20             MR. LaRUSSO:  I have a few questions.

21   CROSS EXAMINATION

22   BY MR. LaRUSSO:

23   Q      Good afternoon.  How are you?

24   A      I'm fine.  Good afternoon.

25   Q      You testified that you represented Mr. Constantine in

GONYA-CROSS-LaRUSSO                                    1297

1  regards to a lawsuit in Florida, correct?

2  A     Yes.

3  Q     Where was that pending?

4  A     Palm Beach County.

5  Q     At the time, was Mr. Constantine residing in Arizona at

6  the time?

7  A     I believe so.

8  Q     Did Mr. Constantine have any difficulty, as you recall,

9  traveling to Florida from time-to-time to deal with this suit?

10 A     I'm not sure what you mean by difficulties.

11 Q     Did he have any difficulty making court appearances when

12 he was scheduled to appear?

13 A     I don't recall.

14 Q     Do you recall on any occasions when Mr. Constantine did

15 not appear in person but had to appear telephonically?

16 A     I don't believe so during my representation.  I recall

17 him telling me, in connection with the representation before,

18 that he had to appear telephonically.

19 Q     It's not unusual for a case which is called to have a

20 client call in as opposed to make a personal appearance, is

21 that correct?

22 A     Well, it depends if the judge will allow it.

23 Q     That's correct.

24 A     In a civil case, it happens if there's a problem with

25 travel, yes.

GONYA-CROSS-LaRUSSO                                    1298

1   Q     Do you remember any occasion when Mr. Constantine did not

2   appear, was actually sanctioned by the court?

3   A     Again, that was prior to my representation.

4   Q     You have knowledge of it?

5   A     My understanding is that it did happen, yes.

6   Q     When you say sanctioned, do you understand that to mean

7   that the plaintiff's legal feels which were incurred for that

8   particular court hearing were ordered paid?

9   A     That is my understanding, correct.

10  Q     Do you recall approximately $3,000 in legal feels?

11  A     I don't remember the amount, but that sounds about right.

12  Q     I have a few questions about the plaintiff, if I may.  Do

13  you know if, in this particular case, the plaintiff garnished

14  Mr. Constantine's wages, to the extent that he had wages to

15  garnish?

16  A     What I recall is that there was a writ of garnishment

17  served on his bank account that was either owned or controlled

18  by Mr. Constantine.

19  Q     That was the Eufora bank account?

20  A     I don't recall which one it was.  It may have been.

21  Q     When a company, in your experience, if you know, receives

22  such an order of garnishment, does the company need to comply?

23          MS. KOMATIREDDY:  Objection.  It calls for a legal

24  conclusion.

25          THE COURT:  If he knows, he can answer that

GONYA-CROSS-LaRUSSO                    1299

1  question.

2  A    Typically, a court order should apply.  Some portion of

3  it may be sanctionable.

4  Q    If there is a subpoena issued in a civil case, my client,

5  as the recipient, has an obligation to either comply or move

6  to quash it?

7  A    Correct.

8  Q    In regards to failure of the company to either -- or the

9  failure of the company to comply with the garnishment order or

10 the subpoena, what happens?

11 A    Again, you're talking typically?

12 Q    Please, in your experience.

13 A    He'll either be subject to some type of a sanction or

14 payment on account.

15 Q    Mr. Constantine was deposed in this case.  You read

16 portions of that deposition, is that correct?

17 A    Correct.

18 Q    That deposition took place in Florida, I believe you

19 said.

20 A    Palm Beach County, yes.

21 Q    Do you remember during the deposition if the plaintiffs

22 lawyer questioned Mr. Constantine about Eufora?

23 A    Yes.

24 Q    Do you know why the plaintiff was questioning

25 Mr. Constantine about Eufora?

GONYA-CROSS-LaRUSSO                                      1300

1          MS. KOMATIREDDY:  Objection.

2          THE COURT:  Sustained.

3   Q    What were the questions that you recall being asked of

4   Mr. Constantine about Eufora?

5          MS. KOMATIREDDY:  Objection.

6          THE COURT:  If you want to offer part of the

7   transcript, I'll allow you to do that.  We have portions here.

8          MR. LaRUSSO:  Let me see if I can rephrase the

9   question.  I don't really need to go through those.

10         THE COURT:  Yes.

11  Q    Would it be a fair statement to say that the plaintiff

12  showed some interest in Eufora and its relationship with

13  Mr. Constantine, as a general -- as a general statement?

14  A    Again, I can't recall specifically what the plaintiff's

15  lawyer asked of Mr. Constantine about Eufora.  I know it came

16  up.  But I don't remember much more than that.

17  Q    Would you say that the lawsuit that was being brought

18  against my client in some respects involved Eufora?

19         MS. KOMATIREDDY:  Objection.

20  A    No.

21         THE COURT:  Overruled.

22         THE WITNESS:  Sorry.

23         THE COURT:  That's okay.  I overruled the objection.

24  If there's an objection next time, wait.

25         THE WITNESS:  I will.  I should know that.

1301

1  Q    Mr. Gonya, do you recall Mr. Constantine at anytime

2  mentioning there were a series of lawsuits ever occurring

3  simultaneous to the one that you were involved in, but they

4  were involved in Arizona involving hockey players?

5           MS. KOMATIREDDY:  Your Honor, I just want to --

6  given the nature of the question, I believe that it involves a

7  legal issue.  Mr. LaRusso just asked about communications

8  between attorneys.

9           THE COURT:  Why don't you approach.

10           (Whereupon a side-bar conference was conducted.)

11           (Matter continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1302

1       (Side-bar conference.)

2       MR. LaRUSSO:  I'm trying to be as specific as I can.

3       MS. KOMATIREDDY:  I didn't want to object, but I

4   just didn't want him to waive privilege.

5       THE COURT:  You could ask him if they told him about

6   the lawsuits.  I'm not sure what the relevance is.

7       MS. KOMATIREDDY:  We did not ask for privileged

8   communications on our examination.

9       MR. LaRUSSO:  Most of these questions are what my

10  client told him.  Like you said, that may open the door to

11  those kinds of questions.  I just want to make sure we don't

12  have another objection coming.

13      Okay.  I have a couple more questions, Judge.

14      (Matter continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1303

1    (The following takes place in open court.)

2    BY MR. LARUSSO:

3    Q.    Are you aware if Mr. Constantine's deposition was

4    provided by the plaintiff's attorney to any other lawyer

5    especially in regards to any other suits especially in

6    Arizona, do you have any recollection of that?

7    A.    I do have a vague recollection, but I can't say with

8    certainty if that occurred.

9         I remember there was some type of an article, a

10   newspaper article that was published right around the

11   time, maybe the day of or the day before Mr. Constantine's

12   deposition, and I remember something about disclosing

13   information in connection with another lawsuit.

14   Q.    Information that was developed in the deposition?

15   A.    This was before the deposition was actually taken.

16   It was the day of the deposition.

17   Q.    When you received the funds from Mr. Constantine from

18   the Ron Richards' account, did you have any knowledge into

19   where or who that money came from other than the

20   information that it came from Ron Richards' account?

21   A.    No.

22   Q.    And do you have any idea whose money that was before

23   it was wired to you, other than the fact that it came from

24   a Ron Richards' account?

25   A.    No.

Gonya  -  Cross/LaRusso

1304

1   Q.    And you know a client account is sometimes referred

2   to as an escrow account?  Are they different, a client

3   account as opposed to an escrow account?

4   A.    In Florida, under our professional rules, we have an

5   IOLA account which is a trust account.

6   Q.    What is the purpose of that?

7   A.    To receive monies in trust on behalf of a client.

8   Q.    For one individual or could it be for other

9   individuals, more than one client?

10  A.    I'm not sure I understand your question.

11  Q.    Is the account specific to a client or can you use it

12  for the purposes of representing separate clients?

13  A.    Well, we would segregate amounts, sub accounts for

14  clients.

15  Q.    But the money is going into the IOLA account

16  initially?

17  A.    Correct.

18          MR. LARUSSO:  I have no further questions, your

19  Honor.

20          Oh, one more if I may.  I apologize.

21  BY MR. LARUSSO:

22  Q.    Do you recall the plaintiff's attorney ever asking in

23  the deposition for Mr. Constantine to make a distinction

24  between not profitable and not valuable?

25          MS. KOMATIREDDY:  Objection.

Gonya  -  Cross/LaRusso

1305

1    I wouldn't object to the actual transcript if

2 there's a question of that sort.

3    THE COURT:  Sustained.

4 BY MR. LARUSSO:

5 Q.   Do you know the difference between not profitable and

6 not valuable?

7 A.   I'm not sure I understand.

8    MR. LARUSSO:  Okay.  Thank you.

9    MS. KOMATIREDDY:  No redirect, your Honor.

10    THE COURT:  You can step down, Mr. Gonya.

11    Thank you.

12    (The witness steps down.)

13    THE COURT:  Members of the jury, we will take a

14 five minute break before we reconvene with Mr. Kaiser.

15 Just a quick break.

16    (The jury is excused.)

17    THE COURT:  Please be seated.

18    First, with respect to the e-mail that

19 Mr. LaRusso is seeking to admit, I'm sustaining the

20 objection by both the government and Mr. Haley.

21    It's clearly hearsay to the extent that

22 Mr. LaRusso is trying to offer this as Mr. Constantine's

23 state of mind.

24    Similar to the e-mail that Mr. Haley sought to

25 introduce a couple of days ago with respect to another

1306

1  witness, the same ruling applies with respect to this.

2       The e-mail in 2010 where Mr. Constantine is

3  essentially blaming Mr. Kenner with respect to this 20

4  percent investment, whatever this may reflect about

5  Mr. Constantine's state of mind in June 2010 with respect

6  to that, it has no probative value as relates to the

7  allegations in the complaint -- in the indictment which

8  relate to Eufora which all occurred as stated in

9  paragraphs 12 through 14 in February 2008 and May 2009

10  relating to representations that were made, and then

11  diversions of what the government says are unauthorized

12  purposes, the diversion of money for unauthorized purposes

13  which again took place between December 2008 with the

14  latest date being December 2009.

15       I don't think this e-mail has any probative

16  value as relates to whether or not monies were diverted

17  during an earlier time frame.  This is after the fact.

18       It relates to a discussion of percentage

19  interest in Eufora that has nothing to do with the alleged

20  diversion that took place with respect to Mr. Constantine,

21  and it's an effort for Mr. Constantine to describe what he

22  thinks Mr. Kenner did, so it's hearsay.

23       It doesn't reflect Mr. Constantine's state of

24  mind as to the allegations against him with respect to the

25  diversions of money, so I believe it has no probative

J. Kaiser  -  Cross/LaRusso

1307

1   value with respect to his state of mind and any probative

2   value is substantially outweighed by the danger of unfair

3   prejudice not just to Mr. Kenner but with respect to the

4   jury being confused about why this e-mail relates to

5   anything with respect to what they need to decide.

6          So I'm sustaining the objection to that.  I do

7   want to bring Mr. Kaiser in with respect to the tape, so

8   why don't we bring him in.

9

10  JOHN KAISER,

11          called as a witness, having been previously

12          duly sworn, was examined and testified further

13          as follows:

14

15          THE COURT:  Have a seat, Mr. Kaiser.

16          Sir, have you had a chance to review a larger

17  portion of that recording?

18          THE WITNESS:  Yes.

19          THE COURT:  Based upon that review of a more

20  substantial portion of the recording, are you able to

21  identify whether or not that's you speaking on that?

22          THE WITNESS:  Yes.

23          THE COURT:  Is it?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.

J. Kaiser  -  Cross/LaRusso

1308

1    So I will allow Mr. LaRusso to question to the

2  limited degree we talked about, Mr. LaRusso, with respect

3  to that snippet without introducing it into evidence.

4    You can ask him whether or not he's reviewed a

5  tape during the break and whether it refreshes his

6  recollection as to what he said about it.

7    MR. LARUSSO:  What I intend to do is like what

8  the Court said.  I'll ask if he listened to the tape, does

9  it refresh his recollection as to a conversation with

10  Mr. Constantine.  And to avoid any problems, I'll ask him

11  just the question do you remember Mr. Constantine saying

12  and you responding and there's one other portion and

13  that's it.

14    THE COURT:  Okay.

15    MR. MISKIEWICZ:  Your Honor, what other portion?

16    MR. LARUSSO:  The one I mentioned.

17    THE COURT:  The portion that's on that one

18  sheet.  He wants to put it in context.

19    MR. LARUSSO:  You don't want to play the tape.

20  I understand that.  As long as he's made the

21  identification.

22    THE COURT:  How much longer do you have then?

23    MR. LARUSSO:  I was hoping, judge, to be done.

24  I hope to get done this afternoon by 4:30 but I have been

25  looking at my notes over lunch and knowing how

J. Kaiser  -  Cross/LaRusso

1309

1  deliberative it's been, I can't estimate it by 4:30.  I

2  hope to.

3           THE COURT:  Let's be efficient.

4           MR. LARUSSO:  I'll try, judge.  I promise.

5           THE COURT:  Let's bring in the jury.

6           MR. MISKIEWICZ:  Your Honor, may be approach?

7           (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Kaiser  -  Cross/LaRusso

1310

1   (The following takes place at sidebar.)

2       MR. MISKIEWICZ:  Your Honor, insofar as counsel

3   is going to be reading from a transcript that he's now

4   marked, I object to the reading of any of the statements

5   by Mr. Constantine essentially for the same reason we

6   objected to the gmail account, because it's again his

7   post-fraud statements, they're hearsay and I don't believe

8   that they're necessarily to put the statements that

9   Mr. Kaiser would admit he said about Mr. Jowdy into

10  context.

11      THE COURT:  It's a close question, but to put

12  what Mr. Kaiser said in context, I'll allow him to put it

13  in.  It's mostly Mr. Kaiser doing the talking.  The

14  snippets of what Mr. Constantine says are very limited.  I

15  don't think there's any prejudice to allowing those in so

16  that he can frame what Mr. Kaiser said.

17      MR. LARUSSO:  So I don't run afoul of the

18  understanding of the court's directive, I'm going to ask

19  him do you remember being asked this question and giving

20  this answer and I'll keep moving on so we don't have to

21  play the tape.

22      THE COURT:  That's fine.

23      (Continued on next page.)

24

25

J. Kaiser  -  Cross/LaRusso

1311

1           (The following takes place in open court.)

2           (The jury is present.)

3           THE COURT:  Please be seated, members of the

4    jury.

5           Go ahead, Mr. LaRusso.

6           MR. LARUSSO:  With the Court's permission.

7

8    BY MR. LARUSSO:

9    Q.   Mr. Kaiser, have you had an opportunity to listen to

10   a taped conversation?

11   A.   Yes.

12   Q.   And after listening to that taped conversation, does

13   it refresh your recollection that Mr. Constantine remarks;

14   do you know what that makes me think about?  Don't you

15   wonder if any of that shit that we, and then you reply Ken

16   Jowdy, Ken Jowdy is a thief.

17           Does that refresh your recollection?

18   A.   Yes.

19   Q.   And that was said by you in response to

20   Mr. Constantine's remark?

21   A.   Yes.

22   Q.   And you also remember, after listening to the tape,

23   that Mr. Constantine's saying; I know you think that, and

24   I'm not saying you're wrong, and you, Mr. Kaiser, reply I

25   know, I know.

J. Kaiser  -  Cross/LaRusso

1312

1  Did you also make those remarks to

2  Mr. Constantine; I know, I know?

3  A.   If that's what was said on the tape.  I wasn't

4  focusing -- I was focusing --

5  Q.   You don't dispute the fact that you did respond to

6  him in that way; is that correct?

7  A.   It was 15 minutes that I listened to.

8  Q.   Do you remember Mr. Constantine saying; listen, I'm

9  not saying you're wrong, I'm not saying you're wrong, I,

10  but I don't know, but I don't know Jowdy, I don't know.

11  Do you really know that?

12  And you reply yes.

13  And Mr. Constantine says, how do you know that?

14  'Cause I want to know.

15  And then you respond.  I, I really know that

16  because I met him 10 years ago from how things played out.

17  I really, he is, he's a guy who had fucking nothing.  He

18  showed that he was some fucking billionaire that he was,

19  that he was, he was -- the fucking guy, he was a busboy.

20  Do you recall that?

21  A.   Yes.

22  Q.   Those were your comments to Mr. Constantine at that

23  time?

24  A.   Yes.

25  Q.   And lastly do you remember Mr. Constantine saying but

J. Kaiser  -  Cross/LaRusso

1313

1  that's what you guys think of me.  That's what you guys

2  are saying about me right now.  You know that, right?  You

3  guys are saying the same thing about me.  I got no money

4  in Eufora.  I didn't do anything.  I, all this other and

5  then you reply, and he manipulated? What?  You asked me

6  about Ken Jowdy.

7           That was the remainder of the conversation that

8  you had with Mr. Constantine at this time; is that

9  correct?

10  A.   Like I said, there was more on the tape.

11  Q.   But did this occur, this conversation did take place?

12  A.   Yes.

13  Q.   So would you agree with me that when you testified

14  earlier that you didn't use the words or -- withdraw that.

15           Did you not use the words Mr. Jowdy is a thief?

16  This refreshes your recollection and in fact you did use

17  those words; is that correct?

18  A.   Yes.

19  Q.   So correct me if I'm wrong, would it be your

20  testimony that the only reason you thought Mr. Jowdy had

21  stolen or misappropriated the money was because Mr. Kenner

22  told you so; is that correct?

23  A.   No.

24  Q.   Do you remember testifying earlier this morning and

25  responding yes to that question?

J. Kaiser  -  Cross/LaRusso

1314

1  A.   No.

2  Q.   We'll let the record stand, okay, Mr. Kaiser?

3       MR. MISKIEWICZ:  Objection.

4       THE COURT:  Sustained.  Move on.

5  BY MR. LARUSSO:

6  Q.   Would it be fair to say then, so the record is clear,

7  if I can, that you believe that not just because

8  Mr. Kenner said it, but other people had said it; is that

9  fair?

10      MR. MISKIEWICZ:  Objection.

11      THE COURT:  You can answer, Mr. Kaiser.

12 A.   At what time frame are we talking about?

13 Q.   At this time.  At this time when you're calling

14 Mr. Jowdy a thief.  Would you agree?

15 A.   Before I thought you were talking about

16 Mr. Constantine.  I thought we left Mr. Jowdy.  If we're

17 going back, I thought we left Mr. Jowdy.

18 Q.   Let me rephrase it and see where we were.

19      Is it your testimony that the only reason you

20 thought Mr. Jowdy had stolen or misappropriated money was

21 because Mr. Kenner told you so?

22 A.   Yes.

23 Q.   If that happens again, please ask me and we will

24 correct the record.

25 A.   I thought we finished with Mr. Jowdy.

J. Kaiser  -  Cross/LaRusso

1315

1    Q.    Just one point of clarification.

2          You testified that you made an appearance in the

3    civil suit against Mr. Jowdy in a mediation, correct?

4    A.    Yes.

5    Q.    Did you make any other appearances in that case such

6    as depositions?

7    A.    Yes.

8    Q.    How many depositions do you remember, Mr. Kaiser?

9    A.    I believe it was one.

10   Q.    Do you remember whose deposition was being taken at

11   the time?

12   A.    It was Mr. Jowdy's.

13   Q.    You appeared for that entire deposition?

14   A.    I don't know if I was there the entire time, no.

15   Q.    And, again, you were there basically aligned with the

16   hockey players at that point?

17   A.    Yes.

18   Q.    Now, I'm going to go back if I may, Mr. Kaiser, to

19   your investments in Eufora for a few moments.

20          (Pause in proceedings.)

21          Mr. Kaiser, I believe we were talking earlier

22   today about notes that you had on a piece of paper that

23   reflected what you believed to be monies of yours that

24   were put into Eufora; is that correct, by Mr. Kenner?

25   A.    Yes.

J. Kaiser   -   Cross/LaRusso

1316

1   Q.   And just so the record is clear, you were testifying

2   that it was Mr. Kenner who provided the information and

3   you wrote it down; is that right?

4   A.   Yes, that's correct.

5   Q.   Would you take a look at Kenner's Exhibit 37.

6        Do you recognize that?

7   A.   Yes.

8   Q.   Is that the document you were referring to?

9   A.   Yes.

10  Q.   That's the piece of paper that contains the

11  information that you had at the time regarding what you

12  believe to be investments made into Eufora?

13  A.   Yes.

14  Q.   So the record is clear, this is what was provided to

15  you by Mr. Kenner?

16  A.   Yes.

17       MR. LARUSSO:  Your Honor, may I ask this be

18  received as Mr. Constantine's exhibit 81.

19       THE COURT:  Any objection from the government?

20       MR. MISKIEWICZ:  No objection.

21       MR. HALEY:  Judge, for purposes of the record,

22  because it's Kenner Exhibit 37, I believe this was offered

23  into evidence yesterday.

24       THE COURT:  Just to be sure, it's offered twice.

25       MR. HALEY:  I have no objection, judge.  Thank

J. Kaiser  -  Cross/LaRusso

1317

1    you.

2              THE COURT:  So C-81 is admitted.

3              MR. LARUSSO:  Thank you, your Honor.

4              MR. HALEY:  It is marked Kenner 37.  Same

5    exhibit.

6              THE COURT:  Okay.

7              (Defense Exhibit C-81 in evidence.)

8    BY MR. LARUSSO:

9    Q.   That's your handwriting; is that correct?

10   A.   Yes.

11   Q.   Just so we understand, what you noted on this

12   document are payments made or monies transmitted to

13   Constantine Management Group by Mr. Kenner on your behalf;

14   is that correct?

15   A.   Yes.

16            I don't know if it was just to that account or

17   not.

18   Q.   The first payment on 2/11 is 11,400.  The next date

19   is 4/2.

20            That's your handwriting?  Correct me if I'm

21   wrong, Mr. Kaiser.

22   A.   Yes.

23   Q.   For 100,000, and on 4/11 for 25,000?

24   A.   Yes.

25   Q.   4/17 for 25,000?

J. Kaiser  -  Cross/LaRusso

1318

1   A.   Yes.

2   Q.   4/24 for 100,000?

3   A.   Yes.

4   Q.   Do you see that?

5   A.   Yes.

6   Q.   That's approximately $261,000 at the time?

7   A.   Yes.

8   Q.   I believe it was your testimony that initially

9   $275,000 went in, correct?

10  A.   Yes.

11  Q.   So we're short a couple thousand, but that would

12  reflect what you believe to be the initial deposit that

13  went into Eufora, correct?

14  A.   Yes.

15  Q.   I used the word deposit.  It's money that was being

16  sent to Eufora on your behalf?

17  A.   Yes, that's correct.

18  Q.   Now, were you involved in a suit, and I believe we

19  talked about it briefly, brought by Mr. Stolper around

20  October 2010 on behalf of the hockey players and I believe

21  it was Mr. Rizzi and Mr. Hughes were part of it as well,

22  do you remember that?

23  A.   Is that the one in Arizona?

24  Q.   Yeah, the one in Arizona, Mr. Kaiser.

25  A.   Yes.

J. Kaiser  -  Cross/LaRusso

1319

1   Q.   That suit ultimately got dismissed; is that correct?

2   A.   Yes, I believe so.

3   Q.   Do you remember, after the suit was dismissed,

4   providing the same proof that we talked about on

5   Defendant's Exhibit C-81 to your attorney Mr. Stolper?

6   A.   The same proof as?

7   Q.   The information that's on this, did you provide the

8   same information to your attorney after the suit was

9   dismissed?

10  A.   I believe Mr. Kenner had it written down in a more --

11  almost on a spreadsheet I believe.  I don't think it was

12  off that piece of paper.

13  Q.   But the proof that we're talking about is proof of

14  what you believed to be over $2 million of investments

15  into Eufora; is that correct, of yours?

16  A.   Yes.

17  Q.   By the way, where did that money come from?

18  A.   It came from Hermosa Beach and other so-called

19  investments, other funds that were sent to Mr. Kenner over

20  the years.

21  Q.   By you?

22  A.   Yes.

23  Q.   From your private funds?

24  A.   My funds, again some family funds.

25  Q.   How much of the 2.2 million was yours personally?

J. Kaiser  -  Cross/LaRusso

1320

1    A.    I don't know.  Over the years there was millions that

2    went to him.

3    Q.    Did you provide documentation of all of that money to

4    the government?

5    A.    Yes, I believe so.

6    Q.    Now, did there come a time when you asked Mr. Stolper

7    to make a claim against Mr. Constantine -- withdraw that.

8           Did there come a time when you asked Mr. Stolper

9    to contact Mr. Constantine in regards to those investments

10   that you claim you made totaling approximately $2 million?

11   A.    No, I don't recall that.

12   Q.    Would you take a look at what's been marked for

13   identification as C-63.

14           (Pause in proceedings.)

15           Have you had an opportunity, Mr. Kaiser, to look

16   at that exhibit?

17   A.    Yes.

18   Q.    Do you recognize it?

19   A.    This looks like the first time I'm seeing this.

20   Q.    Do you recall at any point in time asking Mr. Stolper

21   to write a letter on your behalf requesting clarification

22   of the $2 million?

23   A.    I don't recall at this time exactly what I asked

24   Mr. Stolper to do.  I know he was working on the case.  I

25   don't recall that.

J. Kaiser  -  Cross/LaRusso

1321

1  Q.   So what you're saying is this particular letter, so

2  we're clear, you have no recollection of seeing before; is

3  that correct?

4  A.   No, I don't believe I was copied on this.

5  Q.   Well, do you remember, in sum and substance, asking

6  Mr. Stolper to have Mr. Constantine account for the $2

7  million that you claim was invested into Eufora?

8  A.   No.

9       Like I said, I don't recall that.

10  Q.   Well, I'm going to display again C-81 in evidence.

11       I'm going to direct your attention to the first

12  five entries that we talked about.

13       Do you see those?

14  A.   Yes.

15  Q.   I asked you I believe earlier or you testified that

16  you do not know where that money was deposited into; is

17  that correct?

18  A.   I didn't know.  You were telling me it was CMG

19  account.

20  Q.   I'm sorry.  Sometimes it's my fault, Mr. Kaiser, when

21  I have you looking at an exhibit and your voice kind of

22  projects that way.  I apologize.  Could you repeat it

23  again?

24  A.   I believe you told me it went to CMG account.

25  Q.   Did you take a look at the exhibit C-63?

J. Kaiser  -  Cross/LaRusso

1322

1    Does it refresh your recollection that you were

2  told by Mr. Kenner that the monies you claim belonged to

3  you were sent to Constantine Management Group?

4  A.   Yes.

5  Q.   So that those first five amounts plus all the others

6  that you claim, your best recollection is that Mr. Kenner

7  advised you that it went into Constantine Management

8  Group; is that correct?

9  A.   Yes, that's correct.

10 Q.   I'm going to show you a copy of C-64 which you

11 identified earlier as your affidavit which you signed in

12 October 2010; is that correct, Mr. Kaiser?

13 A.   Yes.

14 Q.   And in 2010, directing your attention to page 2, the

15 end of the first paragraph, you represented in that

16 affidavit that Constantine directed you to wire the funds

17 into Constantine Management Group; is that correct?

18 A.   Yes.

19 Q.   So at this point in time you were aware that your

20 initial investments went into Constantine Management

21 Group; is that correct?

22 A.   Yes, reading this.

23 Q.   Well, it was your affidavit, correct?  That's what

24 you said?

25 A.   Yes.

J. Kaiser  -  Cross/LaRusso

1323

1  Q.   At page 4, paragraph 8, am I also correct that you

2  stated that in the middle of 2009 you went to the Eufora

3  office with proof of my then 2.2 million in wire transfers

4  to Eufora through CMG and other Constantine controlled

5  entities, do you see that?

6           MR. MISKIEWICZ:  Objection, asked and answered

7  this morning.

8           THE COURT:  We went through this this morning.

9  I remember that.

10  BY MR. LARUSSO:

11  Q.   Well, Mr. Constantine -- Mr. Kaiser, let me ask you.

12           Did you have any investigation done to determine

13  if in fact the monies that you claim belong to you were

14  transferred into Constantine Management?

15  A.   At that time I was relying on Mr. Kenner to tell me.

16  Q.   Well, after, at any point up until today, did you

17  investigate to determine the monies that you say belong to

18  you that were deposited to Constantine Management Group

19  were in fact yours?

20  A.   No.  I still haven't seen some accounts.

21  Q.   So you haven't seen all of the Constantine Management

22  accounts to make that determination; is that correct?

23  A.   No.

24           I also haven't seen the Hermosa Beach ventures

25  accounts and I haven't seen Mr. Kenner's accounts.

J. Kaiser  -  Cross/LaRusso

1324

1  Q.   Now, would it be fair to say that those first five

2  were made I believe you testified sometime around 2007; is

3  that correct?

4        If you need to look at your affidavit, it's the

5  second page.

6  A.   I believe at the time that it was one wire.

7  Q.   Well, isn't it a fact that you said that your

8  approximately $275,000 was invested by April of 2007; is

9  that correct?

10       MR. MISKIEWICZ:  Objection, asked and answered.

11       THE COURT:  I'll allow that one question.  You

12  can answer that.  Is that what it says?

13  A.   It says by April 2007.

14  Q.   And we know from your own notes that you believed

15  that it was February 11, 2007, and I'm focusing on the

16  first five through April 24, 2007, correct?

17  A.   Yes.

18       (Pause in proceedings.)

19       MR. LARUSSO:  Your Honor, with the government's

20  permission and the court's as well, I'm just going to mark

21  a copy of Government's Exhibit 1703.

22  BY MR. LARUSSO:

23  Q.   Mr. Kaiser, this document is in evidence as

24  Government's Exhibit 1703.

25       Would you take a look at 1703, particularly the

J. Kaiser  -  Cross/LaRusso

1325

1   monies going into the Constantine Management Group account

2   for February 1, 2007, through February 28, 2007?

3   A.   Okay.

4   Q.   Do you see in this any of the -- withdraw that.

5        The 2011 investment that allegedly was made on

6   your behalf for $11,400?

7   A.   2011?

8   Q.   February 11, 2007.

9   A.   I see 40,000 in 2001.

10  Q.   There's nothing for 2011.

11       MR. LARUSSO:  Judge, I'm sorry.  I'm mixing them

12  up.

13  Q.   February 11, 2007.

14       I apologize, Mr. Kaiser.

15  A.   I don't see anything on February 11.

16  Q.   You didn't do an investigation to determine if in

17  fact that money that you claim was yours was sent to

18  Constantine Management Group, did you?

19  A.   No, I didn't look at these accounts.

20  Q.   Would you agree with me, looking at that Government's

21  exhibit, that monies that you were told were deposited

22  into the Eufora account on February 11, 11,400, they just

23  were not received, they are not in that account; is that

24  correct?

25  A.   I don't see it in this account.

J. Kaiser  -  Cross/LaRusso

1326

1   Q.   I'm going to direct your attention to the next four

2   and hopefully I will move along as quickly as I can.

3            (Pause in proceedings.)

4            MR. LARUSSO:  Just one moment, your Honor.

5            (Pause in proceedings.)

6            MR. LARUSSO:  Your Honor, the defendant offers

7   the monthly statement for Constantine Management Group for

8   the period April 1st, 2007, to April 30, 2007, by way of

9   stipulation that these are true and accurate bank records.

10           THE COURT:  Correct?

11           MR. MISKIEWICZ:  Yes, your Honor.

12           THE COURT:  Mr. Haley, any objection?

13           MR. HALEY:  I don't believe so, judge.  May I

14  take a quick look?

15           THE COURT:  What number is it?

16           MR. HALEY:  C-66.

17           (Pause in proceedings.)

18           MR. HALEY:  No objection, judge.

19           THE COURT:  C-66 is admitted.

20           (Defense Exhibit C-66 in evidence.)

21  BY MR. LARUSSO:

22  Q.   I'm going to focus in on the second through fifth

23  investments that you wrote down on Defendant's Exhibit

24  C-81, the 100,000, the 25, do you see those?

25  A.   Yes.

J. Kaiser  -  Cross/LaRusso

1327

1   Q.   Mr. Kaiser, would you take a look at C-66 and tell me

2   if any of those four investments are in there.

3            (Pause in proceedings.)

4   A.   You took away the sheet.

5   Q.   I'm sorry?

6            THE COURT:  He needs the other sheet.

7   A.   I need the other sheet.

8   Q.   I'm sorry.

9            (Pause in proceedings.)

10  A.   I don't see it on this.

11  Q.   So those four April of '07 investments do not appear

12  on the Constantine Management statement for that month; is

13  that correct?

14  A.   Yes.

15  Q.   Just so the record is clear, you didn't do an

16  investigation to determine whether the money you claimed

17  belonged to you was in fact deposited into the Constantine

18  Management Group account at that time; is that correct?

19  A.   That's correct.

20  Q.   And this is the approximate 275,000 that you got

21  invested according to Mr. Kenner sometime in 2007; is that

22  right?

23  A.   Yes, according to Mr. Kenner.

24  Q.   Mr. Kaiser, is it possible that maybe a mistake was

25  made?

J. Kaiser  -  Cross/LaRusso

1328

1     MR. MISKIEWICZ:  Objection.

2     THE COURT:  Sustained.

3   BY MR. LARUSSO:

4   Q.   Well, let me show you what has been received in

5   evidence as 1706.

6        This is the monthly statement for Constantine

7   Management Group, April 1st of '08 through April 30, '08.

8   I want you to take a look at that.

9        (Pause in proceedings.)

10       Do you see in the April '08 statement some of

11  the monies that you were told were deposited in 2007 going

12  into Constantine Management Group on the dates in

13  question?

14  A.   Yes.

15  Q.   As a matter of fact, could you tell us what dates and

16  amounts seem to correspond to your notes in 2008, not

17  2007.

18  A.   On 4/24, 100,000.

19  Q.   Okay.

20  A.   I didn't know if they were highlighted or not.

21       4/07, 100,000.  That's all I see.

22  Q.   You said 4/24 and what was the other date?

23       I may be able to move through this quickly.  May

24  I have that for a moment.

25       I'm going to show you your notes.

J. Kaiser   -   Cross/LaRusso

1329

1    4/02 for 100,000, do you see that?

2    A.    Yes.

3    Q.    Turning to Government's Exhibit 1706, we now see that

4    investment you believe was put in in '07 appears at least

5    according to this record April 2, do you see that?

6    A.    Yes.

7    Q.    For 100,000?

8    A.    Yes.

9    Q.    Could you read to us who the beneficiary of that is?

10   A.    Wire --

11   Q.    That would be Constantine Management Group and it's

12   from Phil Kenner; is that correct?

13   A.    That's correct.

14   Q.    The next one, April 11, do you see that, 25,000?

15   A.    Yes.

16   Q.    So we match it up, do you see April 11, 25?

17   A.    Yes.

18   Q.    So the investments that you claim were in 2007 appear

19   in the following year 2008; is that right, at least for

20   these two, correct?

21   A.    Yes.

22   Q.    Going back to Mr. Constantine's, the Constantine

23   Management Group, April 17, there's another 25, do you see

24   that?

25   A.    Yes.

J. Kaiser  -  Cross/LaRusso

1330

1  Q.    Match that up with your handwritten notes, April 17

2  for 25?

3  A.    Yes.

4                (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Kaiser - Cross/La Russo

1331

1   BY MR. LA RUSSO:

2   Q.   Now, I'll just do one more if I may, the one that's

3   part of the 275,000.  4/24, for 100,000, you see that?

4   A.   Yes.

5   Q.   You told that, and again just for the record, you

6   were told in 2007 but it appears that these entries now

7   appear in the following year, 2008, correct?

8   A.   Yes.

9   Q.   Take a look at this one on 4/27.  It's a one hundred

10  thousand dollar wire into Constantine Management Group,

11  the originator was Mr. Kenner, right?

12  A.   Yes.

13       MR. MISKIEWICZ:  Objection.  That's not what the

14  record states.

15       THE COURT:  Sustained.

16  Q.   Let's talk about the highlighted portion.  On April

17  24, there's $100,000 being deposited into the Constantine

18  Management Group.  Do you agree with that?

19  A.   Yes.

20  Q.   The originator is Mr. Kenner?

21  A.   Yes.

22       MR. MISKIEWICZ:  Objection.

23  Q.   And there's a second name; is that correct?

24  A.   Yes.

25  Q.   See that?

J. Kaiser - Cross/La Russo

1332

1   A.   Yes.

2   Q.   K Nash, trustee, do you know who K. Nash is?

3   A.   Yes.

4   Q.   Who is she?

5   A.   First name is Kathy Nash, that's her husband is Tyson

6   Nash, hockey player.

7   Q.   And looking at this, does it refresh your

8   recollection that they had invested $100,000 themselves?

9        MR. MISKIEWICZ:  Objection.

10       THE COURT:  Sustained.

11  Q.   Would you agree that this is not the hundred thousand

12  dollars that was deposited into or sent to the Constantine

13  Management Group on your behalf; is that correct?

14       MR. MISKIEWICZ:  Objection.

15       THE COURT:  Sustained.

16  Q.   Mr. Kaiser, the documents that I've shown you, they

17  contradict what you said in your affidavit, is that

18  correct, that the approximately 275,000 that you deposited

19  or you were told was deposited in your behalf on

20  Constantine Management Group was not done in 2007; is that

21  correct?

