1375

```
  1              UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
  2
      - - - - - - - - - - - - - - - X
  3
      UNITED STATES OF AMERICA    :    13-CR-607 (JFB)
  4
          -against-                    U.S. Courthouse
  5
                                  :    Central Islip, New York
  6   PHILLIP A. KENNER
      a/k/a "Philip A. Kenner",
  7       and                     :
      TOMMY C. CONSTANTINE
  8   a/k/a "Tommy C. Hormovitis"

  9              Defendants  :
                                       May 18, 2015
 10   - - - - - - - - - - - - - - - X   9:30 a.m.

 11
      BEFORE:
 12          HONORABLE JOSEPH F. BIANCO
             United States District Judge
 13          and a jury

 14
      APPEARANCES:
 15
      For the Government:    KELLY T. CURRIE
 16                          Acting United States Attorney
                             Federal Plaza
 17                          Central Islip, New York 11722
                             BY:  JAMES M. MISKIEWICZ
 18                               SARITHA KOMATIREDDY
                                  Assistant U.S. Attorneys
 19

 20

 21   For the Defendant:    HALEY, WEINBLATT & CALCAGNI LLP
      Phillip A. Kenner     One Suffolk Square
 22                         1601 Veterans Memorial Highway
                            Suite 425
 23                         Islandia, New York 11749
                            BY:  RICHARD HALEY
 24

 25
```

1376

```
1   For the Defendant:        LaRUSSO & CONWAY LLP
    Tommy C. Constantine      300 Old Country Road
2                             Suite 341
                              Mineola, New York 11501
3                             BY:  ROBERT P. LaRUSSO
                                        and
4                                   ANDREW L. OLIVERAS
                                    26 Strangford Court
5                                   Oceanside, New York 11572

6

7   Court Reporter:           RONALD E. TOLKIN, RPR, RMR, CRR
                              100 Federal Plaza
8                             Central Islip, New York 11722
                              631-712-6105
9                             ronald_tolkin@nyed.uscourts.gov

10                            ***
```

11            THE CLERK:  All rise.

12            THE COURT:  Please be seated.

13            THE CLERK:  Calling case 13-CR-607, U.S.A. versus

14   Kenner and Constantine.

15            Counsel, please state your appearance for your

16   record.

17            MR. MISKIEWICZ:  Good morning, Your Honor.

18            James Miskiewicz for the United States.

19            THE COURT:  Good morning, Mr. Miskiewicz.

20            MS. KOMATIREDDY:  Good morning, Your Honor.

21            Saritha Komatireddy for the United States.

22            THE COURT:  Good morning, Ms. Komatireddy.

23            MR. LaRUSSO:  Robert LaRusso for Mr. Constantine.

24   Good morning, Your Honor.

25            THE COURT:  Good morning, Mr. LaRusso.  Good

1  morning, Mr. Constantine.

2        DEFENDANT CONSTANTINE:  Good morning, Judge.

3        MR. OLIVERAS:  Good morning, Your Honor.

4        Andrew Oliveras for Mr. Constantine.

5        THE COURT:  Good morning, Mr. Oliveras.

6        MR. HALEY:  Richard Haley for Mr. Kenner.

7        Good morning, Your Honor.

8        THE COURT:  Good morning, Mr. Haley and Mr Kenner.

9        Are we ready to go?

10        MR. MISKIEWICZ:  We have an issue regarding a series

11  of exhibits that Mr. LaRusso wants to go over with Mr. Kaiser

12  in his continuation.  There are objections to hearsay,

13  relevance.  It's also beyond the scope.

14        One is an e-mail between Mr. Constantine and Michael

15  Reiff, R-E-I-F-F.  And it takes place in January of 2010.

16  It's after the last of the wires for Eufora.

17        There's another January 2010 e-mail, a series of

18  e-mails between Mr. Constantine and Ms. Allen-Smith -- I don't

19  even know who she is -- forwarding it to other people who I

20  similarly don't know.  There's a G-mail cover sheet basically

21  from Michael Stolper relying on a series of e-mail addresses

22  and no content.

23        There is another e-mail between Mr. Kaiser and Bryan

24  Berard dated January 21st, 2012.  "Let me know if you can hear

25  this on the train."  That's the entire message.

1    Another e-mail between Mr. Kaiser and Bryan Berard

2    dated January 2013, whereby it looks like one of the two is

3    checking their credit card statement to see if they were even

4    present for some purported filing.  Also, it is actually a

5    forwarded message to Agent Galioto.  So we also object for the

6    fact that, you know, it was just forwarded to Agent Galioto.

7    It's totally irrelevant.

8            Finally, there are cover pages for deposition of Ken

9    Jowdy, Volume I and Volume II taken in January 2010.  Just

10   cover pages, and who's present.  Followed by more e-mails

11   between other people, Ron Richards and Sergei Gonchar,

12   et cetera.

13           So I don't understand how any of this is relevant.

14   I don't see that there could be any argument that this

15   represents the defendant's state of mind or his

16   representations to various people during either Eufora or any

17   of the other folks.

18           THE COURT:  Hand them up to me so I can see them.

19           MR. MISKIEWICZ:  Yes, Your Honor.

20           THE COURT:  Mr. LaRusso.

21           MR. LaRUSSO:  Your Honor, the e-mails were provided

22   to Mr. Miskiewicz so that we could avoid any interruption of

23   the testimony.  So I apologize to the Court that we're having

24   to do this right now.  Most of these are going to be shown to

25   the witness so that he can identify the information that was

1   being imparted to him by Mr. Constantine in and around the

2   time of the investments in December of 2009.

3           From what I can remember, Mr. Kaiser's testimony

4   before he finished up was that he witnessed a call by

5   Mr. Constantine to two or three hockey players.  Our position

6   is that the information that we're going to be eliciting from

7   Mr. Kaiser was that before that call was made in the early

8   part of 2010, much of the information regarding these

9   licensing agreements was made not only with Mr. Kaiser but

10  also to all of the hockey players as well.  I'm hoping that we

11  can use the documents to refresh his recollection.

12          In regard to some of the other exhibits, Judge, for

13  example, the depositions, Mr. Kaiser downplayed his

14  participation and role in regards to the civil suit that was

15  filed against Mr. Constantine by the hockey players, Mr. Rizzi

16  and Mr. Hughes against Mr. Jowdy.  These documents are being

17  used to refresh his recollection that he didn't just attend a

18  two-hour deposition.  He attended two days of deposition.

19  That he was there on behalf of Mr. Gonchar.  He takes a very

20  active role, Judge, which is what he tried to downplay to this

21  jury.  What we're trying to do by the other e-mails, Judge, is

22  to show those relationships in the time frame in question.

23          You can see, Judge, from them, it's not to the

24  hockey players.  These e-mails are correspondences between

25  Mr. Kaiser and Mr. Kenner, the lawyer, Mr. Stolper, and

1    Mr. Berard.  It's our argument, as we've been trying to elicit

2    from this witness, that he was aligned with those individuals

3    in terms of the suit that was being filed.  That's essentially

4    the purpose of this.

5            THE COURT:  You really have taken to heart what I

6    said to you last week, you're now going back to areas that you

7    already covered.  Everything you've just told me, you already

8    covered, okay.  Now we're going back to those same areas and

9    you want to start introducing documents.

10           MR. LaRUSSO:  Judge --

11           THE COURT:  What is an e-mail from Sergei Gonchar to

12   Ronald Richards, you want to get into evidence, an e-mail

13   between Sergei Gonchar and Ronald Richards?

14           MR. LaRUSSO:  No, I'm not seeking to introduce it

15   all, Judge.  What I'm trying to say Mr. --

16           THE COURT:  So we have three documents.  We have

17   three documents.  You want to refresh the witness'

18   recollection who already testified he attended the deposition

19   of Jowdy.  Did he already testify to that?

20           MR. LaRUSSO:  He said he attended maybe two hours

21   and he left.

22           THE COURT:  Oh, so now we're going to go back.

23   We're going to go back and try to refresh his recollection

24   that it was two days that he attended as opposed to one.  That

25   is what this case is coming down to?

1     MR. LaRUSSO:  Well, Judge, what's very critical is

2  that the parties were aligned against Mr. Constantine at this

3  point.  They were trying to take over the loan.  He's denied

4  that they were trying to take over the loan.

5     THE COURT:  We've been through this.  So now you're

6  going to try to show that he was taking over the loan because

7  he attended the deposition on two days instead of one.  That's

8  what this shows?

9     MR. LaRUSSO:  It's part of the proof, Judge, that

10  we're going to be trying to establish.  That's all.

11     THE COURT:  He didn't say he needed his recollection

12  to be refreshed on that, did he?

13     MR. LaRUSSO:  No.  What he said is that his

14  recollection was two hours.

15     THE COURT:  You're going to use those to refresh his

16  recollection, okay.

17     MR. LaRUSSO:  Judge, the last two e-mails, again --

18  and Judge, if I can try to just explain for a few minutes,

19  Judge.  There are a series of e-mails that take place between

20  Mr. Berard, Mr. Kaiser, Mr. Harvey, and then there is an

21  e-mail address for Mr. Jowdy.  This witness has attempted to

22  downplay his relationship with these parties.  He played an

23  active role in exchanging information.  Those are some of the

24  e-mails that are there, Judge, offered just for the purpose of

25  establishing relationship.

1    The last one, Judge, is a e-mail involving

2  Mr. Matthew Galioto, the exchange of information that's going

3  on.  Not just between Mr. Kaiser, but Mr. Berard and

4  Mr. Harvey.  And it's our position, Judge, that the

5  information that Mr. Galioto was receiving was coming from

6  them.

7         THE COURT:  Why are trying to get something in from

8  Mr. Berard and Mr. Harvey through Mr. Kaiser?  I don't

9  understand that.

10         MR. LaRUSSO:  Because he's a party to that e-mail

11  chain, Judge.  That's the point.  This is a group of

12  individuals, Judge, that --

13         THE COURT:  What will he say?  This critical e-mail

14  says, "Conversation this morning.  What's Matt's e-mail?  Let

15  me know if you can hear this on the train."

16         What's that mean?

17         MR. LaRUSSO:  Conversations Matthew Galioto, and Mr.

18  Harvey is a party to this, Judge.  That's the point.  These

19  point is that these are the groups of individuals that are

20  behind this, Judge.  And we're going to hope to show through

21  Mr. Privitello that additional information that was imparted

22  was false against my client.

23         THE COURT:  What does this e-mail relate to?

24         MR. LaRUSSO:  Just relationship, Judge.  I'm not

25  even getting into the substance.  It's just relationship of

1   the parties, nothing more.

2         THE COURT:  What relationship, that he knows

3   Mr. Berard?  You already established that he knows Mr. Berard.

4   Does he know Agent Galioto?  We know he knows Agent Galioto.

5   What does this establish?

6         MR. LaRUSSO:  Judge, it establishes a close

7   relationship between Mr. Harvey, Mr. Berard, Mr. Kaiser, and

8   he's imparting information to Agent Galioto.  Harvey, Judge,

9   as the Court may remember, is, at that time, a lawyer for

10  Mr. Jowdy.  And our argument is that this is the relationship

11  that we'll hopefully be able to convince the jury that

12  Mr. Constantine was not behind this, but the others were.

13        THE COURT:  Okay.  I'm not including this.  This is

14  ridiculous, okay.  This is absolutely ridiculous, and the

15  record should reflect that this is ridiculous.  The e-mail has

16  no probative value.  This covers areas that you've already

17  covered with him last week.  You're going back now to areas

18  that you've already covered, and it has no additional

19  probative value.

20        You already established that he knows Mr. Berard.

21  You already established he knows the agent.  An e-mail about

22  nothing, an e-mail about nothing, you want to introduce an

23  e-mail about nothing.  It has no probative value.  I am

24  reading the e-mail, I have no idea what this e-mail is about.

25  It has zero probative value.  To form relationships?  What

1   relationships?

2           MR. LaRUSSO:  Berard, Kaiser, Harvey.

3           THE COURT:  We haven't even heard anything about

4   Harvey.  Who's Harvey?

5           MR. LaRUSSO:  A lawyer for Mr. Jowdy.

6           THE COURT:  Are you going to ask him if he had

7   conversations with Mr. Harvey?  Are you going to ask him that?

8           MR. LaRUSSO:  Judge, I'm not getting into

9   conversations about that.

10          THE COURT:  So why are we getting into an e-mail

11  about it.  If we're not getting into conversations about it,

12  how does the e-mail have any relevance.  Why introduce the

13  e-mail that Mr. Harvey is on?  Mr. LaRusso, I can't even

14  believe that you're making this request to me this morning.  I

15  can't believe it, okay.  This is so far afield from what this

16  case is about.

17          I was so generous in letting you question him

18  regarding these areas.  I'm showing you a lot of leeway.  I'm

19  sitting here thinking, this doesn't have a lot of relevance to

20  the case.  But Mr. LaRusso, I should give him some leeway.

21  Maybe this has some relevance to the defense.  And now what

22  you're doing is, you're abusing that.  You're bringing, on a

23  Monday morning, after having him on the stand for too long

24  last week, after having me end early the day before, so we

25  lost an half an hour the day before.  I'm sitting here

1   thinking this doesn't make a lot of sense, this doesn't make a

2   lot of sense, why are we going into this?  But I'm showing a

3   lot of leeway.  I have a lot of respect for you.  I think

4   you're a great layer.  But this is getting ridiculous.  We're

5   going to now start introducing documents that have no

6   probative value at all.  They're hearsay.  They have no

7   probative value.  They relate to establishing relationships

8   with other witnesses.  That has no probative value.  I am

9   mystified by this.  I am absolutely mystified by this.  I

10  can't allow it to happen, okay.

11          Your client is entitled to a fair trial.  He's not

12  entitled to an endless trial, okay.  And that's what we're

13  having right now, we're having an endless trial.  He's been on

14  the stand for three days.  This does not relate to any of the

15  issues in this case.  I can't let this go on endlessly.  How

16  much leeway do you want?  How much longer are you going to

17  have Mr. Kaiser on the stand?

18          MR. LaRUSSO:  I was hoping to be able to cover these

19  topics within a half-hour, Judge.

20          THE COURT:  Okay.  You have a half-hour.  How about

21  that?  You want a half-hour, I'll give you a half-hour to go

22  over the topics you want.  Is that a deal?

23          MR. LaRUSSO:  Judge, I apologize to the Court if the

24  Court sees it this way.  I'm sorry I am not able to at least

25  articulate enough to the Court to understand the relevancy of

1  this.  When I opened to the jury, the Court may remember there

2  was a shifting of alliances between the parties.  There were a

3  series of parties who were once aligned and they would break

4  the alliances.  It started to play a very significant role in

5  terms of what was happening at this time.

6           THE COURT:  Mr. LaRusso, I'm going to do it again.

7  I'm going to give you what you want.  These documents are not

8  coming into evidence.  They're all hearsay.  You want to

9  refresh his recollection with these documents, go right ahead.

10  You had 30 minutes.

11          MR. LaRUSSO:  Judge, can you give me five minutes to

12  just organize it.

13          THE COURT:  You want to refresh his memory.  If he

14  doesn't remember how long he was with Mr. Jowdy, go right

15  ahead.  But you have half an hour, okay.

16          MR. LaRUSSO:  Judge, may I have a couple of minutes

17  to just go through these, and maybe we can avoid all of that.

18          THE COURT:  Sure.

19          MR. LaRUSSO:  Thank you, Your Honor.

20          MR. MISKIEWICZ:  Your Honor, may I get the documents

21  back?

22          THE COURT:  Here, Mr. Miskiewicz.

23          (Handing.)

24          (Pause in proceeding.)

25          MR. LaRUSSO:  Judge, I cut back.  There are only two

1  areas that I will be going into.

2            THE COURT:  Thank you.

3            Let's bring in the jury.

4            THE CLERK:  Yes, Your Honor.

5            (Witness John Kaiser resumes the stand.)

6            THE CLERK:  All rise.

7            (Whereupon the jury enters the courtroom at 10:05

8  a.m.)

9            THE COURT:  Please be seated.

10           Good morning, members of the jury.

11           ALL JURORS:  Good morning.

12           THE COURT:  It's good to see everyone this morning.

13  Now, I am confused.  Hold on a second here.

14           THE CLERK:  Your Honor, Mr. Schwartz, Juror 5.

15           JUROR 5:  Yes.

16           THE COURT:  Juror 5 had a family scheduling issue.

17  Mr. Schwartz, you are Juror 5.  Everyone else stay where you

18  are.

19           Okay.  So we'll continue with the trial.  As you

20  recall, we have Mr. Kaiser still on cross examination with

21  Mr. LaRusso.

22           Mr. Kaiser, I remind you that you are still under

23  oath.

24           Do you understand?

25           THE WITNESS:  Yes.

1      J O H N   K A I S E R,

2           called as a witness, having been previously duly

3           sworn, was examined and testified as follows:

4           THE COURT:  Go ahead.

5           MR. LaRUSSO:  Your Honor, with your permission.

6   CONTINUED CROSS EXAMINATION

7   BY MR. LaRUSSO:

8   Q    Mr. Kaiser, I believe last Thursday we ended the

9   questioning discussing the telephone calls that you overheard

10  Mr. Constantine make to three hockey players.  The names were

11  Mr. Berard, Mr. Wooley, Mr. DeVries, is that correct?

12  A    Yes, that's correct.

13          MR. LaRUSSO:  With the Court's permission, I would

14  like to read the last couple of questions so we have that.

15          THE COURT:  Yes.

16          MR. LaRUSSO:  This will be on page 1367 of the

17  transcript.  I will be reading lines 11 through 16 (reading):

18          "QUESTION:  They were looking to have their interest

19  in Eufora brought out, correct?

20          ANSWER:  Well, I don't think these three individuals

21  knew that about the bank deals.  That's the difference.

22          QUESTION:  You're speculating.

23          ANSWER:  No, I'm not."

24  Q    Do you remember those last few questions before we

25  recessed on Thursday, Mr. Kaiser?

1   A    I certainly do.

2   Q    Just a couple of questions, if I may.  I'm going to show

3   you what's been received in evidence as Exhibit C-74 and C-75.

4   You've identified these before.  Then I'm going to show you

5   one that's marked only for identification.  I will take it out

6   in case you need to look at them.

7         Would you take a look at these three exhibits, if

8   you need to.  I'm going to focus on C-76 in just a few

9   moments.

10         Mr. Kaiser, will you take a look, especially, at the

11   one that I marked for identification.

12   A    Okay.

13   Q    Do you recognize the last exhibit, C-76?  That's an

14   e-mail from Mr. Constantine to you on January 9th, 2010,

15   regarding the euro -- I'm sorry, Metabank agreement?

16   A    Yes.

17         MR. LaRUSSO:  Your Honor, I'll ask that that be

18   received.

19         THE COURT:  Any objection?

20         MR. MISKIEWICZ:  No, Judge.

21         THE COURT:  C-76 is admitted.

22         (So marked as Defendant's Exhibit C-76 in evidence.)

23   Q    Mr. Kaiser, just a few questions.  These particular

24   e-mails that we're talking about, 74, 75, and 76, they're

25   dated October 23rd, 2009; and then 74 and 76 are dated

1    January 9th, 2010.  Is that correct?

2    A    Yes.

3    Q    In general, these are e-mails between you and

4    Mr. Constantine regarding the licensing agreements, is that

5    correct?  Is that a fair statement?

6    A    Yes, that is a fair statement.

7    Q    You can put those aside.  And just one more, if I may.

8    Marked for identification only, Mr. Kaiser.  Would you take a

9    look at that, please.

10            (Handing.)

11    A    Okay.

12    Q    Did you have an opportunity to review that?

13    A    Yes.

14    Q    Is that part of an e-mail from Mr. Phil Kenner to you and

15    others at or about July 16, 2010?

16    A    Yes, it looks like it.

17    Q    And thereafter, the information imparted in that e-mail,

18    is that correct?

19    A    Say the last part.

20    Q    This is an e-mail from Mr. Kenner to you and other

21    individuals, is that correct, on July 16th, 2010?

22    A    Yes, that is correct.

23            MR. LaRUSSO:  I ask that this be received.

24            MR. MISKIEWICZ:  Objection, for the reasons stated

25    earlier.

1391

1          THE COURT:  Let's have a side-bar.

2          (Whereupon a side-bar conference was conducted.)

3          (Matter continued on the next page.)

1392

1       (Side-bar conference.)

2       MR. LaRUSSO:  For the Court's record, just so I can

3   complete this, there's only a few more questions after this.

4   This is the letter by Mr. Stolper, attached to which is the

5   consent that he be allowed to represent the Eufora partners as

6   well as Mr. Kaiser.  That's why I tabbed this.  He signed this

7   document indicating that he's going to allow Mr. Stolper.  And

8   all I'm going to is, not introduce this or the other document,

9   except maybe the signature page, and read to him and ask him,

10  Does that refresh your recollection?  Because this is the

11  letter he was given this is referred to specifically.  I'll

12  show the Court.

13      THE COURT:  Do you have any objection?

14      MR. HALEY:  Judge, may I just have my client take a

15  look at this?

16      THE COURT:  Yes.

17      MR. LaRUSSO:  That's the end of the examination,

18  Judge.

19      THE COURT:  Okay.

20      (Whereupon Mr. Haley returns to counsel table.)

21      (Pause in the side-bar.)

22      (Whereupon Mr. Haley returns to the side-bar.)

23      MR. LaRUSSO:  Judge, I'm only introducing this page.

24  I'm not introducing anything else.

25      THE COURT:  You want to introduce this?

1393

1      MR. LaRUSSO:  Well, in order to tie it into this.

2  That's the only reason, Judge.

3      MR. HALEY:  Thank you, Judge.  No objection.

4      THE COURT:  Again, I'm going to show Mr. LaRusso

5  some leeway here.

6      MR. LaRUSSO:  I apologize, Judge.

7      THE COURT:  I'm going to show you some leeway and

8  allow you to admit this.  So 37-A is admitted.

9      MR. LaRUSSO:  Just this one page with the signature

10  page of Mr. Kaiser.

11      THE COURT:  Establish that with him.

12      MR. LaRUSSO:  I will.

13      (Whereupon the side-bar conference was concluded.)

14      (Matter continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1      (Matter continued in Open Court.)

2      THE COURT:  37-A is admitted.

3      (So marked as Defendant's Exhibit 37-A in evidence.)

4      MR. LaRUSSO:  Your Honor, may I display it to the

5  jury?

6      THE COURT:  Yes.

7      MR. LaRUSSO:  Your Honor, 37-A.

8  Q    Mr. Kaiser, that is the e-mail from Mr. Constantine to a

9  group of individuals, including yourself, is that correct?

10 A    Yes.

11 Q    It is Phil Kenner to Michael Stolper, and there are CCs

12 to Timothy Gaarn, John Kaiser -- and that's your e-mail

13 address, correct, Mr. Kaiser?

14 A    Yes.

15 Q    -- Bryan Berard and C.R. Gentry.  It's sent Friday,

16 July 16th, 2010.  The subject matter is "Letters and

17 exhibits."  I'm going to direct you down to the middle

18 highlighted portion.  I will read that, if I may.  "Below is

19 the e-mail I just sent to the lawyers for Tommy Constantine

20 and Eufora's lender, Brent Nerguizian."  I'll spell that,

21 N-E-R-G-U-I-Z-I-A-N.  "It attaches an important letter from me

22 and the consent of members, signed by 27 people.  For ease of

23 reference, attach a list of the individuals who have signed."

24 And it's, "Michael."  And that's Michael Stolper, is that

25 correct?

KAISER-CROSS-LaRUSSO                              1395

1   A   Yes, I believe so.

2   Q   Let me show you what's been marked, only for

3   identification at this point.  Take a look at the whole

4   exhibit.  But if you would, I'm going to be directing your

5   attention to a specific page in this exhibit.  Let me direct

6   your attention to that page first.  Do you recognize that?

7   A   Yes.

8   Q   That's your signature?

9   A   Yes, it looks like it.

10  Q   As a matter of fact, your mother also signed this page as

11  well?  Do you recognize that?

12  A   No.

13  Q   You don't recognize your mother's signature?

14  A   No.  Not from this, no.

15  Q   How about Mr. Privitello?

16  A   I'm not familiar with his signature.

17  Q   You signed this on July 9th, 2010.  Is that fair?

18  A   If that's what it states.

19  Q   It's your handwriting, isn't that correct, Mr. Kaiser?

20  A   It doesn't look like I dated that.

21  Q   Somebody else put that date down there?  Is that your

22  testimony?

23  A   Yes, it doesn't look like my writing.

24  Q   But it is your signature on this particular page, is that

25  correct?

KAISER-CROSS-LaRUSSO                                    1396

1    A    I stated that that looks like my signature, yes.

2    Q    Just if you would, I'm going to ask you just to take a

3    look at the attachment to your, if I could use the phrase,

4    signature page.  I'll ask you a few questions.  I'm going to

5    take that back with me.  If you could, just take a look at it.

6    If you need more time, please take it.

7    A    Okay.

8    Q    And look at the last page.

9    A    Yes.

10   Q    We talked about an important letter and the consent of

11   members, signed by 27.  Do you see that?

12   A    Yes.

13   Q    Now take a look at the exhibit that I showed you marked

14   for identification as 37.  Do you recognize that as the letter

15   being referred to in that e-mail?

16   A    Say the question again.

17   Q    In this e-mail communication, you're being told about a

18   consent to transfer -- this is July 16th, 2010 -- signed by 27

19   people.  I'm asking you, is this the exhibit, the one that I

20   showed you for identification, 37, the letter that was

21   referred to in the consent of the members?

22            MR. MISKIEWICZ:  Objection to the consent to

23   transfer.  I don't see that in there.

24   Q    Written consent, members of the Eufora partners.

25   A    No, I'm not sure about that.

1  Q    But you are sure of the signature page, is that correct?

2  A    Like I stated, it looks like my signature.

3          MR. LaRUSSO:  Your Honor, may I ask that just the

4  signature page be received at this time?

5          MR. MISKIEWICZ:  No objection.

6          THE COURT:  Just the signature page.

7          MR. LaRUSSO:  May I have it marked separately as

8  37-B?

9          MR. HALEY:  Let me look at it.

10         Judge, I apologize.  Is this being introduced as an

11 exhibit?

12         MR. LaRUSSO:  Just that page, just the signature

13 page.

14         MR. HALEY:  No objection, Judge.

15         THE COURT:  37-B is admitted in evidence.

16         (So marked as Defendant's 37-B in evidence.)

17         MR. LaRUSSO:  Judge, with your permission, I'm going

18 to mark it as 37-B now and I'll stamp it later.

19         THE COURT:  That's fine.

20 Q    Mr. Kaiser, what you believe to be your signature is in

21 the upper right-hand corner, is that correct?

22 A    Yes.

23 Q    Where my finger is so the jury can see it.

24         Is that your signature?

25 A    I said yes.

1  Q    I'm sorry.  I did not hear you.

2        And then over here on the left-hand column, it

3  appears to be Ethel Dolores Kaiser.  You don't recognize it as

4  --

5        MR. MISKIEWICZ:  Objection.  Asked and answered.

6        THE COURT:  Show him the document.

7  Q    Is that correct, Mr. Kaiser?

8  A    That is correct.

9  Q    And the last part of your testimony before the document

10  was introduced was Mr. Privitello, and you said you're not

11  familiar with his signature, is that correct?

12  A    That's correct.

13        MR. LaRUSSO:  Your Honor, I'm just going to read

14  this portion in the record.  (Reading:)

15        "Acknowledgment.  I have read the written consent of

16  members of AZ Eufora Partners LLC dated July 8, 2010, and I am

17  familiar with its contents.  As an investor in or member of

18  Eufora LLC, I agree that my interests are aligned with the

19  interest of the members of AZ Eufora Partners I LLC.  And as

20  such, I agree with the sum and substance of the consent and

21  its resolutions.  In particular, I agree to be represented by

22  Michael Stolper and Eric Hatzinemos in accordance with the

23  terms of the consent."

24  Q    Mr. Kaiser, just a few more questions.  The other exhibit

25  I showed you, and I'll show it to you again for the last few

1    questions.  It talks about "an important letter from me and

2    the members, signed by 27 people."  Then it has a list of

3    individuals attached who have signed.  Just two more

4    questions, maybe three, maybe one.

5            Exhibit 37 for identification, would you read the

6    first paragraph.  Does that refresh your recollection?

7            MR. MISKIEWICZ:  May I approach the witness to look

8    at the document?

9            THE COURT:  Yes.

10   Q    Read it to yourself, Mr. Kaiser.

11   A    (Witness complies.)

12   Q    Do you recall receiving this letter in connection with

13   the e-mail that I just read to you, which is up here on

14   display.  I believe it was Exhibit --

15           MR. OLIVERAS:  37.

16   Q    Exhibit 37.

17           THE COURT:  37-A.

18           MR. LaRUSSO:  Actually, it was 37-B, Judge.  We had

19   another one marked 37-A.  Thank you.

20   Q    Mr. Kaiser?

21   A    Yes.

22   Q    You recognize that as the letter that was referred to in

23   the e-mail 37-B?

24   A    Yeah, it could be.

25   Q    You had a chance to read it?  Yes?

1    A     Yes.

2    Q     Does this refresh your recollection that you're being

3    told --

4              MR. MISKIEWICZ:  Objection.

5    Q     Does this refresh your recollection, at all, Mr. Kaiser,

6    with regard to being told that this group that you were part

7    of was seeking to acquire loan packaging warrants from the

8    lender of Eufora?

9              MR. MISKIEWICZ:  Objection.

10             THE COURT:  Overruled.

11   A     No.

12   Q     Does this letter refresh your recollection your lawyer,

13   Mr. Stolper, is telling you that they are looking to take over

14   the loan, of Eufora's loan?

15   A     No.

16             MR. LaRUSSO:  I have no further questions, Judge.

17             THE COURT:  Redirect.

18   REDIRECT EXAMINATION

19   BY MR. MISKIEWICZ:

20   Q     Mr. Kaiser, let's start where Mr. LaRusso left off.  Why

21   was there a lawsuit of any kind over Eufora?

22             MR. LaRUSSO:  Judge, I object.  Can we have a

23   side-bar on this?

24             THE COURT:  Come up.

25             (Whereupon a side-bar conference was conducted.)

1401

1    (Side-bar conference.)

2    MR. LaRUSSO:  This calls out a host of allegations

3    against Mr. Constantine, which is hearsay.  I am trying to

4    avoid bringing out these other allegations that appear in the

5    lawsuit that may jeopardize anyone's interest during this

6    trial.  And that's one of the reasons why we didn't offer the

7    letter.  We just offered the letter for purposes of refreshing

8    his recollection.  And that's why I didn't offer the consent

9    of the members because it lays out additional information.

10    THE COURT:  What do you want to go into?

11    MR. MISKIEWICZ:  I want to go into his understanding

12    of why there was a lawsuit.  At this juncture, no one has

13    received a share or an ownership equity interest, including

14    his mother and Mr. Privitello, who's going to testify about

15    that; he participated in the development.  And also because,

16    principally, Mr. LaRusso brought this out, the loan, if

17    anybody is trying to buy out the loan.  The problem with all

18    of this, as he's learning, is that the patent, which is the

19    only valuable asset in the company, is already pledged.  And

20    they're trying to understand.  There's this reorganization.

21    THE COURT:  I will allow him to redirect.  At that

22    level, I don't think that opens the door to these allegations

23    coming in.  You have questioned him regarding the idea that

24    he's trying to take over the company.  So he's entitled to

25    redirect at that level of generality as to what his motivation

1402

1   was, why he was in the lawsuit, not to take it over, but to do

2   the general things.

3          MR. LaRUSSO:  Judge, I have no objection.  I think

4   that's proper redirect.  But can I ask that he lead him so

5   that we don't get into --

6          MR. MISKIEWICZ:  Yes, I will.

7          MR. LaRUSSO:  Okay.  Thank you.

8          That's all.

9          THE COURT:  Okay.

10         (Whereupon the side-bar conference was concluded.)

11         (Matter continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Matter continued in Open Court.)

2    CONTINUED REDIRECT EXAMINATION

3    BY MR. MISKIEWICZ:

4    Q    At this time, the Stolper law firm was bringing a

5    lawsuit, and you were shown some documents that were

6    contemporaneously represented.  Were you and others trying to

7    understand what, if anything, would happen to your equity

8    interest, your ownership interest in that very valuable patent

9    that Eufora had?

10   A    Yes.  Mr. Constantine said it was out of his control.

11   That Mr. Volpee owned it, owned the company slash the patent

12   and everything.  And that if weren't going to sign some of the

13   leases, that we'd never see it again.  He'd sell it over in

14   Europe.

15   Q    So up through December of 2009, you or others gave money

16   to Eufora.  I think you testified to that, is that correct?

17   A    Yes, that's correct.

18   Q    Would you have given anything, a penny, to Eufora if it

19   wasn't for that patent?  If you didn't have that patent?

20   A    No.  The patent was everything.  That's what everyone was

21   investing for.

22   Q    At some point after you and your mother and other people

23   gave their money to Mr. Constantine for Eufora, did you learn

24   or did Mr. Constantine you something about what was going to

25   happen to that patent and your interest in it?

1   A    Yes.  He said it was going to be sold off.  Mr. Volpee

2   owned it.  He was going to sell it off in Europe.  And we were

3   trying to find out exactly what was going on with the shares

4   of the investors.

5   Q    You were asked by Mr. LaRusso questions about wanting to

6   take over the company.  Did you want to take over the company

7   Eufora?

8   A    No.  That's not what we wanted.  Again, we were trying to

9   find out and get answers that we weren't getting from

10  Mr. Constantine.

11  Q    By the way, what is the status of that lawsuit, if you

12  know, today?

13  A    I believe it's stayed.  It's on hold right now.

14  Q    All right.  So to this day, have you gotten any

15  documentation from Mr. Constantine where you, your mom, other

16  people's money has gone when it was invested in Eufora?

17  A    No, nothing.

18  Q    You were shown something that looked like a shopping

19  list.  Do you recall that handwritten document?

20  A    Yes.

21  Q    I believe it was Kenner-37.  I'll show you just a portion

22  of it up on the screen.  It does looks like a shopping list,

23  right, except it has numbers instead of things like eggs and

24  milk, correct?

25  A    Yes, that's correct.

1  Q    Have you ever seen anything other than this that

2  articulates your ownership interest, your mother's ownership

3  interest, anybody else's ownership interest in Eufora with

4  respect to a patent or that patent?

5           MR. HALEY:  I'd just object to the leading nature of

6  the question.

7           THE COURT:  Overruled.

8  A    I'm sorry.  Ask that again.

9  Q    With respect to your putting money in Eufora, your mom

10 and other people, have you ever seen anything, other than this

11 setting, forth your ownership interest in Eufora?

12 A    Just a similar list of what Mr. Kenner wrote up.

13 Q    And then you copied it?

14 A    Yes, that's correct.

15 Q    And this is your handwriting?

16 A    Yes.

17 Q    And Mr. Kenner told you you had how much invested, per

18 this shopping list?

19 A    Approximately $2 million.

20 Q    Mr. Constantine said what to you about this grocery list?

21 A    He said he wasn't aware of it.

22           THE COURT:  That's a superlative document that

23 you're talking about.

24           MR. HALEY:  Thank you.

25 Q    What did Mr. Constantine tell you about the document?

1   A    He stated he wasn't aware that the funds were coming from

2   me.

3   Q    Well, did he agree or did he deny that you had an

4   ownership interest of approximately however many millions you

5   were told?

