1501

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA      :      13-CR-607 (JFB)
4
        -against-                        U.S. Courthouse
5                                 :
                                         Central Islip, New York
6   PHILLIP A. KENNER
    a/k/a "Philip A. Kenner",
7         and                     :
    TOMMY C. CONSTANTINE
8   a/k/a "Tommy C. Hormovitis"

9                 Defendants      :
                                         May 26, 2015
10  - - - - - - - - - - - - - - - X      9:30 a.m.

11
    BEFORE:
12               HONORABLE JOSEPH F. BIANCO
                 United States District Judge
13                     and a jury

14
    APPEARANCES:
15
    For the Government:      KELLY T. CURRIE
16                           Acting United States Attorney
                             Federal Plaza
17                           Central Islip, New York 11722
                             BY:  JAMES M. MISKIEWICZ
18                                SARITHA KOMATIREDDY
                                  Assistant U.S. Attorneys
19

20

21  For the Defendant:      HALEY, WEINBLATT & CALCAGNI LLP
    Phillip A. Kenner       One Suffolk Square
22                           1601 Veterans Memorial Highway
                             Suite 425
23                           Islandia, New York 11749
                             BY:  RICHARD HALEY
24

25
```

1502

```
 1   For the Defendant:      LaRUSSO & CONWAY LLP
     Tommy C. Constantine    300 Old Country Road
 2                           Suite 341
                             Mineola, New York 11501
 3                           BY:  ROBERT P. LaRUSSO
                                      and
 4                                ANDREW L. OLIVERAS
                                  26 Strangford Court
 5                                Oceanside, New York 11572

 6

 7   Court Reporter(s)       OWEN WICKER
                             RONALD TOLKIN
 8                           STEPHANIE PICOZZI
                             100 Federal Plaza
 9                           Central Islip, New York 11722
                             631-712-6102
10

11                           ***

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1503

```
 1              M O R N I N G   S E S S I O N.

 2              (Case called)

 3              (Appearances noted.)

 4         THE COURT:  Good morning, gentlemen.

 5         The Court has received the Government's letter.

 6    First of all, Mr. LaRusso, Michelle told me this morning

 7    your mom passed away.  I just wanted to extend my

 8    condolences.

 9              Are you able to attend the funeral?

10         MR. LARUSSO:  When we have a break I would like

11    to talk to you.  I would like to but it may cause an

12    inconvenience to the Court, but I'll talk to you later in

13    the day.

14         THE COURT:  Even though I told the jurors there

15    was a family emergency, I think I'm still going to tell

16    them a family emergency with one of the lawyers and I'll

17    not give them any more information even though they are

18    asking.  Any objection to that?

19         MR. MISKIEWICZ:  No objection.

20         MR. LARUSSO:  No objection to that, Judge.  I

21    just learned today there was some information in the

22    newspaper about that.  I just hope they didn't read the

23    newspaper.

24         THE COURT:  Let me made sure no one read the

25    newspaper.  I saw you checking your BlackBerry.  It's
```

1504

1    pretty obvious that you were the lawyer.

2           MR. LARUSSO:  Yes.

3           THE COURT:  And again I'll refer to a family

4    emergency and thank you for your patience.

5           I did receive proposed portions of this.

6           MR. LARUSSO:  The two of them are

7    self-explanatory, C 92 is a voice mail from

8    Mr. Miskiewicz, 95 A-2 is a portion of the tape that it

9    was not played, the tape that Mr. Privitello made on the

10   conversation with Mr. Constantine, and this deals what we

11   call a side deal that Mr. Privitello had with Mr. Kaiser

12   regarding the investments in Eufora which he did not

13   testify about.

14          So we feel it may come out during

15   cross-examination that either he denies it or admits it.

16   If he admits it may or may not be introduced in evidence,

17   but I just wanted to highlight this to the Court before we

18   start it.

19          95-B-2 is our complete version of Government's

20   503, 5 T and 6 T.  It kind of brings the two conversations

21   together.  I highlighted, I believe the copy you have, has

22   the highlighted portions.  The first highlighted portion

23   is the transcript of 503.5 T and the second is 503.6 T.

24   What this does it puts those two in context.  We tried to

25   minimize the amount information and that's what we came up

1    with, Judge.

2              THE COURT:  Explain to me the voicemail itself.

3    What is the relevancy?  I don't understand.

4              MR. LARUSSO:  Actually what happened,

5    Mr. Privitello reached out to Mr. Constantine and in

6    regards to trying to settle the dispute regarding the

7    200,000.  If you remember, Judge, the Government brought

8    out Mr. Constantine never offered to return the money to

9    Mr. Privitello in December of 2009, completely left out

10   what happened after December which is when the controversy

11   and conflict really arose, 2010, 2001 and 2012.  This

12   completes the picture of the discussion regarding any kind

13   of money owed or not owed.

14             One of our arguments will be that Mr. Privitello

15   never asked for the money back even though there was a

16   dispute and we'll argue from evidence hopefully that we

17   can admit is that my client on a number of occasions

18   actually offered the money back to Mr. Privitello.  That

19   will be the purpose of the final examination.  This

20   completes the picture with regards to the discussions with

21   regards to returning the money.

22             THE COURT:  Your position is your client offered

23   175 and this is the evidence accepting it?

24             MR. LARUSSO:  That's correct.

25             Actually there is another e-mail which I didn't

1506

1  show the Government where an actual agreement was

2  submitted to Mr. Privitello.  We're not offering the

3  agreement, Judge, we're just offering the fact he was

4  given an opportunity to sign an agreement which would have

5  included these negotiations.  This occurs May 31st.  The

6  e-mail occurs I believe June.

7        THE COURT:  The Government's letter of May 24th,

8  I don't want to deal with the other things now, but the

9  one that relates to Mr. Privitello, they seem to be

10  concerned they will try to offer statements from the civil

11  lawsuit that Mr. Constantine is intending to do that?

12        MR. LARUSSO:  One of our arguments is government

13  misconduct, and included in that is the failure of the

14  agents to properly investigate this case.

15        When Mr. Privitello brought his suit here in

16  June of 2011, there was a counterclaim made -- I'm sorry,

17  Judge -- when the first suit was filed in October of 2010

18  by the hockey players and I believe it was Mr. Hughes and

19  Mr. Rizzi, there was a counterclaim made.  And in the

20  counterclaim there was a paragraph offering 100 percent

21  back to not only Mr. Privitello but to Mr. Rizzi,

22  Mr. Hughes, and to Ethel Kayser.

23        We are going to contend that information was not

24  only imparted to his lawyer but Mr. Privitello was made

25  aware of it.

1   There was other evidence especially in one of

2   these transcripts I showed you he talks about

3   documentation he had seen and that is the documentation

4   that there was an offer made in the counterclaim in

5   December of 2010.  Our point, Judge, he says he didn't get

6   the offer, we claim that he does, and I think it is a

7   matter of fact for the jury to determine whether his

8   information is believable or our information hopefully on

9   cross will show.

10          THE COURT:  You want to introduce an offer was

11  made and a counterclaim for the 200,000?

12          MR. LARUSSO:  That's one part of it, Judge, is

13  that he was in fact -- there was an offer made in 2010, it

14  was made in a counterclaim that his lawyer, Mr. Stolper,

15  and he will admit Mr. Stolper was retained by him and part

16  of his agreement his attorney would keep him apprised all

17  of developments.  We'll show that he was made aware of it

18  in 2010 contrary to his testimony.

19          There is another aspect and I don't want to

20  deceive the Court.  There was a second suit that

21  Mr. Privitello filed and that was in June of 2100, and in

22  his suit he alleged that of his $200,000, 155,000 was

23  diverted to AZ Avalon -- Falcon, I'm sorry, an AZ Falcon,

24  and alleges it was a diversion of the money that was

25  supposed to go to Eufora.  The Government brought this

1508

1   information out just to the point of eliciting the 155,000

2   of it going to AZ Falcon, when if you looked at the AZ

3   Falcon bank statement which we hope to offer, that money

4   was reversed and went to a vendor of Eufora, so it was a

5   proper expenditure.

6           So there were two aspects of the civil suits

7   we'd like to discuss with Mr. Privitello and how far we go

8   with it depends on his answers.  One is the one in 2010

9   where he is made aware, his lawyer was made aware of the

10  fact to return 100 percent of his investment and the one

11  after June 11th in his civil suit he's alleging diversion

12  which we know didn't occur.  That is very critical to us

13  because that is really the beginning of our argument that

14  the Government did not through Mr. Galioto, did not

15  investigate this case properly, they just took some

16  information and that became part of the first indictment,

17  that particular allegation regarding AZ Falcon.

18          THE COURT:  Okay.  But again my ruling with

19  respect to going to the indictment stands that you didn't

20  intend to go to the first indictment.

21          MR. LARUSSO:  Judge, so I'll let the Court know,

22  I will go into the allegation, have him explain it, show

23  that AZ Falcon statement, show that the money went to

24  Bancorp, a vendor of Eufora and did he communicate the

25  information to the Government.  I don't intend to go into

1509

1    whether or not there was an indictment.  That is something

2    I can argue to the Court and ask that it be admitted, but

3    right now this is the foundation for our argument.

4           MS. KOMATIREDDY:  We object to all of this on

5    both hearsay and relevance.  With respect to the voice

6    mail this is pure hearsay, a voice mail from

7    Mr. Privitello and Constantine in 2012, any offers or

8    negotiations as to the return of this money or a portion

9    of the money two and a half years after it has already

10   been stolen from Mr. Privitello and already been spent is

11   totally irrelevant, doesn't mitigate the conduct of any

12   offense, and it is pure hearsay.  This offer is happening

13   after two lawsuits have been filed as defense counsel has

14   just articulated and Mr. Privitello never gets any of the

15   money back anyway.  So the voice mail is hearsay and is

16   irrelevant.

17          Second, with respect to the whole notion of

18   offers coming back, the Government's direct examination

19   was very focused and specific as to whether there were any

20   offers to return the money in December of 2009, and the

21   reason being because within a week of that $200,000 is

22   spend, it's done.  Any offers after that time again are

23   irrelevant and statements about those offers are hearsay.

24          The statements that defense is attempting to

25   introduce in the forum of pleadings and separate lawsuits

1510

1    are approximately a year afterwards.  The lawsuit filed in

2    2010, Mr. Privitello is not even a party to that lawsuit,

3    it's a lawsuit filed out in Arizona so that is completely

4    irrelevant.  Any offer made in that lawsuit was not going

5    to Mr. Privitello.

6            Second, the lawsuit filed in 2011 again is an

7    offer in context of litigation that is not -- that

8    actually -- is coming years after the money is stolen and

9    is diverted.  So all of these things are attempts to put

10   in the defendant's explanation for his stealing of the

11   money years afterwards, an explanation that is concocted

12   not during the fraud, not indicative of any state of mind

13   or intent but rather years after in an attempt to defend

14   himself in litigation.

15           Instead of taking the stand he's trying to not

16   put in prior proceedings from civil cases in a criminal

17   case.  It is entirely inappropriate, hearsay and

18   irrelevant.

19           MR. LARUSSO:  Judge, two points I would like to

20   made.

21           THE COURT:  You don't need to do that.  I'll let

22   it go.

23           MR. LARUSSO:  Thank you.

24           THE COURT:  There was testimony during the

25   direct he didn't get the money back and certainly the

1    impression from the direct could be that as a result of

2    that testimony that it was not offered back at any point.

3    I agree with the Government that the relevance of what

4    happened two years after the Government alleges that that

5    fraud took place and the money was already spent, is

6    limited, but I think the Government is very easily able to

7    explain that to the jury so I'm not concerned about any

8    confusion or prejudice by the Government by allowing in a

9    more complete recitation of the back and forth between

10   Mr. Privitello and Mr. Constantine.  There is no reference

11   to that, either very limit excerpts.  So I'll allow it in.

12           Again I think we should question him first

13   because if he admits there is this back and forth -- I'm

14   not sure you need to put in the voice mail.  He

15   acknowledges that, the back and forth, and you don't need

16   to impeach him with the voice mail.

17           MR. LARUSSO:  I think the Court indicated I

18   should do that in an earlier case so there is no need to

19   acknowledge it.  I agree with the Court.  Obviously we'll

20   proceed.

21           THE COURT:  Bring in the jury.

22           MS. KOMATIREDDY:  On this one quick issue, we do

23   have another attorney who is scheduled to testify and if

24   that is okay with counsel and with the Court I'd like to

25   call Allison Ressler.

1512

 1           THE COURT:  Okay.  Let's bring in the jury.

 2           MR. HALEY:  There are other matters in the

 3   Government's motion in limine.  I assume we'll address

 4   that later.

 5           THE COURT:  Yes.

 6           (Whereupon, the jury at this time enters the

 7   courtroom.)

 8           THE COURT:  Please be seated.  Good morning,

 9   members of the jury.  Welcome back, as you know we were

10   unable to sit last week because one of the lawyers had a

11   family emergency and we've all had that situation where

12   something comes up and we all need time to deal with that.

13           Michelle called everybody, and I also want to

14   expression my appreciation with respect to that.  I'll

15   wait until the end of this week to give you an estimate

16   where we stand on the trial.  Obviously we missed a number

17   of days but I'm hoping to work with the lawyers.  We'll be

18   able to work with the other lawyers.

19           My father was an airplane pilot and he kept

20   saying we'll made up the time in the air -- I don't know

21   what that means but I'll give you an estimate at the end

22   of this week.

23           So we're ready to continue with the trial.  The

24   lawyer discussed taking witnesses out of turn, so we'll

25   interrupt Mr. Privitello's cross examination and we'll

1513

```
1   have cross-examination.

2           MS. KOMATIREDDY:  The Government has entered

3   into a stipulation, identified as 617.  With respect to

4   Government's Exhibit 3396 R, at this time I'd like to move

5   it in evidence 617 and 3396 R.

6           MR. HALEY:  No objection.

7           MR. LARUSSO:  No, your Honor.

8           (Whereupon, Government's Exhibits 3396 R and 617

9   were received in evidence.)

10          MS. KOMATIREDDY:  It is hereby stipulated and

11  agreed by and between the United States of America and the

12  defendant Phillip A. Kenner and Thomas Constantine through

13  their attorneys that Government's Exhibit 3369 R is a bank

14  record, Government's Exhibit 3396 R is a true and accurate

15  copy of a wire transfer money to an account at Citibank.

16          This stipulation in Government's Exhibit 3396 R

17  are admissible into evidence as trial.  Thank you, Judge.

18  The Government calls Allison Ressler.

19          THE CLERK:  Please raise your right hand.

20  A L L I S O N   R E S S L E R,

21          called as a witness, having been first

22          duly sworn, was examined and testified

23          as follows:

24          THE CLERK:  Please state your name and spell it for

25  the record.
```

1514

```
 1              THE WITNESS:  Allison R-E-S-S-L-E-R.

 2              THE COURT:  Please be seated, Ms. Ressler.  Stay

 3    close to the mike and keep your voice up.  Okay.

 4    A     Okay.

 5    DIRECT EXAMINATION

 6    BY MS. KOMATIREDDY:

 7    Q     Good morning.  What do you do for a living?

 8    A     I'm an attorney.

 9    Q     Where do you work?

10    A     Sullivan & Cromwell.

11    Q     In what office?

12    A     Los Angeles.

13    Q     What is your title there?

14    A     I'm a partner.

15    Q     Approximately when did you begin working at Sullivan

16    & Cromwell?

17    A     1984.

18    Q     And in general, can you describe the nature of your

19    practice?

20    A     I do mergers and acquisitions principally.

21    Q     In simple materials what is an acquisition?

22    A     One company or entity buying another.

23    Q     Did there come a time you met an individual named

24    Tommy Constantine?

25    A     Yes.
```

1515

1   Q    Did you meet with him face-to-face?

2   A    I did.

3   Q    Would you recognize him again if you saw him today?

4   A    Yes.

5   Q    Could you look around the courtroom and let us know

6   if you recognize anyone named Mr. Constantine?

7   A    I do.

8            (Mr. Constantine rises.)

9            MR. LARUSSO:  We concede identification.

10           THE COURT:  Identification conceded.

11  Q    When did you meet him?

12  A    I think it was the fall of 2008.

13  Q    Did you work on a potential acquisition on behalf of

14  Mr. Constantine?

15  A    I did.

16  Q    What were you trying to acquire on his behalf?

17  A    I was working on a potential acquisition of Playboy

18  Enterprises.

19  Q    Who were you representing in this attempted

20  acquisition?

21  A    A limited liability company to be formed by

22  Mr. Constantine, Chris Albrecht and Steve Bing.

23  Q    Can you just describe briefly the professions of

24  Mr. Albrecht and Mr. Bing?

25  A    Mr. Bing is a prominent movie producer in Los Angeles

1516

| | |
|---|---|
| 1 | and Mr. Albrecht is currently the CEO of Stars |
| 2 | Entertainment formerly at HBO. |
| 3 | Q   To your knowledge were there any professional hockey |
| 4 | players identified as part of this previously formed |
| 5 | entity that was to be acquired? |
| 6 | A   Not to my knowledge. |
| 7 | Q   Did Mr. Constantine identified any profession hockey |
| 8 | players as potential investors in this entity? |
| 9 | A   Not to my knowledge. |
| 10 | Q   This representation in which you represented |
| 11 | Mr. Constantine and others to acquire Playboy Enterprises |
| 12 | was that the full scope of your representation? |
| 13 | A   It was. |
| 14 | Q   Did you have any other representations involving |
| 15 | Mr. Constantine? |
| 16 | A   I did not. |
| 17 | Q   For the record, were you doing any legal work |
| 18 | pertaining to real estate development projects in Hawaii? |
| 19 | A   I was not. |
| 20 | Q   Were you doing any legal work pertaining to the |
| 21 | company Eufora? |
| 22 | A   I was not. |
| 23 | Q   Did you do any legal work pertaining to real estate |
| 24 | development projects in Mexico? |
| 25 | A   No. |

1517

```
1    Q    Were you doing any legal work to sue an individual
2    named Ken Jowdy?
3    A    No.
4    Q    If you look to your left there is a Government's
5    Exhibit marked 3395.  Do you recognize them?
6    A    Yes.
7    Q    What is it?
8    A    An invoice from Sullivan & Cromwell to Constantine
9    LLC.
10   Q    When is that invoice approximately created in the
11   course of your representation?
12   A    At the conclusion.
13   Q    How is it created?
14   A    I draft text describing the work we did for the
15   client and my billing department generates the invoice.
16   Q    Is this made in the general course of Sullivan &
17   Cromwell's business?
18   A    Yes.
19   Q    Is it kept in the ordinary course of Sullivan &
20   Cromwell's business?
21   A    Yes.
22        MS. KOMATIREDDY:  Government offers 3395 in
23   evidence.
24        MR. LARUSSO:  No objection, your Honor.
25        MR. HALEY:  No objection, sir.
```

Case 2:13-cr-00607-JFB-AYS   Document 303   Filed 07/07/15   Page 18 of 248 PageID #: 5933

1518

```
 1              THE COURT:  3395 is admitted.

 2              (Whereupon, Government Exhibit 3395 was received

 3      in evidence.)

 4      Q    Displaying it for the jury, this invoice is dated

 5      December 23, 2008; is that right?

 6      A    Yes.

 7      Q    And it says on the left Constantine LLC.  Is that the

 8      designation of the to be formed entity?

 9      A    That's correct.

10      Q    The entity you were representing to acquire Playboy;

11      is that correct?

12      A    That's correct.

13      Q    And it says here in the portion for services rendered

14      from October 1, 2008, through the date hereof in

15      connection with your consideration of a transaction

16      involving Playboy Enterprises Inc., PEI.

17              Did I read that correctly?

18      A    Yes.

19      Q    Is that the approximate time frame you worked for Mr.

20      Constantine from October 1, 2008 to the end of December

21      2008?

22      A    Yes.

23      Q    During that time frame did you have any meetings with

24      Mr. Constantine and personnel at Playboy Enterprises?

25      A    I did.
```

1519

1   Q     Where did the meeting take place?

2   A     A meeting at the Playboy mansion with Mr. Hefner and

3   his advisors.

4   Q     And as of December 23, 2008, approximately how much

5   did Mr. Constantine and others owe for your legal work?

6   A     Well, according to the invoice I have in front of me,

7   the total fee was $155,000 and they owed when this was

8   sent about 130.

9   Q     Was payment made on that invoice?

10  A     Yes.

11  Q     How was it made?

12  A     There were two payments made, half on behalf of

13  Mr. Bing and half on behalf of Mr. Constantine.

14  Q     I will turn your attention to 3396 R which is in

15  evidence.  With respect to the payment made on behalf of

16  Mr. Constantine, first -- what was the amount of the

17  payment?

18  A     65,000.

19  Q     Where did this payment come from?

20  A     According to this Citibank wire transmission form

21  from the law offices of Ronald Richards.

22  Q     What is the date of that payment?

23          Message dated.  Look at that.

24  A     The message dated 5/26/09.

25  Q     May 26, 2009?

1520

```
1   A    Yes.
2             MS. KOMATIREDDY:  No further questions.  Thank
3   you.
4             THE COURT:  Okay.  Cross-examination.
5             MR. HALEY:  No questions, your Honor.
6             MR. LARUSSO:  Just a few, if I may, your Honor.
7   CROSS EXAMINATION
8   BY MR. LARUSSO:
9   Q    Good morning, Ms. Ressler.  My name is Bob LaRusso.
10  I represent Mr. Constantine.
11            You mentioned this invoice was paid by two of
12  the three individuals that you described to us, a Mr. Bing
13  and Mr. Constantine; is that correct?
14  A    Yes.
15  Q    And that the $65,000 which is represented by 3396
16  came from Mr. Constantine; is that right?
17  A    It came from the law offices of Ronald Richards.
18  Q    Do you know who Mr. Richards was at the time?
19  A    I do not.
20  Q    Do you know what type of account this money was
21  coming from?
22  A    I do not.
23  Q    As an attorney you know there are various accounts,
24  is that correct, that lawyers hold?
25            MS. KOMATIREDDY:  Objection.
```

1521

1          THE COURT:  Sustained.

2    Q    By the way, you said on direct examination you did no

3    legal work for Eufora.  Had you ever heard the name Eufora

4    before?

5    A    I think it was in the e-mail addresses, but I don't

6    recall.

7    Q    What did you know about this company Eufora at the

8    time that we're talking about?

9    A    I don't really recall knowing very much about the

10   company, so --

11   Q    What you did learn about the company, who did you

12   learn it from, if you know?

13   A    I don't know anything about Eufora specifically.

14   Q    Okay.

15          MR. LARUSSO:  I have no further questions.

16          THE COURT:  Any redirect?

17          MS. KOMATIREDDY:  No, your Honor.

18          THE COURT:  You may step down, Ms. Ressler.

19   Thank you.

20          (Witness excused).

21          THE COURT:  We'll continue with Mr. Privitello.

22

23

24

25

1522

1    N I C H O L A S   P R I V I T E L L O,

2          having been previously sworn, resumed the stand

3          and testified further as follows:

4          THE COURT:  Members of the jury, as you will

5    recall at the end of last week Mr. Privitello was on

6    direct examination, Mr. Haley cross examined him so we'll

7    begin with Mr. LaRusso's cross-examination.

8          I remind you you are still under oath,

9    Mr. Privitello.  Do you understand.

10         THE WITNESS:  Yes.

11   Q    Good morning, Mr. Privitello.

12   A    Good morning.

13   Q    Mr. Privitello, do you recall testifying that you had

14   a relationship with both Mr. Kaiser and Mr. Kenner before

15   your investment in Eufora; is that correct?

16   A    Yes.

17   Q    And I believe you testified that you actually had

18   worked on, and I quote the words, "some projects" together

19   with Mr. Kaiser.  Do you recall that?

20   A    Yes.

21   Q    What projects did you work with Mr. Kaiser on before

22   you became involved in Eufora?

23   A    Just some minor construction projects, I think one

24   tree went through a roof and took down some electrical

25   service.  Small stuff like that.

1523

```
 1   Q    He retained your services and you got paid for those
 2   services.
 3   A    Yes.
 4   Q    Put a time frame on that, please?
 5   A    It was probably --
 6   Q    Did you use December 2009 as the time you made your
 7   investment in Eufora if that helps you try and pinpoint?
 8   A    Five years prior to that or something.
 9   Q    You testified over time you actually became friendly
10   with Mr. Kaiser; is that correct?
11   A    Yes.
12   Q    To the point you attended christenings and birthday
13   parties?
14   A    Yes.
15   Q    And I believe that relationship, that friendly
16   relationship and social relationship was about ten years?
17   A    I believe so, yes.
18   Q    Briefly with regard no Mr. Kenner, I'll not go
19   through all of it, you told the jury that you worked on a
20   house, his house in Arizona; is that correct?
21   A    Correct.
22   Q    You did some electrical work, some audio-video work
23   for him; is that correct?
24   A    I did some audio-video, yeah.
25   Q    When was that?
```

1524

```
 1   A    That was '08, I think.  I can't, you know -- I think

 2   '08, around.

 3   Q    I'm just trying to get a time frame?

 4   A    Yeah.

 5   Q    Before you had an investment in Eufora did you work

 6   on any other projects with Mr. Kenner or Mr. Kaiser,

 7   particularly refer to an entity known as Paradise Valley?

 8   A    Yes.

 9   Q    What was Paradise Valley?

10   A    A home in Arizona.

11   Q    And what kind of relationship did you have with

12   Mr. Kenner and Mr. Kaiser with regards to Paradise Valley?

13             MS. KOMATIREDDY:  Objection, relevancy.

14             THE COURT:  We discussed this last week at

15   sidebar.  If you need to approach.

16             MR. LARUSSO:  I can made an offer of proof.  I'm

17   not staying long in it, I'm not going in depth.  The only

18   one I will be discussing is Los Frailes.  If you want to

19   discuss it at sidebar.

20             THE COURT:  Come up sidebar.

21             (Continued.)

22

23

24

25
```

1525

```
1            (The following occurs at sidebar.)
2            MR. HALEY:  If I may I'd join in the objection.
3            MR. LARUSSO:  So the Government skipped over Los
4    Frailes and they jumped from his blue chip investments and
5    real estate investments to Eufora and made it very clear
6    to the jury this particular investment was different.
7    They then brought out from Mr. Privitello that it was
8    Mr. Constantine that did all of the pitching with regard
9    to that.  That's not what happened.  That's not our
10   position; that this gentleman had a relationship with
11   Mr. Kenner and Mr. Kaiser; that they had invested in Los
12   Frailes; that the pitch was made by Kenner and Kaiser for
13   Los Frailes as well as the investment in Eufora.  It's in
14   the notes of Mr. Galioto.  Mr. Constantine had nothing to
15   do with pitching him for Eufora and our position is he's
16   leading the jury to believe something that didn't occur.
17           THE COURT:  Okay.  I understand.  I'll allow it
18   to the limited extent if you want it bring out or ask him
19   whether or not he and Kenner were pitching Los Frailes --
20           MR. LARUSSO:  I'm getting out of Paradise
21   Valley.
22           THE COURT:  I don't know why all the
23   transactions need to come in.  If he's confused or
24   misstating what the pitch was about, we don't need to go
25   into details of that transaction.
```

1526

1           MR. LARUSSO:  The difference, Judge, is if you

2    look at how he describes the Eufora investments, meaning

3    he had a conversation with Mr. Constantine which we'll

4    show didn't occur, that it was Mr. Constantine in addition

5    to the other two pitching him about the purposes of this.

6    We're arguing it didn't happen.  We'll argue partially

7    because he had a relationship with Kenner and Kaiser

8    because he invested over $250,000 of his own money, he

9    didn't get any documentation at that time.  That he would

10   rely on them when it came time for Mr. Eufora and not

11   Mr. Constantine.  That's the point.  The pitch was made

12   was Los Frailes by Kenner and Kaiser.  I'll say a few

13   facts about the Mexican investment to show how he relied

14   upon them and when we get to Eufora he didn't need to have

15   Constantine because he has Kenner and Kaiser.

16          MS. KOMATIREDDY:  Mr. LaRusso is confusing

17   argument with the facts in the record.  After a series of

18   conservative investments, Mr. Privitello made a real

19   estate investment.  We brought that out and generally said

20   real estate investments, not to name Los Frailes.

21          THE COURT:  I don't think there is any prejudice

22   to either the Government or Mr. Kenner if a name of the

23   investment comes out.

24          MS. KOMATIREDDY:  Because if Mr. LaRusso is

25   trying to elicit that the witness relied on Mr. Kenner,

1527

```
 1  he's going to say he was defrauded in Los Frailes because
 2  that is an entire separate fraud we don't need to argue
 3  about at this trial.
 4           THE COURT:  Those are disconnected.  The witness
 5  in response to that doesn't have to say whether he thought
 6  there was a fraud or not.  All he wants to bring out there
 7  was a prior relationship and dealings where he was already
 8  relying on Kenner's word, true or not true, and he didn't
 9  need to hear anything from Mr. Constantine.
10           MS. KOMATIREDDY:  And in Mr. Haley's cross the
11  witness already testified, the witness talked about
12  Eufora, that he pitched him in December of 2009.
13           THE COURT:  He suggested that is incorrect.
14  That's his right.  There is to be no suggestion of any
15  fraud with respect to that.  We're done.
16           MR. HALEY:  My only concern I don't want him
17  volunteering.
18           THE COURT:  Mr. Privitello.  Come up here.
19           (Mr. Privitello approaches at the sidebar).
20           THE COURT:  I'll ask Mr. LaRusso to bring out
21  some basic facts about Los Frailes whether there is any
22  fraud in connection with that.  I don't want you to
23  reference that.
24           You have to follow my instructions.
25           THE WITNESS:  Of course I will.
```

Privitello - Cross/LaRusso

1528

1          (End of sidebar conference.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1529

```
 1              (In open court.)
 2              MR. LARUSSO:  Now, Mr. Privitello, I believe we
 3    left off with you working on a project called Paradise
 4    Valley.  You did work on that, correct?
 5    A    Yes.
 6    Q    Just tell us what was the project.  Was it installing
 7    video equipment?
 8    A    Audio-visual, TVs.
 9    Q    Who did you do the work for?
10    A    Mr. Kaiser and Mr. Kenner.
11    Q    When did that occur?
12    A    Why not ask Mr. Kenner?  He probably knows better
13    than I do.
14    Q    Mr. Privitello, you are the one on the witness stand,
15    you are the one being asked the questions.  If you don't
16    remember, Mr. Privitello, you can properly say I don't
17    recall.
18    A    I don't recall.
19    Q    And if I have an opportunity to refresh your
20    recollection I will.
21    A    I don't recall.
22    Q    My question is Paradise Valley occurred before your
23    investment in Eufora; is that correct?
24    A    Yes.
25    A    Yes.
```

1530

1    Q    Now, you also testified that you initially were

2    involved in investments of mutual funds and blue chip

3    stocks, things of that nature, but you also testified, do

4    you remember, that there was another thing.  Do you

5    remember that?

6    A    I don't recall.

7    Q    Do you remember the Government asking you, and maybe

8    some real estate investment?

9    A    Yes, something like that.

10   Q    Was that real estate investment a piece of property

11   known as Los Frailes?

12   A    Yes, it was.

13   Q    When did you -- you made an investment in that

14   property?

15   A    Yes.

16   Q    Just asking --

17   A    I'm not crossing any boundaries.

18   Q    Just yes or no.

19   A    Yes.

20   Q    Do you remember when you made the investment?

21   A    '08, I believe.

22   Q    Would it be some time around January of 2008?

23   A    Could be.  I barely know.  I think so.

24   Q    Your investment actually was into a holding company

25   called Pasifico Properties.  P-A-C-I-F-I-C-O; is that

1531

1    correct?

2    A    I don't know if I can answer it the way I want to

3    answer it.

4    Q    You've heard the name --

5    A    I know who the check was made out to.

6    Q    We'll get to that.

7         Who pitched you on this investment?

8    A    Mr. Kenner and Mr. Kaiser, both.

9    Q    When you say "pitched," would it be --

10   A    I didn't say pitched; you said pitched.

11   Q    Take a look at --

12   A    Or just now I didn't say pitch.

13        MR. LARUSSO:  May I approach, your Honor.

14        THE COURT:  Yes.

15   Q    Let me see if I can ask.  Did anybody pitch you with

16   regard to the Los Frailes investment?

17   A    Yes.

18   Q    Did you use the word at any point in time to describe

19   your conversations with Mr. Kenner and Mr. Kaiser

20   regarding this investment, as "they pitched it to me"?

21   A    I don't recall.

22   Q    Let me show you what is marked for identification --

23   before that, do you remember being interviewed by Agent

24   Galioto and another agent on January 18, 2012?

25   A    The exact date I don't recall.

1532

1    Q    Would it be around that period of time you had a

2    conversation with him?

3    A    January 2012.  I can't tell you where I was.

4    Q    My question is not where you were, do you remember

5    having a conversation with Agent Galioto sometime around

6    January 2012?

7    A    Could very well be but I don't recall the exact date.

8    Q    We know at some time you had a conversation with

9    Mr. Galioto before you testified here today; is that

10   right?

11   A    I think so but I can't recall the time frame in 2012.

12   Q    Do you recall speaking to Mr. Galioto?

13   A    Yes.

14   Q    Do you recall speaking to him about the Los Frailes

15   investments we're now talking about?

16   A    Yes.

17   Q    And do you remember he was taking notes when you were

18   talking to him about it?

19   A    I would assume he was talking notes.  I don't actual

20   remember him taking notes.

21   Q    Let me show you what has been marked as 3500 NP-1.

22   I'll refer you to the second page.  Actually I'll let you

23   look at all of this if you need to, look at this portion

24   at the top of the first page and I'll direct you to the

25   middle portion, probably about a third of the way down to

1533

```
 1   the middle portion of the second page.

 2              Actually I'll ask you before we get to the

 3   second page, take a look at the first page.  There are

 4   actually three sections.  Look the first section and third

 5   section dealing with this next series of questions.

 6   A     Some of them I can't read.

 7              MR. LARUSSO:  Maybe I can move this along

 8   quickly, Judge.

 9   Q     I'll direct your attention to this area right here

10   (indicating).

11   A     Okay.

12   Q     Do you see this?  Do you see this?

13   A     Yes.

14   Q     To refresh your recollection that Mr. Kenner and Mr.

15   Kaiser pitched you on the Los Frailes investments?

16   A     Did I use the exact word "pitch," no.  But I just

17   want to made it clear, you said "pitch," I didn't want you

18   to put the word in my mouth at that particular time.  You

19   asked me a question, you said they pitched.  That's all I

20   was getting at.

21   Q     Mr. Privitello, did you look at that document I

22   showed you?

23   A     Yes, not in my handwriting --

24   Q     Here's the question.  Very simple:  Did you tell the

25   agents that Kenner and Kaiser pitched, and I use the word
```

1534

```
1   "pitched" the investment to you?

2   A    You are asking me to tell you exactly what I said,

3   the exact word that I used in 2012, and I'm telling you I

4   can't tell you the exact word.

5                MR. LARUSSO:  Judge, I think he said he used the

6   word.

7                THE WITNESS:  You're asking me --

8                THE COURT:  Mr. Privitello, answer the question.

9                If you don't remember using the exact word tell

10  him you don't remember.

11               THE WITNESS:  I feel I was clear about it

12  already.  He keeps coming.

13               THE COURT:  Let's move on.

14               MR. LARUSSO:  Are you defensive about these

15  questions for a reason?

16               THE COURT:  The jury will disregard that.

17               Mr. LaRusso, I just gave him an instruction to

18  just answer the instruction.  Now I'm giving you the same

19  instruction.

20  Q    Mr. Privitello, after speaking with Mr. Kenner and

21  Mr. Kaiser, did you made an investment in Los Fraíles?

22  A    Yes.

23  Q    How much did you made?

24  A    250,000.

25  Q    Where did that money come from?
```

1535

1    MR. HALEY:  Judge, I would object.

2    THE COURT:  I'm sustaining the objection for the

3    reasons I stated at sidebar.

4  Q    Were you the only one that made an investment in Los

5  Frailes at that time?

6    MR. HALEY:  Your Honor, I will object again.

7    THE COURT:  No, that one I'll allow.  You can

8  answer that if you know.

9  A    I believe there was somebody else, yes.

10  Q    Do you know a person by the name of Jonathan Smith?

11  A    Yes.

12  Q    Who is Jonathan Smith?

13  A    My business partner.

14  Q    He was your partner in a company called Harvest

15  Systems Group?

16  A    Yes.

17  Q    And he like you made an investment in Los Frailes as

18  well?

19  A    Yes.

20  Q    By the way, the money you invested, did you send it

21  into a lawyer's escrow account?

22  A    For Los Frailes?

23    MS. KOMATIREDDY:  Objection.

24    THE COURT:  Sustained.  Mr. LaRusso, I'm

25  sustaining the objection on it.  I allowed the

Case 2:13-cr-00607-JFB-AYS   Document 303   Filed 07/07/15   Page 36 of 248 PageID #: 5951

1536

1    questioning, limited questioning, and I think it has

2    reached that point.

3    Q    Let me now direct my questions to Eufora.

4         I believe you testified that it was Tommy

5    Constantine that proposed the Eufora investment for

6    $200,000 for 1.5 percent interest in the company; is that

7    correct?

8    A    Yes.

9    Q    I'm sorry, I didn't hear you.

10   A    Yes.

11   Q    Isn't it a fact, Mr. Privitello, that it was

12   Mr. Kaiser that actually proposed this specific investment

13   in that amount and in that percentage and not

14   Mr. Constantine?

15   A    I believe I already testified to that.

16        I -- do you want me to go through the whole

17   thing again?

18   Q    No, the question was pretty specific and it requires

19   a yes or no answer.

20   A    No.  Well, ask the question again, please.

21   Q    I said isn't it a fact that it was Mr. Kaiser that

22   proposed this specific investment for 200,000 for one

23   percent interest and not Mr. Constantine?

24   A    If I have to answer yes or no, I have to say no.  I'd

25   like to elaborate but I'll say no.

1537

1        THE COURT:  If you can't answer the question yes

2   or no, just tell him you can't answer it yes or no.

3   A    I can't answer it yes or no.

4   Q    Was it because you had a conversation with Mr. Kaiser

5   before you spoke with Mr. Constantine regarding your

6   particular investment?

7   A    Yes.

8   Q    And that conversation that you had with Mr. Kaiser

9   dealt with the amount of money that you would be investing

10  as well as the percentage you would be getting; is that

11  correct?

12  A    He put me on the phone with Tommy and I think that is

13  when we came up with the amount of percentage.

14  Q    My question to you was -- well, let me back up.  When

15  you say you put him on the phone, where was Mr. Kaiser at

16  the time?

17  A    I think he was in Arizona at the time with Tommy in

18  Arizona.

19  Q    And you were here in New York?

20  A    Yes.

21  Q    We know the investment in Eufora was made December 7,

22  2009; is that correct?

23  A    Yes.

24  Q    Can you tell us when this alleged phone call took

25  place?

1538

```
 1   A    I don't recall.

 2   Q    Well, do you remember testifying that you weren't

 3   sure if this call took place before you made the

 4   investment or before you first contacted Mr. Constantine

 5   or not?

 6             MS. KOMATIREDDY:  Objection.

 7             THE COURT:  Sustained as to form.

 8   Q    Well, let me ask it this way.  Do you remember

 9   whether this telephone call came before you had your first

10   e-mail communication with Mr. Constantine or after?

11   A    You know, they were pretty close everything so I

12   can't swear one way or the other.

13   Q    When you say they were pretty close, so you are not

14   sure which came first; is that correct?

15   A    No.

16   Q    So just so the testimony is clear, your first e-mail

17   communication with Mr. Constantine could have come before

18   the call or it could have come after, that's what you are

19   testifying?

20   A    I think it came before.

21   Q    If I may.  Directing your attention to the transcript

22   of your testimony last week.  Do you recall being asked

23   these questions and giving these answers on page 1432,

24   line 8.

25             Question:  What --
```

1539

```
 1   A     Page 1432?

 2              THE COURT:  No.

 3              MR. LARUSSO:  You just have to listen.

 4              Question:  -- What did Mr. Constantine first of

 5   all when you spoke with Mr. Constantine directly, what

 6   format were you speaking to him on the phone or e-mail?

 7              Answer:  It started out on the phone and I don't

 8   know when the first e-mail was, but they were very close

 9   to one another.  I'm not sure which was first.

10              Do you recall that?

11              MS. KOMATIREDDY:  Objection, your Honor.  No

12   context.

13   Q     Do you recall giving that answer to that question?

14   A     Just a little while ago?

15              THE COURT:  Overruled.

16              THE WITNESS:  You are confusing me.

17   Q     I'm trying to made it as clear as I can.  On May 18,

18   2015, were you asked that question and did you give that

19   answer under oath?

20   A     I think so.

21   Q     You don't know?  Is that your testimony?

22              MR. LARUSSO:  I apologize.  I withdraw that.

23              THE COURT:  Move on, okay.

24   Q     You testified that, and correct me if I'm wrong, that

25   you heard bits and pieces from John Kaiser, Phil and some
```

1540

```
1   guys that were probably around.  Do you recall that
2   testimony?
3   A    I believe so, yes.
4   Q    That was before you spoke with Mr. Constantine or
5   before you e-mailed him; is that correct?
6   A    Yes.
7   Q    Who are these some guys?
8   A    Just different people that I don't remember who they
9   were or what but I heard the name Eufora being thrown
10  around.
11  Q    Are these friends of yours or Mr. Kaiser or
12  Mr. Kenner?
13  A    Just over a year period of time.  I can't recall who
14  they were.  They weren't friends of mine.
15  Q    I'll not ask you to repeat everything that you --
16  that Mr. Kenner or Kaiser told you about the investment.
17  But would you agree with me that it was Mr. Kenner and
18  Mr. Kaiser that pitched Eufora before you even spoke to or
19  even communicated with Mr. Constantine?
20  A    I don't think I would use the word pitch.  Not that
21  it necessarily has any relevance, but they spoke to me
22  about it, they spoke about some details.  They didn't
23  really pitch until like, hey, Nick, invest in it.  I
24  don't, you know -- but they were talking about it,
25  different things.  There wasn't an opportunity to invest
```

1541

1   in it back then.

2   Q    What is your understanding of the word "pitched"?

3   A    Trying to convince you to do something.

4            MS. KOMATIREDDY:  Objection.

5   Q    Did Mr. Kenner and Mr. Kaiser pitch you or of the

6   investment before you and Mr. Constantine had any --

7            MS. KOMATIREDDY:  Objection.

8            THE COURT:  Sustained.  Asked and answered.

9   Q    Do you remember speaking with Agent Galioto sometime

10  before testifying here and maybe a few years ago about the

11  Eufora investment and, quote, telling Agent Galioto that

12  it was Mr. Kenner and Mr. Kaiser that pitched the Eufora

13  investment?

14  A    I don't recall.  You are asking something a couple

15  years ago.  I can't -- you know I did talk to him about

16  it.  Did I say to them they pitched it?  I can't recall

17  what I told him exactly at that time.

18  Q    Would you take a look at 3500 NP-1.  Now I'll direct

19  your attention to the second page.  You can look at the

20  first page to refresh your recollection as to the possible

21  time of this document.

22            After you look the the particular section I'm

23  alluding to which is the first portion of that second

24  page, I'll ask you again, does that refresh your

25  recollection that you told Agent Galioto that Phil Kenner

1542

1    and John Kaiser pitched the investment?

2    A    It's not my handwriting.  I didn't write this.

3    Again, could I have used the word pitched?  Yes.  Can I

4    swear to it under oath that I used the word pitch?  No.

5    Q    Mr. Privitello, does that refresh your recollection

6    that you told Agent --

7    A    No, that hasn't refreshed my recollection.

8    Q    Let me finish my question.  Does it help refresh your

9    recollection that you mentioned only Mr. Kenner and

10   Mr. Kaiser in relation to the Eufora investment when you

11   spoke to Mr. Galioto?

12           MS. KOMATIREDDY:  Objection.  Misstates the

13   record.

14           THE COURT:  Overruled.  You may answer that.

15   A    Rephrase it, please.

16   Q    Does that document help refresh your recollection,

17   Mr. Privitello, that when you spoke with Agent Galioto,

18   you were talking about the Eufora investment that you

19   mentioned Phil Kenner and Mr. John Kaiser as the two

20   people that spoke to you, pitched you, regarding the

21   Eufora investment?

22           MR. HALEY:  I would object to the form, your

23   Honor.

24           THE COURT:  No.  Overruled.  You can answer

25   that.

1543

1    A    I can't answer it yes or no.

2    Q    When you say you can't answer it, you have no

3    recollection of Mr. Kenner and Mr. Kaiser talking to you

4    about the Eufora investment?

5              MS. KOMATIREDDY:  Objection.

6              THE COURT:  Yes, sustained.

7    Q    Well, let me ask you this.  Was there anything that

8    Mr. Kenner and/or Kaiser told you about the Eufora

9    investment that convinced you to invest in Eufora before

10   you spoke with Mr. Constantine?

11   A    It's a yes or no question?

12   Q    If you can.

13   A    Say it one more time.

14   Q    Is there anything Mr. Kenner and/or Mr. Kaiser said

15   to you that convinced you to invest in Eufora before you

16   spoke to Mr. Constantine?

17   A    No.

18   Q    Do you remember at all telling Agent Galioto that

19   both Kenner and Kaiser told you that they invested their

20   own money in Eufora?

21   A    I believe so, yeah, they had their money in there.

22   Q    Would you agree with me the two people you've known

23   for awhile tell you they've invested, that would be a

24   significant factor in you investing in the same entity,

25   would that be correct?

Privitello - Cross/LaRusso

1544

1    A    Yes or no?

2    Q    If you can.

3    A    I can't answer yes or no.

4              (Continued.)

1  CONTINUED CROSS EXAMINATION

2  BY MR. LaRUSSO:

3  Q    Mr. Privitello, isn't a fact that when you spoke to

4  Agent Galioto you never said that Constantine made the pitch

5  for the Eufora investment?

6           MS. KOMATIREDDY:  Objection.

7           THE COURT:  Again, in terms of the question, it's

8  not in evidence but I'll allow him to answer if he recalls.

9  A    Ask the question again, please.

10 Q    Isn't it a fact that Mr. Constantine never pitched you

11 the investment in Eufora, yes or no?

12 A    He did pitch me.

13 Q    Mr. Privitello, could you take a look at those notes

14 again.

15 A    Matt Galioto's notes?  Yeah, sure.

16 Q    How do you know they're Matt Galioto's notes?

17 A    You just told me they were, didn't you?

18 Q    I don't believe I said that.

19 A    I think it's in the record.  Well, it's not my --

20 Q    The record will reflect --

21 A    -- my --

22 Q    The question is simple, Mr. Privitello.  Take a look at

23 the notes.  Anywhere in those notes, did you tell

24 Agent Galioto that Mr. Constantine was the one that pitched

25 you the Eufora investment?

1  A    It's his notes.  It's not -- I don't know what he --

2  you're asking me --

3         THE COURT:  I will sustain the government's

4  objection now.  It's not the proper form of a question.  It's

5  sustained as to the form of the question.

6  Q    Did you tell Agent Galioto that Tommy Constantine pitched

7  you the Eufora investment?

8         MS. KOMATIREDDY:  Objection.  Asked and answered.

9         THE COURT:  Go ahead.  You can answer.

10  A    Did he pitch it?  Did Tommy pitch the --

11  Q    Before you spoke to him.  Did he pitch the investment?

12  A    Yes.

13  Q    Did you ever tell that to Agent Galioto when you first

14  spoke to him?

15  A    I don't recall.  It's two, three years ago.

16  Q    Well, take a look at all those notes, every single line.

17  And you tell me, did you tell Agent Galioto that Tommy

18  Constantine pitched you on Eufora?

19  A    You have to ask him that, not me.

20         MS. KOMATIREDDY:  Objection.

21         THE COURT:  Sustained.

22  Q    Mr. Privitello, I'm going to turn to the e-mails that you

23  testified to last week.  Do you recall testifying that except

24  for the, quote, "straggler," all of the e-mails that were

25  shown to you were the e-mail communications between you and

1   Mr. Constantine?

2   A    Yes.

3        MS. KOMATIREDDY:  Objection.  He didn't testify to

4   that.

5        THE COURT:  Overruled.  Go ahead.

6   Q    I'm going to show you not the first one, but I'm going to

7   show you the second one.  I hope that you can get the monitor

8   on in front of you.  If not, I apologize in advance.  You may

9   have to look at the screen above you.

10       If I may, Mr. Privitello, this is 208.2.  It is

11  received in evidence previously.  Do you see this?

12  A    Yes.

13  Q    It's an e-mail from you to Mr. Constantine dated

14  December 4, 2009, at 2:22 p.m., is that correct?

15  A    Yes.

16  Q    And that's the e-mail that you identified as the first

17  e-mail communication you had with Mr. Constantine, is that

18  correct?

19  A    I have to see all the e-mails.  Is that the first one?

20  Q    I'd be glad to show them to you.

21  A    You know the answer.  So why don't we just --

22       THE COURT:  Mr. Privitello, don't comment.  Just

23  answer the questions.

24  Q    Take a look at all of them.  Take whatever time you need.

25  A    Is that the first one in this bunch?

1    Q    Take a look at all of them.

2    A    Do you want me to go through each time to made sure --

3    Q    Tell me the first e-mail communication you had with

4    Mr. Constantine.

5    A    Can you bring that back up on here?

6         THE COURT:  Can you bring it back up?

7         MR. LaRUSSO:  I gave him all of the exhibits.

8    A    Well, which is the one that I was looking at?

9    Q    You could look at the first one all the way through 11.

10   We were looking at the second one, which is --

11   A    All right.  So there's one --

12   Q    -- 208.

13   A    That was December 4th.  There's one from December 3rd.

14   We're up to Tommy.  So you want to know the ones to Tommy, is

15   that correct?

16   Q    I want to know the first e-mail communication you had

17   with Mr. Constantine directly.

18   A    Yes, it looks like the first one to Tommy.

19   Q    May I take those back and show them to the jury so we can

20   talk about some of them.  If you need them, ask, and I will

21   produce them again.

22         (Handing.)

23         This is your first e-mail communication with

24   Mr. Constantine, December 4, 2009, at 2:22, correct?

25   A    Yes.

PRIVITELLO-CROSS-LaRUSSO                              1549

1    Q    And you're asking Mr. Constantine at this point, I will
2    wire $150,000 to the below account and will overnight a check
3    for $50,000 to obtain 1.5 percent interest in Eufora as
4    described below.  Please let me know the address to overnight
5    the check.  Thanks, Nick."  Do you see that?  I read that
6    correctly, didn't I?
7    A    Yes.
8    Q    This is your first e-mail communication with
9    Mr. Constantine, is that correct?
10   A    I believe so.  In that bunch, yes.
11   Q    And at this point in time, you're telling him that you're
12   going to wire a certain amount of money for a certain
13   percentage in Eufora, is that right?
14   A    Yes.
15   Q    Attached to this appears additional information.  One, I
16   will point to it, if I could, it says, "John."  And then it
17   has, down at the bottom of it after the written portion,
18   "Tommy Constantine."  Is that correct?
19   A    Yes.
20   Q    Is that an insert into this e-mail that you were sending
21   to Mr. Constantine?
22   A    I don't know.  You know, each e-mail, the way it does it,
23   I don't know how exactly it's -- you mean did I cut and paste?
24   Q    Correct.  I'm not saying there's anything wrong, at this
25   point, with cutting and pasting.

1    A    No, I don't think I cut and paste it.  It was a forward

2    or something like that.

3    Q    Where did you get that information to put into this

4    e-mail?

5    A    It was e-mailed to me from John.

6    Q    So "John" is John Kaiser, is that correct?

7    A    Yes.

8    Q    John Kaiser sent to you information that he had gotten

9    from Mr. Constantine, is that right?

10   A    Yes.

11   Q    And so you're inserting it in here to let Tommy know that

12   you know the nature of your investment, is that correct?

13               MS. KOMATIREDDY:  Objection.

14               THE COURT:  It's a little confusing.

15               MR. LaRUSSO:  I agree.

16   Q    At this point in time, you inserted this section in the

17   e-mail to Mr. Constantine to let him know that this is a

18   confirmation of an agreement regarding your investment?

19               MS. KOMATIREDDY:  Objection.

20               THE COURT:  He can answer that.

21   A    I don't know that I inserted it.  But, yes, it was either

22   a forward or something.  G-mail works a little weird.  If

23   somebody's in a conversation, it -- it tags it.  I'm not an

24   expert.  But when you say -- I'm trying to answer --

25   Q    I understand.

PRIVITELLO-CROSS-LaRUSSO                    1551

1   A    -- exactly.

2   Q    You got this information --

3   A    When you say "insert," I can't say yeah, I inserted it,

4   no.  But it's there.  How it got there, I don't know.

5   Q    I guess the word to say is, this is information that you

6   were communicating to Mr. Constantine having received it from

7   someone else, is that right?

8   A    Yes.

9   Q    That includes also the second portion that's highlighted,

10  is that also correct?

11  A    Yeah.  Again, how it got there, either it's a forward

12  or -- I don't believe I cut and pasted it.

13  Q    You know where you got the information from?

14  A    From Tommy Con- -- well, it was John from Tommy.

15  Q    I know it's Tommy Constantine to John.  But did you get

16  this information that you included in this e-mail from John

17  Kaiser?

18  A    Yes.

19  Q    As well as the highlighted portions as well, is that

20  correct?

21  A    Yes.

22  Q    Just so that we're correct, when you are writing to

23  Tommy, you're talking about an investment of $150,000 to the

24  below account, and you're referencing information you got from

25  John Kaiser, is that right?

1  A    Mm-hmm.  Yes.

2  Q    Now, I'm going to go back to the first e-mail that you

3  were alluding to, 208.

4  A    Can I comment on something there, or not?

5        THE COURT:  Only to correct something you've already

6  said.

7  A    Yeah.  It came from John Kaiser.  But it originated from

8  Tommy Constantine.

9  Q    Before that e-mail, the one we're talking about from you

10 to Tommy Constantine, can you point to any other e-mail that

11 you had with Mr. Constantine regarding the information?

12 A    Well, I asked some questions about --

13 Q    Mr. Privitello, that information --

14 A    This one, this e-mail here?  That's up there?  That's

15 what you're talking about, or you're talking about the

16 previous one?

17 Q    I'll let you explain.  We were talking about the first

18 e-mail that you had with Mr. Constantine.  You identified the

19 portion between the name John and Tommy Constantine in the

20 yellow highlighted portion as coming from Mr. Kaiser.  Do you

21 recall that?

22 A    Yes.

23 Q    That was my question.  I also said that you were alluding

24 in your message to Tommy to this information you got from

25 Mr. Kaiser, correct?

1   A    Yes.

2   Q    The first e-mail that you say relates to the Eufora

3   investment, is this, 208.1.  It's in evidence.  Do you

4   remember this one?

5   A    Yes.

6   Q    December 3rd, 2009, at 4:57 p.m.  That's from Mr. Kaiser

7   to you, is that correct?

8   A    Can you scroll up?  Yes.

9   Q    You've seen these before, haven't you?

10  A    I have.  I just want to made sure I answer it right.  I

11  don't want to answer it wrong because you can then turn it

12  around.

13  Q    That's correct?

14  A    Forgive me for trying to answer it correctly.

15  Q    Mr. Privitello, this was a message from Mr. Kaiser to

16  you, is that correct, on December 3rd?

17  A    It's from John.  It originated with Tommy.  He sent it to

18  John and John sent it to me.  Correct.

19  Q    So what Mr. Kaiser is doing is telling you, in this, that

20  the below e-mail he got from Tommy Constantine, is that

21  correct?

22  A    Yes.

23  Q    And when he alludes to this portion down at the bottom,

24  John to Tommy, that's where he received from Mr. Constantine

25  that he was forwarding to you, according to the header we're

1  looking at, is that right?

2  A    Yes.

3  Q    In the conversation that he alludes to, he says -- this

4  is Tommy now, to John -- "per our conversation."  Do you know

5  who "our" is?  Who the parties are?

6  A    I guess he's referring to John and himself.

7  Q    Mr. Kaiser and Mr. Constantine, not you, is that correct?

8  A    Well, I don't know.  We were on the phone.  So maybe he's

9  referring to that conversation.  We were on the phone, right?

10 John, myself, and Tommy.  And we were discussing what

11 percentages and what dollar amount.

12 Q    You lived in New York at the time, right?

13 A    Yes; still do.

14 Q    And Mr. Constantine lives in Arizona?

15 A    Yes.

16 Q    You know what call detail records are?

17 A    No.

18 Q    You know what tolls records are?

19 A    Toll records?

20 Q    Well, when you get telephone bills, you get long distance

21 calls.  They show the calls.

22 A    Mm-hmm.

23 Q    Did you produce those to the government showing the

24 telephone contacts you had with Mr. Constantine?

25          MS. KOMATIREDDY:  Objection.

1    Q    Did you or didn't you?

2         THE COURT:  Sustained as to form.

3    Q    Mr. Privitello, you now know what toll records are?

4    A    Yes.

5    Q    They're long distance calls.  You get a bill every month.

6    A    Mm-hmm.

7         MS. KOMATIREDDY:  Objection.  It's not in evidence.

8         THE COURT:  Overruled.  He can answer that.

9         Go ahead.

10   A    Yes.

11   Q    You have those documents?

12   A    Do I have them, no.

13   Q    Were you ever asked for those documents?

14   A    I don't recall.

15   Q    Looking at these two e-mails alone, would you agree with

16   me that it appears Mr. Kaiser is negotiating on your behalf

17   for your investment in Eufora?

18   A    No.

19   Q    By the way, did Mr. Kaiser ever send you any information

20   via e-mail about the business plans for Eufora?

21   A    He sent me some things.  I believe so, yes.

22   Q    By e-mail?

23   A    I don't recall.

24   Q    At the time, prior to your investment, do you remember

25   getting any e-mails from Mr. Constantine giving you a business

1  plan for Eufora?

2  A    I remember getting something.  I don't remember exactly

3  who it was from.

4  Q    Possibly you got it from Mr. Kaiser, right?

5  A    Possibly I got it from Mr. Constantine.

6  Q    You don't know?

7  A    I don't recall.

8  Q    Well, do you have any e-mails from Mr. Constantine

9  enclosing business materials, business plans for marketing for

10  Eufora?

11            MS. KOMATIREDDY:  Objection.  Asked and answered.

12            THE COURT:  Overruled.  You can answer that.

13  A    I don't recall exactly who sent it.

14  Q    My question is, do you have any e-mails from

15  Mr. Constantine enclosing the material that I just discussed?

16            MS. KOMATIREDDY:  Objection.

17            THE COURT:  Overruled.  He can answer.

18            He's not asking you what you recall.  He's just

19  asking whether you have any e-mails that reflect that, do you

20  have any e-mails.

21            THE WITNESS:  Well, I can't answer yes or no to

22  that.  I'm confused.  Do I have --

23  Q    I'll try to made it easy.  These are all the e-mails you

24  had with Mr. Constantine.  Do you have any in here that talk

25  about a business plan, a marketing pitch, anything from

Case 2:13-cr-00607-JFB-AYS   Document 303   Filed 07/07/15   Page 57 of 248 PageID #: 5972

1  Mr. Constantine in these e-mail that you identify as the ones

2  you had with Mr. Constantine?  Any in here?

3  A    No.

4  Q    There aren't any, correct?  You agree with me?

5  A    Yes.

6  Q    My question was, you have no e-mails --

7           MS. KOMATIREDDY:  Objection.  He's badgering the

8  witness.

9           THE COURT:  Yes.  Sustained.

10 Q    Mr. Privitello, before you spoke with Mr. Constantine did

11 you have a side deal with Mr. Kaiser?

12 A    Yes -- oh, wait.  Before I spoke to him?  No, no.  It was

13 after.

14 Q    How much after?

15 A    It would have been, I would say, weeks, a month.  Again,

16 you're asking me an exact time frame.  It was after.

17 Q    Well, we know, Mr. Privitello, you spoke to Mr. Kaiser,

18 is that correct, before you made your investment?

19 A    Yeah, absolutely.

20 Q    Did you have any discussions with Mr. Kaiser regarding

21 your investment and whether or not he would receive a portion

22 of it?

23 A    Are you asking before, after, or in general?

24 Q    Let's talk in general to start.

25 A    Yes.

1   Q     It's your testimony you never had it before you made your

2   investment in Eufora, is that correct?

3   A     I never had what?

4   Q     You never had this quote, "side deal"?

5   A     I don't believe so.  I believe it was after.

6   Q     Possible you may have had it before?

7              MS. KOMATIREDDY:  Objection.  Asked and answered.

8              THE COURT:  Overruled.  He can answer that.

9   A     That was after, because it was after I gave the money.

10  Q     Can you tell us, what was the side deal that you had with

11  Mr. Kaiser?

12  A     Sure.  John was put through the ringer with everything.

13  He has a brother with -- I believe it's MS.  He's wheelchair

14  bound.

15             MR. HALEY:  I object.  That's not responsive to the

16  question.

17             THE COURT:  Don't characterize what happened.  Give

18  us what the facts are.  Don't characterize it.  Okay?

19             THE WITNESS:  All right.  So that's one of the

20  reasons, I guess, with the defense I have to be very careful

21  and answer it just so --

22  Q     And maybe --

23  A     -- and not --

24             MS. KOMATIREDDY:  Objection.

25             MR. HALEY:  Your Honor, I apologize, may the witness

1    be instructed to answer the question presented to him, rather

2    than --

3              THE COURT:  Mr. Privitello, you don't have to

4    explain anything in terms of why you're answering a certain

5    way.  Just answer the question.

6              THE WITNESS:  Well, there's certain things I can't

7    say either.  So I'm --

8              THE COURT:  No.  I just made a ruling that there are

9    certain transactions that were not relevant to this case.

10   That was my ruling, okay.  With respect to this, if he asks

11   you a question, answer yes or no if it calls for a yes or no.

12   If you can't answer yes or no, say I can't answer it yes or

13   no.  You don't have to give an explanation of what you're

14   thinking is or anything like that.

15             I'm going to instruct you again, Mr. LaRusso, not to

16   made comments to the witness, okay.  Just ask him questions.

17             MR. LaRUSSO:  I apologize, Judge, to the Court.

18   Q    Mr. Privitello, talking about your side deal with

19   Mr. Kaiser, do you remember actually explaining it this way

20   (reading:)

21             "I mean, basically, John, I, that -- that 200 that I

22   sent was 100 percent mine.  And then we were -- we were

23   talking about that John would get, um, would basically pay me

24   50,000 at some point.  And, um, then he would get that."

25             Remember?  Do you remember that?

1   A    Do I remember that?

2   Q    Yes.

3   A    No, I don't remember that.

4   Q    Do you remember making that comment?

5   A    Since it's yes or no, no, I don't remember making that

6   comment.

7   Q    Let me show you what's marked as 95A-2.

8   A    Oh, is that the phone call?

9   Q    That's the phone call.

10  A    Oh, yes.  Yes, with Tommy.  I thought you meant it was

11  between John and I.  It is between Tommy and I.

12  Q    Let me show you.

13  A    I'm visualizing me talking to John, but I was talking to

14  Tommy.  I do recall making a comment like that, yes.

15  Q    You remember telling Mr. Constantine about the side deal

16  that you had with John Kaiser, is that right?

17  A    Yes.

18  Q    Just explain to the jury what the side deal was.  What

19  were you referring to when you talked about "he would pay me

20  50,000 and then he would get back."

21  A    We put up -- I put up 200,000, all my money.  And John

22  wanted to invest as well, or additionally invest, and he

23  wanted to put up 50,000.  So whatever that denominator is, 1.5

24  or a quarter of that 1.5 would be John's.

25  Q    Did you ever ask Mr. Kaiser why didn't he just put up his

1    own $50,000?  Did you, yes or no?  Did you ever ask him that?

2    A    It's not a yes or no question.

3    Q    Did Mr. Kaiser ever tell you why he didn't want to put up

4    50,000 of his own money into Eufora?

5    A    He didn't have the money at the time.

6    Q    Do you remember, also in this same conversation, telling

7    Mr. Constantine that you would have no problem if Mr. Kaiser

8    got a percentage of your investment?

9    A    Yes, I do remember.

10   Q    If you need to look at it, I'll --

11   A    No, no.  I just wasn't sure if you were done.

12   Q    Do you remember, in that conversation with

13   Mr. Constantine, Mr. Constantine telling you that he suspected

14   Mr. Kaiser was getting a percentage of your investment?

15   A    I recall --

16        MS. KOMATIREDDY:  Objection.

17        THE COURT:  Overruled.

18   A    I recall him saying that, yes.

19   Q    And do you remember responding that it was okay with you

20   if he got a percentage because you would consider it a

21   finder's fee?

22   A    Yes.

23   Q    Were you told or did you know at the time that it was

24   illegal to have undeclared, undisclosed investments?

25        MS. KOMATIREDDY:  Objection.

1    Q    Yes or no?

2         THE COURT:  Overruled.  You can answer that.

3    A    I didn't -- well, if you don't mind me asking, can you

4    rephrase, say the question again.

5    Q    Did you know whether it was illegal?

6    A    I didn't know it was illegal or legal.

7    Q    That's fine.

8         Mr. Privitello, having looked at the first few

9    e-mails, having reviewed the side deals that you had with

10   Mr. Constantine, do you agree with me that Mr. Kaiser was

11   doing the negotiations on your behalf with Mr. Constantine for

12   your investment?

13        MS. KOMATIREDDY:  Objection.  Asked and answered.

14        THE COURT:  Sustained.  Asked and answered.

15   Q    I will try to go through these as quickly as I can.  I

16   don't think it's necessary to do all of them.  I'm going to

17   show you the next e-mail, which was marked as 208.3.  It's

18   dated the same day as the first e-mail to Mr. Constantine,

19   December 4, 2009.

20        The upper portion is a response from Mr. Constantine

21   to you, is that correct?

22   A    Yes.

23   Q    Do you see it all?  I want to made sure that I show it to

24   you.

25   A    Yes.

1    Q    This portion down here is your original e-mail to him

2    that we identified as the first e-mail, December 4th, 2009, at

3    12:22, is that correct?

4    A    Yes.

5    Q    Correct?

6    A    Yes.

7    Q    Mr. Constantine is replying to you, at least in a portion

8    here, correct?

9    A    Yes.

10   Q    Is he telling you -- or providing to you an address of

11   Eufora, correct?

12   A    Yes.

13   Q    That address is provided to you for the purpose of

14   sending the check that you were alluding to in your message,

15   is that right?

16   A    Yes.

17   Q    He's not insisting that you send it to Ron Richards'

18   account, is he?

19   A    At that point --

20   Q    At this point?

21   A    At this point, no.

22   Q    He's making it clear to you that if you wish to, you can

23   send the check directly to Eufora.  Yes?

24   A    At this point, yes.

25   Q    208.4, the next e-mail dated December 4, 2009.  This is

1564

1  at 3:04 p.m.  This is your e-mail to Mr. Constantine, is that

2  correct?

3  A    Correct.

4  Q    In here you're telling him that there is a change of

5  plans, is that right?

6  A    Yes.

7  Q    "I missed the wire deadline."

8  A    Correct.

9  Q    "I can overnight the checks totalling $200,000 to obtain

10 1.5 percent interest in Eufora as described below."  Correct?

11 A    Correct.

12 Q    "I can get a check there tomorrow.  Will somebody be

13 there to accept at Eufora?"  And you then insert the address,

14 is that right?

15 A    Yes.

16 Q    So you were telling Mr. Constantine that instead of

17 wiring, you're going to send checks for the total amount, is

18 that right?

19 A    Yes.

20 Q    That was --

21 A    There were also phone calls between us.

22 Q    I understand that.  My same question to you is, you have,

23 you maintain the toll records to show those calls that you

24 made to Mr. Constantine?

25              MS. KOMATIREDDY:  Objection.

1       THE COURT:  Sustained.  Asked and answered.

2   Q    The next e-mail, which is 208.5 dated the same,

3   December 4, 2009, at 3:08 p.m.  This is another e-mail from

4   you, is that correct?

5   A    Yes.

6   Q    It says, "One more thing.  Do you want me to made the

7   check payable to Eufora?"

8   A    Mm-hmm.

9   Q    Am I correct, Mr. Privitello?

10  A    Yes.

11  Q    Then 208.6.  Do you see the exhibit number down here,

12  that's the next e-mail that you identified, dated

13  December 4th, at 6:39 p.m.  Inserted in there are two e-mail

14  messages from you to Mr. Constantine regarding the sending of

15  the check to Eufora, is that correct?

16  A    Yes.

17  Q    What is Mr. Constantine's first response to you with

18  regard to the checks that you wanted to send to Eufora?

19  A    "Either that or wire it all Monday morning.  Checks need

20  to be Cashier's Checks or it will be delayed significantly.

21  So a wire would probably be best unless you have already

22  gotten bank checks."

23  Q    I would agree that's read correct.  What's above that?

24  A    "Yes.  Please made them out to Eufora."

25  Q    What was Mr. Constantine's first response to you about

1    the checks that you wanted to send to Eufora?

2              MS. KOMATIREDDY:  Objection.  Asked and answered.

3              THE COURT:  Sustained.

4    Q    In this reply, Mr. Constantine is telling you, yes, you

5    can send the checks and send them to Eufora, is that correct?

6              MS. KOMATIREDDY:  Objection.

7              THE COURT:  Sustained.  Asked and answered.

8    Q    Did Mr. Constantine, at this point in time, insist that

9    they be wired to Ron Richards' account?  At this point?

10             MS. KOMATIREDDY:  Objection.

11             THE COURT:  I'll let him answer that.

12   A    I'm not sure how I can answer it.  I can't answer.

13   Q    Mr. Privitello, let me ask it this way.  Is it your

14   understanding, from this e-mail from Mr. Constantine, that he

15   was giving you a choice -- the portion that you read, he was

16   giving you a choice, either that or wire the money?  He's

17   telling you, am I not correct, that you have a choice; you

18   want to send it to Mr. Richards' account, go ahead, you want

19   to mail it to Eufora, go ahead?

20             MS. KOMATIREDDY:  Objection, Your Honor.

21   Q    Is that your understanding.

22             THE COURT:  That's okay.  He can answer it.

23   A    I'm just trying to put together the phone calls and the

24   e-mails.  Yeah, it was a big rush.  So I guess whatever could

25   get there faster.  So he was giving me a choice, whatever

1   could get there faster.

2   Q    I know you just testified that it was a rush, is that

3   correct?

4   A    Mm-hmm.

5   Q    Am I correct that you were saying that Mr. Constantine

6   said it was a rush, is that correct?

7   A    He was concerned that it would be delayed.

8   Q    By the way, did you ever speak to Mr. Kaiser about the

9   rush or the need for the money?

10  A    There's probably a phone call in there telling him, look,

11  I'm trying to get Tommy money, or something like that.

12  Q    Do you remember testifying that you don't recall how the

13  money would be sent?

14  A    Yes.

15  Q    You were investing $200,000 at this point.  Did you ask

16  anybody why it was so urgent?

17  A    I don't recall.

18  Q    I would assume that you have a recollection of asking

19  somebody.

20           MS. KOMATIREDDY:  Objection.

21           MR. LaRUSSO:  Withdraw that.  I'm sorry, Judge.

22  Q    Do you know what the urgency was for your money, the

23  $200,000, Mr. Privitello?

24           MS. KOMATIREDDY:  Objection.

25           THE COURT:  Sustained.  Asked and answered.

1   Q    Do you remember Mr. Kaiser telling you that they needed

2   the money for the Neptune loan to avoid default because the

3   patents were placed as collateral?

4              MS. KOMATIREDDY:  Objection.

5              THE COURT:  Overruled.  He can answer that.

6   A    I never knew anything about anything being collateral.

7   Q    Did you know about the Neptune loan?

8   A    I heard about the Neptune loan, absolutely.

9   Q    Did you hear about it from Mr. Kaiser?

10  A    I think I heard about it from Mr. Kaiser and Tommy.  That

11  was after the investment.  That was not before the investment.

12  Q    I'll show you what's been -- in evidence.  I'll show it

13  to you.

14  A    Yes, it was prior.

15  Q    See if this helps and refreshes your recollection that it

16  was before the investment.  This is C-72 in evidence.  This is

17  an e-mail.  Do you see that clearly, Mr. Privitello?

18  A    It's from --

19  Q    Do you see that?

20  A    It's a little blurry, but I can made it out.

21  Q    Can you made that out?

22  A    Yeah, I can made it out.

23  Q    I can show you the actual document.

24  A    That's alright.

25  Q    This is in evidence.  It's an e-mail from Tommy

1   Constantine to Mr. Kaiser.  Do you see that?

2   A    Yes.

3   Q    It's in evidence that this was sent on November 25, 2009.

4   A    Yes.

5   Q    Do you see the highlighted portions, Monday,

6   November 30th, $250,000 to the Neptune loan, urgent?

7   A    Yes.

8   Q    Do you see the bottom highlighted portion, Tuesday,

9   December 30th, 1 million to the Neptune loan, final payment?

10  A    Yes.

11  Q    Do you remember speaking to Mr. Kaiser about the urgency

12  of the monies being forwarded to Neptune in regard to the loan

13  they had with Eufora?

14  A    No.  I knew nothing about Neptune prior thereto.  I've

15  never seen this.

16  Q    You never discussed such information with Mr. Kaiser?

17  A    No.

18  Q    You were in touch with him, were you not?

19  A    Yes.

20  Q    You were discussing your investment you were making?

21  A    Yes.

22  Q    It was urgent, but you don't remember what it was, is

23  that right?

24  A    I was never told what it was.

25           THE COURT:  Do you want to take the morning break?

1    We will take the morning break.

2              Don't discuss the case.

3              (Whereupon the jury leaves the courtroom at 11:13

4    a.m.)

5              THE COURT:  Mr. Privitello, you can take a break.

6              (Witness leaves the courtroom.)

7              (Outside the presence of the jury.)

8              THE COURT:  Mr. LaRusso, I can't have you commenting

9    with the witness.  You've been a lawyer a long time, you know

10   you can't ask a witness that question.  Those are highly

11   argumentative suggestions by an attorney, and you know you're

12   not permitted to do that.

13             I understand he's throwing in explanations of things

14   and he's not exactly doing what he should be doing.  A

15   solution to that is to instruct the witness about what he can

16   do.  He answered the question.  You can't be throwing in these

17   comments into the questions.

18             Also, at one point you were screaming at him.

19   Standing next to him, tossing documents down, screaming at

20   him.  I can't have you doing that either.  I'm very liberal

21   about lawyers approaching the witness.  I can't have you

22   standing over a witness throwing documents and screaming at

23   him.  I can't have that behavior.

24             MR. LaRUSSO:  I apologize.

25             THE COURT:  How much more do you have?

1         MR. LaRUSSO:  At least a half-hour, Judge, maybe 45

2    at most.

3         THE COURT:  Who's the next witness?

4         MS. KOMATIREDDY:  Your Honor, our next witness will

5    be Ricardo Banciella.  He's another attorney.  He's in court

6    this morning.

7         THE COURT:  Do you want to take him out of turn?

8         MS. KOMATIREDDY:  The 45 minutes, we should be able

9    to take the witness then.

10        THE COURT:  Okay.  We'll take a break.

11        (Whereupon a recess was taken at 11:15 a.m.)

12        (Matter resumed.)

13        THE CLERK:  All rise.

14        THE COURT:  Please be seated.

15        MR. LaRUSSO:  One issue before the jury comes out.

16        THE COURT:  Yes.

17        MR. LaRUSSO:  I guess I belabored the point with

18   Mr. Privitello with regard to the side deal that he had with

19   Mr. Kaiser, and he's been insisting that the deal was

20   initially with Mr. Constantine.  The tape that we wanted to

21   play makes it clear that the agreement was with Mr. Kaiser.

22   He never says to Mr. Constantine, "The deal is with you."

23        So I'd like, at this time, to let the witness listen

24   to the tape.  I would made an offer to let the jurors made up

25   their own minds whether the deal was with Mr. Kaiser or was it

1   with Mr. Constantine.  This tape clearly shows that it was

2   with Mr. Kaiser.

3          THE COURT:  I didn't hear him say that the deal was

4   with Mr. Constantine.  But if --

5          MS. KOMATIREDDY:  Yes, Judge, that was the

6   testimony.  Mr. Privitello's position was that the side deal

7   was with Mr. Kaiser after his investment.  Specifically, in

8   fact, Mr. LaRusso quoted from the transcript.  And

9   Mr. Privitello not only said he had a side deal, he also said

10  that he told Mr. Constantine of that side deal in the phone

11  call.  And Mr. LaRusso further quoted from his client's

12  portion of the transcript about whether or not that was legal.

13  And Mr. Privitello, again, answered consistently saying --

14         THE COURT:  I don't remember any inconsistencies.

15  You questioned him regarding this transcript.  He answered yes

16  to everything you said.  Now you want to play it to the jury

17  as if --

18         MR. LaRUSSO:  No.  I think it's --

19         THE COURT:  There was no portion of what you asked

20  him about that side deal he answered no to.  Tell me what he

21  said that would be inconsistent with what's in the tape.

22         MR. LaRUSSO:  Judge, what the tape discloses is that

23  Mr. Privitello had the deal with Mr. Kaiser before he made his

24  investment.

25         THE COURT:  Where does it say that in the tape?

1          MR. LaRUSSO:  Well, you read the first portion where

2     Mr. Constantine is talking to him about the investment and his

3     suspicions that the deal entailed Mr. Kaiser getting a portion

4     of the monies that he was investing.  He doesn't say that I

5     didn't have the deal with Mr. Constantine.  He's basically

6     saying, yeah, I had a side deal.  Here's the deal I had.  And

7     then in the second page it really discloses it, Judge.  He

8     says I had a deal with John saying that this X dollars was

9     giving me X percentage.  And if he got some portion of it,

10    that's a finder's fee.  I don't care.

11         It shows, Judge, and I'm asking this to be played to

12    let the jury draw the conclusion whether it was after the fact

13    or before the fact.  And that's the purpose of playing the

14    tape, Judge.  I'm not asking for anybody to draw an improper

15    inference.  I'm letting the jury draw their own inference as

16    to who he actually had the deal with.

17         There was no deal with Mr. Constantine, Judge.  The

18    first e-mail that he has, he's telling him what he's sending

19    him.  There's not one bit of evidence other than his

20    self-serving declaration that he had a telephone conversation

21    that he spoke to Mr. Constantine about the 200,000 and the

22    1.5.  It was strictly with John Kaiser.

23         THE COURT:  Okay.  Well, we already covered that.

24    Again, I see no portion of this call, no portion of this call

25    that makes reference to the time of the side deal.  You're

1   saying that I want to play this for the jury so they can

2   understand the timing of it.  Yet, I'm reading this and

3   there's no reference to the timing.  He's describing the deal.

4   There is zero reference to the timing of the call.  You're

5   saying I want the jury to made up their own mind as to the

6   timing of the call, but show me what portion refers to the

7   time.  I don't see any portion referring to the timing.

8            MR. LaRUSSO:  Judge, when he says --

9            THE COURT:  Show me.  Show me which part refers to

10   the timing.

11           MR. LaRUSSO:  I guess maybe I'm misleading you.  The

12   side deal is one aspect of it.  I'm talking about the deal

13   with Kaiser, and that's what he alludes to in the second

14   portion he's not referring to.  I had an agreement with John,

15   that deal was with John and nothing to do with

16   Mr. Constantine.  It was strictly with John.

17           THE COURT:  So you're not talking about the side

18   deal now?  You're talking about the investment itself?

19           MR. LaRUSSO:  Yes.

20           MS. KOMATIREDDY:  Your Honor, that is not what the

21   tape says.  It's not at all what the witness said.

22           THE COURT:  Hold on one moment.

23           What's the government's response to that?  I

24   understand what he's arguing now.  He's arguing that that last

25   statement by Mr. Privitello is a reflection that the original

1   deal was with Mr. Kaiser, not Mr. Constantine.

2           MR. LaRUSSO:  Your Honor, his testimony on page 1432

3   where he said Mr. Constantine proposed the deal.

4           THE COURT:  I recall that.

5           MS. KOMATIREDDY:  Your Honor, there are 13 seconds

6   redacted right before the portion that Mr. LaRusso is

7   indicating.  I need to know exactly what was redacted with

8   reference to a side deal.

9           MR. LaRUSSO:  Judge, it has nothing to do with the

10  context of the conversation.  That was taken out because

11  there's matters in there that were redacted.

12          THE COURT:  I'm going to allow him to play it, okay.

13          Let's bring in the jury.

14          MS. KOMATIREDDY:  Your Honor, we ask for a curative

15  instruction to the jury.  There's nothing that Mr. Constantine

16  says in the tape being offered for the truth and can be taken

17  for its truth.  All Mr. Constantine's portion are for

18  contextual reasons.  We ask for a curative instruction.

19          THE COURT:  I will give a curative instruction that

20  this relates to what Mr. Privitello said in the conversation.

21          MR. LaRUSSO:  I understand that, Judge.  But I guess

22  the question could be the context of his answer, not to

23  disregard it.

24          THE COURT:  I'm going to tell them that

25  Mr. Constantine's portion is not being offered for the truth,

1  but to understand the context of Mr. Privitello's statements

2  on the tape.

3          MR. LaRUSSO:  Judge, I know we have procedural ways

4  of doing this.  I've given the government copies of this last

5  night.  I may have to show the witness the transcript of the

6  tape, unless the government is willing to stipulate that this

7  is a fair and accurate translation of the tape.

8          THE COURT:  I'll let you offer it as an aid.  The

9  jury can determine whether or not there's any mistakes in the

10 transcript.  He can authenticate whether that's

11 Mr. Constantine speaking, but he can't authenticate the

12 transcript.

13         MR. LaRUSSO:  No, but I have to have him listen to

14 the tape.  He has to listen to this tape.

15         THE COURT:  He can listen to it as the jury's

16 listening to it.

17         MR. LaRUSSO:  Okay.

18         THE COURT:  You can tell him if he believes

19 anything's inaccurate in the transcript as he listens to it,

20 he can let you know.

21         MR. LaRUSSO:  Okay, Judge.

22         THE COURT:  Are you going to do that now?  Are you

23 going to do that first, Mr. LaRusso?

24         MR. LaRUSSO:  With your permission, Judge.

25         THE COURT:  Are you ready to play it?

1           MR. LaRUSSO:  Let me find out.

2           THE COURT:  And this is another portion of a tape

3     that's already in evidence?  What's the exhibit?

4           MR. LaRUSSO:  The tape itself is C95-A-1.  The

5     transcript that I'm going to leave with the witness is

6     C95-A-2.  That's 1 and 2.

7           THE COURT:  The tape itself is A-1.

8           MR. LaRUSSO:  Yes, that's what I was told.

9           MR. MISKIEWICZ:  The designation is Government

10    Exhibit 503, and it's 503.1, .2, .3.  It goes through to

11    503.8.

12          (Witness resumes the stand.)

13          THE CLERK:  All rise.

14          (Whereupon the jury enters the courtroom at

15    11:45 a.m.)

16          THE COURT:  Everyone be seated.

17          Mr. LaRusso, you're offering a portion of a

18    recording.

19          MR. LaRUSSO:  We're offering a portion of the

20    recording that Mr. Privitello made of his conversation with

21    Mr. Constantine.  Your Honor, that's marked separately as

22    Defendant's C95-A-1.  The copy of the transcript has been

23    marked 95-A-2, an aid to the jury.  I've placed a copy in

24    front of Mr. Privitello.  If there's any portion of this tape

25    that differs from the transcript, Mr. Privitello will be given

1    an opportunity to explain if there are any differences.

2              THE COURT:  So, members of the jury, this is another

3    portion of the recording already produced by the government on

4    the direct case admitted as C95-A-1, and A-2 is the transcript

5    which is used as an aid.  What you hear on the tape controls

6    and not the transcript.

7              Mr. Privitello, as you're listening to the

8    transcript provided by Mr. LaRusso, if there's anything you

9    believe is inaccurate in the transcript, you let us know.

10             THE WITNESS:  Okay.

11             (Audio played for the jury.)

12             (Audio stopped.)

13             THE COURT:  Let me just give you an instruction with

14   regard to the audio, members of the jury.  It's being offered

15   by the defense for a limited purpose, and that's with respect

16   to Mr. Privitello's statements on the tape.  With respect to

17   Mr. Constantine's statements on that tape, you cannot consider

18   those for the truth of what Mr. Constantine is saying on the

19   tape, but only to the context of what Mr. Privitello's

20   statements are on the tape.  I hope that's clear.

21             Okay, Mr. LaRusso.

22             MR. LaRUSSO:  Thank you very much.

23   CONTINUED CROSS EXAMINATION

24   BY MR. LaRUSSO:

25   Q    One question with regards to this, Mr. Privitello.  At

1   the end where you say, I had an agreement with John saying

2   that this X dollar was going to give me X percent, you're

3   talking about a deal you had with John for the $200,000 for

4   the 1.5 percent, correct?

5   A    It was a deal that I had with Tommy Constantine, and John

6   knew about it.  What I was trying to say is, everybody knew --

7   Tommy knew I was putting up 200 and getting 1.5.  John knew I

8   was getting 1.5.  So everybody knew what was out there.  Now,

9   if my 200 was really buying two percent and someone was

10  getting a half somewhere that I didn't know about, I don't

11  know about that.

12  Q    You'd agree with me that in this taped conversation that

13  you secretly recorded without Mr. Constantine's knowledge, you

14  said that you had an agreement with John?

15  A    I was secretly trying to get the truth out --

16  Q    Is that what you said?

17  A    I was trying --

18  Q    Is that what you said?

19  A    I was trying to get the truth out.  Where my money

20  secretly went, that's what I was trying to get out.  That

21  secret.

22  Q    Mr. Privitello, did you tell Mr. Constantine at any

23  point, I had a deal with you and Kaiser?  Do you say that on

24  this tape?  Did you hear that on this tape?

25  A    With -- I mean, I say it on the tape several times, it

1   was 200 for 1.5.

2   Q    I'm talking about this deal.  Do you say at this point in

3   the conversation with Mr. Constantine that I have a deal with

4   you or Mr. Kaiser or did you say I had a deal with

5   Mr. Constantine?

6               MS. KOMATIREDDY:  Objection.

7               THE COURT:  Sustained.  The tape speaks for itself.

8   Q    I will skip a couple of e-mails, if I may.  I'm going to

9   show you 208.9.  This is an e-mail dated December 7, 2009.

10  It's from Mr. Constantine to you.  It's responding to an

11  earlier e-mail from you, am I correct, Mr. Privitello, the

12  same day, at about 11:55 a.m.?

13  A    It looks that way, yes.

14  Q    Take your time to read it.

15  A    Yes.

16  Q    Okay.  So you're telling Mr. Constantine at this point,

17  11:55, "Not yet.  I'm on my way there.  Don't forget, it's

18  going to be two transfers to the law offices like original.

19  Correct?"  And you just get a reply from Mr. Constantine,

20  "Correct, thanks."  Correct?

21  A    Yes.

22  Q    And then the next one, which is 208.10, I want to be sure

23  you see that.  And this is an e-mail of December 7th at 1:43.

24  Actually, it's a response from an earlier e-mail to you, is

25  that correct, Mr. Privitello?  Do you see that?

1   A      You're looking at -- yes.

2              (Matter continued on the next page.)

1582

1  A    You are looking at where I write to Tommy; yes.  Yes,

2  that's right.

3  Q    You are writing to Tommy, correct?

4  A    Yes.

5  Q    You say:  You are not going to believe this.  I may

6  have to do a bank check on the 50,000.  If that's the

7  case, should I still wire the 150,000 to the law offices

8  and mail the 50 to you?  Sorry man.  It's not me I assure

9  you of that.

10         Do you see that?

11  A    Yes.

12  Q    Mr. Constantine responds:  It's fine if the 150K is

13  gone.  Correct?

14  A    Correct.

15  Q    Who is the person that was behind this recent

16  situation?

17  A    The banks, just trying to go from one bank to the

18  other to certify checks to this, to that.  That's really

19  all that was.

20  Q    So Mr. Constantine was just agreeing with you at this

21  point, is that correct?

22         MS. KOMATIREDDY:  Objection.

23         THE COURT:  Overruled.  You can answer.

24  A    He is saying it's okay if the 150 is gone.

25         MR. LaRUSSO:  Your Honor, I have copies of the

1583

1    exhibits with writing on it.  I'm getting a copy for the

2    government.

3    Q    Mr. Privitello, I show you what was received as an

4    aid to the jury, 503.3T.  Do you remember this portion of

5    the taped conversation with Mr. Constantine?

6    A    Yeah.

7    Q    I believe during your testimony you were asked

8    dealing with the second line or the portion of the

9    conversation where Mr. Constantine says:  If that money

10   came from you and it came from Bob Rizzi and it came from

11   Hughes only and then all of a sudden we got three wires

12   with amounts and he is saying put the investment in Ethel

13   Kaiser's name.  You identified "he" as Mr. Kaiser, is that

14   correct?

15   A    Wait.  You mean Tommy saying "he" but I'm

16   acknowledging "he" meant Kaiser?

17   Q    Yes.  Your understanding of his comments to you --

18   A    Yes.

19   Q    -- "he" is referring to Mr. Kaiser?

20   A    Yes.

21   Q    Later when he says to you:  I would say wait a

22   minute, where is Ethel Kaiser's money, then he would have

23   to do some explaining.  "He," again, would be referring to

24   Mr. Kaiser?

25   A    Yes.

1584

1    Q    What did you understand Mr. Constantine to be saying

2    to you at this point?

3    A    He just wanted to know where the money was coming

4    from, you know, so he could see where the money was coming

5    from which he could...

6    Q    The way the money was transmitted by Mr. Kaiser, he

7    couldn't tell who the actual investors were.  That's what

8    he is telling you here?

9              MS. KOMATIREDDY:  Objection.

10             THE COURT:  Sustained.

11   Q    Is that your understanding?

12             THE COURT:  Overruled.

13   A    I transferred the money so I don't see how there

14   could be any confusion.

15   Q    In this particular conversation did you understand

16   him to be telling you that the monies he sent to Ron

17   Nugent's account, claiming it's on behalf of Mr. Rizzi and

18   his mother and others, is he telling you the way it was

19   sent he can't tell whose money it was?

20             MS. KOMATIREDDY:  Objection; argumentative.

21             THE COURT:  Overruled.  You can answer.

22   A    The -- so yes, he is talking about Rizzi and Ethel

23   Kaiser's money, yes; not regarding my money.

24   Q    Not yours?

25   A    Correct.

1585

```
1   Q    He is just explaining to you, you understood it to
2   mean that the way it was sent, that is their money, he
3   couldn't tell whose investment it was at that point?
4   A    Yes.
5   Q    That was your understanding at the point?
6            MS. KOMATIREDDY:  Objection.
7            THE COURT:  Overruled.
8   A    Yes.
9   Q    There is a second part:  But if it goes to Ron
10  Richard's office, then we get one wire from Ron Richards,
11  then we have no idea who is the money come from, then I
12  can put it in whatever name he wants without having to
13  explain.  You see that?
14  A    Yes.
15  Q    The word "he" is referring to Mr. Kaiser?
16  A    Yes.
17  Q    What did you understand him to be saying at this
18  point?
19            MS. KOMATIREDDY:  Objection; foundation.
20            THE COURT:  Overruled.  You can answer.
21  A    That he wants to see that the money is coming from,
22  from who it's coming in from.  My call was about my money.
23  He started talking about John and this other money that
24  had nothing to do with me.  So I don't really know what
25  that is about.
```

1586

1   Q    You then made a comment to him regarding the need for

2   the money.  Then Mr. Constantine replies, says:  Doesn't

3   that contradict, doesn't that contradict if I needed the

4   money right away, why would I want to insert another.

5         What did you understand Mr. Constantine telling

6   you at that point?

7   A    It made absolutely no sense to me.  He is the one

8   that instructed me to send it.

9   Q    I understand that's your testimony.

10        What is he telling you here at this point?

11        MS. KOMATIREDDY:  Objection.

12        THE COURT:  Sustained.  Asked and answered.

13  Sustained.

14  Q    When Mr. Constantine used the words "to insert

15  another," who did you understand the other person to be?

16        MS. KOMATIREDDY:  Objection.

17        THE COURT:  Overruled.

18  A    Ronald Richards.

19  Q    Your reply was you had no idea, correct?

20  A    Correct.

21  Q    But following that, isn't it -- withdrawn.

22        Immediately after you said you had no idea,

23  didn't Mr. Constantine say:  See, that's my point, I was

24  not -- it was not me saying I want you to send it there.

25  It's Johnny Kaiser who is controlling the investors and

1587

```
 1   the investment saying I'm going to send it there, tell

 2   them to send it there and then it will come to me.

 3          I read that correctly?

 4   A    Yeah.

 5          MS. KOMATIREDDY:  No, your Honor; I apologize.

 6   The last sentence:  And then it will come to you.

 7   Q    And it will come to you.  That was on the tape?

 8   That's what Mr. Constantine said to you?

 9   A    Yeah, that it was -- yeah.

10   Q    Mr. Privitello, you also testified that you never

11   received any documentation of your investment in 2009, is

12   that correct?

13   A    Yes.

14   Q    I believe you testified that you never received any

15   stock certificates, operating agreements or dividends or

16   K1s, is that right?

17   A    Correct.

18   Q    Matter of fact, you never received any of that

19   documentation in 2010 as well?

20   A    Correct.

21   Q    Were you aware in 2009 through 2010 that your

22   investment had to be approved by the board of directors

23   before -- and lender before you were given any interest in

24   Euphora?

25          MS. KOMATIREDDY:  Objection.
```

1588

```
1          THE COURT:  Overruled.  He can answer that.

2    A    I was never told that.

3    Q    Did you talk to Mr. Kaiser at all about your

4    documentation and your requests?  Did you?

5    A    I don't understand the question.

6    Q    Did you ask him where is my documentation, why hasn't

7    it been received?

8          MS. KOMATIREDDY:  Objection; asked and answered.

9          THE COURT:  Overruled.

10   A    Did I ask -- yeah; that was when things -- like

11   what's going on here.

12   Q    Did Mr. Kaiser ever tell you it needed board approval

13   before you got it?

14   A    I have no recollection of it.

15         MR. LaRUSSO:  I may not have it.  It may be up

16   here, Judge.  May I approach?

17         While I'm looking for an exhibit, I will move on

18   to another subject and come back to you.

19   Q    Just one other question regarding this.

20         Between the time that you made your investment,

21   which was December 7 of 2009, and the time you filed your

22   suit, which I believe you testified was around June of

23   2011, this was cross-examination, did you ever ask in any

24   of your documentation from Mr. Constantine directly in any

25   e-mail communications?
```

1589

1    A    I don't believe so; no.

2    Q    Now, you also testified on direct that- I believe it

3    was in answer to a question now in December of 2009, did

4    Mr. Constantine ever offer you your money back and you

5    responded no?  Do you recall that question and that

6    answer?

7    A    Yes.

8    Q    Did you ever ask for your money back in those 24

9    days?

10   A    What 24 days?

11   Q    You were asked on direct --

12   A    In '09?  No; it was what's going on here.

13   Q    Did you ask for your money back during the 24 days?

14   A    No.

15   Q    Did you ever ask Mr. Constantine for your money back?

16   A    Yes.

17   Q    That was some many years later, correct?

18   A    Yes.

19   Q    Sometime around 2012?

20   A    Yes.

21   Q    At the time of that request in 2012 from the time you

22   made the investment until that time, you never made a

23   request of Mr. Constantine for the money to be returned?

24   A    Other than the lawsuit and negotiating -- trying to

25   negotiate but figuring out what happened here.

Privitello - Cross/LaRusso

1590

1   Q    That lawsuit was filed June 3, 2011, is that fair?

2   Do you remember?

3   A    No.

4   Q    What's your best recollection?

5   A    2010.

6   Q    You were one of a number of plaintiffs in a lawsuit

7   you filed here in the Eastern District of New York?

8   A    Yes.

9   Q    The others were Mr. Hughes, Mr. Rizzi and Ethel

10  Kaiser?

11  A    Yes.

12  Q    John Kaiser was not a plaintiff in that suit?

13  A    I don't believe so; no.

14  Q    Just "yes" or "no," do you recall having any

15  discussion with Mr. Kaiser why he wasn't a plaintiff in

16  that suit?

17  A    No.

18  Q    After December of 2009, did Mr. Constantine ever made

19  an offer to return your investment?

20  A    I was never offered my money back, never told

21  anything about money coming back to me.

22  Q    Well, do you recall the shareholders meeting?

23  A    Yes.

24  Q    That you testified to on direct?

25  A    Yes.

1591

1   Q    Do you remember when that shareholders meeting was?

2   A    I do not.

3   Q    Would it refresh your recollection if I told you it

4   was sometime around August of 2010, about ten months after

5   your original investment?

6   A    Yeah; that's probably about right.  Probably before

7   the suit.

8   Q    So it would be around that particular period of time?

9   A    I think.

10  Q    Did you get advance notice of that shareholders

11  meeting?

12  A    "Advanced" meaning how much advanced?

13  Q    Whether one day or two days, you knew there was going

14  to be a shareholders meeting before it happened?

15  A    It was like that day.  I can't remember how I found

16  out to call this number, there is a shareholders meeting,

17  and I called.

18  Q    You were advised by somebody somehow you received

19  information about the shareholders meeting?

20  A    Yes.

21  Q    That this shareholders meeting was taking place in

22  Arizona?

23  A    Yes; I believe so.

24  Q    People were permitted to call in to that meeting?

25  A    Yes.

1592

1    Q    As a matter of fact, you were one of the individuals

2    that called in to that meeting, is that right?

3    A    Yes.

4    Q    Were you aware at the time you were calling in or

5    shortly thereafter that the shareholders meeting was going

6    to be recorded?

7    A    No, I didn't -- I don't recall it was going to be

8    recorded or not.

9    Q    As you testify here today, do you remember whether

10   that shareholders meeting was recorded?

11   A    Tommy told me it was recorded in my phone call with

12   him in 2012.  He told me it was recorded.

13   Q    I want you show you a document and have you take a

14   look at it.  It's several pages.  Take a look at that

15   please.

16   A    (Complying)

17            MR. LaRUSSO:  If I may direct the witness to

18   certain portions.

19            THE COURT:  Sure.

20   Q    The first page, I'm not precluding you from looking

21   at all of it.

22            MS. KOMATIREDDY:  It's inappropriate.  The

23   witness has not been not asked for his recollection to be

24   refreshed.

25            THE COURT:  Why don't you approach.

Case 2:13-cr-00607-JFB-AYS   Document 303   Filed 07/07/15   Page 93 of 248 PageID #: 6008

1593

1          MR. LaRUSSO:  He says he doesn't remember it was

2    recorded.  These are selected portions of a document that

3    I'm asking him if it refreshes his recollection.  That's

4    all.  Not asking him -- does it refresh your recollection

5    the meeting was recorded and you attended.

6          THE COURT:  I'm sustaining the objection.

7          MR. LaRUSSO:  May I ask it again, your Honor?

8          THE COURT:  Why don't you approach.

9          (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1594

1           (Sidebar.)

2           MR. LaRUSSO:  The last page is what I'm going to

3   be asking him questions about.  The other pages he

4   identifies himself as being there.  It's identified as

5   being recorded on the last page.

6           THE COURT:  How can he tell you whether or not

7   it was recorded from showing him a transcript?

8           MR. LaRUSSO:  It says it's being recorded and he

9   is present.

10          THE COURT:  In the beginning of the call?  Okay.

11  Okay.

12          MR. LaRUSSO:  One other page so you know.  He

13  identifies himself, says it's being recorded.

14          THE COURT:  Okay.

15          (Sidebar concluded.)

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1595

1    (In open court.)

2    BY MR. LaRUSSO:  (Cont'd)

3    Q    Page 31, some of the highlighted portions, does that

4    refresh your recollection that this shareholders meeting

5    was being recorded and you were aware of it?

6    A    No, it doesn't.  I could have been changing a diaper

7    in the middle of this conversation.  I don't know that I

8    heard that.  It was like, I don't know, seven people on

9    the call.

10         THE COURT:  If it doesn't refresh your

11   recollection, say it doesn't refresh your recollection.

12   A    No.

13   Q    Do you remember during the shareholders meeting --

14   A    Say again.

15   Q    Do you remember during the shareholders meeting you

16   attended being apprised or being told that Mr. Rizzi

17   himself was being offered his money back for his

18   investment during this shareholders meeting during August

19   of 2010?

20         MS. KOMATIREDDY:  Objection; hearsay, relevance,

21   well after the time frame.

22         THE COURT:  Sustained.

23   Q    During the course of that meeting, do you remember

24   either you, Mr. Rizzi or Mr. Hughes or Mrs. Kaiser being

25   offered their money back 100 percent?

1596

1     MS. KOMATIREDDY:  Objection, your Honor.

2     THE COURT:  Overruled.

3  A    I do not.

4  Q    Do you remember that?

5  A    I do not recall.

6  Q    Let me show you what is again same document marked

7  for identification only 89A.  Would you read the

8  highlighted portion to yourself and do you remember during

9  the course of that meeting an offer being made to return a

10 hundred percent of the investment?

11     MS. KOMATIREDDY:  Objection.  Standing

12 objection; admitting this in part or full.

13     THE COURT:  If the witness says he doesn't

14 recall, he is allowed to try to refresh his recollection

15 with a document.  That's the way the Rules of Evidence

16 work.

17     The objection is overruled.

18     Mr. Privitello, the way it works, you can read

19 the document.  If it refreshes your recollection, you tell

20 him it does.  If it doesn't, you tell him it doesn't.

21 A    It doesn't.

22 Q    Do you recall at any point in time during that

23 meeting you yourself personally offered a 100 percent

24 return on your investment?

25 A    I do not.

1597

1  Q    Is it possible that it was done, Mr. Privitello?

2  A    Well, was it possible that it was in here that it was

3  offered?  I can't answer yes.  Is it possible?

4  Q    You don't recall?

5  A    I said that, all right, but I'm figuring you are

6  looking for something different.  I don't recall any money

7  being offered back.  It was a hectic call; a lot of people

8  talking at once.  It was not something that was offered

9  that I recall anything being offered to me, my money back,

10  at all.

11  Q    Do you know a person by the name of Michael Stolper?

12  A    Yes.

13  Q    Who was he?

14  A    Our attorney in the suit.

15  Q    Do you recall when you retained Mr. Stolper?

16  A    The time frame?  No.

17  Q    Did you sign an engagement or acknowledgment?

18  A    I'm sure we did.  I'm sure I did.

19  Q    Let me show you what's been marked only for

20  identification as Exhibit C37.  Actually, it's been

21  received in evidence, 37B.

22        Have you seen this before, Mr. Privitello?

23  A    Yeah; I believe I did.

24  Q    Is that your signature down the bottom column on the

25  left?

1598

1    A    Yes.

2    Q    Dated July 9, 2010.  Is that correct?

3    A    Wait.  Hold on.  I thought this was Michael Stolper.

4    Hold on.  That is my signature.  Yeah, I believe that, you

5    know, I did sign something with Michael to retain him, you

6    know, these exact words but that is my signature.

7    Q    Did you read the upper portion of this exhibit that's

8    in evidence?  I have read the written consent of the

9    members of AZ Euphora Partners.  Do you see that?  Dated

10   July 8, 2010 and I am familiar with its contents.

11   A    I'm not recalling that paragraph but that is my

12   signature.

13   Q    Your signature there, do you remember that signature

14   being put there acknowledging the information that appears

15   on that document?

16   A    Well, like I said --

17              MS. KOMATIREDDY:  Objection, your Honor.

18              THE COURT:  Sustained.  Asked and answered.

19   Sustained.

20   Q    Did you ever see a written consent of members of AZ

21   Euphora Partners before you signed your signature to that

22   document?

23   A    I don't recall.

24   Q    Did you discuss with Mr. Stolper him representing

25   you?

1599

```
1    A    Yeah.

2    Q    Where?

3    A    On the phone I think at -- I don't remember exactly

4    where we were.  I don't recall exactly where we were but I

5    did talk to him about it.

6    Q    Who was "we"?

7    A    Bob Rizzi was there.  I think me and Bob Rizzi and

8    possibly John Kaiser too.

9    Q    Do you remember going to the law offices of Mr. Stolper?

10   A    No, I never went to the law offices.

11   Q    Where were you when you signed this document?

12   A    I don't recall.

13   Q    I note in the exhibit --

14   A    Could have been e-mailed.

15   Q    All the parties, Mr. Privitello, if you note, signed

16   on the same date, July 9, 2010.  Did you notice that?

17   A    It could have been faxed or e-mailed and signed and

18   sent back, it's possible, you know.

19   Q    It also indicates that this particular -- again, if

20   you remember, in addition to the written consent of the

21   members, you agree in sum and substance with the consent

22   and its resolutions.  Do you see that in there?

23   A    Yeah.

24   Q    What was your understanding of that, if you know?

25   A    I guess the agreement with Michael Stolper.
```

Privitello - Cross/LaRusso

1600

1    Q    What was he representing you in regards to?

2    A    What was he representing?

3    Q    You hired him to represent you?

4    A    It was obvious, to get our 400,000 back, my 200, the

5    other parties' 200.  It was a suit with the four of us,

6    myself, Hughes, Rizzi, Ethel, collectively we had 400,000,

7    to resolve that 400,000.

8    Q    There were other individuals that signed this consent

9    as well, is that correct?

10   A    I don't know about that.

11   Q    Did you take a look --

12   A    Oh, yeah.  Ethel; yeah.

13   Q    Did you take a look at the entire exhibit?  Let me

14   direct your attention to 37 only for identification,

15   again, sorry, I only have one copy, it's a document three

16   pages long, actually, five pages long.  And down here does

17   it refresh your recollection you received a copy of this

18   cover page?

19   A    Five years ago, I couldn't say.

20   Q    Did you receive correspondence from Mr. Stolper at

21   all?

22   A    I'm sure.

23   Q    Do you remember at any point in time in that

24   correspondence Mr. Stolper telling you he will keep you

25   apprised of developments in the case?

Privitello - Cross/LaRusso

1601

1    A    I mean, I don't recall he said exactly that.  I would

2    assume so.

3    Q    I'm going to mark this page.  You assume so.  I ask

4    if that refreshes your recollection, part of 37, I will

5    mark it with the number 2.  Directing your attention here,

6    does that refresh your recollection Mr. Stolper was

7    indicating to you he would keep you apprised of

8    developments in the case?

9              MS. KOMATIREDDY:  Objection; hearsay.

10             THE COURT:  Overruled.

11   A    You are asking me something exact words from five

12   years ago so my answer is I do not recall.

13   Q    Are you aware that after you signed that engagement

14   letter -- by the way, what was the fee arrangement with

15   Mr. Stolper?

16   A    We were going to work that out with the resolution.

17   Q    What do you mean "work it out"?

18             MS. KOMATIREDDY:  Objection; relevance.

19             THE COURT:  Overruled.  You can answer.

20   A    Whether it was percentages or money.

21   Q    Percentage of what?

22   A    I had 1.5 percent so if we got the 1.5 percent, he

23   would get a portion.  I don't recall any exact numbers.

24   Or if there was return of monies, then he would get some

25   monies.

**Privitello - Cross/LaRusso**

1602

1    Q    Were you aware shortly after this that Mr. Stolper

2    filed suit in Arizona on behalf of other Euphora

3    investors?

4    A    At that time?

5    Q    At that time.

6    A    I don't recall.  At some point I knew about it.  I

7    don't recall when I found out about it.

8    Q    Were you in communication with Mr. Stolper from the

9    time you signed the engagement letter through let's say

10   the rest of the year, 2010?

11   A    Yeah.

12   Q    Do you recall learning that a lawsuit was filed on

13   behalf of a number of Euphora investors excluding you?

14   A    At some point I knew about it.  When I knew about it,

15   I don't know.

16   Q    That was in Arizona, correct?

17   A    Yes.

18   Q    Do you remember being told at any point in time in

19   regards to that litigation that an offer was made to

20   return 100 percent of your investment that you were

21   seeking in Euphora?

22            MS. KOMATIREDDY:  Objection; relevance.

23            THE COURT:  Overruled.  You can answer.

24   Q    Did there come a time at any point when you learned

25   that you were being offered or had been offered a return

Privitello - Cross/LaRusso

1603

1    in your investment?

2    A    No.

3    Q    As you sit here today --

4    A    During lawsuits?

5    Q    Let me clarify.  You can clarify the answer.

6    A    Give me a time frame.  Ever?

7    Q    Let's take the time frame 2010 when the lawsuit was

8    first filed in Arizona.

9    A    No.

10   Q    2011?

11   A    No.

12   Q    How about 2012?

13   A    It's not -- it's not a "yes" or "no" question.  I

14   would like to elaborate.

15            MR. LaRUSSO:  Your Honor, I have at least

16   another 25 minutes with him.  I apologize to the Court.

17   May we take a recess at this point?  I have to get my

18   notes together.  I don't want to waste any time.

19            THE COURT:  We will take the lunch break a

20   little early until 1:30.

21            Don't discuss the case.  Have a good lunch.

22            (The jury leaves the courtroom.)

23            THE COURT:  Mr. Privitello, you can take the

24   lunch break.

25            (The witness steps down.)

1604

1    MS. KOMATIREDDY:  I apologize for my objection,

2  your Honor.

3    THE COURT:  Sorry.

4    MS. KOMATIREDDY:  I apologize for my objection.

5    THE COURT:  Mr. LaRusso, I wasn't prepared to

6  take the break there.  I have other matters during the

7  lunch break.  I don't know why we needed a break there.

8    When we took the break, you told me you had 45

9  minutes or so.  Now you are telling me at least another 25

10  minutes and we had to break early.

11    MR. LaRUSSO:  I'm still looking for the one

12  document to finish that aspect of the cross.  I apologize

13  to the Court for that.

14    THE COURT:  What does the government want to do

15  with this other witness?  You want to take the other

16  witness out of turn?

17    MS. KOMATIREDDY:  It's okay.  We need to get

18  Mr. Privitello out so we are willing to continue with him.

19    THE COURT:  I will see you at 1:30.

20    (A luncheon recess was taken.)

21

22

23

24

25

1605

1           A F T E R N O O N    S E S S I O N

2

3                THE COURT:  Please be seated.

4                Ready to go?

5                MR. LARUSSO:  Yes, your Honor.

6                THE COURT:  Bring in the jury and bring in

7      Mr. Privitello.

8                THE CLERK:  We're missing one juror.  We're

9      missing one juror, so is there anything to talk about?

10                MR. MISKIEWICZ:  We're looking for

11      Mr. Privitello.  Sorry.

12                THE COURT:  So you will play the tape.

13                MR. LARUSSO:  That's one of the tapes I will

14      play, the voice mail and I have two other areas.  I

15      understand the Government will be calling Mr. Banciella,

16      the next witness.

17                MS. KOMATIREDDY:  Yes.

18                MR. LARUSSO:  I had a chance to look through the

19      material last night and I will object.  I don't think his

20      testimony -- I understand it he will be testifying to

21      receiving payments for legal services coming from

22      Constantine Management Group in February of '08 through

23      June of '08.  I've had a chance to look at the documents

24      backing up those payments, specifically the bank

25      statements for Constantine Management Group.  Upon

1606

1    examining it there clearly appears to be a substantial

2    amount of money to cover these expenses from other

3    sources.  I recall seeing hundreds of thousands of dollars

4    coming in from Mr. Kenner.  Yes, I see one or two from the

5    hockey players going into Constantine Management Group but

6    looking at the statements for February, April and June,

7    there's clearly enough money in there to cover it from

8    other sources other than the hockey players.  So what I'm

9    arguing, it is not relevant at this point because the

10   Government can't show any of the monies paid to this law

11   firm came specifically from the hockey players, it came

12   from a commingled source that clearly from what I saw from

13   the records could have been other sources other than the

14   hockey players.

15            THE COURT:  What do you know the other sources

16   are?

17            MR. LARUSSO:  Mr. Kenner.  Principally

18   Mr. Kenner, Judge.

19            THE COURT:  Okay.  Hold on one second.

20            Is this the next witness?

21            MS. KOMATIREDDY:  Yes, after Mr. Privitello.

22            MR. LARUSSO:  Just one other point and I

23   apologize.

24            The first payment, February 20th of '08 the

25   hockey players don't put their money in until October of

1607

1    '09.  That's the first $100,000.  So I don't see the

2    relevancy on that.  The others are all in April and June.

3    I have at least almost $200,000, 300, coming from

4    Mr. Kenner, both in February and I believe there is one in

5    April and there are 25,000, 27 in April and May.  So my

6    argument is there is sufficient amount of monies coming

7    from outside sources to come from those and it is not

8    relevant.

9              It's more prejudicial because it will be

10   speculating which sources of the funds were used to pay

11   this legal service.

12             MS. KOMATIREDDY:  Your Honor, we gave these

13   exhibits to Mr. LaRusso and Mr. Haley early last week and

14   they actually indicated they had no objection to them

15   coming in so this is a surprise.  Nevertheless, the

16   Government's theory $40,000 from the Tyson Nash investment

17   in Eufora in April of 2008 is diverted to pay

18   Mr. Banciella's legal fees in connection with a personal

19   lawsuit, namely, the race car lawsuit that we've already

20   heard about in which Mr. Constantine was personally named

21   and no hockey players were named.  So the relevance is it

22   is an unauthorized diversion, from Mr. Nash's investment

23   in Eufora.  In addition, as the Court is aware, in

24   Mr. Constantine, in testifying a month before he began the

25   Global Settlement Fund scheme, testified one of the debts

1608

1   he has to satisfy is still pending a $40,000 debt to

2   Ricardo, so it corroborates that transcript and his

3   motivation for starting the GSF.

4           Finally, the argument will be to the jury there

5   are other defendants' statements to show these diverting

6   Tyson Nash's money to Ricardo in 2008, that was

7   specifically diversion of Mr. Nash's money, not any other

8   money.

9           THE COURT:  In light of the Government's offer

10  of proof it is clearly relevant on the issue whether money

11  was diverted.  Certainly if Mr. LaRusso wants to made that

12  argument, whether it's Mr. Nash's and Mr. Constantine's

13  money, he was using other money that he was permitted to

14  use in that account.  That is something for the jury to

15  resolve, but I don't think it is a matter of relevance

16  that should be precluded from the offer of proof on the

17  statements the Government wants to corroborate the bank

18  statement with.

19          Let's bring in the jury.

20          MR. LARUSSO:  Thank you, your Honor.

21          (Whereupon, the jury at this time enters the

22  courtroom.)

23          THE COURT:  Please be seated.  Continue,

24  Mr. LaRusso.

25          MR. LARUSSO:  Thank you, your Honor.

Privitello - Cross/LaRusso

1609

```
 1   Q    Good afternoon, Mr. Privitello.

 2   A    Good afternoon.

 3   Q    Going back to one of the exhibits we were looking at

 4   this morning, and I apologize.  This is in evidence as

 5   C-73, an e-mail dated December 16, 2009, from a CR Gentry

 6   to Mr. Kaiser and Mr. Constantine.  I will not read all of

 7   it.

 8              I will direct your attention to the second page.

 9   This is after your investment you made in December 7th.

10   This is a December 16th e-mail on the same month, 2009.

11              I'll read this in order to complete this,

12   according to the operating agreement, I need to call a

13   board of directors meeting --

14              THE COURT:  Managers.  You said directors.

15              MR. LARUSSO:  I'm sorry, Judge.  I'm ahead of

16   myself.

17              I need to call a Board of Managers meeting.  I

18   have already notified the board member of this and they

19   are aware of the member changes.  I'm hoping I can get all

20   managers lined up for Friday.

21              Do you recall ever seeing this e-mail?

22   A    No.

23   Q    Do you recall ever discussing anything about a board

24   of managers meeting needed to approve your investment?

25   A    No.  What is the date of this?
```

1610

```
1   Q    This would be December 16th, about nine days after

2   your investment.

3   A    No, definitely not.

4   Q    Now, I believe we were talking about whether or not

5   moneys were offered back to you with regards to your

6   investment, and I believe we were talking about a lawsuit

7   that was filed sometime in 2010 and I'll ask you with

8   regard to that, do you recall anyone telling you around

9   that time frame, December of 2010 and including 2010 and

10  11 -- let me back up so this question is more

11  understandable.

12         You testified earlier that you do remember

13  sometime in 2012 discussing the return of your investment

14  with Mr. Constantine.

15  A    Yeah.

16  Q    I don't want to put words in your mouth and I

17  apologize if I do.  You said you didn't made a request

18  after you made your investment in 2009, you didn't made it

19  in 2010, you didn't made it in 2011 but you do remember

20  something in 2012; is that correct?

21  A    Yes.

22  Q    My question to you is do you remember anybody telling

23  you some time around the end of 2010 or the early part of

24  2011 or including all of 2011, that an offer had been made

25  to you to return your investment 100 percent?
```

Privitello - Cross/LaRusso

1611

1   A    I don't recall.  Perhaps some random person told me.

2   Q    Let me show you what I'll mark for identification as

3   C 91-A, and it's a portion of a document.  Please take a

4   look at this.

5            I'll specifically refer you just to paragraph --

6   you can read the whole thing, but paragraphs 58, 59 and

7   60.  My question will be after looking at that does it

8   refresh your recollection that you received notification

9   sometime around December or into 2011 that an offer was

10  made to return your money?

11  A    What am I looking at?  What page do you want me to

12  look at?

13  Q    I think I said paragraphs 58, 59 and 60.

14  A    I didn't see this document.  As far as I can

15  remember, I don't recall seeing this document.

16  Q    And looking specifically at those paragraphs, does it

17  refresh your recollection that at some time around that

18  time period an offer was made to return your 100 percent

19  investment?

20            MS. KOMATIREDDY:  Objection.

21  A    This was during the lawsuit.

22            MS. KOMATIREDDY:  Objection.  Asked and

23  answered.  No foundation.

24            THE COURT:  Again, he puts the document before

25  you and he asks whether it refreshes your recollection or

1612

1    not.  The only thing you need to do is read the document

2    if it helps you to remember what happened.  Telling him

3    yes, it helps you remember and if it doesn't refresh your

4    recollection, say so.

5    A    No.

6    Q    I will show you what is an aid to the jury, 5035 T,

7    5036 T.  Do you remember these two transcripts being used

8    as aids during the playing of those portions of the

9    conversation you had with Mr. Constantine.

10   A    The other day?

11   Q    Yes.

12        Just take a look at them.  You can pull them out

13   of the sleeve if you need to.

14   A    Yes, to that one.

15        Yes.

16   Q    Those two transcripts are just reflective of portions

17   of the conversations; is that correct?

18   A    Yes.

19   Q    It's obvious portions before and portions after; is

20   that correct?

21   A    Yes, I mean this was the beginning of the end.

22   Q    C 95 B-2, would you take a look at that and if you

23   need to use the other exhibits, I ask you whether or not

24   that document reflects additional portions of those two

25   transcripts, additional portions of the taped conversation

Privitello - Cross/LaRusso

1613

1  that are reflective in the two transcripts 5035 T and 5036

2  T?

3  A    Yes.

4  Q    Does that fairly and accurately refresh your

5  recollection, that that likewise is an additional portion

6  of those two parts of the conversations that are

7  reflective in 5035 and 5036 T?

8  A    Yes, it was -- I can't say word-for-word, but this

9  does seem like what is in that phone call.

10             MR. LARUSSO:  Your Honor at this time I ask we

11  play this portion with the same admonish to

12  Mr. Privitello.

13             THE COURT:  Is this 95 B-1?

14             C-905 B-1 is admitted and B-2 is the transcript

15  with the same instruction about the other transcripts.

16             It might be helpful, Mr. LaRusso, if you got a

17  copy of the transcript to put it up on the screen so the

18  jury can see it.

19             MR. LARUSSO:  You have one up there, right,

20  Mr. Privitello.

21             THE WITNESS:  Yes.

22             MR. LARUSSO:  I'll hand up this copy to

23  Mr. Privitello and I'll let him use mine.

24             THE COURT:  Again, members of the jury, the same

25  instructions as I gave you before applies here regarding

Privitello - Cross/LaRusso

1614

1    Mr. Constantine's statement.  They are given to you in

2    context what Mr. Privitello says but they are not being

3    offered for the truth.  Mr. Constantine's statements are

4    not being offered for the truth.

5              (Audio clip played.)

6              (Start and stop).

7    Q    Mr. Privitello, in this discussion with

8    Mr. Constantine, you mentioned a documentation.  What were

9    you referring to when you said "documentation"?

10   A    He said he was going to send me, if I'm accurate, a

11   phone call.  I said I'd like to see the paper that they

12   offered me my money back because I never saw it and he

13   never sent it to me, so I still never saw it.

14   Q    You say, I saw something.  What were you referring to

15   that when you say you saw something?

16   A    I think that was miscommunication (perusing).  I

17   think it was just confusion.  I was confused.  But I did

18   not see any documentation with anything offering my money

19   back, I can assure you that.

20   Q    Well, Mr. Privitello, does this in any way refresh

21   your recollection that the documentation was a court

22   document that actually offered you your 100 percent

23   return, yes or no?

24             MS. KOMATIREDDY:  Objection.

25   A    No.

1615

```
 1            THE COURT:  Overruled.

 2   Q    Now, in this conversation you mentioned the Neptune

 3   loan, correct?

 4   A    Yes.

 5   Q    What was your understanding of this Neptune loan?

 6   A    I don't know.  It was something that they wanted us

 7   to sign but we couldn't really.  That's all I knew about

 8   it.

 9   Q    Do you remember at any point before you made your

10   investment hearing the word Neptune loan before you made

11   it?

12   A    I would have to say no.  I heard it at some point

13   after the agreement, like well after '09.  Well after the

14   investment.

15   Q    How long?  Do you remember how long after?

16   A    I guess it would be about the time of the lawsuit.

17   Q    Would that be your lawsuit or the one in Arizona in

18   2010?

19   A    Mine.

20   Q    And what relation did the Neptune loan have to do

21   with your former investment, if you know?

22   A    I don't know.  We couldn't read it.  It wouldn't let

23   us read it -- they wouldn't let us read it, Eufora.

24            Basically what I understand, Tommy Constantine

25   or the Neptune guy or whoever it was, so I couldn't tell
```

Privitello - Cross/LaRusso

1616

1    you anything about it.

2    Q    Let me show you what has been marked for

3    identification as C 95 C-2 and ask if you recall looking

4    back, being aware some six months after you made your

5    loan, after you made your investment -- do you recall this

6    being a portion of a conversation with Mr. Constantine?

7    A    Hold on --

8    Q    In 2012.

9    A    Hold on.

10   Q    And I'll give you enough time to look at it.

11   A    Six months could be.  You are saying six months

12   after.  Could be.

13   Q    Does it help refresh your recollection that you were

14   aware at least six months after your investment about the

15   loan, the Neptune loan, that's my question to you?

16   A    I can't answer yes or no if you are looking for a yes

17   or no.

18   Q    Well, do you remember, and I'll give you a chance, do

19   you remember telling Mr. Constantine in this conversation,

20   that you know about six months, I don't know if it was

21   exactly, I think it was about six months later, there was

22   a whole thing with the loan and signing something that we

23   couldn't, we couldn't see what the agreement was and

24   that's I guess where the whole mess started.

25         Do you remember making those comments?

Privitello - Cross/LaRusso

1617

1    A    Yes.

2    Q    What loan were you referring to when you made those

3    comments?

4    A    Neptune.

5    Q    And when you said --

6    A    You know I think it was Neptune.  Like I said in the

7    thing I think it was Neptune.  Could have been something

8    else, but that's what I heard, was that I believe it was a

9    Neptune agreement.  If you listen to the conversation,

10   it's just like I said.

11   Q    Do you hear of a man by the name of Volpe?

12   A    I think so.

13   Q    Do you know if he had anything to do with a Neptune

14   loan?

15        MS. KOMATIREDDY:  Objection.

16        THE COURT:  Sustained as to form.

17   Q    Do you know if anybody else was involved in a Neptune

18   loan, other than this period of time?

19   A    I didn't really know anything about it.  I don't know

20   what more I can tell you.  Just like I told Tommy on the

21   phone call, I don't know if we were allowed to read it.  I

22   can't tell you anything about it.  If we're allowed to

23   read it --

24   Q    What is it that you were not allowed to read?

25   A    The agreement.

Privitello - Cross/LaRusso

1618

1  Q    What about the agreement?

2          MS. KOMATIREDDY:  Objection, your Honor.  Lack

3  of knowledge.

4          THE COURT:  I think we covered this.

5  Q    Mr. Privitello, was there a settlement plan being

6  offered at or about this time?

7  A    What time?

8  Q    The same period of time?

9  A    2012?

10  Q    Yes -- no, the six-month period.

11  A    No.  Wait, wait, wait.  Hold on.  This --

12          MS. KOMATIREDDY:  Objection, your Honor.

13          THE COURT:  Sustained.

14  Q    Do you know man by the name of David Boyden.

15  A    Yes.

16  Q    Did you ever ask him to contact Mr. Constantine in

17  regards to your money?

18  A    I think it was the other way around.  Dave approached

19  me.

20  Q    What did Mr. Boyden approach you about?

21  A    Just he knew I was a mess about this whole thing, you

22  know, being taken for 2000 K and it is 2012 now and my

23  hands are in the air.

24          There is one thing I would like to comment but I

25  don't think I can regarding the suit.  He said look, let

Privitello - Cross/LaRusso

1619

1    me reach out to him, meaning Tommy Constantine, and see

2    what I could do.  He was an acquaintance of Tommy's as

3    well as.

4    Q    Why would Mr. Boyden be reaching out on your behalf?

5              MS. KOMATIREDDY:  Objection.

6              THE COURT:  Why don't you approach.

7              (Whereupon, at this time the following took

8    place at the sidebar.)

9              (Continued.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Privitello - Cross/LaRusso

1620

1            (Whereupon, at this time the following took

2     place at the sidebar.)

3            I'm sustaining your objection.  We've spent way

4     too much time on this.  As to settle a civil lawsuit in

5     2012 has no relevance whether Mr. Constantine defrauded

6     this witness in 2009.  I can't let this go on.  It is

7     confusing and has nothing to do whether or not he took the

8     money.  You have to stop and move on to another area.  It

9     is clearly not permissible under the Rules of Evidence.

10    They have no relevance, zero relevance.  I've been way too

11    patient.

12            MR. LARUSSO:  I understand, but we discussed

13    earlier the fact we have the voice mail.

14            THE COURT:  I changed my mind.  I'm sitting here

15    listening to this.  It's a civil lawsuit.  It has no

16    relevance.  Zero.  Okay.

17            MR. LARUSSO:  Okay.  Thank you, your Honor.

18            (End of sidebar conference.)

19            (Continued.)

20

21

22

23

24

25

Privitello - Cross/LaRusso

1621

1    Q    Mr. Privitello, you testified on direct examination

2    about sending your money into the Ron Richards account,

3    the 150,000 and the 50,000.

4           Do you recall that?

5    A    Yes.

6    Q    And I believe at the time you were testifying, a

7    document was shown to you showing that $155,000 after you

8    had sent your money to Ron Richards was then wired to an

9    company called AZ Avalon.

10           Do you recall that?

11   A    Yes.

12   Q    I believe the Government showed this Exhibit 101

13   [sic] in evidence?

14   A    I believe so.

15   Q    That reflected your investment on December 7th?

16   A    Yes.

17           MR. LARUSSO:  I may have misspoke.  1101 to be

18   correct.

19           THE COURT:  Okay.

20   A    Yes.

21   Q    Is that correct?

22   A    Yes.

23   Q    The Government then during your examination noted

24   that on December 7th there was a wire transfer out of

25   $150,000 to AZ Avalon Partners; is that correct?

Privitello - Cross/LaRusso

1622

1    A    Yes.

2    A    Yes.

3         MR. LARUSSO:  There's a stipulation from the

4    Government regarding C 105, a bank record, and we

5    stipulate it is a fair and accurate representation of the

6    bank record reflected herein.

7         THE COURT:  Why don't you show it to Mr. Haley.

8         Does the Government have any objection?

9         MS. KOMATIREDDY:  No, your Honor.

10         MR. HALEY:  Thank you.  No objection, your

11   Honor.

12         THE COURT:  What number.

13         MR. LARUSSO:  C 105, your Honor.

14         THE COURT:  C 105 is admitted.

15         (Whereupon, Defendant's Exhibit C 105 was

16   received in evidence.)

17   Q    If I may just refer to certain portions of this.

18   This is the AZ Avalon Partners LLC.

19         The statement says from December 1, 2009 through

20   December 31, 2009, and it reflects the incoming wire from

21   the law offices of Ron Richards for 155,000.  Do you see

22   that?

23   A    Yes.

24   Q    And the outgoing withdrawals, the following day,

25   there is an outgoing wire to B-a-n-c-o-r-p for 150,000.

Privitello - Cross/LaRusso

1623

1   Do you see that?

2   A    Yes.

3   Q    Do you know what the name Bancorp means?

4   A    No, I thought it was a bank but I guess not.

5   Q    Do you know that it was a vendor of Eufora providing

6   credit cards?

7   A    No, this was the first time I seen that -- not the

8   first time -- actually -- it's the first time in this

9   courtroom is the first time I've seen this.

10  Q    The question was have you ever heard the name Bancorp

11  in reference to your Eufora investment?

12  A    No.

13  Q    Do you know who was providing credit cards to Eufora?

14  A    No.  Bancorp, I believe, was in that three.  The

15  MetaBank.  It might have been Bancorp.

16  Q    So that would be a legitimate expense regarding the

17  moneys for Eufora, correct?

18        MS. KOMATIREDDY:  Objection.

19        THE COURT:  Sustained.

20  Q    By the way did you know that AZ Avalon also was

21  renting to Eufora space in their building for $5,000 a

22  month.  Did you know that?

23  A    No.

24  Q    Now, Mr. Privitello, you filed suit in June of 2011,

25  correct, against Mr. Constantine?

Privitello - Cross/LaRusso

1624

1     A    I don't know the date.  If that's what the document

2     says, then yes.

3     Q    Let me show you what has been marked for

4     identification only as C 88.  Does this refresh your

5     recollection?

6              Just take a look at it, please.

7     A    Yes, I guess.  Again I don't recall the date, but if

8     that is what the documentation is --

9     Q    You are a plaintiff in that suit, right?

10    A    Yes.

11    Q    It was filed on your behalf by Mr. Stolper?

12    A    Yes.

13    Q    In that complaint against Mr. Constantine, did you

14    allege that the 155,000 that went to AZ Falcon Partners

15    was a diverted monies from the company Eufora?

16             MS. KOMATIREDDY:  Objection.

17             THE COURT:  No, that's okay.  You may answer.

18    A    I don't recall.

19    Q    Take a look at paragraph 28.  I'll try and move this

20    along.

21             Do you recall alleging a complaint that instead

22    of directing the fund to Eufora, Mr. Constantine directed

23    the 155,000 of your investment to another Constantine

24    owned entity, AZ Falcon Partners, which owned an airplane?

25    A    This is still when I didn't have the 1.5 percent.

Privitello - Cross/LaRusso

1625

1  Q    You recognize this is one of the allegations you made

2  against Mr. Constantine?

3  A    I don't know exactly.  I recall that paragraph now.

4  Q    Well, you do remember the 155,000, right, that went

5  to AZ Falcon Partners?

6           MS. KOMATIREDDY:  Objection, leading.

7           THE COURT:  Sustained.  I think we've already

8  covered this.

9  Q    By the way, did you ever discuss with Agent Galioto

10  or any other government agent the allegation that was made

11  in this complaint against Mr. Constantine diverting the

12  money to AZ Falcon?

13           MS. KOMATIREDDY:  Objection, relevance.

14           THE COURT:  I'll allow that if he recalls.

15  Q    If you recall.

16  A    If I recall?  I don't believe we really talked much

17  about this suit.  Just told them that we had a suit.  I

18  really don't recall going through any details with him.

19  Q    "Him" being Agent Galioto?

20  A    Yes.

21  Q    Any other agent of the Government?

22  A    At that time, no.  The suit came up but it was like

23  the suit, it was sort of irrelevant because you'll have

24  nothing, I don't have my 200 k or the 1.5 percent.

25  Q    The part of your suit was you were trying to recover

1626

```
 1   money that you claim Constantine had recovered from

 2   Eufora; is that correct?

 3              MS. KOMATIREDDY:  Objection.

 4              THE COURT:  Overruled, you can answer that.

 5   A    It was to have some resolution.  That simple.  I have

 6   no 200 k.  I have no 1.5.  How are we going to resolve

 7   this?

 8   Q    Let me ask you just a few more questions.

 9   A    Okay.

10   Q    I believe in front of you is 3500 NP-4.  Take a look

11   at that, please.  Pull it out of the sleeve.

12              MR. LARUSSO:  I just have a few more questions,

13   Judge.

14   A    Okay.  These are all the e-mails submitted into

15   evidence.  Is that what I'm looking at here?

16   Q    Do you recognize those e-mails?

17              What I'd like you to do, if you look at the

18   first header on the first page --

19   A    I think this was presented in evidence, so --

20   Q    I'm sorry.  Go ahead.

21   A    My e-mails with Tommy and John is in there as well,

22   correct.

23   Q    It's in a different format; is that correct?

24   A    I don't know.  It looks like the e-mails to me, yes.

25              (Continued.)
```

PRIVITELLO-CROSS-LaRUSSO                                    1627

1   CONTINUED CROSS EXAMINATION

2   BY MR. LaRUSSO:

3   Q    Do you know how those e-mails -- I withdraw that.

4         Did you provide these e-mails to anyone before you

5   provided them to the government?

6         MS. KOMATIREDDY:  Objection.

7         THE COURT:  No, overruled.  He may answer that.

8   A    Maybe in the suit.

9   Q    Would you just take a look at the first header,

10  Mr. Privitello.  Does it refresh your recollection that in

11  2011 you forwarded to Mr. Kaiser the e-mails that we're

12  referring to?

13  A    If that's what it says, I guess that's what I did.  You

14  know, yes.  I don't recall sending exactly this batch of

15  e-mails to John Kaiser.  But if it says from, and all these

16  are, I am sure I did.

17  Q    Do you have a recollection of sending it to Mr. Kaiser?

18  A    I sent him some e-mails, correct.  I don't know if it's

19  this exactly.  I'm trying to answer your question exactly,

20  just so there's no doubt of how I'm answering it or anything

21  like that.  This exact pack, I don't have a recollection.  I

22  would say I sent him some e-mails.  It could be this.

23  Q    Did you provide your e-mails to the government?

24  A    Yes.

25  Q    Similar to the pack that I've been showing you that's

1628

1  marked 3500 NP-4?

2  A    Let me go through, but NP-4 looks like that.  Again, it's

3  Gmail.  So you can have it in more than one format.

4           MR. LaRUSSO:  Your Honor, I just ask that they be

5  received at this time.  I only have a few more questions about

6  one of the e-mails.  I'm not going to go through all of them,

7  I promise.

8           MS. KOMATIREDDY:  Objection, Your Honor.  First of

9  all, we need copies of the exhibits.

10          MR. LaRUSSO:  This is your exhibit.

11          MS. KOMATIREDDY:  Second, this is a filing in a

12  civil lawsuit and it has no relevance.

13          THE COURT:  Let me see it.

14          Side-bar.

15          (Whereupon a side-bar conference was conducted.)

16          (Matter continued on the next page.)

17

18

19

20

21

22

23

24

25

1629

1     (Side-bar conference.)

2         MR. LaRUSSO:  This is what was given to us.  Just so

3  the Court knows the offer of proof on this, we have evidence

4  to believe that one of the headers in the e-mail has been

5  inserted.  We haven't been able to get an expert to review it

6  at this time.  We'd had so many other things we're working on.

7  All I want to do is establish whether he did or did not know

8  anything about one of the headers on the second page.  That's

9  it.  See these, Judge?

10        THE COURT:  Keep your voice down.

11        MR. LaRUSSO:  See those lines on the side, to an

12 expert they indicate either cut and paste or forwarding.  I'm

13 not an expert.  We need time for an expert.

14        MS. KOMATIREDDY:  Your Honor, we did not use this

15 version or formatting of the e-mails as our affirmative

16 exhibits for the very reason that it's slightly confusing

17 where the "From" and "To" is going, which is why Government

18 Exhibits 208.1 and 208.11, which are the exhibits we're

19 relying on, were separately printed e-mails that accurately

20 reflected each e-mail.  Opposed to this, which is a

21 conglomeration.  He can't testify to the accuracy of exactly

22 who each piece is coming from, if it was cut and paste.

23 There's nothing this witness can tell you which paragraph --

24        THE COURT:  How did the government get this?  Where

25 did this come from?

1630

1        MS. KOMATIREDDY:  This is a forward that we got from

2   one of our witnesses and we didn't produce it in discovery.  I

3   think it was referring to an exhibit attached to a lawsuit

4   similar to this.

5        MR. LaRUSSO:  No.

6        MS. KOMATIREDDY:  This is not the exhibit we used.

7        THE COURT:  Was this forwarded from Mr. Privitello

8   to the government?

9        MS. KOMATIREDDY:  This was forwarded -- I believe to

10  Mr. Kaiser.  It was forwarded to Mr. Privitello and Mr.

11  Kaiser.  I believe it was from Mr. Kaiser.  The exhibits

12  introduced in evidence were taken directly from

13  Mr. Privitello's Gmail account, taken directly from the Gmail

14  account and offered into evidence.  There's not need, this

15  confuses the record.  It's not properly authenticated.

16       THE COURT:  We can talk about this later.  He can't

17  authenticate this.  I'm concerned, with what your offer of

18  proof is with respect to this, it's going to create a lot

19  confusion.  He's already testified he doesn't know anything

20  about this.

21       MR. LaRUSSO:  This will come up.  I just want to let

22  you know my question.  This is not going any further.  I'm

23  really limiting it, Judge.

24       THE COURT:  Yes.  So the record's clear, Mr. LaRusso

25  has shown me a series of questions.

1631

1        First of all, some of these questions you already

2   asked him.  He's already testified as to what his knowledge

3   may be of the document.  I'll allow one additional question if

4   you want to ask him does he know what those lines represent.

5              MR. LaRUSSO:  That's fine, Judge.

6              THE COURT:  We can argue later whether it should

7   come in.

8              MR. LaRUSSO:  Thank you.

9              (Whereupon the side-bar conference was concluded.)

10             (Matter continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PRIVITELLO-CROSS-LaRUSSO                                    1632

1          (Matter continued in Open Court.)

2    CONTINUED CROSS EXAMINATION

3    BY MR. LaRUSSO:

4    Q    Mr. Privitello, the second page of the document, you see

5    the vertical lines, some of them are full page, some of them

6    are shorter?

7    A    Yes.

8    Q    You know what those vertical lines represent?

9    A    Not for sure, no.

10         MR. LaRUSSO:  I have no further questions, Your

11   Honor.

12         THE COURT:  Redirect.

13   REDIRECT EXAMINATION

14   BY MS. KOMATIREDDY:

15   Q    Mr. Privitello, first, let's look at the e-mail chain.

16   Do you recall on cross-examination Mr. LaRusso walked you

17   through several e-mails in the government's Exhibit 208

18   series?

19   A    Yes.

20   Q    Let's go over a couple things.  Looking at Government

21   Exhibit 208.7, do you see at the top of this e-mail --

22         THE COURT:  Hold on a second.

23   Q    In evidence, Government Exhibit 208.7, dated December 4,

24   2009, right?

25   A    Yes.

1  Q     It's from Tony Constantine to you, right?

2  A     Correct.

3  Q     And he says, "That would be fine (best actually),"

4  right?

5  A     Yes.

6  Q     What is he referring to.

7  A     The wiring the money.

8  Q     When you say the wiring money, what is it that the wiring

9  money indicates in the bottom of this e-mail chain?

10  A     To send it to Ron Richards' account.

11  Q     When you tell him in the previous e-mail, "I think I

12  found a way to do a wire transfer for the 50 as well," is it

13  fair to say that the rest of that paragraph, "probably the

14  best thing for me to do is two different wire transfers Monday

15  morning.  If you agree, should I send it to the attorney's

16  account like in the previous e-mail?  Thanks, and I apologize

17  for any inconvenience," that's what you wrote, Mr. Privitello?

18  A     Yes.

19  Q     And in response to that Mr. Constantine says, "That would

20  be fine (best actually).  Thanks, TC."

21  A     Yes.

22  Q     Let's go to Government Exhibit 208.8.  Mr. Constantine

23  again responds, in the next e-mail in that chain he writes the

24  next e-mail, right?

25  A     Yes.

1  Q    And he writes, "Nick.  Can you advise as to whether or

2  not this wire went out," is that correct?

3  A    Yes.

4  Q    Again, what does "this wire" refer to?

5  A    The 50,000.  Or, no, I think it was maybe the 50.

6  Q    Well, let's look back at what you wrote, Mr. Privitello.

7  "I think I found a way to do a wire transfer for the 50 as

8  well," correct?

9  A    Yes.

10  Q    So at this point, you're discussing sending all $200,000

11  in a wire transfer, correct?

12  A    Correct.

13  Q    Mr. Constantine asked in the previous e-mail, 208.7, he

14  says, "That would be fine (best actually)," is that correct?

15  A    Yes.

16  Q    In the follow-up, 208.8, he says -- he checks in.  He

17  says, "Can you advise as to whether or not this wire went

18  out," is that correct?

19  A    Yes.

20  Q    Now, that $200,000 that you sent to Mr. Privitello.

21  A    Not to Mr. Privitello.

22  Q    I'm sorry, to Mr. Constantine.  The $200,000 that you

23  sent to Mr. Constantine, was that all your money?

24  A    Absolutely 100 percent.

25  Q    And the 1.5 percent that you were supposed to get in

PRIVITELLO-REDIRECT-KOMATIREDDY                    1635

1   return, whose name was that supposed to be in?

2   A     My name.

3   Q     Anyone else's?

4   A     That's it.

5   Q     Turning to 208.1, the first e-mail in this chain where

6   Mr. Constantine writes to Mr. Kaiser, he says, "Per our

7   conversation, please accept this e-mail as confirmation of the

8   final receipt of $200,000.  Eufora's members will lawfully

9   execute a Membership Transfer Consent Form and a Manager

10  Company Operating Agreement to reflect a 1.5 interest in

11  Eufora LLC," correct?

12  A     Yes.

13  Q     And he says, "Which shall be held by Nicholas L.

14  Privitello," correct?

15  A     Yes.

16  Q     Does he mention the interest will be held by anyone else?

17  A     No.

18  Q     This is the fourth one, is that correct?

19  A     Yes.

20  Q     And it's signed, "Sincerely, Tommy Constantine, CEO

21  Eufora LLC, correct?

22  A     Yes.

23  Q     At that time -- or at anytime before you sent money to

24  Mr. Constantine, did he indicate that your interest in Eufora

25  was contingent on anything?

PRIVITELLO-REDIRECT-KOMATIREDDY                    1636

1    A    Absolutely not.

2    Q    Did he indicate that it required any outside approvals?

3    A    No.

4    Q    Did he indicate to you, mention the name of some guy

5    named Volpe?

6    A    No.  He had tons of opportunity in the e-mails.

7    Q    In fact, he told you that the wire transfer was good,

8    right?

9    A    Yes.

10   Q    And he needed it right away, right?

11   A    Yes.

12   Q    And that once you gave him money you would get

13   1.5 percent return, right?

14            MR. LaRUSSO:  Your Honor, objection.

15            THE COURT:  Sustained.  It's leading.

16   Q    Now, we heard a lot from this taped call that you had

17   with Mr. Constantine.  When did that taped call occur?

18   A    May 2012.

19   Q    2012.  So that's approximately two and a half years after

20   your investment?

21   A    Yes.

22   Q    That's after you sued him?

23   A    Yes.

24   Q    Why were you so courteous on that phone call?

25   A    Trying to get my money back.

1  Q    Did the explanation he gave you satisfy you?

2  A    No.  But it was like -- you know, it just felt like --

3          THE COURT:  No, I don't won't you to give your

4  opinion.  Okay?

5  Q    Did the explanation he gave you answer any of the

6  questions that you asked?

7          MR. LaRUSSO:  Your Honor, I object.

8          THE COURT:  He can answer that question.

9  A    No.

10 Q    You were shown an e-mail, you were shown Constantine

11 Exhibit 73, December 16, 2009, is that right?  I think you

12 have it in front of you.  C-73.

13 A    I have a lot of stuff.  Is it in the packet maybe?

14         THE COURT:  You want to help him find it?

15         (Counsel approaching.)

16 Q    What's the date on that e-mail, Mr. Privitello?

17 A    December 16th, '09.

18 Q    When did you actually wire the money to the account?

19 A    December 7th.

20 Q    What we went over before, you'd wired him $200,000, is

21 that correct?

22 A    That's correct.

23 Q    December 7th.  Then $200,000 goes out in two transfers on

24 December 8th -- December 7th and December 8th, is that

25 correct?

1   A     Yes.

2   Q     And it goes to AZ Avalon and Eufora, correct?

3   A     Yes.

4   Q     Looking at Eufora's bank account, Government Exhibit

5   1218.

6            MR. LaRUSSO:  Your Honor, this is beyond the scope.

7            THE COURT:  Yes, sustained.  You can save this for

8   your summations.

9   Q     Mr. Privitello, that e-mail that was shown to you on

10  cross-examination, that e-mail happened after you already sent

11  your money to Mr. Constantine, right?

12  A     Yes.

13  Q     And after he already spent it?

14  A     Yes.

15           MS. KOMATIREDDY:  No further questions.

16           MR. LaRUSSO:  No further questions, Your Honor.

17           THE COURT:  Mr. Haley?

18           MR. HALEY:  No questions, Judge.

19           THE COURT:  Mr. Privitello, thank you very much.

20  You're done.

21           THE WITNESS:  Thank you.

22           (Witness excused.)

23           THE COURT:  Next witness.

24           MS. KOMATIREDDY:  The government calls Ricardo

25  Banciella.

1          MR. LaRUSSO:  May I pick my exhibits up from the

2    witness stand?

3          THE COURT:  Yes.

4          (Documents retrieved.)

5          Sir, come up to the witness stand over here, and

6    remain standing.

7          Please raise your right hand.

8          (Witness sworn.)

9          THE WITNESS:  I do.

10          R I C A R D O    B A N C I E L L A,

11          called as a witness, having been first

12          duly sworn, was examined and testified

13          as follows:

14          THE COURT:  Be seated.  Please state your name and

15    spell it for the record.

16          THE WITNESS:  My name is Ricardo, middle initial A,

17    Banciella.  B-A-N-C-I-E-L-L-A.

18          THE COURT:  Thank you.  Stay close to the mike and

19    keep your voice up, okay.  Thank yo.

20          Okay.  Go ahead.

21    DIRECT EXAMINATION

22    BY MS. KOMATIREDDY:

23    Q    Mr. Banciella, good afternoon.

24          What do you do for a living?

25    A    I am an attorney in Miami, Florida.

1    Q    Where do you work?

2    A    I currently work at my firm, which is named Ricardo A

3    Banciella PA.

4    Q    Where did you work prior to that?

5    A    Prior to that I worked with a law firm by the name of

6    Wampler Buchanan Walker Chabrow Banciella & Stanley PA.

7    Q    Approximately what years were you at Wampler Buchanan?

8    A    I started working at the firm in May of 1994 and left the

9    firm in August of 2012.

10   Q    Where is the Wampler law firm's offices located?

11   A    It was located in Miami, Florida.

12   Q    What was your title there?

13   A    Well, I was a partner at the end.

14   Q    In general, can you describe the nature of your practice

15   at Wampler Buchanan.

16   A    I am a business litigator.  I handled business litigation

17   on the civil side.

18   Q    Was there a time you represented an individual named

19   Tommy Constantine?

20   A    Yes.

21   Q    During approximately what time frame did you represent

22   Mr. Constantine?

23   A    The law firm represented Mr. Constantine between

24   July 2007 and the fall of 2008.

25        MS. KOMATIREDDY:  With the Court's permission, I'd

BANCIELLA-DIRECT-KOMATIREDDY                    1641

1  like proceed with the next section in a leading manner.

2          THE COURT:  Any objection to that?

3          MR. LaRUSSO:  No, Your Honor.

4          MR. HALEY:  No, sir.

5  Q    Focusing on your representation of Mr. Constantine, would

6  it be fair to say that the nature of the lawsuit that you

7  represented Mr. Constantine in was a dispute over a

8  sponsorship agreement between race car drivers?

9  A    Yes.

10  Q    The plaintiff was a racing entity and a race car driver?

11  A    Yes.

12  Q    The defendant was Mr. Constantine's racing company and

13  himself personally, is that correct?

14  A    That's correct.

15  Q    I'm going to hand you what has been marked as Government

16  Exhibit 3311.  Do you recognize that?

17  A    Yes, I do.

18  Q    What is it?

19  A    This is a fee agreement between the Wampler Buchanan firm

20  and Mr. Constantine and Tommy Constantine Racing LLC.

21  Q    Who created it?

22  A    This is a document that I drafted.

23  Q    Approximately what was the date?

24  A    It was created days before it's dated, which is July 26,

25  2007.

BANCIELLA-DIRECT-KOMATIREDDY                    1642

1   Q    Turning to the last page, is that your signature on the
2   last page?
3   A    Yes.
4   Q    At the bottom, is that Mr. Tommy Constantine's signature?
5   A    I believe it to be Mr. Constantine's signature.
6   Q    Did you receive the signed document from Mr. Constantine?
7   A    Yes.
8         MS. KOMATIREDDY:  The government moves 3311 into
9   evidence.
10        MR. LaRUSSO:  No objection, Your Honor.
11        MR. HALEY:  No, objection.
12        THE COURT:  3311 is admitted.
13        (So marked as Government Exhibit 3311 in evidence.)
14        MS. KOMATIREDDY:  Publishing to the jury.
15  Q    Looking at Government Exhibit 3311, the first paragraph
16  reads (reading):
17        "This letter sets out the terms of the engagement of
18  Wampler Buchanan Walker Chabrow Banciella & Stanley PA."
19        The Banciella is you?
20  A    Yes.
21  Q    (Reading):
22        "It provides professional legal services to you and
23  Constantine Racing LLC."
24        Correct.
25  A    Yes.

BANCIELLA-DIRECT-KOMATIREDDY                          1643

1    Q     It says that, "You have engaged WBWCB to take over

2    representation of your defense from Ms. Oberman and that

3    certain law and styles identified as Tommy Constantine

4    Racing?"

5          Is that correct?

6    A     That's correct.

7    Q     Did you represent anyone other than Tommy Constantine

8    Racing or Tommy Constantine?

9    A     No.

10   Q     Were you representing any professional hockey players?

11   A     No.

12   Q     Were you doing any legal work pertaining to real estate

13   development projects in Hawaii?

14   A     No.

15   Q     Were you representing the company Eufora?

16   A     No.

17   Q     Did you do any legal work for Eufora?

18   A     No.

19   Q     Were you doing any legal work pertaining to real estate

20   developments in Mexico?

21   A     No.

22   Q     Were you doing any legal work to sue or help sue an

23   individual named Ken Jowdy?

24   A     No.

25   Q     Now, this letter appears to set up a scope of services.

BANCIELLA-DIRECT-KOMATIREDDY                1644

1  Are there any other engagement letters that you entered into

2  with Mr. Constantine?

3  A     No.

4  Q     This lawsuit suit, Prewitt Enterprises, was this the only

5  lawsuit that you represented him in connection with?

6  A     Well, there was a spin off lawsuit related to the same

7  sponsorship agreement that was filed in Miami Dade County,

8  Florida.  The original Prewitt lawsuit was filed in West Palm

9  Beach County.  So there were these two cases, but they were

10 both related to the sponsorship agreement.

11 Q     But there's this lawsuit that's named here in Government

12 3311 and another lawsuit that Mr. Constantine initiated

13 against the same party, Mr. Prewitt, correct?

14 A     That's correct.

15 Q     That's the entire scope of your representation of

16 Mr. Constantine, is that true?

17 A     That's correct.

18 Q     Now, did Mr. Constantine pay you for the work that you

19 did?

20 A     Yes, he paid the firm.

21 Q     I'm going to hand you what's been marked as Government

22 Exhibit 3326, and then a redacted version of Government

23 3326-R.  Do you recognize this?

24 A     Yes.

25 Q     Just focusing on Government Exhibit 3326, can you tell us

BANCIELLA-DIRECT-KOMATIREDDY                          1645

1   what that is?

2   A    This is a general ledger trial balance for the law firm

3   of Wampler Buchanan.

4   Q    What kind of information is contained?

5   A    The information here is essentially deposits and payments

6   made out of the law firm's operating account.

7   Q    Is the information created at or near the time those

8   deposits or payments occurred?

9   A    Yes.

10  Q    Were they created by an employee of the Wampler Buchanan

11  firm?

12  A    Yes.

13  Q    Were they created in the ordinary course of the firm's

14  business?

15  A    Yes.

16  Q    Were they maintained in the ordinary course of the firm's

17  business?

18  A    Yes.

19  Q    Just looking at 3326-R, is that a fair and accurate

20  record containing portions of 3326 with other portions

21  redacted?

22  A    Yes.

23            MS. KOMATIREDDY:  The government moves 3326-R into

24  evidence.

25            MR. LaRUSSO:  No objection, Your Honor.

BANCIELLA-DIRECT-KOMATIREDDY                    1646

1        MR. HALEY:  No objection.

2        THE COURT:  Government Exhibit 3326-R admitted.

3        (So marked as Government Exhibit 3326-R in

4    evidence.)

5    Q    Looking at Government Exhibit 3326-R.

6    A    Okay.

7    Q    Let's turn to the entry on April 30, 2008.  Did

8    Mr. Constantine pay you on that date?

9    A    Yes.

10   Q    On or about that date?

11   A    Yes.

12   Q    Approximately how much money did you receive?

13   A    Well, there would have been the two items listed here,

14   $36,361.07 and the additional sum of $3,333.31.

15   Q    What was the purpose of those payments?  What were those

16   payments?

17   A    Well, the $36,361.07 was used to pay attorneys' fees and

18   cost incurred by the firm in connection with the legal

19   representation.  The $3,333.31 was transferred into a trust

20   account to also be used for payment of fees and costs in the

21   case.

22   Q    Do those payments have anything to do with Eufora?

23   A    No.  These payments were all made in connection with the

24   Prewitt litigation that's described in the engagement letter.

25   Q    Finally, I'm going to hand you what's been marked

BANCIELLA-DIRECT-KOMATIREDDY                1647

1    Government Exhibit 3312.  It's actually in front of you at the

2    top left of your desk.  Your left, sir.

3    A    Yes.

4    Q    Do you recognize that?

5    A    Yes.  This is an invoice from the Wampler Buchanan law

6    firm dated March 31, 2008.

7    Q    Who creates this invoice?

8    A    The invoice is created by the firm's bookkeeping

9    department.

10   Q    Are the entries in the invoice created at or near the

11   time the work is being done?

12   A    Yes.

13   Q    Is the invoice created in the ordinary course of the

14   firm's business?

15   A    Yes.

16   Q    Is it kept in the ordinary course of the firm's business?

17   A    Yes.

18           MS. KOMATIREDDY:  The government moves 3312 into

19   evidence.

20           MR. LaRUSSO:  No objection, Your Honor.

21           MR. HALEY:  No objection.

22           THE COURT:  Government Exhibit 3312 is admitted.

23           (So marked as Government Exhibit 3312 in evidence.)

24           MS. KOMATIREDDY:  I will publish it for the jury.

25   Q    Going over some of the entries in the invoice, it notes

BANCIELLA-CROSS-LaRUSSO                    1648

1  things like reviewing and finalizing notices to the client,

2  reviewing e-mails.  Is these the kind of legal services that

3  that $40,000 payment was going for?

4  A    Yes.  Well, the invoice reveals a past due balance of

5  $40,268.82, and also shows additional services being performed

6  for the month of March in connection with the sponsorship

7  issue.

8  Q    When did your representation of Mr. Constantine come to

9  an end?

10 A    It ended, I believe, sometime in October of 2008.

11 Q    Up to that point, did Mr. Constantine still owe you money

12 for legal fees?

13 A    Yes, he owed the firm.

14 Q    Approximately how much?

15 A    Approximately $40,000.

16        MS. KOMATIREDDY:  No further questions.

17        THE COURT:  Any cross-examination?

18        MR. LaRUSSO:  I have questions.

19        MR. HALEY:  I have no questions.

20        THE COURT:  All right.

21 CROSS EXAMINATION

22 BY MR. LaRUSSO:

23 Q    Good afternoon.

24        When you identified the $40,000 in April 30th of

25 2008, is that the date you received the money or is that the

BANCIELLA-CROSS-LaRUSSO                                    1649

1  date the entry was made in your books and records, if you

2  know?

3  A    I'm not sure.

4  Q    Do you recall how your firm received payment for those

5  services that are listed there on April 30th, 2008?

6  A    I don't know if it was received by check or wire.

7  Q    You wouldn't know what entity or individual forwarded the

8  money to you for payment, is that correct?

9  A    That's correct.

10        MR. LaRUSSO:  Your Honor, I have no further

11  questions.

12  Q    By the way, you ever hear of a company called Constantine

13  Management Group?

14  A    Yes.

15        MR. LaRUSSO:  No further questions.

16        THE COURT:  Anything else from the government?

17        MS. KOMATIREDDY:  No, Your Honor.

18        THE COURT:  You can step down, sir.  Thank you.

19        (Witness excused.)

20        THE COURT:  Next witness.

21        MS. KOMATIREDDY:  The government calls Gary

22  Edenholm.

23        THE COURT:  Sir, come up to the witness stand, over

24  here.  And remain standing once you get there for the oath,

25  please.

EDENHOLM-DIRECT-KOMATIREDDY                    1650

1          Raise your right hand.

2          E R I C     E D E N H O L M

3          called as a witness, having been first

4          duly sworn, was examined and testified

5          as follows:

6          THE WITNESS:  I do.

7          THE COURT:  Be seated.  Please state your name and

8   spell it for the record.

9          THE WITNESS:  Eric Edenholm.

10         E-R-I-C, E-D-E-N-H-O-L-M.

11         THE COURT:  As you're doing there, Mr. Edenholm,

12  stay close to the mike and keep your voice up.

13         Go ahead.

14  DIRECT EXAMINATION

15  BY MS. KOMATIREDDY:

16  Q    Good afternoon.

17         Mr. Edenholm, where do you live?

18  A    In Arizona.

19  Q    Approximately when did you move to Arizona?

20  A    In 2001.

21  Q    Where were you before then?

22  A    In Los Angeles, California.

23  Q    What do you do for a living?

24  A    I sell vehicles.

25  Q    How long have you been in the car business?

EDENHOLM-DIRECT-KOMATIREDDY                    1651

1    A    About 22 years.

2    Q    Do you run any businesses of your own?

3    A    Yes.

4    Q    In the last ten years, can the name the businesses that

5    you've run?

6    A    Exclusive Imports of Scottsdale, Scottsdale Motors,

7    Imports of Scottsdale, and Edenholm Motor Sports.

8    Q    Did there come a time you met an individual named Tommy

9    Constantine?

10   A    Yes.

11   Q    Approximately when was that?

12   A    Roughly, about 1995.

13   Q    Would you recognize him if you saw him today?

14   A    Yes.

15   Q    Look around the courtroom and see if you see an

16   individual who you recognize to be --

17            MR. LaRUSSO:  We concede the identification.

18            THE COURT:  The identification is conceded.

19   A    Yes.

20   Q    How did you come to meet Mr. Constantine?

21   A    Tommy was introduced to me through mutual friends in the

22   racing business.

23   Q    Did you become friends with Mr. Constantine?

24   A    Yes, I did.

25   Q    Approximately how many years do you know him?

EDENHOLM-DIRECT-KOMATIREDDY                1652

1    A    Roughly, 18 to 20 years.

2    Q    Over the course the time that you've known

3    Mr. Constantine, did you engage in any business transactions

4    with him?

5    A    Yes.

6    Q    I want to focus your attention on a few transactions

7    between you and Mr. Constantine in 2009.  Did there come a

8    time you discussed purchasing Mr. Constantine's home?

9    A    Yes.

10   Q    Tell us about how that discussion came about.

11   A    I had known for a little while Tommy had some troubles

12   with the bank and that he was facing foreclosure.  So he and I

13   discussed purchasing his home.

14   Q    What did Mr. Constantine say about the state of his home?

15   A    About the state of his home?

16   Q    Who owned it?

17   A    I believe that -- I believe he owned it at one point.

18   Q    You said that you had known for some time that it was

19   going into foreclosure.  Is that something you learned from

20   him?

21   A    I believe so.

22   Q    When you talked about -- when you had the discussions

23   with Mr. Constantine about buying his home, did you have the

24   money to buy it outright?

25   A    At the time of the purchase or before?

EDENHOLM-DIRECT-KOMATIREDDY                    1653

1    Q    Before.

2    A    At the time that I bought it?  Can you more be clear?

3    Q    When you first spoke to Mr. Constantine about buying his

4    home, did you have the cash lying around to buy it outright?

5    A    Not at that point.

6    Q    Did you discuss with Mr. Constantine about getting that

7    cash?

8    A    No.

9    Q    What did you discuss to facilitate the sale of his home?

10   A    We didn't really get into any of the facilitating how to

11   get his home purchased.  How much I'd have to come up with.

12   Q    So in 2009 you're discussing the fact that his home's in

13   foreclosure.  Did you also discuss a plane?

14   A    My plane, yes.

15   Q    What did you talk about with respect to your airplane?

16   A    We had several discussions about my airplane.

17   Q    Did you have any discussions about getting rid of your

18   airplane?

19   A    Yes.

20   Q    What did Mr. Constantine say?

21   A    I guess we had to talk about it at different points.

22   Tommy knew I had owned a plane since 2003.  Sometime in 2009 I

23   asked him if he had any interest in helping me sell it.

24   Q    What did he say?

25   A    At that point, he -- I can't remember if he placed an ad

EDENHOLM-DIRECT-KOMATIREDDY                    1654

1  or talked to some people.  He had contacts in the aviation

2  world.  So we discussed him selling it.

3  Q    When in relation to the time that you were talking about

4  buying his home did you also discuss selling your plane?  Is

5  that around the same time?

6  A    I don't remember.  I don't remember which, if it happened

7  first.

8  Q    We'll get to the dates in a minute.

9         Now, what kind of plane did you own at time in 2009?

10  A    A Cessna 414.

11  Q    Did you end up selling that plane?

12  A    Yes, I did.

13  Q    Who did you sell it to?

14  A    I'd have to look at the paperwork, but it was an Arizona

15  company that I believe Tommy had, you know, owned.

16  Q    Who did you negotiate the sale with?

17  A    With Tommy.

18  Q    How much did you sell it for?

19  A    I think it was 450,000.

20  Q    After you sold the airplane, where was the airplane

21  actually being physically kept?

22  A    From 2003 to maybe February or March 2009 it stayed in

23  Scottsdale Air Center.  It was housed in the Scottsdale Air

24  Center.  Shortly after that it was moved over to Tommy's

25  hangar in March of 2009.

EDENHOLM-DIRECT-KOMATIREDDY                    1655

1   Q    After you sold the airplane, did it stay in the hangar?

2   A    I believe it was there for a couple of months.

3   Q    Did you talk to Mr. Constantine about who the buyer of

4   the airplane was?

5   A    That came about after probably six or eight weeks after I

6   sold it.

7   Q    What did he say?

8   A    I believe he sold it to one of the hockey players he

9   knew.

10  Q    Did he say why he was facilitating the selling of your

11  plane to another person?

12  A    That's one of the things he does.

13  Q    Did he say why he was facilitating the sale of the plane,

14  the sale of your plane to another person?

15  A    I learned, maybe about six or eight weeks afterwards,

16  that he had used -- or he had sold the airplane to a gentleman

17  to settle a large debt.

18  Q    I'm going to hand you what has been marked as Government

19  Exhibit 3606.  Do you recognize this?

20  A    Yes.

21  Q    What is it?

22  A    It's the purchase contract for Tommy to purchase the

23  airplane.

24  Q    Looking at page 5 of the contract, is that your signature

25  at the bottom?

EDENHOLM-DIRECT-KOMATIREDDY                    1656

1  A    Yes.

2  Q    Looking at page 6, does that appear to be

3  Mr. Constantine's signature?

4  A    That is his signature.

5  Q    Is this a true and accurate copy of the purchase

6  agreement, the aircraft purchase agreement you made to

7  Mr. Constantine regarding your plane?

8  A    I believe so.

9       MS. KOMATIREDDY:  The government moves 3606 into

10  evidence.

11       MR. LaRUSSO:  No objection, Your Honor.

12       MR. HALEY:  No objection, Your Honor.

13       THE COURT:  Government Exhibit 3606 is admitted into

14  evidence.

15       (So marked as Government Exhibit 3606 in evidence.)

16       MS. KOMATIREDDY:  I am publishing it for the jury.

17  Q    At the top, the agreement is dated and executed June 2nd,

18  2009, right?  If you look at your screen there, to your right.

19  A    The question was?

20  Q    The aircraft purchase agreement is dated June 2nd, 2009,

21  correct?

22  A    Yes.

23  Q    The seller is listed as Zoey Air.  Is that your company?

24  A    Yes.

25  Q    The buyer is listed as Arizona Stock, LLC.  Did you

1   understand that to be Mr. Constantine's company?

2   A    Yes.

3   Q    Looking at paragraph A, it lists a Cessna 1980 414A.  Is

4   that the plane that you were selling to Mr. Constantine?

5   A    Yes.

6   Q    Looking at paragraph -- I'm sorry -- looking at

7   paragraph 1.3, it states a purchase price of $450,000, is that

8   accurate?

9   A    Yes.

10  Q    It also has the wire transfer in paragraph 1.3, a

11  Citibank account in the name of Edenholm Motor Sports, is that

12  right?

13  A    Yes.

14  Q    In fact, did you get $450,000 from Mr. Constantine for

15  your account in Edenholm Motor Sports?

16  A    Yes.

17  Q    Turning to 3053 which is in evidence, this is a monthly

18  statement for Edenholm Motor Sports for June 2009, correct?

19  A    Yes.

20  Q    Now, looking at the wire transfers for June 2nd, 2009, do

21  you see a $450,000 wire transfer into your account?

22  A    Yes.

23  Q    Again, this is your account, correct?

24  A    Yes.

25  Q    Is that $450,000 wire transfer for the purchase of your

EDENHOLM-DIRECT-KOMATIREDDY                          1658

1    plane?

2    A     Yes.

3    Q     Then a few days later, in fact the next day, is a wire

4    transfer out of $450,000, correct?

5    A     Correct.

6    Q     What's that for?

7    A     That was to purchase a piece of property on 93rd Street

8    in Scottsdale.

9    Q     Whose property?

10   A     I believe I bought it from Bank of America.

11   Q     Who lived in that property?

12   A     Tommy Constantine.

13   Q     So the next day you sent $450,000 out to buy

14   Mr. Constantine's home?

15   A     Correct.

16   Q     I'm going to show you what is in evidence by stipulation.

17          MS. KOMATIREDDY:  At this time the government moves

18   into evidence Government's Exhibit 3608, which is a title

19   company record.  The parties agreed to its admission by

20   stipulation.

21          THE COURT:  Is that correct?

22          MR. HALEY:  Yes, sir.

23          MR. LaRUSSO:  No objection.

24          THE COURT:  3608 is admitted.

25          (So marked as Government Exhibit 3608 in evidence.)

1        MS. KOMATIREDDY:  Publishing 3608 for the jury.

2  Q    This is the settlement statement for your purchase of

3  Mr. Constantine's home, correct?

4  A    Yes.

5  Q    The settlement date is June 16, 2009.

6  A    Correct.

7  Q    That's you, the buyer, Eric Edenholm.

8  A    Yes.

9  Q    The seller here is the bank, Bank of America, correct?

10 A    Correct.

11 Q    You said this home was going into foreclosure?

12 A    It was or is, I'm not sure.

13 Q    The property here is 18290 North 93rd Place, Scottsdale

14 Arizona 85255.  Is that the address of -- Mr. Constantine's

15 address?

16 A    Yes.

17 Q    Now, after you bought Mr. Constantine's home -- just for

18 the record, looking at the buyer's closing funds, it's just a

19 credit report for $2,000.  Are those your funds that you used

20 for this purchase?

21 A    Yes.

22 Q    After you bought Mr. Constantine's home, did you live

23 there?

24 A    No.

25 Q    Who lived there?

EDENHOLM-DIRECT-KOMATIREDDY                    1660

1    A    Tommy and his girlfriend.

2    Q    Did Mr. Constantine pay you rent now that you were the

3    owner?

4    A    Yes.

5    Q    What was the rent arrangement?

6    A    $3,000 a month.

7    Q    How much did he end up actually paying you?

8    A    Total?

9    Q    In rent, yes?

10   A    I believe he totally paid $36,000.

11   Q    I'm going to turn your attention to what's in evidence as

12   Government Exhibit 3059.  This is a Citibank statement.  It

13   says the account holder is Eric Edenholm.  Is that you?

14   A    Yes.

15   Q    For the period November 4th to December 2nd, 2009,

16   correct?

17   A    Yes.

18   Q    Looking at the incoming wires, November 6th, 2009,

19   there's a wire for $18,000, correct?

20   A    Yes.

21   Q    What was that $18,000 for?

22   A    I believe that was for six months of rent.

23   Q    From Mr. Constantine?

24   A    Correct.

25   Q    This $18,000, where was it coming from?  The actual

EDENHOLM-DIRECT-KOMATIREDDY                    1661

1    account, where was the account coming from?

2    A    It looks like it was wired from the law offices of Ron

3    Richards.

4    Q    Just going back to 3053, the $450,000 that Mr.

5    Constantine sent you for your plane, where was that money

6    coming from?

7    A    It says the wire was from the law offices of Ron

8    Richards.

9    Q    All right.  Now, later in June of 2009 there's a wire

10   transfer on June 15th of $75,000, is that correct?

11   A    Correct.

12   Q    That's money coming to you?

13   A    Yes.

14   Q    Where is that money coming from?

15   A    A wire from the law offices of Ron Richards.

16   Q    Did you discuss that $75,000 with Mr. Constantine?

17   A    When?

18   Q    At anytime.

19   A    Yes.

20   Q    What was it for?

21   A    Tommy asked me -- he had some vehicles and lots of race

22   car parts in -- I believe they were in Chicago, and he had

23   asked me to help facilitate getting these people paid.  He

24   owed them $75,000 for -- like I said, some race cars, race car

25   parts, scooters, motorcycles, et cetera.  And he had asked me

1    to help him pay these people.  I tried to.  I had a floor

2    plan, I had a floor plan, but I couldn't get the money from

3    the floor plan because these cars did not have titles.  And so

4    when I couldn't come up with the money to help him, he said

5    that he would be able to get it handled.  And so he sent me

6    the money, $75,000, to pay the people where the money was owed

7    to for the cars.

8    Q    When you say "a floor plan," can you explain to us what

9    that means.

10   A    A floor plan helps me -- in order to buy and resell a car

11   while the bank gives $75,000 to buy a blah, blah, blah, and

12   the bank gives me the money to purchase the vehicle.  And then

13   I pay it back once the vehicle's sold.

14   Q    But in this instance, would the bank give you the money?

15   A    This particular time, the bank would not give me the

16   money.  They were race cars and not street cars.

17   Q    Mr. Constantine wires you $75,000.  What happens next?

18   A    If I remember right, that day the wire came in I tried to

19   send it to the place in Chicago.  I think it was Fall Line

20   Motor Sports.  I don't believe it actually took.  So Tommy was

21   upset because the people were upset that it didn't go out that

22   day.  As I recall, he was upset.  And I was just doing the

23   paper and handling selling the cars.  So I said then you

24   handle it, and then I wired him the money the next day.  And

25   then I don't know if I had bad wiring instructions or what,

1663

1    but for some reason it did not go out.  So I sent it to Tommy

2    the next day.

3    Q    What happened after you sent that money out?

4    A    About a week or ten days later the cars came to my shop,

5    along with all of the parts and the scooters and golf carts

6    and motorcycles, and the stuff was put on consignment.

7    Q    I'm going to hand you what's been marked as Government

8    Exhibit 911.  Do you recognize that?

9    A    Yes.

10   Q    What is that?

11   A    One of the vehicles that was being held for the $75,000

12   that was dropped off at my shop.

13   Q    What kind of vehicle is it?

14   A    A Nissan 350Z.

15   Q    Do you recognize it to be one of the vehicles that you

16   received in your shop?

17   A    Yes.

18   Q    Is that a fair and accurate photograph of a Nissan 350Z

19   of the type that you received in your shop?

20   A    Yes.

21            MS. KOMATIREDDY:  The government moves DS-911 into

22   evidence.

23            MR. LaRUSSO:  May I have a side-bar, just briefly.

24            MR. HALEY:  May I see the photograph?

25            THE COURT:  Bring it up.

1664

1          (Whereupon a side-bar conference was conducted.)

2          (Side-bar conference.)

3          THE COURT:  What's the objection?

4          MR. LaRUSSO:  It's actually twofold, Judge.  Our

5    information, it's not the car that he's already testified it

6    was.  I didn't expect that answer.  More importantly, Judge, I

7    had no idea this witness was coming on.  And I don't blame

8    anybody at this point.  The witnesses I prepared for for the

9    rest of the week were given to us a couple of days ago.

10   Again, I don't blame anybody.  It's just going to present a

11   problem for me.  In terms of preparation, I was ready for all

12   the witnesses this week, not this particular witness.  We had

13   received word about two weeks ago, about two weeks ago that he

14   was going to be a witness and then he was taken off.

15         THE COURT:  How much more do you have with him?

16         MS. KOMATIREDDY:  Approximately 15, 20 minutes.  We

17   turned over 3500 February 23rd for this witness and he was

18   never taken off the list.

19         THE COURT:  We can take a break for you to get

20   prepared.  It's a pretty short witness.

21         MR. LaRUSSO:  I may be able to do it, Judge, during

22   the break.

23         THE COURT:  Why don't you see what you can do on a

24   break.

25         MR. LaRUSSO:  I did look at his stuff a long time

1665

1   ago.  You know what these trials are like, Judge.

2          THE COURT:  It seems to be pretty basic.  He just

3   explained bank records.

4          MR. LaRUSSO:  Give me a couple more minutes than a

5   normal break, I may be able to.

6          MR. HALEY:  Can I made a suggestion?

7          THE COURT:  Yes.

8          MR. HALEY:  I certainly can cross examine on a very

9   limited cross with this particular witness, but I share Mr.

10  LaRusso's concern.  I didn't know this witness was being

11  called.  It's no one's fault.  So perhaps, Bob, you can go

12  first.  I'll listen to his cross examination.  It will

13  probably be more extensive that mine.

14         THE COURT:  As soon as the government is done, we'll

15  take the break and then Mr. LaRusso will go first.  What about

16  the photos?

17         MR. LaRUSSO:  He said he believes it is the car.  I

18  can't do anything about that, Judge.  I'll have to see if I

19  can get him to change his mind.  Thank you, Judge.

20         (Whereupon the side-bar conference was concluded.)

21         (Matter continued on the next page.)

22

23

24

25

EDENHOLM-DIRECT-KOMATIREDDY                    1666

1          (Matter continued in Open Court.)

2          THE COURT:  Government Exhibit 911 is admitted.

3          (So marked as Government Exhibit 3911 in evidence.)

4   Q    After you received these cars, what did you do with the

5   cars?

6   A    They sat in the shop on consignment for a few months.

7   Q    Did you sell any of them?

8   A    I did.

9   Q    What did you sell?

10  A    I believe I sold one 350Z.

11  Q    Of the type we see here in Government Exhibit 911?

12  A    Yes.

13  Q    Can you describe the circumstances of the sale; how much

14  you sold it for and who you sold it to.

15  A    I believe we sold it to a place down in Florida for

16  20,000.

17  Q    I'm going to hand you what's been marked as Government

18  Exhibit 3611 and 3614.  Take a look at those.  Starting with

19  3611, do you recognize that?

20  A    Yes.

21  Q    What is it?

22  A    It is a bill of sale to Wire Wheel Classic Sports Cars.

23  Q    Is that a bill of sale that's created by your company,

24  Scottsdale Motors?

25  A    Yes.

EDENHOLM-DIRECT-KOMATIREDDY                    1667

1   Q    Was that created at or near the time of the sale of the

2   vehicle?

3   A    Yes.

4   Q    Was it created in the ordinary course of Scottsdale

5   Motor's business?

6   A    Yes.

7   Q    Is it maintained in the ordinary course of Scottsdale

8   Motor's business?

9   A    Yes.

10  Q    Turning your attention to Government Exhibit 3614, do you

11  recognize that?

12  A    Yes.

13  Q    What is it?

14  A    It's the front end of the car jacket that we put all the

15  documents in for the car, for selling it.

16  Q    Is that also created by your company?

17  A    Yes.

18  Q    At or near the time of the actual sale of a car?

19  A    Yes.

20  Q    Is it created in the ordinary course of Scottsdale

21  Motor's business?

22  A    Yes.

23  Q    Is it kept in the ordinary course of Scottsdale Motor's

24  business?

25  A    Yes.

EDENHOLM-DIRECT-KOMATIREDDY                    1668

1        MS. KOMATIREDDY:  Government moves 3611 and 3614 in

2   evidence.

3        MR. LaRUSSO:  No objection.

4        MR. HALEY:  No objection.

5        THE COURT:  3611 and 3614 are admitted.

6        (So marked as Government Exhibits 3611 and 3614 in

7   evidence.)

8   Q    So you said you sold this car.  I will publish 3611 to

9   the jury.  This is the purchase -- do you want to look at your

10  screen?

11  A    What was the question?

12  Q    This is the bill of sale, 3611?

13  A    Yes.

14  Q    You said you sold it to some place in Florida.  You said

15  Wire Wheel Classic Sports Cars.  Is that who you sold it to?

16  A    Yes.

17  Q    In Vero Beach, Florida?

18  A    Yes.

19  Q    You sold it for approximately $20,000?

20  A    Yes.

21  Q    Turning to Government Exhibit 3614, is that the deal

22  jacket you referred to?

23  A    Yes.

24  Q    What happened to the $20,000 when you sold this car?

25  A    I believe on the jacket it shows that 2,000 of it was

EDENHOLM-DIRECT-KOMATIREDDY                1669

1  kept for profits, expenses, advertising expenses, et cetera,

2  for the company, which is Scottsdale Motors.  And then 18,000

3  was sent to my personal account for another six months of

4  rent.

5  Q    Starting with the expenses.  You said 2,000 was kept for

6  expenses.  That's your business expenses.  And why were you

7  incurring expenses with respect to these cars?

8  A    Well, like it says in the front there, we have to send it

9  out for clean-up or we run advertising on -- whether it's

10 eBay, whatever we use for advertising.  It shows a battery was

11 purchased for the car.

12 Q    It appears a battery purchased for this car on Government

13 Exhibit 3614.  Why did you have to buy a battery?

14 A    The car wouldn't start if it doesn't have a battery.

15 Q    Did it arrive dead?

16 A    I believe so.

17 Q    You said $18,000 went back to you for rent.  Are you

18 referring to -- what rent are you referring to?

19 A    To the rent of Tommy Constantine, the home that he was

20 saying in at that point.

21 Q    Turning your attention to Government Exhibit 3060, which

22 is on your screen.  That's in evidence.  This, again, is in

23 your name, your Citibank account?

24 A    Yes.

25 Q    January 6th to February 2nd, 2010.

EDENHOLM-DIRECT-KOMATIREDDY                    1670

1   A    Yes.

2   Q    I'm looking at the incoming wire, January 22nd -- or I'm

3   sorry.  Incoming wire on January 22nd in the amount of

4   $18,000.  Would that be six months of rent payment that would

5   be credited to you for the sale of this car?

6   A    Yes.

7   Q    Finally, we're going to go back to Government

8   Exhibit 3054.  I will hand you a paper copy of this.  This is

9   in evidence.  Is that another one of your bank account

10  statements?

11  A    Yes.

12  Q    For the month of September of 2009, is that correct?

13  A    Yes.

14  Q    Just looking at this bank statement, September 2009, it's

15  Edenholm Motor Sports bank statement, correct?

16  A    Yes.

17  Q    That's your company?

18  A    Yes.

19  Q    December 16, 2009 -- December 15, 2009, you receive a

20  wire transfer in the amount of $15,000, is that correct?

21  A    Yes.

22  Q    Where is that wire transfer coming from?

23  A    It says wire from law offices of Ron Richards.

24  Q    What was that money for?

25  A    I believe that was repayment of an earlier loan, as well

EDENHOLM-DIRECT-KOMATIREDDY                    1671

1   as some work that was done on some vehicles.

2   Q    Let's just step back for a moment.  You said you were in

3   the business of selling cars.  Did you ever sell cars to

4   Mr. Constantine?

5   A    Yes.

6   Q    I'm going to hand you what's been marked as Government

7   Exhibit 3615 and 3616.  Do you recognize those?

8   A    Yes.

9   Q    What are they?

10  A    They're bill of sales.

11  Q    Who are they created by?

12  A    Scottsdale Motors.

13  Q    Are these bill of sales created at or near the time of

14  the sale of a car?

15  A    Yes.

16  Q    Are they created by an employee of Scottsdale Motors?

17  A    Yes.

18  Q    Are they created in the ordinary course of Scottsdale

19  Motors business?

20  A    Yes.

21  Q    Are they kept in the ordinary course of Scottsdale

22  Motor's business?

23  A    Yes.

24       MS. KOMATIREDDY:  The government moves 3615 and 3616

25  into evidence.    (Continued.)

1672

1    MR. LaRUSSO:  May we have a brief sidebar?

2    THE COURT:  Yes.

3    (Continued on the next page.)

1673

1    MR. LaRUSSO:  I'm objecting to relevancy, Judge.

2    These two invoices deal with cars in May of 2007, I

3    believe.

4         THE COURT:  I don't understand the relevance.

5         MS. KOMATIREDDY:  The witness testified that Mr.

6    Constantine owed him money for work he had done on various

7    cars and that $15,000 payment from the GSF was for part of

8    that work.  These are the two cars he had done work on

9    that had liens on.  In addition, these are also cars,

10   specifically cars, that were mentioned in Mr.

11   Constantine's deposition as the debts he had outstanding

12   just before he started the GSF.

13        THE COURT:  I will overrule the objection.  I

14   think for those reasons, it's relevant.

15        MR. LaRUSSO:  I have to go on the record and say

16   obviously, I haven't had a chance to look at these like I

17   should have.  I don't know what to expect when I sit down

18   with my client in terms of cross.

19        THE COURT:  That's fine.  I'm going to give you

20   more than the normal 15 minutes for the break.  And it's

21   only 3:10.  If you need additional time with your client,

22   that's fine.  I want to try and not have him come back.

23   He is here from Arizona.

24        MR. LaRUSSO:  I will do my best.  I will be very

25   candid with the Court, I hope to be able to do it.

1674

1    THE COURT:  You can always recall him later if

2    something comes up.  I will give you extra time.

3    MR. MISKIEWICZ:  For the record, I did tell Mr.

4    LaRusso's partner on Thursday what has now turned out to

5    be exactly the lineup today; Mr. Edenholm was here.  I did

6    say there were changes or conflicts; may be other people.

7    Maybe he didn't get the first e-mail.

8    THE COURT:  It was clear he wasn't blaming

9    anybody.

10   MR. LaRUSSO:  I wasn't.  I got an e-mail that

11   didn't include him.  I don't know when it came.  That's

12   where the problem lies.

13   MR. MISKIEWICZ:  I do object to Mr. Haley not

14   objecting.

15   MR. LaRUSSO:  I want to be able to say no

16   questions.

17   MR. HALEY:  One final matter.  Rather than

18   recalling the witness, I do intend on questioning this

19   witness briefly in connection with an investment he made

20   in Euphora several years ago, when he purchased a

21   percentage interest of Euphora held by Tommy Constantine.

22   And a couple of years, actually, I think 18 months later,

23   he resold that investment for a significant return on

24   profit.  I mentioned in my opening statement this was the

25   witness I will recall as a defense witness.  I would

1675

1    suggest while he is here...

2            THE COURT:  No reason to recall him.  You can do

3    that.

4            (Sidebar concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1676

```
1              (In open court.)

2              THE COURT:  3615 and 3616 are admitted.

3              (Government Exhibits 3615 and 3616 received in

4    evidence.)

5    Q    Looking at 3615, publishing it for the jury, in this

6    first bill of sale, Mr. Edenholm, what type of car did you

7    sell Mr. Constantine?

8    A    2006 Maserati Quattroporte.

9    Q    3616, second bill of sale, what type of car did you

10   sell Mr. Constantine?

11   A    2008 Ford F350.

12   Q    You testified you had done work on cars for Mr.

13   Constantine.  Are these two of the cars you had done work

14   on?

15   A    I'm not -- I don't know.  I'm not sure.

16   Q    Possibly?

17   A    It's possible.

18             MS. KOMATIREDDY:  No further questions.

19             THE COURT:  We will take the afternoon break.

20             Don't discuss the case.

21             (The jury leaves the courtroom. )

22             THE COURT:  We will take the break.  Let me know

23   when you are ready.

24             You can step down for now.

25             (A recess was taken.)
```

Edenhelm - cross/LaRusso

1677

1      THE COURT:  Please be seated.

2      Mr. LaRusso, you had time to go through it with

3  your client?

4      MR. LaRUSSO:  I think so.

5      THE COURT:  Obviously, if anything comes up, you

6  will reserve the right to recall him.

7      MR. LaRUSSO:  I told that to my client.  I think

8  we are okay.

9      THE COURT:  Let's bring in the witness and bring

10  in the jury.

11      (The jury enters the courtroom.)

12      THE COURT:  Please be seated.

13      We will have cross-examination first by

14  Mr. LaRusso.

15      MR. LaRUSSO:  Thank you, your Honor.

16  **CROSS-EXAMINATION**

17  **BY MR. LaRUSSO**:

18  Q    Good afternoon.  Was Tommy Constantine a race car

19  driver?

20  A    Yes, I believe so.

21  Q    Would you describe him as being successful,

22  competitive?

23  A    Very.

24  Q    What do you mean by "very"?

25  A    Very.  He is very competitive.

Edenhelm - cross/LaRusso

1678

```
1    Q    He won races?

2    A    As far as I know, yes.

3    Q    Did he have any sponsors?

4    A    I believe so.

5    Q    What's the importance of sponsors?

6    A    They pay for -- they pay for all the support and

7    everything for racing.

8    Q    Mr. Constantine was successful in securing

9    sponsorships for his racing team, is that correct?

10   A    To the best of my knowledge, yes.

11   Q    You were shown Government Exhibit 911.  I'm going to

12   put that next to you.  I'm also going to show you what we

13   have marked for identification as C 106.  Do you recognize

14   what's in C 106?

15   A    Yes.

16   Q    What do you recognize about that?

17   A    It's a Nissan 350Z race car.

18   Q    You identified to us on direct that the photograph

19   that the government introduced at 911 was a Nissan 350Z,

20   is that correct?

21   A    I believe so.

22   Q    Do you know that there are various makes and models

23   of the 350Z?

24   A    Yes.

25   Q    There is a GS and GT, is that correct?
```

Edenhelm - cross/LaRusso

1679

1    A    That, I don't know.

2    Q    Would you know that there is a substantial dollar

3    value difference between the various makes of the cars,

4    the 350Zs?

5    A    Yes.

6    Q    And would that difference depend upon a number of

7    factors, including the rear wing or the flag fenders on

8    those cars?

9    A    Would they be identified by rear wings and fenders?

10   Q    Likewise the effective values of those vehicles?

11   A    Yes.

12   Q    You testified that you sold a car, Nissan 350Z, for

13   Mr. Constantine, is that correct?

14   A    Yes.

15   Q    And you sold it for approximately 20,000, is that

16   right?

17   A    Correct.

18   Q    There are other 350Zs that are worth substantially

19   more in the neighborhood of 200 to 400,000, is that

20   correct?

21   A    There can be, yes.

22   Q    Looking at the exhibit I showed you, I believe 109?

23        THE COURT:  106.

24        MR. LaRUSSO:  Sorry, thank you, Judge.

25   Q    106, do you recognize that car is different than the

Edenhelm - cross/LaRusso

1680

1    car you identified at 911, in Government Exhibit 911?

2    A    Yes, now I see.

3    Q    Let me direct your attention to the first $18,000

4    that the government pointed out was paid to rent to you

5    from an account called Ron Richards's account.  Do you

6    recall that?  Then there was a second 18,000, I believe

7    you testified, came from the sale of the 350Z, is this

8    right?

9    A    Yes.

10   Q    You sold the car for 20,000, you kept 2,000 for

11   expenses, and the other 18,000 you kept for rent, is that

12   right?

13   A    Correct.

14   Q    Did you know, at or about this time, that Mr.

15   Constantine was looking to sell a race car, a BMW M6?

16   A    That he was looking to sell the BMW M6, I think so.

17   Q    Do you remember helping him sell the BMW race car?

18   A    I don't recall.

19   Q    Do you know the value of the car, the BMW M6 race

20   car?

21   A    I never saw that car in person, but yes, it's very

22   expensive.

23   Q    Would you agree it would be somewhere in the

24   neighborhood of about $125,000?

25             MS. KOMATIREDDY:  Objection, foundation.

**Edenhelm - cross/LaRusso**

1681

1      THE COURT:  Overruled.  You can answer that, if

2   you know.

3   A    Yes, I would say that's pretty accurate.

4   Q    Do you know whether or not Mr. Constantine, in fact,

5   sold the BMW M6 for 125,000 and deposited it into Ron

6   Richards's account?

7   A    I don't know.

8   Q    By the way, you talked about the sale of your

9   airplane.  Did Mr. Constantine benefit in any way from the

10  sale of the airplane to you for 450,000?

11      MS. KOMATIREDDY:  Objection.

12      THE COURT:  Overruled.  You can answer.

13  A    How do you mean "benefit"?

14  Q    Did he receive any financial benefits from it, such

15  as a commission?

16  A    No, sir.

17  Q    Turning to the lease, did Mr. Constantine pay fair

18  market value for the rental of the house that you bought?

19  A    Yes.

20  Q    I show you what's been marked C 107 for

21  identification.  Can you identify that?  You can look at

22  the first few pages and the last page, please.

23  A    The question is?

24  Q    Do you recognize that?

25  A    I didn't, but first time I have seen it.

1682

1   Q    Just tell us how you recognize this.

2             MS. KOMATIREDDY:  Objection.  He said he didn't

3   recognize it.  He said it's the first time he has seen it.

4             THE COURT:  He was completing his answer.

5   Complete the answer.  What were you saying?

6   A    I have not seen this agreement in quite some time.  I

7   didn't remember it, but this is definitely my signature on

8   the back on the final last page.

9   Q    Does that appear to be the lease that you and Mr.

10  Constantine executed in regards to the home?

11  A    This is the first time I have seen it in obviously

12  five or six years, but I would say yes.

13            MR. LaRUSSO:  Your Honor, I ask it be received

14  at this time.

15            MS. KOMATIREDDY:  Your Honor, we ask what last

16  page is there a signature on.

17            THE COURT:  Is there a page number?  Identify

18  what page number it is.

19            MR. LaRUSSO:  The last page of the document,

20  your Honor.  The last of the entire exhibit.  There is no

21  page number.

22            THE COURT:  Is that correct, Mr. Edenhelm?

23            THE WITNESS:  Yes.

24            THE COURT:  Any objection?

25            MR. HALEY:  Your Honor, may I just see it?

Edenhelm - cross/LaRusso

1683

1    No objection.

2    THE COURT:  107 is admitted.

3    (Government Exhibit C107 received in evidence.)

4    MR. HALEY:  Thank you very much.

5  Q    In regards to the lease to Mr. Constantine --

6  A    I don't have that anymore, by the way.

7  Q    I will not ask you specifically.  I will ask you to

8  try to remember, see if it works:  Did Mr. Constantine

9  receive any type of special considerations in regards to

10  the lease you and he executed in regards to the house?

11  A    Consideration?

12  Q    Because of your relationship and friendship.

13  A    No.

14  Q    You rent it to him at a fair market value?

15  A    I believe so; yes.

16  Q    Now, the government also showed you a number of

17  invoices.  I think they might be up there.  Yes.  These

18  two Lotus invoices.  They are both dated May 30, 2007, May

19  31, 2007.  Is that correct?

20  A    Yes.

21  Q    Exhibits 3615 and 3616.

22  A    Yes.

23  Q    They also asked you regarding these transactions

24  whether they had any connection to the Ron Richards's

25  accounts or wire transfers in 2009, correct?  Let me ask

1684

1  you, do those two Lotus vehicles that are represented by

2  those exhibits have anything to do about any of the wire

3  transfers that you received from the Ron Richards's

4  account?

5  A    No.

6  Q    Now, there came a time when you knew that Mr.

7  Constantine had been indicted, that correct?

8  A    Yes.

9  Q    After he was indicted, did an agent from the FBI with

10 a name of Galioto contact you?

11 A    Yes.

12 Q    Did he ever ask you or inquire of you whether Mr.

13 Constantine received a greater value from the airplane

14 after you had sold it?

15 A    Did he ask me?

16 Q    Whether Mr. Constantine received a greater value from

17 the airplane than the price that you sold it for?

18 A    I don't --

19          MS. KOMATIREDDY:  Objection.

20          THE COURT:  Overruled.  You can answer that, if

21 you remember.

22 Q    I didn't hear the answer.

23 A    So your question to me is:  Did Galioto ask me?

24 Q    Whether or not, in sum and substance, that the plane

25 was sold, Mr. Constantine received 100,000 more than you

Edenhelm - cross/LaRusso

1685

1    received?

2    A    I'm not sure I understand the question exactly.

3    Q    You sold the plane for 450,000, is that correct?

4    A    Correct.

5    Q    You testified that Mr. Constantine made no benefit

6    from it, correct?

7    A    Correct.

8    Q    I'm asking you, did Mr. Galioto ever speak to you and

9    discuss with you the fact he did, in fact, made a profit

10   off the sale of that plane?

11   A    Not that I remember.

12   Q    Do you ever hear the word "global settlement fund"?

13   A    I have heard the word global settlement fund.

14   Q    Were you aware that the global settlement fund monies

15   were used to buy your airplane?

16   A    I did hear that.

17        MS. KOMATIREDDY:  Objection, your Honor.  We

18   need a time frame during the relevant time frame.

19   Q    Can you tell us approximately what time frame you

20   were learning this information?

21   A    I actually don't remember the first time I heard the

22   term.

23   Q    Do you remember learning also that the global

24   settlement fund actually saved $100,000 from the purchase

25   of your airplane?

Edenhelm - cross/Haley

1686

1    A    Yes.

2            MR. LaRUSSO:  No further questions.

3    **CROSS-EXAMINATION**

4    **BY MR. HALEY**:

5    Q    Mr. Edenhelm, my name is Rick Haley.  I represent

6    Phil Kenner.  Afternoon, sir.

7    A    How are you doing?

8    Q    Good.

9            Prior to your appearance here today, you were

10   interviewed by Special Agent Matt Galioto and Joshua R.

11   Wayne at your business known as Edenhelm Motor Group in

12   Scottsdale, Arizona.  Do you recall that?

13   A    Yes.

14   Q    During the course of that interview, did they ask you

15   about your knowledge of Euphora?

16   A    I don't remember.

17   Q    Kindly take a look at this document.

18           Sir, kindly take a look at this document,

19   Exhibit 47.  You may read the entire document.  I'm going

20   to refer your attention specifically to paragraph 2, read

21   that to yourself.

22   A    Okay.

23           (Continued on the next page.)

24

25

Edenholm - Cross/Haley

1687

1  Q    Did you have an opportunity to read that paragraph to

2  yourself?

3  A    Yes.

4  Q    Does that refresh your recollection as to whether or

5  not Special Agent Matt Galioto and Joshua Wayne asked you

6  about your analysis of Eufora?

7  A    Yes.

8  Q    Did there come a point in time, sir, that you

9  invested $250,000 in Eufora LLC?

10  A    Yes.

11  Q    And that was an investment where you would purchase a

12  percentage interest in Eufora which interest belonged to

13  Tommy Constantine, correct?

14  A    When I purchased it the first time from Tommy?

15  Q    Yes.

16  A    I don't know who I purchased it from but I know I

17  made an investment in Eufora.

18  Q    That investment occurred in 2002, 2003?

19  A    Roughly.

20  Q    How much did you invest?

21  A    250,000.

22  Q    Did you later sell your shares in this privately held

23  company to another person?

24  A    Yes.

25  Q    And how long after your $250,000 investment in Eufora

Edenholm - Redirect/Komatireddy

1688

1    did you resell your shares?

2    A    I believe it was about 18 months.

3    Q    And how much did you sell your shares for, sir, your

4    ownership interest?

5    A    I believe a check I received back was for 420, 30 or

6    40,000.

7                MR. HALEY:  I have no further questions, Judge.

8                MS. KOMATIREDDY:  May I approach, Judge.

9    REDIRECT EXAMINATION

10   BY MS. KOMATIREDDY:

11   Q    Just beginning with this lease agreement that

12   Mr. LaRusso showed you C 107.  I will bring it up to you.

13   A    Okay.

14   Q    Looking at the bottom of the page in each of these,

15   is that in the left is sort of a scribble.  Do you see

16   that, on bottom left part on the first page?

17   A    Right.

18   Q    What is that scribble?

19   A    I mean it looks like it is cut off on both sides.

20               MS. KOMATIREDDY:  Can I get the original, Bob?

21               MR. LARUSSO:  That's the copy I have.  That's

22   all I have.

23   Q    Looking at the second to the last page, do you see TC

24   on the bottom right?

25   A    Over there.

Edenholm - Redirect/Komatireddy

1689

1  Q    But you can made out TC?

2  A    Yeah.

3  Q    And does it look like your initial EE, is that how

4  you sign your initials when you sign them with the edge

5  being cut off?

6         It's okay.  You can say yes or no.

7  A    I don't know.  I mean -- it's cut off so it looks

8  similar to my signature to my initials.

9  Q    Fair enough.  Looking at the bottom right corner,

10  there appears to be some sort of indication on the bottom

11  right of each of these pages?

12  A    Yes.

13  Q    Going through page 1, 2, 3, 4, 5, 6, 7.

14  A    Yes.

15  Q    It's not on that last page, is it?

16  A    Right.

17  Q    You testified that you knew about or you heard about

18  this Global Settlement Fund at some point, correct?

19  A    Correct.

20  Q    At the time that you were receiving the money that we

21  discussed in 2009, the $450,000, $75,000, $18,000,

22  $15,000, at that time did you know about the Global

23  Settlement Fund?

24  A    I don't remember when I heard the first time about

25  the Global Settlement Fund.

**Edenholm - Redirect/Komatireddy**

1690

1   Q    Did you know what the Ron Richards account was for?

2   A    I don't know if I knew about that before or after.

3   Q    And at the time that you received those wire

4   transfers, did Mr. Constantine explain to you why those

5   wire transfers were coming from the Ron Richards account?

6   A    Honestly I don't know that I even knew they were

7   coming from the Ron Richards account because I don't get

8   the statements until six weeks after.  So when a wire

9   transfer comes in it's just the wire amount.  I don't see

10  where it is coming from.

11  Q    Lastly, you testified briefly about Mr. Constantine

12  and his securing sponsors for racing cars.  You were asked

13  about that on cross?

14  A    Yes.

15  Q    Were you personally involved in negotiating any of

16  the sponsorship agreements between Mr. Constantine and his

17  race car sponsors?

18  A    Not that I recall.

19       MS. KOMATIREDDY:  No further questions.

20       THE COURT:  Anything else?

21       MR. LARUSSO:  Nothing, your Honor.

22       MR. HALEY:  Judge, yes, maybe three questions.

23

24

25

1691

```
1    CROSS-EXAMINATION

2    BY MR. HALEY:

3    Q    The lease agreement, and I apologize.

4    A    The one that people take from me?

5    Q    The one people take from me, yes.

6         May I see that?

7         Sir, in connection with the lease agreement

8    marked C 107, you indicated previously that that is your

9    signature on that document; is that correct?

10   A    Yes, I believe so.

11   Q    And does this appear to be an original signature?  In

12   other words, does this document appear to be an original

13   rather than a copy?

14   A    Looks to me like a copy.

15        MR. HALEY:  All right.

16   Q    Would you kindly take a look at this document

17   marked --

18        MS. KOMATIREDDY:  We just object on the scope.

19        MR. HALEY:  I haven't asked a question yet.

20   Q    Sir, would you kindly take a look at this document

21   marked Kenner Exhibit 48, specifically on the second page?

22   A    Yes.

23   Q    Do you recognize your signature on that document?

24   A    Yes.

25   Q    Does that appear to be a copy of an original
```

Edenholm - Further Redirect/Komatireddy

1692

1   document?

2   A    Looks like a copy.

3        MR. HALEY:  Thank you.  I have no further

4   questions.

5        MS. KOMATIREDDY:  Very briefly, your Honor.

6   REDIRECT EXAMINATION

7   BY MS. KOMATIREDDY:

8   Q    I will show you what is marked as Government EE 1.

9   Do you see that?

10       I just want you to compare it to what is in

11  evidence as C 107.  Just flip through the pages.  Does

12  Government EE 1 appear to be a copy or a version of C 107

13  without the last page?

14  A    Yes.

15  Q    And EE 1 isn't cut off at the edges, is it?  If you

16  look the bottom right and left?

17  A    Right.

18  Q    You can clearly see Mr. Constantine's initials on the

19  bottom right page of EE 1, correct?

20  A    Correct.

21  Q    But it doesn't have a signature page on it, does it?

22  A    No.

23       MS. KOMATIREDDY:  The Government moves EE 1 in

24  evidence.

25       THE COURT:  Any objection?

Edenholm - Further Redirect/Komatireddy

1693

1             MR. LARUSSO:  May I see it, please?

2             Thank you.

3             May I have a moment, your Honor?

4             Your Honor, may I have a brief sidebar.

5             (Whereupon, at this time the following took

6     place at the sidebar.)

7             (Continued.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Edenholm - Further Redirect/Komatireddy

1694

1    MR. LARUSSO:  These that I gave the Government

2    which is EE 1, does not contain the signature page.  We

3    made copies on the Court's xerox machine here, I'm

4    assuming that the signature page is in the machine.

5    THE COURT:  In here this morning?

6    MR. LARUSSO:  I didn't want to do it in front of

7    the jury.  There was no effort to hide anything, Judge.

8    THE COURT:  So you don't have any objection to

9    the last page now being added?

10    MR. LARUSSO:  I just don't want the jurors

11    thinking there is anything untoward here.

12    MS. KOMATIREDDY:  May I take a quick look at

13    this, Judge?

14    THE COURT:  Yes.

15    MR. LARUSSO:  Thank you, Judge.

16    (End of sidebar conference.)

17    (Continued.)

18

19

20

21

22

23

24

25

Bailey - Direct/Komatireddy

1695

```
1          THE COURT:  Mr. LaRusso me when he made a copy

2    for the purposes of his examination, he left the signature

3    page on the copying machine which is now being attached to

4    EE 1.  Okay.  So EE 1 is admitted as well.

5          (Whereupon, Government Exhibit EE 1 was received

6    in evidence.)

7          MR. LARUSSO:  Thank you very much.  No

8    questions.

9          THE COURT:  You are excused.

10          MS. KOMATIREDDY:  I want to advise the Court.

11    This will take more than 15 minutes.

12          THE COURT:  That's all right.  This is how I

13    made up time in the air.

14          MS. KOMATIREDDY:  Yes, Judge.

15          THE COURT:  Mr. Bailey, if you can come up here

16    and remain standing for the oath.

17          Please raise your right hand.

18    J E F F R E Y   F O X   B A I L E Y,

19          called as a witness, having been first

20          duly sworn, was examined and testified

21          as follows:

22          THE COURT:  You can be seated.  State your full

23    name and spell it for the record, please.

24    A    Full name is Jeffrey Fox Bailey, B-A-I-L-E-Y.

25          THE COURT:  As you are doing now, Mr. Bailey,
```

Bailey - Direct/Komatireddy

1696

1    stay close to the mike.

2    DIRECT EXAMINATION

3    MS. KOMATIREDDY:

4    Q    Where do you live, sir?

5    A    I live in Scottsdale, Arizona.

6    Q    Well, approximately how long have you lived there?

7    A    Lived there since 2004.

8    Q    What do you do for a living?

9    A    I'm retired.

10   Q    What did you do before that?

11   A    I owned an automobile auction in Akron, Ohio.

12   Q    Do you also have a consulting company?

13   A    I still have a consulting company, yes.

14   Q    What is it called?

15   A    JBAZ Consulting.

16   Q    What kind of work does JBAZ Consulting engage in?

17   A    Consulting and financing.

18   Q    Describe in general terms what kind of things do you

19   in finance?

20   A    Primarily things that have collateral attached to

21   them, real estate, automobiles, those types of items.

22   Q    Were you involved in a real estate investment that

23   involved Mr. Tommy Constantine?

24   A    Yes, I was.

25   Q    During the course of that investment, did you meet

1697

1    with Mr. Constantine?

2    A    Yes, I did.

3    Q    Would you recognize him if you saw him today?

4    A    Yes.

5    Q    Well, please look around the room and see if you can

6    identify him?

7                MR. LARUSSO:  Identification conceded.

8    Q    When did you first speak with Mr. Constantine?

9    A    I spoke with Mr. Constantine in 2009.

10   Q    And how did you come to meet him?

11   A    I met him through Eric Edenholm.

12   Q    What were the circumstances that led you to meet him?

13   A    Eric Edenholm had told me that Tommy had invested in

14   a hanger and they were trying to complete the project and

15   ran out of financing and wanted to know if I was willing

16   to assist them.

17   Q    He ran out of financing.  Did you get any information

18   from Mr. Constantine about the state of the hangers?

19   A    That there were bills to be paid and there was a debt

20   on the hangers that needed to be resolved so he could have

21   ownership without any liens on the hangers.

22   Q    What would happen if those debts were not paid?

23   A    My understanding that he would be foreclosed upon.

24   Q    Did you ultimately invest in these hangers?

25   A    Yes, I did.

Bailey - Direct/Komatireddy

1698

1    Q    And during -- in 2009?

2    A    I believe so, yes.

3    Q    And during the course of when you were considering

4    making that investment, did you communicate with

5    Mr. Constantine?

6    A    Yes, I did.

7    Q    I will hand you a set of e-mails that have been

8    marked Government's Exhibit 3402, 3404, 3405, 3407, 3410,

9    3411.

10   A    Okay.

11   Q    Sorry, one more:  3407 (handing.)

12        Did you get a chance to look at these before you

13   came to court today?

14   A    Yes, I did.

15   Q    Are those e-mail communications between you and

16   Mr. Constantine?

17   A    The first one I'm looking at, yes.

18   Q    Would you look at each one for each e-mail that you

19   have in front of you.

20        Who is the sender of that e-mail?

21   A    They are all from Tommy Constantine.

22   Q    And are you either the to or the cc line of each

23   e-mail?

24   A    I'm in from to josephbailey@cox.net and cc to Eric

25   Edenholm.

Bailey - Direct/Komatireddy

1699

1   Q    Looking at each e-mail, are you one of the recipients

2   of each e-mail?

3   A    Yes.

4   Q    Are these e-mails true and accurate copies of e-mails

5   that are on file that you still keep today?

6   A    To the best of my knowledge, yes.

7             MS. KOMATIREDDY:  The Government moves

8   Government's Exhibits 3402, 3404, 3405, 3407, 3410, 3411,

9   and 3417 in evidence.

10            MR. LARUSSO:  May I just have a moment, your

11  Honor?

12            THE COURT:  Yes.

13            MR. HALEY:  Judge, may I as well take a look at

14  these?

15            THE COURT:  Yes.

16            MR. HALEY:  Thank you.

17            Thank you, Judge.

18            MR. LARUSSO:  Judge, may we have a brief

19  sidebar, please.

20            (Whereupon, at this time the following took

21  place at the sidebar.)

22            (Continued.)

23

24

25

Bailey - Direct/Komatireddy

1700

1           (Out of the presence of the jury.)

2           MR. LARUSSO:  I don't have any objections to

3    these but here's the problem I'm having, Judge.  This is

4    another witness that was not supposed to be called this

5    week, and again I don't fault anybody because there has

6    been a lot going on.  The e-mail I got, these were the

7    witnesses for the week.  I know Mr. Miskiewicz has been in

8    touch with my partner.  I did not know about Mr. Bailey

9    coming on today so I don't have my files, my e-mails.  I

10   can't even respond to this at this point in time.

11          THE COURT:  It's 4:20.  We'll break for the day.

12   You'll be prepared for tomorrow morning.

13          MR. LARUSSO:  I've already gone through this.

14   It is just a matter that I'm organized in the morning.

15          MS. KOMATIREDDY:  Is there an objection?

16          MR. LARUSSO:  I'll not made any objections to

17   these.  They are authentic.

18          (End of sidebar conference.)

19          (Continued.)

20

21

22

23

24

25

Bailey - Direct/Komatireddy

1701

1       (In open court.)

2             THE COURT:  Mr. Haley, do you have any

3    objection?

4             MR. HALEY:  No, sir.

5             THE COURT:  Those exhibits are admitted.

6             (Whereupon, Government Exhibit 3402, 3404, 3405,

7    3407, 3410, 3411, and 3417 were received in evidence.)

8    We'll break a few minutes earlier today.

9             We'll reconvene tomorrow morning at 9:30.  The

10   two jurors who have issues next week, Juror 3 and Juror

11   12, just stay in the jury room first.  I want to speak to

12   the lawyers about scheduling and I'll speak with you.

13            Everyone else, please do not discuss the case

14   and do not form an opinion.  I'll see you tomorrow

15   morning.

16            (Whereupon, at this time the jury exits the

17   courtroom.)

18            THE COURT:  If everyone can be seated.  As we

19   know Juror 3 -- so the scheduling issues are two now.  The

20   one I previously advised you of, Juror 3 had plans to go

21   away Wednesday and Thursday of next week.  Again, I

22   expressed last week I'm not sure this didn't come up in

23   JURY selection.  Today Juror 12 indicated that he -- he

24   could not sit next Thursday because he has to go to a

25   wedding next Thursday.  It's unclear to me whether he

1702

1   can't sit the whole day or part of the day.  So my

2   inclination was to tell them both that they are not go --

3   I'll not made them miss their engagements but I'll wait to

4   see where we are at that point to see how to handle it.  I

5   think that is the best way to handle it rather than to

6   excuse them.  I'll not tell them they can't go, or for

7   some reasons we have other jurors raising other issues,

8   we'll have to reassess it then.  Does anyone disagree with

9   that?

10           MR. LARUSSO:  No, your Honor.

11           MR. HALEY:  I apologize.  My mind wandered.  The

12  idea is to keep the jurors, not discharge them?

13           MR. MISKIEWICZ:  Yes, we agree with them.

14           THE COURT:  Any reason I shouldn't bring them

15  out at the same time?

16           MR. HALEY:  No.

17           MR. MISKIEWICZ:  Does that mean we'll miss

18  Wednesday and Thursday because Juror 3 has a Wednesday and

19  Thursday problem?

20           THE COURT:  I don't know what I'll do yet.  I

21  want to wait to see where we're at in the case then.

22           (Respective jurors enter the courtroom.)

23           THE COURT:  So Juror 3, I know what your issue

24  is.  Juror 12, I want you to explain.  You have a wedding

25  to go to, Wednesday and Thursday of the next week?

Bailey - Direct/Komatireddy

1           JUROR 12:  Wednesday night.

2           THE COURT:  Wednesday would be okay and Thursday

3    -- obviously I will not made either of you miss your

4    engagements, but there's a lot of moving pieces with the

5    trial so I don't know exactly how I will address it,

6    whether I'm going to excuse you to let you go on the trip

7    or take those two days off, it depends where we are in the

8    case.  So you'll continue to serve.  I brought you out so

9    you will not be worried, you will not miss your vacation

10   and you will not miss your wedding.

11          JUROR 12:  Thank you, your Honor.

12          (Jurors exit.)

13          MR. LARUSSO:  May I put something on the record

14   in terms of scheduling witnesses.  I do have to advise the

15   Court Mr. Miskiewicz has been keeping us up to date, he's

16   been contacting me or Mr. Constantine.  There must have

17   been some confusion.  I just did not know about these two

18   witnesses.  Edenholm we were able to do the cross and

19   actually I thought we got what we wanted in regards to it.

20   Mr. Bailey is a little different and I apologize, Judge,

21   for where we are.  I'll made sure that I deal directly

22   with Mr. Miskiewicz so this doesn't happen again.

23          THE COURT:  I understand the extenuating

24   circumstances where your partner was in the middle because

25   you weren't available because of your mother, that's fine.

1704

1    We had a good productive day:  We're breaking only ten

2    minutes earlier.

3              Who are your witnesses for tomorrow?

4              MR. MISKIEWICZ:  Actually may I made one comment

5    regarding these two jurors?

6              THE COURT:  Yes.

7              MR. MISKIEWICZ:  I understand the Court is not

8    prepared yet to decide what to do, whether or not to

9    adjourn for the day or excuse them.  I think our

10   preference I think unilaterally would be to keep them

11   because we would be down to two alternates.

12             THE COURT:  That's my concern.  I want to see

13   how many witnesses we get done because my concern is if

14   we're very far off our estimate and I'll let other jurors

15   know that, we can have three or four other jurors raise

16   their hands that they have vacations or this or that.  I

17   need to retain as many jurors as possible too.  The pace

18   of the case is certainly not going the way I expected but

19   you'll let me know during the week where we stand.

20             MR. MISKIEWICZ:  My only request and maybe we

21   can raise this at the end of the week, we're kind of

22   running a travel agency here.  We needed advance notice.

23             THE COURT:  I should have thanked you this

24   morning because I know when my deputy was talking last

25   week to Mr. LaRusso and Mr. Conway was trying to figure

1705

1    out whether Mr. LaRusso needed the whole week or not, and

2    I know you were juggling the witnesses and flight

3    scheduling, and I appreciate the complexities of making

4    witnesses available, but by the end of this week we should

5    have time to made adjustments.

6              MR. MISKIEWICZ:  So right now we have, while

7    Mr. Bailey is still on the stand, we will have John

8    McDonald, he's -- we've also notified counsel of that.

9    Jay McKee.  Tyson Nash -- probably going into Thursday,

10   although maybe as early as tomorrow.  Owen Nolan.  Jackson

11   Stuart and Timothy Garn.  We may replace Mr. Garn with

12   another witness.  It depends how quickly or slowly things

13   go tomorrow, but right now that looks like the lineup for

14   the rest of the week.

15             MR. HALEY:  Mr. Miskiewicz, if you replace

16   Mr. Garn, do you know who that replacement would be?

17             MR. MISKIEWICZ:  Can't say right now.  What I

18   expressed to counsel earlier, what we are attempting to do

19   is plug the last time slot every Thursday with a local

20   witness that we have.  We don't have many.  So if they

21   have to come back we're not flying them across the

22   country.  So if it looks like we're able to finish a whole

23   witness on Thursday, we may save Mr. Garn for next

24   Thursday.  That's the kind of juggling we're doing.

25             THE COURT:  Mr. LaRusso, you indicated this

1706

1    morning there may be some issue with respect to your mom's

2    arrangements.  I want to made sure we're making

3    arrangements.

4              MR. LARUSSO:  So the Court is aware, I want to

5    express my thanks to everyone.  I know how difficult it

6    has been on everybody.  I discussed this with my family.

7    Our funeral will be on Saturday, not this week, so I'll be

8    here for tomorrow and Thursday full days.  My plans are

9    hopefully to leave Thursday night or Friday and then try

10   and get back here on Saturday night so that I can use

11   Sunday to prepare for Monday.  That's my present plans.

12   It will be a two-day affair.  That's my schedule.  So I

13   should be available every day.

14             Monday will be a little difficult but if I knew

15   who the witnesses were on Monday that would help me.

16             THE COURT:  We'll do that.

17             MR. MISKIEWICZ:  Yes.

18             MR. LARUSSO:  I would really appreciate that and

19   made it easier.

20             THE COURT:  I really want to try to be here at

21   9:30 every day.  I want to try to avoid delays.  Many

22   times I say are we ready to go, and they say they are

23   setting up.  Whoever needs to set up come the first thing

24   in the morning before the first witness to get here

25   earlier in the morning.  I don't want to lose a half hour

1707

1    every day.  Certainly if you expect something that we can

2    discuss, we should get here at 9:15.  What time does

3    Mr. Kenner get in the building?

4              THE MARSHAL:  Before 9, usually.

5              MR. HALEY:  To the Marshals credit, there has

6    been no delay.

7              THE COURT:  I don't mind being here 9:15 or

8    9 o'clock.  Sometimes something COMES up overnight, but if

9    you are aware of any issue with any witness, tell me the

10   day before and we'll start at 9 or 9:15 so we're not

11   wasting precious court time.

12             MS. KOMATIREDDY:  I would need for tomorrow's

13   witness Mr. Nash.  One of the issues we raised in the

14   motion we filed on Sunday is the mention of the Paradise

15   Valley issue.

16             THE COURT:  Mr. Haley wanted to be heard.

17             MR. HALEY:  You know, Judge, not to be cute, I

18   always find it intriguing the Government predicts what

19   defense counsel will do in the case.  It has not been my

20   intention and it is not my intention to question during

21   the cross-examination of Mr. Nash, Mr. Ranford or

22   Mr. Sydor, testimony about the ongoing lawsuit between the

23   foregoing victims and Mr. Kaiser and Mr. Berard in

24   connection with that real estate transaction as it relates

25   to Paradise Valley, absent an instance the door is open

Bailey - Direct/Komatireddy

1708

1    through some sort of direction of the witnesses.  It's not

2    my intention to do that and I believe that satisfies that

3    aspect of the motion in limine.

4             THE COURT:  I agree.  And the last one refers to

5    Mr. Peca's mortgage, I guess.

6             MR. HALEY:  I'm a little perplexed as it relates

7    to that item.  The Government intends to offer in evidence

8    the loan transaction history for the year 2009 for

9    Mr. Peca's mortgage at WaterStone Bank.  Is that a select

10   portion of the loan transaction history?  Is it the entire

11   loan transaction history as relates to that mortgage?  I'm

12   perplexed as to what they wish to do.

13            MS. KOMATIREDDY:  I apologize.  Here's a copy

14   for the Court and defense.

15            As is stated in the letter, the payment is for

16   2009 which is the years in which certain of the payments

17   are diverted from the Eufora and Global Settlement Fund

18   frauds by Mr. Kenner to made his portion of this deal that

19   we were supposed to made mortgage payments on this

20   mortgage.

21            THE COURT:  So Mr. Peca testified about this.

22   This is just documenting the actual payments.

23            MS. KOMATIREDDY:  Yes, just the idea.

24            The bank records through Mr. Kenner, the number

25   and dates of money that comes out of fraudulent proceeds

Bailey - Direct/Komatireddy

1709

1   and we want to match that up.  This is sort of the link in

2   the middle to connect the dots with respect to the

3   testimony.

4           MR. HALEY:  When the Government repeatedly says

5   fraudulent transactions and this is the transference of

6   money for fraudulent use, I understand that is the

7   Government's theory.  We don't concede that is the case.

8   Having said that I never have an objection to bank

9   records.  Bank records speak for themselves.

10          I guess my only concern is in whether I need the

11  admonition again or not.  Let me think about that because

12  sometimes when there is an admonition this is not a

13  fraudulent transaction highlights.  Perhaps others are --

14          THE COURT:  I don't know because the Government

15  introduces this.  Obviously Mr. Peca has testified about

16  it will already.

17          MS. KOMATIREDDY:  My intention was to introduce

18  it by stipulation.  If he doesn't object to authenticity

19  so I thought we would introduce it by authenticity --

20          THE COURT:  Whether or not this is a fraud or

21  not, this will be during the summation, I assume.

22          MR. HALEY:  Your Honor, I concede.  I have no

23  objection.  I'll stipulate as to the bank records, Judge.

24  So that issue is resolved.

25          MR. LARUSSO:  Unrelated to the fraud question

1710

1    being discussed.  With regards to the Paradise Valley --

2              THE COURT:  You don't have any objection to

3    this?

4              MR. LARUSSO:  No.

5         The Court may remember we've made allegations in

6    our misconduct motion that Tyson Nash was approached by

7    Mr. Galioto to change his lawsuit from Kaiser and Berard

8    to Mr. Kenner.  And in addition Berard in a deposition

9    testified that he was told not to answer any questions

10   regarding the Global Settlement Fund.

11             The Government has taken a position in response

12   to our motion that that was never said.  This is part of

13   our argument that Mr. Galioto when collecting evidence was

14   trying to get witnesses to do things that would favor the

15   witnesses that the Government was aligning themselves with

16   which would be Kaiser and Berard and in addition telling

17   them not to answer deposition questions that related to

18   the Global Settlement Fund to prevent any further

19   information from being communicated to the attorneys in

20   that case.

21             So I don't intend to get into the fraud but I

22   certainly want to let the Court know right now I would go

23   back, I started it, preparing questions for Mr. Nash and

24   those efforts by Mr. Galioto in that particular case.

25             THE COURT:  If it's limited to that issue I

1711

1    think it does go the agent's credibility.  If in fact it

2    did happen, it would be permissible cross.  But Mr. Haley,

3    you don't have any concerns on that front, do you?

4              MR. HALEY:  I do not your Honor.  Actually I do

5    join in that application.  Mr. LaRusso is not making

6    inquiry in that area.  If he's not, I will.

7              MR. LARUSSO:  That's all, Judge.  That's the

8    area.

9              THE COURT:  I just want to place a ruling on the

10   record.  Earlier today I mentioned briefly at sidebar, I

11   had initially when we were talking about the groups of

12   conversations that Mr. LaRusso wanted to introduce, I did

13   say he could introduce them.  However, after hearing more

14   of Mr. Privitello's testimony, I revisited that one ruling

15   with respect to the voice mail of May 31, 2012, where

16   Mr. Privitello makes reference to be willing to take on

17   $175,000.  It appears to try to settle the matter.  I had

18   initially said I would allow some questioning and

19   potentially some impeachment regarding whether or not

20   there was an offer to pay later.  My initial thinking on

21   that would be that I didn't want the jury to be left with

22   the impression that I was concerned with last week if they

23   go back and read the transcript that Mr. Privitello may

24   have created the impression there was never an offer to

25   pay some of the money back.

Bailey - Direct/Komatireddy

1712

1      However it became clear to me in the lead up to

2   this cross-examination on this, that Mr. Privitello was

3   very careful.

4      I remember Mr. LaRusso asked him a question

5   about an offer to pay back.  He said what are you talking

6   about?  It was clear to me that the references by this

7   witness not being offered any money to be paid back was at

8   the time, the 24-day period, I don't remember how many

9   days it was, as well as in the period in 2010-2009 period,

10  so I disavowed any concern that the jury would be confused

11  that the witness was somehow suggesting in 2012 in

12  connection with -- it wasn't suggesting anything about

13  2012 by his answers to the questions.  That was the only

14  potential relevance to that, and again I was giving

15  Mr. LaRusso some leeway so there wouldn't be a

16  misimpression to the jury and it became clear there

17  wasn't, and the cross-examination then was basically going

18  to get into settlement discussions in connection with the

19  civil lawsuit which under Rule 408 are not permissible

20  unless they are necessary to show bias or prejudice and

21  they weren't necessary for any of those purposes.  Even if

22  they had some marginal probative value for those purposes

23  it would be substantially outweighed by the danger of

24  unfair prejudice and confusion by the jury because as I

25  noted at sidebar and I repeat again, whether or not

1713

1    someone, if someone is involved in a fraudulent

2    transaction it is proven that they are involved in a

3    fraudulent transaction, the fact two or three years later

4    in a civil lawsuit, that there was some effort made to

5    resolve the case and the alleged victim was willing to try

6    to negotiate a settlement, is completely irrelevant to

7    whether or not there was a fraud in the first place and I

8    didn't want the jury to be left with the impression or the

9    suggestion or the idea that if a victim of a fraud -- and

10   obviously the Government has to prove Mr. Privitello is a

11   victim, and I'm not making any conclusions to that, that

12   is for the jury, but if they were to prove that they were

13   defrauded in 2009 -- the fact that Mr. Privitello in 2012

14   is willing to take 175,000 out of $200,000 is not a

15   defense to fraud.

16          So that's why under 403 I concluded any

17   probative value which I said at sidebar was zero,

18   substantially outweighed by a danger of unfair prejudice

19   and confusion by the jury.  And similarly that's why I cut

20   off the questioning, not just the recording, but I told

21   Mr. LaRusso at sidebar that we were done with any

22   cross-examination related to efforts to -- offers of

23   payment or reference to settle a civil case or anything of

24   that nature.

25          All right.  Anything from the Government?

1714

1          MR. MISKIEWICZ:  Not from the Government.

2          MR. LARUSSO:  Not from the defense.

3          THE COURT:  Have a good night.

4          (Whereupon, the proceedings were adjourned until

5    Wednesday, May 27, 2015, at 9:30 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I-N-D-E-X**

**W-I-T-N-E-S-S-E-S**

A L L I S O N   R E S S L E R                    1513

DIRECT EXAMINATION                               1514

BY MS. KOMATIREDDY

CROSS EXAMINATION                                1520

BY MR. LARUSSO

N I C H O L A S   P R I V I T E L L O             1522

REDIRECT EXAMINATION                             1632

BY MS. KOMATIREDDY

R I C A R D O   B A N C I E L L A                 1639

DIRECT EXAMINATION                               1639

BY MS. KOMATIREDDY

CROSS EXAMINATION                                1648

BY MR. LaRUSSO

e R I C   E D E N H O L M                         1650

DIRECT EXAMINATION                               1650

BY MS. KOMATIREDDY

CROSS-EXAMINATION                                1677

BY MR. LaRUSSO

CROSS-EXAMINATION                                1686

BY MR. HALEY

REDIRECT EXAMINATION                             1688

BY MS. KOMATIREDDY

**1716**

CROSS-EXAMINATION                                1691

BY MR. HALEY

REDIRECT EXAMINATION                             1692

BY MS. KOMATIREDDY

J E F F R E Y   F O X   B A I L E Y              1695

DIRECT EXAMINATION                               1696

MS. KOMATIREDDY

**E-X-H-I-B-I-T-S**

Defendant's Exhibit C 105 was received in        1622

evidence


Government's Exhibits 3396 R and 617 were        1513

received in evidence

Government Exhibit 3395 was received in          1518

evidence

Government Exhibit 3311                           1642

Government Exhibit 3326-R                         1646

Government Exhibit 3312                           1647

Government Exhibit 3606                           1656

1717

| | |
|---|---|
| Government Exhibit 3608 | 1658 |
| Government Exhibit 3911 | 1666 |
| Government Exhibits 3611 and 3614 | 1668 |
| Government Exhibits 3615 and 3616 received in evidence | 1676 |
| Government Exhibit C107 received in evidence | 1683 |
| Government Exhibit EE 1 was received in evidence | 1695 |
| Government Exhibit 3402, 3404, 3405, 3407, 3410, 3411, and 3417 were received in evidence | 1701 |

## $

**$100,000** [2] - 1607:1; 1685:24
**$125,000** [1] - 1680:24
**$15,000** [3] - 1670:20; 1673:7; 1689:22
**$150,000** [3] - 1549:2; 1551:23; 1621:25
**$155,000** [2] - 1519:7; 1621:7
**$175,000** [1] - 1711:17
**$18,000** [7] - 1660:19, 21, 25; 1669:17; 1670:4; 1680:3; 1689:21
**$2,000** [1] - 1659:19
**$20,000** [2] - 1668:19, 24
**$200,000** [15] - 1507:22; 1509:21; 1536:6; 1564:9; 1567:15, 23; 1579:3; 1607:3; 1634:10, 20, 22; 1635:8; 1637:20, 23; 1713:14
**$250,000** [4] - 1526:8; 1569:6; 1687:9, 25
**$3,000** [1] - 1660:6
**$3,333.31** [2] - 1646:14, 19
**$36,000** [1] - 1660:10
**$36,361.07** [2] - 1646:14, 17
**$40,000** [5] - 1607:16; 1608:1; 1648:3, 15, 24
**$40,268.82** [1] - 1648:5
**$450,000** [8] - 1657:7, 14, 21, 25; 1658:4, 13; 1661:4; 1689:21
**$5,000** [1] - 1623:21
**$50,000** [2] - 1549:3; 1561:1
**$65,000** [1] - 1520:15
**$75,000** [8] - 1661:10, 16, 24; 1662:6, 11, 17; 1663:11; 1689:21

## '

**'08** [6] - 1524:1; 1530:21; 1605:22; 1606:24
**'09** [4] - 1589:12; 1607:1; 1615:13; 1637:17

## 1

**1** [16] - 1518:14, 20; 1569:9; 1577:6; 1622:19; 1689:13; 1692:8, 12, 15, 19, 23; 1694:2; 1695:4; 1717:7
**1.3** [2] - 1657:7, 10
**1.5** [18] - 1536:6; 1549:3; 1560:23; 1564:10; 1573:22; 1579:4, 7-8; 1580:1; 1601:22; 1624:25; 1625:24; 1626:6; 1634:25; 1635:10; 1636:13
**100** [11] - 1502:8; 1506:20; 1508:10; 1559:22; 1595:25; 1596:23; 1602:20; 1610:25; 1611:18; 1614:22; 1634:24
**100,000** [1] - 1684:25
**101** [1] - 1621:12
**105** [5] - 1622:4, 13-15; 1716:14
**106** [4] - 1678:13; 1679:23, 25
**107** [6] - 1681:20; 1683:2; 1688:12; 1691:8; 1692:11
**109** [1] - 1679:22
**11** [2] - 1548:9; 1610:10
**1101** [1] - 1621:17
**11501** [1] - 1502:2
**11572** [1] - 1502:5
**11722** [2] - 1501:17; 1502:9
**11749** [1] - 1501:23
**11:13** [1] - 1570:3
**11:15** [1] - 1571:11
**11:45** [1] - 1577:15
**11:55** [2] - 1580:12, 17
**11th** [1] - 1508:11
**12** [5] - 1701:11, 23; 1702:24; 1703:1, 11
**1218** [1] - 1638:5
**125,000** [1] - 1681:5
**12:22** [1] - 1563:3
**13** [1] - 1575:5
**13-CR-607** [1] - 1501:3
**130** [1] - 1519:8
**1432** [3] - 1538:23; 1539:1; 1575:2
**15** [4] - 1664:10;

1670:19; 1673:20; 1695:11
**150** [1] - 1582:24
**150,000** [3] - 1582:7; 1621:3; 1622:25
**150K** [1] - 1582:12
**1513** [1] - 1715:4; 1716:18
**1514** [1] - 1715:5
**1518** [1] - 1716:20
**1520** [1] - 1715:7
**1522** [1] - 1715:9
**155,000** [6] - 1507:22; 1508:1; 1622:21; 1624:14, 23; 1625:4
**15th** [1] - 1661:10
**16** [4] - 1609:5; 1637:11; 1659:5; 1670:19
**1601** [1] - 1501:22
**1622** [1] - 1716:14
**1632** [1] - 1715:12
**1639** [1] - 1715:12
**1642** [1] - 1716:22
**1646** [1] - 1716:23
**1647** [1] - 1716:24
**1648** [1] - 1715:15
**1650** [2] - 1715:17
**1656** [1] - 1716:25
**1658** [1] - 1717:1
**1666** [1] - 1717:2
**1668** [1] - 1717:3
**1676** [1] - 1717:4
**1677** [1] - 1715:20
**1683** [1] - 1717:6
**1686** [1] - 1715:22
**1688** [1] - 1715:24
**1691** [1] - 1716:1
**1692** [1] - 1716:3
**1695** [2] - 1716:5; 1717:7
**1696** [1] - 1716:6
**16th** [3] - 1609:10; 1610:1; 1637:17
**1701** [1] - 1717:9
**175** [1] - 1505:23
**175,000** [1] - 1713:14
**18** [5] - 1531:24; 1539:17; 1652:1; 1674:22; 1688:2
**18,000** [3] - 1669:2; 1680:6, 11
**18290** [1] - 1659:13
**1980** [1] - 1657:3

**1994** [1] - 1640:8
**1995** [1] - 1651:12
**1:30** [2] - 1603:20; 1604:19
**1:43** [1] - 1580:23

**1**

## 2

**2** [5] - 1577:6, 10; 1601:5; 1686:20; 1689:13
**2,000** [3] - 1668:25; 1669:5; 1680:10
**20** [2] - 1652:1; 1664:16
**20,000** [3] - 1666:16; 1679:15; 1680:10
**200** [9] - 1559:21; 1579:7, 9; 1580:1; 1600:4; 1625:24; 1626:6; 1679:19
**200,000** [5] - 1505:7; 1507:11; 1536:22; 1560:21; 1573:21
**2000** [1] - 1618:22
**2001** [2] - 1505:11; 1650:20
**2002** [1] - 1687:18
**2003** [3] - 1653:22; 1654:22; 1687:18
**2004** [1] - 1696:7
**2006** [1] - 1676:8
**2007** [5] - 1640:24; 1641:25; 1673:2; 1683:18
**2008** [16] - 1515:12; 1518:5, 14, 20-21; 1519:4; 1530:22; 1607:17; 1608:6; 1640:24; 1646:7; 1647:6; 1648:10, 25; 1649:5; 1676:11
**2009** [53] - 1505:9; 1509:20; 1519:25; 1523:6; 1527:12; 1537:22; 1547:14; 1548:24; 1553:6; 1562:19; 1563:2, 25; 1565:3; 1569:3; 1580:9; 1587:11, 21; 1588:21; 1589:3; 1590:18; 1609:5, 10; 1610:18; 1620:6; 1622:19; 1632:24; 1637:11; 1652:7; 1653:12, 22; 1654:9, 22, 25; 1656:18, 20; 1657:18, 20; 1659:5; 1660:15,

18; 1661:9; 1670:12,
14, 19; 1683:25;
1689:21; 1697:9;
1698:1; 1708:8, 16;
1713:13
**2010** [24] - 1505:11;
1506:17; 1507:5, 13,
18; 1508:8; 1510:2;
1587:19, 21; 1590:5;
1591:4; 1595:19;
1598:2, 10; 1599:16;
1602:10; 1603:7;
1610:7, 9, 19, 23;
1615:18; 1669:25
**2010-2009** [1] - 1712:9
**2011** [11] - 1506:16;
1510:6; 1588:23;
1590:1; 1603:10;
1610:19, 24; 1611:9;
1623:24; 1627:11
**2012** [24] - 1505:11;
1509:7; 1531:24;
1532:3, 6, 11; 1534:3;
1589:19, 21; 1592:12;
1603:12; 1610:13, 20;
1616:8; 1618:9, 22;
1620:5; 1636:18;
1640:9; 1711:15;
1712:11, 13; 1713:13
**2015** [3] - 1501:9;
1539:18; 1714:5
**208** [3] - 1548:12;
1552:3; 1632:17
**208.1** [3] - 1553:3;
1629:18; 1635:5
**208.10** [1] - 1580:22
**208.11** [1] - 1629:18
**208.2** [1] - 1547:10
**208.3** [1] - 1562:17
**208.4** [1] - 1563:25
**208.5** [1] - 1565:2
**208.6** [1] - 1565:11
**208.7** [3] - 1632:21,
23; 1634:13
**208.8** [2] - 1633:22;
1634:16
**208.9** [1] - 1580:9
**20th** [1] - 1606:24
**2100** [1] - 1507:21
**22** [1] - 1651:1
**22nd** [2] - 1670:2
**23** [2] - 1518:5; 1519:4
**23rd** [1] - 1664:17
**24** [3] - 1589:8, 10, 13
**24-day** [1] - 1712:8
**24th** [1] - 1506:7
**25** [3] - 1569:3;

1603:16; 1604:9
**25,000** [1] - 1607:5
**250,000** [2] - 1534:24;
1687:21
**26** [4] - 1501:9;
1502:4; 1519:25;
1641:24
**27** [2] - 1607:5; 1714:5
**28** [1] - 1624:19
**2:22** [2] - 1547:14;
1548:24
**2nd** [5] - 1656:17, 20;
1657:20; 1660:15;
1669:25

---

**3**

**3** [8] - 1577:10;
1590:1; 1689:13;
1701:10, 19-20;
1702:18, 23
**30** [3] - 1646:7;
1683:18; 1688:5
**300** [2] - 1502:1;
1607:3
**3053** [2] - 1657:17;
1661:4
**3054** [1] - 1670:8
**3059** [1] - 1660:12
**3060** [1] - 1669:21
**30th** [4] - 1569:6, 9;
1648:24; 1649:5
**31** [5] - 1595:3;
1622:20; 1647:6;
1683:19; 1711:15
**31st** [1] - 1506:5
**3311** [7] - 1641:16;
1642:8, 12-13, 15;
1644:12; 1716:22
**3312** [5] - 1647:1, 18,
22-23; 1716:24
**3326** [3] - 1644:22, 25;
1645:20
**3326-R** [7] - 1644:23;
1645:19, 23; 1646:2, 5;
1716:23
**3369** [1] - 1513:13
**3395** [5] - 1517:5, 22;
1518:1; 1716:20
**3396** [4] - 1513:4, 8,
14, 16; 1519:14;
1520:15; 1716:18
**3402** [4] - 1698:8;
1699:8; 1701:6; 1717:9
**3404** [4] - 1698:8;
1699:8; 1701:6; 1717:9
**3405** [4] - 1698:8;

1699:8; 1701:6; 1717:9
**3407** [5] - 1698:8, 11;
1699:8; 1701:7; 1717:9
**341** [1] - 1502:2
**3410** [4] - 1698:8;
1699:8; 1701:7; 1717:10
**3411** [4] - 1698:9;
1699:8; 1701:7; 1717:10
**3417** [3] - 1699:9;
1701:7; 1717:10
**3500** [5] - 1532:21;
1541:18; 1626:10;
1628:1; 1664:17
**350Z** [8] - 1663:14, 18;
1666:10; 1678:17, 19,
23; 1679:12; 1680:7
**350Zs** [2] - 1679:4, 18
**3606** [5] - 1655:19;
1656:9, 13, 15; 1716:25
**3608** [5] - 1658:18,
24-25; 1659:1; 1717:1
**3611** [8] - 1666:18;
1668:1, 5-6, 8, 12;
1717:3
**3614** [8] - 1666:18;
1667:10; 1668:1, 5-6,
21; 1669:13; 1717:3
**3615** [7] - 1671:7, 24;
1676:2, 5; 1683:21;
1717:4
**3616** [7] - 1671:7, 24;
1676:2, 5; 1683:21;
1717:4
**37** [2] - 1600:14;
1601:4
**37B** [1] - 1597:21
**3911** [2] - 1666:3;
1717:2
**3:04** [1] - 1564:1
**3:08** [1] - 1565:3
**3:10** [1] - 1673:21
**3rd** [3] - 1548:13;
1553:6, 16

---

**4**

**4** [7] - 1547:14;
1548:24; 1562:19;
1563:25; 1565:3;
1632:23; 1689:13
**40,000** [1] - 1688:6
**400,000** [4] - 1600:4,
6-7; 1679:19
**403** [1] - 1713:16
**408** [1] - 1712:19
**45** [1] - 1654:10

**420** [1] - 1688:5
**425** [1] - 1501:22
**45** [3] - 1571:1, 8;
1604:8
**450,000** [3] - 1654:19;
1681:10; 1685:3
**47** [1] - 1686:19
**48** [1] - 1691:21
**4:20** [1] - 1700:11
**4:57** [1] - 1553:6
**4th** [4] - 1548:13;
1563:2; 1565:13;
1660:15

---

**5**

**5** [3] - 1504:20;
1655:24; 1689:13
**5/26/09** [1] - 1519:24
**50** [4] - 1582:8;
1633:12; 1634:5, 7
**50,000** [7] - 1559:24;
1560:20, 23; 1561:4;
1582:6; 1621:3; 1634:5
**503** [2] - 1504:20;
1577:10
**503.1** [1] - 1577:10
**503.3T** [1] - 1583:4
**503.5** [1] - 1504:23
**503.6** [1] - 1504:23
**503.8** [1] - 1577:11
**5035** [3] - 1612:6;
1613:1, 7
**5036** [3] - 1612:7;
1613:1, 7
**58** [2] - 1611:6, 13
**59** [2] - 1611:6, 13

---

**6**

**6** [3] - 1504:20;
1656:2; 1689:13
**60** [2] - 1611:7, 13
**617** [4] - 1513:3, 5, 8;
1716:18
**631-712-6102** [1] -
1502:9
**65,000** [1] - 1519:18
**6:39** [1] - 1565:13
**6th** [2] - 1660:18;
1669:25

---

**7**

**7** [4] - 1537:21;
1580:9; 1588:21;
1689:13

2

**73** [1] - 1637:11
**7th** [7] - 1580:23;
1609:9; 1621:15, 24;
1637:19, 23

**8**

**8** [2] - 1538:24;
1598:10
**85255** [1] - 1659:14
**88** [1] - 1624:4
**89A** [1] - 1596:7
**8th** [2] - 1637:24

**9**

**9** [5] - 1598:2;
1599:16; 1707:4, 8, 10
**91-A** [1] - 1611:3
**911** [7] - 1663:8;
1666:2, 11; 1678:11,
19; 1680:1
**92** [1] - 1504:7
**93rd** [2] - 1658:7;
1659:13
**95** [4] - 1504:8;
1612:22; 1613:13;
1616:3
**95-A-2** [1] - 1577:23
**95-B-2** [1] - 1504:19
**95A-2** [1] - 1560:7
**9:15** [3] - 1707:2, 7,
10
**9:30** [4] - 1501:10;
1701:9; 1706:21; 1714:5

**A**

**A-1** [1] - 1577:7
**A-2** [2] - 1504:8;
1578:4
**a.m** [5] - 1501:10;
1570:4; 1571:11;
1577:15; 1580:12
**a/k/a** [2] - 1501:6, 8
**able** [12] - 1503:9;
1511:6; 1512:18;
1571:8; 1629:5; 1662:5;
1664:21; 1665:5;
1673:25; 1674:15;
1703:18; 1705:22
**absent** [1] - 1707:25
**absolutely** [5] -
1557:19; 1568:8;
1586:7; 1634:24; 1636:1
**accept** [2] - 1564:13;
1635:7

**accepting** [1] -
1505:23
**according** [4] -
1519:6, 20; 1553:25;
1609:12
**account** [36] - 1513:15;
1520:20; 1535:21;
1549:2; 1551:24;
1563:18; 1566:9, 18;
1584:17; 1608:14;
1621:2; 1630:13;
1633:10, 16; 1637:18;
1638:4; 1645:6;
1646:20; 1657:11, 15,
21, 23; 1660:13;
1661:1; 1669:3, 23;
1670:9; 1680:5; 1681:6;
1684:4; 1690:1, 5, 7
**accounts** [2] -
1520:23; 1683:25
**accuracy** [1] - 1629:21
**accurate** [10] -
1513:14; 1576:7;
1614:10; 1622:5;
1645:19; 1656:5;
1657:8; 1663:18;
1681:3; 1699:4
**accurately** [2] -
1613:4; 1629:19
**acknowledge** [1] -
1511:19
**acknowledges** [1] -
1511:15
**acknowledging** [2] -
1583:16; 1598:14
**acknowledgment** [1] -
1597:17
**acquaintance** [1] -
1619:2
**acquire** [3] - 1515:16;
1516:11; 1518:10
**acquired** [1] - 1516:5
**acquisition** [4] -
1514:21; 1515:13, 17,
20
**acquisitions** [1] -
1514:20
**acting** [1] - 1501:16
**actual** [7] - 1506:1;
1532:19; 1568:23;
1584:7; 1660:25;
1667:18; 1708:22
**actually)** [1] -
1633:20
**ad** [1] - 1653:25
**added** [1] - 1694:9
**addition** [6] - 1526:4;
1599:20; 1601:7;

**1673:9; 1710:8, 16**
**additional** [8] -
1549:15; 1612:24;
1613:5; 1631:23;
1646:14; 1648:5;
1673:21
**additionally** [1] -
1560:22
**address** [8] - 1512:3;
1549:4; 1563:10, 13;
1564:13; 1659:14;
1703:5
**addresses** [1] - 1521:5
**adjourn** [1] - 1704:9
**adjourned** [1] - 1714:4
**adjustments** [1] -
1705:5
**admissible** [1] -
1513:17
**admission** [1] -
1658:19
**admit** [2] - 1505:17;
1507:15
**admits** [3] - 1504:15;
1511:13
**admitted** [16] -
1509:2; 1518:1; 1578:4;
1613:14; 1622:14;
1642:12; 1646:2;
1647:22; 1656:13;
1658:24; 1666:2;
1668:5; 1676:2; 1683:2;
1695:4; 1701:5
**admitting** [1] -
1596:12
**admonish** [1] - 1613:11
**admonition** [2] -
1709:11
**advance** [3] - 1547:8;
1591:10; 1704:22
**advanced** [2] - 1591:12
**advertising** [3] -
1669:1, 9
**advise** [4] - 1634:1,
17; 1695:10; 1703:14
**advised** [2] - 1591:18;
1701:20
**advisors** [1] - 1519:3
**affair** [1] - 1706:12
**afternoon** [8] -
1609:1; 1639:23;
1648:23; 1650:16;
1676:19; 1677:18;
1686:6
**afterwards** [3] -
1510:1, 11; 1655:15

**Agent** [17] - 1531:23;
1532:5; 1541:9, 11, 25;
1542:6, 17; 1543:18;
1545:4, 24; 1546:6, 13,
17; 1625:9, 19;
1686:10; 1687:5
**agent** [4] - 1531:24;
1625:10, 21; 1684:9
**agent's** [1] - 1711:1
**agents** [2] - 1506:14;
1533:25
**ago** [11] - 1539:14;
1541:10, 15; 1546:15;
1600:19; 1601:12;
1664:9, 13; 1665:1;
1674:20
**agree** [15] - 1511:3,
19; 1540:17; 1543:22;
1550:15; 1555:15;
1557:4; 1562:10;
1565:23; 1579:22;
1599:21; 1633:15;
1680:23; 1702:13;
1708:4
**agreed** [2] - 1513:11;
1658:19
**agreeing** [1] - 1582:20
**agreement** [28] -
1506:1, 3-4; 1507:16;
1550:18; 1571:21;
1574:14; 1579:1, 14;
1599:25; 1609:12;
1615:13; 1616:23;
1617:9, 25; 1618:1;
1641:8, 19; 1644:7, 10;
1656:6, 17, 20; 1682:6;
1688:11; 1691:3, 7
**Agreement** [1] -
1635:10
**agreements** [2] -
1587:15; 1690:16
**ahead** [9] - 1546:9;
1547:5; 1555:9;
1566:18; 1609:15;
1626:20; 1639:20;
1650:13
**aid** [5] - 1576:8;
1577:23; 1578:5;
1583:4; 1612:6
**aids** [1] - 1612:8
**Air** [3] - 1654:23;
1656:23
**air** [3] - 1512:20;
1618:23; 1695:13
**aircraft** [2] - 1656:6,
20
**airplane** [17] -
1512:19; 1624:24;

1653:15, 18; 1654:20; 1655:1, 4, 16, 23; 1681:9; 1684:13, 17; 1685:15, 25

**Akron** [1] - 1696:11

**Albrecht** [3] - 1515:22, 24; 1516:1

**aligning** [1] - 1710:15

**allegation** [3] - 1508:17, 22; 1625:10

**allegations** [2] - 1625:1; 1710:5

**allege** [1] - 1624:14

**alleged** [3] - 1507:22; 1537:24; 1713:5

**alleges** [2] - 1507:24; 1511:4

**alleging** [2] - 1508:11; 1624:21

**Allison** [3] - 1511:25; 1513:18; 1514:1

**allow** [8] - 1511:11; 1525:17; 1535:7; 1545:8; 1575:12; 1625:14; 1631:3; 1711:18

**allowed** [5] - 1535:25; 1596:14; 1617:21, 24

**allowing** [1] - 1511:8

**alludes** [3] - 1553:23; 1554:3; 1574:13

**alluding** [4] - 1541:23; 1552:3, 23; 1563:14

**almost** [1] - 1607:3

**alone** [1] - 1555:15

**alright** [1] - 1568:24

**alternates** [1] - 1704:11

**AMERICA** [1] - 1501:3

**America** [3] - 1513:11; 1658:10; 1659:9

**amount** [13] - 1504:25; 1519:16; 1536:13; 1537:9, 13; 1549:12; 1554:11; 1564:17; 1606:2; 1607:6; 1670:3, 20; 1690:9

**amounts** [1] - 1583:12

**analysis** [1] - 1687:6

**ANDREW** [1] - 1502:4

**Angeles** [3] - 1514:12; 1515:25; 1650:22

**Answer** [1] - 1539:7

**answer** [71] - 1531:2; 1534:8, 18; 1535:8; 1536:19, 24; 1537:1-3;

1539:13, 19; 1542:14, 24; 1543:1; 1544:3; 1545:8; 1546:9; 1547:21, 23; 1550:20, 24; 1553:10, 14; 1555:8; 1556:12, 17, 21; 1558:8, 21; 1559:1, 5, 11-12; 1562:2; 1566:11, 22; 1568:5; 1575:22; 1582:23; 1584:21; 1585:20; 1588:1; 1589:3, 6; 1597:3; 1601:12, 19; 1602:23; 1603:5; 1616:16; 1624:17; 1626:4; 1627:7, 19; 1637:5, 8; 1664:6; 1681:1, 12; 1682:4; 1684:20, 22; 1710:9, 17

**answered** [18] - 1541:8; 1546:8; 1556:11; 1558:7; 1562:13; 1565:1; 1566:2, 7; 1567:25; 1570:16; 1572:13, 15, 20; 1586:12; 1588:8; 1598:18; 1611:23

**answering** [2] - 1559:4; 1627:20

**answers** [3] - 1508:8; 1538:23; 1712:13

**anytime** [2] - 1635:23; 1661:18

**anyway** [1] - 1509:15

**apologize** [18] - 1539:22; 1547:8; 1558:25; 1559:17; 1570:24; 1587:5; 1603:16; 1604:1, 4, 12; 1606:23; 1609:4; 1610:17; 1633:16; 1691:3; 1702:11; 1703:20; 1708:13

**appear** [6] - 1656:2; 1682:9; 1691:11, 25; 1692:12

**appearance** [1] - 1686:9

**appearances** [1] - 1503:3

**APPEARANCES** [1] - 1501:14

**application** [1] - 1711:5

**applies** [1] - 1613:25

**appreciate** [2] - 1705:3; 1706:18

**appreciation** [1] - 1512:14

**apprised** [4] - 1507:16; 1595:16; 1600:25; 1601:7

**approach** [8] - 1524:15; 1531:13; 1588:16; 1592:25; 1593:8; 1618:20; 1619:6; 1688:8

**approached** [2] - 1618:18; 1710:6

**approaches** [1] - 1527:19

**approaching** [2] - 1570:21; 1637:15

**approval** [1] - 1588:12

**approvals** [1] - 1636:2

**approve** [1] - 1609:24

**approved** [1] - 1587:22

**approximate** [1] - 1518:19

**April** [8] - 1606:6; 1607:2, 5, 17; 1646:7; 1648:24; 1649:5

**area** [4] - 1533:9; 1620:8; 1711:6, 8

**areas** [1] - 1605:14

**argue** [5] - 1505:16; 1509:2; 1526:6; 1527:2; 1631:6

**arguing** [4] - 1526:6; 1574:24; 1606:9

**argument** [7] - 1508:13; 1509:3; 1526:17; 1607:6; 1608:4, 12; 1710:13

**argumentative** [2] - 1570:11; 1584:20

**arguments** [2] - 1505:14; 1506:12

**Arizona** [19] - 1510:3; 1523:20; 1524:10; 1537:17; 1554:14; 1591:22; 1602:2, 16; 1603:8; 1615:17; 1650:18; 1654:14; 1656:25; 1659:14; 1673:23; 1686:12; 1696:5

**arose** [1] - 1505:11

**arrangement** [2] - 1601:14; 1660:5

**arrangements** [2] - 1706:2

**arrive** [1] - 1669:15

**articulated** [1] - 1509:14

**aspects** [1] - 1508:6

**assist** [1] - 1697:16

**Assistant** [1] - 1501:18

**assume** [6] - 1512:3; 1532:19; 1567:18; 1601:2; 1709:21

**assuming** [1] - 1694:4

**assure** [2] - 1582:8; 1614:19

**attached** [4] - 1549:15; 1630:3; 1695:3; 1696:20

**attempt** [1] - 1510:13

**attempted** [1] - 1515:19

**attempting** [2] - 1509:24; 1705:18

**attempts** [1] - 1510:9

**attend** [1] - 1503:9

**attended** [3] - 1523:12; 1593:5; 1595:16

**attention** [13] - 1519:14; 1533:9; 1538:21; 1541:19; 1600:14; 1601:5; 1609:8; 1652:6; 1660:11; 1667:10; 1669:21; 1680:3; 1686:20

**attorney** [8] - 1507:16; 1511:23; 1514:8; 1520:23; 1570:11; 1571:5; 1597:14; 1639:25

**Attorney** [1] - 1501:16

**attorney's** [1] - 1633:15

**attorneys** [2] - 1513:13; 1710:19

**Attorneys** [1] - 1501:18

**attorneys'** [1] - 1646:17

**auction** [1] - 1696:11

**audio** [7] - 1523:22, 24; 1529:8; 1578:11, 14; 1614:5

**audio-video** [2] - 1523:22, 24

**audio-visual** [1] - 1529:8

**August** [3] - 1591:4; 1595:18; 1640:9

5

authentic [1] - 1700:17
authenticate [3] - 1576:10; 1630:17
authenticated [1] - 1630:15
authenticity [1] - 1709:18
automobile [1] - 1696:11
automobiles [1] - 1696:21
available [3] - 1703:25; 1705:4; 1706:13
Avalon [6] - 1507:23; 1621:9, 25; 1622:18; 1623:20; 1638:2
aviation [1] - 1654:1
avoid [2] - 1568:2; 1706:21
aware [16] - 1506:25; 1507:17; 1508:9; 1587:21; 1592:4; 1595:5; 1601:13; 1602:1; 1607:23; 1609:19; 1616:4, 14; 1685:14; 1706:4; 1707:9
awhile [1] - 1543:23
AZ [17] - 1507:23; 1508:2, 17, 23; 1598:9, 20; 1621:9, 25; 1622:18; 1623:20; 1624:14, 24; 1625:5, 12; 1638:2

**B**

B-1 [2] - 1613:13
B-2 [2] - 1612:22; 1613:14
B-A-I-L-E-Y [1] - 1695:24
B-A-N-C-I-E-L-L-A [1] - 1639:17
backing [1] - 1605:24
bad [1] - 1662:25
badgering [1] - 1557:7
Bailey [6] - 1695:15, 24-25; 1700:8; 1703:20; 1705:7
balance [2] - 1645:2; 1648:4
Banciella [9] - 1571:5; 1605:15; 1638:25; 1639:17, 23; 1640:3, 6; 1642:18
Banciella's [1] -

1607:18
Bancorp [5] - 1508:24; 1623:3, 10, 14
BANCORP [1] - 1622:25
Bank [3] - 1658:10; 1659:9; 1708:9
bank [25] - 1508:3; 1513:13; 1565:22; 1582:6, 17; 1605:24; 1608:17; 1622:4, 6; 1623:4; 1638:4; 1652:12; 1659:9; 1662:11, 14-15; 1665:3; 1670:9, 14-15; 1708:24; 1709:8, 23
banks [1] - 1582:17
bar [8] - 1628:14; 1629:1; 1631:9; 1663:23; 1664:1; 1665:20
barely [1] - 1530:23
basic [2] - 1527:21; 1665:2
batch [1] - 1627:14
battery [4] - 1669:10, 12
Beach [2] - 1644:9; 1668:17
became [5] - 1508:16; 1522:22; 1523:9; 1712:1, 16
become [1] - 1651:23
BEFORE [1] - 1501:11
began [1] - 1607:24
begin [2] - 1514:15; 1522:7
beginning [4] - 1508:13; 1594:10; 1612:21; 1688:11
behalf [12] - 1515:13, 16; 1519:12, 15; 1555:16; 1562:11; 1584:17; 1602:2, 13; 1619:4; 1624:11
behavior [1] - 1570:23
behind [1] - 1582:15
belabored [1] - 1571:17
believable [1] - 1507:8
believes [2] - 1576:18; 1665:17
belonged [1] - 1687:12
below [5] - 1549:2, 4; 1551:24; 1553:20; 1564:10
benefit [3] -

13; 1685:5
benefits [1] - 1681:14
Berard [4] - 1707:23; 1710:7, 16
best [10] - 1565:21; 1590:4; 1633:3, 14, 20; 1634:14; 1673:24; 1678:10; 1699:6; 1702:5
better [1] - 1529:12
between [16] - 1511:9; 1513:11; 1546:25; 1552:19; 1560:11; 1564:21; 1588:20; 1640:23; 1641:8, 19; 1652:7; 1679:3; 1690:16; 1698:15; 1707:22
beyond [1] - 1638:6
BIANCO [1] - 1501:12
bias [1] - 1712:20
big [1] - 1566:24
bill [8] - 1555:5; 1666:22; 1668:12; 1671:10, 13; 1676:6, 9
billing [1] - 1517:15
bills [2] - 1554:20; 1697:19
Bing [5] - 1515:22, 24-25; 1519:13; 1520:12
birthday [1] - 1523:12
bit [1] - 1573:19
bits [1] - 1539:25
BlackBerry [1] - 1503:25
blah [3] - 1662:11
blame [2] - 1664:7, 10
blaming [1] - 1674:8
blue [2] - 1525:4; 1530:2
blurry [1] - 1568:20
BMW [5] - 1680:15-17, 19; 1681:5
Board [1] - 1609:17
board [5] - 1587:22; 1588:12; 1609:13, 18, 23
Bob [6] - 1520:9; 1583:10; 1599:7; 1665:11; 1688:20
bookkeeping [1] - 1647:8
books [1] - 1649:1
bottom [14] - 1549:17; 1553:23; 1569:8; 1597:24; 1633:9; 1642:4; 1655:25;

1689:9; 1692:16, 19
bought [5] - 1653:2; 1658:10; 1659:17, 22; 1681:18
bound [1] - 1558:14
boundaries [1] - 1530:17
Boyden [2] - 1618:14, 20
boyden [1] - 1619:4
break [22] - 1503:10; 1569:25; 1570:1, 5; 1571:10; 1603:19, 24; 1604:6-8, 10; 1664:19, 22, 24; 1665:5, 15; 1673:20; 1676:19, 22; 1700:11; 1701:8
breaking [1] - 1704:1
brief [3] - 1672:1; 1693:4; 1699:18
briefly [7] - 1515:23; 1523:18; 1663:23; 1674:19; 1690:11; 1692:5; 1711:10
bring [16] - 1511:21; 1512:1; 1525:18; 1527:6, 20; 1548:5; 1575:13; 1605:6; 1608:19; 1663:25; 1677:9; 1688:12; 1702:14
brings [1] - 1504:20
brother [1] - 1558:13
brought [6] - 1505:7; 1506:15; 1507:25; 1525:7; 1526:19; 1703:8
Buchanan [8] - 1640:6, 15; 1641:19; 1642:18; 1645:3, 10; 1647:5
building [2] - 1623:21; 1707:3
bunch [2] - 1547:25; 1549:10
business [26] - 1517:17, 20; 1535:13; 1555:20, 25; 1556:9; 1640:16; 1645:14, 17; 1647:14, 16; 1650:25; 1651:22; 1652:3; 1667:5, 8, 21, 24; 1669:6; 1671:3, 19, 22; 1686:11
businesses [2] - 1651:2, 4
buy [7] - 1652:24; 1653:4; 1658:13; 1662:10; 1669:13; 1685:15

buyer [3] - 1655:3; 1656:25; 1659:7
buyer's [1] - 1659:18
buying [5] - 1514:22; 1579:9; 1652:23; 1653:3; 1654:4
BY [29] - 1501:17, 23; 1514:6; 1520:8; 1545:2; 1578:24; 1595:2; 1627:2; 1632:3, 14; 1639:22; 1648:22; 1650:15; 1677:17; 1686:4; 1688:10; 1691:2; 1692:7; 1715:6, 8, 11, 14, 16, 19, 21, 23, 25; 1716:2, 4

**C**

C-2 [1] - 1616:3
C-72 [1] - 1568:16
C-73 [2] - 1609:5; 1637:12
C-905 [1] - 1613:14
C107 [2] - 1683:3; 1717:6
C37 [1] - 1597:20
C95-A-1 [3] - 1577:4, 22; 1578:4
C95-A-2 [1] - 1577:6
CALCAGNI [1] - 1501:21
California [1] - 1650:22
candid [1] - 1673:25
cannot [1] - 1578:17
car [33] - 1607:19; 1641:8, 10; 1650:25; 1661:22, 24; 1662:10; 1664:5; 1665:17; 1667:14, 18; 1668:8, 24; 1669:11, 14; 1670:5; 1671:14; 1676:6, 9; 1677:18; 1678:17; 1679:12, 25; 1680:1, 10, 15, 17, 19-21; 1690:17
cards [2] - 1623:6, 13
care [1] - 1573:10
careful [2] - 1558:20; 1712:3
Cars [2] - 1666:22; 1668:15
cars [22] - 1661:24; 1662:3, 7, 16, 23; 1663:4; 1666:4; 1669:7; 1671:3; 1673:2, 7-10; 1676:12; 1679:3, 8; 1690:12

carts [1] - 1663:5
case [24] - 1503:2; 1506:14; 1508:15; 1510:17; 1511:18; 1559:9; 1570:2; 1578:4; 1582:7; 1600:25; 1601:8; 1603:21; 1646:21; 1676:20; 1701:13; 1702:21; 1703:8; 1704:18; 1707:19; 1709:7; 1710:20, 24; 1713:5, 23
cases [2] - 1510:16; 1644:9
cash [2] - 1653:4, 7
Cashier's [1] - 1565:20
cc [2] - 1698:22, 24
Center [2] - 1654:23
Central [3] - 1501:5, 17; 1502:9
CEO [2] - 1516:1; 1635:20
certain [9] - 1549:12; 1559:4, 6, 9; 1592:18; 1622:17; 1643:3; 1708:16
certainly [6] - 1510:25; 1608:11; 1665:8; 1704:18; 1707:1; 1710:22
certificates [1] - 1587:15
certify [1] - 1582:18
Cessna [2] - 1654:10; 1657:3
cetera [2] - 1661:25; 1669:1
Chabrow [2] - 1640:6; 1642:18
chain [4] - 1632:15; 1633:9, 23; 1635:5
chance [5] - 1605:18, 23; 1616:18; 1673:16; 1698:12
change [3] - 1564:4; 1665:19; 1710:7
changed [1] - 1620:14
changes [2] - 1609:19; 1674:6
changing [1] - 1595:6
characterize [2] - 1558:17
check [11] - 1531:5; 1549:2, 5; 1563:14, 23; 1564:12; 1565:7, 13; 1582:6; 1649:6;

checking [1] - 1503:25
checks [9] - 1564:9, 17; 1565:18, 22; 1566:1, 5; 1582:18; 1634:16
Checks [1] - 1565:20
Chicago [2] - 1661:22; 1662:19
chip [2] - 1525:4; 1530:2
choice [4] - 1566:15-17, 25
Chris [1] - 1515:22
christenings [1] - 1523:12
circumstances [3] - 1666:13; 1697:12; 1703:24
Citibank [5] - 1513:15; 1519:20; 1657:11; 1660:12; 1669:23
civil [11] - 1506:10; 1508:6, 11; 1510:16; 1620:4, 15; 1628:12; 1640:17; 1712:19; 1713:4, 23
claim [2] - 1507:6; 1626:1
claiming [1] - 1584:17
clarify [2] - 1603:5
Classic [2] - 1666:22; 1668:15
clean [1] - 1669:9
clean-up [1] - 1669:9
clear [14] - 1525:5; 1533:17; 1534:11; 1538:16; 1539:17; 1563:22; 1571:21; 1578:20; 1630:24; 1653:2; 1674:8; 1712:1, 6, 16
clearly [8] - 1568:17; 1572:1; 1606:1, 7, 12; 1608:10; 1620:9; 1692:18
CLERK [5] - 1513:19, 24; 1571:13; 1577:13; 1605:8
client [8] - 1505:17, 22; 1517:15; 1648:1; 1673:18, 21; 1677:3, 7
client's [1] - 1572:11
clip [1] - 1614:5
close [7] - 1514:3; 1538:11, 13; 1539:8; 1550:12;

1696:1
closing [1] - 1659:18
collateral [3] - 1568:3, 6; 1696:20
collecting [1] - 1710:13
collectively [1] - 1600:6
column [1] - 1597:24
COMES [1] - 1707:8
coming [27] - 1509:18; 1510:8; 1520:21; 1534:12; 1552:20; 1584:3; 1585:21; 1590:21; 1605:21; 1606:4; 1607:3, 6, 15; 1629:22; 1660:25; 1661:1, 6, 12, 14; 1664:7; 1670:22; 1690:5, 7, 10; 1700:9
comment [8] - 1547:22; 1552:4; 1560:4, 6, 14; 1586:1; 1618:24; 1704:4
commenting [1] - 1570:8
comments [5] - 1559:16; 1570:17; 1583:17; 1616:25; 1617:3
commingled [1] - 1606:12
commission [1] - 1681:15
communicate [2] - 1508:24; 1698:4
communicated [2] - 1540:19; 1710:19
communicating [1] - 1551:6
communication [8] - 1538:10, 17; 1547:17; 1548:3, 16, 23; 1549:8; 1602:8
communications [3] - 1546:25; 1588:25; 1698:15
Company [1] - 1635:10
company [25] - 1514:22; 1515:21; 1516:21; 1521:7, 10-11; 1530:24; 1535:14; 1536:6; 1621:9; 1624:15; 1641:12; 1643:15; 1649:12; 1654:15; 1656:23; 1657:1; 1658:19; 1666:23; 1667:16; 1669:2; 1670:17; 1687:23;

6

1696:12

**compare** [1] - 1692:10

**competitive** [2] - 1677:22, 25

**complaint** [3] - 1624:13, 21; 1625:11

**complete** [5] - 1504:19; 1511:9; 1609:11; 1682:5; 1697:14

**completely** [3] - 1505:9; 1510:3; 1713:6

**completes** [2] - 1505:12, 20

**completing** [1] - 1682:4

**complexities** [1] - 1705:3

**complying** [1] - 1592:16

**Con** [1] - 1551:14

**concede** [4] - 1515:9; 1651:17; 1709:7, 22

**conceded** [3] - 1515:10; 1651:18; 1697:7

**concern** [6] - 1527:16; 1665:10; 1704:12; 1709:10; 1712:10

**concerned** [5] - 1506:10; 1511:7; 1567:7; 1630:17; 1711:22

**concerns** [1] - 1711:3

**concluded** [5] - 1594:15; 1631:9; 1665:20; 1675:4; 1713:16

**conclusion** [2] - 1517:12; 1573:12

**conclusions** [1] - 1713:11

**concocted** [1] - 1510:11

**condolences** [1] - 1503:8

**conduct** [1] - 1509:11

**conducted** [2] - 1628:15; 1664:1

**conference** [10] - 1528:1; 1620:18; 1628:15; 1629:1; 1631:9; 1664:1; 1665:20; 1694:16; 1700:18

**confirmation** [2] - 1550:18; 1635:7

**conflict** [1] - 1505:11

**conflicts** [1] - 1674:6

**confused** [4] - 1525:23; 1556:22; 1614:17; 1712:10

**confuses** [1] - 1630:15

**confusing** [5] - 1526:16; 1539:16; 1550:14; 1620:7; 1629:16

**confusion** [7] - 1511:8; 1584:14; 1614:17; 1630:19; 1703:17; 1712:24; 1713:19

**conglomeration** [1] - 1629:21

**connect** [1] - 1709:2

**connection** [13] - 1518:15; 1527:22; 1607:18; 1644:5; 1646:18, 23; 1648:6; 1674:19; 1683:24; 1691:7; 1707:24; 1712:12, 18

**consent** [5] - 1598:8, 20; 1599:20; 1600:8

**Consent** [1] - 1635:9

**conservative** [1] - 1526:18

**consider** [2] - 1561:20; 1578:17

**consideration** [2] - 1518:15; 1683:11

**considerations** [1] - 1683:9

**considering** [1] - 1698:3

**consignment** [2] - 1663:6; 1666:6

**consistently** [1] - 1572:13

**CONSTANTINE** [1] - 1501:7

**Constantine** [216] - 1502:1; 1504:10; 1505:5, 8; 1506:11; 1509:7; 1511:10; 1513:12; 1514:24; 1515:6, 8, 14, 22; 1516:7, 11, 15; 1517:8; 1518:7, 20, 24; 1519:5, 13, 16; 1520:10, 13, 16; 1525:8, 14; 1526:3, 11, 15; 1527:9; 1536:5, 14, 23; 1537:5; 1538:4, 10, 17; 1539:4; 1540:4, 19; 1541:6; 1544:13;

16; 1545:4, 10, 24; 1546:6, 18; 1547:1, 13, 17; 1548:4, 17, 24; 1549:1, 9, 18, 21; 1550:9, 17; 1551:6, 15; 1552:8, 10-11, 18-19; 1553:20, 24; 1554:7, 14, 24; 1555:25; 1556:5, 8, 15, 24; 1557:1, 10; 1561:13; 1562:10; 1566:4, 14; 1567:5; 1569:1; 1572:4; 1573:5, 17; 1574:16; 1575:1, 3, 15; 1576:11; 1577:21; 1578:18; 1579:5, 22; 1580:3, 5, 10, 16, 19; 1582:12, 20; 1583:5, 9; 1584:1; 1586:2, 5, 14, 23; 1587:8; 1588:24; 1589:4, 15, 23; 1590:18; 1605:22, 25; 1606:5; 1607:20, 24; 1609:6; 1610:14; 1612:9; 1614:8; 1615:24; 1616:6, 19; 1618:16; 1619:1; 1620:5; 1623:25; 1624:13, 22-23; 1625:2, 11; 1626:1; 1633:1, 19; 1634:23; 1635:20, 24; 1637:10; 1640:19; 1641:20; 1642:6, 23; 1643:3, 7-8; 1644:12; 1646:8; 1648:11; 1649:12; 1651:9, 20, 23; 1652:3, 7, 14, 23; 1653:3, 6, 20; 1655:3; 1656:7; 1657:4, 14; 1658:12; 1661:5, 16; 1662:17; 1669:19; 1671:4; 1673:6; 1674:21; 1676:7, 10, 13; 1677:18; 1678:8; 1679:13; 1680:15; 1681:4, 9, 17; 1682:10; 1683:5, 8; 1684:7, 13, 16, 25; 1685:5; 1687:13; 1690:4, 11, 16; 1696:23; 1697:1, 8-9, 18; 1698:5, 16, 21; 1703:16

**constantine** [33] - 1560:15; 1561:7; 1562:11, 18, 20; 1563:7; 1564:1, 16, 24; 1565:14; 1566:8; 1571:20, 22; 1572:1, 10; 1573:2, 21; 1334:13, 22;

1635:6; 1636:17; 1638:11; 1640:22; 1641:5, 7; 1644:2, 16, 18; 1648:8; 1660:2, 23

**Constantine's** [14] - 1565:17, 25; 1575:17, 25; 1578:17; 1579:13; 1608:12; 1614:1, 3; 1642:4; 1656:3; 1657:1; 1673:11; 1692:18

**constantine's** [8] - 1641:12; 1642:5; 1652:8; 1658:14; 1659:3, 14, 17, 22

**construction** [1] - 1522:23

**consulting** [3] - 1696:12, 17

**Consulting** [2] - 1696:15

**cont'd** [1] - 1595:2

**contact** [2] - 1618:16; 1684:10

**contacted** [1] - 1538:4

**contacting** [1] - 1703:16

**contacts** [2] - 1554:24; 1654:1

**contain** [1] - 1694:2

**contained** [1] - 1645:4

**containing** [1] - 1645:20

**contend** [1] - 1506:23

**contents** [1] - 1598:10

**context** [8] - 1504:24; 1510:7; 1539:12; 1575:10, 22; 1576:1; 1578:19; 1614:2

**contextual** [1] - 1575:18

**contingent** [1] - 1635:25

**continue** [5] - 1512:23; 1521:21; 1604:18; 1608:23; 1703:8

**Continued** [14] - 1524:21; 1544:4; 1593:9; 1594:16; 1619:9; 1620:19; 1626:25; 1671:25; 1672:3; 1686:23; 1693:7; 1694:17; 1699:22; 1700:19

**CONTINUED** [4] - 1545:1; 1578:23; 1627:1; 1632:2

**continued** [6] -

8

1581:2; 1628:16;
1631:10; 1632:1;
1665:21; 1666:1

**contract** [2] -
1655:22, 24

**contradict** [2] -
1586:3

**contrary** [1] - 1507:18

**controlling** [1] -
1586:25

**controls** [1] - 1578:5

**controversy** [1] -
1505:10

**conversation** [30] -
1504:10; 1526:3;
1532:2, 5, 8; 1537:4,
8; 1550:23; 1554:3, 9;
1561:6, 12; 1573:20;
1575:10, 20; 1577:20;
1579:12; 1580:3;
1583:5, 9; 1584:15;
1595:7; 1612:9, 25;
1615:2; 1616:6, 19;
1617:9; 1635:7

**conversations** [5] -
1504:20; 1531:19;
1612:17; 1613:6;
1711:12

**convince** [1] - 1541:3

**convinced** [2] -
1543:9, 15

**CONWAY** [1] - 1502:1

**Conway** [1] - 1704:25

**copies** [5] - 1576:4;
1582:25; 1628:9;
1694:3; 1699:4

**copy** [19] - 1504:21;
1513:15; 1577:22;
1583:1; 1600:15, 17;
1613:17, 22; 1656:5;
1670:8; 1688:21;
1691:13, 25; 1692:2,
12; 1695:1; 1708:13

**copying** [1] - 1695:3

**corner** [1] - 1689:9

**Correct** [1] - 1580:20

**correct** [161] -
1505:24; 1518:9, 11-12;
1520:13, 24; 1522:15;
1523:10, 20-21, 23;
1529:4, 23; 1531:1;
1536:7; 1537:11, 22;
1538:14; 1539:24;
1540:5; 1543:25;
1547:14, 18; 1548:15,
24; 1549:9, 18, 24;
1550:6, 12; 1551:10,
20, 22; 1552:5, 25;

1553:7, 13, 16, 18, 21;
1554:7; 1557:4, 18;
1558:2; 1562:21;
1563:3, 5, 8, 11;
1564:2, 8, 10-11;
1565:4, 9, 15, 23;
1566:5, 17; 1567:3,
5-6; 1579:4; 1580:11,
19-20, 25; 1582:3,
13-14, 21; 1583:14;
1584:25; 1586:19;
1587:12, 17, 20;
1589:17; 1598:2;
1600:9; 1602:16;
1610:20; 1612:17, 20;
1615:3; 1621:18, 21,
25; 1623:17, 25;
1626:2, 22-23; 1627:18;
1633:2; 1634:2, 8,
11-12, 14, 18; 1635:11,
14, 18, 21; 1637:21,
25; 1638:22; 1641:13;
1642:24; 1643:5;
1644:13, 17; 1649:8;
1656:21; 1657:18, 23;
1658:4, 15, 21; 1659:3,
6, 9-10; 1660:16, 19,
24; 1661:10; 1670:12,
15, 20; 1678:9, 20, 25;
1679:13, 17, 20;
1680:13; 1682:22;
1683:19, 25; 1684:7;
1685:3, 6-7; 1687:13;
1689:18; 1691:9;
1692:19

**correctly** [4] -
1518:17; 1549:6;
1553:14; 1587:3

**correspondence** [2] -
1600:20, 24

**corroborate** [1] -
1608:17

**corroborates** [1] -
1608:2

**cost** [1] - 1646:18

**costs** [1] - 1646:20

**could..** [1] - 1584:5

**counsel** [6] - 1509:13;
1511:24; 1637:15;
1705:8, 18; 1707:19

**counterclaim** [6] -
1506:16, 19-20; 1507:4,
11, 14

**country** [1] - 1705:22

**Country** [1] - 1502:1

**County** [2] - 1644:7, 9

**couple** [7] - 1541:14;
1580:8; 1632:20;
1655:2; 1664:9;

1674:22

**course** [20] - 1517:11,
16, 19; 1527:25;
1595:23; 1596:9;
1645:13, 16; 1647:13,
16; 1652:2; 1667:4, 7,
20, 23; 1671:18, 21;
1686:14; 1696:25;
1698:3

**court** [8] - 1529:1;
1571:5; 1595:1;
1614:21; 1676:1;
1698:13; 1701:1;
1707:11

**COURT** [276] - 1501:1;
1503:4, 14, 24; 1504:3;
1505:2, 22; 1506:7;
1507:10; 1508:18;
1510:21, 24; 1511:21;
1512:1, 5, 8; 1514:2;
1515:10; 1518:1;
1520:4; 1521:1, 16, 18,
21; 1522:4; 1524:14,
20; 1525:17, 22;
1526:21; 1527:4, 13,
18, 20; 1531:14;
1534:8, 13, 16; 1535:2,
7, 24; 1537:1; 1538:7;
1539:2, 15, 23; 1541:8;
1542:14, 24; 1543:6;
1545:7; 1546:3, 9, 21;
1547:5, 22; 1548:6;
1550:14, 20; 1552:5;
1555:2, 8; 1556:12, 17;
1557:9; 1558:8, 17;
1559:3, 8; 1561:17;
1562:2, 14; 1565:1;
1566:3, 7, 11, 22;
1567:25; 1568:5;
1569:25; 1570:5, 8, 25;
1571:3, 7, 10, 14, 16;
1572:3, 14, 19, 25;
1573:23; 1574:9, 17,
22; 1575:4, 12, 19, 24;
1576:8, 15, 18, 22, 25;
1577:2, 7, 16; 1578:2,
13; 1580:7; 1582:23;
1584:10, 12, 21;
1585:7, 20; 1586:12,
17; 1588:1, 9; 1592:19,
25; 1593:6, 8; 1594:6,
10, 14; 1595:10, 22;
1596:2, 13; 1598:18;
1601:10, 19; 1602:23;
1603:19, 23; 1604:3, 5,
14, 19; 1605:3, 6, 12;
1606:15, 19; 1608:9,
23; 1609:14; 1611:24;
1613:24; 1614:1;
1618:4, 13;

1619:6; 1620:14;
1621:19; 1622:7, 12,
14; 1623:19; 1624:17;
1625:7, 14; 1626:4;
1627:7; 1628:13;
1629:10, 24; 1630:7,
16, 24; 1631:6;
1632:12, 22; 1636:15;
1637:3, 8, 14; 1638:7,
17, 19, 23; 1639:3, 14,
18; 1641:2; 1642:12;
1646:2; 1647:22;
1648:17, 20; 1649:16,
18, 20, 23; 1650:7, 11;
1651:18; 1656:13;
1658:21, 24; 1663:25;
1664:3, 15, 19, 23;
1665:2, 7, 14; 1666:2;
1668:5; 1672:2; 1673:4,
13, 19; 1674:1, 8;
1675:2; 1676:2, 19, 22;
1677:1, 5, 9, 12;
1679:23; 1681:1, 12;
1682:4, 17, 22, 24;
1683:2; 1684:20;
1690:20; 1692:25;
1694:5, 8, 14; 1695:1,
9, 12, 15, 22, 25;
1699:12, 15; 1700:11;
1701:2, 5, 18; 1702:14,
20, 23; 1703:2, 23;
1704:6, 12, 23;
1705:25; 1706:16, 20;
1707:7, 16; 1708:4, 21;
1709:14, 20; 1710:2,
25; 1711:9; 1714:3

**Court** [26] - 1502:4, 7;
1503:5, 12; 1504:17;
1507:20; 1508:21;
1509:2; 1511:17, 19,
24; 1559:17; 1603:16;
1604:13; 1607:23;
1629:3; 1632:1; 1666:1;
1673:25; 1695:10;
1703:15; 1704:7;
1706:4; 1708:14;
1710:5, 22

**Court's** [2] - 1640:25;
1694:3

**courteous** [1] -
1636:24

**Courthouse** [1] -
1501:4

**courtroom** [13] -
1512:7; 1515:5; 1570:3,
6; 1577:14; 1603:22;
1608:22; 1623:9;
1651:15; 1676:21;
1677:11; 1701:17;
1702:22

**cover** [3] - 1600:18; 1606:2, 7
**covered** [3] - 1573:23; 1618:4; 1625:8
**CR** [1] - 1609:5
**create** [1] - 1630:18
**created** [20] - 1517:10, 13; 1641:21, 24; 1645:7, 10, 13; 1647:8, 10, 13; 1666:23; 1667:1, 4, 16, 20; 1671:11, 13, 16, 18; 1711:24
**creates** [1] - 1647:7
**credibility** [1] - 1711:1
**credit** [4] - 1623:6, 13; 1659:19; 1707:5
**credited** [1] - 1670:5
**criminal** [1] - 1510:16
**critical** [1] - 1508:12
**Cromwell** [3] - 1514:10, 16; 1517:8
**Cromwell's** [2] - 1517:17, 20
**CROSS** [14] - 1520:7; 1545:1; 1578:23; 1627:1; 1632:2; 1648:21; 1677:16; 1686:3; 1691:1; 1715:7, 15, 20, 22; 1716:1
**cross** [25] - 1504:15; 1507:9; 1512:25; 1513:1; 1520:4; 1522:6; 1527:10; 1588:23; 1604:12; 1632:16; 1638:10; 1648:17; 1665:8, 12; 1673:18; 1677:13; 1690:13; 1703:18; 1707:21; 1711:2; 1712:2, 17; 1713:22
**CROSS-EXAMINATION** [6] - 1677:16; 1686:3; 1691:1; 1715:20, 22; 1716:1
**cross-examination** [13] - 1504:15; 1513:1; 1520:4; 1522:7; 1588:23; 1632:16; 1638:10; 1648:17; 1677:13; 1707:21; 1712:2, 17; 1713:22
**crossing** [1] - 1530:17
**curative** [3] - 1575:14, 18
**CURRIE** [1] - 1501:15
**cut** [10] - 1549:23;

1550:1; 1551:12; 1629:12, 22; 1688:19; 1689:5, 7; 1692:15; 1713:19
**cute** [1] - 1707:17
**cutting** [1] - 1549:25

**D**

**Dade** [1] - 1644:7
**danger** [2] - 1712:23; 1713:18
**date** [16] - 1518:14; 1519:22; 1531:25; 1532:7; 1599:16; 1609:25; 1624:1, 7; 1637:16; 1641:23; 1646:8, 10; 1648:25; 1649:1; 1659:5; 1703:15
**dated** [18] - 1518:4; 1519:23; 1547:13; 1562:18; 1563:25; 1565:2, 12; 1580:9; 1598:2, 9; 1609:5; 1632:23; 1641:24; 1647:6; 1656:17, 20; 1683:18
**dates** [2] - 1654:8; 1708:25
**Dave** [1] - 1618:18
**David** [1] - 1618:14
**days** [13] - 1512:17; 1589:9, 13; 1591:13; 1610:1; 1641:24; 1658:3; 1663:4; 1664:9; 1703:7; 1706:8; 1712:9
**dead** [1] - 1669:15
**deadline** [1] - 1564:7
**deal** [45] - 1504:11; 1506:8; 1512:12; 1557:11; 1558:4, 10; 1559:18; 1560:15, 18; 1571:18, 22, 25; 1572:3, 6, 9-10, 20, 23; 1573:3, 5-6, 8, 16-17, 25; 1574:3, 12, 15, 18; 1575:1, 3, 8; 1579:3, 5, 23; 1580:2-4; 1668:21; 1673:2; 1703:21; 1708:18
**dealing** [2] - 1533:5; 1583:8
**dealings** [1] - 1527:7
**deals** [2] - 1504:10; 1562:9
**dealt** [1] - 1537:9
**debt** [3] - 1606

**debts** [3] - 1607:25; 1673:11; 1697:22
**deceive** [1] - 1507:20
**December** [48] - 1505:9; 1507:5; 1509:20; 1518:5, 20; 1519:4; 1523:6; 1527:12; 1537:21; 1547:14; 1548:13, 24; 1553:6, 16; 1562:19; 1563:2, 25; 1565:3, 13; 1569:9; 1580:9, 23; 1588:21; 1589:3; 1590:18; 1609:5, 9-10; 1610:1, 9; 1611:9; 1621:15, 24; 1622:19; 1632:23; 1637:11, 17, 19, 23-24; 1660:15; 1670:19
**decide** [1] - 1704:8
**declaration** [1] - 1573:20
**default** [1] - 1568:2
**defend** [1] - 1510:13
**Defendant** [2] - 1501:21; 1502:1
**defendant** [2] - 1513:12; 1641:12
**Defendant's** [3] - 1577:22; 1622:15; 1716:14
**defendant's** [1] - 1510:10
**Defendants** [1] - 1501:9
**defendants'** [1] - 1608:5
**defense** [10] - 1509:13, 24; 1558:20; 1578:15; 1643:2; 1674:25; 1707:19; 1708:14; 1713:15; 1714:2
**defensive** [1] - 1534:14
**definitely** [2] - 1610:3; 1682:7
**defrauded** [2] - 1527:1; 1620:5; 1713:13
**delay** [1] - 1707:6
**delayed** [2] - 1565:20; 1567:7
**delays** [1] - 1706:21
**denies** [1] - 1504:15
**denominator** [1] - 1560:23
**denotment** [2] -

**1517:15; 1647:9
**deposited** [1] - 1681:5
**deposition** [3] - 1673:11; 1710:8, 17    **9**
**deposits** [2] - 1645:5, 8
**depth** [1] - 1524:17
**deputy** [1] - 1704:24
**describe** [7] - 1514:18; 1515:23; 1531:18; 1640:14; 1666:13; 1677:21; 1696:18
**described** [4] - 1520:12; 1549:4; 1564:10; 1646:24
**describes** [1] - 1526:2
**describing** [2] - 1517:14; 1574:3
**designation** [2] - 1518:8; 1577:9
**desk** [1] - 1647:2
**detail** [1] - 1554:16
**details** [3] - 1525:25; 1540:22; 1625:18
**determine** [2] - 1507:7; 1576:9
**development** [3] - 1516:18, 24; 1643:13
**developments** [4] - 1507:17; 1600:25; 1601:8; 1643:20
**diaper** [1] - 1595:6
**difference** [3] - 1526:1; 1679:3, 6
**differences** [1] - 1578:1
**different** [9] - 1525:6; 1540:8, 25; 1597:6; 1626:23; 1633:14; 1653:21; 1679:25; 1703:20
**differs** [1] - 1577:25
**difficult** [2] - 1706:5, 14
**DIRECT** [8] - 1514:5; 1639:21; 1650:14; 1696:2; 1715:5, 13, 18; 1716:6
**direct** [19] - 1509:18; 1510:25; 1511:1; 1521:2; 1522:6; 1532:24; 1533:9; 1536:3; 1541:18; 1578:4; 1589:2, 11; 1590:24; 1592:17; 1600:14; 1609:8;

1621:1; 1678:18; 1680:3
**directed** [1] - 1624:22
**directing** [3] - 1538:21; 1601:5; 1624:22
**direction** [1] - 1708:1
**directly** [7] - 1539:5; 1548:17; 1563:23; 1588:24; 1630:12; 1703:21
**directors** [3] - 1587:22; 1609:13
**disagree** [1] - 1702:8
**disavowed** [1] - 1712:10
**discharge** [1] - 1702:12
**discloses** [2] - 1572:22; 1573:7
**disconnected** [1] - 1527:4
**discovery** [1] - 1630:2
**discuss** [15] - 1508:7; 1524:19; 1570:2; 1598:24; 1603:21; 1625:9; 1653:6, 9, 13; 1654:4; 1661:16; 1676:20; 1685:9; 1701:13; 1707:2
**discussed** [11] - 1512:24; 1524:14; 1556:15; 1569:16; 1620:12; 1652:8, 13; 1654:2; 1689:21; 1706:6; 1710:1
**discussing** [7] - 1524:18; 1554:10; 1569:20; 1609:23; 1610:13; 1634:10; 1653:12
**discussion** [4] - 1505:12; 1590:15; 1614:7; 1652:10
**discussions** [6] - 1505:20; 1557:20; 1652:22; 1653:16; 1712:18
**displaying** [1] - 1518:4
**dispute** [3] - 1505:6, 16; 1641:7
**disregard** [2] - 1534:16; 1575:23
**distance** [2] - 1554:20; 1555:5
**DISTRICT** [2] - 1501:1
**District** [2] - 1501:12; 1590:7

**diversion** [4] - 1507:24; 1508:11; 1607:22; 1608:7
**diverted** [6] - 1507:23; 1510:9; 1607:17; 1608:11; 1624:15; 1708:17
**diverting** [2] - 1608:5; 1625:11
**dividends** [1] - 1587:15
**document** [37] - 1533:21; 1541:21; 1542:16; 1568:23; 1592:13; 1593:2; 1596:6, 15, 19; 1598:15, 22; 1599:11; 1600:15; 1604:12; 1611:3, 14-15, 24; 1612:1, 24; 1614:22; 1621:7; 1624:1; 1631:3; 1632:4; 1641:22; 1642:6; 1682:19; 1686:17-19; 1691:9, 12, 16, 20, 23; 1692:1
**documentation** [13] - 1507:3; 1526:9; 1587:11, 19; 1588:4, 6, 24; 1614:8, 18, 21; 1624:8
**documenting** [1] - 1708:22
**documents** [6] - 1555:11, 13; 1570:19, 22; 1605:23; 1667:15
**Documents** [1] - 1639:4
**dollar** [3] - 1554:11; 1579:2; 1679:2
**dollars** [2] - 1573:8; 1606:3
**done** [14] - 1509:22; 1527:15; 1561:11; 1597:1; 1638:20; 1647:11; 1665:14; 1671:1; 1673:6, 8; 1676:12; 1704:13; 1713:21
**door** [1] - 1707:25
**dots** [1] - 1709:2
**doubt** [1] - 1627:20
**down** [17] - 1521:18; 1522:24; 1532:25; 1549:17; 1553:23; 1563:1; 1565:11; 1570:19; 1597:24; 1600:16; 1603:25; 1629:10; 1649:18; 1666:15; 1673:1;

1676:24; 1704:11
**draft** [1] - 1517:14
**drafted** [1] - 1641:22
**draw** [1] - 1573:12, 14
**driver** [2] - 1641:10; 1677:19
**drivers** [1] - 1641:8
**dropped** [1] - 1663:12
**DS-911** [1] - 1663:21
**due** [1] - 1648:4
**duly** [4] - 1513:22; 1639:12; 1650:4; 1695:20
**during** [28] - 1504:14; 1510:12, 24; 1518:23; 1583:7; 1589:13; 1595:13, 15, 18, 23; 1596:8, 22; 1603:4; 1604:6; 1611:21; 1612:8; 1621:23; 1640:21; 1664:21; 1685:18; 1686:14; 1696:25; 1698:1, 3; 1704:19; 1707:20; 1709:21

**E**

**E-D-E-N-H-O-L-M** [1] - 1650:10
**e-mail** [77] - 1505:25; 1506:6; 1521:5; 1538:10, 16; 1539:6, 8; 1546:25; 1547:13, 16-17; 1548:3, 16, 23; 1549:8, 20, 22; 1550:4, 17; 1551:16; 1552:2, 9-10, 14, 18; 1553:2, 20; 1555:20, 22; 1557:1; 1562:17; 1563:1, 25; 1564:1; 1565:2, 12-13; 1566:14; 1568:17, 25; 1573:18; 1580:9, 11, 23-24; 1588:25; 1609:5, 10, 21; 1629:4, 20; 1632:15, 21; 1633:9, 11, 16, 23-24; 1634:13; 1635:5, 7; 1637:10, 16; 1638:9; 1674:7, 10; 1698:15, 18, 20, 23; 1699:1; 1700:6
**e-mailed** [4] - 1540:5; 1550:5; 1599:14, 17
**e-mails** [35] - 1546:22, 24; 1547:19; 1555:15, 25; 1556:8, 14, 19-20, 23; 1557:6; 1562:9;

1626:14, 16, 21, 24; 1627:3, 11, 15, 18, 22-23; 1628:6; 1629:15, 19; 1632:17; 1636:6; 1648:2; 1698:7; 1699:4; 1700:9
**early** [5] - 1603:20; 1604:10; 1607:13; 1610:23; 1705:10
**easier** [1] - 1706:19
**easily** [1] - 1511:6
**EASTERN** [1] - 1501:1
**Eastern** [1] - 1590:7
**easy** [1] - 1556:23
**eBay** [1] - 1669:10
**Edenhelm** [3] - 1682:22; 1686:5, 11
**Edenholm** [17] - 1649:22; 1650:9, 11, 17; 1651:7; 1657:11, 15, 18; 1659:7; 1660:13; 1670:15; 1674:5; 1676:6; 1697:11, 13; 1698:25; 1703:18
**edge** [1] - 1689:4
**edges** [1] - 1692:15
**EE** [11] - 1689:3; 1692:8, 12, 15, 19, 23; 1694:2; 1695:4; 1717:7
**effective** [1] - 1679:10
**effort** [2] - 1694:7; 1713:4
**efforts** [2] - 1710:24; 1713:22
**eight** [2] - 1655:5, 15
**either** [13] - 1504:15; 1511:11; 1526:22; 1550:21; 1551:11; 1559:7; 1565:19; 1566:16; 1570:20; 1595:24; 1629:12; 1698:22; 1703:3
**elaborate** [2] - 1536:25; 1603:14
**electrical** [2] - 1522:24; 1523:22
**elicit** [1] - 1526:25
**eliciting** [1] - 1508:1
**emergency** [4] - 1503:15; 1504:4; 1512:11
**employee** [2] - 1645:10; 1671:16
**enclosing** [1] - 1556:9, 15

**End** [4] - 1528:1; 1620:18; 1694:16; 1700:18
**end** [14] - 1512:15, 21; 1518:20; 1522:5; 1579:1; 1610:23; 1612:21; 1640:13; 1648:9; 1654:11; 1660:7; 1667:14; 1704:21; 1705:4
**ended** [1] - 1648:10
**engage** [2] - 1652:3; 1696:16
**engaged** [1] - 1643:1
**engagement** [6] - 1597:17; 1601:13; 1602:9; 1642:17; 1644:1; 1646:24
**engagements** [2] - 1702:3; 1703:4
**entailed** [1] - 1573:3
**enter** [1] - 1702:22
**entered** [2] - 1513:2; 1644:1
**Enterprises** [5] - 1515:18; 1516:11; 1518:16, 24; 1644:4
**enters** [4] - 1512:6; 1577:14; 1608:21; 1677:11
**Entertainment** [1] - 1516:2
**entire** [6] - 1527:2; 1600:13; 1644:15; 1682:20; 1686:19; 1708:10
**entirely** [1] - 1510:17
**entity** [10] - 1514:22; 1516:5, 8; 1518:8, 10; 1524:7; 1543:24; 1624:24; 1641:10; 1649:7
**entries** [2] - 1647:10, 25
**entry** [2] - 1646:7; 1649:1
**equipment** [1] - 1529:7
**Eric** [6] - 1650:9; 1659:7; 1660:13; 1697:11, 13; 1698:24
**ERIC** [1] - 1650:10
**escrow** [1] - 1535:21
**especially** [1] - 1507:1
**essentially** [1] - 1645:5
**establish** [1] - 1629:7

**estate** [12] - 1516:18, 23; 1525:5; 1526:19; 1530:8, 10; 1643:12, 19; 1696:21; 1707:24
**estimate** [3] - 1512:15, 21; 1704:14
**et** [2] - 1661:25; 1669:1
**Ethel** [7] - 1506:22; 1583:12, 22; 1584:22; 1590:9; 1600:6, 12
**Eufora** [86] - 1504:12; 1507:25; 1508:4, 24; 1516:21; 1521:3, 7, 13; 1522:15, 22; 1523:7; 1524:5; 1525:5, 13, 15; 1526:2, 10, 14; 1527:12; 1529:23; 1536:3, 5; 1537:21; 1540:9, 18; 1541:11; 1542:10, 18, 21; 1543:4, 8-9, 15, 20; 1545:5, 11, 25; 1546:7, 18; 1549:3, 13; 1553:2; 1555:17, 20; 1556:1, 10; 1558:2; 1561:4; 1563:11, 23; 1564:10, 13; 1565:7, 15, 18, 24; 1566:1, 5, 19; 1569:13; 1607:17, 23; 1615:23; 1623:5, 11, 13, 17, 21; 1624:15, 22; 1626:2; 1635:11, 21, 24; 1638:2; 1643:15, 17; 1646:22; 1687:6, 9, 12, 17, 25; 1708:17
**Eufora's** [2] - 1635:8; 1638:4
**Euphora** [9] - 1587:24; 1598:9, 21; 1602:2, 13, 21; 1674:20; 1686:15
**Evidence** [2] - 1596:15; 1620:9
**evidence** [68] - 1504:16; 1505:16, 23; 1507:1; 1513:5, 9, 17; 1517:23; 1518:3; 1519:15; 1545:8; 1547:11; 1553:3; 1555:7; 1568:12, 16, 25; 1569:3; 1573:19; 1577:3; 1597:21; 1598:8; 1609:4; 1621:13; 1622:16; 1626:15, 19; 1629:3; 1630:12, 14; 1632:23; 1642:9, 13; 1645:24; 1646:4; 1647:19, 23; 1656:10, 14-15;

1657:17; 1658:16, 18, 25; 1660:11; 1663:22; 1666:3; 1668:2, 7; 1669:22; 1670:9; 1671:25; 1676:4; 1683:3; 1692:11, 24; 1695:6; 1699:9; 1701:7; 1708:7; 1710:13; 1716:15, 19, 21; 1717:5, 8, 11
**exact** [11] - 1531:25; 1532:7; 1533:16; 1534:3, 9; 1557:16; 1598:6; 1601:11, 23; 1627:21
**exactly** [20] - 1534:2; 1541:17; 1549:23; 1551:1; 1556:2, 13; 1570:14; 1575:7; 1599:3; 1601:1; 1616:21; 1625:3; 1627:14, 19; 1629:21; 1674:5; 1685:2; 1703:5
**EXAMINATION** [28] - 1514:5; 1520:7; 1545:1; 1578:23; 1627:1; 1632:2, 13; 1639:21; 1648:21; 1650:14; 1677:16; 1686:3; 1688:9; 1691:1; 1692:6; 1696:2; 1715:5, 7, 10, 13, 15, 18, 20, 22, 24; 1716:1, 3, 6
**examination** [22] - 1504:15; 1505:19; 1509:18; 1512:25; 1513:1; 1520:4; 1521:2; 1522:6; 1588:23; 1621:1, 23; 1632:16; 1638:10; 1648:17; 1665:12; 1677:13; 1695:2; 1707:21; 1712:2, 17; 1713:22
**examine** [1] - 1665:8
**examined** [5] - 1513:22; 1522:6; 1639:12; 1650:4; 1695:20
**examining** [1] - 1606:1
**except** [1] - 1546:23
**excerpts** [1] - 1511:11
**excluding** [1] - 1602:13
**exclusive** [1] - 1651:6
**excuse** [3] - 1702:6; 1703:6; 1704:9
**excused** [3] - 1638:22; 1649:19; 1695:9

**execute** [1] - 1635:9
**executed** [3] - 1656:17; 1682:10; 1683:10
**Exhibit** [60] - 1513:4, 13-14, 16; 1517:5; 1518:2; 1577:10; 1597:20; 1621:12; 1622:15; 1632:17, 21, 23; 1633:22; 1637:11; 1638:4; 1641:16; 1642:13, 15; 1644:22, 25; 1646:2, 5; 1647:1, 22-23; 1655:19; 1656:13, 15; 1658:18, 25; 1660:12; 1663:8; 1666:2, 11, 18; 1667:10; 1668:21; 1669:13, 21; 1670:8; 1671:7; 1683:3; 1691:21; 1695:5; 1698:8; 1701:6; 1716:14, 20, 22-25; 1717:1, 6-7, 9
**exhibit** [14] - 1565:11; 1577:3; 1588:17; 1598:7; 1599:13; 1600:13; 1628:10; 1630:3, 6; 1678:11; 1679:22; 1680:1; 1682:20; 1686:19
**EXHIBITS** [1] - 1716:12
**Exhibits** [8] - 1513:8; 1629:18; 1668:6; 1676:3; 1699:8; 1716:18; 1717:3
**exhibits** [13] - 1548:7; 1583:1; 1607:13; 1609:3; 1612:23; 1628:9; 1629:16, 18; 1630:11; 1639:1; 1683:21; 1684:2; 1701:5
**exit** [1] - 1703:12
**exits** [1] - 1701:16
**expect** [3] - 1664:6; 1673:17; 1707:1
**expected** [1] - 1704:18
**expenditure** [1] - 1508:5
**expense** [1] - 1623:16
**expenses** [8] - 1606:2; 1669:1, 5-7; 1680:11
**expensive** [1] - 1680:22
**expert** [5] - 1550:24; 1629:5, 12
**explain** [11] - 1505:2;

1508:22; 1511:7;
1552:17; 1559:4;
1560:18; 1578:1;
1585:13; 1662:8;
1690:4; 1702:24
**explained** [1] - 1665:3
**explaining** [3] -
1559:19; 1583:23;
1585:1
**explanation** [5] -
1510:10; 1559:13;
1637:1, 5
**explanations** [1] -
1570:13
**explanatory** [1] -
1504:7
**express** [1] - 1706:5
**expressed** [2] -
1701:22; 1705:18
**expression** [1] -
1512:14
**extend** [1] - 1503:7
**extensive** [1] -
1665:13
**extent** [1] - 1525:18
**extenuating** [1] -
1703:23
**extra** [1] - 1674:2

**F**

**F350** [1] - 1676:11
**face** [2] - 1515:1
**face-to-face** [1] -
1515:1
**facilitate** [2] -
1653:9; 1661:23
**facilitating** [3] -
1653:10; 1655:10, 13
**facing** [1] - 1652:12
**fact** [24] - 1506:3;
1507:7, 13; 1508:10;
1536:11, 21; 1545:3,
10; 1572:8; 1573:12;
1587:18; 1592:1;
1620:13; 1636:7;
1653:12; 1657:14;
1658:3; 1681:4; 1685:9;
1711:1; 1713:3, 13
**factor** [1] - 1543:24
**factors** [1] - 1679:7
**facts** [4] - 1526:13,
17; 1527:21; 1558:18
**failure** [1] - 1506:13
**fair** [10] - 1576:7;
1590:1; 1622:5;
1633:13; 1641:6;

1645:19; 1663:18;
1681:17; 1683:14;
1689:9
**fairly** [1] - 1613:4
**Falcon** [10] - 1507:23;
1508:2, 17, 23;
1624:14, 24; 1625:5, 12
**fall** [2] - 1515:12;
1640:24
**Fall** [1] - 1662:19
**familiar** [1] - 1598:10
**family** [5] - 1503:15;
1504:3; 1512:11; 1706:6
**far** [4] - 1508:7;
1611:14; 1678:2;
1704:14
**faster** [2] - 1566:25;
1567:1
**father** [1] - 1512:19
**fault** [2] - 1665:11;
1700:5
**favor** [1] - 1710:14
**faxed** [1] - 1599:17
**FBI** [1] - 1684:9
**February** [7] -
1605:22; 1606:6, 24;
1607:4; 1654:22;
1664:17; 1669:25
**Federal** [2] - 1501:16;
1502:8
**fee** [5] - 1519:7;
1561:21; 1573:10;
1601:14; 1641:19
**fees** [4] - 1607:18;
1646:17, 20; 1648:12
**felt** [1] - 1637:2
**fenders** [2] - 1679:7, 9
**few** [12] - 1520:6;
1526:12; 1541:10;
1562:8; 1626:8, 12;
1628:5; 1652:6; 1658:3;
1666:6; 1681:22; 1701:8
**figure** [1] - 1704:25
**figuring** [2] -
1589:25; 1597:5
**file** [1] - 1699:5
**filed** [18] - 1506:17;
1507:21; 1509:13;
1510:1, 3, 6; 1588:21;
1590:1, 7; 1602:2, 12;
1603:8; 1610:7;
1623:24; 1624:11;
1644:7; 1707:14
**files** [1] - 1700:9
**filing** [1] - 1628:11
**final** [5] - 1505:19;
1569:9; 1635:8;

1674:17; 1682:8
**finalizing** [1] -
1648:1
**finally** [3] - 1608:4;
1646:25; 1670:7
**finance** [1] - 1696:19
**financial** [1] -
1681:14
**financing** [3] -
1696:17; 1697:15, 17
**finder's** [2] -
1561:21; 1573:10
**fine** [9] - 1562:7;
1582:12; 1631:5;
1633:3, 20; 1634:14;
1673:19, 22; 1703:25
**finish** [3] - 1542:8;
1604:12; 1705:22
**firm** [14] - 1606:11;
1640:2, 5, 8-9, 23;
1641:19; 1644:20;
1645:2, 11; 1646:18;
1647:6; 1648:13; 1649:4
**firm's** [7] - 1640:10;
1645:6, 13, 16; 1647:8,
14, 16
**first** [83] - 1503:6;
1504:22; 1506:17;
1508:16, 20; 1511:12;
1513:21; 1519:16;
1532:24; 1533:3;
1538:4, 9, 14, 16;
1539:4, 8-9; 1541:20,
23; 1546:13; 1547:6,
16, 19, 25; 1548:3, 9,
16, 18, 23; 1549:8;
1552:2, 17; 1553:2;
1562:8, 18; 1563:2;
1565:17, 25; 1573:1,
18; 1576:23; 1592:20;
1603:8; 1606:24;
1607:1; 1623:7-9;
1626:18; 1627:9;
1628:8; 1631:1;
1632:15; 1635:5;
1639:11; 1642:15;
1650:3; 1653:3; 1654:7;
1665:12, 15; 1674:7;
1676:6; 1677:13;
1680:3; 1681:22, 25;
1682:3, 11; 1685:21;
1687:14; 1688:16;
1689:24; 1695:19;
1697:8; 1698:17;
1701:11; 1706:23;
1713:7
**five** [5] - 1523:8;
1600:16, 19; 1601:11;

**flag** [1] - 1679:7
**flight** [1] - 1705:2
**flip** [1] - 1692:11
**floor** [5] - 1662:1-3, **12**
8, 10
**Florida** [6] - 1639:25;
1640:11; 1644:8;
1666:15; 1668:14, 17
**flying** [1] - 1705:21
**focus** [1] - 1652:6
**focused** [1] - 1509:19
**focusing** [2] - 1641:5;
1644:25
**follow** [2] - 1527:24;
1634:16
**follow-up** [1] -
1634:16
**following** [7] -
1525:1; 1586:21;
1619:7; 1620:1;
1622:24; 1693:5;
1699:20
**follows** [5] - 1513:23;
1522:3; 1639:13;
1650:5; 1695:21
**Ford** [1] - 1676:11
**foreclosed** [1] -
1697:23
**foreclosure** [4] -
1652:12, 19; 1653:13;
1659:11
**foregoing** [1] -
1707:23
**forget** [1] - 1580:17
**forgive** [1] - 1553:14
**form** [8] - 1519:20;
1538:7; 1542:22;
1546:4; 1555:2;
1617:16; 1701:14
**Form** [1] - 1635:9
**format** [3] - 1539:6;
1626:23; 1628:3
**formatting** [1] -
1629:15
**formed** [3] - 1515:21;
1516:4; 1518:8
**former** [1] - 1615:21
**formerly** [1] - 1516:2
**forth** [3] - 1511:9, 13,
15
**forum** [1] - 1509:25
**forward** [4] - 1550:1,
22; 1551:11; 1630:1
**forwarded** [6] -
1569:12; 1627:11;
1630:7, 9-10; 1649:7

forwarding [2] -
1553:25; 1629:12
foundation [4] -
1509:3; 1585:19;
1611:23; 1680:25
four [2] - 1600:5;
1704:15
fourth [1] - 1635:18
Fox [1] - 1695:24
Frailes [17] - 1524:18;
1525:4, 12-13, 19;
1526:12, 20; 1527:1,
21; 1530:11; 1531:16;
1532:14; 1533:15;
1534:21; 1535:5, 17, 22
frame [15] - 1518:19,
23; 1523:4; 1524:3;
1532:11; 1557:16;
1595:21; 1597:16;
1603:6; 1610:9;
1640:21; 1685:18
fraud [12] - 1510:12;
1511:5; 1527:2, 6, 15,
22; 1709:20, 25;
1710:21; 1713:7, 9, 15
frauds [1] - 1708:18
fraudulent [6] -
1708:25; 1709:5, 13;
1713:1, 3
Friday [2] - 1609:20;
1706:9
friendly [2] - 1523:9,
15
friends [4] - 1540:11,
14; 1651:21, 23
friendship [1] -
1683:12
front [11] - 1519:6;
1547:8; 1577:24;
1626:10; 1637:12;
1647:1; 1667:14;
1669:8; 1694:6;
1698:19; 1711:3
full [6] - 1516:12;
1596:12; 1632:5;
1695:22, 24; 1706:8
Fund [7] - 1607:25;
1689:18, 23, 25;
1708:17; 1710:10, 18
fund [5] - 1624:22;
1685:12-14, 24
funds [4] - 1530:2;
1607:10; 1659:18
funeral [2] - 1503:9;
1706:7

G

G-mail [1] - 1550:22
Galioto [27] - 1508:14;
1525:14; 1531:24;
1532:5, 9, 12; 1541:9,
11, 25; 1542:11, 17;
1543:18; 1545:4, 24;
1546:6, 13, 17; 1625:9,
19; 1684:10, 23;
1685:8; 1686:10;
1687:5; 1710:7, 13, 24
Galioto's [2] -
1545:15
Garn [4] - 1705:11, 16,
23
Gary [1] - 1649:21
general [7] - 1514:18;
1517:16; 1557:23;
1640:14; 1645:2;
1696:18
generally [1] -
1526:19
generates [1] -
1517:15
gentleman [2] -
1525:10; 1655:16
gentlemen [1] - 1503:4
Gentry [1] - 1609:5
girlfriend [1] -
1660:1
given [7] - 1506:4;
1576:4; 1577:25;
1587:23; 1614:1;
1629:2; 1664:9
glad [1] - 1547:20
global [4] -
1685:12-14, 23
Global [7] - 1607:25;
1689:18, 22, 25;
1708:17; 1710:10, 18
Gmail [3] - 1628:3;
1630:13
golf [1] - 1663:5
government [30] -
1506:12; 1554:23;
1576:4, 6; 1578:3;
1583:2; 1604:14;
1625:10; 1627:5, 23;
1629:24; 1630:8;
1638:24; 1642:8;
1645:23; 1647:18;
1649:16, 21; 1656:9;
1658:17; 1663:21;
1665:14; 1666:2;
1668:1; 1671:24;
1678:11, 19; 1680:1, 4;
1683:16

Government [90] -
1501:15; 1505:7;
1506:1; 1507:25;
1508:14, 25; 1511:3, 6,
8; 1513:2, 18; 1517:22;
1518:2; 1525:3;
1526:22; 1530:7;
1577:9; 1605:15;
1606:10; 1608:17;
1621:12, 23; 1622:4, 8;
1625:21; 1629:17;
1632:20, 23; 1633:22;
1638:4; 1641:15;
1642:13, 15; 1644:11,
21-22, 25; 1646:2, 5;
1647:1, 22-23; 1655:18;
1656:13, 15; 1658:25;
1660:12; 1663:7;
1666:3, 11, 17;
1667:10; 1668:6, 21;
1669:12, 21; 1670:7;
1671:6; 1676:3; 1683:3;
1692:8, 12, 23; 1694:1;
1695:5; 1699:7; 1701:6;
1707:18; 1708:7;
1709:4, 14; 1710:11,
15; 1713:10, 25;
1714:1; 1716:20, 22-25;
1717:1-4, 6-7, 9
government's [3] -
1546:3; 1574:23;
1632:17
Government's [18] -
1503:5; 1504:19;
1506:7; 1509:18;
1512:3; 1513:4, 8,
13-14, 16; 1517:4;
1607:16; 1608:9;
1658:18; 1698:8;
1699:8; 1709:7; 1716:18
greater [2] - 1684:13,
16
Group [5] - 1535:15;
1605:22, 25; 1606:5;
1649:13
group [1] - 1686:11
groups [1] - 1711:11
GS [1] - 1678:25
GSF [3] - 1608:3;
1673:7, 12
GT [1] - 1678:25
guess [16] - 1551:5;
1554:6; 1558:20;
1566:24; 1571:17;
1574:11; 1575:21;
1599:25; 1615:16;
1616:24; 1623:4;
1626:7; 1627:13;
1708:5;

1709:10
guy [2] - 1615:25;
1636:4
guys [2] - 1540:1, 7

H

HALEY [50] - 1501:21,
23; 1512:2; 1513:6;
1517:25; 1520:5;
1525:2; 1527:16;
1535:1, 6; 1542:22;
1558:15, 25; 1622:10;
1638:18; 1641:4;
1642:11; 1646:1;
1647:21; 1648:19;
1656:12; 1658:22;
1663:24; 1665:6, 8;
1668:4; 1674:17;
1682:25; 1683:4;
1686:4; 1688:7;
1690:22; 1691:2, 15,
19; 1692:3; 1699:13,
16; 1701:4; 1702:11,
16; 1705:15; 1707:5,
17; 1708:6; 1709:4, 22;
1711:4; 1715:23; 1716:2
Haley [9] - 1522:6;
1607:13; 1622:7;
1638:17; 1674:13;
1686:5; 1701:2;
1707:16; 1711:2
Haley's [1] - 1527:10
half [7] - 1509:9;
1519:12; 1571:1;
1579:10; 1636:19;
1706:25
half-hour [1] - 1571:1
hand [14] - 1513:19;
1613:22; 1639:7;
1641:15; 1644:21;
1646:25; 1650:1;
1655:18; 1663:7;
1666:17; 1670:8;
1671:6; 1695:17; 1698:7
handing [1] - 1698:11
Handing [1] - 1548:22
handle [3] - 1662:24;
1702:4
handled [2] - 1640:16;
1662:5
handling [1] - 1662:23
hands [2] - 1618:23;
1704:16
handwriting [2] -
1533:23; 1542:2
hangar [2] - 1654:25;
1655:1

13

**hanger** [1] - 1697:14
**hangers** [4] - 1697:18, 20-21, 24
**Harvest** [1] - 1535:14
**Hawaii** [2] - 1516:18; 1643:13
**HBO** [1] - 1516:2
**header** [3] - 1553:25; 1626:18; 1627:9
**headers** [2] - 1629:4, 8
**hear** [11] - 1527:9; 1536:9; 1568:9; 1572:3; 1578:5; 1579:24; 1617:11; 1649:12; 1684:22; 1685:12, 16
**heard** [17] - 1521:3; 1531:4; 1539:25; 1540:9; 1568:8, 10; 1595:8; 1607:20; 1615:12; 1617:8; 1623:10; 1636:16; 1685:13, 21; 1689:17, 24; 1707:16
**hearing** [2] - 1615:10; 1711:13
**hearsay** [8] - 1509:5, 12, 15, 23; 1510:17; 1595:20; 1601:9
**hectic** [1] - 1597:7
**Hefner** [1] - 1519:2
**held** [5] - 1635:13, 16; 1663:11; 1674:21; 1687:22
**help** [9] - 1542:8, 16; 1616:13; 1637:14; 1643:22; 1661:23; 1662:1, 4; 1706:15
**helpful** [1] - 1613:16
**helping** [2] - 1653:23; 1680:17
**helps** [5] - 1523:7; 1568:15; 1612:2; 1662:10
**here..** [1] - 1675:1
**hereby** [1] - 1513:10
**herein** [1] - 1622:6
**hereof** [1] - 1518:14
**hide** [1] - 1694:7
**highlight** [1] - 1504:17
**highlighted** [10] - 1504:21; 1551:9, 19; 1552:20; 1569:5, 8; 1595:3; 1596:8
**highlights** [1] - 1709:13
**highly** [1] - 1570:10

**Highway** [1] - 1501:22
**himself** [6] - 1510:14; 1554:6; 1594:4, 13; 1595:17; 1641:13
**hired** [1] - 1600:3
**history** [3] - 1708:8, 10
**hmm** [5] - 1552:1; 1554:22; 1555:6; 1565:8; 1567:4
**hockey** [11] - 1506:18; 1516:3, 7; 1606:5, 8, 11, 14, 25; 1607:21; 1643:10; 1655:8
**hold** [9] - 1520:24; 1574:22; 1598:3; 1606:19; 1616:7, 9; 1618:11; 1632:22
**holder** [1] - 1660:13
**holding** [1] - 1530:24
**home** [17] - 1524:10; 1652:8, 13-15, 23; 1653:4, 9, 11; 1654:4; 1658:14; 1659:3, 11, 17, 22; 1669:19; 1682:10
**home's** [1] - 1653:12
**honestly** [1] - 1690:6
**Honor** [66] - 1513:7; 1517:24; 1520:5; 1521:17; 1531:13; 1535:6; 1539:11; 1542:23; 1558:25; 1566:20; 1571:4; 1574:20; 1575:2, 5, 14; 1577:21; 1582:25; 1587:5; 1593:7; 1596:1; 1598:17; 1603:15; 1604:2; 1605:5; 1607:12; 1608:20, 25; 1613:10; 1618:2, 12; 1620:17; 1622:9, 11, 13; 1628:4, 8; 1629:14; 1632:11; 1636:14; 1637:7; 1638:6, 16; 1641:3; 1642:10; 1645:25; 1647:20; 1649:10, 17; 1656:11; 1677:15; 1682:13, 15, 20, 25; 1685:17; 1690:21; 1692:5; 1693:3; 1699:11; 1702:10; 1703:11; 1709:22; 1711:4
**HONORABLE** [1] - 1501:12
**hope** [5] - 1503:22; 1508:3; 1547:7; 1578:20; 1572:21; 1579:11

**hopefully** [3] - 1505:16; 1507:8; 1706:9
**hoping** [2] - 1512:17; 1609:19
**Hormovitis** [1] - 1501:8
**hour** [2] - 1571:1; 1706:25
**house** [4] - 1523:20; 1681:18; 1683:10
**housed** [1] - 1654:23
**Hughes** [6] - 1506:18, 22; 1583:11; 1590:9; 1595:24; 1600:6
**hundred** [1] - 1596:10
**hundreds** [1] - 1606:3

**I**

**idea** [7] - 1585:11; 1586:19, 22; 1664:7; 1702:12; 1708:23; 1713:9
**identification** [13] - 1515:9; 1531:22; 1596:7; 1597:20; 1600:14; 1611:2; 1616:3; 1624:4; 1651:17; 1678:13; 1681:21; 1697:7
**Identification** [1] - 1515:10
**identified** [14] - 1513:3; 1516:4, 7; 1547:16; 1552:18; 1563:2; 1565:12; 1583:13; 1594:4; 1643:3; 1648:24; 1678:18; 1679:9; 1680:1
**identifies** [2] - 1594:4, 13
**identify** [4] - 1557:1; 1681:21; 1682:17; 1697:6
**illegal** [3] - 1561:24; 1562:5
**immediately** [1] - 1586:22
**imparted** [1] - 1506:24
**impeach** [1] - 1511:16
**impeachment** [1] - 1711:19
**importance** [1] - 1678:5
**importantly** [1] - 1664:6
**Imports** [2] - 1651:6

**1511:1; 1711:22, 24; 1713:8
**improper** [1] - 1573:14
**inaccurate** [2] - 1576:19; 1578:9
**inappropriate** [2] - 1510:17; 1592:22
**Inc** [1] - 1518:16
**inclination** [1] - 1702:2
**include** [1] - 1674:11
**included** [3] - 1506:5, 13; 1551:16
**includes** [1] - 1551:9
**including** [3] - 1610:9, 24; 1679:7
**incoming** [4] - 1622:20; 1660:18; 1670:2
**inconsistencies** [1] - 1572:14
**inconsistent** [1] - 1572:21
**inconvenience** [2] - 1503:12; 1633:17
**incorrect** [1] - 1527:13
**incurred** [1] - 1646:18
**incurring** [1] - 1669:7
**INDEX** [1] - 1715:1
**indicate** [4] - 1629:12; 1635:24; 1636:2, 4
**indicated** [5] - 1511:17; 1607:14; 1691:8; 1701:23; 1705:25
**indicates** [2] - 1599:19; 1633:9
**indicating** [2] - 1575:7; 1601:7
**indicating)** [1] - 1533:10
**indication** [1] - 1689:10
**indicative** [1] - 1510:12
**indicted** [2] - 1684:7, 9
**indictment** [4] - 1508:16, 19-20; 1509:1
**individual** [7] - 1514:23; 1517:1; 1640:18; 1643:23; 1649:7; 1651:8, 16
**individuals** [3] - 1520:12; 1592:1; 1600:8

**inference** [2] - 1573:15

**information** [31] - 1503:17, 21; 1504:25; 1506:23; 1507:8; 1508:1, 16, 25; 1549:15; 1550:3, 8; 1551:2, 5, 13, 16, 24; 1552:11, 13, 24; 1555:19; 1569:16; 1591:19; 1598:14; 1645:4, 7; 1664:5; 1685:20; 1697:17; 1710:19

**initial** [3] - 1639:16; 1689:3; 1711:20

**initials** [3] - 1689:4, 8; 1692:18

**initiated** [1] - 1644:12

**inquire** [1] - 1684:12

**inquiry** [1] - 1711:6

**insert** [5] - 1549:20; 1551:3; 1564:13; 1586:4, 14

**Inserted** [1] - 1565:13

**inserted** [4] - 1550:16, 21; 1551:3; 1629:5

**inserting** [1] - 1550:11

**insist** [1] - 1566:8

**insisting** [2] - 1563:17; 1571:19

**installing** [1] - 1529:6

**instance** [2] - 1662:14; 1707:25

**instead** [3] - 1510:15; 1564:16; 1624:21

**instruct** [2] - 1559:15; 1570:15

**instructed** [2] - 1559:1; 1586:8

**instruction** [8] - 1534:17-19; 1575:15, 18-19; 1578:13; 1613:15

**instructions** [3] - 1527:24; 1613:25; 1662:25

**intend** [4] - 1508:20, 25; 1674:18; 1710:21

**intending** [1] - 1506:11

**intends** [1] - 1708:7

**intent** [1] - 1510:13

**intention** [4] -

**interest** [13] - 1536:6, 23; 1549:3; 1564:10; 1587:23; 1635:10, 16, 24; 1653:23; 1674:21; 1687:12; 1688:4

**interrupt** [1] - 1512:25

**interview** [1] - 1686:14

**interviewed** [2] - 1531:23; 1686:10

**intriguing** [1] - 1707:18

**introduce** [6] - 1507:10; 1509:25; 1709:17, 19; 1711:12

**introduced** [4] - 1504:16; 1630:12; 1651:21; 1678:19

**introduces** [1] - 1709:15

**invest** [8] - 1540:23, 25; 1543:9, 15; 1560:22; 1687:20; 1697:24

**invested** [7] - 1525:11; 1526:8; 1535:20; 1543:19, 23; 1687:9; 1697:13

**investigate** [2] - 1506:14; 1508:15

**investing** [4] - 1537:9; 1543:24; 1567:15; 1573:4

**investment** [105] - 1508:10; 1522:15; 1523:7; 1524:5; 1525:6, 13; 1526:13, 19, 23; 1529:23; 1530:8, 10, 13, 20, 24; 1531:7, 16, 20; 1534:1, 21; 1535:4, 17; 1536:5, 12, 22; 1537:6, 21; 1538:4; 1540:16; 1541:6, 11, 13; 1542:1, 10, 18, 21; 1543:4, 9; 1545:5, 11, 25; 1546:7, 11; 1550:12, 18; 1551:23; 1553:3; 1555:17, 24; 1557:18, 21; 1558:2; 1561:8, 14; 1562:12; 1568:11, 16; 1569:20; 1572:7, 24; 1573:2; 1574:18; 1583:12; 1585:3; 1587:1, 11, 22; 1588:20; 1589:.

**investments** [10] - 1504:12; 1525:4; 1526:2, 18, 20; 1530:2; 1532:15; 1533:15; 1561:24

**investors** [5] - 1516:8; 1584:7; 1586:25; 1602:3, 13

**invoice** [14] - 1517:8, 10, 15; 1518:4; 1519:6, 9; 1520:11; 1647:5, 7-8, 10, 13, 25; 1648:4

**invoices** [3] - 1673:2; 1683:17

**involved** [8] - 1522:22; 1530:2; 1617:17; 1690:15; 1696:22; 1713:1

**involving** [2] - 1516:14; 1518:16

**irrelevant** [7] - 1509:11, 16, 23; 1510:4, 18; 1625:23; 1713:6

**Islandia** [1] - 1501:23

**Islip** [3] - 1501:5, 17; 1502:9

**issue** [10] - 1511:22; 1571:15; 1608:10; 1648:7; 1702:23; 1706:1; 1707:9, 15; 1709:24; 1710:25

**issues** [4] - 1701:10, 19; 1702:7; 1707:13

**item** [1] - 1708:7

**items** [2] - 1646:13; 1696:21

**itself** [5] - 1505:2; 1574:18; 1577:4, 7; 1580:7

**J**

**jacket** [3] - 1667:14; 1668:22, 25

**jackson** [1] - 1705:10

**JAMES** [1] - 1501:17

**January** [7] - 1530:22; 1531:24; 1532:3, 6; 1669:25; 1670:2

**Jay** [1] - 1705:9

**JBAZ** [2] - 1696:15

**Jeffrey** [1] - 1695:24

**JFB** [1] - 1501:3

**John** [44] - 1539:25; 1542:1, 19; 1549:16; 1550:5, 8; 1551:14-16, 25; 1552:7, 19; 1553:17, 24; 1554:4, 6, 10; 1558:12; 1559:21, 23; 1560:11, 13, 16, 21; 1573:8, 22; 1574:14-16; 1579:1, 3, 5, 7, 14; 1585:23; 1590:12; 1599:8; 1626:21; 1627:15; 1705:7

**John's** [1] - 1560:24

**Johnny** [1] - 1586:25

**join** [2] - 1525:2; 1711:5

**Jonathan** [2] - 1535:10, 12

**JOSEPH** [1] - 1501:12

**josephbailey@cox.net** [1] - 1698:24

**Joshua** [2] - 1686:10; 1687:5

**Jowdy** [2] - 1517:2; 1643:23

**judge** [6] - 1572:22; 1574:8; 1575:9; 1576:3; 1679:24; 1690:22

**Judge** [55] - 1501:12; 1503:20; 1505:1, 7; 1506:3, 17; 1507:5, 12; 1508:21; 1510:19; 1513:17; 1526:1; 1533:8; 1534:5; 1535:1; 1559:17; 1567:21; 1571:1; 1572:5; 1573:7, 11, 14, 17; 1575:21; 1576:21, 24; 1588:16; 1606:18; 1609:15; 1626:13; 1629:9; 1630:23; 1631:5; 1638:18; 1664:4, 6, 21; 1665:1, 18-19; 1673:1; 1688:7; 1694:7, 13, 15; 1695:14; 1699:13, 17-18; 1700:3; 1703:20; 1707:17; 1709:23; 1711:7

**juggling** [2] - 1705:2,

15

24

**July** [5] - 1598:2, 10; 1599:16; 1640:24; 1641:24

**jumped** [1] - 1525:4

**June** [17] - 1506:6, 16; 1507:21; 1508:11; 1588:22; 1590:1; 1605:23; 1606:6; 1607:2; 1623:24; 1656:17, 20; 1657:18, 20; 1659:5; 1661:9

**Juror** [8] - 1701:10, 19-20, 23; 1702:18, 23

**juror** [2] - 1605:8

**JUROR** [2] - 1703:1, 11

**jurors** [11] - 1503:14; 1571:24; 1694:10; 1701:10; 1702:7, 12, 22; 1704:5, 14-15, 17

**Jurors** [1] - 1703:12

**jury** [61] - 1501:13; 1507:7; 1511:7, 21; 1512:1, 6, 9; 1518:4; 1522:4; 1523:19; 1525:6, 16; 1534:16; 1548:19; 1560:18; 1570:3, 7; 1571:15; 1572:16; 1573:12, 15; 1574:1, 5; 1575:13, 15; 1576:9; 1577:14, 23; 1578:2, 11, 14; 1583:4; 1603:22; 1605:6; 1608:4, 14, 19, 21; 1612:6; 1613:18, 24; 1642:14; 1647:24; 1656:16; 1659:1; 1668:9; 1676:5, 21; 1677:10; 1694:7; 1700:1; 1701:11, 16; 1711:21; 1712:10, 16, 24; 1713:8, 12, 19

**JURY** [1] - 1701:23

**jury's** [1] - 1576:15

---

**K**

**K1s** [1] - 1587:16

**Kaiser** [105] - 1504:11; 1522:14, 19, 21; 1523:10; 1524:6, 12; 1525:11; 1526:7, 12, 15; 1529:10; 1531:8, 19; 1533:15, 25; 1534:21; 1536:12, 21; 1537:4, 8, 15; 1539:25; 1540:11, 16, 18; 1541:5, 12; 1542:1, 10, 19; 1543:3, 8, 14, 19;

1550:6, 8; 1551:17, 25; 1552:7, 20, 25; 1553:6, 15, 19; 1554:7; 1555:16, 19; 1556:4; 1557:11, 17, 20; 1558:11; 1559:19; 1560:16, 25; 1561:3, 7, 14; 1562:10; 1567:8; 1568:1, 9-10; 1569:1, 11, 16; 1571:19, 21, 25; 1572:2, 7, 23; 1573:3, 22; 1574:13; 1575:1; 1579:23; 1580:4; 1583:13, 16, 19, 24; 1584:6; 1585:15; 1586:25; 1588:3, 12; 1590:10, 12, 15; 1595:24; 1599:8; 1609:6; 1627:11, 15, 17; 1630:10; 1635:6; 1707:23; 1710:7, 16

**Kaiser's** [3] - 1583:13, 22; 1584:23

**Kayser** [1] - 1506:22

**keep** [10] - 1507:16; 1514:3; 1600:24; 1601:7; 1629:10; 1639:19; 1650:12; 1699:5; 1702:12; 1704:10

**keeping** [1] - 1703:15

**keeps** [1] - 1534:12

**kELLY** [1] - 1501:15

**Ken** [2] - 1517:2; 1643:23

**KENNER** [1] - 1501:6

**Kenner** [44] - 1501:6, 21; 1513:12; 1522:14; 1523:18; 1524:6, 12; 1525:11, 19; 1526:7, 12, 15, 22, 25; 1529:10, 12; 1531:8, 19; 1533:14, 25; 1534:20; 1540:12, 16-17; 1541:5, 12, 25; 1542:9, 19; 1543:3, 8, 14, 19; 1606:4, 17-18; 1607:4; 1686:6; 1691:21; 1707:3; 1708:18, 24; 1710:8

**Kenner's** [1] - 1527:8

**kept** [10] - 1512:19; 1517:19; 1647:16; 1654:21; 1667:23; 1669:1, 5; 1671:21; 1680:10

**kind** [11] - 1504:20; 1505:12; 1524:18;

1645:4; 1648:2; 1654:9; 1663:13; 1696:16, 18; 1704:21; 1705:24

**kindly** [4] - 1686:17; 1691:16, 20

**knowing** [1] - 1521:9

**knowledge** [9] - 1516:3, 6, 9; 1579:13; 1618:3; 1631:2; 1678:10; 1686:15; 1699:6

**known** [7] - 1524:7; 1530:11; 1543:22; 1652:2, 11, 18; 1686:11

**knows** [2] - 1529:12; 1629:3

**KOMATIREDDY** [151] - 1501:18; 1509:4; 1511:22; 1513:2, 10; 1514:6; 1517:22; 1520:2, 25; 1521:17; 1524:13; 1526:16, 24; 1527:10; 1535:23; 1538:6; 1539:11; 1541:4, 7; 1542:12; 1543:5; 1545:6; 1546:8, 20; 1547:3; 1550:13, 19; 1554:25; 1555:7; 1556:11, 16; 1557:7; 1558:7, 24; 1561:16, 25; 1562:13; 1564:25; 1566:2, 6, 10, 20; 1567:20, 24; 1568:4; 1571:4, 8; 1572:5; 1574:20; 1575:5, 14; 1580:6; 1582:22; 1584:9, 20; 1585:6, 19; 1586:11, 16; 1587:5, 25; 1588:8; 1592:22; 1595:20; 1596:1, 11; 1598:17; 1601:9, 18; 1602:22; 1604:1, 4, 17; 1605:17; 1606:21; 1607:12; 1611:20, 22; 1614:24; 1617:15; 1618:2, 12; 1619:5; 1622:9; 1623:18; 1624:16; 1625:6, 13; 1626:3; 1627:6; 1628:8, 11; 1629:14; 1630:1, 6, 9; 1632:14; 1638:15, 24; 1639:22; 1640:25; 1642:8, 14; 1645:23; 1647:18, 24; 1648:16; 1649:17, 21; 1650:15; 1656:9, 16; 1658:17; 1659:1; 1663:21; 1664:16; 1668:1; 1671:24; 1673:5; 1693:25;

1681:11; 1682:2, 15; 1684:19; 1685:17; 1688:8, 10, 20; 1690:19; 1691:18; 1692:5, 7, 23; 1694:12; 1695:10, 14; 1696:3; 1699:7; 1700:15; 1707:12; 1708:13, 23; 1709:17; 1715:6, 11, 14, 19, 25; 1716:4, 7

---

**L**

**lack** [1] - 1618:2

**large** [1] - 1655:17

**laRUSSO** [1] - 1502:1

**LaRusso** [127] - 1502:3; 1503:6; 1520:9; 1526:16, 24; 1527:20; 1534:17; 1535:24; 1545:2; 1548:7; 1550:15; 1559:15, 17; 1567:21; 1570:8, 24; 1571:1, 15, 17; 1572:8, 11, 18, 22; 1573:1; 1574:8, 11, 19; 1575:2, 6, 9, 21; 1576:3, 13, 17, 21, 23-24; 1577:1, 4, 8, 17, 19; 1578:8, 21-22, 24; 1582:25; 1588:15; 1592:17; 1593:1, 7; 1594:2, 8, 12; 1595:2; 1603:15; 1604:5, 11; 1607:13; 1608:11, 24; 1613:16; 1627:2; 1628:4, 10; 1629:2, 11; 1630:5, 21, 24; 1631:5, 8; 1632:3, 10, 16; 1636:14; 1637:7; 1638:6, 16; 1639:1; 1641:3; 1642:10; 1645:25; 1647:20; 1648:18, 22; 1649:10, 15; 1651:17; 1656:11; 1658:23; 1663:23; 1664:4, 21, 25; 1665:4, 15, 17; 1668:3; 1672:1; 1673:1, 15, 24; 1674:10, 15; 1677:2, 4, 7, 14-15, 17; 1679:24; 1682:13, 19; 1686:2; 1688:12; 1695:1; 1704:25; 1705:1, 25; 1711:5, 12; 1712:4, 15; 1713:21; 1715:16, 21

**LARUSSO** [69] - 1503:10, 20; 1504:2, 6; 1505:4, 24; 1506:12; 1507:12; 1508:21; 1510:19, 23;

16

1511:17; 1513:7; 1515:9; 1517:24; 1520:6, 8; 1521:15; 1524:16; 1525:3, 20; 1526:1; 1529:2; 1531:13; 1533:7; 1534:5, 14; 1539:3, 22; 1605:5, 13, 18; 1606:17, 22; 1608:20, 25; 1609:15; 1613:10, 19, 22; 1620:12, 17; 1621:17; 1622:3, 13; 1626:12; 1688:21; 1690:21; 1693:1; 1694:1, 6, 10, 15; 1695:7; 1697:7; 1699:10, 18; 1700:2, 13, 16; 1702:10; 1703:13; 1706:4, 18; 1709:25; 1710:4; 1711:7; 1714:2; 1715:8

**LaRusso's** [3] - 1522:7; 1665:10; 1674:4

**last** [29] - 1512:10; 1522:5; 1524:14; 1538:22; 1546:23; 1574:24; 1576:4; 1587:6; 1594:2, 5; 1605:19; 1607:13; 1642:1; 1651:4; 1681:22; 1682:8, 15, 19-20; 1688:23; 1689:15; 1692:13; 1694:9; 1701:22; 1704:24; 1705:19; 1708:4; 1711:22

**lastly** [1] - 1690:11

**law** [19] - 1519:21; 1520:17; 1580:18; 1582:7; 1599:9; 1606:10; 1622:21; 1640:5, 10, 23; 1643:3; 1645:2, 6; 1647:5; 1661:2, 7, 15; 1670:23

**lawfully** [1] - 1635:8

**lawsuit** [32] - 1506:11; 1510:1-4, 6; 1589:24; 1590:1, 6; 1602:12; 1603:7; 1607:19; 1610:6; 1611:21; 1615:16; 1620:4, 15; 1628:12; 1630:3; 1641:6; 1644:4-6, 8, 11-12; 1707:22; 1710:7; 1712:19; 1713:4

**lawsuits** [3] - 1509:13, 25; 1603:4

**lawyer** [6] - 1504:1; 1506:24; 1507:14;

1508:9; 1512:24; 1570:4

**lawyer's** [1] - 1535:21

**lawyers** [7] - 1503:16; 1512:10, 17-18; 1520:24; 1570:21; 1701:12

**lead** [1] - 1712:1

**leading** [4] - 1525:16; 1625:6; 1636:15; 1641:1

**learn** [2] - 1521:11

**learned** [4] - 1503:21; 1602:24; 1652:19; 1655:15

**learning** [3] - 1602:12; 1685:20, 23

**lease** [7] - 1681:17; 1682:9; 1683:5, 10; 1688:11; 1691:3, 7

**least** [6] - 1563:7; 1571:1; 1603:15; 1604:9; 1607:3; 1616:14

**leave** [2] - 1577:5; 1706:9

**leaves** [4] - 1570:3, 6; 1603:22; 1676:21

**led** [1] - 1697:12

**ledger** [1] - 1645:2

**leeway** [1] - 1712:15

**left** [14] - 1505:9; 1517:4; 1518:7; 1529:3; 1597:25; 1640:8; 1647:2; 1688:15; 1692:16; 1695:2; 1711:21; 1713:8

**legal** [19] - 1516:17, 20, 23; 1517:1; 1519:5; 1521:3; 1562:6; 1572:12; 1605:21; 1607:11, 18; 1642:22; 1643:12, 17, 19, 22; 1646:18; 1648:2, 12

**legitimate** [1] - 1623:16

**lender** [1] - 1587:23

**letter** [8] - 1503:5; 1506:7; 1601:14; 1602:9; 1642:17; 1643:25; 1646:24; 1708:15

**letters** [1] - 1644:1

**letting** [1] - 1573:15

**liability** [1] - 1515:21

**liberal** [1] - 1570:20

**liens** [1] - 1673:9; 1697:21

**lies** [1] - 1674:

**light** [1] - 1608:9

**likewise** [2] - 1613:5; 1679:10

**limine** [2] - 1512:3; 1708:3

**limit** [1] - 1511:11

**limited** [7] - 1511:6; 1515:21; 1525:18; 1536:1; 1578:15; 1665:9; 1710:25

**limiting** [1] - 1630:23

**Line** [1] - 1662:19

**line** [4] - 1538:24; 1546:16; 1583:8; 1698:22

**lined** [1] - 1609:20

**lines** [4] - 1629:11; 1631:4; 1632:5, 8

**lineup** [2] - 1674:5; 1705:13

**link** [1] - 1709:1

**list** [1] - 1664:18

**listed** [4] - 1646:13; 1649:5; 1656:23, 25

**listen** [7] - 1539:3; 1571:23; 1576:13-15; 1617:9; 1665:12

**listening** [3] - 1576:16; 1578:7; 1620:15

**listens** [1] - 1576:19

**lists** [1] - 1657:3

**litigation** [5] - 1510:7, 14; 1602:19; 1640:16; 1646:24

**litigator** [1] - 1640:16

**live** [4] - 1650:17; 1659:22; 1696:4

**lived** [5] - 1554:12; 1658:11; 1659:25; 1696:6

**lives** [1] - 1554:14

**living** [4] - 1514:7; 1639:24; 1650:23; 1696:8

**LLC** [9] - 1517:9; 1518:7; 1622:18; 1635:11, 21; 1641:20; 1642:23; 1656:25; 1687:9

**LLP** [2] - 1501:21; 1502:1

**loan** [21] - 1568:2, 7-8; 1569:6, 9, 12; 1615:3, 5, 10, 20;

14, 18; 1670:25; 1708:8, 10

**local** [1] - 1705:19

**located** [2] - 1640:10

**look** [60] - 1515:5; 1517:4; 1519:23; 1526:2; 1531:11; 1532:23; 1533:3, 21; 1541:18, 22; 1545:13, 22; 1546:16; 1547:9, 24; 1548:1, 9; 1561:10; 1567:10; 1592:14; 1600:11, 13; 1605:18, 23; 1611:4, 12; 1612:12, 22; 1616:10; 1618:25; 1624:6, 19; 1626:10, 17; 1627:9; 1632:15; 1634:6; 1651:15; 1654:14; 1656:18; 1664:25; 1666:18; 1668:9; 1673:16; 1681:21; 1686:17; 1689:3; 1691:16, 20; 1692:16; 1694:12; 1697:5; 1698:12, 18; 1699:13

**looked** [2] - 1508:2; 1562:8

**looking** [43] - 1548:8, 10; 1554:1; 1555:15; 1581:1; 1582:1; 1588:17; 1592:20; 1597:6; 1604:11; 1605:10; 1606:6; 1609:3; 1611:7, 11, 16; 1616:3, 16; 1626:15; 1632:20; 1638:4; 1642:15; 1645:19; 1646:5; 1655:24; 1656:2; 1657:3, 6, 20; 1659:18; 1660:18; 1670:2, 14; 1676:5; 1679:22; 1680:15; 1688:14, 23; 1689:9; 1698:17; 1699:1

**looks** [11] - 1548:18; 1580:13; 1626:24; 1628:2; 1661:2; 1688:19; 1689:7; 1691:14; 1692:2; 1705:13, 22

**Los** [20] - 1514:12; 1515:25; 1524:18; 1525:3, 11, 13, 19; 1526:12, 20; 1527:1, 21; 1530:11; 1531:16; 1532:14; 1533:15; 1534:21; 1535:4, 17, 22; 1650:22

17

**lose** [1] - 1706:25
**Lotus** [2] - 1683:18; 1684:1
**lunch** [4] - 1603:19, 21, 24; 1604:7
**luncheon** [1] - 1604:20
**lying** [1] - 1653:4

**M**

**M6** [4] - 1680:15, 19; 1681:5
**machine** [3] - 1694:3; 1695:3
**mail** [89] - 1504:7; 1505:25; 1506:6; 1509:6, 15; 1511:14, 16; 1521:5; 1538:10, 16; 1539:6, 8; 1546:25; 1547:13, 16-17; 1548:3, 16, 23; 1549:8, 20, 22; 1550:4, 17, 22; 1551:16; 1552:2, 9-10, 14, 18; 1553:2, 20; 1555:20, 22; 1557:1; 1562:17; 1563:1, 25; 1564:1; 1565:2, 12-13; 1566:14, 19; 1568:17, 25; 1573:18; 1580:9, 11, 23-24; 1582:8; 1588:25; 1605:14; 1609:5, 10, 21; 1620:13; 1629:4, 20; 1632:15, 21; 1633:9, 11, 16, 23-24; 1634:13; 1635:5, 7; 1637:10, 16; 1638:9; 1674:7, 10; 1698:15, 18, 20, 23; 1699:1; 1700:6; 1711:15
**mailed** [4] - 1540:5; 1550:5; 1599:14, 17
**mails** [35] - 1546:22, 24; 1547:19; 1555:15, 25; 1556:8, 14, 19-20, 23; 1557:6; 1562:9; 1566:24; 1580:8; 1626:14, 16, 21, 24; 1627:3, 11, 15, 18, 22-23; 1628:6; 1629:15, 19; 1632:17; 1636:6; 1648:2; 1698:7; 1699:4; 1700:9
**maintain** [1] - 1564:23
**maintained** [2] - 1645:16; 1667:7
**man** [3] - 1582:8; 1617:11; 1618:14
**Management** [4] - 1605:22, 25; 1606:5;

**Manager** [1] - 1635:9
**managers** [3] - 1609:14, 20, 24
**Managers** [1] - 1609:17
**manner** [1] - 1641:1
**mansion** [1] - 1519:2
**March** [4] - 1647:6; 1648:6; 1654:22, 25
**marginal** [1] - 1712:22
**mark** [3] - 1601:3, 5; 1611:2
**marked** [33] - 1517:5; 1531:22; 1532:21; 1560:7; 1562:17; 1577:21, 23; 1596:6; 1597:19; 1616:2; 1624:3; 1628:1; 1641:15; 1642:13; 1644:21; 1646:3, 25; 1647:23; 1655:18; 1656:15; 1658:25; 1663:7; 1666:3, 17; 1668:6; 1671:6; 1678:13; 1681:20; 1691:8, 17, 21; 1692:8; 1698:8
**market** [2] - 1681:18; 1683:14
**marketing** [2] - 1556:9, 25
**MARSHAL** [1] - 1707:4
**Marshals** [1] - 1707:5
**Maserati** [1] - 1676:8
**match** [1] - 1709:1
**material** [2] - 1556:15; 1605:19
**materials** [2] - 1514:21; 1556:9
**Matt** [4] - 1545:15; 1686:10; 1687:5
**matter** [8] - 1507:7; 1581:2; 1587:18; 1592:1; 1608:15; 1674:17; 1700:14; 1711:17
**Matter** [6] - 1571:12; 1628:16; 1631:10; 1632:1; 1665:21; 1666:1
**matters** [3] - 1512:2; 1575:11; 1604:6
**McDonald** [1] - 1705:8
**McKee** [1] - 1705:9
**mean** [13] - 1549:23; 1559:21; 1579:25; 1583:15; 1585:2; 1601:1, 17; 161

**1677:24; 1681:13; 1688:19; 1689:7; 1702:17
**meaning** [3] - 1526:2; 1591:12; 1619:1
**means** [3] - 1512:21; 1623:3; 1662:9
**meant** [2] - 1560:10; 1583:16
**meet** [6] - 1515:1, 11; 1651:20; 1696:25; 1697:10, 12
**meeting** [24] - 1519:1; 1590:22; 1591:1, 11, 14, 16, 19, 21, 24; 1592:2, 5, 10; 1593:5; 1595:4, 13, 15, 18, 23; 1596:9, 23; 1609:13, 17, 24
**meetings** [1] - 1518:23
**member** [2] - 1609:18
**members** [9] - 1512:9; 1522:4; 1578:2, 14; 1598:9, 20; 1599:21; 1613:24; 1635:8
**Membership** [1] - 1635:9
**Memorial** [1] - 1501:22
**mention** [3] - 1635:16; 1636:4; 1707:14
**mentioned** [8] - 1520:11; 1542:9, 19; 1614:8; 1615:2; 1673:10; 1674:24; 1711:10
**mergers** [1] - 1514:20
**mess** [2] - 1616:24; 1618:21
**message** [5] - 1519:23; 1552:24; 1553:15; 1563:14
**messages** [1] - 1565:14
**met** [3] - 1514:23; 1651:8; 1697:11
**MetaBank** [1] - 1623:15
**Mexican** [1] - 1526:13
**Mexico** [2] - 1516:24; 1643:20
**Miami** [3] - 1639:25; 1640:11; 1644:7
**Michael** [4] - 1597:11; 1598:3, 5; 1599:25
**Michelle** [1] - 1503:6; 1512:13
**middle** [6] - 1532:25; 1533:1; 1595:7;

**1709:2
**might** [3] - 1613:16; 1623:15; 1683:17
**mike** [4] - 1514:3; 1639:18; 1650:12; 1696:1
**million** [1] - 1569:9
**mind** [7] - 1510:12; 1562:3; 1574:5; 1620:14; 1665:19; 1702:11; 1707:7
**minds** [1] - 1571:25
**mine** [5] - 1540:14; 1559:22; 1613:23; 1615:19; 1665:13
**Mineola** [1] - 1502:2
**minimize** [1] - 1504:25
**minor** [1] - 1522:23
**minute** [2] - 1583:22; 1654:8
**minutes** [10] - 1571:8; 1603:16; 1604:9; 1664:16; 1665:4; 1673:20; 1695:11; 1701:8; 1704:2
**miscommunication** [1] - 1614:16
**misconduct** [2] - 1506:13; 1710:6
**misimpression** [1] - 1712:16
**Miskiewicz** [5] - 1504:8; 1700:7; 1703:15, 22; 1705:15
**MISKIEWICZ** [15] - 1501:17; 1503:19; 1577:9; 1605:10; 1674:3, 13; 1702:13, 17; 1704:4, 7, 20; 1705:6, 17; 1706:17; 1714:1
**misleading** [1] - 1574:11
**miss** [5] - 1702:3, 17; 1703:3, 9
**missed** [2] - 1512:16; 1564:7
**missing** [2] - 1605:8
**misspoke** [1] - 1621:17
**misstates** [1] - 1542:12
**misstating** [1] - 1525:24
**mistakes** [1] - 1576:9
**mitigate** [1] - 1509:11
**models** [1] - 1678:22
**mom** [1] - 1503:7

mom's [1] - 1706:1
moment [4] - 1574:22;
1671:2; 1693:3; 1699:10
Monday [6] - 1565:19;
1569:5; 1633:14;
1706:11, 14
money [115] - 1505:8,
13, 15, 18, 21;
1507:24; 1508:3, 23;
1509:8, 15, 20; 1510:8,
11, 25; 1511:5;
1513:15; 1520:20;
1526:8; 1534:25;
1535:20; 1537:9;
1543:20; 1549:12;
1558:9; 1560:21;
1561:4; 1566:16;
1567:9, 11, 13, 22;
1568:2; 1579:19;
1583:9, 22; 1584:3, 6,
13, 19, 23; 1585:2, 11,
21-23; 1586:2, 4;
1589:4, 8, 13, 15, 23;
1590:20; 1595:17, 25;
1597:6, 9; 1601:20;
1606:2, 7, 25;
1608:6-8, 10, 13;
1611:10; 1614:12, 18;
1618:17; 1620:8;
1621:2, 8; 1625:12;
1626:1; 1633:7-9;
1634:23; 1635:23;
1636:12, 25; 1637:18;
1638:11; 1646:12;
1648:11, 25; 1649:8;
1652:24; 1661:5, 12,
14; 1662:2, 4, 6, 12,
14, 16, 24; 1663:3;
1670:24; 1673:6;
1689:20; 1708:25;
1709:6; 1711:25; 1712:7
moneys [2] - 1610:5;
1623:17
monies [9] - 1569:12;
1573:4; 1584:16;
1601:24; 1606:10;
1607:6; 1624:15;
1685:14
monitor [1] - 1547:7
month [9] - 1555:5;
1557:15; 1607:24;
1609:10; 1618:10;
1623:22; 1648:6;
1660:6; 1670:12
monthly [1] - 1657:17
months [14] - 1591:4;
1616:4, 11, 14, 20-21;
1655:2; 1660:22;
1666:6; 1669:3; 1670:4;

1674:22; 1688:2
morning [22] - 1503:4,
6; 1512:8; 1514:7;
1520:9; 1522:11;
1565:19; 1569:25;
1570:1; 1571:6; 1609:4;
1633:15; 1694:5;
1700:12, 14; 1701:9,
15; 1704:24; 1706:1, 24
mortgage [5] - 1708:5,
9, 11, 19
most [1] - 1571:2
mother [2] - 1584:18;
1703:25
motion [5] - 1512:3;
1707:14; 1708:3;
1710:6, 12
motivation [1] -
1608:3
Motor [7] - 1651:7;
1657:11, 15, 18;
1662:20; 1670:15;
1686:11
Motor's [5] - 1667:5,
8, 21, 23; 1671:22
motorcycles [2] -
1661:25; 1663:6
Motors [6] - 1651:6;
1666:24; 1669:2;
1671:12, 16, 19
mouth [2] - 1533:18;
1610:16
move [8] - 1513:4;
1533:7; 1534:13;
1539:23; 1588:17;
1620:8; 1624:19;
1650:19
moved [1] - 1654:24
moves [10] - 1642:8;
1645:23; 1647:18;
1656:9; 1658:17;
1663:21; 1668:1;
1671:24; 1692:23;
1699:7
movie [1] - 1515:25
moving [1] - 1703:4
MR [221] - 1503:10,
19-20; 1504:2, 6;
1505:4, 24; 1506:12;
1507:12; 1508:21;
1510:19, 23; 1511:17;
1512:2; 1513:6; 1515:9;
1517:24; 1520:5, 8;
1521:15; 1524:16;
1525:2, 20; 1526:1;
1527:16; 1529:2;
1531:13; 1533:7;
1534:3, 9, 17; 1535:19;

1539:3, 22; 1542:22;
1545:2; 1548:7;
1550:15; 1558:15, 25;
1559:17; 1567:21;
1570:24; 1571:1, 15,
17; 1572:18, 22;
1573:1; 1574:8, 11, 19;
1575:2, 9, 21; 1576:3,
13, 17, 21, 24; 1577:1,
4, 8-9, 19; 1578:22,
24; 1582:25; 1588:15;
1592:17; 1593:1, 7;
1594:2, 8, 12; 1595:2;
1603:15; 1604:11;
1605:5, 10, 13, 18;
1606:17, 22; 1608:20,
25; 1609:15; 1613:10,
19, 22; 1620:12, 17;
1621:17; 1622:3, 10,
13; 1626:12; 1627:2;
1628:4, 10; 1629:2, 11;
1630:5, 21; 1631:5, 8;
1632:3, 10; 1636:14;
1637:7; 1638:6, 16, 18;
1639:1; 1641:3;
1642:10; 1645:25;
1646:1; 1647:20;
1648:18, 22; 1649:10,
15; 1651:17; 1656:11;
1658:22; 1663:23;
1664:4, 21, 25; 1665:4,
6, 8, 17; 1668:3;
1672:1; 1673:1, 15, 24;
1674:3, 10, 13, 15, 17;
1677:4, 7, 15, 17;
1679:24; 1682:13, 19,
25; 1683:4; 1686:2, 4;
1688:7, 21; 1690:21;
1691:2, 15, 19; 1692:3;
1693:1; 1694:1, 6, 10,
15; 1695:7; 1697:7;
1699:10, 13, 16, 18;
1700:2, 13, 16; 1701:4;
1702:10, 13, 16-17;
1703:13; 1704:4, 7, 20;
1705:6, 15, 17; 1706:4,
17-18; 1707:5, 17;
1708:6; 1709:4, 22, 25;
1710:4; 1711:4, 7;
1714:1; 1715:8, 16, 21,
23; 1716:2
MS [151] - 1509:4;
1511:22; 1513:2, 10;
1514:6; 1517:22;
1520:2, 25; 1521:17;
1524:13; 1526:16, 24;
1527:10; 1535:23;
1538:6; 1539:11;
1541:2, 4, 7; 1542:12;
1545:6; 1546:8,

20; 1547:3; 1550:13,
19; 1554:25; 1555:7;
1556:11, 16; 1557:7;
1558:7, 13, 24;
1561:16, 25; 1562:13;
1564:25; 1566:2, 6, 10,
20; 1567:20, 24;
1568:4; 1571:4, 8;
1572:5; 1574:20;
1575:5, 14; 1580:6;
1582:22; 1584:9, 20;
1585:6, 19; 1586:11,
16; 1587:5, 25; 1588:8;
1592:22; 1595:20;
1596:1, 11; 1598:17;
1601:9, 18; 1602:22;
1604:1, 4, 17; 1605:17;
1606:21; 1607:12;
1611:20, 22; 1614:24;
1617:15; 1618:2, 12;
1619:5; 1622:9;
1623:18; 1624:16;
1625:6, 13; 1626:3;
1627:6; 1628:8, 11;
1629:14; 1630:1, 6, 9;
1632:14; 1638:15, 24;
1639:22; 1640:25;
1642:8, 14; 1645:23;
1647:18, 24; 1648:16;
1649:17, 21; 1650:15;
1656:9, 16; 1658:17;
1659:1; 1663:21;
1664:16; 1668:1;
1671:24; 1673:5;
1676:18; 1680:25;
1681:11; 1682:2, 15;
1684:19; 1685:17;
1688:8, 10, 20;
1690:19; 1691:18;
1692:5, 7, 23; 1694:12;
1695:10, 14; 1696:3;
1699:7; 1700:15;
1707:12; 1708:13, 23;
1709:17; 1715:6, 11,
14, 19, 25; 1716:4, 7
must [1] - 1703:16
mutual [2] - 1530:2;
1651:21

N

name [30] - 1513:24;
1520:9; 1521:3;
1526:20, 22; 1531:4;
1535:10; 1540:9;
1552:19; 1583:13;
1585:12; 1597:11;
1617:11; 1618:14;
1623:3, 10; 1635:1;
1636:4; 1639:14, 16;

1640:5; 1650:7; 1651:4;
1657:11; 1669:23;
1684:10; 1686:5;
1695:23

**named** [11] - 1514:23;
1515:6; 1517:2;
1607:20; 1636:5;
1640:2, 18; 1643:23;
1644:11; 1651:8

**namely** [1] - 1607:19

**Nash** [6] - 1607:16;
1705:9; 1707:13, 21;
1710:6, 23

**Nash's** [4] - 1607:22;
1608:6, 12

**nature** [6] - 1514:18;
1530:3; 1550:12;
1640:14; 1641:6;
1713:24

**near** [5] - 1645:7;
1647:10; 1667:1, 18;
1671:13

**necessarily** [1] -
1540:21

**necessary** [3] -
1562:16; 1712:20

**need** [33] - 1510:21;
1511:14, 18; 1512:12;
1524:15; 1525:23;
1526:14; 1527:2, 9;
1532:23; 1547:24;
1548:20; 1561:10;
1565:19; 1567:9;
1575:7; 1586:1;
1604:17; 1609:12, 17;
1612:1, 13, 23; 1628:9;
1629:13; 1630:14;
1673:21; 1685:18;
1704:17; 1707:12;
1709:10

**needed** [9] - 1568:1;
1586:3; 1588:12;
1604:7; 1609:24;
1636:10; 1697:20;
1704:22; 1705:1

**needs** [1] - 1706:23

**negotiate** [3] -
1589:25; 1654:16;
1713:6

**negotiating** [3] -
1555:16; 1589:24;
1690:15

**negotiations** [3] -
1506:5; 1509:8; 1562:11

**neighborhood** [2] -
1679:19; 1680:24

**Neptune** [19] - 1568:2,
7-8; 1569:6, 9, 12, 14;

1615:2, 5, 10, 20, 25;
1616:15; 1617:4, 6-7,
9, 13, 17

**never** [29] - 1505:8,
15; 1509:14; 1545:4,
10; 1558:1, 3-4;
1568:6; 1569:15, 24;
1571:22; 1587:10, 14,
18; 1588:2; 1589:22;
1590:20; 1599:10;
1614:12; 1664:18;
1680:21; 1709:8;
1710:12; 1711:24

**nevertheless** [1] -
1607:15

**NEW** [1] - 1501:1

**New** [9] - 1501:5, 17,
23; 1502:2, 5, 9;
1537:19; 1554:12;
1590:7

**newspaper** [3] -
1503:22, 25

**next** [36] - 1533:5;
1562:17; 1563:25;
1565:2, 12; 1570:19;
1571:3; 1580:22;
1581:2; 1593:9;
1594:16; 1605:16;
1606:20; 1628:16;
1631:10; 1633:23;
1638:23; 1641:1;
1649:20; 1658:3, 13;
1662:17, 24; 1663:2;
1665:21; 1672:3;
1678:12; 1686:23;
1701:10, 21, 24-25;
1702:25; 1705:23

**Nicholas** [1] - 1635:13

**Nick** [3] - 1540:23;
1549:5; 1634:1

**night** [6] - 1576:5;
1605:19; 1703:1;
1706:9; 1714:3

**nine** [1] - 1610:1

**Nissan** [5] - 1663:14,
18; 1678:17, 19;
1679:12

**Nolan** [1] - 1705:10

**normal** [2] - 1665:5;
1673:20

**North** [1] - 1659:13

**note** [2] - 1599:13, 15

**noted** [3] - 1503:3;
1621:23; 1712:25

**notes** [13] - 1525:14;
1532:17, 19-20;
1545:13, 15-16, 23;
1546:1, 16; 16¹⁶

1647:25

**nothing** [10] - 1525:14;
1569:14; 1574:15;
1575:9, 15; 1585:24;
1620:7; 1625:24;
1629:23; 1690:21

**notice** [3] - 1591:10;
1599:16; 1704:22

**notices** [1] - 1648:1

**notification** [1] -
1611:8

**notified** [2] -
1609:18; 1705:8

**notion** [1] - 1509:17

**November** [4] - 1569:3,
6; 1660:15, 18

**NP-1** [2] - 1532:21;
1541:18

**NP-4** [3] - 1626:10;
1628:1

**Nugent's** [1] - 1584:17

**number** [14] - 1505:17;
1512:16; 1565:11;
1590:6; 1591:16;
1601:5; 1602:13;
1622:12; 1679:6;
1682:17, 21; 1683:16;
1708:24

**numbers** [1] - 1601:23

**O**

**o'clock** [1] - 1707:8

**oath** [5] - 1522:8;
1539:19; 1542:4;
1649:24; 1695:16

**Oberman** [1] - 1643:2

**object** [10] - 1509:4;
1535:1, 6; 1542:22;
1558:15; 1605:19;
1637:7; 1674:13;
1691:18; 1709:18

**objecting** [2] -
1673:1; 1674:14

**Objection** [1] -
1595:20

**objection** [111] -
1503:18-20; 1513:6;
1517:24; 1520:25;
1524:13; 1525:2;
1535:2, 23, 25; 1538:6;
1539:11; 1541:4, 7;
1542:12; 1543:5;
1545:6; 1546:4, 8, 20;
1547:3; 1550:13, 19;
1554:25; 1555:7;
1556:1, 16; 1557:7;
1561:16,

25; 1562:13; 1564:25;
1566:2, 6, 10, 20;
1567:20, 24; 1568:4;
1580:6; 1582:22;
1584:9, 20; 1585:6, 19;
1586:11, 16; 1587:25;
1588:8; 1593:6; 1596:1,
11-12, 17; 1598:17;
1601:9, 18; 1602:22;
1604:1, 4; 1607:14;
1611:20, 22; 1614:24;
1617:15; 1618:2, 12;
1619:5; 1620:3; 1622:8,
10; 1623:18; 1624:16;
1625:6, 13; 1626:3;
1627:6; 1628:8;
1636:14; 1641:2;
1642:10; 1645:25;
1646:1; 1647:20;
1656:11; 1658:23;
1664:3; 1668:3;
1673:13; 1680:25;
1681:11; 1682:2, 24;
1683:1; 1684:19;
1685:17; 1692:25;
1694:8; 1700:15;
1701:3; 1709:8, 23;
1710:2

**objections** [2] -
1700:2, 16

**obtain** [2] - 1549:3;
1564:9

**obvious** [3] - 1504:1;
1600:4; 1612:19

**obviously** [8] -
1511:19; 1512:16;
1673:16; 1677:5;
1682:11; 1703:3;
1709:15; 1713:10

**occasions** [1] -
1505:17

**occur** [5] - 1508:12;
1525:16; 1526:4;
1529:11; 1636:17

**occurred** [3] -
1529:22; 1645:8;
1687:18

**occurs** [3] - 1506:5;
1525:1

**Oceanside** [1] - 1502:5

**October** [5] - 1506:17;
1518:14, 20; 1606:25;
1648:10

**OF** [2] - 1501:1, 3

**offense** [1] - 1509:12

**offer** [27] - 1506:10;
1507:4, 6, 10, 13;
1508:3; 1509:12;
1510:4, 7; 1524:16;

1571:24; 1576:8;
1589:4; 1590:19;
1596:9; 1602:19;
1608:9, 16; 1610:24;
1611:9, 18; 1629:3;
1630:17; 1708:7;
1711:20, 24; 1712:5

**offered** [25] - 1505:8,
18, 22; 1511:2;
1575:16, 25; 1578:14;
1590:20; 1595:17, 25;
1596:23; 1597:3, 7-9;
1602:25; 1610:5;
1614:3, 12, 22; 1618:6;
1630:14; 1712:7

**offering** [6] - 1506:2,
20; 1577:17, 19;
1614:18

**offers** [7] - 1509:7,
18, 20, 22-23; 1517:22;
1713:22

**office** [2] - 1514:11;
1585:10

**offices** [12] - 1519:21;
1520:17; 1580:18;
1582:7; 1599:9;
1622:21; 1640:10;
1661:2, 7, 15; 1670:23

**Ohio** [1] - 1696:11

**Old** [1] - 1502:1

**OLIVERAS** [1] - 1502:4

**once** [4] - 1597:8;
1636:12; 1649:24;
1662:13

**One** [2] - 1501:21;
1565:6

**one** [97] - 1503:16, 24;
1505:14; 1506:9, 12;
1507:1, 12; 1508:8, 10;
1511:22; 1512:10;
1514:22; 1522:23;
1524:18; 1529:14;
1535:4, 7; 1536:22;
1538:12; 1539:9;
1543:13; 1545:24;
1547:6, 19, 25;
1548:8-11, 13, 18;
1549:15; 1552:9, 14,
16; 1553:4; 1558:19;
1570:18; 1571:15;
1573:19; 1574:12, 22;
1578:25; 1580:22;
1582:17; 1585:10;
1586:7; 1588:19;
1590:6; 1591:13;
1592:1; 1594:12;
1600:15; 1604:11;
1605:8, 13; 1606:4, 19,
22; 1607:4, 25; 1609:3;

1612:14; 1613:19;
1615:17; 1618:24;
1625:1; 1628:3, 6;
1629:4, 8; 1630:2;
1631:3; 1635:18;
1652:17; 1655:8, 12;
1663:11, 15; 1666:10;
1670:9; 1674:17;
1691:4; 1698:11, 17-18;
1699:1; 1701:20;
1704:4; 1707:13;
1708:4; 1711:14

**one's** [1] - 1665:11

**ones** [2] - 1548:14;
1557:1

**ongoing** [1] - 1707:22

**Open** [2] - 1632:1;
1666:1

**open** [5] - 1529:1;
1595:1; 1676:1; 1701:1;
1707:25

**opening** [1] - 1674:24

**Operating** [1] -
1635:10

**operating** [3] -
1587:15; 1609:12;
1645:6

**opinion** [2] - 1637:4;
1701:14

**opportunity** [6] -
1506:4; 1529:19;
1540:25; 1578:1;
1636:6; 1687:1

**opposed** [1] - 1629:20

**order** [2] - 1609:11;
1662:10

**ordinary** [11] -
1517:19; 1645:13, 16;
1647:13, 16; 1667:4, 7,
20, 23; 1671:18, 21

**organized** [1] -
1700:14

**original** [9] - 1563:1;
1574:25; 1580:18;
1591:5; 1644:8;
1688:20; 1691:11, 25

**originated** [2] -
1552:7; 1553:17

**outgoing** [1] - 1622:24

**outright** [2] -
1652:24; 1653:4

**outside** [3] - 1570:7;
1607:7; 1636:2

**outstanding** [1] -
1673:11

**outweighed** [2] -
1712:23; 1713:18

**overnight** [1] -

1549:2, 4; 1564:9;
1707:8

**overrule** [1] - 1673:13

**overruled** [30] -
1539:15; 1542:14, 24;
1547:5; 1555:8;
1556:12, 17; 1558:8;
1561:17; 1562:2;
1568:5; 1582:23;
1584:12, 21; 1585:7,
20; 1586:17; 1588:1, 9;
1596:2, 17; 1601:10,
19; 1602:23; 1615:1;
1626:4; 1627:7; 1681:1,
12; 1684:20

**owe** [2] - 1519:5;
1648:11

**owed** [7] - 1505:13;
1519:7; 1648:13;
1661:24; 1662:6; 1673:6

**Owen** [1] - 1705:10

**OWEN** [1] - 1502:7

**own** [9] - 1526:8;
1543:20; 1561:1, 4;
1571:25; 1573:15;
1574:5; 1651:2; 1654:9

**owned** [7] - 1624:24;
1652:16; 1653:22;
1654:15; 1696:11

**owner** [1] - 1660:3

**ownership** [2] -
1688:4; 1697:21

**P**

**p.m** [6] - 1547:14;
1553:6; 1564:1; 1565:3,
13; 1714:5

**PA** [3] - 1640:3, 6;
1642:18

**pace** [1] - 1704:17

**PACIFICO** [1] - 1530:25

**pack** [2] - 1627:21, 25

**packet** [1] - 1637:13

**page** [57] - 1532:22,
24; 1533:1, 3; 1538:23;
1539:1; 1541:19, 24;
1573:7; 1575:2; 1581:2;
1592:20; 1593:9;
1594:2, 5, 12, 16;
1595:3; 1600:18;
1601:3; 1609:8;
1611:11; 1626:18;
1628:16; 1629:8;
1631:10; 1632:4;
1642:1; 1655:24;
1656:21;

1682:8, 16-19, 21;
1686:23; 1688:14, 16,
23; 1689:13, 15;
1691:21; 1692:13, 19,
21; 1694:2, 4, 9;
1695:3

**pages** [7] - 1592:14;
1594:3; 1600:16;
1681:22; 1689:11;
1692:11

**paid** [10] - 1520:11;
1523:1; 1606:10;
1644:20; 1660:10;
1661:23; 1680:4;
1697:19, 22; 1712:7

**Palm** [1] - 1644:8

**paper** [3] - 1614:11;
1662:23; 1670:8

**paperwork** [1] -
1654:14

**Paradise** [9] - 1524:7,
9, 12; 1525:20; 1529:3,
22; 1707:14, 25; 1710:1

**paragraph** [14] -
1506:20; 1598:11;
1611:5; 1624:19;
1625:3; 1629:23;
1633:13; 1642:15;
1657:3, 6-7, 10;
1686:20; 1687:1

**paragraphs** [3] -
1611:6, 13, 16

**part** [14] - 1507:12,
15; 1508:16; 1516:4;
1574:9; 1585:9;
1596:12; 1601:4;
1610:23; 1625:25;
1673:7; 1688:16;
1702:1; 1710:12

**partially** [1] - 1526:6

**particular** [12] -
1508:17; 1525:6;
1533:18; 1537:6;
1541:22; 1584:15;
1591:8; 1599:19;
1662:15; 1664:12;
1665:9; 1710:24

**particularly** [1] -
1524:7

**parties** [4] - 1523:13;
1554:5; 1599:15;
1658:19

**parties'** [1] - 1600:5

**partner** [7] - 1514:14;
1535:13; 1640:13;
1674:4; 1700:8; 1703:24

**Partners** [7] - 1598:9,
21; 1621:25; 1622:18;

1624:14, 24; 1625:5
**parts** [4] - 1613:6;
1661:22, 25; 1663:5
**party** [2] - 1510:2;
1644:13
**Pasifico** [1] - 1530:25
**passed** [1] - 1503:7
**past** [1] - 1648:4
**paste** [4] - 1549:23;
1550:1; 1629:12, 22
**pasted** [1] - 1551:12
**pasting** [1] - 1549:25
**patents** [1] - 1568:3
**patience** [1] - 1504:4
**patient** [1] - 1620:11
**pay** [17] - 1559:23;
1560:19; 1607:10, 17;
1644:18; 1646:8, 17;
1660:2; 1662:1, 6, 13;
1678:6; 1681:17;
1711:20, 25; 1712:5
**payable** [1] - 1565:7
**paying** [1] - 1660:7
**payment** [15] - 1519:9,
15, 17, 19, 22; 1569:9;
1606:24; 1646:20;
1648:3; 1649:4, 8;
1670:4; 1673:7;
1708:15; 1713:23
**payments** [12] -
1519:12; 1605:21, 24;
1645:5, 8; 1646:15,
22-23; 1708:16, 19, 22
**Peca** [2] - 1708:21;
1709:15
**Peca's** [2] - 1708:5, 9
**PEI** [1] - 1518:16
**pending** [1] - 1608:1
**people** [14] - 1540:8;
1542:20; 1543:22;
1591:24; 1595:8;
1597:7; 1654:1;
1661:23; 1662:1, 6, 21;
1674:6; 1691:4
**per** [1] - 1554:4
**Per** [1] - 1635:6
**percent** [24] - 1506:20;
1508:10; 1536:6, 23;
1549:3; 1559:22;
1564:10; 1579:2, 4, 9;
1595:25; 1596:10, 23;
1601:22; 1602:20;
1610:25; 1611:18;
1614:22; 1624:25;
1625:24; 1634:24;
1636:13
**percentage** [11] -

1536:13; 1537:10, 13;
1549:13; 1561:8, 14,
20; 1573:9; 1601:21;
1674:21; 1687:12
**percentages** [2] -
1554:11; 1601:20
**performed** [1] - 1648:5
**perhaps** [3] - 1611:1;
1665:11; 1709:13
**period** [11] - 1532:1;
1540:13; 1591:8;
1611:18; 1617:18;
1618:8, 10; 1660:15;
1712:8
**permissible** [3] -
1620:9; 1711:2; 1712:19
**permission** [2] -
1576:24; 1640:25
**permitted** [3] -
1570:12; 1591:24;
1608:13
**perplexed** [2] -
1708:6, 12
**person** [9] - 1535:10;
1582:15; 1586:15;
1597:11; 1611:1;
1655:11, 14; 1680:21;
1687:23
**personal** [2] -
1607:18; 1669:3
**personally** [4] -
1596:23; 1607:20;
1641:13; 1690:15
**personnel** [1] -
1518:24
**pertaining** [5] -
1516:18, 20, 23;
1643:12, 19
**perusing** [1] -
1614:16
**Phil** [4] - 1539:25;
1541:25; 1542:19;
1686:6
**Philip** [1] - 1501:6
**PHILLIP** [1] - 1501:6
**Phillip** [2] - 1501:21;
1513:12
**phone** [19] - 1537:12,
15, 24; 1539:6; 1554:8;
1560:8; 1564:21;
1566:23; 1567:10;
1572:10; 1592:11;
1599:3; 1613:9;
1614:11; 1617:21;
1636:24
**photograph** [3] -
1663:18, 24; 1678:18
**photos** [1] - 1662:10,

**physically** [1] -
1654:21
**pick** [1] - 1639:1
**PICOZZI** [1] - 1502:8
**picture** [2] - 1505:12,
20
**piece** [3] - 1530:10;
1629:22; 1658:7
**pieces** [2] - 1539:25;
1703:4
**pilot** [1] - 1512:19
**pinpoint** [1] - 1523:7
**pitch** [17] - 1525:12,
24; 1526:11; 1531:12,
15; 1533:16; 1540:20,
23; 1541:5; 1542:4;
1545:4, 12; 1546:10;
1556:25
**pitched** [21] - 1527:12;
1531:7, 9-10, 20;
1533:15, 19, 25;
1534:1; 1540:18;
1541:2, 12, 16; 1542:1,
3, 20; 1545:10, 24;
1546:6, 18
**pitching** [4] - 1525:8,
15, 19; 1526:5
**place** [14] - 1511:5;
1519:1; 1537:25;
1538:3; 1591:21;
1619:8; 1620:2;
1662:19; 1666:15;
1668:14; 1693:6;
1699:21; 1711:9; 1713:7
**Place** [1] - 1659:13
**placed** [3] - 1568:3;
1577:23; 1653:25
**plaintiff** [4] -
1590:12, 15; 1624:9;
1641:10
**plaintiffs** [1] -
1590:6
**plan** [8] - 1556:1, 25;
1618:5; 1662:2, 8, 10
**plane** [16] - 1653:13,
22; 1654:4, 9, 11;
1655:11, 13-14; 1656:7;
1657:4; 1658:1; 1661:5;
1684:24; 1685:3, 10
**plans** [6] - 1555:20;
1556:9; 1564:5;
1701:20; 1706:8, 11
**play** [8] - 1571:21;
1572:16; 1574:1;
1575:12; 1576:25;
1605:12, 14; 1613:11
**Playboy** [6] - 1515:17;

24; 1519:2
**played** [4] - 1504:9;
1573:11; 1578:11;
1614:5
**players** [11] - 1506:18;
1516:4, 8; 1606:5, 8,
11, 14, 25; 1607:21;
1643:10; 1655:8
**playing** [2] - 1573:13;
1612:8
**Plaza** [2] - 1501:16;
1502:8
**pleadings** [1] -
1509:25
**plug** [1] - 1705:19
**point** [56] - 1507:5;
1508:1; 1511:2;
1523:12; 1526:11;
1531:18; 1536:2;
1549:1, 11, 16, 25;
1550:16; 1552:10;
1559:24; 1563:19-21,
24; 1566:8; 1567:15;
1570:18; 1571:17;
1579:23; 1580:2, 16;
1582:21; 1584:2;
1585:3, 5, 18; 1586:6,
10, 23; 1596:22;
1600:23; 1602:6, 14,
18, 24; 1603:17;
1606:9, 22; 1615:9, 12;
1634:10; 1648:11;
1652:17; 1653:5, 25;
1664:8; 1669:20;
1687:8; 1689:18;
1700:10; 1702:4
**pointed** [1] - 1680:4
**points** [2] - 1510:19;
1653:21
**portion** [48] - 1504:8,
22; 1509:8; 1518:13;
1532:23, 25; 1533:1;
1541:23; 1549:17;
1551:9; 1552:19;
1553:23; 1557:21;
1562:20; 1563:1, 7;
1566:15; 1569:8;
1572:12, 19; 1573:1, 3,
9, 24; 1574:6, 14;
1575:6, 17, 25; 1577:2,
17, 19, 24; 1578:3;
1583:4, 8; 1596:8;
1598:7; 1601:23;
1611:3; 1613:5, 11;
1616:6; 1708:10, 18
**portions** [16] -
1504:5, 22; 1551:19;
1569:5; 1592:18;
1593:2; 1595:3; 1612:8,

22

**23**

16, 19, 24-25; 1622:17; 1645:20

**position** [5] - 1505:22; 1525:10, 15; 1572:6; 1710:11

**possible** [8] - 1541:20; 1558:6; 1597:1-3; 1599:18; 1676:17; 1704:17

**possibly** [4] - 1556:4; 1599:8; 1676:16

**potential** [4] - 1515:13, 17; 1516:8; 1712:14

**potentially** [1] - 1711:19

**practice** [2] - 1514:19; 1640:14

**precious** [1] - 1707:11

**precluded** [1] - 1608:16

**precluding** [1] - 1592:20

**predicts** [1] - 1707:18

**preference** [1] - 1704:10

**prejudice** [5] - 1511:8; 1526:21; 1712:20, 24; 1713:18

**prejudicial** [1] - 1607:9

**preparation** [1] - 1664:11

**prepare** [1] - 1706:11

**prepared** [5] - 1604:5; 1664:8, 20; 1700:12; 1704:8

**preparing** [1] - 1710:23

**presence** [2] - 1570:7; 1700:1

**present** [3] - 1594:9; 1664:10; 1706:11

**presented** [2] - 1559:1; 1626:19

**pretty** [7] - 1504:1; 1536:18; 1538:11, 13; 1664:20; 1665:2; 1681:3

**prevent** [1] - 1710:18

**previous** [4] - 1552:16; 1633:11, 16; 1634:13

**previously** [5] - 1516:4; 1522:2; 1547:11; 1691:8; 1701:20

**Prewitt** [4] - 1644:4,

8, 13; 1646:24

**price** [2] - 1657:7; 1684:17

**primarily** [1] - 1696:20

**principally** [2] - 1514:20; 1606:17

**printed** [1] - 1629:19

**privately** [1] - 1687:22

**Privitello** [109] - 1504:9, 11; 1505:5, 9, 14, 18; 1506:2, 9, 15, 21, 24; 1507:21; 1508:7; 1509:7, 10, 14; 1510:2, 5; 1511:10; 1521:21; 1522:5, 9, 11, 13; 1525:7; 1526:18; 1527:18; 1529:2, 14, 16; 1533:21; 1534:8, 20; 1536:11; 1542:5, 17; 1545:3, 13, 22; 1546:22; 1547:10, 22; 1552:13; 1553:15; 1555:3; 1557:10, 17; 1559:3, 18; 1562:8; 1565:9; 1566:13; 1567:23; 1568:17; 1570:5; 1571:18; 1572:9, 13, 23; 1574:25; 1575:20; 1577:20, 24-25; 1578:7, 25; 1579:22; 1580:11, 25; 1583:3; 1587:10; 1596:18; 1597:1, 22; 1599:15; 1603:23; 1604:18; 1605:7, 11; 1606:21; 1609:1; 1613:12, 20, 23; 1614:2, 7, 20; 1618:5; 1621:1; 1623:24; 1627:10; 1630:7, 10; 1632:4, 15; 1633:17; 1634:6, 20-21; 1635:14; 1637:16; 1638:9, 19; 1711:16, 23; 1712:2; 1713:10, 13

**Privitello's** [7] - 1512:25; 1572:6; 1576:1; 1578:16, 19; 1630:13; 1711:14

**probative** [2] - 1712:22; 1713:17

**problem** [5] - 1561:7; 1664:11; 1674:12; 1700:3; 1702:19

**procedural** [1] - 1576:3

**proceed** [2] - 1641:1

**proceedings** [2] - 1510:16; 1714:4

**proceeds** [1] - 1708:25

**produce** [3] - 1548:21; 1554:23; 1630:2

**produced** [1] - 1578:3

**producer** [1] - 1515:25

**productive** [1] - 1704:1

**profession** [1] - 1516:7

**professional** [3] - 1516:3; 1642:22; 1643:10

**professions** [1] - 1515:23

**profit** [2] - 1674:24; 1685:9

**profits** [1] - 1669:1

**project** [3] - 1529:3, 6; 1697:14

**projects** [7] - 1516:18, 24; 1522:18, 21, 23; 1524:6; 1643:13

**prominent** [1] - 1515:25

**promise** [1] - 1628:7

**proof** [5] - 1524:16; 1608:10, 16; 1629:3; 1630:18

**proper** [2] - 1508:5; 1546:4

**properly** [4] - 1506:14; 1508:15; 1529:16; 1630:15

**Properties** [1] - 1530:25

**property** [6] - 1530:10, 14; 1658:7, 9, 11; 1659:13

**proposed** [5] - 1504:5; 1536:5, 12, 22; 1575:3

**prove** [2] - 1713:10, 12

**proven** [1] - 1713:2

**provide** [2] - 1627:4, 23

**provided** [3] - 1563:13; 1578:8; 1627:5

**provides** [1] - 1642:22

**providing** [3] - 1563:10; 1623:5, 13

**publish** [2] - 1647:24; 1668:8

**publishing** [4] - 1642:14; 1656:16; 1676:5

**pull** [2] - 1612:12; 1626:11

**purchase** [15] - 1652:25; 1655:22; 1656:5, 20; 1657:7, 25; 1658:7; 1659:2, 20; 1662:12; 1668:9; 1685:24; 1687:11

**purchased** [6] - 1653:11; 1669:11; 1674:20; 1687:14, 16

**purchasing** [2] - 1652:8, 13

**pure** [2] - 1509:6, 12

**purpose** [5] - 1505:19; 1563:13; 1573:13; 1578:15; 1646:15

**purposes** [4] - 1526:5; 1695:2; 1712:21

**put** [25] - 1510:9, 16; 1511:14; 1523:4; 1533:18; 1537:12, 15; 1550:3; 1558:12; 1560:21, 23, 25; 1561:3; 1566:23; 1583:12; 1585:12; 1598:14; 1606:25; 1610:16; 1613:17; 1663:6; 1667:14; 1678:12; 1703:13

**puts** [2] - 1504:24; 1611:24

**putting** [1] - 1579:7

**Q**

**quarter** [1] - 1560:24

**Quattroporte** [1] - 1676:8

**questioned** [1] - 1572:15

**questioning** [5] - 1536:1; 1674:18; 1711:18; 1713:20

**questions** [40] - 1520:2, 5; 1521:15; 1529:15; 1533:5; 1534:15; 1536:3; 1538:23; 1547:23; 1552:12; 1559:16; 1570:17; 1594:3; 1626:8, 12; 1628:5; 1630:25; 1631:1; 1632:10; 1637:6; 1638:15, 18; 1648:16, 18-19; 1649:11, 15; 1674:16; 1676:18; 1686:2; 1688:7; 1690:19, 22; 1692:4;

1695:8; 1710:9, 17, 23; 1712:13
**quick** [2] - 1511:22; 1694:12
**quickly** [3] - 1533:8; 1562:15; 1705:12
**quite** [1] - 1682:6
**quote** [4] - 1522:18; 1541:11; 1546:24; 1558:4
**quoted** [2] - 1572:8, 11

**R**

**R-E-S-S-L-E-R** [1] - 1514:1
**race** [13] - 1607:19; 1641:8, 10; 1661:21, 24; 1662:16; 1677:18; 1678:17; 1680:15, 17, 19; 1690:17
**races** [1] - 1678:1
**racing** [6] - 1641:10, 12; 1651:22; 1678:7, 9; 1690:12
**Racing** [4] - 1641:20; 1642:23; 1643:4, 8
**raise** [6] - 1513:19; 1639:7; 1650:1; 1695:17; 1704:15, 21
**raised** [1] - 1707:13
**raising** [1] - 1702:7
**ran** [2] - 1697:15, 17
**random** [1] - 1611:1
**Ranford** [1] - 1707:21
**rather** [5] - 1510:13; 1559:1; 1674:17; 1691:13; 1702:5
**reach** [1] - 1619:1
**reached** [2] - 1505:5; 1536:2
**reaching** [1] - 1619:4
**read** [28] - 1503:22, 24; 1518:17; 1533:6; 1549:5; 1565:23; 1566:15; 1573:1; 1580:14; 1587:3; 1596:7, 18; 1598:7; 1609:6, 11; 1611:6; 1612:1; 1615:22; 1617:21, 23-24; 1686:19; 1687:1; 1711:23
**reading** [4] - 1559:20; 1574:2; 1642:16, 21
**reads** [1] - 1642:16
**ready** [6] - 1512:23; 1576:25; 1605:4;

1664:11; 1676:23; 1706:22
**real** [12] - 1516:18, 23; 1525:5; 1526:18, 20; 1530:8, 10; 1643:12, 19; 1696:21; 1707:24
**really** [16] - 1505:11; 1508:13; 1521:9; 1540:23; 1573:7; 1579:9; 1582:18; 1585:24; 1615:7; 1617:19; 1625:16, 18; 1630:23; 1653:10; 1706:18, 20
**rear** [2] - 1679:7, 9
**reason** [6] - 1509:21; 1534:15; 1629:16; 1663:1; 1675:2; 1702:14
**reasons** [5] - 1535:3; 1558:20; 1575:18; 1673:14; 1702:7
**reassess** [1] - 1702:8
**recalling** [2] - 1598:11; 1674:18
**receipt** [1] - 1635:8
**receive** [8] - 1504:5; 1557:21; 1600:20; 1642:6; 1646:12; 1670:19; 1681:14; 1683:9
**received** [43] - 1503:5; 1513:9; 1518:2; 1547:11; 1551:6; 1553:24; 1583:3; 1587:11, 14, 18; 1588:7; 1591:18; 1597:21; 1600:17; 1611:8; 1622:16; 1628:5; 1648:25; 1649:4, 6; 1663:16, 19; 1664:13; 1666:4; 1676:3; 1682:13; 1683:3; 1684:3, 13, 16, 25; 1685:1; 1688:5; 1690:3; 1695:5; 1701:7; 1716:14, 19-20; 1717:4, 6-7, 10
**receiving** [2] - 1605:21; 1689:20
**recent** [1] - 1582:15
**recess** [4] - 1571:11; 1603:17; 1604:20; 1676:25
**recipients** [1] - 1699:1
**recitation** [1] - 1511:9

**recognize** [24] - 1515:3, 6; 1517:5; 1625:1; 1626:16; 1641:16; 1644:23; 1647:4; 1651:13, 16; 1655:19; 1663:8, 15; 1666:19; 1667:11; 1671:7; 1678:13, 16; 1679:25; 1681:24; 1682:1, 3; 1691:23; 1697:3
**recollection** [37] - 1529:20; 1533:14; 1541:20, 25; 1542:5, 7, 9, 16; 1543:3; 1567:18; 1568:15; 1588:14; 1590:4; 1591:3; 1592:23; 1593:3; 1595:4, 11; 1596:14, 19; 1600:17; 1601:4, 6; 1611:8, 17, 25; 1612:4; 1613:5; 1614:21; 1616:13; 1624:5; 1627:10, 17, 21; 1687:4
**reconvene** [1] - 1701:9
**record** [20] - 1513:14, 25; 1516:17; 1526:17; 1542:13; 1545:19; 1622:4, 6; 1630:15; 1639:15; 1645:20; 1650:8; 1658:19; 1659:18; 1673:15; 1674:3; 1695:23; 1703:13; 1711:10
**record's** [1] - 1630:24
**recorded** [13] - 1579:13; 1592:6, 8, 10-12; 1593:2, 5; 1594:5, 7-8, 13; 1595:5
**recording** [4] - 1577:18, 20; 1578:3; 1713:20
**records** [12] - 1554:16, 18-19; 1555:3; 1564:23; 1606:13; 1649:1; 1665:3; 1708:24; 1709:9, 23
**recover** [1] - 1625:25
**recovered** [1] - 1626:1
**redacted** [5] - 1575:6, 11; 1644:22; 1645:21
**redirect** [2] - 1521:16; 1632:12
**REDIRECT** [6] - 1632:13; 1688:9; 1692:6; 1715:10, 24; 1716:3
**refer** [7] - 1504:3;

1611:5; 1622:17; 1634:4; 1686:20
**reference** [9] - 1511:10; 1527:23; 1573:25; 1574:3; 1575:8; 1623:11; 1711:16; 1713:23
**references** [1] - 1712:6
**referencing** [1] - 1551:24
**referred** [1] - 1668:22
**referring** [16] - 1554:6, 9; 1560:19; 1574:7, 14; 1583:19, 23; 1585:15; 1614:9, 14; 1617:2; 1627:12; 1630:3; 1633:6; 1669:18
**refers** [3] - 1574:6, 9; 1708:4
**reflect** [3] - 1545:22; 1556:19; 1635:10
**reflected** [3] - 1615:15; 1622:6; 1629:20
**reflection** [1] - 1574:25
**reflective** [3] - 1612:16; 1613:1, 7
**reflects** [2] - 1612:24; 1622:20
**refresh** [24] - 1529:19; 1533:14; 1541:20, 24; 1542:5, 8, 16; 1591:3; 1593:4; 1595:4, 10-11; 1596:14; 1600:17; 1601:6; 1611:8, 17; 1612:3; 1613:4; 1614:20; 1616:13; 1624:4; 1627:10; 1687:4
**refreshed** [2] - 1542:7; 1592:24
**refreshes** [5] - 1568:15; 1593:3; 1596:19; 1601:4; 1611:25
**regard** [8] - 1523:18; 1525:8; 1531:16; 1565:18; 1569:12; 1571:18; 1578:14; 1610:8
**regarding** [24] - 1504:12; 1505:6, 12; 1508:17; 1531:20; 1537:5; 1542:20; 1550:18; 1552:11; 1557:20; 1565:14; 1572:15; 1584:23;

25

1586:1; 1588:19;
1613:25; 1618:25;
1622:4; 1623:16;
1656:7; 1683:23;
1704:5; 1710:10;
1711:19

**regards** [15] - 1505:6,
20-21; 1524:12;
1578:25; 1600:1;
1602:19; 1610:5;
1618:17; 1682:10;
1683:5, 9-10; 1703:19;
1710:1

**related** [4] - 1644:6,
10; 1710:17; 1713:22

**relates** [6] - 1506:9;
1553:2; 1575:20;
1707:24; 1708:6, 11

**relation** [3] -
1542:10; 1615:20;
1654:3

**relationship** [9] -
1522:14; 1523:15;
1524:11; 1525:10;
1526:7; 1527:7; 1683:12

**relevance** [16] -
1509:5; 1511:3;
1540:21; 1595:20;
1601:18; 1602:22;
1607:21; 1608:15;
1620:5, 10, 16;
1625:13; 1628:12;
1673:4; 1712:14

**relevancy** [4] -
1505:3; 1524:13;
1607:2; 1673:1

**relevant** [6] - 1559:9;
1606:9; 1607:8;
1608:10; 1673:14;
1685:18

**relied** [2] - 1526:13,
25

**rely** [1] - 1526:10

**relying** [2] - 1527:8;
1629:19

**remain** [3] - 1639:6;
1649:24; 1695:16

**remember** [84] -
1505:7; 1529:16;
1530:4, 7, 20; 1531:23;
1532:4, 17, 20; 1534:9;
1538:2, 8; 1540:8;
1541:9; 1543:18;
1553:4; 1555:24;
1556:2; 1559:19, 25;
1560:1, 3-5, 15;
1561:6, 9, 12, 19;
1567:12; 1568:1;
1569:11, 22; 1572:14;

1583:4; 1590:2; 1591:12,
15; 1592:9; 1593:1;
1595:13, 15, 23;
1596:4, 8; 1598:13;
1599:3, 9, 20; 1600:23;
1602:18; 1610:12, 19,
22; 1611:15; 1612:2, 7;
1615:9, 15; 1616:18,
25; 1625:4; 1653:25;
1654:6; 1662:18;
1680:17; 1682:7;
1683:8; 1684:21;
1685:11, 21, 23;
1686:16; 1689:24;
1710:5; 1712:4, 8

**remind** [1] - 1522:8

**rendered** [1] - 1518:13

**rent** [12] - 1660:2, 5,
9, 22; 1669:4, 17-19;
1670:4; 1680:4, 11;
1683:14

**rental** [1] - 1681:18

**renting** [1] - 1623:21

**repayment** [1] -
1670:25

**repeat** [2] - 1540:15;
1712:25

**repeatedly** [1] -
1709:4

**rephrase** [2] -
1542:15; 1562:4

**replace** [2] - 1705:11,
15

**replacement** [1] -
1705:16

**replies** [1] - 1586:2

**reply** [3] - 1566:4;
1580:19; 1586:19

**replying** [1] - 1563:7

**report** [1] - 1659:19

**Reporter(s** [1] -
1502:7

**represent** [7] -
1520:10; 1600:3;
1631:4; 1632:8;
1640:21; 1643:7; 1686:5

**representation** [9] -
1516:10, 12; 1517:11;
1622:5; 1641:5; 1643:2;
1644:15; 1646:19;
1648:8

**representations** [1] -
1516:14

**represented** [7] -
1516:10; 1520:15;
1640:18, 23; 1641:7;
1644:5; 1684:1

**representing** [1] -

1515:19; 1518:10;
1598:24; 1600:1;
1643:10, 15

**request** [4] - 1589:21,
23; 1610:17; 1704:20

**requests** [1] - 1588:4

**required** [1] - 1636:2

**requires** [1] - 1536:18

**resell** [2] - 1662:10;
1688:1

**reserve** [1] - 1677:6

**resold** [1] - 1674:23

**resolution** [2] -
1601:16; 1626:5

**resolutions** [1] -
1599:22

**resolve** [4] - 1600:7;
1608:15; 1626:6; 1713:5

**resolved** [2] -
1697:20; 1709:24

**respect** [16] - 1508:19;
1509:5, 17; 1512:14;
1513:3; 1519:15;
1527:15; 1559:10;
1578:15; 1630:18;
1653:15; 1669:7;
1706:1; 1709:2; 1711:15

**respective** [1] -
1702:22

**respond** [1] - 1700:10

**responded** [1] - 1589:5

**responding** [2] -
1561:19; 1580:10

**responds** [2] -
1582:12; 1633:23

**response** [8] - 1527:5;
1562:20; 1565:17, 25;
1574:23; 1580:24;
1633:19; 1710:11

**responsive** [1] -
1558:15

**Ressler** [5] - 1511:25;
1513:18; 1514:2;
1520:9; 1521:18

**rest** [4] - 1602:10;
1633:13; 1664:9;
1705:14

**result** [1] - 1511:1

**resumed** [2] - 1522:2;
1571:12

**resumes** [1] - 1577:12

**retain** [2] - 1598:5;
1704:17

**retained** [3] -
1507:15; 1523:1;
1696:9

**retrieved** [1] - 1639:4

**return** [18] - 1505:8;
1508:10; 1509:8, 20;
1590:19; 1596:9, 24;
1601:24; 1602:20, 25;
1610:13, 25; 1611:10,
18; 1614:23; 1635:1;
1636:13; 1674:23

**returned** [1] - 1589:23

**returning** [1] -
1505:21

**reveals** [1] - 1648:4

**reversed** [1] - 1508:4

**review** [1] - 1629:5

**reviewed** [1] - 1562:9

**reviewing** [2] - 1648:1

**revisited** [1] -
1711:14

**Ricardo** [6] - 1571:5;
1608:2, 6; 1638:24;
1639:16; 1640:2

**RICHARD** [1] - 1501:23

**Richard's** [1] -
1585:10

**Richards** [15] -
1519:21; 1520:17;
1585:10; 1586:18;
1621:2, 8; 1622:21;
1661:3, 8, 15; 1670:23;
1690:1, 5, 7

**Richards'** [3] -
1563:17; 1566:9;
1633:10

**richards'** [1] -
1566:18

**Richards's** [4] -
1680:5; 1681:6;
1683:24; 1684:3

**Rick** [1] - 1686:5

**rid** [1] - 1653:17

**ringer** [1] - 1558:12

**rise** [2] - 1571:13;
1577:13

**rises** [1] - 1515:8

**Rizzi** [11] - 1506:19,
21; 1583:10; 1584:17,
22; 1590:9; 1595:16,
24; 1599:7; 1600:6

**Road** [1] - 1502:1

**ROBERT** [1] - 1502:3

**Ron** [20] - 1563:17;
1566:9; 1584:16;
1585:9; 1621:2, 8;
1622:21; 1633:10;
1661:2, 7, 15; 1670:23;
1680:5; 1681:5;
1683:24; 1684:3;

1690:1, 5, 7
**Ronald** [3] - 1519:21;
1520:17; 1586:18
**RONALD** [1] - 1502:7
**roof** [1] - 1522:24
**room** [2] - 1697:5;
1701:11
**roughly** [3] - 1651:12;
1652:1; 1687:19
**Rule** [1] - 1712:19
**Rules** [2] - 1596:15;
1620:9
**ruling** [5] - 1508:18;
1559:8, 10; 1711:9, 14
**run** [3] - 1651:2, 5;
1669:9
**running** [1] - 1704:22
**rush** [4] - 1566:24;
1567:2, 6, 9

**S**

**sale** [18] - 1653:9;
1654:16; 1655:13;
1666:13, 22-23; 1667:1,
18; 1668:12; 1670:5;
1671:14; 1676:6, 9;
1680:7; 1681:8, 10;
1685:10
**sales** [2] - 1671:10, 13
**SARITHA** [1] - 1501:18
**sat** [1] - 1666:6
**satisfies** [1] - 1708:2
**satisfy** [2] - 1608:1;
1637:1
**Saturday** [2] - 1706:7,
10
**save** [2] - 1638:7;
1705:23
**saved** [1] - 1685:24
**saw** [10] - 1503:25;
1515:3; 1606:12;
1614:12-15; 1651:13;
1680:21; 1697:3
**schedule** [1] - 1706:12
**scheduled** [1] -
1511:23
**scheduling** [4] -
1701:12, 19; 1703:14;
1705:3
**scheme** [1] - 1607:25
**scooters** [2] -
1661:25; 1663:5
**scope** [5] - 1516:12;
1638:6; 1643:25;
1644:15; 1691:18
**Scottsdale** [19] -

1651:6; 1654:23;
1658:8; 1659:13;
1666:24; 1667:4, 7, 20,
23; 1669:2; 1671:12,
16, 18, 21; 1686:12;
1696:5
**screaming** [3] -
1570:18, 22
**screen** [5] - 1547:9;
1613:17; 1656:18;
1668:10; 1669:22
**scribble** [2] -
1688:15, 18
**scroll** [1] - 1553:8
**seated** [12] - 1512:8;
1514:2; 1571:14;
1577:16; 1605:3;
1608:23; 1639:14;
1650:7; 1677:1, 12;
1695:22; 1701:18
**second** [26] - 1504:23;
1507:20; 1509:17;
1510:6; 1532:22;
1533:1, 3; 1541:19, 23;
1547:7; 1548:10;
1551:9; 1573:7;
1574:13; 1583:8;
1585:9; 1606:19;
1609:8; 1628:11;
1629:8; 1632:4, 22;
1676:9; 1680:6;
1688:23; 1691:21
**seconds** [1] - 1575:5
**secret** [1] - 1579:21
**secretly** [3] -
1579:13, 15, 20
**section** [5] - 1533:4;
1541:22; 1550:16;
1641:1
**sections** [1] - 1533:4
**securing** [2] - 1678:8;
1690:12
**see** [66] - 1531:15;
1533:12; 1547:11, 19;
1549:5; 1562:23;
1565:11; 1568:15, 17,
19; 1569:1, 5, 8;
1573:24; 1574:7;
1580:23, 25; 1582:10;
1584:4, 13; 1585:13,
21; 1586:23; 1598:9,
20; 1599:22; 1604:19;
1606:4; 1607:1;
1611:14; 1613:18;
1614:11, 18; 1616:23;
1619:1; 1622:21;
1623:1; 1628:13;
1629:9, 11; 1632:4,
1651:15; 1657:2

1663:24; 1664:23;
1665:18; 1666:11;
1680:2; 1682:25;
1683:8; 1688:15, 23;
1690:9; 1691:6; 1692:9,
18; 1693:1; 1697:5;
1701:14; 1702:4, 21;
1704:12
**seeing** [3] - 1606:3;
1609:21; 1611:15
**seeking** [1] - 1602:21
**seem** [2] - 1506:9;
1613:9
**select** [1] - 1708:9
**selected** [1] - 1593:2
**selection** [1] -
1701:23
**self** [2] - 1504:7;
1573:20
**self-explanatory** [1]
- 1504:7
**self-serving** [1] -
1573:20
**sell** [14] - 1650:24;
1653:23; 1654:13, 18;
1666:7, 9; 1671:3;
1676:7, 10; 1680:15-17;
1687:22; 1688:3
**seller** [2] - 1656:23;
1659:9
**selling** [8] - 1654:2,
4, 11; 1655:10; 1657:4;
1662:23; 1667:15;
1671:3
**send** [19] - 1535:20;
1555:19; 1563:17, 23;
1564:17; 1565:18;
1566:1, 5, 18; 1586:8,
24; 1587:1; 1614:10;
1633:10, 15; 1662:19;
1669:8
**sender** [1] - 1698:20
**sending** [8] - 1549:20;
1563:14; 1565:14;
1573:18; 1621:2;
1627:14, 17; 1634:10
**sense** [1] - 1586:7
**sent** [27] - 1519:8;
1550:8; 1553:17;
1555:21; 1556:13;
1559:22; 1567:13;
1569:3; 1584:16, 19;
1585:2; 1599:18;
1614:13; 1621:8;
1627:18, 22; 1634:20,
23; 1635:23; 1638:10;
1658:13; 1661:5;
1653:1, 3;

1669:3
**sentence** [1] - 1587:6
**separate** [2] -
1509:25; 1527:2
**separately** [2] -
1577:21; 1629:19
**September** [2] -
1670:12, 14
**series** [4] - 1526:17;
1533:5; 1630:25;
1632:18
**serve** [1] - 1703:8
**service** [2] - 1522:25;
1607:11
**services** [9] -
1518:13; 1523:1;
1605:21; 1642:22;
1643:25; 1648:2, 5;
1649:5
**serving** [1] - 1573:20
**set** [3] - 1643:25;
1698:7; 1706:23
**sets** [1] - 1642:17
**setting** [1] - 1706:23
**settle** [5] - 1505:6;
1620:4; 1655:17;
1711:17; 1713:23
**settlement** [9] -
1618:5; 1659:2, 5;
1685:12-14, 24;
1712:18; 1713:6
**Settlement** [7] -
1607:25; 1689:18, 23,
25; 1708:17; 1710:10,
18
**seven** [1] - 1595:8
**several** [5] - 1579:25;
1592:14; 1632:17;
1653:16; 1674:20
**shall** [1] - 1635:13
**share** [1] - 1665:9
**shareholders** [13] -
1590:22; 1591:1, 10,
14, 16, 19, 21; 1592:5,
10; 1595:4, 13, 15, 18
**shares** [3] - 1687:22;
1688:1, 3
**shop** [5] - 1663:4, 12,
16, 19; 1666:6
**short** [1] - 1664:20
**shorter** [1] - 1632:6
**shortly** [3] - 1592:5;
1602:1; 1654:24
**show** [43] - 1506:1;
1507:9, 17; 1508:22;
1526:4, 13; 1531:22;
1532:21; 1547:6, 20;

1548:19; 1554:21;
1560:7, 12; 1562:17,
23; 1564:23; 1568:12,
23; 1574:6, 9; 1576:5;
1580:9; 1583:3;
1592:13; 1596:6;
1597:19; 1606:10;
1608:5; 1611:2; 1612:6;
1616:2; 1622:7; 1624:3;
1658:16; 1678:12;
1681:20; 1692:8;
1712:20

**showed** [6] - 1507:2;
1533:22; 1621:12;
1679:22; 1683:16;
1688:12

**showing** [4] - 1554:23;
1594:7; 1621:7; 1627:25

**shown** [7] - 1546:25;
1621:7; 1630:25;
1637:10; 1638:9;
1678:11

**shows** [5] - 1572:1;
1573:11; 1648:5;
1668:25; 1669:10

**sic** [1] - 1621:13

**Side** [1] - 1664:2

**side** [27] - 1504:11;
1557:11; 1558:4, 10;
1559:18; 1560:15, 18;
1562:9; 1571:18;
1572:6, 9-10, 20;
1573:6, 25; 1574:12,
17; 1575:8; 1628:14;
1629:1, 11; 1631:9;
1640:17; 1663:23;
1664:1; 1665:20

**side-bar** [7] -
1628:14; 1629:1;
1631:9; 1663:23;
1664:1; 1665:20

**Side-bar** [1] - 1664:2

**Sidebar** [3] - 1594:1,
15; 1675:4

**sidebar** [20] - 1524:15,
19-20; 1525:1; 1528:1;
1535:3; 1619:8; 1620:2,
18; 1672:1; 1693:4, 6;
1694:16; 1699:19, 21;
1700:18; 1711:10;
1712:25; 1713:17, 21

**sidebar)** [1] - 1527:19

**sides** [1] - 1688:19

**sign** [6] - 1506:4;
1597:17; 1598:5;
1615:7; 1689:4

**signature** [23] -
1597:24; 1598:4, 6,
12-13, 21; 1642:1, 4-5;

1655:24; 1656:3;
1682:7, 16; 1689:8;
1691:9, 11, 23;
1692:21; 1694:2, 4;
1695:2

**signed** [9] - 1598:21;
1599:11, 15, 17;
1600:8; 1601:13;
1602:9; 1635:20; 1642:6

**significant** [2] -
1543:24; 1674:23

**significantly** [1] -
1565:20

**signing** [1] - 1616:22

**similar** [3] - 1627:25;
1630:4; 1689:8

**similarly** [1] -
1713:19

**simple** [4] - 1514:21;
1533:24; 1545:22;
1626:5

**Sincerely** [1] -
1635:20

**single** [1] - 1546:16

**sit** [5] - 1512:10;
1603:3; 1673:17;
1701:24; 1702:1

**sitting** [1] - 1620:14

**situation** [2] -
1512:11; 1582:16

**six** [14] - 1616:4, 11,
14, 20-21; 1618:10;
1655:5, 15; 1660:22;
1669:3; 1670:4;
1682:12; 1690:8

**six-month** [1] -
1618:10

**skip** [1] - 1580:8

**skipped** [1] - 1525:3

**sleeve** [2] - 1612:13;
1626:11

**slightly** [1] - 1629:16

**slot** [1] - 1705:19

**slowly** [1] - 1705:12

**small** [1] - 1522:25

**Smith** [2] - 1535:10, 12

**social** [1] - 1523:16

**sold** [23] - 1654:20;
1655:1, 6, 8, 16;
1662:13; 1666:10,
14-15; 1668:8, 14-15,
19, 24; 1679:12, 15;
1680:10; 1681:5;
1684:14, 17, 25; 1685:3

**solution** [1] - 1570:15

**someone** [4] - 1551:7;
1579:9; 1713:19

**sometime** [9] - 1532:5;
1541:9; 1589:19;
1591:4; 1610:7, 13;
1611:9; 1648:10;
1653:22

**sometimes** [2] -
1707:8; 1709:12

**somewhere** [2] -
1579:10; 1680:23

**soon** [1] - 1665:14

**sorry** [15] - 1506:16;
1507:23; 1536:9;
1567:21; 1582:8;
1600:15; 1604:3;
1605:11; 1609:15;
1626:20; 1634:22;
1657:6; 1670:3;
1679:24; 1698:11

**sort** [5] - 1625:23;
1688:15; 1689:10;
1708:1; 1709:1

**source** [1] - 1606:12

**sources** [6] - 1606:3,
8, 13, 15; 1607:7, 10

**space** [1] - 1623:21

**speaking** [7] -
1532:12, 14; 1534:20;
1539:6; 1541:9;
1569:11; 1576:11

**speaks** [1] - 1580:7

**Special** [2] - 1686:10;
1687:5

**special** [1] - 1683:9

**specific** [4] -
1509:19; 1536:12, 18,
22

**specifically** [11] -
1521:13; 1572:7;
1605:24; 1606:11;
1608:7; 1611:5, 16;
1673:10; 1683:7;
1686:20; 1691:21

**speculating** [1] -
1607:10

**spell** [4] - 1513:24;
1639:15; 1650:8;
1695:23

**spend** [1] - 1509:22

**spent** [4] - 1509:10;
1511:5; 1620:3; 1638:13

**spin** [1] - 1644:6

**sponsors** [4] - 1678:3,
5; 1690:12, 17

**sponsorship** [5] -
1641:8; 1644:7, 10;
1648:6; 1690:16

**sponsorships** [1] -

1678:9

**Sports** [8] - 1651:7;
1657:11, 15, 18;
1662:20; 1666:22;
1668:15; 1670:15

**Square** [1] - 1501:21

**stand** [10] - 1510:15;
1512:16; 1522:2;
1529:14; 1577:12;
1639:2, 5; 1649:23;
1704:19; 1705:7

**standing** [6] -
1570:19, 22; 1596:11;
1639:6; 1649:24;
1695:16

**stands** [1] - 1508:19

**Stanley** [2] - 1640:6;
1642:18

**Stars** [1] - 1516:1

**start** [5] - 1504:18;
1557:24; 1614:6;
1669:14; 1707:10

**started** [6] - 1539:7;
1585:23; 1616:24;
1640:8; 1673:12;
1710:23

**starting** [3] - 1608:3;
1666:18; 1669:5

**state** [8] - 1510:12;
1513:24; 1639:14;
1650:7; 1652:14;
1695:22; 1697:18

**statement** [12] -
1508:3, 23; 1574:25;
1608:18; 1614:1;
1622:19; 1657:18;
1659:2; 1660:12;
1670:14; 1674:24

**statements** [14] -
1506:10; 1509:23;
1576:1; 1578:16, 20;
1605:25; 1606:6;
1608:5, 17; 1614:3;
1670:10; 1690:8

**states** [1] - 1657:7

**STATES** [2] - 1501:1, 3

**States** [3] - 1501:12,
16; 1513:11

**stay** [6] - 1514:2;
1639:18; 1650:12;
1655:1; 1696:1; 1701:11

**stayed** [1] - 1654:22

**staying** [1] - 1524:17

**stealing** [1] - 1510:10

**step** [4] - 1521:18;
1649:18; 1671:2;
1676:24

**STEPHANIE** [1] - 1502:8

**steps** [1] - 1603:25
**Steve** [1] - 1515:22
**still** [12] - 1503:15;
1522:8; 1554:13;
1582:7; 1604:11;
1608:1; 1614:13;
1624:25; 1648:11;
1696:13; 1699:5; 1705:7
**stipulate** [3] -
1576:6; 1622:5; 1709:23
**stipulated** [1] -
1513:10
**stipulation** [6] -
1513:3, 16; 1622:3;
1658:16, 20; 1709:18
**stock** [1] - 1587:15
**Stock** [1] - 1656:25
**stocks** [1] - 1530:3
**stolen** [2] - 1509:10;
1510:8
**Stolper** [15] - 1507:14;
1597:11, 15; 1598:3,
24; 1599:9, 25;
1600:20, 24; 1601:6,
15; 1602:1, 8; 1624:11
**stop** [1] - 1620:8
**stop)** [1] - 1614:6
**stopped** [1] - 1578:12
**straggler** [1] -
1546:24
**Strangford** [1] -
1502:4
**Street** [1] - 1658:7
**street** [1] - 1662:16
**strictly** [2] -
1573:22; 1574:16
**Stuart** [1] - 1705:11
**stuff** [4] - 1522:25;
1637:13; 1663:6;
1664:25
**styles** [1] - 1643:3
**subject** [1] - 1588:18
**submitted** [2] -
1506:2; 1626:14
**substance** [2] -
1599:21; 1684:24
**substantial** [2] -
1606:1; 1679:2
**substantially** [3] -
1679:18; 1712:23;
1713:18
**successful** [2] -
1677:21; 1678:8
**sudden** [1] - 1583:11
**sue** [3] - 1517:1;
1643:22

**sued** [1] - 1636:22
**sufficient** [1] -
1607:6
**Suffolk** [1] - 1501:21
**suggest** [1] - 1675:1
**suggested** [1] -
1527:13
**suggesting** [2] -
1712:11
**suggestion** [3] -
1527:14; 1665:6; 1713:9
**suggestions** [1] -
1570:11
**suit** [22] - 1506:15,
17; 1507:20, 22;
1508:11; 1588:22;
1590:12, 16; 1591:7;
1597:14; 1600:5;
1602:2; 1618:25;
1623:24; 1624:9;
1625:17, 22-23, 25;
1627:8; 1644:4
**Suite** [2] - 1501:22;
1502:2
**suits** [1] - 1508:6
**Sullivan** [5] -
1514:10, 15; 1517:8,
16, 19
**sum** [3] - 1599:21;
1646:14; 1684:24
**summation** [1] -
1709:21
**summations** [1] -
1638:8
**Sunday** [2] - 1706:11;
1707:14
**support** [1] - 1678:6
**supposed** [5] -
1507:25; 1634:25;
1635:1; 1700:4; 1708:19
**surprise** [1] - 1607:15
**suspected** [1] -
1561:13
**suspicions** [1] -
1573:3
**sustain** [1] - 1546:3
**sustained** [27] -
1521:1; 1535:24;
1538:7; 1541:8; 1543:6;
1546:5, 21; 1555:2;
1557:9; 1562:14;
1565:1; 1566:3, 7;
1567:25; 1580:7;
1584:10; 1586:12;
1595:22; 1598:18;
1617:16; 1618:13;
1623:19; 1625:7;

1636:15; 1638:7
**sustaining** [4] -
1535:2, 25; 1593:6;
1620:3
**swear** [2] - 1538:12;
1542:4
**sworn** [6] - 1513:22;
1522:2; 1639:8, 12;
1650:4; 1695:20
**Sydor** [1] - 1707:22
**Systems** [1] - 1535:15

**T**

**tags** [1] - 1550:23
**talks** [1] - 1507:2
**tape** [31] - 1504:8;
1571:20, 24; 1572:1,
21-22, 25; 1573:14;
1574:21; 1575:16;
1576:2, 6-7, 14;
1577:2, 4, 7, 24;
1578:5, 16-17, 19-20;
1579:24; 1580:7;
1587:7; 1605:12
**taped** [5] - 1579:12;
1583:5; 1612:25;
1636:16
**tapes** [1] - 1605:13
**TC** [3] - 1633:20;
1688:23; 1689:1
**team** [1] - 1678:9
**telephone** [4] -
1538:9; 1554:20, 24;
1573:20
**ten** [5] - 1523:16;
1591:4; 1651:4; 1663:4;
1704:1
**term** [1] - 1685:22
**terms** [7] - 1545:7;
1559:4; 1642:17;
1664:11; 1673:18;
1696:18; 1703:14
**testified** [37] -
1513:22; 1522:3, 17;
1523:9; 1527:11;
1530:1, 3; 1532:9;
1536:4, 15; 1539:24;
1546:23; 1567:2;
1587:10, 14; 1588:22;
1589:2; 1590:24;
1607:25; 1610:12;
1621:1; 1630:19;
1631:2; 1639:12;
1650:4; 1664:5; 1673:5;
1676:12; 1679:12;
1680:7; 1685:5;

1695:20; 1708:21;
1709:15; 1710:9
**testify** [5] - 1504:13;
1511:23; 1547:3;
1592:9; 1629:21
**testifying** [9] -
1522:13; 1538:2, 19;
1541:10; 1546:23;
1567:12; 1605:20;
1607:24; 1621:6
**testimony** [16] -
1507:18; 1510:24;
1511:2; 1538:16, 22;
1539:21; 1540:2;
1558:1; 1572:6; 1575:2;
1583:7; 1586:9;
1605:20; 1707:22;
1709:3; 1711:14
**text** [1] - 1517:14
**thanked** [1] - 1704:23
**THE** [298] - 1503:4, 14,
24; 1504:3; 1505:2, 22;
1506:7; 1507:10;
1508:18; 1510:21, 24;
1511:21; 1512:1, 5, 8;
1513:19, 24; 1514:1;
1515:10; 1518:1;
1520:4; 1521:1, 16, 18,
21; 1522:4, 10;
1524:14, 20; 1525:17,
22; 1526:21; 1527:4,
13, 18, 20, 25;
1531:14; 1534:7, 11,
13, 16; 1535:2, 7, 24;
1537:1; 1538:7; 1539:2,
15-16, 23; 1541:8;
1542:14, 24; 1543:6;
1545:7; 1546:3, 9, 21;
1547:5, 22; 1548:6;
1550:14, 20; 1552:5;
1555:2, 8; 1556:12, 17,
21; 1557:9; 1558:8, 17,
19; 1559:3, 6, 8;
1561:17; 1562:2, 14;
1565:1; 1566:3, 7, 11,
22; 1567:25; 1568:5;
1569:25; 1570:5, 8, 25;
1571:3, 7, 10, 13-14,
16; 1572:3, 14, 19, 25;
1573:23; 1574:9, 17,
22; 1575:4, 12, 19, 24;
1576:8, 15, 18, 22, 25;
1577:2, 7, 13, 16;
1578:2, 10, 13; 1580:7;
1582:23; 1584:10, 12,
21; 1585:7, 20;
1586:12, 17; 1588:1, 9;
1592:19, 25; 1593:6, 8;
1594:6, 10, 14;
1595:10, 22; 1596:2,

13; 1598:18; 1601:10,
19; 1602:23; 1603:19,
23; 1604:3, 5, 14, 19;
1605:3, 6, 8, 12;
1606:15, 19; 1608:9,
23; 1609:14; 1611:24;
1613:13, 21, 24;
1615:1; 1617:16;
1618:4, 13; 1619:6;
1620:14; 1621:19;
1622:7, 12, 14;
1623:19; 1624:17;
1625:7, 14; 1626:4;
1627:7; 1628:13;
1629:10, 24; 1630:7,
16, 24; 1631:6;
1632:12, 22; 1636:15;
1637:3, 8, 14; 1638:7,
17, 19, 21, 23; 1639:3,
9, 14, 16, 18; 1641:2;
1642:12; 1646:2;
1647:22; 1648:17, 20;
1649:16, 18, 20, 23;
1650:6, 9, 11; 1651:18;
1656:13; 1658:21, 24;
1663:25; 1664:3, 15,
19, 23; 1665:2, 7, 14;
1666:2; 1668:5; 1672:2;
1673:4, 13, 19; 1674:1,
8; 1675:2; 1676:2, 19,
22; 1677:1, 5, 9, 12;
1679:23; 1681:1, 12;
1682:4, 17, 22-24;
1683:2; 1684:20;
1690:20; 1692:25;
1694:5, 8, 14; 1695:1,
9, 12, 15, 22, 25;
1699:12, 15; 1700:11;
1701:2, 5, 18; 1702:14,
20, 23; 1703:2, 23;
1704:6, 12, 23;
1705:25; 1706:16, 20;
1707:4, 7, 16; 1708:4,
21; 1709:14, 20;
1710:2, 25; 1711:9;
1714:3

**themselves** [2] -
1709:9; 1710:15

**theory** [2] - 1607:16;
1709:7

**thereafter** [1] -
1592:5

**thereto** [1] - 1569:14

**they've** [1] - 1543:23

**thinking** [3] -
1559:14; 1694:11;
1711:20

**third** [2] - 1532:25;
1533:4

**Thomas** [1] - 1513:12

**thousands** [1] - 1606:3

**three** [9] - 1520:12;
1533:4; 1546:15;
1583:11; 1600:15;
1623:14; 1690:22;
1704:15; 1713:3

**throwing** [3] -
1570:13, 16, 22

**thrown** [1] - 1540:9

**Thursday** [14] -
1674:4; 1701:21, 24-25;
1702:18, 25; 1703:2;
1705:9, 19, 23-24;
1706:8

**timing** [6] - 1574:2-4,
6-7, 10

**Timothy** [1] - 1705:11

**title** [3] - 1514:13;
1640:12; 1658:18

**titles** [1] - 1662:3

**today** [15] - 1503:21;
1515:3; 1532:9; 1592:9;
1603:3; 1651:13;
1674:5; 1686:9; 1697:3;
1698:13; 1699:5;
1700:9; 1701:8, 23;
1711:10

**together** [4] -
1504:21; 1522:18;
1566:23; 1603:18

**TOLKIN** [1] - 1502:7

**toll** [3] - 1554:19;
1555:3; 1564:23

**tolls** [1] - 1554:18

**TOMMY** [1] - 1501:7

**Tommy** [70] - 1501:8;
1502:1; 1514:24;
1536:4; 1537:12, 17;
1546:6, 10, 17;
1548:14, 18; 1549:18;
1550:11; 1551:14, 23;
1552:8, 10, 19, 24;
1553:17, 20, 24;
1554:4, 10; 1560:10,
14; 1567:11; 1568:10,
25; 1579:5, 7; 1582:1,
3; 1583:15; 1592:11;
1615:24; 1617:20;
1619:1; 1626:21;
1635:20; 1640:19;
1641:20; 1642:4;
1643:3, 7-8; 1651:8,
21; 1652:11; 1653:22;
1654:15, 17; 1655:22;
1658:12; 1660:1;
1661:21; 1662:20;
1663:1; 1669:19;

**Thomas** [1] - 1513:12

1674:21; 1677:18;
1687:13; 1696:23;
1697:13; 1698:21

**Tommy's** [2] - 1619:2;
1654:24

**tomorrow** [8] -
1564:12; 1700:12;
1701:9, 14; 1704:3;
1705:10, 13; 1706:8

**tomorrow's** [1] -
1707:12

**tons** [1] - 1636:6

**Tony** [1] - 1633:1

**took** [12] - 1508:15;
1511:5; 1522:24;
1537:24; 1538:3;
1604:8; 1619:7; 1620:1,
7; 1662:20; 1693:5;
1699:20

**top** [4] - 1532:24;
1632:21; 1647:2;
1656:17

**tossing** [1] - 1570:19

**total** [3] - 1519:7;
1564:17; 1660:8

**totalling** [1] - 1564:9

**totally** [2] - 1509:11;
1660:10

**touch** [2] - 1569:18;
1700:8

**transaction** [9] -
1518:15; 1525:25;
1707:24; 1708:8, 10-11;
1709:13; 1713:2

**transactions** [6] -
1525:23; 1559:9;
1652:3, 6; 1683:23;
1709:5

**transcript** [21] -
1504:23; 1538:21;
1572:8, 12, 15; 1576:5,
10, 12, 19; 1577:5, 22,
25; 1578:4, 6, 8-9;
1594:7; 1608:2;
1613:14, 17; 1711:23

**transcripts** [6] -
1507:2; 1612:7, 16, 25;
1613:1, 15

**Transfer** [1] - 1635:9

**transfer** [14] -
1513:15; 1621:24;
1633:12; 1634:7, 11;
1636:7; 1657:10, 21,
25; 1658:4; 1661:10;
1670:20, 22; 1690:9

**transference** [1] -
1709:5

**transferred** [2] -

1584:13; 1646:19

**transfers** [8] -
1580:18; 1633:14;
1637:23; 1657:20;
1683:25; 1684:3; 1690:4

**translation** [1] -
1576:7

**transmission** [1] -
1519:20

**transmitted** [1] -
1584:6

**travel** [1] - 1704:22

**tree** [1] - 1522:24

**trial** [6] - 1512:16,
23; 1513:17; 1527:3;
1645:2; 1703:5

**trials** [1] - 1665:1

**tried** [3] - 1504:24;
1662:1, 18

**trip** [1] - 1703:6

**troubles** [1] - 1652:11

**true** [6] - 1513:14;
1527:8; 1644:16;
1656:5; 1699:4

**trust** [1] - 1646:19

**truth** [8] - 1575:16,
25; 1578:18; 1579:15,
19; 1614:3

**try** [13] - 1506:10;
1523:7; 1556:23;
1562:15; 1596:14;
1624:19; 1673:22;
1683:8; 1706:9, 20-21;
1711:17; 1713:5

**trying** [24] - 1505:6;
1510:15; 1515:16;
1524:3; 1526:25;
1539:17; 1541:3;
1550:24; 1553:14;
1566:23; 1567:11;
1579:6, 15, 17, 19-20;
1582:17; 1589:24;
1625:25; 1627:19;
1636:25; 1697:14;
1704:25; 1710:14

**Tuesday** [1] - 1569:8

**turn** [8] - 1512:24;
1519:14; 1546:22;
1553:11; 1571:7;
1604:16; 1646:7;
1660:11

**turned** [2] - 1664:17;
1674:4

**turning** [7] - 1635:5;
1642:1; 1657:17;
1667:10; 1668:21;
1669:21; 1681:17

**TVs** [1] - 1529:8

**two** [46] - 1504:6, 20, 24; 1508:6; 1509:9, 13; 1510:19; 1511:4; 1519:12; 1520:11; 1526:5; 1542:19; 1543:22; 1546:15; 1555:15; 1565:13; 1579:9; 1580:18; 1591:13; 1605:14; 1606:4; 1612:7, 16, 24; 1613:1, 6; 1633:14; 1636:19; 1637:23; 1644:9; 1646:13; 1664:13; 1673:2, 8; 1676:13; 1683:18; 1684:1; 1701:10, 19; 1703:7, 17; 1704:5, 11; 1706:12; 1713:3

**two-day** [1] - 1706:12

**twofold** [1] - 1664:4

**type** [6] - 1520:20; 1663:19; 1666:11; 1676:6, 9; 1683:9

**types** [1] - 1696:21

**Tyson** [4] - 1607:16; 1608:6; 1705:9; 1710:6

**U**

**U.S** [2] - 1501:4, 18

**ultimately** [1] - 1697:24

**unable** [1] - 1512:10

**unauthorized** [1] - 1607:22

**unclear** [1] - 1701:25

**undeclared** [1] - 1561:24

**under** [6] - 1522:8; 1539:19; 1542:4; 1620:9; 1712:19; 1713:16

**understandable** [1] - 1610:11

**understood** [1] - 1585:1

**undisclosed** [1] - 1561:24

**unfair** [2] - 1712:24; 1713:18

**unilaterally** [1] - 1704:10

**UNITED** [2] - 1501:1, 3

**united** [1] - 1501:12

**United** [2] - 1501:16; 1513:11

**unless** [3] - 1565:21; 1576:6; 1712:20

**unrelated** [1] - 1709:25

**untoward** [1] - 1694:11

**up** [57] - 1504:25; 1512:12, 20; 1514:3; 1524:20; 1527:18; 1537:13; 1548:5, 14; 1552:14; 1553:8; 1560:21, 23, 25; 1561:3; 1571:24; 1574:5; 1579:7; 1588:15; 1605:24; 1609:20; 1610:10; 1613:17, 19, 22; 1625:22; 1630:21; 1634:16; 1639:1, 5, 19; 1643:25; 1648:11; 1649:23; 1650:12; 1653:11; 1654:11; 1660:7; 1662:4; 1663:25; 1669:9; 1674:2; 1677:5; 1683:17; 1688:12; 1695:13, 15; 1701:22; 1703:15; 1706:23; 1707:8; 1709:1; 1712:1

**upper** [2] - 1562:20; 1598:7

**upset** [3] - 1662:21

**urgency** [2] - 1567:22; 1569:11

**urgent** [3] - 1567:16; 1569:6, 22

**V**

**vacation** [1] - 1703:9

**vacations** [1] - 1704:16

**Valley** [9] - 1524:7, 9, 12; 1525:21; 1529:4, 22; 1707:15, 25; 1710:1

**value** [8] - 1679:3; 1680:19; 1681:18; 1683:14; 1684:13, 16; 1712:22; 1713:17

**values** [1] - 1679:10

**various** [4] - 1520:23; 1673:6; 1678:22; 1679:3

**vehicle** [3] - 1662:12; 1663:13; 1667:2

**vehicle's** [1] - 1662:13

**vehicles** [7] - 1650:24; 1661:21; 1663:11, 15; 1671:1; 1679:10; 1684:1

**vendor** [3] - 1561:4;

24; 1623:5

**Vero** [1] - 1668:17

**version** [4] - 1504:19; 1629:15; 1644:22; 1692:12

**vertical** [2] - 1632:5, 8

**Veterans** [1] - 1501:22

**via** [1] - 1555:20

**victim** [3] - 1713:5, 9, 11

**victims** [1] - 1707:23

**video** [3] - 1523:22, 24; 1529:7

**visual** [1] - 1529:8

**visualizing** [1] - 1560:13

**voice** [13] - 1504:7; 1509:5, 15; 1511:14, 16; 1514:3; 1605:14; 1620:13; 1629:10; 1639:19; 1650:12; 1711:15

**voicemail** [1] - 1505:2

**Volpe** [2] - 1617:11; 1636:5

**volunteering** [1] - 1527:17

**W**

**wait** [10] - 1512:15; 1557:12; 1583:15, 21; 1598:3; 1618:11; 1702:3, 21

**walked** [1] - 1632:16

**Walker** [2] - 1640:6; 1642:18

**Wampler** [9] - 1640:6, 10, 15; 1641:19; 1642:18; 1645:3, 10; 1647:5

**wandered** [1] - 1702:11

**wants** [5] - 1527:6; 1585:12, 21; 1608:11, 17

**waste** [1] - 1603:18

**wasting** [1] - 1707:11

**WaterStone** [1] - 1708:9

**Wayne** [2] - 1686:11; 1687:5

**ways** [1] - 1576:3

**WBWCB** [1] - 1643:1

**wedding** [3] - 1701:25; 1702:24; 1703:17

1701:21; 1702:18, 25; 1703:1; 1714:5

**week** [26] - 1509:21; 1512:10, 15, 22; 1522:5; 1524:14; 1538:22; 1546:23; 1607:13; 1663:4; 1664:9, 12; 1700:5, 7; 1701:10, 21-22; 1702:25; 1704:19, 21, 25; 1705:1, 4, 14; 1706:7; 1711:22

**weeks** [6] - 1557:15; 1655:5, 15; 1664:13; 1690:8

**WEINBLATT** [1] - 1501:21

**weird** [1] - 1550:22

**welcome** [1] - 1512:9

**West** [1] - 1644:8

**Wheel** [2] - 1666:22; 1668:15

**wheelchair** [1] - 1558:13

**whole** [9] - 1509:17; 1536:16; 1611:6; 1616:22, 24; 1618:21; 1702:1; 1705:1, 22

**WICKER** [1] - 1502:7

**willing** [6] - 1576:6; 1604:18; 1697:15; 1711:16; 1713:5, 14

**wing** [1] - 1679:7

**wings** [1] - 1679:9

**wire** [44] - 1513:15; 1519:20; 1549:2, 12; 1564:7; 1565:19, 21; 1566:16; 1582:7; 1585:10; 1621:24; 1622:20, 25; 1633:12, 14; 1634:2, 4, 7, 11, 17; 1636:7; 1637:18; 1649:6; 1657:10, 20-21, 25; 1658:3; 1660:19; 1661:7, 9, 15; 1662:18; 1670:2, 20, 22-23; 1683:25; 1684:2; 1690:3, 5, 8

**Wire** [2] - 1666:22; 1668:15

**wired** [5] - 1566:9; 1621:8; 1637:20; 1661:2; 1662:24

**wires** [3] - 1583:11; 1660:18; 1662:17

**wiring** [5] - 1564:17; 1633:7; 1662:25

**wish** [2] - 1563:22;

1708:12

**31**

**withdraw** [3] - 1539:22; 1567:21; 1627:3

**withdrawals** [1] - 1622:24

**withdrawn** [1] - 1586:21

**Witness** [3] - 1570:6; 1638:22; 1639:8

**witness** [64] - 1513:21; 1521:20; 1526:25; 1527:4, 11; 1529:14; 1557:8; 1558:25; 1559:16; 1570:9, 15, 21-22; 1571:3, 9, 23; 1574:21; 1576:5; 1577:5, 12; 1592:17, 23; 1596:13; 1603:25; 1604:15; 1605:16; 1606:20; 1620:6; 1629:23; 1638:23; 1639:2, 5, 11; 1649:19, 23; 1650:3; 1664:7, 12, 14, 17, 20; 1665:9; 1673:5; 1674:18, 25; 1677:9; 1695:19; 1700:4; 1705:12, 20, 23; 1706:24; 1707:9, 13; 1712:7, 11

**WITNESS** [17] - 1514:1; 1522:10; 1527:25; 1534:7, 11; 1539:16; 1556:21; 1558:19; 1559:6; 1578:10; 1613:21; 1638:21; 1639:9, 16; 1650:6, 9; 1682:23

**WITNESSES** [1] - 1715:2

**witnesses** [15] - 1512:24; 1630:2; 1664:8, 12; 1700:7; 1703:14, 18; 1704:3, 13; 1705:2, 4; 1706:15; 1708:1; 1710:14

**won** [1] - 1678:1

**word** [21] - 1527:8; 1531:18; 1533:16, 18, 25; 1534:3, 6, 9; 1540:20; 1541:2; 1542:3; 1551:5; 1585:15; 1613:8; 1615:10; 1664:13; 1685:12

**word-for-word** [1] - 1613:8

**words** [6] - 1522:18; 1586:14; 1598:6; 1601:11; 1610:16;

1691:12

**works** [3] - 1550:22; 1596:18; 1683:8

**world** [1] - 1654:2

**worried** [1] - 1703:9

**worth** [1] - 1679:18

**write** [2] - 1542:2; 1582:1

**writes** [3] - 1633:23; 1634:1; 1635:6

**writing** [3] - 1551:22; 1582:3; 1583:1

**written** [4] - 1549:17; 1598:8, 20; 1599:20

**wrote** [2] - 1633:17; 1634:6

---

**X**

---

**xerox** [1] - 1694:3

---

**Y**

---

**year** [4] - 1510:1; 1540:13; 1602:10; 1708:8

**years** [24] - 1509:9; 1510:8, 11, 13; 1511:4, 15; 1546:15; 1589:17; 1600:19; 1601:12; 1636:19; 1640:7; 1651:1, 4, 25; 1652:1; 1674:20, 22; 1682:12; 1708:16; 1713:3

**yellow** [1] - 1552:20

**yo** [1] - 1639:19

**YORK** [1] - 1501:1

**York** [9] - 1501:5, 17, 23; 1502:2, 5, 9; 1537:19; 1554:12; 1590:7

**yourself** [4] - 1596:8, 23; 1686:21; 1687:2

---

**Z**

---

**zero** [4] - 1574:4; 1620:10, 16; 1713:17

**Zoey** [1] - 1656:23