1718

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA      :   13-CR-607 (JFB)
 4
           -against-                    U.S. Courthouse
 5                                  :
                                        Central Islip, New York
 6    PHILLIP A. KENNER
      a/k/a "Philip A. Kenner",
 7         and                      :
      TOMMY C. CONSTANTINE
 8    a/k/a "Tommy C. Hormovitis"

 9                    Defendants    :
                                        May 27, 2015
10    - - - - - - - - - - - - - - - X   9:30 a.m.

11
      BEFORE:
12                    HONORABLE JOSEPH F. BIANCO
                      United States District Judge
13                         and a jury

14
      APPEARANCES:
15
      For the Government:      KELLY T. CURRIE
16                             Acting United States Attorney
                               Federal Plaza
17                             Central Islip, New York 11722
                               BY:  JAMES M. MISKIEWICZ
18                                  SARITHA KOMATIREDDY
                                    Assistant U.S. Attorneys
19

20

21    For the Defendant:      HALEY, WEINBLATT & CALCAGNI LLP
      Phillip A. Kenner       One Suffolk Square
22                            1601 Veterans Memorial Highway
                              Suite 425
23                            Islandia, New York 11749
                              BY:  RICHARD HALEY
24

25
```

1719

```
 1   For the Defendant:      LaRUSSO & CONWAY LLP
     Tommy C. Constantine    300 Old Country Road
 2                           Suite 341
                             Mineola, New York 11501
 3                   BY:  ROBERT P. LaRUSSO
                            and
 4                   ANDREW L. OLIVERAS
                     26 Strangford Court
 5                   Oceanside, New York 11572

 6

 7   Court Reporter(s)    OWEN WICKER
                          MARY ANN STEIGER
 8                        PERRY AUERBACH
                          100 Federal Plaza
 9                        Central Islip, New York 11722
                          631-712-6102
10

11                     ***
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1720

```
 1             M O R N I N G   S E S S I O N
 2           (Case called.)
 3           (Appearances noted.)
 4           THE COURT:  Okay.  The jurors are all here.  One
 5   of the jurors, Juror 3, was so delighted they brought in
 6   crumb cakes to chambers and I said we don't take any gifts
 7   so we brought it back into the courtroom.
 8           Ready to go.
 9           MR. HALEY:  Yes, sir.
10           MR. LARUSSO:  Yes.
11           MS. KOMATIREDDY:  We are on again Mr. Bailey's
12   direct.  I'll read in stipulations agreed to and the
13   e-mails admitted yesterday has attachments that should be
14   individually marked and I'll read those into the record as
15   well.
16           THE COURT:  Sure.  Bring in the jury.
17   J E F F R E Y   F O X   B A I L E Y,
18           having been previously sworn, resumed the stand
19           and testified further as follows:
20           (Whereupon, the jury at this time enters the
21   courtroom.)
22           THE COURT:  Please be seated.  Good morning,
23   members of the jury.
24           I thank Juror 3 for offering me the crumb cake
25   this morning.  I don't accept any gifts, but you guys can
```

1721

```
 1   eat all the crumb cake you want.  It was a nice thought.
 2           So we're ready to proceed.  As you know
 3   Mr. Bailey was on his direct examination and we'll
 4   continue from that point.
 5           Mr. Bailey, I remind you you are still under
 6   oath.  Do you understand?
 7           THE WITNESS:  Yes, I do.
 8           THE COURT:  Go ahead.
 9           MS. KOMATIREDDY:  Before we continue with the
10   examination I'll read a few things for the record.  The
11   parties have entered into a few additional stipulations,
12   Stip 18, Stip 19, Stip 20 and Stip 21.  And it pertains to
13   Government's Exhibit 4035, 3608 and 3609.  3422 and 3433.
14   1501 through 1526.
15           At this time -- and also 1907.
16           At this time we Stip 18 to Stip 22, and the
17   foregoing exhibits.
18           THE COURT:  They are referred to in the
19   stipulation.
20           MS. KOMATIREDDY:  Yes, your Honor.
21           THE COURT:  Any objection.
22           MR. LARUSSO:  No, your Honor.
23           MR. HALEY:  No, sir.
24           THE COURT:  Those stipulations and the exhibits
25   referred to in those stipulations are admitted.
```

1722

```
 1           (Whereupon, Government Exhibit Stip 18through
 2   22.  Government's Exhibit 4035, 3608 and 3609.  3422 and
 3   3433.  1501 through 1526, 1907, received in evidence.)
 4           MS. KOMATIREDDY:  Also a number of e-mail
 5   attachments 3402, 3404, 3407, through 405, 3410, 3411, and
 6   3417.  Just for the record the attachments of those
 7   e-mails have been separately identified with letters which
 8   I refer to during the course of the examination, those
 9   were included in my exhibits.
10           THE COURT:  Okay.
11           (Whereupon, Government Exhibit 3402, 3404, 3407,
12   through 405, 3410, 3411, and 3417, were received in
13   evidence.)
14           MS. KOMATIREDDY:  All right.
15   Q   So Mr. Bailey, at the end of the day yesterday we
16   went over several set of e-mails.  Do you remember that?
17   A   Yes, I do.
18   Q   I'm going to refer your attention to what is in
19   evidence.
20           MR. HALEY:  Judge, I don't believe the mike is
21   on.  May I approach?
22           THE COURT:  Yes.
23   Q   Referring you to what is in evidence as Government's
24   Exhibit 3402.  It's on your screen as well.
25   A   Okay.
```

*Official Court Reporter*

Bailey - Direct/Komatireddy

1723

1  Q    This is an e-mail from Mr. Constantine to you,
2  correct?
3  A    **Yes, it is.**
4  Q    The subject is Avalon hanger 1, Scottsdale, correct?
5  A    **Yes.**
6  Q    It has a couple attachments and is dated June 11,
7  2009, right?
8  A    **Yes, it is.**
9  Q    I'll read a few lines into the record.
10     Jeff, thank you very much for your time and
11  consideration on this today.  I really appreciate you even
12  considering helping me out in this difficult situation.
13     Can you tell us again what was your
14  understanding what was the difficult situation?
15  A    **The gentleman that he was involved with was getting**
16  **ready to foreclose on the hangers.**
17  Q    Skipping down a few lines, attached, please find the
18  specs on hanger 1 as well as an aerial of the whole
19  property and an elevation rendering.
20     I will turn now to what is in evidence as 3402
21  A.  Taking a look at this sketch, can you describe what
22  we're looking at here?
23  A    **That's the three hangers that were involved -- that**
24  **is considered a hanger condominium of which**
25  **Mr. Constantine had a vested interest in one of those**

Bailey - Direct/Komatireddy

1724

1  **three hangers.**
2  Q    Which one was it that he had an interest in it or
3  that you were looking to buy -- sorry, that you were all
4  discussing?
5  A    **Hanger number 1.**
6  Q    Just blowing up the rightmost hanger, is that the
7  one, hanger 1 on the schematic?
8  A    **Yes.**
9  Q    Going to 3402 B.  Can you describe what we're looking
10  at here?
11  A    **That is the view of the condominium, artist**
12  **rendering.**
13  Q    And just for the record, this is by Dickinson
14  Architects?
15  A    **Yes.**
16  Q    And that's an artist rendering of the outside.
17     And going 3204 C, is that an approximate
18  location of the hanger that you and Mr. Constantine were
19  discussing?
20  A    **Yes, that's the dirt that was involved before the**
21  **condo and the other hanger were built.**
22  Q    Turning to Government's Exhibit 3404.  This is an
23  e-mail from Mr. Constantine to you?
24  A    **Yes.**
25  Q    And the subject line is hanger for schematic?

Bailey - Direct/Komatireddy

1725

1  A    **Yes.**
2  Q    Attachment is Government's Exhibit 3404 A.  What are
3  we looking at here?
4  A    **We're looking at the second hanger that**
5  **Mr. Constantine had ownership in.**
6  Q    It looks like there's a hanger and some offices at
7  the bottom; is that correct?
8  A    **Yes, that's correct.**
9  Q    Turning to Government's Exhibit 3405, there's another
10  e-mail from Mr. Constantine to you on June 11th?
11  A    **Yes, it is.**
12  Q    A couple of attachments.  I will go through them.
13  Turning to 3405 A.  What are we looking at here?
14  A    **That's I believe the east side of the building.**
15  Q    I'm sorry?
16  A    **The east side of hanger, of the hanger.**
17  Q    Okay.  An external view?
18  A    **Yes.**
19  Q    Going to 3405 B.  On the left side there, what is it
20  that you can see there?
21  A    **The left side is the hanger space itself.**
22  Q    It's a big empty open space?
23  A    **Yes.**
24  Q    And 3405 C, another photo of that same hanger,
25  correct?

Bailey - Direct/Komatireddy

1726

1  A    **Yes.**
2  Q    And just looking at this building, it's the office
3  space.  Where was it located?
4  A    **The office space would be where the red brick part of**
5  **the building.**
6  Q    Do you know what time in 2009 who was in those
7  offices?
8  A    **Eufora in Tommy's office where he was running that**
9  **operation.**
10  Q    Initially when you were discussing with
11  Mr. Constantine investing in those hangers, what was the
12  initial investment that you intended to make?  What was
13  the nature?
14  A    **He approached me about basically cleaning up the debt**
15  **on the property, doing financing on the deal.**
16  Q    Did that financing happen?
17  A    **Yes, to some degree.**
18  Q    Tell us how the deal evolved?
19  A    **The deal evolved with the financing, the gentleman,**
20  **Mr. Hilton, had some other stipulations and it just kept**
21  **spiraling out of control.  There were other liens on the**
22  **buildings.  I told Mr. Constantine that I would be**
23  **comfortable in helping the situation, would be able to**
24  **purchase the hangers, getting a bank involved to make sure**
25  **that there was no liens, encumbrances and the property was**

**Bailey - Direct/Komatireddy**

1727

1 free and clear.

2 Q    You said there were other liens on the property.  Can

3 you describe the nature of the other liens?

4 A    When they did the title search there were 25

5 different liens.  I don't know what the specifics were or

6 the amount of money.

7 Q    I'm sorry?

8 A    Or the amount of money.

9 Q    I'll turn your attention to 3407 which is in

10 evidence.  This is an e-mail to Mr. Constantine to Vincent

11 Bjerk, cc to you?

12 A    Yes.

13 Q    Who was Bjerk?

14 A    A senior loan advisor at the time of the Bank of

15 Arizona.

16 Q    This was the time when you asked the bank to get

17 involved in the deal?

18 A    Yes.

19 Q    The third line of this e-mail, what did

20 Mr. Constantine write?

21 A    The hangers are titled in the name of Avalon CMG LLC.

22 I am the sole manager of this entity.

23 Q    Did you know if there were any other members in that

24 entity, Avalon CMG?

25 A    No, I didn't.

---

**Bailey - Direct/Komatireddy**

1728

1 Q    Did Mr. Constantine ever indicate there were any

2 professional hockey players who had interest in the Avalon

3 CMG?

4 A    At that time no.

5 Q    As the financing progressed, were there any up-front

6 payments?

7 A    As we got closer to the deal, there was the original

8 investment was 3.5 million and all the liens and

9 encumbrances, and the thing that could be taken care of

10 was $3,650,000.  I told Mr. Constantine that he would have

11 to come up with the balance.

12 Q    Turning your attention what is in evidence as

13 Government's Exhibit 1102, page 9.  This is a bank

14 statement for an account in the name of the Law Offices of

15 Ronald Richards.

16       In 2009 did you know what the Law Offices of Ron

17 Richards was?

18 A    No, I do not.

19 Q    There's an entry for July 13, 2009, showing JB AZ

20 Consulting receiving $384,300.  JB AZ Consulting, is that

21 your company?

22 A    Yes, it was.

23 Q    Did you receive 384,000 and change in or about July,

24 July 13, 2009?

25 A    Yes.

---

**Bailey - Direct/Komatireddy**

1729

1 Q    What was that payment for, Mr. Bailey?

2 A    That payment was for the $150,000 shortfall and I

3 required them to put six months of payments, approximately

4 a balance of $234,300 in escrow.

5 Q    Why did you require that escrow?

6 A    I required it to make sure I got paid back, for

7 security.

8 Q    Turning your attention to Government's Exhibit 3410

9 which is in evidence.  This is an e-mail from

10 Mr. Constantine to you on July 13, 2009, correct?

11 A    Yes, it is.

12 Q    I'll read it in for the record.

13       Jeff, later today, I'm wiring the six months of

14 interest reserve plus the 150 K for the difference between

15 what you, Bank of Arizona are funding, and what Steve

16 Hilton and Scott Bjerk are willing to accept into your JB

17 AZ Consulting LLC account, right?

18 A    Yes.

19 Q    Who is Scott Bjerk?

20 A    I believe he was the contractor that had liens on the

21 property?

22 Q    Who was Steve Hilton?

23 A    Steve Hilton also was the main financier of the

24 project.

25 Q    Before you?

---

**Bailey - Direct/Komatireddy**

1730

1 A    Before me, yes.

2 Q    And so this up-front payment, what is an up-front

3 payment for?  What are you preparing to do with these

4 hangers?

5 A    Purchase them.

6 Q    So this is a payment to you for you to purchase the

7 hangers with the title in your name?

8 A    It, again, the 150,000, I was told it was

9 $3.5 million to do the financing.  I ended up taking the

10 hangers for the 3.5 million.  Steve Hilton and Scott

11 Bjerk, were not willing to accept the monies so I had to

12 show $150,000 to need to break the closing, to close the

13 deal.

14 Q    To close the deal so the hangers would be in your

15 name?

16 A    Yes.

17 Q    I will turn your attention to what is in evidence as

18 3417.  This is an e-mail from Mr. Constantine to you on

19 July 29th.  Do you see that?

20 A    Yes.

21 Q    And an attachment which I'll turn to, 3407 A?

22       THE COURT:  So the record is clear.  It is to

23 someone else and he's cc'd on it, correct.

24       MS. KOMATIREDDY:  Sorry about that.

25 Q    So the record is clear, to Deborah Koral?

Bailey - Direct/Komatireddy

1731

1 **A   Yes.**

2 Q   Who is Deborah Koral?

3 **A   My attorney.**

4 Q   3471 A.  At the top of this says "Indemnification"?

5 **A   Yes.**

6 Q   Does that appear to be Mr. Constantine's signature at

7 the bottom?

8 **A   It appears to be.**

9 Q   What is your understanding?  What is the purpose of

10 this document?

11 **A   If there were any other unforeseen liens or other**

12 **issues with the property, that Tommy would indemnify me**

13 **from any liabilities.**

14 Q   Now, in terms of the ultimate contract that you

15 entered into with Mr. Constantine, did that go through

16 several drafts?

17 **A   Yes.**

18 Q   And turn to what is in evidence as 3411.  Just for

19 the record, this is an e-mail from Mr. Constantine to you,

20 correct?

21 **A   Yes.**

22 Q   Forwarding an attachment, commercial Real Property

23 Sale Agreement, Hangers 7.109..

24 **A   Correct.**

25 Q   And at the bottom it appears to be a forward from the

---

Bailey - Direct/Komatireddy

1732

1 law offices of Steven Wade Nehgen?

2 **A   Yes.**

3 Q   What did you do when you received this attachment?

4 **A   Forwarded it to my attorney.**

5 Q   Is this the final, looking -- the attachment to this

6 e-mail, was that the final draft of the agreement?

7 **A   No, I don't believe so.**

8 Q   Turning to -- handing you what has been marked as

9 Government's Exhibit 3428.  Do you recognize that?

10 **A   Yes.**

11 Q   Have you had a chance to review that before coming

12 into court today?

13 **A   Yes.**

14 Q   What is it?

15 **A   A lien installment contract.**

16 Q   And is there a signature on it?

17 **A   Yes, it's on page 8.**

18 Q   Page 8, does that also appear to contain

19 Mr. Constantine's signature.

20 **A   Yes.**

21 Q   Is that a true and accurate contract of the

22 installment contract you entered into with Mr. Constantine

23 in 2009?

24 **A   Yes.**

25         MS. KOMATIREDDY:  GX 3428 in evidence.

---

Bailey - Direct/Komatireddy

1733

1         MR. LARUSSO:  No objection, your Honor.

2         MR. HALEY:  No objection, sir.

3         THE COURT:  3428 is admitted.

4         (Whereupon, Government Exhibit 3428 was received

5 in evidence.)

6 Q   Publishing it for the jury.

7         Looking at the first paragraph, a land

8 installment contract between JB AZ Consulting  -- your

9 company?

10 **A   Yes.**

11 Q   -- And AZ Avalon Partners.  What was your

12 understanding who that was?

13 **A   Mr. Constantine.**

14 Q   You stated earlier the purchase price of the property

15 was $3.8 million.  3.85; is that correct?

16 **A   No, I purchased the property for -- I purchased the**

17 **property for 3.5 million.**

18 Q   And the money that you got up front was to make up

19 that difference?

20 **A   No, the money that I got up front was to close the**

21 **deal.  I needed 3,350,000 to close the deal.**

22 Q   Fair enough.  All right.

23         So going to the next page, there's a provision

24 here that says security deposit in the amount of 234,000?

25 **A   Yes.**

---

Bailey - Direct/Komatireddy

1734

1 Q   What is that?

2 **A   When the note was attached to it, that would be**

3 **approximately six months of principal and interest on the**

4 **note, on the land installment contract.**

5 Q   And you said you needed $150,000 to close the deal.

6 I'll turn to what is in evidence as Government's

7 Exhibit 4035.  The settlement statement for First American

8 Title.  Do you see that?

9 **A   Yes.**

10 Q   Naming you as the borrower and Avalon CMG as the

11 seller?

12 **A   Yes.**

13 Q   Is this a fair and accurate copy of the settlement

14 from your closing of the two hangers we are discussing?

15 **A   Yes.**

16 Q   Turning to page 3, there's a deposit here:  Funds for

17 closing.  It says $150,000?

18 **A   Yes.**

19 Q   Is that $150,000 that you referred to as funds to

20 close the deal?

21 **A   Money that I received from Mr. Constantine.**

22 Q   The $234,000 from the land installment contract and

23 the $150,000 needed for closing, added up to the $384,000

24 that you received from Mr. Constantine; is that correct?

25 **A   That's correct.**

---

Bailey - Direct/Komatireddy

1735

1  Q   Going back to the contract, looking at page 11,
2  there's an attachment to the contract that says loan
3  amortization results and a loan overview with an
4  amortization table.
5      Explain what this is?
6  A   Yes, I believe the agreement with Mr. Constantine, we
7  had -- I'm not sure what the amortization, I believe it
8  was for five years, this may have been amortized over a
9  longer period of time, but that would be the agreed upon
10 payment.  Principal and interest would be the breakdown.
11 Q   So looking at this, approximately, under this
12 contract that he entered into with you, he owed you
13 approximately $40,000 a month?
14 A   Yes.
15 Q   And that was to pay off the loan that he had taken on
16 these hangers, correct?
17 A   He did not.
18 Q   To fulfill the land installment contract with you?
19 A   Yes.
20 Q   During the term of this loan, the title for those
21 hangers were in your name, correct?
22 A   Yes.
23 Q   Did this deal with respect to the hangers in fact
24 close?
25 A   Yes.

Bailey - Direct/Komatireddy

1736

1  Q   I'll hand you what has been marked as Government's
2  Exhibit 3426.  Do you recognize that?
3  A   Yes.
4  Q   What is it?
5  A   That's a warranty deed.
6  Q   And what property is being conveyed by this warranty
7  deed?
8  A   The two parcels, hanger, I believe, number 1 and 4.
9  Q   And is this -- did you receive this -- where did you
10 receive this deed from?
11 A   I would receive this probably at the closing and it
12 would have been followed by the Maricopa County recorder.
13 Q   Is this the deed that you received from them?
14 A   Yes.
15     MS. KOMATIREDDY:  Government's Exhibit 3426 in
16 evidence.
17     MR. HALEY:  No objection.
18     MR. LARUSSO:  No objection.
19     THE COURT:  3426 is admitted.
20     (Whereupon, Government Exhibit 3426 was received
21 in evidence.)
22 Q   This is dated July 27, 2009, correct?
23 A   Yes.
24 Q   Conveys Avalon CMG to JB AZ Consulting, your company?
25 A   Yes.

Bailey - Direct/Komatireddy

1737

1  Q   And Exhibit A refers to the legal description of the
2  property itself, the two hangers that we saw pictures of
3  earlier, correct?
4  A   Yes?
5  Q   So as of the closing, after deed has been conveyed,
6  who owns the two hangers?
7  A   JB AZ Consulting.
8  Q   Anyone else?
9  A   No.
10 Q   Did any professional hockey players have an interest
11 in those two hangers?
12 A   With me?
13 A   No.
14 Q   Correct.
15 Q   Now, you testified that you had a loan installment
16 contract with Mr. Constantine and that there was a payment
17 schedule associated with that.
18     Did you receive some payments with respect to
19 that schedule?
20 A   Yes.
21 Q   I will turn your attention to what is in evidence as
22 1307, the bank statement for AZ Avalon Partners with the
23 accompanying checking withdrawal.  The check withdrawal is
24 dated 8/27/09 in the amount of $39,409.26.
25     Did you receive approximately $40,000 from

Bailey - Direct/Komatireddy

1738

1  Mr. Constantine in or about August 27, 2009?
2  A   Yes.
3  Q   Turning to -- before we do that -- earlier that
4  month, just looking at the statement, there is an incoming
5  wire from the Law Offices of Ronald Richards in the amount
6  of $40,000; is that correct?
7  A   Yes, that's what it says.
8  Q   Turning to Government's Exhibit 1308, in or about
9  September 28, 2009, did you receive a payment of
10 approximately $40,000 from Mr. Constantine?
11 A   Yes.
12 Q   And looking at this bank record of AZ Avalon, earlier
13 that month was there an incoming wire from -- of
14 approximately $40,000 from the Law Offices of Ronald
15 Richards?
16 A   Yes.
17 Q   Turning to Government's Exhibit 1309, bank statement
18 for AZ Avalon for October 2009.  Looking at the
19 withdrawal, there's a transfer to an account in the name
20 of JB AZ Consulting, about $40,000?
21 A   Yes.
22 Q   That is on October 30, 2009?
23 A   Yes.
24 Q   Earlier that month there is a large transfer in of
25 approximately $40,000 from the Law Offices of Ronald

Bailey - Direct/Komatireddy

1739

1 Richards, correct.

2 A    Yes.

3 Q    And turning to Government's Exhibit 1310 which is not

4 in evidence, it's a fuller version of Constantine 107. At

5 this time we would move it in evidence. It's a bank

6 record with the second page included.

7          THE COURT:  Mr. LaRusso, any objection?

8          (Pause in proceeding.)

9          MR. LARUSSO:  No, go right ahead. Sorry.

10         THE COURT:  Any objection, Mr. LaRusso?

11         MR. LARUSSO:  No, your Honor.

12         MR. HALEY:  No, sir.

13         THE COURT:  What was that number again?

14         MS. KOMATIREDDY:  1310.

15         THE COURT:  That is admitted.

16         (Whereupon, Government Exhibit 1310 was received

17 in evidence.)

18 Q    Turning to Government's Exhibit 1310, looking at the

19 AZ Avalon bank statement for December of 2009, there's a

20 payment of approximately $42,000 to JB AZ Consulting on

21 December 1st?

22 A    Yes.

23 Q    Did you previous that payment?

24 A    Yes.

25 Q    And on December 1st, in this account, there's an

Bailey - Direct/Komatireddy

1740

1 incoming wire of approximately $43,000 from Eufora,

2 correct?

3 A    Yes.

4 Q    Going to the second page, there's another payment in

5 the same month to you of approximately $40,000 on

6 December 30th, correct?

7 A    Yes.

8 Q    And earlier that month there is an incoming wire from

9 the Law Offices of Ronald Richards, correct?

10 A    Yes.

11 Q    Each of the payments we've looked at that went to

12 you, August, September, October and December of 2009 of

13 approximately $40,000, what were the payments for?

14 A    They were his obligation in the principal and

15 interest of the loan installment contract.

16 Q    Did Mr. Constantine continue to make payments to you?

17 A    After -- in 2010 they became all sporadic.

18 Q    What happened as they became sporadic?

19 A    We had discussions and just trying to keep on target

20 and try to keep the contract in place so we could get the

21 property back.

22 Q    Any discussions about someone else taking over the

23 property?

24 A    Yes, I discussed other options.

25 Q    What were the options?

Bailey - Direct/Komatireddy

1741

1 A    Trying to locate other investors, somebody else that

2 would be more inclined to have use for the hangers.

3 Q    Did Mr. Constantine mention anyone in particular who

4 might be willing to take over the loans?

5 A    He had mentioned Sergei Gonchar was one person that

6 was brought up as far as having a willingness to take over

7 the loan installment contract.

8 Q    Handing you what has been marked as Government's

9 Exhibit 3420. Do you recognize that?

10 A    Yes.

11 Q    What is it?

12 A    A letter of intent to purchase the hangers.

13 Q    And attached to an e-mail from Mr. Constantine to you

14 dated May 14, 2011, correct?

15 A    Yes.

16 Q    Is this a true and accurate copy of an e-mail and an

17 attachment from Mr. Constantine to you on that date?

18 A    Yes, it is.

19         MS. KOMATIREDDY:  Government moves 3420 in

20 evidence.

21         MR. LARUSSO:  No objection.

22         MR. HALEY:  No objection.

23         THE COURT:  3420 is admitted.

24         (Whereupon, Government Exhibit 3420 was received

25 in evidence.

Bailey - Direct/Komatireddy

1742

1 Q    Publishing it for the jury.

2          It appears to be a blank e-mail from

3 Mr. Constantine to you. Subject line:  Term sheet. Term

4 sheet executed, correct?

5 A    Yes.

6 Q    Going to the attachment briefly it's a term sheet in

7 which the borrower would include both AZ Avalon Partners

8 and Sergei and Ksenia Gonchar?

9 A    Yes.

10 Q    And the guarantor is Gonchar Revokable Family Trust?

11 A    Yes.

12 Q    Did this attempt to take over the contract go

13 through?

14 A    No, it did not.

15 Q    What happened?

16 A    You'd have to ask Mr. Gonchar.

17 Q    So what happened with the hangers next?

18 A    I just basically told Tommy he couldn't afford them.

19 Since the length of the contract was getting behind, I had

20 looked at options of selling the hangers on my own.

21 Q    Did you in fact sell the hangers?

22 A    Yes, I did.

23 Q    Showing you Government's 3437 and 3434.

24         Do you recognize those?

25 A    Yes.

Bailey - Direct/Komatireddy

1743

1 Q   What are they?

2 A   This is a warranty deed.  3437 is a warranty deed

3 that JB AZ Consulting LLC conveys to Lightening

4 Enterprises LLC.

5 Q   And 3434 is another warranty deed?

6 A   3434 is a warranty deed that JB AZ Consulting LLC is

7 conveying the property to Tenacious Adventures LLC.

8 Q   Is your signature on both of these documents?

9 A   34 -- yes, both documents.

10 Q   Are these true and accurate documents of warranty

11 deeds that you signed?

12 A   Yes.

13       MS. KOMATIREDDY:  Government moves 3434 and 3437

14 into evidence.

15       MR. LARUSSO:  No objection, your Honor.

16       MR. HALEY:  No objection, Judge.

17       THE COURT:  3434 and 3437 are admitted.

18       (Whereupon, Government Exhibit 3434 and 3437

19 were received in evidence.)

20 Q   I will turn first to 3437.  Looking at this warranty

21 deed dated August 26, 2011 -- correct?

22 A   Yes.

23 Q   -- And what property are you conveying by this deed?

24 A   This would have been the hanger that was part of the

25 condominium.

Bailey - Direct/Komatireddy

1744

1 Q   Who were you conveying it to?

2 A   To Lightening Enterprises.

3 Q   Who is the person behind Lightening Enterprises?

4 A   I believe his name was Roger Helms.

5 Q   Is he a professional hockey player?

6 A   No, not my knowledge.

7 Q   What is your understanding?

8 A   Businessman.

9 Q   Did you sell this hanger to any professional hockey

10 players?

11 A   Again I sold it to Roger Helms, Lightening

12 Enterprises.

13       MS. KOMATIREDDY:  3432 which is in by

14 stipulation.

15 Q   Do you recognize this, Mr. Bailey?

16 A   Yes.

17 Q   Is this the final settlement statement for that sale?

18 A   Yes, it is.

19 Q   I'm turning to what is known as 3434, the other

20 warranty deed dated January 16, 2014, correct?

21 A   Yes.

22 Q   What property are you conveying in this warranty

23 deed?

24 A   This was the standalone hanger.

25 Q   And who did you sell it to?

Bailey - Direct/Komatireddy

1745

1 A   Tenacious Adventures LLC.

2 Q   Who is the person behind Tenacious Adventures LLC.

3 A   Kipp Lassetter.

4 Q   Is he a professional hockey player?

5 A   Not to my knowledge.

6 Q   What is his profession?

7 A   Businessman.

8 Q   So after you conveyed both of these properties, do

9 you currently own any interest in aviation hangers in

10 Scottsdale, Arizona?

11 A   No, not in those two hangers.

12 Q   Those were the only two hangers you bought from

13 Mr. Constantine?

14 A   Yes.

15 Q   Finally, did you talk to Mr. Constantine about other

16 investments?

17       Generally?

18 A   Did I talk to him about investments, no.

19 Q   Did he propose investments to you?

20 A   Yes.

21 Q   I'm going to hand you what is marked as Government's

22 Exhibit 3401.  Do you recognize that?

23 A   Yes.

24 Q   Is that a true and accurate copy of an e-mail from

25 Mr. Constantine to you on March 1, 2010, with attachments?

Bailey - Direct/Komatireddy

1746

1 A   Yes.

2       MS. KOMATIREDDY:  The Government moves 3401 in

3 evidence.

4       MR. HALEY:  Your Honor, may I see the document

5 briefly?

6       MR. LARUSSO:  Your Honor, may we have a brief

7 sidebar.

8       (Whereupon, at this time the following took

9 place at the sidebar.)

10       (Continued.)

Bailey - Direct/Komatireddy

1747

1    MR. LARUSSO:  It's a relevancy question, Judge.
2    THE COURT:  Wait for Mr. Haley.
3    What is the relevance?
4    MS. KOMATIREDDY:  Your Honor, this e-mail
5  Mr. Constantine states that he owns two Palms penthouse
6  condos.  His interest in those condos, purported interest
7  derive from proceeds from the Hawaii fraud.  I don't
8  intend to put it in through with this witness.  We'll use
9  it in closing but we do not need to go through it with
10  this witness.
11    THE COURT:  So you want show his investment to
12  those condos?
13    MS. KOMATIREDDY:  Yes.
14    MR. HALEY:  The question is on relevance and
15  materiality grounds, but if the Government claims there is
16  some connection with the fraud, fine.
17    THE COURT:  I think it meets the relevance
18  standard.
19    MR. LARUSSO:  Very good.
20    (End of sidebar conference.)
21    (Continued.)
22
23
24
25

Bailey - Cross/LaRusso

1748

1    (Open court.)
2    MR. HALEY:  No objection.
3    MR. LARUSSO:  No objection.
4    THE COURT:  3401 is admitted.
5    (Whereupon, Government Exhibit 3401 was received
6  in evidence.)
7    MS. KOMATIREDDY:  No further questions, your
8  Honor.
9    THE COURT:  Cross-examination.
10    Do you want to go first?
11    MR. HALEY:  Judge, I do have some preview
12  questions, but I'll defer to Mr. LaRusso.
13    MS. KOMATIREDDY:  Your Honor, I apologize.  3401
14  includes attachments 3401 A through I, just for the
15  record.
16    THE COURT:  Okay.
17  CROSS-EXAMINATION
18  BY MR. LARUSSO:
19  Q    Good morning, Mr. Bailey.
20  A    Good morning.
21  Q    My name is Robert LaRusso and I represent
22  Mr. Constantine.
23    I will be asking you a number of questions about
24  high finance, so if I ask a question that you don't
25  understand, please say so and I'll try and rephrase it.

Bailey - Cross/LaRusso

1749

1  A    I'll try.
2  Q    You mentioned on direct examination that there was a
3  guy who was foreclosing, I believe his name was
4  Mr. Hilton, on these hangers; is that correct?
5  A    That's correct.
6  Q    Approximately when was that occurring?  Do you know?
7  A    It had been ongoing for quite some time.  I'm not
8  sure when the first threat of foreclosure had taken place.
9  Q    Do you know what type of loan Mr. Hilton had on those
10  hangers?
11  A    It wasn't a loan.  It was liens around the property
12  for the completion of the project and he had paid certain
13  vendors for their services and was asking Mr. Constantine
14  for reimbursement.
15  Q    And you mentioned the word foreclosure.  Was he
16  foreclosing on those liens against the property?
17  A    He had stated that he had it listed for a Sheriff's
18  Sale, yes.
19  Q    And Mr. Hilton had a construction loan, is that what
20  it is called?
21  A    I'm not sure what Mr. Hilton's financial aspects
22  were.  It was approximately over $3 million was
23  Mr. Constantine had owed him for his completion of the
24  hangers.
25  Q    Okay.

Bailey - Cross/LaRusso

1750

1    And if you were not successful in satisfying
2  that indebtedness, the threat was that Mr. Hilton was
3  going to foreclose?
4  A    Absolutely, yes.
5  Q    In terms of the word itself, can you tell us in
6  layman's terminology what would happen if a person
7  forecloses because of that indebtedness?
8  A    They take over as the banks do today.  They take over
9  the property and liquidate it however they see fit.
10  Q    How much do you recall Mr. Hilton being owed at this
11  point in time?
12  A    I believe it was probably 3.2 or $3 million,
13  somewhere in that area.
14  Q    Do you know at this time what the value of the
15  property was?
16  A    At the time of the foreclosure, no.
17  Q    At the time you were negotiating the financial deal?
18  A    No, not at that time.
19  Q    I will show you 1342.  Actually it is in evidence.
20  3402.  I apologize.
21    Do you see that, Mr. Bailey?
22  A    Yes, I do.
23  Q    I want to make sure all the monitors are on.
24  A    Yes, I can see it.
25  Q    This was one of the documents shown to you on direct.

Bailey - Cross/LaRusso

**1751**

1  I'm going to read the last line of the first paragraph.
2  Again, this is from Mr. Constantine to you on June 11,
3  2009.
4        I am a bit outgunned and I'm dealing with a very
5  unreasonable guy.
6        I assume an unreasonably guy is Mr. Hilton?
7  **A   Yes.**
8  Q   It will be good to finally have someone in my
9  corner -- I assume that is you?
10 **A   Yes.**
11 Q   -- With the horsepower we need to defend and protect
12 the significant equity in the property.
13        Could you tell us what your understanding of
14 that is in layman's terminology?
15 **A   That obviously that the $3.5 million that he was**
16 **asking for, that there was a value that far exceeded the**
17 **$3.5 million that my investment would be secured.**
18 Q   So that these two hangers were worth substantially
19 more than the monies that Mr. Hilton was owed; is that
20 correct?
21 **A   When the bank got in, appraisals were done and it was**
22 **substantially more.**
23 Q   You yourself confirmed later when appraisals were
24 done that what Mr. Constantine was alluding to here was
25 there was substantial equity in this and it would have

Bailey - Cross/LaRusso

**1752**

1  been lost if Mr. Hilton had actually gone through with his
2  foreclosure?
3  **A   Yes.**
4  Q   I guess since you mentioned it we might as well jump
5  a little ahead.  I was going to go chronologically but
6  this might be appropriate.
7        You said that the bank had done an appraisal on
8  these two hangers.  Is that in reference to the financial
9  deal that you were negotiating with Mr. Constantine at
10 this point?
11 **A   There was a letter that was in reference that in**
12 **order to have me purchasing rather than financing this**
13 **particular deal, the bank got involved which they required**
14 **certain items for them to take the first lien on the**
15 **property.**
16 Q   So, correct me if I'm wrong, part of the deal that
17 was being negotiated instead of you loaning the money, you
18 were going to buy the property?
19 **A   That's correct.**
20 Q   And that you were negotiating with a bank to borrow
21 the money to purchase the property, that is, to satisfy
22 Mr. Hilton's obligation?
23 **A   That is correct.**
24 Q   And what was the name of the bank?
25 **A   Bank of Arizona.**

Bailey - Cross/LaRusso

**1753**

1  Q   How much were you intending to borrow from the bank
2  in regards to the deal we were talking about?
3  **A   I believe it was on the closing statement, somewhere**
4  **$2,850,000, I believe.  Somewhere in that area.**
5  Q   That money that you were borrowing didn't satisfy the
6  total obligation of Mr. Hilton; is that correct?
7  **A   That's correct.**
8  Q   How was the remainder of the money going to be paid
9  to Mr. Hilton?  Where was it coming from?
10 **A   Out of my pocket.**
11 Q   How much?
12 **A   Whatever the balance was to get it to $3.5 million**
13 **and the total sale was $3,650,000, which was the 150,000**
14 **that came from Mr. Constantine.**
15 Q   Now, this is where I'll ask you to explain.  You
16 mentioned a figure $384,000, is that correct?  Do you
17 remember that?
18 **A   That was money that was put into my account.  That's**
19 **correct.**
20 Q   Can you explain the relationship between the 384,000
21 and the 150,000 that you just mentioned?
22 **A   Out of the $384,300, $150,000 was applied towards the**
23 **purchase of -- my purchase of the hangers from**
24 **Mr. Constantine.  $234,300 were six months of payments on**
25 **the land contract that we agreed to sell Mr. Constantine**

Bailey - Cross/LaRusso

**1754**

1  the property back.
2  Q   So Mr. Constantine was putting in approximately
3  384,000 in order to complete this deal?
4  **A   He was putting in 150,000 to complete it, and the**
5  **other money was in escrow in case he could not make his**
6  **payments.**
7  Q   When you say it was placed in escrow, was that
8  originally part of the deal?
9  **A   No, it was not.**
10 Q   Could you tell the ladies and gentlemen of the jury,
11 what was the original part of the deal regarding the
12 234,000?
13 **A   The original part of the deal was financing, then**
14 **purchasing, then it was 3.2, went to 3.5, went to**
15 **3,650,000.**
16        **More people were coming out of the woodwork when**
17 **I came onto the scene, so that's when there was extra**
18 **security.  And I told Mr. Constantine the only way I would**
19 **go forward, I would not go more than $3.5 million and that**
20 **I wanted money if we enter into the land contract, said he**
21 **could purchase the property back, that I wanted money in**
22 **escrow of six months payments in case he defaulted.**
23 Q   Was there any conversation or discussion with
24 Mr. Constantine about that additional monies being not in
25 escrow but being placed in reserve?

Bailey - Cross/LaRusso

1755

1 A    Escrow and reserve is the same.
2 Q    What does interest reserve mean?
3 A    It's not interest reserve.  Again, it's the land
4 contract, that there is six months of payments that were
5 set aside, that if the payments were not to be made, that
6 money was to be used to make those payments.  It was set
7 aside.  It was Mr. Constantine's money.
8         Until we closed, he sent the money on the 14th.
9 Until we closed on the 29th, it was technically his money,
10 not my money.
11 Q    Let me show you what has been received in evidence.
12 Actually I can display it.  We discussed this earlier.  Do
13 you see that?
14 A    Yes.
15 Q    I will direct your attention to the first paragraph
16 where it says, this is from Mr. Constantine to you:  Later
17 today, I am writing [sic] the six months?
18         THE COURT:  Wiring, not writing.
19 Q    I am writing --
20         THE COURT:  I am "writing."
21         MR. LARUSSO:  I apologize.  I think I better
22 clean the glasses.
23 Q    I'm wiring the six months of interest reserve, plus
24 the 150 K for the difference between what you Bank of
25 Arizona are funding and what Steve Hilton and Scott Bjerk

Bailey - Cross/LaRusso

1756

1 are willing to accept into your JB AZ Consulting account.
2         Directing your attention to the six months of
3 reserve, what is Mr. Constantine referring to at that
4 point?
5 A    He's referring -- you say potato, I say po-ta-to --
6 Q    This may be one of those questions where I need you
7 to help me explain the financial materials.
8 A    If you look at the land installment contract you take
9 the first six months, multiply it times six, and you will
10 get 234,300.  He calls it interest reserve, I call it the
11 reserve of six months of payments if he were to default
12 with taxes of 60-some thousand, and other issues.
13         I wanted a reserve if I was burdened with trying
14 to liquidate the hangers, and again you have reference
15 back to this was 2008-'09.  This was not the best time for
16 real estate in Arizona, so the reserve was set aside for
17 that.
18 Q    So what Mr. Constantine is alluding to here is monies
19 that he was going to give to you for his protection for at
20 least six months if there is a failure to pay the payments
21 that were obligated by the contract?
22 A    Yes.
23 Q    Did that subsequently change and did you ask
24 Mr. Constantine instead if this money was going to become
25 a security deposit instead of a security reserve?

Bailey - Cross/LaRusso

1757

1 A    Again it was money held in escrow and as the payments
2 were not being made, we were using that money to try to
3 keep the land contract in place.
4 Q    The bank required that these hangers be appraised; is
5 that correct?
6 A    That's correct.
7 Q    Let me show you what has been marked -- while I'm
8 getting the exhibit, Mr. Bailey, do you remember the
9 appraised value of the two hangers before you actually
10 concluded this deal with Mr. Constantine?
11 A    Over $6.2 million.
12 Q    I'm sorry?
13 A    Over $6.2 million.
14         (Continued.)

Bailey - Cross/LaRusso

1758

1 BY MR. LARUSSO:
2 Q.    What, again, was the total amount of the money you
3 were investing in this deal?
4 A.    $3.5 million.
5 Q.    So there was substantial equity in these two hangars
6 after your contribution, or after this deal was concluded;
7 is that right?
8 A.    Yes.
9 Q.    Is there a phrase that in financing they talk about
10 loan to value, am I using the right phrase?
11 A.    Well, yes, but when you do loan to value, when I
12 purchased the hangars for the $3.5 million, that's why the
13 bank would not loan money.  They normally will use a seven
14 percent loan to value ratio.
15 Q.    I did get it right.
16 A.    Yes.
17         And so since I purchased $3.5 million, that's
18 why the bank would only treat 2,800,000 that they
19 considered to be valued.
20 Q.    Because of the state of the markets at that time,
21 banks were not lending at the 70 percent loan to value?
22 A.    Banks were not loaning any money to anybody because
23 they were too heavily invested in real estate.
24 Q.    So in the time that you were negotiating with
25 Mr. Constantine, your deal was more 50 percent loan to

Bailey - Cross/LaRusso

1759

1 value; is that correct?
2      What would be the ratio between the money you
3 were investing with what the appraised value of it was?
4 **A.   Again, it was -- I was originally in financing.  When**
5 **the financing did not go through, I ended up buying for**
6 **what I was supposed to finance it for.**
7      **At that point in time I told Mr. Constantine the**
8 **only way I would do this and keep him in the game, would**
9 **be a land installment contract if you want to buy them**
10 **back, you don't have to pay the appraised value of $6.2**
11 **million, you can buy them back for the $3,850,000.00.**
12 Q.   And that was the deal that you had with
13 Mr. Constantine?
14 **A.   Yes.**
15 Q.   And you requested this land installment contract for
16 further protection for yourself?
17 **A.   No, I did it for his own benefit.**
18 Q.   And how is that?
19 **A.   So at least you can try to recoup and give the equity**
20 **back in the properties if the real estate market came**
21 **back.**
22 Q.   He had the right, according to the contract, if he
23 satisfies the terms, to be able to pay off your obligation
24 and then secure the rest of the ownership of the property?
25 **A.   That is correct.**

Bailey - Cross/LaRusso

1760

1 Q.   Do you know what the different appraisal values for
2 the hangars were?
3      I think you mentioned hangar one and hangar
4 four.
5 **A.   It's two hangars, six million divided by two I guess.**
6 Q.   I'm going to show you what's been marked for
7 identification as C-111.
8      Take a look at it and see if there's anything in
9 there that refreshes your recollection in regards to the
10 different appraisal values of the hangars.
11      (Pause in proceedings.)
12 **A.   The question?**
13 Q.   I'm trying to determine at the time you entered into
14 this deal with Mr. Constantine, what was the appraisal
15 value on each one of the hangars?
16 **A.   The appraisal value, one was appraised at 3,750,000,**
17 **the other one was appraised at three million, so the total**
18 **would have been $6,750,000.00.**
19 Q.   And your part of the financial deal was how much did
20 you invest in purchasing these properties?
21 **A.   $3.5 million.**
22 Q.   So there was substantial equity in it at the time?
23 **A.   Yes.**
24 Q.   Now, I apologize for jumping around in terms of time
25 frame, but near the end of your direct examination I

Bailey - Cross/LaRusso

1761

1 believe you testified that you ended up selling off these
2 two hangars; is that correct?
3 **A.   That's correct.**
4 Q.   And you told us that the first one that you sold was
5 I believe in 2011; is that correct?
6 **A.   That's correct.**
7 Q.   Can you tell us again the circumstances for why you
8 sold off one of those hangars in 2011?
9 **A.   Mr. Constantine was falling behind on his payments.**
10 **He had contacted Mr. Gonchar I believe back in June or**
11 **July trying to arrange to have somebody take over the land**
12 **contract or purchase the hangars.**
13      **As that did not work out, I was approached and**
14 **sold the one hangar that was part of the condominium.**
15 Q.   And the date that you sold it would have been around
16 August 2011; is that right?
17 **A.   I believe so, yes.**
18 Q.   Do you remember how much you sold it for?
19 **A.   Three million and seven something.**
20 Q.   Was this the hangar that back in 2009 was worth over
21 $3.75 million?
22 **A.   Yes.**
23 Q.   Would you, at the time you sold this piece of
24 property, would you say that you got fair market value
25 when you sold it for 2.7 million?

Bailey - Cross/LaRusso

1762

1 **A.   The other gentleman that had the hangars, Mr. Hilton,**
2 **had just sold one.  He had two hangars.  He sold one of**
3 **his.**
4      **When I was approached they had a square footage**
5 **in mine that was the square footage price that he had**
6 **paid.**
7      **I told Mr. Constantine we were going to sell it.**
8 **He wasn't real pleased about it, but I said that this debt**
9 **needs to go away.**
10 Q.   When you say this debt needs to go away and you sold
11 it for 2.7 million when it was appraised a few years
12 earlier during a difficult period for 3.75 million, what
13 happened to that equity between the price that you sold
14 and what it was valued at?
15 **A.   There's a lot of appraisals out there.**
16      **Again, the financial aspects of it, I think at**
17 **the time Tommy had engaged with someone for I think 3.1 or**
18 **$3.2 million to try to sell the hangar.**
19 Q.   But you took the price of 3.75?
20 **A.   Again, Mr. Constantine had many opportunities to**
21 **either have somebody buy it, sell it, do whatever he**
22 **wanted to do with it.  I basically just wanted to get the**
23 **$3,850,000.00 back.**
24 Q.   You also identified a second, the other hangar as
25 having been sold, you identified the warranty deed as

Bailey - Cross/LaRusso

1763

1  3434.  This took place some years later; is that correct?

2  A.    It took place in 2014.

3  Q.    Which hangar was this?

4  A.    This was the standalone hangar.

5  Q.    I know you were shown various photographs.

6          When you say standalone, is that the one with

7  the office?

8  A.    Yes.

9  Q.    That had the attached hangar to it?

10  A.    Yes.

11  Q.    And you identified the photograph of that building?

12  A.    Yes.

13  Q.    Do you remember what you sold this one for?

14  A.    I believe I sold that one for 1.6 million.

15  Q.    And do you remember what the appraised value was back

16  in 2009?

17  A.    I believe the document stated three million.

18  Q.    So, again, there would be substantial equity in that

19  building back in 2009 from what you sold it for and what

20  it was appraised at; is that correct?

21  A.    That's correct.

22  Q.    Jumping head from 2009 to 2014, would you say the

23  market in Arizona for the purchase of real estate got a

24  little better?

25  A.    Absolutely.

Bailey - Cross/LaRusso

1764

1  Q.    So that property that might not have been valuable in

2  '09 was more valuable in 2014?

3  A.    I would agree with that assessment.

4  Q.    And could you tell us why at this point in time,

5  we're talking January 16, 2014, why it is that you sold

6  this building for less than what it was appraised back

7  in 2009?

8  A.    Most people would think that I'm an idiot, because I

9  probably left over $2 million on the table.

10          But the bottom line was I'm a person of

11  integrity, I made an agreement with Mr. Constantine at 3.5

12  to 3,850,000, a little bit more money was added on.

13          And basically as far as I was concerned that was

14  an investment.  It was a financial deal that turned into a

15  real estate purchase and I did not feel comfortable taking

16  the money or offering it.  I never went to a realtor.

17  These were people that had contacted me.

18          Mr. Lassetter had an affiliation with

19  Mr. Constantine in another business venture and as I was

20  with Mr. Gonchar, it was the same thing.  I would rather

21  have those people that I had known them and been with them

22  longer to take me out of the deal.

23  Q.    I don't question your integrity.

24          What I'm asking you is at this point in time you

25  sold this property for substantially less than what it was

Bailey - Cross/LaRusso

1765

1  worth?

2  A.    Yes.

3  Q.    You walked away from a lot of money in this case?

4  A.    Yes.

5  Q.    And the person who benefitted was the person who

6  bought the property?

7  A.    Yes.

8  Q.    Do you remember, at this point in time, discussing

9  with Mr. Constantine the possibility of the two of you

10  selling it so that you could realize the equity in the

11  property rather than lose it?

12  A.    I discussed with Mr. Constantine --

13  Q.    The question is, just tell us what you said, what was

14  the nature of that conversation?

15  A.    Just basically that he cannot afford both hangars,

16  that he needed to liquidate the hangars and try to regroup

17  and do what he needed to do.  We did have numerous

18  conversations.

19          He was in disagreement and that's when the

20  conversations were with other people when payments were

21  not coming due and I basically took matters into my own

22  hands and said I'm selling the one hangar, we will

23  regroup, give you some time to get funding together to buy

24  the other hangar and which he did.

25  Q.    The first hangar was in '11.  We're now talking 2014.

Bailey - Cross/LaRusso

1766

1  A.    Correct.

2  Q.    In 2014, before you actually sold it, do you remember

3  talking to Mr. Constantine and saying; if we sell the

4  building, then we can realize the profit from the

5  additional equity that's in it.  Nothing wrong with that.

6  I'm just saying, do you remember the conversation and

7  Mr. Constantine turning it down?

8  A.    Yes.

9  Q.    Tell me why he turned that down?

10  A.    Because that was the hangar where he was running his

11  business Eufora, that was the foundation and, again,

12  that's when I stated fine, find someone else to take me

13  out.

14  Q.    And he didn't take up your offer to sell the property

15  and realize the money from the equity and explain to you

16  that there were other people involved; is that correct?

17          MS. KOMATIREDDY:  Objection.

18  BY MR. LARUSSO:

19  Q.    Do you remember that?

20          THE COURT:  Overruled.

21  BY MR. LARUSSO:

22  Q.    Hockey players in particular, do you remember that?

23  A.    Ask the question again please.

24  Q.    When you and Mr. Constantine were talking about the

25  possibility of selling this second hangar in and around

Bailey - Cross/LaRusso

1767

1  2013, 2014, the discussion centered around selling it so
2  that you could realize as much of the equity that was in
3  it, correct, rather than lose it?
4  A.   I was very comfortable after I sold the first hangar
5  for $2.7 million that the balance owed, I was very
6  comfortable in my position on the hangar that
7  Mr. Constantine was in.
8       I basically told Mr. Constantine verbally that I
9  would live up to the obligations on the land contract even
10 though he was not in compliance, and if he were able to
11 find somebody that was willing to step up and to take that
12 opportunity, that I would prefer he do that.
13      As far as him liquidating it to make a quick --
14 to make some money or to do something like that, that was
15 not a discussion that we had.
16      The discussion was basically I was very
17 frustrated and I wanted to basically end the financial
18 arrangement and get the money back.
19 Q.   So if I understand you correctly, if Mr. Constantine
20 could come up with a buyer to pay more than what you were
21 going to sell it for then --
22 A.   Mr. Constantine could have bought it for exactly what
23 the balance was of the land contract.  Mr. Constantine and
24 only Mr. Constantine.
25 Q.   But at the time -- by the way, do you know where

Bailey - Cross/LaRusso

1768

1  Mr. Constantine was?  Just say yes or no, at the time you
2  sold the property in January of 2014?  Just say yes or no.
3  A.   No.
4  Q.   Okay.
5       By the way, Mr. Lassetter had nothing to do with
6  your discussions with Mr. Constantine about finding a
7  buyer?
8  A.   No.
9       I would correct that.  I never met the
10 gentleman.  He was involved in a company called Set Jet
11 and that was one of the people that Mr. Constantine was
12 trying to engage as far as taking me out and keeping that
13 particular hangar.
14 Q.   By the way, you weren't under any pressure to sell
15 this property in 2014, were you?
16 A.   No.
17 Q.   Had you been approached by law enforcement at all
18 prior to the sale of that property?
19 A.   Yes.
20 Q.   How many times?
21 A.   Once.
22 Q.   By whom, do you remember?
23 A.   It was Mr. Galiano.
24 Q.   You're pointing over here.  Agent Galioto?
25 A.   Yes.

Bailey - Cross/LaRusso

1769

1  Q.   Did anything transpire with Mr. Galioto have anything
2  to do with your desire to get rid of that piece of
3  property?
4  A.   No.
5            MR. LARUSSO:  One moment, if I may, your Honor.
6            (Pause in proceedings.)
7            MR. LARUSSO:  May I just have a moment, your
8  Honor?
9            THE COURT:  Sure.
10           (Pause in proceedings.)
11           MR. LARUSSO:  No further questions.
12      Thank you, your Honor.
13           THE COURT:  Mr. Haley.
14           MR. HALEY:  Thank you, sir.
15
16 CROSS-EXAMINATION
17 BY MR. HALEY:
18 Q.   Mr. Bailey, good morning, sir.
19 A.   Good morning.
20 Q.   Mr. Bailey, my name is Rick Haley and I represent
21 Phillip Kenner.
22      Sir, have you ever had any financial dealings
23 with Phillip Kenner?
24 A.   No.
25 Q.   Have you ever met Phillip Kenner?

Bailey - Cross/Haley

1770

1  A.   No, I have not.
2  Q.   Now, would you characterize your profession as a
3  businessman, sir?
4  A.   Yes.
5  Q.   And as relates to your profession, listening to your
6  testimony, that business has involved investing in real
7  estate on occasions; is that true?
8  A.   When I moved out to Arizona I started looking at real
9  estate opportunities, yes.
10 Q.   And how long, sir, would you say you've been involved
11 in looking into real estate opportunities?
12 A.   Since 2004 in Arizona.
13 Q.   Now, you're not an attorney; is that true, sir?
14 A.   That's true.
15 Q.   Even though you're not an attorney, sir, is it your
16 practice to read a contract that may have legal
17 implications before you sign the contract?
18 A.   No.
19 Q.   Well, who reads the contract?
20 A.   My attorneys.
21 Q.   Do you discuss this contract with your attorneys, the
22 terms and conditions of the contract?
23 A.   Of which contract?
24 Q.   Well, if there's a contract that you're going to sign
25 with reference to a financial transaction, would you

**Bailey - Cross/Haley**

1771

1 discuss the terms and conditions of that contract with
2 your attorney before you sign it; yes or no?
3 **A. Yes.**
4 **Q.** And you do that I take it, sir, so you have an
5 understanding as to the terms and conditions of that
6 contract; is that true?
7         MS. KOMATIREDDY:  Objection, relevance.
8         THE COURT:  Sustained.
9 BY MR. HALEY:
10 **Q.** Well --
11         THE COURT:  Why don't you approach, Mr. Haley.
12         MR. HALEY:  Thank you, sir.
13         (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25

**Bailey - Cross/Haley**

1772

1         (The following takes place at sidebar.)
2         MR. HALEY:  May I make an offer of proof, Judge?
3         THE COURT:  Sure.
4         MR. HALEY:  Your Honor, there's been testimony
5 offered by government witnesses, specifically John Kaiser
6 in particular, that he would sign documents, he wouldn't
7 read the documents even though they have legal
8 implications.
9         Rather than recall this witness as a defense
10 witness, it's my intention to elicit from him the fact
11 that he's a businessman, the fact he's been involved in
12 real estate transactions and his practice and custom when
13 it comes to documents of this nature.
14         THE COURT:  His practice and custom has no
15 relevance to the practice and custom of the other
16 witnesses.
17         You can make argument to the jury that they
18 should have read the documents, but you can't offer him as
19 an expert of what real estate people should or shouldn't
20 do, whether they should rely on their attorneys or not.
21 You can't do that through this witness.  It's not a matter
22 of recalling him.  If you recall him, I don't believe that
23 has any relevance.
24         MR. HALEY:  Then might I move on?
25         THE COURT:  Yes.

**Bailey - Cross/Haley**

1773

1         MR. HALEY:  Because he's established, in my
2 opinion, through the government's direct case, an
3 understanding, if not expertise, in financial transactions
4 in real estate particularly, I would like to ask him
5 questions like if he's familiar with an LLC, and what is
6 the value of an LLC as relates to a real estate
7 transaction, and that's relevant to the defense, Judge.
8         What Phil Kenner did in each one of these
9 instances is establish limited liability corporations for
10 the benefit of his clients.
11         And I think it's important that the jury
12 understand that as part of the defense here what Phil
13 Kenner did as relates to the Hawaiian land investment in
14 particular was in accordance with standard practice in
15 business as relates to real estate transactions in
16 particular.
17         I might also add, Judge, questioning would be
18 relatively limited, but this witness testified he took a
19 look at a contract, that there was a copy of the contract,
20 he was readily able to recognize his signature on that
21 contract, the copy of the contract.
22         John Kaiser testified, as I recall, if I
23 presented him with a document that was a copy, he wasn't
24 able to identify --
25         THE COURT:  You can't use this witness to do

**Bailey - Cross/Haley**

1774

1 those things.
2         Whether Mr. Kaiser can recognize his signature
3 and will state whether it's his signature or not in the
4 context of his transaction and his other experience is
5 completely different situation from this gentleman.  You
6 can't use him to try and impeach Mr. Kaiser.
7         On your point on the LLC he's not an expert
8 witness.  It came out from Mr. Peca I believe or someone
9 explained exactly what you wanted, which is that LLCs
10 provide protection.
11         MR. HALEY:  They did and --
12         THE COURT:  I'll let you do that on the LLC
13 but --
14         MS. KOMATIREDDY:  The objection, first of all,
15 under 701 and 702 he's not been qualified as an expert.
16 The foundation certainly isn't there.  His type of
17 financing deals is different.
18         THE COURT:  I'm not going to let him question
19 about financing.  He wants to bring out an LLC provides
20 protection to whoever is in the LLC.
21         MS. KOMATIREDDY:  I also state we expect to call
22 an expert witness who we provided up from FINRA about
23 business transactions, so it's really not necessary
24 through this witness.
25         THE COURT:  If you do it quickly, I'll let you

Bailey - Cross/Haley

1775

1  do that because I think it's harmless.
2       MR. HALEY:  Judge, it's not my practice to make
3  harmless points and I appreciate the fact there's already
4  in the record the testimony --
5       THE COURT:  There's going to be an expert you
6  can do this through.
7       MR. HALEY:  With all due respect, it's a
8  government expert.
9       And if I may make this point.  It's my position,
10  and as far as this individual is concerned based upon the
11  testimony as elicited by the government, when you say
12  qualify him as an expert, I don't think he has to have a
13  particular degree that says I'm an expert in business
14  finances.
15       I believe the foundation that the government
16  laid in connection with their direct examination of this
17  witness leaves this jury, inappropriately so, with the
18  impression that this is a businessman of long-standing,
19  he's been involved in real estate, and has the background
20  and expertise to not only know a number of things about
21  real estate transactions and investments in real estate
22  transactions.
23       When you say I'm offering him as an expert, I'm
24  offering him as someone that has experience in the field
25  and is able to demonstrate a common sense if not unique

Bailey - Cross/Haley

1776

1  understanding of these transactions.
2       Judge, also, as an offer proof, so we're not
3  back here at the sidebar, the other question I intend on
4  asking is whether he's familiar with the concept of a hard
5  money loan and as to what his understanding is of hard
6  money loan.
7       The reason that's relevant, Judge, as we
8  developed during the course of the defense case, there
9  were instances when Phil Kenner sought hard money loans
10  for purpose of obtaining the financing for the Hawaiian
11  project.
12       The hard money loan is not illegal, fraudulent,
13  and often times people need hard money loans to get a
14  standardized loan.
15       And the final question I want to ask, Judge, is
16  whether or not he's aware, in 2008, 2009, I believe he
17  testified to it, and I want to reaffirm that testimony,
18  the real estate market took a downturn and no one could
19  have predicted that downturn.
20       That's part of what happened in the Hawaiian
21  project.  What happened in the Hawaiian project in
22  connection with the loss of the investments were two
23  things happened.
24       First of all, the real estate market took a
25  downturn in 2008, 2009, and Lehman Brothers went bankrupt

Bailey - Cross/Haley

1777

1  in September 2009.  These will be matters that he will
2  know of in my opinion.
3       THE COURT:  You can ask about the LLC.  Again, I
4  think it's so basic that I don't have any concerns that he
5  needs expertise or is being offered as an expert.
6       You can ask about the downturn to the market.  I
7  think he already testified to that.
8       I'm not going to allow you to use him to explain
9  what a hard money loan is.  You can't take someone who
10  because he's a quote/unquote businessman and start asking
11  him about different terms and transactions and issues that
12  have nothing to do with the facts that he's testifying to.
13  This doesn't involve one of those loans, right?  Hawaiian,
14  that has nothing to do with his testimony.
15       If you don't believe there's any other witness
16  you can do that through, you can call an expert if you
17  think that's important.  You're not going to do it through
18  this witness, okay?
19       MR. HALEY:  Okay.
20       MR. LARUSSO:  Your Honor, I looked through some
21  of my papers and I have just a few questions after
22  Mr. Haley is done.
23       THE COURT:  That's fine.
24       (Continued on next page.)
25

Bailey - Cross/Haley

1778

1       (The following takes place in open court.)
2  BY MR. HALEY:
3  Q.   Mr. Bailey, what is an LLC, sir?
4  A.   A limited liability corporation.
5  Q.   And as an organizational concept, does an LLC have a
6  particular utility when it comes to purchasing and the
7  sale of real estate, sir, if you know?
8  A.   It has.  There are LLCs that are formed to purchase
9  real estate, yes.
10  Q.   Do you know the reason why an LLC is utilized to
11  purchase real estate; yes or no?
12  A.   Yes.
13  Q.   What is that reason, to your understanding?
14  A.   My understanding is to handle it as a separate entity
15  itself both financially and legally.
16  Q.   Does it have, if you know, sir, liability protections
17  for the members of the LLC?
18  A.   That's my understanding, yes.
19  Q.   Now, in 2008, 2009, the real estate market took a
20  downturn, did it not?
21  A.   Absolutely, yes.
22  Q.   Were you able to predict that downturn, sir?
23  A.   No.
24       MR. HALEY:  Thank you, Mr. Bailey.
25       THE COURT:  Mr. LaRusso, you said you have a few

**Bailey - Cross/LaRusso**

1779

1  questions?

2        MR. LARUSSO:  If I could, Judge.

3

4  CROSS-EXAMINATION

5  BY MR. LARUSSO:

6  Q.   Between the time that you sold the first hangar,

7  which was in 2011 for 2.7 I believe you testified to, and

8  the time that you sold the second hangar, I believe it was

9  2014, was Mr. Constantine paying monthly payments to you?

10  A.   He was, yes.  They were making some payments, yes.

11  Q.   What kind of payments was he making?

12  A.   Well, I projected the payment -- he projected them as

13  rent, I projected them as principal reductions on my

14  books.

15  Q.   And how long -- a different view.

16        In regards to those payments, how long of a

17  period of time are we talking about?

18  A.   Eight, nine months, something like that maybe.

19  Q.   Was he current for the most part on those payments?

20  A.   Yes.

21        MR. LARUSSO:  I have no further questions.

22        THE COURT:  Redirect.

23        MS. KOMATIREDDY:  Yes, just two areas.

24

25

**Bailey - Redirect/Komatireddy**

1780

1  REDIRECT EXAMINATION

2  BY MS. KOMATIREDDY:

3  Q.   On cross you testified that as you were preparing to

4  invest in these hangars, the deal changed because more

5  people were coming out of the woodwork.

6        Could you explain what that means?

7  A.   Just that there was other creditors that once one

8  person was going to get paid, everybody kind of lined up

9  at the trough I guess and were putting liens on the

10  property.

11  Q.   Second, you also testified that with respect to the

12  $234,000 money held in escrow, that it was money held in

13  escrow in case Mr. Constantine could not make his

14  payments.

15        What happened to that money?

16  A.   The money was depleted.

17  Q.   It's all gone?

18  A.   Yes.

19        MS. KOMATIREDDY:  No further questions.

20        THE COURT:  Mr. Haley, anything further?

21        MR. HALEY:  No, sir.

22        MR. LARUSSO:  Just one moment, your Honor, if I

23  may.

24        (Pause in proceedings.)

25

**Bailey - Recross/LaRusso**

1781

1  RECROSS-EXAMINATION

2  BY MR. LARUSSO:

3  Q.   Just in regard to the last question, could you

4  explain to the jury what is interest reserves and what

5  it's designed for?

6  A.   The money was again in a land contract.  I believe

7  there was a paragraph that we basically said six months

8  payments would be held in reserve in escrow.

9        At certain times we had -- the property taxes

10  weren't paid and the association dues weren't being paid,

11  the insurance on the property, payments, principal and

12  interest payments, that money was used to keep

13  Mr. Constantine current.

14  Q.   It's like a cushion?

15  A.   A cushion, yes.

16  Q.   The other question was talking about the liens that

17  were on the property before you acquired it, were those

18  liens satisfied at the time that you purchased the

19  property?

20  A.   Yes.

21        MR. LARUSSO:  Thank you.

22        THE COURT:  You can step down, Mr. Bailey.

23  Thank you.

24        THE WITNESS:  Thank you.

25        (The witness steps down.)

**McDonald - Direct/Komatireddy**

1782

1        THE COURT:  We will take the morning break.

2  Don't discuss the case.

3        (The jury is excused.)

4        (Recess taken.)

5        (After recess.)

6        THE COURT:  Please be seated.

7        Who is the next witness?

8        MS. KOMATIREDDY:  John McDonald.

9        THE COURT:  How long is he?

10        MS. KOMATIREDDY:  Not very long, your Honor,

11  hopefully 20 minutes.

12        THE COURT:  Let's bring in the jury.

13        (The jury is present.)

14        THE COURT:  Please be seated.

15        I'll ask the government to call its next

16  witness.

17        MS. KOMATIREDDY:  The government calls John

18  McDonald.

19        THE COURT:  Mr. McDonald, if you would come up

20  to the witness stand and remain standing once you get

21  there for the oath.

22  JOHN MCDONALD,

23        called as a witness, having been first

24        duly sworn, was examined and testified

25        as follows:

McDonald - Direct/Komatireddy

1783

1    THE COURT:  Be seated.
2    Please state your name and spell your last name
3  for the record.
4    THE WITNESS:  John McDonald, M-C-D-O-N-A-L-D.
5    THE COURT:  As you're doing there, Mr. McDonald,
6  stay close to the mike and keep your voice up, okay?
7
8  DIRECT EXAMINATION
9  BY MS. KOMATIREDDY:
10  Q.   Good morning, Mr. McDonald.
11  A.   Good morning.
12  Q.   Where do you work?
13  A.   Playboy Enterprises.
14  Q.   What is your title there?
15  A.   Corporate comptroller.
16  Q.   How long have you worked at Playboy Enterprises?
17  A.   30 years next month.
18  Q.   The acronym PEII, are you familiar with that acronym?
19  A.   Yes.
20  Q.   What does it stand for?
21  A.   Playboy Enterprises International, Inc.
22  Q.   Does Playboy have a logo?
23  A.   Yes.
24  Q.   I'm going to show you what's in evidence as
25  Government's Exhibit 911.

McDonald - Direct/Komatireddy

1784

1    Can you identify the Playboy logo for us?
2  A.   The rabbit head.
3  Q.   I'm going to hand you what's been marked as
4  Government's exhibits which I'll name in a minute. I'll
5  put these here for later.
6  A.   Okay.
7  Q.   Now, did there come a time where Playboy had an
8  agreement with Mr. Constantine?
9  A.   Yes.
10  Q.   Tommy Constantine?
11  A.   Yes.
12  Q.   Looking at Government's Exhibits 2710, 2711, 2720,
13  2712, 2713, 2714, 2715, 2716 and 2717, can you just
14  describe for us what those are?
15  A.   These are invoices to Constantine Management Group.
16  Q.   What is the deal that is underlying these invoices,
17  can you explain the arrangement?
18  A.   The company had a racing team sponsorship agreement
19  with Constantine Management Group that Mr. Constantine was
20  able to offer ad pages in Playboy Magazine as part of
21  sponsorship packages to other sponsors, and so he was able
22  to include ad pages in Playboy Magazine as part of that
23  package and then Playboy invoiced him for the ad pages.
24  Q.   So as part of this arrangement, Mr. Constantine could
25  sell those ad pages to others at whatever price he wanted?

McDonald - Direct/Komatireddy

1785

1  A.   Yes.
2  Q.   Then how much did he owe Playboy in return for that
3  right, approximately?
4  A.   Some of the pages were $25,000 and some pages were
5  $28,000.
6  Q.   Looking at the Government's exhibits that I just
7  named, what is it that those exhibits are invoicing?
8  A.   These are for an ad page in Playboy Magazine.
9  Q.   Are those invoices created by an employee of Playboy?
10  A.   Yes.
11  Q.   Are they created at or near the time that the thing
12  being billed for occurred?
13  A.   Yes.
14  Q.   Are they created in the ordinary course of Playboy's
15  business?
16  A.   Yes.
17  Q.   Are they maintained in the ordinary course of
18  Playboy's business?
19  A.   Yes.
20    MS. KOMATIREDDY:  The Government moves the
21  foregoing exhibits into evidence.
22    MR. LARUSSO:  No objection, your Honor.
23    MR. HALEY:  Judge, may I take a quick look?
24    THE COURT:  Yes.
25    MR. HALEY:  Thank you.

McDonald - Voir Dire/Haley

1786

1    (Pause in proceedings.)
2    MR. HALEY:  Just a brief voir dire.
3
4  VOIR DIRE EXAMINATION
5  BY MR. HALEY:
6  Q.   I take it you're able to identify these documents
7  because on the computer generated documents it says remit
8  to Playboy Enterprises?
9  A.   Yes.
10  Q.   That's the only means by which you're able to
11  identify the document?
12  A.   We produced these invoices so we reprinted them out
13  of our billing system.
14  Q.   The logo is not there, right?
15  A.   Correct.
16    MR. HALEY:  I have no objection, Judge.
17    THE COURT:  The exhibits previously identified
18  by Ms. Komatireddy are admitted into evidence.
19    (Government Exhibits 2710, 2711, 2720, 2712,
20  2713, 2714, 2715, 2716 and 2717 in evidence.)
21    MS. KOMATIREDDY:  Thank you, Judge.
22
23  BY MS. KOMATIREDDY:
24  Q.   Just so I have this clear, on the sponsorship
25  arrangement Playboy didn't actually give Mr. Constantine

McDonald - Direct/Komatireddy

1787

1   any cash under that sponsorship arrangement, right?
2   **A.   Correct.**
3   **Q.**   Now, did Mr. Constantine purchase other services from
4   Playboy Enterprises?
5   **A.   Yes.**
6   **Q.**   I'm going to hand you what's been marked as
7   Government's exhibits 2701, 2721, 2722, 2702, 2724, 2703,
8   through 2709.
9        Do you recognize those?
10  **A.   Yes.**
11  **Q.**   What are they?
12  **A.   Invoices to Tommy Constantine Racing.**
13  **Q.**   Are those invoiced created by an employee of Playboy?
14  **A.   Yes.**
15  **Q.**   Are they created at or near the time the thing is
16  being billed for?
17  **A.   Yes.**
18  **Q.**   Are they created in the ordinary course of Playboy's
19  business?
20  **A.   Yes.**
21  **Q.**   Are they kept in the ordinary course of Playboy's
22  business?
23  **A.   Yes.**
24       MS. KOMATIREDDY: The government moves the
25  foregoing exhibits into evidence.

McDonald - Direct/Komatireddy

1788

1        MR. LARUSSO:  Can I have a brief sidebar?
2        THE COURT:  Yes.
3        (Continued on next page.)

McDonald - Direct/Komatireddy

1789

1        (The following takes place at sidebar.)
2        MR. LARUSSO:  All of these monies I think were
3   paid out of Constantine Management Group and I don't see
4   the relevancy, so I object on relevancy grounds.
5        MS. KOMATIREDDY:  Mr. Constantine diverted
6   proceeds from the Eufora fraud to payoff invoices at
7   Playboy Enterprises.  He had a running account on those
8   invoices.
9        In addition, the evidence also goes to show the
10  relationship between Mr. Kenner and Mr. Constantine
11  because leading up to the Eufora fraud Mr. Kenner paid
12  invoices on behalf of Mr. Constantine.  So it goes to show
13  the conspiracy as well, their mutual support of each other
14  throughout the period 2007-2008.
15       MR. LARUSSO:  I don't know how this relates to
16  the relationship between Kenner and Constantine, but just
17  saying this relates to the Eufora fraud doesn't in any way
18  show why it's relevant to this charge.  This is his
19  private company.  He's paying for these.  There's no
20  evidence that I know of that any of these monies that he
21  paid out of Constantine Management Group had anything to
22  do with Eufora.  I haven't heard anything.
23       MS. KOMATIREDDY:  For example, Mr. Sydor
24  identified he gave money to Eufora to be used for the
25  business expenses, not for Mr. Constantine's Playboy

McDonald - Direct/Komatireddy

1790

1   expenses.
2        THE COURT:  But money came out of which account
3   to pay for these?
4        MS. KOMATIREDDY:  Mr. Constantine took money
5   that was supposed to go to Eufora and directed it to his
6   account and paid for these things.
7        His claim and the defense will argue there's no
8   impropriety in the money going to Constantine Management
9   Group account because that somehow was an account
10  affiliated with Eufora or an appropriate expense of
11  Eufora.  That's why we need to show the actual expenses
12  were personal expenses and not expenses for the business.
13       MR. LARUSSO:  I'm sorry, Judge, I don't
14  understand how these payments from Constantine Management
15  Group have anything to do with diverted funds out of
16  Eufora.
17       THE COURT:  She's said Mr. Sydor --
18       MS. KOMATIREDDY:  Several of our witnesses will
19  testify when they were asked to invest in Eufora, they
20  were told the money would be used for the business of
21  Eufora, not that they were buying out someone else's
22  share, not that they were paying off Mr. Constantine's
23  debts.
24       THE COURT:  The same account their money went
25  into then went to pay some of these invoices?

McDonald - Direct/Komatireddy

1791

1    MS. KOMATIREDDY:  Yes.

2    THE COURT:  Again, this is argument.  If you

3  believe there was some legitimate use of money in that

4  account to pay these, you can argue to the jury.  But they

5  have witnesses to say I put money into Eufora, money went

6  to that account, and then it was used to pay this and

7  they're going to say they didn't authorize him to do that.

8    MR. LARUSSO:  This is part of the problem when

9  we talk about not knowing what this case was all about,

10  and I understand the Court's position.  I understand the

11  Government's offer at this point.

12    But I don't know at this point whether all of

13  these monies that are coming out of Constantine Management

14  match up to money going into Eufora and then diverted over

15  to Constantine for this payment.  That was my objection.

16  I didn't see any evidence of the Eufora monies going into

17  Constantine Management Group to justify the expense.

18    MS. KOMATIREDDY:  Your Honor, the defense have

19  had the Constantine Management Group Bank of America

20  records since January of last year.  They had these

21  Playboy records in discovery.

22    THE COURT:  We discussed this.  I'm overruling

23  the relevancy objection based upon the Government's

24  proffer.  I think the invoices are certainly relevant.

25  The argument of whether or not it was authorized or

McDonald - Direct/Komatireddy

1792

1  involved other monies that were allowed to be used for

2  this is argument to the jury, but it's not a relevancy

3  issue.

4    MR. LARUSSO:  Thank you, Judge.

5    (Continued on next page.)

McDonald - Direct/Komatireddy

1793

1    (The following takes place in open court.)

2    MR. LARUSSO:  No objection, your Honor.

3    THE COURT:  The exhibits previously

4  identified -- I'm sorry.  Mr. Haley.

5    MR. HALEY:  I just need a moment to look at

6  them.

7    THE COURT:  Yes.

8    And in the future if the Government could give

9  Mr. Haley copies.

10    MR. HALEY:  The government has been wonderful,

11  but I just want an opportunity.

12    Thank you.

13    THE COURT:  Any objection?

14    MR. HALEY:  No, sir.

15    THE COURT:  Those exhibits identified previously

16  are admitted into evidence.

17    (Government Exhibits 2701, 2721, 2722, 2702,

18  2724, 2703 through 2709 in evidence.)

19

20  BY MS. KOMATIREDDY:

21  Q.  I'm going to go through a couple of these for

22  examples, Mr. McDonald.

23    So turning to Government's Exhibit 2709 which is

24  now in evidence, could you explain to us what we're

25  looking at here?  It's on your screen as well.

McDonald - Direct/Komatireddy

1794

1  A.  Okay.

2    This is an invoice for Playmates who were wired

3  hired to attend the Birmingham, Alabama, racing.

4  Q.  I'm sorry, Birmingham, Alabama, racing, what's that a

5  reference to?

6  A.  There was a series of races that the racing

7  sponsorship agreement covered, and they were held in

8  various cities and Birmingham, Alabama, was one of them.

9  Q.  So this is a car race?

10  A.  Yes.

11  Q.  Looking at this invoice, can you just go down the

12  line items and explain what each item refers to?

13  A.  The Playmate fees are the fees for hiring three

14  Playmates for eight hours per day.

15    The Playmate airfare is the airfare for the

16  Playmates to travel to Birmingham, Alabama.

17    Security would be the charge for the security

18  for the Playmates.

19    Chaperone travel, there would be a chaperone who

20  would attend the event with the Playmates.

21    Miscellaneous, I'm not sure what all went into

22  that, but miscellaneous is small items.

23    Playboy T-shirts and cobranded head shots would

24  be head shots and photographs of the Playmates.

25  Q.  All of these are things that Mr. Constantine had to

McDonald - Direct/Komatireddy

1795

1  pay for separately under your arrangement?

2  A.  Yes.

3  Q.  So, in essence, this is a bill to him for those

4  items?

5  A.  Yes.

6  Q.  Turning to Government's Exhibit 2717, can you explain

7  to us what this form of invoice is charging for?

8  A.  **This is for an ad page in Playboy Magazine.**

9  Q.  Earlier you testified that Mr. Constantine had the

10  right to sell ad pages in the magazine and then it would

11  have to pay Playboy to do so.

12       How much does he have to pay Playboy in this

13  instance to do so?

14  A.  **$28,000.**

15  Q.  I'm going to hand you what's been marked as

16  government's exhibit 2726.

17       Do you recognize that?

18  A.  Yes.

19  Q.  What is it?

20  A.  **It's a schedule of cash receipts that were received**

21  **related to the invoices that we just talked about, the**

22  **advertising pages and the Playmate fees.**

23  Q.  And is the information in that schedule, where does

24  it come from?

25  A.  **It comes from our advertising billing system.**

McDonald - Direct/Komatireddy

1796

1  Q.  Is that a computerized system?

2  A.  **Yes.**

3  Q.  Is the underlying information created at or near the

4  time of that billing event?

5  A.  **Yes.**

6  Q.  And is it created in the ordinary course of Playboy's

7  business?

8  A.  **Yes.**

9  Q.  Is it kept in the ordinary course of Playboy's

10  business?

11  A.  **Yes.**

12       MS. KOMATIREDDY:  The government moves 2726 into

13  evidence.

14       THE COURT:  Any objection, Mr. LaRusso?

15       MR. LARUSSO:  I'm sorry, Judge.

16  No objection, your Honor.

17       MR. HALEY:  No objection, Judge.

18       THE COURT:  2726 is admitted.

19       (Government Exhibit 2726 in evidence.)

20

21  BY MS. KOMATIREDDY:

22  Q.  Just looking at the schedule, I want to focus your

23  attention on the right two columns.

24       Were all of the payments made for

25  Mr. Constantine's invoice made -- well, what accounts were

McDonald - Direct/Komatireddy

1797

1  they made from?

2  A.  **They came from Constantine Management Group and from**

3  **Phillip Kenner.**

4  Q.  Finally, I'm handing you what's been marked as

5  Government's Exhibit 2719.

6       Do you recognize that?

7  A.  Yes.

8  Q.  What is it?

9  A.  **It's a security log from the Playboy Mansion where**

10  **they sign-in and track people coming and going.**

11  Q.  And is the log created by an employee of Playboy?

12  A.  Yes.

13  Q.  Is it created in the ordinary course of -- are the

14  entries created at or near the time of the entries and

15  exits of the visitor?

16  A.  Yes.

17  Q.  Is it created in the ordinary course of Playboy's

18  business?

19  A.  Yes.

20  Q.  Is it kept in the ordinary course of Playboy's

21  business?

22  A.  Yes.

23       MS. KOMATIREDDY:  The Government moves 2719 into

24  evidence.

25       MR. LARUSSO:  Your Honor, same objection.

McDonald - Direct/Komatireddy

1798

1       THE COURT:  Same ruling.

2       MR. HALEY:  No objection.

3       THE COURT:  2719 is admitted.

4       (Government Exhibit 2719 in evidence.)

5  BY MS. KOMATIREDDY:

6  Q.  Just looking at this log, Mr. McDonald, so whose

7  visits are being logged in this exhibit?

8  A.  **Tommy Constantine.**

9  Q.  And in the fall of 2008, between September 30, 2008,

10  and December, end of December 2008, what's the information

11  here indicate as to Mr. Constantine's visits?

12  A.  **That he came to the Playboy Mansion on September 30th**

13  **at 3:32 p.m., and left that same day at 4:38 p.m.**

14       **(Continued on next page.)**

15

16

17

18

19

20

21

22

23

24

25

McDonald - Cross/Haley

1799

BY MS. KOMATIREDDY:

**Q.** And there are a few more visits will entered there, correct?

**A. Correct.**

**Q.** And just focusing on the first one it says visit note HMA's meeting. Who is HMH? Who is that?

**A. Hugh M. Hefner.**

**Q.** Do you know who Ms. Issari is?

**A. Ms. Issari is an assistant, administrative assistant at the mansion.**

**Q.** And the next two visits, the visitor also has HMH, is that still Mr. Hefner?

**A. Yes.**

**Q.** Can you tell us what Colin and RSR is?

**A. Mr. Colin is an employee of the mansion in the offices and RSR is Richard S. Rosenzweig who was an executive vice president of Playboy who worked closely with Mr. Hefner.**

        MS. KOMATIREDDY: I have no further questions.

        THE COURT: Cross-examination.

        MR. HALEY: Yes.

CROSS-EXAMINATION

BY MR. HALEY:

**Q.** Mr. McDonald, good morning, my name is Rick Haley and

McDonald - Cross/Haley

1800

I represent Phil Kenner.

**A. Good morning.**

**Q.** How long have you worked for Playboy Enterprise?

**A. It will be 30 years next month.**

**Q.** And I apologize. What is your position with Playboy Enterprise?

**A. I'm the corporate comptroller.**

**Q.** Have you ever met Phil Kenner?

**A. No, I have not.**

**Q.** So it's fair to state you wouldn't even recognize Phil Kenner; is that correct?

**A. Correct.**

**Q.** As relates to 2726, I don't know if you have that in front of you.

**A. Yes.**

**Q.** It's true, sir that as relates do that exhibit in the far right-hand corner of the exhibit, it reflects payment from P. Kenner; is that correct?

**A. Yes.**

**Q.** And various numbers, is that true?

**A. Yes.**

**Q.** Do you have any personal knowledge, sir as you sit here on the witness stand today as to the business relationship between Phil Kenner and Tommy Constantine?

**A. Could you repeat the question?**

McDonald - Cross/Haley

1801

**Q.** Sure. Do you have any personal knowledge as you sit here today of the business relationship between Phil Kenner and Tommy Constantine? Yes or no?

**A. No.**

**Q.** Prior to today, sir, were you ever interviewed by any person associated with federal law enforcement?

**A. Could you repeat the question.**

**Q.** Sure.

**A. Sorry. I'm sorry.**

**Q.** Prior to today, were you ever interviewed by a member of the Federal Bureau of Investigation?

**A. I have talked with Ms. , with Ms. Komatireddy prior to being here.**

**Q.** And when and where did that conversation occur?

**A. On a telephone call, I don't know, probably a month or so ago. And a couple of nights ago.**

**Q.** Were both interviews conducted telephonically?

**A. No.**

**Q.** The first one was conducted telephonically, is that your testimony?

**A. Yes.**

**Q.** And the second one was conducted in person; is that your testimony?

**A. Yes.**

**Q.** And where did that second interview take place?

McDonald - Cross/La Russo

1802

**A. In this courthouse.**

**Q.** And she asked you questions, correct?

**A. Yes.**

**Q.** I assume you answered her questions?

**A. Yes.**

**Q.** As you answered letter questions, did she take notes of the conversation if you recall?

**A. I don't, I don't recall her taking any notes, no.**

**Q.** How long was that interview, sir, just approximately?

**A. I don't know, 45 minutes maybe.**

**Q.** The interview conducted of you by telephonically by the agent of the Federal Bureau of Investigation, do you know, sir, whether that interview was recorded?

**A. I don't know, no.**

        MR. HALEY: I have no further questions. Thank you.

        THE COURT: Okay. Mr. La Russo.

        MR. LA RUSSO: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. LA RUSSO:

**Q.** Still good morning.

**A. Good morning.**

**Q.** Have you ever spoken to Mr. Constantine?

**A. I have not.**

McDonald - Cross/La Russo

1803

1 Q. Have you ever met Mr. Constantine?

2 A. No, I have not.

3 Q. By the way, did you negotiate the terms of his

4 agreement with Playboy?

5 A. I did not.

6 Q. Do you know who did?

7 A. I don't know for sure.

8 Q. You don't know for sure?

9 A. It was one of three people.

10 Q. You yourself did?

11 A. No I did not, no.

12 Q. Do you know if anyone at Playboy required the

13 Playmates to attend the races?

14 A. I don't know if it was a requirement or not, no.

15 Q. Do you know who at Playboy may have dictated the cost

16 of these ad pages or the cost of the Playmates to attend

17 the races?

18 A. Well, it was part of agreement, at least for the ad

19 pages, there was the page rate was stipulated in the

20 agreement. There was the publisher at the time I believe

21 was man named Lou Moen, so he may have, I'm not sure who,

22 it was all a negotiated page rate.

23 Q. Do you know what the term rate card means, R-A-T-E,

24 rate card?

25 A. Yes.

McDonald - Cross/La Russo

1804

1 Q. You tell the jury what that is?

2 A. That's the, every year there's a rate card that's

3 produced that is what the cost of an ad page is, and it

4 will give different frequencies if it's a one page page

5 rate or a six time page rate or 12 times.

6 Q. What's the rate card for a full page ad?

7 A. In this example we're looking at, it depends. It

8 really.

9 Q. I'm not referring to Mr. Constantine, I'm just saying

10 what is the rate card for a full page ad for Playboy?

11 A. It changes every year.

12 Q. Approximately what would it be?

13 A. Today or in 2008.

14 Q. In 2008, 2009 would be appropriate.

15 A. Okay. $150,000. Approximately.

16 Q. So according to these invoices Mr. Constantine was

17 paying approximately $25,000; is that correct?

18 A. Yes.

19 Q. For a full page ad?

20 A. Yes.

21 Q. And Mr. Constantine was allowed by this agreement to

22 sell the page for whatever he could get for it; is that

23 correct?

24 A. Yes.

25 Q. And that's what Playboy did to sponsor his cars, is

McDonald - Cross/La Russo

1805

1 allow him to make the difference between what he paid

2 Playboy and what the pages actually go for?

3 A. Yes.

4 Q. And that money is used, raised to help the team that

5 he was racing on?

6 A. Yes. Presumably.

7 Q. And that was the logo on the car?

8 A. Yes.

9 Q. By the way, in the years that you've been with

10 Playboy, to your knowledge had Playboy ever paid

11 sponsorship payments for a racing program of this caliber?

12 A. I'm not sure about the caliber, but I know that we

13 have had other racing sponsorship agreements.

14 Q. NASCAR, Formula One?

15 A. One of them was with Mazda. There was an earlier

16 one, I'm not sure what type of race cars they were.

17 Q. Did Mr. Constantine or are you aware pioneered to get

18 Playboy to sponsor racing teams?

19 A. I don't know.

20 Q. How do I get into the Playboy mansion?

21 MR. LA RUSSO: I have no further questions,

22 Judge. Wait, answer that, no.

23 MS. KOMATIREDDY: Briefly. Redirect

24 examination.

25

McDonald - Redirect/Komatireddy

1806

1 REDIRECT EXAMINATION

2 BY MS. KOMATIREDDY:

3 Q. On this rate card question, Mr. McDonald, the

4 $150,000, that figure, did that actually come up to the

5 cost to Playboy to print the ad?

6 A. No.

7 Q. So when that around 25,000, $28,000, that payment,

8 does that cover Playboy's costs?

9 A. That would, yes, that would approximate the cost of

10 the printing, the paper.

11 Q. Do you actually know how much Mr. Constantine sold

12 the ads for to other people?

13 A. No.

14 MS. KOMATIREDDY: No further questions.

15 THE COURT: Anything further?

16 MR. LA RUSSO: No, your Honor.

17 MR. HALEY: No, sir.

18 THE COURT: Okay. You can step down,

19 Mr. McDonald, thank you.

20 THE COURT: Next witness.

21 MS. KOMATIREDDY: The government calls Jay

22 McKee.

23 THE COURT: Mr. McKee, can you come up to the

24 witness stand and remain standing once ou get up there.

25

McKee - Direct/Komatireddy

1807

1  JAY McKEE,
2        called as a witness, having been first
3        duly sworn, was examined and testified
4  as follows:
5        THE COURT:  You can be seated.  And please state
6  your name and spell it for the record.
7        THE WITNESS:  Jay McKee, J-A-Y, M-C-K-E-E.
8        THE COURT:  Go ahead.
9
10 DIRECT EXAMINATION
11 BY MS. KOMATIREDDY:
12 Q.  Mr. McKee, where do you currently live?
13 A.  Buffalo, New York.
14 Q.  What do you do?
15 A.  I am an assistant coach for the Erie Otters.
16 Q.  What did you do before that?
17 A.  I played in the NHL for 14 years and previously
18 coaching Erie, I coached a few different teams.
19 Q.  When did you get your start in the NHL?
20 A.  Played my first game as an 18 year old, my first full
21 season in 1996.
22 Q.  Were you playing hockey before the age of 18?
23 A.  Yes.  I played hockey my whole life, yes.
24 Q.  Where were you before you joined the NHL?
25 A.  Before the NHL I was with the Niagara Falls Thunder

McKee - Direct/Komatireddy

1808

1  of the NHL.
2  Q.  How old were you when you started in the OHL?
3  A.  I left home, I was drafted and I left home at 15
4  years old?
5  Q.  When you started playing hockey as part of the OHL,
6  How much were you paid?
7  A.  40 or $45 a week.
8  Q.  When you joined the NHL?
9  A.  My first contract was a three year contract for 2.4
10 million.
11 Q.  Fair to say that was the first time you were making
12 real money?
13 A.  Yes.
14 Q.  Did you know what to do with it?
15 A.  I didn't have any financial background, nor did I
16 know what to do with my money, no necessarily.
17 Q.  What was the financial state of your family, of your
18 parents?
19 A.  My parents, we lived in -- my parents had anywhere
20 from 70 or 80,000 in debt, and I didn't have any money,
21 so...
22 Q.  So did there come a time when you looked for some
23 help with respect to using your money or saving your
24 money?
25 A.  I had an agent that managed all my hockey related

McKee - Direct/Komatireddy

1809

1  business.  And he connected me to the World Bank of
2  Canada, I think that's what he did with most of his
3  clients, so for the first three years of my NHL career my
4  money was managed with RVC.
5  Q.  Did you stay with RVC?
6  A.  No.  After my first three years I started working
7  with Phil Kenner.
8  Q.  How did you come to meet Mr. Kenner?
9  A.  Phil found me somehow, I don't know, you'd have to
10 ask him how he found me, but this was in around the start
11 of my career, I believe I met with him in Niagara Falls
12 before I played for the Sabres, he came out to when my
13 family and I camped in the summer which is 45 minutes
14 outside of my hometown in Kingston Ontario, and he came
15 out with a laptop and gave us a presentation, graphs and
16 charts, and we were impressed by the presentation.
17 Q.  He came out with a laptop to your campground?
18 A.  Yes.
19 Q.  Would you recognize Mr. Kenner if you saw him again
20 today?
21 A.  Yes.
22 Q.  Can you look around the courtroom and let us know if
23 you recognize him?
24 A.  Blue shirt.
25        MR. HALEY:  Absolutely conceded, Judge.

McKee - Direct/Komatireddy

1810

1        THE COURT:  Okay.  The witness has identified
2  Mr. Kenner for the record.
3  Q.  As you began to know Mr. Kenner, what did he tell you
4  about himself?
5  A.  Phil was from the Buffalo area which was where I was
6  drafted to at the time, told me that he was a financial
7  advisor, knew some guys on my team, and was interested in
8  managing my money.
9  Q.  Did you end up hiring Mr. Kenner to be your financial
10 advisor?
11 A.  After the first three years of my NHL career I did,
12 yes.
13 Q.  And did you pay him a regular fee for his work?
14 A.  I did.
15 Q.  Can you describe the nature of the fee?
16 A.  It was a small percentage of what my portfolio was,
17 and I believe it might have been a half percent of my
18 whole portfolio.
19 Q.  And was it in intervals?
20 A.  Quarterly.
21 Q.  When Mr. Kenner answered as a financial advisor, what
22 was the types of investments that he advised?
23 A.  In the beginning it was pretty diversified portfolio,
24 it was stocks and bonds, I didn't have background in
25 finance, so I just kind of went along with what he

1 explained and he showed like I said the charts and the

2 graphs of how things would grow over time and some were a

3 little more risky, some aren't, but it was a pretty

4 diversified portfolio.

5 Q.   Did that portfolio of stocks and bonds change?

6 A.   It did.  After a little while he started talking

7 about investing in the small companies, startup companies,

8 a few different things that he had ties to.

9 Q.   And also real estate?

10 A.   Some real estate, yes.

11 Q.   Now, up through 2009, 2010 did Mr. Kenner continue to

12 be your financial advisor?

13 A.   He did, yes, until somewhere I believe late 2010.

14 Q.   I'm going to focus your attention on your

15 interactions with Mr. Kenner in 2009.  Are you familiar

16 with something called the Global Settlement Fund?

17 A.   I am.

18 Q.   Tell us how you learned about it?

19 A.   Well, I had invested in a few different things, one

20 primarily was a golf course Diamonte del Mar in Mexico

21 where he had invested 500,000 into what I believed was

22 going to be a large resort.  I met with Ken Jowdy once in

23 California along with Phil, Phil had come to my home and

24 shown me a bunch of layouts, different plans, lots for

25 homes, and the Global Settlement Fund, that wasn't going

1 well, Ken Jowdy through talking with Phil there was a

2 falling out, things weren't happening, so I was

3 disappointed with that, and the Global Settlement Fund

4 Phil came to Buffalo, met with my wife and I along with

5 Tommy Constantine, we talked about ways we could recoup

6 what we considered were losses or try and get some money

7 back out of that golf course and so we met in Buffalo for

8 that.

9 Q.   Let me step back for a second.  You said that you met

10 Ken Jowdy once in California?

11 A.   Yes.

12 Q.   After that point did you ever talk to Mr. Jowdy

13 again?

14 A.   I didn't have contact with Ken Jowdy, I think once

15 over, once maybe around 2010 or so I asked for some K-1's

16 from him.

17 Q.   Did you get them?

18 A.   I did.

19 Q.   So other than that, did you, the information that you

20 described about falling out and things not going well,

21 where was that coming from?

22 A.   My conversations were mostly with Phil.

23 Q.   When you stated that Mr. Kenner came to meet you in

24 Buffalo along with Mr. Constantine, was that the first

25 time that you were meeting with Mr. Constantine?

1 A.   That was the first time that I had met with

2 Mr. Constantine.  I had felt familiar with him through my

3 conversations with Phil, Phil described him as, as a well

4 off businessman, race car driver, Phil spoke very highly

5 of.

6 Q.   You met with Mr. Constantine in person?

7 A.   I did in Buffalo, yes.

8 Q.   Would you recognize him again if you saw him today?

9 A.   I would.

10 Q.   Please identify him?

11       MR. LA RUSSO:  We concede the identification.

12       THE COURT:  The identification has been

13 conceded.

14 Q.   Where did this meeting in Buffalo take place?

15 A.   Chef's restaurant.

16 Q.   Who else was there?

17 A.   My wife.

18 Q.   And approximately how long was it?

19 A.   How long were the meeting?

20 Q.   Yes.

21 A.   I would guess it was about hour, the length of a

22 dinner.

23 Q.   And what did Mr. Kenner or Mr. Constantine tell you

24 about why they were there?

25 A.   They talked about, there was a number of guys,

1 friends of mine, former teammates, that were invested in

2 the golf course in Mexico the northern property, and it

3 was a talk about how we could go after Ken Jowdy legally,

4 they talked about hiring a high-powered attorney out of

5 California, Ronald Richards, and they talked about how we

6 could potentially recoup some of what I felt was lost

7 money.

8 Q.   Did they specify who else -- I'm sorry.  How that you

9 were going to recoup lost money.  So what was the actual

10 plan they were proposing?

11 A.   The property was bought for, I don't know the exact

12 amount, but it was large amount of land in Mexico, and I

13 was told that it was appraised for a lot more than it was

14 bought for.  I believe we wanted to get control of the

15 property legally from Ken Jowdy.  If we could do that and

16 sell the property, we could get our money back.

17 Q.   Did they specify whether anyone else was going to be

18 contributing to this fund?

19 A.   As I mentioned, a number of players that I had played

20 with or were friends with, also invested with Phil.  And

21 we wanted to put together a large pot of money to legally

22 go after Jowdy.

23 Q.   Did they specify how much money you had to put in?

24 A.   They were asking for a quarter million dollars.

25 Q.   And who did they say the money would go to?

McKee - Direct/Komatireddy

1815

1   **A.**   **The money would go Ron Richards.**

2   Q.   At the time that you were having this conversation

3   about whether to invest, I apologize, whether to

4   contribute to the Global Settlement Fund, did they tell

5   you that Mr. Constantine would be in control of that

6   money?

7   **A.**   **I don't recall them saying, no. No.**

8   Q.   Would that have been important to you in decide

9   whether to send money to this fund?

10   **A.**   **Can you ask the question again.**

11   Q.   Would that have been important to you if

12   Mr. Constantine and not Mr. Richards was in control of the

13   money, would that have been important for you to know?

14   **A.**   **Yes, it would.**

15   Q.   And at the time that you were having this

16   conversation and deciding to give money to the fund, what

17   did Mr. Kenner and Mr. Constantine tell you about how the

18   money would be used?

19   **A.**   **I was under the impression that the money would be**

20   **used to buy Ronald Richards for his expenses to again go**

21   **after Ken Jowdy for the northern property in Mexico.**

22   Q.   Did they say anything about how much of the money

23   would be used?

24   **A.**   **I remember them saying the reason they wanted 250,000**

25   **was so if 50,000 of that was spent or, sorry, I just gave**

McKee - Direct/Komatireddy

1816

1   **them 50,000 they would maybe have to come back in six**

2   **months or a year and ask for and instead of doing that**

3   **they thought it was a better idea to put a large amount of**

4   **money to Ron Richards for the war chest so they wouldn't**

5   **have to have calls for money every six months or a year.**

6   Q.   Did you have any expectation that large amounts of

7   money would be going out?

8         MR. HALEY: Judge, I would object to the leading

9   nature.

10         THE COURT: Sustained as to the leading nature.

11   Q.   Did they tell you the pace at which the money would

12   be used?

13   **A.**   **No.**

14   Q.   Now, in mid 2009, what's going on in your own career?

15   **A.**   **Mid 2009 I was an unrestricted free agent, which**

16   **means I played in St. Louis that year, and after that**

17   **season I was bought out, which means I could go any time.**

18   **I didn't have a job at that point, so I ended up hoping**

19   **that a team would come to me and ask.**

20   Q.   So at this point were you eager to send a quarter

21   million dollars to this fund?

22         MR. HALEY: Can I just object to the leading

23   nature.

24         THE COURT: Sustained.

25   Q.   Did you want to give money to Mr. Constantine and

McKee - Direct/Komatireddy

1817

1   Mr. Kenner?

2   **A.**   **I didn't search them out to give them money. They**

3   **came to me with the idea of a way to recoup what I felt**

4   **were losses.**

5   Q.   Did you ultimately decide to participate?

6   **A.**   **I did.**

7   Q.   Why?

8   **A.**   **I believed in what they said. I felt we would have**

9   **had a chance to get some money back. I obviously wasn't**

10   **happy with nothing being achieved in the property that I**

11   **invested half a million dollars into.**

12         **So after talking to them my wife and I went home**

13   **and talked about it, I talked to some other former**

14   **teammates, and thought that this would be the best course**

15   **of action to recoup some money.**

16   Q.   I'm going show you what's in evidence as Government

17   Exhibit 1526. I'll give you a copy that you can flip

18   through. (Handing.)

19         Do you recognize that?

20   **A.**   **I do.**

21   Q.   What is it?

22   **A.**   **This is a bank statement from my Charles Schwab**

23   **account.**

24   Q.   And just turning to page seven of the bank statement,

25   do you see at the top there's a wire funds disbursed

McKee - Direct/Komatireddy

1818

1   entry

2   **A.**   **I do.**

3   Q.   May 11, 2009?

4   **A.**   **Yes.**

5   Q.   And it's $250,000?

6   **A.**   **Yes.**

7   Q.   Was that the money that you sent for the Global

8   Settlement Fund?

9   **A.**   **I believe that was, yes.**

10   Q.   And I'm now going show you what's in evidence as

11   Government Exhibit 1509. Just looking at this, is this

12   exhibit the one on the right, is that something that you

13   saw at the time that you authorized this transfer?

14   **A.**   **I can't say that I saw that. I'm not sure.**

15   Q.   Just looking at the bottom there, it's signed Phil

16   Kenner as attorney in fact; is that right?

17   **A.**   **Yes.**

18   Q.   Did Mr. Kenner have power of attorney on your behalf

19   at that time?

20   **A.**   **He did.**

21   Q.   Now, after this money went out from your account on

22   May 11th, did you receive an e-mail from either Mr. Kenner

23   or Mr. Constantine about the Global Settlement Fund?

24   **A.**   **I can't recall specific e-mails, sorry.**

25   Q.   I'm going to hand you what's been marked as

McKee - Direct/Komatireddy

1819

1 Government Exhibit 6602.  (Handing.)
2       Do you recognize that?
3 **A.  I've seen this, yes.**
4 **Q.**  Is that your e-mail address at the top there?
5 **A.  It is.**
6 **Q.**  NICJAY74@aol.com?
7 **A.  That's my e-mail account, yes.**
8 **Q.**  That's Mr. Kenner's e-mail afterwards, the "to" line?
9 **A.  I believe so.**
10 **Q.**  Is that a true and accurate e-mail exchange that you
11 and Mr. Kenner made in May of 2009?
12 **A.  I don't know if this, NICJAY74 is for Nicole Jay 74,**
13 **it was a shared e-mail account so I'm not sure if this was**
14 **between Nicole on Phil or myself and Phil.**
15 **Q.**  So let me rephrase the question.  Is it a true and
16 accurate copy of an e-mail between either you or your wife
17 and Mr. Kenner in May 2009?
18 **A.  It is.**
19       MS. KOMATIREDDY:  The government moves it.
20       MR. HALEY:  No objection.
21       MR. LA RUSSO:  No objection.
22       THE COURT:  6602 is admitted.
23       (Government's Exhibit 6602 in evidence.)
24 **Q.**  Publishing for the jury.  Looking at the bottom
25 e-mail first, this appears to be an e-mail from Mr. Kenner

McKee - Direct/Komatireddy

1820

1 to you and your wife's account, do you see that?
2 **A.  Yes.**
3 **Q.**  And at the top there's a reply from you, correct, you
4 or your wife?
5 **A.  Yes.**
6 **Q.**  You or your wife, okay.
7       Let's start with the bottom.  Now, starting with
8 the first line of the body, per our conversation, please
9 acknowledge your approval and authorization for me to have
10 wire transferred $250,000 to attorney Ron Richards' trust
11 account for your proportionate contradiction to the Global
12 Settlement Fund.  In addition to paying for various legal
13 fees -- just let's pause there, various legal fees, what
14 legal fees did Kenner and Constantine explain to you would
15 be paid with the global settlement part of money?
16 **A.  We were hiring Ronald Richards out in California,**
17 **he's described as a high-powered lawyer, so that's what**
18 **the legal fees would have been for.**
19 **Q.**  Did either Mr. Kenner or Mr. Constantine tell you
20 that legal fees would be paid out of the Global Settlement
21 Fund to fund Mr. Constantine's personal race car lawsuit?
22       MR. LA RUSSO:  Your Honor, I object to the
23 leading nature of the question.
24       THE COURT:  Sustained.
25 **Q.**  Did either Mr. Kenner or Mr. Constantine explain or

McKee - Direct/Komatireddy

1821

1 tell you that any money from the Global Settlement Fund
2 would be used to pay any lawyers other than Ron Richards?
3 **A.  No.**
4       MR. LA RUSSO:  Object.
5       THE COURT:  That's okay.  There's no other way
6 to ask that question.  Your response is?
7 **A.  No.**
8 **Q.**  It goes on:  PR agency fees, as well as other
9 protective advances and settlement costs.
10       Based upon your conversation, your in-person
11 meeting with Mr. Kenner and Mr. Constantine, what did you
12 understand those costs to be for?
13 **A.  I wouldn't know what that would mean there.**
14 **Q.**  What did they say the money in general would be used
15 for?
16 **A.  To fund Ron Richards.**
17 **Q.**  And when you say fund Ron Richards, to what end?
18       MR. LA RUSSO:  Asked and answered.
19       THE COURT:  Yes.  Sustained.  I think we've been
20 through that a couple of times.
21 **Q.**  In addition to the fund being for -- sorry.  Let's go
22 on the rest of that.  You will be receiving transfer of
23 membership agreements from Tommy for your acquisition of
24 additional interest in Eufora, LLC, as well as your new
25 LLC and operating agreements reflecting your ownership

McKee - Direct/Komatireddy

1822

1 interest in the Avalon Airpark real estate project, the
2 Falcon 10 aircraft and the 2 Palms Place condominium
3 units.
4       First of all, this Air Park, the Falcon and the
5 Palms condominium units, did Mr. Kenner or Mr. Constantine
6 mention those things before you gave them money?
7 **A.  I don't recall those, no.  I don't recall those.**
8 **Q.**  In your conversation with them in the restaurant, did
9 they mention those things?
10 **A.  Not that I recall.**
11 **Q.**  In this e-mail where it says you're going to get
12 transfer of membership agreement for an interest in
13 Eufora, did you intend for any of your money in the Global
14 Settlement Fund to be used for Eufora?
15 **A.  No.**
16 **Q.**  Would you have given any money to the Global
17 Settlement Fund if you had been told that any portion of
18 it would be used for Eufora?
19 **A.  No.**
20 **Q.**  Did you intend any of your money in the Global
21 Settlement Fund Tommy Constantine used for a Falcon 10
22 aircraft?
23       MR. HALEY:  I would object again just leading
24 nature.
25       THE COURT:  Again, you can't ask these questions

McKee - Direct/Komatireddy

1823

1 that nonleading way so I'm going to allow it.  There's no
2 way to cover these items in a nonleading way.
3          MR. HALEY:  Thank you.
4 **Q.**  Let me ask it again.  Did you intend for any of your
5 money in the Global Settlement Fund to go to a Falcon 10
6 aircraft?
7 **A.  No.**
8 **Q.**  Would you have given money to the Global Settlement
9 Fund if you had been told that any of it would go to a
10 Falcon 10 aircraft?
11 **A.  No.**
12 **Q.**  Would you have -- did you intend any of your money in
13 the Global Settlement Fund to go to two Palms Place
14 condominium units?
15 **A.  No.**
16 **Q.**  Would you have given any money to the Global
17 Settlement Fund if you knew that any portion of it would
18 go to pay for two Palms Place condominium units?
19 **A.  No, I would not.**
20 **Q.**  This e-mail says that you would be getting an
21 interest in these things.  Why would you be getting
22 interest in these things?
23 **A.  I don't have an answer.**
24 **Q.**  Did they explain either Kenner or Constantine explain
25 to you?

McKee - Direct/Komatireddy

1824

1 **A.  Not that I recall, no.**
2 **Q.**  It goes on you may not recall Tommy or I mentioning
3 the Palms units in our conversation.  In any case, because
4 Moreau and Tommy settled that case as part of the Global
5 Settlement Fund, he has graciously elected to include you
6 as a beneficiary -- and the sentence continues.
7          When he says graciously elected, what was your
8 understanding of that statement?
9 **A.  As I mentioned, I don't know if I've seen this**
10 **before.  Or I don't know if I was the one that opened**
11 **this, so I'm not sure what that would mean there.**
12 **Q.**  Did either Mr. Kenner or Mr. Constantine in their
13 conversation with you in the restaurant indicate that they
14 would graciously give you interest in other properties?
15 **A.  Not that I recall.**
16 **Q.**  And in the last sentence it says:  As we discussed,
17 rather than throwing money away only on legal fees the
18 strategy which effectively acquires significant assets,
19 while providing a legal remedy, is by far our best
20 solution.
21          I want to focus on that phrase significant
22 assets.  At the time that you gave money to Global
23 Settlement Fund, did they, did either Kenner or
24 Mr. Constantine he tell you what the state of the Air Park
25 was?

McKee - Direct/Komatireddy

1825

1 **A.  No.**
2 **Q.**  Did they tell you what the financial state of the
3 Falcon 10 aircraft was?
4 **A.  No.**
5 **Q.**  Did they tell you what the financial state of Eufora
6 was?
7 **A.  I asked awhile before, but I didn't know the**
8 **financial state, no.**
9 **Q.**  You asked a lot about Eufora, how did you know about
10 Eufora?
11 **A.  Through Tommy.**
12 **Q.**  Had you made a previous investment in it?
13 **A.  I did, $100,000.**
14 **Q.**  And had you ever got anything back from that
15 investment?
16 **A.  No.**
17 **Q.**  Money or dividends?
18 **A.  Never.**
19 **Q.**  Had you ever gotten any documentation of that
20 investment?
21 **A.  Not that I recall, no documentation.  I may have**
22 **gotten, sorry, I may have gotten some kind of**
23 **documentation on that.**
24 **Q.**  At this time in 2009 did either Mr. Kenner or
25 Mr. Constantine tell you that Eufora was not a profitable

McKee - Direct/Komatireddy

1826

1 endeavor?
2 **A.  No.**
3 **Q.**  And it never had been?
4 **A.  No.**
5 **Q.**  In your conversations with Mr. Kenner and
6 Mr. Constantine in the restaurant, and in this e-mail, did
7 they ever mention that the money that you were putting
8 into the Global Settlement Fund would be used to fund race
9 cars?
10 **A.  No.**
11 **Q.**  Mr. Constantine's rent?
12 **A.  No.**
13 **Q.**  Mr. Kenner's credit card bills?
14 **A.  No.**
15          MS. KOMATIREDDY:  No further questions.
16          THE COURT:  Okay.  Cross-examination.
17          MR. HALEY:  Yes, sir.
18          MS. KOMATIREDDY:  I apologize, Judge, can I have
19 one more series of questions?  It will be short, I
20 promise.
21 **Q.**  I hand you what's been marked as Government's Exhibit
22 767, take a look through it.  (Handing.)
23          Do you recognize that?
24 **A.  I do.**
25 **Q.**  What is it?

McKee - Direct/Komatireddy

1827

1   A.   It's a spreadsheet of how the money from the Global
2   Settlement Fund was used.
3   Q.   And who gave you this spreadsheet?
4   A.   I eventually got this from Phil Kenner.
5        MS. KOMATIREDDY:  The government moves
6   Government Exhibit 767 in evidence.
7        MR. LA RUSSO:  Judge, can we have a site bar on
8   this.
9        THE COURT:  Yes.
10       (Continued on next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

McKee - Direct/Komatireddy

1828

1        (Whereupon, the following occurred at sidebar.)
2        MR. LA RUSSO:  I think my objection is not its
3   admissibility against Mr. Kenner, my objection is to the
4   admissibility against my client.  This is Mr. Kenner's
5   recitation of what happened to the Global Settlement Fund
6   after the two of them had their falling out.  There's no
7   conspiracy going on at this point in time between the two
8   of them.  This is where they're starting to point fingers
9   at each other.  This is Mr. Kenner's explanation, not my
10  client's.  This is Mr. Kenner's explanation.
11       THE COURT:  That's fair.
12       MR. HALEY:  I have no objection.
13       MR. LA RUSSO:  Thank you, Judge.
14       (Continued on next page.)
15
16
17
18
19
20
21
22
23
24
25

McKee - Direct/Komatireddy

1829

1        (Whereupon, the following occurred in open
2   court.)
3        THE COURT:  Members of the jury, I'm admitting
4   Government Exhibit 767.  I'm giving you a limiting
5   instruction.  I mentioned these in the beginning of the
6   trial.  There are some pieces of evidence that you only
7   can consider for a limited purpose, and this is one of
8   those pieces of evidence.  Government Exhibit 767 can only
9   be considered against Mr. Kenner.  You heard the witness
10  testify that this was provided to him by Mr. Kenner, and
11  therefore you can only consider this document against
12  Mr. Kenner.  You cannot consider this document in any way
13  against Mr. Constantine.  Okay.
14  Q.   Mr. McKee, before you received this spreadsheet from
15  Mr. Kenner, did you ask him any questions about the Global
16  Settlement Fund?
17  A.   I did.  I asked a number of times how the money was
18  being used.  Where the account was at.  And I wouldn't get
19  any answers.
20  Q.   And when he talked to you, do you remember
21  specifically what he said or approximately what he said?
22  A.   Yes.  There was, I remember specifically it was about
23  a year after I had sent the money in, it was the following
24  summer, I remember being at a fair with my family and
25  speaking on the phone with him for about 45 minutes to an

McKee - Direct/Komatireddy

1830

1   hour.  And the reason I remember this is because it was
2   taking up time with my family.  My wife and I at the time
3   were getting stressed out about what was going on, why we
4   couldn't get answers.  So I spoke to him for about an hour
5   and I got off the phone and still hadn't gotten any
6   answers.  He told me it's not a good time you know,
7   there'll be a better time to bring it up.  He said it
8   could hurt Eufora.
9        I didn't understand why, I kept asking, he just
10  said it's not a good time, trust me.  Following that is
11  when I contacted Ronald Richards and asked him for the
12  information.
13  Q.   Without telling us what Mr. Richards said, can you
14  tell us what you did with respect to Mr. Richards?
15  A.   What I did?
16  Q.   Without telling us the statements, did you take any
17  action?
18  A.   Yes.  I filed a complaint with the bar in California.
19  Q.   Did you ever file a complaint or sue Mr. Kenner?
20  A.   I have not, no.
21  Q.   Why not?
22  A.   My wife and I talked about it but we had a lot of
23  money invested with him and we were fearful, we always
24  felt that if we were to sue, there would never be a chance
25  to recover anything.

McKee - Cross/Haley

1831

1     **When I talked to Phil, everything always seemed**
2  **fine and good, and there was light at the end of the**
3  **tunnel.  So we feared suing would be, thinking that if we**
4  **did he wouldn't help us anymore.**
5         MS. KOMATIREDDY:  No further questions.
6         THE COURT:  Go ahead, Mr. Haley.
7         MR. HALEY:  Thank you, sir.
8
9  CROSS-EXAMINATION
10 BY MR. HALEY:
11 Q.   Mr. McKee, good afternoon, sir.
12 **A.   Sir.**
13 Q.   My name is Rick Haley.  I represent Phil Kenner.
14 Mr. McKee, taking a look at Government Exhibit 767, you
15 testified a moment ago that this document was ultimately
16 provided to you by Phil Kenner; is that correct?
17 **A.   I believe so, yes.**
18 Q.   And I know you testified just before the government
19 finished with questioning that you had conversations with
20 Phil, Phil told you at some point it wasn't a good time;
21 is that correct?
22 **A.   Yes.**
23 Q.   But we can agree, sir, at some point in time, you
24 received this document from Phil Kenner, is that true?
25 **A.   Yes, sir.**

McKee - Cross/Haley

1832

1  Q.   And would you agree, sir, that this is a very
2  detailed description of the monies as relates to at least
3  the accounting represented to you to be the Global
4  Settlement Fund, is that true?
5  **A.   Correct.**
6  Q.   When you received this document, I take it you
7  reviewed the information contained in the document?
8  **A.   Yes.**
9  Q.   And having reviewed that information, did you then
10 contact Phil?
11 **A.   I don't know if I spoke to him after that or not.**
12 **I'm sure we eventually talked, I don't know if I spoke**
13 **directly about that at this point in time was kind of**
14 **around the time that him and I were having a falling out,**
15 **I was disappointed with seeing this.  I had spoken to, I**
16 **had gotten a response from Ronald Richards before this**
17 **telling me that there was nothing left in the Global**
18 **Settlement Fund and then I received this from Phil.  So**
19 **before getting this from him, I was in a disappointed**
20 **state.**
21 Q.   Despite your disappointment, sir, let me ask you this
22 question.
23 **A.   Sure.**
24 Q.   You received this detailed statement from Phil Kenner
25 as relate to the disbursements out of the Global

McKee - Cross/Haley

1833

1  Settlement Fund.  My question is simply this, did or did
2  you not then contact Phil to discuss the content of this
3  document?
4  **A.   I don't believe that I called him to discuss it, no.**
5  Q.   Did you have any reason to believe, despite falling
6  out, if you called Phil to discuss the content of this he
7  would not have spoken to you?
8         MS. KOMATIREDDY:  Objection.
9         THE COURT:  That's okay, he can answer that.
10 **A.   I wouldn't know.**
11 Q.   Now, with reference to Government Exhibit 6602, do
12 you recall of course a series of questions where the
13 government went line-by-line with reference to the content
14 of that e-mail, correct?
15 **A.   I do.**
16 Q.   It's fair to state, sir, on May 19, 2009 in
17 approximately 1:15 a.m., either you or your wife received
18 in e-mail, is that true?
19 **A.   I believe that's when it was sent, so I don't know,**
20 **that's why I didn't know if we received it or not.**
21 Q.   But there came a point in time that you had an
22 opportunity to read the content of this e-mail, is that
23 true?
24 **A.   Either myself or my wife, yes.**
25 Q.   When you say either yourself or your wife, both of

McKee - Cross/Haley

1834

1  you as you testified to on direct were part and parcel of
2  the original meeting with Phil in the restaurant, true?
3  **A.   We were both there, yes.**
4  Q.   Is it fair to state that you and husband and wife,
5  you were the breadwinner, were interested in having enough
6  information as relates to that $250,000 Global Settlement
7  Fund investment, that true?
8  **A.   I don't understand the question, sir.**
9  Q.   Fair enough.
10       When Phil Kenner discussed with you, and Tommy
11 Constantine discussed with you and your wife the $250,000,
12 I take it your wife was interested as you were in where
13 that money was going?
14 **A.   Of course.**
15 Q.   And my question is simply this, sir, as relates to
16 this particular e-mail, is or is it not your testimony
17 that -- withdrawn.
18       Is it your testimony that with reference to the
19 content of this e-mail you may not have discussed the
20 content with your wife?
21 **A.   That's very possible.**
22 Q.   Well, we can agree, sir, is that the e-mail was
23 responded to by someone, correct?
24 **A.   Yes.**
25 Q.   And who responded acknowledged and approved?

McKee - Cross/Haley

1835

1    A.   I don't recall that's myself or my wife.

2    Q.   Well, following the receipt of this e-mail, did

3    either you or your wife contact Phil Kenner in terms of

4    Phil, the read the e-mail, it seems to cover matters beyond

5    our discussion concerning a lawsuit against Ken Jowdy.

6    Did that happen or did that not happen?

7    A.   I don't know that would have happened.  We had a lot

8    of trust in Phil.

9    Q.   So the question is no, it did not happen; is that

10   correct?

11   A.   I can't answer that yes or no, sorry.

12   Q.   At that point in time was there any disagreement

13   between you and Phil Kenner that would have precluded you

14   from contacting Phil to receive further explanation and

15   clarification as to this particular e-mail?

16   A.   In 2009, no.

17   Q.   Well, at any point in time after the receipt of this

18   e-mail, up to today's date, you did not request of Phil

19   Kenner I take it either you or your wife, that he return

20   your $250,000, isn't that true?

21   A.   I don't believe we ever requested the money back, no.

22   Q.   Well, you testified that --

23   A.   Can I --

24   Q.   Sir, you've answered the question.  Let me ask you

25   this.  The government will have an opportunity to

McKee - Cross/Haley

1836

1    redirect.

2           THE COURT:  Mr. McKee, if he asks you a yes or

3    no question, and you can answer yes or no, answer yes or

4    no.  If there's an explanation on that, the government can

5    get up and ask you.

6           THE WITNESS:  I understand, sir.

7           MR. HALEY:  Thank you, sir.

8    Q.   You testified I believe on direct that you did not

9    commence a lawsuit against Phil Kenner for fear that the

10   lawsuit would result in total loss of your $250,000, is

11   that your testimony?

12   A.   Yes.  Yes.

13   Q.   Is it your view, sir, that by simply calling Phil and

14   asking for the return of your $250,000 that that would

15   have a similar result, is that your testimony?

16   A.   I asked Ronald Richards for the 250,000 back which he

17   said he couldn't do, so I didn't think I had other

18   options.

19   Q.   You didn't think, sir, you had an option to contact

20   Phil Kenner and in substance say Phil, upon your

21   recommendation we sent to $250,000 to Ron Richards, we're

22   displeased in terms of the disbursements that you sent to

23   us and we'd like our return of $250,000, you didn't do

24   that, did you, of Phil Kenner?

25   A.   When Ronald Richards told me that the account was

McKee - Cross/Haley

1837

1    drained, I didn't think that would be an option.

2    Q.   I'll ask the question again, sir.  At any point in

3    time did you call up Phil Kenner, did you call him,

4    e-mail, write him, and in any respect whatsoever, say hey

5    Phil, in substance, we invested $250,000, you sent us a

6    spreadsheet, we'd like our $250,000 back?  Did you ever

7    communicate with Phil Kenner in any fashion in that

8    respect, yes or no?

9    A.   I don't believe so, no.

10   Q.   Sir, when you say I don't believe so, do you have

11   some recollection of making that inquiry?

12   A.   No.  I'm up here almost aware of what I'm saying, so

13   yes or no is direct, and I'm 99 percent sure I have not

14   asked him for the 250 back.

15   Q.   That's okay.  We'll take 99 percent.

16           Now, your original agreement with Phil Kenner

17   was memorialized in connection with a contract, was it

18   not, called the standard advisor's agreement, do you

19   recall that?

20   A.   I know Phil had procedure in the company, I can't

21   recall, you know what, about 10 plus years ago, I can't

22   recall signing specific papers, but I would assume yes.

23   Q.   And did or did you not have an understanding with

24   reference to the contractual relationship between yourself

25   and Phil Kenner that should there be a dispute you could

McKee - Cross/Haley

1838

1    elect to arbitrate that dispute?  Did you have that

2    understanding, sir?

3    A.   I wouldn't know that, no.

4    Q.   Well, when the relationship between you and Phil

5    Kenner started, did you have access to a lawyer of your

6    own choosing?

7    A.   I would assume I would, yes.

8    Q.   And I take it, sir, at no point in time did Phil

9    Kenner insert any type of obstacle for you in terms of

10   consulting an attorney before you signed let's say any

11   agreement with Phil, is that true?

12   A.   No.  Well, yes, that's true.  He never, he would have

13   never been an obstacle.

14   Q.   When Phil met you and showed you information

15   contained on the laptop, the information contained on that

16   laptop as best you were able to tell, appear legit?

17   A.   Yes.

18   Q.   Phil Kenner never told you it was worth a half

19   billion dollars, did he?

20   A.   No, I don't believe he ever told me that.

21   Q.   At any point in time when you had conversation with

22   Phil, did Phil Kenner ever tell you he was hiding in a

23   cave in Mexico, something like that?

24   A.   Phil told me that the federales were out for him in

25   Mexico.  I don't recall him saying he was hiding in a

McKee - Cross/Haley

1839

1 cave.

2 Q.   That would kind of stick out, right?

3 A.   Yes.

4 Q.   The e-mail that we referred to as Government Exhibit

5 6602, do you have that still there?

6 A.   Yep.

7 Q.   Is there any word contained in that e-mail, and I

8 mean a word that you do not understand, for example,

9 transaction, fees, anything of that nature?

10 A.   I think that I understand most of the words in this

11 e-mail.

12 Q.   And sir, I would suggest to you that the e-mail

13 contains approximately 217 words, would that be an

14 approximate estimation?

15 A.   I'd have to count them, but I'm sure that's the

16 ballpark.

17 Q.   We can agree, can we not, sir, at least as far as the

18 writing is concerned, when it says various legal fees, it

19 does not limit itself to fees associated with Ken Jowdy,

20 we can at least agree that that's what it says, true?

21 A.   Various legal fees is not defined, that's correct.

22 Q.   And we can agree as well as other protected advances

23 and settlement costs, no one defines that phrase is

24 capable of at least understanding in terms of the words

25 that are used, true?

McKee - Cross/Haley

1840

1 A.   It's not specific.

2 Q.   No, but the words protective, is it the word that you

3 understand, correct?

4 A.   I don't fully understand what protective advances

5 are.  But I understand the word protective.

6 Q.   Okay.  And did or did you not, and I apologize if I

7 asked the question before, sir, did or did you not

8 have a conversation with your wife as relates to the

9 meaning of those words before you sent back acknowledgment

10 approved?

11 A.   No, we wouldn't have had a discussion regarding words

12 with that e-mail, no.

13 Q.   With respect to the meeting that you had with Phil

14 Kenner and Tommy Constantine, can you give us an

15 approximate time, the duration of that meeting with

16 involving the two of them?

17 A.   When we met in Buffalo.

18 Q.   Yes?

19 A.   Would have been the length of a dinner, I would guess

20 approximately an hour.

21 Q.   I take it you did not, neither you or your wife took

22 notes during this dinner meeting, or did you?

23 A.   No, we would not normally take notes.  I don't

24 believe we've ever taken notes.

25 Q.   Now, going back to your direct testimony, by the way,

McKee - Cross/Haley

1841

1 what is OHL?

2 A.   Ontario Hockey League.

3 Q.   And is that a minor team league before the National

4 Hockey League?

5 A.   It's a developmental league for the NHL.

6 Q.   And how are the Erie Otters doing?

7 A.   The season is over now but we made the finals.

8 Q.   As an assistant coach, I take it?

9 A.   I'd like to think so.

10 Q.   The original three year contract you indicated was

11 for $2.3 million, correct?

12 A.   I believe the exact amount was 2.45 or 2.55.

13 Q.   And you told us that at least as relates to the

14 original business arrangement that you had with Phil, what

15 he was doing is he was charging you a small percentage of

16 your entire portfolio on a quarterly basis, is that true?

17 A.   Correct.

18 Q.   At that point in time did you regard that proposal by

19 Phil as being reasonable?

20 A.   Yes.

21 Q.   And I believe you testified that initially Phil would

22 recommend stocks and bonds and I think you said some were

23 risky and some were not, is that true?

24 A.   Well, he wouldn't recommend, just decisions were made

25 by him.  I pretty much just got statements on that stuff.

McKee - Cross/Haley

1842

1 I recall him saying it's pretty safe, you own a little bit

2 of everything.  I don't fully understand what that means,

3 but it wasn't a handful of stocks and a handful of bonds.

4 I believe it was, he would have to explain, but a little

5 bit of everything, so it was fairly safe for the most

6 part.

7 Q.   You said just a moment ago you would get statements

8 from him, correct, regarding your investments?

9 A.   I would get statements from Schwab, I don't recall

10 getting statements specifically from Phil.

11 Q.   But the statements that you received from Schwab

12 reflected those investments, true?

13 A.   Correct.

14 Q.   Was there ever a point in time where Phil Kenner in

15 any way interfered with your ability to obtain statements

16 from Schwab with respect to your investments?

17 A.   Never.

18 Q.   And I take it, sir, when you received those

19 statements, you and your wife had full and fair

20 opportunity to look at your investments, is that true?

21 A.   We did.

22 Q.   You say you met Ken Jowdy, is that true?

23 A.   I met Ken Jowdy in California along with Phil, yes.

24 Q.   And that was with respect to what ultimately became

25 your $500,000 investment in Diamonte del Mar, is that

1   true?

2   **A.   Correct.**

3   Q.   Did Phil at any point in time ever interfere with

4   your ability should you so desire to speak directly with

5   Ken Jowdy, yes or no?

6   **A.   No.**

7   Q.   I know you testified on direct, sir, that the

8   $250,000 that was sent to Ron Richards was without

9   question at least authorized by you, is that true?

10  **A.   Yes.**

11  Q.   So that Schwab document shown to you where Phil

12  utilized the power of attorney that you had given to him

13  to transfer that $250,000, that's not a document that you

14  believe is fraudulent, correct?

15  **A.   No.**

16  Q.   You testified on direct that there did come a point

17  in time where you invested $100,000 in Eufora, correct?

18  **A.   It was in the ballpark of $100,000, yes.**

19  Q.   And I believe that you were asked questions by the

20  government by way of direct questions would you have

21  invested $100,000 in Eufora if you were told that it

22  wasn't profitable, do you remember that question?

23       MS. KOMATIREDDY:  Misstates the record.

24       THE COURT:  The record speaks for itself.  Go

25  ahead.  You can answer it if you remember.

1   **A.   Can you ask that question again, sir.**

2   Q.   Sure.

3        Do you remember, sir, on direct being asked

4   questions by the government would you have invested

5   $100,000 in Eufora if you were told at the time it wasn't

6   profitable or words to that effect.

7        Do you remember that?

8   **A.   I'm a little confused by that, I'm sorry.**

9   Q.   Well, what do you know, do you know as you sit here

10  today, on that witness stand, whether Eufora has value,

11  yes or no?

12  **A.   I don't know right now, no.**

13  Q.   Do you know as you sit here today whether or not your

14  hundred thousand dollar payment as relates to Eufora

15  reflects a percentage ownership interest that you have in

16  the company?

17  **A.   I don't have a very good documentation to show that.**

18  Q.   But I know you said on direct that I may have

19  received something as relates to Eufora investment.  True?

20  **A.   That's correct.**

21  Q.   And Mr. McKee, I know this is a long time ago, but do

22  you have any idea as to what that something might be?

23  **A.   I believe when I got, when I invested in Eufora, I**

24  **believed it was a one percent or a two percent ownership.**

25  Q.   Reflected in the document, sir?

1   **A.   I can't recall.**

2   Q.   Well, I believe you testified on direct before you

3   made your hundred thousand dollar payment to Eufora or

4   whomever, that you asked a lot of questions.  Is that

5   true?

6   **A.   Yeah.  I did.**

7   Q.   Do you remember being told that Eufora had a patented

8   process with banks in order to offer a debit card wherein

9   persons could reestablish their credit, words to that

10  effect?

11  **A.   Yes.**

12       MS. KOMATIREDDY:  Your Honor, I object to scope.

13       THE COURT:  No, that's okay.  You can go on with

14  it.

15  Q.   When you were told that, Mr. McKee, did you have any

16  reason to doubt the truthfulness of that statement, sir?

17  **A.   No.**

18  Q.   Have you done any independent research, sir, as you

19  sit here today, as relates to Eufora, its prospects for

20  success, whether or not it hold the patent or anything of

21  that nature?

22  **A.   No.  I haven't done anything independent.  Anything**

23  **that I would know, I got through Tommy, through**

24  **conversations mostly.**

25  Q.   Are you familiar with the term private placement?

1   **A.   Not entirely, no.  I've heard the term.**

2   Q.   But did you have an understanding, sir, that with

3   your hundred thousand dollars that was being paid as --

4        MS. KOMATIREDDY:  Objection, your Honor, may we

5   have a sidebar?

6        THE COURT:  Why don't we take the lunch break,

7   okay.  Take the lunch break, we'll reconvene at two

8   o'clock.  Okay.  Don't discuss the case.  You can step

9   down, Mr. McKee.

10       THE WITNESS:  Thank you.

11       (Whereupon, the jury retired from the

12  courtroom.)

13       THE COURT:  Everyone can be seated.  Mr. McKee,

14  you can take your lunch break, thank you.

15       (Witness leaves the courtroom.)

16       THE COURT:  What's the objection?

17       MS. KOMATIREDDY:  Your Honor, we object based on

18  relevance.  We also objected because Mr. McKee is here as

19  a witness with respect to the Global Settlement Fund.

20  He's not alleged to be a victim of the Eufora fraud in

21  this case.  His investment was in a different time period.

22  I believe Mr. Haley is trying to use the word for his

23  knowledge of what an actual private placement in this

24  case, the 2008 contributions that went to Constantine

25  Management Group and the 2008, 2009 contributions that

McKee - Cross/Haley

1847

1 went to Tom Gaarn and then Phil Kenner, those two rounds
2 of raising financing for Eufora in 2008, 2009 are not
3 related to Mr. McKee's earlier investment in Eufora and he
4 has no personal knowledge of the circumstances of those
5 investments, he has no personal knowledge of what a
6 private placement is.  He's an inappropriate witness to
7 get this.
8        THE COURT:  You know, the government is not
9 charging him with a victim in Eufora.  Obviously you can
10 bring out in your summation we're not claiming Mr. McKee
11 was a victim at a different time.  But certainly the
12 defense if they want to try to establish that similar
13 things were told to each of the hockey players, there
14 wasn't one version told to one player and another version
15 told to another player, that's fair game.
16        You can object to the scope but, I'm not going
17 to make Mr. McKee come back during the defense case.  The
18 objection is a little earlier for private placement.  I
19 don't want you to start asking all of these questions
20 about financial terms.  But you can cover what he was told
21 about Eufora.  Okay.
22        MR. HALEY:  Yes, your Honor.  If I may, just,
23 for purposes of the record, when the government makes an
24 offer of proof and says, Judge, this is relevant because
25 it related to our theory that Hawaii investment monies

McKee - Cross/Haley

1848

1 were then unlawfully diverted to pay Kenner's mortgage
2 payments, I understand the government makes that offer of
3 proof and I accepted it at face value.  I might say,
4 Judge, the questions that I asked these questions,
5 particularly this particular witness, has relevance and
6 materiality as to the defense, the theory of the defense.
7        THE COURT:  I understand that.  It's obvious to
8 me that it has relevance and that's why I overruled it.  I
9 show the same -- when Mr. La Russo in other areas told me
10 it's relevant I've given him a lot of headway, too.  I'm
11 happy to give you leeway if you believe it's relevant to
12 your defense.
13        MR. HALEY:  I have no complaint in that regard,
14 the Court has absolutely done that.  I just wanted to make
15 my position clear.  If I haven't done so, I apologize.
16        THE COURT:  Have a good lunch.
17        (Whereupon, court recessed for lunch until two
18 o'clock p.m.)
19
20
21
22
23
24
25

McKee - Cross/Haley

1849

1        A F T E R N O O N   S E S S I O N
2
3        THE COURT:  Please be seated.
4        We'll bring in the jury and bring in the
5 witness.
6        How much longer do you have, Mr. Haley?
7        MR. HALEY:  Not much, Judge.  I'll withdraw the
8 last question but I want to state it on the record with
9 the jury present.
10        THE COURT:  Okay.
11        You can have a seat, Mr. McKee, until the jury
12 comes out.
13 J A Y   M c K E E,
14        having been previously sworn, resumed the stand
15        and testified further as follows:
16        (Whereupon, the jury at this time enters the
17 courtroom.)
18        THE COURT:  Please be seated.  Okay, members of
19 the jury, we'll continue now with Mr. Haley's
20 cross-examination of Mr. McKee.
21 CROSS-EXAMINATION
22 BY MR. HALEY (continued)
23        MR. HALEY:  Your Honor, I withdraw the last
24 question of this witness.
25        THE COURT:  Okay.

McKee - Cross/Haley

1850

1 Q   Mr. McKee, as it relates once again, sir, to the
2 e-mail 6602, between the two of you, you and your wife, at
3 that time let's say back in 2009 when this e-mail was in
4 evidence, sent from Phil Kenner to nicja74@aol.com,
5 between you and your wife who was handling your
6 investments or your finance at that point in time?  You or
7 her?
8 A   She did most of the financial stuff.
9 Q   Well, when you say did most of the financial stuff,
10 you are talking about let's say household bills, making
11 sure the mortgage payment is made, taxes are paid, things
12 of that nature?
13 A   Yes.
14 Q   Can we distinguish things between household finances
15 and your investment portfolio.  When I say your investment
16 portfolio, the investments that we're speaking of that
17 utilized Phil Kenner, that flowed primarily if not
18 exclusively from your income, correct?
19 A   Yes.
20 Q   Well, when investments were discussed with Phil
21 Kenner, would you say Phil, don't talk to me about it,
22 just talk to my wife about it, or would you engage in the
23 conversation as well?
24 A   Most of the conversations over the phone would be
25 between myself and Phil.  My wife would be present at

McKee - Cross/Haley

1851

1 most -- not most, many of the meetings we would have
2 together if they were in Buffalo, but when I would meet
3 with Phil when I was on the road traveling and stuff,
4 obviously she wouldn't be there.
5 Q   Going back to the telephone call, when investments
6 were being discussed with Phil Kenner, you told us just a
7 moment ago you would be on the phone speaking with Phil,
8 is that true?
9 A   Yes.
10 Q   Was there a different protocol between you and your
11 wife if rather than a telephone call there was an e-mail
12 of this nature (indicating) sent to your household?
13 A   We didn't really have a protocol.  We shared an
14 e-mail account.  She sat through the meeting that this
15 e-mail was about.  She could open those e-mails of course.
16 Q   I have no doubt, sir.
17       My question is, though, is it your testimony
18 that when this particular e-mail, if received let's say
19 only by your wife, she would not have discussed the
20 content of this e-mail with you?
21 A   It's quite possible she wouldn't.
22 Q   But when you say it is quite possible, you are not
23 here to state under oath before this jury that at no point
24 did she discuss that content of the e-mail with you,
25 correct?

McKee - Cross/Haley

1852

1 A   I don't recall discussing the content of that e-mail
2 with her.
3 Q   Well, as relates to this particular e-mail and the
4 content of the e-mail, we can agree, can we not, that this
5 didn't deal with household finance, paying the mortgage,
6 paying taxes, things of that nature, we can agree with
7 that?  Isn't that true?
8 A   That's correct.
9 Q   Do you have any reason to believe, sir, that your
10 wife was in 2009 unable to comprehend the words on this
11 document?
12       MS. KOMATIREDDY:  Objection.
13       THE COURT:  Sustained.
14 Q   We can agree, sir, can we not, at least as far as the
15 document is concerned, it came in at least by virtue of
16 the document itself, 1:50 a.m., is that true?
17 A   1:15.
18       MR. HALEY:  I misspoke.
19 Q   And the acknowledgment approved was 3:20 p.m. on 5/18
20 of 2009, correct?
21 A   Yes.
22 Q   I'm curious when an e-mail would come in to your
23 household, on what device would that e-mail be shown?
24 A   It could be through phone, computer, laptop.
25 Q   Well, in 2009, if you recall, what device would be

McKee - Cross/Haley

1853

1 receiving that e-mail in 2009?  Laptop, a desktop computer
2 or phone?
3 A   I wouldn't recall.
4 Q   In 2009 was there any obstacle or impediment that was
5 present in your household that precluded you from seeing
6 that e-mail?
7 A   None.
8 Q   If you recall, sir, prior to that e-mail, on how many
9 occasions had Phil Kenner sent an e-mail to your home
10 relative to your investments where your wife responded to
11 that e-mail without consulting you?
12 A   I wouldn't know.
13 Q   Now, simply going back, sir, to your general
14 relationship with Phil Kenner before the falling out, it
15 is true, is it not, that when Phil would discuss with you
16 let's say a particular investment, he would alert you or
17 discuss with you the risks associated with that
18 investment.  That's true, is it not?
19 A   When I talked to Phil there wasn't much talk about
20 risk.  There was a lot of talk about upside.
21 Q   Well, is it true, sir, that when you inquired of your
22 investments, Phil would give you updates on the
23 investments when you asked?
24 A   The Schwab investments or the $100,000 investments?
25 Q   Any investments that you might be discussing with him

McKee - Cross/Haley

1854

1 as relates to your stock portfolio or other matters.
2 A   I would have a lot of talk with Phil about Eufora,
3 but we didn't talk much about the portfolio.  The Schwab
4 account.
5 Q   Do you recall, sir, being interviewed on March 1,
6 2010, at the United States Attorney's Office in the
7 Southern District of New York, by federal law enforcement
8 agents and an Assistant United States Attorney?
9 A   I do.
10 Q   And do you recall, sir, at that point in time telling
11 at least the agents present that Kenner would tell him
12 about the risks involved when he pitched investment, but
13 doesn't recall a specific conversation with regards to
14 Eufora.
15       Do you recall that statement?
16 A   I don't recall specific conversations about Eufora.
17 I don't necessarily recall that statement.
18 Q   Fair enough.
19       Would you kindly take a look a document marked
20 Kenner Exhibit 49 for identification and you are free to
21 look at the entire document, but I'd ask you to look at
22 the first paragraph of the second page and simply read it
23 to yourself.
24 A   You want me to read the first paragraph?
25 Q   Just to yourself, sir.

McKee - Cross/Haley

1855

1  A   Okay.

2  Q   Does that refresh your recollection as to whether or

3  not when you discussed various investments with Phil

4  Kenner, he would advise you as to the risks associated

5  with those investments?

6  A   If I made this comment, I don't -- I can't recall

7  Phil talking about the risk involved.  I may have made

8  this statement but I'm telling you honestly when we talked

9  about investments, there wasn't much talk about risk.

10  Q   Well, we can agree, can we not, sir, when you spoke

11  with the Assistant United States Attorney and the federal

12  agents were present, it was your objective to answer those

13  questions as truthfully and completely as possible, is

14  that true?

15  A   Yes, absolutely.

16  Q   Can we agree, sir, just as a general proposition,

17  your memory of events, if not your interaction with Phil

18  Kenner, was better five years ago than it is today?

19  A   Should have been.

20      MR. HALEY:  Mr. McKee, thank you, and good luck

21  with your team.

22      THE WITNESS:  Thank you.

23      THE COURT:  Mr. LaRusso.

24      MR. LARUSSO:  Thank you, your Honor.

25

McKee - Cross/LaRusso

1856

1  CROSS-EXAMINATION

2  BY MR. LARUSSO:

3  Q   Good afternoon, Mr. McKee.

4  A   Good afternoon.

5  Q   My name is Robert LaRusso.  I represent

6  Mr. Constantine.

7      During your testimony you talked about an

8  investment in Del Mar, Baja, Mexico.

9  A   Yes, Diamonte del Mar.

10  Q   And that's the investment for $500,000; is that

11  correct?

12  A   Correct.

13  Q   Do you remember when you made that investment?

14  A   I don't specifically remember the date, no.

15  Q   Would it have been well before your contribution into

16  the Global Settlement Fund?

17  A   It would have been, yes.

18  Q   Did you ever visit the location that you were

19  investing in?

20  A   Yes.

21  Q   On how many occasions?

22  A   I believe I was just once, maybe twice.

23  Q   And was that undeveloped land?

24  A   Yes, it was undeveloped.

25  Q   Like for an airstrip?

McKee - Cross/LaRusso

1857

1  A   It wasn't -- when I got there the airstrip, there was

2  no infrastructure there.  It was more of a dirt runway.

3  Q   What happened to that investment?

4  A   I don't know.

5  Q   And just so that you can kind of bring us up to date,

6  your hope in contributing to the Global Settlement Fund

7  was to try and secure the investments you had made in that

8  particular location; is that correct?

9  A   Yes, I was under the impression we were going to go

10  after Jowdy who I was told was the bad guy.  Yes, that's

11  why I visited.

12  Q   And my last question on this, did Mr. Constantine

13  have anything to do with your investment in Diamonte del

14  Mar?

15  A   Not at all.

16  Q   When did you meet Mr. Constantine for the first time?

17  A   I don't remember specific dates.  I believe it was in

18  2009, after my season.  So it would have been in the

19  spring of 2009, I believe.

20  Q   Is that when you met him at the restaurant with your

21  wife?

22  A   Yes.

23  Q   So when you met with him and your wife to discuss the

24  Global Settlement Fund, that was the first time you were

25  ever introduced to him, ever met?

McKee - Cross/LaRusso

1858

1  A   I believe so.

2  Q   Did you ever meet with him again?

3  A   I can't recall meeting with Tommy again after that.

4  Q   So is it fair to say probably the next time you saw

5  him after the meeting about the Global Settlement Fund was

6  when you saw him in court here today?

7  A   Maybe one other time together after that, but this

8  could be our second meeting, yes.

9  Q   And you testified that, let me see, I believe I have

10  the exhibit.

11      MR. LARUSSO:  There's a magic button somewhere

12  and I can't find it, Judge.

13  Q   Mr. McKee, you identified this document and spoke

14  about it on your direct examination, 1509.  This is the

15  wire transfer of $250,000 from your account, Charles

16  Schwab, on May 11, 2009; is that correct?

17  A   Correct.

18  Q   And that was authorized by you because Mr. Kenner had

19  power of attorney?

20  A   Correct.

21  Q   Would you agree with me that at some point prior to

22  May 11th, you met with Mr. Kenner and Mr. Constantine?

23  A   Yes.

24  Q   And do you know how long before this transaction that

25  we just discussed took place?

McKee - Cross/LaRusso

1859

1   A    I don't recall how long before, no.

2   Q    Would it be relatively soon before the transaction?

3   A    I believe it was, yes.

4   Q    You also were shown in evidence Government's

5   Exhibit 6602 and that is, we've been calling it

6   authorization memorandum for the Global Settlement Fund.

7   A    Yes.

8   Q    And you answered a lot of questions regarding your

9   knowledge of and awareness of this particular document.

10   I'll not go into those at this point because you've done

11   it with both the Government and Mr. Haley.  But my

12   direction is to the date that this was received, May 18,

13   2009.  Do you see that?

14   A    Yes, I do.

15   Q    So this would have been approximately seven days

16   after the money had already been sent?

17   A    Yes.

18   Q    So between the time when the money was sent --

19   withdraw that.

20        I'll read to you the lower portion of this

21   exhibit.  I don't believe it was read before.  Let's see

22   if I can bring it all in.

23        It says Tommy has requested from all of us and

24   will provide to us, written documentation of every element

25   of this transaction.  Please respond.  Acknowledged and

---

McKee - Cross/LaRusso

1860

1   approved, to this e-mail accordingly ASAP.

2        Thanks, Phil.

3        Now, obviously I'm not going to ask you if you

4   remember that because you don't have a recollection of

5   this; is that correct?

6   A    Correct.

7   Q    But you would agree with me this was received by your

8   e-mail account at your home?

9   A    Yes.

10   Q    You have no recollection of speaking to your wife

11   about the contents --

12   A    I did not.

13   Q    -- Of this.

14        When for the first time did you actually see

15   this document?

16   A    Well, as I said, I don't recollect if it was myself

17   or my wife that opened it, so if it was me it would have

18   been May 18th.  The next time I saw it was yesterday.

19   Q    Okay.  I'm sorry.  Are you saying that you may have

20   seen this document on May 18th of 2009?

21   A    That's what I said, yes.

22   Q    So you have some recollection of receiving this?

23   A    No, you asked when was the first time you saw it and

24   I'm saying if it was me and not my wife, then it would

25   have been then that I saw.

---

McKee - Cross/LaRusso

1861

1   Q    You don't have a recollection of seeing it but if you

2   did you would have seen it on the day it was opened?

3   A    Yes.

4   Q    Do you have any recollection of talking to your wife

5   about the fact that after you had sent the money there was

6   a request by Mr. Constantine and/or Mr. Kenner for written

7   authorization for the expenditure of money from the Global

8   Settlement Fund, do you have any recollection of that kind

9   of a conversation with your wife?

10   A    That would not be a conversation that her and I would

11   have.

12        (Continued.)

---

McKee  -  Cross/LaRusso

1862

1   BY MR. LARUSSO:

2   Q.   Do you recall speaking to Agent Galioto on May 31st

3   of 2012, I believe it was a telephone call?

4   A.   It's possible.  I don't recollect that date.

5   Q.   You don't know, but you remember speaking on the

6   phone?

7   A.   I spoke to him on the phone, yes.

8   Q.   Do you remember, in any of those telephone

9   conversations with Mr. Galioto, telling him that you

10   recall seeing an e-mail where you signed and gave

11   authorization to use money for the GSF but is not sure if

12   he understood, meaning you, what it meant.

13        Do you remember that about three years ago?

14   A.   Three years ago?  I don't remember that conversation,

15   no.  I'm sorry.

16   Q.   It may have happened?

17   A.   It's possible.

18   Q.   Let me just, if I may, show you what's been marked as

19   3500-JM-1.

20        And there is some writing and highlights which

21   directs you to where I'm asking which is, after looking at

22   that, does it refresh your recollection that you told the

23   agent that you did see an e-mail and that you signed it?

24        (Pause in proceedings.)

25        Does that refresh your recollection that back in

---

McKee - Cross/LaRusso

1863

1   2012, in a conversation with Mr. Galioto, you told him
2   that you had seen the e-mail and that you actually signed
3   it.
4   A.   **To pin that to that specific e-mail, I can't do that.**
5   **I'm sorry.**
6   Q.   Does it help refresh your recollection that you told
7   the agent that you signed the authorization e-mail?
8   A.   **I don't recall signing an authorization e-mail.**
9   Q.   And, again, you would not have any recollection of
10  discussing that with your wife?
11  A.   **No.**
12  Q.   Now, after you had spoken to Mr. Constantine and made
13  the contribution to the Global Settlement Fund, we know
14  you didn't meet with him again, but did you speak with him
15  on the telephone and communicate with him by e-mail?
16  A.   **Regarding the Global Settlement Fund?**
17  Q.   And other topics?
18  A.   **Yeah, I would talk to Mr. Constantine about a number**
19  **of different things.**
20  Q.   And did you have any difficulty reaching or speaking
21  to Mr. Constantine?
22  A.   **No, never.**
23  Q.   Would it be fair to say that you would ask questions
24  and he would give you answers?
25  A.   **Yes.**

McKee - Cross/LaRusso

1864

1   Q.   And vice versa, he would ask questions of you and you
2   would give him answers?
3   A.   **Yes.**
4   Q.   In all those communications that you had with him,
5   would you agree with me that he was straightforward in
6   responding to whatever inquiries you had?
7   A.   **Yes.**
8   Q.   Now, focusing on the Global Settlement Fund, do you
9   remember ever communicating with Mr. Constantine about the
10  Jowdy lawsuit itself?
11  A.   **I don't remember speaking specifically to**
12  **Mr. Constantine about the Jowdy lawsuit.  Which lawsuit?**
13  **Sorry.**
14  Q.   Well, you testified that Mr. Richards was going to be
15  retained to handle legal matters against Mr. Jowdy; is
16  that correct?
17  A.   **Yes.**
18  Q.   Okay.
19       Let me just show you what's been marked for
20  identification as C-98.
21       Do you recognize that as an e-mail coming from
22  your e-mail address to Mr. Constantine on June 20, 2009?
23  A.   **Yes.**
24  Q.   Do you recognize the -- after reading it, do you
25  recognize that as an e-mail communication you and he had

McKee - Cross/LaRusso

1865

1   regarding the legal representation you were contemplating
2   by your contribution?
3   A.   **Yes.**
4        MR. LARUSSO:  Your Honor, may I ask 98 be
5   received at this time.
6        MS. KOMATIREDDY:  No objection, your Honor.
7        MR. LARUSSO:  If I may, your Honor.
8        MR. HALEY:  No objection.
9        THE COURT:  C-98 is admitted.
10       (Defense Exhibit C-98 in evidence.)
11  BY MR. LARUSSO:
12  Q.   Mr. McKee, this is dated June 20th, 2009.  It's from
13  your e-mail, from you, to Mr. Constantine's e-mail
14  address.
15       Content.  Thanks, Tommy.  I have full confidence
16  we are going to end up with a result we will all be happy
17  with.
18       I have sent out all my Jowdy info to Ron and I
19  will keep updated to the situation.
20       I read that correctly?
21  A.   **Yes.**
22  Q.   I have been known not to, so you have to watch me.
23       Ron is Ron Richards; is that correct?
24  A.   **Yes.**
25  Q.   What information were you communicating at this

McKee - Cross/LaRusso

1866

1   point, do you recall?
2   A.   **I would assume that was about the Global Settlement**
3   **Fund.**
4   Q.   But you don't have any specific recollection what
5   that actual information was at this point?
6   A.   **No.**
7        **After seeing that e-mail I wouldn't know what**
8   **that is specific to.**
9        MR. LARUSSO:  I apologize, your Honor.  I
10  thought I had copies of this.  I do not.
11       (Pause in proceedings.)
12       MR. HALEY:  No objection, Judge.
13       THE COURT:  Does the government have any
14  objection?
15       MS. KOMATIREDDY:  No, your Honor.
16       THE COURT:  What number is that?
17       MR. LARUSSO:  Your Honor, this is C-104.  I can
18  display it.
19       THE COURT:  C-104 is admitted.
20       (Defense Exhibit C-104 in evidence.)
21  BY MR. LARUSSO:
22  Q.   Mr. McKee, I may be stating the obvious, but this is
23  an e-mail from Mr. Constantine to a group of e-mails.
24       Do you see your e-mail address in there
25  Nicjay74?

McKee - Cross/LaRusso

1867

1  **A.  I do.**
2  Q.  This is dated June 17, 2009, about a month after you
3  made your contribution, and it's to all.  That would
4  include you.
5        Here are the final drafts of the lawsuits.  This
6  is what will be filed today.
7        For those of you that were involved in Diamante
8  Air, as I stated in my previous e-mail, there will be one
9  more lawsuit for that entity.
10       Please discard the previous drafts of these
11 lawsuits as these are the official documents.  They also
12 contain more aggressive and comprehensive language.
13       Thank you all for your support and I look
14 forward to the day when we recover your investments for
15 all of you.
16       TC.
17       Do you recall that?
18 **A.  I don't recall seeing that, no.**
19 Q.  Mr. McKee, did you ever hear of the name Diamante
20 Air?
21 **A.  No, I never invested in Diamante Air.  I don't think**
22 **I was ever proposed to invest into it.**
23       **So I may have heard it in conversations or**
24 **through some e-mails, but I don't know much about it.**
25 Q.  Do you have any recollection of a lawsuit being

McKee - Cross/LaRusso

1868

1  brought on behalf of the Global Settlement Fund against
2  Diamante Air?
3  **A.  No.**
4  Q.  Did you know that Ken Jowdy was the principal behind
5  Diamante Air?
6        MS. KOMATIREDDY:  Objection.
7        THE COURT:  Overruled.
8        If you know the answer to that from personal
9  knowledge, you can answer.
10 **A.  Can you ask it again.**
11 Q.  Do you know if Ken Jowdy was the principal of
12 Diamante Air?
13 **A.  No.**
14 Q.  By the way, do you remember ever seeing the
15 complaints that are referenced in this e-mail down at the
16 bottom?
17 **A.  No.**
18 Q.  It says, Jowdy complaint 1 and Jowdy complaint 2.
19 **A.  I wouldn't know what those are.**
20 Q.  Well, you knew that there was contemplation of a suit
21 against Mr. Jowdy; is that correct?
22 **A.  I don't understand that question.  Sorry.**
23 Q.  When you testified that it was your thought that the
24 money was going to be used to pay Ron Richards in
25 connection with an action against Ken Jowdy --

McKee - Cross/LaRusso

1869

1  **A.  Correct.**
2  Q.  -- my question is, do you have any recollection of
3  receiving any official court documents that were prepared
4  by Ron Richards in connection with that understanding?
5  **A.  I don't recall.  I would assume I did receive**
6  **something, but I can't recall.**
7  Q.  And this e-mail doesn't refresh your recollection
8  then that two complaints were attached for the recipients
9  of this e-mail, including you?
10 **A.  I don't recall seeing this, no.**
11       MR. LARUSSO:  Mr. Haley.
12       (Pause in proceedings.)
13 BY MR. LARUSSO:
14 Q.  Let me show you what has been marked for
15 identification only as C-97 at this point.  Just take a
16 look at it.  The question will be somewhat similar.
17       Do you recognize this as an e-mail from you or
18 your e-mail address to Mr. Constantine dated October 21st,
19 2009, in reference to some of the legal issues we have
20 been discussing.
21       (Pause in proceedings.)
22 **A.  Your question?**
23 Q.  Do you recognize this as an e-mail from your e-mail
24 address to Mr. Constantine?
25 **A.  It would be, yes.**

McKee - Cross/LaRusso

1870

1        MR. LARUSSO:  Your Honor, I ask this be received
2  at this point.
3        MS. KOMATIREDDY:  No objection.
4        MR. HALEY:  No objection.
5        THE COURT:  C-97 is admitted.
6        (Defense Exhibit C-97 in evidence.)
7  BY MR. LARUSSO:
8  Q.  Again, this is in evidence C-97.
9        It's an e-mail dated October 21st, 2009, from
10 your e-mail address to Mr. Constantine as I'm displaying
11 to the jury.
12       It starts off:  Perfect.  Thanks.
13       There appears to be some attachments to this
14 e-mail; is that correct?
15       Meaning there are some attachments that Mr.
16 Constantine is making so that you can see them.
17       Do you follow my question?
18 **A.  Yes.**
19 Q.  Without reading all of it, starting at the bottom,
20 Mr. Constantine, TC, do you see that?
21 **A.  Yes.**
22 Q.  He's writing to the guys, which you are one of the
23 group receiving e-mails from him, right?
24 **A.  Yes.**
25 Q.  We need to have a conference call as soon as

McKee - Cross/LaRusso

1871

1 possible.  There is a lot to discuss.  Accordingly, I
2 would really like everyone to be on this call.  Is
3 everyone free on either Saturday or Sunday?  Please
4 advise.
5        Then there appears to be an e-mail from Mr. Ron
6 Richards to a number of individuals, do you see that?
7 **A.  Yes.**
8 **Q.**  On the second page it's dear clients.
9        I went to Court today on a motion to disqualify
10 my firm filed by Jowdy on some groundless theory.
11        The Court ruled that Jowdy has no standing to
12 make such a motion, as he is not a former client of my
13 firm.
14        The Judge thought the motion was frivolous and
15 said I scored a lot of points with him.
16        The Judge then ordered his attorney to meet me
17 in person to try and resolve a discovery dispute as Jowdy
18 has refused to provide any documents or answer any of the
19 questions I sent him.
20        We have three motions to compel pending against
21 him.  He wasted a lot of time trying to get rid of me and
22 was defeated.
23        Ron Richards.
24        Do you have a recollection of receiving that,
25 Mr. McKee?

McKee - Cross/LaRusso

1872

1 **A.  I don't recall receiving that, no.**
2 **Q.**  Would it be fair to say though that you do remember
3 receiving updates from Mr. Constantine about the progress
4 of the suit against Mr. Jowdy; would that be fair?
5 **A.  I believe he sent phone calls and e-mails, yes.**
6 **Q.**  Do you remember receiving any e-mail from
7 Mr. Constantine, and I'll try and group these if I can,
8 where he advised you and the others, particularly the
9 hockey players, about monthly conference calls?
10 **A.  I don't recall that.**
11 **Q.**  All right.  I'm going to show you quickly -- I can't
12 do it too quick, what's in evidence as Government's
13 Exhibit 33.
14        At the top it says conference call, one message.
15        MR. LARUSSO:  I'm sorry, Judge.  It should be
16 Defendant's Exhibit C-33.  I called it a Government's
17 exhibit.
18 **Q.**  Do you see I'm pointing to your e-mail?
19 **A.  Yes.**
20 **Q.**  And it talks about our call is scheduled for Sunday,
21 and then it has additional information about where people
22 can call in to try and arrange participation?
23 **A.  Yes.**
24 **Q.**  Do you recall receiving this and other e-mails
25 referencing conference calls of Mr. Constantine?

McKee - Cross/LaRusso

1873

1 **A.  I do recall being a part of at least one conference
2 call.**
3 **Q.**  This one on June 10th, 2009, you have no specific
4 recollection of, but you do remember participating in a
5 conference call with other members, other hockey players?
6 **A.  Vaguely, but yes.**
7 **Q.**  And I'll go through these quickly too.
8        In evidence is C-34.  June 25, 2009.  I'm
9 pointing to your e-mail address, am I correct?
10 **A.  Yes.**
11 **Q.**  Again, another conference call to be scheduled.
12        Do you have any recollection of receiving this?
13 **A.  I don't recall it, no.**
14 **Q.**  If you would like to know, I only have two more of
15 these.
16        And Defendant's Exhibit C-35.  This one is dated
17 August 19.  It's conference call number three and it has
18 your e-mail address included?
19 **A.  Yes.**
20 **Q.**  Do you recall receiving any information about an
21 upcoming conference call?
22 **A.  I don't recall, no.**
23 **Q.**  But you don't dispute the fact that you received this
24 and were apprised of the conference call regarding an
25 update on the Global Settlement Fund?

McKee - Cross/LaRusso

1874

1 **A.  I do not dispute that.**
2 **Q.**  And the last one is C-32.  It's received in evidence.
3 This is June 10, 2009.  It's from Mr. Constantine to
4 Mr. Kenner and you at the top.  It lists other recipients
5 and there's your name.
6        Do you remember receiving an e-mail where
7 Mr. Constantine is providing the following information.
8        I will be arranging a very important conference
9 call and goes on and talks about Ken Jowdy.
10        Do you see that in the first paragraph?
11 **A.  Yes.**
12 **Q.**  And then he says, there's a legal aspect and a media
13 aspect which all of you need to be very aware of and
14 approve before we execute.
15        Do you see that?
16 **A.  I do.**
17 **Q.**  Do you recall ever receiving such an e-mail from
18 Mr. Constantine regarding the Global Settlement Fund?
19 **A.  I don't recall an e-mail, no.**
20 **Q.**  Do you recall any discussions with Mr. Constantine
21 where he told you that Global Settlement Fund may have to
22 be expended for publicity for countering information that
23 was being put in the paper by Mr. Jowdy?
24 **A.  I recall talking about countering different articles
25 that had been put out.**

McKee - Cross/LaRusso

1875

1    I don't recall funds being used from the global
2 investment to be tied into this these articles.
3    Q.   But do you recall that the publicity was in response
4 to Ken Jowdy?
5    A.   I do, yes.
6    Q.   And that the nature of the Global Settlement Fund was
7 according to your recollection principally Mr. Jowdy?
8    A.   Correct.
9    Q.   So if this information that you were receiving had to
10 do with that, would you agree that you would have no
11 objection -- withdrawn.
12       Did anyone ever tell you that the publicity was
13 related directly to your endeavor with these others to go
14 after Mr. Jowdy?
15   A.   I don't understand that question.  Sorry.
16   Q.   You remembered some discussion about publicity having
17 to be put together to counter Mr. Jowdy?
18   A.   Correct, yes.
19   Q.   My question is, did anyone ever tell you that that
20 publicity that was going to be generated and paid for was
21 going to be part of the overall strategy in regards to the
22 Global Settlement Fund?
23   A.   I didn't know publicity was paid for.  I was never
24 advised we would have to pay.
25   Q.   Leaving the payment aside, the information you

McKee - Cross/LaRusso

1876

1 received regarding the publicity to counter Mr. Jowdy was
2 in connection with the overall scope of the effort to go
3 and have Mr. Jowdy account for what he had done regarding
4 your investments?
5    A.   Yes.
6        MS. KOMATIREDDY:  Objection to form.
7        THE COURT:  Overruled.
8 BY MR. LARUSSO:
9    Q.   In evidence as Defendant's Exhibit C-29, Mr. McKee,
10 is an e-mail from Mr. Constantine to the group, including
11 yourself; is that correct?
12   A.   Yes.
13   Q.   On June 18, 2009.
14       Do you remember receiving from Mr. Constantine
15 on that date an e-mail which had a link to a New York Post
16 article, golf resort developer bilked NHL stars?
17   A.   I don't specifically remember this e-mail, but I do
18 remember seeing the articles.
19   Q.   Did you discuss that with Mr. Constantine at any
20 point?
21       Do you remember discussing it with
22 Mr. Constantine at any point?
23   A.   I'm sure I would have talked to him probably over the
24 phone about that, yes.
25   Q.   You had pretty open communication with

McKee - Cross/LaRusso

1877

1 Mr. Constantine; is that correct?
2    A.   Yeah.
3    Q.   You had no problem getting in touch with him, and he
4 had no problem getting in touch with you?
5    A.   No problem at all.
6    Q.   Now, I'm going to show you one that's been received
7 in evidence as Defendant's Exhibit C-31.
8        The date is July 27, 2009, about two months
9 after you made your contribution.
10       This is an e-mail from Mr. Constantine to your
11 e-mail address again?
12   A.   Yes.
13   Q.   I'll go over just portions of it.  What I'm going to
14 ask is as I read it my question will be do you remember
15 this and do you recall the discussion and I apologize but
16 it's just for the sake of trying to save time okay,
17 Mr. McKee?
18   A.   Yes.
19   Q.   As you may recall through our discussions one of the
20 issues that was recently resolved as part of our global
21 settlement effort was Diamante Air.
22       Do you have any recollection now that you had a
23 chance to see this second e-mail referencing Diamante Air,
24 that Diamante Air had something to do with the Global
25 Settlement Fund?

McKee - Cross/LaRusso

1878

1    A.   I don't recall Diamante Air being part of that.
2    Q.   It continues on:  Which involves several airplanes
3 and a lawsuit which was filed by the bank against Phil and
4 those of you who invested in the company.
5        Again, no recollection of this?
6    A.   I don't remember ever reading this.
7    Q.   I'm not going to go into all of it.  There's further
8 explanation.  I'm just going to go to the second page.
9 Actually, let me start at the bottom of the first and I'll
10 read the bottom paragraph.
11       Mr. McKee, can you follow along with me?
12   A.   Yes.
13   Q.   Thank you.
14       For those of you that invested in Diamante Air
15 originally, this solution and your current ownership of
16 this airplane does not alleviate Jowdy's or Thalmann's
17 responsibility for their mismanagement of the original
18 deal.  And we intend to pursue every legal and financial
19 remedy to recover your losses along with our current
20 efforts against Jowdy.
21       This is the last lawsuit that is to be filed.
22 The solution simply got the airplane itself and the bank
23 issues and in brackets loans/personal guarantees/lawsuit
24 sorted out.
25       Finally, this is just one of the investment

McKee - Cross/LaRusso

1879

1 acquisitions and business solutions that overlaid over the
2 legal strategy that we presented as part of the global
3 settlement plan.
4     I have attached the documentation for all of you
5 to sign for your respective share of ownership in the
6 airplane company.  It is a very basic operating agreement,
7 but you should definitely read it, sign it and send it
8 back to me at your convenience.
9     Please do not hesitate to call me if you have
10 any questions.
11     You will be receiving a similar agreement for
12 the ownership interest that we acquire from the bad guys
13 for their Eufora shares as well as the Avalon hangar
14 building which is actually where the plane is kept and
15 where Eufora is headquartered.  I have also attached some
16 photos of the plane.
17     Does that refresh your recollection, Mr. McKee,
18 at all about discussions with Mr. Constantine either over
19 the phone or in e-mail about a broader scope of the Global
20 Settlement Fund and what you remember?
21 A.  **Unfortunately it doesn't, no.**
22 Q.  You don't doubt the accuracy of the information, do
23 you?
24 A.  **No, I don't.**
25 Q.  Now, one of the hopes that you had was to try and

McKee - Cross/LaRusso

1880

1 recover some of your investment from Mr. Jowdy that you
2 made in Diamante Del Mar; is that correct?
3 A.  **Correct.**
4 Q.  Do you remember any efforts that Mr. Constantine made
5 to try and secure monies from that investment to pay back
6 to you and the other hockey players?
7 A.  **No, I don't.**
8 Q.  This was received in evidence.
9     MR. LARUSSO:  May I, your Honor?
10     MR. HALEY:  Thank you.
11 BY MR. LARUSSO:
12 Q.  In evidence as C-24, this is a November 9, 2009
13 e-mail.  You're part of the group recipients; is that
14 correct, Mr. McKee?
15 A.  **Yes.**
16 Q.  And I'm just going to read the first portion.  This
17 is to all from TC.
18     You knew TC to be Tommy Constantine, correct?
19 A.  **Yes.**
20 Q.  That's the way he signed off on his e-mails to you?
21 A.  **Yes.**
22 Q.  Just the first paragraph where it talks about I am
23 happy to report that we have executed the memorandum of
24 understanding.  See attached document with the buyer that
25 I have been working with for almost a year.

McKee - Cross/LaRusso

1881

1     Specifically, we have executed an agreement for
2 him to purchase the Cabo loan from the bank to invest
3 further in and fully develop the Cabo project as well as
4 provide the 15 million cash out of the deal for our
5 settlement costs.
6     And it goes on to talk about Jowdy.  You can
7 read it if you want, but my question is do you have any
8 recollection receiving this information around November
9 2009 from Mr. Constantine?
10 A.  **I don't remember this e-mail, but I remember parts of**
11 **it in conversation.**
12 Q.  Tell me what you remember.
13 A.  **I remember talking about Jowdy going to El Rosario**
14 **and taking over Cabo as a way to potentially get some**
15 **money back.**
16 Q.  That would be part of the discussion you had with
17 Mr. Constantine regarding the purposes of the Global
18 Settlement Fund?
19 A.  **With Mr. Constantine or Kenner.**
20 Q.  And, lastly, do you remember ever seeing the
21 attachment which is the memorandum of understanding signed
22 by Mr. Sonenglick at the end?
23 A.  **This was an e-mail?**
24 Q.  This was attached to the e-mail.
25 A.  **This isn't familiar, no.**

McKee - Cross/LaRusso

1882

1 Q.  Can we turn to Eufora if I could for a few moments.
2     You told us that you invested in Eufora.  You
3 said approximately $100,000; is that right?
4 A.  **Correct.**
5 Q.  That was based upon conversations that you had with
6 Mr. Kenner?
7 A.  **Mr. Kenner and Mr. Constantine.  Most of my**
8 **conversations before I met Tommy would have been with**
9 **Phil.**
10 Q.  And was your interest in Eufora held by a company
11 called AZ Eufora Partners?
12 A.  **I believe so.**
13 Q.  Now, do you know a person by the name of Michael
14 Stolper?
15 A.  **Yes.**
16 Q.  Could you tell us who he is please?
17 A.  **I believe he's a lawyer out of New York City.  I**
18 **don't know him very well.  I believe a group of guys got**
19 **together to file a lawsuit.**
20     **I don't recall exactly who the suit was against,**
21 **but Michael asked for me to get on board with a bunch of**
22 **guys that I know and I didn't get on board with it.**
23 Q.  When you say Michael, who is Michael?
24 A.  **Michael Stolper.**
25 Q.  You say you may have met him on one occasion?

McKee - Cross/LaRusso

1883

1 A. I never met him face-to-face, but I spoke to him over
2 the phone.
3 Q. And did he explain to you what the purpose of signing
4 on would be?
5 A. He did, but I don't recall all the details of it.
6 Q. Do you have any recollection of Mr. Stolper telling
7 you that they were hoping to buy a loan that Eufora had to
8 be able to take over the company and take control from
9 Mr. Constantine?
10 A. I believe that sounds familiar.
11 Q. Before you actually signed -- withdraw that.
12     Before you had your conversations with
13 Mr. Stolper, did you speak with anyone else about being
14 retained by Mr. Stolper for that purpose?
15     I'm not asking you for the conversation. I'm
16 just asking you if you remember speaking to someone and
17 who you spoke to?
18 A. I don't remember specifically speaking to anybody.
19 I'm assuming I would have talked to some of the other guys
20 involved in that. I could name names, but I don't know.
21 It was some of the hockey players that were involved with
22 Eufora and the different things when we got into Phil.
23 Some of the guys that signed on for that I would have
24 spoken to.
25 Q. Did you sign on?

McKee - Cross/LaRusso

1884

1 A. No. I believe I signed -- I believe I allowed him to
2 look into things. I didn't sign on board to follow
3 through with everything, but I said I agree that I get on
4 board to look into things.
5 Q. By the way, do you know a person by the name of Bryan
6 Berard?
7 A. I do.
8 Q. Do you recall having any discussions with him about
9 signing on with Mr. Stolper?
10 A. That was a name I would have brought up. I don't
11 remember specifically, I apologize, but I'm quite sure it
12 would have been Bryan I spoke to about that.
13 Q. You spoke to him on more than one occasion?
14 A. Yes.
15 Q. He was kind of an advocate for this?
16 A. He was I believe, yes.
17 Q. Was there anyone else advocating for this that you
18 know of?
19 A. I can't remember specifically.
20 Q. Just to clarify your testimony, let me show you
21 what's been marked for identification as C-37C.
22     There are two highlights. Do you recognize the
23 one on the right side?
24 A. That's mine, yes.
25 Q. Is this the document that you said you signed but you

McKee - Cross/LaRusso

1885

1 didn't sign on for the lawsuit.
2 A. I would have to go through it.
3 Q. Please. There's only a couple of pages of substance
4 and the question will be if you remember seeing that
5 letter and is that signature on that page, your
6 acknowledgment that you signed on with Mr. Stolper to do
7 an investigation and not file a suit.
8     (Pause in proceedings.)
9 A. It's a lot of legal wording in here, but I believe
10 you're correct.
11 Q. Just so the record is clear, Mr. McKee, when you say
12 I'm correct, this is your signature and this is a page
13 that you signed, correct, acknowledging the rest of the
14 document which is the written consent of the members of AZ
15 Eufora Partners?
16 A. Yes.
17 Q. That was your acknowledgment that you were retaining
18 Mr. Stolper to represent your interest as you understood
19 it for an investigation not a lawsuit?
20 A. Correct.
21 Q. You knew subsequently the lawsuit was filed; is that
22 correct, against Mr. Constantine?
23 A. I believe it was.
24 Q. And you were not party to that; is that correct?
25 A. No.

McKee - Cross/LaRusso

1886

1 Q. And was it part of the reason you were not party to
2 it is because you were aware that they were trying to take
3 over Eufora and the control of Eufora from
4 Mr. Constantine?
5     MS. KOMATIREDDY: Objection.
6     THE COURT: Overruled. You can answer that.
7 A. Can you ask it again. I'm sorry.
8 Q. Part of the reason why you did not sign on to the
9 lawsuit was because this group was seeking to take control
10 of Eufora from Mr. Constantine?
11 A. Yes.
12 Q. Now, do you recall attending a shareholders meeting
13 around the time frame August 2010?
14 A. For?
15 Q. Poorly worded question.
16     Do you recall a Eufora shareholders meeting
17 being called by Mr. Constantine where people had a right
18 to attend in person or to call in?
19 A. I don't recall that. Sorry.
20 Q. Let me show you what's been marked for identification
21 as C-89-A and just read to yourself the first few portions
22 of this. There are other pages if you want just to take a
23 look at it. I will be asking you a question on the fifth
24 page.
25 A. Okay.

McKee - Cross/LaRusso

1887

1     (Pause in proceedings.)
2  Q.  Do you recall participating in a shareholders meeting
3  by telephone sometime around August 2010?
4  A.  **Is this the shareholders meeting, is that what you're**
5  **referring to.**
6  Q.  Let me back up.
7      Does that help refresh your recollection to
8  calling in to a meeting where the topic of discussion
9  would be Eufora and other topics?
10  A.  **That was correct, yes.**
11  Q.  And do you remember and, again, I'm not going through
12  the whole meeting because it was about three hours if I
13  remember correctly, right?
14  A.  **I don't remember.**
15  Q.  Do you know a person by the name of Bob Rizzi?
16  A.  **Bob Rizzi?**
17  Q.  Yes.
18  A.  **I might have heard the name, but I don't know who he**
19  **is or anything about him.**
20  Q.  The name Nick Privitello?
21  A.  **No.**
22  Q.  Do you remember at any point in that meeting where an
23  offer was made to buy out any of the individuals who claim
24  to have invested in Eufora?
25      And that's why I showed you that last page to

McKee - Cross/LaRusso

1888

1  see if it refreshes your recollection.
2      MS. KOMATIREDDY:  Your Honor, I object.  Can we
3  have a sidebar?
4      THE COURT:  No, we don't need a sidebar on this.
5  He's asking if it refreshes his recollection.
6      (Pause in proceedings.)
7  A.  **The question?**
8  Q.  Does it refresh your recollection that there was a
9  discussion about buying or paying back individuals who
10  have claimed to have contributed to Eufora?
11  A.  **I don't recall that conversation, no.**
12      MR. LARUSSO:  Your Honor, just one moment.
13      (Pause in proceedings.)
14      MR. LARUSSO:  Your Honor, no further questions.
15      THE COURT:  Any redirect?
16
17  REDIRECT EXAMINATION
18  BY MS. KOMATIREDDY:
19  Q.  Mr. McKee, I'm going to ask you about just a few
20  things.
21      First of all, on your cross-examination from
22  Mr. Haley, you were asked about when you began your
23  relationship with Mr. Kenner, did you have access to an
24  attorney, if you chose to hire an attorney, do you
25  remember that question?

McKee - Redirect/Komatireddy

1889

1  A.  **I do.**
2  Q.  Did you hire an attorney?
3  A.  **Never.**
4  Q.  Did you hire Phil Kenner?
5  A.  **Yes.**
6  Q.  Did you pay Phil Kenner?
7  A.  **Yes.**
8  Q.  What for?
9  A.  **To manage my finances, be my financial advisor.**
10  Q.  You were asked on cross-examination about whether
11  Mr. Constantine had anything to do with your investment in
12  Diamante Del Mar.
13      Do you remember that question?
14  A.  **Yes.**
15  Q.  Did he have anything to do with your contribution to
16  the Global Settlement Fund?
17  A.  **Yes, he did.**
18  Q.  Did Phil Kenner have something to do with your
19  contribution to the Global Settlement Fund?
20  A.  **Yes.**
21  Q.  Did what each of them told you matter to you in
22  deciding whether to give money?
23      MR. LARUSSO:  I object.  Beyond the scope.
24      MR. HALEY:  Judge, I object to the leading.  I
25  object.

McKee - Redirect/Komatireddy

1890

1      THE COURT:  Ms. Komatireddy, I'm overruling that
2  but I sustain Mr. LaRusso.
3  BY MS. KOMATIREDDY:
4  Q.  Let me break that down.
5      Was what Mr. Kenner told you with respect to the
6  Global Settlement Fund, did that impact your decision on
7  whether to give money to the fund?
8  A.  **Of course.**
9  Q.  Did what Mr. Constantine told you about the Global
10  Settlement Fund impact your decision on whether to give to
11  the fund?
12  A.  **Yes.**
13  Q.  You were shown some notes.  I think you still have
14  them in front of you, 3500-JM-2 marked as Kenner 49 and
15  you were asked about whether you talked to the FBI in
16  2010.
17      Do you remember that?
18  A.  **I do.**
19  Q.  Who represented you during that meeting?
20  A.  **Nobody.**
21  Q.  Take a look at that first paragraph and see if it
22  refreshes your recollection, the last sentence of the
23  first paragraph.
24  A.  **Kenner told McKee, this sentence?**
25  Q.  I'll show it to you.

McKee - Redirect/Komatireddy

1891

1    K-49.  Here you go.
2  A.  What was the question?
3  Q.  Who represented you during your phone call with the
4  FBI in 2010?
5  A.  Here it says Ron Richards.
6        MR. HALEY:  Judge, I object.
7        THE COURT:  Sustained.
8  BY MS. KOMATIREDDY:
9  Q.  If you independently remember?
10  A.  I don't remember being represented.
11  Q.  That's fine.  Don't worry about it.  All right.
12        So during that phone call where were you
13  physically?
14  A.  In the office.  I'm not sure what the building was
15  called.
16  Q.  Was anybody with you?
17  A.  Matt Galioto was with me, Julie Moore, and I believe
18  one other FBI agent.
19  Q.  When you were on the phone call with the FBI, where
20  were you?
21  A.  Which phone call?
22  Q.  The one in 2010.
23  A.  I don't recall where I was.
24  Q.  You were shown an e-mail that's in evidence as
25  Defendant's Exhibit C-31.

McKee - Redirect/Komatireddy

1892

1        Do you remember this e-mail?
2  A.  I remember seeing it here.
3  Q.  What's the date on this e-mail?
4  A.  July 27, 2009.
5  Q.  So that's more than two months after you gave money
6  to the Global Settlement Fund?
7  A.  Yes.
8  Q.  At the time that -- before you gave that money and
9  you were talking to the defendants, did they tell you
10  anything about your money being used for Diamante Air?
11  A.  Not at all, not that I recall.
12  Q.  In this e-mail on the second page, on the first page,
13  I'm sorry, in the first paragraph it says one of the
14  issues that was recently resolved as part of our global
15  settlement effort was Diamante Air which involved several
16  airplanes.
17        Do you know what several airplanes they're
18  talking about?
19  A.  I don't.
20  Q.  And a lawsuit which was filed by the bank against
21  Phil.
22        Do you know what lawsuit they're talking about?
23  A.  I don't.
24  Q.  Did you authorize your money to be used for several
25  airplanes?

McKee - Redirect/Komatireddy

1893

1  A.  Not to my knowledge.
2  Q.  Or for a lawsuit against Phil Kenner?
3  A.  No.
4  Q.  Now, you were also shown an e-mail about the Global
5  Settlement Fund in which the last sentence says Tommy has
6  requested from us and will provide to us written
7  documentation of every element of this transaction.
8        This is Government's Exhibit 6602?
9  A.  Yes.
10  Q.  Mr. LaRusso read this out to you on his cross,
11  correct?
12  A.  Yes.
13  Q.  Did you actually receive written documentation of
14  every element of this transaction?
15  A.  No.
16  Q.  Mr. LaRusso asked you about receiving updates from
17  Mr. Constantine about the Global Settlement Fund, correct?
18  A.  Sorry?
19  Q.  Mr. LaRusso asked you about receiving updates from
20  Mr. Constantine about the Global Settlement Fund?
21  A.  Yes.
22  Q.  He showed you several e-mails talking about Jowdy and
23  suing Jowdy.
24        Whenever you talked to Mr. Constantine either
25  through e-mail or the phone, what did he talk about in

McKee - Redirect/Komatireddy

1894

1  terms of how the fund's money was being used?
2  A.  I don't recall any talks about how the funds were
3  being used.
4  Q.  In the e-mails that they showed you on
5  cross-examination, those e-mails said Jowdy, right?
6        MR. HALEY:  Judge, I object.  This testimony has
7  been with the one exception --
8        THE COURT:  Sustained.
9  BY MS. KOMATIREDDY:
10  Q.  In Defendant's Exhibit C-104, this is an e-mail that
11  defense counsel showed you, right?
12  A.  Yes.
13  Q.  In this lawsuit or this e-mail has two attachments
14  that are titled Jowdy complaint RRA 1 and RRA 2, correct?
15  A.  Yes.
16  Q.  Do you know if these lawsuits went forward?
17  A.  I don't know, no.
18  Q.  Did the defendants ever tell you that the lawsuits
19  were dismissed?
20  A.  Not that I recall.
21  Q.  Did the defendants ever tell you that Ron Richards
22  dismissed your lawsuit against Jowdy?
23  A.  I don't recall hearing that, no.
24  Q.  You don't recall that coming up in any of those
25  updates?

McKee - Redirect/Komatireddy

1895

1  **A.  No.**
2  **Q.**  Finally, going back to Government's Exhibit 6602,
3  Mr. Haley asked you about a sentence in this e-mail about
4  the fund paying for various legal fees.
5  Do you remember that?
6  **A.  I remember seeing the e-mail here, yes.**
7  **Q.**  Do you remember Mr. Haley asking you about that
8  phrase, various legal fees, doesn't specify fees for
9  lawsuits against Jowdy, does it?
10  **A.  It doesn't.**
11  **Q.**  When you had conversations with the defendants about
12  the legal fees that were supposed to be paid for from the
13  Global Settlement Fund, what legal fees did they tell you
14  would be paid for?
15  **A.  Well, I was under the understanding the money was**
16  **going to Ron Richards.**
17  **Q.**  Did they ever tell you that the money would go to an
18  attorney to try and buy Playboy Enterprises?
19  **A.  I never heard that, no.**
20  **Q.**  Did they ever tell you that it would go to fund an
21  attorney to defend Phil Kenner in a lawsuit against his
22  former secretary?
23  **A.  No.**
24  **Q.**  Did they ever tell you that the money would go to
25  fund a lawyer to defend Tommy Constantine in connection

McKee - Redirect/Komatireddy

1896

1  with a race car lawsuit?
2  **A.  No.**
3  **Q.**  What about lawyers in charge of a condo in Las Vegas?
4  **A.  Nope.**
5  **Q.**  Or lawyers hired to get hangars in Scottsdale,
6  Arizona, out of bankruptcy?
7  **A.  No.**
8  **Q.**  They didn't tell you about any of those legal fees in
9  their updates either, did they?
10  **A.  No.**
11  **Q.**  If they had told you your money in the Global
12  Settlement Fund would be used for any of those legal fees,
13  would you have given the money?
14  **A.  I wouldn't have, no.**
15  MS. KOMATIREDDY:  No further question.
16  MR. LARUSSO:  If I may, your Honor.
17  MR. HALEY:  I think I go first.
18  MR. LARUSSO:  You do.
19
20  RECROSS-EXAMINATION
21  BY MR. HALEY:
22  **Q.**  Mr. McKee, you were just asked a direct question by
23  the government if you were told that your money was used
24  to defend a lawsuit by Mr. Kenner's former secretary,
25  would you have authorized use of your funds.

McKee - Recross/Haley

1897

1  Do you recall that question?
2  **A.  I do.**
3  **Q.**  Do you know whether that question to you has any
4  basis in fact one way or another?
5  **A.  Only from the spreadsheet that Phil sent me I saw**
6  **stuff about Kristen Myrick on it.**
7  **Q.**  And the lawsuit the government just referenced as
8  relates to Phil Kenner having to defend a lawsuit brought
9  against him by his former secretary, do you know whether
10  that's a fact that a lawsuit was brought by Phil Kenner's
11  former secretary against him, do you know whether of your
12  own personal knowledge that's a fact?
13  **A.  No.**
14  **Q.**  Do you have any idea as to the contours of a lawsuit
15  involving Phil Kenner and Kristen Myrick, yes or no?
16  **A.  No.**
17  **Q.**  Do you know who represented Kristen Myrick in
18  connection with such a lawsuit?
19  **A.  No.**
20  **Q.**  Does the name Michael Meeks mean anything to you?
21  MS. KOMATIREDDY:  Objection, relevance.
22  MR. HALEY:  I withdraw the question, Judge.
23  BY MR. HALEY:
24  **Q.**  We can agree, sir, can we not, that the document that
25  was given to you by Phil Kenner concerning disbursements

McKee - Recross/Haley

1898

1  of the funds out of the Global Settlement monies
2  specifically advised you of legal fees associated with
3  what's called the Myrick case, true?
4  **A.  I see that, yes.**
5  THE COURT:  Which document are you referring to?
6  MR. HALEY:  I apologize.  Government's Exhibit
7  767.
8  Thank you, your Honor.
9  BY MR. HALEY:
10  **Q.**  Indeed there's several instances, is there not, sir,
11  where Mr. Kenner specifically notes the Myrick lawsuit in
12  connection with legal fees expended; is that true?
13  **A.  Yes.**
14  MR. HALEY:  I have no further questions.
15  Thank you sir.
16  THE COURT:  Mr. LaRusso?
17  MR. LARUSSO:  Just a few.
18
19  RECROSS-EXAMINATION
20  BY MR. LARUSSO:
21  **Q.**  The monies that you attributed to the Global
22  Settlement Fund went into the Ron Richards' account; is
23  that correct?
24  **A.  It was wired to I believe a trust on Ron Richards.**
25  **Q.**  As were other contributors to the Global Settlement

McKee - Recross/LaRusso

1899

1   Fund as you came to learn, correct?
2   **A.   Correct.**
3   **Q.**   Do you know if Ron Richards' account only contained
4   money only belonging to the people who contributed to the
5   Global Settlement Fund?
6   **A.   I wouldn't know.**
7   **Q.**   You have no idea if somebody else may have
8   contributed money that was used to pay for Playboy or
9   whatever else the Government alleges was used?
10  **A.   I wouldn't know.**
11          MR. LARUSSO:  I have no further questions.
12          THE COURT:  You can step down.  Thank you,
13  Mr. McKee, you're done.
14          We will take our afternoon break.  Don't discuss
15  the case.
16          (The witness steps down.)
17          (The jury is excused.)
18          (Recess taken.)
19          (Continued on next page.)
20
21
22
23
24
25

Nash - Direct/Komatireddy

1901

1           THE COURT:  And Mr. Nash, as you were doing
2   there, stay close to the mike and keep your voice up.  Go
3   ahead.
4
5   DIRECT EXAMINATION
6   BY MS. KOMATIREDDY:
7   **Q.**   Good afternoon, Mr. Nash.
8   **A.   Hi.**
9   **Q.**   Where do you currently live?
10  **A.   Scottsdale, Arizona.**
11  **Q.**   What do you currently do?
12  **A.   A broadcaster at the Arizona Coyotes hockey games.**
13  **Q.**   What did you do before then?
14  **A.   I was a professional hockey player.**
15  **Q.**   And approximately when you did start becoming a
16  professional hockey player?
17  **A.   About 1996.**
18  **Q.**   How old were you when you were drafted?
19  **A.   18.**
20  **Q.**   And when did you retire?
21  **A.   2007.**
22  **Q.**   Why did you retire?
23  **A.   Body was a little banged up, doors started to close.**
24  **I couldn't find a job.  Once you hit a certain age.**
25  **Q.**   Now, when you started playing hockey professionally,

Nash - Direct/Komatireddy

1900

1           (After recess.)
2           THE COURT:  Please be seated.  All right.  Ready
3   for the next witness?
4           MS. KOMATIREDDY:  Yes, your Honor.
5           THE COURT:  Who is that?
6           MS. KOMATIREDDY:  Tyson Nash.
7           THE CLERK:  All rise.
8           (Whereupon, the jury entered the courtroom.)
9           THE COURT:  Please be seated.  The government's
10  next witness.
11          MS. KOMATIREDDY:  The government calls Tyson
12  Nash.
13          THE COURT:  Mr. Nash, would you come up here to
14  the witness stand and remain standing once you get there
15  for the oath.
16
17  **TYSON NASH,**
18          called as a witness, having been first
19          duly sworn, was examined and testified
20          as follows:
21          MR. HALEY:  Your Honor, there's an exhibit on
22  the bench, may I take it off?
23          THE COURT:  Yes.  Thank you.  Can you please
24  state your name and spell it for the record please.
25          THE WITNESS:  Tyson Nash, T-Y-S-O-N, N-A-S-H.

Nash - Direct/Komatireddy

1902

1   how far had you gone in school at that point?
2   **A.   I had gone to half year of college.**
3   **Q.**   What was your last job before you were a professional
4   hockey player?
5   **A.   I delivered pizzas.**
6   **Q.**   How much did you make in your first contract with the
7   NHL?
8   **A.   I made $30,000.**
9   **Q.**   When you started making that kind of money, did you
10  have any particular plan of what to did do with it?
11  **A.   Not really at the time.  When you're a professional**
12  **hockey player you can't really afford to work during the**
13  **off season.  So the money I made during the season usually**
14  **lasted until the next season and that's kind of how I**
15  **carried on.**
16  **Q.**   Did there come a time when you started thinking about
17  investing money?
18  **A.   When I became an unrestricted free agent I signed**
19  **with the St. Louis Blues and at that point I made $75,000**
20  **and I split that season with the St. Louis Blues, the big**
21  **club, in the NHL I made 450 at that time for part of**
22  **season, so at that point, yes.**
23  **Q.**   What did you do in terms of trying to figure out how
24  to invest your money?
25  **A.   I talked to players on my current teams, I listened,**

Nash - Direct/Komatireddy

1903

1 I found a guy once I started playing for the St. Louis
2 Blues locally by the name of Basil McRae.
3 Q.   And did Mr. McRae become your financial advisor?
4 A.   Yes, he did.
5 Q.   Did you stick with him?
6 A.   Yes, I did.
7 Q.   For how long?
8 A.   I believe a couple of years, three years.
9 Q.   What happened after those years.
10 A.   There was a downturn in the market, again hockey
11 players were like family and you start talking to other
12 guys, the market kind of took a big dip and I wasn't happy
13 with my portfolio, a good friend of mine by the name of
14 Darryl Sydor had an advisor, Phil Kenner, with whom he was
15 really happy with and that's when I looked into Phil.
16 Q.   Did there come a time when you met the defendant?
17 A.   Yes.  With Kenner.
18 Q.   Would you recognize him again if you saw him today?
19 A.   Yes.
20 Q.   Would you take a look around the courtroom and see if
21 you can identify him?
22 A.   Right there.
23        MR. HALEY:  Conceded.
24        THE COURT:  The identification is conceded.
25 Q.   As you got to know Mr. Kenner, what did he tell you

Nash - Direct/Komatireddy

1904

1 about himself?
2 A.   We hit it off right away, he played hockey, hockey
3 background, he had a great rapport with obviously Darryl
4 Sydor, who I held to the highest standard.  Good friend of
5 mine.  One of my best friends in fact, and he represented
6 a lot of other players that were great hockey players that
7 I respected.  And me and Phil hit it off.
8 Q.   Did you ever visit with him in his home?
9 A.   Yes.
10 Q.   And what was it like?
11 A.   It was very casual, very easy.  I guess casual would
12 be a good way to put it.
13 Q.   Did you end up hiring Mr. Kenner as your financial
14 advisor?
15 A.   I did.
16 Q.   And did you pay him a regular fee for the work that
17 he did for you?
18 A.   Yes, I did.
19 Q.   Can you describe in general terms the nature of the
20 fee?
21 A.   I don't know exactly, I know that I had a financial
22 advisor Charles Schwab who I paid a percentage and I
23 believe Phil also took a quarterly percentage as well.
24 Q.   Now, when Mr. Kenner began serving as your financial
25 advisor what kind of investments did he propose?

Nash - Direct/Komatireddy

1905

1 A.   First of all he set up, we transferred my money from
2 St. Louis, that was with Basil McRae, my first financial
3 advisor, he took that cash over and invested it in a
4 certain portfolio that he was fond of, I was happy with.
5 So once that was all set up that's when he started to,
6 which he really liked about Phil, is the plan, the
7 financial plan that he put us on the budget that he put us
8 on every year knowing how much you were going to make, how
9 much you should be able to save by the end of the year,
10 and setting goals I guess and once that was all set the
11 investments started to come shortly after.
12 Q.   You said that initial portfolio that you liked, what
13 was in that portfolio just in general terms?
14 A.   I don't recall exactly, but it was you know, you
15 basically buy a majority of the stocks and I'd be doing a
16 disservice if I tried to explain it to be honest.  I don't
17 fully understand it, but it's working, it's still working
18 today, I still use it currently.
19 Q.   So aside from that portfolio which had stocks, you
20 also testified that there were other kinds of investments,
21 can you in general terms describe the kind of investments?
22 A.   We started getting in some higher risk investments, I
23 believe the first one was Tech Connect, Technique was
24 another one, and then --
25 Q.   Just explain that a little more.  Was it small

Nash - Direct/Komatireddy

1906

1 companies?
2 A.   Yes, small companies, small investments.
3 Q.   Did you also get introduced to real estate projects?
4 A.   Yes, I did.
5 Q.   I'm going to focus your attention on one particular
6 project the Hawaii project.  Does that sound familiar?
7 A.   Yes.
8 Q.   Are you familiar with the Hawaii project.  How did
9 you hear about the Hawaii project?
10 A.   Through Phil Kenner.
11 Q.   What did Mr. Kenner tell you about it?
12 A.   Just that they had found a great piece of property,
13 he was really excited about it, I remember sitting down
14 with him at one point before we talked money, before we
15 talked anything.  He gave me everything about it, the
16 property, the design, the layout, the plans, straight down
17 the glass, nuts and bolts.  I was excited about it, I
18 wanted to be a part of it and he made that happen.
19 Q.   And what was the plan in terms of in being part of
20 it, what did that mean?
21 A.   A hundred thousand was the investment, that's what I
22 eventually gave to the project.  And that was, I don't
23 recall the exact percentage that that got me, but I'm
24 guessing it got me a small percentage of light and as a
25 hockey player you're excited that was the other part I

Nash - Direct/Komatireddy

1907

1 liked about Phil was it was exciting, it was, I liked the
2 real estate, it intrigued me.  I wanted to be a real
3 estate mogul and this was the first step.
4 Q.   When he talked to you about the Hawaii project, did
5 Mr. Kenner mention anything about other people being
6 involved?
7 A.   Yes.  That was a big I guess sales pitch for me was
8 that other guys were involved.  I think it was just me I
9 think that I'd be a little more nervous, but because other
10 players were involved it kind of put me at ease.
11 Q.   I'm going to hand you what's in evidence as
12 Government Exhibit 1524, direct you to page five.
13        (Handing.)
14        This is a monthly statement.  Do you recognize
15 that as a monthly statement?
16 A.   Yes, I do.
17 Q.   What is it for?
18 A.   This is my Charles Schwab investment account.
19 Q.   And it says Tyson Nash TTEE?
20 A.   What does that stand for.
21 A.   That's a trust account.
22 Q.   Is that times that Mr. Kenner had the ability to sign
23 for your trust account?
24 A.   I believe so.
25 Q.   Going to page five there's a withdrawal here, wire

Nash - Direct/Komatireddy

1908

1 from disburse on May 19, 2005, of $100,000.
2        Does that reflect your investment in the Hawaii
3 project?
4 A.   I believe so.
5 Q.   Now, at the time that you invested money in the
6 Hawaii project, did Mr. Kenner tell you about how the
7 money would be used?
8 A.   We never really got into the great details of it.
9 Just the buy the land I assume.
10 Q.   So in general terms I guess what did you, what was
11 your understanding of how the money would be used?
12 A.   To buy the land.
13 Q.   Did he ever tell you that the money would go to other
14 investors?
15 A.   No.
16 Q.   Did you authorize money to go to other investors?
17 A.   No.
18 Q.   Did he ever tell you the money would go to Mexico?
19 A.   No.
20 Q.   Did you authorize money to go to Mexico from your
21 Hawaii investment?
22 A.   No.
23 Q.   Did you have other investments, sitting here today do
24 you have other investments with Mr. Kenner in Mexico?
25 A.   Yes, I do.

Nash - Direct/Komatireddy

1909

1 Q.   Would it be fair to say that were those separate
2 wires, separate investments than the ones that we were
3 just looking, the $100,000 that we were looking at?
4 A.   From my understanding, separate wires, separate
5 investment.
6 Q.   Now at the time that you were talking to Mr. Kenner
7 about the Hawaii project back in 2005, did you know who
8 Tommy Constantine was?
9 A.   No, I didn't.
10 Q.   Did Mr. Kenner tell you anything about Tommy
11 Constantine having to do with the Hawaii project?
12 A.   No.
13 Q.   Did you authorize any of the money you sent from the
14 Hawaii to go to Tommy Constantine?
15 A.   No.
16 Q.   Did there come a time that you talked to Mr. Kenner
17 about Lehman?
18 A.   Yes.
19 Q.   What did he tell you?
20 A.   He was excited, I know there was a time that -- in
21 the deal, that I remember sitting in my car in the parking
22 lot talking to him and he was ecstatic about the deal that
23 he had worked without I believe the Lehman brother, us
24 giving a hundred thousand and getting back 42,000 or 42.5
25 back,  obviously I was excited.  I got a piece of Hawaii

Nash - Direct/Komatireddy

1910

1 and I got 42,500 back so it was a minimal risk at that
2 point.
3 Q.   I'm going to show you what's in evidence as Kenner 2.
4 It's also been marked as Government Exhibit 761.
5        MS. KOMATIREDDY:  For the record, I'd like to
6 introduce 761.
7        THE COURT:  It's the same document.
8        MS. KOMATIREDDY:  Same document.
9        THE COURT:  Any objection to that?
10        MR. HALEY:  I'm sorry, Judge.
11        THE COURT:  She just wants to introduce the
12 Government Exhibit, a document I think you already
13 introduced.
14        MS. KOMATIREDDY:  It's Kenner 2.
15        MR. HALEY:  Oh, the Hawaii investment, no
16 objection.
17        THE COURT:  Mr. La Russo?
18        MR. LA RUSSO:  No objection, your Honor.  I'm
19 sorry.
20        THE COURT:  What exhibit is it?
21        MS. KOMATIREDDY:  Government's 761.
22        THE COURT:  761 is admitted.
23        (Government's Exhibit 761 in evidence.)
24 Q.   Do you recognize that document, Mr. Nash?  (Handing.)
25 A.   Yes, I do.

Nash - Direct/Komatireddy

1911

1 Q. What do you recognize it to be?

2 A. That's a document with all, I know that I was, I

3 thought that I was part of one of the Big Isles, but I

4 didn't know that there was that many.

5 Q. Sorry, let me ask you a different question. Who did

6 you receive this document from?

7 A. Phil.

8 Q. Just looking at the date of the document, July 21,

9 2006?

10 A. Right.

11 Q. And you testified that when you talked to Mr. Kenner

12 about the Lehman deal he indicated that you would be

13 getting some money back, correct?

14 A. Correct.

15 Q. Is this a document that you got in connection with

16 the Lehman deal?

17 A. I believe it is.

18 Q. I'm going to turn to page four. The second bullet.

19 I'm sorry, second from the bottom. Just reading this for

20 the record. The financing will provide immediate payout

21 of an aggregate of seven million dollars for the benefit

22 of the Na'Alehu members, this money will be used to pay

23 off substantially all currently outstanding

24 pre-development expenses, and then the sentence describes

25 various expenses and it picks up, the third to last line

Nash - Direct/Komatireddy

1912

1 and other anticipated expenses to return approximately 60

2 percent of the capital invested to date by everyone

3 connected with this project.

4 How much money did you invest to date?

5 A. In total or for Hawaii.

6 Q. In total for Hawaii.

7 A. Of a hundred minus the 40.

8 Q. How much money had you invested initially?

9 A. A hundred thousand.

10 Q. And how much did you get back?

11 A. 42.5, I believe.

12 Q. Is 42.5 60 percent of a hundred thousand?

13 A. No.

14 Q. Did there come a time that you talked to Mr. Kenner

15 about Eufora?

16 A. Pardon me.

17 Q. Eufora?

18 A. Yes.

19 Q. An investment in Eufora?

20 A. Yes.

21 Q. Tell us about Eufora, what did Mr. Kenner tell you

22 about the company?

23 A. This was a company that I had heard about numerous

24 times from again Darryl Sydor, I heard or Phil talking

25 about it. I was not a part of it at the time. I had

Nash - Direct/Komatireddy

1913

1 asked a few questions about it. He came to me sometime

2 later and asked me in I wanted to be a part of it. I

3 believe the initial offering was $350,000, I asked if I

4 could get in for more. And they needed money for I think

5 that I was the last piece, they were closing it off at

6 this point. And they had a small amount left that they

7 would make room for me to get involved. They needed money

8 for I believe they were doing some commercials.

9 Q. Did he tell you anything about who had founded the

10 company?

11 A. Tommy Constantine.

12 Q. What did he tell you about Mr. Constantine?

13 A. Just that he was a smart guy, he had this great

14 patent, that was going to make a lot of money. He was

15 excited, he got a lot of the guys involved and he was

16 excited to give me an opportunity to be a part of it.

17 Q. Did you ultimately decide to be a part of Eufora, to

18 send the money for Eufora?

19 A. Yes, I did.

20 Q. How much money did you send?

21 A. A hundred thousand.

22 Q. I'm going to happened you Government Exhibit 760.

23 (Handing.)

24 Do you recognize that document?

25 A. Yes, I do.

Nash - Direct/Komatireddy

1914

1 Q. Can you describe in general terms what the document

2 is?

3 A. It's a wire on April 24, 2008 to the Constantine

4 Management Group.

5 Q. And is this a document that you at some point got

6 from your bank?

7 A. Yes.

8 Q. Is it a true and accurate copy of the document that

9 you got from your bank?

10 A. Yes.

11 MS. KOMATIREDDY: Government moves 760 in

12 evidence.

13 MR. LA RUSSO: No objection, your Honor.

14 MR. HALEY: No objection.

15 THE COURT: 760 is admitted.

16 (Government's Exhibit 760 in evidence.)

17 MS. KOMATIREDDY: Publishing it for the jury.

18 Q. Looking at this wire, it's date April 24, 2008, the

19 wire and $100,000. Is that a reflection of your

20 investment in Eufora?

21 A. Yes, it is.

22 Q. Now, at the time that you made the investment in

23 Eufora, did you see this wire?

24 A. No, I didn't.

25 Q. And it's signed by Phil Kenner trustee for the Nash

1 Management Trust 2007?

2 **A.  Yes.**

3 **Q.**  At that time did Mr.  Kenner have the power to sign

4 on your behalf on behalf of your trust?

5 **A.  Yes, I okayed it.**

6 **Q.**  At the time that you invested money in Eufora, what

7 did Mr. Kenner tell about how the money would be used?

8 **A.   Again we didn't really talk in great depth.  I was**

9 **guessing it was for those commercials that they wanted to**

10 **shoot.  Get those up and running.  And again I got a piece**

11 **of a great, great company or it was worth a lot of money.**

12 **Q.**   And that's what he told you the company needed for,

13 for commercials?

14         MR. HALEY:  Judge, I would object.  She's

15 testifying.  It's repetition of the testimony, I would

16 object.

17         THE COURT:  Sustained.

18 **Q.**  Did there come a time after your investment that you

19 met with Mr. Tommy Constantine?

20 **A.   Yes.**

21 **Q.**  Did you meet with him in person?

22 **A.   Yes, I did.**

23 **Q.**  Can you look around the courtroom and let us know if

24 you see Mr. Constantine?

25         MR. HALEY:  Concede the identification.

1         THE COURT:  The identification has been

2 conceded.

3 **Q.**  Where did you meet him?

4 **A.   I met him at the Eufora building in Scottsdale.**

5 **Q.**  At that time had you been living in Phoenix for a

6 while?

7 **A.   Yes, I had.**

8 **Q.**  Approximately when did you move to Phoenix?

9 **A.   2001.**

10 **Q.**  Now, when you met with Mr. Constantine in the Eufora

11 offices, after your investment, what did he tell you about

12 how your money was used?

13 **A.   We had sat down, he was excited to show me the**

14 **commercials that were made, that were in production, and I**

15 **was impressed, we had a good laugh, it was my first**

16 **opportunity to sit down with Tommy, again a great guy, I**

17 **was ecstatic to be part of this company, the building was**

18 **impressive, the staffs great.  I was again happy to be a**

19 **part of it.**

20 **Q.**   Now, at the time of your investment in Eufora, did

21 Mr. Kenner tell you that your money was being wired to

22 Constantine Management Group?

23 **A.   No.  I had no idea what that really meant.**

24 **Q.**  I'm going show you what's in evidence as Government

25 Exhibit 1706.  Do you see this monthly statement for

1 Constantine Management Group April 2008?

2 **A.  Yes.**

3 **Q.**  Turning to page 2.  Looking at April 24, 2008.  Do

4 you see a wired in of $100,000 from P. Kenner plus K. Nash

5 plus 2?

6 **A.  Yes, I did.**

7 **Q.**  Does that match the wire information for your

8 investment in Eufora?

9 **A.  Yes, it does.**

10 **Q.**  Mr. Nash, I'm going show you the wire now after that

11 message.  Do you see a wire the amount of $40,000 to

12 Wappler Buchanan?

13 **A.  Yes.**

14 **Q.**  Do you know what Wappler Buchanan is?

15 **A.  No, I don't.**

16 **Q.**  Did you authorize money for Wappler Buchanan?

17 **A.  No, I didn't.**

18 **Q.**  Do you see to the Kinetic Speed Shop?

19 **A.  Yes, I do.**

20 **Q.**  Did you authorize your money to go to the Kinetic

21 Speed Shop?

22 **A.  No, I didn't.**

23 **Q.**  Do you know what that is?

24 **A.  No.**

25 **Q.**  Do you see a wire out for the amount of $17,000 to

1 Phillip Kenner?

2 **A.  Yes.**

3 **Q.**  Did you intend to pay Kenner $17,000 in cash that

4 day?

5 **A.  No.**

6 **Q.**  I'm going to turn your attention to a separate

7 interaction with the defendant on the Global Settlement

8 Fund, are you familiar with that?

9 **A.  Yes, I am.**

10 **Q.**  When did you hear about the Global Settlement Fund?

11 **A.  I believe it was 2010, I believe.**

12 **Q.**  How did you hear about it?

13 **A.  Phil had given me a call, we had talked regularly**

14 **about ongoing lawsuits, ongoing investments, some of the**

15 **issues that were still in hand.  He was running low on**

16 **funds, he had mentioned that numerous times that that he**

17 **had been funding a lot of lawsuits out of his own pocket**

18 **and bank account.**

19         **He was getting to the end of his rope.  He said**

20 **he want to sit down with myself and my wife and me was**

21 **going bring Tommy over to the house and to make myself**

22 **available, which I did.**

23 **Q.**  So did that conversation happen at your home?

24 **A.  Yes, it did.**

25 **Q.**  And approximately how long did you sit?

1  A.   It was a couple of hours.

2  Q.   What did Mr. Kenner and Constantine say during that

3  conversation?

4  A.   We had talked a lot about the ongoing issues,

5  Diamonte at length, Diamonte was a project in Mexico that

6  is still up and running today.  But it was a big one,

7  Eufora was another big one.  Tommy had talked a lot about

8  Eufora and the success that he was having.  The valuation

9  of the company.  Just a lot of good stuff, a lot of

10  positive stuff.  But the issue was money and we needed to

11  put a fund together to pay for some things, pay for some

12  lawyers to continue to fight in Cabo, to get rid of some

13  of the bad apples, that we had some our group that were

14  causing issues, Owen Nolan was a guy, Joe Juneau, I

15  believe, Ethan Moreau, Phil had an ongoing lawsuit that

16  needed to get resolved.  There's, and in turn we were all

17  going to get, whoever funded the Global Settlement Fund

18  was going to get a piece of those people that we bought

19  out.  So Joe Juneau, Moreau, Nolan, we were going to buy

20  their shares of Eufora and whatever else they had and in

21  turn I gave $100,000 to the Global Settlement Fund and in

22  turn I was going to get a small percentage of each one of

23  those things.

24  Q.   Okay.  Let me call off on a couple of things you

25  said.  You said that Tommy talked a lot about the

1  valuation of Eufora?

2  A.   Correct.

3  Q.   What did he tell you about the valuation of Eufora?

4  A.   He had mentioned that the patent was talked a lot

5  about the patent again, he was obviously very proud of

6  that.  He said that he had a couple of buyers in line, I

7  believe, there was a valuation of I think a hundred

8  million dollars or something, something big.  So I was

9  excited about it.

10  Q.   You testified about the need to pay lawyers for Cabo.

11  So what was your understanding of what lawyers fees were

12  going to be paid using the Global Settlement Fund money?

13  A.   Phil talked to me quite regularly about going issues

14  in Cabo.  The fight that he was fighting, again I wasn't

15  in that, those conversations, I was never privy to those

16  except through Phil.  So whoever the lawyers were I can't

17  recall at this time, they needed to be paid.  It seemed

18  like something always had to be paid in Cabo.

19  Q.   And then you also talked about some bad apples that

20  Phil said needed to be gotten rid of, Moreau and you said

21  Phil had a personal lawsuit against, what was that?

22  A.   He had a personal lawsuit with his secretary,

23  Christie Myron.

24  Q.   And he told you that he need funds to fund that

25  lawsuit?

1  A.   Yes, he did.

2  Q.   So after learning all of this information, did you

3  decide to give money to the Global Settlement Fund?

4  A.   Yes, I did O it might sound crazy but I was more than

5  happy to, I wanted everything resolved, I wanted Cabo

6  settled, I wanted another bigger piece of Eufora.  And if

7  those guys were bad guys, I wanted them out of our group.

8  I wanted to see us as a group have success.  I wanted to

9  see some money back, there's been a lot of money going out

10  and nothing coming back in and I thought this was an

11  opportunity to put in another hundred thousand which you

12  might think is crazy but you get a bigger percentage in

13  all of these other things that were thriving.

14  Q.   Just to be clear, what was your understanding of

15  where you would be getting this percentage from in these

16  other things?

17  A.   My understanding was that we would be buying those

18  other guys out with cash from the Global Settlement Fund

19  and getting whatever percentages they owned divvied up

20  between the group that funded the Global Settlement Fund.

21  Q.   And in terms of the things that those guys owned,

22  would that include hangar, a plane and an interest in

23  Eufora?

24  A.   And I believe a Palms unit as well.

25  Q.   Palms unit, okay.  Did you, did Kenner or Constantine

1  tell you that your hundred thousand dollars would any part

2  be used to pay for a hangar, a plane, a Palms unit or

3  Eufora?

4  A.   Explain paid?

5  Q.   Not get those interests from settling lawsuits with

6  the bad abilities.  But actually using your money to go

7  directly to pay for either of those things.

8  A.   That was not my understanding, no.

9  Q.   I'm going to turn your attention to what's in

10  evidence as Government Exhibit 1510.  Do you recognize

11  that?

12  A.   Yes, I do.

13  Q.   Just zoom in here for clarity for the jury.  The date

14  on this is June 10th, 2009, right?

15  A.   Correct.

16  Q.   And the wire of $100,000 First Century Bank?

17  A.   That's correct.

18  Q.   And the account name is the beneficiary account name

19  is law offices of Ronald Richards, correct?

20  A.   Yes.

21  Q.   And again signed Phil Kenner trustee for the Nash

22  Family Trust, 2007?

23  A.   Yes.

24  Q.   And at that time did Mr. Kenner have authority to

25  sign on your behalf in the year 2009?

Nash - Direct/Komatireddy

1923

1  A.   Yes, he did.

2  Q.   Does this reflect your contribution to the Global

3  Settlement Fund?

4  A.   Yes.

5  Q.   Now, Mr. Nash, you talked about how Mr. Kenner and

6  Mr. Constantine told that you would be getting a share of

7  a plane, a hangar, Eufora, the Palms, from what these

8  so-called bad apple fellows, right?

9  A.   Right.

10  Q.   Did they tell you anything about who actually owned

11  the plane?

12  A.   No.

13  Q.   Did they tell you anything about the plane being

14  repossessed by a bank?

15         MR. HALEY:  Judge, I would have to object again

16  to the leading nature.  What did they tell you I have no

17  problem with that.

18         THE COURT:  Sustained.  I agree with you.

19  Q.   Let me ask you something.  Did you ever use a hangar

20  in Scottsdale, Arizona?

21  A.   Me personally?

22  Q.   Yes.

23  A.   No.

24  Q.   Did you ever use a Palms condo?

25  A.   No.

---

Nash - Direct/Komatireddy

1924

1  Q.   Do you have documentation as you sit here today that

2  you own any piece of the Palms condo?

3  A.   I thought I did.  I know I talked to them numerous

4  times, I know I have a file at my house with a Falcon

5  folder, but nothing in it, no.

6  Q.   When you say Falcon, you're referring to the plane?

7  A.   The airplane.

8  Q.   What about the Palms condo?

9  A.   No.

10  Q.   In your conversation with Mr. Kenner and

11  Mr. Constantine in your home about the Global Settlement

12  Fund, did they tell you anything about your money going to

13  pay for personal expenses of either of the defendants?

14  A.   No.

15  Q.   Going to pay for Mr. Constantine's rent?

16  A.   No.

17  Q.   For race cars?

18  A.   No.

19  Q.   Now, after 2009 and into 2010 what was your

20  relationship with Mr. Kenner like?

21  A.   I was retired at that point, 2007 I believe was the

22  last year that I played in the NHL.  I wasn't make big

23  dollars anymore.  So I believe in 2010 I had fired Phil,

24  so I think at that point things started to kind of wind

25  down.  I didn't need him anymore.  I didn't want to pay

---

Nash - Direct/Komatireddy

1925

1  the management fee for Phil.

2  Q.   And what about his ability to sign on behalf your

3  trust, what happened to that?

4  A.   I immediately removed that, I believe I removed that

5  probably shortly after 2009, towards the end of 2009,

6  excuse me, or early 2010.

7  Q.   Why?

8  A.   A little scary to be honest to have anyone sign for

9  you.

10  Q.   Did something, he had been signing four for years, so

11  why then?

12  A.   I think the biggest thing I think things started to,

13  I started to look into things a little bit more, Phil was

14  always a guy that I trusted, Tommy as well.  And one thing

15  about hockey players, we're loyal like dogs, and I think I

16  asked Phil, I can't remember when, in 2007 I believe to do

17  a trust for me.  And he had printed out all the trust

18  documents, I had paid a fee of $5,500, and a couple of

19  years later --

20         MR. HALEY:  I'm going to object.  May we

21  approach, Judge?

22         THE COURT:  Yes.

23         (Continued on next page.)

24

25

---

Nash - Direct/Komatireddy

1926

1         (Whereupon, the following occurred at sidebar.)

2         MR. HALEY:  Judge, I'm always reluctant to

3  object to ask for sidebars.  His answer seemed to be going

4  into a yes or no of displeasure or bad act, the

5  establishment of a trust agreement.

6         MS. KOMATIREDDY:  My intention was to elicit

7  that they started looking for documentation, this is the

8  point in his relationship when Mr. Kenner reviews his

9  trust and starts investing it and that's the intention, if

10  you want to stop with the answer, that's fine.

11         THE COURT:  Stop it.  And then --

12         MS. KOMATIREDDY:  I think there's enough in the

13  record, your Honor, I can just move on.

14         THE COURT:  Okay.

15         (Continued on next page in open court.)

16

17

18

19

20

21

22

23

24

25

## Nash - Direct/Komatireddy

**1927**

1  Q   I'll ask you the next question, Mr. Nash.  After you
2  fired Mr. Kenner in 2010 did you continue to talk with
3  him?
4  A   **Yes.**
5  Q   Tell us about that?
6  A   **Phil Kenner was a direct link to all my investments**
7  **that I had through Phil.  He was really my only connection**
8  **that I owned, besides Tommy and Eufora.**
9  Q   Did you continue to talk to Mr. Constantine in that
10 time frame as well?
11 A   **Yes, I did.**
12 Q   And let's go through your Eufora investment.  In 2008
13 when you first invested in Eufora, did you get any
14 documentation of your investment?
15 A   **I don't believe right away, no.**
16 Q   Did you get any stock certificates?
17 A   **No.**
18 Q   Or any K-1s?
19 A   **No.**
20 Q   In 2009 when you were supposed to get additional
21 interest from Eufora in the Global Settlement Fund, at
22 that time did you get documentation of that additional
23 interest you were supposed to get?
24 A   **No, I didn't.**
25 Q   No stock certificates or K-1s?

## Nash - Direct/Komatireddy

**1928**

1  A   **No.**
2  Q   Did there come a time that you talked to Mr. Kenner
3  or Mr. Constantine about getting documentation for your
4  investments?
5  A   **Yes, I did.**
6  Q   Around when was that?
7  A   **I believe 2010.**
8  Q   And what was going on in your career at that time?
9  A   **I was retired.  At that time in 2008 I moved to**
10 **broadcasting.**
11 Q   Showing you what has been marked as Government's
12 Exhibit 762, do you recognize that?
13 A   **Yes, I do.**
14 Q   What is it?
15 A   **It's the paperwork for Eufora.**
16 Q   First of all where did you get that from?
17 A   **From Tommy.**
18 Q   Is that a true and accurate copy of some of the
19 paperwork you got from Mr. Constantine?
20 A   **Yes, it is.**
21     MS. KOMATIREDDY:  The Government offers GX 762
22 in evidence.
23     MR. LARUSSO:  May I ask two questions, your
24 Honor.
25     THE COURT:  Yes.

## Nash - Voir Dire/LaRusso

**1929**

1     MR. LARUSSO:  May I approach the witness just on
2  this exhibit, Judge?
3  VOIR DIRE EXAMINATION
4  BY MR. LARUSSO:
5  Q   Good afternoon, Mr. Nash.  I represent
6  Mr. Constantine.
7     These five pages have handwriting on them.
8  Page 2, page 3, page 4, and page 5.  Do you recognize the
9  handwriting that is on there?
10 A   **The last page is mine and my wife's.**
11 Q   The last page.
12     Could you differentiate between yours and your
13 wife's?
14 A   **The first line Eufora Capital is mine.  Nash Family**
15 **Trust 2007 is my wife's.  Tyson Nash is mine.  Kathleen**
16 **Nash is my wife's.  My signature, my wife's signature and**
17 **her date.**
18 Q   And this last, going back you say to the fourth page,
19 the writing on there?
20 A   **I have no idea.**
21 Q   And the third page?
22 A   **That's my wife.**
23 Q   And the date that appears there, do you know whose
24 handwriting that is?
25 A   **I believe that is my wife.**

## Nash - Voir Dire/LaRusso

**1930**

1  Q   And the second page, whose handwriting is that?
2  A   **I have no idea.**
3  Q   Down there is on the third page a portion down at the
4  bottom by Eufora LLC by its manager and there is a line
5  with no signature.
6     Do you see that?
7  A   **Yes.**
8  Q   When did you get this document?
9  A   **I'm guessing 2010 that it was signed.**
10 Q   At this time can you tell us what is going on in
11 regards to the Eufora investment.  Do you remember?
12 A   **In 2010?**
13 Q   In 2010?
14 A   **Not much.  Not much really ever happened.**
15 Q   Do you know a man by the name of Michael Stolper?
16     MS. KOMATIREDDY:  Objection.
17     THE COURT:  Beyond the cross.
18 Q   Who did you get this document from?
19     MS. KOMATIREDDY:  Asked and answered.
20     THE COURT:  You can stop.
21 A   **I believe Tommy Constantine.**
22 Q   You say you believe.  When did you get the document
23 in reference to the date that appears there?
24     MS. KOMATIREDDY:  Asked and answered.
25 Q   And where.

Nash - Voir Dire/LaRusso

**1931**

1    A    I would have got this from Tommy Constantine.  I went
2    to his office.  I know he gave me on a couple different
3    occasions documents when I went there.  So I got it from
4    Tommy Constantine in 2010 of June.
5    Q    You went to his office on a number of occasions and
6    got a number of documents and you are saying this is one
7    of the documents you got from him?
8    A    That's what I'm saying.
9    Q    Was that document signed at the time the time you got
10   it?  Did you look at it?
11   A    I don't think I looked at it.  Signed by Tommy
12   Constantine?
13   Q    Yes.
14   A    No, it's not signed so obviously not.
15   Q    Did you ask him when you got this document to sign it
16   at all.  Do you have a recollection of that?
17   A    I have no recollection.
18   Q    When you received this document, what did you do with
19   it?
20   A    I put it in my file.
21   Q    And do you have a file just for Eufora?
22   A    Yes, I do.
23   Q    How large is that file?
24   A    Pretty small.
25   Q    Do you have it with you?

Nash - Voir Dire/LaRusso

**1932**

1    A    No, a lot of my documents, there's not a lot and
2    there's a lot of empty signatures and a lot of holes.
3    Q    Sir, did you provide a file to the Government or
4    copies of that file?
5    A    I gave this to the Government.
6    Q    Just this one?
7    A    There's another one to come.
8    Q    There's another one to come?
9            MS. KOMATIREDDY:  We're getting it, your Honor.
10           MR. LARUSSO:  You are anticipating my questions.
11           THE COURT:  Any objection?
12           MR. LARUSSO:  No objection.
13           MR. HALEY:  No, sir.
14           THE COURT:  762 is admitted.
15           It's past 4:30 so we'll stop for the day.  Don't
16   read or listen to anything regarding the case.  Don't
17   discuss the case.  Have a safe trip home and have a good
18   night.
19           You may step down, Mr. Nash.
20           (Whereupon, at this time the jury exits the
21   courtroom.)
22           THE COURT:  What do you have, Mr. Miskiewicz?
23           MR. MISKIEWICZ:  Conclusion of Mr. Nash,
24   cross-examination, followed by Mark Boden, and then Owen
25   Nolan and Timothy Gaarn.

Nash - Voir Dire/LaRusso

**1933**

1            THE COURT:  Any issue issues or discussions
2    regarding those witnesses?
3            MR. LARUSSO:  Judge, not that I know of.
4            MR. HALEY:  No, Judge.
5            THE COURT:  Have A good night.  As we did today,
6    let's try to start at 9:30.
7            MS. KOMATIREDDY:  Thank you, Judge.
8            MR. LARUSSO:  Judge, may I see you a moment with
9    counsel.  We don't have to do it on the record.
10           THE COURT:  I do everything on the record.
11           (Whereupon, at this time the following took
12   place at the sidebar.)
13           (Continued.)

**1934**

1            MR. LARUSSO:  Judge, I've been trying for two
2    days to get reservations and it is very difficult.  Right
3    now it looks like I may be flying out Thursday night
4    coming back Saturday night, but I may not get that flight.
5    I may have to come back on the red-eye Sunday and be at
6    the airport by seven in the morning.  Everything is taking
7    a twist and I'm hoping to complete it now because I don't
8    want to disrupt the trial, but if I have to come back
9    during that hour I'll not be in any shape.
10           THE COURT:  I know you are doing this, but try
11   to make every effort to find any flight.
12           MR. LARUSSO:  I'm trying to get a red-eye on
13   Saturday so I can come in on Sunday.
14           THE COURT:  Just let me know.
15           (End of sidebar conference.)
16           (Continued.)
17           (Whereupon, the proceedings were adjourned until
18   Thursday, May 28, 2015, at 9:30 a.m.)

**1935**

INDEX:

| | | |
|---|---|---|
| 1 | INDEX: | |
| 2 | J E F F R E Y   F O X   B A I L E Y | 1720 |
| 3 | CROSS-EXAMINATION | 1748 |
| 4 | BY MR. LARUSSO | |
| 5 | CROSS-EXAMINATION | 1769 |
| 6 | BY MR. HALEY | |
| 7 | CROSS-EXAMINATION | 1779 |
| 8 | BY MR. LARUSSO | |
| 9 | REDIRECT EXAMINATION | 1780 |
| 10 | BY MS. KOMATIREDDY | |
| 11 | RECROSS-EXAMINATION | 1780 |
| 12 | BY MR. LARUSSO | |
| 13 | | |
| 14 | JOHN MCDONALD | 1782 |
| 15 | DIRECT EXAMINATION | 1783 |
| 16 | BY MS. KOMATIREDDY | |
| 17 | VOIR DIRE EXAMINATION | 1786 |
| 18 | BY MR. HALEY | |
| 19 | CROSS-EXAMINATION | 1799 |
| 20 | BY MR. HALEY | |
| 21 | CROSS-EXAMINATION | 1802 |
| 22 | BY MR. LA RUSSO | |
| 23 | REDIRECT EXAMINATION | 1806 |
| 24 | BY MS. KOMATIREDDY | |
| 25 | | |

**1936**

| | | |
|---|---|---|
| 1 | JAY McKEE | 1807 |
| 2 | DIRECT EXAMINATION | 1807 |
| 3 | BY MS. KOMATIREDDY | |
| 4 | CROSS-EXAMINATION | 1831 |
| 5 | BY MR. HALEY | |
| 6 | CROSS-EXAMINATION | 1849 |
| 7 | BY MR. HALEY | |
| 8 | CROSS-EXAMINATION | 1856 |
| 9 | BY MR. LARUSSO | |
| 10 | REDIRECT EXAMINATION | 1888 |
| 11 | BY MS. KOMATIREDDY | |
| 12 | RECROSS-EXAMINATION | 1896 |
| 13 | BY MR. HALEY | |
| 14 | RECROSS-EXAMINATION | 1898 |
| 15 | BY MR. LARUSSO | |
| 16 | | |
| 17 | TYSON NASH | 1900 |
| 18 | DIRECT EXAMINATION | 1901 |
| 19 | BY MS. KOMATIREDDY | |
| 20 | DIRECT EXAMINATION | 1901 |
| 21 | BY MS. KOMATIREDDY | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**1937**

| | | |
|---|---|---|
| 1 | EXHIBITS: | |
| 2 | Government Exhibits 2710, 2711, 2720, 2712, | 1786 |
| 3 | 2713, 2714, 2715, 2716 and 2717 in evidence | |
| 4 | Government Exhibits 2701, 2721, 2722, 2702, | 1793 |
| 5 | 2724, 2703 through 2709 in evidence | |
| 6 | Government Exhibit 2726 in evidence | 1796 |
| 7 | Government Exhibit 2719 in evidence | 1798 |
| 8 | Government's Exhibit 6602 in evidence | 1819 |
| 9 | Government's Exhibit 761 in evidence | 1910 |
| 10 | Government's Exhibit 760 in evidence | 1914 |
| 11 | | |
| 12 | Defense Exhibit C-98 in evidence | 1865 |
| 13 | Defense Exhibit C-104 in evidence | 1866 |
| 14 | Defense Exhibit C-97 in evidence | 1870 |
| 15 | | |
| 16 | | |
| 17 | Government Exhibit Stip 18through 22. | 1722 |
| 18 | Government's Exhibit 4035, 3608 and 3609. | |
| 19 | 3422 and 3433.  1501 through 1526, 1907, | |
| 20 | received in evidence | |
| 21 | Government Exhibit 3402, 3404, 3407, through | 1722 |
| 22 | 405, 3410, 3411, and 3417, in evidence | |
| 23 | Government Exhibit 3428 in evidence | 1733 |
| 24 | Government Exhibit 3426 in evidence | 1736 |
| 25 | Government Exhibit 1310 in evidence | 1739 |

**1938**

| | | |
|---|---|---|
| 1 | Government Exhibit 3420 in evidence | 1741 |
| 2 | Government Exhibit 3434 and 3437 in evidence | 1743 |
| 3 | Government Exhibit 3401 was received in | 1748 |
| 4 | evidence | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

## $

**$100,000** [13] -
1825:13; 1843:17, 21;
1844:5; 1853:24;
1882:3; 1908:1; 1909:3;
1914:19; 1917:4;
1919:21; 1922:16
**$150,000** [9] - 1729:2;
1730:12; 1734:5, 17,
19, 23; 1753:22;
1804:15; 1806:4
**$17,000** [2] - 1917:25;
1918:3
**$2,850,000** [1] -
1753:4
**$234,000** [2] -
1734:22; 1780:12
**$234,300** [2] - 1729:4;
1753:24
**$25,000** [2] - 1785:4;
1804:17
**$250,000** [14] -
1818:5; 1820:10;
1834:6, 11; 1835:20;
1836:10, 14, 21, 23;
1837:5; 1843:8, 13;
1858:15
**$28,000** [3] - 1785:5;
1795:14; 1806:7
**$3,650,000** [2] -
1728:10; 1753:13
**$3,850,000.00** [2] -
1759:11; 1762:23
**$3.75** [1] - 1761:21
**$30,000** [1] - 1902:8
**$350,000** [1] - 1913:3
**$384,000** [2] -
1734:23; 1753:16
**$384,300** [2] -
1728:20; 1753:22
**$39,409.26** [1] -
1737:24
**$40,000** [10] - 1735:13;
1737:25; 1738:6, 10,
14, 20, 25; 1740:5, 13;
1917:11
**$42,000** [1] - 1739:20
**$43,000** [1] - 1740:1
**$45** [1] - 1808:7
**$5,500** [1] - 1925:18
**$500,000** [2] -
1842:25; 1856:10
**$6,750,000.00** [1] -
1760:18
**$75,000** [1] - 1902:19

## '

**'09** [1] - 1764:2
**'11** [1] - 1765:25

## 1

**1** [9] - 1723:4, 18;
1724:5, 7; 1736:8;
1745:25; 1854:5;
1868:18; 1894:14
**1.6** [1] - 1763:14
**10** [7] - 1822:2, 21;
1823:5, 10; 1825:3;
1837:21; 1874:3
**100** [1] - 1719:8
**107** [1] - 1739:4
**10th** [2] - 1873:3;
1922:14
**11** [5] - 1723:6;
1735:1; 1751:2; 1818:3;
1858:16
**1102** [1] - 1728:13
**11501** [1] - 1719:2
**11572** [1] - 1719:5
**11722** [2] - 1718:17;
1719:9
**11749** [1] - 1718:23
**11th** [3] - 1725:10;
1818:22; 1858:22
**12** [1] - 1804:5
**13** [3] - 1728:19, 24;
1729:10
**13-CR-607** [1] - 1718:3
**1307** [1] - 1737:22
**1308** [1] - 1738:8
**1309** [1] - 1738:17
**1310** [5] - 1739:3, 14,
16, 18; 1937:25
**1342** [1] - 1750:19
**14** [2] - 1741:14;
1807:17
**14th** [1] - 1755:8
**15** [2] - 1808:3; 1881:4
**150** [2] - 1729:14;
1755:24
**150,000** [4] - 1730:8;
1753:13, 21; 1754:4
**1501** [3] - 1721:14;
1722:3; 1937:19
**1509** [2] - 1818:11;
1858:14
**1510** [1] - 1922:10
**1524** [1] - 1907:12
**1526** [4] - 1721:14;
1722:3; 1817:17;

1937:19
**16** [2] - 1744:20;
1764:5
**1601** [1] - 1718:22
**17** [1] - 1867:2
**1706** [1] - 1916:25
**1720** [1] - 1935:2
**1722** [2] - 1937:17, 21
**1733** [1] - 1937:23
**1736** [1] - 1937:24
**1739** [1] - 1937:25
**1741** [1] - 1938:1
**1743** [1] - 1938:2
**1748** [2] - 1935:3;
1938:3
**1769** [1] - 1935:5
**1779** [1] - 1935:7
**1780** [2] - 1935:9, 11
**1782** [1] - 1935:14
**1783** [1] - 1935:15
**1786** [2] - 1935:17;
1937:2
**1793** [1] - 1937:4
**1796** [1] - 1937:6
**1798** [1] - 1937:7
**1799** [1] - 1935:19
**18** [7] - 1721:12, 16;
1807:20, 22; 1859:12;
1876:13; 1901:19
**1802** [1] - 1935:21
**1806** [1] - 1935:23
**1807** [1] - 1936:1
**1819** [1] - 1937:8
**1831** [1] - 1936:4
**1849** [1] - 1936:6
**1856** [1] - 1936:8
**1865** [1] - 1937:12
**1866** [1] - 1937:13
**1870** [1] - 1937:14
**1888** [1] - 1936:10
**1896** [1] - 1936:12
**1898** [1] - 1936:14
**18th** [2] - 1860:18, 20
**18through** [2] -
1722:1; 1937:17
**19** [4] - 1721:12;
1833:16; 1873:17;
1908:1
**1900** [1] - 1936:17
**1901** [2] - 1936:18, 20
**1907** [3] - 1721:15;
1722:3; 1937:19
**1910** [1] - 1937:9
**1914** [1] - 1937:10
**1996** [2] - 1807:21;

1937:19
**1:15** [2] - 1833:17;
1852:17
**1:50** [1] - 1852:16
**1st** [2] - 1739:21, 25

## 2

**2** [9] - 1764:9; 1822:2;
1868:18; 1894:14;
1910:3, 14; 1917:3, 5;
1929:8
**2,800,000** [1] -
1758:18
**2.3** [1] - 1841:11
**2.4** [1] - 1808:9
**2.45** [1] - 1841:12
**2.55** [1] - 1841:12
**2.7** [4] - 1761:25;
1762:11; 1767:5; 1779:7
**20** [3] - 1721:12;
1782:11; 1864:22
**2001** [1] - 1916:9
**2004** [1] - 1770:12
**2005** [2] - 1908:1;
1909:7
**2006** [1] - 1911:9
**2007** [6] - 1901:21;
1915:1; 1922:22;
1924:21; 1925:16;
1929:15
**2007-2008** [1] -
1789:14
**2008** [17] - 1776:16,
25; 1778:19; 1798:9;
1804:13; 1846:24;
1847:2; 1914:3, 18;
1917:1, 3; 1927:12;
1928:9
**2008-'09** [1] - 1756:15
**2009** [67] - 1723:7;
1726:6; 1728:16, 19,
24; 1729:10; 1732:23;
1736:22; 1738:1, 9, 18,
22; 1739:19; 1740:12;
1751:3; 1761:20;
1763:16, 19, 22;
1764:7; 1776:16, 25;
1777:1; 1778:19;
1804:14; 1811:11, 15;
1816:14; 1818:3;
1819:11, 17; 1825:24;
1833:16; 1835:16;
1846:25; 1847:2;
1850:3; 1852:10, 20,
25; 1853:1, 4; 1857:18;
1858:16; 1859:13;
1860:20; 1864:22;

1

1865:12; 1867:2;
1869:19; 1870:9;
1873:3, 8; 1874:3;
1876:13; 1877:8;
1880:12; 1881:9;
1892:4; 1922:14, 25;
1924:19; 1925:5;
1927:20

**2010** [21] - 1740:17;
1745:25; 1811:11, 13;
1812:15; 1854:6;
1886:13; 1887:3;
1890:16; 1891:4, 22;
1918:11; 1924:19, 23;
1925:6; 1927:2; 1928:7;
1930:9, 12-13; 1931:4

**2011** [6] - 1741:14;
1743:21; 1761:5, 8, 16;
1779:7

**2012** [2] - 1862:3;
1863:1

**2013** [1] - 1767:1

**2014** [11] - 1744:20;
1763:2, 22; 1764:2, 5;
1765:25; 1766:2;
1767:1; 1768:2, 15;
1779:9

**2015** [2] - 1718:9;
1934:18

**20th** [1] - 1865:12

**21** [2] - 1721:12;
1911:8

**217** [1] - 1839:13

**21st** [2] - 1869:18;
1870:9

**22** [3] - 1721:16;
1722:2; 1937:17

**234,000** [2] - 1733:24;
1754:12

**234,300** [1] - 1756:10

**24** [3] - 1914:3, 18;
1917:3

**25** [2] - 1727:4; 1873:8

**25,000** [1] - 1806:7

**250** [1] - 1837:14

**250,000** [2] - 1815:24;
1836:16

**26** [2] - 1719:4;
1743:21

**27** [5] - 1718:9;
1736:22; 1738:1;
1877:8; 1892:4

**2701** [3] - 1787:7;
1793:17; 1937:4

**2702** [3] - 1787:7;
1793:17; 1937:4

**2703** [3] - 1787:7;

1793:18; 1937:5

**2709** [4] - 1787:8;
1793:18, 23; 1937:5

**2710** [3] - 1784:12;
1786:19; 1937:2

**2711** [3] - 1784:12;
1786:19; 1937:2

**2712** [3] - 1784:13;
1786:19; 1937:2

**2713** [3] - 1784:13;
1786:20; 1937:3

**2714** [3] - 1784:13;
1786:20; 1937:3

**2715** [3] - 1784:13;
1786:20; 1937:3

**2716** [3] - 1784:13;
1786:20; 1937:3

**2717** [4] - 1784:13;
1786:20; 1795:6; 1937:3

**2719** [5] - 1797:5, 23;
1798:3; 1937:7

**2720** [3] - 1784:12;
1786:19; 1937:2

**2721** [3] - 1787:7;
1793:17; 1937:4

**2722** [3] - 1787:7;
1793:17; 1937:4

**2724** [3] - 1787:7;
1793:18; 1937:5

**2726** [6] - 1795:16;
1796:12, 18-19;
1800:13; 1937:6

**28** [2] - 1738:9;
1934:18

**29th** [2] - 1730:19;
1755:9

---

**3**

**3** [6] - 1720:5, 24;
1734:16; 1749:22;
1750:12; 1929:8

**3,350,000** [1] -
1733:21

**3,650,000** [1] -
1754:15

**3,750,000** [1] -
1760:16

**3,850,000** [1] -
1764:12

**3.1** [1] - 1762:17

**3.2** [3] - 1750:12;
1754:14; 1762:18

**3.5** [14] - 1728:8;
1730:9; 1733:17;
1751:15, 17; 1753:12;
1754:14, 19; 1758:4,

12, 17; 1760:21;
1764:11

**3.75** [2] - 1762:12, 19

**3.8** [1] - 1733:15

**3.85** [1] - 1733:15

**30** [4] - 1738:22;
1783:17; 1798:9; 1800:4

**300** [1] - 1719:1

**30th** [2] - 1740:6;
1798:12

**31st** [1] - 1862:2

**3204** [1] - 1724:17

**33** [1] - 1872:13

**34** [1] - 1743:9

**3401** [7] - 1745:22;
1746:2; 1748:4, 13-14;
1938:3

**3402** [7] - 1722:5, 11,
24; 1723:20; 1724:9;
1750:20; 1937:21

**3404** [5] - 1722:5, 11;
1724:22; 1725:2;
1937:21

**3405** [4] - 1725:9, 13,
19, 24

**3407** [5] - 1722:5, 11;
1727:9; 1730:21;
1937:21

**341** [1] - 1719:2

**3410** [4] - 1722:5, 12;
1729:8; 1937:22

**3411** [4] - 1722:5, 12;
1731:18; 1937:22

**3417** [4] - 1722:6, 12;
1730:18; 1937:22

**3420** [5] - 1741:9, 19,
23-24; 1938:1

**3422** [3] - 1721:13;
1722:2; 1937:19

**3426** [5] - 1736:2, 15,
19-20; 1937:24

**3428** [5] - 1732:9, 25;
1733:3; 1937:23

**3432** [1] - 1744:13

**3433** [3] - 1721:13;
1722:3; 1937:19

**3434** [9] - 1742:23;
1743:5, 13, 17-18;
1744:19; 1763:1; 1938:2

**3437** [7] - 1742:23;
1743:2, 13, 17-18, 20;
1938:2

**3471** [1] - 1731:4

**3500-JM-1** [1] -
1862:19

**3500-JM-2** [1] -
1890:14

**3608** [3] - 1721:13;
1722:2; 1937:18

**3609** [3] - 1721:13;
1722:2; 1937:18

**384,000** [3] - 1728:23;
1753:20; 1754:3

**3:20** [1] - 1852:19

**3:32** [1] - 1798:13

---

**4**

**4** [2] - 1736:8; 1929:8

**40** [2] - 1808:7; 1912:7

**4035** [4] - 1721:13;
1722:2; 1734:7; 1937:18

**405** [3] - 1722:5, 12;
1937:22

**42,000** [1] - 1909:24

**42,500** [1] - 1910:1

**42.5** [3] - 1909:24;
1912:11

**425** [1] - 1718:22

**45** [3] - 1802:10;
1809:13; 1829:25

**450** [1] - 1902:21

**49** [2] - 1854:20;
1890:14

**4:30** [1] - 1932:15

**4:38** [1] - 1798:13

---

**5**

**5** [1] - 1929:8

**5/18** [1] - 1852:19

**50** [1] - 1758:25

**50,000** [2] - 1815:25;
1816:1

**500,000** [1] - 1811:21

---

**6**

**6.2** [3] - 1757:11, 13;
1759:10

**60** [2] - 1912:1, 12

**60-some** [1] - 1756:12

**631-712-6102** [1] -
1719:9

**6602** [10] - 1819:1,
22-23; 1833:11; 1839:5;
1850:2; 1859:5; 1893:8;
1895:2; 1937:8

---

**7**

**7.109.** [1] - 1731:23

**70** [2] - 1758:21;
1808:20

2

**701** [1] - 1774:15
**702** [1] - 1774:15
**74** [1] - 1819:12
**760** [5] - 1913:22; 1914:11, 15-16; 1937:10
**761** [6] - 1910:4, 6, 21-23; 1937:9
**762** [3] - 1928:12, 21; 1932:14
**767** [6] - 1826:22; 1827:6; 1829:4, 8; 1831:14; 1898:7

---

**8**

**8** [2] - 1732:17
**8/27/09** [1] - 1737:24
**80,000** [1] - 1808:20

---

**9**

**9** [2] - 1728:13; 1880:12
**911** [1] - 1783:25
**98** [1] - 1865:4
**99** [2] - 1837:13, 15
**9:30** [3] - 1718:10; 1933:6; 1934:18

---

**A**

**a.m** [4] - 1718:10; 1833:17; 1852:16; 1934:18
**a/k/a** [2] - 1718:6, 8
**abilities** [1] - 1922:6
**ability** [4] - 1842:15; 1843:4; 1907:22; 1925:2
**able** [14] - 1726:23; 1759:23; 1767:10; 1773:20, 24; 1775:25; 1778:22; 1784:20; 1786:6, 10; 1838:16; 1883:8; 1905:9
**absolutely** [6] - 1750:4; 1763:25; 1778:21; 1809:25; 1848:14; 1855:15
**accept** [4] - 1720:25; 1729:16; 1730:11; 1756:1
**accepted** [1] - 1848:3
**access** [2] - 1838:5; 1888:23
**accompanying** [1] - 1737:23
**accordance** [1] - 1773:14

**according** [3] - 1759:22; 1804:16; 1875:7
**accordingly** [2] - 1860:1; 1871:1
**account** [35] - 1728:14; 1729:17; 1738:19; 1739:25; 1753:18; 1756:1; 1789:7; 1790:2, 6, 9, 24; 1791:4, 6; 1817:23; 1818:21; 1819:7, 13; 1820:1, 11; 1829:18; 1836:25; 1851:14; 1854:4; 1858:15; 1860:8; 1876:3; 1898:22; 1899:3; 1907:18, 21, 23; 1918:18; 1922:18
**accounting** [1] - 1832:3
**accounts** [1] - 1796:25
**accuracy** [1] - 1879:22
**accurate** [9] - 1732:21; 1734:13; 1741:16; 1743:10; 1745:24; 1819:10, 16; 1914:8; 1928:18
**achieved** [1] - 1817:10
**acknowledge** [1] - 1820:9
**acknowledged** [2] - 1834:25; 1859:25
**acknowledging** [1] - 1885:13
**acknowledgment** [4] - 1840:9; 1852:19; 1885:6, 17
**acquire** [1] - 1879:12
**acquired** [1] - 1781:17
**acquires** [1] - 1824:18
**acquisition** [1] - 1821:23
**acquisitions** [1] - 1879:1
**acronym** [2] - 1783:18
**act** [1] - 1926:4
**acting** [1] - 1718:16
**action** [3] - 1817:15; 1830:17; 1868:25
**actual** [4] - 1790:11; 1814:9; 1846:23; 1866:5
**ad** [14] - 1784:20, 22-23, 25; 1785:8; 1795:8, 10; 1803:16, 18; 1804:3, 6, 10, 19; 1806:5
**add** [1] - 1773:17

**added** [2] - 1734:23; 1764:12
**addition** [3] - 1789:9; 1820:12; 1821:21
**additional** [7] - 1721:11; 1754:24; 1766:5; 1821:24; 1872:21; 1927:20, 22
**address** [10] - 1819:4; 1864:22; 1865:14; 1866:24; 1869:18, 24; 1870:10; 1873:9, 18; 1877:11
**adjourned** [1] - 1934:17
**administrative** [1] - 1799:9
**admissibility** [2] - 1828:3
**admitted** [19] - 1720:13; 1721:25; 1733:3; 1736:19; 1739:15; 1741:23; 1743:17; 1748:4; 1786:18; 1793:16; 1796:18; 1798:3; 1819:22; 1865:9; 1866:19; 1870:5; 1910:22; 1914:15; 1932:14
**admitting** [1] - 1829:3
**ads** [1] - 1806:12
**advances** [3] - 1821:9; 1839:22; 1840:4
**Adventures** [3] - 1743:7; 1745:1
**advertising** [2] - 1795:22, 25
**advise** [2] - 1855:4; 1871:4
**advised** [4] - 1810:22; 1872:8; 1875:24; 1898:2
**advisor** [12] - 1727:14; 1810:7, 10, 21; 1811:12; 1889:9; 1903:3, 14; 1904:14, 22, 25; 1905:3
**advisor's** [1] - 1837:18
**advocate** [1] - 1884:15
**advocating** [1] - 1884:17
**aerial** [1] - 1723:18
**affiliated** [1] - 1790:10
**affiliation** [1] - 1764:18

**afford** [3] - 1742:18; 1765:15; 1902:12
**afternoon** [6] - 1831:11; 1856:3; 1899:14; 1901:7; 1929:5
**3**
**afterwards** [1] - 1819:8
**age** [2] - 1807:22; 1901:24
**agency** [1] - 1821:8
**agent** [8] - 1768:24; 1802:12; 1808:25; 1816:15; 1862:23; 1863:7; 1891:18; 1902:18
**Agent** [1] - 1862:2
**agents** [3] - 1854:8, 11; 1855:12
**aggregate** [1] - 1911:21
**aggressive** [1] - 1867:12
**ago** [10] - 1801:16; 1831:15; 1837:21; 1842:7; 1844:21; 1851:7; 1855:18; 1862:13
**agree** [19] - 1764:3; 1831:23; 1832:1; 1834:22; 1839:17, 20, 22; 1852:4, 6, 14; 1855:10, 16; 1858:21; 1860:7; 1864:5; 1875:10; 1884:3; 1897:24; 1923:18
**agreed** [3] - 1720:12; 1735:9; 1753:25
**Agreement** [1] - 1731:23
**agreement** [18] - 1732:6; 1735:6; 1764:11; 1784:8, 18; 1794:7; 1803:4, 18, 20; 1804:21; 1822:12; 1837:16, 18; 1838:11; 1879:6, 11; 1881:1; 1926:5
**agreements** [3] - 1805:13; 1821:23, 25
**ahead** [7] - 1721:8; 1739:9; 1752:5; 1807:8; 1831:6; 1843:25; 1901:3
**Air** [15] - 1822:4; 1824:24; 1867:8, 20-21; 1868:2, 5, 12; 1877:21, 23-24; 1878:1, 14; 1892:10, 15
**aircraft** [5] - 1822:2,

22; 1823:6, 10; 1825:3

**airfare** [2] - 1794:15
**Airpark** [1] - 1822:1
**airplane** [4] -
1878:16, 22; 1879:6;
1924:7
**airplanes** [4] -
1878:2; 1892:16, 25
**airport** [1] - 1934:6
**airstrip** [2] -
1856:25; 1857:1
**Alabama** [4] - 1794:3,
8, 16
**alert** [1] - 1853:16
**alleged** [1] - 1846:20
**alleges** [1] - 1899:9
**alleviate** [1] -
1878:16
**allow** [3] - 1777:8;
1805:1; 1823:1
**allowed** [3] - 1792:1;
1804:21; 1884:1
**alluding** [2] -
1751:24; 1756:18
**almost** [2] - 1837:12;
1880:25
**AMERICA** [1] - 1718:3
**America** [1] - 1791:19
**American** [1] - 1734:7
**amortization** [3] -
1735:3, 7
**amortized** [1] - 1735:8
**amount** [13] - 1727:6,
8; 1733:24; 1737:24;
1738:5; 1758:2;
1814:12; 1816:3;
1841:12; 1913:6;
1917:11, 25
**amounts** [1] - 1816:6
**ANDREW** [1] - 1719:4
**ANN** [1] - 1719:7
**answer** [15] - 1805:22;
1823:23; 1833:9;
1835:11; 1836:3;
1843:25; 1855:12;
1868:8; 1871:18;
1886:6; 1926:3, 10;
1930:20
**answered** [8] - 1802:4,
6; 1810:21; 1821:18;
1835:24; 1859:8;
1930:19, 24
**answers** [5] - 1829:19;
1830:4, 6; 1863:24;
1864:2
**anticipated** [1] -
1912:1

**anticipating** [1] -
1932:10
**apologize** [13] -
1748:13; 1750:20;
1755:21; 1760:24;
1800:5; 1815:3;
1826:18; 1840:6;
1848:15; 1866:9;
1877:15; 1884:11;
1898:6
**appear** [3] - 1731:6;
1732:18; 1838:16
**appearances** [1] -
1720:3
**APPEARANCES** [1] -
1718:14
**apple** [1] - 1923:8
**apples** [2] - 1919:13;
1920:19
**applied** [1] - 1753:22
**appraisal** [5] -
1752:7; 1760:1, 10, 14,
16
**appraisals** [3] -
1751:21, 23; 1762:15
**appraised** [11] -
1757:4, 9; 1759:3, 10;
1760:16; 1762:11;
1763:15, 20; 1764:6;
1814:13
**appreciate** [2] -
1723:11; 1775:3
**apprised** [1] - 1873:24
**approach** [4] -
1722:21; 1771:11;
1925:21; 1929:1
**approached** [4] -
1726:14; 1761:13;
1762:4; 1768:17
**appropriate** [3] -
1752:6; 1790:10;
1804:14
**approval** [1] - 1820:9
**approve** [1] - 1874:14
**approved** [4] -
1834:25; 1840:10;
1852:19; 1860:1
**approximate** [4] -
1724:17; 1806:9;
1839:14; 1840:15
**April** [4] - 1914:3, 18;
1917:1, 3
**arbitrate** [1] - 1838:1
**Architects** [1] -
1724:14
**area** [3] - 1750:13;
1753:4; 1810:5

**areas** [2] - 1779:23;
1848:9
**argue** [2] - 1790:7;
1791:4
**argument** [4] -
1772:17; 1791:2, 25;
1792:2
**Arizona** [13] - 1727:15;
1729:15; 1745:10;
1752:25; 1755:25;
1756:16; 1763:23;
1770:8, 12; 1896:6;
1901:10, 12; 1923:20
**arrange** [2] - 1761:11;
1872:22
**arrangement** [7] -
1767:18; 1784:17, 24;
1786:25; 1787:1;
1795:1; 1841:14
**arranging** [1] - 1874:8
**article** [1] - 1876:16
**articles** [3] -
1874:24; 1875:2;
1876:18
**artist** [2] - 1724:11,
16
**ASAP** [1] - 1860:1
**aside** [5] - 1755:5, 7;
1756:16; 1875:25;
1905:19
**aspect** [2] - 1874:12
**aspects** [2] - 1749:21;
1762:16
**assessment** [1] -
1764:3
**assets** [2] - 1824:18,
22
**Assistant** [3] -
1718:18; 1854:8;
1855:11
**assistant** [4] -
1799:9; 1807:15; 1841:8
**associated** [6] -
1737:17; 1801:6;
1839:19; 1853:17;
1855:4; 1898:2
**association** [1] -
1781:10
**assume** [8] - 1751:6, 9;
1802:4; 1837:22;
1838:7; 1866:2; 1869:5;
1908:9
**assuming** [1] - 1883:19
**attached** [9] -
1723:17; 1734:2;
1741:13; 1763:9;
1869:8; 1879:4, 15;

1880:24; 1881:24
**attachment** [9] -
1725:2; 1730:21;
1731:22; 1732:3, 5;
1735:2; 1741:17;
1742:6; 1881:21
**attachments** [10] -
1720:13; 1722:5;
1723:6; 1725:12;
1745:25; 1748:14;
1870:13, 15; 1894:13
**attempt** [1] - 1742:12
**attend** [5] - 1794:3,
20; 1803:13, 16;
1886:18
**attending** [1] -
1886:12
**attention** [13] -
1722:18; 1727:9;
1728:12; 1729:8;
1730:17; 1737:21;
1755:15; 1756:2;
1796:23; 1811:14;
1906:5; 1918:6; 1922:9
**attorney** [18] -
1731:3; 1732:4;
1770:13, 15; 1771:2;
1814:4; 1818:16, 18;
1820:10; 1838:10;
1843:12; 1858:19;
1871:16; 1888:24;
1889:2; 1895:18, 21
**Attorney** [3] -
1718:16; 1854:8;
1855:11
**Attorney's** [1] -
1854:6
**Attorneys** [1] -
1718:18
**attorneys** [3] -
1770:20; 1772:20
**attributed** [1] -
1898:21
**AUERBACH** [1] - 1719:8
**August** [7] - 1738:1;
1740:12; 1743:21;
1761:16; 1873:17;
1886:13; 1887:3
**authority** [1] -
1922:24
**authorization** [6] -
1820:9; 1859:6; 1861:7;
1862:11; 1863:7
**authorize** [7] -
1791:7; 1892:24;
1908:16, 20; 1909:13;
1917:16, 20
**authorized** [5] -

4

5

1791:25; 1818:13;
1843:9; 1858:18;
1896:25
**available** [1] -
1918:22
**Avalon** [14] - 1723:4;
1727:21, 24; 1728:2;
1733:11; 1734:10;
1736:24; 1737:22;
1738:12, 18; 1739:19;
1742:7; 1822:1; 1879:13
**aviation** [1] - 1745:9
**aware** [5] - 1776:16;
1805:17; 1837:12;
1874:13; 1886:2
**awareness** [1] - 1859:9
**awhile** [1] - 1825:7
**AZ** [19] - 1728:19;
1729:17; 1733:8, 11;
1736:24; 1737:7, 22;
1738:12, 18, 20;
1739:19; 1742:7;
1743:3, 6; 1756:1;
1882:11; 1885:14

**B**

**background** [4] -
1775:19; 1808:15;
1810:24; 1904:3
**bad** [8] - 1857:10;
1879:12; 1919:13;
1920:19; 1921:7;
1922:6; 1923:8; 1926:4
**Bailey** [13] - 1721:3,
5; 1722:15; 1729:1;
1744:15; 1748:19;
1750:21; 1757:8;
1769:18, 20; 1778:3,
24; 1781:22
**Bailey's** [1] - 1720:11
**Baja** [1] - 1856:8
**balance** [5] - 1728:11;
1729:4; 1753:12;
1767:5, 23
**ballpark** [2] -
1839:16; 1843:18
**banged** [1] - 1901:23
**bank** [28] - 1726:24;
1727:16; 1728:13;
1737:22; 1738:12, 17;
1739:5, 19; 1751:21;
1752:7, 13, 20, 24-25;
1753:1; 1757:4;
1758:13, 18; 1817:22,
24; 1878:3, 22; 1881:2;
1892:20; 1914:6, 9;
1918:18; 1923:14

**Bank** [6] - 1727:14;
1729:15; 1755:24;
1791:19; 1809:1;
1922:16
**bankrupt** [1] - 1776:25
**bankruptcy** [1] -
1896:6
**banks** [4] - 1750:8;
1758:21; 1845:8
**bar** [2] - 1827:7;
1830:18
**based** [5] - 1775:10;
1791:23; 1821:10;
1846:17; 1882:5
**basic** [2] - 1777:4;
1879:6
**Basil** [2] - 1903:2;
1905:2
**basis** [2] - 1841:16;
1897:4
**became** [4] - 1740:17;
1842:24; 1902:18
**become** [2] - 1756:24;
1903:3
**becoming** [1] - 1901:15
BEFORE [1] - 1718:11
**began** [3] - 1810:3;
1888:22; 1904:24
**beginning** [2] -
1810:23; 1829:5
**behalf** [7] - 1789:12;
1818:18; 1868:1;
1915:4; 1922:25; 1925:2
**behind** [5] - 1742:19;
1744:3; 1745:2; 1761:9;
1868:4
**belonging** [1] - 1899:4
**bench** [1] - 1900:22
**beneficiary** [2] -
1824:6; 1922:18
**benefit** [3] - 1759:17;
1773:10; 1911:21
**benefitted** [1] -
1765:5
**Berard** [1] - 1884:6
**best** [5] - 1756:15;
1817:14; 1824:19;
1838:16; 1904:5
**better** [5] - 1755:21;
1763:24; 1816:3;
1830:7; 1855:18
**between** [27] - 1729:14;
1733:8; 1753:20;
1755:24; 1759:2;
1762:13; 1779:6;
1789:10, 16; 1798:9;
1800:24; 1801:2;

1805:1; 1819:14, 16;
1828:7; 1835:13;
1837:24; 1838:4;
1850:2, 5, 14, 25;
1851:10; 1859:18;
1921:20; 1929:12
**beyond** [3] - 1835:4;
1889:23; 1930:17
**BIANCO** [1] - 1718:12
**big** [8] - 1725:22;
1902:20; 1903:12;
1907:7; 1919:6; 1920:8;
1924:22
**Big** [1] - 1911:3
**bigger** [2] - 1921:6, 12
**biggest** [1] - 1925:12
**bilked** [1] - 1876:16
**bill** [1] - 1795:3
**billed** [2] - 1785:12;
1787:16
**billing** [3] - 1786:13;
1795:25; 1796:4
**billion** [1] - 1838:19
**bills** [2] - 1826:13;
1850:10
**Birmingham** [4] -
1794:3, 8, 16
**bit** [5] - 1751:4;
1764:12; 1842:1, 5;
1925:13
**Bjerk** [6] - 1727:11,
13; 1729:16, 19;
1730:11; 1755:25
**blank** [1] - 1742:2
**blowing** [1] - 1724:6
**blue** [1] - 1809:24
**Blues** [3] - 1902:19;
1903:2
**board** [4] - 1882:21;
1884:2, 4
**Bob** [2] - 1887:15
**Boden** [1] - 1932:24
**body** [2] - 1820:8;
1901:23
**bolts** [1] - 1906:17
**bonds** [4] - 1810:24;
1811:5; 1841:22; 1842:3
**books** [1] - 1779:14
**borrow** [2] - 1752:20;
1753:1
**borrower** [2] -
1734:10; 1742:7
**borrowing** [1] - 1753:5
**bottom** [13] - 1725:7;
1731:7, 25; 1764:10;
1818:15; 1819:24;
1820:7; 1868:16;

1870:19; 1878:9;
1911:19; 1930:4
**bought** [7] - 1745:12;
1765:6; 1767:22;
1814:11, 14; 1816:17;
1919:18
**brackets** [1] - 1878:23
**breadwinner** [1] -
1834:5
**break** [7] - 1730:12;
1782:1; 1846:6, 14;
1890:4; 1899:14
**breakdown** [1] -
1735:10
**brick** [1] - 1726:4
**brief** [3] - 1746:6;
1786:2; 1788:1
**briefly** [3] - 1742:6;
1746:5; 1805:23
**bring** [10] - 1720:16;
1774:19; 1782:12;
1830:7; 1847:10;
1849:4; 1857:5;
1859:22; 1918:21
**broadcaster** [1] -
1901:12
**broadcasting** [1] -
1928:10
**broader** [1] - 1879:19
**brother** [1] - 1909:23
**Brothers** [1] - 1776:25
**brought** [7] - 1720:5,
7; 1741:6; 1868:1;
1884:10; 1897:8, 10
**Bryan** [2] - 1884:5, 12
**Buchanan** [3] -
1917:12, 14, 16
**budget** [1] - 1905:7
**Buffalo** [9] - 1807:13;
1810:5; 1812:4, 7, 24;
1813:7, 14; 1840:17;
1851:2
**building** [11] -
1725:14; 1726:2, 5;
1763:11, 19; 1764:6;
1766:4; 1879:14;
1891:14; 1916:4, 17
**buildings** [1] -
1726:22
**built** [1] - 1724:21
**bullet** [1] - 1911:18
**bunch** [2] - 1811:24;
1882:21
**burdened** [1] - 1756:13
**Bureau** [2] - 1801:11;
1802:12
**business** [22] -

1764:19; 1766:11; 1770:6; 1773:15; 1774:23; 1775:13; 1785:15, 18; 1787:19, 22; 1789:25; 1790:12, 20; 1796:7, 10; 1797:18, 21; 1800:23; 1801:2; 1809:1; 1841:14; 1879:1

**businessman** [7] - 1744:8; 1745:7; 1770:3; 1772:11; 1775:18; 1777:10; 1813:4

**button** [1] - 1858:11

**buy** [14] - 1724:3; 1752:18; 1759:9, 11; 1762:21; 1765:23; 1815:20; 1883:7; 1887:23; 1895:18; 1905:15; 1908:9, 12; 1919:19

**buyer** [3] - 1767:20; 1768:7; 1880:24

**buyers** [1] - 1920:6

**buying** [4] - 1759:5; 1790:21; 1888:9; 1921:17

**BY** [62] - 1718:17, 23; 1748:18; 1758:1; 1766:18, 21; 1769:17; 1771:9; 1778:2; 1779:5; 1780:2; 1781:2; 1783:9; 1786:5, 23; 1793:20; 1796:21; 1798:5; 1799:1, 24; 1802:21; 1806:2; 1807:11; 1831:10; 1849:22; 1856:2; 1862:1; 1865:11; 1866:21; 1869:13; 1870:7; 1876:8; 1880:11; 1888:18; 1890:3; 1891:8; 1894:9; 1896:21; 1897:23; 1898:9, 20; 1901:6; 1929:4; 1935:4, 6, 8, 10, 12, 16, 18, 20, 22, 24; 1936:3, 5, 7, 9, 11, 13, 15, 19, 21

---

**C**

---

**C-104** [5] - 1866:17, 19-20; 1894:10; 1937:13

**C-111** [1] - 1760:7

**C-24** [1] - 1880:12

**C-29** [1] - 1876:9

**C-31** [2] - 1877:7; 1891:25

**C-32** [1] - 1874:2

**C-33** [1] - 1872:16

**C-34** [1] - 1873:8

**C-35** [1] - 1873:16

**C-37C** [1] - 1884:21

**C-89-A** [1] - 1886:21

**C-97** [5] - 1869:15; 1870:5, 8; 1937:14

**C-98** [4] - 1864:20; 1865:9; 1937:12

**Cabo** [8] - 1881:2, 14; 1919:12; 1920:10, 14, 18; 1921:5

**cake** [2] - 1720:24; 1721:1

**cakes** [1] - 1720:6

**CALCAGNI** [1] - 1718:21

**caliber** [2] - 1805:11

**California** [6] - 1811:23; 1812:10; 1814:5; 1820:16; 1830:18; 1842:23

**camped** [1] - 1809:13

**campground** [1] - 1809:17

**Canada** [1] - 1809:2

**cannot** [2] - 1765:15; 1829:12

**capable** [1] - 1839:24

**capital** [1] - 1912:2

**Capital** [1] - 1929:14

**car** [6] - 1794:9; 1805:7; 1813:4; 1820:21; 1896:1; 1909:21

**card** [8] - 1803:23; 1804:2, 6, 10; 1806:3; 1826:13; 1845:8

**care** [1] - 1728:9

**career** [5] - 1809:3, 11; 1810:11; 1816:14; 1928:8

**carried** [1] - 1902:15

**cars** [4] - 1804:25; 1805:16; 1826:9; 1924:17

**case** [19] - 1720:2; 1754:5, 22; 1765:3; 1773:2; 1776:8; 1780:13; 1782:2; 1791:9; 1824:3; 1846:8, 21, 24; 1847:17; 1898:3; 1899:15; 1932:16

**cash** [6] - 1787:1; 1795:20; 1881:4; 1905:3; 1918:3; 1921:18

**casual** [2] - 1904:11

**causing** [1] - 1919:14

**cave** [2] - 1838:23; 1839:1

**cc** [1] - 1727:11

**cc'd** [1] - 1730:23

**centered** [1] - 1767:1

**Central** [3] - 1718:5, 17; 1719:9

**Century** [1] - 1922:16

**certain** [5] - 1749:12; 1752:14; 1781:9; 1901:24; 1905:4

**certainly** [3] - 1774:16; 1791:24; 1847:11

**certificates** [2] - 1927:16, 25

**chambers** [1] - 1720:6

**chance** [4] - 1732:11; 1817:9; 1830:24; 1877:23

**change** [3] - 1728:23; 1756:23; 1811:5

**changed** [1] - 1780:4

**changes** [1] - 1804:11

**chaperone** [2] - 1794:19

**characterize** [1] - 1770:2

**charge** [3] - 1789:18; 1794:17; 1896:3

**charging** [3] - 1795:7; 1841:15; 1847:9

**Charles** [4] - 1817:22; 1858:15; 1904:22; 1907:18

**charts** [2] - 1809:16; 1811:1

**check** [1] - 1737:23

**checking** [1] - 1737:23

**Chef's** [1] - 1813:15

**chest** [1] - 1816:4

**choosing** [1] - 1838:6

**chose** [1] - 1888:24

**Christie** [1] - 1920:23

**chronologically** [1] - 1752:5

**circumstances** [2] - 1761:7; 1847:4

**cities** [1] - 1794:8

**City** [1] - 1882:17

**claim** [2] - 1790:7; 1887:23

**claimed** [1] - 1888:10

**claiming** [1] - 1847:10

**claims** [1] - 1747:15

**clarification** [1] - 1835:15

**clarify** [1] - 1884:20

**clarity** [1] - 1922:13

**clean** [1] - 1755:22

**cleaning** [1] - 1726:14

**clear** [7] - 1727:1; 1730:22, 25; 1786:24; 1848:15; 1885:11; 1921:14

**CLERK** [1] - 1900:7

**client** [2] - 1828:4; 1871:12

**client's** [1] - 1828:10

**clients** [3] - 1773:10; 1809:3; 1871:8

**close** [10] - 1730:12, 14; 1733:20; 1734:5, 20; 1735:24; 1783:6; 1901:2, 23

**closed** [2] - 1755:8

**closely** [1] - 1799:17

**closer** [1] - 1728:7

**closing** [9] - 1730:12; 1734:14, 17, 23; 1736:11; 1737:5; 1747:9; 1753:3; 1913:5

**club** [1] - 1902:21

**CMG** [5] - 1727:21, 24; 1728:3; 1734:10; 1736:24

**coach** [2] - 1807:15; 1841:8

**coached** [1] - 1807:18

**coaching** [1] - 1807:18

**cobranded** [1] - 1794:23

**Colin** [2] - 1799:14

**college** [1] - 1902:2

**columns** [1] - 1796:23

**comfortable** [4] - 1726:23; 1764:15; 1767:4, 6

**coming** [12] - 1732:11; 1753:9; 1754:16; 1765:21; 1780:5; 1791:13; 1797:10; 1812:21; 1864:21; 1894:24; 1921:10; 1934:4

**commence** [1] - 1836:9

**comment** [1] - 1855:6

**commercial** [1] - 1731:22

**commercials** [4] -

1913:8; 1915:9, 13; 1916:14

**common** [1] - 1775:25

**communicate** [2] - 1837:7; 1863:15

**communicating** [2] - 1864:9; 1865:25

**communication** [2] - 1864:25; 1876:25

**communications** [1] - 1864:4

**companies** [4] - 1811:7; 1906:1

**company** [19] - 1728:21; 1733:9; 1736:24; 1768:10; 1784:18; 1789:19; 1837:20; 1844:16; 1878:4; 1879:6; 1882:10; 1883:8; 1912:22; 1913:10; 1915:11; 1916:17; 1919:9

**compel** [1] - 1871:20

**complaint** [6] - 1830:18; 1848:13; 1868:18; 1894:14

**complaints** [2] - 1868:15; 1869:8

**complete** [3] - 1754:3; 1934:7

**completely** [2] - 1774:5; 1855:13

**completion** [2] - 1749:12, 23

**compliance** [1] - 1767:10

**comprehend** [1] - 1852:10

**comprehensive** [1] - 1867:12

**comptroller** [2] - 1783:15; 1800:7

**computer** [3] - 1786:7; 1852:24; 1853:1

**computerized** [1] - 1796:1

**concede** [2] - 1813:11; 1915:25

**conceded** [5] - 1809:25; 1813:13; 1903:23; 1916:2

**concept** [2] - 1776:4; 1778:5

**concerned** [4] - 1764:13; 1775:10; 1839:18; 1852:15

**concerning** [2] -

1835:5; 1897:25

**concerns** [1] - 1777:4

**concluded** [2] - 1757:10; 1758:6

**conclusion** [1] - 1932:23

**conditions** [3] - 1770:22; 1771:1, 5

**condo** [5] - 1724:21; 1896:3; 1923:24; 1924:2, 8

**condominium** [8] - 1723:24; 1724:11; 1743:25; 1761:14; 1822:2, 5; 1823:14, 18

**condos** [3] - 1747:6, 12

**conducted** [4] - 1801:17, 19, 22; 1802:11

**conference** [13] - 1747:20; 1870:25; 1872:9, 14, 25; 1873:1, 5, 11, 17, 21, 24; 1874:8; 1934:15

**confidence** [1] - 1865:15

**confirmed** [1] - 1751:23

**confused** [1] - 1844:8

**Connect** [1] - 1905:23

**connected** [2] - 1809:1; 1912:3

**connection** [12] - 1747:16; 1775:16; 1776:22; 1837:17; 1868:25; 1869:4; 1876:2; 1895:25; 1897:18; 1898:12; 1911:15; 1927:7

**consent** [1] - 1885:14

**consider** [3] - 1829:7, 11

**consideration** [1] - 1723:11

**considered** [4] - 1723:24; 1758:19; 1812:6; 1829:9

**considering** [1] - 1723:12

**conspiracy** [2] - 1789:13; 1828:7

**Constantine** [210] - 1719:1; 1723:1, 25; 1724:18, 23; 1725:5, 10; 1726:11, 22; 1727:10, 20; 1728:1, 10; 1729:10; 1730:18; 1731:15, 19; 1732:22;

1733:13; 1734:21, 24; 1735:6; 1737:16; 1738:1, 10; 1739:4; 1740:16; 1741:3, 13, 17; 1742:3; 1745:13, 15, 25; 1747:5; 1748:22; 1749:13, 23; 1751:2, 24; 1752:9; 1753:14, 24-25; 1754:2, 18, 24; 1755:16; 1756:3, 18, 24; 1757:10; 1758:25; 1759:7, 13; 1760:14; 1761:9; 1762:7, 20; 1764:11, 19; 1765:9, 12; 1766:3, 7, 24; 1767:7, 19, 22-24; 1768:1, 6, 11; 1779:9; 1780:13; 1781:13; 1784:8, 10, 15, 19, 24; 1786:25; 1787:3, 12; 1789:3, 5, 10, 12, 16, 21; 1790:4, 8, 14; 1791:13, 15, 17, 19; 1794:25; 1795:9; 1797:2; 1798:8; 1800:24; 1801:3; 1802:24; 1803:1; 1804:9, 16, 21; 1805:17; 1806:11; 1812:5, 24-25; 1813:2, 6, 23; 1815:5, 12, 17; 1816:25; 1818:23; 1820:14, 19, 25; 1821:11; 1822:5, 21; 1823:24; 1824:12, 24; 1825:25; 1826:6; 1829:13; 1834:11; 1840:14; 1846:24; 1856:6; 1857:12, 16; 1858:22; 1861:6; 1863:12, 18, 21; 1864:9, 12, 22; 1866:23; 1869:18, 24; 1870:10, 16, 20; 1872:3, 7, 25; 1874:3, 7, 18, 20; 1876:10, 14, 19, 22; 1877:1, 10; 1879:18; 1880:4, 18; 1881:9, 17, 19; 1882:7; 1883:9; 1885:22; 1886:4, 10, 17; 1889:11; 1890:9; 1893:17, 20, 24; 1895:25; 1909:8, 11, 14; 1913:11; 1914:3; 1915:19, 24; 1916:10, 22; 1917:1; 1919:2; 1921:25; 1923:6; 1924:11; 1927:9;

1928:3, 19; 1929:6; 1930:21; 1931:1, 4, 12

**CONSTANTINE** [1] - 1718:7

**Constantine's** [11] - 1731:6; 1732:19; 1755:7; 1789:25; 1790:22; 1796:25; 1798:11; 1820:21; 1826:11; 1865:13; 1924:15

**construction** [1] - 1749:19

**Consulting** [11] - 1728:20; 1729:17; 1733:8; 1736:24; 1737:7; 1738:20; 1739:20; 1743:3, 6; 1756:1

**consulting** [2] - 1838:10; 1853:11

**contact** [5] - 1812:14; 1832:10; 1833:2; 1835:3; 1836:19

**contacted** [3] - 1761:10; 1764:17; 1830:11

**contacting** [1] - 1835:14

**contain** [2] - 1732:18; 1867:12

**contained** [5] - 1832:7; 1838:15; 1839:7; 1899:3

**contains** [1] - 1839:13

**contemplating** [1] - 1865:1

**contemplation** [1] - 1868:20

**content** [11] - 1833:2, 6, 13, 22; 1834:19; 1851:20, 24; 1852:1, 4; 1865:15

**contents** [1] - 1860:11

**context** [1] - 1774:4

**continue** [8] - 1721:4, 9; 1740:16; 1811:11; 1849:19; 1919:12; 1927:2, 9

**continued** [4] - 1798:14; 1849:22; 1861:12; 1926:15

**Continued** [13] - 1746:10; 1747:21; 1757:14; 1771:13; 1777:24; 1788:3; 1792:5; 1827:10; 1828:14; 1899:19;

1925:23; 1933:13;
1934:16

**continues** [2] -
1824:6; 1878:2

**contours** [1] - 1897:14

**contract** [48] -
1731:14; 1732:15,
21-22; 1733:8; 1734:4,
22; 1735:1, 12, 18;
1737:16; 1740:15, 20;
1741:7; 1742:12, 19;
1753:25; 1754:20;
1755:4; 1756:8, 21;
1757:3; 1759:9, 15, 22;
1761:12; 1767:9, 23;
1770:16, 19, 21-24;
1771:1, 6; 1773:19, 21;
1781:6; 1808:9;
1837:17; 1841:10;
1902:6

**contractor** [1] -
1729:20

**contractual** [1] -
1837:24

**contradiction** [1] -
1820:11

**contribute** [1] -
1815:4

**contributed** [3] -
1888:10; 1899:4, 8

**contributing** [2] -
1814:18; 1857:6

**contribution** [9] -
1758:6; 1856:15;
1863:13; 1865:2;
1867:3; 1877:9;
1889:15, 19; 1923:2

**contributions** [2] -
1846:24

**contributors** [1] -
1898:25

**control** [7] - 1726:21;
1814:14; 1815:5, 12;
1883:8; 1886:3, 9

**convenience** [1] -
1879:8

**conversation** [26] -
1754:23; 1765:14;
1766:6; 1801:14;
1802:7; 1815:2, 16;
1820:8; 1821:10;
1822:8; 1824:3, 13;
1838:21; 1840:8;
1850:23; 1854:13;
1861:9; 1862:14;
1863:1; 1881:11;
1883:15; 1888:11;
1918:23; 1919:3;
1924:10

**conversations** [16] -
1765:18, 20; 1812:22;
1813:3; 1826:5;
1831:19; 1845:24;
1850:24; 1854:16;
1862:9; 1867:23;
1882:5, 8; 1883:12;
1895:11; 1920:15

**conveyed** [3] - 1736:6;
1737:5; 1745:8

**conveying** [4] -
1743:7, 23; 1744:1, 22

**Conveys** [1] - 1736:24

**conveys** [1] - 1743:3

**CONWAY** [1] - 1719:1

**copies** [3] - 1793:9;
1866:10; 1932:4

**copy** [10] - 1734:13;
1741:16; 1745:24;
1773:19, 21, 23;
1817:17; 1819:16;
1914:8; 1928:18

**corner** [2] - 1751:9;
1800:17

**corporate** [2] -
1783:15; 1800:7

**corporation** [1] -
1778:4

**corporations** [1] -
1773:9

**correct** [123] - 1723:2,
4; 1725:7, 25; 1729:10;
1730:23; 1731:20, 24;
1733:15; 1734:24;
1735:16, 21; 1736:22;
1737:3, 14; 1738:6;
1739:1; 1740:2, 6, 9;
1741:14; 1742:4;
1743:21; 1744:20;
1749:4; 1751:20;
1752:16, 19, 23;
1753:6, 16, 19; 1757:5;
1759:1, 25; 1761:2,
5-6; 1763:1, 20-21;
1766:1, 16; 1767:3;
1768:9; 1786:15;
1787:2; 1799:3;
1800:11, 18; 1802:2;
1804:17, 23; 1820:3;
1831:16, 21; 1832:5;
1833:14; 1834:23;
1835:10; 1839:21;
1840:3; 1841:11, 17;
1842:8, 13; 1843:2, 14,
17; 1844:20; 1850:18;
1851:25; 1852:8, 20;
1856:11; 1857:8;
1858:16, 20; 1860:5;
1864:16; 1865:23;

1868:21; 1869:1;
1870:14; 1873:9;
1875:8, 18; 1876:11;
1877:1; 1880:2, 14, 18;
1882:4; 1885:10, 12-13,
20, 22, 24; 1887:10;
1893:11, 17; 1894:14;
1898:23; 1899:1;
1911:13; 1920:2;
1922:15, 17, 19

**correctly** [3] -
1767:19; 1865:20;
1887:13

**cost** [5] - 1803:15;
1804:3; 1806:5, 9

**costs** [5] - 1806:8;
1821:9, 12; 1839:23;
1881:5

**counsel** [2] - 1894:11;
1933:9

**count** [1] - 1839:15

**counter** [2] - 1875:17;
1876:1

**countering** [2] -
1874:22, 24

**Country** [1] - 1719:1

**County** [1] - 1736:12

**couple** [12] - 1723:6;
1725:12; 1793:21;
1801:16; 1821:20;
1885:3; 1903:8; 1919:1,
24; 1920:6; 1925:18;
1931:2

**course** [19] - 1722:8;
1776:8; 1785:14, 17;
1787:18, 21; 1796:6, 9;
1797:13, 17, 20;
1811:20; 1812:7;
1814:2; 1817:14;
1833:12; 1834:14;
1851:15; 1890:8

**COURT** [155] - 1718:1;
1720:4, 16, 22; 1721:8,
18, 21, 24; 1722:10,
22; 1730:22; 1733:3;
1736:19; 1739:7, 10,
13, 15; 1741:23;
1743:17; 1747:2, 11,
17; 1748:4, 9, 16;
1755:18, 20; 1766:20;
1769:9, 13; 1771:8, 11;
1772:3, 14, 25;
1773:25; 1774:12, 18,
25; 1775:5; 1777:3, 23;
1778:25; 1779:22;
1780:20; 1781:22;
1782:1, 6, 9, 12, 14,
19; 1783:1, 5; 1785:24;
1786:17; 1788:2;

1790:2, 17, 24; 1791:2,
22; 1793:3, 7, 13, 15;
1796:14, 18; 1798:1, 3;
1799:20; 1802:17;
1806:15, 18, 20, 23;
1807:5, 8; 1810:1;
1813:12; 1816:10, 24;
1819:22; 1820:24;
1821:5, 19; 1822:25;
1826:16; 1827:9;
1828:11; 1829:3;
1831:6; 1833:9; 1836:2;
1843:24; 1845:13;
1846:6, 13, 16; 1847:8;
1848:7, 16; 1849:3, 10,
18, 25; 1852:13;
1855:23; 1865:9;
1866:13, 16, 19;
1868:7; 1870:5; 1876:7;
1886:6; 1888:4, 15;
1890:1; 1891:7; 1894:8;
1898:5, 16; 1899:12;
1900:2, 5, 9, 13, 23;
1901:1; 1903:24;
1910:7, 9, 11, 17, 20,
22; 1914:15; 1915:17;
1916:1; 1923:18;
1925:22; 1926:11, 14;
1928:25; 1930:17, 20;
1932:11, 14, 22;
1933:1, 5, 10; 1934:10,
14

**Court** [5] - 1719:4, 7;
1848:14; 1871:9, 11

**court** [9] - 1732:12;
1748:1; 1778:1; 1793:1;
1829:2; 1848:17;
1858:6; 1869:3; 1926:15

**Court's** [1] - 1791:10

**Courthouse** [1] -
1718:4

**courthouse** [1] -
1802:1

**courtroom** [10] -
1720:7, 21; 1809:22;
1846:12, 15; 1849:17;
1900:8; 1903:20;
1915:23; 1932:21

**cover** [4] - 1806:8;
1823:2; 1835:4; 1847:20

**covered** [1] - 1794:7

**Coyotes** [1] - 1901:12

**crazy** [2] - 1921:4, 12

**created** [12] - 1785:9,
11, 14; 1787:13, 15,
18; 1796:3, 6; 1797:11,
13-14, 17

**credit** [2] - 1826:13;
1845:9

creditors [1] - 1780:7
cross [11] - 1748:9;
1780:3; 1799:20;
1826:16; 1849:20;
1888:21; 1889:10;
1893:10; 1894:5;
1930:17; 1932:24
CROSS [16] - 1748:17;
1769:16; 1779:4;
1799:23; 1802:20;
1831:9; 1849:21;
1856:1; 1935:3, 5, 7,
19, 21; 1936:4, 6, 8
cross-examination [8]
- 1748:9; 1799:20;
1826:16; 1849:20;
1888:21; 1889:10;
1894:5; 1932:24
CROSS-EXAMINATION
[16] - 1748:17;
1769:16; 1779:4;
1799:23; 1802:20;
1831:9; 1849:21;
1856:1; 1935:3, 5, 7,
19, 21; 1936:4, 6, 8
crumb [3] - 1720:6, 24;
1721:1
curious [1] - 1852:22
current [5] - 1779:19;
1781:13; 1878:15, 19;
1902:25
CURRIE [1] - 1718:15
cushion [2] - 1781:14
custom [3] - 1772:12,
14

                    D

Darryl [3] - 1903:14;
1904:3; 1912:24
date [18] - 1741:17;
1761:15; 1835:18;
1856:14; 1857:5;
1859:12; 1862:4;
1876:15; 1877:8;
1892:3; 1911:8; 1912:2,
4; 1914:18; 1922:13;
1929:17, 23; 1930:23
dated [11] - 1723:6;
1736:22; 1737:24;
1741:14; 1743:21;
1744:20; 1865:12;
1867:2; 1869:18;
1870:9; 1873:16
dates [1] - 1857:17
days [2] - 1859:15;
1934:2
deal [39] - 1726:15,

18-19; 1727:17; 1728:7;
1730:13; 1733:21;
1734:5, 20; 1735:23;
1750:17; 1752:9, 13,
16; 1753:2; 1754:3, 8,
11, 13; 1757:10;
1758:3, 6, 25; 1759:12;
1760:14, 19; 1764:14,
22; 1780:4; 1784:16;
1852:5; 1878:18;
1881:4; 1909:21;
1911:12, 16
dealing [1] - 1751:4
dealings [1] - 1769:22
deals [1] - 1774:17
dear [1] - 1871:8
debit [1] - 1845:8
Deborah [2] - 1730:25;
1731:2
debt [4] - 1726:14;
1762:8, 10; 1808:20
debts [1] - 1790:23
December [7] -
1739:19, 21, 25;
1740:6, 12; 1798:10
decide [4] - 1815:8;
1817:5; 1913:17; 1921:3
deciding [2] -
1815:16; 1889:22
decision [2] - 1890:6,
10
decisions [1] -
1841:24
deed [14] - 1736:5, 7,
10, 13; 1737:5; 1743:2,
5-6, 21, 23; 1744:20,
23; 1762:25
deeds [1] - 1743:11
default [1] - 1756:11
defaulted [1] -
1754:22
defeated [1] - 1871:22
defend [5] - 1751:11;
1895:21, 25; 1896:24;
1897:8
defendant [2] -
1903:16; 1918:7
Defendant [2] -
1718:21; 1719:1
Defendant's [6] -
1872:16; 1873:16;
1876:9; 1877:7;
1891:25; 1894:10
defendants [5] -
1892:9; 1894:18, 21;
1895:11; 1924:13
Defendants [1] -

1718:9
defense [2] - 1772:9;
1773:7, 12; 1776:8;
1790:7; 1791:18;
1847:12, 17; 1848:6,
12; 1894:11
Defense [6] - 1865:10;
1866:20; 1870:6;
1937:12
defer [1] - 1748:12
defined [1] - 1839:21
defines [1] - 1839:23
definitely [1] -
1879:7
degree [2] - 1726:17;
1775:13
del [4] - 1811:20;
1842:25; 1856:9;
1857:13
Del [3] - 1856:8;
1880:2; 1889:12
delighted [1] - 1720:5
delivered [1] - 1902:5
demonstrate [1] -
1775:25
depleted [1] - 1780:16
deposit [3] - 1733:24;
1734:16; 1756:25
depth [1] - 1915:8
derive [1] - 1747:7
describe [8] -
1723:21; 1724:9;
1727:3; 1784:14;
1810:15; 1904:19;
1905:21; 1914:1
described [3] -
1812:20; 1813:3;
1820:17
describes [1] -
1911:24
description [2] -
1737:1; 1832:2
design [1] - 1906:16
designed [1] - 1781:5
desire [2] - 1769:2;
1843:4
desktop [1] - 1853:1
despite [2] - 1832:21;
1833:5
detailed [2] - 1832:2,
24
details [2] - 1883:5;
1908:8
determine [1] -
1760:13
develop [1] - 1881:3
developed [1] - 1776:8

developer [1] -
1876:16
development [1] -
1911:24
developmental [1] -
1841:5
device [2] - 1852:23,
25
Diamante [15] -
1867:7, 19, 21; 1868:2,
5, 12; 1877:21, 23-24;
1878:1, 14; 1880:2;
1889:12; 1892:10, 15
Diamonte [6] -
1811:20; 1842:25;
1856:9; 1857:13; 1919:5
Dickinson [1] -
1724:13
dictated [1] - 1803:15
difference [4] -
1729:14; 1733:19;
1755:24; 1805:1
different [20] -
1727:5; 1760:1, 10;
1774:5, 17; 1777:11;
1779:15; 1804:4;
1807:18; 1811:8, 19,
24; 1846:21; 1847:11;
1851:10; 1863:19;
1874:24; 1883:22;
1911:5; 1931:2
differentiate [1] -
1929:12
difficult [4] -
1723:12, 14; 1762:12;
1934:2
difficulty [1] -
1863:20
dinner [3] - 1813:22;
1840:19, 22
dip [1] - 1903:12
dire [1] - 1786:2
DIRE [3] - 1786:4;
1929:3; 1935:17
direct [22] - 1720:12;
1721:3; 1749:2;
1750:25; 1755:15;
1760:25; 1773:2;
1775:16; 1834:1;
1836:8; 1837:13;
1840:25; 1843:7, 16,
20; 1844:3, 18; 1845:2;
1858:14; 1896:22;
1907:12; 1927:6
DIRECT [7] - 1783:8;
1807:10; 1901:5;
1935:15; 1936:2, 18, 20
directed [1] - 1790:5

**9**

**directing** [1] - 1756:2
**direction** [1] - 1859:12
**directly** [4] - 1832:13; 1843:4; 1875:13; 1922:7
**directs** [1] - 1862:21
**dirt** [2] - 1724:20; 1857:2
**disagreement** [2] - 1765:19; 1835:12
**disappointed** [3] - 1812:3; 1832:15, 19
**disappointment** [1] - 1832:21
**disburse** [1] - 1908:1
**disbursed** [1] - 1817:25
**disbursements** [3] - 1832:25; 1836:22; 1897:25
**discard** [1] - 1867:10
**discovery** [2] - 1791:21; 1871:17
**discuss** [15] - 1770:21; 1771:1; 1782:2; 1833:2, 4, 6; 1846:8; 1851:24; 1853:15, 17; 1857:23; 1871:1; 1876:19; 1899:14; 1932:17
**discussed** [13] - 1740:24; 1755:12; 1765:12; 1791:22; 1824:16; 1834:10, 19; 1850:20; 1851:6, 19; 1855:3; 1858:25
**discussing** [10] - 1724:4, 19; 1726:10; 1734:14; 1765:8; 1852:1; 1853:25; 1863:10; 1869:20; 1876:21
**discussion** [11] - 1754:23; 1767:1, 15-16; 1835:5; 1840:11; 1875:16; 1877:15; 1881:16; 1887:8; 1888:9
**discussions** [8] - 1740:19, 22; 1768:6; 1874:20; 1877:19; 1879:18; 1884:8; 1933:1
**dismissed** [2] - 1894:19, 22
**display** [2] - 1755:12; 1866:18
**displaying** [1] - 1870:10
**displeased** [1] -

1836:22
**displeasure** [1] - 1926:4
**dispute** [5] - 1837:25; 1838:1; 1871:17; 1873:23; 1874:1
**disqualify** [1] - 1871:9
**disrupt** [1] - 1934:8
**disservice** [1] - 1905:16
**distinguish** [1] - 1850:14
**DISTRICT** [2] - 1718:1
**District** [2] - 1718:12; 1854:7
**diversified** [2] - 1810:23; 1811:4
**diverted** [4] - 1789:5; 1790:15; 1791:14; 1848:1
**divided** [1] - 1760:5
**dividends** [1] - 1825:17
**divvied** [1] - 1921:19
**document** [47] - 1731:10; 1746:4; 1763:17; 1773:23; 1786:11; 1829:11; 1831:15, 24; 1832:6; 1833:3; 1843:11, 13; 1844:25; 1852:11, 15-16; 1854:19, 21; 1858:13; 1859:9; 1860:15, 20; 1880:24; 1884:25; 1885:14; 1897:24; 1898:5; 1910:7, 12, 24; 1911:2, 6, 8, 15; 1913:24; 1914:1, 5, 8; 1930:8, 18, 22; 1931:9, 15, 18
**documentation** [13] - 1825:19, 21, 23; 1844:17; 1859:24; 1879:4; 1893:7, 13; 1924:1; 1926:7; 1927:14, 22; 1928:3
**documents** [18] - 1743:8-10; 1750:25; 1772:6, 13, 18; 1786:6; 1867:11; 1869:3; 1871:18; 1925:18; 1931:3, 6-7; 1932:1
**dogs** [1] - 1925:15
**dollar** [2] - 1844:14; 1845:3
**dollars** [9] - 1814:24; 1816:21; 1817:11;

1838:19; 1846:3; 1911:21; 1920:8; 1922:1; 1924:23
**done** [11] - 1751:21, 24; 1752:7; 1777:22; 1845:18, 22; 1848:14; 1859:10; 1876:3; 1899:13
**doors** [1] - 1901:23
**doubt** [3] - 1845:16; 1851:16; 1879:22
**down** [21] - 1723:17; 1766:7, 9; 1781:22, 25; 1794:11; 1806:18; 1846:9; 1868:15; 1890:4; 1899:12, 16; 1906:13, 16; 1916:13, 16; 1918:20; 1924:25; 1930:3; 1932:19
**downturn** [7] - 1776:18, 25; 1777:6; 1778:20, 22; 1903:10
**draft** [1] - 1732:6
**drafted** [3] - 1808:3; 1810:6; 1901:18
**drafts** [3] - 1731:16; 1867:5, 10
**drained** [1] - 1837:1
**driver** [1] - 1813:4
**due** [2] - 1765:21; 1775:7
**dues** [1] - 1781:10
**duly** [3] - 1782:24; 1807:3; 1900:19
**duration** [1] - 1840:15
**during** [14] - 1722:8; 1735:20; 1762:12; 1776:8; 1840:22; 1847:17; 1856:7; 1890:19; 1891:3, 12; 1902:12; 1919:2; 1934:9

**E**

**e-mail** [118] - 1722:4; 1723:1; 1724:23; 1725:10; 1727:10, 19; 1729:9; 1730:18; 1731:19; 1732:6; 1741:13, 16; 1742:2; 1745:24; 1747:4; 1818:22; 1819:4, 7-8, 10, 13, 16, 25; 1822:11; 1823:20; 1826:6; 1833:14, 18, 22; 1834:16, 19, 22; 1835:2, 4, 15, 18; 1837:4; 1839:4, 7, 11-12; 1840:12; 1850:2;

1851:11, 14-15, 18, 20, 24; 1852:1, 3-4, 22-23; 1853:1, 6, 8-9, 11; 1860:1, 8; 1862:10, 23; 1863:2, 4, 7-8, 15; 1864:21, 25; 1865:13; 1866:7, 23-24; 1867:8; 1868:15; 1869:7, 9, 17-18, 23; 1870:9, 14; 1871:5; 1872:6, 18; 1873:9, 18; 1874:6, 17, 19; 1876:10, 15, 17; 1877:10, 23; 1879:19; 1880:13; 1881:10, 23-24; 1891:24; 1892:1, 3, 12; 1893:4, 25; 1894:10, 13; 1895:3, 6
**e-mails** [14] - 1720:13; 1722:7, 16; 1818:24; 1851:15; 1866:23; 1867:24; 1870:23; 1872:5, 24; 1880:20; 1893:22; 1894:4
**eager** [1] - 1816:20
**early** [1] - 1925:6
**ease** [1] - 1907:10
**east** [2] - 1725:14, 16
**EASTERN** [1] - 1718:1
**easy** [1] - 1904:11
**eat** [1] - 1721:1
**ecstatic** [2] - 1909:22; 1916:17
**effect** [2] - 1844:6; 1845:10
**effectively** [1] - 1824:18
**effort** [4] - 1876:2; 1877:21; 1892:15; 1934:11
**efforts** [2] - 1878:20; 1880:4
**eight** [2] - 1779:18; 1794:14
**either** [20] - 1762:21; 1818:22; 1819:16; 1820:19, 25; 1823:24; 1824:12, 23; 1825:24; 1833:17, 24-25; 1835:3, 19; 1871:3; 1879:18; 1893:24; 1896:9; 1922:7; 1924:13
**El** [1] - 1881:13
**elect** [1] - 1838:1
**elected** [2] - 1824:5, 7
**element** [1] - 1859:24; 1893:7, 14
**elevation** [1] - 1723:19

**10**

**11**

**elicit** [2] - 1772:10; 1926:6

**elicited** [1] - 1775:11

**employee** [4] - 1785:9; 1787:13; 1797:11; 1799:15

**empty** [2] - 1725:22; 1932:2

**encumbrances** [2] - 1726:25; 1728:9

**end** [13] - 1722:15; 1760:25; 1767:17; 1798:10; 1810:9; 1821:17; 1831:2; 1865:16; 1881:22; 1904:13; 1905:9; 1918:19; 1925:5

**End** [2] - 1747:20; 1934:15

**endeavor** [2] - 1826:1; 1875:13

**ended** [4] - 1730:9; 1759:5; 1761:1; 1816:18

**enforcement** [3] - 1768:17; 1801:6; 1854:7

**engage** [2] - 1768:12; 1850:22

**engaged** [1] - 1762:17

**enter** [1] - 1754:20

**entered** [7] - 1721:11; 1731:15; 1732:22; 1735:12; 1760:13; 1799:2; 1900:8

**Enterprise** [2] - 1800:3, 6

**Enterprises** [11] - 1743:4; 1744:2, 12; 1783:13, 16, 21; 1786:8; 1787:4; 1789:7; 1895:18

**enters** [2] - 1720:20; 1849:16

**entire** [2] - 1841:16; 1854:21

**entirely** [1] - 1846:1

**entity** [4] - 1727:22, 24; 1778:14; 1867:9

**entries** [2] - 1797:14

**entry** [2] - 1728:19; 1818:1

**equity** [11] - 1751:12, 25; 1758:5; 1759:19; 1760:22; 1762:13; 1763:18; 1765:10; 1766:5, 15; 1767:2

**Erie** [3] - 1807:15, 18; 1841:6

**escrow** [11] - 1729:4; 1754:5, 7, 22, 25; 1755:1; 1757:1; 1780:12; 1781:8

**essence** [1] - 1795:3

**establish** [2] - 1773:9; 1847:12

**established** [1] - 1773:1

**establishment** [1] - 1926:5

**estate** [28] - 1756:16; 1758:23; 1759:20; 1763:23; 1764:15; 1770:7, 9, 11; 1772:12, 19; 1773:4, 6, 15; 1775:19, 21; 1776:18, 24; 1778:7, 9, 11, 19; 1811:9; 1822:1; 1906:3; 1907:2

**estimation** [1] - 1839:14

**Ethan** [1] - 1919:15

**Eufora** [91] - 1726:8; 1740:1; 1766:11; 1789:6, 11, 17, 22, 24; 1790:5, 10-11, 16, 19, 21; 1791:5, 14, 16; 1821:24; 1822:13, 18; 1825:5, 9-10, 25; 1830:8; 1843:17, 21; 1844:5, 10, 14, 19, 23; 1845:3, 7, 19; 1846:20; 1847:2, 9, 21; 1854:2, 14, 16; 1879:13, 15; 1882:1, 10-11; 1883:7, 22; 1885:15; 1886:3, 10, 16; 1887:9, 24; 1888:10; 1912:15, 17, 19, 21; 1913:17; 1914:20, 23; 1915:6; 1916:4, 10, 20; 1917:8; 1919:7, 20; 1920:1, 3; 1921:6, 23; 1922:3; 1923:7; 1927:8, 12-13, 21; 1928:15; 1929:14; 1930:4, 11; 1931:21

**event** [2] - 1794:20; 1796:4

**events** [1] - 1855:17

**eventually** [3] - 1827:4; 1832:12; 1906:22

**evidence** [88] - 1722:3, 13, 19, 23; 1723:20; 1727:10; 1728:12; 1729:9; 1730:17; 1731:18; 1732:25; 1733:5;

1734:6; 1736:16, 21; 1737:21; 1739:4, 17; 1741:20, 25; 1743:14, 19; 1746:3; 1748:6; 1750:19; 1755:11; 1783:24; 1785:21; 1786:18, 20; 1787:25; 1789:9, 20; 1791:16; 1793:16, 18, 24; 1796:13, 19; 1797:24; 1798:4; 1817:16; 1818:10; 1819:23; 1827:6; 1829:6, 8; 1850:4; 1859:4; 1865:10; 1866:20; 1870:6, 8; 1872:12; 1873:8; 1874:2; 1876:9; 1877:7; 1880:8, 12; 1891:24; 1907:11; 1910:3, 23; 1914:12, 16; 1916:24; 1922:10; 1928:22; 1937:3, 5-10, 12-14, 20, 22-25; 1938:1, 4

**evolved** [2] - 1726:18

**exact** [3] - 1814:11; 1841:12; 1906:23

**exactly** [5] - 1767:22; 1774:9; 1882:20; 1904:21; 1905:14

**EXAMINATION** [38] - 1748:17; 1769:16; 1779:4; 1780:1; 1781:1; 1783:8; 1786:4; 1799:23; 1802:20; 1806:1; 1807:10; 1831:9; 1849:21; 1856:1; 1888:17; 1896:20; 1898:19; 1901:5; 1929:3; 1935:3, 5, 7, 9, 11, 15, 17, 19, 21, 23; 1936:2, 4, 6, 8, 10, 12, 14, 18, 20

**examination** [16] - 1721:3, 10; 1722:8; 1748:9; 1749:2; 1760:25; 1775:16; 1799:20; 1805:24; 1826:16; 1849:20; 1858:14; 1888:21; 1889:10; 1894:5; 1932:24

**examined** [3] - 1782:24; 1807:3; 1900:19

**example** [3] - 1789:23; 1804:7; 1839:8

**examples** [1] - 1793:22

**exceeded** [1] - 1751:16

**except** [1] - 1920:16

**exception** [1] - 1894:7

**exchange** [1] - 1819:10

**excited** [9] - 1906:13, 17, 25; 1909:20, 25; 1913:15; 1916:13; 1920:9

**exciting** [1] - 1907:1

**exclusively** [1] - 1850:18

**excuse** [1] - 1925:6

**excused** [2] - 1782:3; 1899:17

**execute** [1] - 1874:14

**executed** [3] - 1742:4; 1880:23; 1881:1

**executive** [1] - 1799:17

**exhibit** [12] - 1757:8; 1795:16; 1798:7; 1800:16; 1818:12; 1858:10; 1859:21; 1872:17; 1900:21; 1910:20; 1929:2

**Exhibit** [85] - 1721:13; 1722:1, 11, 24; 1724:22; 1725:2, 9; 1728:13; 1729:8; 1732:9; 1733:4; 1734:7; 1736:2, 15, 20; 1737:1; 1738:8, 17; 1739:3, 16, 18; 1741:9, 24; 1743:18; 1745:22; 1748:5; 1783:25; 1793:23; 1795:6; 1796:19; 1797:5; 1798:4; 1817:17; 1818:11; 1819:1, 23; 1826:21; 1827:6; 1829:4, 8; 1831:14; 1833:11; 1839:4; 1854:20; 1859:5; 1865:10; 1866:20; 1870:6; 1872:13, 16; 1873:16; 1876:9; 1877:7; 1891:25; 1893:8; 1894:10; 1895:2; 1898:6; 1907:12; 1910:4, 12, 23; 1913:22; 1914:16; 1916:25; 1922:10; 1928:12; 1937:6-10, 12-14, 17-18, 21, 23-25; 1938:1

**EXHIBITS** [1] - 1937:1

**Exhibits** [5] - 1784:12; 1786:19;

1793:17; 1937:2, 4

**exhibits** [12] -
1721:17, 24; 1722:9;
1784:4; 1785:6, 21;
1786:17; 1787:7, 25;
1793:3, 15

**exits** [2] - 1797:15;
1932:20

**expect** [1] - 1774:21

**expectation** [1] -
1816:6

**expended** [2] -
1874:22; 1898:12

**expenditure** [1] -
1861:7

**expense** [2] - 1790:10;
1791:17

**expenses** [10] -
1789:25; 1790:1, 11-12;
1815:20; 1911:24;
1912:1; 1924:13

**experience** [2] -
1774:4; 1775:24

**expert** [11] - 1772:19;
1774:7, 15, 22; 1775:5,
8, 12-13, 23; 1777:5,
16

**expertise** [3] -
1773:3; 1775:20; 1777:5

**explain** [21] - 1735:5;
1753:15, 20; 1756:7;
1766:15; 1777:8;
1780:6; 1781:4;
1784:17; 1793:24;
1794:12; 1795:6;
1820:14, 25; 1823:24;
1842:4; 1883:3;
1905:16, 25; 1922:4

**explained** [2] -
1774:9; 1811:1

**explanation** [5] -
1828:9; 1835:14;
1836:4; 1878:8

**external** [1] - 1725:17

**extra** [1] - 1754:17

**eye** [2] - 1934:5, 12

---

**F**

**face** [3] - 1848:3;
1883:1

**face-to-face** [1] -
1883:1

**fact** [12] - 1735:23;
1742:21; 1772:10;
1775:3; 1818:16;
1861:5; 1873:23;
1897:4, 10, 12; 1904:5

**facts** [1] - 1777:12

**failure** [1] - 1756:20

**fair** [18] - 1733:22;
1734:13; 1761:24;
1800:10; 1808:11;
1828:11; 1829:24;
1833:16; 1834:4, 9;
1842:19; 1847:15;
1854:18; 1858:4;
1863:23; 1872:2, 4;
1909:1

**fairly** [1] - 1842:5

**Falcon** [8] - 1822:2, 4,
21; 1823:5, 10; 1825:3;
1924:4, 6

**fall** [1] - 1798:9

**falling** [7] - 1761:9;
1812:2, 20; 1828:6;
1832:14; 1833:5;
1853:14

**Falls** [2] - 1807:25;
1809:11

**familiar** [11] -
1773:5; 1776:4;
1783:18; 1811:15;
1813:2; 1845:25;
1881:25; 1883:10;
1906:6, 8; 1918:8

**family** [5] - 1808:17;
1809:13; 1829:24;
1830:2; 1903:11

**Family** [3] - 1742:10;
1922:22; 1929:14

**far** [11] - 1741:6;
1751:16; 1764:13;
1767:13; 1768:12;
1775:10; 1800:17;
1824:19; 1839:17;
1852:14; 1902:1

**fashion** [1] - 1837:7

**FBI** [4] - 1890:15;
1891:4, 18

**fear** [1] - 1836:9

**feared** [1] - 1831:3

**fearful** [1] - 1830:23

**Federal** [4] - 1718:16;
1719:8; 1801:11;
1802:12

**federal** [3] - 1801:6;
1854:7; 1855:11

**federales** [1] -
1838:24

**fee** [6] - 1810:13, 15;
1904:16, 20; 1925:1, 18

**fees** [24] - 1794:13;
1795:22; 1820:13, 18,
20; 1821:8; 1824:17;
1839:9, 18-19, 21;

---

1895:4, 8, 12-13;
1896:8, 12; 1898:2, 12;
1920:11

**fellows** [1] - 1923:8

**felt** [5] - 1813:2;
1814:6; 1817:3, 8;
1830:24

**few** [16] - 1721:10;
1723:9, 17; 1762:11;
1777:21; 1778:25;
1799:2; 1807:18;
1811:8, 19; 1882:1;
1886:21; 1888:19;
1898:17; 1913:1

**field** [1] - 1775:24

**fifth** [1] - 1886:23

**fight** [2] - 1919:12;
1920:14

**fighting** [1] - 1920:14

**figure** [3] - 1753:16;
1806:4; 1902:23

**file** [9] - 1830:19;
1882:19; 1885:7;
1924:4; 1931:20, 23;
1932:3

**filed** [7] - 1830:18;
1867:6; 1871:10;
1878:3, 21; 1885:21;
1892:20

**final** [5] - 1732:5;
1744:17; 1776:15;
1867:5

**finally** [5] - 1745:15;
1751:8; 1797:4;
1878:25; 1895:2

**finals** [1] - 1841:7

**finance** [5] - 1748:24;
1759:6; 1810:25;
1850:6; 1852:5

**finances** [3] -
1775:14; 1850:14;
1889:9

**financial** [31] -
1749:21; 1750:17;
1752:8; 1756:7;
1760:19; 1762:16;
1764:14; 1767:17;
1769:22; 1770:25;
1773:3; 1808:15, 17;
1810:6, 9, 21; 1811:12;
1825:2, 5, 8; 1847:20;
1850:8; 1878:18;
1889:9; 1903:3;
1904:13, 21, 24;
1905:2, 7

**financially** [1] -
1778:15

**financier** [1] -

---

1729:23

**financing** [15] -
1726:15, 19; 1728:5;
1730:9; 1752:12;
1754:13; 1758:9;
1759:4; 1774:17, 19;
1776:10; 1847:2;
1911:20

**fine** [6] - 1747:16;
1766:12; 1777:23;
1831:2; 1891:11;
1926:10

**fingers** [1] - 1828:8

**finished** [1] - 1831:19

**FINRA** [1] - 1774:22

**fired** [2] - 1924:23;
1927:2

**firm** [2] - 1871:10, 13

**first** [57] - 1733:7;
1743:20; 1748:10;
1749:8; 1751:1;
1752:14; 1755:15;
1756:9; 1761:4;
1765:25; 1767:4;
1774:14; 1776:24;
1779:6; 1782:23;
1799:5; 1801:19;
1807:2, 20; 1808:9, 11;
1809:3, 6; 1810:11;
1812:24; 1813:1;
1819:25; 1820:8;
1822:4; 1854:22, 24;
1857:16, 24; 1860:14,
23; 1874:10; 1878:9;
1880:16, 22; 1886:21;
1888:21; 1890:21, 23;
1892:12; 1896:17;
1900:18; 1902:6;
1905:1, 23; 1907:3;
1916:15; 1927:13;
1928:16; 1929:14

**First** [2] - 1734:7;
1922:16

**fit** [1] - 1750:9

**five** [5] - 1735:8;
1855:18; 1907:12, 25;
1929:7

**flight** [2] - 1934:4, 11

**flip** [1] - 1817:17

**flowed** [1] - 1850:17

**flying** [1] - 1934:3

**focus** [4] - 1796:22;
1811:14; 1824:21;
1906:5

**focusing** [2] - 1799:5;
1864:8

**folder** [1] - 1924:5

**follow** [3] - 1870:17;

---

**13**

1878:11; 1884:2

**followed** [2] - 1736:12; 1932:24

**following** [13] - 1746:8; 1772:1; 1778:1; 1789:1; 1793:1; 1828:1; 1829:1, 23; 1830:10; 1835:2; 1874:7; 1926:1; 1933:11

**follows** [5] - 1720:19; 1782:25; 1807:4; 1849:15; 1900:20

**fond** [1] - 1905:4

**footage** [2] - 1762:4

**foreclose** [2] - 1723:16; 1750:3

**forecloses** [1] - 1750:7

**foreclosing** [2] - 1749:3, 16

**foreclosure** [4] - 1749:8, 15; 1750:16; 1752:2

**foregoing** [3] - 1721:17; 1785:21; 1787:25

**form** [2] - 1795:7; 1876:6

**formed** [1] - 1778:8

**former** [7] - 1814:1; 1817:13; 1871:12; 1895:22; 1896:24; 1897:9, 11

**Formula** [1] - 1805:14

**forward** [4] - 1731:25; 1754:19; 1867:14; 1894:16

**forwarded** [1] - 1732:4

**forwarding** [1] - 1731:22

**foundation** [3] - 1766:11; 1774:16; 1775:15

**founded** [1] - 1913:9

**four** [3] - 1760:4; 1911:18; 1925:10

**fourth** [1] - 1929:18

**frame** [3] - 1760:25; 1886:13; 1927:10

**fraud** [6] - 1747:7, 16; 1789:6, 11, 17; 1846:20

**fraudulent** [2] - 1776:12; 1843:14

**free** [5] - 1727:1; 1816:15; 1854:20; 1871:3; 1902:18

**frequencies** [1] -

1804:4

**friend** [2] - 1903:13; 1904:4

**friends** [3] - 1814:1, 20; 1904:5

**frivolous** [1] - 1871:14

**front** [7] - 1728:5; 1730:2; 1733:18, 20; 1800:14; 1890:14

**frustrated** [1] - 1767:17

**fulfill** [1] - 1735:18

**full** [6] - 1804:6, 10, 19; 1807:20; 1842:19; 1865:15

**fuller** [1] - 1739:4

**fully** [4] - 1840:4; 1842:2; 1881:3; 1905:17

**Fund** [70] - 1811:16, 25; 1812:3; 1815:4; 1818:8, 23; 1820:12, 21; 1821:1; 1822:14, 17, 21; 1823:5, 9, 13, 17; 1824:5, 23; 1826:8; 1827:2; 1828:5; 1829:16; 1832:4, 18; 1833:1; 1834:7; 1846:19; 1856:16; 1857:6, 24; 1858:5; 1859:6; 1861:8; 1863:13, 16; 1864:8; 1866:3; 1868:1; 1873:25; 1874:18, 21; 1875:6, 22; 1877:25; 1879:20; 1881:18; 1889:16, 19; 1890:6, 10; 1892:6; 1893:5, 17, 20; 1895:13; 1896:12; 1898:22; 1899:1, 5; 1918:8, 10; 1919:17, 21; 1920:12; 1921:3, 18, 20; 1923:3; 1924:12; 1927:21

**fund** [16] - 1814:18; 1815:9, 16; 1816:21; 1820:21; 1821:16, 21; 1826:8; 1890:7, 11; 1895:4, 20, 25; 1919:11; 1920:24

**fund's** [1] - 1894:1

**funded** [2] - 1919:17; 1921:20

**funding** [4] - 1729:15; 1755:25; 1765:23; 1918:17

**funds** [10] - 1734:16, 19; 1790:15; 1817:25; 1875:1; 1894:2;

1896:25; 1898:1; 1918:16; 1920:24

**future** [1] - 1793:8

**G**

**Gaarn** [2] - 1847:1; 1932:25

**Galiano** [1] - 1768:23

**Galioto** [6] - 1768:24; 1769:1; 1862:2, 9; 1863:1; 1891:17

**game** [3] - 1759:8; 1807:20; 1847:15

**games** [1] - 1901:12

**general** [8] - 1821:14; 1853:13; 1855:16; 1904:19; 1905:13, 21; 1908:10; 1914:1

**generally** [1] - 1745:17

**generated** [2] - 1786:7; 1875:20

**gentleman** [5] - 1723:15; 1726:19; 1762:1; 1768:10; 1774:5

**gentlemen** [1] - 1754:10

**gifts** [2] - 1720:6, 25

**given** [8] - 1822:16; 1823:8, 16; 1843:12; 1848:10; 1896:13; 1897:25; 1918:13

**glass** [1] - 1906:17

**glasses** [1] - 1755:22

**global** [5] - 1820:15; 1875:1; 1877:20; 1879:2; 1892:14

**Global** [71] - 1811:16, 25; 1812:3; 1815:4; 1818:7, 23; 1820:11, 20; 1821:1; 1822:13, 16, 20; 1823:5, 8, 13, 16; 1824:4, 22; 1826:8; 1827:1; 1828:5; 1829:15; 1832:3, 17, 25; 1834:6; 1846:19; 1856:16; 1857:6, 24; 1858:5; 1859:6; 1861:7; 1863:13, 16; 1864:8; 1866:2; 1868:1; 1873:25; 1874:18, 21; 1875:6, 22; 1877:24; 1879:19; 1881:17; 1889:16, 19; 1890:6, 9; 1892:6; 1893:4, 17, 20; 1895:13; 1896:11; 1898:1, 21, 25; 1899:5;

1918:7, 10; 1919:17, 21; 1920:12; 1921:3, 18, 20; 1923:2; 1924:11; 1927:21

**goals** [1] - 1905:10

**golf** [4] - 1811:20; 1812:7; 1814:2; 1876:16

**Gonchar** [6] - 1741:5; 1742:8, 10, 16; 1761:10; 1764:20

**Government** [50] - 1718:15; 1722:1, 11; 1733:4; 1736:20; 1739:16; 1741:24; 1743:18; 1746:2; 1747:15; 1748:5; 1785:20; 1786:19; 1793:8, 17; 1796:19; 1797:23; 1798:4; 1817:16; 1818:11; 1819:1; 1827:6; 1829:4, 8; 1831:14; 1833:11; 1839:4; 1859:11; 1899:9; 1907:12; 1910:4, 12; 1913:22; 1916:24; 1922:10; 1928:21; 1932:3, 5; 1937:2, 4, 6-7, 17, 21, 23-25; 1938:1

**government** [28] - 1741:19; 1743:13; 1772:5; 1775:8, 11, 15; 1782:15, 17; 1787:24; 1793:10; 1796:12; 1806:21; 1819:19; 1827:5; 1831:18; 1833:13; 1835:25; 1836:4; 1843:20; 1844:4; 1847:8, 23; 1848:2; 1866:13; 1896:23; 1897:7; 1900:11; 1914:11

**Government's** [44] - 1721:13; 1722:2, 23; 1724:22; 1725:2, 9; 1728:13; 1729:8; 1732:9; 1734:6; 1736:1, 15; 1738:8, 17; 1739:3, 18; 1741:8; 1742:23; 1745:21; 1783:25; 1784:4, 12; 1785:6; 1787:7; 1791:11, 23; 1793:23; 1795:6; 1797:5; 1819:23; 1826:21; 1859:4; 1872:12, 16; 1893:8; 1895:2; 1898:6; 1910:23; 1914:16; 1928:11; 1937:8-10, 18

**government's** [4] -

**14**

1773:2; 1795:16;
1900:9; 1910:21
**graciously** [3] -
1824:5, 7, 14
**graphs** [2] - 1809:15;
1811:2
**great** [10] - 1904:3, 6;
1906:12; 1908:8;
1913:13; 1915:8, 11;
1916:16, 18
**groundless** [1] -
1871:10
**grounds** [2] - 1747:15;
1789:4
**Group** [13] - 1784:15,
19; 1789:3, 21; 1790:9,
15; 1791:17, 19;
1797:2; 1846:25;
1914:4; 1916:22; 1917:1
**group** [11] - 1866:23;
1870:23; 1872:7;
1876:10; 1880:13;
1882:18; 1886:9;
1919:13; 1921:7, 20
**grow** [1] - 1811:2
**GSF** [1] - 1862:11
**guarantees/lawsuit**
[1] - 1878:23
**guarantor** [1] -
1742:10
**guess** [9] - 1752:4;
1760:5; 1780:9;
1813:21; 1840:19;
1904:11; 1905:10;
1907:7; 1908:10
**guessing** [3] -
1906:24; 1915:9; 1930:9
**guy** [9] - 1749:3;
1751:5; 1857:10;
1903:1; 1913:13;
1916:16; 1919:14;
1925:14
**guys** [16] - 1720:25;
1810:7; 1813:25;
1870:22; 1879:12;
1882:18, 22; 1883:19,
23; 1903:12; 1907:8;
1913:15; 1921:7, 18, 21
**GX** [2] - 1732:25;
1928:21

---

**H**

---

**Haley** [18] - 1747:2;
1769:13, 20; 1771:11;
1777:22; 1780:20;
1793:4, 9; 1799:25;
1831:6, 13; 1846:22;

1849:6; 1859:11;
1869:11; 1888:22;
1895:3, 7
**HALEY** [93] - 1718:21,
23; 1720:9; 1721:23;
1722:20; 1733:2;
1736:17; 1739:12;
1741:22; 1743:16;
1746:4; 1747:14;
1748:2, 11; 1769:14,
17; 1771:9, 12; 1772:2,
4, 24; 1773:1; 1774:11;
1775:2, 7; 1777:19;
1778:2, 24; 1780:21;
1785:23, 25; 1786:2, 5,
16; 1793:5, 10, 14;
1796:17; 1798:2;
1799:21, 24; 1802:15;
1806:17; 1809:25;
1816:8, 22; 1819:20;
1822:23; 1823:3;
1826:17; 1828:12;
1831:7, 10; 1836:7;
1847:22; 1848:13;
1849:7, 22-23; 1852:18;
1855:20; 1865:8;
1866:12; 1870:4;
1880:10; 1889:24;
1891:6; 1894:6;
1896:17, 21; 1897:22;
1898:6, 9, 14; 1900:21;
1903:23; 1910:10, 15;
1914:14; 1915:14, 25;
1923:15; 1925:20;
1926:2; 1932:13;
1933:4; 1935:6, 18, 20;
1936:5, 7, 13
**Haley's** [1] - 1849:19
**half** [4] - 1810:17;
1817:11; 1838:18;
1902:2
**hand** [10] - 1736:1;
1745:21; 1784:3;
1787:6; 1795:15;
1800:17; 1818:25;
1826:21; 1907:11;
1918:15
**handful** [2] - 1842:3
**handing** [3] - 1732:8;
1741:8; 1797:4
**Handing** [6] - 1817:18;
1819:1; 1826:22;
1907:13; 1910:24;
1913:23
**handle** [2] - 1778:14;
1864:15
**handling** [1] - 1850:5
**hands** [1] - 1765:22
**handwriting** [4] -

1929:7, 9, 24; 1930:1
**hangar** [24] - 1760:3;
1761:14, 20; 1762:18,
24; 1763:3, 9; 1765:22,
24-25; 1766:10, 25;
1767:4, 6; 1768:13;
1779:6, 8; 1879:13;
1921:22; 1922:2;
1923:7, 19
**hangars** [15] - 1758:5,
12; 1760:2, 5, 10, 15;
1761:2, 8, 12; 1762:1;
1765:15; 1780:4; 1896:5
**hanger** [19] - 1723:4,
18, 24; 1724:5-7, 18,
21, 25; 1725:4, 6, 16,
21, 24; 1736:8;
1743:24; 1744:9, 24
**Hangers** [1] - 1731:23
**hangers** [34] - 1723:16,
23; 1724:1; 1726:11,
24; 1727:21; 1730:4, 7,
10, 14; 1734:14;
1735:16, 21, 23;
1737:2, 6, 11; 1741:2,
12; 1742:17, 20-21;
1745:9, 11-12; 1749:4,
10, 24; 1751:18;
1752:8; 1753:23;
1756:14; 1757:4, 9
**happy** [9] - 1817:10;
1848:11; 1865:16;
1880:23; 1903:12, 15;
1905:4; 1916:18; 1921:5
**hard** [6] - 1776:4, 9,
12-13; 1777:9
**harmless** [2] - 1775:1,
3
**Hawaii** [16] - 1747:7;
1847:25; 1906:6, 8-9;
1907:4; 1908:2, 6, 21;
1909:7, 11, 14, 25;
1910:15; 1912:5
**Hawaiian** [5] -
1773:13; 1776:10,
20-21; 1777:13
**head** [4] - 1763:22;
1784:2; 1794:23
**headquartered** [1] -
1879:15
**headway** [1] - 1848:10
**hear** [4] - 1867:19;
1906:9; 1918:10, 12
**heard** [8] - 1789:22;
1829:9; 1846:1;
1867:23; 1887:18;
1895:19; 1912:23
**hearing** [1] - 1894:23

**heavily** [1] - 1758:23
**Hefner** [3] - 1799:7,
12, 18
**held** [7] - 1757:1;
1780:12; 1781:8;
1794:7; 1882:10; 1904:4
**Helms** [2] - 1744:4, 11
**help** [6] - 1756:7;
1805:4; 1808:23;
1831:4; 1863:6; 1887:7
**helping** [2] - 1723:12;
1726:23
**hesitate** [1] - 1879:9
**hi** [1] - 1901:8
**hiding** [2] - 1838:22,
25
**high** [3] - 1748:24;
1814:4; 1820:17
**high-powered** [2] -
1814:4; 1820:17
**higher** [1] - 1905:22
**highest** [1] - 1904:4
**highlights** [2] -
1862:20; 1884:22
**highly** [1] - 1813:4
**Highway** [1] - 1718:22
**Hilton** [17] - 1726:20;
1729:16, 22-23;
1730:10; 1749:4, 9, 19;
1750:2, 10; 1751:6, 19;
1752:1; 1753:6, 9;
1755:25; 1762:1
**Hilton's** [2] -
1749:21; 1752:22
**himself** [2] - 1810:4;
1904:1
**hire** [3] - 1888:24;
1889:2, 4
**hired** [2] - 1794:3;
1896:5
**hiring** [5] - 1794:13;
1810:9; 1814:4;
1820:16; 1904:13
**hit** [3] - 1901:24;
1904:2, 7
**HMA's** [1] - 1799:6
**HMH** [2] - 1799:6, 11
**Hockey** [2] - 1841:2, 4
**hockey** [27] - 1728:2;
1737:10; 1744:5, 9;
1745:4; 1766:22;
1807:22; 1808:5, 25;
1847:13; 1872:9;
1873:5; 1880:6;
1883:21; 1901:12, 14,
16, 25; 1902:4, 12;
1903:10; 1904:2, 6;

1906:25; 1925:15

**hold** [1] - 1845:20

**holes** [1] - 1932:2

**home** [10] - 1808:3; 1811:23; 1817:12; 1853:9; 1860:8; 1904:8; 1918:23; 1924:11; 1932:17

**homes** [1] - 1811:25

**hometown** [1] - 1809:14

**honest** [2] - 1905:16; 1925:8

**honestly** [1] - 1855:8

**Honor** [51] - 1721:20, 22; 1733:1; 1739:11; 1743:15; 1746:4, 6; 1747:4; 1748:8, 13; 1769:5, 8, 12; 1772:4; 1777:20; 1780:22; 1782:10; 1785:22; 1791:18; 1793:2; 1796:16; 1797:25; 1802:18; 1806:16; 1820:22; 1845:12; 1846:4, 17; 1847:22; 1849:23; 1855:24; 1865:4, 6-7; 1866:9, 15, 17; 1870:1; 1880:9; 1888:2, 12, 14; 1896:16; 1898:8; 1900:4, 21; 1910:18; 1914:13; 1926:13; 1928:24; 1932:9

**HONORABLE** [1] - 1718:12

**hope** [1] - 1857:6

**hopefully** [1] - 1782:11

**hopes** [1] - 1879:25

**hoping** [3] - 1816:18; 1883:7; 1934:7

**Hormovitis** [1] - 1718:8

**horsepower** [1] - 1751:11

**hour** [5] - 1813:21; 1830:1, 4; 1840:20; 1934:9

**hours** [3] - 1794:14; 1887:12; 1919:1

**house** [2] - 1918:21; 1924:4

**household** [6] - 1850:10, 14; 1851:12; 1852:5, 23; 1853:5

**Hugh** [1] - 1799:7

**hundred** [12] - 1844:14; 1845:3; 1846:3;
1906:21; 1909:24; 1912:7, 9, 12; 1913:21; 1920:7; 1921:11; 1922:1

**hurt** [1] - 1830:8

**husband** [1] - 1834:4

---

**I**

**idea** [8] - 1816:3; 1817:3; 1844:22; 1897:14; 1899:7; 1916:23; 1929:20; 1930:2

**identification** [11] - 1760:7; 1813:11; 1854:20; 1864:20; 1869:15; 1884:21; 1886:20; 1903:24; 1915:25; 1916:1

**identified** [10] - 1722:7; 1762:24; 1763:11; 1786:17; 1789:24; 1793:4, 15; 1810:1; 1858:13

**identify** [6] - 1773:24; 1784:1; 1786:6, 11; 1813:10; 1903:21

**idiot** [1] - 1764:8

**illegal** [1] - 1776:12

**immediate** [1] - 1911:20

**immediately** [1] - 1925:4

**impact** [2] - 1890:6, 10

**impeach** [1] - 1774:6

**impediment** [1] - 1853:4

**implications** [2] - 1770:17; 1772:8

**important** [6] - 1773:11; 1777:17; 1815:8, 11, 13; 1874:8

**impressed** [2] - 1809:16; 1916:15

**impression** [3] - 1775:18; 1815:19; 1857:9

**impressive** [1] - 1916:18

**impropriety** [1] - 1790:8

**in-person** [1] - 1821:10

**inappropriate** [1] - 1847:6

**inappropriately** [1] - 1775:17
**Inc** [1] - 1783:21

**inclined** [1] - 1741:2

**include** [5] - 1742:7; 1784:22; 1824:5; 1867:4; 1921:22

**included** [3] - 1722:9; 1739:6; 1873:18

**includes** [1] - 1748:14

**including** [2] - 1869:9; 1876:10

**income** [1] - 1850:18

**incoming** [4] - 1738:4, 13; 1740:1, 8

**indebtedness** [2] - 1750:2, 7

**indeed** [1] - 1898:10

**Indemnification** [1] - 1731:4

**indemnify** [1] - 1731:12

**independent** [2] - 1845:18, 22

**independently** [1] - 1891:9

**INDEX** [1] - 1935:1

**indicate** [3] - 1728:1; 1798:11; 1824:13

**indicated** [2] - 1841:10; 1911:12

**indicating** [1] - 1851:12

**individual** [1] - 1775:10

**individually** [1] - 1720:14

**individuals** [3] - 1871:6; 1887:23; 1888:9

**info** [1] - 1865:18

**information** [22] - 1795:23; 1796:3; 1798:10; 1812:19; 1830:12; 1832:7, 9; 1834:6; 1838:14; 1865:25; 1866:5; 1872:21; 1873:20; 1874:7, 22; 1875:9, 25; 1879:22; 1881:8; 1917:7; 1921:2

**infrastructure** [1] - 1857:2

**initial** [3] - 1726:12; 1905:12; 1913:3

**inquired** [1] - 1853:21

**inquiries** [1] - 1864:6

**inquiry** [1] - 1837:11

**insert** [1] - 1838:9

**installment** [12] -
1732:15, 22; 1733:8; 1734:4, 22; 1735:18; 1737:15; 1740:15; 1741:7; 1756:8; 1759:9, 15

**instance** [1] - 1795:13

**instances** [3] - 1773:9; 1776:9; 1898:10

**instead** [4] - 1752:17; 1756:24; 1816:2

**instruction** [1] - 1829:5

**insurance** [1] - 1781:11

**integrity** [2] - 1764:11, 23

**intend** [8] - 1747:8; 1776:3; 1822:13, 20; 1823:4, 12; 1878:18; 1918:3

**intended** [1] - 1726:12

**intending** [1] - 1753:1

**intent** [1] - 1741:12

**intention** [3] - 1772:10; 1926:6, 9

**interaction** [2] - 1855:17; 1918:7

**interactions** [1] - 1811:15

**interest** [30] - 1723:25; 1724:2; 1728:2; 1729:14; 1734:3; 1735:10; 1737:10; 1740:15; 1745:9; 1747:6; 1755:2, 23; 1756:10; 1781:4, 12; 1821:24; 1822:1, 12; 1823:21; 1824:14; 1844:15; 1879:12; 1882:10; 1885:18; 1921:22; 1927:21, 23

**interested** [3] - 1810:7; 1834:5, 12

**interests** [1] - 1922:5

**interfere** [1] - 1843:3

**interfered** [1] - 1842:15

**International** [1] - 1783:21

**intervals** [1] - 1810:19

**interview** [4] - 1801:25; 1802:9, 11, 13

**interviewed** [3] - 1801:5, 10; 1854:5

**interviews** [1] - 1801:17

**15**

**16**

**intrigued** [1] - 1907:2
**introduce** [2] - 1910:6, 11
**introduced** [3] - 1857:25; 1906:3; 1910:13
**invest** [8] - 1760:20; 1780:4; 1790:19; 1815:3; 1867:22; 1881:2; 1902:24; 1912:4
**invested** [23] - 1758:23; 1811:19, 21; 1814:1, 20; 1817:11; 1830:23; 1837:5; 1843:17, 21; 1844:4, 23; 1867:21; 1878:4, 14; 1882:2; 1887:24; 1905:3; 1908:5; 1912:2, 8; 1915:6; 1927:13
**investigation** [2] - 1885:7, 19
**Investigation** [2] - 1801:11; 1802:12
**investing** [8] - 1726:11; 1758:3; 1759:3; 1770:6; 1811:7; 1856:19; 1902:17; 1926:9
**investment** [46] - 1726:12; 1728:8; 1747:11; 1751:17; 1764:14; 1773:13; 1825:12, 15, 20; 1834:7; 1842:25; 1844:19; 1846:21; 1847:3, 25; 1850:15; 1853:16, 18; 1854:12; 1856:8, 10, 13; 1857:3, 13; 1875:2; 1878:25; 1880:1, 5; 1889:11; 1906:21; 1907:18; 1908:2, 21; 1909:5; 1910:15; 1912:19; 1914:20, 22; 1915:18; 1916:11, 20; 1917:8; 1927:12, 14; 1930:11
**investments** [39] - 1745:16, 18-19; 1775:21; 1776:22; 1810:22; 1842:8, 12, 16, 20; 1847:5; 1850:6, 16, 20; 1851:5; 1853:10, 22-25; 1855:3, 5, 9; 1857:7; 1867:14; 1876:4; 1904:25; 1905:11, 20-22; 1906:2; 1908:23; 1909:2; 1918:14; 1927:6; 1928:4
**investors** [3] -

1741:1; 1908:14, 16
**invoice** [4] - 1794:2, 11; 1795:7; 1796:25
**invoiced** [2] - 1784:23; 1787:13
**invoices** [2] - 1784:15; 1785:9; 1786:12; 1787:12; 1789:6, 8, 12; 1790:25; 1791:24; 1795:21; 1804:16
**invoicing** [1] - 1785:7
**involve** [1] - 1777:13
**involved** [24] - 1723:15, 23; 1724:20; 1726:24; 1727:17; 1752:13; 1766:16; 1768:10; 1770:6, 10; 1772:11; 1775:19; 1792:1; 1854:12; 1855:7; 1867:7; 1883:20; 1892:15; 1907:6, 8, 10; 1913:7, 15
**involves** [1] - 1878:2
**involving** [2] - 1840:16; 1897:15
**Islandia** [1] - 1718:23
**Isles** [1] - 1911:3
**Islip** [3] - 1718:5, 17; 1719:9
**Issari** [2] - 1799:8
**issue** [3] - 1792:3; 1919:10; 1933:1
**issues** [12] - 1731:12; 1756:12; 1777:11; 1869:19; 1877:20; 1878:23; 1892:14; 1918:15; 1919:4, 14; 1920:13; 1933:1
**item** [1] - 1794:12
**items** [5] - 1752:14; 1794:12, 22; 1795:4; 1823:2
**itself** [9] - 1725:21; 1737:2; 1750:5; 1778:15; 1839:19; 1843:24; 1852:16; 1864:10; 1878:22

## J

**JAMES** [1] - 1718:17
**January** [4] - 1744:20; 1764:5; 1768:2; 1791:20
**Jay** [1] - 1806:21; 1807:7; 1819:12
**JAY** [3] - 1807:1, 7;

1936:1
**JB** [11] - 1728:19; 1729:16; 1733:8; 1736:24; 1737:7; 1738:20; 1739:20; 1743:3, 6; 1756:1
**Jeff** [2] - 1723:10; 1729:13
**Jet** [1] - 1768:22
**JFB** [1] - 1718:3
**job** [3] - 1816:18; 1901:24; 1902:3
**Joe** [2] - 1919:14, 19
**JOHN** [2] - 1782:22; 1935:14
**John** [5] - 1772:5; 1773:22; 1782:8, 17; 1783:4
**joined** [2] - 1807:24; 1808:8
**JOSEPH** [1] - 1718:12
**Jowdy** [47] - 1811:22; 1812:1, 10, 12, 14; 1814:3, 15, 22; 1815:21; 1835:5; 1839:19; 1842:22; 1843:5; 1857:10; 1864:10, 12, 15; 1865:18; 1868:4, 11, 18, 21, 25; 1871:10, 17; 1872:4; 1874:9, 23; 1875:4, 7, 14, 17; 1876:1, 3; 1878:20; 1880:1; 1881:6, 13; 1893:22; 1894:5, 14, 22; 1895:9
**Jowdy's** [1] - 1878:16
**judge** [12] - 1748:11; 1775:2; 1776:2; 1785:23; 1816:8; 1827:7; 1889:24; 1891:6; 1894:6; 1915:14; 1923:15; 1926:2
**Judge** [37] - 1718:12; 1722:20; 1743:16; 1747:1; 1772:2; 1773:7, 17; 1776:7, 15; 1779:2; 1786:16, 21; 1790:13; 1792:4; 1796:15, 17; 1805:22; 1809:25; 1826:18; 1828:13; 1847:24; 1848:4; 1849:7; 1858:12; 1866:12; 1871:14, 16; 1872:15; 1897:22; 1910:10; 1925:21; 1929:2; 1933:3, 7-8; 1934:1

**Julie** [1] - 1891:17
**July** [10] - 1728:19, 23-24; 1729:10; 1730:19; 1736:22; 1761:11; 1877:8; 1892:4; 1911:8
**jump** [1] - 1752:4
**jumping** [2] - 1760:24; 1763:22
**June** [13] - 1723:6; 1725:10; 1751:2; 1761:10; 1864:22; 1865:12; 1867:2; 1873:3, 8; 1874:3; 1876:13; 1922:14; 1931:4
**Juneau** [2] - 1919:14, 19
**Juror** [2] - 1720:5, 24
**jurors** [2] - 1720:4
**jury** [32] - 1718:13; 1720:16, 20, 23; 1733:6; 1742:1; 1754:10; 1772:17; 1773:11; 1775:17; 1781:4; 1782:3, 12-13; 1791:4; 1792:2; 1804:1; 1819:24; 1829:3; 1846:11; 1849:4, 9, 11, 16, 19; 1851:23; 1870:11; 1899:17; 1900:8; 1914:17; 1922:13; 1932:20
**justify** [1] - 1791:17

## K

**K-1's** [1] - 1812:15
**K-1s** [2] - 1927:18, 25
**K-49** [1] - 1891:1
**Kaiser** [4] - 1772:5; 1773:22; 1774:2, 6
**Kathleen** [1] - 1929:15
**keep** [8] - 1740:19; 1757:3; 1759:8; 1781:12; 1783:6; 1865:19; 1901:2
**keeping** [1] - 1768:12
**kELLY** [1] - 1718:15
**Ken** [17] - 1811:22; 1812:1, 10, 14; 1814:3, 15; 1815:21; 1835:5; 1839:19; 1842:22; 1843:5; 1868:4, 11, 25; 1874:9; 1875:4
**KENNER** [1] - 1718:6
**Kenner** [143] - 1718:6, 21; 1769:21, 23, 25;

1773:8, 13; 1776:9;
1789:10, 16; 1797:3;
1800:1, 8, 11, 18, 24;
1801:3; 1809:7, 19;
1810:2, 9, 21; 1811:11,
15; 1812:23; 1813:23;
1815:17; 1817:1;
1818:16, 18, 22;
1819:11, 17, 25;
1820:14, 19, 25;
1821:11; 1822:5;
1823:24; 1824:12, 23;
1825:24; 1826:5;
1827:4; 1828:3; 1829:9,
12, 15; 1830:19;
1831:13, 16, 24;
1832:24; 1834:10;
1835:3, 13, 19; 1836:9,
20, 24; 1837:3, 7, 16,
25; 1838:5, 9, 18, 22;
1840:14; 1842:14;
1847:1; 1850:4, 17, 21;
1851:6; 1853:9, 14;
1854:11, 20; 1855:4,
18; 1858:18, 22;
1861:6; 1874:4;
1881:19; 1882:6;
1888:23; 1889:4, 6, 18;
1890:5, 14, 24; 1893:2;
1895:21; 1897:8, 15,
25; 1898:11; 1903:14,
17, 25; 1904:13, 24;
1906:10; 1907:5, 22;
1908:6, 24; 1909:6, 10,
16; 1910:3, 14;
1911:11; 1912:14, 21;
1914:25; 1915:3, 7;
1916:21; 1917:4;
1918:1, 3; 1919:2;
1921:25; 1922:21, 24;
1923:5; 1924:10, 20;
1926:8; 1927:2, 6;
1928:2

**Kenner's** [8] - 1819:8;
1826:13; 1828:4, 9-10;
1848:1; 1896:24;
1897:10

**kept** [6] - 1726:20;
1787:21; 1796:9;
1797:20; 1830:9;
1879:14

**kind** [16] - 1779:11;
1780:8; 1810:25;
1825:22; 1832:13;
1839:2; 1857:5; 1861:8;
1884:15; 1902:9, 14;
1903:12; 1904:25;
1905:21; 1907:10;
1924:24

**kindly** [1] - 1854:19

**kinds** [1] - 1905:20
**Kinetic** [2] - 1917:18,
20
**Kingston** [1] - 1809:14
**Kipp** [1] - 1745:3
**knowing** [2] - 1791:9;
1905:8
**knowledge** [12] -
1744:6; 1745:5;
1800:22; 1801:1;
1805:10; 1846:23;
1847:4; 1859:9; 1868:9;
1893:1; 1897:12
**known** [3] - 1744:19;
1764:21; 1865:22
**Komatireddy** [3] -
1786:18; 1801:12;
1890:1
**KOMATIREDDY** [100] -
1718:18; 1720:11;
1721:9, 20; 1722:4, 14;
1730:24; 1732:25;
1736:15; 1739:14;
1741:19; 1743:13;
1744:13; 1746:2;
1747:4, 13; 1748:7, 13;
1766:17; 1771:7;
1774:14, 21; 1779:23;
1780:2, 19; 1782:8, 10,
17; 1783:9; 1785:20;
1786:21, 23; 1787:24;
1789:5, 23; 1790:4, 18;
1791:1, 18; 1793:20;
1796:12, 21; 1797:23;
1798:5; 1799:1, 19;
1805:23; 1806:2, 14,
21; 1807:11; 1819:19;
1826:15, 18; 1827:5;
1831:5; 1833:8;
1843:23; 1845:12;
1846:4, 17; 1852:12;
1865:6; 1866:15;
1868:6; 1870:3; 1876:6;
1886:5; 1888:2, 18;
1890:3; 1891:8; 1894:9;
1896:15; 1897:21;
1900:4, 6, 11; 1901:6;
1910:5, 8, 14, 21;
1914:11, 17; 1926:6,
12; 1928:21; 1930:16,
19, 24; 1932:9; 1933:7;
1935:10, 16, 24;
1936:3, 11, 19, 21
**Koral** [2] - 1730:25;
1731:2
**Kristen** [3] - 1897:6,
15, 17
**Ksenia** [1] - 1742:8

## L

**LA** [15] - 1802:18, 21;
1805:21; 1806:16;
1813:11; 1819:21;
1820:22; 1821:4, 18;
1827:7; 1828:2, 13;
1910:18; 1914:13;
1935:22
**ladies** [1] - 1754:10
**laid** [1] - 1775:16
**land** [20] - 1733:7;
1734:4, 22; 1735:18;
1753:25; 1754:20;
1755:3; 1756:8; 1757:3;
1759:9, 15; 1761:11;
1767:9, 23; 1773:13;
1781:6; 1814:12;
1856:23; 1908:9, 12
**language** [1] - 1867:12
**laptop** [6] - 1809:15,
17; 1838:15; 1852:24;
1853:1
**large** [7] - 1738:24;
1811:22; 1814:12, 21;
1816:3, 6; 1931:23
**laRUSSO** [1] - 1719:1
**LaRusso** [14] - 1719:3;
1739:7, 10; 1748:12,
21; 1778:25; 1796:14;
1855:23; 1856:5;
1890:2; 1893:10, 16,
19; 1898:16
**LARUSSO** [77] - 1720:10;
1721:22; 1733:1;
1736:18; 1739:9, 11;
1741:21; 1743:15;
1746:6; 1747:1, 19;
1748:3, 18; 1755:21;
1758:1; 1766:18, 21;
1769:5, 7, 11; 1777:20;
1779:2, 5, 21; 1780:22;
1781:2, 21; 1785:22;
1788:1; 1789:2, 15;
1790:13; 1791:8;
1792:4; 1793:2;
1796:15; 1797:25;
1855:24; 1856:2;
1858:11; 1862:1;
1865:4, 7, 11; 1866:9,
17, 21; 1869:11, 13;
1870:1, 7; 1872:15;
1876:8; 1880:9, 11;
1888:12, 14; 1889:23;
1896:16, 18; 1898:17,
20; 1899:11; 1928:23;
1929:1, 4; 1932:10, 12;
1933:3, 8; 1934:1, 12;
1935:4, 8, 12; 1936:9,

15
**Las** [1] - 1896:3
**Lassetter** [3] -
1745:3; 1764:18; 1768:5
**last** [20] - 1751:1;
1781:3; 1783:2;
1791:20; 1824:16;
1849:8, 23; 1857:12;
1874:2; 1878:21;
1887:25; 1890:22;
1893:5; 1902:3;
1911:25; 1913:5;
1924:22; 1929:10, 18
**lasted** [1] - 1902:14
**lastly** [1] - 1881:20
**late** [1] - 1811:13
**laugh** [1] - 1916:15
**law** [5] - 1732:1;
1768:17; 1801:6;
1854:7; 1922:19
**Law** [6] - 1728:14, 16;
1738:5, 14, 25; 1740:9
**lawsuit** [34] - 1820:21;
1835:5; 1836:9;
1864:10, 12; 1867:9,
25; 1878:3, 21;
1882:19; 1885:1, 19,
21; 1886:9; 1892:20,
22; 1893:2; 1894:13,
22; 1895:21; 1896:1,
24; 1897:7, 10, 14, 18;
1898:11; 1919:15;
1920:21, 25
**lawsuits** [8] - 1867:5,
11; 1894:16, 18;
1895:9; 1918:14, 17;
1922:5
**lawyer** [4] - 1820:17;
1838:5; 1882:17;
1895:25
**lawyers** [7] - 1821:2;
1896:3, 5; 1919:12;
1920:10, 16
**layman's** [2] - 1750:6;
1751:14
**layout** [1] - 1906:16
**layouts** [1] - 1811:24
**leading** [8] - 1789:11;
1816:8, 10, 22;
1820:23; 1822:23;
1889:24; 1923:16
**League** [2] - 1841:2, 4
**league** [2] - 1841:3, 5
**learn** [1] - 1899:1
**learned** [1] - 1811:18
**learning** [1] - 1921:2
**least** [13] - 1756:20;

17

**18**

1759:19; 1803:18; 1832:2; 1839:17, 20, 24; 1841:13; 1843:9; 1852:14; 1854:11; 1873:1

**leaves** [2] - 1775:17; 1846:15

**leaving** [1] - 1875:25

**leeway** [1] - 1848:11

**left** [8] - 1725:19, 21; 1764:9; 1798:13; 1808:3; 1832:17; 1913:6

**legal** [27] - 1737:1; 1770:16; 1772:7; 1820:12-14, 18, 20; 1824:17, 19; 1839:18, 21; 1864:15; 1865:1; 1869:19; 1874:12; 1878:18; 1879:2; 1885:9; 1895:4, 8, 12-13; 1896:8, 12; 1898:2, 12

**legally** [4] - 1778:15; 1814:3, 15, 21

**legit** [1] - 1838:16

**legitimate** [1] - 1791:3

**Lehman** [5] - 1776:25; 1909:17, 23; 1911:12, 16

**lending** [1] - 1758:21

**length** [4] - 1742:19; 1813:21; 1840:19; 1919:5

**less** [2] - 1764:6, 25

**letter** [4] - 1741:12; 1752:11; 1802:6; 1885:5

**letters** [1] - 1722:7

**liabilities** [1] - 1731:13

**liability** [3] - 1773:9; 1778:4, 16

**lien** [2] - 1732:15; 1752:14

**liens** [13] - 1726:21, 25; 1727:2, 5; 1728:8; 1729:20; 1731:11; 1749:11, 16; 1780:9; 1781:16, 18

**life** [1] - 1807:23

**light** [2] - 1831:2; 1906:24

**Lightening** [4] - 1743:3; 1744:2, 11

**limit** [1] - 1839:19

**limited** [4] - 1773:9, 18; 1778:4; 1829:7

**limiting** [1] - 1829:4

**line** [14] - 1724:25; 1727:19; 1742:3; 1751:1; 1764:10; 1794:12; 1819:8; 1820:8; 1833:13; 1911:25; 1920:6; 1929:14; 1930:4

**line-by-line** [1] - 1833:13

**lined** [1] - 1780:8

**lines** [2] - 1723:9, 17

**link** [2] - 1876:15; 1927:6

**liquidate** [3] - 1750:9; 1756:14; 1765:16

**liquidating** [1] - 1767:13

**listed** [1] - 1749:17

**listen** [1] - 1932:16

**listened** [1] - 1902:25

**listening** [1] - 1770:5

**lists** [1] - 1874:4

**live** [3] - 1767:9; 1807:12; 1901:9

**lived** [1] - 1808:19

**living** [1] - 1916:5

**LLC** [22] - 1727:21; 1729:17; 1743:3, 6-7; 1745:1; 1773:5; 1774:7, 12, 19-20; 1777:3; 1778:3, 5, 10, 17; 1821:24; 1930:4

**LLCs** [2] - 1774:9; 1778:8

**LLP** [2] - 1718:21; 1719:1

**loan** [24] - 1727:14; 1735:2, 15, 20; 1737:15; 1740:15; 1741:7; 1749:9, 11, 19; 1758:10, 13-14, 21, 25; 1776:5, 12, 14; 1777:9; 1881:2; 1883:7

**loaning** [2] - 1752:17; 1758:22

**loans** [4] - 1741:4; 1776:9, 13; 1777:13

**loans/personal** [1] - 1878:23

**locally** [1] - 1903:2

**locate** [1] - 1741:1

**located** [1] - 1726:3

**location** [3] - 1724:18; 1856:18; 1857:8

**log** [3] - 1797:9, 11; 1798:6

**logged** [1] - 1798:7

**logo** [4] - 1783:22; 1784:1; 1786:14; 1805:7

**long-standing** [1] - 1775:18

**look** [23] - 1723:21; 1756:8; 1760:8; 1773:19; 1785:23; 1793:5; 1809:22; 1826:22; 1831:14; 1842:20; 1854:19, 21; 1867:13; 1869:16; 1884:2, 4; 1886:23; 1890:21; 1903:20; 1915:23; 1925:13; 1931:10

**looked** [6] - 1740:11; 1742:20; 1777:20; 1808:22; 1903:15; 1931:11

**looking** [35] - 1723:22; 1724:3, 9; 1725:3, 13; 1726:2; 1732:5; 1733:7; 1735:1, 11; 1738:4, 12, 18; 1739:18; 1743:20; 1770:8, 11; 1784:12; 1785:6; 1793:25; 1794:11; 1796:22; 1798:6; 1804:7; 1818:11, 15; 1819:24; 1862:21; 1909:3; 1911:8; 1914:18; 1917:3; 1926:7

**looks** [2] - 1725:6; 1934:3

**lose** [2] - 1765:11; 1767:3

**loss** [2] - 1776:22; 1836:10

**losses** [3] - 1812:6; 1817:4; 1878:19

**lost** [3] - 1752:1; 1814:6, 9

**Lou** [1] - 1803:21

**Louis** [5] - 1816:16; 1902:19; 1903:1; 1905:2

**low** [1] - 1918:15

**lower** [1] - 1859:20

**loyal** [1] - 1925:15

**luck** [1] - 1855:20

**lunch** [5] - 1846:6, 14; 1848:16

---

**M**

---

**M-C-D-O-N-A-L-D** [1] -

1783:4

**M-C-K-E-E** [1] - 1807:7

**magazine** [1] - 1795:10

**Magazine** [4] - 1784:20, 22; 1785:8; 1795:8

**magic** [1] - 1858:11

**mail** [118] - 1722:4; 1723:1; 1724:23; 1725:10; 1727:10, 19; 1729:9; 1730:18; 1731:19; 1732:6; 1741:13, 16; 1742:2; 1745:24; 1747:4; 1818:22; 1819:4, 7-8, 10, 13, 16, 25; 1822:11; 1823:20; 1826:6; 1833:14, 18, 22; 1834:16, 19, 22; 1835:2, 4, 15, 18; 1837:4; 1839:4, 7, 11-12; 1840:12; 1850:2; 1851:11, 14-15, 18, 20, 24; 1852:1, 3-4, 22-23; 1853:1, 6, 8-9, 11; 1860:1, 8; 1862:10, 23; 1863:2, 4, 7-8, 15; 1864:21, 25; 1865:13; 1866:7, 23-24; 1867:8; 1868:15; 1869:7, 9, 17-18, 23; 1870:9, 14; 1871:5; 1872:6, 18; 1873:9, 18; 1874:6, 17, 19; 1876:10, 15, 17; 1877:10, 23; 1879:19; 1880:13; 1881:10, 23-24; 1891:24; 1892:1, 3, 12; 1893:4, 25; 1894:10, 13; 1895:3, 6

**mails** [14] - 1720:13; 1722:7, 16; 1818:24; 1851:15; 1866:23; 1867:24; 1870:23; 1872:5, 24; 1880:20; 1893:22; 1894:4

**main** [1] - 1729:23

**maintained** [1] - 1785:17

**majority** [1] - 1905:15

**man** [2] - 1803:21; 1930:15

**manage** [1] - 1889:9

**managed** [2] - 1808:25; 1809:4

**Management** [15] - 1784:15, 19; 1789:3, 21; 1790:8, 14; 1791:13, 17, 19; 1797:2; 1846:25;

**management** [1] - 1925:1

**manager** [2] - 1727:22; 1930:4

**managing** [1] - 1810:8

**Mansion** [2] - 1797:9; 1798:12

**mansion** [3] - 1799:10, 15; 1805:20

**Mar** [7] - 1811:20; 1842:25; 1856:8; 1857:14; 1880:2; 1889:12

**March** [2] - 1745:25; 1854:5

**Maricopa** [1] - 1736:12

**Mark** [1] - 1932:24

**marked** [22] - 1720:14; 1732:8; 1736:1; 1741:8; 1745:21; 1757:7; 1760:6; 1784:3; 1787:6; 1795:15; 1797:4; 1818:25; 1826:21; 1854:19; 1862:18; 1864:19; 1869:14; 1884:21; 1886:20; 1890:14; 1910:4; 1928:11

**market** [9] - 1759:20; 1761:24; 1763:23; 1776:18, 24; 1777:6; 1778:19; 1903:10, 12

**markets** [1] - 1758:20

**MARY** [1] - 1719:7

**match** [2] - 1791:14; 1917:7

**materiality** [2] - 1747:15; 1848:6

**materials** [1] - 1756:7

**matt** [1] - 1891:17

**matter** [2] - 1772:21; 1889:21

**matters** [5] - 1765:21; 1777:1; 1835:4; 1854:1; 1864:15

**Mazda** [1] - 1805:15

**McDonald** [11] - 1782:8, 18-19; 1783:4, 10; 1793:22; 1798:6; 1799:25; 1806:3, 19

**MCDONALD** [2] - 1782:22; 1935:14

**McKee** [37] - 1806:22; 1807:1, 7, 12; 1829:14; 1831:11, 14; 1836:2;

1844:21; 1845:15; 1846:9, 13, 18; 1847:10, 17; 1849:11, 20; 1850:1; 1855:20; 1856:3; 1858:13; 1865:12; 1866:22; 1867:19; 1871:25; 1876:9; 1877:17; 1878:11; 1879:17; 1880:14; 1885:11; 1888:19; 1890:24; 1896:22; 1899:13; 1936:1

**McKee's** [1] - 1847:3

**McRae** [3] - 1903:2; 1905:2

**mean** [6] - 1755:2; 1821:13; 1824:11; 1839:8; 1897:20; 1906:20

**meaning** [3] - 1840:9; 1862:12; 1870:15

**means** [6] - 1780:6; 1786:10; 1803:23; 1816:16; 1842:2

**meant** [2] - 1862:12; 1916:23

**media** [1] - 1874:12

**Meeks** [1] - 1897:20

**meet** [9] - 1809:8; 1812:23; 1851:2; 1857:16; 1858:2; 1863:14; 1871:16; 1915:21; 1916:3

**meeting** [21] - 1799:6; 1812:25; 1813:14, 19; 1821:11; 1834:2; 1840:13, 15, 22; 1851:14; 1858:3, 5, 8; 1886:12, 16; 1887:2, 4, 8, 12, 22; 1890:19

**meetings** [1] - 1851:1

**meets** [1] - 1747:17

**member** [1] - 1801:10

**members** [8] - 1720:23; 1727:23; 1778:17; 1829:3; 1849:18; 1873:5; 1885:14; 1911:22

**membership** [2] - 1821:23; 1822:12

**memorandum** [3] - 1859:6; 1880:23; 1881:21

**Memorial** [1] - 1718:22

**memorialized** [1] - 1837:17

**memory** [1] - 1855:17

**mention** [5] - 1741:3; 1822:6, 9; 1826:7; 1907:5

**mentioned** [12] - 1741:5; 1749:2, 15; 1752:4; 1753:16, 21; 1760:3; 1814:19; 1824:9; 1829:5; 1918:16; 1920:4

**mentioning** [1] - 1824:2

**message** [2] - 1872:14; 1917:11

**met** [26] - 1768:9; 1769:25; 1800:8; 1803:1; 1809:11; 1811:22; 1812:4, 7, 9; 1813:1, 6; 1838:14; 1840:17; 1842:22; 1857:20, 23, 25; 1858:22; 1882:8, 25; 1883:1; 1903:16; 1915:19; 1916:4, 10

**Mexico** [11] - 1811:20; 1814:2, 12; 1815:21; 1838:23, 25; 1856:8; 1908:18, 20, 24; 1919:5

**Michael** [7] - 1882:13, 21, 23-24; 1897:20; 1930:15

**mid** [2] - 1816:14

**might** [13] - 1741:4; 1752:4, 6; 1764:1; 1772:24; 1773:17; 1810:17; 1844:22; 1848:3; 1853:25; 1887:18; 1921:4, 12

**mike** [3] - 1722:20; 1783:6; 1901:2

**million** [38] - 1728:8; 1730:9; 1733:15, 17; 1749:22; 1750:12; 1751:15, 17; 1753:12; 1754:19; 1757:11, 13; 1758:4, 12, 17; 1759:11; 1760:5, 17, 21; 1761:19, 21, 25; 1762:11, 18; 1763:14, 17; 1764:9; 1767:5; 1808:10; 1814:24; 1816:21; 1817:11; 1841:11; 1881:4; 1911:21; 1920:8

**mine** [8] - 1762:5; 1814:1; 1884:24; 1903:13; 1904:5; 1929:10, 14

**Mineola** [1] - 1719:2

**minimal** [1] - 1910:1

**minor** [1] - 1841:3

**minus** [1] - 1912:7

**minute** [1] - 1784:4

**minutes** [4] - 1782:11; 1802:10; 1809:13; 1829:25

**miscellaneous** [2] - 1794:21

**MISKIEWICZ** [2] - 1718:17; 1932:23

**Miskiewicz** [1] - 1932:22

**mismanagement** [1] - 1878:17

**misspoke** [1] - 1852:18

**misstates** [1] - 1843:23

**Moen** [1] - 1803:21

**mogul** [1] - 1907:3

**moment** [9] - 1769:5, 7; 1780:22; 1793:5; 1831:15; 1842:7; 1851:7; 1888:12; 1933:8

**moments** [1] - 1882:1

**money** [166] - 1727:6, 8; 1733:18, 20; 1734:21; 1752:17, 21; 1753:5, 8, 18; 1754:5, 20-21; 1755:6-10; 1756:24; 1757:1; 1758:2, 13, 22; 1759:2; 1764:12, 16; 1765:3; 1766:15; 1767:14, 18; 1776:5, 9, 12-13; 1777:9; 1780:12, 15-16; 1781:6, 12; 1789:24; 1790:2, 4, 8, 20, 24; 1791:3, 5, 14; 1805:4; 1808:12, 16, 20, 23-24; 1809:4; 1810:8; 1812:6; 1814:7, 9, 16, 21, 23, 25; 1815:1, 6, 9, 13, 16, 18-19, 22; 1816:4, 7, 11, 25; 1817:2, 9, 15; 1818:7, 21; 1820:15; 1821:1, 14; 1822:6, 13, 16, 20; 1823:5, 8, 12, 16; 1824:17, 22; 1825:17; 1826:7; 1827:1; 1829:17, 23; 1830:23; 1834:13; 1835:21; 1859:16, 18; 1861:5, 7; 1862:11; 1868:24; 1881:15; 1889:22; 1890:7; 1892:5, 8, 10, 24; 1894:1; 1895:15, 17, 24; 1896:11, 13, 23; 1899:4, 8; 1902:9,

**19**

13, 17, 24; 1905:1; 1906:14; 1908:5, 7, 11, 13, 16, 18, 20; 1909:13; 1911:13, 22; 1912:4, 8; 1913:4, 7, 14, 18, 20; 1915:6, 11; 1916:12, 21; 1917:16, 20; 1919:10; 1920:12; 1921:3, 9; 1922:6; 1924:12

**monies** [14] - 1730:11; 1751:19; 1754:24; 1756:18; 1789:2, 20; 1791:13, 16; 1792:1; 1832:2; 1847:25; 1880:5; 1898:1, 21

**monitors** [1] - 1750:23

**month** [10] - 1735:13; 1738:4, 13, 24; 1740:5, 8; 1783:17; 1800:4; 1801:15; 1867:2

**monthly** [5] - 1779:9; 1872:9; 1907:14; 1916:25

**months** [18] - 1729:3, 13; 1734:3; 1753:24; 1754:22; 1755:4, 17, 23; 1756:2, 9, 11, 20; 1779:18; 1781:7; 1816:2, 5; 1877:8; 1892:5

**Moore** [1] - 1891:17

**Moreau** [4] - 1824:4; 1919:15, 19; 1920:20

**morning** [14] - 1720:22, 25; 1748:19; 1769:18; 1782:1; 1783:10; 1799:25; 1800:2; 1802:22; 1934:6

**mortgage** [3] - 1848:1; 1850:11; 1852:5

**most** [11] - 1764:8; 1779:19; 1809:2; 1839:10; 1842:5; 1850:8, 24; 1851:1; 1882:7

**mostly** [2] - 1812:22; 1845:24

**motion** [3] - 1871:9, 12, 14

**motions** [1] - 1871:20

**move** [4] - 1739:5; 1772:24; 1916:8; 1926:13

**moved** [2] - 1770:8; 1928:9

**moves** [10] - 1741:19; 1743:13; 1746:2;

1785:20; 1787:24; 1796:12; 1797:23; 1819:19; 1827:5; 1914:11

**MR** [184] - 1720:9; 1721:22; 1722:20; 1733:1; 1736:17; 1739:9, 11-12; 1741:21; 1743:15; 1746:4, 6; 1747:1, 14, 19; 1748:2, 11, 18; 1755:21; 1758:1; 1766:18, 21; 1769:5, 7, 11, 14, 17; 1771:9, 12; 1772:2, 4, 24; 1773:1; 1774:11; 1775:2, 7; 1777:19; 1778:2, 24; 1779:2, 5, 21; 1780:21; 1781:2, 21; 1785:22, 25; 1786:2, 5, 16; 1788:1; 1789:2, 15; 1790:13; 1791:8; 1792:4; 1793:2, 5, 10, 14; 1796:15, 17; 1797:25; 1798:2; 1799:21, 24; 1802:15, 18, 21; 1805:21; 1806:16; 1809:25; 1813:11; 1816:8, 22; 1819:20; 1820:22; 1821:4, 18; 1822:23; 1823:3; 1826:17; 1827:7; 1828:2, 12-13; 1831:7, 10; 1836:7; 1847:22; 1848:13; 1849:7, 22-23; 1852:18; 1855:20, 24; 1856:2; 1858:11; 1862:1; 1865:4, 7-8, 11; 1866:9, 12, 17, 21; 1869:11, 13; 1870:1, 4, 7; 1872:15; 1876:8; 1880:9-11; 1888:12, 14; 1889:23; 1891:6; 1894:6; 1896:16-18, 21; 1897:22; 1898:6, 9, 14, 17, 20; 1899:11; 1900:21; 1903:23; 1910:10, 15, 18; 1914:13; 1915:14, 25; 1923:15; 1925:20; 1926:2; 1928:23; 1929:1, 4; 1932:10, 12-13, 23; 1933:3, 8; 1934:1, 12; 1935:4, 6, 8, 12, 18, 20, 22; 1936:5, 7, 9, 13, 15

**MS** [99] - 1720:11; 1721:9, 20; 1722:4, 14; 1730:24; 1732:25; 1736:15; 1739:14;

1741:19; 1743:13; 1744:13; 1746:2; 1747:4, 13; 1748:7, 13; 1766:17; 1771:7; 1774:14, 21; 1779:23; 1780:2, 19; 1782:8, 10, 17; 1783:9; 1785:20; 1786:21, 23; 1787:24; 1789:5, 23; 1790:4, 18; 1791:1, 18; 1793:20; 1796:12, 21; 1797:23; 1798:5; 1799:1, 19; 1805:23; 1806:2, 14, 21; 1807:11; 1819:19; 1826:15, 18; 1827:5; 1831:5; 1833:8; 1843:23; 1845:12; 1846:4, 17; 1852:12; 1865:6; 1866:15; 1868:6; 1870:3; 1876:6; 1886:5; 1888:2, 18; 1890:3; 1891:8; 1894:9; 1896:15; 1897:21; 1900:4, 6, 11; 1901:6; 1910:5, 8, 14, 21; 1914:11, 17; 1926:6, 12; 1928:21; 1930:16, 19, 24; 1932:9; 1933:7; 1935:10, 16, 24; 1936:3, 11, 19, 21

**multiply** [1] - 1756:9

**mutual** [1] - 1789:13

**Myrick** [5] - 1897:6, 15, 17; 1898:3, 11

**Myron** [1] - 1920:23

**N**

**N-A-S-H** [1] - 1900:25

**Na'Alehu** [1] - 1911:22

**name** [34] - 1727:21; 1728:14; 1730:7, 15; 1735:21; 1738:19; 1744:4; 1748:21; 1749:3; 1752:24; 1769:20; 1783:2; 1784:4; 1799:25; 1807:6; 1831:13; 1856:5; 1867:19; 1874:5; 1882:13; 1883:20; 1884:5, 10; 1887:15, 18, 20; 1897:20; 1900:24; 1903:2, 13; 1922:18; 1930:15

**named** [2] - 1785:7; 1803:21

**names** [1] - 1883:20

**naming** [1] - 1734:10

**NASCAR** [1] - 1805:14

**Nash** [20] - 1900:6, 12-13, 25; 1901:1, 7; 1907:19; 1910:24; 1914:25; 1917:4, 10; 1922:21; 1923:5; 1927:1; 1929:5, 14-16; 1932:19, 23

**NASH** [2] - 1900:17; 1936:17

**National** [1] - 1841:3

**nature** [18] - 1726:13; 1727:3; 1765:14; 1772:13; 1810:15; 1816:9, 23; 1820:23; 1822:24; 1839:9; 1845:21; 1850:12; 1851:12; 1852:6; 1875:6; 1904:19; 1923:16

**near** [5] - 1760:25; 1785:11; 1787:15; 1796:3; 1797:14

**necessarily** [2] - 1808:16; 1854:17

**necessary** [1] - 1774:23

**need** [13] - 1730:12; 1747:9; 1751:11; 1756:6; 1776:13; 1790:11; 1793:5; 1870:25; 1874:13; 1888:4; 1920:10, 24; 1924:25

**needed** [12] - 1733:21; 1734:5, 23; 1765:16; 1913:4, 7; 1915:12; 1919:10, 16; 1920:17, 20

**needs** [3] - 1762:9; 1777:5

**negotiate** [1] - 1803:3

**negotiated** [2] - 1752:17; 1803:22

**negotiating** [4] - 1750:17; 1752:9, 20; 1758:24

**Nehgen** [1] - 1732:1

**nervous** [1] - 1907:9

**never** [17] - 1764:16; 1768:9; 1825:18; 1826:3; 1830:24; 1838:12, 18; 1842:17; 1863:22; 1867:21; 1875:23; 1883:1; 1889:3; 1895:19; 1908:8; 1920:15

**NEW** [1] - 1718:1

**20**

new [1] - 1821:24

New [10] - 1718:5, 17, 23; 1719:2, 5, 9; 1807:13; 1854:7; 1876:15; 1882:17

next [24] - 1733:23; 1742:17; 1771:13; 1777:24; 1782:7, 15; 1783:17; 1788:3; 1792:5; 1798:14; 1799:11; 1800:4; 1806:20; 1827:10; 1828:14; 1858:4; 1860:18; 1899:19; 1900:3, 10; 1902:14; 1925:23; 1926:15; 1927:1

NHL [13] - 1807:17, 19, 24-25; 1808:1, 8; 1809:3; 1810:11; 1841:5; 1876:16; 1902:7, 21; 1924:22

Niagara [2] - 1807:25; 1809:11

nice [1] - 1721:1

nicja74@aol.com [1] - 1850:4

Nicjay74 [1] - 1866:25

NICJAY74 [1] - 1819:12

NICJAY74@aol.com [1] - 1819:6

Nick [1] - 1887:20

Nicole [2] - 1819:12, 14

night [4] - 1932:18; 1933:5; 1934:3

nights [1] - 1801:16

nine [1] - 1779:18

nobody [1] - 1890:20

Nolan [3] - 1919:14, 19; 1932:25

none [1] - 1853:7

nonleading [2] - 1823:1

normally [2] - 1758:13; 1840:23

northern [2] - 1814:2; 1815:21

note [3] - 1734:2, 4; 1799:5

noted [1] - 1720:3

notes [7] - 1802:6, 8; 1840:22-24; 1890:13; 1898:11

nothing [8] - 1766:5; 1768:5; 1777:12, 14; 1817:10; 1832:17;

1921:10; 1924:5

November [2] - 1880:12; 1881:8

number [15] - 1722:4; 1724:5; 1736:8; 1739:13; 1748:23; 1775:20; 1813:25; 1814:19; 1829:17; 1863:18; 1866:16; 1871:6; 1873:17; 1931:5

numbers [1] - 1800:20

numerous [4] - 1765:17; 1912:23; 1918:16; 1924:3

nuts [1] - 1906:17

## O

o'clock [2] - 1846:8; 1848:18

oath [4] - 1721:6; 1782:21; 1851:23; 1900:15

object [20] - 1789:4; 1816:8, 22; 1820:22; 1821:4; 1822:23; 1845:12; 1846:17; 1847:16; 1888:2; 1889:23-25; 1891:6; 1894:6; 1915:14, 16; 1923:15; 1925:20; 1926:3

objected [1] - 1846:18

objection [56] - 1721:21; 1733:1; 1736:17; 1739:7, 10; 1741:21; 1743:15; 1748:2; 1766:17; 1771:7; 1774:14; 1785:22; 1786:16; 1791:15, 23; 1793:2, 13; 1796:14, 16-17; 1797:25; 1798:2; 1819:20; 1828:2, 12; 1833:8; 1846:4, 16; 1847:18; 1852:12; 1865:6, 8; 1866:12, 14; 1868:6; 1870:3; 1875:11; 1876:6; 1886:5; 1897:21; 1910:9, 16, 18; 1914:13; 1930:16; 1932:11

objective [1] - 1855:12

obligated [1] - 1756:21

obligation [4] - 1740:14; 1752:22;

1753:6; 1759:23

obligations [1] - 1767:9

obstacle [3] - 1838:9, 13; 1853:4

obtain [1] - 1842:15

obtaining [1] - 1776:10

obvious [2] - 1848:7; 1866:22

obviously [9] - 1751:15; 1817:9; 1847:9; 1851:4; 1860:3; 1904:3; 1909:25; 1920:5; 1931:14

occasion [2] - 1882:25; 1884:13

occasions [5] - 1770:7; 1853:9; 1856:21; 1931:3, 5

occur [1] - 1801:14

occurred [4] - 1785:12; 1828:1; 1829:1; 1926:1

occurring [1] - 1749:6

Oceanside [1] - 1719:5

October [5] - 1738:18, 22; 1740:12; 1869:18; 1870:9

OF [2] - 1718:1, 3

offer [10] - 1766:14; 1772:2, 18; 1776:2; 1784:20; 1791:11; 1845:8; 1847:24; 1848:2; 1887:23

offered [2] - 1772:5; 1777:5

offering [5] - 1720:24; 1764:16; 1775:23; 1913:3

offers [1] - 1928:21

office [7] - 1726:2, 4, 8; 1763:7; 1891:14; 1931:2, 5

Office [1] - 1854:6

Offices [6] - 1728:14, 16; 1738:5, 14, 25; 1740:9

offices [6] - 1725:6; 1726:7; 1732:1; 1799:16; 1916:11; 1922:19

official [2] - 1867:11; 1869:3

often [1] - 1776:13

OHL [3] - 1808:2, 5; 1841:1

okayed [1] - 1915:5

Old [1] - 1719:1

old [4] - 1807:20; 1808:2, 4; 1901:18

OLIVERAS [1] - 1719:4

once [15] - 1768:21; 1780:7; 1782:20; 1806:24; 1811:22; 1812:10, 14-15; 1850:1; 1856:22; 1900:14; 1901:24; 1903:1; 1905:5, 10

One [2] - 1718:21; 1805:14

one [79] - 1720:4; 1723:25; 1724:2, 7; 1741:5; 1750:25; 1756:6; 1760:3, 15-17; 1761:4, 8, 14; 1762:2; 1763:6, 13-14; 1765:22; 1768:11; 1769:5; 1773:8; 1776:18; 1777:13; 1780:7, 22; 1794:8; 1799:5; 1801:19, 22; 1803:9; 1804:4; 1805:15; 1811:19; 1818:12; 1824:10; 1826:19; 1829:7; 1839:23; 1844:24; 1847:14; 1858:7; 1867:8; 1870:22; 1872:14; 1873:1, 3, 16; 1874:2; 1877:6, 19; 1878:25; 1879:25; 1882:25; 1884:13, 23; 1888:12; 1891:18, 22; 1892:13; 1894:7; 1897:4; 1904:5; 1905:23; 1906:5, 14; 1911:3; 1919:6, 22; 1925:14; 1931:6; 1932:6

ones [1] - 1909:2

ongoing [5] - 1749:7; 1918:14; 1919:4, 15

Ontario [2] - 1809:14; 1841:2

open [7] - 1725:22; 1778:1; 1793:1; 1829:1; 1851:15; 1876:25; 1926:15

Open [1] - 1748:1

opened [3] - 1824:10; 1860:17; 1861:2

operating [2] - 1821:25; 1879:6

operation [1] - 1726:9

opinion [2] - 1773:2; 1777:2

**opportunities** [3] - 1762:20; 1770:9, 11

**opportunity** [8] - 1767:12; 1793:11; 1833:22; 1835:25; 1842:20; 1913:16; 1916:16; 1921:11

**option** [2] - 1836:19; 1837:1

**options** [4] - 1740:24; 1742:20; 1836:18

**order** [3] - 1752:12; 1754:3; 1845:8

**ordered** [1] - 1871:16

**ordinary** [9] - 1785:14, 17; 1787:18, 21; 1796:6, 9; 1797:13, 17, 20

**organizational** [1] - 1778:5

**original** [8] - 1728:7; 1754:11, 13; 1834:2; 1837:16; 1841:10, 14; 1878:17

**originally** [3] - 1754:8; 1759:4; 1878:15

**Otters** [2] - 1807:15; 1841:6

**ou** [1] - 1806:24

**outgunned** [1] - 1751:4

**outside** [2] - 1724:16; 1809:14

**outstanding** [1] - 1911:23

**overall** [2] - 1875:21; 1876:2

**overlaid** [1] - 1879:1

**overruled** [5] - 1766:20; 1848:8; 1868:7; 1876:7; 1886:6

**overruling** [2] - 1791:22; 1890:1

**overview** [1] - 1735:3

**owe** [1] - 1785:2

**owed** [5] - 1735:12; 1749:23; 1750:10; 1751:19; 1767:5

**OWEN** [1] - 1719:7

**Owen** [2] - 1919:14; 1932:24

**own** [10] - 1742:20; 1745:9; 1759:17; 1765:21; 1816:14; 1838:6; 1842:1; 1897:12; 1918:17; 1924:2

**owned** [4] - 1921:19,

21; 1923:10; 1927:8

**ownership** [8] - 1725:5; 1759:24; 1821:25; 1844:15, 24; 1878:15; 1879:5, 12

**owns** [2] - 1737:6; 1747:5

---

## P

**p.m** [4] - 1798:13; 1848:18; 1852:19

**pace** [1] - 1816:11

**package** [1] - 1784:23

**packages** [1] - 1784:21

**page** [54] - 1728:13; 1732:17; 1733:23; 1734:16; 1735:1; 1739:6; 1740:4; 1771:13; 1777:24; 1785:8; 1788:3; 1792:5; 1795:8; 1799:14; 1803:19, 22; 1804:3-6, 10, 19, 22; 1817:24; 1827:10; 1828:14; 1854:22; 1871:8; 1878:8; 1885:5, 12; 1886:24; 1887:25; 1892:12; 1899:19; 1907:12, 25; 1911:18; 1917:3; 1925:23; 1926:15; 1929:8, 10-11, 18, 21; 1930:1, 3

**pages** [14] - 1784:20, 22-23, 25; 1785:4; 1795:10, 22; 1803:16, 19; 1805:2; 1885:3; 1886:22; 1929:7

**paid** [28] - 1729:6; 1749:12; 1753:8; 1762:6; 1780:8; 1781:10; 1789:3, 11, 21; 1790:6; 1805:1, 10; 1808:6; 1820:15, 20; 1846:3; 1850:11; 1875:20, 23; 1895:12, 14; 1904:22; 1920:12, 17-18; 1922:4; 1925:18

**Palms** [13] - 1747:5; 1822:2, 5; 1823:13, 18; 1824:3; 1921:24; 1922:2; 1923:7, 24; 1924:2, 8

**paper** [2] - 1806:10; 1874:23

**papers** [2] - 1777:21; 1837:22

**paperwork** [2] - 1928:15, 19

**paragraph** [12] - 1733:7; 1751:1; 1755:15; 1781:7; 1854:22, 24; 1874:10; 1878:10; 1880:22; 1890:21, 23; 1892:13

**parcel** [1] - 1834:1

**parcels** [1] - 1736:8

**pardon** [1] - 1912:16

**parents** [3] - 1808:18

**Park** [2] - 1822:4; 1824:24

**parking** [1] - 1909:21

**part** [43] - 1726:4; 1743:24; 1752:16; 1754:8, 11, 13; 1760:19; 1761:14; 1773:12; 1776:20; 1779:19; 1784:20, 22, 24; 1791:8; 1803:18; 1808:5; 1820:15; 1824:4; 1834:1; 1842:6; 1873:1; 1875:21; 1877:20; 1878:1; 1879:2; 1880:13; 1881:16; 1886:1, 8; 1892:14; 1902:21; 1906:18, 25; 1911:3; 1912:25; 1913:2, 16-17; 1916:17, 19; 1922:1

**participate** [1] - 1817:5

**participating** [2] - 1873:4; 1887:2

**participation** [1] - 1872:22

**particular** [19] - 1741:3; 1752:13; 1766:22; 1768:13; 1772:6; 1773:14, 16; 1775:13; 1778:6; 1834:16; 1835:15; 1848:5; 1851:18; 1852:3; 1853:16; 1857:8; 1859:9; 1902:10; 1906:5

**particularly** [3] - 1773:4; 1848:5; 1872:8

**parties** [1] - 1721:11

**Partners** [5] - 1733:11; 1737:22; 1742:7; 1882:11; 1885:15

**parts** [1] - 1881:10

**party** [2] - 1885:24; 1886:1

**past** [1] - 1932:15

**patent** [4] - 1845:20;

1913:14; 1920:4

**patented** [1] - 1845:7

**Pause** [14] - 1739:8; 1760:11; 1769:6, 10; 1780:24; 1786:1; 1862:24; 1866:11; 1869:12, 21; 1885:8; 1887:1; 1888:6, 13

**pause** [1] - 1820:13

**pay** [32] - 1735:15; 1756:20; 1759:10, 23; 1767:20; 1790:3, 25; 1791:4, 6; 1795:1, 11-12; 1810:13; 1821:2; 1823:18; 1848:1; 1868:24; 1875:24; 1880:5; 1889:6; 1899:8; 1904:16; 1911:22; 1918:3; 1919:11; 1920:10; 1922:2, 7; 1924:13, 15, 25

**paying** [9] - 1779:9; 1789:19; 1790:22; 1804:17; 1820:12; 1852:5; 1888:9; 1895:4

**payment** [19] - 1729:1; 1730:2, 6; 1735:10; 1737:16; 1738:9; 1739:20, 23; 1740:4; 1779:12; 1791:15; 1800:17; 1806:7; 1844:14; 1845:3; 1850:11; 1875:25

**payments** [30] - 1728:6; 1729:3; 1737:18; 1740:11, 13, 16; 1753:24; 1754:6, 22; 1755:4-6; 1756:11, 20; 1757:1; 1761:9; 1765:20; 1779:9-11, 16, 19; 1780:14; 1781:8, 11-12; 1790:14; 1796:24; 1805:11; 1848:2

**payoff** [1] - 1789:6

**payout** [1] - 1911:20

**Peca** [1] - 1774:8

**PEII** [1] - 1783:18

**pending** [1] - 1871:20

**penthouse** [1] - 1747:5

**people** [18] - 1754:16; 1764:8, 17, 21; 1765:20; 1766:16; 1768:11; 1772:19; 1776:13; 1780:5; 1797:10; 1803:9; 1806:12; 1872:21; 1886:17; 1899:4; 1907:5; 1919:18

**22**

**per** [2] - 1794:14; 1820:8

**percent** [10] - 1758:14, 21, 25; 1810:17; 1837:13, 15; 1844:24; 1912:2, 12

**percentage** [10] - 1810:16; 1841:15; 1844:15; 1904:22; 1906:23; 1919:22; 1921:12, 15

**percentages** [1] - 1921:19

**perfect** [1] - 1870:12

**period** [5] - 1735:9; 1762:12; 1779:17; 1789:14; 1846:21

**PERRY** [1] - 1719:8

**person** [18] - 1741:5; 1744:3; 1745:2; 1750:6; 1764:10; 1765:5; 1780:8; 1801:6, 22; 1813:6; 1821:10; 1871:17; 1882:13; 1884:5; 1886:18; 1887:15; 1915:21

**personal** [11] - 1790:12; 1800:22; 1801:1; 1820:21; 1847:4; 1868:8; 1897:12; 1920:21; 1924:13

**personally** [1] - 1923:21

**persons** [1] - 1845:9

**pertains** [1] - 1721:12

**Phil** [127] - 1773:8, 12; 1776:9; 1800:1, 8, 11, 24; 1801:2; 1809:7, 9; 1810:5; 1811:23; 1812:1, 4, 22; 1813:3; 1814:20; 1818:15; 1819:14; 1827:4; 1831:1, 13, 16, 20, 24; 1832:10, 18, 24; 1833:2, 6; 1834:2, 10; 1835:3, 8, 13-14, 18; 1836:9, 13, 20, 24; 1837:3, 5, 7, 16, 20, 25; 1838:4, 8, 11, 14, 18, 22, 24; 1840:13; 1841:14, 19, 21; 1842:10, 14, 23; 1843:3, 11; 1847:1; 1850:4, 17, 20-21, 25; 1851:3, 6-7; 1853:9, 14-15, 19, 22; 1854:2; 1855:3, 7, 17; 1860:2; 1878:3; 1882:9;

1883:22; 1889:4, 6, 18; 1892:21; 1893:2; 1895:21; 1897:5, 8, 10, 15, 25; 1903:14; 1904:7, 23; 1905:6; 1906:10; 1907:1; 1911:7; 1912:24; 1914:25; 1918:13; 1919:15; 1920:13, 16, 20-21; 1922:21; 1924:23; 1925:1, 13, 16; 1927:6

**Philip** [1] - 1718:6

**PHILLIP** [1] - 1718:6

**Phillip** [6] - 1718:21; 1769:21, 23, 25; 1797:3; 1918:1

**Phoenix** [2] - 1916:5, 8

**phone** [17] - 1829:25; 1830:5; 1850:24; 1851:7; 1852:24; 1853:2; 1862:6; 1872:5; 1876:24; 1879:19; 1883:2; 1891:3, 12, 19, 21; 1893:25

**photo** [1] - 1725:24

**photograph** [1] - 1763:11

**photographs** [2] - 1763:5; 1794:24

**photos** [1] - 1879:16

**phrase** [5] - 1758:9; 1824:21; 1839:23; 1895:8

**physically** [1] - 1891:13

**picks** [1] - 1911:25

**pictures** [1] - 1737:2

**piece** [9] - 1761:23; 1769:2; 1906:12; 1909:25; 1913:5; 1915:10; 1919:18; 1921:6; 1924:2

**pieces** [2] - 1829:6, 8

**pin** [1] - 1863:4

**pioneered** [1] - 1805:17

**pitch** [1] - 1907:7

**pitched** [1] - 1854:12

**pizzas** [1] - 1902:5

**Place** [3] - 1822:2; 1823:13, 18

**place** [14] - 1740:20; 1746:9; 1749:8; 1757:3; 1763:1; 1772:1; 1778:1; 1789:1; 1793:1; 1801:25; 1813:14; 1858:25; 1933:12

**placed** [2] - 1754:7, 25

**placement** [4] - 1845:25; 1846:23; 1847:6, 18

**plan** [6] - 1814:10; 1879:3; 1902:10; 1905:6; 1906:19

**plane** [8] - 1879:14, 16; 1921:22; 1922:2; 1923:7, 11, 13; 1924:6

**plans** [2] - 1811:24; 1906:16

**Playboy** [42] - 1783:13, 16, 21-22; 1784:1, 7, 20, 22-23; 1785:2, 8-9; 1786:8, 25; 1787:4, 13; 1789:7, 25; 1791:21; 1794:23; 1795:8, 11-12; 1797:9, 11; 1798:12; 1799:17; 1800:3, 5; 1803:4, 12, 15; 1804:10, 25; 1805:2, 10, 18, 20; 1806:5; 1895:18; 1899:8

**Playboy's** [9] - 1785:14, 18; 1787:18, 21; 1796:6, 9; 1797:17, 20; 1806:8

**played** [8] - 1807:17, 20, 23; 1809:12; 1814:19; 1816:16; 1904:2; 1924:22

**player** [9] - 1744:5; 1745:4; 1847:14; 1901:14, 16; 1902:4, 12; 1906:25

**players** [16] - 1728:2; 1737:10; 1744:10; 1766:22; 1814:19; 1847:13; 1872:9; 1873:5; 1880:6; 1883:21; 1902:25; 1903:11; 1904:6; 1907:10; 1925:15

**playing** [4] - 1807:22; 1808:5; 1901:25; 1903:1

**Playmate** [3] - 1794:13, 15; 1795:22

**Playmates** [8] - 1794:2, 14, 16, 18, 20, 24; 1803:13, 16

**Plaza** [1] - 1718:16; 1719:8

**pleased** [1] - 1762:8

**plus** [5] - 1729:14; 1755:23; 1837:21; 1917:4

**po** [1] - 1756:5

**po-ta-to** [1] - 1756:5

**pocket** [2] - 1753:10; 1918:17

**point** [52] - 1721:4; 1750:11; 1752:10; 1756:4; 1759:7; 1764:4, 24; 1765:8; 1774:7; 1775:9; 1791:11; 1812:12; 1816:18, 20; 1828:7; 1831:20, 23; 1832:13; 1833:21; 1835:12, 17; 1837:2; 1838:8, 21; 1841:18; 1842:14; 1843:3, 16; 1850:6; 1851:23; 1854:10; 1858:21; 1859:10; 1866:1, 5; 1869:15; 1870:2; 1876:20, 22; 1887:22; 1902:1, 19, 22; 1906:14; 1910:2; 1913:6; 1914:5; 1924:21, 24; 1926:8

**pointing** [3] - 1768:24; 1872:18; 1873:9

**points** [2] - 1775:3; 1871:15

**poorly** [1] - 1886:15

**portfolio** [15] - 1810:16, 18, 23; 1811:4; 1841:16; 1850:15; 1854:1, 3; 1903:13; 1905:4, 12-13, 19

**portion** [5] - 1822:17; 1823:17; 1859:20; 1880:16; 1930:3

**portions** [2] - 1877:13; 1886:21

**position** [5] - 1767:6; 1775:9; 1791:10; 1800:5; 1848:15

**positive** [1] - 1919:10

**possibility** [2] - 1765:9; 1766:25

**possible** [7] - 1834:21; 1851:21; 1855:13; 1862:4, 17; 1871:1

**Post** [1] - 1876:15

**pot** [1] - 1814:21

**potato** [1] - 1756:5

**potentially** [2] - 1814:6; 1881:14

**power** [4] - 1818:18; 1843:12; 1858:19; 1915:3

23

**powered** [2] - 1814:4; 1820:17

**PR** [1] - 1821:8

**practice** [6] - 1770:16; 1772:12, 14-15; 1773:14; 1775:2

**pre** [1] - 1911:24

**pre-development** [1] - 1911:24

**precluded** [2] - 1835:13; 1853:5

**predict** [1] - 1778:22

**predicted** [1] - 1776:19

**prefer** [1] - 1767:12

**prepared** [1] - 1869:3

**preparing** [2] - 1730:3; 1780:3

**present** [6] - 1782:13; 1849:9; 1850:25; 1853:5; 1854:11; 1855:12

**presentation** [2] - 1809:15

**presented** [2] - 1773:23; 1879:2

**president** [1] - 1799:17

**pressure** [1] - 1768:14

**presumably** [1] - 1805:6

**pretty** [6] - 1810:23; 1811:3; 1841:25; 1842:1; 1876:25; 1931:24

**preview** [1] - 1748:11

**previous** [4] - 1739:23; 1825:12; 1867:8, 10

**previously** [6] - 1720:18; 1786:17; 1793:3, 15; 1807:17; 1849:14

**price** [5] - 1733:14; 1762:5, 13, 19; 1784:25

**primarily** [2] - 1811:20; 1850:17

**principal** [7] - 1734:3; 1735:10; 1740:14; 1779:13; 1781:11; 1868:4, 11

**principally** [1] - 1875:7

**print** [1] - 1806:5

**printed** [1] - 1925:17

**printing** [1] - 1806:10

**private** [5] - 1789:19;

1845:25; 1846:23; 1847:6, 18

**Privitello** [1] - 1887:20

**privy** [1] - 1920:15

**problem** [5] - 1791:8; 1877:3-5; 1923:17

**procedure** [1] - 1837:20

**proceed** [1] - 1721:2

**proceeding** [1] - 1739:8

**proceedings** [14] - 1760:11; 1769:6, 10; 1780:24; 1786:1; 1862:24; 1866:11; 1869:12, 21; 1885:8; 1887:1; 1888:6, 13; 1934:17

**proceeds** [2] - 1747:7; 1789:6

**process** [1] - 1845:8

**produced** [2] - 1786:12; 1804:3

**production** [1] - 1916:14

**profession** [3] - 1745:6; 1770:2, 5

**professional** [9] - 1728:2; 1737:10; 1744:5, 9; 1745:4; 1901:14, 16; 1902:3, 11

**professionally** [1] - 1901:25

**proffer** [1] - 1791:24

**profit** [1] - 1766:4

**profitable** [3] - 1825:25; 1843:22; 1844:6

**program** [1] - 1805:11

**progress** [1] - 1872:3

**progressed** [1] - 1728:5

**project** [19] - 1729:24; 1749:12; 1776:11, 21; 1822:1; 1881:3; 1906:6, 8-9, 22; 1907:4; 1908:3, 6; 1909:7, 11; 1912:3; 1919:5

**projected** [3] - 1779:12

**projects** [1] - 1906:3

**promise** [1] - 1826:20

**proof** [4] - 1772:2; 1776:2; 1847:24; 1848:3

**properties** [4] - 1745:8; 1759:20;

1760:20; 1824:14

**property** [50] - 1723:19; 1726:15, 25; 1727:2; 1729:21; 1731:12; 1733:14, 16-17; 1736:6; 1737:2; 1740:21, 23; 1743:7, 23; 1744:22; 1749:11, 16; 1750:9, 15; 1751:12; 1752:15, 18, 21; 1754:1, 21; 1759:24; 1761:24; 1764:1, 25; 1765:6, 11; 1766:14; 1768:2, 15, 18; 1769:3; 1780:10; 1781:9, 11, 17, 19; 1814:2, 11, 15-16; 1815:21; 1817:10; 1906:12, 16

**Property** [1] - 1731:22

**proportionate** [1] - 1820:11

**proposal** [1] - 1841:18

**propose** [2] - 1745:19; 1904:25

**proposed** [1] - 1867:24

**proposing** [1] - 1814:10

**proposition** [1] - 1855:16

**prospects** [1] - 1845:19

**protect** [1] - 1751:11

**protected** [1] - 1839:22

**protection** [4] - 1756:19; 1759:16; 1774:10, 20

**protections** [1] - 1778:16

**protective** [4] - 1821:9; 1840:2, 4

**protocol** [2] - 1851:10, 13

**proud** [1] - 1920:5

**provide** [7] - 1774:10; 1859:24; 1871:18; 1881:4; 1893:6; 1911:20; 1932:3

**provided** [3] - 1774:22; 1829:10; 1831:16

**provides** [1] - 1774:19

**providing** [2] - 1824:19; 1874:7

**provision** [1] - 1733:23

**publicity** [7] -

1874:22; 1875:3, 12, 16, 20, 23; 1876:1

**publisher** [1] - 1803:20

**publishing** [4] - 1733:6; 1742:1; 1819:24; 1914:17

**purchase** [16] - 1726:24; 1730:5; 1733:14; 1741:12; 1752:21; 1753:23; 1754:21; 1761:12; 1763:23; 1764:15; 1778:8, 11; 1787:3; 1881:2

**purchased** [5] - 1733:16; 1758:12, 17; 1781:18

**purchasing** [4] - 1752:12; 1754:14; 1760:20; 1778:6

**purported** [1] - 1747:6

**purpose** [5] - 1731:9; 1776:10; 1829:7; 1883:3, 14

**purposes** [2] - 1847:23; 1881:17

**pursue** [1] - 1878:18

**put** [18] - 1729:3; 1747:8; 1753:18; 1784:5; 1791:5; 1814:21, 23; 1816:3; 1874:23, 25; 1875:17; 1904:12; 1905:7; 1907:10; 1919:11; 1921:11; 1931:20

**putting** [4] - 1754:2, 4; 1780:9; 1826:7

## Q

**qualified** [1] - 1774:15

**qualify** [1] - 1775:12

**quarter** [2] - 1814:24; 1816:20

**quarterly** [3] - 1810:20; 1841:16; 1904:23

**questioning** [2] - 1773:17; 1831:19

**questions** [42] - 1748:7, 12, 23; 1756:6; 1769:11; 1773:5; 1777:21; 1779:1, 21; 1780:19; 1799:19; 1802:2, 4, 6, 15; 1805:21; 1806:14;

1822:25; 1826:15, 19;
1829:15; 1831:5;
1833:12; 1843:19;
1844:4; 1845:4;
1847:19; 1848:4;
1855:13; 1859:8;
1863:23; 1864:1;
1871:19; 1879:10;
1888:14; 1898:14;
1899:11; 1913:1;
1928:23; 1932:10

**quick** [3] - 1767:13;
1785:23; 1872:12
**quickly** [3] - 1774:25;
1872:11; 1873:7
**quite** [5] - 1749:7;
1851:21; 1884:11;
1920:13
**quote/unquote** [1] -
1777:10

---

**R**

---

**rabbit** [1] - 1784:2
**race** [7] - 1794:9;
1805:16; 1813:4;
1820:21; 1826:8;
1896:1; 1924:17
**races** [3] - 1794:6;
1803:13, 17
**racing** [8] - 1784:18;
1794:3, 6; 1805:5, 11,
13, 18
**Racing** [1] - 1787:12
**raised** [1] - 1805:4
**raising** [1] - 1847:2
**rapport** [1] - 1904:3
**rate** [10] - 1803:19,
22-24; 1804:2, 5-6, 10;
1806:3
**RATE** [1] - 1803:23
**rather** [7] - 1752:12;
1764:20; 1765:11;
1767:3; 1772:9;
1824:17; 1851:11
**ratio** [2] - 1758:14;
1759:2
**reaching** [1] - 1863:20
**read** [24] - 1720:12,
14; 1721:10; 1723:9;
1729:12; 1751:1;
1770:16; 1772:7, 18;
1833:22; 1835:4;
1854:22, 24; 1859:20;
1865:20; 1877:14;
1878:10; 1879:7;
1880:16; 1881:7;
1886:21; 1893:10;

1932:16

**readily** [1] - 1773:20
**reading** [4] - 1864:24;
1870:19; 1878:6;
1911:19
**reads** [1] - 1770:19
**ready** [4] - 1720:8;
1721:2; 1723:16; 1900:2
**reaffirm** [1] - 1776:17
**Real** [1] - 1731:22
**real** [30] - 1756:16;
1758:23; 1759:20;
1762:8; 1763:23;
1764:15; 1770:6, 8, 11;
1772:12, 19; 1773:4, 6,
15; 1775:19, 21;
1776:18, 24; 1778:7, 9,
11, 19; 1808:12;
1811:9; 1822:1; 1906:3;
1907:2
**realize** [4] - 1765:10;
1766:4, 15; 1767:2
**really** [15] - 1723:11;
1774:23; 1804:8;
1851:13; 1871:2;
1902:11; 1903:15;
1905:6; 1906:13;
1908:8; 1915:8;
1916:23; 1927:7;
1930:14
**realtor** [1] - 1764:16
**reason** [10] - 1776:7;
1778:10, 13; 1815:24;
1830:1; 1833:5;
1845:16; 1852:9;
1886:1, 8
**reasonable** [1] -
1841:19
**recalling** [1] -
1772:22
**receipt** [2] - 1835:2,
17
**receipts** [1] - 1795:20
**receive** [12] - 1728:23;
1736:9-11; 1737:18, 25;
1738:9; 1818:22;
1835:14; 1869:5;
1893:13; 1911:6
**received** [37] -
1722:3, 12; 1732:3;
1733:4; 1734:21, 24;
1736:13, 20; 1739:16;
1741:24; 1743:19;
1748:5; 1755:11;
1795:20; 1829:14;
1831:24; 1832:6, 18,
24; 1833:17, 20;
1842:11, 18; 1844:19;

1851:18; 1859:12;
1860:7; 1865:5; 1870:1;
1873:23; 1874:2;
1876:1; 1877:6; 1880:8;
1931:18; 1937:20;
1938:3
**receiving** [21] -
1728:20; 1821:22;
1853:1; 1860:22;
1869:3; 1870:23;
1871:24; 1872:1, 3, 6,
24; 1873:12, 20;
1874:6, 17; 1875:9;
1876:14; 1879:11;
1881:8; 1893:16, 19
**recently** [2] -
1877:20; 1892:14
**recess** [4] - 1782:4;
1899:18; 1900:1
**recessed** [1] - 1848:17
**recipients** [3] -
1869:8; 1874:4; 1880:13
**recitation** [1] -
1828:5
**recognize** [32] -
1732:9; 1736:2; 1741:9;
1742:24; 1744:15;
1745:22; 1773:20;
1774:2; 1787:9;
1795:17; 1797:6;
1800:10; 1809:19, 23;
1813:8; 1817:19;
1819:2; 1826:23;
1864:21, 24-25;
1869:17, 23; 1884:22;
1903:18; 1907:14;
1910:24; 1911:1;
1913:24; 1922:10;
1928:12; 1929:8
**recollect** [2] -
1860:16; 1862:4
**recollection** [33] -
1760:9; 1837:11;
1855:2; 1860:4, 10, 22;
1861:1, 4, 8; 1862:22,
25; 1863:6, 9; 1866:4;
1867:25; 1869:2, 7;
1871:24; 1873:4, 12;
1875:7; 1877:22;
1878:5; 1879:17;
1881:8; 1883:6; 1887:7;
1888:1, 5, 8; 1890:22;
1931:16
**recommend** [2] -
1841:22, 24
**recommendation** [1] -
1836:21
**reconvene** [1] - 1846:7
**record** [27] - 1720:14;

1721:10; 1722:6;
1723:9; 1724:13;
1729:12; 1730:22, 25;
1731:19; 1738:12;
1739:6; 1748:15;
1775:4; 1783:3; 1807:6;
1810:2; 1843:23;
1847:23; 1849:8;
1885:11; 1900:24;
1910:5; 1911:20;
1926:13; 1933:9
**recorded** [1] - 1802:13
**recorder** [1] - 1736:12
**records** [2] - 1791:20
**recoup** [6] - 1759:19;
1812:5; 1814:6, 9;
1817:3, 15
**recover** [4] - 1830:25;
1867:14; 1878:19;
1880:1
**RECROSS** [6] - 1781:1;
1896:20; 1898:19;
1935:11; 1936:12, 14
**RECROSS-EXAMINATION**
[6] - 1781:1; 1896:20;
1898:19; 1935:11;
1936:12, 14
**red** [3] - 1726:4;
1934:5, 12
**red-eye** [2] - 1934:5,
12
**redirect** [4] -
1779:22; 1805:23;
1836:1; 1888:15
**REDIRECT** [6] - 1780:1;
1806:1; 1888:17;
1935:9, 23; 1936:10
**reductions** [1] -
1779:13
**reestablish** [1] -
1845:9
**refer** [2] - 1722:8, 18
**reference** [11] -
1752:8, 11; 1756:14;
1770:25; 1794:5;
1833:11, 13; 1834:18;
1837:24; 1869:19;
1930:23
**referenced** [2] -
1868:15; 1897:7
**referencing** [2] -
1872:25; 1877:23
**referred** [4] -
1721:18, 25; 1734:19;
1839:4
**referring** [7] -
1722:23; 1756:3, 5;
1804:9; 1887:5; 1898:5;

1924:6

**refers** [2] - 1737:1; 1794:12

**reflect** [2] - 1908:2; 1923:2

**reflected** [2] - 1842:12; 1844:25

**reflecting** [1] - 1821:25

**reflection** [1] - 1914:19

**reflects** [2] - 1800:17; 1844:15

**refresh** [8] - 1855:2; 1862:22, 25; 1863:6; 1869:7; 1879:17; 1887:7; 1888:8

**refreshes** [4] - 1760:9; 1888:1, 5; 1890:22

**refused** [1] - 1871:18

**regard** [3] - 1781:3; 1841:18; 1848:13

**regarding** [13] - 1754:11; 1840:11; 1842:8; 1859:8; 1863:16; 1865:1; 1873:24; 1874:18; 1876:1, 3; 1881:17; 1932:16; 1933:2

**regards** [6] - 1753:2; 1760:9; 1779:16; 1854:13; 1875:21; 1930:11

**regroup** [2] - 1765:16, 23

**regular** [2] - 1810:13; 1904:16

**regularly** [2] - 1918:13; 1920:13

**reimbursement** [1] - 1749:14

**relate** [1] - 1832:25

**related** [5] - 1795:21; 1808:25; 1847:3, 25; 1875:13

**relates** [20] - 1770:5; 1773:6, 13, 15; 1789:15, 17; 1800:13, 16; 1832:2; 1834:6, 15; 1840:8; 1841:13; 1844:14, 19; 1845:19; 1850:1; 1852:3; 1854:1; 1897:8

**relationship** [11] - 1753:20; 1789:10, 16; 1800:24; 1801:2; 1837:24; 1838:4;

1853:14; 1888:23; 1924:20; 1926:8

**relative** [1] - 1853:10

**relatively** [2] - 1773:18; 1859:2

**relevance** [10] - 1747:3, 14, 17; 1771:7; 1772:15, 23; 1846:18; 1848:5, 8; 1897:21

**relevancy** [5] - 1747:1; 1789:4; 1791:23; 1792:2

**relevant** [7] - 1773:7; 1776:7; 1789:18; 1791:24; 1847:24; 1848:10

**reluctant** [1] - 1926:2

**rely** [1] - 1772:20

**remain** [3] - 1732:20; 1806:24; 1900:14

**remainder** [1] - 1753:8

**remedy** [2] - 1824:19; 1878:19

**remember** [73] - 1722:16; 1753:17; 1757:8; 1761:18; 1763:13, 15; 1765:8; 1766:2, 6, 19, 22; 1768:22; 1815:24; 1829:20, 22, 24; 1830:1; 1843:22, 25; 1844:3, 7; 1845:7; 1856:13; 1857:17; 1860:4; 1862:5, 8, 13-14; 1864:9, 11; 1868:14; 1872:2, 6; 1873:4; 1874:6; 1876:14, 17-18, 21; 1877:14; 1878:6; 1879:20; 1880:4; 1881:10, 12-13, 20; 1883:16, 18; 1884:11, 19; 1885:4; 1887:11, 13-14, 22; 1888:25; 1889:13; 1890:17; 1891:9; 1892:1; 1895:5-7; 1906:13; 1909:21; 1925:16; 1930:11

**remembered** [1] - 1875:16

**remind** [1] - 1721:5

**remit** [1] - 1786:7

**removed** [2] - 1925:4

**rendering** [3] - 1723:19; 1724:12, 16

**rent** [3] - 1779:13; 1826:11; 1924:15

**repeat** [2] - 1800:25; 1801:7

**repetition** [1] - 1915:15

**rephrase** [2] - 1748:25; 1819:15

**reply** [1] - 1820:3

**report** [1] - 1880:23

**Reporter(s** [1] - 1719:7

**repossessed** [1] - 1923:14

**represent** [7] - 1748:21; 1769:20; 1800:1; 1831:13; 1856:5; 1885:18; 1929:5

**representation** [1] - 1865:1

**represented** [6] - 1832:3; 1890:19; 1891:3, 10; 1897:17; 1904:5

**reprinted** [1] - 1786:12

**request** [2] - 1835:18; 1861:6

**requested** [4] - 1759:15; 1835:21; 1859:23; 1893:6

**require** [1] - 1729:5

**required** [5] - 1729:3, 6; 1752:13; 1757:4; 1803:12

**requirement** [1] - 1803:14

**research** [1] - 1845:18

**reservations** [1] - 1934:2

**reserve** [13] - 1729:14; 1754:25; 1755:1-3, 23; 1756:3, 10-11, 13, 16, 25; 1781:8

**reserves** [1] - 1781:4

**resolve** [1] - 1871:17

**resolved** [4] - 1877:20; 1892:14; 1919:16; 1921:5

**resort** [2] - 1811:22; 1876:16

**respect** [13] - 1735:23; 1737:18; 1775:7; 1780:11; 1808:23; 1830:14; 1837:4, 8; 1840:13; 1842:16, 24; 1846:19; 1890:5

**respected** [1] - 1904:7

**respective** [1] -

1879:5

**respond** [1] - 1859:25

**responded** [2] - 1834:23, 25; 1853:10

**26**

**responding** [1] - 1864:6

**response** [3] - 1821:6; 1832:16; 1875:3

**responsibility** [1] - 1878:17

**rest** [3] - 1759:24; 1821:22; 1885:13

**restaurant** [6] - 1813:15; 1822:8; 1824:13; 1826:6; 1834:2; 1857:20

**result** [3] - 1836:10, 15; 1865:16

**results** [1] - 1735:3

**resumed** [2] - 1720:18; 1849:14

**retained** [2] - 1864:15; 1883:14

**retaining** [1] - 1885:17

**retire** [2] - 1901:20, 22

**retired** [3] - 1846:11; 1924:21; 1928:9

**return** [5] - 1785:2; 1835:19; 1836:14, 23; 1912:1

**review** [1] - 1732:11

**reviewed** [2] - 1832:7, 9

**reviews** [1] - 1926:8

**Revokable** [1] - 1742:10

**RICHARD** [1] - 1718:23

**Richard** [1] - 1799:16

**Richards** [34] - 1728:15, 17; 1738:5, 15; 1739:1; 1740:9; 1814:5; 1815:1, 12, 20; 1816:4; 1820:16; 1821:2, 16-17; 1830:11, 13-14; 1832:16; 1836:16, 21, 25; 1843:8; 1864:14; 1865:23; 1868:24; 1869:4; 1871:6, 23; 1891:5; 1894:21; 1895:16; 1898:24; 1922:19

**Richards'** [3] - 1820:10; 1898:22; 1899:3

**Rick** [3] - 1769:20; 1799:25; 1831:13

**rid** [4] - 1769:2; 1871:21; 1919:12; 1920:20

**right-hand** [1] - 1800:17

**rightmost** [1] - 1724:6

**rise** [1] - 1900:7

**risk** [5] - 1853:20; 1855:7, 9; 1905:22; 1910:1

**risks** [3] - 1853:17; 1854:12; 1855:4

**risky** [2] - 1811:3; 1841:23

**Rizzi** [2] - 1887:15

**road** [1] - 1851:3

**Road** [1] - 1719:1

**Robert** [2] - 1748:21; 1856:5

**ROBERT** [1] - 1719:3

**Roger** [2] - 1744:4, 11

**Ron** [22] - 1728:16; 1815:1; 1816:4; 1820:10; 1821:2, 16-17; 1836:21; 1843:8; 1865:18, 23; 1868:24; 1869:4; 1871:5, 23; 1891:5; 1894:21; 1895:16; 1898:22, 24; 1899:3

**Ronald** [13] - 1728:15; 1738:5, 14, 25; 1740:9; 1814:5; 1815:20; 1820:16; 1830:11; 1832:16; 1836:16, 25; 1922:19

**room** [1] - 1913:7

**rope** [1] - 1918:19

**Rosario** [1] - 1881:13

**Rosenzweig** [1] - 1799:16

**rounds** [1] - 1847:1

**RRA** [2] - 1894:14

**RSR** [2] - 1799:14, 16

**ruled** [1] - 1871:11

**ruling** [1] - 1798:1

**running** [6] - 1726:8; 1766:10; 1789:7; 1915:10; 1918:15; 1919:6

**runway** [1] - 1857:2

**Russo** [3] - 1802:17; 1848:9; 1910:17

**RUSSO** [15] - 1802:18, 21; 1805:21; 1806:16;

1813:11; 1819:21; 1820:22; 1821:4, 18; 1827:7; 1828:2, 13; 1910:18; 1914:13; 1935:22

**RVC** [2] - 1809:4

---

**S**

---

**Sabres** [1] - 1809:12

**safe** [3] - 1842:1, 5; 1932:17

**sake** [1] - 1877:16

**Sale** [2] - 1731:23; 1749:18

**sale** [4] - 1744:17; 1753:13; 1768:18; 1778:7

**sales** [1] - 1907:7

**SARITHA** [1] - 1718:18

**sat** [2] - 1851:14; 1916:13

**satisfied** [1] - 1781:18

**satisfies** [1] - 1759:23

**satisfy** [2] - 1752:21; 1753:5

**satisfying** [1] - 1750:1

**Saturday** [3] - 1871:3; 1934:4, 13

**save** [2] - 1877:16; 1905:9

**saving** [1] - 1808:23

**saw** [12] - 1737:2; 1809:19; 1813:8; 1818:13; 1858:4, 6; 1860:18, 23, 25; 1897:5; 1903:18

**scary** [1] - 1925:8

**scene** [1] - 1754:17

**schedule** [5] - 1737:17, 19; 1795:20, 23; 1796:22

**scheduled** [2] - 1872:20; 1873:11

**schematic** [2] - 1724:7, 25

**school** [1] - 1902:1

**Schwab** [10] - 1817:22; 1842:9, 11, 16; 1843:11; 1853:24; 1854:3; 1858:16; 1904:22; 1907:18

**scope** [5] - 1845:12; 1847:16; 1876:2;

1879:19; 1889:23

**scored** [1] - 1871:15

**Scott** [4] - 1729:16, 19; 1730:10; 1755:25

**Scottsdale** [6] - 1723:4; 1745:10; 1896:5; 1901:10; 1916:4; 1923:20

**screen** [2] - 1722:24; 1793:25

**search** [2] - 1727:4; 1817:2

**season** [9] - 1807:21; 1816:17; 1841:7; 1857:18; 1902:13, 20, 22

**seat** [1] - 1849:11

**seated** [10] - 1720:22; 1782:6, 14; 1783:1; 1807:5; 1846:13; 1849:3, 18; 1900:2, 9

**second** [19] - 1725:4; 1739:6; 1740:4; 1762:24; 1766:25; 1779:8; 1780:11; 1801:22, 25; 1812:9; 1854:22; 1858:8; 1871:8; 1877:23; 1878:8; 1892:12; 1911:18; 1930:1

**secretary** [5] - 1895:22; 1896:24; 1897:9, 11; 1920:22

**secure** [3] - 1759:24; 1857:7; 1880:5

**secured** [1] - 1751:17

**security** [8] - 1729:7; 1733:24; 1754:18; 1756:25; 1794:17; 1797:9

**see** [42] - 1725:20; 1730:19; 1734:8; 1746:4; 1750:9, 21, 24; 1755:13; 1760:8; 1789:3; 1791:16; 1817:25; 1820:1; 1858:9; 1859:13, 21; 1860:14; 1862:23; 1866:24; 1870:16, 20; 1871:6; 1872:18; 1874:10, 15; 1877:23; 1880:24; 1888:1; 1890:21; 1898:4; 1903:20; 1914:23; 1915:24; 1916:25; 1917:4, 11, 18, 25; 1921:8; 1930:6; 1933:8

**seeing** [13] - 1832:15; 1853:5; 1861:1;

1862:10; 1866:7; 1867:18; 1868:14; 1869:10; 1876:18; 1881:20; 1885:4; 1892:2; 1895:6

**seeking** [1] - 1886:9

**sell** [15] - 1742:21; 1744:9, 25; 1753:25; 1762:7, 18, 21; 1766:3, 14; 1767:21; 1768:14; 1784:25; 1795:10; 1804:22; 1814:16

**seller** [1] - 1734:11

**selling** [6] - 1742:20; 1761:1; 1765:10, 22; 1766:25; 1767:1

**send** [5] - 1815:9; 1816:20; 1879:7; 1913:18, 20

**senior** [1] - 1727:14

**sense** [1] - 1775:25

**sent** [20] - 1755:8; 1818:7; 1829:23; 1833:19; 1836:21; 1837:5; 1840:9; 1843:8; 1850:4; 1851:12; 1853:9; 1859:16, 18; 1861:5; 1865:18; 1871:19; 1872:5; 1897:5; 1909:13

**sentence** [7] - 1824:6, 16; 1890:22, 24; 1893:5; 1895:3; 1911:24

**separate** [6] - 1778:14; 1909:1, 4; 1918:6

**separately** [2] - 1722:7; 1795:1

**September** [5] - 1738:9; 1740:12; 1777:1; 1798:9, 12

**Sergei** [3] - 1741:5; 1742:8

**series** [3] - 1794:6; 1826:19; 1833:12

**services** [2] - 1749:13; 1787:3

**serving** [1] - 1904:24

**Set** [1] - 1768:10

**set** [7] - 1722:16; 1755:5; 1756:16; 1905:1, 5, 10

**setting** [1] - 1905:10

**settled** [2] - 1824:4; 1921:6

**settlement** [10] - 1734:7, 13; 1744:17; 1820:15; 1821:9;

**28**

1839:23; 1877:21;
1879:3; 1881:5; 1892:15

**Settlement** [71] -
1811:16, 25; 1812:3;
1815:4; 1818:8, 23;
1820:12, 20; 1821:1;
1822:14, 17, 21;
1823:5, 8, 13, 17;
1824:5, 23; 1826:8;
1827:2; 1828:5;
1829:16; 1832:4, 18;
1833:1; 1834:6;
1846:19; 1856:16;
1857:6, 24; 1858:5;
1859:6; 1861:8;
1863:13, 16; 1864:8;
1866:2; 1868:1;
1873:25; 1874:18, 21;
1875:6, 22; 1877:25;
1879:20; 1881:18;
1889:16, 19; 1890:6,
10; 1892:6; 1893:5, 17,
20; 1895:13; 1896:12;
1898:1, 22, 25; 1899:5;
1918:7, 10; 1919:17,
21; 1920:12; 1921:3,
18, 20; 1923:3;
1924:11; 1927:21

**settling** [1] - 1922:5

**seven** [6] - 1758:13;
1761:19; 1817:24;
1859:15; 1911:21;
1934:6

**several** [9] - 1722:16;
1731:16; 1790:18;
1878:2; 1892:15, 17,
24; 1893:22; 1898:10

**shape** [1] - 1934:9

**share** [3] - 1790:22;
1879:5; 1923:6

**shared** [2] - 1819:13;
1851:13

**shareholders** [4] -
1886:12, 16; 1887:2, 4

**shares** [2] - 1879:13;
1919:20

**sheet** [3] - 1742:3, 6

**Sheriff's** [1] -
1749:17

**shirt** [1] - 1809:24

**shirts** [1] - 1794:23

**shoot** [1] - 1915:10

**Shop** [2] - 1917:18, 21

**short** [1] - 1826:19

**shortfall** [1] - 1729:2

**shortly** [2] - 1905:11;
1925:5

**shots** [2] - 1794:23

**show** [27] - 1730:12;
1747:11; 1750:19;
1755:11; 1757:7;
1760:6; 1783:24;
1789:9, 12, 18;
1790:11; 1817:16;
1818:10; 1844:17;
1848:9; 1862:18;
1864:19; 1869:14;
1872:11; 1877:6;
1884:20; 1886:20;
1890:25; 1910:3;
1916:13, 24; 1917:10

**showed** [6] - 1811:1;
1838:14; 1887:25;
1893:22; 1894:4, 11

**showing** [3] - 1728:19;
1742:23; 1928:11

**shown** [9] - 1750:25;
1763:5; 1811:24;
1843:11; 1852:23;
1859:4; 1890:13;
1891:24; 1893:4

**sic** [1] - 1755:17

**side** [5] - 1725:14, 16,
19, 21; 1884:23

**sidebar** [14] - 1746:7,
9; 1747:20; 1772:1;
1776:3; 1788:1; 1789:1;
1828:1; 1846:5; 1888:3;
1926:1; 1933:12;
1934:15

**sidebars** [1] - 1926:3

**sign** [17] - 1770:17,
24; 1771:2; 1772:6;
1797:10; 1879:5, 7;
1883:25; 1884:2;
1885:1; 1886:8;
1907:22; 1915:3;
1922:25; 1925:2, 8;
1931:15

**sign-in** [1] - 1797:10

**signature** [12] -
1731:6; 1732:16, 19;
1743:8; 1773:20;
1774:2; 1885:5, 12;
1929:16; 1930:5

**signatures** [1] -
1932:2

**signed** [22] - 1743:11;
1818:15; 1838:10;
1862:10, 23; 1863:2, 7;
1880:20; 1881:21;
1883:11, 23; 1884:1,
25; 1885:6, 13;
1902:18; 1914:25;
1922:21; 1930:9;
1931:9, 11, 14

**significant** [3] -

1751:12; 1824:18, 21

**signing** [5] - 1837:22;
1863:8; 1883:3; 1884:9;
1925:10

**similar** [4] - 1836:15;
1847:12; 1869:16;
1879:11

**simply** [6] - 1833:1;
1834:15; 1836:13;
1853:13; 1854:22;
1878:22

**sit** [9] - 1800:22;
1801:1; 1844:9, 13;
1845:19; 1916:16;
1918:20, 25; 1924:1

**site** [1] - 1827:7

**sitting** [3] - 1906:13;
1908:23; 1909:21

**situation** [5] -
1723:12, 14; 1726:23;
1774:5; 1865:19

**six** [18] - 1729:3, 13;
1734:3; 1753:24;
1754:22; 1755:4, 17,
23; 1756:2, 9, 11, 20;
1760:5; 1781:7; 1804:5;
1816:1, 5

**sketch** [1] - 1723:21

**skipping** [1] - 1723:17

**small** [11] - 1794:22;
1810:16; 1811:7;
1841:15; 1905:25;
1906:2, 24; 1913:6;
1919:22; 1931:24

**smart** [1] - 1913:13

**so-called** [1] - 1923:8

**so..** [1] - 1808:21

**sold** [24] - 1744:11;
1761:4, 8, 14-15, 18,
23, 25; 1762:2, 10, 13,
25; 1763:13, 19;
1764:5, 25; 1766:2;
1767:4; 1768:2; 1779:6,
8; 1806:11

**sole** [1] - 1727:22

**solution** [3] -
1824:20; 1878:15, 22

**solutions** [1] - 1879:1

**someone** [11] - 1730:23;
1740:22; 1751:8;
1762:17; 1766:12;
1774:8; 1775:24;
1777:9; 1790:21;
1834:23; 1883:16

**sometime** [2] - 1887:3;
1913:1

**somewhat** [1] - 1869:16

**somewhere** [5] -

1750:13; 1753:3;
1811:13; 1858:11

**sonenglick** [1] -
1881:22

**soon** [2] - 1859:2;
1870:25

**sorry** [34] - 1724:3;
1725:15; 1727:7;
1730:24; 1739:9;
1757:12; 1790:13;
1793:4; 1794:4;
1796:15; 1801:9;
1814:8; 1815:25;
1818:24; 1821:21;
1825:22; 1835:11;
1844:8; 1860:19;
1862:15; 1863:5;
1864:13; 1868:22;
1872:15; 1875:15;
1886:7, 19; 1892:13;
1893:18; 1910:10, 19;
1911:5, 19

**sorted** [1] - 1878:24

**sought** [1] - 1776:9

**sound** [2] - 1906:6;
1921:4

**sounds** [1] - 1883:10

**Southern** [1] - 1854:7

**space** [4] - 1725:21;
1726:3

**speaking** [10] -
1829:25; 1850:16;
1851:7; 1860:10;
1862:2, 5; 1863:20;
1864:11; 1883:16, 18

**speaks** [1] - 1843:24

**specific** [10] -
1818:24; 1837:22;
1840:1; 1854:13, 16;
1857:17; 1863:4;
1866:4, 8; 1873:3

**specifically** [13] -
1772:5; 1829:21;
1842:10; 1856:14;
1864:11; 1876:17;
1881:1; 1883:18;
1884:11, 19; 1898:2, 11

**specifics** [1] - 1727:5

**specify** [4] - 1814:8,
17, 23; 1895:8

**specs** [1] - 1723:18

**Speed** [2] - 1917:18, 21

**spell** [3] - 1783:2;
1807:6; 1900:24

**spent** [1] - 1815:25

**spiraling** [1] -
1726:21

**split** [1] - 1902:20

**29**

**spoken** [5] - 1802:24;
1832:15; 1833:7;
1863:12; 1883:24
**sponsor** [2] - 1804:25;
1805:18
**sponsors** [1] - 1784:21
**sponsorship** [7] -
1784:18, 21; 1786:24;
1787:1; 1794:7;
1805:11, 13
**sporadic** [2] - 1740:17
**spreadsheet** [5] -
1827:1, 3; 1829:14;
1837:6; 1897:5
**spring** [1] - 1857:19
**Square** [1] - 1718:21
**square** [1] - 1762:4
**St** [5] - 1816:16;
1902:19; 1903:1; 1905:2
**staffs** [1] - 1916:18
**stand** [9] - 1720:18;
1782:20; 1783:20;
1800:23; 1806:24;
1844:10; 1849:14;
1900:14; 1907:20
**standalone** [3] -
1744:24; 1763:4, 6
**standard** [4] -
1747:18; 1773:14;
1837:18; 1904:4
**standardized** [1] -
1776:14
**standing** [5] -
1775:18; 1782:20;
1806:24; 1871:11;
1900:14
**stars** [1] - 1876:16
**start** [9] - 1777:10;
1807:19; 1809:10;
1820:7; 1847:19;
1878:9; 1901:15;
1903:11; 1933:6
**started** [18] - 1770:8;
1808:2, 5; 1809:6;
1811:6; 1838:5;
1901:23, 25; 1902:9,
16; 1903:1; 1905:5, 11,
22; 1924:24; 1925:12;
1926:7
**starting** [3] - 1820:7;
1828:8; 1870:19
**starts** [2] - 1870:12;
1926:9
**startup** [1] - 1811:7
**state** [17] - 1758:20;
1774:3, 21; 1783:2;
1800:10; 1807:5;

1808:17; 1824:24;
1825:2, 5, 8; 1832:20;
1833:16; 1834:4;
1849:8; 1851:23;
1900:24
**statement** [19] -
1728:14; 1734:7;
1737:22; 1738:4, 17;
1739:19; 1744:17;
1753:3; 1817:22, 24;
1824:8; 1832:24;
1845:16; 1854:15, 17;
1855:8; 1907:14;
1916:25
**statements** [8] -
1830:16; 1841:25;
1842:7, 9-11, 15, 19
**STATES** [2] - 1718:1, 3
**states** [1] - 1747:5
**States** [5] - 1718:12,
16; 1854:6, 8; 1855:11
**stating** [1] - 1866:22
**stay** [3] - 1783:6;
1809:5; 1901:2
**STEIGER** [1] - 1719:7
**step** [8] - 1767:11;
1781:22; 1806:18;
1812:9; 1846:8;
1899:12; 1907:3;
1932:19
**steps** [2] - 1781:25;
1899:16
**Steve** [5] - 1729:15,
22-23; 1730:10; 1755:25
**Steven** [1] - 1732:1
**stick** [2] - 1839:2;
1903:5
**still** [10] - 1721:5;
1799:12; 1802:22;
1830:5; 1839:5;
1890:13; 1905:17;
1918:15; 1919:6
**Stip** [8] - 1721:12, 16;
1722:1; 1937:17
**stipulated** [1] -
1803:19
**stipulation** [2] -
1721:19; 1744:14
**stipulations** [5] -
1720:12; 1721:11,
24-25; 1726:20
**stock** [3] - 1854:1;
1927:16, 25
**stocks** [6] - 1810:24;
1811:5; 1841:22;
1842:3; 1905:15, 19
**Stolper** [9] - 1882:14,
24; 1883:6, 13-14;

1884:9; 1885:6, 18;
1930:15
**stop** [3] - 1926:10;
1932:15
**straight** [1] - 1906:16
**straightforward** [1] -
1864:5
**Strangford** [1] -
1719:4
**strategy** [3] -
1824:18; 1875:21;
1879:2
**stressed** [1] - 1830:3
**stuff** [7] - 1841:25;
1850:8; 1851:3; 1897:6;
1919:9
**subject** [3] - 1723:4;
1724:25; 1742:3
**subsequently** [2] -
1756:23; 1885:21
**substance** [3] -
1836:20; 1837:5; 1885:3
**substantial** [4] -
1751:25; 1758:5;
1760:22; 1763:18
**substantially** [4] -
1751:18, 22; 1764:25;
1911:23
**success** [3] - 1845:20;
1919:8; 1921:8
**successful** [1] -
1750:1
**sue** [2] - 1830:19, 24
**Suffolk** [1] - 1718:21
**suggest** [1] - 1839:12
**suing** [2] - 1831:3;
1893:23
**suit** [4] - 1868:20;
1872:4; 1882:20; 1885:7
**Suite** [2] - 1718:22;
1719:2
**summation** [1] -
1847:10
**summer** [2] - 1809:13;
1829:24
**Sunday** [4] - 1871:3;
1872:20; 1934:5, 13
**support** [2] - 1789:13;
1867:13
**supposed** [5] - 1759:6;
1790:5; 1895:12;
1927:20, 23
**sustain** [1] - 1890:2
**sustained** [10] -
1771:8; 1816:10, 24;
1820:24; 1821:19;
1852:13; 1891:7;

1894:8; 1915:17;
1923:18
**sworn** [5] - 1720:18;
1782:24; 1807:3;
1849:14; 1900:19
**Sydor** [3] - 1903:14;
1904:4; 1912:24
**sydor** [2] - 1789:23;
1790:17
**system** [3] - 1786:13;
1795:25; 1796:1

---

**T**

---

**T-shirts** [1] - 1794:23
**table** [2] - 1735:4;
1764:9
**talks** [4] - 1872:20;
1874:9; 1880:22; 1894:2
**target** [1] - 1740:19
**taxes** [4] - 1756:12;
1781:9; 1850:11; 1852:6
**TC** [4] - 1867:16;
1870:20; 1880:17
**team** [6] - 1784:18;
1805:4; 1810:7;
1816:19; 1841:3;
1855:21
**teammates** [2] -
1814:1; 1817:14
**teams** [3] - 1805:18;
1807:18; 1902:25
**Tech** [1] - 1905:23
**technically** [1] -
1755:9
**Technique** [1] -
1905:23
**telephone** [7] -
1801:15; 1851:5, 11;
1862:3, 8; 1863:15;
1887:3
**telephonically** [3] -
1801:17, 19; 1802:11
**Tenacious** [3] -
1743:7; 1745:1
**term** [7] - 1735:20;
1742:3, 6; 1803:23;
1845:25; 1846:1
**terminology** [2] -
1750:6; 1751:14
**terms** [23] - 1731:14;
1750:5; 1759:23;
1760:24; 1770:22;
1771:1, 5; 1777:11;
1803:3; 1835:3;
1836:22; 1838:9;
1839:24; 1847:20;
1894:1; 1902:23;

**30**

1904:19; 1905:13, 21;
1906:19; 1908:10;
1914:1; 1921:21
**testified** [30] -
1720:19; 1737:15;
1761:1; 1773:18, 22;
1776:17; 1777:7;
1779:7; 1780:3, 11;
1782:24; 1795:9;
1807:3; 1831:15, 18;
1834:1; 1835:22;
1836:8; 1841:21;
1843:7, 16; 1845:2;
1849:15; 1858:9;
1864:14; 1868:23;
1900:19; 1905:20;
1911:11; 1920:10
**testify** [2] - 1790:19;
1829:10
**testifying** [2] -
1777:12; 1915:15
**testimony** [18] -
1770:6; 1772:4; 1775:4,
11; 1776:17; 1777:14;
1801:20, 23; 1834:16,
18; 1836:11, 15;
1840:25; 1851:17;
1856:7; 1884:20;
1894:6; 1915:15
**Thalmann's** [1] -
1878:16
**THE** [163] - 1720:4, 16,
22; 1721:7, 18, 21, 24;
1722:10, 22; 1730:22;
1733:3; 1736:19;
1739:7, 10, 13, 15;
1741:23; 1743:17;
1747:2, 11, 17; 1748:4,
9, 16; 1755:18, 20;
1766:20; 1769:9, 13;
1771:8, 11; 1772:3, 14,
25; 1773:25; 1774:12,
18, 25; 1775:5; 1777:3,
23; 1778:25; 1779:22;
1780:20; 1781:22, 24;
1782:1, 6, 9, 12, 14,
19; 1783:1, 4-5;
1785:24; 1786:17;
1788:2; 1790:2, 17, 24;
1791:2, 22; 1793:3, 7,
13, 15; 1796:14, 18;
1798:1, 3; 1799:20;
1802:17; 1806:15, 18,
20, 23; 1807:5, 7-8;
1810:1; 1813:12;
1816:10, 24; 1819:22;
1820:24; 1821:5, 19;
1822:25; 1826:16;
1827:9; 1828:11;
1829:3; 1831:6; 1833:9;

1836:2, 6; 1843:24;
1845:13; 1846:6, 10,
13, 16; 1847:8; 1848:7,
16; 1849:3, 10, 18, 25;
1852:13; 1855:22;
1865:9; 1866:13, 16,
19; 1868:7; 1870:5;
1876:7; 1886:6; 1888:4,
15; 1890:1; 1891:7;
1894:8; 1898:5, 16;
1899:12; 1900:2, 5, 7,
9, 13, 23, 25; 1901:1;
1903:24; 1910:7, 9, 11,
17, 20, 22; 1914:15;
1915:17; 1916:1;
1923:18; 1925:22;
1926:11, 14; 1928:25;
1930:17, 20; 1932:11,
14, 22; 1933:1, 5, 10;
1934:10, 14
**theory** [3] - 1847:25;
1848:6; 1871:10
**there'll** [1] - 1830:7
**therefore** [1] -
1829:11
**thinking** [2] - 1831:3;
1902:16
**third** [4] - 1727:19;
1911:25; 1929:21;
1930:3
**thousand** [11] -
1756:12; 1844:14;
1845:3; 1846:3;
1906:21; 1909:24;
1912:9, 12; 1913:21;
1921:11; 1922:1
**threat** [2] - 1749:8;
1750:2
**three** [18] - 1723:23;
1724:1; 1760:17;
1761:19; 1763:17;
1794:13; 1803:9;
1808:9; 1809:3, 6;
1810:11; 1841:10;
1862:13; 1871:20;
1873:17; 1887:12;
1903:8
**thriving** [1] - 1921:13
**throughout** [1] -
1789:14
**throwing** [1] - 1824:17
**Thunder** [1] - 1807:25
**Thursday** [2] - 1934:3,
18
**tied** [1] - 1875:2
**ties** [1] - 1811:8
**Timothy** [1] - 1932:25
**title** [4] - 1727:4;

1730:7; 1735:20;
1783:14
**Title** [1] - 1734:8
**titled** [2] - 1727:21;
1894:14
**today** [25] - 1723:11;
1729:13; 1732:12;
1750:8; 1755:17;
1800:23; 1801:2, 5, 10;
1804:13; 1809:20;
1813:8; 1844:10, 13;
1845:19; 1855:18;
1858:6; 1867:6; 1871:9;
1903:18; 1905:18;
1908:23; 1919:6;
1924:1; 1933:5
**today's** [1] - 1835:18
**together** [7] -
1765:23; 1814:21;
1851:2; 1858:7;
1875:17; 1882:19;
1919:11
**Tom** [1] - 1847:1
**TOMMY** [1] - 1718:7
**Tommy** [42] - 1718:8;
1719:1; 1731:12;
1742:18; 1762:17;
1784:10; 1787:12;
1798:8; 1800:24;
1801:3; 1812:5;
1821:23; 1822:21;
1824:2, 4; 1825:11;
1834:10; 1840:14;
1845:23; 1858:3;
1859:23; 1865:15;
1880:18; 1882:8;
1893:5; 1895:25;
1909:8, 10, 14;
1913:11; 1915:19;
1916:16; 1918:21;
1919:7, 25; 1925:14;
1927:8; 1928:17;
1930:21; 1931:1, 4, 11
**Tommy's** [1] - 1726:8
**took** [16] - 1746:8;
1762:19; 1763:1;
1765:21; 1773:18;
1776:18, 24; 1778:19;
1790:4; 1840:21;
1903:12; 1904:12;
1904:23; 1905:3;
1933:11
**top** [6] - 1731:4;
1817:25; 1819:4;
1820:3; 1872:14; 1874:4
**topic** [1] - 1887:8
**topics** [2] - 1863:17;
1887:9
**total** [7] - 1753:6, 13;

1758:2; 1760:17;
1836:10; 1912:5
**touch** [2] - 1877:3
**towards** [2] - 1753:22;
1925:5
**track** [1] - 1797:10
**transaction** [9] -
1770:25; 1773:7;
1774:4; 1839:9;
1858:24; 1859:2, 25;
1893:7, 14
**transactions** [8] -
1772:12; 1773:3, 15;
1774:23; 1775:21;
1776:1; 1777:11
**transfer** [7] -
1738:19, 24; 1818:13;
1821:22; 1822:12;
1843:13; 1858:15
**transferred** [2] -
1820:10; 1905:1
**transpire** [1] - 1769:1
**travel** [2] - 1794:16,
19
**traveling** [1] - 1851:3
**treat** [1] - 1758:18
**trial** [2] - 1829:6;
1934:8
**tried** [1] - 1905:16
**trip** [1] - 1932:17
**trough** [1] - 1780:9
**true** [43] - 1732:21;
1741:16; 1743:10;
1745:24; 1770:7, 13-14;
1771:6; 1800:16, 20;
1819:10, 15; 1831:24;
1832:4; 1833:18, 23;
1834:2, 7; 1835:20;
1838:11; 1839:20, 25;
1841:16, 23; 1842:12,
20, 22; 1843:1, 9;
1844:19; 1845:5;
1851:8; 1852:7, 16;
1853:15, 18, 21;
1855:14; 1898:3, 12;
1914:8; 1928:18
**trust** [12] - 1820:10;
1830:10; 1835:8;
1898:24; 1907:21, 23;
1915:4; 1925:3, 17;
1926:5, 9
**Trust** [4] - 1742:10;
1915:1; 1922:22;
1929:15
**trusted** [1] - 1925:14
**trustee** [2] - 1914:25;
1922:21
**truthfully** [1] -

1855:13

**truthfulness** [1] - 1845:16

**try** [19] - 1740:20; 1748:25; 1749:1; 1757:2; 1759:19; 1762:18; 1765:16; 1774:6; 1812:6; 1847:12; 1857:7; 1871:17; 1872:7, 22; 1879:25; 1880:5; 1895:18; 1933:6; 1934:10

**trying** [13] - 1740:19; 1741:1; 1756:13; 1760:13; 1761:11; 1768:12; 1846:22; 1871:21; 1877:16; 1886:2; 1902:23; 1934:1, 12

**TTEE** [1] - 1907:19

**tunnel** [1] - 1831:3

**turn** [15] - 1723:20; 1727:9; 1730:17, 21; 1731:18; 1734:6; 1737:21; 1743:20; 1882:1; 1911:18; 1918:6; 1919:16, 21-22; 1922:9

**turned** [2] - 1764:14; 1766:9

**turning** [18] - 1724:22; 1725:9, 13; 1728:12; 1729:8; 1732:8; 1734:16; 1738:3, 8, 17; 1739:3, 18; 1744:19; 1766:7; 1793:23; 1795:6; 1817:24; 1917:3

**twice** [1] - 1856:22

**twist** [1] - 1934:7

**two** [39] - 1734:14; 1736:8; 1737:2, 6, 11; 1745:11; 1747:5; 1751:18; 1752:8; 1757:9; 1758:5; 1760:5; 1761:2; 1762:2; 1765:9; 1776:22; 1779:23; 1796:23; 1799:11; 1823:13, 18; 1828:6; 1840:16; 1844:24; 1846:7; 1847:1; 1848:17; 1850:2; 1869:8; 1873:14; 1877:8; 1884:22; 1892:5; 1894:13; 1928:23; 1934:1

**type** [4] - 1749:9; 1774:16; 1805:16; 1838:9

**types** [1] - 1810:22

**Tyson** [5] - 1900:6, 11, 25; 1907:19; 1929:15

**TYSON** [3] - 1900:17, 25; 1936:17

## U

**U.S** [2] - 1718:4, 18

**ultimate** [1] - 1731:14

**ultimately** [4] - 1817:5; 1831:15; 1842:24; 1913:17

**unable** [1] - 1852:10

**under** [10] - 1721:5; 1735:11; 1768:14; 1774:15; 1787:1; 1795:1; 1815:19; 1851:23; 1857:9; 1895:15

**underlying** [2] - 1784:16; 1796:3

**understood** [2] - 1862:12; 1885:18

**undeveloped** [2] - 1856:23

**unforeseen** [1] - 1731:11

**unfortunately** [1] - 1879:21

**unique** [1] - 1775:25

**unit** [3] - 1921:24; 1922:2

**UNITED** [2] - 1718:1, 3

**united** [1] - 1718:12

**United** [4] - 1718:16; 1854:6, 8; 1855:11

**units** [5] - 1822:3, 5; 1823:14, 18; 1824:3

**unlawfully** [1] - 1848:1

**unreasonable** [1] - 1751:5

**unreasonably** [1] - 1751:6

**unrestricted** [2] - 1816:15; 1902:18

**up** [51] - 1724:6; 1726:14; 1728:5, 11; 1730:2, 9; 1733:18, 20; 1734:23; 1741:6; 1759:5; 1761:1; 1766:14; 1767:9, 11, 20; 1774:22; 1780:8; 1782:19; 1783:6; 1789:11; 1791:14; 1806:4, 23-24; 1810:9; 1811:11; 1816:18;

1830:2, 7; 1835:18; 1836:5; 1837:3, 12; 1857:5; 1865:16; 1884:10; 1887:6; 1894:24; 1900:13; 1901:2, 23; 1904:13; 1905:1, 5; 1911:25; 1915:10; 1919:6; 1921:19

**up-front** [3] - 1728:5; 1730:2

**upcoming** [1] - 1873:21

**update** [1] - 1873:25

**updated** [1] - 1865:19

**updates** [6] - 1853:22; 1872:3; 1893:16, 19; 1894:25; 1896:9

**upside** [1] - 1853:20

**utility** [1] - 1778:6

**utilized** [3] - 1778:10; 1843:12; 1850:17

## V

**vaguely** [1] - 1873:6

**valuable** [2] - 1764:1

**valuation** [4] - 1919:8; 1920:1, 3, 7

**value** [17] - 1750:14; 1751:16; 1757:9; 1758:10, 14, 21; 1759:1, 3, 10; 1760:15; 1761:24; 1763:15; 1773:6; 1844:10; 1848:3

**valued** [2] - 1758:19; 1762:14

**values** [2] - 1760:1, 10

**various** [11] - 1763:5; 1794:8; 1800:20; 1820:12; 1839:18, 21; 1855:3; 1895:4, 8; 1911:25

**Vegas** [1] - 1896:3

**vendors** [1] - 1749:13

**venture** [1] - 1764:19

**verbally** [1] - 1767:8

**versa** [1] - 1864:1

**version** [3] - 1739:4; 1847:14

**vested** [1] - 1723:25

**Veterans** [1] - 1718:22

**vice** [2] - 1799:17; 1864:1

**victim** [3] - 1846:20; 1847:9, 11

**view** [4] - 1724:11;

1725:17; 1779:15; 1836:13

**Vincent** [1] - 1727:10

**virtue** [1] - 1852:15  **31**

**visit** [3] - 1799:5; 1856:18; 1904:8

**visited** [1] - 1857:11

**visitor** [2] - 1797:15; 1799:11

**visits** [4] - 1798:7, 11; 1799:2, 11

**voice** [2] - 1783:6; 1901:2

**voir** [1] - 1786:2

**VOIR** [3] - 1786:4; 1929:3; 1935:17

## W

**Wade** [1] - 1732:1

**wait** [2] - 1747:2; 1805:22

**walked** [1] - 1765:3

**wants** [2] - 1774:19; 1910:11

**Wappler** [3] - 1917:12, 14, 16

**war** [1] - 1816:4

**warranty** [11] - 1736:5; 1743:2, 5-6, 10, 20; 1744:20, 22; 1762:25

**wasted** [1] - 1871:21

**watch** [1] - 1865:22

**ways** [1] - 1812:5

**week** [1] - 1808:7

**WEINBLATT** [1] - 1718:21

**whatsoever** [1] - 1837:4

**wherein** [1] - 1845:8

**whole** [4] - 1723:18; 1807:23; 1810:18; 1887:12

**WICKER** [1] - 1719:7

**wife** [40] - 1812:4; 1813:17; 1817:12; 1819:16; 1820:4, 6; 1830:2, 22; 1833:17, 24-25; 1834:4, 11-12, 20; 1835:1, 3, 19; 1840:8, 21; 1842:19; 1850:2, 5, 22, 25; 1851:11, 19; 1852:10; 1853:10; 1857:21, 23; 1860:10, 17, 24; 1861:4, 9; 1863:10;

**32**

1918:20; 1929:22, 25

**wife's** [6] - 1820:1; 1929:10, 13, 15

**willing** [5] - 1729:16; 1730:11; 1741:4; 1756:1; 1767:11

**willingness** [1] - 1741:6

**wind** [1] - 1924:24

**wire** [17] - 1738:5, 13; 1740:1, 8; 1817:25; 1820:10; 1858:15; 1907:25; 1914:3, 18-19, 23; 1917:7, 10-11, 25; 1922:16

**wired** [4] - 1794:2; 1898:24; 1916:21; 1917:4

**wires** [2] - 1909:2, 4

**wiring** [3] - 1729:13; 1755:18, 23

**withdraw** [5] - 1849:7, 23; 1859:19; 1883:11; 1897:22

**withdrawal** [4] - 1737:23; 1738:19; 1907:25

**withdrawn** [2] - 1834:17; 1875:11

**WITNESS** [8] - 1721:7; 1781:24; 1783:4; 1807:7; 1836:6; 1846:10; 1855:22; 1900:25

**witness** [36] - 1747:8, 10; 1772:9, 21; 1773:18, 25; 1774:8, 22, 24; 1775:17; 1777:15, 18; 1781:25; 1782:7, 16, 20, 23; 1800:23; 1806:20, 24; 1807:2; 1810:1; 1829:9; 1844:10; 1846:19; 1847:6; 1848:5; 1849:5, 24; 1899:16; 1900:3, 10, 14, 18; 1929:1

**Witness** [1] - 1846:15

**witnesses** [5] - 1772:5, 16; 1790:18; 1791:5; 1933:2

**wonderful** [1] - 1793:10

**woodwork** [2] - 1754:16; 1780:5

**word** [7] - 1749:15; 1750:5; 1839:7; 1840:2, 5; 1846:22

**worded** [1] - 1886:15

**wording** [1] - 1885:9

**words** [9] - 1839:10, 13, 24; 1840:2, 9, 11; 1844:6; 1845:9; 1852:10

**World** [1] - 1809:1

**worry** [1] - 1891:11

**worth** [5] - 1751:18; 1761:20; 1765:1; 1838:18; 1915:11

**write** [2] - 1727:20; 1837:4

**writing** [8] - 1755:17-20; 1839:18; 1862:20; 1870:22; 1929:19

**written** [5] - 1859:24; 1861:6; 1885:14; 1893:6, 13

---

## Y

**year** [16] - 1791:20; 1804:2, 11; 1807:20; 1808:9; 1816:2, 5, 16; 1829:23; 1841:10; 1880:25; 1902:2; 1905:8; 1922:25; 1924:22

**years** [20] - 1735:8; 1762:11; 1763:1; 1783:17; 1800:4; 1805:9; 1807:17; 1808:4; 1809:3, 6; 1810:11; 1837:21; 1855:18; 1862:13; 1903:8; 1925:10, 19

**yesterday** [3] - 1720:13; 1722:15; 1860:18

**YORK** [1] - 1718:1

**York** [10] - 1718:5, 17, 23; 1719:2, 5, 9; 1807:13; 1854:7; 1876:15; 1882:17

**yourself** [9] - 1751:23; 1759:16; 1803:10; 1833:25; 1837:24; 1854:23, 25; 1876:11; 1886:21

---

## Z

**zoom** [1] - 1922:13