1939

<pre>
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA      :      13-CR-607 (JFB)
 4
          -against-                       U.S. Courthouse
 5                                 :
                                          Central Islip, New York
 6   PHILLIP A. KENNER
     a/k/a "Philip A. Kenner",
 7        and                      :
     TOMMY C. CONSTANTINE
 8   a/k/a "Tommy C. Hormovitis"

 9               Defendants        :
                                          May 28, 2015
10   - - - - - - - - - - - - - - - X       9:30 a.m.

11
     BEFORE:
12              HONORABLE JOSEPH F. BIANCO
                United States District Judge
13                   and a jury

14
     APPEARANCES:
15
     For the Government:       KELLY T. CURRIE
16                             Acting United States Attorney
                               Federal Plaza
17                             Central Islip, New York 11722
                               BY:  JAMES M. MISKIEWICZ
18                                  SARITHA KOMATIREDDY
                                    Assistant U.S. Attorneys
19

20

21   For the Defendant:       HALEY, WEINBLATT & CALCAGNI LLP
     Phillip A. Kenner        One Suffolk Square
22                            1601 Veterans Memorial Highway
                              Suite 425
23                            Islandia, New York 11749
                              BY:  RICHARD HALEY
24

25
</pre>

1940

```
 1    For the Defendant:         LaRUSSO & CONWAY LLP
      Tommy C. Constantine       300 Old Country Road
 2                               Suite 341
                                 Mineola, New York 11501
 3                               BY:  ROBERT P. LaRUSSO
                                          and
 4                                    ANDREW L. OLIVERAS
                                      26 Strangford Court
 5                                    Oceanside, New York 11572

 6

 7    Court Reporter(s)           OWEN WICKER
                                 RONALD TOLKIN
 8                               DOMINIC TURSI
                                 100 Federal Plaza
 9                               Central Islip, New York 11722
                                 631-712-6102
10

11                               ***

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1941

```
1              M O R N I N G   S E S S I O N

2

3                     (Case called)

4                     (Appearances noted.)

5          THE COURT:  All right.  We had one juror that

6    was late but they are all here.  Do you want me to wait

7    for Mr. Miskiewicz?

8              MS. KOMATIREDDY:  I believe he's here.

9              MR. LARUSSO:  Your Honor, while the jury was

10   being brought in, I told you about my schedule last

11   evening.  I got a red-eye flight so I will be in on

12   Sunday.

13             THE COURT:  Very good.  Thank you very much.

14   T Y S O N    N A S H,

15         having been previously sworn, resumed the stand

16         and testified further as follows:

17             (Whereupon, the jury at this time enters the

18   courtroom.)

19             THE COURT:  Be seated.  Good morning, members of

20   the jury.  Good to see everybody again this morning.  As

21   you recalled when we ended yesterday Mr. Nash was on

22   cross-examination.  We'll continue from that point.

23             Mr. Nash, I remind you he had he had.

24   DIRECT EXAMINATION (Cont'd)

25   BY MS. KOMATIREDDY:
```

1942

1   Q    You were talking about documentation you received

2   from Mr. Constantine regarding Eufora, do you remember

3   that?

4   A    Yes.

5   Q    And I believe you testified that you had gone by the

6   offices several times and spoken with Mr. Constantine

7   about documentation; is that right?

8   A    Yes.

9   Q    I'm going to hand you what has been marked as

10  Government's Exhibit 764.  Do you recognize that?

11  A    Yes, I do.

12  Q    What is it?

13  A    It's a transfer of membership, I believe, from

14  Constantine Management Group into Eufora LLC.

15  Q    When did you get this document?

16  A    I got it in 2012, I believe.

17  Q    And who did you get it from?

18  A    I got it from Tommy.

19  Q    Is this a true and accurate copy of the document

20  received from Mr. Constantine in 2012?

21  A    Yes, it is.

22          MS. KOMATIREDDY:  The Government moves 764 in

23  evidence.

24          MR. LARUSSO:  No objection, your Honor.

25          MR. HALEY:  No objection, Your Honor.

1943

1      THE COURT:  Government's Exhibit 764 is

2  admitted.

3      (Whereupon, Government Exhibit 764 was received

4  in evidence.)

5  Q    Look at 764 and what is in evidence as 760.  Looking

6  at 764 on the right side there, there is a transfer of

7  membership interest of Eufora LLC.  Is that

8  Mr. Constantine's signature on the bottom?

9  A    Yes, it is.

10 Q    And it says:  Constantine Management Group hereby

11 transfers and conveys to Tyson S and Cathleen J the

12 undersigned Constantine Management Group LTD for valuable

13 consideration the receipt of which is hereby acknowledged,

14 hereby transfers and conveys to Tyson S and Cathleen Nash

15 Living Trust .5 percent of transferors right, title and

16 interest in Eufora LLC, an Arizona limited liability

17 company to.

18      Dated this 24th day of April, 2008.

19      Now, Mr. Nash you testified that you received

20 this document in 2012, right?

21 A    Yeah, I don't know -- I'm pretty sure it was 2012,

22 yes.

23 Q    So who wrote in 24th day of April, 2008?

24 A    Tommy.

25 Q    And going back to Government's Exhibit 760, this was

1944

1    the wire transfer of the Eufora investment we went over

2    yesterday, do you remember?

3    A    Yes, that is.

4    Q    That is also dated April 24, 2008?

5    A    Correct.

6    Q    Now, let me just step back for a minute.  When we

7    talked about your participation in the GSF, you testified

8    that the defendant told you that you would get an extra

9    share in Eufora for participating in GSF and that share

10   would come from buying out the so-called bad apples, is

11   that fair?

12   A    Yes.

13   Q    And that was Juneau, Nolan and Moreau?

14   A    Yes.

15   Q    Back in 2008, when you first invested in Eufora, did

16   the defendant say anything about your money being used to

17   buy out other peoples' shares in Eufora?

18            MR. LARUSSO:  Your Honor, I object to the form

19   of the question.

20            THE COURT:  Overruled.

21   Q    You may answer.

22   A    No, I didn't.  Again I was under the understanding

23   that that money was going to be used for some upcoming

24   commercials to finish off.  I was lucky enough to get

25   involved when I did.  I came in very late to Eufora.

Nash - Cross/Haley

1945

1    Q    Did they say anything about your money being used to

2    buy out Constantine's share of the company?

3    A    No.

4    Q    Would that have been important for you to know in

5    deciding whether to give money to Eufora?

6    A    Considering the guy running Eufora, I would have been

7    quite concerned he's getting out and I'm getting in, yes.

8         MS. KOMATIREDDY:  No further questions.

9         THE COURT:  Mr. Haley.

10        Cross-examination.

11   CROSS-EXAMINATION

12   BY MR. HALEY:

13   Q    We haven't met, Mr. Nash.  I'm Rick Haley and I

14   represent Mr. Kenner.

15   A    How are you, sir?

16   Q    Kindly take a look at this document marked Kenner

17   Exhibit 50 for identification.  Is it fair to state, sir,

18   that particular document, Kenner Exhibit 50 for

19   identification is simply a larger copy of the photocopy of

20   Exhibit 764?

21   A    Yes, it is.

22   Q    Now, with that document in hand, we can agree, can we

23   not, sir, that at least by virtue of the precise language

24   of that document, what was being conveyed to you was a

25   percentage of an ownership interest held by the transferor

**1946**

1    in this case Tommy Constantine, correct?

2    A    The Constantine Management Group is my understanding,

3    yes.

4    Q    Well, did you have an understanding that Tommy

5    Constantine at the point in time that you invested in

6    Eufora was an owner of the company or had an ownership

7    interest in the company?

8    A    Yes.

9         THE COURT:  When you say "the company,"

10   Constantine Management or Eufora?

11        MR. HALEY:  Eufora.  Thank you, your Honor.

12   Q    So, when you received this document, sir, by virtue

13   of its terms, you were acquiring then once again a

14   percentage of the ownership interest held by Tommy

15   Constantine in Eufora, correct?

16   A    When you say Tommy, I'm guessing Tommy and the

17   Constantine Management Group are two different things.

18        When I originally put my money into Eufora, I

19   was guessing it was going into Eufora.  When I later

20   noticed it went into Constantine Management Group, this is

21   why the document was made up, that I was going to own my

22   shares now in Eufora instead of just the Constantine

23   Management Group.  That's why this document was done in

24   2012 and backdated to 2008.

25   Q    Well, sir, when you received this document, what if

1947

1   any discussions did you have with Tommy Constantine as to

2   the reason that the document said Constantine Management

3   Group as opposed to let's say Eufora.  What did you say to

4   him and what did he say to you?

5   A    I didn't really understand the whole thing at the

6   start.  I gave money to where Phil told me to send the

7   money.  When I saw Constantine Management Group, I still

8   really didn't understand that that wasn't Eufora or maybe

9   it was, I don't really know, but it definitely wasn't to

10  Tommy Constantine, if that's what you are asking.

11  Q    Sir, you testified just a moment ago and you

12  testified on direct that -- these are your words:

13  Guessing about what was being done with your $100,000

14  payment with respect to Eufora.

15       My question is simply this, sir:  The

16  discussions you had with Phil Kenner as relates to

17  obtaining an ownership interest in Eufora in return for

18  your $100,000, could you give us a time frame?  When did

19  that discussion take place?

20  A    I believe I invested in Eufora, and my conversation

21  with Phil Kenner was just before the money was wired back

22  in April of 2008.

23  Q    All right.  And where did that conversation take

24  place?

25  A    Over the phone.  I was sitting in my car in my

1948

1    driveway.

2    Q    Did you now, being seven years ago -- sorry -- seven

3    years ago, as you were seated in your car in this

4    telephone conversation you had with Phil, take notes,

5    written notes, in terms of what Phil was saying to you.

6    Yes or no?

7    A    No, I didn't take any notes.

8    Q    Sir, we can agree, can we not, that there's no

9    question with reference to the conversation you had with

10   Phil Kenner that the substance of it involved you making

11   payment of $100,000 in order to acquire a percentage of an

12   ownership interest in the company called Eufora.  We can

13   agree with that; is that correct?

14   A    Yes.

15   Q    You said on direct, these are your words:  And I was

16   guessing that the money was going to be used for an

17   advertising campaign.

18        Do you remember that testimony?

19   A    For Eufora, correct.  Those were also my words.

20   Q    I understand that, sir.

21        Without guessing, sir, as to what was said, can

22   you state here today under oath, not what you assume and

23   what you guessed, but that Phil Kenner said to you

24   specifically during the course of that conversation, by

25   the way, in sum and substance, these monies are going to

1949

1    be used for an advertising campaign for Eufora.  Can you

2    say that today under oath, because these words are

3    critically important, sir.

4            What is your testimony in that regard?

5    A    Yes, the exact conversation I had with Phil.  Again,

6    I was excited to getting involved in Eufora.  My money was

7    going to be used to help pay for commercials that later

8    Tommy Constantine showed me at his office that were

9    eventually made.

10   Q    How many times were you interviewed by the FBI in

11   connection with this -- before your testimony here today?

12   A    A number of times.

13   Q    Give me some idea.  One, two, three, four, five?

14   A    Probably seven or eight times.

15   Q    How many of those interviews were conducted

16   telephonically?

17   A    A majority of them.

18   Q    How many of those interviews were conducted in

19   person?

20   A    One or two.

21   Q    When was the last time you were interviewed by the

22   FBI or members of the U.S. Attorney's Office in person?

23   A    I believe back in March.

24   Q    Of what year?

25   A    This year.

1950

1  Q     Where did that interview take place?

2  A     That took place here in New York.

3  Q     In this very building --

4  A     In this building, yes.

5  Q     Who was present during that interview?

6  A     The lawyer, Matt Galioto and Josh.

7  Q     Do you know which lawyer?

8  A     (Indicating).  The person I've been speaking with.

9  Q     That would be Assistant United States Attorney Ms.

10  Komatireddy?

11  A     Yes.

12  Q     During the course of that interview, again you were

13  asked questions and you answered the questions, true?

14  A     True.

15  Q     When you were asked those questions and you answered

16  the questions, did you observe one or more of the persons

17  taking notes?

18  A     I don't recall.

19  Q     Well, prior to that point in time there was another

20  point in time you were interviewed in person by the agents

21  or the Assistant United States Attorneys; is that correct?

22  A     I believe so.  Most of them were done over the phone

23  and they had mentioned that some of the calls were

24  recorded and if I minded if someone was listening in.

25  Q     And you certainly said you had no objections to them

1951

1    listening in?

2    A    No issue.

3    Q    To the best of your memory, they advised you they

4    were either recording or taking notes?

5    A    Not on all occasions but most of them, yes.

6             MS. KOMATIREDDY:  Objection.  Your Honor, there

7    is no basis to show the document.

8             THE COURT:  Why don't you approach.

9             MR. HALEY:  Sure.

10             (Whereupon, at this time the following took

11    place at the sidebar.)

12             (Continued.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1952

1       THE COURT:  You can ask him whether or not he

2  talked about the advertising.  If he says I don't remember

3  then you can show him the notes.

4       MR. HALEY:  Okay.  I'll do it a little different

5  way but I'll follow your Honor's protocol.

6       MS. KOMATIREDDY:  Your Honor, this is not

7  contrary here.

8       MR. HALEY:  Let me do it your way.

9       THE COURT:  As long as it is consistent with the

10  rules of evidence.

11            (End of sidebar conference.)

12            (Continued.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1953

1       (In open court.)

2   Q    Sir, following the conversation you had with Phil

3   Kenner as you sat in your car --  by the way you were on

4   your cell phone; is that correct?

5   A    Correct.

6   Q    Was there any further conversation between yourself

7   and Phil Kenner with reference to the $100,000 that you

8   paid for purposes of acquiring ownership interest in

9   Eufora before you received the 2012 document marked and

10  dated 2008?

11  A    I had very few conversations with Phil about Eufora.

12  It was Tommy's baby and Tommy was local.  We might have

13  talked about it on a few different occasions but nothing

14  in great detail.  It was always Tommy I went to about

15  Eufora.

16  Q    Well, during the the course of the conversations you

17  had with Tommy and/or Phil, did you make inquiry as to how

18  the advertising campaign was going.  Yes or no?

19  A    Yeah.

20  Q    Who did you make that inquiry of?

21  A    Tommy, I believe.  As I stated I went to the office

22  and he was deciding to show me the commercials that were

23  done.

24  Q    And as it relates to those commercials, were you

25  impressed with the commercials?

1954

1   A    I thought they were funny.  I thought they were good.

2   Q    Did you see those commercials before you were

3   interviewed telephonically by the FBI?

4   A    Yes, I saw these commercials early on.

5   Q    Sir, when you saw these commercials, did you say in

6   sum and substance to Tommy Constantine, words to the

7   effect, oh, these are the commercials I paid for.  Did you

8   say that, yes or no?

9   A    No.

10  Q    With respect to the discussions you had concerning

11  the prospective legal actions to be brought against Ken

12  Jowdy, I believe you testified on direct indeed there were

13  discussions between yourself and Phil Kenner, perhaps

14  Tommy Constantine as well, as relates to lawsuits to be

15  brought against Ken Jowdy, true?

16  A    Excuse me, losses?

17  Q    Lawsuits.

18  A    Lawsuits, yes.

19  Q    And it's fair to state that the discussion spoke in

20  terms of a plural, lawsuits, as opposed to a lawsuit in

21  particular, correct?

22  A    There was a lot of moving parts, some of which I

23  didn't understand.  I didn't know about lawsuits.  I

24  thought there was a major lawsuit.

25  Q    With reference to the discussions that you had

1955

1   concerning disputes with reference to Phil Kenner LLCs and

2   Ken Jowdy, is it not fair and is it not true -- excuse me.

3   Is it not true that one of the lawsuits/lawsuit that was

4   mentioned involved recovering loans made to Ken Jowdy from

5   Little Isle IV, the company that you were an investor in

6   Ula Makika?  That's true, correct?

7   A   Yes.

8   Q   And at that point in time, when you became aware of

9   this issue regarding moneys loaned by Little Isle IV to

10  Ken Jowdy and his refusal to repay, did you object to a

11  lawsuit being filed for purposes of recovering those

12  monies?  Yes or no?

13  A   Again, there was a lot of moving parts.  I can't say

14  yes or no to that.  I trusted Phil Kenner.  He was

15  fighting on our behalf.  He was doing a great job from my

16  understanding.  He talked to us anytime I had a question.

17  Anytime I had an issue, I would pick up the phone, he'd

18  answer, and he would tell me what was going on.

19           Again I didn't know the other side of it.  I

20  just new Phil's side and it always seemed to put me at

21  ease, and I understand for the most part it was very

22  complex.  That's all I can say.  But it seemed like he was

23  doing a good job.

24  Q   You certainly would have no objection I take it, sir,

25  should there be a lawsuit against Ken Jowdy wherein 5

1956

1   million dollars plus interest is recovered for the benefit

2   of Little Isle IV, you would certainly have no objection

3   in terms of --

4           MS. KOMATIREDDY:  Objection to form and

5   argumentative --

6   Q    -- That lawsuit succeeding, would you?

7           THE COURT:  Overruled.  You can answer.

8   A    No.

9   Q    Well, when this discussion about the lawsuit

10  involving the recovery of the money loaned to Ken Jowdy

11  with all the other moving parts was discussed as you told

12  us a moment ago, did you say in sum and substance, Gee,

13  Phil, you never told me about this loan from Little Isle

14  IV to Ken Jowdy, I have no knowledge of it, and what is

15  this all about.  Did you say something to Phil about that

16  at that point in time?

17          Yes or no?

18  A    I heard it much later after I think after it

19  happened.  Again Phil talked to me about it in great

20  detail.  It is a little foggy at this point but there was

21  a definite issue there.  I think that's how this whole

22  thing started with the original lawsuit with Diamonte.

23  Q    And though I believe you testified on direct that you

24  were unaware of money being loaned from Little Isle IV to

25  Ken Jowdy when the loan was made, we now can agree there

1957

1  did come a point in time that you learned of such loans

2  with Phil Kenner?

3  A    There came a point in time much later.  Again I gave

4  my money to Diamonte to whatever account Phil told me to

5  send it to.  After that I have no idea.

6  Q    I'm not talking about the money to Diamonte.  What

7  I'm really focused on based on my prior question and your

8  answer to the question, is the money loaned to Little Isle

9  IV to Ken Jowdy.

10        I guess from your perspective buying it is going

11  to Diamonte Cabo San Lucas, it's the same issue?

12  A    There's a definite issue there with Ken Jowdy

13  according to what Phil told me.

14  Q    Did you understand, sir, when Little Isle IV was

15  formed as an LLC, Limited Liability Corp., that Phil

16  Kenner would be the managing member.  Do you have that

17  understanding?

18  A    Yes.

19  Q    And when you first had discussions with Phil Kenner

20  in connection with the formation of Little Isle IV LLC,

21  you certainly had the idea, the understanding that the

22  idea was to obtain investors, yourself included, for

23  purposes of investing in primarily real estate in Hawaii,

24  is that true?

25  A    A piece of real estate, yes.

1958

1  Q     And I believe you testified on direct that Phil had a

2  number of documents or information to share with you as

3  relates to the Hawaii land development investment, true?

4  A     That we got after, much later after the investment

5  was made.

6  Q     And can you give us some idea?  Was it a couple of

7  pages, was it a significant amount money?  How can you

8  characterize what you received from Phil Kenner?

9  A     I believe it is a lot.  I believe it was a good chunk

10 of documentation, documentation that I didn't really read

11 over.  We saw one of the documents yesterday.  I received

12 that much later after the investment was made and after I

13 received that $42,500.

14 Q     The documents you received from Phil could have been

15 as much as seven inches in depth?

16 A     I can't say for sure.  It was definitely thick.

17 Q     Sir, of your own personal knowledge, the

18 establishment of Little Isle IV and the land development

19 project itself in Hawaii, that was legitimate, was it not?

20        In other words, there were truly efforts made

21 based upon your contribution, efforts made by Phil Kenner,

22 to develop and invest in land in Hawaii.  That's true, is

23 it not?

24 A     Yes.

25 Q     So you weren't defrauded when it comes to Phil Kenner

1959

1    requesting that you contribute to Little Isle IV and that

2    being a scam, were you?

3           MS. KOMATIREDDY:  Objection.

4           THE COURT:  Sustained.

5    Q    As you sit here today, would you be pleased to know

6    that your ownership interest in Eufora is reflected on its

7    books and records?

8    A    You mean that there's books and records?

9    Q    That shows your ownership interest, meaning that

10   there's books and records, sir, maintained by Eufora that

11   show your ownership interest in the company?

12   A    Yes.

13   Q    You would be pleased to hear that?

14   A    I would be pleased to hear that, yes.

15   Q    Do you have an understanding if this privately held

16   company should be sold publicly, your percentage interest

17   in Eufora may result in a significant financial recovery?

18   A    That's what kept me going through all this, yes.

19   Q    Sir, I want you to take a look at a document marked

20   Kenner Exhibit 52, and you are entitled to see the entire

21   document, but I'll refer your attention at least to the

22   last page.

23           Do you recognize your signature on that

24   document, sir?

25   A    Yes, I do.

1960

```
 1    Q    And where does it appear?

 2    A    On the last page.

 3              MR. HALEY:  Thank you, sir.

 4              Your Honor, I believe by stipulation of counsel

 5    we'd offer that as Kenner Exhibit 52.

 6              MR. LARUSSO:  I have no objection, Judge.  I

 7    know what the document is.

 8              MS. KOMATIREDDY:  Sorry.  No objection.

 9              THE COURT:  Exhibit 52 is admitted.

10              (Whereupon, Defendant's Exhibit 52 was received

11    in evidence.)

12              MR. HALEY:  Thank you.

13    Q    Sir, I'm also going to ask you to look what is marked

14    as Kenner Exhibit 1, a document in evidence, and indeed

15    you are entitled to look at the entire document, but I'm

16    going to refer your attention to the page marked with a

17    green -- yellow sticker.

18    A    I recognize it, yes.

19    Q    And does your signature appear on that document, sir?

20    A    Yes, it does.

21    Q    Now, I understand this is a copy of a document, is

22    that true?

23    A    Yes.

24    Q    Even though it is an a copy, you are still able to

25    recognize your signature, correct?
```

1961

```
1   A    Yes.
2              THE COURT:  Are you offering that, Mr. Haley?
3              MR. HALEY:  I'm sorry?
4              THE COURT:  Are you offering that?
5              MR. HALEY:  Sir, it's already in evidence.  I
6   apologize.
7              THE COURT:  Okay.
8   Q    Now, Mr. Nash, you testified on direct that before
9   you engaged Phil Kenner for his services you had another
10  financial advisor by the name of Mr. McRae, correct?
11  A    Correct.
12  Q    And after you decided to move from Mr. McRae to Phil
13  Kenner, he made various proposals to you in relation to
14  creating an investment portfolio; is that correct?
15  A    Yes, he did.
16  Q    And I believe you testified because you guys shared a
17  common passion for a great sport hockey, there was a
18  natural connection between the two of you; is that
19  correct?
20  A    Yes, there was.
21  Q    And that developed a trust between the two of you, is
22  that true?
23  A    Very much so.
24  Q    Has anyone told you, sir, as you sit here today, that
25  you should no longer trust Phil Kenner?  Yes or no?
```

1962

1    A     Lots of people, yeah.

2    Q     Anyone associated with the federal government tell

3    you that?  Yes or no?

4              MS. KOMATIREDDY:  Objection.

5              MR. HALEY:  Well, I withdraw the question.

6    Q     Are you friendly with Brian Berard?

7    A     No.

8    Q     What other hockey players at least involved in this

9    litigation do you have some sort of relationship with?

10   A     I don't exactly know who is all involved.  A couple,

11   I would say for sure, two or three.  Personal

12   relationship.

13   Q     Other than what you say people told you, have you

14   ever been in an instance where to your own personal

15   knowledge, Phil Kenner lied to you?  Yes or no?

16   A     My own personal experience?

17   Q     Yes.

18   A     Yes.

19   Q     As relates to that point, did you discuss this

20   particular issue with Phil Kenner either in person or over

21   the phone.  Yes or no?

22   A     Yes, I did.

23   Q     I take it you were dissatisfied with his answer?  Yes

24   or no?

25   A     Yes.

1963

1    Q    You testified on direct that you were happy with the

2    portfolio presented to you by Phil; is that correct?

3    A    Yes.

4    Q    And I believe you testified on direct that that

5    specific portfolio was still working today, true?

6    A    Yes.

7    Q    Meaning it is returning at least an investment that

8    you are satisfied with, isn't that true?

9    A    Yes.

10   Q    We know, sir, that the document that was signed by

11   Phil authorizing transfer of moneys to both the Hawaii

12   land development as well as Eufora was done pursuant to a

13   power of attorney, correct?

14   A    Yes, there was.

15   Q    And I believe you testified just so the record is

16   clear, that Phil did have the authority pursuant to the

17   power of attorney you read to him to make those transfers

18   on your behalf, isn't that true?

19   A    I believe so.

20   Q    Sir, I do just need to return briefly to a topic that

21   I did cover a moment ago, but in your direct examination

22   when you were asked specifically about the conversation

23   that you had with Phil concerning Eufora investment, we

24   know it took place in your car while you were on the

25   telephone, but I believe your answer was, again, we didn't

1964

1    talk a great deal about it.  I was guessing it would be

2    used for commercials?

3            MS. KOMATIREDDY:  Objection.  Misstates the

4    record.

5            MR. HALEY:  I'll withdraw the question.

6    Q    Well, did you say that you were excited about

7    obtaining an interest in Eufora because I was getting a

8    piece of a great company?

9    A    Yes.  I wasn't just buying a commercial, I was buying

10   a piece of Eufora.  What he mentioned was that they needed

11   to produce commercials and that's what my money was going

12   to go to.

13   Q    But your primary interest, I take it, was in

14   acquiring the interest of Eufora as a great company and

15   the commercial aspect was important but secondary to you,

16   correct?

17           MS. KOMATIREDDY:  Objection to form,

18   argumentative and asked and answered.

19           THE COURT:  You can answer that.

20   A    I didn't really pay particularly close attention to

21   what the money was going to be used for, I was wanting a

22   piece of Eufora that he told me numerous times prior to

23   that, it was a big company, there was a valuation of it I

24   believe at the time of a lot of money, and I was getting

25   in late and all he told me was that, yeah, it was going to

1965

1   be used primarily for commercials, but I was buying a

2   piece of Eufora not a commercial.

3   Q    And that's what was important to you, was it not,

4   that you were getting a piece of Eufora?  Yes or no?

5   A    Yes.

6         MR. HALEY:  Thank you.

7   Q    Now I know you testified on direct that your memory

8   of the conversation with Phil Kenner in connection with

9   the scope and use of GSF funds, did involve discussions

10  about a lawsuit concerning himself and a person by the

11  name of Kristin Myra (ph), correct?

12  A    Correct.

13  Q    Mr. Nash, you recently settled a lawsuit involving a

14  claim --

15        MS. KOMATIREDDY:  Objection.  Already litigated

16  this, your Honor.

17        THE COURT:  Why don't you approach the bench.

18        (Whereupon, at this time the following took

19  place at the sidebar.)

20        (Continued.)

21

22

23

24

25

1966

1           THE COURT:  Where are you going to?

2           MR. HALEY:  It's not my intention to go into the

3     claims made in the lawsuit as relates to alleged claims by

4     this individual concerning payments owed to him by John

5     Kaiser, wherein John Kaiser claimed that his signature was

6     forged on the document.  That's not my intention to do

7     that.  My intention as indicated on the record yesterday,

8     it is very focused, simply to ask him whether there came a

9     point in time he settled a lawsuit with John Kaiser.

10    That's all I wish to ask him with reference to this

11    particular question.

12          As an offer of proof, Judge, the follow-up

13    question will be prior to settling the lawsuit with John

14    Kaiser, did you have communications with Special Agent

15    Matt Galioto of the Federal Bureau of Investigation

16    wherein he attempted to persuade to you drop the lawsuit

17    against John Kaiser and in turn sue Phil Kenner in place.

18    And I believe, your Honor, that line of inquiry, I don't

19    know what it will lead to, but that line of inquiry is

20    relative and material to the defense of this action

21    wherein we claim consistently that there has been improper

22    --

23          MS. KOMATIREDDY:  -- Settlement is not relevant.

24          THE COURT:  He's not going into the details of

25    the settlement.

1967

1           MS. KOMATIREDDY:  The fact of settlement is not

2      relevant.  It's an attempt to impeach Mr. Kaiser.  The

3      second question is fine, but the first question is not

4      relevant and raises the possibility that Mr. Kaiser

5      settled because he did something improper.

6           THE COURT:  What is the basis of that?

7           MR. HALEY:  If I may, and perhaps it is

8      unnecessary, it is already in the record.  When John

9      Kaiser testified, he was asked did there come a point in

10     time he settled the lawsuit with -- actually specifically

11     said Sydor, no, I did not, then realized it was Nash, yes,

12     I did settle with Tyson Nash.  I believe it is in the

13     record that the settlement in particular was mentioned.

14     So that's in the record as far as that was concerned.

15          THE COURT:  I don't want you to mention it

16     again.  But what you proffer to him, all right.

17          MR. HALEY:  Very well.

18          (End of sidebar conference.)

19          (Continued.)

20

21

22

23

24

25

1968

1    (In open court.)

2    MR. HALEY:  Thank you, Judge.

3    Q    Mr. Nash, I believe you testified a short while ago

4    there has been any number of discussions that you had with

5    Special Agent Matt Galioto, is that true?

6    A    Correct.

7    Q    Do you recall approximately the last time you had a

8    conversation with Agent Matt Galioto?

9    A    In reference to what?  I talked to him this morning.

10   Q    Obviously.

11        Prior to talking to him this morning, when was

12   the last time you talked to him, either telephonically or

13   in person?

14   A    Last night.

15   Q    And prior to that, sir?

16   A    Yesterday morning.

17   Q    There came a point in time, sir, that a dispute

18   between yourself and John Kaiser was resolved, is that

19   true?

20   A    There was a time, yes.

21   Q    Prior to resolving that dispute between yourself and

22   John Kaiser, did you have a conversation with Special

23   Agent Galioto, yes or no?

24   A    Yes.

25   Q    And during the course of that conversation, did the

1969

```
 1   topic of your dispute with John Kaiser come up?  Yes or
 2   no?
 3   A    Yes.
 4   Q    And in substance, sir, during the course of that
 5   conversation, did Special Agent Galioto of the FBI suggest
 6   to you that you discontinue the dispute with John Kaiser
 7   and in turn commence a lawsuit against Phil Kenner?  In
 8   substance did that happen?
 9   A    No.
10   Q    Well, when you discussed the dispute involving John
11   Kaiser with Agent Galioto, when and where did that occur?
12   A    Over the phone numerous times.
13   Q    Was the particulars of the dispute between yourself
14   and John Kaiser discussed between the two of you?  Yes or
15   no?
16   A    Yes, mainly by me.
17   Q    Who initiated that call?
18        Did you or he?
19   A    He initiated the call.  At the end of the
20   conversation we briefly touched on the Kaiser issue, yes.
21   Q    During the course of that call, did you discuss the
22   Global Settlement Fund?  Yes or no?
23   A    Yes.
24   Q    During the course of the call did you discuss Eufora?
25   Yes or no?
```

1970

```
1    A    Yes.

2    Q    Are we talking about a specific call?

3    Q    No, we're talking about that call, sir, before the

4    dispute with Mr. Kaiser that was resolved.

5    A    Okay, yes.

6    Q    Was that discussion that you had with Special Agent

7    Galioto, before the dispute with Mr. Kaiser was resolved,

8    did that occur before or after your testimony in

9    connection with that Arizona lawsuit?  Yes or no?

10   A    We had conversations before and after, yes.

11   Q    During the course of that conversation did you

12   discuss your testimony as relates to that Arizona lawsuit

13   concerning the dispute with John Kaiser?  Yes or no?

14   A    Yes.

15   Q    During the course of that testimony in the Arizona

16   lawsuit -- sorry.  Are you talking about my deposition or

17   my testimony?

18            MR. HALEY:  I'm talking about your deposition,

19   sir.

20            THE WITNESS:  Okay.

21            MR. HALEY:  I'll back up a little bit, sir.

22            There's no question, sir, that before you

23   committed money to the Global Settlement Fund, you had

24   discussions with Phil Kenner about how that money was to

25   be put to use, correct?
```

1971

1    A    I did briefly when they sat in my living room but it

2    was mainly Tommy who took control of that conversation.

3    Q    But Phil Kenner was present part of that

4    conversation, isn't that true?

5    A    Yes, he was.

6    Q    Now, in the course of that deposition, were you asked

7    a question about whether or not you spoke with Phil Kenner

8    about the Global Settlement Fund?

9              MS. KOMATIREDDY:  Objection.  Improper

10   impeachment.

11             THE COURT:  You can answer, if you know.

12             THE WITNESS:  Say the question again, please.

13   Q    Sure.  During the course of the deposition in the

14   Arizona lawsuit, were you asked a question about whether

15   you spoke to Phil Kenner about the Global Settlement Fund?

16   A    I don't recall.

17   Q    Sir, kindly take a look at the document marked Kenner

18   43 for identification.

19   A    Yes.

20   Q    Do you recognize that document?

21   A    I've never seen it in this form but this is my

22   deposition.

23   Q    Would you kindly take a look at page 12, sir, and

24   lines 8 through 10, and just read it to yourself.

25   A    Okay.

1972

1    Q    Does that refresh your recollection as to whether or

2    not you were asked a question about whether you spoke with

3    Phil Kenner about the Global Settlement Fund?

4    A    Yes.  It says no, but it was the context in which

5    this was asked that you are missing.

6    Q    Sir, I didn't ask the question yet.

7    A    Okay.

8    Q    My question is:  Does that refresh your recollection

9    about whether or not you were asked a question about the

10   Global Settlement Fund, does it refresh your recollection?

11   A    Yes.

12   Q    Now, we can agree, sir, that at least as far as that

13   question is concerned:

14        Question:  Did you talk with Phil Kenner about

15   this Global Settlement Fun?

16        Answer:  No. "

17        Is that correct?

18        MS. KOMATIREDDY:  Objection, leading.

19        THE COURT:  If the Government has the larger

20   portion of the transcript, they can read it into the

21   record or they can ask him to explain that.

22   Q    We can agree it says that?

23   A    Yes, it says that.

24        Can I explain the answer?

25   Q    You know, actually yes, explain the answer, sir.

1973

1    A    Okay.  Thank you.

2         The context in which this question was asked was

3    the after conversation about the Global Settlement Fund,

4    not whether I ever talked to Phil Kenner about the Global

5    Settlement Fund.  My obvious answer would be yes, I did

6    talk to Phil Kenner about the Global Settlement Fund as I

7    stated under oath in my own words in my living room, but I

8    didn't talk to Phil Kenner after the money was given to

9    the Global Settlement Fund.  It was just given and I don't

10   recall -- I didn't pay attention to it after.  I was

11   guessing it was being used for whatever he said it was

12   going to be used for and Tommy said it was going to be

13   used for.

14   Q    So when you answered that question, you were

15   referring to the point in time after you received the

16   complete list of how the Global Settlement Funds were

17   disbursed from Phil Kenner, is that the point in time in

18   your mind you were thinking of?

19   A    Sorry.  Ask me again.

20   Q    Sure.

21        We know on your direct testimony there came a

22   point in time when Phil Kenner gave you a very detailed

23   list in evidence as to what had occurred in reference to

24   moneys contributed to the Global Settlement Fund?

25        MS. KOMATIREDDY:  Wrong witness.  That was

1974

1    Mr. McKee's testimony.

2    Q    Did there come a point in time, sir, that you

3    requested of Phil Kenner a list of the disbursements

4    coming out of the Global Defense Fund?

5              THE COURT:  Global Settlement Fund.

6              MR. HALEY:  Yes.

7    A    I believe I had a conversation.  I don't recall ever

8    actually sitting down with Phil.  I remember sitting down

9    with Tommy about the disbursements of the Global

10   Settlement Fund in great detail, but I don't really recall

11   talking to Phil about it.

12   Q    When you say you don't recall, so it may or may not

13   have occurred in terms of the conversation you had with

14   Phil about the disbursements in the Global Settlement

15   Fund?

16   A    It may or may not have happened.

17   Q    Sir, I'm going to ask you to take a look at a

18   document marked Government's Exhibit 767 in evidence.

19   Just take a look at that.

20   A    Okay.

21   Q    Does that appear to be a document reflecting

22   disbursements out of the Global Settlement Fund?

23   A    It could be.  There was no title on that.  I don't

24   know whose bank account this is.

25   Q    Well, we can agree, sir, at least as far as this

1975

1  document is concerned, for example, you see the sum of

2  $25,000.  It says Myra (ph) case.  Do you see that?

3  A    Yes.

4  Q    And would that have some meaning to you in connection

5  with the Global Settlement Fund?

6  A    Yes, it would.

7  Q    Do you know, sir, to the best of your memory, whether

8  or not you ever requested a document of this nature from

9  Phil Kenner?

10 A    I believe I did and seeing that now I believe I went

11 through it with Phil at some point, yes.

12           (Continued.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:13-cr-00607-JFB-AYS   Document 305   Filed 07/07/15   Page 38 of 242 PageID #: 6289

1976

1    CROSS-EXAMINATION (Continued)

2    BY MR. HALEY:

3    Q.    And to the best of your belief and memory, when and

4    where did that meeting take place?  We went through it

5    with Phil.  His place?  Your place?  The best of your

6    memory.

7    A.    I believe that took place at AJ's Grocery Store.

8    Q.    Where is AJ's Grocery store, sir?

9    A.    It is in Scottsdale.

10   Q.    Okay.  When you went over with Phil Kenner,

11   Government Exhibit 767 -- I very seldom use this, so let

12   me give it a try.

13         When you went over this very detailed document

14   in connection with those numbers with Phil Kenner, did he

15   answer any and all questions you might have about those

16   disbursements?  Yes or no?

17   A.    Yes.

18   Q.    And I take it after that -- withdrawn.

19         I take it after that meeting with Phil Kenner

20   where you discussed the disbursements on that document and

21   he gave you answers, after that there was no further

22   discussion between you and he with reference to the Global

23   Settlement Fund.

24         Is that your testimony?

25   A.    Correct.  I had no issue.

Nash - Cross/Mr. Haley

1977

1  Q.   So earlier when I asked:

2            *"Did you talk with Phil Kenner about this Global*

3  *Settlement Fund?"*

4            *"Answer:  No,"* in your disposition, you were

5  referring to the point in time after you received this

6  document.  Is that what your testimony is?

7  A.   Correct.

8            You've got to remember this --

9  Q.   Sir, you have answered the question.

10           Can I have a moment, Judge?

11           (There was a pause in the proceedings.)

12  BY MR. HALEY:

13  Q.   Mr. Nash, of your own -- withdrawn.

14           Mr. Nash, are you aware of the current value of

15  the loan to Ken Jowdy from Little Isle IV in connection

16  with the principal amount with accumulated interest?

17           MS. KOMATIREDDY:  Objection.  Assumes facts not

18  in evidence.

19           THE COURT:  The question is, is he aware.

20  Again, all these questions are not in evidence.  If he

21  knows the answer, he can answer it.

22  A.   I believe 6 million was a number that rings a bell.

23  BY MR. HALEY:

24  Q.   Well, did you have an awareness, sir, at any point in

25  time that the loan to Ken Jowdy was running at 15 percent

1978

1    interest?

2    A.    No.  I don't recall.

3    Q.    Now, you were asked a question on direct in

4    connection with the return of a portion of your $100,000

5    commitment to allow for you.  You received $42,500.  Is

6    that correct?

7    A.    Yes.

8    Q.    And you had been shown a document where the document

9    indicated that upon the closing there would be a 60

10   percent return of investment.

11          Do you recall that?

12   A.    Yes.

13   Q.    So, not that it is insignificant, sir, but we are

14   talking about a $15,000 differential between the document

15   and when you actually received it.  True?

16   A.    Yes.

17   Q.    So the actual numbers didn't come to fruition

18   following Lehman's closing.  Isn't that correct?

19          MS. KOMATIREDDY:  Objection.

20          MR. HALEY:  I withdraw the question, Judge.

21   BY MR. HALEY:

22   Q.    Were you aware, sir, that as a result of the Lehman

23   closing, there were to be additional monies coming into

24   Little Isle IV, or Ula Makika in particular, in the amount

25   of $4 million for what are known as milestone payments?

1979

```
 1            MS. KOMATIREDDY:  Objection.

 2            THE COURT:  Overruled.

 3            You can answer if you know.

 4   A.   I don't know.

 5   BY MR. HALEY:

 6   Q.   Does the name or company Lehman Brothers mean

 7   anything to you, sir?

 8   A.   Yes, it does.

 9   Q.   And of your knowledge, what was Lehman Brothers?

10   A.   A monster company.

11   Q.   And are you aware, sir, that Lehman Brothers went

12   bankrupt in September of 2009?

13   A.   Yes.

14   Q.   Do you blame Phil Kenner for the bankruptcy of the

15   Lehman Brothers?  Yes or no?

16   A.   No.

17            MS. KOMATIREDDY:  Objection.

18            THE COURT:  Overruled.

19            MS. KOMATIREDDY:  It is September 2008, your

20   Honor.

21            MR. HALEY:  Excuse me.  That is correct.

22   September 2008.  Thank you.

23            Thank you, Mr. Nash.  I have no further

24   questions.

25            THE COURT:  Why don't we take a morning break
```

Case 2:13-cr-00607-JFB-AYS   Document 305   Filed 07/07/15   Page 42 of 242 PageID #: 6293

1980

1   before Mr. LaRusso's cross-examination.  The jury may take

2   the morning break.

3            (Recess taken at 11:10 am.)

4            (The following ensued in the absence of the jury

5   at 11:25 am.)

6            THE COURT:  Mr. LaRusso.

7            Mr. Miskiewicz?

8            MR. MISKIEWICZ:  I just want to raise one

9   timekeeping or scheduling issue.

10           We have a witness from California after

11  Mr. Nash.  It is Mr. Nolan.  I'm hoping we can have a

12  relatively brief direct with him, and I'm hoping we can

13  finish with him.

14           And I would ask if the court would consider

15  either -- I don't know how long this next

16  cross-examination will be -- but either consider a

17  slightly shorter lunch or maybe staying a little bit past

18  4:30, if we can.  I know it is difficult to do that but

19  I'm just asking.

20           THE COURT:  How long do you think the cross is

21  going to be?

22           MR. LaRUSSO:  Mr. Miskiewicz had asked me,

23  Judge.  I went through my notes and it is probably going

24  to take at least through lunch and maybe a little past

25  there.

1981

1    But I can tell the Court that my cross on the
2  next witness is not that long, so I don't anticipate it
3  being as long as either Mr. McKee or Mr. Nash.  So I will
4  do whatever I can to try to expedite the conclusion of
5  Mr. Nolan's testimony today, if we can.
6            THE COURT:  Okay.
7            MR. HALEY:  Your Honor, again, it is always a
8  function of what the witness has to say.
9            I don't necessarily think my cross of Mr. Nolan
10  will be that extensive.  Judge, I do ask for the Court's
11  beneficence.  I do have just a few more questions, I mean
12  three or four questions.  Of this witness.
13            THE COURT:  Fine.  Let's bring them in and we
14  will take a shorter lunch break.
15            (The following ensued in the presence of the
16  jury.)
17            THE COURT:  Please be seated.
18            Mr. Haley has a few more questions, so he is
19  going to go before Mr. LaRusso.
20            Go ahead, Mr. Haley.
21            MR. HALEY:  Thank you, your Honor.
22  BY MR. HALEY:
23  Q.   Mr. Nash, you testified on direct that the parting of
24  ways between yourself and Phil Kenner occurred as a result
25  of some dispute between the two of you.  Is that correct?

1982

1    A.    Yes.   Correct.

2    Q.    I see.  Well, isn't it true, sir, that the reason

3    that you no longer used Phil's services was because after

4    your retirement you found that you couldn't afford his

5    fees and that it was time to part ways?  Isn't that true?

6    A.    As I mentioned yesterday, I did.

7               MR. HALEY:  Thank you, sir.  No further

8    questions.

9               THE COURT:  Mr. LaRusso.

10              MR. LaRUSSO:  Thank you, your Honor.

11

12   CROSS-EXAMINATION

13   BY MR. LaRUSSO:

14   Q.    Good morning, Mr. Nash.

15   A.    Good morning.

16   Q.    My name is Bob LaRusso and I represent

17   Mr. Constantine.

18              I'm going to, just at the outset, turn your

19   attention to the commercial that you were talking about

20   earlier.

21              Just by way of setting the stage for the

22   questions, your made your investment on April 24, 2008,

23   into Eufora.  Is that correct?

24   A.    Correct.

25   Q.    That was $100,000?

1983

1  A.    Correct.

2  Q.    To make that investment you spoke to Mr. Kenner about

3  it.  Is that right?

4  A.    Yes.

5  Q.    And in sum and substance, during the course of that

6  conversation he indicated to you that it would be used for

7  a commercial.  Is that correct?

8  A.    Yes.  Not solely, but yes.

9  Q.    So one of the subjects that you brought up in regards

10  to your investment was the need for money to produce a

11  commercial that would enhance the value of Eufora?

12  A.    Yes.

13  Q.    Right.  By way, at the time that you made your

14  investment in April of 2008, you had not met nor spoken to

15  Mr. Constantine at that point.  Is that correct?

16  A.    I don't believe so.

17  Q.    Actually, the first time that you met him is when you

18  talked to him about the Global Settlement Fund in June of

19  2009.

20  A.    I don't believe that's the case, no.

21  Q.    You have a recollection of meeting and speaking to

22  Mr. Constantine before he came to your house and discussed

23  with you Eufora and other aspects?

24  A.    I apologize.  This happened a long time ago.  I'm

25  trying to remember everything.  I'm also trying to burn

1984

1   all this from my memory and move forward with my life.

2          But I thought the first time I met Tommy was at

3   his office after I had invested in Eufora and shortly

4   afterwards, is my understanding.

5   Q.   That is your best recollection.  But it could be that

6   it might have occurred after you first spoke with him

7   about the Global Settlement Fund?

8          MS. KOMATIREDDY:  Objection.

9          THE COURT:  Overruled.

10  A.   I think it would have been weird for him to come into

11  my house for the first time meeting me and asking me for

12  money, but I could be wrong.

13  BY MR. LARUSSO:

14  Q.   Okay.  That is a fair answer.

15         You do remember Mr. Kenner telling you about the

16  fact that there would be a meeting regarding the Global

17  Settlement Fund?

18  A.   Yes.  He set it up.  Correct.

19  Q.   And he set it up.  And at that point in time

20  Mr. Constantine accompanied him to speak with you and your

21  wife.

22  A.   Yes.

23  Q.   Okay.  Let's get back just a few minutes to the

24  commercial.

25         Do you remember ever speaking to Mr. Constantine

1985

1    about the commercial that you understood a portion of your

2    money might be used for?

3    A.    Yes.

4    Q.    Do you recall actually receiving an email from him

5    with the commercial attached?

6    A.    Yes.

7    Q.    Let me show you what's been marked for identification

8    as C122T.  Would you take a look at this, please.

9          Do you recognize that?

10   A.    Yes, I do.

11   Q.    And you recognize it because it is an email dated

12   October 15, 2009, from Mr. Constantine to a number of

13   email addresses, one of which is yours.

14         Is that correct?

15   A.    Correct.

16   Q.    And attached to that email is the -- does it refresh

17   your recollection that is the commercial that we're

18   referring to?

19   A.    It is, yes.

20         MR. LaRUSSO:  Your Honor, may I ask that it be

21   received in evidence at this point?

22         THE COURT:  What number is it?

23         MR. LaRUSSO:  C122.

24         MS. KOMATIREDDY:  No objection, your Honor.

25         MR. HALEY:  No objection.

Nash - Cross/Mr. LaRusso

1986

1    THE COURT:  C122 is admitted.

2    (Defense Exhibit C122 in evidence.)

3    BY MR. LARUSSO:

4    Q.    Dated October 15, 2009, from Mr. Constantine to a

5    number of email addresses, and I believe the highlighted

6    one is NashT18?

7    A.    Correct.

8    Q.    And is that your email address?

9    A.    Yes, it is.

10   Q.    Does that nickname have anything to do with your

11   career in the National Hockey League?

12   A.    Possibly.

13   Q.    The content of the email, Mr. Nash, if I may read:

14   *"This is the new commercial that we will be airing*

15   *nationally for Eufora."*

16          And that is what you understood a portion of

17   your money would be used for.  Is that correct?

18   A.    Yes.

19   Q.    Actually, you had an opportunity to go to

20   Mr. Constantine's office in the Eufora building and speak

21   to him about this commercial.  Correct?

22   A.    Yes.

23   Q.    And at one point you actually noted that awards had

24   been given for this commercial.

25   A.    I believe so.  Yes.

1987

1    Q.   Let me show you what has been marked as C21 for

2    identification.

3         Are these possibly the two awards that you

4    remember seeing when you discussed with Mr. Constantine

5    the commercial that we have been discussing so far?

6    A.   Yes.  It rings a bell.

7         I don't remember seeing these, but I knew they

8    were great commercials.  I was extremely proud of them.

9    Q.   You don't recognize these as the particular awards

10   that you saw in his office?

11   A.   No.  I was more aware of the patent.

12        MR. LARUSSO:  I don't know if I said the exhibit

13   number correctly.  It should have been C121.

14   BY MR. LARUSSO:

15   Q.   Mr. Nash, did you ever have any difficulties

16   communicating with Mr. Constantine?

17   A.   Never.

18   Q.   You were able to reach out to him and speak with him

19   on any subject that you wished to talk to him about?

20   A.   Correct.

21   Q.   Likewise, he was able to discuss with you any issues

22   that you had?

23   A.   Yes.

24   Q.   I'm going to just focus in on the meeting that took

25   place at your house and see if I can put a timeframe on

1988

1    it.

2           Your investment was made June 10, 2009.  I

3    believe one of the Government Exhibits showed a transfer

4    of the money on that day.

5           Do you remember that?

6    A.    Yes.

7    Q.    Would the meetings with Mr. Constantine and

8    Mr. Kenner have occurred sometime around that or shortly

9    before?

10   A.    Can you repeat the question?

11   Q.    If you sent your email June 10 of 2009, would you

12   have met with them around that date, on that date, or

13   shortly before?

14          THE COURT:  You said sent your email.  You mean

15   the money?

16          MR. LaRUSSO:  The money.  I apologize.

17   A.    I sent the money on what date?

18   BY MR. LARUSSO:

19   Q.    Do you remember, it is Government Exhibit 1510, and

20   it says $100,000 to Ron Richards' account June 10, 2009?

21   A.    For the Global Settlement Fund.  Correct?

22   Q.    Correct.

23   A.    Yes.

24   Q.    When would you have met with Mr. Constantine and

25   Mr. Kenner regarding that?

1989

1   A.   Shortly before that.

2   Q.   Now, you told us that there were a lot of issues that

3   were discussed in connection with the use of the Global

4   Settlement Fund monies at that meeting.  Is that correct?

5   A.   Correct.

6   Q.   And then, in addition to discussing the Global

7   Settlement Fund you also mentioned that there was a

8   discussion with Mr. Constantine particularly about Eufora.

9   Is that also correct?

10  A.   Yes.  That was a big part of it because I was getting

11  an extra percentage in a company that had a huge value

12  attached to it, so it was a no-brainer for me.  It was

13  just a selling point from them to me.

14  Q.   Okay.  But in addition to discussing Eufora and the

15  potential, the investment that you had made, you also said

16  that Global Settlement Fund was in part going to be used

17  to get rid of some bad apples.

18            Do you remember that?

19  A.   Yes.

20  Q.   Could you tell us who the bad apples were?

21  A.   Ethan Moreau.  Owen Nolan.  Joe Juneau.  And I think

22  there is one other.

23  Q.   And when you saying that they were classified as the

24  bad apples, is it because they were looking to sell their

25  interests in Eufora?

1990

1    A.    I didn't know at the time they were wanting to sell.

2    I'm sure they all wanted money out of it at some point,

3    but they were causing waves outside of Eufora, is what I

4    mean when I say bad apples.

5    Q.    Thank you.  And part of the discussion centered

6    around the fact that global settlement funds were going to

7    be used to acquire their interest in Eufora and their

8    interest in a hangar as well?

9    A.    Can you say that again?

10   Q.    Part of the discussion that you had regarding the

11   Global Settlement Fund is that the money could be used to

12   acquire their interest in Eufora, which included the

13   interest in the air park, which has been referred to at

14   times as the hangar.  Is that correct?

15   A.    Correct.  And we were obtaining their interest.

16   Q.    And I think you testified that significant for you

17   was the fact that you and others were going to obtain

18   their shares once the Global Settlement Fund had acquired

19   their interest, as we just discussed.  Is that correct?

20   A.    Yes.  Once we paid them out, their percentages would

21   be divvied up between the Global Settlement Fund.

22   Q.    Right.  Do you know if Mr. Juneau's interests were in

23   fact paid out by money from the Global Settlement Fund?

24   A.    I believe they were.

25   Q.    Do you recall that Mr. Juneau's interest was paid out

1991

1    by providing an airplane to him in lieu of the monies that

2    he was seeking for his shares in Eufora?

3            Does that refresh your recollection?

4    A.   I knew he was involved in the Falcon.  Yes.

5    Q.   And do you know that the Falcon that he got in return

6    for his interest was valued at $450,000?

7            Do you remember that?

8    A.   I don't recall exactly what the numbers were.

9    Q.   Well, do you have any recollection of the fact that

10   when Juneau was bought out, the Global Settlement Fund did

11   not have to pay the total amount of money that he was

12   seeking, which was $550,000?

13           MS. KOMATIREDDY:  Objection.

14           THE COURT:  Overruled.

15           If you know.

16   A.   I don't remember all the details of Joe Juneau's

17   situation.

18   BY MR. LARUSSO:

19   Q.   To the best of your recollection, all you know is

20   that the monies from the Global Settlement Fund were used

21   in some fashion to satisfy his interest in Eufora.  The

22   values you don't know.

23   A.   Correct.

24   Q.   Is that fair?

25   A.   Correct.

1992

1    Q.    Okay.  Now, you also, and, again, I'm not going to

2    rehash everything, but just a few points.  You indicated

3    that the Global Settlement Fund had other purposes as

4    well, one of which was to pay lawyers.  Is that correct?

5    A.    That's right.

6    Q.    And so, I don't put words into your mouth, what did

7    you understand at that point when you were told that the

8    monies from the Global Settlement Fund would be used to

9    pay lawyers?

10          Just what do you remember on that?

11   A.    I had no issue with it.  As I stated, they sat in my

12   living room, we discussed some of the ongoing issues, the

13   shortage of funding.  Diamanté and the lawyer fees that

14   were adding up on that side.  Phil running out of money.

15   The buyout of those guys for their interest.  And the

16   Kristie Myrick lawsuit against Phil Kenner.

17   Q.    So there were a number of lawsuits that were

18   discussed in regards to the use of global settlement

19   funds.  Is that correct?

20   A.    Correct.

21   Q.    But the overall purpose was to, as best as possible,

22   settle these open suits and to try and recover as much of

23   the investments that were made in particular with

24   Mr. Jowdy down in Mexico.

25          Is that correct?

1993

1   A.   Absolutely.  It had started with Eufora, as I have

2   mentioned.  Tommy gave a speech about the progress of

3   Eufora and how great it was doing.

4         Phil had talked about Diamanté and how we were

5   close to the finish line.  We needed to get that last kick

6   over the hump and take over the property hopefully and be

7   able to sell it on our own.

8   Q.   Were you aware, before you actually made your

9   investment or contribution into the Global Settlement

10  Fund, that civil suits had actually commenced against

11  Jowdy, Ken Jowdy?

12  A.   That there was --

13         MS. KOMATIREDDY:  Objection.  Personal

14  knowledge.

15         THE COURT:  Overruled.

16         You can answer.

17  A.   Can you say that again?

18  BY MR. LARUSSO:

19  Q.   Okay.  Your contribution is June of 2009.  Correct?

20  A.   Correct.

21  Q.   Do you remember at or about that time whether or not

22  a suit in fact had been filed or was contemplated to be

23  filed against Ken Jowdy in regards to the money in the

24  Global Settlement Fund.

25  A.   I knew there was an ongoing lawsuit against

1994

1    Ken Jowdy.  Yes.

2    Q.   And that -- your statement is right on the money.

3    And I just want to make sure this has been received in

4    evidence as C104.

5         MS. KOMATIREDDY:  Objection, your Honor.

6    BY MR. LaRUSSO:

7    Q.   Do you remember seeing that email dated June 17,

8    2009, from Mr. Constantine to a number of email addresses?

9    A.   My address is on there.  Yes.

10   Q.   And do you remember at any time receiving an email

11   enclosing the two complaints against Mr. Jowdy at or about

12   the time June 17, 2009?

13   A.   To be honest, I don't really recognize this email and

14   the wording in it.  I may or may not -- I obviously got

15   it.  I don't know what it exactly means.  I don't know

16   what's in these.

17   Q.   Just the last question.  Exhibits 104A and 104B, only

18   for identification.  Look at the caption.

19        Does that in any way refresh your recollection

20   to receiving copies of complaints against Mr. Jowdy in

21   regards to the monies the Global Settlement Fund was

22   paying?

23   A.   Yes, that looks familiar.

24   Q.   Okay.  Thank you.

25        Now, you also testified on direct that during

1995

1    your discussions with Mr. Kenner and Mr. Constantine at

2    your home in regards to the Global Settlement Fund, there

3    was mention of a company called Diamanté and the

4    acquisition of Diamanté.

5              Do you remember that?

6    A.    Yes.

7    Q.    What did you understand Diamanté Air to be at that

8    time?

9    A.    Diamanté Air?

10   Q.    Yes.  Did you ever hear of a company called Diamanté?

11   A.    Diamanté.  I don't know what the *Air* is.

12   Q.    Okay.  Do you remember anything about acquiring a

13   company that Mr. Jowdy -- that had ownership of several

14   airplanes?

15   A.    No.

16   Q.    Let me show you, I'm going to put it up on the

17   screen -- by the way, would it be fair to say that

18   Mr. Constantine provided undated information to you and

19   other contributors regarding the monies that were spent by

20   the Global Settlement Fund?

21   A.    I had went in there to Tommy's office.  I don't

22   recall the date.  Again, if I had an issue with anything,

23   both him and Phil were open to sitting down and discussing

24   any issue that I had.

25              I remember going over to Tommy's office and

1996

```
 1   going over the whiteboard where he had everything marked

 2   out as to where the money went.  And I think I had a

 3   conversation as well with his accountant.

 4   Q.   And after those conversations, you were satisfied

 5   that your answers were properly responded to?

 6   A.   Yes.  I didn't do much talking.  I just listened.

 7   And yes, I was satisfied.

 8   Q.   I'm going to show you what has been received in

 9   evidence as Government Exhibit 31.  I'm sorry, Defense

10   Exhibit C31.

11        Do you see that?  That is an email dated

12   July 27, 2009, which is approximately a little more than a

13   month after you made your contribution to the Global

14   Settlement Fund.

15        Do you see your email address in there?

16   A.   Does this screen work here?  For me?

17   Q.   I'm sorry?

18        THE COURT:  She is going to turn it on for you.

19   BY MR. LaRUSSO:

20   Q.   Mr. Nash, do you see your email address up there?

21   A.   Yes, I do.

22   Q.   Just take a look.  And I will ask you to briefly read

23   it to yourself.  I'm going to highlight certain portions

24   of it.

25        Do you recall receiving this email, Mr. Nash?
```

1997

1    And, again, take whatever time you need to look at it.

2    There are two pages.  And I can provide you with the

3    original.

4            It may go faster if I do this, your Honor, with

5    your permission.

6            Mr. Nash, do you remember Mr. Constantine in an

7    email to you on July 27, 2009, telling you, *"As you may*

8    *recall through our discussions, one of the issues that was*

9    *reached in the resolve was a part of our Global Settlement*

10   *effort was Diamanté Air."*

11           Does that refresh your recollection, Mr. Nash,

12   now to having received an email discussing a company

13   called Diamanté Air?

14   A.   Not really, to be honest.

15           I knew we were involved in an airplane.  I knew

16   it as the Falcon.  That's all I really kind of knew.

17           I went to the hangar as well with Tommy and he

18   showed me the plane and he showed me the inside of it and

19   told me I could use it anytime I wanted to.

20   Q.   Does this refresh your recollection that part of the

21   Global Settlement Fund effort was to resolve the ownership

22   of three airplanes that Mr. Jowdy had control of and that

23   Global Settlement Funds were going to be used to resolve

24   that difference, that dispute?

25   A.   Again, the airplanes were something I didn't really

1998

1    know a whole lot about.

2              I wasn't really interested.  It wasn't my

3    original investment.  I didn't invest into any airplanes

4    originally.  All I knew from the Global Settlement Fund is

5    my hundred thousand dollars was -- was getting me a part

6    of a Falcon, and that's all I kind of know.

7              And the only name associated with that Falcon in

8    my recollection is Joe Juneau.

9    Q.   And when you received emails from Mr. Constantine,

10   especially when they discussed the expense of Global

11   Settlement Fund's money, did you call him up if you had

12   any questions regarding what the monies were being spent

13   for?

14   A.   Not really in the process.  I think at the end of it

15   all is when everything kind of hit the fan.

16   Q.   So during this period of time, July of 2009, when you

17   would receive email communications giving you an update on

18   the Global Settlement Fund, you would have read the

19   emails.  Correct?

20   A.   Skimmed it, possibly.

21   Q.   But you never called Mr. Constantine and then asked

22   questions regarding what was contained in that email?

23   A.   I don't believe I would have specifically called.  He

24   may have talked to me about it.  I can't say for sure.

25   Again, they were always open to any discussion.

1999

1   Q.   Does it refresh your recollection a little bit -- and

2   I apologize to the Court.

3        Going on, it talks about *Diamanté Air which*

4   *involves several airplanes and a lawsuit which was filed*

5   *by the bank against Phil and those of you who invested in*

6   *the company?*

7        Does that refresh your recollection more about

8   the Diamanté Air?

9        No?

10  A.   Not really.  I didn't know anything about several

11  airplanes.  I knew about one, really, that I can remember.

12  Q.   Other than Mr. Juneau, did you know that there were

13  other hockey players who also had invested in a company

14  called Diamanté Air?

15  A.   I believe Gonchar rings a bell.  And I believe there

16  was credit lines.

17       Tommy and Phil used to talk to me about a lot of

18  stuff, stuff I didn't care a whole lot about because I

19  wasn't involved so.

20  Q.   Okay.  So you do have some vague recollection about

21  Mr. Gonchar owning some interest in an airplane with other

22  hockey players, but you don't know the particulars of it.

23  Is that correct?

24  A.   I don't know any particulars.

25  Q.   All right.  Do you remember -- and again, I'm not

2000

1  going to read it -- well, let me jump because you have

2  given us much of what your recollection is.  I'm just

3  going to jump down and read the last portion and see if

4  this helps refresh your recollection of more knowledge

5  regarding Diamanté Air.

6         *"For those of you that invested in Diamanté Air*

7  *originally,"* which was not you.  Is that correct?

8  A.    Correct.

9  Q.    *"This solution and your current ownership of this*

10 *airplane does not alleviate Jowdy and Bailman's*

11 *responsibility for this mismanagement of the original*

12 *deal, and we intend to pursue every legal and financial*

13 *remedy to recover your losses along with our current*

14 *endeavors against Jowdy.  This is the last lawsuit that is*

15 *filed.  This solution simply got the airplane, itself, and*

16 *the bank issue, loan, personal guarantee, lawsuit sorted*

17 *out."*

18        Does that refresh your recollection a little

19 more about the acquisition of the airplane for

20 Mr. Gonchar's involvement and others?

21 A.    Not really.  The only thing I cared about was Jowdy.

22 Anything involving Jowdy and Diamanté specifically, Eufora

23 specifically.

24        As long as I didn't owe money, I didn't really

25 pay attention to it.

2001

1   Q.   The last part, I would ask you to listen to this and

2   then I'm going to ask you the same question about

3   recollection.

4        "Finally, this is just one of the investment

5   acquisitions and business solutions that overlay over the

6   legal strategy that we presented as part of the Global

7   Settlement plan.

8        I have attached the documentation for all of you

9   to sign for your respective share of ownership in the

10  airplane company.  This is a very basic operating

11  agreement, but you should definitely read it, sign it, and

12  send it back to me at your convenience.

13       Please do not hesitate to call me if you have

14  any questions.  You will be receiving a similar agreement

15  for the ownership interest that we acquire from the bad

16  guys of the Eufora shares as well as the Avalon hangar

17  building, which is actually where the plane is kept and

18  Eufora's headquarters.  I have also attached photos of the

19  plane?"

20       Does that refresh your recollection anymore

21  about Diamanté Air and its connection with the assets also

22  belonging to the bad guys?

23  A.   Referring to the bad apples?

24  Q.   Yes.

25  A.   Yes.  I recognize some of the verbiage in there.

1   Again, the only plane I ever saw is the Falcon.  The only

2   file I have is a Falcon file in my office, which contains

3   nothing.

4           I don't know where, if I signed something, where

5   it is.  Or what I received after that, I don't know.

6   Q.   You have no doubt that you received this email.

7   Correct?

8   A.   If my address is on it, I must have.

9   Q.   You just don't have a recollection of some of the

10  particulars that we were discussing?

11  A.   No.

12  Q.   By the way, would you agree with me that when you

13  discussed the purposes of the Global Settlement Fund, it

14  was your understanding that the purposes were, quote,

15  *"very broad,"* end quote?

16  A.   Very broad?

17  Q.   Very broad.

18  A.   About the Global Settlement Fund?

19  Q.   Yes.

20  A.   There was, they were laser focussed in some areas and

21  very broad in others.  Yes.

22  Q.   Laser focused on Jowdy and the lawsuit?

23  A.   On Jowdy.

24  Q.   But very broad in other areas such as the airplane

25  and the hangars and other suits and things like that.  Is

Case 2:13-cr-00607-JFB-AYS   Document 305   Filed 07/07/15   Page 65 of 242 PageID #: 6316

2003

1   that correct?

2   A.   Yes.  I didn't, again, I didn't care about any of

3   that other stuff.  All I cared about was Diamanté, getting

4   that figured.

5        That is a big project, worth a lot of money.

6   Eufora apparently was worth, I don't know how much.  Any

7   one of those hit, I am sailing away from the whole thing.

8   That's all I cared about.

9   Q.   When I asked you whether or not you discussed the

10  purposes of the Global Settlement Fund, you characterized

11  the use of the Global Settlement Fund as a very broad

12  area.

13  A.   Well, I mentioned the bad apples.  I mentioned

14  Phil Kenner's secretary.  I mentioned lawsuits and bills.

15  If you call that broad, then...

16  Q.   Do you remember being asked this question and giving

17  this answer?

18        3500 TM3.  Page 30 of deposition September 17,

19  2014.

20        "Question:" -- I keyed up to the wrong page.  I

21  apologize.

22        Page 10.  Line 3.

23        "Question:  What is your understanding of the

24  purposes of the Global Settlement Fund?

25        "Answer:  The Global Settlement Fund, hmm, my

2004

1  *understanding was it was very broad, it was going to be*

2  *used for a number of things."*

3          Do you remember giving that answer to that

4  question?

5  A.   I do in a case that revolved nothing around the

6  Global Settlement Fund.  Yes.

7  BY MR. LaRUSSO:

8  Q.   So you described the purposes of the Global

9  Settlement Fund on a prior occasion as very broad?

10 A.   Apparently, I did.

11 Q.   You did.  Not apparently.  You did.  Is that correct?

12 A.   Correct.

13 Q.   Now, do you remember, after you had made your

14 contribution, being invited to attend by telephone

15 conference call with Mr. Constantine and the other

16 contributors to the Global Settlement Fund?

17 A.   I don't recall.

18 Q.   I will try and do this as quick as I can, Mr. Nash.

19          I'm going to show you what has already been

20 received in evidence as C33, C34, C35, C36, and C32.

21 Okay?  Just take a look at them.

22          I'm going to ask you, do recognize that these

23 are emails from Mr. Constantine?  You are included as one

24 of the recipients.

25 A.   Okay.

2005

1   Q.   And do you agree with me that these are emails that

2   are dated from June 10, the date that you actually made

3   your first contribution, through June 25, again June 10,

4   August 19.

5            And I will show you one more, C36, which is

6   October 22, 2009.

7   A.   Yes, I do.

8   Q.   Does that refresh your recollection that there were a

9   series of conference calls held between June and October

10  where you were invited to participate by way of telephone,

11  with Mr. Constantine providing information regarding the

12  Global Settlement Fund?

13  A.   Yes, I do.

14  Q.   While I'm up here.  In addition to having these

15  conference calls with Mr. Constantine so that you could be

16  updated on the expenditures of money from the Global

17  Settlement Fund, did he also tell you or provide

18  information about publicity that was going to be used in

19  part by the Global Settlement Fund to counter information

20  that Mr. Jowdy had been putting out?

21  A.   Over a newspaper article?

22  Q.   Yes.

23  A.   Yes.

24  Q.   And in fact let me show you what is in evidence as

25  C29.

2006

1          Do you remember an email on June 18 from

2    Mr. Constantine actually referring to a newspaper article

3    in regards to that?

4    A.    That was printed by us?

5    Q.    Yes.

6    A.    Yes.

7    Q.    Now, I had already shown you one of the emails

8    regarding the Jowdy suit.  You've already testified to it.

9          But would it be fair to say that in your

10   continued communications with Mr. Constantine, either in

11   person or by telephone, he also kept you up to date on the

12   status of the lawsuit against Mr. Jowdy?

13   A.    Yes.  Up to a certain point.

14   Q.    When you say certain point, are you talking about a

15   timeframe?

16   A.    Yes.

17   Q.    What timeframe would that be?

18   A.    Much later.  In the end.  I don't think he had much

19   to do with the Jowdy deal at the end of all this.

20   Q.    And when you say *at the end of all this,* we're

21   talking like 2012?  2013?  Your best recollection.

22   A.    2013.

23         He was heavily involved initially.  He was

24   leading the charge and the mediation in California against

25   Ken Jowdy that was, at the time, we all thought was

2007

1    resolved.

2    Q.    You kind of raised an issue I was going to raise a

3    little bit later.  I will get back to that in a minute.

4    But I want to finish, if I could with you, about

5    information Mr. Constantine was providing to you about the

6    Global Settlement Fund and purposes.

7            Do you have any recollection -- I'm going to

8    show them to you so we don't have to waste time in

9    answering the question.

10            C24 in evidence, your Honor.

11            Do you remember receiving this email from

12   Mr. Constantine on November 9, 2009?

13   A.    Yes.  I believe so.

14   Q.    And when you say that Mr. Constantine was

15   spearheading the effort to try to get the investments back

16   from Mr. Jowdy, this was in part some of the efforts that

17   he was making.  Is that correct?

18   A.    Yes.

19   Q.    He had contact with a man by the name of

20   Mr. Sonnenblick, and Mr. Sonnenblick was offering at least

21   $15 million as a possible cashout so that you and the

22   other investors may be able to get a return on the

23   investment that you had made.  Is that right?

24   A.    That name doesn't ring a bell.

25            Again, I don't know the details of it, but,

2008

1   again, we were very close to solving Diamanté.  Yes.

2   Q.   And those were the efforts that Mr. Constantine was

3   making on your behalf as well the other hockey players.

4   Is that right?

5   A.   Him and Phil Kenner, together.  Yes.

6   Q.   Thank you.

7            Do you know a man by the name of Michael

8   Stolper?

9   A.   I know the name.  Never met him personally.

10   Q.   Did you ever discuss Michael Stolper with anyone?

11   A.   I believe so.  We had a lot of lawyers, so forgive

12   me.

13   Q.   Let me see if I can kind of direct you to a

14   timeframe.

15            I'm going to show you what has been marked for

16   identification as C37.  I'm going to refer you to what is

17   in evidence as C37C.  And I will point to a few names

18   here.  Mr. Peca.  Mr. McKee.  And then there's an

19   individual here that you may recognize.

20   A.   Looks like my signature.  Hard to tell.

21   Q.   That's your name.

22   A.   Okay.

23   Q.   Correct?  I believe the date is July 10 of 2010.  Is

24   that correct?

25   A.   Correct.

2009

1    Q.    Just take a look at this.  I'm going to ask you a few

2    questions.  This document is attached to a number of other

3    exhibits.

4    A.    Okay.

5    Q.    Does it refresh your recollection you've ever seen

6    something similar to this?

7    A.    Yes.

8    Q.    Using this document and the knowledge that you had on

9    the page that I showed you, what do you remember about

10   this document that you signed acknowledging in effect

11   Mr. Stolper being able to represent your interest?

12   A.    To be honest about it, not a lot.

13         We were suing everybody and their dog, and that

14   may really, unless you have something to show me to

15   refresh it further, I don't recall.

16   Q.    Do you remember, by signing that acknowledgement,

17   that you were agreeing to allow him to represent you in a

18   dispute with Mr. Constantine?

19   A.    Against?  Dispute against who?

20   Q.    Mr. Constantine and the method in which he was

21   running Eufora.

22   A.    Yes.  I believe that time came when we went after

23   Tommy.

24   Q.    Could you tell us, when you say *we*, who is *"we"*?

25   A.    All the hockey players.  All the investors involved.

2010

1          I remember having a meeting at Tommy's office

2     when we had everyone on the phone and --

3     Q.    That would have been the shareholder's meeting, we

4     are talking about?

5     A.    Shareholder's meeting.  And cops and everyone was

6     there.  And it was our chance to kind of grill him.

7     Q.    Would it be fair to say that this document that I

8     showed you, C37, and in particular the one that had your

9     signature on it, does that refresh your recollection that

10    you hired Mr. Stolper to represent your interest in that

11    regard?

12    A.    Okay.  Yes.

13               (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1   CONTINUED CROSS EXAMINATION

2   BY MR. LaRUSSO:

3   Q    And in regards to Mr. Stolper, did you also represent or

4   retain him to file suit against Mr. Constantine in regards to

5   his running or operating Eufora?

6   A    I believe we did.

7   Q    Were you a party to that group that was going to and did

8   initiate suit against Mr. Constantine?

9   A    I believe I was.  I never wanted to be part of anything.

10  I didn't like controversy.  I was very upfront with everyone

11  about that.  I live in the same city as these guys.  I just

12  wanted to know what was going on.  I wanted to know the truth.

13  And whoever was going to get me that I signed up for it.

14  Q    In regards to -- you say you never spoke to Mr. Stolper?

15  A    I have spoken to Mr. Stolper, I believe.

16  Q    Who else did you speak to in reference to signing on with

17  Mr. Stolper?  Do you know who else pitched you for this?

18  A    Phil Kenner, probably.

19  Q    Anyone else?

20  A    I don't recall.

21  Q    Now, do you remember ever saying that "you never signed

22  on for this," meaning the lawsuit against Mr. Constantine?

23  A    Again, that goes back to my point where I didn't really

24  want to sue anybody.  I just wanted to sit on the sidelines

25  and let everyone else figure it out, and let the dust fall

1    where it may.

2    Q    At this time period when you signed this acknowledgment

3    letter for Mr. Stolper's representation at the time the suit

4    was filed against Mr. Constantine, were you aware that this

5    group that Mr. Stolper was representing was looking to take

6    over Mr. Constantine's control of Eufora?

7    A    Yeah.  I believe there was a large group, yes.

8    Q    Do you know who was a party to that large group?

9    A    I know John Kaiser, Bryan Berard, and Phil Kenner.  I

10   think if I did sign that, my main concern was that if I didn't

11   sign it I wouldn't retain my percentage.

12   Q    So you signed it reluctantly and did not agree with the

13   suit that had been filed against Mr. Constantine, is that

14   fair?

15   A    I didn't fully understand.  Again, I'm not privy to all

16   these conversations; Jowdy, Tommy, and Phil.  I'm privy to one

17   side or the other, never in one room.  That was a constant

18   battle.  Let's everyone get into one room and you guys can

19   answer everything.  And whoever's left standing is the good

20   guy.  And that never happened.

21   Q    There was an effort to do that, wasn't there, the

22   shareholders meeting?

23   A    Yes.

24   Q    That was arranged by Mr. Constantine.

25   A    I don't know who arranged it.

1    Q    Did you participate in it?

2    A    I was there, correct.

3    Q    Were you there in person or were you there by calling in?

4    A    I was there in person.

5    Q    That was a pretty lengthy meeting, is that correct?

6    A    It was a lengthy meeting.  But, again, I wanted everyone

7    in the room.  And Phil Kenner and John Kaiser, and a lot of

8    the people were not allowed in that room.

9    Q    Do you know why they were not allowed in the room?

10   A    I can't recall.

11   Q    Do you remember whether or not any accusations had been

12   made against a number of those individuals, number one, that

13   they weren't shareholders and, two, that they were shown to

14   have defrauded Eufora?  Do you remember that?

15           MR. HALEY:  I object.

16           THE COURT:  Sustained.

17           MR. HALEY:  Thank you.

18   A    I believe there was --

19           THE COURT:  I sustained the objection.  Don't

20   answer.

21           THE WITNESS:  I'm sorry.

22   Q    What did you understand the reason being why those

23   individuals were not permitted at the meeting?

24   A    That rings a bell.  There was a lot of talk about I gave

25   500,000 into this company.  And Tommy would laugh about it and

1    say no, he didn't.  He has no part of this company.  You know,

2    I remember conversations with him about -- about that.  I

3    mean, there was -- I don't know, there was a cop there

4    preventing these guys, or a bodyguard or something.

5    Q    Bob Rizzi?

6    A    I don't recall his name.  But there was someone there not

7    allowing these guys into the room.  Again, I was upset because

8    I wanted them in the room one way or another.  It was the only

9    way we were going to find out the truth.

10   Q    Do you remember at any point in that meeting where any of

11   these investors that were there either by telephone

12   participation or in person, being offered their money back

13   that they invested in Eufora or contributed to Eufora?

14   A    Again, there may have been.  It wasn't me, I can tell you

15   that.  I was going out the door.

16   Q    I'm going to show you what is marked for identification

17   as 89-A.  I'm going to refer you to the last page and just

18   read that to yourself.  See if that refreshes your

19   recollection that Mr. Bob Rizzi is offered a 100 percent

20   return on his investment that he invested in Eufora.

21        (Handing.)

22   A    Yes.  I think I do.

23   Q    You recall that.

24   A    I think there were some conversations, yeah, about --

25   about all of that, I think.  The evaluation of the company.

1    It's just my thinking.

2    Q    That's okay.  But in terms of what transpired at the

3    meeting, do you recall that some of the shareholders,

4    particularly Mr. Rizzi, was being offered his money back?

5    A    I believe so.  I don't know Bob Rizzi.  But I believe

6    that conversation was made.

7    Q    Do you recall other portions of that conversation, other

8    investors being offered their money back?

9    A    I believe so.

10   Q    Does the name Nick Privitello ring a bell?

11   A    No.

12   Q    Do you remember -- again, just turn to the first page.

13   Do you remember a man by the name of Nick Privitello being

14   present, either by a telephone call -- I'm just going to ask

15   you to take a look at some of these names here.

16   A    He wasn't in the room.  I know that.

17   Q    Nick Privitello?

18   A    Again, I don't know him, but I see he was on the phone.

19   Q    Do you remember if he was offered his money back by

20   Mr. Constantine for his investment?

21   A    Again, I don't recall.

22   Q    But you do recall offers being made to some of the

23   shareholders during the course of the meeting to have their

24   monies returned to them?

25   A    As we did with the bad apples.

1   Q    By the way, do you know who was responsible for bringing

2   the cop to the meeting, the shareholders meeting?  Do you

3   remember Tommy Constantine being responsible for inviting him

4   there?

5   A    Inviting the cop?

6   Q    Yes.

7   A    Meaning John Kaiser or?

8   Q    Bob Rizzi.

9   A    Oh, Bob Rizzi.  Yeah.  He was there for protection, I

10  believe.

11  Q    He was there also representing his own interest as well?

12  A    Right.

13  Q    Mr. Nash, this is Defendant's Exhibit C-123.  Take a look

14  at that, please.

15       (Handing.)

16  Q    Do you recognize that?

17  A    That is from me to Tommy.

18  Q    On June 3rd, 2011.  Do you recognize the e-mail?

19  A    I recognize.  I don't know what it's in reference to.

20  Q    Take a look at the exhibit that is attached.  Looking at

21  the entire exhibit --

22       MS. KOMATIREDDY:  Objection, Your Honor.  This is

23  completely irrelevant.

24       MR. LaRUSSO:  If I may, Judge.

25       MS. KOMATIREDDY:  May we have a side-bar to see the

2017

1    exhibit?

2              THE COURT:  Yes.

3              (Whereupon a side-bar conference was conducted.)

4              (Matter continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Side-bar conference.)

2                THE COURT:  I don't need the drama with the

3       objections.  I don't need the banging of the hand on the

4       table.  Okay?

5                MS. KOMATIREDDY:  Yes, sir.

6                MR. LaRUSSO:  Judge, I didn't intend to introduce

7       the exhibit or the attachment.  At least I wasn't intending

8       to.  This is going to establish "glad I didn't sign up for

9       that."  He's telling him that even though he signed the

10      letter, he didn't sign up for a lawsuit.  That's what this

11      shows.  Right now he says he doesn't remember.  I'm asking him

12      to look at it to refresh his recollection of what he meant

13      when he said that.  That's all it's being introduced for.

14               THE COURT:  I will allow it.

15               (Whereupon the side-bar conference was concluded.)

16               (Matter continued on the next page.)

17

18

19

20

21

22

23

24

25

1           (Matter continued in Open Court.)

2    CONTINUED CROSS EXAMINATION

3    BY MR. LaRUSSO:

4    Q    Mr. Nash, let me show this to you again.  Having looked

5    at the entire exhibit, does that help refresh your

6    recollection of what you were referring to in this e-mail to

7    Mr. Constantine at this point in time?

8    A    I believe -- I believe that was it.

9    Q    Tell me what it is that it refreshes your recollection

10   about when you refer to the fact that you didn't sign on?

11   A    Well, from what you showed me, I did sign on.  So I don't

12   know why I'm saying there that I didn't sign on.  Maybe it's

13   to keep Tommy close.  He didn't know that I signed on or

14   something, I don't know.

15   Q    Does it refresh your recollection that you said you

16   didn't sign on to the lawsuit that was filed?

17   A    The lawsuit filed against them, yeah.  I believe that I

18   listened to it.  I wasn't 100 percent sure that I signed up

19   for it.  I know they didn't pay me monies for it.  Again,

20   Tommy and Phil lived in my neighborhood.  I didn't want to

21   rock the boat.  I didn't want to upset anyone.  I didn't want

22   to be close to anyone.  I wanted to make sure that if someone

23   was going to be paid, it was going to be me.

24   Q    The one thing throughout this whole period was the open

25   line of communication with Mr. Constantine, is that correct?

1   A    Yes, he was good with that.

2   Q    Again, you contacted him and he would respond to any

3   inquiries that you had during this whole period of time?

4   A    Correct.

5   Q    I'm going to show you what was received in evidence as

6   762.  Do you recall this exhibit?

7   A    Yes.

8   Q    You testified that this came out of your Eufora file, the

9   documents that you said were there?

10  A    Yes.

11  Q    You testified, I believe on direct, regarding the fact

12  that your wife and yourself wrote much of the information

13  contained in here?

14  A    On the back page, that is correct.

15  Q    However, the third page of this exhibit where the manager

16  of the company Eufora LLC was to sign.  There is no signature,

17  is that correct?

18  A    That' correct.  That's a big part of the reason why we

19  are here today.

20  Q    Can you tell me what you understood this document to be?

21  A    I -- it was always give money first, documents always

22  came later.  I believe this was -- I don't recall if this was

23  the extra percentage that I got from the Global Settlement

24  Fund or if this was the initial ownership I got in Eufora.

25  But this was all the -- pretty much all the documentation I

1    had.

2    Q    But this is not an executed document by anybody at Eufora

3    LLC, is that correct?

4    A    It's not, but I don't know where else I would have got it

5    besides Tommy.

6    Q    Do you remember actually talking to Mr. Constantine

7    during, I believe the dates we're talking about is in June of

8    2010, about a settlement plan?

9    A    Can you give me that again.  I'm sorry.

10   Q    Do you remember speaking to Mr. Constantine around this

11   period of time, June 2010, discussing a settlement plan?

12   A    A settlement plan regarding?

13   Q    Your investment in Eufora?

14   A    Me personally?

15   Q    Yes.

16   A    Possibly.  Again, I don't recall.

17   Q    Now, this particular document, let me ask you a few

18   preparatory questions.  When you bought into Eufora in April

19   of 2008, do you recall that you bought into -- your interest

20   was being held by a company called AZ Eufora Partners?

21             MR. LaRUSSO:  One moment, Your Honor.

22             THE COURT:  Yes.

23             (Whereupon Mr. LaRusso confers with his client.)

24             MR. LaRUSSO:  May I have a moment, Your Honor?

25             (Pause in the proceeding.)

1          Thank you for your indulgence, Your Honor.  This may

2     be better if I approach the witness, Judge.

3     Q    The document that we're talking about is 762.  The third

4     page does not have the signature of the entity that would be

5     issuing you your membership interest.  It is called Eufora LLC

6     Delaware Limited Liability Company.  Do you see that?

7     A    Correct.

8     Q    When you initially made your investment, was your

9     investment into Eufora, a limited liability corporation in

10    Arizona?

11    A    The only thing I knew was, that I found out later, was

12    this Constantine Management Group is where my money originally

13    went.  When I first invested my $100,000 it was Eufora.

14    Whatever the name was irrelevant to me.  Arizona, Delaware,

15    Eufora, Constantine Management, I didn't pay attention to that

16    part.

17    Q    You were just interested in the fact that you wanted your

18    interest, that you were paying for it to be reflected in some

19    documentation?

20    A    Some documentation connected to Eufora.

21    Q    During direct and on cross by Mr. Haley you were shown

22    two additional documents.  Both the same.  One was 764.  And I

23    believe this one is --

24          MR. HALEY:  Kenner Exhibit 50.

25    Q    -- Kenner Exhibit 50.  They're the same exhibits, is that

1   correct?

2   A    Yes.

3   Q    Just to set a background for this, Mr. Nash, this is a

4   document you received from Mr. Constantine, is that right?

5   A    Yes.

6   Q    Do you remember when you received this?

7   A    I believe it was late -- it was 2000 -- it was long after

8   all of 2008.  It was a conversation that me and Tommy had that

9   he didn't know where my money went.  He couldn't recall it.

10  He scared the heck out of me.  So I went down to his office

11  and we drew up this sheet.  And it went from -- Constantine

12  Management Group is where he found it, and he switched it over

13  to Eufora LLC.  And then he backdated it to April 24, 2008,

14  when I originally wired the money in.

15  Q    He did that in your presence, is that correct?

16  A    Yes, he did.

17  Q    When he backdated it, you didn't think there was anything

18  wrong with that, did you?

19  A    I don't know the law.  If this is originally how it was

20  supposed to be, then this is how it is supposed to be.  I

21  trusted Tommy.

22  Q    In your discussions with Mr. Constantine regarding the

23  document we're referring to, at this point did you also

24  discuss that your -- it was originally held by AZ Eufora

25  Partners along with other investors?

1   A    I remember we had conversations about it.  Again, the

2   names are ridiculous.  There are three or four of them.  I

3   thought it was Eufora.  That's all I care about.  I don't

4   remember the conversations.

5   Q    Do you remember any conversation with Mr. Constantine

6   where he's telling you that Constantine Management Group, who

7   owned these shares, was going to be the one that provided you

8   the interest in Eufora that you had?  Do you recall that?

9   A    I remember, yes, kind of questioning what the heck is

10  Constantine Management Group.  We were starting to come

11  together, I was like is that -- is that legit?  Is that

12  Eufora?  Do I really own a piece of this?  And he's telling

13  me, I'm not sure where the money went.  I'm calling him and

14  freaking out.  And then we found it.  Like I said, we printed

15  this sheet up.

16  Q    This particular sheet is a representation of the interest

17  that Mr. Constantine said you had made back in April of 2008,

18  is that right?

19  A    Yes.

20  Q    By the way, when you were discussing this interest that

21  you were receiving, did you recall saying that Mr. Kenner

22  would be very angry that you were doing this?

23  A    This was something concerning -- I don't remember the

24  exact details, you know, I don't remember the exact details of

25  the conversation.

1  Q    Do you recall discussing with Mr. Constantine that you
2  wanted the interest in your own name and not in the name of
3  the corporation?
4  A    Of my personal name, as in --
5  Q    Yes.
6  A    I would have thought the opposite, that I wanted it in my
7  trust name.
8  Q    As opposed to the name of the corporation, some other
9  corporation holding your interest, do you remember that?
10 A    Sorry.  Can you repeat that?  Are you asking me --
11 Q    It's a little confusing.  I understand.
12 A    Did I want my signature on it representing myself
13 personally or my signature representing my trust?
14 Q    You made your original investment in Eufora through your
15 trust, is that correct?
16 A    I don't recall.  I put everything in my trust, yes, for
17 protection.
18 Q    So when you were talking to Mr. Constantine at this point
19 in time about getting documentation about the investment that
20 you made, you were telling him that you wanted it put in the
21 trust name, is that correct?
22 A    That would have made sense, yes.
23 Q    At the time you were talking with him, were you also
24 discussing the fact that your shares were held in an entity
25 with all of Kenner's other clients, other investors?

1  A    Yes.

2  Q    And you did not want to be part of all of the other

3  investors.  You wanted to have your own shares in the trust

4  name.

5  A    In a real company, yeah.

6  Q    Do you remember Mr. Constantine having no problem in

7  doing what you wanted done with the ownership interest that

8  you had in Eufora at that point?

9  A    Yes, he had no issue.  I guess my only question was why

10  wasn't it done like this in the beginning.

11  Q    This is the first time that you spoke directly with

12  Mr. Constantine and made that request, is that correct?

13  A    I think I talked to him numerous times about paperwork

14  and percentages and the actual percentage from the Global

15  Settlement Fund.

16  Q    At any point in time, did you make a request that you

17  wanted documentation?

18  A    Yes.

19  Q    It was at this point in time that you made it and

20  Mr. Constantine obliged you, is that correct?

21  A    Yes.

22  Q    I'm going to show you a couple of exhibits marked 101,

23  102, and 103, and ask you if it refreshes you recollection to

24  the time frame that this occurred.  That's C-102 for

25  identification.  This is C-101.  The last one is C-103.

Case 2:13-cr-00607-JFB-AYS  Document 305  Filed 07/07/15  Page 89 of 242 PageID #: 6340

1          (Handing.)

2          Do you recall -- using those as possibly refreshing

3     your recollection -- that sometime around October 2012 and

4     November 2012 you are talking to Mr. Constantine about the

5     ownership interest that you were receiving in the documents?

6     A    I believe so.

7     Q    Do those documents refresh your recollection that you

8     initially had a hard time getting together and ultimately you

9     did?

10    A    Ultimately we did, yes.

11    Q    By the way, when you finally received that interest, were

12    you glad that you finally got the documentation that you

13    requested of Mr. Constantine that he, in fact, gave you?

14    A    Yes.  As it says here, I said I trust you.  I will own it

15    like you and most everyone else, correct, in Eufora directly,

16    question mark.  That was my main concern.

17    Q    By the way, do you remember at any point in time asking

18    Mr. Constantine to show you further documentation that you had

19    this interest in Eufora in your trust name?

20    A    One more time.

21    Q    Did Mr. Constantine and you ever discuss actually going

22    on the Arizona Corporate Commission website to get proof that

23    you, in fact, had the interest that was being provided to you

24    by Mr. Constantine?

25    A    I believe that happened, yes.

1    Q    Let me show you what has been marked as Defendant's

2    Exhibit C-50.  Would you take a look at C-50, please.

3              (Handing.)

4              Do you remember seeing a document similar to this?

5    A    I believe I saw it on the computer, yes.

6    Q    This is from the Arizona Corporate Commission.

7    A    Yes.

8    Q    It was shown to you on the computer at the time you were

9    discussing the investment that you had finally got documented

10   by Mr. Constantine, is that right?

11   A    Yes.

12             MR. LaRUSSO:  Your Honor, I ask that C-50 be

13   received at this time.

14             MS. KOMATIREDDY:  Objection.

15             THE COURT:  Overruled.

16             Any objection, Mr. Haley?

17             MR. HALEY:  No, sir.

18             THE COURT:  C-50 is admitted.

19             (So marked as Defendant's Exhibit C-50 in evidence.)

20   Q    That's the Arizona Corporate Commission website,

21   highlighted Eufora LLC.  The date of this document is -- well,

22   the date this is printed out is 5/10/2015.  Turning to page 3,

23   highlighted, Mr. Nash, that is the ownership interest we were

24   talking about.  Is that correct, Mr. Nash?

25             THE COURT:  It's blurry.  He can't see it.

1   Q    Do you see that that is the ownership interest reflected
2   in this document?  Is that right?
3   A    Yes.
4   Q    By the way, do you recall at the shareholders meeting
5   Mr. Berard and Mr. Constantine actually discussing that the
6   players wanted to buy the Neptune loan as opposed to the other
7   investors?
8   A    I don't recall whether that came up.
9   Q    Do you remember any discussion about Mr. Berard and the
10  other players looking to buy a loan, a loan that Eufora had
11  from a company called Neptune?
12  A    Is that with the hangar?  Is that the hangar?
13  Q    Just your best recollection.  I can't say that.
14  A    I don't recall.
15  Q    You don't recall any discussion about the Eufora loan
16  during the shareholders meeting?
17  A    I remember the Eufora loan and the company owing money,
18  and I don't know what Neptune means.
19  Q    What do you recall about the loan?  What is your
20  recollection?
21  A    Again, I don't know a lot of the details of the overall
22  company.  I wasn't there on a day-to-day basis like Tommy.  I
23  asked questions of Tommy, he answered.  I knew that there was
24  an outstanding debt that needed to be paid.
25  Q    You don't have any recollection of the hockey players or

1    any of the clients trying to buy Eufora, to try to take over

2    the company?

3    A    I don't recall.

4          MR. LaRUSSO:  One moment, Your Honor.

5    Q    Mr. Nash, just one more question.  I believe that you

6    mentioned that --

7          MR. LaRUSSO:  One moment, Your Honor.

8          (Whereupon Mr. LaRusso confers with his client.)

9          Let me find one more exhibit, Your Honor and we will

10   be done.

11         THE COURT:  Yes.

12         (Pause in proceeding.)

13         MR. LaRUSSO:  Thank you, Your Honor, for your

14   indulgence.

15   Q    Mr. Nash, I'm going to show you one other document marked

16   for identification as C-123.  Do you recognize that as an

17   e-mail from Mr. Constantine to you dated November 21, 2012?

18   Take a look at it, please.

19         (Handing.)

20   A    Yes.

21   Q    You recognize that as an e-mail between you and

22   Mr. Constantine?

23   A    I do.

24   Q    Regarding the shares in Eufora that we were discussing?

25   A    Yes.

1           MR. LaRUSSO:  Your Honor, I ask that it be received

2    at this time as Defendant's Exhibit C-123.

3           MS. KOMATIREDDY:  Objection.

4           THE COURT:  Any objection?

5           MR. HALEY:  No, sir.

6           THE COURT:  Overruled.  I will explain it at the

7    lunch break.

8           (So marked as Defendant Exhibit C-123 in evidence.)

9           MR. LaRUSSO:  I will publish it to the jury and then

10   I'll be done, Your Honor.

11   Q    It is an e-mail dated November 21, 2012, from

12   Mr. Constantine to you, Mr. Nash.  The upper e-mail portion is

13   November 21st at 2:48.  There are a string of e-mails.  And I

14   will start at the bottom, if I may.

15          This is Mr. Constantine at 1:21.  In today's Wall

16   Street Journal, a pdf attached from Tommy Constantine, "Re:

17   For credit invisibles a market takes shape."

18          You then respond back on the same date at 2:04 --

19   I'm sorry -- 2:10.  "Yeah" -- sorry.  The string of e-mail is

20   November 21st at 2:04.  "You mean the global deal, not CMG?"

21   Do you see that?

22   A    Yes.

23   Q    The next e-mail is from you, "Ya, ya.  Sorry.  Thanks,

24   Tyson."

25          Then Mr. Constantine's last remark at 2:48.  "I

1   don't know the answer to that, but I suspect that this can

2   only happen when everyone who participated in it gets together

3   and decides how the money is to be treated (debt or equity)

4   and what the terms are.  This has been a problem since

5   everything became adversarial instead of all of us working

6   together.  I don't know what I'm supposed to do.  I can't do

7   it for some and not for others.  Everyone has to agree.  I

8   don't even know who I'm supposed to talk about how that money

9   should be treated.  So at this point I guess ALL (all meaning

10  those with money actually involved) get in a room and decide

11  or we let the lawyers continue to handle it.  Keep in mind,

12  most of the guys involved (through their ownership of AZ

13  Eufora Partners) are being sued by us because of the lawsuit

14  they filed against us which was dismissed.  So it's a very

15  difficult environment to get anything done until all of this

16  stuff gets sorted out.  The good news is the money has been

17  recorded and has been on the books since day one and no one is

18  trying to take advantage of anyone as has been suggested."

19          What did you understand Mr. Constantine to be

20  telling you at that point with regard to this money?

21  A    Can you go up to my original question?

22  Q    Just tell me.  Make sure I displayed it for you.

23  A    So I'm asking any idea whether it will be paid out for

24  the extra Eufora money from CMG.  Is that supposed to say CMG

25  or Global Settlement Fund?

1  Q    CMG is Constantine Management Group.  You are correct,

2  the Global Settlement Fund.

3  A    That's supposed to say Global Settlement Fund?

4  Q    What is your understanding?  I can't tell you.

5  A    Yes.  If it's from the Global Settlement Fund.  We're

6  talking about the extra percentage that I received, right, and

7  when we would get money.

8  Q    That's what Mr. Constantine's referring to here, is that

9  correct?

10  A    Yes.

11          MR. LaRUSSO:  Thank you.

12          Your Honor, no further questions.

13          THE COURT:  Any redirect?

14  REDIRECT EXAMINATION

15  BY MS. KOMATIREDDY:

16  Q    Mr. Nash, I want to take you back to Hawaii.  How much

17  did you invest in Hawaii?

18  A    $100,000.

19  Q    Now, you were asked about a $6 million loan that went to

20  Mr. Ken Jowdy, correct?

21  A    Yes.

22  Q    What's your basis of knowledge for anything about a loan

23  that went to Kenneth Jowdy?

24  A    Phil Kenner.

25  Q    Did you learn any information about any loan from any

1    other source?

2    A    No.

3    Q    $6 million is more than $100,000, right?

4    A    Yes.

5    Q    So any loan would have included money far beyond what you

6    contributed to Hawaii?

7    A    Yes.

8    Q    Did you know the terms under which other hockey players

9    contributed money to Hawaii?

10   A    No.

11   Q    Do you know what Phil Kenner told them about their money

12   in Hawaii?

13   A    From what he told me.

14   Q    But do you know?

15   A    No.

16   Q    Do you have a line of credit at Northern Trust Bank?

17   A    No, I don't.

18   Q    On cross-examination you were asked about the lawsuits

19   against Kenneth Jowdy and whether efforts were being made to

20   move forward with the lawsuits.

21   A    Right.

22   Q    To the extent you know of any efforts being made to move

23   forward against Kenneth Jowdy, where does that information

24   come from?

25   A    Originally it was Phil Kenner.

1    Q    And then?

2    A    And now it's another lawyer that's been hired to continue

3    the fight.

4    Q    During the period of time between 2005 when you invested

5    in Hawaii and 2009 and 2010, where did all of your information

6    about Ken Jowdy come from?

7    A    Phil Kenner.

8    Q    Do you actually have any personal knowledge of the

9    efforts that Phil Kenner took to fight on your behalf?

10   A    I do.

11   Q    Based on what he told you?

12   A    Based on what he told me, yes.

13   Q    Now, you were also asked if the portfolio Mr. Kenner set

14   up for you is still working today.  Do you remember that

15   question?

16   A    Yes.

17   Q    How about Eufora, have you ever gotten anything back from

18   Eufora?

19   A    No.

20   Q    Have you ever gotten anything back from when you put

21   money into the Global Settlement Fund?

22   A    No.

23   Q    Did those investments work in any way?

24   A    Not to this point, no.

25   Q    Now, discussing your April 2008 contribution -- I'm

1   sorry -- investment in Eufora, you were asked on

2   cross-examination about whether it's important to you how your

3   money was used.  Do you remember that question?

4   A    Right.

5   Q    Remember yesterday when I showed you the bank record,

6   Government Exhibit 1706?

7   A    Yes.

8   Q    Do you remember seeing your money go to Wampler Buchanan

9   for Phil Kenner?

10  A    Yes.

11  Q    Remember $17,000 in cash going to Phil Kenner?

12         MR. LaRUSSO:  Your Honor, this is beyond the scope.

13  It was asked and answered already.

14         THE COURT:  You can answer that.

15  A    I remember seeing that, yes.

16  Q    Was that the first time you saw that yesterday?

17  A    Yes.

18  Q    Are you okay with that?

19         MR. HALEY:  Objection.

20         THE COURT:  Sustained.

21  Q    Is that how you authorized your money to be used?

22  A    No.

23  Q    Would it have been important to you, when you decided to

24  invest in Eufora, to know whether your money would be going

25  into the pockets of Constantine and Kenner instead of the

1  business?

2  A    I wish I would have done everything different up to this

3  point, obviously.  I said I never received any money from any

4  of the investments that I made.  I wish I would have followed

5  it a lot closer.

6  Q    Would it have been important to you for them to tell you

7  that?

8  A    Yes.

9  Q    You were shown the transfer membership document.  This is

10 in front of you.  The transfer of Constantine Management Group

11 to your trust.  Do you remember that?

12 A    The backdated document?

13 Q    The backdated document.

14 A    Yes.

15 Q    You were asked on cross-examination whether

16 Mr. Constantine regularly gave you documentation with respect

17 to your involvement in Eufora, correct?

18 A    Correct.

19 Q    That document -- actually, specifically, I believe you

20 testified that you had a phone conversation with him.

21 Constantine wasn't sure where the money went.  You were

22 freaking out.  And then he found it, right?

23 A    Yes.

24 Q    Did he find the cash?

25 A    He found where the money went.

NASH-REDIRECT-KOMATIREDDY                    2038

1   Q    He found where the money went.  And then you went to his

2   office and sat down with him?

3   A    I believe that's the way it happened.

4   Q    In his office, did he sit there and offer you the money

5   back?

6   A    No.

7   Q    He gave you that one-page document, right?

8   A    Yes.

9   Q    He drew it up right there, printed it out, and backdated

10  it and signed it?

11  A    Yes.

12  Q    Do you even know if Constantine Management Group owned an

13  interest in Eufora in 2008?

14  A    I don't recall.  I don't know.

15  Q    Do you know if it owned an interest in Eufora in 2012?

16  A    No.  Again, I thought I owned Eufora.  And the names were

17  irrelevant to me.  I just wanted to own it like Tommy owned

18  it, as I stated, for tax purposes.

19  Q    Looking at this website that they just showed you,

20  Constantine 50.

21       (Handing.)

22       Look at that list of members.  Is Constantine

23  Management Group in that list.

24  A    No.

25  Q    Let's turn to the Global Settlement Fund.  I want to talk

NASH-REDIRECT-KOMATIREDDY                    2039

1   about the plane for a minute.  You were asked on

2   cross-examination about whether there were several airplanes

3   or just a Falcon.  You testified you only knew about the

4   Falcon, correct?

5   A    Right.

6   Q    I believe you -- you knew about the Falcon, and you

7   thought it was associated with Joe Juneau, right?

8   A    Right.

9   Q    So as far as you're concerned, any interest you were

10  getting in the Falcon was coming out of the settlement with

11  Joe Juneau.

12  A    That's right.

13  Q    And then you talked about Government Exhibit 767, the

14  spreadsheet.  I'm going to just focus on a couple of entries

15  here.  Can you see that, Mr. Nash?

16  A    Yes.

17  Q    Do you see the entry on 6/2/2009?  It says Edenhom Motor

18  Sports.

19  A    Yes.

20  Q    $450,000 goes out.

21  A    Right.

22  Q    It says Cessna 414 purchased, right?  Next to the balance

23  there on the right side.

24  A    Yes.

25  Q    Cessna 414 purchased Juneau settlement, correct?

1   A    Right.

2   Q    Did you authorization any of your money in the Global

3   Settlement Fund to be used for a Cessna instead of a Falcon?

4   A    Again, I don't remember -- I just remember that we

5   were -- -- from my recollection, to this day, I just remember

6   the Falcon.

7   Q    Okay.  Let me ask you this.  As a result of that Juneau

8   settlement, did you get any interest in a Cessna 414?

9   A    I thought it was a Falcon.

10  Q    You said on cross-examination you went and actually saw a

11  Falcon, right?

12  A    Yes.

13  Q    Tommy showed it to you?

14  A    Yes.

15  Q    Did Tommy ever show you a Cessna 414?

16  A    I don't believe so.  I don't know anything about

17  airplanes.  It could have been.  I don't know.  I wouldn't

18  know what kind it was.  I don't know if it was a Falcon or a

19  Cessna or -- I was guessing it was a Falcon.  It was always

20  referred to me as the Falcon.

21  Q    You saw one plane, right?

22  A    Yes.

23  Q    You didn't see three planes?

24  A    No.

25  Q    So the Metro Receiver, the next entry here, $415,000 goes

1  out and the notation, "Falcon and Metro Receiver."  Do you see

2  that?

3  A    Yes.

4  Q    Did Mr. Kenner ever explain to you that your money in the

5  Global Settlement Fund would be going to another airplane, a

6  Metro Receiver?

7  A    Is that the Falcon?

8  Q    A good question.

9         All right.  Now, you also testified about

10  Mr. Constantine e-mailing you about something with respect to

11  a conflict, and you testified we were very close to solving

12  Diamante.  Again, in this time period, all of your knowledge

13  with respect to how close you were to solving Diamante, where

14  did that information come from?

15  A    At that point it came from the group that went down to

16  California for the mediation.  Phil Kenner, Tommy Constantine

17  now at this time.

18  Q    Did you actually ever solve Diamante?

19  A    No.

20  Q    Did you get anything back from your contribution to the

21  Global Settlement Fund?

22  A    No.

23  Q    Finally, you were asked on cross-examination about

24  whether the GSF was for a broad purpose.  I think you were

25  asked about various lawsuits.  So I just want to make sure

1   we're specific here.  You also were asked about a moment where

2   you went to Mr. Constantine's office.  He talked to you, on a

3   whiteboard, about how the money was used, right?

4   A    Correct.

5   Q    Leaving that conversation that day, did he say anything

6   about whether there was any money left in the GSF?

7   A    I don't think there was much -- much left.  I can't

8   recall how it finished.  I know there was a lot of

9   conversation within the group about the Global Settlement

10  Fund.  I left his office feeling okay with what he said

11  happened to the money.

12  Q    In that conversation in his office, did he tell you that

13  he used your money to go pay for some race cars?

14  A    I don't believe so.

15  Q    Did he tell you that he used your money to pay for his

16  rent?

17  A    No.

18  Q    Did he tell you that he used your money to pay for his

19  personal lawyers in a lawsuit in Florida?

20  A    No.

21  Q    Did he tell you that he used your money to pay -- to try

22  to buy Playboy Enterprises for him and some other guys?

23  A    No.

24           MS. KOMATIREDDY:  No further questions.

25           THE COURT:  Anything further?

1      MR. HALEY:  Briefly, Judge.

2  RECROSS EXAMINATION

3  BY MR. HALEY:

4  Q    Mr. Nash, you were asked a moment ago about the mediation

5  in California.  Do you recall that question?

6  A    Yes.

7  Q    Now, you did not attend that mediation, is that true?

8  A    No, I did not.

9  Q    But your wife Cathy did attend that mediation, is that

10 correct?

11 A    That's correct.

12 Q    To your knowledge, present at that mediation was Ken

13 Jowdy, as well as his attorney, Tom Harvey, is that correct?

14 A    Yes.

15 Q    Well, is it fair to say, sir, that the information that

16 Phil Kenner was providing to you with reference to Ken Jowdy

17 and business disputes between himself and Ken Jowdy had direct

18 relevance to that mediation, did it not?

19 A    As far as Diamante?

20 Q    Yes.

21 A    I'm sorry.  Can you ask the question again?

22 Q    Sure.  You know, through your own personal knowledge,

23 that Ken Jowdy, along with an attorney by the name of Tom

24 Harvey, attended a mediation in California where your wife

25 attended, isn't that true?

1   A     Yes.

2   Q     At that point in time, the information that you had

3   available to you in connection with disputes involving Ken

4   Jowdy, came from Phil Kenner and other sources, yes or no?

5   A     Yes.

6   Q     Now, we can agree that the results of that mediation, it

7   was unsuccessful, to your knowledge, correct?

8   A     Right.

9   Q     Sir, when you invested, when you sought an ownership

10  interest in Eufora for your $100,000, you understood at the

11  time that Eufora was a privately held company, is that

12  correct, as opposed to a publically held company like Apple or

13  Microsoft?  You understood that?

14  A     Yes.

15  Q     Did you or did you not, sir, have an understanding at

16  that point in time that Tommy Constantine was one of the

17  members/owners of Eufora?

18  A     Yes.

19        MR. HALEY:  Thank you.

20        I have no further questions.

21        MR. LaRUSSO:  A few questions.

22  RECROSS EXAMINATION

23  BY MR. LaRUSSO:

24  Q     You remember on redirect being asked, did Mr. Constantine

25  give you your money back, and you said no?  Do you recall that

1  a few moments ago?

2  A    When he gave me my interest in Eufora?

3  Q    Yes.  Is it a fact you never asked for your money back?

4  A    I don't fully remember that.  I can't recall.

5  Q    Mr. Nash, isn't it also true that you never really asked

6  for any documentation from Mr. Constantine until 2012 when you

7  received that document signed by Mr. Constantine on your

8  behalf?  Do you recall that?

9  A    I find that real hard to believe.  Again, I stated here

10 that the main reason why we're here is documentation and

11 signatures and missing signatures.  So I was pretty adamant

12 that I wanted documentation to show at least I own the

13 company, it was apparently worth this amount of money.  I

14 wanted that in my file.

15 Q    In 2012 when you asked Mr. Constantine for the

16 documentation, there was no hesitation on his part.  He gave

17 it to you, is that correct?

18 A    He always told me he was getting it together, he was

19 putting it together.

20 Q    In this particular instance, he gave it to you in the

21 name of the trust, which is what you wanted, is that correct?

22 A    That would make sense.

23 Q    By the way, in regard to the Global Settlement Fund, do

24 you remember Mr. Constantine ever telling you that he put his

25 own money into the Ron Richards account?

1    A    In the Global Settlement Fund?

2    Q    No.  In the Ron Richards account, where you sent your

3    money.

4    A    You're referring to the Global Settlement Fund?

5    Q    Yes, hat's correct, Mr. Nash.

6    A    Yes.  I thought that they might both have put money into

7    it, the Global Settlement Fund.

8    Q    So Mr. Kenner and Mr. Constantine --

9    A    Yes.

10   Q    I believe on redirect you also testified, and now there's

11   another lawyer hired to continue the fight.  What did you mean

12   by that?

13   A    Meaning, it seemed like we had ten lawyers and ten

14   lawsuits going at the same time.  That's it.

15   Q    What time frame are we talking about?

16   A    From the moment I started investing it seemed like it was

17   investment/lawsuit, investment/lawsuit, investment/lawsuit.

18   Q    Just directing you to one more topic.  On redirect you

19   were asked a number of questions regarding the Falcon

20   airplane, Mr. Jowdy, Mr. Juneau.  Do you remember that?

21   A    Yes.

22   Q    That was in response to questions that I asked you.  Is

23   it possible, Mr. Nash, that when I said Juneau and the Falcon

24   I meant Jowdy and the Falcon?

25         MS. KOMATIREDDY:  Objection.

1    THE COURT:  Sustained as to form.

2  Q    By the way, the Global Settlement Fund bought the Falcon,

3  is that correct, as far as you know?

4  A    Bought the Falcon, I don't recall.  Again, I thought the

5  Falcon was already in play.  I thought I was getting a

6  percentage of the Falcon.  I don't remember that we actually

7  bought it.

8         Again, I just want to be really clear with the

9  Global Settlement Fund.  I was banking on Diamante and Eufora.

10  That's how it was sold to me.  And mainly Eufora.  According

11  to Tommy, his evaluation.  It was going to sell.  He showed me

12  e-mails of this thing.  And people were asking about it and

13  wanting to buy it for X amount of millions of dollars.  I

14  didn't care about any of this other stuff.  I didn't focus on

15  it.  I'm sorry.  I wish I had a clear idea on it, but I don't.

16  Q    You had an opportunity at that time to ask the questions

17  that you wanted to ask.  And you didn't ask, is that correct?

18         MS. KOMATIREDDY:  Objection.

19         THE COURT:  Overruled.  You can answer that.

20  A    I had an opportunity, yeah.  I wish I had.

21         MR. LaRUSSO:  No further questions, Your Honor.

22         THE COURT:  You can step down, Mr. Nash.  Thank you.

23         (Witness excused.)

24         THE COURT:  I appreciate everybody staying a little

25  bit later so we can finish Mr. Nash.  I'm just going to ask

1   that we will take a little bit shorter lunch break today.  The

2   next witness is from California.  I really want to avoid him

3   having to come back on Monday.  So if we can come back at

4   2:00, hopefully we can conclude him.

5           Don't discuss the case.  Have a good lunch.

6           (Whereupon the jury leaves the courtroom at 1:10

7   p.m.)

8           A JUROR:  Your Honor, the light on the podium is

9   very bright.  It's hard to watch him.

10          THE COURT:  I'm sorry about that.  We'll fix that.

11          Let's be back at 2:00.

12          MR. MISKIEWICZ:  Yes, Your Honor.

13          (Whereupon a luncheon recess was taken at 1:11 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

2049

1              A F T E R N O O N   S E S S I O N

2

3              (Out of the presence of the jury)

4              THE COURT:  Ready to go?

5              MR. MISKIEWICZ:  Yes.

6              THE COURT:  Bring in the jury.

7              (Whereupon, the jury at this time enters the

8    courtroom.)

9              THE COURT:  Please proceed.

10             Okay.  The Government calls its next witness.

11             MR. MISKIEWICZ:  The Government calls Owen

12   Nolan.

13             THE COURT:  Mr. Nolan, why don't you come up to

14   the witness stand and remain standing while we place you

15   under oath.

16             THE CLERK:  Please raise your right hand.

17   **O W E N   N O L A N**,

18        called as a witness, having been first

19        duly sworn, was examined and testified

20        as follows:

21             THE WITNESS:  Owen N-O-L-A-N.

22             THE COURT:  Be seated, Mr. Nolan.

23             Pull your chair up close to the mike and keep

24   your voice up.  Go ahead, Mr. Miskiewicz.

25             MR. MISKIEWICZ:  Thank you, your Honor.

2050

1   DIRECT EXAMINATION

2   BY MR. MISKIEWICZ:

3   Q    Good afternoon, Mr. Nolan.  What state do you live

4   in, Mr. Nolan?

5   A    California.

6   Q    What do you do for a living?

7   A    Retired hockey player.

8   Q    Were you a professional hockey player?

9   A    Yes.

10  Q    When did you start playing hockey?

11  A    Professional in 1990.

12  Q    And how old were you in 1990 when you started?

13  A    18.

14  Q    How far along in formal schooling did you go before

15  you were drafted into hockey?

16  A    I was drafted in high school.

17  Q    When you say professional hockey, you mean the

18  National Hockey League, the NHL?

19  A    Yes.

20  Q    What teams did you before you were a professional

21  hockey player?

22  A    Quebec, Colorado, San Jose, Phoenix, Toronto,

23  Calgary, Minnesota.

24  Q    What was the last year that you played

25  professionally?

Nolan - Direct/Miskiewicz

2051

```
1    A    I believe it was '08.

2    Q    When you joined the NHL -- and did you have a

3    contract your first year?

4    A    Yes.

5    Q    Did you seek advice from any individual about how to

6    manage the money that you got as a professional athlete?

7    A    No.

8    Q    I'm sorry?

9    A    Not right away, no.

10   Q    Did there come a time that you sought professional

11   advice?

12   A    Yes.

13   Q    And briefly, where did you go?

14   A    At my agent's recommendation, someone in Canada.

15   Q    Did you stay with that person in Canada for some

16   period of time?

17   A    No.

18   Q    Did you change to a different person?

19   A    Yes.

20   Q    And who did you switch to?

21   A    Phil Kenner.

22   Q    And do you recall approximately what year you met

23   Mr. Kenner?

24   A    I believe around 2000.

25   Q    Okay.  How -- first of all what team and what city
```

Nolan - Direct/Miskiewicz

2052

 1   were you based out of at that point in 2000?

 2   A    San Jose, California.

 3   Q    Okay.  And you still live in San Jose, California

 4   now?

 5   A    Yes.

 6   Q    How did you come to meet Mr. Kenner?

 7   A    A few of the other players on the team had him and

 8   through conversations we got to talking and eventually set

 9   up a meeting.

10   Q    Do you remember who those people were, your teammates

11   were who recommended him?

12   A    May have been Sean Donovan and Jeff Friesen.

13   Q    And when you were looking for a financial advisor,

14   what were you looking for?

15   A    Someone to help manage my money and make it grow and

16   look after me.

17   Q    And how long did you play in the NHL?  How many

18   years?

19   A    18.

20   Q    So when you met Mr. Kenner, you were already more

21   than halfway through your career, is that accurate?

22   A    Yes.

23   Q    Would you recognize -- did you meet Mr. Kenner

24   face-to-face?

25   A    When?

Nolan - Direct/Miskiewicz

2053

```
1    Q    At any time?  Did you meet with Mr. Kenner?

2    A    Yes.

3    Q    Okay.  And would you recognize him if you saw him

4    again?

5    A    Yes.

6    Q    Would you look around the courtroom and see if you

7    can identify him?

8              MR. HALEY:  Your Honor, my client is standing so

9    it is okay.

10             THE COURT:  Yes, identification has been

11   conceded.

12   Q    During the period of time that Mr. Kenner was your

13   financial advisor, how frequently would you have meetings

14   with him, let's say, face-to-face?

15   A    Maybe once or twice a year.

16   Q    What about by telephone or -- let's do one at a time.

17             What about by telephone?  How frequently, if at

18   all, would you talk to Mr. Kenner about your finances by

19   telephone?

20   A    Uhm, it would vary.  Sometimes he would be easy to

21   get a hold of; many times it would be difficult.  So,

22   sorry, I can't give you an exact number.

23             MR. MISKIEWICZ:  Mr. Nolan, I'll ask you again.

24   Maybe if you can move the mike closer to you, this way you

25   are not buttoned up again the bench there.
```

2054

1     What about e-mails or texts?  Did you

2  communicate with Mr. Kenner by e-mails or texts?

3  A    At times, yes.

4  Q    How frequently would that happen?

5  A    Uhm, it's tough to say.  It wasn't as often as I now

6  know it should have been.

7  Q    Now, when you hired Mr. Kenner, you did hire him or

8  engage in as a financial planner?

9  A    Yes.

10  Q    Did you have some sort of an arrangement for which

11  you would pay him for his services?

12  A    Yes.

13  Q    And do you recall how did that arrangement take

14  place.  How would you pay him, in other words?

15  A    I believe it was a percentage, but I can't be

16  accurate on numbers right now.

17  Q    But a percentage of what?

18  A    My overall portfolio.

19  Q    Do you remember if would you pay him weekly, monthly,

20  quarterly?  How did that work?

21  A    I believe it was quarterly.

22  Q    You said you had a portfolio.  Where was your

23  portfolio at this time, talking about 2000 or the early

24  2000s?

25  A    I believe Charles Schwab.

Nolan - Direct/Miskiewicz

2055

1   Q    What kinds of investments did you have in Charles

2   Schwab that would be managed by Mr. Kenner?

3   A    At the time it was stocks.

4   Q    And did you select the stocks; did he select the

5   stocks?  How did that work?

6   A    It was on his recommendation.

7   Q    Okay.  Was it something that you all talked about?

8   A    I don't recall.

9   Q    All right.  Did there come a time that aside from

10  stocks and -- through Charles Schwab, that you invested in

11  other kinds of business ventures?

12  A    Yes.

13  Q    And were those other investments done in consultation

14  with or at the recommendation of Mr. Kenner?

15  A    Yes.

16  Q    Both.  In other words, talking about it, consulting,

17  and did he make specific recommendations?

18  A    He would present a company to us or whatever it may

19  have been and that's how it started.

20  Q    Okay.  When you say he would bring a recommendation

21  to us, when you say us, who are you talking about?

22  A    My family.

23  Q    Is it fair to say this portfolio, what you had saved

24  from the NHL, was important to you?

25  A    Certainly.

Nolan - Direct/Miskiewicz

2056

1    Q    Why?

2    A    You know a career in the NHL, a career in the NHL is

3    a great life but at some point it has to come to an end

4    and you want to be set for retirement.

5    Q    And is it fair to say that the money that you made

6    while being a professional athlete was not likely to

7    continue after you retired, in other words, that you would

8    run out of money?

9    A    No.

10   Q    Are you familiar with the name of a company called

11   Eufora?

12   A    Yes.

13   Q    Did you ever have any discussions with Mr. Kenner

14   about Eufora?

15   A    Yes.

16   Q    What, if anything, did Mr. Kenner tell but the

17   company Eufora?

18   A    It was a credit card company.

19   Q    A credit card company?

20   A    Yes.

21   Q    Anything else?

22   A    There was a great opportunity to get into, be a smart

23   investment to be a part of, and I agreed and went along

24   with him.

25   Q    At that point did you meet a man by the name of Tommy

2057

1    Constantine?

2    A    I don't recall meeting Tommy.

3    Q    Did you ever meet a man by the name of Tommy

4    Constantine?

5    A    I think I may have briefly.

6    Q    Where would that have been?

7    A    In Arizona.

8    Q    And would it have been under what circumstances did

9    you meet?

10   A    It wasn't for business, it was just social that we

11   are there, at a restaurant.

12   Q    At the time you made your investment in Eufora,

13   whenever that was, did the name Tommy Constantine come up?

14   A    It may have.  I don't recall.

15   Q    Okay.  Other than what Mr. Kenner told you about

16   Eufora, did you have any other information about this

17   company?

18   A    No.

19   Q    Did you have any idea who was running the company at

20   that time?

21   A    No.

22   Q    Do you recall when you made your first investment in

23   Eufora?

24   A    I don't recall the year.

25   Q    I show you what is marked for identification as

2058

1   Government's Exhibit ON-1.

2           Mr. Nolan, I will show you what has been marked

3   as ON-1.  Look at the portion of that that has been

4   highlighted and see if that refreshes your recollection

5   and then I'll ask you some questions.

6   A    It seems to be about the right time but I couldn't

7   say for sure.

8   Q    Okay.  So whether or not that refreshes your

9   recollection, do you have any approximation of the year

10  that you first invested in Eufora?

11  A    Looking at this, if it is correct, in '03.

12  Q    2003?

13  A    Yes.

14  Q    Did you make one, well, let me withdraw that.

15          How much did you invest?  Do you recall that?

16  A    Originally it was 100,000.

17  Q    And when you invested $100,000 in Eufora, was that a

18  loan or were you investing in the company or was there

19  some other benefit that you intended to get?

20  A    I believe that it was shares in the company.

21  Q    Was that based on your conversations with Mr. Kenner

22  or somebody else?

23  A    With Mr. Kenner.

24  Q    After you invested $100,000, did you invest any more

25  in Eufora?

Nolan - Direct/Miskiewicz

2059

1  A    Yes, I put in an additional 100,000 in.  I wanted to

2  help my family and my wife's family out.

3  Q    So what was the purpose of -- when you say your

4  family and your wife's family, you put in 100,000 in

5  Eufora to get what in return?

6  A    I put an additional $100,000 into getting some shares

7  for my wife's family and brothers.

8  Q    And do you recall how soon after your first

9  investment did you make that second investment?

10  A    I don't think it was much longer.

11  Q    You said you made your first investment in the year

12  2003.  Let's focus on Christmas 2003.  Do you know whether

13  or not the second $200,000 was made -- the second $200,000

14  investment was made before or after Christmas 2003?

15          MR. HALEY:  Judge, I apologize.  Is it $100,000

16  or $200,000 investment?  I apologize.

17          THE WITNESS:  $200,000 total.

18          MR. HALEY:  $200,000, total?

19          THE WITNESS:  The second hundred thousand was

20  before Christmas.

21  Q    Did you intend to make that additional investment and

22  get those stocks backs from Eufora?  What did you intend

23  to do the with stock certificates or whatever you were

24  going to get that Christmas?

25  A    I wanted to present it to my family for a Christmas

2060

1    gift.

2    Q     Did you?

3    A     No.

4    Q     Why not?

5    A     Didn't get the proper paperwork or any paperwork to

6    present to them for Christmas so I eventually on the

7    recommendation of Phil, just put a note in an envelope and

8    passed it out for Christmas.

9    Q     Now, you said on the recommendation of Phil, you mean

10   Mr. Kenner?

11   A     Yes.

12   Q     Did you ask anybody for a stock certificate or some

13   kind of documentation showing your family, your brothers

14   now owned a percentage of Eufora, thanks to your

15   investment?

16   A     I did ask for certificates, paperwork, whatever the

17   proper paperwork was.

18   Q     And was that in person or by phone?

19   A     I don't recall how I asked.

20   Q     What, if anything, did Mr. Kenner tell you when you

21   asked for certificates or proper paperwork?

22   A     He thought it was a better idea that he held on to

23   them and it would be better if I just wrote a note, put it

24   in an envelope, and present it that way for Christmas.

25   Q     So did he in essence tell you that he had the stock

Nolan - Direct/Miskiewicz

2061

1   certificates?

2          MR. HALEY:  Well, Judge, I object.

3          THE COURT:  Sustained.

4          MR. MISKIEWICZ:  I'll withdraw that.

5   Q    So did you have any understanding whether there were

6   stock certificates in your name or in the name of your

7   family at that point?

8   A    I believe that he had paperwork and that he was

9   holding it for us.

10  Q    After Christmas of 2003, did you at any point later

11  ask for paperwork reflecting both your ownership and your

12  family's ownership in Eufora?

13  A    Yes.

14  Q    And who did you ask?

15  A    I asked Phil Kenner.

16  Q    And did you ask once or more than once?

17  A    I asked several times.

18  Q    And what, if anything, did Mr. Kenner tell you when

19  you asked?

20  A    I don't recall the specific reason but by the end of

21  it, I was at ease and felt comfortable that everything was

22  okay.

23  Q    Okay.  So you don't remember what he told you?

24  A    Not specifically, no.

25  Q    But you felt at ease?

Nolan - Direct/Miskiewicz

2062

1    A    Yes.

2    Q    Did there come a time when you were no longer at ease

3    with questions you had posed to Mr. Kenner?

4    A    Yes.

5    Q    And approximately what year is that?

6    A    I believe it was 2006, roughly, 2007, maybe.

7    Q    Did that have anything to do with documentation or

8    lack of documentation that you were getting?

9    A    Yes, we made several phone calls, couldn't get return

10   phone calls, just looking for any type of paperwork to

11   show that we were part of something that we invested in

12   it.  It was a lot of song and dances.  I mean the guys

13   really need to sell sand on the beach and the conversation

14   -- I felt at ease having a conversation with him  -- very

15   naive on my part, but I had no reason not to believe him.

16   Q    You liked Mr. Kenner, didn't you?

17   A    Yes, very much.

18   Q    Aside from being a business client of his, would you

19   say that from time to time you would be willing to

20   socialize with him?

21   A    Absolutely.  Considered him a great friend, almost

22   like a brother.

23   Q    You trusted him?

24   A    Very much.

25   Q    And at some point you sued him, right?

Nolan - Direct/Miskiewicz

2063

1    A    Yes.

2    Q    And that ended up in what is called an arbitration?

3    A    Yes.

4    Q    And you testified in an arbitration, right?

5    A    Yes.

6    Q    And among the things covered in the arbitration was

7    Eufora?

8    A    Yes.

9    Q    Did there come a time that you ever had any

10   discussions with Mr. Kenner about investing in a land deal

11   or project in Hawaii?

12   A    Yes.

13   Q    Do you remember approximately when that was -- let me

14   withdraw the question.

15         Was it before or after you invested in Eufora?

16   A    After.

17   Q    Okay.  Could it have been in 2004 or 2005 or later?

18   A    Maybe 2005?  I'm guessing right now.  I don't

19   specifically remember the year.

20   Q    Okay.  Is it fair enough to say if I asked you for

21   your wife's birth date, you would have trouble remembering

22   the date?

23   A    Yes, I do forget that one.

24   Q    And other special days?

25   A    Yes.

Nolan - Direct/Miskiewicz

2064

1  Q    So whenever it was, whatever year it was, do you have

2  a recollection whether or not if you invested in this

3  Hawaii land deal?

4  A    Yes.

5  Q    How much?

6  A    100,000.

7  Q    And what, if anything, were you investing in.  In

8  other words, what were you trying to get as a benefit out

9  of that investment?

10  A    My understanding of the whole project it was a land

11  development located in a great area near a major highway.

12        The idea was to build houses on 20-acre parcels

13  and that was my interpretation of the whole project.

14  Q    And your interpretation was based on whose

15  information?

16  A    Phil Kenner's.

17  Q    Did you talk to anybody or meet anybody other than

18  Phil Kenner when you discussed this Hawaii land deal?

19  A    No.

20  Q    Did you ever go to Hawaii to see it?

21  A    No.

22  Q    Again, what was it about what Mr. Kenner told you

23  that caused you to think this would be a good way to

24  invest $100,000 with your money?

25  A    As I said before, he's a very convincing guy.  It's a

Nolan - Direct/Miskiewicz

2065

1    can't miss opportunity, heard of other projects that were

2    very successful that way and I really didn't know much

3    about it, but I trusted his opinion on it and just

4    followed his lead.

5    Q    And you did in fact write a check or wire money?

6    A    I believe so.

7    Q    Do you have any doubt you invested $100,000?

8    A    No, I invested $100,000.

9    Q    Now, other than $100,000, did you invest any other

10   amounts of money into the Hawaii land deal?

11   A    No.

12   Q    There has been testimony in this case about lines of

13   credit.

14            Did you ever have a line of credit associated

15   with your investment in Hawaii?

16   A    No.

17   Q    Did you ever authorize Mr. Kenner to open up a line

18   of credit in your name?

19   A    No.

20   Q    Did you ever authorize Mr. Kenner to open up a line

21   of credit in a company called Little Isle IV?

22   A    No.

23   Q    What about if there was a company called Little Isle

24   IV and you and Mr. Joe Juneau and Mr. Kenner were somehow

25   vouching for a line of credit in Little Isle IV, do you

Nolan - Direct/Miskiewicz

2066

1   have any memory doing that?

2   A    No.

3   Q    Did there come a time that you learned that a line of

4   credit had been opened in your name?

5   A    Yes.

6   Q    And was that before or after your arbitration?

7   A    Before.

8   Q    And what, if anything, did you learn -- first of all

9   where did you learn the line of credit was opened out of?

10  What bank, in other words?

11  A    Northern Trust.

12  Q    Did you ever learn what the total amount borrowed

13  against that line of credit was, according to Northern

14  Trust's records?

15  A    I believe the total was 2.2 million.

16  Q    Did you intend to invest 2.2 million in Hawaii?

17  A    No.

18  Q    At any time?

19  A    No.

20  Q    I'll show you what has been marked for identification

21  as Government's Exhibit 2154.

22       Showing you Government's Exhibit 2154.  Do you

23  recall ever seeing that document before?

24  A    No.

25  Q    There's a signature on that document.  Does that

2067

1    appear to be your signature?

2    A    It looks like it.

3    Q    There's some handwriting on that document.  If you

4    signed that document, whatever the date is, do you recall

5    whether or not that handwriting was on the document, if

6    and when you did sign it?

7    A    I mean I don't recall seeing this paper so I can't

8    say -- if the writing was on there or not.

9    Q    Is any of the handwriting on there yours?

10   A    Definitely not.

11              MR. MISKIEWICZ:  With the stipulation of the

12   defendants, the Government moves for the admission of

13   2154.

14              THE COURT:  Mr. Haley.

15              MR. HALEY:  Yes, sir.

16              MR. LARUSSO:  No objection.

17              THE COURT:  2154 is admitted.

18              (Whereupon, Government Exhibit 2154 was received

19   in evidence.)

20   Q    So Mr. Nolan, we're now all looking at the document.

21              It is headed Board of Governors of the Federal

22   Reserve System, Statement of Purpose for an Extension of

23   Credit Secured by Margin Stock?  Do you see that?

24              Mr. Nolan?

25              Do you see what I'm referring to?

Nolan - Direct/Miskiewicz

2068

1   A     Yes.

2   Q     Do you have any idea what any of that means?

3   A     No.

4   Q     Did Mr. Kenner, who was your financial advisor,

5   explain what that meant?

6   A     No.

7   Q     Do you know even know if he ever showed you this

8   document?

9   A     I don't know if he did.

10  Q     What I mean by that, right now sitting here, it is

11  2015 and this document was dated whatever, but do you have

12  an independent recollection of ever being shown a document

13  like this by Mr. Kenner, your financial advisor?

14  A     I don't remember ever seeing this.

15        MR. HALEY:  Your Honor -- asked and answered.

16  Q     Towards the bottom here, there's some print.  It says

17  Owen Nolan, is that your handwriting?

18  A     No.

19  Q     And then part one, the middle of this document, it

20  says what is the amount of the credit being extended.

21  $500,000 in handwriting.  Is that yours?

22  A     No.

23  Q     There's a question there:  Will any part of this

24  credit be used to purchase or carry margin stock?  And

25  there's a check mark.  Can you tell one way or the other

Nolan - Direct/Miskiewicz

2069

1   if the check mark is yours?

2   A     I would say no.

3   Q     "And if the answer is no, describe the specific

4   purpose of the credit," and there's some block lettering,

5   "real estate investment"?

6   A     Yes.

7   Q     The lettering "real estate investment," is that your

8   handwriting?

9   A     No.

10  Q     Do you know where that came from?

11  A     No idea.

12  Q     Are you based on this copy, do you know whether or

13  not whether you're certain that's your signature?

14          MR. HALEY:  Objection.

15          THE COURT:  Sustained.  Asked and answered.

16  Q     There's been documentary evidence offered in this

17  case so far and also a series of charts or graphs

18  representing -- I'll show you or publish to you now

19  Government's Exhibit 22 and I'll have a series of

20  questions.

21          Can you see Government's Exhibit 22, Mr. Nolan.

22  Do you see it on the screen in front of you?

23  A     Yes.

24  Q     Okay.  In or about the period May 23, 2007, according

25  to the documentary evidence that has been entered into in

2070

```
1    this trial so far, you had a balance of negative

2    $2,189,796.02 at your Northern Trust line of credit in or

3    about that period of time, May 2007 -- I'm sorry,

4    April 2007.

5              Did you know that you had a line of credit that

6    had that much money drawn against it?

7    A    No.

8    Q    And I'll ask you this.  In or about April of 2007, if

9    there were records showing that Michael Peca had a line of

10   credit, money was drawn against it and some of that money

11   went to pay interest on your line of credit, did you know

12   that was happening in or about April 2007?

13   A    No.

14   Q    Did you owe Mr. Peca the amount that is shown here as

15   being paid to your line of credit.  Did you owe him

16   $12,236.42 in or about that period of time?

17   A    No.

18   Q    Did you ever owe Mr. Peca money?

19   A    No.

20   Q    Did you ever loan him money that he may have been

21   repaying you from some prior loan?

22   A    No.

23   Q    I show you another chart which is in evidence,

24   Government's Exhibit 24.  This is for covering a period

25   June 19, 2007, and there have been records and this chart
```

2071

1   has been admitted showing that money was being drawn

2   against a line of credit belonging to a Sergei Gonchar.

3   Do you know who Mr. Gonchar is?

4   A    Yes.

5   Q    How do you him?

6   A    I don't know him personally, just playing hockey

7   against him.

8   Q    It indicates if there were documents admitted in

9   evidence showing money went from Mr. Gonchar's Northern

10  Trust line of credit through Little Isle IV and then

11  ending up paying down or paying interest of $15,085.26 on

12  your line of credit, did you know that that was happening

13  in or about June of 2007?

14  A    No.

15  Q    Did you know that was happening?

16  A    No.

17  Q    And did you owe Mr. Gonchar money or did Mr. -- or

18  did Mr. Gonchar borrow money from you at any time?

19  A    No.

20  Q    What about Government's Exhibit 27, again another

21  chart based on some bank records and other exhibits that

22  have been offered.  Mattias Norstrom.  Do you know Mattias

23  Norstrom?

24  A    Just from playing hockey against him.  Not

25  personally.

Nolan - Direct/Miskiewicz

2072

1    Q    If there are bank records and other documentation

2    showing that $70,000 came out of his line of credit and

3    some of it went to pay -- make a payment of $14,142.43

4    against your balance on your line or credit, did you know

5    that was happening in or about October of 2007?

6    A    No.

7    Q    And again my question is, did he owe you money or did

8    you owe him money, meaning Norstrom?

9    A    No.

10   Q    What about Glen Murray?  Do you know Glen Murray?

11   A    Just from playing against.

12   Q    And if there is documentary evidence, and I'm

13   referring you to Government's Exhibit 28 showing

14   Mr. Murray having a $100,000 withdrawal from his line of

15   credit of which another $14,142.43 goes to pay interest on

16   your loan, did you know about that when it was happening

17   in or about November of 2007?

18   A    No.

19   Q    Did you owe him money?

20   A    No.

21   Q    Did he owe you money or was he repaying you any

22   money?

23   A    No.

24   Q    I'll show you Government's Exhibit 33.  This is for

25   the period April of 2008.  I'm circling the cursor.  What

Nolan - Direct/Miskiewicz

2073

1    is the name under the cursor?

2    A    Yes.

3    Q    Whose name is that?

4    A    Mine, Owen Nolan.

5    Q    It looks like there is a $10,000 withdrawal from your

6    line of credit.  Do you see that?

7    A    Yes, I see that.

8    Q    And then from Little Isle IV there seems to be

9    payments to a bunch of other people, one of them being

10   who?

11   A    Myself.

12   Q    So $10,000 is being borrowed from your line of credit

13   to pay how much on your line of credit?

14   A    Looks like $10,112.60, maybe.

15   Q    Now what is the balance?

16   A    2,000,199.  Close to 2.2 million.

17   Q    Did you know about this when it was happening?

18   A    No.

19   Q    Did there come a time that you were notified either

20   directly or through others that the line of credit was

21   placed into default?

22   A    I'm not sure when we experienced this, the specific

23   date we became aware of the line of credit.

24   Q    I'm not asking you another date, but did there come a

25   time that you learned you were in default?

Nolan - Direct/Miskiewicz

2074

1    A    Yes.

2    Q    Was there a settlement eventually with Northern

3    Trust?

4    A    Yes.

5    Q    Do you know what was the result of the settlement

6    with Northern Trust?

7    A    They gave us 500,000 for settlement, Northern Trust.

8    Q    So they settled with you in the amount of $500,000

9    and that was applied towards a balance of $2,199,796.02?

10   A    Yes, that's correct.

11            MR. MISKIEWICZ:  May I have a moment, your

12   Honor?

13            MR. MISKIEWICZ:  I'm sorry, one last question.

14            Going back to Eufora.  Did there come a time

15   that you either because of this arbitration or something

16   else, you demanded you would get out of your Eufora

17   investment.

18   A    Can you repeat that?

19   Q    Did you ever try to get out of Eufora as far as an

20   investment was concerned?

21   A    I know I asked out of a couple of investments but I

22   don't recall if that was one of them.  It may have been.

23   Q    Did you ever get any money from the $200,000 that you

24   put in in approximately the year 2003, did you get any

25   money back from that investment in Eufora?

Nolan - Direct/Miskiewicz

2075

1    A    No.

2    Q    Do you know if anybody was -- withdrawn.

3         Did you get an interest -- if you didn't get

4    money out, out of Eufora, did you get anything in lieu of,

5    a stock certificate, some ownership in Eufora?

6    A    Didn't get anything.

7    Q    Did you get an interest in hangars in Scottsdale,

8    Arizona?

9    A    That was another investment.

10   Q    But did you get anything out of that investment?

11   A    No.

12   Q    Did you ever settle with either Mr. Kenner or

13   Mr. Constantine in any kind of action in which you got an

14   interest in an airplane?

15   A    I don't recall any of that.

16   Q    Well, would you recall if you got an airplane?

17   A    No, I don't have an airplane.

18   Q    Did you get an interest in hangars in Scottsdale,

19   Arizona, as a result of any kind of settlement?

20   A    No.

21   Q    As you sit here today, did Mr. Constantine or

22   Mr. Kenner ever, either directly or indirectly, say, okay,

23   words to the effect that if you didn't get anything from

24   Eufora but we are going to settle with you for some other

25   investment?

Nolan - Direct/Miskiewicz

2076

1      MR. HALEY:  Judge, I object.  May we approach

2  briefly?

3      THE COURT:  Yes.

4      MR. HALEY:  Thank you.

5      (Whereupon, at this time the following took

6  place at the sidebar.)

7      (Continued.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nolan - Direct/Miskiewicz

2077

1          (In open court.)

2          MR. HALEY:  Your Honor, my objection is based

3     upon if I understood Mr. Miskiewicz question, just

4     unnecessary confusion in this regard for the jury.

5          Owen Nolan was not an investor in the Global

6     Settlement Fund.  So when you ask him questions do you get

7     an interest in those various hangars and airplanes, that

8     was directly related to the scope of the Global Settlement

9     Fund.

10         THE COURT:  Why are you asking about those?

11         MR. MISKIEWICZ:  Because the representations to

12    other victims who did contribute to the GSF some of the

13    money would go to get out the other bad apples, even

14    Moreau and Owen Nolan.  He got nothing.

15         THE COURT:  Overruled.

16         MR. HALEY:  I know.

17         (End of sidebar conference.)

18         (Continued.)

19

20

21

22

23

24

25

Nolan - Direct/Miskiewicz

2078

1           (In open court.)

2           MR. MISKIEWICZ:  Would you like me to restate

3    the question or perhaps have the reporter read it back?

4           (Question read.)

5           THE COURT:  Do you understand the question,

6    Mr. Nolan?

7           THE WITNESS:  No, not really.

8           THE COURT:  Why don't you rephrase it.

9           MR. MISKIEWICZ:  I don't even understand it.

10          MR. HALEY:  That's why I objected.

11   Q    Did you ever get any money from Mr. Constantine or

12   Mr. Kenner to buy you out of any of your investments in

13   Eufora or Hawaii or anything else?

14   A    No.

15   Q    You invested in some hangars.  Do you know whether or

16   not you own any piece of any hangers in Scottsdale,

17   Arizona today?

18   A    I don't know.

19   Q    And of the $200,000 in Eufora, to this date, you have

20   not received any return on that at all?

21   A    I don't believe so.

22   Q    Okay.  Well, I know you say you don't believe so.  Do

23   you have any reason to believe you either did or didn't?

24   A    No, I don't believe I did.

25          MR. MISKIEWICZ:  All right.  No further

Nolan - Cross/Haley

2079

1    questions.

2            THE COURT:  Okay.  Cross-examination.

3    CROSS-EXAMINATION

4    BY MR. HALEY:

5            MR. HALEY:  Thank you, Judge.

6    Q    Mr. Nolan, good afternoon, sir.

7    A    Good afternoon.

8    Q    My name is Rick Haley and I represent Phil Kenner.

9    A    Yes.

10   Q    Mr. Nolan, I want you to take a look at a document

11   already marked as a Government's exhibit, but for my

12   purposes it is marked as Kenner Exhibit 54 pursuant to a

13   stipulation.  It's a duplicate of a document.

14           THE COURT:  Why don't you admit it as Kenner

15   Exhibit 4.

16           (Whereupon, Defendant's Kenner Exhibit 4 was

17   received in evidence.)

18   Q    As you look at this document, we see 2/13/2012, a

19   special payment 1,702,942.08.  Do you see that figure?

20   A    Yes.

21   Q    And then we see another special adjustment, says

22   special adjustment decrease $495,968.67, do you see that?

23   A    Yes.

24   Q    Do you know the source of this special payment of

25   1,702,942.08?

Nolan - Cross/Haley

2080

1    A    No.

2    Q    Are you certain, sir, that Northern Trust did not

3    resolve a dispute with you by making payment as relates to

4    your account to more than $500,000.  Do you understand my

5    question?

6    A    Can you repeat it?

7    Q    Sure.  Are you certain that the resolution that you

8    had with Northern Trust in connection with your account,

9    if that resolution involved only the payment of one

10    adjustment of $500,000 or did it involve a greater

11    adjustment, greater payment, as relates to your Northern

12    Trust account?

13    A    Our settlement was for 500,000.

14    Q    I take it it relates to the 1,702,942.08 special

15    payment.  You don't know what that means?

16    A    No.

17    Q    Now, in reference to Government's Exhibit 2154, we

18    can agree, sir, that the document has a photocopy of a

19    sticker that says "sign here."  Do you see that?

20    A    Yes.

21    Q    Over the course of your relationship with Phil

22    Kenner, isn't it true, sir, that there would be not only

23    e-mail communications between you and Phil on occasion,

24    and not only telephone conversations between you and Phil

25    on occasion, but certain instances where Phil would send

Nolan - Cross/Haley

2081

1    you through the mail documents to review and sign.  Isn't

2    that true?

3    A    That's possible.

4    Q    I take it under such circumstances when you would

5    receive a document, let's say a document that was perhaps

6    filled out by Phil Kenner for you to sign, particularly a

7    one payment document, was there any prohibition by the way

8    of physical disability, mental disability, where you

9    wouldn't have the opportunity to read this document before

10   you signed it?

11   A    No, I could have read it.  I'm sure I should have,

12   but I could have read it.

13   Q    Well, as relates to this particular document, 2154,

14   when Mr. Miskiewicz read to you in front of the jury the

15   portions of the document as it reflects on the record, you

16   didn't testify you didn't understand what he was saying,

17   correct?

18   A    Correct.

19               (Continued.)

20

21

22

23

24

25

2082

1    CROSS-EXAMINATION (Continued)

2    BY MR. HALEY:

3    Q.   So you were able to understand what he was saying as

4    relates to the content of this document when questioned

5    just a short while ago.  True?

6    A.   Because we reviewed it.

7    Q.   I'm sorry?

8    A.   Because we reviewed it.

9    Q.   I understand, sir, we reviewed it.  But we reviewed

10   it not in a rushed fashion.  Isn't that true?

11   A.   I'm not sure what you are asking me.

12   Q.   Well, you testified just a moment ago that there were

13   occasions where Phil would send you documents, you would

14   have an opportunity to review them, and you signed the

15   documents and I assume you returned them to Phil to return

16   them to, let's say, the bank.  Had that occurred?

17   A.   I believe so.

18   Q.   And with reference to this particular document, did

19   you ever, to the best of your recollection, as relates to

20   this particular document, feel pressure to read it quickly

21   without understanding the document before you, let's say,

22   affixed your signature?

23   A.   I don't remember ever seeing that so I can't say if I

24   ever read it.

25   Q.   Okay.  The relationship that you had with Phil Kenner

2083

1    I know you stated was one of trust.  As a matter of fact,

2    I think you said he was like a brother to you.  Is that

3    correct?

4    A.    Yes.

5    Q.    However, sir, we can agree there did exist a business

6    relationship between you and Phil Kenner.

7    A.    Yes.

8    Q.    And as relates to that business relationship, is it

9    not true that Phil Kenner presented you with a contract

10   known as a Standard Advisor's Inc agreement wherein you

11   signed the contact so that the business relationship

12   between you and Phil in connection with the services he

13   was providing to you would be at least memorialized in

14   writing.  Correct?

15   A.    I believe so.  Yes.

16   Q.    Sir, I apologize for the quality of the document,

17   itself, but I believe it is sufficient.  I'll leave that

18   up to you, sir, as to whether or not you are able to read

19   what is in the document.  I get it in this form and that

20   is the only form in which I get it.

21          But would you kindly just take a look at this

22   document.

23   A.    How much do you want me to read?

24   Q.    I want you to have an opportunity to look at the

25   entire document, but let me refer you to the last page.

NOLAN-CROSS-HALEY

2084

1    And admittedly, it is a very poor copy, sir.

2    But do you see, if you are able to discern that,

3    Mr. Nolan, what appears to be your signature?

4    A.    Yes, I see that.

5    Q.    And indeed, this is the Standard Advisor's Inc,

6    agreement you signed with Phil.  Isn't that true?

7    A.    I don't remember this document, but it seems to be a

8    standard advisory document.

9    Q.    Well, isn't it true, sir, that it was this document

10   that gave you the legal authority to seek arbitration

11   before an arbitration panel with reference to the dispute

12   that developed between you and Phil?  Correct?

13   A.    I'm not saying it is not legit.  I'm just saying I

14   don't remember.

15   Q.    Okay.  Well, if I were to suggest to you that this

16   document was the basis upon which you were able to

17   arbitrate your dispute with Phil, would that refresh your

18   recollection?

19   A.    No.

20   Q.    We can agree, can we not, sir, that there was an

21   arbitration in 2009 wherein you made various claims

22   against Phil Kenner, including a claim for punitive

23   damages?  Isn't that correct?

24   A.    I can't remember what all the claims were.

25   Q.    Well, you were present during that proceeding.

2085

1   Correct?

2   A.   Yes.

3   Q.   As a matter of fact, the proceeding took place over

4   five days, did it not?

5   A.   I have no idea how many days.

6   Q.   Okay.

7   A.   It's part of my life I'm trying to forget.

8   Q.   Sir, I'm going to ask you to take a look at a

9   document marked Kenner Exhibit 56.

10          And I don't want to prolong this proceeding,

11  sir, but I would ask that you at least take a look at the

12  content of the document before I ask you the next

13  question.  Okay?

14          And I mean, are you able to read the words on

15  this document, sir?  Yes or no?

16  A.   I can read the words.  Am I able to translate it?  I

17  don't know.

18  Q.   Well --

19  A.   I don't have your education.

20  Q.   Sir, I respect that you do.  And I appreciate the

21  comment.  But my point is, when you say you can't

22  interpret it:  It is a document in the English language,

23  is that correct?

24  A.   Yes.

25  Q.   And would you just kindly take a look at the last

NOLAN-CROSS-HALEY

2086

1   sentence of this document, on page one.  And looking at

2   that document, does is that refresh your recollection that

3   the arbitration involving Diana Nolan and Owen Nolan,

4   plaintiffs, versus Phil A Kenner, Standard Advisors Inc

5   and Standard Advisors LLC, took place from May 26 to May

6   30 of 2009?

7              Does that refresh your recollection?

8   A.   If that's the dates.

9   Q.   But you are saying that doesn't refresh your

10  recollection that that is when it took place?

11  A.   It may have.  I don't know.  I don't write these

12  dates down.

13  Q.   Well, can we agree, sir, that at the conclusion of

14  the arbitration that took place -- we do agree that an

15  arbitration took place.  Is that correct?

16  A.   Yes.

17  Q.   And do we agree that you were present during every

18  day of that arbitration?

19  A.   Yes.

20  Q.   And do we agree that a number of witnesses, including

21  Phil Kenner, testified at that arbitration?

22  A.   Yes.

23  Q.   And at the conclusion of that arbitration, there was

24  an award, a determination by the arbitrators, as relates

25  to your claims.  True?

2087

1    A.    Yes.

2    Q.    Sir, is it not a fact that that document that you

3    have in front of you -- and I would ask that you look at

4    it, sir; I'm asking you to take a look at that document --

5    is indeed the award that you received following the

6    arbitration?

7    A.    Anything specific I'm looking for?

8    Q.    Well, my question, sir:  Is or is that not the final

9    arbitration award that you received as a result of the

10   arbitration proceedings you brought against Phil Kenner?

11   A.    It looks like the arbitration award.

12   Q.    Well, from your perspective did you win or lose the

13   arbitration?

14            MR. MISKIEWICZ:  Objection.

15            THE COURT:  Sustained.

16   BY MR. HALEY:

17   Q.    Well, is it not true, sir, that as a result of the

18   arbitration there was a determination --

19            MR. MISKIEWICZ:  Objection.

20            THE COURT:  Why don't we take our break now so I

21   can discuss this with the lawyers.

22            (The following ensued in the absence of the jury

23   at 3:10 pm.)

24            THE COURT:  You can step down, Mr. Nolan, and

25   take a 10 or 15-minute break.

NOLAN-CROSS-HALEY

2088

1          (Witness leaves the courtroom.)

2          THE COURT:  Please be seated.

3          What is the objection?

4          MR. MISKIEWICZ:  Relevance.

5          And more specifically, under 403 the findings of

6     the arbitrator should not be provided to this jury because

7     it will be confusing and will be more prejudicial to the

8     government's case than probative.

9          The fact is the arbitration had different

10    evidence before it.  The arbitrators made certain findings

11    regarding breach of fiduciary duty which, not regarding

12    fraud is immaterial to any of the issues that have to be

13    decided by this jury.

14         And the fact that an arbitrator, I think the

15    jury will deem to be like another court, made certain

16    finding of law and fact really have no relevance here.

17         And I think, and I apologize for breaking

18    Mr. Haley's question, but I think that is where he was

19    about to go with his questions:  Isn't it a fact that the

20    arbitrator found no fraud?

21         So that in sum and substance is our objection

22    both to the question and to any effort to introduce the

23    final arbitration award decision, which is a pretty

24    lengthy document, makes a lot of findings of fact and

25    conclusions of law.

2089

```
 1            THE COURT:  Mr. Haley?

 2            MR. HALEY:  Judge, once again, that is not where

 3   I was headed, at least with that question:  Isn't it a

 4   fact that the arbitration --

 5            THE COURT:  Not with that question, but that is

 6   where you were going.

 7            MR. HALEY:  But I like to parse it out.

 8            When we are ready for the objection, Judge, we

 9   can address it.  I'm not sure I could ever get that before

10   the court so I wasn't, frankly, Judge, necessarily going

11   to ask that question.  What I was intending to ask is

12   whether or not he obtained a judgment in the amount of the

13   line of credit, which indeed was true; whether or not he

14   obtained a judgment as relates to attorneys fees pursuant

15   to that standard advisor agreement, which indeed is true;

16   and whether or not, as a result of that he was made whole,

17   at least as relates to his claims against Phil Kenner, in

18   this arbitration proceeding.

19            That was where I was going, judge.

20            THE COURT:  Mr. Miskiewicz, after listening to

21   that, do you have any objection as to what money he

22   received out of the arbitration, as opposed to what the

23   findings and conclusions were?

24            MR. MISKIEWICZ:  I object to the fact that he

25   got an award.  I will, however, on redirect, and perhaps
```

2090

1    there are witnesses that will make it clear that he has

2    never received any money.  So the notion that he received

3    money is really not fair.  I mean, it's inaccurate.  And

4    also there is --

5              THE COURT:  Are you saying he received an actual

6    award but he never actually got the money?

7              MR. MISKIEWICZ:  He never got the money.  And in

8    fact there are a number of witnesses, in fact the last

9    witness, Mr. Nash, had a conversation with Mr. Kenner

10   about there very thing, I think it was Mr. Nash, or

11   Mr. McKee, which Mr. Kenner said he will never see a dime

12   out of this.

13             So we could have gone through a lot of extrinsic

14   material and things that have nothing to do with this.

15   But, at the very least, if he brings that out I don't see

16   how it helps the defense, but that is not my problem.  I

17   will, however, on redirect and perhaps through other

18   witnesses in the future bring out the fact that there was

19   an effort to malign Mr. Nolan and others, we heard a

20   little bit about it this morning, regarding bad apples.

21   There are called bad apples because he lost in this

22   arbitration and now they are trying to, as Mr. Kenner said

23   to one of our witnesses, screw him.

24             So I don't see how any of this is really

25   probative of any of the issues that have to be before the

2091

1    jury and I would ask that it be excluded for that reason.

2         If it comes in, I would just ask for a brief

3    opportunity to redirect on the issue that he did not in

4    fact get any money back.

5         THE COURT:  So my ruling is clear, and again I

6    know you said you didn't intend to do that, Mr Haley, but

7    I want to make clear so there is no misunderstanding, I'm

8    precluding any reference to the conclusions of the

9    arbitration for the reasons that the government indicated.

10        I don't believe they are admissible.  I think

11   they would be highly prejudicial under 403 because the

12   jury might believe that that arbitrators had exactly the

13   same evidence before them and we don't know what the

14   evidence was before the arbitrators.  Plus, it is not

15   binding on them in any way.  So for all those reasons

16   there shouldn't be any reference to the findings or

17   conclusions of the arbitration.

18        If you want to bring out the fact that he did

19   get an award of $1.7 him million, or whatever it was, in

20   attorneys fees, it would be fair game for Mr. Miskiewicz

21   to ask him on redirect:  Have you ever been able to

22   recover any of that money?  Because I wouldn't want the

23   jury to be left with the impression that he was,

24   quote-quote, made whole by the arbitration award.

25        It is up to you whether you want to open that

2092

1   door or not on that particulars issue.

2           MR. HALEY:  First of all, judge, thank you.  And

3   I will obviously abide by the court's ruling.

4           My only comment as relates to -- you are

5   correct, judge, the government can ask did you ever

6   collect on that award and I know the answer be no.

7           I might say, judge, though, as we go down that

8   path, if the government was going further than that, one

9   of the reasons why he hasn't been able to collect on the

10  award, to be brutally honest, is, Phil Kenner has been

11  incarcerated since November 13, 2013, and hasn't been able

12  to make a living, hasn't been able to do what he does,

13  judge, in order to build the assets to address that issue.

14          But all I'm trying the say, judge, is, it

15  strikes me that to the extent that the government asked

16  him:  *So you had an award.  Have you been able to collect*

17  *on it?*

18          If that is as far as they are going, then I

19  think we have solved all of the 403 issues.

20          THE COURT:  Yes.  Except also, again, that opens

21  the door.  And Mr. Miskiewicz or through other witnesses

22  the government would be also entitled to argue and try

23  eliciting from other witnesses, maybe through the

24  statements of Mr. Kenner or other admissible evidence that

25  that was the reason they were, quote-unquote, the bad

NOLAN-CROSS-HALEY

2093

1    apples; that it did not relate to an effort to take over

2    Eufora or some other conduct with respect to Eufora but

3    that they were bad apples because they sued Mr. Kenner.

4            Is that what are suggesting?

5            MR. MISKIEWICZ:  Exactly.

6            THE COURT:  So I don't even think that that

7    could also be a ramification of this.

8            MR. HALEY:  I appreciate that.

9            I might add, however, the arbitration

10   proceeding, itself, has further relevance and materiality.

11           And just, while you are on the bench, for

12   example, as I recall the testimony, it was crystal clear

13   that he claims that he had no awareness of the use of the

14   line of credit.  He claims that he acquired knowledge that

15   his line of credit had been accessed without his

16   authorization.  He had full and fair opportunity to make

17   that specific claim before the arbitration panel in the

18   arbitration proceedings.  He did not do so.  What he did

19   do, judge, that award was based upon a claim by him that

20   he was unaware of the loans coming out of Little Isle IV

21   to Ken Jowdy and he did not authorize Phil Kenner with

22   reference to those specific awards.  It was made crystal

23   clear in the testimony and made crystal clear in the

24   award, itself, that that was the nature of his claim.

25           So to the extent that he had an opportunity to

**NOLAN-CROSS-HALEY**

2094

1    bring this what we claim is a bogus claiming before this

2    jury that he knew nothing about his line of credit being

3    utilized for Little Isle IV in any respect whatsoever, he

4    had full and fair opportunity to raise that in that

5    proceeding and did not do so, like a prior inconsistent

6    statement.

7            THE COURT:  I will allow you to ask him that

8    question, whether he raised, whether he argued in the

9    arbitration that his signature, that he didn't authorize

10   the line of credit.  I think that would be fair.

11           MR. HALEY:  Thank you.

12           THE COURT:  But if the answer is *I don't know*, I

13   don't know what you are going to do.  So given what his

14   recollection is, at the arbitration he may very well have

15   answered.  I don't know what the argument was in the

16   arbitration.  I haven't been following it that closely.

17           MR. HALEY:  The court is pressing because I

18   suspect his answer will be *I don't know*.

19           Given what I have seen thus far, judge, and we

20   will find out, I don't know where I will go from there but

21   at least I will ask the question.

22           THE COURT:  You are still confident we are going

23   to get out of here by 4:30 on this witness?

24           MR. HALEY:  Yes, I am.

25           THE COURT:  Let's keep the break short.

NOLAN-CROSS-HALEY

2095

1        Mr. LaRusso, you are not going to be long?

2        MR. LaRUSSO:  Right now I have about 30 or 40

3   questions.  But it does raise an issue.  I hope we don't

4   have to have a side bar.

5        Mr. Miskiewicz brought out during the direct

6   examination that in that arbitration they discussed

7   Eufora, and then he then proceeded to ask questions about:

8   Well, was any money offered to you with regard to your

9   investments in Eufora and make it appear that the Eufora

10  investments were never sent.

11        There were discussions.  There was an offer

12  made.  And it was Mr. Owen Nolan's lawyers who objected to

13  the full Eufora investment.  So I believe, based upon what

14  has been presented to this jury, I have a right to at

15  least bring about that out.

16        I don't know if he remembers this but I have a

17  right at least to bring it out, Judge.

18        THE COURT:  That is okay.

19        MR. HALEY:  There are other issues associated

20  with it but maybe we can deal with those.

21        THE COURT:  I don't want a lot of sidebars.

22        MR. HALEY:  Judge, in the arbitration award, you

23  saw Mr. LaRusso's point was raised.  And it is reflected

24  in the record.

25        I mean, the arbitration, itself, in terms of

NOLAN-CROSS-HALEY

2096

1   proceedings, over a five day period the transcripts are

2   voluminous.

3          Having said that, Judge, what the arbitration

4   award does reveal specifically is, there was testimony

5   regarding the claim by Mr. Nolan that he had not received

6   Eufora documents reflecting his ownership interest in

7   Eufora.  It is page 9.  And I'm not going to read into

8   evidence what was said, but when they speak about that,

9   the arbitration determined that there was no loss.  That

10  is not my point.  But this is the point, talking about it

11  because there had been no proof of damage with the view

12  that he has had an interest in Eufora.  So that was the

13  view of the arbitrators.  It says:

14          *The remedy, however, is not the full amount of*

15  *the investment.  The Nolans have not shown that failure to*

16  *receive the proper paperwork caused any damage.*

17  *Mr. Kenner claimed that he would get the paperwork, and*

18  *Mr. Constantine confirmed this.  On August 6, 2009,*

19  *Mr. Kenner submitted the forgoing information.  And he*

20  *did.  And that information consisted of this operating*

21  *agreement coming from Eufora that reflected his ownership*

22  *interest in those entities.*

23          So when he testified on direct to this.  As I

24  recall him testifying on direct, *to this day I have never*

25  *received such paperwork*, I ought to be able to ask him

NOLAN-CROSS-HALEY

2097

1   whether this refreshes your recollection as to whether or

2   not in or about August of 2009 you received the paperwork

3   with reference to his Eufora investment, specifically the

4   operation agreement.

5           MR. MISKIEWICZ:  He is asking, essentially what

6   he is asking, is to refresh his recollection about

7   hearsay.  In other words, don't you remember there was

8   some evidence produced during the arbitration that

9   Mr. Kenner never produced to you before but now did in

10  arbitration.  And we object.

11          MR. LaRUSSO:  Judge, I think -- sorry to

12  interrupt.

13          THE COURT:  You want to bring out that he

14  produced the documentation in the arbitration?

15          MR. HALEY:  Yes, sir.

16          THE COURT:  It won't be hearsay.  If in fact he

17  got the documentation in the arbitration, that wouldn't be

18  hearsay.

19          But again, you can try to refresh a witness'

20  recollection with any document, but what seems to happen

21  is you are referring in your question to what the document

22  is, which is not the way to do it and it is an indirect

23  way of getting before the jury this is what the arbitrator

24  found.

25          If you show him a document and it doesn't

2098

1  refresh his recollection of whether or not he was given

2  documentation of any interest in Eufora in the

3  arbitration, then you can argue whether or not there is

4  some other way to get that in.  But let's mot belabor it

5  with this witness.  He is or is not going to remember

6  based upon what you show him.

7          MR. MISKIEWICZ:  For clarification, that

8  means -- I don't have any objection if there was a

9  document that was an exhibit at the arbitration and he was

10  shown it or whatever, produced it in discovery, I'm not

11  objecting to that document.  At least I can redirect on

12  that or we can certainly cross-examine Mr. Kenner at the

13  appropriate time.  But for him to elicit that an

14  arbitrator found --

15          THE COURT:  No.  That is not what I am saying.

16  I am not saying he can't repeat what the arbitrator found

17  with the document in front him.  But he can't say:  Having

18  reviewed the arbitrator's findings, that that --

19          MR. MISKIEWICZ:  Thank you.

20          MR. HALEY:  I'm not doing that.  I didn't mean

21  that.

22          Your Honor, may I say this.

23          THE COURT:  You are saying you are not doing

24  that.  It has happened so many times, with notes of the

25  agents.  When you are refreshing a person's recollection,

2099

1    you are not supposed to say let me show you the notes of

2    agent Galioto on August 3.  Does this refresh your memory?

3              That is not the way you are supposed to do it.

4    I don't know what you are going to do but my concern is

5    not just out of the blue.  I have seen it happen numerous

6    times by questioning of witnesses.

7              When you refresh a witness' recollection with a

8    document, you should not state for the record what the

9    document is.  You should just say I'm showing you the

10   Exhibit 1.  Having reviewed Exhibit 1, does that refresh

11   your recollection?  There should be no reference to what

12   the document is.

13             MR. HALEY:  And Judge, thank you.  If I might

14   make the offer of proof.

15             The question would simply be:

16             *Sir, during the course of the arbitration in*

17   *2009, isn't it a fact that you did receive documents*

18   *reflecting your ownership interest in Eufora?*

19             If he says yes, it ends the questioning.  If he

20   says I don't recall, my -- and I know your Honor will

21   correct me, my understanding of the rules is I can show

22   him the document, not read it, ask him to read that

23   portion of the document:  *On August 6, 2009, Mr. Kenner*

24   *submitted the forgoing information*, and ask if that

25   refreshes his recollection to whether he received such

NOLAN-CROSS-HALEY

2100

1    documents.

2         That is all I'm going to do so.  As I understand

3    the rules -- and I know your Honor will correct me -- you

4    can use virtually any document to refresh a person's

5    recollection.  It could be a stub from a baseball game

6    where he says:  Yes, now I remember buying a hot dog.

7         THE COURT:  That would be fine if that is in

8    fact what happened and it has some relevance to the case.

9    If he doesn't remember, there will either be a stipulation

10   if that is in fact what happened.  I don't want to belabor

11   the record with it.

12        But let's take a quick break and get going.

13        MR. HALEY:  Thank you.

14        MR. LaRUSSO:  Thank you, your Honor.

15        (Recess taken from 3:25 pm.)

16        (The following ensued in the absence of the jury

17   at 3:35 pm.)

18        THE COURT:  I am told that we have a juror who

19   has to leave at 4:30 to make a doctor's appointment so we

20   can't go over with Mr. Nolan.  So be really efficient with

21   time to get this done.

22        MR. HALEY:  Absolutely.

23        (The following ensued in the presence of the

24   jury.)

25        THE COURT:  Mr. Haley, go ahead.

NOLAN-CROSS-HALEY

2101

1    MR. HALEY:  Thank you, judge.

2    BY MR. HALEY:

3    Q.   Now, Mr. Nolan, did you testify on direct that to

4    this day you have not received any documentation

5    reflecting your ownership interest in Eufora?

6    A.   I don't believe I have received any.  No.

7    Q.   Well, sir, isn't it true that on August 6, 2009,

8    Mr. Kenner submitted documentation to you reflecting your

9    ownership interest in Eufora?

10   A.   I don't remember.

11   Q.   Would you kindly take a look at page 9 of this

12   document, sir.  And just read to yourself this paragraph

13   from this point on down to this point.  Just to yourself.

14   A.   Okay.

15   Q.   Having read that portion of the document, sir, does

16   that refresh your recollection that on August 6, 2009, you

17   received documentation or information concerning your

18   ownership interest in Eufora?

19   A.   I don't remember seeing anything.

20   Q.   Now, would you kindly take a look at a document

21   marked in evidence as Kenner Exhibit 1.  And again, sir,

22   you are entitled to look at the entire document but I'm

23   specifically going to refer your attention to this page

24   that has the green sticker on it.

25        Do you see your signature on that document, sir?

2102

1    A.    Yes.

2    Q.    And though it is a photocopy, you are able to

3    recognize your signature.  Correct?

4    A.    I can't recognize my sit but there is some

5    familiarity to it.

6    Q.    When you say there is some familiarity with the

7    signature, itself, familiarity in term of your

8    handwriting.  Correct?

9    A.    I can't say for sure that's my handwriting.  It is

10   very sloppy.

11   Q.    All right.  Well, do you recall ever receiving this

12   document:  *Limited Liability Company Agreement, Little*

13   *Isle IV LLC*?

14   A.    No, I don't.

15   Q.    In other words, as you sit here today is it your

16   testimony that you did not receive it?  Or you may or may

17   not have received it but don't have a recollection?

18   A.    I don't remember.

19   Q.    Sir, would you kindly take a look at Kenner 57.

20   Again, it a photocopy but that is all I have to deal with.

21           Can you take a look at that document.  Do you

22   recognize your signature on that document, sir?

23   A.    I see the signature.  But again, that was I would say

24   almost a sloppy version of what I see.

25   Q.    So it is your testimony that you cannot recognize

NOLAN-CROSS-HALEY

2103

1    your signature.  Is that your testimony?

2    A.    Yes.

3    Q.    Sir, would you kindly take a look at what has been

4    marked Kenner Exhibit 58 for identification.  Again, you

5    are entitled to look at the entire document.

6              And I refer your attention to the last page.  Do

7    you recognize your signature on that document?

8    A.    There is a lot of similarity in that signature but I

9    can't say for sure.

10   Q.    But it is similar to yours.  Is that your testimony?

11   A.    It like similar but I can't say for sure.  I can see

12   some differences.

13   Q.    Would you kindly take a look at what has been marked

14   Kenner Exhibit 59.  And I ask you, again, you are entitled

15   to take a look at the entire document, but I ask you if

16   you recognize your signature on that document.

17   A.    Again, similarities and some differences.

18   Q.    So your answer is that you cannot say that is your

19   signature.  Is that your testimony?

20   A.    I couldn't say 100 percent that is my signature.

21   Q.    Well, is it more probable than not it is your

22   signature, sir?

23              MR. MISKIEWICZ:  Objection.

24              THE COURT:  Sustained as to form.

25   BY MR. HALEY:

2104

1   Q.   Sir, would you kindly take a look at a document that

2   has been marked Kenner Exhibit 60 for identification.

3   Take your time.

4   A.   Yes.  I see it had.

5        Again, I can see similarities and differences.

6   Q.   So it is your testimony that you cannot say that this

7   is a photocopy of your signature?

8        Is that your testimony?

9   A.   Not 100 percent.  In light of the differences, it is

10  unlikely to be my signature.

11  Q.   Sir, would you kindly take a look at a document

12  marked Kenner Exhibit 61.

13       Did you take a look at it?

14  A.   What am I looking for?  Should I briefly read the

15  whole thing?

16  Q.   I'm sorry?

17  A.   It is pretty think.  Do you want me to read the whole

18  thing?

19  Q.   You are certainly entitled to look at the whole

20  document.

21       THE COURT:  Why don't tell him what the question

22  is.

23  BY MR. HALEY:

24  Q.   I will.  Sir, on 12/15/2003 did you receive a

25  facsimile transmittal from Phil Kenner to you which

2105

1  included various documents as attached to that transmittal

2  cover page?

3  A.    So you are asking if I received all these faxes in

4  '03?

5  Q.    Yes.  I'm asking you --

6  A.    I have no idea.

7  Q.    I'm sorry?

8  A.    I have no idea.  How am I supposed to remember if I

9  received over these faxes?

10  Q.    Sir, I wasn't there.  I'm asking the question.

11        Did you receive this fax?  Yes or no?

12  A.    I don't know.

13  Q.    Now, when you filed the papers to commence the

14  arbitration before the arbitration panel, isn't it true,

15  sir, that at that point in time you made no claim in your

16  papers before the arbitration panel that Phil Kevin had

17  accessed your line of credit for purposes of the Little

18  Isle IV investment without your authorization?

19  A.    Could you repeat that?  I didn't quite understand

20  that.

21  Q.    Sure.  Isn't it a fact, sir, that when you filed the

22  claim with the American Arbitration Association with

23  reference to your dispute with Phil Kenner, you did not at

24  that point, in 2009, make any claim that Phil Kenner had

25  accessed your line of credit without your authorization?

2106

1    A.    I don't recall.

2    Q.    When you would meet with Phil Kenner, you said that

3    you would do so at least twice a year.  Is that correct?

4    In person.

5    A.    Once or twice.

6    Q.    And during the course of those meetings, at that

7    point in time would Phil answer any questions you might

8    have of him?  Yes or no?

9    A.    I believe so.

10    Q.    When you would have telephone conversations with Phil

11    Kenner before your dispute, would Phil Kenner answer any

12    questions you might have with him during the course of

13    those telephone conversations?  Yes or no?

14    A.    In a round-about.

15    Q.    Now, you played professional hockey for how many

16    years again, sir?

17    A.    18.

18    Q.    And in your business dealings as a professional

19    hockey player, you were you a fairly savvy individual.

20    Isn't that correct?

21    A.    Define *savvy*.

22    Q.    Sure.  You negotiated a contract at one point in

23    time, did you not, sir?

24    A.    No.

25    Q.    You never negotiated a contract?

2107

1    A.    No.  My agent did.

2    Q.    But I take it your agent would negotiate the contract

3    in consultation with you.  Is that true?

4    A.    I would be -- he would negotiate with the general

5    manager of the team and relay messages to me.

6    Q.    But I take it when he would negotiate a contract with

7    the NHL, he would do so in consultation with you, and you

8    would indicate, I would assume, what you wanted.  Correct?

9    A.    Yes.

10   Q.    And isn't it a fact, sir, that based upon what you

11   wanted in negotiations with the NHL, you were able to

12   negotiate a contract for, there was a provision that you

13   would continue to get paid during an NHL lockout?  During

14   that?

15            MR. MISKIEWICZ:  Objection.

16            THE COURT:  I will allow that.

17            You can answer that if you know.

18   A.    I added in there that I would get paid during a

19   lockout.  But that wasn't the case.  I was paid due to

20   injury.

21   BY MR. HALEY:

22   Q.    I understand that.  But you were able to obtain that

23   clause in your contract negotiations to get paid during a

24   lockout.  Correct?

25   A.    I would have to go back and look at the contract.

2108

1   Q.   I'm sorry?

2   A.   I would have to go back and look at the contract.

3        It wasn't paid during the lockout.  It was when

4   the league resumed.  The year lost on the contract would

5   be added on to the league when the year resumed.

6   Q.   But as a result of that provision and to your credit,

7   you benefited financially, did you not?

8   A.   No.  It was the same amount of the contract.

9   Q.   What was that amount?

10       MR. MISKIEWICZ:  Objection.

11  A.   As long as there was a lockout, players lost a year

12  on their contract.

13       I negotiated a way to, if a lockout happened, I

14  don't get paid during a lockout, but that year, I do not

15  lose that year.  Once the league is underway again, then

16  my year gets added on.

17  BY MR. HALEY:

18  Q.   And that resulted in a financial benefit.  Correct?

19  A.   Well, I don't know if you call it a benefit.  It is

20  under the same contract.

21  Q.   Well, did or did you not receive compensation for

22  that provision in the contract?

23       MR. MISKIEWICZ:  Objection.  Relevance.

24       THE COURT:  Yes.  Sustained.

25       I think we should move on.

**NOLAN-CROSS-HALEY**

2109

1  BY MR. HALEY:

2  Q.   The fact of the matter, sir, that apart from

3  recommendations that Phil Kenner made to you with

4  reference to various investments, you as well would invest

5  in real estate ventures on your own.  Isn't that true?

6  A.   I mean, I purchased a house, if that is what you

7  refer to.

8  Q.   Well, did you purchase a house and adjacent land as

9  well?

10        Do you remember doing things of that nature?

11  A.   Yes.

12  Q.   Do you recall the extent of those real estate

13  investments, the house and other land that you purchased?

14  A.   So what are you asking me?

15  Q.   Well, is it not a fact, sir, that over a period of

16  time through your own efforts you purchased real estate

17  approximating $5 million?

18        MR. MISKIEWICZ:  Objection.  Relevance.

19        THE COURT:  I will allow this and then we will

20  continue on.

21        You can answer that question.

22        THE WITNESS:  I can?

23        I didn't hear what you said.

24        THE COURT:  I said you can answer this question

25  and then we are going to move on.

NOLAN-CROSS-HALEY

2110

1   A.   Okay.  I don't know what the total is.

2   BY MR. HALEY:

3   Q.   All right.  But it is fair to state -- last question,

4   sir -- you definitely had an interest in investing in real

5   estate, did you not?

6   A.   Buying a house to live in.  Yes, I guess so.

7   Q.   Buying a house to live in and also investing in other

8   vacant land.  Isn't that true?  For development purposes.

9   A.   No.

10  Q.   Is it your testimony, sir, that at no point in time

11  did Phil Kenner ever have a discussion with you concerning

12  investing in real estate in Hawaii?

13          Is that your testimony?

14  A.   Shay that again, please?

15  Q.   Sure.  Is it your testimony that at no point in time

16  did Phil Kenner ever even talk to you about investing in

17  real estate development in the State of Hawaii?

18  A.   Phil suggested it and I followed.

19  Q.   And as a result of that, an LLC was created.

20  Correct?

21  A.   I can't remember the procedure he did.

22  Q.   And that was the Little Isle IV.  Is that true?

23  A.   No idea.

24  Q.   Well, did you ever read the operating agreement as

25  relates to Little Isle IV?

2111

1   A.   No.

2   Q.   Do you recall receiving the operating agreement that

3   relates to Little Isle IV?

4   A.   No.

5          MR. MISKIEWICZ:  Asked and answered.

6          MR. HALEY:  May I have a moment, Judge?

7          (Counsel and client confer.)

8   BY MR. HALEY:

9   Q.   Sir, would you kindly take a look at Kenner Exhibit

10  2.

11  A.   What would you like me to look at?

12  Q.   Well, do you recall ever receiving this document?

13  Just yes or no.

14  A.   It doesn't look familiar.

15  Q.   I apologize, sir.  You did testify on direct that you

16  did invest in Little Isle IV.  My question is simply this.

17          After you your investment in Little Isle IV, is

18  it not a fact that Phil Kenner kept you apprised as to the

19  development of the property, operating agreements, and

20  paperwork associated with that project?

21          Isn't that true?

22          MR. MISKIEWICZ:  Objection to form.

23          THE COURT:  That's okay.

24          You can answer that.

25  A.   If I understand you correctly, I would ask about the

2112

1   project.  He would say things are going well, things are

2   moving along.

3           So if that was your question, that is what I was

4   told.

5   Q.   And as relates to those conversations, were there

6   times when Phil would, in turn, offer to send you

7   paperwork associated with that project?

8   A.   I don't remember receiving it.

9           MR. HALEY:  May we have one moment?  Thank you.

10          (There was a pause in the proceedings.)

11          MR. HALEY:  While we are doing that.

12  BY MR. HALEY:

13  Q.   Sir, would you kindly take a look at a document

14  marked Kenner Exhibit 62.  And before I ask you a

15  question, sir.

16          In 2006 or 2007, did you reside at 15471 Francis

17  Oaks Way, Los Gatos, California 95032?

18  A.   That is my address.  I don't know if I was there at

19  that time.

20  Q.   Well, do you ever recall receiving that document,

21  known as a K1?

22  A.   No.

23  Q.   Who, in let's say 2006 and 2007, would handle your

24  federal and state income taxes?

25  A.   My wife did a lot of the paperwork.

2113

1   Q.   Did she do it alone or did she do it with some

2   assistance from someone?

3   A.   I believe she had assistance.

4   Q.   Would that be an accountant?

5   A.   I believe so.

6   Q.   And I take it, in connection with the accountant, you

7   would return over all documents you received as relates to

8   the filing of your taxes, including something known as a

9   Schedule K1?

10  A.   I would guess so.

11           MR. HALEY:  Judge, I would offer this into

12  evidence as Kenner Exhibit 62.

13           MR. MISKIEWICZ:  Objection.

14           THE COURT:  I don't think you can offer it based

15  upon that questioning.  We can talk about it after the

16  jury leaves today.

17           MR. HALEY:  I will talk to the government about

18  that, judge.

19           THE COURT:  Okay.

20  BY MR. HALEY:

21  Q.   Sir, would you kindly take a look at a document

22  marked Kenner 63.

23           Do you see your signature on that document?

24  A.   Yes.

25  Q.   And where does it appear?

NOLAN-CROSS-HALEY

2114

1    A.    Bottom left.

2              (Continued on the following page.)

NOLAN-CROSS-HALEY                                        2115

1   Q    Sir, will you kindly take a look at Kenner Exhibit 2.

2   There is a different response form on this document.  Do you

3   see a relationship between Kenner Exhibit 63 and Kenner

4   Exhibit Number 2, if you read the content of?

5         Let me be specific, sir.  Does Kenner Exhibit 63

6   indicate that you had received and read this particular

7   document, Kenner Exhibit 2, and agree to its terms and

8   conditions?

9   A    You asked me are they the same?

10  Q    Do you see the relationship between Kenner Exhibit 62

11  that bears your signature and says response form?

12  A    A very faded signature, I might add.

13  Q    I understand, sir.  A faded signature.

14  A    You asked me if that is my signature.  I can't tell from

15  that.

16  Q    Is or is that not your signature?

17  A    How can I tell?

18  Q    I'm sorry?

19  A    I can't tell.  It's a faded copy.

20  Q    I thought you testified a moment ago that is your

21  signature?

22  A    You asked me to see the signature.  You asked me if I see

23  the signature.  That is the signature that I saw.  Can I say

24  for sure it is, I have no idea.

25  Q    The record will speak for itself.

NOLAN-CROSS-HALEY                                    2116

1          My question, I guess, is, as you read the content of

2    these documents, do you see the relationship between the

3    response form and Kenner Exhibit Number 2?  Specifically,

4    isn't this response form, which bears a signature, reference

5    this particular document here saying that I have read and

6    agree to the terms of this document in Kenner Exhibit

7    Number 2?

8              MR. MISKIEWICZ:  Objection.

9              THE COURT:  Sustained.

10   Q    Well, do you see the words Owen Nolan --

11             MR. MISKIEWICZ:  Objection.

12             THE COURT:  What document are you referring to?

13             MR. HALEY:  Kenner Exhibit 63.

14             THE COURT:  You're asking if that's his signature or

15   not?

16             MR. HALEY:  Judge, there's also a --

17   A    I'm not saying it's not my signature.  I'm just saying

18   it's not very clear to say it is.  That's all I'm saying.

19   Q    We can agree, sir, where it says "Print Name:  Owen

20   Nolan," you wrote Owen Nolan, is that correct?

21   A    That is my area, yes.

22             MR. HALEY:  Judge, I have no further questions.

23             THE COURT:  Mr. LaRusso.

24             You may proceed.

25             MR. LaRUSSO:  Thank you, Your Honor.

1   CROSS EXAMINATION

2   BY MR. LaRUSSO:

3   Q    It's been a long day, Mr. Nolan.  I will try to be as

4   brief as I can.  Good afternoon.

5        You testified that you recall meeting Tommy

6   Constantine one time, is that correct?

7   A    I may remember meeting him once.

8   Q    I think the word you used, it was very brief.  It was a

9   very brief meeting.  It was a social meeting.  It was not a

10  business meeting, is that correct?

11  A    I believe so, yes.

12  Q    How long did that meeting last, was it more like an

13  introduction hello?

14  A    I arrived at a place with some friends, and he was there.

15  I believe it was a brief encounter.  It was a long time ago.

16  Q    There were no discussions at all about your investment in

17  Eufora?

18  A    Strictly social.  My neighbor's.  I think a little bit

19  about racing cars because he was into the race cars.

20  Q    Do you remember when that occurred?

21  A    No.

22  Q    I'm bad with dates too.  Using the arbitration around

23  2008 or 2009, was your brief meeting with Mr. Constantine

24  before the arbitration or after the arbitration?

25  A    When we first met?

NOLAN-CROSS-LaRUSSO                                    2118

1   Q     Yes, this brief encounter we're talking about.

2   A     Before the arbitration.

3   Q     Do you recall testifying in a deposition at that

4   arbitration on May 26, 2009?

5   A     Yes.

6   Q     Do you remember being asked these series of questions on

7   page 131 (reading):

8              "QUESTION:  Eufora is a company, a company in

9   Scottsdale, is that correct?

10             ANSWER:  I believe so.

11             QUESTION:  And you met the principle, Tommy

12  Constantine, of that company?

13             ANSWER:  I don't remember meeting Tommy.

14             QUESTION:  You don't remember ever meeting him?

15             ANSWER:  No.

16             QUESTION:  Do you remember ever speaking to anybody

17  from that company?

18             ANSWER:  No."

19             Do you remember those questions and giving those

20  answers?

21  A     Not specifically.  But at that time that's what I

22  thought.

23  Q     Your memory is much better years ago, correct, back in

24  2009 than it would be in 2015?

25  A     Some things come and go.

1   Q     It would be more accurate if you didn't meet with him

2   before the arbitration, at least according to the testimony on

3   May 26th, 2009?

4   A     Thinking back, I believe I met him before.

5   Q     But at that time when you testified --

6   A     At that time I didn't think I did.

7   Q     Would it be fair to say that that brief encounter is the

8   only time you ever met Mr. Constantine before the arbitration?

9   A     Yes, I believe so.

10  Q     You never spoke to Mr. Constantine before the arbitration

11  other than the one brief encounter?

12  A     I don't remember.

13  Q     Would it be fair to say that you never once called

14  Mr. Constantine to talk to him about your investment before

15  the arbitration?

16  A     I believe -- I don't believe I did.  I don't remember if

17  I did.

18  Q     Do you agree with me that before the arbitration you

19  never called Eufora's office or Mr. Constantine and said that

20  you would like to come over and see the facility where you

21  invested your money, is that correct?

22  A     That's correct.

23  Q     Just so that I don't have to repeat it later, your

24  investment in Eufora, you testified, was two $100,000 wire

25  transfers, is that correct?

1   A    Yes.

2   Q    You also had a $550,000 in the Scottsdale Air Park, is

3   that correct?

4   A    Yes.

5   Q    So the total investment would have been around $750,000?

6   A    Yes.

7   Q    At the time before the arbitration, where you were

8   living?

9   A    Before the arbitration?  In San Jose.

10  Q    Was there ever a period of time that you lived in

11  Scottsdale?

12  A    Yes.

13  Q    What time period?

14  A    I don't remember.

15  Q    How many years did you live in Scottsdale?

16  A    One year.  Not a full year.

17  Q    Are you aware that you and Mr. Constantine lived close to

18  each other at the time that you lived in Scottsdale, Arizona?

19  A    No.

20  Q    How far was your home from the investment, both Eufora

21  and the Scottsdale Air Park?

22  A    I know where the Air Park is, but I don't know where

23  Eufora is.  I'd say the Air Park was seven, eight miles.  I

24  don't know.

25  Q    Did you ever visit the Air Park during the period of time

1    before the arbitration?

2    A    I went by the area where the hangar was supposed to be.

3    Q    You never stopped and went in to either meet with or

4    speak to any of the principles of Eufora while you were living

5    in Scottsdale?

6    A    I didn't really know anyone.

7    Q    You could have contacted Mr. Kenner if you really needed

8    the information, correct?

9    A    Well, he's the one who pointed out where it was.  So he

10   was with me when I drove by.

11   Q    By the way, you made a number of investments.  I think

12   some of which you talked to us about here today.  The Hawaiian

13   project, I believe, was one.  Did you also invest in Mexican

14   real estate?

15   A    Yes.

16   Q    Cabo San Lucas?

17   A    Yes.

18   Q    Diamante Del Mar?

19   A    Yes.

20   Q    It'd be fair to say you had a number of investments and

21   startup companies.  And again, I don't want to rush this.  If

22   my question's wrong, please correct me.

23   A    Okay.

24   Q    I'm just going to mention the investments.  And the

25   question's going to be, did Mr. Constantine have anything to

1  do with these investments.  Impact Protective Equipment?

2  A    No.

3  Q    Integrated Telecommunication?

4  A    No.

5  Q    Escer Holding?

6            MR. HALEY:  Judge, I object.

7            THE COURT:  I don't know how long a list it is.

8            MR. LaRUSSO:  It's just a number of investments he

9  had with Mr. Kenner and Mr. Constantine had nothing to do with

10 them.

11           MR. HALEY:  Your Honor, I'm objecting on various

12 grounds.  One of them is relevance and materiality.  The other

13 one has to do with other issues we discussed.

14           THE COURT:  We don't need to go company by company.

15 You can establish he had a number of other investments and

16 that Mr. Constantine had nothing to do with them.

17           MR. LaRUSSO:  Judge, that's the question.

18 Q    You had a number of other investments with Mr. Kenner and

19 Mr. Constantine didn't have anything to do with them, is that

20 correct?

21 A    Yes.

22 Q    Now, you testified about the arbitration.  Did that

23 arbitration also involve Eufora?

24 A    I believe so.

25 Q    I believe on direct you mentioned in response to the

NOLAN-CROSS-LaRUSSO                    2123

1  question by the government, that Eufora was discussed, in

2  part, at the arbitration, correct?

3  A    I think so, yes.

4  Q    When I use "Eufora" I'm talking about your entire

5  investment.  The 200,000, the 550,000.  I won't repeat that

6  again.

7  A    Okay.

8  Q    Would it be fair to say that in this arbitration your

9  concern about your investment in Eufora and the Air Park was

10  actually addressed before that by your attorney?

11  A    Can you repeat that?

12  Q    They brought out your investment, they presented your

13  side of the investment to the arbitrators during that

14  proceeding?

15  A    Yes.

16  Q    Would it be fair to say before this arbitration you never

17  inquired about your investments with Mr. Constantine before

18  you filed that lawsuit -- or that arbitration?

19  A    I don't think so.

20  Q    By the way, as a result of this lawsuit there was some

21  discussion about documentation.  Did you ever receive any

22  documentation from Mr. Constantine and/or any of the lawyers

23  involved in the proceedings regarding proof of ownership that

24  we're talking about with Eufora?

25  A    I don't remember.

1  Q     Do you have any recollection of your lawyers receiving

2  any documentation?

3  A     I don't.

4  Q     It could have happened, you just don't have a

5  recollection one way or the other?

6  A     That's correct.

7  Q     Do you remember, at all during this proceeding, providing

8  proof or learning that a company called AZ Eufora Partners

9  owned an interest in Eufora itself?

10 A     Repeat that again.

11 Q     Sure.  Do you remember during this arbitration learning

12 or receiving any proof that AZ Eufora Partners I owned an

13 interest in Eufora?

14 A     I don't remember.

15 Q     Did you ever hear about a holding company having an

16 interest in Eufora?

17 A     No.

18 Q     By the way, during the lawsuit did you learn or did you

19 allege that your interest was a direct interest in Eufora or

20 did you hold your interest to a holding company?

21 A     I can't remember.

22 Q     Is it possible?

23 A     I don't remember.

24 Q     You leave that up to the lawyers, right?

25 A     I suppose so.

1          MR. MISKIEWICZ:  Objection.

2    Q    Do you know a person by the name of Kim Barne?  Have you

3    heard of that name?

4    A    I don't think so.  It doesn't ring a bell.

5    Q    Do you know a person by the name of Tim Gaarn, he is a

6    managing member of a holding company of Eufora's interest?

7    Did you ever hear that in the arbitration?

8    A    I don't remember that.

9    Q    Okay.  Fair enough.

10          After the lawsuit, do you recall being contacted by

11   anyone and being told that you hold your interest in Eufora

12   directly and not to a holding company?

13   A    I don't remember that either.

14   Q    A few more and see where we go.

15   A    Okay.

16   Q    Do you recall at any point either during the arbitration

17   or after the arbitration, Mr. Constantine and/or his lawyers

18   offering 100 percent return of your investment of both Eufora

19   and the Air Park, $750,000?

20   A    I don't remember that.

21   Q    I'm going to show you a document.  I'm going to ask you

22   to look at it.  The only question after looking at it is if it

23   refreshes your recollection that offer was made to you at some

24   point during the arbitration for a full return of your

25   investment in Eufora.

1             (Handing.)

2   A    To be honest, a lot going on those days and I don't

3   remember.

4   Q    Does that in any way help you remember that there was

5   some discussion about an offer being made about your

6   investment in Eufora?

7   A    I don't remember that.

8   Q    Do you recall anything about monies being made available

9   to pay off your Eufora interest from a trust account in the

10  name of Ron Richards?

11  A    It doesn't ring a bell.

12  Q    Since the end of the arbitration, have you ever reached

13  out to Mr. Constantine to get a return of your investment in

14  Eufora?

15  A    No.

16  Q    When I say "Eufora," I'm talking about Eufora and Avalon.

17  A    Yes.

18             MR. LaRUSSO:  Thank you very much.

19             Nothing further, Your Honor.

20             THE COURT:  Redirect.

21  REDIRECT EXAMINATION

22  BY MR. MISKIEWICZ:

23  Q    Mr. Nolan, you were asked by counsel for Mr. Kenner

24  whether or not you received a $1.7 million settlement from

25  North -- I'm sorry -- from the bank in addition to the

1   $500,000 settlement that you testified about.  Do you recall

2   that?

3   A    Repeat it.

4   Q    The line of credit that you testified about on your

5   direct.

6   A    Yes.

7   Q    You said that you received a $500,000 settlement from the

8   bank.

9   A    Yes.

10  Q    The total amount that was due and owing at the time was

11  over 2.2 million, is that correct?

12  A    Yes.

13  Q    Who paid off the balance?

14  A    I did.

15  Q    So when you were shown something that indicated

16  approximately $1.7 million paying off the balance of the line

17  of credit, that came out of your pocket, is that right?

18  A    Yes.

19  Q    It wasn't a bank settlement?

20  A    No.

21  Q    Last question.  You had a couple questions about an air

22  park in Scottsdale.  As you sit here today, do you believe

23  that you still own a percentage of some sir park in

24  Scottsdale, Arizona?

25  A    At this point I don't know what to believe.

1          MR. MISKIEWICZ:  Thank you, very much.

2          No further questions.

3          THE COURT:  Any questions?

4          MR. HALEY:  No, sir.

5          MR. LaRUSSO:  No further questions.

6          THE COURT:  You may step down, Mr. Nolan.  Thank

7     you.

8          (Witness excused at 4:20 p.m.)

9          THE COURT:  Members of the jury, so, as you know, we

10    are not sitting tomorrow.  In terms of where we stand in the

11    trial, I haven't had a chance to speak to the lawyers.  I was

12    focused on trying to get Mr. Nolan done.  So I'm going to

13    speak to them after you leave today.

14         As you know, this is week four of the trial.  But we

15    lost a week, so it's technically week three of the trial.  I

16    don't know where we exactly stand on the estimate of the

17    trial.  We had a good week this week.  As you know, we went

18    through a lot of witnesses this week.  So I do need to speak

19    to the lawyers about that.

20         We do have an issue next week with a couple of

21    jurors who aren't available on Wednesday and Thursday next

22    week.  I'm trying to figure out how to handle that.  So what

23    I'm going to ask you do is -- I'm asking the law clerks to

24    wait over here.  And before you leave today, if you have any

25    conflicts, I'm not suggesting you find any, I just don't want

U.S.A. v. KENNER and CONSTANTINE                    2129

1    any surprises.  So if you have any vacation plans in June or

2    weddings, or any other things, doctor appointments, between

3    Monday and Thursday that you cannot move, please let my law

4    clerk know.  If you're not sure, obviously you can let her

5    know on Monday.  I just don't have a calendar here.  But I

6    just want to make sure in making these assessments to find out

7    if there are other scheduling conflicts that I'm not aware of.

8           Okay.  I'll have a much better grip on the estimate

9    on either Monday or Tuesday to figure out what to do about

10   Monday and Thursday next week.  Keep Wednesday and Thursday of

11   next week open.  We may make other arrangements.  I told the

12   jurors they may go to the things they need to go to.  If

13   necessary, we have the alternates to replace them.  But I

14   would prefer not to do that if I don't have to.

15          I do, again, want to compliment you.  I'm not just

16   saying this.  You've been very conscientious, patient.  You

17   were not only willing to serve the amount of time that I

18   indicated, but you've been great in your understanding on the

19   complexities in the various scheduling that have come up.  And

20   that is no one's fault.  It is no ones's fault.  So I

21   compliment you on that.  I really appreciate it.

22          Have a great weekend.  Don't read anything regarding

23   the case, don't listen to anything about the case, don't

24   discuss the case.  I will see you on Monday at 9:30.  Thank

25   you.

U.S.A. v. KENNER and CONSTANTINE                    2130

1           (Whereupon the jury leaves the courtroom at 4:25

2     p.m.)

3           THE COURT:  You may be seated.

4           Let's see if we can inventory here.  We have Monday.

5     What do we have for Monday?

6           MR. MISKIEWICZ:  On Monday we have another hockey

7     player, Darryl Sydor.  Steven Ross, who's an attorney.  That

8     should be relatively brief.  He was involved in the diversion

9     of GSF funds to the Palms.  James Grdnia, G-R-D-N-I-A.

10          I can go on.  I think that Mr. Grdnia will take us

11    to the end of Monday, but I'll continue.  There's Bruce

12    Berreth.  Chris Berreth, B-E-R-R-E-T-H.  Chris Manfredi.

13    Mr. DiSalvo, and Peter Melley.

14          I can go on.

15          THE COURT:  Well, where is your assessment in terms

16    of, overall, where you stand?

17          MR. MISKIEWICZ:  Our assessment is that if we did

18    not have these breaks next week, we probably will not be able

19    to rest until June 11th.  I understand the situation with the

20    two witnesses -- the two jurors.  If we broke on one of those

21    days, or both of those days, I would just estimate that our

22    resting date would be a couple of days thereafter.  So we're

23    talking about the second or third week of June.  I believe

24    that the defense will have a case.  That's where we're at.

25          THE COURT:  So basically you're thinking two full

1   weeks.  June 11th is basically two full weeks, eight trials

2   days.

3           MR. MISKIEWICZ:  Yes.

4           THE COURT:  So if we lose two trial days, you think

5   it will be June 16th you're resting on.

6           MR. MISKIEWICZ:  Yes.  In all candor, we ditched a

7   couple of witnesses.  We're trying to scale back on direct as

8   much as possible.  But that's where we're at.

9           THE COURT:  Okay.  I'm not binding anyone, I'm just

10  trying to get a sense of how the defense case will be

11  anticipated.  How many trial dates do you have, Mr. Haley?

12          MR. HALEY:  Easily, two, Judge.

13          Your Honor, I might say -- I don't know, perhaps I

14  can work this out with the government.  A perspective witness,

15  C.R. Gentry, it's our anticipation that he was going to be

16  called as a government witness.  They've indicated they're not

17  going to be calling him.  He's currently a government witness.

18          If that's the case, it is my inclination to call him

19  as a defense witness, which would extend that probably two-day

20  window.  Without committing the government to anything, I have

21  been in communication with them about perhaps we could reach

22  some mutually agreeable stipulation to allow a record to come

23  in.  Actually, spreadsheets, Judge, created by Mr. Gentry.

24  And there's some issues about the values of the spreadsheets.

25  We are in talks with the government about whether we would

1    preserve our right to argue in front of the jury that they

2    have value, they don't have value.  But that would preclude

3    the necessity of C.R. Gentry.

4          MR. LaRUSSO:  Judge, I'll be honest with you.  We're

5    not going to stipulate to anything that Mr. C.R. Gentry

6    produced because our information is that what he produced is

7    inaccurate.  So we're not going to be able enter into that

8    stipulation regarding Mr. C.R. Gentry.

9          THE COURT:  Then don't waste your time.

10         MR. HALEY:  Yes.  I apologize.  I did say, when I

11   spoke to Mr. Miskiewicz, that I would speak to Mr. LaRusso

12   about it, and I didn't do so.

13         THE COURT:  Let me speak to my law clerks first.

14         MR. LaRUSSO:  Judge, just to let you know, from our

15   point of view we're looking all 10 to 12 witnesses.  I know

16   two of them will probably be lengthy witnesses, both direct

17   and controls.  The others, hopefully, we'll narrow their

18   scope.  But I think at least a week, Judge.  I'm trying to get

19   my partner to work on that and give me a better estimate.  But

20   that's where I project at this point.

21         THE COURT:  Okay.  One moment.  Let me speak to my

22   law clerks.

23         So my law clerk spoke to one of the jurors.  It's

24   not too bad.  Alternate 3 is a high school teacher.  There's

25   some a graduation activities in June.  He didn't know the

1  exact date, but he said he couldn't miss that.  June 30th,

2  he's starting a vacation on June 30th.  So that's not a

3  problem, as far as I'm concerned.

4          Juror No. 10 had some weekend vacation.  She was

5  planning on coming back on June 8th from her vacation.  She

6  has decided she does not want to be excused.  She'll rearrange

7  that to another weekend.

8          So it seems like we're in decent shape.  I think we

9  should just continue to hold those two other jurors until

10 Tuesday and make an assessment on Tuesday.

11         My concern is that, just doing the math, the

12 government, if we need to take a break for Wednesday and

13 Thursday of next week, the government would rest June 11th.

14 Let's assume Mr. Constantine's case takes a week.  That's the

15 week of the 15th.  Assume Mr. Kenner's case is two or three

16 days.  It will be the following week.  We have summations,

17 instructions, and deliberations.

18         So, without missing any dates, we're well into June,

19 the whole month of June.  So I'm very concerned about skipping

20 those two days given where we're at.  We have four alternates.

21 We have still have two alternates left.  We have no

22 expectation that we're going to need those alternates for the

23 rest of the month of June.

24         You can talk me out of it, but I'm concerned if we

25 take those two days off, we're going to be in July.  We'll

1   have a jury with problems in July.  And that's going to be --

2   Mr. Haley is raising his hand.  The jurors will be getting

3   unhappy here that we're going to take up June, and we start

4   talking about July, we'll have a lot of problems.  My

5   inclination is -- obviously if we had no alternates left, I

6   would be concerned going three or four weeks without any

7   alternates.  But we have two alternates left and we have no

8   problems in June.

9           I still think -- I want to emphasize you guys were

10  great this week.  Everybody did really well.  We covered a lot

11  of witnesses.  It was a shame Mr. LaRusso's mother passing

12  away, which weighed on the five week estimate.  We lost some

13  days and that's not great.  So we have to continue -- the

14  government should continue to do whatever it can to streamline

15  its case.  I'm hoping that the questioning for this week.

16  Obviously we can go on that, we've been through this with

17  other witnesses.  We don't need to have every hockey player

18  asked the same question.  It's a repetition of the same

19  documents the jury has seen two, three times.  Hopefully when

20  you go through the hockey players, you can pare it down.

21          Do you have want to address that now?

22          MR. MISKIEWICZ:  Actually, I have a request, Judge.

23  The witnesses that we have scheduled for the latter half of

24  next week, some of them are the same witnesses we ended up

25  sending home two weeks ago because we had a recess.  Many of

U.S.A. v. KENNER and CONSTANTINE                    2135

1   them are, also, on the West Coast.  We need to make

2   arrangements --

3            THE COURT:  You're saying we can't wait until

4   Tuesday to decide.

5            MR. MISKIEWICZ:  It would be difficult for us to get

6   them here overnight, yes.  I understand that the Court is not

7   prepared to make a decision right now, if you could let us

8   know --

9            THE COURT:  Let me put it this way.  If there are

10  out of town witnesses, I'll hear from anybody now.  Assuming

11  we don't have any other problems with any of the jurors next

12  week, we don't lose a juror to sickness or something else they

13  tell us about Monday or Tuesday, does anybody object to, at

14  the end of the day Tuesday, releasing those two jurors and

15  substituting the two alternates?

16           MR. LaRUSSO:  I don't, Judge.

17           MR. HALEY:  Nor do I, Your Honor.

18           MR. MISKIEWICZ:  No.

19           THE COURT:  I will make arrangements for them to

20  come.  There's a small chance that a bunch of jurors on Monday

21  start telling me they have issues in June, or they're sick,

22  then we may have to recess.  Unless something unexpected

23  happens next week, that's what I'm going to do.

24           MR. MISKIEWICZ:  Thank you.

25           THE COURT:  All right.  There are a couple of more

1  items, a couple of rulings.  I'm not sure it was, but I told

2  the government I would explain it later.  I remember what it

3  was.  It had to do with Mr. LaRusso introduced an Arizona

4  website document that the government objected to.  The

5  government objected to an e-mail of 2012 from Mr. Constantine

6  to Mr. Nash regarding Eufora.  The government objected to the

7  e-mail on hearsay grounds.

8          The reason I overruled that objection, I think the

9  Arizona website goes to the same point.  With other witnesses,

10  what I ruled was any probative value of something that

11  happened three years after the alleged diversion of funds took

12  place had no probative value or so little probative value that

13  it was substantially outweighed by the confusion, under Rule

14  403.

15          That was different with respect to Mr. Nash and his

16  conversation with Mr. Constantine because the government, in

17  its direct of Mr. Nash, brought out a document that Mr. Nash

18  testified was given to him in 2012.  The suggestion by the

19  government by the questioning is that this was an effort to

20  cover up a fraud that had already taken place.  In other

21  words, Mr. Constantine in 2012 was simply papering -- taking a

22  piece of paper and writing on that piece of paper, providing

23  it to cover up the fraud that had taken place earlier.

24          So the suggestion that some aspect of the fraud took

25  place in 2012, it then allowed Mr. Constantine to explain his

U.S.A. v. KENNER and CONSTANTINE                    2137

1    state of mind in 2012 as to why did that document -- what it
2    related to.  So by the government offering something in 2012
3    to try to show that the fraud was continuing, at least with
4    respect to Mr. Nash in 2012 by handing him a piece of paper,
5    that allows Mr. Constantine to get into his state of mind of
6    the e-mail that he sent during that time frame.  What he
7    explained to Mr. Nash, what he's doing, what he's thinking, as
8    well as any website that they viewed together to confirm
9    whether or not he had shares in the company at that time.  So
10   that was the basis for that ruling.
11           MS. KOMATIREDDY:  Thank you, Judge.
12           THE COURT:  There was an objection on redirect that
13   it was asked and answered.  But the redirect was very
14   important, in my view, because the defense did a good job on
15   the cross of suggesting that the money was provided for broad
16   purposes, for various lawsuits.
17           So even though the government obviously did cover
18   the various items, did you authorize funds for X and Y in the
19   direct, given the cross where it was suggested on certain
20   questions that the authorization was so broad that it could
21   have included anything, it's then proper for the government to
22   redirect to confirm and clarify that even though it was meant
23   for very broad purposes, it did not extend to other things
24   that the government already said were diversions of the money.
25   So that was the basis for that.

1          There's two other things I want to briefly cover --

2    three other things.  One is, Mr. LaRusso, you suggested that

3    it was possible that the jurors were asking about your mom

4    because they read some newspaper article.  First of all, I

5    pulled the newspaper article.  It actually does refer to your

6    mom.

7          MR. LaRUSSO:  I didn't see the article.

8          THE COURT:  It says he had a family emergency.  So

9    to the extent they were asking about your mom, they could have

10   gotten that from the article.  If anyone wants to disagree

11   with me based on what transpired, they can certainly disagree

12   with me.  I just want the record to reflect that there were

13   multiple side-bars back and forth about Mr. LaRusso's mom.  He

14   was obviously upset about information he was receiving as he

15   was sitting in court.

16         It's my view that he was speaking extremely loud at

17   the side-bar and describing the situation in a manner that

18   everybody in the courtroom could hear what the situation was.

19   I'm not faulting you.  Under the circumstances, it's

20   understandable.  I have every reason to believe, based upon

21   how loud you were speaking, that that is how the jurors knew

22   that his mom was sick.

23         So I just wanted to clarify that I don't believe

24   they learned it from a newspaper article.  I don't think

25   anyone wants to question them regarding that.

1           MR. LaRUSSO:  No, Your Honor.

2           MR. MISKIEWICZ:  No, Your Honor.

3           MR. HALEY:  No, Your Honor.

4           THE COURT:  The last thing is, Mr. LaRusso, you said

5    this at side-bar.  Actually, there's two things.  You said

6    this at side-bar.  I thought about it some more.  I want the

7    record to be clear.  There was questioning of the Playboy

8    Enterprise witness.  There was discussion about certain

9    invoice.  He suggested that's the problem with this case.

10          I'm not sure what the government is arguing or

11   trying to prove.  I thought about it a little bit more.  I

12   didn't want that left at the side-bar.  It included everyone

13   in this case.  The government put it on the record when they

14   produced those Playboy invoices.  But the idea that you were

15   surprised to learn the government's claiming that some

16   portions of the fund's investment was diverted to purposes of

17   the Playboy Enterprise.  That certainly wasn't a surprise to

18   me.  And I don't know why you suggest it was a surprise to

19   you.  But I went back and looked at the government's letter to

20   you before the trial.  They specifically identified that as

21   one of the diversions.  It may even be in the bail

22   application.  I remember that part of the case.

23          MR. LaRUSSO:  I was trying to articulate --

24   candidly, Judge, sometimes I'm not as clear as I should be the

25   last couple of days.  My recollection was that the invoices

1   you're talking about Tommy Constantine Management Group.  My

2   concern was that the government was alleging that Eufora

3   monies, because I don't believe it was the Global Settlement,

4   were somehow getting into Constantine Management, and then

5   Constantine Management was then paying off these invoices.  So

6   therefore, it would be a fraud.  And that's what their offer

7   of proof was, as far as I was concerned, and I couldn't

8   question it.

9           But right now I don't have any evidence, Judge.  And

10  again, I may be wrong that any Eufora monies went to

11  Constantine Management Group.  That's where I was making my

12  objection.  I'm sorry I didn't make it clearer, Judge.  That's

13  where it is.

14          THE COURT:  Okay.

15          MS. KOMATIREDDY:  Your Honor, I'm happy to clarify

16  for the purposes of going forward.  If the defense takes a

17  look at the Bank of America records for Constantine Management

18  Group produced January 21st, 2014.  During the time period of

19  the Eufora fraud, as charged in the indictment, February to

20  July 2009, there are multiple entries for PEII, which stands

21  for Playboy Enterprises International, Inc..  Those are the

22  alleged diversions.

23          THE COURT:  All right.  And the last thing is --

24  and, Mr. Haley, I know you've been so focused on the trial,

25  this hasn't come up in a while, but I said I would revisit

1   this issue.  I was a little concerned about doing it before

2   trial on Thursday, but I did say that once the government had

3   run their search terms through the computer, that under the

4   Second Circuit case law, that they should return the computer

5   to Mr. Kenner.

6           So I want the government to explain to me why, at

7   this point in the case, where we are now, I assume you

8   completed your search of his computer.  Obviously, I don't

9   think there are any authentication issues at this point

10  regarding the documents and their signatures in the trial.

11  Why, at least the original of the computer -- and I think the

12  case law would require you to retain a mirror image of the

13  computer of non-pertinent photos and other files that are on

14  the mirror image as well, why that shouldn't be done at this

15  point in time.

16          MR. MISKIEWICZ:  Judge, I don't think we'd have an

17  objection to pertinent, non-pertinent materials at this time.

18  I can perhaps offer to discuss this with Mr. Haley and see if

19  there's some stipulation that we can enter into regarding --

20  first of all, I will tell the Court we are no longer

21  searching.  The search is over.  Obviously it's time to start

22  proffering anything that hasn't already been disclosed and

23  discovered.

24          As far as returning the actual laptop, Your Honor, I

25  think our position remains the same.  That it's a tangible

1   piece of evidence.  It is where pertinent, relevant documents

2   reside in their original format.  We will have testimony in

3   the next two weeks from FBI forensic examiners who will say

4   certain documents that will be offered in evidence, and some

5   of them are very large and have been identified, resided only

6   on that laptop.

7           That's critical, because one of those things --

8   among those things were the lines of credit statements that

9   did not go to the victims.  And to juxtapose that, the

10  existence of those lines of credit statement in Mr. Kenner's

11  laptop, against things, for instance, the consensual

12  recordings where he says I don't have it, it's all gone, is

13  very important.  And it's important, I believe, for the entire

14  process to preserve the integrity of the evidence that resides

15  in that tangible item, the laptop, certainly at least through

16  the conclusion of the trial.

17          I mean, I understand that either this government

18  team or any other government team could go back and prevail

19  and try to seek new evidence out of that.  That would be a

20  general warrant, as the opinion suggested.

21          THE COURT:  I'll go back and read it again.  I

22  didn't understand that opinion to say that notwithstanding the

23  fact the government can go back into the computer and do

24  another search whenever it feels like, that it still should be

25  able to retain the original computer as a tangible piece of

1   evidence.  I thought it suggested the opposite.  I thought it

2   suggested that the government should mirror image it, or do

3   what it needed to do to preserve the integrity of the

4   evidence.  But I didn't -- I didn't read that opinion to say

5   that the government can hold the physical computer.

6           A lot of times the FBI doesn't even take the

7   physical computer.  They go in, they mirror image it in the

8   home or office, and leave the original computer because

9   they're so confident of their ability to authenticate the

10  computer through the mirror image.

11          I understand what you're saying.  I understand how

12  important the evidence is.  But if you have the mirror image

13  of the relevant documents, I don't see what you're concerned

14  about this.  Maybe I missed something.  Maybe Mr. Haley missed

15  some notes of what documents you're referring to.

16          Are you contesting whether or not those documents

17  were, in fact, on that computer, Mr. Haley?

18          MR. HALEY:  No, sir.

19          THE COURT:  So they're not going to say that wasn't

20  on the computer, the government got those from somewhere else.

21  So I'm not sure what the basis would be.  But we can talk

22  about it more on Monday.  I don't want this to go endlessly

23  because the government is done searching the computer.  We're

24  in trial.  There is an issue about returning the computer.

25          On Monday, I want you to -- and we'll go back on

1   this -- your position is that you can hold the original.  You

2   need to explain to me your possession.  Show me where it says

3   that the government should be able to do that from a second

4   circuit decision.  All right?

5            MR. MISKIEWICZ:  Will do.

6            MR. HALEY:  Your Honor.

7            THE COURT:  Hold on one second.

8            My law clerk reminded the phone too, which is the

9   same issue.

10           MR. HALEY:  Your Honor, the only reason I'm bring

11  this up now is I think we have some time.  I did endeavor to

12  offer Kenner Exhibit 62 in evidence.  That's a May 1, 2006

13  from Eufora LLC to Owen Nolan, with his address.  I don't know

14  if the government's taking a firm position yet, but they would

15  not consent to stipulate it to admitting it by way of

16  stipulation.

17           And I agree, Judge, I did not approach the

18  government previous to that.  I assumed it would be no

19  problem.  It was an assumption on my part that I shouldn't

20  have taken.  As an offer of proof, Judge, the value of this

21  document, from the defense perspective, is quite significant.

22  This witness clearly testified that at no point authorized his

23  line of credit to the tune of 2.2 million to be accessed by

24  Little Isle IV for the purposes of the Hawaii Land Development

25  Investment.  We have a K-1 in 2006 coming out of Little Isle

U.S.A. v. KENNER and CONSTANTINE                    2145

1    IV, to Owen Nolan, reflecting the capital contributed during

2    the year, $2,300,000.

3            So you have the $100,000 original investment.  You

4    have a $2.2 million original investment.  You then, of course,

5    have distribution in the amount of $761,458.  Judge, it says

6    records maintained by the IRS.  My point, really, is quite

7    simple.  If it's part of the government's theory that Phil

8    Kenner accessed these lines of credit without authorization,

9    he's a pretty inept criminal.  What I mean by that is, in 2006

10   he generates -- Little Isle IV generates a K1 that reflects

11   just that.

12           We believe, and the offer of proof would be that it

13   was sent to the accountants for the purposes of completing

14   their tax returns in that year.  I believe this is a document.

15           THE COURT:  You said the accountants?

16           MR. HALEY:  I misspoke.  The Nolans.  We believe

17   that a search of their tax records would reveal the

18   information contained on this K1.

19           THE COURT:  But that wasn't produced to you by the

20   government.  The government didn't provide you with that.  You

21   got that from your own --

22           MR. MISKIEWICZ:  Your Honor, we did provide it,

23   again, as one of the records that came from the search of

24   Mr. Kenner's house.  So the only place we know it lives is in

25   the defendant's own home and records.  We have no information

U.S.A. v. KENNER and CONSTANTINE                    2146

1   that this information ever either got to Mr. Nolan or was

2   filed with his return to the IRS.  So the basis of our

3   objection was just that, it's a document created by the

4   defendant.

5            THE COURT:  Why don't you ask Mr. Nolan -- what year

6   was that?

7            MR. HALEY:  2006, Judge.

8            THE COURT:  You can ask Mr. Nolan if he or his

9   accountant or wife retained a copy of the tax return for that

10  year, and see whether or not they have a copy of it.

11           MR. HALEY:  Sure, Judge.  My only concern is if it

12  comes from Mr. Nolan, if the government asks Mr. Nolan that

13  question, I predict his answer will be I don't recall.

14           THE COURT:  We're not going to tell him does he

15  recall.  We're going to tell him that he can contact his

16  accountant and/or his wife and get his return for 2006, and

17  obtain a copy of it and see if the K1 is attached to the

18  return.  That doesn't come out of his memory.  I guess he can

19  say he doesn't have that documentation.  Then we'll deal with

20  that when he says that.

21           Do you have any problem with that?

22           MR. MISKIEWICZ:  No, that would solve the problem.

23           MR. HALEY:  If I may, Judge --

24           THE COURT:  Is it actually attached to the tax

25  return?

U.S.A. v. KENNER and CONSTANTINE                    2147

1          MR. HALEY:  I don't know that a K1 is attached to

2     the tax return, Judge.  But when you receive a K1, it would

3     have to be reflected -- I forget the schedule on the tax

4     returns.  The K1 information would have to be reflected on the

5     tax return.

6          THE COURT:  So clarify if he has a copy of his

7     return.  Whoever prepared it, it his accountant or his wife,

8     see whether or not in connection with the tax return they had

9     a K-1.  Okay?

10         MR. MISKIEWICZ:  Yes.

11         MR. HALEY:  All right.  Judge, the search -- in

12    order to make -- it would have been filed in 2007.  Maybe I

13    need, depending when it was sent out -- my point is simply

14    this, Judge.  I think to cover the issue we're going to look

15    at tax records from 2006 through 2008.

16         THE COURT:  Okay.  Any K1s they have for 2006 to

17    2008.

18         MR. HALEY:  Sure.  Thank you, Judge.

19         MR. MISKIEWICZ:  Fine.

20         THE COURT:  The K1s.

21         MR. LaRUSSO:  Going back.  I don't want to belabor

22    the point.  I'd ask the Court's permission, we don't disagree

23    with Ms. Komatireddy's representation to the Court that there

24    are, from Constantine Management Group, monies going to

25    Playboy Enterprises.  We concede that.  It's in the record.

U.S.A. v. KENNER and CONSTANTINE                    2148

1   What we're saying is that the monies from Eufora to

2   Constantine Management Group are not there.  So the payment by

3   Constantine Management Group to Playboy is not relevant to the

4   fraud.  With your permission, we'll put it in a letter so we

5   can maybe articulate a little better what it is.

6          THE COURT:  How can you say it's not relevant to the

7   fraud?  If people who are investing in Eufora, if their money

8   went to Constantine Management Group.

9          MR. LaRUSSO:  Then I have no problem.

10         THE COURT:  I think we've heard evidence, I believe,

11  that people who thought they were investing in Eufora wired

12  mire to Constantine Management Group.  So to the extent you're

13  arguing that well, Constantine Management Group is not Eufora,

14  there is at least some evidence in the record to suggest

15  that's what people who were investing in Eufora, that's where

16  their money went.

17         MR. LaRUSSO:  As far as --

18         THE COURT:  It's all part of it.

19         MR. HALEY:  I have a different position on that,

20  Your Honor, but I'll articulate that at the appropriate time.

21         THE COURT:  I'm sure there's more than one position

22  on that, but that's why, at a minimum, it's relevant.  But

23  it's not the only explanation for it.

24         All right.  So have a good weekend.  I'll see you

25  Monday at 9:30.

U.S.A. v. KENNER and CONSTANTINE                    2149

1          MR. MISKIEWICZ:  Thank you.

2          MR. HALEY:  Thank you, Your Honor.

3          MR. LaRUSSO:  Thank you, Your Honor.

4          (Matter adjourned to Monday, June 1, 2015, at 9:30

5    a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

W I T N E S S E S                                           2150

1

2   T Y S O N   N A S H                                      1941

3   DIRECT EXAMINATION (CONT'D)                              1941

4   BY MS. KOMATIREDDY

5   CROSS-EXAMINATION                                        1945

6   BY MR. HALEY

7   CROSS-EXAMINATION                                        1982

8   BY MR. LARUSSO

9   REDIRECT EXAMINATION                                     2033

10  BY MS. KOMATIREDDY

11  RECROSS EXAMINATION                                      2043

12  BY MR. HALEY

13  RECROSS EXAMINATION                                      2044

14  BY MR. LARUSSO:

15

16  O W E N   N O L A N                                      2049

17  DIRECT EXAMINATION                                       2050

18  BY MR. MISKIEWICZ

19  CROSS-EXAMINATION                                        2079

20  BY MR. HALEY

21  CROSS EXAMINATION                                        2117

22  BY MR. LARUSSO

23  REDIRECT EXAMINATION                                     2126

24  BY MR. MISKIEWICZ

25

E X H I B I T S                                    2151

GOVERNMENT EXHIBIT 764 WAS RECEIVED IN EVIDENCE      1943

GOVERNMENT EXHIBIT 2154 WAS RECEIVED IN EVIDENCE     2067


DEFENDANT'S EXHIBIT 52 WAS RECEIVED IN EVIDENCE      1960

DEFENSE EXHIBIT C122 IN EVIDENCE                     1986

DEFENDANT'S EXHIBIT C-50                             2028

DEFENDANT EXHIBIT C-123                              2031

DEFENDANT'S KENNER EXHIBIT 4 WAS RECEIVED IN         2079

EVIDENCE

## $

**$10,000** [2] - 2073:5, 2073:12
**$10,112.60** [1] - 2073:14
**$100,000** [22] - 1947:13, 1947:18, 1948:11, 1953:7, 1978:4, 1982:25, 1988:20, 2022:13, 2033:18, 2034:3, 2044:10, 2058:17, 2058:24, 2059:6, 2059:15, 2064:24, 2065:7, 2065:8, 2065:9, 2072:14, 2119:24, 2145:3
**$12,236.42** [1] - 2070:16
**$14,142.43** [2] - 2072:3, 2072:15
**$15** [1] - 2007:21
**$15,000** [1] - 1978:14
**$15,085.26** [1] - 2071:11
**$17,000** [1] - 2036:11
**$2,189,796.02** [1] - 2070:2
**$2,199,796.02** [1] - 2074:9
**$2,300,000** [1] - 2145:2
**$200,000** [7] - 2059:13, 2059:16, 2059:17, 2059:18, 2074:23, 2078:19
**$25,000** [1] - 1975:2
**$415,000** [1] - 2040:25
**$42,500** [2] - 1958:13, 1978:5
**$450,000** [2] - 1991:6, 2039:20
**$495,968.67** [1] - 2079:22
**$500,000** [6] - 2068:21, 2074:8, 2080:4, 2080:10, 2127:1, 2127:7
**$550,000** [2] - 1991:12, 2120:2
**$70,000** [1] - 2072:2
**$750,000** [2] - 2120:5, 2125:19
**$761,458** [1] - 2145:5

## '

**'03** [2] - 2058:11, 2105:4

**'08** [1] - 2051:1

## 1

**1** [6] - 1960:14, 2099:10, 2101:21, 2144:12, 2149:4
**1,702,942.08** [3] - 2079:19, 2079:25, 2080:14
**1.7** [3] - 2091:19, 2126:24, 2127:16
**10** [1] - 1971:24, 1988:2, 1988:11, 1988:20, 2003:22, 2005:2, 2005:3, 2008:23, 2087:25, 2132:15, 2133:4
**100** [6] - 1940:8, 2014:19, 2019:18, 2103:20, 2104:9, 2125:18
**100,000** [4] - 2058:16, 2059:1, 2059:4, 2064:6
**101** [1] - 2026:22
**102** [1] - 2026:23
**103** [1] - 2026:23
**104A** [1] - 1994:17
**104B** [1] - 1994:17
**11501** [1] - 1940:2
**11572** [1] - 1940:5
**11722** [2] - 1939:17, 1940:9
**11749** [1] - 1939:23
**11:10** [1] - 1980:3
**11:25** [1] - 1980:5
**11th** [3] - 2130:19, 2131:1, 2133:13
**12** [2] - 1971:23, 2132:15
**12/15/2003** [1] - 2104:24
**13** [1] - 2092:11
**13-CR-607** [1] - 1939:3
**131** [1] - 2118:7
**15** [3] - 1977:25, 1985:12, 1986:4
**15-minute** [1] - 2087:25
**1510** [1] - 1988:19
**15471** [1] - 2112:16
**15th** [1] - 2133:15
**1601** [1] - 1939:22
**16th** [1] - 2131:5
**17** [3] - 1994:7, 1994:12, 2003:18
**1706** [1] - 2036:6
**18** [4] - 2006:1,

2050:13, 2052:19, 2106:17
**19** [2] - 2005:4, 2070:25
**1941** [2] - 2150:2, 2150:3
**1943** [1] - 2151:2
**1945** [1] - 2150:5
**1960** [1] - 2151:6
**1982** [1] - 2150:7
**1986** [1] - 2151:7
**1990** [2] - 2050:11, 2050:12
**1:10** [1] - 2048:6
**1:11** [1] - 2048:13
**1:21** [1] - 2031:15

## 2

**2** [6] - 2111:10, 2115:1, 2115:4, 2115:7, 2116:3, 2116:7
**2,000,199** [1] - 2073:16
**2.2** [6] - 2066:15, 2066:16, 2073:16, 2127:11, 2144:23, 2145:4
**2/13/2012** [1] - 2079:18
**20-acre** [1] - 2064:12
**200,000** [1] - 2123:5
**2000** [4] - 2023:7, 2051:24, 2052:1, 2054:23
**2000s** [1] - 2054:24
**2003** [6] - 2058:12, 2059:12, 2059:14, 2061:10, 2074:24
**2004** [1] - 2063:17
**2005** [3] - 2035:4, 2063:17, 2063:18
**2006** [10] - 2062:6, 2112:16, 2112:23, 2144:12, 2144:25, 2145:9, 2146:7, 2146:16, 2147:15, 2147:16
**2007** [13] - 2062:6, 2069:24, 2070:3, 2070:4, 2070:8, 2070:12, 2070:25, 2071:13, 2072:5, 2072:17, 2112:16, 2112:23, 2147:12
**2008** [21] - 1943:18, 1943:23, 1944:4, 1944:15, 1946:24, 1947:22, 1953:10,

1979:19, 1979:22, 1982:22, 1983:14, 2021:19, 2023:8, 2023:13, 2024:17, 2035:25, 2038:13, 2072:25, 2117:23, 2147:15, 2147:17
**2009** [30] - 1979:12, 1983:19, 1985:12, 1986:4, 1988:2, 1988:11, 1988:20, 1993:19, 1994:8, 1994:12, 1996:12, 1997:7, 1998:16, 2005:6, 2007:12, 2035:5, 2084:21, 2086:6, 2096:18, 2097:2, 2099:17, 2099:23, 2101:7, 2101:16, 2105:24, 2117:23, 2118:4, 2118:24, 2119:3, 2140:20
**2010** [4] - 2008:23, 2021:8, 2021:11, 2035:5
**2011** [1] - 2016:18
**2012** [21] - 1942:16, 1942:20, 1943:20, 1943:21, 1946:24, 1953:9, 2006:21, 2027:3, 2027:4, 2030:17, 2031:11, 2038:15, 2045:6, 2045:15, 2136:5, 2136:18, 2136:21, 2136:25, 2137:1, 2137:2, 2137:4
**2013** [3] - 2006:21, 2006:22, 2092:11
**2014** [2] - 2003:19, 2140:18
**2015** [4] - 1939:9, 2068:11, 2118:24, 2149:4
**2028** [1] - 2151:8
**2031** [1] - 2151:9
**2033** [1] - 2150:9
**2043** [1] - 2150:11
**2044** [1] - 2150:13
**2049** [1] - 2150:16
**2050** [1] - 2150:17
**2067** [1] - 2151:3
**2079** [2] - 2150:19, 2151:10
**21** [2] - 2030:17, 2031:11
**2117** [1] - 2150:21
**2126** [1] - 2150:23
**2154** [8] - 2066:21,

2066:22, 2067:13, 2067:17, 2067:18, 2080:17, 2081:13, 2151:3
**21st** [3] - 2031:13, 2031:20, 2140:18
**22** [3] - 2005:6, 2069:19, 2069:21
**23** [1] - 2069:24
**24** [4] - 1944:4, 1982:22, 2023:13, 2070:24
**24th** [2] - 1943:18, 1943:23
**25** [1] - 2005:3
**26** [3] - 1940:4, 2086:5, 2118:4
**26th** [1] - 2119:3
**27** [3] - 1996:12, 1997:7, 2071:20
**28** [2] - 1939:9, 2072:13
**2:00** [2] - 2048:4, 2048:11
**2:04** [2] - 2031:18, 2031:20
**2:10** [1] - 2031:19
**2:48** [2] - 2031:13, 2031:25

## 3

**3** [4] - 2003:22, 2028:22, 2099:2, 2132:24
**30** [3] - 2003:18, 2086:6, 2095:2
**300** [1] - 1940:1
**30th** [2] - 2133:1, 2133:2
**31** [1] - 1996:9
**33** [1] - 2072:24
**341** [1] - 1940:2
**3500** [1] - 2003:18
**3:10** [1] - 2087:23
**3:25** [1] - 2100:15
**3:35** [1] - 2100:17
**3rd** [1] - 2016:18

## 4

**4** [4] - 1978:25, 2079:15, 2079:16, 2151:10
**40** [1] - 2095:2
**403** [4] - 2088:5, 2091:11, 2092:19, 2136:14
**414** [2] - 2039:22, 2039:25, 2040:8,

2040:15
**425** [1] - 1939:22
**43** [1] - 1971:18
**4:20** [1] - 2128:8
**4:25** [1] - 2130:1
**4:30** [3] - 1980:18, 2094:23, 2100:19

## 5

**5** [3] - 1943:15, 1955:25, 2109:17
**5/10/2015** [1] - 2028:22
**50** [5] - 1945:17, 1945:18, 2022:24, 2022:25, 2038:20
**500,000** [3] - 2013:25, 2074:7, 2080:13
**52** [5] - 1959:20, 1960:5, 1960:9, 1960:10, 2151:6
**54** [1] - 2079:12
**550,000** [1] - 2123:5
**56** [1] - 2085:9
**57** [1] - 2102:19
**58** [1] - 2103:4
**59** [1] - 2103:14

## 6

**6** [7] - 1977:22, 2033:19, 2034:3, 2096:18, 2099:23, 2101:7, 2101:16
**6/2/2009** [1] - 2039:17
**60** [2] - 1978:9, 2104:2
**61** [1] - 2104:12
**62** [4] - 2112:14, 2113:12, 2115:10, 2144:12
**63** [4] - 2113:22, 2115:3, 2115:5, 2116:13
**631-712-6102** [1] - 1940:9

## 7

**760** [2] - 1943:5, 1943:25
**762** [2] - 2020:6, 2022:3
**764** [9] - 1942:10, 1942:22, 1943:1, 1943:3, 1943:5, 1943:6, 1945:20, 2022:22, 2151:2
**767** [3] - 1974:18, 1976:11, 2039:13

## 8

**8** [1] - 1971:24
**89-A** [1] - 2014:17
**8th** [1] - 2133:5

## 9

**9** [3] - 2007:12, 2096:7, 2101:11
**95032** [1] - 2112:17
**9:30** [4] - 1939:10, 2129:24, 2148:25, 2149:4

## A

**a.m** [2] - 1939:10, 2149:5
**a/k/a** [2] - 1939:6, 1939:8
**abide** [1] - 2092:3
**ability** [1] - 2143:9
**able** [25] - 1960:24, 1987:18, 1987:21, 1993:7, 2007:22, 2009:11, 2082:3, 2083:18, 2084:2, 2084:16, 2085:14, 2085:16, 2091:21, 2092:9, 2092:11, 2092:12, 2092:16, 2096:25, 2102:2, 2107:11, 2107:22, 2130:18, 2132:7, 2142:25, 2144:3
**absence** [3] - 1980:4, 2087:22, 2100:16
**absolutely** [3] - 1993:1, 2062:21, 2100:22
**accessed** [5] - 2093:15, 2105:17, 2105:25, 2144:23, 2145:8
**accompanied** [1] - 1984:20
**according** [5] - 1957:13, 2047:10, 2066:13, 2069:24, 2119:2
**account** [9] - 1957:4, 1974:24, 1988:20, 2045:25, 2046:2, 2080:4, 2080:8, 2080:12, 2126:9
**accountant** [6] - 1996:3, 2113:4, 2113:6, 2146:9, 2146:16, 2147:7

**accountants** [2] - 2145:13, 2145:15
**accumulated** [1] - 1977:16
**accurate** [4] - 1942:19, 2052:21, 2054:16, 2119:1
**accusations** [1] - 2013:11
**acknowledged** [1] - 1943:13
**acknowledgement** [1] - 2009:16
**acknowledging** [1] - 2009:10
**acknowledgment** [1] - 2012:2
**acquire** [4] - 1948:11, 1990:7, 1990:12, 2001:15
**acquired** [2] - 1990:18, 2093:14
**acquiring** [4] - 1946:13, 1953:8, 1964:14, 1995:12
**acquisition** [2] - 1995:4, 2000:19
**acquisitions** [1] - 2001:5
**acting** [1] - 1939:16
**action** [2] - 1966:20, 2075:13
**actions** [1] - 1954:11
**activities** [1] - 2132:25
**actual** [4] - 1978:17, 2026:14, 2090:5, 2141:24
**adamant** [1] - 2045:11
**add** [2] - 2093:9, 2115:12
**added** [3] - 2107:18, 2108:5, 2108:16
**adding** [1] - 1992:14
**addition** [4] - 1989:6, 1989:14, 2005:14, 2126:25
**additional** [5] - 1978:23, 2022:22, 2059:1, 2059:6, 2059:21
**address** [10] - 1986:8, 1994:9, 1996:15, 1996:20, 2002:8, 2089:9, 2092:13, 2112:18, 2134:21, 2144:13
**addressed** [1] - 2123:10
**addresses** [3] - 1985:13, 1986:5,

1994:8
**adjacent** [1] - 2109:8
**adjourned** [1] - 2149:4
**adjustment** [4] - 2079:21, 2079:22, 2080:10, 2080:11
**admissible** [2] - 2091:10, 2092:24
**admission** [1] - 2067:12
**admit** [1] - 2079:14
**admitted** [7] - 1943:2, 1960:9, 1986:1, 2028:18, 2067:17, 2071:1, 2071:8
**admittedly** [1] - 2084:1
**admitting** [1] - 2144:15
**advantage** [1] - 2032:18
**adversarial** [1] - 2032:5
**advertising** [4] - 1948:17, 1949:1, 1952:2, 1953:18
**advice** [2] - 2051:5, 2051:11
**advised** [1] - 1951:3
**advisor** [6] - 1961:10, 2052:13, 2053:13, 2068:4, 2068:13, 2089:15
**Advisor's** [2] - 2083:10, 2084:5
**Advisors** [2] - 2086:4, 2086:5
**advisory** [1] - 2084:8
**affixed** [1] - 2082:22
**afford** [1] - 1982:4
**afternoon** [4] - 2050:3, 2079:6, 2079:7, 2117:4
**afterwards** [1] - 1984:4
**agent** [3] - 2099:2, 2107:1, 2107:2
**Agent** [7] - 1966:14, 1968:5, 1968:8, 1968:23, 1969:5, 1969:11, 1970:6
**agent's** [1] - 2051:14
**agents** [2] - 1950:20, 2098:25
**ago** [15] - 1947:11, 1948:2, 1948:3, 1956:12, 1963:21, 1968:3, 1983:24, 2043:4, 2045:1, 2082:5, 2082:12,

2115:20, 2117:15, 2118:23, 2134:25
**agree** [24] - 1945:22, 1948:8, 1948:13, 1956:25, 1972:12, 1972:22, 1974:25, 2002:12, 2005:1, 2012:12, 2032:7, 2044:6, 2080:18, 2083:5, 2084:20, 2086:13, 2086:14, 2086:17, 2086:20, 2115:7, 2116:6, 2116:19, 2119:18, 2144:17
**agreeable** [1] - 2131:2
**agreed** [1] - 2056:23
**agreeing** [1] - 2009:17
**Agreement** [1] - 2102:12
**agreement** [9] - 2001:11, 2001:14, 2083:10, 2084:6, 2089:15, 2096:21, 2097:4, 2110:24, 2111:2
**agreements** [1] - 2111:19
**ahead** [3] - 1981:20, 2049:24, 2100:25
**air** [2] - 1990:13, 2127:21
**Air** [18] - 1995:7, 1995:9, 1995:11, 1997:10, 1997:13, 1999:3, 1999:8, 1999:14, 2000:5, 2000:6, 2001:21, 2120:2, 2120:21, 2120:22, 2120:23, 2120:25, 2123:9, 2125:19
**airing** [1] - 1986:14
**airplane** [13] - 1991:1, 1997:15, 1999:21, 2000:10, 2000:15, 2000:19, 2001:10, 2002:24, 2041:5, 2046:20, 2075:14, 2075:16, 2075:17
**airplanes** [9] - 1995:14, 1997:22, 1997:25, 1998:3, 1999:4, 1999:11, 2039:2, 2040:17, 2077:7
**AJ's** [2] - 1976:7, 1976:8
**ALL** [1] - 2032:9

**allege** [1] - 2124:19
**alleged** [3] - 1966:3, 2136:11, 2140:22
**alleging** [1] - 2140:2
**alleviate** [1] - 2000:10
**allow** [7] - 1978:5, 2009:17, 2018:14, 2094:7, 2107:16, 2109:19, 2131:22
**allowed** [3] - 2013:8, 2013:9, 2136:25
**allowing** [1] - 2014:7
**allows** [1] - 2137:5
**almost** [2] - 2062:21, 2102:24
**alone** [1] - 2113:1
**alternate** [1] - 2132:24
**alternates** [8] - 2129:13, 2133:20, 2133:21, 2133:22, 2134:5, 2134:7, 2135:15
**America** [1] - 2140:17
**AMERICA** [1] - 1939:3
**American** [1] - 2105:22
**amount** [17] - 1958:7, 1977:16, 1978:24, 1991:11, 2045:13, 2047:13, 2066:12, 2068:20, 2070:14, 2074:8, 2089:12, 2096:14, 2108:8, 2108:9, 2127:10, 2129:17, 2145:5
**amounts** [1] - 2065:10
**ANDREW** [1] - 1940:4
**angry** [1] - 2024:22
**answer** [37] - 1944:21, 1955:18, 1956:7, 1957:8, 1962:23, 1963:25, 1964:19, 1971:11, 1972:24, 1972:25, 1973:5, 1976:15, 1977:4, 1977:21, 1979:3, 1984:14, 1993:16, 2003:17, 2004:3, 2012:19, 2013:20, 2032:1, 2036:14, 2047:19, 2069:3, 2092:6, 2094:12, 2094:18, 2103:18, 2106:7, 2106:11, 2107:17, 2109:21, 2109:24, 2111:24, 2146:13
**ANSWER** [4] - 2118:10, 2118:13, 2118:15, 2118:18

**Answer** [1] - 1972:16, 2003:25
**answered** [12] - 1950:13, 1950:15, 1964:18, 1973:14, 1977:9, 2029:23, 2036:13, 2068:15, 2069:15, 2094:15, 2111:5, 2137:13
**answering** [1] - 2007:9
**answers** [3] - 1976:21, 1996:5, 2118:20
**anticipate** [1] - 1981:2
**anticipated** [1] - 2131:11
**anticipation** [1] - 2131:15
**anytime** [3] - 1955:16, 1955:17, 1997:19
**apart** [1] - 2109:2
**apologize** [11] - 1961:6, 1983:24, 1988:16, 1999:2, 2003:21, 2059:15, 2059:16, 2083:16, 2088:17, 2111:15, 2132:10
**appear** [6] - 1960:1, 1960:19, 1974:21, 2067:1, 2095:9, 2113:25
**appearances** [1] - 1941:4
**APPEARANCES** [1] - 1939:14
**Apple** [1] - 2044:12
**apples** [13] - 1944:10, 1989:17, 1989:20, 1989:24, 1990:4, 2001:23, 2003:13, 2015:25, 2077:13, 2090:20, 2090:21, 2093:1, 2093:3
**application** [1] - 2139:22
**applied** [1] - 2074:9
**appointment** [1] - 2100:19
**appointments** [1] - 2129:2
**appreciate** [4] - 2047:24, 2085:20, 2093:8, 2129:21
**apprised** [1] - 2111:18
**approach** [5] - 1951:8, 1965:17, 2022:2, 2076:1, 2144:17
**appropriate** [2] -

2098:13, 2148:20
**approximating** [1] - 2109:17
**approximation** [1] - 2058:9
**April** [14] - 1943:18, 1943:23, 1944:4, 1947:22, 1982:22, 1983:14, 2021:18, 2023:13, 2024:17, 2035:25, 2070:4, 2070:8, 2070:12, 2072:25
**arbitrate** [1] - 2084:17
**arbitration** [75] - 2063:2, 2063:4, 2063:6, 2066:6, 2074:15, 2084:10, 2084:11, 2084:21, 2086:3, 2086:14, 2086:15, 2086:18, 2086:21, 2086:23, 2087:6, 2087:9, 2087:10, 2087:11, 2087:13, 2087:18, 2088:9, 2088:23, 2089:4, 2089:18, 2089:22, 2090:22, 2091:9, 2091:17, 2091:24, 2093:9, 2093:17, 2093:18, 2094:9, 2094:14, 2094:16, 2095:6, 2095:22, 2095:25, 2096:3, 2096:9, 2097:8, 2097:10, 2097:14, 2097:17, 2098:3, 2098:9, 2099:16, 2105:14, 2105:16, 2117:22, 2117:24, 2118:2, 2118:4, 2119:2, 2119:8, 2119:10, 2119:15, 2119:18, 2120:7, 2120:9, 2121:1, 2122:22, 2122:23, 2123:2, 2123:8, 2123:16, 2123:18, 2124:11, 2125:7, 2125:16, 2125:17, 2125:24, 2126:12
**Arbitration** [1] - 2105:22
**arbitrator** [6] - 2088:6, 2088:14, 2088:20, 2097:23, 2098:14, 2098:16
**arbitrator's** [1] - 2098:18

**arbitrators** [6] - 2086:24, 2088:10, 2091:12, 2091:14, 2096:13, 2123:13
**area** [4] - 2003:12, 2064:11, 2116:21, 2121:2
**areas** [2] - 2002:20, 2002:24
**argue** [3] - 2092:22, 2098:3, 2132:1
**argued** [1] - 2094:8
**arguing** [2] - 2139:10, 2148:13
**argument** [1] - 2094:15
**argumentative** [2] - 1956:5, 1964:18
**Arizona** [18] - 1943:16, 1970:9, 1970:12, 1970:15, 1971:14, 2022:10, 2022:14, 2027:22, 2028:6, 2028:20, 2057:7, 2075:8, 2075:19, 2078:17, 2120:18, 2127:24, 2136:3, 2136:9
**arranged** [2] - 2012:24, 2012:25
**arrangement** [2] - 2054:10, 2054:13
**arrangements** [3] - 2129:11, 2135:2, 2135:19
**arrived** [1] - 2117:14
**article** [7] - 2005:21, 2006:2, 2138:4, 2138:5, 2138:7, 2138:10, 2138:24
**articulate** [2] - 2139:23, 2148:5, 2148:20
**aside** [2] - 2055:9, 2062:18
**aspect** [2] - 1964:15, 2136:24
**aspects** [1] - 1983:23
**assessment** [3] - 2130:15, 2130:17, 2133:10
**assessments** [1] - 2129:6
**assets** [2] - 2001:21, 2092:13
**assistance** [2] - 2113:2, 2113:3
**Assistant** [3] - 1939:18, 1950:9, 1950:21

**associated** [7] - 1962:2, 1998:7, 2039:7, 2065:14, 2095:19, 2111:20, 2112:7
**Association** [1] - 2105:22
**assume** [6] - 1948:22, 2082:15, 2107:8, 2133:14, 2133:15, 2141:7
**assumed** [1] - 2144:18
**Assumes** [1] - 1977:17
**assuming** [1] - 2135:10
**assumption** [1] - 2144:19
**athlete** [2] - 2051:6, 2056:6
**attached** [12] - 1985:5, 1985:16, 1989:12, 2001:8, 2001:18, 2009:2, 2016:20, 2031:16, 2105:1, 2146:17, 2146:24, 2147:1
**attachment** [1] - 2018:7
**attempt** [1] - 1967:2
**attempted** [1] - 1966:16
**attend** [3] - 2004:14, 2043:7, 2043:9
**attended** [2] - 2043:24, 2043:25
**attention** [9] - 1959:21, 1960:16, 1964:20, 1973:10, 1982:19, 2000:25, 2022:15, 2101:23, 2103:6
**Attorney** [2] - 1939:16, 1950:9
**attorney** [6] - 1963:13, 1963:17, 2043:13, 2043:23, 2123:10, 2130:7
**Attorney's** [1] - 1949:22
**attorneys** [2] - 2089:14, 2091:20
**Attorneys** [2] - 1939:18, 1950:21
**August** [7] - 2005:4, 2096:18, 2097:2, 2099:2, 2099:23, 2101:7, 2101:16
**authenticate** [1] -

2143:9
**authentication** [1] - 2141:9
**authority** [2] - 1963:16, 2084:10
**authorization** [6] - 2040:2, 2093:16, 2105:18, 2105:25, 2137:20, 2145:8
**authorize** [5] - 2065:17, 2065:20, 2093:21, 2094:9, 2137:18
**authorized** [2] - 2036:21, 2144:22
**authorizing** [1] - 1963:11
**available** [3] - 2044:3, 2126:8, 2128:21
**Avalon** [2] - 2001:16, 2126:16
**avoid** [1] - 2048:2
**award** [16] - 2086:24, 2087:5, 2087:9, 2087:11, 2088:23, 2089:25, 2090:6, 2091:19, 2091:24, 2092:6, 2092:10, 2092:16, 2093:19, 2093:24, 2095:22, 2096:4
**awards** [4] - 1986:23, 1987:3, 1987:9, 2093:22
**aware** [11] - 1955:8, 1977:14, 1977:19, 1978:22, 1979:11, 1987:11, 1993:8, 2012:4, 2073:23, 2120:17, 2129:7
**awareness** [2] - 1977:24, 2093:13
**AZ** [5] - 2021:20, 2023:24, 2032:12, 2124:8, 2124:12

## B

**B-E-R-R-E-T-H** [1] - 2130:12
**baby** [1] - 1953:12
**backdated** [6] - 1946:24, 2023:13, 2023:17, 2037:12, 2037:13, 2038:9
**background** [1] - 2023:3
**backs** [1] - 2059:22
**bad** [17] - 1944:10, 1989:17, 1989:20,

1989:24, 1990:4, 2001:15, 2001:22, 2001:23, 2003:13, 2015:25, 2077:13, 2090:20, 2090:21, 2092:25, 2093:3, 2117:22, 2132:24
**bail** [1] - 2139:21
**Bailman's** [1] - 2000:10
**balance** [7] - 2039:22, 2070:1, 2072:4, 2073:15, 2074:9, 2127:13, 2127:16
**banging** [1] - 2018:3
**bank** [11] - 1974:24, 1999:5, 2000:16, 2036:5, 2066:10, 2071:21, 2072:1, 2082:16, 2126:25, 2127:8, 2127:19
**Bank** [2] - 2034:16, 2140:17
**banking** [1] - 2047:9
**bankrupt** [1] - 1979:12
**bankruptcy** [1] - 1979:14
**bar** [9] - 2016:25, 2017:3, 2018:1, 2018:15, 2095:4, 2138:17, 2139:5, 2139:6, 2139:12
**Barne** [1] - 2125:2
**bars** [1] - 2138:13
**baseball** [1] - 2100:5
**based** [17] - 1957:7, 1958:21, 2035:11, 2035:12, 2052:1, 2058:21, 2064:14, 2069:12, 2071:21, 2077:2, 2093:19, 2095:13, 2098:6, 2107:10, 2113:14, 2138:11, 2138:20
**basic** [1] - 2001:10
**basis** [9] - 1951:7, 1967:6, 2029:22, 2033:22, 2084:16, 2137:10, 2137:25, 2143:21, 2146:2
**battle** [1] - 2012:18
**beach** [1] - 2062:13
**bears** [2] - 2115:11, 2116:4
**became** [3] - 1955:8, 2032:5, 2073:23
**BEFORE** [1] - 1939:11
**beginning** [1] - 2026:10
**behalf** [5] - 1955:15,

1963:18, 2008:3, 2035:9, 2045:8
**belabor** [3] - 2098:4, 2100:10, 2147:21
**belief** [1] - 1976:3
**bell** [8] - 1977:22, 1987:6, 1999:15, 2007:24, 2013:24, 2015:10, 2125:4, 2126:11
**belonging** [2] - 2001:22, 2071:2
**bench** [3] - 1965:17, 2053:25, 2093:11
**beneficence** [1] - 1981:11
**benefit** [5] - 1956:1, 2058:19, 2064:8, 2108:18, 2108:19
**benefited** [1] - 2108:7
**Berard** [4] - 1962:6, 2012:9, 2029:5, 2029:9
**Berreth** [2] - 2130:12
**best** [10] - 1951:3, 1975:7, 1976:3, 1976:5, 1984:5, 1991:19, 1992:21, 2006:21, 2029:13, 2082:19
**better** [7] - 2022:2, 2060:22, 2060:23, 2118:23, 2129:8, 2132:19, 2148:5
**between** [26] - 1953:6, 1954:13, 1961:18, 1961:21, 1968:18, 1968:21, 1969:13, 1969:14, 1976:22, 1978:14, 1981:24, 1981:25, 1990:21, 2005:9, 2030:21, 2035:4, 2043:17, 2080:23, 2080:24, 2083:6, 2083:12, 2084:12, 2115:3, 2115:10, 2116:2, 2129:2
**beyond** [2] - 2034:5, 2036:12
**BIANCO** [1] - 1939:12
**big** [4] - 1964:23, 1989:10, 2003:5, 2020:18
**bills** [1] - 2003:14
**binding** [2] - 2091:15, 2131:9
**birth** [1] - 2063:21
**bit** [9] - 1970:21, 1980:17, 1999:1,

2007:3, 2047:25, 2048:1, 2090:20, 2117:18, 2139:11
**blame** [1] - 1979:14
**block** [1] - 2069:4
**blue** [1] - 2099:5
**blurry** [1] - 2028:25
**Board** [1] - 2067:21
**boat** [1] - 2019:21
**Bob** [6] - 1982:16, 2014:5, 2014:19, 2015:5, 2016:8, 2016:9
**bodyguard** [1] - 2014:4
**bogus** [1] - 2094:1
**books** [4] - 1959:7, 1959:8, 1959:10, 2032:17
**borrow** [1] - 2071:18
**borrowed** [2] - 2066:12, 2073:12
**bottom** [4] - 1943:8, 2031:14, 2068:16, 2114:1
**bought** [6] - 1991:10, 2021:18, 2021:19, 2047:2, 2047:4, 2047:7
**brainer** [1] - 1989:12
**breach** [1] - 2088:11
**break** [10] - 1979:25, 1980:2, 1981:14, 2031:7, 2048:1, 2087:20, 2087:25, 2094:25, 2100:12, 2133:12
**breaking** [1] - 2088:17
**breaks** [1] - 2130:18
**Brian** [1] - 1962:6
**brief** [11] - 1980:12, 2091:2, 2117:4, 2117:8, 2117:9, 2117:15, 2117:23, 2118:1, 2119:7, 2119:11, 2130:8
**briefly** [10] - 1963:20, 1969:20, 1971:1, 1996:22, 2043:1, 2051:13, 2057:5, 2076:2, 2104:14, 2138:1
**bright** [1] - 2048:9
**bring** [10] - 1981:13, 2049:6, 2055:20, 2090:18, 2091:18, 2094:1, 2095:15, 2095:17, 2097:13, 2144:10
**bringing** [1] - 2016:1

**brings** [1] - 2090:15
**broad** [13] - 2002:15, 2002:16, 2002:17, 2002:21, 2002:24, 2003:11, 2003:15, 2004:1, 2004:9, 2041:24, 2137:15, 2137:20, 2137:23
**broke** [1] - 2130:20
**brother** [2] - 2062:22, 2083:2
**Brothers** [4] - 1979:6, 1979:9, 1979:11, 1979:15
**brothers** [2] - 2059:7, 2060:13
**brought** [8] - 1941:10, 1954:11, 1954:15, 1983:9, 2087:10, 2095:5, 2123:12, 2136:17
**Bruce** [1] - 2130:11
**brutally** [1] - 2092:10
**Bryan** [1] - 2012:9
**Buchanan** [1] - 2036:8
**build** [2] - 2064:12, 2092:13
**building** [4] - 1950:3, 1950:4, 1986:20, 2001:17
**bunch** [2] - 2073:9, 2135:20
**Bureau** [1] - 1966:15
**burn** [1] - 1983:25
**business** [11] - 2001:5, 2037:1, 2043:17, 2055:11, 2057:10, 2062:18, 2083:5, 2083:8, 2083:11, 2106:18, 2117:10
**buttoned** [1] - 2053:25
**buy** [8] - 1944:17, 1945:2, 2029:6, 2029:10, 2030:1, 2042:22, 2047:13, 2078:12
**buying** [8] - 1944:10, 1957:10, 1964:9, 1965:1, 2100:6, 2110:6, 2110:7
**buyout** [1] - 1992:15
**BY** [51] - 1939:17, 1939:23, 1941:25, 1945:12, 1976:2, 1977:12, 1977:23, 1978:21, 1979:5, 1981:22, 1982:13, 1984:13, 1986:3, 1987:14, 1988:18,

1991:18, 1993:18,
1994:6, 1996:19,
2004:7, 2011:2,
2019:3, 2033:15,
2043:3, 2044:23,
2050:2, 2079:4,
2082:2, 2087:16,
2101:2, 2103:25,
2104:23, 2107:21,
2108:17, 2109:1,
2110:2, 2111:8,
2112:12, 2113:20,
2117:2, 2126:22,
2150:4, 2150:6,
2150:8, 2150:10,
2150:12, 2150:14,
2150:18, 2150:20,
2150:22, 2150:24

# C

**C-101** [1] - 2026:25
**C-102** [1] - 2026:24
**C-103** [1] - 2026:25
**C-123** [5] - 2016:13, 2030:16, 2031:2, 2031:8, 2151:9
**C-50** [6] - 2028:2, 2028:12, 2028:18, 2028:19, 2151:8
**C.R** [4] - 2131:15, 2132:3, 2132:5, 2132:8
**C104** [1] - 1994:4
**C121** [1] - 1987:13
**C122** [4] - 1985:23, 1986:1, 1986:2, 2151:7
**C122T** [1] - 1985:8
**C21** [1] - 1987:1
**C24** [1] - 2007:10
**C29** [1] - 2005:25
**C31** [1] - 1996:10
**C32** [1] - 2004:20
**C33** [1] - 2004:20
**C34** [1] - 2004:20
**C35** [1] - 2004:20
**C36** [2] - 2004:20, 2005:5
**C37** [2] - 2008:16, 2010:8
**C37C** [1] - 2008:17
**cabo** [1] - 2121:16
**Cabo** [1] - 1957:11
**CALCAGNI** [1] - 1939:21
**calendar** [1] - 2129:5
**Calgary** [1] - 2050:23
**California** [10] - 1980:10, 2006:24,

2041:16, 2043:5,
2043:24, 2048:2,
2050:5, 2052:2,
2052:3, 2112:17
**campaign** [3] - 1948:17, 1949:1, 1953:18
**Canada** [2] - 2051:14, 2051:15
**candidly** [1] - 2139:24
**candor** [1] - 2131:6
**cannot** [4] - 2102:25, 2103:18, 2104:6, 2129:3
**capital** [1] - 2145:1
**caption** [1] - 1994:18
**car** [4] - 1947:25, 1948:3, 1953:3, 1963:24
**card** [2] - 2056:18, 2056:19
**care** [4] - 1999:18, 2003:2, 2024:3, 2047:14
**cared** [3] - 2000:21, 2003:3, 2003:8
**career** [4] - 1986:11, 2052:21, 2056:2
**carry** [1] - 2068:24
**cars** [3] - 2042:13, 2117:19
**case** [26] - 1941:3, 1946:1, 1975:2, 1983:20, 2004:5, 2048:5, 2065:12, 2069:17, 2088:8, 2100:8, 2107:19, 2129:23, 2129:24, 2130:24, 2131:10, 2131:18, 2133:14, 2133:15, 2134:15, 2139:9, 2139:13, 2139:22, 2141:4, 2141:7, 2141:12
**cash** [2] - 2036:11, 2037:24
**cashout** [1] - 2007:21
**Cathleen** [2] - 1943:11, 1943:14
**Cathy** [1] - 2043:9
**caused** [2] - 2064:23, 2096:16
**causing** [1] - 1990:3
**cell** [1] - 1953:4
**centered** [1] - 1990:5
**Central** [3] - 1939:5, 1939:17, 1940:9
**certain** [3] - 1996:23, 2006:13, 2006:14, 2069:13, 2080:2,

2080:7, 2080:25,
2088:10, 2088:15,
2137:19, 2139:8,
2142:4
**certainly** [10] - 1950:25, 1955:24, 1956:2, 1957:21, 2055:25, 2098:12, 2104:19, 2138:11, 2139:17, 2142:15
**certificate** [2] - 2060:12, 2075:5
**certificates** [5] - 2059:23, 2060:16, 2060:21, 2061:1, 2061:6
**Cessna** [6] - 2039:22, 2039:25, 2040:3, 2040:8, 2040:15, 2040:19
**chair** [1] - 2049:23
**chance** [3] - 2010:6, 2128:11, 2135:20
**change** [1] - 2051:18
**characterize** [1] - 1958:8
**characterized** [1] - 2003:10
**charge** [1] - 2006:24
**charged** [1] - 2140:19
**Charles** [3] - 2054:25, 2055:1, 2055:10
**chart** [3] - 2070:23, 2070:25, 2071:21
**charts** [1] - 2069:17
**check** [3] - 2065:5, 2068:25, 2069:1
**Chris** [2] - 2130:12
**Christmas** [9] - 2059:12, 2059:14, 2059:20, 2059:24, 2059:25, 2060:6, 2060:8, 2060:24, 2061:10
**chunk** [1] - 1958:9
**circling** [1] - 2072:25
**circuit** [1] - 2144:4
**Circuit** [1] - 2141:4
**circumstances** [3] - 2057:8, 2081:4, 2138:19
**city** [2] - 2011:11, 2051:25
**civil** [1] - 1993:10
**claim** [11] - 1965:14, 1966:21, 2084:22, 2093:17, 2093:19, 2093:24, 2094:1, 2096:5, 2105:15, 2105:22, 2105:24

**claimed** [2] - 1966:5, 2096:17
**claiming** [2] - 2094:1, 2139:15
**claims** [8] - 1966:3, 2084:21, 2084:24, 2086:25, 2089:17, 2093:13, 2093:14
**clarification** [1] - 2098:7
**clarify** [4] - 2137:22, 2138:23, 2140:15, 2147:6
**classified** [1] - 1989:23
**clause** [1] - 2107:23
**clear** [12] - 1963:16, 2047:8, 2047:15, 2090:1, 2091:5, 2091:7, 2093:12, 2093:23, 2116:18, 2139:7, 2139:24
**clearer** [1] - 2140:12
**clearly** [1] - 2144:22
**CLERK** [1] - 2049:16
**clerk** [3] - 2129:4, 2132:23, 2144:8
**clerks** [3] - 2128:23, 2132:13, 2132:22
**client** [5] - 2021:23, 2030:8, 2053:8, 2062:18, 2111:7
**clients** [2] - 2025:25, 2030:1
**close** [10] - 1964:20, 1993:5, 2008:1, 2019:13, 2019:22, 2041:11, 2041:13, 2049:23, 2073:16, 2120:17
**closely** [1] - 2094:16
**closer** [2] - 2037:5, 2053:24
**closing** [3] - 1978:9, 1978:18, 1978:23
**CMG** [4] - 2031:20, 2032:24, 2033:1
**Coast** [1] - 2135:1
**collect** [3] - 2092:6, 2092:9, 2092:16
**Colorado** [1] - 2050:22
**comfortable** [1] - 2061:21
**coming** [7] - 1974:4, 1978:23, 2039:10, 2093:20, 2096:21, 2133:5, 2144:25
**commence** [2] - 1969:7, 2105:13

**commenced** [1] - 1993:10
**comment** [2] - 2085:21, 2092:4
**commercial** [14] - 1964:9, 1964:15, 1965:2, 1982:19, 1983:7, 1983:11, 1984:24, 1985:1, 1985:5, 1985:17, 1986:14, 1986:21, 1986:24, 1987:5
**commercials** [13] - 1944:24, 1949:7, 1953:22, 1953:24, 1953:25, 1954:2, 1954:4, 1954:5, 1954:7, 1964:2, 1964:11, 1965:1, 1987:8
**Commission** [3] - 2027:22, 2028:6, 2028:20
**commitment** [1] - 1978:5
**committed** [1] - 1970:23
**committing** [1] - 2131:20
**common** [1] - 1961:17
**communicate** [1] - 2054:2
**communicating** [1] - 1987:16
**communication** [2] - 2019:25, 2131:21
**communications** [4] - 1966:14, 1987:17, 2006:10, 2080:23
**companies** [1] - 2121:21
**company** [58] - 1943:17, 1945:2, 1946:6, 1946:7, 1946:9, 1948:12, 1955:5, 1959:11, 1959:16, 1964:8, 1964:14, 1964:23, 1979:6, 1979:10, 1989:11, 1995:3, 1995:10, 1995:13, 1997:12, 1999:6, 1999:13, 2001:10, 2013:25, 2014:1, 2014:25, 2020:16, 2021:20, 2026:5, 2029:11, 2029:17, 2029:22, 2030:2, 2044:11, 2044:12, 2045:13, 2055:18,

2056:10, 2056:17, 2056:18, 2056:19, 2057:17, 2057:19, 2058:18, 2058:20, 2065:21, 2065:23, 2118:8, 2118:12, 2118:17, 2122:14, 2124:8, 2124:15, 2124:20, 2125:6, 2125:12, 2137:9

**Company** [2] - 2022:6, 2102:12

**compensation** [1] - 2108:21

**complaints** [2] - 1994:11, 1994:20

**complete** [1] - 1973:16

**completed** [1] - 2141:8

**completely** [1] - 2016:23

**completing** [1] - 2145:13

**complex** [1] - 1955:22

**complexities** [1] - 2129:19

**compliment** [2] - 2129:15, 2129:21

**computer** [17] - 2028:5, 2028:8, 2141:3, 2141:4, 2141:8, 2141:11, 2141:13, 2142:23, 2142:25, 2143:5, 2143:7, 2143:8, 2143:10, 2143:17, 2143:20, 2143:23, 2143:24

**concede** [1] - 2147:25

**conceded** [1] - 2053:11

**concern** [7] - 2012:10, 2027:16, 2099:4, 2123:9, 2133:11, 2140:2, 2146:11

**concerned** [13] - 1945:7, 1967:14, 1972:13, 1975:1, 2039:9, 2074:20, 2133:3, 2133:19, 2133:24, 2134:6, 2140:7, 2141:1, 2143:13

**concerning** [9] - 1954:10, 1955:1, 1963:23, 1965:10, 1966:4, 1970:13, 2024:23, 2101:17, 2110:11

**conclude** [1] - 2048:4

**concluded** [1] - 2018:15

**conclusion** [4] - 1981:4, 2086:13, 2086:23, 2142:16

**conclusions** [4] - 2088:25, 2089:23, 2091:8, 2091:17

**conditions** [1] - 2115:8

**conduct** [1] - 2093:2

**conducted** [1] - 1949:15, 1949:18, 2017:3

**confer** [1] - 2111:7

**conference** [9] - 1952:11, 1967:18, 2004:15, 2005:9, 2005:15, 2017:3, 2018:1, 2018:15, 2077:17

**confers** [2] - 2021:23, 2030:8

**confident** [2] - 2094:22, 2143:9

**confirm** [2] - 2137:8, 2137:22

**confirmed** [1] - 2096:18

**conflict** [1] - 2041:11

**conflicts** [2] - 2128:25, 2129:7

**confusing** [1] - 2025:11, 2088:7

**confusion** [2] - 2077:4, 2136:13

**connected** [1] - 2022:20

**connection** [16] - 1949:11, 1957:20, 1961:18, 1965:8, 1970:9, 1975:4, 1976:14, 1977:15, 1978:4, 1989:3, 2001:21, 2044:3, 2080:8, 2083:12, 2113:6, 2147:8

**conscientious** [1] - 2129:16

**consensual** [1] - 2142:11

**consent** [1] - 2144:15

**consider** [2] - 1980:14, 1980:16

**consideration** [1] - 1943:13

**considered** [1] - 2062:21

**considering** [1] -

1945:6

**consisted** [1] - 2096:20

**consistent** [1] - 1952:9

**consistently** [1] - 1966:21

**constant** [1] - 2012:17

**constantine** [12] - 2019:25, 2021:6, 2044:24, 2045:6, 2045:7, 2045:15, 2045:24, 2046:8, 2120:17, 2122:9, 2122:19, 2123:17

**CONSTANTINE** [1] - 1939:7

**Constantine** [135] - 1940:1, 1942:2, 1942:6, 1942:14, 1942:20, 1943:10, 1943:12, 1946:1, 1946:2, 1946:5, 1946:10, 1946:15, 1946:17, 1946:20, 1946:22, 1947:1, 1947:2, 1947:7, 1947:10, 1949:8, 1954:6, 1954:14, 1982:17, 1983:15, 1983:22, 1984:20, 1984:25, 1985:12, 1986:4, 1987:4, 1987:16, 1988:7, 1988:24, 1989:8, 1994:8, 1995:1, 1995:18, 1997:6, 1998:9, 1998:21, 2004:15, 2004:23, 2005:11, 2005:15, 2006:2, 2006:10, 2007:5, 2007:12, 2007:14, 2008:2, 2009:18, 2009:20, 2011:4, 2011:8, 2011:22, 2012:4, 2012:13, 2012:24, 2015:20, 2016:3, 2019:7, 2021:10, 2022:12, 2022:15, 2023:4, 2023:11, 2023:22, 2024:5, 2024:6, 2024:10, 2024:17, 2025:1, 2025:18, 2026:6, 2026:12, 2026:20, 2027:4, 2027:13, 2027:18, 2027:21, 2027:24, 2028:10, 2029:5, 2030:17,

2030:22, 2031:12, 2031:15, 2031:16, 2032:19, 2033:1, 2036:25, 2037:10, 2037:16, 2037:21, 2038:12, 2038:20, 2038:22, 2041:10, 2041:16, 2044:16, 2057:1, 2057:4, 2057:13, 2075:13, 2075:21, 2078:11, 2096:18, 2117:6, 2117:23, 2118:12, 2119:8, 2119:10, 2119:14, 2119:19, 2121:25, 2122:16, 2123:22, 2125:17, 2126:13, 2136:5, 2136:16, 2136:21, 2136:25, 2137:5, 2140:1, 2140:4, 2140:5, 2140:11, 2140:17, 2147:24, 2148:2, 2148:3, 2148:8, 2148:12, 2148:13

**Constantine's** [8] - 1943:8, 1945:2, 1986:20, 2012:6, 2031:25, 2033:8, 2042:2, 2133:14

**consultation** [3] - 2055:13, 2107:3, 2107:7

**consulting** [1] - 2055:16

**CONT'D** [1] - 2150:3

**Cont'd** [1] - 1941:24

**contact** [3] - 2007:19, 2083:11, 2146:15

**contacted** [3] - 2020:2, 2121:7, 2125:10

**contained** [3] - 1998:22, 2020:13, 2145:18

**contains** [1] - 2002:2

**contemplated** [1] - 1993:22

**content** [5] - 1986:13, 2082:4, 2085:12, 2115:4, 2116:1

**contesting** [1] - 2143:16

**context** [2] - 1972:4, 1973:2

**continue** [11] - 1941:22, 2032:11, 2035:2, 2046:11, 2056:7, 2107:13,

2109:20, 2130:11, 2133:9, 2134:13, 2134:14

**Continued** [9] - 1951:12, 1952:12, 1965:20, 1967:19, 1975:12, 1976:1, 2076:7, 2077:18, 2082:1

**CONTINUED** [2] - 2011:1, 2019:2

**continued** [7] - 2006:10, 2010:13, 2017:4, 2018:16, 2019:1, 2081:19, 2114:2

**continuing** [1] - 2137:3

**contract** [15] - 2051:3, 2083:9, 2106:22, 2106:25, 2107:2, 2107:6, 2107:12, 2107:23, 2107:25, 2108:2, 2108:4, 2108:8, 2108:12, 2108:20, 2108:22

**contrary** [1] - 1952:7

**contribute** [2] - 1959:1, 2077:12

**contributed** [5] - 1973:24, 2014:13, 2034:6, 2034:9, 2145:1

**contribution** [8] - 1958:21, 1993:9, 1993:19, 1996:13, 2004:14, 2005:3, 2035:25, 2041:20

**contributors** [2] - 1995:19, 2004:16

**control** [3] - 1971:2, 1997:22, 2012:6

**controls** [1] - 2132:17

**controversy** [1] - 2011:10

**convenience** [1] - 2001:12

**conversation** [36] - 1947:20, 1947:23, 1948:4, 1948:9, 1948:24, 1949:5, 1953:2, 1953:6, 1963:22, 1965:8, 1968:8, 1968:22, 1968:25, 1969:5, 1969:20, 1970:11, 1971:2, 1971:4, 1973:3, 1974:7, 1974:13, 1983:6, 1996:3, 2015:6,

2015:7, 2023:8, 2024:5, 2024:25, 2037:20, 2042:5, 2042:9, 2042:12, 2062:13, 2062:14, 2090:9, 2136:16
**conversations** [15] - 1953:11, 1953:16, 1970:10, 1996:4, 2012:16, 2014:2, 2014:24, 2024:1, 2024:4, 2052:8, 2058:21, 2080:24, 2106:10, 2106:13, 2112:5
**conveyed** [1] - 1945:24
**conveys** [2] - 1943:11, 1943:14
**convincing** [1] - 2064:25
**CONWAY** [1] - 1940:1
**cop** [3] - 2014:3, 2016:2, 2016:5
**copies** [1] - 1994:20
**cops** [1] - 2010:5
**copy** [11] - 1942:19, 1945:19, 1960:21, 1960:24, 2069:12, 2084:1, 2115:19, 2146:9, 2146:10, 2146:17, 2147:6
**Corp** [1] - 1957:15
**Corporate** [3] - 2027:22, 2028:6, 2028:20
**corporation** [4] - 2022:9, 2025:3, 2025:8, 2025:9
**correct** [142] - 1944:5, 1946:1, 1946:15, 1948:13, 1948:19, 1950:21, 1953:4, 1953:5, 1954:21, 1955:6, 1960:25, 1961:10, 1961:11, 1961:14, 1961:19, 1963:2, 1963:13, 1964:16, 1965:11, 1965:12, 1968:6, 1970:25, 1972:17, 1976:25, 1977:7, 1978:6, 1978:18, 1979:21, 1981:25, 1982:1, 1982:23, 1982:24, 1983:1, 1983:7, 1983:15, 1984:18, 1985:14, 1985:15, 1986:7, 1986:17, 1986:21,

1987:20, 1988:21, 1988:22, 1989:4, 1989:5, 1989:9, 1990:14, 1990:15, 1990:19, 1991:23, 1991:25, 1992:4, 1992:19, 1992:20, 1992:25, 1993:19, 1993:20, 1998:19, 1999:23, 2000:7, 2000:8, 2002:7, 2003:1, 2004:11, 2004:12, 2007:17, 2008:23, 2008:24, 2008:25, 2013:2, 2013:5, 2019:25, 2020:4, 2020:14, 2020:17, 2020:18, 2021:3, 2022:7, 2023:1, 2023:15, 2025:15, 2025:21, 2026:12, 2026:20, 2027:15, 2028:24, 2033:1, 2033:9, 2033:20, 2037:17, 2037:18, 2039:4, 2039:25, 2042:4, 2043:10, 2043:11, 2043:13, 2044:7, 2044:12, 2045:17, 2045:21, 2046:5, 2047:3, 2047:17, 2058:11, 2074:10, 2081:17, 2081:18, 2083:3, 2083:14, 2084:12, 2084:23, 2085:1, 2085:23, 2086:15, 2092:5, 2099:21, 2100:3, 2102:3, 2102:8, 2106:3, 2106:20, 2107:8, 2107:24, 2108:18, 2110:20, 2116:20, 2117:6, 2117:10, 2118:9, 2118:23, 2119:21, 2119:22, 2119:25, 2120:3, 2121:8, 2121:22, 2122:20, 2123:2, 2124:6, 2127:11
**correctly** [2] - 1987:13, 2111:25
**counsel** [2] - 1960:4, 2126:23
**Counsel** [1] - 2111:7
**counter** [1] - 2005:19
**Country** [1] - 1940:1
**couple** [12] - 1958:6, 1962:10, 2026:22,

2039:14, 2074:21, 2127:21, 2128:20, 2130:22, 2131:7, 2135:25, 2136:1, 2139:25
**course** [18] - 1948:24, 1950:12, 1953:16, 1968:25, 1969:4, 1969:21, 1969:24, 1970:11, 1970:15, 1971:6, 1971:13, 1983:5, 2015:23, 2080:21, 2099:16, 2106:6, 2106:12, 2145:4
**COURT** [157] - 1939:1, 1941:5, 1941:13, 1941:19, 1943:1, 1944:20, 1945:9, 1946:9, 1951:8, 1952:1, 1952:9, 1956:7, 1959:4, 1960:9, 1961:2, 1961:4, 1961:7, 1964:19, 1965:17, 1966:1, 1966:24, 1967:6, 1967:15, 1971:11, 1972:19, 1974:5, 1977:19, 1979:2, 1979:18, 1979:25, 1980:6, 1980:20, 1981:6, 1981:13, 1981:17, 1982:9, 1984:9, 1985:22, 1986:1, 1988:14, 1991:14, 1993:15, 1996:18, 2013:16, 2013:19, 2017:2, 2018:2, 2018:14, 2021:22, 2028:15, 2028:18, 2028:25, 2030:11, 2031:4, 2031:6, 2033:13, 2036:14, 2036:20, 2042:25, 2047:1, 2047:19, 2047:22, 2047:24, 2048:10, 2049:4, 2049:6, 2049:9, 2049:13, 2049:22, 2053:10, 2061:3, 2067:14, 2067:17, 2069:15, 2076:3, 2077:10, 2077:15, 2078:5, 2078:8, 2079:2, 2079:14, 2087:15, 2087:20, 2087:24, 2088:2, 2089:1, 2089:5, 2089:20, 2090:5, 2091:5, 2092:20,

2093:6, 2094:7, 2094:12, 2094:22, 2094:25, 2095:18, 2095:21, 2097:13, 2097:16, 2098:15, 2098:23, 2100:7, 2100:18, 2100:25, 2103:24, 2104:21, 2107:16, 2108:24, 2109:19, 2109:24, 2111:23, 2113:14, 2113:19, 2116:9, 2116:12, 2116:14, 2116:23, 2122:7, 2122:14, 2126:20, 2128:3, 2128:6, 2128:9, 2130:3, 2130:15, 2130:25, 2131:4, 2131:9, 2132:9, 2132:13, 2132:21, 2135:3, 2135:9, 2135:19, 2135:25, 2137:12, 2138:8, 2139:4, 2140:14, 2140:23, 2142:21, 2143:19, 2144:7, 2145:15, 2145:19, 2146:5, 2146:8, 2146:14, 2146:24, 2147:6, 2147:16, 2147:20, 2148:6, 2148:10, 2148:18, 2148:21
**Court** [8] - 1940:4, 1940:7, 1981:1, 1999:2, 2019:1, 2135:6, 2141:20, 2147:23
**court** [9] - 1953:1, 1968:1, 1980:14, 2077:1, 2078:1, 2088:15, 2089:10, 2094:17, 2138:15
**Court's** [2] - 1981:10, 2147:22
**court's** [1] - 2092:3
**Courthouse** [1] - 1939:4
**courtroom** [7] - 1941:18, 2048:6, 2049:8, 2053:6, 2088:1, 2130:1, 2138:18
**cover** [7] - 1963:21, 2105:2, 2136:20, 2136:23, 2137:17, 2138:1, 2147:14
**covered** [2] - 2063:6, 2134:10
**covering** [1] - 2070:24

**created** [3] - 2110:19, 2131:23, 2146:3
**creating** [1] - 1961:14
**credit** [46] - 1999:16, 2031:17, 2034:16, 2056:18, 2056:19, 2065:13, 2065:14, 2065:18, 2065:21, 2065:25, 2066:4, 2066:9, 2066:13, 2068:20, 2068:24, 2069:4, 2070:2, 2070:5, 2070:10, 2070:11, 2070:15, 2071:2, 2071:10, 2071:12, 2072:2, 2072:4, 2072:15, 2073:6, 2073:12, 2073:13, 2073:20, 2073:23, 2089:13, 2093:14, 2093:15, 2094:2, 2094:10, 2105:17, 2105:25, 2108:6, 2127:4, 2127:17, 2142:8, 2142:10, 2144:23, 2145:8
**Credit** [1] - 2067:23
**criminal** [1] - 2145:9
**critical** [1] - 2142:7
**critically** [1] - 1949:3
**CROSS** [12] - 1945:11, 1976:1, 1982:12, 2011:1, 2019:2, 2079:3, 2082:1, 2117:1, 2150:5, 2150:7, 2150:19, 2150:21
**cross** [18] - 1941:22, 1945:10, 1980:1, 1980:16, 1980:20, 1981:1, 1981:9, 2022:21, 2034:18, 2036:2, 2037:15, 2039:2, 2040:10, 2041:23, 2079:2, 2098:12, 2137:15, 2137:19
**CROSS-EXAMINATION** [8] - 1945:11, 1976:1, 1982:12, 2079:3, 2082:1, 2150:5, 2150:7, 2150:19
**cross-examination** [11] - 1941:22, 1945:10, 1980:1, 1980:16, 2034:18, 2036:2, 2037:15, 2039:2, 2040:10,

2041:23, 2079:2
**cross-examine** [1] - 2098:12
**crystal** [3] - 2093:12, 2093:22, 2093:23
**current** [1] - 1977:14, 2000:9, 2000:13
**CURRIE** [1] - 1939:15
**cursor** [2] - 2072:25, 2073:1

# D

**damage** [2] - 2096:11, 2096:16
**damages** [1] - 2084:23
**dances** [1] - 2062:12
**Darryl** [1] - 2130:7
**date** [18] - 1988:12, 1988:17, 1995:22, 2005:2, 2006:11, 2008:23, 2028:21, 2028:22, 2031:18, 2063:21, 2063:22, 2067:4, 2073:23, 2073:24, 2078:19, 2130:22, 2133:1
**dated** [11] - 1943:18, 1944:4, 1953:10, 1985:11, 1986:4, 1994:7, 1996:11, 2005:2, 2030:17, 2031:11, 2068:11
**dates** [6] - 2021:7, 2086:8, 2086:12, 2117:22, 2131:11, 2133:18
**day-to-day** [1] - 2029:22
**days** [14] - 2063:24, 2085:4, 2085:5, 2126:2, 2130:21, 2130:22, 2131:2, 2131:4, 2133:16, 2133:20, 2133:25, 2134:13, 2139:25
**deal** [11] - 1964:1, 2000:12, 2006:19, 2031:20, 2063:10, 2064:3, 2064:18, 2065:10, 2095:20, 2102:20, 2146:19
**dealings** [1] - 2106:18
**debt** [2] - 2029:24, 2032:3
**decent** [1] - 2133:8
**decide** [2] - 2032:10, 2135:4
**decided** [1] - 1961:12,

2036:23, 2088:13, 2133:6
**decides** [1] - 2032:3
**deciding** [2] - 1945:5, 1953:22
**decision** [3] - 2088:23, 2135:7, 2144:4
**decrease** [1] - 2079:22
**deem** [1] - 2088:15
**default** [2] - 2073:21, 2073:25
**DEFENDANT** [1] - 2151:9
**Defendant** [3] - 1939:21, 1940:1, 2031:8
**defendant** [3] - 1944:8, 1944:16, 2146:4
**defendant's** [1] - 2145:25
**Defendant's** [6] - 1960:10, 2016:13, 2028:1, 2028:19, 2031:2, 2079:16
**DEFENDANT'S** [3] - 2151:6, 2151:8, 2151:10
**defendants** [1] - 2067:12
**Defendants** [1] - 1939:9
**defense** [8] - 1966:20, 2090:16, 2130:24, 2131:10, 2131:19, 2137:14, 2140:16, 2144:21
**Defense** [3] - 1974:4, 1986:2, 1996:9
**DEFENSE** [1] - 2151:7
**define** [1] - 1974:21
**definite** [2] - 1956:21, 1957:12
**definitely** [5] - 1947:9, 1958:16, 2001:11, 2067:10, 2110:4
**defrauded** [2] - 1958:25, 2013:14
**Del** [1] - 2121:18
**Delaware** [2] - 2022:6, 2022:14
**deliberations** [1] - 2133:17
**demanded** [1] - 2074:16
**deposition** [7] - 1970:16, 1970:18, 1971:6, 1971:13,

1971:22, 2003:18, 2118:3
**depth** [1] - 1958:15
**describe** [2] - 2069:3
**described** [1] - 2004:8
**describing** [1] - 2138:17
**detail** [3] - 1953:14, 1956:20, 1974:10
**detailed** [2] - 1973:22, 1976:13
**details** [6] - 1966:24, 1991:16, 2007:25, 2024:24, 2029:21
**determination** [2] - 2086:24, 2087:18
**determined** [1] - 2096:9
**develop** [1] - 1958:22
**developed** [2] - 1961:21, 2084:12
**Development** [1] - 2144:24
**development** [7] - 1958:3, 1958:18, 1963:12, 2064:11, 2110:8, 2110:17, 2111:19
**Diamante** [6] - 2041:12, 2041:13, 2041:18, 2043:19, 2047:9, 2121:18
**Diamanté** [19] - 1992:13, 1993:4, 1995:3, 1995:4, 1995:7, 1995:9, 1995:10, 1995:11, 1997:10, 1997:13, 1999:3, 1999:8, 1999:14, 2000:5, 2000:6, 2000:22, 2001:21, 2003:3, 2008:1
**Diamonte** [4] - 1956:22, 1957:4, 1957:6, 1957:11
**Diana** [1] - 2086:3
**difference** [1] - 1997:24
**differences** [4] - 2103:12, 2103:17, 2104:5, 2104:9
**different** [9] - 1946:17, 1952:4, 1953:13, 2037:2, 2051:18, 2088:9, 2115:2, 2136:15, 2148:19
**differential** [1] - 1978:14
**difficult** [4] - 1980:18,

2032:15, 2053:21, 2135:5
**difficulties** [1] - 1987:15
**dime** [1] - 2090:11
**DIRECT** [4] - 1941:24, 2050:1, 2150:3, 2150:17
**direct** [31] - 1947:12, 1948:15, 1954:12, 1956:23, 1958:1, 1961:8, 1963:1, 1963:4, 1963:21, 1965:7, 1973:21, 1978:3, 1980:12, 1981:23, 1994:25, 2008:13, 2020:11, 2022:21, 2043:17, 2095:5, 2096:23, 2096:24, 2101:3, 2111:15, 2122:25, 2124:19, 2127:5, 2131:7, 2132:16, 2136:17, 2137:19
**directing** [1] - 2046:18
**directly** [6] - 2026:11, 2027:15, 2073:20, 2075:22, 2077:8, 2125:12
**disability** [2] - 2081:8
**disagree** [3] - 2138:10, 2138:11, 2147:22
**DiSalvo** [1] - 2130:13
**disbursed** [1] - 1973:17
**disbursements** [6] - 1974:3, 1974:9, 1974:14, 1974:22, 1976:16, 1976:20
**discern** [1] - 2084:2
**disclosed** [1] - 2141:22
**discontinue** [1] - 1969:6
**discovered** [1] - 2141:23
**discovery** [1] - 2098:10
**discuss** [12] - 1962:19, 1969:21, 1969:24, 1970:12, 1987:21, 2008:10, 2023:24, 2027:21, 2048:5, 2087:21, 2129:24, 2141:18
**discussed** [17] - 1956:11, 1969:10, 1969:14, 1976:20, 1983:22, 1987:4,

1989:3, 1990:19, 1992:12, 1992:18, 1998:10, 2002:13, 2003:9, 2064:18, 2095:6, 2122:13, 2123:1
**discussing** [14] - 1987:5, 1989:6, 1989:14, 1995:23, 1997:12, 2002:10, 2021:11, 2024:20, 2025:1, 2025:24, 2028:9, 2029:5, 2030:24, 2035:25
**discussion** [15] - 1947:19, 1954:19, 1956:9, 1970:6, 1976:22, 1989:8, 1990:5, 1990:10, 1998:25, 2029:9, 2029:15, 2110:11, 2123:21, 2126:5, 2139:8
**discussions** [16] - 1947:1, 1947:16, 1954:10, 1954:13, 1954:25, 1957:19, 1965:9, 1968:4, 1970:24, 1995:1, 1997:8, 2023:22, 2056:13, 2063:10, 2095:11, 2117:16
**dismissed** [1] - 2032:14
**displayed** [1] - 2032:22
**disposition** [1] - 1977:4
**Dispute** [1] - 2009:19
**dispute** [17] - 1968:17, 1968:21, 1969:1, 1969:6, 1969:10, 1969:13, 1970:4, 1970:7, 1970:13, 1981:25, 1997:24, 2009:18, 2080:3, 2084:11, 2084:17, 2105:23, 2106:11
**disputes** [3] - 1955:1, 2043:17, 2044:3
**dissatisfied** [1] - 1962:23
**distribution** [1] - 2145:5
**DISTRICT** [2] - 1939:1, 1939:1
**District** [1] - 1939:12
**ditched** [1] - 2131:6
**diversion** [2] - 2130:8, 2136:11

**diversions** [3] - 2137:24, 2139:21, 2140:22
**diverted** [1] - 2139:16
**divvied** [1] - 1990:21
**doctor** [1] - 2129:2
**doctor's** [1] - 2100:19
**document** [141] - 1942:15, 1942:19, 1943:20, 1945:16, 1945:18, 1945:22, 1945:24, 1946:12, 1946:21, 1946:23, 1946:25, 1947:2, 1951:7, 1953:9, 1959:19, 1959:21, 1959:24, 1960:7, 1960:14, 1960:15, 1960:19, 1960:21, 1963:10, 1966:6, 1971:17, 1971:20, 1974:18, 1974:21, 1975:1, 1975:8, 1976:13, 1976:20, 1977:6, 1978:8, 1978:14, 2009:2, 2009:8, 2009:10, 2010:7, 2020:20, 2021:2, 2021:17, 2022:3, 2023:4, 2023:23, 2028:4, 2028:21, 2029:2, 2030:15, 2037:9, 2037:12, 2037:13, 2037:19, 2038:7, 2045:7, 2066:23, 2066:25, 2067:3, 2067:4, 2067:5, 2067:20, 2068:8, 2068:11, 2068:12, 2068:19, 2079:10, 2079:13, 2079:18, 2080:18, 2081:5, 2081:7, 2081:9, 2081:13, 2081:15, 2082:4, 2082:18, 2082:20, 2082:21, 2083:16, 2083:19, 2083:22, 2083:25, 2084:7, 2084:8, 2084:9, 2084:16, 2085:9, 2085:12, 2085:15, 2085:22, 2086:1, 2086:2, 2087:2, 2087:4, 2088:24, 2097:20, 2097:21, 2097:25, 2098:9, 2098:11, 2098:17, 2099:8, 2099:9, 2099:12,

2099:22, 2099:23, 2100:4, 2101:12, 2101:15, 2101:20, 2101:22, 2101:25, 2102:12, 2102:21, 2102:22, 2103:5, 2103:7, 2103:15, 2103:16, 2104:1, 2104:11, 2104:20, 2111:12, 2112:13, 2112:20, 2113:21, 2113:23, 2115:2, 2115:7, 2116:5, 2116:6, 2116:12, 2125:21, 2136:4, 2136:17, 2137:1, 2144:21, 2145:14, 2146:3
**documentary** [3] - 2069:16, 2069:25, 2072:12
**documentation** [31] - 1942:1, 1942:7, 1958:10, 2001:8, 2020:25, 2022:19, 2022:20, 2025:19, 2026:17, 2027:12, 2027:18, 2037:16, 2045:6, 2045:10, 2045:12, 2045:16, 2060:13, 2062:7, 2062:8, 2072:1, 2097:14, 2097:17, 2098:2, 2101:4, 2101:8, 2101:17, 2123:21, 2123:22, 2124:2, 2146:19
**documented** [1] - 2028:9
**documents** [25] - 1958:2, 1958:11, 1958:14, 2020:9, 2020:21, 2022:22, 2027:5, 2027:7, 2071:8, 2081:1, 2082:13, 2082:15, 2096:6, 2099:17, 2100:1, 2105:1, 2113:7, 2116:2, 2134:19, 2141:10, 2142:1, 2142:4, 2143:13, 2143:15, 2143:16
**dog** [2] - 2009:13, 2100:6
**dollars** [3] - 1956:1, 1998:5, 2047:13
**DOMINIC** [1] - 1940:8
**done** [16] - 1946:23, 1947:13, 1950:22,

1953:23, 1963:12, 2026:7, 2026:10, 2030:10, 2031:10, 2032:15, 2037:2, 2055:13, 2100:21, 2128:12, 2141:14, 2143:23
**Donovan** [1] - 2052:12
**door** [3] - 2014:15, 2092:1, 2092:21
**doubt** [2] - 2002:6, 2065:7
**down** [16] - 1974:8, 1992:24, 1995:23, 2000:3, 2023:10, 2038:2, 2041:15, 2047:22, 2071:11, 2086:12, 2087:24, 2092:7, 2101:13, 2128:6, 2134:20
**drafted** [2] - 2050:15, 2050:16
**drama** [1] - 2018:2
**drawn** [3] - 2070:6, 2070:10, 2071:1
**drew** [2] - 2023:11, 2038:9
**driveway** [1] - 1948:1
**drop** [1] - 1966:16
**drove** [1] - 2121:10
**due** [2] - 2107:19, 2127:10
**duly** [1] - 2049:19
**duplicate** [1] - 2079:13
**during** [44] - 1948:24, 1950:5, 1950:12, 1953:16, 1968:25, 1969:4, 1969:21, 1969:24, 1970:11, 1970:15, 1971:13, 1983:5, 1994:25, 1998:16, 2015:23, 2020:3, 2021:7, 2022:21, 2029:16, 2035:4, 2053:12, 2084:25, 2086:17, 2095:5, 2097:8, 2099:16, 2106:6, 2106:12, 2107:13, 2107:18, 2107:23, 2108:3, 2108:14, 2120:25, 2123:13, 2124:7, 2124:11, 2124:18, 2125:16, 2125:24, 2137:6, 2140:18, 2145:1
**dust** [1] - 2011:25
**duty** [1] - 2088:11

# E

**e-mail** [12] - 2016:18, 2019:6, 2030:17, 2030:21, 2031:11, 2031:12, 2031:19, 2031:23, 2080:23, 2136:5, 2136:7, 2137:6
**e-mailing** [1] - 2041:10
**e-mails** [4] - 2031:13, 2047:12, 2054:1, 2054:2
**early** [2] - 1954:4, 2054:23
**ease** [5] - 1955:21, 2061:21, 2061:25, 2062:2, 2062:14
**easily** [1] - 2131:12
**EASTERN** [1] - 1939:1
**easy** [1] - 2053:20
**Edenhom** [1] - 2039:17
**education** [1] - 2085:19
**effect** [3] - 1954:7, 2009:10, 2075:23
**efficient** [1] - 2100:20
**effort** [8] - 1997:10, 1997:21, 2007:15, 2012:21, 2088:22, 2090:19, 2093:1, 2136:19
**efforts** [8] - 1958:20, 1958:21, 2007:16, 2008:2, 2034:19, 2034:22, 2035:9, 2109:16
**eight** [3] - 1949:14, 2120:23, 2131:1
**either** [21] - 1951:4, 1962:20, 1968:12, 1980:15, 1980:16, 1981:3, 2006:10, 2014:11, 2015:14, 2073:19, 2074:15, 2075:12, 2075:22, 2078:23, 2100:9, 2121:3, 2125:13, 2125:16, 2129:9, 2142:17, 2146:1
**elicit** [1] - 2098:13
**eliciting** [1] - 2092:23
**email** [24] - 1985:4, 1985:11, 1985:13, 1985:16, 1986:5, 1986:8, 1986:13, 1988:11, 1988:14, 1994:7, 1994:8,

1994:10, 1994:13, 1996:11, 1996:15, 1996:20, 1996:25, 1997:7, 1997:12, 1998:17, 1998:22, 2002:6, 2006:1, 2007:11
**emails** [5] - 1998:9, 1998:19, 2004:23, 2005:1, 2006:7
**emergency** [1] - 2138:8
**emphasize** [1] - 2134:9
**enclosing** [1] - 1994:11
**encounter** [4] - 2117:15, 2118:1, 2119:7, 2119:11
**end** [11] - 1969:19, 1998:14, 2002:15, 2006:18, 2006:19, 2006:20, 2056:3, 2061:20, 2126:12, 2130:11, 2135:14
**End** [3] - 1952:11, 1967:18, 2077:17
**endeavor** [1] - 2144:11
**endeavors** [1] - 2000:14
**ended** [3] - 1941:21, 2063:2, 2134:24
**ending** [1] - 2071:11
**endlessly** [1] - 2143:22
**ends** [1] - 2099:19
**engage** [1] - 2054:8
**engaged** [1] - 1961:9
**English** [1] - 2085:22
**enhance** [1] - 1983:11
**ensued** [5] - 1980:4, 1981:15, 2087:22, 2100:16, 2100:23
**enter** [2] - 2132:7, 2141:19
**entered** [1] - 2069:25
**Enterprise** [2] - 2139:8, 2139:17
**Enterprises** [3] - 2042:22, 2140:21, 2147:25
**enters** [2] - 1941:17, 2049:7
**entire** [10] - 1959:20, 1960:15, 2016:21, 2019:5, 2083:25, 2101:22, 2103:5, 2103:15, 2123:4, 2142:13

**entities** [1] - 2096:22
**entitled** [7] - 1959:20, 1960:15, 2092:22, 2101:22, 2103:5, 2103:14, 2104:19
**entity** [2] - 2022:4, 2025:24
**entries** [2] - 2039:14, 2140:20
**entry** [2] - 2039:17, 2040:25
**envelope** [2] - 2060:7, 2060:24
**environment** [1] - 2032:15
**Equipment** [1] - 2122:1
**equity** [1] - 2032:3
**Escer** - 2122:5
**especially** [1] - 1998:10
**essence** [1] - 2060:25
**essentially** [1] - 2097:5
**establish** [2] - 2018:8, 2122:15
**establishment** [1] - 1958:18
**estate** [11] - 1957:23, 1957:25, 2069:5, 2069:7, 2109:5, 2109:12, 2109:16, 2110:5, 2110:12, 2110:17, 2121:14
**estimate** [5] - 2128:16, 2129:8, 2130:21, 2132:19, 2134:12
**Ethan** [1] - 1989:21
**Eufora** [186] - 1942:2, 1942:14, 1943:7, 1943:16, 1944:1, 1944:9, 1944:15, 1944:17, 1944:25, 1945:5, 1945:6, 1946:6, 1946:10, 1946:11, 1946:15, 1946:18, 1946:19, 1946:22, 1947:3, 1947:8, 1947:14, 1947:17, 1947:20, 1948:12, 1948:19, 1949:1, 1949:6, 1953:9, 1953:11, 1953:15, 1959:6, 1959:10, 1959:17, 1963:12, 1963:23, 1964:7, 1964:10, 1964:14, 1964:22, 1965:2, 1965:4,

1969:24, 1982:23, 1983:11, 1983:23, 1984:3, 1986:15, 1986:20, 1989:8, 1989:14, 1989:25, 1990:3, 1990:7, 1990:12, 1991:2, 1991:21, 1993:1, 1993:3, 2000:22, 2001:16, 2003:6, 2009:21, 2011:5, 2012:6, 2013:14, 2014:13, 2014:20, 2020:8, 2020:16, 2020:24, 2021:2, 2021:13, 2021:18, 2021:20, 2022:5, 2022:9, 2022:13, 2022:15, 2022:20, 2023:13, 2023:24, 2024:3, 2024:8, 2024:12, 2025:14, 2026:8, 2027:15, 2027:19, 2028:21, 2029:10, 2029:15, 2029:17, 2030:1, 2030:24, 2032:13, 2032:24, 2035:17, 2035:18, 2036:1, 2036:24, 2037:17, 2038:13, 2038:15, 2038:16, 2044:10, 2044:11, 2044:17, 2045:2, 2047:9, 2047:10, 2056:11, 2056:14, 2056:17, 2057:12, 2057:16, 2057:23, 2058:10, 2058:17, 2058:25, 2059:5, 2059:22, 2060:14, 2061:12, 2063:7, 2063:15, 2074:14, 2074:16, 2074:19, 2074:25, 2075:4, 2075:5, 2075:24, 2078:13, 2078:19, 2093:2, 2095:7, 2095:9, 2095:13, 2096:6, 2096:7, 2096:12, 2096:21, 2097:3, 2098:2, 2099:18, 2101:5, 2101:9, 2101:18, 2117:17, 2118:8, 2119:24, 2120:20, 2120:23, 2121:4, 2122:23, 2123:1, 2123:4, 2123:9, 2123:24, 2124:8, 2124:9, 2124:12, 2124:13,

2124:16, 2124:19, 2125:11, 2125:18, 2125:25, 2126:6, 2126:9, 2126:14, 2126:16, 2136:6, 2140:2, 2140:10, 2140:19, 2144:13, 2148:1, 2148:7, 2148:11, 2148:13, 2148:15
**Eufora's** [3] - 2001:18, 2119:19, 2125:6
**evaluation** [2] - 2014:25, 2047:11
**evening** [1] - 1941:11
**eventually** [4] - 1949:9, 2052:8, 2060:6, 2074:2
**EVIDENCE** [5] - 2151:2, 2151:3, 2151:6, 2151:7, 2151:11
**evidence** [48] - 1942:23, 1943:4, 1943:5, 1952:10, 1960:11, 1960:14, 1961:5, 1973:23, 1974:18, 1977:18, 1977:20, 1985:21, 1986:2, 1994:4, 1996:9, 2004:20, 2005:24, 2007:10, 2008:17, 2020:5, 2028:19, 2031:8, 2067:19, 2069:16, 2069:25, 2070:23, 2071:9, 2072:12, 2079:17, 2088:10, 2091:13, 2091:14, 2092:24, 2096:8, 2097:8, 2101:21, 2113:12, 2140:9, 2142:1, 2142:4, 2142:14, 2142:19, 2143:1, 2143:4, 2143:12, 2144:12, 2148:10, 2148:14
**exact** [5] - 1949:5, 2024:24, 2053:22, 2133:1
**exactly** [6] - 1962:10, 1991:8, 1994:15, 2091:12, 2093:5, 2128:16
**examination** [13] - 1941:22, 1945:10, 1963:21, 1980:1, 1980:16, 2034:18, 2036:2, 2037:15, 2039:2, 2040:10,

2041:23, 2079:2, 2095:6
**EXAMINATION** [24] - 1941:24, 1945:11, 1976:1, 1982:12, 2011:1, 2019:2, 2033:14, 2043:2, 2044:22, 2050:1, 2079:3, 2082:1, 2117:1, 2126:21, 2150:3, 2150:5, 2150:7, 2150:9, 2150:11, 2150:13, 2150:17, 2150:19, 2150:21, 2150:23
**examine** [1] - 2098:12
**examined** [1] - 2049:19
**examiners** [1] - 2142:3
**example** [2] - 1975:1, 2093:12
**except** [1] - 2092:20
**excited** [2] - 1949:6, 1964:6
**excluded** [1] - 2091:1
**excuse** [3] - 1954:16, 1955:2, 1979:21
**excused** [3] - 2047:23, 2128:8, 2133:6
**executed** [1] - 2021:2
**Exhibit** [62] - 1942:10, 1943:1, 1943:3, 1943:25, 1945:17, 1945:18, 1945:20, 1959:20, 1960:5, 1960:9, 1960:10, 1960:14, 1974:18, 1976:11, 1986:2, 1988:19, 1996:9, 1996:10, 2016:13, 2022:24, 2022:25, 2028:2, 2028:19, 2031:2, 2031:8, 2036:6, 2039:13, 2058:1, 2066:21, 2066:22, 2067:18, 2069:19, 2069:21, 2070:24, 2071:20, 2072:13, 2072:24, 2079:12, 2079:15, 2079:16, 2080:17, 2085:9, 2099:10, 2101:21, 2103:4, 2103:14, 2104:2, 2104:12, 2111:9, 2112:14, 2113:12, 2115:1, 2115:3, 2115:4, 2115:5, 2115:7, 2115:10,

2116:3, 2116:6, 2116:13, 2144:12
**EXHIBIT** [7] - 2151:2, 2151:3, 2151:6, 2151:7, 2151:8, 2151:9, 2151:10
**exhibit** [11] - 1987:12, 2016:20, 2016:21, 2017:1, 2018:7, 2019:5, 2020:6, 2020:15, 2030:9, 2079:11, 2098:9
**exhibits** [4] - 2009:3, 2022:25, 2026:22, 2071:21
**Exhibits** [2] - 1988:3, 1994:17
**exist** [1] - 2083:5
**existence** [1] - 2142:10
**expectation** [1] - 2133:22
**expedite** [1] - 1981:4
**expenditures** [1] - 2005:16
**expense** [1] - 1998:10
**experience** [1] - 1962:16
**experienced** [1] - 2073:22
**explain** [10] - 1972:21, 1972:24, 1972:25, 2031:6, 2041:4, 2068:5, 2136:2, 2136:25, 2141:6, 2144:2
**explained** [1] - 2137:7
**explanation** [1] - 2148:23
**extend** [2] - 2131:19, 2137:23
**extended** [1] - 2068:20
**Extension** [1] - 2067:22
**extensive** [1] - 1981:10
**extent** [6] - 2034:22, 2092:15, 2093:25, 2109:12, 2138:9, 2148:12
**extra** [5] - 1944:8, 1989:11, 2020:23, 2032:24, 2033:6
**extremely** [2] - 1987:8, 2138:16
**extrinsic** [1] - 2090:13
**eye** [1] - 1941:11

**F**

face [4] - 2052:24, 2053:14
face-to-face [2] - 2052:24, 2053:14
facility [1] - 2119:20
facsimile [1] - 2104:25
fact [42] - 1967:1, 1984:16, 1990:6, 1990:17, 1990:23, 1991:9, 1993:22, 2005:24, 2019:10, 2020:11, 2022:17, 2025:24, 2027:13, 2027:23, 2045:3, 2065:5, 2083:1, 2085:3, 2087:2, 2088:9, 2088:14, 2088:16, 2088:19, 2088:24, 2089:4, 2089:24, 2090:8, 2090:18, 2091:4, 2091:18, 2097:16, 2099:17, 2100:8, 2100:10, 2105:21, 2107:10, 2109:2, 2109:15, 2111:18, 2142:23, 2143:17
facts [1] - 1977:17
faded [3] - 2115:12, 2115:13, 2115:19
failure [1] - 2096:15
fair [26] - 1944:11, 1945:17, 1954:19, 1955:2, 1984:14, 1991:24, 1995:17, 2006:9, 2010:7, 2012:14, 2043:15, 2055:23, 2056:5, 2063:20, 2090:3, 2091:20, 2093:16, 2094:4, 2094:10, 2110:3, 2119:7, 2119:13, 2121:20, 2123:8, 2123:16, 2125:9
fairly [1] - 2106:19
Falcon [27] - 1991:4, 1991:5, 1997:16, 1998:6, 1998:7, 2002:1, 2002:2, 2039:3, 2039:4, 2039:6, 2039:10, 2040:3, 2040:6, 2040:9, 2040:11, 2040:18, 2040:19, 2040:20, 2041:1, 2041:7, 2046:19, 2046:23, 2046:24,

2047:2, 2047:4, 2047:5, 2047:6
fall [1] - 2011:25
familiar [3] - 1994:23, 2056:10, 2111:14
familiarity [3] - 2102:5, 2102:6, 2102:7
family [10] - 2055:22, 2059:2, 2059:4, 2059:7, 2059:25, 2060:13, 2061:7, 2138:8
family's [1] - 2061:12
fan [1] - 1998:15
far [19] - 1967:14, 1972:12, 1974:25, 1987:5, 2034:5, 2039:9, 2043:19, 2047:3, 2050:14, 2069:17, 2070:1, 2074:19, 2092:18, 2094:19, 2120:20, 2133:3, 2140:7, 2141:24, 2148:17
fashion [2] - 1991:21, 2082:10
faster [1] - 1997:4
fault [2] - 2129:20
faulting [1] - 2138:19
fax [1] - 2105:11
faxes [2] - 2105:3, 2105:9
FBI [6] - 1949:10, 1949:22, 1954:3, 1969:5, 2142:3, 2143:6
February [1] - 2140:19
federal [2] - 1962:2, 2112:24
Federal [4] - 1939:16, 1940:8, 1966:15, 2067:21
fees [4] - 1982:5, 1992:13, 2089:14, 2091:20
felt [3] - 2061:21, 2061:25, 2062:14
few [13] - 1953:11, 1953:13, 1981:11, 1981:18, 1984:23, 1992:2, 2008:17, 2009:1, 2021:17, 2044:21, 2045:1, 2052:7, 2125:14
fiduciary [1] - 2088:11
fight [3] - 2035:3, 2035:9, 2046:11
fighting [1] - 1955:15
figure [4] - 2011:25,

2079:19, 2128:22, 2129:9
figured [1] - 2003:4
file [5] - 2002:2, 2011:4, 2020:8, 2045:14
filed [15] - 1955:11, 1993:22, 1993:23, 1999:4, 2000:15, 2012:4, 2012:13, 2019:16, 2019:17, 2032:14, 2105:13, 2105:21, 2123:18, 2146:2, 2147:12
files [1] - 2141:13
filing [1] - 2113:8
filled [1] - 2081:6
final [2] - 2087:8, 2088:23
finally [5] - 2001:4, 2027:11, 2027:12, 2028:9, 2041:23
finances [1] - 2053:18
financial [9] - 1959:17, 1961:10, 2000:12, 2052:13, 2053:13, 2054:8, 2068:4, 2068:13, 2108:18
financially [1] - 2108:7
findings [6] - 2088:5, 2088:10, 2088:24, 2089:23, 2091:16, 2098:18
fine [4] - 1967:3, 1981:13, 2100:7, 2147:19
finish [5] - 1944:24, 1980:13, 1993:5, 2007:4, 2047:25
finished [1] - 2042:8
firm [1] - 2144:14
first [26] - 1944:15, 1957:19, 1967:3, 1983:17, 1984:2, 1984:6, 1984:11, 2005:3, 2015:12, 2020:21, 2022:13, 2026:11, 2036:16, 2049:18, 2051:3, 2051:25, 2057:22, 2058:10, 2059:8, 2059:11, 2066:8, 2092:2, 2117:25, 2132:13, 2138:4, 2141:20
five [4] - 1949:13, 2085:4, 2096:1, 2134:12

fix [1] - 2048:10
flight [1] - 1941:11
Florida [1] - 2042:19
focus [4] - 1987:24, 2039:14, 2047:14, 2059:12
focused [5] - 1957:7, 1966:8, 2002:22, 2128:12, 2140:24
focussed [1] - 2002:20
foggy [1] - 1956:20
follow [2] - 1952:5, 1966:12
follow-up [1] - 1966:12
followed [3] - 2037:4, 2065:4, 2110:18
following [15] - 1951:10, 1953:2, 1965:18, 1978:18, 1980:4, 1981:15, 2010:13, 2076:5, 2087:5, 2087:22, 2094:16, 2100:16, 2100:23, 2114:2, 2133:16
follows [2] - 1941:16, 2049:20
forensic [1] - 2142:3
forged [1] - 1966:6
forget [3] - 2063:23, 2085:7, 2147:3
forgive [1] - 2008:11
forgoing [2] - 2096:19, 2099:24
form [13] - 1944:18, 1956:4, 1964:17, 1971:21, 2047:1, 2083:19, 2083:20, 2103:24, 2111:22, 2115:2, 2115:11, 2116:3, 2116:4
formal [1] - 2050:14
format [1] - 2142:2
formation [1] - 1957:20
formed [1] - 1957:15
forth [1] - 2138:13
forward [4] - 1984:1, 2034:20, 2034:23, 2140:16
four [6] - 1949:13, 1981:12, 2024:2, 2128:14, 2133:20, 2134:6
frame [4] - 1947:18, 2026:24, 2046:15, 2137:6
Francis [1] - 2112:16

frankly [1] - 2089:10
fraud [10] - 2088:12, 2088:20, 2136:20, 2136:23, 2136:24, 2137:3, 2140:6, 2140:19, 2148:4, 2148:7
freaking [2] - 2024:14, 2037:22
frequently [3] - 2053:13, 2053:17, 2054:4
friend [1] - 2062:21
friendly [1] - 1962:6
friends [1] - 2117:14
Friesen [1] - 2052:12
front [6] - 2037:10, 2069:22, 2081:14, 2087:3, 2098:17, 2132:1
fruition [1] - 1978:17
full [8] - 2093:16, 2094:4, 2095:13, 2096:14, 2120:16, 2125:24, 2130:25, 2131:1
fully [2] - 2012:15, 2045:4
Fun [1] - 1972:15
function [1] - 1981:8
Fund [76] - 1969:22, 1970:23, 1971:8, 1971:15, 1972:3, 1972:10, 1973:3, 1973:5, 1973:6, 1973:9, 1973:24, 1974:4, 1974:5, 1974:10, 1974:15, 1974:22, 1975:5, 1976:23, 1977:3, 1983:18, 1984:7, 1984:17, 1988:21, 1989:4, 1989:7, 1989:16, 1990:11, 1990:18, 1990:21, 1990:23, 1991:10, 1991:20, 1992:3, 1992:8, 1993:10, 1993:24, 1994:21, 1995:2, 1995:20, 1996:14, 1997:21, 1998:4, 1998:18, 2002:13, 2002:18, 2003:10, 2003:11, 2003:24, 2003:25, 2004:6, 2004:9, 2004:16, 2005:12, 2005:17, 2005:19, 2007:6, 2020:24, 2026:15, 2032:25,

2033:2, 2033:3, 2033:5, 2035:21, 2038:25, 2040:3, 2041:5, 2041:21, 2042:10, 2045:23, 2046:1, 2046:4, 2046:7, 2047:2, 2047:9, 2077:6, 2077:9

**Fund's** [1] - 1998:11
**fund's** [1] - 2139:16
**funding** [1] - 1992:13
**funds** [6] - 1965:9, 1990:6, 1992:19, 2130:9, 2136:11, 2137:18
**Funds** [2] - 1973:16, 1997:23
**funny** [1] - 1954:1
**future** [1] - 2090:18

## G

**G-R-D-N-I-A** [1] - 2130:9
**Gaarn** [1] - 2125:5
**Galioto** [9] - 1950:6, 1966:15, 1968:5, 1968:8, 1968:23, 1969:5, 1969:11, 1970:7, 2099:2
**game** [2] - 2091:20, 2100:5
**Gatos** [1] - 2112:17
**Gee** [1] - 1956:12
**general** [2] - 2107:4, 2142:20
**generates** [2] - 2145:10
**Gentry** [5] - 2131:15, 2131:23, 2132:3, 2132:5, 2132:8
**gift** [1] - 2060:1
**given** [10] - 1973:8, 1973:9, 1986:24, 2000:2, 2094:13, 2094:19, 2098:1, 2133:20, 2136:18, 2137:19
**glad** [2] - 2018:8, 2027:12
**Glen** [2] - 2072:10
**Global** [82] - 1969:22, 1970:23, 1971:8, 1971:15, 1972:3, 1972:10, 1972:15, 1973:3, 1973:4, 1973:6, 1973:9, 1973:16, 1973:24, 1974:4, 1974:9,

1974:14, 1974:22, 1975:5, 1976:22, 1977:2, 1983:18, 1984:7, 1984:16, 1988:21, 1989:3, 1989:6, 1989:16, 1990:11, 1990:18, 1990:21, 1990:23, 1991:10, 1991:20, 1992:3, 1992:8, 1993:9, 1993:24, 1994:21, 1995:2, 1995:20, 1996:13, 1997:9, 1997:21, 1997:23, 1998:4, 1998:10, 1998:18, 2001:6, 2002:13, 2002:18, 2003:10, 2003:11, 2003:24, 2003:25, 2004:6, 2004:8, 2004:16, 2005:12, 2005:16, 2005:19, 2007:6, 2020:23, 2026:14, 2032:25, 2033:2, 2033:3, 2033:5, 2035:21, 2038:25, 2040:2, 2041:5, 2041:21, 2042:9, 2045:23, 2046:1, 2046:4, 2046:7, 2047:2, 2047:9, 2077:5, 2077:8, 2140:3
**global** [4] - 1974:5, 1990:6, 1992:18, 2031:20
**Gonchar** [6] - 1999:15, 1999:21, 2071:2, 2071:3, 2071:17, 2071:18
**Gonchar's** [2] - 2000:20, 2071:9
**government** [43] - 1962:2, 2091:9, 2092:5, 2092:8, 2092:15, 2092:22, 2113:17, 2123:1, 2131:14, 2131:16, 2131:17, 2131:20, 2131:25, 2133:12, 2133:13, 2134:14, 2136:2, 2136:4, 2136:5, 2136:6, 2136:16, 2136:19, 2137:2, 2137:17, 2137:21, 2137:24, 2139:10, 2139:13, 2140:2, 2141:2, 2141:6, 2142:17, 2142:18, 2142:23,

2143:2, 2143:5, 2143:20, 2143:23, 2144:3, 2144:18, 2145:20, 2146:12
**Government** [14] - 1939:15, 1942:22, 1943:3, 1972:19, 1976:11, 1988:3, 1988:19, 1996:9, 2036:6, 2039:13, 2049:10, 2049:11, 2067:12, 2067:18
**GOVERNMENT** [2] - 2151:2, 2151:3
**Government's** [15] - 1942:10, 1943:1, 1943:25, 1974:18, 2058:1, 2066:21, 2066:22, 2069:19, 2069:21, 2070:24, 2071:20, 2072:13, 2072:24, 2079:11, 2080:17
**government's** [5] - 2088:8, 2139:15, 2139:19, 2144:14, 2145:7
**Governors** [1] - 2067:21
**graduation** [1] - 2132:25
**graphs** [1] - 2069:17
**Grdnia** [2] - 2130:9, 2130:10
**great** [18] - 1953:14, 1955:15, 1956:19, 1961:17, 1964:1, 1964:8, 1964:14, 1974:10, 1987:8, 1993:3, 2056:3, 2056:22, 2062:21, 2064:11, 2129:18, 2129:22, 2134:10, 2134:13
**greater** [2] - 2080:10, 2080:11
**green** [2] - 1960:17, 2101:24
**grill** [1] - 2010:6
**grip** [1] - 2129:8
**Grocery** [2] - 1976:7, 1976:8
**grounds** [2] - 2122:12, 2136:7
**group** [6] - 2011:7, 2012:5, 2012:7, 2012:8, 2041:15, 2042:9
**Group** [26] - 1942:14, 1943:10, 1943:12,

1946:2, 1946:17, 1946:20, 1946:23, 1947:3, 1947:7, 2022:12, 2023:12, 2024:6, 2024:10, 2033:1, 2037:10, 2038:12, 2038:23, 2140:1, 2140:11, 2140:18, 2147:24, 2148:2, 2148:3, 2148:8, 2148:12, 2148:13
**grow** [1] - 1951:9
**GSF** [7] - 1944:7, 1944:9, 1965:9, 2041:24, 2042:6, 2077:12, 2130:9
**guarantee** [1] - 2000:16
**guess** [7] - 1957:10, 2026:9, 2032:9, 2110:6, 2113:10, 2116:1, 2146:18
**guessed** [1] - 1948:23
**guessing** [9] - 1946:16, 1946:19, 1947:13, 1948:16, 1948:21, 1964:1, 1973:11, 2040:19, 2063:18
**guy** [3] - 1945:6, 2012:20, 2064:25
**guys** [12] - 1961:16, 1992:15, 2001:16, 2001:22, 2011:11, 2012:18, 2014:4, 2014:7, 2032:12, 2042:22, 2062:12, 2134:9

## H

**Haley** [18] - 1945:9, 1945:13, 1961:2, 1981:18, 1981:20, 2022:21, 2028:16, 2067:14, 2079:8, 2089:1, 2091:6, 2100:25, 2131:11, 2134:2, 2140:24, 2141:18, 2143:14, 2143:17
**HALEY** [114] - 1939:21, 1939:23, 1942:25, 1945:12, 1946:11, 1951:9, 1952:4, 1952:8, 1960:3, 1960:12, 1961:3, 1961:5, 1962:5, 1964:5,

1965:6, 1966:2, 1967:7, 1967:17, 1968:2, 1970:18, 1970:21, 1974:6, 1976:2, 1977:12, 1977:23, 1978:20, 1978:21, 1979:5, 1979:21, 1981:7, 1981:21, 1981:22, 1982:7, 1985:25, 2013:15, 2013:17, 2022:24, 2028:17, 2031:5, 2036:19, 2043:1, 2043:3, 2044:19, 2053:8, 2059:15, 2059:18, 2061:2, 2067:15, 2068:15, 2069:14, 2076:1, 2076:4, 2077:2, 2077:16, 2078:10, 2079:4, 2079:5, 2082:2, 2089:2, 2089:7, 2092:2, 2093:8, 2094:11, 2094:17, 2094:24, 2095:19, 2095:22, 2097:15, 2098:20, 2099:13, 2100:13, 2100:22, 2101:1, 2101:2, 2103:25, 2104:23, 2107:21, 2108:17, 2109:1, 2110:2, 2111:6, 2111:8, 2112:9, 2112:11, 2112:12, 2113:11, 2113:17, 2113:20, 2116:13, 2116:16, 2116:22, 2122:6, 2122:11, 2128:4, 2131:12, 2132:10, 2135:17, 2139:3, 2143:18, 2144:6, 2144:10, 2145:16, 2146:7, 2146:11, 2146:23, 2147:1, 2147:11, 2147:18, 2148:19, 2149:2, 2150:6, 2150:12, 2150:20
**Haley's** [1] - 2088:18
**half** [1] - 2134:23
**halfway** [1] - 2052:21
**hand** [5] - 1942:9, 1945:22, 2018:3, 2049:16, 2134:2
**Handing** [4] - 2014:21, 2027:1, 2030:19, 2126:1
**handing** [4] - 2016:15,

U.S.A. v. KENNER and CONSTANTINE                                    13

2028:3, 2038:21, 2137:4
**handle** [3] - 2032:11, 2112:23, 2128:22
**handwriting** [8] - 2067:3, 2067:5, 2067:9, 2068:17, 2068:21, 2069:8, 2102:8, 2102:9
**hangar** [7] - 1990:8, 1990:14, 1997:17, 2001:16, 2029:12, 2121:2
**hangars** [5] - 2002:25, 2075:7, 2075:18, 2077:7, 2078:15
**hangers** [1] - 2078:16
**happy** [2] - 1963:1, 2140:15
**hard** [4] - 2008:20, 2027:8, 2045:9, 2048:9
**Harvey** [2] - 2043:13, 2043:24
**hat's** [1] - 2046:5
**Hawaii** [22] - 1957:23, 1958:3, 1958:19, 1958:22, 1963:11, 2033:16, 2033:17, 2034:6, 2034:9, 2034:12, 2035:5, 2063:11, 2064:3, 2064:18, 2064:20, 2065:10, 2065:15, 2066:16, 2078:13, 2110:12, 2110:17, 2144:24
**Hawaiian** [1] - 2121:12
**headed** [2] - 2067:21, 2089:3
**headquarters** [1] - 2001:18
**hear** [8] - 1959:13, 1959:14, 1995:10, 2109:23, 2124:15, 2125:7, 2135:10, 2138:18
**heard** [5] - 1956:18, 2065:1, 2090:19, 2125:3, 2148:10
**hearsay** [4] - 2097:7, 2097:16, 2097:18, 2136:7
**heavily** [1] - 2006:23
**heck** [2] - 2023:10, 2024:9
**held** [10] - 1945:25, 1946:14, 1959:15, 2005:9, 2021:20,

2023:24, 2025:24, 2044:11, 2044:12, 2060:22
**hello** [1] - 2117:13
**help** [5] - 1949:7, 2019:5, 2052:15, 2059:2, 2126:4
**helps** [2] - 2000:4, 2090:16
**hereby** [3] - 1943:10, 1943:13, 1943:14
**hesitate** [1] - 2001:13
**hesitation** [1] - 2045:16
**high** [2] - 2050:16, 2132:24
**highlight** [1] - 1996:23
**highlighted** [4] - 1986:5, 2028:21, 2028:23, 2058:4
**highly** [1] - 2091:11
**highway** [1] - 2064:11
**Highway** [1] - 1939:22
**himself** [2] - 1965:10, 2043:17
**hire** [1] - 2054:7
**hired** [4] - 2010:10, 2035:2, 2046:11, 2054:7
**hit** [2] - 1998:15, 2003:7
**hmm** [1] - 2003:25
**Hockey** [2] - 1986:11, 2050:18
**hockey** [21] - 1961:17, 1962:8, 1999:13, 1999:22, 2008:3, 2009:25, 2029:25, 2034:8, 2050:7, 2050:8, 2050:10, 2050:15, 2050:17, 2050:21, 2071:6, 2071:24, 2106:15, 2106:19, 2130:6, 2134:17, 2134:20
**hold** [7] - 2053:21, 2124:20, 2125:11, 2133:9, 2143:5, 2144:1, 2144:7
**Holding** [1] - 2122:5
**holding** [6] - 2025:9, 2061:9, 2124:15, 2124:20, 2125:6, 2125:12
**home** [5] - 1995:2, 2120:20, 2134:25, 2143:8, 2145:25
**honest** [6] - 1994:13, 1997:14, 2009:12, 2092:10, 2126:2,

2132:4
**Honor** [60] - 1941:9, 1942:24, 1942:25, 1944:18, 1946:11, 1951:6, 1952:6, 1960:4, 1965:16, 1966:18, 1979:20, 1981:7, 1981:21, 1982:10, 1985:20, 1985:24, 1994:5, 1997:4, 2007:10, 2016:22, 2021:21, 2021:24, 2022:1, 2028:12, 2030:4, 2030:7, 2030:9, 2030:13, 2031:1, 2031:10, 2033:12, 2036:12, 2047:21, 2048:8, 2048:12, 2049:25, 2053:8, 2068:15, 2074:12, 2077:2, 2098:22, 2099:20, 2100:3, 2100:14, 2116:25, 2122:11, 2126:19, 2131:13, 2135:17, 2139:1, 2139:2, 2139:3, 2140:15, 2141:24, 2144:6, 2144:10, 2145:22, 2148:20, 2149:2, 2149:3
**Honor's** [1] - 1952:5
**HONORABLE** [1] - 1939:12
**hope** [1] - 2095:3
**hopefully** [4] - 1993:6, 2048:4, 2132:17, 2134:19
**hoping** [3] - 1980:11, 1980:12, 2134:15
**Hormovitis** [1] - 1939:8
**hot** [1] - 2100:6
**house** [9] - 1983:22, 1984:11, 1987:25, 2109:6, 2109:8, 2109:13, 2110:6, 2110:7, 2145:24
**houses** [1] - 2064:12
**huge** [1] - 1989:11
**hump** [1] - 1993:6
**hundred** [2] - 1998:5, 2059:19

---

**I**

**idea** [18] - 1949:13, 1957:5, 1957:21, 1957:22, 1958:6,

2032:23, 2047:15, 2057:19, 2060:22, 2064:12, 2068:2, 2069:11, 2085:5, 2105:6, 2105:8, 2110:23, 2115:24, 2139:14
**identification** [15] - 1945:17, 1945:19, 1971:18, 1985:7, 1987:2, 1994:18, 2008:16, 2014:16, 2026:25, 2030:16, 2053:10, 2057:25, 2066:20, 2103:4, 2104:2
**identified** [2] - 2139:20, 2142:5
**identify** [1] - 2053:7
**image** [6] - 2141:12, 2141:14, 2143:2, 2143:7, 2143:10, 2143:12
**immaterial** [1] - 2088:12
**impact** [1] - 2122:1
**impeach** [1] - 1967:2
**impeachment** [1] - 1971:10
**important** [12] - 1945:4, 1949:3, 1964:15, 1965:3, 2036:2, 2036:23, 2037:6, 2055:24, 2137:14, 2142:13, 2143:12
**impressed** [1] - 1953:25
**impression** [1] - 2091:23
**improper** [3] - 1966:21, 1967:5, 1971:9
**IN** [5] - 2151:2, 2151:3, 2151:6, 2151:7, 2151:10
**inaccurate** [2] - 2090:3, 2132:7
**Inc** [3] - 2083:10, 2084:5, 2086:4
**Inc.** [1] - 2140:21
**incarcerated** [1] - 2092:11
**inches** [1] - 1958:15
**inclination** [2] - 2131:18, 2134:5
**included** [7] - 1957:22, 1990:12, 2004:23, 2034:5, 2105:1, 2137:21,

2139:12
**including** [3] - 2084:22, 2086:20, 2113:8
**income** [1] - 2112:24
**inconsistent** [1] - 2094:5
**indeed** [6] - 1954:12, 1960:14, 2084:5, 2087:5, 2089:13, 2089:15
**independent** [1] - 2068:12
**indicate** [2] - 2107:8, 2115:6
**indicated** [8] - 1966:7, 1978:9, 1983:6, 1992:2, 2091:9, 2127:15, 2129:18, 2131:16
**indicates** [1] - 2071:8
**indicating)** [1] - 1950:8
**indictment** [1] - 2140:19
**indirect** [1] - 2097:22
**indirectly** [1] - 2075:22
**individual** [4] - 1966:4, 2008:19, 2051:5, 2106:19
**individuals** [2] - 2013:12, 2013:23
**indulgence** [2] - 2022:1, 2030:14
**inept** [1] - 2145:9
**information** [26] - 1958:2, 1995:18, 2005:11, 2005:18, 2005:19, 2007:5, 2020:12, 2033:25, 2034:23, 2035:5, 2041:14, 2043:15, 2044:2, 2057:16, 2064:15, 2096:19, 2096:20, 2099:24, 2101:17, 2121:8, 2132:6, 2138:14, 2145:18, 2145:25, 2146:1, 2147:4
**initial** [1] - 2020:24
**initiate** [1] - 2011:8
**initiated** [2] - 1969:17, 1969:19
**injury** [1] - 2107:20
**inquired** [1] - 2123:17
**inquiries** [1] - 2020:3
**inquiry** [1] - 1953:17, 1953:20, 1966:18, 1966:19

inside [1] - 1997:18
insignificant [1] - 1978:13
instance [3] - 1962:14, 2045:20, 2142:11
instances [1] - 2080:25
instead [4] - 1946:22, 2032:5, 2036:25, 2040:3
instructions [1] - 2133:17
Integrated [1] - 2122:3
integrity [2] - 2142:14, 2143:3
intend [6] - 2000:12, 2018:6, 2059:21, 2059:22, 2066:16, 2091:6
intended [1] - 2058:19
intending [2] - 2018:7, 2089:11
intention [3] - 1966:2, 1966:6, 1966:7
interest [80] - 1943:7, 1943:16, 1945:25, 1946:7, 1946:14, 1947:17, 1948:12, 1953:8, 1956:1, 1959:6, 1959:9, 1959:11, 1959:16, 1964:7, 1964:13, 1964:14, 1977:16, 1978:1, 1990:7, 1990:8, 1990:12, 1990:13, 1990:15, 1990:19, 1990:25, 1991:6, 1991:21, 1992:15, 1999:21, 2001:15, 2009:11, 2010:10, 2016:11, 2021:19, 2022:5, 2022:18, 2024:8, 2024:16, 2024:20, 2025:2, 2025:9, 2026:7, 2027:5, 2027:11, 2027:19, 2027:23, 2028:23, 2029:1, 2038:13, 2038:15, 2039:9, 2040:8, 2044:10, 2045:2, 2070:11, 2071:11, 2072:15, 2075:3, 2075:7, 2075:14, 2075:18, 2077:7, 2096:6, 2096:12, 2096:22, 2098:2, 2099:18, 2101:5, 2101:9,

2101:18, 2110:4, 2124:9, 2124:13, 2124:16, 2124:19, 2124:20, 2125:6, 2125:11, 2126:9
interested [2] - 1998:2, 2022:17
interests [2] - 1989:25, 1990:22
International [1] - 2140:21
interpret [1] - 2085:22
interpretation [2] - 2064:13, 2064:14
interrupt [1] - 2097:12
interview [3] - 1950:1, 1950:5, 1950:12
interviewed [4] - 1949:10, 1949:21, 1950:20, 1954:3
interviews [2] - 1949:15, 1949:18
introduce [2] - 2018:6, 2088:22
introduced [2] - 2018:13, 2136:3
introduction [1] - 2117:13
inventory [1] - 2130:4
invest [12] - 1958:22, 1998:3, 2033:17, 2036:24, 2058:15, 2058:24, 2064:24, 2065:9, 2066:16, 2109:4, 2111:16, 2121:13
invested [23] - 1944:15, 1946:5, 1947:20, 1984:3, 1999:5, 1999:13, 2000:6, 2014:13, 2014:20, 2022:13, 2035:4, 2044:9, 2055:10, 2058:10, 2058:17, 2058:24, 2062:11, 2063:15, 2064:2, 2065:7, 2065:8, 2078:15, 2119:21
Investigation [1] - 1966:15
investing [12] - 1957:23, 2046:16, 2058:18, 2063:10, 2064:7, 2110:4, 2110:7, 2110:12, 2110:16, 2148:7, 2148:11, 2148:15
Investment [1] - 2144:25

investment [68] - 1944:1, 1958:3, 1958:4, 1958:12, 1961:14, 1963:7, 1963:23, 1978:10, 1982:22, 1983:2, 1983:10, 1983:14, 1988:2, 1989:15, 1993:9, 1998:3, 2001:4, 2007:23, 2014:20, 2015:20, 2021:13, 2022:8, 2022:9, 2025:14, 2025:19, 2028:9, 2036:1, 2056:23, 2057:12, 2057:22, 2059:9, 2059:11, 2059:14, 2059:16, 2059:21, 2060:15, 2064:9, 2065:15, 2069:5, 2069:7, 2074:17, 2074:20, 2074:25, 2075:9, 2075:10, 2075:25, 2095:13, 2096:15, 2097:3, 2105:18, 2111:17, 2117:16, 2119:14, 2119:24, 2120:5, 2120:20, 2123:5, 2123:9, 2123:12, 2123:13, 2125:18, 2125:25, 2126:6, 2126:13, 2139:16, 2145:3, 2145:4
investment/lawsuit [3] - 2046:17
investments [20] - 1992:23, 2007:15, 2035:23, 2037:4, 2055:1, 2055:13, 2074:21, 2078:12, 2095:9, 2095:10, 2109:4, 2109:13, 2121:11, 2121:20, 2121:24, 2122:1, 2122:8, 2122:15, 2122:18, 2123:17
investor [2] - 1955:5, 2077:5
investors [9] - 1957:22, 2007:22, 2009:25, 2014:11, 2015:8, 2023:25, 2025:25, 2026:3, 2029:7
invisibles [1] - 2031:17
invited [2] - 2004:14, 2005:10

inviting [2] - 2016:3, 2016:5
invoice [1] - 2139:9
invoices [3] - 2139:14, 2139:25, 2140:5
involve [3] - 1965:9, 2080:10, 2122:23
involved [16] - 1944:25, 1948:10, 1949:6, 1955:4, 1962:8, 1962:10, 1991:4, 1997:15, 1999:19, 2006:23, 2009:25, 2032:10, 2032:12, 2080:9, 2123:23, 2130:8
involvement [2] - 2000:20, 2037:17
involves [1] - 1999:4
involving [6] - 1956:10, 1965:13, 1969:10, 2000:22, 2044:3, 2086:3
irrelevant [3] - 2016:23, 2022:14, 2038:17
IRS [2] - 2145:6, 2146:2
Islandia [1] - 1939:23
Isle [29] - 1955:5, 1955:9, 1956:2, 1956:13, 1956:24, 1957:8, 1957:14, 1957:20, 1958:18, 1959:1, 1977:15, 1978:24, 2065:21, 2065:23, 2065:25, 2071:10, 2073:8, 2093:20, 2094:3, 2102:13, 2105:18, 2110:22, 2110:25, 2111:3, 2111:16, 2111:17, 2144:24, 2145:1, 2145:10
Islip [3] - 1939:5, 1939:17, 1940:9
issue [25] - 1951:2, 1955:9, 1955:17, 1956:21, 1957:11, 1957:12, 1962:20, 1969:20, 1976:25, 1980:9, 1992:11, 1995:22, 1995:24, 2000:16, 2007:2, 2026:9, 2091:3, 2092:1, 2092:13, 2095:3, 2128:20, 2141:1, 2143:24, 2144:9, 2147:14
issues [12] - 1987:21,

1989:2, 1992:12, 1997:8, 2088:12, 2090:25, 2092:19, 2095:19, 2122:13, 2131:24, 2135:21, 2141:9
issuing [1] - 2022:5
it'd [1] - 2121:20
item [1] - 2142:15
items [2] - 2136:1, 2137:18
itself [9] - 1958:19, 2000:15, 2083:17, 2093:10, 2093:24, 2095:25, 2102:7, 2115:25, 2124:9
IV [29] - 1955:5, 1955:9, 1956:2, 1956:14, 1956:24, 1957:9, 1957:14, 1957:20, 1958:18, 1959:1, 1977:15, 1978:24, 2065:21, 2065:24, 2065:25, 2071:10, 2073:8, 2093:20, 2094:3, 2102:13, 2105:18, 2110:22, 2110:25, 2111:3, 2111:16, 2111:17, 2144:24, 2145:1, 2145:10

**J**

JAMES [1] - 1939:17
James [1] - 2130:9
January [1] - 2140:18
Jeff [1] - 2052:12
JFB [1] - 1939:3
job [3] - 1955:15, 1955:23, 2137:14
Joe [6] - 1989:21, 1991:16, 1998:8, 2039:7, 2039:11, 2065:24
John [16] - 1966:4, 1966:5, 1966:9, 1966:13, 1966:17, 1967:8, 1968:18, 1968:22, 1969:1, 1969:6, 1969:10, 1969:14, 1970:13, 2012:9, 2013:7, 2016:7
joined [1] - 2051:2
Jose [4] - 2050:22, 2052:2, 2052:3, 2120:9
JOSEPH [1] - 1939:12
Josh [1] - 1950:6

**Journal** [1] - 2031:16
**Jowdy** [48] - 1954:12,
  1954:15, 1955:2,
  1955:4, 1955:10,
  1955:25, 1956:10,
  1956:14, 1956:25,
  1957:9, 1957:12,
  1977:15, 1977:25,
  1992:24, 1993:11,
  1993:23, 1994:1,
  1994:11, 1994:20,
  1995:13, 1997:22,
  2000:10, 2000:14,
  2000:21, 2000:22,
  2002:22, 2002:23,
  2005:20, 2006:8,
  2006:12, 2006:19,
  2006:25, 2007:16,
  2012:16, 2033:20,
  2033:23, 2034:19,
  2034:23, 2035:6,
  2043:13, 2043:16,
  2043:17, 2043:23,
  2044:4, 2046:20,
  2046:24, 2093:21
**judge** [19] - 2018:6,
  2089:19, 2092:2,
  2092:5, 2092:7,
  2092:13, 2092:14,
  2093:19, 2094:19,
  2095:22, 2101:1,
  2113:11, 2113:18,
  2116:16, 2116:22,
  2122:17, 2132:14,
  2141:16, 2147:11
**Judge** [43] - 1939:12,
  1960:6, 1966:12,
  1968:2, 1977:10,
  1978:20, 1980:23,
  1981:10, 2016:24,
  2022:2, 2043:1,
  2059:15, 2061:2,
  2076:1, 2079:5,
  2089:2, 2089:8,
  2089:10, 2095:17,
  2096:3, 2097:11,
  2099:13, 2111:6,
  2122:6, 2131:12,
  2131:23, 2132:4,
  2132:18, 2134:22,
  2135:16, 2137:11,
  2139:24, 2140:9,
  2140:12, 2144:17,
  2144:20, 2145:5,
  2146:7, 2146:11,
  2146:23, 2147:2,
  2147:14, 2147:18
**judgment** [2] -
  2089:12, 2089:14
**July** [8] - 1996:12,

1997:7, 1998:16,
  2008:23, 2133:25,
  2134:1, 2134:4,
  2140:20
**jump** [2] - 2000:1,
  2000:3
**june** [1] - 2131:1
**June** [3] - 1983:18,
  1988:2, 1988:11,
  1988:20, 1993:19,
  1994:7, 1994:12,
  2005:2, 2005:3,
  2005:9, 2006:1,
  2016:18, 2021:7,
  2021:11, 2070:25,
  2071:13, 2129:1,
  2130:19, 2130:23,
  2131:5, 2132:25,
  2133:1, 2133:2,
  2133:5, 2133:13,
  2133:18, 2133:19,
  2133:23, 2134:3,
  2134:8, 2135:21,
  2149:4
**Juneau** [12] - 1944:13,
  1989:21, 1991:10,
  1998:8, 1999:12,
  2039:7, 2039:11,
  2039:25, 2040:7,
  2046:20, 2046:23,
  2065:24
**Juneau's** [3] -
  1990:22, 1990:25,
  1991:16
**JUROR** [1] - 2048:8
**juror** [4] - 1941:5,
  2100:18, 2133:4,
  2135:12
**jurors** [11] - 2128:21,
  2129:12, 2130:20,
  2132:23, 2133:9,
  2134:2, 2135:11,
  2135:14, 2135:20,
  2138:3, 2138:21
**jury** [32] - 1939:13,
  1941:9, 1941:17,
  1941:20, 1980:1,
  1980:4, 1981:16,
  2031:9, 2048:6,
  2049:3, 2049:6,
  2049:7, 2077:4,
  2081:14, 2087:22,
  2088:6, 2088:13,
  2088:15, 2091:1,
  2091:12, 2091:23,
  2094:2, 2095:14,
  2097:23, 2100:16,
  2100:24, 2113:16,
  2128:9, 2130:1,
  2132:1, 2134:1,

2134:19
**juxtapose** [1] - 2142:9

# K

**K-1** [2] - 2144:25,
  2147:9
**K1** [8] - 2112:21,
  2113:9, 2145:10,
  2145:18, 2146:17,
  2147:1, 2147:2,
  2147:4
**K1s** [2] - 2147:16,
  2147:20
**Kaiser** [21] - 1966:5,
  1966:9, 1966:14,
  1966:17, 1967:2,
  1967:4, 1967:9,
  1968:18, 1968:22,
  1969:1, 1969:6,
  1969:11, 1969:14,
  1969:20, 1970:4,
  1970:7, 1970:13,
  2012:9, 2013:7,
  2016:7
**keep** [5] - 2019:13,
  2032:11, 2049:23,
  2094:25, 2129:10
**kELLY** [1] - 1939:15
**Ken** [25] - 1954:11,
  1954:15, 1955:2,
  1955:4, 1955:10,
  1955:25, 1956:10,
  1956:14, 1956:25,
  1957:9, 1957:12,
  1977:15, 1977:25,
  1993:11, 1993:23,
  1994:1, 2006:25,
  2033:20, 2035:6,
  2043:12, 2043:16,
  2043:17, 2043:23,
  2044:3, 2093:21
**KENNER** [2] - 1939:6,
  2151:10
**Kenner** [176] - 1939:6,
  1939:21, 1945:14,
  1945:16, 1945:18,
  1947:16, 1947:21,
  1948:10, 1948:23,
  1953:3, 1953:7,
  1954:13, 1955:1,
  1955:14, 1957:2,
  1957:16, 1957:19,
  1958:8, 1958:21,
  1958:25, 1959:20,
  1960:5, 1960:14,
  1961:9, 1961:13,
  1961:25, 1962:15,
  1962:20, 1965:8,
  1966:17, 1969:7,

1970:24, 1971:3,
  1971:7, 1971:15,
  1971:17, 1972:3,
  1972:14, 1973:4,
  1973:6, 1973:8,
  1973:17, 1973:22,
  1974:3, 1975:9,
  1976:10, 1976:14,
  1976:19, 1977:2,
  1979:14, 1981:24,
  1983:2, 1984:15,
  1988:8, 1988:25,
  1992:16, 1995:1,
  2008:5, 2011:18,
  2012:9, 2013:7,
  2022:24, 2022:25,
  2024:21, 2033:24,
  2034:11, 2034:25,
  2035:7, 2035:9,
  2035:13, 2036:9,
  2036:11, 2036:25,
  2041:4, 2041:16,
  2043:16, 2044:4,
  2046:8, 2051:21,
  2051:23, 2052:6,
  2052:20, 2052:23,
  2053:1, 2053:12,
  2053:18, 2054:2,
  2054:7, 2055:2,
  2055:14, 2056:13,
  2056:16, 2057:15,
  2058:21, 2058:23,
  2060:10, 2060:20,
  2061:15, 2061:18,
  2062:3, 2062:16,
  2063:10, 2064:18,
  2064:22, 2065:17,
  2065:20, 2065:24,
  2068:4, 2068:13,
  2075:12, 2075:22,
  2078:12, 2079:8,
  2079:12, 2079:14,
  2079:16, 2080:22,
  2081:6, 2082:25,
  2083:6, 2083:9,
  2084:22, 2085:9,
  2086:4, 2086:21,
  2087:10, 2089:17,
  2090:9, 2090:11,
  2090:22, 2092:10,
  2092:24, 2093:3,
  2093:21, 2096:17,
  2096:19, 2097:9,
  2098:12, 2099:23,
  2101:8, 2101:21,
  2102:19, 2103:4,
  2103:14, 2104:2,
  2104:12, 2104:25,
  2105:23, 2105:24,
  2106:2, 2106:11,
  2109:3, 2110:11,

2110:16, 2111:9,
  2111:18, 2112:14,
  2113:12, 2113:22,
  2115:1, 2115:3,
  2115:5, 2115:7,
  2115:10, 2116:3,
  2116:6, 2116:13,
  2121:7, 2122:9,
  2122:18, 2126:23,
  2141:5, 2144:12,
  2145:8
**Kenner's** [6] -
  2003:14, 2025:25,
  2064:16, 2133:15,
  2142:10, 2145:24
**Kenneth** [3] - 2033:23,
  2034:19, 2034:23
**kept** [4] - 1959:18,
  2001:17, 2006:11,
  2111:18
**Kevin** [1] - 2105:16
**keyed** [1] - 2003:20
**kick** [1] - 1993:5
**Kim** [1] - 2125:2
**kind** [11] - 1997:16,
  1998:6, 1998:15,
  2007:2, 2008:13,
  2010:6, 2024:9,
  2040:18, 2060:13,
  2075:13, 2075:19
**kindly** [16] - 1945:16,
  1971:17, 1971:23,
  2083:21, 2085:25,
  2101:11, 2101:20,
  2102:19, 2103:3,
  2103:13, 2104:1,
  2104:11, 2111:9,
  2112:13, 2113:21,
  2115:1
**kinds** [2] - 2055:1,
  2055:11
**knowledge** [14] -
  1956:14, 1958:17,
  1962:15, 1979:9,
  1993:14, 2000:4,
  2009:8, 2033:22,
  2035:8, 2041:12,
  2043:12, 2043:22,
  2044:7, 2093:14
**known** [4] - 1978:25,
  2083:10, 2112:21,
  2113:8
**knows** [1] - 1977:21
**KOMATIREDDY** [42] -
  1939:18, 1941:8,
  1941:25, 1942:22,
  1945:8, 1951:6,
  1952:6, 1956:4,
  1959:3, 1960:8,
  1962:4, 1964:3,

1964:17, 1965:15, 1966:23, 1967:1, 1971:9, 1972:18, 1973:25, 1977:17, 1978:19, 1979:1, 1979:17, 1979:19, 1984:8, 1985:24, 1991:13, 1993:13, 1994:5, 2016:22, 2016:25, 2018:5, 2028:14, 2031:3, 2033:15, 2042:24, 2046:25, 2047:18, 2137:11, 2140:15, 2150:4, 2150:10
**Komatireddy** [1] - 1950:10
**Komatireddy's** [1] - 2147:23
**Kristie** [1] - 1992:16
**Kristin** [1] - 1965:11

---

## L

**lack** [1] - 2062:8
**land** [12] - 1958:3, 1958:18, 1958:22, 1963:12, 2063:10, 2064:3, 2064:10, 2064:18, 2065:10, 2109:8, 2109:13, 2110:8
**Land** [1] - 2144:24
**language** [2] - 1945:23, 2085:22
**laptop** [4] - 2141:24, 2142:6, 2142:11, 2142:15
**large** [3] - 2012:7, 2012:8, 2142:5
**larger** [2] - 1945:19, 1972:19
**laRUSSO** [1] - 1940:1
**LaRusso** [58] - 1940:3, 1980:6, 1980:22, 1981:19, 1982:9, 1982:10, 1982:13, 1982:16, 1985:20, 1985:23, 1988:16, 1994:6, 1996:19, 2004:7, 2011:2, 2016:24, 2018:6, 2019:3, 2021:21, 2021:23, 2021:24, 2028:12, 2030:4, 2030:7, 2030:8, 2030:13, 2031:1, 2031:9, 2033:11, 2036:12, 2044:21, 2044:23,

2047:21, 2095:1, 2095:2, 2097:11, 2100:14, 2116:23, 2116:25, 2117:2, 2122:8, 2122:17, 2126:18, 2128:5, 2132:4, 2132:11, 2132:14, 2135:16, 2136:3, 2138:2, 2138:7, 2139:1, 2139:4, 2139:23, 2147:21, 2148:9, 2148:17, 2149:3
**LARUSSO** [15] - 1941:9, 1942:24, 1944:18, 1960:6, 1984:13, 1986:3, 1987:12, 1987:14, 1988:18, 1991:18, 1993:18, 2067:16, 2150:8, 2150:14, 2150:22
**LaRusso's** [4] - 1980:1, 2095:23, 2134:11, 2138:13
**laser** [2] - 2002:20, 2002:22
**last** [27] - 1941:10, 1949:21, 1959:22, 1960:2, 1968:7, 1968:12, 1968:14, 1993:5, 1994:17, 2000:3, 2000:14, 2001:1, 2014:17, 2026:25, 2031:25, 2050:24, 2074:13, 2083:25, 2085:25, 2090:8, 2103:6, 2110:3, 2117:12, 2127:21, 2139:4, 2139:25, 2140:23
**late** [4] - 1941:6, 1944:25, 1964:25, 2023:7
**latter** [1] - 2134:23
**laugh** [1] - 2013:25
**law** [11] - 2023:19, 2088:16, 2088:25, 2128:23, 2129:3, 2132:13, 2132:22, 2132:23, 2141:4, 2141:12, 2144:8
**lawsuit** [36] - 1954:20, 1954:24, 1955:11, 1955:25, 1956:6, 1956:9, 1956:22, 1965:10, 1965:13, 1966:3, 1966:9, 1966:13, 1966:16, 1967:10, 1969:7,

1970:9, 1970:12, 1970:16, 1971:14, 1992:16, 1993:25, 1999:4, 2000:14, 2000:16, 2002:22, 2006:12, 2011:22, 2018:10, 2019:16, 2019:17, 2032:13, 2042:19, 2123:18, 2123:20, 2124:18, 2125:10
**lawsuits** [12] - 1954:14, 1954:17, 1954:18, 1954:20, 1954:23, 1992:17, 2003:14, 2034:18, 2034:20, 2041:25, 2046:14, 2137:16
**lawsuits/lawsuit** [1] - 1955:3
**lawyer** [7] - 1950:6, 1950:7, 1992:13, 2035:2, 2046:11
**lawyers** [14] - 1992:4, 1992:9, 2008:11, 2032:11, 2042:19, 2046:13, 2087:21, 2095:12, 2123:22, 2124:1, 2124:24, 2125:17, 2128:11, 2128:19
**lead** [2] - 1966:19, 2065:4
**leading** [2] - 1972:18, 2006:24
**League** [2] - 1986:11, 2050:18
**league** [3] - 2108:4, 2108:5, 2108:15
**learn** [6] - 2033:25, 2066:8, 2066:9, 2066:12, 2124:18, 2139:15
**learned** [4] - 1957:1, 2066:3, 2073:25, 2138:24
**learning** [2] - 2124:8, 2124:11
**least** [26] - 1945:23, 1959:21, 1962:8, 1963:7, 1972:12, 1974:25, 1980:24, 2007:20, 2018:7, 2045:12, 2083:13, 2085:11, 2089:3, 2089:17, 2090:15, 2094:21, 2095:15, 2095:17, 2098:11, 2106:3, 2119:2, 2132:18, 2137:3,

2141:11, 2142:15, 2148:14
**leave** [6] - 2083:17, 2100:19, 2124:24, 2128:13, 2128:24, 2143:8
**leaves** [4] - 2048:6, 2088:1, 2113:16, 2130:1
**leaving** [1] - 2042:5
**left** [10] - 2012:19, 2042:6, 2042:7, 2042:10, 2091:23, 2114:1, 2133:21, 2134:5, 2134:7, 2139:12
**legal** [4] - 1954:11, 2000:12, 2001:6, 2084:10
**legit** [2] - 2024:11, 2084:13
**legitimate** [1] - 1958:19
**Lehman** [5] - 1978:22, 1979:6, 1979:9, 1979:11, 1979:15
**Lehman's** [1] - 1978:18
**lengthy** [4] - 2013:5, 2013:6, 2088:24, 2132:16
**letter** [4] - 2012:3, 2018:10, 2139:19, 2148:4
**lettering** [2] - 2069:4, 2069:7
**Liability** [3] - 1957:15, 2022:6, 2102:12
**liability** [2] - 1943:16, 2022:9
**lied** [1] - 1962:15
**lieu** [2] - 1991:1, 2075:4
**life** [3] - 1984:1, 2056:3, 2085:7
**light** [2] - 2048:8, 2104:9
**likely** [1] - 2056:6
**likewise** [1] - 1987:21
**Limited** [3] - 1957:15, 2022:6, 2102:12
**limited** [2] - 1943:16, 2022:9
**Line** [1] - 2003:22
**line** [38] - 1966:18, 1966:19, 1993:5, 2019:25, 2034:16, 2065:14, 2065:17, 2065:20, 2065:25, 2066:3, 2066:9,

2066:13, 2070:2, 2070:5, 2070:9, 2070:11, 2070:15, 2071:2, 2071:10, 2071:12, 2072:2, 2072:4, 2072:14, 2073:6, 2073:12, 2073:13, 2073:20, 2073:23, 2089:13, 2093:14, 2093:15, 2094:2, 2094:10, 2105:17, 2105:25, 2127:4, 2127:16, 2144:23
**lines** [6] - 1971:24, 1999:16, 2065:12, 2142:8, 2142:10, 2145:8
**list** [6] - 1973:16, 1973:23, 1974:3, 2038:22, 2038:23, 2122:7
**listen** [2] - 2001:1, 2129:23
**listened** [2] - 1996:6, 2019:18
**listening** [3] - 1950:24, 1951:1, 2089:20
**litigated** [1] - 1965:15
**litigation** [1] - 1962:9
**live** [6] - 2011:11, 2050:3, 2052:3, 2110:6, 2110:7, 2120:15
**lived** [4] - 2019:20, 2120:10, 2120:17, 2120:18
**lives** [1] - 2145:24
**living** [7] - 1971:1, 1973:7, 1992:12, 2050:6, 2092:12, 2120:8, 2121:4
**Living** [1] - 1943:15
**LLC** [14] - 1942:14, 1943:7, 1943:16, 1957:15, 1957:20, 2020:16, 2021:3, 2022:5, 2023:13, 2028:21, 2086:5, 2102:13, 2110:19, 2144:13
**LLCs** [1] - 1955:1
**LLP** [2] - 1939:21, 1940:1
**loan** [19] - 1956:13, 1956:25, 1977:15, 1977:25, 2000:16, 2029:6, 2029:10, 2029:15, 2029:17,

2029:19, 2033:19,
2033:22, 2033:25,
2034:5, 2058:18,
2070:20, 2070:21,
2072:16
**loaned** [4] - 1955:9,
1956:10, 1956:24,
1957:8
**loans** [3] - 1955:4,
1957:1, 2093:20
**local** [1] - 1953:12
**located** [1] - 2064:11
**lockout** [7] - 2107:13,
2107:19, 2107:24,
2108:3, 2108:11,
2108:13, 2108:14
**look** [58] - 1943:5,
1945:16, 1959:19,
1960:13, 1960:15,
1971:17, 1971:23,
1974:17, 1974:19,
1985:8, 1994:18,
1996:22, 1997:1,
2004:21, 2009:1,
2015:15, 2016:13,
2016:20, 2018:12,
2028:2, 2030:18,
2038:22, 2052:16,
2053:6, 2058:3,
2079:10, 2079:18,
2083:21, 2083:24,
2085:8, 2085:11,
2085:25, 2087:3,
2087:4, 2101:11,
2101:20, 2101:22,
2102:19, 2102:21,
2103:3, 2103:5,
2103:13, 2103:15,
2104:1, 2104:11,
2104:13, 2104:19,
2107:25, 2108:2,
2111:9, 2111:11,
2111:14, 2112:13,
2113:21, 2115:1,
2125:22, 2140:17,
2147:14
**looked** [2] - 2019:4,
2139:19
**looking** [16] - 1943:5,
1989:24, 2012:5,
2016:20, 2029:10,
2038:19, 2052:13,
2052:14, 2058:11,
2062:10, 2067:20,
2086:1, 2087:7,
2104:14, 2125:22,
2132:15
**looks** [6] - 1994:23,
2008:20, 2067:2,
2073:5, 2073:14,

2087:11
**Los** [1] - 2112:17
**lose** [4] - 2087:12,
2108:15, 2131:4,
2135:12
**loss** [1] - 2096:9
**losses** [2] - 1954:16,
2000:13
**lost** [5] - 2090:21,
2108:4, 2108:11,
2128:15, 2134:12
**loud** [2] - 2138:16,
2138:21
**LTD** [1] - 1943:12
**Lucas** [2] - 1957:11,
2121:16
**lucky** [1] - 1944:24
**lunch** [6] - 1980:17,
1980:24, 1981:14,
2031:7, 2048:1,
2048:5
**luncheon** [1] -
2048:13

# M

**mail** [13] - 2016:18,
2019:6, 2030:17,
2030:21, 2031:11,
2031:12, 2031:19,
2031:23, 2080:23,
2081:1, 2136:5,
2136:7, 2137:6
**mailing** [1] - 2041:10
**mails** [4] - 2031:13,
2047:12, 2054:1,
2054:2
**main** [3] - 2012:10,
2027:16, 2045:10
**maintained** [2] -
1959:10, 2145:6
**major** [2] - 1954:24,
2064:11
**majority** [1] - 1949:17
**Makika** [2] - 1955:6,
1978:24
**malign** [1] - 2090:19
**man** [5] - 2007:19,
2008:7, 2015:13,
2056:25, 2057:3
**manage** [2] - 2051:6,
2052:15
**managed** [1] - 2055:2
**Management** [30] -
1942:14, 1943:10,
1943:12, 1946:2,
1946:10, 1946:17,
1946:20, 1946:23,
1947:2, 1947:7,
2022:12, 2022:15,

2023:12, 2024:6,
2024:10, 2033:1,
2037:10, 2038:12,
2038:23, 2140:1,
2140:4, 2140:5,
2140:11, 2140:17,
2147:24, 2148:2,
2148:3, 2148:8,
2148:12, 2148:13
**manager** [2] -
2020:15, 2107:5
**managing** [2] -
1957:16, 2125:6
**Manfredi** [1] - 2130:12
**manner** [1] - 2138:17
**Mar** [1] - 2121:18
**March** [1] - 1949:23
**Margin** [1] - 2067:23
**margin** [1] - 2068:24
**mark** [3] - 2027:16,
2068:25, 2069:1
**marked** [31] - 1942:9,
1945:16, 1953:9,
1959:19, 1960:13,
1960:16, 1971:17,
1974:18, 1985:7,
1987:1, 1996:1,
2008:15, 2014:16,
2026:22, 2028:1,
2028:19, 2030:15,
2031:8, 2057:25,
2058:2, 2066:20,
2079:11, 2079:12,
2085:9, 2101:21,
2103:4, 2103:13,
2104:2, 2104:12,
2112:14, 2113:22
**market** [1] - 2031:17
**material** [2] - 1966:20,
2090:14
**materiality** [2] -
2093:10, 2122:12
**materials** [1] -
2141:17
**math** [1] - 2133:11
**Matt** [4] - 1950:6,
1966:15, 1968:5,
1968:8
**matter** [4] - 2083:1,
2085:3, 2109:2,
2149:4
**Matter** [3] - 2017:4,
2018:16, 2019:1
**Mattias** [2] - 2071:22
**McKee** [3] - 1981:3,
2008:18, 2090:11
**McKee's** [1] - 1974:1
**McRae** [2] - 1961:10,
1961:12
**mean** [20] - 1959:8,

1979:6, 1981:11,
1988:14, 1990:4,
2014:3, 2031:20,
2046:11, 2050:17,
2060:9, 2062:12,
2067:7, 2068:10,
2085:14, 2090:3,
2095:25, 2098:20,
2109:6, 2142:17,
2145:9
**meaning** [8] - 1959:9,
1963:7, 1975:4,
2011:22, 2016:7,
2032:9, 2046:13,
2072:8
**means** [5] - 1994:15,
2029:18, 2068:2,
2080:15, 2098:8
**meant** [4] - 2018:12,
2046:24, 2068:5,
2137:22
**mediation** [9] -
2006:24, 2041:16,
2043:4, 2043:7,
2043:9, 2043:12,
2043:18, 2043:24,
2044:6
**meet** [10] - 2052:6,
2052:23, 2053:1,
2056:25, 2057:3,
2057:9, 2064:17,
2106:2, 2119:1,
2121:3
**meeting** [32] - 1976:4,
1976:19, 1983:21,
1984:11, 1984:16,
1987:24, 1989:4,
2010:1, 2010:3,
2010:5, 2012:22,
2013:5, 2013:6,
2013:23, 2014:10,
2015:3, 2015:23,
2016:2, 2029:4,
2029:16, 2052:9,
2057:2, 2117:5,
2117:7, 2117:9,
2117:10, 2117:12,
2117:23, 2118:13,
2118:14
**meetings** [3] - 1988:7,
2053:13, 2106:6
**Melley** [1] - 2130:13
**member** [2] - 1957:16,
2125:6
**members** [4] -
1941:19, 1949:22,
2038:22, 2128:9
**members/owners** [1]
- 2044:17
**membership** [4] -

1942:13, 1943:7,
2022:5, 2037:9
**Memorial** [1] -
1939:22
**memorialized** [1] -
2083:13
**memory** [10] - 1951:3,
1965:7, 1975:7,
1976:3, 1976:6,
1984:1, 2066:1,
2099:2, 2118:23,
2146:18
**mental** [1] - 2081:8
**mention** [3] - 1967:15,
1995:3, 2121:24
**mentioned** [12] -
1950:23, 1955:4,
1964:10, 1967:13,
1982:6, 1989:7,
1993:2, 2003:13,
2003:14, 2030:6,
2122:25
**messages** [1] - 2107:5
**met** [13] - 1945:13,
1983:14, 1983:17,
1984:2, 1988:12,
1988:24, 2008:9,
2051:22, 2052:20,
2117:25, 2118:11,
2119:4, 2119:8
**method** [1] - 2009:20
**Metro** [3] - 2040:25,
2041:1, 2041:6
**Mexican** [1] - 2121:13
**Mexico** [1] - 1992:24
**Michael** [3] - 2008:7,
2008:10, 2070:7
**Microsoft** [1] -
2044:13
**middle** [1] - 2068:19
**might** [13] - 1953:12,
1976:15, 1984:6,
1985:2, 2046:6,
2091:12, 2092:7,
2093:9, 2099:13,
2106:7, 2106:12,
2115:12, 2131:13
**mike** [2] - 2049:23,
2053:24
**miles** [1] - 2120:23
**milestone** [1] -
1978:25
**million** [16] - 1956:1,
1977:22, 1978:25,
2007:21, 2033:19,
2034:3, 2066:15,
2066:16, 2073:16,
2091:19, 2109:17,
2126:24, 2127:11,
2127:16, 2144:23,

2145:4
**millions** [1] - 2047:13
**mind** [4] - 1973:18, 2032:11, 2137:1, 2137:5
**minded** [1] - 1950:24
**mine** [1] - 2073:4
**Mineola** [1] - 1940:2
**minimum** [1] - 2148:22
**Minnesota** [1] - 2050:23
**minute** [3] - 1944:6, 2007:3, 2039:1
**minutes** [1] - 1984:23
**mire** [1] - 2148:12
**mirror** [6] - 2141:12, 2141:14, 2143:2, 2143:7, 2143:10, 2143:12
**Miskiewicz** [11] - 1941:7, 1980:7, 1980:22, 2049:24, 2077:3, 2081:14, 2089:20, 2091:20, 2092:21, 2095:5, 2132:11
**MISKIEWICZ** [56] - 1939:17, 1980:8, 2048:12, 2049:5, 2049:11, 2049:25, 2050:2, 2053:23, 2061:4, 2067:11, 2074:11, 2074:13, 2077:11, 2078:2, 2078:9, 2078:25, 2087:14, 2087:19, 2088:4, 2089:24, 2090:7, 2093:5, 2097:5, 2098:7, 2098:19, 2103:23, 2107:15, 2108:10, 2108:23, 2109:18, 2111:5, 2111:22, 2113:13, 2116:8, 2116:11, 2125:1, 2126:22, 2128:1, 2130:6, 2130:17, 2131:3, 2131:6, 2134:22, 2135:5, 2135:18, 2135:24, 2139:2, 2141:16, 2144:5, 2145:22, 2146:22, 2147:10, 2147:19, 2149:1, 2150:18, 2150:24
**mismanagement** [1] - 2000:11
**miss** [2] - 2065:1, 2133:1

**missed** [2] - 2143:14
**missing** [3] - 1972:5, 2045:11, 2133:18
**misspoke** [1] - 2145:16
**misstates** [1] - 1964:3
**misunderstanding** [1] - 2091:7
**mom** [5] - 2138:3, 2138:6, 2138:9, 2138:13, 2138:22
**moment** [17] - 1947:11, 1956:12, 1963:21, 1977:10, 2021:21, 2021:24, 2030:4, 2030:7, 2042:1, 2043:4, 2046:16, 2074:11, 2082:12, 2111:6, 2112:9, 2115:20, 2132:21
**moments** [1] - 2045:1
**Monday** [16] - 2048:3, 2129:3, 2129:5, 2129:9, 2129:10, 2129:24, 2130:4, 2130:5, 2130:6, 2130:11, 2135:13, 2135:20, 2143:22, 2143:25, 2148:25, 2149:4
**money** [126] - 1944:16, 1944:23, 1945:1, 1945:5, 1946:18, 1947:6, 1947:7, 1947:21, 1948:16, 1949:6, 1956:10, 1956:24, 1957:4, 1957:6, 1957:8, 1958:7, 1964:11, 1964:21, 1964:24, 1970:23, 1970:24, 1973:8, 1983:10, 1984:12, 1985:2, 1986:17, 1988:4, 1988:15, 1988:16, 1988:17, 1990:2, 1990:11, 1990:23, 1991:11, 1992:14, 1993:23, 1994:2, 1996:2, 1998:11, 2000:24, 2003:5, 2005:16, 2014:12, 2015:4, 2015:8, 2015:19, 2020:21, 2022:12, 2023:9, 2023:14, 2024:13, 2029:17, 2032:3, 2032:8, 2032:10, 2032:16,

2032:20, 2032:24, 2033:7, 2034:5, 2034:9, 2034:11, 2035:21, 2036:3, 2036:8, 2036:21, 2036:24, 2037:3, 2037:21, 2037:25, 2038:1, 2038:4, 2040:2, 2041:4, 2042:3, 2042:6, 2042:11, 2042:13, 2042:15, 2042:18, 2042:21, 2044:25, 2045:3, 2045:13, 2045:25, 2046:3, 2046:6, 2051:6, 2052:15, 2056:5, 2056:8, 2064:24, 2065:5, 2065:10, 2070:6, 2070:10, 2070:18, 2070:20, 2071:1, 2071:9, 2071:17, 2071:18, 2072:7, 2072:8, 2072:19, 2072:21, 2072:22, 2074:23, 2074:25, 2075:4, 2077:13, 2078:11, 2089:21, 2090:2, 2090:3, 2090:6, 2090:7, 2091:4, 2091:22, 2095:8, 2119:21, 2137:15, 2137:24, 2148:7, 2148:16
**moneys** [3] - 1955:9, 1963:11, 1973:24
**monies** [17] - 1948:25, 1955:12, 1978:23, 1989:4, 1991:1, 1991:20, 1992:8, 1994:21, 1995:19, 1998:12, 2015:24, 2019:19, 2126:8, 2140:3, 2140:10, 2147:24, 2148:1
**monster** [1] - 1979:10
**month** [3] - 1996:13, 2133:19, 2133:23
**monthly** [1] - 2054:19
**Moreau** [3] - 1944:13, 1989:21, 2077:14
**morning** [10] - 1941:19, 1941:20, 1968:9, 1968:11, 1968:16, 1979:25, 1980:2, 1982:14, 1982:15, 2090:20
**most** [5] - 1950:22, 1951:5, 1955:21,

2027:15, 2032:12
**mot** [1] - 2098:4
**mother** [1] - 2134:11
**Motor** [1] - 2039:17
**mouth** [1] - 1992:6
**move** [8] - 1961:12, 1984:1, 2034:20, 2034:22, 2053:24, 2108:25, 2109:25, 2129:3
**moves** [2] - 1942:22, 2067:12
**moving** [4] - 1954:22, 1955:13, 1956:11, 2112:2
**MR** [227] - 1941:9, 1942:24, 1942:25, 1944:18, 1945:12, 1946:11, 1951:9, 1952:4, 1952:8, 1960:3, 1960:6, 1960:12, 1961:3, 1961:5, 1962:5, 1964:5, 1965:6, 1966:2, 1967:7, 1967:17, 1968:2, 1970:18, 1970:21, 1974:6, 1976:2, 1977:12, 1977:23, 1978:20, 1978:21, 1979:5, 1979:21, 1980:8, 1980:22, 1981:7, 1981:21, 1981:22, 1982:7, 1982:10, 1982:13, 1984:13, 1985:20, 1985:23, 1985:25, 1986:3, 1987:12, 1987:14, 1988:16, 1988:18, 1991:18, 1993:18, 1994:6, 1996:19, 2004:7, 2011:2, 2013:15, 2013:17, 2016:24, 2018:6, 2019:3, 2021:21, 2021:24, 2022:24, 2028:12, 2028:17, 2030:4, 2030:7, 2030:13, 2031:1, 2031:5, 2031:9, 2033:11, 2036:12, 2036:19, 2043:1, 2043:3, 2044:19, 2044:21, 2044:23, 2047:21, 2048:12, 2049:5, 2049:11, 2049:25, 2050:2, 2053:8, 2053:23, 2059:15, 2059:18, 2061:2,

2061:4, 2067:11, 2067:15, 2067:16, 2068:15, 2069:14, 2074:11, 2074:13, 2076:1, 2076:4, 2077:2, 2077:11, 2077:16, 2078:2, 2078:9, 2078:10, 2078:25, 2079:4, 2079:5, 2082:2, 2087:14, 2087:16, 2087:19, 2088:4, 2089:2, 2089:7, 2089:24, 2090:7, 2092:2, 2093:5, 2093:8, 2094:11, 2094:17, 2094:24, 2095:2, 2095:19, 2095:22, 2097:5, 2097:11, 2097:15, 2098:7, 2098:19, 2098:20, 2099:13, 2100:13, 2100:14, 2100:22, 2101:1, 2101:2, 2103:23, 2103:25, 2104:23, 2107:15, 2107:21, 2108:10, 2108:17, 2108:23, 2109:1, 2109:18, 2110:2, 2111:5, 2111:6, 2111:8, 2111:22, 2112:9, 2112:11, 2112:12, 2113:11, 2113:13, 2113:17, 2113:20, 2116:8, 2116:11, 2116:13, 2116:16, 2116:22, 2116:25, 2117:2, 2122:6, 2122:8, 2122:11, 2122:17, 2125:1, 2126:18, 2126:22, 2128:1, 2128:4, 2128:5, 2130:6, 2130:17, 2131:3, 2131:6, 2131:12, 2132:4, 2132:10, 2132:14, 2134:22, 2135:5, 2135:16, 2135:17, 2135:18, 2135:24, 2138:7, 2139:1, 2139:2, 2139:3, 2139:23, 2141:16, 2143:18, 2144:5, 2144:6, 2144:10, 2145:16, 2145:22, 2146:7, 2146:11, 2146:22, 2146:23, 2147:1, 2147:10, 2147:11, 2147:18,

2147:19, 2147:21, 2148:9, 2148:17, 2148:19, 2149:1, 2149:2, 2149:3, 2150:6, 2150:8, 2150:12, 2150:14, 2150:18, 2150:20, 2150:22, 2150:24

**MS** [41] - 1941:8, 1941:25, 1942:22, 1945:8, 1951:6, 1952:6, 1956:4, 1959:3, 1960:8, 1962:4, 1964:3, 1964:17, 1965:15, 1966:23, 1967:1, 1971:9, 1972:18, 1973:25, 1977:17, 1978:19, 1979:1, 1979:17, 1979:19, 1984:8, 1985:24, 1991:13, 1993:13, 1994:5, 2016:22, 2016:25, 2018:5, 2028:14, 2031:3, 2033:15, 2042:24, 2046:25, 2047:18, 2137:11, 2140:15, 2150:4, 2150:10

**multiple** [2] - 2138:13, 2140:20

**Murray** [3] - 2072:10, 2072:14

**must** [1] - 2002:8

**mutually** [1] - 2131:22

**Myra** [2] - 1965:11, 1975:2

**Myrick** [1] - 1992:16

## N

**N-O-L-A-N** [1] - 2049:21

**naive** [1] - 2062:15

**Name** [1] - 2116:19

**name** [39] - 1961:10, 1965:11, 1979:6, 1982:16, 1998:7, 2007:19, 2007:24, 2008:7, 2008:9, 2008:21, 2014:6, 2015:10, 2015:13, 2022:14, 2025:2, 2025:4, 2025:7, 2025:8, 2025:21, 2026:4, 2027:19, 2043:23, 2045:21, 2056:10, 2056:25, 2057:3, 2057:13, 2061:6, 2065:18,

2066:4, 2073:1, 2073:3, 2079:8, 2125:2, 2125:3, 2125:5, 2126:10

**names** [4] - 2008:17, 2015:15, 2024:2, 2038:16

**narrow** [1] - 2132:17

**Nash** [48] - 1941:21, 1941:23, 1943:14, 1943:19, 1945:13, 1961:8, 1965:13, 1967:11, 1967:12, 1968:3, 1977:13, 1977:14, 1979:23, 1980:11, 1981:3, 1981:23, 1982:14, 1986:13, 1987:15, 1996:20, 1996:25, 1997:6, 1997:11, 2004:18, 2016:13, 2019:4, 2023:3, 2028:23, 2028:24, 2030:5, 2030:15, 2031:12, 2033:16, 2039:15, 2043:4, 2045:5, 2046:5, 2046:23, 2047:22, 2047:25, 2090:9, 2090:10, 2136:6, 2136:15, 2136:17, 2137:4, 2137:7

**NashT18** [1] - 1986:6

**National** [2] - 1986:11, 2050:18

**nationally** [1] - 1986:15

**natural** [1] - 1961:18

**nature** [3] - 1975:8, 2093:24, 2109:10

**near** [1] - 2064:11

**necessarily** [2] - 1981:9, 2089:10

**necessary** [1] - 2129:13

**necessity** [1] - 2132:3

**need** [15] - 1963:20, 1983:10, 1997:1, 2018:2, 2018:3, 2062:13, 2122:14, 2128:18, 2129:12, 2133:12, 2133:22, 2134:17, 2135:1, 2144:2, 2147:13

**needed** [5] - 1964:10, 1993:5, 2029:24, 2121:7, 2143:3

**negative** [1] - 2070:1

**negotiate** [4] - 2107:2, 2107:4, 2107:6,

2107:12

**negotiated** [3] - 2106:22, 2106:25, 2108:13

**negotiations** [2] - 2107:11, 2107:23

**neighbor's** [1] - 2117:18

**neighborhood** [1] - 2019:20

**Neptune** [3] - 2029:6, 2029:11, 2029:18

**never** [26] - 1956:13, 1971:21, 1987:17, 1998:21, 2008:9, 2011:9, 2011:14, 2011:21, 2012:17, 2012:20, 2037:3, 2045:3, 2045:5, 2090:2, 2090:6, 2090:7, 2090:11, 2095:10, 2096:24, 2097:9, 2106:25, 2119:10, 2119:13, 2119:19, 2121:3, 2123:16

**NEW** [1] - 1939:1

**new** [3] - 1955:20, 1986:14, 2142:19

**New** [7] - 1939:5, 1939:17, 1939:23, 1940:2, 1940:5, 1940:9, 1950:2

**news** [1] - 2032:16

**newspaper** [5] - 2005:21, 2006:2, 2138:4, 2138:5, 2138:24

**next** [20] - 1980:15, 1981:2, 2017:4, 2018:16, 2031:23, 2039:22, 2040:25, 2048:2, 2049:10, 2085:12, 2128:20, 2128:21, 2129:10, 2129:11, 2130:18, 2133:13, 2134:24, 2135:11, 2135:23, 2142:3

**NHL** [9] - 2050:18, 2051:2, 2052:17, 2055:24, 2056:2, 2107:7, 2107:11, 2107:13

**Nick** [2] - 2015:10, 2015:13

**nick** [1] - 2015:17

**nickname** [1] - 1986:10

**night** [1] - 1968:14

**no-brainer** [1] - 1989:12

**Nolan** [43] - 1944:13, 1980:11, 1981:9, 1989:21, 2049:12, 2049:13, 2049:22, 2050:3, 2050:4, 2053:23, 2058:2, 2067:20, 2067:24, 2068:17, 2069:21, 2073:4, 2077:5, 2077:14, 2078:6, 2079:6, 2079:10, 2084:3, 2086:3, 2087:24, 2090:19, 2096:5, 2100:20, 2101:3, 2116:10, 2116:20, 2117:3, 2126:23, 2128:6, 2128:12, 2144:13, 2145:1, 2146:1, 2146:5, 2146:8, 2147:20

**Nolan's** [2] - 1981:5, 2095:12

**Nolans** [2] - 2096:15, 2145:16

**non** [2] - 2141:13, 2141:17

**non-pertinent** [2] - 2141:13, 2141:17

**Norstrom** [3] - 2071:22, 2071:23, 2072:8

**North** [1] - 2126:25

**Northern** [11] - 2034:16, 2066:11, 2066:13, 2070:2, 2071:9, 2074:2, 2074:6, 2074:7, 2080:2, 2080:8, 2080:11

**notation** [1] - 2041:1

**note** [2] - 2060:7, 2060:23

**noted** [2] - 1941:4, 1986:23

**notes** [10] - 1948:4, 1948:5, 1948:7, 1950:17, 1951:4, 1952:3, 1980:23, 2098:24, 2099:1, 2143:15

**nothing** [9] - 1953:13, 2002:3, 2004:5, 2077:14, 2090:14, 2094:2, 2122:9, 2122:16, 2126:19

**noticed** [1] - 1946:20

**notified** [1] - 2073:19

**notion** [1] - 2090:2

**notwithstanding** [1] - 2142:22

**November** [8] - 2007:12, 2027:4, 2030:17, 2031:11, 2031:13, 2031:20, 2072:17, 2092:11

**number** [23] - 1949:12, 1958:2, 1968:4, 1977:22, 1985:12, 1985:22, 1986:5, 1987:13, 1992:17, 1994:8, 2004:2, 2009:2, 2013:12, 2046:19, 2053:22, 2086:20, 2090:8, 2121:11, 2121:20, 2122:8, 2122:15, 2122:18

**Number** [3] - 2115:4, 2116:3, 2116:7

**numbers** [4] - 1976:14, 1978:17, 1991:8, 2054:16

**numerous** [4] - 1964:22, 1969:12, 2026:13, 2099:5

## O

**Oaks** [1] - 2112:17

**oath** [4] - 1948:22, 1949:2, 1973:7, 2049:15

**object** [9] - 1944:18, 1955:10, 2013:15, 2061:2, 2076:1, 2089:24, 2097:10, 2122:6, 2135:13

**objected** [5] - 2078:10, 2095:12, 2136:4, 2136:5, 2136:6

**objecting** [2] - 2098:11, 2122:11

**objection** [58] - 1942:24, 1942:25, 1955:24, 1956:2, 1956:4, 1959:3, 1960:6, 1960:8, 1962:4, 1964:3, 1964:17, 1965:15, 1971:9, 1972:18, 1977:17, 1978:19, 1979:1, 1979:17, 1984:8, 1985:24, 1985:25, 1991:13, 1993:13, 1994:5, 2013:19, 2016:22,

2028:14, 2028:16, 2031:3, 2031:4, 2036:19, 2046:25, 2047:18, 2067:16, 2069:14, 2077:2, 2087:14, 2087:19, 2088:3, 2088:21, 2089:8, 2089:21, 2098:8, 2103:23, 2107:15, 2108:10, 2108:23, 2109:18, 2111:22, 2113:13, 2116:8, 2116:11, 2125:1, 2136:8, 2137:12, 2140:12, 2141:17, 2146:3
**Objection** [1] - 1951:6
**objections** [2] - 1950:25, 2018:3
**obliged** [1] - 2026:20
**observe** [1] - 1950:16
**obtain** [4] - 1957:22, 1990:17, 2107:22, 2146:17
**obtained** [2] - 2089:12, 2089:14
**obtaining** [3] - 1947:17, 1964:7, 1990:15
**obvious** [1] - 1973:5
**obviously** [11] - 1968:10, 1994:14, 2037:3, 2092:3, 2129:4, 2134:5, 2134:16, 2137:17, 2138:14, 2141:8, 2141:21
**occasion** [3] - 2004:9, 2080:23, 2080:25
**occasions** [3] - 1951:5, 1953:13, 2082:13
**occur** [2] - 1969:11, 1970:8
**occurred** [8] - 1973:23, 1974:13, 1981:24, 1984:6, 1988:8, 2026:24, 2082:16, 2117:20
**Oceanside** [1] - 1940:5
**October** [6] - 1985:12, 1986:4, 2005:6, 2005:9, 2027:3, 2072:5
**OF** [2] - 1939:1, 1939:3
**offer** [15] - 1960:5, 1966:12, 2038:4, 2095:11, 2099:14,

2112:6, 2113:11, 2113:14, 2125:23, 2126:5, 2140:6, 2141:18, 2144:12, 2144:20, 2145:12
**offered** [9] - 2014:12, 2014:19, 2015:4, 2015:8, 2015:19, 2069:16, 2071:22, 2095:8, 2142:4
**offering** [5] - 1961:2, 1961:4, 2007:20, 2125:18, 2137:2
**offers** [1] - 2015:22
**office** [17] - 1949:8, 1953:21, 1984:3, 1986:20, 1987:10, 1995:21, 1995:25, 2002:2, 2010:1, 2023:10, 2038:2, 2038:4, 2042:2, 2042:10, 2042:12, 2119:19, 2143:8
**Office** [1] - 1949:22
**offices** [1] - 1942:6
**often** [1] - 2054:5
**Old** [1] - 1940:1
**old** [1] - 2050:12
**OLIVERAS** [1] - 1940:4
**ON-1** [2] - 2058:1, 2058:3
**once** [12] - 1946:13, 1990:18, 1990:20, 2053:15, 2061:16, 2089:2, 2106:5, 2108:15, 2117:7, 2119:13, 2141:2
**one** [78] - 1941:5, 1949:13, 1949:20, 1950:16, 1955:3, 1958:11, 1980:8, 1983:9, 1985:13, 1986:6, 1986:23, 1988:3, 1989:22, 1992:4, 1997:8, 1999:11, 2001:4, 2003:7, 2004:23, 2005:5, 2006:7, 2010:8, 2012:16, 2012:17, 2012:18, 2013:12, 2014:8, 2019:24, 2021:21, 2022:22, 2022:23, 2024:7, 2026:25, 2027:20, 2030:4, 2030:5, 2030:7, 2030:9, 2030:15, 2032:17, 2038:7, 2040:21, 2044:16,

2046:18, 2053:16, 2058:14, 2063:23, 2068:19, 2068:25, 2073:9, 2074:13, 2074:22, 2080:9, 2081:7, 2083:1, 2086:1, 2090:23, 2092:8, 2106:22, 2112:9, 2117:6, 2119:11, 2120:16, 2121:9, 2121:13, 2122:12, 2122:13, 2124:5, 2130:20, 2132:21, 2132:23, 2138:2, 2139:21, 2142:7, 2144:7, 2145:23, 2148:21
**One** [1] - 1939:21
**one's** [1] - 2129:20
**one-page** [1] - 2038:7
**ones's** [1] - 2129:20
**ongoing** [2] - 1992:12, 1993:25
**open** [12] - 1953:1, 1968:1, 1992:22, 1995:23, 1998:25, 2019:24, 2065:17, 2065:20, 2077:1, 2078:1, 2091:25, 2129:11
**Open** [1] - 2019:1
**opened** [2] - 2066:4, 2066:9
**opens** [1] - 2092:20
**operating** [6] - 2001:10, 2011:5, 2096:20, 2110:24, 2111:2, 2111:19
**operation** [1] - 2097:4
**opinion** [4] - 2065:3, 2142:20, 2142:22, 2143:4
**opportunity** [12] - 1986:19, 2047:16, 2047:20, 2056:22, 2065:1, 2081:9, 2082:14, 2083:24, 2091:3, 2093:16, 2093:25, 2094:4
**opposed** [6] - 1947:3, 1954:20, 2025:8, 2029:6, 2044:12, 2089:22
**opposite** [2] - 2025:6, 2143:1
**order** [3] - 1948:11, 2092:13, 2147:12
**original** [13] - 1956:22, 1997:3, 1998:3, 2000:11, 2025:14,

2032:21, 2141:11, 2142:2, 2142:25, 2143:8, 2144:1, 2145:3, 2145:4
**originally** [9] - 1946:18, 1998:4, 2000:7, 2022:12, 2023:14, 2023:19, 2023:24, 2034:25, 2058:16
**ought** [1] - 2096:25
**outset** [1] - 1982:18
**outside** [1] - 1990:3
**outstanding** [1] - 2029:24
**outweighed** [1] - 2136:13
**overall** [4] - 1992:21, 2029:21, 2054:18, 2130:16
**overlay** [1] - 2001:5
**overnight** [1] - 2135:6
**overruled** [11] - 1944:20, 1956:7, 1979:2, 1984:9, 1991:14, 1993:15, 2028:15, 2031:6, 2047:19, 2077:15, 2136:8
**Overruled** [1] - 1979:18
**owe** [9] - 2000:24, 2070:14, 2070:15, 2070:18, 2071:17, 2072:7, 2072:8, 2072:19, 2072:21
**owed** [1] - 1966:4
**Owen** [13] - 1989:21, 2049:11, 2049:21, 2068:17, 2073:4, 2077:14, 2086:3, 2095:12, 2116:10, 2116:19, 2116:20, 2144:13, 2145:1
**owen** [1] - 2077:5
**OWEN** [1] - 1940:7
**owing** [2] - 2029:17, 2127:10
**own** [22] - 1946:21, 1958:17, 1962:14, 1962:16, 1973:7, 1977:13, 1993:7, 2016:11, 2024:12, 2025:2, 2026:3, 2027:14, 2038:17, 2043:22, 2045:12, 2045:25, 2078:16, 2109:5, 2109:16, 2127:23, 2145:21, 2145:25

**owned** [8] - 2024:7, 2038:12, 2038:15, 2038:16, 2038:17, 2060:14, 2124:9, 2124:12
**owner** [1] - 1946:6
**ownership** [31] - 1945:25, 1946:6, 1946:14, 1947:17, 1948:12, 1953:8, 1959:6, 1959:9, 1959:11, 1995:13, 1997:21, 2000:9, 2001:9, 2001:15, 2020:24, 2026:7, 2027:5, 2028:23, 2029:1, 2032:12, 2044:9, 2061:11, 2061:12, 2075:5, 2096:6, 2096:21, 2099:18, 2101:5, 2101:9, 2101:18, 2123:23
**owning** [1] - 1999:21

**P**

**p.m** [4] - 2048:7, 2048:13, 2128:8, 2130:2
**page** [27] - 1959:22, 1960:2, 1960:16, 1971:23, 2003:18, 2003:20, 2003:22, 2009:9, 2010:13, 2014:17, 2015:12, 2017:4, 2018:16, 2020:14, 2020:15, 2022:4, 2028:22, 2038:7, 2083:25, 2086:1, 2096:7, 2101:11, 2101:23, 2103:6, 2105:2, 2114:2, 2118:7
**pages** [2] - 1958:7, 1997:2
**paid** [16] - 1953:8, 1954:7, 1990:20, 1990:23, 1990:25, 2019:23, 2029:24, 2032:23, 2070:15, 2107:13, 2107:18, 2107:19, 2107:23, 2108:3, 2108:14, 2127:13
**Palms** [1] - 2130:9
**panel** [4] - 2084:11, 2093:17, 2105:14, 2105:16
**paper** [4] - 2067:7,

2136:22, 2137:4
**papering** [1] - 2136:21
**papers** [2] - 2105:13, 2105:16
**paperwork** [16] - 2026:13, 2060:5, 2060:16, 2060:17, 2060:21, 2061:8, 2061:11, 2062:10, 2096:16, 2096:17, 2096:25, 2097:2, 2111:20, 2112:7, 2112:25
**paragraph** [1] - 2101:12
**parcels** [1] - 2064:12
**pare** [1] - 2134:20
**park** [3] - 1990:13, 2127:22, 2127:23
**Park** [7] - 2120:2, 2120:21, 2120:22, 2120:23, 2120:25, 2123:9, 2125:19
**parse** [1] - 2089:7
**part** [31] - 1955:21, 1971:3, 1982:5, 1989:10, 1989:16, 1990:5, 1990:10, 1997:9, 1997:20, 1998:5, 2001:1, 2001:6, 2005:19, 2007:16, 2011:9, 2014:1, 2020:18, 2022:16, 2026:2, 2045:16, 2056:23, 2062:11, 2062:15, 2068:19, 2068:23, 2085:7, 2123:2, 2139:22, 2144:19, 2145:7, 2148:18
**participate** [2] - 2005:10, 2013:1
**participated** [1] - 2032:2
**participating** [1] - 1944:9
**participation** [2] - 1944:7, 2014:12
**particular** [17] - 1945:18, 1954:21, 1962:20, 1966:11, 1967:13, 1978:24, 1987:9, 1992:23, 2010:8, 2021:17, 2024:16, 2045:20, 2081:13, 2082:18, 2082:20, 2115:6, 2116:5
**particularly** [4] - 1964:20, 1989:8,

2015:4, 2081:6
**particulars** [5] - 1969:13, 1999:22, 1999:24, 2002:10, 2092:1
**parting** [1] - 1981:23
**partner** [1] - 2132:19
**Partners** [5] - 2021:20, 2023:25, 2032:13, 2124:8, 2124:12
**parts** [3] - 1954:22, 1955:13, 1956:11
**party** [2] - 2011:7, 2012:8
**passed** [1] - 2060:8
**passing** [1] - 2134:11
**passion** [1] - 1961:17
**past** [2] - 1980:17, 1980:24
**patent** [1] - 1987:11
**path** [1] - 2092:8
**patient** [1] - 2129:16
**pause** [4] - 1977:11, 2021:25, 2030:12, 2112:10
**pay** [21] - 1949:7, 1964:20, 1973:10, 1991:11, 1992:4, 1992:9, 2000:25, 2019:19, 2022:15, 2042:13, 2042:15, 2042:18, 2042:21, 2054:11, 2054:14, 2054:19, 2070:11, 2072:3, 2072:15, 2073:13, 2126:9
**paying** [6] - 1994:22, 2022:18, 2071:11, 2127:16, 2140:5
**payment** [11] - 1947:14, 1948:11, 2072:3, 2079:19, 2079:24, 2080:3, 2080:9, 2080:11, 2080:15, 2081:7, 2148:2
**payments** [3] - 1966:4, 1978:25, 2073:9
**pdf** [1] - 2031:16
**Peca** [4] - 2008:18, 2070:9, 2070:14, 2070:18
**PEII** [2] - 2140:20
**people** [9] - 1962:1, 1962:13, 2013:8, 2047:12, 2052:10, 2073:9, 2148:7, 2148:11, 2148:15

**peoples'** [1] - 1944:17
**percent** [8] - 1943:15, 1977:25, 1978:10, 2014:19, 2019:18, 2103:20, 2104:9, 2125:18
**percentage** [14] - 1945:25, 1946:14, 1948:11, 1959:16, 1989:11, 2012:11, 2020:23, 2026:14, 2033:6, 2047:6, 2054:15, 2054:17, 2060:14, 2127:23
**percentages** [2] - 1990:20, 2026:14
**perhaps** [9] - 1954:13, 1967:7, 2078:3, 2081:5, 2089:25, 2090:17, 2131:13, 2131:21, 2141:18
**period** [20] - 1998:16, 2012:2, 2019:24, 2020:3, 2021:11, 2035:4, 2041:12, 2051:16, 2053:12, 2069:24, 2070:3, 2070:16, 2070:24, 2072:25, 2096:1, 2109:15, 2120:10, 2120:13, 2120:25, 2140:18
**permission** [3] - 1997:5, 2147:22, 2148:4
**permitted** [1] - 2013:23
**person** [27] - 1949:19, 1949:22, 1950:8, 1950:20, 1962:20, 1965:10, 1968:13, 2006:11, 2013:3, 2013:4, 2014:12, 2051:15, 2051:18, 2060:18, 2106:4, 2125:2, 2125:5
**person's** [2] - 2098:25, 2100:4
**personal** [10] - 1958:17, 1962:11, 1962:14, 1962:16, 1993:13, 2000:16, 2025:4, 2035:8, 2042:19, 2043:22
**personally** [5] - 2008:9, 2021:14, 2025:13, 2071:6, 2071:25
**persons** [1] - 1950:16
**perspective** [4] -

1957:10, 2087:12, 2131:14, 2144:21
**persuade** [1] - 1966:16
**pertinent** [4] - 2141:13, 2141:17, 2142:1
**Peter** [1] - 2130:13
**ph** [2] - 1965:11, 1975:2
**Phil** [130] - 1947:6, 1947:16, 1947:21, 1948:4, 1948:5, 1948:10, 1948:23, 1949:5, 1953:2, 1953:7, 1953:11, 1953:17, 1954:13, 1955:1, 1955:14, 1956:13, 1956:15, 1956:19, 1957:2, 1957:4, 1957:13, 1957:15, 1957:19, 1958:1, 1958:8, 1958:14, 1958:21, 1958:25, 1961:9, 1961:12, 1961:25, 1962:15, 1962:20, 1963:2, 1963:11, 1963:16, 1963:23, 1965:8, 1966:17, 1969:7, 1970:24, 1971:3, 1971:7, 1971:15, 1972:3, 1972:14, 1973:4, 1973:6, 1973:8, 1973:17, 1973:22, 1974:3, 1974:8, 1974:11, 1974:14, 1975:9, 1975:11, 1976:5, 1976:10, 1976:14, 1976:19, 1977:2, 1979:14, 1981:24, 1992:14, 1992:16, 1993:4, 1995:23, 1999:5, 1999:17, 2003:14, 2008:5, 2011:18, 2012:9, 2012:16, 2013:7, 2019:20, 2033:24, 2034:11, 2034:25, 2035:7, 2035:9, 2036:9, 2036:11, 2041:16, 2043:16, 2044:4, 2051:21, 2060:7, 2060:9, 2061:15, 2064:16, 2064:18, 2079:8, 2080:21, 2080:23, 2080:24, 2080:25, 2081:6,

2082:13, 2082:15, 2082:25, 2083:6, 2083:9, 2083:12, 2084:6, 2084:12, 2084:17, 2084:22, 2086:4, 2086:21, 2087:10, 2089:17, 2092:10, 2093:21, 2104:25, 2105:16, 2105:23, 2105:24, 2106:2, 2106:7, 2106:10, 2106:11, 2109:3, 2110:11, 2110:16, 2110:18, 2111:18, 2112:6, 2145:7
**Phil's** [2] - 1955:20, 1982:3
**Philip** [1] - 1939:6
**PHILLIP** [1] - 1939:6
**Phillip** [1] - 1939:21
**Phoenix** [1] - 2050:22
**phone** [13] - 1947:25, 1950:22, 1953:4, 1955:17, 1962:21, 1969:12, 2010:2, 2015:18, 2037:20, 2060:18, 2062:9, 2062:10, 2144:8
**photocopy** [5] - 1945:19, 2080:18, 2102:2, 2102:20, 2104:7
**photos** [2] - 2001:18, 2141:13
**physical** [3] - 2081:8, 2143:5, 2143:7
**pick** [1] - 1955:17
**piece** [13] - 1957:25, 1964:8, 1964:10, 1964:22, 1965:2, 1965:4, 2024:12, 2078:16, 2136:22, 2137:4, 2142:1, 2142:25
**pitched** [1] - 2011:17
**place** [27] - 1947:19, 1947:24, 1950:1, 1950:2, 1951:11, 1963:24, 1965:19, 1966:17, 1976:4, 1976:5, 1976:7, 1987:25, 2049:14, 2054:14, 2076:6, 2085:3, 2086:5, 2086:10, 2086:14, 2086:15, 2117:14, 2136:12, 2136:20, 2136:23, 2136:25, 2145:24

**placed** [1] - 2073:21
**plaintiffs** [1] - 2086:4
**plan** [4] - 2001:7, 2021:8, 2021:11, 2021:12
**plane** [6] - 1997:18, 2001:17, 2001:19, 2002:1, 2039:1, 2040:21
**planes** [1] - 2040:23
**planner** [1] - 2054:8
**planning** [1] - 2133:5
**plans** [1] - 2129:1
**play** [2] - 2047:5, 2052:17
**Playboy** [7] - 2042:22, 2139:7, 2139:14, 2139:17, 2140:21, 2147:25, 2148:3
**played** [2] - 2050:24, 2106:15
**player** [6] - 2050:7, 2050:8, 2050:21, 2106:19, 2130:7, 2134:17
**players** [12] - 1962:8, 1999:13, 1999:22, 2008:3, 2009:25, 2029:6, 2029:10, 2029:25, 2034:8, 2052:7, 2108:11, 2134:20
**playing** [4] - 2050:10, 2071:6, 2071:24, 2072:11
**Plaza** [2] - 1939:16, 1940:8
**pleased** [3] - 1959:5, 1959:13, 1959:14
**plural** [1] - 1954:20
**plus** [2] - 1956:1, 2091:14
**pm** [3] - 2087:23, 2100:15, 2100:17
**pocket** [1] - 2127:17
**pockets** [1] - 2036:25
**podium** [1] - 2048:8
**point** [77] - 1941:22, 1946:5, 1950:19, 1950:20, 1955:8, 1956:16, 1956:20, 1957:1, 1957:3, 1962:19, 1966:9, 1967:9, 1968:17, 1973:15, 1973:17, 1973:22, 1974:2, 1975:11, 1977:5, 1977:24, 1983:15, 1984:19, 1985:21, 1986:23, 1989:13,

1990:2, 1992:7, 2006:13, 2006:14, 2008:17, 2011:23, 2014:10, 2019:7, 2023:23, 2025:18, 2026:8, 2026:16, 2026:19, 2027:17, 2032:9, 2032:20, 2035:24, 2037:3, 2041:15, 2044:2, 2044:16, 2052:1, 2056:3, 2056:25, 2061:7, 2061:10, 2062:25, 2085:21, 2095:23, 2096:10, 2101:13, 2105:15, 2105:24, 2106:7, 2106:22, 2110:10, 2110:15, 2125:16, 2125:24, 2127:25, 2132:15, 2132:20, 2136:9, 2141:7, 2141:9, 2141:15, 2144:22, 2145:6, 2147:13, 2147:22
**pointed** [1] - 2121:9
**points** [1] - 1992:2
**poor** [1] - 2084:1
**portfolio** [8] - 1961:14, 1963:2, 1963:5, 2035:13, 2054:18, 2054:22, 2054:23, 2055:23
**portion** [9] - 1972:20, 1978:4, 1985:1, 1986:16, 2000:3, 2031:12, 2058:3, 2099:23, 2101:15
**portions** [4] - 1996:23, 2015:7, 2081:15, 2139:16
**posed** [1] - 2062:3
**position** [5] - 2141:25, 2144:1, 2144:14, 2148:19, 2148:21
**possession** [1] - 2144:2
**possibility** [1] - 1967:4
**possible** [7] - 1992:21, 2007:21, 2046:23, 2081:3, 2124:22, 2131:8, 2138:3
**possibly** [5] - 1986:12, 1987:3, 1998:20, 2021:16, 2027:2
**potential** [1] - 1989:15
**power** [2] - 1963:13,

1963:17
**precise** [1] - 1945:23
**preclude** [1] - 2132:2
**precluding** [1] - 2091:8
**predict** [1] - 2146:13
**prefer** [1] - 2129:14
**prejudicial** [2] - 2088:7, 2091:11
**preparatory** [1] - 2021:18
**prepared** [2] - 2135:7, 2147:7
**presence** [4] - 1981:15, 2023:15, 2049:3, 2100:23
**present** [10] - 1950:5, 1971:3, 2015:14, 2043:12, 2055:18, 2059:25, 2060:6, 2060:24, 2084:25, 2086:17
**presented** [5] - 1963:2, 2001:6, 2083:9, 2095:14, 2123:12
**preserve** [3] - 2132:1, 2142:14, 2143:3
**pressing** [1] - 2094:17
**pressure** [1] - 2082:20
**pretty** [7] - 1943:21, 2013:5, 2020:25, 2045:11, 2088:23, 2104:17, 2145:9
**prevail** [1] - 2142:18
**preventing** [1] - 2014:4
**previous** [1] - 2144:18
**previously** [1] - 1941:15
**primarily** [2] - 1957:23, 1965:1
**primary** [1] - 1964:13
**principal** [1] - 1977:16
**principle** [1] - 2118:11
**principles** [1] - 2121:4
**print** [1] - 2068:16
**Print** [1] - 2116:19
**printed** [4] - 2006:4, 2024:14, 2028:22, 2038:9
**privately** [1] - 1959:15, 2044:11
**Privitello** [3] - 2015:10, 2015:13, 2015:17
**privy** [2] - 2012:15, 2012:16
**probable** [1] - 2103:21
**probative** [5] - 2088:8,

2090:25, 2136:10, 2136:12
**problem** [9] - 2026:6, 2032:4, 2090:16, 2133:3, 2139:9, 2144:19, 2146:21, 2146:22, 2148:9
**problems** [4] - 2134:1, 2134:4, 2134:8, 2135:11
**procedure** [1] - 2110:21
**proceed** [2] - 2049:9, 2116:24
**proceeded** [1] - 2095:7
**proceeding** [10] - 2021:25, 2030:12, 2084:25, 2085:3, 2085:10, 2089:18, 2093:10, 2094:5, 2123:14, 2124:7
**proceedings** [6] - 1977:11, 2087:10, 2093:18, 2096:1, 2112:10, 2123:23
**process** [2] - 1998:14, 2142:14
**produce** [2] - 1964:11, 1983:10
**produced** [9] - 2097:8, 2097:9, 2097:14, 2098:10, 2132:6, 2139:14, 2140:18, 2145:19
**professional** [9] - 2050:8, 2050:11, 2050:17, 2050:20, 2051:6, 2051:10, 2056:6, 2106:15, 2106:18
**professionally** [1] - 2050:25
**proffer** [1] - 1967:16
**proffering** [1] - 2141:22
**progress** [1] - 1993:2
**prohibition** [1] - 2081:7
**project** [10] - 1958:19, 2003:5, 2063:11, 2064:10, 2064:13, 2111:20, 2112:1, 2112:7, 2121:13, 2132:20
**projects** [1] - 2065:1
**prolong** [1] - 2085:10
**proof** [10] - 1966:12, 2027:22, 2096:11, 2099:14, 2123:23,

2124:8, 2124:12, 2140:7, 2144:20, 2145:12
**proper** [5] - 2060:5, 2060:17, 2060:21, 2096:16, 2137:21
**properly** [1] - 1996:5
**property** [2] - 1993:6, 2111:19
**proposals** [1] - 1961:13
**prospective** [1] - 1954:11
**protection** [2] - 2016:9, 2025:17
**Protective** [1] - 2122:1
**protocol** [1] - 1952:5
**proud** [1] - 1987:8
**prove** [1] - 2139:11
**provide** [4] - 1997:2, 2005:17, 2145:20, 2145:22
**provided** [5] - 1995:18, 2024:7, 2027:23, 2088:6, 2137:15
**providing** [7] - 1991:1, 2005:11, 2007:5, 2043:16, 2083:13, 2124:7, 2136:22
**provision** [3] - 2107:12, 2108:6, 2108:22
**publically** [1] - 2044:12
**publicity** [1] - 2005:18
**publicly** [2] - 2031:9, 2069:18
**publish** [2] - 2031:9, 2069:18
**pull** [1] - 2049:23
**pulled** [1] - 2138:5
**punitive** [1] - 2084:22
**purchase** [2] - 2068:24, 2109:8
**purchased** [5] - 2039:22, 2039:25, 2109:6, 2109:13, 2109:16
**Purpose** [1] - 2067:22
**purpose** [4] - 1992:21, 2041:24, 2059:3, 2069:4
**purposes** [20] - 1953:8, 1955:11, 1957:23, 1992:3, 2002:13, 2002:14, 2003:10, 2003:24, 2004:8, 2007:6, 2038:18, 2079:12, 2105:17, 2110:8,

2137:16, 2137:23,
2139:16, 2140:16,
2144:24, 2145:13
**pursuant** [4] -
1963:12, 1963:16,
2079:12, 2089:14
**pursue** [1] - 2000:12
**put** [20] - 1946:18,
1955:20, 1970:25,
1987:25, 1992:6,
1995:16, 2025:16,
2025:20, 2035:20,
2045:24, 2046:6,
2059:1, 2059:4,
2059:6, 2060:7,
2060:23, 2074:24,
2135:9, 2139:13,
2148:4
**putting** [2] - 2005:20,
2045:19

## Q

**quality** [1] - 2083:16
**quarterly** [2] -
2054:20, 2054:21
**Quebec** [1] - 2050:22
**QUESTION** [4] -
2118:8, 2118:11,
2118:14, 2118:16
**question's** [2] -
2121:22, 2121:25
**questioned** [1] -
2082:4
**questioning** [7] -
2024:9, 2099:6,
2099:19, 2113:15,
2134:15, 2136:19,
2139:7
**questions** [45] -
1945:8, 1950:13,
1950:15, 1950:16,
1976:15, 1977:20,
1979:24, 1981:11,
1981:12, 1981:18,
1982:8, 1982:22,
1998:12, 1998:22,
2001:14, 2009:2,
2021:18, 2029:23,
2033:12, 2042:24,
2044:20, 2044:21,
2046:19, 2046:22,
2047:16, 2047:21,
2058:5, 2062:3,
2069:20, 2077:6,
2079:1, 2088:19,
2095:3, 2095:7,
2106:7, 2106:12,
2116:22, 2118:6,
2118:19, 2127:21,

2128:2, 2128:3,
2128:5, 2137:20
**quick** [2] - 2004:18,
2100:12
**quickly** [1] - 2082:20
**quite** [4] - 1945:7,
2105:19, 2144:21,
2145:6
**quote** [5] - 2002:14,
2002:15, 2091:24,
2092:25
**quote-quote** [1] -
2091:24
**quote-unquote** [1] -
2092:25

## R

**race** [2] - 2042:13,
2117:19
**racing** [1] - 2117:19
**raise** [5] - 1980:8,
2007:2, 2049:16,
2094:4, 2095:3
**raised** [3] - 2007:2,
2094:8, 2095:23
**raises** [1] - 1967:4
**raising** [1] - 2134:2
**ramification** [1] -
2093:7
**Re** [1] - 2031:16
**reach** [2] - 1987:18,
2131:21
**reached** [2] - 1997:9,
2126:12
**read** [39] - 1958:10,
1963:17, 1971:24,
1972:20, 1986:13,
1996:22, 1998:18,
2000:1, 2000:3,
2001:11, 2014:18,
2078:3, 2078:4,
2081:9, 2081:11,
2081:12, 2081:14,
2082:20, 2082:24,
2083:18, 2083:23,
2085:14, 2085:16,
2096:7, 2099:22,
2101:12, 2101:15,
2104:14, 2104:17,
2110:24, 2115:4,
2115:6, 2116:1,
2116:5, 2129:22,
2138:4, 2142:21,
2143:4
**reading** [1] - 2118:7
**ready** [2] - 2049:4,
2089:8
**real** [13] - 1957:23,
1957:25, 2026:5,

2045:9, 2069:5,
2069:7, 2109:5,
2109:12, 2109:16,
2110:4, 2110:12,
2110:17, 2121:14
**realized** [1] - 1967:11
**really** [35] - 1947:5,
1947:8, 1947:9,
1957:7, 1958:10,
1964:20, 1974:10,
1994:13, 1997:14,
1997:16, 1997:25,
1998:2, 1998:14,
1999:10, 1999:11,
2000:21, 2000:24,
2009:14, 2011:23,
2024:12, 2045:5,
2047:8, 2048:2,
2062:13, 2065:2,
2078:7, 2088:16,
2090:3, 2090:24,
2100:20, 2121:6,
2121:7, 2129:21,
2134:10, 2145:6
**rearrange** [1] - 2133:6
**reason** [13] - 1947:2,
1982:2, 2013:22,
2020:18, 2045:10,
2061:20, 2062:15,
2078:23, 2091:1,
2092:25, 2136:8,
2138:20, 2144:10
**reasons** [3] - 2091:9,
2091:15, 2092:9
**recalled** [1] - 1941:21
**receipt** [1] - 1943:13
**receive** [10] - 1998:17,
2081:5, 2096:16,
2099:17, 2102:16,
2104:24, 2105:11,
2108:21, 2123:21,
2147:2
**received** [56] - 1942:1,
1942:20, 1943:3,
1943:19, 1946:12,
1946:25, 1953:9,
1958:8, 1958:11,
1958:13, 1958:14,
1960:10, 1973:15,
1977:5, 1978:5,
1978:15, 1985:21,
1994:3, 1996:8,
1997:12, 1998:9,
2002:5, 2002:6,
2004:20, 2020:5,
2023:4, 2023:6,
2027:11, 2028:13,
2031:1, 2033:6,
2037:3, 2045:7,
2067:18, 2078:20,

2079:17, 2087:5,
2087:9, 2089:22,
2090:2, 2090:5,
2096:5, 2096:25,
2097:2, 2099:25,
2101:4, 2101:6,
2101:17, 2102:17,
2105:3, 2105:9,
2113:7, 2115:6,
2126:24, 2127:7
**RECEIVED** [4] -
2151:2, 2151:3,
2151:6, 2151:10
**Receiver** [3] -
2040:25, 2041:1,
2041:6
**receiving** [16] -
1985:4, 1994:10,
1994:20, 1996:25,
2001:14, 2007:11,
2024:21, 2027:5,
2102:11, 2111:2,
2111:12, 2112:8,
2112:20, 2124:1,
2124:12, 2138:14
**recently** [1] - 1965:13
**Recess** [2] - 1980:3,
2100:15
**recess** [3] - 2048:13,
2134:25, 2135:22
**recipients** [1] -
2004:24
**recognize** [25] -
1942:10, 1959:23,
1960:18, 1960:25,
1971:20, 1985:9,
1985:11, 1987:9,
1994:13, 2001:25,
2004:22, 2008:19,
2016:16, 2016:18,
2016:19, 2030:16,
2030:21, 2052:23,
2053:3, 2102:3,
2102:4, 2102:22,
2102:25, 2103:7,
2103:16
**recollection** [64] -
1972:1, 1972:8,
1972:10, 1983:21,
1984:5, 1985:17,
1991:3, 1991:9,
1991:19, 1994:19,
1997:11, 1997:20,
1998:8, 1999:1,
1999:7, 1999:20,
2000:2, 2000:4,
2000:18, 2001:3,
2001:20, 2002:9,
2005:8, 2006:21,
2007:7, 2009:5,

2010:9, 2014:19,
2018:12, 2019:6,
2019:9, 2019:15,
2026:23, 2027:3,
2027:7, 2029:13,
2029:20, 2029:25,
2040:5, 2058:4,
2058:9, 2064:2,
2068:12, 2082:19,
2084:18, 2086:2,
2086:7, 2086:10,
2094:14, 2097:1,
2097:6, 2097:20,
2098:1, 2098:25,
2099:7, 2099:11,
2099:25, 2100:5,
2101:16, 2102:17,
2124:1, 2124:5,
2125:23, 2139:25
**recommendation** [6] -
2051:14, 2055:6,
2055:14, 2055:20,
2060:7, 2060:9
**recommendations** [2]
- 2055:17, 2109:3
**recommended** [1] -
2052:11
**record** [19] - 1963:15,
1964:4, 1966:7,
1967:8, 1967:13,
1967:14, 1972:21,
2036:5, 2081:15,
2095:24, 2099:8,
2100:11, 2115:25,
2131:22, 2138:12,
2139:7, 2139:13,
2147:25, 2148:14
**recorded** [2] -
1950:24, 2032:17
**recording** [1] - 1951:4
**recordings** [1] -
2142:12
**records** [14] - 1959:7,
1959:8, 1959:10,
2066:14, 2070:9,
2070:25, 2071:21,
2072:1, 2104:17,
2145:6, 2145:17,
2145:23, 2145:25,
2147:15
**recover** [3] - 1992:22,
2000:13, 2091:22
**recovered** [1] - 1956:1
**recovering** [2] -
1955:4, 1955:11
**recovery** [2] -
1956:10, 1959:17
**RECROSS** [4] -
2043:2, 2044:22,
2150:11, 2150:13

**red** [1] - 1941:11
**red-eye** [1] - 1941:11
**redirect** [13] -
2033:13, 2044:24,
2046:10, 2046:18,
2089:25, 2090:17,
2091:3, 2091:21,
2098:11, 2126:20,
2137:12, 2137:13,
2137:22
**REDIRECT** [4] -
2033:14, 2126:21,
2150:9, 2150:23
**refer** [10] - 1959:21,
1960:16, 2008:16,
2014:17, 2019:10,
2083:25, 2101:23,
2103:6, 2109:7,
2138:5
**reference** [22] -
1948:9, 1953:7,
1954:25, 1955:1,
1966:10, 1968:9,
1973:23, 1976:22,
2011:16, 2016:19,
2043:16, 2080:17,
2082:18, 2084:11,
2091:8, 2091:16,
2093:22, 2097:3,
2099:11, 2105:23,
2109:4, 2116:4
**referred** [2] - 1990:13,
2040:20
**referring** [14] -
1973:15, 1977:5,
1985:18, 2001:23,
2006:2, 2019:6,
2023:23, 2033:8,
2046:4, 2067:25,
2072:13, 2097:21,
2116:12, 2143:15
**reflect** [1] - 2138:12
**reflected** [7] - 1959:6,
2022:18, 2029:1,
2095:23, 2096:21,
2147:3, 2147:4
**reflecting** [7] -
1974:21, 2061:11,
2096:6, 2099:18,
2101:5, 2101:8,
2145:1
**reflects** [2] - 2081:15,
2145:10
**refresh** [33] - 1972:1,
1972:8, 1972:10,
1985:16, 1991:3,
1994:19, 1997:11,
1997:20, 1999:1,
1999:7, 2000:4,
2000:18, 2001:20,

2005:8, 2009:5,
2009:15, 2010:9,
2018:12, 2019:5,
2019:15, 2027:7,
2084:17, 2086:2,
2086:7, 2086:9,
2097:6, 2097:19,
2098:1, 2099:2,
2099:7, 2099:10,
2100:4, 2101:16
**refreshes** [8] -
2014:18, 2019:9,
2026:23, 2058:4,
2058:8, 2097:1,
2099:25, 2125:23
**refreshing** [2] -
2027:2, 2098:25
**refusal** [1] - 1955:10
**regard** [6] - 1949:4,
2010:11, 2032:20,
2045:23, 2077:4,
2095:8
**regarding** [27] -
1942:2, 1955:9,
1984:16, 1988:25,
1990:10, 1995:19,
1998:12, 1998:22,
2000:5, 2005:11,
2006:8, 2020:11,
2021:12, 2023:22,
2030:24, 2046:19,
2088:11, 2090:20,
2096:5, 2123:23,
2129:22, 2132:8,
2136:6, 2138:25,
2141:10, 2141:19
**regards** [9] - 1983:9,
1992:18, 1993:23,
1994:21, 1995:2,
2006:3, 2011:3,
2011:4, 2011:14
**regularly** [1] - 2037:16
**rehash** [1] - 1992:2
**relate** [1] - 2093:1
**related** [2] - 2077:8,
2137:2
**relates** [22] - 1947:16,
1953:24, 1954:14,
1958:3, 1962:19,
1966:3, 1970:12,
2080:3, 2080:11,
2080:14, 2081:13,
2082:4, 2082:19,
2083:8, 2086:24,
2089:14, 2089:17,
2092:4, 2110:25,
2111:3, 2112:5,
2113:7
**relation** [1] - 1961:13
**relationship** [10] -

1962:9, 1962:12,
2080:21, 2082:25,
2083:6, 2083:8,
2083:11, 2115:3,
2115:10, 2116:2
**relative** [1] - 1966:20
**relatively** [2] -
1980:12, 2130:8
**relay** [1] - 2107:5
**releasing** [1] -
2135:14
**relevance** [8] -
2043:18, 2088:4,
2088:16, 2093:10,
2100:8, 2108:23,
2109:18, 2122:12
**relevant** [8] - 1966:23,
1967:2, 1967:4,
2142:1, 2143:13,
2148:3, 2148:6,
2148:22
**reluctantly** [1] -
2012:12
**remain** [1] - 2049:14
**remains** [1] - 2141:25
**remark** [1] - 2031:25
**remedy** [2] - 2000:13,
2096:14
**remember** [119] -
1942:2, 1944:2,
1948:18, 1952:2,
1974:8, 1977:8,
1983:25, 1984:15,
1984:25, 1987:4,
1987:7, 1988:5,
1988:19, 1989:18,
1991:7, 1991:16,
1992:10, 1993:21,
1994:7, 1994:10,
1995:5, 1995:12,
1995:25, 1997:6,
1999:11, 1999:25,
2003:16, 2004:3,
2004:13, 2006:1,
2007:11, 2009:9,
2009:16, 2010:1,
2011:21, 2013:11,
2013:14, 2014:2,
2014:10, 2015:12,
2015:13, 2015:19,
2016:3, 2018:11,
2021:6, 2021:10,
2023:6, 2024:1,
2024:4, 2024:5,
2024:9, 2024:23,
2024:24, 2025:9,
2026:6, 2027:17,
2028:4, 2029:9,
2029:17, 2035:14,
2036:3, 2036:5,

2036:8, 2036:11,
2036:15, 2037:11,
2040:4, 2040:5,
2044:24, 2045:4,
2045:24, 2046:20,
2047:6, 2052:10,
2054:19, 2061:23,
2063:13, 2063:19,
2068:14, 2082:23,
2084:7, 2084:14,
2084:24, 2097:7,
2098:5, 2100:6,
2100:9, 2101:10,
2101:19, 2102:18,
2105:8, 2109:10,
2110:21, 2112:8,
2117:7, 2117:20,
2118:6, 2118:13,
2118:14, 2118:16,
2118:19, 2119:12,
2119:16, 2120:14,
2123:25, 2124:7,
2124:11, 2124:14,
2124:21, 2124:23,
2125:8, 2125:13,
2125:20, 2126:3,
2126:4, 2126:7,
2136:2, 2139:22
**remembering** [1] -
2063:21
**remembers** [1] -
2095:16
**remind** [1] - 1941:23
**reminded** [1] - 2144:8
**rent** [1] - 2042:16
**repay** [1] - 1955:10
**repaying** [2] -
2070:21, 2072:21
**repeat** [11] - 1988:10,
2025:10, 2074:18,
2080:6, 2098:16,
2105:19, 2119:23,
2123:5, 2123:11,
2124:10, 2127:3
**repetition** [1] -
2134:18
**rephrase** [1] - 2078:8
**replace** [1] - 2129:13
**reporter** [1] - 2078:3
**Reporter(s** [1] -
1940:7
**represent** [7] -
1945:14, 1982:16,
2009:11, 2009:17,
2010:10, 2011:3,
2079:8
**representation** [3] -
2012:3, 2024:16,
2147:23
**representations** [1] -

2077:11
**representing** [5] -
2012:5, 2016:11,
2025:12, 2025:13,
2069:18
**request** [3] - 2026:12,
2026:16, 2134:22
**requested** [3] -
1974:3, 1975:8,
2027:13
**requesting** [1] -
1959:1
**require** [1] - 2141:12
**Reserve** [1] - 2067:22
**reside** [2] - 2112:16,
2142:2
**resided** [1] - 2142:5
**resides** [1] - 2142:14
**resolution** [2] -
2080:7, 2080:9
**resolve** [4] - 1997:9,
1997:21, 1997:23,
2080:3
**resolved** [4] -
1968:18, 1970:4,
1970:7, 2007:1
**resolving** [1] -
1968:21
**respect** [10] - 1947:14,
1954:10, 2037:16,
2041:10, 2041:13,
2085:20, 2093:2,
2094:3, 2136:15,
2137:4
**respective** [1] -
2001:9
**respond** [2] - 2020:2,
2031:18
**responded** [1] -
1996:5
**response** [6] -
2046:22, 2115:2,
2115:11, 2116:3,
2116:4, 2122:25
**responsibility** [1] -
2000:11
**responsible** [2] -
2016:1, 2016:3
**rest** [3] - 2130:19,
2133:13, 2133:23
**restate** [1] - 2078:2
**restaurant** [1] -
2057:11
**resting** [2] - 2130:22,
2131:5
**result** [12] - 1959:17,
1978:22, 1981:24,
2040:7, 2074:5,
2075:19, 2087:9,
2087:17, 2089:16,

2108:6, 2110:19, 2123:20
**resulted** [1] - 2108:18
**results** [1] - 2044:6
**resumed** [3] - 1941:15, 2108:14, 2108:5
**retain** [4] - 2011:4, 2012:11, 2141:12, 2142:25
**retained** [1] - 2146:9
**retired** [2] - 2050:7, 2056:7
**retirement** [2] - 1982:4, 2056:4
**return** [25] - 1947:17, 1963:20, 1978:4, 1978:10, 1991:5, 2007:22, 2014:20, 2059:5, 2062:9, 2078:20, 2082:15, 2113:7, 2125:18, 2125:24, 2126:13, 2141:4, 2146:2, 2146:9, 2146:16, 2146:18, 2146:25, 2147:2, 2147:5, 2147:7, 2147:8
**returned** [2] - 2015:24, 2082:15
**returning** [3] - 1963:7, 2141:24, 2143:24
**returns** [2] - 2145:14, 2147:4
**reveal** [2] - 2096:4, 2145:17
**review** [2] - 2081:1, 2082:14
**reviewed** [6] - 2082:6, 2082:8, 2082:9, 2098:18, 2099:10
**revisit** [1] - 2140:25
**revolved** [1] - 2004:5
**RICHARD** [1] - 1939:23
**Richards** [3] - 2045:25, 2046:2, 2126:10
**Richards'** [1] - 1988:20
**Rick** [2] - 1945:13, 2079:8
**rid** [1] - 1989:17
**ridiculous** [1] - 2024:2
**ring** [4] - 2007:24, 2015:10, 2125:4, 2126:11
**rings** [4] - 1977:22, 1987:6, 1999:15, 2013:24

**Rizzi** [6] - 2014:5, 2014:19, 2015:4, 2015:5, 2016:8, 2016:9
**Road** [1] - 1940:1
**ROBERT** [1] - 1940:3
**rock** [1] - 2019:21
**Ron** [4] - 1988:20, 2045:25, 2046:2, 2126:10
**RONALD** [1] - 1940:7
**room** [12] - 1971:1, 1973:7, 1992:12, 2012:17, 2012:18, 2013:7, 2013:8, 2013:9, 2014:7, 2014:8, 2015:16, 2032:10
**Ross** [1] - 2130:7
**roughly** [1] - 2062:6
**round** [1] - 2106:14
**round-about** [1] - 2106:14
**Rule** [1] - 2136:13
**ruled** [1] - 2136:10
**rules** [3] - 1952:10, 2099:21, 2100:3
**ruling** [3] - 2091:5, 2092:3, 2137:10
**rulings** [1] - 2136:1
**run** [2] - 2056:8, 2141:3
**running** [6] - 1945:6, 1977:25, 1992:14, 2009:21, 2011:5, 2057:19
**rush** [1] - 2121:21
**rushed** [1] - 2082:10

**S**

**sailing** [1] - 2003:7
**San** [6] - 1957:11, 2050:22, 2052:2, 2052:3, 2120:9, 2121:16
**sand** [1] - 2062:13
**SARITHA** [1] - 1939:18
**sat** [4] - 1953:3, 1971:1, 1992:11, 2038:2
**satisfied** [3] - 1963:8, 1996:4, 1996:7
**satisfy** [1] - 1991:21
**saved** [1] - 2055:23
**savvy** [2] - 2106:19, 2106:21
**saw** [13] - 1947:7, 1954:4, 1954:5,

1958:11, 1987:10, 2002:1, 2028:5, 2036:16, 2040:10, 2040:21, 2053:3, 2095:23, 2115:23
**scale** [1] - 2131:7
**scam** [1] - 1959:2
**scared** [1] - 2023:10
**Schedule** [1] - 2113:9
**schedule** [2] - 1941:10, 2147:3
**scheduled** [1] - 2134:23
**scheduling** [3] - 1980:9, 2129:7, 2129:19
**school** [2] - 2050:16, 2132:24
**schooling** [1] - 2050:14
**Schwab** [3] - 2054:25, 2055:2, 2055:10
**scope** [4] - 1965:9, 2036:12, 2077:8, 2132:18
**Scottsdale** [13] - 1976:9, 2075:7, 2075:18, 2078:16, 2118:9, 2120:2, 2120:11, 2120:15, 2120:18, 2120:21, 2121:5, 2127:22, 2127:24
**screen** [3] - 1995:17, 1996:16, 2069:22
**screw** [1] - 2090:23
**Sean** [1] - 2052:12
**search** [7] - 2141:3, 2141:8, 2141:21, 2142:24, 2145:17, 2145:23, 2147:11
**searching** [2] - 2141:21, 2143:23
**seated** [6] - 1941:19, 1948:3, 1981:17, 2049:22, 2088:2, 2130:3
**second** [8] - 1967:3, 2059:9, 2059:13, 2059:19, 2130:23, 2144:3, 2144:7
**Second** [1] - 2141:4
**secondary** [1] - 1964:15
**secretary** [1] - 2003:14
**Secured** [1] - 2067:23
**see** [66] - 1941:20, 1954:2, 1959:20, 1975:1, 1975:2,

1982:2, 1987:25, 1996:11, 1996:15, 1996:20, 2000:3, 2008:13, 2014:18, 2015:18, 2016:25, 2022:6, 2028:25, 2029:1, 2031:21, 2039:15, 2039:17, 2040:23, 2041:1, 2053:6, 2058:4, 2064:20, 2067:23, 2067:25, 2069:21, 2069:22, 2073:6, 2073:7, 2079:18, 2079:19, 2079:21, 2079:22, 2080:19, 2084:2, 2084:4, 2090:11, 2090:15, 2090:24, 2101:25, 2102:23, 2102:24, 2103:11, 2104:4, 2104:5, 2113:23, 2115:3, 2115:10, 2115:22, 2116:2, 2116:10, 2119:20, 2125:14, 2129:24, 2130:4, 2138:7, 2141:18, 2143:13, 2146:10, 2146:17, 2147:8, 2148:24
**seeing** [12] - 1975:10, 1987:4, 1987:7, 1994:7, 2028:4, 2036:8, 2036:15, 2066:23, 2067:7, 2068:14, 2082:23, 2101:19
**seek** [3] - 2051:5, 2084:10, 2142:19
**seeking** [2] - 1991:2, 1991:12
**seldom** [1] - 1976:11
**select** [2] - 2055:4
**sell** [5] - 1989:24, 1990:1, 1993:7, 2047:11, 2062:13
**selling** [1] - 1989:13
**send** [6] - 1947:6, 1957:5, 2001:12, 2080:25, 2082:13, 2112:6
**sending** [1] - 2134:25
**sense** [3] - 2025:22, 2045:22, 2131:10
**sent** [8] - 1988:11, 1988:14, 1988:17, 2046:2, 2095:10, 2137:6, 2145:13, 2147:13
**sentence** [1] - 2086:1

**September** [4] - 1979:12, 1979:19, 1979:22, 2003:18
**Sergei** [1] - 2071:2
**series** [4] - 2005:9, 2069:17, 2069:19, 2118:6
**serve** [1] - 2129:17
**services** [4] - 1961:9, 1982:3, 2054:11, 2083:12
**set** [6] - 1984:18, 1984:19, 2023:3, 2035:13, 2052:8, 2056:4
**setting** [1] - 1982:21
**settle** [4] - 1967:12, 1992:22, 2075:12, 2075:24
**settled** [5] - 1965:13, 1966:9, 1967:5, 1967:10, 2074:8
**Settlement** [83] - 1966:23, 1969:22, 1970:23, 1971:8, 1971:15, 1972:3, 1972:10, 1972:15, 1973:3, 1973:5, 1973:6, 1973:9, 1973:16, 1973:24, 1974:5, 1974:10, 1974:14, 1974:22, 1975:5, 1976:23, 1977:3, 1983:18, 1984:7, 1984:17, 1988:21, 1989:4, 1989:7, 1989:16, 1990:11, 1990:18, 1990:21, 1990:23, 1991:10, 1991:20, 1992:3, 1992:8, 1993:9, 1993:24, 1994:21, 1995:2, 1995:20, 1996:14, 1997:9, 1997:21, 1997:23, 1998:4, 1998:11, 1998:18, 2001:7, 2002:13, 2002:18, 2003:10, 2003:11, 2003:24, 2003:25, 2004:6, 2004:9, 2004:16, 2005:12, 2005:17, 2005:19, 2007:6, 2020:23, 2026:15, 2032:25, 2033:2, 2033:3, 2033:5, 2035:21, 2038:25, 2040:3, 2041:5, 2041:21, 2042:9,

2045:23, 2046:1, 2046:4, 2046:7, 2047:2, 2047:9, 2077:6, 2077:8, 2140:3

**settlement** [20] - 1966:25, 1967:1, 1967:13, 1990:6, 1992:18, 2021:8, 2021:11, 2021:12, 2039:10, 2039:25, 2040:8, 2074:2, 2074:5, 2074:7, 2075:19, 2080:13, 2126:24, 2127:1, 2127:7, 2127:19

**settling** [1] - 1966:13

**seven** [4] - 1942:2, 1949:14, 1958:15, 2120:23

**several** [7] - 1942:6, 1995:13, 1999:4, 1999:10, 2039:2, 2061:17, 2062:9

**shame** [1] - 2134:11

**shape** [2] - 2031:17, 2133:8

**share** [5] - 1944:9, 1945:2, 1958:2, 2001:9

**shared** [1] - 1961:16

**shareholder's** [2] - 2010:3, 2010:5

**shareholders** [7] - 2012:22, 2013:13, 2015:3, 2015:23, 2016:2, 2029:4, 2029:16

**shares** [12] - 1944:17, 1946:22, 1990:18, 1991:2, 2001:16, 2024:7, 2025:24, 2026:3, 2030:24, 2058:20, 2059:6, 2137:9

**Shay** [1] - 2110:14

**sheet** [3] - 2023:11, 2024:15, 2024:16

**short** [3] - 1968:3, 2082:5, 2094:25

**shortage** [1] - 1992:13

**shorter** [3] - 1980:17, 1981:14, 2048:1

**shortly** [4] - 1984:3, 1988:8, 1988:13, 1989:1

**show** [37] - 1951:7, 1952:3, 1953:22, 1959:11, 1985:7, 1987:1, 1995:16,

1996:8, 2004:19, 2005:5, 2005:24, 2007:8, 2008:15, 2009:14, 2014:16, 2019:4, 2020:5, 2026:22, 2027:18, 2028:1, 2030:15, 2040:15, 2045:12, 2057:25, 2058:2, 2062:11, 2066:20, 2069:18, 2070:23, 2072:24, 2097:25, 2098:6, 2099:1, 2099:21, 2125:21, 2137:3, 2144:2

**showed** [12] - 1949:8, 1988:3, 1997:18, 2009:9, 2010:8, 2019:11, 2036:5, 2038:19, 2040:13, 2047:11, 2068:7

**showing** [8] - 2060:13, 2066:22, 2070:9, 2071:1, 2071:9, 2072:2, 2072:13, 2099:9

**shown** [11] - 1978:8, 2006:7, 2013:13, 2022:21, 2028:8, 2037:9, 2068:12, 2070:14, 2096:15, 2098:10, 2127:15

**shows** [2] - 1959:9, 2018:11

**sick** [2] - 2135:21, 2138:22

**sickness** [1] - 2135:12

**side** [16] - 1943:6, 1955:19, 1955:20, 1992:14, 2012:17, 2016:25, 2017:3, 2018:15, 2039:23, 2095:4, 2123:13, 2138:13, 2138:17, 2139:5, 2139:6, 2139:12

**Side** [1] - 2018:1

**side-bar** [7] - 2016:25, 2017:3, 2018:15, 2138:17, 2139:5, 2139:6, 2139:12

**Side-bar** [1] - 2018:1

**side-bars** [1] - 2138:13

**sidebar** [6] - 1951:11, 1952:11, 1965:19, 1967:18, 2076:6, 2077:17

**sidebars** [1] - 2095:21

**sidelines** [1] - 2011:24

**sign** [15] - 2001:9, 2001:11, 2012:10, 2012:11, 2018:8, 2018:10, 2019:10, 2019:11, 2019:12, 2019:16, 2020:16, 2067:6, 2080:19, 2081:1, 2081:6

**signature** [44] - 1943:8, 1959:23, 1960:19, 1960:25, 1966:5, 2008:20, 2010:9, 2020:16, 2022:4, 2025:12, 2025:13, 2066:25, 2067:1, 2069:13, 2082:22, 2084:3, 2094:9, 2101:25, 2102:3, 2102:7, 2102:22, 2102:23, 2103:1, 2103:7, 2103:8, 2103:16, 2103:19, 2103:20, 2103:22, 2104:7, 2104:10, 2113:23, 2115:11, 2115:12, 2115:13, 2115:14, 2115:16, 2115:21, 2115:22, 2115:23, 2116:4, 2116:14, 2116:17

**signatures** [3] - 2045:11, 2141:10

**signed** [17] - 1963:10, 2002:4, 2009:10, 2011:13, 2011:21, 2012:2, 2012:12, 2018:9, 2019:13, 2019:18, 2038:10, 2045:7, 2067:4, 2081:10, 2082:14, 2083:11, 2084:6

**significant** [4] - 1958:7, 1959:17, 1990:16, 2144:21

**signing** [2] - 2009:16, 2011:16

**similar** [5] - 2001:14, 2009:6, 2028:4, 2103:10, 2103:11

**similarities** [2] - 2103:17, 2104:5

**similarity** [1] - 2103:8

**simple** [1] - 2145:7

**simply** [8] - 1945:19, 1947:15, 1966:8, 2000:15, 2099:15, 2111:16, 2136:21, 2147:13

**sit** [8] - 1959:5,

1961:24, 2011:24, 2038:4, 2075:21, 2102:4, 2102:15, 2127:22

**sitting** [7] - 1947:25, 1974:8, 1995:23, 2068:10, 2128:10, 2138:15

**situation** [4] - 1991:17, 2130:19, 2138:17, 2138:18

**Skimmed** [1] - 1998:20

**skipping** [1] - 2133:19

**slightly** [1] - 1980:17

**sloppy** [2] - 2102:10, 2102:24

**small** [1] - 2135:20

**smart** [1] - 2056:22

**so-called** [1] - 1944:10

**social** [3] - 2057:10, 2117:9, 2117:18

**socialize** [1] - 2062:20

**sold** [2] - 1959:16, 2047:10

**solely** [1] - 1983:8

**solution** [2] - 2000:9, 2000:15

**solutions** [1] - 2001:5

**solve** [2] - 2041:18, 2146:22

**solved** [1] - 2092:19

**solving** [3] - 2008:1, 2041:11, 2041:13

**someone** [6] - 1950:24, 2014:6, 2019:22, 2051:14, 2052:15, 2113:2

**sometime** [2] - 1988:8, 2027:3

**sometimes** [2] - 2053:20, 2139:24

**somewhere** [1] - 2143:20

**song** [1] - 2062:12

**Sonnenblick** [2] - 2007:20

**soon** [1] - 2059:8

**sorry** [29] - 1948:2, 1960:8, 1961:3, 1970:16, 1973:19, 1996:9, 1996:17, 2013:21, 2021:9, 2025:10, 2031:19, 2031:23, 2036:1, 2043:21, 2047:15, 2048:10, 2051:8, 2053:22, 2070:3, 2074:13, 2082:7,

2097:11, 2104:16, 2105:7, 2108:1, 2115:18, 2126:25, 2140:12

**sort** [2] - 1962:9, 2054:10

**sorted** [2] - 2000:16, 2032:16

**sought** [2] - 2044:9, 2051:10

**source** [2] - 2034:1, 2079:24

**sources** [1] - 2044:4

**speaking** [7] - 1950:8, 1983:21, 1984:25, 2021:10, 2118:16, 2138:16, 2138:21

**spearheading** [1] - 2007:15

**special** [6] - 2063:24, 2079:19, 2079:21, 2079:22, 2079:24, 2080:14

**Special** [5] - 1966:14, 1968:5, 1968:22, 1969:5, 1970:6

**specific** [11] - 1963:5, 1970:2, 2042:1, 2055:17, 2061:20, 2069:3, 2073:22, 2087:7, 2093:17, 2093:22, 2115:5

**specifically** [16] - 1948:24, 1963:22, 1967:10, 1998:23, 2000:22, 2000:23, 2037:19, 2061:24, 2063:19, 2088:5, 2096:4, 2097:3, 2101:23, 2116:3, 2118:21, 2139:20

**speech** [1] - 1993:2

**spent** [2] - 1995:19, 1998:12

**spoken** [3] - 1942:6, 1983:14, 2011:15

**sport** [1] - 1961:17

**Sports** [1] - 2039:18

**spreadsheet** [1] - 2039:14

**spreadsheets** [2] - 2131:23, 2131:24

**Square** [1] - 1939:21

**stage** [1] - 1982:21

**stand** [5] - 1941:15, 2049:14, 2128:10, 2128:16, 2130:16

**Standard** [4] - 2083:10, 2084:5, 2086:4, 2086:5

**standard** [2] - 2084:8, 2089:15
**standing** [3] - 2012:19, 2049:14, 2053:8
**stands** [1] - 2140:20
**start** [6] - 1947:6, 2031:14, 2050:10, 2134:3, 2135:21, 2141:21
**started** [5] - 1956:22, 1993:1, 2046:16, 2050:12, 2055:19
**starting** [2] - 2024:10, 2133:2
**startup** [1] - 2121:21
**State** [1] - 2110:17
**state** [9] - 1945:17, 1948:22, 1954:19, 2050:3, 2099:8, 2110:3, 2112:24, 2137:1, 2137:5
**statement** [3] - 1994:2, 2094:6, 2142:10
**Statement** [1] - 2067:22
**statements** [2] - 2092:24, 2142:8
**STATES** [2] - 1939:1, 1939:3
**States** [4] - 1939:12, 1939:16, 1950:9, 1950:21
**status** [1] - 2006:12
**stay** [1] - 2051:15
**staying** [2] - 1980:17, 2047:24
**step** [4] - 1944:6, 2047:22, 2087:24, 2128:6
**Steven** [1] - 2130:7
**sticker** [3] - 1960:17, 2080:19, 2101:24
**still** [10] - 1947:7, 1960:24, 1963:5, 2035:14, 2052:3, 2094:22, 2127:23, 2133:21, 2134:9, 2142:24
**stipulate** [2] - 2132:5, 2144:15
**stipulation** [8] - 1960:4, 2067:11, 2079:13, 2100:9, 2131:22, 2132:8, 2141:19, 2144:16
**stock** [6] - 2059:23, 2060:12, 2060:25, 2061:6, 2068:24,

2075:5
**Stock** [1] - 2067:23
**stocks** [5] - 2055:3, 2055:4, 2055:5, 2055:10, 2059:22
**Stolper** [9] - 2008:8, 2008:10, 2009:11, 2010:10, 2011:3, 2011:14, 2011:15, 2011:17, 2012:5
**Stolper's** [1] - 2012:3
**stopped** [1] - 2121:3
**Store** [1] - 1976:7
**store** [1] - 1976:8
**Strangford** [1] - 1940:4
**strategy** [1] - 2001:6
**streamline** [1] - 2134:14
**Street** [1] - 2031:16
**strictly** [1] - 2117:18
**strikes** [1] - 2092:15
**string** [2] - 2031:13, 2031:19
**stub** [1] - 2100:5
**stuff** [5] - 1999:18, 2003:3, 2032:16, 2047:14
**subject** [1] - 1987:19
**subjects** [1] - 1983:9
**submitted** [3] - 2096:19, 2099:24, 2101:8
**substance** [8] - 1948:10, 1948:25, 1954:6, 1956:12, 1969:4, 1969:8, 1983:5, 2088:21
**substantially** [1] - 2136:13
**substituting** [1] - 2135:15
**succeeding** [1] - 1956:6
**successful** [1] - 2065:2
**sue** [2] - 1966:17, 2011:24
**sued** [3] - 2032:13, 2062:25, 2093:3
**sufficient** [1] - 2083:17
**Suffolk** [1] - 1939:21
**suggest** [4] - 1969:5, 2084:15, 2139:18, 2148:14
**suggested** [8] - 2032:18, 2110:18, 2137:19, 2138:2, 2139:9, 2142:20,

2143:1, 2143:2
**suggesting** [3] - 2093:4, 2128:25, 2137:15
**suggestion** [2] - 2136:18, 2136:24
**suing** [1] - 2009:13
**suit** [6] - 1993:22, 2006:8, 2011:4, 2011:8, 2012:3, 2012:13
**Suite** [2] - 1939:22, 1940:2
**suits** [3] - 1992:22, 1993:10, 2002:25
**sum** [6] - 1948:25, 1954:6, 1956:12, 1975:1, 1983:5, 2088:21
**summations** [1] - 2133:16
**Sunday** [1] - 1941:12
**suppose** [2] - 2124:25
**supposed** [10] - 2023:20, 2032:6, 2032:8, 2032:24, 2033:3, 2099:1, 2099:3, 2105:8, 2121:2
**surprise** [2] - 2139:17, 2139:18
**surprised** [1] - 2139:15
**surprises** [1] - 2129:1
**suspect** [2] - 2032:1, 2094:18
**sustained** [11] - 1959:4, 2013:16, 2013:19, 2036:20, 2047:1, 2061:3, 2069:15, 2087:15, 2103:24, 2108:24, 2116:9
**switch** [1] - 2051:20
**switched** [1] - 2023:12
**sworn** [2] - 1941:15, 2049:19
**Sydor** [2] - 1967:11, 2130:7
**System** [1] - 2067:22

## T

**table** [1] - 2018:4
**talks** [2] - 1999:3, 2131:25
**tangible** [3] - 2141:25, 2142:15, 2142:25
**tax** [10] - 2038:18, 2145:14, 2145:17,

2146:9, 2146:24, 2147:2, 2147:3, 2147:5, 2147:8, 2147:15
**taxes** [2] - 2112:24, 2113:8
**teacher** [1] - 2132:24
**team** [5] - 2051:25, 2052:7, 2107:5, 2142:18
**teammates** [1] - 2052:10
**teams** [1] - 2050:20
**technically** [1] - 2128:15
**Telecommunication** [1] - 2122:3
**telephone** [13] - 1948:4, 1963:25, 2004:14, 2005:10, 2006:11, 2014:11, 2015:14, 2053:16, 2053:17, 2053:19, 2080:24, 2106:10, 2106:13
**telephonically** [3] - 1949:16, 1954:3, 1968:12
**ten** [2] - 2046:13
**term** [1] - 2102:7
**terms** [14] - 1946:13, 1948:5, 1954:20, 1956:3, 1974:13, 2015:2, 2032:4, 2034:8, 2095:25, 2115:7, 2116:6, 2128:10, 2130:15, 2141:3
**testified** [42] - 1941:16, 1942:5, 1943:19, 1944:7, 1947:11, 1947:12, 1954:12, 1956:23, 1958:1, 1961:8, 1961:16, 1963:1, 1963:4, 1963:15, 1965:7, 1967:9, 1968:3, 1981:23, 1990:16, 1994:25, 2006:8, 2020:8, 2020:11, 2037:20, 2039:3, 2041:9, 2041:11, 2046:10, 2049:19, 2063:4, 2082:12, 2086:21, 2096:23, 2115:20, 2117:5, 2119:5, 2119:24, 2122:22, 2127:1, 2127:4, 2136:18, 2144:22

**testify** [3] - 2081:16, 2101:3, 2111:15
**testifying** [2] - 2096:24, 2118:3
**testimony** [28] - 1948:18, 1949:4, 1949:11, 1970:8, 1970:12, 1970:15, 1970:17, 1973:21, 1974:1, 1976:24, 1977:6, 1981:5, 2065:12, 2093:12, 2093:23, 2096:4, 2102:16, 2102:25, 2103:1, 2103:10, 2104:6, 2104:8, 2110:10, 2110:13, 2110:15, 2119:2, 2142:2
**texts** [2] - 2054:1, 2054:2
**that'** [1] - 2020:18
**THE** [165] - 1941:5, 1941:13, 1941:19, 1943:1, 1944:20, 1945:9, 1946:9, 1951:8, 1952:1, 1952:9, 1956:7, 1959:4, 1960:9, 1961:2, 1961:4, 1961:7, 1964:19, 1965:17, 1966:1, 1966:24, 1967:6, 1967:15, 1970:20, 1971:11, 1971:12, 1972:19, 1974:5, 1977:19, 1979:2, 1979:18, 1979:25, 1980:6, 1980:20, 1981:6, 1981:13, 1981:17, 1982:9, 1984:9, 1985:22, 1986:1, 1988:14, 1991:14, 1993:15, 1996:18, 2013:16, 2013:19, 2013:21, 2017:2, 2018:2, 2018:14, 2021:22, 2028:15, 2028:18, 2028:25, 2030:11, 2031:4, 2031:6, 2033:13, 2036:14, 2036:20, 2042:25, 2047:1, 2047:19, 2047:22, 2047:24, 2048:10, 2049:4, 2049:6, 2049:9, 2049:13, 2049:16, 2049:21, 2049:22, 2053:10, 2059:17,

2059:19, 2061:3, 2067:14, 2067:17, 2069:15, 2076:3, 2077:10, 2077:15, 2078:5, 2078:7, 2078:8, 2079:2, 2079:14, 2087:15, 2087:20, 2087:24, 2088:2, 2089:1, 2089:5, 2089:20, 2090:5, 2091:5, 2092:20, 2093:6, 2094:7, 2094:12, 2094:22, 2094:25, 2095:18, 2095:21, 2097:13, 2097:16, 2098:15, 2098:23, 2100:7, 2100:18, 2100:25, 2103:24, 2104:21, 2107:16, 2108:24, 2109:19, 2109:22, 2109:24, 2111:23, 2113:14, 2113:19, 2116:9, 2116:12, 2116:14, 2116:23, 2122:7, 2122:14, 2126:20, 2128:3, 2128:6, 2128:9, 2130:3, 2130:15, 2130:25, 2131:4, 2131:9, 2132:9, 2132:13, 2132:21, 2135:3, 2135:9, 2135:19, 2135:25, 2137:12, 2138:8, 2139:4, 2140:14, 2140:23, 2142:21, 2143:19, 2144:7, 2145:15, 2145:19, 2146:5, 2146:8, 2146:14, 2146:24, 2147:6, 2147:16, 2147:20, 2148:6, 2148:10, 2148:18, 2148:21
**then..** [1] - 2003:15
**theory** [1] - 2145:7
**thereafter** [1] - 2130:22
**therefore** [1] - 2140:6
**they've** [1] - 2131:16
**thick** [1] - 1958:16
**thinking** [5] - 1973:18, 2015:1, 2119:4, 2130:25, 2137:7
**third** [3] - 2020:15, 2022:3, 2130:23
**thousand** [2] - 1998:5, 2059:19
**three** [12] - 1949:13,

1962:11, 1981:12, 1997:22, 2024:2, 2040:23, 2128:15, 2133:15, 2134:6, 2134:19, 2136:11, 2138:2
**throughout** [1] - 2019:24
**Thursday** [6] - 2128:21, 2129:3, 2129:10, 2133:13, 2141:2
**Tim** [1] - 2125:5
**timeframe** [4] - 1987:25, 2006:15, 2006:17, 2008:14
**timekeeping** [1] - 1980:9
**title** [2] - 1943:15, 1974:23
**TM3** [1] - 2003:18
**today** [18] - 1948:22, 1949:2, 1949:11, 1959:5, 1961:24, 1963:5, 1981:5, 2020:19, 2035:14, 2048:1, 2075:21, 2078:17, 2102:15, 2113:16, 2121:12, 2127:22, 2128:13, 2128:24
**today's** [1] - 2031:15
**together** [8] - 2008:5, 2024:11, 2027:8, 2032:2, 2032:6, 2045:18, 2045:19, 2137:8
**TOLKIN** [1] - 1940:7
**Tom** [2] - 2043:13, 2043:23
**TOMMY** [1] - 1939:7
**Tommy** [52] - 1939:8, 1940:1, 1942:18, 1943:24, 1946:1, 1946:4, 1946:14, 1946:16, 1947:1, 1947:10, 1949:8, 1953:12, 1953:14, 1953:17, 1953:21, 1954:6, 1954:14, 1971:2, 1973:12, 1974:9, 1984:2, 1993:2, 1997:17, 1999:17, 2009:23, 2012:16, 2013:25, 2016:3, 2016:17, 2019:13, 2019:20, 2021:5, 2023:8, 2023:21, 2029:22, 2029:23, 2031:16,

2038:17, 2040:13, 2040:15, 2041:16, 2044:16, 2047:11, 2056:25, 2057:2, 2057:3, 2057:13, 2117:5, 2118:11, 2118:13, 2140:1
**Tommy's** [4] - 1953:12, 1995:21, 1995:25, 2010:1
**tomorrow** [1] - 2128:10
**took** [16] - 1950:2, 1951:10, 1963:24, 1965:18, 1971:2, 1976:7, 1987:24, 2035:9, 2076:5, 2085:3, 2086:5, 2086:10, 2086:14, 2086:15, 2136:11, 2136:24
**topic** [3] - 1963:20, 1969:1, 2046:18
**Toronto** [1] - 2050:22
**total** [8] - 1991:11, 2059:17, 2059:18, 2066:12, 2066:15, 2110:1, 2120:5, 2127:10
**touched** [1] - 1969:20
**tough** [1] - 2054:5
**towards** [2] - 2068:16, 2074:9
**town** [1] - 2135:10
**transcript** [1] - 1972:20
**transcripts** [1] - 2096:1
**transfer** [7] - 1942:13, 1943:6, 1944:1, 1963:11, 1988:3, 2037:9, 2037:10
**transferor** [1] - 1945:25
**transferors** [1] - 1943:15
**transfers** [4] - 1943:11, 1943:14, 1963:17, 2119:25
**translate** [1] - 2085:16
**transmittal** [2] - 2104:25, 2105:1
**transpired** [2] - 2015:2, 2138:11
**treated** [2] - 2032:3, 2032:9
**trial** [13] - 2070:1, 2128:11, 2128:14, 2128:15, 2128:17, 2131:4, 2131:11,

2139:20, 2140:24, 2141:2, 2141:10, 2142:16, 2143:24
**trials** [1] - 2131:1
**trouble** [1] - 2063:21
**true** [41] - 1942:19, 1950:13, 1950:14, 1954:15, 1955:2, 1955:3, 1955:6, 1957:24, 1958:3, 1958:22, 1960:22, 1961:22, 1963:5, 1963:8, 1963:18, 1968:5, 1968:19, 1971:4, 1982:2, 1982:5, 2043:7, 2043:25, 2045:5, 2080:22, 2081:2, 2082:5, 2082:10, 2083:9, 2084:6, 2084:9, 2086:25, 2087:17, 2089:13, 2089:15, 2101:7, 2105:14, 2107:3, 2109:5, 2110:8, 2110:22, 2111:21
**True** [1] - 1978:15
**truly** [1] - 1958:20
**trust** [14] - 1961:21, 1961:25, 2025:7, 2025:13, 2025:15, 2025:16, 2025:21, 2026:3, 2027:14, 2027:19, 2037:11, 2045:21, 2083:1, 2126:9
**Trust** [11] - 1943:15, 2034:16, 2066:11, 2070:2, 2071:10, 2074:3, 2074:6, 2074:7, 2080:2, 2080:8, 2080:12
**Trust's** [1] - 2066:14
**trusted** [4] - 1955:14, 2023:21, 2062:23, 2065:3
**truth** [2] - 2011:12, 2014:9
**try** [13] - 1976:12, 1981:4, 1992:22, 2004:18, 2007:15, 2030:1, 2042:21, 2074:19, 2092:22, 2097:19, 2117:3, 2137:3, 2142:19
**trying** [15] - 1983:25, 2030:1, 2032:18, 2064:8, 2085:7, 2090:22, 2092:14, 2128:12, 2128:22,

2131:7, 2131:10, 2132:18, 2139:11, 2139:23
**Tuesday** [6] - 2129:9, 2133:10, 2135:4, 2135:13, 2135:14
**tune** [1] - 2144:23
**turn** [7] - 1966:17, 1969:7, 1982:18, 1996:18, 2015:12, 2038:25, 2112:6
**turning** [1] - 2028:22
**TURSI** [3] - 1940:8
**twice** [3] - 2053:15, 2106:3, 2106:5
**two** [35] - 1946:17, 1949:13, 1949:20, 1961:18, 1961:21, 1962:11, 1969:14, 1981:25, 1987:3, 1994:11, 1997:2, 2013:13, 2022:22, 2119:24, 2130:20, 2130:25, 2131:1, 2131:4, 2131:12, 2131:19, 2132:16, 2133:9, 2133:15, 2133:20, 2133:21, 2133:25, 2134:7, 2134:19, 2134:25, 2135:14, 2135:15, 2138:1, 2139:5, 2142:3
**two-day** [1] - 2131:19
**type** [1] - 2062:10
**Tyson** [4] - 1943:11, 1943:14, 1967:12, 2031:24

# U

**U.S** [3] - 1939:4, 1939:18, 1949:22
**Ula** [2] - 1955:6, 1978:24
**ultimately** [2] - 2027:8, 2027:10
**unaware** [2] - 1956:24, 2093:20
**undated** [1] - 1995:18
**under** [15] - 1944:22, 1948:22, 1949:2, 1973:7, 2034:8, 2049:15, 2057:8, 2073:1, 2081:4, 2088:5, 2091:11, 2108:20, 2136:13, 2138:19, 2141:3
**undersigned** [1] - 1943:12

understandable [1] - 2138:20
understood [6] - 1985:1, 1986:16, 2020:20, 2044:10, 2044:13, 2077:3
underway [1] - 2108:15
unexpected [1] - 2135:22
unhappy [1] - 2134:3
UNITED [2] - 1939:1, 1939:3
united [1] - 1939:12
United [3] - 1939:16, 1950:9, 1950:21
unless [2] - 2009:14, 2135:22
unlikely [1] - 2104:10
unnecessary [2] - 1967:8, 2077:4
unquote [1] - 2092:25
unsuccessful [1] - 2044:7
up [48] - 1946:21, 1955:17, 1966:12, 1969:1, 1970:21, 1983:9, 1984:18, 1984:19, 1990:21, 1992:14, 1995:16, 1996:20, 1998:11, 2003:20, 2005:14, 2006:11, 2006:13, 2011:13, 2018:8, 2018:10, 2019:18, 2023:11, 2024:15, 2029:8, 2032:21, 2035:14, 2037:2, 2038:9, 2049:13, 2049:23, 2049:24, 2052:9, 2053:25, 2057:13, 2063:2, 2065:17, 2065:20, 2071:11, 2083:18, 2091:25, 2124:24, 2129:19, 2134:3, 2134:24, 2136:20, 2136:23, 2140:25, 2144:11
upcoming [1] - 1944:23
update [1] - 1998:17
updated [1] - 2005:16
upfront [1] - 2011:10
upper [1] - 2031:12
upset [3] - 2014:7, 2019:21, 2138:14
utilized [1] - 2094:3

**V**

vacant [1] - 2110:8
vacation [4] - 2129:1, 2133:2, 2133:4, 2133:5
vague [1] - 1999:20
valuable [1] - 1943:12
valuation [1] - 1964:23
value [9] - 1977:14, 1983:11, 1989:11, 2132:2, 2136:10, 2136:12, 2144:20
valued [1] - 1991:6
values [2] - 1991:22, 2131:24
various [10] - 1961:13, 2041:25, 2077:7, 2084:21, 2105:1, 2109:4, 2122:11, 2129:19, 2137:16, 2137:18
vary [1] - 2053:20
ventures [2] - 2055:11, 2109:5
verbiage [1] - 2001:25
version [1] - 2102:24
versus [1] - 2086:4
Veterans [1] - 1939:22
victims [2] - 2077:12, 2142:9
view [5] - 2096:11, 2096:13, 2132:15, 2137:14, 2138:16
viewed [1] - 2137:8
virtually [1] - 2100:4
virtue [2] - 1945:23, 1946:12
visit [1] - 2120:25
voice [1] - 2049:24
voluminous [1] - 2096:2
vouching [1] - 2065:25

**W**

wait [3] - 1941:6, 2128:24, 2135:3
Wall [1] - 2031:15
Wampler [1] - 2036:8
wants [2] - 2138:10, 2138:25
warrant [1] - 2142:20
WAS [4] - 2151:2, 2151:3, 2151:6, 2151:10
waste [2] - 2007:8, 2132:9

watch [1] - 2048:9
waves [1] - 1990:3
ways [2] - 1981:24, 1982:5
website [6] - 2027:22, 2028:20, 2038:19, 2136:4, 2136:9, 2137:8
weddings [1] - 2129:2
Wednesday [3] - 2128:21, 2129:10, 2133:12
week [23] - 2128:14, 2128:15, 2128:17, 2128:18, 2128:20, 2128:22, 2129:10, 2129:11, 2130:18, 2130:23, 2132:18, 2133:13, 2133:14, 2133:15, 2133:16, 2134:10, 2134:12, 2134:15, 2134:24, 2135:12, 2135:23
weekend [4] - 2129:22, 2133:4, 2133:7, 2148:24
weekly [1] - 2054:19
weeks [5] - 2131:1, 2134:6, 2134:25, 2142:3
weighed [1] - 2134:12
WEINBLATT [1] - 1939:21
weird [1] - 1984:10
West [1] - 2135:1
whatsoever [1] - 2094:3
wherein [6] - 1955:25, 1966:5, 1966:16, 1966:21, 2083:10, 2084:21
whiteboard [2] - 1996:1, 2042:3
whoever's [1] - 2012:19
whole [15] - 1947:5, 1956:21, 1998:1, 1999:18, 2003:7, 2019:24, 2020:3, 2064:10, 2064:13, 2089:16, 2091:24, 2104:15, 2104:17, 2104:19, 2133:19
WICKER [1] - 1940:7
wife [8] - 1984:21, 2020:12, 2043:9, 2043:24, 2112:25, 2146:9, 2146:16, 2147:7
wife's [4] - 2059:2,

2059:4, 2059:7, 2063:21
willing [2] - 2062:19, 2129:17
win [1] - 2087:12
window [1] - 2131:20
wire [3] - 1944:1, 2065:5, 2119:24
wired [3] - 1947:21, 2023:14, 2148:11
wish [5] - 1966:10, 2037:2, 2037:4, 2047:15, 2047:20
wished [1] - 1987:19
withdraw [6] - 1962:5, 1964:5, 1978:20, 2058:14, 2061:4, 2063:14
withdrawal [2] - 2072:14, 2073:5
withdrawn [3] - 1976:18, 1977:13, 2075:2
WITNESS [8] - 1970:20, 1971:12, 2013:21, 2049:21, 2059:17, 2059:19, 2078:7, 2109:22
witness [22] - 1973:25, 1980:10, 1981:2, 1981:8, 1981:12, 2022:2, 2047:23, 2048:2, 2049:10, 2049:14, 2049:18, 2088:1, 2090:9, 2094:23, 2098:5, 2128:8, 2131:14, 2131:16, 2131:17, 2131:19, 2139:8, 2144:22
witness' [2] - 2097:19, 2099:7
witnesses [19] - 2086:20, 2090:1, 2090:8, 2090:18, 2090:23, 2092:21, 2092:23, 2099:6, 2128:18, 2130:20, 2131:7, 2132:15, 2132:16, 2134:17, 2134:23, 2134:24, 2135:10, 2136:9
word [1] - 2117:8
wording [1] - 1994:14
words [20] - 1947:12, 1948:15, 1948:19, 1949:2, 1954:6, 1958:20, 1973:7, 1992:6, 2054:14,

2055:16, 2056:7, 2064:8, 2066:10, 2075:23, 2085:14, 2085:16, 2097:7, 2102:15, 2116:10, 2136:21
worth [3] - 2003:5, 2003:6, 2045:13
write [2] - 2065:5, 2086:11
writing [2] - 2067:8, 2083:14, 2136:22
written [1] - 1948:5
wrote [4] - 1943:23, 2020:12, 2060:23, 2116:20

**Y**

year [26] - 1949:24, 1949:25, 2050:24, 2051:3, 2051:22, 2053:15, 2057:24, 2058:9, 2059:11, 2062:5, 2063:19, 2064:1, 2074:24, 2106:3, 2108:4, 2108:5, 2108:11, 2108:14, 2108:15, 2108:16, 2120:16, 2145:2, 2145:14, 2146:5, 2146:10
years [7] - 1948:2, 1948:3, 2052:18, 2106:16, 2118:23, 2120:15, 2136:11
yellow [1] - 1960:17
yesterday [8] - 1941:21, 1944:2, 1958:11, 1966:7, 1968:16, 1982:6, 2036:5, 2036:16
YORK [1] - 1939:1
York [7] - 1939:5, 1939:17, 1939:23, 1940:2, 1940:5, 1940:9, 1950:2
yourself [13] - 1953:6, 1954:13, 1957:22, 1968:18, 1968:21, 1969:13, 1971:24, 1981:24, 1996:23, 2014:18, 2020:12, 2101:12, 2101:13