4434

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA    :   13-CR-607

      -against-                US District Court
                               Central Islip, NY

PHILLIP A. KENNER a/k/a
PHILIP A. KENNER, and
TOMMY C. CONSTANTINE a/k/a      June 22, 2015
TOMMY C. HORMOVITIS,            9:50 am

             Defendants.:
- - - - - - - - - - - - - - X


        TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:

                      KELLY T. CURRIE
                      United States Attorney
                      One Pierrepont Plaza
                      Brooklyn, New York 11201
                      By:  JAMES MISKIEWICZ, ESQ.
                           SARITA KOMATIREDDY, ESQ.
                      United States Attorneys

For the Defense:      RICHARD D. HALEY  ESQ.
                      For Defendant Kenner

                      ROBERT LaRUSSO, ESQ.
                      For Defendant Constantine


Court Reporters:      Dominick M. Tursi, CM, CSR
                      Mary Ann Steiger, CSR
                      US District Courthouse
                      1180 Federal Plaza
                      Central Islip, New York 11722
                      (631) 712-6108  Fax:  712-6124
                      DomTursi@email.com


        Proceedings recorded by mechanical stenography.
            Transcript produced by CAT.

4435

1          (Call to Order of the Court.  Appearances stated

2     as indicated above.)

3          (The following ensued in the absence of the

4     jury.)

5          THE COURT:  The jurors are all here.

6          Before I forget, I wanted to ask the government

7     to email my clerk the redacted indictment.  You have taken

8     out the AKAs?

9          MS. KOMATIREDDY:  Yes, judge.

10         THE COURT:  So we can use that for the charge.

11         Are we ready for the jury?

12         MR. HALEY:  Your Honor, no.

13         May I address the court.  I did alert your clerk

14    to a matter that from my perspective needs to be addressed

15    before the jury is brought into the courtroom.  And I

16    believe addressing this matter may actually serve to

17    facilitate our timeline rather than further delay the

18    timeline with the jury.

19         Your Honor, when we concluded on Thursday, the

20    court will recall that Mr. Kenner had left the witness

21    stand having been asked a series of questions by

22    Mr. LaRusso and then questions by Mr. Miskiewicz

23    concerning the conversation he had with Tommy Constantine

24    outside the Home Depot.  I know your Honor's fully

25    familiar with the testimony in that regard.

4436

1      Your Honor may recall that at one point during

2  the course of his testimony I asked one question because

3  it there was some confusion as to whether or not

4  Mr. Kenner's testimony with reference to Ken Jowdy and

5  Louis Freeh mentioned took place within that 26 or

6  27-minute excerpt of the recorded conversation or whether

7  it took place at some point thereafter because there was

8  testimony actually that conversation was longer than 26 or

9  27 minutes; that it was actually I believe possibly 56

10 minutes.

11      The hearing, from my perspective, the inquiry,

12 from my perspective, then concluded.  I did not further

13 question my client from that point on.  I don't know that

14 I said I had no further questions.

15      I know that when the hearing concluded before

16 the court, I then had opportunity to confer with my

17 client.  I have conferred with my client since that

18 testimony and I believe, your Honor, that if we complete

19 his testimony by way of my questioning my client, the

20 record will be complete.

21      And it is my belief that that testimony will,

22 subject to your Honor's determination, result in the

23 authentication of that tape that the government has in its

24 possession as relates to that 26 or 27 minutes of

25 conversation.  Before we do so, judge --

4437

1    THE COURT:  I just want to understand what you

2    are asking me.  But again, we have the jury waiting.  We

3    have to be sensitive to their time Mr. Haley.

4         I'm happy to continue the hearing but, as we did

5    last week, I want to do it when the jury not sitting back

6    there waiting.

7         I assume that you are not up to that point in

8    your direct examination.  I'm sure you have other things

9    you need to cover.

10    MR. HALEY:  I do.  Thank you, judge.  I will

11    move forward.

12    THE COURT:  I will get to it at the lunch break.

13    I am happy to let your client clarify or add to what he

14    said.

15    MR. HALEY:  There is some additional information

16    I'm waiting for.  That will work better.  I just wanted to

17    alert the court, at the earliest possible opportunity, to

18    the issue.

19    THE COURT:  Fine.  I don't have any other

20    matters at lunch today so we can certainly do it at lunch

21    time.  Or, if you are up to that point before lunchtime,

22    we will take a break and do it then.

23    MR. HALEY:  Thank you, Judge.

24    THE COURT:  Are we ready to go?

25    MR. HALEY:  Yes.

4438

1          THE COURT:  Mr. Kenner, you can come back to the

2     witness stand.

3          Let's bring in the jury.

4          (The following ensued in the presence of the

5     jury at 10 am.)

6

7     **PHILLIP A KENNER**

8          called by the Defense, having been previously

9          duly sworn/affirmed, continued testifying as

10         follows:

11         THE COURT:  Good morning, members of the jury.

12    Good to see all of you.  I hope you enjoyed the weekend

13    and Father's Day.

14         We are ready to continue with the trial.  As you

15    know, Mr. Kenner is on direct examination so we will

16    continue from that point.

17         Mr. Kenner, I remind you that you are still

18    under oath.

19         Do you understand?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Go ahead, Mr. Haley.

22         MR. HALEY:  Your Honor, with the court's

23    permission, may I just read out of the record the last two

24    questions asked of Mr. Kenner so we can acclimate

25    ourselves?

4439

1          THE COURT:  Yes.

2          MR. HALEY:  Thank you.

3

4   DIRECT EXAMINATION (Continued)

5   BY MR. HALEY:

6   Q.   Page 4502 of the transcript, involving Kenner

7   Direct/Haley.

8          Question:  When you finally received the

9   spreadsheet reflecting the disbursements of the Global

10  Settlement Fund, you reviewed those disbursements.  Is

11  that correct?

12         Answer:  Yes, I did.

13         *"Question:  The email that you wrote to your

14  clients expressing your view that Tommy Constantine had*

15  *misappropriated GSF fund, that went out actually before*

16  *you removed the detailed list of disbursements.  Is that*

17  *your testimony?*

18         *Answer:  I believe in about that time I'd sent*

19  *out a number of email updates to my clients to let them*

20  *know the status of what was going on, and that probably*

21  *continued through sometime in 2011."*

22         That is when we finished your testimony,

23  Mr. Kenner.

24         Now, with respect to emails that you referenced

25  in your testimony, have you seen those emails before

4440

1    today, sir?

2    A.   I have seen a few of them, yes.

3    Q.   Mr. Kenner, I'm going to ask you to take a look at a

4    document marked Kenner Exhibit 233.  I believe you have

5    familiarity with the document, Mr. Kenner.

6         You can look at the entire document, to be sure,

7    but just take a look at it now.

8    A.   Yes, sir.  I recall this document.

9    Q.   What is it?

10   A.   This was one of the series of updates I had sent

11   along to my client base related to both the legal efforts

12   in Mexico and a commentary on the Global Settlement

13   issues.

14        It was sent out April 19, 2011.

15   Q.   Well, it reads:  *"Gentlemen."*

16        Could you just for purposes be of

17   authentication, who did you, to the best of your

18   knowledge, send that to by way of the category called

19   *gentlemen*?

20   A.   This would have been sent out to certainly each of

21   the individuals who contributed money to the global

22   settlement fund that I believe we saw on the spreadsheets

23   when Jay McKee was on the stand.  And it would have also

24   included other individuals who may or may not have been

25   participants in the global settlement fund that were also

Case 2:13-cr-00607-JFB-AYS   Document 315   Filed 07/08/15   Page 8 of 225 PageID #: 7301

4441

```
1   investors in one or both of the Mexican projects with Ken

2   Jowdy.

3   Q.    And is that a copy of the email, sir?

4   A.    Yes, sir, it is.

5   Q.    How did you acquire that copy?

6   A.    This email was given to, delivered to you by the US

7   government, and then subsequently you delivered it to me

8   in pretrial for review.

9   Q.    Is that a true, accurate, and complete copy of the

10  email that you sent out to the persons you have now

11  identified?

12  A.    Yes, sir, it is a true, accurate, and complete copy.

13          MR. HALEY:  Your Honor, I would offer that as

14  Kenner Exhibit 233.

15          MR. MISKIEWICZ:  No objection.

16          MR. LaRUSSO:  Can we have a side bar.

17          (Continued on the following page.)

18

19

20

21

22

23

24

25
```

Kenner - Direct/Mr. Haley

4442

1          (Discussion at sidebar ensued as follows.)

2          MR. LaRUSSO:  The only objection I have, Judge,

3     is to this paragraph here.

4          As I understand it, this email, and I cannot

5     read it correctly, is Kenner to Kenner on April 19, 2011,

6     which is about a year and a half after the Global

7     Settlement Fund disbursements concluded.  They concluded

8     sometime around the end of 2009, beginning of 2010.

9          This is just out-of-court statements by

10    Mr. Kenner and I don't think this hearsay should be

11    permitted.  I have no objection to the rest of it but that

12    part I don't think should be permitted at this point.

13         MR. HALEY:  May I may an offer of proof, judge?

14    The more operative paragraph was paragraph 3.  It says,

15    reading it -- no, paragraph 2.  As you are --

16         THE COURT:  I read it.  Why do you needing that?

17         MR. HALEY:  Judge, the efforts taken by my

18    client once he learned from his perspective that Tommy

19    Constantine misappropriated the settlement funds were not

20    kept to himself.

21         THE COURT:  Okay.

22         First of all, he already testified Thursday

23    regarding his belief of, quote-unquote, the

24    misappropriation of funds.  He just testified further that

25    he notified his clients of that.

4443

1      So it is already all out there.  All this is is

2  an email memorializing what he already testified to that

3  he sent to his clients.  So the jury has already heard it.

4  I don't know why he shouldn't be able to corroborate what

5  he just testified to without objection regarding the

6  email.

7      I will give an instruction to the jury.  As I

8  have on other occasions, that this information is not

9  being offered for the truth but simply Mr. Kenner is

10  offering as to his state of mind.  And you can obviously

11  cross him on this.

12      MR. LaRUSSO:  Okay.

13      MR. HALEY:  If anyone makes a request to redact

14  any portions of it, but maybe --

15      THE COURT:  You don't want that redacted, that

16  portion.  You want that portion.

17      MR. HALEY:  No.

18      MR. LaRUSSO:  But I would like it all in context

19  at some point.

20      (Discussion at sidebar was concluded.)

21      (Continued on the following page.)

22

23

24

25

4444

1          (The following ensued in open court.)

2          MR. HALEY:  Offer this as Kenner Exhibit 233.

3          THE COURT:  K233 is admitted.

4          Let me giving you an instruction similar to what

5    I gave previously but I want to remind you as relates to

6    this particular exhibit.

7          Exhibit K233, which is the email from Mr. Kenner

8    to other individuals, is not being offered for the truth

9    of the information contained in the email.  Mr. Kenner is

10   permitted to offer that email on what is called his state

11   of mind, what his state of mind was at the time of the

12   email.

13         You can only consider it for that purpose, not

14   the truth of whatever statements he put into that email.

15   Okay?

16         With that instruction it is admitted.

17         (Defense Exhibit K233 in evidence.)

18         MR. HALEY:  Your Honor, though introduced into

19   evidence, may I simply for the record read a portion?

20         THE COURT:  Sure.

21   BY MR. HALEY:

22   Q.   For purposes of the record, Mr. Kenner, would you

23   follow along with me this paragraph of that email.

24         *"As you are all aware, Constantine has*

25   *misappropriated the lion's share of the GSF (Global*

4445

1   *Settlement) Funds, that would have been a great assistance*

2   *to us in the Mexican pursuit of Jowdy, for his own*

3   *benefit.  It has left me with very few financial optioning*

4   *while trying not to quit our legal pursuits."*

5           Now, you testified that there were other emails,

6   sir, that you believe you wrote regarding your belief

7   concerning misappropriation of GSF funds by

8   Mr. Constantine.

9           Is that correct?

10  A.   Yes, sir.

11  Q.   I want you to take a look at Kenner Exhibit 234.

12  A.   Yes, sir, I'm aware of this.

13  Q.   And just what is it?  Without telling us the content

14  of it, sir.

15  A.   This appears to be a March 23, 2011, email between

16  myself and my clients Michael and Kristin Peca with

17  respect to just general updates that were going on at that

18  time with respect to them, personally, and the overall

19  group of Mexican investors and individuals who may have

20  invested in the Global Settlement Fund.

21  Q.   Is that one of the emails you referred to that

22  involved a belief on your part that Tommy Constantine had

23  misappropriated GSF funds and you so advised your clients?

24  A.   That is correct.

25           MR. HALEY:  Your Honor, I'm not going to offer

4446

1    this in evidence but let me show it to counsel.

2              (There was a pause in the proceedings.)

3    BY MR. HALEY:

4    Q.   Now, Mr. Kenner, you testified that you also at some

5    point received a list reflecting the disbursements that

6    came out of the escrow account of Mr. Richards as relates

7    to GSF.

8              Is that correct?

9    A.   Yes, sir.

10   Q.   Let me show you I'm pretty sure what is already in

11   evidence as Government Exhibit 767.  Take a look at this

12   document.

13   A.   I'm familiar with Government Exhibit 767.

14   Q.   What is it?

15   A.   This is a copy of the spreadsheet that Ronald

16   Richards had forwarded to me after January 1 of 2010, that

17   reflects all the incoming and outgoing lawyers for the

18   Global Settlement Fund and also contains notes or a note

19   column with respect to where we believe the funds were

20   appropriated.

21   Q.   Now, sir, with that list in your possession, could

22   you kindly tell us what disbursements contained within

23   that list that you maintained were or are inconsistent

24   with the purposes of the Global Settlement Fund as forth

25   in the previous emails.

4447

1   A.    Pursuant to my understanding of what Mr. Constantine

2   proposed to myself and the rest of the individuals who

3   contributed to the fund.

4        On May 12 of 2009, there was a disbursement to

5   Kerry Rodriguez Greenberg, who I believe was

6   Mr. Constantine's Miami attorneys and not related to any

7   of the other matters in the Global Settlement Fund.

8        On the same day there was a disbursement to

9   Sonnenschein, which is a Los Angeles law firm, which I was

10  unaware of what the relationship was to the Global

11  Settlement Fund.

12       On May 18, 2009, there was a disbursement to

13  Earl Curley & Lagarde, which is an Arizona law firm which

14  I am unaware of what the purpose of that was related to

15  the Global Settlement Fund.

16       On May 18, 2009, there was a disbursement to

17  Silver Law, PC, which is an Arizona attorney, that I was

18  unaware of what Mr. Constantine's purported relationship

19  with the Global Settlement Fund was.

20       On May 22, 2009, there was a disbursement to

21  Chase Bank, I believe to Dickinson Architects, which I'm

22  unaware of what the relationship was to the Global

23  Settlement Fund.

24       On May 26, 2009, there is a disbursement to

25  Sullivan and Cromwell, which I believe was a large New

4448

1   York law firm but I am unaware of what the relevance was

2   to the Global Settlement Fund.

3           On May 27, 2009, there was a disbursement to a

4   Lions Bank of Arizona, which I believe was the Eufora bank

5   account, which I was unaware of why there would be funds

6   disbursed to Eufora at that point in time pursuant to what

7   was represented was the purpose of the Global Settlement

8   Fund by Mr. Constantine to myself and the other

9   contributors.

10          On May 29, 2009, there is a disbursement to

11  Johnson Bank, I believe to the law office of Steven

12  Negden.  I'm unaware of what the relevance was to the

13  Global Settlement Fund.

14          On June 8, 2009, there is a disbursement to

15  Cabin Crafters, which I believe was for repairs to the

16  Falcon 10 airplane, which was never represented as one of

17  the purposes of the Global Settlement Fund.

18          On June 10, 2009, there was another disbursement

19  to Eufora's bank account.

20          On June 10, 2009, there is a disbursement to a

21  gentleman named Sean Hayden.  I'm unaware of what that had

22  to do with the Global Settlement Fund.

23          On June 16, 2009, there is a distribution to

24  Aftrak LLC, but I'm unaware of what that had to do with

25  the Global Settlement Fund.

Kenner - Direct/Mr. Haley

4449

1    On June 17, 2009, there is a distribution to

2    Supermarine of Stewart.  I believe that was related to the

3    Falcon but I'm unaware of why that was distributed

4    personally due to the representations of the Global

5    Settlement Fund.

6    On June 30, 2009, there was a distribution to

7    Perferred Environmental, which I'm unaware of what its

8    relevance was to the Global Settlement Fund.

9    On July 7 there is distribution to a Lions Bank

10   of Arizona, I believe to the Eufora bank account.  I'm

11   unaware of why a Global Settlement was making a

12   disbursement to Eufora's bank account.

13   On July 21 there is another distribution the

14   Lions Bank of Arizona to Eufora's bank account.

15   On July 21 there is another distribution to

16   Steven Negden, the law offices of Steven Negden.

17   On July 21 I believe there is two distributions

18   to a Lions Bank of Arizona, to Eufora's bank account.

19   On August 7 there are two distributions to Bank

20   of America to the bank account for Avalon and Partners,

21   which I'm unaware of why that was made, pursuant to the

22   terms of the Global Settlement.

23   On August 10 there is a distribution to Johnson

24   Bank, to Eufora's bank account again.

25   On August 31, 2009, there is another

4450

1    distribution to Eufora's bank account in Alliance Bank.

2           On September 2, 2009, there is another

3    distribution to Eufora's bank account at Alliance Bank.

4           On September 15, 2009, there is a distribution

5    to Edenholm Motorsports, which I'm unaware of why that

6    distribution was made pursuant to the Global Settlement

7    Fund.

8           On September 15, 2009 there is a distribution to

9    AZ Falcon Partners.

10          On September 25, 2009, there is a distribution

11   to Back of America to Avalon Partners' bank account.

12          On October 13, 2009, there is a distribution

13   again to Kerry Rodriguez, which I believe is the same as

14   the previous Kerry Rodriguez Greenberg, the Florida

15   attorney for Mr. Constantine.  I'm unaware of the purpose

16   of that pursuant to the Global Settlement Fund.

17          On October 21, 2009, there is a distribution to

18   AZ Falcon Partners.  I'm unaware of why that distribution

19   was made pursuant to the terms of the Global Settlement

20   Fund.

21          On October 28, 2009, there is a third

22   distribution for Kerry Rodriguez Greenberg.

23          On November 6, 2009, there is a distribution to

24   Eric Edenholm.

25          On November 23, 2009, there is another

4451

1   distribution to Eufora LLC's bank account.

2   Q.    Thank you, Mr. Kenner.

3         Incidentally, Mr. Kenner, do you recall,

4   Government Exhibit 767 was actually, you distributed this

5   to one or more of your clients.  Is that right?

6   A.    Yes.  We had both June McKee testify to receiving it

7   and having no questions.  And Mr. Nash also received it.

8   And we had a meeting pursuant to his receipt of the

9   spreadsheet.

10  Q.    Was there ever an instance, sir, where a hockey

11  player client of yours, as relates to this case, requested

12  that disbursement sheet and you refused or declined to

13  provide it?

14  A.    Never.

15  Q.    Mr. Kenner, I'm going to read a portion of the

16  indictment that has the heading *The Led Better Fraud*

17  *Scheme*.

18        Within the indictment, itself, it contains

19  various paragraphs but let me read into the record

20  paragraph 21.

21        *"In or about and between October 2006 and May*

22  *2012, the defendant Phillip A Kenner, also known as Philip*

23  *A Kenner"* -- this time with only one L, *"devised,*

24  *supervised, and executed a scheme to defraud certain of*

25  *the investors of money and property, the purchase of real*

4452

1    *property located in Sag Harbor, New York (the Sag Harbor*

2    *Property).   John Doe 10, John Kaiser, and others had owned*

3    *the Sag Harbor property since 2005."*

4              Let me read the next paragraph as well for

5    purposes of following the questions that are about to

6    follow.

7              *"As part of the scheme to defraud, in or about*

8    *October 2006 the defendant Kenner created Led Better*

9    *Development Company LLC (Led Better) a Delaware limited*

10   *liability company, for the purpose of purchasing the Sag*

11   *Harbor property.*

12             *"Thereafter, Kenner created an operating*

13   *agreement stating that Kenner, Berard, Kaiser, and another*

14   *individual, Vincent Tesoriero whose identity is known to*

15   *the grand jury, who were each to be 25 percent owners of*

16   *Led Better.   Kenner did not disclose the operating*

17   *agreement to Berard and Kaiser prior to or at the time of*

18   *the purchase of the Sag Harbor property."*

19             Again, Mr. Kenner, there are other paragraphs

20   that follow that relate to that aspect of the indictment,

21   but for purposes of my questions from this point on I'm

22   going to be questioning you with respect to Led Better.

23             Do you understand that?

24   A.   Yes, sir.

25   Q.   When the Lehman loan closed, what occurred with

4453

1   reference to discussions you had with John Kaiser, not

2   only concerning his desire that his investment money be

3   returned to him, as I believe you previously testified to,

4   but his relationship with Chris Manfredi?

5   A.    There were two main issues that John Kaiser had prior

6   to the closing in August of 2006 and the Lehman Brothers

7   $105 million financing of the Hawaii project venture.

8            One in particular was that Mr. Kaiser had become

9   at great odds with Manfredi during that period of time

10  because Mr. Manfredi was upset that we were no longer

11  going to control the joint venture going forward but it

12  was gong to fall under somebody else's control and he was

13  afraid he was going to lose his job.

14           So he effectively demanded, Manfredi effectively

15  demanded, to receive a $175,000 payout at the closing or,

16  he told both Mr. Kaiser and I one night at dinner in New

17  York City, he was going to withhold his signature, which

18  would in effect have canceled the deal.  Mr. Kaiser and

19  Manfredi didn't speak from that dinner on I believe until

20  years later.

21           Subsequent to that meeting, I had worked out an

22  arrangement with Mr. Manfredi, and had agreed to his terms

23  in the context that I wanted to make sure that the rest of

24  the deal closed for the rest of the investors.

25           Mr. Kaiser at that point, who was furious with

Case 2:13-cr-00607-JFB-AYS   Document 315   Filed 07/08/15   Page 21 of 225 PageID #: 7314

4454

1   Mr. Manfredi for his effective extortion tactics with us,

2   then proposed to me that in order for him to sign off, he

3   would want to be repaid 100 percent of his investment that

4   he had made on behalf of his friends and family in August

5   of 2005, and as a result he told me that he had a real

6   estate project in Sag Harbor, New York, that Manfredi was

7   one of the partners and that he would not go forward with

8   Mr. Manfredi at that point.

9        He told me that in order for him to sign off,

10  for Mr. Kaiser to sign off on the Lehman Brothers deal in

11  August of '06, he was going to need an approximate

12  $400,000 short-term loan to buy out Mr. Manfredi's joint

13  partner at this time, Mr. Thomas Milana, who was unknown

14  to me.

15       So in order to facilitate the closing of the

16  deal, I agreed to those two terms with Mr. Kaiser.

17  Q.   Was the discussion you had with Mr. Kaiser such that

18  Manfredi was going to know of this buyout of his interest

19  and who was behind?

20  A.   No.  In fact, the purpose behind the approximate

21  $400,000 Short Term loam is so the funds would come from a

22  source unrelated to Mr. Kaiser or anyone else that

23  Manfredi knew, because effectively Mr. Kaiser wanted Mr.

24  Manfredi out of the deal without any recovery of invested

25  assets, which I was unaware at the time whether Manfredi

4455

1  had any invested assets in the project or not.

2  Q.   This statement that Mr. Kaiser made to you as to how

3  he wanted Manfredi out of the North Point property -- that

4  is what it was called; correct?

5  A.   Yes, sir.

6  Q.   Who was present during that conversation?  If anyone.

7  A.   Just Mr. Kaiser and myself.

8  Q.   Vincent Tesoriero testified in this case.  Is that

9  correct?

10  A.   Yes, sir, he did.

11  Q.   Prior to his testimony did you have any conversations

12  with him or communications with him in any fashion

13  whatsoever regarding Mr. Kaiser's statement to you that he

14  wanted Manfredi out of the North Point Property?

15  A.   I had not met Mr. Tesoriero at that point in time.  I

16  didn't meet him until months and months later.

17  Q.   And would you tell us the circumstances under which

18  you came as to meet Mr. Tesoriero.

19  A.   He was flown to my house in Arizona to work on a

20  renovation project that Mr. Kaiser was overseeing.

21  Q.   Any discussions regarding Led Better at that point in

22  time between the two of you?

23  A.   To the best of my recollection, they were very brief,

24  and primarily in the context of how the architecture and

25  design plans had been moving along, as Vinny -- excuse me,

4456

1    Mr. Tesoriero was wondering when he was going to start

2    working on that vertical construction.

3    Q.    Okay, Mr. Kenner.  There comes a point in time where

4    we know, as set forth frankly in the exhibit we introduced

5    regarding the Peca line of credit and distributions out of

6    this line of credit, that $395,000 from his line of credit

7    is transferred to John Kaiser.  Is that correct?

8    A.    Yes.  It was through Little Isle IV's bank account

9    and perhaps also through Ula Makika's bank account also.

10   I don't recall.

11   Q.    Would you kindly explain, sir, the purpose of that

12   transfer and, frankly, what occurred as relates to the

13   transfer, and the trail of monies thereafter.

14   A.    Yes.

15         Pursuant to the agreement I had made with

16   Mr. Kaiser to secure his signature, which was required by

17   Lehman Brothers to fund the $105 million lending agreement

18   in August of 2006, prior to that I had agreed with

19   Mr. Kaiser that I would make available a $400,000 loan to

20   him.

21         About a month and a half after the closing, in

22   August of 2006 with Lehman Brothers, Mr. Kaiser told me he

23   was ready to close on that property and asked if I could

24   prepare a new LLC that would be in my name, but for

25   purpose of signatures he asked if I had another person who

4457

1    could sign as the manager of Led Better, just for the

2    purpose of signing the closing documents.

3            So I prepared all of that information and passed

4    it on to our attorney Shimon Betesh, who testified here

5    early in the trial, so he could prepare the proper

6    documents for closing.

7            At that point Mr. Kaiser informed me that he was

8    ready to do the transaction, so pursuant to our previous

9    arrangements, I had wire-transferred $395,000 to a new

10   company, that being Led Better Equipment Company.

11           Eleven days after the closing, those funds, once

12   they were disbursed to Mr. Kaiser through the North Point

13   property sale escrow, he returned $380,000 back to Ula

14   Makika to repay the 11-day loan.  Mr. Kaiser kept $15,000

15   glass of the original loan at that point, which was

16   equivalent to about what Mr. Kaiser had been taking as a

17   fee from the Hawaii project so I had no problem with that

18   at that time.

19           But he did return $380,000 of the $395,000 to

20   Ula Makika, and then those funds date in Ula Makita's bank

21   account, which was the possession of the Hawaiian

22   partners, until subsequent expenses of the company were

23   paid.

24   Q.   We will get to that in a moment as relates to the use

25   of the monies that were returned ultimately to the Ula

4458

1    Makika account.

2            That $395,000, as we know, came out of Peca's

3    line of credit.  Correct?

4    A.   Yes, sir, it did.

5    Q.   At that point in time, sir, what if any document was

6    in existence that permitted Little Isle IV or Ula Makika

7    to lend money to anyone?

8    A.   There were in that series of events first and

9    foremost Mr. Peca had signed a letter of authorization

10   directly with Northern Trust bank authorizing the use of

11   his line of credit for the benefit of Little Isle IV's

12   bank account.

13           So when the funds were removed from Mr. Peca's

14   line of credit, they were transferred, pursuant to that

15   arrangement, to the Little Isle IV bank account.

16           Little Isle IV, pursuant to the 2004 operating

17   agreement signed by both myself and Mr. Kaiser in or about

18   September of 2004, allowed Little Isle IV to lend money

19   pursuant to the acknowledgement of the managed member, who

20   was myself at a time.

21           So pursuant that agreement, I had the authority

22   to lend money.  And I had agreed with Mr. Kaiser previous

23   to the Lehman Brothers closing to lend him that short-term

24   $395,000 loan, which he repaid 11 days later.

25   Q.   What level of awareness did your hockey player

4459

```
 1   clients have in connection with that operating agreement

 2   or other operating agreements?

 3   A.   When any of my clients, or other investors who were

 4   not my clients, invested in the Hawaiian partnership, they

 5   would be given a copy of the most recent operating

 6   agreement and then, subsequent to new bylaws or operating

 7   agreements being created for the company through the

 8   completion of the Lehman Brothers functioning in August of

 9   2006, they would be given, each and every one of them

10   would be given updated bylaw or operating agreement as it

11   related to the previous one that was in effect.

12   Q.   Okay.  So the 395 doesn't come back to Mr. Kaiser;

13   only 380 comes back.  Is that correct?

14   A.   That is correct.

15   Q.   What then, to your personal knowledge, occurs as you

16   relates to that 380 that is returned to the Ula Makika

17   Little Isle IV bank account?

18   A.   On a monthly basis, even following the Lehman

19   Brothers transaction, there were a number of ongoing

20   commitments that Hawaiian partners, Little Isle IV, still

21   had to make.

22            So from that point forward, there was a

23   distribution to myself for $200,000 which was pursuant to

24   an environmental indemnity agreement with respect to the

25   Lehman Brothers closing.
```

4460

1    Lehman Brothers required.  Because of a known

2    petroleum problem on one of the parcels adjacent to the

3    258 and 1,500 acre unlawful site they required that there

4    was a personal indemnity to Lehman Brothers so in the

5    event that there was a seepage from petroleum pits into

6    the water source in the local community, Lehman Brothers

7    did not want to be held responsible for that.

8    So I signed the personal indemnity on the $105

9    million loan in order to facilitate that.  I could have

10   put all of my clients in harm's way on that but instead I

11   agreed with Mr. Kaiser and Mr. Manfredi that I would take

12   on that risk and responsibility in return for a three

13   payments over a five-year period of time that represented

14   less than point five percent of the funds at risk.

15   So $200,000 about six weeks after Mr. Peca's

16   funds were returned by Mr. Kaiser were sent to me, and

17   then there were a series of other consulting payments and

18   expenses of the Hawaiian partners that were paid out of

19   those residual funds.

20   Q.   That environmental indemnity agreement, does it

21   exist?

22   A.   Yes, sir, it does.

23   Q.   Have you seen it?

24   A.   Yes, sir, I have.

25   Q.   Since your arrest did you see it?

4461

1   A.   Yes, sir, I have.

2   Q.   And how did you acquire it following your arrest?

3   A.   The environmental indemnity agreement was turned over

4   by the US government to you, and then subsequently you had

5   provided that to me for review in pretrial.

6   Q.   Brian Berard had testified in this proceeding that he

7   also contributed toward the financing of the Led Better

8   project, for lack of a better term.

9        Do you recall that?

10  A.   Yes, sir, he did.

11  Q.   And how much did he contribute in order that John

12  Kaiser could purchase the property in order to buy out

13  Chris Manfredi and Mr. Milan?

14  A.   I believe Mr. Berard contribute $375,000.

15  Q.   And would you tell the court and jury the

16  conversation you had with Mr. Berard as relates to his

17  commitment to that money in the Led Better project?

18  A.   Mr. Berard, prior to the August 2006 closing with

19  Lehman Brothers, had continued to tell me that he wanted

20  to get involved with more of my independent projects and

21  smaller investment groups, so when that opportunity came

22  up in or about the time of the closing with Lehman

23  Brothers I told Mr. Berard what was going on in Sag

24  Harbor.  And because he had played with the New York

25  Islanders and the New York Rangers, I believe at the time

4462

1   he thought that was a great place, he was familiar with

2   the real estate and asked to get involved.

3            So prior to Mr. Berard's involvement, a number

4   of steps had to take place.

5            First, the operating agreement for Led Better

6   Equipment Corporation was created by myself and signed by

7   myself and comanager at the time, Miss Lauren Gilmore.  It

8   represented a 25 percent interest to each of the four

9   members of the LLC, which was myself, Vincent Tesoriero,

10  John Kaiser, and Brian Berard.

11           As was a custom in my relationship with

12  Mr. Berard, he required that I send the operating

13  agreement and any other relevant documents to his family

14  attorney through him.  Mr. Berard typically would review,

15  on every occasion, all those documents with his family

16  attorney before he returned them to me and agreed to

17  participate.

18           Now with respect to his $375,000, Mr. Berard,

19  his only concern was that he was going to be able to

20  reduce, he was going to be able to retrieve the funds to

21  make available for the Led Better contribution from the

22  paydown of collateral that had occurred during the Lehman

23  Brothers closing on his line of credit.

24           So subsequent to the Lehman closing and the

25  initial paydown of Mr. Berard's line of credit, he

4463

1    communicated directly with Aaron Mascarella at Northern

2    Trust Bank, signed subsequent line-of-credit documents

3    which reduced his collateral requirement, and following

4    the completion of those documents, then either a portion

5    of the 375 or the entire $375,000 was available at

6    Northern Trust, and Mr. Berard wire-transferred those

7    funds to Led Better Development Corporation.

8    Q.    Now, you testified that Mr. Berard received a copy of

9    the Led Better operating agreement.  Is that correct?

10   A.    Yes, sir, just like Mr. Kaiser did.

11   Q.    As set forth in the document, itself, what was his

12   percentage interest in Led Better?

13   A.    25 percent.

14   Q.    Well, were you present when Mr. Kaiser testified that

15   you proposed or told him he could obtain a 50 percent

16   interest in Led Better Development Group for his monetary

17   expense?

18   A.    During Mr. Kaiser's testimony?

19   Q.    Excuse me.  During Mr. Berard's testimony.

20   A.    Yes, I was present.

21   Q.    Is that true:  You told him that he would get 50

22   percent rather than 25 percent as reflected in the

23   document, itself?

24   A.    That is untrue.

25   Q.    Incidentally, Mr. Kenner, you testified that

4464

1   Mr. Berard expressed some interest in becoming involved in

2   some projects that you also had an interest in.

3           You had an interest in Led Better, isn't that

4   true?

5   A.   Yes, I did.

6   Q.   What was your interest?

7   A.   It was a 25 percent interest.

8   Q.   But you didn't contribute any capital to that

9   project, did you?

10  A.   I did not up front.

11  Q.   Well, what was the understanding that you had with

12  John Kaiser as to what you would contribute, do, to get 25

13  percent interest in Led Better when you hadn't made a

14  capital contribution?

15  A.   What Mr. Kaiser knew, and one of the problems he had

16  with Manfredi and Mr. Milana, was that none of the

17  partners of North Point Properties could secure a

18  construction loan for the project they wanted to build.

19          The estimate by Mr. Kaiser was that it would be

20  between $1.5 million and $2 million for the construction

21  of the North Point property house in Sag Harbor, New York,

22  and Mr. Kaiser asked if I would be able to secure a

23  construction loan for that, which I told him there would

24  be no problems in doing.

25          So my contribution to the partnership was going

4465

1    to be the construction loan that I would secure in my own

2    name and taking the liability risk for.

3    Q.    You were present when Mr. Manfredi testified?

4    A.    Yes, I was.

5    Q.    He had acquired a percentage interest in North Point

6    Property before Led Better purchased it.  Is that correct?

7    A.    Yes.

8    Q.    When he obtained his 25 percent interest in North

9    Point Property, had he actually contributed capital to

10   that or was he performing some other of service?  If you

11   know.

12   A.    He contributed zero capital, which was consistent

13   interest with other deals that Manfredi and Mr. Kaiser

14   told me they had done in the past together, and he would

15   effectively be the manager of the project.

16   Q.    So continuing, Mr. Kenner.

17          We know that the 380 comes back to Led Better.

18   You testified a moment ago as to how those monies were

19   subsequently used.

20          As relates to Mr. Berard's $375,000 that he had

21   contributed to Led Better, what to your knowledge occurred

22   as relates to his contribution?

23   A.    His funds were sent directly to the Led Better

24   Development Corporation bank account.  And then, prior to

25   the escrow closing with Shimon Betesh, those funds were

4466

1    transferred to Shimon Betesh's escrow account.

2         I flew with Mr. Kaiser from the West Coast to

3    New York the day before the closing and then attended the

4    closing with Mr. Betesh.  And upon completion of the

5    documents that day, Led Better Development Corporation

6    received all the paperwork at the close of escrow from

7    Mr. Betesh, Mr. Kaiser received a copy of it that day as

8    the seller and then he also received copies of all the

9    buyers' certificates on that particular day.

10        I then forwarded a copy of all of the buyers'

11   certificates that were signed and escrowed onto Mr. Berard

12   as well for his records.

13   Q.   It is your recollection that you were present during

14   that closing, Mr. Kenner?

15   A.   Yes, I was you.  I flew from the West Coast the day

16   before.  I stayed at Mr. Kaiser's house.  And then

17   Mr. Kaiser and I drove out to see the property and do the

18   closing that day.

19        And then within 24 hours I was back on the West

20   Coast, having dinner in Seattle, Washington, with another

21   client of our.

22   Q.   You were here when Mr. Betesh testified.  Is that

23   correct?

24   A.   Yes, sir.

25   Q.   Do you recall whether he had memory of you being

4467

1   present at that closing?

2   A.   I don't he recalled whether I was or not.

3   Q.   How many people were at that closings, to your

4   memory?

5   A.   I believe it was Mr. Betesh, another attorney,

6   myself, and Mr. Kaiser.  And then a number of assistants

7   who were just came in and out with paperwork for us.

8   Q.   During the course of that closing, did you have any

9   extended conversation with Mr. Betesh, if you recall?

10  A.   Not in particular.

11  Q.   Now, continuing.

12        What happened with Led Better following the

13  acquisition of the property which we know is in Sag

14  Harbor, not in Hawaii.

15        But my question is what happened with reference

16  to the property that was purchased by Led Better from that

17  point on, to your knowledge?

18  A.   Well, I began to speak with Wells Fargo Bank as far

19  as creating a construction loan on the project.

20        At the same time -- and the reason Mr. Kaiser

21  and I traveled together from the West Coast is, we had

22  viewed another piece of real estate in Hermosa Beach,

23  California, in the two days prior.

24        At that point we were expecting to start

25  construction, at least engineering survey work and

4468

1    permitting, on the Sag Harbor property in or around the

2    end of 2006, beginning of 2007.

3            We were very fortunate, based on our previous

4    trip to Hermosa Beach, California, the days prior to the

5    Sag Harbor closing, to find out that we actually won a

6    judge's order to be able to purchase the Hermosa Beach

7    property.

8            So at that point Mr. Kaiser and I decided to put

9    the Sag Harbor property on hold as far as vertical

10   construction but to continue through with the permitting

11   engineering and survey work in Sag Harbor.  And Mr. Kaiser

12   and I then renovated, over the next six to eight months,

13   the California beach house.

14           And we had planned at that point in time to come

15   back to Sag Harbor and begin construction approximately a

16   year later, which at that point in time just did not

17   happen.  The real estate values in Sag Harbor continued to

18   go up, and at that point we figured, since the land was

19   worth, according to Mr. Kaiser's realtors, somewhere in

20   the neighborhood of $1.5 million to $2 million, we should

21   just sit on the land at that point in time.

22           And we looked for other projects, which in fact

23   we found one in Arizona close to my home.

24   Q.   Now, while your focus and energies were devoted to

25   those other projects, your energy as well as Mr. Kaiser's,

4469

1   did something happen with reference to the Sag Harbor

2   property?

3   A.   Well, in or about 2011, unknown to me -- excuse me.

4            In or around 2010, Mr. Kaiser contacted me when

5   we talked about just putting the piece of land up for sale

6   and asked me if I was aware that we had lost the property

7   to Suffolk County in a tax conveyance.  And I was as

8   shocked as he was at the time.

9            And because we owned the property for cash, we

10  really hadn't thought about the property tax at that point

11  in time.  All the property tax notices were being sent to

12  an old address, an old mailing address that I used, so we

13  were unaware that they were accruing at the time.

14           But when that occurred, I told Mr. Kaiser to

15  just go in to Suffolk County, explain to them what had

16  happened and tell them we would make good on all arrears

17  in tax payments.

18           So at that point in time I sent Mr. Kaiser a

19  wire transfer I believe for about $28,500 and the next day

20  he went in to Suffolk County and cut a check to them for

21  approximately $27,900 to make the tax conveyance back to

22  Suffolk County go away.

23           (Continued on the following page.)

24

25

4470

BY MR. HALEY:

Q.    That money that went to Kaiser, what was the source

of that money?

A.    It came from my bank account.

Q.    At that point in time, was Mr. Berard's $375,000

still committed to that property?

A.    Yes, sir, it was.

Q.    To your knowledge, Mr. Kenner, did the Sag Harbor

property ultimately get sold?

A.    Yes.

        I found out in or about 2012 that the Led Better

owned property in Sag Harbor was sold by Mr. Kaiser and

Mr. Berard although I was a managing member at the time.

        So I made a series of inquiries into it and

found out that there was a new operating agreement created

that I was cutout of, and there was a signature of my

friend Lauren Gillmore on a brand-new operating agreement

which neither she nor Mr. Kaiser or Mr. Berard had legal

authority to sign since I was the managing member of Led

Better, but the property was sold unbeknownst to me.

        I sent a series of demand letters to Mr. Kaiser

requesting that he pay me my proportionate share of the

Led Better fund proceeds based on the operating agreement

that we originally had signed.

        All of those demand letters went unanswered and

4471

1  in 2013 I filed a lawsuit against Mr. Kaiser for that

2  dispute.

3  Q.   With reference to Bryan Berard's original capital

4  contribution of $375,000, you heard him testify in this

5  trial; is that correct?

6  A.   Yes, sir, I did.

7  Q.   To your knowledge, what occurred with reference to

8  that investment?

9        Did he get it back?  Get part of it back?  To

10  your knowledge, what occurred?

11  A.   From what I understood, Mr. Berard received an agreed

12  upon portion of the proceeds from the Sag Harbor sale when

13  Mr. Kaiser and Mr. Berard decided to sell the property.

14  Q.   Reflective of his $375,000 capital contribution,

15  correct?

16  A.   That's what I understood when I heard his testimony.

17  Q.   Mr. Kenner, when you moved, transferred, $395,000 out

18  of the operating account of Little Isle IV, Ula Makika,

19  which money is traceable to Mike Peca's line of credit

20  under the circumstances you described to us, did you do

21  so, sir, as part of an artifice or scheme to defraud

22  Michael Peca?

23  A.   No, sir.

24  Q.   When you recommended, or when you had conversations

25  with Bryan Berard concerning, as you testified to, his

4472

1    intention, desire, to become part and parcel of the Led

2    Better project, did you do so as part of an artifice or

3    scheme to defraud Bryan Berard?

4    A.    No, sir.

5    Q.    Mr. Kenner, let's move into what I'll call a

6    different sphere, Ken Jowdy.

7          There's been a great deal of testimony

8    concerning Mr. Jowdy in this trial, correct, sir?

9    A.    Yes, sir.

10   Q.    You know Mr. Jowdy, do you not?

11   A.    Very well.

12   Q.    And starting in about 2003, did you have a certain

13   business relationship with Mr. Jowdy; yes or no?

14         Do I have the year, correct?

15   A.    It was 2002 we began our business relationship.

16   Q.    Without describing to this Court and jury the

17   business relationship that you had with Mr. Jowdy, from

18   2002 up to a particular point in time, were you and he in

19   communication regarding those business relationships; yes

20   or no?

21   A.    Yes, sir.

22   Q.    And in what form did those communications take place?

23   A.    Typically they would take place on the phone, many

24   times a day by text message and by e-mail communication.

25   Q.    Was the business relationship that you had with

4473

1   Mr. Jowdy in effect in or about July 2005?

2   A.    Could you restate the question, please?

3   Q.    Sure.

4         There came a point in time, did there not,

5   Mr. Kenner, where there was -- I'll use the words a

6   falling out -- between you and Ken Jowdy; is that true?

7   A.    Yes, sir, there was.

8   Q.    Without belaboring the record, did that have

9   something to do with monies loaned from Little Isle IV,

10  Ula Makika, to Ken Jowdy, which remains unpaid to this

11  day?

12  A.    Yes, sir, that's correct.

13  Q.    Before that time, however, you had this business

14  relationship with Ken Jowdy, correct?

15  A.    Yes, we did.

16  Q.    I believe you told us a moment ago that you would

17  communicate telephonically and via e-mail; is that true?

18  A.    Telephone, text and e-mail.

19  Q.    Look at a document marked Kenner Exhibit 229.

20        MR. HALEY:  Your Honor, both the government as

21  well as Mr. LaRusso have these documents.  I was able to

22  deliver them prior to today.

23  A.    Yes, I'm familiar with this.

24  Q.    What is it, sir?

25  A.    This is an e-mail that Mr. Jowdy had sent to me in or

4474

1    about July 2005 just representing as we were working on

2    closing the Cabo San Lucas deal, and he had a very

3    significant relationship --

4    Q.   Well, don't testify to its content.

5            It's an e-mail between you and Mr. Jowdy; is

6    that correct?

7    A.   Yes, sir, July 8, 2005.

8    Q.   At that point in time, in July 2005, what, if any,

9    projects were you and Mr. Jowdy working on in a summary

10   fashion, Mr. Kenner?

11   A.   Yes.

12           We had our initial project in Diamante Del Mar

13   which was in North Baja, Mexico, we were working on the

14   initial stages of the closing of the Diamante Cabo San

15   Lucas project, and we had a small company that had

16   purchased the Falcon 10 airplane that we heard a lot about

17   during this trial.

18   Q.   Now, at that point in time, specifically on July 8,

19   2005, did you know where Mr. Jowdy physically was located?

20   A.   He was in Mexico.

21   Q.   Is that e-mail, sir, a true, accurate and complete

22   e-mail communication that you received from Ken Jowdy on

23   July 8, 2005, at 7:15 a.m?

24   A.   Yes, sir, it is.

25   Q.   How did you acquire that particular document

4475

1    identified as Kenner Exhibit 229?

2    A.   This e-mail was turned over by the U.S. Government to

3    you during pretrial, and subsequently you had given it to

4    me for review.

5             MR. HALEY:  Your Honor, I offer that as Kenner

6    Exhibit 229.

7             MR. MISKIEWICZ:  No objection.

8             MR. LARUSSO:  No objection, your Honor.

9             THE COURT:  K 229 is admitted.

10            (Defense Exhibit K 229 in evidence.)

11            MR. HALEY:  Your Honor, it's not that lengthy.

12   May I read it into the record?

13            THE COURT:  Sure.

14   BY MR. HALEY:

15   Q.   From Ken Jowdy, dated, subject RE:

16            Thanks... I didn't tell you that I now have

17   Benito driving the lead car, and Bob G. following behind

18   me...  on a serious note, I had another conversation with

19   my FBI buddy today, who is serious about helping us...

20   the immediate challenge, other than keeping me alive down

21   here, is to provide professional security at the new FBO

22   at CSL.

23            I'll stop there for a moment, Mr. Kenner.

24            To your knowledge, who is or was Benito?

25   A.   Benito was one of the individuals who worked for

4476

1   Mr. Jowdy in Mexico.

2   Q.    To your knowledge, who is Bob G?

3   A.    Bob G is Robert Gaudet, who was Mr. Jowdy's director

4   of golf at Diamante Cabo San Lucas.

5   Q.    With reference to I have another conversation with my

6   FBI buddy today, did you come to learn, of your own

7   personal knowledge, who he was referring to?

8   A.    Yes.

9         He was referring to John Behnke.

10  Q.    Of your own personal knowledge, what, if any,

11  relationship does Ken Jowdy have with John Behnke today?

12  A.    Since 2005, John Behnke has been the director of

13  security for Mr. Jowdy personally and the director of

14  security for Diamante Cabo San Lucas in Mexico.

15  Q.    Okay.

16        Continuing:  I am sending him all of the plans

17  as we get them today...  we can't have a more solid and

18  respected guy...  he has been with the secret service and

19  then with the FBI for more than 20 years, and spent about

20  eight years as a right-hand director of Louis Freeh, who

21  is not the director anymore, but is still one of his best

22  friends...  anyway, when we get this thing started, he can

23  be a big help...  and since he is probably somehow reading

24  this, I will say again what a great guy he is and what an

25  asset he would be to our organization...  K.

4477

1      Who is K?

2  A.    Ken Jowdy.

3  Q.    From 2005 up until that moment in time when the

4  dispute between you and Ken Jowdy had occurred, you were

5  still in communication with Ken Jowdy during that period

6  of time via e-mail and other conversations; is that true?

7  A.    Yes, sir.

8  Q.    Once the dispute developed between you and Ken Jowdy

9  concerning the loan repayment and other matters that have

10  been alluded to during testimony, did you end up meeting

11  with Ken Jowdy to discuss these matters?

12  A.    Yes, I did, in or about the spring of 2007.

13  Q.    Where did that meeting take place?

14  A.    In Cabo San Lucas at the home Mr. Jowdy was renting

15  at the time.

16  Q.    Who was present during that meeting?

17  A.    Myself and Mr. Jowdy first, and then at the end of

18  the meeting, which was a short meeting, his brother-in-law

19  Bill Najam arrived.

20  Q.    How did that meeting come to take place?

21  A.    By about February of 2007, through a series of

22  unfulfilled promises by Mr. Jowdy to fix our communication

23  problems which had occurred almost simultaneous with him

24  receiving the March 2006 $125 million loan from Lehman

25  Brothers, I became very disenchanted with the lack of

4478

1    communication Mr. Jowdy had shown me and on behalf of the

2    all of the investors.

3            So after a series of e-mails and communications

4    in October 2006, when he promised to fix our communication

5    problems, which never happened, by about February, I had

6    lost about 15 of the $2 million projection of sales on the

7    property which was a portion of how we were going to repay

8    Mr. Jowdy's loans to the Hawaiian investors.

9            At that point, in or about February 2007, I

10   tried to contact Mr. Jowdy a dozen times a day by text

11   message and by phone, and told him that this was very

12   serious now and his lack of communication was unacceptable

13   and we needed to have a face-to-face meeting.

14           And over a six week period of time, Mr. Jowdy

15   effectively refused to let me know where he was.  I made

16   myself available in Cabo San Lucas on several occasions

17   which I thought would be an easy place for us to meet

18   considering we had a project going there.

19           And Mr. Jowdy finally, after about six weeks or

20   so, told me he would be back in Cabo San Lucas and could

21   have a meeting with me.

22   Q.    Did you travel to Cabo San Lucas?

23   A.    Yes, I did, for that meeting.

24   Q.    And physically where did it take place?  In his

25   office?  In the villa?

Case 2:13-cr-00607-JFB-AYS   Document 315   Filed 07/08/15   Page 46 of 225 PageID #: 7339

4479

1   A.    It took place in the living room of the house

2   Mr. Jowdy was renting at the time.

3   Q.    Would you kindly describe for the Court and jury the

4   substance of the conversation you had with Ken Jowdy at

5   that point in time?

6   A.    It was a conversation that lasted no more than two to

7   three minutes.

8         I told Mr. Jowdy that I had learned, at that

9   point in time, that he had another real estate project

10  going on in Texas, and he had effectively abandoned us for

11  the second time; first at Diamante Del Mar and now second

12  at Diamante Cabo San Lucas, and he was flying around the

13  country in the airplane that my friend and I had

14  purchased.  He was flying to Costa Rica and throughout

15  Mexico looking for new projects to fund with the people

16  from Lehman Brothers, and effectively ignoring those of us

17  who invested upwards of $25 million in cash with Mr. Jowdy

18  and also inclusive of loans that were outstanding.

19        At that point Mr. Jowdy, uncharacteristically to

20  what I had remembered in anything we dealt with before,

21  got very terse or agitated with me, and told me that he

22  effectively didn't need me or my investors any longer,

23  that he had Lehman Brothers to fund anything that he

24  needed, and that he was protected by the FBI, and so I

25  needed to either get on board with him or, frankly, get

4480

1  out of his way.

2          I was stunned by the conversation and I told him

3  we're just going to have to agree to disagree, that's an

4  inappropriate way for us to move forward in our business,

5  and he said, well, I've got some other place to be today,

6  and he actually left the meeting and walked upstairs to

7  his bedroom.

8          And that's when Mr. Najam entered the room from

9  the exterior and asked me if I understood what was going

10  on in the communication with Mr. Jowdy?

11          And I told him I was shocked.  And he said,

12  well, that's how the rules are, so get used to it.

13          And at that point in time I told him I was

14  dismayed by it all and I didn't know what to do and I

15  think I left the house shortly thereafter.

16  Q.    You were talking about the Texas project, correct?

17  A.    Yes, sir.

18  Q.    Did you come to learn who traveled with him to that

19  Texas project at some point in time and the mode of their

20  travel?

21  A.    Yes.

22          During pretrial I was able to review all of the

23  flight logs for the Falcon aircraft, and on one occasion I

24  saw that Mr. Freeh and his wife had traveled to the Texas

25  project with Mr. Jowdy and I believe also with the

4481

1    gentleman from Lehman Brothers, Masoud Bahti on the Falcon

2    10 aircraft.

3    Q.   What is or was your understanding of Mr. Freeh's

4    relationship with Ken Jowdy, just in terms of a

5    relationship, sir?

6    A.   I was unaware of any relationship other than

7    Mr. Behnke and Mr. Freeh, from what Mr. Behnke told me,

8    were best of friends.

9    Q.   Did there come a point in time that you learned that

10   Mr. Freeh and Mr. Jowdy had a different professional

11   relationship in some context?

12   A.   Yes, sir, I did.

13   Q.   In what way, sir?

14   A.   In or about late 2008, when Mr. Constantine was still

15   negotiating and attempting to mediate a settlement between

16   Mr. Jowdy for all of his frauds and embezzlements,

17   Mr. Constantine was holding a conference call with

18   Mr. Jowdy, Mr. Najam--

19   Q.   Let me stop you.

20        Were you present during that conference call?

21   A.   Yes, sir, I was.

22   Q.   What occurred?

23   A.   Mr. Constantine had arranged, has he had on numerous

24   occasions, conference calls with Mr. Jowdy and Mr. Najam.

25        And on that particular phone call, in or about

4482

1    late 2008, I recall Tom Harvey, Mr. Jowdy's New York

2    attorney, representing that he was on the phone for the

3    call.

4            And then the next voice we heard was Mr. Freeh,

5    representing that he was on the phone call representing

6    Mr. Jowdy on the phone call as well, which I recall

7    specifically Mr. Constantine was stunned.

8    Q.    Don't characterize Mr. Constantine's response.  The

9    question was the nature of the conversation, okay?

10           We know, Mr. Kenner, that whatever efforts were

11   made for purposes of settling any number of disputes with

12   Ken Jowdy, including a mediation in California, they never

13   came to fruition, did they, sir?

14   A.    Nothing ever resulted from those meetings or

15   mediations.

16   Q.    To your knowledge, is Mr. Behnke still employed by

17   Mr. Jowdy?

18   A.    To the best of my knowledge he is.

19   Q.    To your knowledge, what, if any, employment does John

20   Kaiser have vis-à-vis his relationship with Ken Jowdy?

21   A.    I believe John Kaiser is the director of vertical

22   construction at Diamante Cabo San Lucas as of about three

23   years ago.

24   Q.    To your knowledge, what, if any, relationship does

25   Bryan Berard have with Ken Jowdy?

4483

1   A.   I believe Bryan Berard has been a sales associate in

2   different roles at Diamante Cabo San Lucas for the last

3   approximately three years.

4            THE COURT:  Are you done with the Mr. Jowdy

5   questions?

6            MR. HALEY:  Yes, your Honor, I am.

7            THE COURT:  Why don't we take the break.  We

8   will take the morning break.

9            Don't discuss the case.

10            (The jury is excused.)

11            (Recess taken.)

12            (After recess.)

13            THE CLERK:  All rise.

14            THE COURT:  Please be seated.

15            (The witness resumes the stand.)

16            THE COURT:  Okay, let's bring in the jury.

17            MR. HALEY:  Your Honor, I'm reaching the

18   conclusion, but I wanted to alert the Court I have a

19   number of documents that were previously marked for

20   identification.

21            It's not my intention to have my client

22   authenticate them all, but there will be any number of

23   them that I will be showing him near the conclusion.

24            I did provide the government, as well as

25   Mr. LaRusso, copies of all those documents so the Court is

4484

1  aware.

2         THE COURT:  Okay.

3         THE CLERK:  All rise.

4         (The jury is present.)

5         THE COURT:  Please be seated.

6         Go ahead, Mr. Haley.

7         MR. HALEY:  Thank you, Judge.

8  BY MR. HALEY:

9  Q.   Mr. Kenner, at the conclusion of the government's

10 case, a number of charts were introduced into evidence

11 without objection and I'm going to refer to a select

12 number of those charts.

13        But would you kindly look at what you have in

14 front of you quickly to confirm that these are the charts

15 that were introduced into evidence by the government at

16 the conclusion of their case.

17        (Pause in proceedings.)

18 A.   Yes, sir.

19 Q.   Keeping them in sequence, Mr. Kenner, please take a

20 look at government chart number 1.

21        Do you see the transactions referenced on that

22 chart, sir?

23 A.   Yes, sir, I do.

24 Q.   To your knowledge, are those transfers, as reflected

25 on that chart, regarding monetary transactions, correct

4485

1    and accurate?

2    A.    Yes, I believe they are.

3    Q.    Now, in March of 2005, we have, as reflected on the

4    chart, $265,000 of Mr. Berard's line of credit ultimately

5    through Big Isle IV being paid into Fidelity National

6    Title; is that correct?

7    A.    Through Big Isle VI.

8    Q.    Excuse me.  Correct.

9          It says for purchase of four Discovery Harbor

10   lots; is that true?

11   A.    Yes, sir, it is.

12   Q.    And what, if any, relationship did that purchase have

13   to the Hawaii land development project?

14   A.    At the time, Big Isle VI was in the process of

15   acquiring two parcels.  One was the Waikapuna parcels that

16   we had been in discussions with; and, second, John Kaiser

17   and Chris Manfredi were interested in acquiring a number

18   of smaller home sites that were in the local community

19   with the intent of building some very small homes on those

20   properties to test out importing different products to the

21   big island of Hawaii from the mainland, to see what kind

22   of lead time it would take before we got into the

23   construction of 8 to 12,000 square foot homes.

24   Q.    We see on that chart, eight years later, June 14,

25   2013, we see payments going to you; is that correct?

4486

1    A.    On April 8 of 2013.

2          Yes, eight years later.

3    Q.    Is that April or June?

4    A.    April 2013.

5    Q.    As relates to that transfer, sir, of 31,528.65, would

6    you describe the circumstances under which you caused that

7    transfer to be made to you and why we go from 265,000 to

8    31,528?

9          Tell us what happened?

10   A.    Yes, sir.

11         The original four parcels that were purchased

12   for approximately $265,000 and had gone through the real

13   estate crash that the rest of North America had, but in

14   that part of the big island of Hawaii, there were just

15   severe devastation to the property values, especially in

16   the small undeveloped home sites, so each of the home

17   sites actually sold for about $9,000 at that time I

18   believe.

19         In or about the spring of 2013, I had been

20   running out of cash and continuing to pursue litigation

21   efforts against Mr. Jowdy in Mexico, and I had been

22   introduced to some new lawyers in Mexico at that time that

23   told me, after our first meeting that I met with them,

24   that they would need a retainer of about 25,000 to start

25   the project with me, the new litigation efforts against

4487

1   Mr. Jowdy in the summer of 2013, and then I would need

2   another approximately $25,000 shortly thereafter.

3          And so at that point in time, some of the assets

4   that we still had that were under my control in Hawaii

5   were these four parcels that I had recently put for sale,

6   and I told the real estate agent to get them out and sell

7   them at whatever he thought fair market value was at that

8   time.

9          So he was able to effectuate a fairly quick

10  sale, and as a result I was able to get the $31,528 and

11  then utilize it for legal funds in Mexico.

12  Q.   Is that the reason why, eight years later, you didn't

13  send to Bryan Berard the 31,528.65 that now is traceable

14  to his line of credit that goes back to March 2005?

15  A.   Well, Mr. Berard's line of credit, just like all the

16  other lines of credit, were capital contributions to

17  Little Isle IV pursuant to which they received their

18  equity ownership in Little Isle IV.

19         So the $265,000 was a contribution to the Little

20  Isle IV partnership and eight years later when I

21  effectuated the sales of those four parcels, I utilized

22  those funds to hire more lawyers to continue to pursue Ken

23  Jowdy to try and retrieve the loans that he had stolen and

24  owed our project which were about $19 million at that

25  point in time to 2013.

4488

1    Q.    Did you believe, at that point in time, sir, that

2    your efforts in that regard were in the interest of your

3    hockey player clients?

4    A.    Absolutely.

5    Q.    Was that part of some artifice or scheme to defraud

6    Bryan Berard in particular?

7    A.    No, sir.

8    Q.    I note, Mr. Kenner, or we note that these payments

9    are made in, as indicated, certain incremental payments,

10   true?

11   A.    Yes, sir.

12   Q.    Within two on the same day and others shortly

13   thereafter.

14         Why didn't you send this attorney that $25,000

15   retainer and why cash, what was that all about?

16   A.    Well, by that point in time, I was running into a lot

17   of difficulties with my banks because I had been told by

18   several banks over the previous year that I had been under

19   investigation and I could not keep money in the accounts

20   and anyone that I was transferring money to, were having

21   problems on their end.

22         Since I was hiring some new attorneys that were

23   unknown to Mr. Jowdy, I decided that it was more important

24   that I took the cash out and paid the attorneys in cash so

25   there would be no trail to who the new attorneys were at

4489

1   that point in time.

2   Q.   Why increments of less than $10,000?

3   A.   You may or may not know, but if you withdraw $10,000

4   or more, the bank has to fill out a special withdrawal

5   form and report that to the Federal Banking Commission.

6   Q.   Was your decision in that regard to make payments in

7   that respect part and parcel of an artifice or scheme to

8   defraud your hockey player clients?

9   A.   No, sir.

10   Q.   By the way, $877.00 went to a car payment; is that

11   correct?

12   A.   Yes, sir.

13   Q.   And do you have reason for doing so at that time,

14   sir?

15   A.   I had a car payment due, but this wasn't the only

16   money I had in my possession.

17   Q.   Well, how do you explain, sir, whereas the other cash

18   was going to a lawyer specifically hired by you to pursue

19   Jowdy, how do you explain the $877.00 cash payment in

20   terms of the money you're entitled to or not entitled to,

21   just tell us, how do you explain it?

22   A.   I had $877.00 I took to the bank that day to make the

23   payment.

24   Q.   If you would go to chart 2, sir, in your possession.

25   A.   Yes, sir.

4490

1   Q.   Are the financial transactions reflected on that

2   chart, to your personal knowledge, correct?

3   A.   Yes, I believe they are.

4   Q.   Rather than go through the same sequence of

5   questions, sir, well, with reference to the 16,261.38 that

6   ultimately you received on June 14, '13, would you

7   describe how we end up with what was originally sums of

8   money far greater than that and ultimately only 16,261.38

9   being traced.

10   A.   In February of '05, pursuant to the same discussions

11   I had with John Kaiser and Chris Manfredi, we purchased a

12   fifth small home site in Discovery Harbor for $86,000.

13          About eight years later, with the same financial

14   issues at stake, to put together some more cash for the

15   new Mexican legal counsel, I was assisting in new

16   litigation filings against Mr. Jowdy in Mexico, I asked

17   the same real estate agent in Hawaii to try and sell that

18   fifth lot, which in fact he did, and the residual proceeds

19   of 16,261 were transferred to me in June of 2013.

20          Subsequent to that, over the next few days, I

21   made two cash withdrawals of that amount for the purpose

22   of delivering them to my new attorneys.

23   Q.   If we can go to chart 3, Mr. Kenner.

24   A.   Yes.

25   Q.   The financial transactions reflected on 3, to your

4491

1    knowledge, true and correct?

2    A.   Yes, sir, I believe they are.

3    Q.   Why don't you just tell us the purpose of those

4    transactions?

5    A.   Yes.

6    Q.   Of your own personal knowledge.

7    A.   Sure.

8         On or about July 7, 2005, I had utilized funds

9    from Little Isle IV to which apparently originated from

10   Michael Peca's line of credit as a capital contribution of

11   Little Isle IV.

12        I deposited it in the title guarantee escrow in

13   order to put another parcel of land in July 2005 under a

14   purchase and sale agreement that would be helpful I

15   believe to access the Waikapuna parcel which was a big

16   issue for us at the time.

17        About two-and-a-half years later, after the

18   close of the Lehman escrow, in December 2007 I had started

19   to incur legal fees and there were also some outstanding

20   expenses due to me from the Hawaii partnership.

21        So at the close of that escrow, when the parcel

22   was not acquired by the joint venture partnership, I

23   distributed the $25,000 back to myself to cover expenses

24   that were outstanding at the time.

25   Q.   When you say cover expenses, Mr. Kenner, the books

4492

1    and records that were maintained by Little Isle IV and/or

2    the other LLCs that tracked those expenses?

3    A.    Not specifically that I recall, but the expenses

4    would have been in connection with the five or $600,000

5    that I had loaned out to the Hawaii partners previous to

6    the closing.

7         And, in addition, the company still owed me

8    about $300,000 at that time on the environmental

9    agreement, the environmental indemnity agreement, and in

10   addition I started to incur legal fees at that point

11   pursuant to the loans that were outstanding with Mr. Jowdy

12   on behalf of the company.

13   Q.    By the way, and I hope I don't belabor the point, who

14   was maintaining books and records for you during this

15   period of time?

16   A.    Up until December of 2007, I was the custodian of all

17   of the banking records for Little Isle and for the rest of

18   the entities related to Little Isle including Na'alehu

19   Ventures.

20        As of December 31st, 2007, John Kaiser became

21   the manager of the Na'alehu Ventures and became the

22   ultimate custodian at that point.

23   Q.    Kristie Myrick was employed by you for a period of

24   time?

25   A.    Yes, sir, from approximately April of 2003 until

1   approximately March 1st of 2007.

2   Q.   In what capacity was she employed by you?

3   A.   She was an office manager for my sports and

4   entertainment practice, and from time-to-time she would

5   also assist as an employee of the efforts in Hawaii and

6   Mexico, in addition to my other assistant at the time.

7   Q.   What, if any, role did she play in maintaining, let's

8   say, expense records, business records associated with

9   those entities during the period of time she was employed

10  by you?

11  A.   She was one of the two girls, but the one who was

12  specifically in charge of keeping all of my books and

13  records on our corporate server up until the time of her

14  termination in or about January of 2007, and then all of

15  the resulting books and records, in addition to tens of

16  thousands of other documents, were kept by her and not

17  returned to me upon her termination.

18  Q.   To your knowledge, where are those books and records

19  if they still exist today?

20  A.   If they still exist, they would still be on that

21  corporate server that Kristie Myrick and her attorney

22  Michael Meeks possess.

23  Q.   Michael Meeks.

24       To your knowledge, did Michael Meeks represent

25  anyone else in connection with the litigation that's been

4494

1   referred to in this proceeding, including the arbitration?

2   A.   Yes, sir.

3        Michael Meeks represented Kristie Myrick, he

4   represented Owen Nolan, he represented Joe Juneau, and he

5   represented Ethan Moreau.

6   Q.   By the way, the picture of Michael Peca on chart

7   number 3, is that a fair and accurate picture of Michael?

8   A.   I believe it is.

9   Q.   Now, skipping chart 4 and let's go to chart 5.

10  A.   Yes, sir.

11  Q.   Mr. Kenner, when I skipped chart 4, to the best of

12  your knowledge, has your testimony up to this point in

13  time been relevant and material to the transactions as set

14  forth in the chart I skipped; yes or no?

15  A.   I'm not sure I understood the question.  I apologize.

16  Q.   I'm not sure I understood the question.

17        The chart I skipped, sir, it reflects various

18  financial transactions; is that correct?

19  A.   Yes, sir, it does.

20  Q.   It simply relates, sir, does it not, to use of lines

21  of credit to purchase title for Honu'apo?

22  A.   That's correct.

23        These were the funds that were still required to

24  close on or about December 28, 2004, for the 1500 acre

25  parcel of Honu'apo.

4495

1    Q.    Looking at chart 4 --

2              THE COURT:  You mean 5.

3              MR. HALEY:  Excuse me.  5.

4    BY MR. HALEY:

5    Q.    Does that chart accurately reflect the financial

6    transactions as set forth in the chart?

7    A.    To the best of my recollection, I believe it's

8    accurate.

9    Q.    As we go down to the 71905, $1.5 million line to that

10   corporate entity?

11   A.    Propiedades Dom.

12   Q.    Thank you for pronouncing that.

13              At that point in time, 2005, who was the manager

14   or owner of that corporate entity?

15   A.    Ken Jowdy.

16   Q.    With reference to Baja Development Corp., who was the

17   owner or managing member of that corporation?

18   A.    Ken Jowdy.

19   Q.    The money that flows ultimately to CMG, Tommy

20   Constantine, 7/21/05, 7/22/05, $650,000, and as we see on

21   the right side of the chart, it ends up in an account

22   controlled by Tommy Constantine, CMG; is that correct?

23   A.    Yes, sir, I see that.

24   Q.    That is Constantine Management Group, true?

25   A.    Yes.

4496

1    Q.    And the basis for that payment to him in that amount

2    at that time, sir?

3    A.    I believe it would have been the 2005 funding

4    consulting agreement between Constantine Management Group

5    and the Hawaiian partners.

6    Q.    From that point on, when he received that money that

7    went to him pursuant to that contract, it reflects he then

8    wrote out checks for the purchase of the Palms Place

9    Condos?

10   A.    I see that on the chart.

11   Q.    Were you part and parcel of that financial transfer

12   in some sense?

13   A.    No, sir, I was not.

14   Q.    Did you even know that he decided to take his 650,000

15   and then purchase the Palms Place Condos?

16   A.    I was only aware that Mr. Constantine was in the

17   process of purchasing a number of condominiums at the

18   Palms Place, but not that specific transaction.

19   Q.    Mr. Kenner, I'm going to skip chart 6.  I'm going to

20   skip chart 7.

21         Chart 8, sir, is the Sag Harbor transfers; do

22   you see that?

23   A.    Yes, sir, I do.

24   Q.    I believe, sir, just a short while ago you testified

25   to the transfers and purposes of those transfers; is that

4497

1   correct?

2   A.   Yes.

3   Q.   I'm going to skip that chart as well, sir.

4        As relates to chart 9, Mr. Kenner, does that

5   chart, to your knowledge, accurately reflect the financial

6   transactions as set forth on the face of the chart?

7   A.   Yes.

8        Those transactions are a portion of the

9   transactions that occurred on that bank statement.

10  Q.   As relates to the Kaiser to Ula Makika to the monies

11  going out to CMG Constantine as reflected on the top line,

12  would you simply explain those transactions to your

13  knowledge?

14  A.   The payments, I believe in December '06 through

15  February '07, were pursuant to a funding consulting

16  agreement or a loan agreement Mr. Constantine had

17  requested at the time of the Lehman Brothers closing in

18  August of 2006 related to the Waikapuna parcel and the

19  future release of the 123.9 acre Urban Expansion parcel.

20  Q.   As relates then to the vertical access axis, would

21  you explain those payments?

22  A.   Yes.

23       Once the $380,000 loan was repaid by Mr. Kaiser

24  to Ula Makika, about six or seven weeks later $200,000 I

25  distributed to me personally pursuant to the environmental

4498

1    indemnity agreement which I think was about a month or

2    month-and-a-half late any ways as far as the payment went,

3    and then subsequent to that I had made a down payment on

4    the California beach house with those funds.

5    Q.    Chart 10, Mr. Kenner.

6    A.    Yes, sir.

7    Q.    To avoid repetition of your testimony, chart 10

8    references -- first of all, are the financial transactions

9    set forth on chart 10 correct, to your knowledge?

10   A.    Yes, to the best of my knowledge.

11   Q.    And reflects $100,000 from Mr. Peca going to

12   Constantine Management Group; is that correct?

13   A.    Yes, sir.

14   Q.    And then money being sent to you; is that correct?

15   A.    Yes, sir, on the same day.

16   Q.    Is that chart relevant to your testimony concerning

17   ownership interest being conveyed by Mr. Constantine to

18   your various hockey player clients in return for money

19   they sent to his personal account, CMG Management?

20   A.    Yes.

21         I believe this transaction Mr. Peca purchased a

22   portion of Mr. Constantine's private Eufora stock, just a

23   small portion of it.

24         And Mr. Constantine, on the 7th of April, was

25   repaying $100,000 advance I had made to him five days

4499

1    earlier I believe on April 2 of 2008.

2              (Continued on next page.)

4500

1    DIRECT EXAMINATION

2    BY MR. HALEY:

3    Q.   So what, if anything, did your client get for that

4    100,000 payment that Mr. Constantine then in turn paid you

5    100,000?

6    A.   Mr. Peca received, I believe, .5 percent ownership in

7    Eufora at the time, which I believe was valued at $20

8    million as a corporate entity.

9    Q.   Chart 11, Mr. Kenner, that chart has some relevance

10   to you?

11   A.   Yes, sir.  April 24th, same transaction as the

12   Peca's.  Mr. Nash, on April 24th of 2008, had purchased a

13   .5 percent interest from Mr. Constantine's private Eufora

14   stock, and as a result of that transaction, Mr.

15   Constantine was able to repay me, on April 28, 2008, a

16   portion of the $25,000 I had advanced to him a week or two

17   earlier.

18   Q.   Now, we saw some bank records -- withdrawn.

19            Without being repetitive, Mr. Kenner, this chart

20   shows money going in to CMG Management to Mr. Constantine,

21   and then him using his account at CMG Management to send

22   money to Playboy in the amount of 28,000.  In return for

23   Mr. Sydor's payment to CMG, in return for Mr. Sydor's

24   payment that day to Tommy Constantine as deposited in

25   Tommy Constantine's personal account, what, if any, value

4501

1    did Mr. Sydor receive for that $50,000 payment for Mr.

2    Constantine?

3    A.    From what I receive on Eufora's books and records,

4    Mr. Sydor received --

5              MR. MISKIEWICZ:  Objection.

6              THE COURT:  Sustained.

7              MR. HALEY:  Thank you.

8    Q.    Now, from what you have seen on their books and

9    records at the time the transfer was made, what was your

10   understanding based upon conversations you had with Tommy

11   Constantine, as well as your clients, as to what, if any,

12   value your client was going to receive in return for that

13   $50,000 payment for Mr. Constantine?

14   A.    I apologize.  Mr. Sydor was receiving a .25 percent

15   interest in Eufora directly from Mr. Constantine's

16   holdings, his private ownership in Eufora for that

17   $50,000.

18   Q.    Sir, taking a look at chart number 13, do you see

19   that chart?

20   A.    Yes, sir, I do.

21   Q.    To your knowledge and understanding, when Mr. Ranford

22   conveyed 200,000 to CMG, account controlled and operated

23   by Constantine management on that date, what, if any,

24   value did he receive for his $200,000 contribution?

25   A.    At that point, Mr. Ranford received a 1 percent

4502

1    interest in Eufora from Mr. Constantine's private equity

2    holdings, private ownership in Eufora.

3    Q.   Other than the $38,000 that went out to you by this

4    chart on 7/11/08, did you know that those other monies

5    were disbursed from Mr. Constantine's account thereafter?

6    A.   No, I was unaware of any of the other transfers,

7    other than Mr. Constantine's $38,000 repayment to me.

8    Q.   Repayment for what?

9    A.   Just funds that I had advanced him upon his request

10   prior to that transaction date.

11   Q.   How common was that during this period of time where

12   you would advance funds to Mr. Constantine or he would

13   advance funds to you?  How would you characterize that?

14   A.   It happened fairly regularly.

15   Q.   Did Mr. Constantine, from your perspective, at times

16   seem to be in need of cash on a short-term basis?

17   A.   On a regular basis he did.

18   Q.   Well, of your personal knowledge, sir, did you have

19   an understanding during the period of time that monies

20   were being loaned to Mr. Kaiser as to his net worth?

21   A.   Mr. Constantine's?

22   Q.   Excuse me, Mr. Constantine.

23   A.   Yes; I believe he was a very wealthy individual.

24   Q.   He is asking you for money, is he not?

25   A.   Yes, sir.

4503

1   Q.    How did that strike you?

2   A.    Well, I think in a common sense it would seem

3   strange, other than the fact that I knew, from what I had

4   seen, Mr. Constantine owned a lot of illiquid assets,

5   whether it be his home property, or his ownership in

6   Eufora, or his ownership in the Avalon hangars, his

7   helicopters when I first met him, so the illiquid assets

8   made sense.  He was a wealthy individual, but from time to

9   time he would be short on cash, so he would approach me,

10  ask if I could lend him cash on a short-term basis.  When

11  it was available, I accommodated.

12  Q.    Mr. Kenner, you say illiquid assets.  That's like my

13  home being worth X amount, yet not being able to

14  necessarily grab the cash unless I sell my home.  I

15  apologize.  What do you mean by illiquid assets?

16  A.    Example of a home is the best example, if you had a

17  million dollar home with no mortgage on it, you couldn't

18  use that to go buy groceries that day, so your home value

19  would be illiquid or not liquid, not accessible.

20  Q.    Very quickly, Mr. Kenner, chart 14, I know there has

21  been testimony with reference to this, but so the jury can

22  acclimate -- chart, $1,481,127, do you see that?

23  A.    Yes, sir, I do.

24  Q.    What did that represent when Mr. Gaarn paid you

25  $81,127 on 12/31/08 after that same day he received

4504

1   through Eufora the sum of 100,000, which previously had

2   been sent to Eufora by Glen Murray on 12/29/08?

3   A.   Glen Murray had purchased some of Mr. Gaarn's private

4   holdings through a company Mr. Gaarn owned called Standard

5   Ventures.  And when Mr. Gaarn received the proceeds from

6   the sale of his private ownership in Eufora, he began to

7   repay me a portion of the $150,000, plus advances, loans I

8   made to him over the previous two years, so the $81,127

9   was calculation he and I had done to repay $70,000 of

10  principal and attach $11,127 of interest that was due on

11  the loan at that time.

12  Q.   Chart 15, sir.

13  A.   Yes, sir.

14  Q.   Now, with reference to this chart, does it accurately

15  reflect the financial transactions involving the various

16  individuals and dates as set forth on that chart?

17  A.   I believe from what I have seen, this appears

18  accurate.

19  Q.   We see, do we not, money going into Mr. Gaarn from

20  Eufora having previously been transferred by Mr. Ranford

21  and Greg DeVries into Eufora, but I want you to take a

22  look at the vertical axis, we see Gaarn and $30,000 going

23  out 12/09 to Kaiser, do you see that?

24  A.   Yes, sir, I do.

25  Q.   Then we see a horizontal line from Kaiser to Standard

4505

1   Advisors, Mr. Kenner, do you see that?

2   A.   Yes, sir, I do.

3   Q.   Starting with the vertical axis, Gaarn 2/12/09,

4   30,000 then the horizontal axis, will you explain that to

5   us?

6   A.   Yes.  In or about February of 2009, Mr. Kaiser and I

7   had a renovation project in Paradise Valley, Arizona that

8   we discussed during this trial, and Mr. Kaiser was in need

9   of money that he needed to contribute to the Paradise

10  Valley property, and since he had been paid back in full

11  by me with respect to the California beach project at that

12  time, and any other outstanding transactions we had, in

13  order to keep track of additional money that Mr. Kaiser

14  was borrowing, I asked that Mr. Gaarn transfer the money

15  to Mr. Kaiser as a loan, and then Mr. Kaiser forwarded

16  that money to me so I could take care of expenses I

17  continued to front and pay for on the Paradise Valley,

18  Arizona renovation project.

19          MR. HALEY:  Quick moment, Judge.

20  Q.   Going to Chart 16, does that chart, to your

21  knowledge, accurately reflect the financial transactions

22  as depicted in that chart?

23  A.   Yes, I believe it does.

24  Q.   And with reference, sir, to the, starting with the

25  Gaarn block and then the axis, we see the 2/25/09,

4506

1    $40,000, 40,300 going to Kaiser.  Do you see that?

2    A.    Yes, I do.

3    Q.    Then we see Kaiser the following day transferring

4    $40,300 to you.  See that?

5    A.    Yes, sir, I do.

6    Q.    Can you explain that transaction?

7    A.    That transaction is identical to what we did on

8    February 12 of '09.  On the previous slide, chart 15, when

9    Mr. Kaiser received $30,000 from Mr. Gaarn, then forwarded

10   the money to me to track Mr. Kaiser's interest in the

11   expenses related to the Arizona renovation project.

12           So on February 25th, I had asked Mr. Gaarn if he

13   would do the same thing for Mr. Kaiser.  There were bills

14   totalling approximately $40,300, so I asked Mr. Gaarn for

15   that for Mr. Kaiser, so he could forward it to me for

16   tracking purposes.

17           As you can see, on the same day, February 25th

18   of 2009, Mr. Gaarn was still in the process of, I believe,

19   repaying me some of the initial loans I had made to him.

20   On that same day, I asked him to forward $30,000 to me

21   directly.

22   Q.    Now, that $40,300 that we were referring to that says

23   occurred on February 26, 2009, see what I'm referring to?

24   A.    Yes, sir, I do.

25   Q.    I'm going to read to you Count Three of the

4507

1  indictment that alleges wire fraud, and Count Three reads

2  as follows:

3          February 26, 2009, $40,300 wire transfer from

4  John Doe's account at Commerce Bank in the Eastern

5  District of New York to an account in the name of Kenner

6  at Bank of America in Scottsdale, Arizona.

7          Do you remember that count in the indictment?

8  A.   Yes, I do.

9  Q.   Who do you know John Doe 10 to be these days, or do

10  you not know?

11  A.   I don't know.  I don't want to guess.

12  Q.   Well, does the name Timothy Gaarn ring a bell?

13  A.   Yes, sir, it does.

14  Q.   By the way, did you ever conspire with Timothy Gaarn

15  to defraud your clients, sir?

16  A.   No, sir, I did not.

17  Q.   With reference, sir, to that transaction, February

18  26, 2009, $40,300 wire transfer as reflected on government

19  chart number 16, when that occurred, was that part of a

20  scheme or artifice to defraud your clients?

21  A.   No, sir.

22  Q.   I'm going to skip chart 17.  Skip chart 18, to not

23  belabor the record.  I only have two charts left.

24          I'm going to show you chart number 19.  Do you

25  recognize that financial transaction depicted on that

4508

1   chart?

2   A.   Yes, I do.

3   Q.   Do they accurately reflect the transactions,

4   financial transactions, as depicted on the chart?

5   A.   I believe they do.

6   Q.   Can you explain to us, sir, as set forth on that

7   chart, the $85,000 that's transferred to you, then the

8   expenses that thereafter follow that payment after you

9   receive that, what that was all about?

10  A.   After Mr. Gaarn had sold .5 percent in Eufora to Mr.

11  Ranford, I had asked Mr. Gaarn at that time if I could

12  borrow some funds now that I believe he had fully repaid

13  me the original loan.  This may have been the second or

14  third occurrence I asked Mr. Gaarn if I could borrow some

15  of his funds.  He had no problem with it.  We were working

16  on other deals at the time together.  And he knew I would

17  be good for the money.

18          On May 20, 2009, Mr. Gaarn wire transferred me

19  $85,000, and actually, a few days later -- that appears to

20  be little more than two weeks after Mr. Gaarn had sold his

21  stock to Mr. Ranford.  A few days later, Mr. Kaiser, I

22  recall, needed some funds to pay down some of his credit

23  card bills and personal expenses.  He actually borrowed

24  another $25,000 from me May 22, 2009.  Then I made a

25  series of personal payments to pay my American Express

4509

1    bill and my Citi MasterCard.  Many of those expenses were

2    related to the Paradise Valley home we were renovating.

3    Then I had a couple of automobile payments I took care of.

4    Q.    I truly hope I'm not repetitive.  As relates to the

5    100,000 transfer on May 4, '09 from William Ranford, to

6    your knowledge, was he aware of that payment?

7    A.    Yes, sir, he was.

8    Q.    To your knowledge, is there a document that you saw

9    that at least advises him from a financial institution of

10   the transfer of his monies on that day?

11   A.    Yes, sir; Charles Schwab transfer confirmation sent

12   to his home in Bellingham, Washington.

13   Q.    Finally, sir, we have government chart number 20.

14         What, if anything, do you know of your own

15   personal knowledge of the transactions reflected in that

16   chart, sir?

17   A.    Nothing at the time.

18   Q.    Well, Count Five of the indictment charges both you

19   and Tommy Constantine with wire fraud and it reads:

20         December 7, 2009, 150,000 wire transfer from

21   John Doe 11's account, that's Mr. Privitello, at Fidelity

22   Investments in the Eastern District of New York to an

23   account in First Century Bank in Los Angeles, California.

24         How do you respond to that accusation in the

25   indictment with respect to your activity?

4510

1    A.    I had no knowledge of that transaction whatsoever.

2    Q.    Count Six also charges you and Tommy Constantine with

3    wire fraud, reads:

4          December 7, 2009, says in the indictment, 50,000

5    wire transfer from John Doe's account, Mr. Privitello, at

6    Citizens Bank in the Eastern District of New York to an

7    account at First Century Bank in Los Angeles, California.

8          What, if anything, do you know as relates to

9    that transfer, and what was your involvement at all in

10   that transfer?

11   A.    I knew nothing about it and had no involvement in

12   that transaction whatsoever.

13   Q.    Mr. Kenner, I'm going to read to you paragraph 28 of

14   the indictment which falls under the Led Better

15   allegations, and it reads:

16          On or about the dates set forth below, within

17   the Eastern District of New York and elsewhere, the

18   defendant Phillip A. Kenner, also known as Philip A.

19   Kenner, did knowingly and intentionally devise a scheme

20   and artifice to defraud Bryan Berard, substituting John

21   Doe and Michael Peca, and to obtain money and property

22   from them by means of false and fraudulent pretenses,

23   representations and promises, and for the purpose of

24   executing such scheme and artifice, did transmit and cause

25   to be transmitted writings, signs, signals, pictures and

4511

1    sounds by means of wire communication in interstate

2    foreign commerce, as set forth below.

3            Count Seven.  November 20, 2008, $43,000 wire

4    transfer from Kenner's account at Wells Fargo in

5    Scottsdale, Arizona to Ula Makika account at Northern

6    Trust Bank in Scottsdale, Arizona.

7            Do you recall that allegation in the indictment?

8    A.   Yes, I do.

9    Q.   Can you tell us what happened as relates to that

10   allegation, what it means to your personal knowledge?

11   A.   The $43,000 wire transfer was a portion of the six

12   months of $267,000 that I personally paid on behalf of the

13   lines of credit at Northern Trust Bank to keep them

14   current and out of default while I was trying to complete

15   the line of credit transfers to Bank of America at that

16   time.

17   Q.   Count Eight reads:

18           December 31, 2008, $35,000 wire transfer from

19   Kenner's account at Wells Fargo Bank in Scottsdale,

20   Arizona to the Little Isle IV account in Northern Trust,

21   Scottsdale, Arizona.

22           As relates to that allegation against you, sir,

23   kindly describe to us the circumstances and reasons for

24   that transfer?

25   A.   That $35,000 was wired from my personal bank to the

Kenner - Direct/Haley

4512

1    Little Isle IV at Northern Trust Bank to make another

2    payment on all of the lines of credit to keep that current

3    and out of default as part and parcel of the $267,000 of

4    payments I made over that six-month period of time, while

5    I was attempting to transfer the lines of credit from

6    Northern Trust Bank to Bank of America and their

7    underlying collateral accounts.

8            MR. HALEY:  Your Honor, I have a number of

9    documents I'm going to be showing Mr. Kenner for purposes

10   of identification, and by way of proffer, what I would

11   ultimately offer in evidence, once authenticated, in order

12   to do so, in an effort to move the matter along, I thought

13   I would stand next to my client and go exhibit by exhibit.

14           THE COURT:  That's fine.

15   Q.   Mr. Kenner, no particular sequence as relates to

16   these exhibits.  I want you to know the exhibit number

17   doesn't necessarily follow sequentially for your purposes

18   and purposes of the jury's understanding.  Okay?

19   A.   Yes, sir.

20   Q.   I want you to take a look at a document previously

21   marked Kenner Exhibit 55 for identification.  Can you tell

22   us what that is?

23   A.   Kenner Exhibit 55 appears to be the Standard

24   Advisors, Inc. agreement with Owen Nolan signed on April

25   3, 2003.

Case 2:13-cr-00607-JFB-AYS   Document 315   Filed 07/08/15   Page 80 of 225 PageID #: 7373

4513

1  Q.    Is that a true and accurate copy of the Standard

2  Advisors agreement executed between yourself and Owen

3  Nolan?

4  A.    Yes, sir, it is.

5  Q.    I want you to take a look at Kenner Exhibit 38.  Just

6  tell us what that is.

7  A.    Kenner Exhibit 38 is a July 12, 2006 e-mail that I

8  sent to Chris Manfredi and John Kaiser, subject:

9  Representations and warranties.  This was the section out

10  of the joint venture closing agreement that both Mr.

11  Manfredi and Mr. Kaiser needed to approve in order to move

12  forward with the joint venture with Lehman Brothers and

13  Windwalker.  This is the e-mail that contains the language

14  we read out of the seven inches of binders stating that --

15  Q.    Not what it states.  Tell me what it is.

16  A.    That's it.

17  Q.    Is this a true and accurate copy of that e-mail you

18  sent to John Kaiser?

19  A.    And Chris Manfredi, yes.

20  Q.    I want you to take a look at a document marked Kenner

21  Exhibit 37.  What is that, sir?

22  A.    Kenner Exhibit 37 is a handwritten document that John

23  Kaiser had made a replication of a similar document that

24  was in my handwriting, and it was faxed by John Kaiser on

25  December 6th of 2009.

4514

1   Q.    Do you recognize -- would you describe to us the

2   circumstances, to your knowledge, under which Kenner

3   Exhibit 37 came to be created?

4   A.    On or about the first and second week of December

5   2009, John Kaiser was at my residence in Arizona working

6   on our renovation project, and he was setting up a meeting

7   with Tommy Constantine to discuss an equity stake in

8   Eufora that Mr. Constantine had promised to both Mr.

9   Kaiser and myself with respect to advances that had been

10  made to him.

11          Mr. Kaiser had asked me if there was a list of

12  all the transfers, and I had previously made a handwritten

13  list as a summation of all the bank records and transfers

14  that had gone on with Mr. Constantine previously.  And on

15  that document, Mr. Kaiser also noted the -- his

16  acknowledgment of the three consulting, funding consulting

17  deal that Mr. Constantine received from Little Isle IV,

18  Ula Makika and Na'Alehu Ventures.

19  Q.    Where is that reflected on the document, just in what

20  portion?

21  A.    On the bottom right corner, designated under the word

22  Hawaii, which Mr. Kaiser actually transcribed in his own

23  pen from, if I recall correctly, my representation that

24  those three were related to Little Isle IV, Ula Makika and

25  Na'Alehu Ventures.

4515

1    Q.    Is this document a complete and accurate copy of the

2    notes that you saw him transcribe in his hand from your

3    meeting and notes with him?

4    A.    Yes; I believe it is.

5    Q.    Kindly take a look at Kenner Exhibit 70.  Do you

6    recognize that document?

7    A.    Yes, sir, I do.

8    Q.    What is it?

9    A.    Kenner Exhibit 70 is a July 21, 2006 letter that was

10   written by Larry Markowitz, Bill Niger with my assistance

11   that went out to the members of Little Isle IV, alerting

12   them to the status of the pending joint venture agreement

13   between our entity and Hawaii, Little Isle IV and Alan

14   Worden and his company Windwalker with respect to the $105

15   million transaction at Lehman Brothers.

16          It accompanies on the last page a response form

17   that Lehman Brothers and Windwalker required each of the

18   members of Little Isle IV sign, which acknowledges that

19   they have received the limited liability company agreement

20   for Na'Alehu Ventures limited liability proposed operating

21   agreement for Windwalker holdings, and that they had been

22   given the opportunity to go get independent consultation

23   for legal, for tax and other matters with respect to

24   independent investigations of this transaction prior to

25   signing.

4516

1  Q.   As relates to this particular document, does it bear

2  anyone's signature?

3  A.   Yes, this is a document that was signed by Darryl

4  Sydor.

5  Q.   Thank you, sir.

6        Tell us what Kenner Exhibit 32 is.

7  A.   Kenner Exhibit 32 was the Na'Alehu management members

8  -- transfer of the managing members' status of Na'Alehu

9  Management LLC, the managing member of Na'Alehu Ventures

10 2006 LLC, from myself to John Kaiser on December 31, 2007,

11 pursuant to one of the clauses in the equity transfer

12 agreement signed between Mr. Kaiser and I prior to the

13 Lehman Brothers closing in August of 2006.

14 Q.   Is this a complete and accurate copy of that

15 document, sir?

16 A.   Yes, sir, it is.

17 Q.   Your signature appears on that document, is that

18 correct?  Yes or no?

19 A.   Yes.

20 Q.   Does John Kaiser's signature appear on that document,

21 also?

22 A.   Yes, sir.

23 Q.   Do you see how, at least on that document, how he

24 writes his "O" in the middle of his name?

25 A.   Yes, I do.

4517

1  Q.    Kindly take a look at Kenner Exhibit 31.  Do you

2  recognize this document?

3  A.    Yes, sir, I do.

4  Q.    What is it?

5  A.    Kenner Exhibit 31 is a loan agreement that was

6  created by Mr. Constantine on or about July 21, 2006 as an

7  agreement between Constantine Management Group and

8  Na'Alehu Ventures 2006, with respect to advanced fees that

9  were paid to Mr. Constantine in the event that a portion

10  of the settlement agreement between Urban Expansion and

11  Lehman Brothers and Windwalker did not complete itself

12  properly.

13  Q.    Is that a complete and accurate copy of the loan

14  agreement?

15  A.    Yes, sir, I believe it is.

16  Q.    To your knowledge, is that John Kaiser's signature on

17  that document?

18  A.    Yes, it is.

19  Q.    Kindly take a look at Kenner Exhibit 29.  What is

20  this document, sir?

21  A.    Kenner Exhibit 29 is an equity transfer agreement,

22  dated July 26, 2006, between myself and John Kaiser with

23  respect to funds that were distributed at the August 2006

24  closing of the Lehman Brothers funding by which Mr. Kaiser

25  gave me a loan of $360,000 from his residual properties at

4518

1   the time of the closing to be paid directly to an entity

2   of my request.

3          It also, in Section 4, gave Mr. Kaiser the right

4   to become the managing member as a result of this

5   agreement of Na'Alehu management 12 months from the date

6   of the JV closing at his sole discretion.  He didn't

7   believe future milestone payments of $4 million were

8   progressing pursuant to a payout and the intentions of the

9   joint venture he agreed to.

10  Q.   Is that a complete and accurate copy of the equity

11  transfer agreement, sir?

12  A.   Yes, sir, it is.

13  Q.   Who signed on the line, John R. Kaiser?

14  A.   John Kaiser did.

15  Q.   Kindly look at Kenner Exhibit 30.  Do you recognize

16  that, document?

17  A.   Yes, sir, I do.

18  Q.   What is it?

19  A.   Kenner Exhibit 30 is an environmental indemnity

20  agreement I discussed earlier dated August 5, 2006 between

21  Na'Alehu Ventures and myself as the guarantor, for any

22  environmental issues that may have arisen with respect to

23  post-closing activities on the properties in Hawaii.

24  Q.   Is that the environmental indemnity agreement that

25  you have referenced in your testimony in connection with

4519

1   payments that ultimately came your way by way of that

2   agreement?

3   A.   Yes, sir.  The 200,000 that was paid in or about

4   December 18, 2006.

5   Q.   Is this document an accurate and complete photocopy

6   of the environmental agreement?

7   A.   Yes, it is.

8   Q.   I notice there is a circle of initials on the faded

9   three pages of the document?

10   A.   Yes, sir.

11   Q.   Whose circle -- whose initials are those?

12   A.   They are John Kaiser's initials on page 1, page 2 and

13   page 3 of the agreement, not on page 4.  But that's the

14   page that John Kaiser signs.

15   Q.   How did his initials come to appear on this document?

16   A.   He initialed each page on the same day I signed the

17   document.

18   Q.   Now, there is in evidence a funding consulting

19   agreement that the government introduced.  We talked about

20   that at great length; have we not?

21   A.   I have seen two of them.

22   Q.   Do his initials appear on each of those pages, if you

23   recall?

24   A.   I don't recall.

25   Q.   What is this particular -- what is this document,

4520

1   Kenner Exhibit 25?

2   A.    Kenner Exhibit 25 is the 2004 bylaws for Little Isle

3   IV LLC that replaced the original December of 2003 bylaws

4   for Little Isle IV.  This was signed by me as the managing

5   member of the Little Isle IV.

6   Q.    You testified previously to an operating agreement,

7   one of which allowed a loan to be paid out of the LLC.  Do

8   you recall that testimony?

9   A.    Yes, sir.

10   Q.    Is that the document you were referring to?

11   A.    I don't believe that this is the document I'm

12   referring to.

13   Q.    Let's go through the rest of it.

14         Do you know in what context or sequence -- do

15   you know in what context this document came to be created?

16   A.    I believe this document was created after the closing

17   of the 258 parcel, as we acquired additional investors

18   into the LLC of Little Isle IV, so this was the second

19   bylaws that were created for Little Isle IV, as our

20   membership grew from five individuals to somewhere in the

21   neighborhood of 10 to 12 individuals.

22   Q.    But the 2004 operating agreement that gave you

23   authority to lend, have you seen that in this proceeding?

24   A.    I don't think I have seen it introduced in evidence

25   yet, but I have seen it in the discovery.

4521

1   Q.   Kenner Exhibit 9 we have seen before; have we not

2   sir?

3   A.   Yes, sir, we have.

4   Q.   For purposes of the record, what is Kenner Exhibit

5   19?

6   A.   Kenner Exhibit 19 is the August 2006 Na'Alehu

7   Ventures LLC bank record from Northern Trust Bank, which

8   incorporates the deposit of $6,834,287.29 from the escrow

9   account at the closing of the Lehman Brothers 105 million

10   with us and Windwalker.

11   Q.   To your knowledge, has this document previously been

12   introduced into evidence as a government exhibit?

13   A.   Yes, I believe I have seen that before.

14   Q.   Kenner Exhibit 16, what is this?  What is that

15   document?

16   A.   I believe this Kenner Exhibit 16 is the same document

17   that we saw earlier, a letter that was written by Larry

18   Markowitz and Bill Niger, July 21, 2006, with my

19   assistance to all the members of Little Isle IV.  I

20   believe we saw the one that had Darryl Sydor's signature

21   on it originally and not being 100 percent certain that

22   this includes the signatures of the Little Isle IV members

23   in their entirety that was sent prior to the closing.

24   Q.   Up to this point in time, you have had some exhibits

25   introduced that contain the signature of a particular

4522

1   individual on that document as a result of their

2   testimony, but this is the document that bears, to your

3   knowledge, everyone's signature?

4   A.   Yes, it does.  And I see including Mr. Joe Juneau's

5   signature on the response form.

6   Q.   At some point in time, did you have in your

7   possession before your arrest this document that contains

8   everyone's signature?

9   A.   Yes, sir, I believe this was the one.

10  Q.   Is Kenner Exhibit 16 a complete and accurate copy of

11  the July 21, 2006 letter as you described it to the

12  members of Little Isle IV LLC in which each response form

13  is attached?

14  A.   Yes, sir, it is.

15  Q.   Tell us what Kenner Exhibit 218 is.

16  A.   Kenner Exhibit 218 is a portion of the seven-inch

17  binder from the closing of the joint venture agreement

18  between Windwalker, Na'Alehu Ventures and Lehman Brothers.

19  It's the environmental and hazardous substance

20  indemnification agreement that I signed personally as an

21  indemnitor.

22  Q.   What do you mean, you signed it personally as an

23  indemnitor?

24  A.   As a result of the agreement with Lehman Brothers as

25  I described before, if there were any biohazards or

4523

1   environmental hazardous materials found in and around the

2   property that caused any litigation subsequent to the

3   closing of the deal, Lehman Brothers required that they

4   were not to be held responsible for any damage that could

5   occur, from what we knew to be a potential petroleum

6   problem in the ground at one of the adjacent parcels to

7   the subject properties on the map.

8            As a result, and mandatory condition for the

9   closing, Lehman Brothers demanded that somebody sign on

10  behalf of the group as a personal guarantor.  The person

11  would effectively be a defendant in a lawsuit if, let's

12  say, the Town of Na'Alehu or the Town of Pahala had a

13  water problem.

14  Q.   Did you believe that the execution of that document

15  was necessary in order for this Hawaii project on behalf

16  of your hockey player clients to continue?

17  A.   Yes is the answer.  If I did not sign this, Lehman

18  Brothers would not have concluded the deal.

19  Q.   Did you ever ask any of your hockey player clients

20  that they, rather than you, are to bear that

21  responsibility?  Yes or no?

22  A.   No, sir.

23  Q.   Why not?

24  A.   With respect to the risk involved, I didn't think it

25  was appropriate to ask any of them to put themselves in

4524

1    that position.

2    Q.    Is this document an accurate and complete copy of the

3    environmental and hazardous substance indemnification

4    agreement?

5    A.    It's a copy of the one that I was sent, I believe,

6    from Larry Markowitz, the closing attorney.

7    Q.    Kindly take a look at Kenner Exhibit 77.  What is

8    that, sir?

9    A.    Kenner Exhibit 77 is the cover sheet for Big Isle

10   Ventures, that was sent to Christopher Manfredi after we

11   hired KPMG, who is one of the biggest appraisal companies

12   in the world, to approve the Waikapuna parcel prior to our

13   first attempt to have Lehman Brothers fund the project.

14   Then in advance of Mr. Constantine and Mr. Hardina (ph)

15   funding the closing of the Waikapuna parcel, in July, on

16   July 1st of 2005, this was delivered to Mr. Manfredi, who

17   testified he was the chief operating officer for the

18   project.  And it represents that the Waikapuna parcel

19   appraised prior to our closing for $35,750,000.  That's

20   the parcel I put on the agreement and closed for about

21   $4.2 million.

22   Q.    Sir, that appraisal at that point in time for those

23   members of Little Isle IV that had a percentage interest,

24   should that property have been sold on that day, would

25   those monies have been distributed pursuant to their

4525

1    ownership interest?

2    A.   Yes, sir, we would have.  If sold for face value, we

3    would have distributed 30 million to the membership of

4    Little Isle IV.

5    Q.   How would that distribution be made, in terms of what

6    would you correlate between the sale and the agreement in

7    his place between you and your hockey player clients?

8    A.   As we have discussed earlier, each of the investors,

9    through their lines of credit and/or their cash

10   investments, received an equity ownership stake in Little

11   Isle IV.

12          As an example, Mr. Nolan, for his $2.2 million

13   line of credit and 100,000 cash contribution, I believe

14   was a 13 percent owner at the time of the August '06

15   closing.  So had this property been sold for that value at

16   that time, Mr. Nolan would have received 13 percent of

17   what Little Isle IV received from that closing, which

18   would have been several million dollars.

19   Q.   Is this document a true and complete reproduction of

20   the appraisal report that you received and saw?

21   A.   This is the summary appraisal report cover sheet.

22   There is approximately a 50-page document that goes behind

23   this with all the detail.

24   Q.   We won't produce that in evidence.

25          Take a look at the next one, Kenner Exhibit 217.

4526

1    Do you recognize that?

2    A.    Yes, sir, I do.

3    Q.    What is that?

4    A.    This is the document you were asked about earlier.

5    This was the second set of bylaws for Little Isle IV that

6    was signed in or about September 1st, I believe September

7    1st of 2004, after conversations between John Kaiser and

8    myself, with respect to lending money specifically to Ken

9    Jowdy at that time.

10            As a result of those conversations, John Kaiser

11   and I decided it was important that not only did we

12   previously believe that prior bylaws allowing for us to

13   invest and to lend money pursuant to the special projects

14   section, but now we were formally going to do that, we

15   were in agreement to do so that in the Purpose section,

16   Article 2, we added some language --

17   Q.    Don't read it.

18   A.    I was double-checking that's where it was in the

19   second paragraph of Article 2, Purpose, we added language

20   specifically referencing the fact we were going to be

21   lending funds.

22   Q.    Is that document an accurate and complete photocopy

23   of the operating agreement, 2004 operating agreement that

24   you just referred to?

25   A.    Yes, sir, it is.

4527

1  Q.   Sir, I'm going to ask you to take a look at a

2  document marked Kenner Exhibit 62.  Do you recognize that

3  document?

4  A.   Yes, sir, I do.

5  Q.   What is it?

6  A.   This was a 2006 Schedule K-1 tax document that was

7  sent to Owen Nolan at his Los Gatos, California address,

8  as a result of the tax filings following Lehman Brothers'

9  2006 closing with us in August of 2006.  It represented

10 Mr. Nolan's then 17 percent stake in the company, which

11 was a 4 percent increase in Little Isle IV as a result of

12 him buying out Joe Juneau's interest in or about 2007

13 prior to us filing the 2006 K-1s.

14        It also reflects Mr. Nolan's total distribution

15 of $761,458, which a portion of that was his $42,553

16 repayment from his original 100,000 cash deposit.  It also

17 reflects his capital contribution of 2.3 million, which

18 would have been the $2.2 million line of credit and the

19 100,000 cash contribution, and then as a result of that

20 transaction, his resulting ending capital account balance.

21        MR. MISKIEWICZ:  What number was that?

22        MR. HALEY:  62.

23 Q.   Now, this document, just for purposes of

24 identification, is titled Schedule K-1.  Do you see that?

25 A.   Yes, sir.

4528

1   Q.   Who, if anyone, would cause this document to be

2   forwarded to Owen Nolan?

3   A.   I would.

4   Q.   And for what purpose?

5   A.   After we closed the joint venture with Windwalker and

6   Lehman Brothers, I believe we waited about a year and a

7   half to two years to finally get the partnership tax

8   documents from Alan Worden and Windwalker, and it was

9   quite a point of contention to actually get those once we

10  did.

11          Then, as a result of the top-down accounting, we

12  were able then to produce the Little Isle IV tax documents

13  for each of the members of Little Isle IV.

14  Q.   At this point in time, were you the operating -- were

15  you the managing member of Little Isle IV?

16  A.   I was the managing member of Little Isle IV at this

17  time.

18  Q.   What was your understanding as the managing member of

19  Little Isle IV in connection with the issuance of a K-1

20  for tax purposes?

21  A.   It was my responsibility to do so.  I had only

22  received, during this period of time, only one tax record

23  from Na'Alehu Ventures, where after this point in time,

24  after December 31, 2007, John Kaiser became the managing

25  member of Na'Alehu Management, which was the managing

4529

1  agent for Na'Alehu Ventures 2006.

2  Q.   Is that document representative of K-1s that you were

3  obligated to forward to your hockey player clients when

4  you had the responsibility and obligation to do so?

5  A.   Yes, sir, it is.

6  Q.   To your knowledge, would other K-1s have similarly

7  contained that type of information that you have placed on

8  -- that you have testified to appears on that document?

9  A.   Yes, sir.

10  Q.   Is this a complete and accurate photocopy of the K-1

11  as relates to Little Isle IV as an LLC and Owen Nolan and

12  the partner's name, address, city, state and zip code?

13  A.   Yes, sir, it is.

14  Q.   I will ask you to take a look at Kenner Exhibit 230.

15  Tell us what that document is, sir.

16  A.   Kenner Exhibit 230 is titled Mama Lahoa House

17  agreement.  That was signed between myself and John

18  Kaiser.  Shortly after -- excuse me, about a year before

19  the joint venture agreement with Lehman Brothers, with

20  respect to the purchase of the home office that I

21  purchased for the company in Hawaii.  At the time, Mr.

22  Kaiser and Mr. Manfredi in 2005, with the real estate

23  markets skyrocketing, were upset with me that frankly I

24  was going to purchase the home --

25  Q.   Let me stop you there.  My only question, sir, you

4530

1   have identified that document, is that correct?

2   A.   Yes, sir, I have.

3   Q.   Is this document a fair and accurate copy of the Mama

4   Lahoa House agreement that you just made reference to, yes

5   or no?

6   A.   Yes, sir.

7   Q.   Mr. Kenner, with reference to the exhibits that you

8   have thus far identified as presented to you within the

9   last 30 minutes, half hour, how did you acquire these

10  documents, sir?

11  A.   All of those documents were turned over to you by the

12  U.S. government, and subsequent to that, you turned them

13  over to me for review in pretrial.

14          MR. HALEY:  This may be an appropriate time.

15          THE COURT:  Let's take the lunch break.

16  Reconvene at 2:10.  Don't discuss the case.  Have a good

17  lunch.

18          (The jury leaves the courtroom.)

19          THE COURT:  If everyone can be seated.  Mr.

20  Kenner, stay up there.

21          You want to ask your client supplemental

22  questions on the tape?

23          MR. HALEY:  I do.

24          THE COURT:  You understand you are still under

25  oath, Mr. Kenner?

Kenner - Direct/Haley

4531

```
1              THE WITNESS:  Yes, sir, I do.

2              THE COURT:  What's the matter?

3              MR. LaRUSSO:  We hadn't finished our

4    conversation.

5              THE COURT:  You want to come back earlier from

6    lunch?

7              MR. HALEY:  Yes, your Honor.  I think it would

8    be beneficial to do so and save time.

9              THE COURT:  Can you come back at ten to 2:00?

10             MR. HALEY:  Sure.

11             THE COURT:  How much more on direct?

12             MR. HALEY:  As I said, the spheres get smaller

13   and smaller for purposes of the court as well as the

14   government.  This was the largest package of documents in

15   what I needed my client to identify.  I do have documents

16   as relates to Led Better, GSF and Eufora.

17             To answer your question, maybe another half

18   hour, Judge.  My intention at that point in time would be

19   then for the documents I have identified, to offer them

20   into evidence and leave the government as well as Mr.

21   LaRusso the opportunity to conduct whatever voir dire or

22   objections they wish to make as relates to the documents.

23             THE COURT:  If you can somehow group the

24   documents.  You are asking for each document, "is this

25   fair, accurate and complete."  Maybe you can do it for the
```

4532

1   whole set rather than each document.

2           MR. HALEY:  Thank you.  I will do that rather

3   than go through that.  I will ask him to identify the

4   document and then ask those questions at the end.  I

5   appreciate your Honor's suggestion.  Thank you.

6           THE COURT:  See you at ten to 2:00.

7           (Whereupon, a luncheon recess was taken at this

8   time.)

9           (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner - Direct/Haley

4533

1           A F T E R N O O N   S E S S I O N

2                        2 pm

3

4

5    PHILLIP A KENNER

6           called by the Defense, having been previously

7           duly sworn/affirmed, continued testifying as

8           follows:

9

10          (The following ensued in the absence of the

11   jury.)

12          THE COURT:  Mr. Kenner, if you could, come up to

13   the stand.  You.

14          Understand you are still under oath?

15          THE WITNESS:  Yes, sir.

16          MR. LaRUSSO:  Before we proceed.  I know the

17   court puts everything on the record but this concerns

18   possible privilege and I have something I would like to

19   put on the record.  If the court wants to make it public,

20   that is fine, but it does deal with privilege.  I'm a

21   little concerned about it.

22          THE COURT:  You can approach.

23          (Continued on the following page.)

24

25

**S E A L E D   R E C O R D**

4534

1    THIS PORTION OF THE TRANSCRIPT IS SEALED

2    (Discussion at sidebar ensued as follows.)

3    THE COURT:  So that the record is clear, Mr.

4    LaRusso said this is going to be on the record but just

5    done at sidebar.

6    MR. LaRUSSO:  Just summarizing what I anticipate

7    happening.

8    Mr. Haley is going to elicit from his client

9    that the testimony he gave last Thursday was not correct.

10   Or was incorrect.  He is going to testify that he was

11   given questions by my client, questions, and based upon

12   those questions I don't know what he is going to say.

13   I know that he was told not to lie or anything,

14   but what he says I will hear for the first time while he

15   is on the stand.

16   Also, the record is I did have a conversation

17   with my client before that.  It is privileged; however, I

18   have asked him if I could disclose it.  He said I could.

19   What the facts are is that he asked me about

20   this.  I basically told him you can't suggest any answers.

21   You can't tell him the answers.

22   I'm concerned about that because he wanted to

23   talk to him about the tape.

24   MR. HALEY:  Talk to who?

25   MR. LaRUSSO:  Your client.  I'm doing all the

**S E A L E D    R E C O R D**

4535

1    work.

2         He then comes back to me and, I don't know at

3    what point, and he says to me what if I write out

4    questions?  And -- quite candidly, judge, a major

5    mistake -- I said yes.  And that is last I heard of it,

6    judge.  I didn't know anything any more.  I didn't even

7    see the questions until later on.  And then Mr. Oliveras

8    becomes involved.

9         And maybe you can explain to the court what

10   happened next.

11        MR. OLIVERAS:  What happened next was, he showed

12   me the questions and asked me were these questions good.

13   Now, I have to put that in the context that through all of

14   the trial he has been writing questions.

15        THE COURT:  I have seen that.

16        MR. OLIVERAS:  I assumed what they were and I

17   said Bob knows what to do with that.

18        Later on that day, while I was sitting where I

19   usually sit, he showed them to Phil as I was sitting right

20   there and he says could you take a look at these.  And he

21   looked at them and then Phil says:  Tom, I'm okay with all

22   of them except for this one.  And then he said just ask

23   him the questions, basically.

24        MR. HALEY:  The problem with that process,

25   judge, is, these questions were presented to my client

S E A L E D   R E C O R D

4536

1    without my knowledge or my authorization.

2           Counsel for Mr. Constantine allowed

3    Mr. Constantine to communicate with my client through

4    these letters, through the correspondence that was

5    submitted to my client, without it being given to me.

6           Had this been given to me, I would have had an

7    opportunity to discuss with my client the questions that

8    purportedly were going to be asked by Mr. LaRusso.  I

9    mean, that is, I don't mean to be, but that is in

10   violation of disciplinary rules.

11          You cannot communicate, whatever the form of

12   communication, you can't communicate with represented

13   parties, whatever the communication, whether they are

14   suggesting answers or not.  And I have a view as to why

15   Tommy Constantine gave my client these questions.  I have

16   a view as to what he hoped my client would say as a result

17   of giving these questions to my client.  But it resulted

18   in a circumstance where my client ended up testifying

19   ultimately inconsistent with previous conversations I had

20   with my client.

21          I believe, your Honor, that I know, at least

22   based upon conversations I have had with my client this

23   morning and based upon the weekend, that he is now

24   prepared to authenticate that tape and explain to the

25   court the circumstances under which he gave an answer that

S E A L E D   R E C O R D

4537

1   we believe we know to be untruthful.

2          MR. LaRUSSO:  May I make a couple of statements.

3          At the time I gave an okay, I didn't think

4   through the consequences.  Let me be very candid with you.

5   But I do know, contrary to what Mr. Haley has suggested,

6   there has been lots of communication going back and forth

7   between the two.

8          I know you take exception to that because you've

9   told my client many times not to do it.

10          MR. HALEY:  How many times have I told your

11   client to stay away from my client?

12          MR. LaRUSSO:  But they've communicated.  They

13   have exchanged information during the trial.  Even helped

14   each other with documents at times.  I saw them passing

15   documents from the computer.

16          But that is not an excuse and I'm not offering

17   that as an excuse.  I want to let the court know I'm

18   waiving privilege in regards to what he told me because he

19   told me to tell the court that.  And that --

20          THE COURT:  The bottom line is, let me hear what

21   Mr. Kenner's testimony is now.

22          Assuming he authenticates the tape, then we are

23   in the same position we were before this all came up.

24          The government can play it if you want.

25          MR. HALEY:  Right.

**S E A L E D   R E C O R D**

4538

1    THE COURT:  The only issue that will come up is

2  if you attempt to impeach him regarding the fact that he,

3  outside the presence of the jury, testified differently,

4  you would then be implicating your client's communications

5  with him, which is problematic.

6    MR. LaRUSSO:  Judge, I'm doing this because it

7  completes the record.

8    As a matter of fact, I told Mr. Haley about this

9  letter after the testimony.  Okay?

10    MR. HALEY:  You did.

11    MR. LaRUSSO:  I didn't hide that.  I knew that

12  wasn't privileged.  At that point maybe things started to

13  clear in my mind and that is why I communicated to him.

14  He was even present when I said these notes should be

15  preserved.

16    So I'm just trying to indicate to the court I

17  don't intend to open up the door to this coming before the

18  jury.  I don't know what the government is going to do.

19  They have a right to proceed in any way possible.  But I

20  just don't want to be a witness at this trial.  That is my

21  concern.

22    MR. HALEY:  We can make this real simple, Judge.

23    I spent Saturday morning a little bit looking at

24  the New York State Code of Professional Responsibility,

25  and I spoke with my client this morning.

**S E A L E D    R E C O R D**

4539

1    The hearing, from my perspective, as relates to

2    the tape, has yet to be concluded.  He is prepared to

3    rectify, before that record is closed, his testimony

4    regarding the authenticity of that tape.  And we can make

5    it that simple.  If people want to then inquire as to the

6    circumstances under which he made that false statement,

7    they are entitled to do so, but that opens up that

8    proverbial Pandora's box.

9         MR. LaRUSSO:  But the point is, he was never

10   told to lie, and he will testify to that, I'm assuming.

11        MR. HALEY:  He was never told to lie.

12        THE COURT:  I understand what the situation is.

13        Why don't we have the hearing.  Before anyone,

14   before the jury, makes any inquiry regarding what

15   transpired here, you have to get clearance from me first.

16        So if the government determines that something

17   that happened outside the presence of the jury should be

18   the subject of questioning Mr. Kenner, you have to ask my

19   permission first.  And the same would go for you.

20        Right now you don't have any intention of doing

21   that.  I don't know if the government has any intention of

22   doing that.

23        MR. MISKIEWICZ:  Not in front of the jury.  We

24   may want to just nail down a couple of things in the

25   hearing.

**S E A L E D   R E C O R D**

4540

1          We would like a copy of whatever this script is

2      that he has.

3          MR. LaRUSSO:  Mr. Haley said to give you a copy

4      and I have no objection to that.

5          MR. HALEY:  I said not yet.

6          MR. LaRUSSO:  With one qualification.  This one

7      section.  Am I correct, you saw this one section between

8      six and seven on the margin was not there.  Eight was not

9      crossed out when it was shown to him.  It was crossed out

10     after the conversation.

11         MR. HALEY:  In that regard, I probably have two

12     or three questions.

13         MR. LaRUSSO:  So that I don't run afoul of your

14     request, in this hearing I can explore that.

15         THE COURT:  Yes.  I'm only talking about in

16     front of the jury.

17         MR. LaRUSSO:  Thank you.

18         MR. HALEY:  Well, you can ask him questions

19     about this.

20         (Discussion at sidebar was concluded.)

21         (Continued on the following page.)

22

23

24

25

Kenner - Direct/Mr. Haley - Jury Out

4541

1    (The following ensued in open court in the

2    absence of the jury.)

3         THE COURT:  Go ahead, Mr. Haley.

4         MR. HALEY:  Thank you, your Honor.

5

6    DIRECT EXAMINATION (Continued)

7    BY MR. HALEY:

8    Q.   Mr. Kenner.

9    A.   Yes, sir.

10   Q.   You recall that you testified before the court on

11   June 18, 2015, with respect to what is being called the

12   Home Depot tape.

13        Do you know which tape we are referring to?

14   A.   Yes, sir, I do.

15   Q.   And you recall that you were asked various questions

16   about that tape by Mr. LaRusso.  Correct?

17   A.   Yes, sir.

18   Q.   And, indeed, you were also asked questions about that

19   tape by Mr. Miskiewicz.  Correct?

20   A.   Yes, I recall.

21   Q.   Prior to your testimony on June 18, 2015, with

22   reference to the Home Depot tape, had you had the

23   opportunity to listen to it?

24   A.   Yes.  I listened to it most of it that morning.

25   Q.   How did you acquire that opportunity?

Kenner - Direct/Mr. Haley - Jury Out

4542

1   A.   That morning, before proceedings began, a copy of the

2   26-minute tape was given to me and I was able to listen to

3   it on my laptop.

4   Q.   Who gave you that copy to listen to?

5   A.   I received it from you.

6   Q.   Since listening to the tape on June 18, 2015, have

7   you had an opportunity to listen again to the tape between

8   then and now?

9   A.   Yes, sir.  I listened to it four more times.

10  Q.   Mr. Kenner, to the best of your recollection is the

11  conversation you had with Tommy Constantine accurately and

12  completely recorded on that 27-minute portion of the

13  entire conversation you listened to?

14  A.   Yes, sir, I believe it is.

15  Q.   We know, sir, that, as you recall, the conversation

16  between yourself and Mr. Constantine you had recorded on

17  your iPhone lasted more than 27 minutes.  Is that correct?

18  A.   Yes, sir, that's correct.

19  Q.   And approximately how long was that conversation you

20  had recorded on your iPhone?

21  A.   I believe the original recording was 56 minutes and

22  33 seconds.

23  Q.   Have you had an opportunity to listen to the entire

24  recording, other than that 27 minutes of conversation?

25  A.   No, sir.  I don't know where it exists.

Kenner - Cross/Mr. Miskiewicz - Jury Out

4543

1    Q.    You have been present, Mr. Kenner, when various

2    witnesses have authenticated documents and even

3    recordings.  Isn't that true?

4    A.    Yes, sir, I have.

5    Q.    Do you have any reason, to the best of your

6    knowledge, to doubt the authenticity of that 27 minutes of

7    conversation as recorded by you between yourself and

8    Mr. Constantine with respect to that Home Depot tape?

9    A.    No.  Now that I've had a chance to review it again, I

10   believe it's accurate.

11            MR. HALEY:  Judge, I have no further questions.

12            THE COURT:  Mr. LaRusso?

13            MR. LaRUSSO:  Can I have one moment, your Honor?

14            (There was a pause in the proceedings.)

15            MR. LaRUSSO:  No questions, your Honor.

16            THE COURT:  Mr. Miskiewicz?

17            MR. MISKIEWICZ:  Very briefly.

18

19   CROSS-EXAMINATION

20   BY MR. MISKIEWICZ:

21   Q.    Mr. Kenner?

22   A.    Yes, sir.

23   Q.    This recording was made in a Home Depot?

24   A.    Yes, sir, it was.

25   Q.    In Scottsdale, Arizona.

Kenner - Cross/Mr. Miskiewicz - Jury Out

4544

1   A.   Yes, sir.

2   Q.   And it was made during an unscheduled or impromptu

3   meeting with Mr. Constantine.

4   A.   Impromptu.  Correct.

5   Q.   And those are your voices, both yours and his, on the

6   recording.  Is that correct?

7   A.   Yes, that's correct.

8   Q.   And your testimony last week, insofar as you have

9   recalled references to Ken Jowdy being missing from the

10  existing 26 or 27-minute portion of the recording that

11  still exists, is that are you now saying that is in error?

12  A.   Yes, sir.  That's correct.

13  Q.   So the commentary that you made -- withdrawn.

14       The testimony that, about an analogy that was

15  used to compare Mr. Constantine used, comparing you and he

16  to a bunch of bank robbers, one of you being the robber

17  the other one being the getaway driver, your testimony was

18  that that was in fact originally a reference to Ken Jowdy.

19       Do you remember staying that on Thursday?

20  A.   I don't believe the reference to the bank robber and

21  the getaway car was referencing Mr. Constantine and

22  myself.

23  Q.   All right.  But is it your testimony that there is

24  nothing missing in that portion of the conversation?

25       In other words, whatever it is that

4545

1    Mr. Constantine said, the word *Jowdy* or *Ken*, was not

2    removed.

3    A.   I don't believe so.  I believe that accurately

4    reflects what was said at that time.

5    Q.   And then you said also that there were times when --

6    withdrawn.

7              You said that shortly after or sometime after

8    you played the recording, you provided something to

9    Mr. Kaiser with which to make a duplicate of that

10   recording.  Do you remember that?

11   A.   Yes, sir.  That's correct.

12   Q.   When did that happen?

13   A.   I believe it happened about two weeks later.

14   Q.   And do you remember when you made the recording?

15   A.   The original record on my iPhone?

16   Q.   In other words, when you met Mr. Constantine in this

17   Home Depot, do you remember approximately when that was?

18   A.   I believe the impromptu meeting between

19   Mr. Constantine and I occurred on August 3 of 2010.

20             And I handed over my phone to Mr. Kaiser and,

21   actually, Mr. Berard, upon further review on the 18th,

22   about 15 days later when they arrived in Scottsdale,

23   Arizona.

24   Q.   How were you able to recollect the date that you made

25   the recording originally?

Kenner - Cross/Mr. Miskiewicz - Jury Out

4546

1   A.   I went back to some text messages that I had sent to

2   Mr. Constantine immediately following the meeting where he

3   had requested some resolution from the issues that were

4   handled between the group of Eufora investors and himself,

5   and had offered during that recording, and I heard it

6   again when I listened to it on the weekend, that I had

7   offered to let the people in New York, referring to

8   Mr. Stolper and his team, speak to Mr. Constantine

9   directly; that I was not the person in charge of the

10  investigation.

11          So I had sent an email to Mr. Constantine that

12  afternoon letting him know that I had passed along the

13  information.

14  Q.   And did you also, in reviewing the recording, at all

15  take note of the fact that the recording is date-stamped

16  digitally date-stamped I believe August 3, 2010?

17          In your review of discovery did take note of

18  that?

19  A.   I did not.

20  Q.   I'm sorry.  August 2, 2010.

21  A.   I --

22  Q.   Did you take note of that in your review of the

23  digital recording?

24  A.   No.  I said August 3.  It was August 2.

25          I didn't know that.  I was referencing the fact

Kenner - Cross/Mr. Miskiewicz - Jury Out

4547

1    that I had sent Mr. Constantine a text message, and I

2    believe on August 3.  And that was my reference to the

3    date because I even remember sending it after the meeting,

4    the impromptu meeting at Home Depot concluded.

5    Q.    Immediately after?

6    A.    I don't recall exactly but I remember sending it

7    because Mr. Constantine inferred that there was very

8    little time left for Mr. Constantine to deal with the

9    investors with respect to Mr. Volpe.

10   Q.    When did Mr. Kaiser have access to the phone on which

11   the original recording was made?  That is my question.

12   A.    Not until the 18th.

13   Q.    And then that is when you made a DVD or a CD or

14   whatever?

15   A.    No.  I'm not sure what Mr. Kaiser did with it at that

16   point.  I actually made, after my impromptu meeting, I had

17   contacted immediately Mr. Stolper.  I told him that there

18   was an impromptu meeting and that I had recorded it.  And

19   Mr. Stolper asked me if I would send him along a copy of

20   it.

21          So I do recall making a copy from my iPhone to a

22   disk and then sending it by mail Mr. Stolper.  And I think

23   at some point either Mr. Stolper or myself told

24   Mr. Kaiser, Mr. Berard, Mr. Gentry, Mr. Gaarn and the

25   others that were involved, Mr. Hasiamos, the others that

4548

1  were involved in the investigation, and I let them know

2  that I had sent a copy to Mr. Stolper.

3  Q.   Okay.  Insofar as there is some portion of this

4  recording now that is no longer on the phone sometime

5  after 26 or 27 minutes, do you have any idea, do you have

6  any personal knowledge as to what happened to the

7  remainder of that recording?

8  A.   All I could piece back together after listening to it

9  again and recalling that I had sent a copy to Mr. Stolper

10  immediately was perhaps something occurred with a portion

11  of the recording on my iPhone and it was deleted in part

12  after I had made the recording.

13        The other recordings I know that were

14  circulating, I believe Mr. Kaiser did make a copy from my

15  phone in or around August 18 when he was in Scottsdale,

16  Arizona.  And so whatever was on my phone at that point in

17  time is whatever Mr. Kaiser would have had on his disk.

18        So I don't know what copy of the recording I

19  listened to the other day.

20  Q.   And the government proffers that there was a copy

21  downloaded from the original iPhone which was seized

22  pursuant to a search warrant.

23        Okay.  No further questions.  Thank you very

24  much, Mr. Kenner.

25        MR. LaRUSSO:  Your Honor, may I just ask a few

4549

1   questions?

2           THE COURT:  Yes.

3

4   CROSS-EXAMINATION

5   BY MR. LaRUSSO:

6   Q.   Mr. Kenner, you said that you made a copy for

7   Mr. Stolper immediately or shortly after it was recorded

8   at Home Depot.

9           Is that correct?

10  A.   Yes, sir.  I believe within 24 hours.

11  Q.   That would have contained the entire 57-minute

12  conversation.  Is that correct?

13  A.   That would have been my attempt to do so.  Correct.

14  Q.   And then you said that after, you had made that copy

15  and sent it to Mr. Stolper and then provided your iPhone

16  to Mr. Kaiser.  Is that correct?

17  A.   That would have been about two weeks later.

18  Q.   Do you know, at the time you provided to the iPhone

19  to Mr. Kaiser, whether the entire conversation was on

20  there or a portion of the conversation was on there?

21  A.   That I do not know.

22  Q.   When did you first realize that your iPhone only

23  contained, I believe you said, 26 minutes of the

24  conversation you had at Home Depot?

25  A.   The first time that I realized that was on or about

4550

1    the 18th of August.  Approximately two weeks after the

2    original recording had happened at Home Depot.

3    Q.    So that the portion that you are saying was deleted

4    from the iPhone occurred between the time it was made and

5    August 18?

6    A.    The best I can recall, yes.

7    Q.    And your testimony last Thursday in regards to

8    Mr. DeVries, how was that relevant to the inquiry

9    regarding the tape and what was on the tape?

10   A.    My reference to Mr. DeVries was simply the fact that

11   after approximately August of 2010 I don't recall

12   listening to the recording ever again until approximately

13   September or October of 2013m when I came across the

14   recording on my iPhone again, and I was with Mr. DeVries

15   in Mexico.

16   Q.    And just a last question.  When did you first realize

17   that the conversation that you had recorded at Home Depot

18   no longer had the portion that were talking about as

19   having been removed or deleted?

20   A.    I believe that would have been on or about the 18th

21   of August 2010.

22   Q.    And how do you know that?

23   A.    About two weeks afterwards.

24   Q.    How do you know that?

25   A.    The only reference I have to that is that I sent a

Kenner - Cross/Mr. LaRusso - Jury Out

4551

1   text message related to that.  It is 26 minutes.

2   Q.   Related to the fact that there was a portion missing?

3   A.   No, related to the fact that I had a 26-minute

4   meeting.

5   Q.   You knew it was 57 minutes.

6   A.   56 minutes and 33 seconds.

7   Q.   I guess I'm asking it inartfully, but did you replay

8   the tape to ensure that the portion was missing on the

9   18th?

10  A.   No, I did not.

11         I looked at the timer that I believe shows up on

12  the line item that you can initiate the replaying of the

13  audio recording.

14  Q.   And who had your iPhone before you noticed on the

15  18th that the time was only approximately 26 minutes of

16  recording?

17  A.   I believe I gave it to Mr. Kaiser and Mr. Berard to

18  listen to that morning.

19  Q.   And did you leave the phone in their custody?

20  A.   Yes.  I did not listen to the phone while they were

21  listening to it.

22         MR. LaRUSSO:  Thank you, your Honor.

23         THE COURT:  All right.  So can we continue with

24  the jury.

25         MR. LaRUSSO:  Yes.

4552

1          THE COURT:  You are going to get the rest of the

2    documents in and you are going to authenticate the

3    recording and play it?

4          MR. HALEY:  Your Honor, I'm going to ask Mr.

5    Kenner questions about the recording.

6          Then I will probably rest and leave it for the

7    government to introduce.  And in redirect I will

8    straighten that out, because I think it would just take

9    too much time at this point.

10          THE COURT:  Let's bring in the jury.

11          MR. LaRUSSO:  While the jury is being brought

12    into the courtroom, any objection to dealing with that

13    sidebar?

14          THE COURT:  I wouldn't have an objection.

15          You can discuss it later.  I will place it under

16    seal for now.

17          I'm placing the sidebar under seal for now until

18    we have a chance to discuss it.

19          MR. LaRUSSO:  Thank you, your Honor.

20          (The following ensued in the presence of the

21    jury at 2:25 pm.)

22          THE COURT:  Please be seated.

23          You may proceed, Mr. Haley.

24          MR. HALEY:  Thank you.

25

Kenner - Direct/Mr. Haley

4553

1    **PHILLIP A KENNER**

2         called by the Defense, having been previously

3         duly sworn/affirmed, continued testifying as

4         follows:

5

6    DIRECT EXAMINATION (Continued)

7    BY MR. HALEY:

8    Q.   Mr. Kenner, I'm going to ask you to take a look at

9    two documents, marked Kenner Exhibit 85 and Kenner Exhibit

10   84 for identification.

11   A.   Yes, sir.

12   Q.   Now, as relates to those exhibits, just for purposes

13   of the record these are K1s.  Is that correct?

14   A.   Yes, sir.

15   Q.   And as relates to -- withdrawn.  Who, in or about

16   2004, 2005, was the managing member for Standard Ventures

17   LLC?

18   A.   At all times I understand Tim Gaarn was the manager

19   of Standard Ventures.

20   Q.   Have you seen these two documents -- withdrawn.

21        Prior to your arrest, had you seen these two

22   documents?

23   A.   I don't believe I saw Kenner Exhibit 84, but I had

24   seen Kenner Exhibit 85.

25   Q.   Well, to your knowledge, in or about 2005 did

Kenner - Direct/Mr. Haley

4554

1   Standard Ventures LLC have an ownership equity interest in

2   Eufora LLC?

3   A.   Yes, sir, it did.

4   Q.   And when you were recommending to your clients that

5   they acquire a percentage of ownership interest in Eufora

6   by way of purchasing a percentage of Timothy Gaarn's

7   interest in the company, at that point in time did you

8   ever a good-faith belief that Timothy Gaarn did indeed

9   have an ownership interest in Eufora?

10  A.   Yes, sir, that's correct.

11  Q.   Is Kenner Exhibit 85 consistent or inconsistent with

12  your belief?

13  A.   Consistent.

14  Q.   Would you take a look at Kenner Exhibit 83.  Do you

15  recognize that document.

16  A.   Yes, sir, I do.

17  Q.   What is it?

18  A.   It is a copy from Bank of America of a check that I

19  wrote to Tim Gaarn on October 25, 2010, for $2000.

20  Q.   And what was the purpose of writing at least that one

21  check on that day?

22  A.   As that point in time in 2010 I still owed Mr. Gaarn

23  money from the loans he had given me in early 2009.  And

24  on my memo line I write *Kenner Loan Repay* with a check for

25  Mr. Gaarn for $2,000.

Kenner - Direct/Mr. Haley

4555

1  Q.   Why did you put that notation on the check, itself?

2  A.   So he knew what the $2,000 was for.

3  Q.   Now if you take a look at Kenner Exhibit 82.  It is a

4  number of documents.

5       Do you recognize the documents attached to

6  Kenner Exhibit 82?

7  A.   Yes, sir, I do.

8  Q.   And what are those documents?

9  A.   There are three specific types of documents.  One is

10  a number of my bank statements that show that Tim Gaarn

11  and Suzy Gaarn, his wife, received deposits from my bank

12  accounts, my various bank accounts, as loans.

13       There are also a couple of documents that are

14  emails that I sent to my bankers at Wells Fargo requesting

15  wire transfers to Timothy and Suzy Gaarn with banking

16  information attached.

17       And then, lastly, I believe there is one email

18  from Tim Gaarn to myself dated September 9, 2008, where he

19  is requesting I send money directly to his mortgage

20  company to keep his home out of foreclosure.

21  Q.   Are these the loans that you referred to earlier in

22  your testimony in connection with money loaned to Tim

23  Gaarn which was being repaid to you by virtue of your

24  client's acquiring interests pertaining to a percentage

25  interest that Timothy Gaarn was conveying to your clients?

Kenner - Direct/Mr. Haley

4556

1   A.    Yes, sir, that's correct.

2   Q.    Take a look at Kenner Exhibit 223.

3         Would you identify that document for us.

4   A.    This is a consulting agreement that Tim Gaarn signed

5   with Little Isle IV and Na'alehu Ventures in June of 2006

6   with respect to funding that he was looking for and

7   assisting with regard to the Hawaii project.

8   Q.    Why did you execute a consulting agreement with

9   Timothy Gaarn?

10        What if anything to your knowledge did he have

11  to offer in connection with the Hawaii project?

12  A.    Mr. Gaarn for a number of years had been working on

13  raising funding sources very similar to Mr. Constantine.

14  And at one point in June of 2006 I asked Mr. Gaarn or Mr.

15  Gaarn asked me -- I don't recall the order -- to

16  memorialize it in writing, so we did.

17  Q.    Well, you heard Mr. Gaarn testify in this courtroom.

18  Is that correct?

19  A.    Yes, I did.

20  Q.    Were moneys paid to him out of the Hawaii project

21  accounts?  Yes or no?

22  A.    Yes.

23  Q.    And on what basis were those monies paid to him?

24  A.    They were paid to Mr. Gaarn pursuant to this

25  consulting agreement.  I believe there is a minimum

4557

1    payment of $50,000 to Mr. Gaarn for his efforts, and I do

2    believe he was paid $45,000.

3         There is also a provision in here that he would

4    be entitled to 5 percent of the gross amount of financing,

5    which frankly we never ended up paying him, which would

6    have been the equivalent of about $1.3 million, at the

7    conclusion of the first $26 million that Lehman Brothers

8    funded us in Hawaii.

9    Q.   Well, when Mr. Gaarn testified in this courtroom, did

10   to the best of your knowledge did he correlate any monies

11   he received from Little Isle IV with that consulting

12   agreement?

13   A.   I was confused by Mr. Gaarn's testimony with respect

14   to this consulting agreement, frankly.

15   Q.   Okay.  I'm going to show you now actually several

16   exhibits.  Kenner Exhibit 224, Kenner Exhibit 225, and

17   Kenner Exhibit 226.  Actually, 227 I trust is not

18   repetitive.  Perhaps you can tell me if they are.

19   A.   They are all unique.

20   Q.   And would you kindly identify what those documents

21   are.

22   A.   Yes, sir.

23        Kenner Exhibit 224 is the conveyance of stock

24   that I originally owned through my company Guide Dog LLC

25   on January 1 of 2005.  This was the document that

4558

1   memorialized that transaction with Mr. Gaarn.

2           Kenner Exhibits 225, 226, and 227 are very

3   similar documents.  Once Mr. Gaarn took over as the

4   manager of AZ Eufora Partners entities from me, which

5   included AZ Eufora Partners II, III, and IV, there were

6   three transfers pursuant to Mr. Gaarn to consolidate those

7   three partnerships into one single LLC, known as AZ Eufora

8   Partners I LLC.  These were all prepared I believe by CR

9   Gentry, all four of those documents.

10  Q.   Now, each one of these documents bears a date, dated

11  this first day of January 2005.

12          Do you see that?

13  A.   Three of the four of them actually do.  The transfer

14  of AZ Eufora Partners III to AZ Eufora Partners I was

15  actually dated the first day of August 2005, and I'm not

16  sure why there was a difference on that one.

17  Q.   Were they actually executed on the dates as reflected

18  in those documents?

19  A.   No.

20  Q.   Would you describe the circumstances under which they

21  came to be, I guess I will call them postdated.

22  A.   These documents were signed sometime in or around

23  October of 2008 as a result of Mr. Constantine hiring

24  Mr. Gentry as the chief executive officer at Eufora.  And

25  after Mr. Gentry came on board at Eufora, I believe he was

4559

1    in charge of making sure all the books and records and

2    accounting had been documented properly.

3         And after a series of meetings with Mr. Gentry,

4    Mr. Gaarn, Mr. Constantine, and myself, we were able to

5    make sure that not only did we reconstruct these

6    transactions probably and then memorialize them based on

7    the dates they were originally agreed to, but I know

8    Mr. Gentry was also working diligently with Mr. Gaarn and

9    Mr. Constantine to make sure the books and records

10   accurately reflected the investments in the corporation?

11   Q.   Well, on your part, were you engaged in some scheme

12   or artifice to defraud your hockey player clients by

13   having knowledge that documents were postdated in order to

14   clear up the books and records so that your clients'

15   ownership interest in Eufora would be recorded on the

16   books and records?

17   A.   No, sir.

18   Q.   I'm going to show you Kenner Exhibit 80, which I

19   believe is in evidence as Constantine 140.

20        But as relates to that document, do you recall

21   seeing that document during the court of this trial prior

22   to today?

23   A.   Yes, sir, I do.

24   Q.   What is that?  Just so we can acclimate ourselves.

25   A.   Well, this was an email sent from CR Gentry to Tim

Kenner - Direct/Mr. Haley

4560

1    Gaarn and copy to me, Edrozo, who I believe was the

2    secretary of Eufora in or about 2009 confirming all of

3    Mr. Gaarn's private stock sale from Standard Ventures to

4    my respective clients Glenn Murray, Greg DeVries, Steve

5    Ruchin, and William Ranford at that point in time and the

6    conveyance of stock that they were to receive as a

7    transfer from Standard Ventures, Mr. Gaarn's company, into

8    their own name inside AZ Eufora Partners I.

9            It also reflects Mr. Gaarn's residual interest

10   of 1.9 percent of Eufora after the completion of these

11   stock transactions.

12   Q.   As you sit here today, do you have any reason to

13   doubt the legitimacy of the information contained in that

14   document?

15   A.   I believe it to be 100 percent accurate.

16   Q.   In your direct testimony you had referred to a

17   spreadsheet created by CR Gentry.  Is that correct?

18   A.   Yes, sir, I recall that.

19   Q.   And before his discharge by Mr. Constantine, what was

20   his position at Eufora, to the best of your knowledge?

21   A.   I believe he was the chief executive officer.

22   Q.   If you know, of your own personal knowledge, how did

23   he acquire the information that was set forth that that

24   spreadsheet you saw?

25   A.   Mr. Gentry held a series of meetings with myself, Mr.

Kenner - Direct/Mr. Haley

4561

1   Gaarn, and Mr. Constantine with respect to all the

2   transactions that had occurred effectively from the

3   beginning of my involvement in Eufora, in or about August

4   of 2002, until the time that he completed the

5   spreadsheets.

6           In particular, he was interested in what was

7   going on with -- what knowledge I had prior to 2005, and

8   Mr. Gaarn, what knowledge he had subsequent to my transfer

9   of interests in management status to him in January of

10  2005.

11  Q.   To your knowledge why was it necessary to create that

12  spreadsheet?

13  A.   I think it was after a number of years there were

14  questions whether or not the books and records accurately

15  had tracked all the inbound and outbound money transfers

16  and subsequent equity transfers.  And I think with respect

17  to Mr. Gentry's efforts, that was part and parcel to his

18  ability to assist the company and go out and raise more

19  funding for operational capital, which they completed in I

20  believe early 2009 with Neptune Capital.

21  Q.   Mr. Gaarn's efforts in that regard and the

22  spreadsheet he created, did that have any benefit to your

23  hockey player clients?

24  A.   The spreadsheet --

25           MR. MISKIEWICZ:  Objection.

Kenner - Direct/Mr. Haley

4562

1   A.   -- was created by Mr. Gentry.

2          THE COURT:  Overruled.

3          You can answer that.  Go ahead.

4   A.   I'm sorry.

5          The spreadsheet was created by Mr. Gentry in

6   order to accurately depict the ownership interests in

7   Eufora for my clients.

8   Q.   Would you kindly take a look at Kenner Exhibit 228.

9          Mr. Kenner, without commenting on the content of

10  that document, is that the spreadsheet that you reviewed

11  as provided to you by CR Gentry?  Yes or no?

12  A.   Yes.

13          (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Kenner  -  Direct/Haley

4563

1   BY MR. HALEY:

2   Q.   Not including Kenner Exhibit 228, bear with me,

3   Mr. Kenner, Kenner Exhibits 223, 224, 225, 226, 227 and

4   Exhibit 82, Kenner Exhibit 83, are complete and accurate

5   photocopies of the information contained on those

6   documents?

7   A.   Yes, sir.

8   Q.   And how did you acquire those copies, sir?

9   A.   I acquired each of these from the U.S. Government,

10  they delivered them to you, and then subsequently you

11  delivered them to me for review in pretrial.

12  Q.   Thank you, sir.

13         Mr. Kenner, I'm going to ask you to take a look

14  at a document marked Kenner Exhibit 97.

15  A.   Yes, sir.

16  Q.   Do you recognize that document?

17  A.   Yes, sir, I do.

18  Q.   What is it?

19  A.   This is a document that was produced to me during

20  litigation when 1st Source Bank of Indiana sued myself and

21  Sergei Gonchar as a result of Ken Jowdy defaulting on the

22  aircraft loan on the Falcon 10 and the Metro Liner.

23  Q.   Is this document an accurate and complete photocopy

24  of the Diamante Air, a Limited Liability Company Operating

25  Agreement?

4564

1    A.    This document is a photocopy of a Diamante Air

2    Limited Liability Operating Agreement, but this was a

3    fraudulent one that Mr. Jowdy produced for the bank.

4             So it's not the one that was originally provided

5    to the bank.

6    Q.    What do you mean?  In what sense was it fraudulent?

7    A.    In or about October of 2005, Mr. Jowdy had asked me

8    if myself, and a couple of the members along with him and

9    himself, would secure a loan for the Falcon 10 in order to

10   do repairs on the airplane which were necessary to the

11   tune of about $750,000.

12            So I agreed and Sergei Gonchar agreed to be

13   guarantors on a new loan with the bank that would provide

14   capital so we could fix the landing gear and engines on

15   the Falcon 10.

16            Mr. Jowdy purported to me that he would be a

17   guarantor on the aircraft as well.

18            About a month later, on November 14, just prior

19   to November 14, when the bank had already received the

20   original operating agreement that I had signed as a

21   managing member and Mr. Jowdy's friend Mark Thalmann had

22   signed as a manager, Mr. Gonchar and I signed our

23   guarantor notices and received no other documents from 1st

24   Source Bank.

25            We were told by Mr. Jowdy that's all the bank

4565

1    needed to release the loan was just our personal guarantor

2    signatures.

3         I came to find out when we were sued about a

4    year-and-a-half later by 1st Source Bank in Indiana and

5    Rick Rozenboom, who was here, that other documents had

6    been presented to the bank.

7         The loan documents, which I had never seen until

8    the lawsuit, were signed on November 14 of 2005 by Mr.

9    Jowdy as the managing member of Diamante Air, which he was

10   not.

11        What I also found in the package was this

12   operating agreement that appears to have been signed by

13   Mr. Jowdy.

14        He added his name as one of the managers of

15   Diamante Air and it was faxed two days after the loan

16   documents were signed.

17        As part of that lawsuit I also discovered that

18   on November 14, Mr. Jowdy also diverted $290,000 cash from

19   the new loan to his bank account under his control, and

20   then about six weeks later, in January of '06, he diverted

21   another $140,000 to his bank account under his control

22   totaling an additional $430,000 of cash that were diverted

23   and Mr. Gonchar and I were left with that as part of our

24   guarantee.

25   Q.   The $200,000 you're referring to as relates to the

Kenner  -  Direct/Haley

4566

1    loan, was there testimony in this courtroom regarding

2    monies received by Mr. Jowdy as relates to that loan?

3    A.    Yes.

4    Q.    Specifically the 200,000?

5    A.    It was 290,000, and Mr. Rozenboom had confirmed that

6    that was transferred at the time of the November 14

7    signing to Mr. Jowdy's account.

8    Q.    Mr. Kenner, I'm going to show you some more exhibits.

9          Kindly take a look at Kenner Exhibit 221 and

10   identify it?

11   A.    This was a series of three Kenner Exhibits.

12         221 is a series of text messages that Bryan

13   Berard sent to me on June 1st, 2010, and June 2, 2010.

14   Q.    And just for purposes of clarity of the record, those

15   test messages, without identifying the content as relates

16   to the allegations in the indictment, what alleged

17   fraudulent scheme do they reference?

18   A.    These three text messages I received from Mr. Berard

19   are relevant to the Sag Harbor portion of the indictment.

20   Q.    Would you kindly take a look at Kenner Exhibit 222

21   and identify that for us.

22   A.    Kenner Exhibit 222 is a single text message that I

23   received from Bryan Berard on June 10th, 2010, referencing

24   the property in Sag Harbor that was owned at that time by

25   myself, John Kaiser and Bryan Berard.

Kenner  -  Direct/Haley

4567

1        Mr. Berard was asking if we could use the

2    property that he identifies as owned by myself and John

3    Kaiser and him as collateral for a loan, a $250,000 loan

4    at the time.

5    Q.    Kindly take a look at a document market Kenner

6    Exhibit 33.

7    A.    Yes, sir.

8    Q.    Do you know who created Kenner Exhibit 33?

9    A.    I do not.

10    Q.    Did you create Kenner Exhibit 33?

11    A.    No, sir, I did not.

12    Q.    At any point in time did you ever acquire knowledge

13    that John Kaiser claimed a 50 percent interest in Led

14    Better contrary to the Led Better operating agreement that

15    you testified to?

16    A.    Yes, sir, I did.

17    Q.    I'm going to show you what's Kenner Exhibit 34.  I

18    believe this is already in evidence.

19        Do you recognize this document?

20    A.    Yes, sir, I do.

21    Q.    What is that?

22    A.    This is a document dated March 1st, 2010, it's a

23    document that references John Kaiser and Bryan Berard

24    naming John Kaiser as the new managing member of Led

25    Better Development Company, and excluding me and releasing

4568

1    my friend Lauren Gillmore as the manager, which she was

2    not at the time.

3          It's dated March 1st, 2010 again and apparently

4    the meeting took place at John Kaiser's home in Setauket

5    New York.

6          This document purports to have been created

7    approximately three months before Mr. Berard is asking me,

8    on those previous text messages, about the property that

9    he, John Kaiser and I owned.

10   Q.   The three documents I have shown you, Mr. Kenner,

11   Kenner Exhibits 221, 222 and 34 -- well, withdrawn.

12         The two documents I have shown you, Kenner

13   Exhibits 221 and Kenner Exhibit 222, are those true,

14   complete and accurate text messages sent to you by Bryan

15   Berard on the dates indicated on those documents?

16   A.   Yes, sir, they are.

17   Q.   And how did you acquire those documents?

18   A.   They were originally on my iPhone and they were

19   turned over by the U.S. Government to you in pretrial, and

20   subsequently you turned them over to me for review.

21   Q.   Mr. Kenner, I'm going to ask you to take a look at

22   Kenner Exhibit 232 for identification.

23   A.   Yes, sir.

24   Q.   And you testified previously on direct that there

25   came a point in time that you acquired knowledge that as

4569

1    you were discussing with Ken Jowdy Texas investments, you

2    learned that Ken Jowdy had used I believe the Falcon

3    aircraft to travel to Texas along with others; is that

4    correct?

5    A.    Yes, sir, that's correct.

6    Q.    Just tell us what is this document, Kenner Exhibit

7    232 for identification purposes?

8    A.    Kenner Exhibit 232 is a passenger manifest that was

9    created by I believe Mark Thalmann at Diamante Air

10   representing a multi-leg trip on the Falcon 10 from Las

11   Vegas to Cabo San Lucas and back to Las Vegas over a four

12   day period of time with passengers including Ken Jowdy,

13   Robert Gaudet, Taffy Jowdy, Louie Freeh, Marilyn Freeh,

14   John Behnke, Fernando Garcia and Ken Ayers.

15   Q.    I'm going to ask you to take a look at Kenner Exhibit

16   231.  I'll ask you if you recognize this document?

17   A.    Yes, sir, I do.

18   Q.    What is it?

19   A.    This was a letter dated September 23rd, 2009, written

20   by attorney Thomas Baker in Arizona with respect to the

21   ongoing litigation we had with Ken Jowdy as sued by Little

22   Isle IV, Ula Makika and myself, Phillip A. Kenner

23   personally, in the U.S. District Court, District of

24   Arizona, with respect to the approximate $5 million loan

25   that was outstanding.

Kenner  -  Direct/Haley

4570

1          In or about that time I had decided to change

2     legal counsel in the case and Mr. Baker was sending out

3     quite a detailed approximately seven page disclosure

4     letter to each of the members of Little Isle IV for their

5     acknowledgment and consent to continue the lawsuit against

6     Mr. Jowdy under his representation, and a number of those

7     individuals were copied on the letter.

8     Q.   At that point in time, Mr. Kenner, approximately how

9     many civil lawsuits were pending as relates to the

10    disputes involving Ken Jowdy and your hockey player

11    clients, can you give us some idea?

12    A.   In Mr. Baker's letter he --

13              MR. MISKIEWICZ:  Objection to the contents of

14    the letter.

15    BY MR. HALEY:

16    Q.   Mr. Kenner, my question to you is at that point in

17    time, when Mr. Baker sent that letter out, to your

18    knowledge, how many lawsuits were pending involving

19    disputes between yourself, Mr. Jowdy and your hockey

20    player clients?

21    A.   Approximately 12 civil lawsuits.

22    Q.   You testified on direct, Mr. Kenner, that there came

23    a point in time that, for lack of a better term, you and

24    Tommy Constantine parted ways; is that correct?

25    A.   Yes, sir, that's correct.

Kenner  -  Direct/Haley

4571

1   Q.   At some point following the parting of ways did you

2   have an occasion to see Tommy Constantine in a Home Depot?

3   A.   Yes, approximately five months after we were no

4   longer in communication there was an impromptu meeting at

5   a Home Depot in Scottsdale, Arizona.

6   Q.   Would you tell us about how it happened to be an

7   impromptu meeting, what occurred?

8   A.   I was walking into Home Depot on that particular day

9   in early August 2010 with my eight year old son.

10            And while we were walking through the parking

11  lot, Mr. Constantine pulled up next to me in a car with

12  his mother and told me he was very surprised to see me,

13  but he thought, because he did run into me, that after a

14  five or six month period of time of not speaking and a lot

15  of issues going back and forth between attorney Michael

16  Stolper's group and Mr. Constantine and his attorneys, he

17  thought it could benefit everybody if we spoke to one

18  another.

19  Q.   So this impromptu meeting, by your testimony, was not

20  set up, you were surprised to see him?

21  A.   Yes, sir.

22  Q.   When he approached you what, if anything, did you do

23  with respect to your iPhone?

24  A.   Well, initially, I told him I didn't think it was a

25  good idea to meet or to discuss anything because of the

Kenner  -  Direct/Haley

4572

1   open case, and he said I really believe that we should.

2   There's a lot to talk about.  We need to save this

3   company.  So I said, all right, and I agreed to do so.

4           I believe Mr. Constantine and his mother took

5   their car and parked it somewhere in the parking lot and I

6   walked inside Home Depot with my son and I asked him to

7   just go entertain himself for a little while.

8           And I took my iPhone out, I put it on record,

9   and I placed it into my front pocket and I sat on a bench

10  just inside the front door of Home Depot and waited for

11  Mr. Constantine to enter.

12  Q.   I take it, he was then unaware that you were

13  recording this conversation; is that correct?

14  A.   That is correct, he was unaware.

15  Q.   During the course of the conversation, does he accuse

16  you of some misconduct, Mr. Kenner?

17  A.   The best that I could follow his representations,

18  yes.

19  Q.   Was that related specifically to the Gaarn transfers?

20  A.   Yes, sir, it was.

21  Q.   Did you respond when he accused you of that

22  misconduct on that day?

23  A.   I did not.

24  Q.   Why not?

25  A.   Mr. Constantine spoke perhaps without taking a breath

Kenner  -  Direct/Haley

4573

1   almost the entire recording, and I just let him continue

2   to talk and talk and talk throughout the entire tape

3   regardless of what he was saying to me.

4   Q.   Well, there were times when you did respond; is that

5   correct?

6   A.   Several times, yes.

7   Q.   Following that conversation with Mr. Kaiser, did you

8   destroy the tape?

9            THE COURT:  Constantine.

10           MR. HALEY:  Excuse me, Judge.

11           MR. HALEY: With Mr. Constantine.

12           Thank you, your Honor.

13  BY MR. HALEY:

14  Q.   Did you destroy the tape?

15  A.   No, sir, I did not.

16  Q.   Did you discard your iPhone?

17  A.   No, sir, I did not.

18  Q.   What did you first do with the recording of your

19  conversation with Tommy Constantine following that

20  recording?

21  A.   The first thing I did after I left the store at some

22  point in the next hour or two I believe I called our

23  attorney in New York, Michael Stolper, and I told him

24  about the impromptu meeting with Mr. Constantine.

25           He asked me what had transpired, and I gave him

4574

1   a synopsis of what I recalled at the time.

2           And I told him that I had made a recording on my

3   iPhone of that entire conversation.

4           So Mr. Stolper asked me if I could put it onto a

5   disk and send it to him so he could listen to it, and I

6   did that immediately.

7   Q.   At the point in time you sent that recording to

8   Mr. Stolper, were you aware that Tommy Constantine was

9   making accusations against you regarding misconduct?

10  A.   Yes, sir, I was.

11  Q.   What was your understanding at that point in time

12  when you sent the recording to Mr. Stolper as to who, if

13  anyone, might then have access to the recording after you

14  conveyed it to Mr. Stolper?

15  A.   I told Mr. Stolper he should share it with our group,

16  which were inclusive of all of the investors of Eufora,

17  specifically the individuals related to Mr. Gaarn's

18  private stock purchase, Mr. Constantine's private stock

19  purchase previous to that, and any other investors that

20  were involved with us in the litigation or investigation

21  efforts at that point in time.

22  Q.   Other than providing -- that recording coming off

23  your iPhone to Mr. Stolper, did you provide, to your

24  knowledge, all or a portion of that recording to any other

25  person in any later point in time?

Kenner   -   Direct/Haley

4575

1  A.   Yes.

2       About two weeks later Mr. Berard -- I believe

3  Mr. Berard and Mr. Kaiser flew into Phoenix, Arizona, and

4  were staying with me for a couple of days.

5       And during that visit I let them listen to the

6  recording on my iPhone and I believe at that time

7  Mr. Kaiser made an additional copy for himself of the

8  recording of Mr. Constantine and I.

9  Q.   At any point in time, Mr. Kenner, did you make any

10  attempts or efforts to destroy or alter that recording so

11  that it wouldn't see the day of light?

12  A.   No, sir.

13       MR. HALEY:  Your Honor, at this time, at this

14  point, I would offer into evidence a number of exhibits as

15  relates to those exhibits identified by my client with

16  reference to Hawaii, Eufora and Led Better.

17       I don't know if the Court's protocol is that I

18  do it in front of the jury or if the Court wants to see if

19  we can reach resolution between the parties.

20       THE COURT:  Come to sidebar.

21       (Continued on next page.)

22

23

24

25

4576

```
 1              (The following takes place at sidebar.)

 2              THE COURT:  I would suggest, to save time,

 3    unless there's a problem doing it this way, that instead

 4    of having a voir dire, for you to conduct your cross and

 5    question him regarding authenticity and then you can move

 6    them in following the crosses.

 7              MR. LARUSSO:  I know Mr. Miskiewicz is going

 8    first.  He will cover a lot of areas that I'll cover.  I

 9    agree.  I will do my examination on those during regular

10    cross.

11              MR. MISKIEWICZ:  That's fine.

12              I do have a question regarding the CD of the

13    Home Depot tape.  We provided a copy to Mr. Haley's client

14    to review and initial so we would have a proper

15    foundation.  If you have the CD or if that's what's you're

16    going to offer --

17              MR. LARUSSO:  I will not object to your copy, if

18    that's what you want.  Does that help?

19              MR. HALEY:  Nor will I.

20              And actually from the point of expediency,

21    whether I offer it or you offer it, I think perhaps that's

22    academic.  I'm not setup to play the darn thing, Judge.

23              MR. MISKIEWICZ:  I'm referring to the fact that

24    typically a CD isn't obvious what's on there and normally

25    a witness would say I have listened to this and I know I
```

Kenner  -  Direct/Haley

4577

1   listened to this because I initialed it and dated it.

2   That's a logistical issue.

3            THE COURT:  I assume there would be a

4   stipulation whatever copy you will use stipulate that's

5   the same recording, it's identical to the recording.

6            MR. HALEY:  Yes.

7            MR. LARUSSO:  Your Honor, I learned for the

8   first time today that Mr. Stolper may have the entire

9   conversation.

10           THE COURT:  I was thinking about that.

11           MR. LARUSSO:  They would have a better chance to

12  get it than I would.

13           THE COURT:  I don't know.

14           MR. LARUSSO:  Is it possible that the government

15  is going to reach out to Mr. Stolper and try and get the

16  entire recording?  Otherwise, I'll have to do it on my

17  own.  I was preparing witnesses tonight.

18           THE COURT:  You can get a subpoena and subpoena

19  him for the recording.

20           MR. LARUSSO:  I'll take it upon myself.

21           THE COURT:  That would save two hours worth of

22  time.

23           MR. LARUSSO:  I will try a phone call first.

24           MR. HALEY:  In terms of the recording, do you

25  want to play it now?

Kenner  -  Direct/Haley

4578

1          MR. MISKIEWICZ:  I was going to ask if I can

2    take the afternoon break before I begin my cross to setup

3    the recording.

4          THE COURT:  That's fine.

5          MR. HALEY:  Thank you.

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4579

1            (The following takes place in open court.)

2            THE COURT:  Members of the jury, we're going to

3     proceed with the government's cross.

4            And, Mr. Haley, the government can question

5     Mr. Kenner on those documents during their cross rather

6     than on voir dire which would add additional time.  The

7     government will question Mr. Kenner as it wishes regarding

8     the documents that Mr. Haley wishes to offer, and

9     Mr. Haley can offer them at the conclusion of the cross.

10           We will let the government setup for cross and

11    we will take the afternoon break now.

12           Don't discuss the case.

13           (The jury is excused.)

14           (Recess taken.)

15           (After recess.)

16           THE CLERK:  All rise.

17           THE COURT:  Please be seated.

18           Let's bring in the jury.

19           THE CLERK:  All rise.

20           (The jury is present.)

21           THE COURT:  Please be seated.

22           MR. HALEY:  Your Honor, I have no further

23    questions of Phil Kenner.

24           THE COURT:  Okay.

25           Cross-examination, Mr. Miskiewicz.

4580

1          MR. MISKIEWICZ:  Thank you, your Honor.

2

3    DIRECT EXAMINATION

4    BY MR. MISKIEWICZ:

5    Q.   Mr. Kenner.

6    A.   Yes, sir.

7    Q.   A phrase used in this trial a lot; we can agree, can

8    we not --

9    A.   I'm sorry, I couldn't understand.

10   Q.   You heard a phrase used repeatedly in this trial; we

11   can agree, can we not?

12   A.   Yes, sir.

13   Q.   I pose a question to you.

14          We can agree, can we not, that when you loaned

15   approximately $5 million of hockey player money to Ken

16   Jowdy to be used in Mexico, you didn't intend to lose that

17   money, did you?

18   A.   No, sir.

19   Q.   You expected that it would be repaid?

20   A.   Yes, sir, I expected it to be repaid at the close of

21   the Cabo San Lucas closing in March 2006.

22   Q.   With interest?

23   A.   Yes, sir, with interest.

24   Q.   15 percent interest?

25   A.   15 percent annual interest.

Kenner  -  Cross/Miskiewicz

4581

1    Q.    And we can agree that this was a time when the real

2    estate market was just beginning to boom, correct?

3    A.    I'm sorry, I'm having a hard time hearing you.  Could

4    you please repeat that for me.

5    Q.    Sure.

6          When you began loaning Mr. Jowdy money, the real

7    estate market in North America, around the world, was just

8    beginning to boom; is that correct?

9    A.    I believe it was a very good time for real estate.

10   Q.    I think you referred to this as an embryonic period

11   in that market?

12   A.    I believe starting in and around 2002, that's

13   correct.

14   Q.    When did you begin making what ultimately turned out

15   to be $5 million worth of loans to Mr. Jowdy?

16   A.    The first loans, loans from the Hawaii entities began

17   in November 2004.

18   Q.    And was all of the $5 million from the Hawaii

19   entities?

20   A.    Yes.

21          There were other loans outside the $5 million

22   that were also given to Mr. Jowdy and are still unpaid to

23   this day.

24   Q.    You testified about giving a loan, having it signed,

25   or you referred to sometimes as a promissory note signed.

Kenner  -  Cross/Miskiewicz

4582

1    Is that in addition to the five million or does

2    that encompass what you're discussing now about more than

3    five million?

4    A.    I'm sorry, I didn't understand the question.

5    Q.    How much in total did you loan to Mr. Jowdy starting

6    in or about November 2004 out of hockey player money?

7    A.    From our Hawaii entities the net total of loans were

8    in the neighborhood of five and a half million dollars and

9    there were a number of other individuals who loaned money

10   directly to Mr. Jowdy for similar terms that also remain

11   unpaid today to the tune of a couple million dollars.

12   Q.    When you say other individuals, who are you referring

13   to?

14   A.    I'm referring to Mattias Norstrom, Joseph Stumple,

15   Glenn Murray and Jere Lethinen.

16   Q.    All of those were hockey players and they were all

17   clients of yours, weren't they?

18   A.    Yes, sir, they were.

19   Q.    Aren't you saying that they loaned money directly to

20   Mr. Jowdy, not through one of your Hawaii entities?

21   A.    That is correct.

22   Q.    Not through the lines of credit?

23   A.    That is correct.

24   Q.    Did you have any role in arranging for those loans?

25   A.    Yes.

Kenner   -   Cross/Miskiewicz

4583

1    I originally introduced Mr. Jowdy to the

2    individuals who made those loans.

3    Q.    Was that documented somehow, the loan itself?

4    A.    The original loan with Mattias Norstrom was for

5    $500,000 in the summer 2004.

6          When Mr. Jowdy originally requested that loan,

7    he and his father met with me and told me they were going

8    to send me a check for $500,000 in the mail, which in fact

9    they did, to memorialize the repayment of the loan which

10   --

11   Q.    Mr. Kenner, I'm going to ask you to please answer the

12   question.

13         Did that loan get documented in any fashion?

14   A.    Mr. Norstrom's loan was documented through the check

15   that Mr. Jowdy and his father delivered to us.

16   Q.    Just a check?

17   A.    As described by Mr. Jowdy and his father.

18   Q.    I'm not asking you to describe Mr. Jowdy.

19         I'm asking you, you were their financial advisor

20   at the time.  You said you played a role of some kind to

21   initiate them into this loan.

22         What was the documentation?  Was there

23   documentation about the loan?

24         I heard you said there was a check.  Fine.

25   Beyond the check, what was it?

Kenner  -  Cross/Miskiewicz

4584

1    A.    For Mr. Norstrom there was nothing else.

2    Q.    What about Mr. Stumple?

3    A.    For Mr. Stumple there was just the wire transfer

4    documents of $1.6 million directly to Mr. Jowdy's company

5    in Mexico.

6              (Continued on next page.)

Kenner - Cross/Miskiewicz

4585

1    BY MR. MISKIEWICZ (Cont'd):

2    Q.    What about Mr. Lethinen?

3    A.    Yes, there was a letter that Mr. Jowdy had prepared

4    for Mr. Lethinen and there was e-mail traffic in evidence

5    that I reviewed pretrial between Mr. Najam, Mr. Jowdy and

6    myself referring to the letter that ultimately was written

7    by Mr. Jowdy.

8    Q.    What letter are you referring to?

9    A.    The --

10   Q.    Go ahead?

11   A.    There was a letter prepared by Mr. Jowdy and typed by

12   his assistant, Sean Hughes and then delivered to myself

13   and Mr. Lethinen as an acknowledgment of the $1.5 million

14   loan that Mr. Jowdy took from him on a 30-day, 10 percent

15   return.

16   Q.    You have a copy of that?

17   A.    Not on me right here, but it is in evidence, I have

18   seen it.

19   Q.    And Glenn Murray, what documentation was there for

20   the loan that you had arranged to Mr. Jowdy?

21   A.    There was no documentation other than the wire

22   transfer and bank statements that showed the money going

23   from Mr. Murray's account directly to Mr. Jowdy's escrow

24   accounts in Las Vegas and the subsequent lawsuit that

25   Mr. Murray won the million judgment on.

Kenner - Cross/Miskiewicz

4586

1  Q.   You were the financial advisor for the hockey

2  players.

3        Obviously you took it upon yourself to treat and

4  be careful with your money, correct?

5  A.   Yes, sir.

6  Q.   Documentation of lending and borrowing of money is

7  kind of important, isn't it?

8  A.   I would agree.

9  Q.   You have testified that you reviewed in anticipation

10  of your testimony today prior to the trial some two

11  million documents that were turned over to you from the

12  government.

13        Do you remember testifying that that I believe

14  Wednesday?

15  A.   I believe so, yes.

16  Q.   And isn't it true, sir, that most of those two

17  million documents were documents that you generated over

18  years prior to the indictment in this case?

19  A.   I don't believe that's true.

20  Q.   Isn't it true, sir, that there were some 89,000 text

21  messages on your telephone, on your iPhone?

22  A.   Yes, sir, that's correct.

23  Q.   There were recovered from your home in Scottsdale,

24  Arizona, 17,316 documents from your home?

25  A.   I believe there were more than that.

Kenner - Cross/Miskiewicz

4587

1    Q.    You think there were more than that?

2    A.    Yes.

3    Q.    More than 17,000 documents from your home?

4    A.    Yes, sir, I believe so.

5    Q.    Okay.

6          On your computer there were over 287,000

7    documents in electronic form.

8          Would you say that's about right or it could

9    have been higher or lower?

10   A.    No.  That sounds accurate, and I was referring in my

11   previous answer to the accumulation of both of those sets.

12         I apologize.

13   Q.    Well, my question is, is it correct, sir, that there

14   were 287,000 documents recovered from your laptop, your

15   iPad which is device No. 1?

16   A.    I believe that's accurate.

17   Q.    The government also produced, gave back to you

18   documents that you had produced in prior litigation, for

19   instance, some 26,000 pages of documents that you have

20   provided to the United States Securities and Exchange

21   Commission.

22         Is that correct?

23   A.    That sounds about accurate.

24   Q.    Boxes and boxes of material contained on disks from

25   the Owen Nolan arbitration and other lawsuits.

Kenner - Cross/Miskiewicz

4588

1        Correct?

2   A.    I believe that's correct as well.

3   Q.    You understand that the indictment in this case does

4   not blame you for losing money in a risky venture.

5        Right?

6   A.    That's my understanding.

7   Q.    You understand that the indictment charges you with

8   stealing money from your clients, correct?

9   A.    That's my understanding.

10  Q.    So the fact that Lehman Brothers went belly up, that

11  the great recession happened, the real estate market

12  bubble burst, you understand there's nothing in the

13  indictment that blames you for that, right?

14  A.    I understand that.

15  Q.    The indictment charges you with, among other things,

16  diverting money belonging to your clients through the

17  lines of credit to Mexico, to this guy Mr. Jowdy.

18       You understand that?

19  A.    Not specifically.

20  Q.    You don't understand that that's what part of what

21  you are charged with?

22  A.    I don't recall that specifically.

23  Q.    Well, in any event, during this period of time, sir,

24  that you have been testifying about, you had a number of

25  limited liability companies open, correct?

Kenner - Cross/Miskiewicz

4589

1  A.   Yes, sir, that's correct.

2  Q.   How many?

3       Can you even approximate how many LLCs you

4  created during the period of time encompassed in the

5  indictment?

6  A.   My best guess would be between 15 and 20 LLCs.

7  Q.   And I think you testified on direct, but in case you

8  hadn't and I'll just ask it what is an LLC?

9       Why do you have an LLC?

10 A.   There are a number of business purposes in my opinion

11 for an LLC.

12      But it's specifically referred to as a limited

13 liability corporation, would typically be established for

14 business purposes and specific to what we needed in

15 Hawaii, I opened up an LLC for the parent company at the

16 time in 2003 known as Little Isle IV.

17      Subsequent to that, on each of the individual

18 land purchases for little Honu'Apo, the 258 acres, I

19 opened up Big Isle IV, for the 1,500 parcels at Honu'Apo I

20 opened up Big Isle V, I opened up for the Waikapuna

21 parcel, purchase and sale contract I opened up

22 Big Isle VI --

23 Q.   If I may, I'm going to stop you.

24      My question was why you open up LLCs.  I think

25 you have explained that.

Kenner - Cross/Miskiewicz

4590

1   A.   In the --

2   Q.   There is no question you opened up a lot of them,

3   correct?

4   A.   Yes, sir.

5        And the specific purpose for each of those

6   parcels was to not put any of the individual parcels at

7   risk in case there was an event adverse to the overall

8   acquisitions in Hawaii, to separate one from another.

9        And I think that's only prudent.

10  Q.   And each one of those LLCs had what's referred to,

11  what's been referred to numerous times in this trial as a

12  managing partner.

13       Right?

14  A.   Yes, sir.

15  Q.   LLCs, unlike corporations, don't issue stock.

16       You have what's called an operating agreement

17  and that operating agreement is pretty much identified as

18  who or what is part of that LLC, correct?

19  A.   That is correct.

20  Q.   Could be a person, could be another LLC that owns a

21  percentage of a parent LLC, so on and so forth.

22       Correct?

23  A.   I have even those occurrences.

24  Q.   We have all seen a lot of those at trial, you

25  introduced a lot of them in your direct.

Kenner - Cross/Miskiewicz

4591

1    My question to you is, in each one of the LLCs,

2    let's focus on Hawaii for now, you were the managing

3    partner, weren't you?

4    A.   Yes, sir, for each one of the LLCs I was the managing

5    partner.

6    Q.   And in each instance, not only were you the managing

7    partner, you were the signatory and the sole signatory on

8    bank accounts opened for each one of those LLCs?

9    A.   As the managing partner I was the sole signatory on

10   each one of them.

11          That's correct.

12   Q.   You may have had other members, but whatever other

13   membership there was in any one of your LLCs, they didn't

14   control the bank accounts, did they?

15   A.   No, sir, I controlled the bank accounts.

16   Q.   You controlled all of the bank accounts relative to

17   the Hawaii land venture, or real estate deal, however you

18   want to call it.

19   A.   I controlled the majority of them.

20   Q.   The majority?

21   A.   Yes, sir.

22          There were some operating accounts that were

23   handled by Mr. Manfredi on the Big Island for day to day

24   month to month operational expenses.

25   Q.   Other than those, though, you controlled all of the

4592

1    operating accounts -- I'm sorry -- all of the LLCs bank

2    accounts that we have heard of relative to the Hawaii real

3    estate venture, in other words for Big Isle IV, Ula

4    Makika, on and on.

5             Correct?

6    A.   For the ones you just mentioned, yes, that's correct.

7    Q.   You also received copies of all of the lines of

8    credit statements that were generated when lines of credit

9    were opened in 2004, correct?

10   A.   I'm not sure what statements you are referring to.

11   Q.   Monthly statements.

12   A.   No, sir.

13   Q.   You didn't get any monthly statements?

14   A.   I don't believe monthly statements began to be issued

15   by Northern Trust Bank on the individual lines of credit

16   until sometime in 2006.

17   Q.   What about the transaction history reports that go

18   back to the inception of each one of the lines of credit?

19             They were found in your home?

20   A.   Yes, sir, they were.

21   Q.   You had those?

22   A.   Those were received in late 2009 after each of the

23   line of credit holders had signed the individual requests

24   to Northern Trust Bank to receive duplicate copies of all

25   the statements.

Kenner - Cross/Miskiewicz

4593

1    Those loan transaction history reports, the

2    first time I ever saw those were at the end of 2009 when

3    we received those statements and I made copies of all for

4    the clients when they were all received.

5    Q.    I see.

6          So you got them when the various hockey players

7    started getting letters of default notifying them that

8    they owed a million or more in each case to Northern

9    Trust.

10   A.    No, sir, that's incorrect.

11   Q.    When did you get those transaction reports?

12   A.    After about August of 2009, approximately six months

13   after the closure of those lines of credit.

14   Q.    I'm confused.

15         You saw the very first week of trial Kristin

16   Peca testified here and she played a portion of a

17   recording.

18         Do you remember a recording she made of you?

19   A.    I certainly remember the recording she made of me.

20         It was four hours and 56 minutes.

21   Q.    And she asked you in that recording, where could she

22   find documents reflecting where her money went from the

23   line of credit and you said, I don't have any.

24         You said that.

25   A.    I recall that.

Kenner - Cross/Miskiewicz

4594

1   Q.   That wasn't 2009 that recording?

2   A.   No, it was 2012.

3   Q.   So you lied to her?

4   A.   That's not true.

5   Q.   You had the records in your house, but you told her

6   in 2012, I don't have any records.  Go to Northern Trust

7   and find them.

8            Isn't that what you said?

9   A.   That's correct, in 2012 I told her to go to Northern

10  Trust, get the documents and trace the money.

11  Q.   Back to the LLCs and the two million pages in records

12  that you have reviewed, you claim that there was a note,

13  promissory note, a loan agreement to Kenneth Jowdy

14  documenting how you on behalf of the player clients would

15  lend him millions of dollars, what turned out to be over

16  $5 million, correct?

17  A.   It was a revolving line of credit document that

18  Mr. Jowdy and myself signed with a witness.

19  Q.   In Mexico?

20  A.   In Mexico in December of 2004.

21  Q.   And you claim that based on that you had not only the

22  authority to collect on that loan, but all of the players

23  were aware that you had made such a loan contemporaneous

24  with the signing of that note?

25  A.   They were all made aware that there was a potential

Kenner - Cross/Miskiewicz

4595

1   to loan money sometime between the summer of 2004 and

2   November of 2004.

3           And they were all made aware that the document

4   had been signed and was in the possession of Mr. Kaiser

5   from that point forward.

6   Q.   How were they made aware?

7   A.   I let them know in face to face meetings with them.

8   Q.   So when two million pages of records, most of them

9   yours, there is not a letter, not a text, not an e-mail

10  contemporaneously of you notifying all of the hockey

11  players that you were loaning money to Ken Jowdy?

12  A.   In 2004 I did not have a text message or an e-mail

13  relationship with my clients.

14          I spoke with them on the phone and I traveled

15  approximately 250 plus days a year to meet with them face

16  to face.

17  Q.   Well, you kept the original documentation, didn't

18  you, regarding the taking of the line of credit, right?

19  A.   I'm not sure I understood the question.

20  Q.   You introduced pledge agreements and other things

21  like that regarding each player's line of credit.

22  A.   I saw those introduced during the trial, that's

23  correct.

24  Q.   You have all those documents with you?

25  A.   With me at what point in time?

Kenner - Cross/Miskiewicz

4596

1   Q.   In your house, prior to your arrest, in various

2   pieces of litigation you produced those documents.

3        Correct?

4        MR. HALEY:  Judge, I would just object to the

5   compound nature of the question.

6        That's my only objection.

7        THE COURT:  Sustained as to form.

8   BY MR. MISKIEWICZ:

9   Q.   You have those documents in your house?

10       MR. HALEY:  Again -- I'll withdraw the

11  objection, Judge.

12  A.   I believe a good portion of those documents were

13  either electronically stored at my house or this paper

14  form.

15  Q.   It was important to keep those notes because they

16  articulate the responsibilities of your players were

17  taking on in terms of borrowing money against what you

18  heard in some cases was their retirement account.

19       Right?

20  A.   I'm not sure I understood that statement.

21  Q.   It was important to keep that paper?

22  A.   I attempted to keep as much paperwork for my client

23  accounts as I could.

24  Q.   And among the things you also kept were operating

25  agreements for your various LLCs, right?

Kenner - Cross/Miskiewicz

4597

1  A.    I believe that's correct as well.

2  Q.    But no paper documenting that Little Isle IV and its

3  various subsidiaries was making a loan to Ken Jowdy in

4  Mexico, had nothing to do with Hawaii, no paper like that

5  in the two million documents that you looked at?

6  A.    That's incorrect.

7  Q.    There is a document, isn't there?

8  A.    Yes, sir, there is.

9  Q.    And that would be the promissory note that you say

10  Ken Jowdy signed with you in Cabo San Lucas.

11        Right?

12  A.    That is correct.

13        That is the document that he not only received

14  the loans, but under the terms of which repayment was

15  approximately $2 million over an 18-month period of time.

16  Q.    So you would agree with me, Mr. Kenner, that if that

17  loan document proves to this jury to be phony, everything

18  you have said in your direct testimony about money going

19  to Mexico and not being stolen is a lie?

20  A.    I'm not --

21        MR. HALEY:   Judge, is that a question or is that

22  a summation?

23        I object as to form.

24        THE COURT:  Sustained as to form.

25        No speaking objections, okay.

Kenner - Cross/Miskiewicz

4598

1          MR. HALEY:  Thank you.

2          THE COURT:  Sustained as to form.

3   BY MR. MISKIEWICZ:

4   Q.   Well, there is no record, no document that shows any

5   player knew anything about the Jowdy loan except for the

6   one document you produced and offered into evidence during

7   your direct.

8          Correct?

9   A.   That in fact would be the loan agreement with

10  Mr. Jowdy.

11  Q.   And if that loan document proves to be phony, then

12  you are lying.

13         Correct?

14         MR. HALEY:  I object to the form.

15         THE COURT:  Sustained as to form.

16  BY MR. MISKIEWICZ:

17  Q.   You have no -- your testimony is that the loan

18  document that is now in evidence as a Kenner exhibit is

19  true and accurate.

20         Correct?

21  A.   Yes, sir, it is.

22  Q.   Kenner 214 is the document that you have been

23  referring to.

24         I know it's kind of small and we don't have to

25  read the entire thing, but so we know what we are talking

Kenner - Cross/Miskiewicz

4599

1  about, can you tell from the screen what I'm referring to?

2  A.   Yes, sir, I can.

3  Q.   This is the document, correct?

4  A.   The revolving line of credit, loans.

5  Q.   And at the end here there are a number of signatures,

6  one of which I guess purports to be Kenneth Aboud Jowdy,

7  correct?

8       THE COURT:  It's not on the seen.

9  BY MR. MISKIEWICZ:

10  Q.   One of these signatures purport to be Mr. Jowdy's

11  signature, right?

12  A.   Yes, that's correct.

13  Q.   And you have used this document, or you have relied

14  on this document as substantiation or proof that you made

15  a loan at a certain percentage, I think it says here 15

16  percent, to Mr. Jowdy and that you withdrew that money

17  from the lines of credit in part.

18       Right?

19  A.   In part.

20  Q.   Did you ever provide copies of this document to any

21  of your hockey player clients contemporaneous with the

22  signing of the document, that is on or about December of

23  '04?

24  A.   I don't believe so.

25       Mr. Kaiser ended up with a copy of the document.

Kenner - Cross/Miskiewicz

4600

1    Q.    And so did you.

2    A.    No.

3            Mr. Kaiser ended up with a copy of the document

4    that I had at his request.

5    Q.    But you also retained a copy of the document.

6    A.    No, I don't believe I did.

7    Q.    Wait, you went to Cabo San Lucas.

8            You met with Mr. Jowdy -- I'm sorry -- did you

9    say Kaiser or Jowdy retained a copy?

10   A.    Actually they both did.

11   Q.    Who had the original?

12   A.    I believe Mr. Jowdy had the original.

13   Q.    And he kept the original when this was signed?

14   A.    Yes, sir.

15   Q.    You didn't bring a second copy to sign?

16   A.    I didn't think about it at the time.

17   Q.    You are at this point well on in your career as a

18   financial advisor, were you not?

19           I mean, it's 2004, you started as a financial

20   advisor in the late 1990s.

21   A.    Early 1990s, about one decade.

22   Q.    You didn't think it was important to have an original

23   of a promissory note in which -- it's not your money, you

24   are loaning other people's money to this guy in Mexico.

25           You didn't think it was necessary to retain an

Kenner - Cross/Miskiewicz

4601

1    original?

2    A.   At the time I had probably dealt with dozens of bank

3    loans and never retained a single original signature of

4    any of the bank loans for any of my clients.

5              And, subsequent to that, this loan was never

6    intended to grow to the size that it did.  In fact,

7    originally it was frankly documenting about a quarter

8    million dollar loan that had already been given to

9    Mr. Jowdy in an oral agreement in 2004.

10   Q.   So you didn't retain a copy, but your testimony is

11   you made a copy down in Cabo San Lucas and then you came

12   home with it.

13             Is that what you are saying?

14   A.   No.

15             Mr. Jowdy made a copy and handed it to me.

16   Q.   So you couldn't make a copy of the unsigned copy so

17   you would have retained an original, you didn't do that,

18   right?

19   A.   No, sir.

20   Q.   And you know from prior litigation that you testified

21   about whether or not this was a forgery, you said that

22   Mr. Kaiser, I think you attributed to Mr. Kaiser he lied

23   when he said that this was a forgery.

24             Correct?

25   A.   I couldn't hear the question.

Kenner - Cross/Miskiewicz

4602

1    I'm sorry.

2    Q.   Did you or did you not testify back on last

3    Wednesday, I believe, that when Mr. Kaiser said that this

4    document was a forgery, that he was lying about that?

5    A.   I think what I said is Mr. Kaiser -- it was untrue

6    when he said that I represented to him that the Arizona

7    case was dismissed because of this document was a forgery.

8    Q.   Are you saying the case wasn't dismissed because it

9    was a forgery?

10   A.   That's correct.

11         The case was not dismissed because of anything

12   to do with that document.

13   Q.   Well, this document played a significant role in a

14   piece of litigation that you were involved in in Nevada,

15   right?

16   A.   It also played a part --

17   Q.   Sir --

18   A.   In the --

19   Q.   I'm just going to ask you -- if I misspeak, you will

20   have an opportunity during redirect to clarify anything.

21         But isn't it true, sir, that this was an

22   important document during your litigation in Nevada over

23   whether or not Ken Jowdy owed you or your players $5

24   million?

25   A.   That is not true.

Kenner - Cross/Miskiewicz

4603

1   Q.   Didn't you on behalf of Little Isle LLC and Ula

2   Makika sue first in state court -- I said Nevada, I

3   misspoke -- Arizona, seeking to get payment for the $5

4   million that you contend that Mr. Jowdy owed you?

5   A.   Yes, in addition I sued him personally for $500,000

6   that he also reneged on me at the time.

7   Q.   My question is, did you sue him in state court in

8   Nevada -- I'm sorry -- in Arizona to get repayment on what

9   is now Kenner 214, the revolving line of credit loan

10  agreement?

11  A.   I don't recall if it was state or federal court in

12  Arizona.

13        But, yes, the lawsuit was filed in Arizona.

14  Q.   Well, eventually it did become transferred or it

15  eventually was in United States District Court in Arizona.

16        Correct -- the lawsuit?

17  A.   I don't recall.

18        I know that Mr. Jowdy spent a lot of time and

19  energy and money to move the case around.

20  Q.   You recall that?

21  A.   Yes, I do recall that because it cost me a lot of

22  money personally.

23  Q.   I'm going to show you what is marked as

24  Government Exhibit 9080 C for identification.

25        I ask you to look at that document.

Kenner - Cross/Miskiewicz

4604

1         MR. MISKIEWICZ:  Your Honor, we also move for

2   the admission of 9080 C as a self-authenticating document

3   from the District Court of Arizona.

4         If the court wishes to inspect the seal, we have

5   it available.

6         THE COURT:  Does Mr. Haley have a copy?

7         MR. HALEY:  Your Honor, I'm pretty sure I know

8   what it is.

9         There may be no objection, if I may review it.

10         (There was a pause in the proceedings.)

11         MR. HALEY:  I do object, Judge.

12         THE COURT:  You want to approach.

13         (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Kenner - Cross/Miskiewicz

4605

1          (Sidebar.)

2          MR. MISKIEWICZ:  Your Honor, specifically the

3     United States District Judge who was assigned the case

4     concluded -- made a number of findings of fact, but

5     concluded that, among other things, that the plaintiff's

6     failure to comply with various court orders, the plaintiff

7     in this case being Mr. Kenner, his failures to respond

8     also lends credence to the claims of forgery and false

9     claim, to Nevada citizenship.

10          This was a lawsuit first initiated in state

11     court to defeat diversity of citizenship the defendant

12     made a number of false claims about his residence,

13     something that came out in one of the earlier bail

14     hearings in this matter.  He testified on direct and he

15     just reiterated that Mr. Kaiser was lying when he said

16     that Mr. Kenner admitted to him that the case was

17     dismissed because of a forged promissory note, and the

18     note, I would proffer, is exactly what the district court

19     is referring to here as the forgery.

20          I didn't --

21          THE COURT:  If you want to read that portion of

22     the order that makes reference to that I think that's

23     proper impeachment, but not the whole order.

24          MR. MISKIEWICZ:  That's fine.

25          MR. HALEY:  Well, it depends upon I guess the

4606

1    way the question is phrased, Judge.

2         If it's did you receive an order -- I'll hear

3    the question then I'll reserve my right.

4         THE COURT:  I don't want to have another

5    sidebar.

6         The portion of this relates to the fact that the

7    judge relied upon that document in connection with this

8    case, is that what you are saying?

9         MR. MISKIEWICZ:  Mr. Jowdy's defense was that he

10   never signed such a promissory note which is now in

11   evidence as a Kenner exhibit and that it was a forgery.

12        There were a series of failures to respond to

13   court orders to appear for deposition, to provide

14   expedited discovery, et cetera, et cetera, and the failure

15   to do so, ultimately, led to the dismissal of the case

16   because in part of the failure to provide any

17   documentation substantiating the claim that this was an

18   authentic document, and also in doing so the court, as I

19   just read, concluded that she believed that the evidence

20   of forgery was also proven by the defendant's behavior,

21   the plaintiff there, defendant here.

22        MR. HALEY:  Judge --

23        THE COURT:  Hold on.

24        It's 4:15.  I have to read this order.  I will

25   tell you to move on to another area and we'll come back to

Kenner - Cross/Miskiewicz

4607

1    this.

2            MR. MISKIEWICZ:  Okay.

3            MR. HALEY:  Thank you, Judge.

4            (Sidebar concluded.)

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4608

1          (In open court.)

2          THE COURT:  Members of the jury, I have to read

3    this document.

4          The government will move on to another area and

5    I'll discuss it with them after.

6    BY MR. MISKIEWICZ:

7    Q.    Sir, over what period of time did you lend hockey

8    player money to Ken Jowdy?

9          I think we got the start date of November of

10   2004.  How long did that continue?

11   A.    To on or about February of 2006.

12   Q.    And then in July of 2006, specifically July 21, 2006,

13   there is a letter, rather long memo that's in evidence,

14   both as a government and I think Kenner exhibit,

15   articulating what was about to happen with respect to the

16   acquisition of parcels, the formation of Naalehu Ventures,

17   the upcoming Lehman loan.

18          You know the document I'm referring to?

19   A.    Yes, the overview of the joint venture agreement.

20   Q.    Okay.

21          And in this first page, you articulate and you

22   wrote this document, didn't you?

23   A.    No, sir.

24   Q.    Who wrote it?

25   A.    The letter was written by our legal counsel, Larry

Kenner - Cross/Miskiewicz

4609

1  Markowitz, with the help of Bill Najam.

2  Q.    So it says very truly yours Phillip A. Kenner?

3  A.    Yes, sir, it does, at the end.

4  Q.    But you got help from counsel drafting this document?

5  A.    This was a letter that Lehman Brothers required, that

6  we have written and signed by each one of the clients --

7  members of Little Isle IV.

8          And Larry Markowitz, our general counsel was

9  instructed by Lehman Brothers attorneys formulated this

10  letter.

11          MR. MISKIEWICZ:  I just want to approach counsel

12  to get the stamped copy.

13          MR. HALEY:  Sure.

14  BY MR. MISKIEWICZ:

15  Q.    For the record I'm showing you --

16          MR. HALEY:  One moment, your Honor.

17  BY MR. MISKIEWICZ:

18  Q.    For the record, I'm showing you what's been marked as

19  Kenner Exhibit 16 in evidence.

20          That's the document you were talking about,

21  correct?

22  A.    Yes, sir.

23  Q.    This Kenner Exhibit 16 also has at the end of it a

24  number of what are referred to as acknowledgment or

25  response forms.

Kenner - Cross/Miskiewicz

4610

1      Right?

2   A.   That is correct.

3   Q.   And --

4   A.   One --

5   Q.   And these were signed by various player clients of

6   yours, for instance this one says Tyson Nash?

7   A.   Yes, sir, I believe they were signed by each one of

8   the members of Little Isle IV as required by

9   Lehman Brothers.

10  Q.   Norstrom, Peca, Rucchin.

11       We haven't heard of that guy, Chris Simon, who's

12  he?

13  A.   He was one of my clients at the time.

14  Q.   Turner Stevenson, et cetera.

15       Now, in this document -- you testified in your

16  direct that there was a total of -- I'm showing you now

17  Kenner Exhibit 215 -- but there was a total of $13 million

18  collected through Little Isle IV from various player

19  clients as well as Mr. Kaiser.

20       Did this include money from the lines of credit,

21  this $13 million?

22  A.   Yes, sir, it did.

23  Q.   Why don't you make any mention of the $13 million in

24  your letter to the members of Little Isle IV right here on

25  the first page?

Kenner - Cross/Miskiewicz

4611

1    Why did you cut out $5 million?

2    A.    The letter that went out to the Little Isle IV

3    members was a state of the union letter for Little Isle

4    IV.

5         Moreover, it was a letter that was drafted to

6    memorialize the joint venture that was occurring with

7    Windwalker at Lehman Brothers.

8    Q.    You are going to have to explain that to me.

9         What is a state of the union letter?

10        MR. HALEY:  Judge, if I can, the comment --

11        MR. MISKIEWICZ:  I'll withdraw the commentary.

12        MR. HALEY:  Thank you.

13   BY MR. MISKIEWICZ:

14   Q.    What is a state of the union letter?

15   A.    I would consider it something different than a

16   memorialization letter that was written on behalf of

17   Little Isle IV to all the members to let them know what

18   was going on in the joint venture proposal between

19   Windwalker, Lehman Brothers and our entities.

20   Q.    Well, sir, I would imagine it was important when you

21   put together this chart to document how much was collected

22   because, after all, this is part of your defense that you

23   didn't steal any money and what you came up with was $13

24   million.

25        Correct?

Kenner - Cross/Miskiewicz

4612

1          MR. HALEY:  I object as to form, Judge.

2          THE COURT:  Sustained as to form.

3    BY MR. MISKIEWICZ:

4    Q.   Wasn't it important to you when you calculated that

5    the total amount from the player clients was $13 million?

6    A.   Wasn't it important?

7    Q.   Yes.

8    A.   In what context?

9    Q.   In this context, sir.

10   A.   I'm not sure I understand.

11        That's why I'm asking.  I apologize.

12   Q.   Prior to testimony here in this federal trial in

13   which you were charged with certain crimes, it was

14   important for you to say that it was a $13 million

15   collection of capital.

16        Isn't that true?

17   A.   I'm not sure I understand the question, but I can

18   confirm that between my client --

19   Q.   You know what, if you don't understand the question,

20   I'll rephrase it.

21        You created or helped create Exhibit 215,

22   correct?

23   A.   Yes, sir, that's correct.

24   Q.   And you put in here that you collected approximately

25   $13 million in capital from your various player clients,

4613

1    also known as the John Does in this indictment.

2            Correct?

3    A.   Including other people, including myself and John

4    Kaiser as well.

5    Q.   And when you were writing to your player clients,

6    many of whom testified here today, you did not say that

7    the total investment to date of the company, our partners

8    and me and the parcels is approximately $8 million, you

9    didn't say $15 million, you said $8 million.

10           You cut $5 million out of that number, didn't

11   you?

12   A.   No, sir, because if I had put $15 million that would

13   have suggested -- or $13 million, that would make it an

14   inaccurate statement.

15   Q.   Sir, isn't it true you cut $5 million out of here

16   because in 2006 nobody but you knew Ken Jowdy borrowed

17   that money and you couldn't tell them in this document

18   because they would ask you, Ken who?

19           Isn't that true?

20   A.   That is untrue.

21   Q.   Also 2006, this loan has been building and building

22   and hasn't been repaid, correct?

23           Did he pay any money to you up to that point in

24   2006?

25   A.   Yes.

Kenner - Cross/Miskiewicz

4614

1    Mr. Jowdy had made a series of payments totaling
2    approximately $2 million and in the month and a half prior
3    to the Lehman Brothers closing in Cabo San Lucas when he
4    was supposed to repay the balance which was approximately
5    $7 million including interest, Mr. Jowdy made a series of
6    about seven payments totaling over a quarter million
7    dollars as he was seeking the rest of our signatures for
8    the closing of the Cabo San Lucas deal.
9    Three days before the closing of the Cabo deal
10   was the last repayment by Mr. Jowdy and he hasn't paid us
11   anything since.
12   Q.   I'm going to use the phrase again, I apologize, I
13   just like it.
14   We can agree, sir, that in various litigation
15   that you commenced against Mr. Jowdy subsequent to this
16   letter, you alleged that he owed your players $5 million,
17   right?
18   A.   I alleged that in the Arizona lawsuit.
19   That's correct.
20   Q.   Okay.
21   So whether the money went up or down, bottom
22   line is, you didn't include anything, anything about how
23   much Mr. Jowdy owed Little Isle IV in 2006, did you?
24   A.   Not in that letter.
25   It was not relevant to the purpose of that

Kenner - Cross/Miskiewicz

4615

1    letter.

2    Q.    Do you remember what you said about Mr. Jowdy in this

3    letter?

4    A.    I don't recall off the top of my head.

5    Q.    While I look for the particular paragraph, would you

6    disagree that you said -- and this letter is going out to

7    your player clients -- Mr. Jowdy has provided value

8    assistance in the acquisition of a Lehman loan for the

9    Hawaii venture?

10          Did you say that in this letter?

11   A.    Could you show me the letter to refresh my

12   recollection, please.

13   Q.    I'll have to come back to it.

14          Let me ask you another question, JND, you know

15   what JND is, who owns JND?

16   A.    I believe that was an entity that Bill Najam set up

17   for Ken Jowdy and Bill Najam to take some ownership in the

18   Hawaii project at that time.

19   Q.    And at page two of Kenner 16, there is a discussion

20   of JN Development, LLC and this is the bullet point of the

21   paragraph.

22          Could you read what it says in the second

23   sentence of that paragraph?

24   A.    Yes.

25          Ken and Bill were instrumental in obtaining

Kenner - Cross/Miskiewicz

4616

1  Lehman's loan commitment and Bill is actively involved in

2  bringing this transaction to completion.

3  Q.   So in 2006 you do tell the players, the other members

4  of Little Isle IV, about essentially how helpful Mr. Jowdy

5  has been to getting Lehman, and Lehman was fundamental,

6  correct?

7  A.   And Lehman was?

8  Q.   Fundamental for the success of the project.

9  A.   Lehman Brothers was the lending institution, that's

10  correct.

11  Q.   And you are attributing the success to getting

12  Lehman Brothers to the table to loan the amount of money

13  that was necessary to do the Hawaii development, you are

14  attributing that to Mr. Jowdy, as well as some other of

15  his partners in JND, correct?

16  A.   Well, his partners in JN Development was himself and

17  Bill Najam.

18  Q.   My question is in that document to the players, you

19  are attributing this important event, getting this huge

20  loan from Lehman, to the help received, in part, through

21  Ken Jowdy and Bill Najam.

22       Correct?

23  A.   That's how it was written by Mr. Markowitz and

24  Mr. Najam, correct.

25  Q.   But you put your name to it, correct, sir?

4617

1    A.    Yes, sir, I did.

2    Q.    But, again, you didn't mention anything about in this

3    paragraph, by the way, in sum and substance, they still

4    owe us $5 million.

5          Right?

6    A.    No.

7          It wasn't relevant to the purpose of the letter.

8    Q.    But, nevertheless, on the next page, page three of

9    Kenner 16, it says here JND now backs a 5 percent member

10   of Little Isle IV, and everything that comes along with

11   Little Isle IV.

12         Right?

13   A.    No, sir.

14   Q.    JND -- does it not say that?

15         The equity ownership of Naalehu, which as you

16   testified is the company that Little Isle and everything

17   else is going to get wrapped up into, 5 percent of that

18   company is now going to be owned by JND, Ken Jowdy and

19   Bill Najam?

20   A.    5 percent of Naalehu Ventures 2006, that is correct.

21   Q.    And basically that's 5 percent of the whole Hawaii

22   project, right?

23   A.    That's 2 and a half percent of the total Hawaii

24   project at that point in time.

25   Q.    Worth millions, potentially, if everything worked

Kenner - Cross/Miskiewicz

4618

1   out?

2   A.   I would have hoped so, yes.

3   Q.   And the only reason you cut him in is because he cut

4   you in on Cabo San Lucas.

5   A.   That is incorrect.

6   Q.   You own 39 percent of Diamante Cabo San Lucas to this

7   day, don't you?

8   A.   Yes, sir, I do.

9   Q.   You got there, in part, by loaning Mr. Jowdy money at

10  a critical stage in the development of his projects in

11  Mexico, didn't you?

12  A.   That is not why I was a 39 percent member.

13  Q.   You didn't put up any money on your own to get that

14  39 percent, did you?

15  A.   That's incorrect.

16  Q.   You borrowed money from two players, Mr. Stumpfel and

17  Mr. Lethinen, you borrowed their money.

18         You gave that money to Mr. Jowdy, and then you

19  formed a company, Baja Ventures 2006, LLC, and that's what

20  got you your almost 40 percent stake of Cabo San Lucas.

21         Isn't that true?

22  A.   That is not true at all.

23  Q.   So if there are documents reflecting that, they are

24  incorrect?

25         MR. HALEY:  I would object.

4619

1          THE COURT:  Sustained as to form.

2          MR. MISKIEWICZ:  We'll move on.

3          THE COURT:  It's 4:30.

4          If you are moving to another area you should

5     stop.

6          MR. MISKIEWICZ:  Okay.

7          THE COURT:  We'll break for the day.

8          We'll reconvene tomorrow at 9:30.  Don't read or

9     listen to anything regarding the case.  Don't discuss the

10    case.  I'll see you tomorrow morning at 9:30.

11         Have a good night.

12         ALL JURORS:  Good night.

13         (Jury leaves the courtroom.)

14         THE COURT:  Everyone can be seated.

15         You can step down, Mr. Kenner.

16         THE WITNESS:  Thank you.

17         (Witness steps down.)

18         THE COURT:  Just to go back to 9080 C, to the

19    extent the government is seeking to offer this order or

20    portion of this order as a finding by the district court

21    judge in Arizona that the document -- the promissory note

22    was a forgery, that I'm not going to permit.

23         As far as I can tell the only reference to any

24    finding by the court is one sentence where the court says,

25    plaintiff's failures to respond also lends credence to the

4620

1    claims of forgery and false claim to Nevada citizenship.

2    But the whole rest of the order relates to essentially a

3    failure by Mr. Kenner, or by Little Isle IV to respond to

4    various discovery requests by Mr. Jowdy.

5           So the whole document refers to basically

6    failure to respond to discovery and that line I do not

7    read that as a finding by the court of forgery.  I'm not

8    going to permit that.

9           MR. MISKIEWICZ:  Very well, your Honor.

10          MR. HALEY:  Thank you, your Honor.

11          THE COURT:  Any issues we need to discuss in

12   order to save time on any sidebars tomorrow that you are

13   aware of?

14          MR. LARUSSO:  Not that I know of.

15          Your Honor, is there any way to project how long

16   cross is going to be?  I have a witness that has flown in

17   and he's going to be available tomorrow and he's also,

18   from what I understand, available Wednesday as well, but I

19   have to do some juggling with other witnesses.

20          Maybe the government can give us some estimate

21   of cross because I have a few hours and I was wondering if

22   he would be using the whole day tomorrow.

23          (There was a pause in the proceedings.)

24          THE COURT:  Some of the jurors want to know if

25   we are going to sit a full day or half day Wednesday, I

4621

1   guess they are aware of the scheduling conflict.

2         I'm going to tell Michele to tell them I intend

3   on sitting a full day on Wednesday, everyone agrees?

4         MR. MISKIEWICZ:  Yes.

5         MR. LARUSSO:  Yes, your Honor.

6         MR. HALEY:  I'd like to keep the juror, Judge,

7   but it's your courtroom.

8         THE COURT:  Tell them they should plan on being

9   here all day on Wednesday.

10         And alternate four has a mandatory work meeting

11   on June 30th.  Is he waiting too?

12         THE CLERK:  He's waiting too.

13         THE COURT:  Tell him not to worry, we'll address

14   that.

15         THE CLERK:  Okay.

16         THE COURT:  Mr. Miskiewicz, what's your best

17   estimate of how long you think it will be?

18         MR. MISKIEWICZ:  It won't be all day.

19         I would like to conclude either right before or

20   shortly after lunch.

21         THE COURT:  Okay.

22         Mr. LaRusso, if you have a couple hours that

23   will take the whole day.

24         MR. LARUSSO:  Right, and if things break

25   differently he's about a half hour away.

4622

1        THE COURT:  You said he's available Wednesday,

2    right?

3        MR. LARUSSO:  Yes, he is.

4        MR. HALEY:  Your Honor actually made the

5    suggestion that perhaps the government and the defense, as

6    well as Mr. LaRusso, may reach some agreement on the

7    exhibits that I have now proffered as Kenner exhibits.

8        And if we can reach agreement on that --

9        THE COURT:  We are obviously not going to have a

10   big debate in front of the jury tomorrow, I would ask the

11   government if there are particular exhibits that Mr. Haley

12   is seeking to introduce that you have objections on, to

13   figure that out.

14       Again, if some of it relates to simply the fact

15   that it's hearsay, unless there is a document in

16   particular that the government has concern about, I

17   believe for all the reasons we have already gone over

18   numerous times that to the extent Mr. Kenner wants to put

19   in e-mails or texts what other people were telling him at

20   the relevant time it should come in, I think for his state

21   of mind.

22       Why don't you see which ones you disagree on.

23       MR. MISKIEWICZ:  We'll work it out.

24       There are those Excel spreadsheets that I think

25   have been marked.  I can cover that on cross-examination

4623

1    and probably we will waive any objection to hearsay.

2              I would ask for the limiting instruction your

3    Honor has given with other similar exhibits.

4              THE COURT:  Okay.

5              Hold on one second.

6              (There was a pause in the proceedings.)

7              THE COURT:  One juror has a vacation July 16th.

8              Again, this shows how the jury is thinking based

9    on what they are seeing.

10             MR. MISKIEWICZ:  I'll be done with my cross by

11   then.

12             THE COURT:  They should be okay.

13             MR. HALEY:  We can agree, can we not, that it

14   will be finished before July 16th?

15             THE COURT:  Yes.

16             We can agree on that.  Any other issues for

17   today, then?

18             MR. MISKIEWICZ:  Not for the government.

19             THE COURT:  There is one ruling I want to

20   amplify at the sidebar and this relates to Mr. LaRusso

21   objected to the portion of the e-mail that Mr. Haley was

22   offering where Mr. Kenner accuses Mr. Constantine of,

23   quote-unquote, misappropriating funds.

24             What I said at sidebar I want to amplify,

25   Mr. Kenner had already testified as to his belief with

4624

1    respect to misappropriation of funds, and testified

2    without objection to the fact that he communicated his

3    belief to the hockey player investments.  So what that

4    e-mail was doing was simply documenting or corroborating

5    what had already come in as testimony that he had made the

6    hockey player clients aware of what he believe to be

7    misappropriation.

8              I have already instructed the jury that that's

9    not for the truth of the matter asserted therein, so they

10   have already been given a limiting instruction.  There is

11   no Bruton issue because Mr. Kenner is on the stand and can

12   be cross-examined with respect to why he believed that

13   there was misappropriation with respect to certain funds.

14             So I do not believe -- and even though it is a

15   later time Mr. LaRusso points out it is not at the time of

16   the alleged diversion.  I think it was 2011 or 2010, I

17   don't remember the exact date -- actually, it was April

18   2011.  It still could potentially go to Mr. Kenner's state

19   of mind.

20             So for all those reasons I believe it was

21   properly admitted into evidence.  Have a good night.  I'll

22   see you at 9:30.

23             MR. MISKIEWICZ:  Thank you, your Honor.

24             MR. HALEY:  Thank you, your Honor.

25             MR. LARUSSO:  Thank you, your Honor.

4625

1          THE COURT:  See you tomorrow.

2          (The trial was adjourned until Tuesday, June

3    23rd, at 9:30 a.m.)

4626

1                           I N D E X

2


3     **PHILLIP A KENNER**                            4438
      DIRECT EXAMINATION (Continued)                4439
4     BY MR. HALEY
      DIRECT EXAMINATION                            4500
5     BY MR. HALEY
      PHILLIP A KENNER                              4533
6     SEALED RECORD                                 4534
      CROSS-EXAMINATION                             4543
7     BY MR. MISKIEWICZ
      CROSS-EXAMINATION                             4549
8     BY MR. LaRUSSO
      PHILLIP A KENNER                              4553
9     DIRECT EXAMINATION (Continued)                4553
      BY MR. HALEY
10    DIRECT EXAMINATION                            4580
      BY MR. MISKIEWICZ

11

12                       E X H I B I T S

13

      Defense Exhibit K233 in evidence              4444
14    Defense Exhibit K229 in evidence              4475

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,481,127** [1] - 4503:22
**$10,000** [2] - 4489:2, 4489:3
**$100,000** [2] - 4498:11, 4498:25
**$105** [4] - 4453:7, 4456:17, 4460:8, 4515:14
**$11,127** [1] - 4504:10
**$125** [1] - 4477:24
**$13** [8] - 4610:17, 4610:21, 4610:23, 4611:23, 4612:5, 4612:14, 4612:25, 4613:13
**$140,000** [1] - 4565:21
**$15** [2] - 4613:9, 4613:12
**$15,000** [1] - 4457:14
**$150,000** [1] - 4504:7
**$175,000** [1] - 4453:15
**$19** [1] - 4487:24
**$2,000** [2] - 4554:25, 4555:2
**$20** [1] - 4500:7
**$200,000** [5] - 4459:23, 4460:15, 4497:24, 4501:24, 4565:25
**$2000** [1] - 4554:19
**$25** [1] - 4479:17
**$25,000** [5] - 4487:2, 4488:14, 4491:23, 4500:16, 4508:24
**$250,000** [1] - 4567:3
**$26** [1] - 4557:7
**$265,000** [3] - 4485:4, 4486:12, 4487:19
**$267,000** [2] - 4511:12, 4512:3
**$27,900** [1] - 4469:21
**$28,500** [1] - 4469:19
**$290,000** [1] - 4565:18
**$30,000** [3] - 4504:22, 4506:9, 4506:20
**$300,000** [1] - 4492:8
**$31,528** [1] - 4487:10
**$35,000** [2] - 4511:18, 4511:25
**$35,750,000** [1] - 4524:19
**$360,000** [1] - 4517:25
**$375,000** [7] - 4461:14, 4462:18, 4463:5, 4465:20, 4470:5, 4471:4, 4471:14

**$38,000** [2] - 4502:3, 4502:7
**$380,000** [3] - 4457:13, 4457:19, 4497:23
**$395,000** [6] - 4456:6, 4457:9, 4457:19, 4458:2, 4458:24, 4471:17
**$40,000** [1] - 4506:1
**$40,300** [5] - 4506:4, 4506:14, 4506:22, 4507:3, 4507:18
**$400,000** [3] - 4454:12, 4454:21, 4456:19
**$42,553** [1] - 4527:15
**$43,000** [2] - 4511:3, 4511:11
**$430,000** [1] - 4565:22
**$45,000** [1] - 4557:2
**$50,000** [4] - 4501:1, 4501:13, 4501:17, 4557:1
**$500,000** [3] - 4583:5, 4583:8, 4603:5
**$6,834,287.29** [1] - 4521:8
**$600,000** [1] - 4492:4
**$650,000** [1] - 4495:20
**$70,000** [1] - 4504:9
**$750,000** [1] - 4564:11
**$761,458** [1] - 4527:15
**$81,127** [2] - 4503:25, 4504:8
**$85,000** [2] - 4508:7, 4508:19
**$86,000** [1] - 4490:12
**$877.00** [3] - 4489:10, 4489:19, 4489:22
**$9,000** [1] - 4486:17

## '

**'04** [1] - 4599:23
**'05** [1] - 4490:10
**'06** [4] - 4454:11, 4497:14, 4525:14, 4565:20
**'09** [2] - 4506:8, 4509:5
**'13** [1] - 4490:6
**'O7** [1] - 4497:15

## 1

**1** [6] - 4446:16, 4484:20, 4501:25, 4519:12, 4557:25, 4587:15

**1,500** [2] - 4460:3, 4589:19
**1.3** [1] - 4557:6
**1.5** [4] - 4464:20, 4468:20, 4495:9, 4585:13
**1.6** [1] - 4584:4
**1.9** [1] - 4560:10
**10** [18] - 4438:5, 4448:16, 4448:18, 4448:20, 4449:23, 4452:2, 4474:16, 4481:2, 4498:5, 4498:7, 4498:9, 4507:9, 4520:21, 4563:22, 4564:9, 4564:15, 4569:10, 4585:14
**100** [3] - 4454:3, 4521:21, 4560:15
**100,000** [7] - 4500:4, 4500:5, 4504:1, 4509:5, 4525:13, 4527:16, 4527:19
**105** [1] - 4521:9
**10th** [1] - 4566:23
**11** [2] - 4458:24, 4500:9
**11's** [1] - 4509:21
**11-day** [1] - 4457:14
**11201** [1] - 4434:14
**11722** [1] - 4434:22
**1180** [1] - 4434:22
**12** [6] - 4447:4, 4506:8, 4513:7, 4518:5, 4520:21, 4570:21
**12,000** [1] - 4485:23
**12/09** [1] - 4504:23
**12/29/08** [1] - 4504:2
**12/31/08** [1] - 4503:25
**123.9** [1] - 4497:19
**13** [1] - 4450:12, 4501:18, 4525:14, 4525:16
**13-CR-607** [1] - 4434:3
**14** [8] - 4485:24, 4490:6, 4503:20, 4564:18, 4564:19, 4565:8, 4565:18, 4566:6
**140** [1] - 4559:19
**15** [10] - 4450:4, 4450:8, 4478:6, 4504:12, 4506:8, 4545:22, 4580:24, 4580:25, 4589:6, 4599:15
**150,000** [1] - 4509:20
**1500** [1] - 4494:24

**16** [10] - 4448:23, 4505:20, 4507:19, 4521:14, 4521:16, 4522:10, 4609:19, 4609:23, 4615:19, 4617:9
**16,261** [1] - 4490:19
**16,261.38** [2] - 4490:5, 4490:8
**16th** [2] - 4623:7, 4623:14
**17** [3] - 4449:1, 4507:22, 4527:10
**17,000** [1] - 4587:3
**17,316** [1] - 4586:24
**18** [9] - 4447:12, 4447:16, 4507:22, 4519:4, 4541:11, 4541:21, 4542:6, 4548:15, 4550:5
**18-month** [1] - 4597:15
**18th** [6] - 4545:21, 4547:12, 4550:1, 4550:20, 4551:9, 4551:15
**19** [5] - 4440:14, 4442:5, 4507:24, 4521:5, 4521:6
**1990s** [2] - 4600:20, 4600:21
**1st** [10] - 4493:1, 4524:16, 4526:6, 4526:7, 4563:20, 4564:23, 4565:4, 4566:13, 4567:22, 4568:3

## 2

**2** [17] - 4442:15, 4450:2, 4464:20, 4468:20, 4478:6, 4489:24, 4499:1, 4519:12, 4526:16, 4526:19, 4533:2, 4546:20, 4546:24, 4566:13, 4597:15, 4614:2, 4617:23
**2.2** [2] - 4525:12, 4527:18
**2.3** [1] - 4527:17
**2/12/09** [1] - 4505:3
**2/25/09** [1] - 4505:25
**20** [5] - 4476:19, 4508:18, 4509:13, 4511:3, 4589:6
**200,000** [3] - 4501:22, 4519:3, 4566:4
**2002** [4] - 4472:15,

**4472:18, 4561:4, 4581:12
**2003** [5] - 4472:12, 4492:25, 4512:25, 4520:3, 4589:16
**2004** [19] - 4458:16, 4458:18, 4494:24, 4520:2, 4520:22, 4526:7, 4526:23, 4553:16, 4581:17, 4582:6, 4583:5, 4592:9, 4594:20, 4595:1, 4595:2, 4595:12, 4600:19, 4601:9, 4608:10
**2005** [27] - 4452:3, 4454:5, 4473:1, 4474:1, 4474:7, 4474:8, 4474:19, 4474:23, 4476:12, 4477:3, 4485:3, 4487:14, 4491:8, 4491:13, 4495:13, 4496:3, 4524:16, 4529:22, 4553:16, 4553:25, 4557:25, 4558:11, 4558:15, 4561:7, 4561:10, 4564:7, 4565:8
**2006** [43] - 4451:21, 4452:8, 4453:6, 4456:18, 4456:22, 4459:9, 4461:18, 4468:2, 4477:24, 4478:4, 4497:18, 4513:7, 4515:9, 4516:10, 4516:13, 4517:6, 4517:8, 4517:22, 4517:23, 4518:20, 4519:4, 4521:6, 4521:18, 4522:11, 4527:6, 4527:9, 4527:13, 4529:1, 4556:5, 4556:14, 4580:21, 4592:16, 4608:11, 4608:12, 4613:16, 4613:21, 4613:24, 4614:23, 4616:3, 4617:20, 4618:19
**2007** [12] - 4468:2, 4477:12, 4477:21, 4478:9, 4491:18, 4492:16, 4492:20, 4493:1, 4493:14, 4516:10, 4527:12, 4528:24
**2008** [9] - 4481:14, 4482:1, 4499:1, 4500:12, 4500:15,

4511:3, 4511:18, 4555:18, 4558:23
**2009** [43] - 4442:8, 4447:4, 4447:12, 4447:16, 4447:20, 4447:24, 4448:3, 4448:10, 4448:14, 4448:18, 4448:20, 4448:23, 4449:1, 4449:6, 4449:25, 4450:2, 4450:4, 4450:8, 4450:10, 4450:12, 4450:17, 4450:21, 4450:23, 4450:25, 4505:6, 4506:18, 4506:23, 4507:3, 4507:18, 4508:18, 4508:24, 4509:20, 4510:4, 4513:25, 4514:5, 4554:23, 4560:2, 4561:20, 4569:19, 4592:22, 4593:2, 4593:12, 4594:1
**2010** [17] - 4442:8, 4446:16, 4469:4, 4545:19, 4546:16, 4546:20, 4550:11, 4550:21, 4554:19, 4554:22, 4566:13, 4566:23, 4567:22, 4568:3, 4571:9, 4624:16
**2011** [7] - 4439:21, 4440:14, 4442:5, 4445:15, 4469:3, 4624:16, 4624:18
**2012** [5] - 4451:22, 4470:11, 4594:2, 4594:6, 4594:9
**2013** [8] - 4471:1, 4485:25, 4486:1, 4486:4, 4486:19, 4487:1, 4487:25, 4490:19
**2013m** [1] - 4550:13
**2015** [4] - 4434:6, 4541:11, 4541:21, 4542:6
**21** [10] - 4449:13, 4449:15, 4449:17, 4450:17, 4451:20, 4515:9, 4517:6, 4521:18, 4522:11, 4608:12
**214** [2] - 4598:22, 4603:9
**215** [2] - 4610:17, 4612:21
**217** [1] - 4525:25

**218** [2] - 4522:15, 4522:16
**22** [3] - 4434:6, 4447:20, 4508:24
**221** [4] - 4566:9, 4566:12, 4568:11, 4568:13
**222** [4] - 4566:20, 4566:22, 4568:11, 4568:13
**223** [2] - 4556:2, 4563:3
**224** [3] - 4557:16, 4557:23, 4563:3
**225** [3] - 4557:16, 4558:2, 4563:3
**226** [3] - 4557:17, 4558:2, 4563:3
**227** [3] - 4557:17, 4558:2, 4563:3
**228** [2] - 4562:8, 4563:2
**229** [5] - 4473:19, 4475:1, 4475:6, 4475:9, 4475:10
**23** [2] - 4445:15, 4450:25
**230** [2] - 4529:14, 4529:16
**231** [1] - 4569:16
**232** [3] - 4568:22, 4569:7, 4569:8
**233** [3] - 4440:4, 4441:14, 4444:2
**234** [1] - 4445:11
**23rd** [2] - 4569:19, 4625:3
**24** [2] - 4466:19, 4549:10
**24th** [2] - 4500:11, 4500:12
**25** [12] - 4450:10, 4452:15, 4462:8, 4463:13, 4463:22, 4464:7, 4464:12, 4465:8, 4501:14, 4520:1, 4520:2, 4554:19
**25,000** [1] - 4486:24
**250** [1] - 4595:15
**258** [3] - 4460:3, 4520:17, 4589:18
**25th** [2] - 4506:12, 4506:17
**26** [13] - 4436:5, 4436:8, 4436:24, 4447:24, 4506:23, 4507:3, 4507:18, 4517:22, 4544:10, 4548:5, 4549:23,

**4551:1, 4551:15
26,000** [1] - 4587:19
**26-minute** [2] - 4542:2, 4551:3
**265,000** [1] - 4486:7
**27** [7] - 4436:9, 4436:24, 4448:3, 4542:17, 4542:24, 4543:6, 4548:5
**27-minute** [3] - 4436:6, 4542:12, 4544:10
**28** [4] - 4450:21, 4494:24, 4500:15, 4510:13
**28,000** [1] - 4500:22
**287,000** [2] - 4587:6, 4587:14
**29** [3] - 4448:10, 4517:19, 4517:21
**290,000** [1] - 4587:1
**2:00** [2] - 4531:9, 4532:6
**2:10** [1] - 4530:16
**2:25** [1] - 4552:21

### 3

**3** [10] - 4442:14, 4490:23, 4490:25, 4494:7, 4512:25, 4519:13, 4545:19, 4546:16, 4546:24, 4547:2
**30** [5] - 4449:6, 4518:15, 4518:19, 4525:3, 4530:9
**30,000** [1] - 4505:4
**30-day** [1] - 4585:14
**30th** [1] - 4621:11
**31** [6] - 4449:25, 4511:18, 4516:10, 4517:1, 4517:5, 4528:24
**31,528** [1] - 4486:8
**31,528.65** [2] - 4486:5, 4487:13
**31st** [1] - 4492:20
**32** [2] - 4516:6, 4516:7
**33** [5] - 4542:22, 4551:6, 4567:6, 4567:8, 4567:10
**34** [2] - 4567:17, 4568:11
**37** [3] - 4513:21, 4513:22, 4514:3
**375** [1] - 4463:5
**38** [2] - 4513:5, 4513:7
**380** [3] - 4459:13, 4459:16, 4465:17

**39** [3] - 4618:6, 4618:12, 4618:14
**395** [1] - 4459:12

### 4

**4** [8] - 4494:9, 4494:11, 4495:1, 4509:5, 4518:3, 4518:7, 4519:13, 4527:11
**4.2** [1] - 4524:21
**40** [1] - 4618:20
**40,300** [1] - 4506:1
**4438** [1] - 4626:3
**4439** [1] - 4626:3
**4444** [1] - 4626:13
**4475** [1] - 4626:14
**4500** [1] - 4626:4
**4502** [1] - 4439:6
**4533** [1] - 4626:5
**4534** [1] - 4626:6
**4543** [1] - 4626:6
**4549** [1] - 4626:7
**4553** [2] - 4626:8, 4626:9
**4580** [1] - 4626:10
**4:15** [1] - 4606:24
**4:30** [1] - 4619:3

### 5

**5** [25] - 4494:9, 4495:2, 4495:3, 4500:6, 4500:13, 4508:10, 4518:20, 4557:4, 4569:24, 4580:15, 4581:15, 4581:18, 4581:21, 4594:16, 4602:23, 4603:3, 4611:1, 4613:10, 4613:15, 4614:16, 4617:4, 4617:9, 4617:17, 4617:20, 4617:21
**50** [3] - 4463:15, 4463:21, 4567:13
**50,000** [1] - 4510:4
**50-page** [1] - 4525:22
**55** [2] - 4512:21, 4512:23
**56** [4] - 4436:9, 4542:21, 4551:6, 4593:20
**57** [1] - 4551:5
**57-minute** [1] - 4549:11

### 6

**6** [2] - 4450:23,

**4496:19
62** [2] - 4527:2, 4527:22
**631** [1] - 4434:23
**650,000** [1] - 4496:14
**6th** [1] - 4513:25

### 7

**7** [7] - 4449:9, 4449:19, 4491:8, 4496:20, 4509:20, 4510:4, 4614:5
**7/11/08** [1] - 4502:4
**7/21/05** [1] - 4495:20
**7/22/05** [1] - 4495:20
**70** [2] - 4515:5, 4515:9
**712-6108** [1] - 4434:23
**712-6124** [1] - 4434:23
**71905** [1] - 4495:9
**767** [3] - 4446:11, 4446:13, 4451:4
**77** [2] - 4524:7, 4524:9
**7:15** [1] - 4474:23
**7th** [1] - 4498:24

### 8

**8** [9] - 4448:14, 4474:7, 4474:18, 4474:23, 4485:23, 4486:1, 4496:21, 4613:8, 4613:9
**80** [1] - 4559:18
**82** [3] - 4555:3, 4555:6, 4563:4
**83** [2] - 4554:14, 4563:4
**84** [2] - 4553:10, 4553:23
**85** [3] - 4553:9, 4553:24, 4554:11
**89,000** [1] - 4586:20

### 9

**9** [3] - 4497:4, 4521:1, 4555:18
**9080** [3] - 4603:24, 4604:2, 4619:18
**97** [1] - 4563:14
**9:30** [4] - 4619:8, 4619:10, 4624:22, 4625:3
**9:50** [1] - 4434:6

### A

**a.m** [2] - 4474:23, 4625:3
**a/k/a** [2] - 4434:5,

4434:6
**Aaron** [1] - 4463:1
**abandoned** [1] - 4479:10
**ability** [1] - 4561:18
**able** [15] - 4443:4, 4462:19, 4462:20, 4464:22, 4468:6, 4473:21, 4480:22, 4487:9, 4487:10, 4500:15, 4503:13, 4528:12, 4542:2, 4545:24, 4559:4
**Aboud** [1] - 4599:6
**absence** [3] - 4435:3, 4533:10, 4541:2
**absolutely** [1] - 4488:4
**academic** [1] - 4576:22
**access** [4] - 4491:15, 4497:20, 4547:10, 4574:13
**accessible** [1] - 4503:19
**acclimate** [3] - 4438:24, 4503:22, 4559:24
**accommodated** [1] - 4503:11
**accompanies** [1] - 4515:16
**according** [1] - 4468:19
**account** [47] - 4446:6, 4448:5, 4448:19, 4449:10, 4449:12, 4449:14, 4449:18, 4449:20, 4449:24, 4450:1, 4450:3, 4450:11, 4451:1, 4456:8, 4456:9, 4457:21, 4458:1, 4458:12, 4458:15, 4459:17, 4465:24, 4466:1, 4470:4, 4471:18, 4495:21, 4498:19, 4500:21, 4500:25, 4501:22, 4502:5, 4507:4, 4507:5, 4509:21, 4509:23, 4510:5, 4510:7, 4511:4, 4511:5, 4511:19, 4511:20, 4521:9, 4527:20, 4565:19, 4565:21, 4566:7, 4585:23, 4596:18
**accounting** [2] - 4528:11, 4559:2

**accounts** [14] - 4488:19, 4512:7, 4555:12, 4556:21, 4585:24, 4591:8, 4591:14, 4591:15, 4591:16, 4591:22, 4592:1, 4592:2, 4596:23
**accruing** [1] - 4469:13
**accumulation** [1] - 4587:11
**accurate** [29] - 4441:9, 4441:12, 4474:21, 4485:1, 4494:7, 4495:8, 4504:18, 4513:1, 4513:17, 4515:1, 4516:14, 4517:13, 4518:10, 4519:5, 4522:10, 4524:2, 4526:22, 4529:10, 4530:3, 4531:25, 4543:10, 4560:15, 4563:4, 4563:23, 4568:14, 4587:10, 4587:16, 4587:23, 4598:19
**accurately** [10] - 4495:5, 4497:5, 4504:14, 4505:21, 4508:3, 4542:11, 4545:3, 4559:10, 4561:14, 4562:6
**accusation** [1] - 4509:24
**accusations** [1] - 4574:9
**accuse** [1] - 4572:15
**accused** [1] - 4572:21
**accuses** [1] - 4623:22
**acknowledgement** [1] - 4458:19
**acknowledges** [1] - 4515:18
**acknowledgment** [4] - 4514:16, 4570:5, 4585:13, 4609:24
**acquire** [10] - 4441:5, 4461:2, 4474:25, 4530:9, 4541:25, 4554:5, 4560:23, 4563:8, 4567:12, 4568:17
**acquired** [5] - 4465:5, 4491:22, 4520:17, 4563:9, 4568:25
**acquiring** [3] - 4485:15, 4485:17, 4555:24
**acquisition** [3] - 4467:13, 4608:16,

4615:8
**acquisitions** [1] - 4590:8
**acre** [3] - 4460:3, 4494:24, 4497:19
**acres** [1] - 4589:18
**actively** [1] - 4616:1
**activities** [1] - 4518:23
**activity** [1] - 4509:25
**add** [2] - 4437:13, 4579:6
**added** [3] - 4526:16, 4526:19, 4565:14
**addition** [6] - 4492:7, 4492:10, 4493:6, 4493:15, 4582:1, 4603:5
**additional** [6] - 4437:15, 4505:13, 4520:17, 4565:22, 4575:7, 4579:6
**address** [6] - 4435:13, 4469:12, 4527:7, 4529:12, 4621:13
**addressed** [1] - 4435:14
**addressing** [1] - 4435:16
**adjacent** [2] - 4460:2, 4523:6
**adjourned** [1] - 4625:2
**admission** [1] - 4604:2
**admitted** [5] - 4444:3, 4444:16, 4475:9, 4605:16, 4624:21
**advance** [4] - 4498:25, 4502:12, 4502:13, 4524:14
**advanced** [3] - 4500:16, 4502:9, 4517:8
**advances** [2] - 4504:7, 4514:9
**adverse** [1] - 4590:7
**advised** [1] - 4445:23
**advises** [1] - 4509:9
**advisor** [4] - 4583:19, 4586:1, 4600:18, 4600:20
**Advisors** [3] - 4505:1, 4512:24, 4513:2
**afoul** [1] - 4540:13
**afraid** [1] - 4453:13
**afternoon** [3] - 4546:12, 4578:2, 4579:11
**afterwards** [1] - 4550:23
**Aftrak** [1] - 4448:24

**agent** [3] - 4487:6, 4490:17, 4529:1
**agitated** [1] - 4479:21
**ago** [4] - 4465:18, 4473:16, 4482:23, 4496:24
**agree** [11] - 4480:3, 4576:9, 4580:7, 4580:11, 4580:14, 4581:1, 4586:8, 4597:16, 4614:14, 4623:13, 4623:16
**agreed** [12] - 4453:22, 4454:16, 4456:18, 4458:22, 4460:11, 4462:16, 4471:11, 4518:9, 4559:7, 4564:12, 4572:3
**Agreement** [2] - 4563:25, 4564:2
**agreement** [76] - 4452:13, 4452:17, 4456:15, 4456:17, 4458:17, 4458:21, 4459:1, 4459:6, 4459:10, 4459:24, 4460:20, 4461:3, 4462:5, 4462:13, 4463:9, 4470:15, 4470:17, 4470:23, 4491:14, 4492:9, 4496:4, 4497:16, 4498:1, 4512:24, 4513:2, 4513:10, 4515:12, 4515:19, 4515:21, 4516:12, 4517:5, 4517:7, 4517:10, 4517:14, 4517:21, 4518:5, 4518:11, 4518:20, 4518:24, 4519:2, 4519:6, 4519:13, 4519:19, 4520:6, 4520:22, 4522:17, 4522:20, 4522:24, 4524:4, 4524:20, 4525:6, 4526:15, 4526:23, 4529:17, 4529:19, 4530:4, 4556:4, 4556:8, 4556:25, 4557:12, 4557:14, 4564:20, 4565:12, 4567:14, 4590:16, 4590:17, 4594:13, 4598:9, 4601:9, 4603:10, 4608:19, 4622:6, 4622:8
**agreements** [4] - 4459:2, 4459:7,

4595:20, 4596:25
**agrees** [1] - 4621:3
**ahead** [5] - 4438:21, 4484:6, 4541:3, 4562:3, 4585:10
**Air** [5] - 4563:24, 4564:1, 4565:9, 4565:15, 4569:9
**aircraft** [5] - 4480:23, 4481:2, 4563:22, 4564:17, 4569:3
**airplane** [4] - 4448:16, 4474:16, 4479:13, 4564:10
**AKAs** [1] - 4435:8
**Alan** [2] - 4515:13, 4528:8
**alert** [3] - 4435:13, 4437:17, 4483:18
**alerting** [1] - 4515:11
**alive** [1] - 4475:20
**ALL** [1] - 4619:12
**allegation** [3] - 4511:7, 4511:10, 4511:22
**allegations** [2] - 4510:15, 4566:16
**alleged** [4] - 4566:16, 4614:16, 4614:18, 4624:16
**alleges** [1] - 4507:1
**Alliance** [2] - 4450:1, 4450:3
**allowed** [3] - 4458:18, 4520:7, 4536:2
**allowing** [1] - 4526:12
**alluded** [1] - 4477:10
**almost** [3] - 4477:23, 4573:1, 4618:20
**alter** [1] - 4575:10
**alternate** [1] - 4621:10
**America** [8] - 4449:20, 4450:11, 4486:13, 4507:6, 4511:15, 4512:6, 4554:18, 4581:7
**AMERICA** [1] - 4434:3
**American** [1] - 4508:25
**amount** [7] - 4490:21, 4496:1, 4500:22, 4503:13, 4557:4, 4612:5, 4616:12
**amplify** [2] - 4623:20, 4623:24
**analogy** [1] - 4544:14
**Angeles** [3] - 4447:9, 4509:23, 4510:7
**Ann** [1] - 4434:21
**annual** [1] - 4580:25

**Answer** [2] - 4439:12, 4439:18
**answer** [6] - 4523:17, 4531:17, 4536:25, 4562:3, 4583:11, 4587:11
**answers** [3] - 4534:20, 4534:21, 4536:14
**anticipate** [1] - 4534:6
**anticipation** [1] - 4586:9
**anyway** [1] - 4476:22
**apologize** [6] - 4494:15, 4501:14, 4503:15, 4587:12, 4612:11, 4614:12
**appear** [4] - 4516:20, 4519:15, 4519:22, 4606:13
**APPEARANCES** [1] - 4434:11
**Appearances** [1] - 4435:1
**appraisal** [4] - 4524:11, 4524:22, 4525:20, 4525:21
**appraised** [1] - 4524:19
**appreciate** [1] - 4532:5
**approach** [4] - 4503:9, 4533:22, 4604:12, 4609:11
**approached** [1] - 4571:22
**appropriate** [2] - 4523:25, 4530:14
**appropriated** [1] - 4446:20
**approve** [2] - 4513:11, 4524:12
**approximate** [4] - 4454:11, 4454:20, 4569:24, 4589:3
**April** [13] - 4440:14, 4442:5, 4486:1, 4486:3, 4486:4, 4492:25, 4498:24, 4499:1, 4500:11, 4500:12, 4500:15, 4512:24, 4624:17
**arbitration** [2] - 4494:1, 4587:25
**Architects** [1] - 4447:21
**architecture** [1] - 4455:24
**area** [3] - 4606:25, 4608:4, 4619:4
**areas** [1] - 4576:8

**arisen** [1] - 4518:22
**Arizona** [34] - 4447:13, 4447:17, 4448:4, 4449:10, 4449:14, 4449:18, 4455:19, 4468:23, 4505:7, 4505:18, 4506:11, 4507:6, 4511:5, 4511:6, 4511:20, 4511:21, 4514:5, 4543:25, 4545:23, 4548:16, 4569:20, 4569:24, 4571:5, 4575:3, 4586:24, 4602:6, 4603:3, 4603:8, 4603:12, 4603:13, 4603:15, 4604:3, 4614:18, 4619:21
**arranged** [2] - 4481:23, 4585:20
**arrangement** [2] - 4453:22, 4458:15
**arrangements** [1] - 4457:9
**arranging** [1] - 4582:24
**arrears** [1] - 4469:16
**arrest** [5] - 4460:25, 4461:2, 4522:7, 4553:21, 4596:1
**arrived** [2] - 4477:19, 4545:22
**article** [2] - 4526:16, 4526:19
**articulate** [2] - 4596:16, 4608:21
**articulating** [1] - 4608:15
**artifice** [8] - 4471:21, 4472:2, 4488:5, 4489:7, 4507:20, 4510:20, 4510:24, 4559:12
**aspect** [1] - 4452:20
**asserted** [1] - 4624:9
**asset** [1] - 4476:25
**assets** [7] - 4454:25, 4455:1, 4487:3, 4503:4, 4503:7, 4503:12, 4503:15
**assigned** [1] - 4605:3
**assist** [2] - 4493:5, 4561:18
**assistance** [4] - 4445:1, 4515:10, 4521:19, 4615:8
**assistant** [2] - 4493:6, 4585:12
**assistants** [1] - 4467:6

**assisting** [2] - 4490:15, 4556:7
**associate** [1] - 4483:1
**associated** [1] - 4493:8
**assume** [2] - 4437:7, 4577:3
**assumed** [1] - 4535:16
**assuming** [2] - 4537:22, 4539:10
**attach** [1] - 4504:10
**attached** [3] - 4522:13, 4555:5, 4555:16
**attempt** [3] - 4524:13, 4538:2, 4549:13
**attempted** [1] - 4596:22
**attempting** [2] - 4481:15, 4512:5
**attempts** [1] - 4575:10
**attended** [1] - 4466:3
**Attorney** [1] - 4434:13
**attorney** [13] - 4447:17, 4450:15, 4457:4, 4462:14, 4462:16, 4467:5, 4482:2, 4488:14, 4493:21, 4524:6, 4569:20, 4571:15, 4573:23
**Attorneys** [1] - 4434:16
**attorneys** [7] - 4447:6, 4488:22, 4488:24, 4488:25, 4490:22, 4571:16, 4609:9
**attributed** [1] - 4601:22
**attributing** [3] - 4616:11, 4616:14, 4616:19
**audio** [1] - 4551:13
**August** [32] - 4449:19, 4449:23, 4449:25, 4453:6, 4454:4, 4454:11, 4456:18, 4456:22, 4459:8, 4461:18, 4497:18, 4516:13, 4517:23, 4518:20, 4521:6, 4525:14, 4527:9, 4545:19, 4546:16, 4546:20, 4546:24, 4547:2, 4548:15, 4550:1, 4550:5, 4550:11, 4550:21, 4558:15, 4561:3, 4571:9, 4593:12
**authentic** [1] -

4606:18
**authenticate** [3] - 4483:22, 4536:24, 4552:2
**authenticated** [2] - 4512:11, 4543:2
**authenticates** [1] - 4537:22
**authenticating** [1] - 4604:2
**authentication** [2] - 4436:23, 4440:17
**authenticity** [3] - 4539:4, 4543:6, 4576:5
**authority** [4] - 4458:21, 4470:19, 4520:23, 4594:22
**authorization** [2] - 4458:9, 4536:1
**authorizing** [1] - 4458:10
**automobile** [1] - 4509:3
**available** [9] - 4456:19, 4462:21, 4463:5, 4478:16, 4503:11, 4604:5, 4620:17, 4620:18, 4622:1
**Avalon** [3] - 4449:20, 4450:11, 4503:6
**avoid** [1] - 4498:7
**aware** [14] - 4444:24, 4445:12, 4469:6, 4484:1, 4496:16, 4509:6, 4574:8, 4594:23, 4594:25, 4595:3, 4595:6, 4620:13, 4621:1, 4624:6
**awareness** [1] - 4458:25
**axis** [5] - 4497:20, 4504:22, 4505:3, 4505:4, 4505:25
**Ayers** [1] - 4569:14
**AZ** [8] - 4450:9, 4450:18, 4558:4, 4558:5, 4558:7, 4558:14, 4560:8

**B**

**backs** [1] - 4617:9
**Bahti** [1] - 4481:1
**bail** [1] - 4605:13
**Baja** [3] - 4474:13, 4495:16, 4618:19
**Baker** [1] - 4569:20

**baker** [2] - 4570:2, 4570:17
**baker's** [1] - 4570:12
**balance** [2] - 4527:20, 4614:4
**Bank** [23] - 4447:21, 4448:4, 4448:11, 4449:9, 4449:14, 4449:18, 4449:19, 4449:24, 4450:1, 4450:3, 4463:2, 4467:18, 4507:6, 4510:6, 4511:6, 4511:15, 4512:6, 4554:18, 4563:20, 4564:24, 4565:4, 4592:15, 4592:24
**bank** [57] - 4448:4, 4448:19, 4449:10, 4449:12, 4449:14, 4449:18, 4449:20, 4449:24, 4450:1, 4450:3, 4450:10, 4451:1, 4456:8, 4456:9, 4457:20, 4458:10, 4458:12, 4458:15, 4459:17, 4465:24, 4470:4, 4489:4, 4489:22, 4497:9, 4500:18, 4507:4, 4509:23, 4510:7, 4511:13, 4511:19, 4511:25, 4512:1, 4512:6, 4514:13, 4521:7, 4544:16, 4544:20, 4555:10, 4555:11, 4555:12, 4564:3, 4564:5, 4564:13, 4564:19, 4564:25, 4565:6, 4565:19, 4565:21, 4585:22, 4591:8, 4591:14, 4591:15, 4591:16, 4592:1, 4601:2, 4601:4
**bankers** [1] - 4555:14
**Banking** [1] - 4489:5
**banking** [2] - 4492:17, 4555:15
**banks** [2] - 4488:17, 4488:18
**bar** [1] - 4441:16
**base** [1] - 4440:11
**based** [9] - 4468:3, 4470:23, 4501:10, 4534:11, 4536:22, 4536:23, 4559:6, 4594:21, 4623:8
**basis** [6] - 4459:18,

4496:1, 4502:16, 4502:17, 4503:10, 4556:23
**Beach** [3] - 4467:22, 4468:4, 4468:6
**beach** [3] - 4468:13, 4498:4, 4505:11
**bear** [3] - 4516:1, 4523:20, 4563:2
**bears** [2] - 4522:2, 4558:10
**became** [4] - 4477:25, 4492:20, 4492:21, 4528:24
**become** [4] - 4453:8, 4472:1, 4518:4, 4603:14
**becomes** [1] - 4535:8
**becoming** [1] - 4464:1
**bedroom** [1] - 4480:7
**BEFORE** [1] - 4434:10
**began** [7] - 4467:18, 4472:15, 4504:6, 4542:1, 4581:6, 4581:16, 4592:14
**begin** [3] - 4468:15, 4578:2, 4581:14
**beginning** [5] - 4442:8, 4468:2, 4561:3, 4581:2, 4581:8
**behalf** [7] - 4454:4, 4478:1, 4492:12, 4511:12, 4523:10, 4523:15, 4594:14, 4603:1, 4611:16
**behavior** [1] - 4606:20
**behind** [4] - 4454:19, 4454:20, 4475:17, 4525:22
**Behnke** [7] - 4476:9, 4476:11, 4476:12, 4481:7, 4482:16, 4569:14
**belabor** [2] - 4492:13, 4507:23
**belaboring** [1] - 4473:8
**belief** [8] - 4436:21, 4442:23, 4445:6, 4445:22, 4554:8, 4554:12, 4623:25, 4624:3
**bell** [1] - 4507:12
**Bellingham** [1] - 4509:12
**belly** [1] - 4588:10
**belonging** [1] - 4588:16
**below** [2] - 4510:16,

4511:2
**bench** [1] - 4572:9
**beneficial** [1] - 4531:8
**benefit** [4] - 4445:3, 4458:11, 4561:22, 4571:17
**Benito** [3] - 4475:17, 4475:24, 4475:25
**Berard** [39] - 4452:13, 4452:17, 4461:6, 4461:14, 4461:16, 4461:18, 4461:23, 4462:10, 4462:12, 4462:14, 4462:18, 4463:6, 4463:8, 4464:1, 4466:11, 4470:13, 4470:18, 4471:11, 4471:13, 4471:25, 4472:3, 4482:25, 4483:1, 4487:13, 4488:6, 4510:20, 4545:21, 4547:24, 4551:17, 4566:13, 4566:18, 4566:23, 4566:25, 4567:1, 4567:23, 4568:7, 4568:15, 4575:2, 4575:3
**Berard's** [8] - 4462:3, 4462:25, 4463:19, 4465:20, 4470:5, 4471:3, 4485:4, 4487:15
**best** [17] - 4440:17, 4455:23, 4476:21, 4481:8, 4482:18, 4494:11, 4495:7, 4498:10, 4503:16, 4542:10, 4543:5, 4550:6, 4557:10, 4560:20, 4572:17, 4589:6, 4621:16
**Betesh** [7] - 4457:4, 4465:25, 4466:4, 4466:7, 4466:22, 4467:5, 4467:9
**Betesh's** [1] - 4466:1
**Better** [35] - 4451:16, 4452:8, 4452:9, 4452:16, 4452:22, 4455:21, 4457:1, 4457:10, 4461:7, 4461:17, 4462:5, 4462:21, 4463:7, 4463:9, 4463:12, 4463:16, 4464:3, 4464:13, 4465:6, 4465:17, 4465:21, 4465:23, 4466:5, 4467:12, 4467:16,

4470:11, 4470:20, 4470:23, 4472:2, 4510:14, 4531:16, 4567:14, 4567:25, 4575:16
**better** [4] - 4437:16, 4461:8, 4570:23, 4577:11
**between** [38] - 4445:15, 4451:21, 4455:22, 4464:20, 4473:6, 4474:5, 4477:4, 4477:8, 4481:15, 4496:4, 4513:2, 4515:13, 4516:12, 4517:7, 4517:10, 4517:22, 4518:20, 4522:18, 4525:6, 4525:7, 4526:7, 4529:17, 4537:7, 4540:7, 4542:7, 4542:16, 4543:7, 4545:18, 4546:4, 4550:4, 4570:19, 4571:15, 4575:19, 4585:5, 4589:6, 4595:1, 4611:18, 4612:18
**beyond** [1] - 4583:25
**BIANCO** [1] - 4434:10
**Big** [8] - 4485:5, 4485:7, 4485:14, 4589:19, 4589:20, 4589:22, 4591:23, 4592:3
**big** [6] - 4476:23, 4485:21, 4486:14, 4491:15, 4524:9, 4622:10
**biggest** [1] - 4524:11
**bill** [1] - 4509:1
**Bill** [11] - 4477:19, 4515:10, 4521:18, 4609:1, 4615:16, 4615:17, 4615:25, 4616:1, 4616:17, 4616:21, 4617:19
**bills** [2] - 4506:13, 4508:23
**binder** [1] - 4522:17
**binders** [1] - 4513:14
**biohazards** [1] - 4522:25
**bit** [1] - 4538:23
**blame** [1] - 4588:4
**blames** [1] - 4588:13
**block** [1] - 4505:25
**board** [2] - 4479:25, 4558:25
**Bob** [4] - 4475:17,

4476:2, 4476:3, 4535:17
**books** [12] - 4491:25, 4492:14, 4493:12, 4493:15, 4493:18, 4501:3, 4501:8, 4559:1, 4559:9, 4559:14, 4559:16, 4561:14
**boom** [2] - 4581:2, 4581:8
**borrow** [2] - 4508:12, 4508:14
**borrowed** [4] - 4508:23, 4613:16, 4618:16, 4618:17
**borrowing** [3] - 4505:14, 4586:6, 4596:17
**bottom** [3] - 4514:21, 4537:20, 4614:21
**box** [1] - 4539:8
**boxes** [2] - 4587:24
**brand** [1] - 4470:17
**brand-new** [1] - 4470:17
**break** [9] - 4437:12, 4437:22, 4483:7, 4483:8, 4530:15, 4578:2, 4579:11, 4619:7, 4621:24
**breath** [1] - 4572:25
**Brian** [2] - 4461:6, 4462:10
**brief** [1] - 4455:23
**briefly** [1] - 4543:17
**bring** [5] - 4438:3, 4483:16, 4552:10, 4579:18, 4600:15
**bringing** [1] - 4616:2
**Brooklyn** [1] - 4434:14
**brother** [1] - 4477:18
**brother-in-law** [1] - 4477:18
**Brothers** [43] - 4453:6, 4454:10, 4456:17, 4456:22, 4458:23, 4459:8, 4459:19, 4459:25, 4460:1, 4460:4, 4460:6, 4461:19, 4461:23, 4462:23, 4477:25, 4479:16, 4479:23, 4481:1, 4497:17, 4513:12, 4515:15, 4515:17, 4516:13, 4517:11, 4517:24, 4521:9, 4522:18, 4522:24, 4523:3, 4523:18, 4524:13,

4528:6, 4529:19, 4557:7, 4588:10, 4609:5, 4609:9, 4610:9, 4611:7, 4611:19, 4614:3, 4616:9, 4616:12
**brothers** [1] - 4523:9
**Brothers'** [1] - 4527:8
**brought** [2] - 4435:15, 4552:11
**Bruton** [1] - 4624:11
**Bryan** [13] - 4471:3, 4471:25, 4472:3, 4482:25, 4483:1, 4487:13, 4488:6, 4510:20, 4566:12, 4566:23, 4566:25, 4567:23, 4568:14
**bubble** [1] - 4588:12
**buddy** [2] - 4475:19, 4476:6
**build** [1] - 4464:18
**building** [3] - 4485:19, 4613:21
**bullet** [1] - 4615:20
**bunch** [1] - 4544:16
**burst** [1] - 4588:12
**business** [10] - 4472:13, 4472:15, 4472:17, 4472:19, 4472:25, 4473:13, 4480:4, 4493:8, 4589:10, 4589:14
**buy** [3] - 4454:12, 4461:12, 4503:18
**buyers'** [2] - 4466:9, 4466:10
**buying** [1] - 4527:12
**buyout** [1] - 4454:18
**BY** [32] - 4439:5, 4444:21, 4446:3, 4470:1, 4475:14, 4484:8, 4495:4, 4500:2, 4541:7, 4543:20, 4549:5, 4553:7, 4563:1, 4570:15, 4573:13, 4580:4, 4585:1, 4596:8, 4598:3, 4598:16, 4599:9, 4608:6, 4609:14, 4609:17, 4611:13, 4612:3, 4626:4, 4626:5, 4626:7, 4626:8, 4626:9, 4626:10
**bylaw** [1] - 4459:10
**bylaws** [6] - 4459:6, 4520:2, 4520:3, 4520:19, 4526:5,

4526:12

# C

**Cabin** [1] - 4448:15
**Cabo** [22] - 4474:2, 4474:14, 4476:4, 4476:14, 4477:14, 4478:16, 4478:20, 4478:22, 4479:12, 4482:22, 4483:2, 4569:11, 4580:21, 4597:10, 4600:7, 4601:11, 4614:3, 4614:8, 4614:9, 4618:4, 4618:6, 4618:20
**calculated** [1] - 4612:4
**calculation** [1] - 4504:9
**California** [9] - 4467:23, 4468:4, 4468:13, 4482:12, 4498:4, 4505:11, 4509:23, 4510:7, 4527:7
**canceled** [1] - 4453:18
**candid** [1] - 4537:4
**candidly** [1] - 4535:4
**cannot** [2] - 4442:4, 4536:11
**capacity** [1] - 4493:2
**Capital** [1] - 4561:20
**capital** [14] - 4464:8, 4464:14, 4465:9, 4465:12, 4471:3, 4471:14, 4487:16, 4491:10, 4527:17, 4527:20, 4561:19, 4564:14, 4612:15, 4612:25
**car** [6] - 4475:17, 4489:10, 4489:15, 4544:21, 4571:11, 4572:5
**card** [1] - 4508:23
**care** [2] - 4505:16, 4509:3
**career** [1] - 4600:17
**careful** [1] - 4586:4
**case** [25] - 4451:11, 4455:8, 4483:9, 4484:10, 4484:16, 4530:16, 4570:2, 4572:1, 4579:12, 4586:18, 4588:3, 4589:7, 4590:7, 4593:8, 4602:7, 4602:8, 4602:11,

4603:19, 4605:3, 4605:7, 4605:16, 4606:8, 4606:15, 4619:9, 4619:10
**cases** [1] - 4596:18
**cash** [20] - 4469:9, 4479:17, 4486:20, 4488:15, 4488:24, 4489:17, 4489:19, 4490:14, 4490:21, 4502:16, 4503:9, 4503:10, 4503:14, 4525:9, 4525:13, 4527:16, 4527:19, 4565:18, 4565:22
**CAT** [1] - 4434:25
**category** [1] - 4440:18
**caused** [2] - 4486:6, 4523:2
**CD** [4] - 4547:13, 4576:12, 4576:15, 4576:24
**Central** [2] - 4434:4, 4434:22
**century** [2] - 4509:23, 4510:7
**certain** [7] - 4451:24, 4472:12, 4488:9, 4521:21, 4599:15, 4612:13, 4624:13
**certainly** [3] - 4437:20, 4440:20, 4593:19
**certificates** [2] - 4466:9, 4466:11
**cetera** [3] - 4606:14, 4610:14
**challenge** [1] - 4475:20
**chance** [3] - 4543:9, 4552:18, 4577:11
**change** [1] - 4570:1
**characterize** [2] - 4482:8, 4502:13
**charge** [4] - 4435:10, 4493:12, 4546:9, 4559:1
**charged** [2] - 4588:21, 4612:13
**charges** [4] - 4509:18, 4510:2, 4588:7, 4588:15
**Charles** [1] - 4509:11
**chart** [55] - 4484:20, 4484:22, 4484:25, 4485:4, 4485:24, 4489:24, 4490:2, 4490:23, 4494:6, 4494:9, 4494:11, 4494:14, 4494:17,

4495:1, 4495:5, 4495:6, 4495:21, 4496:10, 4496:19, 4496:20, 4496:21, 4497:3, 4497:4, 4497:5, 4497:6, 4498:5, 4498:7, 4498:9, 4498:16, 4500:9, 4500:19, 4501:18, 4501:19, 4502:4, 4503:20, 4503:22, 4504:12, 4504:14, 4504:16, 4505:20, 4505:22, 4506:8, 4507:19, 4507:22, 4507:24, 4508:1, 4508:4, 4508:7, 4509:13, 4509:16, 4611:21
**charts** [4] - 4484:10, 4484:12, 4484:14, 4507:23
**Chase** [1] - 4447:21
**check** [10] - 4469:20, 4554:18, 4554:21, 4554:24, 4555:1, 4583:8, 4583:14, 4583:16, 4583:24, 4583:25
**checking** [1] - 4526:18
**checks** [1] - 4496:8
**chief** [3] - 4524:17, 4558:24, 4560:21
**Chris** [7] - 4453:4, 4461:13, 4485:17, 4490:11, 4513:8, 4513:19, 4610:11
**Christopher** [1] - 4524:10
**circle** [2] - 4519:8, 4519:11
**circulating** [1] - 4548:14
**circumstance** [1] - 4536:18
**circumstances** [8] - 4455:17, 4471:20, 4486:6, 4511:23, 4514:2, 4536:25, 4539:6, 4558:20
**Citi** [1] - 4509:1
**Citizens** [1] - 4510:6
**citizenship** [3] - 4605:9, 4605:11, 4620:1
**City** [1] - 4453:17
**city** [1] - 4529:12
**civil** [2] - 4570:9, 4570:21

**claim** [5] - 4594:12, 4594:21, 4605:9, 4606:17, 4620:1
**claimed** [1] - 4567:13
**claims** [3] - 4605:8, 4605:12, 4620:1
**clarify** [2] - 4437:13, 4602:20
**clarity** [1] - 4566:14
**clauses** [1] - 4516:11
**clear** [3] - 4534:3, 4538:13, 4559:14
**clearance** [1] - 4539:15
**CLERK** [6] - 4483:13, 4484:3, 4579:16, 4579:19, 4621:12, 4621:15
**clerk** [2] - 4435:7, 4435:13
**client** [37] - 4436:13, 4436:17, 4436:19, 4437:13, 4440:11, 4442:18, 4451:11, 4466:21, 4483:21, 4500:3, 4501:12, 4512:13, 4530:21, 4531:15, 4534:8, 4534:11, 4534:17, 4534:25, 4535:25, 4536:3, 4536:5, 4536:7, 4536:15, 4536:16, 4536:17, 4536:18, 4536:20, 4536:22, 4537:9, 4537:11, 4538:25, 4575:15, 4576:13, 4596:22, 4612:18
**client's** [2] - 4538:4, 4555:24
**clients** [46] - 4439:14, 4439:19, 4442:25, 4443:3, 4445:16, 4445:23, 4451:5, 4459:1, 4459:3, 4459:4, 4460:10, 4488:3, 4489:8, 4498:18, 4501:11, 4507:15, 4507:20, 4523:16, 4523:19, 4525:7, 4529:3, 4554:4, 4555:25, 4559:12, 4560:4, 4561:23, 4562:7, 4570:11, 4570:20, 4582:17, 4588:8, 4588:16, 4593:4, 4594:14, 4595:13, 4599:21, 4601:4, 4609:6, 4610:5,

4610:13, 4610:19, 4612:5, 4612:25, 4613:5, 4615:7, 4624:6
**clients'** [1] - 4559:14
**close** [7] - 4456:23, 4466:6, 4468:23, 4491:18, 4491:21, 4494:24, 4580:20
**closed** [5] - 4452:25, 4453:24, 4524:20, 4528:5, 4539:3
**closing** [47] - 4453:6, 4453:15, 4454:15, 4456:21, 4457:2, 4457:6, 4457:11, 4458:23, 4459:25, 4461:18, 4461:22, 4462:23, 4462:24, 4465:25, 4466:3, 4466:4, 4466:14, 4466:18, 4467:1, 4467:8, 4468:5, 4474:2, 4474:14, 4492:6, 4497:17, 4513:10, 4516:13, 4517:24, 4518:1, 4518:6, 4518:23, 4520:16, 4521:9, 4521:23, 4522:17, 4523:3, 4523:9, 4524:6, 4524:15, 4524:19, 4525:15, 4525:17, 4527:9, 4580:21, 4614:3, 4614:8, 4614:9
**closings** [1] - 4467:3
**closure** [1] - 4593:13
**CM** [1] - 4434:20
**CMG** [8] - 4495:19, 4495:22, 4497:11, 4498:19, 4500:20, 4500:21, 4500:23, 4501:22
**Coast** [4] - 4466:2, 4466:15, 4466:20, 4467:21
**Code** [1] - 4538:24
**code** [1] - 4529:12
**collateral** [4] - 4462:22, 4463:3, 4512:7, 4567:3
**collect** [1] - 4594:22
**collected** [3] - 4610:18, 4611:21, 4612:24
**collection** [1] - 4612:15
**column** [1] - 4446:19
**comanager** [1] -

4462:7
**coming** [2] - 4538:17, 4574:22
**commenced** [1] - 4614:15
**comment** [1] - 4611:10
**commentary** [3] - 4440:12, 4544:13, 4611:11
**commenting** [1] - 4562:9
**commerce** [2] - 4507:4, 4511:2
**Commission** [2] - 4489:5, 4587:21
**commitment** [2] - 4461:17, 4616:1
**commitments** [1] - 4459:20
**committed** [1] - 4470:6
**common** [2] - 4502:11, 4503:2
**communicate** [4] - 4473:17, 4536:3, 4536:11, 4536:12
**communicated** [4] - 4463:1, 4537:12, 4538:13, 4624:2
**communication** [14] - 4472:19, 4472:24, 4474:22, 4477:5, 4477:22, 4478:1, 4478:4, 4478:12, 4480:10, 4511:1, 4536:12, 4536:13, 4537:6, 4571:4
**communications** [4] - 4455:12, 4472:22, 4478:3, 4538:4
**community** [2] - 4460:6, 4485:18
**companies** [2] - 4524:11, 4588:25
**Company** [4] - 4452:9, 4457:10, 4563:24, 4567:25
**company** [24] - 4452:10, 4457:10, 4457:22, 4459:7, 4474:15, 4492:7, 4492:12, 4504:4, 4515:14, 4515:19, 4527:10, 4529:21, 4554:7, 4555:20, 4557:24, 4560:7, 4561:18, 4572:3, 4584:4, 4589:15, 4613:7, 4617:16,

4617:18, 4618:19
**compare** [1] - 4544:15
**comparing** [1] - 4544:15
**complete** [21] - 4436:18, 4436:20, 4441:9, 4441:12, 4474:21, 4511:14, 4515:1, 4516:14, 4517:11, 4517:13, 4518:10, 4519:5, 4522:10, 4524:2, 4525:19, 4526:22, 4529:10, 4531:25, 4563:4, 4563:23, 4568:14
**completed** [2] - 4561:4, 4561:19
**completely** [1] - 4542:12
**completes** [1] - 4538:7
**completion** [5] - 4459:8, 4463:4, 4466:4, 4560:10, 4616:2
**comply** [1] - 4605:6
**compound** [1] - 4596:5
**computer** [2] - 4537:15, 4587:6
**concern** [3] - 4462:19, 4538:21, 4622:16
**concerned** [2] - 4533:21, 4534:22
**concerning** [7] - 4435:23, 4445:7, 4453:2, 4471:25, 4472:8, 4477:9, 4498:16
**concerns** [1] - 4533:17
**conclude** [1] - 4621:19
**concluded** [14] - 4435:19, 4436:12, 4436:15, 4442:7, 4443:20, 4523:18, 4539:2, 4540:20, 4547:4, 4605:4, 4605:5, 4606:19, 4607:4
**conclusion** [6] - 4483:18, 4483:23, 4484:9, 4484:16, 4557:7, 4579:9
**condition** [1] - 4523:8
**condominiums** [1] - 4496:17
**Condos** [2] - 4496:9,

4496:15
**conduct** [2] - 4531:21, 4576:4
**confer** [1] - 4436:16
**conference** [3] - 4481:17, 4481:20, 4481:24
**conferred** [1] - 4436:17
**confirm** [2] - 4484:14, 4612:18
**confirmation** [1] - 4509:11
**confirmed** [1] - 4566:5
**confirming** [1] - 4560:2
**conflict** [1] - 4621:1
**confused** [2] - 4557:13, 4593:14
**confusion** [1] - 4436:3
**connection** [8] - 4459:1, 4492:4, 4493:25, 4518:25, 4528:19, 4555:22, 4556:11, 4606:7
**consent** [1] - 4570:5
**consequences** [1] - 4537:4
**consider** [2] - 4444:13, 4611:15
**considering** [1] - 4478:18
**consistent** [3] - 4465:12, 4554:11, 4554:13
**consolidate** [1] - 4558:6
**conspire** [1] - 4507:14
**CONSTANTINE** [1] - 4434:6
**Constantine** [85] - 4434:19, 4435:23, 4439:14, 4442:19, 4444:24, 4445:8, 4445:22, 4447:1, 4448:8, 4450:15, 4481:14, 4481:17, 4481:23, 4482:7, 4495:20, 4495:22, 4495:24, 4496:4, 4496:16, 4497:11, 4497:16, 4498:12, 4498:17, 4498:24, 4500:4, 4500:15, 4500:20, 4500:24, 4501:2, 4501:11, 4501:13, 4501:23, 4502:12, 4502:15, 4502:22, 4503:4, 4509:19, 4510:2,

4514:7, 4514:8, 4514:14, 4514:17, 4517:6, 4517:7, 4517:9, 4524:14, 4536:2, 4536:3, 4536:15, 4542:11, 4542:16, 4543:8, 4544:3, 4544:15, 4544:21, 4545:1, 4545:16, 4545:19, 4546:2, 4546:8, 4546:11, 4547:1, 4547:7, 4547:8, 4556:13, 4558:23, 4559:4, 4559:9, 4559:19, 4560:19, 4561:1, 4570:24, 4571:2, 4571:11, 4571:16, 4572:4, 4572:11, 4572:25, 4573:9, 4573:11, 4573:19, 4573:24, 4574:8, 4575:8, 4623:22
**Constantine's** [12] - 4447:6, 4447:18, 4482:8, 4498:22, 4500:13, 4500:25, 4501:15, 4502:1, 4502:5, 4502:7, 4502:21, 4574:18
**construction** [11] - 4456:2, 4464:18, 4464:20, 4464:23, 4465:1, 4467:19, 4467:25, 4468:10, 4468:15, 4482:22, 4485:23
**consultation** [1] - 4515:22
**consulting** [11] - 4460:17, 4496:4, 4497:15, 4514:16, 4519:18, 4556:4, 4556:8, 4556:25, 4557:11, 4557:14
**Cont'd** [1] - 4585:1
**contact** [1] - 4478:10
**contacted** [2] - 4469:4, 4547:17
**contain** [1] - 4521:25
**contained** [8] - 4444:9, 4446:22, 4529:7, 4549:11, 4549:23, 4560:13, 4563:5, 4587:24
**contains** [4] - 4446:18, 4451:18, 4513:13, 4522:7
**contemporaneous** [2]

- 4594:23, 4599:21
**contemporaneously** [1] - 4595:10
**contend** [1] - 4603:4
**content** [4] - 4445:13, 4474:4, 4562:9, 4566:15
**contention** [1] - 4528:9
**contents** [1] - 4570:13
**context** [9] - 4443:18, 4453:23, 4455:24, 4481:11, 4520:14, 4520:15, 4535:13, 4612:8, 4612:9
**continue** [10] - 4437:4, 4438:14, 4438:16, 4468:10, 4487:22, 4523:16, 4551:23, 4570:5, 4573:1, 4608:10
**continued** [9] - 4438:9, 4439:21, 4461:19, 4468:17, 4499:2, 4505:17, 4533:7, 4553:3, 4584:6
**Continued** [16] - 4439:4, 4441:17, 4443:21, 4469:23, 4532:9, 4533:23, 4540:21, 4541:6, 4553:6, 4562:13, 4575:21, 4578:6, 4604:13, 4607:5, 4626:3, 4626:9
**continuing** [4] - 4465:16, 4467:11, 4476:16, 4486:20
**contract** [2] - 4496:7, 4589:21
**contrary** [1] - 4537:5, 4567:14
**contribute** [5] - 4461:11, 4461:14, 4464:8, 4464:12, 4505:9
**contributed** [6] - 4440:21, 4447:3, 4461:7, 4465:9, 4465:12, 4465:21
**contribution** [12] - 4462:21, 4464:14, 4464:25, 4465:22, 4471:4, 4471:14, 4487:19, 4491:10, 4501:24, 4525:13, 4527:17, 4527:19
**contributions** [1] - 4487:16

**contributors** [1] - 4448:9

**control** [6] - 4453:11, 4453:12, 4487:4, 4565:19, 4565:21, 4591:14

**controlled** [6] - 4495:22, 4501:22, 4591:15, 4591:16, 4591:19, 4591:25

**conversation** [34] - 4435:23, 4436:6, 4436:8, 4436:25, 4455:6, 4461:16, 4467:9, 4475:18, 4476:5, 4479:4, 4479:6, 4480:2, 4482:9, 4531:4, 4534:16, 4540:10, 4542:11, 4542:13, 4542:15, 4542:19, 4542:24, 4543:7, 4544:24, 4549:12, 4549:19, 4549:20, 4549:24, 4550:17, 4572:13, 4572:15, 4573:7, 4573:19, 4574:3, 4577:9

**conversations** [8] - 4455:11, 4471:24, 4477:6, 4501:10, 4526:7, 4526:10, 4536:19, 4536:22

**conveyance** [4] - 4469:7, 4469:21, 4557:23, 4560:6

**conveyed** [3] - 4498:17, 4501:22, 4574:14

**conveying** [1] - 4555:25

**copied** [1] - 4570:7

**copies** [7] - 4466:8, 4483:25, 4563:8, 4592:7, 4592:24, 4593:3, 4599:20

**copy** [51] - 4441:3, 4441:5, 4441:9, 4441:12, 4446:15, 4459:5, 4463:8, 4466:7, 4466:10, 4513:1, 4513:17, 4515:1, 4516:14, 4517:13, 4518:10, 4522:10, 4524:2, 4524:5, 4530:3, 4540:1, 4540:3, 4542:1, 4542:4, 4547:19, 4547:21, 4548:2, 4548:9,

4548:14, 4548:18, 4548:20, 4549:6, 4549:14, 4554:18, 4560:1, 4575:7, 4576:13, 4576:17, 4577:4, 4585:16, 4599:25, 4600:3, 4600:5, 4600:9, 4600:15, 4601:10, 4601:11, 4601:15, 4601:16, 4604:6, 4609:12

**corner** [1] - 4514:21

**Corp** [1] - 4495:16

**corporate** [5] - 4493:13, 4493:21, 4495:10, 4495:14, 4500:8

**Corporation** [4] - 4462:6, 4463:7, 4465:24, 4466:5

**corporation** [3] - 4495:17, 4559:10, 4589:13

**corporations** [1] - 4590:15

**correct** [116] - 4439:11, 4445:9, 4445:24, 4446:8, 4455:4, 4455:9, 4456:7, 4458:3, 4459:13, 4459:14, 4463:9, 4465:6, 4466:23, 4471:5, 4471:15, 4472:8, 4472:14, 4473:12, 4473:14, 4474:6, 4480:16, 4484:25, 4485:6, 4485:8, 4485:25, 4489:11, 4490:2, 4491:1, 4494:18, 4494:22, 4495:22, 4497:1, 4498:9, 4498:12, 4498:14, 4516:18, 4530:1, 4534:9, 4540:7, 4541:16, 4541:19, 4542:17, 4542:18, 4544:4, 4544:6, 4544:7, 4544:12, 4545:11, 4549:9, 4549:12, 4549:13, 4549:16, 4553:13, 4554:10, 4556:1, 4556:18, 4560:17, 4569:4, 4569:5, 4570:24, 4570:25, 4572:13, 4572:14, 4573:5, 4581:2, 4581:8,

4581:13, 4582:21, 4582:23, 4586:4, 4586:22, 4587:13, 4587:22, 4588:1, 4588:2, 4588:8, 4588:25, 4589:1, 4590:3, 4590:18, 4590:19, 4590:22, 4591:11, 4592:5, 4592:6, 4592:9, 4594:9, 4594:16, 4595:23, 4596:3, 4597:1, 4597:12, 4598:8, 4598:13, 4598:20, 4599:3, 4599:7, 4599:12, 4601:24, 4602:10, 4603:16, 4609:21, 4610:2, 4611:25, 4612:22, 4612:23, 4613:2, 4613:22, 4614:19, 4616:6, 4616:10, 4616:15, 4616:22, 4616:24, 4616:25, 4617:20

**correctly** [2] - 4442:5, 4514:23

**correlate** [2] - 4525:6, 4557:10

**correspondence** [1] - 4536:4

**corroborate** [1] - 4443:4

**corroborating** [1] - 4624:4

**cost** [1] - 4603:21

**Costa** [1] - 4479:14

**counsel** [8] - 4446:1, 4490:15, 4536:2, 4570:2, 4608:25, 4609:4, 4609:8, 4609:11

**count** [7] - 4506:25, 4507:1, 4507:7, 4509:18, 4510:2, 4511:3, 4511:17

**country** [1] - 4479:13

**County** [4] - 4469:7, 4469:15, 4469:20, 4469:22

**couple** [8] - 4509:3, 4537:2, 4539:24, 4555:13, 4564:8, 4575:4, 4582:11, 4621:22

**course** [3] - 4436:2, 4467:8, 4572:15

**court** [33] - 4435:13, 4435:20, 4436:16, 4437:17, 4442:9,

4444:1, 4461:15, 4531:13, 4533:17, 4533:19, 4535:9, 4536:25, 4537:17, 4537:19, 4538:16, 4541:1, 4541:10, 4559:21, 4579:1, 4603:2, 4603:7, 4603:11, 4604:4, 4605:6, 4605:11, 4605:18, 4606:13, 4606:18, 4608:1, 4619:20, 4619:24, 4620:7

**COURT** [98] - 4434:1, 4435:5, 4435:10, 4437:1, 4437:12, 4437:19, 4437:24, 4438:1, 4438:11, 4438:21, 4439:1, 4442:16, 4442:21, 4443:15, 4444:3, 4444:20, 4475:9, 4475:13, 4483:4, 4483:7, 4483:14, 4483:16, 4484:2, 4484:5, 4495:2, 4501:6, 4512:14, 4530:15, 4530:19, 4530:24, 4531:2, 4531:5, 4531:9, 4531:11, 4531:23, 4532:6, 4533:12, 4533:22, 4534:3, 4535:15, 4537:20, 4538:1, 4539:12, 4540:15, 4541:3, 4543:12, 4543:16, 4549:2, 4551:23, 4552:1, 4552:10, 4552:14, 4552:22, 4562:2, 4573:9, 4575:20, 4576:2, 4577:3, 4577:10, 4577:13, 4577:18, 4577:21, 4578:4, 4579:2, 4579:17, 4579:21, 4579:24, 4596:7, 4597:24, 4598:2, 4598:15, 4599:8, 4604:6, 4604:12, 4605:21, 4606:4, 4606:23, 4608:2, 4612:2, 4619:1, 4619:3, 4619:7, 4619:14, 4619:18, 4620:11, 4620:24, 4621:8, 4621:13, 4621:16, 4621:21, 4622:1, 4622:9, 4623:4,

4623:7, 4623:12, 4623:15, 4623:19, 4625:1

**Court** [11] - 4434:4, 4434:20, 4435:1, 4472:16, 4479:3, 4483:18, 4483:25, 4569:23, 4575:18, 4603:15, 4604:3

**Court's** [1] - 4575:17

**court's** [1] - 4438:22

**Courthouse** [1] - 4434:21

**courtroom** [8] - 4435:15, 4530:18, 4552:12, 4556:17, 4557:9, 4566:1, 4619:13, 4621:7

**cover** [8] - 4437:9, 4491:23, 4491:25, 4524:9, 4525:21, 4576:8, 4622:25

**CR** [4] - 4558:8, 4559:25, 4560:17, 4562:11

**Crafters** [1] - 4448:15

**crash** [1] - 4486:13

**create** [3] - 4561:11, 4567:10, 4612:21

**created** [19] - 4452:8, 4452:12, 4459:7, 4462:6, 4470:15, 4514:3, 4517:6, 4520:15, 4520:16, 4520:19, 4560:17, 4561:22, 4562:1, 4562:5, 4567:8, 4568:6, 4569:9, 4589:4, 4612:21

**creating** [1] - 4467:19

**credence** [2] - 4605:8, 4619:25

**credit** [40] - 4456:5, 4456:6, 4458:3, 4458:11, 4458:14, 4462:23, 4462:25, 4463:2, 4471:19, 4485:4, 4487:14, 4487:15, 4487:16, 4491:10, 4494:21, 4508:22, 4511:13, 4511:15, 4512:2, 4512:5, 4525:9, 4525:13, 4527:18, 4582:22, 4588:17, 4592:8, 4592:15, 4592:18, 4592:23, 4593:13, 4593:23, 4594:17, 4595:18, 4595:21, 4599:4,

4599:17, 4603:9, 4610:20
**crimes** [1] - 4612:13
**critical** [1] - 4618:10
**Cromwell** [1] - 4447:25
**CROSS** [4] - 4543:19, 4549:4, 4626:6, 4626:7
**cross** [14] - 4443:11, 4576:4, 4576:10, 4578:2, 4579:3, 4579:5, 4579:9, 4579:10, 4579:25, 4620:16, 4620:21, 4622:25, 4623:10, 4624:12
**CROSS-EXAMINATION** [4] - 4543:19, 4549:4, 4626:6, 4626:7
**cross-examination** [2] - 4579:25, 4622:25
**cross-examined** [1] - 4624:12
**crossed** [2] - 4540:9
**crosses** [1] - 4576:6
**CSL** [1] - 4475:22
**CSR** [2] - 4434:20, 4434:21
**Curley** [1] - 4447:13
**current** [2] - 4511:14, 4512:2
**CURRIE** [1] - 4434:13
**custodian** [2] - 4492:16, 4492:22
**custody** [1] - 4551:19
**custom** [1] - 4462:11
**cut** [6] - 4469:20, 4611:1, 4613:10, 4613:15, 4618:3
**cutout** [1] - 4470:16

**D**

**damage** [1] - 4523:4
**darn** [1] - 4576:22
**Darryl** [2] - 4516:3, 4521:20
**date** [12] - 4457:20, 4501:23, 4502:10, 4518:5, 4545:24, 4546:15, 4546:16, 4547:3, 4558:10, 4608:9, 4613:7, 4624:17
**date-stamped** [2] - 4546:15, 4546:16
**dated** [10] - 4475:15, 4517:22, 4518:20,

4555:18, 4558:10, 4558:15, 4567:22, 4568:3, 4569:19, 4577:1
**dates** [2] - 4504:16, 4510:16, 4558:17, 4559:7, 4568:15
**days** [14] - 4457:11, 4458:24, 4467:23, 4468:4, 4490:20, 4498:25, 4507:9, 4508:19, 4508:21, 4545:22, 4565:15, 4575:4, 4595:15, 4614:9
**deal** [15] - 4453:18, 4453:24, 4454:10, 4454:16, 4454:24, 4472:7, 4474:2, 4514:17, 4523:3, 4523:18, 4533:20, 4547:8, 4591:17, 4614:8, 4614:9
**dealing** [1] - 4552:12
**deals** [2] - 4465:13, 4508:16
**dealt** [2] - 4479:20, 4601:2
**debate** [1] - 4622:10
**decade** [1] - 4600:21
**December** [16] - 4491:18, 4492:16, 4492:20, 4494:24, 4497:14, 4509:20, 4510:4, 4511:18, 4513:25, 4514:4, 4516:10, 4519:4, 4520:3, 4528:24, 4594:20, 4599:22
**decided** [6] - 4468:8, 4471:13, 4488:23, 4496:14, 4526:11, 4570:1
**decision** [1] - 4489:6
**declined** [1] - 4451:12
**default** [3] - 4511:14, 4512:3, 4593:7
**defaulting** [1] - 4563:21
**defeat** [1] - 4605:11
**Defendant** [2] - 4434:17, 4434:19
**defendant** [6] - 4451:22, 4452:8, 4510:18, 4523:11, 4605:11, 4606:21
**defendant's** [1] - 4606:20
**Defendants** [1] - 4434:7

**defense** [3] - 4606:9, 4611:22, 4622:5
**Defense** [8] - 4434:17, 4438:8, 4444:17, 4475:10, 4533:6, 4553:2, 4626:13, 4626:14
**defraud** [10] - 4451:24, 4452:7, 4471:21, 4472:3, 4488:5, 4489:8, 4507:15, 4507:20, 4545:20, 4583:18
**Del** [2] - 4474:12, 4479:11
**Delaware** [1] - 4452:9
**delay** [1] - 4435:17
**deleted** [3] - 4548:11, 4550:3, 4550:19
**deliver** [1] - 4473:22
**delivered** [7] - 4441:6, 4441:7, 4524:16, 4563:10, 4563:11, 4583:15, 4585:12
**delivering** [1] - 4490:22
**demand** [2] - 4470:21, 4470:25
**demanded** [3] - 4453:14, 4453:15, 4523:9
**depict** [1] - 4562:6
**depicted** [3] - 4505:22, 4507:25, 4508:4
**deposit** [2] - 4521:8, 4527:16
**deposited** [2] - 4491:12, 4500:24
**deposition** [1] - 4606:13
**deposits** [1] - 4555:11
**Depot** [17] - 4435:24, 4541:12, 4541:22, 4543:8, 4543:23, 4545:17, 4547:4, 4549:8, 4549:24, 4550:2, 4550:17, 4571:2, 4571:5, 4571:8, 4572:6, 4572:10, 4576:13
**describe** [7] - 4479:3, 4486:6, 4490:7, 4511:23, 4514:1, 4558:20, 4583:18
**described** [4] - 4471:20, 4522:11, 4522:25, 4583:17
**describing** [1] - 4472:16

**design** [1] - 4455:25
**designated** [1] - 4514:21
**desire** [2] - 4453:2, 4472:1
**destroy** [3] - 4573:8, 4573:14, 4575:10
**detail** [1] - 4525:23
**detailed** [2] - 4439:16, 4570:3
**determination** [1] - 4436:22
**determines** [1] - 4539:16
**devastation** [1] - 4486:15
**developed** [1] - 4477:8
**development** [3] - 4485:13, 4616:13, 4618:10
**Development** [9] - 4452:9, 4463:7, 4463:16, 4465:24, 4466:5, 4495:16, 4567:25, 4615:20, 4616:16
**device** [1] - 4587:15
**devise** [1] - 4510:19
**devised** [1] - 4451:23
**devoted** [1] - 4468:24
**DeVries** [5] - 4504:21, 4550:8, 4550:10, 4550:14, 4560:4
**Diamante** [14] - 4474:12, 4474:14, 4476:4, 4476:14, 4479:11, 4479:12, 4482:22, 4483:2, 4563:24, 4564:1, 4565:9, 4565:15, 4569:9, 4618:6
**Dickinson** [1] - 4447:21
**difference** [1] - 4558:16
**different** [5] - 4472:6, 4481:10, 4483:2, 4485:20, 4611:15
**differently** [2] - 4538:3, 4621:25
**difficulties** [1] - 4488:17
**digital** [1] - 4546:23
**digitally** [1] - 4546:16
**diligently** [1] - 4559:8
**dinner** [3] - 4453:16, 4453:19, 4466:20
**dire** [4] - 4531:21, 4576:4, 4579:6

**direct** [12] - 4437:8, 4438:15, 4531:11, 4560:16, 4568:24, 4570:22, 4589:7, 4590:25, 4597:18, 4598:7, 4605:14, 4610:16
**DIRECT** [9] - 4439:4, 4500:1, 4541:6, 4553:6, 4580:3, 4626:3, 4626:4, 4626:9, 4626:10
**Direct/Haley** [1] - 4439:7
**directly** [12] - 4458:10, 4463:1, 4465:23, 4501:15, 4506:21, 4518:1, 4546:9, 4555:19, 4582:10, 4582:19, 4584:4, 4585:23
**director** [6] - 4476:3, 4476:12, 4476:13, 4476:20, 4476:21, 4482:21
**disagree** [3] - 4480:3, 4615:6, 4622:22
**disbursed** [3] - 4448:6, 4457:12, 4502:5
**disbursement** [13] - 4447:4, 4447:8, 4447:12, 4447:16, 4447:20, 4447:24, 4448:3, 4448:10, 4448:14, 4448:18, 4448:20, 4449:12, 4451:12
**disbursements** [6] - 4439:9, 4439:10, 4439:16, 4442:7, 4446:5, 4446:22
**discard** [1] - 4573:16
**discharge** [1] - 4560:19
**disciplinary** [1] - 4536:10
**disclose** [2] - 4452:16, 4534:18
**disclosure** [1] - 4570:3
**discovered** [1] - 4565:17
**discovery** [5] - 4520:25, 4546:17, 4606:14, 4620:4, 4620:6
**Discovery** [2] - 4485:9, 4490:12
**discretion** [1] - 4518:6

**discuss** [12] - 4477:11, 4483:9, 4514:7, 4530:16, 4536:7, 4552:15, 4552:18, 4571:25, 4579:12, 4608:5, 4619:9, 4620:11

**discussed** [3] - 4505:8, 4518:20, 4525:8

**discussing** [2] - 4569:1, 4582:2

**Discussion** [4] - 4442:1, 4443:20, 4534:2, 4540:20

**discussion** [2] - 4454:17, 4615:19

**discussions** [4] - 4453:1, 4455:21, 4485:16, 4490:10

**disenchanted** [1] - 4477:25

**disk** [3] - 4547:22, 4548:17, 4574:5

**disks** [1] - 4587:24

**dismayed** [1] - 4480:14

**dismissal** [1] - 4606:15

**dismissed** [4] - 4602:7, 4602:8, 4602:11, 4605:17

**dispute** [3] - 4471:2, 4477:4, 4477:8

**disputes** [3] - 4482:11, 4570:10, 4570:19

**distributed** [7] - 4449:3, 4451:4, 4491:23, 4497:25, 4517:23, 4524:25, 4525:3

**distribution** [22] - 4448:23, 4449:1, 4449:6, 4449:9, 4449:13, 4449:15, 4449:23, 4450:1, 4450:3, 4450:4, 4450:6, 4450:8, 4450:10, 4450:12, 4450:17, 4450:18, 4450:22, 4450:23, 4451:1, 4459:23, 4525:5, 4527:14

**distributions** [3] - 4449:17, 4449:19, 4456:5

**DISTRICT** [3] - 4434:1, 4434:1, 4434:10

**district** [2] - 4605:18,

4619:20

**District** [11] - 4434:4, 4434:21, 4507:5, 4509:22, 4510:6, 4510:17, 4569:23, 4603:15, 4604:3, 4605:3

**diversion** [1] - 4624:16

**diversity** [1] - 4605:11

**diverted** [3] - 4565:18, 4565:20, 4565:22

**diverting** [1] - 4588:16

**document** [121] - 4440:4, 4440:5, 4440:6, 4440:8, 4446:12, 4458:5, 4463:11, 4463:23, 4473:19, 4474:25, 4509:8, 4512:20, 4513:20, 4513:22, 4513:23, 4514:15, 4514:19, 4515:1, 4515:6, 4516:1, 4516:3, 4516:15, 4516:17, 4516:20, 4516:23, 4517:2, 4517:17, 4517:20, 4518:16, 4519:5, 4519:9, 4519:15, 4519:17, 4519:25, 4520:10, 4520:11, 4520:15, 4520:16, 4521:11, 4521:15, 4521:16, 4522:1, 4522:2, 4522:7, 4523:14, 4524:2, 4525:19, 4525:22, 4526:4, 4526:22, 4527:2, 4527:3, 4527:6, 4527:23, 4528:1, 4529:2, 4529:8, 4529:15, 4530:1, 4530:3, 4531:24, 4532:1, 4532:4, 4554:15, 4556:3, 4557:25, 4559:20, 4559:21, 4560:14, 4562:10, 4563:14, 4563:16, 4563:19, 4563:23, 4564:1, 4567:5, 4567:19, 4567:22, 4567:23, 4568:6, 4569:6, 4569:16, 4594:17, 4595:3, 4597:7, 4597:13, 4597:17, 4598:4, 4598:6, 4598:11, 4598:18, 4598:22,

4599:3, 4599:13, 4599:14, 4599:20, 4599:22, 4599:25, 4600:3, 4600:5, 4602:4, 4602:7, 4602:12, 4602:13, 4602:22, 4603:25, 4604:2, 4606:7, 4606:18, 4608:3, 4608:18, 4608:22, 4609:4, 4609:20, 4610:15, 4611:21, 4613:17, 4616:18, 4619:21, 4620:5, 4622:15

**documentation** [7] - 4583:22, 4583:23, 4585:19, 4585:21, 4586:6, 4595:17, 4606:17

**documented** [4] - 4559:2, 4583:3, 4583:13, 4583:14

**documenting** [4] - 4594:14, 4597:2, 4601:7, 4624:4

**documents** [69] - 4457:2, 4457:6, 4462:13, 4462:15, 4463:2, 4463:4, 4466:5, 4473:21, 4483:19, 4483:25, 4493:16, 4512:9, 4528:8, 4528:12, 4530:10, 4530:11, 4531:14, 4531:15, 4531:19, 4531:22, 4531:24, 4537:14, 4537:15, 4543:2, 4552:2, 4553:9, 4553:20, 4553:22, 4555:4, 4555:5, 4555:8, 4555:9, 4555:13, 4557:20, 4558:3, 4558:9, 4558:10, 4558:18, 4558:22, 4559:13, 4563:6, 4564:23, 4565:5, 4565:7, 4565:16, 4568:10, 4568:12, 4568:15, 4568:17, 4579:5, 4579:8, 4584:4, 4586:11, 4586:17, 4586:24, 4587:3, 4587:7, 4587:14, 4587:18, 4587:19, 4593:22, 4594:10, 4595:24, 4596:2, 4596:9, 4596:12, 4597:5, 4618:23

**Doe** [4] - 4452:2, 4507:9, 4509:21, 4510:21

**Doe's** [2] - 4507:4, 4510:5

**Dog** [1] - 4557:24

**dollar** [2] - 4503:17, 4601:8

**dollars** [5] - 4525:18, 4582:8, 4582:11, 4594:15, 4614:7

**Dom** [1] - 4495:11

**Dominick** [1] - 4434:20

**DomTursi@email.com** [1] - 4434:23

**done** [5] - 4465:14, 4483:4, 4504:9, 4534:5, 4623:10

**door** [2] - 4538:17, 4572:10

**double** [1] - 4526:18

**double-checking** [1] - 4526:18

**doubt** [2] - 4543:6, 4560:13

**down** [10] - 4475:20, 4495:9, 4498:3, 4508:22, 4528:11, 4539:24, 4601:11, 4614:21, 4619:15, 4619:17

**downloaded** [1] - 4548:21

**dozen** [1] - 4478:10

**dozens** [1] - 4601:2

**drafted** [1] - 4611:5

**drafting** [1] - 4609:4

**driver** [1] - 4544:17

**driving** [1] - 4475:17

**drove** [1] - 4466:17

**due** [4] - 4449:4, 4489:15, 4491:20, 4504:10

**duly** [3] - 4438:9, 4533:7, 4553:3

**duplicate** [2] - 4545:9, 4592:24

**during** [36] - 4436:1, 4453:9, 4455:6, 4462:22, 4463:18, 4463:19, 4466:13, 4467:8, 4474:17, 4475:3, 4477:5, 4477:10, 4477:16, 4480:22, 4492:14, 4493:9, 4502:11, 4502:19, 4505:8, 4528:22, 4537:13, 4544:2,

4546:5, 4559:21, 4563:19, 4572:15, 4575:5, 4576:9, 4579:5, 4588:23, 4589:4, 4595:22, 4598:6, 4602:20, 4602:22

**DVD** [1] - 4547:13

# E

**e-mail** [17] - 4472:24, 4473:17, 4473:18, 4473:25, 4474:5, 4474:21, 4474:22, 4475:2, 4477:6, 4513:7, 4513:13, 4513:17, 4585:4, 4595:9, 4595:12, 4623:21, 4624:4

**e-mails** [2] - 4478:3, 4622:19

**Earl** [1] - 4447:13

**earliest** [1] - 4437:17

**early** [5] - 4457:5, 4554:23, 4561:20, 4571:9, 4600:21

**Eastern** [4] - 4507:4, 4509:22, 4510:6, 4510:17

**EASTERN** [1] - 4434:1

**easy** [1] - 4478:17

**Edenholm** [2] - 4450:5, 4450:24

**Edrozo** [1] - 4560:1

**effect** [3] - 4453:18, 4459:11, 4473:1

**effective** [1] - 4454:1

**effectively** [10] - 4453:14, 4454:23, 4465:15, 4478:15, 4479:10, 4479:16, 4479:22, 4523:11, 4561:2

**effectuate** [1] - 4487:9

**effectuated** [1] - 4487:21

**effort** [1] - 4512:12

**efforts** [12] - 4440:11, 4442:17, 4482:10, 4486:21, 4486:25, 4488:2, 4493:5, 4557:1, 4561:17, 4561:21, 4574:21, 4575:10

**eight** [9] - 4468:12, 4476:20, 4485:24, 4486:2, 4487:12, 4487:20, 4490:13, 4540:8, 4571:9

**Eight** [1] - 4511:17
**either** [5] - 4463:4,
4479:25, 4547:23,
4596:13, 4621:19
**electronic** [1] - 4587:7
**electronically** [1] -
4596:13
**Eleven** [1] - 4457:11
**elicit** [1] - 4534:8
**elsewhere** [1] -
4510:17
**email** [19] - 4435:7,
4439:13, 4439:19,
4441:3, 4441:6,
4441:10, 4442:4,
4443:2, 4443:6,
4444:7, 4444:9,
4444:10, 4444:12,
4444:14, 4444:23,
4445:15, 4546:11,
4555:17, 4559:25
**emails** [6] - 4439:24,
4439:25, 4445:5,
4445:21, 4446:25,
4555:14
**embezzlements** [1] -
4481:16
**embryonic** [1] -
4581:10
**employed** [4] -
4482:16, 4492:23,
4493:2, 4493:9
**employee** [1] - 4493:5
**employment** [1] -
4482:19
**encompass** [1] -
4582:2
**encompassed** [1] -
4589:4
**end** [11] - 4442:8,
4468:2, 4477:10,
4477:17, 4488:21,
4490:7, 4532:4,
4593:2, 4599:5,
4609:3, 4609:23
**ended** [4] - 4536:18,
4557:5, 4599:25,
4600:3
**ending** [1] - 4527:20
**ends** [1] - 4495:21
**energies** [1] - 4468:24
**energy** [2] - 4468:25,
4603:19
**engaged** [1] - 4559:11
**engineering** [2] -
4467:25, 4468:11
**engines** [1] - 4564:14
**enjoyed** [1] - 4438:12
**ensued** [8] - 4435:3,
4438:4, 4442:1,

4444:1, 4533:10,
4534:2, 4541:1,
4552:20
**ensure** [1] - 4551:8
**enter** [1] - 4572:11
**entered** [1] - 4480:8
**entertain** [1] - 4572:7
**entertainment** [1] -
4493:4
**entire** [12] - 4440:6,
4463:5, 4542:13,
4542:23, 4549:11,
4549:19, 4573:1,
4573:2, 4574:3,
4577:8, 4577:16,
4598:25
**entirety** [1] - 4521:23
**entities** [8] - 4492:18,
4493:9, 4558:4,
4581:16, 4581:19,
4582:7, 4582:20,
4611:19
**entitled** [4] - 4489:20,
4539:7, 4557:4
**entity** [6] - 4495:10,
4495:14, 4500:8,
4515:13, 4518:1,
4615:16
**Environmental** [1] -
4449:7
**environmental** [13] -
4459:24, 4460:20,
4461:3, 4492:8,
4492:9, 4497:25,
4518:19, 4518:22,
4518:24, 4519:6,
4522:19, 4523:1,
4524:3
**Equipment** [2] -
4457:10, 4462:6
**equity** [10] - 4487:18,
4502:1, 4514:7,
4516:11, 4517:21,
4518:10, 4525:10,
4554:1, 4561:16,
4617:15
**equivalent** [2] -
4457:16, 4557:6
**Eric** [1] - 4450:24
**error** [1] - 4544:11
**escrow** [10] - 4446:6,
4457:13, 4465:25,
4466:1, 4466:6,
4491:12, 4491:18,
4491:21, 4521:8,
4585:23
**escrowed** [1] -
4466:11
**especially** [1] -
4486:15

**ESQ** [4] - 4434:15,
4434:15, 4434:17,
4434:18
**essentially** [2] -
4616:4, 4620:2
**established** [1] -
4589:13
**estate** [15] - 4454:6,
4462:2, 4467:22,
4468:17, 4479:9,
4486:13, 4487:6,
4490:17, 4529:22,
4581:2, 4581:7,
4581:9, 4588:11,
4591:17, 4592:3
**estimate** [3] - 4464:19,
4620:20, 4621:17
**et** [3] - 4606:14,
4610:14
**Ethan** [1] - 4494:5
**Eufora** [40] - 4448:4,
4448:6, 4449:10,
4451:1, 4498:22,
4500:7, 4500:13,
4501:15, 4501:16,
4502:1, 4502:2,
4503:6, 4504:1,
4504:2, 4504:6,
4504:20, 4504:21,
4508:10, 4514:8,
4531:16, 4546:4,
4554:2, 4554:5,
4554:9, 4558:4,
4558:5, 4558:7,
4558:14, 4558:24,
4558:25, 4559:15,
4560:2, 4560:8,
4560:10, 4560:20,
4561:3, 4562:7,
4574:16, 4575:16
**Eufora's** [8] - 4448:19,
4449:12, 4449:14,
4449:18, 4449:24,
4450:1, 4450:3,
4501:3
**event** [5] - 4460:5,
4517:9, 4588:23,
4590:7, 4616:19
**events** [1] - 4458:8
**eventually** [2] -
4603:14, 4603:15
**evidence** [27] -
4444:17, 4444:19,
4446:1, 4446:11,
4475:10, 4484:10,
4484:15, 4512:11,
4519:18, 4520:24,
4521:12, 4525:24,
4531:20, 4559:19,
4567:18, 4575:14,

4585:4, 4585:17,
4598:6, 4598:18,
4606:11, 4606:19,
4608:13, 4609:19,
4624:21, 4626:13,
4626:14
**exact** [1] - 4624:17
**exactly** [2] - 4547:6,
4605:18
**examination** [5] -
4437:8, 4438:15,
4576:9, 4579:25,
4622:25
**EXAMINATION** [13] -
4439:4, 4500:1,
4541:6, 4543:19,
4549:4, 4553:6,
4580:3, 4626:3,
4626:4, 4626:6,
4626:7, 4626:9,
4626:10
**examined** [1] -
4624:12
**example** [3] - 4503:16,
4525:12
**Excel** [1] - 4622:24
**except** [2] - 4535:22,
4598:5
**exception** [1] - 4537:8
**excerpt** [1] - 4436:6
**Exchange** [1] -
4587:20
**exchanged** [1] -
4537:13
**excluding** [1] -
4567:25
**excuse** [10] - 4455:25,
4463:19, 4469:3,
4485:8, 4495:3,
4502:22, 4529:18,
4537:16, 4537:17,
4573:10
**excused** [2] - 4483:10,
4579:13
**execute** [1] - 4556:8
**executed** [3] -
4451:24, 4513:2,
4558:17
**executing** [1] -
4510:24
**execution** [1] -
4523:14
**executive** [2] -
4558:24, 4560:21
**Exhibit** [56] - 4440:4,
4441:14, 4444:2,
4444:7, 4444:17,
4445:11, 4446:11,
4446:13, 4451:4,
4473:19, 4475:1,

4475:6, 4475:10,
4521:4, 4521:6,
4521:14, 4521:16,
4522:10, 4553:9,
4553:23, 4553:24,
4554:11, 4554:14,
4555:3, 4555:6,
4556:2, 4557:16,
4557:17, 4557:23,
4559:18, 4562:8,
4563:2, 4563:4,
4563:14, 4566:9,
4566:20, 4566:22,
4567:6, 4567:8,
4567:10, 4567:17,
4568:13, 4568:22,
4569:6, 4569:8,
4569:15, 4603:24,
4609:19, 4609:23,
4610:17, 4612:21,
4626:13, 4626:14
**exhibit** [37] - 4444:6,
4456:4, 4512:13,
4512:16, 4512:21,
4512:23, 4513:5,
4513:7, 4513:21,
4513:22, 4514:3,
4515:5, 4515:9,
4516:6, 4516:7,
4517:1, 4517:5,
4517:19, 4517:21,
4518:15, 4518:19,
4520:1, 4520:2,
4521:1, 4521:12,
4522:15, 4522:16,
4524:7, 4524:9,
4525:25, 4527:2,
4529:14, 4529:16,
4598:18, 4606:11,
4608:14
**exhibits** [12] -
4512:16, 4521:24,
4530:7, 4553:12,
4557:16, 4566:8,
4575:14, 4575:15,
4622:7, 4622:11,
4623:3
**Exhibits** [5] - 4558:2,
4563:3, 4566:11,
4568:11, 4568:13
**exist** [3] - 4460:21,
4493:19, 4493:20
**existence** [1] - 4458:6
**existing** [1] - 4544:10
**exists** [2] - 4542:25,
4544:11
**Expansion** [1] -
4497:19
**expansion** [1] -
4517:10

**expected** [2] - 4580:19, 4580:20
**expecting** [1] - 4467:24
**expediency** [1] - 4576:20
**expedited** [1] - 4606:14
**expense** [2] - 4463:17, 4493:8
**expenses** [13] - 4457:22, 4460:18, 4491:20, 4491:23, 4491:25, 4492:2, 4492:3, 4505:16, 4506:11, 4508:8, 4508:23, 4509:1, 4591:24
**explain** [13] - 4456:11, 4469:15, 4489:17, 4489:19, 4489:21, 4497:12, 4497:21, 4505:4, 4506:6, 4508:6, 4535:9, 4536:24, 4611:8
**explained** [1] - 4589:25
**explore** [1] - 4540:14
**Express** [1] - 4508:25
**expressed** [1] - 4464:1
**expressing** [1] - 4439:14
**extended** [1] - 4467:9
**extent** [2] - 4619:19, 4622:18
**exterior** [1] - 4480:9
**extortion** [1] - 4454:1

---

**F**

**face** [8] - 4478:13, 4497:6, 4525:2, 4595:7, 4595:15, 4595:16
**face-to-face** [1] - 4478:13
**facilitate** [3] - 4435:17, 4454:15, 4460:9
**fact** [22] - 4454:20, 4468:22, 4490:18, 4503:3, 4526:20, 4538:2, 4538:8, 4544:18, 4546:15, 4546:25, 4550:10, 4551:2, 4551:3, 4576:23, 4583:8, 4588:10, 4598:9, 4601:6, 4605:4,

4606:6, 4622:14, 4624:2
**facts** [1] - 4534:19
**faded** [1] - 4519:8
**failure** [5] - 4605:6, 4606:14, 4606:16, 4620:3, 4620:6
**failures** [3] - 4605:7, 4606:12, 4619:25
**fair** [4] - 4487:7, 4494:7, 4530:3, 4531:25
**fairly** [2] - 4487:9, 4502:14
**faith** [1] - 4554:8
**Falcon** [12] - 4448:16, 4449:3, 4450:9, 4450:18, 4474:16, 4480:23, 4481:1, 4563:22, 4564:9, 4564:15, 4569:2, 4569:10
**fall** [1] - 4453:12
**falling** [1] - 4473:6
**falls** [1] - 4510:14
**false** [5] - 4510:22, 4539:6, 4605:8, 4605:12, 4620:1
**familiar** [4] - 4435:25, 4446:13, 4462:1, 4473:23
**familiarity** [1] - 4440:5
**family** [3] - 4454:4, 4462:13, 4462:15
**far** [6] - 4467:18, 4469:9, 4490:8, 4498:2, 4530:8, 4619:23
**fargo** [1] - 4511:4
**Fargo** [3] - 4467:18, 4511:19, 4555:14
**fashion** [3] - 4455:12, 4474:10, 4583:13
**father** [3] - 4583:7, 4583:15, 4583:17
**Father's** [1] - 4438:13
**Fax** [1] - 4434:23
**faxed** [2] - 4513:24, 4565:15
**FBI** [4] - 4475:19, 4476:6, 4476:19, 4479:24
**FBO** [1] - 4475:21
**February** [13] - 4477:21, 4478:5, 4478:9, 4490:10, 4497:15, 4505:6, 4506:8, 4506:12, 4506:17, 4506:23, 4507:3, 4507:17,

4608:11
**Federal** [2] - 4434:22, 4489:5
**federal** [2] - 4603:11, 4612:12
**fee** [1] - 4457:17
**fees** [3] - 4491:19, 4492:10, 4517:8
**Fernando** [1] - 4569:14
**few** [7] - 4440:2, 4445:3, 4490:20, 4508:19, 4508:21, 4548:25, 4620:21
**Fidelity** [2] - 4485:5, 4509:21
**fifth** [2] - 4490:12, 4490:18
**figure** [1] - 4622:13
**figured** [1] - 4468:18
**filed** [2] - 4471:1, 4603:13
**filing** [1] - 4527:13
**filings** [2] - 4490:16, 4527:8
**fill** [1] - 4489:4
**finally** [4] - 4439:8, 4478:19, 4509:13, 4528:7
**financial** [18] - 4445:3, 4490:1, 4490:13, 4490:25, 4494:18, 4495:5, 4496:11, 4497:5, 4498:8, 4504:15, 4505:21, 4507:25, 4508:4, 4509:9, 4583:19, 4586:1, 4600:18, 4600:19
**financing** [3] - 4453:7, 4461:7, 4557:4
**findings** [1] - 4605:4
**fine** [7] - 4437:19, 4512:14, 4533:20, 4576:11, 4578:4, 4583:24, 4605:24
**finished** [3] - 4439:22, 4531:3, 4623:14
**firm** [3] - 4447:9, 4447:13, 4448:1
**first** [33] - 4442:22, 4458:8, 4462:5, 4477:17, 4479:11, 4486:23, 4498:8, 4503:7, 4509:23, 4510:7, 4514:4, 4524:13, 4534:14, 4539:15, 4539:19, 4549:22, 4549:25, 4550:16, 4557:7,

4558:11, 4558:15, 4573:18, 4573:21, 4576:8, 4577:8, 4577:23, 4581:16, 4593:2, 4593:15, 4603:2, 4605:10, 4608:21, 4610:25
**five** [11] - 4460:13, 4460:14, 4492:4, 4498:25, 4509:18, 4520:20, 4571:3, 4571:14, 4582:1, 4582:3, 4582:8
**five-year** [1] - 4460:13
**fix** [3] - 4477:22, 4478:4, 4564:14
**flew** [3] - 4466:2, 4466:15, 4575:3
**flight** [1] - 4480:23
**Florida** [1] - 4450:14
**flown** [2] - 4455:19, 4620:16
**flows** [1] - 4495:19
**flying** [2] - 4479:12, 4479:14
**focus** [2] - 4468:24, 4591:2
**follow** [6] - 4444:23, 4452:6, 4452:20, 4508:8, 4512:17, 4572:17
**following** [27] - 4435:3, 4438:4, 4441:17, 4443:21, 4444:1, 4452:5, 4459:18, 4461:2, 4463:3, 4467:12, 4469:23, 4475:17, 4506:3, 4527:8, 4533:10, 4533:23, 4540:21, 4541:1, 4546:2, 4552:20, 4562:13, 4571:1, 4573:7, 4573:19, 4576:1, 4576:6, 4579:1
**follows** [6] - 4438:10, 4442:1, 4507:2, 4533:8, 4534:2, 4553:4
**foot** [1] - 4485:23
**foreclosure** [1] - 4555:20
**foreign** [1] - 4511:2
**foremost** [1] - 4458:9
**forged** [1] - 4605:17
**forgery** [12] - 4601:21, 4601:23, 4602:4, 4602:7, 4602:9, 4605:8, 4605:19,

4606:11, 4606:20, 4619:22, 4620:1, 4620:7
**forget** [1] - 4435:6
**form** [17] - 4472:22, 4489:5, 4515:16, 4522:5, 4522:12, 4536:11, 4587:7, 4596:7, 4596:14, 4597:23, 4597:24, 4598:2, 4598:14, 4598:15, 4612:1, 4612:2, 4619:1
**formally** [1] - 4526:14
**formation** [1] - 4608:16
**formed** [1] - 4618:19
**forms** [1] - 4609:25
**formulated** [1] - 4609:9
**forth** [11] - 4446:24, 4456:4, 4463:11, 4494:14, 4495:6, 4497:6, 4498:9, 4504:16, 4508:6, 4510:16, 4511:2, 4537:6, 4560:23, 4571:15, 4590:21
**fortunate** [1] - 4468:3
**forward** [10] - 4437:11, 4453:11, 4454:7, 4459:22, 4480:4, 4506:15, 4506:20, 4513:12, 4529:3, 4595:5
**forwarded** [5] - 4446:16, 4466:10, 4505:15, 4506:9, 4528:2
**foundation** [1] - 4576:15
**four** [11] - 4462:8, 4485:9, 4486:11, 4487:5, 4487:21, 4542:9, 4558:9, 4558:13, 4569:11, 4593:20, 4621:10
**frankly** [7] - 4456:4, 4456:12, 4479:25, 4529:23, 4557:5, 4557:14, 4601:7
**Fraud** [1] - 4451:16
**fraud** [3] - 4507:1, 4509:19, 4510:3
**frauds** [1] - 4481:16
**fraudulent** [4] - 4510:22, 4564:3, 4564:6, 4566:17
**Freeh** [7] - 4436:5, 4476:20, 4481:7,

4481:10, 4482:4, 4569:13
**freeh** [1] - 4480:24
**Freeh's** [1] - 4481:3
**friend** [4] - 4470:17, 4479:13, 4564:21, 4568:1
**friends** [2] - 4454:4, 4481:8
**friends..** [1] - 4476:22
**front** [9] - 4464:10, 4484:14, 4505:17, 4539:23, 4540:16, 4572:9, 4572:10, 4575:18, 4622:10
**fruition** [1] - 4482:13
**full** [3] - 4505:10, 4620:25, 4621:3
**fully** [2] - 4435:24, 4508:12
**functioning** [1] - 4459:8
**Fund** [21] - 4439:10, 4442:7, 4445:20, 4446:18, 4446:24, 4447:7, 4447:11, 4447:15, 4447:19, 4447:23, 4448:2, 4448:8, 4448:13, 4448:17, 4448:22, 4448:25, 4449:5, 4449:8, 4450:7, 4450:16, 4450:20
**fund** [9] - 4439:15, 4440:22, 4440:25, 4447:3, 4456:17, 4470:23, 4479:15, 4479:23, 4524:13
**fundamental** [2] - 4616:5, 4616:8
**funded** [1] - 4557:8
**funding** [9] - 4496:3, 4497:15, 4514:16, 4517:24, 4519:18, 4524:15, 4556:6, 4556:13, 4561:19
**funds** [33] - 4442:24, 4442:24, 4445:7, 4445:23, 4446:19, 4448:5, 4454:21, 4457:11, 4457:20, 4458:13, 4460:14, 4460:16, 4460:19, 4462:20, 4463:7, 4465:23, 4465:25, 4487:11, 4487:22, 4491:8, 4494:23, 4498:4, 4502:9, 4502:12, 4502:13, 4508:12, 4508:15,

4508:22, 4517:23, 4526:21, 4623:23, 4624:1, 4624:13
**Funds** [1] - 4445:1
**furious** [1] - 4453:25
**future** [2] - 4497:19, 4518:7

## G

**Gaarn** [49] - 4503:24, 4504:4, 4504:5, 4504:19, 4504:22, 4505:3, 4505:14, 4505:25, 4506:9, 4506:12, 4506:14, 4506:18, 4507:12, 4507:14, 4508:10, 4508:11, 4508:14, 4508:18, 4508:20, 4547:24, 4553:18, 4554:8, 4554:19, 4554:22, 4554:25, 4555:10, 4555:11, 4555:15, 4555:18, 4555:23, 4555:25, 4556:4, 4556:9, 4556:12, 4556:14, 4556:15, 4556:17, 4556:24, 4557:1, 4557:9, 4558:1, 4558:3, 4558:6, 4559:4, 4559:8, 4560:1, 4561:1, 4561:8, 4572:19
**Gaarn's** [8] - 4504:3, 4554:6, 4557:13, 4560:3, 4560:7, 4560:9, 4561:21, 4574:17
**Garcia** [1] - 4569:14
**Gatos** [1] - 4527:7
**Gaudet** [2] - 4476:3, 4569:13
**gear** [1] - 4564:14
**general** [2] - 4445:17, 4609:8
**generated** [2] - 4586:17, 4592:8
**gentleman** [2] - 4448:21, 4481:1
**Gentlemen** [1] - 4440:15
**gentlemen** [1] - 4440:19
**Gentry** [12] - 4547:24, 4558:9, 4558:24, 4558:25, 4559:3, 4559:8, 4559:25, 4560:17, 4560:25, 4562:1, 4562:5,

4562:11
**Gentry's** [1] - 4561:17
**getaway** [2] - 4544:17, 4544:21
**Gillmore** [1] - 4470:17, 4568:1
**Gilmore** [1] - 4462:7
**girls** [1] - 4493:11
**given** [15] - 4441:6, 4459:5, 4459:9, 4459:10, 4475:3, 4515:22, 4534:11, 4536:5, 4536:6, 4542:2, 4554:23, 4581:22, 4601:8, 4623:3, 4624:10
**glass** [1] - 4457:15
**Glen** [2] - 4504:2, 4504:3
**Glenn** [3] - 4560:4, 4582:15, 4585:19
**Global** [25] - 4439:9, 4440:12, 4442:6, 4444:25, 4445:20, 4446:18, 4446:24, 4447:7, 4447:10, 4447:15, 4447:19, 4447:22, 4448:2, 4448:7, 4448:13, 4448:17, 4448:22, 4448:25, 4449:4, 4449:8, 4449:11, 4449:22, 4450:6, 4450:16, 4450:19
**global** [2] - 4440:21, 4440:25
**golf** [1] - 4476:4
**Gonchar** [4] - 4563:21, 4564:12, 4564:22, 4565:23
**gong** [1] - 4453:12
**good-faith** [1] - 4554:8
**government** [35] - 4435:6, 4436:23, 4441:7, 4461:4, 4473:20, 4483:24, 4484:15, 4484:20, 4507:18, 4509:13, 4519:19, 4521:12, 4530:12, 4531:14, 4531:20, 4537:24, 4538:18, 4539:16, 4539:21, 4548:20, 4552:7, 4577:14, 4579:4, 4579:7, 4579:10, 4586:12, 4587:17, 4608:4, 4608:14, 4619:19, 4620:20, 4622:5,

4622:11, 4622:16, 4623:18
**Government** [8] - 4434:12, 4446:11, 4446:13, 4451:4, 4475:2, 4563:9, 4568:19, 4603:24
**government's** [2] - 4484:9, 4579:3
**grab** [1] - 4503:14
**grand** [1] - 4482:22
**great** [7] - 4445:1, 4453:9, 4462:1, 4472:7, 4476:24, 4519:20, 4588:11
**greater** [1] - 4490:8
**Greenberg** [3] - 4447:5, 4450:14, 4450:22
**Greg** [2] - 4504:21, 4560:4
**grew** [1] - 4520:20
**groceries** [1] - 4503:18
**gross** [1] - 4557:4
**ground** [1] - 4523:6
**Group** [4] - 4463:16, 4495:24, 4496:4, 4498:12
**group** [7] - 4445:19, 4517:7, 4523:10, 4531:23, 4546:4, 4571:16, 4574:15
**groups** [1] - 4461:21
**grow** [1] - 4601:6
**GSF** [6] - 4439:15, 4444:25, 4445:7, 4445:23, 4446:7, 4531:16
**guarantee** [2] - 4491:12, 4565:24
**guarantor** [5] - 4518:21, 4523:10, 4564:17, 4564:23, 4565:1
**guarantors** [1] - 4564:13
**guess** [7] - 4507:11, 4551:7, 4558:21, 4589:6, 4599:6, 4605:25, 4621:1
**Guide** [1] - 4557:24
**guy** [4] - 4476:24, 4588:17, 4600:24, 4610:11
**guy..** [1] - 4476:18

## H

**Haley** [15] - 4437:3,

4438:21, 4484:6, 4534:8, 4537:5, 4538:8, 4540:3, 4541:3, 4552:23, 4579:4, 4579:8, 4579:9, 4604:6, 4622:11, 4623:21
**HALEY** [92] - 4434:17, 4435:12, 4437:10, 4437:15, 4437:23, 4437:25, 4438:22, 4439:2, 4439:5, 4441:13, 4442:13, 4442:17, 4443:13, 4443:17, 4444:2, 4444:18, 4444:21, 4445:25, 4446:3, 4470:1, 4473:20, 4475:5, 4475:11, 4475:14, 4483:6, 4483:17, 4484:7, 4484:8, 4495:3, 4495:4, 4500:2, 4501:7, 4505:19, 4512:8, 4527:22, 4530:14, 4530:23, 4531:7, 4531:10, 4531:12, 4532:2, 4534:24, 4535:24, 4537:10, 4537:25, 4538:10, 4538:22, 4539:11, 4540:5, 4540:11, 4540:18, 4541:4, 4541:7, 4543:11, 4552:4, 4552:24, 4553:7, 4563:1, 4570:15, 4573:10, 4573:11, 4573:13, 4575:13, 4576:19, 4577:6, 4577:24, 4578:5, 4579:22, 4596:4, 4596:10, 4597:21, 4598:1, 4598:14, 4604:7, 4604:11, 4605:25, 4606:22, 4607:3, 4609:13, 4609:16, 4611:10, 4611:12, 4612:1, 4618:25, 4620:10, 4621:6, 4622:4, 4623:13, 4624:24, 4626:4, 4626:5, 4626:9
**haley's** [1] - 4576:13
**half** [13] - 4442:6, 4456:21, 4491:17, 4498:2, 4528:7, 4530:9, 4531:17, 4565:4, 4582:8, 4614:2, 4617:23,

4620:25, 4621:25
**hand** [2] - 4476:20, 4515:2
**handed** [2] - 4545:20, 4601:15
**handled** [2] - 4546:4, 4591:23
**handwriting** [1] - 4513:24
**handwritten** [2] - 4513:22, 4514:12
**hangars** [1] - 4503:6
**happy** [2] - 4437:4, 4437:13
**Harbor** [24] - 4452:1, 4452:3, 4452:11, 4452:18, 4454:6, 4461:24, 4464:21, 4467:14, 4468:1, 4468:5, 4468:9, 4468:11, 4468:15, 4468:17, 4469:1, 4470:8, 4470:12, 4471:12, 4485:9, 4490:12, 4496:21, 4566:19, 4566:24
**hard** [1] - 4581:3
**Hardina** [1] - 4524:14
**harm's** [1] - 4460:10
**Harvey** [1] - 4482:1
**Hasiamos** [1] - 4547:25
**Hawaii** [36] - 4453:7, 4457:17, 4467:14, 4485:13, 4485:21, 4486:14, 4487:4, 4490:17, 4491:20, 4492:5, 4493:5, 4514:22, 4515:13, 4518:23, 4523:15, 4529:21, 4556:7, 4556:11, 4556:20, 4557:8, 4575:16, 4581:16, 4581:18, 4582:7, 4582:20, 4589:15, 4590:8, 4591:2, 4591:17, 4592:2, 4597:4, 4615:9, 4615:18, 4616:13, 4617:21, 4617:23
**Hawaiian** [6] - 4457:21, 4459:4, 4459:20, 4460:18, 4478:8, 4496:5
**Hayden** [1] - 4448:21
**hazardous** [3] - 4522:19, 4523:1, 4524:3
**head** [1] - 4615:4

**heading** [1] - 4451:16
**hear** [4] - 4534:14, 4537:20, 4601:25, 4606:2
**heard** [13] - 4443:3, 4471:4, 4471:16, 4474:16, 4482:4, 4535:5, 4546:5, 4556:17, 4580:10, 4583:24, 4592:2, 4596:18, 4610:11
**hearing** [8] - 4436:11, 4436:15, 4437:4, 4539:1, 4539:13, 4539:25, 4540:14, 4581:3
**hearings** [1] - 4605:14
**hearsay** [3] - 4442:10, 4622:15, 4623:1
**held** [3] - 4460:7, 4523:4, 4560:25
**helicopters** [1] - 4503:7
**help** [4] - 4576:18, 4609:1, 4609:4, 4616:20
**help..** [1] - 4476:23
**helped** [2] - 4537:13, 4612:21
**helpful** [2] - 4491:14, 4616:4
**helping** [1] - 4475:19
**Hermosa** [3] - 4467:22, 4468:4, 4468:6
**hide** [1] - 4538:11
**higher** [1] - 4587:9
**himself** [6] - 4442:20, 4546:4, 4564:9, 4572:7, 4575:7, 4616:16
**hire** [1] - 4487:22
**hired** [2] - 4489:18, 4524:11
**hiring** [2] - 4488:22, 4558:23
**history** [2] - 4592:17, 4593:1
**hockey** [23] - 4451:10, 4458:25, 4488:3, 4489:8, 4498:18, 4523:16, 4523:19, 4525:7, 4529:3, 4559:12, 4561:23, 4570:10, 4570:19, 4580:15, 4582:6, 4582:16, 4586:1, 4593:6, 4595:10, 4599:21, 4608:7, 4624:3, 4624:6

**hold** [3] - 4468:9, 4606:23, 4623:5
**holders** [1] - 4592:23
**holding** [1] - 4481:17
**holdings** [4] - 4501:16, 4502:2, 4504:4, 4515:21
**Home** [17] - 4435:24, 4541:12, 4541:22, 4543:8, 4543:23, 4545:17, 4547:4, 4549:8, 4549:24, 4550:2, 4550:17, 4571:2, 4571:5, 4571:8, 4572:6, 4572:10, 4576:13
**home** [23] - 4468:23, 4477:14, 4485:18, 4486:16, 4490:12, 4503:5, 4503:13, 4503:14, 4503:16, 4503:17, 4503:18, 4509:2, 4509:12, 4529:20, 4529:24, 4555:20, 4568:4, 4586:23, 4586:24, 4587:3, 4592:19, 4601:12
**homes** [2] - 4485:19, 4485:23
**Honor** [42] - 4435:12, 4435:19, 4436:1, 4436:18, 4438:22, 4441:13, 4444:18, 4445:25, 4473:20, 4475:5, 4475:8, 4475:11, 4483:6, 4483:17, 4512:8, 4531:7, 4536:21, 4541:4, 4543:13, 4543:15, 4548:25, 4551:22, 4552:4, 4552:19, 4573:12, 4575:13, 4577:7, 4579:22, 4580:1, 4604:1, 4604:7, 4605:2, 4609:16, 4620:9, 4620:10, 4620:15, 4621:5, 4622:4, 4623:3, 4624:23, 4624:24, 4624:25
**Honor's** [3] - 4435:24, 4436:22, 4532:5
**HONORABLE** [1] - 4434:10
**Honu'apo** [4] - 4494:21, 4494:25, 4589:18, 4589:19
**hope** [3] - 4438:12,

4492:13, 4509:4
**hoped** [2] - 4536:16, 4618:2
**horizontal** [2] - 4504:25, 4505:4
**HORMOVITIS** [1] - 4434:6
**hour** [4] - 4530:9, 4531:18, 4573:22, 4621:25
**hours** [6] - 4466:19, 4549:10, 4577:21, 4593:20, 4620:21, 4621:22
**house** [11] - 4455:19, 4464:21, 4466:16, 4468:13, 4479:1, 4480:15, 4498:4, 4594:5, 4596:1, 4596:9, 4596:13
**House** [2] - 4529:16, 4530:4
**huge** [1] - 4616:19
**Hughes** [1] - 4585:12

**I**

**idea** [3] - 4548:5, 4570:11, 4571:25
**identical** [2] - 4506:7, 4577:5
**identification** [8] - 4483:20, 4512:10, 4512:21, 4527:24, 4553:10, 4568:22, 4569:7, 4603:24
**identified** [7] - 4441:11, 4475:1, 4530:1, 4530:8, 4531:19, 4575:15, 4590:17
**identifies** [1] - 4567:2
**identify** [6] - 4531:15, 4532:3, 4556:3, 4557:20, 4566:10, 4566:21
**identifying** [1] - 4566:15
**identity** [1] - 4452:14
**ignoring** [1] - 4479:16
**II** [1] - 4558:5
**III** [2] - 4558:5, 4558:14
**illiquid** [5] - 4503:4, 4503:7, 4503:12, 4503:15, 4503:19
**imagine** [1] - 4611:20
**immediate** [1] - 4475:20
**immediately** [6] -

4546:2, 4547:5, 4547:17, 4548:10, 4549:7, 4574:6
**impeach** [1] - 4538:2
**impeachment** [1] - 4605:23
**implicating** [1] - 4538:4
**important** [12] - 4488:23, 4526:11, 4586:7, 4596:15, 4596:21, 4600:22, 4602:22, 4611:20, 4612:4, 4612:6, 4612:14, 4616:19
**importing** [1] - 4485:20
**impromptu** [10] - 4544:2, 4544:4, 4545:18, 4547:4, 4547:16, 4547:18, 4571:4, 4571:7, 4571:19, 4573:24
**inaccurate** [1] - 4613:14
**inappropriate** [1] - 4480:4
**inartfully** [1] - 4551:7
**inbound** [1] - 4561:15
**Inc** [1] - 4512:24
**inception** [1] - 4592:18
**inch** [1] - 4522:16
**inches** [1] - 4513:14
**incidentally** [2] - 4451:3, 4463:25
**include** [2] - 4610:20, 4614:22
**included** [2] - 4440:24, 4558:5
**includes** [1] - 4521:22
**including** [9] - 4482:12, 4492:18, 4494:1, 4522:4, 4563:2, 4569:12, 4613:3, 4614:5
**inclusive** [2] - 4479:18, 4574:16
**incoming** [1] - 4446:17
**inconsistent** [3] - 4446:23, 4536:19, 4554:11
**incorporates** [1] - 4521:8
**incorrect** [6] - 4534:10, 4593:10, 4597:6, 4618:5, 4618:15, 4618:24
**increase** [1] - 4527:11

**incremental** [1] - 4488:9
**increments** [1] - 4489:2
**incur** [2] - 4491:19, 4492:10
**indeed** [1] - 4541:18, 4554:8
**indemnification** [2] - 4522:20, 4524:3
**indemnitor** [2] - 4522:21, 4522:23
**indemnity** [9] - 4459:24, 4460:4, 4460:8, 4460:20, 4461:3, 4492:9, 4498:1, 4518:19, 4518:24
**independent** [3] - 4461:20, 4515:22, 4515:24
**Indiana** [2] - 4563:20, 4565:4
**indicate** [1] - 4538:16
**indicated** [3] - 4435:2, 4488:9, 4568:15
**indictment** [20] - 4435:7, 4451:16, 4451:18, 4452:20, 4507:1, 4507:7, 4509:18, 4509:25, 4510:4, 4510:14, 4511:7, 4566:16, 4566:19, 4586:18, 4588:3, 4588:7, 4588:13, 4588:15, 4589:5, 4613:1
**individual** [8] - 4452:14, 4502:23, 4503:8, 4522:1, 4589:17, 4590:6, 4592:15, 4592:23
**individuals** [14] - 4440:21, 4440:24, 4444:8, 4445:19, 4447:2, 4475:25, 4504:16, 4520:20, 4520:21, 4570:7, 4574:17, 4582:9, 4582:12, 4583:2
**inferred** [1] - 4547:7
**information** [11] - 4437:15, 4443:8, 4444:9, 4457:3, 4529:7, 4537:13, 4546:13, 4555:16, 4560:13, 4560:23, 4563:5
**informed** [1] - 4457:7
**initial** [5] - 4462:25,

4474:12, 4474:14, 4506:19, 4576:14
**initialed** [2] - 4519:16, 4577:1
**initials** [5] - 4519:8, 4519:11, 4519:12, 4519:15, 4519:22
**initiate** [2] - 4551:12, 4583:21
**initiated** [1] - 4605:10
**inquire** [1] - 4539:5
**inquiries** [1] - 4470:14
**inquiry** [3] - 4436:11, 4539:14, 4550:8
**inside** [3] - 4560:8, 4572:6, 4572:10
**insofar** [2] - 4544:8, 4548:3
**inspect** [1] - 4604:4
**instance** [4] - 4451:10, 4587:19, 4591:6, 4610:6
**instead** [2] - 4460:10, 4576:3
**institution** [2] - 4509:9, 4616:9
**instructed** [2] - 4609:9, 4624:8
**instruction** [5] - 4443:7, 4444:4, 4444:16, 4623:2, 4624:10
**instrumental** [1] - 4615:25
**intend** [3] - 4538:17, 4580:16, 4621:2
**intended** [1] - 4601:6
**intent** [1] - 4485:19
**intention** [5] - 4472:1, 4483:21, 4531:18, 4539:20, 4539:21
**intentionally** [1] - 4510:19
**intentions** [1] - 4518:8
**interest** [36] - 4454:18, 4462:8, 4463:12, 4463:16, 4464:1, 4464:2, 4464:3, 4464:6, 4464:7, 4464:13, 4465:5, 4465:8, 4465:13, 4488:2, 4498:17, 4500:13, 4501:15, 4502:1, 4504:10, 4506:10, 4524:23, 4525:1, 4527:12, 4554:1, 4554:5, 4554:7, 4554:9, 4555:25, 4559:15, 4560:9, 4567:13,

4580:22, 4580:23, 4580:24, 4580:25, 4614:5
**interested** [2] - 4485:17, 4561:6
**interests** [3] - 4555:24, 4561:9, 4562:6
**interstate** [1] - 4511:1
**introduce** [2] - 4552:7, 4622:12
**introduced** [13] - 4444:18, 4456:4, 4484:10, 4484:15, 4486:22, 4519:19, 4520:24, 4521:12, 4521:25, 4583:1, 4590:25, 4595:20, 4595:22
**invest** [1] - 4526:13
**invested** [5] - 4445:20, 4454:24, 4455:1, 4459:4, 4479:17
**investigation** [4] - 4488:19, 4546:10, 4548:1, 4574:20
**investigations** [1] - 4515:24
**investment** [5] - 4453:2, 4454:3, 4461:21, 4471:8, 4613:7
**investments** [5] - 4509:22, 4525:10, 4559:10, 4569:1, 4624:3
**investors** [14] - 4441:1, 4445:19, 4451:25, 4453:24, 4459:3, 4478:2, 4478:8, 4479:22, 4520:17, 4525:8, 4546:4, 4547:9, 4574:16, 4574:19
**involved** [11] - 4445:22, 4461:20, 4462:2, 4464:1, 4523:24, 4535:8, 4547:25, 4548:1, 4574:20, 4602:14, 4616:1
**involvement** [4] - 4462:3, 4510:9, 4510:11, 4561:3
**involving** [4] - 4439:6, 4504:15, 4570:10, 4570:18
**iPad** [1] - 4587:15
**iPhone** [20] - 4542:17, 4542:20, 4545:15,

4547:21, 4548:11, 4548:21, 4549:15, 4549:18, 4549:22, 4550:4, 4550:14, 4551:14, 4568:18, 4571:23, 4572:8, 4573:16, 4574:3, 4574:23, 4575:6, 4586:21
**IS** [1] - 4534:1
**Island** [1] - 4591:23
**island** [2] - 4485:21, 4486:14
**Islanders** [1] - 4461:25
**Isle** [73] - 4456:8, 4458:6, 4458:11, 4458:15, 4458:16, 4458:18, 4459:17, 4459:20, 4471:18, 4473:9, 4485:5, 4485:7, 4485:14, 4487:17, 4487:18, 4487:20, 4491:9, 4491:11, 4492:1, 4511:20, 4512:1, 4514:17, 4514:24, 4515:11, 4515:13, 4515:18, 4520:3, 4520:4, 4520:5, 4520:18, 4520:19, 4521:19, 4521:22, 4522:12, 4524:23, 4525:4, 4525:11, 4525:17, 4526:5, 4527:11, 4528:12, 4528:13, 4528:15, 4528:16, 4528:19, 4529:11, 4556:5, 4557:11, 4558:5, 4569:22, 4570:4, 4589:16, 4589:19, 4592:3, 4597:2, 4609:7, 4610:8, 4610:18, 4610:24, 4611:2, 4611:4, 4611:17, 4614:23, 4616:4, 4617:10, 4617:11, 4620:3
**Islip** [2] - 4434:4, 4434:22
**issuance** [1] - 4528:19
**issue** [6] - 4437:18, 4491:16, 4538:1, 4577:2, 4590:15, 4624:11
**issued** [1] - 4592:14

**issues** [8] - 4440:13, 4453:5, 4490:14, 4518:22, 4546:3, 4571:15, 4620:11, 4623:16
**item** [1] - 4551:12
**itself** [6] - 4451:18, 4463:11, 4463:23, 4517:11, 4555:1, 4583:3
**IV** [63] - 4458:6, 4458:15, 4458:16, 4458:18, 4459:17, 4459:20, 4471:18, 4473:9, 4485:5, 4487:17, 4487:18, 4487:20, 4491:9, 4491:11, 4492:1, 4511:20, 4512:1, 4514:17, 4514:24, 4515:11, 4515:13, 4515:18, 4520:3, 4520:4, 4520:5, 4520:18, 4520:19, 4521:19, 4521:22, 4522:12, 4524:23, 4525:4, 4525:11, 4525:17, 4526:5, 4527:11, 4528:12, 4528:13, 4528:15, 4528:16, 4528:19, 4529:11, 4556:5, 4557:11, 4558:5, 4569:22, 4570:4, 4589:16, 4589:19, 4592:3, 4597:2, 4609:7, 4610:8, 4610:18, 4610:24, 4611:2, 4611:4, 4611:17, 4614:23, 4616:4, 4617:10, 4617:11, 4620:3
**IV's** [2] - 4456:8, 4458:11

## J

**JAMES** [1] - 4434:15
**January** [6] - 4446:16, 4493:14, 4557:25, 4558:11, 4561:9, 4565:20
**Jay** [1] - 4440:23
**Jere** [1] - 4582:15
**JN** [2] - 4615:20, 4616:16
**JND** [7] - 4615:14, 4615:15, 4616:15, 4617:9, 4617:14, 4617:18
**job** [1] - 4453:13

**Joe** [3] - 4494:4, 4522:4, 4527:12
**John** [48] - 4452:2, 4453:1, 4453:5, 4456:7, 4461:11, 4462:10, 4464:12, 4476:9, 4476:11, 4476:12, 4482:19, 4482:21, 4485:16, 4490:11, 4492:20, 4507:4, 4507:9, 4509:21, 4510:5, 4510:20, 4513:8, 4513:18, 4513:22, 4513:24, 4514:5, 4516:10, 4516:20, 4517:16, 4517:22, 4518:13, 4518:14, 4519:12, 4519:14, 4526:7, 4526:10, 4528:24, 4529:17, 4566:25, 4567:2, 4567:13, 4567:23, 4567:24, 4568:4, 4568:9, 4569:14, 4613:1, 4613:3
**Johnson** [2] - 4448:11, 4449:23
**joint** [13] - 4453:11, 4454:12, 4491:22, 4513:10, 4513:12, 4515:12, 4518:9, 4522:17, 4528:5, 4529:19, 4608:19, 4611:6, 4611:18
**JOSEPH** [1] - 4434:10
**Joseph** [1] - 4582:14
**Jowdy** [134] - 4436:4, 4441:2, 4445:2, 4472:6, 4472:8, 4472:10, 4472:13, 4472:17, 4473:1, 4473:6, 4473:10, 4473:14, 4473:25, 4474:5, 4474:9, 4474:19, 4474:22, 4475:15, 4476:1, 4476:11, 4476:13, 4477:2, 4477:4, 4477:5, 4477:8, 4477:11, 4477:14, 4477:17, 4477:22, 4478:1, 4478:10, 4478:14, 4478:19, 4479:2, 4479:4, 4479:8, 4479:17, 4479:19, 4480:10, 4480:25, 4481:4, 4481:10, 4481:16, 4481:18, 4481:24,

4482:6, 4482:12, 4482:17, 4482:20, 4482:25, 4483:4, 4486:21, 4487:1, 4487:23, 4488:23, 4489:19, 4490:16, 4492:11, 4495:15, 4495:18, 4526:9, 4544:9, 4544:18, 4545:1, 4563:21, 4564:3, 4564:7, 4564:16, 4564:25, 4565:9, 4565:13, 4565:18, 4566:2, 4569:1, 4569:2, 4569:12, 4569:13, 4569:21, 4570:6, 4570:10, 4570:19, 4580:16, 4581:6, 4581:15, 4581:22, 4582:5, 4582:10, 4582:20, 4583:1, 4583:6, 4583:15, 4583:17, 4583:18, 4585:3, 4585:5, 4585:7, 4585:11, 4585:14, 4585:20, 4588:17, 4594:13, 4594:18, 4595:11, 4597:3, 4597:10, 4598:5, 4598:10, 4599:6, 4599:16, 4600:8, 4600:9, 4600:12, 4601:9, 4601:15, 4602:23, 4603:4, 4603:18, 4608:8, 4613:16, 4614:1, 4614:5, 4614:10, 4614:15, 4614:23, 4615:2, 4615:7, 4615:17, 4616:4, 4616:14, 4616:21, 4617:18, 4618:9, 4618:18, 4620:4
**Jowdy's** [9] - 4476:3, 4478:8, 4482:1, 4564:21, 4566:7, 4584:4, 4585:23, 4599:10, 4606:9
**Judge** [15] - 4437:23, 4442:2, 4484:7, 4505:19, 4538:22, 4543:11, 4573:10, 4576:22, 4596:11, 4604:11, 4605:3, 4606:1, 4607:3, 4612:1, 4621:6
**judge** [16] - 4435:9, 4436:25, 4437:10, 4442:13, 4442:17,

4531:18, 4535:4, 4535:6, 4535:25, 4538:6, 4596:4, 4597:21, 4606:7, 4606:22, 4611:10, 4619:21
**JUDGE** [1] - 4434:10
**judge's** [1] - 4468:6
**judgment** [1] - 4585:25
**juggling** [1] - 4620:19
**July** [24] - 4449:9, 4449:13, 4449:15, 4449:17, 4473:1, 4474:1, 4474:7, 4474:8, 4474:18, 4474:23, 4491:8, 4491:13, 4513:7, 4515:9, 4517:6, 4517:22, 4521:18, 4522:11, 4524:15, 4524:16, 4608:12, 4623:7, 4623:14
**June** [22] - 4434:6, 4448:14, 4448:18, 4448:20, 4448:23, 4449:1, 4449:6, 4451:6, 4485:24, 4486:3, 4490:6, 4490:19, 4541:11, 4541:21, 4542:6, 4556:5, 4556:14, 4566:13, 4566:23, 4621:11, 4625:2
**Juneau** [1] - 4444:4
**Juneau's** [2] - 4522:4, 4527:12
**juror** [2] - 4621:6, 4623:7
**jurors** [2] - 4435:5, 4620:24
**JURORS** [1] - 4619:12
**jury** [43] - 4434:10, 4435:4, 4435:11, 4435:15, 4435:18, 4437:2, 4437:5, 4438:3, 4438:5, 4438:11, 4443:3, 4443:7, 4452:15, 4461:15, 4472:16, 4479:3, 4483:10, 4483:16, 4484:4, 4503:21, 4530:18, 4533:11, 4538:3, 4538:18, 4539:14, 4539:17, 4539:23, 4540:16, 4541:2, 4551:24, 4552:10, 4552:11, 4552:21, 4575:18, 4579:2,

4579:13, 4579:18, 4579:20, 4597:17, 4608:2, 4622:10, 4623:8, 4624:8
**Jury** [1] - 4619:13
**jury's** [1] - 4512:18
**JV** [1] - 4518:6

# K

**K-1** [4] - 4527:6, 4527:24, 4528:19, 4529:10
**K-1s** [3] - 4527:13, 4529:2, 4529:6
**K1s** [1] - 4553:13
**K229** [1] - 4626:14
**K233** [4] - 4444:3, 4444:7, 4444:17, 4626:13
**Kaiser** [129] - 4452:2, 4452:13, 4452:17, 4453:1, 4453:5, 4453:8, 4453:16, 4453:18, 4453:25, 4454:10, 4454:16, 4454:17, 4454:22, 4454:23, 4455:2, 4455:7, 4455:20, 4456:7, 4456:16, 4456:19, 4456:22, 4457:7, 4457:12, 4457:14, 4457:16, 4458:17, 4458:22, 4459:12, 4460:11, 4460:16, 4461:12, 4462:10, 4463:10, 4463:14, 4464:12, 4464:15, 4464:19, 4464:22, 4465:13, 4466:2, 4466:7, 4466:17, 4467:6, 4467:20, 4468:8, 4468:11, 4469:4, 4469:14, 4469:18, 4470:2, 4470:12, 4470:18, 4470:21, 4471:1, 4471:13, 4482:20, 4482:21, 4485:16, 4490:11, 4492:20, 4497:23, 4502:20, 4504:23, 4504:25, 4505:6, 4505:8, 4505:13, 4505:15, 4506:1, 4506:3, 4506:9, 4506:13, 4506:15, 4508:21, 4513:8, 4513:11, 4513:18, 4513:23, 4513:24, 4514:5,

4514:9, 4514:11, 4514:15, 4514:22, 4516:10, 4516:12, 4517:22, 4517:24, 4518:3, 4518:13, 4518:14, 4519:14, 4526:7, 4526:10, 4528:24, 4529:18, 4529:22, 4545:9, 4545:20, 4547:10, 4547:15, 4547:24, 4548:14, 4548:17, 4549:16, 4549:19, 4551:17, 4566:25, 4567:3, 4567:13, 4567:23, 4567:24, 4568:9, 4573:7, 4575:3, 4575:7, 4595:4, 4599:25, 4600:3, 4600:9, 4601:22, 4602:3, 4602:5, 4605:15, 4610:19, 4613:4
**Kaiser's** [10] - 4455:13, 4463:18, 4466:16, 4468:19, 4468:25, 4506:10, 4516:20, 4517:16, 4519:12, 4568:4
**keep** [9] - 4488:19, 4505:13, 4511:13, 4512:2, 4555:20, 4596:15, 4596:21, 4596:22, 4621:6
**keeping** [3] - 4475:20, 4484:19, 4493:12
**KELLY** [1] - 4434:13
**Ken** [45] - 4436:4, 4441:1, 4472:6, 4473:6, 4473:10, 4473:14, 4474:22, 4475:15, 4476:11, 4477:2, 4477:4, 4477:5, 4477:8, 4477:11, 4479:4, 4481:4, 4482:12, 4482:20, 4482:25, 4487:22, 4495:15, 4495:18, 4526:8, 4544:9, 4544:18, 4545:1, 4563:21, 4569:1, 4569:2, 4569:12, 4569:14, 4569:21, 4570:10, 4580:15, 4595:11, 4597:3, 4597:10, 4602:23, 4608:3, 4613:16, 4613:18, 4615:17, 4615:25, 4616:21, 4617:18

**KENNER** [8] - 4434:5, 4434:5, 4438:7, 4533:5, 4553:1, 4626:3, 4626:5, 4626:8

**Kenner** [186] - 4434:17, 4435:20, 4438:1, 4438:15, 4438:17, 4438:24, 4439:6, 4439:23, 4440:3, 4440:4, 4440:5, 4441:14, 4442:5, 4442:10, 4443:9, 4444:2, 4444:7, 4444:9, 4444:22, 4445:11, 4446:4, 4451:2, 4451:3, 4451:15, 4451:22, 4451:23, 4452:8, 4452:12, 4452:13, 4452:16, 4452:19, 4456:3, 4463:25, 4465:16, 4466:14, 4470:8, 4471:17, 4472:5, 4473:5, 4473:19, 4474:10, 4475:1, 4475:5, 4475:23, 4482:10, 4484:9, 4484:19, 4488:8, 4490:23, 4491:25, 4494:11, 4496:19, 4497:4, 4498:5, 4500:9, 4500:19, 4503:12, 4503:20, 4505:1, 4507:5, 4510:13, 4510:18, 4510:19, 4512:9, 4512:15, 4512:21, 4512:23, 4513:5, 4513:7, 4513:20, 4513:22, 4514:2, 4515:5, 4515:9, 4516:6, 4516:7, 4517:1, 4517:5, 4517:19, 4517:21, 4518:15, 4518:19, 4520:1, 4520:2, 4521:1, 4521:4, 4521:6, 4521:14, 4521:16, 4522:10, 4522:15, 4522:16, 4524:7, 4524:9, 4525:25, 4527:2, 4529:14, 4529:16, 4530:7, 4530:20, 4530:25, 4533:12, 4539:18, 4541:8, 4542:10, 4543:1, 4543:21, 4548:24, 4549:6, 4552:5,

4553:8, 4553:9, 4553:23, 4553:24, 4554:11, 4554:14, 4554:24, 4555:3, 4555:6, 4556:2, 4557:16, 4557:17, 4557:23, 4558:2, 4559:18, 4562:8, 4562:9, 4563:2, 4563:3, 4563:4, 4563:13, 4563:14, 4566:8, 4566:9, 4566:11, 4566:20, 4566:22, 4567:5, 4567:8, 4567:10, 4567:17, 4568:10, 4568:11, 4568:12, 4568:13, 4568:21, 4568:22, 4569:6, 4569:8, 4569:15, 4569:22, 4570:8, 4570:16, 4570:22, 4572:16, 4575:9, 4579:5, 4579:7, 4579:23, 4580:5, 4583:11, 4597:16, 4598:18, 4598:22, 4603:9, 4605:7, 4605:16, 4606:11, 4608:14, 4609:2, 4609:19, 4609:23, 4610:17, 4615:19, 4617:9, 4619:15, 4620:3, 4622:7, 4622:18, 4623:22, 4623:25, 4624:11

**Kenner's** [5] - 4436:4, 4511:4, 4511:19, 4537:21, 4624:18

**Kenneth** [2] - 4594:13, 4599:6

**kept** [6] - 4442:20, 4457:14, 4493:16, 4595:17, 4596:24, 4600:13

**Kerry** [4] - 4447:5, 4450:13, 4450:14, 4450:22

**kind** [4] - 4485:21, 4583:20, 4586:7, 4598:24

**kindly** [15] - 4446:22, 4456:11, 4479:3, 4484:13, 4511:23, 4515:5, 4517:1, 4517:19, 4518:15, 4524:7, 4557:20, 4562:8, 4566:9, 4566:20, 4567:5

**knowingly** [1] -

4510:19

**knowledge** [55] - 4440:18, 4459:15, 4465:21, 4467:17, 4470:8, 4471:7, 4471:10, 4475:24, 4476:2, 4476:7, 4476:10, 4482:16, 4482:18, 4482:19, 4482:24, 4484:24, 4490:2, 4491:1, 4491:6, 4493:18, 4493:24, 4494:12, 4497:5, 4497:13, 4498:9, 4498:10, 4501:21, 4502:18, 4505:21, 4509:6, 4509:8, 4509:15, 4510:1, 4511:10, 4514:2, 4517:16, 4521:11, 4522:3, 4529:6, 4536:1, 4543:6, 4548:6, 4553:25, 4556:10, 4557:10, 4559:13, 4560:20, 4560:22, 4561:7, 4561:8, 4561:11, 4567:12, 4568:25, 4570:18, 4574:24

**known** [7] - 4451:22, 4452:14, 4460:1, 4510:18, 4558:7, 4589:16, 4613:1

**knows** [1] - 4535:17

**KOMATIREDDY** [2] - 4434:15, 4435:9

**KPMG** [1] - 4524:11

**Kristie** [3] - 4492:23, 4493:21, 4494:3

**Kristin** [2] - 4445:16, 4593:15

## L

**lack** [4] - 4461:8, 4477:25, 4478:12, 4570:23

**Lagarde** [1] - 4447:13

**Lahoa** [2] - 4529:16, 4530:4

**land** [7] - 4468:18, 4468:21, 4469:5, 4485:13, 4491:13, 4589:18, 4591:17

**landing** [1] - 4564:14

**language** [3] - 4513:13, 4526:16, 4526:19

**laptop** [2] - 4542:3, 4587:14

**large** [1] - 4447:25

**largest** [1] - 4531:14

**Larry** [5] - 4515:10, 4521:17, 4524:6, 4608:25, 4609:8

**LaRusso** [39] - 4434:18, 4435:22, 4441:16, 4442:2, 4443:12, 4443:18, 4473:21, 4483:25, 4531:3, 4531:21, 4533:16, 4534:4, 4534:6, 4534:25, 4536:8, 4537:2, 4537:12, 4538:6, 4538:11, 4539:9, 4540:3, 4540:6, 4540:13, 4540:17, 4541:16, 4543:12, 4543:13, 4543:15, 4548:25, 4549:5, 4551:22, 4551:25, 4552:11, 4552:19, 4621:22, 4622:6, 4623:20, 4624:15, 4626:8

**LARUSSO** [13] - 4475:8, 4576:7, 4576:17, 4577:7, 4577:11, 4577:14, 4577:20, 4577:23, 4620:14, 4621:5, 4621:24, 4622:3, 4624:25

**Las** [3] - 4569:10, 4569:11, 4585:24

**last** [12] - 4437:5, 4438:23, 4483:2, 4515:16, 4530:9, 4534:9, 4535:5, 4544:8, 4550:7, 4550:16, 4602:2, 4614:10

**lasted** [2] - 4479:6, 4542:17

**lastly** [1] - 4555:17

**late** [5] - 4481:14, 4482:1, 4498:2, 4592:22, 4600:20

**Lauren** [3] - 4462:7, 4470:17, 4568:1

**law** [6] - 4447:9, 4447:13, 4448:1, 4448:11, 4449:16, 4477:18

**Law** [1] - 4447:17

**lawsuit** [10] - 4471:1, 4523:11, 4565:8, 4565:17, 4570:5, 4585:24, 4603:13,

4603:16, 4605:10, 4614:18

**lawsuits** [4] - 4570:9, 4570:18, 4570:21, 4587:25

**lawyer** [1] - 4489:18

**lawyers** [3] - 4446:17, 4486:22, 4487:22

**lead** [2] - 4475:17, 4485:22

**learn** [2] - 4476:6, 4480:18

**learned** [5] - 4442:18, 4479:8, 4481:9, 4569:2, 4577:7

**least** [5] - 4467:25, 4509:9, 4516:23, 4536:21, 4554:20

**leave** [3] - 4531:20, 4551:19, 4552:6

**leaves** [2] - 4530:18, 4619:13

**Led** [35] - 4451:16, 4452:8, 4452:9, 4452:16, 4452:22, 4455:21, 4457:1, 4457:10, 4461:7, 4461:17, 4462:5, 4462:21, 4463:7, 4463:9, 4463:12, 4463:16, 4464:3, 4464:13, 4465:6, 4465:17, 4465:21, 4465:23, 4466:5, 4467:12, 4467:16, 4470:11, 4470:19, 4470:23, 4472:1, 4510:14, 4531:16, 4567:13, 4567:14, 4567:24, 4575:16

**led** [1] - 4606:15

**left** [8] - 4435:20, 4445:3, 4480:6, 4480:15, 4507:23, 4547:8, 4565:23, 4573:21

**leg** [1] - 4569:10

**legal** [10] - 4440:11, 4445:4, 4470:18, 4487:11, 4490:15, 4491:19, 4492:10, 4515:23, 4570:2, 4608:25

**legitimacy** [1] - 4560:13

**Lehman** [54] - 4452:25, 4453:6, 4454:10, 4456:17, 4456:22, 4458:23, 4459:8, 4459:18,

4459:25, 4460:1,
4460:4, 4460:6,
4461:19, 4461:22,
4462:22, 4462:24,
4477:24, 4479:16,
4479:23, 4481:1,
4491:18, 4497:17,
4513:12, 4515:15,
4515:17, 4516:13,
4517:11, 4517:24,
4521:9, 4522:18,
4522:24, 4523:3,
4523:9, 4523:17,
4524:13, 4527:8,
4528:6, 4529:19,
4557:7, 4588:10,
4608:17, 4609:5,
4609:9, 4610:9,
4611:7, 4611:19,
4614:3, 4615:8,
4616:5, 4616:7,
4616:9, 4616:12,
4616:20
**Lehman's** [1] - 4616:1
**lend** [9] - 4458:7,
4458:18, 4458:22,
4458:23, 4503:10,
4520:23, 4526:13,
4594:15, 4608:7
**lending** [5] - 4456:17,
4526:8, 4526:21,
4586:6, 4616:9
**lends** [2] - 4605:8,
4619:25
**length** [1] - 4519:20
**lengthy** [1] - 4475:11
**less** [2] - 4460:14,
4489:2
**Lethinen** [5] -
4582:15, 4585:2,
4585:4, 4585:13,
4618:17
**letter** [35] - 4458:9,
4515:9, 4521:17,
4522:11, 4538:9,
4569:19, 4570:4,
4570:7, 4570:12,
4570:14, 4570:17,
4585:3, 4585:6,
4585:8, 4585:11,
4595:9, 4608:13,
4608:25, 4609:5,
4609:10, 4610:24,
4611:2, 4611:3,
4611:5, 4611:9,
4611:14, 4611:16,
4614:16, 4614:24,
4615:1, 4615:3,
4615:6, 4615:10,
4615:11, 4617:7

**letters** [4] - 4470:21,
4470:25, 4536:4,
4593:7
**letting** [1] - 4546:12
**level** [1] - 4458:25
**liability** [6] - 4452:10,
4465:2, 4515:19,
4515:20, 4588:25,
4589:13
**Liability** [2] - 4563:24,
4564:2
**lie** [4] - 4534:13,
4539:10, 4539:11,
4597:19
**lied** [2] - 4594:3,
4601:22
**light** [1] - 4575:11
**limited** [6] - 4452:9,
4515:19, 4515:20,
4588:25, 4589:12
**Limited** [2] - 4563:24,
4564:2
**limiting** [2] - 4623:2,
4624:10
**line** [33] - 4456:5,
4456:6, 4458:3,
4458:11, 4458:14,
4462:23, 4462:25,
4463:2, 4471:19,
4485:4, 4487:14,
4487:15, 4491:10,
4495:9, 4497:11,
4504:25, 4511:15,
4518:13, 4525:13,
4527:18, 4537:20,
4551:12, 4554:24,
4592:23, 4593:23,
4594:17, 4595:18,
4595:21, 4599:4,
4603:9, 4614:22,
4620:6
**line-of-credit** [1] -
4463:2
**Liner** [1] - 4563:22
**lines** [15] - 4487:16,
4494:20, 4511:13,
4512:2, 4512:5,
4525:9, 4582:22,
4588:17, 4592:7,
4592:8, 4592:15,
4592:18, 4593:13,
4599:17, 4610:20
**lion's** [1] - 4444:25
**Lions** [4] - 4448:4,
4449:9, 4449:14,
4449:18
**liquid** [1] - 4503:19
**list** [6] - 4439:16,
4446:5, 4446:21,
4446:23, 4514:11,

4514:13
**listen** [10] - 4541:23,
4542:2, 4542:4,
4542:7, 4542:23,
4551:18, 4551:20,
4574:5, 4575:5,
4619:9
**listened** [7] - 4541:24,
4542:9, 4542:13,
4546:6, 4548:19,
4576:25, 4577:1
**listening** [4] - 4542:6,
4548:8, 4550:12,
4551:21
**litigation** [14] -
4486:20, 4486:25,
4490:16, 4493:25,
4523:2, 4563:20,
4569:21, 4574:20,
4587:18, 4596:2,
4601:20, 4602:14,
4602:22, 4614:14
**living** [1] - 4479:1
**LLC** [28] - 4448:24,
4452:9, 4456:24,
4462:9, 4516:9,
4516:10, 4520:3,
4520:7, 4520:18,
4521:7, 4522:12,
4529:11, 4553:17,
4554:1, 4554:2,
4557:24, 4558:7,
4558:8, 4589:8,
4589:9, 4589:11,
4589:15, 4590:18,
4590:20, 4590:21,
4603:1, 4615:20,
4618:19
**LLC's** [1] - 4451:1
**LLCs** [13] - 4492:2,
4589:3, 4589:6,
4589:24, 4590:10,
4590:15, 4591:1,
4591:4, 4591:8,
4591:13, 4592:1,
4594:11, 4596:25
**loam** [1] - 4454:21
**loan** [67] - 4452:25,
4454:12, 4456:19,
4457:14, 4457:15,
4458:24, 4460:9,
4464:18, 4464:23,
4465:1, 4467:19,
4477:9, 4477:24,
4497:16, 4497:23,
4504:11, 4505:15,
4508:13, 4517:5,
4517:13, 4517:25,
4520:7, 4563:22,
4564:9, 4564:13,

4565:1, 4565:7,
4565:15, 4565:19,
4566:1, 4566:2,
4567:3, 4569:24,
4581:24, 4582:5,
4583:3, 4583:4,
4583:6, 4583:9,
4583:13, 4583:14,
4583:21, 4583:23,
4585:14, 4585:20,
4593:1, 4594:13,
4594:22, 4594:23,
4595:1, 4597:3,
4597:17, 4598:5,
4598:9, 4598:11,
4598:17, 4599:15,
4601:5, 4601:8,
4603:9, 4608:17,
4613:21, 4615:8,
4616:1, 4616:12,
4616:20
**Loan** [1] - 4554:24
**loaned** [7] - 4473:9,
4492:5, 4502:20,
4555:22, 4580:14,
4582:9, 4582:19
**loaning** [4] - 4581:6,
4595:11, 4600:24,
4618:9
**loans** [20] - 4478:8,
4479:18, 4487:23,
4492:11, 4504:7,
4506:19, 4554:23,
4555:12, 4555:21,
4581:15, 4581:16,
4581:21, 4582:7,
4582:24, 4583:2,
4597:14, 4599:4,
4601:3, 4601:4
**local** [2] - 4460:6,
4485:18
**located** [2] - 4452:1,
4474:19
**logistical** [1] - 4577:2
**logs** [1] - 4480:23
**look** [35] - 4440:3,
4440:6, 4440:7,
4445:11, 4446:11,
4473:19, 4484:13,
4484:20, 4501:18,
4504:22, 4512:20,
4513:5, 4513:10,
4515:5, 4517:1,
4517:19, 4518:15,
4524:7, 4525:25,
4527:1, 4529:14,
4535:20, 4553:8,
4554:14, 4555:3,
4556:2, 4562:8,
4563:13, 4566:9,

4566:20, 4567:5,
4568:21, 4569:15,
4603:25, 4615:5
**looked** [4] - 4468:22,
4535:21, 4551:11,
4597:5
**looking** [4] - 4479:15,
4495:1, 4538:23,
4556:6
**Los** [4] - 4447:9,
4509:23, 4510:7,
4527:7
**lose** [2] - 4453:13,
4580:16
**losing** [1] - 4588:4
**lost** [2] - 4469:6,
4478:6
**Louie** [1] - 4569:13
**Louis** [2] - 4436:5,
4476:20
**lower** [1] - 4587:9
**Lucas** [21] - 4474:2,
4474:15, 4476:4,
4476:14, 4477:14,
4478:16, 4478:20,
4478:22, 4479:12,
4482:22, 4483:2,
4569:11, 4580:21,
4597:10, 4600:7,
4601:11, 4614:3,
4614:8, 4618:4,
4618:6, 4618:20
**lunch** [7] - 4437:12,
4437:20, 4530:15,
4530:17, 4531:6,
4621:20
**luncheon** [1] - 4532:7
**lunchtime** [1] -
4437:21
**lying** [3] - 4598:12,
4602:4, 4605:15

**M**

**mail** [19] - 4472:24,
4473:17, 4473:18,
4473:25, 4474:5,
4474:21, 4474:22,
4475:2, 4477:6,
4513:7, 4513:13,
4513:17, 4547:22,
4583:8, 4585:4,
4595:9, 4595:12,
4623:21, 4624:4
**mailing** [1] - 4469:12
**mails** [2] - 4478:3,
4622:19
**main** [1] - 4453:5
**mainland** [1] -
4485:21

maintained [2] - 4446:23, 4492:1
maintaining [2] - 4492:14, 4493:7
major [1] - 4535:4
majority [2] - 4591:19, 4591:20
Makika [15] - 4457:14, 4457:20, 4458:1, 4458:6, 4459:16, 4471:18, 4473:10, 4497:10, 4497:24, 4511:5, 4514:18, 4514:24, 4569:22, 4592:4, 4603:2
Makika's [1] - 4456:9
Makita's [1] - 4457:20
Mama [2] - 4529:16, 4530:3
managed [1] - 4458:19
Management [4] - 4495:24, 4496:4, 4498:12, 4498:19
management [9] - 4500:20, 4500:21, 4501:23, 4516:7, 4516:9, 4517:7, 4518:5, 4528:25, 4561:9
manager [9] - 4457:1, 4465:15, 4492:21, 4493:3, 4495:13, 4553:18, 4558:4, 4564:22, 4568:1
managers [1] - 4565:14
managing [21] - 4470:13, 4470:19, 4495:17, 4516:8, 4516:9, 4518:4, 4520:4, 4528:15, 4528:16, 4528:18, 4528:24, 4528:25, 4553:16, 4564:21, 4565:9, 4567:24, 4590:12, 4591:2, 4591:4, 4591:6, 4591:9
mandatory [2] - 4523:8, 4621:10
Manfredi [29] - 4453:4, 4453:9, 4453:10, 4453:14, 4453:19, 4453:22, 4454:1, 4454:6, 4454:8, 4454:18, 4454:23, 4454:24, 4454:25, 4455:3, 4455:14, 4460:11, 4461:13,

4464:16, 4465:3, 4465:13, 4485:17, 4490:11, 4513:8, 4513:11, 4513:19, 4524:10, 4524:16, 4529:22, 4591:23
Manfredi's [1] - 4454:12
manifest [1] - 4569:8
map [1] - 4523:7
Mar [2] - 4474:12, 4479:11
March [8] - 4445:15, 4477:24, 4485:3, 4487:14, 4493:1, 4567:22, 4568:3, 4580:21
margin [1] - 4540:8
Marilyn [1] - 4569:13
Mark [2] - 4564:21, 4569:9
marked [11] - 4440:4, 4473:19, 4483:19, 4512:21, 4513:20, 4527:2, 4553:9, 4563:14, 4603:23, 4609:18, 4622:25
market [6] - 4487:7, 4567:5, 4581:2, 4581:7, 4581:11, 4588:11
markets [1] - 4529:23
Markowitz [6] - 4515:10, 4521:18, 4524:6, 4609:1, 4609:8, 4616:23
Mary [1] - 4434:21
Mascarella [1] - 4463:1
Masoud [1] - 4481:1
MasterCard [1] - 4509:1
material [2] - 4494:13, 4587:24
materials [1] - 4523:1
matter [7] - 4435:14, 4435:16, 4512:12, 4531:2, 4538:8, 4605:14, 4624:9
matters [5] - 4437:20, 4447:7, 4477:9, 4477:11, 4515:23
Mattias [2] - 4582:14, 4583:4
McKee [2] - 4440:23, 4451:6
me.. [1] - 4475:18
mean [7] - 4495:2, 4503:15, 4522:22, 4536:9, 4564:6,

4600:19
means [3] - 4510:22, 4511:1, 4511:10
mechanical [1] - 4434:25
mediate [1] - 4481:15
mediation [1] - 4482:12
mediations [1] - 4482:15
Meeks [4] - 4493:22, 4493:23, 4493:24, 4494:3
meet [5] - 4455:16, 4455:18, 4478:17, 4571:25, 4595:15
meeting [29] - 4451:8, 4453:21, 4477:10, 4477:13, 4477:16, 4477:18, 4477:20, 4478:13, 4478:21, 4478:23, 4480:6, 4486:23, 4514:6, 4515:3, 4544:3, 4545:18, 4546:2, 4547:3, 4547:4, 4547:16, 4547:18, 4551:4, 4568:4, 4571:4, 4571:7, 4571:19, 4573:24, 4621:10
meetings [4] - 4482:14, 4559:3, 4560:25, 4595:7
member [17] - 4458:19, 4470:13, 4470:19, 4495:17, 4516:9, 4518:4, 4520:5, 4528:15, 4528:16, 4528:18, 4528:25, 4553:16, 4564:21, 4565:9, 4567:24, 4617:9, 4618:12
members [21] - 4438:11, 4462:9, 4515:11, 4515:18, 4516:7, 4521:19, 4521:22, 4522:12, 4524:23, 4528:13, 4564:8, 4570:4, 4579:2, 4591:12, 4608:2, 4609:7, 4610:8, 4610:24, 4611:3, 4611:17, 4616:3
members' [1] - 4516:8
membership [3] - 4520:20, 4525:3, 4591:13

memo [2] - 4554:24, 4608:13
memorialization [1] - 4611:16
memorialize [4] - 4556:16, 4559:6, 4583:9, 4611:6
memorialized [1] - 4558:1
memorializing [1] - 4443:2
memory [2] - 4466:25, 4467:4
mention [2] - 4610:23, 4617:2
mentioned [2] - 4436:5, 4592:6
message [6] - 4472:24, 4478:11, 4547:1, 4551:1, 4566:22, 4595:12
messages [7] - 4546:1, 4566:12, 4566:15, 4566:18, 4568:8, 4568:14, 4586:21
met [6] - 4455:15, 4486:23, 4503:7, 4545:16, 4583:7, 4600:8
Metro [1] - 4563:22
Mexican [4] - 4441:1, 4445:2, 4445:19, 4490:15
Mexico [21] - 4440:12, 4474:13, 4474:20, 4476:1, 4476:14, 4479:15, 4486:21, 4486:22, 4487:11, 4490:16, 4493:6, 4550:15, 4580:16, 4584:5, 4588:17, 4594:19, 4594:20, 4597:4, 4597:19, 4600:24, 4618:11
Miami [1] - 4447:6
Michael [12] - 4445:16, 4471:22, 4491:10, 4493:22, 4493:23, 4493:24, 4494:3, 4494:6, 4494:7, 4510:21, 4571:15, 4573:23
Michele [1] - 4621:2
middle [1] - 4516:24
might [1] - 4574:13
Mike [1] - 4471:19
Milan [1] - 4461:13
Milana [2] - 4454:13, 4464:16

milestone [1] - 4518:7
million [68] - 4453:7, 4456:17, 4460:9, 4464:20, 4468:20, 4477:24, 4478:6, 4479:17, 4487:24, 4495:9, 4500:8, 4503:17, 4515:15, 4518:7, 4521:9, 4524:21, 4525:3, 4525:12, 4525:18, 4527:17, 4527:18, 4557:6, 4557:7, 4569:24, 4580:15, 4581:15, 4581:18, 4581:21, 4582:1, 4582:3, 4582:8, 4582:11, 4584:4, 4585:13, 4585:25, 4586:11, 4586:17, 4593:8, 4594:11, 4594:16, 4595:8, 4597:5, 4597:15, 4601:8, 4602:24, 4603:4, 4610:17, 4610:21, 4610:23, 4611:1, 4611:24, 4612:5, 4612:14, 4612:25, 4613:8, 4613:9, 4613:10, 4613:12, 4613:13, 4613:15, 4614:2, 4614:5, 4614:6, 4614:16, 4617:4
millions [2] - 4594:15, 4617:25
mind [6] - 4443:10, 4444:11, 4538:13, 4622:21, 4624:19
minimum [1] - 4556:25
minutes [16] - 4436:9, 4436:10, 4436:24, 4479:7, 4530:9, 4542:17, 4542:21, 4542:24, 4543:6, 4548:5, 4549:23, 4551:1, 4551:5, 4551:6, 4551:15, 4593:20
misappropriated [4] - 4439:15, 4442:19, 4444:25, 4445:23
misappropriating [1] - 4623:23
misappropriation [5] - 4442:24, 4445:7, 4624:1, 4624:7, 4624:13
misconduct [3] -

4572:16, 4572:22, 4574:9
**miskiewicz** [1] - 4621:16
**MISKIEWICZ** [43] - 4434:15, 4441:15, 4475:7, 4501:5, 4527:21, 4539:23, 4543:17, 4543:20, 4561:25, 4570:13, 4576:11, 4576:23, 4578:1, 4580:1, 4580:4, 4585:1, 4596:8, 4598:3, 4598:16, 4599:9, 4604:1, 4605:2, 4605:24, 4606:9, 4607:2, 4608:6, 4609:11, 4609:14, 4609:17, 4611:11, 4611:13, 4612:3, 4619:2, 4619:6, 4620:9, 4621:4, 4621:18, 4622:23, 4623:10, 4623:18, 4624:23, 4626:7, 4626:10
**Miskiewicz** [5] - 4435:22, 4541:19, 4543:16, 4576:7, 4579:25
**Miss** [1] - 4462:7
**missing** [4] - 4544:9, 4544:24, 4551:2, 4551:8
**misspeak** [1] - 4602:19
**misspoke** [1] - 4603:3
**mistake** [1] - 4535:5
**mode** [1] - 4480:19
**moment** [8] - 4457:24, 4465:18, 4473:16, 4475:23, 4477:3, 4505:19, 4543:13, 4609:16
**monetary** [2] - 4463:16, 4484:25
**money** [71] - 4440:21, 4451:25, 4453:2, 4458:7, 4458:18, 4458:22, 4461:17, 4470:2, 4470:3, 4471:19, 4488:19, 4488:20, 4489:16, 4489:20, 4490:8, 4495:19, 4496:6, 4498:14, 4498:18, 4500:20, 4500:22, 4502:24, 4504:19, 4505:9, 4505:13,

4505:14, 4505:16, 4506:10, 4508:17, 4510:21, 4526:8, 4526:13, 4554:23, 4555:19, 4555:22, 4561:15, 4580:15, 4580:17, 4581:6, 4582:6, 4582:9, 4582:19, 4585:22, 4586:4, 4586:6, 4588:4, 4588:8, 4588:16, 4593:22, 4594:10, 4595:1, 4595:11, 4596:17, 4597:18, 4599:16, 4600:23, 4600:24, 4603:19, 4603:22, 4608:8, 4610:20, 4611:23, 4613:17, 4613:23, 4614:21, 4616:12, 4618:9, 4618:13, 4618:16, 4618:17, 4618:18
**moneys** [1] - 4556:20
**monies** [12] - 4456:13, 4457:25, 4465:18, 4473:9, 4497:10, 4502:4, 4502:19, 4509:10, 4524:25, 4556:23, 4557:10, 4566:2
**month** [9] - 4456:21, 4498:1, 4498:2, 4512:4, 4564:18, 4571:14, 4591:24, 4614:2
**month-and-a-half** [1] - 4498:2
**monthly** [4] - 4459:18, 4592:11, 4592:13, 4592:14
**months** [8] - 4455:16, 4468:12, 4511:12, 4518:5, 4568:7, 4571:3, 4593:12
**Moreau** [1] - 4494:5
**moreover** [1] - 4611:5
**morning** [9] - 4438:11, 4483:8, 4536:23, 4538:23, 4538:25, 4541:24, 4542:1, 4551:18, 4619:10
**mortgage** [2] - 4503:17, 4555:19
**most** [4] - 4459:5, 4541:24, 4586:16, 4595:8
**mother** [2] - 4571:12, 4572:4
**Motorsports** [1] -

4450:5
**move** [11] - 4437:11, 4472:5, 4480:4, 4512:12, 4513:11, 4576:5, 4603:19, 4604:1, 4606:25, 4608:4, 4619:2
**moved** [1] - 4471:17
**moving** [2] - 4455:25, 4619:4
**MR** [174] - 4435:12, 4437:10, 4437:15, 4437:23, 4437:25, 4438:22, 4439:2, 4439:5, 4441:13, 4441:15, 4441:16, 4442:2, 4442:13, 4442:17, 4443:12, 4443:13, 4443:17, 4443:18, 4444:2, 4444:18, 4444:21, 4445:25, 4446:3, 4470:1, 4470:20, 4475:5, 4475:7, 4475:8, 4475:11, 4475:14, 4483:6, 4483:17, 4484:7, 4484:8, 4495:3, 4495:4, 4500:2, 4501:5, 4501:7, 4505:19, 4512:8, 4527:21, 4527:22, 4530:14, 4530:23, 4531:3, 4531:7, 4531:10, 4531:12, 4532:2, 4533:16, 4534:6, 4534:24, 4534:25, 4535:11, 4535:16, 4535:24, 4537:2, 4537:10, 4537:12, 4537:25, 4538:6, 4538:10, 4538:11, 4538:22, 4539:9, 4539:11, 4539:23, 4540:3, 4540:5, 4540:6, 4540:11, 4540:13, 4540:17, 4540:18, 4541:4, 4541:7, 4543:11, 4543:13, 4543:15, 4543:17, 4543:20, 4548:25, 4549:5, 4551:22, 4551:25, 4552:4, 4552:11, 4552:19, 4552:24, 4553:7, 4561:25, 4563:1, 4570:13, 4570:15, 4573:10, 4573:11, 4573:13, 4575:13, 4576:7, 4576:11,

4576:17, 4576:19, 4576:23, 4577:6, 4577:7, 4577:11, 4577:14, 4577:20, 4577:23, 4577:24, 4578:1, 4578:5, 4579:22, 4580:1, 4580:4, 4585:1, 4596:4, 4596:8, 4596:10, 4597:21, 4598:1, 4598:3, 4598:14, 4598:16, 4599:9, 4604:1, 4604:7, 4604:11, 4605:2, 4605:24, 4605:25, 4606:9, 4606:22, 4607:2, 4607:3, 4608:6, 4609:11, 4609:13, 4609:14, 4609:16, 4609:17, 4611:10, 4611:11, 4611:12, 4611:13, 4612:1, 4612:3, 4618:25, 4619:2, 4619:6, 4620:9, 4620:10, 4620:14, 4621:4, 4621:5, 4621:6, 4621:18, 4621:24, 4622:3, 4622:4, 4622:23, 4623:10, 4623:13, 4623:18, 4624:23, 4624:24, 4624:25, 4626:4, 4626:5, 4626:7, 4626:8, 4626:9, 4626:10
**MS** [1] - 4435:9
**multi** [1] - 4569:10
**multi-leg** [1] - 4569:10
**Murray** [6] - 4504:2, 4504:3, 4560:4, 4582:15, 4585:19, 4585:25
**Murray's** [1] - 4585:23
**Myrick** [3] - 4492:23, 4493:21, 4494:3

---

**N**

**Na'alehu** [18] - 4492:18, 4492:21, 4514:18, 4514:25, 4515:20, 4516:7, 4516:8, 4516:9, 4517:8, 4518:5, 4518:21, 4521:6, 4522:18, 4523:12, 4528:23, 4528:25, 4529:1, 4556:5
**Naalehu** [3] - 4608:16,

4617:15, 4617:20
**nail** [1] - 4539:24
**Najam** [12] - 4477:19, 4480:8, 4481:18, 4481:24, 4585:5, 4609:1, 4615:16, 4615:17, 4616:17, 4616:21, 4616:24, 4617:19
**name** [9] - 4456:24, 4465:2, 4507:5, 4507:12, 4516:24, 4529:12, 4560:8, 4565:14, 4616:25
**named** [1] - 4448:21
**naming** [1] - 4567:24
**Nash** [3] - 4451:7, 4500:12, 4610:6
**National** [1] - 4485:5
**nature** [2] - 4482:9, 4596:5
**near** [1] - 4483:23
**necessarily** [2] - 4503:14, 4512:17
**necessary** [5] - 4523:15, 4561:11, 4564:10, 4600:25, 4616:13
**need** [9] - 4437:9, 4454:11, 4479:22, 4486:24, 4487:1, 4502:16, 4505:8, 4572:2, 4620:11
**needed** [9] - 4478:13, 4479:24, 4479:25, 4505:9, 4508:22, 4513:11, 4531:15, 4565:1, 4589:14
**needing** [1] - 4442:16
**needs** [1] - 4435:14
**Negden** [3] - 4448:12, 4449:16
**negotiating** [1] - 4481:15
**neighborhood** [3] - 4468:20, 4520:21, 4582:8
**Neptune** [1] - 4561:20
**net** [2] - 4502:20, 4582:7
**Nevada** [6] - 4602:14, 4602:22, 4603:2, 4603:8, 4605:9, 4620:1
**never** [11] - 4448:16, 4451:14, 4478:5, 4482:12, 4539:9, 4539:11, 4557:5, 4565:7, 4601:3, 4601:5, 4606:10

**nevertheless** [1] - 4617:8
**NEW** [1] - 4434:1
**new** [17] - 4456:24, 4457:9, 4459:6, 4470:15, 4470:17, 4475:21, 4479:15, 4486:22, 4486:25, 4488:22, 4488:25, 4490:15, 4490:22, 4564:13, 4565:19, 4567:24
**New** [19] - 4434:14, 4434:22, 4447:25, 4452:1, 4453:16, 4454:6, 4461:24, 4461:25, 4464:21, 4466:3, 4482:1, 4507:5, 4509:22, 4510:6, 4510:17, 4538:24, 4564:7, 4568:5, 4573:23
**next** [19] - 4452:4, 4468:12, 4469:19, 4482:4, 4490:20, 4499:2, 4512:13, 4525:25, 4532:9, 4535:10, 4535:11, 4571:11, 4573:22, 4575:21, 4578:6, 4584:6, 4604:13, 4607:5, 4617:8
**Niger** [2] - 4515:10, 4521:18
**night** [4] - 4453:16, 4619:11, 4619:12, 4624:21
**nobody** [1] - 4613:16
**Nolan** [9] - 4494:4, 4512:24, 4513:3, 4525:12, 4525:16, 4527:7, 4528:2, 4529:11, 4587:25
**Nolan's** [2] - 4527:10, 4527:14
**none** [1] - 4464:16
**normally** [1] - 4576:24
**Norstrom** [3] - 4582:14, 4583:4, 4610:10
**norstrom** [1] - 4584:1
**Norstrom's** [1] - 4583:14
**North** [10] - 4455:3, 4455:14, 4457:12, 4464:17, 4464:21, 4465:5, 4465:8, 4474:13, 4486:13, 4581:7
**Northern** [14] -

4458:10, 4463:1, 4463:6, 4511:5, 4511:13, 4511:20, 4512:1, 4512:6, 4521:7, 4592:15, 4592:24, 4593:8, 4594:6, 4594:9
**notation** [1] - 4555:1
**note** [17] - 4446:18, 4475:18, 4488:8, 4546:15, 4546:17, 4546:22, 4581:25, 4594:12, 4594:13, 4594:24, 4597:9, 4600:23, 4605:17, 4605:18, 4606:10, 4619:21
**noted** [1] - 4514:15
**notes** [5] - 4446:18, 4515:2, 4515:3, 4538:14, 4596:15
**nothing** [7] - 4482:14, 4509:17, 4510:11, 4544:24, 4584:1, 4588:12, 4597:4
**notice** [1] - 4519:8
**noticed** [1] - 4551:14
**notices** [2] - 4469:11, 4564:23
**notified** [1] - 4442:25
**notifying** [2] - 4593:7, 4595:10
**November** [12] - 4450:23, 4450:25, 4511:3, 4564:18, 4564:19, 4565:8, 4565:18, 4566:6, 4581:17, 4582:6, 4595:2, 4608:9
**number** [34] - 4439:19, 4459:19, 4462:3, 4467:6, 4482:11, 4483:19, 4483:22, 4484:10, 4484:12, 4484:20, 4485:17, 4494:7, 4496:17, 4501:18, 4507:19, 4507:24, 4509:13, 4512:8, 4512:16, 4527:21, 4555:4, 4555:10, 4556:12, 4561:13, 4570:6, 4575:14, 4582:9, 4588:24, 4589:10, 4599:5, 4605:4, 4605:12, 4609:24, 4613:10
**numerous** [3] - 4481:23, 4590:11, 4622:18

**NY** [1] - 4434:4

# O

**oath** [3] - 4438:18, 4530:25, 4533:14
**object** [7] - 4576:17, 4596:4, 4597:23, 4598:14, 4604:11, 4612:1, 4618:25
**objected** [1] - 4623:21
**objection** [18] - 4441:15, 4442:2, 4442:11, 4443:5, 4475:7, 4475:8, 4484:11, 4501:5, 4540:4, 4552:12, 4552:14, 4561:25, 4570:13, 4596:6, 4596:11, 4604:9, 4623:1, 4624:2
**objections** [3] - 4531:22, 4597:25, 4622:12
**obligated** [1] - 4529:3
**obligation** [1] - 4529:4
**obtain** [2] - 4463:15, 4510:21
**obtained** [1] - 4465:8
**obtaining** [1] - 4615:25
**obvious** [1] - 4576:24
**obviously** [3] - 4443:10, 4586:3, 4622:9
**occasion** [3] - 4462:15, 4480:23, 4571:2
**occasions** [3] - 4443:8, 4478:16, 4481:24
**occur** [1] - 4523:5
**occurred** [18] - 4452:25, 4456:12, 4462:22, 4465:21, 4469:14, 4471:7, 4471:10, 4477:4, 4477:23, 4481:22, 4497:9, 4506:23, 4507:19, 4545:19, 4548:10, 4550:4, 4561:2, 4571:7
**occurrence** [1] - 4508:14
**occurrences** [1] - 4590:23
**occurring** [1] - 4611:6
**occurs** [1] - 4459:15
**October** [10] - 4450:12, 4450:17,

4450:21, 4451:21, 4452:8, 4478:4, 4550:13, 4554:19, 4558:23, 4564:7
**odds** [1] - 4453:9
**OF** [4] - 4434:1, 4434:3, 4434:9, 4534:1
**offer** [16] - 4441:13, 4442:13, 4444:2, 4444:10, 4445:25, 4475:5, 4512:11, 4531:19, 4556:11, 4575:14, 4576:16, 4576:21, 4579:8, 4579:9, 4619:19
**offered** [5] - 4443:9, 4444:8, 4546:5, 4546:7, 4598:6
**offering** [3] - 4443:10, 4537:16, 4623:22
**office** [4] - 4448:11, 4478:25, 4493:3, 4529:20
**officer** [3] - 4524:17, 4558:24, 4560:21
**offices** [1] - 4449:16
**old** [3] - 4469:12, 4571:9
**Oliveras** [1] - 4535:7
**oLIVERAS** [1] - 4535:11
**OLIVERAS** [1] - 4535:16
**once** [7] - 4442:18, 4457:11, 4477:8, 4497:23, 4512:11, 4528:9, 4558:3
**one** [73] - 4436:1, 4436:2, 4440:10, 4441:1, 4445:21, 4448:16, 4451:5, 4451:23, 4453:8, 4453:16, 4454:7, 4459:9, 4459:11, 4460:2, 4464:15, 4468:23, 4475:25, 4476:21, 4480:23, 4485:15, 4493:11, 4516:11, 4520:7, 4521:20, 4522:9, 4523:6, 4524:5, 4524:11, 4525:25, 4528:22, 4535:22, 4540:6, 4540:7, 4543:13, 4544:16, 4544:17, 4554:20, 4555:9, 4555:17, 4556:14, 4558:7, 4558:10, 4558:16,

4564:3, 4564:4, 4565:14, 4571:17, 4582:20, 4590:8, 4590:10, 4591:1, 4591:4, 4591:8, 4591:10, 4591:13, 4592:18, 4598:6, 4599:6, 4599:10, 4600:21, 4605:13, 4609:6, 4609:16, 4610:4, 4610:6, 4610:7, 4610:13, 4619:24, 4623:5, 4623:7, 4623:19
**One** [1] - 4434:14
**ones** [2] - 4592:6, 4622:22
**ongoing** [2] - 4459:19, 4569:21
**open** [8] - 4444:1, 4538:17, 4541:1, 4572:1, 4579:1, 4588:25, 4589:24, 4608:1
**opened** [8] - 4589:15, 4589:19, 4589:20, 4589:21, 4590:2, 4591:8, 4592:9
**opens** [1] - 4539:7
**operated** [1] - 4501:22
**Operating** [2] - 4563:24, 4564:2
**operating** [30] - 4452:12, 4452:16, 4458:16, 4459:1, 4459:2, 4459:5, 4459:6, 4459:10, 4462:5, 4462:12, 4463:9, 4470:15, 4470:17, 4470:23, 4471:18, 4515:20, 4520:6, 4520:22, 4524:17, 4526:23, 4528:14, 4564:20, 4565:12, 4567:14, 4590:16, 4590:17, 4591:22, 4592:1, 4596:24
**operational** [2] - 4561:19, 4591:24
**operative** [1] - 4442:14
**opinion** [1] - 4589:10
**opportunity** [11] - 4436:16, 4437:17, 4461:21, 4515:22, 4531:21, 4536:7, 4541:23, 4541:25, 4542:7, 4542:23, 4602:20

**optioning** [1] - 4445:3
**oral** [1] - 4601:9
**order** [24] - 4454:2, 4454:9, 4454:15, 4460:9, 4461:11, 4461:12, 4468:6, 4491:13, 4505:13, 4512:11, 4513:11, 4523:15, 4556:15, 4559:13, 4562:6, 4564:9, 4605:22, 4605:23, 4606:2, 4606:24, 4619:19, 4619:20, 4620:2, 4620:12
**Order** [1] - 4435:1
**orders** [2] - 4605:6, 4606:13
**organization..** [1] - 4476:25
**original** [21] - 4457:15, 4471:3, 4486:11, 4508:13, 4520:3, 4527:16, 4542:21, 4545:15, 4547:11, 4548:21, 4550:2, 4564:20, 4583:4, 4595:17, 4600:11, 4600:12, 4600:13, 4600:22, 4601:1, 4601:3, 4601:17
**originally** [12] - 4470:24, 4490:7, 4521:21, 4544:18, 4545:25, 4557:24, 4559:7, 4564:4, 4568:18, 4583:1, 4583:6, 4601:7
**originated** [1] - 4491:9
**otherwise** [1] - 4577:16
**ourselves** [2] - 4438:25, 4559:24
**out-of-court** [1] - 4442:9
**outbound** [1] - 4561:15
**outgoing** [1] - 4446:17
**outside** [4] - 4435:24, 4538:3, 4539:17, 4581:21
**outstanding** [6] - 4479:18, 4491:19, 4491:24, 4492:11, 4505:12, 4569:25
**overall** [2] - 4445:18, 4590:7
**overruled** [1] - 4562:2
**overseeing** [1] - 4455:20

**overview** [1] - 4608:19
**owe** [1] - 4617:4
**owed** [8] - 4487:24, 4492:7, 4554:22, 4593:8, 4602:23, 4603:4, 4614:16, 4614:23
**Owen** [7] - 4494:4, 4512:24, 4513:2, 4527:7, 4528:2, 4529:11, 4587:25
**own** [12] - 4445:2, 4465:1, 4476:6, 4476:10, 4491:6, 4509:14, 4514:22, 4560:8, 4560:22, 4577:17, 4618:6, 4618:13
**owned** [10] - 4452:2, 4469:9, 4470:12, 4503:4, 4504:4, 4557:24, 4566:24, 4567:2, 4568:9, 4617:18
**owner** [3] - 4495:14, 4495:17, 4525:14
**owners** [1] - 4452:15
**ownership** [7] - 4487:18, 4498:17, 4500:6, 4501:16, 4502:2, 4503:5, 4503:6, 4504:6, 4525:1, 4525:10, 4554:1, 4554:5, 4554:9, 4559:15, 4562:6, 4615:17, 4617:15
**owns** [2] - 4590:20, 4615:15

## P

**package** [2] - 4531:14, 4565:11
**page** [27] - 4439:6, 4441:17, 4443:21, 4469:23, 4499:2, 4515:16, 4519:12, 4519:13, 4519:14, 4519:16, 4532:9, 4533:23, 4540:21, 4562:13, 4570:3, 4575:21, 4578:6, 4584:6, 4604:13, 4607:5, 4608:21, 4610:25, 4615:19, 4617:8
**pages** [5] - 4519:9, 4519:22, 4587:19, 4594:11, 4595:8
**Pahala** - 4523:12

**paid** [17] - 4457:23, 4460:18, 4485:5, 4488:24, 4500:4, 4503:24, 4505:10, 4511:12, 4517:9, 4518:1, 4519:3, 4520:7, 4556:20, 4556:23, 4556:24, 4557:2, 4614:10
**Palms** [3] - 4496:8, 4496:15, 4496:18
**Pandora's** [1] - 4539:8
**paper** [4] - 4596:13, 4596:21, 4597:2, 4597:4
**paperwork** [3] - 4466:6, 4467:7, 4596:22
**paradise** - 4505:7, 4509:2
**Paradise** [2] - 4505:9, 4505:17
**paragraph** [13] - 4442:3, 4442:14, 4442:15, 4444:23, 4451:20, 4452:4, 4510:13, 4526:19, 4615:5, 4615:21, 4615:23, 4617:3
**paragraphs** [2] - 4451:19, 4452:19
**parcel** [17] - 4472:1, 4489:7, 4491:13, 4491:15, 4491:21, 4494:25, 4496:11, 4497:18, 4497:19, 4512:3, 4520:17, 4524:12, 4524:15, 4524:18, 4524:20, 4561:17, 4589:21
**parcels** [12] - 4460:2, 4485:15, 4486:11, 4487:5, 4487:21, 4523:6, 4589:19, 4590:6, 4608:16, 4613:8
**parent** [2] - 4589:15, 4590:21
**parked** [1] - 4572:5
**parking** [2] - 4571:10, 4572:5
**part** [27] - 4442:12, 4445:22, 4452:7, 4471:9, 4471:21, 4472:1, 4472:2, 4486:14, 4488:5, 4489:7, 4496:11, 4507:19, 4512:3, 4548:11, 4559:11, 4561:17, 4565:17,

**paid** — 4565:23, 4588:20, 4590:18, 4599:17, 4599:19, 4602:16, 4606:16, 4611:22, 4616:20, 4618:9
**parted** [1] - 4570:24
**participants** [1] - 4440:25
**participate** [1] - 4462:17
**particular** [17] - 4444:6, 4453:8, 4466:9, 4467:10, 4472:18, 4474:25, 4481:25, 4488:6, 4512:15, 4516:1, 4519:25, 4521:25, 4561:6, 4571:8, 4615:5, 4622:11, 4622:16
**parties** [2] - 4536:13, 4575:19
**parting** [1] - 4571:1
**partner** [6] - 4454:13, 4590:12, 4591:3, 4591:5, 4591:7, 4591:9
**partner's** [1] - 4529:12
**Partners** [9] - 4449:20, 4450:9, 4450:18, 4558:4, 4558:5, 4558:8, 4558:14, 4560:8
**partners** [10] - 4454:7, 4457:22, 4459:20, 4460:18, 4464:17, 4492:5, 4496:5, 4613:7, 4616:15, 4616:16
**Partners'** [1] - 4450:11
**partnership** [6] - 4459:4, 4464:25, 4487:20, 4491:20, 4491:22, 4528:7
**partnerships** [1] - 4558:7
**passed** [2] - 4457:3, 4546:12
**passenger** [1] - 4569:8
**passengers** [1] - 4569:12
**passing** [1] - 4537:14
**past** [1] - 4465:14
**pause** [5] - 4446:2, 4543:14, 4604:10, 4620:23, 4623:6
**Pause** [1] - 4484:17
**pay** [5] - 4470:22, 4505:17, 4508:22,

4508:25, 4613:23
**paydown** [2] - 4462:22, 4462:25
**paying** [1] - 4557:5
**payment** [17] - 4489:10, 4489:15, 4489:19, 4489:23, 4496:1, 4498:2, 4498:3, 4500:4, 4500:23, 4500:24, 4501:1, 4501:13, 4508:8, 4509:6, 4512:2, 4557:1, 4603:3
**payments** [16] - 4460:13, 4460:17, 4469:17, 4485:25, 4488:8, 4488:9, 4489:6, 4497:14, 4497:21, 4508:25, 4509:3, 4512:4, 4518:7, 4519:1, 4614:1, 4614:6
**payout** [2] - 4453:15, 4518:8
**PC** [1] - 4447:17
**Peca** [11] - 4445:16, 4456:5, 4458:9, 4471:22, 4494:6, 4498:11, 4498:21, 4500:6, 4510:21, 4593:16, 4610:10
**Peca's** [6] - 4458:2, 4458:13, 4460:15, 4471:19, 4491:10, 4500:12
**pen** [1] - 4514:23
**pending** [3] - 4515:12, 4570:9, 4570:18
**people** [4] - 4467:3, 4479:15, 4539:5, 4546:7, 4613:3, 4622:19
**people's** [1] - 4600:24
**percent** [38] - 4452:15, 4454:3, 4460:14, 4462:8, 4463:13, 4463:15, 4463:22, 4464:7, 4464:13, 4465:8, 4500:6, 4500:13, 4501:14, 4501:25, 4508:10, 4521:21, 4525:14, 4525:16, 4527:10, 4527:11, 4557:4, 4560:10, 4560:15, 4567:13, 4580:24, 4580:25, 4585:14, 4599:16, 4617:9, 4617:17, 4617:20,

4617:21, 4617:23, 4618:6, 4618:12, 4618:14, 4618:20
**percentage** [8] - 4463:12, 4465:5, 4524:23, 4554:5, 4554:6, 4555:24, 4590:21, 4599:15
**Perferred** [1] - 4449:7
**performing** [1] - 4465:10
**perhaps** [6] - 4456:9, 4548:10, 4557:18, 4572:25, 4576:21, 4622:5
**period** [18] - 4453:9, 4460:13, 4477:5, 4478:14, 4492:15, 4492:23, 4493:9, 4502:11, 4502:19, 4512:4, 4528:22, 4569:12, 4571:14, 4581:10, 4588:23, 4589:4, 4597:15, 4608:7
**permission** [2] - 4438:23, 4539:19
**permit** [2] - 4619:22, 4620:8
**permitted** [4] - 4442:11, 4442:12, 4444:10, 4458:6
**permitting** [2] - 4468:1, 4468:10
**person** [5] - 4456:25, 4523:10, 4546:9, 4574:25, 4590:20
**personal** [19] - 4459:15, 4460:4, 4460:8, 4476:7, 4476:10, 4490:2, 4491:6, 4498:19, 4500:25, 4502:18, 4508:23, 4508:25, 4509:15, 4511:10, 4511:25, 4523:10, 4548:6, 4560:22, 4565:1
**personally** [10] - 4445:18, 4449:4, 4476:13, 4497:25, 4511:12, 4522:20, 4522:22, 4569:23, 4603:5, 4603:22
**persons** [1] - 4441:10
**perspective** [6] - 4435:14, 4436:11, 4436:12, 4442:18, 4502:15, 4539:1
**pertaining** [1] -

4555:24
**petroleum** [3] - 4460:2, 4460:5, 4523:5
**ph** [1] - 4524:14
**Phil** [1] - 4535:19, 4535:21, 4579:23
**Philip** [2] - 4451:22, 4510:18
**PHILIP** [1] - 4434:5
**Phillip** [4] - 4451:22, 4510:18, 4569:22, 4609:2
**PHILLIP** [7] - 4434:5, 4438:7, 4533:5, 4553:1, 4626:3, 4626:5, 4626:8
**Phoenix** [1] - 4575:3
**phone** [15] - 4472:23, 4478:11, 4481:25, 4482:2, 4482:5, 4482:6, 4545:20, 4547:10, 4548:4, 4548:15, 4548:16, 4551:19, 4551:20, 4577:23, 4595:14
**phony** [2] - 4597:17, 4598:11
**photocopies** [1] - 4563:5
**photocopy** [5] - 4519:5, 4526:22, 4529:10, 4563:23, 4564:1
**phrase** [3] - 4580:7, 4580:10, 4614:12
**phrased** [1] - 4606:1
**physically** [2] - 4474:19, 4478:24
**picture** [2] - 4494:6, 4494:7
**pictures** [1] - 4510:25
**piece** [4] - 4467:22, 4469:5, 4548:8, 4602:14
**pieces** [1] - 4596:2
**Pierrepont** [1] - 4434:14
**pits** [1] - 4460:5
**place** [7] - 4436:5, 4436:7, 4462:1, 4462:4, 4472:22, 4472:23, 4477:13, 4477:20, 4478:17, 4478:24, 4479:1, 4480:5, 4525:7, 4552:15, 4568:4, 4576:1, 4579:1
**Place** [2] - 4496:8, 4496:15, 4496:18

**placed** [2] - 4529:7, 4572:9
**placing** [1] - 4552:17
**plaintiff** [2] - 4605:6, 4606:21
**plaintiff's** [2] - 4605:5, 4619:25
**plan** [1] - 4621:8
**planned** [1] - 4468:14
**plans** [2] - 4455:25, 4476:16
**play** [4] - 4493:7, 4537:24, 4552:3, 4576:22, 4577:25
**Playboy** [1] - 4500:22
**played** [6] - 4461:24, 4545:8, 4583:20, 4593:16, 4602:13, 4602:16
**player** [27] - 4451:11, 4458:25, 4488:3, 4489:8, 4498:18, 4523:16, 4523:19, 4525:7, 4529:3, 4559:12, 4561:23, 4570:10, 4570:20, 4580:15, 4582:6, 4594:14, 4598:5, 4599:21, 4608:8, 4610:5, 4610:18, 4612:5, 4612:25, 4613:5, 4615:7, 4624:3, 4624:6
**player's** [1] - 4595:21
**players** [11] - 4582:16, 4586:2, 4593:6, 4594:22, 4595:11, 4596:16, 4602:23, 4614:16, 4616:3, 4616:18, 4618:16
**Plaza** [2] - 4434:14, 4434:22
**pledge** [1] - 4595:20
**plus** [2] - 4504:7, 4595:15
**pm** [2] - 4533:2, 4552:21
**pocket** [1] - 4572:9
**Point** [7] - 4455:3, 4455:14, 4457:12, 4464:17, 4464:21, 4465:5, 4465:9
**point** [92] - 4436:1, 4436:7, 4436:13, 4437:7, 4437:21, 4438:16, 4442:12, 4443:19, 4446:5, 4448:6, 4452:21, 4453:25, 4454:8, 4455:15, 4455:21,

4456:3, 4457:7, 4457:15, 4458:5, 4459:22, 4460:14, 4467:17, 4467:24, 4468:8, 4468:14, 4468:16, 4468:18, 4468:21, 4469:10, 4469:18, 4470:5, 4472:18, 4473:4, 4474:8, 4474:18, 4478:9, 4479:5, 4479:9, 4479:19, 4480:13, 4480:19, 4481:9, 4487:3, 4487:25, 4488:1, 4488:16, 4489:1, 4492:10, 4492:13, 4492:22, 4494:12, 4495:13, 4496:6, 4501:25, 4521:24, 4522:6, 4524:22, 4528:9, 4528:14, 4528:23, 4531:18, 4535:3, 4538:12, 4539:9, 4547:16, 4547:23, 4548:16, 4552:9, 4554:7, 4554:22, 4556:14, 4560:5, 4567:12, 4568:25, 4570:8, 4570:16, 4570:23, 4571:1, 4573:22, 4574:7, 4574:11, 4574:21, 4574:25, 4575:9, 4575:14, 4576:20, 4595:5, 4595:25, 4600:17, 4613:23, 4615:20, 4617:24
**points** [1] - 4624:15
**PORTION** [1] - 4534:1
**portion** [35] - 4443:16, 4444:19, 4451:15, 4463:4, 4471:12, 4478:7, 4497:8, 4498:22, 4498:23, 4500:16, 4504:7, 4511:11, 4514:20, 4517:9, 4522:16, 4527:15, 4542:12, 4544:10, 4544:24, 4548:3, 4548:10, 4549:20, 4550:3, 4550:18, 4551:2, 4551:8, 4566:19, 4574:24, 4593:16, 4596:12, 4605:21, 4606:6, 4619:20, 4623:21
**portions** [1] - 4443:14

**pose** [1] - 4580:13
**position** [3] - 4524:1, 4537:23, 4560:20
**possess** [1] - 4493:22
**possession** [7] - 4436:24, 4446:21, 4457:21, 4489:16, 4489:24, 4522:7, 4595:4
**possible** [4] - 4437:17, 4533:18, 4538:19, 4577:14
**possibly** [1] - 4436:9
**post** [1] - 4518:23
**post-closing** [1] - 4518:23
**postdated** [2] - 4558:21, 4559:13
**potential** [2] - 4523:5, 4594:25
**potentially** [2] - 4617:25, 4624:18
**practice** [1] - 4493:4
**prepare** [2] - 4456:24, 4457:5
**prepared** [6] - 4457:3, 4536:24, 4539:2, 4558:8, 4585:3, 4585:11
**preparing** [1] - 4577:17
**presence** [4] - 4438:4, 4538:3, 4539:17, 4552:20
**present** [12] - 4455:6, 4463:14, 4463:20, 4465:3, 4466:13, 4467:1, 4477:16, 4481:20, 4484:4, 4538:14, 4543:1, 4579:20
**presented** [3] - 4530:8, 4535:25, 4565:6
**preserved** [1] - 4538:15
**pretenses** [1] - 4510:22
**pretrial** [8] - 4441:8, 4461:5, 4475:3, 4480:22, 4530:13, 4563:11, 4568:19, 4585:5
**pretty** [3] - 4446:10, 4590:17, 4604:7
**previous** [14] - 4446:25, 4450:14, 4457:8, 4458:22, 4459:11, 4468:3, 4488:18, 4492:5,

4504:8, 4506:8, 4536:19, 4568:8, 4574:19, 4587:11
**previously** [15] - 4438:8, 4444:5, 4453:3, 4483:19, 4504:1, 4504:20, 4512:20, 4514:12, 4514:14, 4520:6, 4521:11, 4526:12, 4533:6, 4553:2, 4568:24
**primarily** [1] - 4455:24
**principal** [1] - 4504:10
**private** [10] - 4498:22, 4500:13, 4501:16, 4502:1, 4502:2, 4504:3, 4504:6, 4560:3, 4574:18
**privilege** [3] - 4533:18, 4533:20, 4537:18
**privileged** [2] - 4534:17, 4538:12
**Privitello** [2] - 4509:21, 4510:5
**problem** [7] - 4457:17, 4460:2, 4508:15, 4523:6, 4523:13, 4535:24, 4576:3
**problematic** [1] - 4538:5
**problems** [5] - 4464:15, 4464:24, 4477:23, 4478:5, 4488:21
**proceed** [4] - 4533:16, 4538:19, 4552:23, 4579:3
**proceeding** [3] - 4461:6, 4494:1, 4520:23
**Proceedings** [1] - 4434:25
**proceedings** [7] - 4446:2, 4484:17, 4542:1, 4543:14, 4604:10, 4620:23, 4623:6
**proceeds** [4] - 4470:23, 4471:12, 4490:18, 4504:5
**process** [4] - 4485:14, 4496:17, 4506:18, 4535:24
**produce** [2] - 4525:24, 4528:12
**produced** [7] - 4434:25, 4563:19, 4564:3, 4587:17,

4587:18, 4596:2, 4598:6
**products** [1] - 4485:20
**professional** [2] - 4475:21, 4481:10
**Professional** [1] - 4538:24
**proffer** [2] - 4512:10, 4605:18
**proffered** [1] - 4622:7
**proffers** [1] - 4548:20
**progressing** [1] - 4518:8
**project** [38] - 4453:7, 4454:6, 4455:1, 4455:20, 4457:17, 4461:8, 4461:17, 4464:9, 4464:18, 4465:15, 4467:19, 4472:2, 4474:12, 4474:15, 4478:18, 4479:9, 4480:16, 4480:19, 4480:25, 4485:13, 4486:25, 4487:24, 4505:7, 4505:11, 4505:18, 4506:11, 4514:6, 4523:15, 4524:13, 4524:18, 4556:7, 4556:11, 4556:20, 4615:18, 4616:8, 4617:22, 4617:24, 4620:15
**projection** [1] - 4478:6
**projects** [9] - 4441:1, 4461:20, 4464:2, 4468:22, 4468:25, 4474:9, 4479:15, 4526:13, 4618:10
**promised** [2] - 4478:4, 4514:8
**promises** [2] - 4477:22, 4510:23
**promissory** [7] - 4581:25, 4594:13, 4597:9, 4600:23, 4605:17, 4606:10, 4619:21
**pronouncing** [1] - 4495:12
**proof** [2] - 4442:13, 4599:14
**proper** [3] - 4457:5, 4576:14, 4605:23
**properly** [3] - 4517:12, 4559:2, 4624:21
**Properties** [1] - 4464:17
**properties** [4] - 4485:20, 4517:25,

4518:23, 4523:7
**Property** [3] - 4455:14, 4465:6, 4465:9
**property** [37] - 4451:25, 4452:1, 4452:3, 4452:11, 4452:18, 4455:3, 4456:23, 4457:13, 4461:12, 4464:21, 4466:17, 4467:13, 4467:16, 4468:1, 4468:7, 4468:9, 4469:2, 4469:6, 4469:9, 4469:10, 4469:11, 4470:6, 4470:9, 4470:12, 4470:20, 4471:13, 4478:7, 4486:15, 4503:5, 4505:10, 4510:21, 4523:2, 4524:24, 4525:15, 4566:24, 4567:2, 4568:8
**Property** [1] - 4452:2
**Propiedades** [1] - 4495:11
**proportionate** [1] - 4470:22
**proposal** [1] - 4611:18
**proposed** [4] - 4447:2, 4454:2, 4463:15, 4515:20
**protected** [1] - 4479:24
**protocol** [1] - 4575:17
**proven** [1] - 4606:20
**proverbial** [1] - 4539:8
**proves** [2] - 4597:17, 4598:11
**provide** [8] - 4451:13, 4475:21, 4483:24, 4564:13, 4574:23, 4599:20, 4606:13, 4606:16
**provided** [9] - 4461:5, 4545:8, 4549:15, 4549:18, 4562:11, 4564:4, 4576:13, 4587:20, 4615:7
**providing** [1] - 4574:22
**provision** [1] - 4557:3
**prudent** [1] - 4590:9
**public** [1] - 4533:19
**pulled** [1] - 4571:11
**purchase** [15] - 4451:25, 4452:18, 4461:12, 4468:6, 4485:9, 4485:12,

4491:14, 4494:21, 4496:8, 4496:15, 4529:20, 4529:24, 4574:18, 4574:19, 4589:21
**purchased** [10] - 4465:6, 4467:16, 4474:16, 4479:14, 4486:11, 4490:11, 4498:21, 4500:12, 4504:3, 4529:21
**purchases** [1] - 4589:18
**purchasing** [3] - 4452:10, 4496:17, 4554:6
**purport** [1] - 4599:10
**purported** [2] - 4447:18, 4564:16
**purportedly** [1] - 4536:8
**purports** [2] - 4568:6, 4599:6
**purpose** [19] - 4444:13, 4447:14, 4448:7, 4450:15, 4452:10, 4454:20, 4456:11, 4456:25, 4457:2, 4490:21, 4491:3, 4510:23, 4526:15, 4526:19, 4528:4, 4554:20, 4590:5, 4614:25, 4617:7
**purposes** [21] - 4440:16, 4444:22, 4446:24, 4448:17, 4452:5, 4452:21, 4482:11, 4496:25, 4506:16, 4512:9, 4512:17, 4512:18, 4521:4, 4527:23, 4528:20, 4531:13, 4553:12, 4566:14, 4569:7, 4589:10, 4589:14
**pursuant** [27] - 4447:1, 4448:6, 4449:21, 4450:6, 4450:16, 4450:19, 4451:8, 4456:15, 4457:8, 4458:14, 4458:16, 4458:19, 4458:21, 4459:23, 4487:17, 4490:10, 4492:11, 4496:7, 4497:15, 4497:25, 4516:11, 4518:8, 4524:25, 4526:13, 4548:22, 4556:24,

4558:6
**pursue** [3] - 4486:20, 4487:22, 4489:18
**pursuit** [1] - 4445:2
**pursuits** [1] - 4445:4
**put** [20] - 4444:14, 4460:10, 4468:8, 4487:5, 4490:14, 4491:13, 4523:25, 4524:20, 4533:19, 4535:13, 4555:1, 4572:8, 4574:4, 4590:6, 4611:21, 4612:24, 4613:12, 4616:25, 4618:13, 4622:18
**puts** [1] - 4533:17
**putting** [1] - 4469:5

**Q**

**qualification** [1] - 4540:6
**quarter** [2] - 4601:7, 4614:6
**questioning** [3] - 4436:19, 4452:22, 4539:18
**questions** [35] - 4435:21, 4435:22, 4436:14, 4438:24, 4451:7, 4452:5, 4452:21, 4483:5, 4490:5, 4530:22, 4532:4, 4534:11, 4534:12, 4535:4, 4535:7, 4535:12, 4535:14, 4535:23, 4535:25, 4536:7, 4536:15, 4536:17, 4540:12, 4540:18, 4541:15, 4541:18, 4543:11, 4543:15, 4548:23, 4549:1, 4552:5, 4561:14, 4579:23
**quick** [2] - 4487:9, 4505:19
**quickly** [2] - 4484:14, 4503:20
**quit** [1] - 4445:4
**quite** [3] - 4528:9, 4535:4, 4570:3
**quote** [2] - 4442:23, 4623:23
**quote-unquote** [2] - 4442:23, 4623:23

**R**

**raise** [1] - 4561:18

**raising** [1] - 4556:13
**Ranford** [7] - 4501:21, 4501:25, 4504:20, 4508:11, 4508:21, 4509:5, 4560:5
**Rangers** [1] - 4461:25
**rather** [8] - 4435:17, 4463:22, 4490:4, 4523:20, 4532:1, 4532:2, 4579:5, 4608:13
**RE** [1] - 4475:15
**reach** [4] - 4575:19, 4577:15, 4622:6, 4622:8
**reaching** [1] - 4483:17
**read** [20] - 4438:23, 4442:5, 4442:16, 4444:19, 4451:15, 4451:19, 4452:4, 4475:12, 4506:25, 4510:13, 4513:14, 4526:17, 4598:25, 4605:21, 4606:19, 4606:24, 4608:2, 4615:22, 4619:8, 4620:7
**reading** [2] - 4442:15, 4476:23
**reads** [6] - 4440:15, 4507:1, 4509:19, 4510:3, 4510:15, 4511:17
**ready** [5] - 4435:11, 4437:24, 4438:14, 4456:23, 4457:8
**real** [17] - 4451:25, 4454:5, 4462:2, 4467:22, 4468:17, 4479:9, 4486:12, 4487:6, 4490:17, 4529:22, 4538:22, 4581:1, 4581:6, 4581:9, 4588:11, 4591:17, 4592:2
**realize** [2] - 4549:22, 4550:16
**realized** [1] - 4549:25
**really** [2] - 4469:10, 4572:1
**realtors** [1] - 4468:19
**reason** [6] - 4467:20, 4487:12, 4489:13, 4543:5, 4560:12, 4618:3
**reasons** [3] - 4511:23, 4622:17, 4624:20
**recalled** [3] - 4467:2, 4544:9, 4574:1
**recalling** [1] - 4548:9

**receipt** [1] - 4451:8
**receive** [9] - 4453:15, 4501:1, 4501:3, 4501:12, 4501:24, 4508:9, 4560:6, 4592:24, 4606:2
**received** [39] - 4439:8, 4446:5, 4451:7, 4463:8, 4466:6, 4466:7, 4466:8, 4471:11, 4474:22, 4487:17, 4490:6, 4496:6, 4500:6, 4501:4, 4501:25, 4503:25, 4504:5, 4506:9, 4514:17, 4515:19, 4525:10, 4525:16, 4525:17, 4525:20, 4528:22, 4542:5, 4555:11, 4557:11, 4564:19, 4564:23, 4566:2, 4566:18, 4566:23, 4592:7, 4592:22, 4593:3, 4593:4, 4597:13, 4616:20
**receiving** [3] - 4451:6, 4477:24, 4501:14
**recent** [1] - 4459:5
**recently** [1] - 4487:5
**recess** [5] - 4483:11, 4483:12, 4532:7, 4579:14, 4579:15
**recession** [1] - 4588:11
**recognize** [12] - 4507:25, 4514:1, 4515:6, 4517:2, 4518:15, 4526:1, 4527:2, 4554:15, 4555:5, 4563:16, 4567:19, 4569:16
**recollect** [1] - 4545:24
**recollection** [5] - 4455:23, 4466:13, 4495:7, 4542:10, 4615:12
**recommended** [1] - 4471:24
**recommending** [1] - 4554:4
**reconstruct** [1] - 4559:5
**reconvene** [2] - 4530:16, 4619:8
**RECORD** [1] - 4626:6
**record** [25] - 4436:20, 4438:23, 4444:19, 4444:22, 4451:19, 4473:8, 4475:12,

4507:23, 4521:4, 4521:7, 4528:22, 4533:17, 4533:19, 4534:3, 4534:4, 4534:16, 4538:7, 4539:3, 4545:15, 4553:13, 4566:14, 4572:8, 4598:4, 4609:15, 4609:18
**recorded** [10] - 4434:25, 4436:6, 4542:12, 4542:16, 4542:20, 4543:7, 4547:18, 4549:7, 4550:17, 4559:15
**recording** [50] - 4542:21, 4542:24, 4543:23, 4544:6, 4544:10, 4545:8, 4545:10, 4545:14, 4545:25, 4546:5, 4546:14, 4546:15, 4546:23, 4547:11, 4548:4, 4548:7, 4548:11, 4548:12, 4548:18, 4550:2, 4550:12, 4550:14, 4551:13, 4551:16, 4552:3, 4552:5, 4572:13, 4573:1, 4573:18, 4573:20, 4574:2, 4574:7, 4574:12, 4574:13, 4574:22, 4574:24, 4575:6, 4575:8, 4575:10, 4577:5, 4577:16, 4577:19, 4577:24, 4578:3, 4593:17, 4593:18, 4593:19, 4593:21, 4594:1
**recordings** [2] - 4543:3, 4548:13
**records** [22] - 4466:12, 4492:1, 4492:14, 4492:17, 4493:8, 4493:13, 4493:15, 4493:18, 4500:18, 4501:3, 4501:9, 4514:13, 4559:1, 4559:9, 4559:14, 4559:16, 4561:14, 4594:5, 4594:6, 4594:11, 4595:8
**recovered** [2] - 4586:23, 4587:14
**recovery** [1] - 4454:24
**rectify** [1] - 4539:3
**redact** [1] - 4443:13

**redacted** [2] - 4435:7, 4443:15
**redirect** [2] - 4552:7, 4602:20
**reduce** [1] - 4462:20
**reduced** [1] - 4463:3
**refer** [1] - 4484:11
**reference** [25] - 4436:4, 4453:1, 4467:15, 4469:1, 4471:3, 4471:7, 4476:5, 4490:5, 4495:16, 4503:21, 4504:14, 4505:24, 4507:17, 4530:4, 4530:7, 4541:22, 4544:18, 4544:20, 4547:2, 4550:10, 4550:25, 4566:17, 4575:16, 4605:22, 4619:23
**referenced** [3] - 4439:24, 4484:21, 4518:25
**references** [3] - 4498:8, 4544:9, 4567:23
**referencing** [4] - 4526:20, 4544:21, 4546:25, 4566:23
**referred** [11] - 4445:21, 4494:1, 4526:24, 4555:21, 4560:16, 4581:10, 4581:25, 4588:12, 4590:10, 4590:11, 4609:24
**referring** [20] - 4476:7, 4476:9, 4506:22, 4506:23, 4520:10, 4520:12, 4541:13, 4546:7, 4565:25, 4576:23, 4582:12, 4582:14, 4585:6, 4585:8, 4587:10, 4592:10, 4598:23, 4599:1, 4605:19, 4608:18
**refers** [1] - 4620:5
**reflect** [5] - 4495:5, 4497:5, 4504:15, 4505:21, 4508:3
**reflected** [11] - 4463:22, 4484:24, 4485:3, 4490:1, 4490:25, 4497:11, 4507:18, 4509:15, 4514:19, 4558:17, 4559:10
**reflecting** [4] - 4439:9,

4446:5, 4593:22, 4618:23
**reflective** [1] - 4471:14
**reflects** [8] - 4446:17, 4494:17, 4496:7, 4498:11, 4527:14, 4527:17, 4545:4, 4560:9
**refresh** [1] - 4615:11
**refused** [2] - 4451:12, 4478:15
**regard** [6] - 4435:25, 4488:2, 4489:6, 4540:11, 4556:7, 4561:21
**regarding** [20] - 4442:23, 4443:5, 4445:6, 4455:13, 4455:21, 4456:5, 4472:19, 4484:25, 4538:2, 4539:4, 4539:14, 4550:9, 4566:1, 4574:9, 4576:5, 4576:12, 4579:7, 4595:18, 4595:21, 4619:9
**regardless** [1] - 4573:3
**regards** [2] - 4537:18, 4550:7
**regular** [2] - 4502:17, 4576:9
**regularly** [1] - 4502:14
**reiterated** [1] - 4605:15
**relate** [1] - 4452:20
**related** [15] - 4440:11, 4447:6, 4447:14, 4449:2, 4459:11, 4492:18, 4497:18, 4506:11, 4509:2, 4514:24, 4551:1, 4551:2, 4551:3, 4572:19, 4574:17
**relates** [37] - 4436:24, 4444:5, 4446:6, 4451:11, 4456:12, 4457:24, 4459:16, 4461:16, 4465:20, 4465:22, 4486:5, 4494:20, 4497:4, 4497:10, 4497:20, 4509:4, 4510:8, 4511:9, 4511:22, 4512:15, 4516:1, 4529:11, 4531:16, 4531:22, 4539:1, 4553:12, 4553:15, 4559:20, 4565:25,

4566:2, 4566:15, 4570:9, 4575:15, 4606:6, 4620:2, 4622:14, 4623:20
**relationship** [20] - 4447:10, 4447:18, 4447:22, 4453:4, 4462:11, 4472:13, 4472:15, 4472:17, 4472:25, 4473:14, 4474:3, 4476:11, 4481:4, 4481:5, 4481:6, 4481:11, 4482:20, 4482:24, 4485:12, 4595:13
**relationships** [1] - 4472:19
**relative** [2] - 4591:16, 4592:2
**release** [2] - 4497:19, 4565:1
**releasing** [1] - 4567:25
**relevance** [4] - 4448:1, 4448:12, 4449:8, 4500:9
**relevant** [8] - 4462:13, 4494:13, 4498:16, 4550:8, 4566:19, 4614:25, 4617:7, 4622:20
**relied** [2] - 4599:13, 4606:7
**remain** [1] - 4582:10
**remainder** [1] - 4548:7
**remains** [1] - 4473:10
**remember** [12] - 4507:7, 4544:19, 4545:10, 4545:14, 4545:17, 4547:3, 4547:6, 4586:13, 4593:18, 4593:19, 4615:2, 4624:17
**remembered** [1] - 4479:20
**remind** [2] - 4438:17, 4444:5
**removed** [4] - 4439:16, 4458:13, 4545:2, 4550:19
**reneged** [1] - 4603:6
**renovated** [1] - 4468:12
**renovating** [1] - 4509:2
**renovation** [5] - 4455:20, 4505:7, 4505:18, 4506:11, 4514:6
**renting** [2] - 4477:14,

4479:2
**repaid** [8] - 4454:3, 4458:24, 4497:23, 4508:12, 4555:23, 4580:19, 4580:20, 4613:22
**repairs** [2] - 4448:15, 4564:10
**Repay** [1] - 4554:24
**repay** [6] - 4457:14, 4478:7, 4500:15, 4504:7, 4504:9, 4614:4
**repaying** [2] - 4498:25, 4506:19
**repayment** [8] - 4477:9, 4502:7, 4502:8, 4527:16, 4583:9, 4597:14, 4603:8, 4614:10
**repeat** [1] - 4581:4
**repeatedly** [1] - 4508:10
**repetition** [1] - 4498:7
**repetitive** [3] - 4500:19, 4509:4, 4557:18
**rephrase** [1] - 4612:20
**replaced** [1] - 4520:3
**replay** [1] - 4551:7
**replaying** [1] - 4551:12
**replication** [1] - 4513:23
**report** [3] - 4489:5, 4525:20, 4525:21
**Reporters** [1] - 4434:20
**reports** [3] - 4592:17, 4593:1, 4593:11
**represent** [2] - 4493:24, 4503:24
**representation** [2] - 4514:23, 4570:6
**representations** [4] - 4449:4, 4510:23, 4513:9, 4572:17
**representative** [1] - 4529:2
**represented** [11] - 4448:7, 4448:16, 4460:13, 4462:8, 4494:3, 4494:4, 4494:5, 4527:9, 4536:12, 4602:6
**representing** [5] - 4474:1, 4482:2, 4482:5, 4569:10
**represents** [1] - 4524:18

**reproduction** [1] - 4525:19
**request** [5] - 4443:13, 4502:9, 4518:2, 4540:14, 4600:4
**requested** [4] - 4451:11, 4497:17, 4546:3, 4583:6
**requesting** [3] - 4470:22, 4555:14, 4555:19
**requests** [2] - 4592:23, 4620:4
**required** [9] - 4456:16, 4460:1, 4460:3, 4462:12, 4494:23, 4515:17, 4523:3, 4609:5, 4610:8
**requirement** [1] - 4463:3
**reserve** [1] - 4606:3
**residence** [2] - 4514:5, 4605:12
**residual** [4] - 4460:19, 4490:18, 4517:25, 4560:9
**resolution** [2] - 4546:3, 4575:19
**respect** [33] - 4439:24, 4445:17, 4445:18, 4446:19, 4452:22, 4459:24, 4462:18, 4489:7, 4505:11, 4509:25, 4514:9, 4515:14, 4515:23, 4517:8, 4517:23, 4518:22, 4523:24, 4526:8, 4529:20, 4541:11, 4543:8, 4547:9, 4556:6, 4557:13, 4561:1, 4561:16, 4569:20, 4569:24, 4571:23, 4608:15, 4624:1, 4624:12, 4624:13
**respected** [1] - 4476:18
**respective** [1] - 4560:4
**respond** [8] - 4509:24, 4572:21, 4573:4, 4605:7, 4606:12, 4619:25, 4620:3, 4620:6
**response** [5] - 4482:8, 4515:16, 4522:5, 4522:12, 4609:25
**responsibilities** [1] - 4596:16
**responsibility** [4] -

4460:12, 4523:21, 4528:21, 4529:4
**Responsibility** [1] - 4538:24
**responsible** [2] - 4460:7, 4523:4
**rest** [11] - 4442:11, 4447:2, 4453:23, 4453:24, 4486:13, 4492:17, 4520:13, 4552:1, 4552:6, 4614:7, 4620:2
**restate** [1] - 4473:2
**result** [16] - 4436:22, 4454:5, 4487:10, 4500:14, 4518:4, 4522:1, 4522:24, 4523:8, 4526:10, 4527:8, 4527:11, 4527:19, 4528:11, 4536:16, 4558:23, 4563:21
**resulted** [2] - 4482:14, 4536:17
**resulting** [2] - 4493:15, 4527:20
**resumes** [1] - 4483:15
**retain** [2] - 4600:25, 4601:10
**retained** [4] - 4600:5, 4600:9, 4601:3, 4601:17
**retainer** [2] - 4486:24, 4488:15
**retirement** [1] - 4596:18
**retrieve** [2] - 4462:20, 4487:23
**return** [4] - 4457:19, 4460:12, 4498:18, 4500:22, 4500:23, 4501:12, 4585:15
**returned** [7] - 4453:3, 4457:13, 4457:25, 4459:16, 4460:16, 4462:16, 4493:17
**review** [14] - 4441:8, 4461:5, 4462:14, 4475:4, 4480:22, 4530:13, 4543:9, 4545:21, 4546:17, 4546:22, 4563:11, 4568:20, 4576:14, 4604:9
**reviewed** [5] - 4439:10, 4562:10, 4585:5, 4586:9, 4594:12
**reviewing** [1] - 4546:14

**revolving** [3] - 4594:17, 4599:4, 4603:9
**Rica** [1] - 4479:14
**RICHARD** [1] - 4434:17
**Richards** [2] - 4446:6, 4446:16
**Rick** [1] - 4565:5
**right-hand** [1] - 4476:20
**ring** [1] - 4507:12
**rise** [4] - 4483:13, 4484:3, 4579:16, 4579:19
**risk** [5] - 4460:12, 4460:14, 4465:2, 4523:24, 4590:7
**risky** [1] - 4588:4
**robber** [2] - 4544:16, 4544:20
**robbers** - 4544:16
**ROBERT** [1] - 4434:18
**Robert** [2] - 4476:3, 4569:13
**Rodriguez** [4] - 4447:5, 4450:13, 4450:14, 4450:22
**role** [4] - 4493:7, 4582:24, 4583:20, 4602:13
**roles** [1] - 4483:2
**Ronald** [1] - 4446:15
**room** [2] - 4479:1, 4480:8
**Rozenboom** [2] - 4565:5, 4566:5
**Rucchin** [1] - 4610:10
**Ruchin** [1] - 4560:5
**rules** [2] - 4480:12, 4536:10
**ruling** [1] - 4623:19
**run** [2] - 4540:13, 4571:13
**running** [2] - 4486:20, 4488:16

**S**

**Sag** [22] - 4452:1, 4452:3, 4452:10, 4452:18, 4454:6, 4461:23, 4464:21, 4467:13, 4468:1, 4468:5, 4468:9, 4468:11, 4468:15, 4468:17, 4469:1, 4470:8, 4470:12, 4471:12, 4496:21, 4566:19, 4566:24

**sale** [10] - 4457:13, 4469:5, 4471:12, 4487:5, 4487:10, 4491:14, 4504:6, 4525:6, 4560:3, 4589:21
**sales** [3] - 4478:6, 4483:1, 4487:21
**San** [21] - 4474:2, 4474:14, 4476:4, 4476:14, 4477:14, 4478:16, 4478:20, 4478:22, 4479:12, 4482:22, 4483:2, 4569:11, 4580:21, 4597:10, 4600:7, 4601:11, 4614:3, 4614:8, 4618:4, 4618:6, 4618:20
**SARITA** [1] - 4434:15
**sat** [1] - 4572:9
**Saturday** [1] - 4538:23
**save** [5] - 4531:8, 4572:2, 4576:2, 4577:21, 4620:12
**saw** [15] - 4440:22, 4480:24, 4500:18, 4509:8, 4515:2, 4521:17, 4521:20, 4525:20, 4537:14, 4540:7, 4553:23, 4560:24, 4593:2, 4593:15, 4595:22
**schedule** [2] - 4527:6, 4527:24
**scheduling** [1] - 4621:1
**Scheme** [1] - 4451:17
**scheme** [11] - 4451:24, 4452:7, 4471:21, 4472:3, 4488:5, 4489:7, 4507:20, 4510:19, 4510:24, 4559:11, 4566:17
**Schwab** [1] - 4509:11
**Scottsdale** [10] - 4507:6, 4511:5, 4511:6, 4511:19, 4511:21, 4543:25, 4545:22, 4548:15, 4571:5, 4586:23
**screen** [1] - 4599:1
**script** [1] - 4540:1
**seal** [3] - 4552:16, 4552:17, 4604:4
**SEALED** [2] - 4534:1, 4626:6
**Sean** [2] - 4448:21, 4585:12

**search** [1] - 4548:22
**seated** [7] - 4483:14, 4484:5, 4530:19, 4552:22, 4579:17, 4579:21, 4619:14
**Seattle** [1] - 4466:20
**second** [11] - 4479:11, 4485:16, 4508:13, 4514:4, 4520:18, 4526:5, 4526:19, 4600:15, 4615:22, 4623:5
**seconds** [2] - 4542:22, 4551:6
**secret** [1] - 4476:18
**secretary** [1] - 4602:17
**section** [6] - 4513:9, 4518:3, 4526:14, 4526:15, 4540:7
**secure** [5] - 4456:16, 4464:17, 4464:22, 4465:1, 4564:9
**Securities** [1] - 4587:20
**security** [3] - 4475:21, 4476:13, 4476:14
**see** [40] - 4438:12, 4460:25, 4466:17, 4484:21, 4485:21, 4485:24, 4485:25, 4495:20, 4495:23, 4496:10, 4496:22, 4501:18, 4503:22, 4504:19, 4504:22, 4504:23, 4504:25, 4505:1, 4505:25, 4506:1, 4506:3, 4506:4, 4506:17, 4506:23, 4516:23, 4522:4, 4527:24, 4532:6, 4535:7, 4558:12, 4571:2, 4571:12, 4571:20, 4575:11, 4575:18, 4593:5, 4619:10, 4622:22, 4624:22, 4625:1
**seeing** [2] - 4559:21, 4623:9
**seeking** [4] - 4603:3, 4614:7, 4619:19, 4622:12
**seem** [2] - 4502:16, 4503:2
**seepage** [1] - 4460:5
**seized** [1] - 4548:21
**select** [1] - 4484:11
**self** [1] - 4602:2
**self-authenticating** [1] - 4604:2

**sell** [4] - 4471:13, 4487:6, 4490:17, 4503:14
**seller** [1] - 4466:8
**send** [9] - 4440:18, 4462:12, 4487:13, 4488:14, 4500:21, 4547:19, 4555:19, 4574:5, 4583:8
**sending** [5] - 4476:16, 4547:3, 4547:6, 4547:22, 4570:2
**sense** [4] - 4496:12, 4503:2, 4503:8, 4564:6
**sensitive** [1] - 4437:3
**sent** [36] - 4439:18, 4440:10, 4440:14, 4440:20, 4441:10, 4443:3, 4460:16, 4465:23, 4469:11, 4469:18, 4470:21, 4473:25, 4498:14, 4498:19, 4504:2, 4509:11, 4513:8, 4513:18, 4521:23, 4524:5, 4524:10, 4527:7, 4546:1, 4546:11, 4547:1, 4548:2, 4548:9, 4549:15, 4550:25, 4555:14, 4559:25, 4566:13, 4568:14, 4570:17, 4574:7, 4574:12
**sentence** [2] - 4615:23, 4619:24
**separate** [1] - 4590:8
**September** [10] - 4450:2, 4450:4, 4450:8, 4450:10, 4458:18, 4526:6, 4550:13, 4555:18, 4569:19
**sequence** [4] - 4484:19, 4490:4, 4512:15, 4520:14
**sequentially** [1] - 4512:17
**Sergei** [2] - 4563:21, 4564:12
**series** [16] - 4435:21, 4440:10, 4458:8, 4460:17, 4470:14, 4470:21, 4477:21, 4478:3, 4508:25, 4559:3, 4560:25, 4566:11, 4566:12, 4606:12, 4614:1, 4614:5

**serious** [3] - 4475:18, 4475:19, 4478:12
**serve** [1] - 4435:16
**server** [2] - 4493:13, 4493:21
**service** [2] - 4465:10, 4476:18
**set** [15] - 4456:4, 4463:11, 4494:13, 4495:6, 4497:6, 4498:9, 4504:16, 4508:6, 4510:16, 4511:2, 4526:5, 4532:1, 4560:23, 4571:20, 4615:16
**Setauket** [1] - 4568:4
**sets** [1] - 4587:11
**setting** [1] - 4514:6
**Settlement** [25] - 4439:10, 4440:12, 4442:7, 4445:1, 4445:20, 4446:18, 4446:24, 4447:7, 4447:11, 4447:15, 4447:19, 4447:23, 4448:2, 4448:7, 4448:13, 4448:17, 4448:22, 4448:25, 4449:5, 4449:8, 4449:11, 4449:22, 4450:6, 4450:16, 4450:19
**settlement** [5] - 4440:22, 4440:25, 4442:19, 4481:15, 4517:10
**settling** [1] - 4482:11
**setup** [2] - 4576:22, 4578:2, 4579:10
**seven** [6] - 4456:24, 4513:14, 4522:16, 4540:8, 4570:3, 4614:6
**Seven** [1] - 4511:3
**seven-inch** [1] - 4522:16
**several** [5] - 4478:16, 4488:18, 4525:18, 4557:15, 4573:6
**severe** [1] - 4486:15
**share** [3] - 4444:25, 4470:22, 4574:15
**sheet** [3] - 4451:12, 4524:9, 4525:21
**Shimon** [3] - 4457:4, 4465:25, 4466:1
**shocked** [2] - 4469:8, 4480:11
**Short** [1] - 4454:21
**short** [7] - 4454:12,

4458:23, 4477:18, 4496:24, 4502:16, 4503:9, 4503:10
**short-term** [4] - 4454:12, 4458:23, 4502:16, 4503:10
**shortly** [7] - 4480:15, 4487:2, 4488:12, 4529:18, 4545:7, 4549:7, 4621:20
**show** [10] - 4446:1, 4446:10, 4507:24, 4555:10, 4557:15, 4559:18, 4566:8, 4567:17, 4603:23, 4615:11
**showed** [3] - 4535:11, 4535:19, 4585:22
**showing** [5] - 4483:23, 4512:9, 4609:15, 4609:18, 4610:16
**shown** [4] - 4478:1, 4540:9, 4568:10, 4568:12
**shows** [4] - 4500:20, 4551:11, 4598:4, 4623:8
**side** [2] - 4441:16, 4495:21
**Sidebar** [2] - 4605:1, 4607:4
**sidebar** [12] - 4442:1, 4443:20, 4534:2, 4534:5, 4540:20, 4552:13, 4552:17, 4575:20, 4576:1, 4606:5, 4623:20, 4623:24
**sidebars** [1] - 4620:12
**sign** [9] - 4454:2, 4454:9, 4454:10, 4457:1, 4470:19, 4515:18, 4523:9, 4523:17, 4600:15
**signals** [1] - 4510:25
**signatory** [3] - 4591:7, 4591:9
**signature** [14] - 4453:17, 4456:16, 4470:16, 4516:2, 4516:17, 4516:20, 4517:16, 4521:20, 4521:25, 4522:3, 4522:5, 4522:8, 4599:11, 4601:3
**signatures** [6] - 4456:25, 4521:22, 4565:2, 4599:5, 4599:10, 4614:7

**signed** [36] - 4458:9, 4458:17, 4460:8, 4462:6, 4463:2, 4466:11, 4470:24, 4512:24, 4516:3, 4516:12, 4518:13, 4519:16, 4520:4, 4522:20, 4522:22, 4526:6, 4529:17, 4556:4, 4558:22, 4564:20, 4564:22, 4565:8, 4565:12, 4565:16, 4581:24, 4581:25, 4592:23, 4594:18, 4595:4, 4597:10, 4600:13, 4606:10, 4609:6, 4610:5, 4610:7

**significant** [2] - 4474:3, 4602:13

**signing** [5] - 4457:2, 4515:25, 4566:7, 4594:24, 4599:22

**signs** [2] - 4510:25, 4519:14

**Silver** [1] - 4447:17

**similar** [6] - 4444:4, 4513:23, 4556:13, 4558:3, 4582:10, 4623:3

**similarly** [1] - 4529:6

**Simon** [1] - 4610:11

**simple** [2] - 4538:22, 4539:5

**simply** [7] - 4443:9, 4444:19, 4494:20, 4497:12, 4550:10, 4622:14, 4624:4

**simultaneous** [1] - 4477:23

**single** [3] - 4558:7, 4566:22, 4601:3

**sit** [4] - 4468:21, 4535:19, 4560:12, 4620:25

**site** [2] - 4460:3, 4490:12

**sites** [3] - 4485:18, 4486:16, 4486:17

**sitting** [4] - 4437:5, 4535:18, 4535:19, 4621:3

**situation** [1] - 4539:12

**Six** [1] - 4510:2

**six** [11] - 4460:15, 4468:12, 4478:14, 4478:19, 4497:24, 4511:11, 4512:4, 4540:8, 4565:20, 4571:14, 4593:12

**six-month** [1] - 4512:4

**size** [1] - 4601:6

**skip** [5] - 4496:19, 4496:20, 4497:3, 4507:22

**skipped** [3] - 4494:11, 4494:14, 4494:17

**skipping** [1] - 4494:9

**skyrocketing** [1] - 4529:23

**slide** [1] - 4506:8

**small** [6] - 4474:15, 4485:19, 4486:16, 4490:12, 4498:23, 4598:24

**smaller** [4] - 4461:21, 4485:18, 4531:12, 4531:13

**sold** [9] - 4470:9, 4470:12, 4470:20, 4486:17, 4508:10, 4508:20, 4524:24, 4525:2, 4525:15

**sole** [3] - 4518:6, 4591:7, 4591:9

**solid** [1] - 4476:17

**sometime** [7] - 4439:21, 4442:8, 4545:7, 4548:4, 4558:22, 4592:16, 4595:1

**sometimes** [1] - 4581:25

**somewhere** [3] - 4468:19, 4520:20, 4572:5

**son** [2] - 4571:9, 4572:6

**Sonnenschein** [1] - 4447:9

**sorry** [4] - 4546:20, 4562:4, 4580:9, 4581:3, 4582:4, 4592:1, 4600:8, 4602:1, 4603:8

**sounds** [3] - 4511:1, 4587:10, 4587:23

**source** [3] - 4454:22, 4460:6, 4470:2

**Source** [3] - 4563:20, 4564:24, 4565:4

**sources** [1] - 4556:13

**speaking** [2] - 4571:14, 4597:25

**special** [2] - 4489:4, 4526:13

**specific** [4] - 4496:18, 4555:9, 4589:14, 4590:5

**specifically** [15] -

**spent** [3] - 4476:19, 4538:23, 4603:18

**sphere** [1] - 4472:6

**spheres** [1] - 4531:12

**sports** [1] - 4493:3

**spreadsheet** [10] - 4439:9, 4446:15, 4451:9, 4560:17, 4560:24, 4561:12, 4561:22, 4561:24, 4562:5, 4562:10

**spreadsheets** [3] - 4440:22, 4561:5, 4622:24

**spring** [2] - 4477:12, 4486:19

**square** [1] - 4485:23

**stage** [1] - 4618:10

**stages** [1] - 4474:14

**stake** [5] - 4490:14, 4514:7, 4525:10, 4527:10, 4618:20

**stamped** [3] - 4546:15, 4546:16, 4609:12

**stand** [8] - 4435:21, 4438:2, 4440:23, 4483:15, 4512:13, 4533:13, 4534:15, 4624:11

**standard** [1] - 4512:23

**Standard** [8] - 4504:4, 4504:25, 4513:1, 4553:16, 4553:19, 4554:1, 4560:3, 4560:7

**start** [4] - 4456:1, 4467:24, 4486:24, 4608:9

**started** [6] - 4476:22, 4491:18, 4492:10, 4538:12, 4593:7, 4600:19

**starting** [5] - 4472:12, 4505:3, 4505:24, 4581:12, 4582:5

**State** [1] - 4538:24

**state** [13] - 4443:10, 4444:10, 4444:11, 4529:12, 4603:2, 4603:7, 4603:11, 4605:10, 4611:3,

**4611**:9, 4611:14, 4622:20, 4624:18

**statement** [6] - 4455:2, 4455:13, 4497:9, 4539:6, 4596:20, 4613:14

**statements** [12] - 4442:9, 4444:14, 4537:2, 4555:10, 4585:22, 4592:8, 4592:10, 4592:11, 4592:13, 4592:14, 4592:25, 4593:3

**states** [1] - 4513:15

**STATES** [3] - 4434:1, 4434:3, 4434:10

**States** [5] - 4434:13, 4434:16, 4587:20, 4603:15, 4605:3

**stating** [2] - 4452:13, 4513:14

**status** [4] - 4439:20, 4515:12, 4516:8, 4561:9

**stay** [2] - 4530:20, 4537:11

**stayed** [1] - 4466:16

**staying** [2] - 4544:19, 4575:4

**steal** [1] - 4611:23

**stealing** [1] - 4588:8

**Steiger** [1] - 4434:21

**stenography** [1] - 4434:25

**step** [1] - 4619:15

**steps** [2] - 4462:4, 4619:17

**Steve** [1] - 4560:4

**Steven** [3] - 4448:11, 4449:16

**Stevenson** [1] - 4610:14

**Stewart** [1] - 4449:2

**still** [21] - 4438:17, 4459:20, 4470:6, 4476:21, 4477:5, 4481:14, 4482:16, 4487:4, 4492:7, 4493:19, 4493:20, 4494:23, 4506:18, 4530:24, 4533:14, 4544:11, 4554:22, 4581:22, 4617:3, 4624:18

**stipulate** [1] - 4577:4

**stipulation** [1] - 4577:4

**stock** [10] - 4498:22, 4500:14, 4508:21, 4557:23, 4560:3,

**4560**:6, 4560:11, 4574:18, 4590:15

**stolen** [2] - 4487:23, 4597:19

**Stolper** [18] - 4546:8, 4547:17, 4547:19, 4547:22, 4547:23, 4548:2, 4548:9, 4549:7, 4549:15, 4573:23, 4574:4, 4574:8, 4574:12, 4574:14, 4574:15, 4574:23, 4577:8, 4577:15

**Stolper's** [1] - 4571:16

**stop** [5] - 4475:23, 4481:19, 4529:25, 4589:23, 4619:5

**store** [1] - 4573:21

**stored** [1] - 4596:13

**straighten** [1] - 4562:8

**strange** [1] - 4503:3

**strike** [1] - 4503:1

**stumpfel** [1] - 4618:16

**Stumple** [3] - 4582:14, 4584:2, 4584:3

**stunned** [2] - 4480:2, 4482:7

**subject** [4] - 4436:22, 4475:15, 4513:8, 4523:7, 4539:18

**submitted** [1] - 4536:5

**subpoena** [2] - 4577:18

**subsequent** [15] - 4453:21, 4457:22, 4459:6, 4462:24, 4463:2, 4490:20, 4498:3, 4523:2, 4530:12, 4561:8, 4561:16, 4585:24, 4589:17, 4601:5, 4614:15

**subsequently** [6] - 4441:7, 4461:4, 4465:19, 4475:3, 4563:10, 4568:20

**subsidiaries** [1] - 4597:3

**substance** [4] - 4479:4, 4522:19, 4524:3, 4617:3

**substantiating** [1] - 4606:17

**substantiation** [1] - 4599:14

**substituting** [1] - 4510:20

**success** [2] - 4616:8, 4616:11

**sue** [2] - 4603:2, 4603:7
**sued** [4] - 4563:20, 4565:3, 4569:21, 4603:5
**Suffolk** [4] - 4469:7, 4469:15, 4469:20, 4469:22
**suggest** [2] - 4534:20, 4576:2
**suggested** [2] - 4537:5, 4613:13
**suggesting** [1] - 4536:14
**suggestion** [2] - 4532:5, 4622:5
**Sullivan** [1] - 4447:25
**sum** [2] - 4504:1, 4617:3
**summarizing** [1] - 4534:6
**summary** [2] - 4474:9, 4525:21
**summation** [2] - 4514:13, 4597:22
**summer** [3] - 4487:1, 4583:5, 4595:1
**sums** [1] - 4490:7
**Supermarine** [1] - 4449:2
**supervised** [1] - 4451:24
**supplemental** [1] - 4530:21
**supposed** [1] - 4614:4
**surprised** [2] - 4571:12, 4571:20
**survey** [2] - 4467:25, 4468:11
**sustained** [1] - 4501:6
**Sustained** [6] - 4596:7, 4597:24, 4598:2, 4598:15, 4612:2, 4619:1
**Suzy** [2] - 4555:11, 4555:15
**sworn/affirmed** [3] - 4438:9, 4533:7, 4553:3
**Sydor** [4] - 4501:1, 4501:4, 4501:14, 4516:4
**Sydor's** [3] - 4500:23, 4521:20
**synopsis** [1] - 4574:1

### T

**table** [1] - 4616:12
**tactics** [1] - 4454:1

**Taffy** [1] - 4569:13
**tape** [23] - 4436:23, 4530:22, 4534:23, 4536:24, 4537:22, 4539:2, 4539:4, 4541:12, 4541:13, 4541:16, 4541:19, 4541:22, 4542:2, 4542:6, 4542:7, 4543:8, 4550:9, 4551:8, 4573:2, 4573:8, 4573:14, 4576:13
**tax** [12] - 4469:7, 4469:10, 4469:11, 4469:21, 4515:23, 4527:6, 4527:8, 4528:7, 4528:12, 4528:20, 4528:22
**team** [1] - 4546:8
**telephone** [2] - 4473:18, 4586:21
**telephonically** [1] - 4473:17
**ten** [2] - 4531:9, 4532:6
**tens** [1] - 4493:15
**Term** [1] - 4454:21
**term** [6] - 4454:12, 4458:23, 4461:8, 4502:16, 4503:10, 4570:23
**termination** [2] - 4493:14, 4493:17
**terms** [11] - 4449:22, 4450:19, 4453:22, 4454:16, 4481:4, 4489:20, 4525:5, 4577:24, 4582:10, 4596:17, 4597:14
**terse** [1] - 4479:21
**Tesoriero** [6] - 4452:14, 4455:8, 4455:15, 4455:18, 4456:1, 4462:9
**test** [2] - 4485:20, 4566:15
**testified** [38] - 4442:22, 4442:24, 4443:2, 4443:5, 4445:5, 4446:4, 4453:3, 4455:8, 4457:4, 4461:6, 4463:8, 4463:14, 4463:25, 4465:3, 4465:18, 4466:22, 4471:25, 4496:24, 4520:6, 4524:17, 4529:8, 4538:3,

4541:10, 4557:9, 4567:15, 4568:24, 4570:22, 4581:24, 4586:9, 4589:7, 4593:16, 4601:20, 4605:14, 4610:15, 4613:6, 4617:16, 4623:25, 4624:1
**testify** [7] - 4451:6, 4471:4, 4474:4, 4534:10, 4539:10, 4556:17, 4602:2
**testifying** [6] - 4438:9, 4533:7, 4536:18, 4553:3, 4586:13, 4588:24
**testimony** [44] - 4435:25, 4436:2, 4436:4, 4436:8, 4436:18, 4436:19, 4436:21, 4439:17, 4439:22, 4439:25, 4455:11, 4463:18, 4463:19, 4471:16, 4472:7, 4477:10, 4494:12, 4498:7, 4498:16, 4503:21, 4518:25, 4520:8, 4522:2, 4534:9, 4537:21, 4538:9, 4539:3, 4541:21, 4544:8, 4544:14, 4544:17, 4544:23, 4550:7, 4555:22, 4557:13, 4560:16, 4566:1, 4571:19, 4586:10, 4597:18, 4598:17, 4601:10, 4612:12, 4624:5
**Texas** [6] - 4479:10, 4480:16, 4480:19, 4480:24, 4569:1, 4569:3
**text** [14] - 4472:24, 4473:18, 4478:10, 4546:1, 4547:1, 4551:1, 4566:12, 4566:18, 4566:22, 4568:8, 4568:14, 4586:20, 4595:9, 4595:12
**texts** [1] - 4622:19
**Thalmann** [2] - 4564:21, 4569:9
**thanks..** [1] - 4475:16
**THE** [109] - 4434:10, 4435:5, 4435:10, 4437:1, 4437:12, 4437:19, 4437:24, 4438:1, 4438:11,

4438:20, 4438:21, 4439:1, 4442:16, 4442:21, 4443:15, 4444:3, 4444:20, 4475:9, 4475:13, 4483:4, 4483:7, 4483:13, 4483:14, 4483:16, 4484:2, 4484:3, 4484:5, 4495:2, 4501:6, 4512:14, 4530:15, 4530:19, 4530:24, 4531:1, 4531:2, 4531:5, 4531:9, 4531:11, 4531:23, 4532:6, 4533:12, 4533:15, 4533:22, 4534:1, 4534:3, 4535:15, 4537:20, 4538:1, 4539:12, 4540:15, 4541:3, 4543:12, 4543:16, 4549:2, 4551:23, 4552:1, 4552:10, 4552:14, 4552:22, 4562:2, 4573:9, 4575:20, 4576:2, 4577:3, 4577:10, 4577:13, 4577:18, 4577:21, 4578:4, 4579:2, 4579:16, 4579:17, 4579:19, 4579:21, 4579:24, 4596:7, 4597:24, 4598:2, 4598:15, 4599:8, 4604:6, 4604:12, 4605:21, 4606:4, 4606:23, 4608:2, 4612:2, 4619:1, 4619:3, 4619:7, 4619:14, 4619:16, 4619:18, 4620:11, 4620:24, 4621:8, 4621:12, 4621:13, 4621:15, 4621:16, 4621:21, 4622:1, 4622:9, 4623:4, 4623:7, 4623:12, 4623:15, 4623:19, 4625:1
**themselves** [1] - 4523:25
**thereafter** [8] - 4436:7, 4452:12, 4456:13, 4480:15, 4487:2, 4488:13, 4502:5, 4508:8
**therein** [1] - 4624:9
**they've** [1] - 4537:12
**thinking** [2] - 4577:10,

4623:8
**third** [2] - 4450:21, 4508:14
**THIS** [1] - 4534:1
**Thomas** [2] - 4454:13, 4569:20
**thousands** [1] - 4493:16
**three** [20] - 4460:12, 4479:7, 4482:22, 4483:3, 4506:25, 4507:1, 4514:16, 4514:24, 4519:9, 4540:12, 4555:9, 4558:6, 4558:7, 4558:13, 4566:11, 4566:18, 4568:7, 4568:10, 4614:9, 4617:8
**throughout** [2] - 4479:14, 4573:2
**Thursday** [5] - 4435:19, 4442:22, 4534:9, 4544:19, 4550:7
**Tim** [2] - 4553:18, 4554:19, 4555:10, 4555:18, 4555:22, 4556:4, 4559:25
**time-to-time** [1] - 4493:4
**timeline** [2] - 4435:17, 4435:18
**timer** [1] - 4551:11
**Timothy** [7] - 4507:12, 4507:14, 4554:6, 4554:8, 4555:15, 4555:25, 4556:9
**Title** [1] - 4485:6
**title** [2] - 4491:12, 4494:21
**titled** [2] - 4527:24, 4529:16
**today** [15] - 4437:20, 4440:1, 4473:22, 4475:19, 4476:6, 4476:11, 4480:5, 4493:19, 4559:22, 4560:12, 4577:8, 4582:11, 4586:10, 4613:6, 4623:17
**today..** [1] - 4476:17
**together** [6] - 4465:14, 4467:21, 4490:14, 4508:16, 4548:8, 4611:21
**Tom** [2] - 4482:1, 4535:21
**TOMMY** [2] - 4434:6, 4434:6

**Tommy** [18] - 4435:23, 4439:14, 4442:18, 4445:22, 4495:19, 4495:22, 4500:24, 4500:25, 4501:10, 4509:19, 4510:2, 4514:7, 4536:15, 4542:11, 4570:24, 4571:2, 4573:19, 4574:8

**tomorrow** [7] - 4619:8, 4619:10, 4620:12, 4620:17, 4620:22, 4622:10, 4625:1

**tonight** [1] - 4577:17

**took** [12] - 4436:5, 4436:7, 4479:1, 4488:24, 4489:22, 4509:3, 4558:3, 4568:4, 4572:4, 4572:8, 4585:14, 4586:3

**top** [3] - 4497:11, 4528:11, 6615:4

**top-down** [1] - 4528:11

**total** [8] - 4527:14, 4582:5, 4582:7, 4610:16, 4610:17, 4612:5, 4613:7, 4617:23

**totaling** [3] - 4565:22, 4614:1, 4614:6

**totalling** [1] - 4506:14

**toward** [1] - 4461:7

**town** [2] - 4523:12

**trace** [1] - 4594:10

**traceable** [2] - 4471:19, 4487:13

**traced** [1] - 4490:9

**track** [2] - 4505:13, 4506:10

**tracked** [2] - 4492:2, 4561:15

**tracking** [1] - 4506:16

**traffic** [1] - 4585:4

**trail** [2] - 4456:13, 4488:25

**transaction** [21] - 4457:8, 4459:19, 4496:18, 4498:21, 4500:11, 4500:14, 4502:10, 4506:6, 4506:7, 4507:17, 4507:25, 4510:1, 4510:12, 4515:15, 4515:24, 4527:20, 4558:1, 4592:17, 4593:1, 4593:11,

4616:2

**transactions** [22] - 4484:21, 4484:25, 4490:1, 4490:25, 4491:4, 4494:13, 4494:18, 4495:6, 4497:6, 4497:8, 4497:9, 4497:12, 4498:8, 4504:15, 4505:12, 4505:21, 4508:3, 4508:4, 4509:15, 4559:6, 4560:11, 4561:2

**transcribe** [1] - 4515:2

**transcribed** [1] - 4514:22

**transcript** [2] - 4434:25, 4439:6

**TRANSCRIPT** [2] - 4434:9, 4534:1

**transfer** [31] - 4456:12, 4456:13, 4469:19, 4486:5, 4486:7, 4496:11, 4501:9, 4505:14, 4507:3, 4507:18, 4509:5, 4509:10, 4509:11, 4509:20, 4510:5, 4510:9, 4510:10, 4511:4, 4511:11, 4511:18, 4511:24, 4512:5, 4516:8, 4516:11, 4517:21, 4518:11, 4558:13, 4560:7, 4561:8, 4584:3, 4585:22

**transferred** [12] - 4456:7, 4457:9, 4458:14, 4463:6, 4466:1, 4471:17, 4490:19, 4504:20, 4508:7, 4508:18, 4566:6, 4603:14

**transferring** [2] - 4488:20, 4506:3

**transfers** [13] - 4484:24, 4496:21, 4496:25, 4502:6, 4511:15, 4514:12, 4514:13, 4555:15, 4558:6, 4561:15, 4561:16, 4572:19

**transmit** [1] - 4510:24

**transmitted** [1] - 4510:25

**transpired** [2] - 4539:15, 4573:25

**travel** [3] - 4478:22, 4480:20, 4569:3

**traveled** [4] - 4467:21, 4480:18, 4480:24, 4595:14

**treat** [1] - 4586:3

**trial** [19] - 4438:14, 4457:5, 4471:5, 4472:8, 4474:17, 4505:8, 4535:14, 4537:13, 4538:20, 4559:21, 4580:7, 4580:10, 4586:10, 4590:11, 4590:24, 4593:15, 4595:22, 4612:12, 4625:2

**TRIAL** [1] - 4434:9

**tried** [1] - 4478:10

**trip** [2] - 4468:4, 4569:10

**true** [29] - 4441:9, 4441:12, 4463:21, 4464:4, 4473:6, 4473:17, 4474:21, 4477:6, 4485:10, 4488:10, 4491:1, 4495:24, 4513:1, 4513:17, 4525:19, 4543:3, 4568:13, 4586:16, 4586:19, 4586:20, 4594:4, 4598:19, 4602:21, 4602:25, 4612:16, 4613:15, 4613:19, 4618:21, 4618:22

**truly** [2] - 4509:4, 4609:2

**trust** [1] - 4557:17

**Trust** [14] - 4458:10, 4463:2, 4463:6, 4511:6, 4511:13, 4511:20, 4512:1, 4512:6, 4521:7, 4592:15, 4592:24, 4593:9, 4594:6, 4594:10

**truth** [4] - 4443:9, 4444:8, 4444:14, 4624:9

**try** [4] - 4487:23, 4490:17, 4577:15, 4577:23

**trying** [3] - 4445:4, 4511:14, 4538:16

**Tuesday** [1] - 4625:2

**tune** [2] - 4564:11, 4582:11

**turn** [1] - 4500:4

**turned** [9] - 4461:3, 4475:2, 4530:11, 4530:12, 4568:19, 4568:20, 4581:14,

4586:11, 4594:15

**Turner** [1] - 4610:14

**Tursi** [1] - 4434:20

**two** [40] - 4438:23, 4449:17, 4449:19, 4453:5, 4454:16, 4455:22, 4467:23, 4479:6, 4485:15, 4488:12, 4490:21, 4491:17, 4493:11, 4500:16, 4504:8, 4507:23, 4508:20, 4519:21, 4528:7, 4537:7, 4540:11, 4545:13, 4549:17, 4550:1, 4550:23, 4553:9, 4553:20, 4553:21, 4565:15, 4568:12, 4573:22, 4575:2, 4577:21, 4586:10, 4586:16, 4594:11, 4595:8, 4597:5, 4615:19, 4618:16

**two-and-a-half** [1] - 4491:17

**type** [1] - 4529:7

**typed** [1] - 4585:11

**types** [1] - 4555:9

**typically** [4] - 4462:14, 4472:23, 4576:24, 4589:13

**Tyson** [1] - 4610:6

## U

**U.S** [5] - 4475:2, 4530:12, 4563:9, 4568:19, 4569:23

**Ula** [17] - 4456:9, 4457:13, 4457:20, 4457:25, 4458:6, 4459:16, 4471:18, 4473:10, 4497:10, 4497:24, 4513:5, 4514:18, 4514:24, 4569:22, 4592:3, 4603:1

**ultimate** [1] - 4492:22

**ultimately** [12] - 4457:25, 4470:9, 4485:4, 4490:6, 4490:8, 4495:19, 4512:11, 4519:1, 4536:19, 4581:14, 4585:6, 4606:15

**unacceptable** [1] - 4478:12

**unanswered** [1] - 4470:25

**unaware** [22] -

4447:10, 4447:14, 4447:18, 4447:22, 4448:1, 4448:5, 4448:12, 4448:21, 4448:24, 4449:3, 4449:7, 4449:11, 4449:21, 4450:5, 4450:15, 4450:18, 4454:25, 4469:13, 4481:6, 4502:6, 4572:12, 4572:14

**unbeknownst** [1] - 4470:20

**uncharacteristically** [1] - 4479:19

**under** [22] - 4438:18, 4453:12, 4455:17, 4471:20, 4486:6, 4487:4, 4488:18, 4491:13, 4510:14, 4514:2, 4514:21, 4530:24, 4533:14, 4536:25, 4539:6, 4552:15, 4552:17, 4558:20, 4565:19, 4565:21, 4570:6, 4597:14

**underlying** [1] - 4512:7

**understood** [7] - 4471:11, 4471:16, 4480:9, 4494:15, 4494:16, 4595:19, 4596:20

**undeveloped** [1] - 4486:16

**unfulfilled** [1] - 4477:22

**union** [3] - 4611:3, 4611:9, 4611:14

**unique** [1] - 4557:19

**UNITED** [3] - 4434:1, 4434:3, 4434:10

**United** [5] - 4434:13, 4434:16, 4587:20, 4603:15, 4605:3

**unknown** [3] - 4454:13, 4469:3, 4488:23

**unlawful** [1] - 4460:3

**unless** [3] - 4503:14, 4576:3, 4622:15

**unlike** [1] - 4590:15

**unpaid** [2] - 4473:10, 4581:22, 4582:11

**unquote** [2] - 4442:23, 4623:23

**unrelated** [1] - 4454:22

**unscheduled** [1] -

4544:2
**unsigned** [1] - 4601:16
**untrue** [3] - 4463:24, 4602:5, 4613:20
**untruthful** [1] - 4537:1
**up** [44] - 4437:7, 4437:21, 4461:22, 4464:10, 4468:18, 4469:5, 4472:18, 4477:3, 4477:10, 4490:7, 4492:16, 4493:13, 4494:12, 4495:21, 4514:6, 4521:24, 4530:20, 4533:12, 4536:18, 4537:23, 4538:1, 4538:17, 4539:7, 4551:11, 4557:5, 4559:14, 4571:11, 4571:20, 4588:10, 4589:15, 4589:19, 4589:20, 4589:21, 4589:24, 4590:2, 4599:25, 4600:3, 4611:23, 4613:23, 4614:21, 4615:16, 4617:17, 4618:13
**upcoming** [1] - 4608:17
**updated** [1] - 4459:10
**updates** [3] - 4439:19, 4440:10, 4445:17
**upset** [2] - 4453:10, 4529:23
**upstairs** [1] - 4480:6
**upwards** [1] - 4479:17
**Urban** [1] - 4497:19
**urban** [1] - 4517:10
**US** [4] - 4434:4, 4434:21, 4441:6, 4461:4
**us..** [1] - 4475:19
**utilize** [1] - 4487:11
**utilized** [1] - 4487:21, 4491:8

### V

**vacation** [1] - 4623:7
**valley** [2] - 4505:7, 4509:2
**Valley** [2] - 4505:10, 4505:17
**value** [8] - 4487:7, 4500:25, 4501:12, 4501:24, 4503:18, 4525:2, 4525:15, 4615:7
**valued** [1] - 4500:7

**values** [2] - 4468:17, 4486:15
**various** [17] - 4451:19, 4494:17, 4498:18, 4504:15, 4541:15, 4543:1, 4555:12, 4593:6, 4596:1, 4596:25, 4597:3, 4605:6, 4610:5, 4610:18, 4612:25, 4614:14, 4620:4
**Vegas** [3] - 4569:11, 4585:24
**venture** [17] - 4453:7, 4453:11, 4491:22, 4513:10, 4513:12, 4515:12, 4518:9, 4522:17, 4528:5, 4529:19, 4588:4, 4591:17, 4592:3, 4608:19, 4611:6, 4611:18, 4615:9
**ventures** [7] - 4516:9, 4517:8, 4518:21, 4521:7, 4522:18, 4524:10, 4528:23
**Ventures** [16] - 4492:19, 4492:21, 4504:5, 4514:18, 4514:25, 4515:20, 4529:1, 4553:16, 4553:19, 4554:1, 4556:5, 4560:3, 4560:7, 4608:16, 4617:20, 4618:19
**vertical** [6] - 4456:2, 4468:9, 4482:21, 4497:20, 4504:22, 4505:3
**VI** [3] - 4485:7, 4485:14, 4589:22
**via** [2] - 4473:17, 4477:6
**view** [3] - 4439:14, 4536:14, 4536:16
**viewed** [1] - 4467:22
**villa** [1] - 4478:25
**Vincent** [3] - 4452:14, 4455:8, 4462:9
**Vinny** [1] - 4455:25
**violation** [1] - 4536:10
**virtue** [1] - 4555:23
**vis-à-vis** [1] - 4482:20
**visit** [1] - 4575:5
**voice** [1] - 4482:4
**voices** [1] - 4544:5
**voir** [3] - 4531:21, 4576:4, 4579:6
**Volpe** [1] - 4547:9

### W

**Waikapuna** [7] - 4485:15, 4491:15, 4497:18, 4524:12, 4524:15, 4524:18, 4589:20
**wait** [1] - 4600:7
**waited** [2] - 4528:6, 4572:10
**waiting** [5] - 4437:2, 4437:6, 4437:16, 4621:11, 4621:12
**waive** [1] - 4623:1
**waiving** [1] - 4537:18
**walked** [2] - 4480:6, 4572:6
**walking** [2] - 4571:8, 4571:10
**wants** [3] - 4533:19, 4575:18, 4622:18
**warrant** [1] - 4548:22
**warranties** [1] - 4513:9
**Washington** [2] - 4466:20, 4509:12
**water** [2] - 4460:6, 4523:13
**ways** [3] - 4498:2, 4570:24, 4571:1
**wealthy** [2] - 4502:23, 4503:8
**Wednesday** [7] - 4586:14, 4602:3, 4620:18, 4620:25, 4621:3, 4621:9, 4622:1
**week** [6] - 4437:5, 4478:14, 4500:16, 4514:4, 4544:8, 4593:15
**weekend** [3] - 4438:12, 4536:23, 4546:6
**weeks** [10] - 4460:15, 4478:19, 4497:24, 4508:20, 4545:13, 4549:17, 4550:1, 4550:23, 4565:20, 4575:2
**Wells** [3] - 4467:18, 4511:19, 4555:14
**wells** [1] - 4511:4
**West** [4] - 4466:2, 4466:15, 4466:19, 4467:21
**whatsoever** [3] - 4455:13, 4510:1, 4510:12
**whereas** [1] - 4489:17

**whole** [7] - 4532:1, 4605:23, 4617:21, 4620:2, 4620:5, 4620:22, 4621:23
**wife** [2] - 4480:24, 4555:11
**William** [2] - 4509:5, 4560:5
**Windwalker** [11] - 4513:13, 4515:14, 4515:17, 4515:21, 4517:11, 4521:10, 4522:18, 4528:5, 4528:8, 4611:7, 4611:19
**wire** [18] - 4457:9, 4463:6, 4469:19, 4507:1, 4507:3, 4507:18, 4508:18, 4509:19, 4509:20, 4510:3, 4510:5, 4511:1, 4511:3, 4511:11, 4511:18, 4555:15, 4584:3, 4585:21
**wire-transferred** [2] - 4457:9, 4463:6
**wired** [1] - 4511:1
**wish** [1] - 4531:22
**wishes** [3] - 4579:7, 4579:8, 4604:4
**withdraw** [3] - 4489:3, 4596:10, 4611:11
**withdrawal** [1] - 4489:4
**withdrawals** [1] - 4490:21
**withdrawn** [6] - 4500:18, 4544:13, 4545:6, 4553:15, 4553:20, 4568:11
**withdrew** [1] - 4599:16
**withhold** [1] - 4453:17
**witness** [7] - 4435:20, 4438:2, 4483:15, 4538:20, 4576:25, 4594:18, 4620:16
**Witness** [1] - 4619:17
**WITNESS** [4] - 4438:20, 4531:1, 4533:15, 4619:16
**witnesses** [3] - 4543:2, 4577:17, 4620:19
**won** [2] - 4468:5, 4585:25
**wondering** [2] - 4456:1, 4620:21
**word** [2] - 4514:21,

4545:1
**Worden** [2] - 4515:14, 4528:8
**words** [4] - 4473:5, 4544:25, 4545:16, 4592:3
**world** [2] - 4524:12, 4581:7
**worry** [1] - 4621:13
**worth** [6] - 4468:19, 4502:20, 4503:13, 4577:21, 4581:15, 4617:25
**wrapped** [1] - 4617:17
**write** [2] - 4535:3, 4554:24
**writes** [1] - 4516:24
**writing** [4] - 4535:14, 4554:20, 4556:16, 4613:5
**writings** [1] - 4510:25
**written** [8] - 4515:10, 4521:17, 4569:19, 4585:6, 4608:25, 4609:6, 4611:16, 4616:23
**wrote** [6] - 4439:13, 4445:6, 4496:8, 4554:19, 4608:22, 4608:24

### Y

**year** [10] - 4442:6, 4460:13, 4468:16, 4472:14, 4488:18, 4528:6, 4529:18, 4565:4, 4571:9, 4595:15
**year-and-a-half** [1] - 4565:4
**years** [16] - 4453:20, 4476:19, 4476:20, 4482:23, 4483:3, 4485:24, 4486:2, 4487:12, 4487:20, 4490:13, 4491:17, 4504:8, 4528:7, 4556:12, 4561:13, 4586:18
**YORK** [1] - 4434:1
**York** [19] - 4434:14, 4434:22, 4448:1, 4452:1, 4453:17, 4454:6, 4461:24, 4461:25, 4464:21, 4466:3, 4482:1, 4507:5, 4509:22, 4510:6, 4510:17, 4538:24, 4546:7,

4568:5, 4573:23
**yourself** [5] - 4513:2,
4542:16, 4543:7,
4570:19, 4586:3

## Z

**zero** [1] - 4465:12
**zip** [1] - 4529:12