4627

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA     :   13-CR-607

        -against-                 US District Court
                                  Central Islip, NY

PHILLIP A. KENNER a/k/a
PHILIP A. KENNER, and
TOMMY C. CONSTANTINE a/k/a
TOMMY C. HORMOVITIS,

                  Defendants.:  June 23, 2015
- - - - - - - - - - - - - - X   10 am

          TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE JOSEPH F. BIANCO
          UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:
                          KELLY T. CURRIE
                          United States Attorney
                          One Pierrepont Plaza
                          Brooklyn, New York 11201
                          By:  JAMES MISKIEWICZ, ESQ.
                               SARITA KOMATIREDDY, ESQ.
                          United States Attorneys

For the Defense:          RICHARD D. HALEY  ESQ.
                          For Defendant Kenner

                          ROBERT LaRUSSO, ESQ.
                          ANDREW L. OLIVERAS, ESQ.
                          For Defendant Constantine


Court Reporter:           Dominick M. Tursi, CM, CSR
                          US District Courthouse
                          1180 Federal Plaza
                          Central Islip, New York 11722
                          (631) 712-6108  Fax:  712-6124
                          DomTursi@email.com


          Proceedings recorded by mechanical stenography.
          Transcript produced by CAT.

4628

1      (Call to Order of the Court.  Appearances stated

2  as indicated above.)

3      (The following ensued in the absence of the

4  jury. )

5

6      THE COURT:  Good morning.  Are we ready to go?

7      MR. MISKIEWICZ:  Yes, your Honor.

8      MR. LaRUSSO:  Yes, your Honor.

9      MR. HALEY:  Yes.

10      THE COURT:  Bring in the jury.

11      Mr. Kenner, please come up to the stand.

12      (The following ensued in the presence of the

13  jury.)

14

15  **PHILLIP A KENNER**

16      called by the Defense, having been previously

17      duly sworn/affirmed, continued testifying as

18      follows:

19

20      THE COURT:  Good morning, members of the jury.

21  It is good to see you all again.

22      As you know, when we ended yesterday, Mr. Kenner

23  was on cross-examination.  This morning we will continue

24  from that point.

25      Mr. Kenner, I remind you that you are still

Kenner - Cross/Mr. Miskiewicz

4629

1    under oath.  Do you understand?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Go ahead, Mr. Miskiewicz.

4              MR. MISKIEWICZ:  Thank you, your Honor.

5

6    CROSS-EXAMINATION (Continued)

7    BY MR. MISKIEWICZ:

8    Q.   Mr. Kenner, when we broke yesterday I was asking you

9    questions about your interest in Cabo San Lucas.

10             Just to backtrack a little.  At page 4618 of the

11   transcript I asked you:

12             *Question:  You own 39 percent of Diamanté Cabo*

13   *San Lucas to this day, don't you?*

14             *Answer:  Yes, sir, I do.*

15             And that is still your testimony, correct?  You

16   own 39 percent of Cabo San Lucas, right?

17   A.   I believe I do.

18   Q.   And there were some questions about documentation.

19             Let me show you what I'm marking for

20   identification as Government Exhibit 4502.

21             Do you recognize 4502?

22   A.   Yes, I do.

23   Q.   What do you recognize it to be?

24   A.   The operating agreement for Baja Ventures 2006 LLC.

25   Q.   And that is the LLC that you created as a vehicle for

Kenner - Cross/Mr. Miskiewicz

4630

1   which to invest in Mr. Jowdy's Diamanté Cabo San Lucas

2   resort.  Is that correct?

3   A.    That is not correct.

4   Q.    Okay.  Why did you create the LLC?

5   A.    I did not create Baja Ventures 2006 LLC.

6   Q.    Who did create it?

7   A.    It was created by I believe Bill Najam and/or Larry

8   Markowitz.

9   Q.    Okay.  But you don't have any question that this is

10  in fact the limited liability company agreement for Baja

11  Ventures 2006.  Do you.

12  A.    No.  It appears to be.

13         MR. MISKIEWICZ:  The government offers into

14  evidence Exhibit 4502.

15         MR. HALEY:  No objection on my part, judge.

16         MR. LaRUSSO:  No objection, your Honor.

17         THE COURT:  4502 is admitted.

18         (Government Exhibit 4502 in evidence.)

19  BY MR. MISKIEWICZ:

20  Q.    Very briefly.  The first page indicates:  Limited

21  Liability Company Agreement of Baja Ventures 2006 LLC.

22  And according to this, the agreement was in effect dated

23  March 2, 2006.  Right?

24  A.    That's what it says.

25  Q.    But when was it?

Kenner - Cross/Mr. Miskiewicz

4631

1    A.    The top of the letter says dated March 2, 2006.

2          It is appears I signed it on or about the 6th of

3    March.

4    Q.    Okay.  Is this what you were referring to?  This

5    signature page?

6    A.    Yes, sir.

7    Q.    That is your signature.  Right?

8    A.    Yes, sir, that is.

9    Q.    And you are relying on the 6th of March because of, I

10   assume -- correct me if I'm wrong -- because of a fax

11   date.  Is that the reason?

12   A.    Yes, sir.

13   Q.    Okay.  And according to this, which is what describes

14   who is a member and what capital contributions were made,

15   you are a 100 percent member of that LLC.  Right?

16   A.    Yes, sir.

17   Q.    And it says here you contributed $2.5 million.

18         Where did you get that money from?

19   A.    The $2.5 million was originally loans that were made

20   to Ken Jowdy by Jere Lethinen and Joseph Stumple in the

21   summer of 2005.

22         In or about the time of this document being

23   created by Mr. Markowitz and Mr. Najam, Ken Jowdy had

24   informed me that he was not going to be paying back, not

25   only the Hawaiian loans but the loans to Mr. Stumple and

Kenner - Cross/Mr. Miskiewicz

4632

1    Mr. Lethinen at that time.  So as a preventative measure

2    when Mr. Jowdy reneged on the original loan agreement with

3    Mr. Lethinen in the summer of 2005, I signed a debt

4    agreement with both Mr. Stumple and Mr. Lethinen to secure

5    their funds behind Jowdy's promise to repay them, and as a

6    result a few more than steps occurred.  And then on

7    February 23, 2006, Mr. Najam initiated the formation of

8    Baja Ventures 2006 to hold my equity.  Which was not the

9    original plan.

10   Q.   Okay.  I show you what is marked for identification

11   as Government Exhibit 4503.

12            See if you recognize this.

13   A.   I have reviewed it.

14   Q.   Do you recognize that document?

15   A.   Not specifically.

16   Q.   Had you ever seen that documented before?

17   A.   I don't recall specifically if I have or not.

18   Q.   Turning your attention to the third-from-the-last

19   page.

20            Do you see any signatures on that page?

21   A.   Those are both my signatures.

22   Q.   And that is the signature page that accompanies the

23   rest of the document, is it not?

24   A.   Yes, I believe it is.

25   Q.   Do you have any doubt that you signed this document

Kenner - Cross/Mr. Miskiewicz

4633

1  at some point?

2  A.   No, sir.

3       MR. MISKIEWICZ:  The government moves for the

4  admission of 4503.

5       MR. HALEY:  Your Honor, the testimony is that he

6  signed the document.  My only concern is, at least at this

7  point, been able the testify that he saw this document,

8  and the test for authenticity.  I guess that would be my

9  only objection.

10      THE COURT:  There is sufficient authentication

11 by his testimony that that he signed it.  Whether he

12 remembers it or not, it still is permitted to come in.

13      MR. HALEY:  Okay.

14      MR. LaRUSSO:  No objection.

15      THE COURT:  4503 is admitted.

16      (Government Exhibit 4503 in evidence.)

17 BY MR. MISKIEWICZ:

18 Q.   Sir, directing your attention to the first page,

19 entitled Pledge and Securities Agreement, dated March 10,

20 2006, made by Ken Jowdy, Baja Ventures 2006.

21      That is the LLC we are talking about in

22 Government Exhibit 4502?

23 A.   Yes.

24 Q.   Diamanté Properties LLC.

25      What is Diamanté Properties LLC?

Kenner - Cross/Mr. Miskiewicz

4634

1    A.    I believe --

2    Q.    Actually, let me, just to save some time.

3          Diamanté Properties LLC, is that essentially the

4    parent company under which all the Cabo San Lucas LLCs

5    function?

6    A.    Not that I'm aware of.

7    Q.    CSL Properties 2006, KAJ Holdings LLC.  All of them

8    are pledgors.  And they are pledging something.  And the

9    rest of this is favor of Lehman Brothers.  Correct?

10   A.    That is what it appears to be.

11   Q.    You knew that Lehman Brothers, just before Lehman

12   Brothers came in and began to fund the Hawaii properties

13   that are the subject of this indictment, Lehman Brothers

14   also, prior to that, funded Ken Jowdy's resort project in

15   Cabo San Lucas.  Correct?

16   A.    I wouldn't refer to it as Ken Jowdy's resort in Cabo

17   San Lucas.  But Lehman Brothers did fund it for us.

18   Q.    I apologize.  It's not just Ken Jowdy's.  It's yours

19   as well.  Correct?

20   A.    It is also a number of investors as well.

21   Q.    But you will agree that Lehman Brothers funded Cabo

22   San Lucas just a few months before the closing on the

23   Hawaiian properties which are the subject of this

24   indictment.

25   A.    Five months prior.

Kenner - Cross/Mr. Miskiewicz

4635

1    Q.    And in this security agreement, which has your

2    signature as a pledgor in behalf of two companies, Baja

3    Ventures -- that is the one where you had the 100 percent

4    interest.  Correct?

5    A.    Yes, sir.

6    Q.    -- and CSL Properties 2006.

7          Who is CSL?

8    A.    Those are my client investors.

9    Q.    And those are your clients; for instance, like

10   Mr. Berard and others, who put money into Cabo San Lucas?

11   A.    I believe Mr. Berard is one of the investors.  Yes.

12   Q.    And others.  Right?

13   A.    Yes.  He is not the only investor.

14   Q.    At or about the same time, you had clients invest in

15   cash into Hawaii, they were also, at your recommendation,

16   investing other cash in this property.  Is that right?

17   A.    It was several years apart.

18   Q.    Well, it took several years for both Hawaii and Cabo

19   to get going; that is, to get Lehman Brothers.  Correct?

20   A.    No, that's incorrect.

21   Q.    All right.  What period of time?  Or isn't it true,

22   sir, that between 2004 and 2006, your clients were

23   investing both in the Hawaii project and in this project.

24   A.    Between 2004 and 2006 my clients were investors in

25   both projects.  That is correct.

Kenner - Cross/Mr. Miskiewicz

4636

1    Q.    Now, you said that, with respect to the Baja Ventures

2    LLC, the reason it was created is because Mr. Jowdy had

3    already informed you that he wasn't going to pay back the

4    money previously loaned to him?

5    A.    That is correct.

6    Q.    And when you say he wasn't going -- he was telling

7    you this, that he have wasn't going to pay back the money,

8    you mean the money that your hockey player clients loaned

9    through their lines of credit in the Hawaii Northern Trust

10   lines of credit.

11   A.    That's part of it.  But your statement was incorrect.

12   Q.    Okay.  But was partly true.  Some of that 5 million

13   came from their lines of credit?  Or all of their 5

14   million came from their lines of credit?  Which is it?

15   A.    Which 5 million are we speaking about?  With respect

16   to the destination.

17   Q.    Mr. Kenner, you said yesterday, I thought, that

18   during the Hawaii project inception, about $5 million out

19   of lines of credit went to Hawaii -- I'm sorry, went to

20   Mexico from the Northern Trust line of credit.

21         Do you recall saying that?

22   A.    No.  Not completely from the lines of credit.

23   Q.    Well, how much from the lines of credit did go to

24   Mexico?

25   A.    My best guess would be between $1 million and $1.5

4637

1    million.

2    Q.    So your testimony earlier in this cross-examination

3    is in error.

4    A.    No.  I believe you were asking how much money had

5    gone to Mexico to Mr. Jowdy on behalf of the Mexican

6    projects, and I believe my answer was approximately $5

7    million.  I don't think you specifically asked what came

8    directly out of the lines of credit.

9    Q.    Where did the rest of the $5 million come from?

10   A.    I believe some of the funds came from financing from

11   the Centrum loan and then some of the funds came from

12   investments that either Mr. Kaiser and/or myself put into

13   Hawaii project.

14   Q.    The Centrum loan?

15   A.    Was that a question?

16   Q.    Yes.

17   A.    I'm not sure I understand the question.

18   Q.    You sent money from the Centrum loan to Mexico?

19   A.    Yes.

20   Q.    So wherever the money came from -- by the way.  There

21   are records that support what you are saying?

22   A.    I believe we have already seen them on some of the

23   government charts.

24   Q.    But do you have wire-transfer records, documentation

25   showing that on behalf of your clients you were sending,

Kenner - Cross/Mr. Miskiewicz

4638

1   whether it was $5 million or $1.5 million to Mexico?

2          Do you have anything supporting that?

3   A.   I have received, through government production, bank

4   records that were turned over to my attorney and

5   subsequently turned over to me in pretrial to review, that

6   represent all of the bank transfers.

7          Second to that, I had also filed a lawsuit in or

8   about 2008 --

9   Q.   Mr. Kenner --

10  A.   -- against Mr. Jowdy and laid out each and every one

11  of the transactions that were given to Mr. Jowdy --

12          MR. MISKIEWICZ:  Your Honor --

13          MR. HALEY:  Your Honor, I have an objection.

14          THE COURT:  Wait.  Don't speak over him.  The

15  court reporter can't get it down.

16          And Mr. Kenner, confine yourself to the question

17  that he was asking you.  He was asking about

18  documentation.  Does the rest of your answer relate to

19  documentation?

20          THE WITNESS:  Yes, it was.

21          THE COURT:  Go ahead.  Finish your answer.

22  A.   The second half of the answer -- I apologize for

23  speaking over, your Honor.

24          The second half of the answer was that in or

25  about 2008 I filed a lawsuit that we saw yesterday, Little

Kenner - Cross/Mr. Miskiewicz

4639

1    Isle IV, Ula Makika, and myself against Ken Jowdy and the

2    State of Arizona which laid out each and every of the wire

3    transfers that were sent to Mr. Jowdy from the Hawaiian

4    entities.

5    BY MR. MISKIEWICZ:

6    Q.    That was the lawsuit that was dismissed.  Right?

7    A.    That was the Arizona lawsuit that was dismissed.

8    Q.    And it was dismissed because you were ordered by the

9    court to provide discovery on an expedited fashion to

10   substantiate the claim that that note that is now a Kenner

11   Exhibit was true; not a forgery.  Right?

12            MR. HALEY:  I object.

13            THE COURT:  Sustained.

14            MR. HALEY:  Thank you.

15   BY MR. MISKIEWICZ:

16   Q.    Well, were you -- isn't it true, sir, that you

17   refused to provide discovery in that lawsuit?

18   A.    That's completely inaccurate.

19   Q.    Isn't it true, sir, that you repeatedly delayed and

20   avoided submitting to a deposition in that lawsuit?

21   A.    That's also inaccurate.  The deposition was taken

22   before the date that was ordered by the court.

23   Q.    And isn't it true, sir, that ultimately it was

24   dismissed, not at your doing but by the court?

25   A.    The court dismissed the case.  That's correct.

4640

1    Q.    Now, 4503.  This document is -- withdrawn.

2          4502, the Baja Ventures Limited liability

3    company.  Your testimony earlier was this was at or about

4    the time that Mr. Jowdy indicated to you that he was not

5    going to repay the loans that had been made by the hockey

6    players.  Correct?

7    A.    His testimony, related to Baja Ventures 2006, was

8    with respect to the loans that he had taken from Jere

9    Lethinen and Joseph Stumple in the summer of 2005 and had

10   informed me in or about February 19, 2006, he was not

11   going to be repaying at the close of the Cabo loan.

12   Q.    What about the hockey players?  Was he going -- did

13   he also indicate he wasn't gong to be paying back the

14   hockey players, whether it is 5 or 1-1/2 million that they

15   loaned him?

16   A.    It was $5 million that was loaned from the Hawaiian

17   entities.

18          And he did inform me in or about that same day

19   that Lehman Brothers would not let him collateralize his

20   equity position, which was supposed to be 20 percent at

21   the time, to collateralize and receive the $7 million

22   payout so he could pay out the Hawaiian loan in full.

23   Q.    My question to you is, during this time in or about

24   March of 2006, is this when he told you he wasn't going to

25   repay?

Kenner - Cross/Mr. Miskiewicz

4641

1    A.    It was on or about February 19 he told me that he was

2    is not going to pay back either the Hawaiian loans or the

3    loans to Mr. Lethinen or Mr. Stumple, which resulted in

4    the Baja Ventures LLC being created.

5    Q.    And isn't it true, sir, that in, for instance, Kenner

6    Exhibit 93, this is the letter I think you referred to

7    yesterday as not the state of the union, you don't say

8    anything about that to your members in Little Isle IV,

9    that Ken Jowdy isn't going to pay you back?  Do you?

10   A.    This is three months after Mr. Jowdy told us he

11   wasn't going to pay us back.  And I informed each and

12   every one of the members.

13          But this in fact is a disclosure letter related

14   to the joint venture that we did with Lehman Brothers in

15   Alan Warden and Windwalker.

16   Q.    Where do you disclose that the man you just gave 5

17   percent into Na'alehu Ventures is welching on what you

18   claim to be a loan that he owes your clients.  Not your

19   clients; his clients.

20          Where do you disclose that in this letter?

21   A.    This letter was a disclosure letter with respect to

22   the joint venture agreement we were doing with Windwalker

23   and Lehman Brothers and had nothing to do with the actual

24   business affairs, the total business affairs of Little

25   Isle IV.

Kenner - Cross/Mr. Miskiewicz

4642

1    Q.    You don't think your clients would have wanted to

2    know in this letter?

3    A.    They all new.

4    Q.    How?  By calling them?

5    A.    Each one of them was aware.

6    Q.    You are a financial advisor dealing with millions of

7    dollars of money.  You are saying the only way you notify

8    these people, your clients, was on the telephone?

9    A.    And in-person meetings.

10   Q.    And then you had this opportunity several weeks --

11   several months, July of '06, after Mr. Jowdy allegedly

12   says he is not repaying your clients, to document that,

13   and you don't say a worth about it.

14   A.    None of it was allegedly.

15         Mr. Jowdy did inform me on or about February 19.

16   There is email traffic that I have in evidence that would

17   substantiate the dates and the specific actions that were

18   taken by Mr. Jowdy and Mr. Najam and Mr. Markowitz related

19   to the closing of the Cabo San Lucas deal.

20   Q.    Well, emails can related to the closing.  What about

21   emails saying:  *Hey, Phil.  I'm not paying you back.*

22         Do you have an email like that?

23   A.    We didn't need to have one like that because the rest

24   of the emails substantiated that.

25   Q.    Well, my question to you is, there is no email from

Kenner - Cross/Mr. Miskiewicz

4643

1    Mr. Jowdy even referencing the loan, let alone saying he

2    wasn't going to pay.  Is that correct?

3    A.   Prior to February 19 --

4    Q.   Sir, I think --

5              MR. HALEY:  I object.

6              MR. MISKIEWICZ:  -- there is a yes or no in that

7    question.

8              MR. HALEY:  I object.

9              THE COURT:  That is a yes-or-no question.

10             Mr. Kenner, if you cannot answer yes or no, tell

11   him you can't answer yes or no.

12             He is asking you whether there is an email that

13   says something like that.  Is there an email that says

14   something like that or not?

15             THE WITNESS:  Could he restate the question

16   please?

17             THE COURT:  Do you want to restate the question?

18   Or do you want it read back?

19             MR. MISKIEWICZ:  May we have it read back.

20             (The record was read.)

21             THE WITNESS:  Maybe you cold restate it.  I'm

22   not sure I completely understand that.

23   BY MR. MISKIEWICZ:

24   Q.   Is there an email from Mr. Jowdy saying he wasn't

25   going to pay you back whatever he borrowed?

Kenner - Cross/Mr. Miskiewicz

4644

1    A.    I don't believe there is.

2              At that point in time he was still paying it is

3    back.

4              THE COURT:  Mr. Kenner, if there is a further

5    explanation, Mr. Haley gets to redirect after Mr.

6    Miskiewicz is done.

7              THE WITNESS:  Okay.  Okay.

8              THE COURT:  If he asks you whether something

9    happened or not, you don't have to provide an explanation

10   for why it did or did not happen.  He is just asking you

11   whether it happened or not.  Okay?

12             THE WITNESS:  Okay.

13   BY MR. MISKIEWICZ:

14   Q.    Briefly we talked about this yesterday.  You did find

15   it necessary to mention Ken Jowdy being instrumental in

16   obtaining the Lehman Brothers loan for Hawaii, in this

17   paragraph that I'm pointing to.  In your exhibit Kenner

18   93.  Right?

19   A.    Yes.  I read the second sentence yesterday.

20   Q.    And the last sentence in that bullet point says:  I

21   expect both of them to provide valuable service going

22   forward as advisors with regard to the development of the

23   parcels in our relationship with Windwalker.

24             And the parcels are Little Honu-apo, Honu-apo,

25   Waika Puna, et cetera.  Correct?

Kenner - Cross/Mr. Miskiewicz

4645

1    A.    Those are the parcels.  Correct.

2    Q.    That's the Hawaiian land venture.  Right?

3    A.    Yes, it is.

4    Q.    And even though you say at this time he has already

5    notified you he is not going to repay any loans made to

6    him with player money in Mexico, you provided him

7    nevertheless, because he has been so instrumental, a 5

8    percent interest in what was the players venture in

9    Hawaii.  Right?

10   A.    That is correct.  He was given a 5 percent interest

11   at the request of Mr. Masoud Bahti.

12   Q.    Well, whoever Mr. Bahti is --

13   A.    Mr. Bahti was the Lehman Brothers --

14   Q.    I'm not asking.  I haven't finished my question.

15         Whoever he is, ultimately it was up to you to

16   decide, as managing partner of Little Isle IV and

17   subsequently Na'alehu, it was up to you to decide whether

18   or not to cut him in.  Right?

19   A.    Yes, sir.  Mr. Bahti was the lender of Lehman

20   Brothers.

21         I could have chosen not to acquiesce to his

22   request in lieu of perhaps not getting the funding.

23   Q.    So you are saying that Mr. Bahti extorted you to give

24   Ken Jowdy a 5 percent interest?

25   A.    I didn't say that.

Kenner - Cross/Mr. Miskiewicz

4646

1    Q.    He forced you?

2    A.    Mr. Bahti told me that since we were all partners in

3    Cabo San Lucas and that he was going to be our funding

4    source for any and all ventures going forward, he thought

5    it would be a good idea to include Mr. Najam and Mr.

6    Jowdy in the Hawaii partnership.

7    Q.    And you agreed with that.  Right?

8    A.    Yes, sir, I did.

9    Q.    But Mexico and Hawaii were two separate ventures with

10   presumably two entirely different potential -- in fact,

11   they were very different int terms of what ultimately

12   happened.  Isn't that right?

13   A.    I'm not sure I understand in what content.

14   Q.    You are saying that this guy Bahti, whoever he is,

15   from Lehman Brothers, said:  You know, you got this thing

16   in Mexico and you got this thing in Hawaii.  You're all

17   one big family.  Why not cut Mr. Jowdy in for a 5 percent

18   piece.

19              Isn't that what he said?

20              MR. HALEY:  I don't believe that is what he

21   testified to.  I object.

22              THE COURT:  Can you answer that, Mr. Kenner?

23              THE WITNESS:  I don't believe that is accurate.

24   BY MR. MISKIEWICZ:

25   Q.    But you did cut Mr. Jowdy in for 5 percent several

Kenner - Cross/Mr. Miskiewicz

4647

1    months after he told you that he wasn't going to pay back

2    the loans already made to him in Mexico.  Yes or no?  I

3    think that is a yes-or-no.

4    A.    I'm not sure I can answer that with a yes or no.

5    Q.    And as to 4502, now in evidence, explain this again.

6    This was created because Mr. Lethinen and Stumple, who had

7    loaned money to Jowdy, were now not going to get paid

8    back.

9          I don't understand why you would have needed a

10   limited liability company under those circumstances.  Why

11   don't you explain it.

12   A.    Sure.  I would be glad to.

13         In the summer of 2005 Mr. Jowdy approached me

14   again about incremental loans to be made specifically to

15   him.  And one was for a million five from Mr. Lethinen

16   which Mr. Jowdy and Mr. Najam documented with a loan

17   letter.

18         Second, Mr. Stumble also provided a second loan

19   to Mr. Jowdy at that time for about $956,000.  Mr.

20   Lethinen's loan was a 30-day 10 percent loan that was

21   supposed to be repaid by the end of the summer 2005, and

22   it was not, by Mr. Jowdy.  Mr. Jowdy had represented that

23   he was selling another piece of real estate in Georgia

24   that was owned by him.  When that apparently fell through,

25   Mr. Jowdy told me he couldn't pay back Mr. Lethinen that

4648

1   summer.  So I told Mr. Lethinen as a further security

2   measure I would give him a portion of my ownership through

3   a debt agreement, which I signed with Mr. Lethinen in the

4   summer to give him further security as my client that his

5   loan to Mr. Jowdy would be fine.

6           At that time although Mr. Stumple's loan fell

7   under the 15 percent loan arrangement we had made with

8   Hawaii, I felt that it was my obligation, since it was for

9   the same purpose, for to give Mr. Stumple the same deal

10  that I did Mr. Lethinen.  So I signed the same debt

11  arrangement with Mr. Stumple.  Mr. Jowdy assured me,

12  though, still that by the time we closed the Cabo San

13  Lucas deal, he would be able to repay not just the

14  Hawaiian loans but also his advances from Mr. Stumple and

15  Mr. Lethinen, which are documented through bank records as

16  well.

17          Prior to February 19 of 2006, being I had every

18  indication from Mr. Jowdy that the loans would be repaid

19  as collateralized equity by Lehman Brothers, and I had

20  intended to take my ownership as evidenced by a myriad of

21  email correspondence between myself and the Cabo lawyers

22  in my own personal entity called Guide Dog LLC.

23          On or about February 19, Mr. Jowdy informed me

24  that Lehman brothers decided through their committee and

25  through Masoud Bahti that they would not collateralize his

Kenner - Cross/Mr. Miskiewicz

4649

1   equity upon closing, that they had a new rule at the firm

2   that they would not be doing that any longer, so Mr. Jowdy

3   told me he would be unable to repay the entire $7 million

4   Hawaii loan or be able to repay Mr. Stumple and

5   Mr. Lethinen at that point in time.

6           Between the 19th and 23rd of February 2006, in

7   discussions with Bill Najam and myself through email, we

8   decided to start a brand new entity called Baja Ventures

9   2006 which I had previously named on the agreements with

10  Mr. Stumple and Mr. Lethinen in the summer of '05 as a

11  security measure for both of those individuals.

12          At that point Mr. Najam and Mr. Markowitz

13  started the LLC Baja Ventures 2006 to further securitize

14  the two interests.

15  Q.   Thank you.

16  A.   You are welcome.

17  Q.   And as a result of all of that, Mr. Jowdy allegedly

18  did not want to repay or indicated he could not repay --

19  became a 100 percent member of Baja Ventures, that is what

20  securitized, as you say, the Lethinen and Stumple loan.

21  Right?

22  A.   I'm sorry.  Could you repeat that?

23  Q.   Well, as a result of Lethinen and Stumple being told

24  we are not paying you, meaning Jowdy or Jowdy's partners

25  were not paying Lethinen and Stumple back, you then with

Kenner - Cross/Mr. Miskiewicz

4650

1    Mr. Najam created Baja Ventures 2006.

2    A.    With Mr. Najam and Mr. Markowitz.  That's right.

3    Q.    But you are 100 percent owner of the company; not

4    them.

5    A.    That is correct.

6    Q.    And then as a result of all of that, looking at

7    Schedule I of 4503, that is how you got 40 percent almost,

8    or 39 percent of Diamanté Cabo San Lucas.  Right?

9    A.    Not necessarily.

10   Q.    Well, so what you are saying is, Mr. Jowdy indicated

11   he wasn't going to repay two of your clients, you formed

12   an LLC called Baja Ventures, and then that Baja ventures

13   ends up with just one percentage less in ownership equity

14   interest in Cabs San Lucas than Mr. Kenneth A Jowdy.

15              Isn't that what these documents reflect?

16   A.    That is an inaccurate reflexion of what occurred.

17   Q.    By the way, you have you have testified about the

18   Jowdy loan?

19   A.    Yes.

20   Q.    The decision to take some money from the Hawaii

21   venture.  You testified about it before.  Correct?

22   A.    Yes, sir, I have.

23   Q.    And you testified about it in the lawsuit that you

24   initiated against Christine Myrick, your former employee.

25   Correct?

Kenner - Cross/Mr. Miskiewicz

4651

1    A.    I don't recall that deposition.

2    Q.    Well, do you recall what you said when you were asked

3    who you ever spoke to about loaning money to Ken Jowdy?

4    Do you remember?

5    A.    I don't recall.

6    Q.    Do you remember when you said those conversations

7    began?

8    A.    I don't recall what I said during that deposition.

9    Q.    Let me show you what we are going to mark as Myrick

10   1.

11         Showing you Myrick 1 for identification.  And

12   I'm going to ask that you, I direct your attention to page

13   starting at 144 through 146.  Then I will have some

14   questions.

15         (There was a pause in the proceedings.)

16         THE COURT:  Mr. Kenner, are you on the right

17   page?  He is asking about page 144.

18         THE WITNESS:  Yes, sir.  It begins at 144.

19         MR. MISKIEWICZ:  It is only an excerpt, your

20   Honor.  I didn't include the entire deposition.

21   A.    I wasn't going to make my way through to 144.

22         MR. HALEY:  Your Honor, may I simply stand next

23   to Mr. Kenner as he looks at the exhibit?

24         THE COURT:  Sure.

25         MR. HALEY:  Thank you.

Kenner - Cross/Mr. Miskiewicz

4652

1      (There was a pause in the proceedings.)

2           MR. HALEY:  Mr. Miskiewicz, which pages?  All of

3    them?

4           MR. MISKIEWICZ:  I think I suggested.

5           THE COURT:  He said 144 to 146.

6           MR. HALEY:  Thank you, judge.  Okay, I have

7    looked at them.  Thank you.

8    BY MR. MISKIEWICZ:

9    Q.   So does that refresh your recollection as to what you

10   said when you were deposed in the Myrick lawsuit on April

11   21, 2009, in the State of California?

12   A.   Yes, it does.

13   Q.   And when you were asked those questions, that was one

14   of the first times you had been confronted with questions

15   about how money ended up in Mexico.

16        That was one testifying the first depositions in

17   a long range of depositions you have participated in,

18   right?

19   A.   I don't recall if this was the first one.

20   Q.   Okay.  And isn't it true, sir, you were asked who did

21   you notify and speak to about making a loan to Ken Jowdy,

22   and, first of all, you said Mr. Jowdy approached you in

23   October of '04.  Isn't that right?

24   A.   That sounds about right.

25   Q.   And a moment ago you said you were talking to

4653

1    Mr. Jowdy about loans in '05?

2    A.    Unfortunately as I sit here today, we were speaking

3    with Mr. Jowdy about loans for a number of years.

4    Q.    And you were asked who did you talk to and you said

5    some of my partners I believe.  Right?

6    A.    That is correct.

7    Q.    And the only partners you could think of was John

8    Kaiser.

9    A.    That is not correct.

10   Q.    Well, do you name anybody else?  Like Mr. Stumple or

11   Mr. Lethinen or any of the other people who testified in

12   this case as among those who you notified about the loan?

13   A.    The word *notified* isn't used in here at all.

14   Q.    I see.

15   A.    It is line three.

16   Q.    Well, sir, isn't it true that in this deposition you

17   were asked who did you speak to, not *notify*, about the

18   loan?  And do you remember what you said?

19   A.    John Kaiser.

20   Q.    And you were asked:  Anyone else?  And what did you

21   say?

22   A.    Not that I recall.

23   Q.    And this is 2009.  Presumably you would have had a

24   better -- withdrawn.

25            No further questions on this issue.

Kenner - Cross/Mr. Miskiewicz

4654

1      In Kenner Exhibit 93, there is no reference to

2   Tommy Constantine, is there?

3   A.   Not that I recall.

4   Q.   Prior to the date of this, or right at about the date

5   of this, July 21, 2006, Little Isle IV, Ula Makika, had

6   sent millions, or well over a million, approximately 1.3

7   million, to Tommy Constantine's CMG company.  Constantine

8   Management Company.  Correct?

9   A.   Pursuant to the funding consulting agreements.

10  That's correct.

11  Q.   And just so we are clear.  You have seen this in

12  evidence, Government Exhibit 41, when Mr. Petrellese was

13  up here testifying, about a number of summaries tracing

14  money.

15      Do you recall that?

16  A.   I don't recall.

17  Q.   Do you recall that testimony?

18  A.   Not specifically.  No, sir.

19  Q.   You don't recall specifically Government Exhibit 41.

20      But you don't disagree with its finding that,

21  for instance, Constantine Management Group, between

22  12/1/04 and 3/31/06, right about the time of Kenner 69,

23  received from Little Isle, Little Isle IV Ventures, net,

24  almost a quarter of a million dollars during that period

25  of time.  Right?

Kenner - Cross/Mr. Miskiewicz

4655

1   A.    I don't recall specifically but if that is what his

2   bank records assimilated, I would agree with it.

3   Q.    And in addition to that, Ula Makika, which, again,

4   that was a company you controlled, right?

5   A.    Prior you had mentioned Kenner Exhibit 69.  I wasn't

6   familiar with that.  I apologize.

7   Q.    I'm sorry.  I misspoke.  Kenner 93.

8   A.    Okay.

9   Q.    This thing.  And during the same period, 12/1/04 to

10  3/31/06.  See that up there?

11  A.    Tommy Constantine.

12  Q.    Right.  Constantine Management Group received 16

13  deposits from Ula Makika.

14           That is your company, one of your LLCs, correct?

15  A.    Yes, sir, that is one of the Hawaiian entities.

16  Q.    You are controlled it.  Right?

17  A.    Yes, sir.  I controlled that.

18  Q.    You were the managing partner.

19  A.    I was the managing member.  That's right.

20  Q.    You controlled the bank account.  Right?

21  A.    Yes, sir, I did.

22  Q.    Nobody else.

23  A.    Nobody else.

24  Q.    And 16 deposits were made to Constantine Management

25  Group for a net of 1.197 million.  Right?

Kenner - Cross/Mr. Miskiewicz

4656

1    A.    That sounds about accurate.

2    Q.    Now, this is up to March 31 of '06.  That is before

3    Urban Expansion, before Mr. Grdina got involved.  Is that

4    correct?

5    A.    That is not correct.

6    Q.    Well, 1.3 million is before Urban Expansion?

7    A.    I don't know the distribution dates to Constantine

8    Management Group, but 3/31/06 is not before the Urban

9    Expansion loan.

10   Q.    Okay.  So are you saying that this 1.3 million that

11   we just saw summarized during that period of time would

12   include Urban Expansion money?  Or do you know?

13   A.    I think the total was 1.197 that you showed me,

14   million dollars.

15   Q.    Right.  But then you also, through Little Isle IV,

16   sent almost a quarter of a million dollars in addition to

17   that.

18   A.    That may have been prior.

19   Q.    But you don't remember?

20   A.    I don't recall the specific order, but it would make

21   sense to me that it would have been prior to the Ula

22   Makika distributions.

23   Q.    Very quickly, my question is again, in this Kenner

24   93, although you talk at length about Mr. Jowdy, although

25   you provide Mr. Jowdy and his company a 5 percent interest

Kenner - Cross/Mr. Miskiewicz

4657

1    in the players Hawaii deal, you don't make any mention of

2    the significant role Mr. Constantine had made to justify

3    $1.3 million in payments to him, do you?

4    A.   The representation inside the disclosure letter was

5    not a recap of everything that had gone on with Little

6    Isle IV from inception to that date.

7    Q.   So that would be a yes:  The name Tommy Constantine

8    appears no place in this letter to the members of Little

9    Isle IV?

10   A.   I did not see Mr. Constantine's name in that

11   disclosure letter.

12   Q.   Now, I believe you testified that at some point there

13   was a modification of the Little Isle operating agreement

14   to enable it to make loans outside of Hawaii.

15            Didn't you stay that yesterday on direct?

16   A.   I believe there were several modifications of the

17   original bylaws of Little Isle IV from its inception in

18   December 2003 through the Little Isle IV operating

19   agreement that was provided to us during the Lehman

20   closing.

21   Q.   And Kenner 25.  Is this the agreement or the

22   modification of the bylaws that you say permitted Little

23   Isle IV to make investment opportunities outside of

24   Hawaii?

25   A.   Could I see the entire document for my recollection,

Kenner - Cross/Mr. Miskiewicz

4658

1    please?

2    Q.   Sure.

3    A.   Thank you.

4    Q.   You are welcome.

5             (There was a pause in the proceedings.)

6    A.   I have reviewed this.

7             (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner - cross/Miskiewicz

4659

1   Q.    Is that the bylaw that permits Little Isle IV to loan

2   money outside of the Hawaii venture?

3   A.    Both myself, Chris Manfredi and John Kaiser believe

4   that the 2003 bylaws, which were our initial bylaws,

5   permitted lending in any context in the special projects

6   section, which I believe this one -- this was, I believe,

7   our second bylaws signed in -- by me in early 2004, also

8   maintains that same special projects section in Article

9   10, but this is not the one we were referring to

10  yesterday.

11  Q.    No, it isn't.  It's Kenner 217, right?

12  A.    I'm not familiar with all the exhibits by number.

13  Q.    Kenner 217, special project, Article 7, says the

14  managing member of Little Isle IV -- that's you, right?

15  A.    Yes, sir.

16  Q.    -- will be authorized to invest in any real estate

17  projects or project that are deemed appropriate by the

18  managing member and in the best interest of the LLC.

19          That means not just Hawaii, whatever you deem to

20  be appropriate?

21  A.    I'm not sure where you are reading from.

22  Q.    It's a document you offered, Kenner 217.

23  A.    I'm looking at Kenner Exhibit 25 right here.

24  Q.    Turn to the second page where it says "projects."

25          MR. HALEY:  For clarity of the record, which

Kenner - cross/Miskiewicz

4660

1    exhibit?

2              THE COURT:  217.

3              MR. HALEY:  Thank you.

4    A.    Kenner Exhibit 217.  Okay.

5    Q.    Did I read that accurately?

6    A.    Managing member of Little Isle IV will be authorized

7    to invest in any real estate project that are deemed

8    appropriate by the managing member and in the best

9    interest of the LLC.  Managing member, at their sole

10   discretion, can engage in outside ventures deemed to be in

11   the best interest of the LLC, including but not limited to

12   other private equity funds and lending opportunities.

13   Q.    That's what you rely upon, and it's dated September

14   1, 2004, that's what you rely upon as the basis for saying

15   Little Isle IV was permitted to make loans to Ken Jowdy,

16   if not other people, right?

17   A.    On September 1, 2004, John Kaiser and myself signed

18   off on this new operating agreement, but I also believe

19   there was one other section that also specifically allowed

20   lendings.

21   Q.    In that agreement or some other agreement?

22   A.    In this agreement.

23   Q.    Okay.  Assume for the purpose of my next question

24   there is such a provision in there.

25   A.    There is.

Kenner - cross/Miskiewicz

4661

1   Q.   Okay.

2   A.   I found it.

3   Q.   That wasn't what the bylaws originally said for

4   Little Isle IV in Government -- or I should say Kenner

5   Exhibit 25, which you had -- you were looking at earlier.

6   All it said was the purpose, this purpose, talking about

7   what Little Isle IV, its purpose would be, shall be

8   accomplished by presenting one or more -- one or a series

9   of real estate investment opportunities in Hawaii, Hawaii?

10  A.   That is correct.

11  Q.   Following the proper due diligence in evaluating the

12  short and long-term opportunities associated with each.

13         So, originally, the bylaws said you could invest

14  in Hawaii and in associated projects.  Then this Kenner

15  217 expanded that to give you authority to do lending of

16  other kinds like, for instance, to Mr. Jowdy?

17  A.   Correct.  It was altered in the Article 2 purpose

18  section on the September 1, 2004 bylaws of Little Isle IV

19  that John Kaiser and I signed off on.

20  Q.   Right.  But John Kaiser was never a member of Little

21  Isle IV, so why did he need to sign that agreement?

22  A.   It's actually inaccurate.  He was never a member.

23  There was -- the original 2003 bylaws of Little Isle IV

24  represented each of the individuals that had originally

25  invested prior to the 250 in the Little Honu-Apo closing

Kenner - cross/Miskiewicz

4662

1    in late December 2003.

2    Q.    I'm going to show you, borrowing back Mr. Haley's

3    copy, but Government's Exhibit 103, do you recognize any

4    of the e-mail addresses there?

5    A.    All of them.

6    Q.    That's an e-mail you sent, is it not?

7    A.    Yes, it is.

8    Q.    You were sending it in or about November of 2010,

9    long after the date of Kenner Exhibit 217, right?

10   A.    Approximately six years later.

11   Q.    You were sending it to Mr. Stolper, we heard a lot

12   about it in this trial?

13   A.    Yes, sir.

14           MR. MISKIEWICZ:  Government offers 103.

15           MR. LaRUSSO:  Your Honor, may I have a brief

16   sidebar?

17           THE COURT:  Yes.

18           (Continued on the next page.)

19

20

21

22

23

24

25

4663

1      (Sidebar.)

2      MR. LaRUSSO:  Judge, the only qualification is

3  this appears to be Mr. Kenner transmitting information

4  from a source I don't know, or a document I don't know,

5  and it's probably double hearsay, and I don't think he can

6  testify to the truth of it, at least looking at it.  So

7  I'm going to object to the introduction.

8      THE COURT:  It's an admission against.  Kenner

9  wrote this.

10      MR. LaRUSSO:  I don't know if he wrote this.

11  That's the point.  Looks like a transmission.  It has

12  numbers, 8, 17, 100; portions of a document.

13      MR. MISKIEWICZ:  I think -- I would be

14  speculating what he would say.  I believe he just

15  testified he sent this.  I believe that my speculation is

16  it has reference to him getting back to Mr. Stolper about

17  individual paragraphs in some sort of a document.  I will

18  ask him.  I'm not particularly concerned about the

19  references to Mr. Constantine.  We can redact it if

20  counsel wishes.

21      MR. LaRUSSO:  Then I will remove my objection

22  under that.

23      THE COURT:  You want number 8?

24      MR. MISKIEWICZ:  Number 8.

25      THE COURT:  He will redact it so it has only

Kenner - cross/Miskiewicz

4664

1   number 8.

2           MR. LaRUSSO:  Also number 17, too.

3           THE COURT:  He is taking out --

4           MR. MISKIEWICZ:  I'm only interested in

5   references to Little Isle IV.

6           THE COURT:  He is only keeping in the references

7   to 8.

8           MR. LaRUSSO:  That's fine.

9           MR. HALEY:  May I have a moment?  He took my

10  copy.  I want to see it.

11          THE COURT:  Read number 8.  You can redact it

12  later.

13          MR. HALEY:  Okay.

14          (Sidebar concluded.)

15          (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

Kenner - cross/Miskiewicz

4665

1        (In open court.)

2        MR. MISKIEWICZ:  Again, we move for the

3    admission of 103, subject to sidebar.

4        THE COURT:  103 is admitted in redacted form.

5    Only one part that is relevant.  It's going to be redacted

6    later.

7        (Government Exhibit 103 received in evidence.)

8        THE COURT:  Mr. Miskiewicz will read the portion

9    that's in evidence.

10       MR. HALEY:  No objection.

11       MR. LaRUSSO:  Under those terms, no objection.

12   Q.   Let me cover a couple of preliminary questions here.

13       Mr. Kenner, I will not ask you to read anything

14   yet, but the subject heading in the document is

15   "countercomplaint," correct?

16   A.   Yes.

17   Q.   You are writing it -- you wrote this, correct?

18   A.   It appears to be.

19   Q.   You wrote this e-mail to Michael Stolper and cc'd it

20   to a bunch of people, correct?

21   A.   That is correct.

22   Q.   You cc'd it to, among other people, John Kaiser, CR

23   Gentry, Bryan Berard, Timothy Gaarn?

24   A.   And Eric Hatzimemos.

25   Q.   Then were you responding to an earlier e-mail from

Kenner - cross/Miskiewicz

4666

1    Mr. Stolper?

2    A.    I was responding to something.

3    Q.    You were responding to what, a document that had been

4    drafted?

5    A.    I don't recall.

6    Q.    You say in 2010, November 27, 2010, I will read

7    exactly what it says here, 8.

8          MR. HALEY:  You have my copy.

9          THE COURT:  Stand next to Mr. Haley.

10         MR. HALEY:  Thank you, Judge.

11   Q.    8, I am not sure that Kaiser ever signed an agreement

12   with Constantine on behalf of Little Isle IV LLC.  Kenner

13   was the managing member of Little Isle IV LLC, not Kaiser.

14   Kaiser has never been a member of Little Isle IV, LLC.

15         You wrote that, didn't you?

16   A.    Yes, sir, I wrote that.

17   Q.    So in the bylaw signed, you say was signed September

18   1, 2004, which has your signature on behalf of the

19   managing -- being a managing member of Little Isle IV,

20   LLC, there is a second signature of yours as a member of

21   GuideDog, LLC.  Then there is a signature here for John R.

22   Kaiser.  This whole agreement is about Little Isle IV, not

23   John Kaiser's company.  There is no reason to have Mr.

24   Kaiser sign this document expanding the purposes of your

25   corporation, was there?

Kenner - cross/Miskiewicz

4667

1   A.   Yes, there was.

2        Could I see the Little Isle IV bylaws so I can

3   refresh my recollection to the rest of the elements of the

4   document, please?

5   Q.   We will be able to do that on redirect.

6        My question to you is:  Mr. Kaiser was not a

7   member of your company, we just read --

8   A.   I believe it does reflect that in that document.

9   That's why I asked you to refresh my recollection, please.

10  Q.   You wrote in 2010 he was never a member of Little

11  Isle IV.

12       In 2004, my question to you is, he has no

13  authority to sign on behalf of this amendment to the

14  bylaws expanding Little Isle IV's handling of player

15  money, right?

16  A.   I believe he is an equity shareholder in that company

17  by derivative.

18  Q.   I think we will move on.

19  A.   I can show you, if you give me the document.

20  Q.   Mr. Haley will have plenty of time.

21       Sir, I show you what you also introduced into

22  evidence as Kenner 1.  This is the limited liability

23  company agreement of Little Isle IV dated April 26, 2006,

24  right?

25  A.   That is correct.

4668

1    Q.    That would place it -- well, more than two years

2    after this amendment to the bylaws that supposedly gave

3    Little Isle IV authority to lend money to Mexico, right?

4    A.    That's correct.

5    Q.    And this document was found in your home, right?

6    A.    It was turned over by the U.S. Government to my

7    attorney in pretrial.

8    Q.    And when it was turned over, you spent, you said, 100

9    percent of your time over the last several months

10   preparing for and reviewing 2 million pages of documents.

11   You know what PKHOME references in the documents you were

12   provided because the government provided them in a certain

13   order to you, correct?

14   A.    I testified that I spent 100 percent of my time for

15   the last 19 months, not the last several months, preparing

16   for this.

17   Q.    You know what PKHOME means?  This was among the

18   documents retrieved from your house, right?

19   A.    I believe so.

20   Q.    This document is dated two and a half years after the

21   bylaws signed by you and John Kaiser expanding the reach

22   of Little Isle IV, right?

23   A.    That's in correct.

24   Q.    Are you saying April 26, 2006 does not come after

25   September 1, 2004?

4669

1    A.    That's not what I'm saying.  I would agree with that

2    statement.

3    Q.    It says here under the purpose, first page:  The

4    purpose of the company -- says:  The company has been

5    organized to acquire and develop two parcels of real

6    estate in Hawaii, the legal descriptions of which are set

7    forth in Schedule A of this agreement, parentheses, it

8    says together, the property.  Doesn't say anything about

9    lending money outside of Hawaii, does it?

10    A.    No, sir.  This was a new agreement that was drafted

11    in concert with my attorney Larry Markowitz and William

12    Najam and attorneys from Lehman Brothers to address all

13    the open issues prior to the Lehman Brothers agreement to

14    fund joint venture project.

15    Q.    But at this point, your testimony is the company

16    already has made loans, $5 million worth of loans to Ken

17    Jowdy.  You don't mention it in this agreement, do you?

18    A.    No, sir.  One of the sticking points with Lehman

19    Brothers, they no longer wanted us to have the ability to

20    lend money, so that, as part and parcel to creating new

21    operating agreements, that would be in effect upon

22    completion of the joint venture agreement.

23    Q.    Is there a memo to that effect from Lehman Brothers?

24    Is there an e-mail, text, anything other than your say-so?

25    A.    There didn't need to be.  There was a new operating

Kenner - cross/Miskiewicz

4670

1   agreement.

2   Q.   Sir, I'm asking you a yes or no question.  Is there

3   an e-mail attached or anything?

4           MR. HALEY:  Objection.

5   Q.   Not whether it was needed.  Is there anything

6   documenting that Lehman Brothers said what you have just

7   alleged?

8           MR. HALEY:  May my client simply be permitted to

9   answer the question?

10          THE COURT:  That's a yes or no question.  He was

11  explaining why there wasn't such a document.  The question

12  doesn't ask why.  He is asking whether or not.  Mr. Haley

13  can ask you why on redirect.  The question is whether or

14  not there was, Mr. Kenner.

15  A.   There may have been.

16  Q.   Well, in the last 19 months of reviewing 2 million

17  pages' worth of discovery, did you find one?

18  A.   I haven't seen all the e-mail communication between

19  myself and my attorneys during that period of time.

20  Q.   You could have subpoenaed your attorney's e-mails and

21  documents at any point prior to your testimony near this

22  trial, couldn't you?

23          MR. HALEY:  Objection.

24          THE COURT:  Sustained.

25  Q.   Well, holding aside your lawyers, if there was a

Kenner - cross/Miskiewicz

4671

1   document that you recalled signing, or a memo that you

2   sent to one of your player clients, even if you didn't

3   possess it and the government didn't give it to you in

4   discovery, you knew you could have subpoenaed those people

5   for those records prior to your testimony here today,

6   right?

7              MR. HALEY:  Objection.

8              THE COURT:  Sustained.

9   Q.   In this 2006 agreement, you don't say there are

10  outstanding loans.  In fact, all you say is the company

11  shall not own any assets other than the property, meaning

12  the Hawaii proper, right?

13  A.   This was an operating agreement created between my

14  attorneys, Larry Markowitz and William Najam and the

15  attorneys from Lehman Brothers, to satisfy the

16  requirements prior to the joint venture closing.

17  Q.   Are you saying that your lawyers were just concealing

18  the fact that Little Isle IV had an outstanding asset of

19  $5 million, meaning the money loaned to Ken Jowdy, is that

20  what you are saying?

21  A.   I don't believe any operating agreement would

22  disclose something like that.  I have never seen it in all

23  the operating agreements put in front of me.

24  Q.   It says:  The company shall not engage in any

25  business, directly or indirectly, other than the

Kenner - cross/Miskiewicz

4672

1   ownership, management and operation of the property,

2   meaning the Hawaii properties.

3           Again, there is no, except for what we did back

4   in 2004 with Ken Jowdy, there is nothing like that in this

5   agreement, right?

6   A.   I think that would always be assumed, any prior

7   activity would be rolled up into a current agreement.

8   Q.   This document, been a lot of testimony on

9   cross-examination with witnesses with, this is a document

10  that has signatures for various employer clients, right,

11  acknowledging they read the agreement?

12  A.   Yes, sir.

13  Q.   In sum and substance, there is nothing in this

14  agreement in 2006 making reference to the fact that Little

15  Isle IV has and has made loans outside of the Hawaii

16  properties, right?

17          MR. HALEY:  I believe -- objection.

18          THE COURT:  Overruled.  You may answer.

19  A.   Can you ask the question again, please?

20  Q.   There is nothing in this agreement that your employer

21  clients could have read that would have informed them in

22  this agreement that Little Isle IV has previously made

23  loans to Ken Jowdy?

24  A.   That wouldn't be normal language in an operating

25  agreement.

Kenner - cross/Miskiewicz

4673

1   Q.    I'm merely asking you a yes or no question.  Is there

2   anything in this agreement, yes or no, that informs them

3   you made $5 million or more in loans to Ken Jowdy from the

4   Hawaii venture?

5   A.    That is not specifically referenced in the Little

6   Isle IV operating agreement.

7   Q.    Is it referenced at all specifically or otherwise?

8   A.    Where?

9   Q.    Kenner 1.  Kenner 1, specifically or otherwise?  You

10  want to read the whole document?

11  A.    What document is Kenner 1?

12  Q.    Document we have been looking at right now.

13  A.    Sorry, it wasn't disclosed to me.  I don't believe

14  so, not in the limited liability operating agreement of

15  Little Isle IV would that be mentioned.

16          MR. MISKIEWICZ:  Your Honor, I'm about to start

17  a new section.

18          THE COURT:  Let's take the morning break.  Don't

19  discuss the case.

20          (The jury leaves the courtroom.)

21          THE COURT:  We will take a 15-minute break.

22          (Whereupon, at this time a recess was taken.)

23          THE COURT:  Please be seated.

24          Let's bring in the jury.

25          (The jury enters the courtroom.)

4674

1    THE COURT:  Please be seated.

2    BY MR. MISKIEWICZ: (Cont'd)

3    Q.    Mr. Kenner, there has been testimony about a funding

4    consulting agreement, Government's Exhibit 5104.  Do you

5    remember seeing this?

6    A.    Yes, sir.

7    Q.    Do you remember, in sum and substance, this was an

8    agreement between Little Isle IV and Constantine

9    Management Group, correct?

10    A.    That is correct.

11    Q.    There are two of them, one dated 12/15/04 and the

12    other one dated 6/1/05.  You testified in direct that the

13    one on December 15, '04 had your signature.  You also

14    testified that after signing, or having Mr. Constantine

15    sign his signature line on this document, you then

16    retained it and had it signed by Mr. Kaiser at another

17    time, correct?

18    A.    That is correct.

19    Q.    So even though there are dates on both documents, one

20    12/15/04, the other 6/1/05, you would agree that they were

21    not -- both agreements were not signed on the dates that

22    are indicated in that document, correct?

23    A.    That is correct.  We were not all three parties in

24    the room at the same time.

25    Q.    Okay.  You testified, I'll quote from page 4305, your

Kenner - cross/Miskiewicz

4675

1    answer to one of the questions posed to you by Mr. Haley:

2            Question:   When did that happen?

3            Answer:   Well, as I mentioned earlier, there

4    were two signings that actually occurred on each one of

5    these documents.  The original, and this is on 4305, the

6    original consulting agreement that Mr. Constantine had

7    drafted for Little Isle to sign, he had signed it in or

8    about December 15th of '04.  He had called me to his

9    office at the time, which I picked up the document, told

10   Mr. Kaiser I was going to visit with him in the State of

11   Hawaii shortly thereafter on one of our next due diligence

12   trips.  At that point in time, I took the document with me

13   to Hawaii, and Mr. Kaiser and I both signed it the next

14   time we were together.

15           Then it goes on.

16           What do you mean by due diligence trips?

17   A.    Mr. Kaiser and I and Mr. Manfredi would travel to

18   Hawaii on a regular basis between my first meeting with

19   them in 2003 and closing of the Lehman Brother loan in

20   August of 2006, and we would work with local architects,

21   local archeologists, geohazard geologists, engineers, our

22   lawyers, bankers, community planning directors, Mr. Yuen,

23   working on the development of the parcels, the subdivision

24   reconsolidation efforts we were making during all of the

25   periods of time we were in control of the project through

Kenner - cross/Miskiewicz

4676

1    the Lehman closing.

2    Q.    That's what you mean by due diligence trips,

3    shorthand for doing all the kinds of things that needed to

4    be done before Lehman came along; is that right?

5    A.    Yes, sir.

6    Q.    I think you testified about a senator you would meet

7    with periodically?

8    A.    I met with Senator Avery Chumbley on at least one

9    occasion to discuss the extension request by me on the

10   Waikapuna parcel, when I walked away from the Lehman

11   Brothers loan in 2005, prior to the Urban Expansion

12   funding about seven weeks later.

13   Q.    So even though it says, for instance, in the earlier

14   of the two agreements in 5104, even though there it says

15   next to John Kaiser's signature, 12-15-04, didn't happen,

16   he didn't sign it according to you on that date?  He

17   signed it sometime when you were next out in Hawaii?

18   A.    I believe that's correct.

19   Q.    And where were you when you signed it in Hawaii?

20   A.    I don't recall.

21   Q.    Well, was it, you said on direct it was one of those

22   due diligence trips where --

23   A.    The trip could have started in Honolulu, which is on

24   the island of Oahu.  While we were meeting either with

25   bankers or some of our lawyers from Carlsmith Ball.

4677

1    Typically the trips would begin there for me.  And then I

2    would travel to the big island of Hawaii, which is a

3    separate island.  We may have been on a trip to Hilo with

4    Carlsmith Ball lawyers or on the property site itself.  We

5    could have been at one of the rental homes that we

6    utilized until I purchased a home for a home office for

7    the project.  Could have been in any one of those

8    locations.

9    Q.    Was the rental home in Discovery Harbor?

10   A.    I don't believe -- from time to time I believe that

11   they did -- Mr. Kaiser and Mr. Manfredi rented homes in

12   Discovery Harbor as well.

13   Q.    My question is, where would you typically meet Mr.

14   Kaiser during these due diligence trips?

15   A.    Could have been at any one of those locations that I

16   spoke of.

17   Q.    Okay.  Then you said, I think you said similarly

18   after the second agreement was signed 6/1/05, you went

19   back out and you recall testifying, in sum and substance,

20   that you had Mr. Kaiser sign it, backdate it, but sign it

21   during another one of the due diligence trips, right?

22   A.    I believe I testified that he signed it, then dated

23   it pursuant to the date that was on the document just

24   above the signature line.

25   Q.    That's all I meant by backdate.

Kenner - cross/Miskiewicz

4678

1   A.    Okay.  I agree with you.

2   Q.    Move on.

3         Discovery Harbor, you testified on direct -- you

4   testified about this chart 4 in -- sorry, chart 1 in

5   evidence.  You don't disagree with any of the dollar

6   figures and transactions that are depicted in this chart,

7   do you?

8   A.    No, they all appear to be accurate.

9   Q.    And there was another one also regarding Discovery

10  Harbor lot, this has to do with money originating from Mr.

11  Sydor.  You don't disagree with the amounts of money or

12  the transactions depicted here either, do you?

13  A.    They also seem to be accurate.

14  Q.    Your testimony was that Mr. Kaiser and Manfredi

15  decided that they were going to use Discovery Harbor lots

16  to test something?  Could you repeat what they were going

17  to be testing?

18  A.    If I recall correctly, the idea behind purchasing in

19  or about 2005 those individual home sites was, we were

20  still in the extended due diligence process with the

21  District of Cau getting our subdivision and

22  reconsolidation plans approved by the county.  And what

23  Mr. Kaiser wanted to do in particular was make sure that

24  any of the materials or supplies that we needed eventually

25  for the larger scale homes, the 10,000-square foot homes

Kenner - cross/Miskiewicz

4679

1    we intended to build on the properties, we would be able

2    to build those in a small, scaled-down version and get the

3    supplies we needed from the mainland.

4    Q.    I'm going to focus on just a portion of it here.

5          When Discovery Harbor lots were sold in 2013 at

6    a loss, $31,000, you didn't -- you are not disagreeing

7    with the chart, insofar as it indicates they received

8    $31,528.65 and then after receiving it, you subsequently

9    transferred it to yourself in four separate cash

10   withdrawals, correct?

11   A.    That is correct.

12   Q.    And you did that -- why did you do that?

13   A.    I did it for two purposes.  One was that the

14   recommendation of the bank, they suggested that I should

15   withdraw funds in less than 10,000 per withdrawal.  And

16   second, the reason I needed the cash is because we were

17   hiring new attorneys that needed to be paid pursuant to

18   our ongoing pursuit of Mr. Jowdy and the various issues we

19   discussed ad nauseam in this trial.

20   Q.    What bank was this you made these withdrawals?

21   A.    Chase Bank.

22   Q.    Are you saying Chase Bank recommended to you that you

23   make a series of withdrawals of under $10,000 in cash?

24   A.    They told me that, they were the ones that told me if

25   you withdraw less than 15,000 they wouldn't have to fill

Kenner - cross/Miskiewicz

4680

1    out various forms at the bank, so I had an immediate

2    urgency for the money, so I told them I would take it out

3    in $9,000 increments.

4    Q.    So between April 9th -- you made two separate cash

5    withdrawals, the earliest here on April 9, 2013, right?

6    A.    Yes.

7    Q.    And I understand that we are looking at a chart, not

8    the bank records, to move things along, assuming these are

9    accurate and the bank records are in evidence, you are

10   saying that you went to a Chase Manhattan Bank, or Chase

11   Bank, and made a $9,500 cash withdrawal.  When did they

12   tell you to do this?

13             MR. HALEY:  I object, Judge.

14             THE COURT:  Overruled.  You can answer that.

15   A.    When I was attempting to withdraw the entire amount.

16   Q.    So on that day, April 9, 2013, you were going to

17   withdraw the entire sum, whatever these transactions add

18   up to, and they told you, in sum and substance, don't do

19   it that way, do it this way, right?

20   A.    That is correct.

21   Q.    You understand that there would have to be what is

22   referred to as a currency transaction report generated for

23   withdrawal of cash above $10,000, right?

24   A.    I'm not familiar with that.

25   Q.    They told you there would have to be no report filed

Kenner - cross/Miskiewicz

4681

1   if you structured your withdrawals in increments below

2   $10,000, right?

3   A.   They told me they would not have to fill out a

4   document for the bank if that were the case.

5   Q.   And you understand that document eventually goes to

6   the Department of Treasury and its anti-money laundering

7   provision?  That's why they do that, right?

8   A.   I'm not familiar with the government's protocols.

9   Q.   You are saying Chase Bank told you you can avoid

10  making the necessity of filling out this report by

11  structuring these withdrawals in this fashion, right?

12  A.   Yes, sir, they did.  I would have gladly taken the

13  whole $31,000 at once.

14  Q.   And what did you do?  Return to the bank and make a

15  second withdrawal, or just stay there and go back to the

16  end of the line and come back to the same teller and

17  withdraw the second $9,000 on April 9, 2013?

18  A.   I didn't follow that, but I did not get back at the

19  end of the line.  I recall driving around, doing other

20  errands that day, and stopping at a different bank.

21  Q.   So that at the end of that first day, you had $18,500

22  in cash withdrawn, right?

23  A.   Yes, sir.

24  Q.   Representing in part proceeds from the sale of

25  Discovery Harbor lots, right?

Kenner - cross/Miskiewicz

4682

1   A.    That is correct.

2   Q.    And then you returned two more days and made two

3   subsequent cash withdrawals on April 12th and April 17th,

4   2013?

5   A.    Yes.

6   Q.    You did that also at the behest or suggestion of

7   Chase Bank?

8   A.    It didn't have to be suggested more than once.

9   Q.    Just for clarity, chart number 2, this represents the

10  same series of transactions but at a different time.

11  Additional money came out from the proceeds of the sale,

12  June 14th, is that correct?

13  A.    That appears to be correct.

14  Q.    Then, again, went to you, and you withdrew in June,

15  June 14th and June 17th, you made two more cash

16  withdrawals under $10,000, right?

17  A.    That is correct.

18  Q.    And by the way, that box there that says B. Kenner,

19  that's Blake Kenner, your son?

20  A.    Yes.

21  Q.    That's his account?

22  A.    It was a custodian account I held for him.

23  Q.    So you buy Discovery Harbor lots with -- how many

24  were there, by the way?

25  A.    There were five lots.

Kenner - cross/Miskiewicz

4683

1   Q.   You buy it in part with $265,000 drawn down from the

2   Berard line of credit in March of '05?

3   A.   Purchased with funds that were deposited into the

4   Little Isle IV bank account for company purposes.

5   Q.   Well, okay.  My question is where did -- where did

6   that money come from to be deposited in the Big Isle IV

7   account?

8   A.   It was a portion of Mr. Berard's capital contribution

9   to Little Isle IV.

10  Q.   Capital contribution, how do you define capital

11  contribution?  There's been testimony about cash deposits,

12  or investments, I should say, then lines of credit.  How

13  do you define capital contribution?

14  A.   It would include both categories.

15  Q.   So you have no -- you agree that $265,000 came out of

16  Mr. Berard's line of credit?

17  A.   Yes, it did.

18  Q.   At Northern Trust?

19  A.   Yes, sir.

20  Q.   And again, Big Isle -- Big Isle VI, you controlled

21  that LLC?

22  A.   Yes, I did.

23  Q.   You were the managing member of Big Isle VI?

24  A.   Yes, sir.

25  Q.   And capital contributions, we have seen documentation

4684

1   showing that permission that capital contributions, or I

2   should say withdrawal from a line of credit could fund

3   Little Isle IV, correct?

4   A.   Yes, sir.

5   Q.   Where did you get the authority to send the money to

6   Big Isle VI, which is a completely different entity?

7   A.   All of the entities in Hawaii were partners of Little

8   Isle, or subpartners of Little Isle IV.

9   Q.   So basically, to you it didn't matter if the money

10  went to Little Isle IV, Big Isle VI, it was all one big

11  pot of money?

12  A.   All part and parcel from capital contributions to

13  Little Isle IV or the other members who invested.

14  Q.   Now, did Mr. Berard know this at the time that you

15  made this withdrawal in March 24, 2005 with his money,

16  that he was borrowing against his savings, $265,000?

17  A.   Mr. Berard had already authorized the use of his line

18  of credit as a full capital contribution to Little Isle IV

19  for his equity ownership.

20  Q.   So by initially getting involved in the Hawaii

21  project, you are saying that was all the authority you

22  needed to manage his money in this manner, is that right?

23  A.   With the letter of authorization that each one of the

24  line of credit holders signed individually with the bank,

25  giving me authorization to draw down on the line of credit

Kenner - cross/Miskiewicz

4685

1    for Little Isle IV.

2              (Continued on the following page.)

4686

1    BY MR. MISKIEWICZ (Cont'd):

2    Q.    Well, okay.

3          So just to be clear, though, on or about March

4    24, 2005, when Mr. Berard's line of credit was drawn down

5    upon to the tune of $300 -- I'm sorry -- $265,000, you did

6    not specifically notify him on or about that day what you

7    were doing, did you?

8    A.    It would not have been my protocol to let any of the

9    members know on a day-to-day expense basis or purchase

10   basis what specially was going on inside the authorization

11   of Little Isle IV.

12   Q.    And going to chart No. 2, this is another portion of

13   the money that was used to by one of the Discovery Harbor

14   lots, this indicates on or about February 7, 2005,

15   $200,000 was drawn down from Darryl Sydor's line of

16   credit.

17         Correct?

18   A.    Yes, sir.

19   Q.    But in this case you were sending it to the

20   Little Isle IV, not Big Isle VI.

21         Why did you do it that way?

22   A.    I would make a request to the bank and tell them that

23   we were going to drawn down on a portion of someone's line

24   of credit.  And I would ask them to deposit it into the

25   bank accounts.

4687

1    I did notice over the last 19 months when

2 reviewing some of the Northern Trust Bank records that not

3 all of the deposits came from lines of credit went

4 directly into Little Isle IV as the bank had required, and

5 the individuals had signed for.

6    Occasionally the bank had bypassed the

7 Little Isle IV deposit, put it directly into the deposit

8 account.

9 Q.   So are you saying that when Mr. Berard's money went

10 directly to Big Isle VI, that was the bank's fault?

11 A.   That would have been a bank transaction.

12    I had instructed them that we would need the

13 money into the Little -- into Big Isle VI's bank account,

14 and I guess upon review the bank just skipped the

15 Little Isle IV step.

16 Q.   But as with Mr. Berard, just going back to the

17 initial transfer of money, that $200,000, you did not on

18 or about February 7, 2005, tell Mr. Sydor about that

19 transaction, did you?

20 A.   It would not have been my typical protocol to alert

21 any of the individual members of the company about

22 specific expenses or transactions.

23 Q.   And I'm going to show you, again, a copy of the July

24 21, 2006, letter or agreement that Little Isle IV sent to

25 the members of Little Isle IV.

4688

1      This one is -- the one I'm showing you right now

2   is Kenner Exhibit 16.  It's the same as Kenner Exhibit 1

3   and some of the other copies we have seen, correct?

4   A.   It appears to be.

5   Q.   And in this document where you are defining all the

6   parcels then owned by Little Isle IV, you don't ever make

7   mention of Discovery Harbor, do you?

8   A.   This document didn't define all of the parcels that

9   were owned by Little Isle IV.

10  Q.   So you are saying there is another document that

11  defined Little Isle IV's ownership interest in

12  Discovery Harbor lots?

13  A.   Little Isle IV was a member of Big Isle VI.

14       That is correct.

15  Q.   My question to you is, you have Little Honu'Apo, 258

16  acres, that was the original 258 acres that Mr. Manfredi

17  and Mr. Kaiser put a down payment on back in was it 2002?

18  A.   Yes.

19       They put a $10,000 deposit down.

20  Q.   And that holding company was Big Isle IV Ventures,

21  right?

22       Honu'Apo, that's 1,500 acres, Big Isle V,

23  Waikapuna, another 2,015 acres under Ka'u Holding, and --

24  how do you pronounce that?

25  A.   Moaula.

Kenner - Cross/Miskiewicz

4689

1   Q.   Moaula, 1,800 acres under Moaula Farm and Ranch

2   Company, something called Church here under Big Isle IV

3   ventures.

4        It says:

5        As you may know, the company has interests in

6   five Delaware and Hawaii entities, in parentheses, the

7   holding companies, that own, or in the case of Moaula

8   parcel have right to acquire the following parcels of real

9   estate in Hawaii.

10       You never mentioned Discovery Harbor lots in any

11  of this, do you?

12  A.   No, sir, because it was not part of the joint venture

13  roll up with Windwalker and Lehman Brothers.

14  Q.   So you didn't tell Berard and Sydor at the time their

15  money was being drawn down from lines of credit to buy

16  Discovery Harbor, and you didn't tell them over a year

17  later in '06, or there's nothing here that would tell

18  them, hey, by the way, some of your money went to a

19  different parcel of land, not included.

20       Right?

21  A.   The home sites, as they were referred to, were

22  recognized in the joint venture term sheet originally

23  signed with Lehman Brothers and Windwalker and

24  disseminated to the group and the 7 inches of documents

25  that we saw Mr. Sydor send to the court also represents

Kenner - Cross/Miskiewicz

4690

1    the exclusion of the home sites as part of this joint

2    venture roll up --

3    Q.    Mr. Kenner --

4    A.    -- it is documented --

5    Q.    There is nothing in this document, just like there's

6    nothing in this document that says anything about Ken

7    Jowdy borrowing money, there is nothing in this document

8    that says anything about Discovery Harbor lots, is there?

9    A.    There is not.

10         There are a lot of elements that were not

11   recognized in that joint venture roll up disclosure

12   letter.

13   Q.    You testified on direct I believe yesterday about an

14   environmental indemnity agreement, Kenner Exhibit 30.

15         This was also found in your home, correct?

16   A.    Yes, sir.

17   Q.    That indemnity agreement, you also introduced

18   something called Kenner 218 which is also entitled

19   environmental and hazardous substance indemnification

20   agreement.

21   A.    Yes, sir.

22         I recall that.

23   Q.    And there is no mention of Discovery Harbor lots in

24   either of these either, correct?

25   A.    It wouldn't make any sense for them to be in there.

Kenner - Cross/Miskiewicz

4691

1   Q.   My question to you, just yes or no, Discovery Harbor

2   lots is not referenced anywhere in that environmental

3   indemnity agreement, sit?

4   A.   No, sir, it's not.

5   Q.   Yesterday you said -- different topic here -- at some

6   point there were something like 12 lawsuits against

7   Mr. Jowdy.

8           In fact, sir, many of the lawsuits you were

9   referring to were not against Mr. Jowdy.  They were

10   lawsuits, for instance, the Myrick lawsuit that you were

11   involved in.

12           Correct?

13   A.   I never testified that there were 12 lawsuits against

14   Mr. Jowdy.

15   Q.   You didn't -- okay.

16           You testified earlier today that the lawsuit in

17   Las Vegas, Nevada, was ultimately dismissed, right?

18   A.   No, sir.

19   Q.   The district court case in Nevada was not dismissed?

20   A.   No, sir.

21           Mr. Jowdy lost a $1 million judgment to Glenn

22   Murray and I won in Mr. Jowdy's counterclaim against me

23   for indemnification.

24           I represented myself in that case.

25   Q.   The lawsuit that you initiated in behalf of Ula

Kenner - Cross/Miskiewicz

4692

1  Makika and one of the other companies, that was dismissed,

2  wasn't it?

3  A.   The Little Isle IV Ula Makika Phil Kenner lawsuit v

4  Ken Jowdy was dismissed.

5  Q.   Then there was another lawsuit filed in California,

6  this was after the Global Settlement Fund was initiated.

7       Right?

8  A.   There were three lawsuits filed in California.

9  Q.   Well, there's been testimony among others by your

10 former attorney Ron Richards that one of those lawsuits

11 was dismissed without prejudice.

12      You don't disagree with that, right?

13 A.   I do not disagree with that.

14 Q.   There's been testimony about a lawsuit against

15 Ms. Myrick.

16      You settled that lawsuit, did you not?

17 A.   They settled with me out of court.

18 Q.   There was a settlement agreement?

19 A.   Yes, sir.

20 Q.   Neither party admitted wrongdoing or conceded to

21 whatever the other party was doing.

22      Correct?

23 A.   I'm not sure what the specific details were, but they

24 paid me out of court settlement.

25 Q.   One of the allegations you made in the Myrick lawsuit

Kenner - Cross/Miskiewicz

4693

1   was that Ms. Myrick had taken and absconded with the hard

2   drives onto which all of your records for Standard

3   Advisors were located at the time.

4           Right?

5   A.   That is correct, her and her attorney confirmed that

6   during testimony -- during her deposition, excuse me.

7   Q.   And then you settled?

8   A.   They settled with me.

9           They paid me an out-of-court settlement prior to

10  trial.

11  Q.   But you had a lawyer, right?

12  A.   Yes, sir, I did.

13  Q.   You could have done anything -- you could have

14  inserted all kinds of provisions as part of that

15  settlement if you wished.

16          Correct?

17  A.   That is not true.

18          They would have been subject to their agreement.

19  Q.   But you didn't even ask, did you, sir, for your hard

20  drives back, did you?

21  A.   That is incorrect.

22  Q.   You didn't get them back.

23  A.   No, sir, I did not.

24  Q.   Because you didn't want them back.

25  A.   That is absolutely incorrect.

Kenner - Cross/Miskiewicz

4694

1   Q.   Because you knew that there was nothing in those hard

2   drives that Ms. Myrick absconded with that would have

3   supported any contention that you have here that everybody

4   knew what you were doing with respect to money, isn't that

5   true?

6   A.   That also is absolutely incorrect.

7           I would love to have those hard drives back

8   today, if I could.

9   Q.   Why didn't you subpoena them for this trial?

10          MR. HALEY:  I would object.

11          THE COURT:  Sustained.

12          MR. MISKIEWICZ:  May I have a moment, your

13  Honor.

14          (There was a pause in the proceedings.)

15  BY MR. MISKIEWICZ:

16  Q.   There's been testimony, I think you were asked on

17  direct about testimony from Mr. Ranford.

18          Do you recall Mr. Ranford testified that he had

19  met you a few weeks before your arrest.

20          Correct?

21  A.   Yes, I recall that testimony.

22  Q.   And you recall Mr. Ranford testified that he had

23  asked you in that meeting for documentation that he could

24  use to help him understand where his various investments

25  were.

Kenner - Cross/Miskiewicz

4695

1    Right?

2    A.   That was not discussed in that meeting.

3    Q.   My question to you is, you recall testifying -- or do

4    you recall Mr. Ranford had said that?

5    A.   I apologize.

6         Yes, I do recall Mr. Ranford testifying to that.

7    Q.   And you were asked by Mr. Haley whether there was

8    anything untruthful about what Mr. Ranford said to you.

9         Correct?

10   A.   That is correct.

11   Q.   In fact, at page 4187 you were asked if you recall

12   the testimony and you were asked was that truthful

13   testimony from your perspective, sir?

14        Answer:  It was not.  My computer was present

15   and working during our meeting that day.

16        Do you remember answering that -- or giving that

17   testimony a couple of days ago on direct?

18   A.   Yes, I do.

19   Q.   You said that because Mr. Ranford said that he was

20   told by you that your laptop was not working, or your

21   computer was not working.

22        Correct?

23   A.   No.

24        I said it because it was the truth.

25   Q.   My question to you, sir, is you said Mr. Ranford's

4696

1    testimony was untruthful because in the sense that he

2    testified that your laptop was not working and you dispute

3    that.

4         You said that never came up and, in fact, your

5    computer was functioning, correct?

6    A.   My computer was present during our meeting.

7    Q.   And functional?

8    A.   Yes, sir.

9         We looked at web sites while we were on my

10   computer that day.

11   Q.   And so we are clear, the laptop that you provided --

12   I'm sorry -- the laptop that we are talking about at this

13   meeting with Mr. Ranford is what I'm showing you now,

14   device No. 1?

15   A.   Yes.

16   Q.   And this was functional when you met with Mr. Ranford

17   several weeks before your arrest?

18   A.   That is correct.

19   Q.   And, in fact, I believe you testified that there was

20   a question about whether or not you could remember this

21   being your particular MacBook.

22        You remember what you said about how you

23   identified the MacBook?

24   A.   I believe that I recognized that there was a dent in

25   the --

Kenner - Cross/Miskiewicz

4697

1   Q.   Is that the dent you are talking about?

2   A.   That's the one I recognize, yes, sir.

3   Q.   From when TSA representatives dropped it?

4   A.   Yes, sir.

5        That happened on more than one occasion,

6   unfortunately.

7   Q.   Remember you testified about that once before, right?

8   A.   That is correct.

9        That was a different laptop I was referring to

10  at that time.

11  Q.   The Myrick lawsuit, during your deposition on April

12  21, 2009, you were asked a series of questions about how

13  you kept straight and whether or not you kept a ledger,

14  specifically distinguishing Mr. Juneau and Mr. Nolan's

15  contributions to Little Isle IV.

16        Remember that series of questions?

17  A.   I do not.

18  Q.   Do you have any real reason to doubt that you were

19  asked questions about whether you had ledgers or

20  documentation regarding Little Isle IV back during the

21  Myrick lawsuit?

22  A.   I have no reason to doubt that.

23  Q.   In fact, do you remember what you said when you were

24  asked if you had a copy of any ledger?

25  A.   I don't even recall the questions.

Kenner - Cross/Miskiewicz

4698

1    Q.    I'll show you -- I'll refer to this as Myrick 2.

2          Showing you a portion of Myrick 2 with some

3    highlighted text.  Take a minute to see if that will

4    refresh your recollection about what you said.

5          MR. HALEY:  Your Honor, may I just approach?

6          THE COURT:  Yes.

7          MR. HALEY:  Thank you.

8          (There was a pause in the proceedings.)

9          MR. HALEY:  Thank you, Judge.

10   BY MR. MISKIEWICZ:

11   Q.    So, Mr. Kenner, having looked as Myrick 2, does that

12   refresh your recollection that in deposition -- in that

13   deposition in 2009 when asked if you had a ledger you said

14   it was destroyed because the TSA dropped some other

15   laptop, right?

16   A.    Yes, I just read that.

17   Q.    Mr. Kenner, I'm going to turn your attention now to

18   some testimony you gave about Led Better and how that came

19   about.

20          In sum you testified, did you not, sir, on

21   direct that part of the Led Better deal wrapped up in

22   giving Mr. Kaiser a short-term loan of $400,000?

23   A.    It turned out to be $395,000, but, yes, originally he

24   had requested $400,000.

25   Q.    And you said I believe on direct that that happened

Kenner - Cross/Miskiewicz

4699

1   in part because Mr. Manfredi was threatening not to sign

2   the closing documents for Hawaii.

3          Correct?

4   A.   That is correct, in the summer of 2006.

5   Q.   And to buy out Mr. Manfredi in a piece of property

6   having nothing to do with Hawaii, Mr. Kaiser asked you for

7   a short-term loan of what turned out to be $395,000.

8          Right?

9   A.   Effectively he demanded it in return for one of the

10   conditions of his signature.

11   Q.   I'm sorry.

12          Repeat that again.  I didn't hear what you said.

13   A.   He effectively demanded that a loan be made available

14   to him as one of the conditions pursuant to signing off on

15   the Lehman Brothers deal.

16   Q.   Who was that, Mr. Kaiser or Mr. Manfredi effectively

17   demanded?

18   A.   Mr. Kaiser did.

19   Q.   So you are saying that he basically extorted you?

20   A.   I did not say that.

21          I said he effectively demanded.

22   Q.   Well, so what?

23          If he didn't sign, you had Lehman Brothers.  You

24   were the financial person.  That was your job.

25          They were managing the vertical construction and

4700

1    due diligence.  So what?  You could have let him go.

2    A.    No, sir, that's incorrect.

3          Lehman Brothers commanded that each and every

4    member of the Hawaiian partners signed off on the deal or

5    they were not going to go through with the financing of

6    the deal.

7    Q.    So because they wouldn't sign -- when was the

8    signing?

9    A.    Those were the acknowledgment and consent letters

10   that you saw each of the individual Little Isle IV members

11   sign.

12         And subsequently I think in evidence we have

13   seen Mr. Kaiser's response form for his acknowledgment and

14   consent of the deal.

15   Q.    What month, what year?

16   A.    Summer of 2005.

17   Q.    When was Sag Harbor?

18   A.    That was two months after the closing of the

19   financing from Lehman Brothers.

20   Q.    So he already signed on the dotted line for the

21   Lehman closing before any of this stuff happened with the

22   Sag Harbor property.

23         Isn't that correct?

24   A.    Yes, sir.

25         He signed after we had agreed to give him a

4701

1    short-term loan.

2    Q.    Not much leverage at that point, right?

3           I mean, Lehman is on board, Kaiser, Manfredi,

4    everybody signs the closing documents, and then he forces

5    you or demands from you this short-term loan?

6    A.    Are you suggesting that after we agreed to it prior

7    to the signature I should have lied to him and not given

8    him the loan?

9    Q.    Well, you are a businessman, sir, aren't you?

10   A.    Not one to lie to people, if that's what you are

11   insinuating.

12   Q.    Was this in the best interest of your clients?

13   A.    Closing the Lehman Brothers financing, it was 100

14   percent in the best interest of my clients.

15   Q.    Fair enough, that was a bad question.

16          Was paying an extortion demand in the best

17   interest of your clients?

18   A.    The only extortion I'm aware of is a lawsuit I filed

19   against Ken Jowdy and Tom Harvey in California for

20   extortion.

21   Q.    Sir, I'm not asking -- this is a very clear, I think

22   a very clear question.  If you don't understand I'll

23   rephrase it.

24          My question to you is, was paying $395,000

25   effectively extortion money to John Kaiser in the best

Kenner - Cross/Miskiewicz

4702

1    interest of your hockey player clients?

2    A.    Mr. Kaiser's $395,000 --

3    Q.    Sir --

4    A.    Was --

5    Q.    I'm asking you a yes or no question --

6          MR. HALEY:  Judge --

7    BY MR. MISKIEWICZ:

8    Q.    Is paying $395,000 to Mr. Kaiser at that stage in the

9    best interests of your clients?

10   A.    I did not pay Mr. Kaiser $395,000.

11   Q.    You made him a loan, a short-term loan of $395,000?

12   A.    Yes, sir, I did, and he repaid us 11 days later.

13   Q.    Out of --

14         MR. MISKIEWICZ:  Withdrawn.

15   A.    Out of his personal bank account --

16   Q.    Why didn't he -- why did he need a loan for such a

17   short period of time?

18   A.    According to Mr. Kaiser, he didn't have the funds

19   available.

20   Q.    You were involved, there's been some testimony about

21   a property in Scottsdale, Arizona, sometimes referred to

22   as Paradise Valley.

23         Correct?

24   A.    Yes, sir, that's correct.

25   Q.    And that was a joint venture you had with Mr. Kaiser,

Kenner - Cross/Miskiewicz

4703

1    correct, among others?

2    A.    With Mr. Kaiser.

3    Q.    Anybody else?

4    A.    No, sir.

5    Q.    You had previously also been involved in a joint

6    venture with him in a property called -- in Hormosa Beach,

7    California, correct?

8    A.    Her-mo-sa Beach, correct.

9    Q.    And that was -- how much money did you get out of the

10   Hermosa Beach resale when that occurred?

11   A.    How much did I personally?

12   Q.    Well --

13           MR. MISKIEWICZ:  Withdrawn.

14   BY MR. MISKIEWICZ:

15   Q.    What were the proceeds of Hermosa Beach?

16   A.    The net profit I believe was somewhere in the

17   neighborhood of $1.3 million before taxes.

18   Q.    And that money came to you to an account you

19   controlled at Wells Fargo.

20           Isn't that true?

21   A.    All of the money from the escrow came from my account

22   because the title to the house was in my name.

23   Q.    Even though Mr. Kaiser and his relatives had put up

24   the lion's share of the cash to purchase that

25   Hermosa Beach property.

Kenner - Cross/Miskiewicz

4704

1      Right?

2   A.   Can you define lion's share?

3   Q.   Well, wasn't it true, sir, that your portion of the

4   deal was to secure a mortgage while renovations took

5   place, and Mr. Kaiser's role was to come up with a down

6   payment, approximately 20 percent, roughly a million

7   dollars.

8      Right?

9   A.   That's incorrect.

10  Q.   You put in the million dollars?

11  A.   I put in $440,000, and I secured a $4 million loan

12  against the property.

13  Q.   Okay.

14     So at the end, that property was sold at a

15  profit, right?

16  A.   Yes, sir, it was.

17  Q.   What was the profit?

18  A.   Approximately $1.3 million.

19  Q.   And was it supposed to be split?

20  A.   It was split about $653,000 apiece between me and

21  Mr. Kaiser.

22  Q.   Has Mr. Kaiser seen any of that money?

23  A.   Mr. Kaiser saw every penny from the California

24  project, much the same he received every penny back from

25  the Hawaii projects all documented on bank records that I

Kenner - Cross/Miskiewicz

4705

1   have seen in evidence.

2   Q.   And you testified to that in your direct, that he got

3   everything out of the Hermosa Beach project.

4        Right?

5   A.   Yes, sir, all of his original capital contributions

6   and his proportionate share of the profits.

7        That is correct.

8   Q.   So thereafter, shortly thereafter when Paradise

9   Valley property was being renovated, you testified, did

10  you not, at page 4505 that Mr. Kaiser was in need of

11  money, that he needed to contribute to the Paradise Valley

12  property, and since he had been paid back in full by me

13  with respect to the California beach project -- that's

14  Hermosa, right?

15  A.   Yes, sir, it is.

16  Q.   -- at that time, and any other outstanding

17  transactions we had, in order to keep track of additional

18  money that Mr. Kaiser was borrowing, you said, you

19  continue and you say, I asked that Mr. Gaarn transfer the

20  money to Mr. Kaiser as a loan and then Mr. Kaiser

21  forwarded that money to me so I could take care of

22  expenses.  I continued to front and pay for on Paradise

23  Valley Arizona renovation project.

24       That was your testimony, right?

25  A.   That sounds accurate, yes, sir.

Kenner - Cross/Miskiewicz

4706

1    Q.    So here we are in '06, right after Lehman, that's

2    about the same time Paradise Valley and Sag Harbor

3    transactions were occurring.

4              Right?

5    A.    No, sir.

6    Q.    Well, when was Sag Harbor purchased by the Led Better

7    Development Company, LLC?

8    A.    On or about October 26, 2006.

9    Q.    A couple of months after Lehman, right?

10   A.    Approximately two months afterwards.

11   Q.    And Paradise Valley is still in the works?

12   A.    No.

13             We didn't take a look at Paradise Valley until

14   almost a year and a half later.

15   Q.    In or about 2006, are you saying that you were

16   loaning money to Mr. Kaiser in part for the Sag Harbor --

17   the short-term loan?

18   A.    Yes, that's what happened.

19   Q.    Was there any other loans outstanding between you and

20   he?

21   A.    At that point in time?

22   Q.    Yes.

23   A.    Yes.

24             There was a $360,000 loan that was pursuant to

25   the equity transfer agreement that's been put into

4707

1  evidence at the closing signed prior to the closing and

2  then funds transferred from the Naalehu Ventures account

3  post closing with Lehman Brothers.

4  Q.   So it's more money that he owed you?

5  A.   No, sir.

6        It was pursuant to our agreement for him to be

7  able to take out his entire balance of his Hawaii project

8  investment, which totaled $1.176 million after the

9  closing.

10  Q.   So has he repaid you in full since all this occurred?

11  A.   At this point in time Mr. Kaiser owes me money.

12  Q.   To this day?

13  A.   Yes, sir.

14        I have been --

15  Q.   How much?

16  A.   I have been unable to pursue him in the litigation I

17  filed in 2012 against him and subsequently Mr. Berard or

18  the litigation I filed against he and Mr. Berard in 2013.

19  Q.   That wasn't my question.

20        The question was how much does he owe you?

21  A.   I don't know as I sit here today.

22  Q.   Is it a dollar?  $10,000?

23        What are we talking about, serious money?

24  A.   Serious money.

25  Q.   Millions?

Kenner - Cross/Miskiewicz

4708

1    A.    I would have to check my bank records.

2    Q.    Now, you heard testimony from Mr. Nolan and there was

3    other evidence I believe you testified about the Nolan

4    arbitration.

5          Correct?

6    A.    Yes, sir.

7    Q.    And you know that you lost the Nolan arbitration,

8    correct?

9    A.    Can you define lost.

10   Q.    Well, there was a judgment entered against you for a

11   certain amount of money, right?

12   A.    There was a judgment entered against me, that is

13   correct.

14   Q.    And subsequent to that there have been a number of

15   depositions, sometimes called debtor's exams, to try to

16   find that money to pay Mr. Nolan.

17         Right?

18   A.    There have been several depositions, that's correct.

19   Q.    And I believe it was Mr. Kaiser, maybe I am

20   misstating who said this, somebody said that you told them

21   Mr. Nolan will never see a dime out of that money.

22         Is that true?

23   A.    Which portion of that question are you asking me to

24   answer?

25   Q.    Did you ever say that?

Kenner - Cross/Miskiewicz

4709

1   A.    I have never said that.

2   Q.    And do you recall in your debtor's exam August 11,

3   2010 you were asked a question about the loans that were

4   outstanding I guess up through 2010.

5         Do you remember testifying about any loans that

6   were outstanding between you and Mr. Kaiser back in 2010

7   in the debtor's exam arising out of the Olan arbitration?

8   A.    Out of the?

9   Q.    The Nolan, the Owen Nolan arbitration.

10  A.    I don't recall specifically.

11  Q.    Let me show you what I'm going to mark as Nolan 1 for

12  identification, and I'm going to ask you to focus on page

13  65 and 66.

14        If you would read that.

15        MR. HALEY:  May I, Judge?

16        THE COURT:  Yes.

17        MR. HALEY:  Thank you.

18        (There was a pause in the proceedings.)

19        MR. HALEY:  Just 65 and 66?

20        MR. MISKIEWICZ:  Yes.

21        MR. HALEY:  Your Honor, just for purposes of

22  clarity, for the record, I think Mr. Miskiewicz wants him

23  to read 64 and 65 or 65 and 66.

24        It may be my confusion.

25        MR. MISKIEWICZ:  This page and this page.

Kenner - Cross/Miskiewicz

4710

1        MR. HALEY:  Okay.

2        65 and 66.

3   BY MR. MISKIEWICZ:

4   Q.    Mr. Kenner, have you had enough time to read 65 and

5   66?

6   A.    Give me one moment, please.

7             (There was a pause in the proceedings.)

8   A.    Yes, I have read it.

9   Q.    You testified in 2010 that you owed Mr. Kaiser money,

10  not that he owed you money.

11            Isn't that true?

12  A.    That's what it says, but the bank records would show

13  different.

14  Q.    But that's you, that's your deposition in the

15  debtor's exam.

16            Is that not true, sir?

17  A.    It's -- this is what I said in 2010, that's correct.

18            But Mr. Kaiser owes me money and the bank

19  records would reflect that.

20  Q.    And, in fact, you didn't even just say generically

21  that he owed you money.

22            You said you owed him money and you couldn't

23  repay him, so you gave him Baja Ventures 2006, LLC in

24  repayment for the loan he had made you.

25            Isn't that what you said in that deposition?

4711

1    A.    Yes.

2          I recall this part of the deposition and --

3    Q.    Sir, I'm --

4    A.    -- we were discussing -- this is not accurate --

5    Q.    I'm going to ask that you just, please, Mr. Haley's

6    going to have an opportunity.

7          My question is you said in this deposition that

8    because you could not pay Mr. Kaiser back a loan he had

9    made to you, you transferred Baja Ventures 2006, LLC, in

10   repayment of that loan.

11         Yes or no?

12   A.    That's what it says on this document.

13   Q.    And, sir, that's the same corporation that you

14   testified earlier in this trial on direct and also on

15   cross-examination, that owns 39 percent of Mr. Jowdy's and

16   other's Cabo San Lucas.

17         Right?

18   A.    I never had a loan agreement with Mr. Kaiser with

19   reference to Baja Ventures 2006.

20   Q.    Sir, again, I'm asking just a yes or no.

21         You testified here, did you not say, sir:

22         Question:  Are you familiar with Baja Ventures

23   2006?

24         Answer:  Yes.

25         Question:  Do you own that entity?

Kenner - Cross/Miskiewicz

4712

1       Answer:  I don't think I do any longer.

2       Question:  You don't think you do?

3       Answer:  I don't think I do any longer.

4       And then you are asked:

5       What happened?

6       Answer:  I believe I lost it.

7       Question:  Can you explain what you mean by you

8  lost it.

9       Answer:  I had a loan agreement with somebody

10  for some moneys to help pay for legal expenses and I was

11  unable to repay the loan.

12       Question:  Who was the loan agreement with?

13       Answer:  John Kaiser.

14       So you transferred, according to your testimony

15  in August 11th of 2010, Baja Ventures, the same company

16  that has a 39 percent stake in Diamante Cabo San Lucas.

17       Right.

18  A.   That is incorrect.

19  Q.   My only question is, did you or did you not say that?

20  A.   I did not say that.

21       The deposition transcript is incorrect.  It was

22  referring to Hawaii Ventures 2006 and the equity transfer

23  agreement.

24  Q.   You are saying that the person who transcribed your

25  testimony somehow knew about miraculously a company known

Kenner - Cross/Miskiewicz

4713

1   as Baja Ventures which you just happened to own 39 percent

2   of, right, and substituted that word for something else

3   called Hawaii Ventures.

4           Is that what you want these people to believe?

5   A.   That's, in fact, what happened.

6           MR. MISKIEWICZ:  Your Honor, I'm about to begin

7   the second half.

8           THE COURT:  Okay.

9           We'll reconvene at 2 o'clock.  Don't discuss the

10  case.

11          (Jury leaves the courtroom.)

12          THE COURT:  Everyone can be seated.

13          You can step down.

14          (Witness steps down.)

15          THE COURT:  Just before the lunch break there

16  was an issue yesterday that I said I was going to come

17  back to and the court reporter reminded me this morning

18  that I didn't come back to and that was the sealing of the

19  sidebar.

20          Mr. LaRusso, you had asked that I seal that and

21  I sealed it temporarily so that you could be heard on

22  that.  If you want to approach on explaining why it should

23  be sealed I'm happy to do it, but I don't believe there

24  was any reason for that to be sealed.

25          To the extent there was any privileged

Kenner - Cross/Miskiewicz

4714

1    communication, the privilege, as you noted at the sidebar,

2    was waived by Mr. Constantine allowing you to speak to the

3    court about the issue that was raised.  I don't believe

4    the public should be denied access to what you told the

5    court with respect to that, but I'll hear you if there is

6    anything you want to bring to my attention.

7              I don't know of any basis for the sealing of

8    that sidebar.

9              MR. LARUSSO:  Judge, I think I made the

10   arguments at sidebar.

11             I don't think there is anything I can add that

12   will impact that decision.

13             THE COURT:  As I just said, the only portion at

14   sidebar that could possibly be sealed if it was some

15   privileged communication, Mr. LaRusso disclosed to the

16   court certain interactions that occurred between him and

17   his client and stated that he discussed it with his

18   client, his client was waiving the privilege and wanted

19   the court to be aware of what occurred.

20             In any event, whether it was waived or not that

21   was brought to my attention in order to explain why there

22   needed to be a further hearing with respect to the

23   Home Depot tape and I don't believe there is any basis to

24   seal it.  So it is unsealed.

25             Thank you.  How much longer do you have,

4715

1    Mr. Miskiewicz?

2              MR. MISKIEWICZ:  It will not take the full day.

3         I will probably go to the afternoon break.

4              THE COURT:  You still have to play a 25-minute

5    tape though, are you including that?

6              MR. MISKIEWICZ:  I will probably -- no, you are

7    right.

8         So I have that 26-minute tape.  I will conclude

9    with that, I think.

10             THE COURT:  All right.

11        2 o'clock.

12        (Luncheon recess.)

13        (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

4716

```
1              A F T E R N O O N   S E S S I O N

2                        2 pm

3

4              (The following ensued in the absence of the

5    jury.)

6              MR. HALEY:  Your Honor, briefly.

7              Shortly before the recess there was a question

8    asked of my client quite directly that began with:  *Do you*

9    *expect these people to believe*, followed by the question.

10             My memory of the tone of voice that was used by

11   Mr. Miskiewicz in asking the question, at least by way of

12   my memory, was somewhat raised.

13             I did not object at that point in time, judge,

14   because it was my view that by jumping up and objecting

15   when that question was phrased in that fashion it would

16   only have exacerbated the histrionics.  The only thing

17   missing from that statement was:  *Do you expect these*

18   *people to believe because I sure don't.*  He didn't say

19   that, Judge, but that was clearly the implication.

20             It is my position when he said *these people*,

21   he's referring to the sworn jurors in this case.  And I

22   ask the court to do the following.

23             My application is simple judge.  That Mr.

24   Miskiewicz be instructed not to use that kind of

25   terminology in that raised voice again, and that the court
```

Kenner - Cross/Miskiewicz

4717

1  give a curative instruction as relates to whatever

2  language the court feels is appropriate.

3         I don't have the ability to cross-examine Mr.

4  Miskiewicz regarding his beliefs or his view of my

5  client's credibility; that an attorney, whatever

6  phraseology the court wishes to use, that the evidence be

7  based upon the jury's determination as to the credibility

8  of the witnesses, and views or opinions expressed by

9  attorneys representing litigants are not to be considered

10  by the jury.  I again --

11        THE COURT:  I'm not going to give a curative

12  instruction.  As you might recall, you have asked some

13  argumentative questions of the government witnesses.  I

14  didn't give any curative instructions when you asked an

15  open-ended question and you told me:  I'm sorry I let my

16  emotions get the best of me.

17        Do you recall that?

18        MR. HALEY:  Yes, I do.

19        THE COURT:  I did not give a curative

20  instruction when you did it.  If you had objected, I would

21  have sustained the objection as an argumentative question.

22  It obviously was an argumentative question.  I think the

23  jury will understand that and I don't think any curative

24  instruction is needed.  But I will instruct Mr. Miskiewicz

25  don't ask any questions in that style or any argumentative

4718

1   questions.  Okay?  Save it for the summation.

2            MR. MISKIEWICZ:  Will do.

3            MR. HALEY:  My final application, Judge, moving

4   right along.

5            Mr. Miskiewicz showed me a short while ago, and

6   I do appreciate this, a bottle.  I believe he wants to

7   show this bottle the my client.

8            I'm led to believe that, at least by way of

9   proffer, it was received by the US Attorneys office,

10  presumably from Mr. Kaiser.  I don't know that to be a

11  fact.  I'm led to believe they will not be calling Mr.

12  Kaiser as a rebuttal witness so the US Attorney now picks

13  up this bottle and walks over, puts it on the stand and

14  says to my client: *Have you ever seen this before?*  What

15  is the implication going to be as relates to that

16  particular question, judge, but that they acquired it

17  through some sort of procedure by which a witness, who may

18  or may not be recalled as a government witness.  I just

19  believe that that is, again, histrionics, unduly

20  subjective, and I would simply object if that is the way

21  it is going to be done.

22            THE COURT:  I assume the government has a good

23  faith basis for believing Mr. Kenner might be familiar

24  with it based upon what Mr. Kaiser has told them.  Or not.

25  So it is histrionics to ask him about it if I has never

4719

1    seen it.  If he has never seen it, he has never seen it

2    and it will go back in the box.  I don't know how

3    effective that will be.

4              MR. HALEY:  Maybe not, judge.  I have an

5    obligation to raise what I believe to be objections.

6              THE COURT:  You obviously have shown a lot of

7    documents.  Again, I find it is a little bit ironic that

8    you are making these objections, because you stood over

9    witnesses with documents saying isn't it a fact that you

10   told the FBI on July 1, 2004, the following; and the clear

11   suggestion is that you are standing there with a

12   documented that says that.

13             That has the same implication even though there

14   is no FBI agent who testified that is what the document

15   says.  So it is the same dynamic that I have seen over and

16   over again.

17             I don't think it an objectionable thing to show

18   something to a witness that you think the witness might

19   recognize.

20             MR. HALEY:  I will never quarrel with the court.

21   I have a difference of opinion but I will never quarrel

22   with the court.

23             My only comment, Judge, is, I don't believe

24   throughout any of the questioning, I asked any questions

25   of government witnesses, I never said anything remotely

Kenner - Cross/Miskiewicz

4720

1  approaching, in any substance, *do you expect these people*
2  *to believe*.  And that was just the basis of my original
3  objection.

4         THE COURT:  I said it was an objectionable
5  question.  It was argumentative.  I'm not sure I want to
6  grade argumentative questions as to whose is worse.  An
7  argumentative question is an argumentative question.  It
8  is a lawyer suggesting through argument in a question what
9  they think the jury should conclude about the answer.

10         So I am not sure that I agree that his
11  argumentative question was worse than the argumentative
12  questions that have been asked during the defense
13  cross-examination of government witnesses.

14         In any event, I will sustain any objection to --
15  I don't want you to think you are drawing attention to an
16  argumentative question.  Everyone knows an argumentative
17  question, so objecting to it I don't think draws attention
18  to it.  I would sustain the objection.

19         MR. HALEY:  Thank you, judge.

20         THE COURT:  Let's bring in the jury.

21         MR. LaRUSSO:  Your Honor?  We are having some
22  movement on my witnesses, but I do have three available.
23  I'm no sure yet what the order is going to be for
24  tomorrow.  I told the government before we broke for lunch
25  what the order was.  One of the witnesses is flying in

Kenner - Cross/Miskiewicz

4721

1    from Chicago and I may have to put him on the stand first.

2                    I don't know yet exactly what my order is going

3    to be but I now have three witness available.  And,

4    believe or not, Judge, Mr. D'Ambrosio, the witness who has

5    had the patience to be here two days, I think he may even

6    have the patience to stay another day.

7                    So I'm going to be moving.  I don't know that

8    the moving parts are going to be until later today.

9                    THE COURT:  Okay.

10                   (The following ensued in the presence of the

11   jury.)

12

13   **PHILLIP A KENNER**

14          called by the Defense, having been previously

15          duly sworn/affirmed, continued testifying as

16          follows:

17                   THE COURT:  Please be seated.

18                   Go ahead, Mr. Miskiewicz.

19

20   CROSS-EXAMINATION (Continued)

21   BY MR. MISKIEWICZ:

22   Q.   Mr. Kenner, you were asked during your direct

23   examination about a Rubin Paolos and money that came out

24   of the Global Settlement Fund to pay that attorney in

25   Mexico.

1    Do you remember those questions?

2    A.   Yes, sir, I do.

3    Q.   You were also asked questions about Mr. Kaiser's

4    testimony regarding your use of Global Settlement funds to

5    acquire a tequila company.

6    Do you remember being asked those questions by

7    Mr. Haley?

8    A.   Could you restate the question?  That was not clear

9    to me.

10   Q.   Do you remember being asked questions by Mr. Haley in

11   your direct about Mr. Kaiser's testimony that you had

12   acquired a tequila company in Mexico?

13   A.   I remember discussions about that topic.  I didn't

14   follow the question again.  I apologize.

15   Q.   I'm talking now not about discussions with

16   Mr. Kaiser.  I'm simply talking about your testimony.

17   Let me do it this way?

18   A.   Okay.  Thank you.

19   Q.   You were asked what if anything about Mr. Kaiser's

20   testimony regarding tequila was false.  On page 4150 your

21   answer was:

22   *Specifically, everything.  In detail, I have*

23   *never possessed any of those bottles or any similar*

24   *version of those bottles that were represented on the*

25   *government's exhibit on the one-page web page that was*

Kenner - Cross/Miskiewicz

4723

1   *designed by a friend of mine.  Those bottles have never*

2   *been manufactured or any similar replica of them.*

3          Do you remember testifying in this trial to that

4   effect?

5   A.   Yes, I do.

6   Q.   And in fact you did possess and manufacture such

7   bottles, didn't you?

8   A.   That is incorrect.

9   Q.   I'm showing you Government Exhibit 4506 for

10  identification.  And I'm going to ask you to focus on the

11  email address.

12          Whose email address is that?

13  A.   That is an old email address of mine.

14  Q.   It is an old email address of your today?  Or was it

15  an old email address of yours back on the date of this

16  email?

17  A.   That I believe existed in and around the date of that

18  email.

19  Q.   And it is an email to, among other people, Bobby

20  Gaudet, actually two different email addresses, and John

21  Kaiser.  Correct?

22  A.   Yes, sir.

23  Q.   And there is a photograph.  Correct?

24  A.   Correct.

25  Q.   And it concludes:  *Thanks, Phil.*

4724

1          You are Phil, right?

2     A.   Yes, I am.

3     Q.   You recognize the cell phone address?

4     A.   Yes, sir.

5     Q.   At the bottom there?

6     A.   Yes, my cell phone address.

7     Q.   You sent this email, didn't you?

8     A.   I believe I did.

9          MR. MISKIEWICZ:  The government moves the

10    admission of 4506.

11         MR. HALEY:  No objection.

12         MR. LaRUSSO:  No objection, your Honor.

13         THE COURT:  4506 is admitted.

14         (Government Exhibit 4506 in evidence.)

15    BY MR. MISKIEWICZ:

16    Q.   This is sent from your iPhone on July 8, 2008.  And

17    it is sent to, among others, Mr. Kaiser.  Correct?

18    A.   Yes, sir.

19    Q.   And it is a photograph of what appears to be two

20    bottles of something.  And can you read what the label

21    says on the back?

22    A.   Mosquito Rojo.

23    Q.   And that was the name of the company that you

24    testified in direct was merely a website created by a

25    friend of yours.  Correct?

Kenner - Cross/Miskiewicz

4725

1    A.    Yes.   The bottles that were on that website don't

2    represent the bottles that are here.

3    Q.    Same company name.  Correct?

4    A.    Yes, same company name.

5    Q.    And then you heard testimony in the government's case

6    that located in your home was a business card.  It is kind

7    of hard to read case of the red, but the white part says:

8    *Phil Kenner, chairman,* and then the name of the website is

9    *MosquitoRojoTequilla.com*.   Correct?

10   A.    That is correct.

11   Q.    And in fact the cell phone number on the business

12   card is the same cell phone number in your email which is

13   now 4506.  Correct?

14   A.    Yes, that's correct.

15   Q.    You also testified in direct at page 4150, continuing

16   what was you say untrue about Mr. Kaiser's testimony, at

17   line 13.

18          Next, I don't believe I have ever been in

19   communication that I recall with a distributor friend of

20   Mr. Kaiser's who had requested bottles from me, nor have I

21   ever shipped any tequila to Mr. Kaiser either in any form

22   by UPS, FedEx, or any other OS Postal means.

23          You said that under oath, correct?

24   A.    Yes, that's correct.

25   Q.    Showing you what has been marked for identification

Kenner - Cross/Miskiewicz

4726

1    as 4507.

2          Quickly, is this also a string of emails between

3    you and Mr. Kaiser at or about January 2009?

4    A.    That appears to be.

5    Q.    And there is a different email address but you also

6    had this email, did you not, sir:  PAK33@mac.com?

7    A.    That's correct.

8    Q.    You sent this email and received these emails, did

9    you not, sir?

10   A.    Yes, I'm part of sending and receiving these emails.

11   That's correct.

12         MR. MISKIEWICZ:  The government moves for the

13   admission of 4507.

14         MR. HALEY:  No objection.

15         MR. LaRUSSO:  No objection, your Honor.

16         THE COURT:  4507 is admitted.

17         (Government Exhibit 4507 in evidence.)

18   BY MR. MISKIEWICZ:

19   Q.    Very briefly.  In this email chain, mopping other

20   things you are forwarding, are you not, to John Kaiser an

21   email from Bob Gaudet regarding -- I will read it.

22         *It has been requested for us to provide the name

23   and a copy of,* I believe that is ID or id, *for the person

24   who will be picking up tequila.  The following is what I

25   had*, and it goes on and has the name of somebody in

4727

1   Moscow.  Is that correct?

2   A.   Yes.  That's correct.

3   Q.   Was Mr. Gaudet also a partner of yours in Mosquito

4   Rojo?

5   A.   Mr. Goudet was one of the individuals interested in

6   starting the company with me.  That's correct.

7   Q.   Government Exhibit 4508 for identification.  Is this

8   another email from you to Mr. Kaiser in or about 2008?

9   A.   It appears to be.

10  Q.   Phil@standardsadvisor.com.  That was one of your

11  addressers back in 2008.  Is that correct?

12  A.   Yes.  It still is.

13  Q.   You sent this, didn't you?

14  A.   Yes.  Correct.

15           MR. MISKIEWICZ:  The government moves for the

16  admission of 4508.

17           MR. LaRUSSO:  May I just see that for a second?

18           MR. HALEY:  No objection, your Honor.

19           MR. LaRUSSO:  No objection, your Honor.

20           THE COURT:  4508 is admitted.

21           (Government Exhibit 4507 in evidence.)

22  BY MR. MISKIEWICZ:

23  Q.   4508 is an email dated July 4, 2008, to John Kaiser.

24  The subject is *Russian bottle*!  Exclamation.

25           Attached to it is a photograph.  Correct?

Kenner - Cross/Miskiewicz

4728

1    A.    That is correct.

2    Q.    And at the bottom of the email and below the

3    photograph, again it says *Thanks, Phil*.  And it has your

4    cell phone number.  Is that correct?

5    A.    That is correct.

6    Q.    And lastly, I'm going to show you what has been

7    marked as Government Exhibit 4509.  Not much left.  But do

8    you recognize that?

9    A.    This is a bottle that has the labels that Mr. Gaudet

10   printed on his laser printer.  That's correct.

11            MR. MISKIEWICZ:  Your Honor we would move

12   Government Exhibit 4509, as light it is.

13            THE COURT:  Any objection?

14            MR. HALEY:  No objection.

15            MR. LaRUSSO:  No objection, your Honor.

16            THE COURT:  4509 is admitted.

17            (Government Exhibit 4509 in evidence.)

18   BY MR. MISKIEWICZ:

19   Q.    Okay.  Mr. Kaiser, Centrum loan.

20            Mr. Kenner.  I'm sorry.

21            Mr. Kenner, directing your attention to chart

22   four in evidence.

23            You agree that, as represented here, four

24   players, Glenn Murray, Mr. Sydor, Mr. Rucchin, Mr. Nolan,

25   contributed the various sums of money you see here for the

Kenner - Cross/Miskiewicz

4729

1   purpose of Honu'apo in or about 2004.

2   A.    Yes.  That's correct.  December of 2004.

3   Q.    For a total of $3,480,000.  Right?

4   A.    That's correct.

5   Q.    Showing you chart five.  You, on behalf of the

6   players and on behalf of Little Isle IV, obtain a

7   mortgage.  You basically mortgaged Honu'apo after players

8   contributed that money in July of '05.  Correct?

9   A.    That is correct.

10  Q.    And then you obtained a mortgage.  That mortgage, do

11  you remember what the total percentage and the interest

12  rate was for that mortgage?

13  A.    I believe it was about 12 percent interest rate.

14  Q.    Could it have been a little bit more?  12.25 percent?

15  A.    It is very possible.

16  Q.    Six percent plus prime, which was 6.25 at the time?

17  A.    I don't recall the prime rate back in 2005.

18  Q.    But at least 12 percent interest.  Right?

19  A.    I believe it was about 12 percent interest.  That's

20  correct.

21  Q.    And then of that mortgage, Honu'apo was purchased

22  using those players' various contributions and then it was

23  mortgaged.  And then you took that, the proceeds of that

24  mortgage, and you distributed it as indicated below:  1.5

25  million to Propriedad and 905,000 to Ula Makika.  Is that

Kenner - Cross/Miskiewicz

4730

1    correct?

2    A.    That's incorrect.

3    Q.    The money didn't go to Ula Makika?

4    A.    I'm sorry.  905,200.

5    Q.    Did go to Ula Makika.

6    A.    Yes, sir, it did.

7    Q.    Now, Propriedad was a Jowdy-controlled company?

8    A.    100 percent owned, I believe, by Mr. Jowdy.

9    Q.    So I mean this is part of the total $5 million that

10   you say was loaned to Mr. Jowdy.  Correct?

11   A.    The net 5 million, plus or minus.  That is correct.

12   Q.    And the money came from lines of credit of the

13   various players we saw, Murray, Sydor, Rucchin, et cetera.

14   You saw that, right?

15   A.    Yes, I did.

16   Q.    And those players were paying interest whenever their

17   lines of credit were drawn against.

18         Showing you chart six.  They had to pay interest

19   on those lines of credit.  Correct?

20   A.    Little Isle IV was paying interest.  Not the

21   individuals.

22   Q.    And showing you chart number six.  At a time of the

23   Centrum loan at 12 percent interest, Little Isle IV had

24   $16,000 and change in its bank account.  Correct?

25   A.    Yes.  We typically carried a very low cash balance in

4731

1   the accounts.

2   Q.   And in fact all the other LLCs, all of which you

3   controlled, had very low account balances.  Correct?

4   A.   That is correct, in lieu of draining all of the lines

5   of credit just to hold a high balance in any one of the

6   accounts for no particular reason.

7   Q.   Well, there was basically no money -- you said Little

8   Isle IV paid the lines of credit.

9            But we can agree, can we not, that Little Isle

10  IV didn't have any money?  The only money it had was the

11  lines of credit from the players.

12  A.   Little Isle IV had access to the capital

13  contributions of all the investors.

14  Q.   Which were lines of credit.  Correct?

15  A.   Not in its entirety.

16  Q.   Except for $100,000, maybe $250,000, initially

17  contributed.  Correct?

18  A.   No, that's not correct.

19  Q.   Well, in this case the only other capital it had was

20  a mortgage, approximately $3 million, from Centrum.

21  Correct?

22  A.   The Little Isle partners had contributed north of a

23  million dollars cash through this period of time and as

24  incremental capital contributions.

25            To acquire larger equity stakes, each of the

4732

1    line-of-credit holders made their lines of credit

2    available.

3             At no time did I drain the entire lines of

4    credits just so I could hold a high balance in the Little

5    Isle bank account.  We only used the lines of correct

6    whenever necessary to pay for expenses of the company.

7    Q.    My question to you is, you don't dispute the fact

8    that at the time of the Centrum loan -- on the right-hand

9    side of chart number six -- those were the relative

10   balances or those were the balances for the various

11   individuals listed there:  Peca, Nolan, Berard, et cetera.

12   Right?

13   A.    I don't know for a fact but they seem fairly

14   accurate.

15   Q.    And so whoever, whoever you would say is paying down

16   the interest or paying the interest on those loans,

17   whether it is Little Isle IV or however you want to phrase

18   it, somebody is paying at least 6 percent interest on the

19   Peca-Nolan-Berard line of credit.  Correct?

20   A.    Little Isle IV was paying the interest payments on

21   the lines of credit, and the interest rates varied during

22   that period of time.

23   Q.    In fact, sir, they did go up as high as 8 percent in

24   some instances and at some point in time, didn't they?

25   A.    Yes, they did.

Kenner - Cross/Miskiewicz

4733

1    I didn't have any control over the national

2    interest rate.

3    Q.    No, sir.  That wasn't my question.  I apologize if I

4    misunderstood.  I wasn't asking if you control the

5    interest rate.

6          My question is, the lines of credit as

7    determined by Northern Trust bank increased as high as 8

8    percent at various times while these lines of credit were

9    open.  Isn't that true, sir?

10   A.    I don't know for a fact.  But I can tell you I do

11   recall them rising above 6 percent at some point in time.

12   Q.    So the Centrum loan as depicted here, $3 million, you

13   are paying 12 percent interest, that money has already

14   been borrowed from the lines of credit of the various

15   people we have seen in chart four:  Murray, Sydor, et

16   cetera.

17         And now some of those same people are also

18   paying 6 percent interest on their outstanding balance of

19   their line of credit.  Correct?

20   A.    Little Isle IV was paying the interest payments on

21   the outstanding lines of credit pursuant to the agreements

22   with each of the individuals.  We had a loan with Centrum.

23   That is correct.

24   Q.    So in total, though, at least for the 3 million

25   mortgaged in this one piece of property bought with

Kenner - Cross/Miskiewicz

4734

1    borrowed money, remortgaged and then loaned out to

2    Mr. Jowdy at 15 percent, Little Isle is actually paying 18

3    percent in total, isn't it?

4    A.   The funds that were loaned to Mr. Jowdy were in fact

5    at 15 percent.  That's correct.

6    Q.   And Little Isle, which you controlled, is paying a

7    total, for this 3 million at least, a total of 189 percent

8    interest in two different lines of credit and the Centrum

9    loan.

10   A.   The lines of credit were the invested capital of the

11   individuals.  They were two separate decisions.

12   Q.   My question, again, is, when you add up the 12

13   percent on the 3 million that is mortgaged, reborrowed

14   money off of Honu'apo, add that to the at least 6 percent

15   interest that the players are paying on their lines of

16   credit; 12 and 6 is 18.  Right?

17   A.   12 and 6 is 18.  That is correct.

18   Q.   And all you were getting on behalf of your player

19   clients as the financial manager was 15 percent in return

20   for that loan to Mr. Jowdy.  Right?

21   A.   I viewed it as a 15 percent loan that we were only

22   going to pay 12 percent on the money, thus making a net of

23   3 percent at that point in time.

24   Q.   You don't look at it as -- well, withdrawn.

25            Sir, isn't it true you were -- again, the

4735

1   numbers don't work.  You are losing your players' money,

2   as depicted not only in this chart but all of the bank

3   records that support it and all the loan records.  You are

4   losing their money.  Isn't that correct?

5   A.   I don't agree with that statement.

6   Q.   And you are losing it because you don't care because

7   it is not your money.  It is their money.  Isn't that

8   correct?

9   A.   That is also not correct.

10  Q.   And your --

11  A.   I personally guaranteed that loan to Centrum.  So

12  that if something would have happened, I was on the hook

13  for $3 million originally and then subsequently $3.7

14  million.  I believe that was at the extension in February

15  '06 when Mr. Jowdy told us he wasn't going to pay the

16  money back.

17  Q.   Sir, isn't it true the only people on the hook are

18  the various people who have testified over the last six

19  weeks here who said that their portfolios that secured

20  these loans were substantially reduced when Northern Trust

21  defaulted?  They are the ones on the hook, aren't they?

22  A.   No.  I also have over a million dollars still due to

23  me from the Hawaii project that has been unreturned as

24  well.  So I'm as much on the hook as they are.

25  Q.   But you still own, or don't own, 40 percent or 39

4736

1    percent of Diamanté Cabo San Lucas.  Correct?

2         They don't own that.  You do.

3    A.   I'm not sure I understand the connection between the

4    two.

5    Q.   You made a big killing on this money that you

6    borrowed and reborrowed from your players.  You got

7    yourself a 39 percent interest in a corporation, a US

8    corporation down in Mexico.  Right?

9    A.   No, sir, that's not correct, because none of that

10   money is in my capital account in Mexico.  My capital

11   account is accounted for between myself and Mr. Stumple

12   and Mr. Lethinen as I discussed earlier.

13        If any of those funds were my funds, they would

14   have been represented in my capital account, which they

15   are not.  They are represented in Mr. Jowdy's capital

16   account in Mexico.

17   Q.   Now I want to ask you some questions about

18   communicating to your clients during this period of time,

19   by that I mean all the lines of credit were open after the

20   lines of credit.

21        You testified in direct that you pretty much

22   were at the players beck and call 24/7.  Do you remember

23   saying that?  In sum and substance.

24   A.   Yes, sir, I do.

25   Q.   You were also in regular contact with the codefendant

4737

1    in this case, Mr. Constantine, were you not?

2    A.    During what period of time?

3    Q.    Until you had a falling out, whenever you date that

4    falling out to be.

5    A.    I would date that falling out to be early 2010.

6    Q.    Okay.  But you are saying prior to that, there is no

7    question that you and he were in constant contact about a

8    great many issues.  Is that correct?

9    A.    I believe that would be true.

10   Q.    I show you what has been offered in evidence or

11   admitted into evidence as Government Exhibit 7430.  That

12   is a screen shot from your cell phone of a text message

13   back and forth between you and Mr. Constantine, is it not?

14   A.    It appears to be.

15   Q.    And I believe you testified on direct that

16   Mr. Constantine would frequently ask you for money during

17   your association with him.  Correct?

18   A.    I did testify to that.

19   Q.    And this is ne of these examples where he is

20   saying -- I will just read it for the record.  *Negative*

21   *$29 in my account.  $235 in Sarah's.*

22         Who is Sarah?

23   A.    I believe it was his girlfriend at the time.

24   Q.    Sarah Bowers?

25   A.    I don't know her last name.

Kenner - Cross/Miskiewicz

4738

1    Q.    *Dude, this is bad.*

2          And then you respond.  *I have a Palms check for*

3    *you.  Letter to Ethan.  PK.*

4          Did you provide him money as a result of this

5    email text exchange, do you recall?

6    A.    Yes, sir.  I believe I did deliver him a rental check

7    for $6,800 as a result of this text message exchange.

8    Q.    I show you what is in evidence as 1737.  This is a

9    Bank of America statement for Sarah Bowers.  Is that

10   correct?

11   A.    Yes.  There is her name.

12   Q.    And Tommy Constantine?

13   A.    Yes, I see that.

14   Q.    And just jumping to the next-to-the-last page, where

15   it says 9/19.  That would be the approximate date of your

16   email exchanges with Mr. Constantine, is it not?

17   A.    Yes.

18   Q.    A couple of days after.

19   A.    I don't see the date on the initial bubble.  It could

20   have been on or about September 19 as well.

21   Q.    But the subsequent bubbles, the back and forth are

22   dated, for the record, September 22, 2008.  Right?

23   A.    Yes.  That appears to be correct.

24   Q.    And the first bubble, we don't know what the date is,

25   but it does say *235 in Sarah's.*

4739

1    That would comport, would it not, sir, with

2   basically what is left in the account on or about that

3   same period of time.  Correct?

4   A.   I see that on the screen.  Yes.

5   Q.   So my question to you is, your relationship with

6   Mr. Constantine was such at this point that he would

7   reveal to you things this intimate, his and his

8   girlfriend' s Bank of America credit card balance.  Is

9   that fair and accurate?

10  A.   He did on this text message.  Yes.

11  Q.   Well, there is a whole, I don't want to go over

12  everything but -- and would respond and from time to time,

13  help him out with a sum of money.  Is that correct?

14  A.   Just like I would with any of my friend who had a

15  request.  Yes.

16  Q.   You said you did everything you could to be

17  responsive to your clients when they had questions.

18       I show you what has been marked for

19  identification as Government Exhibit 4511.  My question to

20  you is, after you have had an opportunity to look at that,

21  does that appear to be a screen or series of screen shots

22  from your iPhone?

23  A.   Yes, sir, it appears to be.

24  Q.   And it is between you and Jay McKee, one of your

25  hockey player clients.  Correct?

Kenner - Cross/Miskiewicz

4740

1   A.   Yes, sir.

2           MR. MISKIEWICZ:  The government moves for the

3   admission of 4511.

4           MR. HALEY:  Your Honor I believe I have seen it.

5   May I just approach?

6           THE COURT:  Sure.

7           MR. HALEY:  No objection.

8           MR. LaRUSSO:  No objection.

9           THE COURT:  4511 is admitted.

10          (Government Exhibit 4511 in evidence.)

11   BY MR. MISKIEWICZ:

12   Q.   I'm not going to go over every bubble.  But in sum

13   and substance, this is how you communicated with Mr. McKee

14   at this particular time regarding some questions he had.

15   Correct?

16   A.   Yes.

17          This was on June 11, 2011.  I don't believe

18   Mr. McKee was a client of mine any longer.

19   Q.   Okay.  And I show you Government Exhibit 4510.

20   A.   Is that it regarding this exhibit?

21   Q.   That's all the questions I have.  Yes.  Is there

22   anything else you would like to say about that?

23   A.   No.  I was just going to put it aside if we are done.

24   Q.   Thank you.

25   A.   You are welcome.

Kenner - Cross/Miskiewicz

4741

1  Q.   4510.  Do you recognize those three shots?

2  A.   I have seen these before.  Yes.

3  Q.   Are they screen shots from your phone?

4  A.   No, I don't believe they are.  I believe they are

5  screen shots from John Kaiser's iPhone.

6  Q.   And Mr. Kaiser -- well, my request to you is, is this

7  in fact you communicating with Mr. Kaiser on or about the

8  dates set forth herein?

9  A.   Yes.  I think this is text messages with Mr. Kaiser

10  complain about money he has borrowed from people and

11  referring to them as idiots.

12  Q.   Well, my question is, did you in fact, insofar as

13  these are screen shots from Mr. Kaiser's phone with texts

14  to you, do they also represent your reply to him?

15  A.   Yes, I believe they do.

16        MR. MISKIEWICZ:  The government moves for the

17  admission of 4510.

18        MR. HALEY:  No objection, your Honor.

19        MR. LaRUSSO:  No objection, your Honor.

20        THE COURT:  4510 is admitted.

21        (Government Exhibit 4510 in evidence.)

22  BY MR. MISKIEWICZ:

23  Q.   Very briefly.  Did Mr. Kaiser have some sort of

24  nickname for you or something?

25  A.   I believe this was, he probably changed my name on

Kenner - Cross/Miskiewicz

4742

1   his phone after I sued him for trying to steal my property

2   in Arizona and the property in Sag Harbor.  It appears he

3   changed it to SB2, which would have stood for Shit Bird 2.

4   Q.   Slash what?

5   A.   Joker.

6   Q.   Meaning what?

7   A.   I don't know.  I never heard that one before but I

8   know he used to refer to Mr. Constantine as Shit Bird and

9   he used to refer to Mr. Jowdy as Shit bird.  But I've

10  never heard that Joker until I saw these turned over

11  during evidence before trial.

12  Q.   So he asks you in this, whatever that SP2

13  means/Joker:  *Did you talk with Nash?*

14          That is one of your clients at that time, was

15  one of your client.  Correct?

16  A.   Mr. Nash was not one of my clients during this text

17  message exchange.

18  Q.   But he had previously been one of your clients?

19  A.   Yes, sir, he was.

20  Q.   And you asked:  *Not yet.  Why?*

21          And I don't have to read everything in there but

22  your response is:  *Don't answer.*

23  A.   Mr. Nash was trying to --

24  Q.   Mr. Kenner, again, your answer in this Exhibit 4510

25  is:  *Don't answer.*

Kenner - Cross/Miskiewicz

4743

1      Is that true or not?

2   A.   One of the responses, correct, is *don't answer*.

3   Q.   And one of the other responses is:  *Do not answer*

4   *Tyson's call.*

5   A.   That was also another response.  Yes.

6   Q.   And then it goes on.

7   A.   That's correct.

8   Q.   Was Mr. Kaiser in the habit of giving different

9   people nicknames?

10  A.   Yes.

11  Q.   Ever heard the nickname *Nervous Nick*?

12  A.   No, I have not.

13  Q.   Okay.

14  A.   Should I have?

15  Q.   I show you what has been marked for identification as

16  Government Exhibit 104.

17       May I approach counsel?  I'm not sure if I have

18  copied this.

19       (There was a pause in the proceedings.)

20  BY MR. MISKIEWICZ:

21  Q.   Sir, showing you 104 for identification.  Is that a

22  series of emails that you sent and/or received?

23  A.   It appears to be an email communication between

24  myself and Mr. Nash.

25  Q.   And do you recall in fact sending this and/or

Kenner - Cross/Miskiewicz

4744

1    receiving these emails at or about the times depicted

2    herein?

3    A.    What were the dates?

4    Q.    July 2010.

5    A.    That sounds accurate.

6          MR. MISKIEWICZ:  He government moves for the

7    admission of 104.

8          MR. HALEY:  No objection, judge.

9          MR. LaRUSSO:  No objection.

10          THE COURT:  104 is admitted.

11          (Government Exhibit 104 in evidence.)

12    BY MR. MISKIEWICZ:

13    Q.    Sir, you also testified that there were a series of

14    transactions through a company known as Eufora.  I believe

15    you were asked specifically on direct about this chart

16    which $100,000 Michael Peca on April 7, '08, went directly

17    into Tommy Constantine's company CMG.  And then

18    immediately thereafter went out a couple of days -- well,

19    on the same day another $100,000, the same hundred

20    thousand dollars, whichever way you want to look at it,

21    went to you.

22          Do you remember testifying about this chart on

23    direct?

24    A.    I recall that chart.  Yes.

25    Q.    And I show you another version of this, which I

Kenner - Cross/Miskiewicz

4745

1    believe was entered into evidence.  Chart 10C.

2    A.   I don't recall that chart.

3    Q.   You don't recall seeing this chart from

4    Mr. LaRusso --

5    A.   No.  I'm sorry.

6    Q.   -- during cross-examination of one of the witnesses?

7    A.   No.  I'm sorry.  I do not.

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner - Cross/Miskiewicz

4746

1    BY MR. MISKIEWICZ:

2    Q.   But let me ask you this, you don't have any -- you

3    did testify that the reason you got your 100,000 directly

4    out of CMG was because you had loaned Mr. Kenner $100,000

5    a few days before Michael Peca's money was contributed to

6    Eufora?

7    A.   I'm confused.  I didn't loan any money to myself.

8    Q.   You said --

9            THE COURT:  You said Mr. Kenner, you said you

10   loaned money to Mr. Kenner.

11           MR. MISKIEWICZ:  Sorry.

12   Q.   Mr. Kenner, you said on direct that a few days before

13   Mr. Peca deposited or invested $100,000 in Eufora, in this

14   case, CMG, the reason you got back 100,000 on that day was

15   because you had previously given money to Mr. Constantine.

16           Do you recall saying that on direct?

17   A.   I believe I recall that.

18   Q.   Well, my question is this, sir:  What's not depicted

19   here, but is in Government's 1706, bank record for CMG, do

20   you see what's highlighted there?

21           THE COURT:  You have to switch the screen.

22   A.   I see a picture of my head.

23   Q.   Do you see what's highlighted here on 4/3, $100,000

24   going out to, in the benefit of PEII Publishing, out of a

25   CMG account?

Kenner - Cross/Miskiewicz

4747

1   A.    Yes, I see that.

2   Q.    That would have been a day after you put or loaned or

3   gave $100,000 to Mr. Kenner -- to Mr. Constantine, sorry?

4   A.    That sounds accurate.

5   Q.    So actually, to complete this chart, on 4/3/08, money

6   is going to PEII, $100,000 and you have heard the

7   testimony that PEII stands for Playboy International

8   Publishing, correct?

9   A.    Yes, I believe I heard that.

10  Q.    So you gave or loaned Mr. Kenner $100,000 --

11        THE COURT:  Mr. Constantine.

12        MR. MISKIEWICZ:  Sorry.

13  Q.    You gave or loaned Mr. Constantine $100,000 on April

14  2, '08.  Was it a loan, was it a gift, what was it?

15  A.    It was an advance.

16  Q.    An advance?

17  A.    Mr. Constantine had asked if I could loan him

18  $100,000 or advance him $100,000 on that day, and I was

19  able to.

20  Q.    And that money goes out to Playboy, correct?

21  A.    I just saw that for the first time on his bank

22  record; yes.

23  Q.    And then it's only after all of that that you

24  solicited Mr. Peca to invest $100,000 in Eufora, or, in

25  this case, CMG, correct?

Kenner - Cross/Miskiewicz

4748

1   A.   That's incorrect.

2   Q.   You would agree with me that 4/7/08 happens after,

3   not before, 4/3/08, correct?

4   A.   That is correct.  The transaction date did occur

5   after.  I forwarded $100,000 to Mr. Constantine, he

6   subsequently forwarded it onto Playboy Publishing.

7   Q.   And you recall the testimony of Mrs. Peca, said it

8   was about this time that you indicated that to her, that

9   because you were -- because the Pecas were such a

10  long-standing client, that you were giving them an

11  opportunity to get into Eufora.  Do you recall that

12  testimony?

13  A.   Yes.  It was a great time for any of my clients to

14  invest in Eufora, from the information I understood from

15  the company.

16  Q.   So looking at it this way, actually, this 100,000

17  that goes in and comes out, it's not a return of your

18  advance, that money was already sent to Playboy, it's

19  actually just coming back to you, that fair?

20  A.   Are you suggesting Mr. Constantine was supposed to

21  hold the 100,000 in his bank account until he gave it back

22  to me?  I wasn't following.

23  Q.   If you can't answer the question, that's fine.  I

24  will redo it.

25  A.   Can you redo the question, please?

Kenner - Cross/Miskiewicz

4749

1   Q.    The question is, you testified earlier on direct that

2   the only reason you got $100,000 here was in repayment for

3   this advance, correct?

4   A.    That's, in fact, what happened.

5   Q.    Isn't it true, sir, that the way you got repaid was

6   by getting Mr. Peca to send money to Constantine, and

7   having Mr. Constantine send you back the money that same

8   day?

9   A.    Yes, after Mr. Constantine sold his private stock in

10  Eufora, he did, in fact, wire transfer the 100,000 I had

11  previously advanced to him.

12  Q.    So you have testified about that private stock

13  account in your direct.  You owned and have been the

14  managing partner of numerous LLCs.  You know that LLCs

15  don't issue stock certificates to people who have an

16  equity ownership stake in those corporations, correct?

17  A.    Typically, that's correct.

18  Q.    The only thing that -- the only document that

19  reflects whether or not somebody has an ownership stake in

20  an LLC is either the original operating agreement or an

21  amended one that reflects additions or subtractions,

22  right?

23  A.    I have seen them on corporate web sites by the state,

24  various states that hold the LLCs as well.

25  Q.    But what a state corporate website says is what the

4750

1  corporation reports to the state, correct?

2  A.    Yes, I would imagine that's the source of the

3  information.

4  Q.    And you testified, and I don't remember the name or

5  the number of your exhibit, but one of the Kenner exhibits

6  was a spreadsheet prepared by CR Gentry, who was at one

7  point CEO of Eufora?

8  A.    I believe that's all correct, yes.

9  Q.    And you testified that that spreadsheet attempted to

10  document who owned what in Eufora, right?

11  A.    I believe it did document who owned what in Eufora.

12  Q.    And it was -- but that's all it was, a spreadsheet,

13  right?

14  A.    To the best of my understanding, that was the

15  corporate records for Eufora as to who owned what inside

16  the different equity holdings.

17  Q.    There was never an operating agreement or amended

18  operating agreement prepared for Eufora that documented,

19  for instance, Mr. Privitello's ownership in the company,

20  was there?

21  A.    I'm not aware.  I was not an officer of Eufora at

22  this time, so I wouldn't have been involved in any of

23  those documentation processes.

24  Q.    So other than the spreadsheet, you have seen nothing

25  that would tend to indicate who owned what in Eufora?

4751

1   A.   To my understanding, that is more than satisfactory

2   to know who owned what in Eufora, since it was produced by

3   the CEO of the company at the time.

4   Q.   I'm going to ask you again, other than a spreadsheet

5   created by Mr. Gentry, you have never seen any other

6   documentation, operating agreement for Eufora reflecting

7   any of the information that's in that spreadsheet, have

8   you?

9   A.   Personally, I have not.

10  Q.   And Mr. Gentry was CEO between sometime in 2008 and

11  July of 2009, correct?

12  A.   I don't know what the life of his tenure was.   I

13  thought it extended further than that.

14  Q.   Well, he was essentially released in July of 2009

15  because Eufora couldn't afford him anymore, is that

16  correct?

17  A.   Not that I'm aware of.  I thought he was still a

18  board member through the investigation by Michael Stolper

19  and his team in or about sometime in 2010.

20  Q.   My question to you is, though, you and Mr.

21  Constantine assisted Mr. Gentry in the preparation of

22  those spreadsheets, did you not?

23  A.   Yes, we were few of the individuals who had the

24  information.

25  Q.   Because you had been associated with Eufora years

Kenner - Cross/Miskiewicz

4752

1   before Mr. Gentry ever got involved in the company as CEO,

2   correct?

3   A.    Early on with Eufora I was involved, that's correct.

4   Q.    So whatever he had in that spreadsheet was based on

5   information you and Mr. Constantine told him, right?

6   A.    The information in that spreadsheet, to the best of

7   my recollection, reflected information I had given to him

8   for transactions prior to January 1 of 2005, Mr. Gaarn's

9   information from January 1, 2005 until the time the

10   spreadsheet was completed, and Mr. Constantine, with

11   respect to the complimenting information that was

12   necessary from shareholders he was associated with such as

13   himself, Mr. Edenholm, Mr. Andretti and others, Mr.

14   Kennedy and others at the time.

15          MR. MISKIEWICZ:  May I approach counsel for an

16   exhibit?

17          MR. HALEY:  Judge, can we approach briefly?

18          (Continued on the next page.)

19

20

21

22

23

24

25

Kenner - Cross/Miskiewicz

4753

1       (Sidebar.)

2               MR. HALEY:  Just for purposes of the record,

3       these are exhibits that I most certainly marked during the

4       course of Mr. Kenner's testimony and had laid from my

5       perspective the foundation.  It's already occurred at this

6       point, which is fine, but are these now stipulated to be

7       into evidence?  Are you consenting to them?

8               THE COURT:  Some documents are being shown.

9               MR. HALEY:  Correct; not formally admitted into

10      evidence.  I thought it happened a couple of times.

11              THE COURT:  Make sure if you are showing these

12      there won't be any objection.

13              MR. MISKIEWICZ:  I haven't shown these yet or

14      the CR Gentry spreadsheets.  Those are the only ones we

15      might have an objection to, or just limiting instruction.

16              THE COURT:  This is basically a concession.

17      They are not going to object.

18              MR. MISKIEWICZ:  These documents I don't have an

19      objection to the introduction of.

20              THE COURT:  Let's do it as a group, but that's

21      the understanding.

22              MR. HALEY:  Thank you.

23              MR. MISKIEWICZ:  Do you have any objection?

24              MR. LaRUSSO:  He can authenticate -- can you

25      authenticate those?  I have information these were

4754

1    backdated.

2              MR. MISKIEWICZ:  Mr. Gaarn testified they were

3    backdated.

4              MR. HALEY:  If I may, my client testified they

5    were backdated.

6              THE COURT:  Because they are backdated doesn't

7    mean they are not admissible.

8              MR. LaRUSSO:  I didn't realize Mr. Gaarn

9    identified them.

10             MR. MISKIEWICZ:  I don't think he identified all

11   of them.  I think he identified one of the transfers.

12             THE COURT:  One of them.

13             MR. LaRUSSO:  Let me show them to my client.  We

14   might not have an objection to any of them.

15             (Sidebar concluded.)

16             (Continued on the next page.)

17

18

19

20

21

22

23

24

25

Kenner - Cross/Miskiewicz

4755

1          (In open court.)

2          THE COURT:  Are you okay, Mr. LaRusso?

3          MR. LaRUSSO:  I am, your Honor.

4          MR. MISKIEWICZ:  At this time, your Honor, the

5    Government would concede to the admission of Kenner

6    Exhibits 224, 225, 226, 227.

7          THE COURT:  Those are part of a group of

8    documents that Mr. Haley showed his client earlier.  I

9    said I was holding off admitting them until Mr. Kenner's

10   cross.  Mr. Miskiewicz wanted to put them up.  I will

11   admit them now.  I told the Government if there is any

12   document they put up to you they are deeming it admitted,

13   they will not object to it once they put it up on the

14   screen.

15         So 224 through 227 are admitted.

16         (Government Exhibits 224 through 227 received in

17   evidence.)

18         MR. MISKIEWICZ:  I believe there were two

19   others.

20         THE COURT:  Sorry?

21         MR. MISKIEWICZ:  224.

22         THE COURT:  Through 227.

23         MR. MISKIEWICZ:  Yes.

24         MR. HALEY:  For purposes of the record, Mr.

25   Miskiewicz returned to me 226 -- 225 and 226 and 227,

4756

1   correct?

2             MR. MISKIEWICZ:  Yes.  I'm publishing now Kenner

3   224.

4             MR. HALEY:  Thank you.

5   BY MR. MISKIEWICZ:

6   Q.    Mr. Kenner, is that your signature at the bottom

7   there, on the bottom left of that document?

8   A.    Yes, sir, it appears to be.

9   Q.    And this is -- this purports to be a transfer of

10  membership interests of Eufora LLC to somebody else, or

11  something else, very briefly:  The undersigned, Phil

12  Kenner, as managing member of Guide Dog LLC.

13            Guide Dog was your company?

14  A.    Yes, sir, it was.

15  Q.    A Delaware limited liability company for valuable

16  consideration, the receipt of which is hereby

17  acknowledged, hereby transfers and conveys to Standard

18  Ventures LLC, a Delaware limited liability company, all of

19  the transferor's right, title and interest in Eufora LLC,

20  an Arizona limited liability company, and all of that

21  interest being 5.67 percent of the membership interest.

22            It's dated 1st day of January 2005.  Is that

23  date accurate?

24  A.    January 1, 2005, yes, that was the transfer date

25  agreed upon.

Kenner - Cross/Miskiewicz

4757

1   Q.   Standard Ventures LLC, that was Mr. Gaarn's company,

2   correct?

3   A.   It is Mr. Gaarn's company.

4   Q.   In effect, what you have done in this agreement or

5   transfer document is you have taken whatever interest

6   Guide Dog, your company, had, that interest being 5.67

7   percent of Eufora, and you have transferred it to Mr.

8   Gaarn's company, Standard Ventures?

9   A.   Yes, I did, at the time.

10  Q.   And you testified during the charts, and charts

11  portion of your direct, that the reason why money flows

12  through Gaarn's bank account was, in part, he was repaying

13  you for loans previously made, is that right?

14  A.   That is correct.

15  Q.   And also, he was -- it was your testimony that he was

16  also selling to some of those players his interest in

17  Eufora through this membership or this transfer agreement?

18  A.   Not through that transfer agreement, but in that

19  December 31st of 2008 through, I believe, May 24, 2009,

20  Mr. Gaarn sold a portion of his interest, I believe about

21  3 and a half percent of his interest, to different clients

22  of mine.

23  Q.   After this December -- sorry, January 1, 2005

24  transfer, how much of a percentage did Guide Dog have in

25  Eufora?

4758

1    A.    At the time, in Eufora itself, Guide Dog would have

2    been left with zero percent, but Mr. Constantine

3    approached me with respect to this transaction, asking me

4    to be a funding source for another LLC he was establishing

5    called Eufora Capital, in order to fund prepaid card and

6    credit card -- secured credit cards, and I was going to be

7    a 50 percent owner in Eufora Capital per to Mr.

8    Constantine's request.

9    Q.    Was that ever reduced to writing?

10   A.    Yes, sir, it was.

11   Q.    And that is -- you became a 50 percent owner of

12   Eufora Capital, when was that?

13   A.    That was in or about the same time, in 2005, when we

14   talked about Mr. Gaarn joining the company, based on his

15   vast rolodex of banking relationships and credit card

16   companies.

17   Q.    Sorry, you had, at this point, 50 percent ownership

18   in Eufora Capital or something that Mr. Gaarn owned?

19   A.    No, 50 percent ownership in Eufora Capital.

20   Q.    Mr. Constantine's company?

21   A.    No, that was a company Mr. Constantine set up, asked

22   me to fund it with respect to securitizing credit cards

23   and prepaid cards, so Mr. Constantine, through Eufora,

24   could then issue to new cardholders.

25           I was a 50 percent stakeholder in that.  I

4759

1   believe Mr. Constantine had two other individuals who were

2   going to be 25 and 25 percent stakeholders.  That was

3   established some time around the time that this transfer

4   happened with Mr. Gaarn to entice him to join the company.

5   Q.    You remember Lani Donlan?

6   A.    Yes, sir, of course I do.

7   Q.    She testified about her essentially putting you in

8   touch with an attorney in Massachusetts by the name of

9   Steve Ross?

10  A.    Yes, I recall that testimony.

11  Q.    And you remember that it had to do with securing a

12  loan for Mr. Ross for the purchase of a couple of units in

13  Palms Hotel condominium units?

14  A.    Through Mr. Ross?

15  Q.    Through Mr. Ross.

16  A.    Yes that's correct.

17  Q.    Mr. Ross did make a loan to both you and Mr.

18  Constantine, did he not?

19  A.    He did not.

20  Q.    He did not?

21  A.    He did not.

22  Q.    Did you, at some point, prepare documentation or

23  secure, or guarantee a million dollar loan for Mr. Ross to

24  Mr. Constantine for the purchase of those units?

25  A.    Yes, I agreed to be a guarantor on the million dollar

4760

1    loan to Mr. Constantine.

2    Q.    And I show you what's been admitted into evidence as

3    3512.  This is the beginning of that guarantee, that

4    affidavit of guarantor, correct?

5    A.    It appears to be the first paragraph, yes.

6    Q.    In sum and substance, it's you guaranteeing a loan to

7    Mr. Constantine in the amount of a million dollars for the

8    purpose of purchasing these condominium units, right?

9    A.    It was part and parcel to Mr. Constantine's agreement

10   to sell these units to another client of mine, so this is

11   supposed to be a 30-day transaction.

12   Q.    Thank you.  But you signed this guarantee?

13   A.    Yes, sir, I did.

14   Q.    That's your signature at the end?

15   A.    Yes, that appears to be my signature.

16   Q.    In the first paragraph, it also says:  I have

17   previously submitted an itemized and signed financial

18   statement.  Right?

19   A.    Yes, it does.

20   Q.    You did, in fact, submit a financial statement to Mr.

21   Ross to guarantee that loan, did you not?

22   A.    I would assume if it said it on there that I did.

23   Q.    I show you what's admitted into evidence now as

24   Government's 3711, 3711.  It is one of the financial

25   statements that are in evidence in your name, one of your

4761

1    financial statements.  This one says as of May 2005, do

2    you see that?

3    A.    I do see that.

4    Q.    That would have been after your transfer of ownership

5    from Guide Dog, to Guide Dog's interest in Eufora, to Tim

6    Gaarn's Standard Ventures, correct?

7    A.    That's correct.  This was prepared by Bill Najam.

8    Q.    Nevertheless, you were still, as of this date, going

9    back here, transfer purports to occur January 1, 2005,

10   where your 5.67 percent interest in Eufora goes to

11   Standard Venture, and here, May 2005, you are still

12   claiming on a financial statement of Mr. Ross that you own

13   5.8 percent of Eufora.  Am I correct?

14   A.    I see that; yes.

15   Q.    It's not the only financial statement.  There is

16   another one in evidence, 3513.  This is dated February

17   2006.  I have a lot of other real estate assets, non-real

18   estate assets.  You again list 5.8 percent ownership in

19   Eufora, correct?

20   A.    That's correct.  I see that on there, but this also

21   was prepared by Mr. Najam during our lending process, and

22   there are a number of items on there that are incorrect.

23   Q.    Then you also submitted a personal financial

24   statement to the United States Small Business

25   Administration, sometimes known as the SBA, which is in

Kenner - Cross/Miskiewicz

4762

1    evidence as Government's 4231, as another personal

2    financial statement in your name, Phil Kenner, right?

3    A.    It is my name.

4    Q.    Attached to it, again, is another -- I guess looks

5    like a text, Greg, or maybe Greg, please let me know if

6    there is additional information necessary and the time

7    frame for us to acquire the loan.  Thanks for the help in

8    advance.  PK.

9          And at the very top, appears to have gone to

10   somebody named Greg Holst.  Who is that?

11   A.    The lender at First Source Bank who worked with Rick

12   Rozenboom.

13   Q.    And this had to do with one of the aircraft, did it

14   not?

15   A.    I believe it had to do with the Falcon 10.

16   Q.    This package is dated 6th of October 2005.  Do you

17   see that?

18   A.    Yes, I do.

19   Q.    Again, you are intending that you still own 5.8

20   percent of Eufora in this financial statement, correct?

21   A.    Yes, they all would have been taken off of the same

22   financial statement of that May 2005 statement.

23   Q.    And all of those were dated after the document that

24   has been offered in evidence and is in evidence as Kenner

25   224, where you transfer your ownership to Mr. Gaarn,

4763

1   correct?

2   A.   Yes.  Mr. Gentry prepared that transfer of ownership

3   interest, and Mr. Gaarn, some time in 2008, and elected to

4   date it January 1st for simplicity on the new Eufora tax

5   documents that he is refiling.

6   Q.   I take it that's a "yes"?

7   A.   I don't know.

8   Q.   All of those financial statements are dated after the

9   transfer document to Mr. Gaarn, correct?

10  A.   Yes, all dated after the transfer document Mr. Gentry

11  prepared.

12  Q.   Thank you.

13  A.   You are welcome.

14  Q.   A couple of last things.  You -- back to the

15  consulting management -- sorry, the funding consulting

16  agreement, 5104.  I show you what has been marked for

17  identification as 3113.  Take a look at that.  Mr. Kenner,

18  do you recognize what that is?

19  A.   Can I complete looking at that, please?

20  Q.   Sorry, I didn't hear you.

21  A.   I wanted to finish looking at it first.

22  Q.   My question is:  Do you recognize what kind of a bill

23  that is?

24  A.   Ask it again.

25  Q.   Do you recognize what kind of a bill that is you are

4764

1    looking at?

2    A.    Yes, it appears to be American Express bill.

3    Q.    Did you, in fact, at or about the time of closing

4    date here in 2005, have such an American Express account?

5    A.    Yes, sir, I did.

6    Q.    Was that an American Express card or account one that

7    you shared with your wife at the time?

8    A.    Yes, sir, it was.

9    Q.    Does this appear to be one of a monthly statement of

10   you and your wife's American Express Centurion card

11   account?

12   A.    It appears to be the January 2005 statement.

13              MR. HALEY:  Your Honor, I have no objection.

14              THE COURT:  Any objection?

15              MR. LaRUSSO:  No, your Honor.

16              THE COURT:  104?

17              MR. MISKIEWICZ:  3113.

18              THE COURT:  Sorry, 3113 is admitted.

19              (Government Exhibit 3113 received in evidence.)

20   Q.    You said that when you signed with or had Mr. Kaiser

21   sign, it was not on December 15, '04 it was sometime

22   thereafter when you met him in Hawaii for a due diligence

23   meeting, correct?

24   A.    That is correct.

25   Q.    And these American Express receipts from January of

Kenner - Cross/Miskiewicz

4765

1    '05, a month after the date in the consulting agreement,

2    reflect travel that you made to Hawaii early in 2005,

3    isn't that correct?

4    A.   Yes, I recall that travel.

5    Q.   And on page 13 of 20 of what is now Government 3113,

6    there is an Aloha Air charge for $69.70?

7    A.   I see it.

8    Q.   Can you travel that cheaply between Phoenix, Arizona

9    and Honolulu?

10   A.   I wish you could.

11   Q.   So were you in Honolulu at that time?

12   A.   Yes, sir, I was.

13   Q.   In fact, if we look, we can see you were there,

14   because there is beach equipment rentals in Honolulu on

15   1/16, there are pool snacks, couple of other things in

16   Honolulu, right?

17   A.   Yes.

18   Q.   And none of your properties in the Hawaii venture

19   were located in the island of Oahu, which is where

20   Honolulu is located?

21   A.   No, sir, they were not.

22   Q.   And prior to that, you were traveling to Fiji?

23   A.   Yes, sir, I was.

24   Q.   Prior to that, you were in Australia, weren't you?

25   A.   Yes, sir, I was on the same trip.

4766

1  Q.    So you went from Australia, to Fiji, to Oahu and the

2  State of Hawaii?

3  A.    Yes, all of a matter of about two and a half days.

4  Q.    Lastly, sir, there came a time when you were, as you

5  testified, had a falling out with Mr. Constantine,

6  correct?

7  A.    Yes, sir.

8  Q.    I believe you testified on direct that you came upon

9  Mr. Constantine in an impromptu meeting at a Home Depot in

10  Scottsdale, Arizona, correct?

11  A.    I don't recall if I testified to that.

12  Q.    Well, did you meet Mr. Constantine at some point at a

13  Home Depot in Scottsdale, Arizona sometime after your

14  falling out?

15  A.    Yes, sir, there was an impromptu meeting on or about

16  August 2, 2010, about five months after I had stopped

17  speaking with Mr. Constantine.

18  Q.    In sum and substance, sir, you had your iPhone with

19  you, and you recorded the conversation that you had with

20  Mr. Constantine at that time, did you not?

21  A.    That is correct.

22  Q.    And I believe you testified that you listened to the

23  recording, and what is now marked as Government Exhibit

24  4500, it appears to be a complete recording of at least a

25  portion of that meeting that you had with Mr. Constantine

Kenner - Cross/Miskiewicz

4767

1   on that day?

2   A.   I believe what I heard the other day was a portion of

3   that meeting that I recorded.

4   Q.   Total recording time was how much?

5   A.   Originally?

6   Q.   Yes.

7   A.   I believe it was 56 minutes and 33 seconds.

8   Q.   You have had an opportunity to listen to Government's

9   4500, have you not?

10  A.   I have listened to that recording.

11  Q.   And it's shorter now, it's approximately 26 or 27

12  minutes?

13  A.   Just under 27 minutes.

14  Q.   But within that time frame, what is still audible on

15  this recording, it's a complete and accurate reflection of

16  your recording of Mr. Constantine and you, correct?

17  A.   I believe it's exactly what I recorded and then

18  forwarded onto my attorney to share with our group of

19  investors.

20          MR. LaRUSSO:  Can I ask that question be

21  clarified, whether it was the full tape or a portion we

22  were talking about?

23  Q.   It was full tape?

24  A.   I'm sorry, I didn't hear the question.

25  Q.   Government's 4500 is this the full conversation or

Kenner - Cross/Miskiewicz

4768

1    just the remaining or existing portion of a longer

2    conversation?

3    A.    What I was given and listened to the other day, I

4    believe the 26 minutes and change, not the full recording

5    that originally was on my iPhone.

6    Q.    In sum and substance, the recording stops suddenly

7    about 26 or 27 minutes, correct?

8    A.    Yes, just shy of 27 minutes.

9    Q.    You don't know how that happened, do you?

10   A.    I don't recall.

11   Q.    But everything up to that point is a true and

12   accurate recording of your conversation up to that point

13   with Mr. Constantine, correct?

14   A.    Yes, what I heard I believe is accurate.

15            MR. MISKIEWICZ:  Government moves for the

16   admission of 4500 and its publication to the jury at this

17   time.

18            MR. HALEY:  No objection.

19            MR. LaRUSSO:  Your Honor, subject to what we

20   talked about the other day, I will be pursuing that on

21   cross, but no objection subject to that.

22            THE COURT:  4500 is admitted.

23            (Government Exhibit 4500 received in evidence.)

24            THE COURT:  We will take a break, and it is a

25   25-minute tape.  We will take the break and then play it

Kenner - Cross/Miskiewicz

4769

1    for you.  Don't discuss the case.

2              (The jury leaves the courtroom.)

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner - Cross/Miskiewicz

4770

1              (Following a recess.)

2              THE COURT:  Please be seated.

3              This is the last thing you are doing,

4    Mr. Miskiewicz?

5              MR. MISKIEWICZ:  This is it.

6              THE COURT:  So that should take us to 4:30.

7              MR. MISKIEWICZ:  Okay.

8              Your Honor, we have prepared a transcript and

9    the attorneys for both Mr. Constantine and Mr. Kenner have

10   reviewed the transcript and they don't have any issues

11   with and we would like to move it in as an aid for the

12   jury.

13             THE COURT:  Okay.

14             MR. MISKIEWICZ:  I have a copy for your Honor.

15             THE COURT:  Is it going to be up on the screen

16   while it's playing?

17             MR. MISKIEWICZ:  No.

18             It's just a paper copy.

19             MS. KOMATIREDDY:  We do have copies for the

20   jury, your Honor.

21             MR. MISKIEWICZ:  Your Honor, in the courtroom

22   the acoustics are not as good as they are on a computer.

23             So may I direct or request that the jury put on

24   the headphones?  Do you want to do that?

25             THE COURT:  Do you think it's better with the

4771

1   headphones?

2           MR. MISKIEWICZ:  I believe it would be, yes.

3           THE COURT:  I'll tell them to put the headphones

4   on.

5           MR. MISKIEWICZ:  There is a switch on the right

6   that they have to hit to turn the power on.

7           We have turned it all on, but just in case.

8           THE COURT:  A switch on the right of what?

9           MR. MISKIEWICZ:  The headphones and the green

10  light should come on.

11          THE COURT:  Okay.

12          MR. HALEY:  Is this Blue Tooth?

13          MS. KOMATIREDDY:  It's all hooked up.

14          THE COURT:  It will also be playing overhead?

15          MR. MISKIEWICZ:  Yes.

16          MR. HALEY:  If a juror doesn't hear I guess they

17  will signal.

18          MR. MISKIEWICZ:  And there is a headphone for

19  Mr. Kenner.

20          MR. HALEY:  Great.

21          Thank you.

22          (Jury enters the courtroom.)

23          THE COURT:  Everyone can be seated.

24          MR. HALEY:  Mr. Miskiewicz, no objection on that

25  exhibit.

Kenner - Cross/Miskiewicz

4772

1        THE COURT:  Mr. Miskiewicz, you have a

2   transcript you want to offer as an aid?

3        MR. MISKIEWICZ:  Yes, your Honor.

4        With the consent of the defendants, the

5   government would offer 4500 T to be used as an aid to the

6   jury during the publication of this recording.

7        THE COURT:  Any objection?

8        MR. LARUSSO:  No, your Honor.

9        MR. HALEY:  No, your Honor.

10       THE COURT:  Again, the same instruction, this is

11  just an aid and to the extent you hear something different

12  on the recording it's what you hear that controls, not

13  what's on the transcript.

14       The government has advised me that the quality

15  of the recording is better through the earphones which you

16  should have on your chair.  There is a switch on the right

17  ear that you need to turn it on and you will see a green

18  light.  If the green light doesn't go on when you turn the

19  switch, let me know.

20       Everyone's green light is on?  If for some

21  reason they start the recording it's not working just

22  raise your hand and the government going to give each of

23  you a copy of the transcript.

24       (Whereupon, Government Exhibit 4500 T was

25  received in evidence, as of this date.)

Kenner - Cross/Miskiewicz

4773

1              MR. MISKIEWICZ:  With the court's permission.

2              THE COURT:  Yes.

3              Play the recording.

4              (Tape played.)

5              (Tape stopped.)

6              MR. MISKIEWICZ:  Very briefly.

7    BY MR. MISKIEWICZ:

8    Q.    Mr. Kenner, that occurred at a Home Depot, correct?

9    A.    Yes, sir.

10   Q.    And showing you Government Exhibit 3011 for

11   identification, do you recognize that bill?

12   A.    Yes, I do.

13   Q.    That is a Citi MasterCard in your name.

14         Correct?

15   A.    Yes, it is.

16             MR. MISKIEWICZ:  The government offers

17   Government Exhibit 3011 into evidence.

18             MR. HALEY:  No objection.

19             MR. LARUSSO:  No objection, your Honor.

20             THE COURT:  3011 is admitted.

21             (Whereupon, Government Exhibit 3011 was received

22   in evidence, as of this date.)

23   BY MR. MISKIEWICZ:

24   Q.    And, very briefly, you see on August 2 there is a

25   Home Depot charge in the amount of $27.20, you see that?

4774

1    A.    Yes, I see that.

2    Q.    And that was the day you made this recording,

3    correct?

4    A.    Yes, I believe it was.

5    Q.    And showing you Government Exhibit 4501, you then

6    subsequently sent a copy of the recording to other people.

7          Is that accurate?

8    A.    Could you ask the question again?

9          I didn't follow it.

10   Q.    Did you subsequently send a copy of this recording to

11   other people, specifically Mr. Stolper?

12   A.    Yes, I believe I sent it to Mr. Stolper within a day

13   or two of the impromptu meeting on August 2nd.

14   Q.    And 4501 has a screen shot of you indicating to

15   Mr. Constantine in a text that the message that he was

16   attempting to get you to send to others in that recording

17   had been communicated.

18         Correct?

19   A.    That's what it appears, correct.

20         MR. MISKIEWICZ:  The government moves for the

21   admission of 4501.

22         MR. HALEY:  No objection.

23         THE COURT:  Mr. LaRusso, any objection?

24         MR. LARUSSO:  I'm sure I saw it beforehand, but

25   can I just take a quick look at it again.

4775

1           (There was a pause in the proceedings.)

2           MR. LARUSSO:  No objection, your Honor.

3           THE COURT:  4501 is admitted.

4           (Whereupon, Government Exhibit 4501 was received

5   in evidence, as of this date.)

6           MR. MISKIEWICZ:  No further questions.

7           THE COURT:  It's 4:30 so we'll break for the

8   day.

9           I know Mr. Hoffman, juror No. 3, your students

10  are graduating tomorrow.  He also has a vacation planned

11  and I don't want you to miss, so with my deepest gratitude

12  for your service in this case I'm going to excuse him as a

13  juror in this case.

14          I want to emphasize, Mr. Hoffman, as I said to

15  the or jurors who were excused you are not permitted to

16  discuss the case or your views on the case with anybody

17  else.  It would be a violation of your oath, do you

18  understand?

19          A JUROR:  Yes.

20          THE COURT:  I want to thank you for your service

21  and have a great vacation.

22          Mr. Macias, starting tomorrow you will be

23  sitting in the juror No. 3 chair, although I understand

24  you have a scheduling conflict next week, is that

25  accurate?

4776

1          A JUROR:  Yes.

2          THE COURT:  Let me discuss that with you and

3     I'll let everybody else go so I can understand what the

4     issue is.

5          For everybody else we'll reconvene tomorrow at

6     9:30.  Don't discuss the case.  Don't read or view

7     anything having to do with the case and have a good night.

8          (Jury leaves the courtroom.)

9          THE COURT:  Have a seat.

10          (Replacement Juror No. 3 is in the jury box.)

11          THE COURT:  June 30th you have a mandatory

12     meeting at work?

13          A JUROR:  Yes.

14          THE COURT:  Let me just ask you this.

15          Obviously you have been serving for a long time

16     and I'm going to do everything I can to accommodate you,

17     but let me make sure I understand, would you need the

18     whole day?

19          A JUROR:  It's in the afternoon, it starts at 1.

20          THE COURT:  You can possibly do a half a day

21     that day?

22          A JUROR:  Possibly.

23          THE COURT:  Let me ask you a second question.

24          I can draft a letter or make a phone call if you

25     want me to, to communicate to your employer that even

4777

1   though it's a, quote-unquote, mandatory meeting that you

2   can't make it.

3          Most of the time when employers get a letter

4   like that they are accommodating, but I don't want to do

5   that if you think if you miss that meeting it's not good

6   for your career, but I want you to understand I'd be

7   willing to tell them that even though it's, quote-unquote,

8   mandatory you need to serve.

9          Do you want me to write that letter or do you

10  want to attend the meeting?

11         A JUROR:  I think it's fine writing the letter

12  as long as I have it.

13         THE COURT:  So I'll prepare a letter and I'll

14  show it to you so you are okay with it.

15         I don't want it going to your employer if you

16  are not okay with it.  If there are any further issues on

17  that you can let me know.

18         A JUROR:  Yes.

19         My employer just asked if it was possible, so.

20         THE COURT:  As you know, anything is possible,

21  but, as you know, we are trying to accommodate everybody's

22  schedule.

23         So every even a half day, and it would be more

24  than a half day because for you to get there by 1 you

25  would have to leave by 12, so it's two and a half hours

4778

1   we'd lose most of the day and given where we are in the

2   case I don't want to lose any time if I can.

3          I'll write them the letter and you let me know

4   if they have any issues.  My experience is they will be

5   fine.

6          A JUROR:  I think so.

7          THE COURT:  Thank you, again, and I appreciate

8   your continuing service.

9          Have a good night.

10         (Replacement Juror No. 3 leaves the courtroom.)

11         THE COURT:  Everyone can be seated.

12         I didn't know whether it was my headset or not,

13   but there were probably about three sections of the

14   recording where it seemed to skip a few words, it looked

15   like there was a mechanical problem.  I don't know if the

16   original recording is like that or there was something

17   with the equipment.

18         MR. MISKIEWICZ:  The original recording is not

19   like that.

20         I don't know what it was.

21         THE COURT:  Was it just me?

22         MR. HALEY:  I heard actually exactly three as

23   well and one was rather significant.

24         THE COURT:  It was right around the statement

25   regarding the, quote-unquote, bank robber.

4779

1          When you played it previously that didn't

2   happen?  Why did it happen in the courtroom?

3          MR. MISKIEWICZ:  I don't know.

4          I really don't know.  I know it was one long

5   continuous recording.  I think if we talk to one of our IT

6   people it may have been memory buffering or whatever, but

7   I really don't know what the cause of it is.  I think that

8   the recording, though, is one long continuous recording.

9   There is nothing missing on the actual recording.

10          It's just the way it was playing back on the

11   computer.

12          THE COURT:  Also it skipped a few words.

13          MR. MISKIEWICZ:  It did.

14          MR. HALEY:  I have listened to that recording

15   more times than I'd like to think, Judge, but I think the

16   transcript is accurate.

17          I don't know if we could stipulate as to the

18   authenticity of the transcript.  I don't know what your

19   Honor's position in that record is.

20          THE COURT:  You can talk it over with

21   Mr. LaRusso.

22          I guess if both sides stipulated the transcript

23   was accurate -- I don't know, what do you want to do,

24   Mr. LaRusso?

25          MR. LARUSSO:  I did not hear it, but I'm not

4780

1   doubting it because I remember he pointed to it, on page

2   three in his first attribution, the eighth line down it

3   ends with the word us, it seems to be logical, but he

4   didn't hear that.

5        So I'd ask -- I'm going to listen to it again

6   tonight, Judge, and the other is the word vermin, I

7   believe, I heard a B, but my ears might be different, but

8   other than that I didn't any problems with the transcript

9   at all, other than the pauses.

10       THE COURT:  That's what I'm talking about, I'm

11  talking about the three pauses where it came back on it

12  appeared that it skipped a few words.

13       That's what I was referring to.  Again, I'm open

14  to any suggestions.

15       MR. LARUSSO:  Judge, I can go back to my office

16  and listen to the copies again.

17       I don't remember the three pauses to be honest

18  with you.

19       THE COURT:  I didn't mark them.

20       Did you mark them?

21       MR. LARUSSO:  I marked them on my transcript.

22       THE COURT:  Did anyone mark the pauses?

23       MR. MISKIEWICZ:  I did not.

24       MR. HALEY:  Your Honor, I think you and I had

25  the same connection.

4781

1    I do remember specifically three and I do

2 remember the particular pause when the reference to bank

3 robbery was mentioned.

4    THE COURT:  But did you mark with the pauses

5 happened?

6    MR. HALEY:  I did not.

7    MR. LARUSSO:  Judge, on page two near the bottom

8 of the sentence starts with the whole Eufora thing was

9 done that's where one of the pauses occurred.

10    The other one was on page four, again towards

11 the bottom of the first long attribution where it says

12 everything in writing, I heard the second pause around

13 that point, and then like the court said the point dealing

14 with the car I heard that as well.

15    So I had three, Judge.

16    THE COURT:  Okay.

17    One of the ways we -- first of all, listen to

18 the tape again to see if it pauses at exactly those same

19 spots or it was just a one time.

20    MR. MISKIEWICZ:  Will do.

21    THE COURT:  A mechanical thing, but if you

22 wanted to tomorrow morning if the defense wanted to tee up

23 those portions again and at least have the jury hear those

24 portions so they can hear the words that were skipped,

25 that would be one way of dealing with it.

4782

1    Or I could tell the jury there were three pauses

2    in the conversation, approximately three where it appears

3    that words were skipped, but they will have the recording

4    if they wish to listen to those portions they will have it

5    available to them and can replay it as many times as they

6    wish.  I think those are the two options.

7    Think about it and let me know what you want to

8    do.

9    MR. HALEY:  Your Honor, one quick issue.

10   Did the government hear pauses or not?

11   MR. MISKIEWICZ:  In the replay here, yes.

12   MR. HALEY:  I'm sorry.

13   I thought maybe their end of the technology was

14   better than ours and the jury.

15   THE COURT:  Go over what you want to do

16   tomorrow.

17   Mr. LaRusso, you are going to cross Mr. Kenner.

18   MR. LARUSSO:  Starting tomorrow morning, yes,

19   your Honor.

20   THE COURT:  How long do you think you are going

21   to be in light of the government's cross?

22   MR. LARUSSO:  Probably to the break or maybe a

23   little past that.

24   And I have witnesses, I have to go back to the

25   office and see if I can juggle.

4783

1    THE COURT:  I'm sure Mr. Haley will have a short

2  redirect.

3    MR. HALEY:  That's encouraging, your Honor.

4    I do have redirect.

5    THE COURT:  Again, just keep in mind where we

6  are in the trial.

7    Mr. Kenner did at times volunteer or

8  Mr. Miskiewicz gave him opportunities to explain things,

9  so I'm not sure it appeared to me he had said almost

10  everything on direct or was able to explain in the cross.

11  But I don't want to rehash everything that he testified to

12  for two and a half days.

13    MR. HALEY:  I will do my best, Judge.

14    THE COURT:  And then tomorrow are you still

15  juggling?

16    MR. LARUSSO:  All three -- the two witnesses

17  have problems, and Mr. D'Ambrosio who has been patient for

18  the last three days looks like he'll be available either

19  later Thursday or bring him back Monday.

20    The other two I don't know the answer to.  I

21  haven't had a chance to speak with them.  I'll let the

22  government know what the order of witnesses are.  It will

23  either be Mr. Gonchar or Mr. Stumpfel.  Those are the two

24  that have scheduling problems and I'm going to work it out

25  and I'll e-mail Mr. Miskiewicz and let them know what we

4784

1    intend to do tomorrow morning.

2             THE COURT:  I have an issue tomorrow.

3             In the afternoon I'm supposed to be on a panel

4    in the Brooklyn courthouse, I thought it was later, but

5    it's at 5 o'clock which means I have to leave here about

6    3:30 to make sure that I get there.  If you had a witness

7    that had to be completed tomorrow, I could miss that panel

8    and I could go to 4:30.

9             But if there is the ability to stop at 3:30

10   tomorrow --

11            MR. LARUSSO:  Can I notify the court tonight or

12   tomorrow morning?

13            THE COURT:  You can tell me tomorrow morning.

14            I'm going to plan to go, but I'll let them know

15   there could be an issue.

16            MR. LARUSSO:  They are all out of town

17   witnesses.

18            That's what the problem is.

19            THE COURT:  I know and the trial comes first.

20            MR. LARUSSO:  They know that and they changed

21   their --

22            THE COURT:  I'm talking about for me.

23            MR. LARUSSO:  Okay.

24            THE COURT:  I'll be here if the witness is an

25   out-of-town witness.

4785

1          MR. LARUSSO:  Okay.

2          MR. HALEY:  Your Honor, maybe some

3    miscommunication.

4          I marked all those exhibits.  I know we

5    introduced some.  I know the government has some

6    objections to a select category.  Maybe Mr. Miskiewicz and

7    I can find out which ones they objected to because I'm

8    going to introduce them en masse and frankly sit down as

9    relates to those exhibits assuming we have some agreement.

10          MR. MISKIEWICZ:  We don't really have any

11    objections, except for the Excel spreadsheets.

12          I did cross-examine Mr. Kenner.  He basically

13    testified this is a product of information he provided.

14    Mr. Constantine provided it to Mr. Gentry.  It's an Excel

15    spreadsheet.  I don't think it qualifies as a business

16    record.  That would be our objection to that exhibit and I

17    apologize I don't remember the number of it.

18          In the alternative, if the court were to admit

19    it, I believe it's Kenner Exhibit 228, if the court were

20    inclined to admit it, we would ask a limiting instruction

21    be offered similar to other statements that have been

22    offered in evidence.

23          MR. HALEY:  Your Honor, I would be offering and

24    I have no problem in terms of offering it pursuant to the

25    limiting instruction.

4786

1    I believe actually the government's cross on

2  it -- actually it opened the door to offering it.  He was

3  asking about whether it was recorded and frankly now the

4  government has laid before the jury the source of the

5  information.  So it might go to the weight of the document

6  but not to the admissibility.

7          THE COURT:  It should come in as to Mr. Kenner's

8  state of mind.

9          Obviously he's saying he provided information

10  based on his own personal knowledge, that could be offered

11  for the truth, but I'll give a limiting instruction that

12  says to the extent Government Exhibit 228 reflects

13  information that was supplied to Mr. Kenner by Mr. Gentry,

14  it's not being offered for the truth.

15          It's being offered for the state of mind.

16          MR. MISKIEWICZ:  Your Honor, it's Kenner Exhibit

17  228.

18          THE COURT:  I'm sorry.

19          MR. HALEY:  Unless I'm missing what

20  Mr. Miskiewicz is saying maybe I'll take this opportunity

21  because it's real late in the evening, the other exhibits

22  I offered I think the government has no objection.

23          MR. MISKIEWICZ:  No objection.

24          MR. HALEY:  All right.

25          MR. LARUSSO:  Judge, lastly, there are three

4787

1   areas that I may ask both parties to take a look in the

2   transcript.

3           I'll send out an e-mail letting them know what

4   portions we think changes should be made and if we can

5   agree on them we can, otherwise we'll bring it before the

6   court.

7           THE COURT:  You are talking about --

8           MR. LARUSSO:  I'm talking about portions of the

9   transcript itself where there is a different word than

10  what's there.

11          It's very, very minor points in regard to

12  sections.  It will take a short while to take a look at.

13          THE COURT:  If you can't agree and you want to

14  offer a counter transcript to introduce those pages as

15  substitutes for the government's pages for which you think

16  is on there I'll let you do that too.

17          MR. HALEY:  Thank you, your Honor.

18          THE COURT:  Okay.

19          Have a good night.

20          (The trial was adjourned until Wednesday, June

21  24th, at 9:30 a.m.)

22

23

24

25

4788

I N D E X

**PHILLIP A KENNER**                                        4628
CROSS-EXAMINATION (Continued)                   4629
BY MR. MISKIEWICZ
PHILLIP A KENNER                                            4721
CROSS-EXAMINATION (Continued)                   4721
BY MR. MISKIEWICZ

E X H I B I T S

Government Exhibit 4502 in evidence              4630
Government Exhibit 4503 in evidence              4633
Government Exhibit 4506 in evidence              4724
Government Exhibit 4507 in evidence              4726
Government Exhibit 4507 in evidence              4727
Government Exhibit 4509 in evidence              4728
Government Exhibit 4511 in evidence              4740
Government Exhibit 4510 in evidence              4741
Government Exhibit 104 in evidence               4744
Government Exhibit 4500 T was received in        4772
evidence
Government Exhibit 3011 was received in          4773
evidence
Government Exhibit 4501 was received in          4775
evidence
Government Exhibit 103 received in evidence      4665
Government Exhibits 224 through 227 received     4755
in evidence
Government Exhibit 3113 received in evidence     4764
Government Exhibit 4500 received in evidence     4768

## $

**$1.176** [1] - 4707:8
**$10,000** [6] - 4679:23, 4680:23, 4681:2, 4682:16, 4688:19, 4707:22
**$100,000** [15] - 4731:16, 4744:16, 4744:19, 4746:4, 4746:13, 4746:23, 4747:3, 4747:6, 4747:10, 4747:13, 4747:18, 4747:24, 4748:5, 4749:2
**$16,000** [1] - 4730:24
**$18,500** [1] - 4681:21
**$200,000** [2] - 4686:15, 4687:17
**$235** [1] - 4737:21
**$250,000** [1] - 4731:16
**$265,000** [4] - 4683:1, 4683:15, 4684:16, 4686:5
**$27.20** [1] - 4773:25
**$29** [1] - 4737:21
**$3,480,000** [1] - 4729:3
**$300** [1] - 4686:5
**$31,000** [2] - 4679:6, 4681:13
**$31,528.65** [1] - 4679:8
**$360,000** [1] - 4706:24
**$395,000** [7] - 4698:23, 4699:7, 4701:24, 4702:2, 4702:8, 4702:10, 4702:11
**$400,000** [2] - 4698:22, 4698:24
**$440,000** [1] - 4704:11
**$6,800** [1] - 4738:7
**$653,000** [1] - 4704:20
**$69.70** [1] - 4765:6
**$9,000** [2] - 4680:3, 4681:17
**$9,500** [1] - 4680:11
**$956,000** [1] - 4647:19

## '

**'04** [4] - 4652:23, 4674:13, 4675:8, 4764:21
**'05** [5] - 4649:10, 4653:1, 4683:2, 4729:8, 4765:1
**'06** [5] - 4642:11, 4656:2, 4689:17, 4706:1, 4735:15
**'08** [2] - 4744:16, 4747:14

## 1

**1** [25] - 4636:25, 4651:10, 4651:11, 4660:14, 4660:17, 4661:18, 4666:18, 4667:22, 4668:25, 4673:9, 4673:11, 4678:4, 4688:2, 4691:21, 4696:14, 4709:11, 4719:10, 4752:8, 4752:9, 4756:24, 4757:23, 4761:9, 4776:19, 4777:24
**1,500** [1] - 4688:22
**1,800** [1] - 4689:1
**1-1/2** [1] - 4640:14
**1.197** [2] - 4655:25, 4656:13
**1.3** [6] - 4654:6, 4656:6, 4656:10, 4657:3, 4703:17, 4704:18
**1.5** [3] - 4636:25, 4638:1, 4729:24
**1/16** [1] - 4765:15
**10** [5] - 4627:8, 4633:19, 4647:20, 4659:9, 4762:15
**10,000** [1] - 4679:15
**10,000-square** [1] - 4678:25
**100** [9] - 4631:15, 4635:3, 4649:19, 4650:3, 4663:12, 4668:8, 4668:14, 4701:13, 4730:8
**100,000** [5] - 4746:3, 4746:14, 4748:16, 4748:21, 4749:10
**103** [6] - 4662:3, 4662:14, 4665:3, 4665:4, 4665:7, 4788:15
**104** [7] - 4743:16, 4743:21, 4744:7, 4744:10, 4744:11, 4764:16, 4788:12
**10C** [1] - 4745:1
**11** [3] - 4702:12, 4709:2, 4740:17
**11201** [1] - 4627:14
**11722** [1] - 4627:22
**1180** [1] - 4627:21
**11th** [1] - 4712:15
**12** [12] - 4691:6, 4691:13, 4729:13, 4729:18, 4729:19, 4730:23, 4733:13, 4734:12, 4734:16, 4734:17, 4734:22, 4777:25
**12-15-04** [1] - 4676:15
**12.25** [1] - 4729:14
**12/1/04** [2] - 4654:22, 4655:9
**12/15/04** [2] - 4674:11, 4674:20
**12th** [1] - 4682:3
**13** [2] - 4725:17, 4765:5
**13-CR-607** [1] - 4627:3
**144** [5] - 4651:13, 4651:17, 4651:18, 4651:21, 4652:5
**146** [2] - 4651:13, 4652:5
**14th** [2] - 4682:12, 4682:15
**15** [7] - 4648:7, 4674:13, 4734:2, 4734:5, 4734:19, 4734:21, 4764:21
**15,000** [1] - 4679:25
**15-minute** [1] - 4673:21
**15th** [1] - 4675:8
**16** [3] - 4655:12, 4655:24, 4688:2
**17** [2] - 4663:12, 4664:2
**1706** [1] - 4746:19
**1737** [1] - 4738:8
**17th** [2] - 4682:3, 4682:15
**18** [3] - 4734:2, 4734:16, 4734:17
**189** [1] - 4734:7
**19** [10] - 4640:10, 4641:1, 4642:15, 4643:3, 4648:17, 4648:23, 4668:15, 4670:16, 4687:1, 4738:20
**19th** [1] - 4649:6
**1st** [2] - 4756:22, 4763:4

## 2

**2** [17] - 4630:23, 4631:1, 4661:17, 4668:10, 4670:16, 4682:9, 4686:12, 4698:1, 4698:2, 4698:11, 4713:9, 4715:11, 4716:2, 4742:3, 4747:14, 4766:16, 4773:24
**2,015** [1] - 4688:23
**2.5** [2] - 4631:17, 4631:19
**20** [3] - 4640:20, 4704:6, 4765:5
**2002** [1] - 4688:17
**2003** [5] - 4657:18, 4659:4, 4661:23, 4662:1, 4675:19
**2004** [13] - 4635:22, 4635:24, 4659:7, 4660:14, 4660:17, 4661:18, 4666:18, 4667:12, 4668:25, 4672:4, 4719:10, 4729:1, 4729:2
**2005** [27] - 4631:21, 4632:3, 4640:9, 4647:13, 4647:21, 4676:11, 4678:19, 4684:15, 4686:4, 4686:14, 4687:18, 4700:16, 4729:17, 4752:8, 4752:9, 4756:22, 4756:24, 4757:23, 4758:13, 4761:1, 4761:9, 4761:11, 4762:16, 4762:22, 4764:4, 4764:12, 4765:2
**2006** [38] - 4629:24, 4630:5, 4630:11, 4630:21, 4630:23, 4631:1, 4632:7, 4632:8, 4633:20, 4634:7, 4635:6, 4635:22, 4635:24, 4640:7, 4640:10, 4640:24, 4648:17, 4649:6, 4649:9, 4649:13, 4650:1, 4654:5, 4667:23, 4668:24, 4671:9, 4672:14, 4675:20, 4687:24, 4699:4, 4706:8, 4706:15, 4710:23, 4711:9, 4711:19, 4711:23, 4712:22, 4761:17
**2008** [10] - 4638:8, 4638:25, 4724:16, 4727:8, 4727:11, 4727:23, 4738:22, 4751:10, 4757:19, 4763:3
**2009** [8] - 4652:11, 4653:23, 4697:12, 4698:13, 4726:3, 4751:11, 4751:14, 4757:19
**2010** [14] - 4662:8, 4666:6, 4667:10, 4709:3, 4709:4, 4709:6, 4710:9, 4710:17, 4712:15, 4737:5, 4744:4, 4751:19, 4766:16
**2011** [1] - 4740:17
**2012** [1] - 4707:17
**2013** [6] - 4679:5, 4680:5, 4680:16, 4681:17, 4682:4, 4707:18
**2015** [1] - 4627:7
**21** [4] - 4652:11, 4654:5, 4687:24, 4697:12
**217** [7] - 4659:11, 4659:13, 4659:22, 4660:2, 4660:4, 4661:15, 4662:9
**218** [1] - 4690:18
**22** [1] - 4738:22
**224** [7] - 4755:6, 4755:15, 4755:16, 4755:21, 4756:3, 4762:25, 4788:16
**225** [2] - 4755:6, 4755:25
**226** [3] - 4755:6, 4755:25
**227** [6] - 4755:6, 4755:15, 4755:16, 4755:22, 4755:25, 4788:16
**228** [3] - 4785:19, 4786:12, 4786:17
**23** [2] - 4627:7, 4632:7
**235** [1] - 4738:25
**23rd** [1] - 4649:6
**24** [3] - 4684:15, 4686:4, 4757:19
**24/7** [1] - 4736:22
**24th** [1] - 4787:21
**25** [5] - 4657:21, 4659:23, 4661:5, 4759:2
**25-minute** [2] - 4715:4, 4768:25
**250** [1] - 4661:25
**258** [2] - 4688:15, 4688:16
**26** [6] - 4667:23, 4668:24, 4706:8, 4767:11, 4768:4, 4768:7

**26-minute** [1] - 4715:8
**27** [5] - 4666:6, 4767:11, 4767:13, 4768:7, 4768:8
**2nd** [1] - 4774:13

## 3

**3** [12] - 4731:20, 4733:12, 4733:24, 4734:7, 4734:13, 4734:23, 4735:13, 4757:21, 4775:9, 4775:23, 4776:10, 4778:10
**3.7** [1] - 4735:13
**3/31/06** [3] - 4654:22, 4655:10, 4656:8
**30** [1] - 4690:14
**30-day** [2] - 4647:20, 4760:11
**3011** [5] - 4773:10, 4773:17, 4773:20, 4773:21, 4788:13
**30th** [1] - 4776:11
**31** [1] - 4656:2
**3113** [6] - 4763:17, 4764:17, 4764:18, 4764:19, 4765:5, 4788:17
**31st** [1] - 4757:19
**33** [1] - 4767:7
**3512** [1] - 4760:3
**3513** [1] - 4761:16
**3711** [2] - 4760:24
**39** [8] - 4629:12, 4629:16, 4650:8, 4711:15, 4712:16, 4713:1, 4735:25, 4736:7
**3:30** [2] - 4784:6, 4784:9

## 4

**4** [3] - 4678:4, 4704:11, 4727:23
**4/3** [1] - 4746:23
**4/3/08** [2] - 4747:5, 4748:3
**4/7/08** [1] - 4748:2
**40** [2] - 4650:7, 4735:25
**41** [2] - 4654:12, 4654:19
**4150** [2] - 4722:20, 4725:15
**4187** [1] - 4695:11
**4231** [1] - 4762:1
**4305** [2] - 4674:25,

4675:5
**4500** [10] - 4766:24, 4767:9, 4767:25, 4768:16, 4768:22, 4768:23, 4772:5, 4772:24, 4788:12, 4788:17
**4501** [6] - 4774:5, 4774:14, 4774:21, 4775:3, 4775:4, 4788:14
**4502** [9] - 4629:20, 4629:21, 4630:14, 4630:17, 4630:18, 4633:22, 4640:2, 4647:5, 4788:8
**4503** [7] - 4632:11, 4633:4, 4633:15, 4633:16, 4640:1, 4650:7, 4788:8
**4505** [1] - 4705:10
**4506** [2] - 4723:9, 4724:10, 4724:13, 4724:14, 4725:13, 4788:9
**4507** [7] - 4726:1, 4726:13, 4726:16, 4726:17, 4727:21, 4788:9, 4788:10
**4508** [4] - 4727:7, 4727:16, 4727:20, 4727:23
**4509** [5] - 4728:7, 4728:12, 4728:16, 4728:17, 4788:10
**4510** [7] - 4740:19, 4741:1, 4741:17, 4741:20, 4741:21, 4742:24, 4788:11
**4511** [5] - 4739:19, 4740:3, 4740:9, 4740:10, 4788:11
**4618** [1] - 4629:10
**4628** [1] - 4788:2
**4629** [1] - 4788:3
**4630** [1] - 4788:8
**4633** [1] - 4788:8
**4665** [1] - 4788:15
**4721** [2] - 4788:4, 4788:4
**4724** [1] - 4788:9
**4726** [1] - 4788:9
**4727** [1] - 4788:10
**4728** [1] - 4788:10
**4740** [1] - 4788:11
**4741** [1] - 4788:11
**4744** [1] - 4788:12
**4755** [1] - 4788:16
**4764** [1] - 4788:17
**4768** [1] - 4788:17

**4772** [1] - 4788:12
**4773** [1] - 4788:13
**4775** [1] - 4788:14
**4:30** [3] - 4770:6, 4775:7, 4784:8

## 5

**5** [22] - 4636:12, 4636:13, 4636:15, 4636:18, 4637:6, 4637:9, 4638:1, 4640:14, 4640:16, 4641:16, 4645:7, 4645:10, 4645:24, 4646:17, 4646:25, 4656:25, 4669:16, 4671:19, 4673:3, 4730:9, 4730:11, 4784:5
**5.67** [3] - 4756:21, 4757:6, 4761:10
**5.8** [3] - 4761:13, 4761:18, 4762:19
**50** [5] - 4758:7, 4758:11, 4758:17, 4758:19, 4758:25
**5104** [3] - 4674:4, 4676:14, 4763:16
**56** [1] - 4767:7

## 6

**6** [6] - 4732:18, 4733:11, 4733:18, 4734:14, 4734:16, 4734:17
**6.25** [1] - 4729:16
**6/1/05** [3] - 4674:12, 4674:20, 4677:18
**631** [1] - 4627:22
**64** [1] - 4709:23
**65** [6] - 4709:13, 4709:19, 4709:23, 4710:2, 4710:4
**66** [5] - 4709:13, 4709:19, 4709:23, 4710:2, 4710:5
**69** [2] - 4654:22, 4655:5
**6th** [3] - 4631:2, 4631:9, 4762:16

## 7

**7** [7] - 4640:21, 4649:3, 4659:13, 4686:14, 4687:18, 4689:24, 4744:16
**712-6108** [1] - 4627:22
**712-6124** [1] - 4627:22

**7430** [1] - 4737:11

## 8

**8** [11] - 4663:12, 4663:23, 4663:24, 4664:1, 4664:7, 4664:11, 4666:7, 4666:11, 4724:16, 4732:23, 4733:7

## 9

**9** [3] - 4680:5, 4680:16, 4681:17
**9/19** [1] - 4738:15
**905,000** [1] - 4729:25
**905,200** [1] - 4730:4
**93** [5] - 4641:6, 4644:18, 4654:1, 4655:7, 4656:24
**9:30** [2] - 4776:6, 4787:21
**9th** [1] - 4680:4

## A

**a.m** [1] - 4787:21
**a/k/a** [2] - 4627:5, 4627:6
**ability** [3] - 4669:19, 4717:3, 4784:9
**able** [8] - 4633:7, 4648:13, 4649:4, 4667:5, 4679:1, 4707:7, 4747:19, 4783:10
**absconded** [2] - 4693:1, 4694:2
**absence** [2] - 4628:3, 4716:4
**absolutely** [2] - 4693:25, 4694:6
**access** [2] - 4714:4, 4731:12
**accommodate** [2] - 4776:16, 4777:21
**accommodating** [1] - 4777:4
**accompanies** [1] - 4632:22
**accomplished** [1] - 4661:8
**according** [5] - 4630:22, 4631:13, 4676:16, 4702:18, 4712:14
**account** [27] - 4655:20, 4682:21, 4682:22, 4683:4, 4683:7, 4687:8,

4687:13, 4702:15, 4703:18, 4703:21, 4707:2, 4730:24, 4731:3, 4732:5, 4736:10, 4736:11, 4736:14, 4736:16, 4737:21, 4739:2, 4746:25, 4748:21, 4749:13, 4757:12, 4764:4, 4764:6, 4764:11
**accounted** [1] - 4736:11
**accounts** [3] - 4686:25, 4731:1, 4731:6
**accurate** [19] - 4646:23, 4656:1, 4678:8, 4678:13, 4680:9, 4705:25, 4711:4, 4732:14, 4739:9, 4744:5, 4747:4, 4756:23, 4767:15, 4768:12, 4768:14, 4774:7, 4775:25, 4779:16, 4779:23
**accurately** [1] - 4660:5
**acknowledged** [1] - 4756:17
**acknowledging** [1] - 4672:11
**acknowledgment** [2] - 4700:9, 4700:13
**acoustics** [1] - 4770:22
**acquiesce** [1] - 4645:21
**acquire** [5] - 4669:5, 4689:8, 4722:5, 4731:25, 4762:7
**acquired** [2] - 4718:16, 4722:12
**acres** [5] - 4688:16, 4688:22, 4688:23, 4689:1
**actions** [1] - 4642:17
**activity** [1] - 4672:7
**actual** [2] - 4641:23, 4779:9
**ad** [1] - 4679:19
**add** [4] - 4680:17, 4714:11, 4734:12, 4734:14
**addition** [2] - 4655:3, 4656:16
**additional** [3] - 4682:11, 4705:17, 4762:6

additions [1] - 4749:21
address [9] - 4669:12, 4723:11, 4723:12, 4723:13, 4723:14, 4723:15, 4724:3, 4724:6, 4726:5
addressers [1] - 4727:11
addresses [2] - 4662:4, 4723:20
adjourned [1] - 4787:20
administration [1] - 4761:25
admissibility [1] - 4786:6
admissible [1] - 4754:7
admission [12] - 4633:4, 4663:8, 4665:3, 4724:10, 4726:13, 4727:16, 4740:3, 4741:17, 4744:7, 4755:5, 4768:16, 4774:21
admit [3] - 4755:11, 4785:18, 4785:20
admitted [21] - 4630:17, 4633:15, 4665:4, 4692:20, 4724:13, 4726:16, 4727:20, 4728:16, 4737:11, 4740:9, 4741:20, 4744:10, 4753:9, 4755:12, 4755:15, 4760:2, 4760:23, 4764:18, 4768:22, 4773:20, 4775:3
admitting [1] - 4755:9
advance [6] - 4747:15, 4747:16, 4747:18, 4748:18, 4749:3, 4762:8
advanced [1] - 4749:11
advances [1] - 4648:14
advised [1] - 4772:14
advisor [1] - 4642:6
advisors [1] - 4644:22
Advisors [1] - 4693:3
affairs [2] - 4641:24
affidavit [1] - 4760:4
afford [1] - 4751:15
afternoon [3] - 4715:3, 4776:19, 4784:3
afterwards [1] -

4706:10
agent [1] - 4719:14
ago [3] - 4652:25, 4695:17, 4718:5
agree [13] - 4634:21, 4655:2, 4669:1, 4674:20, 4678:1, 4683:15, 4720:10, 4728:23, 4731:9, 4735:5, 4748:2, 4787:5, 4787:13
agreed [5] - 4646:7, 4700:25, 4701:6, 4756:25, 4759:25
agreement [66] - 4629:24, 4630:10, 4630:22, 4632:2, 4632:4, 4635:1, 4641:22, 4648:3, 4657:13, 4657:19, 4657:21, 4660:18, 4660:21, 4660:22, 4661:21, 4666:11, 4666:22, 4667:23, 4669:7, 4669:10, 4669:13, 4669:17, 4669:22, 4670:1, 4671:9, 4671:13, 4671:21, 4672:5, 4672:7, 4672:11, 4672:14, 4672:20, 4672:22, 4672:25, 4673:2, 4673:6, 4673:14, 4674:4, 4674:8, 4675:6, 4677:18, 4687:24, 4690:14, 4690:17, 4690:20, 4691:3, 4692:18, 4693:18, 4706:25, 4707:6, 4711:18, 4712:9, 4712:12, 4712:23, 4749:20, 4750:17, 4750:18, 4751:6, 4757:4, 4757:17, 4757:18, 4760:9, 4763:16, 4765:1, 4785:9
Agreement [2] - 4630:21, 4633:19
agreements [7] - 4649:9, 4654:9, 4669:21, 4671:23, 4674:21, 4676:14, 4733:21
ahead [3] - 4629:3, 4638:21, 4721:18
aid [4] - 4770:11, 4772:2, 4772:5, 4772:11

air [1] - 4765:6
aircraft [1] - 4762:13
Alan [1] - 4641:15
alert [1] - 4687:20
allegations [1] - 4692:25
alleged [1] - 4670:7
allegedly [3] - 4642:11, 4642:14, 4649:17
allowed [1] - 4660:19
allowing [1] - 4714:2
almost [5] - 4650:7, 4654:24, 4656:16, 4706:14, 4783:9
aloha [1] - 4765:6
alone [1] - 4643:1
altered [1] - 4661:17
alternative [1] - 4785:18
amended [2] - 4749:21, 4750:17
amendment [2] - 4667:13, 4668:2
America [2] - 4738:9, 4739:8
AMERICA [1] - 4627:3
American [5] - 4764:2, 4764:4, 4764:6, 4764:10, 4764:25
amount [4] - 4680:15, 4708:11, 4760:7, 4773:25
amounts [1] - 4678:11
Andretti [1] - 4752:13
ANDREW [1] - 4627:18
Answer [8] - 4675:3, 4695:14, 4711:24, 4712:1, 4712:3, 4712:6, 4712:9, 4712:13
answer [24] - 4629:14, 4637:6, 4638:18, 4638:21, 4638:22, 4638:24, 4643:10, 4643:11, 4646:22, 4647:4, 4670:9, 4672:18, 4675:1, 4680:14, 4708:24, 4720:9, 4722:21, 4742:22, 4742:24, 4742:25, 4743:2, 4743:3, 4748:23, 4783:20
answering [1] - 4695:16
anti [1] - 4681:6
anti-money [1] - 4681:6

apart [1] - 4635:17
apiece [1] - 4704:20
apo [2] - 4644:24
Apo [1] - 4661:25
apologize [7] - 4634:18, 4638:22, 4655:6, 4695:5, 4722:14, 4733:3, 4785:17
appear [3] - 4678:8, 4739:21, 4764:9
Appearances [1] - 4628:1
APPEARANCES [1] - 4627:11
appeared [2] - 4780:12, 4783:9
application [2] - 4716:23, 4718:3
appreciate [2] - 4718:6, 4778:7
approach [6] - 4698:5, 4713:22, 4740:5, 4743:17, 4752:15, 4752:17
approached [3] - 4647:13, 4652:22, 4758:3
approaching [1] - 4720:1
appropriate [4] - 4659:17, 4659:20, 4660:8, 4717:2
approved [1] - 4678:22
approximate [1] - 4738:15
April [12] - 4652:10, 4667:23, 4668:24, 4680:4, 4680:5, 4680:16, 4681:17, 4682:3, 4697:11, 4744:16, 4747:13
arbitration [4] - 4708:4, 4708:7, 4709:7, 4709:9
archeologists [1] - 4675:21
architects [1] - 4675:20
areas [1] - 4787:1
argument [1] - 4720:8
argumentative [4] - 4717:13, 4717:21, 4717:22, 4717:25, 4720:5, 4720:6, 4720:7, 4720:11, 4720:16
arguments [1] - 4714:10

arising [1] - 4709:7
Arizona [9] - 4639:2, 4639:7, 4702:21, 4705:23, 4742:2, 4756:20, 4765:8, 4766:10, 4766:13
arrangement [2] - 4648:7, 4648:11
arrest [2] - 4694:19, 4696:17
article [3] - 4659:8, 4659:13, 4661:17
aside [2] - 4670:25, 4740:23
asset [2] - 4671:18
assets [3] - 4671:11, 4761:17, 4761:18
assimilated [1] - 4655:2
assisted [1] - 4751:21
associated [4] - 4661:12, 4661:14, 4751:25, 4752:12
association [1] - 4737:17
assume [4] - 4631:10, 4660:23, 4718:22, 4760:22
assumed [1] - 4672:6
assuming [2] - 4680:8, 4785:9
assured [1] - 4648:11
attached [3] - 4670:3, 4727:25, 4762:4
attempted [1] - 4750:9
attempting [2] - 4680:15, 4774:16
attend [1] - 4777:10
attention [9] - 4632:18, 4633:18, 4651:12, 4698:17, 4714:6, 4714:21, 4720:15, 4720:17, 4728:21
attorney [9] - 4638:4, 4668:7, 4669:11, 4692:10, 4693:5, 4717:5, 4721:24, 4759:8, 4767:18
Attorney [2] - 4627:13, 4718:12
attorney's [1] - 4670:20
Attorneys [2] - 4627:15, 4718:9
attorneys [7] - 4669:12, 4670:19, 4671:14, 4671:15, 4679:17, 4717:9, 4770:9

attribution [2] - 4780:2, 4781:11
audible [1] - 4767:14
August [6] - 4675:20, 4709:2, 4712:15, 4766:16, 4773:24, 4774:13
Australia [2] - 4765:24, 4766:1
authenticate [2] - 4753:24, 4753:25
authentication [1] - 4633:10
authenticity [2] - 4633:8, 4779:18
authority [5] - 4661:15, 4667:13, 4668:3, 4684:5, 4684:21
authorization [3] - 4684:23, 4684:25, 4686:10
authorized [3] - 4659:16, 4660:6, 4684:17
available [7] - 4699:13, 4702:19, 4720:22, 4721:3, 4732:2, 4782:5, 4783:18
Avery [1] - 4676:8
avoid [1] - 4681:9
avoided [1] - 4639:20
aware [6] - 4634:6, 4642:5, 4701:18, 4714:19, 4750:21, 4751:17

**B**

backdate [2] - 4677:20, 4677:25
backdated [4] - 4754:1, 4754:3, 4754:5, 4754:6
backtrack [1] - 4629:10
bad [2] - 4701:15, 4738:1
Bahti [8] - 4645:11, 4645:12, 4645:13, 4645:19, 4645:23, 4646:2, 4646:14, 4648:25
Baja [23] - 4629:24, 4630:5, 4630:10, 4630:21, 4632:8, 4633:20, 4635:2, 4636:1, 4640:2, 4640:7, 4641:4,

4649:8, 4649:13, 4649:19, 4650:1, 4650:12, 4710:23, 4711:9, 4711:19, 4711:22, 4712:15, 4713:1
balance [6] - 4707:7, 4730:25, 4731:5, 4732:4, 4733:18, 4739:8
balances [3] - 4731:3, 4732:10
Ball [2] - 4676:25, 4677:4
Bank [9] - 4679:21, 4679:22, 4680:10, 4680:11, 4681:9, 4682:7, 4687:2, 4738:9, 4739:8
bank [38] - 4638:3, 4638:6, 4648:15, 4655:2, 4655:20, 4679:14, 4679:20, 4680:1, 4680:8, 4680:9, 4681:4, 4681:14, 4681:20, 4683:4, 4684:24, 4686:22, 4686:25, 4687:4, 4687:6, 4687:11, 4687:13, 4687:14, 4702:15, 4704:25, 4708:1, 4710:12, 4710:18, 4730:24, 4732:5, 4733:7, 4735:2, 4746:19, 4747:21, 4748:21, 4757:12, 4762:11, 4778:25, 4781:2
bank's [1] - 4687:10
bankers [2] - 4675:22, 4676:25
banking [1] - 4758:15
based [5] - 4717:7, 4718:24, 4752:4, 4758:14, 4786:10
basis [8] - 4660:14, 4675:18, 4686:9, 4686:10, 4714:7, 4714:23, 4718:23, 4720:2
Beach [6] - 4703:6, 4703:8, 4703:10, 4703:15, 4703:25, 4705:3
beach [2] - 4705:13, 4765:14
became [2] - 4649:19, 4758:11
beck [1] - 4736:22

BEFORE [1] - 4627:9
beforehand [1] - 4774:24
began [3] - 4634:12, 4651:7, 4716:8
begin [2] - 4677:1, 4713:6
beginning [1] - 4760:3
begins [1] - 4651:18
behalf [10] - 4635:2, 4637:5, 4637:25, 4666:12, 4666:18, 4667:13, 4691:25, 4729:5, 4729:6, 4734:18
behest [1] - 4682:6
behind [2] - 4632:5, 4678:18
beliefs [1] - 4717:4
below [3] - 4681:1, 4728:2, 4729:24
benefit [1] - 4746:24
Berard [12] - 4635:10, 4635:11, 4665:23, 4683:2, 4684:14, 4684:17, 4687:16, 4689:14, 4707:17, 4707:18, 4732:11, 4732:19
Berard's [4] - 4683:8, 4683:16, 4686:4, 4687:9
best [13] - 4636:25, 4659:18, 4660:8, 4660:11, 4701:12, 4701:14, 4701:16, 4701:25, 4702:9, 4717:16, 4750:14, 4752:6, 4783:13
better [4] - 4653:24, 4770:25, 4772:15, 4782:14
Better [3] - 4698:18, 4698:21, 4706:6
between [23] - 4635:22, 4635:24, 4636:25, 4648:21, 4649:6, 4654:21, 4670:18, 4671:13, 4674:8, 4675:18, 4680:4, 4704:20, 4706:19, 4709:6, 4714:16, 4726:2, 4736:3, 4736:11, 4737:13, 4739:24, 4743:23, 4751:10, 4765:8
BIANCO [1] - 4627:9
big [4] - 4646:17, 4677:2, 4684:10,

4736:5
Big [13] - 4683:6, 4683:20, 4683:23, 4684:6, 4684:10, 4686:20, 4687:10, 4687:13, 4688:13, 4688:20, 4688:22, 4689:2
Bill [2] - 4630:7, 4649:7
bill [5] - 4761:7, 4763:22, 4763:25, 4764:2, 4773:11
Bird [2] - 4742:3, 4742:8
bird [1] - 4742:9
bit [2] - 4719:7, 4729:14
Blake [1] - 4682:19
Blue [1] - 4771:12
board [2] - 4701:3, 4751:18
Bob [1] - 4726:21
Bobby [1] - 4723:19
borrowed [5] - 4643:25, 4733:14, 4734:1, 4736:6, 4741:10
borrowing [4] - 4662:2, 4684:16, 4690:7, 4705:18
bottle [5] - 4718:6, 4718:7, 4718:13, 4727:24, 4728:9
bottles [8] - 4722:23, 4722:24, 4723:1, 4723:7, 4724:20, 4725:1, 4725:2, 4725:20
bottom [6] - 4724:5, 4728:2, 4756:6, 4756:7, 4781:7, 4781:11
bought [4] - 4733:25
Bowers [2] - 4737:24, 4738:9
box [3] - 4682:18, 4719:2, 4776:10
brand [1] - 4649:8
break [6] - 4673:18, 4673:21, 4713:15, 4715:3, 4768:24, 4768:25, 4775:7, 4782:22
brief [1] - 4662:15
briefly [9] - 4630:20, 4644:14, 4716:6, 4726:19, 4741:23, 4752:17, 4756:11, 4773:6, 4773:24

bring [6] - 4628:10, 4673:24, 4714:6, 4720:20, 4783:19, 4787:5
broke [2] - 4629:8, 4720:24
Brooklyn [2] - 4627:14, 4784:4
brother [1] - 4675:19
Brothers [26] - 4634:9, 4634:11, 4634:12, 4634:13, 4634:17, 4634:21, 4635:19, 4640:19, 4641:14, 4641:23, 4644:16, 4645:13, 4646:20, 4646:15, 4648:19, 4669:12, 4669:13, 4669:19, 4689:13, 4689:23, 4699:15, 4699:23, 4700:3, 4700:19, 4701:13, 4707:3
brothers [5] - 4648:24, 4669:23, 4670:6, 4671:15, 4676:11
brought [1] - 4714:21
Bryan [1] - 4665:23
bubble [3] - 4738:19, 4738:24, 4740:12
bubbles [1] - 4738:21
buffering [1] - 4779:6
build [2] - 4679:1, 4679:2
bullet [1] - 4644:20
bunch [1] - 4665:20
business [7] - 4641:24, 4671:25, 4725:6, 4725:11, 4761:24, 4785:15
businessman [1] - 4701:9
buy [4] - 4682:23, 4683:1, 4689:15, 4699:5
BY [31] - 4629:7, 4630:19, 4633:17, 4639:5, 4639:15, 4643:23, 4644:13, 4646:24, 4652:8, 4674:2, 4686:1, 4694:15, 4698:10, 4702:7, 4703:14, 4710:3, 4721:21, 4724:15, 4726:18, 4727:22, 4728:18, 4740:11, 4741:22, 4743:20, 4744:12, 4746:1, 4756:5, 4773:7, 4773:23,

4788:3, 4788:5
**bylaw** [2] - 4659:1, 4666:17
**bylaws** [13] - 4657:17, 4657:22, 4659:4, 4659:7, 4661:3, 4661:13, 4661:18, 4661:23, 4667:2, 4667:14, 4668:2, 4668:21
**bypassed** [1] - 4687:6

## C

**Cabo** [19] - 4629:9, 4629:12, 4629:16, 4630:1, 4634:4, 4634:15, 4634:16, 4634:21, 4635:10, 4635:18, 4640:11, 4642:19, 4646:3, 4648:12, 4648:21, 4650:8, 4711:16, 4712:16, 4736:1
**Cabs** [1] - 4650:14
**California** [7] - 4652:11, 4692:5, 4692:8, 4701:19, 4703:7, 4704:23, 4705:13
**cannot** [1] - 4643:10
**Capital** [2] - 4758:7, 4758:19
**capital** [21] - 4631:14, 4683:8, 4683:10, 4683:13, 4683:25, 4684:1, 4684:12, 4684:18, 4705:5, 4731:12, 4731:19, 4731:24, 4734:10, 4736:10, 4736:14, 4736:15, 4758:5, 4758:12, 4758:18
**car** [1] - 4781:14
**card** [8] - 4725:6, 4725:12, 4739:8, 4758:5, 4758:6, 4758:15, 4764:6, 4764:10
**cardholders** [1] - 4758:24
**cards** [3] - 4758:6, 4758:22, 4758:23
**care** [2] - 4705:21, 4735:6
**career** [1] - 4777:6
**Carlsmith** [2] - 4676:25, 4677:4
**carried** [1] - 4730:25
**case** [25] - 4639:25,

4653:12, 4673:19, 4681:4, 4686:19, 4689:7, 4691:19, 4691:24, 4713:10, 4716:21, 4725:5, 4725:7, 4731:19, 4737:1, 4746:14, 4747:25, 4769:1, 4771:7, 4775:12, 4775:13, 4775:16, 4776:6, 4776:7, 4778:2
**cash** [15] - 4635:15, 4635:16, 4679:9, 4679:16, 4679:23, 4680:4, 4680:11, 4680:23, 4681:22, 4682:3, 4682:15, 4683:11, 4703:24, 4730:25, 4731:23
**CAT** [1] - 4627:25
**categories** [1] - 4683:14
**category** [1] - 4785:6
**Cau** [1] - 4678:21
**cc'd** [2] - 4665:19, 4665:22
**cell** [6] - 4724:3, 4724:6, 4725:11, 4725:12, 4728:4, 4737:12
**Central** [2] - 4627:4, 4687:22
**Centrum** [11] - 4637:11, 4637:14, 4637:18, 4728:19, 4730:23, 4731:20, 4732:8, 4733:12, 4733:22, 4734:8, 4735:11
**Centurion** [1] - 4764:10
**CEO** [4] - 4750:7, 4751:3, 4751:10, 4752:1
**certain** [3] - 4668:12, 4708:11, 4714:16
**certainly** [1] - 4753:3
**certificates** [1] - 4749:15
**cetera** [4] - 4644:25, 4730:13, 4732:11, 4733:16
**chain** [1] - 4726:19
**chair** [2] - 4772:16, 4775:23
**chairman** [1] - 4725:8
**chance** [1] - 4783:21
**change** [2] - 4730:24, 4768:4

**changed** [3] - 4741:25, 4742:3, 4784:20
**changes** [1] - 4787:4
**charge** [2] - 4765:6, 4773:25
**chart** [21] - 4678:4, 4678:6, 4679:7, 4680:7, 4682:9, 4686:12, 4728:21, 4729:5, 4730:18, 4730:22, 4732:9, 4733:15, 4735:2, 4744:15, 4744:22, 4744:24, 4745:1, 4745:2, 4745:3, 4747:5
**charts** [3] - 4637:23, 4757:10
**Chase** [6] - 4679:21, 4679:22, 4680:10, 4681:9, 4682:7
**cheaply** [1] - 4717:5
**check** [3] - 4708:1, 4738:2, 4738:6
**Chicago** [1] - 4721:1
**chosen** [1] - 4645:21
**Chris** [1] - 4659:3
**Christine** [1] - 4650:24
**Chumbley** [1] - 4676:8
**Church** [1] - 4689:2
**circumstances** [1] - 4647:10
**Citi** [1] - 4773:13
**claim** [2] - 4639:10, 4641:18
**claiming** [1] - 4761:12
**clarified** [1] - 4767:21
**clarity** [3] - 4659:25, 4682:9, 4709:22
**clear** [7] - 4654:11, 4686:3, 4696:11, 4701:21, 4701:22, 4719:10, 4722:8
**clearly** [1] - 4716:19
**client** [16] - 4635:8, 4648:4, 4670:8, 4714:17, 4714:18, 4716:8, 4718:7, 4718:14, 4740:18, 4742:15, 4748:10, 4754:4, 4754:13, 4755:8, 4760:10
**client's** [1] - 4717:5
**clients** [30] - 4635:9, 4635:14, 4635:22, 4635:24, 4636:8, 4637:25, 4641:18, 4641:19, 4642:1,

4642:8, 4642:12, 4650:11, 4671:2, 4672:10, 4672:21, 4701:12, 4701:14, 4701:17, 4702:1, 4702:9, 4734:19, 4736:18, 4739:17, 4739:25, 4742:14, 4742:16, 4742:18, 4748:13, 4757:21
**close** [1] - 4640:11
**closed** [1] - 4648:12
**closing** [18] - 4634:22, 4642:19, 4642:20, 4649:1, 4657:20, 4661:25, 4671:16, 4675:19, 4676:1, 4699:2, 4700:18, 4700:21, 4701:4, 4701:13, 4707:1, 4707:3, 4707:9, 4764:3
**CM** [1] - 4627:20
**CMG** [7] - 4654:7, 4744:17, 4746:4, 4746:14, 4746:19, 4746:25, 4747:25
**codefendant** [1] - 4736:25
**cold** [1] - 4643:21
**collateralize** [3] - 4640:19, 4640:21, 4648:25
**collateralized** [1] - 4648:19
**coming** [1] - 4748:19
**commanded** [1] - 4700:3
**comment** [1] - 4719:23
**committee** [1] - 4648:24
**communicate** [1] - 4776:25
**communicated** [2] - 4740:13, 4774:17
**communicating** [2] - 4736:18, 4741:7
**communication** [5] - 4670:18, 4714:1, 4714:15, 4725:19, 4743:23
**community** [1] - 4675:22
**companies** [4] - 4635:2, 4689:7, 4692:1, 4758:16
**company** [50] - 4630:10, 4634:4, 4640:3, 4647:10,

4650:3, 4654:7, 4655:4, 4655:14, 4656:25, 4666:23, 4667:7, 4667:16, 4667:23, 4669:4, 4669:15, 4671:10, 4671:24, 4683:4, 4687:21, 4688:20, 4689:5, 4712:15, 4712:25, 4722:5, 4722:12, 4724:23, 4725:3, 4725:4, 4727:6, 4730:7, 4732:6, 4744:14, 4744:17, 4748:15, 4750:19, 4751:3, 4752:1, 4756:13, 4756:15, 4756:18, 4756:20, 4757:1, 4757:3, 4757:6, 4757:8, 4758:14, 4758:20, 4758:21, 4759:4
**Company** [4] - 4630:21, 4654:8, 4689:2, 4706:7
**complain** [1] - 4741:10
**complete** [4] - 4747:5, 4763:19, 4766:24, 4767:15
**completed** [2] - 4752:10, 4784:7
**completely** [4] - 4636:22, 4639:18, 4643:22, 4684:6
**completion** [1] - 4669:22
**complimenting** [1] - 4752:11
**comport** [1] - 4739:1
**computer** [7] - 4695:14, 4695:21, 4696:5, 4696:6, 4696:10, 4770:22, 4779:11
**concealing** [1] - 4671:17
**concede** [1] - 4755:5
**conceded** [1] - 4692:20
**concern** [1] - 4633:6
**concerned** [1] - 4663:18
**concert** [1] - 4669:11
**concession** [1] - 4753:16
**conclude** [2] - 4715:8, 4720:9
**concluded** [2] -

4664:14, 4754:15
**concludes** [1] - 4723:25
**conditions** [2] - 4699:10, 4699:14
**condominium** [2] - 4759:13, 4760:8
**confine** [1] - 4638:16
**confirmed** [1] - 4693:5
**conflict** [1] - 4775:24
**confronted** [1] - 4652:14
**confused** [1] - 4746:7
**confusion** [1] - 4709:24
**connection** [2] - 4736:3, 4780:25
**consent** [3] - 4700:9, 4700:14, 4772:4
**consenting** [1] - 4753:7
**consideration** [1] - 4756:16
**considered** [1] - 4717:9
**constant** [1] - 4737:7
**Constantine** [55] - 4627:19, 4654:2, 4654:7, 4654:21, 4655:11, 4655:12, 4655:24, 4656:7, 4657:2, 4657:7, 4663:19, 4666:12, 4674:8, 4674:14, 4675:6, 4714:2, 4737:1, 4737:13, 4737:16, 4738:12, 4738:16, 4739:6, 4742:8, 4746:15, 4747:3, 4747:11, 4747:13, 4747:17, 4748:5, 4748:20, 4749:6, 4749:7, 4749:9, 4751:21, 4752:5, 4752:10, 4758:2, 4758:21, 4758:23, 4759:1, 4759:18, 4759:24, 4760:1, 4760:7, 4766:5, 4766:9, 4766:12, 4766:17, 4766:20, 4766:25, 4767:16, 4768:13, 4770:9, 4774:15, 4785:14
**CONSTANTINE** [1] - 4627:6
**Constantine's** [6] - 4654:7, 4657:10, 4744:17, 4758:8,

4758:20, 4760:9
**construction** [1] - 4699:25
**consulting** [6] - 4654:9, 4674:4, 4675:6, 4763:15, 4765:1
**Cont'd** [1] - 4686:1
**cont'd** [1] - 4674:2
**contact** [2] - 4736:25, 4737:7
**content** [1] - 4646:13
**contention** [1] - 4694:3
**context** [1] - 4659:5
**continue** [2] - 4628:23, 4705:19
**continued** [5] - 4628:17, 4658:7, 4705:22, 4721:15, 4745:8
**Continued** [11] - 4629:6, 4662:18, 4664:15, 4685:2, 4715:13, 4721:20, 4752:18, 4754:16, 4769:3, 4788:3, 4788:4
**continuing** [2] - 4725:15, 4778:8
**continuous** [2] - 4779:5, 4779:8
**contribute** [1] - 4705:11
**contributed** [6] - 4631:17, 4728:25, 4729:8, 4731:17, 4731:22, 4746:5
**contribution** [5] - 4683:8, 4683:10, 4683:11, 4683:13, 4684:18
**contributions** [9] - 4631:14, 4683:25, 4684:1, 4684:12, 4697:15, 4705:5, 4729:22, 4731:13, 4731:24
**control** [3] - 4675:25, 4733:1, 4733:4
**controlled** [9] - 4655:4, 4655:16, 4655:17, 4655:20, 4683:20, 4703:19, 4730:7, 4731:3, 4734:6
**controls** [1] - 4772:12
**conversation** [5] - 4766:19, 4767:25, 4768:2, 4768:12,

4782:2
**conversations** [1] - 4651:6
**conveys** [1] - 4756:17
**copied** [1] - 4743:18
**copies** [3] - 4688:3, 4770:19, 4780:16
**copy** [11] - 4662:3, 4664:10, 4666:8, 4687:23, 4697:24, 4726:23, 4770:14, 4770:18, 4772:23, 4774:6, 4774:10
**corporate** [3] - 4749:23, 4749:25, 4750:15
**corporation** [5] - 4666:25, 4711:13, 4736:7, 4736:8, 4750:1
**corporations** [1] - 4749:16
**correct** [186] - 4629:15, 4630:2, 4630:3, 4631:10, 4634:9, 4634:15, 4634:19, 4635:4, 4635:19, 4635:25, 4636:5, 4639:25, 4640:6, 4643:2, 4644:25, 4645:1, 4645:10, 4650:5, 4650:21, 4650:25, 4653:6, 4653:9, 4654:8, 4654:10, 4655:14, 4656:4, 4656:5, 4661:10, 4661:17, 4665:15, 4665:17, 4665:20, 4665:21, 4667:25, 4668:4, 4668:13, 4668:23, 4674:9, 4674:10, 4674:17, 4674:18, 4674:22, 4674:23, 4676:18, 4679:10, 4679:11, 4680:20, 4682:1, 4682:12, 4682:13, 4682:17, 4684:3, 4686:17, 4688:3, 4688:14, 4690:15, 4690:24, 4691:12, 4692:22, 4693:5, 4693:16, 4694:20, 4695:9, 4695:10, 4695:22, 4696:5, 4696:18, 4697:8, 4699:3, 4699:4, 4700:23, 4702:23, 4702:24, 4703:1,

4703:7, 4703:8, 4705:7, 4708:5, 4708:8, 4708:13, 4708:18, 4710:17, 4723:21, 4723:23, 4723:24, 4724:17, 4724:25, 4725:3, 4725:9, 4725:10, 4725:13, 4725:14, 4725:23, 4725:24, 4726:7, 4726:11, 4727:1, 4727:2, 4727:6, 4727:11, 4727:14, 4727:25, 4728:1, 4728:4, 4728:5, 4728:10, 4729:2, 4729:4, 4729:8, 4729:9, 4729:20, 4730:1, 4730:10, 4730:11, 4730:19, 4730:24, 4731:3, 4731:4, 4731:14, 4731:17, 4731:18, 4731:21, 4732:5, 4732:19, 4733:19, 4733:23, 4734:5, 4734:17, 4735:4, 4735:8, 4735:9, 4736:1, 4736:9, 4737:8, 4737:17, 4738:10, 4738:23, 4739:3, 4739:13, 4739:25, 4740:15, 4742:15, 4743:2, 4743:7, 4747:8, 4747:20, 4747:25, 4748:3, 4748:4, 4749:3, 4749:16, 4749:17, 4750:1, 4750:8, 4751:11, 4751:16, 4752:2, 4752:3, 4753:9, 4756:1, 4757:2, 4757:14, 4759:16, 4760:4, 4761:6, 4761:7, 4761:13, 4761:19, 4761:20, 4762:20, 4763:1, 4763:9, 4764:23, 4764:24, 4765:3, 4766:6, 4766:10, 4766:21, 4767:16, 4768:7, 4768:13, 4773:8, 4773:14, 4774:3, 4774:18, 4774:19
**correctly** [1] - 4678:18
**correspondence** [1] - 4648:21
**counsel** [3] - 4663:20, 4743:17, 4752:15

**counter** [1] - 4787:14
**counterclaim** [1] - 4691:22
**countercomplaint** [1] - 4665:15
**county** [1] - 4678:22
**couple** [9] - 4665:12, 4695:17, 4706:9, 4738:18, 4744:18, 4753:10, 4759:12, 4763:14, 4765:15
**course** [2] - 4753:4, 4759:6
**court** [28] - 4638:15, 4639:9, 4639:22, 4639:24, 4639:25, 4665:1, 4689:25, 4691:19, 4692:17, 4692:24, 4693:9, 4713:17, 4714:3, 4714:5, 4714:16, 4714:19, 4716:22, 4716:25, 4717:2, 4717:6, 4719:20, 4719:22, 4755:1, 4781:13, 4784:11, 4785:18, 4785:19, 4787:6
**COURT** [137] - 4627:1, 4628:6, 4628:10, 4628:20, 4629:3, 4630:17, 4633:10, 4633:15, 4638:14, 4638:21, 4639:13, 4643:9, 4643:17, 4644:4, 4644:8, 4646:22, 4651:16, 4651:24, 4652:5, 4660:2, 4662:17, 4663:8, 4663:23, 4663:25, 4664:3, 4664:6, 4664:11, 4665:4, 4665:8, 4666:9, 4670:10, 4670:24, 4671:8, 4672:18, 4673:18, 4673:21, 4673:23, 4674:1, 4680:14, 4694:11, 4698:6, 4709:16, 4713:8, 4713:12, 4713:15, 4714:13, 4715:4, 4715:10, 4717:11, 4717:19, 4718:22, 4719:6, 4720:4, 4720:20, 4721:9, 4721:17, 4724:13, 4726:16, 4727:20, 4728:13, 4728:16, 4740:6, 4740:9,

4741:20, 4744:10,
4746:9, 4746:21,
4747:11, 4753:8,
4753:11, 4753:16,
4753:20, 4754:6,
4754:12, 4755:2,
4755:7, 4755:20,
4755:22, 4764:14,
4764:16, 4764:18,
4768:22, 4768:24,
4770:2, 4770:6,
4770:13, 4770:15,
4770:25, 4771:3,
4771:8, 4771:11,
4771:14, 4771:23,
4772:1, 4772:7,
4772:10, 4773:2,
4773:20, 4774:23,
4775:3, 4775:7,
4775:20, 4776:2,
4776:9, 4776:11,
4776:14, 4776:20,
4776:23, 4777:13,
4777:20, 4778:7,
4778:11, 4778:21,
4778:24, 4779:12,
4779:20, 4780:10,
4780:19, 4780:22,
4781:4, 4781:16,
4781:21, 4782:15,
4782:20, 4783:1,
4783:5, 4783:14,
4784:2, 4784:13,
4784:19, 4784:22,
4784:24, 4786:7,
4786:18, 4787:7,
4787:13, 4787:18
**Court** [3] - 4627:4,
4627:20, 4628:1
**court's** [1] - 4773:1
**courthouse** [1] -
4784:4
**Courthouse** [1] -
4627:21
**courtroom** [9] -
4673:20, 4673:25,
4713:11, 4769:2,
4770:21, 4771:22,
4776:8, 4778:10,
4779:2
**cover** [1] - 4665:12
**CR** [3] - 4665:22,
4750:6, 4753:14
**create** [3] - 4630:4,
4630:5, 4630:6
**created** [10] - 4629:25,
4630:7, 4631:23,
4636:2, 4641:4,
4647:6, 4650:1,
4671:13, 4724:24,

4751:5
**creating** [1] - 4669:20
**credibility** [2] -
4717:5, 4717:7
**credit** [47] - 4636:9,
4636:10, 4636:13,
4636:14, 4636:19,
4636:20, 4636:22,
4636:23, 4637:8,
4683:2, 4683:12,
4683:16, 4684:2,
4684:18, 4684:24,
4684:25, 4686:4,
4686:16, 4686:24,
4687:3, 4689:15,
4730:12, 4730:17,
4730:19, 4731:5,
4731:8, 4731:11,
4731:14, 4732:1,
4732:19, 4732:21,
4733:6, 4733:8,
4733:14, 4733:19,
4733:21, 4734:8,
4734:10, 4734:16,
4736:19, 4736:20,
4739:8, 4758:6,
4758:15, 4758:22
**credits** [1] - 4732:4
**cross** [14] - 4628:23,
4637:2, 4672:9,
4711:15, 4717:3,
4720:13, 4745:6,
4755:10, 4768:21,
4782:17, 4782:21,
4783:10, 4785:12,
4786:1
**CROSS** [4] - 4629:6,
4721:20, 4788:3,
4788:4
**cross-examination** [6]
- 4628:23, 4637:2,
4672:9, 4711:15,
4720:13, 4745:6
**CROSS-
EXAMINATION** [4] -
4629:6, 4721:20,
4788:3, 4788:4
**cross-examine** [2] -
4717:3, 4785:12
**CSL** [3] - 4634:7,
4635:6, 4635:7
**CSR** [1] - 4627:20
**curative** [5] - 4717:1,
4717:11, 4717:14,
4717:19, 4717:23
**currency** [1] - 4680:22
**current** [1] - 4672:7
**CURRIE** [1] - 4627:12
**custodian** [1] -
4682:22

**cut** [3] - 4645:18,
4646:17, 4646:25

## D

**D'Ambrosio** [2] -
4721:4, 4783:17
**Darryl** [1] - 4686:15
**date** [25] - 4631:11,
4639:22, 4654:4,
4657:6, 4662:9,
4676:16, 4677:23,
4723:15, 4723:17,
4737:3, 4737:5,
4738:15, 4738:19,
4738:24, 4748:4,
4756:23, 4756:24,
4761:8, 4763:4,
4764:4, 4765:1,
4772:25, 4773:22,
4775:5
**dated** [17] - 4630:22,
4631:1, 4633:19,
4660:13, 4667:23,
4668:20, 4674:11,
4674:12, 4677:22,
4727:23, 4738:22,
4756:22, 4761:16,
4762:16, 4762:23,
4763:8, 4763:10
**dates** [6] - 4642:17,
4656:7, 4674:19,
4674:21, 4741:8,
4744:3
**day-to-day** [1] -
4686:9
**days** [11] - 4682:2,
4695:17, 4702:12,
4721:5, 4738:18,
4744:18, 4745:5,
4746:12, 4766:3,
4783:12, 4783:18
**deal** [10] - 4642:19,
4648:9, 4648:13,
4657:1, 4669:21,
4699:15, 4700:4,
4700:6, 4700:14,
4704:4
**dealing** [3] - 4642:6,
4781:13, 4781:25
**debt** [3] - 4632:3,
4648:3, 4648:10
**debtor's** [4] - 4708:15,
4709:2, 4709:7,
4710:15
**December** [8] -
4657:18, 4662:1,
4674:13, 4675:8,
4729:2, 4757:19,
4757:23, 4764:21
**decide** [1] - 4645:16,

4645:17
**decided** [3] - 4648:24,
4649:8, 4678:15
**decision** [2] -
4650:20, 4714:12
**decisions** [1] -
4734:11
**deem** [1] - 4659:19
**deemed** [3] - 4659:17,
4660:7, 4660:10
**deeming** [1] - 4755:12
**deepest** [1] - 4775:11
**defaulted** [1] -
4735:21
**Defendant** [2] -
4627:17, 4627:19
**defendants** [1] -
4772:4
**Defendants** [1] -
4627:7
**defense** [2] - 4720:12,
4781:22
**Defense** [3] - 4627:16,
4628:16, 4721:14
**define** [5] - 4683:10,
4683:13, 4688:8,
4704:2, 4708:9
**defined** [1] - 4688:11
**defining** [1] - 4688:5
**Delaware** [3] - 4689:6,
4756:15, 4756:18
**delayed** [1] - 4639:19
**deliver** [1] - 4738:6
**demand** [1] - 4701:16
**demanded** [4] -
4699:9, 4699:13,
4699:17, 4699:21
**demands** [1] - 4701:5
**denied** [1] - 4714:4
**dent** [2] - 4696:24,
4697:1
**department** [1] -
4681:6
**depicted** [6] - 4678:6,
4678:12, 4733:12,
4735:2, 4744:1,
4746:18
**deposed** [1] - 4652:10
**deposit** [4] - 4686:24,
4687:7, 4688:19
**deposited** [3] -
4683:3, 4683:6,
4746:13
**deposition** [15] -
4639:20, 4639:21,
4651:1, 4651:8,
4651:20, 4653:16,
4693:6, 4697:11,
4698:12, 4698:13,
4710:14, 4710:25,

4645:17
**decided** [3] - 4648:24,
4649:8, 4678:15
**decision** [2] -
4650:20, 4714:12
**decisions** [1] -
4734:11
**deem** [1] - 4659:19
**deemed** [3] - 4659:17,
4660:7, 4660:10
**deeming** [1] - 4755:12
**deepest** [1] - 4775:11
**defaulted** [1] -
4735:21
**Defendant** [2] -
4627:17, 4627:19
**defendants** [1] -
4772:4
**Defendants** [1] -
4627:7
**defense** [2] - 4720:12,
4781:22
**Defense** [3] - 4627:16,
4628:16, 4721:14
**define** [5] - 4683:10,
4683:13, 4688:8,
4704:2, 4708:9
**defined** [1] - 4688:11
**defining** [1] - 4688:5
**Delaware** [3] - 4689:6,
4756:15, 4756:18
**delayed** [1] - 4639:19
**deliver** [1] - 4738:6
**demand** [1] - 4701:16
**demanded** [4] -
4699:9, 4699:13,
4699:17, 4699:21
**demands** [1] - 4701:5
**denied** [1] - 4714:4
**dent** [2] - 4696:24,
4697:1
**department** [1] -
4681:6
**depicted** [6] - 4678:6,
4678:12, 4733:12,
4735:2, 4744:1,
4746:18
**deposed** [1] - 4652:10
**deposit** [4] - 4686:24,
4687:7, 4688:19
**deposited** [3] -
4683:3, 4683:6,
4746:13
**deposition** [15] -
4639:20, 4639:21,
4651:1, 4651:8,
4651:20, 4653:16,
4693:6, 4697:11,
4698:12, 4698:13,
4710:14, 4710:25,

4711:2, 4711:7,
4712:21
**depositions** [2] -
4652:16, 4652:17,
4708:15, 4708:18
**deposits** [4] -
4655:13, 4655:24,
4683:11, 4687:3
**Depot** [5] - 4714:23,
4766:9, 4766:13,
4773:8, 4773:25
**derivative** [1] -
4667:17
**describes** [1] -
4631:13
**descriptions** [1] -
4669:6
**designed** [1] - 4723:1
**destination** [1] -
4636:16
**destroyed** [1] -
4698:14
**detail** [1] - 4722:22
**details** [1] - 4692:23
**determination** [1] -
4717:7
**determined** [1] -
4733:7
**develop** [1] - 4669:5
**development** [2] -
4644:22, 4675:23
**Development** [1] -
4706:7
**device** [1] - 4696:14
**Diamante** [1] -
4712:16
**Diamanté** [7] -
4629:12, 4630:1,
4633:24, 4633:25,
4634:3, 4650:8,
4736:1
**difference** [1] -
4719:21
**different** [18] -
4646:10, 4646:11,
4681:20, 4682:10,
4684:6, 4689:19,
4691:5, 4697:9,
4710:13, 4723:20,
4726:5, 4734:8,
4743:8, 4750:16,
4757:21, 4772:11,
4780:7, 4787:9
**diligence** [10] -
4661:11, 4675:11,
4675:16, 4676:2,
4676:22, 4677:14,
4677:21, 4678:20,
4700:1, 4764:22
**dime** [1] - 4708:21

**direct** [28] - 4651:12, 4657:15, 4674:12, 4676:21, 4678:3, 4690:13, 4694:17, 4695:17, 4698:21, 4698:25, 4705:2, 4711:14, 4721:22, 4722:11, 4724:24, 4725:15, 4736:21, 4737:15, 4744:15, 4744:23, 4746:12, 4746:16, 4749:1, 4749:13, 4757:11, 4766:8, 4770:23, 4783:10

**directing** [2] - 4633:18, 4728:21

**directly** [6] - 4637:8, 4671:25, 4687:4, 4687:7, 4687:10, 4716:8, 4744:16, 4746:3

**directors** [1] - 4675:22

**disagree** [5] - 4654:20, 4678:5, 4678:11, 4692:12, 4692:13

**disagreeing** [1] - 4679:6

**disclose** [3] - 4641:16, 4641:20, 4671:22

**disclosed** [2] - 4673:13, 4714:15

**disclosure** [5] - 4641:13, 4641:21, 4657:4, 4657:11, 4690:11

**Discovery** [13] - 4678:9, 4678:15, 4679:5, 4681:25, 4682:23, 4686:13, 4688:7, 4688:12, 4689:10, 4689:16, 4690:8, 4690:23, 4691:1

**discovery** [7] - 4639:9, 4639:17, 4670:17, 4671:4, 4677:9, 4677:12, 4678:3

**discretion** [1] - 4660:10

**discuss** [7] - 4673:19, 4676:9, 4713:9, 4769:1, 4775:16, 4776:2, 4776:6

**discussed** [4] - 4679:19, 4695:2, 4714:17, 4736:12

**discussing** [1] -

4711:4

**discussions** [3] - 4649:7, 4722:13, 4722:15

**dismissed** [10] - 4639:6, 4639:7, 4639:8, 4639:24, 4639:25, 4691:17, 4691:19, 4692:1, 4692:4, 4692:11

**dispute** [2] - 4696:2, 4732:7

**disseminated** [1] - 4689:24

**distinguishing** [1] - 4697:14

**distributed** [1] - 4729:24

**distribution** [1] - 4656:7

**distributions** [1] - 4656:22

**distributor** [1] - 4725:19

**district** [1] - 4691:19

**DISTRICT** [3] - 4627:1, 4627:1, 4627:10

**District** [3] - 4627:4, 4627:21, 4678:21

**document** [53] - 4631:22, 4632:14, 4632:23, 4632:25, 4633:6, 4633:7, 4640:1, 4642:12, 4657:25, 4659:22, 4663:4, 4663:12, 4663:17, 4665:14, 4666:3, 4666:24, 4667:4, 4667:8, 4667:19, 4668:5, 4668:20, 4670:11, 4671:1, 4672:8, 4672:9, 4673:10, 4673:11, 4673:12, 4674:15, 4674:22, 4675:9, 4675:12, 4677:23, 4681:4, 4681:5, 4688:5, 4688:8, 4688:10, 4690:5, 4690:6, 4690:7, 4711:12, 4719:14, 4749:18, 4750:10, 4750:11, 4755:12, 4756:7, 4757:5, 4762:23, 4763:9, 4763:10, 4786:5

**documentation** [10] - 4629:18, 4637:24, 4638:18, 4638:19,

4683:25, 4694:23, 4697:20, 4750:23, 4751:6, 4759:22

**documented** [7] - 4632:16, 4647:16, 4648:15, 4690:4, 4704:25, 4719:12, 4750:18

**documenting** [1] - 4670:6

**documents** [16] - 4650:15, 4668:10, 4668:11, 4668:18, 4670:21, 4674:19, 4675:5, 4689:24, 4699:2, 4701:4, 4719:7, 4719:9, 4753:8, 4753:18, 4755:8, 4763:5

**dog** [6] - 4756:12, 4756:13, 4757:6, 4757:24, 4758:1, 4761:5

**Dog** [1] - 4648:22

**dog's** [1] - 4761:5

**dollar** [4] - 4678:5, 4707:22, 4759:23, 4759:25

**dollars** [10] - 4642:7, 4654:24, 4656:14, 4656:16, 4704:7, 4704:10, 4731:23, 4735:22, 4744:20, 4760:7

**Dominick** [1] - 4627:20

**DomTursi@email. com** [1] - 4627:23

**done** [7] - 4644:6, 4676:4, 4693:13, 4718:21, 4740:23, 4757:4, 4781:9

**Donlan** [1] - 4759:5

**door** [1] - 4786:2

**dotted** [1] - 4700:20

**double** [1] - 4663:5

**doubt** [3] - 4632:25, 4697:18, 4697:22

**doubting** [1] - 4780:1

**down** [17] - 4638:15, 4679:2, 4683:1, 4684:25, 4686:4, 4686:15, 4686:23, 4688:17, 4688:19, 4689:15, 4704:5, 4713:13, 4713:14, 4732:15, 4736:8, 4780:2, 4785:8

**draft** [1] - 4776:24

**drafted** [3] - 4666:4,

4669:10, 4675:7

**drain** [1] - 4732:3

**draining** [1] - 4731:4

**draw** [1] - 4684:25

**drawing** [1] - 4720:15

**drawn** [6] - 4683:1, 4686:4, 4686:15, 4686:23, 4689:15, 4730:17

**draws** [1] - 4720:17

**drives** [4] - 4693:2, 4693:20, 4694:2, 4694:7

**driving** [1] - 4681:19

**dropped** [2] - 4697:3, 4698:14

**Dude** [1] - 4738:1

**due** [11] - 4661:11, 4675:11, 4675:16, 4676:2, 4676:22, 4677:14, 4677:21, 4678:20, 4700:1, 4735:22, 4764:22

**duly** [2] - 4628:17, 4721:15

**during** [30] - 4636:18, 4640:23, 4651:8, 4654:24, 4655:9, 4656:11, 4657:19, 4670:19, 4675:24, 4677:14, 4677:21, 4693:6, 4695:15, 4696:6, 4697:11, 4697:20, 4720:12, 4721:22, 4732:21, 4736:18, 4737:2, 4737:16, 4742:11, 4742:16, 4745:6, 4753:3, 4757:10, 4761:21, 4772:6

**dynamic** [1] - 4719:15

**E**

**e-mail** [9] - 4662:4, 4662:6, 4665:19, 4665:25, 4669:24, 4670:3, 4670:18, 4783:25, 4787:3

**e-mails** [1] - 4670:20

**ear** [1] - 4772:17

**earliest** [1] - 4680:5

**early** [4] - 4659:7, 4737:5, 4752:3, 4765:2

**earphones** [1] - 4772:15

**ears** [1] - 4780:7

**EASTERN** [1] - 4627:1

**Edenholm** [1] -

4752:13

**effect** [5] - 4630:22, 4669:21, 4669:23, 4723:4, 4757:4

**effective** [1] - 4719:3

**effectively** [5] - 4699:9, 4699:13, 4699:16, 4699:21, 4701:25

**efforts** [1] - 4675:24

**eighth** [1] - 4780:2

**either** [10] - 4637:12, 4641:2, 4676:24, 4678:12, 4690:24, 4725:21, 4749:20, 4783:18, 4783:23

**elected** [1] - 4763:3

**elements** [2] - 4667:3, 4690:10

**email** [30] - 4642:16, 4642:22, 4642:25, 4643:12, 4643:13, 4643:24, 4648:21, 4649:7, 4723:11, 4723:12, 4723:13, 4723:14, 4723:15, 4723:16, 4723:18, 4723:19, 4723:20, 4724:7, 4725:12, 4726:5, 4726:6, 4726:8, 4726:19, 4726:21, 4727:8, 4727:23, 4728:2, 4738:5, 4738:16, 4743:23

**emails** [8] - 4642:20, 4642:21, 4642:24, 4726:2, 4726:8, 4726:10, 4743:22, 4744:1

**emotions** [1] - 4717:16

**emphasize** [1] - 4775:14

**employee** [1] - 4650:24

**employer** [5] - 4672:10, 4672:20, 4776:25, 4777:15, 4777:19

**employers** [1] - 4777:3

**en** [1] - 4785:8

**enable** [1] - 4657:14

**encouraging** [1] - 4783:3

**end** [7] - 4647:21, 4681:16, 4681:19, 4681:21, 4704:14, 4760:14, 4782:13

**ended** [3] - 4628:22, 4652:15, 4717:15
**ends** [2] - 4650:13, 4780:3
**engage** [2] - 4660:10, 4671:24
**engineers** [1] - 4675:21
**ensued** [4] - 4628:3, 4628:12, 4716:4, 4721:10
**entered** [3] - 4708:10, 4708:12, 4745:1
**enters** [2] - 4673:25, 4771:22
**entice** [1] - 4759:4
**entire** [7] - 4649:3, 4651:20, 4657:25, 4680:15, 4680:17, 4707:7, 4732:3
**entirely** [1] - 4646:10
**entirety** [1] - 4731:15
**entities** [5] - 4639:4, 4640:17, 4655:15, 4684:7, 4689:6
**entitled** [2] - 4633:19, 4690:18
**entity** [4] - 4648:22, 4649:8, 4684:6, 4711:25
**environmental** [3] - 4690:14, 4690:19, 4691:2
**equipment** [2] - 4765:14, 4778:17
**equity** [13] - 4632:8, 4640:20, 4648:19, 4649:1, 4650:13, 4660:12, 4667:16, 4684:19, 4706:25, 4712:22, 4731:25, 4749:16, 4750:16
**Eric** [1] - 4665:24
**errands** [1] - 4681:20
**error** [1] - 4637:3
**escrow** [1] - 4703:21
**ESQ** [5] - 4627:14, 4627:15, 4627:16, 4627:18, 4627:18
**essentially** [3] - 4634:3, 4751:14, 4759:7
**established** [1] - 4759:3
**establishing** [1] - 4758:4
**estate** [8] - 4647:23, 4659:16, 4660:7, 4661:9, 4669:6, 4689:9, 4761:17,

4761:18
**et** [4] - 4644:25, 4730:13, 4732:11, 4733:15
**Ethan** [1] - 4738:3
**Eufora** [38] - 4744:14, 4746:6, 4746:13, 4747:24, 4748:11, 4748:14, 4749:10, 4750:7, 4750:10, 4750:11, 4750:15, 4750:18, 4750:21, 4750:25, 4751:2, 4751:6, 4751:15, 4751:25, 4752:3, 4756:10, 4756:19, 4757:7, 4757:17, 4757:25, 4758:1, 4758:5, 4758:12, 4758:18, 4758:19, 4758:23, 4761:5, 4761:10, 4761:13, 4761:19, 4762:20, 4763:4, 4781:8
**evaluating** [1] - 4661:11
**evening** [1] - 4786:21
**event** [2] - 4714:20, 4720:14
**eventually** [2] - 4678:24, 4681:5
**evidence** [62] - 4630:14, 4630:18, 4633:16, 4642:16, 4647:5, 4654:12, 4665:7, 4665:9, 4667:22, 4678:5, 4680:9, 4700:12, 4705:1, 4707:1, 4708:3, 4717:6, 4724:14, 4726:17, 4727:21, 4728:17, 4728:22, 4737:10, 4737:11, 4738:8, 4740:10, 4741:21, 4742:11, 4744:11, 4745:1, 4753:7, 4753:10, 4755:17, 4760:2, 4760:23, 4760:25, 4761:16, 4762:1, 4762:24, 4764:19, 4768:23, 4772:25, 4773:17, 4773:22, 4775:5, 4785:22, 4788:8, 4788:8, 4788:9, 4788:9, 4788:10, 4788:10, 4788:11, 4788:12,

4788:13, 4788:14, 4788:15, 4788:15, 4788:16, 4788:17, 4788:17
**evidenced** [1] - 4648:20
**exacerbated** [1] - 4716:16
**exactly** [5] - 4666:7, 4721:2, 4767:17, 4778:22, 4781:18
**exam** [3] - 4709:2, 4709:7, 4710:15
**examination** [7] - 4628:23, 4637:2, 4672:9, 4711:15, 4720:13, 4721:23, 4745:6
**EXAMINATION** [4] - 4629:6, 4721:20, 4628:3, 4788:4
**examine** [2] - 4717:3, 4785:12
**examples** [1] - 4737:19
**exams** [1] - 4708:15
**Excel** [2] - 4785:11, 4785:14
**except** [3] - 4672:3, 4731:16, 4785:11
**excerpt** [1] - 4651:19
**exchange** [3] - 4738:5, 4738:7, 4742:17
**exchanges** [1] - 4738:16
**exclamation** [1] - 4727:24
**exclusion** [1] - 4690:1
**excuse** [2] - 4693:6, 4775:12
**excused** [1] - 4775:15
**exhibit** [11] - 4644:17, 4651:23, 4660:1, 4674:4, 4722:25, 4740:20, 4750:5, 4752:16, 4766:23, 4771:25, 4785:16
**Exhibit** [63] - 4629:20, 4630:14, 4630:18, 4632:11, 4633:16, 4633:22, 4639:11, 4641:6, 4654:1, 4654:12, 4654:19, 4655:5, 4659:23, 4660:4, 4661:5, 4662:3, 4662:9, 4665:7, 4688:2, 4690:14, 4723:9, 4724:14, 4726:17,

4727:7, 4727:21, 4728:7, 4728:12, 4728:17, 4737:11, 4739:19, 4740:10, 4740:19, 4741:21, 4742:24, 4743:16, 4744:11, 4764:19, 4768:23, 4772:24, 4773:10, 4773:17, 4773:21, 4774:5, 4775:4, 4785:19, 4786:12, 4786:16, 4788:8, 4788:8, 4788:9, 4788:9, 4788:10, 4788:10, 4788:11, 4788:12, 4788:13, 4788:14, 4788:15, 4788:17, 4788:17
**Exhibits** [2] - 4755:16, 4788:16
**exhibits** [7] - 4659:12, 4750:5, 4753:3, 4755:6, 4785:4, 4785:9, 4786:21
**existed** [1] - 4723:17
**existing** [1] - 4768:1
**expanded** [1] - 4661:15
**expanding** [3] - 4666:24, 4667:14, 4668:21
**Expansion** [4] - 4656:3, 4656:6, 4656:9, 4656:12
**expansion** [1] - 4676:11
**expect** [4] - 4644:21, 4716:9, 4716:17, 4720:1
**expedited** [1] - 4639:9
**expense** [1] - 4686:9
**expenses** [4] - 4687:22, 4705:22, 4712:10, 4732:6
**experience** [1] - 4778:4
**explain** [6] - 4647:5, 4647:11, 4712:7, 4714:21, 4783:8, 4783:10
**explaining** [2] - 4670:11, 4713:22
**explanation** [2] - 4644:5, 4644:9
**Express** [5] - 4764:2, 4764:4, 4764:6, 4764:10, 4764:25
**expressed** [1] -

4727:7, 4727:21, 4728:7, 4728:12, 4728:17, 4737:11, 4739:19, 4740:10, 4740:19, 4741:21, 4742:24, 4743:16, 4744:11, 4764:19, 4768:23, 4773:10, 4773:17, 4773:21, 4774:5, 4775:4, 4786:12, 4786:16, 4788:8, 4788:8, 4788:9, 4788:9, 4788:10, 4788:10, 4788:11, 4788:12, 4788:13, 4788:15, 4788:17, 4788:17
**Exhibits** [2] - 4755:16, 4788:16
**exhibits** [7] - 4659:12, 4750:5, 4753:3, 4755:6, 4785:4, 4785:9, 4786:21
**existed** [1] - 4723:17
**existing** [1] - 4768:1
**expanded** [1] - 4661:15
**expanding** [3] - 4666:24, 4667:14, 4668:21
**Expansion** [4] - 4656:3, 4656:6, 4656:9, 4656:12
**expansion** [1] - 4676:11
**expect** [4] - 4644:21, 4716:9, 4716:17, 4720:1
**expedited** [1] - 4639:9
**expense** [1] - 4686:9
**expenses** [4] - 4687:22, 4705:22, 4712:10, 4732:6
**experience** [1] - 4778:4
**explain** [6] - 4647:5, 4647:11, 4712:7, 4714:21, 4783:8, 4783:10
**explaining** [2] - 4670:11, 4713:22
**explanation** [2] - 4644:5, 4644:9
**Express** [5] - 4764:2, 4764:4, 4764:6, 4764:10, 4764:25
**expressed** [1] -

4717:8
**extended** [2] - 4678:20, 4751:13
**extension** [2] - 4676:9, 4735:14
**extent** [3] - 4713:25, 4772:11, 4786:12
**extorted** [2] - 4645:23, 4699:19
**extortion** [4] - 4701:16, 4701:18, 4701:20, 4701:25

### F

**fact** [31] - 4630:10, 4641:13, 4646:10, 4671:10, 4671:18, 4672:14, 4691:8, 4695:11, 4696:4, 4696:19, 4697:23, 4710:20, 4713:5, 4718:11, 4719:9, 4723:6, 4725:11, 4731:2, 4732:7, 4732:13, 4732:23, 4733:10, 4734:4, 4741:7, 4741:12, 4743:25, 4749:4, 4749:10, 4760:20, 4764:3, 4765:13
**fair** [3] - 4701:15, 4739:9, 4748:19
**fairly** [1] - 4732:13
**faith** [1] - 4718:23
**Falcon** [1] - 4762:15
**falling** [5] - 4737:3, 4737:4, 4737:5, 4766:5, 4766:14
**false** [1] - 4722:20
**familiar** [6] - 4655:6, 4659:12, 4680:24, 4681:8, 4711:22, 4718:23
**family** [1] - 4646:17
**Fargo** [1] - 4703:19
**Farm** [1] - 4689:1
**fashion** [3] - 4639:9, 4681:11, 4716:15
**fault** [1] - 4687:10
**favor** [1] - 4634:9
**Fax** [1] - 4627:22
**fax** [1] - 4631:10
**FBI** [2] - 4719:10, 4719:14
**February** [12] - 4632:7, 4640:10, 4641:1, 4642:15, 4643:3, 4648:17, 4648:23, 4649:6,

4686:14, 4687:18, 4735:14, 4761:16
**Federal** [1] - 4627:21
**FedEx** [1] - 4725:22
**fell** [2] - 4647:24, 4648:6
**felt** [1] - 4648:8
**few** [9] - 4632:6, 4634:22, 4694:19, 4746:5, 4746:12, 4751:23, 4778:14, 4779:12, 4780:12
**figures** [1] - 4678:6
**Fiji** [2] - 4765:22, 4766:1
**filed** [8] - 4638:7, 4638:25, 4680:25, 4692:5, 4692:8, 4701:18, 4707:17, 4707:18
**fill** [2] - 4679:25, 4681:3
**filling** [1] - 4681:10
**final** [1] - 4718:3
**financial** [14] - 4642:6, 4699:24, 4734:19, 4760:17, 4760:20, 4760:24, 4761:1, 4761:12, 4761:15, 4761:23, 4762:2, 4762:20, 4762:22, 4763:8
**financing** [4] - 4637:10, 4700:5, 4700:19, 4701:13
**fine** [6] - 4648:5, 4664:8, 4748:23, 4753:6, 4777:11, 4778:5
**finish** [2] - 4638:21, 4763:21
**finished** [1] - 4645:14
**firm** [1] - 4649:1
**first** [20] - 4630:20, 4633:18, 4652:14, 4652:16, 4652:19, 4652:22, 4669:3, 4675:18, 4681:21, 4721:1, 4738:24, 4747:21, 4760:5, 4760:16, 4762:11, 4763:21, 4780:2, 4781:11, 4781:17, 4784:19
**five** [6] - 4634:25, 4647:15, 4682:25, 4689:6, 4729:5, 4766:16
**flows** [1] - 4757:11
**flying** [1] - 4720:25

**focus** [3] - 4679:4, 4709:12, 4723:10
**follow** [3] - 4681:18, 4722:14, 4774:9
**followed** [1] - 4716:9
**following** [14] - 4628:3, 4628:12, 4658:7, 4661:11, 4685:2, 4689:8, 4716:4, 4716:22, 4719:10, 4721:10, 4726:24, 4745:8, 4748:22, 4770:1
**follows** [2] - 4628:18, 4721:16
**foot** [1] - 4678:25
**forced** [1] - 4646:1
**forces** [1] - 4701:4
**forgery** [1] - 4639:11
**form** [3] - 4665:4, 4700:13, 4725:21
**formally** [1] - 4753:9
**formation** [1] - 4632:7
**formed** [1] - 4650:11
**former** [2] - 4650:24, 4692:10
**forms** [1] - 4680:1
**forth** [4] - 4669:7, 4737:13, 4738:21, 4741:8
**forward** [2] - 4644:22, 4646:4
**forwarded** [4] - 4705:21, 4748:5, 4748:6, 4767:18
**forwarding** [1] - 4726:20
**foundation** [1] - 4753:5
**four** [5] - 4679:9, 4728:22, 4728:23, 4733:15, 4781:10
**frame** [2] - 4762:7, 4767:14
**frankly** [1] - 4785:8, 4786:3
**frequently** [1] - 4737:16
**friend** [4] - 4723:1, 4724:25, 4725:19, 4739:14
**front** [2] - 4671:23, 4705:22
**full** [9] - 4640:22, 4684:18, 4705:12, 4707:10, 4715:2, 4767:21, 4767:23, 4767:25, 4768:4
**function** [1] - 4634:5
**functional** [2] -

4696:7, 4696:16
**functioning** [1] - 4696:5
**Fund** [2] - 4692:6, 4721:24
**fund** [12] - 4634:12, 4634:17, 4669:14, 4684:2, 4758:5, 4758:22
**funded** [2] - 4634:14, 4634:21
**funding** [7] - 4645:22, 4646:3, 4654:9, 4674:3, 4676:12, 4758:4, 4763:15
**funds** [12] - 4632:5, 4637:10, 4637:11, 4660:12, 4679:15, 4683:3, 4702:18, 4707:2, 4722:4, 4734:4, 4736:13

## G

**Gaarn** [11] - 4665:23, 4705:19, 4754:2, 4754:8, 4757:20, 4758:14, 4758:18, 4759:4, 4762:25, 4763:3, 4763:9
**Gaarn's** [6] - 4752:8, 4757:1, 4757:3, 4757:8, 4757:12, 4761:6
**Gaudet** [4] - 4723:20, 4726:21, 4727:3, 4728:9
**generated** [1] - 4680:22
**generically** [1] - 4710:20
**Gentry** [11] - 4665:23, 4750:6, 4751:5, 4751:10, 4751:21, 4752:1, 4753:14, 4763:2, 4763:10, 4785:14, 4786:13
**geohazard** [1] - 4675:21
**geologists** [1] - 4675:21
**Georgia** [1] - 4647:23
**gift** [1] - 4747:14
**girlfriend** [1] - 4737:23
**girlfriend'** [1] - 4739:8
**given** [7] - 4638:11, 4645:10, 4701:7, 4746:15, 4752:7, 4768:3, 4778:1

**glad** [1] - 4647:12
**gladly** [1] - 4681:12
**Glenn** [2] - 4691:21, 4728:24
**Global** [3] - 4692:6, 4721:24, 4722:4
**Gonchar** [1] - 4783:23
**gong** [1] - 4640:13
**Goudet** [1] - 4727:5
**Government** [50] - 4627:12, 4629:20, 4630:18, 4632:11, 4633:16, 4633:22, 4654:12, 4654:19, 4665:7, 4723:9, 4724:14, 4726:17, 4727:7, 4727:21, 4728:7, 4728:12, 4728:17, 4737:11, 4739:19, 4740:10, 4740:19, 4741:21, 4743:16, 4744:11, 4755:16, 4764:19, 4768:23, 4772:24, 4773:10, 4773:17, 4773:21, 4774:5, 4775:4, 4786:12, 4788:8, 4788:8, 4788:9, 4788:10, 4788:10, 4788:11, 4788:11, 4788:12, 4788:12, 4788:13, 4788:14, 4788:15, 4788:16, 4788:17, 4788:17
**government** [36] - 4630:13, 4633:3, 4637:23, 4638:3, 4661:4, 4662:14, 4668:6, 4668:12, 4671:3, 4717:13, 4718:18, 4718:22, 4719:25, 4720:13, 4720:24, 4724:9, 4726:12, 4727:15, 4740:2, 4741:16, 4744:6, 4755:5, 4755:11, 4765:5, 4766:23, 4768:15, 4772:5, 4772:14, 4772:22, 4773:16, 4774:20, 4782:10, 4783:22, 4785:5, 4786:4, 4786:22
**government's** [13] - 4662:3, 4674:4, 4681:8, 4722:25, 4725:5, 4746:19, 4760:24, 4762:1, 4767:8, 4767:25,

4782:21, 4786:1, 4787:15
**grade** [1] - 4720:6
**graduating** [1] - 4775:10
**gratitude** [1] - 4775:11
**Grdina** [1] - 4656:3
**great** [4] - 4737:8, 4748:13, 4771:20, 4775:21
**green** [4] - 4771:9, 4772:17, 4772:18, 4772:20
**Greg** [3] - 4762:5, 4762:10
**Group** [4] - 4654:21, 4655:12, 4655:25, 4656:8
**group** [5] - 4674:9, 4689:24, 4753:20, 4755:7, 4767:18
**guarantee** [4] - 4759:23, 4760:3, 4760:12, 4760:21
**guaranteed** [1] - 4735:11
**guaranteeing** [1] - 4760:6
**guarantor** [2] - 4759:25, 4760:4
**guess** [7] - 4633:8, 4636:25, 4687:14, 4709:4, 4762:4, 4771:16, 4779:22
**guide** [7] - 4756:12, 4756:13, 4757:6, 4757:24, 4758:1, 4761:5
**Guide** [1] - 4648:22
**guidedog** [1] - 4666:21
**guy** [1] - 4646:14

## H

**habit** [1] - 4743:8
**HALEY** [81] - 4627:16, 4628:9, 4630:15, 4633:5, 4633:13, 4638:13, 4639:12, 4639:14, 4643:5, 4643:8, 4646:20, 4651:22, 4651:25, 4652:2, 4652:6, 4659:25, 4660:3, 4664:9, 4664:13, 4665:10, 4666:8, 4666:10, 4670:4, 4670:8, 4670:23, 4671:7, 4672:17,

4680:13, 4694:10, 4698:5, 4698:7, 4698:9, 4702:6, 4709:15, 4709:17, 4709:19, 4709:21, 4710:1, 4716:6, 4717:18, 4718:3, 4719:4, 4719:20, 4720:19, 4724:11, 4726:14, 4727:18, 4728:14, 4740:4, 4740:7, 4741:18, 4744:8, 4752:17, 4753:2, 4753:9, 4753:22, 4754:4, 4755:24, 4756:4, 4764:13, 4768:18, 4771:12, 4771:16, 4771:20, 4771:24, 4772:9, 4773:18, 4774:22, 4778:22, 4779:14, 4780:24, 4781:6, 4782:9, 4782:12, 4783:3, 4783:13, 4785:2, 4785:23, 4786:19, 4786:24, 4787:17

**Haley** [10] - 4644:5, 4666:9, 4667:20, 4670:12, 4675:1, 4695:7, 4722:7, 4722:10, 4755:8, 4783:1

**Haley's** [2] - 4662:2, 4711:5

**half** [12] - 4638:22, 4638:24, 4668:20, 4706:14, 4713:7, 4757:21, 4766:3, 4776:20, 4777:23, 4777:24, 4777:25, 4783:12

**hand** [2] - 4732:8, 4772:22

**handling** [1] - 4667:14

**happy** [1] - 4713:23

**harbor** [3] - 4677:9, 4677:12, 4678:3

**Harbor** [19] - 4678:10, 4678:15, 4679:5, 4681:25, 4682:23, 4686:13, 4688:7, 4688:12, 4689:10, 4689:16, 4690:8, 4690:23, 4691:1, 4700:17, 4700:22, 4706:2, 4706:6, 4706:16, 4742:2

**hard** [5] - 4693:1, 4693:19, 4694:1,

4694:7, 4725:7

**Harvey** [1] - 4701:19

**Hatzimemos** [1] - 4665:24

**Hawaii** [51] - 4634:12, 4635:15, 4635:18, 4635:23, 4636:9, 4636:18, 4636:19, 4637:13, 4644:16, 4645:9, 4646:6, 4646:9, 4646:16, 4648:8, 4649:4, 4650:20, 4657:1, 4657:14, 4657:24, 4659:2, 4659:19, 4661:9, 4661:14, 4669:6, 4669:9, 4671:12, 4672:2, 4672:15, 4673:4, 4675:11, 4675:13, 4676:17, 4676:17, 4676:19, 4677:2, 4684:7, 4684:20, 4689:6, 4689:9, 4699:2, 4699:6, 4704:25, 4707:7, 4712:22, 4713:3, 4735:23, 4764:22, 4765:2, 4765:18, 4766:2

**Hawaiian** [10] - 4631:25, 4634:23, 4639:3, 4640:16, 4640:22, 4641:2, 4645:2, 4648:14, 4655:15, 4700:4

**hazardous** [1] - 4690:19

**head** [1] - 4746:22

**heading** [1] - 4665:14

**headphone** [1] - 4771:18

**headphones** [4] - 4770:24, 4771:1, 4771:3, 4771:9

**headset** [1] - 4778:12

**hear** [12] - 4699:12, 4714:5, 4763:20, 4767:24, 4771:16, 4772:11, 4772:12, 4779:25, 4780:4, 4781:23, 4781:24, 4782:10

**heard** [15] - 4662:11, 4708:2, 4713:21, 4725:5, 4742:7, 4742:10, 4743:11, 4747:6, 4747:9, 4767:2, 4768:14, 4778:22, 4780:7,

4781:12, 4781:14

**hearing** [1] - 4714:22

**hearsay** [1] - 4663:5

**held** [1] - 4682:22

**help** [4] - 4694:24, 4712:10, 4739:13, 4762:7

**Her-mo-sa** [1] - 4703:8

**hereby** [2] - 4756:16, 4756:17

**herein** [2] - 4741:8, 4744:2

**Hermosa** [5] - 4703:10, 4703:15, 4703:25, 4705:3, 4705:14

**high** [4] - 4731:5, 4732:4, 4732:23, 4733:7

**highlighted** [3] - 4698:3, 4746:20, 4746:23

**Hilo** [1] - 4677:3

**himself** [1] - 4752:13

**hiring** [1] - 4679:17

**histrionics** [3] - 4716:16, 4718:19, 4718:25

**hit** [1] - 4771:6

**hockey** [6] - 4636:8, 4640:5, 4640:12, 4640:14, 4702:1, 4739:25

**Hoffman** [2] - 4775:9, 4775:14

**hold** [5] - 4632:8, 4731:5, 4732:4, 4748:21, 4749:24

**holders** [2] - 4684:24, 4732:1

**holding** [4] - 4670:25, 4688:20, 4689:7, 4755:9

**Holding** [1] - 4688:23

**holdings** [1] - 4750:16

**Holdings** [1] - 4634:7

**Holst** [1] - 4762:10

**home** [9] - 4668:5, 4677:6, 4677:9, 4678:19, 4689:21, 4690:1, 4690:15, 4725:6

**Home** [5] - 4714:23, 4766:9, 4766:13, 4773:8, 4773:25

**homes** [4] - 4677:5, 4677:11, 4678:25

**honest** [1] - 4780:17

**Honolulu** [6] -

4676:23, 4765:9, 4765:11, 4765:14, 4765:16, 4765:20

**Honor** [49] - 4628:7, 4628:8, 4629:4, 4630:16, 4633:5, 4638:12, 4638:13, 4638:23, 4651:20, 4651:22, 4662:15, 4673:16, 4694:13, 4698:5, 4709:21, 4713:6, 4716:6, 4720:21, 4724:12, 4726:15, 4727:18, 4727:19, 4728:11, 4728:15, 4740:4, 4741:18, 4741:19, 4755:3, 4755:4, 4764:13, 4764:15, 4768:19, 4770:8, 4770:14, 4770:20, 4770:21, 4772:3, 4772:8, 4772:9, 4773:19, 4775:2, 4780:24, 4782:9, 4782:19, 4783:3, 4785:2, 4785:23, 4785:25

**Honor's** [1] - 4779:19

**HONORABLE** [1] - 4627:9

**Honu** [3] - 4644:24, 4661:25

**Honu'apo** [6] - 4688:15, 4688:22, 4729:1, 4729:7, 4729:21, 4734:14

**Honu-apo** [3] - 4644:24, 4661:25

**hook** [4] - 4735:12, 4735:17, 4735:21, 4735:24

**hooked** [1] - 4771:13

**Hormosa** [1] - 4703:6

**HORMOVITIS** [1] - 4627:6

**hotel** [1] - 4759:13

**hours** [1] - 4777:25

**house** [2] - 4668:18, 4703:22

**hundred** [1] - 4744:19

---

## I

**ID** [1] - 4726:23

**id** [1] - 4726:23

**idea** [2] - 4646:5, 4678:18

**identification** [12] - 4629:20, 4632:10,

4651:11, 4709:12, 4723:10, 4725:25, 4727:7, 4739:19, 4743:15, 4743:21, 4763:17, 4773:11

**identified** [4] - 4696:23, 4754:9, 4754:10, 4754:11

**idiots** [1] - 4741:11

**imagine** [1] - 4750:2

**immediate** [1] - 4680:1

**immediately** [1] - 4744:18

**impact** [1] - 4714:12

**implication** [3] - 4716:19, 4718:15, 4719:13

**impromptu** [3] - 4766:9, 4766:15, 4774:13

**in-person** [1] - 4642:9

**inaccurate** [4] - 4639:18, 4639:21, 4650:16, 4661:22

**inception** [3] - 4636:18, 4657:6, 4657:17

**inches** [1] - 4689:24

**inclined** [1] - 4785:20

**include** [4] - 4646:5, 4651:20, 4656:12, 4683:14

**included** [1] - 4689:19

**including** [2] - 4660:11, 4715:5

**incorrect** [13] - 4635:20, 4636:11, 4693:21, 4693:25, 4694:6, 4700:2, 4704:9, 4712:18, 4712:21, 4723:8, 4730:2, 4748:1, 4761:22

**increased** [1] - 4733:7

**incremental** [2] - 4647:14, 4731:24

**increments** [2] - 4680:3, 4681:1

**indemnification** [2] - 4690:19, 4691:23

**indemnity** [3] - 4690:14, 4690:17, 4691:3

**indicate** [2] - 4640:13, 4750:25

**indicated** [7] - 4628:2, 4640:4, 4649:18, 4650:10, 4674:22, 4729:24, 4748:8

**indicates** [3] - 4630:20, 4679:7, 4686:14
**indicating** [1] - 4774:14
**indication** [1] - 4648:18
**indictment** [2] - 4634:13, 4634:24
**indirectly** [1] - 4671:25
**individual** [4] - 4663:17, 4678:19, 4687:21, 4700:10
**individually** [1] - 4684:24
**individuals** [10] - 4649:11, 4661:24, 4687:5, 4727:5, 4730:21, 4732:11, 4733:22, 4734:11, 4751:23, 4759:1
**inform** [2] - 4640:18, 4642:15
**information** [16] - 4663:3, 4748:14, 4750:3, 4751:7, 4751:24, 4752:5, 4752:6, 4752:7, 4752:9, 4752:11, 4753:25, 4762:6, 4785:13, 4786:5, 4786:9, 4786:13
**informed** [6] - 4631:24, 4636:3, 4640:10, 4641:11, 4648:23, 4672:21
**informs** [1] - 4673:2
**initial** [3] - 4659:4, 4687:17, 4738:19
**initiated** [4] - 4632:7, 4650:24, 4691:25, 4692:6
**inserted** [1] - 4693:14
**inside** [3] - 4657:4, 4686:10, 4750:15
**insinuating** [1] - 4701:11
**insofar** [2] - 4679:7, 4741:12
**instance** [7] - 4635:9, 4641:5, 4654:21, 4661:16, 4676:13, 4691:10, 4750:19
**instances** [1] - 4732:24
**instruct** [1] - 4717:24
**instructed** [2] - 4687:12, 4716:24
**instruction** [9] -

**indicates** [3] - 4717:1, 4717:12, 4717:20, 4717:24, 4753:15, 4772:10, 4785:20, 4785:25, 4786:11
**instructions** [1] - 4717:14
**instrumental** [2] - 4644:15, 4645:7
**int** [1] - 4646:11
**intend** [1] - 4784:1
**intended** [2] - 4648:20, 4679:1
**intending** [1] - 4762:19
**interactions** [1] - 4714:16
**interest** [47] - 4629:9, 4635:4, 4645:8, 4645:10, 4645:24, 4650:14, 4656:25, 4659:18, 4660:9, 4660:11, 4688:11, 4701:12, 4701:14, 4701:17, 4702:1, 4729:11, 4729:13, 4729:18, 4729:19, 4730:16, 4730:18, 4730:20, 4730:23, 4732:16, 4732:18, 4732:20, 4732:21, 4733:2, 4733:5, 4733:13, 4733:18, 4733:20, 4734:8, 4734:15, 4736:7, 4756:19, 4756:21, 4757:5, 4757:6, 4757:16, 4757:20, 4757:21, 4761:5, 4761:10, 4763:3
**interested** [2] - 4664:4, 4727:5
**interests** [4] - 4649:14, 4689:5, 4702:9, 4756:10
**international** [1] - 4747:7
**intimate** [1] - 4739:7
**introduce** [2] - 4785:8, 4787:14
**introduced** [3] - 4667:21, 4690:17, 4785:5
**introduction** [2] - 4663:7, 4753:19
**invest** [7] - 4630:1, 4635:14, 4659:16, 4660:7, 4661:13, 4747:24, 4748:14
**invested** [4] - 4661:25,

**indicates** [13] - 4734:10, 4746:13
**investigation** [1] - 4751:18
**investing** [2] - 4635:16, 4635:23
**investment** [3] - 4657:23, 4661:9, 4707:8
**investments** [3] - 4637:12, 4683:12, 4694:24
**investor** [1] - 4635:13
**investors** [6] - 4634:20, 4635:8, 4635:11, 4635:24, 4731:13, 4767:19
**involved** [8] - 4656:3, 4684:20, 4691:11, 4702:20, 4703:5, 4750:22, 4752:1, 4752:3
**iPhone** [5] - 4724:16, 4739:22, 4741:5, 4766:18, 4768:5
**ironic** [1] - 4719:7
**island** [4] - 4676:24, 4677:2, 4677:3, 4765:19
**Isle** [92] - 4639:1, 4641:8, 4641:25, 4645:16, 4654:5, 4654:23, 4656:15, 4657:6, 4657:9, 4657:13, 4657:17, 4657:18, 4657:23, 4659:1, 4659:14, 4660:6, 4660:15, 4661:4, 4661:7, 4661:18, 4661:21, 4661:23, 4664:5, 4666:12, 4666:13, 4666:14, 4666:19, 4666:22, 4667:2, 4667:11, 4667:14, 4667:23, 4668:3, 4668:22, 4671:18, 4672:15, 4672:22, 4673:6, 4673:15, 4674:8, 4675:7, 4683:4, 4683:6, 4683:9, 4683:20, 4683:23, 4684:3, 4684:6, 4684:8, 4684:10, 4684:13, 4684:18, 4685:1, 4686:11, 4686:20, 4687:4, 4687:7, 4687:10, 4687:13, 4687:15, 4687:24,

**indicates** [25] - 4688:6, 4688:9, 4688:11, 4688:13, 4688:20, 4688:22, 4689:2, 4692:3, 4697:15, 4697:20, 4700:10, 4729:6, 4730:20, 4730:23, 4731:8, 4731:9, 4731:12, 4731:22, 4732:5, 4732:17, 4732:20, 4733:20, 4734:2, 4734:6
**Islip** [2] - 4627:4, 4627:22
**issue** [9] - 4653:25, 4713:16, 4714:3, 4749:15, 4758:24, 4776:4, 4782:9, 4784:2, 4784:15
**issues** [6] - 4669:13, 4679:18, 4737:8, 4770:10, 4777:16, 4778:4
**IT** [1] - 4779:5
**itemized** [1] - 4760:17
**items** [1] - 4761:22
**itself** [3] - 4677:4, 4758:1, 4787:9
**IV** [72] - 4639:1, 4641:8, 4641:25, 4645:16, 4654:5, 4654:23, 4656:15, 4657:6, 4657:9, 4657:17, 4657:18, 4657:23, 4659:1, 4659:14, 4660:6, 4660:15, 4661:4, 4661:7, 4661:18, 4661:21, 4661:23, 4664:5, 4666:12, 4666:13, 4666:14, 4666:19, 4666:22, 4667:2, 4667:11, 4667:23, 4668:3, 4668:22, 4671:18, 4672:15, 4672:22, 4673:6, 4674:8, 4683:4, 4683:6, 4683:9, 4684:3, 4684:8, 4684:10, 4684:18, 4685:1, 4686:11, 4686:20, 4687:4, 4687:7, 4687:15, 4687:24, 4688:9, 4688:13, 4688:20, 4689:2, 4692:3, 4697:15,

4697:20, 4700:10, 4729:6, 4730:20, 4730:23, 4731:8, 4731:10, 4731:12, 4732:17, 4732:20, 4733:20
**IV's** [2] - 4667:14, 4688:11

**J**

**JAMES** [1] - 4627:14
**January** [10] - 4726:3, 4752:8, 4752:9, 4756:22, 4756:24, 4757:23, 4761:9, 4763:4, 4764:12, 4764:25
**Jay** [1] - 4739:24
**Jere** [2] - 4631:20, 4640:8
**job** [1] - 4699:24
**John** [17] - 4653:7, 4653:19, 4659:3, 4660:17, 4661:19, 4661:20, 4665:22, 4666:21, 4666:23, 4668:21, 4676:15, 4701:25, 4712:13, 4723:20, 4726:20, 4727:23, 4741:5
**join** [1] - 4759:4
**joining** [1] - 4758:14
**joint** [11] - 4641:14, 4641:22, 4669:14, 4669:22, 4671:16, 4689:12, 4689:22, 4690:1, 4690:11, 4702:25, 4703:5
**joker** [1] - 4742:5
**Joker** [1] - 4742:10
**JOSEPH** [1] - 4627:9
**Joseph** [1] - 4631:20, 4640:9
**Jowdy** [70] - 4631:20, 4631:23, 4632:2, 4633:20, 4636:2, 4637:5, 4638:10, 4638:11, 4639:1, 4639:3, 4640:4, 4641:9, 4641:10, 4642:11, 4642:15, 4642:18, 4643:1, 4643:24, 4644:15, 4645:24, 4646:6, 4646:17, 4646:25, 4647:7, 4647:13, 4647:16, 4647:19, 4647:22, 4647:25, 4648:5, 4648:11, 4648:18, 4648:23,

4649:2, 4649:17, 4649:24, 4650:10, 4650:14, 4650:18, 4651:3, 4652:21, 4652:22, 4653:1, 4653:3, 4656:24, 4656:25, 4660:15, 4661:16, 4669:17, 4671:19, 4672:4, 4672:23, 4673:3, 4679:18, 4690:7, 4691:7, 4691:9, 4691:14, 4691:21, 4692:4, 4701:19, 4730:7, 4730:8, 4730:10, 4734:2, 4734:4, 4734:20, 4735:15, 4742:9

**Jowdy's** [9] - 4630:1, 4632:5, 4634:14, 4634:16, 4634:18, 4649:24, 4691:22, 4711:15, 4736:15

**Jowdy-controlled** [1] - 4730:7

**Judge** [12] - 4666:10, 4680:13, 4698:9, 4709:15, 4716:19, 4718:3, 4719:23, 4721:4, 4779:15, 4780:6, 4781:15, 4783:13

**JUDGE** [1] - 4627:10

**judge** [15] - 4630:15, 4652:6, 4663:2, 4702:6, 4714:9, 4716:13, 4716:23, 4718:16, 4719:4, 4720:19, 4744:8, 4752:17, 4780:15, 4781:7, 4786:25

**judgment** [3] - 4691:21, 4708:10, 4708:12

**juggle** [1] - 4782:25

**juggling** [1] - 4783:15

**July** [10] - 4642:11, 4654:5, 4687:23, 4719:10, 4724:16, 4727:23, 4729:8, 4744:4, 4751:11, 4751:14

**jumping** [2] - 4716:14, 4738:14

**June** [8] - 4627:7, 4682:12, 4682:14, 4682:15, 4740:17, 4776:11, 4787:20

**Juneau** [1] - 4697:14

**juror** [4] - 4771:16,

4775:9, 4775:13, 4775:23

**JUROR** [8] - 4775:19, 4776:1, 4776:13, 4776:19, 4776:22, 4777:11, 4777:18, 4778:6

**Juror** [2] - 4776:10, 4778:10

**jurors** [2] - 4716:21, 4775:15

**jury** [25] - 4627:10, 4628:4, 4628:10, 4628:13, 4628:20, 4673:20, 4673:24, 4673:25, 4716:5, 4717:10, 4717:23, 4720:9, 4720:20, 4721:11, 4768:16, 4769:2, 4770:12, 4770:20, 4770:23, 4772:6, 4776:10, 4781:23, 4782:1, 4782:14, 4786:4

**Jury** [3] - 4713:11, 4771:22, 4776:8

**jury's** [1] - 4717:7

**justify** [1] - 4657:2

## K

**Ka'u** [1] - 4688:23

**Kaiser** [71] - 4637:12, 4653:8, 4653:19, 4659:3, 4660:17, 4661:19, 4661:20, 4665:22, 4666:11, 4666:13, 4666:14, 4666:22, 4666:24, 4667:6, 4668:21, 4674:16, 4675:10, 4675:13, 4675:17, 4677:11, 4677:14, 4677:20, 4678:14, 4678:23, 4688:17, 4698:22, 4699:6, 4699:16, 4699:18, 4701:3, 4701:25, 4702:8, 4702:10, 4702:18, 4702:25, 4703:2, 4703:23, 4704:21, 4704:22, 4704:23, 4705:10, 4705:18, 4705:20, 4706:16, 4707:11, 4708:19, 4709:6, 4710:9, 4710:18, 4711:8, 4711:18, 4712:13, 4718:10, 4718:12, 4718:24, 4722:16, 4723:21,

4724:17, 4725:21, 4726:3, 4726:20, 4727:8, 4727:23, 4728:19, 4741:6, 4741:7, 4741:9, 4741:23, 4743:8, 4764:20

**Kaiser's** [12] - 4666:23, 4676:15, 4700:13, 4702:2, 4704:5, 4722:3, 4722:11, 4722:19, 4725:16, 4725:20, 4741:5, 4741:13

**KAJ** [1] - 4634:7

**keep** [2] - 4705:17, 4783:5

**keeping** [1] - 4664:6

**KELLY** [1] - 4627:12

**Ken** [21] - 4631:20, 4631:23, 4633:20, 4634:14, 4634:16, 4634:18, 4639:1, 4641:9, 4644:15, 4645:24, 4651:3, 4652:21, 4660:15, 4669:16, 4671:19, 4672:4, 4672:23, 4673:3, 4690:6, 4692:4, 4701:19

**Kennedy** [1] - 4752:14

**KENNER** [6] - 4627:5, 4627:5, 4628:15, 4721:13, 4788:2, 4788:4

**Kenner** [80] - 4627:17, 4628:11, 4628:22, 4628:25, 4629:8, 4636:17, 4638:9, 4638:16, 4639:10, 4641:5, 4643:10, 4644:4, 4644:17, 4646:22, 4651:16, 4651:23, 4654:1, 4654:22, 4655:5, 4655:7, 4656:23, 4657:21, 4659:11, 4659:13, 4659:22, 4659:23, 4660:4, 4661:4, 4661:14, 4662:9, 4663:3, 4663:8, 4665:13, 4666:12, 4667:22, 4670:14, 4673:9, 4673:11, 4674:3, 4682:18, 4682:19, 4688:2, 4690:3, 4690:14, 4690:18, 4692:3, 4698:11, 4698:17, 4710:4,

4718:23, 4721:22, 4725:8, 4728:20, 4728:21, 4742:24, 4746:4, 4746:9, 4746:10, 4746:12, 4747:3, 4747:10, 4750:5, 4755:5, 4756:2, 4756:6, 4756:12, 4762:2, 4762:24, 4763:17, 4770:9, 4771:19, 4773:8, 4782:17, 4783:7, 4785:12, 4785:19, 4786:13, 4786:16

**Kenner's** [3] - 4753:4, 4755:9, 4786:7

**Kenneth** [1] - 4650:14

**kept** [2] - 4697:13

**killing** [1] - 4736:5

**kind** [4] - 4716:24, 4725:6, 4763:22, 4763:25

**kinds** [3] - 4661:16, 4676:3, 4693:14

**knowledge** [1] - 4786:10

**known** [3] - 4712:25, 4744:14, 4761:25

**knows** [1] - 4720:16

**KOMATIREDDY** [3] - 4627:15, 4770:19, 4771:13

## L

**label** [1] - 4724:20

**labels** [1] - 4728:9

**laid** [4] - 4638:10, 4639:2, 4753:4, 4786:4

**land** [2] - 4645:2, 4689:19

**language** [2] - 4672:24, 4717:2

**Lani** [1] - 4759:5

**laptop** [6] - 4695:20, 4696:2, 4696:11, 4696:12, 4697:9, 4698:15

**larger** [2] - 4678:25, 4731:25

**Larry** [3] - 4630:7, 4669:11, 4671:14

**LaRusso** [34] - 4627:18, 4628:8, 4630:16, 4633:14, 4662:15, 4663:2, 4663:21, 4664:2, 4664:8, 4665:11,

4713:20, 4714:15, 4720:21, 4724:12, 4726:15, 4727:17, 4727:19, 4728:15, 4740:8, 4741:19, 4744:9, 4745:4, 4753:24, 4754:8, 4754:13, 4755:2, 4755:3, 4764:15, 4767:20, 4768:19, 4774:23, 4779:21, 4779:24, 4782:17

**LARUSSO** [20] - 4663:10, 4714:9, 4772:8, 4773:19, 4774:24, 4775:2, 4779:25, 4780:15, 4780:21, 4781:7, 4782:18, 4782:22, 4783:16, 4784:11, 4784:16, 4784:20, 4784:23, 4785:1, 4786:25, 4787:8

**Las** [1] - 4691:17

**laser** [1] - 4728:10

**last** [13] - 4632:18, 4644:20, 4668:9, 4668:15, 4670:16, 4687:1, 4735:18, 4737:25, 4738:14, 4763:14, 4770:3, 4783:18

**lastly** [3] - 4728:6, 4766:4, 4786:25

**late** [2] - 4662:1, 4786:21

**laundering** [1] - 4681:6

**lawsuit** [19] - 4638:7, 4638:25, 4639:6, 4639:7, 4639:17, 4639:20, 4650:23, 4652:10, 4691:10, 4691:16, 4691:25, 4692:3, 4692:5, 4692:14, 4692:16, 4692:25, 4697:11, 4697:21, 4701:18

**lawsuits** [6] - 4691:6, 4691:8, 4691:10, 4691:13, 4692:8, 4692:10

**lawyer** [2] - 4693:11, 4720:8

**lawyers** [6] - 4648:21, 4670:25, 4671:17, 4675:22, 4676:25, 4677:4

**least** [12] - 4633:6, 4663:6, 4676:8,

4716:11, 4718:8, 4729:18, 4732:18, 4733:24, 4734:7, 4734:14, 4766:24, 4781:23

**leave** [2] - 4777:25, 4784:5

**leaves** [5] - 4673:20, 4713:11, 4769:2, 4776:8, 4778:10

**Led** [3] - 4698:18, 4698:21, 4706:6

**led** [2] - 4718:8, 4718:11

**ledger** [3] - 4697:13, 4697:24, 4698:13

**ledgers** [1] - 4697:19

**left** [4] - 4728:7, 4739:2, 4756:7, 4758:2

**legal** [2] - 4669:6, 4712:10

**Lehman** [39] - 4634:9, 4634:11, 4634:13, 4634:17, 4634:21, 4635:19, 4640:19, 4641:14, 4641:23, 4644:16, 4645:13, 4645:19, 4646:15, 4648:19, 4648:24, 4657:19, 4669:12, 4669:13, 4669:18, 4669:23, 4670:6, 4671:15, 4675:19, 4676:1, 4676:4, 4676:10, 4689:13, 4689:23, 4699:15, 4699:23, 4700:3, 4700:19, 4700:21, 4701:3, 4701:13, 4706:1, 4706:9, 4707:3

**lend** [2] - 4668:3, 4669:20

**lender** [2] - 4645:19, 4762:11

**lending** [5] - 4659:5, 4660:12, 4661:15, 4669:9, 4761:21

**lendings** [1] - 4660:20

**length** [1] - 4656:24

**less** [3] - 4650:13, 4679:15, 4679:25

**Lethinen** [20] - 4631:20, 4632:1, 4632:3, 4632:4, 4640:9, 4641:3, 4647:6, 4647:15, 4647:25, 4648:1, 4648:3, 4648:10,

4648:15, 4649:5, 4649:10, 4649:20, 4649:23, 4649:25, 4653:11, 4736:12

**Lethinen's** [1] - 4647:20

**letter** [21] - 4631:1, 4641:6, 4641:13, 4641:20, 4641:21, 4642:2, 4647:17, 4657:4, 4657:8, 4657:11, 4684:23, 4687:24, 4690:12, 4738:3, 4776:24, 4777:3, 4777:9, 4777:11, 4777:13, 4778:3

**letters** [1] - 4700:9

**letting** [1] - 4787:3

**leverage** [1] - 4701:2

**liability** [8] - 4630:10, 4640:2, 4647:10, 4667:22, 4673:14, 4756:15, 4756:18, 4756:20

**Liability** [1] - 4630:21

**lie** [1] - 4701:10

**lied** [1] - 4701:7

**lieu** [2] - 4645:22, 4731:4

**life** [1] - 4751:12

**light** [6] - 4728:12, 4771:10, 4772:18, 4772:20, 4782:21

**Limited** [1] - 4640:2

**limited** [9] - 4630:10, 4630:20, 4647:10, 4660:11, 4667:22, 4673:14, 4756:15, 4756:18, 4756:20

**limiting** [4] - 4753:15, 4785:20, 4785:25, 4786:11

**line** [21] - 4636:20, 4653:15, 4674:15, 4677:24, 4681:16, 4681:19, 4683:2, 4683:16, 4684:2, 4684:17, 4684:24, 4684:25, 4686:4, 4686:15, 4686:23, 4700:20, 4725:17, 4732:1, 4732:19, 4733:19, 4780:2

**line-of-credit** [1] - 4732:1

**lines** [31] - 4636:9, 4636:10, 4636:13, 4636:14, 4636:19, 4636:22, 4636:23,

4637:8, 4683:12, 4687:3, 4689:15, 4730:12, 4730:17, 4730:19, 4731:4, 4731:8, 4731:11, 4731:14, 4732:1, 4732:3, 4732:5, 4732:21, 4733:6, 4733:8, 4733:14, 4733:21, 4734:8, 4734:10, 4734:15, 4736:19, 4736:20

**lion's** [2] - 4703:24, 4704:2

**list** [1] - 4761:18

**listed** [1] - 4732:11

**listen** [5] - 4767:8, 4780:5, 4780:16, 4781:17, 4782:4

**listened** [4] - 4766:22, 4767:10, 4768:3, 4779:14

**litigants** [1] - 4717:9

**litigation** [2] - 4707:16, 4707:18

**LLC** [35] - 4629:24, 4629:25, 4630:4, 4630:5, 4630:21, 4631:15, 4633:21, 4633:24, 4633:25, 4634:3, 4634:7, 4636:2, 4641:4, 4648:22, 4649:13, 4650:12, 4659:18, 4660:9, 4660:11, 4666:12, 4666:13, 4666:14, 4666:20, 4666:21, 4683:21, 4706:7, 4710:23, 4711:9, 4749:20, 4756:10, 4756:12, 4756:18, 4756:19, 4757:1, 4758:4

**LLCs** [6] - 4634:4, 4655:14, 4731:2, 4749:14, 4749:24

**loan** [66] - 4632:2, 4637:11, 4637:14, 4637:18, 4640:11, 4640:22, 4641:18, 4643:1, 4644:16, 4647:16, 4647:18, 4647:20, 4648:5, 4648:6, 4648:7, 4649:4, 4649:20, 4650:18, 4652:21, 4653:12, 4653:18, 4656:9, 4659:1, 4675:19, 4676:11, 4698:22, 4699:7,

4699:13, 4701:1, 4701:5, 4701:8, 4702:11, 4702:16, 4704:11, 4705:20, 4706:17, 4706:24, 4710:24, 4711:8, 4711:10, 4711:18, 4712:9, 4712:11, 4712:12, 4728:19, 4730:23, 4732:8, 4733:12, 4733:22, 4734:9, 4734:20, 4734:21, 4735:3, 4735:11, 4746:7, 4747:14, 4747:17, 4759:12, 4759:17, 4759:23, 4760:1, 4760:6, 4760:21, 4762:7

**loaned** [14] - 4636:4, 4636:8, 4640:15, 4640:16, 4647:7, 4671:19, 4730:10, 4734:1, 4734:4, 4746:4, 4746:10, 4747:2, 4747:10, 4747:13

**loaning** [2] - 4651:3, 4706:16

**loans** [28] - 4631:19, 4631:25, 4640:5, 4640:8, 4641:2, 4641:3, 4645:5, 4647:2, 4647:14, 4648:14, 4648:18, 4653:1, 4653:3, 4657:14, 4660:15, 4669:16, 4671:10, 4672:15, 4672:23, 4673:3, 4706:19, 4709:3, 4709:5, 4732:16, 4735:20, 4757:13

**local** [2] - 4675:20, 4675:21

**located** [4] - 4693:3, 4725:6, 4765:19, 4765:20

**locations** [2] - 4677:8, 4677:15

**logical** [1] - 4780:3

**long-standing** [1] - 4748:10

**long-term** [1] - 4661:12

**look** [9] - 4706:13, 4734:24, 4739:20, 4744:20, 4763:17, 4765:13, 4774:25, 4787:1, 4787:12

**looked** [4] - 4652:7, 4696:9, 4698:11, 4778:14

**looking** [10] - 4650:6, 4659:23, 4661:5, 4663:6, 4673:12, 4680:7, 4748:16, 4763:19, 4763:21, 4764:1

**looks** [4] - 4651:23, 4663:11, 4762:4, 4783:18

**lose** [2] - 4778:1, 4778:2

**losing** [3] - 4735:1, 4735:4, 4735:6

**loss** [1] - 4679:6

**lost** [5] - 4691:21, 4708:7, 4708:9, 4712:6, 4712:8

**love** [1] - 4694:7

**low** [2] - 4730:25, 4731:3

**Lucas** [17] - 4629:9, 4629:13, 4629:16, 4630:1, 4634:4, 4634:15, 4634:17, 4634:22, 4635:10, 4642:19, 4646:3, 4648:13, 4650:8, 4650:14, 4711:16, 4712:16, 4736:1

**lunch** [2] - 4713:15, 4720:24

**Luncheon** [1] - 4715:12

**M**

**MacBook** [2] - 4696:21, 4696:23

**Macias** [1] - 4775:22

**mail** [9] - 4662:4, 4662:6, 4665:19, 4665:25, 4669:24, 4670:3, 4670:18, 4783:25, 4787:3

**mails** [1] - 4670:20

**mainland** [1] - 4679:3

**maintains** [1] - 4659:8

**Makika** [10] - 4639:1, 4654:5, 4655:3, 4655:13, 4656:22, 4692:1, 4692:3, 4729:25, 4730:3, 4730:5

**man** [1] - 4641:16

**manage** [1] - 4684:22

**Management** [5] - 4654:8, 4654:21,

4655:12, 4655:24, 4656:8
**management** [3] - 4672:1, 4674:9, 4763:15
**manager** [1] - 4734:19
**managing** [15] - 4645:16, 4655:18, 4655:19, 4659:14, 4659:18, 4660:6, 4660:8, 4660:9, 4666:13, 4666:19, 4683:23, 4699:25, 4749:14, 4756:12
**mandatory** [3] - 4776:11, 4777:1, 4777:8
**Manfredi** [9] - 4659:3, 4675:17, 4677:11, 4678:14, 4688:16, 4699:1, 4699:5, 4699:16, 4701:3
**Manhattan** [1] - 4680:10
**manner** [1] - 4684:22
**manufacture** [1] - 4723:6
**manufactured** [1] - 4723:2
**March** [10] - 4630:23, 4631:1, 4631:3, 4631:9, 4633:19, 4640:24, 4656:2, 4683:2, 4684:15, 4686:3
**mark** [6] - 4651:9, 4709:11, 4780:19, 4780:20, 4780:22, 4781:4
**marked** [10] - 4632:10, 4725:25, 4728:7, 4739:18, 4743:15, 4753:3, 4763:16, 4766:23, 4780:21, 4785:4
**marking** [1] - 4629:19
**Markowitz** [7] - 4630:8, 4631:23, 4642:18, 4649:12, 4650:2, 4669:11, 4671:14
**Masoud** [2] - 4645:11, 4648:25
**Massachusetts** [1] - 4759:8
**masse** [1] - 4785:8
**MasterCard** [1] - 4773:13
**materials** [1] - 4678:24

**matter** [2] - 4684:9, 4766:3
**McKee** [3] - 4739:24, 4740:13, 4740:18
**mean** [8] - 4636:8, 4675:16, 4676:2, 4701:3, 4712:7, 4730:9, 4736:19, 4754:7
**meaning** [5] - 4649:24, 4671:11, 4671:19, 4672:2, 4742:6
**means** [4] - 4659:19, 4668:17, 4725:22, 4784:5
**means/Joker** [1] - 4742:13
**meant** [1] - 4677:25
**measure** [3] - 4632:1, 4648:2, 4649:11
**mechanical** [3] - 4627:25, 4778:15, 4781:21
**meet** [3] - 4676:6, 4677:13, 4766:12
**meeting** [17] - 4675:18, 4676:24, 4694:23, 4695:2, 4695:15, 4696:6, 4696:13, 4764:23, 4766:9, 4766:15, 4766:25, 4767:3, 4774:13, 4776:12, 4777:1, 4777:5, 4777:10
**meetings** [1] - 4642:9
**member** [22] - 4631:14, 4631:15, 4649:19, 4655:19, 4659:14, 4659:18, 4660:6, 4660:8, 4660:9, 4661:20, 4661:22, 4666:13, 4666:14, 4666:19, 4666:20, 4667:7, 4667:10, 4683:23, 4688:13, 4700:4, 4751:18, 4756:12
**members** [9] - 4628:20, 4641:8, 4641:12, 4657:8, 4684:13, 4686:9, 4687:21, 4687:25, 4700:10
**membership** [3] - 4756:10, 4756:21, 4757:17
**memo** [2] - 4669:23, 4671:1

**memory** [3] - 4716:10, 4716:12, 4779:6
**mention** [5] - 4644:15, 4657:1, 4669:17, 4688:7, 4690:23
**mentioned** [5] - 4655:5, 4673:15, 4675:3, 4689:10, 4781:3
**merely** [2] - 4673:1, 4724:24
**message** [5] - 4737:12, 4738:7, 4739:10, 4742:17, 4774:15
**messages** [1] - 4741:9
**met** [4] - 4676:8, 4694:19, 4696:16, 4764:22
**Mexican** [1] - 4637:5
**Mexico** [16] - 4636:20, 4636:24, 4637:5, 4637:18, 4638:1, 4645:6, 4646:9, 4646:16, 4647:2, 4652:15, 4668:3, 4721:25, 4722:12, 4736:8, 4736:10, 4736:16
**Michael** [4] - 4665:19, 4744:16, 4746:5, 4751:18
**might** [7] - 4717:12, 4718:23, 4719:18, 4753:15, 4754:14, 4780:7, 4786:5
**million** [53] - 4631:17, 4631:19, 4636:12, 4636:14, 4636:15, 4636:18, 4636:25, 4637:1, 4637:7, 4637:9, 4638:1, 4640:14, 4640:16, 4640:21, 4647:15, 4649:3, 4654:6, 4654:7, 4654:24, 4655:25, 4656:6, 4656:10, 4656:14, 4656:16, 4657:3, 4668:10, 4669:16, 4670:16, 4671:19, 4673:3, 4691:21, 4703:17, 4704:6, 4704:10, 4704:11, 4704:18, 4707:8, 4729:25, 4730:9, 4730:11, 4731:20, 4731:23, 4733:12, 4733:24, 4734:7, 4734:13, 4735:13,

4735:14, 4735:22, 4759:23, 4759:25, 4760:7
**millions** [3] - 4642:6, 4654:6, 4707:25
**mind** [3] - 4783:5, 4786:8, 4786:15
**mine** [5] - 4723:1, 4723:13, 4740:18, 4757:22, 4760:10
**minor** [1] - 4787:11
**minus** [1] - 4730:11
**minute** [1] - 4698:3
**minutes** [6] - 4767:7, 4767:12, 4767:13, 4768:4, 4768:7, 4768:8
**miraculously** [1] - 4712:25
**miscommunication** [1] - 4785:3
**mISKIEWICZ** [1] - 4740:2
**Miskiewicz** [21] - 4629:3, 4644:6, 4652:2, 4665:8, 4709:22, 4715:1, 4716:11, 4716:24, 4717:4, 4717:24, 4718:5, 4721:18, 4755:10, 4755:25, 4770:4, 4771:24, 4772:1, 4783:8, 4783:25, 4785:6, 4786:20
**MISKIEWICZ** [102] - 4627:14, 4628:7, 4629:4, 4629:7, 4630:13, 4630:19, 4633:3, 4633:17, 4638:12, 4639:5, 4639:15, 4643:6, 4643:19, 4643:23, 4644:13, 4646:24, 4651:19, 4652:4, 4652:8, 4662:14, 4663:13, 4663:24, 4664:4, 4665:2, 4673:16, 4674:2, 4686:1, 4694:12, 4694:15, 4698:10, 4702:7, 4702:14, 4703:13, 4703:14, 4709:20, 4709:25, 4710:3, 4713:6, 4715:2, 4715:6, 4718:2, 4721:21, 4724:9, 4724:15, 4726:12, 4726:18, 4727:15, 4727:22,

4728:11, 4728:18, 4740:11, 4741:16, 4741:22, 4743:20, 4744:6, 4744:12, 4746:1, 4746:11, 4747:12, 4752:15, 4753:13, 4753:18, 4753:23, 4754:2, 4754:10, 4755:4, 4755:18, 4755:21, 4755:23, 4756:2, 4756:5, 4764:17, 4768:15, 4770:5, 4770:7, 4770:14, 4770:17, 4770:21, 4771:2, 4771:5, 4771:9, 4771:15, 4771:18, 4772:3, 4773:1, 4773:6, 4773:7, 4773:16, 4773:23, 4774:20, 4775:6, 4778:18, 4779:3, 4779:13, 4780:23, 4781:20, 4782:11, 4785:10, 4786:16, 4786:23, 4788:3, 4788:5
**miss** [3] - 4775:11, 4777:5, 4784:7
**missing** [3] - 4716:17, 4779:9, 4786:19
**misspoke** [1] - 4655:7
**misstating** [1] - 4708:20
**misunderstood** [1] - 4733:4
**mo** [1] - 4703:8
**Moaula** [4] - 4688:25, 4689:1, 4689:7
**modification** [2] - 4657:13, 4657:22
**modifications** [1] - 4657:16
**moment** [4] - 4652:25, 4664:9, 4694:12, 4710:6
**Monday** [1] - 4783:19
**money** [96] - 4631:18, 4635:10, 4636:4, 4636:7, 4636:8, 4637:4, 4637:18, 4637:20, 4642:7, 4645:6, 4647:7, 4650:20, 4651:3, 4652:15, 4654:14, 4656:12, 4659:2, 4667:15, 4668:3, 4669:9, 4669:20, 4671:19, 4678:10, 4678:11, 4680:2,

4681:6, 4682:11, 4683:6, 4684:5, 4684:9, 4684:11, 4684:15, 4684:22, 4686:13, 4687:9, 4687:13, 4687:17, 4689:15, 4689:18, 4690:7, 4694:4, 4701:25, 4703:9, 4703:18, 4703:21, 4704:22, 4705:11, 4705:18, 4705:20, 4705:21, 4706:16, 4707:4, 4707:11, 4707:23, 4707:24, 4708:11, 4708:16, 4708:21, 4710:9, 4710:10, 4710:18, 4710:21, 4710:22, 4721:23, 4728:25, 4729:8, 4730:3, 4730:12, 4731:7, 4731:10, 4733:13, 4734:1, 4734:14, 4734:22, 4735:1, 4735:4, 4735:7, 4735:16, 4736:5, 4736:10, 4737:16, 4738:4, 4739:13, 4741:10, 4746:5, 4746:7, 4746:10, 4746:15, 4747:5, 4747:20, 4748:18, 4749:6, 4749:7, 4757:11
moneys [1] - 4712:10
month [2] - 4700:15, 4765:1
monthly [1] - 4764:9
months [14] - 4634:22, 4634:25, 4641:10, 4642:11, 4647:1, 4668:9, 4668:15, 4670:16, 4687:1, 4700:18, 4706:9, 4706:10, 4766:16
mopping [1] - 4726:19
morning [10] - 4628:6, 4628:20, 4628:23, 4673:18, 4713:17, 4781:22, 4782:18, 4784:1, 4784:12, 4784:13
mortgage [8] - 4704:4, 4729:7, 4729:10, 4729:12, 4729:21, 4729:24, 4731:20
mortgaged [4] - 4729:7, 4729:23, 4733:25, 4734:13

Moscow [1] - 4727:1
Mosquito [2] - 4724:22, 4727:3
MosquitoRojoTequila.com [1] - 4725:9
most [3] - 4753:3, 4777:3, 4778:1
move [6] - 4665:2, 4667:18, 4678:2, 4680:8, 4728:11, 4770:11
movement [1] - 4720:22
moves [9] - 4633:3, 4724:9, 4726:12, 4727:15, 4740:2, 4741:16, 4744:6, 4768:15, 4774:20
moving [3] - 4718:3, 4721:7, 4721:8
MR [227] - 4628:7, 4628:8, 4628:9, 4629:4, 4629:7, 4630:13, 4630:15, 4630:16, 4630:19, 4633:3, 4633:5, 4633:13, 4633:14, 4637:17, 4638:12, 4638:13, 4639:5, 4639:12, 4639:14, 4639:15, 4643:5, 4643:6, 4643:8, 4643:19, 4643:23, 4644:13, 4646:20, 4646:24, 4651:19, 4651:22, 4651:25, 4652:2, 4652:4, 4652:6, 4652:8, 4659:25, 4660:3, 4662:14, 4662:15, 4663:2, 4663:10, 4663:13, 4663:21, 4663:24, 4664:2, 4664:4, 4664:8, 4664:9, 4664:13, 4665:2, 4665:10, 4665:11, 4666:8, 4666:10, 4670:4, 4670:8, 4670:23, 4671:7, 4672:17, 4673:16, 4674:2, 4680:13, 4686:1, 4694:10, 4694:12, 4694:15, 4698:5, 4698:9, 4698:10, 4702:6, 4702:7, 4702:14, 4703:13, 4703:14, 4709:15, 4709:17, 4709:19, 4709:20,

4709:21, 4709:25, 4710:1, 4710:3, 4713:6, 4714:9, 4715:2, 4715:6, 4716:6, 4717:18, 4718:2, 4718:3, 4719:4, 4719:20, 4720:19, 4720:21, 4721:21, 4724:9, 4724:11, 4724:12, 4724:15, 4726:12, 4726:14, 4726:15, 4726:18, 4727:15, 4727:17, 4727:18, 4727:19, 4727:22, 4728:11, 4728:14, 4728:15, 4728:18, 4740:2, 4740:4, 4740:7, 4740:8, 4740:11, 4741:16, 4741:18, 4741:19, 4741:22, 4743:20, 4744:6, 4744:8, 4744:9, 4744:12, 4746:1, 4746:11, 4747:12, 4752:15, 4752:17, 4753:2, 4753:9, 4753:13, 4753:18, 4753:22, 4753:23, 4753:24, 4754:2, 4754:4, 4754:8, 4754:10, 4754:13, 4755:3, 4755:4, 4755:18, 4755:21, 4755:23, 4755:24, 4756:2, 4756:4, 4756:5, 4764:13, 4764:15, 4764:17, 4767:20, 4768:15, 4768:18, 4768:19, 4770:5, 4770:7, 4770:14, 4770:17, 4770:21, 4771:2, 4771:5, 4771:9, 4771:12, 4771:15, 4771:16, 4771:18, 4771:20, 4771:24, 4772:3, 4772:8, 4772:9, 4773:1, 4773:6, 4773:7, 4773:16, 4773:18, 4773:19, 4773:23, 4774:20, 4774:22, 4774:24, 4775:2, 4775:6, 4778:18, 4778:22, 4779:3, 4779:13, 4779:14, 4779:25, 4780:15, 4780:21, 4780:23, 4780:24, 4781:6, 4781:7,

4781:20, 4782:9, 4782:11, 4782:12, 4782:18, 4782:22, 4783:3, 4783:13, 4783:16, 4784:11, 4784:16, 4784:20, 4784:23, 4785:1, 4785:2, 4785:10, 4785:23, 4786:16, 4786:19, 4786:23, 4786:24, 4786:25, 4787:8, 4787:17, 4788:3, 4788:5
MS [2] - 4770:19, 4771:13
Murray [4] - 4691:22, 4728:24, 4730:13, 4733:15
myriad [1] - 4648:20
Myrick [14] - 4650:24, 4651:9, 4651:11, 4652:10, 4691:10, 4692:15, 4692:25, 4693:1, 4694:2, 4697:11, 4697:21, 4698:1, 4698:2, 4698:11

**N**

Na'alehu [2] - 4641:17, 4645:17
Naalehu [1] - 4707:2
Najam [14] - 4630:7, 4631:23, 4632:7, 4642:18, 4646:5, 4647:16, 4649:7, 4649:12, 4650:1, 4650:2, 4669:12, 4671:14, 4761:7, 4761:21
name [19] - 4653:10, 4657:7, 4657:10, 4703:22, 4724:23, 4725:3, 4725:4, 4725:8, 4726:22, 4726:25, 4737:25, 4738:11, 4741:25, 4750:4, 4759:8, 4760:25, 4762:2, 4762:3, 4773:13
named [2] - 4649:9, 4762:10
Nash [4] - 4742:13, 4742:16, 4742:23, 4743:24
national [1] - 4733:1
nauseam [1] - 4679:19
ne [1] - 4737:19
near [2] - 4670:21, 4781:7

necessarily [1] - 4650:9
necessary [4] - 4644:15, 4732:6, 4752:12, 4762:6
necessity [1] - 4681:10
need [9] - 4642:23, 4661:21, 4669:25, 4687:12, 4702:16, 4705:10, 4772:17, 4776:17, 4777:8
needed [11] - 4647:9, 4670:5, 4676:3, 4678:24, 4679:3, 4679:16, 4679:17, 4684:22, 4705:11, 4714:22, 4717:24
negative [1] - 4737:20
neighborhood [1] - 4703:17
Nervous [1] - 4743:11
net [5] - 4654:23, 4655:25, 4703:16, 4730:11, 4734:22
Nevada [2] - 4691:17, 4691:19
never [23] - 4661:20, 4661:22, 4666:14, 4667:10, 4671:22, 4689:10, 4691:13, 4696:4, 4708:21, 4709:1, 4711:18, 4718:25, 4719:1, 4719:20, 4719:21, 4719:25, 4722:23, 4723:1, 4742:7, 4742:10, 4750:17, 4751:5
nevertheless [2] - 4645:7, 4761:8
new [11] - 4642:3, 4649:1, 4649:8, 4660:18, 4669:10, 4669:20, 4669:25, 4673:17, 4679:17, 4758:24, 4763:4
NEW [1] - 4627:1
New [2] - 4627:14, 4627:22
next [16] - 4651:22, 4660:23, 4662:18, 4664:15, 4666:9, 4675:11, 4675:13, 4676:15, 4676:17, 4715:13, 4725:18, 4738:14, 4752:18, 4754:16, 4769:3, 4775:24
next-to-the-last [1] -

4738:14
**Nick** [1] - 4743:11
**nickname** [2] - 4741:24, 4743:11
**nicknames** [1] - 4743:9
**night** [3] - 4776:7, 4778:9, 4787:19
**nobody** [2] - 4655:22, 4655:23
**Nolan** [11] - 4708:2, 4708:3, 4708:7, 4708:16, 4708:21, 4709:9, 4709:11, 4728:24, 4732:11, 4732:19
**Nolan's** [1] - 4697:14
**non** [1] - 4761:17
**non-real** [1] - 4761:17
**none** [3] - 4642:14, 4736:9, 4765:18
**normal** [1] - 4672:24
**north** [1] - 4731:22
**Northern** [5] - 4636:9, 4636:20, 4687:2, 4733:7, 4735:20
**northern** [1] - 4683:18
**note** [1] - 4639:10
**noted** [1] - 4714:1
**nothing** [12] - 4641:23, 4672:4, 4672:13, 4672:20, 4689:17, 4690:5, 4690:6, 4690:7, 4694:1, 4699:6, 4750:24, 4779:9
**notice** [1] - 4687:1
**notified** [3] - 4645:5, 4653:12, 4653:13
**notify** [5] - 4642:7, 4652:21, 4653:17, 4686:6, 4784:11
**November** [2] - 4662:8, 4666:6
**number** [19] - 4634:20, 4653:3, 4654:13, 4659:12, 4663:23, 4663:24, 4664:1, 4664:2, 4664:11, 4682:9, 4708:14, 4725:11, 4725:12, 4728:4, 4730:22, 4732:9, 4750:5, 4761:22, 4785:17
**numbers** [2] - 4663:12, 4735:1
**numerous** [1] - 4749:14
**NY** [1] - 4627:4

# O

**o'clock** [3] - 4713:9, 4715:11, 4784:5
**Oahu** [3] - 4676:24, 4765:19, 4766:1
**oath** [3] - 4629:1, 4725:23, 4775:17
**object** [11] - 4639:12, 4643:5, 4643:8, 4646:21, 4663:7, 4680:13, 4694:10, 4716:13, 4718:20, 4753:17, 4755:13
**objected** [2] - 4717:20, 4785:7
**objecting** [2] - 4716:14, 4720:17
**objection** [50] - 4630:15, 4630:16, 4633:9, 4633:14, 4638:13, 4663:21, 4665:10, 4665:11, 4670:4, 4670:23, 4671:7, 4672:17, 4717:21, 4720:3, 4720:14, 4720:18, 4724:11, 4724:12, 4726:14, 4726:15, 4727:18, 4727:19, 4728:13, 4728:14, 4728:15, 4740:7, 4740:8, 4741:18, 4741:19, 4744:8, 4744:9, 4753:12, 4753:15, 4753:19, 4753:23, 4754:14, 4764:13, 4764:14, 4768:18, 4768:21, 4771:24, 4772:7, 4773:18, 4773:19, 4774:22, 4774:23, 4775:2, 4785:16, 4786:22, 4786:23
**objectionable** [2] - 4719:17, 4720:4
**objections** [4] - 4719:5, 4719:8, 4785:6, 4785:11
**obligation** [2] - 4648:8, 4719:5
**obtain** [1] - 4729:6
**obtained** [1] - 4729:10
**obtaining** [1] - 4644:16
**obviously** [4] - 4717:22, 4719:6, 4776:15, 4786:9
**occasion** [2] - 4676:9, 4697:5

**occasionally** [1] - 4687:6
**occur** [2] - 4748:4, 4761:9
**occurred** [10] - 4632:6, 4650:16, 4675:4, 4703:10, 4707:10, 4714:16, 4714:19, 4753:5, 4773:8, 4781:9
**occurring** [1] - 4706:3
**October** [3] - 4652:23, 4706:8, 4762:16
**OF** [3] - 4627:1, 4627:3, 4627:9
**offer** [3] - 4772:2, 4772:5, 4787:14
**offered** [9] - 4659:22, 4737:10, 4762:24, 4785:21, 4785:22, 4786:10, 4786:14, 4786:15, 4786:22
**offering** [3] - 4785:23, 4785:24, 4786:2
**offers** [3] - 4630:13, 4662:14, 4773:16
**office** [5] - 4675:9, 4677:6, 4718:9, 4780:15, 4782:25
**officer** [1] - 4750:21
**Olan** [1] - 4709:7
**old** [3] - 4723:13, 4723:14, 4723:15
**OLIVERAS** [1] - 4627:18
**once** [4] - 4681:13, 4682:8, 4697:7, 4755:13
**one** [89] - 4635:3, 4635:11, 4638:10, 4641:12, 4642:5, 4642:23, 4646:17, 4647:15, 4650:13, 4652:13, 4652:16, 4652:19, 4655:14, 4655:15, 4659:6, 4659:9, 4660:19, 4661:8, 4665:5, 4669:18, 4670:17, 4671:2, 4674:11, 4674:12, 4674:13, 4674:19, 4675:1, 4675:4, 4675:11, 4676:8, 4676:21, 4677:5, 4677:7, 4677:15, 4677:21, 4678:9, 4679:13, 4684:10, 4684:23, 4686:13, 4688:1, 4692:1, 4692:10,

4692:25, 4697:2, 4697:5, 4699:9, 4699:14, 4701:10, 4710:6, 4720:25, 4722:25, 4727:5, 4727:10, 4731:5, 4733:25, 4739:24, 4742:7, 4742:14, 4742:15, 4742:16, 4742:18, 4743:2, 4743:3, 4745:6, 4749:21, 4750:5, 4750:6, 4754:11, 4754:12, 4760:24, 4760:25, 4761:1, 4761:16, 4762:13, 4764:6, 4764:9, 4778:23, 4779:4, 4779:5, 4779:8, 4781:9, 4781:10, 4781:17, 4781:19, 4781:25, 4782:9
**One** [1] - 4627:13
**one-page** [1] - 4722:25
**ones** [4] - 4679:24, 4735:21, 4753:14, 4785:7
**ongoing** [1] - 4679:18
**open** [7] - 4665:1, 4669:13, 4717:15, 4733:9, 4736:19, 4755:1, 4780:13
**open-ended** [1] - 4717:15
**opened** [1] - 4786:2
**operating** [16] - 4629:24, 4651:13, 4657:18, 4660:18, 4669:21, 4669:25, 4671:13, 4671:21, 4671:23, 4672:24, 4673:6, 4673:14, 4749:20, 4750:17, 4750:18, 4751:6
**operation** [1] - 4672:1
**opinion** [1] - 4719:21
**opinions** [1] - 4717:8
**opportunities** [5] - 4657:23, 4660:12, 4661:9, 4661:12, 4783:8
**opportunity** [6] - 4642:10, 4711:6, 4739:20, 4748:11, 4767:8, 4786:20
**options** [1] - 4782:6
**order** [9] - 4656:20, 4668:13, 4705:17, 4714:21, 4720:23,

4720:25, 4721:2, 4758:5, 4783:22
**Order** [1] - 4628:1
**ordered** [2] - 4639:8, 4639:22
**organized** [1] - 4669:5
**original** [12] - 4632:2, 4632:9, 4657:17, 4661:23, 4675:5, 4675:6, 4688:16, 4705:5, 4720:2, 4749:20, 4778:16, 4778:18
**originally** [9] - 4631:19, 4661:3, 4661:13, 4661:24, 4689:22, 4698:23, 4735:13, 4767:5, 4768:5
**originating** [1] - 4678:10
**OS** [1] - 4725:22
**otherwise** [3] - 4673:7, 4673:9, 4787:5
**out-of-court** [1] - 4693:9
**out-of-town** [1] - 4784:25
**outside** [6] - 4657:14, 4657:23, 4659:2, 4660:10, 4669:9, 4672:15
**outstanding** [8] - 4671:10, 4671:18, 4705:16, 4706:19, 4709:4, 4709:6, 4733:18, 4733:21
**overhead** [1] - 4771:14
**overruled** [2] - 4672:18, 4680:14
**owe** [1] - 4707:20
**owed** [5] - 4707:4, 4710:9, 4710:10, 4710:21, 4710:22
**Owen** [1] - 4709:9
**owes** [3] - 4641:18, 4707:11, 4710:18
**own** [11] - 4629:12, 4629:16, 4648:22, 4671:11, 4689:7, 4711:25, 4713:1, 4735:25, 4736:2, 4761:12, 4762:19, 4786:10
**owned** [11] - 4647:24, 4688:6, 4688:9, 4730:8, 4749:13, 4750:10, 4750:11,

4750:15, 4750:25, 4751:2, 4758:18
**owner** [3] - 4650:3, 4758:7, 4758:11
**ownership** [15] - 4648:2, 4648:20, 4650:13, 4672:1, 4684:19, 4688:11, 4749:16, 4749:19, 4750:19, 4758:17, 4758:19, 4761:4, 4761:18, 4762:25, 4763:2
**owns** [1] - 4711:15

# P

**package** [1] - 4762:16
**page** [36] - 4629:10, 4630:20, 4631:5, 4632:19, 4632:20, 4632:22, 4633:18, 4651:12, 4651:17, 4658:7, 4659:24, 4662:18, 4664:15, 4669:3, 4674:25, 4685:2, 4695:11, 4705:10, 4709:12, 4709:25, 4715:13, 4722:20, 4722:25, 4725:15, 4738:14, 4745:8, 4752:18, 4754:16, 4765:5, 4769:3, 4780:1, 4781:7, 4781:10
**pages** [4] - 4652:2, 4668:10, 4787:14, 4787:15
**pages'** [1] - 4670:17
**paid** [6] - 4647:7, 4679:17, 4692:24, 4693:9, 4705:12, 4731:8
**PAK33@mac.com** [1] - 4726:6
**Palms** [1] - 4738:2
**palms** [1] - 4759:13
**panel** [2] - 4784:3, 4784:7
**Paolos** [1] - 4721:23
**paper** [1] - 4770:18
**Paradise** [7] - 4702:22, 4705:8, 4705:11, 4705:22, 4706:2, 4706:11, 4706:13
**paragraph** [1] - 4644:17, 4760:5, 4760:16
**paragraphs** [1] -

4663:17
**parcel** [6] - 4669:20, 4676:10, 4684:12, 4689:8, 4689:19, 4760:9
**parcels** [8] - 4644:23, 4644:24, 4645:1, 4669:5, 4675:23, 4688:6, 4688:8, 4689:8
**parent** [1] - 4634:4
**parentheses** [2] - 4669:7, 4689:6
**part** [20] - 4630:15, 4636:11, 4665:5, 4669:20, 4681:24, 4683:1, 4684:12, 4689:12, 4690:1, 4693:14, 4698:21, 4699:1, 4706:16, 4711:2, 4725:7, 4726:10, 4730:9, 4755:7, 4757:12, 4760:9
**participated** [1] - 4652:17
**particular** [6] - 4678:23, 4696:21, 4718:16, 4731:6, 4740:14, 4781:2
**particularly** [1] - 4663:18
**parties** [2] - 4674:23, 4787:1
**partly** [1] - 4636:12
**partner** [4] - 4645:16, 4655:18, 4727:3, 4749:14
**partners** [7] - 4646:2, 4649:24, 4653:5, 4653:7, 4684:7, 4700:4, 4731:22
**partnership** [1] - 4646:6
**parts** [1] - 4721:8
**party** [2] - 4692:20, 4692:21
**past** [1] - 4782:23
**patience** [2] - 4721:5, 4721:6
**patient** [1] - 4783:17
**pause** [11] - 4651:15, 4652:1, 4658:5, 4694:14, 4698:8, 4709:18, 4710:7, 4743:19, 4775:1, 4781:2, 4781:12
**pauses** [1] - 4780:9, 4780:11, 4780:17, 4780:22, 4781:4,

4781:9, 4781:18, 4782:1, 4782:10
**pay** [20] - 4636:3, 4636:7, 4640:22, 4641:2, 4641:9, 4641:11, 4643:2, 4643:25, 4647:1, 4647:25, 4702:10, 4705:22, 4708:16, 4711:8, 4712:10, 4721:24, 4730:18, 4732:6, 4734:22, 4735:15
**paying** [21] - 4631:24, 4640:13, 4642:21, 4644:2, 4649:24, 4649:25, 4701:16, 4701:24, 4702:8, 4730:16, 4730:20, 4732:15, 4732:16, 4732:18, 4732:20, 4733:13, 4733:18, 4733:20, 4734:2, 4734:6, 4734:15
**payment** [2] - 4688:17, 4704:6
**payments** [3] - 4657:3, 4732:20, 4733:20
**payout** [1] - 4640:22
**Peca** [7] - 4732:11, 4732:19, 4744:16, 4746:13, 4747:24, 4748:7, 4749:6
**Peca's** [1] - 4746:5
**Peca-Nolan-Berard** [1] - 4732:19
**Pecas** [1] - 4748:9
**PEII** [3] - 4746:24, 4747:6, 4747:7
**penny** [2] - 4704:23, 4704:24
**people** [23] - 4642:8, 4653:11, 4660:16, 4665:20, 4665:22, 4671:4, 4701:10, 4713:4, 4716:9, 4716:18, 4716:20, 4720:1, 4723:19, 4733:15, 4733:17, 4735:17, 4735:18, 4741:10, 4743:9, 4749:15, 4774:6, 4774:11, 4779:6
**per** [2] - 4679:15, 4758:7
**percent** [65] - 4629:12, 4629:16, 4631:15, 4635:3, 4640:20, 4641:17, 4645:8,

4645:10, 4645:24, 4646:17, 4646:25, 4647:20, 4648:7, 4649:19, 4650:3, 4650:7, 4650:8, 4656:25, 4668:9, 4668:14, 4701:14, 4704:6, 4711:15, 4712:16, 4713:1, 4729:13, 4729:14, 4729:16, 4729:18, 4729:19, 4730:8, 4730:23, 4732:18, 4732:23, 4733:8, 4733:11, 4733:13, 4733:18, 4734:2, 4734:3, 4734:5, 4734:7, 4734:13, 4734:14, 4734:19, 4734:21, 4734:22, 4734:23, 4735:25, 4736:1, 4736:7, 4756:21, 4757:7, 4757:21, 4758:2, 4758:7, 4758:11, 4758:17, 4758:19, 4758:25, 4759:2, 4761:10, 4761:13, 4761:18, 4762:20
**percentage** [3] - 4650:13, 4729:11, 4757:24
**perhaps** [1] - 4645:22
**period** [11] - 4635:21, 4654:24, 4655:9, 4656:11, 4670:19, 4702:17, 4731:23, 4732:22, 4736:18, 4737:2, 4739:3
**periodically** [1] - 4676:7
**periods** [1] - 4675:25
**permission** [2] - 4684:1, 4773:1
**permits** [1] - 4659:1
**permitted** [6] - 4633:12, 4657:22, 4659:5, 4660:15, 4670:8, 4775:15
**person** [4] - 4642:9, 4699:24, 4712:24, 4726:23
**personal** [5] - 4648:22, 4702:15, 4761:23, 4762:1, 4786:10
**personally** [3] - 4703:11, 4735:11, 4751:9
**perspective** [2] -

4695:13, 4753:5
**Petrellese** [1] - 4654:12
**Phil** [8] - 4642:21, 4692:3, 4723:25, 4724:1, 4725:8, 4728:3, 4756:11, 4762:2
**Phil@ standardsadvisor. com** [1] - 4727:10
**PHILIP** [1] - 4627:5
**PHILLIP** [5] - 4627:5, 4628:15, 4721:13, 4788:2, 4788:4
**Phoenix** [1] - 4765:8
**phone** [10] - 4724:3, 4724:6, 4725:11, 4725:12, 4728:4, 4737:12, 4741:3, 4741:13, 4742:1, 4776:24
**photograph** [4] - 4723:23, 4724:19, 4727:25, 4728:3
**phrase** [1] - 4732:17
**phrased** [1] - 4716:15
**phraseology** [1] - 4717:6
**picked** [1] - 4675:9
**picking** [1] - 4726:24
**picks** [1] - 4718:12
**picture** [1] - 4746:22
**piece** [4] - 4646:18, 4647:23, 4699:5, 4733:25
**Pierrepont** [1] - 4627:13
**PK** [2] - 4738:3, 4762:8
**PKHOME** [2] - 4668:11, 4668:17
**place** [3] - 4657:8, 4668:1, 4704:5
**plan** [2] - 4632:9, 4784:14
**planned** [1] - 4775:10
**planning** [1] - 4675:22
**plans** [1] - 4678:22
**play** [3] - 4715:4, 4768:25, 4773:3
**playboy** [1] - 4747:7
**Playboy** [3] - 4747:20, 4748:6, 4748:18
**played** [2] - 4773:4, 4779:1
**player** [7] - 4636:8, 4645:6, 4667:14, 4671:2, 4702:1, 4734:18, 4739:25

**players** [15] - 4640:6, 4640:12, 4640:14, 4645:8, 4657:1, 4728:24, 4729:6, 4729:7, 4730:13, 4730:16, 4731:11, 4734:15, 4736:6, 4736:22, 4757:16
**players'** [2] - 4729:22, 4735:1
**playing** [3] - 4770:16, 4771:14, 4779:10
**Plaza** [2] - 4627:13, 4627:21
**Pledge** [1] - 4633:19
**pledging** [1] - 4634:8
**pledgor** [1] - 4635:2
**pledgors** [1] - 4634:8
**plenty** [1] - 4667:20
**plus** [2] - 4729:16, 4730:11
**pm** [1] - 4716:2
**point** [30] - 4628:24, 4633:1, 4633:7, 4644:2, 4644:20, 4649:5, 4649:12, 4657:12, 4663:11, 4669:15, 4670:21, 4675:12, 4691:6, 4701:2, 4706:21, 4707:11, 4716:13, 4732:24, 4733:11, 4734:23, 4739:6, 4750:7, 4753:6, 4758:17, 4759:22, 4766:12, 4768:11, 4768:12, 4781:13
**pointed** [1] - 4780:1
**pointing** [1] - 4644:17
**points** [2] - 4669:18, 4787:11
**pool** [1] - 4765:15
**portfolios** [1] - 4735:19
**portion** [16] - 4648:2, 4665:8, 4679:4, 4683:8, 4686:12, 4686:23, 4698:2, 4704:3, 4708:23, 4714:13, 4757:11, 4757:20, 4766:25, 4767:2, 4767:21, 4768:1
**portions** [6] - 4663:12, 4781:23, 4781:24, 4782:4, 4787:4, 4787:8
**posed** [1] - 4675:1
**position** [3] - 4640:20, 4716:20, 4779:19

**possess** [2] - 4671:3, 4723:6
**possessed** [1] - 4722:23
**possible** [3] - 4729:15, 4777:19, 4777:20
**possibly** [3] - 4714:14, 4776:20, 4776:22
**post** [1] - 4707:3
**Postal** [1] - 4725:22
**pot** [1] - 4684:11
**potential** [1] - 4646:10
**power** [1] - 4771:6
**prejudice** [1] - 4692:11
**preliminary** [1] - 4665:12
**prepaid** [2] - 4758:5, 4758:23
**preparation** [1] - 4751:21
**prepare** [2] - 4759:22, 4777:13
**prepared** [7] - 4750:6, 4750:18, 4761:7, 4761:21, 4763:2, 4763:11, 4770:8
**preparing** [2] - 4668:10, 4668:15
**presence** [2] - 4628:12, 4721:10
**present** [2] - 4695:14, 4696:6
**presenting** [1] - 4661:8
**presumably** [3] - 4646:10, 4653:23, 4718:10
**pretrial** [2] - 4638:5, 4668:7
**pretty** [1] - 4736:21
**preventative** [1] - 4632:1
**previously** [12] - 4628:16, 4636:4, 4649:9, 4672:22, 4703:5, 4721:14, 4742:18, 4746:15, 4749:11, 4757:13, 4760:17, 4779:1
**prime** [2] - 4729:16, 4729:17
**printed** [1] - 4728:10
**printer** [1] - 4728:10
**private** [3] - 4660:12, 4749:9, 4749:12
**privilege** [2] - 4714:1, 4714:18
**privileged** [2] -

4713:25, 4714:15
**Privitello's** [1] - 4750:19
**problem** [3] - 4778:15, 4784:18, 4785:24
**problems** [3] - 4780:8, 4783:17, 4783:24
**procedure** [1] - 4718:17
**Proceedings** [1] - 4627:25
**proceedings** [9] - 4651:15, 4652:1, 4658:5, 4694:14, 4698:8, 4709:18, 4710:7, 4743:19, 4775:1
**proceeds** [4] - 4681:24, 4682:11, 4703:15, 4729:23
**process** [2] - 4678:20, 4761:21
**processes** [1] - 4750:23
**produced** [2] - 4627:25, 4751:2
**product** [1] - 4785:13
**production** [1] - 4638:3
**proffer** [1] - 4718:9
**profit** [3] - 4703:16, 4704:15, 4704:17
**profits** [1] - 4705:6
**project** [18] - 4634:14, 4635:23, 4636:18, 4637:13, 4659:13, 4659:17, 4660:7, 4669:14, 4675:25, 4677:7, 4684:21, 4704:24, 4705:3, 4705:13, 4705:23, 4707:7, 4735:23
**projects** [8] - 4635:25, 4637:6, 4659:5, 4659:8, 4659:17, 4659:24, 4661:14, 4704:25
**promise** [1] - 4632:5
**pronounce** [1] - 4688:24
**proper** [2] - 4661:11, 4671:12
**Properties** [5] - 4633:24, 4633:25, 4634:3, 4634:7, 4635:6
**properties** [6] - 4634:12, 4634:23, 4672:2, 4672:16, 4679:1, 4765:18

**property** [17] - 4635:16, 4669:8, 4671:11, 4672:1, 4677:4, 4699:5, 4700:22, 4702:21, 4703:6, 4703:25, 4704:12, 4704:14, 4705:9, 4705:12, 4733:25, 4742:1, 4742:2
**proportionate** [1] - 4705:6
**Propiedad** [2] - 4729:25, 4730:7
**protocol** [2] - 4686:8, 4687:20
**protocols** [1] - 4681:8
**provide** [7] - 4639:9, 4639:17, 4644:9, 4644:21, 4656:25, 4726:22, 4738:4
**provided** [9] - 4645:6, 4647:18, 4657:19, 4668:12, 4696:11, 4785:13, 4785:14, 4786:9
**provision** [2] - 4660:24, 4681:7
**provisions** [1] - 4693:14
**public** [1] - 4714:4
**publication** [2] - 4768:16, 4772:6
**publishing** [4] - 4746:24, 4747:8, 4748:6, 4756:2
**Puna** [1] - 4644:25
**purchase** [4] - 4686:9, 4703:24, 4759:12, 4759:24
**purchased** [4] - 4677:6, 4683:3, 4706:6, 4729:21
**purchasing** [2] - 4678:18, 4760:8
**purports** [2] - 4756:9, 4761:9
**purpose** [10] - 4648:9, 4660:23, 4661:6, 4661:7, 4661:17, 4669:3, 4669:4, 4729:1, 4760:8
**purposes** [6] - 4666:24, 4679:13, 4683:4, 4709:21, 4753:2, 4755:24
**pursuant** [8] - 4654:9, 4677:23, 4699:17, 4699:14, 4706:24, 4707:6, 4733:21,

4785:24
**pursue** [1] - 4707:16
**pursuing** [1] - 4768:20
**pursuit** [1] - 4679:18
**put** [18] - 4635:10, 4637:12, 4671:23, 4687:7, 4688:17, 4688:19, 4703:23, 4704:10, 4704:11, 4706:25, 4721:1, 4740:23, 4747:2, 4755:10, 4755:12, 4755:13, 4770:23, 4771:3
**puts** [1] - 4718:13
**putting** [1] - 4759:7

### Q

**qualification** [1] - 4663:2
**qualifies** [1] - 4785:15
**quality** [1] - 4772:14
**quarrel** [2] - 4719:20, 4719:21
**quarter** [2] - 4654:24, 4656:16
**questioning** [1] - 4719:24
**questions** [27] - 4629:9, 4629:18, 4651:14, 4652:13, 4652:14, 4653:25, 4665:12, 4675:1, 4697:12, 4697:16, 4697:19, 4697:25, 4717:13, 4717:25, 4718:1, 4719:24, 4720:6, 4720:12, 4722:1, 4722:3, 4722:6, 4722:10, 4736:17, 4739:17, 4740:14, 4740:21, 4775:6
**quick** [2] - 4774:25, 4782:9
**quickly** [2] - 4656:23, 4726:2
**quite** [1] - 4716:8
**quote** [4] - 4674:25, 4777:1, 4777:7, 4778:25
**quote-unquote** [3] - 4777:1, 4777:7, 4778:25

### R

**raise** [2] - 4719:5, 4772:22
**raised** [3] - 4714:3,

4716:12, 4716:25
**Ranch** [1] - 4689:1
**Ranford** [9] - 4694:17, 4694:18, 4694:22, 4695:4, 4695:6, 4695:8, 4695:19, 4696:13, 4696:16
**Ranford's** [1] - 4695:25
**range** [1] - 4652:17
**rate** [5] - 4729:12, 4729:13, 4729:17, 4733:2, 4733:5
**rates** [1] - 4732:21
**rather** [1] - 4778:23
**reach** [1] - 4668:21
**read** [24] - 4643:18, 4643:19, 4643:20, 4644:19, 4660:5, 4664:11, 4665:8, 4665:13, 4666:6, 4667:7, 4672:11, 4672:21, 4673:10, 4698:16, 4709:14, 4709:23, 4710:4, 4710:8, 4724:20, 4725:7, 4726:21, 4737:20, 4742:21, 4776:6
**reading** [1] - 4659:21
**ready** [1] - 4628:6
**real** [10] - 4647:23, 4659:16, 4660:7, 4661:9, 4669:5, 4689:8, 4697:18, 4761:17, 4786:21
**realize** [1] - 4754:8
**really** [3] - 4779:4, 4779:7, 4785:10
**reason** [13] - 4631:11, 4636:2, 4666:23, 4679:16, 4697:18, 4697:22, 4713:24, 4731:6, 4746:3, 4746:14, 4749:2, 4757:11, 4772:21
**reborrowed** [2] - 4734:13, 4736:6
**rebuttal** [1] - 4718:12
**recalled** [2] - 4671:1, 4718:18
**recap** [1] - 4657:5
**receipt** [1] - 4756:16
**receipts** [1] - 4764:25
**receive** [1] - 4640:21
**received** [22] - 4638:3, 4654:23, 4655:12, 4665:7, 4679:7, 4704:24, 4718:9, 4726:8, 4743:22,

4755:16, 4764:19, 4768:23, 4772:25, 4773:21, 4775:4, 4788:12, 4788:13, 4788:14, 4788:15, 4788:16, 4788:17, 4788:17
**receiving** [3] - 4679:8, 4726:10, 4744:1
**recess** [4] - 4673:22, 4715:12, 4716:7, 4770:1
**recognize** [14] - 4629:21, 4629:23, 4632:12, 4632:14, 4662:3, 4697:2, 4719:19, 4724:3, 4728:8, 4741:1, 4763:18, 4763:22, 4763:25, 4773:11
**recognized** [3] - 4689:22, 4690:11, 4696:24
**recollection** [7] - 4652:9, 4657:25, 4667:3, 4667:9, 4698:4, 4698:12, 4752:7
**recommendation** [2] - 4635:15, 4679:14
**recommended** [1] - 4679:22
**reconsolidation** [2] - 4675:24, 4678:22
**reconvene** [2] - 4713:9, 4776:5
**record** [11] - 4643:20, 4659:25, 4709:22, 4737:20, 4738:22, 4746:19, 4747:22, 4753:2, 4755:24, 4779:19, 4785:16
**recorded** [5] - 4627:25, 4766:19, 4767:3, 4767:17, 4786:3
**recording** [27] - 4766:23, 4766:24, 4767:4, 4767:10, 4767:15, 4767:16, 4768:4, 4768:6, 4768:12, 4772:6, 4772:12, 4772:15, 4772:21, 4773:3, 4774:2, 4774:6, 4774:10, 4774:16, 4778:14, 4778:16, 4778:18, 4779:5, 4779:8, 4779:9, 4779:14, 4782:3

**records** [17] - 4637:21, 4637:24, 4638:4, 4648:15, 4655:2, 4671:5, 4680:8, 4680:9, 4687:2, 4693:2, 4704:25, 4708:1, 4710:12, 4710:19, 4735:3, 4750:15
**red** [1] - 4725:7
**redact** [3] - 4663:19, 4663:25, 4664:11
**redacted** [2] - 4665:4, 4665:5
**redirect** [5] - 4644:5, 4667:5, 4670:13, 4783:2, 4783:4
**redo** [2] - 4748:24, 4748:25
**reduced** [2] - 4735:20, 4758:9
**refer** [4] - 4634:16, 4698:1, 4742:8, 4742:9
**reference** [5] - 4654:1, 4663:16, 4672:14, 4711:19, 4781:2
**referenced** [3] - 4673:5, 4673:7, 4691:2
**references** [4] - 4663:19, 4664:5, 4664:6, 4668:11
**referencing** [1] - 4643:1
**referred** [4] - 4641:6, 4680:22, 4689:21, 4702:21
**referring** [8] - 4631:4, 4659:9, 4691:9, 4697:9, 4712:22, 4716:21, 4741:11, 4780:13
**refiling** [1] - 4763:5
**reflect** [4] - 4650:15, 4667:8, 4710:19, 4765:2
**reflected** [1] - 4752:7
**reflecting** [1] - 4751:6
**reflection** [1] - 4767:15
**reflects** [3] - 4749:19, 4749:21, 4786:12
**reflexion** [1] - 4650:16
**refresh** [5] - 4652:9, 4667:3, 4667:9, 4698:4, 4698:12
**refused** [1] - 4639:17
**regard** [2] - 4644:22, 4787:11

**regarding** [9] - 4678:9, 4697:20, 4717:4, 4722:4, 4722:20, 4726:21, 4740:14, 4740:20, 4778:25
**regular** [2] - 4675:18, 4736:25
**rehash** [1] - 4783:11
**relate** [1] - 4638:18
**related** [4] - 4640:7, 4641:13, 4642:18, 4642:20
**relates** [3] - 4717:1, 4718:15, 4785:9
**relationship** [2] - 4644:23, 4739:5
**relationships** [1] - 4758:15
**relative** [1] - 4732:9
**relatives** [1] - 4703:23
**released** [1] - 4751:14
**relevant** [1] - 4665:5
**rely** [2] - 4660:13, 4660:14
**relying** [1] - 4631:9
**remaining** [1] - 4768:1
**remember** [29] - 4651:4, 4651:6, 4653:18, 4656:19, 4674:5, 4674:7, 4695:16, 4696:20, 4696:22, 4697:7, 4697:16, 4697:23, 4709:5, 4722:1, 4722:6, 4722:10, 4722:13, 4723:3, 4729:11, 4736:22, 4744:22, 4750:4, 4759:5, 4759:11, 4780:1, 4780:17, 4781:1, 4781:2, 4785:17
**remembers** [1] - 4633:12
**remind** [1] - 4628:25
**reminded** [1] - 4713:17
**remortgaged** [1] - 4734:1
**remotely** [1] - 4719:25
**remove** [1] - 4663:21
**reneged** [1] - 4632:2
**renovated** [1] - 4705:9
**renovation** [1] - 4705:23
**renovations** [1] - 4704:4
**rental** [4] - 4677:5, 4677:9, 4738:6

**rentals** [1] - 4765:14
**rented** [1] - 4677:11
**repaid** [5] - 4647:21, 4648:18, 4702:12, 4707:10, 4749:5
**repay** [12] - 4632:5, 4640:5, 4640:25, 4645:5, 4648:13, 4649:3, 4649:4, 4649:18, 4650:11, 4710:23, 4712:11
**repaying** [3] - 4640:11, 4642:12, 4757:12
**repayment** [3] - 4710:24, 4711:10, 4749:2
**repeat** [3] - 4649:22, 4678:16, 4699:12
**repeatedly** [1] - 4639:19
**rephrase** [1] - 4701:23
**Replacement** [2] - 4776:10, 4778:10
**replay** [2] - 4782:5, 4782:11
**replica** [1] - 4723:2
**reply** [1] - 4741:14
**report** [3] - 4680:22, 4680:25, 4681:10
**reporter** [2] - 4638:15, 4713:17
**Reporter** [1] - 4627:20
**reports** [1] - 4750:1
**represent** [3] - 4638:6, 4725:2, 4741:14
**representation** [1] - 4657:4
**representatives** [1] - 4697:3
**represented** [7] - 4647:22, 4661:24, 4691:24, 4722:24, 4728:23, 4736:14, 4736:15
**representing** [2] - 4681:24, 4717:9
**represents** [2] - 4682:9, 4689:25
**request** [8] - 4645:11, 4645:22, 4676:9, 4686:22, 4739:15, 4741:6, 4758:8, 4770:23
**requested** [3] - 4698:24, 4725:20, 4726:22
**required** [1] - 4687:4
**requirements** [1] - 4671:16

**resale** [1] - 4703:10
**resort** [3] - 4630:2, 4634:14, 4634:16
**respect** [11] - 4636:1, 4636:15, 4640:8, 4641:21, 4694:4, 4705:13, 4714:5, 4714:22, 4752:11, 4758:3, 4758:22
**respond** [2] - 4738:2, 4739:12
**responding** [3] - 4665:25, 4666:2, 4666:3
**response** [3] - 4700:13, 4742:22, 4743:5
**responses** [2] - 4743:2, 4743:3
**responsive** [1] - 4739:17
**rest** [6] - 4632:23, 4634:9, 4637:9, 4638:18, 4642:23, 4667:3
**restate** [4] - 4643:15, 4643:17, 4643:21, 4722:8
**result** [6] - 4632:6, 4649:17, 4649:23, 4650:6, 4738:4, 4738:7
**resulted** [1] - 4641:3
**retained** [1] - 4674:16
**retrieved** [1] - 4668:18
**return** [4] - 4681:14, 4699:9, 4734:19, 4748:17
**returned** [2] - 4682:2, 4755:25
**reveal** [1] - 4739:7
**review** [2] - 4638:5, 4687:14
**reviewed** [3] - 4632:13, 4658:6, 4770:10
**reviewing** [3] - 4668:10, 4670:16, 4687:2
**RICHARD** [1] - 4627:16
**Richards** [1] - 4692:10
**Rick** [1] - 4762:11
**right-hand** [1] - 4732:8
**rising** [1] - 4733:11
**robber** [1] - 4778:25
**robbery** [1] - 4781:3
**ROBERT** [1] - 4627:18
**Rojo** [2] - 4724:22,

4727:4
**role** [2] - 4657:2, 4704:5
**roll** [3] - 4689:13, 4690:2, 4690:11
**rolled** [1] - 4672:7
**rolodex** [1] - 4758:15
**Ron** [1] - 4692:10
**room** [1] - 4674:24
**Ross** [8] - 4759:9, 4759:12, 4759:14, 4759:15, 4759:17, 4759:23, 4760:21, 4761:12
**roughly** [1] - 4704:6
**Rozenboom** [1] - 4762:12
**Rubin** [1] - 4721:23
**Rucchin** [2] - 4728:24, 4730:13
**rule** [1] - 4649:1
**Russian** [1] - 4727:24

## S

**sa** [1] - 4703:8
**Sag** [6] - 4700:17, 4700:22, 4706:2, 4706:6, 4706:16, 4742:2
**sale** [2] - 4681:24, 4682:11
**San** [14] - 4629:9, 4629:13, 4629:16, 4630:1, 4634:4, 4634:15, 4634:17, 4634:22, 4635:10, 4642:19, 4646:3, 4648:12, 4650:8, 4650:14, 4711:16, 4712:16, 4736:1
**Sarah** [3] - 4737:22, 4737:24, 4738:9
**Sarah's** [2] - 4737:21, 4738:25
**SARITA** [1] - 4627:15
**satisfactory** [1] - 4751:1
**satisfy** [1] - 4671:15
**save** [2] - 4634:2, 4718:1
**savings** [1] - 4684:16
**saw** [11] - 4633:7, 4638:25, 4656:11, 4689:25, 4700:10, 4704:23, 4730:13, 4730:14, 4742:10, 4747:21, 4774:24
**say-so** [1] - 4669:24
**SB2** [1] - 4742:3

**SBA** [1] - 4761:25
**scale** [1] - 4678:25
**scaled** [1] - 4679:2
**scaled-down** [1] - 4679:2
**schedule** [2] - 4669:7, 4777:22
**Schedule** [1] - 4650:7
**scheduling** [1] - 4775:24, 4783:24
**Scottsdale** [3] - 4702:21, 4766:10, 4766:13
**screen** [11] - 4737:12, 4739:4, 4739:21, 4741:3, 4741:5, 4741:13, 4746:21, 4755:14, 4770:15, 4774:14
**seal** [2] - 4713:20, 4714:24
**sealed** [4] - 4713:21, 4713:23, 4713:24, 4714:14
**sealing** [2] - 4713:18, 4714:7
**seat** [1] - 4776:9
**seated** [7] - 4673:23, 4674:1, 4713:12, 4721:17, 4770:2, 4771:23, 4778:11
**second** [17] - 4638:7, 4638:22, 4638:24, 4644:19, 4647:18, 4659:7, 4659:24, 4666:20, 4677:18, 4679:16, 4681:15, 4681:17, 4713:7, 4727:17, 4776:23, 4781:12
**seconds** [1] - 4767:7
**section** [5] - 4659:6, 4659:8, 4660:19, 4661:18, 4673:17
**sections** [2] - 4778:13, 4787:12
**secure** [3] - 4632:4, 4704:4, 4759:23
**secured** [3] - 4704:11, 4735:19, 4758:6
**securing** [1] - 4759:11
**Securities** [1] - 4633:19
**securitize** [1] - 4649:13
**securitized** [1] - 4649:20
**securitizing** [1] - 4758:22
**security** [4] - 4635:1,

4648:1, 4648:4, 4649:11
**see** [33] - 4628:21, 4632:12, 4632:20, 4653:14, 4655:10, 4657:10, 4657:25, 4664:10, 4667:2, 4698:3, 4708:21, 4727:17, 4728:25, 4738:13, 4738:19, 4739:4, 4746:20, 4746:22, 4746:23, 4747:1, 4761:2, 4761:3, 4761:14, 4761:20, 4762:17, 4765:7, 4765:13, 4772:17, 4773:24, 4773:25, 4774:1, 4781:18, 4782:25
**seeing** [2] - 4674:5, 4745:3
**seem** [2] - 4678:13, 4732:13
**select** [1] - 4785:6
**sell** [1] - 4760:10
**selling** [2] - 4647:23, 4757:16
**senator** [2] - 4676:6, 4676:8
**send** [7] - 4684:5, 4689:25, 4749:6, 4749:7, 4774:10, 4774:16, 4787:3
**sending** [6] - 4637:25, 4662:8, 4662:11, 4686:19, 4726:10, 4743:25
**sense** [3] - 4656:21, 4690:25, 4696:1
**sent** [17] - 4637:18, 4639:3, 4654:6, 4656:16, 4662:6, 4663:15, 4671:2, 4687:24, 4724:7, 4724:16, 4724:17, 4726:8, 4727:13, 4743:22, 4748:18, 4774:6, 4774:12
**sentence** [3] - 4644:19, 4644:20, 4781:8
**separate** [5] - 4646:9, 4677:3, 4679:9, 4680:4, 4734:11
**September** [7] - 4660:13, 4660:17, 4661:18, 4666:17, 4668:25, 4738:20, 4738:22
**series** [8] - 4661:8,

4679:23, 4682:10, 4697:12, 4697:16, 4739:21, 4743:22, 4744:13
**serious** [2] - 4707:23, 4707:24
**serve** [1] - 4777:8
**service** [4] - 4644:21, 4775:12, 4775:20, 4778:8
**serving** [1] - 4776:15
**set** [3] - 4669:6, 4741:8, 4758:21
**settled** [4] - 4692:16, 4692:17, 4693:7, 4693:8
**Settlement** [3] - 4692:6, 4721:24, 4722:4
**settlement** [4] - 4692:18, 4692:24, 4693:9, 4693:15
**seven** [1] - 4676:12
**several** [10] - 4635:17, 4635:18, 4642:10, 4642:11, 4646:25, 4657:16, 4668:9, 4668:15, 4696:17, 4708:18
**shall** [3] - 4661:7, 4671:11, 4671:24
**share** [4] - 4703:24, 4704:2, 4705:6, 4767:18
**shared** [1] - 4764:7
**shareholder** [1] - 4667:16
**shareholders** [1] - 4752:12
**sheet** [1] - 4689:22
**shipped** [1] - 4725:21
**Shit** [3] - 4742:3, 4742:8, 4742:9
**short** [11] - 4661:12, 4698:22, 4699:7, 4701:1, 4701:5, 4702:11, 4702:17, 4706:17, 4718:5, 4783:1, 4787:12
**short-term** [6] - 4698:22, 4699:7, 4701:1, 4701:5, 4702:11, 4706:17
**shorter** [1] - 4767:11
**shorthand** [1] - 4676:3
**shortly** [3] - 4675:11, 4705:8, 4716:7
**shot** [2] - 4737:12, 4774:14

**shots** [5] - 4739:21, 4741:1, 4741:3, 4741:5, 4741:13
**show** [24] - 4629:19, 4632:10, 4651:9, 4662:2, 4667:19, 4667:21, 4687:23, 4698:1, 4709:11, 4710:12, 4718:7, 4719:17, 4728:6, 4737:10, 4738:8, 4739:18, 4740:19, 4743:15, 4744:25, 4754:13, 4760:2, 4760:23, 4763:16, 4777:14
**showed** [3] - 4656:13, 4718:5, 4755:8
**showing** [15] - 4637:25, 4651:11, 4684:1, 4688:1, 4696:13, 4698:2, 4723:9, 4725:25, 4729:5, 4730:18, 4730:22, 4743:21, 4753:11, 4773:10, 4774:5
**shown** [3] - 4719:6, 4753:8, 4753:13
**shy** [1] - 4768:8
**side** [1] - 4732:9
**sidebar** [7] - 4662:16, 4665:3, 4713:19, 4714:1, 4714:8, 4714:10, 4714:14
**Sidebar** [4] - 4663:1, 4664:14, 4753:1, 4754:15
**sides** [1] - 4779:22
**sign** [13] - 4661:21, 4666:24, 4667:13, 4674:15, 4675:7, 4676:16, 4677:20, 4699:1, 4699:23, 4700:7, 4700:11, 4764:21
**signal** [1] - 4771:17
**signature** [16] - 4631:5, 4631:7, 4632:22, 4635:2, 4666:18, 4666:20, 4666:21, 4674:13, 4674:15, 4676:15, 4677:24, 4699:10, 4701:7, 4756:6, 4760:14, 4760:15
**signatures** [3] - 4632:20, 4632:21, 4672:10
**signed** [32] - 4631:2,

4632:3, 4632:25, 4633:6, 4633:11, 4648:3, 4648:10, 4659:7, 4660:17, 4661:19, 4666:11, 4666:17, 4668:21, 4674:16, 4674:21, 4675:7, 4675:13, 4676:17, 4676:19, 4677:18, 4677:22, 4684:24, 4687:5, 4689:23, 4700:4, 4700:20, 4700:25, 4707:1, 4760:12, 4760:17, 4764:20
**significant** [2] - 4657:2, 4778:23
**signing** [4] - 4671:1, 4674:14, 4699:14, 4700:8
**signings** [1] - 4675:4
**signs** [1] - 4701:4
**similar** [3] - 4722:23, 4723:2, 4785:21
**similarly** [1] - 4677:17
**simple** [1] - 4716:23
**simplicity** [1] - 4763:4
**simply** [4] - 4651:22, 4670:8, 4718:20, 4722:16
**sit** [4] - 4653:2, 4691:3, 4707:21, 4785:8
**site** [1] - 4677:4
**sites** [5] - 4678:19, 4689:21, 4690:1, 4696:9, 4749:23
**sitting** [1] - 4775:23
**six** [6] - 4662:10, 4729:16, 4730:18, 4730:22, 4732:9, 4735:18
**skip** [1] - 4778:14
**skipped** [5] - 4687:14, 4779:12, 4780:12, 4781:24, 4782:3
**slash** [1] - 4742:4
**small** [2] - 4679:2, 4761:24
**snacks** [1] - 4765:15
**sold** [4] - 4679:5, 4704:14, 4749:9, 4757:20
**sole** [1] - 4660:9
**solicited** [1] - 4747:24
**sometime** [5] - 4676:17, 4751:10, 4751:19, 4764:21, 4766:13
**sometimes** [3] -

4702:21, 4708:15, 4761:25
**somewhat** [1] - 4716:12
**somewhere** [1] - 4703:16
**son** [1] - 4682:19
**sorry** [25] - 4636:19, 4649:22, 4655:7, 4673:13, 4678:4, 4686:5, 4696:12, 4699:11, 4717:15, 4728:20, 4730:4, 4745:5, 4745:7, 4746:11, 4747:3, 4747:12, 4755:20, 4757:23, 4758:17, 4763:15, 4763:20, 4764:18, 4767:24, 4782:12, 4786:18
**sort** [3] - 4663:17, 4718:17, 4741:23
**sounds** [5] - 4652:24, 4656:1, 4705:25, 4744:5, 4747:4
**source** [6] - 4646:4, 4663:4, 4750:2, 4758:4, 4762:11, 4786:4
**SP2** [1] - 4742:12
**speaking** [4] - 4636:15, 4638:23, 4653:2, 4766:17
**special** [3] - 4659:5, 4659:8, 4659:13
**specially** [1] - 4686:10
**specific** [4] - 4642:17, 4656:20, 4687:22, 4692:23
**specifically** [18] - 4632:15, 4632:17, 4637:7, 4647:14, 4654:18, 4654:19, 4655:1, 4660:19, 4673:5, 4673:7, 4673:9, 4686:6, 4697:14, 4709:10, 4722:22, 4744:15, 4774:11, 4781:1
**speculating** [1] - 4663:14
**speculation** [1] - 4663:15
**spent** [2] - 4668:8, 4668:14
**split** [2] - 4704:19, 4704:20
**spots** [1] - 4781:19
**spreadsheet** [10] - 4750:6, 4750:9,

4750:12, 4750:24, 4751:4, 4751:7, 4752:4, 4752:6, 4752:10, 4785:15
**spreadsheets** [3] - 4751:22, 4753:14, 4785:11
**stage** [1] - 4702:8
**stake** [3] - 4712:16, 4749:16, 4749:19
**stakeholder** [1] - 4758:25
**stakeholders** [1] - 4759:2
**stakes** [1] - 4731:25
**stand** [5] - 4628:11, 4651:22, 4666:9, 4718:13, 4721:1
**Standard** [1] - 4693:2
**standard** [5] - 4756:17, 4757:1, 4757:8, 4761:6, 4761:11
**standing** [2] - 4719:11, 4748:10
**stands** [1] - 4747:7
**start** [3] - 4649:8, 4673:16, 4772:12
**started** [2] - 4649:13, 4676:23
**starting** [4] - 4651:13, 4727:6, 4775:22, 4782:18
**starts** [2] - 4776:19, 4781:8
**State** [2] - 4639:2, 4652:11
**state** [8] - 4641:7, 4675:10, 4749:23, 4749:25, 4750:1, 4766:2, 4786:8, 4786:15
**statement** [17] - 4636:11, 4669:2, 4716:17, 4735:5, 4738:9, 4760:18, 4760:20, 4761:12, 4761:15, 4761:24, 4762:2, 4762:20, 4762:22, 4764:9, 4764:12, 4778:24
**statements** [4] - 4760:25, 4761:1, 4763:8, 4785:21
**states** [1] - 4749:24
**STATES** [3] - 4627:1, 4627:3, 4627:10
**States** [3] - 4627:13, 4627:15, 4761:24
**stay** [3] - 4657:15,

4681:15, 4721:6
**steal** [1] - 4742:1
**stenography** [1] - 4627:25
**step** [2] - 4687:15, 4713:13
**steps** [2] - 4632:6, 4713:14
**Steve** [1] - 4759:9
**sticking** [1] - 4669:18
**still** [17] - 4628:25, 4629:15, 4633:12, 4644:2, 4648:12, 4678:20, 4706:11, 4715:4, 4727:12, 4735:22, 4735:25, 4751:17, 4761:8, 4761:11, 4762:19, 4767:14, 4783:14
**stipulate** [1] - 4779:17
**stipulated** [2] - 4753:6, 4779:22
**stock** [3] - 4749:9, 4749:12, 4749:15
**Stolper** [7] - 4662:11, 4663:16, 4665:19, 4666:1, 4751:18, 4774:11, 4774:12
**stood** [2] - 4719:8, 4742:3
**stop** [1] - 4784:9
**stopped** [2] - 4766:16, 4773:5
**stopping** [1] - 4681:20
**stops** [1] - 4768:6
**straight** [1] - 4697:13
**string** [1] - 4726:2
**structured** [1] - 4681:1
**structuring** [1] - 4681:11
**students** [1] - 4775:9
**stuff** [1] - 4700:21
**stumble** [1] - 4647:18
**Stumpfel** [1] - 4783:23
**Stumple** [16] - 4631:20, 4631:25, 4632:4, 4640:9, 4641:3, 4647:6, 4648:9, 4648:11, 4648:14, 4649:4, 4649:10, 4649:20, 4649:23, 4649:25, 4653:10, 4736:11
**Stumple's** [1] - 4648:6
**style** [1] - 4717:25
**subdivision** [2] - 4675:23, 4678:21
**subject** [8] - 4634:13, 4634:23, 4665:3,

4665:14, 4693:18, 4727:24, 4768:19, 4768:21
**subjective** [1] - 4718:20
**submit** [1] - 4760:20
**submitted** [2] - 4760:17, 4761:23
**submitting** [1] - 4639:20
**subpartners** [1] - 4684:8
**subpoena** [1] - 4694:9
**subpoenaed** [2] - 4670:20, 4671:4
**subsequent** [3] - 4682:3, 4708:14, 4738:21
**subsequently** [9] - 4638:5, 4645:17, 4679:8, 4700:12, 4707:17, 4735:13, 4748:6, 4774:6, 4774:10
**substance** [11] - 4672:13, 4674:7, 4677:19, 4680:18, 4690:19, 4720:1, 4736:23, 4740:13, 4760:6, 4766:18, 4768:6
**substantially** [1] - 4735:20
**substantiate** [2] - 4639:10, 4642:17
**substantiated** [1] - 4642:24
**substituted** [1] - 4713:2
**substitutes** [1] - 4787:15
**subtractions** [1] - 4749:21
**suddenly** [1] - 4768:6
**sued** [1] - 4742:1
**sufficient** [1] - 4633:10
**suggested** [3] - 4652:4, 4679:14, 4682:8
**suggesting** [3] - 4701:6, 4720:8, 4748:20
**suggestion** [2] - 4682:6, 4719:11
**suggestions** [1] - 4780:14
**sum** [12] - 4672:13, 4674:7, 4677:19, 4680:17, 4680:18,

4698:20, 4736:23, 4739:13, 4740:12, 4760:6, 4766:18, 4768:6
**summaries** [1] - 4654:13
**summarized** [1] - 4656:11
**summation** [1] - 4718:1
**summer** [10] - 4631:21, 4632:3, 4640:9, 4647:13, 4647:21, 4648:1, 4648:4, 4649:10, 4699:4, 4700:16
**sums** [1] - 4728:25
**supplied** [1] - 4786:13
**supplies** [2] - 4678:24, 4679:3
**support** [2] - 4637:21, 4735:3
**supported** [1] - 4694:3
**supporting** [1] - 4638:2
**supposed** [6] - 4640:20, 4647:21, 4704:19, 4748:20, 4760:11, 4784:3
**supposedly** [1] - 4668:2
**sustain** [2] - 4720:14, 4720:18
**Sustained** [1] - 4694:11
**sustained** [4] - 4639:13, 4670:24, 4671:8, 4717:21
**switch** [5] - 4746:21, 4771:5, 4771:8, 4772:16, 4772:19
**sworn** [1] - 4716:21
**sworn/affirmed** [2] - 4628:17, 4721:15
**Sydor** [7] - 4678:11, 4687:18, 4689:14, 4689:25, 4728:24, 4730:13, 4733:15
**Sydor's** [1] - 4686:15

---

# T

**tape** [7] - 4714:23, 4715:5, 4715:8, 4767:21, 4767:23, 4768:25, 4781:18
**Tape** [2] - 4773:4, 4773:5
**tax** [1] - 4763:4

**taxes** [1] - 4703:17
**team** [1] - 4751:19
**technology** [1] - 4782:13
**tee** [1] - 4781:22
**telephone** [1] - 4642:8
**teller** [1] - 4681:16
**temporarily** [1] - 4713:21
**tend** [1] - 4750:25
**tenure** [1] - 4751:12
**tequila** [5] - 4722:5, 4722:12, 4722:20, 4725:21, 4726:24
**term** [8] - 4661:12, 4689:22, 4698:22, 4699:7, 4701:1, 4701:5, 4702:11, 4706:17
**terminology** [1] - 4716:25
**terms** [3] - 4646:11, 4665:11, 4785:24
**test** [2] - 4633:8, 4678:16
**testified** [51] - 4646:21, 4650:17, 4650:21, 4650:23, 4653:11, 4657:12, 4663:15, 4668:14, 4674:12, 4674:14, 4674:25, 4676:6, 4677:22, 4678:3, 4678:4, 4690:13, 4691:13, 4691:16, 4694:18, 4694:22, 4696:2, 4696:19, 4697:7, 4698:20, 4705:2, 4705:9, 4708:3, 4710:9, 4711:14, 4711:21, 4719:14, 4724:24, 4725:15, 4735:18, 4736:21, 4737:15, 4744:13, 4749:1, 4749:12, 4750:4, 4750:9, 4754:2, 4754:4, 4757:10, 4759:7, 4766:5, 4766:8, 4766:11, 4766:22, 4783:11, 4785:13
**testify** [4] - 4633:7, 4663:6, 4737:18, 4746:3
**testifying** [10] - 4628:17, 4652:16, 4654:13, 4677:19, 4695:3, 4695:6, 4709:5, 4721:15,

4723:3, 4744:22
**testimony** [42] - 4629:15, 4633:5, 4633:11, 4637:2, 4640:3, 4640:7, 4654:17, 4669:15, 4670:21, 4671:5, 4672:8, 4674:3, 4678:14, 4683:11, 4692:9, 4692:14, 4693:6, 4694:16, 4694:17, 4694:21, 4695:12, 4695:13, 4695:17, 4696:1, 4698:18, 4702:20, 4705:24, 4708:2, 4712:14, 4712:25, 4722:4, 4722:11, 4722:16, 4722:20, 4725:5, 4725:16, 4747:7, 4748:7, 4748:12, 4753:4, 4757:15, 4759:10
**testing** [1] - 4678:17
**text** [10] - 4669:24, 4698:3, 4737:12, 4738:5, 4738:7, 4739:10, 4741:9, 4742:16, 4762:5, 4774:15
**texts** [1] - 4741:13
**THE** [145] - 4627:9, 4628:6, 4628:10, 4628:20, 4629:2, 4629:3, 4630:17, 4633:10, 4633:15, 4638:14, 4638:20, 4638:21, 4639:13, 4643:9, 4643:15, 4643:17, 4643:21, 4644:4, 4644:7, 4644:8, 4644:12, 4646:22, 4646:23, 4651:16, 4651:18, 4651:24, 4652:5, 4660:2, 4662:17, 4663:8, 4663:23, 4663:25, 4664:3, 4664:6, 4664:11, 4665:4, 4665:8, 4666:9, 4670:10, 4670:24, 4671:8, 4672:18, 4673:18, 4673:21, 4673:23, 4674:1, 4680:14, 4694:11, 4698:6, 4709:16, 4713:8, 4713:12, 4713:15, 4714:13, 4715:4, 4715:10, 4717:11,

4717:19, 4718:22, 4719:6, 4720:4, 4720:20, 4721:9, 4721:17, 4724:13, 4726:16, 4727:20, 4728:13, 4728:16, 4740:6, 4740:9, 4741:20, 4744:10, 4746:9, 4746:21, 4747:11, 4753:8, 4753:11, 4753:16, 4753:20, 4754:6, 4754:12, 4755:2, 4755:7, 4755:20, 4755:22, 4764:14, 4764:16, 4764:18, 4768:22, 4768:24, 4770:2, 4770:6, 4770:13, 4770:15, 4770:25, 4771:3, 4771:8, 4771:11, 4771:14, 4771:23, 4772:1, 4772:7, 4772:10, 4773:2, 4773:20, 4774:23, 4775:3, 4775:7, 4775:20, 4776:2, 4776:9, 4776:11, 4776:14, 4776:20, 4776:23, 4777:13, 4777:20, 4778:7, 4778:11, 4778:21, 4778:24, 4779:12, 4779:20, 4780:10, 4780:19, 4780:22, 4781:4, 4781:16, 4781:21, 4782:15, 4782:20, 4783:1, 4783:5, 4783:14, 4784:2, 4784:13, 4784:19, 4784:22, 4784:24, 4786:7, 4786:18, 4787:7, 4787:13, 4787:18
**thereafter** [5] - 4675:11, 4705:8, 4744:18, 4764:22
**third** [1] - 4632:18
**third-from-the-last** [1] - 4632:18
**thousand** [1] - 4744:20
**threatening** [1] - 4699:1
**three** [19] - 4641:10, 4653:15, 4674:23, 4692:8, 4720:22, 4721:3, 4741:1, 4778:13, 4778:22, 4780:2, 4780:11,

4780:17, 4781:1, 4781:15, 4782:1, 4782:2, 4783:16, 4783:18, 4786:25
**throughout** [1] - 4719:24
**Thursday** [1] - 4783:19
**Tim** [1] - 4761:5
**Timothy** [1] - 4665:23
**title** [2] - 4703:22, 4756:19
**today** [7] - 4653:2, 4671:5, 4691:16, 4694:8, 4707:21, 4721:8, 4723:14
**together** [2] - 4669:8, 4675:14
**Tom** [1] - 4701:19
**Tommy** [5] - 4654:2, 4654:7, 4657:7, 4738:12, 4744:17
**TOMMY** [2] - 4627:6, 4627:6
**tommy** [1] - 4655:11
**tomorrow** [14] - 4720:24, 4775:10, 4775:22, 4776:5, 4781:22, 4782:16, 4782:18, 4783:14, 4784:1, 4784:2, 4784:7, 4784:10, 4784:12, 4784:13
**tone** [1] - 4716:10
**tonight** [2] - 4780:6, 4784:11
**took** [5] - 4635:18, 4664:9, 4675:12, 4704:4, 4729:23
**Tooth** [1] - 4771:12
**top** [2] - 4631:1, 4762:9
**topic** [2] - 4691:5, 4722:13
**total** [10] - 4641:24, 4656:13, 4729:3, 4729:11, 4730:9, 4733:24, 4734:3, 4734:7, 4767:4
**totaled** [1] - 4707:8
**touch** [1] - 4759:8
**towards** [1] - 4781:10
**town** [2] - 4784:16, 4784:25
**tracing** [1] - 4654:13
**track** [1] - 4705:17
**traffic** [1] - 4642:16
**transaction** [6] - 4680:22, 4687:11, 4687:19, 4748:4,

4758:3, 4760:11
**transactions** [10] - 4638:11, 4678:6, 4678:12, 4680:17, 4682:10, 4687:22, 4705:17, 4706:3, 4744:14, 4752:8
**transcribed** [1] - 4712:24
**transcript** [16] - 4627:25, 4629:11, 4712:21, 4770:8, 4770:10, 4772:2, 4772:13, 4772:23, 4779:16, 4779:18, 4779:22, 4780:8, 4780:21, 4787:2, 4787:9, 4787:14
**TRANSCRIPT** [1] - 4627:9
**transfer** [19] - 4637:24, 4687:17, 4705:19, 4706:25, 4712:22, 4749:10, 4756:9, 4756:24, 4757:5, 4757:17, 4757:18, 4757:24, 4759:3, 4761:4, 4761:9, 4762:25, 4763:2, 4763:9, 4763:10
**transferor's** [1] - 4756:19
**transferred** [5] - 4679:9, 4707:2, 4711:9, 4712:14, 4757:7
**transfers** [4] - 4638:6, 4639:3, 4754:11, 4756:17
**transmission** [1] - 4663:11
**transmitting** [1] - 4663:3
**travel** [4] - 4675:17, 4677:2, 4765:2, 4765:4, 4765:8
**traveling** [1] - 4765:22
**treasury** [1] - 4681:6
**TRIAL** [1] - 4627:9
**trial** [11] - 4662:12, 4670:22, 4679:19, 4693:10, 4694:9, 4711:14, 4723:3, 4742:11, 4763:6, 4784:19, 4787:20
**trip** [3] - 4676:23, 4677:3, 4765:25
**trips** [7] - 4675:12, 4675:16, 4676:2,

4676:22, 4677:1, 4677:14, 4677:21
**true** [23] - 4635:21, 4636:12, 4639:11, 4639:16, 4639:19, 4639:23, 4641:5, 4652:20, 4653:16, 4693:17, 4694:5, 4703:20, 4704:3, 4708:22, 4710:11, 4710:16, 4733:9, 4734:25, 4735:17, 4737:9, 4743:1, 4749:5, 4768:11
**trust** [1] - 4683:18
**Trust** [5] - 4636:9, 4636:20, 4687:2, 4733:7, 4735:20
**truth** [4] - 4663:6, 4695:24, 4786:11, 4786:14
**truthful** [1] - 4695:12
**try** [1] - 4708:15
**trying** [3] - 4742:1, 4742:23, 4777:21
**TSA** [2] - 4697:3, 4698:14
**tune** [1] - 4686:5
**turn** [5] - 4659:24, 4698:17, 4771:6, 4772:17, 4772:18
**turned** [8] - 4638:4, 4638:5, 4668:6, 4668:8, 4698:23, 4699:7, 4742:10, 4771:7
**turning** [1] - 4632:18
**Tursi** [1] - 4627:20
**two** [35] - 4635:2, 4646:9, 4646:10, 4649:14, 4650:11, 4668:1, 4668:20, 4669:5, 4674:11, 4675:4, 4676:14, 4679:13, 4680:4, 4682:2, 4682:15, 4700:18, 4706:10, 4721:5, 4723:20, 4724:19, 4734:8, 4734:11, 4736:4, 4755:18, 4759:1, 4766:3, 4774:13, 4777:25, 4781:7, 4782:6, 4783:12, 4783:16, 4783:20, 4783:23
**typical** [1] - 4687:20
**typically** [4] - 4677:1, 4677:13, 4730:25, 4749:17

**Tyson's** [1] - 4743:4

### U

**U.S** [1] - 4668:6
**Ula** [10] - 4639:1, 4654:5, 4655:3, 4655:13, 4656:21, 4691:25, 4692:3, 4729:25, 4730:3, 4730:5
**ultimately** [4] - 4639:23, 4646:15, 4646:11, 4691:17
**unable** [3] - 4649:3, 4707:16, 4712:11
**under** [14] - 4629:1, 4634:4, 4647:10, 4648:7, 4663:22, 4665:11, 4669:3, 4679:23, 4682:16, 4688:23, 4689:1, 4689:2, 4725:23, 4767:13
**undersigned** [1] - 4756:11
**understood** [1] - 4748:14
**unduly** [1] - 4718:19
**unfortunately** [2] - 4653:2, 4697:6
**union** [1] - 4641:7
**UNITED** [3] - 4627:1, 4627:3, 4627:10
**United** [3] - 4627:13, 4627:15, 4761:24
**units** [5] - 4759:12, 4759:13, 4759:24, 4760:8, 4760:10
**unless** [1] - 4786:19
**unquote** [4] - 4777:1, 4777:7, 4778:25
**unreturned** [1] - 4735:23
**unsealed** [1] - 4714:24
**untrue** [1] - 4725:16
**untruthful** [2] - 4695:8, 4696:1
**up** [33] - 4628:11, 4645:15, 4645:17, 4650:13, 4652:15, 4654:13, 4655:10, 4656:2, 4672:7, 4675:9, 4680:18, 4689:13, 4690:2, 4690:11, 4696:4, 4698:21, 4703:23, 4704:5, 4709:4, 4716:14, 4718:13,

4726:24, 4732:23, 4734:12, 4755:10, 4755:12, 4755:13, 4758:21, 4768:11, 4768:12, 4770:15, 4771:13, 4781:22
**UPS** [1] - 4725:22
**urban** [1] - 4676:11
**Urban** [4] - 4656:3, 4656:6, 4656:8, 4656:12
**urgency** [1] - 4680:2
**US** [5] - 4627:4, 4627:21, 4718:9, 4718:12, 4736:7
**utilized** [1] - 4677:6

### V

**vacation** [2] - 4775:10, 4775:21
**Valley** [7] - 4702:22, 4705:9, 4705:11, 4705:23, 4706:2, 4706:11, 4706:13
**valuable** [2] - 4644:21, 4756:15
**varied** [1] - 4732:21
**various** [12] - 4672:10, 4679:18, 4680:1, 4694:24, 4728:25, 4729:22, 4730:13, 4732:10, 4733:8, 4733:14, 4735:18, 4749:24
**vast** [1] - 4758:15
**Vegas** [1] - 4691:17
**vehicle** [1] - 4629:25
**venture** [18] - 4641:14, 4641:22, 4645:2, 4645:8, 4650:21, 4659:2, 4669:14, 4669:22, 4671:16, 4673:4, 4689:12, 4689:22, 4690:2, 4690:11, 4702:25, 4703:6, 4761:11, 4765:18
**Ventures** [28] - 4629:24, 4630:5, 4630:11, 4630:21, 4632:8, 4633:20, 4635:3, 4636:1, 4640:2, 4640:7, 4641:4, 4641:17, 4649:8, 4649:13, 4649:19, 4650:1, 4650:12, 4654:23, 4688:20, 4707:2, 4710:23, 4711:9, 4711:19, 4711:22,

4712:15, 4712:22, 4713:1, 4713:3
**ventures** [9] - 4646:4, 4646:9, 4650:12, 4660:10, 4689:3, 4756:18, 4757:1, 4757:8, 4761:6
**vermin** [1] - 4780:6
**version** [3] - 4679:2, 4722:24, 4744:25
**vertical** [1] - 4699:25
**VI** [7] - 4683:20, 4683:23, 4684:6, 4684:10, 4686:20, 4687:10, 4688:13
**VI's** [1] - 4687:13
**view** [3] - 4716:14, 4717:4, 4776:6
**viewed** [1] - 4734:21
**views** [2] - 4717:8, 4775:16
**violation** [1] - 4775:17
**visit** [1] - 4675:10
**voice** [2] - 4716:10, 4716:25
**volunteer** [1] - 4783:7

**W**

**Waika** [1] - 4644:25
**Waikapuna** [2] - 4676:10, 4688:23
**wait** [1] - 4638:14
**waived** [2] - 4714:2, 4714:20
**waiving** [1] - 4714:18
**walked** [1] - 4676:10
**walks** [1] - 4718:13
**wants** [2] - 4709:22, 4718:6
**Warden** [1] - 4641:15
**ways** [1] - 4781:17
**web** [3] - 4696:9, 4722:25, 4749:23
**website** [4] - 4724:24, 4725:1, 4725:8, 4749:25
**Wednesday** [1] - 4787:20
**week** [1] - 4775:24
**weeks** [5] - 4642:10, 4676:12, 4694:19, 4696:17, 4735:19
**weight** [1] - 4786:5
**welching** [1] - 4641:17
**welcome** [4] - 4649:16, 4658:4, 4740:25, 4763:13
**Wells** [1] - 4703:19
**whichever** [1] -

4744:20
**white** [1] - 4725:7
**whole** [6] - 4666:22, 4673:10, 4681:13, 4739:11, 4776:18, 4781:8
**wife** [1] - 4764:7
**wife's** [1] - 4764:10
**William** [2] - 4669:11, 4671:14
**willing** [1] - 4777:7
**Windwalker** [5] - 4641:15, 4641:22, 4644:23, 4689:13, 4689:23
**wire** [3] - 4637:24, 4639:2, 4749:10
**wire-transfer** [1] - 4637:24
**wish** [3] - 4765:10, 4782:4, 4782:6
**wished** [1] - 4693:15
**wishes** [2] - 4663:20, 4717:6
**withdraw** [5] - 4679:15, 4679:25, 4680:15, 4680:17, 4681:17
**withdrawal** [6] - 4679:15, 4680:11, 4680:23, 4681:15, 4684:2, 4684:15
**withdrawals** [8] - 4679:10, 4679:20, 4679:23, 4680:5, 4681:1, 4681:11, 4682:3, 4682:16
**withdrawn** [6] - 4640:1, 4653:24, 4681:22, 4702:14, 4703:13, 4734:24
**withdrew** [1] - 4682:14
**Witness** [1] - 4713:14
**WITNESS** [8] - 4629:2, 4638:20, 4643:15, 4643:21, 4644:7, 4644:12, 4646:23, 4651:18
**witness** [10] - 4718:12, 4718:17, 4718:18, 4719:18, 4721:3, 4721:4, 4784:6, 4784:24, 4784:25
**witnesses** [13] - 4672:9, 4717:8, 4717:13, 4719:9, 4719:25, 4720:13, 4720:22, 4720:25,

4745:6, 4782:24, 4783:16, 4783:22, 4784:17
**won** [1] - 4691:22
**word** [5] - 4653:13, 4713:2, 4780:3, 4780:6, 4787:9
**words** [5] - 4778:14, 4779:12, 4780:12, 4781:24, 4782:3
**works** [1] - 4706:11
**worse** [2] - 4720:6, 4720:11
**worth** [3] - 4642:13, 4669:16, 4670:17
**wrapped** [1] - 4698:21
**write** [2] - 4777:9, 4778:3
**writing** [4] - 4665:17, 4758:9, 4777:11, 4781:12
**wrongdoing** [1] - 4692:20
**wrote** [7] - 4663:9, 4663:10, 4665:17, 4665:19, 4666:15, 4666:16, 4667:10

**Y**

**year** [3] - 4689:16, 4700:15, 4706:14
**years** [7] - 4635:17, 4635:18, 4653:3, 4662:10, 4668:1, 4668:20, 4751:25
**yes-or-no** [2] - 4643:9, 4647:3
**yesterday** [12] - 4628:22, 4629:8, 4636:17, 4638:25, 4641:7, 4644:14, 4644:19, 4657:15, 4659:10, 4690:13, 4691:5, 4713:16
**YORK** [1] - 4627:1
**York** [2] - 4627:14, 4627:22
**yourself** [3] - 4638:16, 4679:9, 4736:7
**Yuen** [1] - 4675:22

**Z**

**zero** [1] - 4758:2