4789

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA     :  13-CR-607

    -against-                    US District Court
                           Central Islip, NY

PHILLIP A. KENNER a/k/a
PHILIP A. KENNER, and
TOMMY C. CONSTANTINE a/k/a
TOMMY C. HORMOVITIS,

                Defendants.:  June 24, 2015
- - - - - - - - - - - - - - X   9:45 am

        TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:
                        KELLY T. CURRIE
                        United States Attorney
                        One Pierrepont Plaza
                        Brooklyn, New York 11201
                        By:  JAMES MISKIEWICZ, ESQ.
                              SARITA KOMATIREDDY, ESQ.
                        United States Attorneys

For the Defense:
                        RICHARD D. HALEY  ESQ.
                        For Defendant Kenner

                        ROBERT LaRUSSO, ESQ.
                        ANDREW L. OLIVERAS, ESQ.
                        For Defendant Constantine

Court Reporter:
                        Dominick M. Tursi, CM, CSR
                        US District Courthouse
                        1180 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6108  Fax:  712-6124
                        DomTursi@email.com

             Proceedings recorded by mechanical stenography.
               Transcript produced by CAT.

4790

1                  (Call to Order of the Court.)

2                  (The following ensued in the absence of the

3       jury.)

4                  THE COURT:  The jurors are all here.

5                  I was thinking more about the recording.  I

6       don't know if you had more time to think about that.  I

7       was going to tell the jury that there were a couple of

8       portions where there was a technical issue but that they

9       will have the whole record available to them.

10                 Also, I will give the lawyers an opportunity to

11      replay any portion if they wish to.

12                 MR. LaRUSSO:  I don't think I'm going to make an

13      issue of it, Judge.

14                 I spoke to Mr. Miskiewicz.  There was some kind

15      of technical difficulty, apparently.  Having listened to

16      the recording, that is the way I looked at it.

17                 THE COURT:  Okay.  But the recording that you

18      listened to doesn't have that skip.

19                 MR. LaRUSSO:  That's correct.

20                 THE COURT:  Do you have any problem with me

21      saying this to the jury?

22                 MR. LaRUSSO:  None whatsoever.

23                 THE COURT:  Mr. Haley?

24                 MR. HALEY:  No, sir.

25                 MR. MISKIEWICZ:  For the record, what I

4791

1    discovered is that because the recording is on an Apple

2    Macintosh format playing on a Windows laptop, it was

3    running an Apple piece of software, Quicktime.  And

4    basically the two machines are, at least our machine was

5    not the latest and greatest in terms of memory capacity,

6    causing that skipping.

7              We replicated it last night.  It skips at

8    different places.  It is essentially almost like a

9    minicrash in terms of memory usage.  But it skips at

10   random places.

11             But I would represent to the court the actual

12   recording, physically there is nothing wrong with the

13   recording.  You can either play it on an Apple laptop and

14   nothing will happen.  Or we could convert the existing

15   recording into a Window Media Player format, an MP3

16   format, and then, again, there should be no problem.

17             But the recording, itself, does not have a skip.

18   It is a function of the machine we are using.

19             THE COURT:  Even if the defense counsel don't

20   intend to replay those portions, I do think for purposes

21   of deliberations we should have, I think the easiest thing

22   to do is play it off of an Apple computer.  Right?

23             MR. MISKIEWICZ:  Yes.  I will probably borrow my

24   daughter's and bring it in.

25             MR. HALEY:  Your Honor may recall throughout

4792

1   this litigation I have some familiarity with this issue as

2   relates to the incompatibility between Apple operating

3   systems and Microsoft operating systems.

4           THE COURT:  I know that.  So that is where I

5   believe we are.

6           Where do we stand, Mr. LaRusso, with your

7   witnesses?

8           MR. LaRUSSO:  Still a little juggling.

9           Last night I had a chance to meet with

10  Sergei Gonchar.  As I indicated to the court, he was one

11  of three witnesses that we were going to call.  We weren't

12  sure of the order.  He has an obligation tomorrow with his

13  family, so he asked if he could go on today.

14          THE COURT:  Is he long or short?

15          MR. LaRUSSO:  He is not long, Judge.  I have two

16  exhibits, only two, I'm going to be showing.  It may only

17  turn out to be one.  I anticipate my examination may be an

18  hour; maybe a little longer than that; maybe an hour and a

19  half, at most.

20          He is here today.  Mr. Conway, on my behalf,

21  sent emails last night advising both Mr. Miskiewicz and

22  Mr. Haley finally of the order.

23          Another witness flew in yesterday, late.  I

24  haven't talked to him, Judge, so I'm going to be preparing

25  him tonight.  We will be ready to go forward Thursday with

4793

1    the two witnesses I indicated because I anticipate between

2    Mr. Gonchar's direct and cross we will probably be able to

3    cover until approximately 3:30.  That is what I

4    anticipate.

5           So I understand that at this point it is my

6    request.  And I am asking for your indulgence, if we could

7    break the cross and allow Mr. Gonchar to get on so we

8    don't have a problem with him because I would like to

9    extend him until tomorrow.

10          THE COURT:  Break the cross of Mr. Kenner?

11          MR. LaRUSSO:  Yes.  Put Mr. Gonchar on right

12   now.

13          THE COURT:  Oh.  Okay.

14          MR. LaRUSSO:  That is why we sent the email out

15   last night.

16          THE COURT:  So he is here right now?

17          MR. LaRUSSO:  He is.

18          THE COURT:  Let's do that.

19          MR. HALEY:  Fine.

20          THE COURT:  Let's bring in the jury.

21          (The following ensued in the presence of the

22   jury.)

23          THE COURT:  Please be seated.

24          Good morning, members of the jury.  I hope

25   everyone is doing well this morning.

4794

1          Before we get started, there was one thing I

2   wanted to point out.

3          Yesterday, as you probably noticed, during the

4   playing of the recording I think there were approximately

5   three portions where it skipped a few words.  We have

6   determined that that was a problem with the computer that

7   it was being played on.

8          The recording that is in evidence does not have

9   those skips.  Those were like random skips that happened

10  as a result of the computer that the recording was playing

11  on.

12         I told the lawyers that if they wanted to replay

13  those portions of the recording during which it skipped,

14  that I would let them do that.  That is up to them.  I

15  don't know if they are going to do that or not.

16         But I also wanted you to know that if you want

17  to listen to the recordings again, in part or in whole,

18  during your deliberations, or any piece of evidence, you

19  just write me a note saying you want to listen to the

20  recording again and you can come out.

21         And the government is fixing the computer so

22  that when you hear it, it won't have those random skips

23  due to the computer program.

24         With that, we are, as you probably can imagine,

25  trying to juggle a lot of witnesses' schedules and we have

Gonchar - Direct/Mr. LaRusso

4795

1    got a witness who we are going to take out of order

2    because he is not available tomorrow, and then we will go

3    back to Mr. Kenner's cross-examination.

4            This is a witness for Mr. Constantine, so

5    Mr. LaRusso is going to call the witness.

6            Go ahead, Mr. LaRusso.

7            MR. LaRUSSO:  Thank you very much, your Honor.

8            The defendant Mr. Constantine calls Sergei

9    Gonchar.

10           THE COURT:  Mr. Gonchar, come up to the witness

11   stand and remain standing for the oath.

12

13   **SERGEI GONCHAR**

14           called by the Defense, having been first duly

15           sworn/affirmed, was examined and testified as

16           follows:

17           THE COURT:  If you could, hold that mic up close

18   to you.  Pull it down.

19

20   DIRECT EXAMINATION

21   BY MR. LaRUSSO:

22   Q.   We spoke a little bit yesterday.  Is that correct,

23   Mr. Gonchar?

24   A.   Yes, it is.

25   Q.   You have a tendency to drop your voice a little bit,

Gonchar - Direct/Mr. LaRusso

4796

1   so I will try and keep myself as loud as I can so that

2   maybe you can respond likewise so that everybody can hear

3   your answers.  Okay?

4   A.   Okay.

5   Q.   I have no problem speaking loud, so we will try to be

6   able to communicate as best we can.

7            Where do you presently reside?

8   A.   Florida.

9   Q.   Do you reside there with your family?

10  A.   It is the summer.  Actually, through the season, I

11  should say hockey season, I am in Dallas, Texas.

12  Q.   My next question is, what do you do for a living?

13  A.   I play hockey.

14  Q.   Who do you play for?

15  A.   Montreal Canadians.

16  Q.   That is a professional team in the National Hockey

17  League?

18  A.   Yes, it is.

19  Q.   How long have you played in the National Hockey

20  League?

21  A.   I started the 1994, '95 season.

22  Q.   How many teams have you played for in the National

23  Hockey League?

24  A.   I started with the Washington Capitals.  And I played

25  for Boston Bruins for four months.  Then I played for

Gonchar - Direct/Mr. LaRusso

4797

1   Pittsburgh Penguins for five years.  Then I was in Ottawa

2   for three years.  I was in Dallas for a year.  And last

3   year I was in Montreal.

4   Q.   Are you still under contract with the Montreal

5   Canadiens?

6   A.   Technically, yes, until July 1.  Yes.

7   Q.   Are you available to play for the New York Rangers

8   after that?

9   A.   If they want me to.

10  Q.   Before playing in the National Hockey League, here in

11  North America, did you play hockey anyplace else?

12  A.   I played hockey in Russia when I was growing up.  I

13  started playing since I was 6 years old.  Played in my

14  hometown, Chelyabinsk.  I played there until I was 18.

15  Then I moved to Moscow.  I played for them in Moscow for

16  two years.  And then I moved to NHL to Washington.

17  Q.   You were born in Russia, I assume?

18  A.   Yes.

19  Q.   Are you an American citizen?

20  A.   Yes, I am.

21  Q.   Do you know a person by the name of Phil Kenner?

22  A.   Yes, I do.

23  Q.   Do you see him here the court?

24  A.   Yes.  He is right here.

25       MR. HALEY:  Identification conceded, Judge.

Gonchar - Direct/Mr. LaRusso

4798

1    THE COURT:  Okay.  Identification has been

2  conceded.

3  BY MR. LaRUSSO:

4  Q.   Would you tell us, please, how it is that you came to

5  meet Mr. Kenner.

6  A.   Yes.  I met him through my teammates when I was

7  playing in Washington.  A couple of my teammates

8  introduced me to him back then.  They told me that he is

9  the guy who's helping them with their investments.

10       Obviously, growing up in a different system, I

11  didn't know anything about investments in the stock

12  market, and teammates introduced me a little bit and then

13  they introduce me to Phil Kenner.  And we start

14  communicating and sometime down the road he started

15  working for me, maybe a year or two later.

16  Q.   Did you form a business relationship with Mr. Kenner

17  after meeting him?

18  A.   Yes.

19  Q.   Would you just briefly tell us the progression of

20  that relationship after you began that relationship

21  with him.

22  A.   When he started -- I mean when we start working

23  together, he was working with Assante, a big company, and

24  that he was helping me with my bond and stocks portfolio.

25       Then down the road he start introducing me to

Gonchar - Direct/Mr. LaRusso

4799

1   another investments that he told me that very good, you

2   know, to invest into.  Some of them were start-up

3   companies.  Some of them were real estate deals.  And

4   because I trusted him at that time, I made those

5   investments on his suggestions.

6   Q.   Did you have any kind of a fee arrangement with

7   Mr. Kenner?

8   A.   Yes.  He was charging certain percentage.  Yes.

9   Q.   I'm just going to ask you a couple of questions about

10  the real estate investments and the start-up companies.

11          Could you explain to the jury, first, the

12  start-up companies that you invested through Mr. Kenner.

13  A.   One was rubber business company.  And another one was

14  Eufora.

15  Q.   In regards to the rubber company, how much did you

16  invest?

17  A.   250,000, if I remember correctly.

18  Q.   I'll leave Eufora for subsequent questioning.

19          You mentioned real estate?

20  A.   Yes.

21  Q.   Could you just briefly describe to us the real estate

22  investments you had with Mr. Kenner.

23  A.   There was two investments in Mexico, two projects in

24  Mexico, and one of them in Hawaii.

25  Q.   Can tell us, do you recall how much you invested in

Gonchar - Direct/Mr. LaRusso

4800

1   both of those, and just a little bit about the investments

2   that you were told.

3   A.   You are talking about Mexico.  Correct?

4   Q.   Please.

5   A.   Yes.  In Mexico there was the two pieces of land.

6   One was up north and another one was in Cabo San Lucas.

7            Up north I invest $500,000, and in Cabo San

8   Lucas was $250,000.  They were -- two of those properties

9   were presented to me as good real estate investments.

10           And Phil told me that we're going to develop

11  them and, you know, build golf courses on them, and it was

12  going to be very good investment and it is going to be

13  wonderful destination that people are going to go to and

14  spend time over there.

15  Q.   Do you recall at all investing in real estate in

16  Hawaii?

17  A.   Yes, I do.

18  Q.   Just tell us a little bit about that, please.

19  A.   That's another real estate investment that

20  Phil Kenner presented to me.

21           He told me it is a good piece of property.  We

22  were very fortunate to invest into because, if I remember

23  correctly, a friend of a friend, you know, run into

24  somebody who was selling it.  So we were very fortunate

25  to, you know, have a chance to invest into it.

Gonchar - Direct/Mr. LaRusso

4801

1    And he told me it is, you know, how Hawaii is

2    another great destination; that is why we have to buy land

3    and we're going to develop that.

4    Q.   In either of those investments, did you become aware

5    of lines of credit at Northern Trust Bank?

6    A.   No.  In Hawaiian deal, yes, later on.

7    Q.   Could you just tell us about your knowledge of that

8    Northern Trust line of credit.

9    A.   When Phil told me about an investment, that he told

10   me there is a group putting money together and original

11   investment was around $100,000.  I don't know how much the

12   rest of the group investing into.

13       But then he told me that he put me as a guaranty

14   for a million dollars against my bond portfolio and he

15   opened up a line of credit and we were going to spend the

16   money to develop that project.

17   Q.   Just stay with that just for a few minutes.

18       Can you tell us what happened with the lines of

19   credit that you opened up after speaking with Mr. Kenner.

20   A.   Sometime down the road I -- I mean, Kenner was making

21   payments on the line of credit for sometime, and then

22   sometime down the road, a year, I don't remember exact

23   time later, I find out that my money, I mean the line of

24   credit, I mean the payments were not made and, you know,

25   they took my money.

Gonchar - Direct/Mr. LaRusso

4802

1  Q.   And how much, when you say they took your money?

2  A.   Around a million dollars.

3  Q.   Have you recovered any of that money?

4  A.   Yes.  We reached a settlement agreement with Northern

5  Trust Bank and I received some of that money.

6  Q.   Approximately how much?

7  A.   I signed a nondisclosure agreement so I don't know if

8  I'm allowed to say it in the court or not.

9        THE COURT:  You can say it.

10  BY MR. LaRUSSO:

11  Q.   You can say it.

12  A.   So it is just over 500 grand.

13  Q.   Do you know a company by the name of Diamanté Air?

14  A.   Yes, I do.

15  Q.   And I think we will save that just for a little bit

16  later, like Eufora.  I'd like to go into Eufora for a

17  moment.

18        You indicated to us that you also invested in a

19  company called Eufora.  Tell us a little bit about that,

20  please.

21  A.   Eufora was a company -- first all, Phil Kenner is the

22  guy who introduced me to that project.  He told me that

23  Tommy Constantine is a friend of his, and he invented the

24  company which is going to do the credit -- which are going

25  to help to build credit for the people without credit

Gonchar - Direct/Mr. LaRusso

4803

1    history, about the history of credit.  And there is no

2    another thing on the market like this.

3            So he suggest we visit in this company because

4    it is going to be something that is going to, you know,

5    change the credit card business and told me it is a good

6    investment to do.

7    Q.   After speaking with Mr. Kenner, did you in fact

8    invest in Eufora?

9    A.   Yes, I did.  $250,000.

10   Q.   You made other investments to Eufora at subsequent

11   times.  Is that correct?  Yes or no?

12   A.   Yes.

13   Q.   Do you know a person by the name of

14   Tommy Constantine?

15   A.   Yes, I do.

16   Q.   Do you see him in court here today?

17   A.   Yes.  He's here to my left.

18            MR. LaRUSSO:  Can I say indicating the defendant

19   Mr. Constantine, your Honor?

20            THE COURT:  Yes.

21            Does everyone concede that identification?

22            MR. MISKIEWICZ:  Yes.

23            THE COURT:  Mr. Haley?

24            MR. HALEY:  Yes, sir.

25            THE COURT:  The identification is conceded.

Gonchar - Direct/Mr. LaRusso

4804

BY MR. LaRUSSO:

Q.   When for the first time did you meet Mr. Constantine?
Could you give us the circumstances of that meeting.

A.   Yes.  First time I met him, I would say at the end of
2009 season, hockey season I should say, which is like,
probably like April.

Q.   April of 2009?

A.   Yes.

Q.   Can you tell us the circumstances under which you
met him.

A.   Yes.

       Him and Phil Kenner came to my house because at
that time they felt we needed put money together as a
group.

Q.   Who should put money together as a group?  I'm sorry.

A.   The hockey players.  And we have to put money
together as a group to put that investments.  And also
fight against Ken Jowdy.

       Ken Jowdy is the guy who was involved, who was
the guy who was running the Mexico project.

Q.   Now, those are the initial conversations you had with
Mr. Kenner.  Were they over the telephone before you met?

A.   Yes.

Q.   There came a time after speaking with Mr. Kenner you
actually met Mr. Constantine?

Gonchar - Direct/Mr. LaRusso

4805

1   A.   Yes.

2   Q.   Where did you meet him?

3   A.   At my house.

4   Q.   Where were you living at the time?

5   A.   Pittsburgh, Pennsylvania.

6   Q.   And who was present during the meeting?

7   A.   It was three of us and my wife and the kids.

8   Q.   And can you tell us how long do you remember this

9   meeting lasting.

10  A.   I would say an hour and a half, two hours.

11  Q.   Could you just relate to us the nature of the

12  conversation you had at that point; what you remember and

13  who said what during the recall.

14  A.   I mean, the purpose of the meeting was, you know, to

15  talk about everything that happened with us as a group, I

16  mean with all the investments.

17          They give me update at that time what was going

18  on, and then after that we were talking about the plan how

19  we're going to move forward.

20          Then they presented the idea of, you know,

21  explain to me the idea of putting money together at that

22  time of investments and, as I said, you know, fight

23  against Ken Jowdy.

24  Q.   And were there any other discussions regarding the

25  use of the money that was going to be contributed?

4806

1    A.   Yes.  You know, they explained how it is going to

2    work.  It is going to, you know, go towards the building,

3    lawyers, you know, PR.

4    Q.   I'm sorry.  I missed that.  What was the last one?

5    A.   You know, right before they came over, there was the

6    article in the newspaper and part of the money we were

7    talking is going to be used to, you know, put the article

8    out there to make sure that we explain, you know, our side

9    of the story.  So PR company.

10        I said PR.

11   Q.   PR, meaning?

12   A.   Public relations.

13   Q.   After meeting with Mr. Kenner and Mr. Constantine,

14   did you agree to contribute money?

15   A.   Yes, I did.

16   Q.   How much did you contribute?

17   A.   250.

18   Q.   I'm going to show you what has been received in

19   evidence as -- I don't know, is your screen on in front of

20   you, Mr. Gonchar?

21   A.   Yes, it is.

22   Q.   You can use that; otherwise, there is one behind you.

23        It has been received as Government Exhibit 767.

24   And it shows that on May 5, 2009, S. Gonchar and K.

25   Gonchar, TTE --

Gonchar - Direct/Mr. LaRusso

4807

1    THE COURT:  Mr. LaRusso, you have to focus that.

2    BY MR. LaRUSSO:

3    Q.    Do you see that, Mr. Gonchar?

4    A.    Yes, I do.

5    Q.    On May 5, 2009, S. Gonchar, K. Gonchar, TTE,

6    $250,000.

7          Do you see that?

8    A.    Yes.

9    Q.    Was that on or about the time that you made the

10   contribution?

11   A.    Yes.

12   Q.    And did you send that money to a trust account?

13         Did you come to learn that you sent that money

14   to a trust account that was in the name of Ron Richards?

15   A.    Yes.

16   Q.    I'm taking it, at this point, you had the meeting

17   before the contribution was made.  Is that correct?

18   A.    Yes.

19   Q.    Okay.  Let me show you what has been marked as

20   Defendant's Exhibit C294.

21         Have you seen this document before?

22   A.    Yes.  It is email sent to --

23   Q.    I'm sorry.  You have to speak up.  I know I'm close

24   to you and you have a tendency to drop your voice.

25   A.    I'm saying yes, I have seen it.  This email has been

Gonchar - Direct/Mr. LaRusso

4808

1   sent to all hockey players.

2   Q.   Do you recognize this as an email communication

3   between you and Mr. Kenner shortly after you had made the

4   contribution that we just talked about?

5   A.   Yes, I do.

6   Q.   Do you recall receiving it?

7   A.   Yes.

8           MR. LaRUSSO:  Your Honor, may I ask that this be

9   received as Defendant's Exhibit C294?

10          MS. KOMATIREDDY:  No objection.

11          MR. HALEY:  No objection, Judge.

12          THE COURT:  C294 is admitted.

13          (Defense Exhibit C294 in evidence.)

14  BY MR. LaRUSSO:

15  Q.   This is an email received from Mr. Kenner.  Is that

16  correct?

17  A.   Yes, that's correct.

18  Q.   And according to the document, it was received on

19  May 18, 2009.  Is that right?

20  A.   Yes.

21  Q.   That would be approximately 13 days after you had

22  sent your contribution into the Ron Richards trust

23  account.  Is that right?

24  A.   Yes.

25  Q.   Did you read this email?

Gonchar - Direct/Mr. LaRusso

4809

1    A.    Back then, yes.

2    Q.    And at the time that you read it, having reviewed it,

3    do you understand the comments that are made in that

4    email?

5    A.    Yes.

6    Q.    Before we go into that.  You responded to Mr. Kenner,

7    did you not?

8    A.    Yes, I did.

9    Q.    I believe you responded, according to this exhibit,

10   on May 19, 2009.  Is that right?

11   A.    Yes.

12   Q.    And you write the words *"acknowledged and approved."*

13   Is that right?

14   A.    Yes, that's correct.

15   Q.    Just staying with those words.  What was your

16   understanding at this point; when you said *"acknowledged*

17   *and approved,"* you read it and you approved the contents

18   of the information that was emailed to you by Mr. Kenner.

19   Is that right?

20   A.    Yes, sir.

21   Q.    Some of the terms are easily understood and

22   explainable, but I would like to ask a series of questions

23   of you what your understanding of some of the terms are in

24   this authorization email.  Okay?

25   A.    Okay.

Gonchar - Direct/Mr. LaRusso

4810

1  Q.   It says here, I will just read it quickly.  *"Per our*
2  *conversation."*

3          That's alluding to the conversation you had in
4  April with Mr. Kenner and Mr. Constantine.  Is that right?

5  A.   Yes.

6  Q.   *"Please acknowledge your approval and authorization*
7  *for me to have wire transferred 250,000 to attorney*
8  *Ron Richard's trust account for your proportionate*
9  *contribution to the Global Settlement fund in addition to*
10  *the fund paying for various legal fees."*

11          What did you understand the legal fees to be?

12  A.   Since we were suing Kenneth Jowdy we hired the
13  lawyer.  So the legal fees are fees that I understood that
14  we were going to pay for.

15          Also, Phil Kenner hired attorneys in Mexico that
16  represent us over there, so it is the lawyer's fees that I
17  understand that we were going to pay for.

18  Q.   Were there any other legal fees or lawsuits that you
19  were told about at this point, if you remember?

20  A.   I know there was some lawsuits that Phil Kenner was
21  involved.  I knew that.  No.

22  Q.   Do you remember specifically as you testify here
23  today?

24  A.   He was sued by one of his assistants.  Her name was
25  Christine Myrick.

Gonchar - Direct/Mr. LaRusso

4811

1   Q.   That came up in your conversation when you met with

2   him at your house.  Is that correct?

3   A.   Yes.

4   Q.   The next phrase is *"PR agency fees."*  What did you

5   understand that to mean?

6   A.   As I said before, that, you know, there was the

7   article.  And we want to also hire a PR company to make

8   sure that we were not, you know, put article out there

9   which were going to telling our side of the story.

10  Q.   *"As well as other protective advances and settlement*

11  *costs."*

12           What did you understand that to mean?

13  A.   Settlement costs.  If we're going to get to

14  settlement with somebody, we're going to have to spend

15  money on that.

16  Q.   Do you recall what the term *protective advances*

17  meant, at this time?

18  A.   No, I don't.

19  Q.   You also said, *"You will be receiving transfer of*

20  *membership agreements from Tommy."*

21           I assume that's Tommy Constantine.  Is that

22  correct?

23  A.   Yes, it is.

24  Q.   *"For your acquisition of additional interest in*

25  *Eufora, LLC, as well as your new LLC and operating*

Gonchar - Direct/Mr. LaRusso

4812

1   *agreements reflecting your ownership interests in the*

2   *Avalon Air Park real estate project, the Falcon 10*

3   *aircraft and the two Palms Place condominium communities."*

4           Could you tell us what you understood that to

5   mean.

6   A.   I understood from that that, since we put money into

7   Global Settlement Fund, and Tommy was -- the group put

8   money and the return we were going to get percentage of

9   the real estate investment or Eufora company and all those

10  things we were putting money into this return, we were

11  going to get some of the percentage from those businesses.

12  Q.   Continuing reading.  *"You may recall Tommy and I*

13  *mentioning the Palms units in our conversation."*

14          What did you understand that to be referring to?

15  A.   The Palm units is the units that some of the players

16  invested into with Tommy, and Phil was involved there,

17  too.

18          And I believe, if I remember correctly, that

19  Tommy was making payments on those and Phil was making

20  payments on those, but there was some issue that needs to

21  be fixed.  And, you know, I understood from that email the

22  money will go there to fix the problem.

23  Q.   Did you learn at the time, or subsequently learn,

24  what was the Avalon Air Park project and the Falcon 10,

25  referring to those two?

Gonchar - Direct/Mr. LaRusso

4813

1    A.    The Avalon Air Park project was two buildings,

2    hangars.  And some of the players put the money into them.

3    They bought, I don't remember exactly when, but I knew the

4    players invest money into it and we need -- I mean, we are

5    going to put some money from the Global Settlement Fund to

6    fix it.

7    Q.    And what about the Falcon 10 aircraft?

8    A.    Falcon 10 aircraft is the aircraft that they bought

9    for us as a group to bring clients to the property in

10   Mexico to show the property.  And I actually was also put

11   as a guarantor for that plane.

12            And then the deal was that we were supposed to

13   use that plane and charter out and make payments for the

14   plane.  And what happened after -- I mean, that's what I

15   been told, but then we find out that payments were not

16   being made.  And the bank went after me because I was put

17   as the personal guarantor on that loan and obviously, we

18   need to fix.  At that time we want to fix that problem.

19            And Tommy Constantine eventually did that.  He

20   helped me with that.

21   Q.    Was that also part of the Global Settlement Fund?

22   A.    Yes.

23   Q.    Let me just, if I could, just ask a few questions

24   about what you just said.

25            When you talk about being a guarantor on a loan,

Gonchar - Direct/Mr. LaRusso

4814

1   you are talking about events that occurred prior to the

2   formation of the Global Settlement Fund.  Is that correct?

3   A.    Yes.

4   Q.    And you talked about an airplane and taking people

5   down to Mexico.  Is that correct?

6   A.    That's how it was presented to me by Phil Kenner.

7   Q.    That all occurred before the formation of the Global

8   Settlement Fund?

9   A.    Yes.

10  Q.    Could you tell us what you recall of those events

11  before the Global Settlement Fund.  How did it come about

12  that you learned about the Falcon 10 being used to take

13  people down to Mexico?

14  A.    Originally, it was presented by Phil Kenner to me

15  that we need to have those planes to fly people in, and

16  since there was two projects, so one of them up north and,

17  I don't remember, I think there was an airport nearby, but

18  I don't think it was convenient, you know, to -- right

19  there we need to have airplanes to make sure that people

20  can come and see the property before they invest in it,

21  and that's why we got those planes.

22          But then down the road I found out that I was

23  the personal guarantor on that, once I received the note

24  from the bank that the payments were not made and the bank

25  is going after me.

Gonchar - Direct/Mr. LaRusso

4815

1   Q.   When you received notification from the bank that

2   they were going after you as a guarantor on the loans for

3   those planes, were you aware that you had signed a

4   guaranty?

5   A.   I didn't remember signing it.

6   Q.   Let me show you what has been marked as C295.

7            Do you recognize this document and the signature

8   that appears?

9   A.   Yes.  It is my signature.

10  Q.   That is your signature on the second page?

11  A.   Yes, it is.

12  Q.   So you signed this document.  Is that correct?

13  A.   Yes.

14  Q.   Do you remember reading the document at the time you

15  signed it?

16  A.   No.

17  Q.   Did you know the terms of the document?

18  A.   No.

19  Q.   Did you have a lawyer at all to discuss this with?

20  A.   No.

21  Q.   Did you contribute any money to this venture?

22  A.   No.  I just was put as the personal guarantor on

23  that.

24  Q.   You were aware -- you were not aware that you were

25  guarantor?

Gonchar - Direct/Mr. LaRusso

4816

1    A.    No.

2    Q.    When you found out that you were a guarantor, did you

3    have a conversation with Mr. Kenner?

4    A.    Yes, I did.

5    Q.    Just tell us what that was.

6    A.    I spoke to Phil Kenner.  He told me that we need

7    these planes.  And he told me that Jowdy supposed to make

8    those payments and he has the arrangement with him that he

9    is going to, not only bring people to the property, but

10    also charter them out, and he is going to make money for

11    the monthly payments.

12         But I guess he didn't do it, and money payment,

13    I mean the monthly payments were not made.  And that's why

14    the bank went after me.

15         And Phil told me that we going to sell the

16    plane.  But it wasn't that easy because back then the

17    economy wasn't that good.  And then Tommy, Tommy

18    Constantine, stepped in and helped me a lot with that.  He

19    talked with the bank and removed me from the personal

20    guarantee.

21    Q.    That was after you met Mr. Constantine?

22    A.    Yes.

23    Q.    How much was your personal guarantee?

24    A.    I would say like 1.5.

25    Q.    Let me ask you, you identified your signature on that

Gonchar - Direct/Mr. LaRusso

4817

1   document.  There is no question about that.  Is that

2   correct?

3   A.    Yes.

4   Q.    You signed it?

5   A.    Yes.

6   Q.    You just don't have a recollection of reading it.  Is

7   that correct?

8   A.    Yes, it is.

9   Q.    You don't have a recollection of what that document

10  was that you signed.  But there is no question it is your

11  signature.  You did sign that?

12  A.    Yes.

13  Q.    Okay.  After meeting with Mr. Constantine and

14  Mr. Kenner and after you had received the emails on

15  May 18, 2009, and then acknowledged the authorization on

16  the following day, do you recall having a conversation

17  with Mr. Constantine, shortly thereafter, in regards to

18  your contribution that you made of $250,000?

19  A.    Yes.

20  Q.    Would you tell us what you recall of that

21  conversation.

22  A.    He asked me if he can use some of that money for his

23  personal use and then he will repay me later.

24  Q.    Did he say why he needed to use the money for his

25  personal use?

Gonchar - Direct/Mr. LaRusso

4818

1   A.   I just don't remember all the details like, but back

2   then I thought it was reasonable and I allowed him to use

3   that.

4   Q.   That is in reference to your original contribution of

5   250,000.  Is that correct?

6   A.   Yes, it is.

7   Q.   Why did you do that at that time?

8   A.   I don't know.  We become friends with Tommy and built

9   relationship.  I was talking to him.  He was explaining to

10  me, you know, what's going on with the investments.  And

11  then, obviously, he was helping me with bank.  So I start

12  knowing him.

13          And that's why I allowed him and I trusted him,

14  I trust him, and that's why I allowed him to use a portion

15  of that money.

16  Q.   So it would be fair to say that after you made the

17  contribution, after you met with Mr. Constantine, you

18  stayed in regular touch with him.  Is that correct?

19  A.   Yes, it is.

20  Q.   Do you recall receiving any progress reports on the

21  progress of the Global Settlement Fund and the objectives

22  that were laid out in the authorization agreements?

23  A.   Yes, because I was talking to him regularly.

24  Q.   Do you recall any conference calls with some of the

25  other contributors to the Global Settlement Fund?

Gonchar - Direct/Mr. LaRusso

4819

1   A.   Yes.

2   Q.   Tell us about that, please.

3   A.   I don't remember exact date, but usually, you know,

4   when I talked to Tommy there would be, you know, he would

5   give me head's up of conference call, and short after we

6   would receive email about the time and telephone number to

7   make the call to, and then we get on the phone and talk

8   about what we're doing and what's going on.

9   Q.   In the conference call, did Mr. Constantine answer

10  all the questions that were asked either by you or any of

11  the other hockey players?

12  A.   Yes.

13  Q.   Was he, in your opinion, straightforward in

14  responding to those questions?

15  A.   Yes.

16  Q.   After your initial contribution to the Global

17  Settlement Fund, did you make any other payments to the

18  Ron Richards trust account?

19  A.   Yes, I did.

20  Q.   Do you recall how many that you made?  And how much

21  the monies were?  Let me back up.

22       You do recall making additional wire transfers

23  to the Ron Richards trust account?

24  A.   Yes, I did.

25  Q.   Would it be fair to say that they totalled in excess

Gonchar - Direct/Mr. LaRusso

4820

1   of a million dollars?

2   A.   Yes.

3   Q.   I'm just going to go back to Government Exhibit 767.

4   I direct your attention to September 9, 2009.

5   Highlighted.  It says, *"The G55 Foundation [Gonchar Swiss*

6   *account] $749,985."*

7            Do you see that?

8   A.   Yes, I do.

9   Q.   Do you recall that amount of money being wired to the

10  trust account?

11  A.   Yes.

12  Q.   Just tell us, what is the G55 Foundation?

13  A.   That's account in Switzerland that I had, so I

14  transfer money from Europe to Ron Richards' account.

15  Q.   Could you give us the circumstances under which you

16  made this contribution.  Tell us about it.

17  A.   I remember there was that, I remember that there was

18  a loan was taken by Eufora, and to pay that loan

19  Tommy Constantine put money against -- I'm sorry, that

20  Tommy Constantine put patents against the loan, so to get

21  those patents back he need to buy back that loan.  So I

22  transferred the money, you know, to that.  I mean, this

23  money went to that.

24  Q.   I'm sorry?

25  A.   A good portion of this transfer went to that.

Gonchar - Direct/Mr. LaRusso

4821

1  Q.   I'm going to direct your attention to immediately

2  after your wire transfer into the Ron Richards' account,

3  the $700-plus, there is an entry 9/9/2009, Neptune Company

4  500,000.

5          Does that help refresh your recollection as to

6  the use of the money that you were depositing?

7  A.   I believe Neptune is the company that Tommy took a

8  loan from so.

9  Q.   That was one of the intended purposes of the money

10 that you sent.  Correct?

11 A.   Yes.

12 Q.   And there is, immediately after that, an entry *9/9 of*

13 *'09, Eufora, LLC.*

14         Do you see that?

15 A.   Yes, I do.

16 Q.   Would it be fair to say that also, that I believe is

17 in the amount of 250,000?

18 A.   Yes.

19 Q.   And that was also what you understood your money to

20 be used for?

21 A.   Yes.

22 Q.   Was that in -- was there any particular discussion

23 why that money was going to Eufora?  If you recall.

24 A.   I don't remember exactly what it was going to be used

25 for.  All I know that I was, for that I was buying

Gonchar - Direct/Mr. LaRusso

4822

1  additional, I mean I was getting additional percentage of

2  the company.

3  Q.   And these were the requests made by Mr. Constantine?

4  You had discussions with him about this before you sent

5  the money.  Correct?

6  A.   Yes.

7  Q.   Now, you said you made additional contributions or

8  transfers to Ron Richards' account.

9           I'm going to turn to the third page of

10  Government Exhibit 747, and on November 6, 2009, if I can

11  bring it down.

12           Do you see that?

13  A.   Yes.

14  Q.   It says, *"The G55 Foundation [Gonchar Swiss account]*

15  *$362,355.58."*

16           Do you see that?

17  A.   Yes, I do.

18  Q.   That was another wire transfer that you made.  Is

19  that right?

20  A.   Yes.

21  Q.   Can you give us the circumstances under which you

22  made that transfer.

23  A.   I don't remember exactly what that was for.  I just

24  remember that for, that also I was getting additional

25  percentage of the company.

Gonchar - Direct/Mr. LaRusso

4823

1    But, you know, we talked with Tommy and he was

2    back then giving me head's up on what he was doing.  Some

3    of the money, he was using it towards the commercial.  He

4    was making, you know, he was giving me the reasons like

5    why we need those money.  And that's why back then I

6    thought it was reasonable and that's why I give him the

7    money.  That's why I transferred the money.

8    Q.    And in regards to this money, did you also discuss

9    with Mr. Constantine his use of that for his own personal

10   expenses?

11   A.    This wire transfer?  I don't remember that.

12   Q.    At any point in time after the first conversation

13   regarding the 250, did you give him permission to use

14   monies that you may have transferred?

15   A.    I don't remember that.

16   Q.    Okay.  The last one.  November 30, 2009.  Gonchar

17   138,000.

18        Do you see that?

19   A.    Yes.

20   Q.    And can you tell us the circumstances under which

21   that contribution was made and for what purpose.

22   A.    I was buying additional stock in Eufora, and Tommy,

23   once again he told me that we need the company's money.

24   Back then he may have given me the reasons for Eufora.  I

25   just don't remember what it is right now.

Gonchar - Direct/Mr. LaRusso

4824

1   Q.   By the way, you mentioned that Mr. Constantine helped

2   you in regards to the guarantee that you were being held

3   responsible for by 1st Source Bank.  Is that correct?

4   A.   Yes.

5   Q.   Does he provide any other financial assistance

6   to you?

7   A.   Yes.  He helped me to get a mortgage for my place in

8   Florida through a friend of his who is working at 1st

9   Source Bank.  He also helped me with my lawyers in

10  Pittsburgh to represent me against, in a case against

11  First Source Bank.  And he helped me to negotiate the fees

12  that they trying to charge me at the end of the case.

13  Q.   I'm sorry.  I just want to clarify that.

14       In addition to helping you with the guaranty and

15  helping you with the mortgage, did he help you with your

16  legal fees in regards to that?

17  A.   Yes.

18  Q.   What was the outcome on that?  What did he do to help

19  you in that regard?

20  A.   He helped me to negotiate with those lawyers with the

21  company.  And the bill originally was like 65,000 or

22  75,000, and we were able to negotiate it down to like 15.

23  Q.   Now let me just go back for a minute to the

24  contribution on November 6 of 2009.

25       Do you see that?

Gonchar - Direct/Mr. LaRusso

4825

1    A.    Yes.

2    Q.    There is an entry November 6, 2009 to Eufora for

3    250,000.

4          Do you see that?

5    A.    Yes.

6    Q.    What was the rest of the money supposed to be

7    used for?

8    A.    I don't remember.

9    Q.    Do you recall any conversations with Mr. Constantine

10   where you said that you were giving him permission to use

11   it for his personal expenses as long as it was paid back?

12          MS. KOMATIREDDY:  Objection.  Leading.

13          THE WITNESS:  Yes.

14          THE COURT:  Sustained.  Sustained as to form.

15   BY MR. LaRUSSO:

16   Q.    Mr. Gonchar, do you remember any additional

17   conversations with Mr. Gonchar (sic) in regard to any

18   other monies that you had contributed to him, to the

19   Ron Richards' trust account?  Specifically referring to

20   the 362,000.

21   A.    No.  I'm not sure.

22   Q.    What happened to the remainder of the money after the

23   250 went to Eufora?

24          Do you recall any discussions with

25   Mr. Constantine about the remainder of that money?

Gonchar - Direct/Mr. LaRusso

4826

1    A.    You meant this wire transfer, the last?

2    Q.    Yes.

3    A.    I don't remember.

4    Q.    By the way, do you remember or did there come a time

5    when questions arose regarding the use of the monies in

6    the Global Settlement Fund?

7    A.    Yes.

8    Q.    And after --

9    A.    I should go back to your question.  I should say

10   that, you know, with the money going into the Ron

11   Richards' account and our original conversation with Tommy

12   about using this money, I should say that when I told him

13   that he can use the money, I'm assuming that there was the

14   money that, you know, I'm putting in and he's taking it,

15   but he's going to pay me back.

16          It is not like we discussed every single time.

17   We just had a general conversation in the beginning, and

18   that's the way I understood it; that he can take money

19   and, you know, use it, but as long as he's going to pay it

20   back.  That's the deal we had.

21   Q.    So that deal was initially when you first had made

22   the transfer to the Global Settlement Fund?

23   A.    Yes.

24   Q.    And was that agreement also, did it cover the other

25   monies that you --

Gonchar - Direct/Mr. LaRusso

4827

1    A.    Yes.  As I said, like in my understanding it was like

2    as long as he is going to pay it back, I don't mind him

3    using the money I'm putting in.

4    Q.    That would include all of the monies that you had put

5    into the Ron Richards' account?

6    A.    Yes.

7    Q.    Is that right?

8    A.    Yes.

9    Q.    But there did come a time when questions were raised

10   regarding the proper expenditures of money out of the

11   Global Settlement Fund.  Isn't that correct?

12   A.    Yes, it is.

13   Q.    And when you learned that information, what did you

14   do?

15   A.    I hired the forensic accountant.  I don't know if I'm

16   pronouncing it right.

17   Q.    That's okay.  Forensic accountant?

18   A.    Yes, forensic accountant.

19   Q.    Why did you hire a forensic accountant?  What was the

20   purpose?

21   A.    To see how the money was spent.

22   Q.    That means all the money that you had sent into the

23   Global Settlement Fund or into the Ron Richards' account.

24   Is that correct?

25   A.    Yes.

Gonchar - Direct/Mr. LaRusso

4828

1    Q.    How did you come to hire the forensic accountant?

2    A.    I ask Tommy if he can recommend me a lawyer that I

3    can talk to about it.  And so he recommended to me,

4    introduced me to a lawyer, and that lawyer introduced me

5    to Mr. Temple, who is the accountant so.

6    Q.    What did you ask Mr. Temple to do?

7    A.    To go through the records and check everything out

8    and tell me what was happening.

9    Q.    So you hired him to perform an analysis of the monies

10   that you had contributed as well, as the other hockey

11   players, to Ron Richards' trust account.  Is that correct?

12   A.    Yes.

13                MS. KOMATIREDDY:  Objection.

14                THE COURT:  Overruled.

15   BY MR. LaRUSSO:

16   Q.    Did there come a time when you met again with

17   Mr. Temple after you had hired him to perform those

18   services?

19   A.    Yes.

20   Q.    Could you tell us what happened.

21   A.    I talked on the phone with him.  He was giving me

22   updates and telling me like what he find out.

23   Q.    Did there come a point in time when he gave you his

24   conclusions regarding his analysis of the monies that had

25   gone into that account?

Gonchar - Direct/Mr. LaRusso

4829

1          MS. KOMATIREDDY:  Objection.  Hearsay.

2          THE COURT:  Overruled.

3          You can answer.

4          THE WITNESS:  Yes.

5    BY MR. LaRUSSO:

6    Q.   Can you tell use, please, what he said to you and

7    what you said to him.

8    A.   I was talking to him mostly about my money and the

9    wire transfers putting in, and he looked into them and he

10   told me, and then he told me where the money go after

11   that.

12          And back then I remember I was satisfied with

13   his explanation.  And the money was spent accordingly, you

14   know, as I was told before.

15   Q.   Did there come a time when you were contacted by

16   individuals about alleged wrongdoing that Mr. Constantine

17   was alleged to have done while operating Eufora?

18   A.   Yes.

19   Q.   And who contacted you?

20   A.   Phil Kenner.  And then Brian Berard was also involved

21   in that.

22   Q.   Can you tell us about that, please, what they told

23   you.

24   A.   Yes.  Phil Kenner had called.  I had been told that

25   Tommy is not doing the right things for you guys and that

Gonchar - Direct/Mr. LaRusso

4830

1   we should, you know, go after him.

2   Q.   And was there any discussion with Mr. Kenner -- did

3   you say it was just Mr. Kenner or was anybody else in

4   contact?

5   A.   No.  I said in the beginning it was just Mr. Kenner

6   on the phone, originally called.  But then we had a

7   meeting in New York where some of the hockey players flew

8   in, some of the employees of Eufora flew in, and then

9   there was a lawyer group in New York.  And we sat down and

10  we had a meeting.  And, you know, after that meeting I

11  decided not to participate and not to go after

12  Constantine.

13  Q.   Let me ask you a few questions about that.  Who set

14  up the meeting?

15  A.   To my knowledge it was Phil Kenner.

16  Q.   And do you know a person by the name of Brian Berard?

17  A.   Brian Berard was involved in that, too, as I said.

18  Q.   And when you went to New York, do you remember where

19  you went?  Who you met with?

20  A.   It was the office building on, I believe, very close

21  to Times Square.  I don't remember the exact address.  We

22  went there.  The lawyer on that site was the -- I try to

23  remember while we are talking.  I don't remember the last

24  name right now.

25          But we were in the room together, and he was

4831

1   telling us that we should go after Tommy soon because he

2   is not doing the right things.  But since I was talking

3   with Tommy regularly and he was giving me updates and, you

4   know, all the stuff that he is trying to do and the way he

5   was showing me the emails, how he is negotiating with the

6   banks about Eufora, so I knew, you know, it is not true.

7   So that's why I didn't participate in that lawsuit.

8   Q.    In this meeting was there any discussion about what

9   they were going to do?

10  A.    They were going to sue Tommy Constantine.

11  Q.    And was there any discussions about taking control of

12  the company?

13  A.    Yes.

14  Q.    And can you tell us what was said in regards to that.

15  A.    After they agreed to sue Tommy Constantine, they fold

16  he company.  You know, they were two different, I mean a

17  few different things, if I remember that correctly, how

18  they going to pursue.  They were thinking about maybe

19  lessening or talking about selling the patent and making

20  plans how what to do with the company after they will take

21  over.

22  Q.    When you say take over, take over from

23  Mr. Constantine.  Is that right?

24  A.    Yes, it is.

25  Q.    By the way, at this meeting in New York, did you tell

Gonchar - Direct/Mr. LaRusso

4832

1    Mr. Constantine in advance that the meeting was taking

2    place?

3    A.    Yes.

4    Q.    And did you in any way permit Mr. Constantine to hear

5    part of or all of the conversation that occurred?

6    A.    Yes.

7    Q.    How did you do that?

8    A.    Through my cell phone.

9    Q.    And what do you mean through your cell phone?  What

10   did you do?

11   A.    He was listening to the conversation while he was on

12   the phone.

13   Q.    So you turned your cell phone on?

14   A.    Yes.

15   Q.    Unbeknownst to the other participants?

16   A.    Yes.

17   Q.    Allowing Mr. Constantine to listen to the

18   conversation.

19   A.    Yes.

20   Q.    And did that also include the fact that there was

21   going to be an effort to take over the company from him?

22   A.    Say it again?

23   Q.    Including, was your phone operating and working at

24   the time that the discussion took place regarding the

25   taking over the company from Mr. Constantine?

Gonchar - Direct/Mr. LaRusso

4833

1   A.   Yes.  I believe so, yes.

2   Q.   By the way, did you in any way become part of the

3   efforts to take over the company from Mr. Constantine?

4   A.   No.

5   Q.   Why not?

6   A.   Because I didn't think it was the right thing to do.

7   I knew it was his company, he created, came up with the

8   idea, he created the patent, he was working hard to

9   deliver, and I thought it is not the right thing to do.

10  Q.   Do you recall at any point in time being asked to

11  sign an engagement letter allowing a lawyer to sue

12  Mr. Constantine?

13  A.   Yes.

14  Q.   Can you tell us about that.

15  A.   They asked me to sign because I have been told we

16  have to do it as a group, you know, as a group of

17  investors, and I said I don't want to be part of it.

18  Q.   Just a few more topics, if I can, Mr. Gonchar.

19         Do you recall at any point in time receiving a

20  telephone call from Brian Berard regarding the Neptune

21  loan?

22  A.   Again, what?

23  Q.   Telephone call from Mr. Berard regarding the Neptune

24  loan.

25  A.   Yes.  He was -- we talk, I think it was more than

Gonchar - Direct/Mr. LaRusso

4834

```
 1   one, I think maybe a few times we were talking about it.
 2   And he was trying to tell me that Tommy wants to keep
 3   everything to himself, and Neptune loan that we have to
 4   buy because otherwise Tommy is going to keep it and
 5   they're not going to get -- we're not going to get our
 6   shares.
 7   Q.   By the way, did there come a time that you, yourself,
 8   contributed to purchasing the loan that we are talking
 9   about?
10   A.   Yes.
11   Q.   Can you tell the jury about that.
12   A.   Yes.  As we talked before, that I transfer 750 and
13   part of the money was, you know, buy that loan back
14   because I felt this loan was against the patents, and the
15   patents has a really big value in the company, so I know
16   that it is very important that we get it through the
17   company.
18   Q.   Who were you working with in regards to buying the
19   loan at this time?
20   A.   The most I thought it was Tommy Constantine.
21   Q.   Did you make any contribution to buy that loan?
22   A.   What?
23   Q.   Did you make any contribution?
24        That was the 500,000 --
25   A.   Yes.
```

Gonchar - Direct/Mr. LaRusso

4835

1   Q.   -- that we saw.  Is that right?

2   A.   Yes.

3   Q.   Okay.  After the monies had been contributed to the

4   Ron Richards' trust account, did there come a time when

5   you provided additional financial help to any of the

6   entities that we talked about such as AZ, Avalon, or the

7   Falcon?

8   A.   Yes.  I know once in a while we make the monthly

9   payment for the building, and Tommy would pay me back a

10  couple of weeks later or sometime later.  Yes.

11  Q.   Can you tell us what happened to the hangars, if you

12  know?

13  A.   I know they both were sold.  Second one sold when

14  Tommy was arrested, a little while ago.

15           And I was in the hangars, I was in the

16  buildings, and I thought that it is a good investment

17  because they were nice buildings.  Right next to the

18  airport.  Next to the -- what do you call the access to

19  the -- how you call that, where the airplanes?  Airstrip?

20  Yes.

21           So you can drive that plane pretty much from the

22  building, from the hangar.  That's why I thought it was a

23  good investment and that's why I help them to make

24  payments.

25  Q.   One more question and I will be finished.  Do you

Gonchar - Direct/Mr. LaRusso

4836

1    recall anyone ever asking you to be a guarantor again on

2    the loan?

3    A.   Yes.

4         There was another thing.  I don't remember

5    exactly what year it was.  It was another time Phil Kenner

6    was asking me to be guarantor on those apartments and --

7    condos, I should say, in Las Vegas.

8    Q.   And did you sign a guarantee for those?

9    A.   No.

10   Q.   Why not?

11   A.   Tommy explained to me and said not to.

12   Q.   Could you tell us, as you are sitting here today

13   testifying, what is your relationship with

14   Mr. Constantine?  How would you describe your

15   relationship?

16   A.   I consider him as my friend.  You know, we speak

17   often, we share the same religion, you know, talking about

18   different things, families, you know, vacation to Las

19   Vegas together, we went to Mexico together.

20        I think we have relationship that all good

21   friends have, in my opinion.

22        MR. LaRUSSO:  Your Honor, I have no further

23   questions.

24        THE COURT:  Cross-examination?

25

4837

1    CROSS-EXAMINATION

2    BY MS. KOMATIREDDY:

3    Q.    Good morning, Mr. Gonchar.  My name is Sarita

4    Komatireddy.  I'm one of the prosecutors in the case.

5    A.    Okay.

6    Q.    You just mentioned -- let's pick up where you left

7    off.

8           You mentioned that Mr. Kenner at one point asked

9    you to be a guarantor on a loan involving some Palm

10   condos.  Is that right?

11   A.    Yes, that's right.

12   Q.    And Mr. Constantine told you not to do it?

13   A.    Yes.

14   Q.    You said *"Tommy explained it to me."*  What did he

15   explain to you?

16           MR. HALEY:  Well, I would object, your Honor.

17           THE COURT:  Why don't you approach.

18           (Continued on the following page.)

19

20

21

22

23

24

25

Gonchar - Cross/Ms. Komatireddy

4838

1    (Discussion at sidebar ensued as follows.)

2    MR. LaRUSSO:  I apologize to Mr. Haley.  I did

3    not go over that with the witness.  But I do know from my

4    client that it had to do with the lack of equity in them

5    and the fact he just got off another guaranty.  That was

6    the advice that I've been told he was given.  I don't

7    think he remembers.

8    MR. HALEY:  It is going to call for, in my

9    opinion, rank hearsay.  That is my objection.

10   What did Tommy Constantine tell you about what

11   you should or should not do or participate in this

12   particular loan is simply going to call for rank hearsay.

13   This is not a state-of-mind exception to the

14   hearsay rule as it relates to Tommy Constantine.  It is

15   inviting --

16   THE COURT:  Well, as to Tommy Constantine is an

17   admission, right?  He is a defendant, so they don't need

18   an exception for that.

19   MR. HALEY:  No, it is -- I guess what I'm

20   struggling with, Judge, it is not an admission by

21   Tommy Constantine in that respect.

22   From my perspective, it's what did Tommy

23   Constantine tell you about whether or not you should sign

24   as a guarantor in connection with those particular

25   condominiums.  Is that what it is?

Gonchar - Cross/Ms. Komatireddy

4839

1    MR. LaRUSSO:  Yes.

2    MS. KOMATIREDDY:  It is an admission because

3    those condominiums units paid -- it is an admission

4    because the government is asking the question and it's not

5    hearsay.

6    MR. LaRUSSO:  I don't understand what the

7    relevance is.

8    MS. KOMATIREDDY:  The relevance is because those

9    Palms condos are the Gilmartin Ross Palms condos.  Phil

10   Kenner is guarantor and that has been made emphasized

11   multiple times, and I'm kind of curious why Tommy told

12   Gonchar not to be a guarantor.  I would expect it is

13   because those were not significant assets and Mr.

14   Constantine misrepresented to all of the other players.

15   Gonchar he may have actually told the truth to, but he

16   told everyone else that he was against assets and --

17   THE COURT:  I think it is relevant, and it's an

18   admissible as an admission.

19   And you forgot to offer 295.  Do you want to?

20   MR. LaRUSSO:  I'm sorry, Judge.  I do want to.

21   MR. HALEY:  Sometimes these transactions are

22   just a bit confusing.

23   THE COURT:  Fine.  Do you have any objection to

24   295 coming in?

25   MR. HALEY:  No.

Gonchar - Cross/Ms. Komatireddy

4840

1          (Discussion at sidebar was concluded.)

2          (Continued on the following page.)

Gonchar - Cross/Ms. Komatireddy

4841

1      (The following ensued in open court.)

2      MR. LaRUSSO:  For the record, I forgot to offer

3  295.

4      THE COURT:  295 is admitted.

5      And the objection is overruled.

6      You can answer the question.

7      Go ahead.

8  BY MS. KOMATIREDDY:

9  Q.    Mr. Gonchar, you testified that, *"Tommy told me not*

10 *to guarantee those Palms, loans on the Palm condos."*  And

11 you said, *"Tommy explained it to me."*

12      What did he explain to you?

13 A.    I don't remember all the detail of the conversation.

14 I just remember after that conversation that I recognize,

15 you know, it's not a thing that I should do.

16 Q.    You don't remember him explaining anything about the

17 state of the condos or whether it was or was not a good

18 investment?

19 A.    As I said, I don't remember exactly like how that

20 conversation went.  I just remember that, you know, I

21 understood it is not what I want to do.

22 Q.    He told you that there wasn't any equity in those

23 condos.  Right?

24      MR. HALEY:  Your Honor, I would object.  Well --

25 I object.

Gonchar - Cross/Ms. Komatireddy

4842

1       THE COURT:  It's cross-examination.  She is

2  allowed to lead on cross-examination.

3       You can answer that.

4  BY MS. KOMATIREDDY:

5  Q.   He told you that there wasn't any equity in those

6  condos.  Right?

7  A.   I don't remember.

8       One thing I would say like how I come to the

9  solution not to do it, I just remember that it is not -- I

10  just remember that I decide not to do it after I talked to

11  Tommy.

12  Q.   Let's go a few years back.  You began your testimony

13  by talking about Mr. Kenner.

14  A.   Yes.

15  Q.   And you said that Mr. Kenner at some point was your

16  financial advisor.  Is that right?

17  A.   Yes, that's correct.

18  Q.   And you also talked about how you are a professional

19  hockey player.  And you're still a professional hockey

20  player today?

21  A.   Yes.

22  Q.   In your career you have won at least one Stanley Cup.

23  Right?

24  A.   That's right.  Yes.

25  Q.   In 2009?

Gonchar - Cross/Ms. Komatireddy

4843

1    A.    Yes.

2    Q.    In Detroit?

3    A.    Yes.

4    Q.    Is that the Joe Louis Arena?

5    A.    Yes, it is.

6    Q.    And you won that as a member of the Pittsburgh

7    Penguins?

8    A.    Yes.

9    Q.    I'm going to hand you what has been marked as

10   Government Exhibit 7304.

11         Do you recognize that?

12   A.    Yes.

13   Q.    What is that?

14   A.    Picture of me with Tommy Constantine, with

15   Phil Kenner, and Jason Louis.  I believe there was another

16   two guys, they are friends of Jason Louis, if I remember

17   correctly.

18   Q.    It was that day that you won the Stanley Cup in 2009.

19   Right?

20   A.    It is.

21         MS. KOMATIREDDY:  Government moves 7304 in

22   evidence.

23         MR. LaRUSSO:  I have no objection, your Honor.

24         MR. HALEY:  No objection, Judge.

25         THE COURT:  7304 is admitted.

Gonchar - Cross/Ms. Komatireddy

4844

1         (Government Exhibit 7304 in evidence.)

2    BY MS. KOMATIREDDY:

3    Q.    And on that day, Phil Kenner was with you.  Right?

4    A.    Yes.

5    Q.    Where is he in this picture?

6    A.    Sitting next to me.

7    Q.    Next to you behind the Cup.  Right?

8    A.    Yes.

9    Q.    And at that time you were on good terms with

10   Mr. Kenner.  Correct?

11   A.    Yes.

12   Q.    You were good friends, you said?

13   A.    Yes.

14   Q.    In addition to him being your financial advisor?

15   A.    Yes.

16   Q.    By the way, do you know how Mr. Kenner paid for the

17   tickets for that Stanley Cup final?

18   A.    I don't know.

19   Q.    You didn't buy them for him, did you?

20   A.    No.  I don't remember buying them for him.

21   Q.    At least not intentionally.

22   A.    What's that?

23   Q.    Moving on.  Okay.

24         So Mr. Kenner is your financial advisor and you

25   said that he advised you to invest in several real estate

Gonchar - Cross/Ms. Komatireddy

4845

1    deals.  Correct?

2    A.    Yes.

3    Q.    And he also advised you to invest in Eufora long

4    before you met Mr. Constantine.  Correct?

5    A.    That is correct.

6    Q.    Both of those real estate deals, Hawaii and Mexico,

7    those were also deals that happened long before you met

8    Mr. Constantine.  Correct?

9    A.    Yes.

10   Q.    And when Mr. Kenner advised you to invest in them, he

11   told you that there would be a cash contribution and also

12   this line of credit.  Right?

13   A.    Yes.

14   Q.    So about --

15   A.    In beginning, no.

16          Hold on.  In the beginning, it was just cash.

17   Never been told about the line of credit.  Later on I was

18   told there was a line of credit.

19   Q.    Were you told about the line of credit after it was

20   already open?

21   A.    Yes.

22   Q.    So you weren't told about the line of credit in the

23   beginning?

24   A.    No.

25   Q.    Only later?

Gonchar - Cross/Ms. Komatireddy

4846

1   A.   Yes.

2   Q.   And then you were told that your line of credit had

3   to be guaranteed by your bonds.  Right?

4   A.   Yes.

5   Q.   Bonds that you moved from another bank to Northern

6   Trust.  Right?

7   A.   Yes.  We open up account in the Northern Trust

8   because I've been told they doing better job managing his

9   bond portfolio.

10  Q.   That investment, you testified, was involving real

11  estate in Hawaii and the money was supposed to be used to

12  develop the land in Hawaii.  Correct?

13  A.   It is correct.  Yes.

14  Q.   In fact, the plan was to build houses and sell them.

15  That is how you were supposed to get your money back.  Is

16  that right?

17  A.   That's what I was told.  Yes.

18  Q.   But the deal in Hawaii never developed at all,

19  did it?

20  A.   Yes, it didn't.

21  Q.   And it never worked out?

22  A.   Never worked out.  Yes.

23  Q.   That is a deal that Phil Kenner advised you to get

24  into.  Correct?

25  A.   Correct.

Gonchar - Cross/Ms. Komatireddy

4847

1   Q.   That's not something that Tommy Constantine had

2   anything to do with.  Right?

3   A.   Yes.  That's correct.

4   Q.   He didn't advise you to get into it.

5   A.   No.

6   Q.   He wasn't supposed to get any money out of it.

7   A.   Nobody told me anything about Tommy getting any money

8   from that.

9   Q.   That was a totally different thing?  Yes?  Totally

10  different from Eufora.

11  A.   From Eufora, yes.

12  Q.   And you also testified that you were involved in real

13  estate in Mexico on the advice of Mr. Kenner.  Correct?

14  A.   It is correct.  Yes.

15  Q.   Two properties.  You invested a total of $750,000 in

16  those properties?

17  A.   Yes.  That's correct.

18  Q.   And that was a separate investment from Hawaii.

19  Right?

20  A.   Correct.  Yes.

21  Q.   You actually authorized separate wire transfers from

22  the Mexico properties.  Right?

23  A.   Yes.

24  Q.   And the money for Hawaii was not supposed to go to

25  Mexico.  Right?  It was separate.

Gonchar - Cross/Ms. Komatireddy

4848

1   A.   Not when the deals were introduced to us, no.

2   Q.   The money from Mexico was not supposed to go to

3   Hawaii.  They were separate?

4   A.   I mean, nobody told me that money was going to go

5   back and forth when the deals were presented to me, no.

6   Q.   You testified at the end you lost all of your line of

7   credit.  Almost a million dollars.  Is that right?

8   A.   Yes.

9   Q.   And that was your bond account, your retirement fund,

10  is that fair?

11  A.   Bond portfolio, yes.

12  Q.   Mr. Gonchar, I'm going to show you what is in

13  evidence as Government Exhibit 2139.  I want you to take a

14  minute to look at it.

15              Have you ever seen this before?

16  A.   I don't remember seeing this.

17  Q.   It's in evidence as a loan transaction history for a

18  loan in your name.

19              Do you see that, sir?

20  A.   Of course I do see my name, but I don't remember

21  seeing it.

22  Q.   Do you see that loan number, 278547?

23  A.   On the top.  Yes.

24  Q.   And it is in evidence as a loan transaction history

25  for your line of credit.  Okay?

4849

1   A.   Okay.

2   Q.   Now, I'm going to point your attention to a

3   transaction in October 2005.

4        Do you see in October of 2005 there is a note

5   increase here of $375,000?

6   A.   Okay.  Yes.

7   Q.   That is in addition to your loan.  You're borrowing

8   $375,000 against your bond portfolio.  Okay?

9        Does that seem like a fair representation?

10  A.   Yes.

11  Q.   I'm going to show you what is in evidence as

12  Government Exhibit 2101.  Page 78.  This is a bank account

13  statement from Little Isle IV.

14        Are you familiar with Little Isle IV?

15  A.   It's account I supposed to, you know, this company is

16  a Hawaiian company, yes.

17  Q.   It was the company that Mr. Kenner managed for the

18  Hawaii project.  Right?

19  A.   Yes.

20  Q.   So on that same day, October 28, 2005, do you see the

21  $375,000 coming in to this account for Little Isle IV?

22  A.   Um-hum.

23  Q.   From that same loan account of yours.

24  A.   Okay.

25  Q.   278547.

Gonchar - Cross/Ms. Komatireddy

4850

1    A.    I can see that, yes.

2              (Continued on following page.)

Gonchar  -  Cross/Komatireddy

4851

1  BY MS. KOMATIREDDY:

2  Q.   And on that same day money then goes out -- I'm

3  sorry -- a couple days later, on October 31st, do you see

4  money then goes out on October 31st, a little over

5  $300,000?

6  A.   Um-hum.

7  Q.   It goes to this other account.  I know this takes a

8  couple of steps, but just bear with me, okay?

9  A.   Okay.

10  Q.   So this other account ends in 6189, do you see that?

11  A.   6189, yes.

12  Q.   I'm going to turn your attention to the account

13  statement for that account which is in evidence as 2102.

14  We're going to go to page 15.

15        Do you see on that same day the deposits, 10/31,

16  you have a little over $300,000 coming in; do you see

17  that?

18  A.   Yes, I do.

19  Q.   I'm going to go to withdrawals.

20        Do you see on that same day, October 31st,

21  $330,000 going to Constantine Management Group?

22  A.   Yes, I do.

23  Q.   Did you intend to pay Mr. Tommy Constantine $330,000

24  from your Hawaii line of credit?

25  A.   I wasn't discuss money going from Hawaiian deal to

Gonchar  -  Cross/Komatireddy

4852

1    Constantine Management Group.

2    Q.    Did Mr. LaRusso show you that document before you

3    came into Court today?

4    A.    I didn't see that document, no.

5    Q.    Now, let's talk about your investments in Eufora.

6          You testified that you made a couple of

7    investments in Eufora with Mr. Kenner before you met

8    Mr. Constantine, correct?

9    A.    Yes.

10   Q.    I believe you testified you met Mr. Constantine in

11   April 2009 roughly?

12   A.    Roughly, yes.

13   Q.    And until that time -- before that time, I apologize,

14   you knew Mr. Kenner as your financial advisor, correct?

15   A.    Yes.

16   Q.    He told you about Eufora being a promising credit

17   card company?

18   A.    Yes.

19   Q.    And he told you Tommy Constantine was a person who

20   had founded that company?

21   A.    Yes.

22   Q.    And in 2008, I think you said you had put

23   approximately 200 or $250,000 into Eufora before you ever

24   met Mr. Constantine?

25   A.    That's correct.

Gonchar  -  Cross/Komatireddy

4853

1   Q.    When you put that money into Eufora, it was for an

2   investment in Eufora, correct?

3   A.    Yes.

4   Q.    The money was supposed to go for the company,

5   correct?

6   A.    Yeah.

7          I was buying stock.  I don't know where the

8   money supposed to go.  I was told to transfer the money,

9   you get a certain percentage, and I did transfer the

10  money.

11  Q.    Now, when you talked about the Global Settlement Fund

12  on direct examination, you talked about you had a

13  conversation with both Kenner and Constantine about the

14  Global Settlement Fund; do you remember that?

15  A.    Yes.

16  Q.    And you said it was supposed to go towards legal fees

17  for Jowdy, some other problems that were there and in that

18  first conversation, right?

19  A.    Yes.

20  Q.    Then you also said you had another conversation with

21  Mr. Constantine where he told you that he needed some

22  money for personal use, and you were happy to give it to

23  him because he was your friend and you trusted him?

24  A.    Yes.

25  Q.    Before you ever met Mr. Constantine, when you first

Gonchar  -  Cross/Komatireddy

4854

1    invested in Eufora, did you ever have a conversation with

2    Tommy or anyone else where he said he needed money for his

3    personal use and asked you to lend it to him?

4    A.   Before I met him, you're saying?

5    Q.   Yes.

6    A.   No, we never had a conversation about him needing

7    money for his personal use, no.

8    Q.   Was any of your investment in Eufora, before you met

9    Mr. Constantine, money that you were sending to Eufora,

10   was any of that -- did you authorize any of that to go to

11   his personal use?

12   A.   I was buying stock from -- Phil Kenner present I can

13   buy stock for a certain amount of the company.  I was

14   buying stock.  I didn't know where the money going and who

15   is selling the stock, which entity.

16           I just been told, you know, this is the company

17   we should invest, it's going to be doing very well, and

18   you have to -- and I suggest you send money and that's

19   what I did.

20   Q.   He told you Tommy Constantine was the founder of

21   Eufora, right?

22   A.   Yes.

23   Q.   And the CEO of Eufora?

24   A.   Yes.

25   Q.   Did he ever tell you that the CEO of Eufora was

Gonchar  -  Cross/Komatireddy

4855

1  selling his stock away from the company?

2  A.  Never.

3  MR. LARUSSO:  Objection to the form, your Honor.

4  THE COURT:  I don't know what the objection is.

5  MR. LARUSSO:  Away from the company.  There's no

6  facts about that, Judge.

7  THE COURT:  Again, the lawyer's question is not

8  evidence.  I'll allow you to ask it.

9  MS. KOMATIREDDY:  It rephrase it, your Honor.

10  BY MS. KOMATIREDDY:

11  Q.  In your conversation with Mr. Kenner, when he's

12  recommending that you invest in Eufora because it's a

13  promising company, did he ever tell you, as you sit here

14  today, do you remember him ever telling you that Tommy

15  Constantine, the CEO of the company, was selling his own

16  personal stock?

17  A.  I don't remember him telling me that.

18  Q.  You also testified that there came a time later when

19  you invested in Eufora around the time of the Global

20  Settlement Fund, correct?

21  A.  Yes.

22  Q.  You said you gave money in return for a percentage of

23  the company, correct?

24  A.  Yes.

25  Q.  And you had conversations with Mr. Constantine about

Gonchar  -  Cross/Komatireddy

4856

1    that, correct?

2    A.    Yes.

3    Q.    I'm going to hand you what's been marked as

4    Government's Exhibit 4608.

5            (Exhibit handed.)

6            Have you had a chance to read it?

7    A.    Yes.

8    Q.    Do you recognize that?

9    A.    Yes.

10   Q.    What is it?

11   A.    It's money that I give to the company in the

12   beginning.

13           I should correct myself.  Since I see this

14   e-mail, originally I guess it was a loan and Tommy

15   actually was paying me monthly, but then I convert that

16   loan to the stock of the company.

17   Q.    Let me first identify this document and put it up on

18   the screen.

19           Is this a true and accurate copy of an e-mail

20   from Mr. Constantine to you, CC'ing Phil Kenner?

21   A.    Yeah, I think it's a true copy.

22   Q.    Do you remember getting this e-mail?

23   A.    Yes.

24           MS. KOMATIREDDY:  The government moves 4608 into

25   evidence.

Gonchar  -  Cross/Komatireddy

4857

1    A.    Now, I remember it.

2              MR. LARUSSO:  No objection, your Honor.

3              MR. HALEY:  No objection, Judge.

4              THE COURT:  4608 is admitted.

5              (Government Exhibit 4608 in evidence.)

6    BY MS. KOMATIREDDY:

7    Q.    Now, the date of the e-mail is August 29, 2009,

8    correct?

9    A.    Yes.

10   Q.    This is after you met Tommy and after you had your

11   initial conversation about the Global Settlement Fund,

12   correct?

13   A.    Yes.

14   Q.    It says, subject, Eufora investment, correct?

15   A.    Yes.

16   Q.    It says:

17             Sergei, per our conversation, the deal points

18   that we are proposing to you as a prospective investor is

19   as follows, correct?

20   A.    Yes.

21   Q.    500 to 750K investment.

22             Then it has a couple of bullet points, I think

23   what you described it was originally supposed to be a

24   loan, then it turned into an investment; is that right?

25   A.    Yes.

Gonchar  -  Cross/Komatireddy

4858

1  Q.    And in return for your investment, it says, in bullet

2  point three, you will be provided with a two percent to

3  three percent interest in the company; two percent for

4  500,000, three percent for 750,000 based on a current

5  valuation of 25 million.

6         Do you see that?

7  A.    Yes.

8  Q.    Which one did you end up taking, the two percent or

9  the 3 percent?

10  A.    I believe it was 3 percent.

11  Q.    So you put $750,000 into the Ron Richards account in

12  exchange for a 3 percent share in Eufora?

13  A.    Yes.  If I remember correctly, yes.

14  Q.    It says here:

15         However you elect to be paid off, whether you

16  elect to be paid off in year two or not, you will be

17  getting this interest in the company, correct?

18  A.    Yes.

19  Q.    As far as you're concerned, as you sit here today,

20  you have that interest in the company, right?

21  A.    Yeah, I do I believe I do have interest in Eufora,

22  yeah, total over six percent.

23  Q.    And in this e-mail in August 2009, Mr. Constantine

24  doesn't say that he has to ask anyone else permission to

25  give you interest in the company, does he?

Gonchar  -  Cross/Komatireddy

4859

1   A.    In this e-mail it doesn't say that.

2   Q.    He doesn't say that he's not actually the CEO, but

3   somebody else is the CEO, and you have to talk to them

4   first.

5         He doesn't say that, does he?

6   A.    It doesn't say it here.

7   Q.    Did he say it in your phone conversations?

8   A.    About him talking to somebody?

9   Q.    Yeah.

10  A.    No, I don't remember that.

11  Q.    He didn't tell you that he had to go get permission

12  from a lender or some guy in Europe, did he?

13  A.    Europe, he told me there's a lender in Europe.  We

14  had a conversation about that, but he didn't tell me that

15  he has to ask permission from the lender in Europe, no.

16  Q.    He just said; you give me this money, $750,000,

17  you'll get a 3 percent share of the company, and as far as

18  you're concerned that's what happened, right?

19  A.    Yes.

20  Q.    Now, in that arrangement that we just looked at, it

21  had a -- one of the terms was an interest only payment.

22        So as part of this arrangement you had with

23  Mr. Constantine, you had the option of getting money back

24  in small amounts; is that right?

25  A.    Yes.

Gonchar  -  Cross/Komatireddy

4860

1   Q.   I'm going to show you what's in evidence as

2   Government's Exhibit 1218, which is a bank statement for

3   Eufora, LLC.

4            Do you see that?

5   A.   Yes, I do.

6   Q.   It's dated December 2009, do you see that?

7   A.   Yes.

8   Q.   Looking at the second page, in payments, I'm going to

9   highlight a payment here.

10            Do you see a payment to -- is that you and your

11  wife, Mr. Gonchar?

12  A.   Yes, it is.

13  Q.   You're receiving $6,250; is that correct?

14  A.   Yes.

15  Q.   Why are you receiving that money from Eufora?

16  A.   Maybe few reasons.  Maybe, you know, as I said

17  before, that I was loaning Tommy money for the building,

18  for different projects, and he would pay me money back.

19            I don't remember exactly what was this one for,

20  but I do remember that he was paying me back from some of

21  the transactions.

22  Q.   So this is Mr. Constantine paying you back for an

23  earlier loan you gave him?

24  A.   The loan, when you say earlier loan, what you mean

25  about the loan, which one?

Gonchar  -  Cross/Komatireddy

4861

1      It might be payment for -- let's say I made

2   payment for the building and Tommy would pay me for that

3   payment I made for the building so...

4   Q.   I understand, okay.

5   A.   I just don't remember exactly which one, $6,250.  I

6   don't remember if it's for the building or something else.

7   Q.   At various times you had made loans to Tommy in small

8   amounts and he would pay you back?

9   A.   Yes, yes, that's correct.

10  Q.   This is one of those payments back to you?

11  A.   I would say so, yes.

12  Q.   Let's talk about those buildings for a second.

13      I'm going to show you what's in evidence as

14  Government's Exhibit 3420 A.

15      The buildings you're referring to are two

16  hangars in Scottsdale, Arizona, correct?

17  A.   Yes.

18  Q.   And those two hangars in Scottsdale, Arizona, you

19  knew that a man named Jeff Bailey owned those hangars,

20  right?

21  A.   Yes.

22  Q.   There were no hockey players who owned those hangars

23  in 2009, right?  It was Jeff Bailey?

24  A.   2009?  I just don't remember back then.

25  Q.   Well, you knew at some point a man named Jeff Bailey

4862

1   owned those hangars?

2   A.   Yes.

3   Q.   You tried to buy those hangars from Jeff Bailey,

4   right?

5   A.   Yes.

6   Q.   And this document says that you are going to take out

7   a loan of $3.8 million to buy those two hangars in

8   Scottsdale, Arizona, in 2011, right?

9   A.   Okay, yes.

10  Q.   Do you remember doing that?

11  A.   Now I see the document; yes, I do.

12  Q.   Let's scroll to the bottom.

13        Is that your signature, Mr. Gonchar?

14  A.   Yes.

15  Q.   You didn't ultimately buy the hangars, did you?

16  A.   No.

17  Q.   Why not?

18  A.   I don't remember why.

19  Q.   But Mr. Constantine is the one who set this

20  opportunity up for you, right?

21  A.   Yes, he did.

22  Q.   Now, let's turn to the planes.

23        You testified that you were a guarantor on a

24  loan agreement for two planes, correct?

25  A.   Yes.

Gonchar  -  Cross/Komatireddy

4863

1   Q.   I'm going to put on the screen Government's Exhibit

2   4237 which is in evidence.

3        Looking at the loan and security agreement,

4   that's your signature, Mr. Gonchar?

5   A.   Yes, it is.

6   Q.   When did you find out that you were a guarantor on

7   this loan?

8   A.   I think when I received a note, a letter from the

9   bank that they're going after me.

10  Q.   And you received a letter they were going after you

11  because the loan hadn't been paid, right?

12  A.   Yes.

13  Q.   And you called Mr. Kenner after you received that

14  letter, right?

15  A.   Yes, I did.

16  Q.   And he told you that he would make the payments,

17  correct?

18  A.   Yes.

19  Q.   And then he didn't make the payments, correct?

20  A.   He did maybe for a short period of time, and then he

21  stopped making them.

22  Q.   And then because he stopped making them, the bank

23  came after you for the full amount of the loan, right?

24  A.   Yes.

25  Q.   And when you're talking about the full amount of the

Gonchar  -  Cross/Komatireddy

4864

1    loan, I'm going to turn your attention to 4212.

2             Have you seen this before?

3    A.   Yes, it's a settlement agreement.

4    Q.   You see your signature there at the bottom?

5    A.   Yes.

6    Q.   As a guarantor, right?

7    A.   Yes.

8    Q.   And we're talking about the full amount of the loan.

9    You owed the bank more than $1.3 million in 2009 because

10   of these two aircraft, right?

11   A.   Um-hum, yes, that's correct.

12   Q.   And we're talking about the two aircraft, we're

13   talking about the Falcon 10 and the Fairchild Metro,

14   right?

15   A.   Yes, that's correct.

16   Q.   You were personally on the hook because Mr. Kenner

17   wasn't making the payments, right?

18   A.   Ken Jowdy originally was supposed to make the

19   payments.

20            And then when he wasn't making the payments,

21   Phil Kenner picked it up and started making some payments

22   for some period of time, yes.

23   Q.   So you were personally on the hook for more than 1.3

24   million because neither Ken Jowdy nor Phil Kenner were

25   making the payments?

Gonchar  -  Cross/Komatireddy

4865

1    A.    Yes.

2    Q.    And it was Tommy Constantine who got you off the

3    hook, right?

4    A.    That's correct.

5    Q.    You testified on direct that he talked to the bank

6    and got them to let go of the guarantee, right?

7    A.    Yes.

8    Q.    Did he tell you how he was going to talk to the bank

9    and get them to let go of the guarantee?

10   A.    If I remember correctly, I believe one of the planes

11   he was helping bank to sell it so they get some money for

12   that.

13             And the second one, he put a group of guys

14   together and he was able to buy that plane from the bank

15   and that's how the bank let me from my guarantee.

16   Q.    You knew that money, or did you know that money out

17   of the Global Settlement Fund was being used to get you

18   out of your $1.3 million loan?

19   A.    Part of it, yes, part of the global settlement.

20             The global settlement was originally created,

21   you know, to do things like this, you know, pay for the

22   building, help me with airplane and all that stuff.

23             Yes, that's correct.

24   Q.    So you believed that the Global Settlement Fund was

25   partly created to help you get out of your $1.3 million

Gonchar - Cross/Komatireddy

4866

1    loan on the airplanes?

2    A.    Yes.

3    Q.    And you put in initially $250,000 into the Global

4    Settlement Fund, right?

5    A.    Yes.

6    Q.    And you testified that later you had other

7    conversations and you put in a little bit over another 1.2

8    million or so for Eufora, right?

9    A.    Yes.

10    Q.    But to be getting $250,000, you'll agree with me,

11    Mr. Gonchar, 250,000 is a lot less than 1.3 million?

12    A.    Yes.

13        We were putting money together as a group. When

14    we all put money together, there's a lot of money into the

15    Global Settlement Fund.

16    Q.    So you thought all of the other hockey players wanted

17    to help you out with your $1.3 million loan?

18    A.    I was helping them. We were doing it as a group.

19    Q.    So you were okay with taking money from other

20    professional hockey players to paydown your $1.3 million

21    loan?

22    A.    Yeah, but they were taking money --

23    Q.    It's a yes or no question, Mr. Gonchar.

24        You were okay with taking money from other

25    professional hockey players to paydown your $1.3 million

Gonchar  -  Cross/Komatireddy

4867

1  loan?

2          Yes or no?

3  A.    No, it's not about me getting paid my loan.  We never

4  discussed payment, paying just one personal loan.

5          It's about fixing the problem we had and it's

6  not about one person only, one person benefiting from that

7  because other guys benefit from the Global Settlement Fund

8  in different ways.

9  Q.    Right.

10          And you had that discussion with Phil Kenner and

11  Tommy Constantine, right?

12  A.    Yeah.

13          We put money together because we had discussion

14  and because we decide --

15  Q.    And you had that discussion in your home, right, in

16  Pittsburgh, in May 2009?

17  A.    Yes.

18  Q.    And it was the three of you in your home, right?

19  A.    My wife and my kids, yes.

20  Q.    Your wife and your kids?

21  A.    Yes.

22  Q.    And no one else?

23  A.    No.

24          MS. KOMATIREDDY:  Your Honor, may we have a

25  brief sidebar?

Gonchar  -  Cross/Komatireddy

4868

1    THE COURT:  Let's take the break.  Let's take

2    the morning break.  Don't discuss the case.

3    A JUROR:  Your Honor, I was wondering, when an

4    exhibit that's already in evidence is presented, could you

5    please identify what that exhibit is, not just the number,

6    maybe show the first page or something, because like when

7    the Ron Richards was presented it wasn't clear for a while

8    what that actually was.

9    THE COURT:  Okay.  Thank you.

10   (The jury is excused.)

11   (The witness steps down.)

12   THE COURT:  If everyone could be seated.

13   A couple of things.  First, the court reporter

14   has asked that Mr. Kenner not do the printing during the

15   testimony.  It distracts her ability to hear the

16   testimony, so I would ask that you be sensitive to that.

17   In addition, Ms. Komatireddy, you made a comment

18   regarding the Stanley Cup tickets where he said he didn't

19   pay for Mr. Kenner to go, and then you said at least not

20   intentionally and then you withdrew it.

21   I want to emphasize again, and I told this to

22   Mr. LaRusso and to Mr. Haley, it really disturbs me when

23   lawyers insert their comments in between questions.  It's

24   inappropriate.  And just because they did it doesn't mean

25   that the government can do it.  It's inappropriate.  It

Gonchar  -  Cross/Komatireddy

4869

1   bothers me when lawyers do it and I don't want it to

2   happen again.

3              MS. KOMATIREDDY:  Yes, sir.

4              THE COURT:  In addition, Mr. Kenner is overtly

5   shaking his head yes, up and down, every time Mr. Gonchar

6   says something that he agrees with.

7              Again, I have warned him numerous times about

8   that, Mr. Haley.  That bothers me as well.

9              The goal is that both sides get a fair trial.

10  And when anybody, whether it be a lawyer or a defendant,

11  does something to try and influence the jury, that bothers

12  me.

13             When Mr. Kenner is up here testifying he has

14  every chance he wants to tell the jury his side.  They

15  don't need his cues to know when a witness is saying

16  something that he believes is true versus when it's not.

17             Mr. Kenner, I'm telling you again, the next time

18  I see it, in front of the jury I'm going to warn you not

19  to make body language, not to utilize your body language

20  when a witness is testifying.

21             Do you understand, Mr. Kenner?  If I see you

22  doing it again, I'm going to warn you in front of the jury

23  because the jury needs to know they shouldn't be looking

24  to you to see whether or not you agree with a piece of

25  testimony.

Gonchar  -  Cross/Komatireddy

4870

1          Do you understand?

2          MR. KENNER:  Yes, sir, I do.

3          MS. KOMATIREDDY:  Your Honor, the reason I asked

4    for a sidebar is, and I didn't want to make this comment

5    in front of the jury, Mr. LaRusso, during the last five

6    minutes, was doing the same thing, shaking his head.  He

7    used a hand gesture and Mr. Gonchar clearly looked over to

8    him for the cue and he gave it.  I would ask that that

9    stop.

10          THE COURT:  I didn't see Mr. LaRusso do it.

11   Mr. Kenner is in my direct line of sight to the witness

12   box.  I saw him doing it.

13          The comment is going to end.  This is a Court of

14   law.  It's not a street brawl, okay?  And, as I said

15   before, you're all very professional.  I like all of you

16   personally.

17          It's going to stop, okay?  We're not going to

18   have that.  It's up to the jury to decide who to believe

19   and not to believe.  They don't need the defendants or the

20   lawyers help.  And if I see it from anybody, I'm going to

21   warn you now in front of the jury.  I have warned you

22   enough times, everybody, outside the presence of the jury.

23   I will warn you in front of the jury.  Does everybody

24   understand that?

25          MR. LARUSSO:  Yes, your Honor.

Gonchar  -  Cross/Komatireddy

4871

```
 1                MS. KOMATIREDDY:  Yes, your Honor.
 2                MR. HALEY:  My closed eyes don't indicate I'm
 3    asleep.
 4                MR. LARUSSO:  Judge, I have to go on the record.
 5                Ms. Komatireddy was correct.  I did shake my
 6    head up and down and I do apologize to both.
 7                THE COURT:  I understand it sometimes.  I'm not
 8    saying everyone is a statue, but you have to be cognizant
 9    of your body language when you're doing something like.
10                And to me at least with Mr. Kenner it's clear
11    that he's doing it in a very overt representative manner.
12    And if I see it again, I'm going to warn you in front of
13    the jury because they need to know that that's not
14    appropriate, okay?
15                How much longer do you have?
16                MS. KOMATIREDDY:  Probably 15 minutes, your
17    Honor.
18                THE COURT:  Okay.  Thank you.
19                (Recess taken.)
20                (After recess.)
21                THE CLERK:  All rise.
22                THE COURT:  Please be seated.
23                (The witness resumes the stand.)
24                THE COURT:  Let's bring in the jury.
25                MR. MISKIEWICZ:  Your Honor, while we're
```

Gonchar  -  Cross/Komatireddy

4872

1   waiting, we received a copy of the Home Depot tape from

2   Mr. Stolper's office.  It just came in a few minutes ago.

3   We will make a copy and provide it to counsel either later

4   today or tomorrow morning.

5           THE COURT:  It's 50 minutes?

6           MR. MISKIEWICZ:  It looks like it's about the

7   same length.

8           THE COURT:  Okay.

9           Mr. LaRusso, do you have any objection to any of

10  Mr. Haley's exhibits for Mr. Kenner?

11          MR. LARUSSO:  No, I don't, your Honor.

12          MR. HALEY:  Thank you, Judge.

13          Your Honor, it's a circumstance I have frankly

14  never encountered before in this respect.  I'll withhold

15  my comments until afterwards.  It has to do with my

16  redirect of Mr. Kenner.

17          THE COURT:  Okay.

18          MR. LARUSSO:  Just to make the record complete,

19  I'm not sure I should be doing this.  We contacted

20  Mr. Stolper, Mr. Oliveras did, and he said he didn't know

21  what we were talking about.  I'm glad the government was

22  able to jog his memory as to what he had.

23          THE COURT:  They're going to give you a copy of

24  it.

25          MR. LARUSSO:  I understand.

Gonchar - Cross/Komatireddy

4873

1    THE CLERK:  All rise.

2        (The jury is present.)

3    THE COURT:  Please be seated.

4        Go ahead, Ms. Komatireddy.

5    MS. KOMATIREDDY:  Thank you.

6  BY MS. KOMATIREDDY:

7  Q.   When we left off, Mr. Gonchar, we were talking about

8  that conversation in your home between you, Mr. Kenner,

9  Mr. Constantine and your wife and kids were present, do

10  you remember that?

11  A.   Yes, I do.

12  Q.   April or May of 2009, right?

13  A.   Yes.

14  Q.   And we were talking about your $1.3 million loan to

15  the bank for two airplanes, right?

16  A.   Yes.

17  Q.   Did you ever talk to Michael Peca directly and tell

18  him that you had $1.3 million loan that you expected money

19  from the Global Settlement Fund to go to pay down?

20  A.   I don't remember talking to him.

21  Q.   How about Darryl Sydor?

22  A.   I don't remember if I had a conversation about this

23  particular reason.

24  Q.   How about Steven Rucchin?

25  A.   No.

Gonchar  -  Cross/Komatireddy

4874

1    Q.    Glen Murray?

2    A.    No.

3    Q.    Mattias Norstrom?

4    A.    No.

5    Q.    You know all those people, right, as professional

6    hockey players?

7    A.    Yes, I do.

8    Q.    Now, after that loan was paid off, you retained an

9    interest in the Falcon 10 airplane, correct?

10   A.    I believe we all did as a group.

11   Q.    And that interest was in something called AZ Falcon

12   Partners, right?

13   A.    Yes.

14   Q.    At some point you had a conversation with

15   Mr. Constantine where he gave you paperwork for AZ Falcon

16   Partners, correct?

17   A.    I don't remember.

18   Q.    You don't know if you actually have documentation of

19   that interest?

20   A.    I don't remember that.

21   Q.    Okay.

22            Well, let's take a look at 4602.

23            (Exhibit handed.)

24            Let me know what that is.

25            (Pause in proceedings.)

Now, on the first page, there's an e-mail from Mr. Constantine to you, correct?

A. Yes.

Q. The subject line is AZ Falcon Partners docs?

A. Yes.

Q. There's an attachment with an operating agreement, right?

A. Yes.

Q. Do you remember getting this e-mail?

A. Now that I see it, yes.

Q. Do you remember forwarding it to your lawyer?

A. No, I don't remember.

Q. The e-mail from Mr. Constantine to you, you remember getting that and the attachment, correct?

A. Yes.

Q. This is a true and accurate copy of that e-mail and attachment?

MR. LARUSSO: Your Honor, may we have a sidebar for a brief second?

(Continued on next page.)

Gonchar   -   Cross/Komatireddy

4876

1      (The following takes place at sidebar.)

2          MR. LARUSSO:  I've never seen it.  When she said

3  did you send this to your lawyer, I thought this person

4  might be his lawyer, and I'm a little concerned about

5  privileged communications.

6          MS. KOMATIREDDY:  It's not privileged

7  communication because it's been disclosed.  I don't know

8  who that was.  It doesn't matter for us who it was.  I'm

9  happy to redact it for the version submitted to the jury.

10  It's a forwarded e-mail.

11         THE COURT:  It's not privilege and it's

12  irrelevant really.

13         MR. LARUSSO:  What I'm concerned about is if

14  he's sending this to his lawyer, or someone who works in

15  his law firm, this is all privilege even though it may be

16  Mr. Constantine's e-mail.

17         MS. KOMATIREDDY:  This was produced in civil

18  litigations and there was a --

19         THE COURT:  Wait a second.  If Tommy Constantine

20  sends something to Mr. Gonchar, it's not privilege, but

21  the fact Mr. Gonchar sends it to his lawyer, potentially

22  that's privilege.  That doesn't cloak the e-mail itself

23  with privilege.

24         MR. LARUSSO:  Can I disagree?  Because if I have

25  information that I want my lawyer to look at, even though

Gonchar  -  Cross/Komatireddy

4877

1    it's information coming from another source, that's a

2    privileged communication.

3              THE COURT:  The top is.  Your argument is the

4    e-mail itself is privileged?

5              MR. LARUSSO:  I'm saying -- not this.  I'm

6    saying if it's a lawyer, Judge.  We're all speculating

7    because I don't know.

8              THE COURT:  Ask him if it's his lawyer or not.

9              MR. LARUSSO:  That's the reason I did that.

10   Because if it's not a lawyer, there's no objection.

11             THE COURT:  I thought you were saying your

12   client's e-mail was privilege.

13             MR. LARUSSO:  No.

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

Gonchar  -  Voir Dire/LaRusso

4878

1      (The following takes place in open court.)

2  BY MS. KOMATIREDDY:

3  Q.   Mr. Gonchar, for the record, who is Leslie Chatburn?

4  A.   I don't recall.

5           MS. KOMATIREDDY:  The government moves 4602 in

6  evidence.

7           THE COURT:  Any objection?

8           MR. LARUSSO:  May I have a question or two, if I

9  may, your Honor?

10          THE COURT:  Yes.

11

12  VOIR DIRE EXAMINATION

13  BY MR. LARUSSO:

14  Q.   Mr. Gonchar, at or around the time of the e-mail,

15  we're talking June of 2014, did you have any attorneys

16  that were representing you in any capacity?

17  A.   Yeah.

18          In 2014, there is two cases, one against Jowdy

19  and another one is -- okay, now I remember who it is.

20          Leslie is a lady who works in Ed Flemming's

21  office in Phoenix, Arizona.

22  Q.   Who is Ed Flemming?

23  A.   He's a lawyer who represent me in that case of the --

24  one of the cases.

25          THE COURT:  Does the government care about the

4879

1    top e-mail?

2              MS. KOMATIREDDY:  We will ask for a redacted

3    version.

4              THE COURT:  The top of the e-mail to Leslie

5    Chatburn will be redacted.

6              Any objection?

7              MR. LARUSSO:  Yes, based upon what I discussed

8    at the sidebar.

9              May I elaborate, Judge?

10             (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gonchar   -   Voir Dire/LaRusso

4880

1      (The following takes place at sidebar.)

2          MR. LARUSSO:  My objection, Judge, if

3  Mr. Gonchar is sending documents, including this e-mail,

4  to his attorney through you, the entire e-mail is a

5  privileged communication.  That is not only the heading,

6  but also what is being sent.

7          I have no objection to this coming in if they

8  have another way of obtaining the document.  You can't

9  introduce an e-mail.  I don't know where they got this

10  from.  It seems like it came from a lawyer.

11          MS. KOMATIREDDY:  We did not get this from

12  Mr. Gonchar's lawyer.  We got it from opposing counsel.

13          These were turned over in exactly this form in

14  the civil litigation which Mr. Gonchar was a defendant.

15          Certainly the attached agreement is not

16  privileged because it's an agreement Mr. Constantine

17  provided Mr. Gonchar.

18          Mr. Constantine then sent a cover e-mail to

19  Mr. Gonchar and then Mr. Gonchar shared that with other

20  partners who think they have an interest in this plane,

21  which is what that other lawsuit is about.  I didn't feel

22  the need to go into the details of the other lawsuit.

23          THE COURT:  This is not a privileged

24  communication.  The e-mail is definitely not privileged

25  just because you give a document or an e-mail to your

4881

1  lawyer does not make the document or e-mail privilege.

2          The government did not obtain this in some way

3  that violated his privilege with his lawyer, so I'm

4  overruling the objection, okay?

5          MR. LARUSSO:  Judge, I don't want a redaction.

6          THE COURT:  Okay.

7          MS. KOMATIREDDY:  Okay.

8          (Continued on next page.)

Gonchar  -  Cross/Komatireddy

4882

1              (The following takes place in open court.)

2              THE COURT:  Mr. Haley, do you have an objection?

3              MR. HALEY:  Thanks for asking, Judge.  No.

4              THE COURT:  The request to have the top portion

5      redacted has been withdrawn, so 4602 is admitted.

6              MS. KOMATIREDDY:  Thank you, Judge, publishing

7      it for the jury.

8      BY MS. KOMATIREDDY:

9      Q.    I'm going to focus on the e-mail on the first page.

10             Is that Cyrulik?

11     A.    What's Cyrulik mean?

12     Q.    The from and to and the subject line, is that the

13     Russian language, the script?

14     A.    You're asking me if it's the Russian language?

15     Q.    Yeah.

16     A.    Which part of the e-mail?

17     Q.    In the part I'm pointing to right here, or do you

18     know what language that's in?

19     A.    Yes.  It is Russian, yes.

20     Q.    Is it fair to say that the first part is the from,

21     and it's from Tommy Constantine?

22     A.    Yes.

23     Q.    And the second is the date sent on June 8, 2010?

24     A.    Yes.

25     Q.    And it's to you, sir, Mr. Gonchar?

Gonchar   -   Cross/Komatireddy

4883

1    A.    Yes.

2    Q.    That's your e-mail address at the time?

3    A.    Yes.

4    Q.    And the subject line is AZ Falcon Partners docs?

5    A.    Yes.

6    Q.    It says:

7              Please see the attached docs.

8              Mr. Constantine is writing to you, correct?

9    A.    Yes.

10   Q.    The rest of the e-mail has details about the plane

11   and its ownership, the Falcon 10, right?

12   A.    Yes.

13   Q.    Now, I'm going to focus on a point here.  There's a

14   lot here, but I'm going to focus on a bullet point.

15             It says:  The group of partners that I have

16   involved so far are all accomplished, low-key men of means

17   and great guys as far as I am concerned.

18             Do you see that?

19   A.    Yes, I do.

20   Q.    That's a reference to the people who are partners in

21   AZ Falcon Partners, correct?

22   A.    Yes.

23   Q.    That includes you, right?

24   A.    Yes.

25   Q.    And also multiple other people who are not

Gonchar  -  Cross/Komatireddy

4884

1    professional hockey players, right?

2    A.   Yes.

3    Q.   And attached to this is the amended and restating

4    operating agreement of AZ Falcon Partners, LLC, correct?

5    A.   Yes.

6    Q.   And it says it's effective June 1, 2009, right?

7    A.   Yes.

8    Q.   Which is approximately one year before this e-mail

9    was sent?

10   A.   Yes.

11   Q.   One year, you're saying?

12   Q.   Approximately.

13        The e-mail is sent to you in 2010, and the

14   agreement is effective in 2009, correct?

15   A.   Yeah.

16   Q.   When you go through this operating agreement and look

17   at the exhibit with the members, it has a number of

18   blanks, right?

19   A.   Yeah.

20   Q.   It indicates there's supposed to be 10 members each

21   putting in $235,000, right?

22   A.   Yes, that's correct.

23   Q.   One of those people is you?

24   A.   Yes.

25   Q.   And the other nine are not professional hockey

Gonchar  -  Cross/Komatireddy

4885

1   players?

2   A.   Yes and no.  I mean, some of it is.

3        Whoever is going to buy in for 235, they were

4   going to pay me money, but I thought the hockey players

5   also have access to the planes because we're able to cap

6   out that plane from involvement in the Global Settlement

7   Fund.

8        (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Gonchar - Cross/Komatireddy

4886

1   Q.   So the hockey players would have access if they paid

2   for the fuel and the costs, right?

3   A.   Yes.

4   Q.   But they are not mentioned in this agreement when you

5   are talking about this other group of men that

6   Mr. Constantine referred to in that e-mail, with reference

7   to the other low key men?

8   A.   Yes.

9   Q.   At the time he sent you that operating agreement, I

10  will show you a document in evidence, Exhibit 4218, and it

11  is also called an operating agreement of AZ Falcon

12  Partners.

13          Do you see that?

14  A.   Yes.

15  Q.   The effective date of this agreement is May 29, 2009,

16  do you see that?

17  A.   Yes, I do.

18  Q.   -- Which is a couple of days before the other one,

19  June 1, 2009, right?

20  A.   Yes.

21  Q.   Mr. Constantine never showed you this agreement, did

22  he?  I mean your signature is not at the end, is it?

23  A.   I don't see my signature here, no.

24  Q.   Here it is Sue Ellen Ferguson, Eric Edenholm and

25  Tommy Constantine, right?

Gonchar - Cross/Komatireddy

4887

1   A.   Yes.

2   Q.   Did you ever talk to any of those people about

3   ownership in the Falcon 10 airplane?

4   A.   No.

5   Q.   Then there came a time when the Falcon 10 airplane

6   got transferred from AZ Falcon Partners to another LLC

7   called Falcon 10 Partners, right?

8   A.   I don't think it was transferred.

9   Q.   Do you remember the Falcon 10 Partners?

10   A.   Yeah, but I don't think a plane was transferred as

11   far as I remember.

12   Q.   I will show you what is in evidence as Government's

13   Exhibit 4246, it is an amended and restated operating

14   agreement of Falcon 10 Partners.

15        Do you see that?

16   A.   Yes.

17   Q.   And it says it is effective March 15, 2011.  Do you

18   see that?

19   A.   Yes.

20   Q.   And it says here, that the purposes of the company

21   are to acquire, own, maintain, operate for private use,

22   and dispose aircraft, namely a Dassault Falcon 10.  Right?

23   A.   Yes.

24   Q.   And N530TC, was the registration number of the Falcon

25   10, right?

4888

1    A.    Yes.

2    Q.    And on this amended operating agreement, the list of

3    the people executing this agreement is Mr. Constantine.

4    Do you see that?

5    A.    Yes.

6    Q.    Who is that?

7    A.    I don't know.

8    Q.    I will show you what has been marked as Government's

9    Exhibit 4601.

10           Do you recognize that?

11   A.    Yes.

12   Q.    That's another e-mail, the main e-mail on that page,

13   is an e-mail from Mr. Constantine to you and it appears to

14   be to some others, correct?

15   A.    Yes.

16   Q.    In or about October 15, 2012?

17   A.    Yes.

18           MS. KOMATIREDDY:  The Government moves 4601 in

19   evidence.

20           MR. LARUSSO:  No objection.

21           MR. HALEY:  Your Honor.

22           MR. HALEY:  No objection, Judge.

23           THE COURT:  4601 is admitted.

24           (Whereupon, Government Exhibit 4601 was received

25   in evidence.)

4889

1     MS. KOMATIREDDY:  Publishing it for the jury.

2  Q.   The subject line is GSF summary revision, correct?

3  A.   Yes.

4  Q.   I'll read some of it into the record.

5     Gentlemen:  It occurred to me that I left a

6  significant fact out of that summary with respect to the

7  Falcon 10.  Basically it was the same outcome of the

8  Avalon building.  Our intent was to save the airplane from

9  foreclosure, refurbish it and share ownership with all of

10  the players that contributed to the Global Settlement

11  Fund.  Unfortunately as I stated, they all followed

12  Kenner's direction and sued me which resulted in me losing

13  the airplane to foreclosure.  Sergei Gonchar -- that's

14  you, right?

15  A.   Yeah.

16  Q.   -- Subsequently bought it from the bank along with a

17  number of other unrelated individuals who invested in the

18  airplane with him."

19     Now, we're talking about unrelated individuals,

20  that is a reference to people not related to the Global

21  Settlement Fund, right.

22     Yes?

23  A.   Yes.

24  Q.   "I now manage the counsel for Sergei who owns the

25  airplane with the others.  It should also be noted that

Gonchar - Cross/Komatireddy

4890

1    collectively the Global Settlement Fund put about $350,000

2    into the airplane, whereas Sergei and the new investors

3    put in close to $1 million to buy it and keep it."

4            Did I read that correctly?

5    A.   Yes, you did.

6    Q.   Now, you were asked on your direct whether there came

7    a time where someone else asked you to guarantee a loan,

8    and you responded that Mr. Kenner asked you to guarantee a

9    loan in connection the Palms units?

10   A.   Yes.

11   Q.   Correct?

12   A.   Yes.

13   Q.   But that's not the only time someone else asked you

14   to guarantee another loan, correct?

15   A.   I don't remember anything else.

16   Q.   Are you a guarantor for a Falcon 50?

17   A.   Yes.

18   Q.   A Falcon 50 is a different plane, right?

19   A.   Yes.

20   Q.   A plane that Tommy Constantine took out a

21   $1.3 million loan on, right?

22   A.   Yes.

23   Q.   And you personally guaranteed that loan also, right?

24   A.   Yes.

25   Q.   And you are the sole guarantor on that loan?

Gonchar - Cross/Komatireddy

4891

1    A.    Yes.

2    Q.    And Tommy Constantine made no payment on that loan,

3    did he?

4    A.    He was making payments monthly before he got

5    arrested.

6    Q.    And when you said that before, when you asked me

7    previously, before, about other loans, the thought it was

8    related.  I didn't know that you were talking about the

9    businesses involved, so you didn't make yourself clear.

10         If you are saying overall with other businesses,

11   yes, I was involved in the Falcon 50.

12   Q.    Any other personal guarantees you made on behalf of

13   Tommy Constantine?

14   A.    We were involved in the Falcon 20.  There was a loan.

15   Q.    What was the amount?

16   A.    Over $1 million but it was paid off.

17   Q.    On the Falcon 50, that $1.3 million loan has not been

18   paid off, has it not?

19   A.    No.

20   Q.    If he goes to jail you have to make all the payments

21   on that $1.3 million loan on the Falcon 50?

22   A.    The plane was sold and there is an amount of I think

23   $200,000 outstanding on the loan.

24   Q.    And you are responsible for it?

25   A.    Yes.

Gonchar - Cross/Komatireddy

4892

1   Q.   Solely responsible for it?

2   A.   Yes.

3   Q.   Now, you testified that you put in around

4   $1.2 million into the Global Settlement Fund, correct,

5   when you add up all the numbers?

6   A.   I think it is more than 1.2.

7   Q.   Okay.  More than $1.2 million in the Global

8   Settlement Fund?

9   A.   Yes.

10   Q.   And you said in the past that you didn't get anything

11   back, did you?

12   A.   When you are saying get anything back, what do you

13   mean by that?

14   Q.   Did you get anything back from the Global Settlement

15   Fund?

16   A.   We all get something back, a percentage of the

17   businesses that we were involved into like Avalon

18   building, airplanes.  We all get something back I'm

19   informed.

20   Q.   Mr. Gonchar, you got out of a $1.3 million loan on a

21   Falcon 10, didn't you?

22   A.   Yes.

23   Q.   Because of money that came out of the Global

24   Settlement Fund?

25   A.   I don't think there was money involved.  I mean a lot

4893

1    of money was involved from the Global Settlement Fund

2    going into the plane.  Because Tommy, the way he done it,

3    he brought a group of guys together and they put money in,

4    besides hockey players, how we got out of the loan.  It's

5    not that we took money, $1.3 million and moved it to the

6    airplane.  That's not the way it worked.

7    Q.   So no money from the Global Settlement Fund was

8    supposed to go to that airplane?

9    A.   I'm not saying $1.3 million.  I don't remember

10   exactly how much it was, maybe a little bit but not a lot

11   of money was put from the Global Settlement Fund to 1st

12   Source Bank as far as I remember.

13   Q.   Do you know now how much money went to the 1st Source

14   Bank from the Global Settlement Fund?

15   A.   I don't remember that.

16   Q.   Were you ever shown the bank records of the Ronald

17   Richards account that showed how much money went to the

18   1st Source Bank?

19   A.   I looked at it when the accountant, forensic

20   accountant, made it for me, I mean, the statement and I

21   looked at it.  Yes.

22   Q.   So you know that some money did go to get you out of

23   that $1.3 million loan, right, from the Global Settlement

24   Fund?

25   A.   Yes, I think so.  Yes.  I don't remember how much was

Gonchar - Cross/Komatireddy

4894

1    it.

2              Can you refresh my memory and tell me how much

3    was it?

4    Q.    The only question, Mr. Gonchar, and let me back up.

5              In the past you said that you did not receive

6    any of your Global Settlement Fund money back, is that the

7    truth?

8              Isn't that right?

9    A.    When you are saying "money back," you mean cash

10   coming to my personal account?  I just don't understand

11   sending the money back.  What do you mean by that?

12   Q.    Okay.  In September of last year you gave a

13   deposition.  Do you remember that?

14   A.    September of last year, okay.

15   Q.    Do you remember you sat down with a lawyer in a room,

16   and you testified under oath and on the record?

17              Yes?

18   A.    Yes.

19   Q.    And when asked a question:  Have you received any of

20   that money back?  You answered no, right?

21   A.    Yes.

22   Q.    All I'm asking you, sir, as a result of some money

23   coming out of the Global Settlement Fund, you got out of

24   that $1.3 million loan, right?

25   A.    Yes, I got out.

Gonchar - Cross/Haley

4895

1    Q.   Do you consider yourself to be a victim in this case?

2    A.   Which case?

3    Q.   This case.

4    A.   The one here, yes.

5         MS. KOMATIREDDY:  No further questions.

6         THE COURT:  Okay.  Mr. Haley.

7         MR. HALEY:  Thank you, Judge.

8    CROSS-EXAMINATION

9    BY MR. HALEY:

10   Q.   Mr. Gonchar, good afternoon.

11   A.   Good afternoon.

12   Q.   I'm Rick Haley, and I represent Phil Kenner.

13        The discussions that you had with Phil Kenner

14   concerning your initial contribution to the Hawaiian land

15   development project -- do you know what I mean by the

16   Hawaiian development project?

17   A.   Yes, I do.

18   Q.   I believe you testified there was an initial $100,000

19   contribution toward that project; is that correct?

20   A.   Yes, it is.

21   Q.   And then there came a point in time that your line of

22   credit was also accessed for purposes of that Hawaiian

23   project, is that true?

24   A.   Yes.

25   Q.   Did you have an understanding at that time, and I

Gonchar - Cross/Haley

4896

1    know we're going back now 11 years. I mean, this happened

2    in 2004?

3    A.   I don't remember exactly, but a long time ago is for

4    sure.

5    Q.   And did you have an understanding, sir, that as a

6    result of your cash contribution and later as a result of

7    Phil Kenner having access to your line of credit, you

8    would be obtaining a percentage ownership interest in the

9    Hawaiian land development project. Did you understand

10   that?

11   A.   Yes, I did.

12   Q.   Did you have an understanding, Mr. Gonchar, that the

13   more you contributed by way of either your cash

14   contribution or your line of credit, the greater your

15   percentage ownership interest would be as relates to

16   perhaps others who had invested less. Did you have an

17   understanding of that?

18   A.   Yes.

19   Q.   Over the years, when you had this relationship with

20   Phil Kenner, before you and he disagreed on whether or not

21   Tommy Constantine had utilized GSF funds appropriately,

22   how would you describe that relationship between you and

23   Phil?

24   A.   I think it was a normal relationship between two

25   guys, one of them investing money for another, so he would

Gonchar - Cross/Haley

4897

1    occasionally stop at my house and stop on the road once in
2    a while and talk on the phone.
3    Q.   Let's talk about the occasions when he would stop at
4    your house.
5             When you met him at your house and spoke with
6    Phil if you had any questions that relates to your money
7    and investments, would he answer those questions for you?
8    A.   Yes.
9    Q.   And at the times you met him on the road, where, on
10   those occasions, I know we're going back many, many years,
11   if you had any questions about the status of your
12   investments, would Phil answer your questions, sir?  Yes
13   or no?
14   A.   Yes.
15   Q.   And when you would have the telephone conversations,
16   if you had any questions during those telephone
17   conversations of Phil Kenner regarding the status -- I
18   guess, the status of your investments, would Phil answer
19   those questions, sir?  Yes or no?
20   A.   Yes.  I want to make sure we're talking before.
21   Q.   We're talking before.
22   A.   Yes.
23   Q.   I understand we're talking before you developed that
24   dispute with Phil Kenner, as you testified to, where he
25   believed, by your testimony, that Tommy Constantine had

4898

```
1    not done the right thing with GSF and you disagreed with

2    him and that's when that relationship between you and Phil

3    fell apart?

4    A.   Yes, not at that time.  Way on we still worked for a

5    few more years and we still communicated, but you know

6    like I probably should say the reports were not as full as

7    they used to be and we ended up breaking our relationship

8    up, if I recall correctly, 2010.

9    Q.   Okay.  But I'll call it the deterioration of your

10   relationship with Phil at least it began with you having a

11   different view with Phil as to whether or not Tommy was

12   appropriately using the GSF funds, that's when it began to

13   deteriorate, is that true?

14   A.   Yes, I should say that.  And also when they tried to

15   take Eufora away from Tommy, two things that --

16   Q.   I understand.

17          Well, let's focus on that.  I understand that,

18   sir.  It was not only the dispute you had with Phil Kenner

19   as relates to his belief that Tommy had not done the right

20   thing with GSF, but also the dispute that you had with

21   Phil Kenner because you became aware that Phil and others

22   were looking to take over Eufora, isn't that true?

23   A.   Is it true.

24   Q.   And that was Tommy's Constantine's company, from your

25   perspective?
```

Gonchar - Cross/Haley

4899

1    A.    Yes.

2    Q.    I'm just going to jump around a little bit, sir.

3          I just want you to take a look at a document,

4    it's entitled Kenner Exhibit 235.  It's just a very simple

5    document.

6          Is that your signature on the document?

7    A.    Yes, it is.

8          MR. HALEY:  I'd offer Kenner 235 in evidence,

9    your Honor.

10         MR. LARUSSO:  No objection, your Honor.

11         MS. KOMATIREDDY:  No objection, your Honor.

12         THE COURT:  235 is admitted.

13         (Whereupon, Defendant's Exhibit K-235 was

14    received in evidence.)

15   Q.    Just for purposes of the record, Kenner Exhibit 235,

16   sir, is a document that speaks for itself.  I just want

17   the jury to know what we're referring to that you just

18   identified as bearing your signature.  Okay?

19   A.    Yes.

20   Q.    When you had the discussions with Phil Kenner for the

21   first time regarding his recommendation to you that you

22   invest in Eufora or consider investing in Eufora because

23   he viewed it as a promising company and I guess by your

24   testimony certainly an investment he felt comfortable in

25   recommending to you.

Gonchar - Cross/Haley

4900

1    When you had those conversations, sir, do you

2  remember where they took place?

3  A.   No, I don't.  Mostly by phone because I was traveling

4  a lot and he was traveling a lot and most of the times we

5  were talking on the phone.

6       I'm thinking that those conversations were over

7  the phone.

8  Q.   Now, having telephone a conversation with Phil Kenner

9  over the telephone, that was a result of you being in a

10  position where you are traveling a great deal; is that

11  correct?

12  A.   Yes, and he's traveling.  Both of us are traveling.

13  Q.   And is it fair to state, sir, because you are both

14  busy, you and your profession -- and by the way it has

15  been a very successful career for you, has it not?

16  A.   Thank you.  It was.

17       MR. HALEY:  Stanley Cup winner.  Congrats.

18       THE WITNESS:  Thank you.

19  Q.   And you've done quite well financially over the years

20  as a result of your chosen profession?

21  A.   Yes.

22  Q.   But is it fair to state, sir, that in order for you

23  to be able to invest money that is required as a result of

24  your profession over the years through your financial

25  advisor when you were both traveling, these kind of

4901

1    telephone conversations were necessary, weren't they?

2    A.    Yes.

3    Q.    Because if they didn't happen, you wouldn't have any

4    ability to really invest simply due to the fact that you

5    are traveling all the time.

6          Is that a fair statement?

7    A.    Yes.

8    Q.    I don't expect, sir, and it is not meant to be a

9    critical question.  I don't expect when you would have the

10   telephone conversations with Phil you would be taking

11   notes of those conversations, or were you taking notes of

12   the conversations?

13   A.    No.

14   Q.    During any of those telephone conversations, was

15   there ever an instance, to your knowledge, where you said

16   like, Phil, I'm really not understanding this particular

17   investment and then he refused to give you at least an

18   understanding from your perspective.  Did that ever

19   happen?

20         Do you understand the question?

21   A.    Yes, I do.  Yes, I do.

22         No, he was explaining to me at the time

23   everything that I asked for, but a lot of times when I

24   talked to him and he explained me everything, I would be

25   satisfied with that.  But unfortunately way down we

4902

1   wouldn't achieve what we were supposed to and --

2   Q.    Mr. Gonchar, that's the truth.  I understand that,

3   sir.

4          Later on, you had certainly an expectation, a

5   hope, that these investments would work out.  It's

6   certainly human.  That was your hope and expectation, was

7   it not?

8   A.    Yes.

9   Q.    But did you have an understanding, sir, unlike

10  investments in stocks and bonds that are traded publicly,

11  there was a risk associated with let's say investments in

12  land developments.  Do you understand there were some

13  risks associated with that?

14  A.    Yes.

15  Q.    And did you understand, sir, there were some risks

16  associated with what you characterized as a start-up

17  company.

18          Do you understand that?

19  A.    Yes.

20  Q.    And by the way, when you talked earlier about the

21  occasions where you would actually meet with Phil Kenner,

22  do you recall instances where Phil traveled to meet with

23  you in St. Petersburg, Russia?

24  A.    Yes, sir.  He went to Europe and he had seen a few

25  players.

Gonchar - Cross/Haley

4903

1    Q.    Do you recall instances where Phil Kenner traveled to

2    meet with you let's say in Panama City, Panama?

3    A.    Yes.

4    Q.    What about Zurich, Switzerland?

5    A.    Yes.

6    Q.    What about Washington, D.C.?

7    A.    Yes.

8    Q.    What about Ottawa, Canada?

9    A.    I don't remember him coming to Ottawa.

10   Q.    How about Pittsburgh, Pennsylvania?

11   A.    He went over there.

12   Q.    We'll move on, sir.

13           Now, there's been mention of course with

14   reference -- well, there were few personal guarantees

15   we're speaking of.  I'm talking about a personal guarantee

16   where both you and Phil Kenner were the guarantors.

17           I believe you know what I'm talking about that

18   relates to the airplane?

19   A.    Yes.

20   Q.    And I will not belabor the record, sir, but that was

21   an incidence where both you and he -- you both were on the

22   hook, so to speak, as relates to that loan; is that

23   correct?

24   A.    Yes.

25   Q.    The questions asked of you by Mr. LaRusso concerning

Gonchar - Cross/Haley

4904

1    the meeting with the lawyer where there was then a group

2    of you, and by "you" I mean you as well as hockey player

3    clients of Phil Kenner's, talking about bringing legal

4    action against Tommy.  Do you remember the name of that

5    lawyer?

6    A.    (No response.)

7    Q.    Mr. Gonchar, I'm going to suggest a name.  Michael

8    Stolper?

9    A.    Yes.

10   Q.    And that meeting took place Mr. Mr. Stolper's offices

11   I believe you said in Manhattan, New York; is that

12   correct?

13   A.    Yes.

14   Q.    Do you remember that Phil Kenner participated in that

15   meeting in Mr. Stolper's office via telephone.  He was on

16   a conference call?

17   A.    Yes, he was on the telephone.  Yes.

18   Q.    Do you remember what other hockey players were

19   present that the meeting, if you recall?

20   A.    There were a few of them.  I believe Jay McKee, if

21   I'm correct, Michael Peca was there, Kaiser was there,

22   Berard was there.

23   Q.    Do you remember if Bill Ranford was there?

24   A.    I don't remember that.

25   Q.    So he may or may not; is that correct?

Gonchar - Redirect/LaRusso

4905

1   A.   Yes.

2   Q.   But it's clear, as you told not these people, but as

3   you've told the jury, that the purpose of that meeting

4   with Phil Kenner's participation telephonically, was to

5   commence a lawsuit against Tommy Constantine and you did

6   not agree with that, is that true?

7   A.   Yes, that's correct.

8        MR. HALEY:  May I have a moment, Judge?

9        Mr. Gonchar, it has been a pleasure meeting you.

10   Thank you.

11        THE WITNESS:  You're welcome.

12        THE COURT:  Redirect.

13        MR. LARUSSO:  Just briefly, if I may.

14   REDIRECT EXAMINATION

15   BY MR. LARUSSO:

16   Q.   Mr. Gonchar, I promise just a few questions.

17        (Indicating.)  You were shown this by the

18   Government's Exhibit 4608?

19   A.   Yes.

20   Q.   Directing your attention to the second bullet point

21   where it talks about ten percent preferred return with

22   interest only payments being made monthly beginning

23   immediately, continuing through the first 12 months.

24        If you took the ten percent of the 750 and

25   divided it by 12 you would get $6,250.  Do you agree with

Gonchar - Redirect/LaRusso

4906

1    that?

2    A.   Yes.

3    Q.   Do you remember being asked questions about the --

4    you are shaking your head.  Do you remember the questions

5    you were asked about a payment you received for $6,250?

6    A.   Yes.

7    Q.   Does that refresh your recollection as to that

8    $6,250?

9    A.   Yes.

10   Q.   What was that $6,250?

11   A.   A payment for that loan.

12   Q.   Okay.

13        You also were asked, did you consider yourself a

14   victim in this case, and you said yes.  Do you consider

15   yourself a victim of Mr. Tommy Constantine?

16   A.   No.

17        MR. LARUSSO:  No further questions, your Honor.

18        THE COURT:  Anything further?

19        MS. KOMATIREDDY:  No, sir.

20        THE COURT:  Anything further, Mr. Haley?

21        MR. HALEY:  No, thank you.

22        THE COURT:  You are done.  You can go.

23        THE WITNESS:  Thank you.

24        MR. LARUSSO:  Before he leaves may we talk a few

25   minutes?  Is it possible?

4907

1    THE COURT:  (Addressing the witness.)  If you

2    can hang around for a few minutes.

3    MR. LARUSSO:  Thank you.  I'll not ask him for

4    an autograph, I promise you.

5    THE COURT:  All right.

6    Mr. Kenner, if you could retake the stand.

7    Mr. Kenner, do you understand that you are still

8    under oath?

9    THE WITNESS:  Yes, sir.

10    THE COURT:  Mr. LaRusso.

11    MR. LARUSSO:  Yes, your Honor.  Just a few

12    moments.

13    CROSS EXAMINATION (Cont'd)

14    BY MR. LARUSSO:

15    MR. HALEY:  Your Honor, if I may remove these

16    exhibits.

17    Q.   Good afternoon, Mr. Kenner.

18    A.   Good afternoon, Mr. LaRusso.

19    Q.   I'm going to use Government's Exhibit 767, a small

20    portion.  Let me see if I can reduce this a little bit.

21    I will direct your attention to the testimony

22    you gave regarding the Global Settlement Fund.

23    You testified that this spreadsheet was prepared

24    by Mr. Richards and you, is that a fair statement?

25    A.   Yes, sir, Mr. Richards had provided me the first, I

4908

1  believe, five columns and as a result of receiving the

2  spreadsheet with information that I knew personally and

3  other information that I attempted to gather, I put the

4  notes column in this column 6, and then I also had

5  highlighted the yellow highlighting.

6  Q.    So is it fair to say that all of the notes on the

7  three pages are notes that you inserted into the

8  spreadsheet that was provided by Mr. Richards?

9  A.    I believe that is correct.

10  Q.    Did you have input from anybody else with regards to

11  the notes you were making with regard to the Global

12  Settlement Fund?

13  A.    I did, but I don't recall who it was at the time.

14  Q.    Would it be a fair statement to say that in preparing

15  those notes, you did not do an independent investigation

16  of each one of the expenses that appeared on this sheet?

17  A.    My recollection is that the notes that I put in

18  column 6 were all based on my independent investigation.

19         As I said there may have been a few other

20  individuals who assisted in that information, but that was

21  information that I created based on my independent

22  investigation.

23  Q.    And in terms of your independent investigation, did

24  you make contact with some of the entities that appear on

25  here or some of the names.  Did you do that for each and

4909

1   every one of them?

2   A.    Not for each and every one of them, but for many of

3   them to try and figure out who they were.

4   Q.    And if I'm correct, when you were answering questions

5   the other day in regards to the individual entries that

6   were pointed out to you, you testified that in regards to

7   them, you were either unaware of what the purpose was of

8   that expense or you testified that you were unaware of the

9   purported relationship with the Global Settlement Fund, is

10  that fair?

11  A.    I believe that's what I testified to.

12  Q.    Directing your attention to May 12th of 2009.  Do you

13  see that entry?

14  A.    I see several, yes.

15  Q.    Sonnenschein for $8,000?

16  A.    I see the Sonnenschein, I believe.

17  Q.    That was one of the ones you said you were unaware of

18  the relationship with the Global Settlement Fund?

19  A.    Yes, sir.

20  Q.    And the comment that you wrote is TCLA attorneys, and

21  then there's -- I can't make that out.

22        Do you see that?

23  A.    That is a URL website link that I put on there.  So

24  if the individuals that I highlighted on the left column,

25  when I e-mailed this to them, they would be able or if

Gonchar - Cross/LaRusso

4910

1   handed it to them, they would be able to look up these

2   companies.

3   Q.    Let me just make sure the record is clear the.  TL is

4   Tommy Constantine?

5   A.    Yes.

6   Q.    LA is LA attorneys?

7   A.    Los Angeles.

8   Q.    Who gave you that information?

9   A.    Pardon me?

10  Q.    Who gave you that information?

11  A.    When I looked up Sonnenschein I knew that was one of

12  their offices, and previously I had recalled other

13  requests prior to Mr. Constantine for me to forward funds

14  on his behalf to Sonnenschein in Los Angeles.

15  Q.    Did you contact Sonnenschein and ask them him about

16  this $8,000?

17  A.    No, sir, I did not.

18  Q.    You wouldn't happen to know a man by the name of Rick

19  Ross.  Does that mean anything to you?

20  A.    I have heard that name before.

21  Q.    In what capacity?

22  A.    I understand Mr. Ross or I understand that Mr. Ross

23  is a real estate attorney.

24  Q.    And did Mr. Ross have anything to do with the

25  development down in Mexico?

4911

1  A.   No, he does not.

2  Q.   Well, let me show you what has been marked as C-258

3  for identification, and I'm using this just to see if it

4  refreshes your recollection.

5  A.   Yes, sir, that's fine.

6  Q.   Was Mr. Ross an attorney in that firm?

7  A.   I do see his e-mail, rross@sonnenschein.com.

8  Q.   Do you know him to be an attorney in the firm of

9  Sonnenschein Nath & Rosenthal?

10  A.   It appears that he is, yes.

11  Q.   Do you also know that he held another position at the

12  time that you made these entries as chairman of the Global

13  Hotels and Resorts Practice Group?

14  A.   I know that now that I see that.  I recall what his

15  involvement was, more than just a real estate attorney.

16  That's correct.

17  Q.   Did the Global Settlement Fund hire him with regard

18  to the possibility of a hotel down in Cabo, Mexico?

19  A.   At what time period?

20  Q.   At any time period that we're talking about now.

21  A.   If you don't mind I'll just read the e-mail.

22  Q.   Sure.

23  A.   I believe this e-mail was referring to a payment

24  Mr. Constantine asked me to make in December of '08, prior

25  to the Global Settlement Fund beginning, and I think that

4912

1  was this that was referencing.

2  Q.   Outside of the e-mail itself used to refresh your

3  recollection, do you remember whether or not Mr. Ross was

4  in any way involved in the continued developments of the

5  projects down in Mexico after that e-mail?

6  A.   I don't recall specifically.

7  Q.   All right.  But in regards to that entry for

8  Sonnenschein, you have no independent recollection or

9  independent evidence of your investigation that was or was

10 not related to his possible involvement in the Cabo

11 projects down in Mexico?

12 A.   That is correct, I do not have any independent

13 knowledge of that.

14 Q.   We heard testimony from Mr. Gonchar today about the

15 guarantee on those airplanes and the loans that were given

16 to Diamante Air.

17        Do you recall his testimony?

18 A.   Yes, sir, I do.

19 Q.   I believe it came out from Mr. Haley that you were

20 also a guarantor on that; is that right?

21 A.   Yes, sir.  Unfortunately I was.

22 Q.   And can you tell us who was the principal of Diamante

23 Air?

24 A.   It was Ken Jowdy at all times.

25 Q.   And whose primary responsibility was it for the loans

4913

1   in regards to those airplanes?

2   A.    As proposed to me by Ken Jowdy, he was solely

3   responsible for those loans and the comfort level that

4   Mr. Gonchar and I had was were to the guarantees pursuant

5   to our conversations at the time, was frankly because

6   Mr. Jowdy had always proposed to us that he was personally

7   guarantying the loans.

8          Unfortunately I found out later --

9   Q.    -- You are anticipating my question.  I just want you

10  to tell us, not to recount Mr. Gonchar's testimony.

11  A.    Yes, sir, I apologize.

12  Q.    You don't have to apologize.  I just wanted to make

13  it's clear what I wanted you to do.

14  A.    Pursuant to Mr. Jowdy's representation that he was

15  also going to be a personal guarantor on the loan,

16  Mr. Gonchar and I felt comfortable that since Mr. Jowdy

17  was managing the day-to-day operations of the plane, that

18  we would be in a secure position.  And, second, Mr. Jowdy

19  had referenced as Mr. Gonchar did today that those planes

20  would be used for the benefit of bringing potential

21  customers and other important people to the Diamante

22  project.  So, in that context, Mr. Gonchar and I were very

23  comfortable that we had a built-in source for rentals

24  which according to Mr. Jowdy would pay down the loans.

25          Now, specifically the loans, they were never

Gonchar - Cross/LaRusso

4914

1    represented to myself, Mr. Gonchar, or the other partners

2    that they were with respect to purchasing the Falcon 10.

3            We were under the assumption based on wire

4    transfers we had made to Mr. Jowdy approximately five to

5    six months earlier that we had already purchased those

6    airplanes and I have seen them on bank records that the

7    Government provided in pretrial that Mr. Jowdy diverted

8    the entire original $750,000 from our wire transfers to

9    other accounts of his own, unknown to all of us.

10           The purpose for the loans in fact were

11   specifically to handle engine repairs and landing gear

12   repairs and also to install RVSM and TAWS, which were

13   being required by the FAA at the time with respect to jet

14   airplanes and safety measures as well.

15           So we were defrauded by Mr. Jowdy from day one,

16   notwithstanding the fact he had no authority to sign the

17   loan itself.

18   Q.   And take us up to the point when the Global

19   Settlement Fund is formed.  What happened with those

20   airplanes and what happened to Mr. Jowdy's responsibility

21   for them?

22   A.   After I had confronted Mr. Jowdy in or about the

23   spring of 2007 about his frauds between the $3 million

24   loan he took out at Diamante del Mar unknown to all of the

25   investors which ultimately led to our total loss and

4915

1   foreclosure of that property and the ongoing embezzlement

2   issues and lack of attention of Cabo San Lucas and

3   corporate resources in the first year of operations,

4   Mr. Jowdy began negotiating with us with the help of

5   Mr. Constantine to create a settlement for us, frankly,

6   not to pursue Mr. Jowdy legally for, I guess,

7   Mr. Constantine and Mr. Jowdy can refer to them as the

8   mismanagement issues which carried a global perspective on

9   all of the things Mr. Jowdy had done.

10          Shortly into those negotiations or in or about

11  that same time that Mr. Constantine began mediating for

12  myself and the rest of our investors, Mr. Jowdy decided I

13  think from a tactical perspective to stop making payments

14  on the Falcon 10 aircraft.  And as a result of that,

15  Mr. Constantine suggested that we should just on behalf of

16  the investors, bring the airplane loans current once we

17  were contacted originally by 1st Source Bank.

18          So I believe I made a series of payments,

19  perhaps five months, plus or minus, at approximately

20  $10,500 per payment in order to bring the loans current,

21  the loan current on the Falcon 10 as I was told.

22          I did not go back to any of the other investors

23  at the time for any of those funds.

24          During that five-month period of time,

25  Mr. Constantine had negotiated on our behalf to have with

4916

1  Mr. Jowdy, to have the plane turned over to us so we could

2  have it in our possession, and more importantly have title

3  in our control because it was still under Mr. Jowdy's

4  title control.

5  Q.    What time period are we talking about now?

6  A.    I think we're talking somewhere near the end of 2007,

7  early 2008.

8  Q.    Okay.

9  A.    While Mr. Constantine was still of the belief that

10  Mr. Jowdy was working towards a settlement with all of the

11  investors that he had borrowed money from, equity, cash

12  investments that we had made with him, totaling in the

13  neighborhood of about $25 million by that point in time.

14  And that the point in time we expected to receive the

15  title transferred by Mr. Jowdy to a new entity that we had

16  yet to determine what it was.

17          In order for us to physically have the airplane

18  considering me and Mr. Gonchar were on the hook for the

19  loan, and Mr. Jowdy effectively reneged on that offer or

20  that agreement, and that's when I decided that I wasn't

21  going to keep paying $10,500 a month on an airplane I

22  couldn't control and our decision between myself and

23  Mr. Constantine and conversations with Mr. Gonchar were

24  frankly we would be better off dealing with the bank and

25  ultimately Mr.  Mr. Gonchar and I were sued for that loan.

4917

1  Q.   And that we had heard from Mr. Rozenboom, I believe,

2  from 1st Source Bank as to his dealings with you, and

3  Mr. Constantine regarding those loans; is that correct?

4  A.   Yes, sir, that is correct.

5  Q.   Jumping ahead now to 2009 around the time of the

6  Global Settlement Fund and the contribution made by the

7  hockey players, was Diamante Air and this problem also

8  part of the resolution that was trying to be arrived at?

9  A.   Yes, sir, it was.

10 Q.   You have a good memory.

11      Do you recall when the e-mails were shown to

12 some of the hockey players that Mr. Constantine had sent

13 updating them on Diamante Air and what was happening with

14 the airplanes and what was going to take place.  Do you

15 recall that?

16 A.   Yes, sir.  I recall seeing those.

17 Q.   I believe that was sometime like in July of 2009, I

18 believe?

19 A.   That sounds accurate.

20 Q.   Do you know how many funds, how much money from the

21 Global Settlement Fund were disbursed in order to try and

22 resolve that problem?

23 A.   I don't recall specifically.

24 Q.   Okay.  But they would be on the list if you looked at

25 them and analyzed them, correct?

Gonchar - Cross/LaRusso

4918

1    A.    Yes, sir, I would believe so.

2    Q.    Since we're on the Global Settlement Fund, is it fair

3    to say that the first hockey player that you contacted in

4    regards to an effort to deal with the Jowdy litigation and

5    other problems, was Sergei Gonchar?

6    A.    I can't say specifically that is was Mr. Gonchar, but

7    based on my recollection of the events, Mr. Gonchar would

8    have been one of the first four or five individuals that

9    we contacted because when we began our travels around the

10   United States and Canada to meet face-to-face with many of

11   the future contributors.  Mr. Gonchar I believe may have

12   been the first stop we made after we left Los Angeles.

13   Q.    You heard his testimony.  That was the first time you

14   met Mr. Constantine; is that correct?

15   A.    To the best of my knowledge, yes.

16   Q.    In regards to the other hockey players who

17   contributed, other hockey players that you and

18   Mr. Constantine visited, how many of those had for the

19   first time finally met Mr. Constantine?

20   A.    I would say more than half of them.

21   Q.    And would it be fair to say that the procedure was

22   followed that you would set up the meeting, you and/or

23   Mr. Constantine would then visit with the hockey players

24   we now know either in their homes or in a restaurant?

25   A.    Yes, sir.

4919

1   Q.   It would be at those locations that Mr. Constantine

2   primarily and you as well, would give them information as

3   to what the purpose of the Global Settlement Fund was, is

4   that a fair statement?

5   A.   Yes, I believe so.

6   Q.   Would it also be a fair statement that these meetings

7   lasted not briefly, but in most cases for a fairly lengthy

8   period of time?

9   A.   They were all approximately two to three hours in

10  length as Mr. Constantine very articulately described the

11  detail to each and every one of them.

12  Q.   I think you testified on direct to some of the the

13  detail that Mr. Constantine communicated to these hockey

14  players, and I'll get to that in a minute.  I'm kind of

15  looking at the procedure.

16          After you met with the hockey players and/or

17  their wives, I believe in some cases, how many of the

18  hockey players did you visit actually ended up

19  contributing?  Do you know?

20  A.   I believe all of them.

21  Q.   So --

22  A.   Excuse me.  With the exception of Chris Simon and

23  Brian Berard who I visited with in Moskow, Russia, in

24  Chekhov, at their request.

25  Q.   I don't know if anyone ever asked you this but maybe

Gonchar - Cross/LaRusso

4920

1   this is good time to do this.

2          At the time you were meeting with the hockey

3   players you and Mr. Constantine weren't conspiring to

4   steal money from hockey players, were you?

5   A.   No.

6   Q.   What was your purpose?

7   A.   My purpose was to finally come up with the solution

8   to solve a number of issues, specifically originating with

9   Mr. Jowdy and his ongoing frauds against the entire group

10  of us.

11  Q.   In detail you discussed many of those relationships

12  that led to that belief; is that correct?

13  A.   Yes.

14  Q.   Again, finishing up with procedure:  After you met

15  with them, there came a point in time when you sent

16  confirming or what we've been talking about, authorization

17  e-mails, to all of the individuals who agreed to

18  contribute to the Global Settlement Fund, is that right?

19          MR. MISKIEWICZ:  Objection, asked and answered.

20          THE COURT:  Overruled.  You can answer that.

21  A.   Prior to the use of the funds, Mr. Constantine was

22  very adamant, and I agreed with him, that an authorization

23  e-mail should be sent to each and every one of them.

24          As a result Mr. Constantine prepared that e-mail

25  for me.  He then dictated it to me and I followed through

4921

1    and made sure each and everyone of the investors

2    contributors did in fact receive it and respond to us.

3    Q.    I'm talking about the e-mail which we haven't talked

4    about before, right?

5    A.    That is correct.  We haven't spoken about that.

6    Q.    With regards to that e-mail, was it your intention as

7    well as Mr. Constantine's to incorporate as much as what

8    you told the investors the money was going to be used for?

9    A.    It was our intention to tell them everything that was

10   discussed in the face-to-face meetings, and nearing the

11   end, one of the topics that has been referred to as the

12   two Palms units that were incrementally added --

13            MR. LARUSSO:  You are anticipating another

14   question.  I'm sorry for interrupting you.  Explain that

15   at this time.

16   A.    So during that period of time, Mr. Constantine had

17   been sued unfortunately by somebody who tried to break a

18   real estate contract with him and as a result

19   Mr. Constantine settled out of court and was released from

20   the lawsuit to his victory, I would say.

21            At that point I had already disbursed north of

22   300,000 towards the unit, in addition to the million

23   dollars personal guarantee I had put on the loan for

24   Mr. Constantine.  As a result, Mr. Constantine asked if I

25   thought it was appropriate or if I would be willing to

4922

1    agree to donate those units for the benefit of the Global

2    Settlement Fund contributors, and I thought that was very

3    appropriate at the time.

4    Q.   And so that became part of the discussion with each

5    one of the hockey players; is that correct?

6    A.   That's correct.

7         I don't recall if it was part of the initial

8    phone call he had with Mr. Mattias Norstrom, but I know

9    during that trip Mr. Constantine and I had those

10   discussions for the first time, and that's why I think he

11   added that as an excerpt to the authorization e-mail we

12   may have spoken about with each and every one of them.

13   Q.   Speaking about the authorization e-mail, would it be

14   fair to say that all of the hockey player contributors

15   were e-mailed this message, as you call it, to review and

16   then acknowledge and approve.  Is that a fair statement as

17   part of the procedure being utilized?

18   A.   Yes, sir, I believe the e-mail at the bottom,

19   notwithstanding the first very sentence which needed to be

20   slightly altered depending on the timing of the wire

21   transfer, we had already received a verbal confirmation

22   like we had after the Peca meeting in Columbus, Ohio where

23   they verbally authorized me to wire transfer the funds

24   immediately and we followed up with a letter like this.

25        The dollar amounts were also changed pursuant to

4923

1   the contribution levels of each of the individuals.  But

2   from that point on where it says line 3 at the end, in

3   addition to the fund paying, etcetera, that was consistent

4   to the best of my recollection on each and every one of

5   the e-mails.

6   Q.   And using what we were looking at and I'll identify

7   it for the record, C-294; is that correct?

8   A.   That's what I see, correct.

9   Q.   That was the one that was introduced this morning

10  through Mr. Gonchar.

11           Can you, using this e-mail, tell us what was

12  actually explained to the hockey player contributors that

13  they acknowledged by way of reading this and sending back

14  to you that they approved?

15  A.   I will do my best.

16  Q.   Thank you.

17           THE COURT:  So the jury knows after this we'll

18  take our lunch break.

19           THE WITNESS:  I'll try to be quick then, your

20  Honor.

21           THE COURT:  No, that's okay.

22  A.   The -- each and every one of the contributors to the

23  Global Settlement Fund had been in part a part of ongoing

24  litigation efforts against Mr. Jowdy in Mexico and also in

25  the United States.

Gonchar - Cross/LaRusso

4924

1        We had previously hired several sets of

2   attorneys in Mexico to sue him on different fraudulent

3   actions with respect to Diamante Cabo San Lucas, Diamante

4   del Mar, the Diamante San Lucas airport which he defrauded

5   us and several other individuals of ours, in addition to

6   the personal line Joseph Stolper had given him for

7   $6.3 million, we also hired a firm I previously mentioned,

8   Akin Gump out of Washington, D.C., to pursue legal

9   strategy against Mr. Jowdy at that time.

10        So not only myself but a number of the Global

11   Settlement contributors had already funded money towards

12   those legal efforts.

13        As a result of that, the idea of putting

14   together one single fund to be able to not only pursue

15   Mr. Jowdy in those efforts but also some of the other

16   people who were hurting some of our private investors,

17   that the group in part or in whole were interested in

18   seeking success like myself and Mr. Constantine.

19   Q.   While you are on that subject, I'm sorry for

20   interpreting, was the Myrick suit part of that plan at

21   this point?

22   A.   Absolutely, it was.

23   Q.   How did that relate to, you know, the hockey players

24   and the investments that they made?

25   A.   Ms. Myrick was actually part of several of the

4925

1   investments that the other people were involved with.  She

2   was the first person who went out to hire Michael Meeks

3   with her boss to try and get Owen Nolan to sue me

4   originally.  Ms. Myrick and Mr. Meeks contacted

5   approximately 100 of my current and former clients at that

6   time and made a series of salacious allegations about my

7   business practice.  In particular they alleged I no longer

8   had or I had no documents representing all of the players'

9   investments which is interesting since they possessed all

10  of them.

11          She then went on a slander and defamation

12  campaign with anyone and everyone surrounding my

13  support --

14          MR. MISKIEWICZ:  Objection.

15          MR. LARUSSO:  I'll just ask the question.

16  Q.   With regard to the Myrick suit, was it discussed with

17  each one of the hockey players who contributed?

18  A.   Yes.

19  Q.   Was there any objection to the Global Settlement

20  Fund, to including the Myrick lawsuit as part of the

21  Global Settlement Fund strategy?

22  A.   None whatsoever.

23  Q.   Explain what the e-mail is authorizing, that is, the

24  e-mails that were received back from the individual hockey

25  player contributors?

Gonchar - Cross/LaRusso

4926

1   A.    All right.

2             In short, various legal fees as we get to line 4

3   was representing our Mexican and U.S. efforts versus Ken

4   Jowdy, beyond ongoing litigation effort that existed with

5   Kristen Myrick, Owen Nolan, Joe Juneau and Ethan Moreau,

6   PR fees, public relations, I think Mr. Gonchar described

7   that earlier told that there were issues that Mr. Jowdy

8   had put in the media with the help of the New York Daily

9   News, that were adverse to the positions of the groups as

10  a whole, and for that purpose he was looking for public

11  relations help for the group.

12            Protective advancements, that may have ranged

13  from our efforts to continue the operations of some of the

14  entities at the time that the Global Settlement was

15  started --

16  Q.    Such as?

17  A.    Each of the entities that are later recognized, the

18  Avalon Airpark, Eufora, the issues with respect to the

19  airplane or airplanes as we came to find out through the

20  lawsuit, and the Palms condos eventually.

21  Q.    How did you explain to the hockey players protective

22  advances?

23  A.    I actually didn't do it.  It was described by

24  Mr. Constantine.

25  Q.    In your presence when it was described?

Gonchar - Cross/LaRusso

4927

1   A.   Yes, sir.

2   Q.   How was it described to the hockey players by

3   Mr. Constantine?

4             MR. MISKIEWICZ:  Objection, hearsay.

5             THE COURT:  No, overruled.  It goes to the state

6   of mind.

7             Go ahead.

8   A.   To the best of my recollection, Mr. Constantine was

9   very forthright with the individuals, suggesting that

10  because of all of our other concerted efforts, some of our

11  businesses, as mentioned below, needed additional

12  financial attention during this period of time as a result

13  of funds being spent on litigation efforts that did not

14  need to be spent at that time in our opinion.

15            In addition, they were also regarding

16  Mr. Constantine's proposal that as a result of a number of

17  adverse parties, including Myrick, Nolan, Moreau and

18  Juneau, we would seek to buy them out of their various

19  investments that had crossover with our groups' efforts as

20  a whole.

21  Q.   Was Mr. Juneau actually bought out, do you recall?

22  A.   Yes, sir, he was.

23  Q.   Do you know the circumstances behind that and how the

24  Global Settlement Fund interacted with that?

25  A.   Yes, I believe as proposed by Mr. Constantine, the

Gonchar - Cross/LaRusso

4928

1   Global Settlement was going to buy both Mr. Nolan and

2   Mr. Juneau out of their $550,000 invested in the Avalon

3   Airpark.

4          Mr. Nolan, according to everything I recall and

5   I have seen since, refused to communicate the board accept

6   that offer from the Global Settlement.

7          Mr. Juneau, through his financial advisor in

8   Quebec, I believe maintained communication about some

9   settlement terms with Mr. Constantine, and at that time

10  Mr. Constantine was able to secure an agreement with

11  Mr. Juneau through the use of $450,000 of the Global

12  Settlement Funds, as opposed to the $550,000 he had

13  originally budgeted for that, by purchasing an airplane

14  from a friend of his, and then ultimately transferring the

15  airplane in-kind to Mr. Juneau to settle out that 550,000.

16  Q.   That is Mr. Edenholm?

17  A.   Yes, that was Mr. Edenholm who was here.

18  Q.   How much of the Global Settlement Fund monies were

19  used to by the plane from Mr. Edenholm?

20  A.   I believe $450,000, to the best of my knowledge.

21  Q.   And again, just completely understanding of the

22  hockey players as communicated by you and then

23  memorialized in the e-mails that they received.

24  A.   The last portion was a settlement cost or costs.  I

25  believe that is what I was alluding to with the group's

Gonchar - Cross/LaRusso

4929

1   effort as a whole to settle open investment issues with

2   Kristin Myrick, Joe Juneau, Ethan Moreau and Owen Nolan at

3   the time.

4   Q.    I'm not going to ask you to explain it, but there is

5   a reference to the Palm units later on, is that correct,

6   that you've already described to us?

7   A.    Yes, sir, that is correct.

8   Q.    Again -- well, let me just do this, if I may.

9          I will show you what has been marked as C-283 --

10         THE COURT:  Let's take a break.

11         MR. LARUSSO:  That's fine.

12         THE COURT:  We're going to go to 3:30 or 3:45

13   and we'll end a little early today.

14         Have a good lunch.

15         (Jury exists.)

16         THE COURT:  I understand there are certain

17   aspects that you may want to have Mr. Kenner clarify or

18   expand upon, but please, he was on the stand for two and a

19   half days.  We've heard every aspect of every one of these

20   e-mails and transactions.  So, please, to the extent

21   Mr. Kenner is giving you the whole explanation again, I

22   would ask you to focus him on particular points.

23         MR. LARUSSO:  So you know what I'm planning on

24   doing.  Obviously the Global Settlement Fund is a very

25   significant part of our defense and he wants to have a

4930

1    complete picture what the hockey players were told.

2           What I was going to do as I was approaching is

3    show him the e-mails, have him identify them and go on.

4           I had no intention of going through each one of

5    them, Judge.

6           THE COURT:  Okay.

7           MR. LARUSSO:  That was my intention at the

8    recess.

9           THE COURT:  Okay.  Have a good lunch.

10          MS. KOMATIREDDY:  I ask at this time can we make

11   a formal application for the 26.2 material from

12   Mr. Stumple including all communications between Mr.

13   Stumple and Mr. Constantine that pertain to the subject of

14   his testimony.

15          THE COURT:  Yes, if these witnesses have any

16   e-mails or text messages they should be produced.

17          MR. LARUSSO:  I'll be meeting with him tonight

18   and I'll go over that.  Specifically, I got from him what

19   we provided to the Government and maybe one or two other

20   matters that I have.

21          THE COURT:  All right.

22          (Whereupon, a recess was taken.)

23

24

25

Gonchar - Cross/LaRusso

4931

1              A F T E R N O O N   S E S S I O N

2                           2:15 pm

3

4              (The following ensued in the absence of the

5    jury.)

6              THE COURT:  You have an issue for your redirect?

7              MR. HALEY:  Yes.  It is unique, from my

8    perspective, on my redirect.

9              In view of the testimony of Sergei Gonchar which

10   I didn't address in my direct examination of Mr. Kenner, I

11   would like to address that.  And I will qualify what I'm

12   saying.  I will endeavor to be brief on this, but I would

13   like to address that when I but it him back on redirect.

14             THE COURT:  Fine.

15             MR. HALEY:  There are certain aspects of his

16   testimony I want to address.

17             THE COURT:  Fine.

18             MR. HALEY:  Thank you.

19             THE COURT:  Let's bring in the jury.

20             (The following ensued in the presence of the

21   jury.)

22             THE COURT:  Please be seated.

23   PHILLIP A KENNER

24        called by the Defense, having been previously

25        duly sworn/affirmed, continued testifying as

4932

1        follows:

2      CROSS-EXAMINATION (Continued)

3      BY MR. LaRUSSO:

4      Q.   Mr. Kenner, I'm going show you what has been marked

5      for identification as C283, part of this document, and

6      these are labeled separately from SMC000013

7      through SMC00029.

8            Have you seen these documents before and do you

9      recognize them as the emails that you sent to the

10     individual contributors to the Global Settlement Fund,

11     that is, the hockey players, and their responses

12     acknowledging and approving the information that's

13     contained therein?

14     A.   Yes, I believe they are.

15     Q.   Is that correct?

16     A.   Yes, I believe they are.

17           MR. LaRUSSO:  Your Honor, I'm just going to mark

18     them separately but not at this time.  That group that I

19     had indicated as C283-1 I will be moving them in at

20     another time, not now, if that is all right.  It is not

21     necessary.  If that is all right with the court.

22           THE COURT:  Okay.

23           MR. LaRUSSO:  Thank you.

24     BY MR. LaRUSSO:

25     Q.   Mr. Kenner, there was testimony, you will recall,

4933

1   about Mr. Ranford contributing to the Global Settlement

2   Fund.

3           There was his reference to $100,000 and then

4   there was reference to $400,000.

5           Do you remember that?

6   A.   Yes, sir, I do.

7   Q.   And there was a reference during his examination that

8   he possibly contributed $4,000.

9   A.   I do recall that.

10  Q.   And you also recall that -- let me just go over this

11  document very quickly.

12          767.  This is your spreadsheet in regards to the

13  contribution the Global Settlement Fund.  And I'm going to

14  look at 65 which is highlighted, I will put it so

15  everybody can see it.

16          This is Mr. William Ranford, $100,000.  That is

17  the first contribution he made.  Right?

18  A.   That's correct.

19  Q.   Now, going down to 6/12 if 2009, that is an outgoing

20  to Mr. Ranford for 100,000.  Is that correct?

21  A.   Yes, it is.

22  Q.   So he was returned his initial investment of 100,000.

23  Is that right?

24  A.   That is correct.

25  Q.   And do you recall -- yes or no -- the reason why that

4934

1   was returned to him at that point?

2   A.    I believe I do.  I may have addressed it on direct.

3   Q.    Okay.  I believe you did.

4         In fact he did not have his authorization

5   emailed, reviewed sent back, and then his money was

6   returned to him so that the procedure could be followed

7   that we talked about.  Is that correct?

8   A.    That was a portion of it.

9         Mr. Ranford had spoken to me originally about

10  the Global Settlement on the phone.  And we had been

11  trying to make arrangements to get together face to face

12  between our two schedule conflicts since it had become a

13  little more arduous to do so.

14        At that point Mr. Ranford had suggested that we

15  be able to meet a few weeks later, and Mr. Constantine had

16  offered to return the money at that point in time so we

17  did.  And then subsequent to my face-to-face meeting with

18  Mr. Ranford, he then agreed to put $300,000 in.  So that

19  was his management contribution at that point in time.

20  Q.    But the original was sent because he did not yet

21  authorized the monies pursuant to procedure that had been

22  set in place.

23  A.    That is correct.  There was not an original email

24  confirmation sent out to him.

25  Q.    And that was Mr. Constantine's request.  Is that

Kenner - Cross/Mr. LaRusso

4935

1    correct?

2    A.    I believe --

3    Q.    It was both you and Mr. Constantine insisting that

4    the money go back until that authorization email was

5    received from Mr. Ranford.

6    A.    Yes, sir.

7    Q.    You talked about, I believe on direct and on cross,

8    concerning an $85,000 disbursement by the Global

9    Settlement Fund on -- let me put it up correctly --

10   November 6, 2009 to Rubin Correo for $85,000.  Is that

11   correct?

12   A.    Yes, sir, to Rubin Correo.

13   Q.    Do you recall in any earlier payments that were made

14   to a different Mexican attorney in regards to your efforts

15   to sue Jowdy?

16   A.    Yes, sir, I do.

17   Q.    That was I believe said it was a $22,000 payment?

18   A.    I don't recall ever representing the amount.

19   Q.    Do you recall the amount?

20   A.    I do not, off the top of my head.

21   Q.    Do you remember when it was made?

22   A.    Early in the Global Settlement distributions.

23   Q.    And do you recall who that was made to?

24   A.    Yes, sir.

25   Q.    Who was that made to?

Kenner - Cross/Mr. LaRusso

4936

1    A.    It was to one of our other Mexican attorneys

2    Francisco Paredes Duarte.

3    Q.    Did you point that out on your spreadsheet?

4    A.    I believe I did on the first page.

5          It is on May 14, 2009, three lines above where

6    *Mattias Norstrom* is highlighted.

7    Q.    I'm going to ask you a couple of questions about what

8    happened between the time of this payment and the time of

9    the 85,000.

10         Do you recall that you and Mr. Constantine

11   discussed the further use of Global Settlement fund money

12   to pay for legal representation in Mexico?  Do you recall

13   that?

14   A.    I do remember paying myself about another $100,000

15   for Mr. Peredes Duarte during that period of time.

16   Q.    Where did that money come from?

17   A.    My personal.

18   Q.    But do you recall any discussions between the

19   payments that we just looked at on the Global Settlement

20   Fund in May and then later in November discussing the fact

21   that Mr. Constantine was I believe you said something

22   about reluctant to send any more money back down to Mexico

23   because of the public corruption picture that was existing

24   down there?

25   A.    Yes, sir, I recall that.

4937

1   Q.   As a matter of fact, prior to the $85,000 actually

2   being sent, you had a meeting with Mr. Constantine in

3   regards to that.  Is that correct?

4   A.   Yes, I believe that's correct.  I believe --

5   Q.   Did you have that in your offices?

6   A.   To the best my recollection I believe I did.  And I

7   also believe Mr. Kaiser may have been with me during that

8   meeting.

9   Q.   And I think you described that as a pretty heated

10  discussion.  Is that right?

11  A.   It got right to the point.

12  Q.   Voices were raised.  Is that right?

13  A.   I believe so.  Yes, sir.

14  Q.   And Mr. Constantine was opposed to sending any

15  further money down there because of the public corruption

16  issue, and you and Mr. Kaiser were likewise as adamant

17  about needing to send the money down to continue pursuing

18  Mr. Jowdy.  Is that correct?

19  A.   I believe that was the sum and substance of the

20  meeting.

21  Q.   Would it be fair to say that in the end you won on

22  that argument and Mr. Constantine reluctantly agreed to

23  send the money down?  Is that correct?

24  A.   As a result of the funds, I don't think any of us

25  won.

4938

1   Q.   Let me just again get to the point.

2           This money had nothing to do with the tequila

3   company.  Is that correct?

4   A.   Absolutely not.

5   Q.   And that never came up in your discussion with

6   Mr. Constantine regarding whether this money should be

7   sent down.

8   A.   Absolutely not.

9   Q.   As a matter of fact, you provided him all of the

10  necessary information in an email, correct, so that money

11  could be properly sent to the attorney that you have just

12  described?

13  A.   For Senior Correo?

14  Q.   Yes.

15  A.   Yes, sir I did.

16  Q.   Is this the email dated November 4, 2009, you to

17  Mr. Constantine providing the information so that he could

18  forward the money down to Mr. Correo?

19  A.   That appears to be accurate.  Yes, sir.

20  Q.   There is no mention of tequila bottles in this.  Is

21  that correct?

22  A.   Not that I recall.

23           MR. LaRUSSO:  Your Honor, I will ask that C, I

24  said nine but I think it 257, I may have misstated that, I

25  ask that 257 be received.

Kenner - Cross/Mr. LaRusso

4939

1        THE COURT:  Any objection?

2        MR. LaRUSSO:  One more question --

3        THE COURT:  Hold on.

4        MR. MISKIEWICZ:  I'm sorry, your Honor.

5        (There was a pause in the proceedings.)

6        THE WITNESS:  Mr. LaRusso, may I see the exhibit

7   again, please?

8   BY MR. LaRUSSO:

9   Q.    Sure.

10  A.    I apologize.

11  Q.    You can leave it there after you look at it.

12       MR. MISKIEWICZ:  May I voir dire -- your Honor.

13       THE COURT:  Yes.

14  VOIR DIRE EXAMINATION

15  BY MR. MISKIEWICZ:

16  Q.    Mr. Kenner.  257:  Do you have that in front of you?

17  A.    Yes, sir.

18  Q.    What do you contend this to be?

19  A.    These are wiring instructions for one of our

20  attorneys in Mexico, Mr. Rubin Israel Paolo Cirillo.

21  Q.    And you are associating it with some wire transfer

22  that appears on 767, Government Exhibit 767?

23  A.    Yes, sir.

24  Q.    Which one of those transfers do you say is reflected

25  in this document?

4940

1   A.   I believe it is the November 2009 wire transfer for

2   the $85,000.

3   Q.   This document doesn't have any instruction here to

4   wire any particular amount of money, does it?

5   A.   There is no specific dollar amount down there.  No,

6   there isn't.

7           MR. MISKIEWICZ:  The government objects to its

8   admission.

9           THE COURT:  Mr. Haley?

10          MR. HALEY:  I'm sure I have no objection, judge.

11          No objection.

12          THE COURT:  The objection is overruled Exhibit

13  C257 is admitted.

14          (Defense Exhibit C257 in evidence.)

15          MR. MISKIEWICZ:  May we approach on an issue,

16  though?

17          THE COURT:  Yes.

18          (Continued on the following page.)

19

20

21

22

23

24

25

Kenner - Cross/Mr. LaRusso

4941

1          (Discussion at sidebar ensued as follows.)

2          MR. MISKIEWICZ:  It has to do with one of the

3    court's rulings regarding Government Exhibit 767 which

4    Mr. LaRusso is using now.

5          It was previously admitted only against

6    Mr. Kenner, on I believe Mr. LaRusso's argument that the

7    conspiracy, that they were not really coconspirators at

8    this time.  I think the cross-examination has established

9    now that he has adopted it and Mr. Constantine has played

10   a role in its creation.

11         So we would ask that the prior ruling, if not

12   right now then at some later point, be modified to have

13   this document admitted as against both defendants, not

14   merely one.

15         THE COURT:  We can talk about that later.

16         On the issue of the document, he authenticated

17   it as relates to that payment.  The fact that it doesn't

18   have the number goes to the weight, not its admissibility.

19         MR. MISKIEWICZ:  Okay.

20         (Discussion at sidebar was concluded.)

21         (Continued on the following page.)

22

23

24

25

4942

1        (The following ensued in open court.)

2   CROSS-EXAMINATION (Continued)

3   BY MR. LaRUSSO:

4   Q.    Mr. Kenner, one more question, or two, on the Global

5   Settlement Fund at this point.

6             On June 17 down at the bottom there is a mention

7   of Supermarine of Stewart for $3,500 (sic).  Do you see

8   that?

9   A.    Yes, sir, I do.

10  Q.    And over on your notes it says Falcon.

11  A.    Yes, sir, it does.

12  Q.    Do you know who was paying the rent for, or do you

13  know that this it was actually a rent payment for the

14  hangar for the Falcon 10?

15  A.    Yes, sir, I do, because previous to the Global

16  Settlement I had made approximately ten payments of $3,500

17  while we were in negotiations with Mr. Constantine -- or,

18  excuse me, with Mr. Jowdy to have the title transferred to

19  us.  So I spent $35,000 over ten months prior to the

20  Global Settlement to pay for storage while Mr. Jowdy

21  refused to release the Falcon plane to us.

22  Q.    So this was picking, the Global Settlement funds were

23  picking up this payment at this point in time.  Is that

24  correct?

25  A.    I did see that on the spreadsheet after the fact.

4943

1    Yes, sir.

2    Q.    So this would be a proper authorization for the

3    expenditure of Global Settlement Fund, as you see it now.

4    Is that correct?

5    A.    Yes, I would agree.

6    Q.    And it is also fair to say that your analysis of

7    these expenses was not, in your own words, complete to the

8    point where you were satisfied on all occasions?

9    A.    That's correct.  Not on all occasions.

10   Q.    I'm going to take you to a portion of your direct

11   testimony where you talked about a hostile takeover of

12   Eufora at this point.

13   A.    Okay.

14   Q.    You testified that there was a group that was

15   actually seeking to hostilely take over the management

16   controlling of Eufora from Mr. Constantine and his

17   management team.

18         Who was that group?  Can you tell us who, the

19   people that were involved in that?

20   A.    Specifically from a leadership position?

21   Q.    Give us, identify who the leadership was and who

22   participated in that effort.

23   A.    Okay.  It was quite a significant group so I will do

24   my best from my memory to refer to the entire list.

25         From a leadership position it was Mr. Stolper,

4944

1   the lead attorney out of New York.  It was his

2   investigative partners Mr. Eric Hatzimemos and a former

3   CIA individual named Oliver Libby, who was involved in the

4   investigations as well.

5           The remainder of that I would call the

6   leadership team would have been CR Gentry, who provided

7   the majority of the information to the investigation team.

8           And the Eufora partners, one managing member and

9   board member Tim Aaron.

10          Then representing the group of individuals was

11  lead by, excuse me, the individual who led the group of

12  investor individuals at that point was Brian Berard.

13          And then there was further assistance by John

14  Kaiser and myself.

15  Q.   Early on there was a select group of people, am I

16  correct, who were involved in discussing the takeover of

17  the company?

18  A.   That was the specific group.

19          After the initial conversations on or about June

20  26 of 2010 Mr. Stolper contacted me for the first time on

21  the phone.  Prior to that I was solely in email

22  communication with Mr. Stolper or the other members of his

23  New York team, specifically Mr. Libby and Mr.

24  Hatzimemos.

25          And on the 26th of June he asked me on the phone

Kenner - Cross/Mr. LaRusso

4945

1    if I could you make arrangements for the rest of the

2    Eufora investors to be available for a conference call in

3    the immediate near future, which I did in order to

4    facilitate Mr. Stolper's dissemination of the information

5    he would like to share with the group.

6    Q.   Mr. Kenner, how would he have gone about the hostile

7    takeover of the company from Mr. Constantine?

8    A.   Could you repeat that --

9    Q.   How were they going to accomplish the hostile

10   takeover?

11   A.   Okay.  I'm sorry.  I just didn't hear.

12   Q.   I'm sorry, I apologize.

13   A.   That's okay.

14   Q.   I'll try to keep my voice up.

15   A.   It's okay.  I just have a hearing issue.  I'm sorry.

16          After the June 26 request to put the group

17   together on a conference call for Mr. Stolper to

18   disseminate that information, effectively it was each and

19   every member that signed on that authorization form for

20   Mr. Stolper to continue his representation of the group,

21   in part or in whole.

22          There were a number of individuals, including

23   myself, John Kaiser, Brian Berard, Jay McKee and Michael

24   Peca, who had expressed specific interest in funding the

25   loan takeover process from Brent Nerguzian and Neptune

Kenner - Cross/Mr. LaRusso

4946

1    Capital at that time.

2    Q.   Do you know, of the group, who actually made contact,

3    if any, with Mr. Nerguzian to try and buy the loan?

4    A.   I did not participate in any of those calls, but to

5    the best of my recollection I believe it was led by CR

6    Gentry because of his previous relationship with

7    Mr. Nerguzian.

8              And I believe Mr. Stolper would have

9    participated on a series of those phone calls with

10   Mr. Nerguzian and handled his attorneys at the time.

11   Q.   And at this you were aware that Mr. Constantine was

12   unaware because these were secret negotiations with

13   Mr. Nerguzian to try and buy the loans.  Is that correct?

14   A.   I believe at the beginning Mr. Constantine was

15   unaware of this.  Yes.

16   Q.   And you anticipated my next question.

17             There came a time that you found out about it.

18   Is that right?

19   A.   Yes.  I believe sometime in and around Mr. Stolper's

20   first communication with the group as a whole

21   Mr. Constantine became aware of the discussions with

22   Mr. Nerguzian to buy the loan.

23   Q.   Do you recall the testimony of Mr. Gonchar regarding

24   the meeting in Mr. Stolper's office where he opened his

25   telephone so Mr. Constantine could listen to the

Kenner - Cross/Mr. LaRusso

4947

1    conversation?

2            Do you recall that testimony?

3    A.   Yes, sir, I do.

4    Q.   Were you present at that meeting?

5    A.   Not physically.  I was on the phone.

6            (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4948

1   BY MR. LARUSSO:

2   Q.   Do you remember the letter that's been shown to most

3   of the hockey players?

4          I believe it was a July 16, 2010 letter that

5   Mr. Stolper had written to all the Eufora partner members

6   seeking their written consent for representation?

7   A.   Yes, sir, I do.

8   Q.   Did you receive a copy of that?

9   A.   I believe I received a copy of that at the time.

10   Q.   And you reviewed it?

11   A.   I'm sure I reviewed it.

12   Q.   You were not a recipient of this letter, an intended

13   recipient of the letter; is that correct?

14   A.   I don't believe it was seeking my signature

15   authorization.

16   Q.   That was my question.

17          You did not sign the authorization to hire

18   Mr. Stolper; is that correct?

19   A.   No, sir, I did not.

20   Q.   Take a look at C 37.

21          Is that the letter you had an opportunity to see

22   before it was sent out?

23          (Pause in proceedings.)

24   A.   As I review this, first I would like to say this was

25   not the letter I was referring to when you first asked the

4949

1   question.

2           I was just referring to the general

3   acknowledgment that accompanies all of these signature

4   pages, so I apologize if I was confused.

5   Q.   Did you ever see that letter before?

6   A.   Yes, sir, I know that I've seen this letter.

7   Q.   At the time the letter was written, did you have an

8   opportunity to review it after it was written or before it

9   was written?

10  A.   I'm certain it was after it was written.

11  Q.   Under what circumstances do you recall receiving that

12  letter?

13          (Pause in proceedings.)

14  A.   Without reviewing every page in detail, I believe

15  this was part of the correspondence going back and forth

16  between Mr. Stolper and the attorneys for Mr. Nerguzian

17  and Mr. Constantine at the time with reference to ongoing

18  mediation or discussions on what steps to take next.

19  Q.   And you had an opportunity at some point to receive a

20  copy or an original letter that was sent to one of the

21  intended recipients; is that correct?

22  A.   Yes, sir.

23  Q.   To your knowledge, does that letter publicly disclose

24  that Mr. Gaarn and Mr. Gentry have been removed as members

25  of the board of directors and fired from their employment

4950

1    at Eufora on page 2?

2    A.    I did see on page 4 of 5 there's a reference to a

3    question asking why Mr. Constantine would remove those two

4    gentlemen, yes.

5          Is there something on page 2 I should look at

6    specifically?

7    Q.    No.

8          At this point in time, around this letter of

9    July 16, 2010, it was public knowledge that

10   Mr. Constantine had in fact removed both Gaarn and Gentry;

11   is that correct?

12   A.    Yes, I believe so.

13   Q.    You testified that Mr. Privitello, Nicholas

14   Privitello, was inaccurate in his description of a cabana

15   party.

16          Do you remember that?

17   A.    Yes, sir, I am.

18   Q.    You know Mr. Nicholas Privitello; is that correct?

19   A.    I have met him several times in the past.

20   Q.    He was a close friend of Mr. John Kaiser?

21   A.    Very close friend.

22   Q.    And he had made or had sent money to the Ron

23   Richards' account for an investment or interest in Eufora;

24   is that correct?  You were aware of that?

25          MR. MISKIEWICZ:  Objection.

4951

1           THE COURT:  Sustained as to form.

2           MR. LARUSSO:  I'll move on to the next area.

3    BY MR. LARUSSO:

4    Q.   My question is:

5           Was Mr. Privitello, in his testimony, truthful

6    about the circumstances surrounding his investment in

7    Eufora?

8           MR. MISKIEWICZ:  Objection.  May we approach?

9           THE COURT:  Yes.

10          (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner  -  Cross/LaRusso

4952

1    (The following takes place at sidebar.)

2         MR. LARUSSO:  I can maybe cut to the quick.

3         And the part I'm asking him to elicit is in this

4    group he knows that Mr. Privitello was instructed not to

5    ask for his shares of money back because his interest was

6    used -- going to be used as a hook to take over the

7    company.  I was going to have him explain it.  I was

8    trying to lay a foundation.  That's where we're heading,

9    Judge.

10        MR. MISKIEWICZ:  Well, it's news to me.  I also

11   think this is inappropriate.  This is not really

12   cross-examination.  This is some sort of using him as a

13   foil for Mr. Constantine to testify through Mr. Kenner.

14   That's my objection.

15        THE COURT:  That's one of the benefits of a

16   joint trial.  I will remind Mr. LaRusso when he's done

17   about his severance motion before, and whether or not

18   there are in fact antagonistic defenses.

19        It seems to me that's exactly what he's doing,

20   and it's permissible for him to do that, so objection

21   overruled.

22        MR. HALEY:  May I see the letter though?

23        (Continued on next page.)

24

25

4953

1    (The following takes place in open court.)

2         MR. LARUSSO:  May I ask it in a different

3    fashion, your Honor?

4         THE COURT:  Yes.

5    BY MR. LARUSSO:

6    Q.   Mr. Kenner, are you aware that there came a time when

7    members of the group had instructed Mr. Privitello not to

8    ask for his shares or interest, I should say, or money

9    back that he had sent to acquire an interest in Eufora?

10   A.   Yes, sir, I am.

11   Q.   Was that done for purposes of using him as a hook to

12   take over the company?

13   A.   I believe it was for the intention of preserving his

14   litigation issues in conjunction with the group, that's

15   correct.

16   Q.   Could you tell us who approached Mr. Privitello and

17   what you learned in regards to what he was told to do or

18   asked to do?

19   A.   You effectively stated it properly.

20   Q.   Pardon me?

21   A.   You stated it correctly, that Mr. Privitello was

22   instructed by the leadership of the group to not take any

23   of his funding back in order to maintain leverage in

24   potential litigation with Mr. Constantine at that time.

25   Q.   That strategy would be part of their overall plan to

Kenner  -  Cross/LaRusso

4954

1   takeover the company and control from Mr. Constantine?

2   A.   Yes, I believe that was Mr. Stolper's intention.

3   Q.   We heard testimony about Mr. Jowdy and his two

4   Diamante projects and I'm not going to go into that.

5        But we also heard about the two championship

6   golf courses that have been built and I believe somebody

7   testified there was significant amount of vertical

8   construction that's ongoing down there; is that correct?

9   A.   That's what I recall.

10  Q.   That's what it is now; is that correct?

11  A.   Yes, after 2010 when we decided to voluntarily

12  dismiss the cases in California.

13  Q.   Could you tell us what the project looked like when

14  you initiated the litigation against Mr. Jowdy as part of

15  the Global Settlement Fund in 2009?

16  A.   Yes, sir.

17       After about three-and-a-half years of Mr. Jowdy

18  being in control, we were aware that nearly $50 million of

19  construction budget had been spent on the project.

20       And at my last visit to the project, there was a

21  desalination facility that I was aware was budgeted for

22  approximately three to three-and-a-half million dollars

23  for construction.

24       There was a golf course at or near completion at

25  that point in time.

4955

1    About two-and-a-half years later, and according

2    to reports I had read from Mr. Jowdy's statement,

3    approximately $9 million over budget which was effectively

4    like paying $200,000 for a Honda Accord thinking it's

5    still a great car.

6         There was the most basic, and I can't

7    understate -- overstate that enough, the most basic of

8    infrastructure delivered to the property with respect to

9    the electric, electricity, waste water, fiberoptic,

10   sewage.

11        There was a very rudimentary road system put in

12   place and virtually nothing else.

13        During our deposition Mr. Jowdy, in 2010, in

14   January 2010, during the ongoing litigation in California,

15   I believe Mr. Jowdy struggled to express, as the leader of

16   Diamante Cabo San Lucas, approximately 37 of the $50

17   million where it had gone.

18   Q.   I'm going to talk to you about the $15,000 payment.

19        I'm going to show you what is in evidence as

20   chart 15.

21        Do you see the payment on February 9, 2009, for

22   15,000 to Gilmartin, Magence & Ross?

23   A.   I can see a portion of that on the screen.

24   Q.   You described, and I believe in detail, the loan that

25   was obtained from this firm and Mr. Constantine was the

4956

1    borrower; is that correct?

2           And I believe you said that you were a guarantor

3    on it?

4    A.    Yes, sir, that's correct.

5    Q.    In regards to the background to this loan, you had a

6    client by the name of Mr. Moreau; is that correct?

7    A.    Yes, I did, from 1994 until about this time.

8    Q.    Do you recall Mr. Moreau negotiating to buy one of

9    Mr. Constantine's condos at the Palms?

10   A.    Yes, sir, I do.

11   Q.    Could you tell us about what happened when he sought

12   to buy the Palms and what ultimately occurred regarding

13   that?

14   A.    Approximately a year-and-a-half earlier, plus or

15   minus, Mr. Moreau had been looking for some real estate,

16   residential real estate in Las Vegas, and had approached

17   me about looking at a number of residential homes in

18   addition to a few towers that were proposed in Las Vegas

19   to go up at the time.  I believe there were 24 new

20   residential towers under permit in Las Vegas, Nevada.

21          One of the places that Mr. Moreau wanted to look

22   at was the Palms Place Tower that Mr. Constantine had

23   under agreement a significant number of residential units

24   through his friend and owner Mr. George Maloof at the

25   time.

4957

1    I told Mr. Moreau that if he were interested in

2    the Palms, that I can introduce him to Mr. Constantine

3    directly with respect to his acquisition of any number of

4    the units Mr. Constantine already had.

5    And as a result they reached an agreement,

6    written agreement, for Mr. Moreau to purchase two of the

7    units that were adjacent units and I believe Mr. Moreau

8    made a $290,000 deposit on the units at that point in

9    time.

10    The terms of the agreement between Mr. Moreau

11    and Mr. Constantine required that at the time of the units

12    completion, about a year-and-a-half later, Mr. Constantine

13    would need to close on the units first with the Palms in

14    Las Vegas, and within a 30-day period of time Mr. Moreau

15    would then close subsequent to that with his own funding

16    sources on that unit.

17    Just prior to Mr. Constantine receiving the loan

18    for a million dollars from Mr. Ross, Mr. Moreau confirmed

19    to both myself and Mr. Constantine that he was going to go

20    forward with that deal at that time.

21    Neither myself, nor Mr. Constantine, nor

22    Mr. Moreau were at risk, other than Mr. Moreau's original

23    $290,000 deposit prior to confirming that he was preparing

24    to close on those units after Mr. Constantine did.

25    So I assisted Mr. Moreau in finding several

4958

1  funding sources at that point in time.  I also signed a

2  promissory note to lend Mr. Moreau $40,000 to help him

3  with some of the closing proceeds on the short-term

4  personal loan between he and I until his hockey season

5  started and he received paychecks.

6          And as Mr. Constantine was able to secure a loan

7  with Mr. Ross at Gilmartin, Magence & Ross in Boston, they

8  also required an additional $250,000 down payment to bring

9  the loan to value ratio I believe to 65 percent loan to

10  value.

11          Mr. Constantine did not have the funds at the

12  time so I made the arrangements for the $250,00 to be

13  deposited on his behalf and I took care of that.

14          I also wire transferred $20,000 to Mr. Ross in

15  Boston as an advanced fee on Mr. Ross's due diligence

16  prior to him agreeing to make the loan.

17          And then subsequent to that I made a series of

18  payments to the project waiting for Mr. -- excuse me -- to

19  the units, to the mortgage on the two units, prior to

20  Mr. Moreau ultimately deciding that he was not going to

21  close on the units.

22  Q.    So Mr. Moreau decided that he was not going to

23  complete his end of the bargain; is that correct?

24  A.    That is correct.

25  Q.    Did he end up filing suit against Mr. Constantine and

4959

1    sought to recover the $290,000?

2    A.    Yes, sir, he did, in addition to a number of other

3    efforts by him and his attorney at the time.

4    Q.    Now, this was a client of yours; is that correct?

5    A.    Yes, sir, it was right up until about that time.

6    Q.    Did there come a point in time when the owners of the

7    Palms were seeking their money for the contract to buy

8    that unit?

9    A.    Yes, sir.

10    Q.    Who was on the hook for that?  Who was responsible

11    for that at that point?

12    A.    Mr. Constantine was.

13    Q.    Did you lend him any help as a result of what

14    Mr. Moreau had put him in this particular position?

15    A.    Certainly I did.

16    Q.    What did you do?

17    A.    In addition to the original 20,000, the subsequent

18    $250,000, plus a $25,000 fee that I paid to the individual

19    who originally lent us the 250,000, I made a series of

20    monthly mortgage payments to the tune of $15,000 apiece.

21    Q.    So Mr. Constantine becomes the borrower?

22    A.    Yes, sir, on the $1 million loan.

23    Q.    Did you pay the deficiency payment of approximately

24    $249,000?

25    A.    Yes, sir, I did.

Kenner  -  Cross/LaRusso

4960

1    Q.    And you also incurred additional costs of 20,000 for

2    the closing?

3    A.    Yes, sir.

4    Q.    And I think you testified that you began making the

5    monthly payments; is that right?

6    A.    Yes, sir, I did.

7    Q.    Would it be fair to say that you kind of felt

8    obligated at this point because Mr. Constantine had been

9    put in the situation by a client of yours who did not want

10   to go through on an obligation he made?

11   A.    Yes, I was disappointed in that to say the least.

12   Q.    So this payment over here on February 9 for $15,000,

13   that was a payment that you had made pursuant to the

14   testimony that you just gave?

15   A.    Yes, sir, it was.

16   Q.    And would it be fair to say that Mr. Constantine did

17   not know where the money was coming from, but he knew the

18   payment was being made by you?

19   A.    He knew the payment was being made by me.

20   Q.    But did not know where the source of the funds were?

21   A.    He just knew they were funds that were mine.

22   Q.    I'm going to show you what's been marked for

23   identification as C 260 for identification.  Would you

24   take a look at this.

25          First of all, do you recognize this document?

Kenner  -  Cross/LaRusso

4961

1   A.   Yes, sir, I do.

2   Q.   What is that?

3   A.   This is a June 2008 personal bank statement of mine

4   from Wells Fargo bank.

5   Q.   Directing your attention to --

6            MR. LARUSSO:  At this time, I'll ask it be

7   received into evidence, your Honor, as Defendant's Exhibit

8   C 260.

9            MR. MISKIEWICZ:  No objection.

10            MR. HALEY:  No objection.

11            THE COURT:  C 260 is admitted.

12            (Defense Exhibit C 260 in evidence.)

13   BY MR. LARUSSO:

14   Q.   Do you see highlighted the deficiency payment you

15   made, the payment you described to the jury?

16   A.   Yes, sir, I do for $249,000 on June 19 of 2008.

17   Q.   Thank you.

18   A.   You're welcome.

19            MR. LARUSSO:  Your Honor, if I may display that

20   for the jury.

21   BY MR. LARUSSO:

22   Q.   And that's the highlighted portion we were talking

23   about?

24   A.   Yes, sir.

25   Q.   Just a few questions on the lines of credit if I may,

4962

1   Mr. Kenner.

2         These lines of credit we have been talking about

3   were paid down at the time of the Lehman loan in August

4   2006; is that correct?

5   A.   Yes, sir, that's correct.

6         MR. MISKIEWICZ:  Objection to form.

7         THE COURT:  Overruled.

8   A.   Yes, sir, that's correct.

9   Q.   Were the lines of credit after the Lehman loan

10  continued to be assessed, monies taken out?

11  A.   Yes, sir, they were pursuant to conversations I had

12  with each and every one of the line of credit holders at

13  that time.

14  Q.   The balances were increasing.  Why?

15  A.   They were increasing primarily because Mr. Jowdy had

16  failed to repay us the loans he owed us of approximately

17  $7 million in principal and interest by March of 2006.

18        And at that point in time Mr. Jowdy effectively

19  abandoned all communication with myself regarding our

20  efforts at Diamante Cabo San Lucas which I addressed in a

21  very lengthy e-mail and he was avoiding me with telephone

22  conversations at that point as well.

23  Q.   Talking about the time frame after the Lehman closing

24  in August 2006, did any of the payments that you made to

25  Mr. Constantine for consulting services have anything to

4963

1   do with the increases in the lines of credit that

2   ultimately were being foreclosed upon?

3   A.    I believe there were some additional payments made to

4   Mr. Constantine by the Hawaii partners after the Lehman

5   closing pursuant to agreements that were signed in order

6   to facilitate the joint venture between Lehman Brothers,

7   Windwalker and our group also.

8   Q.    Did those payments have anything to do with what

9   happened in regards to the lines of credit after the

10  Lehman loan closed?

11  A.    No.

12        The lines of credit closed because the capital

13  of the Little Isle IV and Na'alehu Ventures 2006 dried up

14  as a result of Mr. Jowdy reneging on his commitment to

15  repay the loan and his efforts with the promise from Sue

16  Botman of Lehman Brothers to help facilitate those within

17  the first year-and-a-half through vertical construction

18  sales at Diamante Cabo San Lucas, withdrawals of Mr. Jowdy

19  and Mr. Najam at that time which led to the strife between

20  Mr. Jowdy and the entire group of investors.

21  Q.    I'm going to ask you a couple of questions about the

22  Hawaiian projects and the consulting agreements if I

23  could.

24        You testified that you were seeking funding for

25  the development of those projects in Hawaii, but the banks

4964

1    were not interested in angel investment and angel

2    development?

3    A.    Yes, sir.

4    Q.    What did you mean by those two phrases?

5    A.    I apologize.

6          Those are lending terms or banking terms that I

7    had become accustomed to in that period of time.

8          Our land was a very significant land masses

9    totaling approximately 6,000 acres and approximately two

10   miles of coastline on the big island of Hawaii, and most

11   of the banks were leery of sinking development money into

12   projects without seeing the beginning of infrastructure

13   and the subdivision plan approvals from the county at that

14   point in time.

15         So it forced myself, John Kaiser, Chris Manfredi

16   on behalf of the group to seek alternative investment

17   development, investment dollars, which is very common in

18   real estate developments at that time.

19   Q.    That's when you went and sought the services of

20   Mr. Constantine and others, consulting services, to try

21   and secure the funding that you needed at this point; is

22   that correct?

23   A.    Yes, not just Mr. Constantine, but upwards of a dozen

24   individuals as well.

25   Q.    And they were likewise paid for their services?

Kenner  -  Cross/LaRusso

4965

1    A.    Yes, through advanced fees or other consultant deals.

2    Q.    Same kind of deals you had with Mr. Constantine; is

3    that correct?

4    A.    Many of them turned out to be much more costly

5    because they didn't deliver anything.

6    Q.    Some of the people that were included in that

7    category would be Donny Rae?

8    A.    Yes, sir.

9    Q.    Tim Gaarn?

10   A.    Mr. Gaarn was paid an advanced fee, that's correct.

11   Q.    And Rich Salgado?

12   A.    Yes, sir.

13   Q.    Nick James?

14   A.    No, I don't believe Mr. James was paid for that.

15   Q.    And how about Robert Gaudet?

16   A.    Yes, Robert Gaudet was paid for that in part in

17   conjunction with a golf feasibility study he was doing for

18   us at the time prior to the Lehman closing.

19   Q.    Now just so I'm clear, these individuals sought to

20   obtain funding for the Hawaiian project and were paid for

21   their services substantially is your testimony, correct?

22   A.    Yes, sir, in addition to other individuals we haven't

23   discussed.

24   Q.    But they produced nothing all of the times that they

25   were hired and paid for their services; is that correct?

4966

1    A.    Mr. Gaarn was the other gentleman on the list besides

2    Mr. Constantine who was able to deliver.

3    Q.    We will talk about him in a few moments.

4          Could you tell us, just briefly, what were the

5    efforts that you noticed in regards to Mr. Constantine

6    trying to secure the funding for the Hawaiian projects?

7    A.    From my first conversation with Mr. Constantine in

8    and around the closing of the 258 acre parcel in December

9    2003, I had told him about the early development plans on

10   that small parcel of land, albeit not a small parcel in

11   and of itself.

12         In our general discussions he told me that he

13   had a great network of financial people, high net wealth

14   individuals, who were in the lending business if I sought

15   any further funding for vertical construction or basic

16   infrastructure.

17         Over the following six months, before the summer

18   of 2004, Mr. Constantine, probably unknown to me at the

19   time, had reached out to a number of his individuals that

20   he was dealing with.

21         And by the summer of 2004, when I had placed the

22   1500 acre Honu'apo parcel under contract with a December

23   '04 proposed closing date, I knew that my infrastructure

24   costs were going to grow far outside the scope of what

25   myself and my Hawaiian partners could fund reasonably at

4967

1    that time, so I had further conversations with

2    Mr. Constantine about it.

3         In the summer of 2004, he told me that based on

4    preliminary discussions he had had prior to my request for

5    assistance, he felt very comfortable that he could put

6    together, at a minimum, funding in the 10 to $15 million

7    range and basically upwards of whatever I would need for

8    infrastructure and vertical construction.

9    Q.   After you had retained his services, did you have an

10   opportunity to participate in conference calls, e-mail

11   communications with Mr. Constantine regarding his efforts?

12   A.   I don't specifically recall e-mail correspondence,

13   but I'm sure it occurred.

14        I do know that in and around that time

15   Mr. Constantine had arranged a number of conference calls

16   with potential lenders who I described additional details

17   of the development project, the proposed development

18   project to them, in addition to what information

19   Mr. Constantine had already previously disseminated

20   amongst them, and that continued right through I would say

21   until the time that Lehman Brothers closed two years

22   later.

23   Q.   Do you remember any names of the individuals that

24   were approached in discussing the possibility of funding

25   the Hawaiian projects?

Kenner   -   Cross/LaRusso

4968

1          Does the name Steve Hilton mean anything?

2     A.    Yes, sir, I do recall Mr. Hilton.

3     Q.    What do you recall about Mr. Hilton?

4     A.    From what I recall Mr. Hilton at the time was a very

5     significant businessman in the housing construction world.

6          And in addition to, if I remember correctly, a

7     personal desire to potentially get involved on the lending

8     side, I think Mr. Hilton had also proposed that through

9     his company he would also be -- he could be a very

10    significant partner for us going forward on the

11    residential and commercial construction site.

12    Q.    Did you participate in any discussions with

13    Mr. Hilton, or did you just discuss this with

14    Mr. Constantine?

15    A.    To the best of my recollection, I may have had one or

16    two calls with Mr. Hilton.

17         I know that Mr. Constantine would consistently

18    ask me for additional information from our group in

19    Hawaii, and I would request that specifically from

20    Mr. Manfredi and deliver it to Mr. Constantine to share

21    with Mr. Hilton or some of the other people.

22    Q.    Let me show you what's been marked as C 261 and 262.

23         Do you recognize these as e-mail communications

24    between you and Mr. Constantine regarding the funding of

25    the Hawaiian project?

4969

1   A.    I do remember these individuals without reviewing the

2   details of the e-mail.

3   Q.    What individuals do you recognize?

4   A.    These were two other individuals, very significant

5   real estate developers, in the southwest region and in

6   western Canada, Mr. Losch and Mr. Dewar.

7             Both of these gentleman were the two main

8   principals in a series of development companies and had an

9   incredibly large footprint of real estate development, as

10  I said, in the southwest region surrounding Phoenix and

11  Arizona.

12            And I was also aware of very similar development

13  projects that they had in western Canada that had

14  synergies with what we were trying to do in Hawaii at the

15  time.

16            (Continued on next page.)

17

18

19

20

21

22

23

24

25

4970

1   Q.   You may have gotten me in trouble by talking about

2   these before they were introduced.  I apologize to the

3   Court.

4        These are e-mails between you and

5   Mr. Constantine regarding his efforts to secure funding,

6   is that correct, for the Hawaiian projects?

7   A.   C-262, yes.

8   Q.   Yes.

9   A.   And C-261.

10        MR. LARUSSO:  May I ask they be received.

11        MR. MISKIEWICZ:  No objection.

12        MR. LARUSSO:  No objection.

13        THE COURT:  C-261 and 262 are admitted.

14        (Whereupon, Defendant's Exhibit C-261 and C-262

15   was received in evidence.)

16   Q.   I would like you to turn to C-261.  We can see the

17   heading, Project, Joint Venture Obligations.  And it talks

18   about visiting the Hawaiian proposal from Constantine to

19   you and to Mr. David Dewar as you described.

20        What is the information here in reference to the

21   efforts to secure funding, without reading it all, just

22   describe to us what the significance or purpose of that

23   information is?

24   A.   Without reading it to the best of my recollection, my

25   communications with Mr. Losch and Mr. Dewar to

4971

1  Mr. Constantine at the time, were that they were

2  potentially going to be both lending partners, personally

3  through the company and also through banking relationships

4  they had in place using on their own real estate

5  developments throughout North America, and they were

6  potentially going to be an extremely valuable joint

7  venture partner at the time which may or may not at that

8  time had been a new concept to for me to swallow, but I

9  was certainly excited about considering the breadth of the

10  real estate prosecution down there at the time.

11  Q.   That was March 12, 2006; is that correct?

12  A.   Yes, sir, that is correct.

13  Q.   That is about five months before the Lehman closing;

14  is that right?

15  A.   Yes, sir, and as I stated we previously I believe on

16  direct, I didn't believe that the Lehman Brothers closing

17  had 100 percent certainty to close, maybe until the week

18  we finally closed the deal.  So these ongoing efforts were

19  paramount to our potential success over in Hawaii at the

20  time.

21  Q.   This was after the Gardena loan over in 2005?

22  A.   Yes, Gardena loan through the Urban Expansion was

23  really just a stopgap measure for us to be taken out of a

24  very difficult position in or about October 2005 after I

25  had turned down Lehman Brothers '05 offer which became too

4972

1   egregious for us to sign at the time.

2   Q.    While you were on the Gardena loan, how significant

3   was the Gardena loan that Mr. Constantine secured to your

4   efforts to develop the Hawaiian project?

5   A.    There were probably two very important issues that

6   were resolved with respect to the Urban Expansion loan.

7          First and foremost, we had approximately

8   $720,000 tied up between our initial deposit and the seven

9   weeks of $64,440 extension fees I had been paying which

10  were to expire about ten days after my first introduction

11  to the Urban Expansion loan.  It certainly saved not just

12  the $720,000 plus or minus that I had tied up in the

13  project that we would have lost but moreover we would have

14  lost that $35,750,000 parcel with the two miles of

15  Hawaiian beach frontage.  That was first and foremost on

16  our concern list at the time.

17         But what we also found prior to that, and one of

18  the reasons we wanted an oceanfront parcel, after the

19  purchase of both the 258 acres and the 1500 acres at

20  Honu'Apo, we found out from a lot of the Hawaiian banks

21  who did have an interest in the future of funding

22  infrastructure and construction loans for us frankly

23  without a waterfront parcel it diminished their desire to

24  deal with us.

25         Lehman Brothers in 2005, their big concern was

4973

1   we hasn't closed on that parcel yet and they wanted to

2   major sure 100 percent it would be and that's when their

3   terms increased and that's something I couldn't sign.  But

4   come after 2006 after the Urban Expansion loan had closed

5   and we did it after the Waikapuna parcel through the

6   efforts of the Urban Expansion loan, Lehman Brothers was

7   much more lenient in their lending terms, at least

8   initially.

9   Q.    Going back to C-262, an e-mail from you to

10  Mr. Constantine, actually a chain e-mail, dated March 10,

11  2006, it references e-mails from Ken Losch.  I'll direct

12  your attention to those comments, you are the 500-pound

13  gorilla, PK.  What was your understanding of that

14  statement?

15  A.    At that point in time, there was a lot of stress in

16  the Hawaii group, particularly we had come through the

17  funding of the Urban Expansion loan which was a great gift

18  to us at the moment that the time.  But subsequent to

19  that, the deal in Cabo San Lucas has just closed, about to

20  close, but I had been informed at that point Mr. Jowdy was

21  not going to be paying us back the loans, that he owed us

22  totally approximately $7 million including interest.  So

23  at that point in time I had another parcel that we see on

24  the Hawaiian map called Mola Ula that had a subsequent

25  closing date later in 2006 that I was now potentially

4974

1   unable to close on because of Mr. Jowdy not following

2   through on the original loan agreement and his promise to

3   repay it at that time.

4           So when Mr. Losch and Mr. Dewar were called at

5   the table I was concerned at that point in time we may

6   have to alter some of our development plans.

7   Q.   Let me show you what has been received in evidence as

8   C-58, an e-mail dated November 18, 2005, talks about a

9   conference call, an e-mail from Mr. Chris Manfredi to

10  Mr. Constantine, and it references an e-mail from

11  Mr. Constantine in the middle to you, cc:  Mr. Chris

12  Manfredi.

13          That's what I was just alluding to.

14          Are you able to read that now?

15  A.   Yes, sir.

16  Q.   I'm just going to show you the top portion I was

17  alluding to earlier and the middle portion is an e-mail

18  from Mr. Constantine, the date before, referenced to you

19  and Mr. Manfredi and cc, talking about a conference call.

20  It says we have a conference call scheduled for tomorrow

21  at 3:00 p.m. with Investors Mortgage of Arizona.  Do you

22  recall this e-mail?

23  A.   Yes, sir, I do.

24  Q.   Could you tell us who the Investors Mortgage of

25  Arizona is and what their significance is to the Hawaiian

4975

1    projects?

2    A.   I don't recall who the principals of that group are

3    in particular, but this was after we had closed the Urban

4    Expansion loan in the underlying Waikapuna parcel and at

5    that point in time we were pushing forward with the county

6    of Ka'u, we were pushing forward with the planning

7    director, Mr. Chris Yuen, to get our underlying

8    subdivision parcel reconsolidation plans approved, and we

9    were looking for now infrastructure development of money

10   at Waikapuna out of the parcels that we closed on.

11   Q.   This company was looking to take over that financing?

12   A.   Yes, sir.

13   Q.   And that's where there is a reference for $15 million

14   for Waikapuna only, is that correct?

15   A.   Yes.  In the funding agreement, I believe I have told

16   Mr. Constantine early on that we needed a minimum of

17   $10 million for infrastructure loans or I wasn't frankly

18   interested in it and he assured me he would only be

19   dealing with people at higher dollar amounts.

20           By the time we got to 2005, I believe I asked

21   him to seek vertical and infrastructure development loans

22   at a minimum of $15 million.  So that's what I think he's

23   referring to here.

24           MR. LARUSSO:  May I just have a few moments,

25   your Honor?

4976

1        Your Honor, just one moment.  Thank you.

2        Your Honor, I have no further questions.  I'm

3    sorry.  There is one.  I apologize.

4    Q.   You testified, I believe, on a number of occasions,

5    that you and Mr. Constantine would on many occasions or

6    often, lend money to each other and then repay it of

7    course; is that correct?

8    A.   Yes, sir.  That is correct.

9    Q.   And they were small amounts as well as large amounts

10   of money?

11   A.   Both small and large amounts, that's correct.

12   Q.   On occasion they would be documented and on other

13   occasions they wouldn't be documented?

14   A.   Yes, sir, that is correct.

15   Q.   You had established a trusting relationship to be

16   able to make those payments; is that right?

17   A.   Yes, that is correct.

18   Q.   Do you remember in particular a loan to Bob Gaudet

19   for the Los Frailes project?

20   A.   From who?

21   Q.   Let's me show you what has been marked for

22   identification as C-289?

23        MR. LARUSSO:  Judge, may we have a brief sidebar

24   on this?

25        (Whereupon, at this time the following took

Kenner - Cross/LaRusso

4977

1    place at the sidebar.)

2              (Continued.)

Kenner - Cross/LaRusso

4978

1      MR. LARUSSO:  Sorry, Judge.  It's one of these

2    documents I didn't make a copy of.

3      THE COURT:  What's the issue?

4      MR. LARUSSO:  This is a promissory note for a

5    loan made June 11th of '07 to Bob Gaudet from Los Frailes

6    --

7      MR. HALEY:  May I make an objection.  I

8    anticipate this is going to be a rather lengthy discussion

9    we'll have.  Perhaps we may break now so I may review this

10   document with my client so I can effectively state my

11   position on this.  I believe Mr. LaRusso is about to open

12   up a door.

13     MR. LARUSSO:  That's what Mr. Miskiewicz did and

14   I didn't realize it.  He told me so and I don't know and I

15   may.

16     THE COURT:  What is the relevance?

17     MR. LARUSSO:  He took it upon himself the

18   obligation to pay back Mr. Constantine the $500,000 that

19   is part of the relationship between the two of them.

20     MR. HALEY:  I need to consult my client in that

21   regard.  I believe it may open up the door and it may

22   result in jury confusion to the issues presented in this

23   case and --

24     MR. LARUSSO:  May I cut you short.  I may

25   withdraw all of this.  I don't know what time it is, is it

Kenner - Cross/LaRusso

4979

1    3:30?  Let me take a look at this.  We may not even need

2    to discuss this.  Okay?

3              MR. HALEY:  Thank you.

4              MR. LARUSSO:  Thank you.

5              (End of sidebar conference.)

6              (Continued.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4980

1          (In open court.)

2          THE COURT:  Members of the jury, the lawyers

3    want to talk about that document, it's 3:35.  I'll let

4    them do that.  Then Mr. Haley will have a brief redirect

5    of Mr. Kenner, and then my understanding he will rest

6    Mr. Kenner's case and then Mr. LaRusso will continue with

7    his witnesses tomorrow.

8          So don't read or listen to anything regarding

9    the case.  Don't discuss the case, have a good night.

10   I'll see you tomorrow morning at 9:30.

11         (Whereupon, at this time the jury exits the

12   courtroom.)

13         THE COURT:  You may step down.

14         MR. LARUSSO:  Your Honor, I have a feeling I'll

15   probably rest, but I just want to go through it again

16   tonight but I think that's where I'm heading in terms of

17   my cross being over.

18         THE COURT:  Who are your witnesses tomorrow?

19         MR. LARUSSO:  Mr. Stumple will be on tomorrow

20   and Mark D'Ambrosio.  That should take the whole day.

21         Mr. D'Ambrosio possibly will have to come back

22   but that's okay.

23         THE COURT:  Are you saying you don't have any

24   debate about what witnesses to be called?

25         MR. LARUSSO:  They are not very long witnesses

4981

1    for Monday.  I think we have three right now, but not

2    long.  Nowhere near the witnesses that will be put on.

3           THE COURT:  So you probably will rest your case

4    on Monday?

5           MR. LARUSSO:  Absolutely.

6           MS. KOMATIREDDY:  Who are your witnesses?

7           MR. LARUSSO:  I'll give it to you later.  I have

8    two.

9           MR. MISKIEWICZ:  Well, we'll take the two.

10          I do have an application, your Honor, regarding

11   discovery.  We're not getting that.

12          If I may be heard.

13          THE COURT:  Yes.

14          MR. MISKIEWICZ:  This last couple e-mails that

15   came in, the one particularly that refers to the 500-pound

16   gorilla.  This is clearly the tail end of a much longer

17   sentence, conversation.  This is a counteroffer.  It says

18   right in the e-mail, from this Mr. Losch, as I understand,

19   Mr. LaRusso is trying to make it look as if

20   Mr. Constantine has brought these major players to the

21   table to finance Hawaii.  But if you read what is now in

22   evidence, it is the tail end of what is preceded by an

23   obviously much longer conversation.  It is basically

24   Mr. Kenner's rejection of a letter of intent from these

25   heavy hitters, supposed heavy hitters.

4982

1    We don't have the letter of intent.  Obviously

2  this could have been covered by the 26.2 material from the

3  defense, and for that reason, under the rule of

4  completeness, we demand, with all due respect, the entire

5  conversation, note just this portion of it which says

6  nothing really.

7    THE COURT:  You should produce any other portion

8  of that e-mail chain you have in your position, you should

9  produce it under the rule of completeness.

10    MR. MISKIEWICZ:  Your Honor, clearly there are

11  attachments, there's a letter of intent from Mr. Losch

12  which I think will bear very importantly for purposes of

13  the continued examination of Mr. Kenner because one of the

14  reasons he's rejecting it he doesn't want to provide any

15  due diligence to these folks and I suspect when we see

16  that letter of intent it will have a whole series of

17  requests for opening the books, showing us what is going

18  on.

19    MR. LARUSSO:  Your Honor --

20    THE COURT:  We don't need to speculate what is

21  in there.  If there is anything that relates to the Lehman

22  Brothers whether they be attachments or other e-mails in

23  that chain, you should produce them.

24    MR. LARUSSO:  Absolutely, Judge.  We will do

25  that.

4983

1          THE COURT:  All right.  I'll see you tomorrow

2    morning at 9:30.

3          MR. MISKIEWICZ:  Thank you, your Honor.

4          (Whereupon, the proceedings were adjourned until

5    Thursday, June 25, 2015, at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4984

1          **I N D E X**

2

3    **SERGEI GONCHAR**                          4795
     DIRECT EXAMINATION                       4795
     BY MR. LaRUSSO
4    CROSS-EXAMINATION                        4837
     BY MS. KOMATIREDDY
5    VOIR DIRE EXAMINATION                    4878
     BY MR. LaRUSSO
6    CROSS-EXAMINATION                        4895
     BY MR. HALEY
7    REDIRECT EXAMINATION                     4905
     BY MR. LaRUSSO
8    CROSS EXAMINATION (Cont'd)               4907
     BY MR. LaRUSSO
9
     **PHILLIP A KENNER**                        4931
10   CROSS-EXAMINATION (Continued)            4932
     BY MR. LaRUSSO
11

12         **E X H I B I T S**

13   Government Exhibit 7304 in evidence       4844
     Government Exhibit 4608 in evidence       4857
14   Defense Exhibit C294 in evidence          4808
     Defense Exhibit K-235 in evidence         4899
15   Defense Exhibit C257 in evidence          4940
     Defense Exhibit C 260 in evidence         4961
16   Defense Exhibit C-261 and C-262 in evidence  4970
     Government Exhibit 4601 in evidence       4888
17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 4975:17
**$10,500** [2] - 4915:20, 4916:21
**$100,000** [5] - 4801:11, 4895:18, 4933:3, 4933:16, 4936:14
**$15** [3] - 4967:6, 4975:13, 4975:22
**$15,000** [3] - 4955:18, 4959:20, 4960:12
**$20,000** [1] - 4958:14
**$200,000** [2] - 4891:23, 4955:4
**$22,000** [1] - 4935:17
**$235,000** [1] - 4884:21
**$249,000** [2] - 4959:24, 4961:16
**$25** [1] - 4916:13
**$25,000** [1] - 4959:18
**$250,00** [1] - 4958:12
**$250,000** [9] - 4800:8, 4803:9, 4807:6, 4817:18, 4852:23, 4866:3, 4866:10, 4958:8, 4959:18
**$290,000** [3] - 4957:8, 4957:23, 4959:1
**$3,500** [2] - 4942:7, 4942:16
**$300,000** [3] - 4851:5, 4851:16, 4934:18
**$330,000** [2] - 4851:21, 4851:23
**$35,000** [1] - 4942:19
**$35,750,000** [1] - 4972:14
**$350,000** [1] - 4890:1
**$362,355.58** [1] - 4822:15
**$375,000** [3] - 4849:5, 4849:8, 4849:21
**$4,000** [1] - 4933:8
**$40,000** [1] - 4958:2
**$400,000** [1] - 4933:4
**$450,000** [2] - 4928:11, 4928:20
**$50** [2] - 4954:18, 4955:16
**$500,000** [2] - 4800:7, 4978:18
**$550,000** [2] - 4928:2, 4928:12
**$6,250** [6] - 4860:13, 4861:5, 4905:25, 4906:5, 4906:8, 4906:10
**$64,440** [1] - 4972:9

**$720,000** [2] - 4972:8, 4972:12
**$749,985** [1] - 4820:6
**$750,000** [4] - 4847:15, 4858:11, 4859:16, 4914:8
**$8,000** [2] - 4909:15, 4910:16
**$85,000** [4] - 4935:8, 4935:10, 4937:1, 4940:2

## '

**'05** [1] - 4971:25
**'07** [1] - 4978:5
**'08** [1] - 4911:24
**'09** [1] - 4821:13
**'95** [1] - 4796:21
**'O4** [1] - 4966:23

## 1

**1** [6] - 4797:6, 4884:6, 4886:19, 4890:3, 4891:16, 4959:22
**1.2** [4] - 4866:7, 4892:4, 4892:6, 4892:7
**1.3** [18] - 4864:9, 4864:23, 4865:18, 4865:25, 4866:11, 4866:17, 4866:20, 4866:25, 4873:14, 4873:18, 4890:21, 4891:17, 4891:21, 4892:20, 4893:5, 4893:9, 4893:23, 4894:24
**1.5** [1] - 4816:24
**10** [24] - 4812:2, 4812:24, 4813:7, 4813:8, 4814:12, 4864:13, 4874:9, 4883:11, 4884:20, 4887:3, 4887:5, 4887:7, 4887:9, 4887:14, 4887:22, 4887:25, 4889:7, 4892:21, 4914:2, 4915:14, 4915:21, 4942:14, 4967:6, 4973:10
**10/31** [1] - 4851:15
**100** [3] - 4925:5, 4971:17, 4973:2
**100,000** [2] - 4933:20, 4933:22
**11** [1] - 4896:1
**11201** [1] - 4789:14
**11722** [1] - 4789:22

**1180** [1] - 4789:21
**11th** [1] - 4978:5
**12** [3] - 4905:23, 4905:25, 4971:11
**1218** [1] - 4860:2
**12th** [1] - 4909:12
**13** [1] - 4808:21
**13-CR-607** [1] - 4789:3
**138,000** [1] - 4823:17
**14** [1] - 4936:5
**15** [6] - 4824:22, 4851:14, 4871:16, 4887:17, 4888:16, 4955:20
**15,000** [1] - 4955:22
**1500** [2] - 4966:22, 4972:19
**16** [2] - 4948:4, 4950:9
**17** [1] - 4942:6
**18** [4] - 4797:14, 4808:19, 4817:15, 4974:8
**19** [2] - 4809:10, 4961:16
**1994** [2] - 4796:21, 4956:7
**1st** [7] - 4824:3, 4824:8, 4893:11, 4893:13, 4893:18, 4915:17, 4917:2

## 2

**2** [2] - 4950:1, 4950:5
**20** [1] - 4891:14
**20,000** [2] - 4959:17, 4960:1
**200** [1] - 4852:23
**2003** [1] - 4966:9
**2004** [4] - 4890:2, 4966:18, 4966:21, 4967:3
**2005** [8] - 4849:3, 4849:4, 4849:20, 4971:21, 4971:24, 4972:25, 4974:8, 4975:20
**2006** [8] - 4962:4, 4962:17, 4962:24, 4963:13, 4971:11, 4973:4, 4973:11, 4973:25
**2007** [2] - 4914:23, 4916:6
**2008** [4] - 4852:22, 4916:7, 4961:3, 4961:16
**2009** [37] - 4804:5, 4804:7, 4806:24, 4807:5, 4808:19,

**4809**:10, 4817:15, 4820:4, 4822:10, 4823:16, 4824:24, 4825:2, 4842:25, 4843:18, 4852:11, 4857:7, 4858:23, 4860:6, 4861:23, 4861:24, 4864:9, 4867:16, 4873:12, 4884:6, 4884:14, 4886:15, 4886:19, 4909:12, 4917:5, 4917:17, 4933:19, 4935:10, 4936:5, 4938:16, 4940:1, 4954:15, 4955:21
**2010** [9] - 4882:23, 4884:13, 4898:8, 4944:20, 4948:4, 4950:9, 4954:11, 4955:13, 4955:14
**2011** [2] - 4862:8, 4887:17
**2012** [1] - 4888:16
**2014** [2] - 4878:15, 4878:18
**2015** [2] - 4789:7, 4983:5
**2101** [1] - 4849:12
**2102** [1] - 4851:13
**2139** [1] - 4848:13
**235** [5] - 4885:3, 4899:4, 4899:8, 4899:12, 4899:15
**24** [2] - 4789:7, 4956:19
**25** [2] - 4858:5, 4983:5
**250** [3] - 4806:17, 4823:13, 4825:23
**250,000** [7] - 4799:17, 4810:7, 4818:5, 4821:17, 4825:3, 4866:11, 4959:19
**257** [2] - 4938:24, 4938:25, 4939:16
**258** [2] - 4966:8, 4972:19
**26** [2] - 4944:20, 4945:16
**26.2** [2] - 4930:11, 4982:2
**260** [5] - 4960:23, 4961:8, 4961:11, 4961:12, 4984:15
**261** [1] - 4968:22
**262** [2] - 4968:22, 4970:13
**26th** [1] - 4944:25
**278547** [2] - 4848:22, 4849:25

**28** [1] - 4849:20
**29** [2] - 4857:7, 4886:15
**295** [4] - 4839:19, 4839:24, 4841:3, 4841:4
**2:15** [1] - 4931:2

## 3

**3** [6] - 4858:9, 4858:10, 4858:12, 4859:17, 4914:23, 4923:2
**3.8** [1] - 4862:7
**30** [1] - 4823:16
**30-day** [1] - 4957:14
**300,000** [1] - 4921:22
**31st** [3] - 4851:3, 4851:4, 4851:20
**3420** [1] - 4861:14
**362,000** [1] - 4825:20
**37** [2] - 4948:20, 4955:16
**3:00** [1] - 4974:21
**3:30** [3] - 4793:3, 4929:12, 4979:1
**3:35** [1] - 4980:3
**3:45** [1] - 4929:12

## 4

**4** [3] - 4926:2, 4938:16, 4950:2
**4212** [1] - 4864:1
**4218** [1] - 4886:10
**4237** [1] - 4863:2
**4246** [1] - 4887:13
**4601** [5] - 4888:9, 4888:18, 4888:23, 4888:24, 4984:16
**4602** [3] - 4874:22, 4878:5, 4882:5
**4608** [6] - 4856:4, 4856:24, 4857:4, 4857:5, 4905:18, 4984:13
**4795** [2] - 4984:2, 4984:3
**4808** [1] - 4984:14
**4837** [1] - 4984:4
**4844** [1] - 4984:13
**4857** [1] - 4984:13
**4878** [1] - 4984:5
**4888** [1] - 4984:14
**4895** [1] - 4984:6
**4899** [1] - 4984:14
**4905** [1] - 4984:7
**4907** [1] - 4984:8
**4931** [1] - 4984:9

**4932** [1] - 4984:10
**4940** [1] - 4984:15
**4961** [1] - 4984:15
**4970** [1] - 4984:16

**5**

**5** [3] - 4806:24, 4807:5, 4950:2
**50** [6] - 4872:5, 4890:16, 4890:18, 4891:11, 4891:17, 4891:21
**500** [2] - 4802:12, 4857:21
**500,000** [3] - 4821:4, 4834:24, 4858:4
**500-pound** [2] - 4973:12, 4981:15
**550,000** [1] - 4928:15

**6**

**6** [7] - 4797:13, 4822:10, 4824:24, 4825:2, 4908:4, 4908:18, 4935:10
**6,000** [1] - 4964:9
**6.3** [1] - 4924:7
**6/12** [1] - 4933:19
**6189** [2] - 4851:10, 4851:11
**631** [1] - 4789:22
**65** [2] - 4933:14, 4958:9
**65,000** [1] - 4824:21

**7**

**7** [2] - 4962:17, 4973:22
**700-plus** [1] - 4821:3
**712-6108** [1] - 4789:22
**712-6124** [1] - 4789:22
**7304** [5] - 4843:10, 4843:21, 4843:25, 4844:1, 4984:13
**747** [1] - 4822:10
**75,000** [1] - 4824:22
**750** [2] - 4834:12, 4905:24
**750,000** [1] - 4858:4
**750K** [1] - 4857:21
**767** [7] - 4806:23, 4820:3, 4907:19, 4933:12, 4939:22, 4941:3
**78** [1] - 4849:12

**8**

**8** [1] - 4882:23
**85,000** [1] - 4936:9

**9**

**9** [4] - 4820:4, 4955:3, 4955:21, 4960:12
**9/9** [1] - 4821:12
**9/9/2009** [1] - 4821:3
**9:30** [3] - 4980:10, 4983:2, 4983:5
**9:45** [1] - 4789:8

**A**

**a.m** [1] - 4983:5
**a/k/a** [2] - 4789:5, 4789:6
**Aaron** [1] - 4944:9
**abandoned** [1] - 4962:19
**ability** [2] - 4868:15, 4901:4
**able** [16] - 4793:2, 4796:6, 4824:22, 4865:14, 4872:22, 4885:5, 4900:23, 4909:25, 4910:1, 4924:14, 4928:10, 4934:15, 4958:6, 4966:2, 4974:14, 4976:16
**absence** [2] - 4790:2, 4931:4
**Absolutely** [1] - 4981:5
**absolutely** [4] - 4924:22, 4938:4, 4938:8, 4982:24
**accept** [1] - 4928:5
**access** [4] - 4835:18, 4885:5, 4886:1, 4896:7
**accessed** [1] - 4895:22
**accompanies** [1] - 4949:3
**accomplish** [1] - 4945:9
**accomplished** [1] - 4883:16
**Accord** [1] - 4955:4
**according** [5] - 4808:18, 4809:9, 4913:24, 4928:4, 4955:1
**accordingly** [1] - 4829:13
**account** [34] -

4807:12, 4807:14, 4808:23, 4810:8, 4819:18, 4819:23, 4820:6, 4820:10, 4820:13, 4820:14, 4821:2, 4822:7, 4822:14, 4825:19, 4826:11, 4827:5, 4827:23, 4828:11, 4828:25, 4835:4, 4846:7, 4848:9, 4849:12, 4849:15, 4849:21, 4849:23, 4851:7, 4851:10, 4851:12, 4851:13, 4858:11, 4893:17, 4894:10, 4950:23
**accountant** [8] - 4827:15, 4827:17, 4827:18, 4827:19, 4828:1, 4828:5, 4893:19, 4893:20
**accounts** [1] - 4914:9
**accurate** [4] - 4856:19, 4875:16, 4917:19, 4938:19
**accustomed** [1] - 4964:7
**achieve** [1] - 4902:1
**acknowledge** [2] - 4810:6, 4922:16
**acknowledged** [4] - 4809:12, 4809:16, 4817:15, 4923:13
**acknowledging** [1] - 4932:12
**acknowledgment** [1] - 4949:3
**acquire** [2] - 4887:21, 4953:9
**acquisition** [2] - 4811:24, 4957:3
**acre** [2] - 4966:8, 4966:22
**acres** [3] - 4964:9, 4972:19
**action** [1] - 4904:4
**actions** [1] - 4924:3
**actual** [1] - 4791:11
**adamant** [2] - 4920:22, 4937:16
**add** [1] - 4892:5
**added** [2] - 4921:12, 4922:11
**addition** [16] - 4810:9, 4824:14, 4844:14, 4849:7, 4868:17, 4869:4, 4921:22, 4923:3, 4924:5, 4927:15, 4956:18,

4959:2, 4959:17, 4965:22, 4967:18, 4968:6
**additional** [15] - 4811:24, 4819:22, 4822:1, 4822:7, 4822:24, 4823:22, 4825:16, 4835:5, 4927:11, 4958:8, 4960:1, 4963:3, 4967:16, 4968:18
**address** [6] - 4830:21, 4883:2, 4931:10, 4931:11, 4931:13, 4931:16
**addressed** [2] - 4934:2, 4962:20
**Addressing** [1] - 4907:1
**adjacent** [1] - 4957:7
**adjourned** [1] - 4983:4
**admissibility** [1] - 4941:18
**admissible** [1] - 4839:18
**admission** [6] - 4838:17, 4838:20, 4839:2, 4839:3, 4839:18, 4940:8
**admitted** [12] - 4808:12, 4841:4, 4843:25, 4857:4, 4882:5, 4888:23, 4899:12, 4940:13, 4941:5, 4941:13, 4961:11, 4970:13
**adopted** [1] - 4941:9
**advance** [1] - 4832:1
**advanced** [3] - 4958:15, 4965:1, 4965:10
**advancements** [1] - 4926:12
**advances** [3] - 4811:10, 4811:16, 4926:22
**adverse** [2] - 4926:9, 4927:17
**advice** [2] - 4838:6, 4847:13
**advise** [1] - 4847:4
**advised** [4] - 4844:25, 4845:3, 4845:10, 4846:23
**advising** [1] - 4792:21
**advisor** [6] - 4842:16, 4844:14, 4844:24, 4852:14, 4900:25, 4928:7
**afternoon** [4] -

4895:10, 4895:11, 4907:17, 4907:18
**afterwards** [1] - 4872:15
**agency** [1] - 4811:4
**ago** [3] - 4835:14, 4872:2, 4896:3
**agree** [7] - 4806:14, 4866:10, 4869:24, 4905:6, 4905:25, 4922:1, 4943:5
**agreed** [5] - 4831:15, 4920:17, 4920:22, 4934:18, 4937:22
**agreeing** [1] - 4958:16
**agreement** [28] - 4802:4, 4802:7, 4826:24, 4862:24, 4863:3, 4864:3, 4875:6, 4880:15, 4880:16, 4884:4, 4884:14, 4884:16, 4886:4, 4886:9, 4886:11, 4886:15, 4886:21, 4887:14, 4888:2, 4888:3, 4916:20, 4928:10, 4956:23, 4957:5, 4957:6, 4957:10, 4974:2, 4975:15
**agreements** [5] - 4811:20, 4812:1, 4818:22, 4963:5, 4963:22
**agrees** [1] - 4869:6
**ahead** [5] - 4795:6, 4841:7, 4873:4, 4917:5, 4927:7
**Air** [8] - 4802:13, 4812:2, 4812:24, 4813:1, 4912:16, 4912:23, 4917:7, 4917:13
**aircraft** [8] - 4812:3, 4813:7, 4813:8, 4864:10, 4864:12, 4887:22, 4915:14
**Airpark** [2] - 4926:18, 4928:3
**airplane** [19] - 4814:4, 4865:22, 4874:9, 4887:3, 4887:5, 4889:8, 4889:13, 4889:18, 4889:25, 4890:2, 4893:6, 4893:8, 4903:18, 4915:16, 4916:17, 4916:21, 4926:19, 4928:13, 4928:15
**airplanes** [12] -

4814:19, 4835:19, 4866:1, 4873:15, 4892:18, 4912:15, 4913:1, 4914:6, 4914:14, 4914:20, 4917:14, 4926:19
**airport** [3] - 4814:17, 4835:18, 4924:4
**airstrip** [1] - 4835:19
**Akin** [1] - 4924:8
**albeit** [1] - 4966:10
**allegations** [1] - 4925:6
**alleged** [3] - 4829:16, 4829:17, 4925:7
**allow** [2] - 4793:7, 4855:8
**allowed** [5] - 4802:8, 4818:2, 4818:13, 4818:14, 4842:2
**allowing** [2] - 4832:17, 4833:11
**alluding** [4] - 4810:3, 4928:25, 4974:13, 4974:17
**almost** [2] - 4791:8, 4848:7
**alter** [1] - 4974:6
**altered** [1] - 4922:20
**alternative** [1] - 4964:16
**amended** [3] - 4884:3, 4887:13, 4888:2
**AMERICA** [1] - 4789:3
**America** [2] - 4797:11, 4971:5
**American** [1] - 4797:19
**amount** [13] - 4820:9, 4821:17, 4854:13, 4863:23, 4863:25, 4864:8, 4891:15, 4891:22, 4935:18, 4935:19, 4940:4, 4940:5, 4954:7
**amounts** [7] - 4859:24, 4861:8, 4922:25, 4975:19, 4976:9, 4976:11
**analysis** [3] - 4828:9, 4828:24, 4943:6
**analyzed** [1] - 4917:25
**ANDREW** [1] - 4789:18
**angel** [2] - 4964:1
**Angeles** [3] - 4910:7, 4910:14, 4918:12
**answer** [8] - 4819:9, 4829:3, 4841:6, 4842:3, 4897:7,

4897:12, 4897:18, 4920:20
**answered** [2] - 4894:20, 4920:19
**answering** [1] - 4909:4
**answers** [1] - 4796:3
**antagonistic** [1] - 4952:18
**anticipate** [4] - 4792:17, 4793:1, 4793:4, 4978:8
**anticipated** [1] - 4946:16
**anticipating** [2] - 4913:9, 4921:13
**anyplace** [1] - 4797:11
**apart** [1] - 4898:3
**apartments** [1] - 4836:6
**apiece** [1] - 4959:20
**apologize** [11] - 4838:2, 4852:13, 4871:6, 4913:11, 4913:12, 4939:10, 4945:12, 4949:4, 4964:5, 4970:2, 4976:3
**appear** [1] - 4908:24
**APPEARANCES** [1] - 4789:11
**appeared** [1] - 4908:16
**Apple** [5] - 4791:1, 4791:3, 4791:13, 4791:22, 4792:2
**application** [2] - 4930:11, 4981:10
**approach** [3] - 4837:17, 4940:15, 4951:8
**approached** [3] - 4953:16, 4956:16, 4967:24
**approaching** [1] - 4930:2
**appropriate** [3] - 4871:14, 4921:25, 4922:3
**appropriately** [2] - 4896:21, 4898:12
**approval** [1] - 4810:6
**approvals** [1] - 4964:13
**approve** [1] - 4922:16
**approved** [5] - 4809:12, 4809:17, 4923:14, 4975:8
**approving** [1] - 4932:12

**April** [5] - 4804:6, 4804:7, 4810:4, 4852:11, 4873:12
**arduous** [1] - 4934:13
**area** [1] - 4951:2
**Arena** [1] - 4843:4
**argument** [3] - 4877:3, 4937:22, 4941:6
**Arizona** [7] - 4861:16, 4861:18, 4862:8, 4878:21, 4969:11, 4974:21, 4974:25
**arose** [1] - 4826:5
**arranged** [1] - 4967:15
**arrangement** [4] - 4799:6, 4816:8, 4859:20, 4859:22
**arrangements** [3] - 4934:11, 4945:1, 4958:12
**arrested** [2] - 4835:14, 4891:5
**arrived** [1] - 4917:8
**article** [4] - 4806:6, 4806:7, 4811:7, 4811:8
**articulately** [1] - 4919:10
**asleep** [1] - 4871:3
**aspect** [1] - 4929:19
**aspects** [2] - 4929:17, 4931:15
**Assante** [1] - 4798:23
**assessed** [1] - 4962:10
**assets** [2] - 4839:13, 4839:16
**assistance** [3] - 4824:5, 4944:13, 4967:5
**assistants** [1] - 4810:24
**assisted** [2] - 4908:20, 4957:25
**associated** [3] - 4902:11, 4902:13, 4902:16
**associating** [1] - 4939:21
**assume** [2] - 4797:17, 4811:21
**assuming** [1] - 4826:13
**assumption** [1] - 4914:3
**assured** [1] - 4975:18
**attached** [3] - 4880:15, 4883:7, 4884:3
**attachment** [3] -

4875:6, 4875:14, 4875:17
**attachments** [2] - 4982:11, 4982:22
**attempted** [1] - 4908:3
**attention** [4] - 4820:4, 4821:1, 4849:2, 4851:12, 4864:1, 4905:20, 4907:21, 4909:12, 4915:2, 4927:12, 4961:5, 4973:12
**attorney** [10] - 4810:7, 4880:4, 4910:23, 4911:6, 4911:8, 4911:15, 4935:14, 4938:11, 4944:1, 4959:3
**Attorney** [1] - 4789:13
**attorneys** [9] - 4810:15, 4878:15, 4909:20, 4910:6, 4924:2, 4936:1, 4939:20, 4946:10, 4949:16
**Attorneys** [1] - 4789:15
**August** [4] - 4857:7, 4858:23, 4962:3, 4962:24
**authenticated** [1] - 4941:16
**authority** [1] - 4914:16
**authorization** [14] - 4809:24, 4810:6, 4817:15, 4818:22, 4920:16, 4920:22, 4922:11, 4922:13, 4934:4, 4935:4, 4943:2, 4945:19, 4948:15, 4948:17
**authorize** [1] - 4854:10
**authorized** [3] - 4847:21, 4922:23, 4934:21
**authorizing** [1] - 4925:23
**autograph** [1] - 4907:4
**available** [4] - 4790:9, 4795:2, 4797:7, 4945:2
**Avalon** [8] - 4812:2, 4812:24, 4813:1, 4835:6, 4889:8, 4892:17, 4926:18, 4928:2
**avoiding** [1] - 4962:21
**aware** [12] - 4801:4,

4815:3, 4815:24, 4898:21, 4946:11, 4946:21, 4950:24, 4953:6, 4954:18, 4954:21, 4969:12
**AZ** [9] - 4835:6, 4874:11, 4874:15, 4875:4, 4883:4, 4883:21, 4884:4, 4886:11, 4887:6

### B

**background** [1] - 4956:5
**Bailey** [4] - 4861:19, 4861:23, 4861:25, 4862:3
**balances** [1] - 4962:14
**Bank** [10] - 4801:5, 4802:5, 4824:3, 4824:9, 4824:11, 4893:12, 4893:14, 4893:18, 4915:17, 4917:2
**bank** [25] - 4813:16, 4814:24, 4815:1, 4816:14, 4816:19, 4818:11, 4846:5, 4849:12, 4860:2, 4863:9, 4863:22, 4864:9, 4865:5, 4865:8, 4865:11, 4865:14, 4865:15, 4873:15, 4889:16, 4893:16, 4914:6, 4916:24, 4961:3, 4961:4
**banking** [2] - 4964:6, 4971:3
**banks** [4] - 4831:6, 4963:25, 4964:11, 4972:20
**bargain** [1] - 4958:23
**based** [7] - 4858:4, 4879:7, 4908:18, 4908:21, 4914:3, 4918:7, 4967:3
**basic** [3] - 4955:6, 4955:7, 4966:15
**beach** [1] - 4972:15
**bear** [2] - 4851:8, 4982:12
**bearing** [1] - 4899:18
**became** [4] - 4898:21, 4922:4, 4946:21, 4971:25
**become** [5] - 4801:4, 4818:8, 4833:2, 4934:12, 4964:7

becomes [1] - 4959:21
BEFORE [1] - 4789:9
began [8] - 4798:20, 4842:12, 4898:10, 4898:12, 4915:4, 4915:11, 4918:9, 4960:4
beginning [10] - 4826:17, 4830:5, 4845:15, 4845:16, 4845:23, 4856:12, 4905:22, 4911:25, 4946:14, 4964:17
behalf [7] - 4792:20, 4891:12, 4910:14, 4915:15, 4915:25, 4958:13, 4964:16
behind [3] - 4806:22, 4844:7, 4927:23
belabor [1] - 4903:20
belief [3] - 4898:19, 4916:9, 4920:12
believes [1] - 4869:16
below [1] - 4927:11
benefit [3] - 4867:7, 4913:20, 4922:1
benefiting [1] - 4867:6
benefits [1] - 4952:15
Berard [9] - 4829:20, 4830:16, 4830:17, 4833:20, 4833:23, 4904:22, 4919:23, 4944:12, 4945:23
best [11] - 4796:6, 4918:15, 4923:4, 4923:15, 4927:8, 4928:20, 4937:6, 4943:24, 4946:5, 4968:15, 4970:24
better [2] - 4846:8, 4916:24
between [23] - 4792:2, 4793:1, 4808:3, 4868:23, 4873:8, 4896:22, 4896:24, 4898:2, 4914:23, 4916:22, 4930:12, 4934:12, 4936:8, 4936:18, 4949:16, 4957:10, 4958:4, 4963:6, 4963:19, 4968:24, 4970:4, 4972:8, 4978:19
beyond [1] - 4926:4
BIANCO [1] - 4789:9
big [4] - 4798:23, 4834:15, 4964:10, 4972:25
bill [1] - 4824:21
Bill [1] - 4904:23

bit [12] - 4795:22, 4795:25, 4798:12, 4800:1, 4800:18, 4802:15, 4802:19, 4839:22, 4866:7, 4893:10, 4899:2, 4907:20
blanks [1] - 4884:18
board [3] - 4928:5, 4944:9, 4949:25
Bob [2] - 4976:18, 4978:5
body [3] - 4869:19, 4871:9
bond [6] - 4798:24, 4801:14, 4846:9, 4848:9, 4848:11, 4849:8
bonds [3] - 4846:3, 4846:5, 4902:10
books [1] - 4982:17
born [1] - 4797:17
borrow [1] - 4791:23
borrowed [1] - 4916:11
borrower [2] - 4956:1, 4959:21
borrowing [1] - 4849:7
boss [1] - 4925:3
Boston [3] - 4796:25, 4958:7, 4958:15
bothers [3] - 4869:1, 4869:8, 4869:11
Botman [1] - 4963:16
bottles [1] - 4938:20
bottom [4] - 4862:12, 4864:4, 4922:18, 4942:6
bought [4] - 4813:3, 4813:8, 4889:16, 4927:21
box [1] - 4870:12
brawl [1] - 4870:14
breadth [1] - 4971:9
break [8] - 4793:7, 4793:10, 4868:1, 4868:2, 4921:17, 4923:18, 4929:10, 4978:9
breaking [1] - 4898:7
Brent [1] - 4945:25
Brian [7] - 4829:20, 4830:16, 4830:17, 4833:20, 4919:23, 4944:12, 4945:23
brief [5] - 4867:25, 4875:19, 4931:12, 4976:23, 4980:4
briefly [5] - 4798:19,

4799:21, 4905:13, 4919:7, 4966:4
bring [10] - 4791:24, 4793:20, 4813:9, 4816:9, 4822:11, 4871:24, 4915:16, 4915:20, 4931:19, 4958:8
bringing [2] - 4904:3, 4913:20
Brooklyn [1] - 4789:14
Brothers [8] - 4963:6, 4963:16, 4967:21, 4971:16, 4971:25, 4972:25, 4973:6, 4982:22
brought [2] - 4893:3, 4981:20
Bruins [1] - 4796:25
budget [2] - 4954:19, 4955:3
budgeted [2] - 4928:13, 4954:21
build [3] - 4800:11, 4802:25, 4846:14
building [11] - 4806:2, 4830:20, 4835:9, 4835:22, 4860:17, 4861:2, 4861:3, 4861:6, 4865:22, 4889:8, 4892:18
buildings [5] - 4813:1, 4835:16, 4835:17, 4861:12, 4861:15
built [2] - 4818:8, 4913:23, 4954:6
built-in [1] - 4913:23
bullet [4] - 4857:22, 4858:1, 4883:14, 4905:20
business [5] - 4798:16, 4799:13, 4803:5, 4925:7, 4966:14
businesses [5] - 4812:11, 4891:9, 4891:10, 4892:17, 4927:11
businessman [1] - 4968:5
busy [1] - 4900:14
buy [21] - 4801:2, 4820:21, 4834:4, 4834:13, 4834:21, 4844:19, 4854:13, 4862:3, 4862:7, 4862:15, 4865:14, 4885:3, 4890:3, 4927:18, 4928:1, 4946:3, 4946:13,

4946:22, 4956:8, 4956:12, 4959:7
buying [7] - 4821:25, 4823:22, 4834:18, 4844:20, 4853:7, 4854:12, 4854:14
BY [40] - 4795:21, 4798:3, 4802:10, 4804:1, 4807:2, 4808:14, 4825:15, 4828:15, 4829:5, 4837:2, 4841:8, 4842:4, 4844:2, 4851:1, 4855:10, 4857:6, 4873:6, 4878:2, 4878:13, 4882:8, 4895:9, 4905:15, 4907:14, 4932:3, 4932:24, 4939:8, 4939:15, 4942:3, 4948:1, 4951:3, 4953:5, 4961:13, 4961:21, 4984:3, 4984:4, 4984:5, 4984:6, 4984:7, 4984:8, 4984:10

## C

C-258 [1] - 4911:2
C-261 [5] - 4970:9, 4970:13, 4970:14, 4970:16, 4984:16
C-262 [4] - 4970:7, 4970:14, 4973:9, 4984:16
C-283 [1] - 4929:9
C-289 [1] - 4976:22
C-294 [1] - 4923:7
C-58 [1] - 4974:8
C257 [3] - 4940:13, 4940:14, 4984:15
C283 [1] - 4932:5
C283-1 [1] - 4932:19
C294 [5] - 4807:20, 4808:9, 4808:12, 4808:13, 4984:14
C295 [1] - 4815:6
cabana [1] - 4950:14
Cabo [10] - 4800:6, 4800:7, 4911:18, 4912:10, 4915:2, 4924:3, 4955:16, 4962:20, 4963:18, 4973:19
California [2] - 4954:12, 4955:14
campaign [1] - 4925:12

Canada [4] - 4903:8, 4918:10, 4969:6, 4969:13
Canadians [1] - 4796:15
Canadiens [1] - 4797:5
cap [1] - 4885:5
capacity [3] - 4791:5, 4878:16, 4910:21
Capital [1] - 4946:1
capital [1] - 4963:12
Capitals [1] - 4796:24
car [1] - 4955:5
card [2] - 4803:5, 4852:17
care [2] - 4878:25, 4958:13
career [2] - 4842:22, 4900:15
carried [1] - 4915:8
case [14] - 4824:10, 4824:12, 4837:4, 4868:2, 4878:23, 4895:1, 4895:2, 4895:3, 4906:14, 4978:23, 4980:6, 4980:9, 4981:3
cases [5] - 4878:18, 4878:24, 4919:7, 4919:17, 4954:12
cash [6] - 4845:11, 4845:16, 4894:9, 4896:6, 4896:13, 4916:11
CAT [1] - 4789:25
category [1] - 4965:7
causing [1] - 4791:6
cc [2] - 4974:11, 4974:19
CC'ing [1] - 4856:20
cell [3] - 4832:8, 4832:9, 4832:13
Central [2] - 4789:4, 4789:22
CEO [5] - 4854:23, 4854:25, 4855:15, 4859:2, 4859:3
certain [6] - 4799:8, 4853:9, 4854:13, 4929:16, 4931:15, 4949:10
certainly [7] - 4880:15, 4899:24, 4902:4, 4902:6, 4959:15, 4971:9, 4972:11
certainty [1] - 4971:17
chain [3] - 4973:10, 4982:8, 4982:23

**chairman** [1] - 4911:12
**championship** [1] - 4954:5
**chance** [4] - 4792:9, 4800:25, 4856:6, 4869:14
**change** [2] - 4803:5
**changed** [1] - 4922:25
**characterized** [1] - 4902:16
**charge** [1] - 4824:12
**charging** [1] - 4799:8
**chart** [1] - 4955:20
**charter** [2] - 4813:13, 4816:10
**Chatburn** [2] - 4878:3, 4879:5
**check** [1] - 4828:7
**Chekhov** [1] - 4919:24
**Chelyabinsk** [1] - 4797:14
**chosen** [1] - 4900:20
**Chris** [5] - 4919:22, 4964:15, 4974:9, 4974:11, 4975:7
**Christine** [1] - 4810:25
**CIA** [1] - 4944:3
**circumstance** [1] - 4872:13
**circumstances** [8] - 4804:3, 4804:9, 4820:15, 4822:21, 4823:20, 4927:23, 4949:11, 4951:6
**Cirillo** [1] - 4939:20
**citizen** [1] - 4797:19
**City** [1] - 4903:2
**civil** [2] - 4876:17, 4880:14
**clarify** [2] - 4824:13, 4929:17
**clear** [7] - 4868:7, 4871:10, 4891:9, 4905:2, 4910:3, 4913:13, 4965:19
**clearly** [3] - 4870:7, 4981:16, 4982:10
**CLERK** [2] - 4871:21, 4873:1
**client** [6] - 4838:4, 4956:6, 4959:4, 4960:9, 4978:10, 4978:20
**client's** [1] - 4877:12
**clients** [3] - 4813:9, 4904:3, 4925:5
**cloak** [1] - 4876:22
**close** [13] - 4795:17,

4807:23, 4830:20, 4890:3, 4950:20, 4950:21, 4957:13, 4957:15, 4957:24, 4958:21, 4971:17, 4973:20, 4974:1
**closed** [10] - 4871:2, 4963:10, 4963:12, 4967:21, 4971:18, 4973:1, 4973:4, 4973:19, 4975:3, 4975:10
**closing** [10] - 4958:3, 4960:2, 4962:23, 4963:5, 4965:18, 4966:8, 4966:23, 4971:13, 4971:16, 4973:25
**CM** [1] - 4789:20
**coastline** [1] - 4964:10
**coconspirators** [1] - 4941:7
**cognizant** [1] - 4871:8
**collectively** [1] - 4890:1
**Columbus** [1] - 4922:22
**column** [4] - 4908:4, 4908:18, 4909:24
**columns** [1] - 4908:1
**comfort** [1] - 4913:3
**comfortable** [4] - 4899:24, 4913:16, 4913:23, 4967:5
**coming** [9] - 4839:24, 4849:21, 4851:16, 4877:1, 4880:7, 4894:10, 4894:23, 4903:9, 4960:17
**commence** [1] - 4905:5
**comment** [4] - 4868:17, 4870:4, 4870:13, 4909:20
**comments** [4] - 4809:3, 4868:23, 4872:15, 4973:12
**commercial** [2] - 4823:3, 4868:11
**commitment** [1] - 4963:14
**common** [1] - 4964:17
**communicate** [2] - 4796:6, 4928:5
**communicated** [3] - 4898:5, 4919:13, 4928:22
**communicating** [1] - 4798:14

**communication** [9] - 4808:2, 4876:7, 4877:2, 4880:5, 4880:24, 4928:8, 4944:22, 4946:20, 4962:19
**communications** [5] - 4876:5, 4930:12, 4967:11, 4968:23, 4970:25
**communities** [1] - 4812:3
**companies** [5] - 4799:3, 4799:10, 4799:12, 4910:2, 4969:8
**Company** [1] - 4821:3
**company** [57] - 4798:23, 4799:13, 4799:15, 4802:13, 4802:19, 4802:21, 4802:24, 4803:3, 4806:9, 4811:7, 4812:9, 4821:7, 4822:2, 4822:25, 4824:21, 4831:12, 4831:16, 4831:20, 4832:21, 4832:25, 4833:3, 4833:7, 4834:15, 4834:17, 4849:15, 4849:16, 4849:17, 4852:17, 4852:20, 4853:4, 4854:13, 4854:16, 4855:1, 4855:5, 4855:13, 4855:15, 4855:23, 4856:11, 4856:16, 4858:3, 4858:17, 4858:20, 4858:25, 4859:17, 4887:20, 4898:24, 4899:23, 4902:17, 4938:3, 4944:17, 4945:7, 4952:7, 4953:12, 4954:1, 4968:9, 4971:3, 4975:11
**company's** [1] - 4823:23
**complete** [4] - 4872:18, 4930:1, 4943:7, 4958:23
**completely** [1] - 4928:21
**completeness** [2] - 4982:4, 4982:9
**completion** [2] - 4954:24, 4957:12
**computer** [5] - 4791:22, 4794:6,

4794:10, 4794:21, 4794:23
**concede** [1] - 4803:21
**conceded** [3] - 4797:25, 4798:2, 4803:25
**concept** [1] - 4971:8
**concern** [2] - 4972:16, 4972:25
**concerned** [6] - 4858:19, 4859:18, 4876:4, 4876:13, 4883:17, 4974:5
**concerning** [2] - 4895:14, 4903:25, 4935:8
**concerted** [1] - 4927:10
**concluded** [2] - 4840:1, 4941:20
**conclusions** [1] - 4828:24
**condominium** [1] - 4812:3
**condominiums** [2] - 4838:25, 4839:3
**condos** [10] - 4836:7, 4837:10, 4839:9, 4841:10, 4841:17, 4841:23, 4842:6, 4926:20, 4956:9
**conference** [12] - 4818:24, 4819:5, 4819:9, 4904:16, 4945:2, 4945:17, 4967:10, 4967:15, 4974:9, 4974:19, 4974:20, 4979:5
**confirmation** [2] - 4922:21, 4934:24
**confirmed** [1] - 4957:18
**confirming** [2] - 4920:16, 4957:23
**conflicts** [1] - 4934:12
**confronted** [1] - 4914:22
**confused** [1] - 4949:4
**confusing** [1] - 4839:22
**confusion** [1] - 4978:22
**congrats** [1] - 4900:17
**conjunction** [2] - 4953:14, 4965:17
**connection** [2] - 4838:24, 4890:9
**consent** [1] - 4948:6
**consider** [5] - 4836:16, 4895:1,

4899:22, 4906:13, 4906:14
**considering** [2] - 4916:18, 4971:9
**consistent** [1] - 4923:3
**consistently** [1] - 4968:17
**conspiracy** [1] - 4941:7
**conspiring** [1] - 4920:3
**Constantine** [194] - 4789:19, 4795:4, 4795:8, 4802:23, 4803:14, 4803:19, 4804:2, 4804:25, 4806:13, 4810:4, 4811:21, 4813:19, 4816:18, 4816:21, 4817:13, 4817:17, 4818:17, 4819:9, 4820:19, 4820:20, 4822:3, 4824:1, 4825:9, 4825:25, 4829:16, 4830:12, 4831:10, 4831:15, 4831:23, 4832:1, 4832:4, 4832:17, 4832:25, 4833:3, 4833:12, 4834:20, 4836:14, 4837:12, 4838:10, 4838:14, 4838:16, 4838:21, 4838:23, 4839:14, 4843:14, 4845:4, 4845:8, 4847:1, 4851:21, 4851:23, 4852:1, 4852:8, 4852:10, 4852:19, 4852:24, 4853:13, 4853:21, 4853:25, 4854:9, 4854:20, 4855:15, 4855:25, 4856:20, 4858:23, 4859:23, 4860:22, 4862:19, 4865:2, 4867:11, 4873:9, 4874:15, 4875:2, 4875:13, 4876:19, 4880:16, 4880:18, 4882:21, 4883:8, 4886:6, 4886:21, 4886:25, 4888:3, 4888:13, 4890:20, 4891:2, 4891:13, 4896:21, 4897:25, 4905:5, 4906:15, 4910:4, 4910:13, 4911:24, 4915:5,

4915:7, 4915:11, 4915:15, 4915:25, 4916:9, 4916:23, 4917:3, 4917:12, 4918:14, 4918:18, 4918:19, 4918:23, 4919:1, 4919:10, 4919:13, 4920:3, 4920:21, 4920:24, 4921:16, 4921:19, 4921:24, 4922:9, 4924:18, 4926:24, 4927:3, 4927:8, 4927:25, 4928:9, 4928:10, 4930:13, 4934:15, 4935:3, 4936:10, 4936:21, 4937:2, 4937:14, 4937:22, 4938:6, 4938:17, 4941:9, 4942:17, 4943:16, 4945:7, 4946:11, 4946:14, 4946:21, 4946:25, 4949:17, 4950:3, 4950:10, 4952:13, 4953:24, 4954:1, 4955:25, 4956:22, 4957:2, 4957:4, 4957:11, 4957:12, 4957:17, 4957:19, 4957:21, 4957:24, 4958:6, 4958:11, 4958:25, 4959:12, 4959:21, 4960:8, 4960:16, 4962:25, 4963:4, 4964:20, 4964:23, 4965:2, 4966:2, 4966:5, 4966:7, 4966:18, 4967:2, 4967:11, 4967:15, 4967:19, 4968:14, 4968:17, 4968:20, 4968:24, 4970:5, 4970:18, 4971:1, 4972:3, 4973:10, 4974:10, 4974:11, 4974:18, 4975:16, 4976:5, 4978:18, 4981:20
**CONSTANTINE** [1] - 4789:6
**constantine** [1] - 4823:9
**Constantine's** [6] - 4876:16, 4898:24, 4921:7, 4927:16, 4934:25, 4956:9
**construction** [9] - 4954:8, 4954:19, 4954:23, 4963:17,

4966:15, 4967:8, 4968:5, 4968:11, 4972:22
**consult** [1] - 4978:20
**consultant** [1] - 4965:1
**consulting** [3] - 4962:25, 4963:22, 4964:20
**Cont'd** [2] - 4907:13, 4984:8
**contact** [4] - 4830:4, 4908:24, 4910:15, 4946:2
**contacted** [8] - 4829:15, 4829:19, 4872:19, 4915:17, 4918:3, 4918:9, 4925:4, 4944:20
**contained** [1] - 4932:13
**contend** [1] - 4939:18
**contents** [1] - 4809:17
**context** [1] - 4913:22
**continue** [4] - 4926:13, 4937:17, 4945:20, 4980:6
**Continued** [17] - 4837:18, 4840:2, 4875:20, 4877:14, 4879:10, 4881:8, 4932:2, 4940:18, 4941:21, 4942:2, 4947:6, 4951:10, 4952:23, 4977:2, 4979:6, 4984:10
**continued** [8] - 4850:2, 4885:8, 4912:4, 4931:25, 4962:10, 4967:20, 4969:16, 4982:13
**continuing** [2] - 4812:12, 4905:23
**contract** [4] - 4797:4, 4921:18, 4959:7, 4966:22
**contribute** [4] - 4806:14, 4806:16, 4815:21, 4920:18
**contributed** [10] - 4805:25, 4825:18, 4828:10, 4834:8, 4835:3, 4889:10, 4896:13, 4918:17, 4925:17, 4933:8
**contributing** [2] - 4919:19, 4933:1
**contribution** [24] - 4807:10, 4807:17, 4808:4, 4808:22,

4810:9, 4817:18, 4818:4, 4818:17, 4819:16, 4820:16, 4823:21, 4824:24, 4834:21, 4834:23, 4845:11, 4895:14, 4895:19, 4896:6, 4896:14, 4917:6, 4923:1, 4933:13, 4933:17, 4934:19
**contributions** [1] - 4822:7
**contributors** [10] - 4818:25, 4918:11, 4921:2, 4922:2, 4922:14, 4923:12, 4923:22, 4924:11, 4925:25, 4932:10
**control** [6] - 4831:11, 4916:3, 4916:4, 4916:22, 4954:1, 4954:18
**controlling** [1] - 4943:16
**convenient** [1] - 4814:18
**conversation** [35] - 4805:12, 4810:2, 4810:3, 4811:1, 4812:13, 4816:3, 4817:16, 4817:21, 4823:12, 4826:11, 4826:17, 4832:5, 4832:11, 4832:18, 4841:13, 4841:14, 4841:20, 4853:13, 4853:18, 4853:20, 4854:1, 4854:6, 4855:11, 4857:11, 4857:17, 4859:14, 4873:8, 4873:22, 4874:14, 4900:8, 4947:1, 4966:7, 4981:17, 4981:23, 4982:5
**conversations** [21] - 4804:21, 4825:9, 4825:17, 4855:25, 4859:7, 4866:7, 4897:15, 4897:17, 4900:1, 4900:6, 4901:1, 4901:10, 4901:11, 4901:12, 4901:14, 4913:5, 4916:23, 4944:19, 4962:11, 4962:22, 4967:1
**convert** [2] - 4791:14, 4856:15
**Conway** [1] - 4792:20

**copy** [10] - 4856:19, 4856:21, 4872:1, 4872:3, 4872:23, 4875:16, 4948:8, 4948:9, 4949:20, 4978:2
**corporate** [1] - 4915:3
**Correct** [1] - 4847:20
**correct** [151] - 4790:19, 4795:22, 4800:3, 4803:11, 4807:17, 4808:16, 4808:17, 4809:14, 4811:2, 4811:22, 4814:2, 4814:5, 4815:12, 4817:2, 4817:7, 4818:5, 4818:18, 4821:10, 4822:5, 4824:3, 4827:11, 4827:24, 4828:11, 4842:17, 4844:10, 4845:1, 4845:4, 4845:5, 4845:8, 4846:12, 4846:13, 4846:24, 4846:25, 4847:3, 4847:13, 4847:14, 4847:17, 4852:8, 4852:14, 4852:25, 4853:2, 4853:5, 4855:20, 4855:23, 4856:1, 4856:13, 4857:8, 4857:12, 4857:14, 4857:19, 4858:17, 4860:13, 4861:9, 4861:16, 4862:24, 4863:17, 4863:19, 4864:11, 4864:15, 4865:4, 4865:23, 4871:5, 4874:9, 4874:16, 4875:2, 4875:14, 4883:8, 4883:21, 4884:4, 4884:14, 4884:22, 4888:14, 4889:2, 4890:11, 4890:14, 4892:4, 4895:19, 4900:11, 4903:23, 4904:12, 4904:21, 4904:25, 4905:7, 4908:9, 4909:4, 4911:16, 4912:12, 4917:3, 4917:4, 4917:25, 4918:14, 4920:12, 4921:5, 4922:5, 4922:6, 4923:7, 4923:8, 4929:5, 4929:7, 4932:15, 4933:18, 4933:20, 4933:24, 4934:7,

4934:23, 4935:1, 4935:11, 4937:3, 4937:4, 4937:18, 4937:23, 4938:3, 4938:10, 4938:21, 4942:24, 4943:4, 4943:9, 4944:16, 4946:13, 4948:13, 4948:18, 4949:21, 4950:11, 4950:18, 4950:24, 4953:15, 4954:8, 4954:10, 4956:1, 4956:4, 4956:6, 4958:23, 4958:24, 4959:4, 4962:4, 4962:5, 4962:8, 4964:22, 4965:3, 4965:10, 4965:21, 4965:25, 4970:6, 4971:11, 4971:12, 4975:14, 4976:7, 4976:8, 4976:11, 4976:14, 4976:17
**correctly** [12] - 4799:17, 4800:23, 4812:18, 4831:17, 4843:17, 4858:13, 4865:10, 4890:4, 4898:8, 4935:9, 4953:21, 4968:6
**Correo** [4] - 4935:10, 4935:12, 4938:13, 4938:18
**correspondence** [2] - 4949:15, 4967:12
**corruption** [2] - 4936:23, 4937:15
**cost** [1] - 4928:24
**costly** [1] - 4965:4
**costs** [6] - 4811:11, 4811:13, 4886:2, 4928:24, 4960:1, 4966:24
**counsel** [4] - 4791:19, 4872:3, 4880:12, 4889:24
**counteroffer** [1] - 4981:17
**county** [2] - 4964:13, 4975:5
**couple** [13] - 4790:7, 4798:7, 4799:9, 4835:10, 4851:3, 4851:8, 4852:6, 4857:22, 4868:13, 4886:18, 4936:7, 4963:21, 4981:14
**course** [4] - 4848:20, 4903:13, 4954:24,

4976:7
**courses** [2] - 4800:11, 4954:6
**court** [14] - 4791:11, 4792:10, 4797:23, 4802:8, 4803:16, 4841:1, 4868:13, 4878:1, 4882:1, 4921:19, 4932:21, 4942:1, 4953:1, 4980:1
**COURT** [116] - 4789:1, 4790:4, 4790:17, 4790:20, 4790:23, 4791:19, 4792:4, 4792:14, 4793:10, 4793:13, 4793:16, 4793:18, 4793:20, 4793:23, 4795:10, 4795:17, 4798:1, 4802:9, 4803:20, 4803:23, 4803:25, 4807:1, 4808:12, 4825:14, 4828:14, 4829:2, 4836:24, 4837:17, 4838:16, 4839:17, 4839:23, 4841:4, 4842:1, 4843:25, 4855:4, 4855:7, 4857:4, 4868:1, 4868:9, 4868:12, 4869:4, 4870:10, 4871:7, 4871:18, 4871:22, 4871:24, 4872:5, 4872:8, 4872:17, 4872:23, 4873:3, 4876:11, 4876:19, 4877:3, 4877:8, 4877:11, 4878:7, 4878:10, 4878:25, 4879:4, 4880:23, 4881:6, 4882:2, 4882:4, 4888:23, 4895:6, 4899:12, 4905:12, 4906:18, 4906:20, 4906:22, 4907:1, 4907:5, 4907:10, 4920:20, 4923:17, 4923:21, 4927:5, 4929:10, 4929:12, 4929:16, 4930:6, 4930:9, 4930:15, 4930:21, 4931:6, 4931:14, 4931:17, 4931:19, 4931:22, 4932:12, 4939:1, 4939:3, 4939:13, 4940:9, 4940:12, 4940:17, 4941:15, 4951:1,

4951:9, 4952:15, 4953:4, 4961:11, 4962:7, 4970:13, 4978:3, 4978:16, 4980:2, 4980:13, 4980:18, 4980:23, 4981:3, 4981:13, 4982:7, 4982:20, 4983:1
**Court** [6] - 4789:4, 4789:20, 4790:1, 4852:3, 4870:13, 4970:3
**court's** [1] - 4941:3
**Courthouse** [1] - 4789:21
**courtroom** [1] - 4980:12
**cover** [3] - 4793:3, 4826:24, 4880:18
**covered** [1] - 4982:2
**CR** [2] - 4944:6, 4946:5
**create** [1] - 4915:5
**created** [5] - 4833:7, 4833:8, 4865:20, 4865:25, 4908:21
**creation** [1] - 4941:10
**credit** [31] - 4801:5, 4801:8, 4801:15, 4801:19, 4801:21, 4801:24, 4802:24, 4802:25, 4803:1, 4803:5, 4845:12, 4845:17, 4845:18, 4845:19, 4845:22, 4846:2, 4848:7, 4848:25, 4851:24, 4852:16, 4895:22, 4896:7, 4896:14, 4961:25, 4962:2, 4962:9, 4962:12, 4963:1, 4963:9, 4963:12
**critical** [1] - 4901:9
**cross** [11] - 4793:2, 4793:7, 4793:10, 4795:3, 4836:24, 4842:1, 4842:2, 4935:7, 4941:8, 4952:12, 4980:17
**CROSS** [9] - 4837:1, 4895:8, 4907:13, 4932:2, 4942:2, 4984:4, 4984:6, 4984:8, 4984:10
**cross-examination** [6] - 4795:3, 4836:24, 4842:1, 4842:2, 4941:8, 4952:12

**CROSS-EXAMINATION** [7] - 4837:1, 4895:8, 4932:2, 4942:2, 4984:4, 4984:6, 4984:10
**crossover** [1] - 4927:19
**CSR** [1] - 4789:20
**cue** [1] - 4870:8
**cues** [1] - 4869:15
**Cup** [6] - 4842:22, 4843:18, 4844:7, 4844:17, 4868:18, 4900:17
**curious** [1] - 4839:11
**current** [5] - 4858:4, 4915:16, 4915:20, 4915:21, 4925:5
**CURRIE** [1] - 4789:12
**customers** [1] - 4913:21
**cut** [2] - 4952:2, 4978:24
**Cyrulik** [2] - 4882:10, 4882:11

**D**

**D'Ambrosio** [2] - 4980:20, 4980:21
**D.C** [2] - 4903:6, 4924:8
**Daily** [1] - 4926:8
**Dallas** [2] - 4796:11, 4797:2
**Darryl** [1] - 4873:21
**Dassault** [1] - 4887:22
**date** [7] - 4819:3, 4857:7, 4882:23, 4886:15, 4966:23, 4973:25, 4974:18
**dated** [4] - 4860:6, 4938:16, 4973:10, 4974:8
**daughter's** [1] - 4791:24
**David** [1] - 4970:19
**day-to-day** [1] - 4913:17
**days** [5] - 4808:21, 4851:3, 4886:18, 4929:19, 4972:10
**deal** [14] - 4801:6, 4813:12, 4826:20, 4826:21, 4846:18, 4846:23, 4851:25, 4857:17, 4900:10, 4918:4, 4957:20, 4971:18, 4972:24,

4973:19
**dealing** [3] - 4916:24, 4966:20, 4975:19
**dealings** [1] - 4917:2
**deals** [8] - 4799:3, 4845:1, 4845:6, 4845:7, 4848:1, 4848:5, 4965:1, 4965:2
**debate** [1] - 4980:24
**December** [4] - 4860:6, 4911:24, 4966:8, 4966:22
**decide** [3] - 4842:10, 4867:14, 4870:18
**decided** [5] - 4830:11, 4915:12, 4916:20, 4954:11, 4958:22
**deciding** [1] - 4958:20
**decision** [1] - 4916:22
**defamation** [1] - 4925:11
**defendant** [5] - 4795:8, 4803:18, 4838:17, 4869:10, 4880:14
**Defendant** [2] - 4789:17, 4789:19
**Defendant's** [5] - 4807:20, 4808:9, 4899:13, 4961:7, 4970:14
**defendants** [2] - 4870:19, 4941:13
**Defendants** [1] - 4789:7
**defense** [3] - 4791:19, 4929:25, 4982:3
**Defense** [11] - 4789:16, 4795:14, 4808:13, 4931:24, 4940:14, 4961:12, 4984:14, 4984:14, 4984:15, 4984:15, 4984:16
**defenses** [1] - 4952:18
**deficiency** [2] - 4959:23, 4961:14
**definitely** [1] - 4880:24
**defrauded** [2] - 4914:15, 4924:4
**del** [2] - 4914:24, 4924:4
**deliberations** [2] - 4791:21, 4794:18
**deliver** [4] - 4833:9, 4965:5, 4966:2, 4968:20
**delivered** [1] - 4955:8

**demand** [1] - 4982:4
**deposit** [3] - 4957:8, 4957:23, 4972:8
**deposited** [1] - 4958:13
**depositing** [1] - 4821:6
**deposition** [2] - 4894:13, 4955:13
**deposits** [1] - 4851:15
**Depot** [1] - 4872:1
**desalination** [1] - 4954:21
**describe** [4] - 4799:21, 4836:14, 4896:22, 4970:22
**described** [13] - 4857:23, 4919:10, 4926:6, 4926:23, 4926:25, 4927:2, 4929:6, 4937:9, 4938:12, 4955:24, 4961:15, 4967:16, 4970:19
**description** [1] - 4950:14
**desire** [2] - 4968:7, 4972:23
**destination** [1] - 4800:13, 4801:2
**detail** [6] - 4841:13, 4919:11, 4919:13, 4920:11, 4949:14, 4955:24
**details** [5] - 4818:1, 4880:22, 4883:10, 4967:16, 4969:2
**deteriorate** [1] - 4898:13
**deterioration** [1] - 4898:9
**determine** [1] - 4916:16
**determined** [1] - 4794:6
**Detroit** [1] - 4843:2
**develop** [5] - 4800:10, 4801:3, 4801:16, 4846:12, 4972:4
**developed** [2] - 4846:18, 4897:23
**developers** [1] - 4969:5
**development** [17] - 4895:15, 4895:16, 4896:9, 4910:25, 4963:25, 4964:2, 4964:11, 4964:17, 4966:9, 4967:17, 4969:8, 4969:9,

4969:12, 4974:6, 4975:9, 4975:21
**developments** [4] - 4902:12, 4912:4, 4964:18, 4971:5
**Dewar** [4] - 4969:6, 4970:19, 4970:25, 4974:4
**Diamante** [13] - 4912:16, 4912:22, 4913:21, 4914:24, 4917:7, 4917:13, 4924:3, 4924:4, 4954:4, 4955:16, 4962:20, 4963:18
**Diamanté** [1] - 4802:13
**dictated** [1] - 4920:25
**different** [14] - 4791:8, 4798:10, 4831:16, 4831:17, 4836:18, 4847:9, 4847:10, 4860:18, 4867:8, 4890:18, 4898:11, 4924:2, 4935:14, 4953:2
**difficult** [1] - 4971:24
**difficulty** [1] - 4790:15
**diligence** [2] - 4958:15, 4982:15
**diminished** [1] - 4972:23
**dire** [1] - 4939:12
**DIRE** [3] - 4878:12, 4939:14, 4984:5
**direct** [15] - 4793:2, 4820:4, 4821:1, 4853:12, 4865:5, 4870:11, 4890:6, 4907:21, 4919:12, 4931:10, 4934:2, 4935:7, 4943:10, 4971:16, 4973:11
**DIRECT** [2] - 4795:20, 4984:3
**directing** [3] - 4905:20, 4909:12, 4961:5
**direction** [1] - 4889:12
**directly** [2] - 4873:17, 4957:3
**director** [1] - 4975:7
**directors** [1] - 4949:25
**disagree** [1] - 4876:24
**disagreed** [2] - 4896:20, 4898:1
**disappointed** [1] - 4960:11
**disbursed** [2] - 4917:21, 4921:21

**disbursement** [1] - 4935:8
**disclose** [1] - 4949:23
**disclosed** [1] - 4876:7
**discovered** [1] - 4791:1
**discovery** [1] - 4981:11
**discuss** [7] - 4815:19, 4823:8, 4851:25, 4868:2, 4968:13, 4979:2, 4980:9
**discussed** [8] - 4826:16, 4867:4, 4879:7, 4920:11, 4921:10, 4925:16, 4936:11, 4965:23
**discussing** [3] - 4936:20, 4944:16, 4967:24
**Discussion** [4] - 4838:1, 4840:1, 4941:1, 4941:20
**discussion** [11] - 4821:22, 4830:2, 4831:8, 4832:24, 4867:10, 4867:13, 4867:15, 4922:4, 4937:10, 4938:5, 4978:8
**discussions** [13] - 4805:24, 4822:4, 4825:24, 4831:11, 4895:13, 4899:20, 4922:10, 4936:18, 4946:21, 4949:18, 4966:12, 4967:4, 4968:12
**dismiss** [1] - 4954:12
**display** [1] - 4961:19
**dispose** [1] - 4887:22
**dispute** [3] - 4897:24, 4898:18, 4898:20
**disseminate** [1] - 4945:18
**disseminated** [1] - 4967:19
**dissemination** [1] - 4945:4
**distracts** [1] - 4868:15
**distributions** [1] - 4935:22
**DISTRICT** [3] - 4789:1, 4789:1, 4789:10
**District** [2] - 4789:4, 4789:21
**disturbs** [1] - 4868:22
**diverted** [1] - 4914:7
**divided** [1] - 4905:25
**docs** [3] - 4875:4,

4883:4, 4883:7
**document** [30] - 4807:21, 4808:18, 4815:7, 4815:12, 4815:14, 4815:17, 4817:1, 4817:9, 4852:2, 4852:4, 4856:17, 4862:6, 4862:11, 4880:8, 4880:25, 4881:1, 4886:10, 4899:3, 4899:5, 4899:6, 4899:16, 4932:5, 4933:11, 4939:25, 4940:3, 4941:13, 4941:16, 4960:25, 4978:10, 4980:3
**documentation** [1] - 4874:18
**documented** [2] - 4976:12, 4976:13
**documents** [4] - 4880:3, 4925:8, 4932:8, 4978:2
**dollar** [3] - 4922:25, 4940:5, 4975:19
**dollars** [8] - 4801:14, 4802:2, 4820:1, 4848:7, 4921:23, 4954:22, 4957:18, 4964:17
**Dominick** [1] - 4789:20
**DomTursi@email. com** [1] - 4789:20
**donate** [1] - 4922:1
**done** [9] - 4829:17, 4893:2, 4898:1, 4898:19, 4900:19, 4906:22, 4915:9, 4952:16, 4953:11
**Donny** [1] - 4965:7
**door** [2] - 4978:12, 4978:21
**down** [38] - 4795:18, 4798:14, 4798:25, 4801:20, 4801:22, 4814:5, 4814:13, 4814:22, 4822:11, 4824:22, 4830:9, 4868:11, 4869:5, 4871:6, 4873:19, 4894:15, 4901:25, 4910:25, 4911:18, 4912:5, 4912:11, 4913:24, 4933:19, 4936:22, 4936:24, 4937:15, 4937:17, 4937:23, 4938:7, 4938:18, 4940:5,

4942:6, 4954:8, 4958:8, 4962:3, 4971:10, 4971:25, 4980:13
**dozen** [1] - 4964:23
**dried** [1] - 4963:13
**drive** [1] - 4835:21
**drop** [2] - 4795:25, 4807:24
**Duarte** [2] - 4936:2, 4936:16
**due** [5] - 4794:23, 4901:4, 4958:15, 4982:4, 4982:15
**duly** [2] - 4795:14, 4931:25
**during** [18] - 4794:3, 4794:13, 4794:18, 4805:6, 4805:13, 4868:14, 4870:5, 4897:16, 4901:14, 4915:24, 4921:16, 4922:9, 4927:12, 4933:7, 4936:15, 4937:7, 4955:13, 4955:14

# E

**e-mail** [63] - 4856:14, 4856:19, 4856:22, 4857:7, 4858:23, 4859:1, 4875:1, 4875:9, 4875:13, 4875:16, 4876:10, 4876:16, 4876:22, 4877:4, 4877:12, 4878:14, 4879:1, 4879:4, 4880:3, 4880:4, 4880:9, 4880:18, 4880:24, 4880:25, 4881:1, 4882:9, 4882:16, 4883:2, 4883:10, 4884:8, 4884:13, 4886:6, 4888:12, 4888:13, 4911:7, 4911:21, 4911:23, 4912:2, 4912:5, 4920:23, 4920:24, 4921:3, 4921:6, 4922:11, 4922:13, 4922:18, 4923:11, 4925:23, 4962:21, 4967:10, 4967:12, 4968:23, 4969:2, 4973:9, 4973:10, 4974:8, 4974:9, 4974:10, 4974:17, 4974:22, 4981:18, 4982:8

**e-mailed** [2] - 4909:25, 4922:15
**e-mails** [12] - 4917:11, 4920:17, 4923:5, 4925:24, 4928:23, 4929:20, 4930:3, 4930:16, 4970:4, 4973:11, 4981:14, 4982:22
**early** [6] - 4916:7, 4929:13, 4935:22, 4944:15, 4966:9, 4975:16
**easiest** [1] - 4791:21
**easily** [1] - 4809:21
**EASTERN** [1] - 4789:1
**easy** [4] - 4816:16
**economy** [1] - 4816:17
**Ed** [2] - 4878:20, 4878:22
**Edenholm** [4] - 4886:24, 4928:16, 4928:17, 4928:19
**effective** [4] - 4884:6, 4884:14, 4886:15, 4887:17
**effectively** [6] - 4916:19, 4945:18, 4953:19, 4955:3, 4962:18, 4978:10
**effort** [5] - 4832:21, 4918:4, 4926:4, 4929:1, 4943:22
**efforts** [20] - 4833:3, 4923:24, 4924:12, 4924:15, 4926:3, 4926:13, 4927:10, 4927:13, 4927:19, 4935:14, 4959:3, 4962:20, 4963:15, 4966:5, 4967:11, 4970:5, 4970:21, 4971:18, 4972:4, 4973:6
**egregious** [1] - 4972:1
**either** [7] - 4791:13, 4801:4, 4819:10, 4872:3, 4896:13, 4909:7, 4918:24
**elaborate** [1] - 4879:9
**elect** [2] - 4858:15, 4858:16
**electric** [1] - 4955:9
**electricity** [1] - 4955:9
**elicit** [1] - 4952:3
**Ellen** [1] - 4886:24
**email** [15] - 4793:14, 4807:22, 4807:25, 4808:2, 4808:15,

4808:25, 4809:4, 4809:24, 4812:21, 4819:6, 4934:23, 4935:4, 4938:10, 4938:16, 4944:21
**emailed** [2] - 4809:18, 4934:5
**emails** [4] - 4792:21, 4817:14, 4831:5, 4932:9
**embezzlement** [1] - 4915:1
**emphasize** [1] - 4868:21
**emphasized** [1] - 4839:10
**employees** [1] - 4830:8
**employment** [1] - 4949:25
**encountered** [1] - 4872:14
**end** [15] - 4804:4, 4824:12, 4848:6, 4858:8, 4870:13, 4886:22, 4916:6, 4921:11, 4923:2, 4929:13, 4937:21, 4958:23, 4958:25, 4981:16, 4981:22
**End** [1] - 4979:5
**endeavor** [1] - 4931:12
**ended** [2] - 4898:7, 4919:18
**ends** [1] - 4851:10
**engagement** [1] - 4833:11
**engine** [1] - 4914:11
**ensued** [8] - 4790:2, 4793:21, 4838:1, 4841:1, 4931:4, 4931:20, 4941:1, 4942:1
**entire** [6] - 4880:4, 4914:8, 4920:9, 4943:24, 4963:20, 4982:4
**entities** [4] - 4835:6, 4908:24, 4926:14, 4926:17
**entitled** [1] - 4899:4
**entity** [2] - 4854:15, 4916:15
**entries** [2] - 4909:5, 4911:12
**entry** [5] - 4821:3, 4821:12, 4825:2, 4909:13, 4912:7
**equity** [4] - 4838:4,

4841:22, 4842:5, 4916:11
**Eric** [2] - 4886:24, 4944:2
**ESQ** [5] - 4789:14, 4789:15, 4789:16, 4789:18, 4789:18
**essentially** [1] - 4791:8
**established** [2] - 4941:8, 4976:15
**estate** [23] - 4799:3, 4799:10, 4799:19, 4799:21, 4800:9, 4800:15, 4800:19, 4812:2, 4812:9, 4844:25, 4845:6, 4846:11, 4847:13, 4910:23, 4911:15, 4921:18, 4956:15, 4956:16, 4964:18, 4969:5, 4969:9, 4971:4, 4971:10
**etcetera** [1] - 4923:3
**Ethan** [2] - 4926:5, 4929:2
**Eufora** [57] - 4799:14, 4799:18, 4802:16, 4802:19, 4802:21, 4803:8, 4803:10, 4811:25, 4812:9, 4820:18, 4821:13, 4821:23, 4823:22, 4823:24, 4825:2, 4825:23, 4829:17, 4830:8, 4831:6, 4845:3, 4847:10, 4847:11, 4852:5, 4852:7, 4852:16, 4852:23, 4853:1, 4853:2, 4854:1, 4854:8, 4854:9, 4854:21, 4854:23, 4854:25, 4855:12, 4855:19, 4857:14, 4858:12, 4858:21, 4860:3, 4860:15, 4866:8, 4898:15, 4898:22, 4899:22, 4926:18, 4943:12, 4943:16, 4944:8, 4945:2, 4948:5, 4950:1, 4950:23, 4951:7, 4953:9
**Europe** [6] - 4820:14, 4859:12, 4859:13, 4859:15, 4902:24
**events** [3] - 4814:1, 4814:10, 4918:7
**eventually** [2] -

4813:19, 4926:20
**evidence** [41] - 4794:8, 4794:18, 4806:19, 4808:13, 4843:22, 4844:1, 4848:13, 4848:17, 4848:24, 4849:11, 4851:13, 4855:8, 4856:25, 4857:5, 4860:1, 4861:13, 4863:2, 4868:4, 4878:6, 4886:10, 4887:12, 4888:19, 4888:25, 4899:8, 4899:14, 4912:9, 4940:14, 4955:19, 4961:7, 4961:12, 4970:15, 4974:7, 4981:22, 4984:13, 4984:13, 4984:14, 4984:14, 4984:14, 4984:15, 4984:16, 4984:16
**exact** [3] - 4801:22, 4819:3, 4830:21
**exactly** [11] - 4813:3, 4821:24, 4822:23, 4836:5, 4841:19, 4860:19, 4861:5, 4880:13, 4893:10, 4896:3, 4952:19
**examination** [11] - 4792:17, 4795:3, 4836:24, 4842:1, 4842:2, 4853:12, 4931:10, 4933:7, 4941:8, 4952:12, 4982:13
**EXAMINATION** [16] - 4795:20, 4837:1, 4878:12, 4895:8, 4905:14, 4907:13, 4932:2, 4939:14, 4942:2, 4984:3, 4984:4, 4984:5, 4984:6, 4984:7, 4984:8, 4984:10
**examined** [1] - 4795:15
**exception** [3] - 4838:13, 4838:18, 4919:22
**excerpt** [1] - 4922:11
**excess** [1] - 4819:25
**exchange** [1] - 4858:12
**excited** [1] - 4971:9
**excuse** [4] - 4919:22, 4942:18, 4944:11, 4958:18

**excused** [1] - 4868:10
**executing** [1] - 4888:3
**Exhibit** [41] - 4806:23, 4807:20, 4808:9, 4808:13, 4820:3, 4822:10, 4843:10, 4844:1, 4848:13, 4849:12, 4856:4, 4856:5, 4857:5, 4860:2, 4861:14, 4863:1, 4874:23, 4886:10, 4887:13, 4888:9, 4888:24, 4899:4, 4899:13, 4899:15, 4905:18, 4907:19, 4939:22, 4940:12, 4940:14, 4941:3, 4961:7, 4961:12, 4970:14, 4984:13, 4984:13, 4984:14, 4984:14, 4984:15, 4984:15, 4984:16, 4984:16
**exhibit** [5] - 4809:9, 4868:4, 4868:5, 4884:17, 4939:6
**exhibits** [3] - 4792:16, 4872:10, 4907:16
**existed** [1] - 4926:4
**existing** [2] - 4791:14, 4936:23
**exists** [1] - 4929:15
**exits** [1] - 4980:11
**expand** [1] - 4929:18
**Expansion** [7] - 4971:22, 4972:6, 4972:11, 4973:4, 4973:6, 4973:17, 4975:4
**expect** [3] - 4839:12, 4901:8, 4901:9
**expectation** [2] - 4902:4, 4902:6
**expected** [2] - 4873:18, 4916:14
**expenditure** [1] - 4943:3
**expenditures** [1] - 4827:10
**expense** [1] - 4909:8
**expenses** [4] - 4823:10, 4825:11, 4908:16, 4943:7
**expire** [1] - 4972:10
**explain** [10] - 4799:11, 4805:21, 4806:8, 4837:15, 4841:12, 4921:14, 4925:23, 4926:21, 4929:4, 4952:7

**explainable** [1] - 4809:22
**explained** [6] - 4806:1, 4836:11, 4837:14, 4841:11, 4901:24, 4923:12
**explaining** [3] - 4818:9, 4841:16, 4901:22
**explanation** [2] - 4829:13, 4929:21
**express** [1] - 4955:15
**expressed** [1] - 4945:24
**extend** [1] - 4793:9
**extension** [1] - 4972:9
**extent** [1] - 4929:20
**extremely** [1] - 4971:6
**eyes** [1] - 4871:2

**F**

**FAA** [1] - 4914:13
**face** [8] - 4918:10, 4921:10, 4934:11, 4934:17
**face-to-face** [3] - 4918:10, 4921:10, 4934:17
**facilitate** [3] - 4945:4, 4963:6, 4963:16
**facility** [1] - 4954:21
**fact** [18] - 4803:7, 4832:20, 4838:5, 4846:14, 4876:21, 4889:6, 4901:4, 4914:10, 4914:16, 4921:2, 4934:4, 4936:20, 4937:1, 4938:9, 4941:17, 4942:25, 4950:10, 4952:18
**facts** [1] - 4855:6
**failed** [1] - 4962:16
**fair** [24] - 4818:16, 4819:25, 4821:16, 4848:10, 4849:9, 4869:9, 4882:20, 4900:13, 4900:22, 4901:6, 4907:24, 4908:6, 4908:14, 4909:10, 4918:2, 4918:21, 4919:4, 4919:6, 4922:14, 4922:16, 4937:21, 4943:6, 4960:7, 4960:16
**Fairchild** [1] - 4864:13
**fairly** [1] - 4919:7
**Falcon** [38] - 4812:2,

4812:24, 4813:7,
4813:8, 4814:12,
4835:7, 4864:13,
4874:9, 4874:11,
4874:15, 4875:4,
4883:4, 4883:11,
4883:21, 4884:4,
4886:11, 4887:3,
4887:5, 4887:6,
4887:7, 4887:9,
4887:14, 4887:22,
4887:24, 4889:7,
4890:16, 4890:18,
4891:11, 4891:14,
4891:17, 4891:21,
4892:21, 4914:2,
4915:14, 4915:21,
4942:10, 4942:14,
4942:21
**familiar** [1] - 4849:14
**familiarity** [1] - 4792:1
**families** [1] - 4836:18
**family** [2] - 4792:13,
4796:9
**far** [7] - 4858:19,
4859:17, 4883:16,
4883:17, 4887:11,
4893:12, 4966:24
**Fargo** [1] - 4961:4
**fashion** [1] - 4953:3
**Fax** [1] - 4789:22
**feasibility** [1] -
4965:17
**February** [2] -
4955:21, 4960:12
**Federal** [1] - 4789:21
**fee** [4] - 4799:6,
4958:15, 4959:18,
4965:10
**fees** [14] - 4810:10,
4810:11, 4810:13,
4810:16, 4810:18,
4811:4, 4824:11,
4824:16, 4853:16,
4926:2, 4926:6,
4965:1, 4972:9
**fell** [1] - 4898:3
**felt** [6] - 4804:13,
4834:14, 4899:24,
4913:16, 4960:7,
4967:5
**Ferguson** [1] -
4886:24
**few** [24] - 4794:5,
4801:17, 4813:23,
4830:13, 4831:17,
4833:18, 4834:1,
4842:12, 4860:16,
4872:2, 4898:5,
4902:24, 4903:14,

4904:20, 4905:16,
4906:24, 4907:2,
4907:11, 4908:19,
4934:15, 4956:18,
4961:25, 4966:3,
4975:24
**fiberoptic** [1] - 4955:9
**fight** [2] - 4804:18,
4805:22
**figure** [1] - 4909:3
**filing** [1] - 4958:25
**final** [1] - 4844:17
**finally** [4] - 4792:22,
4918:19, 4920:7,
4971:18
**finance** [1] - 4981:21
**financial** [10] - 4824:5,
4835:5, 4842:16,
4844:14, 4844:24,
4852:14, 4900:24,
4927:12, 4928:7,
4966:13
**financially** [1] -
4900:19
**financing** [1] -
4975:11
**fine** [5] - 4793:19,
4911:5, 4929:11,
4931:14, 4931:17
**Fine** [1] - 4839:23
**finished** [1] - 4835:25
**finishing** [1] - 4920:14
**fired** [1] - 4949:25
**firm** [5] - 4876:15,
4911:6, 4911:8,
4924:7, 4955:25
**first** [41] - 4795:14,
4799:11, 4802:21,
4804:2, 4804:4,
4823:12, 4826:21,
4853:18, 4853:25,
4856:17, 4859:4,
4868:6, 4868:13,
4875:1, 4882:9,
4882:20, 4899:21,
4905:23, 4907:25,
4915:3, 4918:3,
4918:8, 4918:12,
4918:13, 4918:19,
4922:10, 4922:19,
4925:2, 4933:17,
4936:4, 4944:20,
4946:20, 4948:24,
4948:25, 4957:13,
4960:25, 4963:17,
4966:7, 4972:7,
4972:10, 4972:15
**First** [1] - 4824:11
**five** [8] - 4797:1,
4870:5, 4908:1,

4914:4, 4915:19,
4915:24, 4918:8,
4971:13
**five-month** [1] -
4915:24
**fix** [4] - 4812:22,
4813:6, 4813:18
**fixed** [1] - 4812:21
**fixing** [2] - 4794:21,
4867:5
**Flemming** [1] -
4878:22
**Flemming's** [1] -
4878:20
**flew** [3] - 4792:23,
4830:7, 4830:8
**florida** [1] - 4796:8
**Florida** [1] - 4824:8
**fly** [1] - 4814:15
**focus** [6] - 4807:1,
4882:9, 4883:13,
4883:14, 4898:17,
4929:22
**foil** [1] - 4952:13
**fold** [1] - 4831:15
**folks** [1] - 4982:15
**followed** [5] -
4889:11, 4918:22,
4920:25, 4922:24,
4934:6
**following** [22] -
4790:2, 4793:21,
4817:16, 4837:18,
4840:2, 4841:1,
4850:2, 4876:1,
4878:1, 4880:1,
4882:1, 4931:4,
4931:20, 4940:18,
4941:21, 4942:1,
4947:6, 4952:1,
4953:1, 4966:17,
4974:1, 4976:25
**follows** [5] - 4795:16,
4838:1, 4857:19,
4932:1, 4941:1
**footprint** [1] - 4969:9
**forced** [1] - 4964:15
**foreclosed** [1] -
4963:2
**foreclosure** [3] -
4889:9, 4889:13,
4915:1
**foremost** [2] - 4972:7,
4972:15
**forensic** [5] - 4827:15,
4827:18, 4827:19,
4828:1, 4893:19
**Forensic** [1] - 4827:17
**forgot** [2] - 4839:19,
4841:2

**form** [7] - 4798:16,
4825:14, 4855:3,
4880:13, 4945:19,
4951:1, 4962:6
**formal** [1] - 4930:11
**format** [3] - 4791:2,
4791:15, 4791:16
**formation** [2] -
4814:2, 4814:7
**formed** [1] - 4914:19
**former** [2] - 4925:5,
4944:2
**forth** [2] - 4848:5,
4949:15
**forthright** [1] - 4927:9
**fortunate** [2] -
4800:22, 4800:24
**forward** [8] - 4792:25,
4805:19, 4910:13,
4938:18, 4957:20,
4968:10, 4975:5,
4975:6
**forwarded** [1] -
4876:10
**forwarding** [1] -
4875:11
**foundation** [1] -
4952:8
**Foundation** [3] -
4820:5, 4820:12,
4822:14
**founded** [1] - 4852:20
**founder** [1] - 4854:20
**four** [2] - 4796:25,
4918:8
**Frailes** [2] - 4976:19,
4978:5
**frame** [1] - 4962:23
**Francisco** [1] - 4936:2
**frankly** [6] - 4872:13,
4913:5, 4915:5,
4916:24, 4972:22,
4975:17
**frauds** [2] - 4914:23,
4920:9
**fraudulent** [1] -
4924:2
**friend** [10] - 4800:23,
4802:23, 4824:8,
4836:16, 4853:23,
4928:14, 4950:20,
4950:21, 4956:24
**friends** [4] - 4818:8,
4836:21, 4843:16,
4844:12
**front** [8] - 4806:19,
4869:18, 4869:22,
4870:5, 4870:21,
4870:23, 4871:12,
4939:16

**frontage** [1] - 4972:15
**fuel** [1] - 4886:2
**full** [4] - 4863:23,
4863:25, 4864:8,
4898:6
**function** [1] - 4791:18
**Fund** [65] - 4812:7,
4813:5, 4813:21,
4814:2, 4814:8,
4814:11, 4818:21,
4818:25, 4819:17,
4826:6, 4826:22,
4827:11, 4827:23,
4853:11, 4853:14,
4855:20, 4857:11,
4865:17, 4865:24,
4866:4, 4866:15,
4867:7, 4873:19,
4885:7, 4889:11,
4889:21, 4890:1,
4892:4, 4892:8,
4892:15, 4892:24,
4893:1, 4893:7,
4893:11, 4893:14,
4893:24, 4894:6,
4894:23, 4907:22,
4908:12, 4909:9,
4909:18, 4911:17,
4911:25, 4914:19,
4917:6, 4917:21,
4918:2, 4919:3,
4920:18, 4922:2,
4923:23, 4925:20,
4925:21, 4927:24,
4928:18, 4929:24,
4932:10, 4933:2,
4933:13, 4935:9,
4936:20, 4942:5,
4943:3, 4954:15
**fund** [7] - 4810:9,
4810:10, 4848:9,
4923:3, 4924:14,
4936:11, 4966:25
**funded** [1] - 4924:11
**funding** [17] -
4945:24, 4953:23,
4957:15, 4958:1,
4963:24, 4964:21,
4965:20, 4966:6,
4966:15, 4967:6,
4967:24, 4968:24,
4970:5, 4970:21,
4972:21, 4973:17,
4975:15
**Funds** [1] - 4928:12
**funds** [13] - 4896:21,
4898:12, 4910:13,
4915:23, 4917:20,
4920:21, 4922:23,
4927:13, 4937:24,

4942:22, 4958:11, 4960:20, 4960:21
**future** [3] - 4918:11, 4945:3, 4972:21

**G**

**G55** [3] - 4820:5, 4820:12, 4822:14
**Gaarn** [5] - 4949:24, 4950:10, 4965:9, 4965:10, 4966:1
**Gardena** [4] - 4971:21, 4971:22, 4972:2, 4972:3
**gather** [1] - 4908:3
**Gaudet** [4] - 4965:15, 4965:16, 4976:18, 4978:5
**gear** [1] - 4914:11
**general** [3] - 4826:17, 4949:2, 4966:12
**gentleman** [2] - 4966:1, 4969:7
**gentlemen** [2] - 4889:5, 4950:4
**Gentry** [4] - 4944:6, 4946:6, 4949:24, 4950:10
**George** [1] - 4956:24
**gesture** [1] - 4870:7
**gift** [1] - 4973:17
**Gilmartin** [3] - 4839:9, 4955:22, 4958:7
**given** [4] - 4823:24, 4838:6, 4912:15, 4924:6
**glad** [1] - 4872:21
**Glen** [1] - 4874:1
**global** [3] - 4865:19, 4865:20, 4915:8
**Global** [78] - 4810:9, 4812:7, 4813:5, 4813:21, 4814:2, 4814:7, 4814:11, 4818:21, 4818:25, 4819:16, 4826:6, 4826:22, 4827:11, 4827:23, 4853:11, 4853:14, 4855:19, 4857:11, 4865:17, 4865:24, 4866:3, 4866:15, 4867:7, 4873:19, 4885:6, 4889:10, 4889:20, 4890:1, 4892:4, 4892:7, 4892:14, 4892:23, 4893:1, 4893:7, 4893:11, 4893:14, 4893:23,

4894:6, 4894:23, 4907:22, 4908:11, 4909:9, 4909:18, 4911:12, 4911:17, 4911:25, 4914:18, 4917:6, 4917:21, 4918:2, 4919:3, 4920:18, 4922:1, 4923:23, 4924:10, 4925:19, 4925:21, 4926:14, 4927:24, 4928:1, 4928:6, 4928:11, 4928:18, 4929:24, 4932:10, 4933:1, 4933:13, 4934:10, 4935:8, 4935:22, 4936:11, 4936:19, 4942:4, 4942:15, 4942:20, 4942:22, 4943:3, 4954:15
**goal** [1] - 4869:9
**golf** [1] - 4800:11, 4954:6, 4954:24, 4965:17
**GONCHAR** [2] - 4795:13, 4984:2
**gonchar** [2] - 4866:23, 4878:3
**Gonchar** [65] - 4792:10, 4793:7, 4793:11, 4795:9, 4795:10, 4795:23, 4806:20, 4806:24, 4806:25, 4807:3, 4807:5, 4820:5, 4822:14, 4823:16, 4825:16, 4825:17, 4833:18, 4837:3, 4839:12, 4839:15, 4841:9, 4848:12, 4860:11, 4862:13, 4863:4, 4866:11, 4869:5, 4870:7, 4873:7, 4876:20, 4876:21, 4878:14, 4880:3, 4880:14, 4880:17, 4880:19, 4882:25, 4889:13, 4892:20, 4894:4, 4895:10, 4896:12, 4902:2, 4904:7, 4905:9, 4905:16, 4912:14, 4913:4, 4913:16, 4913:19, 4913:22, 4914:1, 4916:18, 4916:23, 4916:25, 4918:5, 4918:6, 4918:7, 4918:11, 4923:10,

4926:6, 4931:9, 4946:23
**Gonchar's** [3] - 4793:2, 4880:12, 4913:10
**gorilla** [2] - 4973:13, 4981:16
**Government** [18] - 4789:12, 4806:23, 4820:3, 4822:10, 4843:10, 4844:1, 4848:13, 4849:12, 4857:5, 4888:18, 4888:24, 4914:7, 4930:19, 4939:22, 4941:3, 4984:13, 4984:13, 4984:16
**government** [10] - 4794:21, 4839:4, 4843:21, 4856:24, 4868:25, 4872:21, 4878:5, 4878:25, 4892:2, 4943:7
**Government's** [8] - 4856:4, 4860:2, 4861:14, 4863:1, 4887:12, 4888:8, 4905:18, 4907:19
**grand** [1] - 4802:12
**great** [6] - 4801:2, 4883:17, 4900:10, 4955:5, 4966:13, 4973:17
**greater** [1] - 4896:14
**greatest** [1] - 4791:5
**Group** [3] - 4851:21, 4852:1, 4911:13
**group** [45] - 4801:10, 4801:12, 4804:14, 4804:15, 4804:17, 4805:15, 4812:7, 4813:9, 4830:9, 4833:16, 4865:13, 4866:13, 4866:18, 4874:10, 4883:15, 4886:5, 4893:3, 4904:1, 4920:9, 4924:17, 4926:11, 4932:18, 4943:14, 4943:18, 4943:23, 4944:10, 4944:11, 4944:15, 4944:18, 4945:5, 4945:16, 4945:20, 4946:2, 4946:20, 4952:4, 4953:7, 4953:14, 4953:22, 4963:7, 4963:20, 4964:16, 4968:18, 4973:16, 4975:2

**group's** [1] - 4928:25
**groups** [1] - 4926:9
**groups'** [1] - 4927:19
**grow** [1] - 4966:24
**growing** [2] - 4797:12, 4798:10
**GSF** [5] - 4889:2, 4896:21, 4898:1, 4898:12, 4898:20
**guarantee** [14] - 4816:20, 4816:23, 4824:2, 4836:8, 4841:10, 4865:6, 4865:9, 4865:15, 4890:7, 4890:8, 4890:14, 4903:15, 4912:15, 4921:23
**guaranteed** [2] - 4846:3, 4890:23
**guarantees** [3] - 4891:12, 4903:14, 4913:4
**guarantor** [22] - 4813:11, 4813:17, 4813:25, 4814:23, 4815:2, 4815:22, 4815:25, 4816:2, 4836:1, 4836:6, 4837:9, 4838:24, 4839:10, 4839:12, 4862:23, 4863:6, 4864:6, 4890:16, 4890:25, 4912:20, 4913:15, 4956:2
**guarantors** [1] - 4903:16
**guaranty** [4] - 4801:13, 4815:4, 4824:14, 4838:5
**guarantying** [1] - 4913:7
**guess** [6] - 4816:12, 4838:19, 4856:14, 4897:18, 4899:23, 4915:6
**Gump** [1] - 4924:8
**guy** [5] - 4798:9, 4802:22, 4804:19, 4804:20, 4859:12
**guys** [7] - 4829:25, 4843:16, 4865:13, 4867:7, 4883:17, 4893:3, 4896:25

**H**

**HALEY** [37] - 4789:16, 4790:24, 4791:25, 4793:19, 4797:25, 4803:24, 4808:11,

4837:16, 4838:3, 4838:19, 4839:21, 4839:25, 4841:24, 4843:24, 4857:3, 4871:2, 4872:12, 4882:3, 4888:21, 4888:22, 4895:7, 4895:9, 4899:8, 4900:17, 4905:8, 4906:21, 4907:15, 4931:7, 4931:15, 4931:18, 4940:10, 4952:22, 4961:10, 4978:7, 4978:20, 4979:3, 4984:6
**Haley** [13] - 4790:23, 4792:22, 4803:23, 4838:2, 4868:22, 4869:8, 4882:2, 4895:6, 4895:12, 4906:20, 4912:19, 4940:9, 4980:4
**Haley's** [1] - 4872:10
**half** [10] - 4792:19, 4805:10, 4918:20, 4929:19, 4954:17, 4954:22, 4955:1, 4956:14, 4957:12, 4963:17
**hand** [3] - 4843:9, 4856:3, 4870:7
**handed** [3] - 4856:5, 4874:23, 4910:1
**handle** [1] - 4914:11
**handled** [1] - 4946:10
**hang** [1] - 4907:2
**hangar** [2] - 4835:22, 4942:14
**hangars** [11] - 4813:2, 4835:11, 4835:15, 4861:16, 4861:18, 4861:19, 4861:22, 4862:1, 4862:3, 4862:7, 4862:15
**happy** [2] - 4853:22, 4876:9
**hard** [1] - 4833:8
**Hatzimemos** [2] - 4944:2, 4944:24
**Hawaii** [20] - 4799:24, 4800:16, 4801:1, 4845:6, 4846:11, 4846:12, 4846:18, 4847:18, 4847:24, 4848:3, 4849:18, 4851:24, 4963:4, 4963:25, 4964:10, 4968:19, 4969:14, 4971:19, 4973:16, 4981:21

**Hawaiian** [20] - 4801:6, 4849:16, 4851:25, 4895:14, 4895:16, 4895:22, 4896:9, 4963:22, 4965:20, 4966:6, 4966:25, 4967:25, 4968:25, 4970:6, 4970:18, 4972:4, 4972:15, 4972:20, 4973:24, 4974:25

**head** [5] - 4869:5, 4870:6, 4871:6, 4906:4, 4935:20

**head's** [2] - 4819:5, 4823:2

**heading** [4] - 4880:5, 4952:8, 4970:17, 4980:16

**hear** [5] - 4794:22, 4796:2, 4832:4, 4868:15, 4945:11

**heard** [4] - 4910:20, 4912:14, 4917:1, 4918:13, 4929:19, 4954:3, 4954:5, 4981:12

**hearing** [1] - 4945:15

**hearsay** [5] - 4838:9, 4838:12, 4838:14, 4839:5, 4927:4

**Hearsay** [1] - 4829:1

**heated** [1] - 4937:9

**heavy** [2] - 4981:25

**held** [2] - 4824:2, 4911:11

**help** [16] - 4802:25, 4821:5, 4824:15, 4824:18, 4835:5, 4835:23, 4865:22, 4865:25, 4866:17, 4870:20, 4915:4, 4926:8, 4926:11, 4958:2, 4959:13, 4963:16

**helped** [7] - 4813:20, 4816:18, 4824:1, 4824:7, 4824:9, 4824:11, 4824:20

**helping** [7] - 4798:9, 4798:24, 4818:11, 4824:14, 4824:15, 4865:11, 4866:18

**high** [1] - 4966:13

**higher** [1] - 4975:19

**highlight** [1] - 4860:9

**highlighted** [7] - 4820:5, 4908:5, 4909:24, 4933:14, 4936:6, 4961:14,

**highlighting** [1] - 4908:5

**Hilton** [8] - 4968:1, 4968:2, 4968:3, 4968:4, 4968:8, 4968:13, 4968:16, 4968:21

**himself** [2] - 4834:3, 4978:17

**hire** [6] - 4811:7, 4827:19, 4828:1, 4911:17, 4925:2, 4948:17

**hired** [8] - 4810:12, 4810:15, 4827:15, 4828:9, 4828:17, 4924:1, 4924:7, 4965:25

**history** [4] - 4803:1, 4848:17, 4848:24

**hitters** [2] - 4981:25

**hockey** [48] - 4796:11, 4796:13, 4797:11, 4797:12, 4804:5, 4804:16, 4808:1, 4819:11, 4828:10, 4830:7, 4842:19, 4861:22, 4866:16, 4866:20, 4866:25, 4874:6, 4884:1, 4884:25, 4885:4, 4886:1, 4893:4, 4904:2, 4904:18, 4917:7, 4917:12, 4918:3, 4918:16, 4918:17, 4918:23, 4919:13, 4919:16, 4919:18, 4920:2, 4920:4, 4922:5, 4922:14, 4923:12, 4924:23, 4925:17, 4925:24, 4926:21, 4927:2, 4928:22, 4930:1, 4932:11, 4948:3, 4958:4

**Hockey** [4] - 4796:16, 4796:19, 4796:23, 4797:10

**hold** [3] - 4795:17, 4845:16, 4939:3

**holders** [1] - 4962:12

**Home** [1] - 4872:1

**home** [3] - 4867:15, 4867:18, 4873:8

**homes** [2] - 4918:24, 4956:17

**hometown** [1] - 4797:14

**Honda** [1] - 4955:4

**Honor** [45] - 4791:25, 4795:7, 4803:19, 4808:8, 4836:22, 4837:16, 4841:24, 4843:23, 4855:3, 4855:9, 4857:2, 4867:24, 4868:3, 4870:3, 4870:25, 4871:1, 4871:17, 4871:25, 4872:11, 4872:13, 4875:18, 4878:9, 4888:21, 4899:9, 4899:10, 4899:11, 4906:17, 4907:11, 4907:15, 4923:20, 4932:17, 4938:23, 4939:4, 4939:12, 4953:3, 4961:7, 4961:19, 4975:25, 4976:1, 4976:2, 4980:14, 4981:10, 4982:10, 4982:19, 4983:3

**HONORABLE** [1] - 4789:9

**Honu'apo** [2] - 4966:22, 4972:20

**hook** [8] - 4864:16, 4864:23, 4865:3, 4903:22, 4916:18, 4952:6, 4953:11, 4959:10

**hope** [3] - 4793:24, 4902:5, 4902:6

**HORMOVITIS** [1] - 4789:6

**hostile** [3] - 4943:11, 4945:6, 4945:9

**hostilely** [1] - 4943:15

**hotel** [1] - 4911:18

**Hotels** [1] - 4911:13

**hour** [3] - 4792:18, 4805:10

**hours** [2] - 4805:10, 4919:9

**house** [6] - 4804:12, 4805:3, 4811:2, 4897:1, 4897:4, 4897:5

**houses** [1] - 4846:14

**housing** [1] - 4968:5

**hum** [3] - 4849:22, 4851:6, 4864:11

**human** [1] - 4902:6

**hurting** [1] - 4924:16

### I

**idea** [4] - 4805:20, 4805:21, 4833:8,

4924:13

**identification** [9] - 4797:25, 4798:1, 4803:21, 4803:25, 4911:3, 4932:5, 4960:23, 4976:22

**identified** [2] - 4816:25, 4899:18

**identify** [5] - 4856:17, 4868:5, 4923:6, 4930:3, 4943:21

**imagine** [1] - 4794:24

**immediate** [1] - 4945:3

**immediately** [4] - 4821:1, 4821:12, 4905:23, 4922:24

**important** [3] - 4834:16, 4913:21, 4972:5

**importantly** [2] - 4916:2, 4982:12

**in-kind** [1] - 4928:15

**inaccurate** [1] - 4950:14

**inappropriate** [3] - 4868:24, 4868:25, 4952:11

**incidence** [1] - 4903:21

**include** [2] - 4827:4, 4832:20

**included** [1] - 4965:6

**includes** [1] - 4883:23

**including** [7] - 4832:23, 4880:3, 4925:20, 4927:17, 4930:12, 4945:22, 4973:22

**incompatibility** [1] - 4792:2

**incorporate** [1] - 4921:7

**increase** [1] - 4849:5

**increased** [1] - 4973:3

**increases** [1] - 4963:1

**increasing** [2] - 4962:14, 4962:15

**incredibly** [1] - 4969:9

**incrementally** [1] - 4921:12

**incurred** [1] - 4960:1

**independent** [7] - 4908:15, 4908:18, 4908:21, 4908:23, 4912:8, 4912:9, 4912:12

**indicate** [1] - 4871:2

**indicated** [4] - 4792:10, 4793:1,

4802:18, 4932:19

**indicates** [1] - 4884:20

**Indicating** [1] - 4905:17

**indicating** [1] - 4803:18

**individual** [6] - 4909:5, 4925:24, 4932:10, 4944:3, 4944:11, 4959:18

**individuals** [22] - 4829:16, 4889:17, 4889:19, 4908:20, 4909:24, 4918:8, 4920:17, 4923:1, 4924:5, 4927:9, 4944:10, 4944:12, 4945:22, 4964:24, 4965:19, 4965:22, 4966:14, 4966:19, 4967:23, 4969:1, 4969:3, 4969:4

**indulgence** [1] - 4793:6

**influence** [1] - 4869:11

**information** [21] - 4809:18, 4827:13, 4876:25, 4877:1, 4908:2, 4908:3, 4908:20, 4908:21, 4910:8, 4910:10, 4919:2, 4932:12, 4938:10, 4938:17, 4944:7, 4945:4, 4945:18, 4967:18, 4968:18, 4970:20, 4970:23

**informed** [2] - 4892:19, 4973:20

**infrastructure** [9] - 4955:8, 4964:12, 4966:16, 4966:23, 4967:8, 4972:22, 4975:9, 4975:17, 4975:21

**initial** [9] - 4804:21, 4819:16, 4857:11, 4895:14, 4895:18, 4922:7, 4933:22, 4944:19, 4972:8

**initiated** [1] - 4954:14

**input** [1] - 4908:10

**insert** [1] - 4868:23

**inserted** [1] - 4908:7

**insisting** [1] - 4935:3

**install** [1] - 4914:12

**instance** [1] - 4901:15

**instances** [2] -

4902:22, 4903:1
**instructed** [3] - 4952:4, 4953:7, 4953:22
**instruction** [1] - 4940:3
**instructions** [1] - 4939:19
**intend** [2] - 4791:20, 4851:23
**intended** [3] - 4821:9, 4948:12, 4949:21
**intent** [5] - 4889:8, 4981:24, 4982:1, 4982:11, 4982:16
**intention** [6] - 4921:6, 4921:9, 4930:4, 4930:7, 4953:13, 4954:2
**intentionally** [2] - 4844:21, 4868:20
**interacted** [1] - 4927:24
**interest** [22] - 4811:24, 4858:3, 4858:17, 4858:20, 4858:21, 4858:25, 4859:21, 4874:9, 4874:11, 4874:19, 4880:20, 4896:8, 4896:15, 4905:22, 4945:24, 4950:23, 4952:5, 4953:8, 4953:9, 4962:17, 4972:21, 4973:22
**interested** [4] - 4924:17, 4957:1, 4964:1, 4975:18
**interesting** [1] - 4925:9
**interests** [1] - 4812:1
**interpreting** [1] - 4924:20
**interrupting** [1] - 4921:14
**introduce** [3] - 4798:13, 4880:9, 4957:2
**introduced** [8] - 4798:8, 4798:12, 4802:22, 4828:4, 4848:1, 4923:9, 4970:2
**introducing** [1] - 4798:25
**introduction** [1] - 4972:10
**invented** [1] - 4802:23
**invest** [16] - 4799:2, 4799:16, 4800:7,

4800:22, 4800:25, 4803:8, 4813:4, 4814:20, 4844:25, 4845:3, 4845:10, 4854:17, 4855:12, 4899:22, 4900:23, 4901:4
**invested** [10] - 4799:12, 4799:25, 4802:18, 4812:16, 4847:15, 4854:1, 4855:19, 4889:17, 4896:16, 4928:2
**investigation** [6] - 4908:15, 4908:18, 4908:22, 4908:23, 4912:9, 4944:7
**investigations** [1] - 4944:4
**investigative** [1] - 4944:2
**investing** [4] - 4800:15, 4801:12, 4896:25, 4899:22
**investment** [26] - 4800:12, 4800:19, 4801:9, 4801:11, 4803:6, 4812:9, 4835:16, 4835:23, 4841:18, 4846:10, 4847:18, 4853:2, 4854:8, 4857:14, 4857:21, 4857:24, 4858:1, 4899:24, 4901:17, 4929:1, 4933:22, 4950:23, 4951:6, 4964:1, 4964:16, 4964:17
**investments** [28] - 4798:9, 4798:11, 4799:1, 4799:5, 4799:10, 4799:22, 4799:23, 4800:1, 4800:9, 4801:4, 4803:10, 4804:17, 4805:16, 4805:22, 4818:10, 4852:5, 4852:7, 4897:7, 4897:12, 4897:18, 4902:5, 4902:10, 4902:11, 4916:12, 4924:24, 4925:1, 4925:9, 4927:19
**investor** [2] - 4857:18, 4944:12
**investors** [12] - 4833:17, 4890:2, 4914:25, 4915:12, 4915:16, 4915:22, 4916:11, 4921:1,

4921:8, 4924:16, 4945:2, 4963:20
**Investors** [2] - 4974:21, 4974:24
**inviting** [1] - 4838:15
**involved** [19] - 4804:19, 4810:21, 4812:16, 4829:20, 4830:17, 4847:12, 4883:16, 4891:9, 4891:11, 4891:14, 4892:17, 4892:25, 4893:1, 4912:4, 4925:1, 4943:19, 4944:3, 4944:16, 4968:7
**involvement** [3] - 4885:6, 4911:15, 4912:10
**involving** [2] - 4837:9, 4846:10
**irrelevant** [1] - 4876:12
**island** [1] - 4964:10
**Isle** [4] - 4849:13, 4849:14, 4849:21, 4963:13
**Islip** [2] - 4789:4, 4789:22
**Israel** [1] - 4939:20
**issue** [10] - 4790:8, 4790:13, 4792:1, 4812:20, 4931:6, 4937:16, 4940:15, 4941:16, 4945:15, 4978:3
**issues** [9] - 4915:2, 4915:8, 4920:8, 4926:7, 4926:18, 4929:1, 4953:14, 4972:5, 4978:22
**itself** [7] - 4791:17, 4876:22, 4877:4, 4899:16, 4912:2, 4914:17, 4966:11
**IV** [4] - 4849:13, 4849:14, 4849:21, 4963:13

**J**

**jail** [1] - 4891:20
**JAMES** [1] - 4789:14
**James** [2] - 4965:13, 4965:14
**January** [1] - 4955:14
**Jason** [2] - 4843:15, 4843:16
**Jay** [2] - 4904:20, 4945:23

**Jeff** [4] - 4861:19, 4861:23, 4861:25, 4862:3
**jet** [1] - 4914:13
**job** [1] - 4846:8
**Joe** [3] - 4843:4, 4926:5, 4929:2
**jog** [1] - 4872:22
**John** [4] - 4944:13, 4945:23, 4950:20, 4964:15
**joint** [3] - 4952:16, 4963:6, 4971:6
**Joint** [1] - 4970:17
**Joseph** [1] - 4924:6
**JOSEPH** [1] - 4789:9
**Jowdy** [51] - 4804:18, 4804:19, 4805:23, 4810:12, 4816:7, 4853:17, 4864:18, 4864:24, 4878:18, 4912:24, 4913:2, 4913:6, 4913:16, 4913:18, 4913:24, 4914:4, 4914:7, 4914:15, 4914:22, 4915:4, 4915:6, 4915:7, 4915:9, 4915:12, 4916:1, 4916:10, 4916:15, 4916:19, 4918:4, 4920:9, 4923:24, 4924:9, 4924:15, 4926:4, 4926:7, 4935:15, 4937:18, 4942:18, 4942:20, 4954:3, 4954:14, 4954:17, 4955:13, 4955:15, 4962:15, 4962:18, 4963:14, 4963:18, 4963:20, 4973:20, 4974:1
**Jowdy's** [4] - 4913:14, 4914:20, 4916:3, 4955:2
**judge** [3] - 4871:4, 4881:5, 4940:10
**JUDGE** [1] - 4789:10
**Judge** [24] - 4790:13, 4792:15, 4792:24, 4797:25, 4808:11, 4838:20, 4839:20, 4843:24, 4855:6, 4857:3, 4872:12, 4877:6, 4879:9, 4880:2, 4882:3, 4882:6, 4888:22, 4895:7, 4905:8, 4930:5, 4952:9, 4976:23, 4978:1,

4982:24
**juggle** [1] - 4794:25
**juggling** [1] - 4792:8
**July** [4] - 4797:6, 4917:17, 4948:4, 4950:9
**jump** [1] - 4899:2
**jumping** [1] - 4917:5
**June** [13] - 4789:7, 4878:15, 4882:23, 4884:6, 4886:19, 4942:6, 4944:19, 4944:25, 4945:16, 4961:3, 4961:16, 4978:5, 4983:5
**Juneau** [8] - 4926:5, 4927:18, 4927:21, 4928:2, 4928:7, 4928:11, 4928:15, 4929:2
**JUROR** [1] - 4868:3
**jurors** [1] - 4790:4
**Jury** [1] - 4929:15
**jury** [37] - 4789:10, 4790:3, 4790:7, 4790:21, 4793:20, 4793:22, 4793:24, 4799:11, 4834:11, 4868:10, 4869:11, 4869:14, 4869:18, 4869:22, 4869:23, 4870:5, 4870:18, 4870:21, 4870:22, 4870:23, 4871:13, 4871:24, 4873:2, 4876:9, 4882:7, 4889:1, 4899:17, 4905:3, 4923:17, 4931:5, 4931:19, 4931:21, 4961:15, 4961:20, 4978:22, 4980:2, 4980:11

**K**

**K-235** [2] - 4899:13, 4984:14
**Ka'u** [1] - 4975:6
**Kaiser** [7] - 4904:21, 4937:7, 4937:16, 4944:14, 4945:23, 4950:20, 4964:15
**keep** [6] - 4796:1, 4834:2, 4834:4, 4890:3, 4916:21, 4945:14
**KELLY** [1] - 4789:12
**Ken** [9] - 4804:18, 4804:19, 4805:23, 4864:18, 4864:24,

4912:24, 4913:2,
4926:3, 4973:11
**KENNER** [5] - 4789:5,
4789:5, 4870:2,
4931:23, 4984:9
**Kenner** [107] -
4789:17, 4793:10,
4797:21, 4798:5,
4798:13, 4798:16,
4799:7, 4799:12,
4799:22, 4800:20,
4801:19, 4801:20,
4802:21, 4803:7,
4804:12, 4804:22,
4804:24, 4806:13,
4808:3, 4808:15,
4809:6, 4809:18,
4810:4, 4810:15,
4810:20, 4814:6,
4814:14, 4816:3,
4816:6, 4817:14,
4829:20, 4829:24,
4830:2, 4830:3,
4830:5, 4830:15,
4836:5, 4837:8,
4839:10, 4842:13,
4842:15, 4843:15,
4844:3, 4844:10,
4844:16, 4844:24,
4845:10, 4846:23,
4847:13, 4849:17,
4852:7, 4852:14,
4853:13, 4854:12,
4855:11, 4856:20,
4863:13, 4864:16,
4864:21, 4864:24,
4867:10, 4868:14,
4868:19, 4869:4,
4869:13, 4869:17,
4869:21, 4870:11,
4871:10, 4872:10,
4872:16, 4873:8,
4890:8, 4895:12,
4895:13, 4896:7,
4896:20, 4897:17,
4897:24, 4898:18,
4898:21, 4899:4,
4899:8, 4899:15,
4899:20, 4900:8,
4902:21, 4903:1,
4903:16, 4904:14,
4907:6, 4907:7,
4907:17, 4929:17,
4929:21, 4931:10,
4932:4, 4932:25,
4939:16, 4941:6,
4942:4, 4945:6,
4952:13, 4953:6,
4962:1, 4980:5,
4982:13
**Kenner's** [6] - 4795:3,

4889:12, 4904:3,
4905:4, 4980:6,
4981:24
**Kenneth** [1] - 4810:12
**key** [2] - 4883:16,
4886:7
**kids** [4] - 4805:7,
4867:19, 4867:20,
4873:9
**kind** [8] - 4790:14,
4799:6, 4839:11,
4900:25, 4919:14,
4928:15, 4960:7,
4965:2
**knowing** [1] - 4818:12
**knowledge** [8] -
4801:7, 4830:15,
4901:15, 4912:13,
4918:15, 4928:20,
4949:23, 4950:9
**knows** [2] - 4923:17,
4952:4
**Komatireddy** [4] -
4837:4, 4868:17,
4871:5, 4873:4
**KOMATIREDDY** [41] -
4789:15, 4808:10,
4825:12, 4828:13,
4829:1, 4837:2,
4839:2, 4839:8,
4841:8, 4842:4,
4843:21, 4844:2,
4851:1, 4855:9,
4855:10, 4856:24,
4857:6, 4867:24,
4869:3, 4870:3,
4871:1, 4871:16,
4873:5, 4873:6,
4876:6, 4876:17,
4878:2, 4878:5,
4879:2, 4880:11,
4881:7, 4882:6,
4882:8, 4888:18,
4889:1, 4895:5,
4899:11, 4906:19,
4930:10, 4981:6,
4984:4
**Kristen** [1] - 4926:5
**Kristin** [1] - 4929:2

## L

**LA** [2] - 4910:6
**labeled** [1] - 4932:6
**lack** [2] - 4838:4,
4915:2
**lady** [1] - 4878:20
**laid** [1] - 4818:22
**land** [9] - 4800:5,
4801:2, 4846:12,

4895:14, 4896:9,
4902:12, 4964:8,
4966:10
**landing** [1] - 4914:11
**language** [6] -
4869:19, 4871:9,
4882:13, 4882:14,
4882:18
**laptop** [2] - 4791:2,
4791:13
**large** [3] - 4969:9,
4976:9, 4976:11
**LaRusso** [56] -
4789:18, 4790:12,
4790:19, 4790:22,
4792:6, 4792:8,
4792:15, 4793:11,
4793:14, 4793:17,
4795:5, 4795:6,
4795:7, 4795:21,
4798:3, 4802:10,
4803:18, 4804:1,
4807:1, 4807:2,
4808:8, 4808:14,
4825:15, 4828:15,
4829:5, 4836:22,
4838:2, 4839:1,
4839:6, 4839:20,
4841:2, 4843:23,
4852:2, 4868:22,
4870:5, 4870:10,
4872:9, 4903:25,
4907:10, 4907:18,
4932:3, 4932:17,
4932:23, 4932:24,
4938:23, 4939:2,
4939:6, 4939:8,
4941:4, 4942:3,
4952:16, 4978:11,
4980:6, 4981:19,
4984:3, 4984:10
**LARUSSO** [65] -
4855:3, 4855:5,
4857:2, 4870:25,
4871:4, 4872:11,
4872:18, 4872:25,
4875:18, 4876:2,
4876:13, 4876:24,
4877:5, 4877:9,
4877:13, 4878:8,
4878:13, 4879:7,
4880:2, 4881:5,
4888:20, 4899:10,
4905:13, 4905:15,
4906:17, 4906:24,
4907:3, 4907:11,
4907:14, 4921:13,
4925:15, 4929:11,
4929:23, 4930:7,
4930:17, 4948:1,

4951:2, 4951:3,
4952:2, 4953:2,
4953:5, 4961:6,
4961:13, 4961:19,
4961:21, 4970:10,
4970:12, 4975:24,
4976:23, 4978:1,
4978:4, 4978:13,
4978:17, 4978:24,
4979:4, 4980:14,
4980:19, 4980:25,
4981:5, 4981:7,
4982:19, 4982:24,
4984:5, 4984:7,
4984:8
**LaRusso's** [1] -
4941:6
**Las** [6] - 4836:7,
4836:18, 4956:16,
4956:18, 4956:20,
4957:14
**last** [15] - 4791:7,
4792:9, 4792:21,
4793:15, 4797:2,
4806:4, 4823:16,
4826:1, 4830:23,
4870:5, 4894:12,
4894:14, 4928:24,
4954:20, 4981:14
**lasted** [1] - 4919:7
**lasting** [1] - 4805:9
**late** [1] - 4792:23
**latest** [1] - 4791:5
**law** [2] - 4870:14,
4876:15
**lawsuit** [7] - 4831:7,
4880:21, 4880:22,
4905:5, 4921:20,
4925:20, 4926:20
**lawsuits** [2] - 4810:18,
4810:20
**lawyer** [26] - 4810:13,
4815:19, 4828:2,
4828:4, 4830:9,
4830:22, 4833:11,
4869:10, 4875:11,
4876:3, 4876:4,
4876:14, 4876:21,
4876:25, 4877:6,
4877:8, 4877:10,
4878:23, 4880:10,
4880:12, 4881:1,
4881:3, 4894:15,
4904:1, 4904:5
**lawyer's** [2] - 4810:16,
4855:7
**lawyers** [9] - 4790:10,
4794:12, 4806:3,
4824:9, 4824:20,
4868:23, 4869:1,

4870:20, 4980:2
**lay** [1] - 4952:8
**lead** [3] - 4842:2,
4944:1, 4944:11
**leader** [1] - 4955:15
**leadership** [5] -
4943:20, 4943:21,
4943:25, 4944:6,
4953:22
**leading** [1] - 4825:12
**League** [4] - 4796:17,
4796:20, 4796:23,
4797:10
**learn** [3] - 4807:13,
4812:23
**learned** [9] - 4814:12,
4827:13, 4953:17
**least** [9] - 4791:4,
4842:22, 4844:21,
4868:19, 4871:10,
4898:10, 4901:17,
4960:11, 4973:7
**leave** [2] - 4799:18,
4939:11
**leaves** [1] - 4906:24
**led** [5] - 4914:25,
4920:12, 4944:11,
4946:5, 4963:19
**leery** [1] - 4964:11
**left** [6] - 4803:17,
4837:6, 4873:7,
4889:5, 4909:24,
4918:12
**legal** [11] - 4810:10,
4810:11, 4810:13,
4810:18, 4824:16,
4853:16, 4904:3,
4924:8, 4924:12,
4926:2, 4936:12
**legally** [1] - 4915:6
**Lehman** [15] - 4962:3,
4962:9, 4962:23,
4963:4, 4963:6,
4963:10, 4963:16,
4965:18, 4967:21,
4971:13, 4971:16,
4971:25, 4972:25,
4973:6, 4982:21
**lend** [4] - 4854:3,
4958:2, 4959:13,
4976:6
**lender** [3] - 4859:12,
4859:13, 4859:15
**lenders** [1] - 4967:16
**lending** [5] - 4964:6,
4966:14, 4968:7,
4971:2, 4973:7
**length** [2] - 4872:7,
4919:10
**lengthy** [3] - 4919:7,

4962:21, 4978:8
**lenient** [1] - 4973:7
**lent** [1] - 4959:19
**Leslie** [3] - 4878:3, 4878:20, 4879:4
**less** [2] - 4866:11, 4896:16
**lessening** [1] - 4831:19
**letter** [23] - 4833:11, 4863:8, 4863:10, 4863:14, 4922:24, 4948:2, 4948:4, 4948:12, 4948:13, 4948:21, 4948:25, 4949:5, 4949:6, 4949:7, 4949:12, 4949:20, 4949:23, 4950:8, 4952:22, 4981:24, 4982:1, 4982:11, 4982:12
**level** [1] - 4913:3
**levels** [1] - 4923:1
**leverage** [1] - 4953:23
**Libby** [2] - 4944:3, 4944:23
**likewise** [3] - 4796:2, 4937:16, 4964:25
**line** [25] - 4801:8, 4801:15, 4801:21, 4801:23, 4845:12, 4845:17, 4845:18, 4845:19, 4845:22, 4846:2, 4848:6, 4848:25, 4851:24, 4870:11, 4875:4, 4882:12, 4883:4, 4889:2, 4895:21, 4896:7, 4896:14, 4923:2, 4924:6, 4926:2, 4962:12
**lines** [9] - 4801:5, 4801:18, 4936:5, 4961:25, 4962:2, 4962:9, 4963:1, 4963:9, 4963:12
**link** [1] - 4909:23
**list** [5] - 4888:2, 4917:24, 4943:24, 4966:1, 4972:16
**listen** [5] - 4794:17, 4794:19, 4832:17, 4946:25, 4980:8
**listened** [2] - 4790:15, 4790:18
**listening** [1] - 4832:11
**litigation** [10] - 4792:1, 4880:14, 4918:4, 4923:24, 4926:4, 4927:13,

4953:14, 4953:24, 4954:14, 4955:14
**litigations** [1] - 4876:18
**living** [2] - 4796:12, 4805:4
**LLC** [6] - 4811:25, 4821:13, 4860:3, 4884:4, 4887:6
**loan** [102] - 4813:17, 4813:25, 4820:18, 4820:20, 4820:21, 4821:8, 4833:21, 4833:24, 4834:3, 4834:8, 4834:13, 4834:14, 4834:19, 4834:21, 4836:2, 4837:9, 4838:12, 4848:17, 4848:18, 4848:22, 4848:24, 4849:7, 4849:23, 4856:14, 4856:16, 4857:24, 4860:23, 4860:24, 4860:25, 4862:7, 4862:24, 4863:3, 4863:7, 4863:11, 4863:23, 4864:1, 4864:8, 4865:18, 4866:1, 4866:17, 4866:21, 4867:1, 4867:3, 4867:4, 4873:14, 4873:18, 4874:8, 4890:7, 4890:9, 4890:14, 4890:21, 4890:23, 4890:25, 4891:2, 4891:14, 4891:17, 4891:21, 4891:23, 4892:20, 4893:4, 4893:23, 4894:24, 4903:22, 4906:11, 4913:15, 4914:17, 4914:24, 4915:21, 4916:19, 4916:25, 4921:23, 4945:25, 4946:3, 4946:22, 4955:24, 4956:5, 4957:17, 4958:4, 4958:6, 4958:9, 4958:16, 4959:22, 4962:3, 4962:9, 4963:10, 4963:15, 4971:21, 4971:22, 4972:2, 4972:3, 4972:6, 4972:11, 4973:4, 4973:6, 4973:17, 4974:2, 4975:4, 4976:18, 4978:5
**loaning** [1] - 4860:17

**loans** [20] - 4815:2, 4841:10, 4861:7, 4891:7, 4912:15, 4912:25, 4913:3, 4913:7, 4913:24, 4913:25, 4914:10, 4915:16, 4915:20, 4917:3, 4940:13, 4962:16, 4972:22, 4973:21, 4975:17, 4975:21
**locations** [1] - 4919:1
**look** [14] - 4848:14, 4874:22, 4876:25, 4884:16, 4899:3, 4910:1, 4933:14, 4939:11, 4948:20, 4950:5, 4956:21, 4960:24, 4979:1, 4981:19
**looked** [10] - 4790:16, 4829:9, 4859:20, 4870:7, 4893:19, 4893:21, 4910:11, 4917:24, 4936:19, 4954:13
**looking** [11] - 4860:8, 4863:3, 4869:23, 4898:22, 4919:15, 4923:6, 4926:10, 4956:15, 4956:17, 4975:9, 4975:11
**looks** [1] - 4872:6
**Los** [5] - 4910:7, 4910:14, 4918:12, 4976:19, 4978:5
**Losch** [6] - 4969:6, 4970:25, 4973:11, 4974:4, 4981:18, 4982:11
**losing** [1] - 4889:12
**loss** [1] - 4914:25
**lost** [3] - 4848:6, 4972:13, 4972:14
**loud** [2] - 4796:1, 4796:5
**Louis** [3] - 4843:4, 4843:15, 4843:16
**low** [2] - 4883:16, 4886:7
**low-key** [1] - 4883:16
**Lucas** [9] - 4800:6, 4800:8, 4915:2, 4924:3, 4924:4, 4955:16, 4962:20, 4963:18, 4973:19
**lunch** [3] - 4923:18, 4929:14, 4930:9

**M**

**machine** [2] - 4791:4, 4791:18
**machines** [1] - 4791:4
**Macintosh** [1] - 4791:2
**Magence** [2] - 4955:22, 4958:7
**mail** [63] - 4856:14, 4856:19, 4856:22, 4857:7, 4858:23, 4859:1, 4875:1, 4875:9, 4875:13, 4875:16, 4876:10, 4876:16, 4876:22, 4877:4, 4877:12, 4878:14, 4879:1, 4879:4, 4880:3, 4880:4, 4880:9, 4880:18, 4880:24, 4880:25, 4881:1, 4882:9, 4882:16, 4883:2, 4883:10, 4884:8, 4884:13, 4886:6, 4888:12, 4888:13, 4911:7, 4911:21, 4911:23, 4912:2, 4912:5, 4920:23, 4920:24, 4921:3, 4921:6, 4922:11, 4922:13, 4922:18, 4923:11, 4925:23, 4962:21, 4967:10, 4967:12, 4968:23, 4969:2, 4973:9, 4973:10, 4974:8, 4974:9, 4974:10, 4974:17, 4974:22, 4981:18, 4982:8
**mailed** [2] - 4909:25, 4922:15
**mails** [12] - 4917:11, 4920:17, 4923:5, 4925:24, 4928:23, 4929:20, 4930:3, 4930:16, 4970:4, 4973:11, 4981:14, 4982:22
**main** [2] - 4888:12, 4969:7
**maintain** [2] - 4887:21, 4953:23
**maintained** [1] - 4928:8
**major** [2] - 4973:2, 4981:20
**majority** [1] - 4944:7
**Maloof** [1] - 4956:24

**man** [3] - 4861:19, 4861:25, 4910:18
**manage** [1] - 4889:24
**managed** [1] - 4849:17
**management** [3] - 4934:19, 4943:15, 4943:17
**Management** [2] - 4851:21, 4852:1
**managing** [3] - 4846:8, 4913:17, 4944:8
**Manfredi** [5] - 4964:15, 4968:20, 4974:9, 4974:12, 4974:19
**Manhattan** [1] - 4904:11
**manner** [1] - 4871:11
**map** [1] - 4973:24
**Mar** [2] - 4914:24, 4924:4
**March** [4] - 4887:17, 4962:17, 4971:11, 4973:10
**mark** [1] - 4932:17
**Mark** [1] - 4980:20
**marked** [11] - 4807:19, 4815:6, 4843:9, 4856:3, 4888:8, 4911:2, 4929:9, 4932:4, 4960:22, 4968:22, 4976:21
**market** [2] - 4798:12, 4803:2
**masses** [1] - 4964:8
**material** [2] - 4930:11, 4982:2
**matter** [3] - 4876:8, 4937:1, 4938:9
**matters** [1] - 4930:20
**Mattias** [3] - 4874:3, 4922:8, 4936:6
**McKee** [2] - 4904:20, 4945:23
**mean** [33] - 4798:22, 4801:20, 4801:23, 4801:24, 4805:14, 4805:16, 4811:5, 4811:12, 4812:5, 4813:4, 4813:14, 4816:13, 4820:22, 4822:1, 4831:16, 4832:9, 4848:4, 4860:24, 4868:24, 4882:11, 4885:2, 4886:22, 4892:13, 4892:25, 4893:20, 4894:9, 4894:11,

4895:15, 4896:1, 4904:2, 4910:19, 4964:4, 4968:1
**meaning** [1] - 4806:11
**means** [2] - 4827:22, 4883:16
**meant** [3] - 4811:17, 4826:1, 4901:8
**measure** [1] - 4971:23
**measures** [1] - 4914:14
**mechanical** [1] - 4789:25
**Media** [1] - 4791:15
**media** [1] - 4926:8
**mediating** [1] - 4915:11
**mediation** [1] - 4949:18
**Meeks** [1] - 4925:2
**meeks** [1] - 4925:4
**meet** [9] - 4792:9, 4798:5, 4804:2, 4805:2, 4902:21, 4902:22, 4903:2, 4918:10, 4934:15
**meeting** [31] - 4798:17, 4804:3, 4805:6, 4805:9, 4805:14, 4806:13, 4807:16, 4817:13, 4830:7, 4830:10, 4830:14, 4831:8, 4831:25, 4832:1, 4904:1, 4904:10, 4904:15, 4904:19, 4905:3, 4905:9, 4918:22, 4920:2, 4922:22, 4930:17, 4934:17, 4937:2, 4937:8, 4937:20, 4946:24, 4947:4
**meetings** [2] - 4919:6, 4921:10
**member** [4] - 4843:6, 4944:8, 4944:9, 4945:19
**members** [8] - 4793:24, 4884:17, 4884:20, 4944:22, 4948:5, 4949:24, 4953:7, 4980:2
**membership** [1] - 4811:20
**memorialized** [1] - 4928:23
**memory** [6] - 4791:5, 4791:9, 4872:22, 4894:2, 4917:10, 4943:24

**men** [3] - 4883:16, 4886:5, 4886:7
**mention** [3] - 4903:13, 4938:20, 4942:6
**mentioned** [7] - 4799:19, 4824:1, 4837:6, 4837:8, 4886:4, 4924:7, 4927:11
**mentioning** [1] - 4812:13
**merely** [1] - 4941:14
**message** [1] - 4922:15
**messages** [1] - 4930:16
**met** [26] - 4798:6, 4804:4, 4804:10, 4804:22, 4804:25, 4811:1, 4816:21, 4818:17, 4828:16, 4830:19, 4845:4, 4845:7, 4852:7, 4852:10, 4852:24, 4853:25, 4854:4, 4854:8, 4857:10, 4897:5, 4897:9, 4918:14, 4918:19, 4919:16, 4920:14, 4950:19
**Metro** [1] - 4864:13
**Mexican** [3] - 4926:3, 4935:14, 4936:1
**Mexico** [24] - 4799:23, 4799:24, 4800:3, 4800:5, 4804:20, 4810:15, 4813:10, 4814:5, 4814:13, 4836:19, 4845:6, 4847:13, 4847:22, 4847:25, 4848:2, 4910:25, 4911:18, 4912:5, 4912:11, 4923:24, 4924:2, 4936:12, 4936:22, 4939:20
**mic** [1] - 4795:17
**Michael** [5] - 4873:17, 4904:7, 4904:21, 4925:2, 4945:23
**Microsoft** [1] - 4792:3
**middle** [2] - 4974:11, 4974:17
**might** [2] - 4861:1, 4876:4
**miles** [1] - 4964:10, 4972:14
**million** [45] - 4801:14, 4802:2, 4820:1, 4848:7, 4858:5, 4862:7, 4864:9,

**Mola** [1] - 4973:24
**moment** [4] - 4802:17, 4905:8, 4973:18, 4976:1
**moments** [3] - 4907:12, 4966:3, 4975:24
**Monday** [2] - 4981:1, 4981:4
**money** [148] - 4801:10, 4801:16, 4801:23, 4801:25, 4802:1, 4802:3, 4802:5, 4804:13, 4804:15, 4804:16, 4805:21, 4805:25, 4806:6, 4806:14, 4807:12, 4807:13, 4811:15, 4812:6, 4812:8, 4812:10, 4812:22, 4813:2, 4813:4, 4813:5, 4815:21, 4816:10, 4816:12, 4817:22, 4817:24, 4818:15, 4820:9, 4820:14, 4820:19, 4820:22, 4820:23, 4821:6, 4821:9, 4821:19, 4821:23, 4822:5, 4823:3, 4823:5, 4823:7, 4823:8, 4823:23, 4825:6, 4825:22, 4825:25, 4826:10, 4826:12, 4826:13, 4826:14, 4826:18, 4827:3, 4827:10, 4827:21, 4827:22, 4829:8, 4829:10, 4829:13, 4834:13, 4846:11, 4846:15, 4847:6, 4847:7, 4847:24, 4848:2, 4848:4, 4851:2, 4851:4, 4851:25, 4853:1, 4853:4, 4853:8, 4853:10, 4853:22, 4854:2, 4854:7, 4854:9, 4854:14, 4854:18, 4855:22, 4856:11, 4859:16, 4859:23, 4860:15, 4860:17, 4860:18, 4865:11, 4865:16, 4866:13, 4866:14, 4866:19, 4866:22, 4866:24, 4867:13, 4873:18, 4885:4, 4892:23, 4892:25, 4893:1,

4893:3, 4893:5, 4893:7, 4893:11, 4893:13, 4893:17, 4893:22, 4894:6, 4894:9, 4894:11, 4894:20, 4894:22, 4896:25, 4897:6, 4900:23, 4916:11, 4917:20, 4920:4, 4921:8, 4924:11, 4934:5, 4934:16, 4935:4, 4936:11, 4936:16, 4936:22, 4937:15, 4937:17, 4937:23, 4938:2, 4938:6, 4938:10, 4938:18, 4940:4, 4950:22, 4952:5, 4953:8, 4959:7, 4960:17, 4964:11, 4975:9, 4976:6, 4976:10
**monies** [12] - 4819:21, 4823:14, 4825:18, 4826:5, 4826:25, 4827:4, 4828:9, 4828:24, 4835:3, 4928:18, 4934:21, 4962:10
**month** [2] - 4915:24, 4916:21
**monthly** [8] - 4816:11, 4816:13, 4835:8, 4856:15, 4891:4, 4905:22, 4959:20, 4960:5
**months** [7] - 4796:25, 4905:23, 4914:5, 4915:19, 4942:19, 4966:17, 4971:13
**Montreal** [3] - 4796:15, 4797:3, 4797:4
**Moreau** [19] - 4926:5, 4927:17, 4929:2, 4956:6, 4956:8, 4956:15, 4956:21, 4957:1, 4957:6, 4957:7, 4957:10, 4957:14, 4957:18, 4957:22, 4957:25, 4958:2, 4958:20, 4958:22, 4959:14
**Moreau's** [1] - 4957:22
**moreover** [1] - 4972:13
**morning** [8] - 4793:24, 4793:25, 4837:3, 4868:2, 4872:4, 4923:9, 4980:10,

**Miskiewicz** [1] - 4790:14, 4792:21, 4978:13
**MISKIEWICZ** [26] - 4789:14, 4790:25, 4791:23, 4803:22, 4871:25, 4872:6, 4920:19, 4925:14, 4927:4, 4939:4, 4939:12, 4939:15, 4940:7, 4940:15, 4941:2, 4941:19, 4950:25, 4951:8, 4952:10, 4961:9, 4962:6, 4970:11, 4981:9, 4981:14, 4982:10, 4983:3
**mismanagement** [1] - 4915:8
**misrepresented** [1] - 4839:14
**missed** [1] - 4806:4
**misstated** [1] - 4938:24
**modified** [1] - 4941:12

4864:24, 4865:18, 4865:25, 4866:8, 4866:11, 4866:17, 4866:20, 4866:25, 4873:14, 4873:18, 4890:3, 4890:21, 4891:16, 4891:17, 4891:21, 4892:4, 4892:7, 4892:20, 4893:5, 4893:9, 4893:23, 4894:24, 4914:23, 4916:13, 4921:22, 4924:7, 4954:18, 4954:22, 4955:3, 4955:17, 4957:18, 4959:22, 4962:17, 4967:6, 4973:22, 4975:13, 4975:17, 4975:22
**mind** [4] - 4827:2, 4838:13, 4911:21, 4927:6
**mine** [2] - 4960:21, 4961:3
**minicrash** [1] - 4791:9
**minimum** [3] - 4967:6, 4975:16, 4975:22
**minus** [3] - 4915:19, 4956:15, 4972:12
**minute** [3] - 4824:23, 4848:14, 4919:14
**minutes** [7] - 4801:17, 4870:6, 4871:16, 4872:2, 4872:5, 4906:25, 4907:2

4983:2
**Mortgage** [2] - 4974:21, 4974:24
**mortgage** [4] - 4824:7, 4824:15, 4958:19, 4959:20
**Moscow** [2] - 4797:15
**Moskow** [1] - 4919:23
**most** [8] - 4792:19, 4834:20, 4900:4, 4919:7, 4948:2, 4955:6, 4955:7, 4964:10
**mostly** [2] - 4829:8, 4900:3
**motion** [1] - 4952:17
**move** [3] - 4805:19, 4903:12, 4951:2
**moved** [4] - 4797:15, 4797:16, 4846:5, 4893:5
**moves** [4] - 4843:21, 4856:24, 4878:5, 4888:18
**moving** [2] - 4844:23, 4932:19
**MP3** [1] - 4791:15
**MR** [164] - 4790:12, 4790:19, 4790:22, 4790:24, 4790:25, 4791:23, 4791:25, 4792:8, 4792:15, 4793:11, 4793:14, 4793:17, 4793:19, 4795:7, 4795:21, 4797:25, 4798:3, 4802:10, 4803:18, 4803:22, 4803:24, 4804:1, 4807:2, 4808:8, 4808:11, 4808:14, 4825:15, 4828:15, 4829:5, 4836:22, 4837:16, 4838:2, 4838:8, 4838:19, 4839:1, 4839:6, 4839:20, 4839:21, 4839:25, 4841:2, 4841:24, 4843:23, 4843:24, 4855:3, 4855:5, 4857:2, 4857:3, 4870:2, 4870:25, 4871:2, 4871:4, 4871:25, 4872:6, 4872:11, 4872:12, 4872:18, 4872:25, 4875:18, 4876:2, 4876:13, 4876:24, 4877:5, 4877:9, 4877:13, 4878:8,

4878:13, 4879:7, 4880:2, 4881:5, 4882:3, 4888:20, 4888:21, 4888:22, 4895:7, 4895:9, 4899:8, 4899:10, 4900:17, 4905:8, 4905:13, 4905:15, 4906:17, 4906:21, 4906:24, 4907:3, 4907:11, 4907:14, 4907:15, 4920:19, 4921:13, 4925:14, 4925:15, 4927:4, 4929:11, 4929:23, 4930:7, 4930:17, 4931:7, 4931:15, 4931:18, 4932:3, 4932:17, 4932:23, 4932:24, 4938:23, 4939:2, 4939:4, 4939:8, 4939:12, 4939:15, 4940:7, 4940:10, 4940:15, 4941:2, 4941:19, 4942:3, 4948:1, 4950:25, 4951:2, 4951:3, 4951:8, 4952:2, 4952:10, 4952:22, 4953:2, 4953:5, 4961:6, 4961:9, 4961:10, 4961:13, 4961:19, 4961:21, 4962:6, 4970:10, 4970:11, 4970:12, 4975:24, 4976:23, 4978:1, 4978:4, 4978:7, 4978:13, 4978:17, 4978:20, 4978:24, 4979:3, 4979:4, 4980:14, 4980:19, 4980:25, 4981:5, 4981:7, 4981:9, 4981:14, 4982:10, 4982:19, 4982:24, 4983:3, 4984:3, 4984:5, 4984:6, 4984:7, 4984:8, 4984:10
**MS** [40] - 4808:10, 4825:12, 4828:13, 4829:1, 4837:2, 4839:2, 4839:8, 4841:8, 4842:4, 4843:21, 4844:2, 4851:1, 4855:9, 4855:10, 4856:24, 4857:6, 4867:24, 4869:3, 4870:3, 4871:1, 4871:16,

4873:5, 4873:6, 4876:6, 4876:17, 4878:2, 4878:5, 4879:2, 4880:11, 4881:7, 4882:6, 4882:8, 4888:18, 4889:1, 4895:5, 4899:11, 4906:19, 4930:10, 4981:6, 4984:4
**multiple** [2] - 4839:11, 4883:25
**Murray** [1] - 4874:1
**Myrick** [9] - 4810:25, 4924:20, 4924:25, 4925:4, 4925:16, 4925:20, 4926:5, 4927:17, 4929:2

# N

**N530TC** [1] - 4887:24
**Na'alehu** [1] - 4963:13
**Najam** [1] - 4963:19
**name** [16] - 4797:21, 4802:13, 4803:13, 4807:14, 4810:24, 4830:16, 4830:24, 4837:3, 4848:18, 4848:20, 4904:4, 4904:7, 4910:18, 4910:20, 4956:6, 4968:1
**named** [3] - 4861:19, 4861:25, 4944:3
**namely** [1] - 4887:22
**names** [2] - 4908:25, 4967:23
**Nath** [1] - 4911:9
**National** [4] - 4796:16, 4796:19, 4796:22, 4797:10
**nature** [1] - 4805:11
**near** [4] - 4916:6, 4945:3, 4954:24, 4981:2
**nearby** [1] - 4814:17
**nearing** [1] - 4921:10
**nearly** [1] - 4954:18
**necessary** [3] - 4901:1, 4932:21, 4938:10
**need** [19] - 4813:4, 4813:18, 4814:15, 4814:19, 4816:6, 4820:21, 4823:5, 4823:23, 4838:17, 4869:15, 4870:19, 4871:13, 4880:22, 4927:14, 4957:13,

4967:7, 4978:20, 4979:1, 4982:20
**needed** [8] - 4804:13, 4817:24, 4853:21, 4854:2, 4922:19, 4927:11, 4964:21, 4975:16
**needing** [2] - 4854:6, 4937:17
**needs** [2] - 4812:20, 4869:23
**negotiate** [3] - 4824:11, 4824:20, 4824:22
**negotiated** [1] - 4915:25
**negotiating** [3] - 4831:5, 4915:4, 4956:8
**negotiations** [3] - 4915:10, 4942:17, 4946:12
**neighborhood** [1] - 4916:13
**Neptune** [6] - 4821:3, 4821:7, 4833:20, 4833:23, 4834:3, 4945:25
**Nerguzian** [7] - 4945:25, 4946:3, 4946:7, 4946:10, 4946:13, 4946:22, 4949:16
**net** [1] - 4966:13
**network** [1] - 4966:13
**Nevada** [1] - 4956:20
**never** [12] - 4845:17, 4846:18, 4846:21, 4846:22, 4854:6, 4855:2, 4867:3, 4872:14, 4876:2, 4886:21, 4913:25, 4938:5
**NEW** [1] - 4789:1
**new** [5] - 4811:25, 4890:2, 4916:15, 4956:19, 4971:8
**New** [11] - 4789:14, 4789:22, 4797:7, 4830:7, 4830:9, 4830:18, 4831:25, 4904:11, 4926:8, 4944:1, 4944:23
**news** [1] - 4952:10
**News** [1] - 4926:9
**newspaper** [1] - 4806:6
**Next** [2] - 4835:18, 4844:7
**next** [16] - 4796:12,

4811:4, 4835:17, 4844:6, 4869:17, 4875:20, 4877:14, 4879:10, 4881:8, 4885:8, 4946:16, 4949:18, 4951:2, 4951:10, 4952:23, 4969:16
**NHL** [1] - 4797:16
**nice** [1] - 4835:17
**Nicholas** [2] - 4950:13, 4950:18
**nick** [1] - 4965:13
**night** [5] - 4791:7, 4792:9, 4792:21, 4793:15, 4980:9
**nine** [4] - 4884:25, 4938:24
**nobody** [2] - 4847:7, 4848:4
**Nolan** [6] - 4925:3, 4926:5, 4927:17, 4928:1, 4928:4, 4929:2
**nondisclosure** [1] - 4802:7
**none** [2] - 4790:22, 4925:22
**normal** [1] - 4896:24
**Norstrom** [3] - 4874:3, 4922:8, 4936:6
**North** [2] - 4797:11, 4971:5
**north** [4] - 4800:6, 4800:7, 4814:16, 4921:21
**Northern** [5] - 4801:5, 4801:8, 4802:4, 4846:5, 4846:7
**note** [7] - 4794:19, 4814:23, 4849:4, 4863:8, 4958:2, 4978:4, 4982:5
**noted** [1] - 4889:25
**notes** [9] - 4901:11, 4908:4, 4908:6, 4908:7, 4908:11, 4908:15, 4908:17, 4942:10
**nothing** [6] - 4791:12, 4791:14, 4938:2, 4955:12, 4965:24, 4982:6
**noticed** [2] - 4794:3, 4966:5
**notification** [1] - 4815:1
**notwithstanding** [2] - 4914:16, 4922:19
**November** [9] -

4822:10, 4823:16, 4824:24, 4825:2, 4935:10, 4936:20, 4938:16, 4940:1, 4974:8
**nowhere** [1] - 4981:2
**number** [18] - 4819:6, 4848:22, 4868:5, 4884:17, 4887:24, 4889:17, 4920:8, 4924:10, 4927:16, 4941:18, 4945:22, 4956:17, 4956:23, 4957:3, 4959:2, 4966:19, 4967:15, 4976:4
**numbers** [1] - 4892:5
**numerous** [1] - 4869:7
**NY** [1] - 4789:4

## O

**oath** [3] - 4795:11, 4894:16, 4907:8
**object** [3] - 4837:16, 4841:24, 4841:25
**objection** [44] - 4808:10, 4808:11, 4825:12, 4828:13, 4829:1, 4838:9, 4839:23, 4841:5, 4843:23, 4843:24, 4855:3, 4855:4, 4857:2, 4857:3, 4872:9, 4877:10, 4878:7, 4879:6, 4880:2, 4880:7, 4881:4, 4882:2, 4888:20, 4888:22, 4899:10, 4899:11, 4920:19, 4925:14, 4925:19, 4927:4, 4939:1, 4940:10, 4940:11, 4940:12, 4950:25, 4951:8, 4952:14, 4952:20, 4961:9, 4961:10, 4962:6, 4970:11, 4970:12, 4978:7
**objectives** [1] - 4818:21
**objects** [1] - 4940:7
**obligated** [1] - 4960:8
**obligation** [3] - 4792:12, 4960:10, 4978:18
**Obligations** [1] - 4970:17
**obtain** [2] - 4881:2, 4965:20
**obtained** [1] - 4955:25

**obtaining** [2] - 4880:8, 4896:8
**obviously** [6] - 4798:10, 4813:17, 4818:11, 4929:24, 4981:23, 4982:1
**occasion** [1] - 4976:12
**occasionally** [1] - 4897:1
**occasions** [8] - 4897:3, 4897:10, 4902:21, 4943:8, 4943:9, 4976:4, 4976:5, 4976:13
**occurred** [6] - 4814:1, 4814:7, 4832:5, 4889:5, 4956:12, 4967:13
**oceanfront** [1] - 4972:18
**October** [8] - 4849:3, 4849:4, 4849:20, 4851:3, 4851:4, 4851:20, 4888:16, 4971:24
**OF** [3] - 4789:1, 4789:3, 4789:9
**offer** [6] - 4839:19, 4841:2, 4899:8, 4916:19, 4928:6, 4971:25
**offered** [1] - 4934:16
**office** [5] - 4830:20, 4872:2, 4878:21, 4904:15, 4946:24
**offices** [3] - 4904:10, 4910:12, 4937:5
**often** [2] - 4836:17, 4976:6
**Ohio** [1] - 4922:22
**old** [1] - 4797:13
**Oliver** [1] - 4944:3
**Oliveras** [1] - 4872:20
**OLIVERAS** [1] - 4789:18
**once** [5] - 4814:23, 4823:23, 4835:8, 4897:1, 4915:16
**one** [83] - 4792:10, 4792:17, 4794:1, 4799:13, 4799:24, 4800:6, 4806:4, 4806:22, 4810:24, 4814:16, 4821:9, 4823:16, 4834:1, 4835:13, 4835:25, 4837:4, 4837:8, 4842:8, 4842:22, 4858:8, 4859:21,

4860:19, 4860:25, 4861:5, 4861:10, 4862:19, 4865:10, 4865:13, 4867:4, 4867:6, 4867:22, 4878:18, 4878:19, 4878:24, 4884:8, 4884:11, 4884:23, 4886:18, 4895:4, 4896:25, 4908:16, 4909:1, 4909:2, 4909:17, 4910:11, 4914:15, 4918:8, 4919:11, 4920:23, 4921:11, 4922:5, 4922:12, 4923:4, 4923:9, 4923:22, 4924:14, 4925:17, 4929:19, 4930:4, 4930:19, 4936:1, 4939:2, 4939:19, 4939:24, 4941:2, 4941:14, 4942:4, 4944:8, 4949:20, 4952:15, 4956:8, 4956:21, 4962:12, 4968:15, 4972:17, 4976:1, 4976:3, 4978:1, 4981:15, 4982:13
**One** [1] - 4789:13
**ones** [1] - 4909:17
**ongoing** [8] - 4915:1, 4920:9, 4923:23, 4926:4, 4949:17, 4954:8, 4955:14, 4971:18
**open** [11] - 4841:1, 4845:20, 4846:7, 4878:1, 4882:1, 4929:1, 4942:1, 4953:1, 4978:11, 4978:21, 4980:1
**opened** [3] - 4801:15, 4801:19, 4946:24
**opening** [1] - 4982:17
**operate** [1] - 4887:21
**operating** [12] - 4792:2, 4792:3, 4811:25, 4829:17, 4832:23, 4875:6, 4884:4, 4884:16, 4886:9, 4886:11, 4887:13, 4888:2
**operations** [3] - 4913:17, 4915:3, 4926:13
**opinion** [4] - 4819:13, 4836:21, 4838:9, 4927:14

**opportunity** [6] - 4790:10, 4862:20, 4948:21, 4949:8, 4949:19, 4967:10
**opposed** [2] - 4928:12, 4937:14
**opposing** [1] - 4880:12
**option** [1] - 4859:23
**Order** [1] - 4790:1
**order** [10] - 4792:12, 4792:22, 4795:1, 4900:22, 4915:20, 4916:17, 4917:21, 4945:3, 4953:23, 4963:5
**original** [10] - 4801:10, 4818:4, 4826:11, 4914:8, 4934:20, 4934:23, 4949:20, 4957:22, 4959:17, 4974:2
**originally** [12] - 4814:14, 4824:21, 4830:6, 4856:14, 4857:23, 4864:18, 4865:20, 4915:17, 4925:4, 4928:13, 4934:9, 4959:19
**originating** [1] - 4920:8
**otherwise** [2] - 4806:22, 4834:4
**Ottawa** [3] - 4797:1, 4903:8, 4903:9
**outcome** [2] - 4824:18, 4889:7
**outgoing** [1] - 4933:19
**outside** [3] - 4870:22, 4912:2, 4966:24
**outstanding** [1] - 4891:23
**overall** [2] - 4891:10, 4953:25
**Overruled** [2] - 4828:14, 4829:2
**overruled** [6] - 4841:5, 4920:20, 4927:5, 4940:12, 4952:21, 4962:7
**overruling** [1] - 4881:4
**overstate** [1] - 4955:7
**overt** [1] - 4871:11
**overtly** [1] - 4869:4
**owed** [3] - 4864:9, 4962:16, 4973:21
**Owen** [3] - 4925:3, 4926:5, 4929:2
**own** [7] - 4823:9, 4855:15, 4887:21,

4914:9, 4943:7, 4957:15, 4971:4
**owned** [3] - 4861:19, 4861:22, 4862:1
**owner** [1] - 4956:24
**owners** [1] - 4959:6
**ownership** [6] - 4812:1, 4883:11, 4887:3, 4889:9, 4896:8, 4896:15
**owns** [1] - 4889:24

## P

**p.m** [1] - 4974:21
**page** [28] - 4815:10, 4822:9, 4837:18, 4840:2, 4849:12, 4850:2, 4851:14, 4860:8, 4868:6, 4875:1, 4875:20, 4877:14, 4879:10, 4881:8, 4882:9, 4885:8, 4888:12, 4936:4, 4940:18, 4941:21, 4947:6, 4949:14, 4950:1, 4950:2, 4950:5, 4951:10, 4952:23, 4969:16
**pages** [2] - 4908:7, 4949:4
**paid** [19] - 4825:11, 4839:3, 4844:16, 4858:15, 4858:16, 4863:11, 4867:3, 4874:8, 4886:1, 4891:16, 4891:18, 4959:18, 4962:3, 4964:25, 4965:10, 4965:14, 4965:16, 4965:20, 4965:25
**Palm** [4] - 4812:15, 4837:9, 4841:10, 4929:5
**Palms** [14] - 4812:3, 4812:13, 4839:9, 4841:10, 4890:9, 4921:12, 4926:20, 4956:9, 4956:12, 4956:22, 4957:2, 4957:13, 4959:7
**Panama** [2] - 4903:2
**Paolo** [1] - 4939:20
**paperwork** [1] - 4874:15
**paramount** [1] - 4971:19
**parcel** [12] - 4966:8, 4966:10, 4966:22, 4972:14, 4972:18,

4972:23, 4973:1, 4973:5, 4973:23, 4975:4, 4975:8
**parcels** [1] - 4975:10
**pardon** [2] - 4910:9, 4953:20
**Paredes** [1] - 4936:2
**Park** [3] - 4812:2, 4812:24, 4813:1
**part** [32] - 4794:17, 4806:6, 4813:21, 4832:5, 4833:2, 4833:17, 4834:13, 4859:22, 4865:19, 4882:16, 4882:17, 4882:20, 4917:8, 4922:4, 4922:7, 4922:17, 4923:23, 4924:17, 4924:20, 4924:25, 4925:20, 4929:25, 4932:5, 4945:21, 4949:15, 4952:3, 4953:25, 4954:14, 4965:16, 4978:19
**participants** [1] - 4832:15
**participate** [6] - 4830:11, 4831:7, 4838:11, 4946:4, 4967:10, 4968:12
**participated** [3] - 4904:14, 4943:22, 4946:9
**participation** [1] - 4905:4
**particular** [11] - 4821:22, 4838:12, 4838:24, 4873:23, 4901:16, 4925:7, 4929:22, 4940:4, 4959:14, 4975:3, 4976:18
**particularly** [2] - 4973:16, 4981:15
**parties** [1] - 4927:17
**partly** [1] - 4865:25
**partner** [3] - 4948:5, 4968:10, 4971:7
**partners** [9] - 4880:20, 4883:15, 4883:20, 4914:1, 4944:2, 4944:8, 4963:4, 4966:25, 4971:2
**Partners** [11] - 4874:12, 4874:16, 4875:4, 4883:4, 4883:21, 4884:4, 4886:12, 4887:6, 4887:7, 4887:9,

4887:14
**party** [1] - 4950:15
**past** [3] - 4892:10, 4894:5, 4950:19
**patent** [2] - 4831:19, 4833:8
**patents** [4] - 4820:20, 4820:21, 4834:14, 4834:15
**pause** [3] - 4939:5, 4948:23, 4949:13
**Pause** [1] - 4874:25
**pay** [20] - 4810:14, 4810:17, 4820:18, 4826:15, 4826:19, 4827:2, 4835:9, 4851:23, 4860:18, 4861:2, 4861:8, 4865:21, 4868:19, 4873:19, 4885:4, 4913:24, 4936:12, 4942:20, 4959:23, 4978:18
**paychecks** [1] - 4958:5
**paydown** [2] - 4866:20, 4866:25
**paying** [12] - 4810:10, 4856:15, 4860:20, 4860:22, 4867:4, 4916:21, 4923:3, 4936:14, 4942:12, 4955:4, 4972:9, 4973:21
**payment** [29] - 4816:12, 4835:9, 4859:21, 4860:9, 4860:10, 4861:1, 4861:2, 4861:3, 4867:4, 4891:2, 4906:5, 4906:11, 4911:23, 4915:20, 4935:17, 4936:8, 4941:17, 4942:13, 4942:23, 4955:18, 4955:21, 4958:8, 4959:23, 4960:12, 4960:13, 4960:18, 4960:19, 4961:14, 4961:15
**payments** [36] - 4801:21, 4801:24, 4812:19, 4812:20, 4813:13, 4813:15, 4814:24, 4816:8, 4816:11, 4816:13, 4819:17, 4835:24, 4860:8, 4861:10, 4863:16, 4863:19, 4864:17, 4864:19,

4864:20, 4864:21, 4864:25, 4891:4, 4891:20, 4905:22, 4915:13, 4915:18, 4935:13, 4936:19, 4942:16, 4958:18, 4959:20, 4960:5, 4962:24, 4963:3, 4963:8, 4976:16
**Peca** [4] - 4873:17, 4904:21, 4922:22, 4945:24
**Penguins** [2] - 4797:1, 4843:7
**Pennsylvania** [2] - 4805:5, 4903:10
**people** [24] - 4800:13, 4802:25, 4814:4, 4814:13, 4814:15, 4814:19, 4816:9, 4874:5, 4882:20, 4883:25, 4884:23, 4887:2, 4888:3, 4889:20, 4905:2, 4913:21, 4924:16, 4925:1, 4943:19, 4944:15, 4965:6, 4966:13, 4968:21, 4975:19
**per** [3] - 4810:1, 4857:17, 4915:20
**percent** [15] - 4858:2, 4858:3, 4858:4, 4858:8, 4858:9, 4858:10, 4858:12, 4858:22, 4859:17, 4905:21, 4905:24, 4958:9, 4971:17, 4973:2
**percentage** [10] - 4799:8, 4812:8, 4812:11, 4822:1, 4822:25, 4853:9, 4855:22, 4892:16, 4896:8, 4896:15
**Peredes** [1] - 4936:15
**perform** [2] - 4828:9, 4828:17
**perhaps** [3] - 4896:16, 4915:19, 4978:9
**period** [12] - 4863:20, 4864:22, 4911:19, 4911:20, 4915:24, 4916:5, 4919:8, 4921:16, 4927:12, 4936:15, 4957:14, 4964:7
**permissible** [1] - 4952:20
**permission** [5] -

4823:13, 4825:10, 4858:24, 4859:11, 4859:15
**permit** [2] - 4832:4, 4956:20
**person** [8] - 4797:21, 4803:13, 4830:16, 4852:19, 4867:6, 4876:3, 4925:2
**personal** [26] - 4813:17, 4814:23, 4815:22, 4816:19, 4816:23, 4817:23, 4817:25, 4823:9, 4825:11, 4853:22, 4854:3, 4854:7, 4854:11, 4855:16, 4867:4, 4891:12, 4894:10, 4903:14, 4903:15, 4913:15, 4921:23, 4924:6, 4936:17, 4958:4, 4961:3, 4968:7
**personally** [7] - 4864:16, 4864:23, 4870:16, 4890:23, 4908:2, 4913:6, 4971:2
**perspective** [6] - 4838:22, 4898:25, 4901:18, 4915:8, 4915:13, 4931:8
**pertain** [1] - 4930:13
**Petersburg** [1] - 4902:23
**Phil** [55] - 4797:21, 4798:13, 4800:10, 4800:20, 4801:9, 4802:21, 4804:12, 4810:15, 4810:20, 4812:16, 4812:19, 4814:6, 4814:14, 4816:6, 4816:15, 4829:20, 4829:24, 4830:15, 4836:5, 4839:9, 4843:15, 4844:3, 4846:23, 4854:12, 4856:20, 4864:21, 4864:24, 4867:10, 4895:12, 4895:13, 4896:7, 4896:20, 4896:23, 4897:6, 4897:12, 4897:17, 4897:18, 4897:24, 4898:2, 4898:10, 4898:11, 4898:18, 4898:21, 4899:20, 4900:8, 4901:10, 4901:16, 4902:21, 4902:22,

4903:1, 4903:16, 4904:3, 4904:14, 4905:4
**PHILIP** [1] - 4789:5
**PHILLIP** [3] - 4789:5, 4931:23, 4984:9
**Phoenix** [2] - 4878:21, 4969:10
**phone** [19] - 4819:7, 4828:21, 4830:6, 4832:8, 4832:9, 4832:12, 4832:13, 4832:23, 4859:7, 4897:2, 4900:3, 4900:5, 4900:7, 4922:8, 4934:10, 4944:21, 4944:25, 4946:9, 4947:5
**phrase** [1] - 4811:4
**phrases** [1] - 4964:4
**physically** [3] - 4791:12, 4916:17, 4947:5
**pick** [1] - 4837:6
**picked** [1] - 4864:21
**picking** [2] - 4942:22, 4942:23
**Picture** [1] - 4843:14
**picture** [3] - 4844:5, 4930:1, 4936:23
**piece** [4] - 4791:3, 4794:18, 4800:21, 4869:24
**pieces** [1] - 4800:5
**Pierrepont** [1] - 4789:13
**Pittsburgh** [6] - 4797:1, 4805:5, 4824:10, 4843:6, 4867:16, 4903:10
**PK** [1] - 4973:13
**place** [16] - 4824:7, 4832:2, 4832:24, 4876:1, 4878:1, 4880:1, 4882:1, 4900:2, 4904:10, 4917:14, 4934:22, 4952:1, 4953:1, 4955:12, 4971:4, 4977:1
**Place** [2] - 4812:3, 4956:22
**placed** [1] - 4966:21
**places** [3] - 4791:8, 4791:10, 4956:21
**plan** [5] - 4805:18, 4846:14, 4924:20, 4953:25, 4964:13
**plane** [18] - 4813:11, 4813:13, 4813:14,

4816:16, 4835:21, 4865:14, 4880:20, 4883:10, 4885:6, 4887:10, 4890:18, 4890:20, 4891:22, 4893:2, 4913:17, 4916:1, 4928:19, 4942:21

**planes** [9] - 4814:15, 4814:21, 4815:3, 4816:7, 4862:22, 4862:24, 4865:10, 4885:5, 4913:19

**planning** [2] - 4929:23, 4975:6

**plans** [4] - 4831:20, 4966:9, 4974:6, 4975:8

**play** [6] - 4791:13, 4791:22, 4796:13, 4796:14, 4797:7, 4797:11

**played** [10] - 4794:7, 4796:19, 4796:22, 4796:24, 4796:25, 4797:12, 4797:13, 4797:14, 4797:15, 4941:9

**player** [7] - 4842:19, 4842:20, 4904:2, 4918:3, 4922:14, 4923:12, 4925:25

**Player** [1] - 4791:15

**players** [42] - 4804:16, 4808:1, 4812:15, 4813:2, 4813:4, 4819:11, 4828:11, 4830:7, 4839:14, 4861:22, 4866:16, 4866:20, 4866:25, 4874:6, 4884:1, 4885:1, 4885:4, 4886:1, 4889:10, 4893:4, 4902:25, 4904:18, 4917:7, 4917:12, 4918:16, 4918:17, 4918:23, 4919:14, 4919:16, 4919:18, 4920:3, 4920:4, 4922:5, 4924:23, 4925:17, 4926:21, 4927:2, 4928:22, 4930:1, 4932:11, 4948:3, 4981:20

**players'** [1] - 4925:8

**playing** [6] - 4791:2, 4794:4, 4794:10, 4797:10, 4797:13, 4798:7

**Plaza** [2] - 4789:13, 4789:21

**pleasure** [1] - 4905:9

**plus** [4] - 4915:19, 4956:14, 4959:18, 4972:12

**pm** [1] - 4931:2

**point** [57] - 4793:5, 4794:2, 4805:12, 4807:16, 4809:16, 4810:19, 4823:12, 4828:23, 4833:10, 4833:19, 4837:8, 4842:15, 4849:2, 4858:2, 4861:25, 4874:14, 4883:13, 4883:14, 4895:21, 4905:20, 4914:18, 4916:13, 4916:14, 4920:15, 4921:21, 4923:2, 4924:21, 4934:1, 4934:14, 4934:16, 4934:19, 4936:3, 4937:11, 4938:1, 4941:12, 4942:5, 4942:23, 4943:8, 4943:12, 4944:12, 4949:19, 4950:8, 4954:25, 4957:8, 4958:1, 4959:6, 4959:11, 4960:8, 4962:18, 4962:22, 4964:14, 4964:21, 4973:15, 4973:20, 4973:23, 4974:5, 4975:5

**pointed** [1] - 4909:6

**pointing** [1] - 4882:17

**points** [3] - 4857:17, 4857:22, 4929:22

**portfolio** [5] - 4798:24, 4801:14, 4846:9, 4848:11, 4849:8

**portion** [14] - 4790:11, 4818:14, 4820:25, 4882:4, 4907:20, 4928:24, 4934:8, 4943:10, 4955:23, 4961:22, 4974:16, 4974:17, 4982:5, 4982:7

**portions** [4] - 4790:8, 4791:20, 4794:5, 4794:13

**position** [9] - 4900:10, 4911:11, 4913:18, 4943:20, 4943:25, 4959:14, 4971:24, 4978:11, 4982:8

**positions** [1] - 4926:9

**possessed** [1] - 4925:9

**possession** [1] - 4916:2

**possibility** [2] - 4911:18, 4967:24

**possible** [2] - 4906:25, 4912:10

**possibly** [2] - 4933:8, 4980:21

**potential** [4] - 4913:20, 4953:24, 4967:16, 4971:19

**potentially** [5] - 4876:21, 4968:7, 4971:2, 4971:6, 4973:25

**PR** [6] - 4806:3, 4806:9, 4806:10, 4811:4, 4811:7, 4926:6

**pR** [1] - 4806:11

**practice** [1] - 4925:7

**Practice** [1] - 4911:13

**preceded** [1] - 4981:22

**preferred** [1] - 4905:21

**preliminary** [1] - 4967:4

**prepared** [2] - 4907:23, 4920:24

**preparing** [3] - 4792:24, 4908:14, 4957:23

**presence** [4] - 4793:21, 4870:22, 4926:25, 4931:20

**present** [6] - 4805:6, 4854:12, 4873:2, 4873:9, 4904:19, 4947:4

**presented** [9] - 4800:9, 4800:20, 4805:20, 4814:6, 4814:14, 4848:5, 4868:4, 4868:7, 4978:22

**presently** [1] - 4796:7

**preserving** [1] - 4953:13

**pretrial** [1] - 4914:7

**pretty** [2] - 4835:21, 4937:9

**previous** [2] - 4942:15, 4946:6

**previously** [8] - 4891:7, 4910:12, 4924:1, 4924:7,

4931:24, 4941:5, 4967:19, 4971:15

**primarily** [2] - 4919:2, 4962:15

**primary** [1] - 4912:25

**principal** [2] - 4912:22, 4962:17

**principals** [2] - 4969:8, 4975:2

**printing** [1] - 4868:14

**private** [2] - 4887:21, 4924:16

**privilege** [8] - 4876:11, 4876:15, 4876:20, 4876:22, 4876:23, 4877:12, 4881:1, 4881:3

**privileged** [8] - 4876:5, 4876:6, 4877:2, 4877:4, 4880:5, 4880:16, 4880:23, 4880:24

**Privitello** [8] - 4950:13, 4950:14, 4950:18, 4951:5, 4952:4, 4953:7, 4953:16, 4953:21

**problem** [10] - 4790:20, 4791:16, 4793:8, 4794:6, 4796:5, 4812:22, 4813:18, 4867:5, 4917:7, 4917:22

**problems** [2] - 4853:17, 4918:5

**procedure** [6] - 4918:21, 4919:15, 4920:14, 4922:17, 4934:6, 4934:21

**Proceedings** [1] - 4789:25

**proceedings** [5] - 4874:25, 4939:5, 4948:23, 4949:13, 4983:4

**proceeds** [1] - 4958:3

**process** [1] - 4945:25

**produce** [3] - 4982:7, 4982:9, 4982:23

**produced** [4] - 4789:25, 4876:17, 4930:16, 4965:24

**profession** [3] - 4900:14, 4900:20, 4900:24

**professional** [9] - 4796:16, 4842:18, 4842:19, 4866:20, 4866:25, 4870:15, 4874:5, 4884:1,

4884:25

**program** [1] - 4794:23

**progress** [2] - 4818:20, 4818:21

**progression** [1] - 4798:19

**project** [24] - 4801:16, 4802:22, 4804:20, 4812:2, 4812:24, 4813:1, 4849:18, 4895:15, 4895:16, 4895:19, 4895:23, 4896:9, 4913:22, 4954:13, 4954:19, 4954:20, 4958:18, 4965:20, 4967:17, 4967:18, 4968:25, 4972:4, 4972:13, 4976:19

**Project** [1] - 4970:17

**projects** [14] - 4799:23, 4814:16, 4860:18, 4912:5, 4912:11, 4954:4, 4963:22, 4963:25, 4964:12, 4966:6, 4967:25, 4969:13, 4970:6, 4975:1

**promise** [4] - 4905:16, 4907:4, 4963:15, 4974:2

**promising** [3] - 4852:16, 4855:13, 4899:23

**promissory** [2] - 4958:2, 4978:4

**pronouncing** [1] - 4827:16

**proper** [2] - 4827:10, 4943:2

**properly** [2] - 4938:11, 4953:19

**properties** [4] - 4800:8, 4847:15, 4847:16, 4847:22

**property** [7] - 4800:21, 4813:9, 4813:10, 4814:20, 4816:9, 4915:1, 4955:8

**proportionate** [1] - 4810:8

**proposal** [2] - 4927:16, 4970:18

**proposed** [7] - 4913:2, 4913:6, 4927:25, 4956:18, 4966:23, 4967:17, 4968:8

**proposing** [1] - 4857:18

**prosecution** [1] -

4971:10
**prosecutors** [1] - 4837:4
**prospective** [1] - 4857:18
**protective** [4] - 4811:10, 4811:16, 4926:12, 4926:21
**provide** [3] - 4824:5, 4872:3, 4982:14
**provided** [9] - 4835:5, 4858:2, 4880:17, 4907:25, 4908:8, 4914:7, 4930:19, 4938:9, 4944:6
**providing** [1] - 4938:17
**public** [6] - 4806:12, 4926:6, 4926:10, 4936:23, 4937:15, 4950:9
**publicly** [2] - 4902:10, 4949:23
**publishing** [2] - 4882:6, 4889:1
**pull** [1] - 4795:18
**purchase** [2] - 4957:6, 4972:19
**purchased** [1] - 4914:5
**purchasing** [3] - 4834:8, 4914:2, 4928:13
**purported** [1] - 4909:9
**purpose** [11] - 4805:14, 4823:21, 4827:20, 4905:3, 4909:7, 4914:10, 4919:3, 4920:6, 4920:7, 4926:10, 4970:22
**purposes** [7] - 4791:20, 4821:9, 4887:20, 4895:22, 4899:15, 4953:11, 4982:12
**pursuant** [7] - 4913:4, 4913:14, 4922:25, 4934:21, 4960:13, 4962:11, 4963:5
**pursue** [4] - 4831:18, 4915:6, 4924:8, 4924:14
**pursuing** [1] - 4937:17
**pushing** [2] - 4975:5, 4975:6
**put** [47] - 4793:11, 4801:13, 4804:13, 4804:15, 4804:16, 4804:17, 4806:7,

4811:8, 4812:6, 4812:7, 4813:2, 4813:5, 4813:10, 4813:16, 4815:22, 4820:19, 4820:20, 4827:4, 4852:22, 4853:1, 4856:17, 4858:11, 4863:1, 4865:13, 4866:3, 4866:7, 4866:14, 4867:13, 4890:1, 4890:3, 4892:3, 4893:3, 4893:11, 4908:3, 4908:17, 4909:23, 4921:23, 4926:8, 4933:14, 4934:18, 4935:9, 4945:16, 4955:11, 4959:14, 4960:9, 4967:5, 4981:2
**putting** [9] - 4801:10, 4805:21, 4812:10, 4826:14, 4827:3, 4829:9, 4866:13, 4884:21, 4924:13

## Q

**qualify** [1] - 4931:11
**Quebec** [1] - 4928:8
**questioning** [1] - 4799:18
**questions** [27] - 4799:9, 4809:22, 4813:23, 4819:10, 4819:14, 4826:5, 4827:9, 4830:13, 4836:23, 4868:23, 4895:5, 4897:6, 4897:7, 4897:11, 4897:12, 4897:16, 4897:19, 4903:25, 4905:16, 4906:3, 4906:4, 4906:17, 4909:4, 4936:7, 4961:25, 4963:21, 4976:2
**quick** [2] - 4923:19, 4952:2
**quickly** [2] - 4810:1, 4933:11
**Quicktime** [1] - 4791:3
**quite** [2] - 4900:19, 4943:23

## R

**Rae** [1] - 4965:7
**raised** [2] - 4827:9, 4937:12
**random** [3] - 4791:10,

4794:9, 4794:22
**Ranford** [8] - 4904:23, 4933:1, 4933:16, 4933:20, 4934:9, 4934:14, 4934:18, 4935:5
**range** [1] - 4967:7
**ranged** [1] - 4926:12
**Rangers** [1] - 4797:7
**rank** [2] - 4838:9, 4838:12
**rather** [1] - 4978:8
**ratio** [1] - 4958:9
**reached** [3] - 4802:4, 4957:5, 4966:19
**read** [12] - 4808:25, 4809:2, 4809:17, 4810:1, 4856:6, 4889:4, 4890:4, 4911:21, 4955:2, 4974:14, 4980:8, 4981:21
**reading** [4] - 4812:12, 4815:14, 4817:6, 4923:13, 4970:21, 4970:24
**ready** [1] - 4792:25
**real** [23] - 4799:3, 4799:10, 4799:19, 4799:21, 4800:9, 4800:15, 4800:19, 4812:2, 4812:9, 4844:25, 4845:6, 4846:10, 4847:12, 4910:23, 4911:15, 4921:18, 4956:15, 4956:16, 4964:18, 4969:5, 4969:9, 4971:4, 4971:10
**realize** [1] - 4978:14
**really** [9] - 4834:15, 4868:22, 4876:12, 4901:4, 4901:16, 4941:7, 4952:11, 4971:23, 4982:6
**reason** [5] - 4870:3, 4873:23, 4877:9, 4933:25, 4982:3
**reasonable** [2] - 4818:2, 4823:6
**reasonably** [1] - 4966:25
**reasons** [5] - 4823:4, 4823:24, 4860:16, 4972:18, 4982:14
**recalled** [1] - 4910:12
**receive** [6] - 4819:6, 4894:5, 4916:14, 4921:2, 4948:8, 4949:19

**received** [28] - 4802:5, 4806:18, 4806:23, 4808:9, 4808:15, 4808:18, 4814:23, 4815:1, 4817:14, 4863:8, 4863:10, 4863:13, 4872:1, 4888:24, 4894:19, 4899:14, 4906:5, 4922:21, 4925:24, 4928:23, 4935:5, 4938:25, 4948:9, 4958:5, 4961:7, 4970:10, 4970:15, 4974:7
**receiving** [9] - 4808:6, 4811:19, 4818:20, 4833:19, 4860:13, 4860:15, 4908:1, 4949:11, 4957:17
**recess** [4] - 4871:19, 4871:20, 4930:8, 4930:22
**recipient** [2] - 4948:12, 4948:13
**recipients** [1] - 4949:21
**recognize** [10] - 4808:2, 4815:7, 4841:14, 4843:11, 4856:8, 4888:10, 4932:9, 4960:25, 4968:23, 4969:3
**recognized** [1] - 4926:17
**recollection** [15] - 4817:6, 4817:9, 4821:5, 4906:7, 4908:17, 4911:4, 4912:3, 4912:8, 4918:7, 4923:4, 4927:8, 4937:6, 4946:5, 4968:15, 4970:24
**recommend** [1] - 4828:2
**recommendation** [1] - 4899:21
**recommended** [1] - 4828:3
**recommending** [2] - 4855:12, 4899:25
**reconsolidation** [1] - 4975:8
**record** [12] - 4790:9, 4790:25, 4841:2, 4871:4, 4872:18, 4878:3, 4889:4, 4894:16, 4899:15, 4903:20, 4910:3,

4923:7
**recorded** [1] - 4789:25
**recording** [13] - 4790:5, 4790:16, 4790:17, 4791:1, 4791:12, 4791:13, 4791:15, 4791:17, 4794:4, 4794:8, 4794:10, 4794:13, 4794:20
**recordings** [1] - 4794:17
**records** [3] - 4828:7, 4893:16, 4914:6
**recount** [1] - 4913:10
**recover** [1] - 4959:1
**recovered** [1] - 4802:3
**redact** [1] - 4876:9
**redacted** [3] - 4879:2, 4879:5, 4882:5
**redaction** [1] - 4881:5
**REDIRECT** [2] - 4905:14, 4984:7
**redirect** [6] - 4872:16, 4905:12, 4931:6, 4931:8, 4931:13, 4980:4
**reduce** [1] - 4907:20
**refer** [2] - 4915:7, 4943:24
**reference** [13] - 4818:4, 4883:20, 4886:6, 4889:20, 4903:14, 4929:5, 4933:3, 4933:4, 4933:7, 4949:17, 4950:2, 4970:20, 4975:13
**referenced** [2] - 4913:19, 4974:18
**references** [2] - 4973:11, 4974:10
**referencing** [1] - 4912:1
**referred** [2] - 4886:6, 4921:11
**referring** [9] - 4812:14, 4812:25, 4825:19, 4861:15, 4899:17, 4911:23, 4948:25, 4949:2, 4975:23
**refers** [1] - 4981:15
**reflected** [1] - 4939:24
**reflecting** [1] - 4812:1
**refresh** [4] - 4821:5, 4894:2, 4906:7, 4912:2
**refreshes** [1] - 4911:4
**refurbish** [1] - 4889:9

refused [3] - 4901:17, 4928:5, 4942:21
regard [6] - 4824:19, 4825:17, 4908:11, 4911:17, 4925:16, 4978:21
regarding [24] - 4805:24, 4823:13, 4826:5, 4827:10, 4828:24, 4832:24, 4833:20, 4833:23, 4868:18, 4897:17, 4899:21, 4907:22, 4917:3, 4927:15, 4938:6, 4941:3, 4946:23, 4956:12, 4962:19, 4967:11, 4968:24, 4970:5, 4980:8, 4981:10
regards [22] - 4799:15, 4817:17, 4823:8, 4824:2, 4824:16, 4831:14, 4834:18, 4908:10, 4909:5, 4909:6, 4912:7, 4913:1, 4918:4, 4918:16, 4921:6, 4933:12, 4935:14, 4937:3, 4953:17, 4956:5, 4963:9, 4966:5
region [2] - 4969:5, 4969:10
registration [1] - 4887:24
regular [1] - 4818:18
regularly [2] - 4818:23, 4831:3
rejecting [1] - 4982:14
rejection [1] - 4981:24
relate [2] - 4805:11, 4924:23
related [3] - 4889:20, 4891:8, 4912:10
relates [9] - 4792:2, 4838:14, 4896:15, 4897:6, 4898:19, 4903:18, 4903:22, 4941:17, 4982:21
relations [3] - 4806:12, 4926:6, 4926:11
relationship [18] - 4798:16, 4798:20, 4818:9, 4836:13, 4836:15, 4836:20, 4896:19, 4896:22, 4896:24, 4898:2, 4898:7, 4898:10, 4909:9, 4909:18,

4946:6, 4976:15, 4978:19
relationships [2] - 4920:11, 4971:3
release [1] - 4942:21
released [1] - 4921:19
relevance [3] - 4839:7, 4839:8, 4978:16
relevant [1] - 4839:17
religion [1] - 4836:17
reluctant [1] - 4936:22
reluctantly [1] - 4937:22
remain [1] - 4795:11
remainder [3] - 4825:22, 4825:25, 4944:5
remember [99] - 4799:17, 4800:22, 4801:22, 4805:8, 4805:12, 4810:19, 4810:22, 4812:18, 4813:3, 4814:17, 4815:5, 4815:14, 4818:1, 4819:3, 4820:17, 4821:24, 4822:23, 4822:24, 4823:11, 4823:15, 4823:25, 4825:8, 4825:16, 4826:3, 4826:4, 4829:12, 4830:18, 4830:21, 4830:23, 4831:17, 4836:4, 4841:13, 4841:14, 4841:16, 4841:19, 4841:20, 4842:7, 4842:9, 4842:10, 4843:16, 4844:20, 4848:16, 4848:20, 4853:14, 4855:14, 4855:17, 4856:22, 4857:1, 4858:13, 4859:10, 4860:19, 4860:20, 4861:5, 4861:6, 4861:24, 4862:10, 4862:18, 4865:10, 4873:10, 4873:20, 4873:22, 4874:17, 4874:20, 4875:9, 4875:11, 4875:12, 4875:13, 4878:19, 4887:9, 4887:11, 4890:15, 4893:9, 4893:12, 4893:15, 4893:25, 4894:13, 4894:15, 4896:3, 4900:2, 4903:9, 4904:4, 4904:14, 4904:18, 4904:23,

4904:24, 4906:3, 4906:4, 4912:3, 4933:5, 4935:21, 4936:14, 4948:2, 4950:16, 4967:23, 4968:6, 4969:1, 4976:18
remembers [1] - 4838:7
remind [1] - 4952:16
remove [2] - 4907:15, 4950:3
removed [3] - 4816:19, 4949:24, 4950:10
reneged [1] - 4916:19
reneging [1] - 4963:14
rent [2] - 4942:12, 4942:13
rentals [1] - 4913:23
repairs [2] - 4914:11, 4914:12
repay [5] - 4817:23, 4962:16, 4963:15, 4974:3, 4976:6
repeat [1] - 4945:8
rephrase [1] - 4855:9
replay [3] - 4790:11, 4791:20, 4794:12
replicated [1] - 4791:7
reporter [1] - 4868:13
Reporter [1] - 4789:20
reports [3] - 4818:20, 4898:6, 4955:2
represent [5] - 4791:11, 4810:16, 4824:10, 4878:23, 4895:12
representation [5] - 4849:9, 4913:14, 4936:12, 4945:20, 4948:6
representative [1] - 4871:11
represented [1] - 4914:1
representing [5] - 4878:16, 4925:8, 4926:3, 4935:18, 4944:10
request [7] - 4793:6, 4882:4, 4919:24, 4934:25, 4945:16, 4967:4, 4968:19
requests [3] - 4822:3, 4910:13, 4982:17
required [4] - 4900:23, 4914:13, 4957:11, 4958:8
reside [2] - 4796:7,

4796:9
residential [5] - 4956:16, 4956:17, 4956:20, 4956:23, 4968:11
resolution [1] - 4917:8
resolve [1] - 4917:22
resolved [1] - 4972:6
Resorts [1] - 4911:13
resources [1] - 4915:3
respect [14] - 4838:21, 4872:14, 4889:6, 4914:2, 4914:13, 4924:3, 4926:18, 4955:8, 4957:3, 4972:6, 4982:4
respond [2] - 4796:2, 4921:2
responded [3] - 4809:6, 4809:9, 4890:8
responding [1] - 4819:14
response [1] - 4904:6
responses [1] - 4932:11
responsibility [2] - 4912:25, 4914:20
responsible [5] - 4824:3, 4891:24, 4892:1, 4913:3, 4959:10
rest [8] - 4801:12, 4825:6, 4883:10, 4915:12, 4945:1, 4980:5, 4980:15, 4981:3
restated [1] - 4887:13
restating [1] - 4884:3
restaurant [1] - 4918:24
result [20] - 4794:10, 4894:22, 4896:6, 4900:9, 4900:20, 4900:23, 4908:1, 4915:14, 4920:24, 4921:18, 4921:24, 4924:13, 4927:12, 4927:16, 4937:24, 4957:5, 4959:13, 4963:14, 4978:22
resulted [1] - 4889:12
resumes [1] - 4871:23
retained [2] - 4874:8, 4967:9
retake [1] - 4907:6
retirement [1] - 4848:9
return [6] - 4812:8, 4812:10, 4855:22, 4858:1, 4905:21,

4934:16
returned [3] - 4933:22, 4934:1, 4934:6
review [4] - 4922:15, 4948:24, 4949:8, 4978:9
reviewed [4] - 4809:2, 4934:5, 4948:10, 4948:11
reviewing [2] - 4949:14, 4969:1
revision [1] - 4889:2
Rich [1] - 4965:11
RICHARD [1] - 4789:16
Richard's [1] - 4810:8
Richards [10] - 4807:14, 4808:22, 4819:18, 4819:23, 4858:11, 4868:7, 4893:17, 4907:24, 4907:25, 4908:8
Richards' [10] - 4820:14, 4821:2, 4822:8, 4825:19, 4826:11, 4827:5, 4827:23, 4828:11, 4835:4, 4950:23
Rick [2] - 4895:12, 4910:18
rise [2] - 4871:21, 4873:1
risk [2] - 4902:11, 4957:22
risks [2] - 4902:13, 4902:15
road [8] - 4798:14, 4798:25, 4801:20, 4801:22, 4814:22, 4897:1, 4897:9, 4955:11
ROBERT [1] - 4789:18
Robert [2] - 4965:15, 4965:16
role [1] - 4941:10
Ron [17] - 4807:14, 4808:22, 4810:8, 4819:18, 4819:23, 4820:14, 4821:2, 4822:8, 4825:19, 4826:10, 4827:5, 4827:23, 4828:11, 4835:4, 4858:11, 4868:7, 4950:22
Ronald [1] - 4893:16
room [2] - 4830:25, 4894:15
Rosenthal [1] - 4911:9
Ross [12] - 4839:9, 4910:19, 4910:22,

schedules [1] - 4794:25
scope [1] - 4966:24
Scottsdale [1] - 4861:16, 4861:18, 4862:8
screen [4] - 4806:19, 4856:18, 4863:1, 4955:23
script [1] - 4882:13
scroll [1] - 4862:12
season [6] - 4796:10, 4796:11, 4796:21, 4804:5, 4958:4
seated [5] - 4793:23, 4868:12, 4871:22, 4873:3, 4931:22
second [10] - 4815:10, 4835:13, 4860:8, 4861:12, 4865:13, 4875:19, 4876:19, 4882:23, 4905:20, 4913:18
secret [1] - 4946:12
secure [7] - 4913:18, 4928:10, 4958:6, 4964:21, 4966:6, 4970:5, 4970:21
secured [1] - 4972:3
security [1] - 4863:3
see [73] - 4797:23, 4803:16, 4807:3, 4807:7, 4814:20, 4820:7, 4821:14, 4822:12, 4822:16, 4823:18, 4824:25, 4825:4, 4827:21, 4848:19, 4848:20, 4848:22, 4849:4, 4849:20, 4850:1, 4851:3, 4851:10, 4851:15, 4851:16, 4851:20, 4852:4, 4856:13, 4858:6, 4860:4, 4860:6, 4860:10, 4862:11, 4864:4, 4869:18, 4869:21, 4869:24, 4870:10, 4870:20, 4871:12, 4875:10, 4883:7, 4883:18, 4886:13, 4886:16, 4886:23, 4887:15, 4887:18, 4888:4, 4907:20, 4909:13, 4909:14, 4909:16, 4909:22, 4911:3, 4911:7, 4911:14, 4923:8, 4933:15, 4939:6, 4942:7,

4942:25, 4943:3, 4948:21, 4949:5, 4950:2, 4952:22, 4955:21, 4955:23, 4961:14, 4970:16, 4973:23, 4980:10, 4982:15, 4983:1
seeing [4] - 4848:16, 4848:21, 4917:16, 4964:12
seek [3] - 4927:18, 4964:16, 4975:21
seeking [6] - 4924:18, 4943:15, 4948:6, 4948:14, 4959:7, 4963:24
seem [1] - 4849:9
select [1] - 4944:15
sell [3] - 4816:15, 4846:14, 4865:11
selling [5] - 4800:24, 4831:19, 4854:15, 4855:1, 4855:15
send [6] - 4807:12, 4854:18, 4876:3, 4936:22, 4937:17, 4937:23
sending [6] - 4854:9, 4876:14, 4880:3, 4894:11, 4923:13, 4937:14
sends [2] - 4876:20, 4876:21
Senior [1] - 4938:13
sensitive [1] - 4868:16
sent [29] - 4792:21, 4793:14, 4807:13, 4807:22, 4808:1, 4808:22, 4821:10, 4822:4, 4827:22, 4880:6, 4880:18, 4882:23, 4884:9, 4884:13, 4886:9, 4917:12, 4920:15, 4920:23, 4932:9, 4934:5, 4934:20, 4934:24, 4937:2, 4938:7, 4938:11, 4948:22, 4949:20, 4950:22, 4953:9
sentence [2] - 4922:19, 4981:17
separate [4] - 4847:18, 4847:21, 4847:25, 4848:3
separately [2] - 4932:6, 4932:18
September [3] - 4820:4, 4894:12, 4894:14

Sergei [8] - 4792:10, 4795:8, 4857:17, 4889:13, 4889:24, 4890:2, 4918:5, 4931:9
SERGEI [2] - 4795:13, 4984:2
series [8] - 4809:22, 4915:18, 4925:6, 4946:9, 4958:17, 4959:19, 4969:8, 4982:16
services [8] - 4828:18, 4962:25, 4964:19, 4964:20, 4964:25, 4965:21, 4965:25, 4967:9
set [4] - 4830:13, 4862:19, 4918:22, 4934:22
sets [1] - 4924:1
settle [2] - 4928:15, 4929:1
settled [1] - 4921:19
Settlement [77] - 4810:9, 4812:7, 4813:5, 4813:21, 4814:2, 4814:8, 4814:11, 4818:21, 4818:25, 4819:17, 4826:6, 4826:22, 4827:11, 4827:23, 4853:11, 4853:14, 4855:20, 4857:11, 4865:17, 4865:24, 4866:4, 4866:15, 4867:7, 4873:19, 4885:6, 4889:10, 4889:21, 4890:1, 4892:4, 4892:8, 4892:14, 4892:24, 4893:1, 4893:7, 4893:11, 4893:14, 4893:23, 4894:6, 4894:23, 4907:22, 4908:12, 4909:9, 4909:18, 4911:17, 4911:25, 4914:19, 4917:6, 4917:21, 4918:2, 4919:3, 4920:18, 4922:2, 4923:23, 4924:11, 4925:19, 4925:21, 4926:14, 4927:24, 4928:1, 4928:6, 4928:12, 4928:18, 4929:24, 4932:10, 4933:1, 4933:13, 4934:10, 4935:9, 4935:22, 4936:11,

4936:19, 4942:5, 4942:16, 4942:20, 4942:22, 4943:3, 4954:15
settlement [11] - 4802:4, 4811:10, 4811:13, 4811:14, 4864:3, 4865:19, 4865:20, 4915:5, 4916:10, 4928:9, 4928:24
seven [1] - 4972:8
several [2] - 4844:25, 4909:14, 4924:1, 4924:5, 4924:25, 4950:19, 4957:25
severance [1] - 4952:17
sewage [1] - 4955:10
shake [1] - 4871:5
shaking [3] - 4869:5, 4870:6, 4906:4
share [6] - 4836:17, 4858:12, 4859:17, 4889:9, 4945:5, 4968:20
shared [1] - 4880:19
shares [3] - 4834:6, 4952:5, 4953:8
sheet [1] - 4908:16
short [2] - 4792:14, 4819:5, 4863:20, 4926:2, 4958:3, 4978:24
short-term [1] - 4958:3
shortly [3] - 4808:3, 4817:17, 4915:10
show [23] - 4806:18, 4807:19, 4813:10, 4815:6, 4848:12, 4849:11, 4852:2, 4860:1, 4861:13, 4868:6, 4886:10, 4887:12, 4888:8, 4911:2, 4929:9, 4930:3, 4932:4, 4955:19, 4960:22, 4968:22, 4974:7, 4974:16, 4976:21
showed [2] - 4886:21, 4893:17
showing [3] - 4792:16, 4831:5, 4982:17
shown [4] - 4893:16, 4905:17, 4917:11, 4948:2
shows [1] - 4806:24
sic [1] - 4825:17

4910:24, 4911:6, 4912:3, 4955:22, 4957:18, 4958:7, 4958:14
Ross's [1] - 4958:15
roughly [2] - 4852:11, 4852:12
Rozenboom [1] - 4917:1
rross@ sonnenschein.com [1] - 4911:7
rubber [2] - 4799:13, 4799:15
Rubin [3] - 4935:10, 4935:12, 4939:20
Rucchin [1] - 4873:24
rudimentary [1] - 4955:11
rule [3] - 4838:14, 4982:3, 4982:9
ruling [1] - 4941:11
rulings [1] - 4941:3
run [1] - 4800:23
running [2] - 4791:3, 4804:20
Russia [4] - 4797:12, 4797:17, 4902:23, 4919:23
Russian [3] - 4882:13, 4882:14, 4882:19
RVSM [1] - 4914:12

S

safety [1] - 4914:14
salacious [1] - 4925:6
sales [1] - 4963:18
Salgado [1] - 4965:11
San [9] - 4800:6, 4800:7, 4915:2, 4924:3, 4924:4, 4955:16, 4962:20, 4963:18, 4973:19
SARITA [1] - 4789:15
Sarita [1] - 4837:3
sat [2] - 4830:9, 4894:15
satisfied [3] - 4829:12, 4901:25, 4943:8
save [2] - 4802:15, 4889:8
saved [1] - 4972:11
saw [2] - 4835:1, 4870:12
schedule [1] - 4934:12
scheduled [1] - 4974:20

**sic)** [1] - 4942:7
**side** [4] - 4806:8, 4811:9, 4869:14, 4968:8
**sidebar** [14] - 4838:1, 4840:1, 4867:25, 4870:4, 4875:18, 4876:1, 4879:8, 4880:1, 4941:1, 4941:20, 4952:1, 4976:23, 4977:1, 4979:5
**sides** [1] - 4869:9
**sight** [1] - 4870:11
**sign** [9] - 4817:11, 4833:11, 4833:15, 4836:8, 4838:23, 4914:16, 4948:17, 4972:1, 4973:3
**signature** [14] - 4815:7, 4815:9, 4815:10, 4816:25, 4817:11, 4862:13, 4863:4, 4864:4, 4886:22, 4886:23, 4899:6, 4899:18, 4948:14, 4949:3
**signed** [9] - 4802:7, 4815:3, 4815:12, 4815:15, 4817:4, 4817:10, 4945:19, 4958:1, 4963:5
**significance** [2] - 4970:22, 4974:25
**significant** [11] - 4839:13, 4889:6, 4929:25, 4943:23, 4954:7, 4956:23, 4964:8, 4968:5, 4968:10, 4969:4, 4972:2
**signing** [1] - 4815:9
**similar** [1] - 4969:12
**Simon** [1] - 4919:22
**simple** [1] - 4899:4
**simply** [2] - 4838:12, 4901:4
**single** [2] - 4826:16, 4924:14
**sinking** [1] - 4964:11
**sit** [2] - 4855:13, 4858:19
**site** [2] - 4830:22, 4968:11
**sitting** [2] - 4836:12, 4844:6
**situation** [1] - 4960:9
**six** [3] - 4858:22, 4914:5, 4966:17
**skip** [2] - 4790:18,

4791:17
**skipped** [2] - 4794:5, 4794:13
**skipping** [1] - 4791:6
**skips** [5] - 4791:7, 4791:9, 4794:9, 4794:22
**slander** [1] - 4925:11
**slightly** [1] - 4922:20
**small** [7] - 4859:24, 4861:7, 4907:19, 4966:10, 4976:9, 4976:11
**SMC000013** [1] - 4932:6
**SMC00029** [1] - 4932:7
**so..** [1] - 4861:3
**software** [1] - 4791:3
**sold** [3] - 4835:13, 4891:22
**sole** [1] - 4890:25
**solely** [3] - 4892:1, 4913:2, 4944:21
**solution** [2] - 4842:9, 4920:7
**solve** [1] - 4920:8
**someone** [3] - 4876:14, 4890:7, 4890:13
**sometime** [7] - 4798:14, 4801:20, 4801:21, 4801:22, 4835:10, 4917:17, 4946:19
**sometimes** [2] - 4839:21, 4871:7
**somewhere** [1] - 4916:6
**Sonnenschein** [7] - 4909:15, 4909:16, 4910:11, 4910:14, 4910:15, 4911:9, 4912:8
**soon** [1] - 4831:1
**sorry** [16] - 4804:15, 4806:4, 4807:23, 4820:19, 4820:24, 4824:13, 4839:20, 4851:3, 4921:14, 4924:19, 4939:4, 4945:11, 4945:12, 4945:15, 4976:3, 4978:1
**sort** [1] - 4952:12
**sought** [5] - 4956:11, 4959:1, 4964:19, 4965:19, 4966:14
**sounds** [1] - 4917:19
**source** [1] - 4877:1,

4913:23, 4960:20
**Source** [8] - 4824:3, 4824:9, 4824:11, 4893:12, 4893:13, 4893:18, 4915:17, 4917:2
**sources** [2] - 4957:16, 4958:1
**southwest** [2] - 4969:5, 4969:10
**speaking** [6] - 4796:5, 4801:19, 4803:7, 4804:24, 4903:15, 4922:13
**speaks** [1] - 4899:16
**specific** [3] - 4940:5, 4944:18, 4945:24
**specifically** [14] - 4810:22, 4825:19, 4912:6, 4913:25, 4914:11, 4917:23, 4918:6, 4920:8, 4930:18, 4943:20, 4944:23, 4950:6, 4967:12, 4968:19
**speculate** [1] - 4982:20
**speculating** [1] - 4877:6
**spend** [3] - 4800:14, 4801:15, 4811:14
**spent** [6] - 4827:21, 4829:13, 4927:13, 4927:14, 4942:19, 4954:19
**spoken** [3] - 4921:5, 4922:12, 4934:9
**spreadsheet** [6] - 4907:23, 4908:2, 4908:8, 4933:12, 4936:3, 4942:25
**spring** [1] - 4914:23
**Square** [1] - 4830:21
**St** [1] - 4902:23
**stand** [5] - 4792:6, 4795:11, 4871:23, 4907:6, 4929:18
**standing** [1] - 4795:11
**Stanley** [5] - 4842:22, 4843:18, 4844:17, 4868:18, 4900:17
**start** [8] - 4798:13, 4798:22, 4798:25, 4799:2, 4799:10, 4799:12, 4818:11, 4902:16
**start-up** [4] - 4799:2, 4799:10, 4799:12, 4902:16
**started** [9] - 4794:1,

4796:21, 4796:24, 4797:13, 4798:14, 4798:22, 4864:21, 4926:15, 4958:5
**state** [6] - 4838:13, 4841:17, 4900:13, 4900:22, 4927:5, 4978:10
**state-of-mind** [1] - 4838:13
**statement** [13] - 4849:13, 4851:13, 4860:2, 4893:20, 4901:6, 4907:24, 4908:14, 4919:4, 4919:6, 4922:16, 4955:2, 4961:3, 4973:14
**STATES** [3] - 4789:1, 4789:3, 4789:10
**States** [4] - 4789:13, 4789:15, 4918:10, 4923:25
**statue** [1] - 4871:8
**status** [3] - 4897:11, 4897:17, 4897:18
**stay** [1] - 4801:17
**stayed** [1] - 4837:14
**staying** [1] - 4809:15
**steal** [1] - 4920:4
**stenography** [1] - 4789:25
**step** [1] - 4980:13
**stepped** [1] - 4816:18
**steps** [3] - 4851:8, 4868:11, 4949:18
**Steve** [1] - 4968:1
**Steven** [1] - 4873:24
**Stewart** [1] - 4942:7
**still** [9] - 4792:8, 4797:4, 4842:19, 4898:4, 4898:5, 4907:7, 4916:3, 4916:9, 4955:5
**stock** [10] - 4798:11, 4823:22, 4853:7, 4854:12, 4854:13, 4854:14, 4854:15, 4855:1, 4855:16, 4856:16
**stocks** [2] - 4798:24, 4902:10
**Stolper** [10] - 4872:20, 4904:8, 4924:6, 4943:25, 4944:20, 4945:17, 4946:8, 4948:5, 4948:18, 4949:16
**stolper** [2] - 4944:22, 4945:20

**Stolper's** [5] - 4872:2, 4904:10, 4904:15, 4946:19, 4954:2
**stolper's** [2] - 4945:4, 4946:24
**stop** [7] - 4870:9, 4870:17, 4897:1, 4897:3, 4915:13, 4918:12
**stopgap** [1] - 4971:23
**stopped** [2] - 4863:21, 4863:22
**storage** [1] - 4942:20
**story** [2] - 4806:9, 4811:9
**straightforward** [1] - 4819:13
**strategy** [3] - 4924:9, 4925:21, 4953:25
**street** [1] - 4870:14
**stress** [1] - 4973:15
**strife** [1] - 4963:19
**struggled** [1] - 4955:15
**struggling** [1] - 4838:20
**study** [1] - 4965:17
**stuff** [2] - 4831:4, 4865:22
**Stumple** [3] - 4930:12, 4930:13, 4980:19
**subdivision** [2] - 4964:13, 4975:8
**subject** [7] - 4857:14, 4875:4, 4882:12, 4883:4, 4889:2, 4924:19, 4930:13
**submitted** [1] - 4876:9
**subsequent** [8] - 4799:18, 4803:10, 4934:17, 4957:15, 4958:17, 4959:17, 4973:18, 4973:24
**Subsequently** [1] - 4889:16
**subsequently** [1] - 4812:23
**substance** [1] - 4937:19
**substantially** [1] - 4965:21
**success** [2] - 4924:18, 4971:19
**successful** [1] - 4900:15
**Sue** [2] - 4886:24, 4963:15
**sue** [6] - 4831:10, 4831:15, 4833:11, 4924:2, 4925:3,

4935:15
**sued** [4] - 4810:24, 4889:12, 4916:25, 4921:17
**suggest** [3] - 4803:3, 4854:18, 4904:7
**suggested** [2] - 4915:15, 4934:14
**suggesting** [1] - 4927:9
**suggestions** [1] - 4799:5
**suing** [1] - 4810:12
**suit** [3] - 4924:20, 4925:16, 4958:25
**sum** [1] - 4937:19
**summary** [2] - 4889:2, 4889:6
**summer** [4] - 4796:10, 4966:17, 4966:21, 4967:3
**Supermarine** [1] - 4942:7
**support** [1] - 4925:13
**supposed** [18] - 4813:12, 4816:7, 4825:6, 4846:11, 4846:15, 4847:6, 4847:24, 4848:2, 4849:15, 4853:4, 4853:8, 4853:16, 4857:23, 4864:18, 4884:20, 4893:8, 4902:1, 4981:25
**surrounding** [3] - 4925:12, 4951:6, 4969:10
**suspect** [1] - 4982:15
**sustained** [3] - 4825:14, 4951:1
**swallow** [1] - 4971:8
**Swiss** [2] - 4820:5, 4822:14
**Switzerland** [2] - 4820:13, 4903:4
**sworn/affirmed** [2] - 4795:15, 4931:25
**Sydor** [1] - 4873:21
**synergies** [1] - 4969:14
**system** [2] - 4798:10, 4955:11
**systems** [2] - 4792:3

**T**

**table** [2] - 4974:5, 4981:21
**tactical** [1] - 4915:13
**tail** [2] - 4981:16,

4981:22
**takeover** [6] - 4943:11, 4944:16, 4945:7, 4945:10, 4945:25, 4954:1
**talks** [3] - 4905:21, 4970:17, 4974:8
**tape** [1] - 4872:1
**TAWS** [1] - 4914:12
**TCLA** [1] - 4909:20
**team** [5] - 4796:16, 4943:17, 4944:6, 4944:7, 4944:23
**teammates** [3] - 4798:6, 4798:7, 4798:12
**teams** [1] - 4796:22
**technical** [2] - 4790:8, 4790:15
**technically** [1] - 4797:6
**telephone** [15] - 4804:22, 4819:6, 4833:20, 4833:23, 4897:15, 4897:16, 4900:8, 4900:9, 4901:1, 4901:10, 4901:14, 4904:15, 4904:17, 4946:25, 4962:21
**telephonically** [1] - 4905:4
**Temple** [3] - 4828:5, 4828:6, 4828:17
**ten** [5] - 4905:21, 4905:24, 4942:16, 4942:19, 4972:10
**tendency** [2] - 4795:25, 4807:24
**tequila** [2] - 4938:2, 4938:20
**term** [2] - 4811:16, 4958:3
**terms** [15] - 4791:5, 4791:9, 4809:21, 4809:23, 4815:17, 4844:9, 4859:21, 4908:23, 4928:9, 4957:10, 4964:6, 4973:3, 4973:7, 4980:16
**testified** [26] - 4795:15, 4841:9, 4846:10, 4847:12, 4852:6, 4852:10, 4855:18, 4862:23, 4865:5, 4866:6, 4892:3, 4894:16, 4895:18, 4897:24, 4907:23,

4909:6, 4909:8, 4909:11, 4919:12, 4943:14, 4950:13, 4954:7, 4960:4, 4963:24, 4976:4
**testify** [2] - 4810:22, 4952:13
**testifying** [4] - 4836:13, 4869:13, 4869:20, 4931:25
**testimony** [22] - 4842:12, 4868:15, 4868:16, 4869:25, 4897:25, 4899:24, 4907:21, 4912:14, 4912:17, 4913:10, 4918:13, 4930:14, 4931:9, 4931:16, 4932:25, 4943:11, 4946:23, 4947:2, 4951:5, 4954:3, 4960:14, 4965:21
**Texas** [1] - 4796:11
**text** [1] - 4930:16
**THE** [126] - 4789:9, 4790:4, 4790:17, 4790:20, 4790:23, 4791:19, 4792:4, 4792:14, 4793:10, 4793:13, 4793:16, 4793:18, 4793:20, 4793:23, 4795:10, 4795:17, 4798:1, 4802:9, 4803:20, 4803:23, 4803:25, 4807:1, 4808:12, 4825:13, 4825:14, 4828:14, 4829:2, 4829:4, 4836:24, 4837:17, 4838:16, 4839:17, 4839:23, 4841:4, 4842:1, 4843:25, 4855:4, 4855:7, 4857:4, 4868:1, 4868:9, 4868:12, 4869:4, 4870:10, 4871:7, 4871:18, 4871:21, 4871:22, 4871:24, 4872:5, 4872:8, 4872:17, 4872:23, 4873:1, 4873:3, 4876:11, 4876:19, 4877:3, 4877:8, 4877:11, 4878:7, 4878:10, 4878:25, 4879:4, 4880:23, 4881:6, 4882:2, 4882:4, 4888:23, 4895:6, 4899:12,

4900:18, 4905:11, 4905:12, 4906:18, 4906:20, 4906:22, 4906:23, 4907:1, 4907:5, 4907:9, 4907:10, 4920:20, 4923:17, 4923:19, 4923:21, 4927:5, 4929:10, 4929:12, 4929:16, 4930:6, 4930:9, 4930:15, 4930:21, 4931:6, 4931:14, 4931:17, 4931:19, 4931:22, 4932:22, 4939:1, 4939:3, 4939:6, 4939:13, 4940:9, 4940:12, 4940:17, 4941:15, 4951:1, 4951:9, 4952:15, 4953:4, 4961:11, 4962:7, 4970:13, 4978:3, 4978:16, 4980:2, 4980:13, 4980:18, 4980:23, 4981:3, 4981:13, 4982:7, 4982:20, 4983:1
**thereafter** [1] - 4817:17
**therein** [1] - 4932:13
**thinking** [4] - 4790:5, 4831:18, 4900:6, 4955:4
**third** [1] - 4822:9
**three** [15] - 4792:11, 4794:5, 4797:2, 4805:7, 4858:2, 4858:3, 4858:4, 4867:18, 4908:7, 4919:9, 4936:5, 4954:17, 4954:22, 4981:1
**three-and-a-half** [2] - 4954:17, 4954:22
**throughout** [2] - 4791:25, 4971:5
**Thursday** [2] - 4792:25, 4983:5
**tickets** [2] - 4844:17, 4868:18
**tied** [2] - 4972:8, 4972:12
**Tim** [2] - 4944:9, 4965:9
**timing** [1] - 4922:20
**title** [4] - 4916:2, 4916:4, 4916:15, 4942:18
**TL** [1] - 4910:3

**today** [13] - 4792:13, 4792:20, 4803:16, 4810:23, 4836:12, 4842:20, 4852:3, 4855:14, 4858:19, 4872:4, 4912:14, 4913:19, 4929:13
**together** [18] - 4798:23, 4801:10, 4804:13, 4804:15, 4804:17, 4805:21, 4830:25, 4836:19, 4865:14, 4866:13, 4866:14, 4867:13, 4893:3, 4924:14, 4934:11, 4945:17, 4967:6
**TOMMY** [2] - 4789:6, 4789:6
**Tommy** [72] - 4802:23, 4803:14, 4811:20, 4811:21, 4812:7, 4812:12, 4812:16, 4812:19, 4813:19, 4816:17, 4818:8, 4819:4, 4820:19, 4820:20, 4821:7, 4823:1, 4823:22, 4826:11, 4828:2, 4829:25, 4831:1, 4831:3, 4831:10, 4831:15, 4834:2, 4834:4, 4834:20, 4835:9, 4835:14, 4836:11, 4837:14, 4838:10, 4838:14, 4838:16, 4838:21, 4838:22, 4839:11, 4841:9, 4841:11, 4842:11, 4843:14, 4847:1, 4847:7, 4851:23, 4852:19, 4854:2, 4854:20, 4855:14, 4856:14, 4857:10, 4860:17, 4861:2, 4861:7, 4865:2, 4867:11, 4876:19, 4882:21, 4886:25, 4890:20, 4891:2, 4891:13, 4893:2, 4896:21, 4897:25, 4898:11, 4898:15, 4898:19, 4904:4, 4905:5, 4906:15, 4910:4
**Tommy's** [1] - 4898:24
**tomorrow** [10] - 4792:12, 4793:9, 4795:2, 4872:4, 4974:20, 4980:7,

4980:10, 4980:18, 4980:19, 4983:1
**tonight** [3] - 4792:25, 4930:17, 4980:16
**took** [13] - 4801:25, 4802:1, 4821:7, 4832:24, 4890:20, 4893:5, 4900:2, 4904:10, 4905:24, 4914:24, 4958:13, 4976:25, 4978:17
**top** [7] - 4848:23, 4877:3, 4879:1, 4879:4, 4882:4, 4935:20, 4974:16
**topics** [2] - 4833:18, 4921:11
**total** [3] - 4847:15, 4858:22, 4914:25
**totaling** [2] - 4916:12, 4964:9
**totalled** [1] - 4819:25
**totally** [3] - 4847:9, 4973:22
**touch** [1] - 4818:18
**toward** [1] - 4895:19
**towards** [6] - 4806:2, 4823:3, 4853:16, 4916:10, 4921:22, 4924:11
**Tower** [1] - 4956:22
**towers** [2] - 4956:18, 4956:20
**traded** [1] - 4902:10
**transaction** [3] - 4848:17, 4848:24, 4849:3
**transactions** [3] - 4839:21, 4860:21, 4929:20
**TRANSCRiPT** [1] - 4789:9
**transcript** [1] - 4789:25
**transfer** [16] - 4811:19, 4820:14, 4820:25, 4821:2, 4822:18, 4822:22, 4823:11, 4826:1, 4826:22, 4834:12, 4853:8, 4853:9, 4922:21, 4922:23, 4939:21, 4940:1
**transferred** [10] - 4810:7, 4820:22, 4823:7, 4823:14, 4887:6, 4887:8, 4887:10, 4916:15, 4942:18, 4958:14
**transferring** [1] -

4928:14
**transfers** [7] - 4819:22, 4822:8, 4829:9, 4847:21, 4914:4, 4914:8, 4939:24
**traveled** [2] - 4902:22, 4903:1
**traveling** [7] - 4900:3, 4900:4, 4900:10, 4900:12, 4900:25, 4901:5
**travels** [1] - 4918:9
**trial** [2] - 4869:9, 4952:16
**TRIAL** [1] - 4789:9
**tried** [3] - 4862:3, 4898:14, 4921:17
**trip** [1] - 4922:9
**trouble** [1] - 4970:1
**true** [10] - 4831:6, 4856:19, 4856:21, 4869:16, 4875:16, 4895:23, 4898:13, 4898:22, 4898:23, 4905:6
**Trust** [5] - 4801:5, 4801:8, 4802:5, 4846:6, 4846:7
**trust** [11] - 4807:12, 4807:14, 4808:22, 4810:8, 4818:14, 4819:18, 4819:23, 4820:10, 4825:19, 4828:11, 4835:4
**trusted** [3] - 4799:4, 4818:13, 4853:23
**trusting** [1] - 4976:15
**truth** [3] - 4839:15, 4894:7, 4902:2
**truthful** [1] - 4951:5
**try** [12] - 4796:1, 4796:5, 4830:22, 4869:11, 4909:3, 4917:21, 4923:19, 4925:3, 4945:14, 4946:3, 4946:13, 4964:20
**trying** [10] - 4794:25, 4824:12, 4831:4, 4834:2, 4917:8, 4934:11, 4952:8, 4966:6, 4969:14, 4981:19
**TTE** [2] - 4806:25, 4807:5
**tune** [1] - 4959:20
**turn** [6] - 4792:17, 4822:9, 4851:12, 4862:22, 4864:1,

4970:16
**turned** [6] - 4832:13, 4857:24, 4880:13, 4916:1, 4965:4, 4971:25
**Tursi** [1] - 4789:20
**two** [56] - 4791:4, 4792:15, 4792:16, 4793:1, 4797:16, 4798:15, 4799:23, 4800:5, 4800:8, 4805:10, 4812:3, 4812:25, 4813:1, 4814:16, 4831:16, 4843:16, 4847:15, 4858:2, 4858:3, 4858:8, 4858:16, 4861:15, 4861:18, 4862:7, 4862:24, 4864:10, 4864:12, 4873:15, 4878:8, 4878:18, 4896:24, 4898:15, 4919:9, 4921:12, 4929:18, 4930:19, 4934:12, 4942:4, 4950:3, 4954:3, 4954:5, 4955:1, 4957:6, 4958:19, 4964:4, 4964:9, 4967:21, 4968:16, 4969:4, 4969:7, 4972:5, 4972:14, 4978:19, 4981:8, 4981:9
**two-and-a-half** [1] - 4955:1

**U**

**U.S** [1] - 4926:3
**Ula** [1] - 4973:24
**ultimately** [7] - 4862:15, 4914:25, 4916:25, 4928:14, 4956:12, 4958:20, 4963:2
**Um-hum** [3] - 4849:22, 4851:6, 4864:11
**unable** [1] - 4974:1
**unaware** [5] - 4909:7, 4909:8, 4909:17, 4946:12, 4946:15
**unbeknownst** [1] - 4832:15
**under** [15] - 4797:4, 4804:9, 4820:15, 4822:21, 4823:20, 4894:16, 4907:8, 4914:3, 4916:3, 4949:11, 4956:20,

4956:23, 4966:22, 4982:3, 4982:9
**underlying** [2] - 4975:4, 4975:7
**understate** [1] - 4955:7
**understood** [8] - 4809:21, 4810:13, 4812:4, 4812:6, 4812:21, 4821:19, 4826:18, 4841:21
**unfortunately** [5] - 4889:11, 4901:25, 4912:21, 4913:8, 4921:17
**unique** [1] - 4931:7
**unit** [3] - 4921:22, 4957:16, 4959:8
**UNITED** [1] - 4789:1, 4789:3, 4789:10
**United** [4] - 4789:13, 4789:15, 4918:10, 4923:25
**units** [19] - 4812:13, 4812:15, 4839:3, 4890:9, 4921:12, 4922:1, 4929:5, 4956:23, 4957:4, 4957:7, 4957:8, 4957:11, 4957:13, 4957:24, 4958:19, 4958:21
**unknown** [3] - 4914:9, 4914:24, 4966:18
**unlike** [1] - 4902:9
**unrelated** [2] - 4889:17, 4889:19
**up** [55] - 4794:14, 4795:10, 4795:17, 4797:12, 4798:10, 4799:2, 4799:10, 4799:12, 4800:6, 4800:7, 4801:15, 4801:19, 4807:23, 4811:1, 4814:16, 4819:5, 4819:21, 4823:2, 4830:14, 4833:7, 4837:6, 4846:7, 4856:17, 4858:8, 4862:20, 4864:21, 4869:5, 4869:13, 4870:18, 4871:6, 4892:5, 4894:4, 4898:7, 4898:8, 4902:16, 4910:1, 4910:11, 4914:18, 4918:22, 4919:18, 4920:7, 4920:14, 4922:24, 4935:9, 4938:5,

4942:23, 4945:14, 4956:19, 4958:25, 4959:5, 4963:13, 4972:8, 4972:12, 4978:12, 4978:21
**update** [1] - 4805:17
**updates** [2] - 4828:22, 4831:3
**updating** [1] - 4917:13
**upwards** [2] - 4964:23, 4967:7
**Urban** [7] - 4971:22, 4972:6, 4972:11, 4973:4, 4973:6, 4973:17, 4975:3
**URL** [1] - 4909:23
**US** [2] - 4789:4, 4789:21
**usage** [1] - 4791:9
**utilize** [1] - 4869:19
**utilized** [2] - 4896:21, 4922:17

**V**

**vacation** [1] - 4836:18
**valuable** [1] - 4971:6
**valuation** [1] - 4858:5
**value** [3] - 4834:15, 4958:9, 4958:10
**various** [4] - 4810:10, 4861:7, 4926:2, 4927:18
**Vegas** [6] - 4836:7, 4836:19, 4956:16, 4956:18, 4956:20, 4957:14
**venture** [3] - 4815:21, 4963:6, 4971:7
**Venture** [1] - 4970:17
**Ventures** [1] - 4963:13
**verbal** [1] - 4922:21
**verbally** [1] - 4922:23
**version** [2] - 4876:9, 4879:3
**versus** [2] - 4869:16, 4926:3
**vertical** [5] - 4954:7, 4963:17, 4966:15, 4967:8, 4975:21
**via** [1] - 4904:15
**victim** [3] - 4895:1, 4906:14, 4906:15
**victory** [1] - 4921:20
**view** [2] - 4898:11, 4931:9
**viewed** [1] - 4899:23
**violated** [1] - 4881:3
**virtually** [1] - 4955:12
**visit** [4] - 4803:3,

4918:23, 4919:18, 4954:20
**visited** [2] - 4918:18, 4919:23
**visiting** [1] - 4970:18
**voice** [3] - 4795:25, 4807:24, 4945:14
**voices** [1] - 4937:12
**VOIR** [3] - 4878:12, 4939:14, 4984:5
**voir** [1] - 4939:12
**voluntarily** [1] - 4954:11

## W

**Waikapuna** [4] - 4973:5, 4975:4, 4975:10, 4975:14
**wait** [1] - 4876:19
**waiting** [2] - 4872:1, 4958:18
**wants** [3] - 4834:2, 4869:14, 4929:25
**warn** [5] - 4869:18, 4869:22, 4870:21, 4870:23, 4871:12
**warned** [2] - 4869:7, 4870:21
**Washington** [5] - 4796:24, 4797:16, 4798:7, 4903:6, 4924:8
**waste** [1] - 4955:9
**water** [1] - 4955:9
**waterfront** [1] - 4972:23
**ways** [1] - 4867:8
**wealth** [1] - 4966:13
**website** [1] - 4909:23
**week** [1] - 4971:17
**weeks** [3] - 4835:10, 4934:15, 4972:9
**weight** [1] - 4941:18
**welcome** [2] - 4905:11, 4961:18
**Wells** [1] - 4961:4
**western** [2] - 4969:6, 4969:13
**whatsoever** [2] - 4790:22, 4925:22
**whereas** [1] - 4890:2
**whole** [11] - 4790:9, 4794:17, 4924:17, 4926:10, 4927:20, 4929:1, 4929:21, 4945:21, 4946:20, 4980:20, 4982:16
**wife** [5] - 4805:7, 4860:11, 4867:19,

4867:20, 4873:9
**William** [1] - 4933:16
**willing** [1] - 4921:25
**Window** [1] - 4791:15
**Windows** [1] - 4791:2
**Windwalker** [1] - 4963:7
**winner** [1] - 4900:17
**wire** [16] - 4810:7, 4819:22, 4821:2, 4822:18, 4823:11, 4826:1, 4829:9, 4847:21, 4914:3, 4914:8, 4922:20, 4922:23, 4939:21, 4940:1, 4940:4, 4958:14
**wired** [1] - 4820:9
**wiring** [1] - 4939:19
**wish** [1] - 4790:11
**withdraw** [1] - 4978:25
**withdrawals** [2] - 4851:19, 4963:18
**withdrawn** [1] - 4882:5
**withdrew** [1] - 4868:20
**withhold** [1] - 4872:14
**witness** [12] - 4792:23, 4795:1, 4795:4, 4795:5, 4795:10, 4838:3, 4868:11, 4869:15, 4869:20, 4870:11, 4871:23, 4907:1
**WITNESS** [8] - 4825:13, 4829:4, 4900:18, 4905:11, 4906:23, 4907:9, 4923:19, 4939:6
**witnesses** [10] - 4792:7, 4792:11, 4793:1, 4930:15, 4980:7, 4980:18, 4980:24, 4980:25, 4981:2, 4981:6
**witnesses'** [1] - 4794:25
**wives** [1] - 4919:17
**won** [5] - 4842:22, 4843:6, 4843:18, 4937:21, 4937:25
**wonderful** [1] - 4800:13
**wondering** [1] - 4868:3
**words** [4] - 4794:5, 4809:12, 4809:15, 4943:7

**works** [2] - 4876:14, 4878:20
**world** [1] - 4968:5
**write** [2] - 4794:19, 4809:12
**writing** [1] - 4883:8
**written** [7] - 4948:5, 4948:6, 4949:7, 4949:8, 4949:9, 4949:10, 4957:6
**wrongdoing** [1] - 4829:16
**wrote** [1] - 4909:20

## Y

**year** [14] - 4797:2, 4797:3, 4798:15, 4801:22, 4836:5, 4858:16, 4884:8, 4884:11, 4894:12, 4894:14, 4915:3, 4956:14, 4957:12, 4963:17
**year-and-a-half** [3] - 4956:14, 4957:12, 4963:17
**years** [14] - 4797:1, 4797:2, 4797:13, 4797:16, 4842:12, 4896:1, 4896:19, 4897:10, 4898:5, 4900:19, 4900:24, 4954:17, 4955:1, 4967:21
**yellow** [1] - 4908:5
**yesterday** [3] - 4792:23, 4794:3, 4795:22
**YORK** [1] - 4789:1
**York** [11] - 4789:14, 4789:22, 4797:7, 4830:7, 4830:9, 4830:18, 4831:25, 4904:11, 4926:8, 4944:1, 4944:23
**yourself** [5] - 4834:7, 4891:9, 4895:1, 4906:13, 4906:15
**Yuen** [1] - 4975:7

## Z

**Zurich** [1] - 4903:4