4985

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA      :   13-CR-607

    -against-                    US District Court
                              Central Islip, NY

PHILLIP A. KENNER a/k/a
PHILIP A. KENNER, and
TOMMY C. CONSTANTINE a/k/a
TOMMY C. HORMOVITIS,

               Defendants.:   June 25, 2015
- - - - - - - - - - - - - - X   10:10 am

        TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:

                        KELLY T. CURRIE
                        United States Attorney
                        One Pierrepont Plaza
                        Brooklyn, New York 11201
                        By:  JAMES MISKIEWICZ, ESQ.
                             SARITA KOMATIREDDY, ESQ.
                        United States Attorneys

For the Defense:          RICHARD D. HALEY  ESQ.
                        For Defendant Kenner

                        ROBERT LaRUSSO, ESQ.
                        ANDREW L. OLIVERAS, ESQ.
                        For Defendant Constantine

Court Reporter:          Dominick M. Tursi, CM, CSR
                        US District Courthouse
                        1180 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6108  Fax:  712-6124
                        DomTursi@email.com

        Proceedings recorded by mechanical stenography.
          Transcript produced by CAT.

4986

1           (Call to Order of the Court.)

2           (The following ensued in the absence of the

3      jury.)

4           THE COURT:  All right.  A couple of jurors were

5      late today, but they are all here now.

6           I gave you a copy of my proposed letter for

7      Juror No. 3's employer.  Any objection to that?

8           MR. MISKIEWICZ:  No, your Honor.

9           MR. LaRUSSO:  I have reviewed it.  No,

10     your Honor.

11          MR. HALEY:  No, sir.  Thank you.

12          THE COURT:  Ready to go, Mr. Haley?

13          MR. HALEY:  I am.

14          THE COURT:  The first thing we will do is, you

15     will offer those documents.  I will admit the documents,

16     rather.  You already offered them.  I will give the jury a

17     limiting instruction regarding Mr. Gentry's worksheet.

18          MR. MISKIEWICZ:  Spreadsheet.

19          THE COURT:  Do you have the number of that

20     exhibit?

21          MR. HALEY:  Your Honor, I'm at a complete loss

22     right now to bring it to mind.  There were so many

23     exhibits.

24          May I have a moment, Judge?

25          THE COURT:  Yes.

4987

1          MR. LaRUSSO:  While Mr. Haley is looking.

2          I have no further questions of Mr. Kenner.

3          THE COURT:  Okay.

4          MR. HALEY:  Might we do it during the break?

5          THE COURT:  Sure.  I will give them the

6     instruction and give them the number later.

7          MR. HALEY:  Thank you.

8          Your Honor, I'm going to be absolutely unable to

9     tick off these numbers.

10         THE COURT:  No, you don't have to do that.  I

11    will just say all the exhibits that you offered at the end

12    of Mr. Kenner's direct testimony are admitted.

13         MR. HALEY:  I will look at the record, the

14    transcript, and then match it up so that I don't misstate.

15         THE COURT:  At some point I'm going to ask both

16    sides to prepare a list of what documents they believe

17    have been admitted so we have no confusion on that.

18         MR. HALEY:  I would want to do that myself,

19    Judge.  Thank you.

20         THE COURT:  Let's bring in the jury.

21         MR. MISKIEWICZ:  Very briefly, before we do.  I

22    would like to have an opportunity to raise an issue

23    regarding reverse discovery.  We don't need to do that

24    now.  It will wait until the break.

25         THE COURT:  Absolutely.  You did raise an issue

4988

1    at sidebar and we said we would come back to it.

2            I don't think that, simply because Mr. LaRusso

3    utilized that Global Settlement Fund document that was

4    prepared by Mr. Kenner, that it should be admissible

5    against Mr. Constantine.

6            It is a little unusual to take a document that

7    is not admissible against your client and seem to rely on

8    it to some extent, but I think he was using it more as a

9    reference just to have Mr. Kenner testify to certain

10   transactions.  So I'm not going to change that ruling.

11           I assume you don't want that to be admitted

12   against your client.  Right?

13           MR. LaRUSSO:  No, Judge.  But I should make the

14   court aware of the fact that our next witness was the

15   accountant who at Mr. Gonchar's request reviewed that list

16   from Mr. Kenner.  He is the one that actually reviewed

17   every one of them.  And you may have a different opinion

18   at the end.

19           I'm not certain at this point, Judge, whether we

20   are going to withdraw our objection.  So can we just hold

21   that?

22           THE COURT:  Sure.

23           MR. LaRUSSO:  Because I think at the end of his

24   testimony I may say there is no reason to not allow it

25   against both.

4989

1          THE COURT:  Okay.

2          Let's bring in the jurors.

3          Mr. Kenner, you can come up to the witness

4     stand.

5

6     **PHILLIP A KENNER**

7          called by the Defense, having been previously

8          duly sworn/affirmed, continued testifying as

9          follows:

10         MR. HALEY:  Your Honor, if you recall, you gave

11    me the opportunity on redirect to address some of the

12    testimony of Sergei Gonchar.

13         THE COURT:  Yes.

14         MR. HALEY:  Thank you.

15         THE COURT:  And obviously, if you want, you can

16    address the tape.

17         MR. HALEY:  I will.  The answer is yes,

18    yes, yes.

19         Your Honor, there will be then some additional

20    redirect questions, but I am endeavoring to abide by my

21    representation.

22         (The following ensued in the presence of the

23    jury.)

24         THE COURT:  Please be seated.

25         Good morning, members of the jury.  Good to see

4990

1    you all again.

2           When we left off yesterday, Mr. LaRusso was

3    having a discussion about whether he wanted to ask any

4    additional questions.  He advised me that he is done.

5           Is that correct?

6           MR. LaRUSSO:  That is right, your Honor.

7           THE COURT:  So we will now proceed with

8    redirect.

9           Before we do that.  As you might recall,

10   Mr. Haley, at the end of his direct examination, offered a

11   whole series of documents that were in various folders

12   that he showed Mr. Kenner, and I said I was going to hold

13   off on admitting those until his lawyer had a chance to

14   cross-examine him with respect to any of those documents.

15          At this point I am going to admit all of those

16   documents.  I won't repeat the numbers, but all the

17   documents that Mr. Haley offered at the end of

18   Mr. Kenner's direct are admitted.

19          I do want to give one instruction regarding

20   one document.  I will give you the number later, I don't

21   have the number offhand, but I think you will know which

22   document I'm referring to.  It was referred to during the

23   testimony as Mr. Gentry's spreadsheet, which was given to

24   Mr. Kenner.

25          I want to give you that same limiting

Kenner - Redirect/Mr. Haley

4991

1    instruction I gave you with respect to certain other

2    documents and testimony.

3           Mr. Kenner is only allowed to offer that

4    document as to his state of mind; not as to the treatment

5    of the information contained in the information provided

6    by Mr. Gentry, but on the issue of what Mr. Kenner's state

7    of mind was at the time.  That is what he is permitted to

8    offer that particular document for.  Okay?

9           So with that instruction, we will now have

10   redirect.

11          MR. HALEY:  Thank you, your Honor.

12          THE COURT:  Mr. Kenner, I remind you, you are

13   still under oath.

14          Do you understand?

15          THE WITNESS:  Yes, sir.

16          THE COURT:  Go ahead.

17

18   REDIRECT EXAMINATION

19   BY MR. HALEY:

20   Q.   Phil, following the afternoon break yesterday,

21   Mr. LaRusso questioned you, at least by my calculation,

22   for about an hour and 20 minutes and your testimony indeed

23   will be and is now a matter of record.  During the course

24   of that testimony, you answered questions regarding your

25   relationship with Tommy Constantine and efforts to secure

Kenner - Redirect/Mr. Haley

4992

1  funding through the fund consulting agreement and the

2  Urban Expansion loan.

3           Do you recall that testimony?

4  A.   Yes, sir, I do.

5  Q.   Do you know, as you sit here today, approximately how

6  much time of that hour and 20 minutes of your testimony

7  was devoted to detailed explanations as to those

8  transactions that were part and parcel of the funding

9  consulting agreement in the Urban Expansion loan?

10          MR. MISKIEWICZ:  Objection.

11          THE COURT:  Sustained.

12  BY MR. HALEY:

13  Q.   You were asked questions, Mr. Kenner, on

14  cross-examination by Mr. Miskiewicz as to your

15  understanding of the nature of the allegations against you

16  in the indictment.

17          Do you remember that question?

18  A.   Yes, sir.

19  Q.   Do you understand, sir, that the government, as

20  relates to that indictment and in the prosecution of you,

21  alleged that the funding consulting agreement and the

22  Urban Expansion loan were part and parcel of this

23  conspiracy you had with Tommy Constantine to defraud your

24  hockey player clients?

25          Do you have that understanding?

Kenner - Redirect/Mr. Haley

4993

1    A.    Yes, I'm aware of that.

2    Q.    The detailed testimony you gave before the jury

3    yesterday concerning those communications with

4    Tommy Constantine, communications with others, the

5    circumstances under which the loan consulting agreement,

6    as well as the funding -- excuse me, the circumstances

7    under which the funding consulting agreement as well as

8    the Urban Expansion agreement came to be created and

9    monies paid out, was that part of an artifice and scheme

10   to defraud your hockey player clients?

11   A.    No, sir.

12   Q.    Now, Sergei Gonchar testified yesterday.  Correct,

13   sir?

14   A.    Yes, I was aware.

15   Q.    And as relates to his testimony, we can agree that

16   there was a line of credit established for purposes of the

17   Hawaiian land development with respect to Sergei Gonchar.

18   True?

19   A.    Yes, sir.  He established a line of credit for his

20   investment of capital.

21   Q.    In this document that has been introduced into

22   evidence -- I'm going to show you in a moment, Mr. Kenner,

23   Kenner Exhibit 235 now introduced into evidence, which is

24   the authorization letter that Sergei Gonchar signed, that

25   reads as follows to Northern Trust:

Kenner - Redirect/Mr. Haley

4994

1         "Please allow Philip A. Kenner to access this

2   outstanding LOC for direct deposits into the Little Isle

3   IV account in Northern Trust Bank.  He is authorized to

4   sign for the release of funds related to my LLC?

5         "Thank you for your assistance in this matter."

6         Signature, Sergei Gonchar?

7         Do you recall that?

8   A.    Yes, sir, I do.

9   Q.    We've seen, have we not, Mr. Kenner, that same letter

10  of authorization with reference to other hockey player

11  clients?  Is that true?

12  A.    That's correct.  Northern Trust Bank sent one of

13  these letters of authorization to each client, and each

14  client independently returned it on their own to Northern

15  Trust Bank.

16  Q.    There came a point in time, sir, as testified by

17  Mr. Gonchar, that you did access his line of credit.  Is

18  that true?

19  A.    Yes, sir, I did, pursuant to our agreement to invest

20  in the Hawaii land development project.

21  Q.    And was your ability to access his line of credit the

22  result of Kenner Exhibit 235?

23  A.    Yes, sir, it was.  That was the authorization to

24  do so.

25  Q.    Of your own knowledge, would you have been able to

4995

1    access his line of credit if all the other documents had

2    not been at least in place with Northern Trust bearing his

3    signature regarding the pledge agreement, the master note,

4    and a myriad of other documents?

5            Would that have occurred?

6    A.   It would not.

7    Q.   At any point in time, did you forge Sergei Gonchar's

8    signature on any one of the underlying Northern Trust

9    documents that, again, have been referred to during the

10   course of this trial, in order for you to access his line

11   of credit?

12   A.   No, sir.

13   Q.   Now, Mr. Kenner, I'm going to ask you to take a look

14   at a document marked Kenner Exhibit 236.

15           Do you recognize that document?

16   A.   Yes, sir, I do.

17   Q.   And what is it?

18   A.   This was a report generated to identify the use of

19   funds from Mr. Gonchar's line of credit, I believe, prior

20   to the Lehman Brothers funding in August of 2006.

21   Q.   And is the information contained in that document,

22   sir, information of your own personal knowledge?

23   A.   Yes, sir, it is.

24   Q.   And in what sense?

25   A.   I created this document.

Kenner - Voir Dire/Mr. Miskiewicz

4996

1  Q.   Well, in creating the document, it refers to various

2  financial transactions.  Is that correct?  Transfers,

3  things of that nature?

4  A.   Yes, sir.  It refers to all of the transfers related

5  to the funds that initiated out of Mr. Gonchar's line of

6  credit.

7  Q.   And do you know of those financial transactions of

8  your own personal knowledge?

9  A.   Yes, sir, I do.

10        MR. HALEY:  Your Honor, I would offer Kenner

11  Exhibit 236 into evidence.

12        MR. MISKIEWICZ:  Brief voir dire?

13        THE COURT:  Yes.

14  VOIR DIRE EXAMINATION

15  BY MR. MISKIEWICZ:

16  Q.   When was this document generated?

17  A.   In the last 18 months.

18  Q.   So in anticipation of this trial?

19  A.   Yes, sir.

20  Q.   Not during the Lehman closing.

21  A.   No, sir.  Most of the documents that we have been

22  able to access for this information were sent to myself

23  and each of the individual clients pursuant to written

24  requests we had made in the fall of 2009, approximately

25  five months after the lines of credit collateral receipts

Kenner - Redirect/Mr. Haley

4997

1   by Northern Trust Bank.

2   Q.    Let me try it again.  Not during the Lehman closing.

3   Is that correct?

4   A.    Not during the Lehman closing what?  I'm sorry.

5   Q.    This was not generated at any point during the Lehman

6   closing, was it?

7   A.    Oh.  No, sir.

8          MR. MISKIEWICZ:  No objection.

9          THE COURT:  Any objection?

10         MR. LaRUSSO:  No, your Honor.

11         THE COURT:  Exhibit 236 is admitted.

12         (Defense Exhibit 236 in evidence.)

13  REDIRECT EXAMINATION (Continued)

14  BY MR. HALEY:

15  Q.    Now, Mr. Kenner, as relates to 236, the financial

16  matters set forth on that document.  Is there anything in

17  existence to corroborate those financial transactions?

18  A.    Yes, sir.  There were two sets of documents I used

19  primarily.  It was the bank records from Northern Trust

20  Bank representing the various bank accounts that are

21  referenced in there, which would have included Big Isle

22  Ventures bank account, Big Isle Ventures payroll account,

23  Ula Makika's bank account, Big Isle Ventures -- I think

24  previously mentioned that.

25         I think that would be it on this document.

Kenner - Redirect/Mr. Haley

4998

1    And then, in addition, I utilized Mr. Gonchar's

2    loan history transaction that we had received in the fall

3    of 2009 pursuant to requests that Mr. Gonchar had sent to

4    Northern Trust Bank for himself and I to receive copies of

5    his loan transaction history, which was the same for all

6    of the line of credit holders at that point in time.

7    Q.   The document that you utilized to create what is now

8    Kenner Exhibit 236, how did you acquire those documents

9    following your arrest?

10   A.   All of those documents were turned over by the US

11   government to you in pretrial, and subsequent to that you

12   turned them over to me for review.

13   Q.   The document speaks for itself, Mr. Kenner.  And I

14   don't mean to belabor the point, but we see an entry

15   10/28/05, 375,000?

16   A.   Yes, sir.  There was a $375,000 advance from

17   Mr. Gonchar's line of credit to Little Isle IV's bank

18   account.

19   Q.   Yesterday, when Mr. Gonchar testified, the government

20   isolated on a document that $375,000 transfer.  Do you

21   recall that?

22   A.   Yes, sir, I saw that.

23   Q.   And I believe that the question was asked of

24   Mr. Gonchar:  *Were you aware of that $375,000 transfer?*

25       Was that question asked him, to your memory?

4999

1    A.    I believe it was.

2    Q.    And what was, to your memory, his answer?

3    A.    I believe he said he was unaware of that $375,000

4    advance.

5    Q.    Well, in making that $375,000 advance out of his line

6    of credit, were you breaking some promise that you made to

7    him, sir, regarding the use of this line of credit?

8    A.    No, sir.  Each one of the individual line of credit

9    holders had given authorization for their lines of credit

10   to be used like cash pursuant to the letter of

11   authorization that they sent back to Northern Trust Bank.

12         There were no contingencies or other documents

13   that would have required individual consent or

14   confirmation incremental to those authorizations to access

15   the funds and deposit it to Little Isle IV for the use of

16   the Hawaiian project.

17   Q.    Would it have been possible to maintain the protocol

18   and process for the Hawaiian land development by

19   contacting each one of the hockey player clients in

20   advance before you accessed their line of credit at a

21   particular point in time?

22   A.    It would have been very difficult to do so.

23   Q.    Well, during the discussions that you had with your

24   client -- and I don't want to cover your direct testimony,

25   sir -- we learned that these lines of credit were part of

5000

1   a pooled fund.   Is that correct?

2   A.   That's correct.   The approximate $13 million that was

3   collectively invested in Little Isle IV by each of the

4   investors, including John Kaiser and myself.

5   Q.   Well, once you had access to the line of credit as

6   authorized by the master note, why didn't you at that

7   point in time immediately empty the whole line of credit

8   and pour it into the pool?

9   A.   I certainly had authorization to put the entire

10  $13 million into the Little Isle IV bank account at

11  one point in time and then utilize that $13 million pool

12  to pay the monthly expenses going forward.

13          It probably would have saved a lot of these

14  conversations, but I would have begun to incur

15  approximately a $40,000 a month fee for the line of credit

16  payments that would have been unnecessary because we only

17  drew down on the lines of credit as the funds were

18  necessary for expenses on a monthly and ongoing basis.  It

19  would have been an irresponsible business tactic to do so.

20  Q.   Now, Sergei Gonchar was asked -- do you recall

21  whether Sergei Gonchar was asked by the government during

22  cross-examination of him whether he ever authorized his

23  line of credit monies that were going to the Hawaii land

24  development project to go to Mexico and maybe from Mexico

25  come back to the Hawaii land project?

5001

1    Do you recall that?

2    A.    I was a little confused by that question, but I do

3    recall something to that nature.

4    Q.    And I believe he testified no, he never authorized

5    his money that was going to the Hawaii land development

6    project to go to Mexico.  Is that correct?

7    A.    Yes, that is what he said.  He said no.

8    Q.    And was his testimony truthful as far as that is

9    concerned?

10    A.    Yes, sir, it was.

11    Q.    Well, by your previous testimony, some of the hockey

12    player investors did authorize those monies.  That is your

13    testimony, is that correct?

14    A.    Correct.  In fact, all of them were aware of it.

15    Q.    But your chart here shows that zero loans to Jowdy.

16    Isn't that true?

17    A.    Yes.  Although the question insinuated that there was

18    money that was transferred and Mr. Gonchar was unaware of

19    it, none of the money traceable to Mr. Gonchar's line of

20    credit went to the loans to Ken Jowdy.

21    Q.    Is that because he never gave you authorization to do

22    so?  Correct?

23    A.    Well, Mr. Gonchar was aware and had given the same

24    authorization as everybody else, but in fact none of his

25    money was actually used.

Kenner - Redirect/Mr. Haley

5002

1  Q.   The relationship you had with Sergei Gonchar

2  commenced at a particular point in time and then at some

3  point ceased.  Is that correct?

4  A.   Yes.  It began in the mid to late '90s and ceased

5  somewhere around the fall of 2010.

6  Q.   When it began, does this photograph give us some idea

7  as to the nature of your relationship?

8  A.   Actually, that photograph, I believe, was taken on

9  June 12, 2009, in the Pittsburgh Penguins' locker room

10 immediately following Game 7 win of the Stanley Cup at Joe

11 Louis Arena in Detroit, Michigan, so it was very much near

12 the end.

13          In fact that was three months after Mr. Gonchar

14 was aware that his line of credit collateral was seized.

15          That was a very special night.

16 Q.   Incidentally, sir, not to -- well.  As relates to

17 Sergei Gonchar in connection with his professional career,

18 he was, is, quite successful.  Is that correct?

19 A.   Yes, sir.  I believe he has earned somewhere in the

20 neighborhood of $50 million during his career.  Excuse me,

21 50, 5-0, million dollars during his career.

22          MR. MISKIEWICZ:  Judge, irrelevant.

23          THE COURT:  Yes.  Sustained.

24          The jury will disregard that.

25 BY MR. HALEY:

5003

1    Q.    The relationship, however, did not maintain itself.

2    Is that true?

3    A.    No.  We terminated the relationship somewhere in the

4    fall, approximately the fall, of 2010.

5    Q.    What happened?

6    A.    As a result of the Michael Stolper investigation of

7    Mr. Constantine and Eufora in the spring and summer of

8    2010, I represented to my clients the information that I

9    had received from Mr. Stolper's investigation team, and

10   let them all know that they needed to make an independent

11   decision with respect to Mr. Stolper's representations and

12   his group of investigators.  And at that point in time,

13   Mr. Gonchar made up his own mind, like the rest of them

14   did, and chose to align himself with Mr. Constantine at

15   that point in time.

16            I continued to work for Mr. Gonchar for another

17   three to six months, notwithstanding our conflict on that

18   issue, but it became untenable at that point in time.

19   Q.    Mr. Kenner, I'm going to ask you some questions about

20   the content of what is being characterized as the Home

21   Depot recording.  You know what I'm referring to, do you?

22   A.    Yes, I'm aware of it.

23   Q.    That was the recording that was played for the jury

24   the other day.  Correct?

25   A.    Yes, sir.  I was here.

Kenner - Redirect/Mr. Haley

5004

1   Q.   As an aid to the jury, a transcript of that recording

2   was utilized by the jury and you and I and every person

3   associated with this case in the courtroom.  Is that

4   correct?

5   A.   I believe everyone had a copy.  I have not seen a

6   copy, not then and not until now.

7   Q.   Well, I'm going to reference various parts of the

8   transcript --

9   A.   Okay.

10  Q.   -- for purposes of my questioning of you, rather than

11  have the entire tape replayed.  So if it needs to be

12  replayed, certainly it can be done, but I think that is

13  the protocol I'm going to follow.  All right?

14  A.   I would appreciate that.

15  Q.   I'm going to be showing you what is marked 4500T.

16          And just by way of the reference, it says, *Kevin*

17  *Constantine Home Depot Tape*.  And we, of course, can see,

18  as set forth in the document, Kenner, Cashier, and then

19  Kenner, Cashier, and then we will pick up with

20  Constantine, Kenner.

21  A.   Okay.

22  Q.   We see, sir, early on in the tape.

23          *CONSTANTINE:  So I know you're not gonna believe*

24  *anything I tell you, but I'm gonna try anyway.*

25          Do you see that?

5005

1  A.    Yes, sir, I do.

2  Q.    Now, that meeting you had with Mr. Constantine, I

3  know you testified on direct that was not a prearranged

4  meeting.  Is that correct?

5  A.    No, it was a surprise for me to see him that day.

6  Q.    And at that point in time, what was your relationship

7  with Mr. Constantine?

8  A.    Adversarial.

9  Q.    At that point in time, was he aware of the efforts by

10  Stolper to commence litigation and to investigate a myriad

11  of matters?

12  A.    Yes, sir.  He had gone out of his way to blame all of

13  that activity on me.

14  Q.    Well, when he says:

15        *So I know you're not gonna believe anything I*

16  *tell you but I'm gonna try anyway,* why did you continue

17  the conversation with him?  Why didn't you just turn your

18  back and walk away?

19  A.    There was open negotiations between Mr. Stolper's

20  team and Mr. Constantine and his attorneys at that point

21  in time, and there was every reason to believe there would

22  be litigation pending soon, based on the inability to come

23  to common ground or an agreement between the parties, so I

24  thought it might be a good opportunity to hear what

25  Mr. Constantine had to say.

Kenner - Redirect/Mr. Haley

5006

1    And I immediately thought before he entered the

2    building to record the conversation so I could share it

3    with Mr. Stolper and all of the investors.

4    Q.   You did so in secret?

5    A.   Yes.  Mr. Constantine was unaware of that.

6    Q.   The transcript and recordings, Mr. Kenner, speak for

7    itself, but just by way of the next sentence.

8        *There's huge misunderstandings between us that*

9    *cultivated and got exponentially worse when you stopped*

10   *communicating with me.*

11       Do you see that?

12   A.   Yes, sir, I do.

13   Q.   And then Mr. Constantine continues to speak.  Do you

14   see the highlighted portions?

15       *Everything that would make you happy, the Nolan,*

16   *uh, arbitration award, I got them to where they're gonna*

17   *take interest that's not even gonna come from you to wipe*

18   *everything away.  I fixed your whole life and my whole*

19   *life, and for some reason in the midst of all this you f'n*

20   *blew a gasket and are trying to bury us all.*

21       Do you see that?

22   A.   Yes, sir, I do.

23   Q.   Did that have any meaning to you when he said that?

24   Did he fix the -- did that have meaning to you, sir?

25   A.   What I understood it to mean was some of the same

5007

1    rhetoric that I had heard from Mr. Constantine through

2    others indirectly over the years, in that he was always

3    trying the fix everybody's problems.

4            He was in fact a very hard-working guy.  I would

5    commend him on that over the years.  And he wasn't afraid

6    to try and consummate a deal with anybody over the years

7    as well.

8            So I knew that he was trying to make amends with

9    me for a significant portion of Eufora that he owed me at

10   the time.  He knew that the Nolan arbitration was wearing

11   on me because I was hoping to pay him back from

12   Mr. Jowdy's loans that he was persuing.

13           And then frankly, you know, the end of that is,

14   I believed he was just either trying to persuade me or

15   intimidate me into believing that it wasn't going to be a

16   good thing for us to, you know, put Eufora on the fire and

17   fight over it between the parties.

18   Q.   He continues, we see of course, not to skip your

19   response, sir, the next response after that is:

20           KENNER:  *I haven't done anything yet.*

21           What did you mean by that response at that point

22   in time in connection with the second statement by

23   Mr. Constantine?

24   A.   I think he was, again, he was he alluding to fact,

25   and I heard it from others that he spoke to, that he was

5008

1    representing that I was in charge of this investigation, I

2    was the one spearheading it, and I was the one making all

3    the investors adverse to him. And I was just telling him

4    I haven't done anything yet.

5    Q.   We go on to see Mr. Constantine.

6              *You've gotta stop. You gotta stop and just*

7    *listen for a minute, or maybe meet with me and talk to me*

8    *and we'll work it out together.*

9              Is that consistent with what you believe he was

10   trying to achieve at that in point by way of this

11   conversation with you?

12   A.   Yes. His belief that I was in charge of this legal

13   activity out of New York and Mr. Stolper's group.

14   Q.   Again, the next paragraph speaks for itself, when he

15   says on the following page:

16             *Because there's a plan being emailed to all you*

17   *guys that is an f'n slam dunk for everybody. Slam dunk,*

18   *everybody's happy, you -- the releases, I'm asking you to*

19   *sign, the first name on it is yours.*

20             Did you have an understanding of what he was,

21   from his state of mind, saying?

22   A.   No. I had no idea. It was very confusing to me.

23   Q.   He goes on to say:

24             *I'm protecting you. I'm protecting Tim, too.*

25   *I'm protecting everybody. And you think that I'm the*

5009

1    *enemy and you think that you're gonna cut a deal to f me*

2    *up?  You're not gonna f'n pinch the guy who drove the*

3    *getaway car, they're gonna pinch the guy that f'n robbed*

4    *the bank.  And I know you think I robbed the bank, but I*

5    *have answered for everything.*

6         What did he mean by that?

7    A.   I had no idea at the time.  I had no idea.  I

8    couldn't follow what his analogy was.

9    Q.   Well, were you, either directly or through some

10   conveyance by others, saying things about Tommy as to what

11   you regarded as misconduct on his behalf?

12   A.   Could you ask that again, please?  I couldn't hear.

13   I apologize.

14   Q.   I'm not sure I understood it, so I'm going to

15   withdraw the question.

16        He goes on to say:

17        *Do you wanna make it stop or do you want to keep*

18   *going?  This is fate that I see you at the f'n parking lot*

19   *at Home Depot with my mother.  So I'm gonna take a shot*

20   *and talk to you and try to fix it.  Do you wanna try to*

21   *fix it or do you wanna keep going?  Tell me what you want?*

22        And you answer:

23        *I'm not in charge of any of this stuff.*

24        He says:  *Tim Gaarn is?*

25        Again, your answer will be heard on the tape.

Kenner - Redirect/Mr. Haley

5010

1    He goes on to say:

2         *But the only person that's doing all the talking*

3    *is you...and CR, who, by the way, is being indicted in*

4    *Arizona for bank fraud.  That's a fact.  So, you guys have*

5    *this little team you've putting together and nobody wants*

6    *to take responsibility.*

7         Did you know anything about -- who is CR, by the

8    way?

9    A.    CR Gentry, his former CEO.

10   Q.    Did you know anything about CR Gentry being indicted

11   in Arizona for bank fraud?

12   A.    No, sir.  All that was new information to me that

13   day.

14   Q.    Do you have any knowledge that CR Gentry was being

15   indicted in Arizona for bank fraud?

16   A.    No, I had no idea.

17   Q.    Do you know to this day whether CR Gentry was

18   indicted in Arizona for bank fraud?

19   A.    I don't believe he has.

20   Q.    So based upon your knowledge, as you sit here today,

21   when he said to you, Tommy Constantine said to you,

22   *CR Gentry is being indicted in Arizona for bank fraud*,

23   that was not truthful.  Correct?

24   A.    That was not truthful.

25   Q.    You go on to say, Kenner:

Kenner - Redirect/Mr. Haley

5011

1          *I'm a complete passenger on this.*

2          *Who's in charge then?*

3          *The guys in New York.*

4          You then see, sir, again following other

5     comments made by Mr. Constantine as he speaks in

6     succession of words, get to the point:

7          *No, because Stolper has monopolized my lawyer's*

8     *time so much that it has delayed us.*

9          Do you know who he was referring to when he says

10    *Stolper*?

11    A.   Yes.  That was Michael Stolper, the attorney leading

12    the investigation effort out of New York, that I referred

13    to previously when I said he was in charge.

14    Q.   The next page, where it continues, you interject at

15    times.  The responses speak for themselves, sir.

16          It continues.  We get to the point where you

17    say:

18          *You got CR doing spreadsheets.  I didn't*

19    *realize, or Mia doing spreadsheets.  I didn't realize Mia*

20    *was so good at doing spreadsheets, so I don't need your*

21    *help with spreadsheets any more.*

22          What did you mean by that?

23    A.   Well, up until this point, I remember I don't think

24    Mr. Constantine took a breath through his initial

25    statements from the point where he first said to me,

5012

1   *you're not going to believe anything that I tell you, but*

2   *I'm going to try anyways.*

3          That was the first thing he said to me in five

4   months.  And finally he had made a comment to me previous

5   about me not being involved somehow with something he

6   wanted to talk to me about.

7          And I was just referring to the fact that he and

8   I had worked for quite some time on initiating a different

9   business.  And at one point in time when he felt like he

10  had money and other people who could help him, he didn't

11  need me anymore.  And I felt that he had cut me out.  And

12  I think he refuted that in here.  He said, *no, because you*

13  *blew me off.*

14         And I basically told him that, not only here did

15  he tell me on the phone previously that he had other

16  people who could do the work I was doing, he didn't need

17  me any more, he didn't need any of my investment capital,

18  but then he went on to say but he could use $35,000 for

19  legal fees from me even though I was no longer his

20  partner.  This was about the only time I could cut in to

21  say anything.

22  Q.   Well, the reference to CR doing spreadsheets, who

23  is CR?

24  A.   That is CR Gentry, the former CEO of Eufora.

25  Q.   And who was Mia?

5013

1   A.    Mia was the secretary at Eufora.

2   Q.    The spreadsheets that you are referring to in that

3   particular comment, are those the spreadsheets that have

4   any relevance to this litigation or are they some other

5   spreadsheets?

6   A.    I believe they were some of both.

7   Q.    Okay.  Going on, sir.  He says to you:

8              *You're in deep f'n shit if this stuff happens.*

9   *You are in deep shit.  The f'n FBI is all over this f'n*

10  *thing and they're not asking about anybody else and I'm*

11  *trying to stop you from burning down your own life.*

12             When he said this to you, what was your

13  understanding of what he was saying, whether it had any

14  meaning?  Just tell us.

15  A.    Well, I did kind of understand what he was talking

16  about.

17             It was reference to other conversations he had

18  previously had with me where he told me that if we didn't

19  agree to the very onerous terms that were the final

20  settlement agreement with Mr. Jowdy, that now that he had

21  aligned himself with Mr. Freeh with the assistance of

22  Mr. Harvey in New York, that they were going to f up our

23  lives and, you know, we would be at risk.

24             And at this point I know that Mr. Galioto had

25  begun to make phone calls to a number of my clients

Kenner - Redirect/Mr. Haley

5014

1  insinuating all kind of crazy business dealings, and I had

2  to sit down and spend a lot of time with each client and

3  show them where all their money went, the transactions

4  that Mr. Galioto was referring to.

5            And Mr. Constantine was basically telling me

6  that, you know, Mr. Galioto and his efforts would never

7  end until something like this happened.

8  Q.   This FBI investigation then at that point in time you

9  had an awareness of.  Is that true?

10  A.   Since on or about August of 2009, about five weeks

11  after I spoke to Mr. Galioto on the phone, in addition to

12  a number of other individuals and let him know that

13  Mr. Jowdy had embezzled or misappropriated or diverted

14  somewhere in the neighborhood of about $25 million of cash

15  and loans for me and my investors.

16  Q.   But after that conversation, did something change in

17  terms of the nature and focus of the FBI investigation?

18  A.   Almost immediately.

19  Q.   And just what changed, insofar as you were concerned?

20  A.   After the -- excuse me.  During that initial phone

21  conversation, the US Attorney and Mr. Galioto, who were on

22  the phone at the time, asked Mr. Ron Richards, who was

23  here, and myself if I would voluntarily accept a subpoena

24  to come to New York and testify in a Southern District

25  grand jury about the misappropriations of about

Kenner - Redirect/Mr. Haley

5015

1   $25 million that Mr. Jowdy had undertaken, and we agreed

2   to do so.

