5291

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA     :  13-CR-607

    -against-                    US District Court
                           Central Islip, NY

PHILLIP A. KENNER a/k/a
PHILIP A. KENNER, and
TOMMY C. CONSTANTINE a/k/a
TOMMY C. HORMOVITIS,

              Defendants.:  June 30, 2015
- - - - - - - - - - - - - - X   10 am

        TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE JOSEPH F. BIANCO
        UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:
                        KELLY T. CURRIE
                        United States Attorney
                        One Pierrepont Plaza
                        Brooklyn, New York 11201
                        By:  JAMES MISKIEWICZ, ESQ.
                              SARITA KOMATIREDDY, ESQ.
                        United States Attorneys

For the Defense:         RICHARD D. HALEY  ESQ.
                        For Defendant Kenner

                        ROBERT LaRUSSO, ESQ.
                        ANDREW L. OLIVERAS, ESQ.
                        For Defendant Constantine

Court Reporter:          Dominick M. Tursi, CM, CSR
                        US District Courthouse
                        1180 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6108  Fax:  712-6124
                        DomTursi@email.com

Proceedings recorded by mechanical stenography.
Transcript produced by CAT.

5292

1          (Call to Order of the Court.)

2          THE COURT:  The jurors are all here.  Are we

3  ready to go.

4          MR. LaRUSSO:  I know yesterday the government

5  asked if Mr. D'Ambrosio would listen to the tape.  I

6  wasn't with him when I did it but he listened to it.  He

7  did tell me that it is authentic and will be able to say

8  it is a fair and accurate representation of what he heard.

9          There will be an issue in regards to the portion

10  the government is playing.  There are other aspects that

11  were taken out that we feel complete the conversation.

12  Mr. Oliveras has done extensive work on that, has prepared

13  a transcript that show portions that the government are

14  playing and what is left out.  So we would like them to

15  play that portion of it as well.

16          THE COURT:  Has Mr. Haley and the government

17  sees the portions or not?

18          MR. LaRUSSO:  Your Honor, we have just finished

19  and will make copies.

20          THE COURT:  Are you putting Mr. Semple on first?

21          MR. LaRUSSO:  No.  Mr. Semple was good.  We are

22  not going to interrupt Mr. D'Ambrosio.  Mr. Foster, who is

23  flying in, should be here about 11:30 so we may put him on

24  at the break.  He is a short witness.  Not more than an

25  hour and is he going to leave.

5293

1            THE COURT:  All right.  Let's bring in the jury.

2            MR. MISKIEWICZ:  Your Honor, again we renew our

3      request for reciprocal discovery.  Mr. Foster we have

4      received nothing on.  For that matter we still haven't

5      received anything as to Mr. D'Ambrosio.

6            MR. LaRUSSO:  To my understanding they got

7      everything that we had.  Exhibits.  And Mr. Conway

8      reviewed it and I know it was emailed over the weekend.  I

9      think Saturday.

10            THE COURT:  All right.

11            MR. LaRUSSO:  To complete the record, the

12      exhibits were sent.  The emails were Sunday.

13            THE COURT:  Is Mr. D'Ambrosio here?

14            MR. LaRUSSO:  Yes.

15            (The following ensued in the presence of the

16      jury.)

17            THE COURT:  Good morning, members of the jury.

18      I hope you are all doing well this morning.  We are

19      continuing with Mr. D'Ambrosio's testimony.

20            As you recall he was on cross-examination by the

21      government so we will continue from that point.

22            Mr. D'Ambrosio, I remind that you are still

23      under oath.  Do you understand that?

24            THE WITNESS:  Yes.

25            THE COURT:  Go ahead, Miss Komatireddy.

D'Ambrosio - Cross/Ms. Komatireddy

5294

1        MS. KOMATIREDDY:  Thank you.

2

3   **MARK D'AMBROSIO**

4        called by the Defense, having been previously

5        duly sworn/affirmed, continued testifying as

6        follows:

7

8   CROSS-EXAMINATION (Continued)

9   BY MS. KOMATIREDDY:

10  Q.   Good morning, Mr. D'Ambrosio.  How are you?

11  A.   Good morning.

12  Q.   When we left off yesterday, we were talking about a

13  letter and an action by the board of managers of Eufora.

14       Do you remember that?

15  A.   You going to bring me the exhibit?

16  Q.   I will hand to you a letter marked C271.  I remarked

17  it Government Exhibit 4780.

18       I asked you about who were the members of the

19  board of managers of Eufora were in 2009.  Do you remember

20  that question?

21  A.   Yes.

22  Q.   And on direct you testified that this document, C271,

23  in redacted form Government Exhibit 4780, was a true and

24  accurate written consent of the members of Eufora.

25  Correct?

5295

1  A.   Depends on what part of 2009.  Which date.

2  Q.   Let me just ask the question again.  Listen to

3  question.

4       On direct you testified that this document is a

5  true and accurate document, business record of Eufora.

6  Right?

7  A.   Looks to be.  Yes.

8       MS. KOMATIREDDY:  Government moves 4780 into

9  evidence.

10       MR. LaRUSSO:  Your Honor, may we approach for a

11  brief minute on this?

12       (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

D'Ambrosio - Cross/Ms. Komatireddy

5296

1           (Discussion at sidebar ensued as follows.)

2           MR. LaRUSSO:  I have no objection to what the

3    redactions are.  But I just feel that the last page, which

4    has Mr. Kennedy's signature on it.  Should be part of that

5    as well.

6           MS. KOMATIREDDY:  It is the copy I got.

7           THE COURT:  The same redaction should be made on

8    the last page with Mr. Kennedy's signature.

9           MR. LaRUSSO:  That is the last page.

10          THE COURT:  But she has to redact the same

11   paragraph on that page.

12          MR. LaRUSSO:  Yes.

13          (Discussion at sidebar was concluded.)

14          (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

D'Ambrosio - Cross/Ms. Komatireddy

5297

1          (The following ensued in open court.)

2          MR. HALEY:  No objection, your Honor, with the

3     redaction as discussed.

4          THE COURT:  The redaction made to the document

5     that are not relevant.  So with those redactions, 4780 is

6     admitted.

7          (Government Exhibit 4780 in evidence.)

8     BY MS. KOMATIREDDY:

9     Q.   Now take a look at this.  Header is:  *Action By*

10    *Written Consent of the Members of Eufora LLC.*  Correct?

11    A.   Yes.

12    Q.   And it is dated July 12, 2010.  Correct?

13    A.   Yes.

14    Q.   And it states at the bottom two paragraphs.

15         *Whereas, the undersigned members of the company,*

16    *after due consideration of all available facts, deem it to*

17    *be in the best interests of the company to remove Tim*

18    *Gaarn and Carlton R "CR" Gentry from the company board of*

19    *managers effective immediately;*

20         *Whereas, the undersigned members of the company,*

21    *after due consideration, wish to replace promptly the*

22    *foregoing removed members of the company's board of*

23    *managers with the following new managers:  Dominic Volpe*

24    *and William Daniel Kennedy.*

25         Correct?

D'Ambrosio - Cross/Ms. Komatireddy

5298

1    A.    Yes, that's correct.

2    Q.    And on the second page there are signatures including

3    a separately filed or faxed page with Mr. Kennedy's

4    signature.

5          Do you see that on the screen there in front of

6    you?

7    A.    Yes.

8    Q.    And those individuals are signing, as it says here,

9    *the foregoing members of the company hold and possess in*

10   *the aggregate a majority of the membership interests of*

11   *the company as of the date hereof.*  Correct?

12   A.    Yes.

13   Q.    And in describing those signatures, the document

14   describes the signatories as the below members of the

15   company.  Correct?

16   A.    Yes.

17   Q.    It doesn't say in this paragraph that these people

18   below are members of the board of managers, does it?

19   A.    I don't know if their signature would be required if

20   they were not on the board.

21   Q.    It is a yes-or-no question.  It doesn't say in that

22   paragraph that these individuals are members of the board

23   of managers, does it?

24   A.    Not in that paragraph.

25   Q.    And in fact it actually explains at the very top

D'Ambrosio - Cross/Ms. Komatireddy

5299

1    that, *the undersigned constituting members of the company*

2    *holding at least 50 percent of the membership interest in*

3    *the company are signing this document pursuant to the*

4    *authority in the operating agreement.*

5            Correct?

6    A.    That's what it reads.  Yes.

7    Q.    Now, long before this document was signed, you and

8    the other members of the board had a meeting.  Correct?

9    A.    Which meeting are you alluding to?

10   Q.    The meeting on August 21, 2009, over the telephone.

11   Do you recall that?

12   A.    But which one?

13   Q.    Let me hand you what I'm going to mark as Government

14   Exhibit 508.

15            Do you recognize that?

16   A.    Yes.

17   Q.    What is it?

18   A.    This is the disk that I listened to in the office

19   yesterday.

20   Q.    And that that disk contains excerpts of a conference

21   call.  Correct?

22   A.    Yes.

23   Q.    And that conference call was a meeting of the board

24   of managers of Eufora.  Correct?

25   A.    Not all the managers, no.

D'Ambrosio - Cross/Ms. Komatireddy

5300

1   Q.   That conference call was a meeting of some of the

2   managers on the board of managers.  Correct?

3   A.   Yes.

4   Q.   And you were on there, that conference call.

5   Correct?

6   A.   Yes.

7   Q.   And on that disk GX 508, the nine clips you listened

8   to are true and accurate portions of that recorded call.

9   Correct?

10  A.   I mean the disks was split up so I can't stay that it

11  is, all the sounds and all the bits were not split or

12  spliced.  But from what I heard, it seems to be fair and

13  accurate.

14  Q.   Did you have an opportunity to listen to that last

15  night, Mr. D'Ambrosio?

16  A.   Yes.

17  Q.   And you had available to you the full recording of

18  the board meetings from Mr. LaRusso.  Correct?

19  A.   Yes.

20  Q.   And you had all the time you needed to review the

21  contents of 508.  Correct?

22  A.   Yes.

23  Q.   And those are true and accurate portions of the

24  conference call that included the members of the board of

25  managers of Eufora on August 21, 2009.  Correct?

D'Ambrosio - Cross/Ms. Komatireddy

5301

1   A.   Yes.

2            Not all of the board members but some of them,

3   yes.

4            MS. KOMATIREDDY:   The government moves 508 into

5   evidence.

6            MR. LaRUSSO:   No objection.

7            THE COURT:   508?

8            MS. KOMATIREDDY:   Yes, sir.  It includes 508.1

9   through 508.9.

10           THE COURT:   These are nine clips of one

11  recording.  Is that correct?

12           MS. KOMATIREDDY:   Yes.

13           THE COURT:   Okay.

14           MR. HALEY:   No objection.

15           THE COURT:   508.1 through 508.9 are admitted.

16           (Government Exhibits 508.1 through 508.9 in

17  evidence.)

18           MS. KOMATIREDDY:   Now I will publish them to the

19  jury.

20           (Audio playing.)

21           MS. KOMATIREDDY:   508.2.

22           (Audio playing.)

23           MS. KOMATIREDDY:   508.3.

24           (Audio playing.)

25           MS. KOMATIREDDY:   508.4.

D'Ambrosio - Cross/Ms. Komatireddy

5302

1          (Audio playing.)

2               MS. KOMATIREDDY:  508.5.

3          (Audio playing.)

4               MS. KOMATIREDDY:  508.6.

5     BY MS. KOMATIREDDY:

6     Q.    For the record, Mr. D'Ambrosio.  That voice we just

7     heard is Mr. Constantine's.  Correct?

8     A.    Yes.

9               MS. KOMATIREDDY:  508.7.

10          (Audio playing.)

11               MS. KOMATIREDDY:  508.8.

12          (Audio playing.)

13               MS. KOMATIREDDY:  And when we are talking about

14    paying Brent, that is a reference to Brent Nerguzian.

15    Correct?

16    A.    Yes.

17    Q.    The individual associated with Neptune Capital.

18    Correct?

19    A.    Yes.

20    Q.    That is where Eufora had a loan out to -- I'm sorry.

21    Let me rephrase.

22               That that was the lender for Eufora at this time

23    period.  Correct?

24    A.    Yes.

25    Q.    A lender.

D'Ambrosio - Cross/Ms. Komatireddy

5303

1  A.    Yes.

2  Q.    Lastly, 508.9.

3         (Audio playing.)

4         (Audio stopped.)

5  BY MS. KOMATIREDDY:

6  Q.    When it said *Mark* on that last clip, that was a

7  reference to you, sir?

8  A.    Yes.

9  Q.    And you answered that you voted in favor, back in

10 August 2009, on this call.  Correct?

11 A.    Yes.

12 Q.    Now, what is your actual title at Eufora today?

13 A.    You know, I'm not sure I could answer that.

14 Q.    Do you have a title?

15 A.    The company is not really operational right now.  It

16 is just in the patents ever since this issue.  We really

17 haven't been able to recover.

18 Q.    What was your title in 2008 and 2009?

19 A.    I'm trying to think of -- during that time I don't

20 recall what title I was given.

21 Q.    Well you were a member of the board of managers.  We

22 know that, right?

23 A.    Yes.

24 Q.    You were involved in the daily organizations of the

25 company.  Is that fair?

D'Ambrosio - Cross/Ms. Komatireddy

5304

1    A.    Part of them, yes.

2    Q.    I mean, you testified that you talked to them

3    regularly about Eufora.  Correct?

4    A.    I guess it depends on your definition of *regularly*.

5    Q.    Well, you were in the office from time to time.

6    Correct?

7    A.    Yes.

8    Q.    You talked to Mr. Constantine and Mia Edrozo and CR

9    Gentry about the finances of Eufora.  Correct?

10   A.    Not necessarily about finances.  My responsibilities

11   was more marketing and customer acquisition.

12   Q.    In terms of the officers running the company, you,

13   Mia Edrozo, Tommy Constantine and CR Gentry were basically

14   those officers, right?

15   A.    Yes.

16   Q.    And the four of you would talk regularly to be

17   responsible about running the company.  Right?

18   A.    Yes.

19   Q.    You had to communicate.  Right?

20   A.    Yes.

21   Q.    So you would talk in person at the office if you were

22   there at times.  Right?

23   A.    Yes.

24   Q.    You talked through email.  Right?

25   A.    Yes.

D'Ambrosio - Cross/Ms. Komatireddy

5305

1   Q.   In fact there is a Eufora domain.  Right?

2   Eufora.com?

3   A.   Um-hmm.

4   Q.   *Um-hmm* is yes?

5   A.   Yes.  Sorry.

6   Q.   That's okay.

7        And you had an email address mark@eufora.com.

8   Is that correct?

9   A.   Yes.

10  Q.   You also had markdambrosio@eufora.com.  Is that

11  right?

12  A.   Yes.

13  Q.   The defendant Constantine had tommy@eufora.com.

14  Right?

15  A.   Yes.

16  Q.   He also had the email address

17  tommyconstantine@eufora.com.  Is that correct?

18  A.   Yes.

19  Q.   CR Gentry had crgentry@eufora.com.  Correct?

20  A.   Yes.

21  Q.   As well as crg@eufora.com.  Correct?

22  A.   I'm not 100 percent sure about the crg.  I never used

23  that email address.

24  Q.   And Mia Edrozo had miaedrozo@eufora.com.  Correct?

25  A.   Yes.

**D'Ambrosio - Cross/Ms. Komatireddy**

5306

1   Q.   And you all talked through email about Eufora.

2   Correct?

3   A.   Yes.

4   Q.   You also had instant messaging that you used, didn't

5   you?

6   A.   At times we were using instant messaging.  Yes.

7   Q.   The Microsoft MSN instant messenger that you would

8   use from time to time also with your colleagues.  Correct?

9   A.   I don't know if it was MSN or Yahoo but most of the

10  time used some sort of IM client, yes.

11  Q.   And one of your IM user names was

12  MarkD'Ambrosio-8002.  Correct?

13  A.   I'm not sure.

14  Q.   Now, you testified that CR negotiated the Neptune

15  loan while Tommy was away racing.  Correct?

16  A.   Yes.

17  Q.   But you knew about the Neptune loan before it was

18  finalized.  Correct?

19  A.   Before it was signed.

20  Q.   Before it was finalized.  Right?

21  A.   If we are talking about finalized as in signed, yes.

22  Q.   You knew -- you got the term sheet from Neptune.

23  A.   Are you telling me that I received the term sheet?

24  Q.   Well, let me hand you what has been marked as

25  Government Exhibit 4779A and 4779.  That's an email from

D'Ambrosio - Cross/Ms. Komatireddy

5307

1    you at mark@eufora.com.  Correct?  2779?

2    A.    I'm sorry.  What is the question?

3    Q.    That is an email.  That is your address:

4    Mark@eufora.com.  Correct?

5    A.    Yes.

6    Q.    And attached to this email is a term sheet.  This

7    email is dated September 15, 2008.  Right?

8    A.    That is what it says.  Yes.

9    Q.    The subject is email term underscore sheet dot PDF.

10   Right?

11   A.    Correct.

12   Q.    And attached to this email is a term sheet that has,

13   among other things, your initials on it.  Right?

14   A.    Correct.

15         MR. KOMATIREDDY:  The government moves 2779 and

16   2779A into evidence.

17         MR. LaRUSSO:  May I just ask a few questions,

18   judge, with regard to this?

19   BY MR. LaRUSSO:

20   Q.    Mr. D'Ambrosio, do you recognize the email of

21   September 15, 2008, that you sent?

22         This is yours, right?

23   A.    Yes.

24   Q.    You sent it to who?  Mr. CR Gentry?

25   A.    That's what it says.  Yes.

D'Ambrosio - Cross/Ms. Komatireddy

5308

1  Q.    Is there any indication on the email that there is an

2  attachment?  Or does it just give you an instruction as to

3  how to locate the attachment?

4          Did you read it?

5  A.    Can I see it again, please?

6          What is the question again.

7  Q.    Did you read the email?

8  A.    Yes.

9  Q.    What does it talk about in reference to the

10  attachment?

11  A.    It says this message is ready to be sent with the

12  following file.

13  Q.    Is there an attachment to that email?

14  A.    It looks like there is an attachment.

15  Q.    Okay.  To the best of your recollection that is the

16  attachment?

17  A.    I can't testify if that is the exact.

18  Q.    How would you be able to determine if that is the

19  attachment to the email?

20  A.    If I opened the email and looked at the file that was

21  attached.  There could be a different version.

22          MR. LaRUSSO:  Can I have just a moment, your

23  Honor?

24          MS. KOMATIREDDY:  May I resume questioning, your

25  Honor?

D'Ambrosio - Cross/Ms. Komatireddy

5309

1    THE COURT:  Hold on a second.  Let Mr. LaRusso

2  finish.

3    (There was a pause in the proceedings.)

4    MR. LaRUSSO:  No objection, your Honor.

5    MR. HALEY:  No objection, judge.

6    THE COURT:  4779 and 4779A admitted.

7    (Government Exhibits 4779 and 4779A in

8  evidence.)

9  BY MS. KOMATIREDDY:

10  Q.   Mr. D'Ambrosio, did you just testify that if you

11  opened up your email and looked at it, you could tell if

12  the attachment I handed you is in fact the attachment to

13  this email?  Correct?

14  A.   Yes.  If I was to go back and look at this email and

15  it was the same email and had an attachment, and if that

16  document matched the document you showed me, yes, it would

17  be the same.

18  Q.   And you still have your Eufora email.  Correct?

19  A.   Just depends on the date.

20  Q.   But you could go back and check.

21    Right now if we had a break, you could go back

22  and check your Eufora email and see if it was there.

23  Correct?

24  A.   Depending on the date, yes.

25  Q.   Were you asked to check whether you had any emails

D'Ambrosio - Cross/Ms. Komatireddy

5310

1   related to your testimony today?

2   A.   I'm sorry.  I don't understand that question.

3   Q.   Were you asked by Mr. LaRusso to check whether you

4   had any emails related to your today?

5   A.   No.

6        MS. KOMATIREDDY:  Your Honor, I ask for a

7   sidebar.

8        THE COURT:  Let's do it at the break.

9   BY MS. KOMATIREDDY:

10  Q.   So this attachment 4779A is dated September 12, 2008.

11  Correct?  On your screen there.

12  A.   What is your question?

13  Q.   The attachment at the top left is dated -- I'm sorry.

14  Let me show you the Exhibit number here, 2779A.

15        On the top left, it is dated September 12, 2008.

16  Correct?

17  A.   Before it was --

18  Q.   Let me give you the whole thing so you have it.

19  A.   Okay.

20  Q.   Can you see that date up in the upper left-hand

21  corner?

22  A.   Yes.

23  Q.   Next to the date there are four sets of initials.

24  Right?

25  A.   Yes.  That's what it looks like, yes.

D'Ambrosio - Cross/Ms. Komatireddy

5311

1   Q.   I'm going to point to them.  The MD is you?

2   A.   Yes.

3   Q.   TC Tommy Constantine?

4   A.   Yes.

5   Q.   BN is Brent Nerguzian.  Right?

6   A.   I'm assuming that BN would be Brent Nerguzian.

7   Q.   This looks like CR Gentry?

8   A.   I would assume that would be CR's initials.

9   Q.   And it says here:  Gentlemen, this is a term sheet --

10  sorry.  Let me just read the subject line.  *Term Sheet in*

11  *Proposed Joint Venture and Related Financing.*  Correct?

12  A.   Yes.

13  Q.   And it is a multipage document that has various terms

14  for the prospective loan.  Right?

15  A.   Yes.

16  Q.   In fact in the back on page 6 it has your signature

17  and Tommy Constantine's signature.  Correct?

18  A.   Yes.

19  Q.   As well as CR Gentry's.  Correct?

20  A.   Yes.

21  Q.   So you knew about the terms of the Neptune loan

22  before it became final in February 2009.  Right?

23  A.   Well, some of the terms.

24  Q.   Some of the terms.  Okay.

25  A.   Are we talking about just the ones on this document

D'Ambrosio - Cross/Ms. Komatireddy

5312

1  or the ones in the 200-page contract?

2  Q.   So I'm going to hand you what has been marked

3  Government Exhibit 2778 and 2778A.

4       Now, 4778 is an email from CRGentry@Eufora.com.

5  Right?

6  A.   That's what it looks like.  Right.

7  Q.   Tommy@Eufora.com, that's Mr. Constantine.  Correct?

8  A.   Yes.

9  Q.   And you and Mia Edrozo.  Correct?

10 A.   Yes.

11 Q.   And it attaches the final revisions of the documents.

12      If you look at 4778A, that is a document marked

13 February 4, 2009.  Correct?

14 A.   I'm sorry.  What is that?

15 Q.   The document that is the attachment is marked

16 February 4, 2009.  Correct?

17 A.   Assuming that this is the attachment that goes to

18 this email.  Yes.

19 Q.   Just looking at it on its own, on the back on page 10

20 that's got your signature, correct?

21 A.   That is my signature.  Yes.

22 Q.   As well as Tommy Constantine's signature on page 9.

23 A.   Same document.  Yes.

24      MS. KOMATIREDDY:  The government moves 4778 and

25 4778A into evidence.

D'Ambrosio - Cross/Ms. Komatireddy

5313

1          MR. LaRUSSO:  No objection.

2          MR. HALEY:  No objection, judge.

3          THE COURT:  Those two documents are admitted.

4          (Government Exhibits 4778 and 4778A in

5   evidence.)

6   BY MS. KOMATIREDDY:

7   Q.    Looking at 4778, the email dated February 12, 2009.

8   Correct?

9   A.    Yes.

10  Q.    *Attached are the final revisions to the documents for*

11  *the deal with Neptune.  I am in the process of reviewing*

12  *them now.*

13          The first two sentences, did I read that

14  correctly?

15  A.    Yes.

16  Q.    And in the beginnings of the second paragraph it

17  says:  *You should review the documents.*  Correct?

18  A.    Yes.

19  Q.    The last sentence is:  *If you have any comments or*

20  *concerns, with any being all caps, please respond ti me as*

21  *soon as possible.*

22          Correct?

23  A.    Yes.

24  Q.    And the attachment is a term sheet dated February 4,

25  2009.  Right?

D'Ambrosio - Cross/Ms. Komatireddy

5314

1   A.    Yes.   This document is dates February 4, 2009.

2   Q.    It's got everyone's signature.   Brent Nerguzian's.

3   Tommy Constantine's.   You, Mark D'Ambrosio.   And CR

4   Gentry.   Right?

5   A.    Yes.

6   Q.    And on page 4 in the term sheet it says that there is

7   a financial advisory fee.   Correct?

8   A.    Yes.

9   Q.    It says:   *The borrower shall pay Neptune a $500,000*

10  *financial advisory fee "the financial advisory fee"*

11  *pursuant to a letter agreement.*   Correct?

12  A.    Yes.

13  Q.    And everyone, including you and Mr. Constantine,

14  signed off on this document.   Correct?

15  A.    Yes.

16  Q.    And in order for that loan to actually become final,

17  you and Mr. Constantine also had to sign off on an

18  operating agreement.   Right?

19  A.    Yes.

20  Q.    I'm going to hand you what has been marked Government

21  Exhibit 210.

22        That is the Amended and Restated Operating

23  Agreement from Eufora for February 3, 2009.   Right?

24  A.    Without -- I mean, it looks to be.   Yes.

25  Q.    Let's look at the last few pages.   Tell me if you see

D'Ambrosio - Cross/Ms. Komatireddy

5315

1    your signature there.

2    A.   Yes.

3         MS. KOMATIREDDY:  The government moves 210 into

4    evidence.

5         THE COURT:  Any objection, Mr. LaRusso?

6         MR. LaRUSSO:  No objection, judge.

7         MR. HALEY:  No, sir.

8         THE COURT:  Government 210 is admitted.

9         (Government Exhibit 210 in evidence.)

10   BY MS. KOMATIREDDY:

11   Q.   Government Exhibit 210, the amended and restated

12   operating agreement of Eufora LLC IS dated February 23,

13   2009.

14        Now, on direct you testified about an operating

15   AGREEMENT that was admitted as Constantine 265 dated

16   August 16, 2002.  Do you remember that?  It is on your

17   screen now as well.

18   A.   If this is the same one that you showed me yesterday,

19   yes.

20   Q.   In case there is any doubt, let's go to the back.

21   That is your sit.  Right?

22   A.   Yes.

23   Q.   And now we have a second operating agreement February

24   23, 2009.  Right?

25   A.   Yes.

D'Ambrosio - Cross/Ms. Komatireddy

5316

1   Q.   These are the only two final executed operating

2   agreements that Eufora has.  Right?

3   A.   I'm not sure.  There could be another operating

4   agreement.

5   Q.   From when?

6   A.   I just know that we had more than one operating

7   agreement.

8   Q.   What is the operating agreement that is in effect

9   today?

10  A.   I wouldn't be able to answer that.

11  Q.   So the operating agreement has everyone's interest in

12  it, doesn't it?

13       It is a schedule, schedule A, with the

14  percentage interest of every member.  Right?

15  A.   Well, not every member.

16  Q.   You are saying this operating agreement does not

17  actually list every member of Eufora?

18  A.   At this time, before we reached out to the hockey

19  guys, this is probably an accurate document.

20  Q.   You is it accurate or unaccurate (sic)?

21  A.   No.  Accurate.

22  Q.   Because it all adds up to 100 percent.  Right?

23  A.   I would assume so, yes.

24  Q.   That is what it says.  Right?

25  A.   Yes.

D'Ambrosio - Cross/Ms. Komatireddy

5317

1  Q.    Those numbers, I mean if you want a calculator,

2  Mr. D'Ambrosio, I can give you one.

3  A.    No.  I'm good.

4  Q.    Are you sure?

5  A.    Yes.

6  Q.    Okay.  So they all add up to 100 percent.  Right?

7  A.    Yes.

8  Q.    So there are no more members other than the ones

9  listed here in this operating agreement.  Correct?

10  A.    Looks to be correct.

11  Q.    But you can't tell us if this is the operating

12  agreement that is in effect today.

13  A.    No, I cannot.

14  Q.    Now, Mr. D'Ambrosio, you also testified on direct

15  about this chart, C279.  Right?

16  A.    Yes.

17  Q.    You testified that Mr. LaRusso made the chart.

18  Correct?

19  A.    Yes.

20  Q.    And you verified it as accurate.  Right?

21  A.    I believe it to be accurate.  Yes.

22  Q.    Walk us through all the steps you took between when

23  Mr. LaRusso first handed you this chart and what you did

24  to verify that it was accurate.

25  A.    Going based on of memory of what I believe to be true

D'Ambrosio - Cross/Ms. Komatireddy

5318

1    and accurate.  And there was one minor change that we made

2    to the flow chart.  But to my knowledge this is accurate.

3    Q.    You didn't consult any operating agreements, did you,

4    before verifying this as accurate?

5    A.    I know who the members are.

6    Q.    You didn't consult any transfers of membership

7    interest documents, like this one that we saw yesterday,

8    did you?  C267.

9    A.    That's considered.  Yes.

10   Q.    You didn't go back to your Eufora offices and find

11   out if there are any more of these, did you?

12   A.    Did I go back yesterday to Eufora offices and check?

13   That is from my recollection that's true and accurate.

14   Q.    And you testified that there was a correction made.

15              I'm going to hand you MD2.  Do you recognize,

16   this is your previous draft of this chart; right?

17   A.    Not my previous draft.

18   Q.    Sorry.  Mr. LaRusso's draft of this chart.  Right?

19   A.    Yes.

20              MS. KOMATIREDDY:  The government moves MD2 into

21   evidence.

22              MR. LaRUSSO:  May I see it?

23              No objection, your Honor.

24              MR. HALEY:  Judge, may I?  (Referring).

25              No objection, judge.

D'Ambrosio - Cross/Ms. Komatireddy

5319

1           THE COURT:  MD2 is admitted.

2           (Government Exhibit MD2 in evidence.)

3    BY MS. KOMATIREDDY:

4    Q.   Publishing MD2 for the jurors.

5           The distinction between those two charts, other

6    than the color, is MD2 doesn't have any Intended Investors

7    and Actual Investors entries.  Right?

8    A.   That is correct.

9    Q.   So on C279, which was introduced yesterday, you have

10   these bullet points of intended investors and actual

11   investors.  Correct?

12   A.   Yes.

13   Q.   Now, just to be clear.  An intended investors is

14   someone who does not have a share of the company as we sit

15   here today.  Correct?

16   A.   I would agree.  Yes.

17   Q.   What's that?

18   A.   I would agree.  Yes.

19   Q.   And actual investors, they do have a share of the

20   company?  Or not?

21   A.   Yes.

22   Q.   What percentage interest does Sergei Gonchar have in

23   Eufora today?

24   A.   I would not be able to answer that.

25   Q.   Just going back to the operating agreement that we

D'Ambrosio - Cross/Ms. Komatireddy

5320

1   have, Government Exhibit 210, and the schedule A.

2         Is Sergei Gonchar listed as a member in this

3   schedule?

4   A.   No.

5   Q.   Neither is Tyson Nash.  Right?

6   A.   No.

7   Q.   Neither is Constantine Management Group.  Right?

8   A.   No, Constantine is not listed there.

9   Q.   So back to C267.  When Mr. LaRusso showed you this

10  transfer membership interest form, saying that an interest

11  went to Constantine Management Group in 2008, do you see

12  that it says 4 percent goes to Constantine Management

13  Group.  Right?  C9 Consulting.

14  A.   Yes.

15  Q.   You testified that Mr. Kennedy -- the person behind

16  C9, right?

17  A.   Yes.

18  Q.   He had actually started out with 10 percent interest

19  in the company.  Right?

20  A.   Yes.

21  Q.   And then at some point he had gotten rid of 2 percent

22  and that money went back to the company because the

23  company needed capital.  Right?

24  A.   My understanding is that is correct.  My memory, yes.

25  Q.   And then he transferred this 4 percent to Constantine

D'Ambrosio - Cross/Ms. Komatireddy

5321

1  Management Group and that money went to Mr. Constantine

2  because, as you testified yesterday, it was his money so

3  he cold spend it how he wanted.  Right?

4  A.   Well, it is his interest to start with.  He was the

5  one that elected to be a partner.  And yes, what he does

6  with his shares is his priority.

7  Q.   I'm going to show you, just to complete the record,

8  Constantine 266.  Is that transfer document for the other

9  2 percent?  Right?

10 A.   This looks to be accurate.  Yes.

11        MS. KOMATIREDDY:  The government moves C266 into

12 evidence.

13        MR. LaRUSSO:  No objection, your Honor.

14        MR. HALEY:  No objection, judge.

15        THE COURT:  266 is admitted.

16        (Government Exhibit 266 in evidence.)

17 BY MS. KOMATIREDDY:

18 Q.   When Mr. Kennedy transferred his other 2 percent,

19 looking at C266, that transfer was to AZ Eufora Partners I

20 LLC.  Right?

21 A.   I think this, yes, it is, but I think --

22 Q.   When he transferred that 2 percent, that money went

23 back to the company because the company needed money,

24 right?

25 A.   Yes.  But there is one document that we missed on

D'Ambrosio - Cross/Ms. Komatireddy

5322

1  this particular transfer.

2  Q.   What's missing?

3  A.   This document.  There was another assignment.  I

4  remember that the percentage should have went to the

5  company officers, I think, and then to a new investor.

6  Q.   Well, this transfer document, which is a company

7  document, says it goes from C9 Consulting to AZ Eufora

8  Partners I LLC.  Right?

9  A.   Yes.  That was a mistake.

10  Q.   But it is a signed record and a record of the

11  company.  Right?

12  A.   Yes.  There was one other part there that, like I

13  said, was documented incorrectly, but because of the way

14  the money flowed, his interest went to Eufora first and

15  then to a new investor.

16  Q.   Is there a document, another document, that corrects

17  this document?

18  A.   Like I said, I think we missed that document.

19  Q.   You don't have it, do you?

20  A.   I said we missed it.  I remember a mistake on this

21  document.

22  Q.   But you did not produce another document except for

23  this document to Mr. LaRusso or anybody before you came

24  into court today.

25  A.   Well, that was why we hired CR, was to clean up

D'Ambrosio - Cross/Ms. Komatireddy

5323

1   documentation.

2   Q.   You don't have another document transferring away C9

3   Consulting's interest other than the two that I'm showing

4   you right here, Constantine Exhibit 266 and Constantine

5   Exhibit 267.  Right?

6   A.   They might have created another document to fix this

7   mistake, yes.

8   Q.   But according to this document, he started out --

9   when I say *he*, I mean Dan Kennedy, started out with 10

10  percent membership interest in this company C9 Consulting,

11  it went down by two in 2006, and then it went down by

12  another four in 2008, leaving 4 percent membership

13  interest owned by C9 Consulting.

14  A.   But the money never went to this and then it went to

15  the company.

16  Q.   Which document?  Both of them are incorrect?

17  A.   No.  Just the first.  From the 10 percent to the 8

18  percent.

19  Q.   Just the one that has to do with the hockey players.

20  A.   No.  The first one.

21  Q.   The one that has to do with AZ Eufora Partners I LLC.

22  Correct?

23  A.   That is correct.  Dan did not receive any money from

24  that.

25  Q.   The company did.

D'Ambrosio - Cross/Ms. Komatireddy

5324

1   A.   Yes.  So the proper way to do that would be to

2   document --

3   Q.   There is no question pending.

4        Let's just go to the second document you say is

5   accurate.  It says C9 Consulting is left with 4 percent

6   membership interest after it conveys this other 4 percent

7   to Constantine Management Group.  Correct?

8   A.   Yes.

9   Q.   If we go back to the operating agreement, February

10  2009, this schedule A, C9 Consulting has 4.445 percent of

11  the company.  Correct?

12  A.   That's what it says.  Yes.

13  Q.   All right.  We talked about Mr. Privitello yesterday.

14  I want to clarify one thing.

15       You said that $155,000 went from the Ron

16  Richards account to AZ Avalon.  Do you remember that?

17  A.   Yes.

18  Q.   And you said that part of that was supposed go to the

19  bank.  So it was rerouted to the bank on behalf of Eufora.

20  Right?

21  A.   Yes.

22  Q.   That's $150,000 went to Bancorp Eufora.  Right?

23  Talking about this part of the transaction now.

24  A.   Yes.

25  Q.   And the other $5,000 you said went to Avalon because

D'Ambrosio - Cross/Ms. Komatireddy

5325

1   Eufora had to pay rent.  Right?

2   A.   That was our landlord.  Yes.

3   Q.   So when we look at the actual bank record for AZ

4   Avalon Partners December 2009, in evidence as Government

5   Exhibit 1310, you see on December 7, $155,000 incoming

6   wire.  Do you see that?

7   A.   Yes.

8   Q.   And do you see on December 8, $150,000 going out to

9   Bancorp, the bank for Eufora.  Right?

10  A.   Yes.

11  Q.   And then you see another $5,000 going back to Eufora.

12  Right?

13  A.   Yes.

14  Q.   Didn't stay with Avalon for rent.  Right?

15  A.   I don't know if that was a different transaction or

16  not.

17  Q.   Now, you also testified that Mr. CR Gentry gave

18  himself 2.5 percent of the company.  Right?

19  A.   Yes.

20  Q.   That was in connection with this operating agreement

21  that we were just looking at, that 2009 transaction where

22  everyone is finalizing the percentages because you had to

23  create this new operating agreement.  Right?

24  A.   Yes.

25  Q.   And the reason you had to create this new operating

D'Ambrosio - Cross/Ms. Komatireddy

5326

1    agreement was because the lender was insisting that the

2    paperwork of the company come together.  Right?

3    A.    My understanding is yes.

4    Q.    You had to have a valid operating agreement or they

5    wouldn't lend you money.  Right?

6    A.    Yes.

7    Q.    And that involved all of you:  You, Mia, CR, and

8    Mr. Constantine talking about the shares of the company

9    and finalizing that in order to actually, all of you, sign

10   off on that operating agreement.  Correct?

11   A.    No.

12   Q.    It didn't involve all of you coming together by email

13   over and over again?

14   A.    It did, but I believe they were separately.  It

15   wasn't all together, all at one time.

16   Q.    Okay.  Well, you certainly communicated with

17   Mr. Gentry about these shareholders.  Right?

18   A.    Yes.

19   Q.    And you are the one who decided to give him another

20   point in Eufora.  Right?

21   A.    I don't remember exactly what the terms were.

22   Q.    You said you wanted to do something for him and for

23   Mia, so you were going to give him another point and give

24   Mia another point 3 percent to do something for them

25   because they were working so hard for the company without

D'Ambrosio - Cross/Ms. Komatireddy

5327

1   pay.  Right?

2   A.   I could have.  Yes.

3   Q.   I'm going to hand you what has been marked as

4   Government Exhibit 4768.  That is an email from you to

5   Mr. Gentry.  Right?

6   A.   Yes.

7   Q.   And it is a conversation that you are having back and

8   forth so there is actually three emails in this chain.

9   Right?

10  A.   Yes.

11          MS. KOMATIREDDY:  The government moves 4768 into

12  evidence.

13          MR. LaRUSSO:  No objection, your Honor.

14          MR. HALEY:  No objection, judge.

15          THE COURT:  4768 is admitted.

16          (Government Exhibit 4768 in evidence.)

17  BY MS. KOMATIREDDY:

18  Q.   So when CR Gentry got 4.5 percent in 2009, in

19  February of 2009, that was after there was a January 2009

20  email from you to him saying I want to do something for

21  you and Mia.  Right?

22  A.   That's what it looks like.  Yes.

23  Q.   Take one full point from mine for you and point three

24  for Mia so I end up with 15.5.  Right?

25          Did I read that correctly?

D'Ambrosio - Cross/Ms. Komatireddy

5328

1   A.   I'm sorry.  Where is that?

2   Q.   Take one full point from mine for you and do point

3   three for Mia so I end up with 15.5.  Correct?

4   A.   Yes.

5   Q.   Then Mr. Gentry responds.  He asks you to adjust the

6   numbers so that Mia Edrozo ends up at 1.67 percent, and

7   he, Mr. Gentry, ends up at 2.5 percent.  Correct?

8   A.   Yes.

9   Q.   He says let know what think.  Right?

10  A.   Yes.

11  Q.   And you say yes.

12  A.   Top email.  Yes.

13  Q.   And before everything is signed off on, Mr. Gentry

14  communicates with you about the shareholders' shares

15  again.  Right?

16  A.   I'm sorry.  One more time?

17  Q.   Before the final signoff, Mr. Gentry talks to both

18  you and Miss Edrozo and Mr. Constantine again about

19  everyone's shares.  Right?

20  A.   If you are referring to -- the shares now?

21  Q.   I'm now going to show you 4769.  That is another

22  email from Mr. Gentry to you.  Right?

23  A.   Yes.

24  Q.   This one includes Mr. Constantine in the *To* line.

25  Right?

D'Ambrosio - Cross/Ms. Komatireddy

5329

1    A.    Yes.

2            MS. KOMATIREDDY:   The government moves 4769 in

3    evidence.

4            MR. LaRUSSO:  No objection, your Honor.

5            MR. HALEY:  No objection, Judge.

6            THE COURT:  4769 is admitted.

7            (Government Exhibit 4769 in evidence.)

8    BY MS. KOMATIREDDY:

9    Q.    And here Mr. Gentry says to everyone on this email:

10   *Attached is the updated shareholder registry I sent to*

11   *Brent today.*  Correct?

12   A.    Yes.

13   Q.    And it is shows in the attachment Mr. Gentry at 2.5

14   percent.  Correct?

15   A.    Yes.

16   Q.    Now, you testified that Eufora has several loans out

17   to you and Mr. Constantine.  Right?

18   A.    Yes.

19   Q.    You testified that approximately a million three to

20   you.  Right?

21   A.    Yes.  I think so, yes.

22   Q.    And approximately a million five to Mr. Constantine.

23   Is that correct?

24   A.    Approximately.  Yes.

25   Q.    But there is no loan agreement between Eufora and

D'Ambrosio - Cross/Ms. Komatireddy

5330

1    you, is there?

2    A.    I think we do have a loan agreement.

3    Q.    You didn't produce a loan agreement before you came

4    to court today, did you?

5    A.    No.

6    Q.    There is no loan agreement between Eufora and Tommy

7    Constantine for $1.5 million, is there?

8    A.    There might be, yes.

9    Q.    You don't know, as you sit here today, whether

10   Eufora's paying you interest and how much interest you are

11   getting on that loan, do you?

12   A.    No.  I think there is a loan agreement.

13   Q.    As you sit here today, you cannot actually tell us

14   what the terms of have loan are, can you?

15   A.    No.

16   Q.    You don't knows the interest rate.  Right?

17   A.    Yes.  I'm not going to charge my own company

18   interest.

19   Q.    Well, so then zero interest.  Is that right?

20   A.    I honestly would have to look at the loan document.

21   If you have the loan document, I would be happy to look at

22   it.

23   Q.    So you don't the interest rate.

24   A.    That is right.

25   Q.    For your loan or Mr. Constantine's loan.  Right?

D'Ambrosio - Cross/Ms. Komatireddy

5331

1   A.   I'm not sure what the interest is at.

2   Q.   You testified about Eufora's offices being under

3   construction in 2008.  Do you recall that?

4   A.   Yes.

5   Q.   And I believe you said you didn't move into the

6   hangar building until 2009.  Correct?

7   A.   I said that we were working from home and I believed

8   that we didn't rush into the building.  I know I started

9   moving things in but to the best of my knowledge, my

10  memory wasn't until the first of the year.

11  Q.   I'm going to hand you what has been marked as MD2.

12  This was Eufora's office building before the hangars.

13  Right?

14  A.   No.

15  Q.   You don't recognize that?

16  A.   I do.

17  Q.   What is it?

18  A.   It's Eufora's first office.

19            MS. KOMATIREDDY:  The government moves MD2 into

20  evidence.

21            MR. LaRUSSO:  May I just ask a question or two?

22            THE COURT:  Yes.

23            MR. LaRUSSO:  Mr. D'Ambrosio, when you say first

24  office, what do you mean by that?

25            THE WITNESS:  There was another office that was

D'Ambrosio - Cross/Ms. Komatireddy

5332

1  down the street from our original office before we moved

2  into the hangar.

3           So that was our original.  Then we moved into

4  another office.  I don't know the exact duration of the

5  second office.  Then we worked from home until the

6  building was finished.  And then we moved into the

7  building.

8           MR. LaRUSSO:  No objection.

9           MR. HALEY:  No objection, judge.

10          THE COURT:  MD2 is admitted.

11          (Government Exhibit MD2 in evidence.)

12          (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

D'Ambrosio - Cross/Ms. Komatireddy

5333

1    CROSS-EXAMINATION   (Continued)

2    BY MS. KOMATIREDDY:

3    Q.    Let's talk a little bit about Eufora's business.

4              You testified that Eufora issued prepaid credit

5    cards, prepaid debit cards, right?  Have I got that right?

6    A.    Yes.

7    Q.    Prepaid card.

8    A.    Yes.

9    Q.    And as far as the prepaid card services offered, it

10   had something called a value load.

11             Is that right?

12   A.    Yes.

13   Q.    And different people at Eufora had the value load

14   accounts, right?

15   A.    Can you qualify that question?

16   Q.    Sure.

17             You have a value load account, right?

18   A.    Everybody who had a card was able to load money to

19   their account and others.

20   Q.    Okay.  So you had a card issued by Eufora, correct?

21   A.    Yes.

22   Q.    And everyone who worked for the company had a card

23   issued by Eufora, correct?

24   A.    I'm assuming that they did.  I'm not sure if

25   everybody did.

D'Ambrosio - Cross/Ms. Komatireddy

5334

1   Q.   Okay.  Mia Edrozo had one, right?

2   A.   I guess so, yes.

3   Q.   And Mr. Constantine had one, right?

4   A.   Yes.

5   Q.   And in fact Mr. Constantine had two cards, right?

6   A.   I'm not sure if he had two.

7   Q.   And he had one for his mother, didn't

8   Mr. Constantine, correct?

9   A.   I'm not sure.

10  Q.   He had one for his now wife Sara Bower, correct?

11  A.   I think Sara had one.

12  Q.   And he had one for his ex-girlfriend Kristie

13  something, right?

14  A.   I'm not sure.

15  Q.   And when you have a prepaid credit card, if you send

16  money to Eufora for that card, Eufora had an internal

17  system to add value to the card, right?

18  A.   Say that one more time.

19  Q.   When you -- in order to add value to your card you

20  have to load the card, right?

21  A.   Yes.

22  Q.   That is the lingo you guys used at Eufora, right?

23  A.   Yes. There was a mechanism of whether it's a wire or

24  a money order.  There was a number of ways to load

25  customers' accounts.

D'Ambrosio - Cross/Ms. Komatireddy

5335

1   Q.    And one of the ways is to wire transfer money into a

2   Eufora account, right?

3   A.    Yes.

4   Q.    And it could be wire transferred into an operating, a

5   Eufora operating account and then transferred over, right?

6   A.    Umm --

7   Q.    Money can be transferred to a Eufora operating

8   account and then transferred over to a card account,

9   right?

10  A.    It would have to be somebody's name.  I don't know

11  why somebody would transfer to Eufora and then -- I mean

12  all of the transfers go to Eufora and to an account.

13  Q.    Right.  And Eufora has several accounts, right, at

14  the bank?

15  A.    I think more than one.

16  Q.    It has an operating account, right, for operating

17  expenses?

18  A.    I assume if there is more than one -- yes there's at

19  least one operating account.

20  Q.    And there is a value load account, right?

21  A.    I believe there was -- my understanding was, yes,

22  there was a separate account that was kept for value

23  loads.

24  Q.    And when money came into the value load account, it

25  would then get allocated to a card, right?

D'Ambrosio - Cross/Ms. Komatireddy

5336

1    A.    Yes.

2    Q.    And it would get allocated to the card by the

3    instructions of the person sending the money, right?

4    A.    Depends.

5    Q.    Well, there are several ways you can allocate money.

6    You can use your cash hold system, right?

7    A.    Yes.

8    Q.    Which is your internal computer system, to take money

9    from one account and put it on a card, right?

10   A.    Yes.

11   Q.    That's the system that Danny Kennedy (ph) designed,

12   right?

13   A.    Yes.

14   Q.    And there is also another way which certain Eufora

15   insider's can also use their phone for example to load

16   their card, right?

17   A.    Yes.

18   Q.    And you can do it from your office?

19   A.    Yes.  And there was a reason why only Eufora -- I'm

20   sorry.

21   Q.    Only Eufora members can do that --

22   A.    Only Eufora, only Eufora employees.  And it depends

23   on really on what time you're talking about, which year.

24   Customers want to obviously be able to use their mobil

25   phone to load --

D'Ambrosio - Cross/Ms. Komatireddy

5337

1   Q.   Just to be clear in terms of the lingo, for example

2   in Government Exhibit 7413, when it says -- going to do a

3   value load.  That means loading someone's individual card

4   account with money, right?

5   A.   I'm sorry, this monitor is out.

6        Okay, so one more time?

7   Q.   For example, in the Government Exhibit that we're

8   looking at right now, 7413.  When someone says they're

9   going to do a value load, that means loading someone's

10  individual card account with money, right?

11  A.   No.  There is a sub-account under the account.

12  Q.   Okay, so loading a particular card with money, right?

13  A.   Yes.

14  Q.   What does mean?

15  A.   It's loading -- there's -- we had a system where

16  companies that had other employees, they could load their

17  account and with that you could have other cardholders.

18  Q.   So someone's card, either a particular account that

19  is associated with one person, or an account that is

20  associated with multiple people.

21       Is that fair?

22  A.   Yes.

23  Q.   And when wire transfers came in, you testified on

24  direct about a wire transfer that came in from the Ron

25  Richards account.  Remember that?  You testified about

D'Ambrosio - Cross/Ms. Komatireddy

5338

1    that $150,000?

2    A.    I'm sorry one more time.

3    Q.    You testified a direct about this wire transfer that

4    came in from a Ron Richards' account.  Remember that?

5    A.    Yes.

6    Q.    So when wire transfers came in from the Ron Richards'

7    account -- I'm turning your attention to 1105 page 37.

8    And the wire was from Ron Richards to Eufora value load

9    account.  That money went for a particular person's card,

10   right?

11   A.    I can't answer that.

12   Q.    Well, it didn't go to your card, did it?

13   A.    No.

14   Q.    But it went to somebody's card?

15   A.    Could have went to the company, or I don't know what

16   the distribution was there.  But if the banking account

17   shows $15,000 to Eufora, then it was Eufora.

18   Q.    Well, Mr. D'Ambrosio, you testified that you under

19   that -- for maybe a month or two in terms of the salary

20   from Eufora, right?

21   A.    Yes.  I believe it was probably two months or so.

22   Q.    And actually Eufora was not the only vendor you were

23   involved in.  You have another company, right?

24   A.    Yes.

25   Q.    You have a company called Dish Zero, right?

D'Ambrosio - Cross/Ms. Komatireddy

5339

1   A.   Yes.

2   Q.   And that's another company that you started.

3        Well, why don't you tell us what Dish Zero is?

4   A.   Dish Zero was a co-branch of Dish Network.  And we

5   sold home satellite systems.

6   Q.   And were you a member of the Dish Zero, LLC?

7   A.   Yes.

8   Q.   And Tommy Constantine was also a member of Dish Zero,

9   LLC, right?

10  A.   Yes.

11  Q.   And Dish Zero got money from the Ron Richards

12  accounts, didn't it?

13  A.   Are you telling me that it did?

14  Q.   I'm asking you.

15  A.   No, it got money from -- it got money from Sergei

16  Gonchar.

17  Q.   It really got money from Eufora, didn't it?

18  A.   Are you telling me that it's coming from Eufora to

19  Dish Zero?

20  Q.   Do you remember one way or another?

21  A.   I'm remember that Sergei once made an investment in

22  Dish Zero.

23  Q.   So I'm going show you what is in evidence as

24  Government Exhibit -- we'll get to that in a minute.

25        MS. KOMATIREDDY:  Your Honor, actually, may I

D'Ambrosio - Cross/Ms. Komatireddy

5340

1    ask for the morning break so I can get that?

2              THE COURT:  We'll take the morning break.  Don't

3    discuss the case.

4              (A recess was taken.)

5              THE COURT:  Everyone be seated.

6              You can take a break.

7              THE WITNESS:  Thank you.

8              THE COURT:  The Government had asked for a

9    sidebar but I put it off to the break.  I'm getting a

10   little more confused because when it was asked,

11   Mr. LaRusso asked to introduce e-mails, you said no.  But

12   you did not mention you produced e-mails the past couple

13   of days.

14             MR. LaRUSSO:  My understanding is all the

15   e-mails, Judge, came from him.  I didn't ask -- I never

16   asked him, Judge.  That was the problem.  But he was the

17   one that produced over the 30 e-mails that they got.

18             MS. KOMATIREDDY:  Judge, I'm sorry, that is not

19   correct.  We got all of the e-mails from another source of

20   ours who had Eufora --

21             MR. LaRUSSO:  Anyway, the question was --

22             THE COURT:  Mr. LaRusso asked for the e-mails.

23             MR. LaRUSSO:  I didn't ask for the e-mails.

24             THE COURT:  I know you were the one that asked,

25   but if you weren't the one --

D'Ambrosio - Cross/Ms. Komatireddy

5341

1     MR. LaRUSSO:  No, I did not.

2     THE COURT:  Okay.  If you want to, if you want

3     to ask him when he comes in, you can do so.  Ask him about

4     the e-mails, not who asked him to produce them or not.

5     MR. LaRUSSO:  Thank you, your Honor.

6     MS. KOMATIREDDY:  Yes.

7     THE COURT:  Do you want to ask him after the

8     break?

9     MS. KOMATIREDDY:  No, I don't.  He volunteered

10    coming in to evidence.  Our concern is he's on medication

11    so --

12    THE COURT:  All right.  If there is no

13    objection.

14    MR. LaRUSSO:  Okay.  Thank you very much.

15    (A recess was taken.)

16    (After recess the following occurred.)

17    MR. LaRUSSO:  Before the jury comes out, I think

18    it's important to let the Court know what happened.

19    There was a public exchange of words between

20    myself and Mr. Miskiewicz.  He accused me of lying and I

21    verbally challenged him at that point.

22    I think this trial has reached a point where the

23    tension is causing us to, at least myself, to act

24    sometimes inappropriately, and I apologize that the Court

25    wasn't here when it happened.  It should not have.  From

D'Ambrosio - Cross/Ms. Komatireddy

5342

1    my point, I apologize to the Court.  But I want the Court

2    to be aware of the fact that; one, there have been no lies

3    from my part.

4            In regards to these e-mails, Mr. Miskiewicz can

5    put on record whatever he wishes.  I asked that my client

6    try and get all of the e-mails as the Court directed.  The

7    problem is, I didn't oversee it.  I asked Mr. Conway to do

8    so and what he did is that e-mails were provided to him.

9    He looked at them and then requested that they be turned

10   over.  I believe there was a batch of e-mails that were

11   turned over.  Whether they're relevant or not relevant, I

12   don't know, and I can't answer to that at this point.

13           There was a second group that was turned over, I

14   believe, yesterday.  Those were the ones that I believe

15   came from Mr. D'Ambrosio -- that I don't even know because

16   I don't know the source.  What I'm aware of is that two

17   batches of e-mails were turned over.  The value of them I

18   can't attest to because I didn't look at them.

19           And what I'm concerned about is these

20   allegations that I am lying to the Government and lying to

21   the Court.  It just, it just strikes me, Judge, that you

22   know I have worked 40 years of my life for my reputation,

23   and to have that publicly mentioned in a courtroom, it was

24   very disturbing.  And I think the Court should be aware of

25   what happened, and I apologize for having to put this on

D'Ambrosio - Cross/Ms. Komatireddy

5343

1   the record.  But I want the Court to know what transpired.

2          THE COURT:  I don't think you lied to the Court.

3   Obviously, if I did, I would let you know.

4          I saw you producing documents.  If you delegated

5   to other people to have that done, that is fine too.  I'm

6   not suggesting that you should do it personally when I ask

7   you to do it.  So I don't think there is anything

8   improper, and I believe you complied with my direction.

9          So I don't think there is anything to discuss.

10          I would suggest -- we've been on trial for nine

11   weeks, but -- and I think it's been pretty civilized

12   between the attorneys.  And I just ask that both sides try

13   to continue that.  It's not productive to be yelling or

14   calling each other names or screaming.  You have to work

15   these things out, otherwise it affects negatively on both

16   sides when that happens, when there is a breakdown of that

17   professional relationship.

18          So -- but let's continue, okay?

19          Is the Government ready to go?

20          Okay.  Let's bring in the jury.

21   BY MS. KOMATIREDDY:

22   Q.   Before the break we were talking about a company Dish

23   Zero, right?

24   A.   Yes.

25   Q.   I'm going show you what is in evidence as Government

D'Ambrosio - Cross/Ms. Komatireddy

5344

1    Exhibit 1214.  It's a bank statement for Eufora, LLC.

2             Do you see that?

3    A.    Yes.

4    Q.    For September 2009, right?

5    A.    Yes.

6    Q.    And in September 2009, your company, Dish Zero, got

7    $30,000 from the Eufora expense account, right?

8    A.    From Sergei's investment, yes.

9    Q.    But it came from Eufora's bank account, right?

10   A.    Correct.

11   Q.    And at the beginning of September 2009, the

12   balance -- to the end of August 2009, the balance in the

13   Eufora bank account was a little over $1,000, correct?

14   A.    That is what it looks like, yes.

15   Q.    And then there is two major deposits from the Law

16   Offices of Ronald Richards the first week of September,

17   first and second week, $8,000 and a quarter of a million

18   dollars, right?

19   A.    Yes.

20   Q.    And your money that went to your company, Dish Zero,

21   came from the money that came in from the Ron Richards

22   account, right?

23   A.    I'm sorry, I can't answer that.

24   Q.    I'm going to show you what has been marked as

25   Government Exhibit 1218, also in evidence.

D'Ambrosio - Cross/Ms. Komatireddy

5345

1     This was a Eufora bank account for December

2     2009, right?

3     A.    Yes.

4     Q.    And in December of 2009, your company, Dish Zero,

5     gets $65,000 to the Eufora bank account, correct?

6     A.    Yes.

7     Q.    And that's on December 2nd, right?

8     A.    December 2nd, yes.

9     Q.    Now, if you look at the previous month's bank

10    statement of November 2009, you look at the last day of

11    that month, November 30th, there is $130,000 that comes in

12    from the Law Offices of Ron Richards, correct?

13    A.    That is what it looks like, yes.

14    Q.    Now, over the years you also got checks from Eufora

15    paid out to you.

16          Isn't that right?

17    A.    Maybe for repayments to my loans.

18    Q.    For repayment of your loans.  You said you had a

19    $1.3 million loan outstanding?

20    A.    There was sometimes that if somebody had money and I

21    made a short-term loan, I would get paid back.

22    Q.    But you don't have any documentation for those loans,

23    do you?

24    A.    I'm sure we do, yes.  And they are documents, not

25    checks.

D'Ambrosio - Cross/Ms. Komatireddy

5346

1    Q.   Okay.  So I'm going to show you what has been marked

2    Government Exhibit 4745 through 4754.

3              MS. KOMATIREDDY:  At this time, your Honor, we

4    move these in as certified bank records.

5              MR. LaRUSSO:  No objection, your Honor.

6              MR. HALEY:  No objection.

7              THE COURT:  They're received.

8              (Government Exhibits 4745 through 4754 in

9    evidence.)

10   BY MS. KOMATIREDDY:

11   Q.   I'm going to give you a minute to just look through

12   them, okay?

13             Each of these checks is from Eufora, LLC.

14             Isn't that right?

15   A.   That's right.

16   Q.   And each one is made out to you, personally, Mark

17   D'Ambrosio, correct?

18   A.   Yes.

19             MS. KOMATIREDDY:  And I'm also going to offer

20   Government 4758 through 4760.

21             MR. LaRUSSO:  No objection, your Honor.

22             MR. HALEY:  No objection, Judge.

23             THE COURT:  Received.

24             (Government Exhibits 4758 through 4760 in

25   evidence.)

D'Ambrosio - Cross/Ms. Komatireddy

5347

1   BY MS. KOMATIREDDY:

2   Q.   Just so the jury can take a look at an example of

3   what we're looking at, these are checks cashed at your

4   bank account from Eufora to you, correct?

5   A.   That's the way it looks, yes.

6   Q.   Now, in the beginning of your testimony you talked

7   about -- we went over the 2002 operating agreement.  Let's

8   just go back to that for a minute.

9          In the 2002 operating agreement with Eufora,

10  which is in Constantine 265, Mr. Constantine had a

11  particular interest in this company, and I believe it was

12  50 percent, correct?

13  A.   Yes.

14  Q.   Here we go, 50 percent, right?

15  A.   Correct.

16  Q.   And next I'm going to hand you what has been marked

17  as Government Exhibit 4738, 4743.

18         Those are transfer documents from

19  Mr. Constantine's interest, correct?

20  A.   That's the way it looks, yes.

21         MS. KOMATIREDDY:  The Government offers 4743,

22  4738 into evidence.

23         MR. LaRUSSO:  No objection, your Honor.

24         THE COURT:  Mr. Haley, any objection?

25         MR. HALEY:  No, sir.

D'Ambrosio - Cross/Ms. Komatireddy

5348

1          THE COURT:  4738, 4743 in evidence.

2          (Government Exhibits 4738, 4743 in evidence.)

3     BY MS. KOMATIREDDY:

4     Q.    In April of 2013, Mr. Constantine transferred his

5     50 percent membership interest in Eufora to the 2002

6     trust, according to this document, 4738, correct?

7     A.    That's the way it looks, yes.

8     Q.    And we have a specific transfer document that looks

9     like the other one, also dated April 15, 2003, with

10    Mr. Constantine's signature, correct?

11    A.    Yes.

12    Q.    And yet in February 2009, Mr. Constantine still had

13    43 percent of Eufora, right?

14    A.    Yes, that is correct.  I'm not sure if that was the

15    2002 trust for Tommy Constantine.

16    Q.    Now, we talked a little bit about e-mails between you

17    and your colleagues.  I'm going to hand you a set of

18    e-mails.

19          MS. KOMATIREDDY:  These are by stipulation, your

20    Honor.  They have been marked Government Exhibits 4715

21    through 4722, as well as 4710.

22          THE COURT:  Any objection?

23          MR. LaRUSSO:  I need to look at them, if I

24    could.

25          I'm sorry.  I saw them.  Thank you.  No

D'Ambrosio - Cross/Ms. Komatireddy

5349

1    objection.

2                MR. LaRUSSO:  Can we have a brief sidebar on

3    this, please?

4                (Continued on the following page.

D'Ambrosio - Cross/Ms. Komatireddy

5350

1           (The following occurred at sidebar.)

2           MR. LaRUSSO:  I apologize to the Court, but I

3   don't remember seeing these.  When did we get these?

4           MS. KOMATIREDDY:  During the break we had.  We

5   discussed this during the break.  These are -- we had

6   additional e-mails to offer and these e-mails --

7   Mr. D'Ambrosio was party and Mr. Constantine was a party.

8   Some of them were Mr. Constantine.  They go to defense

9   statements and the state of mind at the time of the fraud.

10  They're from 2008 during the time of the Eufora.  He

11  should have gotten them.  I don't expect it was -- it was

12  our discussion.

13          MR. LaRUSSO:  I got these in discovery.

14          MS. KOMATIREDDY:  These are e-mails that we have

15  obtained from our investigation -- you from other members

16  of --

17          MR. HALEY:  I did see the e-mails, Judge, before

18  the questioning.  So I certainly have no objection.

19          MR. LaRUSSO:  Just haven't had a chance.  Where

20  did they come from?  Did they come from a computer?

21          MS. KOMATIREDDY:  They came from C.R. Gentry

22  and -- each one talking.

23          There is e-mails among the -- they talk about

24  status of the company.  Those are e-mails from a relevant

25  time period.

D'Ambrosio - Cross/Ms. Komatireddy

5351

1    MR. LaRUSSO:  Again, I'm not familiar with

2    computers like a lot of other people, but normally when I

3    see an e-mail, I see where it's coming from.  This is

4    just, this is like something printed up and typed up.

5    MS. KOMATIREDDY:  Mr. Gentry does not use such

6    e-mails.  This is what an e-mail looks like when it's

7    printed out.

8    THE COURT:  Every e-mail system is different.

9    MS. KOMATIREDDY:  Mr. Constantine should have

10   every one of these e-mails.  He is on every one of these

11   e-mails.

12   MR. LaRUSSO:  We can check that, we can -- it

13   would take some time, that is it problem.  There are those

14   and thousands of e-mails.

15   Judge, I think the point is that I haven't

16   looked at these.  So I don't know whether or not there is

17   an authenticity objection.  But if Mr. D'Ambrosio

18   remembers these e-mails, I can't object.  I can't do that.

19   And I won't object if he identifies them.

20   THE COURT:  Why don't you lay a foundation.

21   MS. KOMATIREDDY:  I only skipped that because --

22   THE COURT:  Okay.

23   (Continued on the following page.)

24

25

D'Ambrosio - Voir Dire/Mr. LaRusso

5352

1    (The following occurred in open court.)

2    BY MS. KOMATIREDDY:

3    Q.   Mr. D'Ambrosio, did you get a chance to look through

4    those e-mails?

5    A.   Yes.

6    Q.   And you're on most of these e-mails, either a sender

7    or recipient or as a cc?

8    A.   Yes, I'm copied in some of these e-mails, correct.

9    Q.   And Mr. Constantine is on some of these e-mails as

10   either as sender or recipient or as a cc, correct?

11   A.   Yes.

12         MS. KOMATIREDDY:  The government moves 4715

13   through 4722 and 4750 into evidence.

14         MR. LaRUSSO:  May I, your Honor?  Briefly?

15         THE COURT:  Yes.

16   VOIR DIRE EXAMINATION

17   BY MR. LaRUSSO:

18   Q.   Mr. D'Ambrosio, the ones that she just showed you,

19   you said that some of them you're on.

20         Is that what you said?

21   A.   It looks like some of them are to me or just copied.

22   During this time that the company needed money, if I

23   couldn't help, some of these e-mails that were copied to

24   me, I didn't -- I wouldn't acknowledge them.

25   Q.   Mr. D'Ambrosio, can you take a look at the pack that

D'Ambrosio - Voir Dire/Mr. LaRusso

5353

1   was just given to you.  And the ones that you can

2   identify, identify them.  And if your name is on them,

3   likewise do the same.

4   A.   My name looks like they're on the majority of these.

5   Q.   Which ones are they not on, either as a direct

6   participant or as a cc?

7   A.   Usually to Tommy and then to myself.  This one is to

8   C.R. and me copied.  This one is to me and then Tommy.

9   This one I'm copied on.

10  Q.   They appear to be e-mails that you received.

11          Is that correct?

12  A.   Yes.

13  Q.   To the best of your recollection?

14  A.   Yes.

15  Q.   You don't dispute these e-mails at this point.

16          Is that correct?

17  A.   That I received them?

18  Q.   That you received them.

19  A.   Yes.

20  Q.   That you remember reading them?

21  A.   I'm not sure.  It's been so long.

22          MR. LaRUSSO:  I have no objection to these.

23          THE COURT:  Okay.  So the exhibits are in

24  evidence.

25          (Government Exhibit 4715 through 4722 and 4750

D'Ambrosio - Cross/Ms. Komatireddy

5354

1    in evidence.)

2    CROSS-EXAMINATION  (Continued)

3    BY MS. KOMATIREDDY:

4    Q.   Mr. D'Ambrosio, let's look at the one that you wrote,

5    Government Exhibit 4719.

6           I'll put it up on the screen so it's easier.

7    You got it?

8    A.   Yes.

9    Q.   And that's your writing in response to an e-mail

10   chain, right?  There is an e-mail below.

11   A.   Okay, yes.

12   Q.   And just so we have content before we go through

13   this.

14          Fair to say almost on a regular basis, maybe

15   every couple of weeks or every month, Mr. D'Ambrosio would

16   e-mail you, Mr. Constantine and C.R. Gentry about the

17   operating account in Eufora, right?

18   A.   Yes.

19   Q.   During this time period in 2008, correct?

20          You can refer to that in front of you, as well.

21   But in 2008, this would be -- we're looking at 4719.

22   A.   Yes.

23   Q.   One of those conversations about the operating

24   balance of the Eufora operating accounts, right?

25   A.   Yes.

D'Ambrosio - Cross/Ms. Komatireddy

5355

1   Q.   And when you look at these e-mails, some of the

2   e-mails leading up to it -- let's look at 4715.

3        Government Exhibit 4715, this is an e-mail dated

4   March 11, 2008 from Mr. D'Ambrosio to Mr. Constantine, you

5   and Mr. Gentry.  The subject line is, *operating balance*

6   *negative $20,000*, right?

7   A.   Yes.

8   Q.   And it asks at the end, *When will the 200K be here*,

9   correct?

10  A.   Yes.

11  Q.   And in 4716 Government Exhibit, a few days later,

12  Mr. D'Ambrosio asks again, *ETA of 200K*, correct?

13  A.   Yes.

14  Q.   And in Government Exhibit 4717, Mr. D'Ambrosio asks

15  again, *I have yet to hear from anyone on the ETA of the*

16  *200K or any other funding*, correct?

17  A.   Yes.

18  Q.   That is not a question, I guess.  But it's a

19  statement, right?

20  A.   Yes.  This was an every couple of months occurrence

21  from 2004 on.

22  Q.   And on this e-mail there is also Phil Kenner on the

23  e-mail, right?

24  A.   Yes.

25  Q.   He is a recipient of the e-mail?

D'Ambrosio - Cross/Ms. Komatireddy

5356

1   A.    That is what it looks like, yes.

2   Q.    4718.  And let's look now at 4719.

3         So at the beginning of the e-mail chain on 4719,

4   Mr. D'Ambrosio writes, The operating balance of $53,000

5   and change, fair?

6   A.    Yes.

7   Q.    And it's referring to her e-mail as my monthly --

8   it's my end-of-the-month e-mail, right?

9   A.    That is what it says.

10  Q.    Mr. Constantine responds, *Please see my previous*

11  *e-mail that I sent on this subject.  Since I'm in Mexico,*

12  *I'll say it this way, no mas*, right?

13  A.    Yes.

14  Q.    Mr. D'Ambrosio writes, *So we are closing our doors.*

15  *Eufora will be no longer and we should all start looking*

16  *for jobs?*  Right?

17  A.    Yes.  That was Tommy and me also bantering back and

18  forth and Tommy also telling her, *Don't worry, we won't*

19  *close the doors*.  And she would be worried about where

20  we're going to get cash from, so --

21  Q.    Okay.  And you respond and you say, *This is why I*

22  *have been pushing.  T C said no more money.*  Right?

23  A.    Yes.

24  Q.    And it looks like you're trying to get the plan

25  together to get more funding, correct?

D'Ambrosio - Cross/Ms. Komatireddy

5357

1   A.   That is what it looks like, yes.

2   Q.   Now, you said this was a month-to-month thing.

3        Fair to say that since this inception, Eufora

4   has never made a profit?

5   A.   That's correct.

6   Q.   In fact, on every tax return that Eufora has filed,

7   it's declared a negative number in the entry for operating

8   income, right?

9   A.   That would be correct.

10  Q.   And you're familiar with the tax returns because you

11  have reviewed them for the Government, right?

12  A.   Some of the times, yes.  I mean, the tax accountant

13  prepared them mostly.

14  Q.   And the accountant prepared them and you get them

15  after the accountant prepared them.  So you're familiar

16  with the final filed tax returns, right?

17  A.   Yes.

18  Q.   I'm going to hand you what is marked as Government

19  Exhibit 4725 to 4730.

20       Are those the tax returns for Eufora for the

21  years 2002 through 2007, correct?

22  A.   That is what it looks like, correct.

23       MS. KOMATIREDDY:  Government moves 4725 through

24  4730 in evidence.

25       MR. LaRUSSO:  No objection, your Honor.

D'Ambrosio - Cross/Ms. Komatireddy

5358

1          MR. HALEY:  No objection.

2          THE COURT:  Those exhibits are admitted.

3          (Government Exhibits 4725 through 4730 in

4    evidence.)

5    BY MS. KOMATIREDDY:

6    Q.    Now, you also testified that you would speak with

7    other members of the company from time to time, right?

8    A.    Yes.

9    Q.    I'm going to hand you a couple of these, Government

10   Exhibit 4705 and Government Exhibit 4703.  Those are --

11   you can take a minute to review, but they're excerpts of

12   some of your instant message conversations, right?

13   A.    Looks to be so, yes.

14         MS. KOMATIREDDY:  Government moves 4703 and 4705

15   in evidence.

16         (Government Exhibits 4703 and 4705 in evidence.)

17         THE COURT:  I'm sorry.  Any objection?

18         MR. LaRUSSO:  I didn't hear the witness answer

19   whether he was able to identify them.

20         THE WITNESS:  They look like a conversation.

21   I'm not sure.  I can't testify that these are accurate.  I

22   mean --

23   BY MS. KOMATIREDDY:

24   Q.    They're accurate?

25   A.    I wouldn't be able to tell you what any of this is.

D'Ambrosio - Cross/Ms. Komatireddy

5359

1    I don't remember this conversation and I'm not sure if

2    this is correct.

3              (Continued on the following page.)

D'Ambrosio - Cross/Komatireddy

5360

1           THE COURT:  Is there any objection?

2           MR. LARUSSO:  I do, your Honor.

3           MR. HALEY:  Judge, may I just see this.  You are

4    just talking about this exhibit?

5           MS. KOMATIREDDY:  Yes, right there.

6           THE WITNESS:  And this here.

7           MS. KOMATIREDDY:  That one exhibit.

8           MR. HALEY:  Your Honor, from my standpoint I

9    have no objection.

10          THE COURT:  I'll sustain it.

11   Q.   You testified that you messaged other members of the

12   company regularly, right?

13   A.   What do you mean by regularly?

14   Q.   How about you messaged other members of the company?

15   A.   I'm sure I had, yes.

16   Q.   And you messaged other members of the company with

17   what you said your handle was, Mark D'Ambrosio 8002?

18   A.   You said that; I didn't.

19   Q.   You don't remember that your handle was at Mark

20   D'Ambrosio 8002?

21   A.   My IT guys would have set it up.  I would never use

22   that handle.  You are the one that said it was my handle.

23   When I logged on it was just Mark.

24   Q.   Do you think I just made that up yesterday?

25          MR. LARUSSO:  Objection, your Honor.

D'Ambrosio - Cross/Komatireddy

5361

1    THE COURT:  Sustained.

2    A.  Do you think --

3    THE COURT:  When I say sustained you don't have

4    to answer.

5    Q.  You were aware of Mr. Constantine's value loads from

6    Eufora, right?

7    A.  Yes.

8    Q.  And you knew that Mr. Constantine was taking money

9    from Eufora to load his personal card, right?

10   A.  Yes.  Sometimes that money would be the money that he

11   just deposited into the account.

12   Q.  You said to your colleague, C.R. Gentry, that you

13   spoke to Mr. Constantine -- I'm sorry, that you spoke to

14   Mr. Drozin about the value loads and between

15   Mr. Constantine's the value loads and the expense value

16   loads, the company risked bouncing value loads with

17   BancFirst and then the company would be done for sure,

18   right?

19   A.  I don't think so.

20   Q.  You had no problem with Mr. Constantine taking money

21   from Eufora for his own use?

22   A.  No, it was his own money.

23   Q.  You had no problem with it?

24   A.  Do I have a problem with him loading his own money to

25   load on his card?  No, that's his money.

5362

1    Q.   Just like you have no problem taking money from

2    DishZero from the Eufora capital account, right?

3    A.   That was the investment for Sergei.

4             MS. KOMATIREDDY:  No further questions.

5             THE COURT:  Mr. Haley.

6             MR. HALEY:  Thank you, Judge.

7    RECROSS EXAMINATION

8    BY MR. HALEY:

9    Q.   Mr. D'Ambrosio, good afternoon, sir.

10   A.   Good afternoon.

11   Q.   You probably figured it out but I represent Phil

12   Kenner?

13   A.   Yes, I got that.

14   Q.   You were aware, were you not, that a person by the

15   name of Michael Stolper commenced litigation against

16   Eufora and Tommy Constantine.

17             Were you named as a defendant in that litigation

18   as well, sir?

19   A.   Yes, if you are talking about the lawsuits that were

20   filed against myself, Tommy, Mia, Brent Nerguzian.

21   Q.   And the attorney who was representing the plaintiffs

22   in this action, people who would bring the lawsuit, that

23   attorney was named Michael Stolper; is that correct?

24   A.   That's correct.

25   Q.   Now, as relates to that lawsuit, was there a claim in

5363

1  that lawsuit that there had been mismanagement of Eufora

2  including let's say the misuse of a credit card belonging

3  to Tommy Constantine, if you recall?

4  A.    I don't recall.

5  Q.    C.R. Gentry by your testimony was hired to clean up

6  the documentation, correct?

7  A.    Yes.

8  Q.    Do you recall when he was hired for that purpose?

9  A.    Well, he originally came on as the consultant to

10 raise funds which he was not successful in doing and I

11 don't know the exact date of when he was given the task to

12 help clean up the books.

13 Q.    Well, whenever that occurred, sir, why was it

14 necessary to hire C.R. Gentry to help clean up the books?

15 A.    My personal opinion is, it wasn't in my area of

16 expertise and we needed somebody with a higher degree to

17 make sure everything was documented correctly because we

18 felt we had a very promising company and this would need

19 to be done at some point in time.

20 Q.    And --

21 A.    I'm sorry.  May I continue?

22        This was also very important if we were going to

23 raise money.  We needed to make sure everything was

24 accounted for.

25 Q.    At least at that point in time there was concern that

D'Ambrosio - Recross/Haley

5364

1  the documentation of Eufora LLC needed to be, in your

2  words, cleaned up, correct?

3  A.    I'm sorry.  Ask the question one more time.

4  Q.    Sure.

5        Do you recall, sir, saying we hired C.R. Gentry

6  to clean up the documentation.  Do you recall that

7  testimony?

8  A.    Yes.

9  Q.    As relates to the words "clean up the documentation,"

10 were you referring to the need to make sure that the

11 documentation as relates to Eufora was cleaned up in the

12 sense that the books and records, for example, reflected

13 the accurate ownership interest of various

14 owners/investors?

15 A.    Yes, that was the term that C.R. used.

16 Q.    And you understood that term, correct?

17 A.    Just exactly the way you described it, to make sure

18 everything was accounted for and make sure everybody had

19 correct documentation and this is what was going to be

20 required as we move forward for a larger raise amount.

21 Q.    Did you have an understanding when C.R. was hired

22 that cleaning up the documentation included documenting

23 the ownership interest that was held by various hockey --

24 National Hockey League players?

25 A.    Can you ask it one more time, please?

D'Ambrosio - Recross/Haley

5365

1   Q.   Okay.

2            Did you have an understanding when C.R. Gentry

3   was hired, that National Hockey League players had

4   contributed money to Eufora for purposes of obtaining an

5   ownership interest in Eufora through the sale of let's say

6   someone's ownership stock in the company?

7   A.   Yes, but they held their interest in another company.

8   Q.   I understand that.  And the name of that company was?

9   A.   AZ Eufora Partners was one of them, yes.

10  Q.   Now, you were not intimately familiar with the books

11  and records of Eufora because as you told us your job was

12  primarily marketing, isn't that true?

13  A.   Yes.

14  Q.   But C.R. Gentry was tasked, to your knowledge, with

15  documenting the books and records of Eufora in order that

16  various ownership interests, whether they were held by way

17  of the individual or held by way of some other LLC were

18  actually recorded on the books and records?

19  A.   Yes, this is what he told us was needed to be done.

20  Q.   And you agreed because you hired him for that

21  purpose, true?

22  A.   Originally, no, he was not hired for that purpose but

23  we needed to make sure that everything was documented and

24  everything was correct if we were going to go raise a

25  large amount for the company.

5366

1   Q.   So initially not hired for that purpose, there came a

2   point in time where that was his task, is that true?

3   A.   Yeah, I would say that since he was not successful in

4   raising money.  What I know about C.R., he was just

5   creating another job for himself.

6            MS. KOMATIREDDY:  Objection, move to strike.

7            THE COURT:  Overruled.

8   Q.   Did you or did you not testify on direct, we hired

9   C.R. to clean up the documentation.

10           Did you say that or did you not say that on your

11  direct examination?

12  A.   He was not originally hired for that, but, yes, he

13  was there to help -- I'm sorry.  After he was hired as a

14  consultant, he told us that we needed to make sure all the

15  documentation is correct.  So --

16  Q.   Okay.

17           Are you aware that however you characterized his

18  role, C.R. Gentry created spreadsheets to reflect

19  ownership interest in Eufora based upon information

20  provided him by various individuals as well as the review

21  of books and records?

22  A.   Yes, he created spreadsheets.

23  Q.   Do you have any reason to doubt the authenticity of

24  the spreadsheets he created?

25  A.   Whether they were accurate --

D'Ambrosio - Recross/Haley

5367

1    Q.   Yes.

2    A.   Oh, they had problems all the time.

3    Q.   And that's because you had intimate knowledge of the

4    books and records given your role as a marketing guy, is

5    that your testimony?

6    A.   No, we learned that afterwards.

7    Q.   From other sources, I take it?  Correct?

8    A.   Yeah, after a complete audit, yes.

9    Q.   Well, with reference to what has been marked Kenner

10   228, have you seen this spreadsheet before?

11   A.   I couldn't answer that I seen this spreadsheet

12   before.  I seen many spreadsheets.  I don't know if I've

13   seen this one in particular.

14   Q.   Have you seen spreadsheets created by C.R. Gentry

15   that include names on this spreadsheet reflecting

16   ownership interest held by let's say Glenn Murray?

17   A.   I don't recall.

18   Q.   Let's say held by Steve Rucchin?

19   A.   I don't believe I ever heard that name before.

20   Q.   Let's say Darryl Sydor?

21   A.   I've heard that name before but I'm not sure it was

22   reflected on the spreadsheet.

23   Q.   Would you take a look at K-228, and I'll point to

24   that line there, sir.

25              Does that serve to refresh your recollection as

D'Ambrosio - Recross/Haley

5368

1  to whether it was reflected on the spreadsheet, the name

2  Darryl Sydor?

3  A.   I know that name but I can't say that I've seen this

4  spreadsheet.

5  Q.   My question is:  Does this document serve to refresh

6  your recollection as to whether Darryl Sydor was one of

7  the persons that had an ownership interest in Eufora?

8  A.   I'm not sure he had a direct ownership in Eufora.

9  Q.   Indeed his ownership interest may derive from another

10  entity as you said a moment ago?

11  A.   Yes.

12  Q.   What about the name William Ranford, does that mean

13  anything to you?

14  A.   I don't think I heard that name before.

15  Q.   Sir, would you kindly take a look at this

16  spreadsheet, and I know it is in small type.

17  A.   I can see it.

18       MR. HALEY:  Do you want to borrow my glasses?

19       THE WITNESS:  No, I'm good.

20       Okay.

21  Q.   Does the name Standard Ventures mean anything to you?

22  A.   Yes, I heard the name Standard Ventures, yes.

23  Q.   Did you have an understanding or did you have an

24  understanding as to who had ownership interest in Standard

25  Ventures?

D'Ambrosio - Recross/Haley

5369

1   A.   (Pause.)

2   Q.   Yes or no?

3   A.   No.

4   Q.   Okay.

5        As relates to, and I apologize, sir, as relates

6   to Kenner Exhibit 242, did you ever see this spreadsheet

7   before?

8   A.   Honestly I'm trying to be helpful.  I've seen so many

9   spreadsheets I don't know if I've seen this exact

10  spreadsheet or not.

11  Q.   Sir, my only question is do you recall seeing this

12  spreadsheet?

13  A.   Are those different than the spreadsheets you just

14  showed me?

15  Q.   I can't testify for you.

16  A.   I can't tell the difference.

17  Q.   Okay.  But is it fair to state, sir, that the

18  spreadsheets you are looking at, to the best of your

19  knowledge, these are the type of spreadsheets that were

20  created by C.R. Gentry, correct?

21  A.   Yes.

22  Q.   And at the point in time C.R. Gentry was creating

23  these spreadsheets, was he the Chief Executive Officer of

24  Eufora?  Yes or no?

25  A.   What was the date with respect to the spreadsheet?

D'Ambrosio - Recross/Haley

5370

1   Q.   This would be as of 12/21/2009.

2   A.   And I apologize.

3        Did we ever go over a data he was actually --

4   that actually took over as president and CEO?

5   Q.   When did C.R. Gentry take over as president and CEO

6   of Eufora?

7   A.   I don't know the exact date.

8   Q.   Not knowing the exact date, sir, to the best of your

9   knowledge, in or about December of 2009, to the best of

10  your knowledge, was C.R. Gentry the president and CEO of

11  Eufora LLC?

12  A.   Without having the facts, I can't testify yes or no

13  to that.

14  Q.   You told us on direct that Mia was the VP of

15  operations in 2013 and she has been with us since the

16  beginning; is that correct?

17  A.   Yes.

18  Q.   And I apologize.  How do you pronounce her last name?

19  A.   Edrozo, E-D-R-O-Z-O.

20  Q.   Do you know if Mia worked for C.R. Gentry as he tried

21  to clean up the documentation for Eufora LLC?

22  A.   Do I know if Mia worked hand in hand with C.R.?

23  Q.   Yes.

24  A.   I'm not sure.  I'm not sure.

25  Q.   Okay.

D'Ambrosio - Recross/Haley

5371

1    Do you know if Mia assisted C.R. Gentry as he

2    began to clean up the books and the documentations for

3    Eufora LLC?

4    A.   I assume if there were certain bank information or

5    deposit information that may be C.R. didn't have access

6    to, he could potentially ask Mia for her assistance.

7    Q.   But can we agree, sir, that Mia, since she was

8    involved from the beginning with Eufora LLC --

9    A.   Yes.

10   Q.   -- Would be in a position given that history with the

11   company to have a pretty good understanding as to the

12   books and records of the company to the extent that she

13   had access to those books and records over that period of

14   time.

15        Would that be a fair statement?

16   A.   Just to give certain information with what came in

17   and what came out, she -- I don't believe she had any

18   knowledge what ownership, percentages, only access to the

19   information.

20   Q.   No, but what came in -- when you say what came in,

21   you are talking about what came in in terms of money,

22   right?

23   A.   Yes, if that's what you are alluding to in order to

24   create a spreadsheet.

25   Q.   And when you say what went out, you are talking about

D'Ambrosio - Recross/Haley

5372

1    what went out in terms of money?

2    A.    Yes.

3    Q.    And can we agree that that would be a significant

4    component in cleaning up the books and records, isn't that

5    true?

6    A.    I think only the in, not the out.

7    Q.    Okay.

8    A.    I mean if the investors were investing in, C.R. had

9    only information of the money coming in.

10    Q.    In other words, it's your testimony that the money

11    coming in from various individuals would certainly be

12    important for C.R. Gentry as he then began to clean up the

13    books to make sure that the money came in then reflected

14    respective ownership interests in Eufora, true?

15    A.    That's correct.

16    Q.    Okay.

17          You testified that, and I know it was yesterday,

18    sir, but you testified that Tommy was screaming at these

19    guys.  Do you remember that testimony?

20    A.    I think we said two different occasion or occasions,

21    and what particular occasion?

22    Q.    I'm talking about the occasion where you were a

23    little struck by the fact because they were great friends

24    and Tommy was the godfather of his child?

25    A.    Yes, that was Brent Nerguzian's call.

D'Ambrosio - Recross/Haley

5373

1   Q.   And you were present during that call?

2   A.   I heard the screaming and Tommy and I shared the

3   office and I was in the office.

4   Q.   And Tommy, because he was screaming, seemed angry; is

5   that correct?

6   A.   Yes.

7   Q.   And during the course of that conversation or that

8   end of the conversation that you heard from Tommy then,

9   was he speaking in rapid succession, such that the

10  listener couldn't get a word in edgewise, if you recall?

11  A.   No, I think there were some times that the gentleman

12  could have spoken up if he wanted to, for sure.

13  Q.   So the best of your memory, Tommy would pause to give

14  the individual an opportunity to respond as he was, to use

15  your words, screaming at him, correct?

16  A.   I don't think he would necessarily pause unless he

17  asked a question.

18          I just remember that Brent was not defending

19  himself about participating behind our backs about selling

20  the loan.

21  Q.   And it's your testimony that Brent had the

22  opportunity to get a word in edgewise?

23  A.   Brent has the personality to do so.  So if he wanted

24  to, I'm sure he could.

25  Q.   So it is your memory of that conversation that Brent

D'Ambrosio - Recross/Haley

5374

1    had the opportunity to get a word in edgewise as Tommy was

2    screaming at him.  That's my question.

3    A.   Yes, I think that he would have had the opportunity

4    if he wanted to have an argument with Tommy.

5    Q.   Do you know whether Brent said anything as relates to

6    Tommy's conversation with him when Tommy was screaming at

7    him?

8    A.   I think he acknowledged what he did was wrong, and

9    probably was, you know.  There was a conflict of interest

10   and there could be some legal repercussions, and he said

11   we were going to get his loan paid off and that was pretty

12   much it.

13   Q.   I'm sorry.  So this was a conference call.  You were

14   part and parcel of this telephone conversation?

15   A.   I was in the office.  It didn't originally start as a

16   conference call but Tommy would use the speakerphone a

17   lot.

18   Q.   I wasn't there --

19   A.   Sorry.

20   Q.   Mr. D'Ambrosio, here's my question of you:  When the

21   conversation started, where Tommy began screaming at this

22   gentleman --

23   A.   Right.

24   Q.   -- Was that on the speakerphone that the point in

25   time?

D'Ambrosio - Recross/Haley

5375

1   A.   Yes.

2   Q.   I see.

3        And you were then a party to this conversation?

4   Yes or no?

5   A.   Did I participate or --

6   Q.   Yes.

7   A.   I did not participate but I overheard it and I was in

8   the office.

9   Q.   When the conversation started, if you recall, did

10  Tommy say, Brent, it's Tommy, I'm here with Mark, we have

11  to talk to you?

12       Did he say to Brent that you were part and

13  parcel of that conversation insofar as being there on

14  speakerphone?

15  A.   He could have but I don't remember.

16  Q.   When Tommy was screaming at Brent, did you interrupt

17  Tommy at any point in time.  Yes or no?

18  A.   No.

19  Q.   Did you at any point in time during the course of the

20  conversation say anything to Brent?  Yes or no?

21  A.   No.

22  Q.   Well, to digress a little bit though, I have to ask

23  you this question, Mr. D'Ambrosio.

24       At some point in your direct when you were

25  testifying about Eufora, the patents, from your

D'Ambrosio - Recross/Haley

5376

1    perspective, the value of the company, you did say, these

2    companies sell for ten times earnings?  Do you recall

3    that?

4    A.    Yes.

5    Q.    What do you mean by that?

6    A.    Well, when I said that particular sentence, we were

7    talking about a licensing deal and when you have a

8    licensing deal you have very little overhead and you are

9    basically collecting royalties.  And depending what the

10   life span is and how valuable the patents are and

11   concerning what the net revenues are, companies can sell

12   for many multiples, publically traded companies sell for

13   100 time multiples; retail company sell for three time

14   multiple.  Usually technology companies in the space we

15   were in, probably 20 multiple.

16   Q.    Meaning that the owners of that company, should that

17   occur, would reap some significant product?

18   A.    Yes.

19   Q.    And that's true, is it not, sir, whether at the point

20   in time the company was sold, whether or not that company

21   was making a dime, isn't that correct?

22   A.    Most technology companies are very valuable companies

23   especially if the were software, large amounts of monies,

24   millions of dollars in losses.  To give you some examples

25   if you would like --

D'Ambrosio - Recross/Haley

5377

1  Q.   Let me ask you this:  Do you know if Facebook before

2  it went public, ever made a profit?

3  A.   I think before it went public, yes, Facebook did.

4  Facebook was profitable.

5  Q.   Can you think of companies based upon your knowledge

6  and experience that before they went public, never made a

7  profit but once they were made public those owners

8  obtained significant return of their investment?

9         MS. KOMATIREDDY:  Objection, relevance.

10         THE COURT:  Sustained.

11  Q.   You made mention, sir, in your direct testimony that

12  there was a point in time where John Kaiser was present at

13  Eufora offices and I believe said to Tommy Constantine in

14  your presence that I need ten percent and Phil Kenner

15  needs ten percent.  Do you recall that testimony?

16  A.   Yes.

17  Q.   That was a statement made by John Kaiser, correct?

18  A.   Yes.

19  Q.   Was Phil Kenner physically present when John Kaiser

20  made that statement?

21  A.   No.

22  Q.   Sir, I'm going to ask you to take a look as what is

23  marked as Kenner 243.

24  A.   Okay.

25  Q.   As relates to this particular document, sir, do you

D'Ambrosio - Recross/Haley

5378

1    see your name Mark as a cc on this document?

2    A.    Yes.

3    Q.    And to the best of your knowledge, is this document a

4    fair and accurate copy of an e-mail sent by C.R. Gentry to

5    Tommy Constantine in which you were cc'd?

6    A.    Yes.  You are talking about the e-mail header?

7    Q.    Yes.

8    A.    Yes.

9    Q.    Do you have any reason to doubt the fact that this

10   e-mail is an e-mail that was sent by C.R. Gentry to Tommy

11   Constantine with a copy to you?

12   A.    No, if this e-mail address was correct, there would

13   be no reason it wouldn't be correct.

14            MR. HALEY:  I offer Kenner 243.

15            MS. KOMATIREDDY:  No objection, your Honor.

16            MR. LARUSSO:  No objection, your Honor.

17            THE COURT:  243 is admitted.

18            (Whereupon, Defendant's Exhibit K-243 was

19   received in evidence.)

20            MR. HALEY:  I'm sorry, Judge, my mind wandered.

21            THE COURT:  Do you need more water?

22            THE WITNESS:  I'm good.  Thank you.

23   Q.    During the course of the efforts by C.R. Gentry to

24   clean up the books and records, there would be

25   communications between he and Tommy Constantine; is that

D'Ambrosio - Redirect/LaRusso

5379

1   correct?

2   A.    There could be.

3   Q.    Well, as relates to Kenner Exhibit 243, this indeed

4   is an e-mail from C.R. Gentry to Tommy Constantine,

5   addressed to Tommy, where there is a communication between

6   the two of them, is there not, regarding member registry

7   for AZ Eufora Partners LLC and other matters contained in

8   this document.

9         That is clearly a communication between

10  C.R. Gentry and Tommy Constantine at a point in time where

11  he is in the process of cleaning up the books and records,

12  correct?

13  A.    That's what it looks like, yes.

14          MR. HALEY:  Thank you, sir.

15          THE WITNESS:  You're welcome.

16          THE COURT:  Redirect.

17          MR. LARUSSO:  Thank you, your Honor.

18  REDIRECT EXAMINATION.

19  BY MR. LARUSSO:

20  Q.    Mr. D'Ambrosio, regarding the board meeting on

21  August 21, 2009, who was present at that meeting?

22  A.    It was -- that was the telephone call, correct?

23  Q.    Yes.

24  A.    Yes.  So it was a conference call, myself, Brent

25  Nerguzian, Tommy Constantine, C.R. Gentry and Tim Gaarn.

D'Ambrosio - Redirect/LaRusso

5380

1   Q.   Is it fair to say that everyone on the telephone were

2   speaking at the same time?

3   A.   Yes, and I was the one who recorded the call.

4   Q.   That's not my question.

5   A.   Sorry.

6   Q.   When you were asked if you had access to a full

7   recording from myself, I was not the one that provided the

8   recording to you, someone else did, is that correct --

9   yesterday?

10  A.   Yes.

11  Q.   But you had access to the full recording if you

12  wished to; is that right?

13  A.   Yes, because I was originally doing the recording.

14  Q.   How did you have access to the full recording if you

15  wished to do so?

16  A.   Just log into my server, my computer, and pull the

17  recording file.

18  Q.   And by the way, did you in fact do so and do you know

19  whether or not that was turned over to the Government?

20  A.   I supplied it to Andrew last night and I don't know

21  if he supplied the full recording.

22  Q.   On an earlier occasion do you remember providing a

23  copy to Mr. CR Gentry?

24  A.   That would be the only way he got the recording

25  because you could tell my voice is different from

5381

1  everybody else's voice on the telephone call.  And yes, I

2  do remember sending it to C.R. for recordkeeping.

3  Q.    You were shown this exhibit on cross-examination.

4  A.    Yes.

5  Q.    Which is C-279 which is a chart?

6  A.    Yes.  I highlighted a portion of it.  You were asked

7  questions by the Government regarding the intended

8  investors and actual investors.

9          Mr. D'Ambrosio, you were shown MD-2 which was

10  being called a draft, am I correct?

11  A.    Yes.

12  Q.    This draft was shown by myself to you; is that

13  correct?

14  A.    Yes, prior to making the changes.  Yes.

15  Q.    And we had a conversation, and we discussed the

16  content of this chart?

17  A.    Yes.

18  Q.    We're talking about the draft?

19  A.    Yes, I'm looking at it.  Yes.

20  Q.    And after we had had our conversation and you had

21  provided additional information, the chart was changed; is

22  that correct?

23  A.    Yes, that's the colored chart.

24  Q.    So as we see C-279?

25  A.    Yes.

5382

1    Q.    These changes were made based upon the information

2    you provided; is that correct?

3    A.    Yes.

4    Q.    And that information that was put into this chart was

5    accurate information; is that correct?

6          MS. KOMATIREDDY:  Objection, leading, your

7    Honor.

8          THE COURT:  No, he can lead on this.  Go ahead.

9    Q.    Is that correct?

10   A.    That's correct.

11   Q.    And would you explain to the jury why you added or

12   why these two provisions were added to the chart after our

13   interview, that is, the intended investors and the actual

14   investors?

15   A.    So Nick Privitello and John Kaiser were going to

16   participate in the buying of the loan and wrapped into

17   Eufora Delaware which we were going to have everybody own

18   their interest directly into Eufora Delaware.

19          And Nick Privitello and John Kaiser were not

20   approved.  Their investment was not recognized.  It was

21   attempted to be returned.  And Sergei and the Volpe Group

22   were the only ones that participated in the buying of the

23   loan.

24   Q.    So this information that was put onto the chart was

25   done to reflect the true facts, the accurate facts in

5383

1    regards to the Capital 3 investors in the Neptune loan?

2    A.    Yes.

3    Q.    Those that were intended and the ones that actually

4    participated?

5    A.    That's correct.

6    Q.    This completes the picture as far as you knew at the

7    time?

8    A.    I think that's the best explanation, yes.

9    Q.    I believe it was touched upon both by the Government

10   and a little bit by Mr. Haley.  And let me ask you, if I

11   may, you were asked whether or not Eufora had turned a

12   profit.  I think that was actually by the Government.  Do

13   you recall that?

14   A.    Yes.

15   Q.    And do you remember at that point in time she showed

16   you tax returns and the tax returns I believe one of the

17   questions was:  There was no profit eventually with regard

18   to the tax returns that were filed between 2002 and 2007;

19   is that right?

20   A.    That is correct.

21   Q.    Well, can you describe the difference between a

22   valuable company and a profitable company?

23   A.    A valuable company has potentially a certain business

24   model or IP, that is very valuable, and has a process of

25   future projections how it is going to make money.  And one

D'Ambrosio - Redirect/LaRusso

5384

1    that is a profitable company is anything that makes a

2    dollar more than they loss or spent.

3    Q.    Would you consider your participation in Eufora, that

4    is, Eufora being a valuable company?

5    A.    Absolutely.

6    Q.    Would you explain why you believe that Eufora was a

7    valuable company?

8    A.    Well, not only me because I was the founder, we had

9    plenty of investors in Eufora Capital III, and prior to

10   that people that were in the industry that basically told

11   us how valuable or what we had it was.  And the group that

12   we raised capital from in order to buy the loan was in the

13   midst of this whole lawsuit and we raised money from very

14   savvy experienced individuals that had a $25 million

15   valuation, based strictly off the patents and what we had

16   protected.

17   Q.    And that value remains today?

18   A.    That's correct.

19   Q.    Give us some examples of valuable companies you may

20   be familiar with?

21   A.    Probably most of the people here would --

22             MS. KOMATIREDDY:  Objection, your Honor.

23             THE COURT:  Yes, we don't need to go into other

24   examples.

25   Q.    You were shown documents and e-mails reflecting that

D'Ambrosio - Redirect/LaRusso

5385

1   you and Mr. Constantine were aware of the discussions

2   going on concerning the Nerguzian loan; is that correct?

3   A.   Yes.

4   Q.   You were shown quite a few e-mails and quite a few

5   documents; is that right?

6   A.   Yes.

7   Q.   Did you have any role or did you and Mr. Constantine

8   have any role in the negotiation of the terms of those

9   loans that were taking place regarding the Nerguzian loan?

10  A.   No, that was C.R. strictly.

11  Q.   So you are not telling this jury that you didn't

12  eventually know about the terms, you say you did not

13  participate in the negotiations of those loans; is that

14  correct?

15  A.   That's correct.  Unfortunately negotiated really bad

16  terms and when we learned of them we had no choice.  We

17  still had to move forward.

18  Q.   You were also asked questions about Mr. Daniel

19  Kennedy and whether he was a member of this board or that

20  board.  But you do remember the Government asking whether

21  or not Mr. Kennedy was a member of Eufora when contacted

22  regarding the $15,000 payment.

23       Do you remember that?

24  A.   Yes.

25  Q.   I believe that was to Carey Rodriguez, do you recall

5386

1   that testimony?

2   A.   Yes.

3   Q.   And the questions being asked of you was a suggestion

4   that Mr. Kennedy was not a member of the board at the time

5   of $15,000?

6   A.   That's correct, he was removed as a member of the

7   board of Eufora AZ.

8   Q.   Was the Government correct on that?

9   A.   Yes.

10   Q.   Can you explain?

11   A.   He was removed from the board during or before the

12   Brent loan and, yes, so he was not a board member of

13   Eufora at that point.

14   Q.   Did he become a member of any other Eufora entity, if

15   you know?  If you need to use the chart I'll put it up

16   here?

17   A.   He was a board member of Eufora Delaware.

18   Q.   So that would be one of the investors that came

19   through the purchase of the Neptune loan that was then

20   converted into equity and became part of Eufora Delaware?

21   A.   Yes.

22   Q.   By the way, you used the term IP.  What does that

23   mean?

24   A.   Intellectual Property.

25   Q.   What does that mean in layman's terms?

5387

1  A.   Trademarks, patents, anything of value that is --

2  value that we can monetize or someone is willing to pay

3  you a certain dollar of amount because you've protected an

4  idea or copyright.

5  Q.   That would be the Eufora patents?

6  A.   Yes.

7  Q.   Now, yesterday you listened to portions of the board

8  meetings on August 21st, correct?  That was the disk that

9  was provided by the Government that you listened to last

10  night?

11  A.   That's correct.

12  Q.   It isn't the whole board meeting?

13  A.   That's correct.

14  Q.   And isn't it a fact that there really was -- withdraw

15  that.

16         Do you recall at that meeting whether there was

17  a vote taken to remove Mr. Gentry as the company's CEO and

18  president at that time?

19  A.   I'm sorry, one more time.

20  Q.   At that meeting do you recall whether there was a

21  vote taken to remove C.R. Gentry as the CEO and president

22  of Eufora?

23  A.   I think the term, yes -- I'm not sure if we removed

24  him.  I think it was more of a leave of absence.

25  Q.   Did Mr. Gentry continue to represent himself as the

5388

1   company's CEO and president after this board meeting on

2   August 21, 2009?

3   A.   Yes.

4   Q.   Can you explain what you mean by that.  Explain your

5   answer?

6   A.   Well, after he was actually fully terminated, we were

7   receiving e-mails and we saw that he was still presenting

8   himself as president and CEO.

9        He was still communicating with our banking

10  partner and he was still talking to other investors

11  representing himself as president and CEO.

12       There was also an e-mail to one of the intended

13  investors that I think is documented saying pending board

14  approval, and his signature says president and CEO.

15  Q.   Are you referring to an e-mail that took place back

16  in 2009, December of 2009, to Mr. Kaiser?

17  A.   I think 2009, yes.

18  Q.   And that was an investment that needed to be approved

19  by the board.

20  A.   Yes.

21  Q.   By the way, did you ever come to learn that

22  Mr. Gentry Friday's analysis of the financial records

23  including ownership percentages were inaccurate?

24  A.   Yes.

25  Q.   Tell us what you knew about what you learned?

D'Ambrosio - Redirect/LaRusso

5389

1    MR. HALEY:  I will object.

2    THE COURT:  Yes, sustained.

3    MR. HALEY:  Thank you.

4  Q.  Do you know if there was any outside audit or

5  auditors asked to look at the books and record of Eufora

6  in regards to the percentage interest of the shareholders?

7  A.  Yes.

8  Q.  Who was that individual?

9  A.  One of the hockey players, I think Sergei Gonchar,

10  ordered an independent audit.

11  Q.  Do you know the individual that he hired to do that?

12  A.  The law firm is Semple, Marchal, I think.  I think

13  there is a couple other names in the accounting firm.

14  Q.  The Government showed you an e-mail talking about I

15  guess this is Mr. Gentry to you and Mr. Constantine,

16  talking about percentages on the shareholder registry?

17    Do you recall this e-mail?  I just turned the

18  page.

19  A.  This is the one that the prosecution just showed me,

20  if this is the same one.  It looks exactly the same.

21  Q.  And to your knowledge and awareness, these

22  percentages by Mr. Gentry, are they accurate?

23  A.  Depending on the time, I know that Tyson Nash owned

24  and finally acknowledged his ownership directly in the

25  company.  I don't know exactly the date that he decided to

D'Ambrosio - Redirect/LaRusso

5390

1   do that.

2   Q.   So what you are saying is that Mr. Nash who you know

3   had a direct interest in Eufora, if it was at this time,

4   he should have been listed in here; is that correct?

5   A.   Yes, looks like that is the only one missing unless

6   you have another page or if I could compare it to the

7   flowchart.  It looks like C.R. is not on there and Tyson

8   Nash.  C.R. is not on the flowchart.

9   Q.   Okay.

10   A.   And Tyson Nash is not on this e-mail.

11   Q.   By the way, there is AZ Eufora Partners listed here.

12   Do you know who the members of AZ Partners were?

13   A.   I couldn't say that I know all the members, no.

14   Q.   Did you come to learn who the members were?

15   A.   Most of the hockey guys, besides the two that wanted

16   to own their interest directly with us.

17   Q.   Who was the second one that wanted to own the

18   interest directly with Eufora?

19   A.   Tyson Nash and Sergei Gonchar.

20   Q.   There was also an examination regarding Mr. Gentry's

21   2.5 percent interest in the company.

22        Do you recall that?

23   A.   That is correct.

24   Q.   And there was an e-mail or other documentation shown

25   to you where you approved an increase in his percentage

D'Ambrosio - Redirect/LaRusso

5391

1   interest in Eufora?

2   A.   Yes.

3   Q.   Could you explain how this all came about and what

4   you knew at the time of Mr. Gentry's interest in Eufora?

5   A.   At the time I thought that he was taking a certain

6   percentage from Tommy's shares --

7   Q.   I'm sorry.  I missed a word.

8   A.   At the time I thought that he mentioned that Tommy

9   was willing to give him a small percentage and --

10  Q.   From his own --

11  A.   From his.  And I elected to give some of mine until

12  we realized that he was taking those percentages from all

13  of the investors.

14  Q.   You talked about, I believe, the fact that he had

15  taken for himself an interest because of sweat equity; is

16  that correct?

17  A.   Yes, that's what he claimed.  Yes.

18  Q.   Would you tell us about that, please?

19  A.   Because I guess we couldn't afford to pay him a

20  salary that he was requesting, he was going to subsidize

21  his salary for interest.

22  Q.   You were shown the operating agreement where he had a

23  2.5 percent interest.  Do you recall that?

24  A.   Yeah, again I was told that Tommy was willing to give

25  him some of his shares and he kind of forced me into

5392

1  electing to give some of my shares.

2  Q.   You didn't question it that the time?

3  A.   I did not.

4  Q.   By the way, in regards to DishZero, is

5  Mr. Constantine a member of DishZero directly?

6  A.   No.

7  Q.   Do you know how Mr. Gonchar holds his interest in

8  DishZero.  You said he owned a 50 percent interest.  Do

9  you know how he owns that?

10  A.   They started an LLC, DishZero Partners.

11  Q.   Who is "they"?

12  A.   Tommy and Sergei.

13  Q.   So both Mr. Gonchar and Mr. Constantine had an

14  interest in DishZero which was your company, correct?

15  A.   Yes.

16  Q.   And they held it through the holding company you just

17  described?

18  A.   Yes.

19        MR. LARUSSO:  Your Honor, just one moment, if I

20  may.

21        Your Honor, I apologize to the Court, but you

22  may remember he wanted to play a little bit more of the

23  tape.  I need to kind of cue it up and it will take a few

24  minutes.  May we take a shortened lunch break?

25        THE COURT:  That's it?

D'Ambrosio - Redirect/LaRusso

5393

1              MR. LARUSSO:  Yes.

2              THE COURT:  We'll break until 2 o'clock.

3              MR. LARUSSO:  Judge, one other thing, and I

4      apologize.

5              THE COURT:  We'll do it after lunch.

6              (Whereupon, at this time the jury exits the

7      courtroom.)

8              MR. LARUSSO:  Thank you, your Honor.

9              THE COURT:  If everybody will be seated.

10             My understanding of aiding and abetting with

11     respect to the Sag Harbor, although it says section 2 of

12     the indictment, my hearing of the evidence and the

13     testimony, the Government is not alleging any aiding and

14     abetting, that was just Mr. Kenner.  Is that accurate?

15             MS. KOMATIREDDY:  That is accurate, your Honor,

16     I think we wanted an aiding and abetting theory applies to

17     Count 2 through 6.

18             THE COURT:  Just pull section 2 out of Count 7

19     and 8.  I don't want the jury to be confused in case they

20     notice that.

21             MS. KOMATIREDDY:  Yes.

22             One last thing.  I would ask for a copy of the

23     clips the defense intends to introduce.

24             THE COURT:  Do you have those cued up?

25             MR. LARUSSO:  We have the whole recording.  We

D'Ambrosio - Redirect/LaRusso

5394

1    would have them listen to it and identify.

2              MR. OLIVERAS:  I'll be able to give it to them

3    shortly.

4              THE COURT:  Does the Government have a copy of

5    the transcript.

6              MR. OLIVERAS:  Part of my problem is I just

7    realized part of my transcript is partially wrong, so I

8    want to fix it first.

9              MR. LARUSSO:  He did it last night in haste,

10   Judge, so --

11             THE COURT:  Thank you.

12             (Whereupon, a recess was taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25

D'Ambrosio - Redirect/Mr. LaRusso

5395

 1              A F T E R N O O N   S E S S I O N

 2                        2:15 PM

 3

 4         (The following ensued in the presence of the

 5    jury.)

 6

 7    **MARK D'AMBROSIO**

 8         called by the Defense, having been previously

 9         duly sworn/affirmed, continued testifying as

10         follows:

11              MR. LaRUSSO:  May I, your Honor.

12              THE COURT:  Yes.

13

14    REDIRECT EXAMINATION (Continued)

15    BY MR. LaRUSSO:

16    Q.   Mr. D'Ambrosio, you talked on cross-examination about

17    value loads?

18    A.   Yes.

19    Q.   Quickly, what is a value load?

20    A.   Value load is a load of funds that is loaded onto a

21    prepaid card or prepaid cards.  In particular, an account

22    and subaccounts.

23    Q.   When you mention subaccount, what is a subaccount?

24    A.   One company, one individual could have family

25    members, employees, multiple individuals or subaccounts

D'Ambrosio - Redirect/Mr. LaRusso

5396

1    under a main account.

2    Q.    Are you aware of the subaccounts that Mr. Constantine

3    had on his Eufora prepaid card?

4    A.    Yes.

5    Q.    What subaccounts do you recall?

6    A.    You recall he had the Falcon, the airplane mechanics,

7    pilots, landscaping.  I know that at one point ran cards

8    for expenses for the racing program, employees, company

9    expenses, people that worked for us.

10   Q.    So the subaccount can be both business and personal?

11   A.    Yes.

12   Q.    How were these prepaid cards loaded?  Where does the

13   money come from?

14   A.    It can be loaded in cash.  It could be loaded by

15   wire.  It could be loaded with an ACH cashier's check.

16   Q.    By whom?  Who does that?

17   A.    Anyone could actually.  You could load to someone

18   else's account if you wanted to.  So you just tell us what

19   account want to load it to and we load it to that account.

20   Q.    So the money going into there could be both personal

21   monies belonging to an individual, and the company's

22   money.  Is that correct?

23   A.    Yes.

24   Q.    I think you were asked questions regarding the

25   valuing loads and whether or not those value loads for

D'Ambrosio - Redirect/Mr. LaRusso

5397

1    Mr. Constantine were used for his personal use.

2            Do you recall that testimony?

3    A.    Yes.

4    Q.    And you testified I guess in sum and substance that

5    Mr. Constantine made certain deposits and then hit value

6    loads using his own money.  Is that right?

7    A.    Yes.

8    Q.    All right.  May I just show you, and this is in

9    evidence as C 249, I've taken out of C249, your Honor, I

10   didn't but somebody pulled out of C249 separately a marked

11   receipt 249A.

12           Actually, I could do it from here since they are

13   in evidence, judge.

14           These are checks from Mr. Constantine's personal

15   account to Bank of America.  The first is March 7, '08.

16   This is again the Exhibit C249A.  And it says down in the

17   memo section deposit value load.

18           Do you see that?

19   A.    Yes.

20   Q.    That would be an example of an individual using his

21   own checking account to fund the cards.  Is that right?

22   A.    Yes.  His account and/or other cards that are

23   subaccounts of his account.

24   Q.    And I am just going to show you another couple of

25   examples.

D'Ambrosio - Redirect/Mr. LaRusso

5398

1          March 12, 2008.  $2,000 from Mr. Constantine's

2     account.  It says value load in the memo section.

3          June 3, 2008, $5,000.  It says value load as

4     well?

5     A.   Yes.

6     Q.   Is that correct?

7     A.   Yes.

8     Q.   January 21, '07, $5,000, looks likes BL expense.  Do

9     you see that?

10    A.   Yes.

11    Q.   March 7, '08, deposit value load in the memo section

12    $4,000.

13          March 12, 2008, 200 value load again in the memo

14    section?

15    A.   Yes.

16    Q.   And lastly, there is a June 3, 2008, check, $5,000,

17    again value load in the memo section.  Correct?

18    A.   Yes?

19    Q.   So these are examples that, you would agree with me,

20    show how an individual such as Mr. Constantine put his

21    personal fund into Eufora for personal expenses on the

22    value load card?

23    A.   That's one way.  He could also wire funds in.

24    Q.   And that was used quite frequently, was it not?

25    A.   Yes.

D'Ambrosio - Redirect/Mr. LaRusso

5399

1   Q.    And there are other ways.

2   A.    There are electronic checks, data checks, cash and

3   wires.

4   Q.    Okay.  I'm going to show you -- I will leave it in

5   the sleeves -- 4745 through 4754.  And 4758 and 4759.

6         Do you remember being shown those on your

7   cross-examination?

8   A.    Yes.

9   Q.    And can you describe those checks to us.

10  A.    Yes.

11  Q.    Are you able to tell us about these?

12  A.    So to the best of my knowledge, the three for $5,500

13  was the salary I was getting paid after the Nerguzian

14  loan.  And these remainder amounts, you can see in the

15  memo one card, which was my company credit card, for

16  Eufora.

17  Q.    What exhibit number are you referring to?

18  A.    The 4747.

19  Q.    Go ahead.

20  A.    So these were repayment of expenses that I charged on

21  my card that the company needed to reimburse me.

22  Q.    The others?

23  A.    That is the only reason.  These are either short term

24  loans or reimbursing me for company expenses.  The three

25  $5,500 was salary.

D'Ambrosio - Redirect/Mr. LaRusso

5400

1   Q.   Thank you.

2            Let me show you what is a disk.  It has written

3   on it 8/21/2009 Eufora Board Managers Telephone Meeting.

4            Did you have a chance to listen to that?

5   A.   Yes.

6   Q.   Is this the entire board meeting on that day?

7   A.   Yes.  27, yes.

8   Q.   And let me show you what has been marked for

9   identification as C327T and 328T.  Are those two

10  transcripts of portions of the shareholders meeting that

11  took place on August 21, 2009?

12  A.   Yes, sir.

13  Q.   We have had a chance to review these transcripts with

14  the content of the shareholders' meeting tape, and they

15  are fair and accurate representations of what appears on

16  that tape of those portions.  Is that right?

17  A.   Yes.

18  Q.   I notice that there are highlighted portions on these

19  transcripts.  Do they reflect anything?

20  A.   Yes.  In particular here, it is --

21  Q.   By here you are referring to Exhibit 237T?

22  A.   Right.  On this particular transcript it says that --

23  Q.   Well, don't tell us what it says.

24            Was that there on the portion played to you

25  during the cross-examination?

D'Ambrosio - Redirect/Mr. LaRusso

5401

1   A.   No.

2   Q.   The highlighted portion you are recall was not on the

3   portion played.  Is that correct?

4   A.   Only on the full version.

5   Q.   And then on the second transcript C328T, likewise the

6   highlighted portion you don't recall being on the clips

7   that were played to you during cross-examination?

8   A.   Yes.  The prosecution did not play this is on the

9   full disk here.

10          MR. LaRUSSO:  May I ask that the entire tape

11   marked 8/21/2009 be received and these two transcripts,

12   which are C327T and 328T, be received as aids to the jury.

13          MS. KOMATIREDDY:  Given our discussions at

14   lunch, we have no objection to the transcripts and those

15   clips being played.  We haven't received a transcript so

16   we can't -- we object to the entire tape.  We have to look

17   at it.

18          MR. LaRUSSO:  We are not playing the entire

19   tape.  We are just playing selected portions.

20   Mr. Oliveras is going to queue up those portions.

21          THE COURT:  Are you admitting the entire tape or

22   are you just admitting a portion of the clips?

23          MR. LaRUSSO:  I was going to introduce it all,

24   judge, but if there is an objection and the court wants, I

25   will redact out later the portions that we are going to

D'Ambrosio - Redirect/Mr. LaRusso

5402

1    play to match up to these transcripts.

2              THE COURT:  Okay.  So only the portions that are

3    played are admitted.

4              MR. LaRUSSO:  Okay.

5              MR. HALEY:  No objection.  Judge.

6              THE COURT:  So the additional -- have they been

7    isolated?

8              MR. OLIVERAS:  On this.  On a separate file.

9              THE COURT:  Why don't we give that a number.

10             MR. OLIVERAS:  We have agreed to 327 and 328.

11             THE COURT:  Separate audio files C327 and C328

12   are admitted.  And the transcripts are admitted as an aid

13   with the same instruction I gave you regarding

14   transcripts.

15             (Defense Exhibits C327 and C328, and C327T and

16   C328T in evidence.)

17             THE COURT:  Go ahead.

18             (Audio played.)

19             MR. LaRUSSO:  Your Honor, the second is an

20   expanded clips 5 and 6.  But before we play it, I should

21   note that there is portions of the text that is marked out

22   by the two stars.  That would be Mr. Gaarn's remarks.

23             We did not separately attribute it to him but

24   when you see the two stars and the phrasings in it, that

25   is Mr. Gaarn.

5403

1           THE COURT:  Okay.

2           (Audio playing.)

3           (Audio stopped.)

4           MR. LaRUSSO:  Thank you, your Honor.  No further

5  questions.

6           THE COURT:  Recross?

7           MS. KOMATIREDDY:  No.

8           MR. HALEY:  Can I have a few questions?

9

10  RECROSS-EXAMINATION

11  BY MR. HALEY:

12  Q.   Sir, on that tape, is that Timothy Gaarn?

13  A.   Yes, sir.

14  Q.   Was there more than one Timothy Gaarn to your

15  knowledge that had an association with Eufora?

16  A.   Not to my knowledge.  No.

17           MR. HALEY:  Thank you.

18           THE COURT:  You can step down.  Thank you.

19           (The witness was excused.)

20

21           MR. LaRUSSO:  May I call Jeff Foster at this,

22  time, your Honor?

23           THE COURT:  Yes.

24

25  **JEFF FOSTER**

5404

1      called by the Defense, having been first duly

2      sworn/affirmed, was examined and testified as

3      follows:

4

5  DIRECT EXAMINATION

6  BY MR. LaRUSSO:

7  Q.   Mr. Foster, what is your occupation?

8  A.   I am in the financial service business.  I have three

9  financial services companies.

10      I can elaborate if you would like me to.

11  Q.   Would you just describe those three companies for us,

12  briefly.

13  A.   The first company is called Pay Ventures.  And we

14  acquire and process credit card transactions on behalf of

15  our customers.

16      The second is called Pay Teller, and we run

17  financial services kiosks for a couple of different

18  verticals.

19      And the third is called Card Platform.  We are a

20  prepaid credit card issuer.

21  Q.   Are you involved with any other business issues, such

22  as cash management?

23  A.   No.

24  Q.   Could you just briefly describe your work history.

25  A.   Well when I graduated college I got into the

5405

1    construction business.  I was in that for the better part

2    of a decade.

3          In 1998 I started my first payment software

4    company, called Payment Plus.

5          In 2002 we sold that company to a British public

6    company called Retail Decisions and I went the work for

7    Retail Decisions.  I ran sales, marketing, PR and client

8    services for North and South America and Asia for them up

9    until the end of 2006.

10         And I left and started Pay Ventures which is one

11   of three companies that I continue to run.  I'm CEO of Pay

12   Ventures and Card Platforms.  I'm just on the board of Pay

13   Teller.

14   Q.   Other those three companies that you mentioned, are

15   you involved in any other business ventures?

16   A.   Well, I'm an active investor in a number of them but

17   nothing that I have anything to do with from a management

18   perspective.

19   Q.   Would you just describe a little bit more what Card

20   Platform is.

21   A.   Sure.  So a prepaid debit card issuer is basically,

22   at a high level we are owners and operators of programs.

23   Our particular brand is mostly payroll cards.

24         So a prepaid card is essentially kind of a

25   checkless checking account, if you will.  The vast

5406

1    majority of prepaid card holders are what we refer to as

2    the underbank or the unbank.

3           So like in our particular case, people generally

4    get one of our cards when they sign up to go to work for

5    one of our companies.  Applebee's is an example of one of

6    our customers.  You go in to take a job as a dish washer

7    or a waiter, or whatever it is, and as you are filling out

8    your paperwork, when get to the part where you are filling

9    out your direct-deposit information, if you don't have a

10   bank account and you can't give them your bank account and

11   routing number, then they issue you one of our cards and

12   they make a direct deposit to that card.

13   Q.   Do you know a person by the name of Tommy

14   Constantine?

15   A.   Yes.

16   Q.   Do you see him here in court today?

17   A.   Yes.  He's right there.

18          MR. LaRUSSO:  Indicating the defendant

19   Mr. Constantine -- your Honor.

20          MR. MISKIEWICZ:  No objection.

21          MR. HALEY:  Identification conceded.

22          THE COURT:  Identification is conceded.

23   BY MR. LaRUSSO:

24   Q.   Could you tell us how you met Mr. Constantine.

25   A.   It was kind of a circuitous introduction.  I was

5407

1   talking with one of my partners and investors, a guy by

2   the name of Craig Davis, about how I was really looking

3   for a product that would help to legitimately repair

4   credit scores of, you know, my prospective customers we

5   weren't issuing at the time.

6          And somehow or other he started having a

7   conversation about it with a guy named Dominic Volpe who I

8   also knew who both Craig and I did business with at a

9   company called Allied Wallet.  And Dominic's brother,

10  cousin or something had something to do so with Eufora.

11         And Dominic set up a call and I met Tommy over

12  the phone.  And kind of the big trade show for the

13  payments business is called the Electronic Transactions

14  Association Annual Conference, and that conference

15  happened to be coming up like within the next week or so

16  and I was going.  It was in San Diego.  And Tommy came and

17  met me there.  That was the first time I met him in

18  person, which was maybe a week or two after the first time

19  I met him over the phone.

20  Q.   Do you recall approximately when this occurred?

21  A.   Spring of 2011.

22  Q.   Did you continue your discussions with

23  Mr. Constantine?

24  A.   Yes.

25  Q.   Can you tell us what the nature of those discussions

Foster - Direct/Mr. LaRusso

5408

1   were, please.

2   A.    Well.  They were kind of all over the map.  We, you

3   know, really wanted the four products, you know, for our

4   arsenal of products within --

5   Q.    Could you explain to the jury why you were interested

6   in the Eufora products and what they were.

7   A.    So there's two values to us as a program manager, and

8   I think there may be more to the actual consumer.  But the

9   first was that you can deliver real value to the card

10  holder.

11          Everything in the prepaid card business is about

12  retention, keeping your customers.  The lifetime value of

13  your average prepaid card you probably know, Netspan or

14  Greendot, companies like that, Rushcard, for example, the

15  average lifetime value of one of those cards, depending

16  upon what their monthly revenue is, is somewhere in the

17  neighborhood of three or four months, which is as long as

18  they generally keep a customer.

19          The more value you provide to the customer, the

20  longer you can keep them.  So, number one, if you can

21  deliver real, real credit repair, not the stuff that like

22  the scams over the internet things, but if you can really

23  deliver an increased credit score to somebody, obviously

24  they are going to be interested in keeping that card.

25          But the Eufora product was really another

Foster - Direct/Mr. LaRusso

5409

1    generation of that altogether.  What Eufora is is

2    essentially they take the annual or the monthly fee that

3    you charge for a card.  Let's just call it $10.  I can't

4    recall exactly what we were going to charge.  Let's call

5    it $10.  And you do a two year contract with the customer

6    when you issue them the card.

7              So you say:  All right.  Well, here is a $240

8    contract for me to improve your credit.  $240 plus, let's

9    say, 15 percent interest.  And then they sign the

10   contract, you issue them the card, and then they have to

11   load at least as much on that card as you are charging for

12   the fee.  And then you report to the bureaus that they

13   have got this loan that is performing.

14   Q.   Is that the credit bureau?

15   A.   Yes.

16             So I don't know which two, but out of tree

17   credit bureaus, I believe that Eufora was integrated with

18   two of them.

19             So it does two things.  Number one, it really

20   improves the credit.

21             Experian, TransUnion, and the rest of these guys

22   have all determined a long time ago that paying your

23   electricity bill or water bill has absolutely nothing to

24   do with creditworthiness.  It doesn't have anything to do

25   with the likelihood that you are going to repay a loan.

Foster - Direct/Mr. LaRusso

5410

1   So the only way you have you have to improve somebody's

2   credit is by actually giving them a loan and having it

3   paid off.  So that is what the product did.

4           So in addition to delivering real value in terms

5   of raising the credit score, it was also a two-year

6   contract.  So, you know, the lifetime value of these

7   cards, to my understanding, when he was issuing them, in

8   the first place was like 17 months.  I mean, it was a huge

9   multiple of the normal general-purpose reloadable lifetime

10  value.

11  Q.  So from your point of view and your company, you saw

12  the value in Eufora.  Is that correct?

13  A.  Yes.  Absolutely.

14  Q.  Would you tell us just the nature of your discussions

15  with Mr. Constantine.

16  A.  So we had, you know, of course we wanted to be the

17  exclusive issuer of the Eufora card.  You know, you might

18  as well go for whatever you can get.  He wasn't interested

19  in allowing us to do that.  He was having a number of

20  conversations with other large prepaid companies, and he

21  was also dealing with some attorneys that were interested

22  in the intellectual property around the products, and so

23  forth.

24          So in the end, we signed a deal, memorandum of

25  understanding, sometime in 2013 whereby as soon as I was

5411

1   able to get bank approval for the program, Eufora would

2   buy 10,000 cards from us and we would sell them and manage

3   the program, do the customer service, and all the rest of

4   that stuff.

5   Q.   Were you able to find any funding for the project

6   that you were hoping to enter into?

7   A.   Well, it wasn't funding.  In the prepaid business,

8   you have a sponsor bank and what we have to do, the only

9   thing that they have to do really, is just approve the

10  issuance of that card.

11          And we took it to two banks and neither of them

12  would approve it.

13  Q.   Do you know why?

14  A.   No.

15  Q.   Did your relationship continue with Mr. Constantine

16  or did it come to an end?

17  A.   No.  We were continuing to look for new banks, you

18  know, and then he got arrested.

19  Q.   And that ceased the discussions.  Is that correct?

20  A.   For now.  Yes.

21  Q.   What do you mean *for now*?

22  A.   Well, I mean, we would still be interested in doing

23  business with him.  Obviously, we couldn't under these

24  circumstances.

25  Q.   I'm just going to show you a number of documents.

Foster - Direct/Mr. LaRusso

5412

1  The first is marked C313.  And I have marked a separate

2  document, which contains much of what is in that but it is

3  a redacted version, marked C313R.

4           Have you seen them before today?

5  A.   I saw it today.  I can't remember the last time I saw

6  it.  Probably 2011.

7  Q.   And maybe we will do them all so we can try and move

8  this along.

9  A.   Sure.

10 Q.   C317.  C318, marked separately as 318A.  And lastly,

11 C320.

12          Do you recognize these documents?

13 A.   Yes.

14 Q.   Would you tell us what they are.

15 A.   So C313 looks to be some follow-up correspondence

16 just after the first in-person meeting that Tommy and I

17 had in California regarding the program and some of the

18 offers that I made him, some of which he seems not to have

19 liked very much.

20 Q.   This is an email that you recognize --

21 A.   Yes.

22 Q.   -- containing correspondence between you and

23 Mr. Constantine --

24 A.   Yes.

25 Q.   -- regarding the business discussions?

Foster - Direct/Mr. LaRusso

5413

1   A.   Yes.

2   Q.   Would you continue.

3   A.   So 317 is -- so we got a signed contract with a

4   brokerage to do a card, and they were very interested in

5   adding Eufora as a product to their card after we

6   explained it to them.

7   Q.   This email relates to that?

8   A.   Yes.

9        318 is an email from our chief operating

10  officer, who is also our general counsel, with basically

11  it looks like he's attached this memorandum of

12  understanding, 318A, which is essentially the signed deal

13  that we did with Eufora.  It looks like it is dated

14  September 17, 2013.

15       C320 is our standard program management

16  agreement that we were hoping that we would be able to get

17  signed by Eufora but we weren't able to.

18       MR. LaRUSSO:  Your Honor, may I ask that C313R,

19  317, 318, 318A, and 320 be received at this time.

20       MR. MISKIEWICZ:  May we approach?

21       THE COURT:  Yes.

22       (Continued on the following page.)

23

24

25

Foster - Direct/Mr. LaRusso

5414

1                    (Discussion at sidebar ensued as follows.)

2                    (Continued on the following page.)

Foster - Direct/Mr. LaRusso

5415

1      (The following occurred at sidebar.)

2      MR. MISKIEWICZ:  Two sorts of objections.

3      First is 313.  We were provided an unredacted

4  version of 313R.  313, the only portion redacted is the

5  portion in which Mr. Constantine is basically saying he is

6  going to get the hockey players out of Eufora.  And I

7  don't understand why that redaction is there.  We would

8  ask that for completeness, that it be omitted, in an

9  unredacted fashion.

10      THE COURT:  What is the other objection?

11      MR. MISKIEWICZ:  The other objection is the

12  e-mail of 2013, just on relevance.  And also, well, just

13  on relevance, and the fallout under the exception at that

14  point really can't go to Mr. Constantine's state of mind

15  regarding -- that's all.

16      MR. LaRUSSO:  Can I just explain that this is a

17  hostile group.  This isn't the hockey players.  This is

18  the minority of people.  And, you know, Mr. Kenner being

19  part of the group.  That is why we redacted it, Judge.

20      MR. MISKIEWICZ:  We know that the hockey players

21  were part of the group but -- and also I think it's

22  unfair.

23      THE COURT:  One second.

24      (There was a pause in the proceedings.)

25      THE COURT:  Because the way Mr. Kenner is

5416

1    characterizing the redacted version, I don't want that to

2    come in.  If you want to question him regarding what is in

3    that without making reference to that, in other words, ask

4    whether or not whether they were discussing buying out the

5    hockey players, I'll let you question him on that.  And

6    ask him if he wants to refresh his recollection without

7    referencing anything about Mr. Kenner's behavior.  Okay.

8              MR. HALEY:  Thank you, Judge.

9              THE COURT:  And I overrule the other objection.

10             I would sustain the objection except my

11   recollection on the issue of relevance, my recollection is

12   the Government at various times suggested that Eufora

13   never had any value at any time, and Mr. Constantine in

14   the deposition transcript comes off.  So I think that the

15   Government has opened the door.  And I'm thinking they're

16   correct that it would otherwise be irrelevant to the

17   charges.

18             MS. KOMATIREDDY:  Just a distinction between

19   value and profitable.  I just want to put that distinction

20   on --

21             MR. HALEY:  I try not to be asleep at the

22   switch, but is there any other e-mail that I have to worry

23   about with some redaction?

24             MS. KOMATIREDDY:  No.

25             MR. LaRUSSO:  Your Honor, just for the record,

Foster - Direct/Mr. LaRusso

5417

1    I'm not going to be displaying any more.  I'm not going to

2    display it, so it Mr. Haley will have an opportunity to

3    look at it, okay?

4              (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Foster - Direct/Mr. LaRusso

5418

1    (The following occurred in open court.)

2    THE COURT:  Those exhibits are admitted.

3    (Defense Exhibits received in evidence.)

4    MR. LaRUSSO:  Just a coupe of more questions, if

5  I may.

6  BY MR. LaRUSSO:

7  Q.   You are the CEO of a prepaid credit card company.

8       Is that correct?

9  A.   That's correct.

10 Q.   Do you, yourself, have prepaid cards?

11 A.   Sure, yeah.

12 Q.   Do you load those cards?

13 A.   I don't physically load them myself but I have people

14 in the office who load them, yes.

15 Q.   And how is that done?

16 A.   I call either my head issuer, or my CFO, and I just

17 tell them, load $1,000 or $5,000 or whatever it is that I

18 want, and they load it.  It only takes a few seconds.

19 Q.   And the money that is used to load those cards, where

20 does that come from?

21 A.   Most of it is company money.

22 Q.   Why is company money used in regards to paying those

23 expenses?

24 A.   Well, yeah, I mean in some cases it's, you know, I'm

25 paying restaurant bills or hotel bills that are at

Foster - Cross/Mr. Miskiewicz

5419

1   conferences or things like that.  And in some cases it's,

2   you know, it's my personal use.  I mean, we account for

3   everything.  So it doesn't really -- I mean, we have, we

4   have dozens and dozens of people who have cards and they

5   get loaded all the time.  That is what we do.

6   Q.   But you take care of your own personal expenses.

7        Is that correct?

8   A.   Yes, in the end.  I mean, we quarterly or something

9   like that, we move money around.

10  Q.   But the expenses of the business, that money comes

11  from the investors?

12  A.   Oh, absolutely, yes.  Well, if it's a customer, we

13  make money too.

14        MR. LaRUSSO:  All right.  No further questions.

15        THE COURT:  All right.  Any cross?

16  CROSS-EXAMINATION

17  BY MR. MISKIEWICZ:

18  Q.   Good afternoon, Mr. Foster.  My name is Jim

19  Miskiewicz.  I'm one of the prosecutors in this case.

20        Just a few questions.

21        With respect to what is now in evidence as

22  Constantine's C313R.

23  A.   I don't have my copies.

24  Q.   Do you have a copy?

25  A.   I don't.

Foster - Cross/Mr. Miskiewicz

5420

1    Q.   I'll put it on the screen.

2         This was an exchange of e-mails between you and

3    Mr. Constantine, correct?

4    A.   Yes, it is.

5    Q.   And my question to you is, this is, starts on the

6    prior page.

7         Tommy Constantine wrote, beginning, *Gentlemen*.

8    And it goes onto the next page, my question is about the

9    next page.

10        It says, *We are debt free and fully funded and*

11   *have a highly capable management team that lives and*

12   *breathes the product and an international law firm*

13   *representing our patent efforts including enforcement.*

14        Can you read that, I know it's kind of --

15   A.   Yes, I can read it.

16   Q.   Okay.  You saw that?

17   A.   Yes.

18   Q.   Did I read it correctly?

19   A.   Yes, you seem to have.

20   Q.   In or about that time were you told that

21   Mr. D'Ambrosio actually was owed $1.3 million by Eufora?

22   A.   No, I wouldn't have.  I mean, we wouldn't have

23   engaged in any of those.  I certainly wouldn't have asked

24   him that or anything about that.

25   Q.   But did you know that -- I take it that nobody told

Foster - Cross/Mr. Miskiewicz

5421

1   you that?

2   A.   Nobody told me.

3   Q.   Did Mr. Constantine tell you that he owed, he was

4   owed $1.5 million by Eufora?

5   A.   I don't recall.

6   Q.   Would you agree that debt free means zero, being as

7   in the company didn't owe anybody any money?

8   A.   You know, it's a difficult question to answer.  I

9   mean, my company owes me probably $2 million.  I don't

10  think its on the balance sheet.

11  Q.   Okay.  My question is, nobody told you about the $2.8

12  million owed --

13  A.   That's correct.  No, that's correct.

14  Q.   Let me complete the sentence so the reporter can get

15  it.

16  A.   I'm sorry.

17  Q.   Nobody told you about the approximately $2.8 million

18  owed to Mr. D'Ambrosio and Mr. Constantine at or about

19  this time?

20  A.   No.

21  Q.   And also the last question, sir, did, at or about

22  this time, 2011, did Mr. Constantine tell you that he was

23  attempting to exit out or remove minority shareholders in

24  the form of hockey players who previously invested in

25  Eufora?

Foster - Cross/Mr. Miskiewicz

5422

1   A.   So I don't know what the time frames were.  He and I

2   definitely had conversations about some of his investors

3   who he was, who he was managing out of the organization or

4   something along those lines.  I became aware at some point

5   that there was a dispute between he and some of his

6   investors, yes.  But I don't know exactly when.

7   Q.   And when you say, managing out, you mean getting

8   those investors out of Eufora?

9   A.   You know, I don't, I couldn't say exactly how.  I

10  mean, that's my own vernacular.  I couldn't say exactly

11  what the conversation was.  I just remember him explaining

12  to me there was a dispute with some of the these guys and

13  that he was -- and that they were getting out somehow or

14  another, or they were leaving themselves, or he was

15  getting them out.  Something along those lines, but they

16  were separating.

17  Q.   I'm going to show you a document and ask if this

18  refreshes your recollection that it was on or about this

19  same day that he was telling you that he was trying to

20  exit the hockey player investors.

21       MR. MISKIEWICZ:  And I'm sorry, I'm just going

22  to call this Foster 1, your Honor.

23  BY MR. MISKIEWICZ:

24  Q.   I'm showing you what has been marked as Foster 1 --

25  I'm sorry, is this Foster?

Foster - Cross/Mr. Miskiewicz

5423

1    A.    Yes, it's Foster.

2    Q.    Got it.

3          I'm going to ask you if you can read that

4    paragraph and then I'll have a question.  Please don't

5    read it aloud.

6          Mr. Foster, is that --

7          MR. LaRUSSO:  May I just have a sidebar briefly

8    on this?

9          (The following occurred at sidebar.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Foster - Cross/Mr. Miskiewicz

5424

1          MR. LaRUSSO:  I'm a little concerned that he may

2    mention something about the crooked advisor.  I have no

3    objection, Judge.  If you read it, you know, safe for,

4    whatever, leave that out.  As long as we know he's talking

5    about the group of minority people and adversarial.

6    That's all I'm concerned about as long as it's --

7          THE COURT:  Just include it.

8          MR. MISKIEWICZ:  Yes, Judge.

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Foster - Redirect/Mr. LaRusso

5425

1          (The following occurred in open court.)

2     BY MR. MISKIEWICZ:

3     Q.   Sir, have you read that portion of Foster 1?

4          Does that refresh your recollection on or about

5     that date, that is May 12, 2011, Mr. Constantine told you

6     that he was attempting to exit a group of minority

7     shareholders out of his company?

8     A.   Yes.

9     Q.   Thank you very much.

10          MR. MISKIEWICZ:  No further questions.

11          MR. HALEY:  I have no questions, Judge.

12     REDIRECT EXAMINATION

13     BY MR. LaRUSSO:

14     Q.   Our agreement was -- let me just complete the

15     statement, if I may.

16          Does this refresh your recollection that, quote,

17     at this point Mr. Constantine is telling you, our only

18     need for investment at this point is for the purposes of

19     attempting to exit a group of minority shareholders that

20     have become -- that is my words -- have become

21     adversarial, correct?

22     A.   Yes.

23     Q.   And this is at May 13, 2011.

24          Is that right?

25     A.   Yes, that is the date on it.  Yes.

Semple - Direct/Mr. LaRusso

5426

1  Q.   Were you aware that there had been a suit filed prior

2  to this e-mail by a group looking to take over Eufora?

3  A.   You know, I think he references something in there

4  about it, but I don't recall knowing it.  And I don't

5  remember it now.

6            MR. LaRUSSO:  No further questions.

7            THE COURT:  You can step down.

8            Next witness, Mr. LaRusso.

9            MR. LaRUSSO:  Mr. Constantine at this time calls

10  Robert Semple.

11  **ROBERT MICHAEL SEMPLE**

12         called as a witness, having been first duly sworn,

13         was examined and testified as follows:

14            THE COURT:  Please state your name and spell

15  your last name for the record.

16            THE WITNESS:  Robert Michael Semple,

17  S-E-M-P-L-E.

18            THE COURT:  And you have to just keep your voice

19  up and speak into the mic, okay?

20            Thank you.

21            MR. LaRUSSO:  Thank you, your Honor.

22  DIRECT EXAMINATION

23  BY MR. LaRUSSO:

24  Q.   Good afternoon, Mr. Semple.

25  A.   Good afternoon.

Semple - Direct/Mr. LaRusso

5427

1  Q.   Where do you presently reside?

2  A.   Phoenix, Arizona.

3  Q.   How long have you resided in Phoenix, Arizona?

4  A.   For 34 years.

5  Q.   And prior to becoming a resident of Phoenix, Arizona

6  where did you live?

7  A.   Cleveland, Ohio.

8  Q.   They didn't do too well in the playoffs, did they?

9  A.   What?

10  Q.   They didn't do well in the playoffs.

11  A.   No.

12  Q.   Are you married?

13  A.   Yes, I am.

14  Q.   How many children do you have?

15  A.   I have four children.

16  Q.   Can you tell us how you are presently employed or

17  what is your occupation?

18  A.   I'm a certified public accountant and the managing

19  partner, founding partner of the firm Semple, Marchal &

20  Cooper.

21       I told him I was going to be trouble for you.  I

22  apologize.

23       Semple, Marchal & Cooper.

24  Q.   You're a partner in that firm?

25  A.   Yes, I am.

Semple - Direct/Mr. LaRusso

5428

1    Q.    How long have you been a partner in that firm?

2    A.    I was a founding partner, so 32 years, 33 years.

3    Q.    How many employees do you have?

4    A.    Approximately 40.

5    Q.    And what do you do in the firm?

6    A.    I'm the managing partner.  I also head up the

7    litigation support practice group.

8    Q.    Can you describe what kind of work and type of

9    clients you have?

10   A.    The firm is primarily an audit practice, and we work

11   with small and big market public companies.  That's

12   probably half our practice.

13   Q.    Can you describe your work history and your

14   employment?

15   A.    I was the controller for a law firm from 19 -- I

16   think '75, '76 when I was finishing my education.

17           I went into public accounting in 1978, I

18   believe.  I became certified in 1979.  And I moved to

19   Phoenix, Arizona in 1981.

20   Q.    When you say certified, what does that mean?

21   A.    I became a certified public accountant.  I passed the

22   exam.  I put in my two years of experience.

23   Q.    You mentioned the, public accounting.  What is the

24   difference between public accounting and let's say

25   forensic accounting?

Semple - Direct/Mr. LaRusso

5429

1    A.    Public accounting is where we hold ourselves out as

2    certified public accountants.  We're available to

3    businesses who retain us to do audits, reviews, tax

4    returns, etcetera.  We also do litigation support and

5    forensic accounting.

6    Q.    What is forensic accounting?  Give us an idea of what

7    that is?

8    A.    Forensic accounting is really investigative

9    accounting.  It's where we are hired to look at a set of

10   facts, review financial transactions and provide opinions,

11   oftentimes provide opinions on the results of our reviews

12   of the transactions.

13   Q.    Did there come a time when you either worked for or

14   were in an adversarial position with a company called

15   Resolution Trust Company?

16   A.    Yes.

17         The Resolution Trust Company was formed, I

18   believe in 1988 by the congress.  And it -- worked with a

19   lot of real estate developers, contractors.  And we were

20   adverse to the RTC for a number of years, two or three

21   years.  And then we were also retained by the RTC, their

22   investigation -- cross county for the --

23   Q.    What was the purpose of the creation of the

24   Resolution Trust Company?

25   A.    Basically to take over troubled assets from savings

Semple - Direct/Mr. LaRusso

5430

1  and loans to liquidate those assets for the taxpayers, and

2  you know, put money back in the system.

3  Q.   Is the Resolution Trust Company a federally funded

4  program?

5  A.   Yes.  It was formed by congress.

6  Q.   And you say that you and your firm were hired by the

7  Resolution Trust Company?

8  A.   Yes.  Resolution Trust Corporation.

9  Q.   Resolution Trust Corporation.

10       Who did you work with and what kind of work did

11  you do for them?

12  A.   I did investigative and foreign accounting.  I worked

13  under David Notsinger and Julia Roberts (ph) who are both

14  FBI agents who were assigned to the RTC investigative

15  division.

16  Q.   What was your relation with the FBI in regards to

17  your duties with the Resolution Trust Company?

18  A.   Basically because of the fact that we did forensic

19  accounting and we knew our way around town, or we knew

20  most of the players in the market, we were retained by

21  them to assist them in doing forensic reviews of loan

22  transactions primarily.

23  Q.   Loan transactions that might have been under

24  investigation?

25  A.   Yes.

Semple - Direct/Mr. LaRusso

5431

1   Q.    Did you have occasion at that time to testify in

2   federal proceedings regarding the accounting work that you

3   performed for the Resolution Trust Company?

4   A.    Most of our work was done in federal bankruptcy.

5   Q.    In any of those proceedings were you qualified as an

6   expert in the area of forensic accounting?

7   A.    Yes.

8   Q.    At this time approximately how many times?

9   A.    You mean just with the, during that time period?

10  Q.    Let's take it all the way to the present.

11         How many times have you qualified as an expert

12  in either federal courts or state courts?

13  A.    About a copy of hundred times.

14  Q.    And does that include both civil and criminal cases?

15  A.    Yes.

16  Q.    Does it also include state cases?

17  A.    Yes.

18  Q.    What was your most recent federal case where you were

19  qualified as an exert?

20  A.    It was a murder for hire case.  We did forensic

21  accounting on a nine and-a-half year payout to an

22  individual hired by a woman to have her husband executed,

23  killed.

24  Q.    And you testified as an expert in regards to the work

25  that you performed.

Semple - Direct/Mr. LaRusso

5432

1    Is that correct?

2    A.   We testified against both the hit man originally, and

3    then against the wife about a year and-a-half ago.

4    Q.   I'm going ask you if you ever heard of a term or an

5    entity known as on and account known as the Global

6    Settlement Fund?

7    A.   Yes.

8    Q.   When did you first hear about it and from whom did

9    you hear about it?

10   A.   I think I initially heard about it during the time

11   that I ways retained by Dennis Wilenchik.

12        Dennis Wilenchik was an attorney hired by Eufora

13   in defense of a lawsuit that they were involved in.

14   Q.   Tell us how it came about that you heard about the

15   Global Settlement Fund?

16   A.   I think I heard about it during the time that we were

17   performing services, because there was money that came out

18   of the Global Settlement Fund into a company by the name

19   of Eufora that we were reviewing.

20   Q.   Did there come a point in time where you were asked

21   to speak with an attorney by the name of Robert Lane and a

22   client of his by the name of Sergei Gonchar?

23   A.   Yes.

24   Q.   Tell us how that came about.

25   A.   I received a call from Robert Lane.  And he asked me

Semple - Direct/Mr. LaRusso

5433

1   if I would be interested in taking on a forensic

2   engagement on behalf of one of his clients, Sergei

3   Gonchar, who had put money into the Global Settlement

4   Fund.

5   Q.   What did you do after he had made you aware of that

6   information?

7   A.   I talked to Sergei Gonchar to find out what it was he

8   was looking for me to do.  And he said he put a

9   substantial amount of money in, and he wanted information

10  on work, how the money was used.  And make sure that it

11  was used for its intended purpose.

12  Q.   Was this a telephone conversation or an in-person

13  conversation with Mr. Gonchar?

14  A.   The initial conference was a telephone conferences.

15  Q.   Did Mr. Gonchar explain anything about his

16  involvement with the Global Settlement Fund?

17  A.   At that time, not so much.  He didn't really tell me

18  much.

19  Q.   Did you agree to be retained by Mr. Gonchar with

20  regards to his request?

21  A.   By his attorney Robert Lane, yes.

22  Q.   What happens next?

23  A.   I received certain accountings from the Global

24  Settlement Fund.  The Global Settlement funds had flowed

25  through an attorney/client trust account for an individual

Semple - Direct/Mr. LaRusso

5434

1   by the name of Ron Richards.  And he was a California

2   attorney.  And we received an accounting analysis from,

3   that he had prepared along with Mr. Kenner.

4          I received another one that he had prepared

5   himself.  And then I received one that had been prepared

6   from, by the accountants at Eufora.

7   Q.   Let me just identify when you say, he also prepared.

8          What did you mean by that?  You said there was

9   an accounting by Mr. Richards and then there was an

10  accounting --

11  A.   Yes.  One prepared by Mr. Richards and Mr. Kenner

12  together.  One was prepared by Mr. Richards himself.  And

13  one that was prepared by the accountants at Eufora.

14  Q.   And after receiving those documents, what did you --

15  by the way, just to clarify the record.

16         You had people working for you at the time.  Is

17  that correct?

18  A.   Yes.

19  Q.   And they were assisting you in this task?

20  A.   Yes.

21  Q.   You were the supervisor of the project that we're now

22  talking about?

23  A.   Yes.

24  Q.   What happened after you received those three

25  accountings?

5435

1   A.   You know we compared the three financial analysis

2   schedules that we were given.  We prepared one that we

3   felt was a combined schedule that included the running

4   totals from Ron Richards' schedule, and then the detail

5   from the Kenner-Richards schedule.

6          And then we used that information and we

7   actually tested from there.

8   Q.   Did you prepare any documents from those three

9   accountings?

10  A.   We received documents from Mr. Constantine, certain

11  documents were given to us that we requested on the

12  deposits that were made into the account.  And then we

13  asked for detail on certain transactions.  We asked for

14  invoices, cancelled checks, other information from

15  Mr. Richards.

16  Q.   I'm going show what you has been marked for

17  identification as C283.

18         You have seen this document before, have you

19  not?

20  A.   Yes.  I believe this is several pages.

21  Q.   And do those work papers -- for the record, the work

22  papers have Bates stamps down at the bottom.  SMC 00001

23  through and including the same letters and zeros, 45.

24         Is that correct?

25  A.   Yes.

5436

1    Q.   For purposes of the following question if you need to

2    refer to any documents in there, I may ask you to just

3    refer to the page set of numbers so that later on if

4    somebody wants to follow it, they can by looking at the

5    exhibits and the numbers we talked about.

6             You mentioned that you were given three

7    accounts.  Are they contained in the work papers?

8             You know what?  Tell us the numbers, the SMC

9    numbers for those documents?

10   A.   The first accounting schedules are SMC 005 through

11   008.

12   Q.   And who are those received from?

13   A.   They are the ones that were prepared by Mr. Richards

14   and Mr. Kenner.

15   Q.   Okay.

16   A.   We then we received a second set, and it's 010 and

17   011.

18   Q.   Who were those received from?

19   A.   From Ron Richards..

20   Q.   Okay.

21   A.   The third one was 012, and that was prepared by me

22   and -- with the accounting staff at Eufora.

23   Q.   What did you do after you and the people who worked

24   under you do with those after those three accounts were

25   received?

Semple - Direct/Mr. LaRusso

5437

1    A.    We compared the three, looked for similarities or for

2    differences in the three.  And then we prepared a single

3    schedule which incorporated the detail from the

4    Richards-Kenner schedule, and then the running totals from

5    the Ron Richards schedules at 010.

6    Q.    Let me show you what is received in evidence as

7    Government Exhibit 767.

8          Do you recognize this?

9    A.    Yes.

10          This is the schedule that combines the

11   information from the two schedules that I just talked

12   about.

13   Q.    And who prepared that?

14   A.    I believe it was prepared by somebody in my office.

15   Q.    Did there come a point in time when you received

16   additional information regarding the authorization for the

17   expenditures out of Mr. Richards' trust account.

18          Do you understand the question?

19   A.    Yes.

20   Q.    Please.

21   A.    Yes.

22   Q.    And what did you receive and from whom did you

23   receive it?

24   A.    We received a series of e-mails which are contained

25   in our work papers, I think 013 through -- I'm looking at

5438

1   the detail, 013 through 031 appear to be copies of the

2   e-mails that we received.

3   Q.   And what do those documents purport to be?

4   A.   Basically confirmation by the players on the

5   contributions that they were making to the Global

6   Settlement Fund and various -- uses for those funds.

7   Q.   And were those e-mails reviewed by you and/or members

8   of your staff?

9   A.   Yes.

10  Q.   After reviewing the documents and after you had

11  prepared the schedule which is 767, what did you do then?

12  A.   I contacted Ron Richards and requested certain

13  information; copies of the bills for the insurance fees

14  that were paid, etcetera.

15  Q.   Did you receive any?

16  A.   No.

17  Q.   Did Mr. Richards offer you any explanation why?

18  A.   Yes.

19       He felt that they would violate attorney-client

20  privileges.  And I respected that.

21  Q.   After you had spoken with Mr. Richards, what did you

22  then do?

23  A.   I contacted Mr. Lane and told him that we had kind of

24  hit a brick wall.  We were able to obtain certain

25  information, but other information we were not able to

5439

1   verify.

2          And he recommended that we have a telephone

3   conference with Sergei Gonchar and discuss the results of

4   our findings today, and ask for, decide how he wanted us

5   to proceed.

6   Q.   Before we get to the conversation with Mr. Gonchar,

7   did you perform an analysis of the disbursements out of

8   the Ron Richards' account?

9   A.   Yes.

10  Q.   And what did you actually do?  Explain to the jury

11  how you went about your analysis and examination.

12          By the way, let me withdraw that question.

13          Did you do a forensic audit in regards to the

14  request by Mr. Gonchar?

15  A.   No.

16  Q.   What did you do?

17  A.   We did a forensic review of procedures that we were

18  in the process of doing.  It wasn't a litigation issue

19  because there was not ongoing litigation.  But he wanted

20  us to review certain things.

21          And so our initial assessment was determining

22  what information they could provide to us, what

23  information we could obtain from Mr. Richards or other

24  third parties, and then sit down with the client and say,

25  Look, this is how we recommend we go forward with this

5440

1    issue.

2    Q.   What is the difference between forensic audit and a

3    forensic review?

4    A.   A forensic audit, generally we go out and confirm

5    with third parties, you know, banks and what have you,

6    receipt of funds.

7            A forensic review is basically just a review and

8    analysis of information that is provided to us by third

9    parties.

10   Q.   Is a forensic review an acceptable accounting

11   procedure?

12   A.   It's really referred to as part an agreed upon

13   procedure of engagement, yes.  Whatever the client agrees

14   that you can do, whatever you agree is the procedures that

15   you're going to perform.  It's referred to as an agreed

16   upon procedures agreement.

17   Q.   Did you perform an analysis of the expenditures out

18   of the Ron Richards' account?

19   A.   We did an initial review of some of the expenses,

20   yes.

21   Q.   Using 767.  Can you tell us what kind of review you

22   did with regards to expenditures from the Ron Richards

23   account.

24   A.   Many of the expenses already had notes.  And so what

25   we did was make inquiry in regard to the notes, and use of

Semple - Direct/Mr. LaRusso

5441

1    the funds.

2            For example, James Gardina, says Avalon

3    building.  Intrigue investment.  And we traced that money

4    into a Security Title Agency's account.  Which then was

5    returned out on May 12th of '09.

6            We looked at $300,00 from Security Title.  And

7    again it related to the Avalon building.  That money again

8    came back to Security Title, $300,000 on 5/12.  So that

9    money was in and out.

10           The next one we did was $500,000 --  with

11   Mr. Constantine's approval.  I contacted him and asked him

12   to explain to me what purpose those funds were for.

13   Q.   And what did he tell you?

14   A.   He told me that they --

15           MS. KOMATIREDDY:  Objection, your Honor.

16   Objection.

17           THE COURT:  Why don't we take a break and I'll

18   discuss this with the attorneys.

19           We'll take a break.

20           (The jury left the courtroom.)

21           THE WITNESS:  Your Honor, should I leave the

22   courtroom?

23           THE COURT:  Yes.

24           (Pause)

25           Mr. LaRusso, I don't know exactly whether you're

5442

1    going to go through each entry and say --

2              MR. LaRUSSO:  No, I wasn't, judge.

3          What I was doing was taking a select group of

4    them and move through.  And then he will then give the

5    results of his findings for Mr. Gonchar.  I was not

6    intending to go through everyone.  There are some that we

7    have to go through because they highlight the course of

8    the trial.

9              THE COURT:  It's one thing for him to testify,

10   you know I looked at this transaction to see where the

11   money came from, where it came from and where it went out.

12   That is obviously how he reviewed the documents.

13         But to the extent that he is going to be

14   testifying to what other people told him, if these aren't

15   people who were testifying at trial -- obviously

16   Mr. Gonchar has testified -- I'm not concerned about him,

17   whatever Mr. Gonchar said during the trial, and

18   assumptions for purposes of this review.  But this, I

19   don't even know what his --

20             MS. KOMATIREDDY:  That's actually, your Honor --

21   Mr. Nussbaum was going to be a government witness.  And

22   the defense stipulated.  They didn't want him to fly out.

23   They wanted us to stipulate.  So we wrote up a

24   stipulation.  We read that stipulation into evidence that

25   it was -- instability concerning Mr. Nussbaum's records,

5443

1    so bare bones.  There were two expenditures, what they

2    were for.  That is how the stipulation reads.  If there is

3    more coming -- we had him on a flight.  We cancelled the

4    flight.

5              THE COURT:  Is that what he is going to say

6    about what Mr. Nussbaum told you, or you don't know.

7              MR. LaRUSSO:  He is going to say it related to

8    the airport.  No, we don't need to elicit that.  I'm not

9    going to get into a dispute here.  But there are others

10   that he dealt with documents --

11             THE COURT:  Not assuming, fine.  But again, and

12   if someone testified, I don't mind he had an assumption.

13   But if he is going to be trying to say well this is what

14   he told me, obviously he can't do that.  All right.

15             MR. LaRUSSO:  I spoke to him about this.  So

16   I'll do it during the break just to make sure he

17   understands.  We had gone through this already, your

18   Honor.

19             MS. KOMATIREDDY:  Along those lines, your Honor,

20   I know he testified on direct they reviewed a number of

21   e-mails.  Does it include e-mails from players who did not

22   testify here?  Many of I think a couple of others.  So an

23   analysis based on the whole bunch, it is certainly not all

24   evidence.  Seems to be a summary witness which is fine if

25   it's summarizing evidence.  But --

5444

1      THE COURT:  Are they e-mails of the hockey

2   players would didn't testify or are they e-mails in

3   evidence?

4      MS. KOMATIREDDY:  They are not all in evidence,

5   your Honor.  I can go through them.

6      MR. LaRUSSO:  Mr. Kenner actually identified

7   every one of them.  I just didn't offer them into

8   evidence.  I'll do that now.

9      I'm sorry for interrupting.  If the Court will

10  remember, I went through each one of them and he

11  identified them.

12      But for the record, I didn't ask they be

13  introduced, those particulars ones.

14      THE COURT:  You didn't offer them?

15      MR. LaRUSSO:  I have been looking through and I

16  didn't find it.  But again I have been doing so many

17  different things I really don't know.  I was going to

18  offer them separately.  I may have offered them through

19  the number, but I haven't found it in the record yet to be

20  able to verify.

21      But I think, if the Court recalls there was a

22  foundation for it through Mr. Kenner's testimony.  That I

23  do remember.

24      THE COURT:  I don't remember you taking the

25  whole group of e-mails as a group and showing it to him,

5445

1    and he acknowledging them.  And that's the same group

2    that --

3               MR. LaRUSSO:  That is the same group.

4               MS. KOMATIREDDY:  It is the same group, your

5    Honor.  And I'm just checking Mr. Kenner's testimony and

6    if you want to --

7               MR. LaRUSSO:  Yes.  If you want to show them to

8    me?

9               MS. KOMATIREDDY:  We can do this on the break,

10   your Honor.  We don't have to take the Court's time.

11              (A recess was taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5446

```
 1            THE COURT:  Please be seated.

 2    Just review the schedule where we think we are.  How long

 3    will you be on direct?

 4            MR. LARUSSO:  Probably the rest of the day.  I

 5    have one short witness coming in tomorrow, Mr. Kennedy,

 6    and that's my case.

 7            THE COURT:  The Government has a rebuttal case

 8    or no rebuttal?

 9            MR. MISKIEWICZ:  We possibly have one rebuttal

10    witness, Robert Crisalli, the forensic computer expert who

11    testified once before.  We couldn't ask him about the Home

12    Depot tape.

13            THE COURT:  So it will be short.

14            MR. MISKIEWICZ:  Short, five minutes.

15            THE COURT:  As far as a rough estimate on each

16    of your summations.

17            MR. MISKIEWICZ:  I was talking with Mr. Haley

18    about it.  I anticipate my summation being two hours,

19    possibly two and a half.  It will not go all day.  I think

20    I'll fall asleep if it goes longer than that.

21            MR. HALEY:  I don't envision, your Honor, the

22    same thing with Mr. Miskiewicz.  A couple hours.  I don't

23    envision a five-hour summation on my part.

24            THE COURT:  Why don't we say this, because we

25    have to have the charge conference too.  We can post the
```

5447

```
1    charge tonight and have the charge conference during the

2    lunch break or first thing in the morning.  Maybe during

3    the lunch break because you'll not be done today.

4              MR. HALEY:  I can suggest a joint request for

5    your consideration.  Obviously when the case gets finished

6    with Mr. LaRusso, the Government puts on its rebuttal, we

7    have the charge conference, assuming your Honor consents,

8    Mr. Miskiewicz has his summations the first thing Thursday

9    morning and I then follow with my summation thereafter.

10   Does that meets with the Court's schedule?

11             THE COURT:  And then Mr. LaRusso goes on Monday.

12             MR. LARUSSO:  And you leave me at the end of the

13   day on Thursday.  That would be great, Judge, because I'll

14   start working on my summation -- I'm only kidding, Judge.

15             THE COURT:  My thinking, the Government tomorrow

16   afternoon and then you and Mr. LaRusso and hopefully the

17   rebuttal on Thursday and hopefully charge them on Monday

18   morning, that was my hope.

19             I don't like to break up the summations over the

20   weekend if I can avoid it.

21             MR. HALEY:  It's okay with me.

22             MR. MISKIEWICZ:  So in other words I would sum

23   up tomorrow afternoon.  I would ask for the opportunity to

24   do it first thing Thursday morning.

25             THE COURT:  I don't think -- we'll not let
```

5448

1    Mr. LaRusso go on Thursday then.  So it would be you,

2    Mr. Haley and Mr. Haley on Monday morning and rebuttal.

3            MR. MISKIEWICZ:  I understand.  There's no good

4    or bad way of doing it.  I would ask, I would prefer to

5    have the additional evening to work on slides, PowerPoint

6    slides that would accompany the summation and do it

7    Thursday morning rather than tomorrow and then I know

8    Mr. LaRusso will go on Monday.

9            THE COURT:  Do you prefer that?

10           MR. LARUSSO:  I would prefer that.

11           THE COURT:  Do you prefer that?

12           MR. HALEY:  I prefer them not have enough

13   time --

14           THE COURT:  So we'll do it that way.  So the

15   jury will get the case -- the charge will take a half day.

16   I would be able to do my charge on Monday.

17           MR. MISKIEWICZ:  There hasn't been a discussion

18   about a Rule 29 argument.  I don't know what the sense of

19   that will be.

20           THE COURT:  What I'll do obviously state the

21   grounds for Rule 29 but I'll reserve under the rule and

22   submit the case to the jury.  In a case like this I would

23   like full briefing with a cite to the transcript.  You can

24   state the ground and supplemental authority later.

25           MR. HALEY:  My Rule 29, Judge, will probably be

Semple - Direct/LaRusso

5449

1  very focused on one particular count, it has to deal with

2  the allegation regarding Tim Gaarn being a co-conspirator.

3           THE COURT:  All right.  Bring in the jury.

4           MR. LARUSSO:  While they are being brought in, I

5  don't remember if the Court remembers, we've been trying

6  to get Mr. DeVries in and it's still a no.  We've been

7  working through his lawyer and if he does come I guarantee

8  you, with me it's only about 20 minutes, dealing with one

9  aspect of the case.

10          The Court may remember Mr. Kaiser testified in

11 Mr. Constantine's presence he made calls to some hockey

12 players and tried to divide them out at 50 cents on the

13 dollar.  Mr. DeVries will testify that never happened

14 and so we would get him in just for that purpose, Judge.

15          THE COURT:  Given our revised schedule we would

16 have plenty of time tomorrow.

17          MR. LARUSSO:  If he comes in.

18          MR. HALEY:  I have great faith in the Canadian

19 Mounted Police, Judge.

20          THE COURT:  I put them on the stand once while I

21 was a prosecutor.

22          (Whereupon, the jury at this time enters the

23 courtroom.)

24          THE COURT:  Okay.  Please be seated.

25          MR. LARUSSO:  May I, your Honor?

Semple - Direct/LaRusso

5450

1       Thank you.

2   Q.   Mr. Semple, let me back up.  We talked about the

3   e-mails from the hockey players.  You had an opportunity

4   to review them; is that correct?

5   A.   Yes.

6   Q.   Before you began your analysis?

7   A.   Yes.

8   Q.   And those e-mails spelled out the parameters of the

9   lawful use of the moneys in the Ron Richards trust

10  account?

11  A.   Yes.

12  Q.   You were talking about the May 12, 2009, Mr. Nussbaum

13  and Gillis, and you said you knew Mr. Gillis and Mr.

14  Nussbaum, you spoke with him and there was an objection.

15  Just so that you understand, if you do speak to anybody in

16  reference to any of these, you can tell us that you spoke

17  to whomever that may be but in reference to what was said

18  to you regarding that, I would ask you not to.  But if you

19  were given documents or directed to documents, you could

20  do that.  All right?

21  A.   I understand.

22  Q.   Could you again tell us what you did in reference to

23  your analysis of the expenditures in the Ron Richards

24  account and take it from the time you were talking about

25  with Mr. Nussbaum?

5451

1    A.    I'll take it from there.  I just called Randy

2    Nussbaum to inquire about the use of the funds, was

3    provided access to a forbearance agreement with Steve

4    Hilton.  Steve was the lender on the building, and --

5    Q.    What building was that?

6    A.    Pardon?

7    Q.    Was that the Avalon hangers?

8    A.    The Avalon building, yes.  That's all I was looking

9    for in the firm.

10          Going through, again, most of the attorney fees

11   I did not have documentation for.  Another attorney I did

12   call, Steve Silver who is a friend of mine just to discuss

13   with him the receipt of funds from the Global Settlement

14   Fund.

15          I really kind of looked at some of the major

16   sponsors like the Edenholm Motor Sports, the purchase I

17   discussed on 4/14 which was provided to Mr. Juneau as part

18   of his settlement.  A payment to Aerospace Reports and

19   Cabin Crafters related to the Falcon 10, the Metro

20   aircraft.  Those were the aircraft that they had owned in

21   conjunction with their investment with Mr. Jowdy in

22   Mexico.

23   Q.    Are you familiar with that Falcon 10?

24   A.    Yes.

25   Q.    Could you tell us what you know from your review

5452

1    and/or document analysis?

2    A.    Well, the 1st Source Bank was a lender, they

3    determined there was a deficiency.  All the planes were

4    sold, including the Metro.  The Falcon 10 was the last

5    aircraft that had not been sold.

6          What the bank was willing to provide them was

7    credit towards the deficiency was they felt insufficient.

8    And so what they did they actually negotiated with the

9    bank and financed 425,000 for the plane and purchased the

10   plane.  And then they paid 415,000 as part of the

11   settlement of the guaranteed issues.  Those guaranteed

12   issues of for Sergei Gonchar.

13   Q.    In what entity was the ownership of the plane held?

14   A.    In AZ Falcon Partners and it still is today.

15   Q.    Have you ever heard of a company called Falcon 10

16   Partners?

17   A.    Yes.

18   Q.    Are you familiar with that company?

19   A.    Yes, I am, I'm the accountant for that company.

20   Q.    Was the Falcon 10 ever transferred out of AZ Falcon?

21   A.    No.

22   Q.    What happened?

23   A.    AZ Falcon owns the aircraft still but the Falcon 10

24   partners bought the loan from 1st Source Bank and there

25   were transfer documents that were put into escrow, but the

5453

1  plane was actually not transferred because of the claim

2  that the players had in that plane, in the aircraft.  And

3  there was no determination whether there was a loan or

4  whether they would take an interest in the plane or how

5  they would be compensated.

6         So the aircraft to this day was not transferred,

7  the documents are still in escrow and I was concerned

8  about it because I wanted the depreciation to go to the

9  Falcon 10 Partners.

10 Q.   Will you continue?

11 A.   The Newmark, McKess and Rose (ph) those were payments

12 from the Palms units.  They paid on May 12, $45,000 which

13 was three payments.

14        Then they were paying basically 15,000 a month

15 thereafter.  We confirmed that by reviewing the agreement.

16        The JB AZ consultant was 384,000, and that was

17 the payment to Jeff Bailey who was supposed to be the

18 lender on the Avalon building.  He converted it at the

19 closing to be the owner with a buyback option agreement,

20 but that was the payoff between the amount he was willing

21 to finance the loan for pay off and what was served to

22 Steve Hilton.

23 Q.   All right.

24 A.   And then the Neptune company, that was the Eufora

25 loan payoff.  Again, we traced those funds in either into

Semple - Direct/LaRusso

5454

1   escrow or into the Eufora bank accounts.

2   Q.   What entry are you referring to now?

3   A.   There's a $500,000 payment to Neptune and we traced

4   that.  I don't recall as I sit here whether we traced it

5   into the Eufora bank accounts or into escrow but we traced

6   that payment.

7          There is a $250,000 payment same day to Eufora

8   and we traced that in the Eufora bank records.

9          Again, two additional payments, one on 11/6,

10   $250,000 to Eufora and another one on 11/30, $138,000

11   there is to Eufora.

12          We also then traced -- listed on this schedule

13   there was a discrepancy between this schedule and the one

14   prepared by Eufora.  This one lists on 12/7, a payment to

15   AZ Falcon Partners in the amount of $155,000.

16   Q.   Do you know what I can do for a moment, let me take

17   that document and I'll show it to the jury.

18          For the record this is 767.

19          Mr. Semple, you are referring to an entry.  What

20   date and which one so we can be able to follow along with

21   your testimony.  There is a screen to your immediate

22   right?

23   A.   I was going to say you stole my exhibits.

24          I'm referring to the payment on 12/7, 2009, it

25   lists AZ Falcon Partners, $155,000.  And that was not a

5455

1  payment that went through AZ Falcon first.

2  Q.   What did you determine upon an analysis of those

3  entries?

4  A.   Those funds were transferred to Avalon Partners, and

5  it was an improper transfer.  I think on December 7th, the

6  funds did go to Avalon Partners, we actually traced those

7  funds, and on December 9th they were actually paid over to

8  Eufora, which was where they were supposed to go.

9  Q.   Now, again, we highlighted some of the expenditures

10  that you analyzed.  After you completed your review, what

11  did you do?

12  A.   We never really completed our review.

13  Q.   Can you explain?

14  A.   As I said, we kind of hit a brick wall.  I didn't

15  have bank statements, I didn't have canceled checks,

16  didn't have copies of invoices for legal fees or other

17  expenditures.  I believe I was able to get a certain

18  amount of information from Avalon, Eufora and AZ Falcon

19  and I received whatever information I could but I was not

20  able to get a complete accounting for all of these

21  transactions.

22        So again I compared the three sets -- the three

23  analysis that I was provided, looked for discrepancy, sat

24  down and went through those with Sergei's attorney, Bob

25  Lane, and telephonically through Sergei, and we walked

5456

1  through the expenses and my recommendation was that we

2  proceed to make demand for the bank records from Ron

3  Richards, and request from the law firms directly, copies

4  of the bills paid or at least copies of the case captions

5  so we could understand who was being represented and

6  Sergei's comment to me was look, you've done more than I

7  expected.  This is more information that I really thought

8  I was going to get.  I'm very comfortable with what you

9  are giving me and I don't want you to proceed any further

10  with the engagement.

11  Q.   Do you recall any conversations as you were going

12  through each one of these expenditures with Mr. Gonchar on

13  the phone about the authorizations that were given by him

14  to anyone in particular?

15  A.   His comment was that these expenditures was

16  consistent with his intended purpose when he provided

17  money and the other players provided money, he had no

18  issues.

19       One of the concerns I had was the attorney's

20  fees and who the attorney fees were paid for, because

21  there were certain expenditures that were actually noted

22  that were Constantine or Kenner related, and Sergei said

23  look, we don't have a problem with that, we knew they were

24  being paid and it's not an issue.

25  Q.   Do you recall any discussion about any litigation

Semple - Direct/LaRusso

5457

1    costs that might haven been part of the expenditures here?

2    A.    Litigation costs?

3    Q.    Particular litigations.

4    A.    I don't understand the question.

5    Q.    Did you ever here of the Myrick lawsuit?

6    A.    Yes.

7    Q.    Did that come up in any discussion?

8    A.    It was noted on the scheduled I received from

9    Mr. Kenner, a former employee of his and they were very

10   helpful about providing me information and letting me know

11   what expenses were their expenses and what expenses were

12   related to the Global Settlement Fund that took place.

13             (Continued.)

14

15

16

17

18

19

20

21

22

23

24

25

Semple - Direct/Mr. LaRusso

5458

1    DIRECT EXAMINATION (Continued)

2    BY MR. LaRUSSO:

3    Q.    How did you leave off with Mr. Gonchar?

4    A.    Mr. Gonchar said:  Look.  Thank you.  I appreciate

5    it.  Get me a bill.  Not too big but get me a bill.  And I

6    appreciate, you know, you doing the work.

7              And I said:  Look, I mean would you like us to

8    issue a formal report?  And he said no, I don't need a

9    formal report because this is the schedule we gave him how

10   to work from.  He said that's more than what I really

11   need.  This is more than I was expecting.  And I guess I

12   don't really want to spend any more money on it.  So we

13   never issued a formal report.

14   Q.    Do you know, in your conversation with Mr. Gonchar,

15   either at this time or earlier, him telling you

16   specifically they had given anyone permission to utilize

17   the monies that he had contributed to the Global

18   Settlement or to the Ron Richards trust account?

19   A.    Yes.

20   Q.    Where did he tell you this and what did he say?

21   A.    Well, he didn't tell me initially.

22             After I had done the analysis and I told him

23   what my concerns were with the expenditures that were

24   going out, you know, he said look.  You know, my agreement

25   with Tommy was that he had money coming in from the sale

Semple - Direct/Mr. LaRusso

5459

1   of a --

2           MS. KOMATIREDDY:  Objection, your Honor,

3   hearsay.

4   A.    Okay.

5           THE COURT:  I will allow it.  Mr. Gonchar

6   testified so I will allow him to testify.

7           MS. KOMATIREDDY:  Hearsay, your Honor, 804.

8           Testifying as to Mr. Constantine's statements to

9   Mr. Gonchar.  It is not in evidence.

10          THE COURT:  No.  The objection is overruled.  Go

11  ahead.

12  A.    There were two payments that I discussed with

13  Mr. Gonchar.  One was a $75,000 payment that --

14  Q.    On what date?

15  A.    I don't know because you took my schedule.

16  Q.    I'm going to give it back.

17  A.    It is hard enough.

18  Q.    I'm going to give it back to you.

19  A.    I appreciate it.

20          One of the discussions we had was in relation to

21  a $75,000 payment that went to Edenholm Motorsports on

22  June 15.  So Edenholm Motorsports received $75,000, and

23  there was a question mark on that.

24          And then there was a nine-eight, a Northwest

25  Value Partners $124,982 deposit.  And there was no

Semple - Direct/Mr. LaRusso

5460

1    information on that.

2           And I questioned Sergei.  I said we need to look

3    into that.  He said I know what that is.  He said we

4    advanced $75,000 from the Global Settlement to allow a

5    lien to be paid off on the vehicle that Constantine was

6    going to sell, and the money was supposed to come back in.

7    The $124,982 was Mr. Constantine's money.

8           So there was an $50,000 overpayment -- I mean,

9    $50,000 excess in that transaction that was to reimburse a

10   portion of expenses that he paid.

11   Q.   Mr. Gonchar advised you that he had given

12   Mr. Constantine permission to utilize the money that he

13   had deposited for personal reasons.

14          Is that correct?

15   A.   Yes.  That's correct.

16          That was again in our last discussion with his

17   attorney Bob Lane.  It was done telephonically when we

18   reviewed the schedule, this schedule.

19   Q.   Did you ever, did you have any discussion with

20   Mr. Gonchar about sharing your findings, your analysis,

21   with any of the other hockey players?

22   A.   We had not issued a formal report so I asked him to

23   keep it confidential.  He called me probably 90 or 100 or

24   120 days later and says look.  Some of the players are

25   asking to see the document.

Semple - Direct/Mr. LaRusso

5461

1      I said:  Well as long as you tell them this is

2  not our formal report.  We didn't issue a report.  That is

3  just the analysis we prepared.  He says, no, they just

4  asked me questions.  Would you mind talking to them.

5  Q.   Did you speak to any of the hockey players?

6  A.   Yes.

7  Q.   Who did you speak to?

8  A.   I talked to Tyson Nash a couple of times.  I talked

9  to Peca at least once.  And then I talked to a group of

10  prayers on a telephone conference.  And I know there were

11  other people -- there was a conference call and there was

12  lots going on behind the scenes.

13      I was trying to listen carefully.  I had to step

14  out of a restaurant so I could hear the conversation.  But

15  I was walking through this with them.  Unfortunately, at

16  that conference I didn't have this document in front of

17  me, but the other time when I talked to Mr. Nash, I talked

18  to him a couple of times:  Very polite; had a lot of

19  questions, very similar to Sergei's.  His response to me

20  was similar.

21  Q.   Could you summarize for us what you said to him in

22  regard to these expenditures and what if any questions he

23  had regarding it.

24      THE WITNESS:  Am I allowed to talk about my

25  conversations with Mr. Nash?

Semple - Direct/Mr. LaRusso

5462

1    THE COURT:  Yes.

2    THE WITNESS:  Okay.

3  A.   I went through the same process.

4        I told him what money, you know, he was asking

5  about certain expenses that I looked at.  Like, you know,

6  the Edenholm Motorsports.  There was $450,000 payment.  I

7  said that was in general aircraft.  He said:  Oh, right.

8  I remember that now.

9        And so as we went through this, you know, it was

10  kind of jogging his memory and Tyson's.  So we spent some

11  time on phone walking through these expenses.  He was very

12  comfortable at the end.

13        And he actually called me a second time and

14  asked me a few more followup questions.  And my comment to

15  him was, look.  If there is any documents you want,

16  anything you need, you let me know and I'll see if I can

17  get it for you.

18        He said no.  You've answered my questions.  He

19  said, that was really what I needed to know and thank you.

20  Q.   You mentioned a conference call.  Who was the

21  conference call with?

22  A.   Tyson.  Tyson Nash actually scheduled the conference

23  call, I believe.  And there were a number of other players

24  on it.  I don't remember who they all were.

25  Q.   Summarize for us again, what was the nature of this

Semple - Direct/Mr. LaRusso

5463

1    discussion?

2    A.    They wanted to walk through the Global Settlement

3    Fund accounting:  How much went in.  How much money went

4    out.  What was the purpose of some of the expenditures.

5    You know, what my findings were, et cetera.

6    Q.    And you explained to them your findings that the

7    expenses that you analyzed were within the purposes as you

8    understood them.  Is that correct?

9    A.    I didn't make that determination.  My responsibility

10   was to tell them how the expenses were paid, how the money

11   was used.

12           But consistent with all the emails I saw, I

13   didn't see anything that was abnormal, with the exception

14   again of some of the expenditures for attorney fees, which

15   Sergei Gonchar said:  Look, we authorized those.

16   Q.    Did there come a time when you spoke with an

17   Assistant US Attorney in New York and an agent by the name

18   of Galioto?

19           MS. KOMATIREDDY:  May I ask for a brief sidebar?

20           THE COURT:  Yes.

21           (Continued on the following page.)

22

23

24

25

Semple - Direct/Mr. LaRusso

5464

1           (Discussion at sidebar ensued as follows.)

2           MS. KOMATIREDDY:  We have been advised that the

3    witness may testify that an Assistant US Attorney in the

4    Southern District of New York said that there wasn't fraud

5    in this case, didn't see a case here, and we object under

6    402 and 403.

7           We don't think another AUSA or another office's

8    interpretation is something of relevance of the case, what

9    a prosecutor thinks is relevant.  I want to make sure the

10   defendant --

11          MR. LaRUSSO:  I'm not sure I heard everything.

12          THE COURT:  She said he's going to testify to

13   the AUSA in the Southern District's opinion regarding the

14   case.

15          Is that where this is going?

16          MR. LaRUSSO:  No.  There an opinion expressed,

17   and based upon the conversation there was going to be --

18   what he is going to say, judge, is that he shared the

19   information relative to what his findings were; that

20   Mr. Galioto was basically dismissive of him.

21          He said that he was Mr. Constantine's lawyer,

22   and basically anything that he said was not reliable.  He

23   was showing his opinion at that point that whatever the

24   information was being shared he was not interest in.  The

25   assistant said I am.  And then they continued the

Semple - Direct/Mr. LaRusso

5465

1    discussion about the $155,000 where this witness testified

2    that he explained it, Mr. Galioto dismissed it, continued

3    to believe that the money was appropriately sent to AZ

4    Falcon when it wasn't, and it became part of the first

5    indictment.

6           So the point is that this shows that this agent

7    was closed-minded in regard to learning about what the

8    true set of facts were, and ignored them when he was being

9    told what they were and was very critical of this

10   particular person.

11          MR. HALEY:  May I make a suggestion.

12          Your Honor, I know it is your courtroom but

13   perhaps we can dismiss the jury and this argument can be

14   made now in open court.

15          THE COURT:  All right.

16          (Discussion at side bar was concluded.)

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

5466

1           (The following ensued in open court.)

2           THE COURT:  This is going to take more than a

3    minute.

4           It is 4:20 so we are going to stop for the day.

5    Here is what I envision is going to happen tomorrow.  I

6    believe that the presentation of the evidence will be

7    completed somewhere around lunchtime; hopefully, before

8    lunch.

9           What has to happen at that point is that I need

10   to then meet with the lawyers to go over my instructions

11   on the law so I have to spend some time with them, showing

12   them what my instructions are and discussing it.  They are

13   entitled to see my instructions before their summations.

14          So I think, rather than have you hang around in

15   the middle of the day for a couple of hours, I will send

16   you home early tomorrow, with a half day.

17          Then what will happen is, on Thursday morning

18   you will hear, I think each summation is going to be

19   approximately two hours.  So you will hear the

20   government's summation and then Mr. Haley's summation on

21   Thursday, and then Mr. LaRusso's summation on Monday

22   morning.  The government gets what is called a rebuttal

23   summation, no longer than 30 minutes.  And then you will

24   get my instructions on the law.

25          Depending upon what time of day it is on Monday,

5467

1   you may begin your deliberations on Monday or start your

2   deliberations first thing Tuesday morning.

3           Sometimes jurors ask what is the schedule during

4   deliberations.  You continue to show up here.  No hotel

5   room.  And there is no sequestering in federal cases.  So

6   the same schedule as we have during the trial:  9:30 to

7   4:30.

8           The one difference is that during deliberations

9   you get free lunch, supplied by the government.  That is

10  the only difference.  You get to eat lunch in the jury

11  room during deliberations.

12          So that is the schedule.  Don't make plans.  I

13  expect to finish at lunchtime tomorrow.  That is my best

14  guess, but don't make plans so that you can be here in

15  case we go longer.  My hope is somewhere around lunch.

16          Don't read or listen to anything regarding the

17  case.  Have a good night.  Don't discuss the case.  See

18  you tomorrow.

19          (The following ensued in the absence of the jury

20  at 4:25 pm.)

21          THE COURT:  Please be seated.

22          Mr. Semple, tomorrow morning at 9:30.  I know

23  you had to rearrange your vacation.  I apologize for that

24  but we did everything we could.

25          THE WITNESS:  I asked my wife.  She said I

5468

1  thought you were going to be upset.  She said why don't

2  you spend a week there.

3         (Witness leaves courtroom.)

4         THE COURT:  Okay.  To make sure I understand.

5         First of all, anything the AUSA said in that

6  meeting he had with the AUSA is not relevant, it is off

7  limits, it is prejudicial to the extent he said he was

8  opining in the Southern District about the case.  So I

9  just want to make sure he understands that.

10         I don't if you discussed that with him.

11         MR. LaRUSSO:  I did, Judge.

12         Just so I let you know.  The AUSA said there was

13  nothing here.  Later he made some other comment to the

14  lawyer.  He knows not to bring that out.  The only comment

15  that I thought was okay was after the colloquy between

16  Mr. Semple and Mr. Galioto the assistant said I want to

17  hear.  And that is the only comment he made.  And then he

18  explained what further what transpired.  He spent another

19  30 minutes.

20         THE COURT:  On the $155,000 or --

21         MR. LaRUSSO:  No, that was just part of it.

22  That is what led to the disagreement, the $155,000.  I'm

23  not sure I have it in order, Judge, whether it was the

24  $155,000 that Mr. Galioto then responded in regard to

25  Mr. Constantine's lawyer I don't need anything from you,

5469

1    you're not independent and objective.

2           But there was also another part, and I don't

3    know where this came in, Judge, and I apologize, but

4    talking about the hockey players' authorization, and that

5    there were documents to support the expenditures and

6    Mr. Galioto said, in effect, only certain folks would do

7    documentation like that.  And he responds, you know, you

8    complain when they make the document and you complain when

9    they don't makes the document.

10          So there was a tremendous amount of

11   dismissiveness on Mr. Galioto's part in regards to what

12   this witness was supposedly cooperating in providing to

13   the government.  And we are offering that, judge, as I

14   stated at sidebar, to show the state of mind of

15   Mr. Galioto and his failure to properly investigate and to

16   use information that he was told was inaccurate that was

17   actually included in the first indictment, Judge, that $15

18   5,000.

19          MS. KOMATIREDDY:  Judge, under 403, it is not

20   probative of many things.  To the extent that it leads to

21   any argument that Mr. LaRusso wants to make, it once again

22   leads to an argument that has repeatedly been made and

23   ruled inadmissible, the arguing up the first indictment.

24   This $155,000 transaction that they are obsessed with that

25   was specifically pled in the first indictment that we very

5470

1    clearly presented in this case as -- and no side disputes,

2    the chart showing where the money went and what it went

3    for in terms of that $155,000 tracing the money is not

4    probative of anything in the relevant indictment, it is

5    not probative of anything that the jury has to decide, and

6    it is incredibly prejudicial.

7            I would ask that everything that AUSA said not

8    be permitted because an AUSA's opinion from another

9    district, their opinion about basically the credibility7

10   of a witness, not even the underlying facts mis not

11   relevant.

12           And the same goes really for Special Agent

13   Galioto as well.  These are not commentary on the

14   underlying facts.  This is apparently some argument that

15   was allegedly had about this witness' credibility.  The

16   jury can assess the witness's credibility on their own

17   based on the testimony.

18           THE COURT:  Yes.

19           Mr. LaRusso, again independent of this issue of

20   trying to go back to the first indictments and what

21   happened in the first indictment, you said it is probative

22   as to the agent's my mind, but the jury is not being asked

23   to determine the agent's state of mind.

24           MR. LaRUSSO:  Judge, two things.

25           I'm not looking to introduce --

5471

1          THE COURT:  I said apart from that but --

2          MR. LaRUSSO:  Misconduct, judge.

3          THE COURT:  When you said this is relevant to

4    the agent --

5          MR. LaRUSSO:  Misconduct, judge, on the part of

6    the agent, how he conducted his investigation.

7          He was closed minded to the facts and did not

8    want to hear anything, even to the point of --

9          THE COURT:  Let me ask you this.

10         If a defense lawyer calls up an AUSA and says I

11   want to present to you certain information regarding my

12   client's innocence, and the AUSA says to the lawyer we are

13   not interested in that.  We have done a thorough

14   investigation.  We don't think anything you are going to

15   present is going to be reliable, is it your position that

16   you will be able to introduce to the jury that the AUSA

17   was closed minded in that they are refused to consider

18   evidence that you wanted to present to them; that it goes

19   to their state of mind?  Would that be the same argument?

20         MR. LaRUSSO:  I think it is different when you

21   are dealing with an investigator as opposed to an

22   assistant, Judge, because they rely upon the information

23   gathered by the investigators.

24         What I am trying to say, judge, is that

25   Mr. Galioto at this point in time, like you have heard

5472

1    throughout the course of this trial, they didn't pursue

2    leads, they didn't want to pursue the leads; we are

3    arguing that there was misconduct here in terms of

4    ignoring the facts that would have shown that these

5    individuals were not responsible for the crime.

6         Yes, it may be only one incident but it

7    certainly gives us the opportunity to argue the other

8    facets of the case.  When I heard Mr. Josh Wayne say that

9    they didn't even ask Jowdy about the $1.5 million that

10   went to his company, it was mind boggling.  I was really

11   shocked at that point in time.

12        But that is the kind of argument that we are

13   making.  They did not, and we can argue purposely, pursue

14   leads that could lead to information that they didn't want

15   to uncover.

16        Here is a man, an investigator, who is being

17   he's wrong.  That this is not right.  And he is purposely

18   telling him I'm not interested.  He is telling them I'm

19   not interested in knowing what information you uncovered.

20   And he was very dismissive.  And he even continued on it.

21        I'm not looking to introduce it into the factors

22   that became part of the first indictment, but it certainly

23   gives you an indication of what the agent's view of the

24   evidence was.  And if the jury concludes that this is the

25   way he conducted an investigation, that he refused to look

5473

1  at information that would exonerate an individual or is

2  refusing to follow information that could lead to an

3  exoneration or at least the truth, they have a right to

4  know the sloppiness of the investigation.

5          There are lots of cases that talk about the fact

6  that the failure of agents and law enforcement officers to

7  do their investigation properly is something the jurors

8  can use to infer whether or not they did their job in the

9  overall investigation.

10          And we have been, we opened to the jury on it.

11  And I know that is not the reason for introducing the

12  evidence, it still has to be relevant, but at this point

13  in time, Judge, I think the fact that you have an

14  assistant who is interested in reviewing information, that

15  Mr. Galioto was purposely trying to discredit the

16  information that is being provided, to the point where he

17  is ignoring this $155,000, that was wrong.

18          He took that report.  That was the problem.  He

19  took the report that Mr. Kenner and Mr. Richards had

20  prepared and took it as gospel.  He thought that money

21  went to AZ Falcon.  That is why it was in the indictment.

22  And he didn't want to hear from nobody.

23          MS. KOMATIREDDY:  I just want to point out one

24  thing.  Mr. LaRusso's comment actually explains actually

25  why there is a problem.

5474

1          The agent's view, the evidence is not relevant.

2     The government would never be permitted, and the Second

3     Circuit has said the government is not permitted, to put a

4     case agent up and have him testify in opinion format with

5     respect to hearsay on their view of the evidence.

6          So that is opinion testimony the other way

7     around coming in through a third-party witness.  We don't

8     think it is probative of anything and ask that it not be

9     admitted.

10          THE COURT:  I think certainly his state of mind

11     is not probative of anything.  And there is always under

12     403 a risk that a trial becomes about the investigation

13     and not about the evidence that the government has

14     presented.

15          But I think the best way the handle this, I

16     think what I'm going to allow you to do is simply ask him

17     whether or not the agent was receptive to receiving his

18     report of the information.  And he can testify that he

19     declined.  He was not interested.

20          This pull back-and-forth exchange between the

21     AUSA and the agent, and the agent explained why he was not

22     interested, under 403 I'm going the preclude that.

23          If you are trying to show the sloppiness of the

24     investigation, then you can show the sloppiness of the

25     investigation by arguing to the jury:  Look.  He wasn't

5475

1    interested in what I had to present.  He declined to do

2    so.  And that was, quote-unquote, sloppy.

3           But I'm very concerned about this

4    back-and-forth, trying to suggest that the AUSA wants to

5    do one thing and the agent wasn't interested.  That gets

6    into a whole host of issues, a lot of things going on at

7    the time of that investigation, and it really is a side

8    issue in the case.

9           The government's investigation is not on trial

10   here.  The question is whether or not they have proven,

11   with the witnesses they have, and Agent Galioto isn't one

12   of those witnesses, whether or not it was proved beyond a

13   reasonable doubt.

14          And to try to make this, calling it misconduct,

15   I didn't hear that in any description of the case.  And

16   that is why I asked you that question.  That is not

17   misconduct.  You can say whether that is prudent or not.

18   That is not government misconduct.  That is not government

19   misconduct if someone says I want to proffer you

20   information.  It might be good practice to accept whatever

21   information you can get, but it is not, quote-unquote,

22   misconduct as that is defined under the law.

23          So I will allow you to ask him a leading

24   question as to whether or not he offered to present

25   essentially the summary of the information he presented to

5476

1    the jury to Agent Galioto and that Agent Galioto declined

2    that invitation, and then leave it at that.  Okay?

3            MR. LaRUSSO:  Would the court permit at least

4    the opportunity to explain the specific instance of the

5    155,000?  Because that would be I think at least, one,

6    accurate, and, number two, show the jurors what the

7    information, at least in part, was being provided and

8    being ignored.

9            THE COURT:  Well, I guess you can say you were

10   presenting him a summary of what you presented to the

11   jury, yes.

12           And did that include the $155,000?  And his

13   testimony is that he declined that, too.  Right?

14           MR. LaRUSSO:  Yes, he did.

15           THE COURT:  But again, the $155,000 is not one

16   of the counts in the current indictment, so I'm not sure.

17           MS. KOMATIREDDY:  Sorry, your Honor, to clarify.

18   The dispute about the 155,000 is about whether it was AZ

19   Falcon or AZ Avalon.

20           The government's proof, consistent with the

21   defendant's theory, says it went to AZ Avalon.

22           MR. LARUSSO:  The only reason, Judge, the first

23   indictment was the mistake.  The first indictment was

24   completely wrong.  They put the 155,000 into AZF.

25           THE COURT:  I have another matter waiting on the

5477

1  phone.

2          But if you want to say that presentation would

3  have included the $155,000, that is okay.  But beyond that

4  I rule under 403 that any probative value as to the

5  government's investigation would be substantially

6  outweighed by danger of unfair prejudice and having a

7  minitrial about an AUSA and agent in the district and

8  their interaction at a meeting is so far afield as to what

9  is true as to decide the case.

10          So how much longer do you have, do you think,

11  now?

12          MR. LaRUSSO:  I think that was probably the last

13  part I was going to do so I don't think it is going to

14  take too long, Judge.  Mr. Kennedy should be maybe an

15  hour, at most, counting cross.

16          THE COURT:  I'm going to post jury instructions

17  tonight.  There are just a couple of things I want to

18  note.

19          I think obviously the first part are the

20  standard instructions.  A lot of it is from the wire fraud

21  case but there are a couple of things I wanted to

22  highlight.

23          On the money laundering, a peculiar issue that I

24  have been wrestling with how to deal with.  Under the term

25  *proceeds*, the Supreme Court in a case called *Santos*

5478

1    defined proceeds for purpose of the money laundering

2    statute to mean *profits*, not *gross receipts*.  So it won't

3    be what is left over after you paid your expenses.  That

4    that would be what can be capable being laundered.

5              In 2009 Congress responded to that and changed

6    the definition to make clear that proceeds is not profits;

7    that it is gross receipts.

8              However, in this indictment the money laundering

9    conspiracy spans 10 years or so, including that change in

10   the law.  My view is that ex-post facto problem if the

11   government is trying to prove conduct prior to Congress

12   amending the statute, that I should give the definition of

13   proceeds as it was prior to the amendment.  So that is why

14   I just wanted to be clear.

15             The government did not propose a definition of

16   proceeds at all, but that is what I have in there

17   currently.

18             There is also an instruction about the statute

19   of limitations under conspiracy counts, for the reason,

20   because they span 15 years, I explain to the jury they

21   must, for Count One, that the conspiracy continued after

22   October 28, 2008, 28 or 29.  And the same would be true of

23   money laundering.

24             But one thing that occurred to me in particular

25   on the money laundering conspiracy, I essentially wanted

5479

1    to shorten it, I want to tell the jury basically that they

2    have to find that the money laundering conspiracy extended

3    into, I won't tell then the reason, but the effective date

4    of the change in the law in the money laundering, then

5    they are to use the new definition of *proceeds*, which then

6    they can only find him guilty of conduct after that date.

7              Do you understand what I am saying on that?

8              MR. MISKIEWICZ:  Yes.

9              THE COURT:  Other than that, obviously a lot of

10   it is from Judge Sands.  We will talk about it once you

11   have had a chance to read it.

12             MR. LaRUSSO:  I don't know if we have somebody

13   who is going to try to put a letter together, to save

14   time, on Rule 29.

15             So if we can do something tonight, do we have

16   permission to submit it to you?

17             THE COURT:  Yes.

18             MR. LaRUSSO:  I know I won't be able to have the

19   time.

20             THE COURT:  Again, I don't want you to go crazy

21   tonight to get something in.

22             As long as you put the grounds obviously on the

23   record, you can supply us with any commentaries to the

24   transcript, exhibits, cases assuming your client were

25   convicted on any count.

5480

1        MR. LaRUSSO:  Very good.  Thank you.

2        MS. KOMATIREDDY:  We just ask for a 26.2 on

3    Mr. Kennedy.

4        THE COURT:  Anything else on Mr. Kennedy?

5        MR. LaRUSSO:  Judge, I don't know.  I know that

6    there was a discussion between the government and

7    Mr. Semple about other additional material he may have.

8    He said he didn't have it; the lawyer had it, and that is

9    how we left it.

10        I know of no other emails other than what I'm

11    dealing with here, which the documents are about maybe six

12    or seven inches high.

13        MS. KOMATIREDDY:  On Mr. Kennedy?

14        THE COURT:  Oh, Kennedy.  No, I have nothing on

15    Kennedy, your Honor.  Maybe a transfer.  I have the

16    transfer form.  That is all.

17        MS. KOMATIREDDY:  I have what you gave us

18    yesterday.  That's all.

19        MR. LaRUSSO:  I don't have anything as of now.

20        THE COURT:  Just be sure that whatever he is

21    going to testify about, if he has any emails corroborating

22    testimony.

23        MR. LaRUSSO:  I will talk to him tonight, judge,

24    and I will ask him.

25        THE COURT:  Thank you.  See you tomorrow

5481

1    morning.  Have a good night.

2              (Proceedings adjourned at 4:40 pm.)

3

4                   CERTIFICATE OF COURT REPORTER

5    I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
6

7

8                         _____
                          Dominick M. Tursi, CM, CSR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5482

I N D E X

**MARK D'AMBROSIO**                                          5294
CROSS-EXAMINATION (Continued)                               5294
BY MS. KOMATIREDDY
VOIR DIRE EXAMINATION                                       5352
BY MR. LaRUSSO
CROSS-EXAMINATION  (Continued)                             5354
BY MS. KOMATIREDDY
RECROSS EXAMINATION                                         5362
BY MR. HALEY
REDIRECT EXAMINATION.                                       5379
BY MR. LARUSSO
MARK D'AMBROSIO                                             5395
REDIRECT EXAMINATION (Continued)                           5395
BY MR. LaRUSSO
RECROSS-EXAMINATION                                        5403
BY MR. HALEY

**JEFF FOSTER**                                             5403
DIRECT EXAMINATION                                         5404
BY MR. LaRUSSO
CROSS-EXAMINATION                                          5419
BY MR. MISKIEWICZ
REDIRECT EXAMINATION                                       5425
BY MR. LaRUSSO

**ROBERT MICHAEL SEMPLE**                                  5426
DIRECT EXAMINATION                                         5426
BY MR. LaRUSSO

5483

1

**E X H I B I T S**

2

| | |
|---|---|
| Government Exhibit 4780 in evidence | 5297 |
| Government Exhibits 508.1 through 508.9 in evidence | 5301 |
| Government Exhibits 4779 and 4779A in evidence | 5309 |
| Government Exhibits 4778 and 4778A in evidence | 5313 |
| Government Exhibit 210 in evidence | 5315 |
| Government Exhibit MD2 in evidence | 5319 |
| Government Exhibit 266 in evidence | 5321 |
| Government Exhibit 4768 in evidence | 5327 |
| Government Exhibit 4769 in evidence | 5329 |
| Government Exhibit MD2 in evidence | 5332 |
| Government Exhibits 4745 through 4754 in evidence. | 5346 |
| Government Exhibits 4758 through 4760 in evidence. | 5346 |
| Government Exhibits 4738, 4743 in evidence. | 5348 |
| Government Exhibit 4715 through 4722 and 4750 in evidence. | 5353 |
| Government Exhibits 4725 through 4730 in evidence. | 5358 |
| Government Exhibits 4703 and 4705 in evidence. | 5358 |
| Defense Exhibits received in evidence. | 5418 |
| Defendant's Exhibit K-243 was received in evidence | 5378 |
| Defense Exhibits C327 and C328, and C327T and C328T in evidence | 5402 |

## $

**$1,000** [2] - 5344:13, 5418:17
**$10** [2] - 5409:3, 5409:5
**$124,982** [2] - 5459:25, 5460:7
**$130,000** [1] - 5345:11
**$138,000** [1] - 5454:10
**$15** [1] - 5469:17
**$15,000** [3] - 5338:17, 5385:22, 5386:5
**$150,000** [3] - 5324:22, 5325:8, 5338:1
**$155,000** [14] - 5324:15, 5325:5, 5454:15, 5454:25, 5465:1, 5468:20, 5468:22, 5468:24, 5469:24, 5470:3, 5473:17, 5476:12, 5476:15, 5477:3
**$2,000** [1] - 5398:1
**$20,000** [1] - 5355:6
**$240** [2] - 5409:7, 5409:8
**$25** [1] - 5384:14
**$250,000** [2] - 5454:7, 5454:10
**$30,000** [1] - 5344:7
**$300,00** [1] - 5441:6
**$300,000** [1] - 5441:8
**$4,000** [1] - 5398:12
**$45,000** [1] - 5453:12
**$450,000** [1] - 5462:6
**$5,000** [6] - 5324:25, 5325:11, 5398:3, 5398:8, 5398:16, 5418:17
**$5,500** [2] - 5399:12, 5399:25
**$50,000** [2] - 5460:8, 5460:9
**$500,000** [5] - 5314:9, 5441:10, 5454:3
**$53,000** [1] - 5356:4
**$65,000** [1] - 5345:5
**$75,000** [4] - 5459:13, 5459:21, 5459:22, 5460:4
**$8,000** [1] - 5344:17

**'07** [1] - 5398:8
**'08** [2] - 5397:15, 5398:11
**'09** [1] - 5441:5

**'75** [1] - 5428:16
**'76** [1] - 5428:16

## 0

**00001** [1] - 5435:22
**005** [1] - 5436:10
**008** [1] - 5436:11
**010** [2] - 5436:16, 5437:5
**011** [1] - 5436:17
**012** [1] - 5436:21
**013** [2] - 5437:25, 5438:1
**031** [1] - 5438:1

## 1

**1** [3] - 5422:22, 5422:24, 5425:3
**1.3** [2] - 5345:19, 5420:21
**1.5** [3] - 5330:7, 5421:4, 5472:9
**1.67** [1] - 5328:6
**10** [13] - 5291:8, 5312:19, 5320:18, 5323:9, 5323:17, 5451:19, 5451:23, 5452:4, 5452:15, 5452:20, 5452:23, 5453:9, 5478:9
**10,000** [1] - 5411:2
**100** [5] - 5305:22, 5316:22, 5317:6, 5376:13, 5460:23
**11** [1] - 5355:4
**11/30** [1] - 5454:10
**11/6** [1] - 5454:9
**1105** [1] - 5338:7
**11201** [1] - 5291:14
**11722** [1] - 5291:22
**1180** [1] - 5291:21
**11:30** [1] - 5292:23
**12** [9] - 5297:12, 5310:10, 5310:15, 5313:7, 5398:1, 5398:13, 5425:5, 5450:12, 5453:12
**12/21/2009** [1] - 5370:1
**12/7** [2] - 5454:14, 5454:24
**120** [1] - 5460:24
**1214** [1] - 5344:1
**1218** [1] - 5344:25
**12th** [1] - 5441:5
**13** [1] - 5425:23
**13-CR-607** [1] - 5291:3
**1310** [1] - 5325:5

## 15

**15** [6] - 5307:7, 5307:21, 5348:9, 5409:9, 5459:22, 5478:20
**15,000** [1] - 5453:14
**15.5** [2] - 5327:24, 5328:3
**155,000** [3] - 5476:5, 5476:18, 5476:24
**16** [1] - 5315:16
**17** [2] - 5410:8, 5413:14
**19** [1] - 5428:15
**1978** [1] - 5428:17
**1979** [1] - 5428:18
**1981** [1] - 5428:19
**1988** [1] - 5429:18
**1998** [1] - 5405:3
**1st** [2] - 5452:2, 5452:24

## 2

**2** [9] - 5320:21, 5321:9, 5321:18, 5321:22, 5393:2, 5393:11, 5393:17, 5393:18, 5421:9
**2.5** [5] - 5325:18, 5328:7, 5329:13, 5390:21, 5391:23
**2.8** [2] - 5421:11, 5421:17
**20** [2] - 5376:15, 5449:8
**200** [1] - 5398:13
**200-page** [1] - 5312:1
**2002** [8] - 5315:16, 5347:7, 5347:9, 5348:5, 5348:15, 5357:21, 5383:18, 5405:5
**2003** [1] - 5348:9
**2004** [1] - 5355:21
**2006** [2] - 5323:11, 5405:9
**2007** [2] - 5357:21, 5383:18
**2008** [17] - 5303:18, 5307:7, 5307:21, 5310:10, 5310:15, 5320:11, 5323:12, 5331:3, 5350:10, 5354:19, 5354:21, 5355:4, 5398:1, 5398:3, 5398:13, 5398:16, 5478:22
**2009** [40] - 5294:19, 5295:1, 5299:10, 5300:25, 5303:10,

5303:18, 5311:22, 5312:13, 5312:16, 5313:7, 5313:25, 5314:1, 5314:23, 5315:13, 5315:24, 5324:10, 5325:4, 5325:21, 5327:18, 5327:19, 5331:6, 5344:4, 5344:6, 5344:11, 5344:12, 5345:2, 5345:4, 5345:10, 5348:12, 5370:9, 5379:21, 5388:2, 5388:16, 5388:17, 5400:11, 5450:12, 5454:24, 5478:5
**200K** [3] - 5355:8, 5355:12, 5355:16
**2010** [1] - 5297:12
**2011** [5] - 5407:21, 5412:6, 5421:22, 5425:5, 5425:23
**2013** [5] - 5348:4, 5370:15, 5410:25, 5413:14, 5415:12
**2015** [1] - 5291:7
**21** [6] - 5299:10, 5300:25, 5379:21, 5388:2, 5398:8, 5400:11
**210** [7] - 5314:21, 5315:3, 5315:8, 5315:9, 5315:11, 5320:1, 5483:6
**21st** [1] - 5387:8
**228** [1] - 5367:10
**23** [2] - 5315:12, 5315:24
**237T** [1] - 5400:21
**242** [1] - 5369:6
**243** [4] - 5377:23, 5378:14, 5378:17, 5379:3
**249** [1] - 5397:9
**249A** [1] - 5397:11
**26.2** [1] - 5480:2
**265** [2] - 5315:15, 5347:10
**266** [5] - 5321:8, 5321:15, 5321:16, 5323:4, 5483:7
**267** [1] - 5323:5
**27** [1] - 5400:7
**2778** [1] - 5312:3
**2778A** [1] - 5312:3
**2779** [2] - 5307:1, 5307:15
**2779A** [2] - 5307:16, 5310:14

**28** [2] - 5478:22
**29** [5] - 5448:18, 5448:21, 5448:25, 5478:22, 5479:14
**2:15** [1] - 5395:2
**2nd** [2] - 5345:7, 5345:8

## 3

**3** [5] - 5314:23, 5326:24, 5383:1, 5398:3, 5398:16
**30** [4] - 5291:7, 5340:17, 5466:23, 5468:19
**30th** [1] - 5345:11
**313** [2] - 5415:3, 5415:4
**313R** [1] - 5415:4
**317** [2] - 5413:3, 5413:19
**318** [2] - 5413:9, 5413:19
**318A** [3] - 5412:10, 5413:12, 5413:19
**32** [1] - 5428:2
**320** [1] - 5413:19
**327** [1] - 5402:10
**328** [1] - 5402:10
**328T** [2] - 5400:9, 5401:12
**33** [1] - 5428:2
**34** [1] - 5427:4
**37** [1] - 5338:7
**384,000** [1] - 5453:16

## 4

**4** [10] - 5312:13, 5312:16, 5313:24, 5314:1, 5314:6, 5320:12, 5320:25, 5323:12, 5324:5, 5324:6
**4.445** [1] - 5324:10
**4.5** [1] - 5327:18
**4/14** [1] - 5451:17
**40** [2] - 5342:22, 5428:4
**402** [1] - 5464:6
**403** [5] - 5464:6, 5469:19, 5474:12, 5474:22, 5477:4
**415,000** [1] - 5452:10
**425,000** [1] - 5452:9
**43** [1] - 5348:13
**45** [1] - 5435:23
**4703** [4] - 5358:10, 5358:14, 5358:16,

5483:13
**4705** [4] - 5358:10, 5358:14, 5358:16, 5483:13
**4710** [1] - 5348:21
**4715** [6] - 5348:20, 5352:12, 5353:25, 5355:2, 5355:3, 5483:11
**4716** [1] - 5355:11
**4717** [1] - 5355:14
**4718** [1] - 5356:2
**4719** [4] - 5354:5, 5354:21, 5356:2, 5356:3
**4722** [4] - 5348:21, 5352:13, 5353:25, 5483:11
**4725** [4] - 5357:19, 5357:23, 5358:3, 5483:12
**4730** [4] - 5357:19, 5357:24, 5358:3, 5483:12
**4738** [6] - 5347:17, 5347:22, 5348:1, 5348:2, 5348:6, 5483:11
**4743** [5] - 5347:17, 5347:21, 5348:1, 5348:2, 5483:11
**4745** [4] - 5346:2, 5346:8, 5399:5, 5483:9
**4747** [1] - 5399:18
**4750** [3] - 5352:13, 5353:25, 5483:11
**4754** [4] - 5346:2, 5346:8, 5399:5, 5483:9
**4758** [4] - 5346:20, 5346:24, 5399:5, 5483:10
**4759** [1] - 5399:5
**4760** [3] - 5346:20, 5346:24, 5483:10
**4768** [5] - 5327:4, 5327:11, 5327:15, 5327:16, 5483:7
**4769** [5] - 5328:21, 5329:2, 5329:6, 5329:7, 5483:8
**4778** [5] - 5312:4, 5312:24, 5313:4, 5313:7, 5483:5
**4778A** [4] - 5312:12, 5312:25, 5313:4, 5483:5
**4779** [4] - 5306:25, 5309:6, 5309:7,

5483:4
**4779A** [5] - 5306:25, 5309:6, 5309:7, 5310:10, 5483:4
**4780** [6] - 5294:17, 5294:23, 5295:8, 5297:5, 5297:7, 5483:2
**4:20** [1] - 5466:4
**4:25** [1] - 5467:20
**4:30** [1] - 5467:7
**4:40** [1] - 5481:2

## 5

**5** [1] - 5402:20
**5,000** [1] - 5469:18
**5/12** [1] - 5441:8
**50** [6] - 5299:2, 5347:12, 5347:14, 5348:5, 5392:8, 5449:12
**508** [5] - 5299:14, 5300:7, 5300:21, 5301:4, 5301:7
**508.1** [4] - 5301:8, 5301:15, 5301:16, 5483:3
**508.2** [1] - 5301:21
**508.3** [1] - 5301:23
**508.4** [1] - 5301:25
**508.5** [1] - 5302:2
**508.6** [1] - 5302:4
**508.7** [1] - 5302:9
**508.8** [1] - 5302:11
**508.9** [5] - 5301:9, 5301:15, 5301:16, 5303:2, 5483:3
**5294** [2] - 5482:3, 5482:4
**5297** [1] - 5483:2
**5301** [1] - 5483:3
**5309** [1] - 5483:4
**5313** [1] - 5483:5
**5315** [1] - 5483:6
**5319** [1] - 5483:6
**5321** [1] - 5483:7
**5327** [1] - 5483:7
**5329** [1] - 5483:8
**5332** [1] - 5483:8
**5346** [2] - 5483:9, 5483:10
**5348** [1] - 5483:11
**5352** [1] - 5482:5
**5353** [1] - 5483:11
**5354** [1] - 5482:6
**5358** [2] - 5483:12, 5483:13
**5362** [1] - 5482:7
**5378** [1] - 5483:15

**5379** [1] - 5482:8
**5395** [2] - 5482:9, 5482:9
**5402** [1] - 5483:16
**5403** [2] - 5482:10, 5482:12
**5404** [1] - 5482:12
**5418** [1] - 5483:14
**5419** [1] - 5482:13
**5425** [1] - 5482:14
**5426** [2] - 5482:16, 5482:16

## 6

**6** [3] - 5311:16, 5393:17, 5402:20
**631** [1] - 5291:22

## 7

**7** [4] - 5325:5, 5393:18, 5397:15, 5398:11
**712-6108** [1] - 5291:22
**712-6124** [1] - 5291:22
**7413** [2] - 5337:2, 5337:8
**767** [4] - 5437:7, 5438:11, 5440:21, 5454:18
**7th** [1] - 5455:5

## 8

**8** [3] - 5323:17, 5325:8, 5393:19
**8/21/2009** [2] - 5400:3, 5401:11
**8002** [2] - 5360:17, 5360:20
**804** [1] - 5459:7

## 9

**9** [1] - 5312:22
**90** [1] - 5460:23
**9:30** [2] - 5467:6, 5467:22
**9th** [1] - 5455:7

## A

**a/k/a** [2] - 5291:5, 5291:6
**abetting** [3] - 5393:10, 5393:14, 5393:16
**able** [24] - 5292:7, 5303:17, 5308:18, 5316:10, 5319:24, 5333:18, 5336:24, 5358:19, 5358:25,

5394:2, 5399:11, 5411:1, 5411:5, 5413:16, 5413:17, 5438:24, 5438:25, 5444:20, 5448:16, 5454:20, 5455:17, 5455:20, 5471:16, 5479:18
**abnormal** [1] - 5463:13
**above-entitled** [1] - 5481:5
**absence** [2] - 5387:24, 5467:19
**absolutely** [4] - 5384:5, 5409:23, 5410:13, 5419:12
**accept** [1] - 5475:20
**acceptable** [1] - 5440:10
**access** [7] - 5371:5, 5371:13, 5371:18, 5380:6, 5380:11, 5380:14, 5451:3
**accompany** [1] - 5448:6
**according** [2] - 5323:8, 5348:6
**account** [61] - 5324:16, 5333:17, 5333:19, 5335:2, 5335:5, 5335:8, 5335:12, 5335:16, 5335:19, 5335:20, 5335:22, 5335:24, 5336:9, 5337:4, 5337:10, 5337:11, 5337:17, 5337:18, 5337:19, 5337:25, 5338:4, 5338:7, 5338:9, 5338:16, 5344:7, 5344:9, 5344:13, 5344:22, 5345:1, 5345:5, 5347:4, 5354:17, 5361:11, 5362:2, 5395:21, 5396:1, 5396:18, 5396:19, 5397:15, 5397:21, 5397:22, 5397:23, 5398:2, 5405:25, 5406:10, 5419:2, 5432:5, 5433:25, 5435:12, 5437:17, 5439:8, 5440:18, 5440:23, 5441:4, 5450:10, 5450:24, 5458:18
**accountant** [6] - 5357:12, 5357:14,

5357:15, 5427:18, 5428:21, 5452:19
**accountants** [3] - 5429:2, 5434:6, 5434:13
**accounted** [2] - 5363:24, 5364:18
**accounting** [23] - 5389:13, 5428:17, 5428:23, 5428:24, 5428:25, 5429:1, 5429:5, 5429:6, 5429:8, 5429:9, 5430:12, 5430:19, 5431:2, 5431:6, 5431:21, 5434:2, 5434:9, 5434:10, 5436:10, 5436:22, 5440:10, 5455:20, 5463:3
**accountings** [3] - 5433:23, 5434:25, 5435:9
**accounts** [9] - 5333:14, 5334:25, 5335:13, 5339:12, 5354:24, 5436:7, 5436:24, 5454:1, 5454:5
**accurate** [30] - 5292:8, 5294:24, 5295:5, 5300:8, 5300:13, 5300:23, 5316:19, 5316:20, 5316:21, 5317:20, 5317:21, 5317:24, 5318:1, 5318:2, 5318:4, 5318:13, 5321:10, 5324:5, 5358:21, 5358:24, 5364:13, 5366:25, 5378:4, 5382:5, 5382:25, 5389:22, 5393:14, 5393:15, 5400:15, 5476:6
**accused** [1] - 5341:20
**ACH** [1] - 5396:15
**acknowledge** [1] - 5352:24
**acknowledged** [2] - 5374:8, 5389:24
**acknowledging** [1] - 5445:1
**acquire** [1] - 5404:14
**acquisition** [1] - 5304:11
**act** [1] - 5341:23
**action** [2] - 5294:13, 5362:22
**Action** [1] - 5297:9

**active** [1] - 5405:16
**Actual** [1] - 5319:7
**actual** [7] - 5303:12, 5319:10, 5319:19, 5325:3, 5381:8, 5382:13, 5408:8
**add** [3] - 5317:6, 5334:17, 5334:19
**added** [2] - 5382:11, 5382:12
**adding** [1] - 5413:5
**addition** [1] - 5410:4
**additional** [7] - 5350:6, 5381:21, 5402:6, 5437:16, 5448:5, 5454:9, 5480:7
**address** [5] - 5305:7, 5305:16, 5305:23, 5307:3, 5378:12
**addressed** [1] - 5379:5
**adds** [1] - 5316:22
**adjourned** [1] - 5481:2
**adjust** [1] - 5328:5
**admitted** [18] - 5297:6, 5301:15, 5309:6, 5313:3, 5315:8, 5315:15, 5319:1, 5321:15, 5327:15, 5329:6, 5332:10, 5358:2, 5378:17, 5402:3, 5402:12, 5418:2, 5474:9
**admitting** [2] - 5401:21, 5401:22
**advanced** [1] - 5460:4
**adversarial** [3] - 5424:5, 5425:21, 5429:14
**adverse** [1] - 5429:20
**advised** [2] - 5460:11, 5464:2
**advisor** [1] - 5424:2
**advisory** [3] - 5314:7, 5314:10
**Aerospace** [1] - 5451:18
**affects** [1] - 5343:15
**afford** [1] - 5391:19
**afield** [1] - 5477:8
**afternoon** [7] - 5362:9, 5362:10, 5419:18, 5426:24, 5426:25, 5447:16, 5447:23
**afterwards** [1] - 5367:6
**Agency's** [1] - 5441:4
**agent** [10] - 5463:17,

5465:6, 5471:4, 5471:6, 5474:4, 5474:17, 5474:21, 5475:5, 5477:7
**Agent** [4] - 5470:12, 5475:11, 5476:1
**agent's** [4] - 5470:22, 5470:23, 5472:23, 5474:1
**agents** [2] - 5430:14, 5473:6
**aggregate** [1] - 5298:10
**ago** [3] - 5368:10, 5409:22, 5432:3
**agree** [8] - 5319:16, 5319:18, 5371:7, 5372:3, 5398:19, 5421:6, 5433:19, 5440:14
**agreed** [4] - 5365:20, 5402:10, 5440:12, 5440:15
**Agreement** [1] - 5314:23
**agreement** [34] - 5299:4, 5314:11, 5314:18, 5315:12, 5315:23, 5316:4, 5316:7, 5316:8, 5316:11, 5316:16, 5317:9, 5317:12, 5319:25, 5324:9, 5325:20, 5325:23, 5326:1, 5326:4, 5326:10, 5329:25, 5330:2, 5330:3, 5330:6, 5330:12, 5347:7, 5347:9, 5391:22, 5413:16, 5425:14, 5440:16, 5451:3, 5453:15, 5453:19, 5458:24
**AGREEMENT** [1] - 5315:15
**agreements** [2] - 5316:2, 5318:3
**agrees** [1] - 5440:13
**ahead** [5] - 5293:25, 5382:8, 5399:19, 5402:17, 5459:11
**aid** [1] - 5402:12
**aiding** [3] - 5393:10, 5393:13, 5393:16
**aids** [1] - 5401:12
**aircraft** [7] - 5451:20, 5452:5, 5452:23, 5453:6, 5462:7
**airplane** [1] - 5396:6

**airport** [1] - 5443:8
**allegation** [1] - 5449:2
**allegations** [1] - 5342:20
**allegedly** [1] - 5470:15
**alleging** [1] - 5393:13
**Allied** [1] - 5407:9
**allocate** [1] - 5336:5
**allocated** [2] - 5335:25, 5336:2
**allow** [5] - 5459:5, 5459:6, 5460:4, 5474:16, 5475:23
**allowed** [1] - 5461:24
**allowing** [1] - 5410:19
**alluding** [2] - 5299:9, 5371:23
**almost** [1] - 5354:14
**aloud** [1] - 5423:5
**altogether** [1] - 5409:1
**Amended** [1] - 5314:22
**amended** [1] - 5315:11
**amending** [1] - 5478:12
**amendment** [1] - 5478:13
**America** [2] - 5397:15, 5405:8
**AMERICA** [1] - 5291:3
**amount** [8] - 5364:20, 5365:25, 5387:3, 5433:9, 5453:20, 5454:15, 5455:18, 5465:10
**amounts** [2] - 5376:23, 5399:14
**analysis** [16] - 5388:22, 5434:2, 5435:1, 5439:7, 5439:11, 5440:8, 5440:17, 5443:23, 5450:6, 5450:23, 5452:1, 5455:2, 5455:23, 5458:22, 5460:20, 5461:3
**analyzed** [2] - 5455:10, 5463:7
**and-a-half** [2] - 5431:21, 5432:3
**Andrew** [1] - 5380:20
**ANDREW** [1] - 5291:18
**angry** [1] - 5373:4
**annual** [1] - 5409:2
**Annual** [1] - 5407:14
**answer** [11] - 5303:13, 5316:10, 5319:24, 5338:11, 5342:12,

5344:23, 5358:18, 5361:4, 5367:11, 5388:5, 5421:8
**answered** [2] - 5303:9, 5462:18
**anticipate** [1] - 5446:18
**anyway** [1] - 5340:21
**apart** [1] - 5471:1
**apologize** [12] - 5341:24, 5342:1, 5342:25, 5350:2, 5369:5, 5370:2, 5370:18, 5392:21, 5393:4, 5427:22, 5467:23, 5469:3
**appear** [2] - 5353:10, 5438:1
**APPEARANCES** [1] - 5291:11
**Applebee's** [1] - 5406:5
**applies** [1] - 5393:16
**appreciate** [3] - 5458:4, 5458:6, 5459:19
**approach** [2] - 5295:10, 5413:20
**appropriately** [1] - 5465:3
**approval** [3] - 5388:14, 5411:1, 5441:11
**approve** [2] - 5411:9, 5411:12
**approved** [3] - 5382:20, 5388:18, 5390:25
**April** [2] - 5348:4, 5348:9
**area** [2] - 5363:15, 5431:6
**argue** [2] - 5472:7, 5472:13
**arguing** [3] - 5469:23, 5472:3, 5474:25
**argument** [8] - 5374:4, 5448:18, 5465:13, 5469:21, 5469:22, 5470:14, 5471:19, 5472:12
**Arizona** [4] - 5427:2, 5427:3, 5427:5, 5428:19
**arrested** [1] - 5411:18
**arsenal** [1] - 5408:4
**Asia** [1] - 5405:8
**asleep** [2] - 5416:21, 5446:20
**aspect** [1] - 5449:9

**aspects** [1] - 5292:10
**assess** [1] - 5470:16
**assessment** [1] - 5439:21
**assets** [2] - 5429:25, 5430:1
**assigned** [1] - 5430:14
**assignment** [1] - 5322:3
**assist** [1] - 5430:21
**assistance** [1] - 5371:6
**assistant** [4] - 5464:25, 5468:16, 5471:22, 5473:14
**Assistant** [2] - 5463:17, 5464:3
**assisted** [1] - 5371:1
**assisting** [1] - 5434:19
**associated** [3] - 5302:17, 5337:19, 5337:20
**Association** [1] - 5407:14
**association** [1] - 5403:15
**assume** [4] - 5311:8, 5316:23, 5335:18, 5371:4
**assuming** [6] - 5311:6, 5312:17, 5333:24, 5443:11, 5447:7, 5479:24
**assumption** [1] - 5443:12
**assumptions** [1] - 5442:18
**attached** [6] - 5307:6, 5307:12, 5308:21, 5313:10, 5329:10, 5413:11
**attaches** [1] - 5312:11
**attachment** [16] - 5308:2, 5308:3, 5308:10, 5308:13, 5308:14, 5308:16, 5308:19, 5309:12, 5309:15, 5310:10, 5310:13, 5312:15, 5312:17, 5313:24, 5329:13
**attempted** [1] - 5382:21
**attempting** [3] - 5421:23, 5425:6, 5425:19
**attention** [1] - 5338:7
**attest** [1] - 5342:18

**Attorney** [3] - 5291:13, 5463:17, 5464:3

**attorney** [13] - 5362:21, 5362:23, 5432:12, 5432:21, 5433:21, 5434:2, 5438:19, 5451:10, 5451:11, 5455:24, 5456:20, 5460:17, 5463:14

**attorney's** [1] - 5456:19

**attorney-client** [1] - 5438:19

**attorney/client** [1] - 5433:25

**attorneys** [3] - 5343:12, 5410:21, 5441:18

**Attorneys** [1] - 5291:15

**attribute** [1] - 5402:23

**audio** [13] - 5301:20, 5301:22, 5301:24, 5302:1, 5302:3, 5302:10, 5302:12, 5303:3, 5303:4, 5402:11, 5402:18, 5403:2, 5403:3

**audit** [7] - 5367:8, 5389:4, 5389:10, 5428:10, 5439:13, 5440:2, 5440:4

**auditors** [1] - 5389:5

**audits** [1] - 5429:3

**August** [9] - 5299:10, 5300:25, 5303:10, 5315:16, 5344:12, 5379:21, 5387:8, 5388:2, 5400:11

**AUSA** [12] - 5464:7, 5464:13, 5468:5, 5468:6, 5468:12, 5470:7, 5471:10, 5471:12, 5471:16, 5474:21, 5475:4, 5477:7

**AUSA's** [1] - 5470:8

**authentic** [1] - 5292:7

**authenticity** [2] - 5351:17, 5366:23

**authority** [2] - 5299:4, 5448:24

**authorization** [2] - 5437:16, 5469:4

**authorizations** [1] - 5456:13

**authorized** [1] - 5463:15

**available** [3] - 5297:16, 5300:17, 5429:2

**Avalon** [14] - 5324:16, 5324:25, 5325:4, 5325:14, 5441:2, 5441:7, 5451:7, 5451:8, 5453:18, 5455:4, 5455:6, 5455:18, 5476:19, 5476:21

**average** [2] - 5408:13, 5408:15

**avoid** [1] - 5447:20

**aware** [11] - 5342:2, 5342:16, 5342:24, 5361:5, 5362:14, 5366:17, 5385:1, 5396:2, 5422:4, 5426:1, 5433:5

**awareness** [1] - 5389:21

**AZ** [23] - 5321:19, 5322:7, 5323:21, 5324:16, 5325:3, 5365:9, 5379:7, 5386:7, 5390:11, 5390:12, 5452:14, 5452:20, 5452:23, 5453:16, 5454:15, 5454:25, 5455:1, 5455:18, 5465:3, 5473:21, 5476:18, 5476:19, 5476:21

**AZF** [1] - 5476:24

## B

**back-and-forth** [2] - 5474:20, 5475:4

**backs** [1] - 5373:19

**bad** [2] - 5385:15, 5448:4

**Bailey** [1] - 5453:17

**balance** [6] - 5344:12, 5354:24, 5355:5, 5356:4, 5421:10

**BancFirst** [1] - 5361:17

**Bancorp** [2] - 5324:22, 5325:9

**Bank** [3] - 5397:15, 5452:2, 5452:24

**bank** [25] - 5324:19, 5325:3, 5325:9, 5335:14, 5344:1, 5344:9, 5344:13, 5345:1, 5345:5, 5345:9, 5346:4, 5347:4, 5371:4,

**5406:10, 5411:1, 5411:8, 5452:6, 5452:9, 5454:1, 5454:5, 5454:8, 5455:15, 5456:2

**banking** [2] - 5338:16, 5388:9

**bankruptcy** [1] - 5431:4

**banks** [3] - 5411:11, 5411:17, 5440:5

**bantering** [1] - 5356:17

**bar** [1] - 5465:16

**bare** [1] - 5443:1

**based** [8] - 5317:25, 5366:19, 5377:5, 5382:1, 5384:15, 5443:23, 5464:17, 5470:17

**basis** [1] - 5354:14

**batch** [1] - 5342:10

**batches** [1] - 5342:17

**Bates** [1] - 5435:22

**became** [7] - 5311:22, 5386:20, 5422:4, 5428:18, 5428:21, 5465:4, 5472:22

**become** [4] - 5314:16, 5386:14, 5425:20

**becomes** [1] - 5474:12

**becoming** [1] - 5427:5

**BEFORE** [1] - 5291:9

**began** [4] - 5371:2, 5372:12, 5374:21, 5450:6

**begin** [1] - 5467:1

**beginning** [6] - 5344:11, 5347:6, 5356:3, 5370:16, 5371:8, 5420:7

**beginnings** [1] - 5313:16

**behalf** [3] - 5324:19, 5404:14, 5433:2

**behavior** [1] - 5416:7

**behind** [3] - 5320:15, 5373:19, 5461:12

**belonging** [2] - 5363:2, 5396:21

**below** [3] - 5298:14, 5298:18, 5354:10

**best** [13] - 5297:17, 5308:15, 5331:9, 5353:13, 5369:18, 5370:8, 5370:9, 5373:13, 5378:3, 5383:8, 5399:12, 5467:13, 5474:15

**better** [1] - 5405:1

**between** [24] - 5317:22, 5319:5, 5329:25, 5330:6, 5341:19, 5343:12, 5348:16, 5361:14, 5378:25, 5379:5, 5379:9, 5383:18, 5383:21, 5412:22, 5416:18, 5420:2, 5422:5, 5428:24, 5440:2, 5453:20, 5454:13, 5468:15, 5474:20, 5480:16

**beyond** [2] - 5475:12, 5477:3

**BIANCO** [1] - 5291:9

**big** [3] - 5407:12, 5428:11, 5458:5

**bill** [4] - 5409:23, 5458:5

**bills** [4] - 5418:25, 5438:13, 5456:4

**bit** [6] - 5333:3, 5348:16, 5375:22, 5383:10, 5392:22, 5405:19

**bits** [1] - 5300:11

**BL** [1] - 5398:8

**BN** [2] - 5311:5, 5311:6

**board** [29] - 5294:13, 5294:19, 5297:18, 5297:22, 5298:18, 5298:20, 5298:22, 5299:8, 5299:23, 5300:2, 5300:18, 5300:24, 5301:2, 5303:21, 5379:20, 5385:19, 5385:20, 5386:4, 5386:7, 5386:11, 5386:12, 5386:17, 5387:7, 5387:12, 5388:1, 5388:13, 5388:19, 5400:6, 5405:12

**Board** [1] - 5400:3

**Bob** [2] - 5455:24, 5460:17

**boggling** [1] - 5472:10

**bones** [1] - 5443:1

**books** [16] - 5363:12, 5363:14, 5364:12, 5365:10, 5365:15, 5365:18, 5366:21, 5367:4, 5371:2, 5371:12, 5371:13, 5372:4, 5372:13, 5378:24, 5379:11, 5389:5

**borrow** [1] - 5368:18

**borrower** [1] - 5314:9

**bottom** [2] - 5297:14, 5435:22

**bought** [1] - 5452:24

**bouncing** [1] - 5361:16

**Bower** [1] - 5334:10

**branch** [1] - 5339:4

**brand** [1] - 5405:23

**break** [20] - 5292:24, 5309:21, 5310:8, 5340:1, 5340:2, 5340:6, 5340:9, 5341:8, 5343:22, 5350:4, 5350:5, 5392:24, 5393:2, 5441:17, 5441:19, 5443:16, 5445:9, 5447:2, 5447:3, 5447:19

**breakdown** [1] - 5343:16

**breathes** [1] - 5420:12

**Brent** [19] - 5302:14, 5311:5, 5311:6, 5314:2, 5329:11, 5362:20, 5372:25, 5373:18, 5373:21, 5373:23, 5373:25, 5374:5, 5375:10, 5375:12, 5375:16, 5375:20, 5379:24, 5386:12

**brick** [2] - 5438:24, 5455:14

**brief** [3] - 5295:11, 5349:2, 5463:19

**briefing** [1] - 5448:23

**briefly** [4] - 5352:14, 5404:12, 5404:24, 5423:7

**bring** [6] - 5293:1, 5294:15, 5343:20, 5362:22, 5449:3, 5468:14

**British** [1] - 5405:5

**brokerage** [1] - 5413:4

**Brooklyn** [1] - 5291:14

**brother** [1] - 5407:9

**brought** [1] - 5449:4

**building** [5] - 5331:6, 5331:8, 5331:12, 5332:6, 5332:7, 5441:3, 5441:7, 5451:4, 5451:5, 5451:8, 5453:18

**bullet** [1] - 5319:10

**bunch** [1] - 5443:23

**bureau** [1] - 5409:14

**bureaus** [2] - 5409:12,

5409:17
**business** [15] - 5295:5, 5333:3, 5383:23, 5396:10, 5404:8, 5404:21, 5405:1, 5405:15, 5407:8, 5407:13, 5408:11, 5411:7, 5411:23, 5412:25, 5419:10
**businesses** [1] - 5429:3
**buy** [2] - 5384:12, 5411:2
**buyback** [1] - 5453:19
**buying** [3] - 5382:16, 5382:22, 5416:4
**BY** [47] - 5294:9, 5297:8, 5302:5, 5303:5, 5307:19, 5309:9, 5310:9, 5313:6, 5315:10, 5319:3, 5321:17, 5327:17, 5329:8, 5333:2, 5343:21, 5346:10, 5347:1, 5348:3, 5352:2, 5352:17, 5354:3, 5358:5, 5358:23, 5362:8, 5379:19, 5395:15, 5403:11, 5404:6, 5406:23, 5418:6, 5419:17, 5422:23, 5425:2, 5425:13, 5426:23, 5458:2, 5482:4, 5482:5, 5482:6, 5482:7, 5482:8, 5482:10, 5482:11, 5482:13, 5482:14, 5482:15, 5482:17

## C

**C-279** [2] - 5381:5, 5381:24
**C.R** [36] - 5350:21, 5353:8, 5354:16, 5361:12, 5363:5, 5363:14, 5364:5, 5364:15, 5364:21, 5365:2, 5365:14, 5366:4, 5366:9, 5366:18, 5367:14, 5369:20, 5369:22, 5370:5, 5370:10, 5370:20, 5370:22, 5371:1, 5371:5, 5372:8, 5372:12, 5378:4, 5378:10, 5378:23, 5379:4,

5379:10, 5379:25, 5381:2, 5385:10, 5387:21, 5390:7, 5390:8
**C249** [2] - 5397:9, 5397:10
**C249A** [1] - 5397:16
**C266** [2] - 5321:11, 5321:19
**C267** [2] - 5318:8, 5320:9
**C271** [2] - 5294:16, 5294:22
**C279** [2] - 5317:15, 5319:9
**C283** [1] - 5435:17
**C313** [2] - 5412:1, 5412:15
**C313R** [3] - 5412:3, 5413:18, 5419:22
**C317** [1] - 5412:10
**C318** [1] - 5412:10
**C320** [2] - 5412:11, 5413:15
**C327** [3] - 5402:11, 5402:15, 5483:16
**C327T** [4] - 5400:9, 5401:12, 5402:15, 5483:16
**C328** [3] - 5402:11, 5402:15, 5483:16
**C328T** [3] - 5401:5, 5402:16, 5483:16
**C9** [8] - 5320:13, 5320:16, 5322:7, 5323:2, 5323:10, 5323:13, 5324:5, 5324:10
**Cabin** [1] - 5451:19
**calculator** [1] - 5317:1
**California** [2] - 5412:17, 5434:1
**Canadian** [1] - 5449:18
**canceled** [1] - 5455:15
**cancelled** [2] - 5435:14, 5443:3
**cannot** [2] - 5317:13, 5330:13
**capable** [2] - 5420:11, 5478:4
**Capital** [3] - 5302:17, 5383:1, 5384:9
**capital** [3] - 5320:23, 5362:2, 5384:12
**caps** [1] - 5313:20
**captions** [1] - 5456:4
**card** [50] - 5333:7, 5333:9, 5333:18, 5333:20, 5333:22,

5334:15, 5334:16, 5334:17, 5334:19, 5334:20, 5335:8, 5335:25, 5336:2, 5336:9, 5336:16, 5337:3, 5337:10, 5337:12, 5337:18, 5338:9, 5338:12, 5338:14, 5361:9, 5361:25, 5363:2, 5395:21, 5396:3, 5398:22, 5399:15, 5399:21, 5404:14, 5404:20, 5405:21, 5405:24, 5406:1, 5406:12, 5408:9, 5408:11, 5408:13, 5408:24, 5409:3, 5409:6, 5409:10, 5409:11, 5410:17, 5411:10, 5413:4, 5413:5, 5418:7
**Card** [3] - 5404:19, 5405:12, 5405:19
**cardholders** [1] - 5337:17
**cards** [18] - 5333:5, 5334:5, 5395:21, 5396:7, 5396:12, 5397:21, 5397:22, 5405:23, 5406:4, 5406:11, 5408:15, 5410:7, 5411:2, 5418:10, 5418:12, 5418:19, 5419:4
**care** [1] - 5419:6
**carefully** [1] - 5461:13
**Carey** [1] - 5385:25
**Carlton** [1] - 5297:18
**case** [31] - 5315:20, 5340:3, 5393:19, 5406:3, 5419:19, 5431:18, 5431:20, 5446:6, 5446:7, 5447:5, 5448:15, 5448:22, 5449:9, 5456:4, 5464:5, 5464:8, 5464:14, 5467:15, 5467:17, 5468:8, 5470:1, 5472:8, 5474:4, 5475:8, 5475:15, 5477:9, 5477:21, 5477:25
**cases** [7] - 5418:24, 5419:1, 5431:14, 5431:16, 5467:5, 5473:5, 5479:24
**cash** [5] - 5336:6, 5356:20, 5396:14,

5399:2, 5404:22
**cashed** [1] - 5347:3
**cashier's** [1] - 5396:15
**CAT** [1] - 5291:25
**causing** [1] - 5341:23
**cc** [4] - 5352:7, 5352:10, 5353:6, 5378:1
**cc'd** [1] - 5378:5
**ceased** [1] - 5411:19
**Central** [2] - 5291:4, 5291:22
**cents** [1] - 5449:12
**CEO** [11] - 5370:4, 5370:5, 5370:10, 5387:17, 5387:21, 5388:1, 5388:8, 5388:11, 5388:14, 5405:11, 5418:7
**certain** [18] - 5336:14, 5371:4, 5371:16, 5383:23, 5387:3, 5391:5, 5397:5, 5433:23, 5435:10, 5435:13, 5438:12, 5438:24, 5439:20, 5455:17, 5456:21, 5462:5, 5469:6, 5471:11
**certainly** [8] - 5326:16, 5350:18, 5372:11, 5420:23, 5443:23, 5472:7, 5472:22, 5474:10
**CERTIFICATE** [1] - 5481:4
**certified** [6] - 5346:4, 5427:18, 5428:18, 5428:20, 5428:21, 5429:2
**certify** [1] - 5481:5
**cetera** [1] - 5463:5
**CFO** [1] - 5418:16
**chain** [3] - 5327:8, 5354:10, 5356:3
**challenged** [1] - 5341:21
**chance** [5] - 5350:19, 5352:3, 5400:4, 5400:13, 5479:11
**change** [4] - 5318:1, 5356:5, 5478:9, 5479:4
**changed** [2] - 5381:21, 5478:5
**changes** [2] - 5381:14, 5382:1
**characterized** [1] - 5366:17
**characterizing** [1] -

5416:1
**charge** [10] - 5330:17, 5409:3, 5409:4, 5446:25, 5447:1, 5447:7, 5447:17, 5448:15, 5448:16
**charged** [1] - 5399:20
**charges** [1] - 5416:17
**charging** [1] - 5409:11
**chart** [15] - 5317:15, 5317:17, 5317:23, 5318:2, 5318:16, 5318:18, 5381:5, 5381:16, 5381:21, 5381:23, 5382:4, 5382:12, 5382:24, 5386:15, 5470:2
**charts** [1] - 5319:5
**check** [8] - 5309:20, 5309:22, 5309:25, 5310:3, 5318:12, 5351:12, 5396:15, 5398:16
**checking** [3] - 5397:21, 5405:25, 5445:5
**checkless** [1] - 5405:25
**checks** [10] - 5345:14, 5345:25, 5346:13, 5347:3, 5397:14, 5399:2, 5399:9, 5435:14, 5455:15
**Chief** [1] - 5369:23
**chief** [1] - 5372:24
**child** [1] - 5373:24
**children** [2] - 5427:14, 5427:15
**choice** [1] - 5385:16
**Circuit** [1] - 5474:3
**circuitous** [1] - 5406:25
**circumstances** [1] - 5411:24
**cite** [1] - 5448:23
**civil** [1] - 5431:14
**civilized** [1] - 5343:11
**claim** [2] - 5362:25, 5453:1
**claimed** [1] - 5391:17
**clarify** [3] - 5324:14, 5434:15, 5476:17
**clean** [11] - 5322:25, 5363:5, 5363:12, 5363:14, 5364:6, 5364:9, 5366:9, 5370:21, 5371:2, 5372:12, 5378:24
**cleaned** [2] - 5364:2, 5364:11

**cleaning** [3] - 5364:22, 5372:4, 5379:11

**clear** [4] - 5319:13, 5337:1, 5478:6, 5478:14

**clearly** [2] - 5379:9, 5470:1

**Cleveland** [1] - 5427:7

**client** [8] - 5306:10, 5342:5, 5405:7, 5432:22, 5438:19, 5439:24, 5440:13, 5479:24

**client's** [1] - 5471:12

**clients** [2] - 5428:9, 5433:2

**clip** [1] - 5303:6

**clips** [7] - 5300:7, 5301:10, 5393:23, 5401:6, 5401:15, 5401:22, 5402:20

**close** [1] - 5356:19

**closed** [3] - 5465:7, 5471:7, 5471:17

**closed-minded** [1] - 5465:7

**closing** [2] - 5356:14, 5453:19

**CM** [2] - 5291:20, 5481:8

**co** [2] - 5339:4, 5449:2

**co-branch** [1] - 5339:4

**co-conspirator** [1] - 5449:2

**cold** [1] - 5321:3

**colleague** [1] - 5361:12

**colleagues** [2] - 5306:8, 5348:17

**collecting** [1] - 5376:9

**college** [1] - 5404:25

**colloquy** [1] - 5468:15

**color** [1] - 5319:6

**colored** [1] - 5381:23

**combined** [1] - 5435:3

**combines** [1] - 5437:10

**comfortable** [2] - 5456:8, 5462:12

**coming** [11] - 5326:12, 5339:18, 5341:10, 5351:3, 5372:9, 5372:11, 5407:15, 5443:3, 5446:5, 5458:25, 5474:7

**commenced** [1] - 5362:15

**comment** [7] - 5456:6, 5456:15, 5462:14,

5468:13, 5468:14, 5468:17, 5473:24

**commentaries** [1] - 5479:23

**commentary** [1] - 5470:13

**comments** [1] - 5313:19

**communicate** [1] - 5304:19

**communicated** [1] - 5326:16

**communicates** [1] - 5328:14

**communicating** [1] - 5388:9

**communication** [2] - 5379:5, 5379:9

**communications** [1] - 5378:25

**companies** [17] - 5337:16, 5376:2, 5376:11, 5376:12, 5376:14, 5376:22, 5377:5, 5384:19, 5404:9, 5404:11, 5405:11, 5405:14, 5406:5, 5408:14, 5410:20, 5428:11

**Company** [7] - 5429:15, 5429:17, 5429:24, 5430:3, 5430:7, 5430:17, 5431:3

**company** [96] - 5297:15, 5297:17, 5297:18, 5297:20, 5298:9, 5298:11, 5298:15, 5299:1, 5299:3, 5303:15, 5303:25, 5304:12, 5304:17, 5319:14, 5319:20, 5320:19, 5320:22, 5320:23, 5321:23, 5322:5, 5322:6, 5322:11, 5323:10, 5323:15, 5323:25, 5324:11, 5325:18, 5326:2, 5326:8, 5326:25, 5330:17, 5333:22, 5338:15, 5338:23, 5338:25, 5339:2, 5343:22, 5344:6, 5344:20, 5345:4, 5347:11, 5350:24, 5352:22, 5358:7, 5360:12, 5360:14, 5360:16, 5361:16, 5361:17, 5363:18,

5365:6, 5365:7, 5365:8, 5365:25, 5371:11, 5371:12, 5376:1, 5376:13, 5376:16, 5376:20, 5383:22, 5383:23, 5384:1, 5384:4, 5384:7, 5389:25, 5390:21, 5392:14, 5392:16, 5395:24, 5396:8, 5399:15, 5399:21, 5399:24, 5404:13, 5405:4, 5405:5, 5405:6, 5407:9, 5410:11, 5418:7, 5418:21, 5418:22, 5421:7, 5421:9, 5425:7, 5429:14, 5432:18, 5452:15, 5452:18, 5452:19, 5453:24, 5472:10

**company's** [4] - 5297:22, 5387:17, 5388:1, 5396:21

**compare** [1] - 5390:6

**compared** [3] - 5435:1, 5437:1, 5455:22

**compensated** [1] - 5453:5

**complain** [2] - 5469:8

**complete** [7] - 5292:11, 5293:11, 5321:7, 5367:8, 5421:14, 5425:14, 5455:20

**completed** [3] - 5455:10, 5455:12, 5466:7

**completely** [1] - 5476:24

**completeness** [1] - 5415:8

**completes** [1] - 5383:6

**complied** [1] - 5343:8

**component** [1] - 5372:4

**computer** [4] - 5336:8, 5350:20, 5380:16, 5446:10

**computers** [1] - 5351:2

**conceded** [2] - 5406:21, 5406:22

**concern** [2] - 5341:10, 5363:25

**concerned** [6] - 5342:19, 5424:1,

5424:6, 5442:16, 5453:7, 5475:3

**concerning** [3] - 5376:11, 5385:2, 5442:25

**concerns** [3] - 5313:20, 5456:19, 5458:23

**concluded** [2] - 5296:13, 5465:16

**concludes** [1] - 5472:24

**conduct** [2] - 5478:11, 5479:6

**conducted** [2] - 5471:6, 5472:25

**conference** [20] - 5299:20, 5299:23, 5300:1, 5300:4, 5300:24, 5374:13, 5374:16, 5379:24, 5407:14, 5433:14, 5439:3, 5446:25, 5447:1, 5447:7, 5461:10, 5461:11, 5461:16, 5462:20, 5462:21, 5462:22

**Conference** [1] - 5407:14

**conferences** [2] - 5419:1, 5433:14

**confidential** [1] - 5460:23

**confirm** [1] - 5440:4

**confirmation** [1] - 5438:4

**confirmed** [1] - 5453:15

**conflict** [1] - 5374:9

**confused** [2] - 5340:10, 5393:19

**Congress** [2] - 5478:5, 5478:11

**congress** [2] - 5429:18, 5430:5

**conjunction** [1] - 5451:21

**connection** [1] - 5325:20

**consent** [1] - 5294:24

**Consent** [1] - 5297:10

**consents** [1] - 5447:7

**consider** [2] - 5384:3, 5471:17

**consideration** [3] - 5297:16, 5297:21, 5447:5

**considered** [1] - 5318:9

**consistent** [3] -

5456:16, 5463:12, 5476:20

**conspiracy** [5] - 5478:9, 5478:19, 5478:21, 5478:25, 5479:2

**conspirator** [1] - 5449:2

**CONSTANTINE** [1] - 5291:6

**Constantine** [83] - 5291:19, 5304:8, 5304:13, 5305:13, 5311:3, 5312:7, 5314:13, 5314:17, 5315:15, 5320:7, 5320:8, 5320:11, 5320:12, 5320:25, 5321:1, 5321:8, 5323:4, 5324:7, 5326:8, 5328:18, 5328:24, 5329:17, 5329:22, 5330:7, 5334:3, 5334:5, 5334:8, 5339:8, 5347:10, 5348:4, 5348:12, 5348:15, 5350:7, 5350:8, 5351:9, 5352:9, 5354:16, 5355:4, 5356:10, 5361:8, 5361:13, 5361:20, 5362:16, 5363:3, 5377:13, 5378:5, 5378:11, 5378:25, 5379:4, 5379:10, 5379:25, 5385:1, 5385:7, 5389:15, 5392:5, 5392:13, 5396:2, 5397:1, 5397:5, 5398:20, 5406:14, 5406:19, 5406:24, 5407:23, 5410:15, 5411:15, 5412:23, 5415:5, 5416:13, 5420:3, 5420:7, 5421:3, 5421:18, 5421:22, 5425:5, 5425:17, 5426:9, 5435:10, 5456:22, 5460:5, 5460:12

**Constantine's** [19] - 5302:7, 5311:17, 5312:22, 5314:3, 5330:25, 5347:19, 5348:10, 5361:5, 5361:15, 5397:14, 5398:1, 5415:14, 5419:22, 5441:11,

5449:11, 5459:8,
5460:7, 5464:21,
5468:25
**constituting** [1] -
5299:1
**construction** [2] -
5331:3, 5405:1
**consult** [2] - 5318:3,
5318:6
**consultant** [3] -
5363:9, 5366:14,
5453:16
**Consulting** [6] -
5320:13, 5322:7,
5323:10, 5323:13,
5324:5, 5324:10
**Consulting's** [1] -
5323:3
**consumer** [1] - 5408:8
**contacted** [4] -
5385:21, 5438:12,
5438:23, 5441:11
**contained** [3] -
5379:7, 5436:7,
5437:24
**containing** [1] -
5412:22
**contains** [2] -
5299:20, 5412:2
**content** [3] - 5354:12,
5381:16, 5400:14
**contents** [1] - 5300:21
**continue** [11] -
5293:21, 5343:13,
5343:18, 5363:21,
5387:25, 5405:11,
5407:22, 5411:15,
5413:2, 5453:10,
5467:4
**continued** [8] -
5294:5, 5332:12,
5395:9, 5414:2,
5464:25, 5465:2,
5472:20, 5478:21
**Continued** [19] -
5294:8, 5295:12,
5296:14, 5333:1,
5349:4, 5351:23,
5354:2, 5359:3,
5395:14, 5413:22,
5417:4, 5424:9,
5457:13, 5458:1,
5463:21, 5465:17,
5482:4, 5482:6,
5482:9
**continuing** [2] -
5293:19, 5411:17
**contract** [6] - 5312:1,
5409:5, 5409:8,
5409:10, 5410:6,

5413:3
**contractors** [1] -
5429:19
**contributed** [2] -
5365:4, 5458:17
**contributions** [1] -
5438:5
**controller** [1] -
5428:15
**conversation** [24] -
5292:11, 5327:7,
5358:20, 5359:1,
5373:7, 5373:8,
5373:25, 5374:6,
5374:14, 5374:21,
5375:3, 5375:9,
5375:13, 5375:20,
5381:15, 5381:20,
5407:7, 5422:11,
5433:12, 5433:13,
5439:6, 5458:14,
5461:14, 5464:17
**conversations** [7] -
5354:23, 5358:12,
5410:20, 5422:2,
5456:11, 5461:25
**converted** [2] -
5386:20, 5453:18
**conveys** [1] - 5324:6
**convicted** [1] -
5479:25
**Conway** [2] - 5293:7,
5342:7
**Cooper** [2] - 5427:20,
5427:23
**cooperating** [1] -
5469:12
**copied** [5] - 5352:8,
5352:21, 5352:23,
5353:8, 5353:9
**copies** [7] - 5292:19,
5419:23, 5438:1,
5438:13, 5455:16,
5456:3, 5456:4
**copy** [8] - 5296:6,
5378:4, 5378:11,
5380:23, 5393:22,
5394:4, 5419:24,
5431:13
**copyright** [1] - 5387:4
**corner** [1] - 5310:21
**Corporation** [2] -
5430:8, 5430:9
**correct** [174] -
5294:25, 5297:10,
5297:12, 5297:25,
5298:1, 5298:11,
5298:15, 5299:5,
5299:8, 5299:21,
5299:24, 5300:2,

5300:5, 5300:9,
5300:18, 5300:21,
5300:25, 5301:11,
5302:7, 5302:15,
5302:18, 5302:23,
5303:10, 5304:3,
5304:6, 5304:9,
5305:8, 5305:17,
5305:19, 5305:21,
5305:24, 5306:2,
5306:8, 5306:12,
5306:15, 5306:18,
5307:1, 5307:4,
5307:11, 5307:14,
5309:13, 5309:18,
5309:23, 5310:11,
5310:16, 5311:11,
5311:17, 5311:19,
5312:7, 5312:9,
5312:13, 5312:16,
5312:20, 5313:8,
5313:17, 5313:22,
5314:7, 5314:11,
5314:14, 5317:9,
5317:10, 5317:18,
5319:8, 5319:11,
5319:15, 5320:24,
5323:22, 5323:23,
5324:7, 5324:11,
5326:10, 5328:3,
5328:7, 5329:11,
5329:14, 5329:23,
5331:6, 5333:20,
5333:23, 5334:8,
5334:10, 5340:19,
5344:10, 5344:13,
5345:5, 5345:12,
5346:17, 5347:4,
5347:12, 5347:15,
5347:19, 5348:6,
5348:10, 5348:14,
5352:8, 5352:10,
5353:11, 5353:16,
5354:19, 5355:9,
5355:12, 5355:16,
5356:25, 5357:5,
5357:9, 5357:21,
5357:22, 5359:2,
5362:23, 5362:24,
5363:6, 5364:2,
5364:16, 5364:19,
5365:24, 5366:15,
5367:7, 5369:20,
5370:16, 5372:15,
5373:5, 5373:15,
5376:21, 5377:17,
5378:12, 5378:13,
5379:1, 5379:12,
5379:22, 5380:8,
5381:10, 5381:13,
5381:22, 5382:2,

5382:5, 5382:9,
5382:10, 5383:5,
5383:20, 5384:18,
5385:2, 5385:14,
5385:15, 5386:6,
5386:8, 5387:8,
5387:11, 5387:13,
5390:4, 5390:23,
5391:16, 5392:14,
5396:22, 5398:6,
5398:17, 5401:3,
5410:12, 5411:19,
5416:16, 5418:8,
5418:9, 5419:7,
5420:3, 5421:13,
5425:21, 5432:1,
5434:17, 5435:24,
5450:4, 5460:14,
5460:15, 5463:8,
5481:5
**correction** [1] -
5318:14
**correctly** [4] -
5313:14, 5327:25,
5363:17, 5420:18
**corrects** [1] - 5322:16
**correspondence** [2] -
5412:15, 5412:22
**corroborating** [1] -
5480:21
**costs** [2] - 5457:1,
5457:2
**counsel** [1] - 5413:10
**count** [2] - 5449:1,
5479:25
**Count** [3] - 5393:17,
5393:18, 5478:21
**counting** [1] - 5477:15
**counts** [2] - 5476:16,
5478:19
**county** [1] - 5429:22
**coupe** [1] - 5418:4
**couple** [14] - 5340:12,
5354:15, 5355:20,
5358:9, 5389:13,
5397:24, 5404:17,
5443:22, 5446:22,
5461:8, 5461:18,
5466:15, 5477:17,
5477:21
**course** [6] - 5373:7,
5375:19, 5378:23,
5410:16, 5442:7,
5472:1
**court** [17] - 5297:1,
5322:24, 5330:4,
5342:1, 5342:6,
5342:21, 5342:24,
5343:1, 5350:2,
5352:1, 5401:24,

5406:16, 5418:11,
5425:1, 5465:14,
5466:1, 5476:3
**COURT** [144] - 5291:1,
5292:2, 5292:16,
5292:20, 5293:1,
5293:10, 5293:13,
5293:17, 5293:25,
5296:7, 5296:10,
5297:4, 5301:7,
5301:10, 5301:13,
5301:15, 5309:1,
5309:6, 5310:8,
5313:3, 5315:5,
5315:8, 5319:1,
5321:15, 5327:15,
5329:6, 5331:22,
5332:10, 5340:2,
5340:5, 5340:8,
5340:22, 5340:24,
5341:2, 5341:7,
5341:12, 5343:2,
5346:7, 5346:23,
5347:24, 5348:1,
5348:22, 5351:8,
5351:20, 5351:22,
5352:15, 5353:23,
5358:2, 5358:17,
5360:1, 5360:10,
5361:1, 5361:3,
5362:5, 5366:7,
5377:10, 5378:17,
5378:21, 5379:16,
5382:8, 5384:23,
5389:2, 5392:25,
5393:2, 5393:5,
5393:9, 5393:18,
5393:24, 5394:4,
5394:11, 5395:12,
5401:21, 5402:2,
5402:6, 5402:9,
5402:11, 5402:17,
5403:1, 5403:6,
5403:18, 5403:23,
5406:22, 5413:21,
5415:10, 5415:23,
5415:25, 5416:9,
5418:2, 5419:15,
5424:7, 5426:7,
5426:14, 5426:18,
5441:17, 5441:23,
5442:9, 5443:5,
5443:11, 5444:1,
5444:14, 5444:24,
5446:1, 5446:7,
5446:13, 5446:15,
5446:24, 5447:11,
5447:15, 5447:25,
5448:9, 5448:11,
5448:14, 5448:20,
5449:3, 5449:15,

5449:20, 5449:24, 5459:5, 5459:10, 5462:1, 5463:20, 5464:12, 5465:15, 5466:2, 5467:21, 5468:4, 5468:20, 5470:18, 5471:1, 5471:3, 5471:9, 5474:10, 5476:9, 5476:15, 5476:25, 5477:16, 5479:9, 5479:17, 5479:20, 5480:4, 5480:14, 5480:20, 5480:25, 5481:4
**Court** [13] - 5291:4, 5291:20, 5292:1, 5341:18, 5341:24, 5342:1, 5343:2, 5392:21, 5444:9, 5444:21, 5449:5, 5449:10, 5477:25
**Court's** [2] - 5445:10, 5447:10
**Courthouse** [1] - 5291:21
**courtroom** [7] - 5342:23, 5393:7, 5441:20, 5441:22, 5449:23, 5465:12, 5468:3
**courts** [2] - 5431:12
**cousin** [1] - 5407:10
**CR** [14] - 5297:18, 5304:8, 5304:13, 5305:19, 5306:14, 5307:24, 5311:7, 5311:19, 5314:3, 5322:25, 5325:17, 5326:7, 5327:18, 5380:23
**CR's** [1] - 5311:8
**Crafters** [1] - 5451:19
**Craig** [2] - 5407:2, 5407:8
**crazy** [1] - 5479:20
**create** [3] - 5325:23, 5325:25, 5371:24
**created** [6] - 5323:6, 5366:18, 5366:22, 5366:24, 5367:14, 5369:20
**creating** [2] - 5366:5, 5369:22
**creation** [1] - 5429:23
**credibility** [2] - 5470:15, 5470:16
**credibility7** [1] - 5470:9
**credit** [17] - 5333:4,

5334:15, 5363:2, 5399:15, 5404:14, 5404:20, 5407:4, 5408:21, 5408:23, 5409:8, 5409:14, 5409:17, 5409:20, 5410:2, 5410:5, 5418:7, 5452:7
**creditworthiness** [1] - 5409:24
**crg** [1] - 5305:22
**crg@eufora.com** [1] - 5305:21
**CRGentry@Eufora. com** [1] - 5312:4
**crgentry@eufora. com** [1] - 5305:19
**crime** [1] - 5472:5
**criminal** [1] - 5431:14
**Crisalli** [1] - 5446:10
**critical** [1] - 5465:9
**crooked** [1] - 5424:2
**cross** - 5293:20, 5381:3, 5395:16, 5399:7, 5400:25, 5401:7, 5419:15, 5429:22, 5477:15
**CROSS** [7] - 5294:8, 5333:1, 5354:2, 5419:16, 5482:4, 5482:6, 5482:13
**cross-examination** [6] - 5293:20, 5381:3, 5395:16, 5399:7, 5400:25, 5401:7
**CROSS-EXAMINATION** [7] - 5294:8, 5333:1, 5354:2, 5419:16, 5482:4, 5482:6, 5482:13
**CSR** [2] - 5291:20, 5481:8
**cue** [1] - 5392:23
**cued** [1] - 5393:24
**current** [1] - 5476:16
**CURRIE** [1] - 5291:12
**customer** [6] - 5304:11, 5408:18, 5408:19, 5409:5, 5411:3, 5419:12
**customers** [5] - 5336:24, 5404:15, 5406:6, 5407:4, 5408:12
**customers'** [1] - 5334:25

## D

**D'AMBROSIO** [4] - 5294:3, 5395:7, 5482:3, 5482:9
**D'Ambrosio** [39] - 5292:5, 5292:22, 5293:5, 5293:13, 5293:22, 5294:10, 5300:15, 5302:6, 5307:20, 5309:10, 5314:3, 5317:2, 5317:14, 5331:23, 5338:18, 5342:15, 5346:17, 5350:7, 5351:17, 5352:3, 5352:18, 5352:25, 5354:4, 5354:15, 5355:4, 5355:12, 5355:14, 5356:4, 5356:14, 5360:17, 5360:20, 5362:9, 5374:20, 5375:23, 5379:20, 5381:9, 5395:16, 5420:21, 5421:18
**D'Ambrosio's** [1] - 5293:19
**daily** [1] - 5303:24
**Dan** [2] - 5323:9, 5323:23
**danger** [1] - 5477:6
**Daniel** [2] - 5297:24, 5385:18
**Danny** [1] - 5336:11
**Darryl** [3] - 5367:20, 5368:2, 5368:6
**data** [2] - 5370:3, 5399:2
**date** [17] - 5295:1, 5298:11, 5309:19, 5309:24, 5310:20, 5310:23, 5363:11, 5369:25, 5370:7, 5370:8, 5389:25, 5425:5, 5425:25, 5454:20, 5459:14, 5479:3, 5479:6
**dated** [12] - 5297:12, 5307:7, 5310:10, 5310:13, 5310:15, 5313:7, 5313:24, 5315:12, 5315:15, 5348:9, 5355:3, 5413:13
**dates** [1] - 5314:1
**David** [1] - 5430:13
**Davis** [1] - 5407:2
**days** [3] - 5340:13, 5355:11, 5460:24

**deal** [7] - 5313:11, 5376:7, 5376:8, 5410:24, 5413:12, 5449:1, 5477:24
**dealing** [4] - 5410:21, 5449:8, 5471:21, 5480:11
**dealt** [1] - 5443:10
**debit** [2] - 5333:5, 5405:21
**debt** [2] - 5420:10, 5421:6
**decade** [1] - 5405:2
**December** [11] - 5325:4, 5325:5, 5325:8, 5345:1, 5345:4, 5345:7, 5345:8, 5370:9, 5388:16, 5455:5, 5455:7
**decide** [3] - 5439:4, 5470:5, 5477:9
**decided** [2] - 5326:19, 5389:25
**Decisions** [2] - 5405:6, 5405:7
**declared** [1] - 5357:7
**declined** [4] - 5474:19, 5475:1, 5476:1, 5476:13
**deem** [1] - 5297:16
**Defendant** [2] - 5291:17, 5291:19
**defendant** [4] - 5305:13, 5362:17, 5406:18, 5464:10
**Defendant's** [2] - 5378:18, 5483:15
**defendant's** [1] - 5476:21
**Defendants** [1] - 5291:7
**defending** [1] - 5373:18
**Defense** [8] - 5291:16, 5294:4, 5395:8, 5402:15, 5404:1, 5418:3, 5483:14, 5483:16
**defense** [5] - 5350:8, 5393:23, 5432:13, 5442:22, 5471:10
**deficiency** [2] - 5452:3, 5452:7
**defined** [2] - 5475:22, 5478:1
**definitely** [1] - 5422:2
**definition** [5] - 5304:4, 5478:6, 5478:12, 5478:15, 5479:5

**degree** [1] - 5363:16
**Delaware** [4] - 5382:17, 5382:18, 5386:17, 5386:20
**delegated** [1] - 5343:4
**deliberations** [5] - 5467:1, 5467:2, 5467:4, 5467:8, 5467:11
**deliver** [3] - 5408:9, 5408:21, 5408:23
**delivering** [1] - 5410:4
**demand** [1] - 5456:2
**Dennis** [1] - 5432:11
**dennis** [1] - 5432:12
**deposit** [5] - 5371:5, 5397:17, 5398:11, 5406:9, 5406:12, 5459:25
**deposited** [2] - 5361:11, 5460:13
**deposition** [1] - 5416:14
**deposits** [3] - 5344:15, 5397:5, 5435:12
**Depot** [1] - 5446:12
**depreciation** [1] - 5453:8
**derive** [1] - 5368:9
**describe** [7] - 5383:21, 5399:9, 5404:11, 5404:24, 5405:19, 5428:8, 5428:13
**described** [2] - 5364:17, 5392:17
**describes** [1] - 5298:14
**describing** [1] - 5298:13
**description** [1] - 5475:15
**designed** [1] - 5336:11
**detail** [4] - 5435:4, 5435:13, 5437:3, 5438:1
**determination** [2] - 5453:3, 5463:9
**determine** [3] - 5308:18, 5455:2, 5470:23
**determined** [2] - 5409:22, 5452:3
**determining** [1] - 5439:21
**developers** [1] - 5429:19
**DeVries** [2] - 5449:6,

5449:13
**Diego** [1] - 5407:16
**difference** [6] - 5369:16, 5383:21, 5428:24, 5440:2, 5467:8, 5467:10
**differences** [1] - 5437:2
**different** [10] - 5308:21, 5325:15, 5333:13, 5351:8, 5369:13, 5372:20, 5380:25, 5404:17, 5444:17, 5471:20
**difficult** [1] - 5421:8
**digress** [1] - 5375:22
**dime** [1] - 5376:21
**DIRE** [2] - 5352:16, 5482:5
**direct** [18] - 5294:22, 5295:4, 5315:14, 5317:14, 5337:24, 5338:3, 5353:5, 5366:8, 5366:11, 5368:8, 5370:14, 5375:24, 5377:11, 5390:3, 5406:9, 5406:12, 5443:20, 5446:3
**DIRECT** [5] - 5404:5, 5426:22, 5458:1, 5482:12, 5482:16
**direct-deposit** [1] - 5406:9
**directed** [2] - 5342:6, 5450:19
**direction** [1] - 5343:8
**directly** [6] - 5382:18, 5389:24, 5390:16, 5390:18, 5392:5, 5456:3
**disagreement** [1] - 5468:22
**disbursements** [1] - 5439:7
**discovery** [2] - 5293:3, 5350:13
**discredit** [1] - 5473:15
**discrepancy** [2] - 5454:13, 5455:23
**discuss** [6] - 5340:3, 5343:9, 5439:3, 5441:18, 5451:12, 5467:17
**discussed** [6] - 5297:3, 5350:5, 5381:15, 5451:17, 5459:12, 5468:10
**discussing** [2] - 5416:4, 5466:12

discussion [9] - 5350:12, 5448:17, 5456:25, 5457:7, 5460:16, 5460:19, 5463:1, 5465:1, 5480:6
**Discussion** [5] - 5296:1, 5296:13, 5414:1, 5464:1, 5465:16
**discussions** [8] - 5385:1, 5401:13, 5407:22, 5407:25, 5410:14, 5411:19, 5412:25, 5459:20
**dish** [3] - 5339:19, 5339:22, 5406:6
**Dish** [11] - 5338:25, 5339:3, 5339:4, 5339:6, 5339:8, 5339:11, 5343:22, 5344:6, 5344:20, 5345:4
**DishZero** [6] - 5362:2, 5392:4, 5392:5, 5392:8, 5392:10, 5392:14
**disk** [6] - 5299:18, 5299:20, 5300:7, 5387:8, 5400:2, 5401:9
**disks** [1] - 5300:10
**dismiss** [1] - 5465:13
**dismissed** [1] - 5465:2
**dismissive** [2] - 5464:20, 5472:20
**dismissiveness** [1] - 5469:11
**display** [1] - 5417:2
**displaying** [1] - 5417:1
**dispute** [5] - 5353:15, 5422:5, 5422:12, 5443:9, 5476:18
**disputes** [1] - 5470:1
**distinction** [3] - 5319:5, 5416:18, 5416:19
**distribution** [1] - 5338:16
**DISTRICT** [3] - 5291:1, 5291:1, 5291:10
**district** [2] - 5470:9, 5477:7
**District** [4] - 5291:4, 5291:21, 5464:4, 5468:8
**District's** [1] - 5464:13
**disturbing** [1] -

5342:24
**divide** [1] - 5449:12
**division** [1] - 5430:15
**document** [53] - 5294:22, 5295:4, 5295:5, 5297:7, 5298:13, 5299:3, 5299:7, 5309:16, 5311:13, 5311:25, 5312:12, 5312:15, 5312:23, 5314:1, 5314:14, 5316:19, 5321:8, 5321:25, 5322:3, 5322:6, 5322:7, 5322:16, 5322:17, 5322:18, 5322:21, 5322:22, 5322:23, 5323:2, 5323:6, 5323:8, 5323:16, 5324:2, 5324:4, 5330:20, 5330:21, 5348:6, 5348:8, 5368:5, 5377:25, 5378:1, 5378:3, 5379:8, 5412:2, 5422:17, 5435:18, 5452:1, 5454:17, 5460:25, 5461:16, 5469:8, 5469:9
**documentation** [15] - 5323:1, 5345:22, 5363:6, 5364:1, 5364:6, 5364:9, 5364:11, 5364:19, 5364:22, 5366:9, 5366:15, 5370:21, 5390:24, 5451:11, 5469:7
**documentations** [1] - 5371:2
**documented** [4] - 5322:13, 5363:17, 5365:23, 5388:13
**documenting** [2] - 5364:22, 5365:15
**documents** [29] - 5312:11, 5313:3, 5313:10, 5313:17, 5318:7, 5343:4, 5345:24, 5347:18, 5384:25, 5385:5, 5411:25, 5412:12, 5434:14, 5435:8, 5435:10, 5435:11, 5436:2, 5436:9, 5438:3, 5438:10, 5442:12, 5443:10, 5450:19, 5452:25, 5453:7, 5462:15,

5469:5, 5480:11
**dollar** [3] - 5384:2, 5387:3, 5449:13
**dollars** [2] - 5344:18, 5376:24
**domain** [1] - 5305:1
**Dominic** [3] - 5297:23, 5407:7, 5407:11
**Dominic's** [1] - 5407:9
**Dominick** [2] - 5291:20, 5481:8
**DomTursi@email. com** [1] - 5291:23
**done** [13] - 5292:12, 5343:5, 5361:17, 5363:19, 5365:19, 5382:25, 5418:15, 5431:4, 5447:3, 5456:6, 5458:22, 5460:17, 5471:13
**door** [1] - 5416:15
**doors** [2] - 5356:14, 5356:19
**dot** [1] - 5307:9
**doubt** [4] - 5315:20, 5366:23, 5378:9, 5475:13
**down** [9] - 5323:11, 5332:1, 5397:16, 5403:18, 5426:7, 5435:22, 5439:24, 5455:24
**dozens** [2] - 5419:4
**draft** [6] - 5318:16, 5318:17, 5318:18, 5381:10, 5381:12, 5381:18
**Drozin** [1] - 5361:14
**due** [2] - 5297:16, 5297:21
**duly** [4] - 5294:5, 5395:9, 5404:1, 5426:12
**duration** [1] - 5332:4
**during** [24] - 5303:19, 5350:4, 5350:5, 5350:10, 5352:22, 5354:19, 5373:1, 5373:7, 5375:19, 5378:23, 5386:11, 5400:25, 5401:7, 5431:9, 5432:10, 5432:16, 5442:17, 5443:16, 5447:1, 5447:2, 5467:3, 5467:6, 5467:8, 5467:11
**duties** [1] - 5430:17

**E**

**E-D-R-O-Z-O** [1] - 5370:19
**e-mail** [29] - 5351:3, 5351:6, 5351:8, 5354:9, 5354:10, 5354:16, 5355:3, 5355:22, 5355:23, 5355:25, 5356:3, 5356:7, 5356:8, 5356:11, 5378:4, 5378:6, 5378:10, 5378:12, 5379:4, 5388:12, 5388:15, 5389:14, 5389:17, 5390:10, 5390:24, 5415:12, 5416:22, 5426:2
**e-mails** [49] - 5340:11, 5340:12, 5340:15, 5340:17, 5340:19, 5340:22, 5340:23, 5341:4, 5342:4, 5342:6, 5342:8, 5342:10, 5342:17, 5348:16, 5348:18, 5350:6, 5350:14, 5350:17, 5350:23, 5350:24, 5351:6, 5351:10, 5351:11, 5351:14, 5351:18, 5352:4, 5352:6, 5352:8, 5352:9, 5352:23, 5353:10, 5353:15, 5355:1, 5355:2, 5384:25, 5385:4, 5388:7, 5420:2, 5437:24, 5438:2, 5438:7, 5443:21, 5444:1, 5444:2, 5444:25, 5450:3, 5450:8
**early** [1] - 5466:16
**earnings** [1] - 5376:2
**easier** [1] - 5354:6
**EASTERN** [1] - 5291:1
**eat** [1] - 5467:10
**Edenholm** [4] - 5451:16, 5459:21, 5459:22, 5462:6
**edgewise** [3] - 5373:10, 5373:22, 5374:1
**Edrozo** [8] - 5304:8, 5304:13, 5305:24, 5312:9, 5328:6, 5328:18, 5334:1, 5370:19
**education** [1] -

5428:16
**effect** [3] - 5316:8, 5317:12, 5469:6
**effective** [2] - 5297:19, 5479:3
**efforts** [2] - 5378:20, 5420:13
**eight** [1] - 5459:24
**either** [10] - 5337:18, 5352:6, 5352:10, 5353:5, 5399:23, 5418:16, 5429:13, 5431:12, 5453:25, 5458:15
**elaborate** [1] - 5404:10
**elected** [2] - 5321:5, 5391:11
**electing** [1] - 5392:1
**electricity** [1] - 5409:23
**electronic** [1] - 5399:2
**Electronic** [1] - 5407:13
**elicit** [1] - 5443:8
**email** [35] - 5304:24, 5305:7, 5305:16, 5305:23, 5306:1, 5306:25, 5307:3, 5307:6, 5307:7, 5307:9, 5307:12, 5307:20, 5308:1, 5308:7, 5308:13, 5308:19, 5308:20, 5309:11, 5309:13, 5309:14, 5309:15, 5309:18, 5309:22, 5312:4, 5312:18, 5313:7, 5326:12, 5327:4, 5327:20, 5328:12, 5328:22, 5329:9, 5412:20, 5413:7, 5413:9
**emailed** [1] - 5293:8
**emails** [7] - 5293:12, 5309:25, 5310:4, 5327:8, 5463:12, 5480:10, 5480:21
**employed** [1] - 5427:16
**employee** [1] - 5457:9
**employees** [5] - 5336:22, 5337:16, 5395:25, 5396:8, 5428:3
**employment** [1] - 5428:14
**end** [12] - 5327:24, 5328:3, 5344:12, 5355:8, 5356:8,

5373:8, 5405:9, 5410:24, 5411:16, 5419:8, 5447:12, 5462:12
**end-of-the-month** [1] - 5356:8
**ends** [2] - 5328:6, 5328:7
**enforcement** [2] - 5420:13, 5473:6
**engaged** [1] - 5420:23
**engagement** [3] - 5433:2, 5440:13, 5456:10
**ensued** [8] - 5293:15, 5296:1, 5297:1, 5395:4, 5414:1, 5414:1, 5466:1, 5467:19
**enter** [1] - 5411:6
**enters** [1] - 5449:22
**entire** [5] - 5400:6, 5401:10, 5401:16, 5401:18, 5401:21
**entitled** [2] - 5466:13, 5481:5
**entity** [4] - 5368:10, 5386:14, 5432:5, 5452:13
**entries** [2] - 5319:7, 5455:3
**entry** [4] - 5357:7, 5442:1, 5454:2, 5454:19
**envision** [3] - 5446:21, 5446:23, 5466:5
**equity** [2] - 5386:20, 5391:15
**escrow** [4] - 5452:25, 5453:7, 5454:1, 5454:5
**especially** [1] - 5376:23
**ESQ** [5] - 5291:14, 5291:15, 5291:16, 5291:18, 5291:18
**essentially** [5] - 5405:24, 5409:2, 5413:12, 5475:25, 5478:25
**estate** [1] - 5429:19
**estimate** [1] - 5446:15
**et** [1] - 5463:5
**ETA** [2] - 5355:12, 5355:15
**etcetera** [2] - 5429:4, 5438:14
**Eufora** [165] - 5294:13, 5294:19, 5294:24,

5295:5, 5297:10, 5299:24, 5300:25, 5302:20, 5302:22, 5303:12, 5304:3, 5304:9, 5305:1, 5306:1, 5309:18, 5309:22, 5314:23, 5315:12, 5316:2, 5316:17, 5318:10, 5318:12, 5319:23, 5321:19, 5322:7, 5322:14, 5323:21, 5324:19, 5324:22, 5325:1, 5325:9, 5325:11, 5326:20, 5329:16, 5329:25, 5330:6, 5333:4, 5333:13, 5333:20, 5333:23, 5334:16, 5334:22, 5335:2, 5335:5, 5335:7, 5335:11, 5335:12, 5335:13, 5336:14, 5336:19, 5336:21, 5336:22, 5338:8, 5338:17, 5338:20, 5338:22, 5339:17, 5339:18, 5340:20, 5344:1, 5344:7, 5344:13, 5345:1, 5345:5, 5345:14, 5346:13, 5347:4, 5347:9, 5348:5, 5348:13, 5350:10, 5354:17, 5354:24, 5356:15, 5357:3, 5357:6, 5357:20, 5361:6, 5361:9, 5361:21, 5362:2, 5362:16, 5363:1, 5364:1, 5364:11, 5365:4, 5365:5, 5365:9, 5365:11, 5365:15, 5366:19, 5368:7, 5368:8, 5369:24, 5370:6, 5370:11, 5370:21, 5371:3, 5371:8, 5372:14, 5375:25, 5377:13, 5379:7, 5382:17, 5382:18, 5383:11, 5384:3, 5384:4, 5384:6, 5384:9, 5385:21, 5386:7, 5386:13, 5386:14, 5386:17, 5386:20, 5387:5, 5387:22, 5389:5, 5390:3, 5390:11, 5390:18, 5391:1, 5391:4, 5396:3,

5398:21, 5399:16, 5400:3, 5403:15, 5407:10, 5408:6, 5408:25, 5409:1, 5409:17, 5410:12, 5410:17, 5411:1, 5413:5, 5413:13, 5413:17, 5415:6, 5416:12, 5420:21, 5421:4, 5421:25, 5422:8, 5426:2, 5432:12, 5432:19, 5434:6, 5434:13, 5436:22, 5453:24, 5454:1, 5454:5, 5454:7, 5454:8, 5454:10, 5454:11, 5454:14, 5455:8, 5455:18
**Eufora's** [6] - 5330:10, 5331:2, 5331:12, 5331:18, 5333:3, 5349:4
**Eufora.com** [1] - 5305:2
**evening** [1] - 5448:5
**eventually** [2] - 5383:17, 5385:12
**evidence** [78] - 5295:9, 5297:7, 5301:5, 5301:17, 5307:16, 5309:8, 5312:25, 5313:5, 5315:4, 5315:9, 5318:21, 5319:2, 5321:12, 5321:16, 5325:4, 5327:12, 5327:16, 5329:3, 5329:7, 5331:20, 5332:11, 5339:23, 5341:10, 5343:25, 5344:25, 5346:9, 5346:25, 5347:22, 5348:1, 5348:2, 5352:13, 5353:24, 5354:1, 5357:24, 5358:4, 5358:15, 5358:16, 5378:19, 5393:12, 5397:9, 5397:13, 5402:16, 5418:3, 5419:21, 5437:6, 5442:24, 5443:24, 5443:25, 5444:3, 5444:4, 5444:8, 5459:9, 5466:6, 5471:18, 5472:24, 5473:12, 5474:1, 5474:5, 5474:13, 5483:2, 5483:3, 5483:4,

5483:5, 5483:6, 5483:6, 5483:7, 5483:7, 5483:8, 5483:8, 5483:9, 5483:10, 5483:11, 5483:12, 5483:13, 5483:14, 5483:14, 5483:15, 5483:16
**ex** [2] - 5334:12, 5478:10
**ex-girlfriend** [1] - 5334:12
**ex-post** [1] - 5478:10
**exact** [6] - 5308:17, 5332:4, 5363:11, 5369:9, 5370:7, 5370:8
**exactly** [9] - 5326:21, 5364:17, 5389:20, 5389:25, 5409:4, 5422:6, 5422:9, 5422:10, 5441:25
**exam** [1] - 5428:22
**examination** [9] - 5293:20, 5366:11, 5381:3, 5390:20, 5395:16, 5399:7, 5400:25, 5401:7, 5439:11
**EXAMINATION** [24] - 5294:8, 5333:1, 5352:16, 5354:2, 5362:7, 5379:18, 5395:14, 5403:10, 5404:5, 5419:16, 5425:12, 5426:22, 5458:1, 5482:4, 5482:5, 5482:6, 5482:7, 5482:8, 5482:9, 5482:10, 5482:12, 5482:13, 5482:14, 5482:16
**examined** [2] - 5404:2, 5426:13
**example** [9] - 5336:15, 5337:1, 5337:7, 5347:2, 5364:12, 5397:20, 5406:5, 5408:14, 5441:2
**examples** [5] - 5376:24, 5384:19, 5384:24, 5397:25, 5398:19
**except** [2] - 5322:22, 5416:10
**exception** [2] - 5415:13, 5463:13
**excerpts** [2] - 5299:20, 5358:11
**excess** [1] - 5460:9

**exchange** [3] - 5341:19, 5420:2, 5474:20
**exclusive** [1] - 5410:17
**excused** [1] - 5403:19
**executed** [2] - 5316:1, 5431:22
**Executive** [1] - 5369:23
**exert** [1] - 5431:19
**exhibit** [5] - 5294:15, 5360:4, 5360:7, 5381:3, 5399:17
**Exhibit** [50] - 5294:17, 5294:23, 5297:7, 5299:14, 5306:25, 5310:14, 5312:3, 5314:21, 5315:9, 5315:11, 5319:2, 5320:1, 5321:16, 5323:4, 5323:5, 5325:5, 5327:4, 5327:16, 5329:7, 5337:7, 5339:24, 5344:1, 5344:25, 5346:2, 5347:17, 5353:25, 5354:5, 5355:3, 5355:11, 5355:14, 5357:19, 5358:10, 5369:6, 5378:18, 5379:3, 5397:16, 5400:21, 5437:7, 5483:2, 5483:6, 5483:6, 5483:7, 5483:7, 5483:8, 5483:8, 5483:11, 5483:15
**Exhibits** [21] - 5293:7, 5301:16, 5309:7, 5313:4, 5346:8, 5346:24, 5348:2, 5358:3, 5358:16, 5402:15, 5418:3, 5483:3, 5483:4, 5483:5, 5483:9, 5483:10, 5483:11, 5483:12, 5483:13, 5483:14, 5483:16
**exhibits** [8] - 5293:12, 5348:20, 5353:23, 5358:2, 5418:2, 5436:5, 5454:23, 5479:24
**exit** [4] - 5421:23, 5422:20, 5425:6, 5425:19
**exits** [1] - 5393:6
**exonerate** [1] - 5473:1

**exoneration** [1] - 5473:3
**expanded** [1] - 5402:20
**expect** [2] - 5350:11, 5467:13
**expected** [1] - 5456:7
**expecting** [1] - 5458:11
**expenditures** [16] - 5437:17, 5440:17, 5440:22, 5443:1, 5450:23, 5455:9, 5455:17, 5456:12, 5456:15, 5456:21, 5457:1, 5458:23, 5461:22, 5463:4, 5463:14, 5469:5
**expense** [3] - 5344:7, 5361:15, 5398:8
**expenses** [21] - 5335:17, 5396:8, 5396:9, 5398:21, 5399:20, 5399:24, 5418:23, 5419:6, 5419:10, 5440:19, 5440:24, 5456:1, 5457:11, 5460:10, 5462:5, 5462:11, 5463:7, 5463:10, 5478:3
**Experian** [1] - 5409:21
**experience** [2] - 5377:6, 5428:22
**experienced** [1] - 5384:14
**expert** [4] - 5431:6, 5431:11, 5431:24, 5446:10
**expertise** [1] - 5363:16
**explain** [14] - 5382:11, 5384:6, 5386:10, 5388:4, 5391:3, 5408:5, 5415:16, 5433:15, 5439:10, 5441:12, 5455:13, 5476:4, 5476:19
**explained** [5] - 5413:6, 5463:6, 5465:2, 5468:18, 5474:21
**explaining** [1] - 5422:11
**explains** [2] - 5298:25, 5473:24
**explanation** [2] - 5383:8, 5438:17
**expressed** [1] - 5464:16

**extended** [1] - 5479:2
**extensive** [1] - 5292:12
**extent** [4] - 5371:12, 5442:13, 5468:7, 5469:20

## F

**Facebook** [3] - 5377:1, 5377:3, 5377:4
**Federal** [1] - 5291:21
**federal** [5] - 5431:2, 5431:4, 5431:12, 5431:18, 5467:5
**federally** [1] - 5430:3
**fee** [5] - 5314:7, 5314:10, 5409:2, 5409:12
**fees** [6] - 5438:13, 5451:10, 5455:16, 5456:20, 5463:14
**felt** [4] - 5363:18, 5435:3, 5438:19, 5452:7
**few** [10] - 5307:17, 5314:25, 5355:11, 5385:4, 5392:23, 5403:8, 5418:18, 5419:20, 5462:14
**figured** [1] - 5362:11
**file** [4] - 5308:12, 5308:20, 5380:17, 5402:8
**filed** [6] - 5298:3, 5357:6, 5357:16, 5362:20, 5383:18, 5426:1
**files** [1] - 5402:11
**filling** [2] - 5406:7, 5406:8
**final** [7] - 5311:22, 5312:11, 5313:10, 5314:16, 5316:1, 5328:17, 5357:16
**finalized** [3] - 5306:18, 5306:20, 5306:21
**finalizing** [2] - 5325:22, 5326:9
**finally** [1] - 5389:24
**finance** [1] - 5453:21
**financed** [1] - 5452:9
**finances** [2] - 5304:9, 5304:10
**financial** [9] - 5314:7, 5314:10, 5388:22, 5404:8, 5404:9, 5404:17, 5429:10, 5435:1
**Financing** [1] - 5311:11

**faxed** [1] - 5298:3
**FBI** [2] - 5430:14, 5430:16
**February** [12] - 5311:22, 5312:13, 5312:16, 5313:7, 5313:24, 5314:1, 5314:23, 5315:12, 5315:23, 5324:9, 5327:19, 5348:12
**Federal** [1] - 5291:21

**findings** [6] - 5439:4, 5442:5, 5460:20, 5463:5, 5463:6, 5464:19
**fine** [3] - 5343:5, 5443:11, 5443:24
**finish** [2] - 5309:2, 5467:13
**finished** [3] - 5292:18, 5332:6, 5447:5
**finishing** [1] - 5428:16
**firm** [11] - 5389:12, 5389:13, 5420:12, 5427:19, 5427:24, 5428:1, 5428:5, 5428:10, 5428:15, 5430:6, 5451:9
**firms** [1] - 5456:3
**first** [42] - 5292:20, 5313:13, 5317:23, 5322:14, 5323:17, 5323:20, 5331:10, 5331:18, 5331:23, 5344:16, 5344:17, 5394:8, 5397:15, 5404:1, 5404:13, 5405:3, 5407:17, 5407:18, 5408:9, 5410:8, 5412:1, 5412:16, 5415:3, 5426:12, 5432:8, 5436:10, 5447:2, 5447:8, 5447:24, 5455:1, 5465:4, 5467:2, 5468:5, 5469:17, 5469:23, 5469:25, 5470:20, 5470:21, 5472:22, 5476:22, 5476:23, 5477:19
**five** [3] - 5329:22, 5446:14, 5446:23
**five-hour** [1] - 5446:23
**fix** [2] - 5323:6, 5394:8
**flight** [2] - 5443:3, 5443:4
**flow** [1] - 5318:2
**flowchart** [2] - 5390:7, 5390:8
**flowed** [2] - 5322:14, 5433:24
**fly** [1] - 5442:22
**flying** [1] - 5292:23
**focused** [1] - 5449:1
**folks** [1] - 5469:6
**follow** [5] - 5412:15, 5436:4, 5447:9, 5454:20, 5473:2
**follow-up** [1] - 5412:15

**facets** [1] - 5472:8
**fact** [15] - 5298:25, 5305:1, 5309:12, 5311:16, 5334:5, 5342:2, 5357:6, 5372:23, 5378:9, 5380:18, 5387:14, 5391:14, 5430:18, 5473:5, 5473:13
**facto** [1] - 5478:10
**factors** [1] - 5472:21
**facts** [10] - 5297:16, 5370:12, 5382:25, 5429:10, 5465:8, 5470:10, 5470:14, 5471:7, 5472:4
**failure** [2] - 5469:15, 5473:6
**fair** [12] - 5292:8, 5300:12, 5303:25, 5337:21, 5354:14, 5356:5, 5357:3, 5369:17, 5371:15, 5378:4, 5380:1, 5400:15
**faith** [1] - 5449:18
**Falcon** [18] - 5396:6, 5451:19, 5451:23, 5452:4, 5452:14, 5452:15, 5452:20, 5452:23, 5453:9, 5454:15, 5454:25, 5455:1, 5455:18, 5465:4, 5473:21, 5476:19
**fall** [1] - 5446:20
**fallout** [1] - 5415:13
**familiar** [7] - 5351:1, 5357:10, 5357:15, 5365:10, 5384:20, 5451:23, 5452:18
**family** [1] - 5395:24
**far** [4] - 5333:9, 5383:6, 5446:15, 5477:8
**fashion** [1] - 5415:9
**favor** [1] - 5303:9
**Fax** [1] - 5291:22

**following** [27] - 5293:15, 5295:12, 5296:14, 5297:1, 5297:23, 5308:12, 5332:12, 5341:16, 5349:4, 5350:1, 5351:23, 5352:1, 5359:3, 5395:4, 5413:22, 5414:2, 5415:1, 5417:4, 5418:1, 5423:9, 5424:9, 5425:1, 5436:1, 5463:21, 5465:17, 5466:1, 5467:19
**follows** [7] - 5294:6, 5296:1, 5395:10, 5404:3, 5414:1, 5426:13, 5464:1
**followup** [1] - 5462:14
**forbearance** [1] - 5451:3
**forced** [1] - 5391:25
**foregoing** [3] - 5297:22, 5298:9, 5481:5
**foreign** [1] - 5430:12
**forensic** [17] - 5428:25, 5429:5, 5429:6, 5429:8, 5430:18, 5430:21, 5431:6, 5431:20, 5433:1, 5439:13, 5439:17, 5440:2, 5440:3, 5440:4, 5440:7, 5440:10, 5446:10
**form** [4] - 5294:23, 5320:10, 5421:24, 5480:16
**formal** [5] - 5458:8, 5458:9, 5458:13, 5460:22, 5461:2
**format** [1] - 5474:4
**formed** [2] - 5429:17, 5430:5
**former** [1] - 5457:9
**forth** [5] - 5327:8, 5356:18, 5410:23, 5474:20, 5475:4
**forward** [3] - 5364:20, 5385:17, 5439:25
**Foster** [3] - 5403:21, 5422:24, 5422:25
**foster** [8] - 5292:22, 5293:3, 5404:7, 5419:18, 5422:22, 5423:1, 5423:6, 5425:3
**FOSTER** [2] - 5403:25,

5482:12
**foundation** [2] - 5351:20, 5444:22
**founder** [1] - 5384:8
**founding** [2] - 5427:19, 5428:2
**four** [6] - 5304:16, 5310:23, 5323:12, 5408:3, 5408:17, 5427:15
**frames** [1] - 5422:1
**fraud** [3] - 5350:9, 5464:4, 5477:20
**free** [3] - 5420:10, 5421:6, 5467:9
**frequently** [1] - 5398:24
**Friday's** [1] - 5388:22
**friend** [1] - 5451:12
**friends** [1] - 5372:23
**front** [3] - 5298:5, 5354:20, 5461:16
**full** [10] - 5300:17, 5327:23, 5328:2, 5380:6, 5380:11, 5380:14, 5380:21, 5401:4, 5401:9, 5448:23
**fully** [2] - 5388:21, 5420:10
**Fund** [10] - 5432:6, 5432:15, 5432:18, 5433:4, 5433:16, 5433:24, 5438:6, 5451:14, 5457:12, 5463:3
**fund** [2] - 5397:21, 5398:21
**funded** [2] - 5420:10, 5430:3
**funding** [4] - 5355:16, 5356:25, 5411:5, 5411:7
**funds** [14] - 5363:10, 5395:20, 5398:23, 5433:24, 5438:6, 5440:6, 5441:1, 5441:12, 5451:2, 5451:13, 5453:25, 5455:4, 5455:6, 5455:7
**future** [1] - 5383:25

# G

**Gaarn** [6] - 5297:18, 5379:25, 5402:25, 5403:12, 5403:14, 5449:2
**Gaarn's** [1] - 5402:22

**galioto** [2] - 5468:24, 5471:25
**Galioto** [11] - 5463:18, 5464:20, 5465:2, 5468:16, 5469:6, 5469:15, 5470:13, 5473:15, 5475:11, 5476:1
**Galioto's** [1] - 5469:11
**Gardina** [1] - 5441:2
**gathered** [1] - 5471:23
**general** [3] - 5410:9, 5413:10, 5462:7
**general-purpose** [1] - 5410:9
**generally** [3] - 5406:3, 5408:18, 5440:4
**generation** [1] - 5409:1
**gentleman** [2] - 5373:11, 5374:22
**gentlemen** [1] - 5311:9
**Gentlemen** [1] - 5420:7
**Gentry** [50] - 5297:18, 5304:9, 5304:13, 5305:19, 5307:24, 5311:7, 5314:4, 5325:17, 5326:17, 5327:5, 5327:18, 5328:5, 5328:7, 5328:13, 5328:17, 5328:22, 5329:9, 5329:13, 5350:21, 5351:5, 5354:16, 5355:5, 5361:12, 5363:5, 5363:14, 5364:5, 5365:2, 5365:14, 5366:18, 5367:14, 5369:20, 5369:22, 5370:5, 5370:10, 5370:20, 5371:1, 5372:12, 5378:4, 5378:10, 5378:23, 5379:4, 5379:10, 5379:25, 5380:23, 5387:17, 5387:21, 5387:25, 5388:22, 5389:15, 5389:22
**Gentry's** [3] - 5311:19, 5390:20, 5391:4
**Gillis** [2] - 5450:13
**girlfriend** [1] - 5334:12
**given** [14] - 5303:20, 5353:1, 5363:11, 5367:4, 5371:10, 5401:13, 5435:2,

5435:11, 5436:6, 5449:15, 5450:19, 5456:13, 5458:16, 5460:11
**glasses** [1] - 5368:18
**Glenn** [1] - 5367:16
**Global** [13] - 5432:5, 5432:15, 5432:18, 5433:3, 5433:16, 5433:23, 5433:24, 5438:5, 5451:13, 5457:12, 5458:17, 5460:4, 5463:2
**godfather** [1] - 5372:24
**gonchar** [2] - 5433:13, 5442:17
**Gonchar** [28] - 5319:22, 5320:2, 5339:16, 5389:9, 5390:19, 5392:7, 5392:13, 5432:22, 5433:3, 5433:7, 5433:15, 5433:19, 5439:3, 5439:6, 5439:14, 5442:5, 5442:16, 5452:12, 5456:12, 5458:3, 5458:4, 5458:14, 5459:5, 5459:9, 5459:13, 5460:11, 5460:20, 5463:15
**gospel** [1] - 5473:20
**government** [38] - 5292:4, 5292:10, 5292:13, 5292:16, 5293:21, 5295:8, 5301:4, 5307:15, 5312:24, 5315:3, 5315:8, 5318:20, 5321:11, 5327:11, 5329:2, 5331:19, 5340:8, 5342:20, 5343:19, 5346:20, 5347:21, 5348:20, 5352:12, 5357:11, 5358:14, 5416:15, 5442:21, 5466:22, 5467:9, 5469:13, 5474:2, 5474:3, 5474:13, 5475:18, 5478:11, 5478:15, 5480:6
**Government** [73] - 5291:12, 5294:17, 5294:23, 5297:7, 5299:13, 5301:16, 5306:25, 5309:7, 5312:3, 5313:4, 5314:20, 5315:9,

5315:11, 5319:2, 5320:1, 5321:16, 5325:4, 5327:4, 5327:16, 5329:7, 5332:11, 5337:2, 5337:7, 5339:24, 5343:25, 5344:25, 5346:2, 5346:8, 5346:24, 5347:17, 5348:2, 5353:25, 5354:5, 5355:3, 5355:11, 5355:14, 5357:18, 5357:23, 5358:3, 5358:9, 5358:10, 5358:16, 5380:19, 5381:7, 5383:9, 5383:12, 5385:20, 5386:8, 5387:9, 5389:14, 5393:13, 5394:4, 5416:12, 5437:7, 5446:7, 5447:6, 5447:15, 5483:2, 5483:3, 5483:4, 5483:5, 5483:6, 5483:6, 5483:7, 5483:7, 5483:8, 5483:8, 5483:9, 5483:10, 5483:11, 5483:11, 5483:12, 5483:13
**government's** [4] - 5466:20, 5475:9, 5476:20, 5477:5
**graduated** [1] - 5404:25
**great** [3] - 5372:23, 5447:13, 5449:18
**Greendot** [1] - 5408:14
**gross** [2] - 5478:2, 5478:7
**ground** [1] - 5448:24
**grounds** [2] - 5448:21, 5479:22
**group** [17] - 5342:13, 5384:11, 5415:17, 5415:19, 5415:21, 5424:5, 5425:6, 5425:19, 5426:2, 5428:7, 5442:3, 5444:25, 5445:1, 5445:3, 5445:4, 5461:9
**Group** [6] - 5320:7, 5320:11, 5320:13, 5321:1, 5324:7, 5382:21
**guarantee** [1] - 5449:7
**guaranteed** [2] -

5452:11
**guess** [9] - 5304:4, 5334:2, 5355:18, 5389:15, 5391:19, 5397:4, 5458:11, 5467:14, 5476:9
**guilty** [1] - 5479:6
**guy** [3] - 5367:4, 5407:1, 5407:7
**guys** [7] - 5316:19, 5334:22, 5360:21, 5372:19, 5390:15, 5409:21, 5422:12
**GX** [1] - 5300:7

# H

**Haley** [8] - 5292:16, 5347:24, 5362:5, 5383:10, 5417:2, 5446:17, 5448:2
**HALEY** [43] - 5291:16, 5297:2, 5301:14, 5309:5, 5313:2, 5315:7, 5318:24, 5321:14, 5327:14, 5329:5, 5332:9, 5346:6, 5346:22, 5347:25, 5350:17, 5358:1, 5360:3, 5360:8, 5362:6, 5362:8, 5368:18, 5378:14, 5378:20, 5379:14, 5389:1, 5389:3, 5402:5, 5403:8, 5403:11, 5403:17, 5406:21, 5416:8, 5416:21, 5425:11, 5446:21, 5447:4, 5447:21, 5448:12, 5448:25, 5449:18, 5465:11, 5482:7, 5482:11
**Haley's** [1] - 5466:20
**half** [6] - 5428:12, 5431:21, 5432:3, 5446:19, 5448:15, 5466:16
**hand** [15] - 5294:16, 5299:13, 5306:24, 5310:20, 5312:2, 5314:20, 5318:15, 5327:3, 5331:11, 5347:16, 5348:17, 5357:18, 5358:9, 5370:22
**handed** [2] - 5309:12, 5317:23
**handle** [5] - 5360:17, 5360:19, 5360:22, 5474:15

hang [1] - 5466:14
**hangar** [2] - 5331:6, 5332:2
**hangars** [1] - 5331:12
**hangers** [1] - 5451:7
**happy** [1] - 5330:21
**Harbor** [1] - 5393:11
**hard** [2] - 5326:25, 5459:17
**haste** [1] - 5394:9
**haven** [1] - 5457:1
**head** [2] - 5418:16, 5428:6
**header** [2] - 5297:9, 5378:6
**hear** [11] - 5355:15, 5358:18, 5432:8, 5432:9, 5461:14, 5466:18, 5466:19, 5468:17, 5471:8, 5473:22, 5475:15
**heard** [17] - 5292:8, 5300:12, 5302:7, 5367:19, 5367:21, 5368:14, 5368:22, 5373:2, 5373:8, 5432:4, 5432:10, 5432:14, 5432:16, 5452:15, 5464:11, 5471:25, 5472:8
**hearing** [1] - 5393:12
**hearsay** [3] - 5459:3, 5459:7, 5474:5
**held** [8] - 5364:23, 5365:7, 5365:16, 5365:17, 5367:16, 5367:18, 5392:16, 5452:13
**help** [5] - 5352:23, 5363:12, 5363:14, 5366:13, 5407:3
**helpful** [2] - 5369:8, 5457:10
**hereof** [1] - 5298:11
**high** [2] - 5405:22, 5480:12
**higher** [1] - 5363:16
**highlight** [2] - 5442:7, 5477:22
**highlighted** [5] - 5381:6, 5400:18, 5401:2, 5401:6, 5455:9
**highly** [1] - 5420:11
**Hilton** [3] - 5451:4, 5453:22
**himself** [9] - 5325:18, 5366:5, 5373:19, 5387:25, 5388:8, 5388:11, 5391:15,

5434:5, 5434:12
**hire** [2] - 5363:14, 5431:20
**hired** [17] - 5322:25, 5363:5, 5363:8, 5364:5, 5364:21, 5365:3, 5365:20, 5365:22, 5366:1, 5366:8, 5366:12, 5366:13, 5389:11, 5429:9, 5430:6, 5431:22, 5432:12
**history** [3] - 5371:10, 5404:24, 5428:13
**hit** [4] - 5397:5, 5432:2, 5438:24, 5455:14
**hmm** [2] - 5305:3, 5305:4
**Hockey** [2] - 5364:24, 5365:5
**hockey** [17] - 5316:18, 5323:19, 5364:23, 5389:9, 5390:15, 5415:6, 5415:17, 5415:20, 5416:5, 5421:24, 5422:20, 5444:1, 5449:11, 5450:3, 5460:21, 5461:5, 5469:4
**hold** [4] - 5298:9, 5309:1, 5336:6, 5429:1
**holder** [1] - 5408:10
**holders** [1] - 5406:1
**holding** [2] - 5299:2, 5392:16
**holds** [1] - 5392:7
**home** [4] - 5331:7, 5332:5, 5339:5, 5466:16
**Home** [1] - 5446:11
**honestly** [2] - 5330:20, 5369:8
**Honor** [59] - 5292:18, 5293:2, 5295:10, 5297:2, 5308:23, 5308:25, 5309:4, 5310:6, 5318:23, 5321:13, 5327:13, 5329:4, 5339:25, 5341:5, 5346:3, 5346:5, 5346:21, 5347:23, 5348:20, 5352:14, 5357:25, 5360:2, 5360:8, 5360:25, 5378:15, 5378:16, 5379:17, 5382:7, 5384:22, 5392:19, 5392:21,

5393:8, 5393:15, 5395:11, 5397:9, 5402:19, 5403:4, 5403:22, 5406:19, 5413:18, 5416:25, 5422:22, 5426:21, 5441:15, 5441:21, 5442:20, 5443:18, 5443:19, 5444:5, 5445:5, 5445:10, 5446:21, 5447:7, 5449:25, 5459:2, 5459:7, 5465:12, 5476:17, 5480:15
**HONORABLE** [1] - 5291:9
**hope** [3] - 5293:18, 5447:18, 5467:15
**hopefully** [3] - 5447:16, 5447:17, 5466:7
**hoping** [2] - 5411:6, 5413:16
**HORMOVITIS** [1] - 5291:6
**host** [1] - 5475:6
**hostile** [1] - 5415:17
**hotel** [2] - 5418:25, 5467:4
**hour** [3] - 5292:25, 5446:23, 5477:15
**hours** [4] - 5446:18, 5446:22, 5466:15, 5466:19
**huge** [1] - 5410:8
**hundred** [1] - 5431:13
**husband** [1] - 5431:22

# I

**idea** [2] - 5387:4, 5429:6
**identification** [4] - 5400:9, 5406:21, 5406:22, 5435:17
**identified** [2] - 5444:6, 5444:11
**identifies** [1] - 5351:19
**identify** [5] - 5353:2, 5358:19, 5394:1, 5434:7
**ignored** [2] - 5465:8, 5476:8
**ignoring** [2] - 5472:4, 5473:17
**Ill** [1] - 5384:9
**IM** [2] - 5306:10, 5306:11
**immediate** [1] -

5454:21
**immediately** [1] - 5297:19
**important** [3] - 5341:18, 5363:22, 5372:12
**improper** [2] - 5343:8, 5455:5
**improve** [2] - 5409:8, 5410:1
**improves** [1] - 5409:20
**in-person** [2] - 5412:16, 5433:12
**inaccurate** [2] - 5388:23, 5469:16
**inadmissible** [1] - 5469:23
**inappropriately** [1] - 5341:24
**inception** [1] - 5357:3
**inches** [1] - 5480:12
**incident** [1] - 5472:6
**include** [6] - 5367:15, 5424:7, 5431:14, 5431:16, 5443:21, 5476:12
**included** [5] - 5300:24, 5364:22, 5435:3, 5469:17, 5477:3
**includes** [1] - 5301:8, 5328:24
**including** [8] - 5298:2, 5314:13, 5363:2, 5388:23, 5420:13, 5435:23, 5452:4, 5478:9
**income** [1] - 5357:8
**incoming** [1] - 5325:5
**incorporated** [1] - 5437:3
**incorrect** [1] - 5323:16
**incorrectly** [1] - 5322:13
**increase** [1] - 5390:25
**increased** [1] - 5408:23
**incredibly** [1] - 5470:6
**indeed** [2] - 5368:9, 5379:3
**independent** [3] - 5389:10, 5469:1, 5470:19
**indicating** [1] - 5406:18
**indication** [2] - 5308:1, 5472:23
**indictment** [13] - 5393:12, 5465:5,

5469:17, 5469:23, 5469:25, 5470:4, 5470:21, 5472:22, 5473:21, 5476:16, 5476:23, 5478:8
**indictments** [1] - 5470:20
**individual** [14] - 5302:17, 5337:3, 5337:10, 5365:17, 5373:14, 5389:8, 5389:11, 5395:24, 5396:21, 5397:20, 5398:20, 5431:22, 5433:25, 5473:1
**individuals** [7] - 5298:8, 5298:22, 5366:20, 5372:11, 5384:14, 5395:25, 5472:5
**industry** [1] - 5384:10
**infer** [1] - 5473:8
**information** [45] - 5366:19, 5371:4, 5371:5, 5371:16, 5371:19, 5372:9, 5381:21, 5382:1, 5382:4, 5382:5, 5382:24, 5406:9, 5433:6, 5433:9, 5435:6, 5435:14, 5437:11, 5437:16, 5438:13, 5438:25, 5439:22, 5439:23, 5440:8, 5455:18, 5455:19, 5456:7, 5457:10, 5460:1, 5464:19, 5464:24, 5469:16, 5471:11, 5471:22, 5472:14, 5472:19, 5473:1, 5473:16, 5474:18, 5475:20, 5475:21, 5475:25, 5476:7
**initial** [3] - 5433:14, 5439:21, 5440:19
**initials** [3] - 5307:13, 5310:23, 5311:8
**innocence** [1] - 5471:12
**inquire** [1] - 5451:2
**inquiry** [1] - 5440:25
**insider's** [1] - 5336:15
**insisting** [1] - 5326:1
**insofar** [1] - 5375:13
**instability** [1] - 5442:25
**instance** [1] - 5476:4
**instant** [4] - 5306:4,

5306:6, 5306:7, 5358:12
**instruction** [3] - 5308:2, 5402:13, 5478:18
**instructions** [7] - 5336:3, 5466:10, 5466:12, 5466:13, 5466:24, 5477:16, 5477:20
**insufficient** [1] - 5452:7
**insurance** [1] - 5438:13
**integrated** [1] - 5409:17
**intellectual** [2] - 5386:24, 5410:22
**Intended** [1] - 5319:6
**intended** [8] - 5319:10, 5319:13, 5381:7, 5382:13, 5383:3, 5388:12, 5433:11, 5456:16
**intending** [1] - 5442:6
**intends** [1] - 5393:23
**interaction** [1] - 5477:8
**interest** [51] - 5299:2, 5316:11, 5316:14, 5318:7, 5319:22, 5320:10, 5320:18, 5321:4, 5322:14, 5323:3, 5323:10, 5323:13, 5324:6, 5330:10, 5330:16, 5330:18, 5330:19, 5330:23, 5331:1, 5347:11, 5347:19, 5348:5, 5364:13, 5364:23, 5365:5, 5365:7, 5366:19, 5367:16, 5368:7, 5368:9, 5368:24, 5374:9, 5382:18, 5389:6, 5390:3, 5390:16, 5390:18, 5390:21, 5391:1, 5391:4, 5391:15, 5391:21, 5391:23, 5392:7, 5392:8, 5392:14, 5409:9, 5453:4, 5464:24
**interested** [15] - 5408:5, 5408:24, 5410:18, 5410:21, 5411:22, 5413:4, 5433:1, 5471:13, 5472:18, 5472:19, 5473:14, 5474:19,

5474:22, 5475:1, 5475:5
**interests** [4] - 5297:17, 5298:10, 5365:16, 5372:14
**internal** [2] - 5334:16, 5336:8
**international** [1] - 5420:12
**internet** [1] - 5408:22
**interpretation** [1] - 5464:8
**interrupt** [2] - 5292:22, 5375:16
**interrupting** [1] - 5444:9
**interview** [1] - 5382:13
**intimate** [1] - 5367:3
**intimately** [1] - 5365:10
**intrigue** [1] - 5441:3
**introduce** [6] - 5340:11, 5393:23, 5401:23, 5470:25, 5471:16, 5472:21
**introduced** [2] - 5319:9, 5444:13
**introducing** [1] - 5473:11
**introduction** [1] - 5406:25
**invested** [1] - 5421:24
**investigate** [1] - 5469:15
**investigation** [15] - 5350:15, 5429:22, 5430:24, 5471:6, 5471:14, 5456:25, 5473:4, 5473:7, 5473:9, 5474:12, 5474:24, 5474:25, 5475:7, 5475:9, 5477:5
**investigative** [3] - 5429:8, 5430:12, 5430:14
**investigator** [2] - 5471:21, 5472:16
**investigators** [1] - 5471:23
**investing** [1] - 5372:8
**investment** [9] - 5339:21, 5344:8, 5362:3, 5377:8, 5382:20, 5388:18, 5425:18, 5441:3, 5451:21
**investor** [3] - 5322:5, 5322:15, 5405:16
**Investors** [2] - 5319:6,

5319:7
**investors** [21] - 5319:10, 5319:11, 5319:13, 5319:19, 5372:8, 5381:8, 5382:13, 5382:14, 5383:1, 5384:9, 5386:18, 5388:10, 5388:13, 5391:13, 5407:1, 5419:11, 5422:2, 5422:6, 5422:8, 5422:20
**invitation** [1] - 5476:2
**invoices** [1] - 5435:14, 5455:16
**involve** [1] - 5326:12
**involved** [7] - 5303:24, 5326:7, 5338:23, 5371:8, 5404:21, 5405:15, 5432:13
**involvement** [1] - 5433:16
**IP** [2] - 5383:24, 5386:22
**irrelevant** [1] - 5416:16
**IS** [1] - 5315:12
**Islip** [2] - 5291:4, 5291:22
**isolated** [1] - 5402:7
**issuance** [1] - 5411:10
**issue** [14] - 5292:9, 5303:16, 5406:11, 5409:6, 5409:10, 5416:11, 5439:18, 5440:1, 5456:24, 5458:8, 5461:2, 5470:19, 5475:8, 5477:23
**issued** [5] - 5333:4, 5333:20, 5333:23, 5458:13, 5460:22
**issuer** [4] - 5404:20, 5405:21, 5410:17, 5418:16
**issues** [5] - 5404:21, 5452:11, 5452:12, 5456:18, 5475:16
**issuing** [2] - 5407:5, 5410:7
**IT** [1] - 5360:21

**J**

**JAMES** [1] - 5291:14
**James** [1] - 5441:2
**January** [2] - 5327:19, 5398:8
**JB** [1] - 5453:16
**Jeff** [2] - 5403:21,

5453:17
**JEFF** [2] - 5403:25, 5482:12
**Jim** [1] - 5419:18
**job** [4] - 5365:11, 5366:5, 5406:6, 5473:8
**jobs** [1] - 5356:16
**jogging** [1] - 5462:10
**John** [5] - 5377:12, 5377:17, 5377:19, 5382:15, 5382:19
**joint** [1] - 5447:4
**Joint** [1] - 5311:1
**JOSEPH** [1] - 5291:9
**Josh** [1] - 5472:8
**Jowdy** [2] - 5451:21, 5472:9
**judge** [31] - 5307:18, 5309:5, 5313:2, 5315:6, 5318:24, 5318:25, 5321:14, 5327:14, 5332:9, 5340:15, 5340:16, 5340:18, 5342:21, 5346:22, 5350:17, 5351:15, 5397:13, 5401:24, 5402:5, 5415:19, 5416:8, 5424:3, 5424:8, 5425:11, 5442:2, 5464:18, 5469:13, 5471:2, 5471:5, 5471:24, 5480:23
**Judge** [23] - 5329:5, 5360:3, 5362:6, 5378:20, 5393:3, 5394:10, 5447:13, 5447:14, 5448:25, 5449:14, 5449:19, 5468:11, 5468:23, 5469:3, 5469:17, 5469:19, 5470:24, 5471:22, 5473:13, 5476:22, 5477:14, 5479:10, 5480:5
**JUDGE** [1] - 5291:10
**Julia** [1] - 5430:13
**July** [1] - 5297:12
**June** [4] - 5291:7, 5398:3, 5398:16, 5459:22
**Juneau** [1] - 5451:17
**jurors** [5] - 5292:2, 5319:4, 5467:3, 5473:7, 5476:6
**jury** [37] - 5291:10, 5293:1, 5293:16, 5293:17, 5301:19, 5341:17, 5343:20,

5347:2, 5382:11,
5385:11, 5393:6,
5393:19, 5395:5,
5401:12, 5408:5,
5439:10, 5441:20,
5448:15, 5448:22,
5449:3, 5449:22,
5454:17, 5465:13,
5467:10, 5467:19,
5470:5, 5470:16,
5470:22, 5471:16,
5472:24, 5473:10,
5474:25, 5476:1,
5476:11, 5477:16,
5478:20, 5479:1

**K**

**K-228** [1] - 5367:23
**K-243** [2] - 5378:18,
5483:15
**Kaiser** [7] - 5377:12,
5377:17, 5377:19,
5382:15, 5382:19,
5388:16, 5449:10
**keep** [4] - 5408:18,
5408:20, 5426:18,
5460:23
**keeping** [2] - 5408:12,
5408:24
**KELLY** [1] - 5291:12
**Kennedy** [15] -
5297:24, 5320:15,
5321:18, 5323:9,
5336:11, 5385:19,
5385:21, 5386:4,
5446:5, 5477:14,
5480:3, 5480:4,
5480:13, 5480:14,
5480:15
**Kennedy's** [3] -
5296:4, 5296:8,
5298:3
**KENNER** [2] - 5291:5,
5291:5
**Kenner** [22] - 5291:17,
5355:22, 5362:12,
5367:9, 5369:6,
5377:14, 5377:19,
5377:23, 5378:14,
5379:3, 5393:14,
5415:18, 5415:25,
5434:3, 5434:11,
5435:5, 5436:14,
5437:4, 5444:6,
5456:22, 5457:9,
5473:19
**Kenner's** [3] - 5416:7,
5444:22, 5445:5
**Kenner-Richards** [1] -
5435:5

**kept** [1] - 5335:22
**kidding** [1] - 5447:14
**killed** [1] - 5431:23
**kind** [15] - 5391:25,
5392:23, 5405:24,
5406:25, 5407:12,
5408:2, 5420:14,
5428:8, 5430:10,
5438:23, 5440:21,
5451:15, 5455:14,
5462:10, 5472:12
**kindly** [1] - 5368:15
**kiosks** [1] - 5431:17
**knowing** [3] - 5370:8,
5426:4, 5472:19
**knowledge** [14] -
5318:2, 5331:9,
5365:14, 5367:3,
5369:19, 5370:9,
5370:10, 5371:18,
5377:5, 5378:3,
5389:21, 5399:12,
5403:15, 5403:16
**known** [2] - 5432:5
**knows** [2] - 5330:16,
5468:14
**Komatireddy** [1] -
5293:25
**KOMATIREDDY** [96] -
5291:15, 5294:1,
5294:9, 5295:8,
5296:6, 5297:8,
5301:4, 5301:8,
5301:12, 5301:18,
5301:21, 5301:23,
5301:25, 5302:2,
5302:4, 5302:5,
5302:9, 5302:11,
5302:13, 5303:5,
5307:15, 5308:24,
5309:9, 5310:6,
5310:9, 5312:24,
5313:6, 5315:3,
5315:10, 5318:20,
5319:3, 5321:11,
5321:17, 5327:11,
5327:17, 5329:2,
5329:8, 5331:19,
5333:2, 5339:25,
5340:18, 5341:6,
5341:9, 5343:21,
5346:3, 5346:10,
5346:19, 5347:1,
5347:21, 5348:3,
5348:19, 5350:4,
5350:14, 5350:21,
5351:5, 5351:9,
5351:21, 5352:2,
5352:12, 5354:3,
5357:23, 5358:5,

5358:14, 5358:23,
5360:5, 5360:7,
5362:4, 5366:6,
5377:9, 5378:15,
5382:6, 5384:22,
5393:15, 5393:21,
5401:13, 5403:7,
5416:18, 5416:24,
5441:15, 5442:20,
5443:19, 5444:4,
5445:4, 5445:9,
5459:2, 5459:7,
5463:19, 5464:2,
5469:19, 5473:23,
5476:17, 5480:2,
5480:13, 5480:17,
5482:4, 5482:6
**Kristie** [1] - 5334:12

**L**

**landlord** [1] - 5325:2
**landscaping** [1] -
5396:7
**lane** [1] - 5438:23
**Lane** [5] - 5432:21,
5432:25, 5433:21,
5455:25, 5460:17
**large** [3] - 5365:25,
5375:23, 5410:20
**larger** [1] - 5364:20
**LARUSSO** [19] -
5360:2, 5360:25,
5378:16, 5379:17,
5379:19, 5392:19,
5393:1, 5393:3,
5393:8, 5393:25,
5394:9, 5446:4,
5447:12, 5448:10,
5449:4, 5449:17,
5449:25, 5476:22,
5482:8
**LaRusso** [121] -
5291:18, 5292:4,
5292:18, 5292:21,
5293:6, 5293:11,
5293:14, 5295:10,
5296:2, 5296:9,
5296:12, 5300:18,
5301:6, 5307:17,
5307:19, 5308:22,
5309:1, 5309:4,
5310:3, 5313:1,
5315:5, 5315:6,
5317:17, 5317:23,
5318:22, 5320:9,
5321:13, 5322:23,
5327:13, 5329:4,
5331:21, 5331:23,
5332:8, 5340:11,
5340:14, 5340:21,

5340:22, 5340:23,
5341:1, 5341:5,
5341:14, 5341:17,
5346:5, 5346:21,
5347:23, 5348:23,
5349:2, 5350:2,
5350:13, 5350:19,
5351:1, 5351:12,
5352:14, 5352:17,
5353:22, 5357:25,
5358:18, 5395:11,
5395:15, 5401:10,
5401:18, 5401:23,
5402:4, 5402:19,
5403:4, 5403:21,
5404:6, 5406:18,
5406:23, 5413:18,
5415:16, 5416:25,
5418:4, 5418:6,
5419:14, 5423:7,
5424:1, 5425:13,
5426:6, 5426:8,
5426:9, 5426:21,
5426:23, 5441:25,
5442:2, 5443:7,
5443:15, 5444:6,
5444:15, 5445:3,
5445:7, 5447:6,
5447:11, 5447:16,
5448:1, 5448:8,
5458:2, 5464:11,
5464:16, 5468:11,
5468:21, 5469:21,
5470:19, 5470:24,
5471:2, 5471:5,
5471:20, 5476:3,
5476:14, 5477:12,
5479:12, 5479:18,
5480:1, 5480:5,
5480:19, 5480:23,
5482:5, 5482:10,
5482:13, 5482:15,
5482:17
**LaRusso's** [3] -
5318:18, 5466:21,
5473:24
**last** [19] - 5296:3,
5296:8, 5296:9,
5300:14, 5303:6,
5313:19, 5314:25,
5345:10, 5370:18,
5380:20, 5387:9,
5393:22, 5394:9,
5412:5, 5421:21,
5426:15, 5452:4,
5460:16, 5477:12
**lastly** [3] - 5303:2,
5398:16, 5412:10
**laundered** [1] - 5478:4
**laundering** [7] -

5477:23, 5478:1,
5478:8, 5478:23,
5478:25, 5479:2,
5479:4
**Law** [2] - 5344:15,
5345:12
**law** [10] - 5389:12,
5420:12, 5428:15,
5456:3, 5466:11,
5466:24, 5473:6,
5475:22, 5478:10,
5479:4
**lawful** [1] - 5450:9
**lawsuit** [6] - 5362:22,
5362:25, 5363:1,
5384:13, 5432:13,
5457:5
**lawsuits** [1] - 5362:19
**lawyer** [7] - 5449:7,
5464:21, 5468:14,
5468:25, 5471:10,
5471:12, 5480:8
**lawyers** [1] - 5466:10
**lay** [1] - 5351:20
**layman's** [1] - 5386:25
**lead** [3] - 5382:8,
5472:14, 5473:2
**leading** [3] - 5355:2,
5382:6, 5475:23
**leads** [5] - 5469:20,
5469:22, 5472:2,
5472:14
**League** [2] - 5364:24,
5365:3
**learn** [2] - 5388:21,
5390:14
**learned** [3] - 5367:6,
5385:16, 5388:25
**learning** [1] - 5465:7
**least** [11] - 5299:2,
5335:19, 5341:23,
5363:25, 5409:11,
5456:4, 5461:9,
5473:3, 5476:3,
5476:5, 5476:7
**leave** [8] - 5292:25,
5387:24, 5399:4,
5424:4, 5441:21,
5447:12, 5458:3,
5476:2
**leaves** [1] - 5468:3
**leaving** [2] - 5323:12,
5422:14
**led** [1] - 5468:22
**left** [10] - 5292:14,
5294:12, 5310:13,
5310:15, 5310:20,
5324:5, 5405:10,
5441:20, 5478:3,
5480:9

left-hand [1] - 5310:20
legal [2] - 5374:10, 5455:16
legitimately [1] - 5407:3
lend [1] - 5326:5
lender [6] - 5302:22, 5302:25, 5326:1, 5451:4, 5452:2, 5453:18
letter [4] - 5294:13, 5294:16, 5314:11, 5479:13
letters [1] - 5435:23
letting [1] - 5457:10
level [1] - 5405:22
licensing [2] - 5376:7, 5376:8
lied [1] - 5343:2
lien [1] - 5460:5
lies [1] - 5342:2
life [2] - 5342:22, 5376:10
lifetime [4] - 5408:12, 5408:15, 5410:6, 5410:9
likelihood [1] - 5409:25
likewise [2] - 5353:3, 5401:5
limitations [1] - 5478:19
limits [1] - 5468:7
line [4] - 5311:10, 5328:24, 5355:5, 5367:24
lines [3] - 5422:4, 5422:15, 5443:19
lingo [2] - 5334:22, 5337:1
liquidate [1] - 5430:1
list [1] - 5316:17
listed [6] - 5317:9, 5320:2, 5320:8, 5390:4, 5390:11, 5454:12
listen [7] - 5292:5, 5295:2, 5300:14, 5394:1, 5400:4, 5461:13, 5467:16
listened [5] - 5292:6, 5299:18, 5300:7, 5387:7, 5387:9
listener [1] - 5373:10
lists [2] - 5454:14, 5454:25
litigation [8] - 5362:15, 5362:17, 5428:7, 5429:4, 5439:18, 5439:19,

5456:25, 5457:2
litigations [1] - 5457:3
live [1] - 5427:6
lives [1] - 5420:11
LLC [17] - 5297:10, 5315:12, 5321:20, 5322:8, 5323:21, 5339:6, 5339:9, 5344:1, 5346:13, 5364:1, 5365:17, 5370:11, 5370:21, 5371:3, 5371:8, 5377:9, 5392:10
load [36] - 5333:10, 5333:13, 5333:17, 5333:18, 5334:20, 5334:24, 5335:20, 5335:24, 5336:15, 5336:25, 5337:3, 5337:9, 5337:16, 5338:8, 5361:9, 5361:25, 5395:19, 5395:20, 5396:17, 5396:19, 5397:17, 5398:2, 5398:3, 5398:11, 5398:13, 5398:17, 5398:22, 5409:11, 5418:12, 5418:13, 5418:14, 5418:17, 5418:18, 5418:19
loaded [6] - 5395:20, 5396:12, 5396:14, 5396:15, 5419:5
loading [5] - 5337:3, 5337:9, 5337:12, 5337:15, 5361:24
loads [10] - 5335:23, 5361:5, 5361:14, 5361:15, 5361:16, 5395:17, 5396:25, 5397:6
loan [39] - 5302:20, 5306:15, 5306:17, 5311:14, 5311:21, 5314:16, 5329:25, 5330:2, 5330:3, 5330:6, 5330:11, 5330:12, 5330:14, 5330:20, 5330:21, 5330:25, 5345:19, 5345:21, 5373:20, 5374:11, 5382:16, 5382:23, 5383:1, 5384:12, 5385:2, 5385:9, 5386:12, 5386:19, 5399:14, 5409:13, 5409:25, 5410:2, 5430:21, 5430:23, 5452:24,

5453:3, 5453:21, 5453:25
loans [8] - 5329:16, 5345:17, 5345:18, 5345:22, 5385:9, 5385:13, 5399:24, 5430:1
locate [1] - 5308:3
log [1] - 5380:16
logged [1] - 5360:23
Look [1] - 5439:25
look [39] - 5297:9, 5309:14, 5312:12, 5314:25, 5325:3, 5330:20, 5330:21, 5342:18, 5345:9, 5345:10, 5346:11, 5347:2, 5348:23, 5352:3, 5352:25, 5354:4, 5355:1, 5355:2, 5356:2, 5358:20, 5367:23, 5368:15, 5377:22, 5389:5, 5401:16, 5411:17, 5417:3, 5429:9, 5456:6, 5456:23, 5458:4, 5458:7, 5458:24, 5460:2, 5460:24, 5462:15, 5463:15, 5472:25, 5474:25
looked [10] - 5308:20, 5309:11, 5342:9, 5351:16, 5437:1, 5441:6, 5442:10, 5451:15, 5455:23, 5462:5
looking [19] - 5312:19, 5313:7, 5321:19, 5325:21, 5337:8, 5347:3, 5354:21, 5356:15, 5369:18, 5381:19, 5407:2, 5426:2, 5433:8, 5436:4, 5437:25, 5444:15, 5451:8, 5470:25, 5472:21
looks [31] - 5295:7, 5308:14, 5310:25, 5311:7, 5312:6, 5314:24, 5317:10, 5321:10, 5327:22, 5344:14, 5345:13, 5347:5, 5347:20, 5348:7, 5348:8, 5351:6, 5352:21, 5353:4, 5356:1, 5356:24, 5357:1, 5357:22, 5358:13, 5379:13, 5389:20,

5390:5, 5390:7, 5398:8, 5412:15, 5413:11, 5413:13
loss [1] - 5384:2
losses [1] - 5376:24
lunch [9] - 5392:24, 5393:5, 5401:14, 5447:2, 5447:3, 5466:8, 5467:9, 5467:10, 5467:15
lunchtime [2] - 5466:7, 5467:13
lying [3] - 5341:20, 5342:20

M

mail [29] - 5351:3, 5351:6, 5351:8, 5354:9, 5354:10, 5354:16, 5355:3, 5355:22, 5355:23, 5355:25, 5356:3, 5356:7, 5356:8, 5356:11, 5378:4, 5378:6, 5378:10, 5378:12, 5379:4, 5388:12, 5388:15, 5389:14, 5389:17, 5390:10, 5390:24, 5415:12, 5416:22, 5426:2
mails [49] - 5340:11, 5340:12, 5340:15, 5340:17, 5340:19, 5340:22, 5340:23, 5341:4, 5342:4, 5342:6, 5342:8, 5342:8, 5342:10, 5342:17, 5348:16, 5348:18, 5350:6, 5350:14, 5350:17, 5350:23, 5350:24, 5351:6, 5351:10, 5351:11, 5351:14, 5351:18, 5352:4, 5352:6, 5352:8, 5352:9, 5352:23, 5353:10, 5353:15, 5355:1, 5355:2, 5384:25, 5385:4, 5388:7, 5420:2, 5437:24, 5438:2, 5438:7, 5443:21, 5444:1, 5444:2, 5444:25, 5450:3, 5450:8
main [1] - 5356:1
major [2] - 5344:15, 5451:15
majority [3] - 5298:10, 5353:4, 5406:1

man [2] - 5432:2, 5472:16
manage [1] - 5411:2
Management [5] - 5320:7, 5320:11, 5320:12, 5321:1, 5324:7
management [4] - 5404:22, 5405:17, 5413:15, 5420:11
manager [1] - 5408:7
managers [13] - 5294:13, 5294:19, 5297:19, 5297:23, 5298:18, 5298:23, 5299:24, 5299:25, 5300:2, 5300:25, 5303:21
Managers [1] - 5400:3
managing [4] - 5422:3, 5422:7, 5427:18, 5428:6
map [1] - 5408:2
March [4] - 5355:4, 5397:15, 5398:1, 5398:13
march [1] - 5398:11
Marchal [3] - 5389:12, 5427:19, 5427:23
mark [2] - 5299:13, 5459:23
MARK [4] - 5294:3, 5395:7, 5482:3, 5482:9
Mark [8] - 5303:6, 5314:3, 5346:16, 5360:17, 5360:19, 5360:23, 5375:10, 5378:1
mark@eufora.com [3] - 5305:7, 5307:1, 5307:4
MarkD'Ambrosio-8002 [1] - 5306:12
markdambrosio@ eufora.com [1] - 5305:10
marked [25] - 5294:16, 5306:24, 5312:2, 5312:12, 5312:15, 5314:20, 5327:3, 5331:11, 5344:24, 5346:1, 5347:16, 5348:20, 5357:18, 5367:9, 5377:23, 5397:10, 5400:8, 5401:11, 5402:21, 5412:1, 5412:3, 5412:10, 5422:24, 5435:16

market [2] - 5428:11, 5430:20
marketing [4] - 5304:11, 5365:12, 5367:4, 5405:7
married [1] - 5427:12
mas [1] - 5356:12
match [1] - 5402:1
matched [1] - 5309:16
material [1] - 5480:7
matter [3] - 5293:4, 5476:25, 5481:5
matters [1] - 5379:7
McKess [1] - 5453:11
MD [1] - 5311:1
MD-2 [1] - 5381:9
MD2 [12] - 5318:15, 5318:20, 5319:1, 5319:2, 5319:4, 5319:6, 5331:11, 5331:19, 5332:10, 5332:11, 5483:6, 5483:8
mean [35] - 5300:10, 5304:2, 5314:24, 5317:1, 5323:9, 5331:24, 5335:11, 5337:14, 5357:12, 5358:22, 5360:13, 5368:12, 5368:21, 5372:8, 5376:5, 5386:23, 5386:25, 5388:4, 5410:8, 5411:21, 5411:22, 5418:24, 5419:2, 5419:3, 5419:8, 5420:22, 5421:9, 5422:7, 5422:10, 5428:20, 5431:9, 5434:8, 5458:7, 5460:8, 5478:2
meaning [1] - 5376:16
means [3] - 5308:3, 5337:9, 5421:6
mechanical [1] - 5291:25
mechanics [1] - 5396:6
mechanism [1] - 5334:23
medication [1] - 5341:10
meet [1] - 5466:10
meeting [17] - 5299:8, 5299:9, 5299:10, 5299:23, 5300:1, 5379:20, 5379:21, 5387:12, 5387:16, 5387:20, 5388:1, 5400:6, 5400:10,

5400:14, 5412:16, 5468:6, 5477:8
Meeting [1] - 5400:3
meetings [2] - 5300:18, 5387:8
meets [1] - 5447:10
member [16] - 5303:21, 5316:14, 5316:15, 5316:17, 5320:2, 5339:6, 5339:8, 5379:6, 5385:19, 5385:21, 5386:4, 5386:6, 5386:12, 5386:14, 5386:17, 5392:5
members [27] - 5293:17, 5294:18, 5294:24, 5297:15, 5297:20, 5297:22, 5298:9, 5298:14, 5298:18, 5298:22, 5299:1, 5299:8, 5300:4, 5301:2, 5317:8, 5318:5, 5336:21, 5350:15, 5358:7, 5360:11, 5360:14, 5360:16, 5390:12, 5390:13, 5390:14, 5395:25, 5438:7
Members [1] - 5297:10
membership [8] - 5298:10, 5299:2, 5318:6, 5320:10, 5323:10, 5323:12, 5324:6, 5348:5
memo [6] - 5397:17, 5398:2, 5398:11, 5398:13, 5398:17, 5399:15
memorandum [2] - 5410:24, 5413:11
memory [6] - 5317:25, 5320:24, 5331:10, 5373:13, 5373:25, 5462:10
mention [4] - 5340:12, 5377:11, 5395:23, 5424:2
mentioned [6] - 5342:23, 5391:8, 5405:14, 5428:23, 5436:6, 5462:20
message [2] - 5308:11, 5358:12
messaged [3] - 5360:11, 5360:14, 5360:16
messaging [2] -

5306:4, 5306:6
messenger [1] - 5306:7
met [5] - 5406:24, 5407:11, 5407:17, 5407:19
Metro [2] - 5451:19, 5452:4
Mexico [2] - 5356:11, 5451:22
Mia [19] - 5304:8, 5304:13, 5305:24, 5312:9, 5326:7, 5326:23, 5326:24, 5327:21, 5327:24, 5328:3, 5328:6, 5334:1, 5362:20, 5370:14, 5370:20, 5370:22, 5371:1, 5371:6, 5371:7
miaedrozo@eufora. com [1] - 5305:24
mic [1] - 5426:19
Michael [3] - 5362:15, 5362:23, 5426:16
MICHAEL [2] - 5426:11, 5482:16
Microsoft [1] - 5306:7
middle [1] - 5466:15
midst [1] - 5384:13
might [6] - 5323:6, 5330:8, 5410:17, 5430:23, 5457:1, 5475:20
million [12] - 5329:19, 5329:22, 5330:7, 5344:17, 5345:19, 5384:14, 5420:21, 5421:4, 5421:9, 5421:12, 5421:17, 5472:9
millions [1] - 5376:24
mind [11] - 5350:9, 5378:20, 5415:14, 5443:12, 5461:4, 5469:14, 5470:22, 5470:23, 5471:19, 5472:10, 5474:10
minded [3] - 5465:7, 5471:7, 5471:17
mine [4] - 5327:23, 5328:2, 5391:11, 5451:12
minitrial [1] - 5477:7
minor [1] - 5318:1
minority [5] - 5415:18, 5421:23, 5424:5, 5425:6, 5425:19
minute [6] - 5295:11, 5339:24, 5346:11,

5347:8, 5358:11, 5466:3
minutes [5] - 5392:24, 5446:14, 5449:8, 5466:23, 5468:19
mis [1] - 5470:10
misconduct [8] - 5471:2, 5471:5, 5472:3, 5475:14, 5475:17, 5475:18, 5475:19, 5475:22
MISKIEWICZ [21] - 5291:14, 5293:2, 5406:20, 5413:20, 5415:2, 5415:11, 5415:20, 5419:17, 5422:21, 5422:23, 5424:8, 5425:2, 5425:10, 5446:9, 5446:14, 5446:17, 5447:22, 5448:3, 5448:17, 5479:8, 5482:14
Miskiewicz [5] - 5341:20, 5342:4, 5419:19, 5446:22, 5447:8
mismanagement [1] - 5363:1
Miss [2] - 5293:25, 5328:18
missed [4] - 5321:25, 5322:18, 5322:20, 5391:7
missing [2] - 5322:2, 5390:5
mistake [4] - 5322:9, 5322:20, 5323:7, 5476:23
misuse [1] - 5363:2
mobil [1] - 5336:24
model [1] - 5383:24
moment [4] - 5308:22, 5368:10, 5392:19, 5454:16
Monday [8] - 5447:11, 5447:17, 5448:2, 5448:8, 5448:16, 5466:21, 5466:25, 5467:1
monetize [1] - 5387:2
Money [1] - 5335:7
money [89] - 5320:22, 5321:1, 5321:2, 5321:22, 5321:23, 5322:14, 5323:14, 5323:23, 5326:5, 5333:18, 5334:16, 5334:24, 5335:1, 5335:24, 5336:3,

5336:5, 5336:8, 5337:4, 5337:10, 5337:12, 5338:9, 5339:11, 5339:15, 5339:17, 5344:20, 5344:21, 5345:20, 5352:22, 5356:22, 5361:8, 5361:10, 5361:20, 5361:22, 5361:24, 5361:25, 5362:1, 5363:23, 5365:4, 5366:4, 5371:21, 5372:1, 5372:9, 5372:10, 5372:13, 5383:25, 5384:13, 5396:20, 5396:22, 5397:6, 5418:19, 5418:21, 5418:22, 5419:9, 5419:10, 5419:13, 5421:7, 5430:2, 5432:17, 5433:3, 5433:9, 5433:10, 5441:3, 5441:7, 5441:9, 5442:11, 5456:17, 5458:12, 5458:25, 5460:6, 5460:7, 5460:12, 5462:4, 5463:3, 5463:10, 5465:3, 5470:2, 5470:3, 5473:20, 5477:23, 5478:1, 5478:8, 5478:23, 5478:25, 5479:2, 5479:4
moneys [1] - 5450:9
monies [3] - 5376:23, 5396:21, 5458:17
monitor [1] - 5337:5
month [7] - 5338:19, 5345:11, 5354:15, 5356:8, 5357:2, 5453:14
month's [1] - 5345:9
month-to-month [1] - 5357:2
monthly [3] - 5356:7, 5408:16, 5409:2
months [4] - 5338:21, 5355:20, 5408:17, 5410:8
morning [17] - 5293:17, 5293:18, 5294:10, 5294:11, 5340:1, 5340:2, 5447:2, 5447:9, 5447:18, 5447:24, 5448:2, 5448:7, 5466:17, 5466:22,

5467:2, 5467:22, 5481:1
**most** [11] - 5306:9, 5352:6, 5376:22, 5384:21, 5390:15, 5418:21, 5430:20, 5431:4, 5431:18, 5451:10, 5477:15
**mostly** [2] - 5357:13, 5405:23
**mother** [1] - 5334:7
**Motor** [1] - 5451:16
**Motorsports** [3] - 5459:21, 5459:22, 5462:6
**Mounted** [1] - 5449:19
**move** [8] - 5331:5, 5346:4, 5364:20, 5366:6, 5385:17, 5412:7, 5419:9, 5442:4
**moved** [4] - 5332:1, 5332:3, 5332:6, 5428:18
**moves** [13] - 5295:8, 5301:4, 5307:15, 5312:24, 5315:3, 5318:20, 5321:11, 5327:11, 5329:2, 5331:19, 5352:12, 5357:23, 5358:14
**moving** [1] - 5331:9
**MR** [186] - 5292:4, 5292:18, 5292:21, 5293:2, 5293:6, 5293:11, 5293:14, 5295:10, 5296:2, 5296:9, 5296:12, 5297:2, 5301:6, 5301:14, 5307:15, 5307:17, 5307:19, 5308:22, 5309:4, 5309:5, 5313:1, 5313:2, 5315:6, 5315:7, 5318:22, 5318:24, 5321:13, 5327:14, 5329:4, 5329:5, 5331:21, 5331:23, 5332:8, 5332:9, 5340:14, 5340:23, 5341:1, 5341:5, 5341:14, 5341:17, 5346:5, 5346:6, 5346:21, 5346:22, 5347:23, 5347:25, 5348:23, 5349:2, 5350:2, 5350:13, 5350:17, 5350:19, 5351:1,

5351:12, 5352:14, 5352:17, 5353:22, 5357:25, 5358:1, 5358:18, 5360:2, 5360:3, 5360:8, 5360:25, 5362:6, 5362:8, 5368:18, 5378:14, 5378:16, 5378:20, 5379:14, 5379:17, 5379:19, 5389:1, 5389:3, 5392:19, 5393:1, 5393:3, 5393:8, 5393:25, 5394:2, 5394:6, 5394:9, 5395:11, 5395:15, 5401:10, 5401:18, 5401:23, 5402:4, 5402:5, 5402:8, 5402:10, 5402:19, 5403:4, 5403:8, 5403:11, 5403:17, 5403:21, 5404:6, 5406:18, 5406:20, 5406:21, 5406:23, 5413:18, 5413:20, 5415:2, 5415:11, 5415:16, 5415:20, 5416:8, 5416:21, 5416:25, 5418:4, 5418:6, 5419:14, 5419:17, 5422:21, 5422:23, 5423:7, 5424:1, 5424:8, 5425:2, 5425:10, 5425:11, 5425:13, 5426:6, 5426:9, 5426:21, 5426:23, 5442:2, 5443:7, 5443:15, 5444:6, 5444:15, 5445:3, 5445:7, 5446:4, 5446:9, 5446:14, 5446:17, 5446:21, 5447:4, 5447:12, 5447:21, 5447:22, 5448:3, 5448:10, 5448:12, 5448:17, 5448:25, 5449:4, 5449:17, 5449:18, 5449:25, 5458:2, 5464:11, 5464:16, 5465:11, 5468:11, 5468:21, 5470:24, 5471:2, 5471:5, 5471:20, 5476:3, 5476:14, 5476:22, 5477:12, 5479:8, 5479:12, 5479:18, 5480:1, 5480:5, 5480:19, 5480:23,

5482:5, 5482:7, 5482:8, 5482:10, 5482:11, 5482:13, 5482:14, 5482:15, 5482:17
**MS** [94] - 5294:1, 5294:9, 5295:8, 5296:6, 5297:8, 5301:4, 5301:8, 5301:12, 5301:18, 5301:21, 5301:23, 5301:25, 5302:2, 5302:4, 5302:5, 5302:9, 5302:11, 5302:13, 5303:5, 5308:24, 5309:9, 5310:6, 5310:9, 5312:24, 5313:6, 5315:3, 5315:10, 5318:20, 5319:3, 5321:11, 5321:17, 5327:11, 5327:17, 5329:2, 5329:8, 5331:19, 5333:2, 5339:25, 5340:18, 5341:6, 5341:9, 5343:21, 5346:3, 5346:10, 5346:19, 5347:1, 5347:21, 5348:3, 5348:19, 5350:4, 5350:14, 5350:21, 5351:5, 5351:9, 5351:21, 5352:2, 5352:12, 5354:3, 5357:23, 5358:5, 5358:14, 5358:23, 5360:5, 5360:7, 5362:4, 5366:6, 5377:9, 5378:15, 5382:6, 5384:22, 5393:15, 5393:21, 5401:13, 5403:7, 5416:18, 5416:24, 5441:15, 5442:20, 5443:19, 5444:4, 5445:4, 5445:9, 5459:2, 5459:7, 5463:19, 5464:2, 5469:19, 5473:23, 5476:17, 5480:2, 5480:13, 5480:17, 5482:4, 5482:6
**MSN** [2] - 5306:7, 5306:9
**multipage** [1] - 5311:13
**multiple** [5] - 5337:20, 5376:14, 5376:15, 5395:25, 5410:9

**multiples** [2] - 5376:12, 5376:13
**murder** [1] - 5431:20
**Murray** [1] - 5367:16
**must** [1] - 5478:21
**Myrick** [1] - 5457:5

# N

**name** [25] - 5335:10, 5353:2, 5353:4, 5362:15, 5365:8, 5367:19, 5367:21, 5368:1, 5368:3, 5368:12, 5368:14, 5368:21, 5368:22, 5370:18, 5378:1, 5406:13, 5407:2, 5419:18, 5426:14, 5426:15, 5432:18, 5432:21, 5432:22, 5434:1, 5463:17
**named** [3] - 5362:17, 5362:23, 5407:7
**names** [4] - 5306:1, 5343:14, 5367:15, 5389:13
**Nash** [10] - 5320:5, 5389:23, 5390:2, 5390:8, 5390:10, 5390:19, 5461:8, 5461:17, 5461:25, 5462:22
**National** [2] - 5364:24, 5365:3
**nature** [3] - 5407:25, 5410:14, 5462:25
**necessarily** [2] - 5304:10, 5373:16
**necessary** [1] - 5363:14
**need** [17] - 5348:23, 5363:18, 5364:10, 5377:14, 5378:21, 5384:23, 5386:15, 5392:23, 5425:18, 5436:1, 5443:8, 5458:8, 5458:11, 5460:2, 5462:16, 5466:9, 5468:25
**needed** [13] - 5300:20, 5320:23, 5321:23, 5352:22, 5363:16, 5363:23, 5364:1, 5365:19, 5365:23, 5366:14, 5388:18, 5399:21, 5462:19
**needs** [1] - 5377:15
**negative** [2] - 5355:6, 5357:7

**negatively** [1] - 5343:15
**negotiated** [3] - 5306:14, 5385:15, 5452:8
**negotiation** [1] - 5385:8
**negotiations** [1] - 5385:13
**neighborhood** [1] - 5408:17
**Neptune** [11] - 5302:17, 5306:14, 5306:17, 5306:22, 5311:21, 5313:11, 5314:9, 5383:1, 5386:19, 5453:24, 5454:3
**Nerguzian** [8] - 5302:14, 5311:5, 5311:6, 5362:20, 5379:25, 5385:2, 5385:9, 5399:13
**Nerguzian's** [2] - 5314:2, 5372:25
**net** [1] - 5376:11
**Netspan** [1] - 5408:13
**Network** [1] - 5339:4
**never** [11] - 5305:22, 5323:14, 5340:15, 5357:4, 5360:21, 5377:6, 5416:13, 5449:13, 5455:12, 5458:13, 5474:2
**NEW** [1] - 5291:1
**new** [7] - 5297:23, 5322:5, 5322:15, 5325:23, 5325:25, 5411:17, 5479:5
**New** [4] - 5291:14, 5291:22, 5463:17, 5464:4
**Newmark** [1] - 5453:11
**next** [8] - 5310:23, 5347:16, 5407:15, 5420:8, 5420:9, 5426:8, 5433:22, 5441:10
**Nick** [2] - 5382:15, 5382:19
**night** [6] - 5300:15, 5380:20, 5387:10, 5394:9, 5467:17, 5481:1
**nine** [5] - 5300:7, 5301:10, 5343:10, 5431:21, 5459:24
**nine-eight** [1] - 5459:24

**nobody** [5] - 5420:25, 5421:2, 5421:11, 5421:17, 5473:22
**normal** [1] - 5410:9
**normally** [1] - 5351:2
**North** [1] - 5405:8
**Northwest** [1] - 5459:24
**note** [2] - 5402:21, 5477:18
**noted** [2] - 5456:21, 5457:8
**notes** [2] - 5440:24, 5440:25
**nothing** [5] - 5293:4, 5405:17, 5409:23, 5468:13, 5480:14
**notice** [2] - 5393:20, 5400:18
**Notsinger** [1] - 5430:13
**November** [2] - 5345:10, 5345:11
**number** [16] - 5310:14, 5334:24, 5357:7, 5399:17, 5402:9, 5405:16, 5406:11, 5408:20, 5409:19, 5410:19, 5411:25, 5429:20, 5443:20, 5444:19, 5462:23, 5476:6
**numbers** [6] - 5317:1, 5328:6, 5436:3, 5436:5, 5436:8, 5436:9
**Nussbaum** [6] - 5442:21, 5443:6, 5450:12, 5450:14, 5450:25, 5451:2
**Nussbaum's** [1] - 5442:25
**NY** [1] - 5291:4

## O

**o'clock** [1] - 5393:2
**oath** [1] - 5293:23
**object** [5] - 5351:18, 5351:19, 5389:1, 5401:16, 5464:5
**objection** [58] - 5296:2, 5297:2, 5301:6, 5301:14, 5309:4, 5309:5, 5313:1, 5313:2, 5315:5, 5315:6, 5318:23, 5318:25, 5321:13, 5321:14, 5327:13, 5327:14,

5329:4, 5329:5, 5332:8, 5332:9, 5341:13, 5346:5, 5346:6, 5346:21, 5346:22, 5347:23, 5347:24, 5348:22, 5349:1, 5350:18, 5351:17, 5353:22, 5357:25, 5358:1, 5358:17, 5360:1, 5360:9, 5360:25, 5366:6, 5377:9, 5378:15, 5378:16, 5382:6, 5384:22, 5401:14, 5401:24, 5402:5, 5406:20, 5415:10, 5415:11, 5416:9, 5416:10, 5424:3, 5441:15, 5441:16, 5450:14, 5459:2, 5459:10
**objections** [1] - 5415:2
**objective** [1] - 5469:1
**obsessed** [1] - 5469:24
**obtain** [2] - 5438:24, 5439:23
**obtained** [2] - 5350:15, 5377:8
**obtaining** [1] - 5365:4
**obviously** [12] - 5336:24, 5343:3, 5408:23, 5411:23, 5442:12, 5442:15, 5443:14, 5447:5, 5448:20, 5477:19, 5479:9, 5479:22
**occasion** [5] - 5372:20, 5372:21, 5372:22, 5380:22, 5431:1
**occasions** [1] - 5372:20
**occupation** [2] - 5404:7, 5427:17
**occur** [1] - 5376:17
**occurred** [10] - 5341:16, 5350:1, 5352:1, 5363:13, 5407:20, 5415:1, 5418:1, 5423:9, 5425:1, 5478:24
**occurrence** [1] - 5355:20
**October** [1] - 5478:22
**OF** [4] - 5291:1, 5291:3, 5291:9, 5481:4
**offer** [7] - 5346:19,

5350:6, 5378:14, 5438:17, 5444:7, 5444:14, 5444:18
**offered** [3] - 5333:9, 5444:18, 5475:24
**offering** [1] - 5469:13
**offers** [2] - 5347:21, 5412:18
**office** [17] - 5299:18, 5304:5, 5304:21, 5331:12, 5331:18, 5331:24, 5331:25, 5332:1, 5332:4, 5332:5, 5336:18, 5373:3, 5374:15, 5375:8, 5418:14, 5437:14
**office's** [1] - 5464:7
**Officer** [1] - 5369:23
**officer** [1] - 5413:10
**officers** [4] - 5304:12, 5304:14, 5322:5, 5473:6
**offices** [4] - 5318:10, 5318:12, 5331:2, 5377:13
**Offices** [2] - 5344:16, 5345:12
**oftentimes** [1] - 5429:11
**Ohio** [1] - 5427:7
**OLIVERAS** [5] - 5291:18, 5394:2, 5394:6, 5402:8, 5402:10
**Oliveras** [2] - 5292:12, 5401:20
**omitted** [1] - 5415:8
**once** [7] - 5339:21, 5377:7, 5446:11, 5449:20, 5461:9, 5469:21, 5479:10
**one** [123] - 5299:12, 5301:10, 5306:11, 5315:18, 5316:6, 5317:2, 5318:1, 5318:7, 5321:5, 5321:25, 5322:12, 5323:19, 5323:20, 5323:21, 5324:14, 5326:15, 5326:19, 5327:23, 5328:2, 5328:16, 5328:24, 5334:1, 5334:3, 5334:7, 5334:10, 5334:11, 5334:12, 5334:18, 5335:1, 5335:15, 5335:18, 5335:19, 5336:9, 5337:6, 5337:19,

5338:2, 5339:20, 5340:17, 5340:24, 5340:25, 5342:2, 5346:16, 5348:9, 5350:22, 5351:10, 5353:7, 5353:8, 5353:9, 5354:4, 5354:23, 5360:7, 5360:22, 5364:3, 5364:25, 5365:9, 5367:13, 5368:6, 5380:3, 5380:7, 5383:16, 5383:25, 5386:18, 5387:19, 5388:12, 5389:9, 5389:19, 5389:20, 5390:5, 5390:17, 5392:19, 5393:3, 5393:22, 5395:24, 5396:7, 5398:23, 5399:15, 5403:14, 5405:10, 5406:4, 5406:5, 5406:11, 5407:1, 5408:15, 5408:20, 5409:19, 5415:23, 5419:19, 5433:2, 5434:4, 5434:5, 5434:11, 5434:12, 5434:13, 5435:2, 5436:21, 5441:10, 5442:9, 5444:7, 5444:10, 5446:5, 5446:9, 5449:1, 5449:8, 5454:9, 5454:10, 5454:13, 5454:14, 5454:20, 5456:12, 5456:19, 5459:13, 5459:20, 5467:8, 5472:6, 5473:23, 5475:5, 5475:11, 5476:5, 5476:15, 5478:24
**One** [2] - 5291:13, 5478:21
**ones** [11] - 5311:25, 5312:1, 5317:8, 5342:14, 5352:18, 5353:1, 5353:5, 5382:22, 5383:3, 5436:13, 5444:13
**ongoing** [1] - 5439:19
**open** [6] - 5297:1, 5352:1, 5418:1, 5425:1, 5465:14, 5466:1
**opened** [4] - 5308:20, 5309:11, 5416:15, 5473:10
**Operating** [1] -

5314:22
**operating** [37] - 5299:4, 5314:18, 5315:12, 5315:14, 5315:23, 5316:1, 5316:3, 5316:6, 5316:8, 5316:11, 5316:16, 5317:9, 5317:11, 5318:3, 5319:25, 5324:9, 5325:20, 5325:23, 5325:25, 5326:4, 5326:10, 5335:4, 5335:5, 5335:7, 5335:16, 5335:19, 5347:7, 5347:9, 5354:17, 5354:23, 5354:24, 5355:5, 5356:4, 5357:7, 5391:22, 5413:9
**operational** [1] - 5303:15
**operations** [1] - 5370:15
**operators** [1] - 5405:22
**opining** [1] - 5468:8
**opinion** [8] - 5363:15, 5464:13, 5464:16, 5464:23, 5470:8, 5470:9, 5474:4, 5474:6
**opinions** [2] - 5429:10, 5429:11
**opportunity** [10] - 5300:14, 5373:14, 5373:22, 5374:1, 5374:3, 5417:2, 5447:23, 5450:3, 5472:7, 5476:4
**opposed** [1] - 5471:21
**option** [1] - 5453:19
**Order** [1] - 5292:1
**order** [8] - 5314:16, 5326:9, 5334:19, 5334:24, 5365:15, 5371:23, 5384:12, 5468:23
**ordered** [1] - 5389:10
**organization** [1] - 5422:3
**organizations** [1] - 5303:24
**original** [2] - 5332:1, 5332:3
**originally** [6] - 5363:9, 5365:22, 5366:12, 5374:15, 5380:13, 5432:2
**otherwise** [2] -

5343:15, 5416:16
**ourselves** [1] - 5429:1
**outside** [1] - 5389:4
**outstanding** [1] -
5345:19
**outweighed** [1] -
5477:6
**overall** [1] - 5473:9
**overhead** [1] - 5376:8
**overheard** [1] - 5375:7
**overpayment** [1] -
5460:8
**overrule** [1] - 5416:9
**overruled** [2] - 5366:7,
5459:10
**oversee** [1] - 5342:7
**owe** [1] - 5421:7
**owed** [5] - 5420:21,
5421:3, 5421:4,
5421:12, 5421:18
**owes** [1] - 5421:9
**own** [14] - 5312:19,
5330:17, 5361:21,
5361:22, 5361:24,
5382:17, 5390:16,
5390:17, 5391:10,
5397:6, 5397:21,
5419:6, 5422:10,
5470:16
**owned** [4] - 5323:13,
5389:23, 5392:8,
5451:20
**owner** [1] - 5453:19
**owners** [3] - 5376:16,
5377:7, 5405:22
**owners/investors** [1]
- 5364:14
**ownership** [16] -
5364:13, 5364:23,
5365:5, 5365:6,
5365:16, 5366:19,
5367:16, 5368:7,
5368:8, 5368:9,
5368:24, 5371:18,
5372:14, 5388:23,
5389:24, 5452:13
**owns** [2] - 5392:9,
5452:23

---

**P**

**pack** [1] - 5352:25
**page** [29] - 5295:12,
5296:3, 5296:8,
5296:9, 5296:11,
5296:14, 5298:2,
5298:3, 5311:16,
5312:19, 5312:22,
5314:6, 5332:12,
5338:7, 5349:4,

5351:23, 5359:3,
5389:18, 5390:6,
5413:22, 5414:2,
5417:4, 5420:6,
5420:8, 5420:9,
5424:9, 5436:3,
5463:21, 5465:17
**pages** [2] - 5314:25,
5435:20
**paid** [16] - 5345:15,
5345:21, 5374:11,
5399:13, 5410:3,
5438:14, 5452:10,
5453:12, 5455:7,
5456:4, 5456:20,
5456:24, 5460:5,
5460:10, 5463:10,
5478:3
**Palms** [1] - 5453:12
**papers** [4] - 5435:21,
5435:22, 5436:7,
5437:25
**paperwork** [2] -
5326:2, 5406:8
**paragraph** [6] -
5296:11, 5298:17,
5298:22, 5298:24,
5313:16, 5423:4
**paragraphs** [1] -
5297:14
**parameters** [1] -
5450:8
**parcel** [2] - 5374:14,
5375:13
**pardon** [1] - 5451:6
**part** [30] - 5295:1,
5296:4, 5304:1,
5322:12, 5324:18,
5324:23, 5342:3,
5374:14, 5375:12,
5386:20, 5394:6,
5394:7, 5405:1,
5406:8, 5415:19,
5415:21, 5440:12,
5446:23, 5451:17,
5452:10, 5457:1,
5465:4, 5468:21,
5469:2, 5469:11,
5471:5, 5472:22,
5476:7, 5477:13,
5477:19
**partially** [1] - 5394:7
**participant** [1] -
5353:6
**participate** [4] -
5375:5, 5375:7,
5382:16, 5385:13
**participated** [2] -
5382:22, 5383:4
**participating** [1] -

5373:19
**participation** [1] -
5384:3
**particular** [19] -
5322:1, 5337:12,
5337:18, 5338:9,
5347:11, 5367:13,
5372:21, 5376:6,
5377:25, 5395:21,
5400:20, 5400:22,
5405:23, 5406:3,
5449:1, 5456:14,
5457:3, 5465:10,
5478:24
**particulars** [1] -
5444:13
**parties** [3] - 5439:24,
5440:5, 5440:9
**partner** [8] - 5321:5,
5388:10, 5427:19,
5427:24, 5428:1,
5428:2, 5428:6
**partners** [2] - 5407:1,
5452:24
**Partners** [17] -
5321:19, 5322:8,
5323:21, 5325:4,
5365:9, 5377:7,
5390:11, 5390:12,
5392:10, 5452:14,
5452:16, 5453:9,
5454:15, 5454:25,
5455:4, 5455:6,
5459:25
**party** [4] - 5350:7,
5375:3, 5474:7
**passed** [1] - 5428:21
**past** [1] - 5340:12
**patent** [1] - 5420:13
**patents** [6] - 5303:16,
5375:25, 5376:10,
5384:15, 5387:1,
5387:5
**pause** [4] - 5309:3,
5373:13, 5373:16,
5415:24
**Pause** [2] - 5369:1,
5441:24
**pay** [6] - 5314:9,
5325:1, 5327:1,
5387:2, 5391:19,
5453:21
**Pay** [1] - 5404:13,
5404:16, 5405:10,
5405:11, 5405:12
**paying** [6] - 5302:14,
5330:10, 5409:22,
5418:22, 5418:25,
5453:14
**payment** [13] -

5385:22, 5405:3,
5451:18, 5453:17,
5454:3, 5454:6,
5454:7, 5454:14,
5454:24, 5455:1,
5459:13, 5459:21,
5462:6
**Payment** [1] - 5405:4
**payments** [5] -
5407:13, 5453:11,
5453:13, 5454:9,
5459:12
**payoff** [2] - 5453:20,
5453:25
**payout** [1] - 5431:21
**payroll** [1] - 5405:23
**PDF** [1] - 5307:9
**Peca** [1] - 5461:9
**peculiar** [1] - 5477:23
**pending** [2] - 5324:3,
5388:13
**people** [19] - 5298:17,
5333:13, 5337:20,
5343:5, 5351:2,
5362:22, 5384:10,
5384:21, 5396:9,
5406:3, 5415:18,
5418:13, 5419:4,
5424:5, 5434:16,
5436:23, 5442:14,
5442:15, 5461:11
**percent** [34] - 5299:2,
5305:22, 5316:22,
5317:6, 5320:12,
5320:18, 5320:21,
5320:25, 5321:9,
5321:18, 5321:22,
5323:10, 5323:12,
5323:17, 5323:18,
5324:5, 5324:6,
5324:10, 5325:18,
5326:24, 5327:18,
5328:6, 5328:7,
5329:14, 5347:12,
5347:14, 5348:5,
5348:13, 5377:14,
5377:15, 5390:21,
5391:23, 5392:8,
5409:9
**percentage** [7] -
5316:14, 5319:22,
5322:4, 5389:6,
5390:25, 5391:6,
5391:9
**percentages** [6] -
5325:22, 5371:18,
5388:23, 5389:16,
5389:22, 5391:12
**perform** [3] - 5439:7,
5440:15, 5440:17

**performed** [2] -
5431:3, 5431:25
**performing** [2] -
5409:13, 5432:17
**perhaps** [1] - 5465:13
**period** [5] - 5302:23,
5350:25, 5354:19,
5371:13, 5431:9
**permission** [3] -
5458:16, 5460:12,
5479:16
**permit** [1] - 5476:3
**permitted** [3] - 5470:8,
5474:2, 5474:3
**person** [10] - 5304:21,
5320:15, 5336:3,
5337:19, 5362:14,
5406:13, 5407:18,
5412:16, 5433:12,
5465:10
**person's** [1] - 5338:9
**personal** [11] - 5361:9,
5363:15, 5396:10,
5396:20, 5397:1,
5397:14, 5398:21,
5419:2, 5419:6,
5460:13
**personality** [1] -
5373:23
**personally** [2] -
5343:6, 5346:16
**persons** [1] - 5368:7
**perspective** [2] -
5376:1, 5405:18
**ph** [3] - 5336:11,
5430:13, 5453:11
**Phil** [4] - 5355:22,
5362:11, 5377:14,
5377:19
**PHILIP** [1] - 5291:5
**PHILLIP** [1] - 5291:6
**Phoenix** [4] - 5427:2,
5427:3, 5427:5,
5428:19
**phone** [7] - 5336:15,
5336:25, 5407:12,
5407:19, 5456:13,
5462:11, 5477:1
**phrasings** [1] -
5402:24
**physically** [2] -
5377:19, 5418:13
**picture** [1] - 5383:6
**Pierrepont** [1] -
5291:13
**pilots** [1] - 5396:7
**place** [5] - 5385:9,
5388:15, 5400:11,
5410:8, 5457:12
**plaintiffs** [1] - 5362:21

**plan** [1] - 5356:24
**plane** [6] - 5452:9, 5452:10, 5452:13, 5453:1, 5453:2, 5453:4
**planes** [1] - 5452:3
**plans** [2] - 5467:12, 5467:14
**Platform** [2] - 5404:19, 5405:20
**Platforms** [1] - 5405:12
**play** [5] - 5292:15, 5392:22, 5401:8, 5402:1, 5402:20
**played** [6] - 5400:24, 5401:3, 5401:7, 5401:15, 5402:3, 5402:18
**player** [1] - 5422:20
**players** [21] - 5323:19, 5364:24, 5365:3, 5389:9, 5415:6, 5415:17, 5415:20, 5416:5, 5421:24, 5430:20, 5438:4, 5443:21, 5444:2, 5449:12, 5450:3, 5453:2, 5456:17, 5460:21, 5460:24, 5461:5, 5462:23
**players'** [1] - 5469:4
**playing** [13] - 5292:10, 5292:14, 5301:20, 5301:22, 5301:24, 5302:1, 5302:3, 5302:10, 5302:12, 5303:3, 5401:18, 5401:19, 5403:2
**playoffs** [2] - 5427:8, 5427:10
**Plaza** [2] - 5291:13, 5291:21
**pled** [1] - 5469:25
**plenty** [2] - 5384:9, 5449:16
**Plus** [1] - 5405:4
**plus** [1] - 5409:8
**PM** [1] - 5395:2
**pm** [2] - 5467:20, 5481:2
**point** [47] - 5293:21, 5311:1, 5320:21, 5326:20, 5326:23, 5326:24, 5327:23, 5328:2, 5341:21, 5341:22, 5342:1, 5342:12, 5351:15, 5353:15, 5363:19, 5363:25, 5366:2,

5367:23, 5369:22, 5374:24, 5375:17, 5375:19, 5375:24, 5376:19, 5377:12, 5379:10, 5383:15, 5386:13, 5396:7, 5410:11, 5415:14, 5422:4, 5425:17, 5425:18, 5432:20, 5437:15, 5464:23, 5465:6, 5466:9, 5471:8, 5471:25, 5472:11, 5473:12, 5473:16, 5473:23
**points** [1] - 5319:10
**Police** [1] - 5449:19
**polite** [1] - 5461:18
**portion** [12] - 5292:9, 5292:15, 5381:6, 5400:24, 5401:2, 5401:3, 5401:6, 5401:22, 5415:4, 5415:5, 5425:3, 5460:10
**portions** [13] - 5292:13, 5292:17, 5300:8, 5300:23, 5387:7, 5400:10, 5400:16, 5400:18, 5401:19, 5401:20, 5401:25, 5402:2, 5402:21
**position** [3] - 5371:10, 5429:14, 5471:15
**possess** [1] - 5298:9
**possible** [1] - 5313:21
**possibly** [2] - 5446:9, 5446:19
**post** [3] - 5446:25, 5477:16, 5478:10
**potentially** [2] - 5371:6, 5383:23
**PowerPoint** [1] - 5448:5
**PR** [1] - 5405:7
**practice** [4] - 5428:7, 5428:10, 5428:12, 5475:20
**prayers** [1] - 5461:10
**preclude** [1] - 5474:22
**prefer** [5] - 5448:4, 5448:9, 5448:10, 5448:11, 5448:12
**prejudice** [1] - 5477:6
**prejudicial** [2] - 5468:7, 5470:6
**prepaid** [19] - 5333:4, 5333:5, 5333:7, 5333:9, 5334:15, 5395:21, 5396:3,

5396:12, 5404:20, 5405:21, 5405:24, 5406:1, 5408:11, 5408:13, 5410:20, 5411:7, 5418:7, 5418:10
**prepare** [1] - 5435:8
**prepared** [21] - 5292:12, 5357:13, 5357:14, 5357:15, 5434:3, 5434:4, 5434:5, 5434:7, 5434:11, 5434:12, 5434:13, 5435:2, 5436:13, 5436:21, 5437:2, 5437:13, 5437:14, 5438:11, 5454:14, 5461:3, 5473:20
**presence** [4] - 5293:15, 5377:14, 5395:4, 5449:11
**present** [10] - 5373:1, 5377:12, 5377:19, 5379:21, 5431:10, 5471:11, 5471:15, 5471:18, 5475:1, 5475:24
**presentation** [2] - 5466:6, 5477:2
**presented** [4] - 5470:1, 5474:14, 5475:25, 5476:10
**presenting** [2] - 5388:7, 5476:10
**presently** [2] - 5427:1, 5427:16
**president** [9] - 5370:4, 5370:5, 5370:10, 5387:18, 5387:21, 5388:1, 5388:8, 5388:11, 5388:14
**pretty** [3] - 5343:11, 5371:11, 5374:11
**previous** [4] - 5318:16, 5318:17, 5345:9, 5356:10
**previously** [3] - 5294:4, 5395:8, 5421:24
**primarily** [3] - 5365:12, 5428:10, 5430:22
**printed** [2] - 5351:4, 5351:7
**priority** [1] - 5321:6
**privileges** [1] - 5438:20
**Privitello** [3] - 5324:13, 5382:15,

5382:19
**probative** [7] - 5469:20, 5470:4, 5470:5, 5470:21, 5474:8, 5474:11, 5477:4
**problem** [12] - 5340:16, 5342:7, 5351:13, 5361:20, 5361:23, 5361:24, 5362:1, 5394:6, 5456:23, 5473:18, 5473:25, 5478:10
**problems** [1] - 5367:2
**procedure** [2] - 5440:11, 5440:13
**procedures** [3] - 5439:17, 5440:14, 5440:16
**proceed** [3] - 5439:5, 5456:2, 5456:9
**Proceedings** [2] - 5291:25, 5481:2
**proceedings** [5] - 5309:3, 5415:24, 5431:2, 5431:5, 5481:5
**proceeds** [6] - 5477:25, 5478:1, 5478:6, 5478:13, 5478:16, 5479:5
**process** [6] - 5313:11, 5379:11, 5383:24, 5404:14, 5439:18, 5462:3
**produce** [3] - 5322:22, 5330:3, 5341:4
**produced** [3] - 5291:25, 5340:12, 5340:17
**producing** [1] - 5343:4
**product** [6] - 5376:17, 5407:3, 5408:25, 5410:3, 5413:5, 5420:12
**productive** [1] - 5343:13
**products** [4] - 5408:3, 5408:4, 5408:6, 5410:22
**professional** [1] - 5343:17
**proffer** [1] - 5475:19
**profit** [5] - 5357:4, 5377:2, 5377:7, 5383:12, 5383:17
**profitable** [4] - 5377:4, 5383:22, 5384:1, 5416:19

**profits** [2] - 5478:2, 5478:6
**program** [7] - 5396:8, 5408:7, 5411:1, 5411:3, 5412:17, 5413:15, 5430:4
**programs** [1] - 5405:22
**project** [2] - 5411:5, 5434:21
**projections** [1] - 5383:25
**promising** [1] - 5363:18
**promptly** [1] - 5297:21
**pronounce** [1] - 5370:18
**proof** [1] - 5476:20
**proper** [1] - 5324:1
**properly** [2] - 5469:15, 5473:7
**property** [1] - 5410:22
**Property** [1] - 5386:24
**propose** [1] - 5478:15
**Proposed** [1] - 5311:11
**prosecution** [2] - 5389:19, 5401:8
**prosecutor** [2] - 5449:21, 5464:9
**prosecutors** [1] - 5419:19
**prospective** [2] - 5311:14, 5407:4
**protected** [2] - 5384:16, 5387:3
**prove** [1] - 5478:11
**proved** [1] - 5475:12
**proven** [1] - 5475:10
**provide** [5] - 5408:19, 5429:10, 5429:11, 5439:22, 5452:6
**provided** [15] - 5342:8, 5366:20, 5380:7, 5381:21, 5382:2, 5387:9, 5415:3, 5440:8, 5451:3, 5451:17, 5455:23, 5456:16, 5456:17, 5473:16, 5476:7
**providing** [3] - 5380:22, 5457:10, 5469:12
**provisions** [1] - 5382:12
**prudent** [1] - 5475:17
**public** [14] - 5341:19, 5377:2, 5377:3, 5377:6, 5377:7,

5405:5, 5427:18, 5428:11, 5428:17, 5428:21, 5428:23, 5428:24, 5429:1, 5429:2
**publically** [1] - 5376:12
**publicly** [1] - 5342:23
**publish** [1] - 5301:18
**publishing** [1] - 5319:4
**pull** [3] - 5380:16, 5393:18, 5474:20
**pulled** [1] - 5397:10
**purchase** [2] - 5386:19, 5451:16
**purchased** [1] - 5452:9
**purport** [1] - 5438:3
**purpose** [12] - 5363:8, 5365:21, 5365:22, 5366:1, 5410:9, 5429:23, 5433:11, 5441:12, 5449:14, 5456:16, 5463:4, 5478:1
**purposely** [3] - 5472:13, 5472:17, 5473:15
**purposes** [5] - 5365:4, 5425:18, 5436:1, 5442:18, 5463:7
**pursuant** [2] - 5299:3, 5314:11
**pursue** [3] - 5472:1, 5472:2, 5472:13
**pushing** [1] - 5356:22
**put** [22] - 5292:23, 5336:9, 5340:9, 5342:5, 5342:25, 5354:6, 5382:4, 5382:24, 5386:15, 5398:20, 5416:19, 5420:1, 5428:22, 5430:2, 5433:3, 5433:8, 5449:20, 5452:25, 5474:3, 5476:24, 5479:13, 5479:22
**puts** [1] - 5447:6
**putting** [1] - 5292:20

## Q

**qualified** [3] - 5431:5, 5431:11, 5431:19
**qualify** [1] - 5333:15
**quarter** [1] - 5344:17
**quarterly** [1] - 5419:8
**questioned** [1] -

5460:2
**questioning** [2] - 5308:24, 5350:18
**questions** [20] - 5307:17, 5362:4, 5381:7, 5383:17, 5385:18, 5386:3, 5396:24, 5403:5, 5403:8, 5418:4, 5419:14, 5419:20, 5425:10, 5425:11, 5426:6, 5461:4, 5461:19, 5461:22, 5462:14, 5462:18
**queue** [1] - 5401:20
**quickly** [1] - 5395:19
**quite** [3] - 5385:4, 5398:24
**quote** [3] - 5425:16, 5475:2, 5475:21
**quote-unquote** [2] - 5475:2, 5475:21

## R

**racing** [2] - 5306:15, 5396:8
**raise** [4] - 5363:10, 5363:23, 5364:20, 5365:24
**raised** [2] - 5384:12, 5384:13
**raising** [2] - 5366:4, 5410:5
**ran** [2] - 5396:7, 5405:7
**Randy** [1] - 5451:1
**Ranford** [1] - 5368:12
**rapid** [1] - 5373:9
**rate** [2] - 5330:16, 5330:23
**rather** [2] - 5448:7, 5466:14
**reached** [2] - 5316:18, 5341:22
**read** [15] - 5308:4, 5308:7, 5311:10, 5313:13, 5327:25, 5420:14, 5420:15, 5420:18, 5423:3, 5423:5, 5424:3, 5425:3, 5442:24, 5467:16, 5479:11
**reading** [1] - 5353:20
**reads** [2] - 5299:6, 5443:2
**ready** [3] - 5292:3, 5308:11, 5343:19
**real** [5] - 5408:9, 5408:21, 5410:4,

5429:19
**realized** [2] - 5391:12, 5394:7
**really** [27] - 5303:15, 5303:16, 5336:23, 5339:17, 5385:16, 5387:14, 5407:2, 5408:3, 5408:22, 5408:25, 5409:19, 5411:9, 5415:14, 5419:3, 5429:8, 5433:17, 5440:12, 5444:17, 5451:15, 5455:12, 5456:7, 5458:10, 5458:12, 5462:19, 5470:12, 5472:10, 5475:7
**reap** [1] - 5376:17
**rearrange** [1] - 5467:23
**reason** [10] - 5325:25, 5336:19, 5366:23, 5378:9, 5378:13, 5399:23, 5473:11, 5476:22, 5478:19, 5479:3
**reasonable** [1] - 5475:13
**reasons** [1] - 5460:13
**rebuttal** [5] - 5446:7, 5446:8, 5446:9, 5447:6, 5447:17, 5442:1, 5466:22
**receipt** [3] - 5397:11, 5440:6, 5451:13
**receipts** [2] - 5478:2, 5478:7
**receive** [4] - 5323:23, 5437:22, 5437:23, 5438:15
**received** [34] - 5293:4, 5293:5, 5306:23, 5346:7, 5346:23, 5353:10, 5353:17, 5353:18, 5378:19, 5401:11, 5401:12, 5401:15, 5413:19, 5418:3, 5432:25, 5433:23, 5434:2, 5434:4, 5434:5, 5434:24, 5435:10, 5436:12, 5436:16, 5436:18, 5436:25, 5437:6, 5437:15, 5437:24, 5438:2, 5455:19, 5457:8, 5459:22, 5483:14, 5483:15
**receiving** [3] - 5388:7, 5434:14, 5474:17

**recent** [1] - 5431:18
**receptive** [1] - 5474:17
**recess** [5] - 5340:4, 5341:15, 5341:16, 5394:12, 5445:11
**recipient** [3] - 5352:7, 5352:10, 5355:25
**reciprocal** [1] - 5293:3
**recognize** [7] - 5299:15, 5307:20, 5318:15, 5331:15, 5412:12, 5412:20, 5437:8
**recognized** [1] - 5382:20
**recollection** [11] - 5308:15, 5318:13, 5353:13, 5367:25, 5368:6, 5416:6, 5416:11, 5422:18, 5425:4, 5425:16
**recommend** [1] - 5439:25
**recommendation** [1] - 5456:1
**recommended** [1] - 5439:2
**record** [19] - 5293:11, 5295:5, 5302:6, 5321:7, 5322:10, 5325:3, 5342:5, 5343:1, 5389:5, 5416:25, 5426:15, 5434:15, 5435:21, 5444:12, 5444:19, 5454:18, 5479:23, 5481:5
**recorded** [4] - 5291:25, 5300:8, 5365:18, 5380:3
**recording** [11] - 5300:17, 5301:11, 5380:7, 5380:8, 5380:11, 5380:13, 5380:14, 5380:17, 5380:21, 5380:24, 5393:25
**recordkeeping** [1] - 5381:2
**records** [16] - 5346:4, 5364:12, 5365:11, 5365:15, 5365:18, 5366:21, 5367:4, 5371:12, 5371:13, 5372:4, 5378:24, 5379:11, 5388:22, 5442:25, 5454:8, 5456:2
**recover** [1] - 5303:17

**recross** [1] - 5403:6
**RECROSS** [4] - 5362:7, 5403:10, 5482:7, 5482:10
**RECROSS-EXAMINATION** [2] - 5403:10, 5482:10
**redact** [2] - 5296:10, 5401:25
**redacted** [5] - 5294:23, 5412:3, 5415:4, 5415:19, 5416:1
**redaction** [5] - 5296:7, 5297:3, 5297:4, 5415:7, 5416:23
**redactions** [2] - 5296:3, 5297:5
**redirect** [1] - 5379:16
**REDIRECT** [6] - 5379:18, 5395:14, 5425:12, 5482:8, 5482:9, 5482:14
**refer** [4] - 5354:20, 5406:1, 5436:2, 5436:3
**reference** [8] - 5302:14, 5303:7, 5308:9, 5367:9, 5416:3, 5450:16, 5450:17, 5450:22
**references** [1] - 5426:3
**referencing** [1] - 5416:7
**referred** [2] - 5440:12, 5440:15
**referring** [9] - 5328:20, 5356:7, 5364:10, 5388:15, 5399:17, 5400:21, 5454:2, 5454:19, 5454:24
**referring)** [1] - 5318:24
**reflect** [3] - 5366:18, 5382:25, 5400:19
**reflected** [4] - 5364:12, 5367:22, 5368:1, 5372:13
**reflecting** [2] - 5367:15, 5384:25
**refresh** [5] - 5367:25, 5368:5, 5416:6, 5425:4, 5425:16
**refreshes** [1] - 5422:18
**refused** [2] - 5471:17, 5472:25
**refusing** [1] - 5473:2

**regard** [6] - 5307:18, 5383:17, 5440:25, 5461:22, 5465:7, 5468:24
**regarding** [20] - 5379:6, 5379:20, 5381:7, 5385:9, 5385:22, 5390:20, 5396:24, 5402:13, 5412:17, 5412:25, 5415:15, 5416:2, 5431:2, 5437:16, 5449:2, 5450:18, 5461:23, 5464:13, 5467:16, 5471:11
**regards** [12] - 5292:9, 5342:4, 5383:1, 5389:6, 5392:4, 5418:22, 5430:16, 5431:24, 5433:20, 5439:13, 5440:22, 5469:11
**registry** [3] - 5329:10, 5379:6, 5389:16
**regular** [1] - 5354:14
**regularly** [5] - 5304:3, 5304:4, 5304:16, 5360:12, 5360:13
**reimburse** [2] - 5399:21, 5460:9
**reimbursing** [1] - 5399:24
**related** [7] - 5310:1, 5310:4, 5441:7, 5443:7, 5451:19, 5456:22, 5457:12
**Related** [1] - 5311:11
**relates** [9] - 5362:25, 5364:9, 5364:11, 5369:5, 5374:5, 5377:25, 5379:3, 5413:7
**relation** [2] - 5430:16, 5459:20
**relationship** [2] - 5343:17, 5411:15
**relative** [1] - 5464:19
**relevance** [5] - 5377:9, 5415:12, 5415:13, 5416:11, 5464:8
**relevant** [11] - 5297:5, 5342:11, 5350:24, 5464:9, 5468:6, 5470:4, 5470:11, 5471:3, 5473:12, 5474:1
**reliable** [2] - 5464:22, 5471:15
**reloadable** [1] - 5410:9

**rely** [1] - 5471:22
**remainder** [1] - 5399:14
**remains** [1] - 5384:17
**remarked** [1] - 5294:16
**remarks** [1] - 5402:22
**remember** [35] - 5294:14, 5294:19, 5315:16, 5322:4, 5322:20, 5324:16, 5326:21, 5337:25, 5338:4, 5339:20, 5339:21, 5350:3, 5353:20, 5359:1, 5360:19, 5372:19, 5373:18, 5375:15, 5380:22, 5381:2, 5383:15, 5385:20, 5385:23, 5392:22, 5399:6, 5412:5, 5422:11, 5426:5, 5444:10, 5444:23, 5444:24, 5449:5, 5449:10, 5462:8, 5462:24
**remembers** [2] - 5351:18, 5449:5
**remind** [1] - 5293:22
**remove** [4] - 5297:17, 5387:17, 5387:21, 5421:23
**removed** [4] - 5297:22, 5386:6, 5386:11, 5387:23
**renew** [1] - 5293:2
**rent** [2] - 5325:1, 5325:14
**repair** [2] - 5407:3, 5408:21
**repay** [1] - 5409:25
**repayment** [2] - 5345:18, 5399:20
**repayments** [1] - 5345:17
**repeatedly** [1] - 5469:22
**repercussions** [1] - 5374:10
**rephrase** [1] - 5302:21
**replace** [1] - 5297:21
**report** [10] - 5409:12, 5458:8, 5458:9, 5458:13, 5460:22, 5461:2, 5473:18, 5473:19, 5474:18
**Reporter** [1] - 5291:20
**reporter** [1] - 5421:14
**REPORTER** [1] - 5481:4

**Reports** [1] - 5451:18
**represent** [2] - 5362:11, 5387:25
**representation** [1] - 5292:8
**representations** [1] - 5400:15
**represented** [1] - 5456:5
**representing** [3] - 5362:21, 5388:11, 5420:13
**reputation** [1] - 5342:22
**request** [5] - 5293:3, 5433:20, 5439:14, 5447:4, 5456:3
**requested** [3] - 5342:9, 5435:11, 5438:12
**requesting** [1] - 5391:20
**required** [2] - 5298:19, 5364:20
**rerouted** [1] - 5324:19
**reserve** [1] - 5448:21
**reside** [1] - 5427:1
**resided** [1] - 5427:3
**resident** [1] - 5427:5
**Resolution** [9] - 5429:15, 5429:17, 5429:24, 5430:3, 5430:7, 5430:8, 5430:9, 5430:17, 5431:3
**respect** [4] - 5369:25, 5393:11, 5419:21, 5474:5
**respected** [1] - 5438:20
**respective** [1] - 5372:14
**respond** [3] - 5313:20, 5356:21, 5373:14
**responded** [2] - 5468:24, 5478:5
**responds** [3] - 5328:5, 5356:10, 5469:7
**response** [2] - 5354:9, 5461:19
**responsibilities** [1] - 5304:10
**responsibility** [1] - 5463:9
**responsible** [2] - 5304:17, 5472:5
**rest** [3] - 5409:21, 5411:3, 5446:4
**Restated** [1] - 5314:22
**restated** [1] - 5315:11

**restaurant** [2] - 5418:25, 5461:14
**results** [3] - 5429:11, 5439:3, 5442:5
**resume** [1] - 5308:24
**Retail** [2] - 5405:6, 5405:7
**retail** [1] - 5376:13
**retain** [1] - 5429:3
**retained** [4] - 5429:21, 5430:20, 5432:11, 5433:19
**retention** [1] - 5408:12
**return** [2] - 5357:6, 5377:8
**returned** [2] - 5382:21, 5441:5
**returns** [7] - 5357:10, 5357:16, 5357:20, 5383:16, 5383:18, 5429:4
**revenue** [1] - 5408:16
**revenues** [1] - 5376:11
**review** [20] - 5300:20, 5313:17, 5358:11, 5366:20, 5400:13, 5429:10, 5439:17, 5439:20, 5440:3, 5440:7, 5440:10, 5440:19, 5440:21, 5442:18, 5446:2, 5450:4, 5451:25, 5455:10, 5455:12
**reviewed** [6] - 5293:8, 5357:11, 5438:7, 5442:12, 5443:20, 5460:18
**reviewing** [5] - 5313:11, 5432:19, 5438:10, 5453:15, 5473:14
**reviews** [3] - 5429:3, 5429:11, 5430:21
**revised** [1] - 5449:15
**revisions** [2] - 5312:11, 5313:10
**RICHARD** [1] - 5291:16
**Richards** [26] - 5324:16, 5337:25, 5338:8, 5339:11, 5344:16, 5344:21, 5345:12, 5434:1, 5434:9, 5434:11, 5434:12, 5435:5, 5435:15, 5436:13, 5437:4, 5437:5, 5438:12, 5438:17, 5438:21, 5439:23,

5440:22, 5450:9, 5450:23, 5456:3, 5458:18, 5473:19
**Richards'** [6] - 5338:4, 5338:6, 5435:4, 5437:17, 5439:8, 5440:18
**Richards-Kenner** [1] - 5437:4
**Richards.** [1] - 5436:19
**rid** [1] - 5320:21
**risk** [1] - 5474:12
**risked** [1] - 5361:16
**ROBERT** [3] - 5291:18, 5426:11, 5482:16
**Robert** [6] - 5426:10, 5426:16, 5432:21, 5432:25, 5433:21, 5446:10
**Roberts** [1] - 5430:13
**Rodriguez** [1] - 5385:25
**role** [4] - 5366:18, 5367:4, 5385:7, 5385:8
**Ron** [20] - 5324:15, 5337:24, 5338:4, 5338:6, 5338:8, 5339:11, 5344:21, 5345:12, 5434:1, 5434:5, 5436:19, 5437:5, 5438:12, 5439:8, 5440:18, 5440:22, 5450:9, 5450:23, 5456:2, 5458:18
**Ronald** [1] - 5344:16
**room** [2] - 5467:5, 5467:11
**Rose** [1] - 5453:11
**rough** [1] - 5446:15
**routing** [1] - 5406:11
**royalties** [1] - 5376:9
**RTC** [3] - 5429:20, 5429:21, 5430:14
**Rucchin** [1] - 5367:18
**Rule** [4] - 5448:18, 5448:21, 5448:25, 5479:14
**rule** [2] - 5448:21, 5477:4
**ruled** [1] - 5469:23
**run** [2] - 5404:16, 5405:11
**running** [4] - 5304:12, 5304:17, 5435:3, 5437:4
**rush** [1] - 5331:8

**Rushcard** [1] - 5408:14

## S

**S-E-M-P-L-E** [1] - 5426:17
**safe** [1] - 5424:3
**Sag** [1] - 5393:11
**salary** [5] - 5338:19, 5391:20, 5391:21, 5399:13, 5399:25
**sale** [2] - 5365:5, 5458:25
**sales** [1] - 5405:7
**San** [1] - 5407:16
**Sands** [1] - 5479:10
**Santos** [1] - 5477:25
**Sara** [2] - 5334:10, 5334:11
**SARITA** [1] - 5291:15
**sat** [1] - 5455:23
**satellite** [1] - 5339:5
**Saturday** [1] - 5293:9
**save** [1] - 5479:13
**savings** [1] - 5429:25
**savvy** [1] - 5384:14
**saw** [9] - 5318:7, 5343:4, 5348:25, 5388:7, 5410:11, 5412:5, 5420:16, 5463:12
**scams** [1] - 5408:22
**scenes** [1] - 5461:12
**schedule** [24] - 5316:13, 5320:1, 5320:3, 5324:10, 5435:3, 5435:4, 5435:5, 5437:3, 5437:4, 5437:10, 5438:11, 5446:2, 5447:10, 5449:15, 5454:12, 5454:13, 5458:9, 5459:15, 5460:18, 5467:3, 5467:6, 5467:12
**scheduled** [2] - 5457:8, 5462:22
**schedules** [4] - 5435:2, 5436:10, 5437:5, 5437:11
**score** [2] - 5408:23, 5410:5
**scores** [1] - 5407:4
**screaming** [9] - 5343:14, 5372:18, 5373:2, 5373:4, 5373:15, 5374:2, 5374:6, 5374:21, 5375:16

**screen** [6] - 5298:5, 5310:11, 5315:17, 5354:6, 5420:1, 5454:21
**seated** [5] - 5340:5, 5393:9, 5446:1, 5449:24, 5467:21
**Second** [1] - 5474:2
**second** [15] - 5298:2, 5309:1, 5313:16, 5315:23, 5324:4, 5332:5, 5342:13, 5344:17, 5390:17, 5401:5, 5402:19, 5404:16, 5415:23, 5436:16, 5462:13
**seconds** [1] - 5418:18
**section** [7] - 5393:11, 5393:18, 5397:17, 5398:2, 5398:11, 5398:14, 5398:17
**Security** [3] - 5441:4, 5441:6, 5441:8
**see** [35] - 5298:5, 5308:5, 5309:22, 5310:20, 5314:25, 5318:22, 5320:11, 5325:5, 5325:6, 5325:8, 5325:11, 5344:2, 5350:17, 5351:3, 5356:10, 5360:3, 5368:17, 5369:6, 5375:2, 5378:1, 5381:24, 5397:18, 5398:9, 5399:14, 5402:24, 5406:16, 5442:10, 5460:25, 5462:16, 5463:13, 5464:5, 5466:13, 5467:17, 5480:25
**seeing** [2] - 5350:3, 5369:11
**seem** [1] - 5420:19
**sees** [1] - 5292:17
**select** [1] - 5442:3
**selected** [1] - 5401:19
**sell** [6] - 5376:2, 5376:11, 5376:12, 5376:13, 5411:2, 5460:6
**selling** [1] - 5373:19
**SEMPLE** [1] - 5426:11, 5482:16
**Semple** [13] - 5292:20, 5292:21, 5389:12, 5426:10, 5426:16, 5426:24, 5427:19, 5427:23, 5450:2, 5454:19, 5467:22,

5468:16, 5480:7
**send** [2] - 5334:15, 5466:15
**sender** [2] - 5352:6, 5352:10
**sending** [2] - 5336:3, 5381:2
**sense** [2] - 5364:12, 5448:18
**sent** [9] - 5293:12, 5307:21, 5307:24, 5308:11, 5329:10, 5356:11, 5378:4, 5378:10, 5465:3
**sentence** [3] - 5313:19, 5376:6, 5421:14
**sentences** [1] - 5313:13
**separate** [4] - 5335:22, 5402:8, 5402:11, 5412:1
**separately** [6] - 5298:3, 5326:14, 5397:10, 5402:23, 5412:10, 5444:18
**separating** [1] - 5422:16
**September** [9] - 5307:7, 5307:21, 5310:10, 5310:15, 5344:4, 5344:6, 5344:11, 5344:16, 5413:14
**sequestering** [1] - 5467:5
**Sergei** [18] - 5319:22, 5320:2, 5339:15, 5339:21, 5362:3, 5382:21, 5389:9, 5390:19, 5392:12, 5432:22, 5433:2, 5433:7, 5439:3, 5452:12, 5455:25, 5456:22, 5460:2, 5463:15
**Sergei's** [4] - 5344:8, 5455:24, 5456:6, 5461:19
**series** [1] - 5437:24
**serve** [2] - 5367:25, 5368:5
**served** [1] - 5453:21
**server** [1] - 5380:16
**service** [2] - 5404:8, 5411:3
**services** [5] - 5333:9, 5404:9, 5404:17, 5405:8, 5432:17
**set** [7] - 5348:17,

5360:21, 5407:11, 5429:9, 5436:3, 5436:16, 5465:8
**sets** [2] - 5310:23, 5455:22
**settlement** [2] - 5451:18, 5452:11
**Settlement** [13] - 5432:6, 5432:15, 5432:18, 5433:3, 5433:16, 5433:24, 5438:6, 5451:13, 5457:12, 5458:18, 5460:4, 5463:2
**seven** [1] - 5480:12
**several** [4] - 5329:16, 5335:13, 5336:5, 5435:20
**shall** [1] - 5314:9
**share** [2] - 5319:14, 5319:19
**shared** [3] - 5373:2, 5464:18, 5464:24
**shareholder** [2] - 5329:10, 5389:16
**shareholders** [6] - 5326:17, 5389:6, 5400:10, 5421:23, 5425:7, 5425:19
**shareholders'** [2] - 5328:14, 5400:14
**shares** [8] - 5321:6, 5326:8, 5328:14, 5328:19, 5328:20, 5391:6, 5391:25, 5392:1
**sharing** [1] - 5460:20
**sheet** [9] - 5306:22, 5306:23, 5307:6, 5307:9, 5307:12, 5311:9, 5313:24, 5314:6, 5421:10
**Sheet** [1] - 5311:10
**shocked** [1] - 5472:11
**short** [6] - 5292:24, 5345:21, 5399:23, 5446:5, 5446:13, 5446:14
**short-term** [1] - 5345:21
**shorten** [1] - 5479:1
**shortened** [1] - 5392:24
**shortly** [1] - 5394:3
**show** [26] - 5292:13, 5310:14, 5321:7, 5328:21, 5339:23, 5343:25, 5344:24, 5346:1, 5397:8, 5397:24, 5398:20,

5399:4, 5400:2, 5400:8, 5407:12, 5411:25, 5422:17, 5435:16, 5437:6, 5445:7, 5454:17, 5467:4, 5469:14, 5474:23, 5474:24, 5476:6
**showed** [8] - 5309:16, 5315:18, 5320:9, 5352:18, 5369:14, 5383:15, 5389:14, 5389:19
**showing** [6] - 5323:3, 5422:24, 5444:25, 5464:23, 5466:11, 5470:2
**shown** [9] - 5381:3, 5381:9, 5381:12, 5384:25, 5385:4, 5390:24, 5391:22, 5399:6, 5472:4
**shows** [3] - 5329:13, 5338:17, 5465:6
**sic** [1] - 5316:20
**side** [3] - 5465:16, 5470:1, 5475:7
**sidebar** [13] - 5296:1, 5296:13, 5310:7, 5340:9, 5349:2, 5350:1, 5414:1, 5415:1, 5423:7, 5423:9, 5463:19, 5464:1, 5469:14
**sides** [2] - 5343:12, 5343:16
**sign** [4] - 5314:17, 5326:9, 5406:4, 5409:9
**signatories** [1] - 5298:14
**signature** [13] - 5296:4, 5296:8, 5298:4, 5298:19, 5311:16, 5311:17, 5312:20, 5312:21, 5312:22, 5314:2, 5315:1, 5348:10, 5388:14
**signatures** [2] - 5298:2, 5298:13
**signed** [10] - 5299:7, 5306:19, 5306:21, 5314:14, 5322:10, 5328:13, 5410:24, 5413:3, 5413:12, 5413:17
**significant** [3] - 5372:3, 5376:17, 5377:8

**signing** [2] - 5298:8, 5299:3
**signoff** [1] - 5328:17
**Silver** [1] - 5451:12
**similar** [2] - 5461:19, 5461:20
**similarities** [1] - 5437:1
**simply** [1] - 5474:16
**single** [1] - 5437:2
**sit** [6] - 5315:21, 5319:14, 5330:9, 5330:13, 5439:24, 5454:4
**six** [1] - 5480:11
**skipped** [1] - 5351:21
**sleeves** [1] - 5399:5
**slides** [2] - 5448:5, 5448:6
**sloppiness** [3] - 5473:4, 5474:23, 5474:24
**sloppy** [1] - 5475:2
**small** [3] - 5368:16, 5391:9, 5428:11
**SMC** [3] - 5435:22, 5436:8, 5436:10
**software** [2] - 5376:23, 5405:3
**sold** [5] - 5339:5, 5376:20, 5405:5, 5452:4, 5452:5
**someone** [7] - 5319:14, 5337:8, 5380:8, 5387:2, 5396:17, 5443:12, 5475:19
**sometime** [1] - 5410:25
**sometimes** [4] - 5341:24, 5345:20, 5361:10, 5467:3
**somewhere** [3] - 5408:16, 5466:7, 5467:15
**soon** [2] - 5313:21, 5410:25
**sorry** [32] - 5302:20, 5305:5, 5307:2, 5310:2, 5310:13, 5311:10, 5312:14, 5318:18, 5328:1, 5328:16, 5336:20, 5337:5, 5338:2, 5340:18, 5344:23, 5348:25, 5358:17, 5361:13, 5363:21, 5364:3, 5366:13, 5374:13, 5374:19, 5378:20, 5380:5,

5387:19, 5391:7, 5421:16, 5422:21, 5422:25, 5444:9, 5476:17
**sort** [1] - 5306:10
**sorts** [1] - 5415:2
**sounds** [1] - 5300:11
**Source** [1] - 5452:2, 5452:24
**source** [2] - 5340:19, 5342:16
**sources** [1] - 5367:7
**South** [1] - 5405:8
**Southern** [3] - 5464:4, 5464:13, 5468:8
**space** [1] - 5376:14
**span** [2] - 5376:10, 5478:20
**spans** [1] - 5478:9
**speakerphone** [3] - 5374:16, 5374:24, 5375:14
**speaking** [2] - 5373:9, 5380:2
**Special** [1] - 5470:12
**specific** [2] - 5348:8, 5476:4
**specifically** [2] - 5458:16, 5469:25
**spell** [1] - 5426:14
**spelled** [1] - 5450:8
**spend** [4] - 5321:3, 5458:12, 5466:11, 5468:2
**spent** [3] - 5384:2, 5462:10, 5468:18
**spliced** [1] - 5300:12
**split** [2] - 5300:10, 5300:11
**spoken** [2] - 5373:12, 5438:21
**sponsor** [1] - 5411:8
**sponsors** [1] - 5451:16
**Sports** [1] - 5451:16
**spreadsheet** [12] - 5367:10, 5367:11, 5367:15, 5367:22, 5368:1, 5368:4, 5368:16, 5369:6, 5369:10, 5369:12, 5369:25, 5371:24
**spreadsheets** [10] - 5366:18, 5366:22, 5366:24, 5367:12, 5367:14, 5369:9, 5369:13, 5369:18, 5369:19, 5369:23
**Spring** [1] - 5407:21
**staff** [2] - 5436:22,

5438:8
**stamps** [1] - 5435:22
**stand** [1] - 5449:20
**standard** [2] - 5413:15, 5477:20
**Standard** [3] - 5368:21, 5368:22, 5368:24
**standpoint** [1] - 5360:8
**stars** [2] - 5402:22, 5402:24
**start** [5] - 5321:4, 5356:15, 5374:15, 5447:14, 5467:1
**started** [11] - 5320:18, 5323:8, 5323:9, 5331:8, 5339:2, 5374:21, 5375:9, 5392:10, 5405:3, 5405:10, 5407:6
**starts** [1] - 5420:5
**state** [12] - 5350:9, 5369:17, 5415:14, 5426:14, 5431:12, 5431:16, 5448:20, 5448:24, 5469:14, 5470:23, 5471:19, 5474:10
**statement** [7] - 5344:1, 5345:10, 5355:19, 5371:15, 5377:17, 5377:20, 5425:15
**statements** [3] - 5350:9, 5455:15, 5459:8
**states** [1] - 5297:14
**STATES** [3] - 5291:1, 5291:3, 5291:10
**States** [2] - 5291:13, 5291:15
**status** [1] - 5350:24
**statute** [3] - 5478:2, 5478:12, 5478:18
**stay** [2] - 5300:10, 5325:14
**stenography** [1] - 5291:25
**step** [3] - 5403:18, 5426:7, 5461:13
**steps** [1] - 5317:22
**Steve** [5] - 5367:18, 5451:3, 5451:4, 5451:12, 5453:22
**still** [14] - 5293:4, 5293:22, 5309:18, 5348:12, 5385:17, 5388:7, 5388:9, 5388:10, 5411:22,

5449:6, 5452:14, 5452:23, 5453:7, 5473:12
**stipulate** [1] - 5442:23
**stipulated** [1] - 5442:22
**stipulation** [4] - 5348:19, 5442:24, 5443:2
**stock** [1] - 5365:6
**stole** [1] - 5454:23
**Stolper** [2] - 5362:15, 5362:23
**stop** [1] - 5466:4
**stopped** [2] - 5303:4, 5403:3
**street** [1] - 5332:1
**strictly** [2] - 5384:15, 5385:10
**strike** [1] - 5366:6
**strikes** [1] - 5342:21
**struck** [1] - 5372:23
**stuff** [2] - 5408:21, 5411:4
**sub** [1] - 5337:11
**sub-account** [1] - 5337:11
**subaccount** [3] - 5395:23, 5396:10
**subaccounts** [5] - 5395:22, 5395:25, 5396:2, 5396:5, 5397:23
**subject** [4] - 5307:9, 5311:10, 5355:5, 5356:11
**submit** [2] - 5448:22, 5479:16
**subsidize** [1] - 5391:20
**substance** [1] - 5397:4
**substantial** [1] - 5433:9
**substantially** [1] - 5477:5
**successful** [2] - 5363:10, 5366:3
**succession** [1] - 5373:9
**suggest** [3] - 5343:10, 5447:4, 5475:4
**suggested** [1] - 5416:12
**suggesting** [1] - 5343:6
**suggestion** [2] - 5386:3, 5465:11
**suit** [1] - 5426:1
**sum** [2] - 5397:4,

5447:22
**summarize** [2] - 5461:21, 5462:25
**summarizing** [1] - 5443:25
**summary** [3] - 5443:24, 5475:25, 5476:10
**summation** [10] - 5446:18, 5446:23, 5447:9, 5447:14, 5448:6, 5466:18, 5466:20, 5466:21, 5466:23
**summations** [4] - 5446:16, 5447:8, 5447:19, 5466:13
**Sunday** [1] - 5293:12
**supervisor** [1] - 5434:21
**supplemental** [1] - 5448:24
**supplied** [3] - 5380:20, 5380:21, 5467:9
**supply** [1] - 5479:23
**support** [3] - 5428:7, 5429:4, 5469:5
**supposed** [4] - 5324:18, 5453:17, 5455:8, 5460:6
**supposedly** [1] - 5469:12
**Supreme** [1] - 5477:25
**sustain** [2] - 5360:10, 5416:10
**sustained** [4] - 5361:1, 5361:3, 5377:10, 5389:2
**sweat** [1] - 5391:15
**switch** [1] - 5416:22
**sworn** [1] - 5426:12
**sworn/affirmed** [3] - 5294:5, 5395:9, 5404:2
**Sydor** [3] - 5367:20, 5368:2, 5368:6
**system** [7] - 5334:17, 5336:6, 5336:8, 5336:11, 5337:15, 5351:8, 5430:2
**systems** [1] - 5339:5

# T

**talks** [1] - 5328:17
**tape** [10] - 5292:5, 5392:23, 5400:14, 5400:16, 5401:10, 5401:16, 5401:19,

5401:21, 5403:12, 5446:12
**task** [3] - 5363:11, 5366:2, 5434:19
**tasked** [1] - 5365:14
**tax** [9] - 5357:6, 5357:10, 5357:12, 5357:16, 5357:20, 5383:16, 5383:18, 5429:3
**taxpayers** [1] - 5430:1
**TC** [1] - 5311:3
**team** [1] - 5420:11
**technology** [2] - 5376:14, 5376:22
**Telephone** [1] - 5400:3
**telephone** [9] - 5299:10, 5374:14, 5379:22, 5380:1, 5381:1, 5433:12, 5433:14, 5439:2, 5461:10
**telephonically** [2] - 5455:25, 5460:17
**Teller** [2] - 5404:16, 5405:13
**ten** [3] - 5376:2, 5377:14, 5377:15
**tension** [1] - 5341:23
**term** [16] - 5306:22, 5306:23, 5307:6, 5307:9, 5307:12, 5311:9, 5313:24, 5314:6, 5345:21, 5364:15, 5364:16, 5386:22, 5387:23, 5399:23, 5432:4, 5477:24
**Term** [1] - 5311:10
**terminated** [1] - 5388:6
**terms** [18] - 5304:12, 5311:13, 5311:21, 5311:23, 5311:24, 5326:21, 5330:14, 5337:1, 5338:19, 5371:21, 5372:1, 5385:8, 5385:12, 5385:16, 5386:25, 5410:4, 5470:3, 5472:3
**tested** [1] - 5435:7
**testified** [35] - 5294:22, 5295:4, 5304:2, 5306:14, 5315:14, 5317:14, 5317:17, 5318:14, 5320:15, 5321:2, 5325:17, 5329:16,

5329:19, 5331:2, 5333:4, 5337:23, 5337:25, 5338:3, 5338:18, 5358:6, 5360:11, 5372:17, 5372:18, 5397:4, 5404:2, 5426:13, 5431:24, 5432:2, 5442:16, 5443:12, 5443:20, 5446:11, 5449:10, 5459:6, 5465:1
**testify** [17] - 5308:17, 5309:10, 5358:21, 5366:8, 5369:15, 5370:12, 5431:1, 5442:9, 5443:22, 5444:2, 5449:13, 5459:6, 5464:3, 5464:12, 5474:4, 5474:18, 5480:21
**testifying** [6] - 5294:5, 5375:25, 5395:9, 5442:14, 5442:15, 5459:8
**testimony** [21] - 5293:19, 5310:1, 5347:6, 5363:5, 5364:7, 5367:5, 5372:10, 5372:19, 5373:21, 5377:11, 5377:15, 5386:1, 5393:13, 5397:2, 5444:22, 5445:5, 5454:21, 5470:17, 5474:6, 5476:13, 5480:22
**text** [1] - 5402:21
**THE** [156] - 5291:9, 5292:2, 5292:16, 5292:20, 5293:1, 5293:10, 5293:13, 5293:17, 5293:24, 5293:25, 5296:7, 5296:10, 5297:4, 5301:7, 5301:10, 5301:13, 5301:15, 5309:1, 5309:6, 5310:8, 5313:3, 5315:5, 5315:8, 5319:1, 5321:15, 5327:15, 5329:6, 5331:22, 5331:25, 5332:10, 5340:2, 5340:5, 5340:7, 5340:8, 5340:22, 5340:24, 5341:2, 5341:7, 5341:12, 5343:2, 5346:7, 5346:23, 5347:24,

5348:1, 5348:22, 5351:8, 5351:20, 5351:22, 5352:15, 5353:23, 5358:2, 5358:17, 5358:20, 5360:1, 5360:6, 5360:10, 5361:1, 5361:3, 5362:5, 5366:7, 5368:19, 5377:10, 5378:17, 5378:21, 5378:22, 5379:15, 5379:16, 5382:8, 5384:23, 5389:2, 5392:25, 5393:2, 5393:5, 5393:9, 5393:18, 5393:24, 5394:4, 5394:11, 5395:12, 5401:21, 5402:2, 5402:6, 5402:9, 5402:11, 5402:17, 5403:1, 5403:6, 5403:18, 5403:23, 5406:22, 5413:21, 5415:10, 5415:23, 5415:25, 5416:9, 5418:2, 5419:15, 5424:7, 5426:7, 5426:14, 5426:16, 5426:18, 5441:17, 5441:21, 5441:23, 5442:9, 5443:5, 5443:11, 5444:1, 5444:14, 5444:24, 5446:1, 5446:7, 5446:13, 5446:15, 5446:24, 5447:11, 5447:15, 5447:25, 5448:9, 5448:11, 5448:14, 5448:20, 5449:3, 5449:15, 5449:20, 5449:24, 5459:5, 5459:10, 5461:24, 5462:1, 5462:2, 5463:20, 5464:12, 5465:15, 5466:2, 5467:21, 5467:25, 5468:4, 5468:20, 5470:18, 5471:1, 5471:3, 5471:9, 5474:10, 5476:9, 5476:15, 5476:25, 5477:16, 5479:9, 5479:17, 5479:20, 5480:4, 5480:14, 5480:20, 5480:25
**themselves** [1] - 5422:14
**theory** [2] - 5393:16, 5476:21

**thereafter** [2] - 5447:9, 5453:15
**thinking** [2] - 5416:15, 5447:15
**thinks** [1] - 5464:9
**third** [6] - 5404:19, 5436:21, 5439:24, 5440:5, 5440:8, 5474:7
**third-party** [1] - 5474:7
**thorough** [1] - 5471:13
**thousands** [1] - 5351:14
**three** [23] - 5327:8, 5327:23, 5328:3, 5329:19, 5376:13, 5399:12, 5399:24, 5404:8, 5404:11, 5405:11, 5405:14, 5408:17, 5429:20, 5434:24, 5435:1, 5435:8, 5436:6, 5436:24, 5437:1, 5437:2, 5453:13, 5455:22
**throughout** [1] - 5472:1
**Thursday** [8] - 5447:8, 5447:13, 5447:17, 5447:24, 5448:1, 5448:7, 5466:17, 5466:21
**ti** [1] - 5313:20
**Tim** [3] - 5297:17, 5379:25, 5449:2
**Timothy** [2] - 5403:12, 5403:14
**title** [4] - 5303:12, 5303:14, 5303:18, 5303:20
**Title** [3] - 5441:4, 5441:6, 5441:8
**today** [19] - 5303:12, 5310:1, 5310:4, 5316:9, 5317:12, 5319:15, 5319:23, 5322:24, 5329:11, 5330:4, 5330:9, 5330:13, 5384:17, 5406:16, 5412:4, 5412:5, 5439:4, 5447:3, 5452:14
**together** [6] - 5326:2, 5326:12, 5326:15, 5356:25, 5434:12, 5479:13
**TOMMY** [2] - 5291:6, 5291:6

**Tommy** [48] - 5304:13, 5306:15, 5311:3, 5311:17, 5312:22, 5314:3, 5330:6, 5339:8, 5348:15, 5353:7, 5353:8, 5356:17, 5356:18, 5362:16, 5362:20, 5363:3, 5372:18, 5372:24, 5373:2, 5373:4, 5373:8, 5373:13, 5374:1, 5374:4, 5374:6, 5374:16, 5374:21, 5375:10, 5375:16, 5375:17, 5377:13, 5378:5, 5378:10, 5378:25, 5379:4, 5379:5, 5379:10, 5379:25, 5391:8, 5391:24, 5392:12, 5406:13, 5407:11, 5407:16, 5412:16, 5420:7, 5458:25
**Tommy's** [2] - 5374:6, 5391:6
**tommy@eufora.com** [2] - 5305:13, 5312:7
**tommyconstantine@ eufora.com** [1] - 5305:17
**tomorrow** [11] - 5446:5, 5447:15, 5447:23, 5448:7, 5449:16, 5466:5, 5466:16, 5467:13, 5467:18, 5467:22, 5480:25
**tonight** [5] - 5447:1, 5477:17, 5479:15, 5479:21, 5480:23
**took** [10] - 5317:22, 5370:4, 5388:15, 5400:11, 5411:11, 5457:12, 5459:15, 5473:18, 5473:19, 5473:20
**top** [4] - 5298:25, 5310:13, 5310:15, 5328:12
**totals** [2] - 5435:4, 5437:4
**touched** [1] - 5383:9
**towards** [1] - 5452:7
**town** [1] - 5430:19
**traced** [8] - 5441:3, 5453:25, 5454:3, 5454:4, 5454:5, 5454:8, 5454:12, 5455:6

tracing [1] - 5470:3
trade [1] - 5407:12
traded [1] - 5376:12
trademarks [1] - 5387:1
transaction [6] - 5324:23, 5325:15, 5325:21, 5442:10, 5460:9, 5469:24
transactions [7] - 5404:14, 5429:10, 5429:12, 5430:22, 5430:23, 5435:13, 5455:21
Transactions [1] - 5407:13
transcript [11] - 5291:25, 5292:13, 5394:5, 5394:7, 5400:22, 5401:5, 5401:15, 5416:14, 5448:23, 5479:24, 5481:5
TRANSCRIPT [1] - 5291:9
transcripts [8] - 5400:10, 5400:13, 5400:19, 5401:11, 5401:14, 5402:1, 5402:12, 5402:14
transfer [15] - 5320:10, 5321:8, 5321:19, 5322:1, 5322:6, 5335:1, 5335:11, 5337:24, 5338:3, 5347:18, 5348:8, 5452:25, 5455:5, 5480:15, 5480:16
transferred [12] - 5320:25, 5321:18, 5321:22, 5335:4, 5335:5, 5335:7, 5335:8, 5348:4, 5452:20, 5453:1, 5453:6, 5455:4
transferring [1] - 5323:2
transfers [4] - 5318:6, 5335:12, 5337:23, 5338:6
transpired [2] - 5343:1, 5468:18
TransUnion [1] - 5409:21
tree [1] - 5409:16
tremendous [1] - 5469:10
TRIAL [1] - 5291:9
trial [9] - 5341:22,

5343:10, 5442:8, 5442:15, 5442:17, 5467:6, 5472:1, 5474:12, 5475:9
tried [2] - 5370:20, 5449:12
trouble [1] - 5427:21
troubled [1] - 5429:25
true [16] - 5294:23, 5295:5, 5300:8, 5300:23, 5317:25, 5318:13, 5365:12, 5365:21, 5366:2, 5372:5, 5372:14, 5376:19, 5382:25, 5465:8, 5477:9, 5478:22
trust [6] - 5348:6, 5348:15, 5433:25, 5437:17, 5450:9, 5458:18
Trust [9] - 5429:15, 5429:17, 5429:24, 5430:3, 5430:7, 5430:8, 5430:9, 5430:17, 5431:3
truth [1] - 5473:3
try [6] - 5342:6, 5343:12, 5412:7, 5416:21, 5475:14, 5479:13
trying [13] - 5303:19, 5356:24, 5369:8, 5422:19, 5443:13, 5449:5, 5461:13, 5470:20, 5471:24, 5473:15, 5474:23, 5475:4, 5478:11
Tuesday [1] - 5467:2
turned [2] - 5342:9, 5342:11, 5342:13, 5342:17, 5380:19, 5383:11, 5389:17
turning [1] - 5338:7
Tursi [2] - 5291:20, 5481:8
two [42] - 5297:14, 5313:3, 5313:13, 5316:1, 5319:5, 5323:3, 5323:11, 5331:21, 5334:5, 5334:6, 5338:19, 5338:21, 5342:16, 5344:15, 5372:20, 5379:6, 5382:12, 5390:15, 5400:9, 5401:11, 5402:22, 5402:24, 5407:18, 5408:7, 5409:5, 5409:16, 5409:18,

5409:19, 5410:5, 5411:11, 5415:2, 5428:22, 5429:20, 5437:11, 5443:1, 5446:18, 5446:19, 5454:9, 5459:12, 5466:19, 5470:24, 5476:6
two-year [1] - 5410:5
type [3] - 5368:16, 5369:19, 5428:8
typed [2] - 5351:4
Tyson [8] - 5320:5, 5389:23, 5390:7, 5390:10, 5390:19, 5461:8, 5462:22
Tyson's [1] - 5462:10

## U

um-hmm [2] - 5305:3, 5305:4
Umm [1] - 5335:6
unaccurate [1] - 5316:20
unbank [1] - 5406:2
uncover [1] - 5472:15
uncovered [1] - 5472:19
under [19] - 5293:23, 5331:2, 5337:11, 5338:18, 5396:1, 5411:23, 5415:13, 5430:13, 5430:23, 5436:24, 5448:21, 5464:5, 5469:19, 5474:11, 5474:22, 5475:22, 5477:4, 5477:24, 5478:19
underbank [1] - 5406:2
underlying [2] - 5470:10, 5470:14
underscore [1] - 5307:9
undersigned [3] - 5297:15, 5297:20, 5299:1
understood [2] - 5364:16, 5463:8
unfair [2] - 5415:22, 5477:6
unfortunately [2] - 5385:15, 5461:15
UNITED [3] - 5291:1, 5291:3, 5291:10
United [2] - 5291:13, 5291:15
units [1] - 5453:12
unless [2] - 5373:16,

5390:5
unquote [2] - 5475:2, 5475:21
unredacted [2] - 5415:3, 5415:9
up [53] - 5300:10, 5309:11, 5310:20, 5316:22, 5317:6, 5322:25, 5327:24, 5328:3, 5328:6, 5328:7, 5351:4, 5354:6, 5355:2, 5360:21, 5360:24, 5363:5, 5363:12, 5363:14, 5364:2, 5364:6, 5364:9, 5364:11, 5364:22, 5366:9, 5370:21, 5371:2, 5372:4, 5372:12, 5373:12, 5378:24, 5379:11, 5386:15, 5392:23, 5393:24, 5401:20, 5402:1, 5405:8, 5406:4, 5407:11, 5407:15, 5412:15, 5426:19, 5428:6, 5442:23, 5447:19, 5447:23, 5450:2, 5457:7, 5467:4, 5469:23, 5471:10, 5474:4
updated [1] - 5329:10
upper [1] - 5310:20
upset [1] - 5468:1
US [4] - 5291:4, 5291:21, 5463:17, 5464:3
user [1] - 5306:11
uses [1] - 5438:6
utilize [2] - 5458:16, 5460:12

## V

vacation [1] - 5467:23
valid [1] - 5326:4
valuable [9] - 5376:10, 5376:22, 5383:22, 5383:23, 5383:24, 5384:4, 5384:7, 5384:11, 5384:19
valuation [1] - 5384:15
Value [1] - 5459:25
value [44] - 5333:10, 5333:13, 5333:17, 5334:17, 5334:19, 5335:20, 5335:22, 5335:24, 5337:3, 5337:9, 5338:8,

5342:17, 5361:5, 5361:14, 5361:15, 5361:16, 5376:1, 5384:17, 5387:1, 5387:2, 5395:17, 5395:19, 5395:20, 5396:25, 5397:5, 5397:17, 5398:2, 5398:3, 5398:11, 5398:13, 5398:17, 5398:22, 5408:9, 5408:12, 5408:15, 5408:19, 5410:4, 5410:6, 5410:10, 5410:12, 5416:13, 5416:19, 5477:4
values [1] - 5408:7
valuing [1] - 5396:25
various [8] - 5311:13, 5364:13, 5364:23, 5365:16, 5366:20, 5372:11, 5416:12, 5438:6
vast [1] - 5405:25
vehicle [1] - 5460:5
vendor [1] - 5338:22
Venture [1] - 5311:11
Ventures [6] - 5368:21, 5368:22, 5368:25, 5404:13, 5405:10, 5405:12
ventures [1] - 5405:15
verbally [1] - 5341:21
verified [1] - 5317:20
verify [3] - 5317:24, 5439:1, 5444:20
verifying [1] - 5318:4
vernacular [1] - 5422:10
version [5] - 5308:21, 5401:4, 5412:3, 5415:4, 5416:1
verticals [1] - 5404:18
view [5] - 5410:11, 5472:23, 5474:1, 5474:5, 5478:10
violate [1] - 5438:19
voice [4] - 5302:6, 5380:25, 5381:1, 5426:18
VOIR [2] - 5352:16, 5482:5
Volpe [3] - 5297:23, 5382:21, 5407:7
volunteered [1] - 5341:9
vote [2] - 5387:17, 5387:21
voted [1] - 5303:9
VP [1] - 5370:14

## W

**waiter** [1] - 5406:7
**waiting** [1] - 5476:25
**walk** [2] - 5317:22, 5463:2
**walked** [1] - 5455:25
**walking** [2] - 5461:15, 5462:11
**wall** [2] - 5438:24, 5455:14
**Wallet** [1] - 5407:9
**wandered** [1] - 5378:20
**wants** [5] - 5401:24, 5416:6, 5436:4, 5469:21, 5475:4
**washer** [1] - 5406:6
**water** [2] - 5378:21, 5409:23
**Wayne** [1] - 5472:8
**ways** [5] - 5334:24, 5335:1, 5336:5, 5399:1, 5432:11
**week** [5] - 5344:16, 5344:17, 5407:15, 5407:18, 5468:2
**weekend** [2] - 5293:8, 5447:20
**weeks** [2] - 5343:11, 5354:15
**welcome** [1] - 5379:15
**whereas** [2] - 5297:15, 5297:20
**whereby** [1] - 5410:25
**whole** [7] - 5310:18, 5384:13, 5387:12, 5393:25, 5443:23, 5444:25, 5475:6
**wife** [3] - 5334:10, 5432:3, 5467:25
**Wilenchik** [2] - 5432:11, 5432:12
**William** [2] - 5297:24, 5368:12
**willing** [5] - 5387:2, 5391:9, 5391:24, 5452:6, 5453:20
**wire** [12] - 5325:6, 5334:23, 5335:1, 5335:4, 5337:23, 5337:24, 5338:3, 5338:6, 5338:8, 5396:15, 5398:23, 5477:20
**wires** [1] - 5399:3
**wish** [1] - 5297:21
**wished** [2] - 5380:12, 5380:15
**wishes** [1] - 5342:5

**withdraw** [2] - 5387:14, 5439:12
**witness** [15] - 5292:24, 5358:18, 5403:19, 5426:8, 5426:12, 5442:21, 5443:24, 5446:5, 5446:10, 5464:3, 5465:1, 5468:3, 5469:12, 5470:10, 5474:7
**WITNESS** [13] - 5293:24, 5331:25, 5340:7, 5358:20, 5360:6, 5368:19, 5378:22, 5379:15, 5426:16, 5441:21, 5461:24, 5462:2, 5467:25
**witness'** [1] - 5470:15
**witness's** [1] - 5470:16
**witnesses** [2] - 5475:11, 5475:12
**woman** [1] - 5431:22
**word** [4] - 5373:10, 5373:22, 5374:1, 5391:7
**words** [8] - 5341:19, 5364:2, 5364:9, 5372:10, 5373:15, 5416:3, 5425:20, 5447:22
**worried** [1] - 5356:19
**worry** [2] - 5356:18, 5416:22
**wrapped** [1] - 5382:16
**wrestling** [1] - 5477:24
**writes** [2] - 5356:4, 5356:14
**writing** [1] - 5354:9
**written** [2] - 5294:24, 5400:2
**Written** [1] - 5297:10
**wrote** [3] - 5354:4, 5420:7, 5442:23

## Y

**Yahoo** [1] - 5306:9
**year** [6] - 5331:10, 5336:23, 5409:5, 5410:5, 5431:21, 5432:3
**years** [11] - 5342:22, 5345:14, 5357:21, 5427:4, 5428:2, 5428:22, 5429:20, 5429:21, 5478:9,

5478:20
**yelling** [1] - 5343:13
**yes-or-no** [1] - 5298:21
**yesterday** [15] - 5292:4, 5294:12, 5299:19, 5315:18, 5318:7, 5318:12, 5319:9, 5321:2, 5324:13, 5342:14, 5360:24, 5372:17, 5380:9, 5387:7, 5480:18
**YORK** [1] - 5291:1
**York** [4] - 5291:14, 5291:22, 5463:17, 5464:4
**yourself** [1] - 5418:10

## Z

**Zero** [11] - 5338:25, 5339:3, 5339:4, 5339:6, 5339:8, 5339:11, 5339:19, 5339:22, 5344:6, 5344:20, 5345:4
**zero** [3] - 5330:19, 5343:23, 5421:6
**zeros** [1] - 5435:23