22  A.   Yes.

23  Q.   And in fact, one of the deposits that we examined the

24  following year wasn't even deposited on your behalf, it

25  was deposited on behalf of the Nashes; is that?

J. Kaiser - Cross/La Russo

1333

1    A.    Yes, that's what it looked like.

2    Q.    Now, you testified that based upon this information

3    that you were provided by Mr. Kenner, you had made a

4    demand for 20 percent of Eufora; is that correct?

5    A.    Based upon what Phil Kenner said that's what him

6    and --

7    Q.    But what these documents showed is that your demand

8    was for investments allegedly made in 2007 which were

9    nonexistent in 2007, correct?

10            MR. MISKIEWICZ:  Objection.

11            THE COURT:  Yes, sustained.  These are not now

12   factual questions any longer.

13            MR. LA RUSSO:  Your Honor, can we take a five

14   minute break?

15            THE COURT:  We'll take the afternoon break.

16   Okay.  Don't discuss the case.

17            (Whereupon, the jury retired from the

18   courtroom.)

19            MR. LA RUSSO:  Thank you, your Honor.

20            THE COURT:  Everyone can be seated.  You can

21   take a break, Mr. Kaiser.

22            (Witness leaves the courtroom.

23            THE COURT:  Mr. La Russo, we're having like

24   these mini-summations with each witness, we can put a

25   statue up there, having the witness read the bank records

J. Kaiser - Cross/La Russo

1334

1   which he has no knowledge of simply goes to where his

2   money had may or may not have gone, those are summation

3   arguments.  We have every witness, you did the same thing

4   with Ms. Peca, are you aware that it's not Mr. Gonchar

5   that you claim is a victim in this case.

6           You're trying through each witness a summation

7   and that extends the length of each witness exponentially.

8   You can understand I've lost -- what day we're on, is this

9   two and a half days, three days?  You can't do this with

10  every witness.  I'll give you as much time as you want

11  with your summation.  You can't do that through witnesses.

12  He has no factual information about these bank records.

13  You're just using him to make arguments to the jury.

14          If it was a short trial, it wouldn't concern me

15  so much, but we have a lot of witnesses.  Where do we

16  stand on the government's estimate with the case?  I want

17  to say something to the jury at the end of the day today.

18          MR. MISKIEWICZ:  We're slipping.  At this stage

19  at the rate we're going, I don't see us even resting until

20  the fifth week.

21          THE COURT:  We have -- each witness is on the

22  stand for two or three days.  I don't know where this

23  estimate of five weeks came based upon where I'm sitting.

24  If I thought that it was necessary for each witness to be

25  on the stand for two or three days, then I would fault the

J. Kaiser - Cross/La Russo

1335

1    estimate.  But I'm faulting how much time we're spending

2    with each witness.  And if you combine that with going

3    into tangential issues that's why this witness is on the

4    stand for two or three days.  Similar to Mr. and

5    Mrs. Peca, he's not a long-winded witness, his answers are

6    yes or no, very direct in his response.  We don't have the

7    witness who's extending his testimony by virtue of his

8    narratives.  He's sitting there.  We have to move along,

9    okay.

10            MR. LA RUSSO:  Judge, if you give me a few

11   minutes I'll look at my notes.

12            THE COURT:  You have my promise, I'm not

13   limiting your summation.  You can take as long as you

14   want.  Okay.

15            MR. LA RUSSO:  Thank you, Judge.

16            THE COURT:  I promise I will not cut you off.

17            MR. LA RUSSO:  Judge, I may want you to --

18            THE COURT:  Mr. Haley, you look like an angel

19   over there.

20            MR. HALEY:  Judge, I like the promise you made

21   about the summation.

22            THE COURT:  You have the same promise.

23            MR. HALEY:  I've endeavored to do so, Judge.

24            THE COURT:  You're doing great.

25            (Recess taken at this point.)

J. Kaiser - Cross/La Russo

1336

1      (After recess.)

2      THE COURT:  Let's bring in the jury.

3      MR. LA RUSSO:  Your Honor, thank you for the

4  time.  We've tried to cut it down so we can get ourselves

5  done by hopefully 4:30.

6      THE COURT:  Then the government has redirect.

7      MR. HALEY:  No objection.

8      THE COURT:  We're making every effort to try to

9  finish you today, Mr. Kaiser.

10      THE WITNESS:  Thanks.

11      THE CLERK:  All rise.

12      (Whereupon, the jury entered the courtroom.)

13      THE COURT:  Please be seated.  Go ahead,

14  Mr. La Russo.

15      MR. LA RUSSO:  Thank you, your Honor.

16  BY MR. LA RUSSO:

17  Q.  Mr. Kaiser, I'm going to direct your attention to the

18  investments that were made in Eufora December of 2009.

19  I'm not going to repeat what, much of what you said, but I

20  would like to ask you, isn't it a fact that your testimony

21  was that you didn't personally invest in Eufora in

22  December of 2009; is that correct?

23  A.  That's correct.

24  Q.  And you also testified that the money that was sent

25  was sent to Mr. Richards' client trust account; is that

J. Kaiser - Cross/La Russo

1337

1   correct?

2   A.   Yes, that's correct.

3   Q.   Were you being represented by Mr. Richards at this

4   point in time?

5   A.   No.

6   Q.   Were you at any point working with the hockey players

7   in respect to the Jowdy suit who were represented by

8   Mr. Richards at this time?

9   A.   No.

10   Q.   Would it be fair to say that you knew Mr. Richards at

11   this point; is that correct?

12           MR. MISKIEWICZ:  Objection.

13           THE COURT:  Overruled.  You can answer that.

14   A.   Yes, I met him.

15   Q.   And you trusted that Mr. Richards would forward the

16   funds to Eufora that you sent in December of 2009?

17   A.   I was instructed by Mr. Constantine to send the

18   funds, not to Eufora but the Eufora funds to Mr. Richards.

19   A.   Yes.

20   Q.   Now, just to highlight, you sent wire transfers to

21   Mr. Richards account; is that correct?

22   A.   Yes.

23   Q.   I believe you said 150,000 on December 16th and there

24   was another wire for 50,000 on December 29th, is that

25   accurate?

J. Kaiser - Cross/La Russo

1338

1    A.    Yes.

2    Q.    Let me just show you what's been received in evidence

3    as Government Exhibit 1101.  And those wire transfers are

4    reflected on the dates December 16th and December 29th at

5    the bottom; is that correct?

6    A.    Yes.  That is correct.

7    Q.    And which account did you use to transfer those

8    funds, do you remember?

9    A.    Which account of mine?

10   Q.    Yes.

11   A.    No, not offhand.

12   Q.    How many accounts did you have at this time?

13   A.    A couple.  Maybe three or four.

14   Q.    And it could have been any one of those; is that

15   correct?

16   A.    Yes.

17   Q.    Do you know what accounts the money came from before

18   it was received in your account?  Do you understand the

19   question?  It's a little confusing.

20   A.    No.  I don't recall which accounts it came from.

21   Q.    We know that you testified that the 200,000 was made

22   up of investments by your mother, Mr. Rizzi and

23   Mr. Hughes; is that correct?

24   A.    Yes.

25   Q.    And you don't know which one their accounts the money

J. Kaiser - Cross/La Russo

1339

1     came from that were deposited into yours; is that correct?

2     A.    That's correct.

3     Q.    Did you at any point tell Mr. Constantine that this

4     money the 200,000 belonged to other people?

5     A.    Yes.  The three individuals, the money was coming

6     from Bob Rizzi, TR Hughes, and Delores Patrick.

7     Q.    When did you tell Mr. Constantine that?

8     A.    Before the money came in.

9     Q.    And that was in a personal conversation or in a

10    telephone conversation?

11    A.    In person.

12    Q.    Where?

13    A.    At the hangar.

14    Q.    And who else was there at the time?

15    A.    I don't recall.

16    Q.    And it's your best recollection that what you told

17    him is that this $200,000 was investments by your mother,

18    Mr. Rizzi, and Mr. Hughes; is that correct?

19    A.    Yes.

20    Q.    Certainly not yours?

21    A.    Certainly not mine, correct.

22    Q.    Okay.  Let me show you a document that was displayed

23    for the jury.  It's Government Exhibit JK-1.

24          MR. LA RUSSO:  Only when you're in a rush,

25    Judge, does it happen.

J. Kaiser - Cross/La Russo

1340

1    THE COURT:  Do you want to help him.

2    MR. LA RUSSO:  This is where I need help, Judge,

3    on this.  Thank you.

4    Q.   Now, this a document that you identified as the

5    wiring instructions that you got regarding the 200,000; is

6    that correct?

7    A.   Yes.

8    Q.   Directing that the monies be going to Ron Richards'

9    account in California?

10   A.   Yes.

11   Q.   And then here this is your handwriting, correct?

12   A.   Yes.

13   Q.   Could you tell us what those two accounts are on the

14   left-hand side which begins, I believe it's a 19 and then

15   a 79 -- I'm sorry, both are seven nine.  You see that?

16   A.   They're my accounts.

17   Q.   And what did that writing indicate or signify when

18   you placed it there?

19   A.   I'm not sure.

20   Q.   It says total 150,000 wire, right?

21   A.   Yes.

22   Q.   Could you read the three initials regarding this

23   total 150,000 that you wrote on this document?

24   A.   Mom, TR and Bob.

25   Q.   Would it be fair to say that you're indicating that

J. Kaiser - Cross/La Russo

1341

1    those three are part of the $150,000 that you're referring

2    to in that wire, correct?

3    A.    Yeah, I believe that's the first one wire, yes.

4    Q.    Do you have a similar note indicating who the fourth

5    or the party is for the additional $50,000?

6    A.    It's the same three people.

7    Q.    Do you have a document to reflect that?

8    A.    I'm not sure.

9    Q.    Do you know what account the other $50,000 came from

10   that you sent to Eufora?

11   A.    It was probably would have been those two.

12   Q.    I'm sorry, I misspoke, I meant to Mr. Richards'

13   account?

14   A.    Excuse me.

15   Q.    I misspoke.  I said the wrong account.

16         Do you know which account the additional $50,000

17   came from that you forwarded to Mr. Richards' account?

18   A.    It came from my, one of those two accounts I believe

19   that are on the previous page.

20   Q.    It is your testimony that you had no part of this

21   investment; is that correct?

22   A.    Yes, that's correct.

23   Q.    How much did Mr. Rizzi invest?

24   A.    I believe a third of that, of the 200.

25   Q.    Do you know if that was his personal money or if it

J. Kaiser - Cross/La Russo

1342

1    it belonged to somebody else?

2    A.    I believe it was his personal money.

3    Q.    You don't know for a fact, do you?  You're shaking

4    your head.  I apologize.

5    A.    No.  I believe whether he sent me, wrote me a check I

6    believe it came out of one of his accounts.

7    Q.    And in regards to Mr. Hughes, how much did he invest?

8    A.    I believe about a third of the money.

9    Q.    And to your knowledge, did all of money come from

10   Mr. Hughes or from him personally or from somebody else?

11            MR. MISKIEWICZ:  Objection.

12            THE COURT:  Overruled.  You can answer that.

13   A.    I don't know.

14   Q.    And in regards to your mother, Ethel Kaiser, how much

15   did she invest?

16   A.    A third.

17   Q.    And do you know where her money came from?

18   A.    From my mother.

19   Q.    What account?

20   A.    I don't recall.

21   Q.    Now, Mr. Kaiser, separate and apart from the 200,000

22   that we just talked about, you also facilitated another

23   transfer for Mr. Privitello to Eufora; is that correct?

24   A.    No.

25   Q.    Did you talk to Mr. Privitello in regards to his

J. Kaiser - Cross/La Russo

1343

1  investment?

2  A.   Yes.

3  Q.   Did you know that he was depositing or investing

4  $200,000 in Eufora?

5  A.   Yes.  He was talking with Mr. Constantine on that.

6  Q.   Do you know if his money came from him personally or

7  from somebody else?

8  A.   I believe from him personally.

9  Q.   Prior to actually investing in Eufora Mr. Kaiser, did

10 you have a conversation with Mr. Constantine where he

11 explained what the money would be used for?

12 A.   Yes.

13 Q.   Would it be fair to say that he told you that the

14 company had a loan outstanding that had to be paid?

15 A.   Yes, we had conversations about a loan.

16 Q.   And that Mr. Constantine also explained that it's

17 part of the loan the assets of the company including the

18 patents had to be pledged as collateral?

19 A.   No.  Never.

20 Q.   Well, did he tell thought company had outstanding

21 invoices, bills that had to be paid from one of its

22 issuing banks?

23 A.   No.

24 Q.   Let me show you what's marked for identification as

25 C-72.  (Handing.)

J. Kaiser - Cross/La Russo

1344

1    Would you examine that, please.

2    A.   Yes.

3    Q.   Previously you testified you communicated with

4    Mr. Constantine by e-mail, right?

5    A.   Yes.

6    Q.   As well as in person?

7    A.   Yes.

8    Q.   And do you recognize that is one of the e-mails that

9    you and he used to communicate information?

10   A.   Yes.

11   Q.   And this e-mail was one was sent to you on November

12   25, 2009; is that correct?

13   A.   Yes.

14   Q.   And that would be about maybe three weeks before the

15   first investment was made by you?

16   A.   It wasn't made by me.

17   Q.   You wired it into --

18   A.   Yes.

19   Q.   Mr. Richards account on behalf of others; is that

20   correct?

21   A.   Yes.   That's correct.

22        MR. LA RUSSO:  Your Honor, at this time I ask

23   that this, Defendant's Exhibit C-72 be received.

24        MR. MISKIEWICZ:  No objection.

25        THE COURT:

J. Kaiser - Cross/La Russo

1345

1   Q.    Mr. Kaiser --

2            THE COURT:  Hold on, I'm just asking Mr. Haley.

3            MR. HALEY:  Sorry, your Honor.  No objection,

4   Judge, thank you.

5            THE COURT:  C-72 is admitted.

6            (Defendant's Exhibit Constantine C-72 in

7   evidence.)

8   Q.    In this e-mail, Mr. Constantine refers to you as

9   Johnny; is that correct?

10  A.    Yes.

11  Q.    And he says besides buying the three percent and then

12  in brackets plus or minus two morons, do you know who he

13  was referring to?

14  A.    Yes.  I believe so.

15  Q.    Who were they?

16  A.    They were two hockey players.

17  Q.    Do you know their names?

18  A.    Ethan Moreau and Owen Nolan.

19  Q.    They had sued Mr. Constantine and others to try and

20  regain their assets; is that correct?

21  A.    I believe they sued Mr. Constantine and Mr. Kenner.

22  Correct.

23  Q.    And it goes on to say we are actually desperately

24  trying to raise three to five million for between 10 and

25  20 percent of the company.  Do you see that?

J. Kaiser - Cross/La Russo

1346

1    A.   Yes.

2    Q.   So before you made the investment he was advising you

3    that they were seeking to raise this kind of money for the

4    company, correct?

5    A.   Yes.

6         I didn't make the investment at that time.

7    Q.   I understand that.

8         But this is before you make the investment?

9    A.   No.

10        Again, I just want to repeat myself.

11   Q.   Your testimony is that you didn't make the

12   investment.  You made it on behalf other people?

13   A.   Yes.

14   Q.   I understand that, thank you.

15        But he also tells you that he needs money and he

16   says here are immediate cash needs, Monday November 30,

17   250,000 to Bancorp card usage fees, urgent.  Monday

18   November 30th, $250,000 to Neptune loan, urgent.  Monday,

19   November 30th, 50,000 to Eufora for may role, et cetera.

20   Tuesday, December 30th, 50,000 to Eufora for payroll, and

21   Tuesday, December 30th, one million to Neptune loan final

22   payment.

23        Did I read that correctly?  Didn't I?

24   A.   Yes.

25   Q.   And so you're being notified before you make the

J. Kaiser - Cross/La Russo

1347

1   investment that at least a substantial amount of money is

2   needed after your investments were made December 30, 2009;

3   is that correct?

4   A.   Yes.

5   Q.   So you were aware when you made your investments that

6   there were outstanding obligations on the part of company?

7   A.   Yes, as per this e-mail, yes.

8   Q.   This e-mail also discloses that there was a loan and

9   the final payment had to be made.  So my question is, were

10  you aware that there was a loan that had to be paid on

11  behalf of the company?

12  A.   Yeah, on e-mail.

13  Q.   I know it's in the e-mail, you read it, you received

14  it?

15  A.   Yes.

16  Q.   So my question is when you testified that you did not

17  know about a loan, in fact you did know about a loan

18  before you made your investment, the investments were

19  made?

20          MR. MISKIEWICZ:  Objection.

21          THE COURT:  Sustained as to form.

22  Q.   Mr. Kaiser, you testified at the time you made the

23  investment on behalf of the people, you did not know that

24  there was an outstanding loan.  I'm asking you does this

25  refresh your recollection that in fact there was?

J. Kaiser - Cross/La Russo

1348

1    MR. MISKIEWICZ:  Objection.

2    THE COURT:  Sustained as to form.

3  Q.   Mr. Kaiser, when you received this e-mail, did you

4  know before you made your investment that Eufora had the

5  obligations that are listed there?

6  A.   I don't recall.

7  Q.   Do you recall e-mail but you don't recall this?

8  A.   Yeah, well, I believe at the time I believe Neptune

9  is and Bancorp is associated with Eufora so it's just part

10 of Eufora to me.

11 Q.   It says Neptune loan Mr. Kaiser, do you see that,

12 Neptune loan?

13 A.   I still think it's part of Eufora.

14 Q.   Well, do you know the person behind Neptune loan?

15 A.   No.

16 Q.   Do you know that there was a lender whose company was

17 known as Neptune?

18 A.   No.

19 Q.   Did you ask Mr. Constantine what the hell are you

20 talking about?

21    MR. MISKIEWICZ:  Objection.

22    THE COURT:  Sustained as to form.

23    MR. LA RUSSO:  Withdraw that.

24 Q.   Did you e-mail Constantine back and say what is this

25 loan all about?  Did you do that?

J. Kaiser - Cross/La Russo

1349

1    A.   No, I don't believe that I did.

2    Q.   I know --

3              MR. MISKIEWICZ:  Objection.

4              MR. LA RUSSO:  Withdraw that.

5    Q.   Would it be fair to say that this e-mail was

6    communicated to you as part of the information that you

7    used to evaluate whether to recommend investments to your

8    mother and your friend?

9    A.   No.

10   Q.   You didn't?

11   A.   No.

12   Q.   Mr. Kaiser, let's finish off the e-mail at this

13   point, please.  The balance, that's balance of the loan,

14   right?  How did you understand it when you received the

15   e-mail?

16   A.   Was that a question?

17   Q.   The balance of the loan?

18             MR. MISKIEWICZ:  Objection.

19             THE COURT:  He's asking you whether when you saw

20   the term the balance in the e-mail what was your

21   understanding that that related to?

22             THE WITNESS:  I thought that was related to

23   future payments with the deal with Metabank.

24   Q.   The balance 1,400,000 to 3,400,000 will be supplied

25   as needed to advertise the Credit Builder and sweepstakes

J. Kaiser - Cross/La Russo

1350

1    products nationally -- that's in brackets the last word --

2    and to license the products to Metabank and others between

3    December 1st and April 1st, 2010.

4            The question is tell us what your understanding

5    was?

6    A.   My understanding was the deal with Metabank was being

7    signed, and that it had to be future payments to Metabank,

8    Metabank was going to be producing over a million dollars

9    a month.

10   Q.   So did you understand that at the time that you read

11   it?

12   A.   I understood exactly what I just said.

13   Q.   Did you understand the paragraph above which talked

14   about the Neptune loan?

15           MR. MISKIEWICZ:  Objection.

16           THE COURT:  Sustained.  Asked and answered.

17   Q.   By the way, Mr. Kaiser, do you have a recollection of

18   the percentage of ownership interest in Eufora that you

19   and your associates were each going to be purchasing for

20   the amount of money that you invested in December?

21   A.   Which associates are you referring?

22   Q.   Your mother, Mr. Hughes and Mr. Rizzi.

23   A.   I believe there were for 200,000 I believe it was 1.5

24   percentage of Eufora.

25   Q.   Were you to get any portion of that?

J. Kaiser - Cross/La Russo

1351

1   A.   No.

2   Q.   Mr. Kaiser, shortly after you and Mr. Privitello

3   wired the money for the Eufora investment to Mr. Richards'

4   account, do you recall receiving an e-mail from an

5   individual by the name of Carleton CR Gentry as before?

6        MR. MISKIEWICZ:  Objection to form, you and

7   Mr. Privitello wired the money.

8        MR. LA RUSSO:  I'll rephrase it, Judge and break

9   it down.

10  Q.   You know that Mr. Privitello likewise forwarded

11  $200,000 to Eufora?

12  A.   Yes.

13  Q.   Deposited into the Ron Richards account?

14  A.   Wherever Mr. Constantine instructed him to.

15  Q.   So there's in December, approximately that the point

16  400,000 from Mr. Privitello, and 200,000 that you invested

17  and you testified and your mother and the two associates?

18       MR. MISKIEWICZ:  Objection to form.

19       THE COURT:  Overruled.  You can answer that?

20  A.   Yes.

21  Q.   So do you recall receiving an e-mail from Mr. CR

22  Gentry at Eufora after the investments were made?

23  A.   Which e-mail?

24  Q.   That you got a number of e-mails do you recall

25  communications with Mr. Gentry by way of e-mail?

J. Kaiser - Cross/La Russo

1352

1   A.   I believe Mr. Gentry was the one that was organizing

2   the percentage and putting the documentation together for

3   them.

4   Q.   Tell us who CR Gentry is, if you know?

5   A.   I believe that he was the upper management of Eufora.

6   Q.   So according to your testimony at this point in time,

7   he's communicating with you to formalize your investment,

8   right?

9   A.   I believe Mr. Constantine told Mr. CR Gentry to --

10  about putting something in writing reference my mother, TR

11  Hughes, Bob Rizzi.

12  Q.   I'm going to show you what's been marked as C-73 for

13  identification.  Is that one of the e-mails received from

14  Mr. Gentry during the period of time that you were

15  communicating him in regards to your investments?

16  (Handing.) ?

17  A.   Yes, I believe so.

18  Q.   Have you had a chance to look at that thoroughly

19  before answering?

20  A.   Yes.

21          MR. LA RUSSO:  Your Honor, at this time I ask

22  that C-73 be received at this time.

23          MR. MISKIEWICZ:  Objection, hearsay.

24          THE COURT:  Overruled.  Mr. Haley, do you have

25  any objection?

J. Kaiser - Cross/La Russo

1353

1     MR. HALEY:  No, sir.

2     THE COURT:  C-73 is admitted.

3     (Defendant's Exhibit Constantine C-73 in

4  evidence.)

5     MR. LA RUSSO:  I'm just waiting just a second,

6  your Honor.  The juror is coughing.  Maybe if she gets

7  some water.

8     A JUROR:  I have water, thank you.

9     THE COURT:  Go ahead.

10    MR. LA RUSSO:  Thank you, your Honor.

11 Q.   Mr. Kaiser, this e-mail is to you December 16, 2009

12 and that was after the first 150,000 was sent in to

13 Eufora; is that correct?

14 A.   Yes.

15 Q.   And John is you?

16 A.   Yes.

17 Q.   Attached is a word document that contains the

18 membership interest you provided for Triple Diamond Black

19 and the other new members.  I need to have you confirm the

20 following.  What is Triple Diamond Black?

21 A.   That was an LLC that was set up by Mr. Kenner for

22 myself.

23 Q.   For what purpose?

24 A.   For my Eufora investment.

25 Q.   So you had an LLC to hold your Eufora investment?

1354

1   A.    Yes.

2   Q.    When was that set up?

3   A.    I'm not sure.

4   Q.    Did you ever see any documentation in regards to it?

5   A.    Yes.

6   Q.    Would it be fair to say that that entity was

7   according to you to hold the monies that you claimed that

8   you were owed by Mr. Kenner; is that correct?

9   A.    That was holding what Mr. Constantine was at that

10  point saying what my membership was.

11  Q.    Well, it certainly wasn't anything to do with the

12  money that was sent on December 16th of 2009; is that

13  correct?

14  A.    That's correct.

15  Q.    And this Black Diamond Trust, it says -- I'm reading

16  down so you can follow with me, you are the managing

17  member?

18  A.    Yes.

19  Q.    What did you understand that to mean?

20  A.    That I was in charge of it.  It was my LLC.

21  Q.    And then Mr. Gentry asks for the tax ID and the EIN

22  number of the trust, correct?

23  A.    Yes.

24  Q.    And then asks does Ethel have an e-mail account phone

25  number; is that correct?

J. Kaiser - Cross/La Russo

1355

1    A.    Yes.

2    Q.    And would it be fair that's in regards to her

3    investment, correct?

4    A.    Yes.

5    Q.    And then lastly, it says are these the addresses that

6    we should use for all correspondence of each person and

7    their K1's, correct?

8    A.    Yes.

9    Q.    What's a K-1?

10   A.    When you have an LLC that's your record of tax, so

11   the K-1 you'll get annually.

12   Q.    And I'm not going to read the next paragraph, it

13   talks about the operating agreement that's being provided.

14   And just turn to the next page.  I'm going to read the

15   highlighted portion if I could.

16             In order to complete this, according to the

17   operating agreement, I need to call a board of managers

18   meeting.  I have already notified the board member of this

19   and they are aware of the member changes.  I am hoping I

20   can get all managers lined up for Friday.

21             What did you understand that to mean?

22   A.    Board members of Eufora.  I assume he was getting

23   them together.

24   Q.    In order to improve the investments that you were

25   seeking to make; is that correct?

J. Kaiser - Cross/La Russo

1356

1   A.    Yes.

2   Q.    At this point when he writes the e-mail he's just

3   tells you he's going to try to get them together to

4   accomplish that purpose?

5   A.    Yes.

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. KAISER-CROSS-LaRUSSO                    1357

1    Q     And attached to this document are the percentages that
2    you and the others were to receive as a result of investments
3    in Eufora, is that correct?
4    A     Yes.
5    Q     You saw this, am I right?
6    A     Yes.
7    Q     Triple Black Diamond, which is you, is 2.11, is that
8    correct?
9    A     Yes.
10   Q     According to your testimony, Mr. Kaiser, that's supposed
11   to represent monies that Mr. Kenner said you had invested in
12   Eufora in the past, is that correct?
13   A     Yes, that is correct.
14   Q     That was his statement to you, is that right?
15   A     Yes.  Well, he said it should have been a lot more.  The
16   percentage should have been a lot higher.
17   Q     Your mother, her percentage was .5?
18   A     Yes.
19   Q     Mr. Rizzi, .5?
20   A     Yes.
21   Q     Mr. Hughes, .5?
22   A     Yes.
23   Q     And then the last one is Mr. Privitello, .15, is that
24   correct?
25   A     Yes.

J. KAISER-CROSS-LaRUSSO                                    1358

1           THE COURT:  It is 1.5.

2           MR. LaRUSSO:  I'm sorry, Judge.  It is 1.5.

3  Q    Mr. Kaiser, do you know the term "credit investor"?

4           MR. LaRUSSO:  I apologize, Judge.  Just a moment.

5  Q    Do you know the term "credited investor"?

6  A    Yes, I do.

7  Q    What does that mean?

8           MR. MISKIEWICZ:  Objection.

9           THE COURT:  No, he can answer that.

10 A    As it relates to what?

11 Q    As it relates to the placement of investors, what is a

12 credited investor?

13 A    You checked out already.

14 Q    Meaning what?

15 A    A background proof of funds.

16 Q    Something like due diligence?

17 A    Yes.

18 Q    Were you a credited investor?

19          MR. MISKIEWICZ:  Objection.

20          THE COURT:  Overruled.  Was he?

21          MR. LaRUSSO:  Did he consider himself a credited

22 investor.

23          THE COURT:  You can answer that.

24 A    Yes.

25 Q    As well as the other individuals that you invested for?

1    A    Yes.

2    Q    Before wiring the money to Mr. Richards' account, do you

3    recall a conversation with Mr. Constantine where he tells you

4    about some of the licensing deals that were being negotiated

5    between Eufora and certain large prepaid credit card

6    companies?

7    A    Yes.

8    Q    That was actually part of the appeal of the investment

9    opportunity, would you agree with me?

10   A    It certainly was.

11   Q    When Mr. Constantine told you about those perspective

12   licensing deals, did you believe him?

13   A    Yes.

14   Q    Did you believe he was being truthful about those

15   licensing deals now?

16        MR. MISKIEWICZ:  Objection.

17        THE COURT:  Sustained.

18   Q    Mr. Kaiser, yesterday you testified that a couple of the

19   companies that you remember that were large potential

20   licensees were American Express and Visa.  I believe those are

21   the two that you mentioned?

22   A    And also Metabank.

23   Q    And Metabank.

24        Do you remember a company called Net Spend, N-E-T,

25   S-P-E-N-D.

1  A    Yes, that was another one.

2  Q    Do you remember corresponding with Mr. Constantine about

3  these?

4  A    Yes.

5  Q    I will show you what's been marked for identification as

6  C-74.  And trying to save you some time, I will show you what

7  has been marked for identification as C-75.  Will you look at

8  those, please.

9         (Handing.)

10 Q    I will try to phrase a general question so we don't have

11 to go through the e-mails line for line.  Do you recognize

12 those?

13 A    Yes.

14 Q    Are those the e-mails that you received from

15 Mr. Constantine regarding the potential licensees?

16 A    Yes.

17         MR. LaRUSSO:  I ask that C-74 and C-75 be received

18 at this time.

19         MR. MISKIEWICZ:  Objection.  Hearsay.

20         MR. HALEY:  No objection.

21         THE COURT:  I will place the ruling on the record.

22 C-74 and C-75 are admitted in evidence.

23         (So marked as Defense C-74 and C-75 in evidence.)

24 Q    Would you say that Mr. Constantine was communicating

25 openly with you about the progress for the perspective

J. KAISER-CROSS-LaRUSSO                    1361

1   licensing deals with Net Spend and Metabank?

2   A    Yes, at that time he was.

3   Q    Now, going back to the lawsuit that was filed against

4   Mr. Constantine in Arizona by Mr. Stober, was he your

5   attorney?

6   A    He was -- I guess you could say I was working with him.

7   Q    Did you sign an agreement?

8   A    I believe that I did.

9   Q    Were you a plaintiff in that lawsuit?

10  A    I believe I was.

11  Q    You have no knowledge?

12  A    Which lawsuit?

13  Q    The Arizona lawsuit that Mr. Stober filed in October of

14  2010?

15  A    I don't know if that was the three individuals or I was.

16  Q    Let me see if I can refresh your recollection.  Remember

17  the suit by the hockey players, Mr. Rizzi, Mr. Hughes?

18  A    Yes.

19  Q    Were you part of that suit?

20  A    I believe I was.

21  Q    You're not sure?

22  A    I'm just getting a little confused between that and the

23  other suit.

24  Q    Let's stick to the Arizona one.  You have no recollection

25  whether you were or weren't, is that correct?

J. KAISER-CROSS-LaRUSSO                                    1362

1    A    That's correct.

2    Q    Well, would it be fair to say that the Arizona lawsuit,

3    as understood it, dealt with Eufora investments, recovering

4    their money, correct?

5    A    Yes.

6    Q    If I told you were not listed as a plaintiff in that

7    suit, would that surprise you?

8    A    Well, like I said, I don't recall.  I guess it was a

9    strategic from Mr. Stober.

10   Q    If you accept that fact, would you tell us why you were

11   not a plaintiff in that case?

12   A    I don't know.

13        MR. MISKIEWICZ:  Objection.  Relevance.

14        THE COURT:  You can answer.

15   A    I'd have to ask Mr. Stober that.

16   Q    Did you ask Mr. Stober to be a plaintiff in an action

17   brought by Eufora investments against Mr. Constantine?

18   A    Like I said, I'd have to ask Mr. Stober that question.

19   Q    Related to a little different fact pattern.  Before the

20   lawsuit was filed, were you part of a group who attempted to

21   purchase a Eufora loan using Mr. Stober?

22   A    No.  We were attempting to get all the paperwork and

23   documentation on it.  I was in contact with Mr. Constantine

24   with reference to the same.

25   Q    You were aware that there was a loan, is that correct?

J. KAISER-CROSS-LaRUSSO                          1363

1          MR. MISKIEWICZ:  Objection.

2   Q    At this point?

3   A    Which loan are you referring to?

4   Q    The Eufora loan, the one that you were advised of in

5   November of 2009, the Neptune loan.

6   A    I believe the company was being rolled up into a new

7   entity, a new Eufora with a Mr. Volpe buying it.

8   Q    But isn't it a fact that you and others were seeking to

9   find a loan for yourself and a particular group of people?

10  A    No.  Like I said, a Mr. Volpe was buying and we were

11  trying to get answers to find out what Eufora was going to

12  turn into, what everyone's membership was going to be

13  interested in.

14  Q    Do you know if either yourself or others approached the

15  lender to find a loan on behalf of yourself and others?

16          MR. MISKIEWICZ:  Objection.  Asked and answered.

17          THE COURT:  Sustained.

18  Q    We know, Mr. Kaiser, that your testimony is that there

19  was a person by the name of Volpe involved in the purchase of

20  the loan.  But did you try -- did you participate with a group

21  of people to buy -- and I'll use the word "first," before

22  Mr. Volpe?

23  A    My understanding is Mr. Volpe had bought the loan.  We

24  couldn't find out anything that was going on with the company.

25  If we went to sign the leases that -- that released everybody

1   from any kind of fraud before or after, it was a 19-page

2   release.  And that if we didn't sign it, Mr. Volpe was taking

3   the company to Europe.

4   Q    Where did you learn that from?

5   A    I learned that from Mr. Constantine.

6   Q    In a direct conversation with him?

7   A    Yes.

8   Q    When did you have that conversation?

9   A    I had it in 2010.

10  Q    Do you remember when in 2010?

11  A    I don't recall the exact date.

12  Q    On the phone or in person?

13  A    I believe it was both.

14  Q    Well, Mr. Kaiser, at this point in time, you had been

15  part of a group that retained Mr. Stober, is that right?

16  A    Yes.

17  Q    He was representing you with regard to your interest in

18  Eufora, is that correct?

19  A    Yes.  He was looking for documentation and some

20  transparency, and Mr. Stober was assisting us in that.

21  Q    Can you tell us, in your experience, to buy the loan of a

22  company whose assets are collateralized, is that a significant

23  event?

24       MR. LaRUSSO:  I'll withdraw that.  That's improper.

25  Q    A loan from a company whose assets are collateralized, a

J. KAISER-CROSS-LaRUSSO                    1365

1   lender would have substantial input in the direction of that

2   company, is that correct?

3            MR. MISKIEWICZ:  Objection.

4            THE COURT:  Sustained.

5   Q    Could you tell us why you were seeking to buy the loan?

6            MR. MISKIEWICZ:  Objection.

7            THE COURT:  Sustained.  He already testified that he

8   wasn't seeking to buy the loan.

9   Q    So people that you were affiliated with, were they

10  attempting to buy the loan?

11           MR. MISKIEWICZ:  Objection.

12           THE COURT:  It was asked and answered.

13           MR. LaRUSSO:  One moment, Your Honor.

14  Q    Now, Mr. Kaiser, you testified about a conversation where

15  Mr. Constantine talked about buying the players' share for

16  $0.50 on the dollar, do you remember that?

17  A    I certainly do.

18  Q    Isn't it a fact that it was you that wanted to buy some

19  of the players for $0.50 on the dollar because you had been

20  under the impression that you had invested $2 million in

21  Eufora only to learn that you didn't have that interest?

22  A    No.  That's not correct.  That is incorrect.

23  Q    When did the call take place between Mr. Constantine and

24  the hockey players?

25  A    It was in early 2010.

J. KAISER-CROSS-LaRUSSO                                    1366

1    Q    Can you tell us, if I remember -- withdrawn.

2              Did he call all the three hockey players?

3    A    Yes, he did.

4    Q    Individually?

5    A    Yes.

6    Q    Can you tell us what specific amounts, if any, he

7    discussed with them during those calls?

8    A    He asked to buy them out of Eufora for whatever they had

9    in it.  Let me back up.  First he said the three individuals

10   he was going to call were all broke.  Then he called them up

11   in front of me, on speakerphone, in succession, and said the

12   same thing:  Would you like to buy your Eufora -- if I can buy

13   your Eufora investment for $0.50 on the dollar, would you take

14   it?  And they said yes.  Each individual he called said yes.

15   Q    Did he mention anything about specific dollar amounts?

16   A    50 percent of what they had, there shares were.  So if

17   someone spent 100,000, he'd give him $50,000 and they were our

18   of Eufora.

19   Q    One of the calls was made to a man by the name of Greg

20   DeVries, is that correct?

21   A    Yes.

22   Q    He was a hockey player?

23   A    Yes.

24   Q    Do you know if any of these three hockey players had

25   previously asked that their interest be bought out before that

1  conversation?