6   A    No, he agreed.

7   Q    Constantine agreed?

8   A    Yes.

9   Q    To this day, how many shares do you have -- or what

10  document do you have showing that you have anything in Eufora?

11  A    I have nothing for that.

12  Q    And the money that supposedly went through Mr. Kenner

13  into Eufora for you, do you have an accounting of that money?

14  Did you get that money back?

15  A    No.

16  Q    What about your mom's money?

17  A    No.

18  Q    Very quickly.  You were asked earlier this morning by

19  Mr. LaRusso, questions harking back to last Thursday about

20  overhearing a series of telephone calls.  Do you remember

21  that?

22  A    Yes, I do.

23  Q    I think he said you overheard telephone calls that

24  Mr. Constantine placed to Greg DeVries, Jason Wooley, and I

25  think he said Berard.  Did you hear that?

1  A    They were on speakerphone.  I wasn't overhearing that.

2  Q    Okay.  Was it Berard?

3  A    Yes.

4  Q    Now, you were also asked last week a series -- withdrawn.

5        Very quickly.  You were asked, really, by both

6  Mr. Haley and Mr. LaRusso, a series of questions about some

7  notes of an interview.  I'm going to show you the notes that

8  you were shown, 3500 JK-1.

9        (Handing.)

10  Q    In that time frame, roughly October of 2010, you were

11  asked, by Mr. Haley and also Mr. LaRusso, a series of

12  questions, did you tell the FBI X, Y, and Z.  Do you remember

13  those questions?

14  A    Yes, I do.

15  Q    Mr. Haley wanted to know, did you have a conversation or

16  did you tell the FBI that you had a conversation with Ken

17  Jowdy about Ken Jowdy borrowing money from Hawaii.  Do you

18  remember that question?

19  A    Yes.

20  Q    Now, you said you don't recall or you didn't -- you never

21  see those notes?

22  A    No, I never saw the notes.

23  Q    In or about that time frame that you're talking to the

24  FBI, were you telling them about what Mr. Jowdy told you or

25  what other people were telling you about Ken Jowdy?

1   A    What Mr. Kenner was telling me about Ken Jowdy.

2   Q    So if there are notes that reflect something along the

3   lines of Ken Jowdy wanted to borrow money from Hawaii, did Ken

4   Jowdy ask you that question or were you telling the FBI what

5   you had been told?

6             MR. HALEY:  I object to the leading nature of the

7   question.  I don't know whose testifying.

8             THE COURT:  Sustained as to leading.

9   Q    Did you ever have a conversation with Ken Jowdy in which

10  he asked you for money to be borrowed from the Hawaii project?

11  A    No.

12  Q    Did somebody tell you that Kenneth Jowdy wanted to borrow

13  money?

14  A    Yes.

15  Q    Who was that?

16  A    Mr. Kenner.

17  Q    Okay.  Anybody else?

18  A    No.

19  Q    Do you even know if that is true?

20  A    I don't believe it's true.

21  Q    You were asked by Mr. LaRusso, also on those notes, a

22  series of questions about Tommy Constantine supposedly raising

23  money for the Hawaii project from a series of people.  Do you

24  remember those questions?

25  A    Yes.

1   Q    He asked you about a Donnie Rae, Nick James, Robert

2   Goudet.  Do you recall those questions?

3   A    Yes, I do.

4   Q    Now, did you personally ever know whether or not

5   Mr. Constantine did any work on the Hawaii project by way of

6   raising funds from these various people?

7   A    No, I don't that.

8   Q    Okay.  Did anybody tell you that?

9   A    Yes.

10  Q    Who told you that?

11  A    Mr. Kenner.

12  Q    When did he tell you that?

13  A    After the Hawaii closing.

14  Q    In fact, wasn't there a question about what, if any --

15  why was Mr. Constantine getting money out of the Lehman

16  closing?

17  A    Yes, that's correct.

18  Q    Who raised that?

19  A    I did, and I believe others did.

20  Q    What, if anything, did Mr. Kenner tell you about why

21  Mr. Constantine was getting money out of the Lehman closing?

22  A    He stated that he was working on raising the funds for

23  the closing.

24  Q    Did you ever see any funds that were produced by virtue

25  of Mr. Constantine supposedly doing fundraising?

1  A     No, I did not.

2  Q     Do you know the name Ken Nguyen?

3  A     Yes.

4  Q     Was there -- at some point, did you have a discussion

5  about that person with Mr. Kenner?

6  A     Yes.

7  Q     First of all, tell us what you were first told by Mr.

8  Kenner about Ken Nguyen and Tommy Constantine?

9  A     That Mr. Constantine was working with Ken Nguyen to bring

10 funding for the Hawaii project.

11 Q     And then what happened to Mr. Nguyen's money?

12 A     Mr. Nguyen, he passed away.  He died before he could

13 invest in Hawaii.

14 Q     Who told you he died?

15 A     Mr. Kenner.

16 Q     Did you do your own investigation to find out if

17 Mr. Nguyen is actually still alive?

18           MR. HALEY:  Objection.

19           THE COURT:  Sustained.

20 Q     Did there come a time that you learned anything about

21 Mr. Nguyen?

22           THE COURT:  Sustained.  It's the same question.

23 Q     Did you ever see any money produced by Mr. Nguyen?

24 A     No.

25 Q     In 2006 when the Lehman deal closed, at least the first

1  milestone of money was provided, had you even met Tommy

2  Constantine?

3  A    No.

4  Q    You were also asked a series of questions, again, I think

5  by Mr. LaRusso, about Constantine Management Group.  Do you

6  remember that?

7  A    Yes, I do.

8  Q    Did Constantine Management Group have anything to do with

9  the Hawaii project?

10  A    No.

11  Q    By the way, who controlled all of the money in the Hawaii

12  project?

13  A    Mr. Kenner.

14  Q    Who controlled all of the real estate ventures that you

15  testified about, Hermosa Beach, the PV or Paradise Valley

16  house, Sag Harbor, Hawaii?

17  A    Mr. Kenner.

18  Q    Did you have control over any of those bank account?

19  A    None.

20  Q    I'm going to show you what has been marked as Government

21  203 and 203-A and 204 and 204-A.  Take a look at that

22  document.  Have you ever seen that -- particularly referring

23  to 203-A and 204-A, have you ever seen that?

24  A    Yes.

25            (Matter continued on the next page.)

Kaiser - Redirect/Miskiewicz

1412

1   BY MR. MISKIEWICZ:

2   Q.   And did you receive -- my question now is did you

3   receive this during, at some point the Stolper lawsuit

4   that you were asked questions about from Mr. La Russo?

5   A.   Yes.  That's correct.

6        MR. MISKIEWICZ:  The government would offer

7   203-A and 204-A?

8        MR. HALEY:  No objection.

9        MR. LA RUSSO:  No objection, your Honor.

10       THE COURT:  203-A and 204-A are admitted.

11       (Government's Exhibit 203-A and 204-A in

12   evidence.)

13  Q.   Showing you 203-A and 204-A.  This is a chain of --

14  well, why don't you tell us.  What is this?

15  A.   These are text messages between Mr. Constantine and

16  Mr. Kenner, and --

17  Q.   And what is the date?

18  A.   April 24, 2008 and April -- yeah, April 24, 2008.

19  Q.   And can you tell who's in the green and who's in the

20  gray here, who is speaking?

21  A.   Mr. Kenner is speaking, I'm sending CMG 100k today.

22  Please send the extra 25k back to me.

23  Q.   So kind of have to line both of these up, correct?

24  A.   Yes.

25  Q.   So do you know where or why Mr. Kenner is sending

1413

1    Constantine Management Group $100,000 on this day April

2    24, 2009?

3              MR. HALEY:  Objection.

4              THE COURT:  Sustained.

5    Q.   Did you know that this was happening at the time,

6    this is April of 2008?

7    A.   No.  Not at the time.

8    Q.   Okay.  And would it be fair to say you had no

9    knowledge of any of the other comments on this e-mail

10   chain, correct?

11   A.   Yes, that's correct.

12   Q.   Finally, Mr. Kaiser, you were asked again by

13   Mr. La Russo about with respect to your million dollar

14   loan, do you recall that?

15   A.   Yes.

16   Q.   You said that, juxtapose with a million dollars that

17   you gave to Mr. Kenner with approximately 800 thousand, a

18   little bit more than 800,000 that you received from the

19   Lehman loan, do you recall those questions?

20   A.   Yes.

21   Q.   The question was --

22              THE COURT:  Sustained.

23              MR. MISKIEWICZ:  I'm sorry.

24   Q.   Did you ever get that million dollars back?

25   A.   No.

1414

1  Q.    The $800,000 -- what did you get -- why did you get

2  approximately $800,000 from Lehman closing funds?

3  A.    I had another loan that went in in there just prior

4  to closing, I had expenses, and I also had back pay.

5  Q.    Back pay?

6  A.    Yeah, for working for those years.

7  Q.    What were you doing during those years?  What was

8  your annual salary for the years that you were working on

9  the project?

10 A.    It was approximately $45,000 a year.

11 Q.    And what were you doing for that money?

12 A.    Again, I was doing the due diligence on it, I was

13 laying out the locks, planning.

14 Q.    And your expense, did you have to fly?

15 A.    Yes.

16 Q.    To Hawaii?

17 A.    Back and forth, pay for prints, anything that was

18 laid out in the early years.

19 Q.    So that million dollar loan that you testified about

20 and the 800,000 that got out of the Lehman closing, are

21 they one and the same are or they two different things?

22 A.    No, they're two different things.

23 Q.    You testified you never got your million dollars back

24 ever.  What about the money from, you said that you --

25 withdrawn.

Kaiser - Recross/Haley

1415

1    As you sit here today, Mr. Kaiser, you have an

2    estimate of how much money you have either gained or lost

3    as a result of the various transactions and real estate

4    deals that you did with Mr. Kenner and/or Constantine?

5    MR. HALEY:  Object, your Honor.

6    THE COURT:  Yes.  Sustained.

7    Q.   Well, are you only $300,000 in debt as a result of

8    the various deals?

9    MR. HALEY:  Objection.

10   THE COURT:  Sustained.  I think we've gone

11   through this.

12   MR. MISKIEWICZ:  No further questions.

13   THE COURT:  Any recross, Mr. Haley?

14   MR. HALEY:  Briefly, Judge.

15

16   RECROSS-EXAMINATION

17   BY MR. HALEY:

18   Q.   Mr. Kaiser, Mr. Miskiewicz asked you a series of

19   questions about reimbursement for expenses at the Hawaii

20   project.  Do you recall that question?

21   A.   Yes.

22   Q.   He asked you a question about payment of wages as a

23   result of your efforts with respect to the Hawaii project.

24   Do you recall that question?

25   A.   Yes.

Kaiser - Recross/Haley

1416

1   Q.   Sir, during the course of the Hawaii project, are you

2   aware that Mr. Kenner as well, incurred significant

3   expenses?

4   A.   I don't know what Mr. Kenner's expenses were.

5   Q.   Well, did Mr. Kenner fly from the east coast to

6   Hawaii back and forth on any number of occasions, to your

7   knowledge?

8   A.   Yes.

9   Q.   To your knowledge, did Mr. Kenner take a salary with

10  reference to his efforts as pertains to the Hawaii

11  project?

12  A.   Yes, I believe he did.

13  Q.   Do you know if there was an instance where Mr. Kenner

14  sought reimbursement for salary owed to him as a result of

15  the Hawaii project?

16  A.   I believe so.

17  Q.   Now, do you still have Kenner Exhibit 43 in front of

18  you, the notes that were given to you by Mr. Miskiewicz?

19  A.   Yes.

20  Q.   You have that in front of you, is that correct, sir?

21  A.   Yes.

22  Q.   Did Mr. Kenner tell you when you spoke with the FBI

23  on October 19, 2010 that you should tell the FBI that you

24  met Jowdy twice in New York City?  Did he tell you to say

25  that?

1417

1    MR. MISKIEWICZ:  Objection to form.

2    THE COURT:  Yes.  Sustained.

3  Q.    Well, sir, is it not true that you met Ken Jowdy at a

4  restaurant called Trust, T-R-U-S-T, in New York City in or

5  about the year 2003?

6  A.    Yes, something like, probably around 2003.

7  Q.    And is it not true that after that first meeting, at

8  Trust in 2003 involving yourself and Ken Jowdy, that you

9  met him another time at a bar in New York City where you

10  discussed Hawaii and lending the money from Hawaii to

11  Mexico; isn't that true?

12  A.    No.  What is true, I did see him at a bar, I believe

13  it was in 2004.

14  Q.    So we can agree that you met Ken Jowdy twice in New

15  York City, right?

16  A.    Yes.

17  Q.    And Phil Kenner did tell you that you must tell the

18  FBI that you met Ken Jowdy twice New York City?

19    MR. MISKIEWICZ:  Objection.

20    THE COURT:  Sustained.

21  Q.    Did you ever meet Ken Jowdy in Mexico, sir?

22  A.    Yes.

23  Q.    Do you recall whether or not on October 19, 2010 you

24  told the FBI that you met Ken Jowdy in Mexico?

25    MR. MISKIEWICZ:  Objection.  Asked and answered.

Kaiser - Recross/Haley

1418

1    THE COURT:  Yes.  I think you went through that.

2    Q.  Did you ever discuss with Special Agent Galioto the

3    loan between Hawaii, or the Hawaii project and Ken Jowdy,

4    yes or no?

5         MR. MISKIEWICZ:  Objection.

6         THE COURT:  I'll let him answer that.  Go ahead.

7    A.  State the question again.

8    Q.  Sure.  Did you ever discuss with Special Agent

9    Galioto a loan from the Hawaii project to Ken Jowdy, yes

10   or no?

11   A.  Yes, I believe Mr. -- I told --

12   Q.  The question is yes or no?

13   A.  I believe that I did.

14   Q.  Would you finally take a look at Kenner exhibit 37,

15   these are your handwritten notes.  Do you recall that

16   document?

17   A.  Yes.

18   Q.  In the bottom right hand corner of the document, do

19   you know what these figures represent?  Yes or no?

20   A.  No.

21   Q.  That's your handwriting, correct?

22   A.  That's correct.

23   Q.  When you wrote those figures on that document, did

24   you have any discussion with Phil Kenner as to what those

25   figures represented, yes or no?

1419

1    A.    No.

2          MR. HALEY:  May I have a moment, Judge.

3    Q.    Sir, finally, with reference again to Kenner exhibit

4    37, this is your handwriting where you say Hawaii; is that

5    correct?

6    A.    Yes.

7    Q.    You testified that these notes were generated from

8    notes you copied from Phil Kenner; is that correct?

9    A.    Exactly, they looked just like that.

10   Q.    Do you know if Phil Kenner's notes has the words

11   Hawaii on it, yes or no?

12   A.    I don't know.

13         MR. HALEY:  Thank you.

14         THE COURT:  Okay.  Mr. La Russo.

15

16   RECROSS-EXAMINATION

17   BY MR. LA RUSSO:

18   Q.    Mr. Kaiser, you testified on redirect that

19   Mr. Constantine agreed that he owed you 20 percent

20   interest in Eufora; is that correct?

21   A.    Yes.

22   Q.    Isn't it a fact that Mr. Constantine did --

23   vehemently disagreed with your position that you were owed

24   20 percent?  Do you remember that?

25   A.    No.  He actually said that, like I testified, that he

Kaiser - Recross/La Russo

1420

1    feels I'm owed more than that.

2    Q.   Let me ask you, I believe sometime last week you were

3    shown for identification Defendant's Exhibit C-70 and you

4    received it as an e-mail that you received from

5    Mr. Constantine on June 3, 2010, do you remember that?

6    A.   Yes.

7    Q.   And would it be fair to say on June 3, 2010 you're

8    actually writing an e-mail to Mr. Constantine reiterating

9    your position that you're owed 20 percent; is that

10   correct?

11   A.   That's correct.

12              MR. LA RUSSO:  Your Honor, I ask that this

13   e-mail be received.  We've redacted portion, it's C-70-A

14              MR. MISKIEWICZ:  Objection.

15              THE COURT:  Let me see it.

16              (Continued on next page.)

17

18

19

20

21

22

23

24

25

Kaiser - Recross/La Russo

1421

1    (Whereupon, the following occurred at sidebar.)

2    (Document handed to the Court.)

3    THE COURT:  We've already discussed this one.

4    MR. LA RUSSO:  Judge, he just testified that

5    Mr. Constantine agreed with him that he was owed 20

6    percent or more, this is directly with regards exactly

7    what he just testified to.

8    THE COURT:  Okay.  I'll allow you to read the

9    portion of the e-mail that relates to that.  We're not

10   introducing the whole document.

11   MR. LA RUSSO:  It's the first paragraph, judge.

12   MR. MISKIEWICZ:  Your Honor, that's

13   Mr. Constantine speaking.

14   THE COURT:  I know, but he testified

15   Mr. Constantine agreed.  If he wants to impeach him from a

16   portion of the e-mail with Mr. Constantine suggested that

17   he doesn't know how you do that.

18   MR. MISKIEWICZ:  I guess the record stands on

19   its own.  I specifically recall that he said exactly the

20   same thing last week, that Mr. Constantine said that he

21   thought that he was owed more than that.  And then the

22   story changes.  So it's Mr. Constantine's story changes,

23   and not this witness.

24   THE COURT:  I don't remember the witness

25   testifying to that.

Kaiser - Recross/La Russo

1422

1    MR. MISKIEWICZ:  I thought he said a moment ago

2  that Mr. Constantine did agree him that he didn't know how

3  much he owed to Eufora and probably owed more than 20

4  percent.  The story changes, that's the problem.  It's

5  Mr. Constantine's story, so it's hearsay.

6    THE COURT:  I know, but this hasn't come out, so

7  I want to correct the record without getting into the

8  whole details of the e-mail, at least in June of 2010

9  Mr. Constantine is no longer claiming that he's entitled

10  to 20 percent.

11    MR. MISKIEWICZ:  I would just ask if he can just

12  lead him through that.

13    MR. LA RUSSO:  I can read the first paragraph.

14    THE COURT:  No.  Why don't you ask him does this

15  e-mail from Mr. Constantine indicate in 2010

16  Mr. Constantine was not taking the position that you were

17  owed 20 percent?  If he denies that, then we'll worry

18  about reading the portion of the e-mail into the record.

19  I don't think that he's going to deny that.  All right.

20    MR. LA RUSSO:  All right.

21    (Continued on next page.)

22

23

24

25

Kaiser - Recross/La Russo

1423

1    (Whereupon, the following occurred in open
2    court.)
3    BY MR. LA RUSSO:
4    Q.    Mr. Kaiser, just a couple of questions.  This e-mail
5    that you identified as occurring on request June 3, 2010
6    you wrote yours early in the morning around 6:42; is that
7    correct?
8    A.    Looks like it.
9    Q.    And you're getting a reply just under two hours later
10   from Mr. Constantine on June 3, 2010 at 8:37 a.m.; is that
11   correct?
12   A.    That's correct.
13   Q.    Would you agree with me Mr. Kaiser that
14   Mr. Constantine is disagreeing about you in regards to the
15   20 percent that you claim that you are owed in his reply
16   to you, this is on June 3, 2010?
17   A.    No.
18   Q.    Yes or no?
19   A.    No.
20   Q.    Mr. Kaiser?
21   A.    No.
22         MR. LA RUSSO:  Your Honor, I renew my
23   application.
24         THE COURT:  Why don't you come up.
25         (Continued on next page.)

Kaiser - Recross/La Russo

1424

1           (Whereupon, the following occurred at sidebar.)

2           THE COURT:  You can read into the record

3    starting here where he says you can't send an e-mail like

4    this telling me that you've sent e-mails and you're

5    entitled to 20 percent.  From here to here.

6           MR. LA RUSSO:  I'll just make sure I understand

7    you.  I see it right there.

8           THE COURT:  You can read that, too.

9           MR. LA RUSSO:  Thank you, Judge.

10           (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kaiser - Recross/La Russo

1425

1    (Whereupon, the following occurred in open

2    court.)

3    BY MR. LA RUSSO:

4    Q.   Mr. Kaiser, in reply to your request or reply to your

5    earlier e-mail about the 20 percent, didn't

6    Mr. Constantine respond to you, you can't send me an

7    e-mail like this, telling me that you sent me millions and

8    you're entitled to 20 percent company with less than all

9    the facts.  If you want to do this now versus as part of

10   the reorganization, and you want to do it via e-mail as

11   opposed to man to man, you really need to get all your

12   facts straight first, which I suspect will be very

13   frustrating for both of us and probably counterproductive.

14   The reason that I say that is because you know as well as

15   anyone that there's a lot of moving parts.

16        Is that the reply, yes or no, that

17   Mr. Constantine gave to your e-mail?

18   A.   Yes.

19        MR. LA RUSSO:  No further questions, your Honor.

20        THE COURT:  Okay.  You can step down,

21   Mr. Kaiser.  Thank you.  Why don't we go another 15

22   minutes before the break.  The government will call its

23   next witness.

24        MS. KOMATIREDDY:  Yes, your Honor.  The

25   government calls Nick Privitello.

1426

1    THE COURT:  Mr. Privitello, if you can come up

2  to the witness stand and remain standing for the oath.

3

4  **NICHOLAS PRIVITELLO**,

5                 called as a witness, having been first

6                 duly sworn, was examined and testified

7                 as follows:

8    THE COURT:  Please state your name and spell it

9  for the record.

10    THE WITNESS:  Nicholas Privitello,

11  N-I-C-H-O-L-A-S P-R-I-V-I-T-E-L-L-O.

12    THE COURT:  If you can just stay close to the

13  mike and keep your voice up, Mr. Privitello, that would be

14  helpful.

15    Go ahead.

16

17  DIRECT EXAMINATION

18  BY MS. KOMATIREDDY:

19  Q.   Good morning, Mr. Privitello.  Where do you live?

20  A.   Northport, New York.

21  Q.   Is that here in Long Island?

22  A.   Yes.

23  Q.   How long have you lived in Long Island?

24  A.   My whole life.

25  Q.   Whole life.  What do you do for a living?

Privitello - Direct/Komatireddy

1427

1   A.   Electrician.

2   Q.   And how long have you been an electrician?

3   A.   About 25 years.

4   Q.   What was your first job as an electrician?  Who did

5   you work for?

6   A.   Family.

7   Q.   When you say family, who specifically?

8   A.   My father.

9   Q.   How long did you work for your father?

10  A.   Good question, probably about seven years.

11  Q.   Do you still work for your father?

12  A.   No.

13  Q.   Where do you work now?

14  A.   For myself.

15  Q.   So you have your own business?

16  A.   Correct.

17  Q.   When did you split off and create your own business?

18  A.   I guess about, actually it was about 25 years ago

19  that I had my own business and maybe 23, somewhere around

20  there, and then prior to that seven years I worked for my

21  father.

22  Q.   How did you learn to become an electrician?

23  A.   Schooling, on the job with family.

24  Q.   And how did you get to the point where you were able

25  to own your own business?

Privitello - Direct/Komatireddy

1428

1   A.   Just you know learning the trade and having some

2   contacts, being on the island so long and I figured it's a

3   good time to start my own business.

4   Q.   Did there come a time when you met an individual

5   named Phil Kenner?

6   A.   Yes.

7   Q.   Can you recognize that person if you saw him today?

8   A.   Yes.

9   Q.   Take a look around the courtroom and see if you

10  recognize anyone?

11  A.   In the blue shirt or striped shirt.

12       MS. KOMATIREDDY:  May the record reflect the

13  witness has identified the defendant Kenner.

14       MR. HALEY:  The witness has identified the

15  defendant Kenner.

16       THE COURT:  Yes.

17  Q.   Can you describe the circumstances you met with Phil

18  Kenner?

19  A.   We did some work on his home in Arizona.

20  Q.   As you got to know Mr. Kenner, what did he tell you

21  about himself?

22  A.   He had all sorts of investments, he had sports

23  celebrities investing with him and a lot of big names that

24  were investing with him.

25  Q.   When you say sports celebrity, was he specific about

1   any sort of sport?

2   A.    Hockey.

3   Q.    Did he tell you any stories or invite you to

4   anything?

5   A.    Yeah, I'm sure he told me some stories, I'm not sure

6   that I can recall them now, but stories.

7   Q.    Does a story about a cabana ring a bell?

8   A.    Yes.  Yeah.  After working on this place one night,

9   one of the guys with -- dinner and had some drinks and he

10  mentioned I think in Vegas there is this club or something

11  cost 25,000 to get in.

12          MR. HALEY:  I'm going to object at this point.

13  I'd ask for an offer of proof, Judge.

14          THE COURT:  No.  I'll allow it as background to

15  how the relationship developed.  Briefly.  I assume it's

16  not going to be too long.  Go ahead.

17  A.    He mentioned it was worth every nickel, getting into

18  this Vegas club, kind of like this crazy pool party and

19  you have your own little cabana and he mentioned it's

20  worth every nickel and to somebody like myself, it's just

21  a long way, to me it could be worth every nickel because I

22  don't have the money to spend on that.  I figured he could

23  be making it if he can drop 25 grand on party for the

24  afternoon.

25  Q.    Now, did there come a time that you talked to

1430

1    Mr. Kenner about a company called Eufora?

2    A.    Yes.

3    Q.    Approximately when was that?

4    A.    When I actually spoke to him about it, it was late

5    '09 I heard bits and piece from John Kaiser, Phil, some

6    guys that were probably around at the time, I can't recall

7    names or anything like that.  They knew a lot about it, I

8    assume it was a credit card company, kind of just heard

9    it, didn't really talk to anybody about it.

10   Q.    You said in late 2009 you talked to Mr. Kenner about

11   Eufora.  What did he tell you about Eufora?

12   A.    Had patents, sort of like -- he had patents where you

13   could build your credit, they had a way of building your

14   credit as start a career builder, and other patents that

15   other companies were using ideas like that with patents,

16   it should become very profitable very soon.

17   Q.    Did he tell you anything about the business model?

18   A.    Yeah.  He did.

19   Q.    Can you recall what that was?

20   A.    They -- people with bad credit, for people with bad

21   credit and they would, you almost have like a secured

22   credit card, I may not be explaining this exactly the way

23   it was presented to me.  The big thing to them is they

24   reported to two of the big credit bureaus, total of three,

25   and they were looking to sign up the third one shortly.

1431

1    And that was the main thing and it has a career builder

2    especially at that time a lot of people were in trouble,

3    it looked like an excellent model, still does.

4    Q.    You mentioned that they had a deal they were going to

5    sign up a third?

6    A.    Metabank.

7    Q.    Tell me what Mr. Kenner told you about Metabank?

8    A.    I'm not sure what the exact details he told me, just

9    that it was a big bank, heavy hitter that does a lot of

10   business and would bring quite a bit of revenue into

11   Eufora.

12   Q.    What did he tell you, did he explain anything to you

13   about how Metabank would work with Eufora?

14   A.    I don't recall exactly, but it was some, they

15   would -- licensing probably, you know, it was the main

16   thing.  I'm sure there were some other ways, too, but I'm

17   sure licensing.

18   Q.    Licensing from the credit card?

19   A.    Yeah, since they had the patents.

20   Q.    What did all of this information that Mr. Kenner told

21   you play in your decision about whether or not to invest?

22   A.    I figured this guy was a successful guy and that was

23   valuable, his verification.

24   Q.    What, if anything, did Mr. Kenner tell you about the

25   people behind the company?

1432

1    A.    Mainly Tommy Constantine.

2    Q.    What did he tell you about Mr. Constantine?

3    A.    He's a founder, is going to -- got the patents,

4    that's what I understood.

5    Q.    Did there come a time when you spoke with

6    Mr. Constantine directly?

7    A.    Yes.

8    Q.    And what did Mr. Constantine -- first of all when you

9    spoke Mr. Constantine directly, what format were you

10   speaking to him?  On the phone, e-mail?

11   A.    It started out on the phone and I don't know when the

12   first e-mail was, but they were very close to one another.

13   I'm note sure which was first.

14   Q.    In those conversations, what did Mr. Constantine tell

15   you about himself?

16   A.    That he was the founder of this company, he raced for

17   Playboy racing, and just had the companies, you know, he

18   was validating also what Phil already told me.

19   Q.    What did he tell you about the company Eufora?

20   A.    Met with Metabank, he met with a total of three banks

21   that he was just about to sign with, I think one was ready

22   to be inked any day, like that day or in two days.  It was

23   very, very close.  And two other big banks that I can't

24   recall.

25   Q.    Now, did that conversation with Mr. Constantine

Privitello - Direct/Komatireddy

1433

1    result in any kind of proposal for you to invest in

2    Eufora?

3    A.    Yes.

4    Q.    Who proposed the investment?

5    A.    Mr. Constantine.

6    Q.    And what did Mr. Constantine propose?

7    A.    200,000 for 1.5 percent.

8    Q.    Who would be giving the 200,000 and who would be

9    getting the 1.5 percent?

10   A.    I would be getting 200,000 and I would be receiving

11   1.5 percent of Eufora.

12   Q.    What did Mr. Constantine tell you how your money, the

13   $200,000 would be used?

14   A.    I guess for operations I guess in a responsible

15   manner for Eufora.

16   Q.    Now, let's just step back for a minute.  You

17   testified that you're an electrician.  Where were you

18   getting the money to make this investment?

19   A.    Years of hard work, and savings, and being

20   conservative on not blowing my parties on cabana parties.

21         MR. HALEY:  I object.

22         THE COURT:  Sustained.  The jury will disregard

23   the last portion of the answer.

24         MR. HALEY:  Thank you.

25   Q.    Up until that point in 2009 had you invested in any

Privitello - Direct/Komatireddy

1434

1    startup companies or small companies?

2    A.    Start up companies?  No.

3    Q.    What kind of investments had you made up until that

4    point?

5    A.    Mutual funds, some like blue chip stocks, things of

6    that nature.  There was another thing.

7    Q.    Let me lead you through that.  Blue chip stocks,

8    mutual funds and maybe some real estate?

9    A.    Yes.

10   Q.    Why were you now interested in investing in a company

11   like Eufora?

12   A.    Well, it seemed like an excellent company,

13   everything, I did some due diligence on it, the patents

14   were real, looked to me as far as I can go it looked real,

15   that was when my wife went back after maternity leave and

16   it's tough, when your wife comes back,  it's a big deal, I

17   think, for anybody.  So it looked like an investment that

18   would afford her to stay home.

19   Q.    You mentioned the patents several times.  In your

20   conversations with Mr. Kenner and Mr. Constantine at the

21   time that you invested in Eufora, did they ever tell you

22   anything about the patents being held as collateral --

23   A.    No way.

24   Q.    (Continuing) -- for a loan?

25   A.    No, none whatsoever.

1435

1   Q.   Would that be important to you in deciding whether to

2   invest?

3   A.   Exactly.

4   Q.   Why?

5   A.   It's collateral.

6   Q.   So let's focus own the actual investment.  Tell us

7   about how you made the investment, physically what

8   happened?

9   A.   At Mr. Constantine's direction he wanted me to wire

10  $200,000 to Ron Richards' account, which is an attorney

11  and I don't know where he was, maybe in California.  And

12  that's what I did.  And actually there was some back and

13  forth.  First there was certified check, then it was that,

14  it was some back and forth, but at the end of the day it

15  went to Ron Richards' account.

16  Q.   You say there was some back and forth during this

17  time.  Were you communicating with Mr. Constantine?

18  A.   Yeah, e-mail and phone calls.

19          MS. KOMATIREDDY:  Your Honor, this would be a

20  good moment for the break.

21          THE COURT:  Why don't we take the morning break.

22  Don't discuss the case.

23          (Whereupon, the jury retired from the

24  courtroom.)

25          (Recess taken at this point.)

Privitello - Direct/Komatireddy

1436

1     (After recess.)

2     THE COURT:  Please be seated.  All right.  We'll

3  bring the jury in.

4     Mr. Privitello, if you can pull the mike a

5  little closer to you.  That's good, thanks.

6     THE CLERK:  All rise.

7     (Whereupon, the jury entered the courtroom.)

8     THE COURT:  Be seated.  Okay, Ms. Komatireddy.

9  Go ahead.

10  Q.   Before the break, Mr. Privitello, you were saying

11  that at the time that you were make your investment you

12  were in communication with Mr. Constantine via phone and

13  e-mail, correct?

14  A.   Yes.

15  Q.   I'm going to happened you what's been marked as

16  Government's Exhibit 208.1 and 208.11.  Would you look

17  through this.  (Handing.)

18     Have you had a chance to look through that

19  before you came in to court today?

20  A.   Yes.

21  Q.   What are they?

22  A.   Some of the e-mails between Mr. Constantine and

23  myself.

24  Q.   Approximately when is the timeframe in which this

25  e-mail conversation takes place?  Right around the time,

Privitello - Direct/Komatireddy

1437

1    before or after you decided to invest in Eufora?

2    A.    Correct.

3    Q.    Where are you physically when this conversation is

4    happening?

5    A.    I know some of them were in the bank parking lot.

6    Q.    The bank parking lot, can you explain that a little

7    bit?

8    A.    Yeah, there's a sense of urgency that had to get done

9    right away, even in these e-mail -- it says I've scrambled

10   around, get didn't exactly have 200,000 liquid so I was

11   trying to come up with the money that I needed to send.

12   Q.    Each of the exhibits before you, 208.1 through

13   208.11, are those true and accurate copies of e-mail

14   communications that you had between you and

15   Mr. Constantine?

16   A.    Yes.

17          MS. KOMATIREDDY:   The government moves 208.1

18   through 208.11 into evidence.

19          MR. HALEY:   No objection.

20          MR. LA RUSSO:   One moment, your Honor, please.

21          MR. LA RUSSO:   Just a few questions if I may,

22   your Honor.

23          THE COURT:   Yes.

24

25

1438

1    VOIR DIRE EXAMINATION

2    BY MR. LA RUSSO:

3    Q.   Mr. Privitello, these aren't all the e-mails that you

4    and Mr. Constantine exchanged; is that correct?

5    A.   I believe they are, there might be a straggler, but I

6    believe this is it.

7    Q.   Assuming that, assuming they were in order, I haven't

8    had a chance to look through each one of those, but it

9    starts December 3rd, 2009 at 4:57 through December 7th,

10   2009 at 1:59; is that correct?

11   A.   Yes.

12   Q.   To your recollection, are there any more than these?

13   A.   I don't recall

14   Q.   These e-mail communications that you've identified do

15   they contain just solely information between you and

16   Mr. Constantine?

17   A.   No, John Kaiser is in there as well.

18   Q.   When you say John Kaiser is in there, what do you

19   mean?

20   A.   He's in.  E-mails.

21   Q.   Is he in the e-mails as the CC or is he in the

22   e-mails as actually participating in the conversations?

23   A.   The forward, there might be a cc, I'd have to really

24   go through one by one.

25   Q.   Just for the record, in regards to these e-mails,

Privitello - Voir Dire/La Russo

1439

1  you're in communication with Mr. Kaiser at the same time

2  you're speaking to Mr. Constantine?

3  A.    Collect.

4  Q.    And is he likewise communicating information to you

5  regarding the Eufora investments that are the subject of

6  these e-mails?

7          MS. KOMATIREDDY:  Objection, your Honor, scope.

8          THE COURT:  You can answer.

9  A.    Can you repeat it again.

10  Q.    Is Mr. Kaiser forwarding information to you regarding

11  Eufora investments in here?

12  A.    Yes.

13  Q.    And how often does Mr. Kaiser involved in your e-mail

14  communications regarding these Eufora investments, if you

15  remember?

16  A.    I don't remember.

17  Q.    He was involved, correct?

18  A.    Yes.

19  Q.    Did CC him on these e-mails when you spoke with

20  Mr. Constantine?

21  A.    I don't recall.  It's here.  I'd have to go through

22  each one.