3        About two, two and a half weeks later, we

4   received by letter a formal request, subpoena request, for

5   me to come to New York a few weeks later and testify in

6   the grand jury about the $25 million I had detailed on the

7   first phone call with Mr. Galioto.

8        And approximately two weeks later I found out

9   that, again by letter, before the end of August -- excuse

10  me, before the end of July 2009, that they were

11  terminating my appearance, and I had found out that a

12  grand jury had convened on me, a special grand jury had

13  convened on me, in the Southern District of New York in

14  August of 2009.

15  Q.   Now, we will go further along with reference to this

16  tape, sir.  Skip pages 12 and 13 and 14.  Let's go to --

17  and this is Tommy Constantine still talking.

18       We're talking about page 11 where Tommy starts:

19  *Okay.  You're right.*  And then it continues on the next

20  page.  Continues the next page.

21       You do say:  *I can tell the guys in New York*

22  *that we met and you asked for us to stop bit --*

23       *No, that's not what I --*

24       *Kenner:  I'm not the puppet master, really.*

25       *Ugh.  I'm not asking Michael Stolper to stop for*

Kenner - Redirect/Mr. Haley

5016

1   *me.*

2          *Listen, if I was, if I was, I could make a call*

3   *and say stop.  I don't.*

4          *Phil, the only people --*

5          On page 13, begins to speak again at length.

6   A.   Yes.

7   Q.   Continue through page 14.

8          To page 15.

9          And then he says:

10         *I'm worried about -- frankly, I'm worried about*

11  *you and a couple of other people.  And I know why they're*

12  *playing so hardball with Tim, because he has liability,*

13  *too.*

14         By the way, when he refers to Tim, who do you

15  believe he was referring to?

16  A.   That was Tim Gaarn, who testified here.

17  Q.   And then he says:

18         *What do you think is gonna happen when $700,000*

19  *shows up, going from the players that already bought it*

20  *the first time, to the bank account, back to Tim Gaarn,*

21  *excuse me Tim Gaar -- to Eufora's bank account -- back to*

22  *Tim Gaarn's account, to your account?  Like, this is not*

23  *gonna look good, right?*

24         I mean, that's what he said.  Right?

25  A.   Yes.  I could hardly follow his logic on that, but I

5017

```
 1    think he was trying to insinuate that guys were buying
 2    fake stock or stock that didn't exist or they were buying
 3    their own stock.  I couldn't follow what he was talking
 4    about, but none of it made any sense to me.
 5    Q.   Well, there were Gaarn transactions, as we know.  Is
 6    that correct?
 7    A.   Yes, sir.  Tim Gaarn sold approximately 3.5 percent
 8    of his stock between December 31 of '08 and May 24 of '09
 9    for $700,000.
10    Q.   And that were the transactions that involved your
11    hockey player clients William Ranford and Steve Rucchin.
12    Is that correct?
13    A.   That is correct.
14    Q.   Well, when Tommy says they're buying their own stocks
15    back, was that true or false?
16    A.   That was false.  I had no idea what he was talking
17    about.
18    Q.   But he is making an accusation, is he not, sir, as
19    relates to the Tim Gaarn stock sales involving you and two
20    of your hockey player clients?
21             That is who he is referring to, presumably, is
22    he not?
23    A.   In sum and substance, I believe he was trying to.
24    Q.   Was this the first time you had had an experience
25    where Tommy Constantine would make, let's say, a false
```

Kenner - Redirect/Mr. Haley

5018

1    accusation to deflect attention or accusations focused

2    his way?

3    A.    No, it was not.

4              (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5019

1  REDIRECT EXAMINATION (cont'd).

2  BY MR. HALEY:

3  Q.   Goes on to say:  There's so much shit that you're not

4  thinking about in this whole equation that needs to just

5  be put to bed and move forward productively.  I'm here to

6  ask you not to blow, burn down the house.  Don't burn down

7  the house.

8        It goes on again, the transcript, and the tape

9  will speak for itself.

10        At one point, on page 18, you said:  That's a

11  camera, that's mic.  That's the ceiling above CR's desk.

12  That's been there for a year and a half.  When I was

13  screaming at you about being in his office, that's why.

14        Do you know what he meant by that?

15  A.   At that point in time, he showed me a picture on his

16  camera of something I couldn't make out, that he was

17  telling me was a surveillance camera he had installed

18  above CR Gentry's desk.  And then I had no idea what he

19  was talking about, screaming at me about being in Gentry's

20  office.  I didn't know what that meant.

21        But he was showing me a picture on his camera,

22  trying to insinuate, I guess, it had something to do with

23  Gentry's pending indictment in Arizona.

24  Q.   Did you have any personal knowledge when he said that

25  he had bugged CR Gentry's office by way of putting a

Kenner - redirect/Haley

5020

1   camera and mic in the office?  Did you know that to be

2   true?

3   A.   That was the first I heard of it.

4              A JUROR:  Excuse me.  I got word I may have an

5   emergency situation.

6              THE COURT:  Let's take a break.

7              (The jury leaves the courtroom.)

8              (Pause)

9              THE COURT:  He said he got a text his daughter

10  may be going to the Emergency Room.

11             We will take a break and wait to hear back from

12  him.

13             (At this time a recess was taken.)

14             THE COURT:  Please be seated.

15             The juror, for the record, it's alternate 6,

16  told my law clerk basically he is monitoring the situation

17  and waiting for more information.  He still may have to

18  leave, but he said he wants to continue.

19             Mr. Kenner, retake the stand.

20             (Whereupon the witness retakes the witness

21  stand.)

22             (The jury enters the courtroom.)

23             THE COURT:  Please be seated.

24             I understand alternate 6 is waiting for more

25  information, and obviously, if you need to break again at

Kenner - redirect/Haley

5021

1   any point, raise your hand right away.

2             Go ahead, Mr. Haley.

3             MR. HALEY:  Thank you, your Honor.

4   BY MR. HALEY:  (Cont'd)

5   Q.   Mr. Kenner, we were -- I believe we left off, sir,

6   you testified concerning the highlighted portion.  I won't

7   repeat that, sir.

8             In terms of Mr. Gaarn and stock transactions, we

9   covered, "there is a camera."  And the transcript, sir,

10  the conversation then continues, again, it will be

11  available if it's requested by the jury.

12            There comes a point in time where, at least what

13  we have for purposes of this transcript and the recording,

14  comes to an end, true?

15  A.   Yes.

16  Q.   Now, when Tommy Constantine within that litany of

17  statements made the accusation with respect to Tim Gaarn

18  and the Gaarn stock sales, did you respond to that?

19  A.   No, I did not.

20  Q.   Why not?

21  A.   I didn't understand what he was talking about, and I

22  had no issues with the transaction Mr. Gaarn had had.

23  Q.   With reference to this recording, I believe you

24  testified on direct that you maintained the recording and

25  turned it over to whom, sir?

Kenner - redirect/Haley

5022

1   A.    Immediately after the recording at Home Depot, I went

2   home and I made a copy of the CD -- a copy of the

3   recording on to a CD, and I sent it by mail to the

4   attorney for the group that was investigating Mr.

5   Constantine, including all the investors.

6   Q.    When you made that recording at that time, it was

7   your understanding, impression, belief, that the entire

8   recording, as contained on your iPhone, was copied to be

9   sent out?

10  A.    Yes, sir, that's what I tried to do.

11  Q.    At the point in time you sent this recording to

12  Michael Stolper, were William Ranford and Steven Rucchin

13  part of what I will call the Stolper group?

14  A.    Yes.

15  Q.    When you sent that recording off to attorney Stolper,

16  did you give him any instructions that only he and he

17  alone should listen to that tape?

18          MR. MISKIEWICZ:  Objection.

19          THE COURT:  Overruled.  You can answer that.

20  A.    No, sir, it was for Mr. Stolper to share with the

21  group.

22  Q.    Mr. Kenner, I'm going to ask you to look at a

23  document marked Kenner Exhibit 237.

24  A.    Yes, sir.

25  Q.    What is it?

Kenner - redirect/Haley

5023

1   A.    This was -- these were two text messages that I sent

2   to Michael Stolper on August 18, 2010 and his two

3   responses immediately to me thereafter.  This was the day

4   that Mr. Constantine held a conference call and in-person

5   shareholder meeting at Eufora's office in his Scottsdale,

6   Arizona.

7   Q.    And that particular e-mail was sent to Mr. Stolper

8   for what purpose?

9   A.    This text message was sent to him while I was

10  listening to a conference call on a phone, and I just

11  informed Mr. Stolper, who I believe was also listening at

12  the time, I just commented on some of the representations

13  Mr. Constantine had made to the entire group of Eufora

14  investors.

15  Q.    Any particular comment that Mr. Constantine had made

16  during that conversation?

17  A.    Yes, he insinuated to the entire group that the Tim

18  Gaarn stock sales were illegal and that he was working

19  with law enforcement to go after Tim Gaarn for those

20  sales.  And then shortly thereafter, he said, about a

21  minute later, he threatened that law enforcement was going

22  to get involved to go after Mr. Gaarn.

23  Q.    Let me ask you this, Mr. Kenner:  Is this a true,

24  accurate and complete copy of the text messages that you

25  just testified to?

Kenner - redirect/Haley

5024

1   A.   Yes, sir.

2        MR. MISKIEWICZ:  The government has no

3   objection.

4        MR. HALEY:  Makes things easier, Judge.  Thank

5   you.

6   Q.   As relates --

7        THE COURT:  Hold on.  Any objection?

8        MR. LaRUSSO:  To these, no, your Honor.

9        THE COURT:  What's the number?

10       MR. HALEY:  Kenner Exhibit 237.

11       THE COURT:  Okay.  Kenner Exhibit 237 is

12  admitted.

13       (Kenner Exhibit 237 received in evidence.)

14  Q.   Just for purposes of the record, as relates to Kenner

15  Exhibit 237, first block, this is a message from who to

16  who?

17  A.   The top two text message blocks are messages I sent

18  to attorney Michael Stolper with the appropriate time

19  stamps, and the bottom two blocks were his responses to

20  me.

21  Q.   For purposes of the record, the first block simply

22  reads:  Tommy has the Kenner gave Gaarn stock as an

23  illegal transfer issue on the table.  He's threatening

24  with law enforcement to go after us.

25       Who wrote that?

Kenner - redirect/Haley

5025

1    A.    I wrote that to attorney Stolper.

2    Q.    Then the next block, he just threatened law

3    enforcement involvement to settle the issue with the

4    Kenner/Gaarn transfer.  Do you see that?

5    A.    Yes, sir.

6    Q.    Who wrote that?

7    A.    I wrote that again to Mr. Stolper.

8    Q.    And then Stolper responds, correct?

9    A.    Yes, sir, he did.

10   Q.    What was his response?

11   A.    Eight seconds later, he responded:   Predictable.

12   Q.    Did he respond further?

13   A.    About a minute 45 seconds later, he responded:

14   Hopefully recorded.

15   Q.    How did you regard Tommy's comment in that regard?

16   A.    I believe them to be just more an attempt to disrupt

17   the group's continuity between attorney Michael Stolper

18   and the people that Mr. Constantine thought were leading

19   the investigation efforts against him.

20   Q.    Was there any truth to his claim of the illegal

21   transfer issue on the table regarding Kenner and Gaarn?

22   A.    No, sir.

23   Q.    Mr. Miskiewicz, on cross-examination, asked the

24   question that related to should it be proven that the

25   Jowdy loan is phony, and I don't recall the balance of his

Kenner - redirect/Haley

5026

1  question.  Do you recall that instance, where he asked the

2  question, in that vein?

3  A.   Yes, I do.

4  Q.   We are not going to repeat any testimony, Mr. Kenner,

5  regarding the circumstances under which the loan came into

6  existence or the document known as the revolving line of

7  credit, but my question to you is this:  As relates to the

8  document itself, the revolving line of credit, has there

9  been any instance that you are aware of where Mr. Jowdy

10  has offered and utilized that document as an authenticate

11  in any litigation?

12  A.   Yes, sir, he did.

13  Q.   And you were present when that occurred, is that

14  correct?

15  A.   Yes, sir, I was in the courtroom that day.

16  Q.   Would you tell us what occurred?

17  A.    I was on the witness stand in the Glenn Murray versus

18  Ken Jowdy million dollar lawsuit in Nevada, and Jowdy's

19  attorneys presented the revolving line of credit document

20  as an authentic document in the case, and the question --

21          MR. MISKIEWICZ:  Objection.

22          THE COURT:  Why don't you approach?

23          (Continued on the next page.)

24

25

Kenner - redirect/Haley

5027

1          (Sidebar.)

2          MR. HALEY:  The litigation he is referring to is

3   a litigation involving Glenn Murray versus Ken Jowdy.  And

4   in that litigation, part of Mr. Jowdy's defense was that

5   the obligation to pay back Ken Jowdy pursuant to their

6   agreements was not indeed -- it was falsified.  Part of

7   his defense was there was no need for there to be any loan

8   that I -- that loan of money, because I had access to

9   money from the revolving line of credit, the specific line

10  of credit we are speaking of.  So he, to his attorney in

11  the presence of Phil Kenner, offered that as an authentic

12  document to show that -- to make that point.

13         MR. MISKIEWICZ:  Sorry, who didn't need

14  authority?  I lost the train there.

15         MR. HALEY:  I might have lost the train myself,

16  quite frankly, gentlemen.

17         During the course of that litigation, the line

18  of credit document was offered by Ken Jowdy as an

19  authentic document to show that he had access to a line of

20  credit from Little Isle IV that was flowing his way in

21  defense of the claim against Glenn Murray.  That's my

22  understanding of the circumstances.

23         THE COURT:  This is all obviously hearsay in the

24  context of another litigation.  I will let you bring out,

25  because there has been some back and forth regarding the

Kenner - redirect/Haley

5028

1   authenticity of that document, that he relied on in that

2   litigation, but in terms of the details that you just

3   explained, I'm going to sustain the objection.  I don't

4   think you need to go into the details of the civil

5   litigation.  You can ask him again, I think he said it,

6   did Mr. Jowdy and his attorneys rely on that document to

7   be authentic in that litigation.

8            MR. HALEY:  Thank you.

9            MR. MISKIEWICZ:  Judge, may we have -- I guess

10  in light of the ruling, it wouldn't matter.  I think he

11  already testified to that.

12           MR. HALEY:  I will leave it alone then.

13           THE COURT:  I think he did, too.

14           MR. MISKIEWICZ:  I would ask the Court to strike

15  that, but you are saying it should be permitted?

16           THE COURT:  Yeah, the door has been opened on

17  that because of the other questioning of him regarding the

18  other litigation, so I'm going to allow it to that extent,

19  but no more.

20           (Sidebar concluded.)

21           (Continued on the next page.)

22

23

24

25

Kenner - redirect/Haley

5029

1        (In open court.)

2    BY MR. HALEY:

3    Q.   Mr. Kenner, with reference to Diamante Cabo San

4    Lucas, did there come a point in time that Diamante Cabo

5    San Lucas was established by way of an LLC?

6    A.   Yes, sir.

7    Q.   And when the line of credit was signed by Mr. Jowdy,

8    as you testified to, had Diamante Cabo San Lucas, at that

9    point in time, been actually formalized by way of an LLC?

10   A.   Not yet at that time.

11   Q.   Well, it's true, is it not, that the document itself,

12   the revolving line of credit that Mr. Jowdy signed, refers

13   to Diamante Can San Lucas, is that correct?

14   A.   Yes, sir, it does.

15   Q.   Would you explain to us how it happened it makes

16   reference to an LLC not yet actually created as a Delaware

17   corporation?

18   A.   The revolving line of credit does not actually refer

19   to Diamante Cabo San Lucas as an LLC.  It simply

20   references it in name.  In 2004, when Mr. Jowdy informed

21   me it was important for us as a development group at

22   Diamante, the parent company, to go to Cabo San Lucas,

23   look for a golf location to further our notoriety or our

24   exposure in the golf world, he talked about going

25   immediately going to Cabo San Lucas to develop a new

Kenner - redirect/Haley

5030

1   resort called Diamante Cabo San Lucas, and the property we

2   first looked at was called Corencia.

3          We were going to rename it Diamante Cabo San

4   Lucas.  When that fell through, the second property was

5   Coletta and Santa Maria Bay, and then when that deal fell

6   through, the third property, eventual site for Diamante,

7   was a property known as El Cardenal, which was then

8   ultimately named Diamante Cabo San Lucas when that deal

9   was finalized with Lehman Brothers in March of '06.

10  Q.    Now, just a series of questions, Mr. Kenner,

11  regarding some of the questions asked of you on

12  cross-examination.  With respect to the instance where you

13  were at Chase Bank and were advised, told, of the need to

14  report transactions by way of a currency transaction

15  report, CTR, you told us that you were advised by the bank

16  as relates to that, is that correct?

17  A.    I believe that's what I said.

18  Q.    And you were asked by Mr. Miskiewicz on

19  cross-examination, is it your testimony that Chase Bank

20  advised you, in substance, not to comply with those CTR

21  requirements?  Do you recall that question?

22  A.    Yes, I recall that question.

23  Q.    Just tell us who you were speaking with at the

24  branch.  Was it -- who were you speaking with at the

25  branch as it relates to that conversation?

Kenner - redirect/Haley

5031

1    A.   The teller at the window when I asked her about

2    making a withdrawal.

3    Q.   What is your memory as to the conversation you had

4    between you and this teller?

5    A.   I told the teller I wanted to withdraw the funds that

6    were just deposited, and I believe she had told me that

7    she wouldn't have to fill out paperwork if I would take

8    out less than $10,000 increments, and she asked me if I

9    needed all that money that day, and I told her no.

10   Q.   Now, as relates to that less-than-$10,000 increments,

11   I believe you testified on direct you were seeking to

12   avoid the authorities knowing of those transfers, is that

13   true?

14   A.   The withdrawals?

15   Q.   Yes.

16   A.   Yes.

17   Q.   And we will let the prior testimony stand in that

18   regard.

19        Let's move on to another matter, sir.

20        Government 103, the e-mail to Mr. Stolper,

21   paragraph 8, where you referred to whether Tommy

22   Constantine had -- John Kaiser had a particular ownership

23   interest, do you recall that e-mail?

24   A.   Yes, I do.

25   Q.   Would you explain the substance and meaning of that

Kenner - redirect/Haley

5032

1    e-mail?

2    A.    I recall Mr. Stolper forwarding along a

3    countercomplaint that Mr. Constantine and his lawyers

4    filed against the Eufora investors and the individuals

5    that he believed were involved with the investigation.

6    And Mr. Stolper asked me to take a look at the details of

7    the countercomplaint and make any commentary, any specific

8    issues I thought were not factually accurate at that time.

9          And based on memory, I responded to him to try

10   and get a response back to him for the group.

11   Q.    Well, at that point in time, the response you gave to

12   Mr. Stolper was or was it not accurate?

13   A.    As I sit here today, I know it was not accurate.

14   Q.    The questions asked by Mr. Miskiewicz of you on

15   cross-examination regarding the Centrum loan and the

16   issues related to interest payments to the -- from the

17   lines of credit as relates to the loan, do you recall that

18   series of questions?

19   A.    Yes, I do.

20   Q.    Would you simply explain what you were trying to

21   accomplish as relates to that matter and whether or not

22   you succeeded?  Just tell us.

23   A.    The Centrum loan, which was taken out to be a very

24   short-term loan, we thought it would be maybe as short as

25   30 days, was a 12 percent interest rate loan, as I recall,

Kenner - redirect/Haley

5033

1    and we had an opportunity that was ongoing with Mr. Jowdy

2    at 15 percent due to the revolving line of credit loan.

3           So at that point in time, I believe we were in a

4    better position to gain 3 percent interest on that money,

5    which reduced our cost of capital by 3 percent as a result

6    of that transaction.  And frankly, had we been paid back

7    at the Lehman closing March of '06, it would have been a

8    very positive transaction for the group in my opinion.

9    Q.   When you made that decision, was that decision a part

10   of an artifice or scheme to defraud your hockey player

11   clients?

12   A.   No, sir.

13   Q.   Mr. Kenner, a number of questions were asked by Mr.

14   Miskiewicz concerning whether or not you had made

15   disclosure of the Jowdy loan and the loan to, excuse me,

16   number of questions were asked by Mr. Miskiewicz as to

17   whether or not you had given disclosure of the Jowdy loan

18   and the monies flowing to Tommy Constantine in the exhibit

19   marked Kenner Exhibit 16.  Do you recall those questions?

20   A.   Yes, sir, I do.

21   Q.   There has been testimony and you testified that you

22   held certain licenses, Title VII and --

23   A.   Series 7, Series 63 and Series 65 license I held for

24   a number of years.

25           (Continued on the following page.)

Kenner - Redirect/Mr. Haley

5034

1  BY MR. HALEY:

2  Q.    As a result of your obtaining of licenses as a result

3  of your profession as a financial advisor, did you have an

4  understanding as to what type of information is included

5  in an operating agreement and what type of information is

6  not included in an operating agreement?

7  A.    Yes.

8  Q.    And did you have an understanding, sir, as to what

9  type of information would be included in a disclosure

10  letter of this type, identified as Kenner Exhibit 16?

11  A.    Yes, sir.

12  Q.    Now, those documents were prepared by others.  Is

13  that correct?

14  A.    Yes.  It was prepared by our securities attorney

15  Larry Markowitz, and attorney William Machem.

16  Q.    But you are aware of the contents of those documents.

17  Is that correct?

18  A.    Yes, sir.  They had asked me questions during

19  preparation.

20  Q.    Did they have, as they prepared those document in

21  connection with the Lehman loan, access to books and

22  records of what I will call the Hawaii land project?

23  A.    Yes, they did.

24  Q.    Was there ever an instance where you refused to

25  provide them such records or where you hid such records

Kenner - Redirect/Mr. Haley

5035

1    from those attorneys?

2    A.    No, sir.

3    Q.    By the way, as relates to the package of documents

4    that was created vis-à-vis the Lehman closing with

5    reference to whether was called the home site lots.

6    A.    Yes, sir.

7    Q.    Did they appear referenced in any particular

8    document?

9    A.    The home sites, which have been referred to here as

10   the Discovery Harbor lots, were originally referenced as

11   being specifically excluded from the deal with Lehman

12   Brothers and Windwalker during the term sheet initially

13   signed between the parties and then subsequent to the

14   final documentation which was the 7-inch-thick package

15   that Mr. Sydor forwarded to the court, it is also

16   referenced in there as the home sites being specifically

17   excluded as a contribution of the joint venture

18   partnership.

19   Q.    You were asked a question as to whether or not the, I

20   believe it was the equity transfer agreement, made

21   reference to the Discovery Harbor property?  Or was it the

22   environmental indemnity agreement?

23         Do you recall which one?

24         I will ask the question this way, sir.

25   A.    Okay.

Kenner - Redirect/Mr. Haley

5036

1   Q.   With reference to what has been referred to as the

2   environmental indemnity agreement and/or the home, the

3   equity transfer agreement, were the Discovery Harbor

4   properties mentions in either of those documents?

5   A.   No.

6                (Continued on the following page.)

Kenner - Redirect/Haley

5037

1  Q.    Why not?

2  A.    It was a completely separate business transaction,

3  neither had anything to do with the other.

4  Q.    There was an American Express bill shown to you; is

5  that correct?

6  A.    Yes, I believe it was the January 2005 bill.

7  Q.    And I'm going to show you Exhibit 3113, introduced in

8  evidence as a Government's Exhibit.

9  A.    Yes, sir, this is the.

10  Q.    Were there any specific events that occurred on or

11  about January 2005 as concerns that Amex statement that

12  you recall of relevance to this proceeding?

13  A.    As usual practice, Mr. Jowdy on behalf of Diamante,

14  had utilized my credit card with or without my knowledge

15  on occasion, to pay for advances on expenses that Diamante

16  had occured, and in or around this time, I believe in

17  December and January of 2005, we incurred significant --

18  excuse me, December of 2004 and January of 2005, we

19  incurred significant expenses in the neighborhood of 80 to

20  100,000 as part and parcel of throwing a five-day

21  hospitality event in Cabo San Lucas on behalf of both of

22  the Diamante properties.  And in January Mr. Jowdy made

23  arrangement to meet with some hard money lenders in

24  Australia and Fuji in funding the Mexican projects around

25  I believe it was probably on this statement that I had

5038

1   paid for the travel for that which probably totaled

2   another $30,000 plus or minus, just for that trip alone.

3   Q.   When you were asked questions about your 39 percent

4   interest in Diamante Cabo San Lucas by Mr. Miskiewicz, you

5   did have that business relationship with Ken Jowdy at that

6   time; is that correct?

7   A.   Yes, sir, I did.

8   Q.   Now, I do want to read, and I'm almost finished,

9   Mr. Kenner.  I do want to read in the record the testimony

10  you gave on cross-examination by Mr. Miskiewicz, which

11  begins at page 4712 at line 14.

12          Mr. Miskiewicz:  So you transferred, according

13  to your testimony in August 11, 2010, Baja Ventures, the

14  same company that has a 39 percent stake in Diamante Cabo

15  San Lucas, right?

16  A.   That is incorrect.

17  Q.   My only question is did or did you not say that?

18  A.   I did not say that.

19          MR. MISKIEWICZ:  Objection.

20          THE COURT:  I'll allow him to read a portion of

21  that.  I assume he's setting up a question.

22          MR. HALEY:  I am, Judge, not without purpose.

23  Thank you.

24          THE COURT:  Go ahead.

25  BY MR. HALEY:

Kenner - Redirect/Haley

5039

1    Answer:  I did not say that.  The deposition

2 transcript is incorrect.  It was referring to Hawaii

3 Ventures 2006 in the equity transfer agreement. "

4 Q.   Do you remember did you say "it" was referring to the

5 Hawaiian Venture 2006 the equity transfer agreement or

6 "I?"

7 A.   I believe it was meant to say "I" was.

8    Question:  So you are saying the person who

9 transcribed this testimony somehow miraculously knew the

10 company of Baja Ventures which you just happened to own

11 39 percent of, right, and substituted that word for

12 something else called Hawaiian Ventures.  Is that what you

13 want these people to believe?"

14 Q.   Do you have do you recall that question?

15 A.   Yes, sir, I do.

16 Q.   Now, when Mr. Miskiewicz said is that what you want

17 these people to believe, who do you believe he was

18 referring to?

19    MR. MISKIEWICZ:  Objection.

20    THE COURT:  Overruled, you can answer.

21 A.   He was referring to the members of the jury.

22 Q.   Let me ask you this question:  The day you gave that

23 answer to that deposition, where were you?

24 A.   I was on a telephone at my home in Las Vegas.

25 Q.   And how did that come to be, sir, that you were on a

5040

1    telephone in a home in Las Vegas during this deposition?

2    A.    It was a telephonic deposition.  The person asking

3    the questions was I believe in a legal office with a

4    stenographer in Phoenix, Arizona, and my attorney at the

5    time was on a conference call with us in his office at a

6    separate location, being Arizona, and they called me

7    together on the phone.

8    Q.    Preceding that telephonic deposition, had you

9    previously been deposed regarding Hawaii Ventures and Baja

10   Ventures LLC or Baja Ventures 2006?

11   A.    Yes, sir.  It was in the same matter.

12   Q.    When did that take place?

13   A.    It took place about a month and a half, two months

14   prior to the best of my recollection when all parties were

15   together at the law offices of Mr. Nolan and his attorney,

16   Mr. Meeks.

17   Q.    During that in-person deposition, was the name Hawaii

18   Ventures mentioned during the course of your deposition?

19   A.    Yes, it was.

20   Q.    Was the entity known as Baja Ventures mentioned

21   during the course of that deposition?

22   A.    Yes, it also was.

23   Q.    Were there documents wherein the word Baja Ventures

24   2006 appeared during the course of that deposition?

25   A.    Yes, sir.

Kenner - Redirect/Haley

5041

1   Q.    Now, you had participated in depositions before; is

2   that correct?

3   A.    Yes, sir.

4   Q.    And as relates to documents utilized in depositions

5   outside of court, who in your experience marks that

6   deposition for purposes of the transcript?

7   A.    The stenographer would mark the exhibits when they

8   were presented to the person giving the interview.

9   Q.    And in so doing I take it the stenographer at that

10  point in time would have an opportunity to at least see

11  the face of the document; is that correct?

12  A.    Yes, of course.

13  Q.    In other words, it is different than what you see me

14  doing around the courtroom, where I take a document and I

15  may put a sticker on it, the attorney himself.

16        In these civil depositions, it is the

17  stenographer that does it?

18  A.    Yes, it is the stenographer, not the attorneys.

19  Q.    So, Mr. Kenner, there was nothing miraculous, was

20  there about this stenographer knowing of Baja Ventures

21  2006 before you made that comment on the record that day?

22  A.    No, sir.

23        MR. HALEY:  May I have one quick moment, Judge.

24  Q.    Finally, Mr. Kenner, and I hope I don't eat my words,

25  Mr. Kenner, I'll ask you to take a look at Kenner

Kenner - Redirect/Haley

5042

1   Exhibit 238.

2          Do you recognize that?

3   A.   Yes, I do.

4   Q.   And just what is it?

5   A.   This was a text message, two text messages that

6   Michael Peca sent me on July 14, 2010, regarding the

7   potential loan buyout at Eufora from Mr. Constantine and

8   Neptune Lenders.

9          MR. HALEY:  Your Honor, I believe this is

10  admitted as 2308, but I don't want to speak for

11  Mr. LaRusso.

12         MR. LARUSSO:  I have no objection, Judge.

13         MR. MISKIEWICZ:  No objection.

14         THE COURT:  238 is admitted.

15         (Whereupon, Defendant's Exhibit 2308 was

16  received in evidence.)

17  Q.   Now, it reads from Mr. Peca to you, "if not all

18  willing members get a chance to be part of the loan

19  buyouts, mean more percentage.  There may be a lynching,

20  FYI.

21         Do you see that?

22  A.   Yes.

23  Q.   And in summary fashion, Mr. Kenner, can you tell us

24  what, if any, meaning and relevance that particular text

25  message by Michael Peca has to matters under consideration

Kenner - Recross/Miskiewicz

5043

1  by this jury?

2  A.    During Mr. Peca's testimony he said he was unaware of

3  any loan buyout proceedings with regard to the attempt to

4  take over Eufora, but as a result of Mr. Stolper's

5  meetings and conference calls with the various Eufora

6  members in early July of 2010, he let everybody know that

7  there was the Neptune loan was outstanding and one of the

8  ways to secure control over the company was to buy that

9  out.

10            A number of the individuals, including Mr. Peca,

11  represented to myself and to Mr. Stolper, that they wanted

12  to participate and putting up more money to actually buy

13  out the loan to help effectuate that process.

14            I believe Mr. Peca, Mr. Berard, Mr. McKee, also

15  were very adamant, they wanted to put up additional

16  capital in order to take advantage of that.

17            MR. HALEY:  Judge, I have no further questions.

18            Thank you, Mr. Kenner.

19            THE COURT:  Recross.

20  RECROSS-EXAMINATION

21  BY MR. MISKIEWICZ:

22  Q.    Sir, let's start with, you were asked a series of

23  questions by Mr. LaRusso yesterday about an exhibit that

24  Mr. LaRusso just showed you which is a variation of a

25  chart you've seen in the Government's case.  The

5044

1    mortgaging of Honuapo, titled Hawaii:  Centrum loan.  You

2    testified with respect to, I believe this particular

3    transaction here, $290,000 going from Mr. Constantine's

4    CMG account back to your company Ula Makika.  Again why

5    was the money coming back to you at that particular

6    moment?

7    A.    I don't recall previously testifying about that

8    transaction.

9    Q.    Well, why was it then?  Why did Mr. Constantine send

10   you back -- you sent $650,000 out of the Centrum Financial

11   Services Mortgage proceeds to CMG.  Mr. LaRusso asked you,

12   I believe, a question about why the money was flowing back

13   and forth.  So why did Mr. Constantine at that particular

14   moment send you that money, if you recall?

15   A.    Okay.  I apologize.

16          I don't remember that specific question, but

17   with respect to the 290,000, if I recall correctly, I

18   think there was an issue at the bank when I had initiated,

19   I believe, a $300,000 wire transfer to Mr. Constantine as

20   part and parcel to his funding consulting agreement and

21   there may have been a second wire transfer sent by the

22   bank to Mr. Constantine in and around that period of time.

23   I can verify it with the bank statements, if we have them.

24          I think when we realized that the bank had in

25   error send sent a second wire transfer simply based on

Kenner - Recross/Miskiewicz

5045

1    some confusion between the banker and myself, I informed

2    Mr. Constantine and he sent a wire transfer back

3    immediately for $290,000.

4    Q.   I will show you what is in evidence --

5              MR. MISKIEWICZ:  May I have a moment to confer.

6    Q.   I will show you what is in evidence as 1751, this is

7    a Bank of America statement for Constantine Management

8    Group from that period of time on this chart.

9              Is this the $300,000, the couple $300,000 wire

10   transfers that you are referring to?

11   A.   Can I see the whole statement, please?

12   Q.   You can see the whole statement, but my question is

13   you said there were two $300,000 wire transfers, sir?

14   A.   I'm trying to recall from looking at this statement,

15   the portion that I can see.

16             Those are two transfers for 300 and 350,000, but

17   I'm not sure what the dates are.  There are references to

18   a previous exhibit.

19   Q.   Are you saying this had something to do with the fact

20   that there was something wrong with one of the wire

21   transfers that had to come back to you from the

22   fund-raising agreement?

23   A.   What I was referring to in the period of time it may

24   be different.  That's why I suggested to you if I saw the

25   bank statements I should show you which one.  But I do

5046

1  recall there was a point in time there were two wire

2  transfers sent for similar amounts to Mr. Constantine on

3  or about the same day and I realized that with the banker

4  because there was some miscommunication.  I had asked

5  Mr. Constantine to return the funds, and he sent back, I

6  believe it was a wire transfer for $290,000.  I just don't

7  recall the dates that those transactions occurred.  But

8  Mr. Constantine was completely cooperative with the

9  mistake on our end.

10  Q.    He was cooperative?

11  A.    He returned the funds when I requested that he return

12  the funds.

13  Q.    And it's a return of funds, is it your testimony,

14  that was accidently sent to him?