2          MR. MISKIEWICZ:  Objection.

3          THE COURT:  Overruled.

4          If you know, you can answer that.

5  A    I don't know.

6  Q    You know there were at least three other hockey players

7  that were looking to have their interest bought out, is that

8  correct.  Mr. Juneau, Mr. Moreau?

9  A    I wasn't dealing with them.  That was through

10 Mr. Constantine.

11 Q    They were looking to have their interest in Eufora bought

12 out, correct?

13 A    Well, I don't think these three individuals knew that --

14 about the Metabank deals.  That's the difference.

15 Q    You're speculating.

16 A    No, I'm not.

17 Q    You said you think there's a difference.  And you know

18 that, Mr. Kaiser?

19         MR. MISKIEWICZ:  Objection.

20         THE COURT:  Sustained.  Just ask questions

21 Mr. LaRusso, don't lecture him.

22         MR. LaRUSSO:  I'm looking for an exhibit, Your

23 Honor.  I'll be right there.

24         Your Honor, I will move on.  I hope I will find it

25 before we finish today.

J. KAISER-CROSS-LaRUSSO                                        1368

1   Q    Did there a come point in time where Mr. Constantine --

2              THE COURT:  It's 4:30.  We're going to break for the

3   day.  I said I'll give you an estimate at the end of the week

4   each week.  We went slowly this week.  We didn't have a full

5   day Monday, but we went slower than anticipated this week.  We

6   will make up that time next week.  So I'll speak to the

7   lawyers, see how we're doing.  We'll catch up next week.

8              I'll see you Monday morning at 9:30.  Don't read or

9   listen to anything regarding the case.  Don't discuss the case

10  among yourselves or with anyone else.  I'll let you know the

11  schedule next week.

12             Everyone else, I'll see you Monday morning at 9:30.

13             (Whereupon the jury leaves the courtroom except

14  Juror No. 5.)

15             THE COURT:  Can you go back into the jury room for a

16  moment.  I'll speak to the lawyers first.

17             You can be seated.

18             Mr. Kaiser, you can step down.  I apologize that you

19  have to come back Monday.

20             THE WITNESS:  Yes, Your Honor.

21             (Witness excused at 4:30 p.m.)

22             THE COURT:  My inclination is to excuse Juror No. 5.

23  We still have five alternates.  I've already said at this

24  point in trial we're already behind, we can't lose two days

25  next week.  The jurors will be extremely unhappy, to say the

J. KAISER-CROSS-LaRUSSO                    1369

1    least.

2            Is there any objection to excusing him?

3            MR. MISKIEWICZ:  Not at all from the government.

4            MR. LaRUSSO:  No, Your Honor, not at all.

5            MR. HALEY:  No, sir.

6            THE COURT:  Bring him in.

7            (Whereupon Juror No. 5 reenters the courtroom.)

8            THE COURT:  You can be seated.

9            I'm going to excuse you from the case.  You probably

10   figured out, I can't afford to lose two days.  As I said, we

11   have alternates available so I'm going to excuse you from the

12   case.  I appreciate your service.  I just want to emphasize to

13   you that on your way out, if there's jurors back there, you

14   can't discuss the case at all with them, obviously, on your

15   way out.

16           JUROR NO. 5:  Thank you, Your Honor.

17           THE COURT:  All right.  So I assume it's the same

18   line up we've been talking about for three days.

19   Mr. Privitello is next.

20           MR. MISKIEWICZ:  We're shuffling because people have

21   conflicts in this schedule.  But as of right now, here's our

22   best estimate:  Mr. Privitello, followed by Tyson Nash,

23   followed by Ricardo Banciella.  Then we'll probably get to

24   Mr. Chris Manfredi, Mr. Grdina, Richards, Darryl Sydor,

25   William Ranford.

J. KAISER-CROSS-LaRUSSO                    1370

1        Our handwriting expert, John Osborn, texted me late

2   yesterday.  He has a number of other trials.  So I may put him

3   on early next week.  Earlier than I anticipated.  So probably

4   Wednesday or Thursday of next week.

5        Also, for the record, I have provided his entire

6   report, curriculum vitae, the blow-ups ups and photographs of

7   materials that he provided.  Mr. LaRusso asked for additional

8   exemplars from Mr. Kaiser, which we did last night.  We

9   provided him the additional exemplars.

10        MR. LaRUSSO:  We acknowledge that, Your Honor.

11        MR. MISKIEWICZ:  That's the line-up for the moment.

12        THE COURT:  Okay.

13        MR. HALEY:  Judge, I mentioned this before, but I

14   can work it out with the government.  I am going to need to

15   confirm addresses on perspective government witnesses.  My

16   best source of that is, frankly, through the government.  They

17   have greater resources than me.

18        THE COURT:  They will provide you with whatever

19   current addresses they have.

20        MR. MISKIEWICZ:  Sure.

21        THE COURT:  Again, I don't want to badger everybody,

22   and Mr. LaRusso, I know you get the brunt of it because you're

23   always going last, I really urge you to look, every once in a

24   while -- this goes for the government too, you should look

25   over to the jury and see, whether or not, when you go on and

J. KAISER-CROSS-LaRUSSO                    1371

1    on, in the examination of any witness, whether it is

2    productive.  Look at their body language sometimes as you're

3    questioning.  That should give you some indication of wether

4    or not the questioning of the witnesses is going on for too

5    long.  Because it's not productive, it's not helpful for

6    anybody when witnesses are on the stand for three days,

7    whatever point any lawyer is trying to make after that, at

8    that stage can get lost because the juror listens to this

9    person for ever and ever.  So just keep that in mind when

10   you're up there doing the questioning.

11              MR. HALEY:  Also, simply so Your Honor might

12   understand, I never got up to object, but my point is with

13   regards to one particular government witness, and I'm not here

14   to be critical, my view of are redirect is redirect.  It's not

15   a repetition of direct.

16              THE COURT:  The government, I pointed that out to

17   Mr. Miskiewicz, and the redirects since then have been

18   extremely short.

19              MR. HALEY:  Yes.

20              THE COURT:  I hope it continues.  I haven't really

21   heard -- we've got a lot of repetition on cross.  You've

22   repeated what he said on direct.  I agree with you, I

23   certainly don't expect to hear it when I hear for the third

24   time what he has to say on these various topics.  So I will

25   make sure if the government redirects on anything, that it's

1372

1    something that's come up before.

2              I'll see you on Monday at 9:30.

3              (Whereupon the matter was adjourned to May 19, 2015,

4    at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

W I T N E S S E S                                              1373

1

2   J O H N     K A I S E R                                   **1185**

3   CROSS EXAMINATION                                         **1186**

4   BY MR. LARUSSO

5

6   P A T R I C K     G O N Y A                               **1276**

7   DIRECT EXAMINATION                                        **1276**

8   BY MS. KOMATIREDDY

9   CROSS EXAMINATION                                         **1296**

10  BY MR. LARUSSO

11

12

13  JOHN KAISER                                               **1307**

14  BY MR. LARUSSO

15

16

17

18

19

20

21

22

23

24

25

EXHIBITS                                    1374

GOVERNMENT EXHIBIT 3397                          1279

GOVERNMENT EXHIBIT 3321                          1286

GOVERNMENT'S EXHIBIT 8021-R                      1289


DEFENSE EXHIBIT C-81 IN EVIDENCE                 1317

DEFENSE EXHIBIT C-66 IN EVIDENCE                 1326

DEFENDANT'S EXHIBIT CONSTANTINE C-72             1345

DEFENDANT'S EXHIBIT CONSTANTINE C-73             1353

DEFENSE C-74 AND C-75                            1360

## $

**$0.50** [3] - 1365:16, 1365:19, 1366:13
**$100,000** [2] - 1331:17, 1332:8
**$105** [1] - 1206:4
**$11,400** [1] - 1325:6
**$110,000** [2] - 1219:19, 1270:22
**$12,268** [1] - 1219:5
**$13,377.57** [1] - 1288:1
**$15** [2] - 1204:25, 1205:19
**$15,000** [2] - 1287:12, 1288:7
**$150,000** [1] - 1341:1
**$172,000** [1] - 1220:6
**$180,000** [1] - 1213:25
**$195,000** [1] - 1220:12
**$20** [1] - 1186:25
**$200,000** [3] - 1339:17, 1343:4, 1351:11
**$221,000** [1] - 1196:16
**$250,000** [1] - 1346:18
**$261,000** [1] - 1318:6
**$275,000** [10] - 1238:14, 1238:18, 1238:21, 1240:15, 1240:25, 1244:23, 1246:8, 1248:8, 1318:9, 1324:8
**$3,000** [2] - 1219:3, 1298:10
**$3,677.40** [1] - 1287:19
**$305** [1] - 1221:16
**$34,513** [1] - 1219:11
**$50,000** [4] - 1341:5, 1341:9, 1341:16, 1366:17
**$500,000** [1] - 1264:15
**$550,000** [1] - 1188:23
**$580,026** [1] - 1223:13
**$60,000** [1] - 1196:1
**$8,000** [1] - 1286:23
**$800,000** [3] - 1217:8, 1220:17, 1221:24
**$840,000** [2] - 1192:8, 1195:1

## '

**'02** [1] - 1198:11
**'03** [1] - 1198:12
**'06** [2] - 1191:13, 1207:12
**'07** [5] - 1191:13,
1238:1, 1247:17, 1327:11, 1329:4
**'08** [2] - 1328:7, 1328:10
**'08** [1] - 1328:7

## 1

**1** [9] - 1210:13, 1210:21, 1213:3, 1213:24, 1221:16, 1222:5, 1289:21, 1294:4, 1325:2
**1,400,000** [1] - 1349:24
**1.1** [1] - 1215:12
**1.5** [3] - 1350:23, 1358:1, 1358:2
**1.7** [2] - 1240:18, 1240:24
**10** [7] - 1210:24, 1211:22, 1211:24, 1212:2, 1230:3, 1312:16, 1345:24
**100** [1] - 1181:7
**100,000** [9] - 1317:23, 1318:2, 1326:24, 1328:18, 1328:21, 1329:1, 1329:7, 1331:3, 1366:17
**10:25** [1] - 1202:15
**10:30** [1] - 1185:15
**10:45** [1] - 1184:11
**10:50** [2] - 1202:13, 1202:14
**11** [10] - 1264:6, 1269:2, 1292:23, 1324:15, 1325:8, 1325:13, 1325:15, 1325:22, 1329:14, 1329:16
**11,400** [2] - 1317:18, 1325:22
**1101** [1] - 1338:3
**11501** [1] - 1181:2
**11572** [1] - 1181:5
**11722** [2] - 1180:17, 1181:8
**11749** [1] - 1180:23
**1185** [1] - 1373:2
**1186** [1] - 1373:3
**11:00** [1] - 1203:10
**12** [2] - 1287:25, 1306:9
**1276** [2] - 1373:6, 1373:7
**1279** [1] - 1374:2
**1286** [1] - 1374:3
**1289** [1] - 1374:4
**1296** [1] - 1373:9

**12th** [4] - 1286:21, 1287:6, 1287:7, 1296:16
**13-CR-607** [2] - 1180:3, 1181:15
**1307** [1] - 1373:13
**1317** [1] - 1374:7
**1326** [1] - 1374:8
**1345** [1] - 1374:9
**1353** [1] - 1374:10
**1360** [1] - 1374:11
**1395** [1] - 1277:8
**13th** [1] - 1287:11
**14** [4] - 1180:9, 1206:7, 1207:14, 1306:9
**15** [9] - 1186:25, 1187:4, 1190:6, 1205:4, 1249:24, 1267:13, 1294:2, 1312:7, 1357:23
**15,000** [1] - 1295:25
**150,000** [4] - 1337:23, 1340:20, 1340:23, 1353:12
**15th** [1] - 1288:6
**16** [4] - 1206:7, 1293:12, 1293:13, 1353:11
**1601** [1] - 1180:22
**16th** [3] - 1337:23, 1338:4, 1354:12
**17** [6] - 1219:4, 1219:10, 1270:11, 1293:13, 1329:23, 1330:1
**1703** [3] - 1324:21, 1324:24, 1324:25
**1706** [2] - 1328:5, 1329:3
**172** [1] - 1292:15
**18** [5] - 1190:7, 1220:5, 1220:12, 1293:16, 1295:5
**18290** [1] - 1290:18
**19** [2] - 1340:14, 1372:3
**19-page** [1] - 1364:1
**199** [1] - 1295:19
**1:30** [4] - 1255:7, 1258:4, 1270:4, 1274:20
**1:45** [1] - 1275:2
**1:50** [1] - 1275:16
**1st** [4] - 1326:8, 1328:7, 1350:3

## 2

**2** [10] - 1220:10,

**1250:23**, 1264:10, 1319:14, 1320:10, 1320:22, 1321:6, 1322:14, 1329:5, 1365:20
**2.11** [1] - 1357:7
**2.2** [3] - 1253:13, 1319:25, 1323:3
**2/11** [1] - 1317:18
**20** [12] - 1185:15, 1187:4, 1252:16, 1252:21, 1253:3, 1253:22, 1275:6, 1278:13, 1279:12, 1306:3, 1333:4, 1345:25
**200** [1] - 1341:24
**200,000** [6] - 1338:21, 1339:4, 1340:5, 1342:21, 1350:23, 1351:16
**2000** [1] - 1199:8
**2001** [1] - 1325:9
**2002** [3] - 1199:11, 1199:13, 1199:19
**2003** [1] - 1187:24
**2004** [4] - 1186:7, 1195:12, 1199:8, 1204:16
**2005** [2] - 1205:17, 1207:14
**2006** [10] - 1186:8, 1188:1, 1199:18, 1204:17, 1206:3, 1206:11, 1206:13, 1210:7, 1218:4, 1294:5
**2007** [28] - 1196:11, 1236:18, 1238:8, 1238:9, 1243:4, 1243:10, 1245:14, 1247:6, 1294:5, 1324:2, 1324:8, 1324:13, 1324:15, 1324:16, 1325:2, 1325:8, 1325:13, 1326:8, 1327:21, 1328:11, 1328:17, 1329:18, 1331:6, 1332:20, 1333:8, 1333:9
**2008** [12] - 1188:14, 1188:18, 1236:19, 1249:2, 1268:23, 1268:24, 1268:25, 1306:9, 1306:13, 1328:16, 1329:19, 1331:7
**2009** [41] - 1239:25, 1240:3, 1240:5,

**1250:19**, 1250:23, 1268:19, 1269:1, 1269:3, 1270:22, 1277:3, 1277:10, 1278:1, 1278:13, 1278:22, 1279:12, 1279:14, 1286:21, 1287:4, 1287:6, 1287:7, 1287:11, 1287:17, 1287:23, 1287:25, 1288:6, 1289:6, 1291:5, 1293:6, 1296:15, 1296:16, 1306:9, 1306:14, 1323:2, 1336:18, 1336:22, 1337:16, 1344:12, 1347:2, 1353:11, 1354:12, 1363:5
**2010** [28] - 1189:13, 1189:20, 1189:23, 1193:2, 1193:6, 1197:18, 1209:10, 1209:18, 1232:12, 1245:21, 1245:23, 1246:16, 1247:15, 1247:17, 1256:13, 1263:21, 1268:19, 1278:2, 1306:2, 1306:5, 1318:20, 1322:12, 1322:14, 1350:3, 1361:14, 1364:9, 1364:10, 1365:25
**2011** [5] - 1192:6, 1192:17, 1325:5, 1325:7, 1325:10
**2013** [4] - 1212:14, 1213:1, 1269:5, 1269:13
**2015** [2] - 1180:9, 1372:3
**2103** [2] - 1217:21, 1217:25
**22** [1] - 1292:16
**23rd** [3] - 1289:6, 1291:4, 1293:6
**24** [2] - 1324:16, 1331:17
**25** [7] - 1184:10, 1291:7, 1326:24, 1329:16, 1329:23, 1330:2, 1344:12
**25,000** [3] - 1317:23, 1317:25, 1329:14
**250,000** [1] - 1346:17
**25th** [3] - 1223:8, 1223:10, 1224:21
**26** [1] - 1181:4
**275,000** [9] - 1243:4,

1243:10, 1243:25, 1245:14, 1247:2, 1247:6, 1327:20, 1331:3, 1332:18
**28** [1] - 1325:2
**289369** [2] - 1223:12, 1224:16
**28th** [1] - 1287:17
**29th** [2] - 1337:24, 1338:4
**2O01** [1] - 1224:14

### 3

**3** [4] - 1220:10, 1238:17, 1290:7, 1294:3
**3,400,000** [1] - 1349:24
**3.5** [1] - 1209:2
**30** [11] - 1210:23, 1211:16, 1211:19, 1212:18, 1212:20, 1212:21, 1213:8, 1326:8, 1328:7, 1346:16, 1347:2
**30-day** [3] - 1211:1, 1211:17, 1212:11
**300** [2] - 1181:1, 1221:2
**30th** [4] - 1346:18, 1346:19, 1346:20, 1346:21
**31** [1] - 1294:5
**3223** [1] - 1287:15
**32nd** [1] - 1211:5
**3321** [6] - 1283:18, 1284:12, 1286:4, 1286:6, 1287:10, 1374:3
**3322** [1] - 1287:3
**3323** [2] - 1287:3, 1287:20
**3324** [1] - 1287:4
**3324-A** [2] - 1288:2, 1288:12
**3397** [5] - 1278:5, 1278:24, 1279:2, 1279:3, 1374:2
**341** [1] - 1181:2
**350** [1] - 1221:3
**36** [1] - 1204:7
**37** [3] - 1316:5, 1316:22, 1317:4
**3rd** [1] - 1256:13

### 4

**4** [7] - 1189:9, 1189:25, 1190:25,

**79** [1] - 1340:15

### 8

**8** [5] - 1212:1, 1253:9, 1292:22, 1292:23, 1323:1
**800** [1] - 1221:9
**800,000** [1] - 1221:2
**8021-C** [1] - 1289:10
**8021-R** [5] - 1288:22, 1289:9, 1289:18, 1289:19, 1374:4
**81** [1] - 1316:18
**82,915** [1] - 1219:19
**83** [1] - 1295:1
**85.70** [1] - 1219:3
**85255** [1] - 1290:18
**88** [2] - 1219:5, 1219:6

### 9

**9** [1] - 1218:4
**90** [3] - 1213:2, 1213:8, 1213:16
**93rd** [1] - 1290:18
**9:30** [5] - 1180:10, 1368:8, 1368:12, 1372:2, 1372:4
**9:55** [1] - 1181:12

### A

**a.m** [5] - 1180:10, 1181:12, 1202:15, 1203:11, 1372:4
**a/k/a** [2] - 1180:6, 1180:8
**ability** [1] - 1272:5
**able** [8] - 1187:11, 1209:2, 1219:1, 1265:6, 1271:23, 1272:1, 1307:20, 1328:23
**absent** [1] - 1268:1
**accept** [1] - 1362:10
**accomplish** [1] - 1356:4
**according** [8] - 1217:1, 1327:21, 1327:23, 1329:5, 1352:6, 1354:7, 1355:16, 1357:10
**account** [71] - 1210:19, 1215:1, 1215:3, 1218:1, 1218:11, 1219:25, 1220:3, 1220:11, 1220:15, 1220:19, 1221:25, 1223:8,

1209:13, 1248:17, 1291:7, 1323:1
**4/02** [1] - 1329:1
**4/07** [1] - 1328:21
**4/11** [1] - 1317:23
**4/17** [1] - 1317:25
**4/2** [1] - 1317:19
**4/24** [4] - 1318:2, 1328:18, 1328:22, 1331:3
**4/27** [1] - 1331:9
**40,000** [1] - 1325:9
**400,000** [1] - 1351:16
**403** [1] - 1274:5
**425** [1] - 1180:22
**43** [1] - 1193:13
**45,410** [1] - 1219:13
**4:30** [5] - 1308:24, 1309:1, 1336:5, 1368:2, 1368:21
**4th** [1] - 1212:14

### 5

**5** [10] - 1193:21, 1209:6, 1295:19, 1357:17, 1357:19, 1357:21, 1368:14, 1368:22, 1369:7, 1369:16
**50** [1] - 1366:16
**50,000** [2] - 1337:24, 1346:19, 1346:20
**500-plus** [1] - 1225:23
**55** [4] - 1270:25, 1271:4, 1271:6
**580,000** [1] - 1224:22

### 6

**6** [3] - 1218:17, 1278:22, 1279:14
**6,834,287.29** [1] - 1218:20
**60** [3] - 1211:20, 1212:21, 1213:8
**60-day** [2] - 1211:17, 1212:19
**61** [1] - 1271:1
**631-712-6105** [1] - 1181:8
**69,400** [1] - 1219:19

### 7

**7** [1] - 1292:6
**70-A** [1] - 1256:4
**700** [5] - 1217:8, 1220:16, 1221:1, 1221:9, 1221:23

**1223:12, 1224:18, 1224:21, 1224:25, 1225:2, 1225:4, 1225:22, 1226:2, 1247:10, 1285:8, 1294:7, 1294:14, 1294:16, 1294:17, 1295:6, 1296:7, 1298:17, 1298:19, 1299:14, 1303:18, 1303:20, 1303:24, 1304:1, 1304:2, 1304:3, 1304:5, 1304:11, 1304:15, 1310:6, 1317:16, 1321:6, 1321:19, 1321:24, 1325:1, 1325:22, 1325:23, 1325:25, 1327:18, 1336:25, 1337:21, 1338:7, 1338:9, 1338:18, 1340:9, 1341:9, 1341:13, 1341:15, 1341:16, 1341:17, 1342:19, 1344:19, 1351:4, 1351:13, 1354:24, 1359:2
**accounted** [1] - 1229:14
**accounting** [1] - 1284:4
**accounts** [22] - 1219:24, 1240:14, 1242:12, 1287:2, 1294:4, 1294:13, 1294:22, 1295:10, 1304:13, 1323:20, 1323:22, 1323:25, 1325:19, 1338:12, 1338:17, 1338:20, 1338:25, 1340:13, 1340:16, 1341:18, 1342:6
**accuracy** [1] - 1242:21
**accurate** [8] - 1190:23, 1190:24, 1246:4, 1246:17, 1259:17, 1265:5, 1326:9, 1337:25
**accurately** [1] - 1263:6
**accusation** [1] - 1260:3
**accusations** [2] - 1232:9, 1233:18
**accuse** [3] - 1230:4, 1231:25, 1233:8
**accused** [3] - 1231:18, 1234:8, 1274:15

**accuses** [1] - 1233:13
**accusing** [4] - 1247:11, 1247:23, 1250:14, 1259:7
**Ace** [1] - 1183:5
**acknowledge** [1] - 1370:10
**acknowledges** [1] - 1260:7
**acronym** [1] - 1200:3
**acting** [2] - 1180:16, 1262:13
**action** [1] - 1362:16
**actions** [1] - 1262:10
**active** [3] - 1228:9, 1228:23, 1259:7
**activities** [2] - 1200:25, 1261:4
**activity** [1] - 1274:8
**acts** [1] - 1274:11
**actual** [4] - 1187:22, 1199:14, 1279:12, 1305:1
**addition** [4] - 1197:23, 1220:19, 1237:20, 1240:15
**additional** [10] - 1237:3, 1239:19, 1242:10, 1248:4, 1248:22, 1249:25, 1341:5, 1341:16, 1370:7, 1370:9
**address** [5] - 1236:4, 1273:4, 1290:12, 1290:14, 1290:17
**addresses** [3] - 1355:5, 1370:15, 1370:19
**adds** [1] - 1259:21
**adjourned** [1] - 1372:3
**admissibility** [1] - 1273:8
**admission** [1] - 1260:14
**admit** [6] - 1235:7, 1259:14, 1259:15, 1267:9, 1305:19, 1310:9
**admitted** [9] - 1263:6, 1279:2, 1286:4, 1289:18, 1317:2, 1326:19, 1345:5, 1353:2, 1360:22
**advance** [1] - 1216:5
**advertise** [1] - 1349:25
**advise** [1] - 1275:12
**advised** [2] - 1322:7, 1363:4
**advising** [1] - 1346:2

advocating [1] - 1228:6
affidavit [26] - 1242:14, 1242:19, 1243:2, 1243:8, 1243:12, 1243:17, 1243:22, 1244:7, 1245:7, 1246:5, 1246:10, 1246:12, 1247:4, 1247:12, 1247:15, 1247:16, 1247:23, 1248:17, 1250:13, 1253:7, 1253:9, 1322:11, 1322:16, 1322:23, 1324:4, 1332:17
affiliated [4] - 1186:10, 1186:14, 1197:4, 1365:9
affiliates [3] - 1282:6, 1282:14
afford [1] - 1369:10
afield [1] - 1234:6
afoul [3] - 1233:4, 1255:4, 1310:17
AFTERNOON [1] - 1275:1
afternoon [6] - 1276:17, 1276:18, 1296:23, 1296:24, 1308:24, 1333:15
Agent [4] - 1189:16, 1194:5, 1212:14
agent [3] - 1209:10, 1212:21, 1212:25
agents [11] - 1189:23, 1190:2, 1191:1, 1193:1, 1193:5, 1194:11, 1194:16, 1197:17, 1209:16, 1209:20, 1210:1
ago [4] - 1249:24, 1250:19, 1305:25, 1312:16
agree [15] - 1198:1, 1207:19, 1208:7, 1218:5, 1222:22, 1267:24, 1272:12, 1277:21, 1313:13, 1314:14, 1325:20, 1331:18, 1332:11, 1359:9, 1371:22
agreement [11] - 1192:17, 1192:18, 1192:19, 1206:3, 1281:12, 1281:13, 1281:15, 1282:19, 1355:13, 1355:17, 1361:7
agreements [1] -

1271:5
ahead [6] - 1231:22, 1236:6, 1239:24, 1311:5, 1336:13, 1353:9
aligned [1] - 1315:15
ALL [1] - 1185:9
allegation [3] - 1263:15, 1263:19, 1280:2
allegations [13] - 1232:15, 1233:16, 1259:9, 1262:2, 1262:6, 1262:23, 1263:2, 1263:14, 1263:21, 1263:25, 1265:17, 1306:7, 1306:24
alleged [8] - 1262:19, 1262:23, 1264:22, 1268:16, 1269:10, 1274:11, 1306:19
allegedly [3] - 1251:12, 1325:5, 1333:8
alleging [2] - 1271:21, 1272:3
Alliance [3] - 1288:4, 1288:9, 1288:13
allow [9] - 1224:24, 1239:24, 1274:16, 1274:18, 1297:22, 1300:7, 1308:1, 1310:12, 1324:11
allowed [2] - 1286:10, 1291:12
allowing [1] - 1310:15
alluded [1] - 1250:18
almost [1] - 1319:11
alternates [3] - 1184:3, 1368:23, 1369:11
Aman [1] - 1296:9
America [2] - 1294:8, 1294:24
AMERICA [1] - 1180:3
American [2] - 1264:16, 1359:20
amount [17] - 1187:4, 1192:11, 1192:12, 1198:21, 1209:4, 1210:12, 1215:21, 1216:12, 1218:20, 1218:21, 1221:20, 1222:6, 1242:7, 1298:11, 1347:1, 1350:20
amounted [1] - 1264:13
amounts [8] - 1251:5,

1251:7, 1253:19, 1304:13, 1322:5, 1328:16, 1366:6, 1366:15
analyzed [1] - 1274:5
AND [1] - 1374:11
ANDREW [1] - 1181:4
Andrew [1] - 1182:7
angel [1] - 1335:18
announce [1] - 1183:3
annually [1] - 1355:11
answer [25] - 1188:10, 1213:12, 1221:5, 1224:24, 1230:7, 1231:4, 1231:22, 1235:8, 1239:23, 1240:22, 1245:19, 1249:6, 1249:9, 1266:21, 1298:25, 1310:20, 1314:11, 1324:12, 1337:13, 1342:12, 1351:19, 1358:9, 1358:23, 1362:14, 1367:4
answered [7] - 1189:15, 1205:25, 1323:6, 1324:10, 1350:16, 1363:16, 1365:12
answering [2] - 1296:11, 1352:19
answers [4] - 1234:19, 1259:23, 1335:5, 1363:11
anticipated [4] - 1248:21, 1261:24, 1368:5, 1370:3
antsy [1] - 1213:3
anytime [2] - 1212:25, 1301:1
apart [1] - 1342:21
apartment [1] - 1290:19
apologize [16] - 1187:17, 1193:18, 1217:24, 1267:5, 1268:3, 1270:12, 1271:2, 1284:14, 1285:13, 1285:14, 1304:20, 1321:22, 1325:14, 1342:4, 1358:4, 1368:18
appeal [1] - 1359:8
appear [8] - 1297:12, 1297:15, 1297:18, 1298:2, 1327:11, 1329:18, 1331:7
appearance [3] - 1181:17, 1297:20, 1315:2

appearances [2] - 1297:11, 1315:5
APPEARANCES [1] - 1180:14
appeared [1] - 1315:13
appearing [2] - 1220:11, 1243:13
applies [1] - 1306:1
apply [1] - 1299:2
appreciate [4] - 1203:6, 1203:14, 1263:3, 1369:12
approach [5] - 1232:19, 1254:8, 1256:23, 1301:9, 1309:6
approached [1] - 1363:14
appropriate [1] - 1247:10
approximate [2] - 1218:20, 1327:20
April [24] - 1243:4, 1243:10, 1245:14, 1247:6, 1247:17, 1289:6, 1291:4, 1293:6, 1324:8, 1324:13, 1324:16, 1326:8, 1327:11, 1328:7, 1328:10, 1329:5, 1329:14, 1329:16, 1329:23, 1330:1, 1331:16, 1350:3
area [7] - 1204:10, 1209:8, 1235:16, 1235:18, 1236:4, 1236:9, 1260:19
areas [1] - 1204:13
argue [2] - 1262:7, 1269:14
arguing [1] - 1261:5
argument [1] - 1273:7
arguments [3] - 1263:13, 1334:3, 1334:13
Arizona [13] - 1189:21, 1204:19, 1205:19, 1290:11, 1297:5, 1301:4, 1303:6, 1318:23, 1318:24, 1361:4, 1361:13, 1361:24, 1362:2
arranged [1] - 1264:15
article [3] - 1277:18, 1303:9, 1303:10
aside [1] - 1248:8
aspect [2] - 1269:16,

1273:12
asserted [1] - 1257:5
assets [5] - 1293:1, 1343:17, 1345:20, 1364:22, 1364:25
Assistant [1] - 1180:18
assisting [1] - 1364:20
associate [2] - 1264:21, 1292:19
associated [1] - 1348:9
associates [4] - 1186:22, 1350:19, 1350:21, 1351:17
assume [5] - 1190:9, 1191:21, 1234:22, 1355:22, 1369:17
assumed [1] - 1252:20
assuming [1] - 1282:15
attached [2] - 1353:17, 1357:5
attack [1] - 1262:14
attempted [1] - 1362:20
attempting [3] - 1195:23, 1362:22, 1365:10
attention [11] - 1186:5, 1189:12, 1193:22, 1253:11, 1281:19, 1287:15, 1288:2, 1321:11, 1322:14, 1326:1, 1336:17
attorney [9] - 1227:17, 1242:18, 1270:21, 1276:20, 1303:4, 1304:22, 1319:5, 1319:8, 1361:5
Attorney [1] - 1180:16
attorneys [2] - 1270:6, 1301:8
Attorneys [1] - 1180:18
August [16] - 1186:8, 1188:1, 1199:18, 1206:3, 1206:11, 1206:13, 1207:12, 1210:7, 1218:4, 1219:4, 1219:10, 1220:5, 1220:12, 1223:8, 1223:10, 1224:21
authenticity [2] - 1235:10, 1235:11
available [4] - 1274:13, 1275:20,

1289:10, 1369:11
**Avenue** [1] - 1277:8
**avoid** [2] - 1280:4, 1308:10
**aware** [18] - 1188:1, 1192:10, 1192:12, 1199:4, 1199:6, 1200:25, 1208:22, 1226:19, 1227:3, 1227:6, 1234:16, 1303:3, 1322:19, 1334:4, 1347:5, 1347:10, 1355:19, 1362:25
**AZ** [1] - 1242:15

## B

**background** [4] - 1227:9, 1228:20, 1259:21, 1358:15
**backup** [1] - 1202:1
**bad** [5] - 1199:9, 1272:25, 1273:1, 1273:2, 1274:11
**badger** [1] - 1370:21
**balance** [8] - 1218:4, 1218:8, 1218:9, 1349:13, 1349:17, 1349:20, 1349:24
**Banciella** [1] - 1369:23
**Bancorp** [2] - 1346:17, 1348:9
**bandage** [1] - 1183:5
**Bank** [4] - 1288:4, 1288:13, 1294:8, 1294:24
**bank** [22] - 1210:18, 1214:24, 1217:15, 1221:15, 1222:7, 1287:2, 1290:22, 1290:23, 1294:1, 1294:4, 1294:7, 1294:13, 1294:14, 1294:23, 1295:6, 1295:10, 1298:17, 1298:19, 1326:9, 1333:25, 1334:12
**banks** [1] - 1343:22
**bar** [15] - 1182:9, 1182:11, 1183:6, 1183:14, 1184:13, 1279:19, 1279:23, 1280:1, 1280:10, 1284:15, 1284:16, 1285:1, 1285:16, 1301:10, 1302:1
**based** [13] - 1234:19, 1245:13, 1245:23,

1246:10, 1247:5, 1252:4, 1253:4, 1262:15, 1279:15, 1307:19, 1333:2, 1333:5, 1334:23
**basis** [2] - 1201:9, 1205:22
**Beach** [6] - 1239:10, 1293:18, 1297:4, 1299:20, 1319:18, 1323:24
**bear** [3] - 1217:24, 1261:17, 1261:20
**bears** [2] - 1261:12, 1262:16
**became** [2] - 1199:11, 1199:17
**becoming** [1] - 1260:25
**BEFORE** [1] - 1180:11
**began** [1] - 1213:9
**begin** [3] - 1185:12, 1265:5, 1279:10
**beginning** [4] - 1198:22, 1218:4, 1218:9, 1262:3
**begins** [1] - 1340:14
**behalf** [29] - 1241:7, 1241:9, 1243:25, 1248:15, 1249:1, 1283:7, 1287:8, 1287:11, 1287:18, 1287:24, 1288:4, 1288:6, 1288:13, 1295:16, 1304:7, 1317:13, 1318:16, 1318:20, 1320:21, 1325:6, 1332:13, 1332:19, 1332:24, 1332:25, 1344:19, 1346:12, 1347:11, 1347:23, 1363:15
**behind** [3] - 1217:25, 1348:14, 1368:24
**belief** [1] - 1263:20
**believes** [1] - 1263:25
**belong** [3] - 1239:16, 1323:13, 1323:17
**belonged** [4] - 1322:2, 1327:17, 1339:4, 1342:1
**beneficiary** [1] - 1329:9
**benefit** [1] - 1265:18
**benefited** [1] - 1264:12
**best** [5] - 1263:5, 1322:6, 1339:16, 1369:22, 1370:16
**between** [17] -

1187:24, 1191:13, 1199:13, 1211:24, 1212:2, 1221:1, 1268:4, 1273:17, 1301:8, 1304:24, 1305:5, 1306:13, 1345:24, 1350:2, 1359:5, 1361:22, 1365:23
**BIANCO** [1] - 1180:12
**billionaire** [1] - 1312:18
**bills** [1] - 1343:21
**bit** [3] - 1220:5, 1226:14, 1263:12
**Black** [4] - 1353:18, 1353:20, 1354:15, 1357:7
**blame** [3] - 1264:20, 1266:1, 1269:17
**blaming** [2] - 1234:1, 1306:3
**blocked** [3] - 1286:8, 1286:11, 1286:13
**blow** [1] - 1370:6
**blow-ups** [1] - 1370:6
**board** [3] - 1355:17, 1355:18, 1355:22
**Bob** [4] - 1214:6, 1339:6, 1340:24, 1352:11
**body** [1] - 1371:2
**bold** [1] - 1266:4
**borrowed** [1] - 1296:10
**bottom** [5] - 1217:20, 1289:21, 1291:7, 1292:16, 1338:5
**bought** [7] - 1207:21, 1291:11, 1293:19, 1363:23, 1366:25, 1367:7, 1367:11
**bracketed** [1] - 1209:8
**brackets** [4] - 1218:17, 1247:9, 1345:12, 1350:1
**break** [21] - 1184:10, 1185:16, 1203:5, 1235:13, 1236:5, 1255:7, 1257:13, 1258:3, 1267:18, 1267:19, 1270:4, 1270:5, 1275:9, 1305:14, 1305:15, 1308:5, 1333:14, 1333:15, 1333:21, 1351:8, 1368:2
**Brickell** [1] - 1277:8
**bridge** [1] - 1212:19
**brief** [4] - 1182:9,