23  Q.    Would it be fair to say that you're relying upon

24  Mr. Kaiser at this point for a lot of the information that

25  you're getting, Mr. Privitello?

Privitello - Voir Dire/La Russo

1440

1   A.   No.

2        MR. LA RUSSO:  Your Honor, in regards just to

3   the e-mails, I have no objection to the e-mails.

4        THE COURT:  Okay.  So 208.1 through 208.11 are

5   admitted.

6        (Government's Exhibits 208.1 through 208,11 in

7   evidence.)

8        MS. KOMATIREDDY:  Thank you, your Honor.

9

10  DIRECT EXAMINATION (Continued.)

11  BY MS. KOMATIREDDY:

12  Q.   Turning to 208.1 let's start with the beginning of

13  this chain,  I want to turn your attention actually to

14  what's at the bottom.  You see that, there's an e-mail

15  from Mr. Constantine and Mr. Kaiser; is that correct?

16  A.   208.1?

17  Q.   And 208.1, December 3, 2009, 4:37 p.m.  Do you see

18  that?

19  A.   Yes.

20  Q.   The subject line?

21  A.   Confirmation of transfer of membership interest.

22       MS. KOMATIREDDY:  I'm going to read in for the

23  record, your Honor.

24       THE COURT:  Thank you.

25       MS. KOMATIREDDY:  John, per our conversation

Privitello - Voir Dire/La Russo

1441

1   please accept this e-mail as confirmation that upon

2   receipt of $200,000, Eufora's members will formally

3   execute a membership transfer consent form and amend the

4   company's operating agreement to reflect a 1.5 percent

5   interest in Eufora LLC which shall be held by Nicholas L.

6   Privitello, and then it gives your address and phone

7   number.

8   A.   Correct.

9   Q.   Signed sincerely Tommy Constantine?

10  A.   Correct.

11  Q.   At the top of 208.1 does that appear to be a forward

12  from Mr. Kaiser to you?

13  A.   I believe so.

14  Q.   How do you know Mr. Kaiser?

15  A.   Worked on some projects together, friends with him

16  for I'd say approximately ten years.

17  Q.   And how, if at all, was he involved in this

18  transaction in terms of your investment in Eufora?

19  A.   Well, he knew that I was stressing out about my wife

20  going back to work.

21             MR. LA RUSSO:  Objection, your Honor.

22             THE COURT:  Yes, sustained as to what someone

23  else knew.  Don't speculate as to what someone else knew.

24  Describe the conversation.

25  A.   I stressed to John Kaiser about that I was stressing

Privitello - Voir Dire/La Russo

1442

1  out about my wife going back to work and would love for

2  her to stay home.  After communicating back and forth with

3  him, he said I don't know if you ever heard of the company

4  Eufora, I said sure, he said there might be a good

5  opportunity, if you'd like I can put you in contact with

6  Mr. Constantine.

7  Q.   Earlier you described that you had conversations with

8  both Mr. Kenner and Mr. Constantine about investing in

9  Eufora; is that correct?

10 A.   Correct.

11 Q.   Was that after you had talked to Mr. Kaiser?

12 A.   Yeah, I think he introduced Kenner to me.

13 Q.   I'm going to show you 208.2.  December 4, 2009, is

14 that you writing to Tommy Constantine?

15 A.   Yes.

16 Q.   Is there anyone cc'd on that e-mail?

17 A.   I don't see a cc.

18 Q.   Can you read what you write to Mr. Constantine?

19 A.   I will wire 150,000 to the below account and will

20 overnight a check for 50,000 to obtain a 1.5 percent

21 interest in Eufora as described below.  Please let me know

22 the address to overnight the check.

23 Q.   When you reference to the below account, what account

24 are you referencing?

25 A.   Ron Richards account, law offices of.

Privitello - Voir Dire/La Russo

1443

1    Q.    That's the account highlighted in yellow at the

2    bottom of that e-mail?

3    A.    Correct.

4    Q.    When you say it had was to obtain a 1.5 percent

5    interest in Eufora as described below, what description

6    are you referencing?

7    A.    The -- what he sent to John, you know, per our

8    conversation.

9    Q.    When you say he, what Mr. Constantine sent to John?

10   A.    Yes.

11   Q.    Turning to 208.3?

12             MR. LA RUSSO:   Your Honor, may I have a brief

13   sidebar not related to this?

14             THE COURT:   Yes.

15             (Continued on next page.)

Privitello - Voir Dire/La Russo

1444

1    (Whereupon, the following occurred at sidebar.)

2    MR. LA RUSSO:  I just got a call from my sister.

3 My mother not doing well.  She's been sick, I don't know

4 what the situation.  She's 97, these had some problems

5 over the last couple of weeks.  I've been in touch with

6 her every day, she sounded good to me.  It bothers me a

7 little bit.

8    THE COURT:  Do you need to make a call right

9 now?

10    MR. LA RUSSO:  I'd feel better if I could make

11 the call now.

12    THE COURT:  We'll that a short recess.

13    (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Privitello - Voir Dire/La Russo

1445

```
1            (Whereupon, the following occurred in open
2    court.)
3            THE COURT:  We'll take a short break.  Don't
4    discuss the case.
5            (Whereupon, the jury retired from the
6    courtroom.)
7            THE COURT:  Okay, everyone can be seated.  We'll
8    take a break, okay.
9            (Recess taken at this point.)
10           (After recess.)
11           THE COURT:  Please be seated.  Did you get more
12   information, Mr. La Russo?
13           MR. LA RUSSO:  Yes.  It may be serious.  My
14   sister is outside of Salt Lake City.  She's going down.
15   What I would suggest to the Court we can continue up to
16   the lunch break and I'll be able to get more information.
17           THE COURT:  I'm sorry to hear about the whole
18   situation.  But are you okay to go to lunch?
19           MR. LA RUSSO:  Absolutely.  Absolutely.
20           THE COURT:  Okay.  Let's bring Mr. Privitello
21   back in.
22           (Witness enters the courtroom.)
23           (Whereupon, the jury entered the courtroom.)
24           THE COURT:  Okay, please be seated.  Go ahead.
25           MS. KOMATIREDDY:  Thank you, Judge.
```

Privitello - Voir Dire/La Russo

1446

1    Q.    Mr. Privitello, we're on 208.2, December 4, 2009, you
2    state that you will wire $150,000 to the below account and
3    overnight a check for $50,000, it goes on, to obtain a 1.5
4    interest in Eufora as described below, referencing
5    Mr. Constantine's representation that you would get a 1.5
6    percent interest in Eufora, correct?
7    A.    Correct.
8    Q.    Let's move on to 208.3.  After your e-mail, is that
9    your previous e-mail right there, in the middle of 208.3?
10   A.    Yes.
11   Q.    Mr. Privitello, it would help you to look at the
12   screen behind you as well.
13   A.    Yes.
14   Q.    Whatever is easier.  Does Mr. Constantine respond to
15   your e-mail?
16   A.    Yes.  But through --
17   Q.    Let's go one step at a time.  How does he respond to
18   this e-mail?
19   A.    Through John Kaiser.
20   Q.    I'm sorry?
21   A.    Looks like through, we're on 208.3.
22   Q.    208.3, who is the e-mail from?
23   A.    It's from me.
24   Q.    I see what you're saying.  All right.  Let's go to
25   the top of 208.3.  Who is that e-mail from?

Privitello - Voir Dire/La Russo

1447

1   A.   That's from Tommy Constantine, yes.

2   Q.   And who is that e-mail to?

3   A.   Me.

4   Q.   And is Mr. Kaiser cc'd on that e-mail?

5   A.   I don't see it.

6   Q.   In that e-mail that Mr. Constantine sends to you with

7   Eufora LLC and the address, that's in response to your

8   question please let me know the address to overnight the

9   check?

10  A.   Yes.

11  Q.   And then he says, thanks, Nick, I look forward to

12  meeting you and working with you.  Correct?

13  A.   Correct.

14  Q.   Signed Tommy Constantine, correct?

15  A.   Correct.

16  Q.   Let's move on to 208.4.  Directing the jury's

17  attention to the bottom of the first page of 208.4, to the

18  previous e-mail.  On the top you write back to

19  Mr. Constantine, correct?

20  A.   Yes.

21  Q.   And you write:  Tommy, change of plans, I missed the

22  wire deadline, 2:30 in my bank, so I can overnight checks

23  totalling $200,000 to obtain a 1.5 interest in Eufora as

24  described below.  I can get the checks there tomorrow.

25  Will someone be there to accept them at -- and then you

Privitello - Voir Dire/La Russo

1448

1  copy in the address that he had previously given to you,

2  correct?

3  A.   Correct.

4  Q.   And then he says -- and then you say is that correct,

5  thanks, Nick.

6        Right?

7  A.   Yes.

8  Q.   It says that you missed the wire deadline.  Were you

9  in a hurry?

10  A.   Yes.  Absolutely.

11  Q.   Why were you in a hurry?

12  A.   As per Tommy it was urgent that I got the money like

13  the next day, that day.

14  Q.   Did Tommy explain to you why it was urgent?

15  A.   I don't recall.

16  Q.   Moving to 208.5.  You then write Mr. Constantine

17  another e-mail, correct?

18  A.   Yes.

19  Q.   You say Tommy, one more thing, do you want me to make

20  the check payable to Eufora LLC?

21        Correct?

22  A.   Yes.

23  Q.   Moving to 208.6.  Mr. Constantine then responds to

24  your question, correct?

25  A.   Yes.

1449

1    Q.    And he says, yes, please make them out to Eufora LLC.

2          Correct?

3    A.    Correct.

4    Q.    And then he says either that or wire it all Monday

5    morning.  The checks need to be cashiers checks or we will

6    be delayed significantly.  So a wire would be probably

7    best unless you have already gotten the bank checks.

8    Signed TC.

9          Correct?

10   A.    Correct.

11   Q.    Just to be clear, in terms of where a wire would go,

12   what was your understanding of where you were supposed to

13   accepted a wire of money?

14   A.    To the law offices of Ron Richards.

15   Q.    And that is the account, if you go to page 2?

16   A.    Yes.

17   Q.    We're still at the bottom of the e-mail chain,

18   correct?

19   A.    Yes.

20   Q.    Turning to 208.7.  After Tommy tells you the previous

21   e-mail we just read aloud, you respond with:  I think I

22   found a way to do a wire transfer.

23         Correct?

24   A.    Correct.

25   Q.    I think I found a way to do a wire transfer for the

Privitello - Voir Dire/La Russo

1450

1    50 as well.  Probably the best thing for me to do is two

2    different wire transfers Monday morning.  If you agree,

3    should I send it to the attorney's account like in the

4    previous e-mail.  Thanks and I apologize for any

5    inconvenience, Nick.

6            Is that how it reads?

7    A.   Yes.

8    Q.   Again the attorney's account which is account?

9    A.   Ron Richards law offices.

10   Q.   And then Mr. Constantine responds, right?

11   A.   Yes.

12   Q.   And he responds that will be fine, best actually.

13           Correct?

14   A.   Yes.

15   Q.   Thanks, TC.

16           Correct?

17   A.   Correct.

18   Q.   Turning to 208.8.  Then Mr. Constantine writes to you

19   again, right?

20   A.   Yes.

21   Q.   He writes Nick, can you advise as to whether or not

22   this wire went out?  Thanks, TC.

23           Correct?

24   A.   Correct.

25   Q.   And this e-mail is Monday morning December 7, 2009 at

1451

1   11:48 a.m., right?

2   A.   Yes.

3   Q.   So it's a Monday after the Friday that was previously

4   missed?

5   A.   Yes.

6   Q.   Turning to 208.9.  You respond, correct?  208.9.

7   A.   I'm missing that.  I don't have 208.9.

8   Q.   That e-mail is part of the e-mail chain?

9   A.   Yes.

10  Q.   And 208.9 you respond?

11  A.   Not yet, I'm on my way there, don't forget this is

12  going to be two transfers to the law offices like the

13  original, correct.

14  Q.   And when you're referencing the law offices what are

15  you referencing there?

16  A.   Law offices of Ron Richards.

17  Q.   Mr. Constantine replies back, correct?

18  A.   Yes.

19  Q.   And he says correct?  Thanks, TC.

20       Correct?

21  A.   Yes.

22  Q.   Turning to 208.10, write to Tommy again, right?

23  A.   Yes.

24  Q.   You say Tommy, you're not going to believe in, I may

25  have to do a bank check on the 50,000 if that's the case,

Privitello - Voir Dire/La Russo

1452

1    should I still wire the 150 to the law offices and mail

2    the 50 to you, sorry, man.  Not me, I assure you of that.

3            Correct?

4    A.   Yes.

5    Q.   Mr. Constantine responds?

6    A.   It's fine, the 150 has gone.

7    Q.

8    Q.   The 150k has gone?

9    A.   Yes.

10   Q.   Signed TC?

11   A.   Yes.

12   Q.   Turning to 208.11.  You respond to Mr. Constantine

13   it's fine, 150 is on the way, I'm working on trying to

14   wire the 50.

15           Correct?

16   A.   Correct.

17   Q.   How does Mr. Constantine respond?

18   A.   Thank you.

19   Q.   Signed TC, correct?

20   A.   Yes.

21   Q.   During this timeframe were you also speaking with

22   Mr. Constantine over the phone?

23   A.   Yes.

24           (Continued on next page.)

25

1453

```
1    Q     And what were you talking about?
2    A     Just getting the money, wire the money, how fast, how
3    to scramble the money.
4    Q     When you say scramble, where physically are you?
5    A     Two different banks, in the bank parking lot,
6    e-mailing.
7    Q     Just for the record, are these banks in New York
8    State?
9    A     Yes.
10   Q     Here on Long Island?
11   A     Yes.
12   Q     Do you ultimately wire 200,000 to the attorney's
13   account?
14   A     Yes.
15   Q     I'll show you what is in evidence as 3302.  Do you
16   recognize that?
17   A     It's a little hard to see that.
18   Q     Here's a paper copy.
19   A     Yes.
20   Q     What is that?
21   A     That's me.  That's the wire transfer.
22   Q     Flipping through it on the second page, first of all,
23   whose account does this pertain to?
24   A     My account and my wife's.
25   Q     And what amount of wire transfer were you requesting?
```

1454

1    A    150,000.

2    Q    Where were you sending it to?

3    A    Ron Richards.  Law Offices of Ron Richards &

4    Associates, a Professional Corporation, apparently.

5    Q    Turning your attention to what is in evidence as

6    3306.  Do you recognize that?

7    A    Yes.

8    Q    What is that?

9    A    That's the wire, 50,000.

10   Q    And it came from a different bank?

11   A    Yes.

12   Q    Is this also your account, Mr. Privitello?

13   A    Yes.

14   Q    What is the amount that you were wiring from this

15   bank?

16   A    50,000.

17   Q    Where were you wiring it to?

18   A    Law Offices of Ronald Richards.

19   Q    Did you include special instructions on this wire?

20   A    Yes, that 1.5 interest/ownership in Eufora, LLC.

21   Q    I will also show you what is in evidence as 3305,

22   that's a bank record, a Citizen's Bank.  Do you see this

23   wire transfer request record?

24   A    Yes.

25   Q    Do you see your special instructions on the digital

1455

1    version of this record?

2    A    Yes.

3    Q    What are those instructions again?

4    A    For 1.5 percentage ownership interest in Eufora, LLC.

5    Q    Turning to your attention what is in evidence as

6    Government's Exhibit 1101.

7              Now, the date of these wire transfers, turning

8    back for a second, go back to this, when did you do your

9    transfers?

10   A    '07, I'm sorry, December 7th, Pearl Harbor Day.

11   Q    December 7, 2009?

12   A    Yes.

13   Q    Going to Government's Exhibit 1101, this is in

14   evidence as bank account records of Mr. Ron Richards.

15   Turning to December 7, 2009, do you see two wire transfers

16   there, Mr. Privitello?

17   A    Yes.

18   Q    Do those two wire transfers at 150 and 50 reflect

19   your investment in Eufora?

20   A    Correct.

21   Q    I'll turn your attention to the next page of the

22   bottom of this, the withdrawals.  On 12/7, do you see

23   withdrawals of $155,000?

24   A    Yes.

25   Q    Where does it go?

Privitello - Direct/Komatireddy

1456

```
1    A    AZ Avalon Partners, LLC.

2    Q    On 12/8, do you see a withdrawal again?

3    A    Yes, to Eufora, LLC operating AC.

4    Q    And how much goes to Eufora?

5    A    50,000.

6    Q    I'll turn your attention to what is in evidence as

7    Government's Exhibit 1218.

8         The bank statement for the Eufora operating

9    account, correct?

10   A    Yes.

11   Q    What is the time period, the ending date of the

12   statement?

13   A    12/31/09.

14   Q    Just going to 12/8 2009, do you see that $50,000

15   transfer?

16   A    Yes.

17   Q    I'll go to the withdrawals.  And magnify the period

18   from 12/8 to 12/15.  Do you see a wire out to Carey

19   Rodriguez Greenberg?

20   A    Yes.

21   Q    What is the amount of that wire?

22   A    15,000.

23   Q    Do you know who Carey Rodriguez Greenberg is?

24   A    No.

25   Q    Did you authorize monies to go to Carey Rodriguez
```

1    Greenberg?

2    A    Not in any way.

3    Q    Did you authorize your money for Eufora to pay legal

4    fees for Mr. Constantine's personal lawyer in a race car

5    lawsuit?

6    A    No.

7    Q    By the way, do you know Sergei Gonchar?

8    A    No.

9    Q    Do you authorize on any of your money to go to him?

10   A    No.

11   Q    After you sent money to be invested in Eufora, did

12   you receive any documentation of your investment in 2009?

13   A    None.

14   Q    Did you receive any stock certificates?

15   A    None.

16   Q    Any dividends?

17   A    No.

18   Q    Do you know what a K-1 is?

19   A    Yes.

20   Q    What is a K-1?

21   A    In my terms a profit-loss for a corporation and flows

22   down to the individual.

23   Q    Is it the form you file with your taxes?

24   A    Yes.

25   Q    Did you receive any K-1s for your ownership share in

1458

1   Eufora?

2   A    No.

3   Q    Going back to 208.1 which is in evidence.

4          Did you receive a membership transfer consent

5   form from Mr. Constantine after you gave the $200,000 to

6   the attorney's account?

7   A    No.

8   Q    Did you receive an amended operating agreement?

9   A    No.

10  Q    From Mr. Constantine?

11  A    No.

12  Q    Just for the record, now that you have all of 208.1

13  to 208.11 in front of you, is that a complete set of the

14  e-mail conversations between you and Mr. Constantine

15  between December 3, 2009, and December 7, 2009?

16  A    Yes.

17  Q    Now, did there come a time when you made a recorded

18  phone call with Mr. Constantine?

19  A    Yes.

20  Q    What led you to record that call?

21  A    Just trying to get my money back and just wanted

22  everything recorded so there was no confusion.

23  Q    Approximately when did you record that call?

24  A    May of 2012.

25  Q    I will hand you what has been marked as Government's

1459

```
1    Exhibit 503, and also Government's Exhibits 503.1 T

2    through Government's Exhibit 501.8 T.

3              Do you recognize those?

4    A    Yes.

5    Q    Starting with 503, what is it?

6    A    My conversation with Tommy.

7    Q    Does that CD contain a portion of your conversation

8    with Mr. Constantine?

9    A    Yes.

10   Q    Do you recognize your signature and the date on that

11   CD?

12   A    Yes.

13   Q    Did you review that CD before coming to court today?

14   A    Yes.

15   Q    Are those excerpts on the CD true and accurate

16   excepts of your conversations with Mr. Constantine?

17   A    Yes.

18   Q    Government's Exhibits 503.1 T through 506.8 T, does

19   that also have the date and your initials?

20   A    Yes.

21   Q    Did you review those exhibits before coming to court

22   today?

23   A    Yes.

24   Q    Are those fair and accurate transcriptions of the

25   clips that are on 503?
```

Privitello - Direct/Komatireddy

1460

1    A    Yes.

2         MS. KOMATIREDDY:  The Government moves 503 in

3    evidence, and 503.1 T through 503.8 T as an aid for the

4    jury.

5         MR. LARUSSO:  May I ask this questions.

6         THE COURT:  Yes.

7    VIOR DIRE EXAMINATION

8    BY MR. LARUSSO:

9    Q    With regard to 503, the disk containing the excerpts

10   or clips, approximately how long are those clips in total?

11   A    I don't know.  I didn't add up the time.

12   Q    Five minutes, ten minutes?

13   A    Ten minutes?

14   Q    The conversations that you recorded, did you record

15   that on your -- as a result of your own decision or did

16   you consult with other people before you recorded the

17   conversation?

18   A    My decision.

19   Q    Did you ever contact Mr. Kaiser with regard to the

20   call that you were making?

21   A    No, not at all.

22   Q    Did you ever talk to him after about this

23   conversation that you had?

24   A    Not a conversation.

25   Q    How long was the conversation with Mr. Constantine?

1461

1  A    Three hours.

2  Q    You recorded the entire conversation in three hours?

3  A    Yes.

4  Q    You listened to it after you recorded it?

5  A    Once.

6  Q    Would it be fair to say some of these clips or

7  snippets are repeated often in that three-hour

8  conversation?

9  A    I don't recall.

10  Q    Well, the topics.

11        Take a look?

12  A    (Perusing.)  Yeah, I guess so.  Yeah.  It's all about

13  Ron Richards.

14  Q    Without discussing what the topics were, these were

15  just snippets about topics that were repeated for a number

16  of conversations during that three-hour period?

17  A    I don't understand the question.  Are you saying all

18  the conversation was was this?

19  Q    That's it?

20  A    No.

21  Q    There's a lot more to those conversations; is that

22  correct?

23  A    Yes.

24        MR. LARUSSO:  Your Honor, I object.  I'd like to

25  be heard at sidebar, if I may?

1462

1          (Whereupon, at this time the following took

2    place at the sidebar.)

3          MR. LARUSSO:  The objection is to the fact these

4    clips are misleading, they don't tell the entire story as

5    to the nature of these topics and subjects, they leave the

6    jury with a different impression as to what they are

7    actually talking about.  I had a chance, many hours

8    discussing this with my client, Mr. Oliveras has reviewed

9    it, and to play the snippets without playing the entire

10   conversation will leave the jury --

11         THE COURT:  Keep your voice down.  The solution

12   would be to allow you to play additional portions.

13         MR. LARUSSO:  We're in the process of trying to

14   do that.

15         MS. KOMATIREDDY:  We've turned over transcripts

16   last Thursday because we expected --

17         THE COURT:  Why don't we take a lunch break.

18         MR. LARUSSO:  Judge, just a second.  They turned

19   them over last Thursday and I have a lot of other things

20   to do and unfortunately I can't spend my time doing the

21   entire exhibit.

22         (End side bar.)

23         (Continued.)

24

25

1463

1    (Open court.)

2    THE COURT:  I have to discuss the issue

3  regarding the records with the attorneys.  Why don't we

4  reconvene at 1:30.  Have a good lunch.

5    (Whereupon, at this time the jury exits the

6  courtroom.)

7    THE COURT:  You may leave the courtroom,

8  Mr. Privitello.

9    Okay, Mr. LaRusso, so have you isolated other

10 portions you wish to offer?

11    MR. LARUSSO:  We've isolated a number of them,

12 Judge, three hours over the weekend, it was pretty hard to

13 do so.  I hope to be able to actually identify for the

14 Court where they are on the tapes so we can play them at

15 the appropriate time.

16    Judge, there are portions that we are trying to

17 isolate so we can play them.  We don't have them on a

18 separate disk at this point.

19    THE COURT:  How are we going to play them at the

20 same time?  I don't understand.  The only way we can

21 possibly do it is to have you play a large portion of the

22 excerpt on cross.

23    MR. LARUSSO:  That's what I was anticipating.

24 Let the Government play theirs and I'll play mine with

25 regard to that and put it in context.

1464

1        MS. KOMATIREDDY:  Your Honor, I want to alert

2    the Court, first of all, this conversation was turned over

3    in discovery a long time ago, approximately a year ago,

4    the defense has had it for a long time, and as I stated at

5    side bar we turned over last Thursday for a reason.

6        Second, we made cuts based on several things.

7    There is again a lot of finger-pointing on this call, we

8    were very careful to scrutinize this call, to excise all

9    of that.

10       Next, there is a lot of hearsay and false

11   exculpatory statements from Mr. Constantine.  This is a

12   2012 call.  Years after the money is stolen and years

13   after the money is diverted and much of the rest of the

14   conversation is false exculpatory.  The only ground

15   counsel would have to admit anything would be the rule of

16   completeness and I would ask to see what portions they are

17   seeking to admit under that rule.

18       THE COURT:  I think we're talking in a vacuum

19   right now.  I agree with your assessment that certain

20   portions may not be admissible under the rule of

21   completeness if they are simply false exculpatories, but

22   until they isolate what they are seeking to offer, I can't

23   make a ruling.  And Mr. LaRusso, I understand your

24   argument, but this is not an ideal situation where during

25   the trial today we'll have to be trying to make rulings.

1465

1   That's why I try before every witness testifies, I ask if

2   there are any problems, do you anticipate any problems?

3   If you told me you anticipate other portions on the tape,

4   I could have spent a weekend looking over those things.

5   So it's not an ideal situation.  Do you have transcripts

6   of them?

7           What do you have.

8           MR. LARUSSO:  No, we don't, Judge.  So you

9   understand, when we got these on Thursday, I didn't

10  address it Thursday, Friday and Saturday, the first time I

11  looked at them were perhaps Saturday afternoon, and

12  perhaps Sunday, trying to digest it.

13          The overall impart of the clips, Judge, is to

14  remove the nature of this conversation and that is that.

15  It also includes John Kaiser in terms of his investments

16  and his involvement in this.

17          These clips make it appear Mr. Constantine was

18  the one who was responsible for the monies going directly

19  to Ron Richards' account.  We'd argue, hopefully show on

20  cross and through other witnesses that is really not what

21  happened.  For example, clip number 3, Judge, this is what

22  the situation is.  It starts out:  So the reason that this

23  -- your money was directed to the lawyer's office instead

24  of us, it doesn't have the portion of the conversation

25  that talks about John Kaiser actually being the person who

1466

1    was making that objection.

2            MS. KOMATIREDDY:  Your Honor, I'll give you a

3    copy of it so you can refer to it.  And I want to be clear

4    about one thing, what is cut has been before and after,

5    nothing cut in between.  So actually Mr. Constantine's

6    statement that it is John Kaiser's fault is in the clip.

7    It says Johnny is controlling the investors which is his

8    theory.  We are planning to confront his theory head on on

9    the direct.

10           MR. LARUSSO:  Judge, I think the point is if you

11   just read this clip, it looks like they are talking about

12   Mr. Constantine in the way he views the investments.  It's

13   really talking about Mr. Kaiser in the investment that he

14   made directly to Ron Richards' account.  He uses the word

15   "if" in two sections in that main paragraph where he talks

16   about if he sends the money into Richards' account in his

17   name, Mr. Constantine would be unaware as to who the

18   actual investors were which I believe in this case is

19   Mr. Rizzi and Mr. Hughes and his mother.

20           MS. KOMATIREDDY:  We can solve that problem,

21   either through a leading man or otherwise, have this

22   witness state that the reference to "he" in this first

23   portion of the clip is to Mr. Kaiser.  We can make that

24   clear at the outset.

25           THE COURT:  Okay.  It sounds to me at least some

1467

1    of these things you may be able to work out with the

2    Government.  Assuming it provides context for the clip and

3    if you are seeking to play anything that relates to him

4    pointing the finger at Mr. Kenner, that creates problems,

5    so I want to specifically know if there is any portion

6    that you are trying to offer along those lines.

7              MR. LARUSSO:  Judge, I can do that right before

8    we begin.  I'll work with them right now and make sure

9    that that doesn't happen.

10             THE COURT:  So why don't you try to isolate what

11   additional portions you want to play and we'll reconvene

12   this afternoon.

13             (Whereupon, an afternoon recess was taken.)

14

15

16

17

18

19

20

21

22

23

24

25

1          **A-F-T-E-R-N-O-O-N    S-E-S-S-I-O-N**

2          THE COURT:  Be seated.

3          Are we making any progress?

4          MR. LaRUSSO:  Your Honor, over the lunch recess --

5    there's two things.  I've been trying to call.  I just got a

6    call back from my sister, finally.  I've been trying to call

7    for 45 minutes.  I just got a call back at the start.

8          With regard to the other clips that we would like to

9    play, we're at a point where we've been able to put them on

10   disk, 90 percent.  But right now we don't have a complete

11   disk.  What I suggest is, we withdraw our objection to the

12   government's clips and at a future time we can ask that the

13   Court evaluate our clips of the transcripts.  The government

14   can make their objection.  If the Court finds that it's

15   hearsay, it's not relevant, it's exculpatory, at that point it

16   doesn't get in at all.  I'm just trying to figure a way of

17   doing it.

18         THE COURT:  I just want to make sure that you don't

19   intend to question, you don't intend on calling him back then,

20   if I rule not to play the clips.

21         MR. LaRUSSO:  Right.  Just remind the jury these are

22   clips.  Just preparatory, Judge.  I don't really need to call

23   him back.  I think he lives in the area, if it becomes

24   necessary.  I don't think he lives out of state.

25         THE COURT:  Okay.  Any objection?

1469

1     MR. MISKIEWICZ:  We have no objection to that

2  procedure.  I don't know that -- we may feel -- depending on

3  Your Honor's ruling and also what it is that they want to

4  play, we haven't heard that yet, we'll have to evaluate

5  whether or not Mr. Privitello is necessary to give an

6  interpretation if they play additional stuff.

7     THE COURT:  I think we should take it one step at a

8  time.  I think that's the best way to handle it for purposes

9  of today so we can continue, okay.

10    MR. LaRUSSO:  Judge, I really apologize to the

11  court.  I just got this call from my sister.  I've been trying

12  to reach her.  Will you give me the opportunity to call her

13  back?

14    THE COURT:  Sure.  I understand it's a difficult

15  decision.  Whatever you need to do.

16    MR. LaRUSSO:  I really appreciate it, Your Honor.

17    THE COURT:  Okay.

18    (Pause in the proceeding.)

19    MR. LaRUSSO:  Your Honor, may I approach at the

20  side-bar?

21    THE COURT:  Yes.

22    (Whereupon a side-bar conference was conducted.)

23    (Matter continued on the next page.)

24

25

1470

1           (Side-bar conference.)

2           MR. LaRUSSO:  I apologize.  My sister said that she

3    went to the hospital and went to her room.  She's able to move

4    her fingers but she's really unresponsive.  They think she may

5    have had a massive stroke.  They believe that she probably has

6    aspirations, pneumonia, which could mean her death in a day,

7    it could mean in another day.  She's going to stay at her

8    bedside and try to give me updated reports.

9           THE COURT:  Is she in New York?  Where is she?

10          MR. LaRUSSO:  No.  She's in Salt Lake City.  To be

11   honest, Your Honor, that's what bothers me the most, that I'm

12   not there.  My sister's bearing the brunt of it.  I'm just

13   telling where it is, Judge, where I am right now.  I can't

14   tell you anymore than what they just indicated to me.  My

15   client's concerned about me.  He's worried.  He's expressed

16   his sympathy.  I understand, you know, it's a tough time for

17   me, but it's also a tough time for all of you, the obligations

18   and responsibilities you have.  I'll be honest, Judge, I don't

19   have a clear request at this time, based upon what I have.  We

20   can continue.

21          THE COURT:  Two things I'll tell you -- three

22   things.  First thing is stop apologizing, okay.  You don't

23   have to apologize.  I understand the situation.  The second

24   thing is there are accommodations we need to make to deal with

25   the family circumstances, despite everybody's schedule.  I'll

1471

1    make an accommodation for you, whatever you need, once you

2    know better exactly what you need.  So I don't want you to

3    worry that I'm not going to accommodate you.  Your family

4    comes first.

5            MR. LaRUSSO:  I appreciate that.

6            THE COURT:  We have four alternates.  So we're still

7    good.  The third thing is, if you're able to continue until

8    you get more information, I'd like to continue today.  If, for

9    whatever reason, at some point you feel like emotionally you

10   can't handle it given what you have going on, you just have to

11   let me know.

12           MR. LaRUSSO:  I'll be honest, Judge, I think I'm a

13   macho man, I think I can do everything.  I'll be candid with

14   you, I'm getting responses from Mr. Oliveras and my client

15   that I'm not really myself, and that's what concerns me.  Can

16   we continue with the examination, at least let's finish with

17   Mr. Privitello direct, finish Mr. Haley's cross, and then I'll

18   consult with my client and then I'll let you know whether or

19   not that's the situation.

20           THE COURT:  That's fair enough.  That doesn't mean

21   you have to go longer, Mr. Haley.

22           MR. LaRUSSO:  I'll give you my notes.

23           THE COURT:  How much longer does the government

24   have?

25           MS. KOMATIREDDY:  Ten minutes, Your Honor.

1472

1     THE COURT:  Okay.  We will do Mr. Haley and then
2  we'll see how you feel.  You may have more information by then
3  too.
4     MR. LaRUSSO:  I told her to e-mail me, with your
5  permission.
6     MR. HALEY:  I hope I don't choke on these words.
7  But Judge, I do not intend on being very long with
8  Mr. Privitello.
9     THE COURT:  We'll take it one step at a time.  The
10  other thing is, a juror told Michelle this morning that he has
11  vacation for two days in the week of June 3rd.
12     THE CLERK:  June 3rd, which is a Thursday.
13     THE COURT:  He said he didn't think the trial was
14  going to go that long, which disturbs me because we said five
15  weeks, and that's the fifth week.  So I don't know why he
16  didn't raise that during jury selection.  We'll do the same
17  thing we did with the other juror, I'm going to keep him on
18  and we'll see where we stand that week.  We're certainly still
19  going to be going then.
20     All right.  So we're good for now.
21     MR. LaRUSSO:  Thank you very much, Judge.
22     THE COURT:  Sure.
23     One more thing, I just wanted to mention, it's my
24  practice to put these things on the record, my intern is
25  standing right here, Dominick, he indicated to me that he

1473

1    thinks he may recognize Mr. Privitello because his uncle is an

2    electrician and may have worked for Mr. Privitello at some

3    point.  He's an intern, he's not working on the case.  He

4    basically is observing.  Obviously it's not going to effect my

5    fairness or impartiality, but it's my practice, when a staff

6    member recognizes somebody, that it be put on the record.

7              Anyone want to be heard on that?

8              MR. MISKIEWICZ:  No, Your Honor.

9              MR. LaRUSSO:  No, thank you.

10             MR. HALEY:  No, Your Honor.

11             (Whereupon the side-bar conference was concluded.)

12             (Matter continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1474

1           (Matter continued in Open Court.)

2           THE COURT:  All right.  Bring in the jury.

3           Please get Mr. Privitello.

4           (Witness resumes the witness stand.)

5           THE CLERK:  All rise.

6           (Whereupon the jury enters the courtroom at

7    1:55 p.m.)

8           THE COURT:  You may be seated.

9           Members of the jury, we are ready to continue with

10   the direct examination of Mr. Privitello.

11          Go ahead.

12          (So marked as Government Exhibits 503, 503.1-T

13   through 503.8-T in evidence.)

14          Exhibit 503 is admitted and 503.1-T through 503.8-T

15   are admitted, but only as an aid.  Again, the same instruction

16   that I gave you earlier.  This is an English language

17   recording.  Therefore, the transcripts are not evidence

18   themselves.  They're simply an aid to the jury, as the

19   government has submitted.  But if you hear something different

20   on the recording than what's on the transcript, what you hear

21   controls, not what's on the transcript.