15  A.    It was a return of funds sent in error based on a

16  miscommunication between myself and the banker.

17  Q.    Let me show you the entire portion here of this

18  report.

19          In fact, sir, isn't it true that --

20  A.    May I see the whole statement, please?

21  Q.    I'm showing you a portion of the statement I'm asking

22  you about.

23          Isn't it true, sir, that you received money from

24  Mr. Moreau, one of your client at the time, and if I can

25  write on Mr. LaRusso's chart, Ethan Moreau, 290,000 on

5047

1   7/27/05, goes right into Mr. Constantine's account.

2   That's that wire transfer.  (Indicating)

3   A.    It appears to be.

4   Q.    7/27/05?

5   A.    There appears to be a wire transfer for $290,000,

6   that's correct.

7   Q.    The only function of that is that Mr. Constantine

8   then does immediately wire transfer that money back out to

9   you?

10  A.    Not actually to mean.  It was wired out to the

11  Hawaiian partners bank account.

12  Q.    Who controls this bank account?

13  A.    I do.

14  Q.    You always controlled it, didn't you?

15  A.    Yes, sir, I always controlled all of the Hawaiian

16  bank accounts.  Those were my responsibilities as the

17  managing partner.

18  Q.    Having seen this, do you want to revise anything

19  about your testimony that this was necessitated by having

20  returned some of the fund-raising money?

21  A.    No, sir.

22  Q.    Today, earlier, you testified about your meetings

23  with Special Agent Matthew Galioto, and I take it, sir,

24  your testimony is having met with Mr. Galioto and having

25  subsequently learned that Ken Jowdy hired Louie Freeh, a

5048

1   former FBI director, that in essence, that was a

2   government conspiracy to shift the direction of this

3   investigation towards you and absolve Mr. Jowdy because

4   the former director of the FBI now represented Mr. Jowdy

5   as a defense lawyer.

6          Is that fair?

7   A.   I never met with Mr. Galioto.  We spoke on the phone

8   on one occasion for about 20 to 30 minutes on June 24 of

9   2009.

10  Q.   How many minutes?

11  A.   About 20 to 30 minutes, I believe.

12  Q.   Okay.  Telephonically?

13  A.   Yes, sir.

14  Q.   And that was the first time you met with -- spoke to

15  the FBI about what you are testifying about here?

16  A.   Yes, sir, I believe it was.

17  Q.   But my question to you is, in sum and substance, you

18  are accusing the FBI of having diverted attention away

19  from Mr. Jowdy and focused on you because Louie Freeh, the

20  former director of the FBI, the director who supported the

21  impeachment of the former President of the United States,

22  decided it was more important to save Ken Jowdy and wanted

23  this investigation to go after you.  Is that your

24  testimony?

25  A.   That is not my testimony.

Kenner - Recross/Miskiewicz

5049

1    Q.    What was the purpose of suggesting that immediately

2    after Louie Freeh got involved in this investigation, a

3    subpoena was drawn and the investigation or investigator

4    ceased having an investigation with you.  Wasn't that your

5    purpose in testifying about that, testifying there was a

6    conspiracy?

7    A.    I wasn't attempting.  I was merely stating the fact

8    what happened between June 24, 2009, and the beginning of

9    August 2009.

10   Q.    And the fact is that after some event, having to do

11   with Mr. Freeh, you -- your subpoena which you had

12   voluntarily accepted to receive was withdrawn, dropped,

13   you were never called to the grand jury.  Is that your

14   testimony?

15   A.    No, sir, but you can draw your own conclusion.

16   Q.    Well, my question to you is:  You received a

17   subpoena?

18   A.    Yes, sir, I received a subpoena through my attorney

19   Ronald Richards.

20   Q.    And there was a particular date for you to appear?

21   A.    Yes, I believe there was.

22   Q.    How soon after this telephonic interview with

23   Mr. Galioto did that subpoena direct you to appear in

24   Manhattan?

25   A.    I believe we received the subpoena a few weeks after

5050

1   the telephonic interview and I believe I was subpoenaed to

2   be in New York to testify shortly thereafter, within weeks

3   rather than within months.

4   Q.    And your interview, telephonic interview, was June of

5   2009, with Special Agent Galioto; is that correct?

6   A.    I believe it was June 24th.  That is correct.

7   Q.    So by July, August, 2009 you were supposed to appear

8   before the grand jury in the Southern District of New

9   York, is that approximately correct?

10  A.    That was my impression from the correspondence we had

11  exchanged with Mr. Galioto.

12  Q.    The next thing you knew that was withdrawn, and you

13  were never called to the grand jury, right?

14  A.    That's correct.  We made several inquiries as to when

15  they would need me, letting them know I would be available

16  anytime they needed follow-up.

17  Q.    Because subsequently the facts as you know them is

18  that at that point Mr. Jowdy was retaining the former

19  director of the FBI?

20  A.    Yes, sir, he did.

21  Q.    You've seen in this trial, among others, your own

22  attorney Mr. Haley utilize prior testimony from various

23  witnesses, correct?

24  A.    Yes, I believe so.

25  Q.    In fact one of the last series of questions just a

Kenner - Recross/Miskiewicz

5051

1    few moments ago on redirect was about a deposition or a

2    couple of depositions you gave in connection with a civil

3    litigation, correct?

4    A.    Yes, sir.

5    Q.    And it's true, sir, I asked you questions in your

6    cross that you then needed to clarify in redirect,

7    correct?

8    A.    Yes, we did.

9    Q.    Because in essence you believed or you wanted to

10   clarify the record that the transcript misunderstood what

11   you meant to say in a particular deposition, correct?

12   A.    I just answered the question Mr. Haley asked me.

13   Q.    In sum and substance, you've seen how prior testimony

14   under oath is used repeatedly throughout this process by

15   both sides, correct?

16   A.    Yes, I've been part of that.

17   Q.    And your testimony is that the FBI, the U.S.

18   Attorney's Office in Manhattan did not want you under oath

19   in a deposition essentially or transcript which might at

20   some point prove valuable, like right here.  Is that your

21   testimony?

22   A.    I was excited and willing to testify in front of the

23   Southern District or whoever the Government asked me to

24   testify at that point in 2009.

25   Q.    Where is the grand jury subpoena you said you

Kenner - Recross/Miskiewicz

5052

1   received?

2   A.   I've seen it in evidence.

3   Q.   Where?

4   A.   It was part of the documents that were turned over by

5   the U.S. government to Mr. Haley and then subsequently in

6   my possession for review.

7   Q.   And is there actually, did you see then a letter

8   saying that you were no longer required, or is the

9   subpoena simply hanging out there because you chose not to

10  testify before the grand jury?

11  A.   No, there was a letter sent back to us, a second

12  letter by the AUSA at that point in July of 2009

13  rescinding the original request for me, the Court subpoena

14  requiring me to go in front of the Southern District.

15  Q.   It's your contention because of this conspiracy to

16  divert attention away from Jowdy towards you, right?

17  A.   No, sir, we didn't receive any answer back as to why

18  they had terminated my grand jury subpoena at that point

19  in time.  But I was excited and willing to testify in

20  front of the grand jury.

21  Q.   Well, isn't it true, sir, that you continued to have

22  interviews and discussions with the FBI well after that

23  telephonic interview in 2009?

24  A.   I believe the only interviews I had with the FBI

25  after that point in time were on an unrelated matter to

5053

1   what Mr. Galioto and what the other individuals

2   interviewed me on June 24, 2009.

3   Q.   Well, do you recall in September 8, 2011, you

4   provided another telephonic interview to agents in

5   Virginia about Ken Jowdy, among other people?

6   A.   I recall being contacted by two FBI agents with

7   respect to the Roger Clemens investigation and the Senator

8   Mitchell hearings, and part and parcel to their

9   investigation they informed me they wanted to know about

10  the relationship with Roger Clemens, Mr. Jowdy providing

11  drugs to him and their collective relationship with Brian

12  McNamee who testified in front of Congress.

13  Q.   You have a recollection of that interview as well,

14  don't you?

15  A.   Yes, sir, I was a participant in I believe two phone

16  calls with those two agents.

17  Q.   And you told the FBI among other things, that

18  Mr. Jowdy was providing performance enhancing drugs to

19  Roger Clemens, correct?

20  A.   I indicated the information that I knew at that time.

21  Q.   And providing sex for hire at a number of Mexican

22  real estate developments that you've testified about today

23  or over the last week or so, correct?

24  A.   Although the statement is true, I don't recall if I

25  told that to the agents.

Kenner - Recross/Miskiewicz

5054

1  Q.    And there is nothing there at that time in which you

2  indicated anything about again reminding the FBI that you

3  wanted to voluntarily appear before the grand jury, is

4  there?

5  A.    It was --

6  Q.    Would you like to see the report, sir?

7         MR. HALEY:  May he be allowed to finish his

8  answer?

9         MR. MISKIEWICZ:  I'll withdraw the last

10  comments.

11  A.    It was an unrelated matter.

12  Q.    But you would agree with me, would this refresh your

13  recollection, it sounds like you would agree you didn't

14  comment anything about your continued willingness to

15  appear before any tribunal, grand jury or otherwise at

16  that point at the request of a subpoena.

17         Isn't that true?

18  A.    No, I believe during that 2011 interview, the two

19  phone calls if they needed me for any follow-up in person

20  or on the phone, to please just contact me directly.

21  Q.    Sir, just to go back to the original contact, the

22  original telephone contact, do you recall where you said

23  you lived at the time?

24  A.    During which original contact?

25  Q.    With Special Agent Galioto.

5055

1  A.    I don't recall where I specifically said I lived, but

2  at the time I believed I had two residences, one in

3  Scottsdale, Arizona where I spent about half my time with

4  my children, and my other residence was in Las Vegas,

5  Nevada, where I lived with my girlfriend at the time.

6            I would commute on a weekly basis back and

7  forth.

8  Q.    Showing you what has been marked for identification

9  as PK 1, I'm using that to distinguish between Kenner-1,

10  etcetera.

11           (Handing to counsel.)

12           MR. HALEY:   Thank you.

13  Q.    Directing your attention to the first two lines of

14  that exhibit.  Let me ask you, if that helps refresh your

15  recollection about what you told Special Agent Galioto

16  about where your residence was at that time in 2009?

17  A.    (Perusing.)  No, it does not because I've never

18  resided in Bolder, Colorado.

19  Q.    So you never told Special Agent Galioto on the phone

20  that you were then living in Bolder, Colorado, right?

21  A.    No, sir, I've been in Bolder, Colorado for a grand

22  total of three days in my life.

23  Q.    I assume you reject that as you have I think you have

24  previously rejected any suggestion that you told people

25  that you were living in a hole or in a cave in Mexico.

5056

1  Certainly that is untrue, is that your testimony?

2  A.   I'm sorry.  I didn't follow the question.

3  Q.   You are saying that Mr. Galioto or Special Agent

4  Galioto made up the fact that you told him that in June of

5  2009 you were residing in Bolder, Colorado, is that your

6  testimony?

7  A.   It is entirely possible that in June of 2009 when I

8  did the phone interview with Mr. Galioto that I was in

9  Bolder, Colorado on that three day trip with my family,

10  but I would never use the term I resided in Bolder,

11  Colorado because I only had been there approximately three

12  days in my life.

13  Q.   That was an interview by phone in which Mr. Richards

14  was participating by?

15  A.   Yes, sir, he was on my behalf.

16  Q.   And he was there to help you in any way if necessary

17  during that interview, correct?

18  A.   No, actually Mr. Galioto had arranged the phone call

19  with Mr. Richards, and he was participating to help

20  coordinate getting everyone on the phone together.

21  Q.   So Mr. Richards would have overheard whether or not

22  you said I'm currently residing in Colorado or not,

23  correct?

24  A.   Anybody on the phone would have heard whether I said

25  that or not.

5057

1  Q.    And you did tell the FBI then, as you've testified,

2  that in sum and substance, as you've been testifying, Ken

3  Jowdy stole this money from hockey players.  Isn't that

4  what you told Mr. Galioto, and I'm summarizing greatly,

5  but in sum and substance?

6  A.    In summary, yes, in fact I laid out a few of the

7  details I knew at that point in time including the very

8  first wire transfer being made to Mr. Jowdy in or about

9  August 2 of 2002 and the fact that he had immediately

10  diverted approximately 400 of the first $750,000

11  deliberation my investors gave him in August of 2002, in

12  addition to other details regarding the thefts that

13  Diamante Air that we spoke about previously in this trial,

14  the $3 million loan he inadvertently took out at the

15  Diamante Del Mar to have the property total loss and in

16  foreclosure and our ongoing concerns about embezzlement,

17  diversion at the Diamante house, Cabo San Lucas diversions

18  that had occurred that led Mr. Richards to file two

19  California lawsuits on behalf of the 19 investors.

20  Q.    You said all that during your telephonic interviews?

21  A.    Yes, sir, I did.

22  Q.    Showing you PK-1 again.  Show me where it says any of

23  that?

24  A.    I don't believe it says that.  I recall reviewing

25  that document during pretrial.

Kenner - Recross/Miskiewicz

5058

1      MR. HALEY:  Judge, may I just object --

2      THE COURT:  Sustained.

3      MR. MISKIEWICZ:  I'll withdraw that.

4   Q.   Isn't it true, sir, that during that interview, you

5   didn't say any of that, you said Mr. Jowdy had approached

6   you about needing capital for his Mexico project and you

7   in sum and substance were not interested because the

8   answers or information he gave to you were vague about the

9   investment, isn't that true?

10  A.   That wouldn't make any sense considering my clients

11  and I loaned Mr. Jowdy in the neighborhood of $25 million.

12  Q.   Isn't it true, sir, that you also merely told the FBI

13  that Michael Peca who was then during these discussions,

14  purported discussions with Mr. Jowdy, living in New York

15  while playing for the Islanders, and that he on his own,

16  decided to invest but not because of you.  Isn't that what

17  you told the FBI?

18  A.   I don't recall that.

19  Q.   Let me show you PK-1, and ask you look at any of it.

20  I would suggest looking at the last couple of paragraphs

21  (handing).

22  A.   This doesn't appear to be notes from the entire

23  conversation but I do see the Michael Peca comment and it

24  doesn't say it has anything to do with Michael Peca

25  investing in the Jowdy project without me.

Kenner - Recross/Miskiewicz

5059

1       MR. MISKIEWICZ:  Government would offer PK-1 in

2   evidence.

3           THE COURT:  Any objection?

4           MR. LARUSSO:  May I see it first, Judge?

5           MR. HALEY:  May I see it?  May I see the

6   highlighted portion?

7           MR. HALEY:  Your Honor, can we approach?

8           THE COURT:  Yes.

9           (Whereupon, at this time the following took

10  place at the sidebar.)

11          (Continued.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner - Recross/Miskiewicz

5060

1          MR. HALEY:  (Handing to Court).

2          Judge, I don't believe a proper foundation has

3    been laid for the introduction of this document.

4          THE COURT:  Lay a foundation.

5          MR. MISKIEWICZ:  Okay.

6          (End of sidebar conference.)

7          (Continued.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kenner - Recross/Miskiewicz

5061

1          (In open court.)

2     Q.    It's true, sir, you continued to have telephonic

3     interviews, communicate information to law enforcement

4     right up through 2012, correct?

5     A.    I don't recall specifically any other interviews

6     other than the one in 2009 we've been discussing and the

7     two phone calls that we had with the Virginia agents.

8     Q.    Do you remember having another either meeting or

9     telephonic conversation with members of the Southern

10    District of New York at 4:30 p.m. on or about March 20,

11    2012 -- let me show you what I'm marking for

12    identification as Government's Exhibit PK-3.

13          MR. LARUSSO:  May I, your Honor, look over their

14    shoulder?

15          MR. MISKIEWICZ:  Your Honor, we're trying to

16    resolve an issue.  We may work around it and will return

17    to this issue after the next break.

18    Q.    But in the meanwhile, Mr. Kenner, you provided to

19    various law enforcement agencies, including the FBI, all

20    kinds of information, including Social Security numbers

21    and date of births of your various former clients of

22    yours, didn't you?

23    A.    Not that I recall.

24    Q.    PX-4.

25          I'll ask you to look at this and ask you whether

5062

1    or not this is a document you prepared?

2    A.    Okay.  Yes, I recall this document.

3    Q.    And that's a document that you provided to law

4    enforcement agents, including the FBI and Scott Romanofsky

5    in 2012, is it not?

6    A.    I don't believe Mr. Romanofsky was involved in the

7    discussion.

8    Q.    Sir, who was it then?

9    A.    I believe that was prepared at the request of the

10   criminal division of the IRS either out of Scottsdale,

11   Arizona or Denver, Colorado.

12   Q.    And in sum and substance you were attempting to get

13   among other people, Brian Berard, Ken Jowdy and Tommy

14   Constantine, arrested by the IRS at that time, were you

15   not?

16   A.    At that point in time I was sharing investigation

17   with the criminal division of the IRS.

18   Q.    And among the pieces of information you were sharing

19   was Social Security numbers, dates and birth and other

20   personal information, privacy right information obtained

21   when you were associated with those men, correct?

22              MR. HALEY:  I just object to the form, your

23   Honor.

24              THE COURT:  Sustained as to form.

25   Q.    Among the pieces of information you provided were

5063

1   Social Security numbers and dates of birth and

2   Constantine, Jowdy, Brian Berard, correct, those people?

3   A.   Although I'm pretty sure the criminal division of the

4   IRS had the date of birth and Social Security numbers --

5           MR. MISKIEWICZ:  Sir, please I'll ask you to

6   answer the question.

7   Q.   The question I think is straightforward.  Yes or no?

8   A.   Could you ask the question again then.

9           (Whereupon, the record was read back by the

10  reporter.)

11  A.   Yes, those pieces of information were requested by

12  the investigators I was speaking with.

13  Q.   Isn't it true, sir, that during that entire period of

14  time, June of 2009 when you first had a telephonic

15  interview with Mr. Jowdy, to March of 2012 --

16          THE COURT:  You mean Agent Galioto.

17          MR. MISKIEWICZ:  I'm sorry.  I apologize.  May I

18  rephrase that again.

19  Q.   From June of 2009 until March of 2012, isn't it true,

20  sir, that you never once produced this loan agreement that

21  you purport to justify the stealing of millions of dollars

22  from your hockey players, did you?

23  A.   That is incorrect.  That document was in evidence

24  during the lawsuit I filed against Ken Jowdy in Arizona

25  for the nonrepayment of the loan.

5064

1  Q.  You never mentioned it to the FBI, you never produced

2  a copy of it.  I'm not asking you about what you said and

3  whatever litigation.

4          I'm asking you, sir, for three years you were in

5  contact with FBI agents around the country, you never once

6  produced that document, did you?

7  A.  I was never requested to by any of those individuals.

8  Q.  And you never were requested to produce Social

9  Security numbers, but you did that anyway?

10  A.  No, sir, I was requested by the criminal division of

11  the IRS in Scottsdale and subsequently in Denver.

12  Q.  The same IRS you would expect that would have that

13  information in their files anyway, isn't that what you

14  said a minute ago?

15  A.  Yes, sir, it was part of the request that they had to

16  put in sum and summary of each of those individuals for

17  them.

18  Q.  I'm confused with all due respect in sum and summary

19  -- I will do this as delicately as possible --

20          MR. HALEY:  I object to the form, Judge.

21          THE COURT:  Sustained.  No comments.  Ask

22  questions.

23          MR. HALEY:  Thank you.

24  Q.  Aren't you just making all of this up as you sit

25  there?

5065

1  A.    No, sir.

2  Q.    Aren't you lying about these documents, your

3  interactions with the people who relied upon you to take

4  care of their money?  Aren't you just lying about

5  everything?

6  A.    No, sir.

7  Q.    Are you lying about even being summoned to the grand

8  jury and then dropped like a hot potato?

9         MR. HALEY:  Now I will object, your Honor.

10         THE COURT:  Sustained.

11         MR. HALEY:  Thank you.

12  Q.    Aren't you lying about being summoned to the grand

13  jury and then the FBI deciding they were going to favor

14  Mr. Jowdy in Mexico over you.  Aren't you lying about

15  that?

16         MR. HALEY:  Judge, I object.

17         THE COURT:  Sustained.

18  Q.    Mr. LaRusso yesterday show you in connection with the

19  fund-raising agreement that is now in evidence as

20  Defendant's Exhibit C-261, among other documents, and

21  C-261 is on the screen now.

22         Sir, at the bottom of that line is where it

23  begins Gentlemen.  That is you writing, correct?

24  A.    I believe it is, yes.

25  Q.    And you are allegedly writing now to Ken Losch, among

5066

1    others, who you testified yesterday was a potential

2    funding source for the Hawaii development?

3    A.    Nothing was allegedly written.

4          This e-mail was sent in response to a series of

5    meetings face-to-face and phone calls that I had with both

6    Mr. Dewar and Mr. Losch at the time.

7    Q.    Mr. Losch at some point actually went to Hawaii, did

8    he not?

9    A.    I don't recall if he did or not.  I know they were

10    planning to as a result of our ongoing conversations.

11    Q.    Mr. Gaarn testified here that he received $200,000 as

12    an advance or finders' fee, if you will, because he put

13    somebody that he knew in touch with somebody else and that

14    chain of events ultimately led that Lehman Brothers

15    financing the Cabo San Lucas deal in Mexico.  Do you

16    remember that testimony?

17    A.    I believe it went something like that, correct.

18    Q.    You don't disagree that you in fact got for lack of a

19    better word finder's fee of about $200,000 for his role in

20    securing the Lehman Brothers money that went to that Cabo

21    San Lucas property?

22    A.    I believe in fact Mr. Jeff Keswin received a check

23    for 200,000 as a referral fee.  I'm not sure what

24    Mr. Gaarn and Mr. Keswin did as a result of Mr. Keswin

25    receiving that initial $200,000 payment, but I am aware

Kenner - Recross/Miskiewicz

5067

1  also that Mr. Jowdy subsequently or previous to that

2  disbursement to Mr. Keswin sent Mr. Gaarn $25,000 with

3  respect to the introduction assistance.

4  Q.    In sum, then, Mr. Gaarn got either entirely or a

5  percentage of $225,000 for making an introduction which

6  ultimately did lead to the financing of Cabo San Lucas,

7  correct?

8  A.    I believe that's what the payment was for.

9  Q.    This series of meetings, this e-mail string, led to

10 zero dollars for the Hawaii venture, correct?

11 A.    I'm sorry, could you ask that question again?  I

12 couldn't hear it.

13 Q.    This series of meetings with Mr. Losch and e-mail

14 strings led to zero dollars in financing for the Hawaii

15 venture; isn't that correct?

16 A.    That is correct, because in March of 2006 --

17        MR. MISKIEWICZ:  Sir, again, Mr. Haley I'm sure

18 will have an opportunity.

19        THE WITNESS:  All right.

20 Q.    Zero dollars as a result of this e-mail, but

21 nevertheless you took capital out of the Hawaii ventures

22 to the tune of over $1 million and gave it to

23 Mr. Constantine for this (indicating)?

24 A.    For that e-mail?  No, he was not paid a million

25 dollars for that e-mail.

5068

1   Q.    Did you get anything more than an e-mail out of this

2   from Mr. Losch?

3   A.    I couldn't hear the word.

4   Q.    Did you get anything more out of Mr. Losch than an

5   e-mail?

6   A.    No, we terminated those discussions with Mr. Losch in

7   or about the closing of the Cabo San Lucas deal with

8   Lehman Brothers and they proposed to be our funding

9   partner instead.  That happened about two weeks after this

10  e-mail correspondence.

11  Q.    Sir, isn't it true that Mr. Losch wanted more

12  documentation about where the money went and you simply

13  were not prepared and could not reveal, to your words, a

14  serious land or real estate developer, like Mr. Losch,

15  that you had siphoned off $5 million from the Hawaii

16  venture and sent it to Mexico.  Isn't that true?  Isn't

17  that why you backed out?

18  A.    The entire transaction with Mr. Losch was transparent

19  and information was provided to him that would stand

20  detection produced and provided by Chris Manfredi at the

21  time, and as a result we were working very diligently to

22  consummate this deal with Mr. Losch, and two weeks after

23  that e-mail you just showed me, was the closing or the

24  Cabo San Lucas deal and I met with Masood Bhatti in New

25  York at Mr. Bhatti's request a few days after the closing

5069

1   or the Cabo deal which was only two weeks after this

2   e-mail and he suggested that since we were already

3   partners in Mexico he would like to be my funding source,

4   and it seemed to me at the time one of the largest

5   commercial lenders in the world would be a much better

6   lender for our project than either these gentlemen,

7   Mr. Losch or Dewar, but nowhere in the context of a

8   multibillion dollar firm like Lehman Brothers.

9   Q.    You used the word transparent, your relationship or

10  your discussions with Mr. Losch at that time until Lehman

11  Brothers came along, you had described as transparent, is

12  that correct?

13  A.    Yes, sir.

14  Q.    So where is the e-mail, the letter or the text

15  transmitting to him this alleged loan agreement to Ken

16  Jowdy in Mexico out of your Hawaii venture.  Where is it?

17  A.    Why would there be a loan agreement for Mr. Jowdy

18  transmitted to these gentlemen?  They weren't joining

19  Little Isle IV, they were going to be my 50 percent --

20  Q.    Where is the e-mail, the text, or the letter

21  explaining that of the $13 million you had collected from

22  your various hockey player clients, $5 million was down in

23  Mexico.  Where is that?

24  A.    That is not requested by Mr. Losch nor would it be

25  something that you would share with him.  He wasn't

Kenner - Recross/Miskiewicz

5070

1  joining Little Isle IV, as a member he was proposing

2  jointly with myself to have a joint venture agreement with

3  our entity and his entity.

4  Q.   So you were prepared to sign a joint venture with

5  Mr. Losch where you told him I collected $13 million from

6  my hockey player clients but you don't need to know that 5

7  million of it is missing.

8         Is that what your testimony is?

9  A.   That would make no sense to me to have that

10  conversation.  I didn't ask Mr. Losch and Mr. Dewar the

11  details what they did with the rest of their real estate

12  transactions either.

13  Q.   I believe you were asked a series of questions also

14  from Mr. LaRusso about Global Settlement Fund monies and

15  do you recall being asked a series of questions about

16  Mr. Ranford's $400,000 in two separate wire transfers sent

17  to the account of Ron Richards?

18         Do you remember those questions yesterday?

19  A.   Yes, sir.

20  Q.   And your testimony is that 100,000 of it was returned

21  because you didn't have authorization at the time,

22  correct?

23  A.   I believe specifically the 100,000 was returned

24  because after the first phone call with Mr. Ranford when

25  he approved the first 100,000, we had a follow-up phone

Kenner - Recross/Miskiewicz

5071

1    call where he was concerned about getting together so we

2    could understand, he could understand further the dealings

3    and at that point I returned the 100,000 with

4    Mr. Constantine's assistance and we -- Mr. Ranford and I

5    arranged to meet at that point, I believe, in Hermosa

6    Beach, California, and subsequently to that he approved a

7    $300,000 wire.

8    Q.    How much did Mr. Ranford invest in Mexico?

9    A.    In which projects?

10   Q.    Which project did he invest in?

11   A.    He invested in Los Frailes.

12   Q.    In about 2009, just a couple weeks before the Global

13   Settlement Fund went into effect, correct?

14   A.    I don't recall the specific dates but that seems

15   appropriate.

16   Q.    So it wouldn't have been, I mean was he contributing

17   to the Global Settlement Fund to get back his investment

18   in Los Frailes which he only had make a couple months

19   earlier?

20   A.    The Los Frailes investment had nothing to do with the

21   Global Settlement Fund or Mr. Jowdy at the time.

22   Q.    So then it had to do with the investment that he made

23   in Mexico in which property?

24   A.    It had nothing -- Mr. Ranford was not an investor in

25   Mexico, despite the line of questioning and answers that

Kenner - Recross/Miskiewicz

5072

1    had occurred when Mr. Ranford was on the stand.

2    Q.    So, but he was contributing to the Global Settlement

3    Fund for what purpose?

4    A.    I was discussing with all of my clients what was

5    going on in the various investments that they were related

6    to.  And at that point in time Mr. Ranford was involved in

7    Eufora and as a result of our discussions he understood

8    the global parameters of the Global Settlement Fund and

9    offered to be a $300,00 investor at that time, or

10   contributor, excuse me.

11   Q.    Sir, the record will speak for itself.  But the

12   exhibits that were offered in evidence show wire transfers

13   from Mr. Ranford's account to Eufora or Constantine

14   Management Group or Ron Richards, all of them signed by

15   you as attorney in fact.

16         Do you remember the exhibits I'm referring to?

17   A.    Yes, sir.  I believe I do.

18   Q.    And do you remember how much money went into Eufora.

19   How much of Mr. Ranford's money went into Eufora, if you

20   recall?  If you don't recall, that's fine.

21   A.    I recall Mr. Ranford bought private stock in Eufora

22   --

23   Q.    My question to you is how much money?

24         MR. HALEY:  I would just object as to form, your

25   Honor --

Kenner - Recross/Miskiewicz

5073

1  Q.   How much money did Mr. Ranford invest in Eufora?

2  A.   I believe he invested $400,000 to the best of my

3  recollection.

4        I believe it was a $200,000 investment in late

5  2008, and then in February of 2009, he invested a second

6  time at 100,000, and in May of 2009, he invested for a

7  third time another 100,000.

8        I believe he represented or was represented in

9  the FBI agent's 3500 notes he had told him on a telephonic

10  conversation during this trial.

11  Q.   Regardless of what the notes are that you say you've

12  read, my question is, your recollection is that he

13  invested $400,000 in Eufora in a couple of different

14  transactions, correct?

15  A.   Yes, I believe that is correct.

16  Q.   And your testimony is you keep offer to contribute

17  300,000 towards the Global Settlement Fund to get back

18  a$400,000 investment in Eufora?

19  A.   No, no one was seeking to receive a refund of their

20  Eufora investment that the time.  The contributions had

21  been outlined in detail during the trial but I'm glad to

22  go through the Global Settlement details if you would

23  like.

24  Q.   You are saying you didn't contribute any money to any

25  Mexico land deal that Ken Jowdy was associated with,

5074

1  right?

2  A.   That is correct, he was not.

3  Q.   Just Los Frailes in early 2009 and Mr. Jowdy had

4  nothing to do with Los Frailes, right?

5  A.   He did not.  Mr. Ranford would have stood to benefit

6  from some of the reclamation that went on in the efforts

7  in Mexico against Mr. Jowdy at the time.

8  Q.   Is it true you just stole Mr. Ranford's $300,000

9  because you needed more money to go into the Global

10  Settlement Fund at that point?

11            MR. HALEY:  Judge, I object.

12            THE COURT:  Let's not have argumentative

13  questions.  You can save that for summation.

14            Let's take a lunch break.  We'll reconvene at

15  2 o'clock.  Don't discuss the case.

16            Have a good lunch.

17            (Jury exits.)

18            (One juror remains in the courtroom.)

19            A JUROR:  Your Honor, I believe I need to go to

20  the hospital.

21            THE COURT:  All right.  Will you tell the other

22  jurors to come back?

23            Please be seated.

24            Also you heard he needs to leave to go to the

25  hospital so I don't think we should continue.  I think we

5075

1    need to keep our alternates at this point.

2            MR. LARUSSO:  Definitely, Judge, we agree.

3            THE COURT:  Why don't we bring them back in.  I

4    know, Mr. LaRusso, I know you have witnesses ready.  But

5    let's bring him back in.

6            (Whereupon, the jury at this time enters the

7    courtroom.)

8            THE COURT:  As you know Alternate No. 6's

9    daughter is in the hospital and he needs to go take care

10   of her.

11           We'll end for the day.  We'll come back Monday

12   morning at 9:30 to continue.  Don't discuss the case.

13   Don't read anything regarding the case and I'll see you

14   Monday at 9:30.

15           Thank you.

16           A JUROR:  Your Honor, what kind of time frame do

17   we have, so I can go back to work?

18           THE COURT:  The presentation of the evidence

19   will be complete on Tuesday, is my expectation, and the

20   summations will be on Wednesday, going into Thursday.  So

21   we are near the end of the case, okay.

22           A JUROR:  A full week coming up.

23           THE COURT:  You definitely have a full week and

24   you have some time to deliberate.  The summations will

25   take approximately a day-and-a-half.  So you will probably

5076

1    begin deliberations on Thursday, maybe Monday morning, but

2    then the holiday begins.

3           Have a good weekend.

4           (Whereupon, at this time the jury exits the

5    courtroom.)

6           THE COURT:  Be seated.  So the record is clear,

7    Alternate No. 6 was not in the jury box because he's on

8    the phone with respect to the emergency that I thought

9    would be prudent while everybody else was getting

10   instructions, reminding them not to talk or read about the

11   case.

12          I don't know how much more.  Mr. Miskiewicz, any

13   question that begins, aren't you lying or isn't it a fact

14   you stole.  They are all argumentative questions and I

15   don't want any more of those along the lines, okay?

16          MR. MISKIEWICZ:  Yes, sir.

17          THE COURT:  How much more on redirect?

18          MR. MISKIEWICZ:  Very little, maybe 15 minutes.

19          THE COURT:  I should say recross.

20          MR. LARUSSO:  Mine is 15 or 20 minutes and I

21   just have some bullet points.

22          Here's the problem I have.  I have two

23   witnesses, one has been here all week.  He's coming back,

24   Judge, he's available.  The other one is on vacation,

25   that's why I was trying to get Mr. Semple.  This is usual,

5077

1  Judge, he may be able to, where he is, get on a video

2  conferencing.  I've done it in hearings, never did it at a

3  trial, I don't know if there is any objection.  I've done

4  some research because I anticipated this with other

5  witnesses but it didn't materialize until now.

6         If I can work it out so that he can be available

7  for a deposition on Tuesday, would that be something the

8  Court would entertain?

9         I haven't had a chance to speak to the

10  Government nor Mr. Haley because it just came up now.

11         THE COURT:  All right.  If there is no

12  objection, all right.  If there is an objection, I would

13  entertain that.  Mr. Haley, do you have a view on that?