1183:12, 1275:21, 1284:14
**briefly** [1] - 1318:19
**bring** [11] - 1191:2, 1203:7, 1260:15, 1266:8, 1275:8, 1275:11, 1307:7, 1307:8, 1309:5, 1336:2, 1369:6
**bringing** [2] - 1189:21, 1262:5
**broke** [2] - 1296:9, 1366:10
**broken** [1] - 1183:4
**brother** [1] - 1214:6
**brought** [4] - 1279:18, 1300:17, 1318:19, 1362:17
**browbeating** [2] - 1228:13, 1228:16
**brunt** [1] - 1370:22
**Bruton** [1] - 1233:4
**build** [1] - 1187:3
**Builder** [1] - 1349:25
**bunch** [2] - 1227:17, 1241:8
**burden** [2] - 1272:15, 1272:25
**busboy** [1] - 1312:19
**business** [9] - 1271:8, 1271:13, 1271:14, 1284:8, 1284:10, 1292:10, 1292:18, 1295:7, 1296:6
**businesses** [5] - 1291:15, 1291:17, 1292:13, 1292:21, 1296:7
**buy** [12] - 1207:23, 1207:25, 1208:14, 1363:21, 1364:21, 1365:5, 1365:8, 1365:10, 1365:18, 1366:8, 1366:12
**buying** [4] - 1345:11, 1363:7, 1363:10, 1365:15
**BY** [38] - 1180:17, 1180:23, 1186:2, 1203:18, 1224:1, 1225:8, 1226:24, 1227:10, 1229:18, 1231:1, 1236:8, 1241:16, 1244:21, 1247:1, 1248:7, 1249:14, 1250:10, 1256:2, 1276:16, 1281:3, 1286:18, 1296:22, 1303:2, 1304:21, 1305:4,

1311:8, 1314:5, 1317:8, 1323:10, 1324:22, 1326:21, 1328:3, 1331:1, 1336:16, 1373:4, 1373:8, 1373:10, 1373:14

## C

**C-58** [1] - 1205:6
**C-63** [2] - 1320:13, 1321:25
**C-64** [2] - 1244:6, 1322:10
**C-66** [5] - 1326:16, 1326:19, 1326:20, 1327:1, 1374:8
**C-70-A** [2] - 1256:4, 1256:16
**C-72** [5] - 1343:25, 1344:23, 1345:5, 1345:6, 1374:9
**C-73** [5] - 1352:12, 1352:22, 1353:2, 1353:3, 1374:10
**C-74** [5] - 1360:6, 1360:17, 1360:22, 1360:23, 1374:11
**C-75** [5] - 1360:7, 1360:17, 1360:22, 1360:23, 1374:11
**C-81** [6] - 1317:2, 1317:7, 1319:5, 1321:10, 1326:24, 1374:7
**Cabo** [4] - 1222:24, 1223:2, 1230:1, 1231:8
**CALCAGNI** [1] - 1180:21
**California** [4] - 1196:8, 1227:13, 1227:14, 1340:9
**capacity** [4] - 1191:22, 1195:20, 1229:13, 1295:16
**car** [5] - 1271:7, 1271:8, 1271:14, 1295:8, 1295:12
**card** [3] - 1264:16, 1346:17, 1359:5
**care** [3] - 1244:22, 1245:3, 1254:6
**Carey** [3] - 1276:24, 1276:25, 1289:22
**Carleton** [1] - 1351:5
**cars** [2] - 1263:24, 1281:16
**case** [29] - 1181:15,

1202:13, 1242:15, 1258:4, 1263:15, 1269:16, 1272:6, 1273:12, 1274:4, 1280:3, 1286:10, 1286:12, 1286:15, 1297:19, 1297:24, 1298:13, 1299:4, 1299:15, 1315:5, 1320:24, 1333:16, 1334:5, 1334:16, 1362:11, 1368:9, 1369:9, 1369:12, 1369:14

**cash** [11] - 1217:5, 1221:23, 1222:11, 1222:15, 1222:18, 1223:1, 1223:4, 1245:9, 1271:10, 1271:13, 1346:16

**catch** [1] - 1368:7

**caught** [1] - 1230:2

**center** [2] - 1279:16, 1281:4

**centerpiece** [1] - 1263:13

**central** [2] - 1272:5, 1274:3

**Central** [3] - 1180:5, 1180:17, 1181:8

**ceremony** [2] - 1184:9, 1185:13

**certain** [4] - 1234:4, 1273:21, 1286:8, 1359:5

**certainly** [11] - 1187:2, 1228:20, 1259:7, 1271:22, 1272:1, 1339:20, 1339:21, 1354:11, 1359:10, 1365:17, 1371:23

**certainty** [1] - 1303:8

**certified** [2] - 1289:3, 1289:10

**cetera** [1] - 1346:19

**chance** [8] - 1193:24, 1194:2, 1256:5, 1271:16, 1273:6, 1288:24, 1307:16, 1352:18

**changed** [7] - 1215:13, 1215:15, 1215:16, 1216:11, 1216:18, 1221:6, 1250:11

**changes** [2] - 1234:5, 1355:19

**changing** [1] - 1226:13

**charge** [1] - 1354:20

**charged** [1] - 1269:21

**check** [2] - 1272:14, 1342:5

**checked** [1] - 1358:13

**chief** [1] - 1200:6

**chose** [1] - 1264:13

**Chris** [4] - 1198:2, 1219:4, 1220:6, 1369:24

**civil** [5] - 1231:5, 1277:12, 1297:24, 1299:4, 1315:3

**claim** [12] - 1241:2, 1269:16, 1269:19, 1320:7, 1320:10, 1321:7, 1322:2, 1322:6, 1323:13, 1325:17, 1329:18, 1334:5

**claimed** [2] - 1327:16, 1354:7

**claiming** [3] - 1265:21, 1265:24, 1272:10

**claims** [1] - 1262:17

**clarification** [2] - 1315:1, 1320:21

**clarify** [1] - 1198:19

**clear** [12] - 1220:10, 1259:5, 1262:2, 1262:8, 1281:19, 1285:10, 1288:10, 1314:6, 1316:1, 1316:14, 1321:2, 1327:15

**clearly** [7] - 1233:21, 1260:25, 1262:12, 1272:4, 1274:3, 1296:9, 1305:21

**CLERK** [9] - 1181:13, 1181:15, 1185:5, 1203:12, 1275:3, 1275:15, 1276:4, 1276:11, 1336:11

**client** [25] - 1183:2, 1233:19, 1260:4, 1261:1, 1261:9, 1261:15, 1261:17, 1261:19, 1261:22, 1261:25, 1265:3, 1271:24, 1272:21, 1272:25, 1297:20, 1299:4, 1300:18, 1302:10, 1304:1, 1304:2, 1304:7, 1304:9, 1304:11, 1336:25

**client's** [3] - 1233:21, 1261:21, 1263:20

**clients** [3] - 1282:2,

1304:12, 1304:14

**clip** [1] - 1234:25

**close** [3] - 1197:25, 1201:7, 1310:11

**closed** [2] - 1207:5, 1207:11

**closing** [27] - 1206:23, 1206:24, 1207:3, 1207:6, 1207:9, 1207:11, 1207:19, 1208:23, 1209:11, 1210:7, 1210:8, 1215:11, 1215:13, 1215:24, 1216:2, 1216:5, 1216:9, 1216:19, 1216:22, 1217:8, 1218:2, 1218:12, 1219:22, 1221:23, 1222:18, 1222:21, 1225:16

**clothing** [1] - 1277:19

**CMG** [6] - 1247:9, 1248:24, 1253:13, 1321:18, 1321:24, 1323:4

**co** [2] - 1262:19, 1262:22

**co-conspirator** [2] - 1262:19, 1262:22

**Cody** [2] - 1214:8, 1214:10

**collateral** [1] - 1343:18

**collateralized** [2] - 1364:22, 1364:25

**collected** [1] - 1214:25

**collecting** [4] - 1199:23, 1200:19, 1200:22, 1201:2

**combine** [1] - 1335:2

**coming** [7] - 1183:6, 1190:16, 1208:3, 1272:15, 1285:3, 1302:12, 1339:5

**commence** [1] - 1185:23

**commenced** [1] - 1279:13

**comments** [1] - 1312:22

**commercial** [2] - 1277:12, 1279:9

**communicate** [1] - 1344:9

**communicated** [2] - 1344:3, 1349:6

**communicating** [3] - 1352:7, 1352:15, 1360:24

**communication** [1] - 1207:2

**communications** [6] - 1253:25, 1256:7, 1256:10, 1301:7, 1302:8, 1351:25

**companies** [3] - 1251:16, 1359:6, 1359:19

**company** [40] - 1195:18, 1195:20, 1204:18, 1204:24, 1205:3, 1205:19, 1214:19, 1236:24, 1237:1, 1237:5, 1237:6, 1237:11, 1237:21, 1242:10, 1245:8, 1248:23, 1249:21, 1251:15, 1278:10, 1279:18, 1283:7, 1298:21, 1298:22, 1299:8, 1299:9, 1343:14, 1343:17, 1343:20, 1345:25, 1346:4, 1347:6, 1347:11, 1348:16, 1359:24, 1363:6, 1363:24, 1364:3, 1364:22, 1364:25, 1365:2

**Company** [1] - 1214:20

**company's** [1] - 1248:21

**complaint** [1] - 1306:7

**complete** [2] - 1187:6, 1355:16

**completeness** [1] - 1274:18

**comply** [3] - 1298:22, 1299:5, 1299:9

**component** [1] - 1265:11

**computer** [1] - 1258:13

**Con** [1] - 1295:13

**concern** [1] - 1334:14

**concerns** [2] - 1233:15, 1272:19

**conclude** [1] - 1205:2

**Concluded** [1] - 1183:16

**concluded** [3] - 1184:13, 1280:10, 1285:16

**conclusion** [1] - 1298:24

**condition** [1] - 1183:15

**condos** [1] - 1293:18

**conducted** [5] - 1182:11, 1184:1, 1279:23, 1284:16, 1301:10

**Conducted** [1] - 1183:1

**conference** [11] - 1182:11, 1184:1, 1184:13, 1279:23, 1280:1, 1280:10, 1284:16, 1285:1, 1285:16, 1301:10, 1302:1

**Conference** [2] - 1183:1, 1183:16

**confirm** [2] - 1353:19, 1370:15

**conflict** [1] - 1282:15

**conflicts** [1] - 1369:21

**confused** [2] - 1307:4, 1361:22

**confusing** [2] - 1193:14, 1338:19

**connection** [7] - 1261:23, 1271:24, 1273:17, 1281:20, 1283:1, 1297:17, 1303:13

**consider** [1] - 1358:21

**conspiracy** [3] - 1266:7, 1269:12, 1269:19

**conspirator** [2] - 1262:19, 1262:22

**conspirators** [1] - 1234:1

**CONSTANTINE** [4] - 1180:7, 1203:6, 1374:9, 1374:10

**constantine** [14] - 1205:18, 1277:20, 1277:25, 1278:10, 1286:22, 1299:15, 1299:22, 1299:25, 1300:4, 1300:13, 1300:15, 1301:1, 1359:3, 1368:1

**Constantine** [199] - 1181:1, 1181:16, 1182:4, 1182:7, 1202:3, 1202:8, 1203:3, 1208:24, 1209:12, 1209:16, 1209:20, 1210:1, 1227:18, 1228:4, 1228:14, 1228:17, 1228:19, 1229:2, 1229:4, 1229:9, 1229:12, 1232:8, 1232:14, 1233:12,

1233:15, 1234:21,
1234:22, 1234:23,
1236:18, 1237:7,
1237:10, 1238:2,
1238:4, 1242:11,
1242:13, 1242:17,
1244:3, 1245:8,
1246:11, 1247:7,
1247:8, 1247:12,
1247:15, 1247:19,
1247:23, 1248:24,
1248:25, 1249:3,
1249:17, 1250:5,
1250:14, 1250:20,
1251:15, 1252:1,
1252:6, 1252:10,
1252:15, 1252:25,
1253:3, 1253:6,
1253:14, 1253:23,
1254:1, 1256:8,
1256:11, 1259:20,
1262:4, 1262:9,
1262:13, 1262:18,
1264:9, 1264:19,
1265:7, 1265:16,
1266:2, 1268:2,
1268:5, 1269:17,
1270:15, 1273:15,
1274:8, 1277:14,
1278:10, 1278:15,
1278:17, 1279:8,
1279:9, 1279:11,
1281:7, 1281:21,
1282:2, 1282:5,
1282:9, 1282:15,
1282:18, 1282:22,
1283:1, 1284:1,
1287:18, 1288:18,
1289:4, 1290:2,
1290:8, 1290:9,
1291:10, 1292:9,
1292:11, 1292:23,
1292:25, 1293:21,
1294:6, 1294:11,
1294:14, 1294:21,
1295:2, 1295:9,
1295:13, 1295:17,
1295:24, 1296:25,
1297:5, 1297:8,
1297:14, 1298:1,
1298:18, 1303:17,
1304:23, 1306:2,
1306:20, 1306:21,
1308:10, 1308:11,
1310:5, 1310:14,
1311:13, 1312:2,
1312:8, 1312:13,
1312:22, 1312:25,
1313:8, 1314:16,
1317:13, 1320:7,
1320:9, 1321:6,

1322:3, 1322:7,
1322:16, 1322:17,
1322:20, 1323:4,
1323:11, 1323:14,
1323:18, 1323:21,
1325:1, 1325:18,
1326:7, 1327:12,
1327:17, 1328:6,
1328:12, 1329:11,
1329:22, 1331:10,
1331:17, 1332:12,
1332:20, 1337:17,
1339:3, 1339:7,
1343:5, 1343:10,
1343:16, 1344:4,
1345:6, 1345:8,
1345:19, 1345:21,
1348:19, 1348:24,
1351:14, 1352:9,
1353:3, 1354:9,
1359:11, 1360:2,
1360:15, 1360:24,
1361:4, 1362:17,
1362:23, 1364:5,
1365:15, 1365:23,
1367:10
**Constantine's** [14] -
1245:24, 1248:20,
1271:7, 1281:5,
1288:6, 1303:3,
1303:11, 1305:22,
1306:5, 1306:23,
1311:20, 1311:23,
1316:18, 1329:22
**constantine's** [5] -
1183:15, 1287:8,
1287:11, 1287:24,
1298:14
**construction** [1] -
1294:16
**consulting** [2] -
1188:24, 1192:18
**contact** [3] - 1202:3,
1320:9, 1362:23
**contacted** [1] -
1213:10
**contained** [2] -
1283:24, 1289:18
**contains** [3] -
1283:25, 1316:10,
1353:17
**contemporaneous** [1]
- 1284:5
**contents** [1] - 1243:22
**context** [6] - 1234:9,
1260:19, 1267:15,
1308:18, 1310:10,
1310:12
**continue** [5] -
1185:10, 1203:15,

1247:4, 1253:21,
1282:10
**Continued** [8] -
1232:21, 1235:20,
1254:9, 1255:12,
1256:25, 1257:15,
1309:7, 1310:23
**CONTINUED** [3] -
1203:17, 1281:2,
1286:17
**continued** [18] -
1182:12, 1183:17,
1184:14, 1185:1,
1202:16, 1223:15,
1259:3, 1274:24,
1279:24, 1280:11,
1281:1, 1284:17,
1285:17, 1286:1,
1301:11, 1302:14,
1330:4, 1356:6
**continues** [1] -
1371:20
**contradict** [1] -
1332:17
**contradicts** [1] -
1259:8
**contribute** [1] -
1226:16
**contribution** [2] -
1213:24, 1222:11
**controlled** [4] -
1248:24, 1253:14,
1298:17, 1323:4
**conversation** [22] -
1205:3, 1211:11,
1215:15, 1233:14,
1259:17, 1259:19,
1260:18, 1267:15,
1269:18, 1308:9,
1311:10, 1311:12,
1313:7, 1313:11,
1339:9, 1339:10,
1343:10, 1359:3,
1364:6, 1364:8,
1365:14, 1367:1
**conversations** [5] -
1201:22, 1249:22,
1252:24, 1266:2,
1343:15
**CONWAY** [1] - 1181:1
**COO** [1] - 1200:3
**copied** [1] - 1321:4
**copies** [1] - 1258:15
**copy** [6] - 1260:17,
1278:9, 1283:23,
1289:10, 1322:10,
1324:21
**corner** [1] - 1224:15
**cornerstone** [1] -
1265:3

**corporation** [1] -
1293:20
**correct** [241] - 1186:8,
1186:9, 1187:11,
1187:19, 1190:6,
1190:11, 1190:13,
1190:16, 1190:20,
1192:9, 1192:10,
1192:16, 1197:10,
1198:2, 1198:7,
1198:8, 1199:12,
1200:10, 1200:12,
1200:15, 1200:23,
1201:18, 1203:24,
1204:1, 1204:4,
1204:8, 1204:11,
1204:12, 1204:15,
1205:5, 1205:23,
1206:4, 1206:5,
1206:11, 1207:4,
1207:7, 1207:10,
1208:5, 1208:6,
1209:17, 1209:18,
1210:14, 1210:15,
1210:25, 1211:7,
1211:12, 1211:23,
1212:1, 1212:22,
1213:22, 1213:23,
1214:1, 1215:9,
1215:22, 1215:23,
1216:6, 1216:10,
1216:23, 1217:5,
1217:9, 1218:5,
1219:17, 1219:22,
1220:2, 1220:4,
1220:17, 1221:1,
1221:3, 1221:9,
1222:4, 1223:3,
1224:7, 1225:10,
1225:11, 1225:14,
1226:3, 1226:4,
1226:12, 1226:21,
1227:22, 1228:23,
1229:5, 1230:19,
1230:23, 1231:9,
1232:5, 1236:19,
1236:20, 1236:21,
1236:22, 1237:11,
1238:10, 1238:15,
1238:20, 1238:25,
1239:2, 1239:5,
1239:17, 1239:18,
1240:25, 1241:4,
1241:5, 1241:17,
1242:5, 1242:11,
1244:1, 1244:23,
1245:1, 1245:10,
1245:25, 1246:5,
1248:9, 1249:1,
1249:18, 1249:21,
1250:1, 1250:2,

1250:24, 1251:8,
1251:9, 1251:10,
1251:11, 1251:13,
1251:20, 1252:6,
1252:13, 1252:16,
1253:7, 1253:16,
1256:13, 1281:6,
1282:24, 1287:7,
1291:6, 1295:3,
1295:17, 1297:1,
1297:21, 1297:23,
1298:9, 1299:7,
1299:16, 1299:17,
1304:17, 1312:6,
1313:9, 1313:17,
1313:19, 1313:22,
1314:24, 1315:3,
1315:24, 1316:4,
1317:9, 1317:14,
1317:20, 1318:9,
1318:13, 1318:17,
1319:1, 1319:15,
1321:3, 1321:17,
1322:8, 1322:9,
1322:12, 1322:17,
1322:21, 1322:23,
1323:1, 1323:22,
1324:3, 1324:9,
1324:16, 1325:24,
1326:10, 1327:13,
1327:18, 1327:19,
1329:12, 1329:13,
1329:20, 1331:7,
1331:23, 1332:13,
1332:18, 1332:21,
1333:4, 1333:9,
1336:22, 1336:23,
1337:1, 1337:2,
1337:11, 1337:21,
1338:5, 1338:6,
1338:15, 1338:23,
1339:1, 1339:2,
1339:18, 1339:21,
1340:6, 1340:11,
1341:2, 1341:21,
1341:22, 1342:23,
1344:12, 1344:20,
1344:21, 1345:9,
1345:20, 1345:22,
1346:4, 1347:3,
1353:13, 1354:8,
1354:13, 1354:14,
1354:22, 1354:25,
1355:3, 1355:7,
1355:25, 1357:3,
1357:8, 1357:12,
1357:13, 1357:24,
1361:25, 1362:1,
1362:4, 1362:25,
1364:18, 1365:2,
1365:22, 1366:20,

1367:8, 1367:12
**correctly** [5] -
1189:18, 1200:7,
1218:6, 1245:5,
1346:23
**correspond** [1] -
1328:16
**correspondence** [1] -
1355:6
**corresponding** [1] -
1360:2
**coughing** [1] - 1353:6
**counsel** [3] - 1181:17,
1182:9, 1310:2
**Country** [1] - 1181:1
**County** [2] - 1297:4,
1299:20
**couple** [8] - 1189:2,
1197:9, 1291:15,
1302:13, 1305:25,
1318:11, 1338:13,
1359:18
**course** [4] - 1183:10,
1191:23, 1284:8,
1284:10
**COURT** [222] - 1180:1,
1181:14, 1181:21,
1181:24, 1182:2,
1182:5, 1182:10,
1183:14, 1184:2,
1184:8, 1185:2,
1185:7, 1185:10,
1185:23, 1192:25,
1193:15, 1193:20,
1202:6, 1202:12,
1203:1, 1203:3,
1203:7, 1203:13,
1205:9, 1205:25,
1206:21, 1208:21,
1211:14, 1212:9,
1212:24, 1213:12,
1213:20, 1221:5,
1221:11, 1221:19,
1222:14, 1224:24,
1225:3, 1225:6,
1226:23, 1227:5,
1229:17, 1230:7,
1231:4, 1231:22,
1232:20, 1233:7,
1233:11, 1233:24,
1234:6, 1234:18,
1235:2, 1235:12,
1235:16, 1236:2,
1240:22, 1241:15,
1244:14, 1244:20,
1245:19, 1246:25,
1248:6, 1249:7,
1249:10, 1250:9,
1254:8, 1255:6,
1256:18, 1256:21,

1256:24, 1257:9,
1257:13, 1258:3,
1258:8, 1258:17,
1258:20, 1258:25,
1259:10, 1259:19,
1260:5, 1260:15,
1261:14, 1263:12,
1265:6, 1265:12,
1265:15, 1266:8,
1266:12, 1266:16,
1266:19, 1266:25,
1267:4, 1267:11,
1267:14, 1267:17,
1267:21, 1268:7,
1268:11, 1268:14,
1268:20, 1269:23,
1270:3, 1270:10,
1270:14, 1270:18,
1270:24, 1271:3,
1271:16, 1273:1,
1273:10, 1274:20,
1275:4, 1275:8,
1275:14, 1275:18,
1276:13, 1277:23,
1279:2, 1280:8,
1285:6, 1285:10,
1286:2, 1286:4,
1286:7, 1288:10,
1289:12, 1289:17,
1296:18, 1298:25,
1300:2, 1300:6,
1300:10, 1300:21,
1300:23, 1301:9,
1302:5, 1305:3,
1305:10, 1305:13,
1305:17, 1307:15,
1307:19, 1307:23,
1307:25, 1308:14,
1308:17, 1308:22,
1309:3, 1309:5,
1310:11, 1310:22,
1311:3, 1314:4,
1314:11, 1316:19,
1316:24, 1317:2,
1317:6, 1323:8,
1324:11, 1326:10,
1326:12, 1326:15,
1326:19, 1327:6,
1328:2, 1331:15,
1332:10, 1332:15,
1333:11, 1333:15,
1333:20, 1333:23,
1334:21, 1335:12,
1335:16, 1335:18,
1335:22, 1335:24,
1336:2, 1336:6,
1336:8, 1336:13,
1337:13, 1340:1,
1342:12, 1344:25,
1345:2, 1345:5,
1347:21, 1348:2,

1348:22, 1349:19,
1350:16, 1351:19,
1352:24, 1353:2,
1353:9, 1358:1,
1358:9, 1358:20,
1358:23, 1359:17,
1360:21, 1362:14,
1363:17, 1365:4,
1365:7, 1365:12,
1367:3, 1367:20,
1368:2, 1368:15,
1368:22, 1369:6,
1369:8, 1369:17,
1370:12, 1370:18,
1370:21, 1371:16,
1371:20
**Court** [13] - 1181:4,
1181:7, 1183:11,
1185:1, 1235:9,
1235:15, 1258:12,
1258:14, 1272:12,
1281:1, 1286:1,
1289:11, 1308:8
**court** [12] - 1236:1,
1256:1, 1258:2,
1264:5, 1269:13,
1288:25, 1297:11,
1298:2, 1298:8,
1299:2, 1303:1,
1311:1
**court's** [2] - 1310:18,
1324:20
**Court's** [4] - 1254:7,
1255:5, 1263:3,
1311:6
**Courthouse** [1] -
1180:4
**courtroom** [13] -
1185:6, 1203:10,
1258:7, 1258:24,
1266:11, 1267:20,
1275:16, 1277:16,
1333:18, 1333:22,
1336:12, 1368:13,
1369:7
**CR** [4] - 1351:5,
1351:21, 1352:4,
1352:9
**create** [1] - 1285:9
**created** [6] - 1218:11,
1262:4, 1272:20,
1284:3, 1291:11,
1291:14
**creating** [1] - 1201:25
**credit** [5] - 1224:11,
1224:19, 1226:5,
1358:3, 1359:5
**Credit** [2] - 1218:14,
1349:25
**credited** [4] - 1358:5,

1358:12, 1358:18,
1358:21
**Credits** [2] - 1218:16,
1218:19
**crimes** [1] - 1264:14
**criminal** [1] - 1274:8
**critical** [3] - 1260:25,
1273:19, 1371:14
**cross** [6] - 1185:11,
1234:21, 1268:2,
1275:23, 1296:18,
1371:21
**CROSS** [5] - 1186:1,
1203:17, 1296:21,
1373:3, 1373:9
**cross-examination** [3]
- 1185:11, 1268:2,
1296:18
**CRR** [1] - 1181:7
**current** [4] - 1264:19,
1282:6, 1282:14,
1370:19
**curriculum** [1] -
1370:6
**CURRIE** [1] - 1180:15
**cut** [4] - 1266:17,
1267:3, 1335:16,
1336:4

# D

**danger** [1] - 1307:2
**Darryl** [1] - 1369:24
**data** [3] - 1199:24,
1200:19, 1201:25
**date** [14] - 1207:17,
1212:15, 1218:25,
1242:7, 1278:12,
1278:13, 1278:21,
1286:22, 1289:5,
1292:5, 1306:14,
1317:18, 1328:22,
1364:11
**dates** [10] - 1246:18,
1251:5, 1251:7,
1253:19, 1268:15,
1269:8, 1284:1,
1328:12, 1328:15,
1338:4
**days** [22] - 1210:23,
1211:5, 1211:8,
1211:9, 1211:19,
1211:20, 1212:20,
1213:2, 1213:8,
1213:16, 1290:13,
1305:25, 1334:9,
1334:22, 1334:25,
1335:4, 1368:24,
1369:10, 1369:18,
1371:6

**deal** [6] - 1210:22,
1235:12, 1261:6,
1297:9, 1349:23,
1350:6
**dealing** [3] - 1199:21,
1259:9, 1367:9
**deals** [6] - 1271:10,
1359:4, 1359:12,
1359:15, 1361:1,
1367:14
**dealt** [1] - 1362:3
**debt** [1] - 1273:16
**debts** [1] - 1272:3
**December** [24] -
1240:5, 1268:25,
1269:3, 1287:23,
1287:25, 1288:6,
1296:15, 1306:13,
1306:14, 1336:18,
1336:22, 1337:16,
1337:23, 1337:24,
1338:4, 1346:20,
1346:21, 1347:2,
1350:3, 1350:20,
1351:15, 1353:11,
1354:12
**decide** [1] - 1307:5
**default** [1] - 1230:2
**defendant** [4] -
1264:12, 1264:13,
1274:15, 1326:6
**Defendant** [2] -
1180:21, 1181:1
**DEFENDANT'S** [2] -
1374:9, 1374:10
**Defendant's** [6] -
1256:15, 1319:5,
1326:23, 1344:23,
1345:6, 1353:3
**Defendants** [1] -
1180:9
**defendants** [2] -
1263:10, 1264:22
**Defense** [3] - 1317:7,
1326:20, 1360:23
**defense** [4] - 1263:13,
1265:3, 1266:6,
1270:6
**DEFENSE** [3] -
1374:7, 1374:8,
1374:11
**definitely** [1] -
1273:14
**defraud** [1] - 1262:5
**defrauded** [1] -
1264:24
**degree** [1] - 1308:2
**Del** [3] - 1231:8,
1231:12, 1231:14
**deliberative** [1] -

1309:1

**Delores** [1] - 1339:6

**demand** [2] - 1333:4, 1333:7

**demonstrate** [1] - 1274:12

**demonstrates** [1] - 1262:25

**denial** [1] - 1260:1

**deny** [1] - 1244:15

**denying** [1] - 1261:2

**depict** [1] - 1200:7

**deposed** [1] - 1299:15

**deposit** [4] - 1208:12, 1208:18, 1318:12, 1318:15

**deposited** [18] - 1208:14, 1215:1, 1219:24, 1219:25, 1220:3, 1321:16, 1323:18, 1325:21, 1327:17, 1328:11, 1331:17, 1332:12, 1332:18, 1332:19, 1332:24, 1332:25, 1339:1, 1351:13

**depositing** [1] - 1343:3

**deposition** [25] - 1270:14, 1270:23, 1289:5, 1289:7, 1290:2, 1290:6, 1291:4, 1292:6, 1292:16, 1292:23, 1294:2, 1295:1, 1295:19, 1296:15, 1299:16, 1299:18, 1299:21, 1303:3, 1303:12, 1303:14, 1303:15, 1303:16, 1304:23, 1315:10, 1315:13

**depositions** [3] - 1288:19, 1315:6, 1315:8

**Deposits** [1] - 1218:19

**deposits** [1] - 1332:23

**depth** [1] - 1273:6

**describe** [6] - 1200:5, 1232:2, 1279:6, 1279:15, 1281:11, 1306:21

**described** [3] - 1245:8, 1270:18, 1271:19

**describing** [1] - 1232:4

**description** [1] - 1273:21

**desperate** [1] - 1273:2

**desperately** [1] - 1345:23

**despite** [1] - 1264:18

**detailed** [1] - 1251:22

**determination** [2] - 1286:9, 1323:22

**determine** [4] - 1323:12, 1323:17, 1325:16, 1327:16

**develop** [3] - 1186:22, 1187:1, 1187:11

**developed** [2] - 1231:14, 1303:14

**development** [9] - 1186:11, 1187:13, 1187:18, 1187:22, 1198:6, 1199:7, 1199:14, 1283:4, 1283:13

**DeVries** [1] - 1366:20

**Diamante** [1] - 1231:12

**Diamanté** [2] - 1191:20, 1191:21

**Diamond** [4] - 1353:18, 1353:20, 1354:15, 1357:7

**difference** [3] - 1305:5, 1367:14, 1367:17

**different** [4] - 1199:23, 1236:4, 1304:2, 1362:19

**difficult** [3] - 1207:1, 1235:4, 1272:17

**difficulties** [1] - 1297:10

**difficulty** [2] - 1297:8, 1297:11

**diligence** [1] - 1358:16

**dire** [1] - 1249:3

**direct** [13] - 1186:5, 1189:12, 1192:22, 1193:21, 1240:20, 1287:15, 1321:11, 1326:1, 1335:6, 1336:17, 1364:6, 1371:15, 1371:22

**DIRECT** [4] - 1276:15, 1281:2, 1286:17, 1373:7

**directed** [8] - 1242:13, 1246:13, 1247:7, 1247:24, 1249:20, 1249:22, 1250:4, 1322:16

**directing** [4] - 1253:11, 1288:2, 1322:14, 1340:8

**direction** [2] - 1248:23, 1365:1

**directive** [1] - 1310:18

**directly** [4] - 1261:12, 1262:16, 1264:25, 1266:5

**directors** [2] - 1282:8, 1282:14

**disbursement** [1] - 1226:2

**discloses** [1] - 1347:8

**disclosing** [1] - 1303:12

**discuss** [6] - 1202:13, 1243:21, 1258:4, 1333:16, 1368:9, 1369:14

**discussed** [5] - 1253:3, 1253:6, 1289:12, 1289:15, 1366:7

**discussing** [3] - 1201:10, 1204:18, 1209:5

**discussion** [2] - 1236:23, 1306:18

**discussions** [1] - 1279:11

**dismissed** [3] - 1319:1, 1319:3, 1319:9

**display** [3] - 1217:18, 1217:20, 1321:10

**displayed** [1] - 1339:22

**displaying** [1] - 1279:4

**dispute** [6] - 1207:16, 1279:16, 1281:4, 1281:15, 1282:23, 1312:5

**distinction** [1] - 1304:23

**DISTRICT** [2] - 1180:1, 1180:1

**District** [1] - 1180:12

**diversion** [8] - 1264:10, 1268:23, 1269:7, 1269:8, 1273:12, 1273:20, 1306:12, 1306:20

**diversions** [7] - 1264:11, 1264:12, 1268:16, 1268:17, 1271:25, 1306:11, 1306:25

**divert** [1] - 1272:9

**diverted** [6] - 1261:15, 1261:17, 1261:22, 1271:21, 1272:8,

1306:16

**diverting** [1] - 1271:12

**doctor** [1] - 1318:5

**document** [35] - 1189:4, 1189:7, 1189:25, 1190:25, 1194:14, 1194:22, 1205:11, 1205:12, 1209:24, 1216:3, 1217:19, 1251:5, 1251:24, 1251:25, 1252:4, 1254:6, 1278:14, 1278:17, 1279:6, 1279:7, 1281:18, 1284:6, 1286:8, 1286:19, 1288:11, 1289:2, 1316:8, 1317:12, 1324:23, 1339:22, 1340:4, 1340:23, 1341:7, 1353:17, 1357:1

**document's** [1] - 1193:15

**documentary** [4] - 1241:11, 1241:19, 1241:22, 1241:25

**documentation** [7] - 1215:5, 1241:6, 1320:3, 1352:2, 1354:4, 1362:23, 1364:19

**documents** [5] - 1189:3, 1192:20, 1216:2, 1332:16, 1333:7

**Doe** [1] - 1269:2

**dollar** [5] - 1331:10, 1365:16, 1365:19, 1366:13, 1366:15

**dollars** [6] - 1208:14, 1213:21, 1225:23, 1248:12, 1332:12, 1350:8

**domestic** [3] - 1219:4, 1219:10, 1220:12

**done** [11] - 1254:6, 1255:11, 1260:2, 1265:22, 1285:12, 1291:9, 1308:23, 1308:24, 1323:12, 1332:20, 1336:5

**Donne** [1] - 1188:14

**Donnie** [4] - 1188:5, 1189:21, 1190:2, 1191:1

**door** [1] - 1302:10

**doubt** [1] - 1232:8

**down** [25] - 1189:12, 1193:23, 1194:11,

1217:20, 1218:23, 1220:5, 1221:17, 1221:21, 1222:2, 1222:4, 1222:6, 1222:20, 1223:2, 1241:8, 1251:23, 1305:10, 1305:12, 1316:3, 1319:10, 1326:23, 1336:4, 1351:9, 1354:16, 1368:18

**dream** [1] - 1187:17

**driver** [1] - 1271:9

**drivers** [1] - 1271:15

**driving** [1] - 1195:21

**due** [3] - 1211:5, 1222:3, 1358:16

**duly** [3] - 1185:21, 1276:9, 1307:12

**during** [31] - 1183:10, 1186:6, 1186:15, 1186:20, 1188:15, 1190:9, 1192:22, 1195:12, 1199:8, 1201:6, 1204:16, 1204:23, 1213:1, 1235:13, 1260:25, 1262:19, 1262:21, 1267:18, 1270:3, 1271:11, 1273:17, 1277:3, 1280:4, 1288:17, 1296:14, 1297:16, 1299:21, 1306:17, 1308:5, 1352:14, 1366:7

**E**

**e-mail** [38] - 1201:12, 1201:13, 1201:15, 1205:15, 1253:25, 1255:3, 1256:7, 1256:10, 1267:22, 1268:4, 1268:8, 1278:20, 1305:18, 1305:24, 1306:2, 1306:15, 1307:4, 1344:4, 1344:11, 1345:8, 1347:7, 1347:8, 1347:12, 1347:13, 1348:3, 1348:7, 1348:24, 1349:5, 1349:12, 1349:15, 1349:20, 1351:4, 1351:21, 1351:23, 1351:25, 1353:11, 1354:24, 1356:2

**e-mails** [6] - 1268:20, 1344:8, 1351:24,

1352:13, 1360:11, 1360:14
**E-U-F-O-R-A** [1] - 1291:20
**early** [5] - 1185:16, 1199:10, 1236:19, 1365:25, 1370:3
**earnest** [1] - 1208:11
**EASTERN** [1] - 1180:1
**effect** [1] - 1215:21
**effective** [1] - 1233:3
**efficient** [1] - 1309:3
**effort** [2] - 1306:21, 1336:8
**eight** [2] - 1211:24, 1212:2
**EIN** [1] - 1354:21
**either** [11] - 1217:4, 1222:10, 1222:18, 1223:4, 1271:14, 1293:25, 1298:17, 1299:5, 1299:8, 1299:13, 1363:14
**elicited** [1] - 1261:11
**embarrassed** [1] - 1183:8
**emergency** [1] - 1183:7
**emphasize** [1] - 1369:12
**employee** [1] - 1200:10
**employment** [2] - 1191:18, 1291:9
**end** [6] - 1236:18, 1238:8, 1296:12, 1322:15, 1334:17, 1368:3
**endeavor** [2] - 1291:14, 1292:3
**endeavored** [1] - 1335:23
**ended** [1] - 1235:3
**engaged** [9] - 1188:2, 1188:16, 1192:1, 1192:15, 1194:24, 1195:9, 1195:13, 1196:13, 1205:18
**engagement** [7] - 1278:9, 1279:7, 1279:14, 1282:17, 1282:18, 1282:22, 1288:17
**entailed** [1] - 1206:3
**entered** [1] - 1336:12
**Enterprises** [2] - 1281:9, 1282:23
**enters** [4] - 1185:6, 1203:10, 1266:11, 1275:16