22          Okay.  Go ahead.

23          MS. KOMATIREDDY:  Thank you, Judge.

24          I'm going to play what's in evidence as 503.1.

25          (Audio played for the jury.)

PRIVITELLO-DIRECT-KOMATIREDDY                    1475

1  CONTINUED DIRECT EXAMINATION

2  BY MS. KOMATIREDDY:

3  Q    Now in this clip, Mr. Privitello, Mr. Constantine is

4  referencing "the players."  Did you hear that?

5  A    Yes.

6  Q    What was your understanding of what players he was

7  referencing?

8  A    The hockey players.

9  Q    Did he tell you anything about whether the hockey players

10  invested in Eufora?

11  A    Yes.

12  Q    That they had?

13  A    That they had, yes.

14  Q    Is this clip, Mr. Constantine also mentioned that the

15  players had wired money to Eufora bank account.  Did you wire

16  money to Eufora's bank account?

17  A    To Ron Richard's account, I wired to.

18  Q    You wired to Ron Richard's account?

19  A    Yes.

20         MS. KOMATIREDDY:  I'm now going to play 503.7.

21         (Audio played for the jury.)

22         (Audio stopped.)

23  Q    Now I will turn your attention to what's in evidence as

24  Government Exhibit 208.7.  Do you remember this e-mail?

25  A    Yes.

PRIVITELLO-DIRECT-KOMATIREDDY                    1476

1  Q    At the bottom of this e-mail, what are the wire's

2  instructions?

3  A    To go to Ron Richards' account.

4  Q    Looking at the top of the e-mail, the second one from the

5  top, you tell Mr. Constantine that you found a way to do a

6  wire transfer, correct?

7  A    Yes.

8  Q    And you say, "If you agree, should I send it to the

9  attorneys account like in the previous e-mail?"  Correct?

10 A    Yes.

11 Q    And how does Mr. Constantine respond?

12 A    "That would be fine."  Parentheses, "(best, actually)."

13 Q    I'm going to turn your attention now and play clip 503.8.

14 Did there come a time when you discussed with Mr. Constantine

15 the account itself?

16 A    Yes.

17          (Audio played for the jury.)

18          (Audio stopped.)

19 Q    Just for the record, the first voice on the clip, whose

20 voice is that?

21 A    That's me.

22 Q    Whose voice respond?

23 A    Tommy Constantine.

24 Q    I'm now going to play what's in evidence as 503.3.

25          (Audio played for the jury.)

1           (Audio stopped.)

2   Q    I'm just going to pause for a minute.  When

3   Mr. Constantine references "he," is he referencing John --

4   A    Yes.

5           (Audio played for the jury.)

6           (Audio stopped.)

7   Q    Let's go back to what's in evidence as 208.7.

8   Mr. Privitello, who directed you to send the money to Ron

9   Richards' account?

10  A    Tommy Constantine.

11  Q    I'm going to play what's in evidence as 503.4.

12          (Audio played for the jury.)

13          (Audio stopped.)

14  Q    First of all, there's some chirping birds, right?

15  A    Yes.

16  Q    Where are you?

17  A    I'm at home.

18  Q    In your backyard?

19  A    In the yard, yes.

20          (Audio played for the jury.)

21          (Audio stopped.)

22  Q    Mr. Constantine references seeing the inbound wire

23  transfers to Ron Richards' account, right?

24  A    Yes.

25  Q    Let's go back to those wire transfers.  Turning to

PRIVITELLO-DIRECT-KOMATIREDDY                    1478

1    Government Exhibit 1101.  Looking at the wire transfers on

2    December 7th, what does Ron Richards' account show as the

3    source of the inbound wire transfers on 12/7?

4    A    Myself and my wife, from our account to their account to

5    Ron Richards' account.

6    Q    Going back to what is in evidence as Government

7    Exhibit 3306, this was your wire transfer request, correct?

8    A    Yes.

9    Q    What did you write on the wire transfer request?

10   A    "For 1.5 interest ownership in Eufora LLC."

11   Q    And we saw on Government Exhibit 3305, additional

12   transmission of that request.  What are the special

13   instructions?

14   A    To go to Ron Richards' account.

15   Q    For what?

16   A    For 1.5 percent interest ownership in Eufora LLC.

17            MS. KOMATIREDDY:  I'm going to play what's in

18   evidence as 503.2.

19            (Audio played for the jury.)

20            (Audio stopped.)

21   Q    Now, in December 2009, did Mr. Constantine ever offer you

22   your money back?

23   A    No.

24   Q    I'm going to turn your attention to what's in evidence as

25   503.5?

PRIVITELLO-DIRECT-KOMATIREDDY                    1479

1      (Audio played for the jury.)

2      (Audio stopped.)

3  Q    I'm going to turn your attention to what's in evidence as

4  Government Exhibit 1101.  Just go back, your money comes in on

5  December 7, 2009, is that correct?

6  A    Correct.

7  Q    The wire transfer's, they occur on December 7th,

8  $155,000, and December 8th, $50,000, is that correct?

9  A    Yes.

10 Q    So you put in $200,000 on December 7th, right?

11 A    Yes.

12 Q    And over the next day, a little bit more than $200,000

13 goes out of the same account, correct?

14 A    Yes.

15 Q    So I'm going to play the clip one more time, 503.5.

16     (Audio played for the jury.)

17     (Audio stopped.)

18 Q    In the day between when your wired money was sent to Ron

19 Richards' account and then wired out of Ron Richards' account,

20 did Mr. Constantine ever offer you your money back?

21 A    No.

22 Q    Finally, did there come a time when you were on a

23 shareholders call for Eufora?

24 A    Yes.

25 Q    Who invited you to that call?

1  A    I heard about the call, I think, from John Kaiser.

2  Q    Did Mr. Constantine tell you about the call?

3  A    I was -- he knew I was on the call.

4  Q    Did he tell you about it in advance?

5  A    Yes.

6  Q    Did he invite you to it or did John Kaiser invite you to

7  it?

8  A    I don't recall.

9  Q    You were on this call approximately what year?

10  A    That would be 2010.

11  Q    Now I'm going to play what's in evidence at 503.6.

12         (Audio played for the jury.)

13         (Audio stopped.)

14  Q    As you sit here today, Mr. Privitello, did you wire

15  $200,000 of your own money at Mr. Constantine's direction to

16  Eufora?

17  A    Yes.

18  Q    For Eufora?

19  A    Yes.

20  Q    Do you have 1.5 percent of Eufora?

21  A    No.

22         MS. KOMATIREDDY:  No further questions.

23         THE COURT:  Cross-examination, Mr. Haley.

24         MR. HALEY:  Yes.

25         Thank you, Judge.

PRIVITELLO-CROSS-HALEY                              1481

1    CROSS EXAMINATION
2    BY MR. HALEY:
3    Q    Mr. Privitello, good afternoon, sir.
4    A    Good afternoon.
5    Q    Mr. Privitello, you say you first met Phil Kenner through
6    John Kaiser certificate, is that correct?
7    A    Yes.
8    Q    As a result of that introduction, there came a point in
9    time where you actually did some electrical work for Phil, is
10   that true?
11   A    More audio/video, yes, work at his house in Arizona.
12   Q    At that point in time, Phil Kenner didn't, in any respect
13   whatsoever, solicit you for financial investment, correct?
14   A    While we were out there, I don't know if I can say.  I
15   don't know.
16   Q    Well, let me ask you this, I'll rephrase the question.
17   You meet Phil Kenner for the first time at his home in
18   Arizona, is that true?
19   A    I think it was possibly a birthday party prior to that.
20   But I don't know.  At John Kaiser's house.
21   Q    Could it have been a christening at John Kaiser's house
22   where you may have met Phil for the first time?
23   A    There was a christening as well as a birthday party.
24   That's two separate occasion.
25   Q    But the conversation that came around, let's say, to

1   Eufora, if I recall your direct testimony, occurred when you

2   were out in Arizona, is that true?

3   A    It was after the work that I did in Arizona.

4   Q    Mr. Kenner paid you for that work, is that true?

5   A    Yes.

6   Q    $29,000?

7   A    I don't recall the amount, but that sounds about right.

8   Q    When you were at his home in Arizona doing electrical

9   work, did you inquire of him as to what his occupation was or

10  did you know that prior to that?

11  A    I knew it prior.

12  Q    If you recall, who brought up Phil's occupation, did you

13  bring it up or he brought it up, or kind of a mutual

14  discussion?  How would you describe that?

15  A    I don't recall.

16  Q    Phil Kenner has a nice house, does he not?

17  A    Yes.

18  Q    You said a moment ago the work that you did for him was

19  installing audio/visual equipment in his home?

20  A    He was building a separate structure on the property.

21  Q    Now, other than observing, and other than the

22  conversation you say you had with him concerning the bottom

23  part, do you remember your direct testimony?

24  A    Yes.

25  Q    Was that the basis on which you determined that he was a

PRIVITELLO-CROSS-HALEY                                    1483

1    wealthy man, sir?

2    A    No.

3    Q    Well, he had mentioned to you, as I recall your direct

4    testimony, that he had hockey players clients as clients, is

5    that true?

6    A    Yes.

7    Q    So he has a nice house.  He talks about a bottom party.

8    He has hockey players as clients.  That's the information you

9    had available to you at that point time, is that correct?

10   A    I believe so.

11   Q    Then you said on direct there comes a point in time he

12   tells you about a company called Eufora, is that true?

13   A    Yes.

14   Q    This conversation that you had with Phil Kenner, do you

15   recall where it took place?  In the kitchen?  In the pool?

16   Where did it take place?

17   A    One of them was on the phone.  It was a phone call.

18   Q    Did that precede your meeting with him in Arizona or

19   subsequent to the meeting?

20   A    I don't recall that, no.  It was after the meeting in

21   Arizona, yes.

22   Q    Did you call him or did he call you?

23   A    Phil called.

24   Q    Now, as I believe you testified on direct, you explained

25   Eufora was, in your perspective, an excellent business model,

1484

1    is that true?

2    A    It seemed to be, yes.

3    Q    And did you say on direct, "Excellent business model.

4    Still is"?  Did you say that on direct?

5    A    Yes.  It seems to be.  That is what it seems to be if all

6    things are true in what I've been told.

7    Q    Did you find anything that Phil told you about Eufora as

8    being suspicious?

9              MS. KOMATIREDDY:  Objection to the form.

10             THE COURT:  No.  Overruled.  He can answer that.

11   A    That's one thing I can't say.  No, I can't say that.

12   Q    But you were at least intrigued enough about it that

13   there came a point in time that you started to give thought,

14   perhaps, to start investing in Eufora, is that true?

15   A    Yes.

16             MS. KOMATIREDDY:  Your Honor, may we have a brief

17   side-bar?

18             THE COURT:  Yes.

19             (Whereupon a side-bar conference was conducted.)

20             (Matter continued on the next page.)

21

22

23

24

25

1485

1       (Side-bar conference.)

2           MS. KOMATIREDDY:  We instructed --

3           COURT REPORTER:  I am sorry.  I can't hear you.

4           MS. KOMATIREDDY:  We instructed the witness not to

5   discuss the fraud that was not charged.  The one that he is

6   referring to is the real estate investment that he lost money

7   in.  I don't want this witness to come across that he is

8   withholding information.

9           THE COURT:  I didn't know that was what you were

10  referring to.

11          MR. HALEY:  No.

12          MS. KOMATIREDDY:  That is the past --

13          MR. HALEY:  My question is focused on the witness.

14          THE COURT:  He is talking about the other deal, the

15  real estate investment that he believes he was defrauded on?

16          MR. HALEY:  We deny he was defrauded in Los Frailes.

17  We have no intention of going in that direction.  I have no

18  intention of creeping that door open an inch.

19          THE COURT:  Do you want me to give an instruction to

20  the jury?  I can say that there is another transaction that is

21  not relevant to the case.

22          MR. HALEY:  Thank you.

23          MS. KOMATIREDDY:  Thank you, Your Honor.

24          (Whereupon the side-bar conference was concluded.)

25          (Matter continued on the next page.)

1       (Matter continued in Open Court.)

2       THE COURT:  Members of the jury, I just want to give

3  you an instruction.  The witness has mentioned in his

4  testimony that there's one thing that I'm not going to talk

5  about.  I just want to clarify what he's referring to, there

6  is a transaction that he was involved in with Mr. Kenner

7  that's not the subject matter of the case.  So I've determined

8  that there's no need to go into that other transaction.  So

9  that's what he's referring to.  I make determinations all the

10 time on relevancy grounds, and they're trying to stay focused

11 on the case, as I have instructed previously.  I made certain

12 rulings on what transactions are relevant to the case.

13      Okay.  Go ahead, Mr. Haley.

14 CONTINUED CROSS EXAMINATION

15 BY MR. HALEY:

16 Q   Mr. Privitello, getting back to the conversation that you

17 had with Phil Kenner in Arizona where Eufora was brought up.

18 Isn't it true, sir, that approximately 23 months lapsed

19 between the point in time that you had this conversation with

20 Phil Kenner in his home in Arizona and the actual time you

21 invested in Eufora, isn't that true?

22 A   It was much further.  When I was at his house, we were

23 also working on another project.  That's when I first met him.

24 When I actually spoke to him about Eufora, I don't recall.  It

25 was closer to the date of purchase.

PRIVITELLO-CROSS-HALEY                                    1487

1   Q    When you say much closer, are we talking --

2   A    December.  I heard -- I heard conversation about it.  But

3   he certainly wasn't pitching to invest in Eufora in that time

4   frame.  Not when I first met him.

5   Q    Thank you.

6   A    It was much closer to the time of the sale.

7   Q    Thank you, sir.

8         Now, with reference to Government Exhibits 208.1,

9   208.2, 208.3, 208.4, 208.5, 208.6, 208.7, 208.8, 208.9,

10  208.10, 208.11, you identified those documents as e-mails

11  between yourself and Tommy Constantine, is that correct?

12  A    Correct.

13  Q    Do you recall, sir, when you were shown these e-mails by

14  the prosecutor on direct, taking some time to review them and

15  make sure you were able to truthfully and accurately identify

16  these e-mails?

17  A    Yes.

18  Q    Sir, is it not true that at no point does Phil Kenner's

19  name appear in any respect on any of these e-mails?  Is that

20  not true?

21  A    He does not, that is correct.

22  Q    Other than Tommy Constantine, the other only other person

23  who appears on the e-mails either directly by way of

24  communication between you and that other person or by way of

25  CC, is John Kaiser, is that correct?

PRIVITELLO-CROSS-HALEY                                    1488

1   A    Well, there's no CC.  But he's in the bulk of them.

2   Q    I'm sorry, sir?

3   A    You said CC.  I don't recall seeing any CC in there.

4   Q    I apologize.  You're correct.  The only other person that

5   appears within this e-mail attachment regarding the

6   representations made to you as relates to your $200,000

7   investment in Eufora for 1.5 percent of interest in Eufora is

8   John Kaiser?

9   A    Yeah.  It looks like he is brought in by Tommy

10  Constantine, yes.

11  Q    I'm sorry?

12  A    I asked Tommy a question.  He sent me to John Kaiser.

13  And then John forwarded to me, naturally, because that was the

14  end of the question.

15  Q    The reason that you're communicating with John Kaiser at

16  this point in time because Phil Kenner had nothing to do in

17  terms of directing you to transfer $200,000 to Tommy

18  Constantine in return for 1.5 interest, isn't that true?

19  A    No.  It was strictly validation that the company was a

20  good company, the patents were real.  You know, it was a good

21  investment.  Not in these e-mails, though, by a phone call.

22  But no, he did not direct me to send money to Ron Richards.

23            (Matter continued on the next page.)

24

25

1489

1  BY MR. HALEY:

2  Q.   As a matter of fact, isn't it a fair statement that

3  the person that was more involved in recommending Eufora

4  as an investment was John Kaiser rather than Phil Kenner,

5  isn't that true?

6  A.   John put me in contact with Tommy Constantine and he

7  said about the same amount that Phil said, look, you know,

8  he said you've heard the name thrown around in the past,

9  it looks like there's an opportunity.  You might want to

10  talk to Tommy.  John Kaiser was in Arizona and Tom -- he

11  was with Tommy and called me up and Tommy told me more

12  detail about Eufora.

13  Q.   I understand that, but there's most certainly

14  conversations you're having with John Kaiser as relates to

15  your decision to invest in Eufora, isn't that true?

16  A.   I don't know that to be true.

17  Q.   John Kaiser wasn't telling you as well thought this

18  was a good investment.

19  A.   He's saying more than Phil Kenner, correct.

20  Q.   He was saying more than Phil Kenner, correct?

21  A.   No, I'm saying that's what you're saying.  I think

22  that I answered the question already.  They said about the

23  same.

24  Q.   Okay.  Before your appearance here today, sir, you

25  took legal steps, did you not, to enforce your claim for

Privitello - Cross/Haley

1490

1    the 1.5 percent ownership interest in Eufora that Tommy

2    Constantine had promised you?

3              MS. KOMATIREDDY:  Objection, relevance.

4              THE COURT:  Overruled.  You can answer that.

5    A.    About 10 months after receiving no money back, no

6    offer of any money back, no 1.5 percent we felt we had no

7    other choice.

8    Q.    When you say we, who is we?

9    A.    Ethel Kaiser, and Hughes.

10   Q.    And as a result of the volume of e-mail you had, at

11   the point who did you name as a defendant in the civil

12   action?

13   A.    Tommy Constantine.

14             MS. KOMATIREDDY:  Objection.

15             THE COURT:  Overruled.  You can answer.

16   A.    Tommy Constantine.

17             MR. HALEY:  May I have a moment, Judge?

18   Q.    Sir, would you kindly take a look at this document

19   and just read it to yourself and please take as much time

20   looking at this document as you did with the e-mails so

21   you understand the context.  (Handing.)

22   A.    Do you want me to read this whole thing?

23   Q.    I certainly don't want to waste your time.

24   A.    No, no, I'm asking -- I'm not being condescending.

25   Q.    Do you recognize that document, sir?

Privitello - Cross/Haley

1491

1   A.   This exact document from 2012, some I -- I couldn't

2   swear, I mean it's from 2012.

3   Q.   Actually it's from 2011, correct?

4   A.   Okay.

5   Q.   Sir, you testified a moment ago that you took legal

6   action against Tommy Constantine, correct?

7   A.   Yes.

8   Q.   Is that document the lawsuit that you filed against

9   Tommy Constantine in this very court, the United States

10   District Court for the Eastern District of New York?

11   Please take a look at it.

12          MS. KOMATIREDDY:  Objection, foundation.

13   A.   I don't know, this is from 2011, I can't remember

14   word-for-word a document from 2011.

15   Q.   Does your name appear on the document?

16   A.   Yes.

17   Q.   Does it appear to be a lawsuit?

18   A.   Yes.

19   Q.   The other people that you mentioned in connection

20   with being plaintiffs in the lawsuit, they are named on

21   that document?

22   A.   Yes.

23   Q.   Is Tommy Constantine the sole and exclusive defendant

24   on that document?

25   A.   Yes.

Privitello - Cross/Haley

1492

1    Q.    Anywhere in that document do you even remotely

2    mention Phil Kenner, yes or no?

3              MS. KOMATIREDDY:  Objection.

4              THE COURT:  Why don't you rephrase that.

5    Q.    Sir, did there come a point in time before you met or

6    you filed your lawsuit that you met with an attorney, yes

7    or no?

8    A.    Say that again?

9    Q.    Before you filed the lawsuit against Tommy

10   Constantine, did you meet with an attorney, yes or no?

11   A.    Yes.

12   Q.    Not what was discussed but did you have a discussion

13   with that attorney, yes or no?

14   A.    Yes.

15   Q.    Did you tell that attorney that the point in time the

16   facts as you knew or believed them to be, yes or no?

17   A.    Yes.

18   Q.    And as a consequence of those discussions, this

19   lawsuit was filed against Tommy Constantine, true?

20   A.    Yes.

21   Q.    Do you know, sir, have you ever sought to amend that

22   lawsuit to name Phil Kenner as a defendant?

23   A.    Me, no.

24   Q.    Mr. Privitello, let me just ask you this very

25   straightforward question.  Phil Kenner never promised you

Privitello - Cross/Haley

1493

1    any 1.5 interest in Eufora in return for your $200,000

2    investment, correct?

3    A.    No.   Tommy Constantine.

4    Q.    And finally, sir, the recordings that you made with

5    Tommy Constantine as has just been introduced in evidence

6    and the transcripts read in front of the jury, you made

7    those recordings before you wanted to find out from Tommy

8    Constantine exactly what happened, correct or what his

9    position was, correct?

10   A.    I guess that's a fair statement.

11   Q.    And because Phil Kenner had no involvement whatsoever

12   in making a promise to you of 1.5 interest in Eufora for

13   your $200,000, you never made any surreptitious recordings

14   with Phil Kenner, do you?

15        MS. KOMATIREDDY:  Objection.

16        THE COURT:  No.  I'll let it go.  Go ahead, you

17   can answer it.

18   A.    Say the question again, please.

19   Q.    I'll rephrase it.  Did you ever secretly record a

20   conversation with Phil Kenner?

21   A.    Regarding Eufora, no.

22   Q.    Now, with reference to the shareholders telephone

23   call I believe you testified on direct I was invited by

24   either Tommy Constantine or John Kaiser to participate in

25   that shareholders telephone call, is that true?

Privitello - Cross/Haley

1494

1    A.    Yes.

2    Q.    Was Phil Kenner a participant in that shareholders

3    telephone call?

4    A.    He was physically there with John Kaiser, physically

5    outside the door but wasn't allowed in.

6    Q.    So John Kaiser was in the room and Phil Kenner

7    wasn't?

8    A.    Both John Kaiser and Phil Kenner were outside the

9    shareholders meeting but neither one of them was allowed

10   in.

11   Q.    So neither John Kaiser nor Phil Kenner had any

12   influence or role in that shareholders meeting that you

13   telephonically recorded; is that correct?

14   A.    Not to my knowledge.

15            MR. HALEY:  May I have a moment, Judge?

16            THE COURT:  Sure.

17            MR. HALEY:  Mr. Privitello, thank you for your

18   testimony.

19            THE WITNESS:  Thank you.

20            THE COURT:  Did you want a sidebar?

21            MR. LA RUSSO:  Please.

22            (Continued on next page.)

23

24

25

Privitello - Cross/Haley

1495

1    (Whereupon, the following occurred at sidebar.)

2    MR. LA RUSSO:  Can I be candid with the Court?

3    My mind is wandering, I haven't been paying full

4    attention.  I'd like to be able to say that I'm 100

5    percent ready to go.  I think because of what happened I

6    think I'd be doing my client a disservice.

7    THE COURT:  That's fine.

8    MR. LA RUSSO:  What I'd like to suggest to the

9    Court, as soon as I leave here I'm going to be getting on

10   the phone, finding out as much information as I can.  I do

11   know and the priest was called, that I do know, but I

12   don't know if the rights were offered.  I don't know.

13   This is the information that I can't give to the Court.

14   THE COURT:  So I'm going to say to the jury that

15   one of the lawyers has some family issue that we have to

16   address today, so we're going to have to break early.  I

17   think it's good if they know it's personal circumstances.

18   MR. LA RUSSO:  I think that's fine, Judge, I

19   would appreciate that.

20   THE COURT:  I'm going to tell them to come back

21   tomorrow morning.  If you find out anything else, let us

22   know.

23   MR. LA RUSSO:  My suggestion is if my mother

24   passes, I will probably have to go out and I will leave

25   that information as quickly as I can.

Privitello - Cross/Haley

1496

1         THE COURT:  Okay.

2             (Continued on next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Privitello - Cross/Haley

1497

1      (Whereupon, the following occurred in open

2  court.) I.

3          THE COURT:  Members of the jury, one of the

4  lawyers has a personal family emergency that came up today

5  that has to be dealt with.  So I apologize for breaking

6  early today, but we're going to reconvene tomorrow morning

7  at 9:30.  Don't discuss the case among yourselves, with

8  anyone else, don't do any listening regarding the case and

9  have a good night.

10          Thank you.

11          (Whereupon, the jury retired from the

12  courtroom.)

13          THE COURT:  Please be seated.  So Mr. La Russo,

14  before you leave today make sure that you have Michele's

15  phone number so you can call her, even if it's late

16  tonight don't be afraid to call her.  Obviously we'll call

17  the jurors first thing in the morning if you're not going

18  to be able to be here tomorrow.  You can call six o'clock

19  in the morning.

20          MR. LA RUSSO:  Okay, your Honor.

21          THE COURT:  You're in my thoughts and prayers.

22  I hope everything goes well.

23          MR. LA RUSSO:  Thank you, I appreciate that.

24          THE COURT:  Obviously the government will keep

25  you posted.  I hope we'll be able to continue tomorrow but

Privitello - Cross/Haley

1498

1    it's possible we won't.

2              THE WITNESS:  I may have an issue.  Tomorrow I'm

3    available.  And for the rest of the week, I don't think

4    that I'm going to be able to be available the rest of the

5    week.

6              THE COURT:  If we're not able to have court

7    tomorrow then we'll have you come back next week when

8    you're available.

9              THE WITNESS:  All right, thank you.

10             THE COURT:  All right.  Have a good night.

11             (Whereupon, court recessed for the day in this

12   matter until Tuesday, May 19, 2015 at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

W I T N E S S E S                                    1499

1    J O H N   K A I S E R                           1388

2    CONTINUED CROSS EXAMINATION                     1388

3    BY MR. LARUSSO:

4    REDIRECT EXAMINATION                            1400

5    BY MR. MISKIEWICZ:

6    RECROSS-EXAMINATION                             1415

7    BY MR. HALEY

8    RECROSS-EXAMINATION                             1419

9    BY MR. LA RUSSO

10

11   NICHOLAS PRIVITELLO                             1426

12   DIRECT EXAMINATION                              1426

13   BY MS. KOMATIREDDY

14   VOIR DIRE EXAMINATION                           1438

15   BY MR. LA RUSSO

16   DIRECT EXAMINATION (CONTINUED.)                 1440

17   BY MS. KOMATIREDDY

18   CONTINUED DIRECT EXAMINATION                    1475

19   BY MS. KOMATIREDDY

20   CROSS EXAMINATION                               1481

21   BY MR. HALEY

22

23

24

25

E X H I B I T S                                        1500

1      GOVERNMENT'S EXHIBIT 203-A AND 204-A IN        1412

2      EVIDENCE

3      GOVERNMENT'S EXHIBITS 208.1 THROUGH 208,11 IN  1440

4      EVIDENCE

5      GOVERNMENT EXHIBITS 503, 503.1-T THROUGH        1474

6      503.8-T IN EVIDENCE

7

8

9      DEFENDANT'S EXHIBIT C-76                        1389

10     DEFENDANT'S EXHIBIT 37-A                        1394

11     DEFENDANT'S 37-B                                1397

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S.A. v. KENNER and CONSTANTINE _____ 1

## $

**$100,000** [1] - 1413:1
**$150,000** [1] - 1446:2
**$155,000** [2] - 1455:23, 1479:8
**$200,000** [12] - 1433:12, 1435:10, 1441:2, 1447:23, 1458:5, 1479:10, 1479:12, 1480:15, 1488:6, 1488:17, 1493:1, 1493:13
**$29,000** [1] - 1482:6
**$300,000** [1] - 1415:7
**$45,000** [1] - 1414:10
**$50,000** [3] - 1446:3, 1456:14, 1479:8
**$800,000** [2] - 1414:1, 1414:2

## '

**'07** [1] - 1455:10
**'09** [1] - 1430:5

## 1

**1.5** [20] - 1433:7, 1433:9, 1433:11, 1441:4, 1442:20, 1443:4, 1446:3, 1446:5, 1447:23, 1454:20, 1455:4, 1478:10, 1478:16, 1480:20, 1488:7, 1488:18, 1490:1, 1490:6, 1493:1, 1493:12
**10** [1] - 1490:5
**100** [2] - 1376:7, 1495:4
**100k** [1] - 1412:21
**10:05** [1] - 1387:7
**11** [1] - 1388:17
**1101** [4] - 1455:6, 1455:13, 1478:1, 1479:4
**11501** [1] - 1376:2
**11572** [1] - 1376:5
**11722** [2] - 1375:17, 1376:8
**11749** [1] - 1375:23
**11:48** [1] - 1451:1
**12/15** [1] - 1456:18
**12/31/09** [1] - 1456:13
**12/7** [2] - 1455:22, 1478:3
**12/8** [3] - 1456:2, 1456:14, 1456:18

## 

**1218** [1] - 1456:7
**13-CR-607** [2] - 1375:3, 1376:13
**1367** [1] - 1388:16
**1388** [2] - 1499:1, 1499:2
**1389** [1] - 1500:9
**1394** [1] - 1500:10
**1397** [1] - 1500:11
**1400** [1] - 1499:4
**1412** [1] - 1500:1
**1415** [1] - 1499:6
**1419** [1] - 1499:8
**1426** [2] - 1499:11, 1499:12
**1438** [1] - 1499:14
**1440** [2] - 1499:16, 1500:3
**1474** [1] - 1500:5
**1475** [1] - 1499:18
**1481** [1] - 1499:20
**15** [1] - 1425:21
**15,000** [1] - 1456:22
**150** [4] - 1452:1, 1452:6, 1452:13, 1455:18
**150,000** [2] - 1442:19, 1454:1
**150k** [1] - 1452:8
**16** [2] - 1388:17, 1390:15
**1601** [1] - 1375:22
**16th** [1] - 1390:21, 1394:16, 1396:18
**18** [1] - 1375:9
**19** [3] - 1416:23, 1417:23, 1498:12
**1:30** [1] - 1463:4
**1:55** [1] - 1474:7
**1:59** [1] - 1438:10

## 2

**2** [2] - 1405:19, 1449:15
**20** [11] - 1419:19, 1419:24, 1420:9, 1421:5, 1422:3, 1422:10, 1422:17, 1423:15, 1424:5, 1425:5, 1425:8
**200,000** [5] - 1433:7, 1433:8, 1433:10, 1437:10, 1453:12
**2003** [3] - 1417:5, 1417:6, 1417:8
**2004** [1] - 1417:13
**2006** [1] - 1410:25
**2008** [3] - 1412:18, 1413:6

## 

**2009** [20] - 1379:2, 1389:25, 1403:15, 1413:2, 1430:10, 1433:25, 1438:9, 1438:10, 1440:17, 1442:13, 1446:1, 1450:25, 1455:11, 1455:15, 1456:14, 1457:12, 1458:15, 1478:21, 1479:5
**2010** [23] - 1377:15, 1377:17, 1378:9, 1379:8, 1389:14, 1390:1, 1390:15, 1390:21, 1394:16, 1395:17, 1396:18, 1398:16, 1407:10, 1416:23, 1417:23, 1420:5, 1420:7, 1422:8, 1422:15, 1423:5, 1423:10, 1423:16, 1480:10
**2011** [3] - 1491:3, 1491:13, 1491:14
**2012** [5] - 1377:24, 1458:24, 1464:12, 1491:1, 1491:2
**2013** [1] - 1378:2
**2015** [2] - 1375:9, 1498:12
**203** [1] - 1411:21
**203-A** [7] - 1411:21, 1411:23, 1412:7, 1412:10, 1412:11, 1412:13, 1500:1
**204** [1] - 1411:21
**204-A** [7] - 1411:21, 1411:23, 1412:7, 1412:10, 1412:11, 1412:13, 1500:1
**208,11** [2] - 1440:6, 1500:3
**208.1** [13] - 1436:16, 1437:12, 1437:17, 1440:4, 1440:6, 1440:12, 1440:16, 1440:17, 1441:11, 1458:3, 1458:12, 1487:8, 1500:3
**208.10** [2] - 1451:22, 1487:10
**208.11** [7] - 1436:16, 1437:13, 1437:18, 1440:4, 1452:12, 1458:13, 1487:10
**208.2** [3] - 1442:13, 1446:1, 1487:9
**208.3** [7] - 1443:11, 1446:8, 1446:9, 1446:21, 1446:22,

## 

1446:25, 1487:9
**208.4** [3] - 1447:16, 1447:17, 1487:9
**208.5** [2] - 1448:16, 1487:9
**208.6** [2] - 1448:23, 1487:9
**208.7** [4] - 1449:20, 1475:24, 1477:7, 1487:9
**208.8** [2] - 1450:18, 1487:9
**208.9** [5] - 1451:6, 1451:7, 1451:10, 1487:9
**21st** [1] - 1377:24
**23** [2] - 1427:19, 1486:18
**23rd** [1] - 1389:25
**24** [3] - 1412:18, 1413:2
**25** [3] - 1427:3, 1427:18, 1429:23
**25,000** [1] - 1429:11
**25k** [1] - 1412:22
**26** [1] - 1376:4
**27** [4] - 1394:22, 1396:11, 1396:18, 1399:2
**2:30** [1] - 1447:22

## 3

**3** [8] - 1420:5, 1420:7, 1423:5, 1423:10, 1423:16, 1440:17, 1458:15, 1465:21
**30** [1] - 1386:10
**300** [1] - 1376:1
**3302** [1] - 1453:15
**3305** [2] - 1454:21, 1478:11
**3306** [2] - 1454:6, 1478:7
**341** [1] - 1376:2
**3500** [1] - 1407:8
**37** [7] - 1396:14, 1396:20, 1399:5, 1399:15, 1399:16, 1418:14, 1419:4
**37-A** [7] - 1393:8, 1394:2, 1394:3, 1394:7, 1399:17, 1399:19, 1500:10
**37-B** [7] - 1397:8, 1397:15, 1397:16, 1397:18, 1399:18, 1399:23, 1500:11
**3rd** [1] - 1438:9, 1472:11, 1472:12

## 4

**4** [2] - 1442:13, 1446:1
**425** [1] - 1375:22
**43** [1] - 1416:17
**45** [1] - 1468:7
**4:37** [1] - 1440:17
**4:57** [1] - 1438:9

## 5

**5** [4] - 1387:14, 1387:15, 1387:16, 1387:17
**50** [4] - 1450:1, 1452:2, 1452:14, 1455:18
**50,000** [5] - 1442:20, 1451:25, 1454:9, 1454:16, 1456:5
**501.8** [1] - 1459:2
**503** [8] - 1459:1, 1459:5, 1459:25, 1460:2, 1460:9, 1474:12, 1474:14, 1500:5
**503.1** [4] - 1459:1, 1459:18, 1460:3, 1474:24
**503.1-T** [3] - 1474:12, 1474:14, 1500:5
**503.2** [1] - 1478:18
**503.3** [1] - 1476:24
**503.4** [1] - 1477:11
**503.5** [2] - 1478:25, 1479:15
**503.6** [1] - 1480:11
**503.7** [1] - 1475:20
**503.8** [2] - 1460:3, 1476:13
**503.8-T** [3] - 1474:13, 1474:14, 1500:6
**506.8** [1] - 1459:18

## 6

**631-712-6105** [1] - 1376:8
**6:42** [1] - 1423:6

## 7

**7** [5] - 1450:25, 1455:11, 1455:15, 1458:15, 1479:5
**74** [2] - 1389:24, 1389:25
**75** [1] - 1389:24
**76** [2] - 1389:24, 1389:25