14         MR. HALEY:  I'm reluctant, Judge, to agree.

15  Given the gravitas, for a lack of better term, the jury's

16  ability to assess a witness' credibility in person has

17  value.  The videotaped depositions -- your Honor, I'd have

18  to consult with my client.

19         MR. LARUSSO:  Your Honor, I'm not talking about

20  a deposition, I'm talking about live testimony.

21         MR. HALEY:  But it would be videotaped.  I need

22  to confer with my client.

23         MR. LARUSSO:  I'll do some quick research, I

24  didn't do a thorough job but I understand it becomes a

25  right of confrontation and I think it is the defendants

5078

1    that have that right.  I don't know if the Government has

2    a reciprocal right, but I'd like the parties to consider

3    it.

4         THE COURT:  That's why I asked Mr. Haley first.

5         MS. KOMATIREDDY:  Your Honor, if I may, my

6    concern, I would oppose that because my concern is

7    Mr. Semple, he's testifying about tax returns and

8    accountants, it involves voluminous documents.  I think

9    the practical aspect of that, the expected testimony he

10   will testify there was no misuse of GSF funds, going

11   through bank records and his backup and I don't see -- my

12   fear is it would be impractical, it would involve

13   technical difficulties which happens from time to time and

14   at the end of the day it would take longer.  We would have

15   to redo it or something.

16        THE COURT:  To the extent it will involve

17   exhibits and documents, it is going to be -- first of all

18   we don't have the capacity to wire that, someone would

19   have to come in and the Court as it sits now is not

20   equipped for a video.

21        MR. LARUSSO:  I apologize.  I had done it in

22   Brooklyn, I assumed it could be done here.

23        THE COURT:  The point is well taken.  How would

24   the Government on cross-examination show the document?

25   They would they put up the documents?

5079

1          MR. LARUSSO:  One of the cases I read talked

2   about that.  They discussed ways whether it could be done.

3   Let me do this, Judge, I'll talk to the witness, see if I

4   can bring him back Monday or Tuesday somehow and if I have

5   to, if I think the law permits it I'll send a letter to

6   the Court immediately if I think it is justifiable.

7          THE COURT:  I want you to know, to let him know

8   he has to come back.  Have you subpoenaed him?

9          MR. LARUSSO:  I try not to subpoena witnesses,

10  Judge.  I don't like to force people to come voluntarily,

11  he has come voluntarily.

12         THE COURT:  If you are in a situation where he

13  says I have to go on vacation, we'll take him as we've

14  done with other witness because at whatever point, Monday

15  or Tuesday, if he wants to go on the stand first thing

16  Monday morning so he wants to go on his vacation, that's

17  fine.  Unfortunately, it is one of the rare situations

18  where I can't accommodate the witness at the end of the

19  case.  He has to make arrangements, assuming everybody is

20  not in agreement on the video which I'm pretty confident

21  will not be practical.

22         If you want me to tell him that now I will.

23         MR. LARUSSO:  No, I think the point is well

24  made.

25         MR. HALEY:  Your Honor, to assist the Court we

5080

1    would not consent.  I would prefer Mr. Semple not be told

2    while on vacation.  And I need to confer with my client.

3              THE COURT:  So you have Mr. Semple.  You still

4    have the same witnesses?

5              MR. LARUSSO:  Same.

6              THE COURT:  You said you had two or three.

7              MR. LARUSSO:  Right now definitely two for sure.

8    I have to go back and check to make sure the list we've

9    disclosed to the Government, Mr. Foster, Mr. D'Ambrosio,

10   Mr. Semple and Mr. Kennedy and maybe one more.  That is

11   the four we have lined up right now.

12             THE COURT:  Can you do all four on Monday or is

13   that impossible?

14             MR. LARUSSO:  Between Mr. D'Ambrosio and

15   Mr. Semple, we cannot conclude on Monday.  The only two

16   long witnesses are Mr. D'Ambrosio and Mr. Semple.

17             THE COURT:  Okay.  Any other issues you want to

18   raise today?

19             MR. MISKIEWICZ:  Just to go back to reciprocal

20   discovery, with respect to e-mails that were turned over,

21   basically right in the middle of cross-examination, Agent

22   Wayne and I contacted Mr. Losch one of the authors of this

23   purported e-mail, he had no recollection of every sending

24   the letter of intent.

25             Now I got more stuff from Mr. LaRusso.  There is

5081

1    no way to effectively either stipulate to move things

2    along or raise objections that are well founded if we're

3    getting hit at the last minute.

4            With respect to Mr. D'Ambrosio, I suspect there

5    are all kinds of communication between Mr. Constantine and

6    Mr. D'Ambrosio, after all, he was a member of the board of

7    Eufora or an officer, and I've asked Mr. LaRusso

8    throughout, as to provide 3500 material, seven or eight

9    weeks prior to the commencement of the trial.

10           We're right at the point where we're trying to

11   get the case done and move things along as possible.  It

12   really puts the Government in a prejudicial situation

13   where --

14           THE COURT:  Mr. LaRusso?

15           MR. LARUSSO:  With regards to that, first of all

16   Mr. D'Ambrosio works in Eufora, and though I never asked

17   for the e-mail, there is no need for e-mail for that.  So

18   I will check and see if there are any.  I personally don't

19   have any and I never asked for any.  Because of the

20   working relationship started back in the early 2000 up to

21   the present time.  So e-mails never crossed my mind.

22           In regards to Mr. Losch, I take exception to the

23   Government's version.  I asked for e-mails to be turned

24   over to the Government last night at their request which

25   lays out the relationship candidly between Mr. Losch,

5082

1    Kenner and Constantine.  And based upon what happened on

2    cross I intend to introduce them.  So that is really a

3    nonissue.

4              THE COURT:  Who are the other witness besides

5    Mr. D'Ambrosio?

6              MR. MISKIEWICZ:  Kennedy and Foster, I know

7    nothing about those people or Mr. D'Ambrosio.

8              THE COURT:  Are --

9              MR. LARUSSO:  Again, the same situation,

10   situation, but I'll check.

11             THE COURT:  Ask them now and turn them over by

12   the end of the day tomorrow so they have time.

13             MR. LARUSSO:  Judge, I'll take a look at it and

14   get it done and turn it over as quickly as we can.

15             MR. MISKIEWICZ:  We also know from material we

16   produced in Rule 16 and maybe in anticipatory 3500 for TR

17   Gentry, there are e-mails back and forth between players

18   at Euphoria.  It is incredible to believe that Mr.

19   D'Ambrosio didn't communicate with the defendant.

20             MR. LARUSSO:  I haven't required him to and I'll

21   find out whether there is.

22             THE COURT:  Okay.

23             MR. LARUSSO:  One other request, Judge.  The

24   Government during their recross of Mr. Kenner produced two

25   documents, actually three.  One was a 302 which doesn't

5083

1    really pertain to my client, but the other two documents,

2    one was a list reflecting records that Mr. Kenner

3    allegedly turned over to the criminal division of the IRS

4    and I believe the other document which I didn't get a

5    close look at but there were multiple pages and it deals

6    with Mr. Kenner's information, I believe, about

7    Mr. Constantine and others.

8          I know that the Government has represented to us

9    at sidebar this was turned over.  I have never seen it.

10   It doesn't mean -- it's not there, I'm not alleging that.

11   I would just like to have copies of those so I can review

12   them over the weekend.

13         That's my only request.

14         MR. MISKIEWICZ:  We'll review whether or not we

15   gave it to him, meanwhile we'll give another copy.  I

16   think counsel is referring to what I marked what I gave to

17   him as PK-3, that is what I was making reference to by

18   Mr. Haley, and I was trying to work around that issue.

19         MR. HALEY:  I didn't mean to turn my back on the

20   Court.  No disrespect intended.

21         THE COURT:  That's fine.  Before we break I did

22   want to go back to the severance motion made during the

23   beginning of the trial because I heard Mr. Kenner's

24   testimony for four days.  I've listened very carefully to

25   his testimony, and Mr. LaRusso, correct me if I'm wrong,

5084

1    but in terms of him pointing any finger as to any criminal

2    conduct with respect to Mr. Constantine, as it relates to

3    Eufora, that in almost every instance, not only is the

4    defense consistent, but in my view was bolstered by

5    Mr. Kenner's testimony because as Mr. Miskiewicz noted at

6    one sidebar, he was essentially explaining, I think what

7    Mr. Constantine's defense with respect to Eufora, that

8    these were private stock purchases and therefore whatever

9    money he got with respect to those he can use in any way

10   he saw fit.

11            With regard to the Hawaiian money and the

12   funding, consulting agreement, he testified that that was

13   legitimate.

14            With respect to the Global Settlement Fund, he,

15   I think, testified that the hockey players were told they

16   had other uses besides Mr. Jowdy.  So in all of those

17   respects, not only -- it actually is helpful for

18   Mr. Constantine that Mr. Kenner got up on the stand and

19   essentially outlined what is his exact position with

20   respect to all of those issues.

21            MR. LARUSSO:  With regard to Eufora and the

22   Hawaiian projects.

23            THE COURT:  The Global Settlement Fund, I was

24   going to get to that.  As to the purpose, the initiation

25   of the Global Settlement Fund, defenses are completely

5085

1    consistent and again helpful for Mr. Constantine and

2    Mr. Kenner articulating in any great detail.

3         Obviously as relates to certain expenditures in

4    the Global Settlement Fund, Mr. Kenner did testify that he

5    had no knowledge of it and it was unrelated to the purpose

6    of the Global Settlement Fund.  But I don't view that as

7    antagonistic to your client's testimony.  I don't think

8    you will stand up in front of the jury and say that

9    Mr. Constantine told the hockey players that he was going

10   to use the money for his cars and for Playboy.  That was

11   your position that Mr. Gonchar or other's money he was

12   permitted to use.

13        MR. LARUSSO:  Yes.

14        THE COURT:  Just because Mr. Kenner said that he

15   wasn't aware how that related to the Global Settlement

16   Fund, that is not antagonistic either.  It's true it

17   wasn't related to the Global Settlement Fund.

18        MR. LARUSSO:  I know the Court has a better

19   recollection than I do.

20        There came a point in time during the direction

21   that Mr. Kenner went through specific disbursements from

22   the Ron Richards account.  I made it very clear from his

23   testimony that at least 20 or 30 of those expenses never

24   fell within the authorized category that the hockey

25   players had authorized, and it was very clear that later

5086

1  on he took an antagonistic approach by participating with

2  a group accusing Mr. Constantine misappropriating money

3  from Eufora as to the Global Settlement Fund.

4          So we are at odds directly with regard to those

5  listed expenses.  I crossed him a little bit on it, I

6  didn't cross him on all of them, just a few.  But --

7          THE COURT:  You say "at odds," to the extent

8  that Mr. Kenner said he wasn't involved in that and his

9  understanding which is clear in the e-mail, for example,

10  that cars and Playboy Enterprises were not related to the

11  Global Settlement Fund.  So it's not at odds

12  quote/unquote, but under the law with respect to

13  severance, for them to be antagonistic for purposes of

14  severance, if the jury believed Mr. Kenner, they would

15  have to convict Mr. Constantine.

16          That's the standard and what I'm telling you

17  they can believe even on that issue, which is the only

18  issue where there is any tension, even if they believe

19  Kenner, they could acquit Mr. Constantine.  They can say

20  Mr. Kenner didn't authorize those, but Mr. Constantine had

21  other money, and Mr. Gonchar gave him $5 million that he

22  had owed money that was in the Global Settlement Fund and

23  he had used as Mr. Gonchar testified, that he saw fit,

24  right.

25          So it's not that they believed Mr. Kenner as far

5087

1   as I'm hearing.  On the misappropriations, that wasn't a

2   misappropriation.  It was Mr. Constantine thought given

3   the situation in Mexico, that was not smart.  But

4   Mr. Kenner didn't accuse him of embezzling $85,000,

5   accused him to disburse it.  Even though he called that

6   misappropriate, that wasn't.  It was an agreement on

7   funds.

8           MR. LARUSSO:  Selective ones, I agree.  There is

9   enough evidence in the record to indicate even Mr. Kenner

10  was not alleging that there was a misappropriation.  I'm

11  trying to counter the Government's position this whole

12  Global Settlement Fund was a conspiracy to defraud the

13  hockey players.  So what Mr. Kenner does by his testimony

14  eliciting a list of expenses that doesn't fall within the

15  authorized period it is bolstering the Government's case

16  against Mr. Kenner.

17          There's another aspect, and I'll be very candid.

18  We've been trying to avoid direct conflicts, I'm sure the

19  Court has probably seen it, there is one coming up and

20  we've all heard the testimony and that is the $700,000

21  that the Government alleges Mr. Kenner and Mr. Gaarn were

22  responsible or Mr. Kenner was responsible for diverting

23  from Eufora.  That taped conversation is clear as to who

24  Mr. Constantine is accusing of participating in that, and

25  I haven't yet in my mind drawn the kind of questions I'll

5088

1    be asking.

2            I may be leaving it alone to avoid directly

3    implicating Mr. Kenner and I may leave it with Mr. Gaarn.

4    At some point I think on Monday you may be seeing

5    Mr. Constantine taking a divergent view clearly from

6    Mr. Kenner.

7            THE COURT:  Well, again, you don't want to make

8    the severance motion three times.  I understand you may be

9    pointing the finger to Mr. Kenner as relates to Mr. Gaarn,

10   but I'm more focused what you said would be a trial where

11   Mr. Haley and Mr. Kenner essentially would work for the

12   prosecution.  And what I saw on the witness stand would be

13   the exact opposite.

14           I'm not suggesting Mr. Kenner, that was his

15   goal, but it was his testimony that was completely

16   consistent and helped Mr. Constantine on so many different

17   levels and on the one theory where there is a contention

18   that was outlined and I heard with respect to expenses,

19   and that's fine, that Mr. Kenner says we're not authorized

20   or related to the purpose.  It doesn't help the

21   Government, because, Mr. Kenner, there was no conspiracy,

22   so they believe Mr. Kenner.  Mr. Constantine did it on his

23   own, they couldn't find him guilty of any conspiracy based

24   on Mr. Kenner's testimony.

25           But in any event as I said and I don't want to

5089

1    repeat it, but even if Mr. Kenner did not authorize those,

2    in Mr. Constantine's defense, from what I see, is that if

3    it wasn't an issue, even holding Mr. Gonchar independent

4    of Mr. Kenner.

5              So whether or not Mr. Kenner authorized it or

6    believed it was related or proper, Mr. Constantine was

7    dealing with all these people on his own and he had his

8    own authorization or agreement.  And Mr. Gonchar testified

9    he had.  It was completely independent of Mr. Kenner.

10             MR. LARUSSO:  The Court correctly noted the

11   legal effect of the testimony, and that is that they

12   believed Mr. Kenner, there was no conspiracy.  That it was

13   my client who was the sole person responsible for it.  Now

14   I have to face that kind of testimony coming from my

15   codefendant.

16             This jury is evaluating the overall conspiracy

17   of the Hawaiian monies, the Eufora monies and the Global

18   Settlement Fund monies.

19             Judge, in is another problem that arises and we

20   don't realize it.  There may be a finding of conspiracy

21   against Mr. Constantine and the Global Settlement Fund

22   because the Government raised the possibly that

23   Mr. Gonchar was involved.  I think his wife and his two

24   children were also present at the time.

25             So we have a lot of co-conspirators the jury may

5090

1    consider.  I'm being a little facetious with regard to

2    this, but it was pretty clear from the questioning they

3    were trying to probe Mr. Gonchar that he himself was

4    possibly benefitting this in a criminal way.

5           Maybe Mr. Kenner may not be a conspirator and

6    the jury may so find but now based upon the testimony

7    there may be a finding of guilt, and I must still contend

8    the testimony I have of Mr. Kenner.

9           THE COURT:  I didn't view Mr. Gonchar as a

10   coconspirator.  I thought it related to the fact they were

11   trying to show Mr. Gonchar offered this other deal with

12   Mr. Constantine because he was getting out of the airplane

13   venture with a personal guarantee and, therefore, that's

14   why he had a different relationship and understanding and

15   possibly with the other hockey players.  I don't believe

16   they are implying anything criminal.

17          I want to go back because I've been very, you

18   know, astute to the issue of the antagonistic defenses and

19   it seemed like Mr. Kenner's testimony was extremely

20   helpful to Mr. Constantine in 90 percent of the case and

21   the other ten percent I would say is neutral because I

22   think even if Mr. Kenner never testified, nobody is

23   expecting that the defense here, other than Mr. Gonchar,

24   that the money that Mr. Peca or these other people gave to

25   the Global Settlement Fund was authorized to go to some of

5091

1    these other issues.

2            I think the money is fungible and I think that

3    would be the defense as I understood it.

4            Okay.  It's 1:30.  We have to eat lunch.  I this

5    which talked enough.  Have a good weekend.  I'll see you

6    9:30.

7            If some reason that juror calls tomorrow and

8    says that his daughter is very ill or some ongoing

9    situation, if he says I can't be here on Monday, my

10   inclines would be to excuse him because we can't lose any

11   more days.  The jury has a vacation in July, some of the

12   jurors.  Any objection to that?

13           MR. LARUSSO:  No objection.

14           MR. HALEY:  No objection.

15           MR. LARUSSO:  I would like to keep him, he's one

16   of the attentive ones, but I agree with the Court's

17   analysis.

18           MS. KOMATIREDDY:  I would let the Court know I

19   do have a trial schedule in Brooklyn for July 13th and my

20   supervisor is requesting an adjournment from Judge Gleason

21   today.

22           I don't want you to learn from the grapevine.

23           THE COURT:  I was with Judge Gleason in Brooklyn

24   yesterday and he's well aware of the situation going on

25   here.

5092

1          MS. KOMATIREDDY:  Thank you.

2          THE COURT:  All right.

3          (Proceeding adjourned until Monday, June 29,

4     2015, at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5093

**I N D E X**

| | |
|---|---|
| **PHILLIP A KENNER** | 4989 |
| REDIRECT EXAMINATION | 4991 |
| BY MR. HALEY | |
| VOIR DIRE EXAMINATION | 4996 |
| BY MR. MISKIEWICZ | |
| REDIRECT EXAMINATION (Continued) | 4997 |
| BY MR. HALEY | |
| RECROSS-EXAMINATION | 5043 |
| BY MR. MISKIEWICZ | |


**E X H I B I T S**

| | |
|---|---|
| Defense Exhibit 236 in evidence | 4997 |
| Defendant's Exhibit 2308 was received in evidence | 5042 |
| Kenner Exhibit 237 received in evidence | 5024 |

**$**

**$10,000** [1] - 5031:8
**$13** [5] - 5000:2, 5000:10, 5000:11, 5069:21, 5070:5
**$200,000** [4] - 5066:11, 5066:19, 5066:25, 5073:4
**$225,000** [1] - 5067:5
**$25** [4] - 5014:14, 5015:1, 5015:6, 5058:11
**$25,000** [1] - 5067:2
**$290,000** [4] - 5044:3, 5045:3, 5046:6, 5047:5
**$30,000** [1] - 5038:2
**$300,00** [1] - 5072:9
**$300,000** [6] - 5044:19, 5045:9, 5045:13, 5071:7, 5074:8
**$35,000** [1] - 5012:18
**$375,000** [5] - 4998:16, 4998:20, 4998:24, 4999:3, 4999:5
**$40,000** [1] - 5000:15
**$400,000** [3] - 5070:16, 5073:2, 5073:13
**$50** [1] - 5002:20
**$650,000** [1] - 5044:10
**$700,000** [3] - 5016:18, 5017:9, 5087:20
**$750,000** [1] - 5057:10
**$85,000** [1] - 5087:4

**'**

**'06** [2] - 5030:9, 5033:7
**'08** [1] - 5017:8
**'09** [1] - 5017:8
**'90s** [1] - 5002:4

**1**

**1** [2] - 5055:9, 5067:22
**10/28/05** [1] - 4998:15
**100,000** [7] - 5037:20, 5070:20, 5070:23, 5070:25, 5071:3, 5073:6, 5073:7
**103** [1] - 5031:20
**10:10** [1] - 4985:8
**11** [2] - 5015:18, 5038:13
**11201** [1] - 4985:14

**11722** [1] - 4985:22
**1180** [1] - 4985:21
**12** [3] - 5002:9, 5015:16, 5032:25
**13** [2] - 5015:16, 5016:5
**13-CR-607** [1] - 4985:3
**13th** [1] - 5091:19
**14** [4] - 5015:16, 5016:7, 5038:11, 5042:6
**15** [4] - 5016:8, 5033:2, 5076:18, 5076:20
**16** [3] - 5033:19, 5034:10, 5082:16
**1751** [1] - 5045:6
**18** [3] - 4996:17, 5019:10, 5023:2
**19** [1] - 5057:19
**1:30** [1] - 5091:4

**2**

**2** [2] - 5057:9, 5074:15
**20** [7] - 4991:22, 4992:6, 5048:8, 5048:11, 5061:10, 5076:20, 5085:23
**200,000** [1] - 5066:23
**2000** [1] - 5081:20
**2002** [2] - 5057:9, 5057:11
**2004** [2] - 5029:20, 5037:18
**2005** [4] - 5037:6, 5037:11, 5037:17, 5037:18
**2006** [7] - 4995:20, 5039:3, 5039:5, 5040:10, 5040:24, 5041:21, 5067:16
**2008** [1] - 5073:5
**2009** [25] - 4996:24, 4998:3, 5002:9, 5014:10, 5015:10, 5015:14, 5048:9, 5049:8, 5049:9, 5050:5, 5050:7, 5051:24, 5052:12, 5052:23, 5053:2, 5055:16, 5056:5, 5056:7, 5061:6, 5063:14, 5063:19, 5071:12, 5073:5, 5073:6, 5074:3
**2010** [7] - 5002:5, 5003:4, 5003:8, 5023:2, 5038:13, 5042:6, 5043:6

**2011** [2] - 5053:3, 5054:18
**2012** [5] - 5061:4, 5061:11, 5062:5, 5063:15, 5063:19
**2015** [2] - 4985:7, 5092:4
**2308** [3] - 5042:10, 5042:15, 5093:11
**235** [2] - 4993:23, 4994:22
**236** [7] - 4995:14, 4996:11, 4997:12, 4997:15, 4998:8, 5093:10
**237** [6] - 5022:23, 5024:10, 5024:11, 5024:13, 5024:15, 5093:12
**238** [2] - 5042:1, 5042:14
**24** [4] - 5017:8, 5048:8, 5049:8, 5053:2
**24th** [1] - 5050:6
**25** [1] - 4985:7
**29** [1] - 5092:3
**290,000** [2] - 5044:17, 5046:25

**3**

**3** [3] - 5033:4, 5033:5, 5057:14
**3's** [1] - 4986:7
**3.5** [1] - 5017:7
**30** [4] - 5032:25, 5048:8, 5048:11, 5085:23
**300** [1] - 5045:16
**300,000** [1] - 5073:17
**302** [1] - 5082:25
**31** [1] - 5017:8
**3113** [1] - 5037:7
**350,000** [1] - 5045:16
**3500** [3] - 5073:9, 5081:8, 5082:16
**375,000** [1] - 4998:15
**39** [3] - 5038:3, 5038:14, 5039:11

**4**

**400** [1] - 5057:10
**45** [1] - 5025:13
**4500T** [1] - 5004:15
**4712** [1] - 5038:11
**4989** [1] - 5093:3
**4991** [1] - 5093:4
**4996** [1] - 5093:5

**4997** [2] - 5093:6, 5093:10
**4:30** [1] - 5061:10

**5**

**5** [4] - 5068:15, 5069:22, 5070:6, 5086:21
**5-0** [1] - 5002:21
**50** [2] - 5002:21, 5069:19
**5024** [1] - 5093:12
**5042** [1] - 5093:11
**5043** [1] - 5093:7

**6**

**6** [3] - 5020:15, 5020:24, 5076:7
**6's** [1] - 5075:8
**63** [1] - 5033:23
**631** [1] - 4985:22
**65** [1] - 5033:23

**7**

**7** [2] - 5002:10, 5033:23
**7-inch-thick** [1] - 5035:14
**7/27/05** [2] - 5047:1, 5047:4
**712-6108** [1] - 4985:22
**712-6124** [1] - 4985:22

**8**

**8** [2] - 5031:21, 5053:3
**80** [1] - 5037:19

**9**

**90** [1] - 5090:20
**9:30** [4] - 5075:12, 5075:14, 5091:6, 5092:4

**A**

**a$400,000** [1] - 5073:18
**a.m** [1] - 5092:4
**a/k/a** [2] - 4985:5, 4985:6
**abide** [1] - 4989:20
**ability** [2] - 4994:21, 5077:16
**able** [3] - 4994:25, 4996:22, 5077:1
**absence** [1] - 4986:2
**absolutely** [2] -

4987:8, 4987:25
**absolve** [1] - 5048:3
**accept** [1] - 5014:23
**accepted** [1] - 5049:12
**access** [11] - 4994:1, 4994:17, 4994:21, 4995:1, 4995:10, 4996:22, 4999:14, 5000:5, 5027:8, 5027:19, 5034:21
**accessed** [1] - 4999:20
**accidently** [1] - 5046:14
**accommodate** [1] - 5079:18
**accomplish** [1] - 5032:21
**according** [1] - 5038:12
**account** [17] - 4994:3, 4997:22, 4997:23, 4998:18, 5000:10, 5016:20, 5016:21, 5016:22, 5044:4, 5047:1, 5047:11, 5047:12, 5070:17, 5072:13, 5085:22
**accountant** [1] - 4988:15
**accountants** [1] - 5078:8
**accounts** [2] - 4997:20, 5047:16
**accurate** [4] - 5023:24, 5032:8, 5032:12, 5032:13
**accusation** [3] - 5017:18, 5018:1, 5021:17
**accusations** [1] - 5018:1
**accuse** [1] - 5087:4
**accused** [1] - 5087:5
**accusing** [3] - 5048:18, 5086:2, 5087:24
**achieve** [1] - 5008:10
**acquire** [1] - 4998:8
**acquit** [1] - 5086:19
**activity** [2] - 5005:13, 5008:13
**adamant** [1] - 5043:15
**addition** [3] - 4998:1, 5014:11, 5057:12
**additional** [3] - 4989:19, 4990:4, 5043:15
**address** [2] - 4989:11, 4989:16

**adjourned** [1] - 5092:3
**adjournment** [1] - 5091:20
**admissible** [2] - 4988:4, 4988:7
**admit** [2] - 4986:15, 4990:15
**admitted** [8] - 4987:12, 4987:17, 4988:11, 4990:18, 4997:11, 5024:12, 5042:10, 5042:14
**admitting** [1] - 4990:13
**advance** [5] - 4998:16, 4999:4, 4999:5, 4999:20, 5066:12
**advances** [1] - 5037:15
**advantage** [1] - 5043:16
**adversarial** [1] - 5005:8
**adverse** [1] - 5008:3
**advised** [4] - 4990:4, 5030:13, 5030:15, 5030:20
**advisor** [1] - 5034:3
**afraid** [1] - 5007:5
**afternoon** [1] - 4991:20
**agencies** [1] - 5061:19
**Agent** [8] - 5047:23, 5050:5, 5054:25, 5055:15, 5055:19, 5056:3, 5063:16, 5080:21
**agent's** [1] - 5073:9
**agents** [7] - 5053:4, 5053:6, 5053:16, 5053:25, 5061:7, 5062:4, 5064:5
**ago** [2] - 5051:1, 5064:14
**agree** [8] - 4993:15, 5013:19, 5054:12, 5054:13, 5075:2, 5077:14, 5087:8, 5091:16
**agreed** [1] - 5015:1
**agreement** [29] - 4992:1, 4992:9, 4992:21, 4993:5, 4993:7, 4993:8, 4994:19, 4995:3, 5005:23, 5013:20, 5034:5, 5034:6, 5035:20, 5035:22, 5036:2, 5036:3, 5039:3, 5039:5,

5044:20, 5045:22, 5063:20, 5065:19, 5069:15, 5069:17, 5070:2, 5079:20, 5084:12, 5087:6, 5089:8
**agreements** [1] - 5027:6
**ahead** [3] - 4991:16, 5021:2, 5038:24
**aid** [1] - 5004:1
**Air** [1] - 5057:13
**airplane** [1] - 5090:12
**align** [1] - 5003:14
**aligned** [1] - 5013:21
**allegations** [1] - 4992:15
**alleged** [2] - 4992:21, 5069:15
**allegedly** [3] - 5065:25, 5066:3, 5083:3
**alleges** [1] - 5087:21
**alleging** [2] - 5083:10, 5087:10
**allow** [4] - 4988:24, 4994:1, 5028:18, 5038:20
**allowed** [2] - 4991:3, 5054:7
**alluding** [1] - 5007:24
**almost** [3] - 5014:18, 5038:8, 5084:3
**alone** [4] - 5022:17, 5028:12, 5038:2, 5088:2
**Alternate** [2] - 5075:8, 5076:7
**alternate** [2] - 5020:15, 5020:24
**alternates** [1] - 5075:1
**amends** [1] - 5007:8
**AMERICA** [1] - 4985:3
**America** [1] - 5045:7
**American** [1] - 5037:4
**Amex** [1] - 5037:11
**amounts** [1] - 5046:2
**analogy** [1] - 5009:8
**analysis** [1] - 5091:17
**ANDREW** [1] - 4985:18
**Answer** [1] - 5039:1
**answer** [10] - 4989:17, 4999:2, 5009:22, 5009:25, 5022:19, 5039:20, 5039:23, 5052:17, 5054:8, 5063:6
**answered** [3] - 4991:24, 5009:5,

5051:12
**answers** [2] - 5058:8, 5071:25
**antagonistic** [5] - 5085:7, 5085:16, 5086:1, 5086:13, 5090:18
**anticipated** [1] - 5077:4
**anticipation** [1] - 4996:18
**anticipatory** [1] - 5082:16
**anytime** [1] - 5050:16
**anyway** [4] - 5004:24, 5005:16, 5064:9, 5064:13
**anyways** [1] - 5012:2
**apologize** [4] - 5009:13, 5044:15, 5063:17, 5078:21
**appear** [7] - 5035:7, 5049:20, 5049:23, 5050:7, 5054:3, 5054:15, 5058:22
**appearance** [1] - 5015:11
**APPEARANCES** [1] - 4985:11
**appeared** [1] - 5040:24
**appreciate** [1] - 5004:14
**approach** [3] - 5026:22, 5059:7, 5086:1
**approached** [1] - 5058:5
**appropriate** [2] - 5024:18, 5071:15
**approved** [2] - 5070:25, 5071:6
**approximate** [1] - 5000:2
**arbitration** [2] - 5006:16, 5007:10
**Arena** [1] - 5002:11
**argumentative** [2] - 5074:12, 5076:14
**arises** [1] - 5089:19
**Arizona** [12] - 5010:4, 5010:11, 5010:15, 5010:18, 5010:22, 5019:23, 5023:6, 5040:4, 5040:6, 5055:3, 5062:11, 5063:24
**arranged** [2] - 5056:18, 5071:5
**arrangement** [1] -

5037:23
**arrangements** [1] - 5079:19
**arrest** [1] - 4998:9
**arrested** [1] - 5062:14
**articulating** [1] - 5085:2
**artifice** [2] - 4993:9, 5033:10
**aspect** [2] - 5078:9, 5087:17
**assess** [1] - 5077:16
**assist** [1] - 5079:25
**assistance** [1] - 4994:5, 5013:21, 5067:3, 5071:4
**associated** [3] - 5004:3, 5062:21, 5073:25
**assume** [3] - 4988:11, 5038:21, 5055:23
**assumed** [1] - 5078:22
**assuming** [1] - 5079:19
**astute** [1] - 5090:18
**attempt** [2] - 5025:16, 5043:3
**attempting** [2] - 5049:7, 5062:12
**attention** [4] - 5018:1, 5048:18, 5052:16, 5055:13
**attentive** [1] - 5091:16
**Attorney** [2] - 4985:13, 5014:21
**attorney** [15] - 5011:11, 5022:4, 5022:15, 5024:18, 5025:1, 5025:17, 5027:10, 5034:14, 5034:15, 5040:4, 5040:15, 5041:15, 5049:18, 5050:22, 5072:15
**Attorney's** [1] - 5051:18
**attorneys** [5] - 5005:20, 5026:19, 5028:6, 5035:1, 5041:18
**Attorneys** [1] - 4985:15
**August** [12] - 4995:20, 5014:10, 5015:9, 5015:14, 5023:2, 5038:13, 5049:9, 5050:7, 5057:9, 5063:24
**AUSA** [1] - 5052:12
**Australia** [1] - 5037:24

**authentic** [4] - 5026:20, 5027:11, 5027:19, 5028:7
**authenticate** [1] - 5026:10
**authenticity** [1] - 5028:1
**authorities** [1] - 5031:12
**authority** [1] - 5027:14
**authorization** [11] - 4993:24, 4994:10, 4994:13, 4994:23, 4999:9, 4999:11, 5000:9, 5001:21, 5001:24, 5070:21, 5089:8
**authorizations** [1] - 4999:14
**authorize** [3] - 5001:12, 5086:20, 5089:1
**authorized** [10] - 4994:3, 5000:6, 5000:22, 5001:4, 5085:24, 5085:25, 5087:15, 5088:19, 5089:5, 5090:25
**authors** [1] - 5080:22
**available** [4] - 5021:11, 5050:15, 5076:24, 5077:6
**avoid** [3] - 5031:12, 5087:18, 5088:2
**award** [1] - 5006:16
**aware** [14] - 4988:14, 4993:1, 4993:14, 4998:24, 5001:14, 5001:23, 5002:14, 5003:22, 5005:9, 5026:9, 5034:16, 5066:25, 5085:15, 5091:24
**awareness** [1] - 5014:9

## B

**backed** [1] - 5068:17
**backup** [1] - 5078:11
**Baja** [7] - 5038:13, 5039:10, 5040:9, 5040:10, 5040:20, 5040:23, 5041:20
**balance** [1] - 5025:25
**Bank** [10] - 4994:3, 4994:12, 4994:15, 4997:1, 4997:20, 4998:4, 4999:11, 5030:13, 5030:19,