**enthusiastically** [1] - 1280:8
**entire** [12] - 1215:20, 1260:17, 1260:19, 1260:21, 1260:23, 1261:8, 1267:6, 1269:18, 1269:20, 1315:13, 1315:14, 1370:5
**entirely** [1] - 1263:11
**entities** [5] - 1253:14, 1271:24, 1272:10, 1273:18, 1323:5
**entitled** [1] - 1234:19, 1234:21
**entity** [6] - 1217:15, 1247:8, 1248:24, 1281:10, 1354:6, 1363:7
**entries** [3] - 1286:14, 1321:12, 1331:6
**entry** [1] - 1223:8
**escrow** [2] - 1304:2, 1304:3
**especially** [2] - 1303:5
**Esquire** [1] - 1289:25
**essence** [2] - 1237:1, 1241:22
**essentially** [2] - 1306:3, 1310:5
**establish** [3] - 1272:1, 1272:2, 1272:22
**establishes** [1] - 1273:17
**estate** [5] - 1264:8, 1283:4, 1283:13, 1291:11, 1293:24
**estimate** [6] - 1309:1, 1334:16, 1334:23, 1335:1, 1368:3, 1369:22
**et** [1] - 1346:19
**Ethan** [1] - 1345:18
**Ethel** [2] - 1342:14, 1354:24
**eufora** [1] - 1291:18
**Eufora** [105] - 1236:15, 1236:24, 1237:23, 1238:12, 1238:15, 1238:19, 1238:22, 1239:19, 1240:12, 1240:13, 1240:16, 1241:3, 1241:4, 1241:7, 1241:12, 1242:16, 1243:5, 1245:8, 1247:10, 1247:18, 1249:4, 1250:1, 1250:20, 1250:24, 1252:16, 1252:18, 1253:13,

1253:22, 1254:1, 1268:21, 1268:23, 1268:24, 1269:9, 1269:10, 1271:11, 1271:14, 1273:21, 1273:22, 1283:7, 1285:8, 1288:4, 1288:13, 1292:9, 1298:19, 1299:22, 1299:25, 1300:4, 1300:12, 1300:15, 1300:18, 1306:8, 1306:19, 1313:4, 1315:19, 1315:24, 1316:12, 1318:13, 1318:16, 1319:15, 1321:7, 1323:2, 1323:4, 1325:22, 1333:4, 1336:18, 1336:21, 1337:16, 1337:18, 1341:10, 1342:23, 1343:4, 1343:9, 1346:19, 1346:20, 1348:4, 1348:9, 1348:10, 1348:13, 1350:18, 1350:24, 1351:3, 1351:11, 1351:22, 1352:5, 1353:13, 1353:24, 1353:25, 1355:22, 1357:3, 1357:12, 1359:5, 1362:3, 1362:17, 1362:21, 1363:4, 1363:7, 1363:11, 1364:18, 1365:21, 1366:8, 1366:12, 1366:13, 1366:18, 1367:11
**Europe** [2] - 1188:8, 1364:3
**evaluate** [1] - 1349:7
**event** [3] - 1185:14, 1251:17, 1364:23
**events** [3] - 1207:2, 1207:3, 1225:21
**EVIDENCE** [2] - 1374:7, 1374:8
**evidence** [34] - 1193:16, 1193:18, 1204:7, 1217:18, 1217:25, 1224:13, 1241:11, 1241:19, 1241:22, 1241:25, 1244:17, 1260:6, 1264:6, 1265:1, 1272:22, 1278:24, 1279:3, 1284:13, 1286:6, 1289:10, 1289:18, 1289:20,

1308:3, 1316:23, 1317:7, 1321:10, 1324:23, 1326:20, 1328:5, 1338:2, 1345:7, 1353:4, 1360:22, 1360:23
**ex** [1] - 1189:21
**ex-hockey** [1] - 1189:21
**exact** [1] - 1364:11
**exactly** [4] - 1215:5, 1237:17, 1320:23, 1350:12
**examination** [7] - 1185:11, 1189:5, 1192:22, 1268:2, 1296:18, 1302:8, 1371:1
**EXAMINATION** [9] - 1186:1, 1203:17, 1276:15, 1281:2, 1286:17, 1296:21, 1373:3, 1373:7, 1373:9
**examine** [1] - 1344:1
**examined** [4] - 1185:22, 1276:9, 1307:12, 1332:23
**example** [1] - 1264:11
**excellent** [1] - 1245:9
**except** [1] - 1368:13
**excess** [1] - 1248:11
**exchange** [4] - 1243:4, 1245:14, 1247:7, 1268:4
**exciting** [1] - 1185:14
**exclude** [1] - 1240:5
**excluding** [1] - 1240:11
**excruciating** [1] - 1183:11
**exculpatories** [1] - 1234:3
**exculpatory** [1] - 1257:4
**excuse** [5] - 1239:22, 1341:14, 1368:22, 1369:9, 1369:11
**excused** [2] - 1305:16, 1368:21
**excusing** [1] - 1369:2
**execute** [1] - 1282:18
**exemplars** [2] - 1370:8, 1370:9
**EXHIBIT** [7] - 1374:2, 1374:3, 1374:4, 1374:7, 1374:8, 1374:9, 1374:10
**Exhibit** [26] - 1193:13, 1204:7, 1217:20,

1224:14, 1256:16, 1278:5, 1278:24, 1279:3, 1283:18, 1286:6, 1288:22, 1289:19, 1316:5, 1316:22, 1317:7, 1319:5, 1324:21, 1324:24, 1326:20, 1326:23, 1329:3, 1338:3, 1339:23, 1344:23, 1345:6, 1353:3
**exhibit** [9] - 1204:8, 1217:25, 1316:18, 1317:5, 1320:16, 1321:21, 1321:25, 1325:21, 1367:22
**exhibits** [1] - 1217:18
**expands** [1] - 1269:12
**expect** [2] - 1216:20, 1371:23
**expecting** [1] - 1216:22
**experience** [3] - 1298:21, 1299:12, 1364:21
**expert** [1] - 1370:1
**explain** [4] - 1200:17, 1221:8, 1263:4, 1286:7
**explained** [2] - 1343:11, 1343:16
**explode** [1] - 1274:1
**exponentially** [1] - 1334:7
**Express** [2] - 1264:16, 1359:20
**expressed** [1] - 1232:8
**expressing** [1] - 1233:15
**extending** [1] - 1335:7
**extends** [1] - 1334:7
**extent** [3] - 1199:1, 1298:14, 1305:21
**extremely** [1] - 1368:25, 1371:18
**extrinsic** [1] - 1260:5

**F**

**face** [4] - 1201:17, 1237:7
**face-to-face** [2] - 1201:17, 1237:7
**facilitated** [1] - 1342:22
**fact** [34] - 1188:20, 1192:4, 1208:10, 1208:23, 1220:1,

1241:2, 1242:9, 1243:3, 1257:7, 1259:22, 1260:1, 1261:6, 1264:8, 1272:8, 1272:24, 1303:23, 1306:17, 1312:5, 1313:16, 1323:13, 1323:19, 1324:7, 1325:17, 1327:17, 1328:15, 1332:23, 1336:20, 1342:3, 1347:17, 1347:25, 1362:10, 1362:19, 1363:8, 1365:18

**factual** [2] - 1333:12, 1334:12
**failure** [2] - 1299:8, 1299:9
**fair** [31] - 1192:7, 1195:25, 1201:6, 1201:14, 1207:17, 1209:1, 1222:9, 1226:1, 1227:24, 1231:18, 1232:6, 1237:4, 1237:15, 1250:11, 1252:8, 1253:2, 1259:16, 1281:5, 1281:10, 1282:21, 1300:11, 1314:6, 1314:9, 1324:1, 1337:10, 1340:25, 1343:13, 1349:5, 1354:6, 1355:2, 1362:2
**fairly** [1] - 1200:5
**faith** [1] - 1262:13
**fall** [1] - 1187:5
**false** [6] - 1234:3, 1247:11, 1257:4, 1262:5, 1262:24, 1265:17
**falsely** [2] - 1247:12, 1250:14
**family** [4] - 1213:3, 1214:3, 1214:5, 1319:24
**far** [7] - 1199:1, 1199:21, 1223:1, 1231:15, 1234:6, 1239:1, 1295:25
**fashion** [1] - 1275:25
**fast** [1] - 1246:21
**fault** [2] - 1321:20, 1334:25
**faulting** [1] - 1335:1
**favors** [1] - 1264:13
**FBI** [1] - 1189:14
**fearful** [1] - 1248:19
**February** [11] -

1268:23, 1278:13, 1279:12, 1306:9, 1324:15, 1325:2, 1325:8, 1325:13, 1325:15, 1325:22
**Federal** [2] - 1180:16, 1181:7
**fee** [1] - 1296:4
**fees** [2] - 1188:24, 1346:17
**fell** [1] - 1183:3
**felt** [1] - 1229:19
**few** [20] - 1189:3, 1211:8, 1211:19, 1217:18, 1217:19, 1228:1, 1228:10, 1228:11, 1238:6, 1247:21, 1250:18, 1253:23, 1254:5, 1255:8, 1267:23, 1290:13, 1296:20, 1298:12, 1315:19, 1335:10
**fifth** [2] - 1326:22, 1334:20
**figure** [1] - 1228:21
**figured** [1] - 1369:10
**filed** [4] - 1261:8, 1361:3, 1361:13, 1362:20
**final** [3] - 1221:20, 1346:21, 1347:9
**finances** [1] - 1295:14
**financial** [1] - 1273:16
**fine** [7] - 1184:8, 1194:17, 1255:6, 1270:8, 1280:5, 1296:24, 1310:22
**finger** [1] - 1265:17
**finish** [7] - 1188:10, 1206:18, 1249:7, 1249:9, 1336:9, 1349:12, 1367:25
**finished** [4] - 1228:13, 1228:16, 1249:6, 1314:25
**firm** [11] - 1276:23, 1277:3, 1277:9, 1282:19, 1283:23, 1286:21, 1287:10, 1287:18, 1287:24, 1288:5, 1289:22
**firm's** [4] - 1277:7, 1278:9, 1279:7, 1288:16
**first** [29] - 1187:25, 1194:10, 1195:16, 1199:17, 1220:11, 1225:2, 1236:17, 1236:21, 1247:17,

1260:6, 1276:8, 1281:19, 1282:1, 1296:16, 1305:18, 1317:18, 1320:19, 1321:11, 1322:5, 1322:15, 1324:1, 1324:16, 1332:5, 1341:3, 1344:15, 1353:12, 1363:21, 1366:9, 1368:16
**five** [14] - 1227:24, 1246:21, 1291:8, 1292:8, 1296:13, 1305:14, 1321:12, 1322:5, 1324:1, 1324:16, 1333:13, 1334:23, 1345:24, 1368:23
**flat** [1] - 1296:4
**flesh** [2] - 1234:15, 1234:17
**flipped** [1] - 1233:17
**Florida** [6] - 1276:22, 1277:8, 1297:1, 1297:9, 1299:18, 1304:4
**focus** [1] - 1326:22
**focusing** [2] - 1312:4, 1324:15
**follow** [3] - 1223:10, 1261:14, 1354:16
**followed** [2] - 1369:22, 1369:23
**following** [13] - 1233:1, 1236:1, 1255:1, 1256:1, 1257:1, 1258:1, 1303:1, 1310:1, 1311:1, 1329:19, 1331:7, 1332:24, 1353:20
**follows** [3] - 1185:22, 1276:10, 1307:13
**footballer** [1] - 1197:5
**foreclosed** [1] - 1293:15
**foreclosure** [1] - 1293:25
**foreseeable** [1] - 1290:15
**form** [11] - 1197:11, 1202:6, 1222:14, 1222:22, 1229:17, 1278:19, 1347:21, 1348:2, 1348:22, 1351:6, 1351:18
**formalize** [1] - 1352:7
**formed** [1] - 1292:13
**former** [1] - 1264:21
**forth** [1] - 1289:17

**forward** [2] - 1246:21, 1337:15
**forwarded** [2] - 1341:17, 1351:10
**foundation** [2] - 1235:9, 1268:1
**four** [5] - 1204:13, 1326:1, 1327:2, 1327:11, 1338:13
**fourth** [1] - 1341:4
**frame** [8] - 1187:9, 1207:21, 1212:16, 1245:18, 1277:24, 1306:17, 1310:16, 1314:12
**frankly** [2] - 1290:16, 1370:16
**fraud** [7] - 1262:7, 1268:24, 1268:25, 1269:2, 1269:10, 1271:11, 1280:7, 1310:7, 1364:1
**frauds** [2] - 1269:9, 1269:14
**fraudulently** [1] - 1264:9
**free** [1] - 1189:11
**Friday** [1] - 1355:20
**friend** [10] - 1195:7, 1196:8, 1197:25, 1208:24, 1209:12, 1209:16, 1214:7, 1278:4, 1292:20, 1349:8
**friends** [3] - 1213:3, 1214:4, 1214:5
**from..** [1] - 1207:24
**front** [1] - 1366:11
**fucking** [3] - 1312:17, 1312:18, 1312:19
**full** [2] - 1289:10, 1368:4
**Fund** [13] - 1226:14, 1226:17, 1226:20, 1233:23, 1261:9, 1261:10, 1262:4, 1262:11, 1262:15, 1262:20, 1263:1, 1265:25, 1285:4
**fund** [6] - 1187:21, 1204:24, 1205:4, 1209:21, 1210:1, 1271:22
**funded** [2] - 1226:20, 1261:8
**funding** [55] - 1186:11, 1186:15, 1186:18, 1187:10, 1187:12, 1187:13, 1187:18, 1187:19,

1188:2, 1188:16, 1188:20, 1188:24, 1192:1, 1192:5, 1192:8, 1192:15, 1193:7, 1194:24, 1195:2, 1195:8, 1195:9, 1195:13, 1195:23, 1196:13, 1196:17, 1197:2, 1197:9, 1197:19, 1197:22, 1199:24, 1200:15, 1200:17, 1200:21, 1200:23, 1201:3, 1201:24, 1202:4, 1202:8, 1203:20, 1204:18, 1205:14, 1205:18, 1206:3, 1206:17, 1206:19, 1207:23, 1207:24, 1208:4, 1208:7, 1208:17, 1208:23, 1209:16, 1210:17, 1237:3, 1237:20
**funds** [26] - 1187:5, 1209:21, 1210:2, 1210:10, 1214:7, 1219:21, 1240:1, 1240:4, 1247:8, 1247:10, 1247:24, 1249:23, 1264:7, 1264:10, 1272:2, 1303:17, 1319:19, 1319:23, 1319:24, 1322:16, 1337:16, 1337:18, 1338:8, 1358:15
**future** [7] - 1190:19, 1190:23, 1282:6, 1282:14, 1290:15, 1349:23, 1350:7

## G

**G-O-N-Y-A** [1] - 1276:12
**galioto** [2] - 1212:17, 1213:7
**Galioto** [3] - 1189:16, 1194:5, 1212:14
**Garner** [3] - 1195:4, 1195:6, 1197:18
**Garner's** [1] - 1195:16
**garnish** [1] - 1298:15
**garnished** [1] - 1298:13
**garnishment** [3] - 1298:16, 1298:22, 1299:9
**Gaudet** [9] - 1191:5,

1191:10, 1191:17, 1192:1, 1193:2, 1193:6, 1194:6, 1194:23, 1195:1
**GAUDET** [1] - 1191:6
**general** [3] - 1300:13, 1360:10
**generating** [1] - 1271:14
**gentleman** [2] - 1189:17, 1233:17
**Gentry** [8] - 1351:5, 1351:22, 1351:25, 1352:1, 1352:4, 1352:9, 1352:14, 1354:21
**given** [5] - 1210:15, 1215:21, 1216:13, 1217:1, 1301:6
**Global** [13] - 1226:14, 1226:16, 1226:19, 1233:23, 1261:9, 1261:10, 1262:4, 1262:11, 1262:14, 1262:19, 1263:1, 1265:25, 1285:3
**global** [1] - 1272:15
**gmail** [1] - 1310:6
**golf** [9] - 1191:10, 1191:14, 1191:16, 1191:19, 1191:22, 1191:23, 1194:6
**Gonchar** [1] - 1334:4
**Gonya** [10] - 1276:3, 1276:12, 1276:24, 1281:4, 1289:25, 1295:15, 1295:22, 1296:12, 1301:1, 1305:10
**gonya** [1] - 1276:13
**GOVERNMENT** [2] - 1374:2, 1374:3
**Government** [8] - 1180:15, 1278:5, 1278:23, 1279:3, 1283:17, 1286:6, 1338:3, 1339:23
**government** [40] - 1215:8, 1233:3, 1241:20, 1258:14, 1260:24, 1261:3, 1262:2, 1262:17, 1262:19, 1262:22, 1264:4, 1265:21, 1265:24, 1267:7, 1267:17, 1267:25, 1268:15, 1270:15, 1270:18, 1271:23, 1272:21, 1273:10, 1274:16, 1276:2,

1278:23, 1284:12, 1289:9, 1305:20, 1306:11, 1316:19, 1320:4, 1336:6, 1369:3, 1370:14, 1370:15, 1370:16, 1370:24, 1371:13, 1371:16, 1371:25
**Government's** [8] - 1217:20, 1224:13, 1288:22, 1289:19, 1324:21, 1324:24, 1325:20, 1329:3
**government's** [8] - 1264:5, 1265:15, 1266:3, 1271:19, 1272:5, 1273:13, 1324:19, 1334:16
**GOVERNMENT'S** [1] - 1374:4
**grdina** [1] - 1208:24
**Grdina** [2] - 1209:1, 1369:24
**great** [3] - 1203:4, 1237:5, 1335:24
**greater** [1] - 1370:17
**Greenberg** [1] - 1276:25
**Greg** [1] - 1366:19
**groceries** [1] - 1295:8
**grounds** [4] - 1244:14, 1244:16, 1244:17, 1244:18
**Group** [25] - 1242:11, 1247:9, 1251:15, 1292:25, 1294:14, 1295:2, 1295:13, 1317:13, 1322:3, 1322:8, 1322:17, 1322:21, 1323:18, 1325:1, 1325:18, 1326:7, 1327:18, 1328:7, 1328:12, 1329:11, 1329:23, 1331:10, 1331:18, 1332:13, 1332:20
**group** [4] - 1362:20, 1363:9, 1363:20, 1364:15
**Group's** [1] - 1294:21
**GSF** [2] - 1268:18, 1270:22
**guess** [6] - 1187:9, 1199:9, 1261:14, 1268:1, 1361:6, 1362:8
**guy** [3] - 1292:20, 1312:17, 1312:19
**guys** [3] - 1313:1, 1313:3

## H

**Haley** [11] - 1182:1, 1189:5, 1193:20, 1267:22, 1286:2, 1305:20, 1305:24, 1326:12, 1335:18, 1345:2, 1352:24
**HALEY** [34] - 1180:21, 1180:23, 1181:25, 1193:12, 1193:17, 1256:19, 1257:10, 1257:12, 1267:23, 1268:6, 1269:24, 1270:2, 1270:12, 1270:17, 1279:1, 1286:3, 1289:16, 1296:19, 1316:21, 1316:25, 1317:4, 1326:13, 1326:16, 1326:18, 1335:20, 1335:23, 1336:7, 1345:3, 1353:1, 1360:20, 1369:5, 1370:13, 1371:11, 1371:19
**half** [1] - 1334:9
**Hall** [1] - 1277:1
**hand** [6] - 1224:15, 1258:14, 1276:4, 1283:17, 1288:21, 1340:14
**Handing** [4] - 1283:19, 1288:23, 1343:25, 1360:9
**handing** [3] - 1205:10, 1287:3, 1352:16
**handwriting** [7] - 1251:24, 1252:3, 1252:4, 1317:9, 1317:20, 1340:11, 1370:1
**handwritten** [4] - 1242:3, 1251:7, 1330:1
**hangar** [1] - 1339:13
**hard** [1] - 1235:6
**Hawaii** [8] - 1189:22, 1194:7, 1209:21, 1210:2, 1210:17, 1221:7, 1222:23, 1283:4
**Hawaiian** [53] - 1186:6, 1186:11, 1186:18, 1186:23, 1187:7, 1188:2, 1188:12, 1188:17, 1188:21, 1188:24, 1190:3, 1191:3, 1192:2, 1192:5,

1192:9, 1192:15, 1193:3, 1193:7, 1194:24, 1195:8, 1195:10, 1195:14, 1195:23, 1196:14, 1196:17, 1197:2, 1197:4, 1197:19, 1198:2, 1198:6, 1198:10, 1198:20, 1198:23, 1199:8, 1199:15, 1200:5, 1201:10, 1201:14, 1201:20, 1201:24, 1202:4, 1203:20, 1204:2, 1204:14, 1206:20, 1207:20, 1208:19, 1210:9, 1220:23, 1221:3, 1221:9, 1223:5, 1233:23
**head** [3] - 1286:25, 1287:14, 1342:4
**health** [1] - 1183:7
**hear** [5] - 1234:13, 1249:13, 1267:15, 1371:23
**heard** [14] - 1188:18, 1197:22, 1200:17, 1204:21, 1204:23, 1226:14, 1237:6, 1237:8, 1248:4, 1266:13, 1271:17, 1289:5, 1371:21
**hearing** [2] - 1248:20, 1298:8
**hearsay** [14] - 1227:5, 1227:7, 1233:2, 1256:17, 1257:8, 1267:25, 1268:7, 1268:8, 1268:12, 1305:21, 1306:22, 1310:7, 1352:23, 1360:19
**held** [2] - 1215:20, 1294:22
**hell** [1] - 1348:19
**help** [7] - 1186:18, 1194:22, 1267:15, 1283:10, 1290:5, 1340:1, 1340:2
**helped** [1] - 1206:20
**helpful** [1] - 1371:5
**helps** [1] - 1285:9
**Hermosa** [4] - 1239:9, 1239:10, 1319:18, 1323:24
**hesitate** [1] - 1198:18
**high** [2] - 1200:9, 1274:5
**higher** [2] - 1200:9,

1357:16
**highlight** [1] - 1337:20
**highlighted** [3] - 1328:20, 1331:16, 1355:15
**Highway** [1] - 1180:22
**himself** [4] - 1268:2, 1268:5, 1271:8, 1358:21
**hired** [3] - 1188:2, 1194:23, 1196:13
**hockey** [26] - 1188:8, 1188:13, 1189:21, 1224:6, 1225:12, 1225:17, 1226:6, 1227:17, 1228:7, 1229:1, 1229:5, 1229:8, 1272:17, 1282:25, 1301:4, 1315:16, 1318:20, 1332:6, 1337:6, 1345:16, 1361:17, 1365:24, 1366:2, 1366:22, 1366:24, 1367:6
**hold** [3] - 1345:2, 1353:25, 1354:7
**holding** [1] - 1354:9
**Holding** [2] - 1214:20, 1215:4
**holds** [2] - 1293:10, 1293:14
**Honor** [76] - 1181:19, 1181:22, 1181:25, 1182:3, 1182:6, 1184:12, 1185:24, 1193:12, 1203:2, 1203:6, 1205:8, 1217:14, 1225:7, 1236:7, 1249:12, 1254:3, 1254:4, 1256:15, 1256:19, 1256:23, 1257:12, 1258:15, 1258:16, 1260:16, 1261:13, 1261:24, 1267:5, 1267:23, 1268:19, 1268:22, 1269:4, 1269:11, 1270:8, 1270:20, 1271:2, 1271:6, 1274:21, 1275:7, 1275:12, 1277:22, 1278:25, 1279:19, 1285:15, 1286:16, 1288:12, 1289:14, 1296:19, 1301:5, 1304:19, 1305:9, 1308:15, 1309:6, 1310:2, 1316:17, 1317:3,

1324:19, 1326:4, 1326:6, 1326:11, 1333:13, 1333:19, 1336:3, 1336:15, 1344:22, 1345:3, 1352:21, 1353:6, 1353:10, 1365:13, 1367:23, 1367:24, 1368:20, 1369:4, 1369:16, 1370:10, 1371:11

**HONORABLE** [1] - 1180:12
**hook** [1] - 1189:9
**hope** [4] - 1308:24, 1309:2, 1367:24, 1371:20
**hopefully** [6] - 1184:8, 1189:2, 1218:25, 1259:14, 1326:2, 1336:5
**hoping** [6] - 1216:24, 1216:25, 1265:1, 1273:8, 1308:23, 1355:19
**Hormovitis** [1] - 1180:8
**hour** [2] - 1296:4, 1296:5
**hourly** [1] - 1296:2
**hours** [3] - 1227:24, 1227:25, 1228:1
**house** [6] - 1192:21, 1215:19, 1290:12, 1290:19, 1290:20, 1290:25
**Hughes** [13] - 1240:4, 1240:7, 1242:16, 1318:21, 1338:23, 1339:6, 1339:18, 1342:7, 1342:10, 1350:22, 1352:11, 1357:21, 1361:17
**hundred** [2] - 1331:9, 1332:11
**husband** [1] - 1332:5

**I**

**ID** [1] - 1354:21
**idea** [6] - 1188:14, 1224:3, 1224:12, 1225:1, 1231:13, 1303:22
**identification** [12] - 1189:4, 1193:11, 1193:17, 1193:19, 1256:4, 1277:21, 1308:21, 1320:13, 1343:24, 1352:13,

1360:5, 1360:7
**identified** [8] - 1197:14, 1204:8, 1268:4, 1268:5, 1284:6, 1288:2, 1322:11, 1340:4
**identify** [3] - 1204:6, 1277:18, 1307:21
**immediate** [1] - 1346:16
**impeach** [3] - 1259:1, 1260:4, 1260:6
**impeachment** [3] - 1244:16, 1244:19, 1260:20
**important** [3] - 1190:15, 1190:19, 1275:24
**impression** [2] - 1272:20, 1365:20
**improper** [1] - 1364:24
**improprieties** [1] - 1272:22
**improve** [1] - 1355:24
**IN** [2] - 1374:7, 1374:8
**in..** [1] - 1206:24
**inadmissible** [1] - 1267:25
**Inc** [1] - 1291:23
**inclination** [1] - 1368:22
**included** [1] - 1204:2
**including** [2] - 1262:11, 1343:17
**incorrect** [1] - 1365:22
**incurred** [1] - 1298:7
**indicate** [1] - 1340:17
**indicated** [2] - 1264:6, 1274:6
**indicating** [3] - 1243:3, 1340:25, 1341:4
**indicating)** [1] - 1277:20
**indication** [1] - 1371:3
**indictment** [6] - 1264:20, 1264:22, 1269:5, 1269:6, 1269:20, 1306:7
**individual** [9] - 1191:5, 1197:1, 1277:13, 1282:7, 1282:13, 1283:10, 1304:8, 1351:5, 1366:14
**individually** [1] - 1366:4
**individuals** [18] - 1186:18, 1188:2, 1191:2, 1194:23,

1197:14, 1197:15, 1197:23, 1214:25, 1271:22, 1271:25, 1273:18, 1274:9, 1304:9, 1339:5, 1358:25, 1361:15, 1366:9, 1367:13
**induce** [1] - 1262:6
**inflammatory** [1] - 1274:10
**information** [33] - 1189:14, 1190:16, 1190:18, 1196:25, 1200:22, 1201:2, 1201:19, 1203:23, 1210:6, 1213:9, 1230:12, 1242:21, 1246:5, 1252:5, 1262:15, 1262:21, 1279:15, 1283:24, 1283:25, 1284:3, 1284:5, 1284:7, 1303:13, 1303:14, 1303:20, 1316:2, 1316:11, 1319:7, 1319:8, 1333:2, 1334:12, 1344:9, 1349:6
**initial** [5] - 1210:10, 1248:19, 1249:16, 1318:12, 1322:20
**initials** [1] - 1340:22
**input** [1] - 1365:1
**inputted** [1] - 1284:5
**insist** [1] - 1253:22
**insofar** [1] - 1310:2
**instance** [2] - 1264:14, 1269:2
**instructed** [4] - 1210:18, 1280:6, 1337:17, 1351:14
**instructions** [1] - 1340:5
**insurance** [2] - 1183:7, 1197:5
**insure** [1] - 1229:13
**intend** [2] - 1265:4, 1308:7
**intended** [1] - 1261:1
**intent** [3] - 1261:6, 1266:6, 1273:22
**intention** [1] - 1261:10
**interest** [19] - 1231:13, 1231:16, 1243:5, 1245:15, 1247:7, 1252:18, 1253:4, 1253:22, 1254:1, 1282:16, 1300:12, 1306:19, 1350:18, 1353:18, 1364:17,

1365:21, 1366:25, 1367:7, 1367:11
**interested** [1] - 1363:13
**interrupt** [1] - 1188:9
**interview** [5] - 1189:20, 1190:12, 1190:22, 1193:2, 1213:1
**interviewed** [3] - 1190:10, 1212:13, 1212:15
**introduce** [3] - 1259:18, 1260:12, 1305:25
**introduced** [6] - 1193:13, 1193:16, 1195:7, 1217:19, 1225:13, 1260:9
**introducing** [1] - 1308:3
**invest** [9] - 1198:9, 1237:23, 1237:25, 1238:5, 1240:11, 1336:21, 1341:23, 1342:7, 1342:15
**invested** [33] - 1198:11, 1198:15, 1198:22, 1199:4, 1210:9, 1213:18, 1222:18, 1222:23, 1222:24, 1223:2, 1223:5, 1225:25, 1238:15, 1238:22, 1238:23, 1240:13, 1240:16, 1240:24, 1241:3, 1241:4, 1243:3, 1243:9, 1245:13, 1247:6, 1321:7, 1324:8, 1327:21, 1332:8, 1350:20, 1351:16, 1357:11, 1358:25, 1365:20
**investigate** [1] - 1323:17
**investigation** [3] - 1323:12, 1325:16, 1327:16
**investing** [4] - 1238:18, 1239:4, 1343:3, 1343:9
**investment** [40] - 1186:6, 1198:19, 1199:1, 1215:18, 1217:5, 1221:3, 1221:6, 1221:9, 1222:11, 1222:25, 1223:4, 1233:23, 1238:11, 1240:8,

1244:4, 1246:9, 1248:19, 1250:24, 1274:1, 1306:4, 1325:5, 1329:4, 1341:21, 1343:1, 1344:15, 1346:2, 1346:6, 1346:8, 1346:12, 1347:1, 1347:18, 1347:23, 1348:4, 1351:3, 1352:7, 1353:24, 1353:25, 1355:3, 1359:8, 1366:13
**investments** [38] - 1220:23, 1222:10, 1222:19, 1238:8, 1239:19, 1241:12, 1248:4, 1248:14, 1248:23, 1249:17, 1249:20, 1249:25, 1252:2, 1252:9, 1315:19, 1316:12, 1319:14, 1319:19, 1320:9, 1322:20, 1326:23, 1327:2, 1327:11, 1329:18, 1333:8, 1336:18, 1338:22, 1339:17, 1347:2, 1347:5, 1347:18, 1349:7, 1351:22, 1352:15, 1355:24, 1357:2, 1362:3, 1362:17
**investor** [6] - 1225:9, 1358:3, 1358:5, 1358:12, 1358:18, 1358:22
**Investors** [2] - 1204:19, 1205:19
**investors** [9] - 1189:22, 1215:20, 1217:2, 1224:8, 1263:16, 1264:23, 1271:12, 1273:24, 1358:11
**invoices** [2] - 1288:16, 1343:21
**involve** [2] - 1197:2, 1281:5
**involved** [21] - 1186:23, 1199:10, 1199:11, 1199:17, 1200:14, 1204:18, 1226:25, 1227:6, 1230:20, 1231:7, 1239:8, 1240:6, 1262:11, 1263:8, 1281:15, 1292:20, 1300:18, 1301:3, 1301:4, 1318:18,

1363:19
**involvement** [1] - 1190:2
**involves** [1] - 1301:6
**involving** [3] - 1281:15, 1282:23, 1301:4
**IOLA** [2] - 1304:5, 1304:15
**ironically** [1] - 1262:25
**irrelevant** [1] - 1263:11
**island** [1] - 1204:10
**Islandia** [1] - 1180:23
**Islip** [3] - 1180:5, 1180:17, 1181:8
**issue** [8] - 1182:9, 1233:24, 1233:25, 1234:15, 1235:4, 1261:1, 1274:3, 1301:7
**issued** [1] - 1299:4
**issues** [4] - 1273:15, 1273:16, 1285:9, 1335:3
**issuing** [1] - 1343:22
**item** [1] - 1220:11
**Items** [3] - 1218:16, 1218:24, 1220:11
**items** [1] - 1219:3
**itself** [3] - 1187:22, 1260:9, 1274:9

## J

**JAMES** [1] - 1180:17
**James** [7] - 1181:20, 1196:5, 1196:12, 1214:8, 1214:10, 1214:18
**January** [1] - 1256:13
**JFB** [1] - 1180:3
**JK-1** [5] - 1189:4, 1193:11, 1209:5, 1209:20, 1339:23
**JK-3** [2] - 1212:4, 1212:10
**job** [1] - 1273:10
**John** [4] - 1185:4, 1269:2, 1353:15, 1370:1
**JOHN** [2] - 1307:10, 1373:13
**Johnny** [1] - 1345:9
**Jordan** [1] - 1296:9
**JOSEPH** [1] - 1180:12
**Jowdy** [66] - 1226:21, 1227:1, 1227:3, 1227:12, 1229:3,

1229:14, 1229:23, 1230:4, 1230:9, 1230:13, 1230:15, 1230:19, 1230:22, 1231:7, 1231:19, 1231:25, 1232:4, 1232:9, 1232:15, 1233:8, 1233:14, 1233:16, 1234:8, 1236:12, 1259:1, 1259:7, 1259:9, 1259:12, 1259:24, 1260:1, 1260:2, 1261:7, 1261:20, 1262:6, 1262:10, 1262:14, 1263:2, 1263:8, 1263:20, 1263:21, 1263:23, 1264:1, 1264:8, 1264:21, 1264:22, 1265:4, 1265:8, 1265:17, 1265:21, 1266:1, 1266:21, 1283:10, 1310:9, 1311:16, 1312:10, 1313:6, 1313:15, 1313:20, 1314:14, 1314:16, 1314:17, 1314:20, 1314:25, 1315:3, 1337:7
**Jowdy's** [1] - 1315:12
**Judge** [31] - 1180:12, 1184:6, 1193:18, 1197:12, 1206:18, 1211:15, 1212:6, 1235:1, 1255:3, 1255:9, 1257:10, 1257:14, 1259:4, 1262:1, 1264:18, 1265:2, 1265:13, 1265:24, 1269:22, 1269:24, 1272:19, 1302:13, 1335:15, 1335:17, 1335:23, 1339:25, 1340:2, 1345:4, 1351:8, 1358:2, 1358:4
**judge** [23] - 1228:10, 1228:12, 1228:13, 1228:16, 1229:1, 1229:11, 1263:2, 1265:10, 1268:3, 1269:25, 1272:12, 1273:4, 1297:22, 1308:23, 1309:4, 1316:21, 1316:25, 1325:11, 1326:13, 1326:18, 1335:10, 1335:20, 1370:13
**July** [1] - 1268:23

**jumping** [2] - 1239:25, 1240:3
**June** [3] - 1268:25, 1278:1, 1306:5
**Juneau** [1] - 1367:8
**juror** [2] - 1353:6, 1371:8
**Juror** [3] - 1368:14, 1368:22, 1369:7
**JUROR** [2] - 1353:8, 1369:16
**JURORS** [1] - 1185:9
**jurors** [3] - 1259:6, 1368:25, 1369:13
**jury** [39] - 1180:13, 1185:2, 1185:6, 1185:8, 1203:7, 1203:10, 1233:18, 1234:13, 1236:2, 1246:7, 1248:3, 1257:6, 1258:6, 1259:10, 1261:3, 1262:8, 1265:7, 1272:20, 1275:11, 1275:13, 1275:16, 1275:19, 1279:5, 1286:10, 1305:13, 1305:16, 1307:4, 1309:5, 1311:2, 1311:4, 1333:17, 1334:13, 1334:17, 1336:2, 1336:12, 1339:23, 1368:13, 1368:15, 1370:25

## K

**K-1** [2] - 1355:9, 1355:11
**K1's** [1] - 1355:7
**KAISER** [2] - 1307:10, 1373:13
**Kaiser** [108] - 1185:2, 1185:4, 1185:17, 1186:3, 1186:5, 1187:10, 1190:1, 1190:5, 1191:25, 1192:23, 1193:21, 1194:13, 1202:7, 1203:8, 1203:9, 1203:19, 1210:5, 1211:16, 1212:3, 1212:10, 1212:13, 1212:25, 1217:22, 1218:7, 1219:1, 1220:15, 1226:25, 1229:19, 1229:20, 1231:23, 1234:4, 1236:10, 1244:22, 1245:20, 1246:7,