**7th** [5] - 1438:9, 1455:10, 1478:2, 1479:7, 1479:10

## 8

**8** [1] - 1398:16
**800** [1] - 1413:17
**800,000** [2] - 1413:18, 1414:20
**8:37** [1] - 1423:10
**8th** [1] - 1479:8

## 9

**90** [1] - 1468:10
**97** [1] - 1444:4
**9:30** [3] - 1375:10, 1497:7, 1498:12
**9th** [3] - 1389:14, 1390:1, 1395:17

## A

**a.m** [5] - 1375:10, 1387:8, 1423:10, 1451:1, 1498:12
**a/k/a** [2] - 1375:6, 1375:8
**able** [16] - 1383:11, 1385:18, 1385:24, 1427:24, 1445:16, 1463:13, 1467:1, 1468:9, 1470:3, 1471:7, 1487:15, 1495:4, 1497:18, 1497:25, 1498:4, 1498:6
**absolutely** [5] - 1383:14, 1385:9, 1445:19, 1448:10
**abusing** [1] - 1384:22
**AC** [1] - 1456:3
**accept** [2] - 1441:1, 1447:25
**accepted** [1] - 1449:13
**accommodate** [1] - 1471:3
**accommodation** [1] - 1471:1
**accommodations** [1] - 1470:24
**accordance** [1] - 1398:22
**account** [40] - 1411:18, 1435:10, 1435:15, 1442:19, 1442:23, 1442:25, 1443:1, 1446:2, 1449:15, 1450:3,

1450:8, 1453:13, 1453:23, 1453:24, 1454:12, 1455:14, 1456:9, 1458:6, 1465:19, 1466:14, 1466:16, 1475:15, 1475:16, 1475:17, 1475:18, 1476:3, 1476:9, 1476:15, 1477:9, 1477:23, 1478:2, 1478:4, 1478:5, 1478:14, 1478:13, 1479:19
**accounting** [1] - 1406:13
**accurate** [3] - 1437:13, 1459:15, 1459:24
**accurately** [1] - 1487:15
**acknowledgment** [1] - 1398:15
**acquire** [1] - 1400:7
**acting** [1] - 1375:16
**action** [2] - 1490:12, 1491:6
**active** [2] - 1379:20, 1381:23
**actual** [3] - 1435:6, 1466:18, 1486:20
**actually** [1] - 1476:12
**add** [1] - 1460:11
**additional** [7] - 1382:21, 1383:18, 1401:9, 1462:12, 1467:11, 1469:6, 1478:11
**address** [9] - 1381:21, 1394:13, 1441:6, 1442:22, 1447:7, 1447:8, 1448:1, 1465:10, 1495:16
**addresses** [1] - 1377:21
**admissible** [1] - 1464:20
**admit** [3] - 1393:8, 1464:15, 1464:17
**admitted** [8] - 1389:21, 1393:8, 1394:2, 1397:15, 1412:10, 1440:5, 1474:14, 1474:15
**advance** [1] - 1480:4
**advise** [1] - 1450:21
**afford** [1] - 1434:18
**afield** [1] - 1384:15
**afraid** [1] - 1497:16
**afternoon** [6] - 1429:24, 1465:11,

1467:12, 1467:13, 1481:3, 1481:4
**AFTERNOON** [1] - 1468:1
**agent** [1] - 1383:21
**Agent** [7] - 1378:5, 1378:6, 1383:4, 1383:8, 1418:2, 1418:8
**ago** [6] - 1422:1, 1427:18, 1464:3, 1482:18, 1491:5
**agree** [10] - 1398:18, 1398:20, 1398:21, 1406:3, 1417:14, 1422:2, 1423:13, 1450:2, 1464:19, 1476:8
**agreed** [5] - 1406:6, 1406:7, 1419:19, 1421:5, 1421:15
**agreement** [3] - 1389:15, 1441:4, 1458:8
**agreements** [2] - 1379:9, 1390:4
**ahead** [12] - 1386:9, 1386:15, 1388:4, 1418:6, 1426:15, 1429:16, 1436:9, 1445:24, 1474:11, 1474:22, 1486:13, 1493:16
**aid** [3] - 1460:3, 1474:15, 1474:18
**alert** [1] - 1464:1
**aligned** [4] - 1380:2, 1381:2, 1386:3, 1398:18
**alive** [1] - 1410:17
**ALL** [1] - 1387:11
**allegations** [3] - 1401:2, 1401:4, 1401:22
**Allen** [1] - 1377:18
**Allen-Smith** [1] - 1377:18
**alliances** [2] - 1386:2, 1386:4
**allow** [7] - 1385:10, 1392:7, 1393:8, 1401:21, 1421:8, 1429:14, 1462:12
**allowed** [3] - 1392:5, 1494:5, 1494:9
**almost** [1] - 1430:21
**aloud** [1] - 1449:21
**alternates** [1] - 1471:6
**amend** [2] - 1441:3, 1492:21

**amended** [1] - 1458:8
**AMERICA** [1] - 1375:3
**amount** [5] - 1453:25, 1454:14, 1456:21, 1482:7, 1489:7
**AND** [1] - 1500:1
**ANDREW** [1] - 1376:4
**andrew** [1] - 1377:4
**annual** [1] - 1414:8
**ANSWER** [2] - 1388:20, 1388:23
**answer** [7] - 1418:6, 1433:23, 1439:8, 1484:10, 1490:4, 1490:15, 1493:17
**answered** [3] - 1398:5, 1417:25, 1489:22
**answers** [1] - 1404:9
**anticipate** [2] - 1465:2, 1465:3
**anticipating** [1] - 1463:23
**apologize** [10] - 1378:23, 1385:23, 1393:6, 1397:10, 1450:4, 1469:10, 1470:2, 1470:23, 1488:4, 1497:5
**apologizing** [1] - 1470:22
**appear** [6] - 1401:4, 1441:11, 1465:17, 1487:19, 1491:15, 1491:17
**appearance** [2] - 1376:15, 1489:24
**APPEARANCES** [1] - 1375:14
**application** [1] - 1423:23
**appreciate** [4] - 1469:16, 1471:5, 1495:19, 1497:23
**approach** [2] - 1399:7, 1469:19
**appropriate** [1] - 1463:15
**April** [5] - 1412:18, 1413:1, 1413:6
**area** [1] - 1468:23
**areas** [6] - 1380:6, 1380:8, 1383:16, 1383:17, 1384:18, 1387:1
**argue** [1] - 1465:19
**argument** [4] - 1378:14, 1380:1, 1383:10, 1464:24
**Arizona** [11] -

1428:19, 1481:11, 1481:18, 1482:2, 1482:3, 1482:8, 1483:18, 1483:21, 1486:17, 1486:20, 1489:10
**articulate** [1] - 1385:25
**articulates** [1] - 1405:2
**aside** [1] - 1390:7
**aspirations** [1] - 1470:6
**assessment** [1] - 1464:19
**asset** [1] - 1401:19
**Assistant** [1] - 1375:18
**Associates** [1] - 1454:4
**assume** [2] - 1429:15, 1430:8
**assuming** [1] - 1438:7, 1467:2
**assure** [1] - 1452:2
**attach** [1] - 1394:23
**attached** [2] - 1392:4, 1399:3
**attaches** [1] - 1394:21
**attachment** [2] - 1396:3, 1488:5
**attempted** [1] - 1381:21
**attend** [1] - 1379:17
**attended** [5] - 1379:18, 1380:18, 1380:20, 1380:24, 1381:7
**attention** [13] - 1395:5, 1395:6, 1440:13, 1447:17, 1454:5, 1455:5, 1455:21, 1456:6, 1475:23, 1476:13, 1478:24, 1479:3, 1495:4
**Attorney** [1] - 1375:16
**attorney** [5] - 1435:10, 1492:6, 1492:10, 1492:13, 1492:15
**attorney's** [4] - 1450:3, 1450:8, 1453:12, 1458:6
**attorneys** [2] - 1463:3, 1476:9
**Attorneys** [1] - 1375:18
**audio** [21] - 1474:25, 1475:21, 1475:22, 1476:17, 1476:18,

1476:25, 1477:1, 1477:5, 1477:6, 1477:12, 1477:13, 1477:20, 1477:21, 1478:19, 1478:20, 1479:1, 1479:2, 1479:16, 1479:17, 1480:12, 1480:13
**audio/video** [1] - 1481:11
**audio/visual** [1] - 1482:19
**authorize** [3] - 1456:25, 1457:3, 1457:9
**available** [4] - 1483:9, 1498:3, 1498:4, 1498:8
**Avalon** [1] - 1456:1
**avoid** [3] - 1378:22, 1386:17, 1401:4
**aware** [3] - 1405:21, 1406:1, 1416:2
**AZ** [3] - 1398:16, 1398:19, 1456:1

## B

**background** [1] - 1429:14
**backyard** [1] - 1477:18
**bad** [2] - 1430:20
**Bank** [1] - 1454:22
**bank** [16] - 1388:21, 1411:18, 1431:9, 1437:5, 1437:6, 1447:22, 1449:7, 1451:25, 1453:5, 1454:10, 1454:15, 1454:22, 1455:14, 1456:8, 1475:15, 1475:16
**banks** [4] - 1432:20, 1432:23, 1453:5, 1453:7
**bar** [22] - 1391:1, 1391:2, 1392:1, 1392:21, 1392:22, 1393:13, 1400:23, 1400:25, 1401:1, 1402:10, 1417:9, 1417:12, 1462:22, 1464:5, 1469:20, 1469:22, 1470:1, 1473:11, 1484:17, 1484:19, 1485:1, 1485:24
**based** [2] - 1464:6, 1470:19

**basis** [1] - 1482:25
**Beach** [1] - 1411:15
**bearing** [1] - 1470:12
**become** [2] - 1427:22, 1430:16
**becomes** [1] - 1468:23
**bedside** [1] - 1470:8
**BEFORE** [1] - 1375:11
**begin** [1] - 1467:8
**beginning** [1] - 1440:12
**behalf** [1] - 1379:19
**behind** [4] - 1382:20, 1383:12, 1431:25, 1446:12
**believes** [1] - 1485:15
**bell** [1] - 1429:7
**below** [8] - 1394:18, 1442:19, 1442:21, 1442:23, 1443:5, 1446:2, 1446:4, 1447:24
**Berard** [15] - 1377:24, 1378:1, 1380:1, 1381:20, 1382:3, 1382:8, 1383:3, 1383:7, 1383:20, 1384:2, 1388:11, 1394:15, 1406:25, 1407:2
**best** [5] - 1449:7, 1450:1, 1450:12, 1469:8, 1476:12
**better** [2] - 1444:10, 1471:2
**between** [24] - 1377:14, 1377:18, 1377:23, 1378:1, 1378:11, 1379:24, 1380:13, 1381:19, 1382:3, 1383:7, 1386:2, 1390:3, 1412:15, 1418:3, 1436:22, 1437:14, 1438:15, 1458:14, 1458:15, 1466:5, 1479:18, 1486:19, 1487:11, 1487:24
**beyond** [1] - 1377:13
**BIANCO** [1] - 1375:12
**big** [6] - 1428:23, 1430:23, 1430:24, 1431:9, 1432:23, 1434:16
**birds** [1] - 1477:14
**birthday** [2] - 1481:19, 1481:23
**bit** [5] - 1413:18, 1431:10, 1437:7, 1444:7, 1479:12

**bits** [1] - 1430:5
**blowing** [1] - 1433:20
**blue** [3] - 1428:11, 1434:5, 1434:7
**borrow** [2] - 1408:3, 1408:12
**borrowed** [1] - 1408:10
**borrowing** [1] - 1407:17
**bothers** [2] - 1444:6, 1470:11
**bottom** [9] - 1418:18, 1440:14, 1443:2, 1447:17, 1449:17, 1455:22, 1476:1, 1482:22, 1483:7
**break** [10] - 1386:3, 1425:22, 1435:20, 1435:21, 1436:10, 1445:3, 1445:8, 1445:16, 1462:17, 1495:16
**breaking** [1] - 1497:5
**Brent** [1] - 1394:20
**brief** [2] - 1443:12, 1484:16
**briefly** [2] - 1415:14, 1429:15
**bring** [7] - 1387:3, 1410:9, 1431:10, 1436:3, 1445:20, 1474:2, 1482:13
**bringing** [3] - 1384:22, 1401:4, 1403:4
**brought** [6] - 1388:19, 1401:16, 1482:12, 1482:13, 1486:17, 1488:9
**brunt** [1] - 1470:12
**Bryan** [3] - 1377:23, 1378:1, 1394:15
**build** [1] - 1430:13
**builder** [2] - 1430:14, 1431:1
**building** [2] - 1430:13, 1482:20
**bulk** [1] - 1488:1
**bureaus** [1] - 1430:24
**business** [9] - 1427:15, 1427:17, 1427:19, 1427:25, 1428:3, 1430:17, 1431:10, 1483:25, 1484:3
**buy** [1] - 1401:17
**BY** [27] - 1375:17, 1375:23, 1388:7, 1400:19, 1403:3, 1412:1, 1415:17,

1419:17, 1423:3, 1425:3, 1426:18, 1438:2, 1440:11, 1460:8, 1475:2, 1481:2, 1486:15, 1489:1, 1499:3, 1499:5, 1499:7, 1499:9, 1499:13, 1499:15, 1499:17, 1499:19, 1499:21

## C

**C-70** [1] - 1420:3
**C-70-A** [1] - 1420:13
**C-74** [1] - 1389:3
**C-75** [1] - 1389:3
**C-76** [5] - 1389:8, 1389:13, 1389:21, 1389:22, 1500:9
**C.R** [1] - 1394:15
**cabana** [3] - 1429:7, 1429:19, 1433:20
**CALCAGNI** [1] - 1375:21
**California** [1] - 1435:11
**candid** [2] - 1471:13, 1495:2
**car** [1] - 1457:4
**card** [4] - 1378:3, 1430:8, 1430:22, 1431:18
**career** [2] - 1430:14, 1431:1
**careful** [1] - 1464:8
**Carey** [3] - 1456:18, 1456:23, 1456:25
**case** [17] - 1376:13, 1380:25, 1384:16, 1384:20, 1385:15, 1389:6, 1435:22, 1445:4, 1451:25, 1466:18, 1473:3, 1485:21, 1486:7, 1486:11, 1486:12, 1497:7, 1497:8
**cashiers** [1] - 1449:5
**CC** [6] - 1438:21, 1439:19, 1487:25, 1488:1, 1488:3
**cc** [2] - 1438:23, 1442:17
**cc'd** [2] - 1442:16, 1447:4
**CCs** [1] - 1394:11
**CD** [4] - 1459:7, 1459:11, 1459:13, 1459:15
**celebrities** [1] -

1428:23
**celebrity** [1] - 1428:25
**Central** [3] - 1375:5, 1375:17, 1376:8
**certain** [2] - 1464:19, 1486:11
**certainly** [5] - 1389:1, 1472:18, 1487:3, 1489:13, 1490:23
**certificate** [1] - 1481:6
**certificates** [1] - 1457:14
**certified** [1] - 1435:13
**cetera** [1] - 1378:12
**chain** [6] - 1382:11, 1412:13, 1413:10, 1440:13, 1449:17, 1451:8
**chance** [4] - 1399:25, 1436:18, 1438:8, 1462:7
**change** [1] - 1447:21
**changes** [2] - 1421:22, 1422:4
**charged** [1] - 1485:5
**check** [7] - 1435:13, 1442:20, 1442:22, 1446:3, 1447:9, 1448:20, 1451:25
**checking** [1] - 1378:3
**checks** [5] - 1447:22, 1447:24, 1449:5, 1449:7
**chip** [1] - 1434:5, 1434:7
**chirping** [1] - 1477:14
**choice** [1] - 1490:7
**choke** [1] - 1472:6
**christening** [2] - 1481:21, 1481:23
**circumstances** [3] - 1428:17, 1470:25, 1495:17
**Citizen's** [1] - 1454:22
**City** [7] - 1416:24, 1417:4, 1417:9, 1417:15, 1417:18, 1445:14, 1470:10
**civil** [2] - 1379:14, 1490:11
**claim** [2] - 1423:15, 1489:25
**claiming** [1] - 1422:9
**clarify** [1] - 1486:5
**clear** [4] - 1449:11, 1466:3, 1466:24, 1470:19
**CLERK** [8] - 1376:11, 1376:13, 1387:4, 1387:6, 1387:14,

1436:6, 1472:12, 1474:5

**client** [7] - 1382:22, 1385:11, 1392:14, 1462:8, 1471:14, 1471:18, 1495:6

**client's** [1] - 1470:15

**clients** [3] - 1483:4, 1483:8

**clip** [10] - 1465:21, 1466:6, 1466:11, 1466:23, 1467:2, 1475:3, 1475:14, 1476:13, 1476:19, 1479:15

**clips** [12] - 1459:25, 1460:10, 1461:6, 1462:4, 1465:13, 1465:17, 1468:8, 1468:12, 1468:13, 1468:20, 1468:22

**close** [4] - 1383:6, 1426:12, 1432:12, 1432:23

**closed** [1] - 1410:25

**closer** [4] - 1436:5, 1486:25, 1487:1, 1487:6

**closing** [7] - 1409:13, 1409:16, 1409:21, 1409:23, 1414:2, 1414:4, 1414:20

**club** [2] - 1429:10, 1429:18

**CMG** [1] - 1412:21

**coast** [1] - 1416:5

**collateral** [2] - 1434:22, 1435:5

**collect** [1] - 1439:3

**column** [1] - 1398:2

**coming** [7] - 1380:25, 1382:5, 1386:8, 1401:23, 1406:1, 1459:13, 1459:21

**comments** [1] - 1413:9

**communicating** [4] - 1435:17, 1439:4, 1442:2, 1488:15

**communication** [4] - 1396:17, 1436:12, 1439:1, 1487:24

**communications** [3] - 1437:14, 1438:14, 1439:14

**companies** [5] - 1430:15, 1432:17, 1434:1, 1434:2

**company** [17] - 1401:19, 1401:24,

1403:11, 1404:6, 1425:8, 1430:1, 1430:8, 1431:25, 1432:16, 1432:19, 1434:10, 1434:12, 1442:3, 1483:12, 1488:19, 1488:20

**company's** [1] - 1441:4

**complete** [3] - 1392:3, 1458:13, 1468:10

**completeness** [2] - 1464:16, 1464:21

**complies** [1] - 1399:11

**concerned** [1] - 1470:15

**concerning** [1] - 1482:22

**concerns** [1] - 1471:15

**concluded** [4] - 1393:13, 1402:10, 1473:11, 1485:24

**condescending** [1] - 1490:24

**conducted** [4] - 1391:2, 1400:25, 1469:22, 1484:19

**conference** [12] - 1391:2, 1392:1, 1393:13, 1400:25, 1401:1, 1402:10, 1469:22, 1470:1, 1473:11, 1484:19, 1485:1, 1485:24

**confirmation** [2] - 1440:21, 1441:1

**confront** [1] - 1466:8

**confused** [1] - 1387:13

**confusion** [1] - 1458:22

**connection** [2] - 1399:12, 1491:19

**consent** [13] - 1392:5, 1394:22, 1396:10, 1396:18, 1396:21, 1396:22, 1396:24, 1398:15, 1398:20, 1398:23, 1401:8, 1441:3, 1458:4

**consequence** [1] - 1492:18

**conservative** [1] - 1433:20

**constantine** [9] - 1379:1, 1388:10, 1394:8, 1403:24, 1409:5, 1409:15,

1409:21, 1409:25, 1447:19

**Constantine** [128] - 1376:1, 1376:14, 1376:23, 1377:1, 1377:4, 1377:14, 1377:18, 1379:5, 1379:15, 1381:2, 1383:12, 1389:14, 1390:4, 1394:19, 1401:3, 1403:10, 1403:23, 1404:10, 1404:15, 1405:20, 1405:25, 1406:7, 1406:24, 1408:22, 1410:8, 1410:9, 1411:2, 1411:5, 1411:8, 1412:15, 1413:1, 1415:4, 1419:19, 1419:22, 1420:5, 1420:8, 1421:5, 1421:13, 1421:15, 1421:16, 1421:20, 1422:2, 1422:9, 1422:15, 1422:16, 1423:10, 1423:14, 1425:6, 1425:17, 1432:1, 1432:2, 1432:6, 1432:8, 1432:9, 1432:14, 1432:25, 1433:5, 1433:6, 1433:12, 1434:20, 1435:17, 1436:12, 1436:22, 1437:15, 1438:4, 1438:16, 1439:2, 1439:20, 1440:15, 1441:9, 1442:6, 1442:8, 1442:14, 1442:18, 1443:9, 1446:14, 1447:1, 1447:6, 1447:14, 1448:16, 1448:23, 1450:10, 1450:18, 1451:17, 1452:5, 1452:12, 1452:17, 1452:22, 1458:5, 1458:10, 1458:14, 1458:18, 1459:8, 1459:16, 1460:25, 1464:11, 1465:17, 1466:12, 1466:17, 1475:3, 1475:14, 1476:5, 1476:11, 1476:14, 1476:23, 1477:3, 1477:10, 1477:22, 1478:21, 1479:20, 1480:2, 1487:11, 1487:22, 1488:10, 1488:18, 1489:6,

1490:2, 1490:13, 1490:16, 1491:6, 1491:9, 1491:23, 1492:10, 1492:19, 1493:3, 1493:5, 1493:8, 1493:24

**CONSTANTINE** [2] - 1375:7, 1377:2

**Constantine's** [7] - 1421:22, 1422:5, 1435:9, 1446:5, 1457:4, 1466:5, 1480:15

**consult** [2] - 1460:16, 1471:18

**contact** [3] - 1442:5, 1460:19, 1489:6

**contacts** [1] - 1428:2

**contain** [2] - 1438:15, 1459:7

**containing** [1] - 1460:9

**contemporaneously** [1] - 1403:6

**content** [1] - 1377:22

**contents** [1] - 1398:17

**context** [3] - 1463:25, 1467:2, 1490:21

**continuation** [1] - 1377:12

**continue** [9] - 1387:19, 1445:15, 1469:9, 1470:20, 1471:7, 1471:8, 1471:16, 1474:9, 1497:25

**Continued** [10] - 1420:16, 1422:21, 1423:25, 1424:10, 1440:10, 1443:15, 1444:13, 1462:23, 1494:22, 1496:2

**continued** [14] - 1391:3, 1393:14, 1394:1, 1402:11, 1403:1, 1411:25, 1452:24, 1469:23, 1473:12, 1474:1, 1484:20, 1485:25, 1486:1, 1488:23

**CONTINUED** [7] - 1388:6, 1403:2, 1475:1, 1486:14, 1499:2, 1499:16, 1499:18

**Continuing** [1] - 1434:24

**control** [2] - 1403:10, 1411:18

**controlled** [2] -

1411:11, 1411:14

**controlling** [1] - 1466:7

**controls** [1] - 1474:21

**conversation** [30] - 1407:15, 1407:16, 1408:9, 1432:25, 1436:25, 1437:3, 1440:25, 1441:24, 1443:8, 1459:6, 1459:7, 1460:17, 1460:23, 1460:24, 1460:25, 1461:2, 1461:8, 1461:18, 1462:10, 1464:2, 1464:14, 1465:14, 1465:24, 1481:25, 1482:22, 1483:14, 1486:16, 1486:19, 1487:2, 1493:20

**Conversation** [1] - 1382:14

**conversations** [14] - 1382:17, 1384:7, 1384:9, 1384:11, 1434:12, 1434:20, 1438:22, 1442:7, 1458:14, 1459:16, 1460:14, 1461:16, 1461:21, 1489:14

**convince** [1] - 1383:11

**CONWAY** [1] - 1376:1

**copied** [2] - 1405:13, 1419:8

**copies** [1] - 1437:13

**copy** [3] - 1448:1, 1453:18, 1466:3

**corner** [2] - 1397:21, 1418:18

**corporation** [1] - 1457:21

**Corporation** [1] - 1454:4

**correct** [113] - 1388:11, 1388:12, 1388:19, 1390:1, 1390:5, 1390:18, 1390:21, 1390:22, 1394:9, 1394:13, 1394:25, 1395:19, 1395:25, 1397:1, 1397:21, 1398:7, 1398:8, 1398:11, 1398:12, 1403:16, 1403:17, 1404:24, 1404:25, 1405:14, 1409:17, 1412:5, 1412:23, 1413:10, 1413:11, 1416:20, 1418:21, 1418:22,

1419:5, 1419:8,
1419:20, 1420:10,
1420:11, 1422:7,
1423:7, 1423:11,
1423:12, 1427:16,
1436:13, 1437:2,
1438:4, 1438:10,
1439:17, 1440:15,
1441:8, 1441:10,
1442:9, 1442:10,
1443:3, 1446:6,
1446:7, 1447:12,
1447:13, 1447:14,
1447:15, 1447:19,
1448:2, 1448:3,
1448:4, 1448:17,
1448:21, 1448:24,
1449:2, 1449:3,
1449:9, 1449:10,
1449:18, 1449:23,
1449:24, 1450:13,
1450:16, 1450:17,
1450:23, 1450:24,
1451:6, 1451:13,
1451:17, 1451:19,
1451:20, 1452:3,
1452:15, 1452:16,
1452:19, 1455:20,
1456:9, 1461:22,
1476:6, 1476:9,
1478:7, 1479:5,
1479:6, 1479:8,
1479:13, 1481:6,
1481:13, 1483:9,
1487:11, 1487:12,
1487:21, 1487:25,
1488:4, 1489:19,
1489:20, 1491:3,
1491:6, 1493:2,
1493:8, 1493:9,
1494:13
**correspondences** [1]
- 1379:24
**cost** [1] - 1429:11
**counsel** [3] - 1376:15,
1392:20, 1464:15
**counterproductive** [1]
- 1425:13
**Country** [1] - 1376:1
**couple** [5] - 1386:16,
1388:14, 1389:2,
1423:4, 1444:5
**course** [1] - 1416:1
**COURT** [160] - 1375:1,
1376:12, 1376:19,
1376:22, 1376:25,
1377:5, 1377:8,
1378:18, 1378:20,
1380:5, 1380:11,
1380:16, 1380:22,

1381:5, 1381:11,
1381:15, 1382:7,
1382:13, 1382:23,
1383:2, 1383:13,
1384:3, 1384:6,
1384:10, 1385:20,
1386:6, 1386:13,
1386:18, 1386:22,
1387:2, 1387:9,
1387:12, 1387:16,
1388:4, 1388:15,
1389:19, 1389:21,
1391:1, 1392:13,
1392:16, 1392:19,
1392:25, 1393:4,
1393:7, 1393:11,
1394:2, 1394:6,
1397:6, 1397:15,
1397:19, 1398:6,
1399:9, 1399:17,
1400:10, 1400:17,
1400:24, 1401:10,
1401:21, 1402:9,
1405:7, 1405:22,
1408:8, 1410:19,
1410:22, 1412:10,
1413:4, 1413:22,
1415:6, 1415:10,
1415:13, 1417:2,
1417:20, 1418:1,
1418:6, 1419:14,
1420:15, 1421:3,
1421:8, 1421:14,
1421:24, 1422:6,
1422:14, 1423:24,
1424:2, 1424:8,
1425:20, 1426:1,
1426:8, 1426:12,
1428:16, 1429:14,
1433:22, 1435:21,
1436:2, 1436:8,
1437:23, 1439:8,
1440:4, 1440:24,
1441:22, 1443:14,
1444:8, 1444:12,
1445:3, 1445:7,
1445:11, 1445:17,
1445:20, 1445:24,
1460:6, 1462:11,
1462:17, 1463:2,
1463:7, 1463:19,
1464:18, 1466:25,
1467:10, 1468:2,
1468:18, 1468:25,
1469:7, 1469:14,
1469:17, 1469:21,
1470:9, 1470:21,
1471:6, 1471:20,
1471:23, 1472:1,
1472:9, 1472:13,
1472:22, 1474:2,

1474:8, 1480:23,
1484:10, 1484:18,
1485:3, 1485:9,
1485:14, 1485:19,
1486:2, 1490:4,
1490:15, 1492:4,
1493:16, 1494:16,
1494:20, 1495:7,
1495:14, 1495:20,
1496:1, 1497:3,
1497:13, 1497:21,
1497:24, 1498:6,
1498:10
**Court** [23] - 1376:4,
1376:7, 1378:23,
1383:9, 1385:23,
1385:24, 1385:25,
1386:1, 1392:12,
1394:1, 1403:1,
1421:2, 1445:15,
1463:14, 1464:2,
1468:13, 1468:14,
1474:1, 1486:1,
1491:10, 1495:2,
1495:9, 1495:13
**court** [12] - 1423:2,
1425:2, 1436:19,
1445:2, 1459:13,
1459:21, 1463:1,
1469:11, 1491:9,
1497:2, 1498:6,
1498:11
**Court's** [2] - 1388:13,
1392:2
**Courthouse** [1] -
1375:4
**courtroom** [11] -
1387:7, 1428:9,
1435:24, 1436:7,
1445:6, 1445:22,
1445:23, 1463:6,
1463:7, 1474:6,
1497:12
**cover** [4] - 1377:20,
1378:8, 1378:10,
1385:18
**covered** [4] - 1380:7,
1380:8, 1383:17,
1383:18
**covers** [1] - 1383:16
**crazy** [1] - 1429:18
**create** [1] - 1427:17
**creates** [1] - 1467:4
**credit** [9] - 1378:3,
1430:8, 1430:13,
1430:14, 1430:20,
1430:21, 1430:22,
1430:24, 1431:18
**creeping** [1] - 1485:18
**critical** [2] - 1381:1,

1382:13
**cross** [5] - 1387:20,
1463:22, 1465:20,
1471:17, 1480:23
**CROSS** [5] - 1388:6,
1481:1, 1486:14,
1499:2, 1499:20
**cross-examination** [1]
- 1480:23
**CRR** [1] - 1376:7
**CURRIE** [1] - 1375:15
**cut** [3] - 1386:25,
1466:4, 1466:5
**cuts** [1] - 1464:6

## D

**date** [7] - 1395:21,
1412:17, 1455:7,
1456:11, 1459:10,
1459:19, 1486:25
**dated** [6] - 1377:24,
1378:2, 1389:25,
1395:20, 1398:16
**days** [6] - 1379:18,
1380:24, 1381:7,
1385:14, 1432:22,
1472:11
**deadline** [2] -
1447:22, 1448:8
**deal** [6] - 1385:22,
1410:25, 1431:4,
1434:16, 1470:24,
1485:14
**deals** [3] - 1388:21,
1415:4, 1415:8
**dealt** [1] - 1497:5
**death** [1] - 1470:6
**debt** [1] - 1415:7
**December** [20] -
1379:2, 1403:15,
1438:9, 1440:17,
1442:13, 1446:1,
1450:25, 1455:10,
1455:11, 1455:15,
1458:15, 1478:2,
1478:21, 1479:5,
1479:7, 1479:8,
1479:10, 1487:2
**decided** [1] - 1437:1
**deciding** [1] - 1435:1
**decision** [5] -
1431:21, 1460:15,
1460:18, 1469:15,
1489:15
**DEFENDANT** [1] -
1377:2
**Defendant** [2] -
1375:21, 1376:1
**defendant** [5] -

1428:13, 1428:15,
1490:11, 1491:23,
1492:22
**Defendant's** [4] -
1389:22, 1394:3,
1397:16, 1420:3
**DEFENDANT'S** [3] -
1500:9, 1500:10,
1500:11
**defendant's** [1] -
1378:15
**Defendants** [1] -
1375:9
**defense** [2] - 1384:21,
1464:4
**defrauded** [2] -
1485:15, 1485:16
**delayed** [1] - 1449:6
**denied** [1] - 1381:3
**denies** [1] - 1422:17
**deny** [3] - 1406:3,
1422:19, 1485:16
**deposition** [5] -
1378:8, 1379:18,
1380:18, 1381:7
**depositions** [1] -
1379:13
**describe** [3] -
1428:17, 1441:24,
1482:14
**described** [5] -
1442:7, 1442:21,
1443:5, 1466:4,
1447:24
**description** [1] -
1443:5
**despite** [1] - 1470:25
**detail** [1] - 1489:12
**details** [2] - 1422:8,
1431:8
**determinations** [1] -
1486:9
**determined** [2] -
1482:25, 1486:7
**developed** [1] -
1429:15
**development** [1] -
1401:15
**DeVries** [2] - 1388:11,
1406:24
**died** [2] - 1410:12,
1410:14
**difference** [1] -
1388:21
**different** [7] - 1414:21,
1414:22, 1450:2,
1453:5, 1454:10,
1462:6, 1474:19
**difficult** [1] - 1469:14
**digest** [1] - 1465:12

**digital** [1] - 1454:25
**diligence** [2] - 1414:12, 1434:13
**dinner** [1] - 1429:9
**DIRE** [3] - 1438:1, 1460:7, 1499:14
**direct** [15] - 1394:17, 1395:5, 1466:9, 1471:17, 1474:10, 1482:1, 1482:23, 1483:3, 1483:11, 1483:24, 1484:3, 1484:4, 1487:14, 1488:22, 1493:23
**DIRECT** [6] - 1426:17, 1440:10, 1475:1, 1499:12, 1499:16, 1499:18
**directed** [2] - 1465:23, 1477:8
**directing** [3] - 1395:4, 1447:16, 1488:17
**direction** [3] - 1435:9, 1480:15, 1485:17
**directly** [6] - 1421:6, 1432:6, 1432:9, 1465:18, 1466:14, 1487:23
**disagreed** [1] - 1419:23
**disagreeing** [1] - 1423:14
**discovery** [1] - 1464:3
**discuss** [7] - 1418:2, 1418:8, 1435:22, 1445:4, 1463:2, 1485:5, 1497:7
**discussed** [4] - 1417:10, 1421:3, 1476:14, 1492:12
**discussing** [3] - 1388:9, 1461:14, 1462:8
**discussion** [4] - 1410:4, 1418:24, 1482:14, 1492:12
**discussions** [1] - 1492:18
**disk** [4] - 1460:9, 1463:18, 1468:10, 1468:11
**display** [2] - 1394:4, 1399:14
**disregard** [1] - 1433:22
**disservice** [1] - 1495:6
**DISTRICT** [2] - 1375:1, 1375:1
**District** [3] - 1375:12, 1491:10

**disturbs** [1] - 1472:14
**diverted** [1] - 1464:13
**dividends** [1] - 1457:16
**document** [24] - 1392:7, 1392:8, 1398:6, 1398:9, 1399:8, 1404:19, 1405:22, 1405:25, 1406:10, 1411:22, 1418:16, 1418:18, 1418:23, 1421:10, 1490:18, 1490:20, 1490:25, 1491:1, 1491:8, 1491:14, 1491:15, 1491:21, 1491:24, 1492:1
**Document** [1] - 1421:2
**documentation** [2] - 1404:15, 1457:12
**documents** [11] - 1379:11, 1379:16, 1380:9, 1380:16, 1380:17, 1385:5, 1386:7, 1386:9, 1386:20, 1403:5, 1487:10
**dollar** [2] - 1413:13, 1414:19
**dollars** [3] - 1413:16, 1413:24, 1414:23
**Dolores** [1] - 1398:3
**Dominick** [1] - 1472:25
**done** [1] - 1437:8
**Donnie** [1] - 1409:1
**door** [3] - 1401:22, 1485:18, 1494:5
**down** [7] - 1380:25, 1394:17, 1395:21, 1425:20, 1445:14, 1457:22, 1462:11
**downplay** [2] - 1379:20, 1381:22
**downplayed** [1] - 1379:13
**drinks** [1] - 1429:9
**drop** [1] - 1429:23
**due** [2] - 1414:12, 1434:13
**duly** [2] - 1388:2, 1426:6
**during** [10] - 1378:16, 1401:5, 1412:3, 1414:7, 1416:1, 1435:16, 1452:21, 1461:16, 1464:24, 1472:16