5045:7

**bank** [25] - 4997:19, 4997:20, 4997:22, 4997:23, 4998:17, 5000:10, 5009:4, 5010:4, 5010:11, 5010:15, 5010:18, 5010:22, 5016:20, 5016:21, 5030:15, 5044:18, 5044:22, 5044:23, 5044:24, 5045:25, 5047:11, 5047:12, 5047:16, 5078:11

**banker** [3] - 5045:1, 5046:3, 5046:16

**based** [8] - 5005:22, 5010:20, 5032:9, 5044:25, 5046:15, 5082:1, 5088:23, 5090:6

**basis** [2] - 5000:18, 5055:6

**bay** [1] - 5030:5

**Beach** [1] - 5071:6

**bearing** [1] - 4995:2

**became** [1] - 5003:18

**becomes** [1] - 5077:24

**bed** [1] - 5019:5

**BEFORE** [1] - 4985:9

**began** [2] - 5002:4, 5002:6

**begin** [1] - 5076:1

**beginning** [2] - 5049:8, 5083:23

**begins** [5] - 5016:5, 5038:11, 5065:23, 5076:2, 5076:13

**begun** [2] - 5000:14, 5013:25

**behalf** [5] - 5009:11, 5037:13, 5037:21, 5056:15, 5057:19

**belabor** [1] - 4998:14

**belief** [2] - 5008:12, 5022:7

**benefit** [1] - 5074:5

**benefitting** [1] - 5090:4

**Berard** [3] - 5043:14, 5062:13, 5063:2

**best** [2] - 5040:14, 5073:2

**better** [5] - 5033:4, 5066:19, 5069:5, 5077:15, 5085:18

**between** [16] - 5005:19, 5005:23, 5006:8, 5007:17, 5017:8, 5025:17,

5031:4, 5035:13, 5045:1, 5046:16, 5049:8, 5055:9, 5080:14, 5081:5, 5081:25, 5082:17

**Bhatti** [1] - 5068:24

**Bhatti's** [1] - 5068:25

**BIANCO** [1] - 4985:9

**Big** [3] - 4997:21, 4997:22, 4997:23

**bill** [2] - 5037:4, 5037:6

**birth** [3] - 5062:19, 5063:1, 5063:4

**births** [1] - 5061:21

**bit** [2] - 5015:22, 5086:5

**blame** [1] - 5005:12

**blew** [2] - 5006:20, 5012:13

**block** [3] - 5024:15, 5024:21, 5025:2

**blocks** [2] - 5024:17, 5024:19

**blow** [1] - 5019:6

**board** [1] - 5081:6

**Bolder** [6] - 5055:18, 5055:20, 5055:21, 5056:5, 5056:9, 5056:10

**bolstered** [1] - 5084:4

**bolstering** [1] - 5087:15

**books** [1] - 5034:21

**bottom** [2] - 5024:19, 5065:22

**bought** [2] - 5016:19, 5072:21

**box** [1] - 5076:7

**branch** [2] - 5030:24, 5030:25

**break** [9] - 4987:4, 4987:24, 4991:20, 5020:6, 5020:11, 5020:25, 5061:17, 5074:14, 5083:21

**breaking** [1] - 4999:6

**breath** [1] - 5011:24

**Brian** [3] - 5053:11, 5062:13, 5063:2

**brief** [1] - 4996:12

**briefly** [1] - 4987:21

**bring** [7] - 4986:22, 4987:20, 4989:2, 5027:24, 5075:3, 5075:5, 5079:4

**Brooklyn** [4] - 4985:14, 5078:22, 5091:19, 5091:23

**Brothers** [8] -

4995:20, 5030:9, 5035:12, 5066:14, 5066:20, 5068:8, 5069:8, 5069:11

**bugged** [1] - 5019:25

**building** [1] - 5006:2

**bullet** [1] - 5076:21

**burn** [1] - 5019:6

**burning** [1] - 5013:11

**bury** [1] - 5006:20

**business** [5] - 5000:19, 5012:9, 5014:1, 5037:2, 5038:5

**buy** [2] - 5043:8, 5043:12

**buying** [3] - 5017:1, 5017:2, 5017:14

**buyout** [2] - 5042:7, 5043:3

**buyouts** [1] - 5042:19

**BY** [15] - 4991:19, 4992:12, 4996:15, 4997:14, 5002:25, 5019:2, 5021:4, 5029:2, 5034:1, 5038:25, 5043:21, 5093:4, 5093:5, 5093:6, 5093:7

### C

**C-261** [2] - 5065:20, 5065:21

**Cabo** [19] - 5029:3, 5029:4, 5029:8, 5029:19, 5029:22, 5029:25, 5030:1, 5030:3, 5030:8, 5037:21, 5038:4, 5038:14, 5057:17, 5066:15, 5066:20, 5067:6, 5068:7, 5068:24, 5069:1

**calculation** [1] - 4991:21

**California** [2] - 5057:19, 5071:6

**camera** [6] - 5019:11, 5019:16, 5019:17, 5019:21, 5020:1, 5021:9

**candid** [1] - 5087:17

**candidly** [1] - 5081:25

**cannot** [1] - 5080:15

**capacity** [1] - 5078:18

**capital** [6] - 4993:20, 5012:17, 5033:5, 5043:16, 5058:6, 5067:21

**car** [1] - 5009:3

**card** [1] - 5037:14

**Cardenal** [1] - 5030:7

**care** [2] - 5065:4, 5075:9

**career** [3] - 5002:17, 5002:20, 5002:21

**carefully** [1] - 5083:24

**cars** [2] - 5085:10, 5086:10

**case** [12] - 5004:3, 5026:20, 5043:25, 5074:15, 5075:12, 5075:13, 5075:21, 5076:11, 5079:19, 5081:11, 5087:15, 5090:20

**cases** [1] - 5079:1

**cash** [2] - 4999:10, 5014:14

**Cashier** [2] - 5004:18, 5004:19

**CAT** [1] - 4985:25

**category** [1] - 5085:24

**cave** [1] - 5055:25

**CD** [2] - 5022:2, 5022:3

**ceased** [3] - 5002:3, 5002:4, 5049:4

**ceiling** [1] - 5019:11

**Central** [2] - 4985:4, 4985:22

**Centrum** [4] - 5032:15, 5032:23, 5044:1, 5044:10

**CEO** [2] - 5010:9, 5012:24

**certain** [5] - 4988:9, 4988:19, 4991:1, 5033:22, 5085:3

**certainly** [5] - 5000:9, 5004:12, 5056:1

**chain** [1] - 5066:14

**chance** [3] - 4990:13, 5042:18, 5077:9

**change** [2] - 4988:10, 5014:16

**changed** [1] - 5014:19

**characterized** [1] - 5003:20

**charge** [5] - 5008:1, 5008:12, 5009:23, 5011:2, 5011:13

**chart** [4] - 5001:15, 5043:25, 5045:8, 5046:25

**Chase** [2] - 5030:13, 5030:19

**check** [4] - 5066:22, 5080:8, 5081:18,

5082:10

**children** [2] - 5055:4, 5089:24

**chose** [2] - 5003:14, 5052:9

**Chris** [1] - 5068:20

**circumstances** [4] - 4993:5, 4993:6, 5026:5, 5027:22

**civil** [3] - 5028:4, 5041:16, 5051:2

**claim** [2] - 5025:20, 5027:21

**clarify** [2] - 5051:6, 5051:10

**clear** [6] - 5076:6, 5085:22, 5085:25, 5086:9, 5087:23, 5090:2

**clearly** [1] - 5088:5

**Clemens** [3] - 5053:7, 5053:10, 5053:19

**clerk** [1] - 5020:16

**client** [12] - 4988:7, 4988:12, 4994:13, 4994:14, 4999:24, 5014:2, 5046:24, 5077:18, 5077:22, 5080:2, 5083:1, 5089:13

**client's** [1] - 5085:7

**clients** [15] - 4992:24, 4993:10, 4994:11, 4996:23, 4999:19, 5003:8, 5013:25, 5017:11, 5017:20, 5033:11, 5058:10, 5061:21, 5069:22, 5070:6, 5072:4

**close** [1] - 5083:5

**closing** [9] - 4996:20, 4997:2, 4997:4, 4997:6, 5033:7, 5035:4, 5068:7, 5068:23, 5068:25

**CM** [1] - 4985:20

**CMG** [2] - 5044:4, 5044:11

**co** [1] - 5089:25

**co-conspirators** [1] - 5089:25

**coconspirator** [1] - 5090:10

**codefendant** [1] - 5089:15

**Coletta** [1] - 5030:5

**collateral** [2] - 4996:25, 5002:14

**collected** [2] - 5069:21, 5070:5

**collective** [1] - 5053:11
**collectively** [1] - 5000:3
**Colorado** [8] - 5055:18, 5055:20, 5055:21, 5056:5, 5056:9, 5056:11, 5056:22, 5062:11
**coming** [5] - 5044:5, 5075:22, 5076:23, 5087:19, 5089:14
**commence** [1] - 5005:10
**commenced** [1] - 5002:2
**commencement** [1] - 5081:9
**commend** [1] - 5007:5
**comment** [7] - 5012:4, 5013:3, 5023:15, 5025:15, 5041:21, 5054:14, 5058:23
**commentary** [1] - 5032:7
**commented** [1] - 5023:12
**comments** [3] - 5011:5, 5054:10, 5064:21
**commercial** [1] - 5069:5
**common** [1] - 5005:23
**communicate** [2] - 5061:3, 5082:19
**communicating** [1] - 5006:10
**communication** [1] - 5081:5
**communications** [2] - 4993:3, 4993:4
**commute** [1] - 5055:6
**company** [5] - 5029:22, 5038:14, 5039:10, 5043:8, 5044:4
**complete** [4] - 4986:21, 5011:1, 5023:24, 5075:19
**completely** [5] - 5037:2, 5046:8, 5084:25, 5088:15, 5089:9
**comply** [1] - 5030:20
**concern** [2] - 5078:6
**concerned** [3] - 5001:9, 5014:19, 5071:1
**concerning** [3] - 4993:3, 5021:6,

5033:14
**concerns** [2] - 5037:11, 5057:16
**conclude** [1] - 5080:15
**concluded** [1] - 5028:20
**conclusion** [1] - 5049:15
**conduct** [1] - 5084:2
**confer** [3] - 5045:5, 5077:22, 5080:2
**conference** [5] - 5023:4, 5023:10, 5040:5, 5043:5, 5060:6
**conferencing** [1] - 5077:2
**confident** [1] - 5079:20
**confirmation** [1] - 4999:14
**conflict** [1] - 5003:17
**conflicts** [1] - 5087:18
**confrontation** [1] - 5077:25
**confused** [2] - 5001:2, 5064:18
**confusing** [1] - 5008:22
**confusion** [2] - 4987:17, 5045:1
**Congress** [1] - 5053:12
**connection** [5] - 5002:17, 5007:22, 5034:21, 5051:2, 5065:18
**consent** [2] - 4999:13, 5080:1
**consider** [2] - 5078:2, 5090:1
**consideration** [1] - 5042:25
**considering** [1] - 5058:10
**consistent** [4] - 5008:9, 5084:4, 5085:1, 5088:16
**conspiracy** [10] - 4992:23, 5048:2, 5049:6, 5052:15, 5087:12, 5088:21, 5088:23, 5089:12, 5089:16, 5089:20
**conspirator** [1] - 5090:5
**conspirators** [1] - 5089:25
**Constantine** [66] -

5022:8
**contend** [1] - 5090:7
**content** [1] - 5003:20
**contention** [2] - 5052:15, 5088:17
**contents** [1] - 5034:16
**context** [2] - 5027:24, 5069:7
**contingencies** [1] - 4999:12
**continue** [5] - 5005:16, 5016:7, 5020:18, 5074:25, 5075:12
**continued** [6] - 4989:8, 5003:16, 5018:4, 5052:21, 5054:14, 5061:2
**Continued** [8] - 4997:13, 5026:23, 5028:21, 5033:25, 5036:6, 5059:11, 5060:7, 5093:6
**continues** [7] - 5006:13, 5007:18, 5011:14, 5011:16, 5015:19, 5015:20, 5021:10
**continuity** [1] - 5025:17
**contribute** [2] - 5073:16, 5073:24
**contributing** [2] - 5071:16, 5072:2
**contribution** [1] - 5035:17
**contributions** [1] - 5073:20
**contributor** [1] - 5072:10
**control** [1] - 5043:8
**controlled** [2] - 5047:14, 5047:15
**controls** [1] - 5047:12
**convened** [2] - 5015:12, 5015:13
**conversation** [14] - 5005:17, 5006:2, 5008:11, 5014:16, 5014:21, 5021:10, 5023:16, 5030:25, 5031:3, 5058:23, 5061:9, 5070:10, 5073:10, 5087:23
**conversations** [3] - 5000:14, 5013:17, 5066:10
**conveyance** [1] - 5009:10
**convict** [1] - 5086:15

**cooperative** [2] - 5046:8, 5046:10
**coordinate** [1] - 5056:20
**copied** [1] - 5022:8
**copies** [2] - 4998:4, 5083:11
**copy** [8] - 4986:6, 5004:5, 5004:6, 5022:2, 5023:24, 5064:2, 5083:15
**Corencia** [1] - 5030:2
**corporation** [1] - 5029:17
**correct** [60] - 4990:5, 4993:12, 4994:12, 4996:2, 4997:3, 5000:1, 5000:2, 5001:6, 5001:13, 5001:14, 5001:22, 5002:3, 5002:18, 5003:24, 5004:4, 5005:4, 5010:23, 5017:6, 5017:12, 5017:13, 5025:8, 5026:14, 5029:13, 5030:16, 5034:13, 5034:17, 5037:5, 5038:6, 5041:2, 5041:11, 5047:6, 5050:5, 5050:6, 5050:9, 5050:14, 5050:23, 5051:3, 5051:7, 5051:11, 5051:15, 5053:19, 5053:23, 5056:17, 5056:23, 5061:4, 5062:21, 5063:2, 5065:23, 5066:17, 5067:7, 5067:10, 5067:15, 5067:16, 5069:12, 5070:22, 5071:13, 5073:14, 5073:15, 5074:2, 5083:25
**correctly** [2] - 5044:17, 5089:10
**correspondence** [2] - 5050:10, 5068:10
**corroborate** [1] - 4997:17
**cost** [1] - 5033:5
**counsel** [2] - 5055:11, 5083:16
**counter** [1] - 5087:11
**countercomplaint** [2] - 5032:3, 5032:7
**country** [1] - 5064:5
**couple** [8] - 4986:4, 5016:11, 5045:9,

**constantine** [2] - 5006:5, 5014:5
**CONSTANTINE** [2] - 4985:6, 5004:23
**Constantine's** [5] - 5044:3, 5047:1, 5071:4, 5084:7, 5089:2
**consult** [1] - 5077:18
**consulting** [7] - 4992:1, 4992:9, 4992:21, 4993:5, 4993:7, 5044:20, 5084:12
**consummate** [2] - 5007:6, 5068:22
**cont'd** [1] - 5021:4
**cont'd)** [1] - 5019:1
**contact** [5] - 5054:20, 5054:21, 5054:22, 5054:24, 5064:5
**contacted** [2] - 5053:6, 5080:22
**contacting** [1] - 4999:19
**contained** [3] - 4991:5, 4995:21,

4985:19, 4988:5, 4991:25, 4992:23, 4993:4, 5003:7, 5003:14, 5004:17, 5004:20, 5005:2, 5005:7, 5005:20, 5005:25, 5006:13, 5007:1, 5007:23, 5008:5, 5010:21, 5011:5, 5011:24, 5015:17, 5017:25, 5021:16, 5022:5, 5023:4, 5023:13, 5023:15, 5025:18, 5031:22, 5032:3, 5033:18, 5042:7, 5044:9, 5044:13, 5044:19, 5044:22, 5045:2, 5045:7, 5046:2, 5046:5, 5046:8, 5047:7, 5062:14, 5063:2, 5067:23, 5072:13, 5081:5, 5082:1, 5083:7, 5084:2, 5084:18, 5085:1, 5085:9, 5086:2, 5086:15, 5086:19, 5086:20, 5087:2, 5087:24, 5088:5, 5088:16, 5088:22, 5089:6, 5089:21, 5090:12, 5090:20

5051:2, 5058:20, 5071:12, 5071:18, 5073:13
**course** [9] - 4991:23, 4995:10, 5004:17, 5007:18, 5027:17, 5040:18, 5040:21, 5040:24, 5041:12
**COURT** [83] - 4985:1, 4986:4, 4986:12, 4986:14, 4986:19, 4986:25, 4987:3, 4987:5, 4987:10, 4987:15, 4987:20, 4987:25, 4988:22, 4989:1, 4989:13, 4989:15, 4989:24, 4990:7, 4991:12, 4991:16, 4992:11, 4996:13, 4997:9, 4997:11, 5002:23, 5020:6, 5020:9, 5020:14, 5020:23, 5022:19, 5024:7, 5024:9, 5024:11, 5026:22, 5027:23, 5028:13, 5028:16, 5038:20, 5038:24, 5039:20, 5042:14, 5043:19, 5058:2, 5059:3, 5059:8, 5060:4, 5062:24, 5063:16, 5064:21, 5065:10, 5065:17, 5074:12, 5074:21, 5075:3, 5075:8, 5075:18, 5075:23, 5076:6, 5076:17, 5076:19, 5077:11, 5078:4, 5078:16, 5078:23, 5079:7, 5079:12, 5080:3, 5080:6, 5080:12, 5080:17, 5081:14, 5082:4, 5082:8, 5082:11, 5082:22, 5083:21, 5084:23, 5085:14, 5086:7, 5088:7, 5090:9, 5091:23, 5092:2
**court** [5] - 4988:14, 5029:1, 5035:15, 5041:5, 5061:1
**Court** [14] - 4985:4, 4985:20, 4986:1, 5028:14, 5052:13, 5077:8, 5078:19, 5079:6, 5079:25, 5083:20, 5085:18, 5087:19, 5089:10, 5091:18

**Court's** [1] - 5091:16
**Court)** [1] - 5060:1
**Courthouse** [1] - 4985:21
**courtroom** [8] - 5004:3, 5020:7, 5020:22, 5026:15, 5041:14, 5074:18, 5075:7, 5076:5
**cover** [1] - 4999:24
**covered** [1] - 5021:9
**CR** [13] - 5010:3, 5010:7, 5010:9, 5010:10, 5010:14, 5010:17, 5010:22, 5011:18, 5012:22, 5012:23, 5012:24, 5019:18, 5019:25
**CR's** [1] - 5019:11
**crazy** [1] - 5014:1
**create** [1] - 4998:7
**created** [4] - 4993:8, 4995:25, 5029:16, 5035:4
**creating** [1] - 4996:1
**credibility** [1] - 5077:16
**credit** [37] - 4993:16, 4993:19, 4994:17, 4994:21, 4995:1, 4995:11, 4995:19, 4996:6, 4996:25, 4998:6, 4998:17, 4999:6, 4999:7, 4999:8, 4999:9, 4999:20, 4999:25, 5000:5, 5000:7, 5000:15, 5000:17, 5000:23, 5001:20, 5002:14, 5026:7, 5026:8, 5026:19, 5027:9, 5027:10, 5027:18, 5027:20, 5029:7, 5029:12, 5029:18, 5032:17, 5033:2, 5037:14
**criminal** [8] - 5062:10, 5062:17, 5063:3, 5064:10, 5083:3, 5084:1, 5090:4, 5090:16
**cross** [13] - 4990:14, 4992:14, 5000:22, 5025:23, 5030:12, 5030:19, 5032:15, 5038:10, 5051:6, 5078:24, 5080:21, 5082:2, 5086:6
**cross-examination** [9] - 4992:14, 5000:22,

5025:23, 5030:12, 5030:19, 5032:15, 5038:10, 5078:24, 5080:21
**cross-examine** [1] - 4990:14
**crossed** [2] - 5081:21, 5086:5
**CSR** [1] - 4985:20
**CTR** [2] - 5030:15, 5030:20
**cultivated** [1] - 5006:9
**Cup** [1] - 5002:10
**currency** [1] - 5030:14
**CURRIE** [1] - 4985:12
**cut** [3] - 5009:1, 5012:11, 5012:20

**D**

**D'Ambrosio** [9] - 5080:9, 5080:14, 5080:16, 5081:4, 5081:6, 5081:16, 5082:5, 5082:7, 5082:19
**date** [3] - 5049:20, 5061:21, 5063:4
**dates** [5] - 5045:17, 5046:7, 5062:19, 5063:1, 5071:14
**daughter** [3] - 5020:9, 5075:9, 5091:8
**day-and-a-half** [1] - 5075:25
**days** [6] - 5032:25, 5055:22, 5056:12, 5068:25, 5083:24, 5091:11
**deal** [12] - 5007:6, 5009:1, 5030:5, 5030:8, 5035:11, 5066:15, 5068:7, 5068:22, 5068:24, 5069:1, 5073:25, 5090:11
**dealing** [1] - 5089:7
**dealings** [2] - 5014:1, 5071:2
**deals** [1] - 5083:5
**December** [3] - 5017:8, 5037:17, 5037:18
**decided** [2] - 5048:22, 5058:16
**deciding** [1] - 5065:13
**decision** [3] - 5003:11, 5033:9
**deep** [2] - 5013:8, 5013:9

**Defendant** [2] - 4985:17, 4985:19
**defendant** [1] - 5082:19
**Defendant's** [3] - 5042:15, 5065:20, 5093:11
**defendants** [1] - 5077:25
**Defendants** [1] - 4985:7
**defense** [9] - 5027:4, 5027:7, 5027:21, 5048:5, 5084:4, 5084:7, 5089:2, 5090:23, 5091:3
**Defense** [4] - 4985:16, 4989:7, 4997:12, 5093:10
**defenses** [2] - 5084:25, 5090:18
**definitely** [3] - 5075:2, 5075:23, 5080:7
**deflect** [1] - 5018:1
**defraud** [4] - 4992:23, 4993:10, 5033:10, 5087:12
**Del** [1] - 5057:15
**Delaware** [1] - 5029:16
**delayed** [1] - 5011:8
**deliberate** [1] - 5075:24
**deliberation** [1] - 5057:11
**deliberations** [1] - 5076:1
**delicately** [1] - 5064:19
**Denver** [2] - 5062:11, 5064:11
**deposed** [1] - 5040:9
**deposit** [1] - 4999:15
**deposited** [1] - 5031:6
**deposition** [15] - 5039:1, 5039:23, 5040:1, 5040:2, 5040:8, 5040:17, 5040:18, 5040:21, 5040:24, 5041:6, 5051:1, 5051:11, 5051:19, 5077:7, 5077:20
**depositions** [5] - 5041:1, 5041:4, 5041:16, 5051:2, 5077:17
**deposits** [1] - 4994:2
**Depot** [4] - 5003:21, 5004:17, 5009:19,

5022:1
**described** [1] - 5069:11
**desk** [2] - 5019:11, 5019:18
**despite** [1] - 5071:25
**detail** [2] - 5073:21, 5085:2
**detailed** [3] - 4992:7, 4993:2, 5015:6
**details** [7] - 5028:2, 5028:4, 5032:6, 5057:7, 5057:12, 5070:11, 5073:22
**detection** [1] - 5068:20
**Detroit** [1] - 5002:11
**develop** [1] - 5029:25
**developer** [1] - 5068:14
**development** [7] - 4993:17, 4994:20, 4999:18, 5000:24, 5001:5, 5029:21, 5066:2
**developments** [1] - 5053:22
**devoted** [1] - 4992:7
**dewar** [1] - 5066:6
**Dewar** [2] - 5069:7, 5070:10
**Diamante** [18] - 5029:3, 5029:4, 5029:8, 5029:13, 5029:19, 5029:22, 5030:1, 5030:3, 5030:6, 5030:8, 5037:13, 5037:15, 5037:22, 5038:4, 5038:14, 5057:13, 5057:15, 5057:17
**different** [7] - 4988:17, 5012:8, 5041:13, 5045:24, 5073:13, 5088:16, 5090:14
**difficult** [1] - 4999:22
**difficulties** [1] - 5078:13
**diligently** [1] - 5068:21
**dire** [1] - 4996:12
**DIRE** [2] - 4996:14, 5093:5
**direct** [10] - 4987:12, 4990:10, 4990:18, 4994:2, 4999:24, 5005:3, 5021:24, 5031:11, 5049:23, 5087:18
**directing** [1] - 5055:13

**direction** [2] - 5048:2, 5085:20
**directly** [4] - 5009:9, 5054:20, 5086:4, 5088:2
**director** [5] - 5048:1, 5048:4, 5048:20, 5050:19
**disagree** [1] - 5066:18
**disburse** [1] - 5087:5
**disbursement** [1] - 5067:2
**disbursements** [1] - 5085:21
**disclosed** [1] - 5080:9
**disclosure** [1] - 5033:15, 5033:17, 5034:9
**discovery** [2] - 4987:23, 5080:20
**Discovery** [3] - 5035:10, 5035:21, 5036:3
**discuss** [2] - 5074:15, 5075:12
**discussed** [1] - 5079:2
**discussing** [2] - 5061:6, 5072:4
**discussion** [2] - 4990:3, 5062:7
**discussions** [7] - 4999:23, 5052:22, 5058:13, 5058:14, 5068:6, 5069:10, 5072:7
**disregard** [1] - 5002:24
**disrespect** [1] - 5083:20
**disrupt** [1] - 5025:16
**distinguish** [1] - 5055:9
**DISTRICT** [3] - 4985:1, 4985:1, 4985:10
**District** [8] - 4985:4, 4985:21, 5014:24, 5015:13, 5050:8, 5051:23, 5052:14, 5061:10
**divergent** [1] - 5088:5
**diversion** [1] - 5057:17
**diversions** [1] - 5057:17
**divert** [1] - 5052:16
**diverted** [3] - 5014:13, 5048:18, 5057:10
**diverting** [1] - 5087:22
**division** [5] - 5062:10,

5062:17, 5063:3, 5064:10, 5083:3
**document** [44] - 4988:3, 4988:6, 4990:20, 4990:22, 4991:4, 4991:8, 4993:21, 4995:14, 4995:15, 4995:21, 4995:25, 4996:1, 4996:16, 4997:16, 4997:25, 4998:7, 4998:13, 4998:20, 5004:18, 5022:23, 5026:6, 5026:8, 5026:10, 5026:19, 5026:20, 5027:12, 5027:18, 5027:19, 5028:1, 5028:6, 5029:11, 5034:20, 5035:8, 5041:11, 5041:14, 5057:25, 5060:3, 5062:1, 5062:2, 5062:3, 5063:23, 5064:6, 5078:24, 5083:4
**documentation** [2] - 5035:14, 5068:12
**documents** [30] - 4986:15, 4987:16, 4990:11, 4990:14, 4990:16, 4990:17, 4991:2, 4995:1, 4995:4, 4995:9, 4996:21, 4997:18, 4998:8, 4998:10, 4999:12, 5034:12, 5034:16, 5035:3, 5036:4, 5040:23, 5041:4, 5052:4, 5052:5, 5065:20, 5078:8, 5078:17, 5078:25, 5082:25, 5083:1
**dollar** [2] - 5026:18, 5069:8
**dollars** [6] - 5002:21, 5063:21, 5067:10, 5067:14, 5067:20, 5067:25
**Dominick** [1] - 4985:20
**DomTursi@email. com** [1] - 4985:23
**done** [12] - 4990:4, 5004:12, 5007:20, 5008:4, 5077:2, 5077:3, 5078:21, 5078:22, 5079:2, 5079:14, 5081:11, 5082:14

**door** [1] - 5028:16
**down** [6] - 5000:17, 5013:11, 5014:2, 5019:6, 5069:22
**draw** [1] - 5049:15
**drawn** [2] - 5049:3, 5087:25
**drew** [1] - 5000:17
**dropped** [2] - 5049:12, 5065:8
**drove** [1] - 5009:2
**drugs** [2] - 5053:11, 5053:18
**due** [2] - 5033:2, 5064:18
**duly** [1] - 4989:8
**dunk** [2] - 5008:17
**During** [1] - 5014:20
**during** [36] - 4987:4, 4990:22, 4991:23, 4995:9, 4996:20, 4997:2, 4997:4, 4997:5, 4999:23, 5000:21, 5002:20, 5002:21, 5023:16, 5027:17, 5034:18, 5035:12, 5040:1, 5040:17, 5040:18, 5040:21, 5040:24, 5043:2, 5054:18, 5054:24, 5056:17, 5057:20, 5057:25, 5058:4, 5058:13, 5063:13, 5063:24, 5073:10, 5073:21, 5082:24, 5083:22, 5085:20

---

# E

**e-mail** [21] - 5023:7, 5031:20, 5031:23, 5032:1, 5066:4, 5067:9, 5067:13, 5067:20, 5067:24, 5067:25, 5068:1, 5068:5, 5068:10, 5068:23, 5069:2, 5069:14, 5069:20, 5080:23, 5081:17, 5086:9
**End** [1] - 5060:6
**endeavoring** [1] - 4989:20
**enemy** [1] - 5009:1
**enforcement** [7] - 5023:19, 5023:21, 5024:24, 5025:3, 5061:3, 5061:19, 5062:4
**enhancing** [1] - 5053:18
**ensued** [2] - 4986:2, 4989:22
**entered** [1] - 5006:1
**Enterprises** [1] - 5086:10
**enters** [2] - 5020:22,

**eat** [2] - 5041:24, 5091:4
**effect** [2] - 5071:13, 5089:11
**effectively** [1] - 5081:1
**effectuate** [1] - 5043:13
**effort** [1] - 5011:12
**efforts** [5] - 4991:25, 5005:9, 5014:6, 5025:19, 5074:6
**eight** [2] - 5025:11, 5081:8
**either** [10] - 5007:14, 5009:9, 5036:4, 5061:8, 5062:10, 5067:4, 5069:6, 5070:12, 5081:1, 5085:16
**EI** [1] - 5030:7
**eliciting** [1] - 5087:14
**emailed** [1] - 5008:16
**embezzled** [1] - 5014:13
**embezzlement** [1] - 5057:16
**embezzling** [1] - 5087:4
**Emergency** [1] - 5020:10
**emergency** [2] - 5020:5, 5076:8
**employer** [1] - 4986:7
**empty** [1] - 5000:7
**end** [17] - 4987:11, 4988:18, 4988:23, 4990:10, 4990:17, 5002:12, 5007:13, 5014:7, 5015:9, 5015:10, 5021:14, 5046:9, 5075:11, 5075:21, 5078:14, 5079:18, 5082:12

**5075:6**
**entertain** [2] - 5077:8, 5077:13
**entire** [9] - 5000:9, 5004:11, 5022:7, 5023:13, 5023:17, 5046:17, 5058:22, 5063:13, 5068:18
**entirely** [2] - 5056:7, 5067:4
**entity** [3] - 5040:20, 5070:3
**entry** [1] - 4998:14
**environmental** [1] - 5035:22, 5036:2
**equation** [1] - 5019:4
**equipped** [1] - 5078:20
**equity** [4] - 5035:20, 5036:3, 5039:3, 5039:5
**error** [2] - 5044:25, 5046:15
**ESQ** [5] - 4985:14, 4985:15, 4985:16, 4985:18, 4985:18
**essence** [2] - 5048:1, 5051:9
**essentially** [4] - 5051:19, 5084:6, 5084:19, 5088:11
**established** [3] - 4993:16, 4993:19, 5029:5
**estate** [3] - 5053:22, 5068:14, 5070:11
**etcetera** [1] - 5055:10
**Ethan** [1] - 5046:25
**Eufora** [27] - 5003:7, 5007:9, 5007:16, 5012:24, 5013:1, 5023:13, 5032:4, 5042:7, 5043:4, 5043:5, 5072:7, 5072:13, 5072:18, 5072:19, 5072:21, 5073:1, 5073:13, 5073:18, 5073:20, 5081:7, 5081:16, 5084:3, 5084:7, 5084:21, 5086:3, 5087:23, 5089:17
**Eufora's** [2] - 5016:21, 5023:5
**Euphoria** [1] - 5082:18
**evaluating** [1] - 5089:16
**event** [3] - 5037:21, 5049:10, 5088:25

events [2] - 5037:10, 5066:14
eventual [1] - 5030:6
evidence [19] - 4993:22, 4993:23, 4996:11, 4997:12, 5024:13, 5037:8, 5042:16, 5045:4, 5045:6, 5052:2, 5059:2, 5063:23, 5065:19, 5072:12, 5075:18, 5087:9, 5093:10, 5093:11, 5093:12
exact [2] - 5084:19, 5088:13
examination [10] - 4990:10, 4992:14, 5000:22, 5025:23, 5030:12, 5030:19, 5032:15, 5030:18, 5078:24, 5080:21
EXAMINATION [9] - 4991:18, 4996:14, 4997:13, 5019:1, 5043:20, 5093:4, 5093:5, 5093:6, 5093:7
examine [1] - 4990:14
example [1] - 5086:9
exception [1] - 5081:22
exchanged [1] - 5050:11
excited [2] - 5051:22, 5052:19
excluded [2] - 5035:11, 5035:17
Excuse [1] - 5020:4
excuse [9] - 4993:6, 5002:20, 5014:20, 5015:9, 5016:21, 5033:15, 5037:18, 5072:10, 5091:10
exhibit [9] - 4986:20, 5022:23, 5024:10, 5024:11, 5024:15, 5033:18, 5043:23, 5045:18, 5055:14
Exhibit [19] - 4993:23, 4994:22, 4995:14, 4996:11, 4997:11, 4997:12, 4998:8, 5024:13, 5033:19, 5034:10, 5037:7, 5037:8, 5042:1, 5042:15, 5061:12, 5065:20, 5093:10, 5093:11, 5093:12
exhibits [6] - 4986:23,

events [2] - 5037:10, 5066:14
4987:11, 5041:7, 5072:12, 5072:16, 5078:17
exist [1] - 5017:2
existence [2] - 4997:17, 5026:6
exits [2] - 5074:17, 5076:4
Expansion [4] - 4992:2, 4992:9, 4992:22, 4993:8
expect [1] - 5064:12
expectation [1] - 5075:19
expected [1] - 5078:9
expecting [1] - 5090:23
expenditures [1] - 5085:3
expenses [8] - 5000:12, 5000:18, 5037:15, 5037:19, 5085:23, 5086:5, 5087:14, 5088:18
experience [2] - 5017:24, 5041:5
explain [3] - 5029:15, 5031:25, 5032:20
explained [1] - 5028:3
explaining [2] - 5069:21, 5084:6
explanations [1] - 4992:7
exponentially [1] - 5006:9
exposure [1] - 5029:24
Express [1] - 5037:4
extent [4] - 4988:8, 5028:18, 5078:16, 5086:7
extremely [1] - 5090:19