1247:16, 1247:22, 1249:7, 1249:24, 1250:13, 1250:18, 1256:3, 1258:9, 1258:21, 1259:22, 1261:12, 1261:20, 1262:12, 1262:25, 1266:3, 1266:4, 1266:8, 1266:12, 1267:7, 1267:18, 1268:4, 1269:9, 1275:8, 1305:14, 1307:7, 1307:15, 1310:9, 1310:12, 1310:13, 1310:16, 1311:9, 1311:24, 1314:2, 1314:11, 1315:8, 1315:18, 1315:21, 1317:21, 1318:24, 1320:15, 1321:20, 1322:12, 1323:11, 1324:23, 1325:14, 1327:1, 1327:24, 1332:16, 1333:21, 1336:9, 1336:17, 1342:14, 1342:21, 1343:9, 1345:1, 1347:22, 1348:3, 1348:11, 1349:12, 1350:17, 1351:2, 1353:11, 1357:10, 1358:3, 1359:18, 1363:18, 1364:14, 1365:14, 1367:18, 1368:18, 1370:8
**Kaiser's** [2] - 1185:11, 1275:23
**Kathy** [1] - 1332:5
**Kau** [2] - 1214:20, 1215:4
**keep** [3] - 1276:13, 1310:20, 1371:9
**Keith** [1] - 1214:6
**kELLY** [1] - 1180:15
**Ken** [7] - 1259:1, 1259:12, 1266:21, 1283:10, 1311:15, 1311:16, 1313:6
**KENNER** [1] - 1180:6
**Kenner** [119] - 1180:6, 1180:21, 1181:16, 1182:1, 1186:16, 1186:17, 1187:13, 1187:25, 1188:3, 1191:10, 1192:20, 1193:13, 1196:9, 1198:24, 1200:20, 1201:3, 1203:23, 1203:24, 1210:15,

1210:18, 1211:6, 1212:18, 1213:2, 1213:10, 1213:17, 1214:14, 1214:17, 1214:22, 1215:16, 1215:21, 1216:13, 1216:25, 1219:11, 1219:13, 1220:24, 1225:13, 1227:18, 1229:1, 1229:4, 1230:8, 1234:3, 1234:5, 1234:14, 1234:24, 1236:13, 1237:8, 1238:11, 1238:13, 1239:1, 1239:4, 1239:8, 1239:20, 1239:21, 1240:17, 1240:24, 1241:3, 1241:11, 1242:1, 1242:3, 1242:13, 1243:6, 1243:9, 1243:25, 1244:22, 1246:8, 1246:22, 1246:23, 1247:2, 1247:14, 1247:18, 1247:25, 1248:8, 1248:15, 1249:1, 1249:23, 1250:1, 1250:4, 1251:20, 1252:5, 1252:13, 1252:22, 1255:4, 1262:3, 1262:12, 1264:7, 1264:9, 1264:14, 1264:18, 1265:16, 1269:17, 1292:19, 1306:3, 1306:22, 1307:3, 1313:21, 1314:8, 1314:21, 1315:24, 1316:2, 1316:15, 1316:22, 1317:4, 1317:13, 1319:10, 1319:19, 1322:2, 1322:6, 1323:15, 1327:21, 1327:23, 1329:12, 1331:11, 1331:20, 1333:3, 1333:5, 1345:21, 1353:21, 1354:8, 1357:11
**Kenner's** [5] - 1204:7, 1240:14, 1245:24, 1316:5, 1323:25
**kept** [1] - 1284:10
**kind** [7] - 1201:13, 1261:24, 1272:7, 1283:24, 1321:21, 1346:3, 1364:1
**kinds** [1] - 1302:11
**knowing** [2] - 1235:5,

1308:25
**knowledge** [8] -
1186:17, 1198:19,
1216:5, 1298:4,
1303:18, 1334:1,
1342:9, 1361:11
**known** [3] - 1205:13,
1259:24, 1348:17
**knows** [2] - 1231:4,
1298:25
**Komatireddy** [1] -
1181:23
**KOMATIREDDY** [36] -
1180:18, 1181:22,
1268:18, 1268:22,
1269:7, 1270:8,
1270:20, 1271:2,
1271:6, 1275:6,
1276:2, 1276:16,
1278:23, 1279:4,
1279:21, 1280:6,
1280:9, 1281:3,
1284:12, 1285:7,
1285:15, 1286:16,
1286:18, 1288:21,
1289:9, 1296:17,
1298:23, 1300:1,
1300:5, 1300:19,
1301:5, 1302:3,
1302:7, 1304:25,
1305:9, 1373:8

## L

**LA** [42] - 1258:12,
1259:3, 1259:14,
1259:21, 1260:11,
1260:23, 1261:24,
1264:4, 1265:10,
1265:13, 1265:23,
1267:5, 1267:13,
1268:3, 1268:9,
1268:13, 1269:4,
1269:11, 1269:25,
1270:5, 1272:12,
1273:4, 1274:19,
1274:21, 1331:1,
1333:13, 1333:19,
1335:10, 1335:15,
1335:17, 1336:3,
1336:15, 1336:16,
1339:24, 1340:2,
1344:22, 1348:23,
1349:4, 1351:8,
1352:21, 1353:5,
1353:10
**lacked** [1] - 1272:2
**laid** [1] - 1268:1
**land** [1] - 1186:12
**language** [1] - 1371:2

**large** [3] - 1222:6,
1359:5, 1359:19
**larger** [1] - 1307:16
**laRUSSO** [4] - 1181:1,
1203:2, 1300:8,
1365:13
**LARUSSO** [60] -
1224:1, 1225:7,
1225:8, 1226:24,
1227:8, 1227:10,
1229:18, 1231:1,
1233:8, 1233:13,
1234:11, 1234:25,
1235:4, 1235:11,
1235:14, 1235:18,
1236:7, 1236:8,
1241:16, 1244:18,
1244:21, 1247:1,
1248:7, 1249:12,
1249:14, 1250:10,
1254:3, 1255:2,
1255:8, 1256:2,
1256:15, 1257:14,
1303:2, 1304:18,
1304:21, 1305:4,
1305:8, 1308:7,
1308:16, 1308:19,
1308:23, 1309:4,
1310:17, 1311:6,
1311:8, 1314:5,
1316:17, 1317:3,
1317:8, 1323:10,
1324:19, 1324:22,
1325:11, 1326:4,
1326:6, 1326:21,
1328:3, 1373:4,
1373:10, 1373:14
**LaRusso** [53] -
1181:3, 1182:3,
1182:4, 1182:8,
1183:2, 1184:5,
1184:12, 1185:12,
1185:24, 1186:2,
1197:12, 1203:3,
1203:16, 1203:18,
1205:8, 1206:18,
1211:15, 1212:6,
1216:15, 1217:13,
1236:3, 1236:6,
1275:23, 1277:21,
1278:25, 1279:19,
1279:22, 1280:2,
1284:14, 1285:2,
1285:12, 1289:14,
1296:20, 1296:22,
1301:7, 1302:2,
1302:9, 1305:19,
1305:22, 1308:1,
1308:2, 1311:5,
1358:2, 1358:4,

1358:21, 1360:17,
1364:24, 1367:21,
1367:22, 1369:4,
1370:7, 1370:10,
1370:22
**last** [12] - 1183:3,
1214:9, 1228:22,
1236:9, 1271:18,
1278:14, 1291:8,
1292:8, 1350:1,
1357:23, 1370:8,
1370:23
**lasted** [2] - 1227:21,
1227:23
**lastly** [6] - 1264:18,
1269:1, 1287:23,
1288:5, 1312:25,
1355:5
**late** [1] - 1370:1
**latest** [1] - 1306:14
**Law** [5] - 1270:21,
1287:9, 1287:16,
1287:22
**lawsuit** [17] - 1228:22,
1231:5, 1263:23,
1264:1, 1279:18,
1281:4, 1281:9,
1281:20, 1297:1,
1300:17, 1303:13,
1361:3, 1361:9,
1361:12, 1361:13,
1362:2, 1362:20
**lawsuits** [8] - 1226:20,
1226:25, 1227:3,
1227:12, 1230:3,
1230:22, 1301:2,
1302:6
**lawyer** [5] - 1261:4,
1299:22, 1300:15,
1303:4, 1371:7
**lawyers** [2] - 1368:7,
1368:16
**lay** [1] - 1227:8
**lead** [3] - 1235:2,
1280:4, 1280:8
**leading** [1] - 1252:20
**learn** [9] - 1188:19,
1192:4, 1192:14,
1195:1, 1195:13,
1196:16, 1226:10,
1364:4, 1365:21
**learned** [4] - 1192:6,
1192:7, 1202:7,
1364:5
**leases** [1] - 1363:25
**least** [6] - 1222:9,
1329:4, 1329:19,
1347:1, 1367:6,
1369:1
**leaves** [3] - 1267:20,

1333:22, 1368:13
**leaving** [1] - 1259:6
**lecture** [1] - 1367:21
**ledger** [5] - 1283:23,
1287:10, 1287:17,
1287:23, 1288:5
**left** [7] - 1209:6,
1212:4, 1224:15,
1236:4, 1314:16,
1314:17, 1340:14
**left-hand** [2] -
1224:15, 1340:14
**legal** [11] - 1230:3,
1282:21, 1283:3,
1283:6, 1283:9,
1283:12, 1295:16,
1298:7, 1298:10,
1298:23, 1301:7
**Lehman** [26] - 1186:7,
1187:25, 1195:12,
1199:9, 1199:13,
1199:18, 1204:17,
1206:2, 1206:13,
1206:19, 1207:11,
1210:6, 1210:8,
1215:24, 1216:2,
1216:9, 1216:19,
1216:22, 1217:8,
1218:2, 1218:12,
1218:21, 1219:22,
1221:23, 1222:18,
1225:16
**lender** [3] - 1348:16,
1363:15, 1365:1
**lender..** [1] - 1202:1
**lenders** [1] - 1199:21
**length** [1] - 1334:7
**letter** [11] - 1264:5,
1271:19, 1273:11,
1273:13, 1278:9,
1278:13, 1279:14,
1282:17, 1286:23,
1320:21, 1321:1
**license** [1] - 1350:2
**licensees** [2] -
1359:20, 1360:15
**licensing** [5] -
1237:15, 1359:4,
1359:12, 1359:15,
1361:1
**life** [1] - 1207:1
**likewise** [3] - 1192:1,
1195:13, 1351:10
**limited** [3] - 1234:10,
1308:2, 1310:14
**limiting** [1] - 1335:13
**line** [18] - 1224:11,
1224:18, 1253:11,
1282:1, 1291:7,
1292:16, 1292:23,

1293:12, 1293:13,
1293:16, 1294:3,
1295:5, 1295:19,
1360:11, 1369:18,
1370:11
**line-up** [1] - 1370:11
**lined** [1] - 1355:20
**lines** [1] - 1226:5
**list** [3] - 1242:1,
1242:3
**listed** [2] - 1348:5,
1362:6
**listen** [6] - 1267:7,
1267:8, 1267:11,
1311:9, 1312:8,
1368:9
**listened** [2] - 1308:8,
1312:7
**listening** [3] -
1267:10, 1311:12,
1311:22
**listens** [1] - 1371:8
**literally** [2] - 1290:22,
1290:23
**litigation** [2] -
1277:12, 1279:9
**live** [1] - 1290:10
**lives** [2] - 1189:21,
1196:8
**living** [1] - 1276:19
**LLC** [18] - 1278:11,
1279:8, 1281:21,
1282:3, 1282:9,
1282:15, 1284:1,
1288:4, 1288:13,
1291:23, 1291:24,
1292:9, 1292:25,
1353:21, 1353:25,
1354:20, 1355:10
**LLC's** [1] - 1282:6
**LLCs** [1] - 1292:13
**LLP** [2] - 1180:21,
1181:1
**loan** [58] - 1186:7,
1188:1, 1195:12,
1199:9, 1199:13,
1199:18, 1199:24,
1204:17, 1206:2,
1206:13, 1206:20,
1208:4, 1211:1,
1211:17, 1212:11,
1212:17, 1212:19,
1213:5, 1215:14,
1215:16, 1215:17,
1218:21, 1223:10,
1223:12, 1224:18,
1224:21, 1343:14,
1343:15, 1343:17,
1346:18, 1346:21,
1347:8, 1347:10,

1347:17, 1347:24, 1348:11, 1348:12, 1348:14, 1348:25, 1349:13, 1349:17, 1350:14, 1362:21, 1362:25, 1363:3, 1363:4, 1363:5, 1363:9, 1363:15, 1363:20, 1363:23, 1364:21, 1364:25, 1365:5, 1365:8, 1365:10
**Loan** [1] - 1223:4
**located** [1] - 1277:7
**location** [1] - 1204:2
**locations** [1] - 1204:8
**logically** [1] - 1205:2
**long-winded** [1] - 1335:5
**look** [42] - 1189:6, 1193:10, 1193:21, 1193:25, 1205:7, 1209:6, 1209:24, 1212:3, 1212:10, 1217:24, 1233:19, 1243:12, 1243:15, 1244:6, 1244:9, 1248:17, 1253:9, 1256:5, 1260:24, 1270:3, 1273:6, 1274:19, 1283:18, 1287:20, 1316:5, 1320:12, 1320:15, 1321:25, 1324:4, 1324:25, 1325:19, 1326:14, 1327:1, 1328:8, 1331:9, 1335:11, 1335:18, 1352:18, 1360:7, 1370:23, 1370:24, 1371:2
**looked** [2] - 1209:19, 1333:1
**looking** [22] - 1186:11, 1186:14, 1187:9, 1189:8, 1190:25, 1194:14, 1204:24, 1205:16, 1209:5, 1251:25, 1287:4, 1287:10, 1287:23, 1308:25, 1321:21, 1325:20, 1332:7, 1364:19, 1367:7, 1367:11, 1367:22
**looks** [3] - 1189:8, 1219:6, 1320:19
**lose** [3] - 1248:19, 1368:24, 1369:10
**loss** [1] - 1272:7
**losses** [2] - 1264:20,

1266:1
**lost** [2] - 1334:8, 1371:8
**Ltd** [1] - 1247:9
**Lucas** [1] - 1223:2
**luggage** [1] - 1183:3
**lunch** [13] - 1185:16, 1235:13, 1236:5, 1257:13, 1258:3, 1258:5, 1258:9, 1258:21, 1266:9, 1267:19, 1270:4, 1276:6, 1308:25
**luncheon** [1] - 1274:22
**lying** [3] - 1233:9, 1246:12, 1247:16

## M

**mail** [38] - 1201:12, 1201:13, 1201:15, 1205:15, 1253:25, 1255:3, 1256:7, 1256:10, 1267:22, 1268:4, 1268:8, 1278:20, 1305:18, 1305:24, 1306:2, 1306:15, 1307:4, 1344:4, 1344:11, 1345:8, 1347:7, 1347:8, 1347:12, 1347:13, 1348:3, 1348:7, 1348:24, 1349:5, 1349:12, 1349:15, 1349:20, 1351:4, 1351:21, 1351:23, 1351:25, 1353:11, 1354:24, 1356:2
**mails** [6] - 1268:20, 1344:8, 1351:24, 1352:13, 1360:11, 1360:14
**major** [1] - 1265:10
**man** [6] - 1188:5, 1195:4, 1196:5, 1201:16, 1366:19
**man-to-man** [1] - 1201:16
**Management** [30] - 1242:11, 1247:9, 1251:15, 1292:25, 1293:21, 1294:14, 1294:21, 1295:2, 1295:13, 1317:13, 1322:3, 1322:7, 1322:17, 1322:20, 1323:14, 1323:18, 1323:21, 1325:1,

1325:18, 1326:7, 1327:12, 1327:18, 1328:7, 1328:12, 1329:11, 1329:23, 1331:10, 1331:18, 1332:13, 1332:20
**management** [2] - 1200:12, 1352:5
**managers** [3] - 1282:7, 1355:17, 1355:20
**managing** [1] - 1354:16
**manfredi** [2] - 1201:23, 1206:15
**Manfredi** [16] - 1198:2, 1198:4, 1199:7, 1199:25, 1200:14, 1200:22, 1201:7, 1202:3, 1202:9, 1203:19, 1204:17, 1205:3, 1205:22, 1219:4, 1220:6, 1369:24
**Manfredi's** [1] - 1198:19
**manipulated** [1] - 1313:5
**manipulator** [1] - 1259:25
**Mar** [3] - 1231:8, 1231:12, 1231:14
**March** [5] - 1268:19, 1278:1, 1278:22, 1279:14, 1294:5
**mark** [1] - 1324:20
**marked** [22] - 1189:4, 1205:6, 1256:3, 1278:5, 1279:3, 1283:17, 1286:6, 1287:3, 1288:22, 1289:19, 1292:6, 1292:15, 1292:22, 1294:2, 1310:4, 1317:4, 1320:12, 1343:24, 1352:12, 1360:5, 1360:7, 1360:23
**Mastercard** [1] - 1291:18
**match** [2] - 1329:16, 1330:1
**material** [1] - 1274:10
**materials** [1] - 1370:7
**math** [1] - 1221:1
**Matter** [11] - 1182:12, 1183:17, 1184:14, 1185:1, 1279:24, 1280:11, 1281:1, 1284:17, 1285:17,

1286:1, 1301:11
**matter** [16] - 1202:16, 1223:15, 1242:9, 1254:7, 1257:5, 1263:7, 1263:8, 1279:9, 1282:2, 1282:6, 1282:9, 1283:1, 1284:1, 1302:14, 1328:15, 1372:3
**matters** [3] - 1263:9, 1272:14, 1273:5
**mattress** [1] - 1188:22
**mean** [8] - 1201:1, 1292:1, 1292:2, 1297:10, 1298:6, 1354:19, 1355:21, 1358:7
**meaning** [3] - 1200:6, 1215:15, 1358:14
**meant** [1] - 1341:12
**mechanism** [1] - 1262:5
**mediating** [1] - 1228:10
**mediation** [11] - 1227:13, 1227:14, 1227:16, 1227:21, 1228:7, 1228:9, 1228:12, 1229:7, 1230:10, 1231:11, 1315:3
**medical** [1] - 1183:15
**meet** [2] - 1191:12, 1224:8
**meeting** [18] - 1188:19, 1189:13, 1194:4, 1196:12, 1236:21, 1236:23, 1237:7, 1237:10, 1237:16, 1247:19, 1250:19, 1250:22, 1252:8, 1252:15, 1253:2, 1253:6, 1253:21, 1355:18
**meetings** [2] - 1227:11, 1253:23
**member** [3] - 1354:17, 1355:18, 1355:19
**members** [11] - 1185:8, 1186:10, 1214:3, 1214:5, 1236:2, 1275:19, 1282:7, 1305:13, 1311:3, 1353:19, 1355:22
**membership** [6] - 1243:5, 1245:15, 1247:7, 1353:18, 1354:10, 1363:12

**Memorial** [1] - 1180:22
**mention** [1] - 1366:15
**mentioned** [8] - 1183:8, 1200:22, 1203:3, 1212:17, 1264:4, 1308:16, 1359:21, 1370:13
**mentioning** [2] - 1292:2, 1301:2
**merits** [5] - 1263:1, 1263:19, 1263:20, 1263:25, 1264:1
**met** [18] - 1187:25, 1188:14, 1191:10, 1191:18, 1191:19, 1193:5, 1194:6, 1195:17, 1196:9, 1198:24, 1236:17, 1238:2, 1238:4, 1238:7, 1249:17, 1252:6, 1312:16, 1337:14
**Metabank** [9] - 1349:23, 1350:2, 1350:6, 1350:7, 1350:8, 1359:22, 1359:23, 1361:1, 1367:14
**Mexican** [5] - 1221:13, 1221:14, 1222:4, 1222:12
**Mexico** [8] - 1191:15, 1191:16, 1197:22, 1221:7, 1222:2, 1231:8, 1263:9, 1283:13
**Miami** [3] - 1276:22, 1277:8, 1293:18
**Michael** [2] - 1224:4, 1224:16
**mid** [1] - 1260:18
**middle** [6] - 1193:22, 1193:23, 1209:7, 1250:19, 1250:22, 1323:2
**might** [7] - 1207:16, 1211:1, 1211:16, 1211:20, 1211:25, 1294:16, 1371:11
**Milian** [1] - 1276:24
**million** [36] - 1186:25, 1187:4, 1204:25, 1205:4, 1205:19, 1206:4, 1206:7, 1208:14, 1208:18, 1209:2, 1209:13, 1210:13, 1210:21, 1213:3, 1213:21, 1213:24, 1215:12,

1218:17, 1222:5, 1238:17, 1240:18, 1240:24, 1248:11, 1250:23, 1253:13, 1264:10, 1319:14, 1319:25, 1320:10, 1320:22, 1321:7, 1323:3, 1345:24, 1346:21, 1350:8, 1365:20

**millions** [2] - 1264:9, 1320:1

**mind** [10] - 1215:11, 1222:17, 1233:21, 1233:22, 1261:21, 1305:23, 1306:5, 1306:24, 1307:1, 1371:9

**mine** [4] - 1220:3, 1249:23, 1338:9, 1339:21

**Mineola** [1] - 1181:2

**mini** [1] - 1333:24

**mini-summations** [1] - 1333:24

**minus** [1] - 1345:12

**minute** [4] - 1217:13, 1279:22, 1305:14, 1333:14

**minutes** [8] - 1184:10, 1185:16, 1249:24, 1254:5, 1267:13, 1275:6, 1312:7, 1335:11

**misappropriated** [4] - 1230:15, 1236:12, 1313:21, 1314:20

**MISKIEWICZ** [92] - 1180:17, 1181:19, 1184:7, 1192:24, 1197:11, 1202:5, 1202:10, 1205:24, 1206:16, 1208:20, 1211:13, 1212:5, 1212:7, 1212:23, 1213:11, 1213:19, 1221:4, 1221:10, 1221:18, 1222:13, 1224:23, 1226:22, 1227:4, 1229:16, 1230:6, 1230:24, 1231:3, 1231:21, 1232:18, 1233:2, 1233:25, 1234:15, 1235:10, 1240:21, 1241:14, 1244:13, 1244:15, 1245:18, 1246:24, 1248:5, 1249:6, 1250:8, 1256:17, 1256:23,

1257:2, 1260:16, 1263:7, 1275:12, 1308:15, 1309:6, 1310:2, 1314:3, 1314:10, 1316:20, 1323:6, 1324:10, 1326:11, 1328:1, 1331:13, 1331:22, 1332:9, 1332:14, 1333:10, 1334:18, 1337:12, 1342:11, 1344:24, 1347:20, 1348:1, 1348:21, 1349:3, 1349:18, 1350:15, 1351:6, 1351:18, 1352:23, 1358:8, 1358:19, 1359:16, 1360:19, 1362:13, 1363:1, 1363:16, 1365:3, 1365:6, 1365:11, 1367:2, 1367:19, 1369:3, 1369:20, 1370:11, 1370:20

**Miskiewicz** [2] - 1181:20, 1371:17

**mispronounce** [1] - 1204:1

**missed** [1] - 1214:9

**misspoke** [2] - 1341:12, 1341:15

**mistake** [2] - 1234:11, 1327:24

**mistaken** [4] - 1211:4, 1212:11, 1212:21, 1242:6

**mixing** [1] - 1325:11

**mom** [1] - 1340:24

**moment** [11] - 1217:24, 1236:16, 1254:3, 1257:10, 1258:21, 1326:4, 1328:24, 1358:4, 1365:13, 1368:16, 1370:11

**moments** [2] - 1250:18, 1315:19

**Monday** [8] - 1346:16, 1346:17, 1346:18, 1368:5, 1368:8, 1368:12, 1368:19, 1372:2

**money** [142] - 1186:21, 1187:4, 1188:12, 1191:2, 1192:16, 1193:3, 1193:7, 1194:7, 1197:13, 1198:16, 1198:22, 1199:4, 1206:9, 1208:11, 1209:11,

1209:21, 1210:2, 1211:5, 1213:17, 1214:2, 1214:17, 1214:21, 1214:25, 1216:9, 1216:13, 1216:25, 1217:4, 1217:11, 1218:2, 1218:20, 1220:22, 1221:8, 1221:12, 1221:17, 1221:22, 1221:25, 1222:1, 1222:20, 1222:23, 1223:1, 1223:4, 1225:17, 1225:24, 1226:2, 1229:20, 1229:21, 1229:23, 1230:13, 1230:16, 1236:12, 1237:15, 1237:23, 1237:25, 1238:5, 1238:12, 1238:14, 1238:15, 1238:24, 1239:2, 1239:4, 1239:5, 1239:7, 1239:12, 1239:13, 1239:16, 1240:13, 1240:14, 1240:16, 1242:7, 1245:3, 1246:13, 1248:9, 1249:4, 1257:3, 1257:7, 1261:1, 1261:3, 1261:10, 1261:15, 1261:17, 1261:22, 1263:16, 1263:22, 1264:2, 1266:7, 1268:16, 1268:17, 1270:25, 1271:9, 1271:12, 1271:21, 1272:8, 1272:9, 1272:10, 1273:3, 1273:16, 1273:18, 1274:12, 1274:15, 1291:13, 1295:15, 1296:6, 1296:10, 1303:19, 1303:22, 1304:15, 1306:12, 1306:25, 1313:3, 1313:21, 1314:20, 1318:15, 1319:17, 1320:3, 1321:16, 1325:17, 1327:16, 1334:2, 1336:24, 1338:17, 1338:25, 1339:4, 1339:5, 1339:8, 1341:25, 1342:2, 1342:8, 1342:9, 1342:17, 1343:6, 1343:11, 1346:3, 1346:15, 1347:1, 1350:20, 1351:3, 1351:7,

1354:12, 1359:2, 1362:4

**moneys** [1] - 1265:24

**monies** [31] - 1214:13, 1215:6, 1217:16, 1220:19, 1220:20, 1222:3, 1222:17, 1226:19, 1229:14, 1240:11, 1241:2, 1241:6, 1242:10, 1266:1, 1272:4, 1272:16, 1272:23, 1285:3, 1304:7, 1306:16, 1315:23, 1317:12, 1322:2, 1323:13, 1323:17, 1325:1, 1325:21, 1328:11, 1340:8, 1354:7, 1357:11

**month** [2] - 1327:12, 1350:9

**monthly** [3] - 1201:9, 1326:7, 1328:6

**months** [2] - 1238:6, 1247:21

**Moreau** [2] - 1345:18, 1367:8

**morning** [20] - 1181:19, 1181:21, 1181:22, 1181:24, 1181:25, 1182:2, 1182:3, 1182:5, 1182:6, 1184:10, 1185:8, 1185:9, 1185:13, 1186:3, 1186:4, 1313:24, 1323:7, 1323:8, 1368:8, 1368:12

**morons** [1] - 1345:12

**mortgage** [1] - 1295:8

**Mortgage** [2] - 1204:19, 1205:19

**mortgages** [1] - 1295:12

**most** [4] - 1227:21, 1273:14, 1283:16, 1302:9

**mostly** [1] - 1310:13

**mother** [12] - 1214:6, 1240:4, 1240:6, 1338:22, 1339:17, 1342:14, 1342:18, 1349:8, 1350:22, 1351:17, 1352:10, 1357:17

**mother's** [2] - 1214:23, 1215:1

**motive** [4] - 1271:11, 1271:12, 1272:1, 1273:15

**move** [11] - 1218:15, 1225:6, 1235:16, 1236:9, 1290:11, 1299:5, 1314:4, 1326:2, 1328:23, 1335:8, 1367:24

**moves** [3] - 1278:23, 1284:12, 1289:9

**moving** [3] - 1291:2, 1293:16, 1310:20

**MR** [267] - 1181:19, 1181:25, 1182:3, 1182:6, 1182:8, 1183:2, 1184:5, 1184:7, 1184:12, 1185:24, 1186:2, 1192:24, 1193:12, 1193:17, 1197:11, 1197:12, 1202:5, 1202:10, 1203:2, 1203:6, 1203:18, 1205:8, 1205:24, 1206:16, 1206:18, 1208:20, 1211:13, 1211:15, 1212:5, 1212:6, 1212:7, 1212:23, 1213:11, 1213:19, 1216:15, 1217:13, 1221:4, 1221:10, 1221:18, 1222:13, 1224:1, 1224:23, 1225:7, 1225:8, 1226:22, 1226:24, 1227:4, 1227:8, 1227:10, 1229:16, 1229:18, 1230:6, 1230:24, 1231:3, 1231:21, 1232:18, 1233:2, 1233:8, 1233:13, 1233:25, 1234:11, 1234:15, 1234:25, 1235:4, 1235:10, 1235:11, 1235:14, 1235:18, 1236:7, 1236:8, 1240:21, 1241:14, 1241:16, 1244:13, 1244:15, 1244:18, 1244:21, 1245:18, 1246:24, 1247:1, 1248:5, 1248:7, 1249:6, 1249:12, 1249:14, 1250:8, 1250:10, 1254:3, 1255:2, 1255:8, 1255:10, 1256:2, 1256:15, 1256:17, 1256:19, 1256:23, 1257:2, 1257:10, 1257:12, 1257:14,

1258:12, 1259:3, 1259:14, 1259:21, 1260:11, 1260:16, 1260:23, 1261:24, 1263:7, 1264:4, 1265:10, 1265:13, 1265:23, 1267:5, 1267:13, 1267:23, 1268:3, 1268:6, 1268:9, 1268:13, 1269:4, 1269:11, 1269:24, 1269:25, 1270:2, 1270:5, 1270:12, 1270:17, 1272:12, 1273:4, 1274:19, 1274:21, 1275:12, 1277:21, 1278:25, 1279:1, 1279:19, 1279:22, 1280:2, 1284:14, 1285:2, 1285:12, 1286:3, 1289:14, 1289:16, 1296:19, 1296:20, 1296:22, 1300:8, 1302:2, 1302:9, 1303:2, 1304:18, 1304:21, 1305:4, 1305:8, 1308:7, 1308:15, 1308:16, 1308:19, 1308:23, 1309:4, 1309:6, 1310:2, 1310:17, 1311:6, 1311:8, 1314:3, 1314:5, 1314:10, 1316:17, 1316:20, 1316:21, 1316:25, 1317:3, 1317:4, 1317:8, 1323:6, 1323:10, 1324:10, 1324:19, 1324:22, 1325:11, 1326:4, 1326:6, 1326:11, 1326:13, 1326:16, 1326:18, 1326:21, 1328:1, 1328:3, 1331:1, 1331:13, 1331:22, 1332:9, 1332:14, 1333:10, 1333:13, 1333:19, 1334:18, 1335:10, 1335:15, 1335:17, 1335:20, 1335:23, 1336:3, 1336:7, 1336:15, 1336:16, 1337:12, 1339:24, 1340:2, 1342:11, 1344:22, 1344:24, 1345:3, 1347:20, 1348:1, 1348:21, 1348:23, 1349:3,

1349:4, 1349:18, 1350:15, 1351:6, 1351:8, 1351:18, 1352:21, 1352:23, 1353:1, 1353:5, 1353:10, 1358:2, 1358:4, 1358:8, 1358:19, 1358:21, 1359:16, 1360:17, 1360:19, 1360:20, 1362:13, 1363:1, 1363:16, 1364:24, 1365:3, 1365:6, 1365:11, 1365:13, 1367:2, 1367:19, 1367:22, 1369:3, 1369:4, 1369:5, 1369:20, 1370:10, 1370:11, 1370:13, 1370:20, 1371:11, 1371:19, 1373:4, 1373:10, 1373:14
**MS** [34] - 1181:22, 1268:18, 1268:22, 1269:7, 1270:8, 1270:20, 1271:2, 1271:6, 1275:6, 1276:2, 1276:16, 1278:23, 1279:4, 1279:21, 1280:6, 1280:9, 1281:3, 1284:12, 1285:7, 1285:15, 1286:16, 1286:18, 1289:9, 1296:17, 1298:23, 1300:1, 1300:5, 1300:19, 1301:5, 1302:3, 1302:7, 1304:25, 1305:9, 1373:8

**N**

**Na'alehu** [2] - 1218:1, 1223:7
**name** [26] - 1188:5, 1189:17, 1191:5, 1195:4, 1196:5, 1196:19, 1197:1, 1198:2, 1204:21, 1208:24, 1214:7, 1214:9, 1214:10, 1224:4, 1264:17, 1276:11, 1276:23, 1277:3, 1290:7, 1293:21, 1294:11, 1331:23, 1332:5, 1351:5, 1363:19, 1366:19
**named** [4] - 1276:25, 1277:13, 1283:10,

1292:19
**names** [2] - 1197:18, 1345:17
**narratives** [1] - 1335:8
**narrow** [1] - 1234:7
**Nash** [5] - 1332:2, 1332:5, 1332:6, 1369:22
**Nashes** [1] - 1332:25
**nationally** [1] - 1350:1
**naturalization** [3] - 1184:9, 1185:13, 1202:12
**nature** [3] - 1277:11, 1279:16, 1301:6
**near** [2] - 1184:5, 1248:22
**necessarily** [1] - 1310:8
**necessary** [6] - 1183:9, 1187:19, 1200:23, 1208:8, 1208:17, 1334:24
**need** [18] - 1183:13, 1189:9, 1203:4, 1245:9, 1255:6, 1260:10, 1260:12, 1272:22, 1274:13, 1298:22, 1300:9, 1307:5, 1324:4, 1327:7, 1340:2, 1353:19, 1355:17, 1370:14
**needed** [11] - 1187:5, 1187:13, 1187:18, 1212:18, 1228:22, 1237:3, 1237:20, 1274:13, 1347:2, 1349:25
**needing** [1] - 1273:15
**needs** [6] - 1212:7, 1249:4, 1295:7, 1327:6, 1346:15, 1346:16
**negates** [1] - 1265:1
**negotiated** [1] - 1359:4
**negotiating** [1] - 1204:18
**neighborhood** [4] - 1206:7, 1217:8, 1220:16, 1221:2
**Neptune** [9] - 1346:18, 1346:21, 1348:8, 1348:11, 1348:12, 1348:14, 1348:17, 1350:14, 1363:5
**Net** [2] - 1359:24, 1361:1
**NET** [1] - 1359:24

**never** [10] - 1188:18, 1192:22, 1193:6, 1221:15, 1231:18, 1232:3, 1291:14, 1292:5, 1343:19, 1371:12
**NEW** [1] - 1180:1
**new** [3] - 1353:19, 1363:6, 1363:7
**New** [6] - 1180:5, 1180:17, 1180:23, 1181:2, 1181:5, 1181:8
**newspaper** [1] - 1303:10
**next** [42] - 1182:12, 1183:17, 1184:14, 1189:3, 1202:16, 1219:13, 1223:15, 1230:3, 1232:21, 1235:20, 1254:9, 1255:12, 1256:25, 1257:15, 1274:24, 1275:5, 1275:21, 1276:1, 1279:24, 1280:11, 1281:23, 1284:17, 1285:17, 1300:24, 1301:11, 1302:14, 1309:7, 1310:23, 1317:18, 1326:1, 1329:14, 1330:4, 1355:12, 1355:14, 1356:6, 1368:6, 1368:7, 1368:11, 1368:25, 1369:19, 1370:3, 1370:4
**Nick** [1] - 1196:5
**nick** [1] - 1196:12
**night** [3] - 1183:3, 1271:18, 1370:8
**nine** [1] - 1340:15
**NO** [2] - 1196:20, 1369:16
**nobody** [1] - 1243:19
**Nolan** [1] - 1345:18
**none** [1] - 1270:7
**nonexistent** [1] - 1333:9
**normally** [1] - 1239:23
**North** [1] - 1290:18
**Northern** [2] - 1224:11, 1225:9
**not..** [1] - 1291:24
**note** [2] - 1269:8, 1341:4
**noted** [3] - 1181:12, 1275:2, 1317:11
**notes** [12] - 1190:12, 1190:15, 1190:22,

1194:9, 1194:11, 1308:25, 1315:22, 1324:14, 1328:16, 1328:25, 1330:1, 1335:11
**nothing** [15] - 1226:1, 1229:11, 1260:2, 1262:24, 1264:1, 1264:3, 1285:3, 1286:11, 1292:14, 1293:10, 1293:14, 1294:1, 1306:19, 1312:17, 1325:10
**notified** [3] - 1247:18, 1346:25, 1355:18
**November** [6] - 1205:17, 1344:11, 1346:16, 1346:18, 1346:19, 1363:5
**Number** [1] - 1290:7
**number** [12] - 1197:8, 1204:7, 1224:20, 1224:25, 1225:2, 1225:4, 1249:17, 1326:15, 1351:24, 1354:22, 1354:25, 1370:2