## E

**e-mail** [86] - 1377:14, 1377:17, 1377:21, 1377:23, 1378:1, 1380:11, 1380:12, 1381:21, 1382:1, 1382:10, 1382:13, 1382:14, 1382:23, 1383:15, 1383:21, 1383:22, 1383:23, 1383:24, 1384:10, 1384:12, 1384:13, 1389:14, 1390:14, 1390:17, 1390:20, 1394:8, 1394:12, 1394:19, 1396:15, 1396:17, 1399:13, 1399:23, 1413:9, 1420:4, 1420:8, 1420:13, 1421:9, 1421:16, 1422:8, 1422:15, 1422:18, 1423:4, 1424:3, 1425:5, 1425:7, 1425:10, 1425:17, 1432:10, 1432:12, 1435:18, 1436:13, 1436:25, 1437:9, 1437:13, 1438:14, 1439:13, 1440:14, 1441:1, 1442:16, 1443:2, 1446:8, 1446:9, 1446:15, 1446:18, 1446:22, 1446:25, 1447:2, 1447:4, 1447:6, 1447:18, 1448:17, 1449:17, 1449:21, 1450:4, 1450:25, 1451:8, 1458:14, 1472:4, 1475:24, 1476:1, 1476:4, 1476:9, 1488:5, 1490:10
**e-mailing** [1] - 1453:6
**e-mails** [28] - 1377:18, 1378:10, 1378:21, 1379:21, 1379:24, 1381:17, 1381:19, 1381:24, 1389:24, 1390:3, 1424:4, 1436:22, 1438:3, 1438:20, 1438:21, 1438:22, 1438:25, 1439:6, 1439:19, 1440:3, 1487:10, 1487:13, 1487:16, 1487:19, 1487:23, 1488:21, 1490:20

**early** [6] - 1379:7, 1384:24, 1414:18, 1423:6, 1495:16, 1497:6
**ease** [1] - 1394:22
**easier** [1] - 1446:14
**east** [1] - 1416:5
**EASTERN** [1] - 1375:1
**Eastern** [1] - 1491:10
**effect** [1] - 1473:4
**efforts** [2] - 1415:23, 1416:10
**eggs** [1] - 1404:23
**either** [6] - 1378:16, 1415:2, 1449:4, 1466:21, 1487:23, 1493:24
**electrical** [2] - 1481:9, 1482:8
**electrician** [6] - 1427:1, 1427:2, 1427:4, 1427:22, 1433:17, 1473:2
**elicit** [1] - 1380:1
**eliciting** [1] - 1379:6
**emergency** [1] - 1497:4
**emotionally** [1] - 1471:9
**End** [1] - 1462:22
**end** [4] - 1384:24, 1392:17, 1435:14, 1488:14
**ended** [1] - 1388:8
**ending** [1] - 1456:11
**endless** [2] - 1385:12, 1385:13
**endlessly** [1] - 1385:15
**enforce** [1] - 1489:25
**English** [1] - 1474:16
**entered** [2] - 1436:7, 1445:23
**enters** [3] - 1387:7, 1445:22, 1474:6
**entire** [5] - 1377:25, 1461:2, 1462:4, 1462:9, 1462:21
**entitled** [6] - 1385:11, 1385:12, 1401:24, 1422:9, 1424:5, 1425:8
**equipment** [1] - 1482:19
**equity** [2] - 1401:13, 1403:7
**Eric** [1] - 1398:22
**especially** [2] - 1389:10, 1431:2
**essentially** [1] -

1380:3
**establish** [3] - 1381:10, 1383:5, 1393:11
**established** [3] - 1383:3, 1383:20, 1383:21
**establishes** [1] - 1383:6
**establishing** [2] - 1381:25, 1385:7
**estate** [5] - 1411:14, 1415:3, 1434:8, 1485:6, 1485:15
**estimate** [1] - 1415:2
**et** [1] - 1378:12
**Ethel** [2] - 1398:3, 1490:9
**Eufora** [85] - 1377:16, 1378:16, 1388:19, 1392:5, 1396:24, 1398:16, 1398:18, 1398:19, 1400:8, 1400:21, 1403:9, 1403:16, 1403:18, 1403:23, 1404:7, 1404:16, 1405:3, 1405:9, 1405:11, 1406:10, 1406:13, 1419:20, 1422:3, 1430:1, 1430:11, 1431:11, 1431:13, 1432:19, 1433:2, 1433:11, 1433:15, 1434:11, 1434:21, 1437:1, 1439:5, 1439:11, 1439:14, 1441:5, 1441:18, 1442:4, 1442:9, 1442:21, 1443:5, 1446:4, 1446:6, 1447:7, 1447:23, 1448:20, 1449:1, 1454:20, 1455:4, 1455:19, 1456:3, 1456:4, 1456:8, 1457:3, 1457:11, 1458:1, 1475:10, 1475:15, 1478:10, 1478:16, 1479:23, 1480:16, 1480:18, 1480:20, 1482:1, 1483:12, 1483:25, 1484:7, 1484:14, 1486:17, 1486:21, 1486:24, 1487:3, 1487:7, 1489:3, 1489:12, 1489:15, 1490:1, 1493:1, 1493:12, 1493:21

**Eufora's** [4] - 1394:20, 1400:14, 1441:2, 1475:16
**euro** [1] - 1389:15
**Europe** [2] - 1403:14, 1404:2
**evaluate** [2] - 1468:13, 1469:4
**evidence** [31] - 1380:12, 1386:8, 1389:3, 1389:22, 1394:3, 1397:15, 1397:16, 1412:12, 1437:18, 1440:7, 1453:15, 1454:5, 1454:21, 1455:5, 1455:14, 1456:6, 1458:3, 1460:3, 1474:13, 1474:17, 1474:24, 1475:23, 1476:24, 1477:7, 1477:11, 1478:6, 1478:18, 1478:24, 1479:3, 1480:11, 1493:5
**EVIDENCE** [3] - 1500:2, 1500:4, 1500:6
**exact** [2] - 1431:8, 1491:1
**exactly** [10] - 1404:3, 1419:9, 1421:6, 1421:19, 1430:22, 1431:14, 1435:3, 1437:10, 1471:2, 1493:8
**examination** [5] - 1387:20, 1392:17, 1471:16, 1474:10, 1480:23
**EXAMINATION** [21] - 1388:6, 1400:18, 1403:2, 1415:16, 1419:16, 1426:17, 1438:1, 1440:10, 1460:7, 1475:1, 1481:1, 1486:14, 1499:2, 1499:4, 1499:6, 1499:8, 1499:12, 1499:14, 1499:16, 1499:18, 1499:20
**examined** [2] - 1388:3, 1426:6
**example** [2] - 1379:13, 1465:21
**Excellent** [1] - 1484:3
**excellent** [3] - 1431:3, 1434:12, 1483:25
**except** [2] - 1392:9,

1404:23
**excepts** [1] - 1459:16
**excerpt** [1] - 1463:22
**excerpts** [2] - 1459:15, 1460:9
**exchange** [1] - 1382:2
**exchanged** [1] - 1438:4
**exchanging** [1] - 1381:23
**excise** [1] - 1464:8
**exclusive** [1] - 1491:23
**exculpatories** [1] - 1464:21
**exculpatory** [3] - 1464:11, 1464:14, 1468:15
**execute** [1] - 1441:3
**Exhibit** [21] - 1389:3, 1389:22, 1394:3, 1399:5, 1399:14, 1399:16, 1412:11, 1416:17, 1420:3, 1436:16, 1455:6, 1455:13, 1456:7, 1459:1, 1459:2, 1474:14, 1475:24, 1478:1, 1478:7, 1478:11, 1479:4
**exhibit** [10] - 1389:13, 1395:4, 1395:5, 1396:13, 1396:19, 1397:11, 1398:24, 1418:14, 1419:3, 1462:21
**EXHIBIT** [3] - 1500:1, 1500:9, 1500:10
**exhibits** [6] - 1377:11, 1379:12, 1389:7, 1394:17, 1437:12, 1459:21
**Exhibits** [5] - 1440:6, 1459:1, 1459:18, 1474:12, 1487:8
**EXHIBITS** [2] - 1500:3, 1500:5
**exits** [1] - 1463:5
**expected** [1] - 1462:16
**expense** [1] - 1414:14
**expenses** [4] - 1414:4, 1415:19, 1416:3, 1416:4
**explain** [4] - 1381:18, 1431:12, 1437:6, 1448:14
**explained** [1] - 1483:24
**explaining** [1] - 1430:22

**expressed** [1] - 1470:15
**extra** [1] - 1412:22

## F

**fact** [6] - 1378:6, 1395:10, 1409:14, 1419:22, 1462:3, 1489:2
**facts** [3] - 1425:9, 1425:12, 1492:16
**fair** [12] - 1385:11, 1390:5, 1390:6, 1395:17, 1413:8, 1420:7, 1439:23, 1459:24, 1461:6, 1471:20, 1489:2, 1493:10
**fairness** [1] - 1473:5
**false** [4] - 1382:22, 1464:10, 1464:14, 1464:21
**familiar** [3] - 1395:16, 1398:11, 1398:17
**family** [8] - 1387:16, 1427:6, 1427:7, 1427:23, 1470:25, 1471:3, 1495:15, 1497:4
**far** [2] - 1384:15, 1434:14
**fast** [1] - 1453:2
**father** [4] - 1427:8, 1427:9, 1427:11, 1427:21
**fault** [1] - 1466:6
**FBI** [8] - 1407:12, 1407:16, 1407:24, 1408:4, 1416:22, 1416:23, 1417:18, 1417:24
**Federal** [2] - 1375:16, 1376:7
**fees** [1] - 1457:4
**felt** [1] - 1490:6
**few** [9] - 1381:18, 1388:24, 1389:8, 1389:23, 1392:3, 1396:4, 1398:24, 1398:25, 1437:21
**fifth** [1] - 1472:15
**figure** [1] - 1468:16
**figured** [3] - 1428:2, 1429:22, 1431:22
**figures** [3] - 1418:19, 1418:23, 1418:25
**file** [1] - 1457:23
**filed** [6] - 1379:15, 1380:3, 1491:8,

1492:6, 1492:9, 1492:19
**filing** [1] - 1378:4
**finally** [7] - 1378:8, 1413:12, 1418:14, 1419:3, 1468:6, 1479:22, 1493:4
**financial** [1] - 1481:13
**fine** [7] - 1397:19, 1450:12, 1452:6, 1452:13, 1476:12, 1495:7, 1495:18
**finger** [3] - 1397:23, 1464:7, 1467:4
**finger-pointing** [1] - 1464:7
**fingers** [1] - 1470:4
**finish** [2] - 1471:16, 1471:17
**finished** [1] - 1379:4
**firm** [1] - 1403:4
**first** [30] - 1395:6, 1399:6, 1410:7, 1410:25, 1417:7, 1421:11, 1422:13, 1425:12, 1426:5, 1427:4, 1432:8, 1432:12, 1432:13, 1435:13, 1447:17, 1453:22, 1464:2, 1465:10, 1466:22, 1470:22, 1471:4, 1476:19, 1477:14, 1481:5, 1481:17, 1481:22, 1486:23, 1487:4, 1497:17
**five** [3] - 1386:11, 1460:12, 1472:14
**flipping** [1] - 1453:22
**flows** [1] - 1457:21
**fly** [2] - 1414:14, 1416:5
**focus** [2] - 1389:8, 1435:6
**focused** [2] - 1485:13, 1486:10
**folks** [1] - 1378:17
**followed** [1] - 1378:10
**following** [9] - 1421:1, 1423:1, 1424:1, 1425:1, 1444:1, 1445:1, 1462:1, 1495:1, 1497:1
**follows** [2] - 1388:3, 1426:7
**forget** [1] - 1451:11
**form** [6] - 1383:25, 1417:1, 1441:3, 1457:23, 1458:5, 1484:9

**formally** [1] - 1441:2
**format** [1] - 1432:9
**forth** [7] - 1405:11, 1414:17, 1416:6, 1435:13, 1435:14, 1435:16, 1442:2
**forward** [3] - 1438:23, 1441:11, 1447:11
**forwarded** [3] - 1378:5, 1378:6, 1488:13
**forwarding** [2] - 1377:19, 1439:10
**foundation** [1] - 1491:12
**founder** [2] - 1432:3, 1432:16
**four** [1] - 1471:6
**Frailes** [1] - 1485:16
**frame** [4] - 1379:22, 1407:10, 1407:23, 1487:4
**fraud** [1] - 1485:5
**Friday** [3] - 1394:15, 1451:3, 1465:10
**friends** [1] - 1441:15
**front** [4] - 1416:17, 1416:20, 1458:13, 1493:6
**frustrating** [1] - 1425:13
**full** [1] - 1495:3
**funding** [1] - 1410:10
**fundraising** [1] - 1409:25
**funds** [7] - 1406:1, 1409:6, 1409:22, 1409:24, 1414:2, 1434:5, 1434:8
**future** [1] - 1468:12

## G

**G-mail** [1] - 1377:20
**Gaarn** [1] - 1394:12
**gained** [1] - 1415:2
**Galioto** [10] - 1378:5, 1378:6, 1382:2, 1382:5, 1382:17, 1383:4, 1383:8, 1418:2, 1418:9
**general** [2] - 1390:3, 1402:2
**generality** [1] - 1401:25
**generated** [1] - 1419:7
**generous** [1] - 1384:17
**Gentry** [1] - 1394:15
**given** [5] - 1392:11,

1403:18, 1416:18, 1448:1, 1471:10
**Gonchar** [5] - 1378:11, 1379:11, 1380:11, 1380:13, 1457:7
**Goudet** [1] - 1409:2
**government** [8] - 1412:6, 1425:22, 1425:25, 1437:17, 1468:13, 1471:23, 1474:19, 1497:24
**Government** [12] - 1375:15, 1411:20, 1460:2, 1463:24, 1467:2, 1474:12, 1475:24, 1478:1, 1478:6, 1478:11, 1479:4, 1487:8
**GOVERNMENT** [1] - 1500:5
**government's** [1] - 1468:12
**Government's** [10] - 1412:11, 1436:16, 1440:6, 1455:6, 1455:13, 1456:7, 1458:25, 1459:1, 1459:2, 1459:18
**GOVERNMENT'S** [2] - 1500:1, 1500:3
**grand** [1] - 1429:23
**gray** [1] - 1412:20
**great** [1] - 1385:4
**green** [1] - 1412:19
**Greenberg** [3] - 1456:19, 1456:23, 1457:1
**Greg** [1] - 1406:24
**grocery** [1] - 1405:20
**ground** [1] - 1464:14
**grounds** [1] - 1486:10
**Group** [3] - 1411:5, 1411:8, 1413:1
**group** [3] - 1382:11, 1394:9, 1400:6
**groups** [1] - 1382:19
**guess** [6] - 1421:18, 1427:18, 1433:14, 1461:12, 1493:10
**guy** [2] - 1431:22
**guys** [2] - 1429:9, 1430:6

# H

**Haley** [12] - 1377:6, 1377:8, 1392:20, 1392:22, 1407:6, 1407:11, 1407:15,

1415:13, 1471:21, 1472:1, 1480:23, 1486:13
**HALEY** [39] - 1375:21, 1375:23, 1377:6, 1392:14, 1393:3, 1397:9, 1397:14, 1405:5, 1405:24, 1408:6, 1410:18, 1412:8, 1413:3, 1415:5, 1415:9, 1415:14, 1415:17, 1419:2, 1419:13, 1428:14, 1429:12, 1433:21, 1433:24, 1437:19, 1472:6, 1473:10, 1480:24, 1481:2, 1485:11, 1485:13, 1485:16, 1485:22, 1486:15, 1489:1, 1490:17, 1494:15, 1494:17, 1499:7, 1499:21
**Haley's** [1] - 1471:17
**half** [6] - 1384:25, 1385:19, 1385:20, 1385:21, 1386:15
**half-hour** [4] - 1385:19, 1385:20, 1385:21
**hand** [5] - 1378:18, 1397:21, 1398:2, 1418:18, 1458:25
**handed** [1] - 1421:2
**Handing** [5] - 1386:23, 1390:10, 1407:9, 1436:17, 1490:21
**handle** [2] - 1469:8, 1471:10
**handwriting** [4] - 1395:19, 1405:15, 1418:21, 1419:4
**handwritten** [2] - 1404:19, 1418:15
**Harbor** [2] - 1411:16, 1455:10
**hard** [3] - 1433:19, 1453:17, 1463:12
**harking** [1] - 1406:19
**Harvey** [11] - 1381:20, 1382:4, 1382:8, 1382:18, 1383:7, 1383:8, 1384:2, 1384:4, 1384:7, 1384:13
**Hatzinemos** [1] - 1398:22
**Hawaii** [25] - 1407:17, 1408:3, 1408:10, 1408:23, 1409:5,

1409:13, 1410:10, 1410:13, 1411:9, 1411:11, 1411:16, 1414:16, 1415:19, 1415:23, 1416:1, 1416:6, 1416:10, 1416:15, 1417:10, 1418:3, 1418:9, 1419:4, 1419:11
**head** [1] - 1466:8
**hear** [9] - 1377:24, 1382:15, 1398:1, 1406:25, 1445:17, 1474:19, 1474:20, 1475:4, 1485:3
**heard** [11] - 1384:3, 1430:5, 1430:8, 1442:3, 1461:25, 1469:4, 1473:7, 1480:1, 1487:2, 1489:8
**hearsay** [7] - 1377:12, 1385:6, 1386:8, 1401:3, 1422:5, 1464:10, 1468:15
**heart** [1] - 1380:5
**heavy** [1] - 1431:9
**held** [2] - 1434:22, 1441:5
**help** [1] - 1446:11
**helpful** [1] - 1426:14
**Hermosa** [1] - 1411:15
**highlighted** [2] - 1394:18, 1443:1
**Highway** [1] - 1375:22
**himself** [2] - 1428:21, 1432:15
**hitter** [1] - 1431:9
**hockey** [10] - 1379:5, 1379:10, 1379:15, 1379:24, 1388:10, 1429:2, 1475:8, 1475:9, 1483:4, 1483:8
**hold** [2] - 1387:13, 1404:13
**home** [8] - 1428:19, 1434:18, 1442:2, 1477:17, 1481:17, 1482:8, 1482:19, 1486:20
**honest** [3] - 1470:11, 1470:18, 1471:12
**Honor** [46] - 1376:17, 1376:20, 1376:24, 1377:3, 1377:7, 1378:19, 1378:21, 1386:19, 1386:20, 1387:4, 1387:14, 1388:5, 1389:17,

1394:4, 1394:7, 1397:3, 1398:13, 1412:9, 1415:5, 1420:12, 1421:12, 1423:22, 1425:19, 1425:24, 1435:19, 1437:20, 1437:22, 1439:7, 1440:2, 1440:8, 1440:23, 1441:21, 1443:12, 1461:24, 1464:1, 1466:2, 1468:4, 1469:16, 1469:19, 1470:11, 1471:25, 1473:8, 1473:10, 1484:16, 1485:23, 1497:20
**Honor's** [1] - 1469:3
**HONORABLE** [1] - 1375:12
**hope** [5] - 1382:20, 1463:13, 1472:6, 1497:22, 1497:25
**hopefully** [2] - 1383:11, 1465:19
**hoping** [2] - 1379:10, 1385:18
**Hormovitis** [1] - 1375:8
**hospital** [1] - 1470:3
**host** [1] - 1401:2
**hour** [9] - 1379:18, 1384:25, 1385:19, 1385:20, 1385:21, 1386:15, 1461:7, 1461:16
**hours** [7] - 1380:20, 1381:14, 1423:9, 1461:1, 1461:2, 1462:7, 1463:12
**house** [7] - 1411:16, 1481:11, 1481:20, 1481:21, 1482:16, 1483:7, 1486:22
**Hughes** [3] - 1379:16, 1466:19, 1490:9
**hurry** [2] - 1448:9, 1448:11

# I

**idea** [2] - 1383:24, 1401:23
**ideal** [2] - 1464:24, 1465:5
**ideas** [1] - 1430:15
**identification** [8] - 1389:5, 1389:11, 1390:8, 1395:3, 1396:14, 1396:20,

1399:5, 1420:3
**identified** [6] - 1389:4, 1423:5, 1428:13, 1428:14, 1438:14, 1487:10
**identify** [3] - 1378:25, 1463:13, 1487:15
**II** [1] - 1378:9
**impart** [1] - 1465:13
**imparted** [3] - 1379:1, 1382:21, 1390:17
**impartiality** [1] - 1473:5
**imparting** [1] - 1383:8
**impeach** [1] - 1421:15
**important** [4] - 1394:21, 1396:10, 1399:1, 1435:1
**impression** [1] - 1462:6
**IN** [3] - 1500:1, 1500:3, 1500:6
**inbound** [2] - 1477:22, 1478:3
**inch** [1] - 1485:18
**include** [1] - 1454:19
**includes** [1] - 1465:15
**including** [3] - 1383:13, 1394:9, 1401:13
**inconvenience** [1] - 1450:5
**incurred** [1] - 1416:2
**indicate** [1] - 1422:15
**indicated** [2] - 1470:14, 1472:25
**indicating** [1] - 1392:7
**individual** [2] - 1428:4, 1457:22
**individuals** [8] - 1380:2, 1382:12, 1382:19, 1388:20, 1390:21, 1394:9, 1394:23, 1399:3
**influence** [1] - 1494:12
**information** [24] - 1378:25, 1379:6, 1379:8, 1381:23, 1382:2, 1382:5, 1382:21, 1383:8, 1390:17, 1401:9, 1431:20, 1438:15, 1439:4, 1439:10, 1439:24, 1445:12, 1445:16, 1471:8, 1472:2, 1483:8, 1485:8, 1495:10, 1495:13, 1495:25
**initials** [1] - 1459:19

**inked** [1] - 1432:22
**inquire** [1] - 1482:9
**installing** [1] - 1482:19
**instance** [1] - 1416:13
**instead** [3] - 1381:7, 1404:23, 1465:23
**instructed** [3] - 1485:2, 1485:4, 1486:11
**instruction** [3] - 1474:15, 1485:19, 1486:3
**instructions** [5] - 1454:19, 1454:25, 1455:3, 1476:2, 1478:13
**intend** [3] - 1468:19, 1472:7
**intention** [2] - 1485:17, 1485:18
**interest** [28] - 1388:18, 1398:19, 1401:5, 1401:13, 1403:8, 1403:25, 1405:2, 1405:3, 1405:11, 1406:4, 1419:20, 1440:21, 1441:5, 1442:21, 1443:5, 1446:4, 1446:6, 1447:23, 1455:4, 1478:10, 1478:16, 1488:7, 1488:18, 1490:1, 1493:1, 1493:12
**interest/ownership** [1] - 1454:20
**interested** [1] - 1434:10
**interests** [1] - 1398:18
**intern** [2] - 1472:24, 1473:3
**interpretation** [1] - 1469:6
**interruption** [1] - 1378:22
**interview** [1] - 1407:7
**intrigued** [1] - 1484:12
**introduce** [5] - 1380:14, 1383:22, 1384:12, 1392:8, 1392:25
**introduced** [4] - 1397:10, 1398:10, 1442:12, 1493:5
**introducing** [5] - 1380:9, 1385:5, 1392:23, 1392:24, 1421:10
**introduction** [1] -

1481:8
**invest** [7] - 1410:13, 1431:21, 1433:1, 1435:2, 1437:1, 1487:3, 1489:15
**invested** [7] - 1404:16, 1405:17, 1433:25, 1434:21, 1457:11, 1475:10, 1486:21
**investigation** [1] - 1410:16
**investing** [6] - 1403:21, 1428:23, 1428:24, 1434:10, 1442:8, 1484:14
**investment** [18] - 1433:4, 1433:18, 1434:17, 1435:6, 1435:7, 1436:11, 1441:18, 1455:19, 1457:12, 1466:13, 1481:13, 1485:6, 1485:15, 1488:7, 1488:21, 1489:4, 1489:18, 1493:2
**investments** [8] - 1379:2, 1428:22, 1434:3, 1439:5, 1439:11, 1439:14, 1465:15, 1466:12
**investor** [1] - 1398:17
**investors** [3] - 1404:4, 1466:7, 1466:18
**invite** [3] - 1429:3, 1480:6
**invited** [2] - 1479:25, 1493:23
**involved** [5] - 1439:13, 1439:17, 1441:17, 1486:6, 1489:3
**involvement** [2] - 1465:16, 1493:11
**involving** [2] - 1382:1, 1417:8
**irrelevant** [1] - 1378:7
**Island** [3] - 1426:21, 1426:23, 1453:10
**island** [1] - 1428:2
**Islandia** [1] - 1375:23
**Islip** [3] - 1375:5, 1375:17, 1376:8
**isolate** [3] - 1463:17, 1464:22, 1467:10
**isolated** [2] - 1463:9, 1463:11
**issue** [9] - 1377:10, 1387:16, 1463:2, 1495:15, 1498:2
**issues** [1] - 1385:15
**itself** [1] - 1476:15

**J**

**James** [2] - 1376:18, 1409:1
**JAMES** [1] - 1375:17
**January** [7] - 1377:15, 1377:17, 1377:24, 1378:2, 1378:9, 1389:14, 1390:1
**Jason** [1] - 1406:24
**jeopardize** [1] - 1401:5
**JFB** [1] - 1375:3
**JK-1** [1] - 1407:8
**job** [2] - 1427:4, 1427:23
**John** [34] - 1387:5, 1394:12, 1430:5, 1438:17, 1438:18, 1440:25, 1441:25, 1443:7, 1443:9, 1446:19, 1465:15, 1465:25, 1466:6, 1477:3, 1480:1, 1480:6, 1481:6, 1481:20, 1481:21, 1487:25, 1488:8, 1488:12, 1488:13, 1488:15, 1489:4, 1489:6, 1489:10, 1489:14, 1489:17, 1493:24, 1494:4, 1494:6, 1494:8, 1494:11
**Johnny** [1] - 1466:7
**JOSEPH** [1] - 1375:12
**Jowdy** [25] - 1378:9, 1379:16, 1380:19, 1381:21, 1383:10, 1384:5, 1386:14, 1407:17, 1407:24, 1407:25, 1408:1, 1408:3, 1408:4, 1408:9, 1408:12, 1416:24, 1417:3, 1417:8, 1417:14, 1417:18, 1417:21, 1417:24, 1418:3, 1418:9
**judge** [15] - 1380:10, 1381:17, 1383:6, 1384:8, 1385:23, 1386:11, 1392:14, 1397:10, 1397:17, 1400:22, 1402:3, 1421:4, 1421:11, 1466:10, 1469:10
**Judge** [55] - 1375:12, 1377:2, 1379:12, 1379:20, 1379:21,

1379:23, 1380:15, 1381:1, 1381:9, 1381:18, 1381:19, 1381:24, 1382:1, 1382:4, 1382:11, 1382:12, 1382:18, 1382:20, 1382:24, 1383:8, 1385:19, 1386:16, 1386:25, 1389:20, 1392:18, 1392:23, 1393:2, 1393:3, 1393:6, 1397:14, 1399:18, 1400:16, 1415:14, 1419:2, 1424:9, 1429:13, 1445:25, 1462:18, 1463:12, 1463:16, 1465:8, 1465:13, 1465:21, 1467:7, 1468:22, 1470:13, 1470:18, 1471:12, 1472:7, 1472:21, 1474:23, 1480:25, 1490:17, 1494:15, 1495:18
**July** [6] - 1390:15, 1390:21, 1394:16, 1395:17, 1396:18, 1398:16
**juncture** [1] - 1401:12
**June** [8] - 1420:5, 1420:7, 1422:8, 1423:5, 1423:10, 1423:16, 1472:11, 1472:12
**juror** [2] - 1472:10, 1472:17
**Juror** [3] - 1387:14, 1387:16, 1387:17
**JUROR** [1] - 1387:15
**jurors** [1] - 1497:17
**JURORS** [1] - 1387:11
**jury** [42] - 1375:13, 1379:21, 1383:11, 1386:1, 1387:3, 1387:7, 1387:10, 1394:5, 1397:23, 1433:22, 1435:23, 1436:3, 1436:7, 1445:5, 1445:23, 1460:4, 1462:6, 1462:10, 1463:5, 1468:21, 1472:16, 1474:2, 1474:6, 1474:9, 1474:18, 1474:25, 1475:21, 1476:17, 1476:25, 1477:5, 1477:12, 1477:20, 1478:19, 1479:1, 1479:16,

1480:12, 1485:20, 1486:2, 1493:6, 1495:14, 1497:3, 1497:11
**jury's** [1] - 1447:16
**juxtapose** [1] - 1413:16

**K**

**K-1** [2] - 1457:18, 1457:20
**K-1s** [1] - 1457:25
**kaiser** [2] - 1383:7, 1395:19
**Kaiser** [78] - 1377:11, 1377:23, 1378:1, 1379:7, 1379:9, 1379:13, 1379:25, 1381:20, 1382:3, 1382:8, 1384:2, 1385:17, 1387:5, 1387:20, 1387:22, 1388:8, 1388:25, 1389:10, 1389:23, 1390:8, 1392:6, 1393:10, 1394:8, 1394:12, 1394:13, 1397:20, 1398:3, 1398:7, 1398:24, 1399:10, 1399:20, 1400:5, 1400:20, 1413:12, 1415:1, 1415:18, 1419:18, 1423:4, 1423:13, 1423:20, 1425:4, 1425:21, 1430:5, 1438:17, 1438:18, 1439:1, 1439:10, 1439:13, 1439:24, 1440:15, 1441:12, 1441:14, 1441:25, 1442:11, 1446:19, 1447:4, 1460:19, 1465:15, 1465:25, 1466:13, 1466:23, 1480:1, 1480:6, 1481:6, 1487:25, 1488:8, 1488:12, 1488:15, 1489:4, 1489:10, 1489:14, 1489:17, 1490:9, 1493:24, 1494:4, 1494:6, 1494:8, 1494:11
**Kaiser's** [4] - 1379:3, 1466:6, 1481:20, 1481:21
**keep** [4] - 1426:13, 1462:11, 1472:17, 1497:24

kELLY [1] - 1375:15
Ken [19] - 1378:8,
1407:16, 1407:17,
1407:25, 1408:1,
1408:3, 1408:9,
1410:2, 1410:8,
1410:9, 1417:3,
1417:8, 1417:14,
1417:18, 1417:21,
1417:24, 1418:3,
1418:9
KENNER [1] - 1375:6
Kenner [74] - 1375:6,
1375:21, 1376:14,
1377:6, 1377:8,
1379:25, 1390:14,
1390:20, 1394:11,
1405:12, 1405:17,
1406:12, 1408:1,
1408:16, 1409:11,
1409:20, 1410:5,
1410:8, 1410:15,
1411:13, 1411:17,
1412:16, 1412:21,
1412:25, 1413:17,
1415:4, 1416:2,
1416:5, 1416:9,
1416:13, 1416:17,
1416:22, 1417:17,
1418:14, 1418:24,
1419:3, 1419:8,
1428:5, 1428:13,
1428:15, 1428:18,
1428:20, 1430:1,
1430:10, 1431:7,
1431:20, 1431:24,
1434:20, 1442:8,
1442:12, 1467:4,
1481:5, 1481:12,
1481:17, 1482:4,
1482:16, 1483:14,
1486:6, 1486:17,
1486:20, 1488:16,
1489:4, 1489:19,
1489:20, 1492:2,
1492:22, 1492:25,
1493:11, 1493:14,
1493:20, 1494:2,
1494:6, 1494:8,
1494:11
Kenner's [3] - 1416:4,
1419:10, 1487:18
Kenner-37 [1] -
1404:21
Kenneth [1] - 1408:12
kind [7] - 1400:21,
1412:23, 1429:18,
1430:8, 1433:1,
1434:3, 1482:13
kindly [1] - 1490:18

kitchen [1] - 1483:15
knowledge [4] -
1413:9, 1416:7,
1416:9, 1494:14
knows [5] - 1383:2,
1383:3, 1383:4,
1383:20, 1383:21
kOMATIREDDY [1] -
1485:4
KOMATIREDDY [37] -
1375:18, 1376:20,
1425:24, 1426:18,
1428:12, 1435:19,
1437:17, 1439:7,
1440:8, 1440:11,
1440:22, 1440:25,
1445:25, 1460:2,
1462:15, 1464:1,
1466:2, 1466:20,
1471:25, 1474:23,
1475:2, 1475:20,
1478:17, 1480:22,
1484:9, 1484:16,
1485:2, 1485:12,
1485:23, 1490:3,
1490:14, 1491:12,
1492:3, 1493:15,
1499:13, 1499:17,
1499:19
Komatireddy [3] -
1376:21, 1376:22,
1436:8

L

LA [32] - 1412:9,
1419:17, 1420:12,
1421:4, 1421:11,
1422:13, 1422:20,
1423:3, 1423:22,
1424:6, 1424:9,
1425:3, 1425:19,
1437:20, 1437:21,
1438:2, 1440:2,
1441:21, 1443:12,
1444:2, 1444:10,
1445:13, 1445:19,
1494:21, 1495:2,
1495:8, 1495:18,
1495:23, 1497:20,
1497:23, 1499:9,
1499:15
laid [1] - 1414:18
Lake [2] - 1445:14,
1470:10
language [1] -
1474:16
lapsed [1] - 1486:18
large [1] - 1463:21
LARUSSO [12] -