F

f'n [8] - 5006:19, 5008:17, 5009:2, 5009:3, 5009:18, 5013:8, 5013:9
face [4] - 5041:11, 5066:5, 5089:14
face-to-face [1] - 5066:5
facetious [1] - 5090:1
fact [21] - 4988:14, 5001:14, 5001:24, 5002:13, 5007:4, 5007:24, 5010:4, 5012:7, 5045:19,

5046:19, 5049:7, 5049:10, 5050:25, 5056:4, 5057:6, 5057:9, 5066:18, 5066:22, 5072:15, 5076:13, 5090:10
facts [1] - 5050:17
factually [1] - 5032:8
fair [1] - 5048:6
fake [1] - 5017:2
fall [6] - 4996:24, 4998:2, 5002:5, 5003:4, 5087:14
false [3] - 5017:15, 5017:16, 5017:25
falsified [1] - 5027:6
family [1] - 5056:9
far [2] - 5001:8, 5086:25
fashion [1] - 5042:23
fate [1] - 5009:18
favor [1] - 5065:13
Fax [1] - 4985:22
FBI [24] - 5013:9, 5014:8, 5014:17, 5048:1, 5048:4, 5048:15, 5048:18, 5048:20, 5050:19, 5051:17, 5052:22, 5052:24, 5053:6, 5053:17, 5054:2, 5057:1, 5058:12, 5058:17, 5061:19, 5062:4, 5064:1, 5064:5, 5065:13, 5073:9
fear [1] - 5078:12
February [1] - 5073:5
Federal [1] - 4985:21
fee [4] - 5000:15, 5066:12, 5066:19, 5066:23
fees [1] - 5012:19
fell [3] - 5030:4, 5030:5, 5085:24
felt [2] - 5012:9, 5012:11
few [6] - 5015:5, 5049:25, 5051:1, 5057:6, 5068:25, 5086:6
fight [1] - 5007:17
file [1] - 5057:18
filed [2] - 5032:4, 5063:24
files [1] - 5064:13
fill [1] - 5031:7
final [2] - 5013:19, 5035:14
finalized [1] - 5030:9

finally [2] - 5012:4, 5041:24
Financial [1] - 5044:10
financial [5] - 4996:2, 4996:7, 4997:15, 4997:17, 5034:3
financing [3] - 5066:15, 5067:6, 5067:14
finder's [1] - 5066:19
finders' [1] - 5066:12
fine [4] - 5072:20, 5079:17, 5083:21, 5088:19
finger [2] - 5084:1, 5088:9
finish [1] - 5054:7
finished [1] - 5038:8
fire [1] - 5007:16
firm [1] - 5069:8
first [23] - 4986:14, 5008:19, 5011:25, 5012:3, 5015:7, 5016:20, 5017:24, 5020:3, 5024:15, 5024:21, 5030:2, 5048:14, 5055:13, 5057:8, 5057:10, 5059:4, 5063:14, 5070:24, 5070:25, 5078:4, 5078:17, 5079:15, 5081:15
fit [2] - 5084:10, 5086:23
five [4] - 4996:25, 5012:3, 5014:10, 5037:20
five-day [1] - 5037:20
fix [4] - 5006:24, 5007:3, 5009:20, 5009:21
fixed [1] - 5006:18
flowing [3] - 5027:20, 5033:18, 5044:12
focus [1] - 5014:17
focused [3] - 5018:1, 5048:19, 5088:10
folders [1] - 4990:11
follow [8] - 5004:13, 5009:8, 5016:25, 5017:3, 5050:16, 5054:19, 5056:2, 5070:25
follow-up [3] - 5050:16, 5054:19, 5070:25
following [11] - 4986:2, 4989:22, 4991:20, 4998:9,

5002:10, 5008:15, 5011:4, 5018:4, 5033:25, 5036:6, 5059:9
follows [4] - 4989:9, 4993:25
force [1] - 5079:10
foreclosure [1] - 5057:16
forge [1] - 4995:7
form [4] - 5062:22, 5062:24, 5064:20, 5072:24
formal [1] - 5015:4
formalized [1] - 5029:9
former [8] - 5010:9, 5012:24, 5048:1, 5048:4, 5048:20, 5048:21, 5050:18, 5061:21
forth [6] - 4997:16, 5004:18, 5027:25, 5044:13, 5055:7, 5082:17
forward [2] - 5000:12, 5019:5
forwarded [1] - 5035:15
forwarding [1] - 5032:2
foster [1] - 5080:9
Foster [1] - 5082:6
foundation [2] - 5060:2, 5060:4
founded [1] - 5081:2
four [3] - 5080:11, 5080:12, 5083:24
Frailes [5] - 5071:11, 5071:18, 5071:20, 5074:3, 5074:4
frame [1] - 5075:16
frankly [4] - 5007:13, 5016:10, 5027:16, 5033:6
fraud [5] - 5010:4, 5010:11, 5010:15, 5010:18, 5010:22
freeh [1] - 5013:21
Freeh [4] - 5047:25, 5048:19, 5049:2, 5049:11
front [5] - 5051:22, 5052:14, 5052:20, 5053:12, 5085:8
Fuji [1] - 5037:24
full [2] - 5075:22, 5075:23
function [1] - 5047:7
fund [5] - 4992:1,

5000:1, 5045:22, 5047:20, 5065:19
**Fund** [23] - 4988:3, 5070:14, 5071:13, 5071:17, 5071:21, 5072:3, 5072:8, 5073:17, 5074:10, 5084:14, 5084:23, 5084:25, 5085:4, 5085:6, 5085:16, 5085:17, 5086:3, 5086:11, 5086:22, 5087:12, 5089:18, 5089:21, 5090:25
**fund-raising** [3] - 5045:22, 5047:20, 5065:19
**funding** [12] - 4992:1, 4992:8, 4992:21, 4993:6, 4993:7, 4995:20, 5037:24, 5044:20, 5066:2, 5068:8, 5069:3, 5084:12
**funds** [13] - 4994:4, 4995:19, 4996:5, 4999:15, 5000:17, 5031:5, 5046:5, 5046:11, 5046:12, 5046:13, 5046:15, 5078:10, 5087:7
**fungible** [1] - 5091:2
**FYI** [1] - 5042:20

## G

**Gaar** [1] - 5016:21
**Gaarn** [22] - 5009:24, 5016:16, 5016:20, 5017:5, 5017:7, 5017:19, 5021:8, 5021:17, 5021:18, 5021:22, 5023:18, 5023:19, 5023:22, 5024:22, 5025:21, 5066:11, 5066:24, 5067:2, 5067:4, 5087:21, 5088:3, 5088:9
**Gaarn's** [1] - 5016:22
**gain** [1] - 5033:4
**Galioto** [22] - 5013:24, 5014:4, 5014:6, 5014:11, 5014:21, 5015:7, 5047:23, 5047:24, 5048:7, 5049:23, 5050:5, 5050:11, 5053:1, 5054:25, 5055:15, 5055:19, 5056:3, 5056:4, 5056:8,

5056:18, 5057:4, 5063:16
**Game** [1] - 5002:10
**gasket** [1] - 5006:20
**generated** [3] - 4995:18, 4996:16, 4997:5
**gentlemen** [3] - 5027:16, 5069:6, 5069:18
**Gentlemen** [1] - 5065:23
**Gentry** [8] - 4991:6, 5010:9, 5010:10, 5010:14, 5010:17, 5010:22, 5012:24, 5082:17
**Gentry's** [6] - 4986:17, 4990:23, 5019:18, 5019:19, 5019:23, 5019:25
**getaway** [1] - 5009:3
**girlfriend** [1] - 5055:5
**given** [6] - 4990:23, 4999:9, 5001:23, 5033:17, 5077:15, 5087:2
**glad** [1] - 5073:21
**Gleason** [2] - 5091:20, 5091:23
**Glenn** [3] - 5026:17, 5027:3, 5027:21
**Global** [24] - 4988:3, 5070:14, 5071:12, 5071:17, 5071:21, 5072:2, 5072:8, 5073:17, 5073:22, 5074:9, 5084:14, 5084:23, 5084:25, 5085:4, 5085:6, 5085:15, 5085:17, 5086:3, 5086:11, 5086:22, 5087:12, 5089:17, 5089:21, 5090:25
**global** [1] - 5072:8
**goal** [1] - 5088:15
**golf** [2] - 5029:23, 5029:24
**Gonchar** [28] - 4989:12, 4993:12, 4993:17, 4993:24, 4994:6, 4994:17, 4998:3, 4998:19, 4998:24, 5000:20, 5000:21, 5001:18, 5001:23, 5002:1, 5002:13, 5002:17, 5003:13, 5003:16, 5085:11, 5086:21,

5086:23, 5089:3, 5089:8, 5089:23, 5090:3, 5090:9, 5090:11, 5090:23
**Gonchar's** [7] - 4988:15, 4995:7, 4995:19, 4996:5, 4998:1, 4998:17, 5001:19
**gonna** [12] - 5004:23, 5004:24, 5005:15, 5005:16, 5006:16, 5006:17, 5009:1, 5009:2, 5009:3, 5009:19, 5016:18, 5016:23
**gotta** [2] - 5008:6
**government** [5] - 4992:19, 4998:11, 4998:19, 5000:21, 5024:2, 5031:20, 5048:2, 5052:5, 5059:1
**Government** [13] - 4985:12, 5051:23, 5077:10, 5078:1, 5078:24, 5080:9, 5081:12, 5081:24, 5082:24, 5083:8, 5087:21, 5088:21, 5089:22
**Government's** [6] - 5037:8, 5043:25, 5061:12, 5081:23, 5087:11, 5087:15
**grand** [16] - 5014:25, 5015:6, 5015:12, 5049:13, 5050:8, 5050:13, 5051:25, 5052:10, 5052:18, 5052:20, 5054:3, 5054:15, 5055:21, 5055:7, 5065:12
**grapevine** [1] - 5091:22
**gravitas** [1] - 5077:15
**great** [1] - 5085:2
**greatly** [1] - 5057:4
**ground** [1] - 5005:23
**group** [11] - 5003:12, 5008:13, 5022:4, 5022:13, 5022:21, 5023:13, 5023:17, 5029:21, 5032:10, 5033:8, 5086:2
**Group** [2] - 5045:8, 5072:14
**group's** [1] - 5025:17
**GSF** [1] - 5078:10
**guarantee** [1] -

5090:13
**guess** [2] - 5019:22, 5028:9
**guilt** [1] - 5090:7
**guilty** [1] - 5088:23
**guy** [3] - 5007:4, 5009:2, 5009:3
**guys** [5] - 5008:17, 5010:4, 5011:3, 5015:21, 5017:1

## H

**Haley** [14] - 4986:12, 4987:1, 4990:10, 4990:17, 5021:2, 5050:22, 5051:12, 5052:5, 5067:17, 5077:10, 5077:13, 5078:4, 5083:18, 5088:11
**HALEY** [54] - 4985:16, 4986:11, 4986:13, 4986:21, 4987:4, 4987:7, 4987:13, 4987:18, 4989:10, 4989:14, 4989:17, 4991:11, 4991:19, 4992:12, 4996:10, 4997:14, 5002:25, 5019:2, 5021:3, 5021:4, 5024:4, 5024:10, 5027:2, 5027:15, 5028:8, 5028:12, 5029:2, 5034:1, 5038:22, 5038:25, 5041:23, 5042:9, 5043:17, 5054:7, 5055:12, 5058:1, 5059:5, 5059:7, 5060:1, 5062:22, 5064:20, 5064:23, 5065:9, 5065:11, 5065:16, 5072:24, 5074:11, 5077:14, 5077:21, 5079:25, 5083:19, 5091:14, 5093:4, 5093:6
**half** [5] - 5015:3, 5019:12, 5040:13, 5055:3, 5075:25
**hand** [1] - 5021:1
**handing** [2] - 5055:11, 5060:1
**handing)** [1] - 5058:21
**hanging** [1] - 5052:9
**happy** [2] - 5006:15, 5008:18
**Harbor** [3] - 5035:10, 5035:21, 5036:3

**hard** [2] - 5007:4, 5037:23
**hard-working** [1] - 5007:4
**hardball** [1] - 5016:12
**hardly** [1] - 5016:25
**Harvey** [1] - 5013:22
**Hawaii** [16] - 4994:20, 5000:23, 5000:25, 5001:5, 5034:22, 5039:2, 5040:9, 5040:17, 5044:1, 5066:2, 5066:7, 5067:10, 5067:14, 5067:21, 5068:15, 5069:16
**Hawaiian** [10] - 4993:17, 4999:16, 4999:18, 5039:5, 5039:12, 5047:11, 5047:15, 5084:11, 5084:22, 5089:17
**hear** [5] - 5005:24, 5009:12, 5020:11, 5067:12, 5068:3
**heard** [9] - 5007:1, 5007:25, 5009:25, 5020:3, 5056:24, 5074:24, 5083:23, 5087:20, 5088:18
**hearing** [1] - 5087:1
**hearings** [2] - 5053:8, 5077:2
**hearsay** [1] - 5027:23
**held** [3] - 5023:4, 5033:22, 5033:23
**help** [6] - 5011:21, 5012:10, 5043:13, 5056:16, 5056:19, 5088:20
**helped** [1] - 5088:16
**helpful** [3] - 5084:17, 5085:1, 5090:20
**helps** [1] - 5055:14
**Hermosa** [1] - 5071:5
**hid** [1] - 5034:25
**highlighted** [3] - 5006:14, 5021:6, 5059:6
**himself** [5] - 4998:4, 5003:14, 5013:21, 5041:15, 5090:3
**hire** [1] - 5053:21
**hired** [1] - 5047:25
**history** [2] - 4998:2, 4998:5
**hit** [1] - 5081:3
**hockey** [17] - 4992:24, 4993:10, 4994:10, 4999:19, 5001:11,

5017:11, 5017:20, 5033:10, 5057:3, 5063:22, 5069:22, 5070:6, 5084:15, 5085:9, 5085:24, 5087:13, 5090:15
**hold** [3] - 4988:20, 4990:12, 5024:7
**holders** [2] - 4998:6, 4999:9
**holding** [1] - 5089:3
**hole** [1] - 5055:25
**holiday** [1] - 5076:2
**home** [7] - 5022:2, 5035:5, 5035:9, 5035:16, 5036:2, 5039:24, 5040:1
**Home** [4] - 5003:20, 5004:17, 5009:19, 5022:1
**Honor** [25] - 4986:8, 4986:10, 4986:21, 4987:8, 4989:10, 4989:19, 4990:6, 4991:11, 4996:10, 4997:10, 5021:3, 5024:8, 5042:9, 5059:7, 5061:13, 5061:15, 5062:23, 5065:9, 5072:25, 5074:19, 5075:16, 5077:17, 5077:19, 5078:5, 5079:25
**HONORABLE** [1] - 4985:9
**Honuapo** [1] - 5044:1
**hope** [1] - 5041:24
**hopefully** [1] - 5025:14
**hoping** [1] - 5007:11
**HORMOVITIS** [1] - 4985:6
**hospital** [3] - 5074:20, 5074:25, 5075:9
**hospitality** [1] - 5037:21
**hot** [1] - 5065:8
**hour** [2] - 4991:22, 4992:6
**house** [3] - 5019:6, 5019:7, 5057:17
**huge** [1] - 5006:8

**I**

**idea** [7] - 5002:6, 5008:22, 5009:7, 5010:16, 5017:16, 5019:18
**identification** [2] -

5055:8, 5061:12
**identified** [1] - 5034:10
**identify** [1] - 4995:18
**ill** [1] - 5091:8
**illegal** [3] - 5023:18, 5024:23, 5025:20
**immediately** [12] - 5000:7, 5002:10, 5006:1, 5014:18, 5022:1, 5023:3, 5029:25, 5045:3, 5047:8, 5049:1, 5057:9, 5079:6
**impeachment** [1] - 5048:21
**implicating** [1] - 5088:3
**implying** [1] - 5090:16
**important** [2] - 5029:21, 5048:22
**impossible** [1] - 5080:13
**impractical** [1] - 5078:12
**impression** [2] - 5022:7, 5050:10
**in-person** [2] - 5023:4, 5040:17
**inability** [1] - 5005:22
**inadvertently** [1] - 5057:14
**incidentally** [1] - 5002:16
**inclines** [1] - 5091:10
**included** [4] - 4997:21, 5034:4, 5034:6, 5034:9
**including** [7] - 5000:4, 5022:5, 5043:10, 5057:7, 5061:19, 5061:20, 5062:4
**incorrect** [3] - 5038:16, 5039:2, 5063:23
**incredible** [1] - 5082:18
**incremental** [1] - 4999:14
**increments** [2] - 5031:8, 5031:10
**incur** [1] - 5000:14
**incurred** [2] - 5037:17, 5037:19
**indeed** [2] - 4991:22, 5027:6
**indemnity** [2] - 5035:22, 5036:2
**independent** [3] - 5003:10, 5089:3,

5089:9
**independently** [1] - 4994:14
**indicate** [1] - 5087:9
**indicated** [2] - 5053:20, 5054:2
**indicating** [2] - 5047:2, 5067:23
**indicted** [5] - 5010:3, 5010:10, 5010:15, 5010:18, 5010:22
**indictment** [3] - 4992:16, 4992:20, 5019:23
**indirectly** [1] - 5007:2
**individual** [3] - 4996:23, 4999:8, 4999:13
**individuals** [6] - 5014:12, 5032:4, 5043:10, 5053:1, 5064:7, 5064:16
**information** [24] - 4991:5, 4995:21, 4995:22, 4996:22, 5003:8, 5010:12, 5020:17, 5020:25, 5034:4, 5034:5, 5034:9, 5053:20, 5058:8, 5061:3, 5061:20, 5062:18, 5062:20, 5062:25, 5063:11, 5064:13, 5068:19, 5083:6
**informed** [4] - 5023:11, 5029:20, 5045:1, 5053:9
**initial** [3] - 5011:24, 5014:20, 5066:25
**initiated** [2] - 4996:5, 5044:18
**initiating** [1] - 5012:8
**initiation** [1] - 5084:24
**inquiries** [1] - 5050:14
**insinuate** [2] - 5017:1, 5019:22
**insinuated** [2] - 5001:17, 5023:17
**insinuating** [1] - 5014:1
**insofar** [1] - 5014:19
**installed** [1] - 5019:17
**instance** [5] - 5026:1, 5026:9, 5030:12, 5034:24, 5084:3
**instead** [1] - 5068:9
**instruction** [5] - 4986:17, 4987:6, 4990:19, 4991:1, 4991:9

5089:9
**independently** [1] - 4994:14
**indicate** [1] - 5087:9

**instructions** [2] - 5022:16, 5076:10
**intend** [1] - 5082:2
**intended** [1] - 5083:20
**intent** [1] - 5080:24
**interactions** [1] - 5065:3
**interest** [6] - 5006:17, 5031:23, 5032:16, 5032:25, 5033:4, 5038:4
**interested** [1] - 5058:7
**interject** [1] - 5011:14
**interview** [14] - 5041:8, 5049:22, 5050:1, 5050:4, 5052:23, 5053:4, 5053:13, 5054:18, 5056:8, 5056:13, 5056:17, 5058:4, 5063:15
**interviewed** [1] - 5053:2
**interviews** [5] - 5052:22, 5052:24, 5057:20, 5061:3, 5061:5
**intimidate** [1] - 5007:15
**introduce** [1] - 5082:2
**introduced** [3] - 4993:21, 4993:23, 5037:7
**introduction** [3] - 5060:3, 5067:3, 5067:5
**invest** [5] - 4994:19, 5058:16, 5071:8, 5071:10, 5073:1
**invested** [6] - 5000:3, 5071:11, 5073:2, 5073:5, 5073:6, 5073:13
**investigate** [1] - 5005:10
**investigating** [1] - 5022:4
**investigation** [16] - 5003:6, 5003:9, 5008:1, 5011:12, 5014:8, 5014:17, 5025:19, 5032:5, 5048:3, 5048:23, 5049:2, 5049:3, 5049:4, 5053:7, 5053:9, 5062:16
**investigator** [1] - 5049:3
**investigators** [2] - 5003:12, 5063:12

**investing** [1] - 5058:25
**investment** [9] - 4993:20, 5012:17, 5058:9, 5071:17, 5071:20, 5071:22, 5073:4, 5073:18, 5073:20
**investments** [1] - 5072:5
**investor** [2] - 5071:24, 5072:9
**investors** [10] - 5000:4, 5001:12, 5006:3, 5008:3, 5014:15, 5022:5, 5023:14, 5032:4, 5057:11, 5057:19
**involve** [2] - 5078:12, 5078:16
**involved** [9] - 5012:5, 5017:10, 5023:22, 5032:5, 5049:2, 5062:6, 5072:6, 5086:8, 5089:23
**involvement** [1] - 5025:3
**involves** [1] - 5078:8
**involving** [2] - 5017:19, 5027:3
**iPhone** [1] - 5022:8
**irrelevant** [1] - 5002:22
**irresponsible** [1] - 5000:19
**IRS** [7] - 5062:10, 5062:14, 5062:17, 5063:4, 5064:11, 5064:12, 5083:3
**Islanders** [1] - 5058:15
**Isle** [11] - 4994:2, 4997:21, 4997:22, 4997:23, 4998:17, 4999:15, 5000:3, 5000:10, 5027:20, 5069:19, 5070:1
**Islip** [2] - 4985:4, 4985:22
**isolated** [1] - 4998:20
**issue** [15] - 4987:22, 4987:25, 4991:6, 5003:18, 5024:23, 5025:3, 5025:21, 5044:18, 5061:16, 5061:17, 5083:18, 5086:17, 5086:18, 5089:3, 5090:18
**issues** [6] - 5021:22, 5032:8, 5032:16,

5080:17, 5084:20, 5091:1
**itself** [8] - 4998:13, 5003:1, 5006:7, 5008:14, 5019:9, 5026:8, 5029:11, 5072:11
**IV** [7] - 4994:3, 4999:15, 5000:3, 5000:10, 5027:20, 5069:19, 5070:1
**IV's** [1] - 4998:17

## J

**JAMES** [1] - 4985:14
**January** [5] - 5037:6, 5037:11, 5037:17, 5037:18, 5037:22
**Jeff** [1] - 5066:22
**job** [1] - 5077:24
**Joe** [1] - 5002:10
**John** [2] - 5000:4, 5031:22
**joining** [2] - 5069:18, 5070:1
**joint** [3] - 5035:17, 5070:2, 5070:4
**jointly** [1] - 5070:2
**JOSEPH** [1] - 4985:9
**Jowdy** [50] - 5001:15, 5001:20, 5013:20, 5014:13, 5015:1, 5025:25, 5026:9, 5026:18, 5027:3, 5027:5, 5027:18, 5029:12, 5029:20, 5033:1, 5033:15, 5033:17, 5037:13, 5037:22, 5038:5, 5047:25, 5048:3, 5048:4, 5048:19, 5048:22, 5050:18, 5052:16, 5053:5, 5053:10, 5053:18, 5057:3, 5057:8, 5058:5, 5058:11, 5058:14, 5058:25, 5062:13, 5063:2, 5063:15, 5063:24, 5065:14, 5067:1, 5069:16, 5069:17, 5071:21, 5073:25, 5074:3, 5074:7, 5084:16
**Jowdy's** [3] - 5007:12, 5026:18, 5027:4
**Judge** [27] - 4986:24, 4987:19, 4988:13, 4988:19, 5002:22,

5024:4, 5038:22, 5041:23, 5042:12, 5043:17, 5058:1, 5059:4, 5060:2, 5064:20, 5065:16, 5074:11, 5075:2, 5076:24, 5077:1, 5077:14, 5079:3, 5079:10, 5082:13, 5082:23, 5089:19, 5091:20, 5091:23
**JUDGE** [1] - 4985:10
**judge** [1] - 5028:9
**July** [7] - 5015:10, 5042:6, 5043:6, 5050:7, 5052:12, 5091:11, 5091:19
**June** [2] - 4985:7, 5002:9, 5048:8, 5049:8, 5050:4, 5050:6, 5053:2, 5056:4, 5056:7, 5063:14, 5063:19, 5092:3
**Juror** [1] - 4986:7
**juror** [3] - 5020:15, 5074:18, 5091:7
**JUROR** [4] - 5020:4, 5074:19, 5075:16, 5075:22
**jurors** [4] - 4986:4, 4989:2, 5074:22, 5091:12
**Jury** [1] - 5074:17
**jury** [40] - 4985:10, 4986:3, 4986:16, 4987:20, 4989:23, 4989:25, 4993:2, 5002:24, 5003:23, 5004:1, 5004:2, 5014:25, 5015:6, 5015:12, 5020:7, 5020:22, 5021:11, 5039:21, 5043:1, 5049:13, 5050:8, 5050:13, 5051:25, 5052:10, 5052:18, 5052:20, 5054:3, 5054:15, 5065:8, 5065:13, 5075:6, 5076:4, 5076:7, 5085:8, 5086:14, 5089:16, 5089:25, 5090:6, 5091:11
**jury's** [1] - 5077:15
**justifiable** [1] - 5079:6
**justify** [1] - 5063:21

## K

**Kaiser** [2] - 5000:4,

5031:22
**keep** [5] - 5009:17, 5009:21, 5073:16, 5075:1, 5091:15
**KELLY** [1] - 4985:12
**Ken** [15] - 5001:20, 5026:18, 5027:3, 5027:5, 5027:18, 5038:5, 5047:25, 5048:22, 5053:5, 5057:2, 5062:13, 5063:24, 5065:25, 5069:15, 5073:25
**Kennedy** [2] - 5080:10, 5082:6
**KENNER** [5] - 4985:5, 4985:5, 4989:6, 5007:20, 5093:3
**Kenner** [91] - 4985:17, 4987:2, 4988:4, 4988:9, 4988:16, 4989:3, 4990:12, 4990:24, 4991:3, 4991:12, 4992:13, 4993:22, 4993:23, 4994:1, 4994:9, 4994:22, 4995:13, 4995:14, 4996:10, 4997:15, 4998:8, 4998:13, 5003:19, 5004:18, 5004:19, 5004:20, 5006:6, 5010:25, 5014:25, 5020:19, 5021:5, 5022:22, 5022:23, 5023:23, 5024:10, 5024:11, 5024:13, 5024:14, 5024:22, 5025:21, 5026:4, 5027:11, 5029:3, 5030:10, 5033:13, 5033:19, 5034:10, 5038:9, 5041:19, 5041:24, 5041:25, 5042:23, 5043:18, 5061:18, 5082:1, 5082:24, 5083:2, 5084:18, 5085:2, 5085:4, 5085:14, 5085:21, 5086:8, 5086:14, 5086:19, 5086:20, 5086:25, 5087:4, 5087:9, 5087:13, 5087:16, 5087:21, 5087:22, 5088:3, 5088:6, 5088:9, 5088:11, 5088:14, 5088:19, 5088:21, 5088:22, 5089:1, 5089:4,

5089:5, 5089:9, 5089:12, 5090:5, 5090:8, 5090:22, 5093:12
**Kenner's** [8] - 4987:12, 4990:18, 4991:6, 5083:6, 5083:23, 5084:5, 5088:24, 5090:19
**Kenner-1** [1] - 5055:9
**Kenner/Gaarn** [1] - 5025:4
**Keswin** [4] - 5066:22, 5066:24, 5067:2
**Kevin** [1] - 5004:16
**kind** [5] - 5013:15, 5014:1, 5075:16, 5087:25, 5089:14
**kinds** [1] - 5061:20, 5081:5
**knowing** [2] - 5031:12, 5041:20
**knowledge** [8] - 4994:25, 4995:22, 4996:8, 5010:14, 5010:20, 5019:24, 5037:14, 5085:5
**known** [3] - 5026:6, 5030:7, 5040:20
**KOMATIREDDY** [4] - 4985:15, 5078:5, 5091:18, 5092:1

## L

**lack** [2] - 5066:18, 5077:15
**laid** [2] - 5057:6, 5060:3
**land** [9] - 4993:17, 4994:20, 4999:18, 5000:23, 5000:25, 5001:5, 5034:22, 5068:14, 5073:25
**largest** [1] - 5069:4
**Larry** [1] - 5034:15
**LARUSSO** [26] - 5042:12, 5059:4, 5061:13, 5075:2, 5076:20, 5077:19, 5077:23, 5078:21, 5079:1, 5079:9, 5079:23, 5080:5, 5080:7, 5080:14, 5081:15, 5082:9, 5082:13, 5082:20, 5082:23, 5084:21, 5085:13, 5085:18, 5087:8, 5089:10, 5091:13, 5091:15

**LaRusso** [22] - 4985:18, 4986:9, 4987:1, 4988:2, 4988:13, 4988:23, 4990:2, 4990:6, 4991:21, 4997:10, 5024:8, 5042:11, 5043:23, 5043:24, 5044:11, 5065:18, 5070:14, 5075:4, 5080:25, 5081:7, 5081:14, 5083:25
**LaRusso's** [1] - 5046:25
**Las** [3] - 5039:24, 5040:1, 5055:4
**last** [7] - 4996:17, 5050:25, 5053:23, 5054:9, 5058:20, 5081:3, 5081:24
**late** [3] - 4986:5, 5002:4, 5073:4
**law** [11] - 5020:16, 5023:19, 5023:21, 5024:24, 5025:2, 5040:15, 5061:3, 5061:19, 5062:3, 5079:5, 5086:12
**lawsuit** [2] - 5026:18, 5063:24
**lawsuits** [1] - 5057:19
**lawyer** [2] - 4990:13, 5048:5
**lawyer's** [1] - 5011:7
**lawyers** [1] - 5032:3
**lay** [1] - 5060:4
**lays** [1] - 5081:25
**lead** [1] - 5067:6
**leading** [2] - 5011:11, 5025:18
**learn** [1] - 5091:22
**learned** [2] - 4999:25, 5047:25
**least** [5] - 4991:21, 4995:2, 5021:12, 5041:10, 5085:23
**leave** [4] - 5020:18, 5028:12, 5074:24, 5088:3
**leaves** [1] - 5020:7
**leaving** [1] - 5088:2
**led** [4] - 5057:18, 5066:14, 5067:9, 5067:14
**left** [2] - 4990:2, 5021:5
**legal** [4] - 5008:12, 5012:19, 5040:3, 5089:11
**legitimate** [1] -

5084:13
**Lehman** [15] - 4995:20, 4996:20, 4997:2, 4997:4, 4997:5, 5030:9, 5033:7, 5034:21, 5035:4, 5035:11, 5066:14, 5066:20, 5068:8, 5069:8, 5069:10
**lender** [1] - 5069:6
**lenders** [2] - 5037:23, 5069:5
**Lenders** [1] - 5042:8
**length** [1] - 5016:5
**less** [1] - 5031:8
**less-than-$10,000** [1] - 5031:10
**letter** [14] - 4986:6, 4993:24, 4994:9, 4999:10, 5015:4, 5015:9, 5034:10, 5052:7, 5052:11, 5052:12, 5069:14, 5069:20, 5079:5, 5080:24
**letters** [1] - 4994:13
**letting** [1] - 5050:15
**levels** [1] - 5088:17
**liability** [1] - 5016:12
**license** [1] - 5033:23
**licenses** [2] - 5033:22, 5034:2
**life** [5] - 5006:18, 5006:19, 5013:11, 5055:22, 5056:12
**light** [1] - 5028:10
**limiting** [2] - 4986:17, 4990:25
**line** [34] - 4993:16, 4993:19, 4994:17, 4994:21, 4995:1, 4995:10, 4995:19, 4996:5, 4998:6, 4998:17, 4999:5, 4999:7, 4999:8, 4999:20, 5000:5, 5000:7, 5000:15, 5000:23, 5001:19, 5002:14, 5026:6, 5026:8, 5026:19, 5027:9, 5027:17, 5027:19, 5029:7, 5029:12, 5029:18, 5033:2, 5038:11, 5065:22, 5071:25
**lined** [1] - 5080:11
**lines** [7] - 4996:25, 4999:9, 4999:25, 5000:17, 5032:17,

5055:13, 5076:15
**list** [5] - 4987:16, 4988:15, 5080:8, 5083:2, 5087:14
**listed** [1] - 5086:5
**Listen** [1] - 5016:2
**listen** [2] - 5008:7, 5022:17
**listened** [1] - 5083:24
**listening** [2] - 5023:10, 5023:11
**litany** [1] - 5021:16
**litigation** [15] - 5005:10, 5005:22, 5013:4, 5026:11, 5027:2, 5027:3, 5027:4, 5027:17, 5027:24, 5028:2, 5028:5, 5028:7, 5028:18, 5051:3, 5064:3
**live** [1] - 5077:20
**lived** [3] - 5054:23, 5055:1, 5055:5
**lives** [1] - 5013:23
**living** [3] - 5055:20, 5055:25, 5058:14
**LLC** [6] - 4994:4, 5029:5, 5029:9, 5029:16, 5029:19, 5040:10
**loan** [31] - 4992:2, 4992:9, 4992:22, 4993:5, 4998:2, 4998:5, 5025:25, 5026:5, 5027:7, 5027:8, 5032:15, 5032:17, 5032:23, 5032:24, 5032:25, 5033:2, 5033:15, 5033:17, 5034:21, 5042:7, 5042:18, 5043:3, 5043:7, 5043:13, 5044:1, 5057:14, 5063:20, 5063:25, 5069:15, 5069:17
**loaned** [1] - 5058:11
**loans** [4] - 5001:15, 5001:20, 5007:12, 5014:15
**LOC** [1] - 4994:2
**location** [2] - 5029:23, 5040:6
**locker** [1] - 5002:9
**logic** [1] - 5016:25
**look** [12] - 4987:13, 4995:13, 5016:23, 5022:22, 5029:23, 5032:6, 5041:25,