**O**

**O'Keefe** [1] - 1276:24
**oath** [2] - 1185:17, 1290:3
**object** [7] - 1205:24, 1257:12, 1285:2, 1302:3, 1305:1, 1310:4, 1371:12
**objected** [1] - 1310:6
**objecting** [1] - 1233:5
**objection** [97] - 1192:24, 1197:11, 1202:5, 1202:10, 1206:16, 1208:20, 1211:13, 1212:5, 1212:23, 1213:11, 1213:19, 1213:20, 1221:4, 1221:10, 1221:18, 1222:13, 1224:23, 1226:22, 1227:4, 1229:16, 1230:6, 1230:24, 1231:3, 1231:21, 1232:18, 1240:21, 1241:14, 1244:13, 1245:18, 1246:24, 1248:5, 1250:8, 1256:17, 1256:18, 1257:9, 1267:22, 1268:12, 1278:25, 1279:1, 1286:2,

1286:3, 1289:13, 1289:16, 1298:23, 1300:1, 1300:5, 1300:19, 1300:23, 1300:24, 1302:12, 1304:25, 1305:20, 1307:6, 1314:3, 1314:10, 1316:19, 1316:20, 1316:25, 1323:6, 1324:10, 1326:12, 1326:18, 1328:1, 1331:13, 1331:22, 1332:9, 1332:14, 1333:10, 1336:7, 1337:12, 1342:11, 1344:24, 1345:3, 1347:20, 1348:1, 1348:21, 1349:3, 1349:18, 1350:15, 1351:6, 1351:18, 1352:23, 1352:25, 1358:8, 1358:19, 1359:16, 1360:19, 1360:20, 1362:13, 1363:1, 1363:16, 1365:3, 1365:6, 1365:11, 1367:2, 1367:19, 1369:2

**obligation** [1] - 1299:5
**obligations** [2] - 1347:6, 1348:5
**obvious** [4] - 1187:10, 1187:16, 1196:23, 1238:24
**obviously** [8] - 1187:16, 1247:20, 1262:23, 1271:21, 1273:6, 1273:22, 1274:18, 1369:14
**occasion** [3] - 1190:13, 1190:14, 1298:1
**occasions** [3] - 1249:18, 1267:24, 1297:14
**occupation** [2] - 1191:17, 1195:16
**occur** [3] - 1232:11, 1250:16, 1313:11
**occurred** [11] - 1206:2, 1206:11, 1207:13, 1207:16, 1210:6, 1210:8, 1216:9, 1258:1, 1271:25, 1303:8, 1306:8
**occurring** [1] - 1301:2
**Oceanside** [1] - 1181:5

**October** [13] - 1189:13, 1189:23, 1193:2, 1193:6, 1197:17, 1207:14, 1209:11, 1287:11, 1287:17, 1294:4, 1318:20, 1322:12, 1361:13
**OF** [2] - 1180:1, 1180:3
**offer** [4] - 1256:15, 1270:16, 1300:6, 1305:22
**offered** [4] - 1257:4, 1271:7, 1316:22, 1316:24
**offers** [1] - 1326:6
**offhand** [1] - 1338:11
**Office** [1] - 1287:9, 1287:22
**office** [1] - 1253:12, 1277:7, 1323:3
**officer** [2] - 1190:5, 1200:6
**officers** [2] - 1282:8, 1282:14
**offices** [1] - 1250:20
**Offices** [1] - 1287:12
**often** [2] - 1201:19, 1243:15
**Old** [1] - 1181:1
**OLIVERAS** [3] - 1181:4, 1182:6, 1255:10
**Oliveras** [1] - 1182:7
**once** [4] - 1216:3, 1227:13, 1243:16, 1370:23
**one** [85] - 1184:3, 1189:3, 1189:8, 1191:2, 1194:8, 1194:23, 1197:18, 1201:24, 1204:10, 1204:13, 1216:3, 1218:24, 1219:4, 1219:13, 1224:8, 1231:5, 1233:19, 1236:9, 1237:18, 1247:24, 1254:3, 1254:5, 1255:9, 1256:10, 1260:3, 1262:1, 1264:5, 1264:11, 1266:4, 1267:23, 1268:24, 1269:19, 1271:21, 1272:13, 1273:5, 1273:8, 1273:11, 1273:20, 1285:5, 1290:25, 1293:19, 1293:20, 1294:15,

1296:7, 1298:20, 1301:3, 1304:8, 1304:9, 1304:20, 1308:12, 1308:16, 1308:17, 1315:1, 1315:9, 1318:23, 1318:24, 1324:6, 1324:11, 1326:4, 1329:14, 1331:2, 1331:9, 1332:23, 1338:14, 1338:25, 1341:3, 1341:18, 1342:6, 1343:21, 1344:8, 1344:11, 1346:21, 1352:1, 1352:13, 1357:23, 1360:1, 1361:24, 1363:4, 1365:13, 1366:19, 1371:13
**One** [1] - 1180:21
**ones** [1] - 1237:18
**onward** [1] - 1293:16
**Open** [3] - 1185:1, 1281:1, 1286:1
**open** [7] - 1235:3, 1236:1, 1256:1, 1258:1, 1302:10, 1303:1, 1311:1
**open-ended** [1] - 1235:3
**openly** [1] - 1360:25
**operating** [3] - 1200:6, 1355:13, 1355:17
**opportunity** [1] - 1216:1, 1243:12, 1252:9, 1254:4, 1263:3, 1311:9, 1320:15, 1359:9
**opposed** [2] - 1297:20, 1304:3
**optimistic** [1] - 1248:20
**order** [11] - 1186:22, 1187:17, 1187:18, 1208:8, 1275:20, 1275:24, 1298:22, 1299:2, 1299:9, 1355:16, 1355:24
**ordered** [1] - 1298:8
**ordinary** [2] - 1284:7, 1284:10
**organizing** [1] - 1352:1
**original** [1] - 1255:3
**originator** [2] - 1331:11, 1331:20
**Osborn** [1] - 1370:1
**ourselves** [1] - 1336:4
**outlines** [1] - 1199:22
**outright** [1] - 1262:18

**outside** [2] - 1234:12, 1258:20
**outstanding** [4] - 1343:14, 1343:20, 1347:6, 1347:24
**outweighed** [2] - 1274:7, 1307:2
**overall** [1] - 1272:19
**overcome** [1] - 1268:12
**overruled** [18] - 1206:21, 1211:14, 1221:5, 1221:19, 1230:7, 1240:22, 1241:15, 1244:20, 1245:19, 1250:9, 1300:21, 1300:23, 1337:13, 1342:12, 1351:19, 1352:24, 1358:20, 1367:3
**overstating** [3] - 1192:11, 1192:12
**owed** [15] - 1215:12, 1216:12, 1220:22, 1221:2, 1221:8, 1221:12, 1221:16, 1221:22, 1221:25, 1238:13, 1238:17, 1239:12, 1239:13, 1295:15, 1354:8
**Owen** [1] - 1345:18
**owing** [1] - 1222:3
**own** [13] - 1198:22, 1209:21, 1210:2, 1214:7, 1214:18, 1234:2, 1234:3, 1261:22, 1265:18, 1291:21, 1291:22, 1294:1, 1324:14
**owned** [2] - 1293:25, 1298:17
**ownership** [1] - 1350:18
**owns** [1] - 1290:21

**P**

**p.m** [3] - 1275:2, 1275:17, 1368:21
**page** [55] - 1182:12, 1183:17, 1184:14, 1189:9, 1189:10, 1189:25, 1190:25, 1193:21, 1193:22, 1202:16, 1209:6, 1220:10, 1223:7, 1223:15, 1232:21, 1235:20, 1244:10, 1254:9, 1255:12, 1256:25, 1257:15,

1270:11, 1270:25, 1271:1, 1271:4, 1271:6, 1274:24, 1278:14, 1279:24, 1280:11, 1284:17, 1285:17, 1289:21, 1290:6, 1291:7, 1292:6, 1292:15, 1292:22, 1292:23, 1294:2, 1295:1, 1295:19, 1301:11, 1302:14, 1309:7, 1310:23, 1322:14, 1323:1, 1324:5, 1330:4, 1341:19, 1355:14, 1356:6
**pages** [1] - 1189:10
**Paid** [3] - 1218:16, 1218:24, 1220:12
**paid** [21] - 1192:4, 1192:16, 1193:3, 1195:22, 1196:3, 1196:4, 1197:9, 1197:14, 1218:21, 1219:3, 1223:1, 1261:4, 1272:3, 1283:15, 1295:12, 1295:21, 1296:12, 1298:8, 1343:14, 1343:21, 1347:10
**pain** [1] - 1183:10
**paint** [1] - 1272:25
**paints** [1] - 1273:2
**Palm** [2] - 1297:4, 1299:20
**paper** [8] - 1242:4, 1242:6, 1251:10, 1251:12, 1252:1, 1315:22, 1316:10, 1319:12
**paperwork** [1] - 1362:22
**paragraph** [11] - 1244:9, 1248:17, 1253:9, 1281:19, 1281:23, 1281:25, 1282:4, 1322:15, 1323:1, 1350:13, 1355:12
**paragraphs** [1] - 1306:9
**parcels** [3] - 1187:20, 1187:21, 1199:23
**part** [34] - 1183:12, 1183:13, 1184:2, 1187:6, 1204:1, 1218:21, 1218:22, 1219:21, 1228:9, 1256:20, 1259:18, 1260:1, 1261:6,

U.S.A. v. KENNER and CONSTANTINE — 19

1273:19, 1277:9,
1283:3, 1283:6,
1283:9, 1283:12,
1291:22, 1300:6,
1318:21, 1331:3,
1341:1, 1341:20,
1343:17, 1347:6,
1348:9, 1348:13,
1349:6, 1359:8,
1361:19, 1362:20,
1364:15
**participate** [3] -
1227:11, 1262:7,
1363:20
**participated** [1] -
1262:14
**particular** [13] -
1187:4, 1188:1,
1188:15, 1205:14,
1272:13, 1272:14,
1273:5, 1273:11,
1298:8, 1298:13,
1321:1, 1363:9,
1371:13
**particularly** [4] -
1186:6, 1187:25,
1189:16, 1324:25
**partner** [7] - 1198:1,
1198:5, 1202:9,
1204:17, 1205:17,
1277:10
**Partners** [1] - 1242:16
**partners** [3] - 1186:21,
1282:7, 1282:13
**party** [1] - 1341:5
**passed** [1] - 1213:2
**past** [1] - 1357:12
**patent** [1] - 1237:15
**patents** [3] - 1237:2,
1237:14, 1343:18
**patience** [1] - 1203:14
**Patrick** [6] - 1276:2,
1276:12, 1289:25,
1295:21, 1296:7,
1339:6
**pattern** [1] - 1362:19
**Pause** [11] - 1256:22,
1257:11, 1315:20,
1320:14, 1324:18,
1326:3, 1326:5,
1326:17, 1327:3,
1327:9, 1328:9
**paused** [1] - 1197:21
**pay** [7] - 1215:20,
1264:16, 1273:16,
1274:13, 1274:14,
1288:16, 1296:6
**paying** [4] - 1295:7,
1295:8, 1296:4,
1296:5

**Payment** [1] - 1223:9
**payment** [16] -
1223:10, 1224:2,
1224:10, 1286:24,
1287:7, 1287:13,
1287:20, 1288:3,
1288:8, 1295:8,
1296:16, 1299:14,
1317:18, 1346:22,
1347:9
**payments** [13] -
1284:2, 1285:3,
1285:4, 1285:6,
1285:7, 1288:14,
1295:12, 1296:13,
1296:14, 1317:12,
1349:23, 1350:7
**payout** [1] - 1206:6
**payroll** [1] - 1346:20
**Peca** [5] - 1195:7,
1224:4, 1224:15,
1334:4, 1335:5
**penalties** [1] -
1242:15
**pending** [1] - 1297:3
**people** [11] - 1197:9,
1229:3, 1314:8,
1339:4, 1341:6,
1346:12, 1347:23,
1363:9, 1363:21,
1365:9, 1369:20
**per** [2] - 1289:17,
1347:7
**percent** [14] - 1210:24,
1211:22, 1211:24,
1212:1, 1212:2,
1252:16, 1252:21,
1253:3, 1253:22,
1306:4, 1333:4,
1345:11, 1345:25,
1366:16
**percentage** [7] -
1252:18, 1306:18,
1350:18, 1350:24,
1352:2, 1357:16,
1357:17
**percentages** [1] -
1357:1
**performed** [1] -
1188:20
**performers** [2] -
1199:22, 1200:19
**period** [20] - 1186:7,
1186:15, 1186:20,
1188:15, 1190:9,
1195:12, 1199:8,
1201:6, 1201:21,
1204:16, 1204:23,
1206:22, 1222:9,
1240:8, 1252:20,

1259:25, 1269:18,
1269:21, 1326:8,
1352:14
**perjury** [1] - 1242:15
**permission** [5] -
1182:8, 1254:7,
1267:6, 1311:6,
1324:20
**permit** [1] - 1260:7
**person** [13] - 1196:19,
1201:17, 1224:4,
1277:16, 1297:15,
1339:11, 1344:6,
1348:14, 1355:6,
1363:19, 1364:12,
1371:9
**person-to-person** [1]
- 1201:17
**personal** [12] -
1271:13, 1294:7,
1295:7, 1295:11,
1295:14, 1296:7,
1297:20, 1339:9,
1341:25, 1342:2
**personally** [10] -
1264:12, 1279:9,
1281:7, 1281:22,
1282:3, 1319:25,
1336:21, 1342:10,
1343:6, 1343:8
**persons** [1] - 1264:13
**perspective** [3] -
1359:11, 1360:25,
1370:15
**pertained** [1] -
1282:22
**pertaining** [2] -
1283:4, 1283:13
**Phil** [2] - 1329:12,
1333:5
**Philip** [1] - 1180:6
**PHILLIP** [1] - 1180:6
**Phillip** [2] - 1180:21,
1292:19
**phone** [4] - 1201:16,
1211:6, 1354:24,
1364:12
**phony** [2] - 1192:17,
1192:19
**photographs** [1] -
1370:6
**phrase** [1] - 1360:10
**picked** [1] - 1201:16
**picture** [3] - 1272:25,
1273:1, 1273:2
**piece** [10] - 1208:15,
1242:4, 1242:6,
1251:10, 1251:12,
1252:1, 1293:24,
1315:22, 1316:10,

1319:12
**piecemeal** [1] -
1269:15
**place** [18] - 1216:6,
1233:1, 1236:1,
1247:10, 1255:1,
1256:1, 1257:1,
1261:3, 1291:4,
1299:18, 1303:1,
1306:13, 1306:20,
1310:1, 1311:1,
1313:11, 1360:21,
1365:23
**Place** [1] - 1290:18
**placed** [2] - 1258:13,
1340:18
**placement** [1] -
1358:11
**plaintiff** [8] - 1298:12,
1298:13, 1299:24,
1300:11, 1361:9,
1362:6, 1362:11,
1362:16
**plaintiff's** [4] - 1298:7,
1300:14, 1303:4,
1304:22
**plaintiffs** [1] - 1299:21
**plan** [1] - 1266:7
**play** [4] - 1199:7,
1258:10, 1308:19,
1310:21
**played** [6] - 1188:8,
1199:14, 1235:7,
1258:18, 1259:8,
1312:16
**player** [6] - 1188:8,
1188:13, 1189:21,
1224:6, 1332:6,
1366:22
**players** [23] - 1225:12,
1225:17, 1226:6,
1227:17, 1228:7,
1229:1, 1229:5,
1229:8, 1262:5,
1262:6, 1272:17,
1282:25, 1301:4,
1315:16, 1318:20,
1337:6, 1345:16,
1361:17, 1365:19,
1365:24, 1366:2,
1366:24, 1367:6
**players'** [1] - 1365:15
**playing** [2] - 1234:12,
1258:15
**Plaza** [2] - 1180:16,
1181:7
**pleasant** [1] - 1211:11
**pledged** [1] - 1343:18
**plus** [3] - 1221:2,
1322:5, 1345:12

**point** [34] - 1201:24,
1203:4, 1203:22,
1206:1, 1222:24,
1223:9, 1230:4,
1233:3, 1234:4,
1241:10, 1269:15,
1274:23, 1277:18,
1315:1, 1315:16,
1320:20, 1322:19,
1323:16, 1335:25,
1337:4, 1337:6,
1337:11, 1339:3,
1349:13, 1351:15,
1352:6, 1354:10,
1356:2, 1363:2,
1364:14, 1368:1,
1368:24, 1371:7,
1371:12
**pointed** [1] - 1371:16
**pointing** [1] - 1265:17
**police** [1] - 1190:5
**polluted** [1] - 1234:2
**pool** [1] - 1271:2
**portion** [20] - 1206:9,
1209:7, 1209:19,
1218:23, 1239:13,
1258:10, 1258:14,
1259:9, 1286:8,
1286:9, 1289:3,
1299:2, 1307:17,
1307:20, 1308:12,
1308:15, 1308:17,
1331:16, 1350:25,
1355:15
**portions** [10] -
1194:15, 1250:13,
1270:15, 1271:20,
1274:17, 1289:18,
1290:6, 1299:16,
1300:7
**posed** [1] - 1294:3
**position** [8] - 1194:13,
1200:9, 1233:10,
1265:2, 1265:6,
1265:16, 1265:20,
1266:4
**possibility** [1] -
1237:14
**possible** [8] -
1197:21, 1211:1,
1211:16, 1211:19,
1212:10, 1213:7,
1267:6, 1327:24
**possibly** [3] - 1187:5,
1263:5, 1285:5
**post** [1] - 1310:7
**post-fraud** [1] -
1310:7
**potential** [4] -
1199:21, 1260:20,

1359:19, 1360:15
**practice** [2] - 1276:22, 1277:11
**precluded** [1] - 1282:12
**prejudice** [4] - 1274:7, 1274:14, 1307:3, 1310:15
**prejudicial** [1] - 1272:21
**prepaid** [2] - 1291:18, 1359:5
**prepared** [1] - 1242:18
**preparing** [1] - 1242:14
**presence** [2] - 1234:13, 1235:15
**present** [8] - 1194:13, 1227:16, 1228:4, 1265:1, 1288:17, 1288:18, 1289:7, 1311:2
**presented** [3] - 1192:22, 1250:23, 1251:1
**presenting** [2] - 1251:19, 1262:8
**presently** [3] - 1291:17, 1292:25, 1293:4
**pretty** [3] - 1199:23, 1206:2, 1259:5
**previous** [1] - 1341:19
**previously** [6] - 1185:21, 1276:25, 1289:17, 1307:11, 1344:3, 1366:25
**principals** [2] - 1282:8, 1282:13
**private** [1] - 1319:23
**privilege** [1] - 1302:4
**privileged** [1] - 1302:7
**Privitello** [11] - 1240:8, 1269:1, 1342:23, 1342:25, 1351:2, 1351:7, 1351:10, 1351:16, 1357:23, 1369:19, 1369:22
**pro** [9] - 1191:11, 1191:14, 1191:16, 1191:19, 1191:22, 1191:23, 1194:6, 1197:5
**probative** [5] - 1274:6, 1306:6, 1306:15, 1306:25, 1307:1
**problem** [3] - 1183:7, 1234:12, 1297:24
**problems** [2] - 1270:7,

1308:10
**proceed** [2] - 1185:17, 1275:24
**proceedings** [12] - 1190:23, 1256:22, 1257:11, 1315:20, 1320:14, 1324:18, 1326:3, 1326:5, 1326:17, 1327:3, 1327:9, 1328:9
**proceeds** [1] - 1264:14
**produce** [1] - 1215:5
**producing** [1] - 1350:8
**productive** [2] - 1371:2, 1371:5
**products** [2] - 1350:1, 1350:2
**professional** [3] - 1271:8, 1282:25, 1304:4
**profit** [1] - 1291:15
**profitable** [4] - 1291:14, 1292:3, 1304:24, 1305:5
**program** [1] - 1295:14
**programs** [1] - 1291:12
**progress** [1] - 1360:25
**project** [76] - 1186:11, 1186:14, 1186:18, 1186:23, 1187:1, 1187:3, 1187:7, 1187:14, 1188:3, 1188:13, 1188:17, 1188:21, 1188:25, 1190:3, 1191:3, 1192:2, 1192:5, 1192:9, 1192:15, 1193:3, 1193:7, 1194:24, 1195:9, 1195:10, 1195:14, 1195:23, 1196:14, 1196:17, 1197:2, 1197:5, 1197:19, 1198:2, 1198:6, 1198:10, 1198:16, 1198:20, 1198:23, 1199:8, 1199:15, 1200:6, 1201:10, 1201:14, 1201:20, 1201:24, 1202:4, 1203:21, 1204:2, 1204:14, 1204:24, 1205:4, 1205:14, 1205:20, 1206:14, 1206:20, 1206:23, 1207:20, 1208:8, 1208:19, 1210:9,

1220:23, 1221:13, 1221:14, 1222:4, 1222:12, 1223:5, 1225:13, 1230:1, 1230:17, 1231:8, 1231:12, 1231:14, 1239:8, 1239:9, 1283:13
**projects** [6] - 1225:10, 1230:19, 1231:7, 1264:8, 1283:4, 1321:22
**promise** [5] - 1309:4, 1335:12, 1335:16, 1335:20, 1335:22
**pronounce** [1] - 1189:17
**pronunciation** [1] - 1204:4
**proof** [14] - 1250:23, 1251:2, 1251:18, 1251:19, 1252:2, 1253:12, 1253:18, 1253:19, 1319:4, 1319:6, 1319:13, 1323:3, 1358:15
**proper** [1] - 1265:5
**properly** [2] - 1204:6, 1204:13
**property** [15] - 1187:6, 1187:11, 1199:20, 1207:7, 1207:10, 1207:20, 1207:21, 1207:23, 1207:25, 1208:9, 1208:12, 1208:15, 1208:18, 1209:3, 1239:12
**prosecutor** [1] - 1286:12
**prospects** [1] - 1245:9
**prove** [3] - 1257:5, 1265:19, 1272:5
**provide** [4] - 1241:19, 1319:7, 1320:3, 1370:18
**provided** [15] - 1215:8, 1241:10, 1241:25, 1252:5, 1262:16, 1262:21, 1303:4, 1316:2, 1316:14, 1333:3, 1353:18, 1355:13, 1370:5, 1370:7, 1370:9
**providing** [5] - 1189:14, 1201:2, 1203:23, 1282:22, 1319:4
**proving** [1] - 1273:19
**Pruitt** [3] - 1279:18,

1281:9, 1282:23
**public** [4] - 1183:9, 1183:13, 1184:2, 1279:15
**publically** [1] - 1183:8
**publicly** [1] - 1183:2
**published** [1] - 1303:10
**purchase** [10] - 1187:5, 1187:6, 1187:20, 1207:7, 1207:9, 1208:12, 1209:2, 1263:23, 1362:21, 1363:19
**purchased** [2] - 1208:19, 1290:25
**purchasing** [2] - 1187:21, 1350:19
**pure** [1] - 1257:8
**purpose** [6] - 1260:4, 1279:6, 1288:14, 1304:6, 1353:23, 1356:4
**purposes** [9] - 1193:12, 1193:19, 1261:22, 1263:18, 1286:14, 1304:12, 1306:12, 1316:21
**put** [18] - 1183:5, 1189:3, 1190:20, 1208:11, 1209:1, 1246:22, 1248:9, 1261:25, 1272:16, 1286:12, 1308:18, 1310:8, 1310:11, 1310:12, 1315:24, 1329:4, 1333:24, 1370:2
**putting** [2] - 1352:2, 1352:10

## Q

**quash** [1] - 1299:6
**QUESTION** [7] - 1291:8, 1293:10, 1293:14, 1294:21, 1295:6, 1295:21, 1296:2
**questioned** [1] - 1299:22
**questioning** [9] - 1261:7, 1262:9, 1262:20, 1265:4, 1266:3, 1299:24, 1371:3, 1371:4, 1371:10
**questions** [19] - 1189:15, 1193:24, 1205:12, 1217:19,

1233:5, 1234:20, 1253:10, 1255:8, 1296:17, 1296:19, 1296:20, 1298:12, 1300:3, 1302:9, 1302:11, 1302:13, 1304:18, 1333:12, 1367:20
**quick** [2] - 1305:15, 1326:14
**quickly** [2] - 1326:2, 1328:23
**quite** [2] - 1263:5, 1281:11

## R

**race** [4] - 1271:7, 1271:8, 1271:14, 1281:10
**Racing** [9] - 1278:10, 1279:8, 1281:21, 1282:3, 1282:5, 1282:9, 1282:15, 1284:1, 1292:9
**racing** [8] - 1261:4, 1263:24, 1274:9, 1281:5, 1281:16, 1291:12, 1291:13, 1295:14
**radar** [1] - 1231:17
**rae** [1] - 1188:19
**Rae** [5] - 1188:5, 1188:14, 1189:21, 1190:2, 1191:2
**RAE** [1] - 1188:5
**raise** [4] - 1186:22, 1276:4, 1345:24, 1346:3
**raised** [3] - 1264:7, 1264:10, 1264:15
**Ranford** [1] - 1369:25
**range** [2] - 1186:25, 1187:5
**ranking** [1] - 1200:9
**rate** [2] - 1296:2, 1334:19
**rather** [1] - 1286:12
**read** [23] - 1209:8, 1216:16, 1218:5, 1244:16, 1248:18, 1263:3, 1281:23, 1281:25, 1282:4, 1285:10, 1286:14, 1286:19, 1290:5, 1299:15, 1329:9, 1333:25, 1340:22, 1346:23, 1347:13, 1350:10, 1355:12, 1355:14, 1368:8

reading [17] - 1245:5, 1291:7, 1292:7, 1292:17, 1292:24, 1293:9, 1293:13, 1293:16, 1294:3, 1294:20, 1295:5, 1295:20, 1296:1, 1310:3, 1310:4, 1322:22, 1354:15
ready [6] - 1185:10, 1185:15, 1202:13, 1203:1, 1203:15
real [5] - 1264:8, 1283:4, 1283:13, 1291:11, 1293:24
realize [3] - 1187:17, 1254:5, 1255:10
realized [1] - 1242:25
really [13] - 1257:4, 1260:7, 1263:7, 1292:1, 1294:17, 1294:18, 1294:19, 1300:9, 1312:11, 1312:15, 1312:17, 1370:23, 1371:20
reason [8] - 1183:6, 1190:15, 1190:18, 1236:11, 1296:11, 1310:5, 1313:20, 1314:19
reasons [2] - 1274:6, 1289:17
recalled [1] - 1247:20
receive [14] - 1210:24, 1216:21, 1217:11, 1220:20, 1222:17, 1271:10, 1278:17, 1286:22, 1287:11, 1287:18, 1287:24, 1288:6, 1304:7, 1357:2
received [31] - 1188:23, 1192:8, 1195:25, 1196:2, 1196:16, 1206:9, 1214:13, 1215:6, 1217:7, 1217:15, 1218:2, 1219:21, 1220:16, 1221:23, 1222:15, 1270:22, 1284:2, 1303:17, 1316:18, 1325:23, 1328:4, 1338:2, 1338:18, 1344:23, 1347:13, 1348:3, 1349:14, 1352:13, 1352:22, 1360:14, 1360:17
receives [1] - 1298:21
receiving [2] - 1351:4,

1351:21
Recess [1] - 1335:25
recess [5] - 1183:12, 1202:15, 1260:25, 1274:22, 1336:1
recipient [1] - 1299:5
recognize [10] - 1194:1, 1194:3, 1244:7, 1266:25, 1278:6, 1283:20, 1316:6, 1320:18, 1344:8, 1360:11
recollection [46] - 1190:1, 1191:1, 1193:10, 1194:4, 1194:16, 1194:18, 1194:22, 1197:6, 1202:2, 1205:13, 1205:17, 1207:13, 1208:17, 1209:15, 1209:25, 1210:3, 1212:6, 1212:8, 1213:14, 1213:16, 1225:21, 1228:2, 1232:13, 1248:18, 1259:12, 1260:9, 1266:20, 1266:22, 1287:1, 1287:5, 1303:6, 1303:7, 1308:6, 1308:9, 1311:13, 1311:17, 1313:16, 1321:2, 1322:1, 1322:6, 1332:8, 1339:16, 1347:25, 1350:17, 1361:16, 1361:24
recommend [1] - 1349:7
reconvene [4] - 1202:13, 1258:4, 1275:23, 1305:14
record [26] - 1181:18, 1183:13, 1190:15, 1190:18, 1193:12, 1198:9, 1216:16, 1220:10, 1222:7, 1284:3, 1288:10, 1290:6, 1293:6, 1314:2, 1314:6, 1314:24, 1316:1, 1316:14, 1316:21, 1327:15, 1329:5, 1331:5, 1331:14, 1355:10, 1360:21, 1370:5
recorded [3] - 1212:11, 1234:16, 1284:7
recording [7] - 1259:11, 1259:17,

1260:22, 1260:23, 1262:9, 1307:17, 1307:20
records [4] - 1206:14, 1326:9, 1333:25, 1334:12
recovering [1] - 1362:3
redacted [5] - 1256:19, 1270:2, 1285:9, 1285:11, 1286:5
redaction [2] - 1286:7, 1286:8
redactions [1] - 1255:10
redirect [6] - 1233:4, 1234:20, 1305:9, 1336:6, 1371:14
redirects [2] - 1371:17, 1371:25
reduce [2] - 1218:14, 1218:24
reenters [1] - 1369:7
reference [12] - 1189:11, 1203:22, 1206:1, 1215:13, 1220:21, 1234:14, 1234:23, 1270:24, 1295:2, 1295:22, 1352:10, 1362:24
references [1] - 1255:4
referencing [3] - 1239:25, 1240:3, 1253:24
referred [2] - 1278:4, 1304:1
referring [8] - 1270:12, 1273:3, 1288:11, 1316:8, 1341:1, 1345:13, 1350:21, 1363:3
refers [1] - 1345:8
reflect [4] - 1306:4, 1306:23, 1318:12, 1341:7
reflected [3] - 1251:12, 1315:23, 1338:4
reflects [2] - 1279:7, 1286:23
refresh [28] - 1189:25, 1191:1, 1193:10, 1194:4, 1194:15, 1194:18, 1194:22, 1197:6, 1202:2, 1205:16, 1207:13, 1209:15, 1209:25, 1210:2, 1213:14,

1213:16, 1259:12, 1266:20, 1266:22, 1287:1, 1287:4, 1308:9, 1311:13, 1311:17, 1322:1, 1332:7, 1347:25, 1361:16
refreshed [1] - 1212:8
refreshes [5] - 1205:12, 1248:18, 1260:9, 1308:5, 1313:16
refreshing [2] - 1205:11, 1212:6
regain [1] - 1345:20
regard [3] - 1190:1, 1220:22, 1364:17
regarding [14] - 1205:13, 1215:6, 1227:11, 1239:11, 1254:1, 1259:23, 1260:20, 1272:17, 1273:23, 1316:11, 1340:5, 1340:22, 1360:15, 1368:9
regards [20] - 1196:25, 1201:2, 1210:17, 1233:22, 1243:24, 1255:9, 1262:17, 1272:20, 1273:7, 1297:1, 1299:8, 1303:5, 1320:9, 1342:7, 1342:14, 1342:25, 1352:15, 1354:4, 1355:2, 1371:13
regular [1] - 1205:22
relate [5] - 1263:21, 1269:20, 1271:20, 1273:21, 1306:8
related [6] - 1263:23, 1272:16, 1273:11, 1349:21, 1349:22, 1362:19
relates [10] - 1183:15, 1263:2, 1265:18, 1272:14, 1306:6, 1306:16, 1306:18, 1307:4, 1358:10, 1358:11
relating [1] - 1306:10
relationship [3] - 1201:7, 1272:9, 1300:12
relatively [1] - 1275:21
release [1] - 1364:2
released [1] - 1363:25
relevance [12] - 1233:7, 1261:18, 1268:9, 1270:19,

1271:3, 1271:4, 1271:5, 1271:20, 1274:3, 1285:6, 1302:6, 1362:13
relevancy [1] - 1268:11
relevant [8] - 1271:23, 1272:4, 1272:8, 1273:14, 1273:25, 1286:10, 1286:14
reluctance [1] - 1235:5
rely [1] - 1190:22
relying [1] - 1323:15
remainder [3] - 1214:2, 1221:24, 1313:7
remaining [2] - 1187:20, 1187:21
remark [1] - 1311:20
remarks [2] - 1311:13, 1312:1
remember [50] - 1187:1, 1188:5, 1189:13, 1189:20, 1189:22, 1191:25, 1197:17, 1201:22, 1204:16, 1209:10, 1209:22, 1212:13, 1212:19, 1213:4, 1213:5, 1242:14, 1243:2, 1244:12, 1245:12, 1245:15, 1251:2, 1286:25, 1287:14, 1293:23, 1298:1, 1298:11, 1299:21, 1300:16, 1303:9, 1303:12, 1308:11, 1310:19, 1311:22, 1312:8, 1312:25, 1313:24, 1315:8, 1315:10, 1318:22, 1319:3, 1321:5, 1323:9, 1338:8, 1359:19, 1359:24, 1360:2, 1361:16, 1364:10, 1365:16, 1366:1
remembered [2] - 1245:22, 1245:23
remind [1] - 1268:15
repaid [1] - 1216:8
repay [1] - 1213:2
repeat [11] - 1187:15, 1195:11, 1207:8, 1216:14, 1240:2, 1245:2, 1246:6, 1253:8, 1321:22, 1336:19, 1346:10
repeated [2] -

1248:21, 1371:22
**repeating** [1] -
1203:22
**repetition** [2] -
1371:15, 1371:21
**rephrase** [4] -
1279:21, 1300:8,
1314:18, 1351:8
**reply** [4] - 1311:15,
1311:24, 1312:12,
1313:5
**report** [2] - 1190:20,
1370:6
**Reporter** [1] - 1181:7
**reporter** [1] - 1216:16
**repossessed** [1] -
1293:25
**represent** [6] -
1269:13, 1277:24,
1278:3, 1279:8,
1282:25, 1357:11
**representation** [15] -
1248:21, 1259:17,
1273:23, 1279:10,
1279:13, 1279:17,
1282:16, 1283:3,
1283:6, 1283:9,
1283:12, 1288:18,
1297:16, 1297:17,
1298:3
**representations** [10] -
1245:13, 1245:24,
1246:11, 1247:5,
1257:7, 1259:4,
1261:11, 1263:9,
1263:15, 1306:10
**represented** [7] -
1243:9, 1277:13,
1281:10, 1296:25,
1322:15, 1337:3,
1337:7
**representing** [6] -
1281:20, 1282:5,
1282:7, 1282:12,
1304:12, 1364:17
**request** [1] - 1183:11
**requesting** [1] -
1320:21
**requires** [1] - 1282:16
**residence** [1] - 1216:4
**residing** [1] - 1297:5
**resolve** [1] - 1285:9
**resources** [1] -
1370:17
**respect** [24] - 1268:17,
1268:18, 1268:22,
1269:1, 1269:7,
1269:9, 1272:2,
1273:22, 1274:9,
1274:11, 1283:25,

1305:18, 1305:25,
1306:1, 1306:3,
1306:5, 1306:20,
1306:24, 1307:1,
1307:3, 1307:5,
1307:7, 1308:2,
1337:7
**respects** [1] - 1300:18
**respond** [9] - 1290:8,
1291:10, 1292:11,
1293:2, 1294:6,
1295:9, 1295:24,
1312:5, 1312:15
**responding** [2] -
1308:12, 1313:25
**response** [3] -
1260:12, 1311:19,
1335:6
**responses** [1] -
1261:12
**responsibility** [1] -
1239:2
**responsible** [1] -
1273:20
**rest** [3] - 1214:21,
1221:25, 1282:4
**resting** [1] - 1334:19
**result** [3] - 1216:13,
1295:16, 1357:2
**resumes** [2] - 1185:4,
1203:9
**retained** [2] - 1192:14,
1364:15
**retake** [1] - 1185:3
**retired** [3] - 1197:5,
1258:6, 1333:17
**review** [8] - 1193:23,
1194:2, 1194:15,
1216:1, 1239:11,
1288:24, 1307:16,
1307:19
**reviewed** [12] -
1209:25, 1216:3,
1242:19, 1259:11,
1271:18, 1271:19,
1273:13, 1288:15,
1296:13, 1296:14,
1308:14
**Ricardo** [1] - 1369:23
**Ricardo's** [1] -
1270:25
**ricardo's** [1] - 1271:4
**RICHARD** [1] -
1180:23
**Richard** [3] - 1182:1,
1196:19, 1197:1
**Richards** [13] -
1227:17, 1287:9,
1287:16, 1287:22,