1460:5, 1460:8,
1461:24, 1462:3,
1462:13, 1462:18,
1463:11, 1463:23,
1465:8, 1466:10,
1467:7, 1499:3
laRUSSO [2] - 1376:1,
1392:17
LaRusso [80] -
1376:3, 1376:23,
1376:25, 1377:11,
1378:20, 1378:21,
1380:10, 1380:14,
1380:20, 1381:1,
1381:9, 1381:13,
1381:17, 1382:10,
1382:17, 1382:24,
1383:6, 1384:2,
1384:5, 1384:8,
1384:13, 1384:20,
1385:18, 1385:23,
1386:6, 1386:11,
1386:16, 1386:19,
1386:25, 1387:21,
1388:5, 1388:7,
1388:13, 1388:16,
1389:17, 1390:23,
1392:2, 1392:23,
1393:1, 1393:4,
1393:6, 1393:9,
1393:12, 1394:4,
1394:7, 1397:3,
1397:7, 1397:12,
1397:17, 1398:13,
1399:18, 1400:16,
1400:20, 1400:22,
1401:2, 1401:16,
1402:3, 1402:7,
1404:5, 1406:19,
1407:6, 1407:11,
1408:21, 1411:5,
1463:9, 1464:23,
1468:4, 1468:21,
1469:10, 1469:16,
1469:19, 1470:2,
1470:10, 1471:5,
1471:12, 1471:22,
1472:4, 1472:21,
1473:9
last [23] - 1377:16,
1380:6, 1381:17,
1382:1, 1383:17,
1384:24, 1388:8,
1388:14, 1388:24,
1389:13, 1390:19,
1396:8, 1398:9,
1398:25, 1406:19,
1407:4, 1420:2,
1421:20, 1433:23,
1444:5, 1462:16,
1462:19, 1464:5

late [3] - 1430:4,
1430:10, 1497:15
law [10] - 1403:4,
1442:25, 1449:14,
1450:9, 1451:12,
1451:14, 1451:16,
1452:1, 1454:3,
1454:18
lawsuit [15] - 1400:21,
1401:5, 1401:12,
1402:1, 1403:5,
1404:11, 1412:3,
1457:5, 1491:8,
1491:17, 1491:20,
1492:6, 1492:9,
1492:19, 1492:22
lawyer [5] - 1379:25,
1383:9, 1384:5,
1400:12, 1457:4
lawyer's [1] - 1465:23
lawyers [3] - 1394:19,
1495:15, 1497:4
layer [1] - 1385:4
laying [1] - 1414:13
lays [1] - 1401:9
lead [3] - 1402:4,
1422:12, 1434:7
leading [4] - 1405:5,
1408:6, 1408:8,
1466:21
learn [2] - 1403:23,
1427:22
learned [1] - 1410:20
learning [2] - 1401:18,
1428:1
leases [1] - 1403:13
least [6] - 1385:24,
1410:25, 1422:8,
1466:25, 1471:16,
1484:12
leave [7] - 1434:15,
1462:5, 1462:10,
1463:7, 1495:9,
1495:24, 1497:14
led [1] - 1458:20
leeway [6] - 1384:18,
1384:20, 1385:3,
1385:16, 1393:5,
1393:7
left [3] - 1380:21,
1398:2, 1400:20
left-hand [1] - 1398:2
legal [3] - 1457:3,
1489:25, 1491:5
Lehman [6] - 1409:15,
1409:21, 1410:25,
1413:19, 1414:2,
1414:20
lender [2] - 1394:20,
1400:8

lending [1] - 1417:10
less [1] - 1425:8
letter [12] - 1392:4,
1392:11, 1394:21,
1396:10, 1396:14,
1396:20, 1399:1,
1399:12, 1399:22,
1400:12, 1401:7
Letters [1] - 1394:16
letting [1] - 1384:17
level [2] - 1401:22,
1401:25
licensing [5] - 1379:9,
1390:4, 1431:15,
1431:17, 1431:18
life [2] - 1426:24,
1426:25
likewise [1] - 1439:4
line [2] - 1412:23,
1440:20
lines [3] - 1388:17,
1408:3, 1467:6
liquid [1] - 1437:10
list [7] - 1394:23,
1399:2, 1404:19,
1404:22, 1405:12,
1405:18, 1405:20
listened [1] - 1461:4
listening [1] - 1497:8
live [1] - 1426:19
lived [1] - 1426:23
lives [2] - 1468:23,
1468:24
living [1] - 1426:25
LLC [13] - 1398:16,
1398:18, 1398:19,
1441:5, 1447:7,
1448:20, 1449:1,
1454:20, 1455:4,
1456:1, 1456:3,
1478:10, 1478:16
LLP [2] - 1375:21,
1376:1
loan [15] - 1381:3,
1381:4, 1381:6,
1400:7, 1400:14,
1401:16, 1401:17,
1413:14, 1413:19,
1414:3, 1414:19,
1418:3, 1418:9,
1434:24
locks [1] - 1414:13
look [26] - 1389:6,
1389:7, 1389:10,
1390:9, 1392:15,
1395:3, 1395:20,
1395:23, 1396:3,
1396:5, 1396:8,
1396:13, 1397:9,
1399:7, 1411:21,

11

1418:14, 1428:9, 1436:16, 1436:18, 1438:8, 1446:11, 1447:11, 1461:11, 1489:7, 1490:18, 1491:11
**looked** [7] - 1404:18, 1419:9, 1431:3, 1434:14, 1434:17, 1465:11
**looking** [7] - 1388:18, 1400:13, 1430:25, 1465:4, 1476:4, 1478:1, 1490:20
**looks** [11] - 1378:2, 1390:16, 1395:9, 1396:1, 1397:2, 1404:22, 1423:8, 1446:21, 1466:11, 1488:9, 1489:9
**Los** [1] - 1485:16
**loss** [1] - 1457:21
**lost** [3] - 1384:25, 1415:2, 1485:6
**love** [1] - 1442:1
**lunch** [5] - 1445:16, 1445:18, 1462:17, 1463:4, 1468:4

**M**

**macho** [1] - 1471:13
**magnify** [1] - 1456:17
**mail** [88] - 1377:14, 1377:17, 1377:20, 1377:21, 1377:23, 1378:1, 1380:11, 1380:12, 1381:21, 1382:1, 1382:10, 1382:13, 1382:14, 1382:23, 1383:15, 1383:21, 1383:22, 1383:23, 1383:24, 1384:10, 1384:12, 1384:13, 1389:14, 1390:14, 1390:17, 1390:20, 1394:8, 1394:12, 1394:19, 1396:15, 1396:17, 1399:13, 1399:23, 1413:9, 1420:4, 1420:8, 1420:13, 1421:9, 1421:16, 1422:8, 1422:15, 1422:18, 1423:4, 1424:3, 1425:5, 1425:7, 1425:10, 1425:17, 1432:10, 1432:12, 1435:18, 1436:13, 1436:25,

1437:9, 1437:13, 1438:14, 1439:13, 1440:14, 1441:1, 1442:16, 1443:2, 1446:8, 1446:9, 1446:15, 1446:18, 1446:22, 1446:25, 1447:2, 1447:4, 1447:6, 1447:18, 1448:17, 1449:17, 1449:21, 1450:4, 1450:25, 1451:8, 1452:1, 1458:14, 1472:4, 1475:24, 1476:1, 1476:4, 1476:9, 1488:5, 1490:10
**mailing** [1] - 1453:6
**mails** [28] - 1377:18, 1378:10, 1378:21, 1379:21, 1379:24, 1381:17, 1381:19, 1381:24, 1389:24, 1390:3, 1424:4, 1436:22, 1438:3, 1438:20, 1438:21, 1438:22, 1438:25, 1439:6, 1439:19, 1440:3, 1487:10, 1487:13, 1487:16, 1487:19, 1487:23, 1488:21, 1490:20
**main** [3] - 1431:1, 1431:15, 1466:15
**man** [6] - 1425:11, 1452:2, 1466:21, 1471:13, 1483:1
**Management** [3] - 1411:5, 1411:8, 1413:1
**manner** [1] - 1433:15
**mark** [1] - 1397:18
**marked** [14] - 1389:5, 1389:11, 1389:22, 1390:8, 1394:3, 1395:2, 1396:13, 1397:7, 1397:16, 1399:19, 1411:20, 1436:15, 1458:25, 1474:12
**massive** [1] - 1470:5
**maternity** [1] - 1434:15
**Matt's** [1] - 1382:14
**matter** [6] - 1394:16, 1395:10, 1486:7, 1488:23, 1489:2, 1498:12
**Matter** [12] - 1391:3, 1393:14, 1394:1,

1402:11, 1403:1, 1411:25, 1469:23, 1473:12, 1474:1, 1484:20, 1485:25, 1486:1
**matthew** [1] - 1382:2
**Matthew** [1] - 1382:17
**mean** [6] - 1382:16, 1438:19, 1470:6, 1470:7, 1471:20, 1491:2
**meet** [3] - 1417:21, 1481:17, 1492:10
**meeting** [7] - 1417:7, 1447:12, 1483:18, 1483:19, 1483:20, 1494:9, 1494:12
**member** [2] - 1398:17, 1473:6
**members** [13] - 1387:10, 1394:22, 1396:11, 1396:21, 1396:24, 1398:16, 1398:19, 1399:2, 1401:9, 1441:2, 1474:9, 1486:2, 1497:3
**membership** [3] - 1440:21, 1441:3, 1458:4
**Memorial** [1] - 1375:22
**memory** [1] - 1386:13
**mention** [2] - 1472:23, 1492:2
**mentioned** [9] - 1429:10, 1429:17, 1429:19, 1431:4, 1434:19, 1475:14, 1483:3, 1486:3, 1491:19
**message** [2] - 1377:25, 1378:5
**messages** [1] - 1412:15
**met** [17] - 1411:1, 1416:24, 1417:3, 1417:9, 1417:14, 1417:18, 1417:24, 1428:4, 1428:17, 1432:20, 1481:5, 1481:22, 1486:23, 1487:4, 1492:5, 1492:6
**Metabank** [5] - 1389:15, 1431:6, 1431:7, 1431:13, 1432:20
**Mexico** [3] - 1417:11, 1417:21, 1417:24

**Michael** [6] - 1377:14, 1377:21, 1394:11, 1394:24, 1398:22
**Michele's** [1] - 1497:14
**Michelle** [1] - 1472:10
**middle** [2] - 1394:17, 1446:9
**might** [4] - 1438:5, 1438:23, 1442:4, 1489:9
**mike** [2] - 1426:13, 1436:4
**milestone** [1] - 1411:1
**milk** [1] - 1404:24
**million** [6] - 1405:19, 1413:13, 1413:16, 1413:24, 1414:19, 1414:23
**millions** [2] - 1406:4, 1425:7
**mind** [2] - 1378:15, 1495:3
**mine** [1] - 1463:24
**Mineola** [1] - 1376:2
**minute** [2] - 1433:16, 1477:2
**minutes** [10] - 1381:18, 1386:10, 1386:11, 1386:16, 1425:22, 1460:12, 1460:13, 1468:7, 1471:25
**MISKIEWICZ** [33] - 1375:17, 1376:17, 1377:10, 1378:19, 1386:20, 1389:20, 1390:24, 1396:22, 1397:5, 1398:5, 1399:7, 1400:4, 1400:9, 1400:19, 1401:11, 1402:6, 1403:3, 1412:1, 1412:6, 1413:23, 1415:12, 1417:1, 1417:19, 1417:25, 1418:5, 1420:14, 1421:12, 1421:18, 1422:1, 1422:11, 1469:1, 1473:8, 1499:5
**Miskiewicz** [6] - 1376:18, 1376:19, 1378:22, 1386:22, 1415:18, 1416:18
**misleading** [1] - 1462:4
**missed** [3] - 1447:21, 1448:8, 1451:4
**missing** [1] - 1451:7

**model** [4] - 1430:17, 1431:3, 1483:25, 1484:3
**mom** [2] - 1404:15, 1405:9
**mom's** [1] - 1406:16
**moment** [8] - 1419:2, 1422:1, 1435:20, 1437:20, 1482:18, 1490:17, 1491:5, 1494:15
**moments** [1] - 1389:9
**Monday** [5] - 1384:23, 1449:4, 1450:2, 1450:25, 1451:3
**money** [52] - 1403:15, 1403:23, 1404:16, 1405:9, 1406:12, 1406:13, 1406:14, 1406:16, 1407:17, 1408:3, 1408:10, 1408:13, 1408:23, 1409:15, 1409:21, 1410:11, 1410:23, 1411:1, 1411:11, 1414:11, 1414:24, 1415:2, 1417:10, 1429:22, 1433:12, 1433:18, 1437:11, 1448:12, 1449:13, 1453:2, 1453:3, 1457:3, 1457:9, 1457:11, 1458:21, 1464:12, 1464:13, 1465:23, 1466:16, 1475:15, 1475:16, 1477:8, 1478:22, 1479:4, 1479:18, 1479:20, 1480:15, 1485:6, 1488:22, 1490:5, 1490:6
**monies** [2] - 1456:25, 1465:18
**months** [2] - 1486:18, 1490:5
**morning** [30] - 1376:17, 1376:19, 1376:20, 1376:22, 1376:24, 1376:25, 1377:1, 1377:2, 1377:3, 1377:5, 1377:7, 1377:8, 1382:14, 1384:14, 1384:23, 1387:10, 1387:11, 1387:12, 1406:18, 1423:6, 1426:19, 1435:21, 1449:5, 1450:2, 1450:25, 1472:10, 1495:21, 1497:6,

1497:17, 1497:19
**most** [3] - 1378:24, 1470:11, 1489:13
**mother** [6] - 1395:10, 1401:14, 1403:22, 1444:3, 1466:19, 1495:23
**mother's** [2] - 1395:13, 1405:2
**motivation** [1] - 1401:25
**move** [3] - 1446:8, 1447:16, 1470:3
**moves** [2] - 1437:17, 1460:2
**moving** [3] - 1425:15, 1448:16, 1448:23
**MR** [176] - 1376:17, 1376:23, 1377:3, 1377:6, 1377:10, 1378:19, 1378:21, 1380:10, 1380:14, 1380:20, 1381:1, 1381:9, 1381:13, 1381:17, 1382:10, 1382:17, 1382:24, 1383:6, 1384:2, 1384:5, 1384:8, 1385:18, 1385:23, 1386:11, 1386:16, 1386:19, 1386:20, 1386:25, 1388:5, 1388:7, 1388:13, 1388:16, 1389:17, 1389:20, 1390:23, 1390:24, 1392:2, 1392:14, 1392:17, 1392:23, 1393:1, 1393:3, 1393:6, 1393:9, 1393:12, 1394:4, 1394:7, 1396:22, 1397:3, 1397:5, 1397:7, 1397:9, 1397:12, 1397:14, 1397:17, 1398:5, 1398:13, 1399:7, 1399:15, 1399:18, 1400:4, 1400:9, 1400:16, 1400:19, 1400:22, 1401:2, 1401:11, 1402:3, 1402:6, 1402:7, 1403:3, 1405:5, 1405:24, 1408:6, 1410:18, 1412:1, 1412:6, 1412:8, 1412:9, 1413:3, 1413:23, 1415:5, 1415:9, 1415:12, 1415:14,

1415:17, 1417:1, 1417:19, 1417:25, 1418:5, 1419:2, 1419:13, 1419:17, 1420:12, 1420:14, 1421:4, 1421:11, 1421:12, 1421:18, 1422:1, 1422:11, 1422:13, 1422:20, 1423:3, 1423:22, 1424:6, 1424:9, 1425:3, 1425:19, 1428:14, 1429:12, 1433:21, 1433:24, 1437:19, 1437:20, 1437:21, 1438:2, 1440:2, 1441:21, 1443:12, 1444:2, 1444:10, 1445:13, 1445:19, 1460:5, 1460:8, 1461:24, 1462:3, 1462:13, 1462:18, 1463:11, 1463:23, 1465:8, 1466:10, 1467:7, 1468:4, 1468:21, 1469:1, 1469:10, 1469:16, 1469:19, 1470:2, 1470:10, 1471:5, 1471:12, 1471:22, 1472:4, 1472:6, 1472:21, 1473:8, 1473:9, 1473:10, 1480:24, 1481:2, 1485:11, 1485:13, 1485:16, 1485:22, 1486:15, 1489:1, 1490:17, 1494:15, 1494:17, 1494:21, 1495:2, 1495:8, 1495:18, 1495:23, 1497:20, 1497:23, 1499:3, 1499:5, 1499:7, 1499:9, 1499:15, 1499:21
**MS** [37] - 1376:20, 1425:24, 1426:18, 1428:12, 1435:19, 1437:17, 1439:7, 1440:8, 1440:11, 1440:22, 1440:25, 1445:25, 1460:2, 1462:15, 1464:1, 1466:2, 1466:20, 1471:25, 1474:23, 1475:2, 1475:20, 1478:17, 1480:22, 1484:9, 1484:16, 1485:2, 1485:4, 1485:12, 1485:23,

1490:3, 1490:14, 1491:12, 1492:3, 1493:15, 1499:13, 1499:17, 1499:19
**must** [1] - 1417:17
**mutual** [3] - 1434:5, 1434:8, 1482:13
**mystified** [2] - 1385:9

# N

**N-E-R-G-U-I-Z-I-A-N** [1] - 1394:21
**name** [8] - 1410:2, 1426:8, 1466:17, 1487:19, 1489:8, 1490:11, 1491:15, 1492:22
**named** [2] - 1428:5, 1491:20
**names** [3] - 1388:10, 1428:23, 1430:7
**naturally** [1] - 1488:13
**nature** [5] - 1405:5, 1408:6, 1434:6, 1462:5, 1465:14
**necessary** [2] - 1468:24, 1469:5
**need** [12] - 1389:6, 1389:8, 1396:6, 1425:11, 1444:8, 1449:5, 1468:22, 1469:15, 1470:24, 1471:1, 1471:2, 1486:8
**needed** [2] - 1381:11, 1437:11
**Nerguizian** [1] - 1394:20
**never** [6] - 1403:13, 1407:20, 1407:22, 1414:23, 1492:25, 1493:13
**NEW** [1] - 1375:1
**New** [15] - 1375:5, 1375:17, 1375:23, 1376:2, 1376:5, 1376:8, 1416:24, 1417:4, 1417:9, 1417:14, 1417:18, 1426:20, 1453:7, 1470:9, 1491:10
**next** [24] - 1391:3, 1393:14, 1402:11, 1411:25, 1420:16, 1422:21, 1423:25, 1424:10, 1425:23, 1443:15, 1444:13, 1448:13, 1452:24, 1455:21, 1464:10,

1469:23, 1473:12, 1479:12, 1484:20, 1485:25, 1488:23, 1494:22, 1496:2, 1498:7
**Nguyen** [5] - 1410:2, 1410:8, 1410:9, 1410:12, 1410:17
**nguyen** [2] - 1410:21, 1410:23
**Nguyen's** [1] - 1410:11
**nice** [2] - 1482:16, 1483:7
**NICHOLAS** [3] - 1426:4, 1426:11, 1499:11
**Nicholas** [2] - 1426:10, 1441:5
**Nick** [6] - 1409:1, 1425:25, 1447:11, 1448:5, 1450:5, 1450:21
**nickel** [3] - 1429:17, 1429:20, 1429:21
**night** [3] - 1429:8, 1497:9, 1498:10
**none** [4] - 1411:19, 1434:25, 1457:13, 1457:15
**Northport** [1] - 1426:20
**note** [1] - 1432:13
**notes** [12] - 1407:7, 1407:21, 1407:22, 1408:2, 1408:21, 1416:18, 1418:15, 1419:7, 1419:8, 1419:10, 1471:22
**nothing** [8] - 1383:1, 1383:22, 1383:23, 1404:17, 1406:11, 1466:5, 1488:16
**number** [6] - 1416:6, 1441:7, 1461:15, 1463:11, 1465:21, 1497:15
**numbers** [1] - 1404:23

# O

**o'clock** [1] - 1497:18
**oath** [2] - 1387:23, 1426:2
**object** [8] - 1378:5, 1400:22, 1405:5, 1408:6, 1415:5, 1429:12, 1433:21, 1461:24
**objection** [37] -

1389:19, 1390:24, 1392:13, 1393:3, 1396:22, 1397:5, 1397:14, 1398:5, 1400:4, 1400:9, 1402:3, 1410:18, 1412:8, 1412:9, 1413:3, 1415:9, 1417:1, 1417:19, 1417:25, 1418:5, 1420:14, 1437:19, 1439:7, 1440:3, 1441:21, 1462:3, 1466:1, 1468:11, 1468:14, 1468:25, 1469:1, 1484:9, 1490:3, 1490:14, 1491:12, 1492:3, 1493:15
**objections** [1] - 1377:12
**obligations** [1] - 1470:17
**observing** [2] - 1473:4, 1482:21
**obtain** [4] - 1442:20, 1443:4, 1446:3, 1447:23
**obviously** [3] - 1473:4, 1497:16, 1497:24
**occasion** [1] - 1481:24
**occasions** [1] - 1416:6
**occupation** [2] - 1482:9, 1482:12
**occur** [1] - 1479:7
**occurred** [9] - 1421:1, 1423:1, 1424:1, 1425:1, 1444:1, 1445:1, 1482:1, 1495:1, 1497:1
**occurring** [1] - 1423:5
**Oceanside** [1] - 1376:5
**October** [4] - 1389:25, 1407:10, 1416:23, 1417:23
**OF** [2] - 1375:1, 1375:3
**offer** [10] - 1401:6, 1401:8, 1412:6, 1429:13, 1463:10, 1464:22, 1467:6, 1478:21, 1479:20, 1490:6
**offered** [3] - 1381:24, 1401:7, 1495:12
**office** [1] - 1465:23

**offices** [7] - 1442:25, 1449:14, 1450:9, 1451:12, 1451:14, 1451:16, 1452:1
**Offices** [2] - 1454:3, 1454:18
**often** [2] - 1439:13, 1461:7
**Old** [1] - 1376:1
**OLIVERAS** [3] - 1376:4, 1377:3, 1399:15
**Oliveras** [4] - 1377:4, 1377:5, 1462:8, 1471:14
**once** [3] - 1386:3, 1461:5, 1471:1
**One** [1] - 1375:21
**one** [42] - 1377:14, 1378:2, 1380:24, 1381:7, 1382:1, 1389:5, 1389:11, 1390:7, 1393:9, 1396:19, 1399:4, 1399:19, 1401:6, 1401:12, 1414:21, 1421:3, 1429:8, 1429:9, 1430:25, 1432:12, 1432:21, 1437:20, 1438:8, 1438:24, 1439:22, 1446:17, 1448:19, 1465:18, 1466:4, 1469:7, 1472:9, 1472:23, 1476:4, 1479:15, 1483:17, 1484:11, 1485:5, 1486:4, 1494:9, 1495:15, 1497:3
**open** [5] - 1423:1, 1425:1, 1445:1, 1485:18, 1497:1
**Open** [5] - 1394:1, 1403:1, 1463:1, 1474:1, 1486:1
**opened** [1] - 1386:1
**opens** [1] - 1401:22
**operating** [4] - 1441:4, 1456:3, 1456:8, 1458:8
**operations** [1] - 1433:14
**opportunity** [4] - 1390:12, 1442:5, 1469:12, 1489:9
**opposed** [2] - 1380:24, 1425:11
**order** [2] - 1393:1, 1438:7
**organize** [1] - 1386:12

**original** [1] - 1451:13
**otherwise** [1] - 1466:21
**outset** [1] - 1466:24
**outside** [3] - 1445:14, 1494:5, 1494:8
**overall** [1] - 1465:13
**overheard** [2] - 1388:9, 1406:23
**overhearing** [2] - 1406:20, 1407:1
**overnight** [5] - 1442:20, 1442:22, 1446:3, 1447:8, 1447:22
**overruled** [5] - 1400:10, 1405:7, 1484:10, 1490:4, 1490:15
**owed** [11] - 1416:14, 1419:19, 1419:23, 1420:1, 1420:9, 1421:5, 1421:21, 1422:3, 1422:17, 1423:15
**own** [12] - 1410:16, 1421:19, 1427:15, 1427:17, 1427:19, 1427:25, 1428:3, 1429:19, 1435:6, 1460:15, 1480:15
**owned** [3] - 1403:11, 1404:2
**ownership** [12] - 1401:13, 1403:8, 1405:2, 1405:3, 1405:11, 1406:4, 1455:4, 1457:25, 1478:10, 1478:16, 1490:1

---

**P**

---

**P-R-I-V-I-T-E-L-L-O** [1] - 1426:11
**p.m** [2] - 1440:17, 1474:7
**packaging** [1] - 1400:7
**page** [38] - 1388:16, 1391:3, 1392:9, 1392:23, 1393:9, 1393:10, 1393:14, 1395:5, 1395:6, 1395:10, 1395:24, 1396:4, 1396:8, 1397:1, 1397:4, 1397:6, 1397:12, 1397:13, 1402:11, 1411:25, 1420:16,

1422:21, 1423:25, 1424:10, 1443:15, 1444:13, 1447:17, 1449:15, 1452:24, 1453:22, 1455:21, 1469:23, 1473:12, 1484:20, 1485:25, 1488:23, 1494:22, 1496:2
**pages** [2] - 1378:8, 1378:10
**paid** [1] - 1482:4
**paper** [1] - 1453:18
**Paradise** [1] - 1411:15
**paragraph** [4] - 1399:6, 1421:11, 1422:13, 1466:15
**parentheses** [1] - 1476:12
**parking** [3] - 1437:5, 1437:6, 1453:5
**part** [9] - 1379:8, 1381:9, 1390:14, 1390:19, 1398:9, 1400:6, 1425:9, 1451:8, 1482:23
**participant** [1] - 1494:2
**participate** [1] - 1493:24
**participated** [1] - 1401:15
**participating** [1] - 1438:22
**participation** [1] - 1379:14
**particular** [3] - 1389:23, 1395:24, 1398:21
**particularly** [1] - 1411:22
**parties** [7] - 1381:2, 1381:22, 1383:1, 1386:2, 1386:3, 1433:20
**Partners** [3] - 1398:16, 1398:19, 1456:1
**partners** [2] - 1392:5, 1396:24
**parts** [1] - 1425:15
**party** [7] - 1382:10, 1382:18, 1429:18, 1429:23, 1481:19, 1481:23, 1483:7
**passed** [1] - 1410:12
**passes** [1] - 1495:24
**past** [2] - 1485:12, 1489:8
**patent** [9] - 1401:18, 1403:8, 1403:11,

1403:19, 1403:20, 1403:25, 1405:4
**patents** [10] - 1402:12, 1430:14, 1430:15, 1431:19, 1432:3, 1434:13, 1434:19, 1434:22, 1488:20
**pause** [4] - 1386:24, 1392:21, 1469:18, 1477:2
**pay** [4] - 1414:4, 1414:5, 1414:17, 1457:3
**payable** [1] - 1448:20
**paying** [1] - 1495:3
**payment** [1] - 1415:22
**Pearl** [1] - 1455:10
**penny** [1] - 1403:18
**people** [17] - 1377:19, 1378:11, 1378:16, 1394:22, 1396:19, 1399:2, 1403:22, 1405:10, 1407:25, 1408:23, 1409:6, 1430:20, 1431:2, 1431:25, 1460:16, 1491:19
**people's** [1] - 1404:16
**per** [4] - 1405:17, 1440:25, 1443:7, 1448:12
**percent** [25] - 1419:19, 1419:24, 1420:9, 1421:6, 1422:4, 1422:10, 1422:17, 1423:15, 1424:5, 1425:5, 1425:8, 1433:7, 1433:9, 1433:11, 1441:4, 1442:20, 1443:4, 1446:6, 1468:10, 1478:16, 1480:20, 1488:7, 1490:1, 1490:6, 1495:5
**percentage** [1] - 1455:4
**perhaps** [3] - 1465:11, 1465:12, 1484:14
**period** [3] - 1456:11, 1456:17, 1461:16
**permission** [1] - 1388:5, 1388:13, 1397:17, 1472:5
**person** [7] - 1410:5, 1428:7, 1465:25, 1487:22, 1487:24, 1488:4, 1489:3
**personal** [3] - 1457:4, 1495:17, 1497:4
**personally** [1] -

1409:4
**perspective** [1] - 1483:25
**pertain** [1] - 1453:23
**pertains** [1] - 1416:10
**Perusing** [1] - 1461:12
**Phil** [37] - 1390:14, 1394:11, 1417:17, 1418:24, 1419:8, 1419:10, 1428:5, 1428:17, 1430:5, 1432:18, 1481:5, 1481:9, 1481:12, 1481:17, 1481:22, 1482:16, 1483:14, 1483:23, 1484:7, 1486:17, 1486:20, 1487:18, 1488:16, 1489:4, 1489:7, 1489:19, 1489:20, 1492:2, 1492:22, 1492:25, 1493:11, 1493:14, 1493:20, 1494:2, 1494:6, 1494:8, 1494:11
**Phil's** [1] - 1482:12
**Philip** [1] - 1375:6
**PHILLIP** [1] - 1375:6
**Phillip** [1] - 1375:21
**phone** [12] - 1432:10, 1432:11, 1435:18, 1436:12, 1441:6, 1452:22, 1458:18, 1483:17, 1488:21, 1495:10, 1497:15
**phrase** [1] - 1396:3
**physically** [5] - 1435:7, 1437:3, 1453:4, 1494:4
**piece** [1] - 1430:5
**pitching** [1] - 1487:3
**place** [7] - 1377:15, 1381:19, 1429:8, 1436:25, 1462:2, 1483:15, 1483:16
**placed** [1] - 1406:24
**plaintiffs** [1] - 1491:20
**planning** [2] - 1414:13, 1466:8
**plans** [1] - 1447:21
**play** [24] - 1386:4, 1431:21, 1462:9, 1462:12, 1463:14, 1463:17, 1463:19, 1463:21, 1463:24, 1467:3, 1467:11, 1468:9, 1468:20, 1469:4, 1469:6, 1474:24, 1475:20, 1476:13, 1476:24,

possibly [2] - 1463:21, 1481:19
posted [1] - 1497:25
practice [2] - 1472:24, 1473:5
prayers [1] - 1497:21
precede [1] - 1483:18
preparatory [1] - 1468:22
present [2] - 1378:4, 1378:10
presented [1] - 1430:23
pretty [1] - 1463:12
previous [5] - 1446:9, 1447:18, 1449:20, 1450:4, 1476:9
previously [4] - 1388:2, 1448:1, 1451:3, 1486:11
priest [1] - 1495:11
principally [1] - 1401:16
prints [1] - 1414:17
Privitello [35] - 1382:21, 1395:15, 1398:10, 1401:14, 1425:25, 1426:1, 1426:10, 1426:13, 1426:19, 1436:4, 1436:10, 1438:3, 1439:25, 1441:6, 1445:20, 1446:1, 1446:11, 1454:12, 1455:16, 1463:8, 1469:5, 1471:17, 1472:8, 1473:1, 1473:2, 1474:3, 1474:10, 1475:3, 1477:8, 1480:14, 1481:3, 1481:5, 1486:16, 1492:24, 1494:17
PRIVITELLO [2] - 1426:4, 1499:11
probative [7] - 1383:16, 1383:19, 1383:23, 1383:25, 1385:6, 1385:7, 1385:8
problem [3] - 1401:17, 1422:4, 1466:20
problems [4] - 1444:4, 1465:2, 1467:4
procedure [1] - 1469:2
proceeding [2] - 1386:24, 1469:18
process [1] - 1462:13
produced [2] - 1409:24, 1410:23

Playboy [1] - 1432:17
played [12] - 1381:22, 1474:25, 1475:21, 1476:17, 1476:25, 1477:5, 1477:12, 1477:20, 1478:19, 1479:1, 1479:16, 1480:12
players [12] - 1379:5, 1379:10, 1379:15, 1379:24, 1388:10, 1475:4, 1475:6, 1475:8, 1475:9, 1475:15, 1483:4, 1483:8
playing [1] - 1462:9
Plaza [2] - 1375:16, 1376:7
pledged [1] - 1401:19
pneumonia [1] - 1470:6
point [32] - 1381:3, 1382:11, 1382:18, 1382:19, 1395:3, 1403:22, 1410:4, 1412:3, 1427:24, 1429:12, 1433:25, 1434:4, 1435:25, 1439:24, 1445:9, 1463:18, 1466:10, 1468:9, 1468:15, 1471:9, 1473:3, 1481:8, 1481:12, 1483:9, 1483:11, 1484:13, 1486:19, 1487:18, 1488:16, 1490:11, 1492:5, 1492:15
pointing [2] - 1464:7, 1467:4
pool [2] - 1429:18, 1483:15
portion [13] - 1394:18, 1398:14, 1404:21, 1420:13, 1421:9, 1421:16, 1422:18, 1433:23, 1459:7, 1463:21, 1465:24, 1466:23, 1467:5
portions [7] - 1462:12, 1463:10, 1463:16, 1464:16, 1464:20, 1465:3, 1467:11
position [6] - 1379:5, 1382:4, 1419:23, 1420:9, 1422:16, 1493:9
possible [1] - 1498:1
1477:11, 1478:17, 1479:15, 1480:11

Professional [1] - 1454:4
profit [1] - 1457:21
profit-loss [1] - 1457:21
profitable [1] - 1430:16
progress [1] - 1468:3
project [15] - 1408:10, 1408:23, 1409:5, 1410:10, 1411:9, 1411:12, 1414:9, 1415:20, 1415:23, 1416:1, 1416:11, 1416:15, 1418:3, 1418:9, 1486:23
projects [1] - 1441:15
promise [1] - 1493:12
promised [2] - 1490:2, 1492:25
proof [2] - 1381:9, 1429:13
proper [1] - 1402:4
property [1] - 1482:20
proposal [1] - 1433:1
propose [1] - 1433:6
proposed [1] - 1433:4
prosecutor [1] - 1487:14
provided [2] - 1378:21, 1411:1
provides [1] - 1467:2
pull [1] - 1436:4
purchase [1] - 1486:25
purported [1] - 1378:4
purpose [2] - 1380:4, 1381:24
purposes [1] - 1401:7, 1469:8
put [9] - 1390:7, 1395:21, 1442:5, 1463:25, 1468:9, 1472:24, 1473:6, 1479:10, 1489:6
putting [1] - 1405:9
PV [1] - 1411:15

Q

QUESTION [2] - 1388:18, 1388:22
questioned [1] - 1401:23
questioning [1] - 1388:9
questions [28] - 1388:14, 1388:24, 1389:2, 1389:23, 1392:3, 1396:4,

1398:24, 1399:1, 1399:4, 1400:16, 1404:5, 1406:19, 1407:6, 1407:12, 1407:13, 1408:22, 1408:24, 1409:2, 1411:4, 1412:4, 1413:19, 1415:12, 1415:19, 1423:4, 1425:19, 1437:21, 1460:5, 1480:22
quickly [3] - 1406:18, 1407:5, 1495:25
quite [1] - 1431:10

R

R-E-I-F-F [1] - 1377:15
race [1] - 1457:4
raced [1] - 1432:16
racing [1] - 1432:17
Rae [1] - 1409:1
raise [1] - 1472:16
raised [1] - 1409:18
raising [3] - 1408:22, 1409:6, 1409:22
rather [1] - 1489:4
reach [1] - 1469:12
read [20] - 1388:14, 1392:9, 1394:18, 1398:13, 1398:15, 1399:5, 1399:10, 1399:13, 1399:25, 1421:8, 1422:13, 1424:2, 1424:8, 1440:22, 1442:18, 1449:21, 1466:11, 1490:19, 1490:22, 1493:6
reading [5] - 1383:24, 1388:17, 1398:14, 1422:18
reads [1] - 1450:6
ready [4] - 1377:9, 1432:21, 1474:9, 1495:5
real [8] - 1411:14, 1415:3, 1434:8, 1434:14, 1485:6, 1485:15, 1488:20
really [12] - 1380:5, 1407:5, 1425:11, 1430:9, 1438:23, 1465:20, 1466:13, 1468:22, 1469:10, 1469:16, 1470:4, 1471:15
reason [6] - 1393:2, 1425:14, 1464:5, 1465:22, 1471:9,

1488:15
reasons [2] - 1390:24, 1401:6
receipt [1] - 1441:2
receive [7] - 1412:2, 1412:3, 1457:12, 1457:14, 1457:25, 1458:4, 1458:8
received [9] - 1389:3, 1389:18, 1390:23, 1397:4, 1401:13, 1413:18, 1420:4, 1420:13
receiving [4] - 1382:5, 1399:12, 1433:10, 1490:5
Recess [2] - 1435:25, 1445:9
recess [5] - 1436:1, 1444:12, 1445:10, 1467:13, 1468:4
recessed [2] - 1388:25, 1498:11
recognize [15] - 1389:13, 1395:6, 1395:11, 1395:13, 1396:14, 1398:3, 1399:22, 1428:7, 1428:10, 1453:16, 1454:6, 1459:3, 1459:10, 1473:1, 1490:25
recognizes [1] - 1473:6
recollection [15] - 1379:11, 1379:17, 1380:18, 1380:23, 1381:11, 1381:14, 1381:16, 1386:9, 1392:10, 1399:6, 1400:2, 1400:5, 1400:12, 1401:8, 1438:12
recommending [1] - 1489:3
reconvene [3] - 1463:4, 1467:11, 1497:6
record [24] - 1376:16, 1383:15, 1392:2, 1398:14, 1421:18, 1422:7, 1422:18, 1424:2, 1426:9, 1428:12, 1438:25, 1440:23, 1453:7, 1454:22, 1454:23, 1455:1, 1458:12, 1458:20, 1458:23, 1460:14, 1472:24, 1473:6, 1476:19,