5058:19, 5061:13, 5061:25, 5082:13, 5083:5
**looked** [1] - 5030:2
**looking** [3] - 4987:1, 5045:14, 5058:20
**Los** [5] - 5071:11, 5071:18, 5071:20, 5074:3, 5074:4
**Losch** [19] - 5065:25, 5066:6, 5066:7, 5067:13, 5068:2, 5068:4, 5068:6, 5068:11, 5068:14, 5068:18, 5068:22, 5069:7, 5069:10, 5069:24, 5070:5, 5070:10, 5080:22, 5081:22, 5081:25
**lose** [1] - 5091:10
**loss** [2] - 4986:21, 5057:15
**lost** [2] - 5027:14, 5027:15
**Louie** [3] - 5047:25, 5048:19, 5049:2
**Louis** [1] - 5002:11
**Lucas** [19] - 5029:4, 5029:5, 5029:8, 5029:13, 5029:19, 5029:22, 5029:25, 5030:1, 5030:4, 5030:8, 5037:21, 5038:4, 5038:15, 5057:17, 5066:15, 5066:21, 5067:6, 5068:7, 5068:24
**lunch** [3] - 5074:14, 5074:16, 5091:4
**lying** [6] - 5065:2, 5065:4, 5065:7, 5065:12, 5065:14, 5076:13
**lynching** [1] - 5042:19

## M

**Machem** [1] - 5034:15
**mail** [22] - 5022:3, 5023:7, 5031:20, 5031:23, 5032:1, 5066:4, 5067:9, 5067:13, 5067:20, 5067:24, 5067:25, 5068:1, 5068:5, 5068:10, 5068:23, 5069:2, 5069:14, 5069:20, 5080:23, 5081:17, 5086:9
**mails** [2] - 5080:20, 5081:21, 5081:23,

5082:17
**maintain** [2] - 4999:17, 5003:1
**maintained** [1] - 5021:24
**Makika** [1] - 5044:4
**Makika's** [1] - 4997:23
**Management** [2] - 5045:7, 5072:14
**managing** [1] - 5047:17
**Manfredi** [1] - 5068:20
**Manhattan** [2] - 5049:24, 5051:18
**Mar** [1] - 5057:15
**March** [6] - 5030:9, 5033:7, 5061:10, 5063:15, 5063:19, 5067:16
**Maria** [1] - 5030:5
**mark** [1] - 5041:7
**marked** [6] - 4995:14, 5004:15, 5022:23, 5033:19, 5055:8, 5083:16
**marking** [1] - 5061:11
**Markowitz** [1] - 5034:15
**marks** [1] - 5041:5
**Masood** [1] - 5068:24
**master** [3] - 4995:3, 5000:6, 5015:24
**match** [1] - 4987:14
**material** [2] - 5081:8, 5082:15
**materialize** [1] - 5077:5
**matter** [8] - 4991:23, 4994:5, 5028:10, 5031:19, 5032:21, 5040:11, 5052:25, 5054:11
**matters** [3] - 4997:16, 5005:11, 5042:25
**Matthew** [1] - 5047:23
**McKee** [1] - 5043:14
**McNamee** [1] - 5053:12
**mean** [12] - 4998:14, 5006:25, 5007:21, 5009:6, 5011:22, 5016:24, 5042:19, 5047:10, 5063:16, 5071:16, 5083:10, 5083:19
**meaning** [5] - 5006:23, 5006:24, 5013:14, 5031:25, 5042:24
**meant** [4] - 5019:14,

5019:20, 5039:7, 5051:11
**meanwhile** [2] - 5061:18, 5083:15
**mechanical** [1] - 4985:25
**meeks** [1] - 5040:16
**meet** [5] - 5008:7, 5037:23, 5071:5
**meeting** [4] - 5005:2, 5005:4, 5023:5, 5061:8
**meetings** [5] - 5043:5, 5047:22, 5066:5, 5067:9, 5067:13
**member** [2] - 5070:1, 5081:6
**members** [5] - 4989:25, 5039:21, 5042:18, 5043:6, 5061:9
**memory** [4] - 4998:25, 4999:2, 5031:3, 5032:9
**men** [1] - 5062:21
**mentioned** [4] - 4997:24, 5040:18, 5040:20, 5064:1
**mentions** [1] - 5036:4
**merely** [2] - 5049:7, 5058:12
**message** [5] - 5023:9, 5024:15, 5024:17, 5042:5, 5042:25
**messages** [4] - 5023:1, 5023:24, 5024:17, 5042:5
**met** [5] - 5015:22, 5047:24, 5048:7, 5048:14, 5068:24
**Mexican** [2] - 5037:24, 5053:21
**Mexico** [17] - 5000:24, 5001:6, 5055:25, 5058:6, 5065:14, 5066:15, 5068:16, 5069:3, 5069:16, 5069:23, 5071:8, 5071:23, 5071:25, 5073:25, 5074:7, 5087:3
**Mia** [4] - 5011:19, 5012:25, 5013:1
**mic** [2] - 5019:11, 5020:1
**Michael** [12] - 5003:6, 5011:11, 5015:25, 5022:12, 5023:2, 5024:18, 5025:17, 5042:6, 5042:25,

5058:13, 5058:23, 5058:24
**Michigan** [1] - 5002:11
**mid** [1] - 5002:4
**middle** [1] - 5080:21
**midst** [1] - 5006:19
**might** [5] - 4987:4, 4990:9, 5005:24, 5027:15, 5051:19
**million** [19] - 5000:2, 5000:10, 5000:11, 5002:20, 5002:21, 5014:14, 5015:1, 5015:6, 5026:18, 5057:14, 5058:11, 5067:22, 5067:24, 5068:15, 5069:21, 5069:22, 5070:5, 5070:7, 5086:21
**millions** [1] - 5063:21
**mind** [7] - 4986:22, 4991:4, 4991:7, 5003:13, 5008:21, 5081:21, 5087:25
**mine** [1] - 5076:20
**minus** [1] - 5038:2
**minute** [5] - 5008:7, 5023:21, 5025:13, 5064:14, 5081:3
**minutes** [7] - 4991:22, 4992:6, 5048:8, 5048:10, 5048:11, 5076:18, 5076:20
**miraculous** [1] - 5041:19
**miraculously** [1] - 5039:9
**misappropriate** [1] - 5087:6
**misappropriated** [1] - 5014:13
**misappropriating** [1] - 5086:2
**misappropriation** [2] - 5087:2, 5087:10
**misappropriations** [2] - 5014:25, 5087:1
**miscommunication** [2] - 5046:4, 5046:16
**misconduct** [1] - 5009:11
**MISKIEWICZ** [36] - 4985:14, 4986:8, 4986:18, 4987:21, 4992:10, 4996:12, 4996:15, 4997:8, 5002:22, 5022:18, 5024:2, 5026:21, 5027:13, 5028:9,

5028:14, 5038:19, 5039:19, 5042:13, 5043:21, 5045:5, 5054:9, 5058:3, 5059:1, 5060:5, 5061:15, 5063:5, 5063:17, 5067:17, 5076:16, 5076:18, 5080:19, 5082:6, 5082:15, 5083:14, 5083:15, 5093:7
**Miskiewicz** [12] - 4992:14, 5025:23, 5030:18, 5032:14, 5033:14, 5033:16, 5038:4, 5038:10, 5038:12, 5039:16, 5076:12, 5084:5
**missing** [1] - 5070:7
**misstate** [1] - 4987:14
**mistake** [1] - 5046:9
**misunderstandings** [1] - 5006:8
**misunderstood** [1] - 5051:10
**misuse** [1] - 5078:10
**Mitchell** [1] - 5053:8
**moment** [6] - 4986:24, 4993:22, 5041:23, 5044:6, 5044:14, 5045:5
**moments** [1] - 5051:1
**Monday** [11] - 5075:11, 5075:14, 5076:1, 5079:4, 5079:14, 5079:16, 5080:12, 5080:15, 5088:4, 5091:9, 5092:3
**money** [37] - 5001:5, 5001:18, 5001:19, 5001:25, 5012:10, 5014:3, 5027:8, 5027:9, 5031:9, 5033:4, 5037:23, 5043:12, 5044:5, 5044:12, 5044:14, 5046:23, 5047:8, 5047:20, 5057:3, 5065:4, 5066:20, 5068:12, 5072:18, 5072:19, 5072:23, 5073:1, 5073:24, 5074:9, 5084:9, 5084:11, 5085:10, 5085:11, 5086:2, 5086:21, 5086:22, 5090:24, 5091:2
**monies** [8] - 4993:9, 5000:23, 5001:12,

5033:18, 5070:14, 5089:17, 5089:18
**monitoring** [1] - 5020:16
**monopolized** [1] - 5011:7
**month** [2] - 5000:15, 5040:13
**monthly** [2] - 5000:12, 5000:18
**months** [8] - 4996:17, 4996:25, 5002:13, 5003:17, 5012:4, 5040:13, 5050:3, 5071:18
**Moreau** [2] - 5046:24, 5046:25
**morning** [4] - 4989:25, 5075:12, 5076:1, 5079:16
**Mortgage** [1] - 5044:11
**mortgaging** [1] - 5044:1
**most** [1] - 4996:21
**mother** [1] - 5009:19
**motion** [2] - 5083:22, 5088:8
**move** [4] - 5019:5, 5031:19, 5081:1, 5081:11
**MR** [121] - 4986:8, 4986:9, 4986:11, 4986:13, 4986:18, 4986:21, 4987:1, 4987:4, 4987:7, 4987:13, 4987:18, 4987:21, 4988:13, 4988:23, 4989:10, 4989:14, 4989:17, 4990:6, 4991:11, 4991:19, 4992:10, 4992:12, 4996:10, 4996:12, 4996:15, 4997:8, 4997:10, 4997:14, 5002:22, 5002:25, 5019:2, 5021:3, 5021:4, 5022:18, 5024:2, 5024:4, 5024:8, 5024:10, 5026:21, 5027:2, 5027:13, 5027:15, 5028:8, 5028:9, 5028:12, 5028:14, 5029:2, 5034:1, 5038:19, 5038:22, 5038:25, 5039:19, 5041:23, 5042:9, 5042:12, 5042:13, 5043:17,

5043:21, 5045:5, 5054:7, 5054:9, 5055:12, 5058:1, 5058:3, 5059:1, 5059:4, 5059:5, 5059:7, 5060:1, 5060:5, 5061:13, 5061:15, 5062:22, 5063:5, 5063:17, 5064:20, 5064:23, 5065:9, 5065:11, 5065:16, 5067:17, 5072:24, 5074:11, 5075:2, 5076:16, 5076:18, 5076:20, 5077:14, 5077:19, 5077:21, 5077:23, 5078:21, 5079:1, 5079:9, 5079:23, 5079:25, 5080:8, 5080:7, 5080:14, 5080:19, 5081:15, 5082:6, 5082:9, 5082:13, 5082:15, 5082:20, 5082:23, 5083:14, 5083:19, 5084:21, 5085:13, 5085:18, 5087:8, 5089:10, 5091:13, 5091:14, 5091:15, 5093:4, 5093:5, 5093:6, 5093:7
**MS** [3] - 5078:5, 5091:18, 5092:1
**multibillion** [1] - 5069:8
**multiple** [1] - 5083:5
**Murray** [3] - 5026:17, 5027:3, 5027:21
**must** [1] - 5090:7
**myriad** [2] - 4995:4, 5005:10

## N

**name** [3] - 5008:19, 5029:20, 5040:17
**named** [1] - 5030:8
**nature** [5] - 4992:15, 4996:3, 5001:3, 5002:7, 5014:17
**near** [2] - 5002:11, 5075:21
**necessary** [2] - 5000:18, 5056:16
**necessitated** [1] - 5047:19
**need** [17] - 4987:23, 5011:20, 5012:11, 5012:16, 5012:17, 5020:25, 5027:7,

5027:13, 5028:4, 5030:13, 5050:15, 5070:6, 5074:19, 5075:1, 5077:21, 5080:2, 5081:17
**needed** [6] - 5003:10, 5031:9, 5050:16, 5051:6, 5054:19, 5074:9
**needing** [1] - 5058:6
**needs** [4] - 5004:11, 5019:4, 5074:24, 5075:9
**negotiations** [1] - 5005:19
**neighborhood** [4] - 5002:20, 5014:14, 5037:19, 5058:11
**Neptune** [2] - 5042:8, 5043:7
**neutral** [1] - 5090:21
**Nevada** [2] - 5026:18, 5055:5
**never** [22] - 5001:4, 5001:21, 5014:6, 5048:7, 5049:13, 5050:13, 5055:17, 5055:19, 5056:10, 5063:20, 5064:1, 5064:5, 5064:7, 5064:8, 5077:2, 5081:16, 5081:19, 5081:21, 5083:9, 5085:23, 5090:22
**nevertheless** [1] - 5067:21
**new** [2] - 5010:12, 5029:25
**NEW** [1] - 4985:1
**New** [15] - 4985:14, 4985:22, 5008:13, 5011:3, 5011:12, 5013:22, 5014:24, 5015:5, 5015:13, 5015:21, 5050:2, 5050:8, 5058:14, 5061:10, 5068:24
**next** [12] - 4988:14, 5006:7, 5007:19, 5008:14, 5011:14, 5015:19, 5015:20, 5025:2, 5026:23, 5028:21, 5050:12, 5061:17
**night** [2] - 5002:15, 5081:24
**nobody** [2] - 5010:5, 5090:22
**Nolan** [3] - 5006:15, 5007:10, 5040:15

**none** [3] - 5001:19, 5001:24, 5017:4
**nonissue** [1] - 5082:3
**nonrepayment** [1] - 5063:25
**Northern** [10] - 4993:25, 4994:3, 4994:12, 4994:14, 4995:2, 4995:8, 4997:1, 4997:19, 4998:4, 4999:11
**note** [2] - 4995:3, 5000:6
**noted** [2] - 5084:5, 5089:10
**notes** [3] - 5058:22, 5073:9, 5073:11
**nothing** [7] - 5041:19, 5054:1, 5066:3, 5071:20, 5071:24, 5074:4, 5082:7
**notoriety** [1] - 5029:23
**notwithstanding** [1] - 5003:17
**nowhere** [1] - 5069:7
**number** [12] - 4986:19, 4987:6, 4990:20, 4990:21, 5013:25, 5014:12, 5024:9, 5033:13, 5033:16, 5033:24, 5043:10, 5053:21
**numbers** [7] - 4987:9, 4990:16, 5061:20, 5062:19, 5063:1, 5063:4, 5064:9
**NY** [1] - 4985:4

## O

**o'clock** [1] - 5074:15
**oath** [3] - 4991:13, 5051:14, 5051:18
**object** [7] - 5058:1, 5062:22, 5064:20, 5065:9, 5065:16, 5072:24, 5074:11
**objection** [21] - 4986:7, 4988:20, 4992:10, 4997:8, 4997:9, 5022:18, 5024:3, 5024:7, 5026:21, 5028:3, 5038:19, 5039:19, 5042:12, 5042:13, 5059:3, 5077:3, 5077:12, 5091:12, 5091:13, 5091:14
**objections** [1] - 5081:2

**obligation** [1] - 5027:5
**obtained** [1] - 5062:20
**obtaining** [1] - 5034:2
**obviously** [4] - 4989:15, 5020:25, 5027:23, 5085:3
**occasion** [2] - 5037:15, 5048:8
**occurred** [1] - 5037:16
**occurred** [7] - 4995:5, 5026:13, 5026:16, 5037:10, 5046:7, 5057:18, 5072:1
**odds** [3] - 5086:4, 5086:7, 5086:11
**OF** [3] - 4985:1, 4985:3, 4985:9
**offer** [6] - 4986:15, 4991:3, 4991:8, 4996:10, 5059:1, 5073:16
**offered** [10] - 4986:16, 4987:11, 4990:10, 4990:17, 5026:10, 5027:11, 5027:18, 5072:9, 5072:12, 5090:11
**offhand** [1] - 4990:21
**office** [7] - 5019:13, 5019:20, 5019:25, 5020:1, 5023:5, 5040:3, 5040:5
**Office** [1] - 5051:18
**officer** [1] - 5081:7
**offices** [1] - 5040:15
**OLIVERAS** [1] - 4985:18
**once** [3] - 5000:5, 5063:20, 5064:5
**One** [2] - 4985:13, 5074:18
**one** [38] - 4988:16, 4988:17, 4990:19, 4990:20, 4994:12, 4995:8, 4999:8, 4999:19, 5000:11, 5008:2, 5012:9, 5019:10, 5035:23, 5041:23, 5043:7, 5045:20, 5045:25, 5046:24, 5048:8, 5050:25, 5055:2, 5061:6, 5069:4, 5073:19, 5076:23, 5076:24, 5079:1, 5079:17, 5080:10, 5080:22, 5082:23, 5082:25, 5083:2, 5084:6, 5087:19, 5088:17, 5091:15

**onerous** [1] - 5013:19
**ones** [2] - 5087:8, 5091:16
**ongoing** [5] - 5000:18, 5033:1, 5057:16, 5066:10, 5091:8
**open** [3] - 5005:19, 5029:1, 5061:1
**opened** [1] - 5028:16
**operating** [2] - 5034:5, 5034:6
**opinion** [2] - 4988:17, 5033:8
**opportunity** [6] - 4987:22, 4989:11, 5005:24, 5033:1, 5041:10, 5067:18
**oppose** [1] - 5078:6
**opposite** [1] - 5088:13
**Order** [1] - 4986:1
**order** [2] - 4995:10, 5043:16
**original** [4] - 5052:13, 5054:21, 5054:22, 5054:24
**originally** [1] - 5035:10
**otherwise** [1] - 5054:15
**outlined** [3] - 5073:21, 5084:19, 5088:18
**outside** [1] - 5041:5
**outstanding** [2] - 4994:2, 5043:7
**overall** [1] - 5089:16
**overheard** [1] - 5056:21
**overruled** [2] - 5022:19, 5039:20
**owed** [2] - 5007:9, 5086:22
**own** [15] - 4994:14, 4994:25, 4995:22, 4996:8, 5003:13, 5013:11, 5017:3, 5017:14, 5039:10, 5049:15, 5050:21, 5058:15, 5088:23, 5089:7, 5089:8
**ownership** [1] - 5031:22

## P

**p.m** [1] - 5061:10
**package** [2] - 5035:3, 5035:14
**page** [15] - 5008:15, 5011:14, 5015:18, 5015:20, 5016:5,

5016:7, 5016:8, 5018:4, 5019:10, 5026:23, 5028:21, 5033:25, 5036:6, 5038:11
**pages** [2] - 5015:16, 5083:5
**paid** [4] - 4993:9, 5033:6, 5038:1, 5067:24
**paperwork** [1] - 5031:7
**paragraph** [2] - 5008:14, 5031:21
**paragraphs** [1] - 5058:20
**parameters** [1] - 5072:8
**parcel** [5] - 4992:8, 4992:22, 5037:20, 5044:20, 5053:8
**parent** [1] - 5029:22
**parking** [1] - 5009:18
**part** [15] - 4992:8, 4992:22, 4993:9, 4999:25, 5022:13, 5027:4, 5027:6, 5033:9, 5037:20, 5042:18, 5044:20, 5051:16, 5052:4, 5053:8, 5064:15
**participant** [1] - 5053:15
**participate** [1] - 5043:12
**participated** [1] - 5041:1
**participating** [4] - 5056:14, 5056:19, 5086:1, 5087:24
**particular** [14] - 4991:8, 4999:21, 5002:2, 5013:3, 5023:7, 5023:15, 5031:22, 5035:7, 5042:24, 5044:2, 5044:5, 5044:13, 5049:20, 5051:11
**parties** [5] - 5005:23, 5007:17, 5035:13, 5040:14, 5078:2
**partner** [3] - 5012:20, 5047:17, 5068:9
**partners** [2] - 5047:11, 5069:3
**partnership** [1] - 5035:18
**parts** [1] - 5004:7
**passenger** [1] - 5011:1

**Pause** [1] - 5020:8
**pay** [4] - 5000:12, 5007:11, 5027:5, 5037:15
**payment** [2] - 5066:25, 5067:8
**payments** [2] - 5000:16, 5032:16
**payroll** [1] - 4997:22
**Peca** [9] - 5042:6, 5042:17, 5042:25, 5043:10, 5043:14, 5058:13, 5058:23, 5058:24, 5090:24
**Peca's** [1] - 5043:2
**pending** [2] - 5005:22, 5019:23
**Penguins'** [1] - 5002:9
**people** [16] - 5012:10, 5012:16, 5016:4, 5016:11, 5025:18, 5039:13, 5039:17, 5053:5, 5055:24, 5062:13, 5063:2, 5065:3, 5079:10, 5082:7, 5089:7, 5090:24
**percent** [11] - 5017:7, 5032:25, 5033:2, 5033:4, 5033:5, 5038:3, 5038:14, 5039:11, 5069:19, 5090:20, 5090:21
**percentage** [2] - 5042:19, 5067:5
**performance** [1] - 5053:18
**period** [5] - 5044:22, 5045:8, 5045:23, 5063:13, 5087:15
**permits** [1] - 5079:5
**permitted** [3] - 4991:7, 5028:15, 5085:12
**person** [10] - 5004:2, 5010:2, 5023:4, 5039:8, 5040:2, 5040:17, 5041:8, 5054:19, 5077:16, 5089:13
**personal** [5] - 4995:22, 4996:8, 5019:24, 5062:20, 5090:13
**personally** [1] - 5081:18
**persuade** [1] - 5007:14
**persuing** [1] - 5007:12
**pertain** [1] - 5083:1
**Perusing** [1] - 5055:17

**Phil** [3] - 4991:20, 5016:4, 5027:11
**PHILIP** [1] - 4985:5
**Philip** [1] - 4994:1
**PHILLIP** [3] - 4985:5, 4989:6, 5093:3
**Phoenix** [1] - 5040:4
**phone** [23] - 5012:15, 5013:25, 5014:11, 5014:20, 5014:22, 5015:7, 5023:10, 5040:7, 5048:7, 5053:15, 5054:19, 5054:20, 5055:19, 5056:8, 5056:13, 5056:18, 5056:20, 5056:24, 5061:7, 5066:5, 5070:24, 5070:25, 5076:8
**phony** [1] - 5025:25
**photograph** [2] - 5002:6, 5002:8
**pick** [1] - 5004:19
**picture** [2] - 5019:15, 5019:21
**pieces** [3] - 5062:18, 5062:25, 5063:11
**Pierrepont** [1] - 4985:13
**pinch** [2] - 5009:2, 5009:3
**Pittsburgh** [1] - 5002:9
**PK** [1] - 5055:9
**PK-1** [3] - 5057:22, 5058:19, 5059:1
**PK-3** [2] - 5061:12, 5083:17
**place** [4] - 4995:2, 5040:12, 5040:13, 5059:10
**plan** [1] - 5008:16
**planning** [1] - 5066:10
**Playboy** [2] - 5085:10, 5086:10
**played** [1] - 5003:23
**player** [10] - 4992:24, 4993:10, 4994:10, 4999:19, 5001:12, 5017:11, 5017:20, 5033:10, 5069:22, 5070:6
**players** [9] - 5016:19, 5057:3, 5063:22, 5082:17, 5084:15, 5085:9, 5085:25, 5087:13, 5090:15
**playing** [2] - 5016:12, 5058:15
**Plaza** [2] - 4985:13,

4985:21
**pledge** [1] - 4995:3
**plus** [1] - 5038:2
**point** [61] - 4987:15, 4988:19, 4990:15, 4994:16, 4995:7, 4997:5, 4998:6, 4998:14, 4999:21, 5000:7, 5000:11, 5002:2, 5002:3, 5003:12, 5003:15, 5003:18, 5005:6, 5005:9, 5005:20, 5007:21, 5008:10, 5011:6, 5011:16, 5011:23, 5011:25, 5012:9, 5013:24, 5014:8, 5019:10, 5019:15, 5021:1, 5021:12, 5022:11, 5027:12, 5029:4, 5029:9, 5032:11, 5033:3, 5041:10, 5046:1, 5050:18, 5051:20, 5051:24, 5052:12, 5052:18, 5052:25, 5054:16, 5057:7, 5062:16, 5066:7, 5071:3, 5071:5, 5072:6, 5074:10, 5075:1, 5078:23, 5079:14, 5079:23, 5081:10, 5085:20, 5088:4
**pointing** [2] - 5084:1, 5088:9
**points** [1] - 5076:21
**pool** [2] - 5000:8, 5000:11
**pooled** [1] - 5000:1
**portion** [7] - 5007:9, 5021:6, 5038:20, 5045:15, 5046:17, 5046:21, 5059:6
**portions** [1] - 5006:14
**position** [4] - 5033:4, 5084:19, 5085:11, 5087:11
**positive** [1] - 5033:8
**possession** [1] - 5052:6
**possible** [4] - 4999:17, 5056:7, 5064:19, 5081:11
**possibly** [3] - 5089:22, 5090:4, 5090:15
**potato** [1] - 5065:8
**potential** [2] - 5042:7, 5066:1
**pour** [1] - 5000:8

**practical** [2] - 5078:9, 5079:21
**practice** [1] - 5037:13
**prearranged** [1] - 5005:3
**preceding** [1] - 5040:8
**predictable** [1] - 5025:11
**prefer** [1] - 5080:1
**prejudicial** [1] - 5081:12
**preparation** [1] - 5034:19
**prepare** [1] - 4987:16
**prepared** [8] - 4988:4, 5034:12, 5034:14, 5034:20, 5062:1, 5062:9, 5068:13, 5070:4
**presence** [2] - 4989:22, 5027:11
**present** [3] - 5026:13, 5081:21, 5089:24
**presentation** [1] - 5075:18
**presented** [2] - 5026:19, 5041:8
**President** [1] - 5048:21
**presumably** [1] - 5017:21
**pretrial** [2] - 4998:11, 5057:25
**pretty** [3] - 5063:3, 5079:20, 5090:2
**previous** [4] - 5001:11, 5012:4, 5045:18, 5067:1
**previously** [9] - 4989:7, 4997:24, 5011:13, 5012:15, 5013:18, 5040:9, 5044:7, 5055:24, 5057:13
**primarily** [1] - 4997:19
**privacy** [1] - 5062:20
**private** [2] - 5072:21, 5084:8
**probe** [1] - 5090:3
**problem** [2] - 5076:22, 5089:19
**problems** [1] - 5007:3
**proceed** [1] - 4990:7
**proceeding** [2] - 5037:12, 5092:3
**proceedings** [1] - 5043:3
**Proceedings** [1] - 4985:25
**proceeds** [1] -

5044:11
**process** [3] - 4999:18, 5043:13, 5051:14
**produce** [1] - 5064:8
**produced** [7] - 4985:25, 5063:20, 5064:1, 5064:6, 5068:20, 5082:16, 5082:24
**productively** [1] - 5019:5
**profession** [1] - 5034:3
**professional** [1] - 5002:17
**project** [10] - 4994:20, 4999:16, 5000:24, 5000:25, 5001:6, 5034:22, 5058:6, 5058:25, 5069:6, 5071:10
**projects** [3] - 5037:24, 5071:9, 5084:22
**promise** [1] - 4999:6
**proper** [2] - 5060:2, 5089:6
**properties** [2] - 5036:4, 5037:22
**property** [8] - 5030:1, 5030:4, 5030:6, 5030:7, 5035:21, 5057:15, 5066:21, 5071:23
**proposed** [2] - 4986:6, 5068:8
**proposing** [1] - 5070:1
**prosecution** [2] - 4992:20, 5088:12
**protecting** [1] - 5008:24, 5008:25
**protocol** [2] - 4999:17, 5004:13
**prove** [1] - 5051:20
**proven** [1] - 5025:24
**provide** [2] - 5034:25, 5081:8
**provided** [7] - 4991:5, 5053:4, 5061:18, 5062:3, 5062:25, 5068:19, 5068:20
**providing** [3] - 5053:10, 5053:18, 5053:21
**prudent** [1] - 5076:9
**puppet** [1] - 5015:24
**purchases** [1] - 5084:8
**purport** [1] - 5063:21
**purported** [2] -

5058:14, 5080:23
**purpose** [8] - 5023:8, 5038:22, 5049:1, 5049:5, 5072:3, 5084:24, 5085:5, 5088:20
**purposes** [7] - 4993:16, 5004:10, 5021:13, 5024:14, 5024:21, 5041:6, 5086:13
**pursuant** [5] - 4994:19, 4996:23, 4998:3, 4999:10, 5027:5
**put** [6] - 5000:9, 5007:16, 5019:5, 5041:15, 5043:15, 5064:16, 5066:12, 5078:25
**puts** [1] - 5081:12
**putting** [3] - 5010:5, 5019:25, 5043:12
**PX-4** [1] - 5061:24

**Q**

**questioned** [1] - 4991:21
**questioning** [4] - 5004:10, 5028:17, 5071:25, 5090:2
**questions** [27] - 4987:2, 4989:20, 4990:4, 4991:24, 4992:13, 5003:19, 5030:10, 5030:11, 5032:14, 5032:18, 5033:13, 5033:16, 5033:19, 5034:18, 5038:3, 5040:3, 5043:17, 5043:23, 5050:25, 5051:5, 5064:22, 5070:13, 5070:15, 5070:18, 5074:13, 5076:14, 5087:25
**quick** [2] - 5041:23, 5077:23
**quickly** [1] - 5082:14
**quite** [3] - 5002:18, 5012:8, 5027:16
**quote/unquote** [1] - 5086:12

**R**

**raise** [5] - 4987:22, 4987:25, 5021:1, 5080:18, 5081:2
**raised** [1] - 5089:22

**raising** [3] - 5045:22, 5047:20, 5065:19
**Ranford** [11] - 5017:11, 5022:12, 5070:24, 5071:4, 5071:8, 5071:24, 5072:1, 5072:6, 5072:21, 5073:1, 5074:5
**Ranford's** [4] - 5070:16, 5072:13, 5072:19, 5074:8
**rare** [1] - 5079:17
**rate** [1] - 5032:25
**rather** [3] - 4986:16, 5004:10, 5050:3
**read** [8] - 5038:8, 5038:9, 5038:20, 5063:9, 5073:12, 5075:13, 5076:10, 5079:1
**reads** [3] - 4993:25, 5024:22, 5042:17
**ready** [2] - 4986:12, 5075:4
**real** [3] - 5053:22, 5068:14, 5070:11
**realize** [2] - 5011:19, 5089:20
**realized** [2] - 5044:24, 5046:3
**really** [4] - 5015:24, 5081:12, 5082:2, 5083:1
**reason** [4] - 4988:24, 5005:21, 5006:19, 5091:7
**receipts** [1] - 4996:25
**receive** [4] - 4998:4, 5049:12, 5052:17, 5073:19
**received** [14] - 4998:2, 5003:9, 5015:4, 5024:13, 5042:16, 5046:23, 5049:16, 5049:18, 5049:25, 5052:1, 5066:11, 5066:22, 5093:11, 5093:12
**receiving** [1] - 5066:25
**recess** [1] - 5020:13
**reciprocal** [2] - 5078:2, 5080:19
**reclamation** [1] - 5074:6
**recognize** [2] - 4995:15, 5042:2
**recollection** [8] - 5040:14, 5053:13,

5054:13, 5055:15, 5073:3, 5073:12, 5080:23, 5085:19
**reconvene** [1] - 5074:14
**record** [13] - 4987:13, 4991:23, 5006:2, 5020:15, 5024:14, 5024:21, 5038:9, 5041:21, 5051:10, 5063:9, 5072:11, 5076:6, 5087:9
**recorded** [2] - 4985:25, 5025:14
**recording** [12] - 5003:21, 5003:23, 5004:1, 5021:13, 5021:23, 5021:24, 5022:1, 5022:3, 5022:6, 5022:8, 5022:11, 5022:15
**recordings** [1] - 5006:6
**records** [6] - 4997:19, 5034:22, 5034:25, 5078:11, 5083:2
**recross** [3] - 5043:19, 5076:19, 5082:24
**RECROSS** [2] - 5043:20, 5093:7
**RECROSS-EXAMINATION** [2] - 5043:20, 5093:7
**REDIRECT** [5] - 4991:18, 4997:13, 5019:1, 5093:4, 5093:6
**redirect** [7] - 4989:11, 4989:20, 4990:8, 4991:10, 5051:1, 5051:6, 5076:17
**redo** [1] - 5078:15
**reduced** [1] - 5033:5
**refer** [1] - 5029:18
**reference** [14] - 4988:9, 4994:10, 5004:7, 5004:16, 5012:22, 5013:17, 5015:15, 5021:23, 5029:3, 5029:16, 5035:5, 5035:21, 5036:1, 5083:17
**referenced** [4] - 4997:21, 5035:7, 5035:10, 5035:16
**references** [2] - 5029:20, 5045:17
**referral** [1] - 5066:23
**referred** [6] - 4990:22, 4995:9, 5011:12,

5031:21, 5035:9, 5036:1
**referring** [17] - 4990:22, 5003:21, 5011:9, 5012:7, 5013:2, 5014:4, 5016:15, 5017:21, 5027:2, 5039:2, 5039:4, 5039:18, 5039:21, 5045:10, 5045:23, 5072:16, 5083:16
**refers** [4] - 4996:1, 4996:4, 5016:14, 5029:12
**reflecting** [1] - 5083:2
**refresh** [2] - 5054:12, 5055:14
**refund** [1] - 5073:19
**refused** [1] - 5034:24
**refuted** [1] - 5017:12
**regard** [8] - 5025:15, 5031:18, 5043:3, 5084:11, 5084:21, 5086:4, 5090:1
**regarded** [1] - 5009:11
**regarding** [16] - 4986:17, 4987:23, 4990:19, 4991:24, 4995:3, 4999:7, 5025:21, 5026:5, 5027:25, 5028:17, 5030:11, 5032:15, 5040:9, 5042:6, 5057:12, 5075:13
**regardless** [1] - 5073:11
**regards** [2] - 5081:15, 5081:22
**reject** [1] - 5055:23
**rejected** [1] - 5055:24
**related** [11] - 4994:4, 4996:4, 5025:24, 5032:16, 5072:5, 5085:15, 5085:17, 5086:10, 5088:20, 5089:6, 5090:10
**relates** [18] - 4992:20, 4993:15, 4997:15, 5002:16, 5017:19, 5024:6, 5024:14, 5026:7, 5030:16, 5030:25, 5031:10, 5032:17, 5032:21, 5035:3, 5041:4, 5084:2, 5085:3, 5088:9
**relationship** [13] - 4991:25, 5002:1, 5002:7, 5003:1,