1337:10, 1337:15,
1337:18, 1337:21,
1344:19, 1351:13,
1369:24
**Richards'** [10] -
1285:8, 1303:18,
1303:20, 1303:24,
1336:25, 1340:8,
1341:12, 1341:17,
1351:3, 1359:2
**rise** [6] - 1181:13,
1185:5, 1203:12,
1275:3, 1275:15,
1336:11
**Rizzi** [12] - 1214:6,
1240:7, 1242:16,
1318:21, 1338:22,
1339:6, 1339:18,
1341:23, 1350:22,
1352:11, 1357:19,
1361:17
**RMR** [1] - 1181:7
**Road** [1] - 1181:1
**Rob** [1] - 1191:10
**ROBERT** [1] - 1181:3
**Robert** [5] - 1181:4,
1191:5, 1193:6,
1194:6, 1242:16
**Rodriguez** [3] -
1276:24, 1276:25,
1289:22
**role** [7] - 1199:7,
1199:14, 1200:15,
1203:20, 1228:23,
1259:7, 1346:19
**rolled** [1] - 1363:6
**Romanowksi** [1] -
1194:5
**Romanowski** [1] -
1189:17
**Ron** [7] - 1227:17,
1285:8, 1303:18,
1303:20, 1303:24,
1340:8, 1351:13
**Ronald** [3] - 1287:9,
1287:16, 1287:22
**RONALD** [1] - 1181:7
ronald_tolkin@nyed
.uscourts.gov [1] -
1181:9
**room** [2] - 1183:7,
1368:15
**RPR** [1] - 1181:7
**rule** [1] - 1235:9
**rules** [2] - 1260:6,
1304:4
**ruling** [3] - 1270:9,
1306:1, 1360:21
**run** [2] - 1230:17,
1255:4, 1310:17

**running** [1] - 1233:4
**rush** [1] - 1339:24
**RUSSO** [42] - 1258:12,
1259:3, 1259:14,
1259:21, 1260:11,
1260:23, 1261:24,
1264:4, 1265:10,
1265:13, 1265:23,
1267:5, 1267:13,
1268:3, 1268:9,
1268:13, 1269:4,
1269:11, 1269:25,
1270:5, 1272:12,
1273:4, 1274:19,
1274:21, 1331:1,
1333:13, 1333:19,
1335:10, 1335:15,
1335:17, 1336:3,
1336:15, 1336:16,
1339:24, 1340:2,
1344:22, 1348:23,
1349:4, 1351:8,
1352:21, 1353:5,
1353:10
**Russo** [6] - 1258:22,
1258:25, 1266:19,
1271:16, 1333:23,
1336:14

## S

**S-P-E-N-D** [1] -
1359:25
**salesman** [1] -
1188:22
**Salgato** [2] - 1196:19,
1197:1
**SALGATO** [1] -
1196:21
**San** [1] - 1223:2
**sanction** [1] - 1299:13
**sanctionable** [1] -
1299:3
**sanctioned** [2] -
1298:2, 1298:6
**SARITHA** [1] -
1180:18
**saritha** [1] - 1181:23
**save** [4] - 1189:2,
1208:18, 1253:10,
1360:6
**saw** [6] - 1192:17,
1221:15, 1293:17,
1349:19, 1357:5
**schedule** [2] -
1368:11, 1369:21
**scheduled** [1] -
1297:12
**scope** [1] - 1269:21
**Scott** [1] - 1189:17

**Scottsdale** [4] -
1290:11, 1290:18,
1294:9, 1294:24
**screaming** [1] -
1228:17
**screen** [4] - 1217:22,
1279:4, 1285:10,
1286:13
**Sealed** [2] - 1183:1,
1183:16
**sealed** [1] - 1183:14
**seat** [1] - 1307:15
**seated** [14] - 1181:14,
1185:7, 1203:13,
1258:8, 1267:21,
1275:4, 1275:18,
1276:13, 1305:17,
1311:3, 1333:20,
1336:13, 1368:17,
1369:8
**second** [12] - 1197:21,
1209:7, 1218:24,
1220:10, 1244:9,
1244:10, 1253:11,
1268:25, 1324:5,
1326:22, 1331:23,
1353:5
**section** [1] - 1209:24
**secure** [11] - 1188:20,
1199:24, 1200:15,
1200:20, 1200:23,
1201:3, 1201:23,
1202:8, 1205:18,
1208:8, 1209:2
**secured** [4] - 1206:17,
1206:19, 1207:20,
1237:14
**see** [56] - 1202:14,
1205:12, 1218:7,
1218:8, 1218:14,
1218:16, 1218:24,
1219:1, 1219:19,
1220:13, 1223:9,
1223:13, 1224:16,
1227:8, 1241:6,
1248:18, 1253:14,
1256:19, 1268:14,
1269:23, 1274:20,
1274:20, 1277:16,
1300:8, 1314:18,
1318:4, 1321:13,
1323:5, 1325:4,
1325:9, 1325:15,
1325:25, 1326:24,
1327:10, 1328:10,
1328:21, 1329:1,
1329:3, 1329:5,
1329:14, 1329:16,
1329:23, 1331:3,
1331:25, 1334:19,

1340:15, 1345:25, 1348:11, 1354:4, 1361:16, 1368:7, 1368:8, 1368:12, 1370:25, 1372:2

**seeing** [5] - 1194:10, 1199:19, 1225:2, 1320:19, 1321:2

**seeking** [7] - 1205:3, 1305:19, 1346:3, 1355:25, 1363:8, 1365:5, 1365:8

**seem** [2] - 1198:18, 1328:16

**segregate** [1] - 1304:13

**selling** [1] - 1197:5

**send** [2] - 1246:13, 1337:17

**sense** [2] - 1272:13, 1292:2

**sent** [30] - 1192:21, 1208:4, 1210:11, 1214:7, 1214:18, 1215:1, 1215:6, 1216:4, 1221:21, 1222:6, 1222:20, 1238:11, 1242:10, 1242:12, 1246:13, 1247:2, 1318:16, 1319:19, 1322:3, 1325:17, 1332:12, 1336:24, 1336:25, 1337:16, 1337:20, 1341:10, 1342:5, 1344:11, 1353:12, 1354:12

**separate** [6] - 1269:14, 1282:16, 1282:18, 1295:13, 1304:12, 1342:21

**separated** [1] - 1295:11

**September** [2] - 1212:14, 1213:1

**series** [4] - 1193:24, 1248:22, 1249:17, 1301:2

**served** [1] - 1298:17

**service** [1] - 1369:12

**services** [3] - 1188:20, 1192:5, 1282:21

**SESSION** [1] - 1275:1

**set** [3] - 1289:17, 1353:21, 1354:2

**Settlement** [13] - 1226:14, 1226:16, 1226:20, 1233:23, 1261:9, 1261:10, 1262:4, 1262:11,

---

1262:15, 1262:20, 1263:1, 1265:25, 1285:4

**settlement** [1] - 1272:15

**seven** [1] - 1340:15

**several** [2] - 1194:23, 1271:20

**shaking** [1] - 1342:3

**share** [2] - 1264:13, 1365:15

**shareholders** [2] - 1282:8, 1282:13

**shares** [1] - 1366:16

**sheet** [4] - 1308:18, 1327:4, 1327:6, 1327:7

**shift** [2] - 1264:20, 1269:17

**shifting** [1] - 1266:1

**shit** [1] - 1311:15

**short** [3] - 1318:11, 1334:14, 1371:18

**shortly** [1] - 1351:2

**show** [23] - 1205:6, 1207:1, 1223:7, 1224:13, 1251:4, 1256:3, 1264:7, 1265:7, 1271:7, 1271:11, 1271:23, 1272:8, 1272:16, 1278:5, 1322:10, 1328:4, 1328:25, 1338:2, 1339:22, 1343:24, 1352:12, 1360:5, 1360:6

**showed** [11] - 1189:25, 1192:19, 1204:7, 1225:22, 1243:17, 1243:19, 1251:2, 1252:1, 1300:12, 1312:18, 1333:7

**showing** [5] - 1224:21, 1241:6, 1255:3, 1273:11, 1284:1

**shown** [1] - 1332:16

**shows** [4] - 1218:4, 1262:9, 1262:13, 1265:23

**shuffling** [1] - 1369:20

**side** [17] - 1182:9, 1182:11, 1183:6, 1183:14, 1184:13, 1228:25, 1229:8, 1279:19, 1279:23, 1280:10, 1281:9, 1284:15, 1284:16, 1285:16, 1301:10,

---

1340:14

**Side** [3] - 1280:1, 1285:1, 1302:1

**side-bar** [12] - 1182:9, 1182:11, 1183:6, 1183:14, 1184:13, 1279:19, 1279:23, 1280:10, 1284:15, 1284:16, 1285:16, 1301:10

**Side-bar** [3] - 1280:1, 1285:1, 1302:1

**sidebar** [4] - 1233:1, 1255:1, 1257:1, 1310:1

**Sidebar** [3] - 1183:1, 1183:16, 1184:1

**sides** [2] - 1229:3, 1229:7

**sign** [3] - 1361:7, 1363:25, 1364:2

**signature** [2] - 1278:16, 1278:21

**signed** [7] - 1242:22, 1242:25, 1278:14, 1278:16, 1279:13, 1322:11, 1350:7

**significant** [1] - 1364:22

**signify** [1] - 1340:17

**signing** [2] - 1242:15, 1244:15

**Silver** [3] - 1270:21

**similar** [3] - 1305:24, 1335:4, 1341:4

**similarly** [1] - 1264:24

**simple** [1] - 1293:23

**simply** [2] - 1334:1, 1371:11

**simultaneous** [1] - 1301:3

**sit** [4] - 1194:10, 1195:22, 1197:13, 1208:25

**sitting** [3] - 1222:2, 1334:23, 1335:8

**situation** [1] - 1230:2

**six** [1] - 1227:25

**skip** [1] - 1235:12

**slipping** [1] - 1334:18

**slower** [1] - 1368:5

**slowly** [1] - 1368:4

**snippet** [1] - 1308:3

**snippets** [2] - 1273:21, 1310:14

**so-called** [2] - 1192:19, 1319:18

**so..** [2] - 1194:12, 1291:14

**software** [2] - 1284:4

---

**sold** [4] - 1215:19, 1239:12, 1291:11, 1293:19

**someone** [2] - 1208:3, 1366:17

**sometime** [9] - 1199:11, 1199:13, 1238:8, 1250:19, 1250:22, 1279:12, 1292:4, 1324:2, 1327:21

**sometimes** [4] - 1291:12, 1304:1, 1321:20, 1371:2

**somewhere** [5] - 1191:13, 1206:7, 1214:1, 1217:7, 1220:16

**sorry** [21] - 1188:9, 1198:18, 1199:9, 1203:21, 1211:15, 1213:8, 1214:9, 1228:15, 1229:22, 1240:2, 1242:2, 1257:14, 1300:22, 1321:20, 1325:11, 1327:5, 1327:8, 1340:15, 1341:12, 1345:3, 1358:2

**sort** [2] - 1260:19, 1305:2

**sought** [5] - 1187:1, 1188:12, 1195:8, 1264:19, 1305:24

**sound** [2] - 1266:15, 1266:16

**sounds** [2] - 1266:17, 1298:11

**source** [1] - 1370:16

**speakerphone** [1] - 1366:11

**speaking** [2] - 1232:7, 1307:21

**spearheading** [1] - 1187:14

**specific** [4] - 1302:2, 1304:11, 1366:6, 1366:15

**specifically** [1] - 1300:14

**speculate** [1] - 1286:11

**speculating** [1] - 1367:15

**spell** [1] - 1291:19

**Spend** [2] - 1359:24, 1361:1

**spending** [1] - 1291:13, 1335:1

**spent** [1] - 1366:17

---

**spoken** [1] - 1259:16

**sponsorship** [6] - 1271:5, 1271:10, 1281:12, 1281:13, 1281:15, 1291:12

**spreadsheet** [1] - 1319:11

**spreadsheets** [1] - 1199:22

**Square** [1] - 1180:21

**stage** [3] - 1268:25, 1334:18, 1371:8

**stand** [9] - 1185:3, 1185:4, 1203:9, 1314:2, 1334:16, 1334:22, 1334:25, 1335:4, 1371:6

**start** [3] - 1185:12, 1270:5, 1292:12

**started** [1] - 1213:3

**starting** [5] - 1199:19, 1270:23, 1286:21, 1290:6, 1291:7

**state** [9] - 1181:17, 1233:21, 1233:22, 1261:21, 1276:11, 1305:23, 1306:5, 1306:23, 1307:1

**statement** [12] - 1207:17, 1245:17, 1247:11, 1257:3, 1258:23, 1300:11, 1300:13, 1326:7, 1327:12, 1328:6, 1328:10, 1357:14

**statements** [6] - 1207:2, 1261:16, 1310:4, 1310:7, 1310:8

**states** [1] - 1331:14

**STATES** [2] - 1180:1, 1180:3

**States** [6] - 1180:12, 1180:16, 1181:15, 1181:20, 1181:23, 1191:14

**statue** [1] - 1333:25

**status** [2] - 1201:14, 1231:12

**steal** [5] - 1229:21, 1261:1, 1261:10, 1265:4, 1266:7

**stealing** [1] - 1274:15

**step** [3] - 1258:20, 1305:10, 1368:18

**steps** [3] - 1189:2, 1258:24, 1305:12

**Steve** [1] - 1270:20

**stick** [1] - 1361:24

**still** [15] - 1185:17,

1216:17, 1221:8, 1221:12, 1221:20, 1221:22, 1222:3, 1222:7, 1222:20, 1234:5, 1268:7, 1272:24, 1323:20, 1348:13, 1368:23
**stipulation** [1] - 1326:9
**Stober** [9] - 1361:4, 1361:13, 1362:9, 1362:15, 1362:16, 1362:18, 1362:21, 1364:15, 1364:20
**stolen** [8] - 1229:20, 1229:23, 1230:13, 1236:12, 1257:3, 1257:8, 1313:21, 1314:20
**Stolper** [7] - 1318:19, 1319:5, 1320:6, 1320:8, 1320:20, 1320:24, 1321:6
**stomach** [1] - 1184:3
**stood** [2] - 1228:19, 1237:13
**stopped** [1] - 1258:19
**straights** [1] - 1249:3
**Strangford** [1] - 1181:4
**strategic** [1] - 1362:9
**stricken** [1] - 1233:6
**strong** [1] - 1273:7
**sub** [2] - 1294:17, 1304:13
**subject** [5] - 1226:13, 1268:2, 1272:13, 1273:5, 1299:19
**subpoena** [2] - 1299:4, 1299:10
**substance** [2] - 1292:14, 1321:5
**substantial** [3] - 1307:20, 1347:1, 1365:1
**substantially** [2] - 1274:7, 1307:2
**success** [2] - 1237:3, 1248:22
**succession** [1] - 1366:11
**sudden** [1] - 1246:22
**sue** [2] - 1283:10
**sued** [2] - 1345:19, 1345:21
**Suffolk** [1] - 1180:21
**suggest** [1] - 1274:8
**suggested** [1] - 1296:8
**suit** [12] - 1261:8,

1297:9, 1315:3, 1318:18, 1319:1, 1319:3, 1319:8, 1337:7, 1361:17, 1361:19, 1361:23, 1362:7
**Suite** [2] - 1180:22, 1181:2
**suits** [1] - 1303:5
**sum** [2] - 1192:16, 1321:5
**summarized** [1] - 1264:11
**summation** [5] - 1334:2, 1334:6, 1334:11, 1335:13, 1335:21
**summations** [1] - 1333:24
**supplement** [1] - 1257:2
**supplied** [1] - 1349:24
**support** [1] - 1202:1
**supporting** [1] - 1259:4
**supposed** [5] - 1210:20, 1210:24, 1263:22, 1264:3, 1357:10
**surprise** [1] - 1362:7
**surprised** [1] - 1263:12
**sustain** [1] - 1213:20
**Sustained** [1] - 1348:22
**sustained** [29] - 1192:25, 1202:6, 1205:25, 1208:21, 1212:9, 1212:24, 1221:11, 1222:14, 1226:23, 1229:17, 1246:25, 1248:6, 1264:20, 1300:2, 1305:3, 1314:4, 1328:2, 1331:15, 1332:10, 1332:15, 1333:11, 1347:21, 1348:2, 1350:16, 1359:17, 1363:17, 1365:4, 1365:7, 1367:20
**sustaining** [2] - 1305:19, 1307:6
**sweepstakes** [1] - 1349:25
**swore** [1] - 1242:21
**sworn** [4] - 1185:22, 1276:5, 1276:9, 1307:12
**Sydor** [1] - 1369:24

## T

**T.R** [1] - 1240:4
**tailored** [1] - 1233:9
**talks** [2] - 1259:24, 1355:13
**tangential** [1] - 1335:3
**tape** [29] - 1233:13, 1234:9, 1235:7, 1235:10, 1258:10, 1260:8, 1260:12, 1260:13, 1260:17, 1260:20, 1266:10, 1266:13, 1266:14, 1266:17, 1267:6, 1267:8, 1267:12, 1267:14, 1307:7, 1308:5, 1308:8, 1308:19, 1310:21, 1311:22, 1312:3, 1313:10
**Tape** [2] - 1258:18, 1258:19
**taped** [2] - 1311:10, 1311:12
**tax** [2] - 1354:21, 1355:10
**team** [1] - 1281:5
**telephone** [1] - 1339:10
**telephonically** [2] - 1297:15, 1297:18
**ten** [1] - 1211:25
**term** [4] - 1248:22, 1349:20, 1358:3, 1358:5
**terms** [7] - 1207:3, 1215:13, 1215:16, 1216:18, 1273:12, 1273:15, 1279:7
**Tesoriero** [1] - 1214:7
**testified** [42] - 1185:22, 1186:6, 1186:8, 1187:24, 1198:15, 1199:11, 1206:1, 1206:2, 1206:6, 1211:4, 1211:22, 1213:22, 1213:24, 1214:3, 1221:12, 1236:18, 1238:13, 1239:7, 1244:22, 1246:7, 1247:2, 1247:14, 1249:15, 1249:24, 1276:9, 1295:15, 1296:25, 1307:12, 1313:13, 1315:2, 1321:15, 1324:2, 1333:2, 1336:24, 1338:21, 1344:3,

1347:16, 1347:22, 1351:17, 1359:18, 1365:7, 1365:14
**testify** [2] - 1190:19, 1240:20
**testifying** [6] - 1199:5, 1208:22, 1220:1, 1272:23, 1313:24, 1316:1
**testimony** [36] - 1193:5, 1193:8, 1197:8, 1197:15, 1206:14, 1210:14, 1217:1, 1217:7, 1220:15, 1232:3, 1233:9, 1233:17, 1236:11, 1236:17, 1237:13, 1238:7, 1239:11, 1243:21, 1243:24, 1246:4, 1249:5, 1249:16, 1250:11, 1259:5, 1259:8, 1264:14, 1313:20, 1314:19, 1318:8, 1335:7, 1336:20, 1341:20, 1346:11, 1352:6, 1357:10, 1363:18
**texted** [1] - 1370:1
**THE** [251] - 1181:13, 1181:14, 1181:15, 1181:21, 1181:24, 1182:2, 1182:5, 1182:10, 1183:14, 1184:2, 1184:8, 1185:2, 1185:5, 1185:7, 1185:10, 1185:19, 1185:23, 1192:25, 1193:15, 1193:20, 1202:6, 1202:12, 1203:1, 1203:3, 1203:7, 1203:12, 1203:13, 1205:9, 1205:25, 1206:21, 1208:21, 1211:14, 1212:9, 1212:24, 1213:12, 1213:20, 1221:5, 1221:11, 1221:19, 1222:14, 1224:24, 1225:1, 1225:3, 1225:5, 1225:6, 1226:23, 1227:5, 1229:17, 1230:7, 1231:4, 1231:22, 1232:20, 1233:7, 1233:11, 1233:24, 1234:6, 1234:18, 1235:2, 1235:12, 1235:16, 1236:2,

1240:22, 1241:15, 1244:14, 1244:20, 1245:19, 1246:25, 1248:6, 1249:7, 1249:8, 1249:10, 1249:11, 1250:9, 1254:8, 1255:6, 1256:18, 1256:21, 1256:24, 1257:9, 1257:13, 1258:3, 1258:8, 1258:17, 1258:20, 1258:25, 1259:10, 1259:19, 1260:5, 1260:15, 1261:14, 1263:12, 1265:6, 1265:12, 1265:15, 1266:8, 1266:12, 1266:15, 1266:16, 1266:17, 1266:19, 1266:23, 1266:25, 1267:2, 1267:4, 1267:11, 1267:14, 1267:16, 1267:17, 1267:21, 1268:7, 1268:11, 1268:14, 1268:20, 1269:23, 1270:3, 1270:10, 1270:14, 1270:18, 1270:24, 1271:3, 1271:16, 1273:1, 1273:10, 1274:20, 1275:3, 1275:4, 1275:8, 1275:14, 1275:15, 1275:18, 1276:4, 1276:6, 1276:11, 1276:12, 1276:13, 1277:23, 1279:2, 1280:8, 1285:6, 1285:10, 1286:2, 1286:4, 1286:7, 1288:10, 1288:12, 1289:12, 1289:17, 1296:18, 1298:25, 1300:2, 1300:6, 1300:10, 1300:21, 1300:22, 1300:23, 1300:25, 1301:9, 1302:5, 1305:3, 1305:10, 1305:13, 1305:17, 1307:15, 1307:18, 1307:19, 1307:22, 1307:23, 1307:24, 1307:25, 1308:14, 1308:17, 1308:22, 1309:3, 1309:5, 1310:11, 1310:22, 1311:3, 1314:4, 1314:11, 1316:19, 1316:24, 1317:2, 1317:6,

1323:8, 1324:11, 1326:10, 1326:12, 1326:15, 1326:19, 1327:6, 1328:2, 1331:15, 1332:10, 1332:15, 1333:11, 1333:15, 1333:20, 1333:23, 1334:21, 1335:12, 1335:16, 1335:18, 1335:22, 1335:24, 1336:2, 1336:6, 1336:8, 1336:10, 1336:11, 1336:13, 1337:13, 1340:1, 1342:12, 1344:25, 1345:2, 1345:5, 1347:21, 1348:2, 1348:22, 1349:19, 1349:22, 1350:16, 1351:19, 1352:24, 1353:2, 1353:9, 1358:1, 1358:9, 1358:20, 1358:23, 1359:17, 1360:21, 1362:14, 1363:17, 1365:4, 1365:7, 1365:12, 1367:3, 1367:20, 1368:2, 1368:15, 1368:20, 1368:22, 1369:6, 1369:8, 1369:17, 1370:12, 1370:18, 1370:21, 1371:16, 1371:20

**theft** [1] - 1262:18
**themselves** [2] - 1264:10, 1332:8
**then-wife** [1] - 1264:17
**Theodore** [1] - 1242:16
**theory** [1] - 1266:3
**thereafter** [3] - 1219:10, 1249:20, 1249:22
**they've** [2] - 1265:2, 1293:15
**thief** [18] - 1230:5, 1231:19, 1231:25, 1232:4, 1233:9, 1233:14, 1259:2, 1259:13, 1259:23, 1260:2, 1260:10, 1263:8, 1266:5, 1266:21, 1311:16, 1313:15, 1314:14
**thinking** [2] - 1211:25, 1262:17
**thinks** [5] - 1261:18, 1261:19, 1261:20,

1306:22
**third** [6] - 1219:4, 1281:25, 1341:24, 1342:8, 1342:16, 1371:23
**thirds** [2] - 1189:12, 1193:23
**thoroughly** [1] - 1352:18
**thousand** [4] - 1225:23, 1318:11, 1331:10, 1332:11
**three** [24] - 1211:9, 1219:16, 1264:15, 1285:7, 1334:9, 1334:22, 1334:25, 1335:4, 1338:13, 1339:5, 1340:22, 1341:1, 1341:6, 1344:14, 1345:11, 1345:24, 1361:15, 1366:2, 1366:9, 1366:24, 1367:6, 1367:13, 1369:18, 1371:6
**Thursday** [1] - 1370:4
**tied** [1] - 1264:25
**Tim** [1] - 1195:4
**time-to-time** [1] - 1297:9
**Timothy** [1] - 1197:18
**title** [2] - 1199:25, 1200:1
**today** [22] - 1183:10, 1184:5, 1195:22, 1197:13, 1198:15, 1199:5, 1203:4, 1208:22, 1208:25, 1220:2, 1222:7, 1243:13, 1275:22, 1277:16, 1288:25, 1293:4, 1293:6, 1315:22, 1323:16, 1334:17, 1336:9, 1367:25
**together** [4] - 1199:20, 1352:2, 1355:23, 1356:3
**TOLKIN** [1] - 1181:7
**TOMMY** [1] - 1180:7
**Tommy** [20] - 1180:8, 1181:1, 1202:3, 1209:12, 1209:16, 1242:17, 1277:14, 1278:10, 1279:8, 1281:21, 1282:2, 1282:5, 1282:8, 1282:15, 1283:25, 1290:9, 1292:9, 1294:11

**took** [10] - 1228:23, 1244:22, 1245:3, 1252:8, 1255:3, 1263:22, 1299:18, 1306:13, 1306:20, 1327:4
**top** [2] - 1286:25, 1287:14
**topics** [1] - 1371:24
**total** [3] - 1216:12, 1340:20, 1340:23
**totaled** [1] - 1248:11
**totaling** [2] - 1221:23, 1320:10
**touch** [2] - 1202:9, 1205:22
**town** [1] - 1275:20
**TR** [1] - 1339:6, 1340:24, 1352:10
**transaction** [3] - 1224:18, 1224:20, 1269:20
**transactions** [4] - 1240:6, 1251:22, 1261:2, 1284:6
**transcript** [11] - 1271:18, 1273:14, 1273:24, 1289:3, 1292:7, 1292:16, 1294:3, 1295:1, 1300:7, 1305:1, 1310:3
**transfer** [4] - 1214:15, 1272:14, 1338:7, 1342:23
**transferred** [1] - 1323:14
**transfers** [11] - 1219:16, 1221:15, 1241:8, 1241:23, 1251:6, 1251:13, 1253:13, 1253:20, 1323:3, 1337:20, 1338:3
**transmitted** [2] - 1214:13, 1317:12
**transparency** [1] - 1364:20
**travel** [2] - 1291:13, 1297:25
**traveling** [1] - 1297:9
**trial** [8] - 1183:10, 1246:4, 1247:14, 1264:7, 1267:24, 1269:14, 1334:14, 1368:24
**trials** [1] - 1370:2
**tried** [5] - 1194:6, 1261:25, 1263:4, 1292:12, 1336:4

**tries** [1] - 1274:12
**trip** [1] - 1296:8
**triple** [1] - 1357:7
**Triple** [2] - 1353:18, 1353:20
**truck** [1] - 1195:21
**trucking** [2] - 1195:18, 1195:20
**true** [5] - 1233:16, 1245:10, 1245:17, 1253:16, 1326:9
**Trust** [2] - 1224:11, 1354:15
**trust** [5] - 1283:23, 1304:5, 1304:7, 1336:25, 1354:22
**trusted** [1] - 1337:15
**trustee** [1] - 1332:2
**truth** [1] - 1257:5
**truthful** [1] - 1359:14
**try** [13] - 1188:16, 1192:8, 1200:23, 1221:8, 1223:9, 1228:21, 1230:1, 1309:4, 1336:8, 1345:19, 1356:3, 1360:10, 1363:20
**trying** [36] - 1186:22, 1188:20, 1188:24, 1191:2, 1195:2, 1197:2, 1197:19, 1197:22, 1198:18, 1200:15, 1200:20, 1201:23, 1202:3, 1202:8, 1203:20, 1203:22, 1205:18, 1209:21, 1210:1, 1217:4, 1225:17, 1253:10, 1260:5, 1265:8, 1265:13, 1265:19, 1265:20, 1269:15, 1269:17, 1302:2, 1305:22, 1334:6, 1345:24, 1360:6, 1363:11, 1371:7
**Tuesday** [2] - 1346:20, 1346:21
**tune** [1] - 1209:12
**turn** [9] - 1187:16, 1189:9, 1236:15, 1275:13, 1289:21, 1292:15, 1295:19, 1355:14, 1363:12
**turned** [1] - 1215:17
**turning** [7] - 1278:14, 1281:18, 1281:25, 1292:6, 1292:22, 1294:2, 1329:3
**twice** [1] - 1316:24

**two** [33] - 1189:12, 1189:22, 1193:23, 1211:5, 1211:9, 1214:21, 1219:3, 1226:20, 1229:7, 1230:19, 1230:22, 1231:7, 1235:1, 1244:18, 1250:13, 1263:10, 1270:23, 1292:10, 1293:18, 1329:20, 1334:9, 1334:22, 1334:25, 1335:4, 1340:13, 1341:11, 1341:18, 1345:12, 1345:16, 1351:17, 1359:21, 1368:24, 1369:10
**two-thirds** [2] - 1189:12, 1193:23
**type** [2] - 1299:13, 1303:9
**typically** [2] - 1299:2, 1299:11
**Tyson** [2] - 1332:5, 1369:22

## U

**U.S** [2] - 1180:4, 1180:18
**ultimately** [1] - 1319:1
**unauthorized** [4] - 1263:18, 1272:24, 1306:11, 1306:12
**unaware** [1] - 1216:17
**under** [7] - 1185:17, 1220:11, 1242:15, 1274:5, 1290:2, 1304:4, 1365:20
**undermine** [1] - 1265:20
**underneath** [1] - 1218:19
**understood** [2] - 1350:12, 1362:3
**unfair** [2] - 1274:14, 1307:2
**unfortunately** [1] - 1291:24
**unhappy** [1] - 1368:25
**UNITED** [2] - 1180:1, 1180:3
**united** [1] - 1180:12
**United** [5] - 1180:16, 1181:15, 1181:20, 1181:23, 1191:14
**unparalleled** [1] - 1237:3
**unredacted** [3] - 1268:14, 1269:23,

1270:1
**unsure** [2] - 1216:21, 1267:2
**unusual** [1] - 1297:19
**up** [37] - 1186:7, 1187:25, 1195:12, 1199:9, 1199:13, 1201:16, 1204:16, 1208:11, 1209:1, 1224:15, 1228:19, 1230:2, 1252:20, 1267:3, 1276:14, 1286:13, 1296:12, 1300:16, 1323:16, 1325:12, 1329:16, 1330:1, 1333:25, 1338:22, 1353:21, 1354:2, 1355:20, 1363:6, 1366:9, 1366:10, 1368:6, 1368:7, 1369:18, 1370:11, 1371:10, 1371:12, 1372:1
**update** [1] - 1201:14
**upper** [2] - 1224:15, 1352:5
**ups** [2] - 1370:6
**urge** [1] - 1370:23
**urgent** [2] - 1346:17, 1346:18
**usage** [1] - 1346:17
**utilize** [1] - 1274:16
**utilizing** [1] - 1186:17

**V**

**vacuum** [1] - 1269:12
**vague** [1] - 1303:7
**valid** [2] - 1290:13, 1290:14
**validates** [1] - 1259:22
**validating** [1] - 1263:1
**validation** [1] - 1259:23
**validity** [2] - 1232:16, 1262:20
**valuable** [3] - 1237:2, 1304:24, 1305:6
**value** [6] - 1230:18, 1274:6, 1306:6, 1306:16, 1307:1, 1307:2
**various** [8] - 1199:23, 1242:12, 1251:16, 1271:24, 1273:18, 1274:13, 1295:9, 1371:24
**ventures** [1] - 1323:24
**Ventures** [2] - 1218:1, 1223:8

**verge** [1] - 1237:2
**verify** [1] - 1194:9
**version** [5] - 1234:3, 1268:14, 1269:23, 1285:9, 1285:11
**versus** [2] - 1181:16, 1273:24
**Veterans** [1] - 1180:22
**viable** [2] - 1199:20, 1245:8
**victim** [2] - 1269:10, 1334:5
**victimize** [1] - 1264:23
**victims** [4] - 1263:10, 1264:16, 1264:21, 1265:18
**view** [2] - 1234:5, 1371:14
**Vincent** [2] - 1214:6, 1214:18
**virtue** [1] - 1335:7
**virus** [1] - 1184:4
**Visa** [1] - 1359:20
**vitae** [1] - 1370:6
**voice** [6] - 1266:14, 1266:16, 1266:24, 1267:1, 1276:13, 1321:21
**Volpe** [6] - 1363:7, 1363:10, 1363:19, 1363:22, 1363:23, 1364:2
**vs** [1] - 1242:16

**W**

**wages** [2] - 1298:14
**Waikapuna** [1] - 1204:2, 1204:10, 1204:13, 1204:24, 1205:14, 1205:20, 1206:23, 1206:24, 1207:4, 1207:6, 1207:9, 1207:11, 1207:25, 1208:8, 1208:12, 1208:23, 1209:3, 1209:11
**wait** [1] - 1300:24
**waiting** [1] - 1353:5
**waive** [1] - 1302:4
**walk** [1] - 1281:18
**wants** [2] - 1258:22, 1308:18
**waste** [1] - 1236:3
**water** [2] - 1353:7, 1353:8
**Wednesday** [1] - 1370:4
**week** [12] - 1275:21, 1334:20, 1368:3,

1368:4, 1368:5, 1368:6, 1368:7, 1368:11, 1368:25, 1370:3, 1370:4
**weekly** [1] - 1201:9
**weeks** [3] - 1270:23, 1334:23, 1344:14
**WEINBLATT** [1] - 1180:21
**wether** [1] - 1371:3
**whole** [4] - 1267:8, 1267:12, 1267:14
**wife** [1] - 1264:17
**William** [1] - 1369:25
**winded** [1] - 1335:5
**wire** [25] - 1210:18, 1210:20, 1214:14, 1219:4, 1219:10, 1219:16, 1220:12, 1238:24, 1241:8, 1241:22, 1251:5, 1251:12, 1253:13, 1272:14, 1322:16, 1323:3, 1324:6, 1329:10, 1331:10, 1337:20, 1337:24, 1338:3, 1340:20, 1341:2, 1341:3
**wired** [7] - 1214:23, 1244:25, 1247:8, 1303:23, 1344:17, 1351:3, 1351:7
**wires** [3] - 1214:18, 1217:12, 1242:5
**wiring** [4] - 1239:2, 1245:3, 1340:5, 1359:2
**wish** [1] - 1234:13
**wishes** [1] - 1270:15
**withdraw** [18] - 1196:24, 1197:12, 1197:15, 1197:23, 1211:15, 1222:15, 1232:6, 1242:25, 1245:5, 1247:25, 1249:15, 1251:18, 1313:14, 1320:7, 1325:4, 1348:23, 1349:4, 1364:24
**withdrawn** [5] - 1198:4, 1202:10, 1213:9, 1232:2, 1366:1
**witness** [36] - 1185:3, 1185:21, 1190:12, 1190:23, 1203:9, 1234:2, 1258:24, 1266:11, 1267:20, 1270:16, 1275:5, 1275:13, 1275:19,

1275:20, 1276:1, 1276:8, 1280:6, 1286:14, 1288:10, 1305:12, 1306:1, 1307:11, 1333:24, 1333:25, 1334:3, 1334:6, 1334:7, 1334:10, 1334:21, 1334:24, 1335:2, 1335:3, 1335:5, 1335:7, 1371:1, 1371:13
**Witness** [5] - 1185:4, 1203:9, 1276:5, 1333:22, 1368:21
**WITNESS** [21] - 1185:19, 1225:1, 1225:5, 1249:8, 1249:11, 1266:15, 1266:17, 1266:23, 1267:2, 1267:16, 1276:6, 1276:12, 1288:12, 1300:22, 1300:25, 1307:18, 1307:22, 1307:24, 1336:10, 1349:22, 1368:20
**witnesses** [9] - 1190:10, 1190:16, 1272:23, 1275:24, 1334:11, 1334:15, 1370:15, 1371:4, 1371:6
**wonder** [1] - 1311:15
**word** [9] - 1198:1, 1198:5, 1200:17, 1232:3, 1280:7, 1318:15, 1350:1, 1353:17, 1363:21
**words** [7] - 1228:10, 1228:11, 1232:1, 1232:2, 1313:14, 1313:15, 1313:17
**worry** [2] - 1234:18, 1234:20
**worth** [2] - 1253:1, 1292:1
**wrestling** [1] - 1235:5
**wrist** [1] - 1183:4
**writ** [1] - 1298:16
**write** [2] - 1251:23, 1320:21
**writes** [1] - 1356:2
**writing** [5] - 1194:11, 1251:24, 1261:25, 1340:17, 1352:10
**written** [5] - 1245:21, 1246:16, 1246:17, 1247:20, 1319:10
**wrongdoing** [1] -

1234:8
**wrote** [7] - 1241:8, 1242:1, 1251:23, 1316:3, 1326:23, 1340:23, 1342:5

**Y**

**year** [6] - 1199:16, 1238:9, 1277:3, 1329:19, 1331:7, 1332:24
**years** [8] - 1190:6, 1230:3, 1246:21, 1291:8, 1292:8, 1312:16, 1319:20, 1320:1
**yelling** [1] - 1228:17
**yesterday** [8] - 1189:5, 1189:8, 1204:7, 1216:3, 1271:17, 1316:23, 1359:18, 1370:2
**YORK** [1] - 1180:1
**York** [6] - 1180:5, 1180:17, 1180:23, 1181:2, 1181:5, 1181:8
**yourself** [6] - 1209:8, 1227:19, 1246:22, 1363:9, 1363:14, 1363:15
**yourselves** [1] - 1368:10

**Z**

**zero** [2] - 1218:5, 1218:9