1493:19
**recorded** [7] - 1458:17, 1458:22, 1460:14, 1460:16, 1461:2, 1461:4, 1494:13
**recording** [2] - 1474:17, 1474:20
**recordings** [3] - 1493:4, 1493:7, 1493:13
**records** [2] - 1455:14, 1463:3
**recross** [1] - 1415:13
**RECROSS** [4] - 1415:16, 1419:16, 1499:6, 1499:8
**RECROSS-EXAMINATION** [4] - 1415:16, 1419:16, 1499:6, 1499:8
**redacted** [1] - 1420:13
**redirect** [5] - 1400:17, 1401:21, 1401:25, 1402:4, 1419:18
**REDIRECT** [3] - 1400:18, 1403:2, 1499:4
**refer** [1] - 1466:3
**reference** [7] - 1394:23, 1416:10, 1419:3, 1442:23, 1466:22, 1487:8, 1493:22
**references** [2] - 1477:3, 1477:22
**referencing** [8] - 1442:24, 1443:6, 1446:4, 1451:14, 1451:15, 1475:4, 1475:7, 1477:3
**referred** [4] - 1392:11, 1396:15, 1396:21, 1399:22
**referring** [5] - 1411:22, 1485:6, 1485:10, 1486:5, 1486:9
**reflect** [3] - 1383:15, 1408:2, 1428:12, 1441:4, 1455:18
**refresh** [12] - 1379:11, 1379:17, 1380:17, 1380:23, 1381:15, 1386:9, 1386:13, 1392:10, 1399:6, 1400:2, 1400:5, 1400:12
**refreshed** [1] - 1381:12

**refreshing** [1] - 1401:7
**regard** [6] - 1379:12, 1400:6, 1460:9, 1460:19, 1463:25, 1468:8
**regarding** [13] - 1377:10, 1379:8, 1384:18, 1389:15, 1390:4, 1401:23, 1439:5, 1439:10, 1439:14, 1463:3, 1488:5, 1493:21, 1497:8
**regards** [5] - 1379:14, 1421:6, 1423:14, 1438:25, 1440:2
**Reiff** [1] - 1377:15
**reimbursement** [2] - 1415:19, 1416:14
**reiterating** [1] - 1420:8
**relate** [3] - 1382:23, 1385:7, 1385:14
**related** [1] - 1443:13
**relates** [4] - 1421:9, 1467:3, 1488:6, 1489:14
**relationship** [8] - 1381:22, 1381:25, 1382:24, 1382:25, 1383:2, 1383:7, 1383:10, 1429:15
**relationships** [4] - 1379:22, 1383:25, 1384:1, 1385:7
**relevance** [5] - 1377:13, 1384:12, 1384:19, 1384:21, 1490:3
**relevancy** [2] - 1385:25, 1486:10
**relevant** [4] - 1378:13, 1468:15, 1485:21, 1486:12
**relying** [1] - 1377:21, 1439:23
**remain** [1] - 1426:2
**remember** [18] - 1379:3, 1383:9, 1386:1, 1386:14, 1388:24, 1406:20, 1407:12, 1407:18, 1408:24, 1411:6, 1419:24, 1420:5, 1421:24, 1439:15, 1439:16, 1475:24, 1482:23, 1491:13
**remind** [2] - 1387:22, 1468:21
**remotely** [1] - 1492:1
**remove** [1] - 1465:14

**renew** [1] - 1423:22
**reorganization** [2] - 1401:20, 1425:10
**repeat** [1] - 1439:9
**repeated** [2] - 1461:7, 1461:15
**rephrase** [3] - 1481:16, 1492:4, 1493:19
**replies** [1] - 1451:17
**reply** [5] - 1423:9, 1423:15, 1425:4, 1425:16
**reported** [1] - 1430:24
**Reporter** [1] - 1376:7
**REPORTER** [1] - 1485:3
**reports** [1] - 1470:8
**represent** [2] - 1392:5, 1418:19
**representation** [1] - 1446:5
**representations** [2] - 1378:16, 1488:6
**represented** [3] - 1398:21, 1403:6, 1418:25
**represents** [1] - 1378:15
**request** [8] - 1384:14, 1423:5, 1425:4, 1454:23, 1470:19, 1478:7, 1478:9, 1478:12
**requesting** [1] - 1453:25
**resolutions** [1] - 1398:21
**respect** [7] - 1385:3, 1405:4, 1405:9, 1413:13, 1415:23, 1481:12, 1487:19
**respond** [10] - 1425:6, 1446:14, 1446:17, 1449:21, 1451:6, 1451:10, 1452:12, 1452:17, 1476:11, 1476:22
**responds** [4] - 1448:23, 1450:10, 1450:12, 1452:5
**response** [1] - 1447:7
**responses** [1] - 1471:14
**responsibilities** [1] - 1470:18
**responsible** [2] - 1433:14, 1465:19
**rest** [3] - 1464:13, 1498:3, 1498:4

**restaurant** [1] - 1417:4
**result** [8] - 1415:3, 1415:7, 1415:23, 1416:14, 1433:1, 1460:15, 1481:8, 1490:10
**resumes** [1] - 1387:5, 1474:4
**retired** [3] - 1435:23, 1445:5, 1497:11
**return** [2] - 1488:18, 1493:1
**returns** [2] - 1392:20, 1392:22
**revenue** [1] - 1431:10
**review** [4] - 1390:12, 1459:13, 1459:21, 1487:14
**reviewed** [1] - 1462:8
**RICHARD** [1] - 1375:23
**Richard** [1] - 1377:6
**Richard's** [2] - 1475:17, 1475:18
**Richards** [13] - 1378:11, 1380:12, 1380:13, 1442:25, 1449:14, 1450:9, 1451:16, 1454:3, 1454:18, 1455:14, 1461:13, 1488:22
**Richards'** [13] - 1435:10, 1435:15, 1465:19, 1466:14, 1466:16, 1476:3, 1477:9, 1477:23, 1478:2, 1478:5, 1478:14, 1479:19
**ridiculous** [4] - 1383:14, 1383:15, 1385:4
**right-hand** [1] - 1397:21
**rights** [1] - 1495:12
**ring** [1] - 1429:7
**rise** [4] - 1376:11, 1387:6, 1436:6, 1474:5
**Rizzi** [2] - 1379:15, 1466:19
**RMR** [1] - 1376:7
**Road** [1] - 1376:1
**ROBERT** [1] - 1376:3
**Robert** [2] - 1376:23, 1409:1
**Rodriguez** [3] - 1456:19, 1456:23, 1456:25
**role** [5] - 1379:14, 1379:20, 1381:23,

1386:4, 1494:12
**Ron** [24] - 1378:11, 1435:10, 1435:15, 1442:25, 1449:14, 1450:9, 1451:16, 1454:3, 1455:14, 1461:13, 1465:19, 1466:14, 1475:17, 1475:18, 1476:3, 1477:8, 1477:23, 1478:2, 1478:5, 1478:14, 1479:18, 1479:19, 1488:22
**Ronald** [3] - 1380:12, 1380:13, 1454:18
**RONALD** [1] - 1376:7
ronald_tolkin@nyed .uscourts.gov [1] - 1376:9
**room** [2] - 1470:3, 1494:6
**roughly** [1] - 1407:10
**RPR** [1] - 1376:7
**rule** [4] - 1464:15, 1464:17, 1464:20, 1468:20
**ruling** [2] - 1464:23, 1469:3
**rulings** [2] - 1464:25, 1486:12
**Russo** [5] - 1412:4, 1413:13, 1419:14, 1445:12, 1497:13
**RUSSO** [32] - 1412:9, 1419:17, 1420:12, 1421:4, 1421:11, 1422:13, 1422:20, 1423:3, 1423:22, 1424:6, 1424:9, 1425:3, 1425:19, 1437:20, 1437:21, 1438:2, 1440:2, 1441:21, 1443:12, 1444:2, 1444:10, 1445:13, 1445:19, 1494:21, 1495:2, 1495:8, 1495:18, 1495:23, 1497:20, 1497:23, 1499:9, 1499:15

## S

**Sag** [1] - 1411:16
**salary** [3] - 1414:8, 1416:9, 1416:14
**sale** [1] - 1487:6
**Salt** [2] - 1445:14, 1470:10
**Saritha** [1] - 1376:21

**SARITHA** [1] - 1375:18
**Saturday** [2] - 1465:10, 1465:11
**savings** [1] - 1433:19
**saw** [3] - 1407:22, 1428:7, 1478:11
**schedule** [1] - 1470:25
**scheduling** [1] - 1387:16
**schooling** [1] - 1427:23
**Schwartz** [2] - 1387:14, 1387:17
**scope** [2] - 1377:13, 1439:7
**scramble** [2] - 1453:3, 1453:4
**scrambled** [1] - 1437:9
**screen** [1] - 1404:22, 1446:12
**scrutinize** [1] - 1464:8
**seated** [10] - 1376:12, 1387:9, 1436:2, 1436:8, 1445:7, 1445:11, 1445:24, 1468:2, 1474:8, 1497:13
**second** [6] - 1387:13, 1453:22, 1455:8, 1462:18, 1470:23, 1476:4
**Second** [1] - 1464:6
**secretly** [1] - 1493:19
**sections** [1] - 1466:15
**secured** [1] - 1430:21
**see** [32] - 1378:3, 1378:14, 1378:18, 1379:23, 1387:12, 1396:11, 1396:23, 1397:23, 1403:13, 1407:21, 1409:24, 1410:23, 1417:12, 1420:15, 1424:7, 1428:9, 1440:14, 1440:17, 1442:17, 1446:24, 1447:5, 1453:17, 1454:22, 1454:25, 1455:15, 1455:22, 1456:2, 1456:14, 1456:18, 1464:16, 1472:2, 1472:18
**seeing** [2] - 1477:22, 1488:3
**seeking** [5] - 1380:14, 1400:7, 1464:17, 1464:22, 1467:3

**sees** [1] - 1385:24
**selection** [1] - 1472:16
**sell** [2] - 1403:13, 1404:2
**send** [8] - 1412:22, 1424:3, 1425:6, 1437:11, 1450:3, 1476:8, 1477:8, 1488:22
**sending** [3] - 1412:21, 1412:25, 1454:2
**sends** [2] - 1447:6, 1466:16
**sense** [3] - 1385:1, 1385:2, 1437:8
**sent** [9] - 1394:15, 1394:19, 1424:4, 1425:7, 1443:7, 1443:9, 1457:11, 1479:18, 1488:12
**separate** [3] - 1463:18, 1481:24, 1482:20
**separately** [1] - 1397:7
**Sergei** [4] - 1378:11, 1380:11, 1380:13, 1457:7
**series** [13] - 1377:10, 1377:17, 1377:21, 1381:19, 1386:3, 1406:20, 1407:4, 1407:6, 1407:11, 1408:22, 1408:23, 1411:4, 1415:18
**serious** [1] - 1445:13
**SESSION** [1] - 1468:1
**set** [1] - 1458:13
**setting** [1] - 1405:11
**seven** [2] - 1427:10, 1427:20
**several** [2] - 1434:19, 1464:6
**shall** [1] - 1441:5
**share** [2] - 1401:13, 1457:25
**shareholders** [6] - 1479:23, 1493:22, 1493:25, 1494:2, 1494:9, 1494:12
**shares** [2] - 1404:3, 1406:9
**sheet** [1] - 1377:20
**shifting** [1] - 1386:2
**shirt** [2] - 1428:11
**shopping** [3] - 1404:18, 1404:22, 1405:18
**short** [2] - 1444:12,

1445:3
**shortly** [1] - 1430:25
**show** [19] - 1379:22, 1381:6, 1382:20, 1389:2, 1389:4, 1392:12, 1393:4, 1393:7, 1395:2, 1398:6, 1398:25, 1404:21, 1407:7, 1411:20, 1442:13, 1453:15, 1454:21, 1465:19, 1478:2
**showed** [3] - 1396:13, 1396:20, 1398:25
**showing** [4] - 1384:18, 1385:2, 1406:10, 1412:13
**shown** [6] - 1378:24, 1403:5, 1404:18, 1407:8, 1420:3, 1487:13
**shows** [1] - 1381:8
**sick** [1] - 1444:3
**side** [16] - 1391:1, 1391:2, 1392:21, 1392:22, 1393:13, 1400:23, 1400:25, 1402:10, 1462:22, 1464:5, 1469:20, 1469:22, 1473:11, 1484:17, 1484:19, 1485:24
**Side** [4] - 1392:1, 1401:1, 1470:1, 1485:1
**side-bar** [14] - 1391:1, 1391:2, 1392:21, 1392:22, 1393:13, 1400:23, 1400:25, 1402:10, 1469:20, 1469:22, 1473:11, 1484:17, 1484:19, 1485:24
**Side-bar** [4] - 1392:1, 1401:1, 1470:1, 1485:1
**sidebar** [8] - 1421:1, 1424:1, 1443:13, 1444:1, 1461:25, 1462:2, 1494:20, 1495:1
**sign** [4] - 1403:12, 1430:25, 1431:5, 1432:21
**signature** [17] - 1392:9, 1393:9, 1395:8, 1395:13, 1395:16, 1395:24, 1396:1, 1396:4, 1397:1, 1397:2,

1397:4, 1397:6, 1397:12, 1397:20, 1397:24, 1398:11, 1459:10
**signed** [14] - 1392:6, 1394:22, 1394:23, 1395:10, 1395:17, 1396:11, 1396:18, 1399:2, 1399:3, 1441:9, 1447:14, 1449:8, 1452:10, 1452:19
**significant** [2] - 1386:4, 1416:2
**significantly** [1] - 1449:6
**similar** [1] - 1405:12
**similarly** [1] - 1377:20
**simply** [2] - 1464:21, 1474:18
**sincerely** [1] - 1441:9
**sister** [5] - 1444:2, 1445:14, 1468:6, 1469:11, 1470:2
**sister's** [1] - 1470:12
**sit** [2] - 1415:1, 1480:14
**sitting** [2] - 1384:19, 1384:25
**situation** [7] - 1444:4, 1445:18, 1464:24, 1465:5, 1465:22, 1470:23, 1471:19
**six** [1] - 1497:18
**slash** [1] - 1403:11
**small** [1] - 1434:1
**Smith** [1] - 1377:18
**snippets** [3] - 1461:7, 1461:15, 1462:9
**sold** [1] - 1404:1
**sole** [1] - 1491:23
**solely** [1] - 1438:15
**solicit** [1] - 1481:13
**solution** [1] - 1462:11
**solve** [1] - 1466:20
**someone** [3] - 1441:22, 1441:23, 1447:25
**sometime** [1] - 1420:2
**somewhere** [1] - 1427:19
**soon** [2] - 1430:16, 1495:9
**sorry** [12] - 1385:24, 1389:15, 1398:1, 1405:8, 1413:23, 1445:17, 1446:20, 1452:2, 1455:10, 1485:3, 1488:2, 1488:11

**sort** [2] - 1429:1, 1430:12
**sorts** [1] - 1428:22
**sought** [2] - 1416:14, 1492:21
**sounded** [1] - 1444:6
**sounds** [2] - 1466:25, 1482:7
**source** [1] - 1478:3
**speakerphone** [1] - 1407:1
**speaking** [6] - 1412:20, 1412:21, 1421:13, 1432:10, 1439:2, 1452:21
**special** [5] - 1454:19, 1454:25, 1454:19
**Special** [2] - 1418:2, 1418:8
**specific** [2] - 1395:5, 1428:25
**specifically** [4] - 1392:11, 1421:19, 1427:7, 1467:5
**speculate** [1] - 1441:23
**speculating** [1] - 1388:22
**spell** [2] - 1394:20, 1426:8
**spend** [2] - 1429:22, 1462:20
**spent** [1] - 1465:4
**split** [1] - 1427:17
**sport** [1] - 1429:1
**sports** [2] - 1428:22, 1428:25
**Square** [1] - 1375:21
**staff** [1] - 1473:5
**stamp** [1] - 1397:18
**stand** [7] - 1384:23, 1385:14, 1385:17, 1387:5, 1426:2, 1472:18, 1474:4
**standing** [2] - 1426:2, 1472:25
**stands** [1] - 1421:18
**start** [9] - 1380:9, 1385:5, 1400:20, 1428:3, 1430:14, 1434:2, 1440:12, 1468:7, 1484:14
**started** [3] - 1386:4, 1432:11, 1484:13
**starting** [2] - 1424:3, 1459:5
**starts** [2] - 1438:9, 1465:22
**startup** [1] - 1434:1
**state** [7] - 1376:15,

1378:15, 1418:7, 1426:8, 1446:2, 1466:22, 1468:24
**State** [1] - 1453:8
**statement** [8] - 1378:3, 1390:5, 1390:6, 1456:8, 1456:12, 1466:6, 1489:2, 1493:10
**statements** [1] - 1464:11
**states** [1] - 1395:18
**STATES** [2] - 1375:1, 1375:3
**States** [5] - 1375:12, 1375:16, 1376:18, 1376:21, 1491:9
**status** [1] - 1404:11
**stay** [6] - 1387:17, 1426:12, 1434:18, 1442:2, 1470:7, 1486:10
**stayed** [1] - 1404:13
**step** [5] - 1425:20, 1433:16, 1446:17, 1469:7, 1472:9
**steps** [1] - 1489:25
**still** [11] - 1387:20, 1387:22, 1410:17, 1416:17, 1427:11, 1431:3, 1449:17, 1452:1, 1471:6, 1472:18, 1484:4
**stock** [1] - 1457:14
**stocks** [2] - 1434:5, 1434:7
**stolen** [1] - 1464:12
**Stolper** [10] - 1377:21, 1379:25, 1392:4, 1392:7, 1394:11, 1394:24, 1398:22, 1400:13, 1403:4, 1412:3
**stop** [1] - 1470:22
**stopped** [10] - 1475:22, 1476:18, 1477:1, 1477:6, 1477:13, 1477:21, 1478:20, 1479:2, 1479:17, 1480:13
**stories** [3] - 1429:3, 1429:5, 1429:6
**story** [6] - 1421:22, 1422:4, 1422:5, 1429:7, 1462:4
**straggler** [1] - 1438:5
**straight** [1] - 1425:12
**straightforward** [1] - 1492:25
**Strangford** [1] -

1376:4
**stressed** [1] - 1441:25
**stressing** [2] - 1441:19, 1441:25
**strictly** [1] - 1488:19
**striped** [1] - 1428:11
**stroke** [1] - 1470:5
**structure** [1] - 1482:20
**stuff** [1] - 1469:6
**subject** [4] - 1394:16, 1439:5, 1440:20, 1486:7
**subjects** [1] - 1462:5
**submitted** [1] - 1474:19
**subsequent** [1] - 1483:19
**substance** [2] - 1382:25, 1398:20
**successful** [1] - 1431:22
**Suffolk** [1] - 1375:21
**suggest** [3] - 1445:15, 1468:11, 1495:8
**suggested** [1] - 1421:16
**suggestion** [1] - 1495:23
**suit** [2] - 1379:24, 1380:3
**Suite** [2] - 1375:22, 1376:2
**sum** [1] - 1398:20
**Sunday** [1] - 1465:12
**superlative** [1] - 1405:22
**supposed** [1] - 1449:12
**supposedly** [3] - 1406:12, 1408:22, 1409:25
**surreptitious** [1] - 1493:13
**suspect** [1] - 1425:12
**suspicious** [1] - 1484:8
**sustained** [11] - 1408:8, 1410:19, 1410:22, 1413:4, 1413:22, 1415:6, 1415:10, 1417:2, 1417:20, 1433:22, 1441:22
**swear** [1] - 1491:2
**sworn** [2] - 1388:3, 1426:6
**sympathy** [1] - 1470:16

**T**

**tabbed** [1] - 1392:6
**table** [1] - 1392:20
**talks** [4] - 1399:1, 1465:25, 1466:15, 1483:7
**tape** [1] - 1465:3
**tapes** [1] - 1463:14
**taxes** [1] - 1457:23
**TC** [6] - 1449:8, 1450:15, 1450:22, 1451:19, 1452:10, 1452:19
**telephone** [6] - 1388:9, 1406:20, 1406:23, 1493:22, 1493:25, 1494:3
**telephonically** [1] - 1494:13
**ten** [4] - 1441:16, 1460:12, 1460:13, 1471:25
**terms** [8] - 1380:3, 1386:5, 1398:23, 1441:18, 1449:11, 1457:21, 1465:15, 1488:17
**testified** [17] - 1380:18, 1388:3, 1403:16, 1411:15, 1414:19, 1414:23, 1419:7, 1419:18, 1419:25, 1421:4, 1421:7, 1421:14, 1426:6, 1433:17, 1483:24, 1491:5, 1493:23
**testifies** [1] - 1465:1
**testify** [2] - 1380:19, 1401:14
**testifying** [2] - 1408:7, 1421:25
**testimony** [9] - 1378:23, 1379:3, 1395:22, 1398:9, 1482:1, 1482:23, 1483:4, 1486:4, 1494:18
**text** [1] - 1412:15
**THE** [169] - 1376:11, 1376:12, 1376:13, 1376:19, 1376:22, 1376:25, 1377:8, 1378:18, 1378:20, 1380:5, 1380:11, 1380:16, 1380:22, 1381:5, 1381:11, 1381:15, 1382:7, 1382:13, 1382:23,

1383:2, 1383:13, 1384:3, 1384:6, 1384:10, 1385:20, 1386:6, 1386:13, 1386:18, 1386:22, 1387:2, 1387:4, 1387:6, 1387:9, 1387:12, 1387:14, 1387:16, 1387:25, 1388:4, 1388:15, 1389:19, 1389:21, 1391:1, 1392:13, 1392:16, 1392:19, 1392:25, 1393:4, 1393:7, 1393:11, 1394:2, 1394:6, 1397:6, 1397:15, 1397:19, 1398:6, 1399:9, 1399:17, 1400:10, 1400:17, 1400:24, 1401:10, 1401:21, 1405:7, 1405:22, 1408:8, 1410:19, 1410:22, 1412:10, 1413:4, 1413:22, 1415:6, 1415:10, 1415:13, 1417:2, 1417:20, 1418:1, 1418:6, 1419:14, 1420:15, 1421:3, 1421:8, 1421:14, 1421:24, 1422:6, 1422:14, 1423:24, 1424:2, 1424:8, 1425:20, 1426:1, 1426:8, 1426:10, 1426:12, 1428:16, 1429:14, 1433:22, 1435:21, 1436:2, 1436:6, 1436:8, 1437:23, 1439:8, 1440:4, 1440:24, 1441:22, 1443:14, 1444:8, 1444:12, 1445:3, 1445:7, 1445:11, 1445:17, 1445:20, 1445:24, 1460:6, 1462:11, 1462:17, 1463:2, 1463:7, 1463:19, 1464:18, 1466:25, 1467:10, 1468:2, 1468:18, 1468:25, 1469:7, 1469:14, 1469:17, 1469:21, 1470:9, 1470:21, 1471:6, 1471:20, 1471:23, 1472:1, 1472:9, 1472:12, 1472:13, 1472:22, 1474:2,

1474:5, 1474:8, 1480:23, 1484:10, 1484:18, 1485:9, 1485:14, 1485:19, 1486:2, 1490:4, 1490:15, 1492:4, 1493:16, 1494:16, 1494:19, 1494:20, 1495:7, 1495:14, 1495:20, 1496:1, 1497:3, 1497:13, 1497:21, 1497:24, 1498:2, 1498:6, 1498:9, 1498:10
**theirs** [1] - 1463:24
**themselves** [1] - 1474:18
**theory** [2] - 1466:8
**thereafter** [1] - 1390:17
**therefore** [1] - 1474:17
**thinking** [2] - 1384:19, 1385:1
**thinks** [1] - 1473:1
**third** [3] - 1430:25, 1431:5, 1471:7
**thoughts** [1] - 1497:21
**thousand** [1] - 1413:17
**three** [16] - 1379:5, 1380:16, 1380:17, 1385:14, 1388:10, 1388:20, 1389:7, 1399:4, 1430:24, 1432:20, 1461:1, 1461:2, 1461:7, 1461:16, 1463:12, 1470:21
**three-hour** [2] - 1461:7, 1461:16
**THROUGH** [2] - 1500:3, 1500:5
**thrown** [1] - 1489:8
**Thursday** [9] - 1388:8, 1388:25, 1406:19, 1462:16, 1462:19, 1464:5, 1465:9, 1465:10, 1472:12
**tie** [1] - 1393:1
**timeframe** [2] - 1436:24, 1452:21
**Timothy** [1] - 1394:12
**today** [16] - 1404:12, 1412:21, 1415:1, 1428:7, 1436:19, 1459:13, 1459:22, 1464:25, 1469:9, 1471:8, 1480:14, 1489:24, 1495:16, 1497:4, 1497:6,

18

1497:14
**together** [1] - 1441:15
**TOLKIN** [1] - 1376:7
**Tom** [1] - 1489:10
**TOMMY** [1] - 1375:7
**Tommy** [42] - 1375:8, 1376:1, 1394:19, 1408:22, 1410:8, 1411:1, 1432:1, 1441:9, 1442:14, 1447:1, 1447:14, 1447:21, 1448:12, 1448:14, 1448:19, 1449:20, 1451:22, 1451:24, 1459:6, 1476:23, 1477:10, 1487:11, 1487:22, 1488:9, 1488:12, 1488:17, 1489:6, 1489:10, 1489:11, 1490:1, 1490:13, 1490:16, 1491:6, 1491:9, 1491:23, 1492:9, 1492:19, 1493:3, 1493:5, 1493:7, 1493:24
**tomorrow** [7] - 1447:24, 1495:21, 1497:6, 1497:18, 1497:25, 1498:2, 1498:7
**tonight** [1] - 1497:16
**took** [4] - 1462:1, 1483:15, 1489:25, 1491:5
**top** [5] - 1441:11, 1446:25, 1447:18, 1476:4, 1476:5
**topics** [6] - 1385:19, 1385:22, 1461:10, 1461:14, 1461:15, 1462:5
**total** [3] - 1430:24, 1432:20, 1460:10
**totalling** [1] - 1447:23
**totally** [1] - 1378:7
**touch** [1] - 1444:5
**tough** [3] - 1434:16, 1470:16, 1470:17
**trade** [1] - 1428:1
**train** [2] - 1377:25, 1382:15
**transaction** [4] - 1441:18, 1485:20, 1486:6, 1486:8
**transactions** [2] - 1415:3, 1486:12
**transcript** [3] - 1388:17, 1474:20, 1474:21

**transcriptions** [1] - 1459:24
**transcripts** [5] - 1462:15, 1465:5, 1468:13, 1474:17, 1493:6
**transfer** [15] - 1396:18, 1396:23, 1440:21, 1441:3, 1449:22, 1449:25, 1453:21, 1453:25, 1454:23, 1456:15, 1458:4, 1476:6, 1478:7, 1478:9, 1488:17
**transfer's** [1] - 1479:7
**transfers** [10] - 1450:2, 1451:12, 1455:7, 1455:9, 1455:15, 1455:18, 1477:23, 1477:25, 1478:1, 1478:3
**transmission** [1] - 1478:12
**trial** [7] - 1385:11, 1385:12, 1385:13, 1387:19, 1401:6, 1464:25, 1472:13
**tried** [1] - 1379:20
**trouble** [1] - 1431:2
**true** [27] - 1408:19, 1408:20, 1417:3, 1417:7, 1417:11, 1417:12, 1437:13, 1459:15, 1481:10, 1481:18, 1482:2, 1482:4, 1483:5, 1483:12, 1484:1, 1484:6, 1484:14, 1486:18, 1486:21, 1487:18, 1487:20, 1488:18, 1489:5, 1489:15, 1489:16, 1492:19, 1493:25
**Trust** [2] - 1417:4, 1417:8
**TRUST** [1] - 1417:4
**truthfully** [1] - 1487:15
**try** [6] - 1380:23, 1381:6, 1381:18, 1465:1, 1467:10, 1470:8
**trying** [27] - 1379:21, 1380:1, 1380:15, 1381:3, 1381:4, 1381:10, 1382:7, 1401:3, 1401:17, 1401:20, 1401:24, 1403:6, 1404:3, 1404:8, 1437:11,

1452:13, 1458:21, 1462:13, 1463:16, 1464:25, 1465:12, 1467:6, 1468:5, 1468:6, 1468:16, 1469:11, 1486:10
**Tuesday** [1] - 1498:12
**turn** [7] - 1440:13, 1455:21, 1456:6, 1475:23, 1476:13, 1478:24, 1479:3
**turned** [4] - 1462:15, 1462:18, 1464:2, 1464:5
**turning** [12] - 1440:12, 1443:11, 1449:20, 1450:18, 1451:6, 1451:22, 1452:12, 1454:5, 1455:5, 1455:7, 1455:15, 1477:25
**twice** [3] - 1416:24, 1417:14, 1417:18
**two** [27] - 1378:2, 1379:5, 1379:18, 1380:20, 1380:24, 1381:7, 1381:14, 1381:17, 1386:25, 1399:3, 1414:21, 1414:22, 1423:9, 1430:24, 1432:22, 1432:23, 1450:1, 1451:12, 1453:5, 1455:15, 1455:18, 1466:15, 1468:5, 1470:21, 1472:11, 1481:24
**two-hour** [1] - 1379:18

**U**

**U.S** [2] - 1375:4, 1375:18
**U.S.A** [1] - 1376:13
**ultimately** [1] - 1453:12
**unaware** [1] - 1466:17
**uncle** [1] - 1473:1
**under** [4] - 1387:22, 1423:9, 1464:17, 1464:20
**understood** [1] - 1432:4
**unfortunately** [1] - 1462:20
**UNITED** [2] - 1375:1, 1375:3
**united** [1] - 1375:12
**United** [4] - 1375:16, 1376:18, 1376:21,

1491:9
**unless** [1] - 1449:7
**unresponsive** [1] - 1470:4
**up** [25] - 1378:18, 1379:4, 1399:13, 1400:24, 1403:15, 1404:22, 1405:12, 1412:23, 1423:24, 1426:1, 1426:13, 1430:25, 1431:5, 1433:25, 1434:2, 1434:3, 1437:11, 1445:15, 1460:11, 1482:12, 1482:13, 1486:17, 1489:11, 1497:4
**updated** [1] - 1470:8
**upper** [1] - 1397:21
**urgency** [1] - 1437:8
**urgent** [2] - 1448:12, 1448:14
**uses** [1] - 1466:14

**V**

**vacation** [1] - 1472:11
**vacuum** [1] - 1464:18
**validating** [1] - 1432:18
**validation** [1] - 1488:19
**Valley** [1] - 1411:15
**valuable** [3] - 1401:19, 1403:8, 1431:23
**value** [7] - 1383:16, 1383:19, 1383:23, 1383:25, 1385:6, 1385:7, 1385:8
**various** [4] - 1378:16, 1409:6, 1415:3, 1415:8
**Vegas** [2] - 1429:10, 1429:18
**vehemently** [1] - 1419:23
**ventures** [1] - 1411:14
**verification** [1] - 1431:23
**version** [1] - 1455:1
**versus** [2] - 1376:13, 1425:9
**Veterans** [1] - 1375:22
**via** [2] - 1425:10, 1436:12
**views** [1] - 1466:12
**VIOR** [1] - 1460:7
**virtue** [1] - 1409:24
**voice** [5] - 1426:13, 1462:11, 1476:19,

1476:20, 1476:22
**VOIR** [2] - 1438:1, 1499:14
**Volpee** [1] - 1403:11, 1404:1
**Volume** [2] - 1378:9
**volume** [1] - 1490:10

**W**

**wages** [1] - 1415:22
**wandering** [1] - 1495:3
**wants** [2] - 1377:11, 1421:15
**warrants** [1] - 1400:7
**waste** [1] - 1490:23
**ways** [1] - 1431:16
**wealthy** [1] - 1483:1
**week** [12] - 1380:6, 1383:17, 1384:24, 1407:4, 1420:2, 1421:20, 1472:11, 1472:15, 1472:18, 1498:3, 1498:5, 1498:7
**weekend** [2] - 1463:12, 1465:4
**weeks** [2] - 1444:5, 1472:15
**WEINBLATT** [1] - 1375:21
**whatsoever** [3] - 1434:25, 1481:13, 1493:11
**whereby** [1] - 1378:2
**whole** [7] - 1395:3, 1421:10, 1422:8, 1426:24, 1426:25, 1445:17, 1490:22
**wife** [5] - 1434:15, 1434:16, 1441:19, 1442:1, 1478:4
**wife's** [1] - 1453:24
**wire** [37] - 1435:9, 1442:19, 1446:2, 1447:22, 1448:8, 1449:4, 1449:6, 1449:11, 1449:13, 1449:22, 1449:25, 1450:2, 1450:22, 1452:1, 1452:14, 1453:2, 1453:12, 1453:21, 1453:25, 1454:9, 1454:19, 1454:23, 1455:7, 1455:15, 1455:18, 1456:18, 1456:21, 1475:15, 1476:6, 1477:22, 1477:25,

1478:1, 1478:3, 1478:7, 1478:9, 1479:7, 1480:14
**wire's** [1] - 1476:1
**wired** [5] - 1475:15, 1475:17, 1475:18, 1479:18, 1479:19
**wires** [1] - 1377:16
**wiring** [2] - 1454:14, 1454:17
**wish** [1] - 1463:10
**withdraw** [1] - 1468:11
**withdrawal** [1] - 1456:2
**withdrawals** [3] - 1455:22, 1455:23, 1456:17
**withdrawn** [2] - 1407:4, 1414:25
**withholding** [1] - 1485:8
**WITNESS** [5] - 1387:25, 1426:10, 1494:19, 1498:2, 1498:9
**Witness** [4] - 1387:5, 1399:11, 1445:22, 1474:4
**witness** [19] - 1378:25, 1380:2, 1381:21, 1388:2, 1399:7, 1421:23, 1421:24, 1425:23, 1426:2, 1426:5, 1428:13, 1428:14, 1465:1, 1466:22, 1474:4, 1485:4, 1485:7, 1485:13, 1486:3
**witness'** [1] - 1380:17
**witnessed** [1] - 1379:4
**witnesses** [2] - 1385:8, 1465:20
**Wooley** [2] - 1388:11, 1406:24
**word** [3] - 1466:14, 1491:14
**word-for-word** [1] - 1491:14
**words** [2] - 1419:10, 1472:6
**worried** [1] - 1470:15
**worry** [2] - 1422:17, 1471:3
**worth** [3] - 1429:17, 1429:20, 1429:21
**write** [6] - 1442:18, 1447:18, 1447:21, 1448:16, 1451:22,

1478:9
**writes** [2] - 1450:18, 1450:21
**writing** [3] - 1395:23, 1420:8, 1442:14
**written** [2] - 1396:24, 1398:15
**wrote** [3] - 1405:12, 1418:23, 1423:6

## Y

**yard** [1] - 1477:19
**year** [4] - 1414:10, 1417:5, 1464:3, 1480:9
**years** [12] - 1414:6, 1414:7, 1414:8, 1414:18, 1427:3, 1427:10, 1427:18, 1427:20, 1433:19, 1441:16, 1464:12
**yellow** [1] - 1443:1
**YORK** [1] - 1375:1
**York** [15] - 1375:5, 1375:17, 1375:23, 1376:2, 1376:5, 1376:8, 1416:24, 1417:4, 1417:9, 1417:15, 1417:18, 1426:20, 1453:7, 1470:9, 1491:10
**yourself** [5] - 1394:9, 1399:10, 1417:8, 1487:11, 1490:19
**yourselves** [1] - 1497:7

## Z

**zero** [1] - 1383:25