5003:3, 5005:6, 5038:5, 5053:10, 5053:11, 5069:9, 5081:20, 5081:25, 5090:14
**release** [1] - 4994:4
**releases** [1] - 5008:18
**relevance** [3] - 5013:4, 5037:12, 5042:24
**relied** [2] - 5028:1, 5065:3
**reluctant** [1] - 5077:14
**rely** [2] - 4988:7, 5028:6
**remains** [1] - 5074:18
**remember** [9] - 4992:17, 5011:23, 5039:4, 5044:16, 5061:8, 5066:16, 5070:18, 5072:16, 5072:18
**remind** [1] - 4991:12
**reminding** [2] - 5054:2, 5076:10
**rename** [1] - 5030:3
**repeat** [4] - 4990:16, 5021:7, 5026:4, 5089:1
**repeatedly** [1] - 5051:14
**rephrase** [1] - 5063:18
**replayed** [2] - 5004:11, 5004:12
**report** [5] - 4995:18, 5030:14, 5030:15, 5046:18, 5054:6
**Reporter** [1] - 4985:20
**reporter** [1] - 5063:10
**representation** [1] - 4989:21
**representations** [2] - 5003:11, 5023:12
**represented** [6] - 5003:8, 5043:11, 5048:4, 5073:8, 5083:8
**representing** [2] - 4997:20, 5008:1
**request** [12] - 4988:15, 5015:4, 5052:13, 5054:16, 5062:9, 5064:15, 5068:25, 5081:24, 5082:23, 5083:13
**requested** [7] - 5021:11, 5046:11, 5063:11, 5064:7, 5064:8, 5064:10, 5069:24
**requesting** [1] -

5091:20
**requests** [2] - 4996:24, 4998:3
**required** [3] - 4999:13, 5052:8, 5082:20
**requirements** [1] - 5030:21
**requiring** [1] - 5052:14
**rescinding** [1] - 5052:13
**research** [2] - 5077:4, 5077:23
**resided** [2] - 5055:18, 5056:10
**residence** [2] - 5055:4, 5055:16
**residences** [1] - 5055:2
**residing** [2] - 5056:5, 5056:22
**resolve** [1] - 5061:16
**resort** [1] - 5030:1
**respect** [21] - 4990:14, 4991:1, 4993:17, 5003:11, 5021:17, 5030:12, 5044:2, 5044:17, 5053:7, 5064:18, 5067:3, 5076:8, 5080:20, 5081:4, 5084:2, 5084:7, 5084:9, 5084:14, 5084:20, 5086:12, 5088:18
**respects** [1] - 5084:17
**respond** [2] - 5021:18, 5025:12
**responded** [3] - 5025:11, 5025:13, 5032:9
**responds** [1] - 5025:8
**response** [7] - 5007:19, 5007:21, 5025:10, 5032:10, 5032:11, 5066:4
**responses** [3] - 5011:15, 5023:3, 5024:19
**responsibilities** [1] - 5047:16
**responsibility** [1] - 5010:6
**responsible** [3] - 5087:22, 5089:13
**rest** [2] - 5003:13, 5070:11
**result** [11] - 4994:22, 5003:6, 5033:5, 5034:2, 5043:4, 5066:10, 5066:24,

5067:20, 5068:21, 5072:7
**retaining** [1] - 5050:18
**retake** [1] - 5020:19
**retakes** [1] - 5020:20
**return** [5] - 5046:5, 5046:11, 5046:13, 5046:15, 5061:16
**returned** [6] - 4994:14, 5046:11, 5047:20, 5070:20, 5070:23, 5071:3
**returns** [1] - 5078:7
**reveal** [1] - 5068:13
**reverse** [1] - 4987:23
**review** [4] - 4998:12, 5052:6, 5083:11, 5083:14
**reviewed** [3] - 4986:9, 4988:15, 4988:16
**reviewing** [1] - 5057:24
**revise** [1] - 5047:18
**revolving** [7] - 5026:6, 5026:8, 5026:19, 5027:9, 5029:12, 5029:18, 5033:2
**rhetoric** [1] - 5007:1
**RICHARD** [1] - 4985:16
**Richards** [9] - 5014:22, 5049:19, 5056:13, 5056:19, 5056:21, 5057:18, 5070:17, 5072:14, 5085:22
**risk** [1] - 5013:23
**robbed** [2] - 5009:3, 5009:4
**ROBERT** [1] - 4985:18
**Roger** [3] - 5053:7, 5053:10, 5053:19
**role** [1] - 5066:19
**Romanofsky** [2] - 5062:4, 5062:6
**Ron** [4] - 5014:22, 5070:17, 5072:14, 5085:22
**Ronald** [1] - 5049:19
**Room** [1] - 5020:10
**room** [1] - 5002:9
**Rucchin** [2] - 5017:11, 5022:12
**Rule** [1] - 5082:16
**ruling** [2] - 4988:10, 5028:10

## S

**sales** [4] - 5017:19,

5021:18, 5023:18, 5023:20
**San** [19] - 5029:3, 5029:5, 5029:8, 5029:13, 5029:19, 5029:22, 5029:25, 5030:1, 5030:3, 5030:8, 5037:21, 5038:4, 5038:15, 5057:17, 5066:15, 5066:21, 5067:6, 5068:7, 5068:24
**Santa** [1] - 5030:5
**SARITA** [1] - 4985:15
**save** [2] - 5048:22, 5074:13
**saved** [1] - 5000:13
**saw** [5] - 4998:22, 5045:24, 5084:10, 5086:23, 5088:12
**schedule** [1] - 5091:19
**scheme** [2] - 4993:9, 5033:10
**Scott** [1] - 5062:4
**Scottsdale** [4] - 5023:5, 5055:3, 5062:10, 5064:11
**screaming** [2] - 5019:13, 5019:19
**screen** [1] - 5065:21
**seated** [5] - 4989:24, 5020:14, 5020:23, 5074:23, 5076:6
**second** [6] - 5007:22, 5030:4, 5044:21, 5044:25, 5052:11, 5073:5
**seconds** [2] - 5025:11, 5025:13
**secret** [1] - 5006:4
**secretary** [1] - 5013:1
**secure** [2] - 4991:25, 5043:8
**securing** [1] - 5066:20
**securities** [1] - 5034:14
**Security** [5] - 5061:20, 5062:19, 5063:1, 5063:4, 5064:9
**see** [33] - 4989:25, 4998:14, 5004:17, 5004:22, 5004:25, 5005:5, 5006:11, 5006:14, 5006:21, 5007:18, 5008:5, 5009:18, 5011:4, 5025:4, 5041:10, 5041:13, 5042:21, 5045:11, 5045:12,

5045:15, 5046:20, 5052:7, 5054:6, 5058:23, 5059:4, 5059:5, 5075:13, 5078:11, 5079:3, 5081:18, 5089:2, 5091:5
**seeing** [1] - 5088:4
**seeking** [2] - 5031:11, 5073:19
**seem** [1] - 4988:7
**seized** [1] - 5002:14
**selective** [1] - 5087:8
**Semple** [7] - 5076:25, 5078:7, 5080:1, 5080:3, 5080:10, 5080:15, 5080:16
**Senator** [1] - 5053:7
**send** [4] - 5044:9, 5044:14, 5044:25, 5079:5
**sending** [1] - 5080:23
**sense** [4] - 4995:24, 5017:4, 5058:10, 5070:9
**sent** [26] - 4994:12, 4996:22, 4998:3, 4999:11, 5022:9, 5022:11, 5022:15, 5023:1, 5023:7, 5023:9, 5024:17, 5042:6, 5044:10, 5044:21, 5044:25, 5045:2, 5046:2, 5046:5, 5046:14, 5046:15, 5052:11, 5066:4, 5067:2, 5068:16, 5070:16
**sentence** [1] - 5006:7
**separate** [3] - 5037:2, 5040:6, 5070:16
**September** [1] - 5053:3
**Sergei** [10] - 4989:12, 4993:12, 4993:17, 4993:24, 4994:6, 4995:7, 5000:20, 5000:21, 5002:1, 5002:17
**series** [13] - 4990:11, 5030:10, 5032:18, 5033:23, 5043:22, 5050:25, 5066:4, 5067:9, 5067:13, 5070:13, 5070:15
**serious** [1] - 5068:14
**Services** [1] - 5044:11
**set** [2] - 4997:16, 5004:18

**sets** [1] - 4997:18
**setting** [1] - 5038:21
**settle** [1] - 5025:3
**settlement** [1] - 5013:20
**Settlement** [24] - 4988:3, 5070:14, 5071:13, 5071:17, 5071:21, 5072:2, 5072:8, 5073:17, 5073:22, 5074:10, 5084:14, 5084:23, 5084:25, 5085:4, 5085:6, 5085:15, 5085:17, 5086:3, 5086:11, 5086:22, 5087:12, 5089:18, 5089:21, 5090:25
**seven** [1] - 5081:8
**several** [1] - 5050:14
**severance** [4] - 5083:22, 5086:13, 5086:14, 5088:8
**sex** [1] - 5053:21
**share** [3] - 5006:2, 5022:20, 5069:25
**shareholder** [1] - 5023:5
**sharing** [2] - 5062:16, 5062:18
**sheet** [1] - 5035:12
**shift** [1] - 5048:2
**shit** [3] - 5013:8, 5013:9, 5019:3
**short** [1] - 5032:24
**short-term** [1] - 5032:24
**shortly** [2] - 5023:20, 5050:2
**shot** [1] - 5009:19
**shoulder** [1] - 5061:14
**show** [16] - 4993:22, 5014:3, 5027:12, 5027:19, 5037:7, 5045:4, 5045:6, 5045:25, 5046:17, 5057:22, 5058:19, 5061:11, 5065:18, 5072:12, 5078:24, 5090:11
**showed** [4] - 4990:12, 5019:15, 5043:24, 5068:23
**showing** [5] - 5004:15, 5019:21, 5046:21, 5055:8, 5057:22
**shown** [1] - 5037:4
**shows** [2] - 5001:15, 5016:19

**sidebar** [5] - 4988:1, 5059:10, 5060:6, 5083:9, 5084:6
**Sidebar** [5] - 5027:1, 5028:20
**sides** [2] - 4987:16, 5051:15
**sign** [3] - 4994:4, 5008:19, 5070:4
**signature** [3] - 4994:6, 4995:3, 4995:8
**signed** [5] - 4993:24, 5029:7, 5029:12, 5035:13, 5072:14
**significant** [3] - 5007:9, 5037:17, 5037:19
**similar** [1] - 5046:2
**simply** [7] - 4988:2, 5024:21, 5029:19, 5032:20, 5044:25, 5052:9, 5068:12
**siphoned** [1] - 5068:15
**sit** [5] - 4992:5, 5010:20, 5014:2, 5032:13, 5064:24
**site** [2] - 5030:6, 5035:5
**sites** [2] - 5035:9, 5035:16
**sits** [1] - 5078:19
**situation** [7] - 5020:5, 5020:16, 5079:12, 5081:12, 5082:9, 5082:10, 5087:3, 5091:9, 5091:24
**situations** [1] - 5079:17
**six** [1] - 5003:17
**skip** [2] - 5007:18, 5015:16
**slam** [2] - 5008:17
**smart** [1] - 5087:3
**Social** [5] - 5061:20, 5062:19, 5063:1, 5063:4, 5064:8
**sold** [1] - 5017:7
**sole** [1] - 5089:13
**someone** [1] - 5078:18
**somewhere** [4] - 5002:5, 5002:19, 5003:3, 5014:14
**soon** [2] - 5005:22, 5049:22
**sorry** [5] - 4997:4, 5027:13, 5056:2, 5063:17, 5067:11
**sounds** [1] - 5054:13

**source** [2] - 5066:2, 5069:3
**Southern** [6] - 5014:24, 5015:13, 5050:8, 5051:23, 5052:14, 5061:9
**speaking** [4] - 5027:10, 5030:23, 5030:24, 5063:12
**speaks** [3] - 4998:13, 5008:14, 5011:5
**spearheading** [1] - 5008:2
**Special** [6] - 5047:23, 5050:5, 5054:25, 5055:15, 5055:19, 5056:3
**special** [2] - 5002:15, 5015:12
**specific** [6] - 5027:9, 5032:7, 5037:10, 5044:16, 5071:14, 5085:21
**specifically** [5] - 5035:11, 5035:16, 5055:1, 5061:5, 5070:23
**spend** [1] - 5014:2
**spent** [1] - 5055:3
**spreadsheet** [2] - 4986:18, 4990:23
**spreadsheets** [8] - 5011:18, 5011:19, 5011:20, 5011:21, 5012:22, 5013:2, 5013:3, 5013:5
**spring** [1] - 5003:7
**stake** [1] - 5038:14
**stamps** [1] - 5024:19
**stand** [11] - 4989:4, 5020:19, 5020:21, 5026:17, 5031:17, 5068:19, 5072:1, 5079:15, 5084:18, 5085:8, 5088:12
**standard** [1] - 5086:16
**Stanley** [1] - 5002:10
**start** [1] - 5043:22
**started** [1] - 5081:20
**starts** [1] - 5015:18
**state** [3] - 4991:4, 4991:6, 5008:21
**statement** [10] - 5007:22, 5037:11, 5037:25, 5045:7, 5045:11, 5045:12, 5045:14, 5046:20, 5046:21, 5053:24
**statements** [4] - 5011:25, 5021:17,

5044:23, 5045:25
**STATES** [3] - 4985:1, 4985:3, 4985:10
**States** [3] - 4985:13, 4985:15, 5048:21
**stating** [1] - 5049:7
**stealing** [1] - 5063:21
**stenographer** [6] - 5040:4, 5041:7, 5041:9, 5041:17, 5041:18, 5041:20
**stenography** [1] - 4985:25
**Steve** [1] - 5017:11
**Steven** [1] - 5022:12
**sticker** [1] - 5041:15
**still** [5] - 4991:13, 5015:17, 5020:17, 5080:3, 5090:7
**stipulate** [1] - 5081:1
**stock** [1] - 5017:2, 5017:3, 5017:8, 5017:19, 5021:8, 5021:18, 5023:18, 5024:22, 5072:21, 5084:8
**stocks** [1] - 5017:14
**stole** [3] - 5057:3, 5074:8, 5076:14
**Stolper** [24] - 5003:6, 5005:10, 5006:3, 5011:7, 5011:10, 5011:11, 5015:25, 5022:12, 5022:13, 5022:15, 5022:20, 5023:2, 5023:7, 5023:11, 5024:18, 5025:1, 5025:7, 5025:8, 5025:17, 5031:20, 5032:2, 5032:6, 5032:12, 5043:11
**Stolper's** [5] - 5003:9, 5003:11, 5005:19, 5008:13, 5043:4
**stood** [1] - 5074:5
**stop** [7] - 5008:6, 5009:17, 5013:11, 5015:22, 5015:25, 5016:3
**stopped** [1] - 5006:9
**straightforward** [1] - 5063:7
**strike** [1] - 5028:14
**string** [1] - 5067:9
**strings** [1] - 5067:14
**stuff** [3] - 5009:23, 5013:8, 5080:25
**subpoena** [14] - 5014:23, 5015:4,

5049:3, 5049:11, 5049:17, 5049:18, 5049:23, 5049:25, 5051:25, 5052:9, 5052:13, 5052:18, 5054:16, 5079:9
**subpoenaed** [2] - 5050:1, 5079:8
**subsequent** [2] - 4998:11, 5035:13
**subsequently** [6] - 5047:25, 5050:17, 5052:5, 5064:11, 5067:1, 5071:6
**substance** [9] - 5017:23, 5030:20, 5031:25, 5048:17, 5051:13, 5057:2, 5057:5, 5058:7, 5062:12
**substituted** [1] - 5039:11
**succeeded** [1] - 5032:22
**successful** [1] - 5002:18
**succession** [1] - 5011:6
**suggest** [1] - 5058:20
**suggested** [2] - 5045:24, 5069:2
**suggesting** [2] - 5049:1, 5088:14
**suggestion** [1] - 5055:24
**sum** [10] - 5017:23, 5048:17, 5051:13, 5057:2, 5057:5, 5058:7, 5062:12, 5064:16, 5064:18, 5067:4
**summarizing** [1] - 5057:4
**summary** [4] - 5042:23, 5057:6, 5064:16, 5064:18
**summation** [1] - 5074:13
**summations** [2] - 5075:20, 5075:24
**summer** [1] - 5003:7
**summoned** [2] - 5065:7, 5065:12
**supervisor** [1] - 5091:20
**supported** [1] - 5048:20
**supposed** [1] - 5050:7
**surprise** [1] - 5005:5
**surveillance** [1] -

5019:17
**suspect** [1] - 5081:4
**sustain** [1] - 5028:3
**sustained** [7] - 4992:11, 5002:23, 5058:2, 5062:24, 5064:21, 5065:10, 5065:17
**sworn/affirmed** [1] - 4989:8
**Sydor** [1] - 5035:15

## T

**table** [2] - 5024:23, 5025:21
**tactic** [1] - 5000:19
**Tape** [1] - 5004:17
**tape** [7] - 4989:16, 5004:11, 5004:22, 5009:25, 5015:16, 5019:8, 5022:17
**taped** [1] - 5087:23
**tax** [1] - 5078:7
**team** [3] - 5003:9, 5005:20, 5010:5
**technical** [1] - 5078:13
**telephone** [3] - 5039:24, 5040:1, 5054:22
**telephonic** [12] - 5040:2, 5040:8, 5049:22, 5050:1, 5050:4, 5052:23, 5053:4, 5057:20, 5061:2, 5061:9, 5063:14, 5073:9
**telephonically** [1] - 5048:12
**teller** [3] - 5031:1, 5031:4, 5031:5
**ten** [1] - 5090:21
**tension** [1] - 5086:18
**term** [4] - 5032:24, 5035:12, 5056:10, 5077:15
**terminated** [3] - 5003:3, 5052:18, 5068:6
**terminating** [1] - 5015:11
**terms** [5] - 5013:19, 5014:17, 5021:8, 5082:2, 5084:1
**testified** [25] - 4993:12, 4994:16, 4998:19, 5001:4, 5005:3, 5016:16, 5021:6, 5021:24,

5023:25, 5028:11, 5029:8, 5031:11, 5033:21, 5044:2, 5047:22, 5053:12, 5053:22, 5057:1, 5066:1, 5066:11, 5084:12, 5084:15, 5086:23, 5089:8, 5090:22
**testify** [10] - 4988:9, 5014:24, 5015:5, 5050:2, 5051:22, 5051:24, 5052:10, 5052:19, 5078:10, 5085:4
**testifying** [7] - 4989:8, 5044:7, 5048:15, 5049:5, 5057:2, 5078:7
**testimony** [55] - 4987:12, 4988:24, 4989:12, 4990:23, 4991:2, 4991:22, 4991:24, 4992:3, 4992:6, 4993:2, 4993:15, 4999:24, 5001:8, 5001:11, 5001:13, 5026:4, 5030:19, 5031:17, 5033:21, 5038:9, 5038:13, 5039:9, 5043:2, 5046:13, 5047:19, 5047:24, 5048:24, 5048:25, 5049:14, 5050:22, 5051:13, 5051:17, 5051:21, 5056:1, 5056:6, 5066:16, 5070:8, 5070:20, 5073:16, 5077:20, 5078:9, 5083:24, 5083:25, 5084:5, 5085:7, 5085:23, 5087:13, 5087:20, 5088:15, 5088:24, 5089:11, 5089:14, 5090:6, 5090:8, 5090:19
**text** [10] - 5020:9, 5023:1, 5023:9, 5023:24, 5024:17, 5042:5, 5042:24, 5069:14, 5069:20
**THE** [85] - 4985:9, 4986:4, 4986:12, 4986:14, 4986:19, 4986:25, 4987:3, 4987:5, 4987:10, 4987:15, 4987:20, 4987:25, 4988:22,

4989:1, 4989:13, 4989:15, 4989:24, 4990:7, 4991:12, 4991:15, 4991:16, 4992:11, 4996:13, 4997:9, 4997:11, 5002:23, 5020:6, 5020:9, 5020:14, 5020:23, 5022:19, 5024:7, 5024:9, 5024:11, 5026:22, 5027:23, 5028:13, 5028:16, 5038:20, 5038:24, 5039:20, 5042:14, 5043:19, 5058:2, 5059:3, 5059:8, 5060:4, 5062:24, 5063:16, 5064:21, 5065:10, 5065:17, 5067:19, 5074:12, 5074:21, 5075:3, 5075:8, 5075:18, 5075:23, 5076:6, 5076:17, 5076:19, 5077:11, 5078:4, 5078:16, 5078:23, 5079:7, 5079:12, 5080:3, 5080:6, 5080:12, 5080:17, 5081:14, 5082:4, 5082:8, 5082:11, 5082:22, 5083:21, 5084:23, 5085:14, 5086:7, 5088:7, 5090:9, 5091:23, 5092:2

**thefts** [1] - 5057:12
**themselves** [1] - 5011:15
**theory** [1] - 5088:17
**thereafter** [3] - 5023:3, 5023:20, 5050:2
**therefore** [2] - 5084:8, 5090:13
**thinking** [1] - 5019:4
**third** [2] - 5030:6, 5073:7
**thorough** [1] - 5077:24
**threatened** [2] - 5023:21, 5025:2
**threatening** [1] - 5024:23
**three** [9] - 5002:13, 5003:17, 5055:22, 5056:9, 5056:11, 5064:4, 5080:6, 5082:25, 5088:8
**throughout** [2] - 5051:14, 5081:8

**throwing** [1] - 5037:20
**Thursday** [2] - 5075:20, 5076:1
**tick** [1] - 4987:9
**Tim** [13] - 5008:24, 5009:24, 5016:12, 5016:14, 5016:16, 5016:20, 5016:21, 5016:22, 5017:7, 5017:19, 5021:17, 5023:17, 5023:19
**Title** [1] - 5033:22
**titled** [1] - 5044:1
**today** [8] - 4986:5, 4992:5, 5010:20, 5032:13, 5047:22, 5053:22, 5080:18, 5091:21
**together** [6] - 5008:8, 5010:5, 5040:7, 5040:15, 5056:20, 5071:1
**Tommy** [14] - 4991:25, 4992:23, 4993:4, 5009:10, 5010:21, 5015:17, 5015:18, 5017:14, 5017:25, 5021:16, 5024:22, 5031:21, 5033:18, 5062:13
**TOMMY** [2] - 4985:6, 4985:6
**Tommy's** [1] - 5025:15
**tomorrow** [2] - 5082:12, 5091:7
**took** [6] - 5011:24, 5040:13, 5057:14, 5059:9, 5067:21, 5086:1
**top** [1] - 5024:17
**total** [2] - 5055:22, 5057:15
**totaled** [1] - 5038:1
**touch** [1] - 5066:13
**towards** [3] - 5048:3, 5052:16, 5073:17
**TR** [1] - 5082:16
**traceable** [1] - 5001:19
**train** [2] - 5027:14, 5027:15
**transaction** [10] - 4998:2, 4998:5, 5021:22, 5030:14, 5033:6, 5033:8, 5037:2, 5044:3, 5044:8, 5068:18
**transactions** [13] - 4988:10, 4992:8, 4996:2, 4996:7,

4997:17, 5014:3, 5017:5, 5017:10, 5021:8, 5030:14, 5046:7, 5070:12, 5073:14
**transcribed** [1] - 5039:9
**TRANSCRIPT** [1] - 4985:9
**transcript** [12] - 4985:25, 4987:14, 5004:1, 5004:8, 5006:6, 5019:8, 5021:9, 5021:13, 5039:2, 5041:6, 5051:10, 5051:19
**transfer** [18] - 4998:20, 4998:24, 5024:23, 5025:4, 5025:21, 5035:20, 5036:3, 5039:3, 5039:5, 5044:19, 5044:21, 5044:25, 5045:2, 5046:6, 5047:2, 5047:5, 5047:8, 5057:8
**transferred** [2] - 5001:18, 5038:12
**transfers** [10] - 4996:2, 4996:4, 5031:12, 5045:10, 5045:13, 5045:16, 5045:21, 5046:2, 5070:16, 5072:12
**transmitted** [1] - 5069:18
**transmitting** [1] - 5069:15
**transparent** [3] - 5068:18, 5069:9, 5069:11
**travel** [1] - 5038:1
**treatment** [1] - 4991:4
**trial** [11] - 4995:10, 4996:18, 5050:21, 5057:13, 5073:10, 5073:21, 5077:3, 5081:9, 5083:23, 5088:10, 5091:19
**TRIAL** [1] - 4985:9
**tribunal** [1] - 5054:15
**tried** [1] - 5022:10
**trip** [2] - 5038:2, 5056:9
**True** [1] - 4993:18
**true** [27] - 4994:11, 4994:18, 5001:16, 5003:2, 5014:9, 5017:15, 5020:2, 5021:14, 5023:23,

5029:11, 5031:13, 5046:19, 5046:23, 5051:5, 5052:21, 5053:24, 5054:17, 5058:4, 5058:9, 5058:12, 5061:2, 5063:13, 5063:19, 5068:11, 5068:16, 5074:8, 5085:16
**Trust** [10] - 4993:25, 4994:3, 4994:12, 4994:15, 4995:2, 4995:8, 4997:1, 4997:19, 4998:4, 4999:11
**truth** [1] - 5025:20
**truthful** [3] - 5001:8, 5010:23, 5010:24
**try** [9] - 4997:2, 5004:24, 5005:16, 5007:6, 5009:20, 5012:2, 5032:9, 5079:9
**trying** [19] - 5006:20, 5007:3, 5007:8, 5007:14, 5008:10, 5013:11, 5017:1, 5017:23, 5019:22, 5032:20, 5045:14, 5061:15, 5076:25, 5081:10, 5083:18, 5087:11, 5087:18, 5090:3, 5090:11
**Tuesday** [4] - 5075:19, 5077:7, 5079:4, 5079:15
**tune** [1] - 5067:22
**turn** [4] - 5005:17, 5082:11, 5082:14, 5083:19
**turned** [8] - 4998:10, 4998:12, 5021:25, 5052:4, 5080:20, 5081:23, 5083:3, 5083:9
**Tursi** [1] - 4985:20
**two** [33] - 4997:18, 5015:3, 5015:8, 5017:19, 5023:1, 5023:2, 5024:17, 5024:19, 5040:13, 5042:5, 5045:13, 5045:16, 5046:1, 5053:6, 5053:15, 5053:16, 5054:18, 5055:2, 5055:13, 5057:18, 5061:7, 5068:9, 5068:22, 5069:1, 5070:16, 5076:22, 5080:6,

5080:7, 5080:15, 5082:24, 5083:1, 5089:23
**type** [4] - 5034:4, 5034:5, 5034:9, 5034:10

# U

**U.S** [2] - 5051:17, 5052:5
**ugh** [1] - 5015:25
**Ula** [2] - 4997:23, 5044:4
**ultimately** [3] - 5030:8, 5066:14, 5067:6
**unable** [1] - 4987:8
**unaware** [4] - 4999:3, 5001:18, 5006:5, 5043:2
**under** [8] - 4991:13, 4993:5, 4993:7, 5026:5, 5042:25, 5051:14, 5051:18, 5086:12
**underlying** [1] - 4995:8
**understood** [4] - 5006:25, 5009:14, 5072:7, 5091:3
**undertaken** [1] - 5015:1
**unfortunately** [1] - 5079:17
**UNITED** [3] - 4985:1, 4985:3, 4985:10
**United** [3] - 4985:13, 4985:15, 5048:21
**unnecessary** [1] - 5000:16
**unrelated** [3] - 5052:25, 5054:11, 5085:5
**untenable** [1] - 5003:18
**untrue** [1] - 5056:1
**unusual** [1] - 4988:6
**up** [25] - 4987:14, 4989:3, 5003:13, 5004:19, 5009:2, 5011:23, 5013:22, 5016:19, 5038:21, 5043:12, 5043:15, 5050:16, 5054:19, 5056:4, 5061:4, 5064:24, 5070:25, 5075:22, 5077:10, 5078:25, 5080:11, 5081:20, 5084:18,

5085:8, 5087:19
**Urban** [4] - 4992:2, 4992:9, 4992:22, 4993:8
**US** [4] - 4985:4, 4985:21, 4998:10, 5014:21
**uses** [1] - 5084:16
**usual** [1] - 5037:13, 5076:25
**utilize** [2] - 5000:11, 5050:22
**utilized** [7] - 4988:3, 4998:1, 4998:7, 5004:2, 5026:10, 5037:14, 5041:4

## V

**vacation** [5] - 5076:24, 5079:13, 5079:16, 5080:2, 5091:11
**vague** [1] - 5058:8
**valuable** [1] - 5051:20
**value** [1] - 5077:17
**variation** [1] - 5043:24
**various** [10] - 4990:11, 4996:1, 4997:20, 5004:7, 5043:5, 5050:22, 5061:19, 5061:21, 5069:22, 5072:5
**Vegas** [3] - 5039:24, 5040:1, 5055:4
**vein** [1] - 5026:2
**venture** [8] - 5035:17, 5067:10, 5067:15, 5068:16, 5069:16, 5070:2, 5070:4, 5090:13
**Venture** [1] - 5039:5
**ventures** [1] - 5067:21
**Ventures** [14] - 4997:22, 4997:23, 5038:13, 5039:3, 5039:10, 5039:12, 5040:9, 5040:10, 5040:18, 5040:20, 5040:23, 5041:20
**verify** [1] - 5044:23
**version** [1] - 5081:23
**versus** [2] - 5026:17, 5027:3
**video** [3] - 5077:1, 5078:20, 5079:20
**videotaped** [2] - 5077:17, 5077:21
**view** [5] - 5077:13, 5084:4, 5085:6, 5088:5, 5090:9

**VII** [1] - 5033:22
**Virginia** [2] - 5053:5, 5061:7
**vis-à-vis** [1] - 5035:4
**voir** [1] - 4996:12
**VOIR** [2] - 4996:14, 5093:5
**voluminous** [1] - 5078:8
**voluntarily** [5] - 5014:23, 5049:12, 5054:3, 5079:10, 5079:11

## W

**wait** [2] - 4987:24, 5020:11
**waiting** [2] - 5020:17, 5020:24
**walk** [1] - 5005:18
**wanna** [3] - 5009:17, 5009:20, 5009:21
**wants** [4] - 5010:5, 5020:18, 5079:15, 5079:16
**Wayne** [1] - 5080:22
**ways** [2] - 5043:8, 5079:2
**wearing** [1] - 5007:10
**Wednesday** [1] - 5075:20
**week** [4] - 5053:23, 5075:22, 5075:23, 5076:23
**weekend** [3] - 5076:3, 5083:12, 5091:5
**weekly** [1] - 5055:6
**weeks** [11] - 5014:10, 5015:3, 5015:5, 5015:8, 5049:25, 5050:2, 5068:9, 5068:22, 5069:1, 5071:12, 5081:9
**wherein** [1] - 5040:23
**whole** [9] - 4990:11, 5000:7, 5006:18, 5019:4, 5045:11, 5045:12, 5046:20, 5087:11
**wife** [1] - 5089:23
**William** [3] - 5017:11, 5022:12, 5034:15
**willing** [3] - 5042:18, 5051:22, 5052:19
**willingness** [1] - 5054:14
**win** [1] - 5002:10
**window** [1] - 5031:1
**Windwalker** [1] -

5035:12
**wipe** [1] - 5006:17
**wire** [17] - 5044:19, 5044:21, 5044:25, 5045:2, 5045:9, 5045:13, 5045:20, 5046:1, 5046:6, 5047:2, 5047:5, 5047:8, 5057:8, 5070:16, 5071:7, 5072:12, 5078:18
**wired** [1] - 5047:10
**withdraw** [5] - 4988:20, 5009:15, 5031:5, 5054:9, 5058:3
**withdrawal** [1] - 5031:2
**withdrawals** [1] - 5031:14
**withdrawn** [2] - 5049:12, 5050:12
**WITNESS** [2] - 4991:15, 5067:19
**witness** [10] - 4988:14, 4989:3, 5020:20, 5026:17, 5079:3, 5079:14, 5079:18, 5082:4, 5088:12
**witness'** [1] - 5077:16
**witnesses** [7] - 5050:23, 5075:4, 5076:23, 5077:5, 5079:9, 5080:4, 5080:16
**word** [6] - 5020:4, 5039:11, 5040:23, 5066:19, 5068:3, 5069:9
**words** [4] - 5011:6, 5041:13, 5041:24, 5068:13
**works** [1] - 5081:16
**worksheet** [1] - 4986:17
**world** [2] - 5029:24, 5069:5
**worried** [2] - 5016:10
**worse** [1] - 5006:9
**write** [1] - 5046:25
**writing** [2] - 5065:23, 5065:25
**written** [2] - 4996:23, 5066:3
**wrote** [4] - 5024:25, 5025:1, 5025:6, 5025:7

## Y

**year** [1] - 5019:12
**years** [5] - 5007:2, 5007:5, 5007:6, 5033:24, 5064:4
**yesterday** [10] - 4990:2, 4991:20, 4993:3, 4993:12, 4998:19, 5043:23, 5065:18, 5066:1, 5070:18, 5091:24
**YORK** [1] - 4985:1
**York** [15] - 4985:14, 4985:22, 5008:13, 5011:3, 5011:12, 5013:22, 5014:24, 5015:5, 5015:13, 5015:21, 5050:2, 5050:9, 5058:14, 5061:10, 5068:25
**you...and** [1] - 5010:3

## Z

**zero** [4] - 5001:15, 5067:10, 5067:14, 5067:20