749

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA      :      13-CR-607 (JFB)
4
      -against-                      U.S. Courthouse
5
                              :      Central Islip, New York
6  PHILLIP A. KENNER
   a/k/a "Philip A. Kenner",
7        and                  :
   TOMMY C. CONSTANTINE
8  a/k/a "Tommy C. Hormovitis"

9              Defendants    :
                                     May 11, 2015
10 - - - - - - - - - - - - - - - X   9:30 a.m.

11
   BEFORE:
12          HONORABLE JOSEPH F. BIANCO
            United States District Judge
13          and a jury

14
   APPEARANCES:
15
   For the Government:      KELLY T. CURRIE
16                          Acting United States Attorney
                            Federal Plaza
17                          Central Islip, New York 11722
                            BY:  JAMES M. MISKIEWICZ
18                               SARITHA KOMATIREDDY
                                 Assistant U.S. Attorneys
19

20

21 For the Defendant:      HALEY, WEINBLATT & CALCAGNI LLP
   Phillip A. Kenner       One Suffolk Square
22                         1601 Veterans Memorial Highway
                           Suite 425
23                         Islandia, New York 11749
                           BY:  RICHARD HALEY
24

25

1   For the Defendant:        LaRUSSO & CONWAY LLP
    Tommy C. Constantine      300 Old Coutry Road
2                             Suite 341
                              Mineola, New York 11501
3                             BY:  ROBERT P. LaRUSSO
                                      and
4                                 ANDREW L. OLIVERAS
                                  26 Strangford Court
5                                 Oceanside, New York 11572

6

7   Court Reporter:           RONALD E. TOLKIN, RPR, RMR, CRR
                              100 Federal Plaza
8                             Central Islip, New York 11722
                              631-712-6105
9                             ronald_tolkin@nyed.uscourts.gov

10                            ***

11          THE CLERK:  United States of America against Phillip

12   Kenner and Tommy Constantine.  13-CR-607.

13          Please state your appearances for the record.

14          MR. MISKIEWICZ:  James Miskiewicz for the United

15   States.

16          Good morning, Your Honor.

17          THE COURT:  Good morning.

18          MS. KOMATIREDDY:  Saritha Komatireddy for the United

19   States.

20          Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MR. LaRUSSO:  Robert LaRusso for Mr. Constantine who

23   is present in court.

24          THE COURT:  Good morning, Mr. Constantine.

25          DEFENDANT CONSTANTINE:  Good morning, Your Honor.

U.S.A. v. KENNER and CONSTANTINE                    751

1            MR. HALEY:  Richard Haley for the Defendant Kenner.

2            THE COURT:  Good morning, Mr. Kenner.

3            DEFENDANT KENNER:  Good morning, Your Honor.

4            THE COURT:  Juror Number 5, ironically, was late

5    this morning.  So -- but he has arrived.  So are we ready to

6    bring them out?

7            MR. MISKIEWICZ:  We have no issues.

8            MR. LaRUSSO:  No issues, Your Honor.

9            MR. HALEY:  No issues, Your Honor.

10           THE COURT:  Bring in the witness and the jury.

11           (Whereupon the jury enters the courtroom at 10:11

12   a.m.)

13           (Witness recalled to the stand.)

14           THE CLERK:  All rise.

15           THE COURT:  Good morning, members of the jury.  I

16   hope you all had a good weekend.  We are ready to continue

17   with the trial.

18           As you recall, Ms. Peca was on cross-examination on

19   Thursday, and we will continue.

20           Ms. Peca, I remind you, you are still under oath.

21           K R I S T I N     P E C A,

22           called as a witness, having been previously duly

23           sworn, was examined and testified as follows:

24           MR. HALEY:  With the Court's permission, may I read

25   into the record the last two questions when we broke, for a

1  frame of reference?

2        THE COURT:  Sure.

3        MR. HALEY:  Your Honor, as reflected in the record

4  in the proceedings concluded on Thursday, the last two

5  questions and answers were given by the witness, page 770,

6  line 22 (reading):

7        "QUESTION:  Is it your testimony on this witness

8  stand, under oath, that at no point in time Phillip Kenner

9  never sent you Northern Trust documents that may have been in

10  his possession?

11        ANSWER:  Not the kind that we were looking for.

12        QUESTION:  Well, to the best of your memory, what

13  kind of Northern Trust documents did he send you?

14        ANSWER:  I can't recall."

15  CONTINUED CROSS EXAMINATION

16  BY MR. HALEY:

17  Q    Now, Mrs. Peca, with respect to the Northern Trust

18  documents, the ones that you did receive from Phil Kenner, did

19  you follow-up with Mr. Kenner by way of a conversation, either

20  telephonically or by way of text, requesting specific Northern

21  Trust documents that you believe existed?

22  A    My husband did, yes.

23  Q    What response did you receive?

24  A    There were a lot of delays, diversions.  I can't recall

25  any specific answers with respect to this matter.

1   Q    Well, was that request of specific Northern Trust

2   documents made after you received the default letter?

3   A    There were definitely conversations about that, yes.

4   Q    My question, ma'am, the request for specific Northern

5   Trust documents that you were looking for, was that request to

6   Phil Kenner made after you received the default letter from

7   Northern Trust?

8   A    Are you asking me about my husband?  Questioning him?

9   Q    Well, your questioning him and your knowledge of your

10  husband's questioning of him.

11  A    That was a conversation between my husband and him.  So I

12  don't feel comfortable stating what was said.  I did not speak

13  to Phil after that.

14  Q    Well, when you reported the six hours of conversation

15  between yourself and Phil Kenner, that occurred after you

16  received the default letter, correct?

17  A    The tape recordings of 2012, correct.

18  Q    Would you tell us, approximately, of those six hours of

19  recorded conversations, how many times did you have

20  conversations with Phil that resulted in six hours of recorded

21  conversations?

22  A    I'm not sure.  Probably four, three.  Three or four.

23  Q    So we have three conversations, six hours is the total,

24  we're talking about conversations two hours in duration,

25  approximately?

1   A    Some could have been, yes.

2   Q    Well, you would agree, ma'am, at least as far as speaking

3   with you for two hours, Phil Kenner, at least at that point in

4   time, was responsive to your inquiry.  Isn't that a correct

5   statement?

6   A    Responsive to my inquiry?

7   Q    Sure.

8   A    Could you be more detailed, please.

9   Q    Sure.  Well, the two hours of conversation between

10  yourself and Phil Kenner, presumably, had some content in

11  terms of the conversation, is that correct?

12  A    Yes.

13  Q    I take it during, let's say, one or two-hour

14  conversations, there was nothing prohibiting you from asking

15  Phil Kenner any question you desired, isn't that true?

16  A    Sure.  Correct.

17  Q    So it is fair to state that, at least as far as those

18  conversations were concerned, he was responsive to your

19  inquiries, is that true?

20  A    Responsive, yes and no.  He answered not always directly.

21  Q    Well, of those six hours of conversations, the excerpts

22  of the conversations that you wished this jury to hear on your

23  direct have already been reflected in the record, isn't that

24  true?

25  A    Say that again.  I didn't understand that.

1  Q    Yes.  When you were on your direct examination, the

2  government identified certain recorded conversations, with the

3  transcriptions of those conversations.  You authenticated

4  those conversations.  And those conversations were read to the

5  jury.  Do you recall that?

6  A    Yes.

7  Q    Is it your testimony today that there were other

8  conversations where Phil Kenner, let's say, was either evasive

9  or deceitful?  Is that your testimony here today?

10 A    Not necessarily other conversations.  It could have been

11 the same conversations as well, yes.

12 Q    Within that six hours of recorded conversations, did you

13 record the statements he made to you that he was hiding in his

14 place in Mexico?

15 A    You'd have to listen to all the tapes to see.  It could

16 have been, definitely, in an e-mail as well.

17 Q    And you have that e-mail in your possession, ma'am?

18 A    I don't have any e-mails in my possession anymore.

19 Q    Was that e-mail provided to the government when you

20 provided the e-mails that you claim were in your possession

21 prior to today?

22 A    Yes, it was.

23 Q    When Phil Kenner told you he was hiding in his place in

24 Mexico, did you tell your husband about what Phil Kenner said?

25         MS. KOMATIREDDY:  Objection.

K. PECA-CROSS-HALEY                                    756

1          THE COURT:  No, that's okay.

2          You can answer that if you remember.

3          THE WITNESS:  Yes, I did.

4    Q    What was his response?

5    A    I can't remember exactly but I think it was something to

6    the effect of another story, another something elaborate, some

7    crazy explanation.  That sort of reaction.

8    Q    When you were interviewed by the FBI on those three

9    occasions, did you tell the FBI that Phil Kenner told you he

10   was hiding in his place in Mexico?

11   A    I can't remember if I told them that or not.

12   Q    Kindly take a look at Exhibit 23 for identification.  I

13   believe it was previously identified, these writings, as your

14   handwritten notes.

15   A    Yes.

16   Q    Take a look at it.  Do you recognize that document?

17   A    Yes, I do.

18   Q    We can agree, based on your prior testimony, those are

19   your handwritten notes?

20   A    Yes.

21   Q    Anywhere in those notes, is it reflected you told the FBI

22   that Phil Kenner told you he was hiding in his place in

23   Mexico?

24   A    I don't believe it does.  I don't see it.

25   Q    Incidentally, you were -- were or were you not intimately

1    involved in knowing of your husband's finances and his

2    investments?

3    A    Yes.

4    Q    So you did more than just pay the water bills and things

5    of that nature, correct?

6              MS. KOMATIREDDY:  Objection.  Asked and answered.

7              THE COURT:  We went through that last week.

8    Q    With respect to the Hawaii investment, the Hawaii land

9    investment, is it not true that when Phil was talking to you

10   about that investment he told you that profitability with

11   reference to a real estate investment could take as much as

12   5 to 20 years to come to fruition?

13   A    I can't remember the specifics of that conversation.

14   Q    So kindly take a look at the first page of Exhibit 23.

15   Do you see the word Hawaii?  Do you see that word, ma'am?

16   A    Yes.

17   Q    Do you see this sentence here (indicating)?

18   A    This here (indicating)?

19   Q    Read it to yourself.  Just read it to yourself.  You can

20   look at mine.

21   A    Okay.

22   Q    Does that refresh your recollection whether Phil told

23   you, in substance, with reference to real estate investments,

24   profitability may take between 5 and 20 years?

25   A    At the end, yes.

1    Q    That helps refresh your recollection that that was one of

2    the investments, at least risk, that were made known to you

3    that it may take that long to maximize your profits, is that

4    correct?

5    A    Yes.

6    Q    Thank you.  I will take the document back.

7         (Handing.)

8    Q    Now, ma'am, kindly take a look at what is marked in

9    evidence Kenner Exhibit 17.  Just a two-page document.

10        (Witness reviewing the document.)

11        Do you recognize that document?

12   A    Not really.

13   Q    On page 2, however, of that document, do you see your

14   signature?

15   A    I do.  It is from 2005.

16   Q    Is it fair to state that on that document, on the front

17   page of that document your correct address is listed, is that

18   correct?

19   A    Our old address.

20   Q    Well, at that time you did live there, is that correct?

21   A    Actually, we lived in Edmonton.  But that was a summer

22   address.

23   Q    But that was your address, summer address or not, not

24   Phil Kenner's address, is that correct?

25   A    Our summer address.  That was our summer address,

1    correct.

2    Q    Back when you signed that document, is it fair to state

3    that you were aware that it would be Northern Trust that would

4    be handling your line of credit as it relates to the Hawaiian

5    investment?  Correct?

6    A    Yes.

7    Q    And though your address is not stated on that document,

8    ma'am, we can agree that you had a desire to, let's say,

9    contact Northern Trust from the day you signed that document

10    up until the day you testified on this witness stand, you

11    would have been able to locate their address, is that true?

12    A    Sure.

13    Q    Thank you.  May I have the document?

14    A    Here.

15         (Handing.)

16    Q    By the way, after your husband fulfilled his contractual

17    obligation with the Islander, that $20 million contract, he

18    continued to play in the NHL, did he not?

19    A    He did.

20    Q    And to his credit, from that point on did he earn

21    approximately another 8 to 10 million over his career?

22    A    You want what the totals are?  In that 20 million

23    contract you're mentioning --

24    Q    If I may, the question's really quite simple.

25         MS. KOMATIREDDY:  Objection, Your Honor.  Let the

1   witness answer.

2           THE COURT:  Let her finish her answer.

3           Go ahead.

4   A    The 20 million contract was cut short.  There was a year

5   that was taken out of that because there was an NHL lock out

6   that year.  So it wasn't a 20 million.  It ended up not being

7   20 million.  I don't know the exact amount of money that came

8   off of that.  I don't know what the total amount was that he's

9   made for his career, but that sounds about right.

10  Q    So when you say it sounds about right, it sounds about

11  right that after his contract with the Islanders, he made

12  approximately -- again, to his credit -- another

13  8 to 10 million in his NHL career, career?

14  A    Edmonton, a year in Toronto, and then two years in

15  Columbus.

16  Q    In those years with those teams, approximately, he made

17  another 8 to $10 million, is that true?

18          MS. KOMATIREDDY:  Objection.  Asked and answered.

19          THE COURT:  Sustained.

20  Q    By the way, and it is my failing, the recorded

21  conversation that was introduced into evidence, when was that

22  recorded, ma'am, what year?

23  A    What are you referring to?

24  Q    The recorded conversations that have been introduced into

25  evidence with the transcripts, when did that occur, what year?

1   A     2012.

2   Q     Ma'am, I'm going to show you two documents marked already

3   in evidence Kenner Exhibit 1 and Kenner Exhibit 2.  Are those

4   documents familiar to you?

5   A     They are not familiar to me, not right now.

6   Q     Is it fair to state, ma'am, that each document bears on

7   the face of the document the writing Little Isle IV LLC, and

8   that's the April 26, 2006 document, and the July 21, 2006

9   documents bears Little Isle IV LLC?  Is that correct?

10  A     Yes.  I said I am not familiar with it.

11  Q     Well, the title's familiar because that's the LLC, is it

12  not --

13  A     Yes.

14  Q     You have to let me finish.

15        The title is familiar because that's the LLC, is it

16  not, by which the Hawaiian land development was organized?

17  A     Yes.

18  Q     Ma'am, take a look at this document marked Kenner

19  Exhibit 25 for identification.  It's a four-page document.  I

20  don't want to restrict your ability to read it line by line,

21  but if you can just familiarize yourself with the document.

22  A     Okay.

23  Q     Do you recognize that document?

24  A     I do not.

25  Q     Does that document, as well, bear the name Little Isle IV

1    LLC?

2    A    It does.

3    Q    When you testified the other day that at some point in

4    time you received a package of documents, by your explanation,

5    maybe seven inches in depth, do you know whether or not these

6    three documents were part of that package that you received?

7    A    I can't say right now.

8            MS. KOMATIREDDY:  Objection.

9            THE COURT:  Overruled.

10           What was your answer?

11           THE WITNESS:  I can't say right now.

12   Q    Well, do you have any reason to believe that that very

13   large package of documents you received from Phil Kenner with

14   reference to your Hawaiian investment, that those documents

15   were not included as part of that package of documents?

16           MS. KOMATIREDDY:  Objection.

17           THE COURT:  Sustained.

18   Q    Do you know, ma'am, whether or not that package of

19   documents that you received from Phil Kenner, perhaps seven

20   inches in depth, whether any of those documents contained the

21   name Little Isle IV LLC on them?

22           MS. KOMATIREDDY:  Objection, Your Honor.

23           THE COURT:  You can answer.

24   A    I wouldn't be able to answer for sure, but I believe they

25   did.

763

1    Q    By the way, that package of documents seven inches in

2    depth, that didn't just consist of single pages where you're

3    required to sign your signature without an attachment, did it?

4    A    I don't recall anything like that.

5    Q    Kindly take a look at the exhibit marked 18 for

6    identification.  I would ask, it's not that long, that you

7    read that document silently to yourself.

8                MS. KOMATIREDDY:  Your Honor, can we approach?

9                THE COURT:  Yes.

10               (Whereupon a side-bar conference was conducted.)

11               (Matter continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Side-bar conference.)

2              MR. HALEY:  I'm showing her a different document,

3    Your Honor.  This is a different document, Judge, that one I'm

4    showing her now.

5              THE COURT:  It does look the same to me.

6              MR. HALEY:  No, Judge.  The exhibit she has in her

7    possession is not what I'm asking questions on now.  This is

8    what I will be asking questions on this document, Judge.

9              THE COURT:  The one she's looking at now, you don't

10   have an objection to that?

11             MS. KOMATIREDDY:  I don't know what she's looking

12   at.

13             MR. HALEY:  It's Exhibit 18.  It was previously

14   marked as an exhibit.  I think you have it, but I'll go get

15   it.

16             THE COURT:  This is all hearsay.

17             MR. HALEY:  If I may, Judge.  The relevance of this

18   document, if this is the document that does contain my

19   client's statement to Michael and Kristin, amongst others,

20   that -- which include Constantine stealing and misappropriates

21   GSF funds for his benefit, I believe the entire document is

22   admissible.  But if we need to redact it, that's an issue for

23   Your Honor to address.

24             My point is, Judge, that it's not being offered for

25   the truth of the matter therein contained.  It's being offered

1   to show Phil Kenner's state of mind.  As I indicated in my

2   opening statement, there came a point in time where he

3   believed that Tommy Constantine misappropriated GSF funds.

4   And this is the e-mail he sent specifically to Kris and

5   Michael at that time to let them know that long before he was

6   arrested, he was far from a co-conspirator as Constantine has

7   alleged in the indictment, and the jury has a right to

8   consider his state of mind and his intent at that point in

9   time.  Again, to the extent that there is a need to redact

10   information that relates to Jowdy, that can be accomplished.

11         MS. KOMATIREDDY:  We object, Your Honor, because

12   this doesn't go to the defendant's state of mind at the

13   relevant time period, which would be at the time the fraud's

14   being committed, at the time that the money was actually being

15   taken from the victims.  It doesn't go to the representations

16   made to the victims at the time that their money is taken.  It

17   doesn't go the state of mind of the defendant at the time that

18   their money is taken.

19         As Mrs. Peca and her husband testified, they

20   contributed to the GSF in May of 2009.  This is a March 2011

21   e-mail; years afterwards.  This e-mail constitutes false

22   exculpatory information as part of his cover up and it's

23   hearsay.

24         MR. HALEY:  May I finish the record, Your Honor.

25         THE COURT:  Yes.

766

1          MR. HALEY:  The allegation is that the GSF fund was

2    established with various representations.  The representations

3    are a matter of record.  It then became, as argued by the

4    government and presented by the government, misuse of those

5    funds by Tommy Constantine.  Phil Kenner saw the misuse of

6    those funds and alerted his clients that those funds were

7    being misused.  That goes directly to his state of mind and

8    directly addresses the scope of the conspiratorial conduct.

9          THE COURT:  Okay.  The timing of this, to me, has no

10   probative value on his state of mind.  This is in 2011.  What

11   led up to the money, as alleged, to have been diverted, any

12   probative is substantially outweighed by the danger of unfair

13   prejudice in terms of the jury relying on this for the truth

14   of the matter asserted.

15         I think it's -- even though you're saying it's not

16   being offered for that purpose, I think it's being offered for

17   that purpose as well.  I don't think his state of mind in 2011

18   as to what happened in 2009 has any relevance to a defendant

19   who was speaking to the authorities in an arrest situation

20   saying well, I didn't know anything about this, he's the one

21   he took the money.

22         That's my ruling.  You've put it in on the record.

23   I'm memorializing your record for appeal.

24         MR. HALEY:  Yes, Your Honor.

25         (Matter continued on the next page.)

1                 (Matter continued in Open Court.)

2    CONTINUED CROSS EXAMINATION

3    BY MR. HALEY:

4    Q    Take a look at what is marked Kenner Exhibit 18.

5                 (Handing.)

6    A    I looked at it.

7    Q    Did you have a chance to read that document?

8    A    I did.

9    Q    Is the name Michael Stolper familiar to you?

10   A    It is.

11   Q    How is he familiar to you?

12   A    He is a New York City attorney.

13   Q    Did Michael Stolper represent you and your husband in

14   connection with a lawsuit filed against Tommy Constantine?

15                MS. KOMATIREDDY:  Objection.

16                THE COURT:  No, I'll allow it.

17                You can answer that question.

18   A    He did.  If that's what you're referring to, the e-mail

19   that Phil organized, yes.

20   Q    When you say "the e-mail that Phil organized," Phil

21   helped organize that lawsuit against Tommy Constantine, isn't

22   that correct?

23   A    Yes.

24   Q    Indeed, this e-mail reflects that --

25                MS. KOMATIREDDY:  Objection.  It is not in evidence.

```
 1            THE COURT:  Don't read from it.

 2            MR. HALEY:  Correct.

 3   Q    On June 28, 2011, was your e-mail KMP --

 4   A    Yes, that's out e-mail address.

 5   Q    Okay, thank you.

 6            And on that day in April of 2011.

 7            MS. KOMATIREDDY:  Objection.  Misstates the record.

 8            MR. HALEY:  Excuse me.  You're correct.

 9   Q    In June of 2011, to your knowledge, was Phil Kenner's

10   e-mail kenner33@gmail.com?

11   A    Yes, it was.

12            MR. HALEY:  May I have a moment, Judge?

13            THE COURT:  Yes.

14   Q    Finally, Mrs. Peca, are you aware how much money Phil

15   Kenner contributed by way of his own funds into this Global

16   Settlement Fund?

17   A    No, I am not.

18            MR. HALEY:  Thank you for your testimony.

19            THE COURT:  Mr. LaRusso.

20            MR. LaRUSSO:  Thank you, Your Honor.

21   CROSS EXAMINATION

22   BY MR. LaRUSSO:

23   Q    Good morning, Mrs. Peca.

24   A    Good morning.

25   Q    How are you?
```

1    A    Fine.

2    Q    My name is Robert LaRusso and I represent

3    Mr. Constantine.

4         Your testimony on direct was that the first time

5    that you met my client was sometime around May of 2009, is

6    that correct.

7    A    Correct.

8    Q    Is it also fair to say that's the first time you also

9    spoke to Mr. Constantine?

10   A    Yes.  Tommy Constantine, yes.

11   Q    That meeting, again, just to do the background, was at

12   your home in Ohio?

13   A    Yes.

14   Q    Now, you also testified on direct examination that after

15   that meeting, a wire transfer was sent by yourself and your

16   husband for $250,000 to the escrow account, is that correct?

17   A    That is correct.

18   Q    The date of that check was May 8, 2009?

19   A    That is correct.

20   Q    Do you recall that?

21   A    Yes.

22   Q    Would it be fair to say at the meeting that you had with

23   Mr. Constantine and Mr. Kenner would have occurred sometime

24   prior to that check being written, that wire being sent, is

25   that correct?

1   A    Yes.

2   Q    Do you know how long before you sent that wire transfer?

3   A    Right around the same time.

4   Q    Now, I will focus the next series of questions, if I

5   could, on the meeting that took place at your home with

6   Mr. Kenner and Mr. Constantine.

7             You testified on direct that, essentially, the main

8   purpose of the meeting, from your perspective, was that they

9   were soliciting contributions for a Global Settlement Fund, is

10  that correct?

11  A    Yes.

12  Q    Actually, I believe your testimony was that it was the

13  main purpose of the meeting, is that correct?

14  A    Correct.

15  Q    I believe you also said that at some point there was a

16  very brief conversation.  I believe you might have said

17  somewhere around ten minutes where other minor items were

18  discussed.  Do you remember that?

19  A    Yes.

20  Q    Do you remember what those other minor items were?

21  A    An airplane and a hangar.

22  Q    Do you recall the context in which that came up?

23  A    I don't recall the exact wording.  I don't recall the

24  exact quote of that.

25  Q    Do you remember any portion of that conversation dealing

1  with other investors in Eufora who had filed suit, and that

2  Mr. Constantine was discussing with you a settlement with them

3  wherein the shares in Eufora would then be transferred to you

4  and other investors as a result of its efforts to settle with

5  those individuals?  Do you remember something along those

6  lines?

7  A    I do remember them mentioning that there will be

8  incentive, if you will, that if we go ahead with this Global

9  Settlement Fund, we'll benefit from it, from Eufora.

10 Q    Do you remember the names of these individuals?

11 A    I don't.

12 Q    You don't recall the name of Mr. Nolan?

13 A    I know his name, yes.

14 Q    Mr. Juneau?

15 A    Yes.

16 Q    Mr. Moreau?

17 A    Yes.

18 Q    Is it possible that those names came up in the first

19 meeting with Mr. Constantine and Mr. Kenner with regards to

20 settling up with them?

21 A    Sure.

22 Q    So in reference to this conversation that you were having

23 with Mr. Constantine and Mr. Kenner about these minor issues,

24 do you remember anything else being discussed regarding the

25 possible purchase of the Global Settlement Fund monies?

1   A    Can you be more specific?

2   Q    Well, do you remember any discussion about transferring

3   assets from them to other members such as yourself?

4   A    No.

5   Q    This meeting occurred sometime before May 8th when you

6   made your wire transfer contributions, is that correct?

7   A    Yes.

8   Q    You, on direct examination, said there came a time when

9   you received an e-mail from Mr. Kenner, is that correct?

10  A    Mm-hmm.

11  Q    That e-mail, I believe on direct you referred to a date

12  of May 18, 2009, is that correct?

13  A    I don't remember the date offhand.

14  Q    Were you shown that e-mail on your direct examination?

15  A    Yes.

16          MR. LaRUSSO:  Your Honor, it takes a few minutes to

17  warm up.

18          THE COURT:  They're on the TV.  Do you want her to

19  see those?

20  Q    Is this the e-mail that you received from Mr. Kenner?

21  A    Yes, it looks like it.  Mine's coming in now.

22  Q    I just want to make sure that you see all of it.

23          Do you recognize that?

24  A    Yes.

25  Q    If that's hard to see, we do have the one above you.

1   A    Yes.

2   Q    You see that's May 18, 2009?

3   A    Yes.

4   Q    Down at the bottom, it says, "Thanks, Phil."  You're

5   familiar with this e-mail, correct?

6   A    Yes.

7   Q    This e-mail you received approximately ten days after you

8   wired the money into the Global Settlement Fund?

9   A    Yes.

10  Q    This particular e-mail that Mr. Kenner is sending to you

11  is a request for authorization for the use of that money, is

12  that correct?

13  A    Yes.

14  Q    Did you review this with your husband?

15  A    We did.

16  Q    Did you read it?

17  A    We did.

18  Q    You understood what's contained in that e-mail at the

19  time?

20  A    We did.

21  Q    Without going through all of it, would you agree with me

22  that that e-mail is seeking authorization for a number of

23  other purposes than strictly for legal fees or a suit against

24  Mr. Jowdy?

25  A    Yes.

1  Q    As a matter of fact, it talks about PR agency fees.

2  A    Yes.

3  Q    It talks about other prospective advances and the

4  settlement costs.

5  A    Yes.

6  Q    It then goes on to talk about transferring interest to

7  you in Avalon Air Park real estate projects, a Falcon 10

8  aircraft, and the two Palms Place condominium units.  Do you

9  see that?

10  A    Yes, I do.  I do not recall him mentioning this, but yes.

11  Q    At the time that you received this, and after you

12  reviewed it, this particular request for authorization is

13  going beyond what you had originally understood your

14  contribution to be, is that correct?

15  A    Yes.

16  Q    Did you, at that point in time, call Mr. Kenner?

17  A    My husband made phone calls.

18  Q    Did you and/or your husband send any e-mails asking for

19  clarification?

20  A    No.  He didn't take my phone call.

21  Q    I would assume you shared that information.

22  A    He did.

23  Q    Your husband shared that information with you?

24  A    Yes, he did.

25  Q    Would it be fair to say, in sum and substance, he

1  confirmed to you that they were other purposes for the Global

2  Settlement Fund that they were seeking authorization for, is

3  that correct?

4  A    It was explained that those were just the incentives.

5  The main purpose was to go forward with the legal action

6  against Jowdy.

7  Q    When you use the word "those are incentives" --

8  A    Yes.

9  Q    -- are you saying that this was something that you were

10  going to receive a benefit from --

11  A    Yes, we were.

12  Q    -- for going forward with the suit against Jowdy?  Is

13  that your understanding?

14  A    It was for putting that large amount of money up front.

15  Q    As you read this, and as you understood it at the time,

16  this is actually making a fairly concrete statement that the

17  funds were going to be used for multiple purposes, is that

18  correct?

19          MS. KOMATIREDDY:  Objection.

20          THE COURT:  I think it's to form.

21  Q    Did you understand this e-mail to refer to the multiple

22  purposes for the money you were contributing to the Global

23  Settlement Fund?

24  A    It definitely said that, yes.

25  Q    Well, as a matter of fact, Mrs. Peca, sometime in the

776

1  early morning, I believe about five hours after you received

2  this e-mail, you and your husband replied to this e-mail, is

3  that correct?

4  A    My husband did, yes.

5  Q    Are you familiar with the reply e-mail that your husband

6  sent?

7  A    Yes.

8  Q    I will show you what's been received in evidence.

9  A    My screen is freaking out on me.

10  Q    I'm the last person to ask.

11  A    It's giving me a migraine.

12        THE COURT:  Turn it off.

13  Q    Mrs. Peca, I will direct your attention to the last line

14  of the paragraph that's displayed.  I'll read it.  This is the

15  same May 18th e-mail you received from Mr. Kenner.

16  A    Yes.

17  Q    "As we discussed, rather than throwing money away only on

18  legal fees, this strategy which effectively acquires

19  significant assets while providing a legal remedy, is by far

20  our best solution."  Did I read that correctly?

21  A    You did.

22  Q    When you read the words "as we discussed," you were

23  referring to the meeting that you had with Mr. Constantine and

24  Mr. Kenner in your home, is that correct?

25  A    I wasn't referring.  Phil was.

1  Q    Well, did you understood when you read that sentence what

2  he was referring to?

3  A    Yes.

4  Q    And then he goes on to explain that rather than throwing

5  money away only on legal fees, the strategy actually includes

6  acquiring significant assets at the same time while providing

7  a legal remedy, is that correct?

8  A    That is correct.

9  Q    So when you read this e-mail, you know knew that the

10 Global Settlement Fund had more than one purpose, legal, which

11 you talked about, it also had another one.  And that is

12 acquiring significant assets, is that correct?

13 A    That is correct.

14 Q    Well, now jumping to the next exhibit, C-26.  I'm sorry

15 you have to turn your head.  I apologize for that.

16       Now, if you hook at the defendant's exhibit, I will

17 try to reduce it a little bit so we can see it all.

18 A    That's fine.  I saw it?

19 Q    Now, if you notice, this exhibit has -- I'm sorry?

20 A    I saw it.

21 Q    You saw it, thank you.

22       This particular exhibit has the May 18th e-mail that

23 was sent at 1:14 a.m. that we just talked about.

24 A    Correct.

25 Q    Then there's a response from your e-mail, you said it was

1  sent by your husband.  And this comes at 6:10 in the morning,

2  approximately five hours or so after, is that correct?

3  A    Yes.

4  Q    You did talk to your husband before he sent this

5  response, is that correct?  Withdraw that.

6            Who sent this response?

7  A    That's my response.  The other one was his response.

8  Q    This is your response?

9  A    Yes.

10 Q    So you responded to this e-mail --

11 A    Yes.

12 Q    -- approximately five hours after it was received, is

13 that correct?

14 A    If that's what the time shows, yes.

15 Q    And what you ask, and I'm going to just highlight some

16 aspects of it, if I could.  "Hey, before we sign off on an

17 approved letter" -- that's the authorization Mr. Kenner was

18 seeking in the earlier e-mail, is that correct?

19 A    Yes.

20 Q    You wanted some questions answered.  The question you

21 ask, and I quote, "Can we please have the written

22 documentation as to exactly how much percentage we obtained

23 with our contribution?"  Do you see that?

24 A    Yes.

25 Q    That was your question, is that right?

K. PECA-CROSS-LaRUSSO

779

1   A    Yes.

2   Q    What contribution were you referring to when you asked

3   this question?

4   A    Eufora.

5   Q    So the additional percentages that you would be getting,

6   is that correct?

7   A    Correct.  Because now that they're mentioning we're going

8   to be getting Eufora percentages, if that's going to be thrown

9   in as an incentive, then tell us what it's going to be.  What

10  are the percentages if this is truly, really a thing?

11  Q    But the point is, if I may, the monies that were being

12  contributed to Global Settlement Fund were not just for the

13  legal fees, but also to help acquire assets that may benefit

14  you with an increased percentage in Eufora, is that correct?

15  A    That's what they were saying in this letter.

16  Q    That's what you understood it to mean?

17  A    In the letter, yes.

18  Q    That's what you're asking here, you're asking about your

19  percentage that you would get from those acquired assets?

20  A    Yes.

21  Q    I'll finish reading it.  It says, "Michael mentioned last

22  Monday that you told him that we'd have it by last Wednesday,

23  but we still haven't received it.  We want to be diligent on

24  our recordkeeping."  That's your ownership interest, that's

25  why you placed that there, correct?

1  A    Yes, because we still hadn't received any paperwork about

2  that.

3  Q    So between the time that you received the initial

4  authorization request and the time that you sent the e-mail to

5  Mr. Kenner, you don't ask any questions about the legal fees,

6  do you?

7  A    No, because the whole thing is there.

8  Q    You don't ask any questions about who the lawyer will be?

9  A    We know who the lawyer is.

10  Q    You know who the lawyer was.  Who told you who the lawyer

11  was going to be?

12  A    They did.  Ronald Richards.  It was going to his account,

13  escrow account.

14  Q    Did you have any information about Mr. Richards at that

15  point?

16  A    Other than he was the attorney that's representing us in

17  the fight against Jowdy.

18  Q    It's a name that you heard for the first time from

19  Mr. Kenner, is that correct?

20  A    Couldn't say 100 percent this is the first time.  But

21  yes, this is the lawyer that's representing us.

22  Q    But the point is that the only thing that you asked was

23  the percentage of your increased interest in Eufora, is that

24  correct?

25  A    In that e-mail, correct.

1   Q    You don't ask anything about all of the other assets that

2   you testified on direct were really not topics of subjects

3   that you were contributing to regarding the Global Settlement

4   Fund?

5   A    Right.  My husband was making a call about that.

6   Q    I'm sorry?

7   A    My husband made a call about that.

8   Q    Now, when you sent that e-mail to Mr. Kenner, did you get

9   a response?

10  A    That one?

11  Q    You're participating.

12  A    Yeah, I can't remember right now.  You're going to show

13  me one.

14  Q    You remember getting an e-mail in response from

15  Mr. Kenner or Mr. Constantine?

16  A    I don't recall it.

17  Q    I'll show you what's in evidence as C-27.  Do you see

18  that?

19  A    Yes.

20  Q    It's an e-mail from Mr. Constantine to your e-mail

21  address on the same day as those other two e-mails that we

22  just discussed.

23  A    Okay.

24  Q    I believe this one comes in at approximately 12:33.

25  A    Okay.

1  Q    Did you have an opportunity to discuss this with your

2  husband?

3  A    Yes.

4  Q    You read this one thoroughly?

5  A    Yes.

6  Q    This e-mail, it further explains what the purpose of the

7  Global Settlement Fund was; and it also further explains what

8  the monies that are being contributed to that fund would be

9  used for, is that correct?

10             MS. KOMATIREDDY:  Objection.

11             THE COURT:  Overruled.

12  Q    Is that correct?

13  A    Yes.

14  Q    You did read this?

15  A    I did.

16  Q    You did discuss it with your husband?

17  A    Yes.

18  Q    And without reading all of it, it talks about the

19  acquisition of Mr. Juneau's and Mr. Nolan's shares after they

20  were, if I can use the phrase, bought out of the shares in

21  Eufora, is that correct?

22  A    Yes.

23  Q    It also talks about their interest in the air park.

24  A    Yes.

25  Q    It also talks, down at the bottom, about the Palm condo

1  that Mr. Moreau owns a part of?

2  A    Yes, it talks about that.

3  Q    Mrs. Peca, the point is, is that on the day that you

4  received the authorization request for the expenditures of the

5  Global Settlement Fund monies, you asked a question and you

6  got a response from Mr. Constantine almost immediately

7  explaining not the legal aspects of the fund, but the

8  acquisition aspect of the fund, is that correct?

9  A    According to that e-mail, that -- referring to that, yes.

10  Q    You read it, right?

11  A    Yes.

12  Q    That's what it says, is that right?

13  A    Yes.

14  Q    So as you reviewed these e-mails, would you agree with me

15  that the Global Settlement Fund had multiple purposes, not

16  just to file suit against Mr. Jowdy?

17  A    I don't agree with that.

18  Q    Did Mr. Jowdy have anything to do with buying out the

19  Eufora shares from Mr. Nolan and Mr. Moreau and Mr. Juneau?

20  A    Say that again.

21  Q    Did Mr. Jowdy have anything to do with the contents of

22  this e-mail that Mr. Constantine had written to you?

23  A    Not that I know.

24  Q    Yet all of the activities Mr. Constantine is laying out

25  for you in terms of what the Global Settlement Fund monies

1   would be used for, these aspects that he's referring to have

2   nothing to do with Mr. Jowdy, correct?

3   A    Correct.

4   Q    After you asked that question and received that response,

5   again, did you discuss it with your husband?

6   A    Yes.

7   Q    Now, you had already made your contribution back on

8   May 8th, about ten days before these e-mails were received and

9   discussed, is that correct?

10  A    Yes.

11  Q    Did you ever ask for the return of your $250,000?

12  A    Not at that time.

13  Q    As a matter of fact, you don't make a request for that

14  money for quite some time, correct?

15  A    Correct.

16  Q    Do you recall, at any point after receiving that e-mail

17  on May 18th from Mr. Constantine, actually acknowledging the

18  authorization that you had received from Mr. Kenner on

19  May 18th, and acknowledging what was laid out by

20  Mr. Constantine in his e-mail of May 18th?

21  A    Did I -- say it again.

22  Q    Did you actually respond to their request and tell them

23  that yes, I agree to everything that you said in those

24  e-mails?

25  A    I didn't personally, no.

1  Q    Your husband did?

2  A    Yes.

3  Q    And you're familiar with that, is that correct?

4  A    Yes.

5  Q    That's Defendant's Exhibit C-28, an e-mail from your

6  e-mail address.  It's dated May 22nd, 2009, to Mr. Kenner, is

7  that right?

8  A    Yes.

9  Q    Your husband writes, and you understood, quote, "I

10 understand and accept the terms of this settlement plan.

11 Thanks."  I read that correctly?

12 A    I just thought it was just an acknowledge -- shorter.  I

13 don't remember it being that long.

14 Q    Does that refresh your recollection?

15 A    It does not.

16 Q    Well, let me ask you, this acknowledgment, this

17 acceptance takes place four days later, is that correct --

18          MS. KOMATIREDDY:  Objection.  Leading.

19 Q    -- from the original e-mails that were reviewed on

20 May 18th?

21          MS. KOMATIREDDY:  Lacks foundation, Your Honor.

22          THE COURT:  Overruled.  You're just referring to the

23 prior e-mail?

24          MR. LaRUSSO:  Yes, Judge.  The one from May 18th.

25          THE COURT:  This was four days after the prior

1   e-mail.

2            THE WITNESS:  That appears to be four days later,

3   yes.

4   Q    You had an opportunity to think about the proposal that

5   was being offered in those May 18th e-mails?

6            MS. KOMATIREDDY:  Objection, Your Honor.

7            THE COURT:  Sustained as to form.

8   Q    Did you discuss between May 18th and May 22nd the

9   acceptance of the agreement with your husband?

10  A    I believe we did, yes.

11  Q    That discussion also entailed your deliberations whether

12  to accept it or not, is that correct?

13  A    Yes.

14  Q    You both agreed to accept it, correct?

15  A    Yes.

16  Q    That's why, on May 22nd, that e-mail was sent by your

17  husband?

18            MS. KOMATIREDDY:  Objection.

19            THE COURT:  Overruled.

20            You can answer.

21  Q    You can answer.

22  A    I can answer?  Oh, can you say it again.

23            (Record read by the reporter.)

24  A    Okay.  Yes.

25  Q    You also -- ma'am, following those e-mails, do you recall

1   any continued communications, either by telephone or e-mail

2   with Mr. Constantine, regarding the Global Settlement Fund?

3   A    Yes.

4   Q    Would it be fair to say that that communication was a

5   series of conference calls that Mr. Constantine set up so that

6   all who contributed to the fund would discuss with him the

7   progress or the status of the object of the Global Settlement

8   Fund?  Is that fair?

9   A    That would be part of it.  It's also the official

10  paperwork for the GSF, which we never received.

11  Q    But you do recall that you, as one of the participants in

12  the Global Settlement Fund, you and your husband, received

13  e-mail communications of a proposed conference call, is that

14  correct?

15  A    Yes, I recall that.

16  Q    That went out to all of the contributors, as far as you

17  knew?

18  A    I wouldn't know.

19  Q    You recall these were on a monthly basis?

20  A    I have no idea.

21  Q    Did you participate in the conference calls?

22  A    I did not.

23  Q    Did your husband participate in these conference calls?

24  A    I think he did.  He probably --

25  Q    Would it be fair to say -- I'm sorry.

1  A    I think he was on them.

2  Q    But you were aware of them, is that correct?

3  A    I was aware of them.

4  Q    Did you ever -- these conference calls, Mr. Constantine

5  provided, if you know, advanced notifications to the

6  participants so they could make arrangements to be a party to

7  these calls, is that correct?

8  A    Sounds correct.

9  Q    Would it be fair to say these conference calls lasted at

10  least many months after are you originally made your

11  contribution in May of 2009?

12  A    I have no idea.

13  Q    Well, I'm going to show you a series of e-mails, if I

14  could, that have been received in evidence.

15        THE COURT:  Please approach and do it one by one.

16  Q    This is C-33 in evidence.  That's the e-mail dated

17  June 10th.  This is C-34, which is an e-mail dated June 25th.

18  You can look at them, familiarize yourself with these.

19        And then there is a e-mail dated August 19th, 2009,

20  C-35.  And then lastly, this one is C-36, and this is

21  conference call four, which is October 22nd, 2009.

22  A    Okay.

23  Q    And just so that -- I direct your attention to the group

24  e-mail addresses.  You see your e-mail address in them?

25  A    In one.

1   Q     But only one, but in the others?

2   A     Yes.  Yes.  Yes.

3   Q     So do these refresh your recollection that there was

4   communications between Mr. Constantine and your husband that

5   you became aware of, that conference calls were going to take

6   place regarding the Global Settlement Fund?

7   A     Sure.  I see that there were updates.

8   Q     Do you remember ever e-mailing anything to

9   Mr. Constantine regarding any questions that you may have

10  regarding the expenditures of the monies?

11  A     I can't recall.  It's been too long.

12  Q     I'm just going to show you one of the e-mails.  This is

13  the fourth one, which was received as C-36.  At the top -- I'm

14  sorry that you have to turn.  I apologize.  It says this is

15  conference call number 4, October 22nd, 2009.  And then there

16  is an e-mail from Mr. Constantine directed to your e-mail

17  address, is that correct?

18  A     Correct.

19  Q     He's actually reporting to you and your husband that he's

20  "waiting for a few more guys to respond, and I will let you

21  know.  If possible, I will move the call to accommodate your

22  schedule.  You can probably imagine what it's like rounding up

23  20 guys in multiple time zones globally."  Did I read it

24  correctly?

25  A     Yes.

1  Q    Then he goes on and says, "I'll keep you posted."  Then

2  there's a middle portion which I'll read just to be complete.

3  And the only reference I'll deal with, in the middle,

4  October 22nd, at 8:21, this is from your e-mail address.

5  "Well, give us your opinion.  We'll be gone from 11:30."  And

6  then in brackets.  It's T-r-e-v, [Trev has to arrive one

7  half-hour before the game.]"

8         Who's Trev?

9  A    My son.

10  Q    I may have to repeat.  The microphone's not picking that

11  up.  Your son, correct.

12  A    Yes.

13  Q    "At 2:30ish.  His game will go from 12:30 to 1:30/1:45,

14  and it takes another 20, 30 minutes for him to get undressed

15  and out of the equipment."  Long story short, you're telling

16  Mr. Constantine your schedule may impact your participation in

17  this conference, is that correct?

18  A    I think so, yes.

19  Q    Well, did I just read it?

20  A    Yes.

21  Q    That's what it says, is that correct?

22  A    Yes.

23  Q    That's in reference to the conference call.

24  A    Yes.

25  Q    I'm not trying to be difficult.  I'm just trying to get

1    these fact as they appear and as you understood them.  Okay?

2    A    Yes.

3    Q    And again, a day earlier, down at the bottom, you talk

4    about the schedule of your son again in reference in trying to

5    get together to talk to Mr. Constantine, correct?

6    A    Yes.

7    Q    So my point is that for many months after you made the

8    contribution, there were conference calls.  Conference calls

9    that you participated in, is that correct?

10   A    Yes.

11   Q    Or you arranged for your husband to participate in?

12   A    Yes.

13              (Matter continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

K. Peca - Cross/La Russo

792

1    BY MR. LA RUSSO:

2    Q.    And after those conference calls your husband would

3    report to you on the information that Mr. Constantine was

4    providing to the other participants; is that correct?

5    A.    I believe so, yes.

6    Q.    I believe testified a while ago that in regards to

7    Global Settlement Fund monies, you made a request for your

8    money back.  Is that correct?

9          Is that your testimony?

10   A.    Yes.

11   Q.    Who did you make it to?

12   A.    I believe the person we requested the money back from

13   was Ron Richards, the lawyer.

14   Q.    Who did you do that?

15   A.    By e-mail.

16   Q.    When did you do that?

17   A.    I don't recall the date.

18   Q.    2009?

19   A.    I don't know, I can't recall the exact date.

20   Q.    2010?

21   A.    I can't recall the exact date.

22   Q.    So it could be 2009, 2010, 2011?  You don't have a

23   recollection; is that correct?

24          MS. KOMATIREDDY:  Objection.

25          THE COURT:  Sustained.

K. Peca - Cross/La Russo

793

1    Q.    You don't remember when that occurred; is that right?

2              MS. KOMATIREDDY:  Objection.  Asked and

3    answered.

4              THE COURT:  Sustained.  She's answered already.

5    Q.    Did you ever -- by the way, did you produce that

6    e-mail for the government?

7    A.    I'm pretty sure that I did.

8    Q.    Did you ever send an e-mail to Mr. Constantine?

9    A.    I can't recall.

10   Q.    Were you aware of the fact that you and your husband

11   were in constant contact -- withdraw that -- on periodic

12   contact with him.  Do you have a recollection of sending

13   him an e-mail?

14             MS. KOMATIREDDY:  Objection, it's been answered.

15             THE COURT:  Sustained.

16   Q.    If you had such an e-mail, would you have turned that

17   over to the government?

18             MS. KOMATIREDDY:  Objection.

19             THE COURT:  Sustained.  She answered that

20   already.

21   Q.    Were you asked for an e-mail to confirm that you made

22   a request for the monies?

23             MS. KOMATIREDDY:  Objection.

24             THE COURT:  You can answer that.

25   A.    I don't remember that, I don't remember anything

794

1   specific.

2   Q.   Mrs. Peca, the prosecutor asked you when you invested

3   in Eufora in April of 2008 if you were aware that the

4   company's patents had been pledged as collateral, do you

5   recall that?

6   A.   Yes.

7   Q.   Let me just kind of clarify the next series of

8   questions if I may.  Your testimony on direct was that you

9   had made two investments in Eufora through Mr. Kenner; is

10  that correct?

11  A.   Yes.

12  Q.   I believe the first one was 2004 for approximately

13  $166,000?

14  A.   Yes.

15  Q.   And the second one was in April of 2008?

16  A.   Yes.

17  Q.   Now, when the government asked you if you were aware

18  that the company's patents had been pledged as collateral,

19  do you remember your answer?

20          MS. KOMATIREDDY:  Objection, your Honor, that

21  wasn't the question.  Misstates.

22          THE COURT:  Why don't you just ask your

23  questions.  Don't refer back, if you want to read the

24  question and answer into the record I'll let you do that.

25  Otherwise just ask your questions.

K. Peca - Cross/La Russo

795

1    MR. LA RUSSO:  Very well, your Honor.

2  Q.   Mrs. Peca, do you remember responding to a question

3  from the government regarding whether or not Eufora's

4  patents were pledged as collateral responding quote, no,

5  no, no, I never -- no, no, never.

6    MS. KOMATIREDDY:  Again, that wasn't the

7  question, your Honor.

8    THE COURT:  You didn't read the question,

9  Mr. La Russo.  If you're going to read, read the question.

10    MR. LA RUSSO:  If I may.

11  Q.   Let me direct your attention to these questions and

12  these answers, is that right, so I can ask you about.

13  That, do you remember if on page 703 testifying, line 10,

14  there was a question:  Did he, meaning Mr. Kenner, tell

15  you at the time you invested those in Eufora, whether

16  those patents held were as collateral for a loan?  And

17  your answer was:  If they were held as collateral?  That's

18  the question, your answer to yourself:  No, no, never.

19    Do you remember that question and that answer?

20  A.   I do.

21  Q.   And just to complete it, question was:  Would that

22  have been important to you in deciding whether to invest

23  money?  And your answer was yeah, of course.

24    All right.  Do you remember those questions and

25  those answers?

796

1   A.   Yes.

2   Q.   So that before you would have invested in April of

3   2008 it would have been important to you to know if the

4   valuable patents of Eufora had been used as collateral for

5   a loan; is that correct?

6   A.   Yes.

7   Q.   That's just -- correct?

8   A.   Yes.

9   Q.   Just so he can take it to the next step, that if you

10  had known that they were, that is, the patents pledged as

11  collateral for the loan, I take it from your testimony at

12  least in the implication, you would not have invested that

13  money in April of 2008, correct?

14  A.   Correct.

15  Q.   Mrs. Peca, has anyone other than the prosecutor here

16  ever implied that Eufora patents had been pledged as

17  collateral for a loan?

18          MS. KOMATIREDDY:  Objection, form.

19          THE COURT:  Yes.  Sustained as to form.

20  Q.   Mrs. Peca, have you ever seen any documentation by --

21  first of all, have you ever seen any documentation of a

22  loan of those patents prior to your investments in April

23  of 2008?

24  A.   No.

25  Q.   Did you ask to see any proof of a loan, collateral of

K. Peca - Cross/La Russo

797

1  the patent being pledged collateral prior to your

2  investment?

3          MS. KOMATIREDDY:  Objection.

4          THE COURT:  Sustained.

5  Q.  Mrs. Peca, would it surprise you to know that there

6  was no loan in existence in April of 2008?

7          MS. KOMATIREDDY:  Objection.

8          THE COURT:  Sustained.

9  Q.  Do you know that the only loan pledging collateral

10  for the patents of Eufora occurred in February of 2009?

11          MS. KOMATIREDDY:  Objection.

12          THE COURT:  Sustained.

13  Q.  Do you have any knowledge as you are testifying here

14  today when the loan, if one --if there was one in

15  existence, pledging the patents as collateral for the

16  loan?

17          MS. KOMATIREDDY:  Objection to this whole line

18  of questioning, your Honor.

19          MR. LA RUSSO:  Your Honor, may we have a sidebar

20  for a moment, please?

21          THE COURT:  Yes.

22          (Continued on next page.)

23

24

25

K. Peca - Cross/La Russo

798

1          (Whereupon, the following occurred at sidebar.)

2          THE COURT:  She's already testified she has no

3     knowledge of the loan, you're asking her all these

4     questions.

5          MR. LA RUSSO:  Judge, the purpose is to show

6     that the loans didn't occur until 2009.

7          THE COURT:  Why don't you do that through

8     another witness.  You can't do that through this witness.

9     I already told the jury the prosecutor's questions are not

10    evidence.  She's asked whether she talked to the lawyer

11    about that.  You're sitting here and trying to establish

12    all this other evidence is, conference calls that were

13    already in evidence that she said she didn't participate

14    in.  This is taking too long.

15         MR. LA RUSSO:  Judge, in regard to this, the

16    purpose of introducing this was to show that the

17    government is wrong in their facts.

18         THE COURT:  Mr. La Russo, you know you can't do

19    that through her.  She has no awareness of any of this.

20    Can you wait for when the proper witness is on to

21    establish this and not waste time with Mrs. Peca?  She

22    can't -- you're trying to get out the answer you know she

23    has no answer to because she's already told you she wasn't

24    aware of a loan, when the loan occurred.  She already told

25    you no.  So why don't you stop and move on so we can get

K. Peca - Cross/La Russo

799

1    done.  We have an hour left.  She's not coming back

2    tomorrow.  How much more do you have?

3                MR. LA RUSSO:  What I'll do is if we take a

4    five-minute break, I'll go through my questioning.  That

5    cannot be within the line of questioning.

6                THE COURT:  Okay.

7                MR. LA RUSSO:  Thank you, your Honor.

8                (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

800

```
 1              (Whereupon, the following occurred in open
 2     court.)
 3              THE COURT:  We'll take our morning break.  Take
 4     a ten-minute break.  We're only going to 12:30.  I'll only
 5     give you 10 minutes, okay.
 6              (Whereupon, the jury retired from the
 7     courtroom.)
 8              (Recess taken at this point.)
 9              (After recess.)
10              THE COURT:  Please be seated.  Bring in the
11     jury.  How much more do you have, Mr. La Russo.
12              MR. LA RUSSO:  Mr. Miskiewicz asked me that.
13     Probably a half hour.
14              MS. KOMATIREDDY:  And the redirect will be
15     brief.
16              MR. HALEY:  No recross.
17              (Recess taken.)
18              (Whereupon, the jury entered the courtroom.)
19              THE COURT:  Please be seated.  Go ahead
20     Mr. La Russo.
21              MR. LA RUSSO:  Thank you, your Honor.
22     Q.   Mrs. Peca, on direct examination you were asked by
23     the prosecutor in regards to the authorization e-mail back
24     on May 18th of 2009, whether there was anything in that
25     e-mail about race cars, rent.  Do you remember those
```

801

1  questions?

2  A.    I do.

3  Q.    And there was something to do with a personal lawsuit

4  as well.  I'm directing your attention to those.

5         Are you aware that the rent was actually

6  mortgage payments on the Palms condo that was discussed in

7  that e-mail?

8         MS. KOMATIREDDY:  Objection.

9         MR. LA RUSSO:  Asking if she was aware,

10 your Honor.

11        THE COURT:  I'll let her answer that.  Again, an

12 attorney's question is not evidence.  So you can answer

13 that Mrs. Peca.  Go ahead.

14 A.    Towards which Palms unit?

15 Q.    Just the Palms unit in question that was mentioned in

16 the May 18th e-mail.

17 A.    Towards the Monroe condo.

18 Q.    Yes?

19 A.    Is that what you're talking about?

20 Q.    Yes.  Were you aware of that?

21 A.    Was I aware that the money went towards that?

22 Q.    Yes.

23 A.    No.

24 Q.    And were you aware that the money going to the race

25 car was actually going to a law firm that was handling a

802

1   lawsuit?

2   A.    For what?

3   Q.    Regarding Mr. Constantine's racing team.

4   A.    No, I did not know that.

5   Q.    I'd like to just go over one of the exhibits that the

6   government has presented as 1102, this is the escrow

7   account of Mr. Ron Richards dated up in the right-hand

8   corner, May 29, 2009.  And you testified regarding your

9   contribution to Mr. Ron Richards' escrow account; is that

10  correct?

11  A.    Yes.

12  Q.    And if you look at the second entry under the

13  deposits, in addition you see the wire transfer on May 8th

14  from Michael Peca for 250,000?

15  A.    I do.

16  Q.    That's one that you testified to here that was made

17  in regards to the Global Settlement Fund; is that right?

18  A.    Yes.

19  Q.    Now, if you would look at the other additions that

20  are listed in this bank record, the first one is May 5th,

21  there's a wire transfer from S. Gonchar and K. Gonchar for

22  250,000, do you see that?

23  A.    I do.

24  Q.    Do you know who he is?

25  A.    Sergei Gonchar is a player.

803

1   Q.   He was a hockey player, correct?

2   A.   Yes.

3   Q.   And he was one of the contributors to the fund?

4   A.   Correct.

5   Q.   And yours is May 8th; is that right?

6   A.   Correct.

7   Q.   There are three other I'd like to direct your

8   attention to, all on May 11th.  Darryl Sydor, do you see

9   that?

10  A.   I do.

11  Q.   Jay McKee?

12  A.   Yes.

13  Q.   And Jer Lehtinen, L-E-H-T-I-N-E-N.  Do you know who

14  those individuals are?

15  A.   They're also players, hockey players.

16  Q.   I want to make sure the jury heard?

17  A.   They're hockey players.

18  Q.   Thank you.  Were you aware they likewise were

19  contributors to the fund?

20  A.   I don't remember exactly who was involved, but now

21  that I see that, that that made sense.

22  Q.   Do you know if Mr. Gonchar is -- withdraw that.  Are

23  you aware that Mr. Gonchar does not consider himself a

24  victim of the Global Settlement Fund fraud charge in this

25  indictment?

804

1      MS. KOMATIREDDY:  Objection.

2      THE COURT:  Sustained.  Sustained.  The jury

3  will disregard that.

4  Q.   I'm going to go over to the second page of this

5  exhibit.  This is withdrawals, checks and withdrawals.

6  I'm directing your attention to the first six.  Do you see

7  that?

8  A.   I do.

9  Q.   The first one is May 6, wire transfer to Intrigue

10  Investment Company for 120,000, do you recognize that?

11  A.   I do not.

12  Q.   Do you know a company by the name of Intrigue

13  Investment Company?

14  A.   I do not.

15  Q.   Just jumping back to the other page, prior to May 6,

16  that withdrawal, the only deposit into that account was

17  the 250,000 from Sergei Gonchar; is that right?

18  A.   Correct.

19  Q.   Do you know switching the page whether or not

20  Mr. Gonchar approved expenditures that appear on Mr. Ron

21  Richards' escrow account?

22      MS. KOMATIREDDY:  Objection.

23      THE COURT:  Sustained as to this whole line of

24  questioning.

25  Q.   May 6, it appears to be another withdrawal for 15,000

805

1   to HL Group.  Do you know who that is?

2   A.    I do not.

3   Q.    You do remember the May 18, 2009 e-mail there was a

4   reference to PR agency fees.  You do remember that?

5   A.    I do remember that.

6   Q.    And May 11th there's a wire transfer to Security

7   Title Agency.  Do you have any knowledge of that?

8   A.    I do not.

9   Q.    And then there is a $45,000 to Gilmartin, Magence,

10  M-A-G-E-N-C-E & Ross, do you have any knowledge of that.

11  I do not?

12  Q.    So you have no knowledge of the expenditures that

13  were made from this escrow account; is that correct?

14  A.    Yes.

15  Q.    Did you at any time ask -- withdraw that.  Did you at

16  any time ask for an accounting of Mr. Richards escrow

17  account?

18  A.    I believe my husband did, yes.

19  Q.    Do you know who he spoke to?

20  A.    I can't remember, I wouldn't be able to say for sure.

21  Q.    Mrs. Peca, do you know or are you aware that you and

22  your husband's ownership interest in Eufora is held

23  indirectly through a holding company called AZ Eufora's

24  Partners 1?

25  A.    Do I know that it's held by a company called that?

K. Peca - Cross/La Russo

806

1    Q.    That's correct.

2    A.    Sounds correct.

3    Q.    And that holding company AZ Eufora Partners 1 was set

4    up by Mr. Constantine, is that correct, I'm sorry, by

5    Mr. Kenner?

6    A.    I believe so.  Yes.

7    Q.    And that was the holding company that was holding

8    your interest in Eufora, correct?

9    A.    I guess, yes.

10   Q.    Do you know who the managing partner of AZ Eufora

11   Partners 1 was?

12   A.    I can't remember the details right now, no.

13   Q.    Ever hear of the name Tim Gaarn?

14         MS. KOMATIREDDY:  Objection.

15   A.    I have.

16         THE COURT:  Overruled.

17   Q.    And how do you know the name of Tim Gaarn?

18   A.    I remember it in relation to this stuff.

19   Q.    So would it be fair to say that Mr. Gaarn to your

20   recollection was the managing partner -- I'm sorry,

21   managing member of AZ Eufora Partners 1?

22         MS. KOMATIREDDY:  Your Honor, may we ask for a

23   timeframe, the timing of the representations.

24   Q.    During the time of most of your questioning in 2009,

25   2010, did it ever happen?

K. Peca - Cross/La Russo

807

1  A.   I wouldn't have known back then.  I know the name

2  sounds familiar to me now.  So no,, I can't say for sure

3  that I would know.

4  Q.   But the best of your recollection, you heard his name

5  in connection with being a managing member of AZ Eufora

6  Partners 1?

7  A.   That sounds right.

8  Q.   I'm going to show you what's been marked for

9  identification only as C-37.  And I'm trying to move this

10  along as quickly as I can.  I'm going to just refer you to

11  some documents that are contained in the exhibit, all

12  right.  And just direct your attention to the first couple

13  of paragraphs to refresh your recollection and if you need

14  more time or an opportunity to review it all, please do

15  so.  This is another page in the exhibit.

16       MS. KOMATIREDDY:  Your Honor, if counsel could

17  identify the page for the record.

18       MR. LA RUSSO:  Judge, the best way I can do it

19  is the page that I'm referring to says list of

20  individuals --

21       MS. KOMATIREDDY:  Reading from something not in

22  evidence.

23       MR. LA RUSSO:  There's no other reference,

24  Judge.

25       THE COURT:  Do you want to go up and look at the

K. Peca - Cross/La Russo

808

1   pages.

2   Q.   Mrs. Peca, have you had a chance to review that?

3   A.   Yes.

4           MR. LA RUSSO:  Government has helped me out,

5   Judge, we want to number the pages, so we don't have a

6   problem.  We numbered it one.

7   A.   Okay.

8   Q.   The page behind that, do you recognize that?

9   A.   Yes.

10  Q.   What is that?

11  A.   My husband's signature.

12  Q.   Okay.  So does this help refresh your recollection

13  that you and your husband owned an interest in AZ Eufora

14  Partners 1?

15  A.   In Eufora, correct.

16  Q.   AZ Eufora Partners 1?

17  A.   Okay, yes.

18  Q.   Correct?

19  A.   Correct.

20  Q.   And if -- you testified that you received no

21  paperwork in reference to Eufora, is that correct, in

22  documentation, do you remember that testimony?

23  A.   Regarding the supposed increased percentages from the

24  GSF, yes, that's correct.

25  Q.   Have you received any other documentation other than

809

1    that in regard to your interest in AZ Eufora Partners 1?

2    A.   Some informal documentation, yes.

3    Q.   Who did you get that from?

4    A.   E-mails, I wouldn't be able to say a hundred percent,

5    but I believe they were from Tommy, not Phil.

6    Q.   And the documentation that you received showed an

7    interest in AZ Eufora Partners 1, is that correct, as you

8    recall?

9    A.   Yeah, I can't recall.

10   Q.   And would it be fair to say that the parties

11   responsible for providing the documentation would be the

12   parties who have the authority or managing authority over

13   AZ Eufora Partners 1?

14            MS. KOMATIREDDY:  Objection.

15   Q.   If you know?

16            THE COURT:  Sustained as to the form of the

17   question.

18   Q.   Do you know who was responsible -- withdraw that.

19            In regards to the LLC, the Eufora Partners 1, do

20   you know who's responsible in that company for providing

21   you with documentation of your ownership interest in that

22   company?

23   A.   I do not.

24   Q.   Would it be fair to say it would be somebody who is

25   in charge.  Is that correct?

810

1      MS. KOMATIREDDY:  Objection.

2      THE COURT:  Sustained.

3      MR. LA RUSSO:  I'll rephrase it, Judge, if I

4  may.

5  Q.   Do you know what a managing member is?  Do you know

6  what that phrase means?

7  A.   Yes.

8  Q.   Would you tell us what your understanding of that

9  phrase managing member?

10  A.   If you're a member, that means an ownership interest

11  in it, but they also have management duties.

12  Q.   Would you say within those duties would be the

13  responsibility of providing documentation to other owners

14  when requested?

15      MS. KOMATIREDDY:  Objection.

16      THE COURT:  Sustained.

17  Q.   Do you remember having conversations -- withdraw

18  that.

19      Are you aware that Mr. Constantine was sued by

20  AZ Eufora Partners 1 in late 2010?

21      MS. KOMATIREDDY:  Objection.

22      THE COURT:  I'll allow that.  You can answer

23  that if you know.

24  A.   I know he was sued, I don't know the timeframe.

25  Q.   Do you remember having any conversations with

811

1   Mr. Constantine or any conversation with your husband

2   where your interests were discussed in AZ Eufora

3   Partners 1 wherein you were asked to convert it to

4   interest in Eufora?

5   A.   I don't remember doing that, no.

6   Q.   Do you recall any kind of conversations covering that

7   kind of topic?

8   A.   It doesn't sound familiar.

9   Q.   Mrs. Peca, did Mr. Constantine have anything to do

10  with the management of your or your husband's financial

11  affairs?

12  A.   Our investment portfolio, no.

13  Q.   That would be Mr. Kenner, correct?

14  A.   Correct.

15  Q.   Did he ever give you any advice during the time that

16  the Northern Trust lines of credit were being created or

17  used, I'm trying to cover the time period you testified

18  regarding Northern Trust lines of credit?

19  A.   Did he advise us regarding the Northern Trust line of

20  credit, is that what you're asking?

21  Q.   Yes.

22  A.   No.

23  Q.   It had nothing to do with the Northern Trust lines of

24  credit; is that correct?

25        MS. KOMATIREDDY:  Objection.

K. Peca - Cross/La Russo

812

1              THE COURT:  Overruled.

2    A.    No.

3    Q.    As a matter of fact, during the period that the lines

4    of credit were created and used, you didn't even know my

5    client at that point; is that correct?

6    A.    Created in 2005, definitely when they were created,

7    most likely -- well, it blends, because 2008, 2009, that's

8    when we met him.

9    Q.    Okay.  I'm sorry, finish your answer.

10   A.    That's also when we had the default notice.

11   Q.    That's a good reference point.  The default notice

12   was March of 2009; is that correct?

13   A.    Yes.

14   Q.    And up to that point you had not heard of or spoken

15   to or met with Mr. Constantine, is that correct, I'm

16   sorry, you had not spoken to Mr. Constantine or met

17   Mr. Constantine?

18   A.    Correct.

19              MR. LA RUSSO:  One moment, your Honor.

20              No further questions, your Honor.

21              THE COURT:  Okay.  Redirect.

22

23   REDIRECT EXAMINATION

24   BY MS. KOMATIREDDY:

25   Q.    Mrs. Peca, I only have about five areas I want to

1    cover.

2    A.    Okay.

3    Q.    First, in April 2008, you invested in Eufora for a

4    second time, right?

5    A.    Correct.

6    Q.    And you saw a wire where you and Michael sent hundred

7    thousand dollars and you saw the wire transfer request and

8    you saw that wire transfer request for the first time

9    years after your investment, correct?

10   A.    Yes.

11   Q.    And in court on Thursday we saw that that wire

12   transfer was to Constantine Management Group, correct?

13   A.    Yes.

14   Q.    At the time that you made an investment in Eufora

15   April 2008, did Mr. Kenner tell you that you would be

16   buying shares that the owner Constantine was selling out

17   of his company?  Let me rephrase that.

18        Did you hear anybody tell you at the time that

19   you made an investment in Eufora that you would be -- that

20   some other investor would be selling out of the company

21   and you were buying their interest?

22        MR. HALEY:  I would object, your Honor.

23        THE COURT:  Overruled.  You can answer that.

24   A.    No.  Never.

25   Q.    What were you told about how your money in Eufora

814

1   would be used?

2   A.   Our money was to be used just on some last minute

3   filing of paperwork and legal work because they had the

4   deal ready to go with the bank and they just needed to

5   cover these last few costs to get everything going.

6   Q.   Costs for Eufora, business costs, correct?

7   A.   Correct, the credit card company.

8   Q.   Mr. Haley asked you about your recorded conversations

9   with Mr. Kenner, that you had several hours of

10  conversations, correct?

11  A.   Yes.

12  Q.   And fair to say those conversations had two parties,

13  he talked and you talked?

14  A.   Correct.

15  Q.   Did Mr. Kenner answer the questions that you asked

16  him to your satisfaction?

17  A.   Not all of them, no.

18  Q.   What did he do?

19  A.   He did a lot of things, he would delay answering,

20  would get off topic, he'd delayed, he diverted, and he was

21  talking to other people, honestly it seemed like a

22  different conspiracy theory for defending what was going

23  on at the time.  But it's very hard to get a direct answer

24  out of him to be honest with you.

25  Q.   Now, Mr. Haley showed you some notes that you took in

K. Peca - Redirect/Komatireddy

815

1   2008 reflecting a conversation that you had with

2   Mr. Kenner, right?

3   A.   Correct.

4   Q.   And he showed you notes that said something to the

5   effect of maximum profitability would be from five to 20

6   years, correct?

7   A.   Um-hmm.

8   Q.   What did those notes and what does your memory --

9   what do you recall Mr. Kenner said at the same time about

10   what would happen to your line of credit?

11   A.   Yes, that first of all that maximum profitability

12   would just be an end result, a total we would be making

13   money before then.  But the line of credit itself was only

14   supposed to be a six month thing, until this Lehman

15   Brothers funding came through and all the lines of credit

16   would be paid off and not a penny would ever, ever go

17   missing to the bond account that was being held as

18   collateral for that.

19   Q.   I'm going to show you what Mr. Haley showed you,

20   Kenner 35.  Do your notes from 2008 reflect that six month

21   profit?

22   A.   They do, that's the very first thing written there,

23   within six month he settled the four million to pay off

24   the two million line of credit, so it was a six month

25   thing.

K. Peca - Redirect/Komatireddy

816

1   Q.   Let's talk about the Global Settlement Fund.

2   A.   Okay.

3   Q.   I want it be very clear Mrs. Peca, at the time that

4   you and Michael gave money to the Global Settlement Fund,

5   what did the defendants tell you that money would be used

6   for?

7   A.   They said that Tommy was explaining it and he was

8   doing most of the talking, it was necessary for us to put

9   this money together in order for the lawsuit to go forward

10  against Jowdy.  He even at one point, I don't think it was

11  when we first talked about it on the phone, got a guy on

12  phone who supposed had a deal with Tommy in place to

13  purchase this Mexico land that would make everybody whole,

14  not just for the GSF, but for the outside investments that

15  Phil had us in.  We had this guy on the phone to give us

16  credibility saying how close this was and go over this

17  legal hurdle everything will be okay, you'll get your

18  money back.  They kept saying that on the phone, it was

19  held at a legal office of the very lawyer who is going to

20  be leading this legal fight.

21  Q.   Mr. La Russo showed you a series of e-mails and

22  mentioned a plane and a hangar and a condo, a series of

23  e-mails that you and Michael responded and acknowledged

24  and approved, correct?

25  A.   Um-hmm.

K. Peca - Redirect/Komatireddy

817

1  Q.   Even at that time when you acknowledged and approved

2  what did you understand your money would go to?

3  A.   Again, it was for the legal fight, Michael had called

4  and asked about those, why they all of a sudden seemed to

5  be playing a bigger role, as mentioned during the meeting

6  and that's because they said we didn't talk about it as

7  much, and he's explaining, the money was for the legal

8  fight.

9  Q.   So you had conversations with the defendants aside

10 from that e-mail?

11 A.   Um-hmm.

12 Q.   In which think explained to you the purpose of the

13 GSF funds?

14 A.   Correct, Michael did, yes.

15 Q.   By the way, let's talk about things in that e-mail

16 for a minute?

17 A.   All right.

18 Q.   That plane, anywhere in your conversations with the

19 defendants, did they ever tell you that the plane was

20 being bought out of bankruptcy?

21 A.   No, no.

22 Q.   Would that have been important to you even if you had

23 consented to investing in a plane?

24 A.   Yes, it would mean, the whole things, yeah, that

25 doesn't make sense.  I didn't have any interest in owning

818

1  a plane anyway.  The whole thing is, I was just trying

2  hard to wrap my head around so yes.

3  Q.    What about the shared cost of the hangars?  Anywhere

4  in you e-mails, anywhere in your conversations, did they

5  tell you that they were buying airplane hangars out of

6  bankruptcy?

7  A.    No, never, first time I'm hearing it.

8  Q.    Would that have been important to you even if you had

9  decided to invest in hangars?

10  A.    Yeah, yeah.

11  Q.    And in that e-mail or anywhere in the your

12  conversations with the defendants in May 2009 did the

13  defendants tell you that Eufora's patents were being held

14  as a collateral for the loan?

15  A.    Never.

16  Q.    Would that have been important for you when you gave

17  your money to the defendants?

18  A.    Absolutely.

19  Q.    Would that have been an important thing for you to

20  have acknowledged and approved?

21  A.    Absolutely.

22  Q.    In anywhere in that e-mail and anywhere about your

23  conversations with the defendants, did they ever tell you

24  that your money would be used to fund Tommy Constantine's

25  personal lawsuit in connection with his racing team?

K. Peca - Recross/Haley

819

1    A.    Never.

2    Q.    Did you authorize your funds to be used in that

3    manner

4    A.    No.

5    Q.    Did they ever tell you that your money was being used

6    to fund Tommy Constantine's lawyer to go speculate on

7    buying Playboy Enterprises?

8    A.    No.

9              MR. HALEY:  Judge, I object to this.

10             THE COURT:  Sustained.

11   Q.    Would you have authorized your money to be used for

12   Mr. Kenner or Mr. Constantine's personal projects?

13   A.    No.  Absolutely not.

14             MS. KOMATIREDDY:  No further questions.

15             THE COURT:  Mr. La Russo?  Mr. Haley?

16             MR. HALEY:  Actually two questions, Judge.

17

18   RECROSS-EXAMINATION

19   BY MR. HALEY:

20   Q.    Ma'am, with reference to what's been marked KP 12,

21   her notes, the notes with reference to your return --

22   withdrawn.

23             The notes that you made in connection with

24   within six months we'll have our money back or words to

25   that effect, do you see those notes.

K. Peca - Recross/Haley

820

1    A.    You'll have, yeah.

2    Q.    Those notes were taken in February of 2008; is that

3    correct?

4    A.    Yes.

5    Q.    So they're not contemporaneous notes that were taken

6    back in 2005, when Phil first recommended the investment

7    to you, correct?

8    A.    These specific ones were, but from day one it was

9    only supposed to be six months.

10   Q.    I understand that, but that's not my question.  My

11   question is really quite simple, my question is these

12   notes here as indicated here were February 12, 2008,

13   correct?  Is that true?

14   A.    Yes.

15   Q.    My question, I'll ask it again, these notes here were

16   not taken contemporaneous with the time in 2005 when you

17   say Phil made that representation to you?

18   A.    Correct.

19   Q.    Is that correct?

20   A.    Correct.

21        MR. HALEY:  Thank you.  Judge, I have no further

22   questions.  You can step down.

23        MR. LA RUSSO:  Your Honor, just a few questions

24   on what she testified to.

25        THE COURT:  Okay.

K. Peca - Recross/La Russo

821

RECROSS-EXAMINATION

BY MR. LA RUSSO:

Q.    You testified that you remembered that in your

initial meeting with Mr. Constantine and Mr. Kenner was on

the telephone; is that correct?

A.    Yes.

Q.    And do you recall how long that he was own the

telephone?

A.    The length, it was about five, 10 minutes.

Q.    Did he remain in the house or did he walk outside?

A.    He was pacing around the room.

Q.    And how long, was he on that call for the length of

time that he was not speaking to you and your husband?

Withdraw that, withdraw that.

        Did he ever tell you the name of the individual

was that he was speaking to on the phone?

A.    I believe he said the name.

Q.    Does the name Sonenglick mean anything?  Does that

refresh your recollection?

A.    No, sorry.

Q.    Would it be fair to say in sum and substance he told

you that he was negotiating with somebody to provide

funding for some of the investments that had been made to

K. Peca - Recross/La Russo

822

1    try and make some of the hockey players at least recover

2    some of the money that they invested; is that correct?

3    A.    Can you repeat that.

4    Q.    There's many parts to it.

5          Tell me when you understood Mr. Constantine tell

6    you the essence of that conversation was with that person

7    on the phone?

8          MS. KOMATIREDDY:  Objection.

9          THE COURT:  You can answer that.

10   A.    He had a gentleman on the phone that was all set to

11   by land in Mexico, that would have made enough money to

12   make everybody whole and then some.

13   Q.    Did he tell you how much money was involved, in terms

14   of trying to make the hockey players whole?

15   A.    He mentioned the approximate figures.

16   Q.    Would 15, $20 million be in the neighborhood of what

17   he said?  Would that refresh your recollection?

18   A.    I wouldn't remember that.

19   Q.    And you have no knowledge of he negotiated a

20   memorandum of understanding regarding some of the terms

21   that you just discussed, correct?

22         MS. KOMATIREDDY:  Objection.

23         THE COURT:  Overruled.  You can answer that.

24   A.    I can't remember the details, no. .

25   Q.    Now, you testified on redirect about Mr. Kenner on

K. Peca - Recross/La Russo

823

1  many occasions causing breakdown in communication between

2  you and your husband and he -- I'm not going to repeat all

3  of that.  Do you recall those series of questions?

4  A.    Breakdown?

5  Q.    Communication, unable to get ahold of him.

6  A.    Yes.

7  Q.    In regards to Mr. Constantine, actually prior to the

8  lawsuit in 2010, you had the ability to communicate and in

9  fact there was communication; is that correct?

10 A.    There was decent communication.

11 Q.    You could e-mail him which was done often; is that

12 correct?

13 A.    Correct.

14 Q.    So he was available to answer any communications that

15 you made during that period of time; is that right?

16 A.    At the point in time you're referencing, yes.

17 Q.    The point in time I'm referencing, yes.  With respect

18 to the Global Settlement Fund, just so -- you don't know

19 the full extent of the monies deposited into that fund, do

20 you?

21 A.    I don't recall the details, no.

22 Q.    Are you aware that Mr. Constantine himself deposited

23 $125,000 into Mr. Richards' escrow account?

24 A.    No.

25         MS. KOMATIREDDY:  Objection.

824

1            THE COURT:  Sustained, she testified she doesn't
2    know.
3            MR. LA RUSSO:  No further questions, your Honor.
4            THE COURT:  You can step down, Mrs. Peca.  Thank
5    you.
6            THE WITNESS:  I'm done?
7            THE COURT:  Yes.  Let me see the lawyers at
8    sidebar.
9            (Continued on next page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

825

1           (Whereupon, the following occurred at sidebar.)

2           THE COURT:  Who is the next witness.

3           MS. KOMATIREDDY:  Mr. Mascarella.  His direct

4   examination will be an hour, hour and a half.

5           THE COURT:  Okay.  We only have another 15

6   minutes and we're stopping at 12:30.  Why don't we stop

7   now.  Okay.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

826

1              (In open court.)

2         THE COURT:  Members of the jury, we're not going

3    to be able to start the next witness now so we're going to

4    recess now for the day.  Don't discuss the case.  I'll see

5    you tomorrow morning at 9:30.  Have a good day.

6              (Whereupon, the jury retired from the

7    courtroom.)

8         THE COURT:  If everyone would be seated.

9         So I assume it's the same lineup or theme we

10   discussed Thursday, correct.

11        MR. MISKIEWICZ:  We had one, we have Mascarella,

12   who will be on for a good part of day, and then we'll have

13   Ethel Kaiser followed by John Kaiser.  We have one other

14   witness, Mr. Gonya, who is very brief, he's an attorney,

15   he also has a trial next week.  You may want to stick him

16   in somewhere in between, probably Wednesday.

17        THE COURT:  And Mr. Haley, my law clerk did

18   speak to someone at Northern Trust and they said they're

19   going to contact you and arrange for production.  Have you

20   heard from them?

21        MR. HALEY:  I have not, but I came directly here

22   from my home this morning.

23        THE COURT:  Apparently the documents are

24   assembled and ready to be produced.

25        MR. HALEY:  Thank you.

827

1          THE COURT:  We had discussed this prior to trial

2    and I wanted to make sure that there weren't any issues,

3    you talked to me about Mr. Jowdy and concerns about his

4    availability.  I assume that you don't continue to have

5    those concerns, correct.

6          MR. HALEY:  Apparently not, Judge.  I'm advised

7    that he has been served, was served by actually

8    Mr. La Russo.  So my understanding is service was accepted

9    so he'd be available.

10          MR. LA RUSSO:  Your Honor, just for the record,

11    my partner, Mr. Conway, has been in touch with a lawyer in

12    Mr. Free's office, they're the ones that had the

13    compliance with the subpoena.  So I'm not anticipating any

14    problems if we need to get him in on a particular day.

15          MR. HALEY:  Final item, there are prospective

16    witnesses.  I will need more current addresses so I can

17    make sure the subpoenas don't go out to the wrong address.

18    I'm sure that I can get the addresses from the government.

19          THE COURT:  All right.  Have a good day.

20          THE COURT:  I'll see you tomorrow at 9:30.

21          (Whereupon, court recessed for the day in this

22    matter at 12:15 p.m., to resume Tuesday, May 12, 2015 at

23    9:30 a.m.)

24

25

W I T N E S S E S                                     828

1

2    K R I S T I N    P E C A                          751

3

4    CONTINUED CROSS EXAMINATION                       752

5    BY MR. HALEY

6    CROSS EXAMINATION                                 768

7    BY MR. LaRUSSO

8    REDIRECT EXAMINATION                              812

9    BY MS. KOMATIREDDY

10   RECROSS-EXAMINATION                               819

11   BY MR. HALEY

12   RECROSS-EXAMINATION                               821

13   BY MR. LA RUSSO

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$10** [1] - 760:17
**$125,000** [1] - 823:23
**$166,000** [1] - 794:13
**$20** [2] - 759:17, 822:16
**$250,000** [2] - 769:16, 784:11
**$45,000** [1] - 805:9

**1**

**1** [14] - 761:3, 805:24, 806:3, 806:11, 806:21, 807:6, 808:14, 808:16, 809:1, 809:7, 809:13, 809:19, 810:20, 811:3
**10** [6] - 759:21, 760:13, 774:7, 795:13, 800:5, 821:11
**100** [2] - 750:7, 780:20
**10:11** [1] - 751:11
**10th** [1] - 788:17
**11** [1] - 749:9
**1102** [1] - 802:6
**11501** [1] - 750:2
**11572** [1] - 750:5
**11722** [2] - 749:17, 750:8
**11749** [1] - 749:23
**11:30** [1] - 790:5
**11th** [2] - 803:8, 805:6
**12** [3] - 819:20, 820:12, 827:22
**120,000** [1] - 804:10
**12:15** [1] - 827:22
**12:30** [3] - 790:13, 800:4, 825:6
**12:33** [1] - 781:24
**13-CR-607** [2] - 749:3, 750:12
**15** [2] - 822:16, 825:5
**15,000** [1] - 804:25
**1601** [1] - 749:22
**17** [1] - 758:9
**18** [6] - 763:5, 764:13, 767:4, 772:12, 773:2, 805:3
**18th** [11] - 776:15, 777:22, 784:17, 784:19, 784:20, 785:20, 785:24, 786:5, 786:8, 800:24, 801:16
**19th** [1] - 788:19
**1:14** [1] - 777:23

**1:30/1:45** [1] - 790:13

**2**

**2** [2] - 758:13, 761:3
**20** [9] - 757:12, 757:24, 759:22, 760:4, 760:6, 760:7, 789:23, 790:14, 815:5
**2004** [1] - 794:12
**2005** [4] - 758:15, 812:6, 820:6, 820:16
**2006** [2] - 761:8
**2008** [13] - 794:3, 794:15, 796:3, 796:13, 796:23, 797:6, 812:7, 813:3, 813:15, 815:1, 815:20, 820:2, 820:12
**2009** [22] - 765:20, 766:18, 769:5, 769:18, 772:12, 773:2, 785:6, 788:11, 788:19, 788:21, 789:15, 792:18, 792:22, 797:10, 798:6, 800:24, 802:8, 805:3, 806:24, 812:7, 812:12, 818:12
**2010** [5] - 792:20, 792:22, 806:25, 810:20, 823:8
**2011** [7] - 765:20, 766:10, 766:17, 768:3, 768:6, 768:9, 792:22
**2012** [2] - 753:17, 761:1
**2015** [2] - 749:9, 827:22
**21** [1] - 761:8
**22** [1] - 752:6
**22nd** [6] - 785:6, 786:8, 786:16, 788:21, 789:15, 790:4
**23** [2] - 756:12, 757:14
**25** [1] - 761:19
**250,000** [3] - 802:14, 802:22, 804:17
**25th** [1] - 788:17
**26** [2] - 750:4, 761:8
**28** [1] - 768:3
**29** [1] - 802:8
**2:30ish** [1] - 790:13

**3**

**30** [1] - 790:14
**300** [1] - 750:1
**341** [1] - 750:2
**35** [1] - 815:20

**4**

**4** [1] - 789:15
**425** [1] - 749:22

**5**

**5** [3] - 751:4, 757:12, 757:24
**5th** [1] - 802:20

**6**

**6** [3] - 804:9, 804:15, 804:25
**631-712-6105** [1] - 750:8
**6:10** [1] - 778:1

**7**

**703** [1] - 795:13
**751** [1] - 828:2
**752** [1] - 828:4
**768** [1] - 828:6
**770** [1] - 752:5

**8**

**8** [4] - 759:21, 760:13, 760:17, 769:18
**812** [1] - 828:8
**819** [1] - 828:10
**821** [1] - 828:12
**8:21** [1] - 790:4
**8th** [4] - 772:5, 784:8, 802:13, 803:5

**9**

**9:30** [4] - 749:10, 826:5, 827:20, 827:23

**A**

**a.m** [4] - 749:10, 751:12, 777:23, 827:23
**a/k/a** [2] - 749:6, 749:8
**ability** [2] - 761:20, 823:8
**able** [5] - 759:11,

762:24, 805:20, 809:4, 826:3
**absolutely** [3] - 818:18, 818:21, 819:13
**accept** [2] - 785:10, 786:12, 786:14
**acceptance** [2] - 785:17, 786:9
**accepted** [1] - 827:8
**accommodate** [1] - 789:21
**accomplished** [1] - 765:10
**according** [1] - 783:9
**account** [11] - 769:16, 780:12, 780:13, 802:7, 802:9, 804:16, 804:21, 805:13, 805:17, 815:17, 823:23
**accounting** [1] - 805:16
**acknowledge** [1] - 785:12
**acknowledged** [3] - 816:23, 817:1, 818:20
**acknowledging** [2] - 784:17, 784:19
**acknowledgment** [1] - 785:16
**acquire** [1] - 779:13
**acquired** [1] - 779:19
**acquires** [1] - 776:18
**acquiring** [2] - 777:6, 777:12
**acquisition** [2] - 782:19, 783:8
**Acting** [1] - 749:16
**action** [1] - 775:5
**activities** [1] - 783:24
**addition** [1] - 802:13
**additional** [1] - 779:5
**additions** [1] - 802:19
**address** [18] - 758:17, 758:19, 758:22, 758:23, 758:24, 758:25, 759:7, 759:11, 764:23, 768:4, 781:21, 785:6, 788:24, 789:17, 790:4, 827:17
**addresses** [4] - 766:8, 788:24, 827:16, 827:18
**admissible** [1] - 764:22
**advanced** [1] - 788:5

**advances** [1] - 774:3
**advice** [1] - 811:15
**advise** [1] - 811:19
**advised** [1] - 827:6
**affairs** [1] - 811:11
**afterwards** [1] - 765:21
**agency** [2] - 774:1, 805:4
**Agency** [1] - 805:7
**ago** [1] - 792:6
**agree** [7] - 754:2, 756:18, 759:8, 773:21, 783:14, 783:17, 784:23
**agreed** [1] - 786:14
**agreement** [1] - 786:9
**ahead** [4] - 760:3, 771:8, 800:19, 801:13
**ahold** [1] - 823:5
**air** [1] - 782:23
**Air** [1] - 774:7
**aircraft** [1] - 774:8
**airplane** [2] - 770:21, 818:5
**alerted** [1] - 766:6
**allegation** [1] - 766:1
**alleged** [2] - 765:7, 766:11
**allow** [2] - 767:16, 810:22
**almost** [1] - 783:6
**America** [1] - 750:11
**AMERICA** [1] - 749:3
**amount** [3] - 760:7, 760:8, 775:14
**ANDREW** [1] - 750:4
**answer** [29] - 756:2, 760:1, 760:2, 762:10, 762:23, 762:24, 767:17, 786:20, 786:21, 786:22, 793:24, 794:19, 794:24, 795:17, 795:18, 795:19, 795:23, 798:22, 798:23, 801:11, 801:12, 810:22, 812:9, 813:23, 814:15, 814:23, 822:9, 822:23, 823:14
**ANSWER** [2] - 752:11, 752:14
**answered** [8] - 754:20, 757:6, 760:18, 778:20, 793:3, 793:4, 793:14, 793:19

**answering** [1] - 814:19

**answers** [4] - 752:5, 752:25, 795:12, 795:25

**anticipating** [1] - 827:13

**anyway** [1] - 818:1

**apologize** [2] - 777:15, 789:14

**appeal** [1] - 766:23

**appear** [2] - 791:1, 804:20

**APPEARANCES** [1] - 749:14

**appearances** [1] - 750:13

**approach** [2] - 763:8, 788:15

**approved** [5] - 778:17, 804:20, 816:24, 817:1, 818:20

**approximate** [1] - 822:15

**April** [10] - 761:8, 768:6, 794:3, 794:15, 796:2, 796:13, 796:22, 797:6, 813:3, 813:15

**areas** [1] - 812:25

**argued** [1] - 766:3

**arrange** [1] - 826:19

**arranged** [1] - 791:11

**arrangements** [1] - 788:6

**arrest** [1] - 766:19

**arrested** [1] - 765:6

**arrive** [1] - 790:6

**arrived** [1] - 751:5

**aside** [1] - 817:9

**aspect** [1] - 783:8

**aspects** [3] - 778:16, 783:7, 784:1

**assembled** [1] - 826:24

**asserted** [1] - 766:14

**assets** [7] - 772:3, 776:19, 777:6, 777:12, 779:13, 779:19, 781:1

**Assistant** [1] - 749:18

**assume** [3] - 774:21, 826:9, 827:4

**attachment** [1] - 763:3

**attention** [7] - 776:13, 788:23, 795:11, 801:4, 803:8, 804:6, 807:12

**Attorney** [1] - 749:16

**attorney** [3] - 767:12,

780:16, 826:14

**attorney's** [1] - 801:12

**Attorneys** [1] - 749:18

**August** [1] - 788:19

**authenticated** [1] - 755:3

**authorities** [1] - 766:19

**authority** [2] - 809:12

**authorization** [9] - 773:11, 773:22, 774:12, 775:2, 778:17, 780:4, 783:4, 784:18, 800:23

**authorize** [1] - 819:2

**authorized** [1] - 819:11

**availability** [1] - 827:4

**available** [2] - 823:14, 827:9

**Avalon** [1] - 774:7

**aware** [19] - 759:3, 768:14, 788:2, 788:3, 789:5, 793:10, 794:3, 794:17, 798:24, 801:5, 801:9, 801:20, 801:21, 801:24, 803:18, 803:23, 805:21, 810:19, 823:22

**awareness** [1] - 798:19

**AZ** [12] - 805:23, 806:3, 806:10, 806:21, 807:5, 808:13, 808:16, 809:1, 809:7, 809:13, 810:20, 811:2

**B**

**background** [1] - 769:11

**bank** [2] - 802:20, 814:4

**bankruptcy** [2] - 817:20, 818:6

**bar** [2] - 763:10, 764:1

**based** [1] - 756:18

**basis** [1] - 787:19

**bear** [1] - 761:25

**bears** [2] - 761:6, 761:9

**became** [2] - 766:3, 789:5

**BEFORE** [1] - 749:11

**behind** [1] - 808:8

**benefit** [4] - 764:21, 771:9, 775:10, 779:13

**best** [4] - 752:12, 776:20, 807:4, 807:18

**between** [9] - 753:11, 753:15, 754:9, 757:24, 780:3, 786:8, 789:4, 823:1, 826:16

**beyond** [1] - 774:13

**BIANCO** [1] - 749:12

**bigger** [1] - 817:5

**bills** [1] - 757:4

**bit** [1] - 777:17

**blends** [1] - 812:7

**bond** [1] - 815:17

**bottom** [3] - 773:4, 782:25, 791:3

**bought** [2] - 782:20, 817:20

**brackets** [1] - 790:6

**break** [3] - 799:4, 800:3, 800:4

**breakdown** [2] - 823:1, 823:4

**brief** [3] - 770:16, 800:15, 826:14

**bring** [3] - 751:6, 751:10, 800:10

**broke** [1] - 751:25

**Brothers** [1] - 815:15

**business** [1] - 814:6

**buying** [5] - 783:18, 813:16, 813:21, 818:5, 819:7

**BY** [14] - 749:17, 749:23, 752:16, 767:3, 768:22, 792:1, 812:24, 819:19, 821:4, 828:5, 828:7, 828:9, 828:11, 828:13

**C**

**C-26** [1] - 777:14

**C-27** [1] - 781:17

**C-28** [1] - 785:5

**C-33** [1] - 788:16

**C-34** [1] - 788:17

**C-35** [1] - 788:20

**C-36** [2] - 788:20, 789:13

**C-37** [1] - 807:9

**CALCAGNI** [1] - 749:21

**cannot** [1] - 799:5

**car** [1] - 801:25

**card** [1] - 814:7

**career** [4] - 759:21, 760:9, 760:13

**cars** [1] - 800:25

**case** [1] - 826:4

**causing** [1] - 823:1

**Central** [3] - 749:5, 749:17, 750:8

**certain** [1] - 755:2

**chance** [2] - 767:7, 808:2

**charge** [1] - 803:24, 809:25

**check** [2] - 769:18, 769:24

**checks** [1] - 804:5

**City** [1] - 767:12

**claim** [1] - 755:20

**clarification** [1] - 774:19

**clarify** [1] - 794:7

**clear** [1] - 816:3

**CLERK** [2] - 750:11, 751:14

**clerk** [1] - 826:17

**client** [2] - 769:5, 812:5

**client's** [1] - 764:19

**clients** [1] - 766:6

**close** [1] - 816:16

**co** [1] - 765:6

**co-conspirator** [1] - 765:6

**collateral** [14] - 794:4, 794:18, 795:4, 795:16, 795:17, 796:4, 796:11, 796:17, 796:25, 797:1, 797:9, 797:15, 815:18, 818:14

**Columbus** [1] - 760:15

**comfortable** [1] - 753:12

**coming** [2] - 772:21, 799:1

**committed** [1] - 765:14

**communicate** [1] - 823:8

**communication** [5] - 787:4, 823:1, 823:5, 823:9, 823:10

**communications** [4] - 787:1, 787:13, 789:4, 823:14

**Company** [2] - 804:10, 804:13

**company** [10] -

804:12, 805:23, 805:25, 806:3, 806:7, 809:20, 809:22, 813:17, 813:20, 814:7

**company's** [2] - 794:4, 794:18

**complete** [2] - 790:2, 795:21

**compliance** [1] - 827:13

**concerned** [1] - 754:18

**concerns** [2] - 827:3, 827:5

**concluded** [1] - 752:4

**concrete** [4] - 782:25, 801:6, 801:17, 816:22

**condominium** [1] - 774:8

**conduct** [1] - 766:8

**conducted** [1] - 763:10

**conference** [17] - 763:10, 764:1, 787:5, 787:13, 787:21, 787:23, 788:4, 788:9, 788:21, 789:5, 789:15, 790:17, 790:23, 791:8, 792:2, 798:12

**confirm** [1] - 793:21

**confirmed** [1] - 775:1

**connection** [4] - 767:14, 807:5, 818:25, 819:23

**consented** [1] - 817:23

**consider** [2] - 765:8, 803:23

**consist** [1] - 763:2

**conspiracy** [1] - 814:22

**conspirator** [1] - 765:6

**conspiratorial** [1] - 766:8

**constant** [1] - 793:11

**CONSTANTINE** [2] - 749:7, 750:25

**Constantine** [49] - 750:1, 750:12, 750:22, 750:24, 764:20, 765:3, 765:6, 766:5, 767:14, 767:21, 769:3, 769:9,

769:10, 769:23,
770:6, 771:2,
771:19, 771:23,
776:23, 781:15,
781:20, 783:6,
783:22, 783:24,
784:17, 784:20,
787:2, 787:5, 788:4,
789:4, 789:9,
789:16, 790:16,
791:5, 792:3, 793:8,
806:4, 810:19,
811:1, 811:9,
812:15, 812:16,
812:17, 813:12,
813:16, 821:6,
822:5, 823:7, 823:22
**Constantine's** [4] -
802:3, 818:24,
819:6, 819:12
**constitutes** [1] -
765:21
**contact** [4] - 759:9,
793:11, 793:12,
826:19
**contain** [1] - 764:18
**contained** [4] -
762:20, 764:25,
773:18, 807:11
**contemporaneous** [2]
- 820:5, 820:16
**content** [1] - 754:10
**contents** [1] - 783:21
**context** [1] - 770:22
**continue** [3] - 751:16,
751:19, 827:4
**continued** [6] -
759:18, 763:11,
766:25, 767:1,
787:1, 791:13
**Continued** [3] -
797:22, 799:8, 824:9
**CONTINUED** [3] -
752:15, 767:2, 828:4
**contract** [4] - 759:17,
759:23, 760:4,
760:11
**contractual** [1] -
759:16
**contributed** [5] -
765:20, 768:15,
779:12, 782:8, 787:6
**contributing** [2] -
775:22, 781:3
**contribution** [5] -
774:14, 778:23,
779:2, 784:7,
788:11, 791:8, 802:9
**contributions** [2] -
770:9, 772:6

**contributors** [3] -
787:16, 803:3,
803:19
**conversation** [13] -
752:19, 753:11,
753:14, 754:9,
754:11, 757:13,
760:21, 770:16,
770:25, 771:22,
811:1, 815:1, 822:6
**conversations** [30] -
753:3, 753:19,
753:20, 753:21,
753:23, 753:24,
754:14, 754:18,
754:21, 754:22,
755:2, 755:3, 755:4,
755:8, 755:10,
755:11, 755:12,
760:24, 810:17,
810:25, 811:6,
814:8, 814:10,
814:12, 817:9,
817:18, 818:4,
818:12, 818:23
**convert** [1] - 811:3
**CONWAY** [1] - 750:1
**Conway** [1] - 827:11
**corner** [1] - 802:8
**correct** [133] - 753:16,
753:17, 754:4,
754:11, 754:16,
757:5, 758:4,
758:17, 758:18,
758:20, 758:24,
759:1, 759:5, 761:9,
767:22, 768:2,
768:8, 769:6, 769:7,
769:16, 769:17,
769:19, 769:25,
770:10, 770:13,
770:14, 772:6,
772:9, 772:12,
773:5, 773:12,
774:14, 775:3,
775:18, 776:3,
776:24, 777:7,
777:8, 777:12,
777:13, 777:24,
778:2, 778:5,
778:13, 778:18,
779:6, 779:7,
779:14, 779:25,
780:19, 780:24,
780:25, 782:9,
782:12, 782:21,
783:8, 784:2, 784:3,
784:9, 784:14,
784:15, 785:3,
785:17, 786:12,

786:14, 787:14,
788:2, 788:7, 788:8,
789:17, 789:18,
790:11, 790:17,
790:21, 791:5,
791:9, 792:4, 792:8,
792:23, 794:10,
796:5, 796:7,
796:13, 796:14,
802:10, 803:1,
803:4, 803:6,
804:18, 805:13,
806:1, 806:2, 806:4,
806:8, 808:15,
808:18, 808:19,
808:21, 808:24,
809:7, 809:25,
811:13, 811:14,
811:24, 812:5,
812:12, 812:15,
812:18, 813:5,
813:9, 813:12,
814:6, 814:7,
814:10, 814:14,
815:3, 816:9,
816:24, 817:14,
820:3, 820:7,
820:13, 820:18,
820:19, 820:20,
821:7, 822:2,
822:21, 823:9,
823:12, 823:13,
826:10, 827:5
**correctly** [3] - 776:20,
785:11, 789:24
**cost** [1] - 818:3
**costs** [4] - 774:4,
814:5, 814:6
**counsel** [1] - 807:16
**couple** [1] - 807:12
**course** [1] - 795:23
**Court** [3] - 750:4,
750:7, 767:1
**COURT** [83] - 749:1,
750:17, 750:21,
750:24, 751:2,
751:4, 751:10,
751:15, 752:2,
756:1, 757:7, 760:2,
760:19, 762:9,
762:17, 762:23,
763:9, 764:5, 764:9,
764:16, 765:25,
766:9, 767:16,
768:1, 768:13,
768:19, 772:18,
775:20, 776:12,
782:11, 785:22,
785:25, 786:7,
786:19, 788:15,

792:25, 793:4,
793:15, 793:19,
793:24, 794:22,
795:8, 796:19,
797:4, 797:8,
797:12, 797:21,
798:2, 798:7,
798:18, 799:6,
800:3, 800:10,
800:19, 801:11,
804:2, 804:23,
806:16, 807:25,
809:16, 810:2,
810:16, 810:22,
812:1, 812:21,
813:23, 819:10,
819:15, 820:25,
822:9, 822:23,
824:1, 824:4, 824:7,
825:2, 825:5, 826:2,
826:8, 826:17,
826:23, 827:1,
827:19, 827:20
**court** [5] - 750:23,
800:2, 813:11,
826:1, 827:21
**Court's** [1] - 751:24
**Courthouse** [1] -
749:4
**courtroom** [4] -
751:11, 800:7,
800:18, 826:7
**Coutry** [1] - 750:1
**cover** [4] - 765:22,
811:17, 813:1, 814:5
**covering** [1] - 811:6
**crazy** [1] - 756:7
**created** [4] - 811:16,
812:4, 812:6
**credibility** [1] - 816:16
**credit** [13] - 759:4,
759:20, 760:12,
811:16, 811:18,
811:20, 811:24,
812:4, 814:7,
815:10, 815:13,
815:15, 815:24
**CROSS** [5] - 752:15,
767:2, 768:21,
828:4, 828:6
**cross** [1] - 751:18
**cross-examination** [1]
- 751:18
**CRR** [1] - 750:7
**current** [1] - 827:16
**CURRIE** [1] - 749:15
**cut** [1] - 760:4

## D

**danger** [1] - 766:12
**Darryl** [1] - 803:8
**date** [6] - 769:18,
772:11, 772:13,
792:17, 792:19,
792:21
**dated** [5] - 785:6,
788:16, 788:17,
788:19, 802:7
**days** [5] - 773:7,
784:8, 785:17,
785:25, 786:2
**deal** [3] - 790:3, 814:4,
816:12
**dealing** [1] - 770:25
**deceitful** [1] - 755:9
**decent** [1] - 823:10
**decided** [1] - 818:9
**deciding** [1] - 795:22
**default** [5] - 753:2,
753:6, 753:16,
812:10, 812:11
**defendant** [2] -
765:17, 766:18
**Defendant** [3] -
749:21, 750:1, 751:1
**DEFENDANT** [1] -
750:25, 751:3
**Defendant's** [1] -
785:5
**defendant's** [2] -
765:12, 777:16
**defendants** [7] -
816:5, 817:9,
817:19, 818:12,
818:13, 818:17,
818:23
**Defendants** [1] -
749:9
**defending** [1] - 814:22
**definitely** [4] - 753:3,
755:16, 775:24,
812:6
**delay** [1] - 814:19
**delayed** [1] - 814:20
**delays** [1] - 752:24
**deliberations** [1] -
786:11
**deposit** [1] - 804:16
**deposited** [2] -
823:19, 823:22
**deposits** [1] - 802:13
**depth** [3] - 762:5,
762:20, 763:2
**desire** [1] - 759:8
**desired** [1] - 754:15
**detailed** [1] - 754:8
**details** [3] - 806:12,

822:24, 823:21

**development** [1] - 761:16

**different** [3] - 764:2, 764:3, 814:22

**difficult** [1] - 790:25

**diligent** [1] - 779:23

**direct** [18] - 754:23, 755:1, 769:4, 769:14, 770:7, 772:8, 772:11, 772:14, 776:13, 781:2, 788:23, 794:8, 795:11, 800:22, 803:7, 807:12, 814:23, 825:3

**directed** [1] - 789:16

**directing** [2] - 801:4, 804:6

**directly** [4] - 754:20, 766:7, 766:8, 826:21

**discuss** [6] - 782:1, 782:16, 784:5, 786:8, 787:6, 826:4

**discussed** [11] - 770:18, 771:24, 776:17, 776:22, 781:22, 784:9, 801:6, 811:2, 822:21, 826:10, 827:1

**discussing** [1] - 771:2

**discussion** [2] - 772:2, 786:11

**displayed** [1] - 776:14

**disregard** [1] - 804:3

**DISTRICT** [2] - 749:1, 749:1

**District** [1] - 749:12

**diversions** [1] - 752:24

**diverted** [2] - 766:11, 814:20

**document** [28] - 756:16, 758:6, 758:9, 758:10, 758:11, 758:13, 758:16, 758:17, 759:2, 759:7, 759:9, 759:13, 761:6, 761:7, 761:8, 761:18, 761:19, 761:21, 761:23, 761:25, 763:7, 764:2, 764:3, 764:8, 764:18, 764:21, 767:7

**documentation** [10] - 778:22, 796:20,

796:21, 808:22, 808:25, 809:2, 809:6, 809:11, 809:21, 810:13

**documents** [19] - 752:9, 752:13, 752:18, 752:21, 753:2, 753:5, 761:2, 761:4, 761:9, 762:4, 762:6, 762:13, 762:14, 762:15, 762:19, 762:20, 763:1, 807:11, 826:23

**dollars** [1] - 813:7

**done** [2] - 799:1, 823:11, 824:6

**down** [5] - 773:4, 782:25, 791:3, 820:22, 824:4

**duly** [1] - 751:22

**duration** [1] - 753:24

**during** [6] - 754:13, 806:24, 811:15, 812:3, 817:5, 823:15

**duties** [2] - 810:11, 810:12

## E

**e-mail** [73] - 755:16, 755:17, 755:19, 765:4, 765:21, 767:18, 767:20, 767:24, 768:3, 768:4, 768:10, 772:9, 772:11, 772:14, 772:20, 773:5, 773:7, 773:10, 773:18, 773:22, 775:21, 776:2, 776:5, 776:15, 777:9, 777:22, 777:25, 778:10, 778:18, 780:4, 780:25, 781:8, 781:14, 781:20, 782:6, 783:9, 783:22, 784:16, 784:20, 785:5, 785:6, 785:23, 786:1, 786:16, 787:1, 787:13, 788:16, 787:17, 788:19, 788:24, 789:16, 790:4, 792:15, 793:6, 793:8, 793:13, 793:16, 793:21, 800:23,

800:25, 801:7, 801:16, 805:3, 817:10, 817:15, 818:11, 818:22, 823:11

**e-mailing** [1] - 789:8

**e-mails** [16] - 755:18, 755:20, 774:18, 781:21, 783:14, 784:8, 784:24, 785:19, 786:5, 786:25, 788:13, 789:12, 809:4, 816:21, 816:23, 818:4

**early** [1] - 776:1

**earn** [1] - 759:20

**EASTERN** [1] - 749:1

**Edmonton** [2] - 758:21, 760:14

**effect** [3] - 756:6, 815:5, 819:25

**effectively** [1] - 776:18

**efforts** [1] - 771:4

**either** [3] - 752:19, 755:8, 787:1

**elaborate** [1] - 756:6

**end** [2] - 757:25, 815:12

**ended** [1] - 760:6

**entailed** [1] - 786:11

**entered** [1] - 800:18

**Enterprises** [1] - 819:7

**enters** [1] - 751:11

**entire** [1] - 764:21

**entry** [1] - 802:12

**equipment** [1] - 790:15

**escrow** [8] - 769:16, 780:13, 802:6, 802:9, 804:21, 805:13, 805:16, 823:23

**essence** [1] - 822:6

**essentially** [1] - 770:7

**establish** [2] - 798:11, 798:21

**established** [1] - 766:2

**estate** [3] - 757:11, 757:23, 774:7

**Ethel** [1] - 826:13

**Eufora** [37] - 771:1, 771:3, 771:9, 779:4, 779:8, 779:14, 780:23, 782:21, 783:19, 794:3, 794:9, 795:15, 796:4, 796:16,

797:10, 805:22, 806:3, 806:8, 806:10, 806:21, 807:5, 808:13, 808:15, 808:16, 808:21, 809:1, 809:7, 809:13, 809:19, 810:20, 811:2, 811:4, 813:3, 813:14, 813:19, 813:25, 814:6

**Eufora's** [3] - 795:3, 805:23, 818:13

**evasive** [1] - 755:8

**evidence** [14] - 758:9, 760:21, 760:25, 761:3, 767:25, 776:8, 781:17, 788:14, 788:16, 798:10, 798:12, 798:13, 801:12, 807:22

**exact** [5] - 760:7, 770:23, 770:24, 792:19, 792:21

**exactly** [3] - 756:5, 778:22, 803:20

**EXAMINATION** [11] - 752:15, 767:2, 768:21, 812:23, 819:18, 821:3, 828:4, 828:6, 828:8, 828:10, 828:12

**examination** [7] - 751:18, 755:1, 769:14, 772:8, 772:14, 800:22, 825:4

**examined** [1] - 751:23

**excerpts** [1] - 754:21

**exculpatory** [1] - 765:22

**excuse** [1] - 768:8

**exhibit** [10] - 763:5, 764:6, 764:14, 777:14, 777:16, 777:19, 777:22, 804:5, 807:11, 807:15

**Exhibit** [9] - 756:12, 757:14, 758:9, 761:3, 761:19, 764:13, 767:4, 785:5

**exhibits** [1] - 802:5

**existed** [1] - 752:21

**existence** [2] - 797:6, 797:15

**expenditures** [4] - 783:4, 789:10, 804:20, 805:12

**explain** [1] - 777:4

**explained** [2] - 775:4, 817:12

**explaining** [3] - 783:7, 816:7, 817:7

**explains** [2] - 782:6, 782:7

**explanation** [2] - 756:7, 762:4

**extent** [2] - 765:9, 823:19

## F

**face** [1] - 761:7

**fact** [7] - 774:1, 775:25, 784:13, 791:1, 793:10, 812:3, 823:9

**facts** [1] - 798:17

**failing** [1] - 760:20

**fair** [16] - 754:17, 758:16, 759:2, 761:6, 769:8, 769:22, 774:25, 787:4, 787:8, 787:25, 788:9, 806:19, 809:10, 809:24, 814:12, 821:23

**fairly** [1] - 775:16

**Falcon** [1] - 774:7

**false** [1] - 765:21

**familiar** [12] - 761:4, 761:5, 761:10, 761:11, 761:15, 767:9, 767:11, 773:5, 776:5, 785:3, 807:2, 811:8

**familiarize** [2] - 761:21, 788:18

**far** [5] - 754:2, 754:17, 765:6, 776:19, 787:16

**FBI** [3] - 756:8, 756:9, 756:21

**February** [3] - 797:10, 820:2, 820:12

**Federal** [2] - 749:16, 750:7

**fees** [7] - 773:23, 774:1, 776:18, 777:5, 779:13, 780:5, 805:4

**few** [4] - 772:16, 789:20, 814:5, 820:23

**fight** [4] - 780:17, 816:20, 817:3, 817:8

**figures** [1] - 822:15

**file** [1] - 783:16
**filed** [2] - 767:14, 771:1
**filing** [1] - 814:3
**final** [1] - 827:15
**finally** [1] - 768:14
**finances** [1] - 757:1
**financial** [1] - 811:10
**fine** [2] - 769:1, 777:18
**finish** [5] - 760:2, 761:14, 765:24, 779:21, 812:9
**firm** [1] - 801:25
**first** [19] - 757:14, 769:4, 769:8, 771:18, 780:18, 780:20, 794:12, 796:21, 802:20, 804:6, 804:9, 807:12, 813:3, 813:8, 815:11, 815:22, 816:11, 818:7, 820:6
**five** [7] - 776:1, 778:2, 778:12, 799:4, 812:25, 815:5, 821:11
**five-minute** [1] - 799:4
**focus** [1] - 770:4
**follow** [1] - 752:19
**follow-up** [1] - 752:19
**followed** [1] - 826:13
**following** [4] - 786:25, 798:1, 800:1, 825:1
**follows** [1] - 751:23
**form** [5] - 775:20, 786:7, 796:18, 796:19, 809:16
**forward** [3] - 775:5, 775:12, 816:9
**foundation** [1] - 785:21
**four** [8] - 753:22, 761:19, 785:17, 785:25, 786:2, 788:21, 815:23
**four-page** [1] - 761:19
**fourth** [1] - 789:13
**frame** [1] - 752:1
**fraud** [1] - 803:24
**fraud's** [1] - 765:13
**freaking** [1] - 776:9
**free's** [1] - 827:12
**front** [2] - 758:16, 775:14
**fruition** [1] - 757:12
**fulfilled** [1] - 759:16
**full** [1] - 823:19
**Fund** [24] - 768:16, 770:9, 771:9,

771:25, 773:8, 775:2, 775:23, 777:10, 779:12, 781:4, 782:7, 783:5, 783:15, 783:25, 787:2, 787:8, 787:12, 789:6, 792:7, 802:17, 803:24, 816:1, 816:4, 823:18
**fund** [10] - 766:1, 782:8, 783:7, 783:8, 787:6, 803:3, 803:19, 818:24, 819:6, 823:19
**funding** [2] - 815:15, 821:25
**funds** [9] - 764:21, 765:3, 766:5, 766:6, 768:15, 775:17, 817:13, 819:2

## G

**Gaarn** [3] - 806:13, 806:17, 806:19
**game** [2] - 790:7, 790:13
**gentleman** [1] - 822:10
**Gilmartin** [1] - 805:9
**given** [1] - 752:5
**Global** [24] - 768:15, 770:9, 771:8, 771:25, 773:8, 775:1, 775:22, 777:10, 779:12, 781:3, 782:7, 783:5, 783:15, 783:25, 787:2, 787:7, 787:12, 789:6, 792:7, 802:17, 803:24, 816:1, 816:4, 823:18
**globally** [1] - 789:23
**Gonchar** [7] - 802:21, 802:25, 803:22, 803:23, 804:17, 804:20
**Gonya** [1] - 826:14
**Government** [1] - 749:15
**government** [12] - 755:2, 755:19, 766:4, 793:6, 793:17, 794:17, 795:3, 798:17, 802:6, 808:4, 827:18
**Group** [2] - 805:1, 813:12

**group** [1] - 788:23
**GSF** [8] - 764:21, 765:3, 765:20, 766:1, 787:10, 808:24, 816:14, 817:13
**guess** [1] - 806:9
**guy** [2] - 816:11, 816:15
**guys** [2] - 789:20, 789:23

## H

**Haley** [6] - 751:1, 814:8, 814:25, 815:19, 819:15, 826:17
**HALEY** [31] - 749:21, 749:23, 751:1, 751:9, 751:24, 752:3, 752:16, 764:2, 764:6, 764:13, 764:17, 765:24, 766:1, 766:24, 767:3, 768:2, 768:8, 768:12, 768:18, 800:16, 813:22, 819:9, 819:16, 819:19, 820:21, 826:21, 826:25, 827:6, 827:15, 828:5, 828:11
**half** [3] - 790:7, 800:13, 825:4
**half-hour** [1] - 790:7
**hand** [1] - 802:7
**handing** [1] - 758:7
**Handing** [2] - 759:15, 767:5
**handling** [2] - 759:4, 801:25
**handwritten** [2] - 756:14, 756:19
**hangar** [2] - 770:21, 816:22
**hangars** [3] - 818:3, 818:5, 818:9
**hard** [3] - 772:25, 814:23, 818:2
**Hawaii** [3] - 757:8, 757:15
**Hawaiian** [3] - 759:4, 761:16, 762:14
**head** [2] - 777:15, 818:2
**hear** [3] - 754:22, 806:13, 813:18
**heard** [5] - 780:18,

803:16, 807:4, 812:14, 826:20
**hearing** [1] - 818:7
**hearsay** [2] - 764:16, 765:23
**held** [7] - 795:16, 795:17, 805:22, 805:25, 815:17, 816:19, 818:13
**help** [2] - 779:13, 808:12
**helped** [2] - 767:21, 808:4
**helps** [1] - 758:1
**hiding** [4] - 755:13, 755:23, 756:10, 756:22
**highlight** [1] - 778:15
**Highway** [1] - 749:22
**himself** [2] - 803:23, 823:22
**HL** [1] - 805:1
**hmm** [4] - 772:10, 815:7, 816:25, 817:11
**hockey** [5] - 803:1, 803:15, 803:17, 822:1, 822:14
**holding** [4] - 805:23, 806:3, 806:7
**home** [4] - 769:12, 770:5, 776:24, 826:22
**honest** [1] - 814:24
**honestly** [1] - 814:21
**Honor** [35] - 750:16, 750:20, 750:25, 751:3, 751:8, 751:9, 752:3, 759:25, 762:22, 763:8, 764:3, 764:23, 765:11, 765:24, 766:24, 768:20, 772:16, 785:21, 786:6, 794:20, 795:1, 795:7, 797:18, 797:19, 799:7, 800:21, 801:10, 806:22, 807:16, 812:19, 812:20, 813:22, 820:23, 824:3, 827:10
**HONORABLE** [1] - 749:12
**hook** [1] - 777:16
**hope** [1] - 751:16
**Hormovitis** [1] - 749:8
**hour** [6] - 754:13, 790:7, 799:1,

800:13, 825:4
**hours** [13] - 753:14, 753:18, 753:20, 753:23, 753:24, 754:3, 754:9, 754:21, 755:12, 776:1, 778:2, 778:12, 814:9
**house** [1] - 821:12
**hundred** [2] - 809:4, 813:6
**hurdle** [1] - 816:17
**husband** [38] - 752:22, 753:8, 753:11, 755:24, 759:16, 765:19, 767:13, 769:16, 773:14, 774:17, 774:18, 774:23, 776:2, 776:4, 776:5, 778:1, 778:4, 781:5, 781:7, 782:2, 782:16, 784:5, 785:1, 785:9, 786:9, 786:17, 787:12, 787:23, 789:4, 789:19, 791:11, 792:2, 793:10, 805:18, 808:13, 811:1, 821:15, 823:2
**husband's** [5] - 753:10, 757:1, 805:22, 808:11, 811:10

## I

**idea** [2] - 787:20, 788:12
**identification** [4] - 756:12, 761:19, 763:6, 807:9
**identified** [2] - 755:2, 756:13
**identify** [1] - 807:17
**imagine** [1] - 789:22
**immediately** [1] - 783:6
**impact** [1] - 790:16
**implication** [1] - 796:12
**implied** [1] - 796:16
**important** [6] - 795:22, 796:3, 817:22, 818:8, 818:16, 818:19
**incentive** [2] - 771:8, 779:9
**incentives** [2] - 775:4, 775:7

**inches** [3] - 762:5, 762:20, 763:1
**incidentally** [1] - 756:25
**include** [1] - 764:20
**included** [1] - 762:15
**includes** [1] - 777:5
**increased** [3] - 779:14, 780:23, 808:23
**indeed** [1] - 767:24
**indicated** [2] - 765:1, 820:12
**indicating** [2] - 757:17, 757:18
**indictment** [2] - 765:7, 803:25
**indirectly** [1] - 805:23
**individual** [1] - 821:17
**individuals** [4] - 771:5, 771:10, 803:14, 807:20
**informal** [1] - 809:2
**information** [6] - 765:10, 765:22, 774:21, 774:23, 780:14, 792:3
**initial** [2] - 780:3, 821:6
**inquiries** [1] - 754:19
**inquiry** [2] - 754:4, 754:6
**intent** [1] - 765:8
**interest** [14] - 774:6, 779:24, 780:23, 782:23, 805:22, 806:8, 808:13, 809:1, 809:7, 809:21, 810:10, 811:4, 813:21, 817:25
**interests** [1] - 811:2
**interviewed** [1] - 756:8
**intimately** [1] - 756:25
**Intrigue** [2] - 804:9, 804:12
**introduced** [2] - 760:21, 760:24
**introducing** [1] - 798:16
**invest** [2] - 795:22, 818:9
**invested** [6] - 794:2, 795:15, 796:2, 796:12, 813:3, 822:2
**investing** [1] - 817:23
**investment** [12] - 757:8, 757:9, 757:10, 757:11,

759:5, 762:14, 797:2, 811:12, 813:9, 813:14, 813:19, 820:6
**Investment** [2] - 804:10, 804:13
**investments** [7] - 757:2, 757:23, 758:2, 794:9, 796:22, 816:14, 821:25
**investor** [1] - 813:20
**investors** [2] - 771:1, 771:4
**involved** [3] - 757:1, 803:20, 822:13
**ironically** [1] - 751:4
**Islander** [1] - 759:17
**Islanders** [1] - 760:11
**Islandia** [1] - 749:23
**Isle** [4] - 761:7, 761:9, 761:25, 762:21
**Islip** [3] - 749:5, 749:17, 750:8
**issue** [1] - 764:22
**issues** [5] - 751:7, 751:8, 751:9, 771:23, 827:2
**item** [1] - 827:15
**items** [2] - 770:17, 770:20
**itself** [1] - 815:13
**IV** [4] - 761:7, 761:9, 761:25, 762:21

### J

**James** [1] - 750:14
**JAMES** [1] - 749:17
**Jay** [1] - 803:11
**Jer** [1] - 803:13
**JFB** [1] - 749:3
**John** [1] - 826:13
**JOSEPH** [1] - 749:12
**Jowdy** [11] - 765:10, 773:24, 775:6, 775:12, 780:17, 783:16, 783:18, 783:21, 784:2, 816:10, 827:3
**Judge** [13] - 749:12, 764:3, 764:6, 764:8, 764:17, 764:24, 768:12, 785:24, 807:24, 808:5, 810:3, 819:16, 827:6
**judge** [5] - 798:5, 798:15, 807:18, 819:9, 820:21
**July** [1] - 761:8

**jumping** [2] - 777:14, 804:15
**June** [4] - 768:3, 768:9, 788:17
**Juneau** [2] - 771:14, 783:19
**Juneau's** [1] - 782:19
**juror** [1] - 751:4
**jury** [16] - 749:13, 751:10, 751:11, 751:15, 754:22, 755:5, 765:7, 766:13, 798:9, 800:6, 800:11, 800:18, 803:16, 804:2, 826:2, 826:6

### K

**Kaiser** [2] - 826:13
**keep** [1] - 790:1
**KELLY** [1] - 749:15
**KENNER** [2] - 749:6, 751:3
**Kenner** [57] - 749:6, 749:21, 750:12, 751:1, 751:2, 752:8, 752:18, 752:19, 753:6, 753:15, 754:3, 754:10, 754:15, 755:8, 755:23, 755:24, 756:9, 756:22, 758:9, 761:3, 761:18, 762:13, 762:19, 766:5, 767:4, 768:15, 769:23, 770:6, 771:19, 771:23, 772:9, 772:20, 773:10, 774:16, 776:15, 776:24, 778:17, 780:5, 780:19, 781:8, 781:15, 784:18, 785:6, 794:9, 795:14, 806:5, 811:13, 813:15, 814:9, 814:15, 815:2, 815:9, 815:20, 819:12, 821:6, 822:25
**Kenner's** [3] - 758:24, 765:1, 768:9
**kenner33@gmail.com** [1] - 768:10
**kept** [1] - 816:18
**kind** [5] - 752:11, 752:13, 794:7, 811:6, 811:7

**kindly** [4] - 756:12, 757:14, 758:8, 763:5
**KMP** [1] - 768:3
**knowing** [1] - 757:1
**knowledge** [8] - 753:9, 768:9, 797:13, 798:3, 805:7, 805:10, 805:12, 822:19
**known** [3] - 758:2, 796:10, 807:1
**KOMATIREDDY** [53] - 749:18, 750:18, 755:25, 757:6, 759:25, 760:18, 762:8, 762:16, 762:22, 763:8, 764:11, 765:11, 767:15, 767:25, 768:7, 775:19, 782:10, 785:18, 785:21, 786:6, 786:18, 792:24, 793:2, 793:14, 793:18, 793:23, 794:20, 795:6, 796:18, 797:3, 797:7, 797:11, 797:17, 800:14, 801:8, 804:1, 804:22, 806:14, 806:22, 807:16, 807:21, 809:14, 810:1, 810:15, 810:21, 811:25, 812:24, 819:14, 822:8, 822:22, 823:25, 825:3, 828:9
**Komatireddy** [1] - 750:18
**KP** [1] - 819:20
**Kris** [1] - 765:4
**Kristin** [1] - 764:19

### L

**L-E-H-T-I-N-E-N** [1] - 803:13
**LA** [21] - 792:1, 795:1, 795:10, 797:19, 798:5, 798:15, 799:3, 799:7, 800:12, 800:21, 801:9, 807:18, 807:23, 808:4, 810:3, 812:19, 820:23, 821:4, 824:3, 827:10, 828:13
**lacks** [1] - 785:21

**laid** [1] - 784:19
**land** [4] - 757:8, 761:16, 816:13, 822:11
**large** [2] - 762:13, 775:14
**laRUSSO** [1] - 750:1
**LaRusso** [11] - 750:3, 750:22, 751:8, 768:19, 768:20, 768:22, 769:2, 772:16, 785:24, 828:7
**last** [9] - 751:25, 752:4, 757:7, 776:10, 776:13, 779:21, 779:22, 814:2, 814:5
**lasted** [1] - 788:9
**lastly** [1] - 788:20
**late** [2] - 751:4, 810:20
**law** [2] - 801:25, 826:17
**lawsuit** [7] - 767:14, 767:21, 801:3, 802:1, 816:9, 818:25, 823:8
**lawyer** [10] - 780:8, 780:9, 780:10, 780:21, 792:13, 798:10, 816:19, 819:6, 827:11
**lawyers** [1] - 824:7
**laying** [1] - 783:24
**leading** [2] - 785:18, 816:20
**least** [7] - 754:2, 754:3, 754:17, 758:2, 788:10, 796:12, 822:1
**led** [1] - 766:11
**left** [1] - 799:1
**legal** [16] - 773:23, 775:5, 776:18, 776:19, 777:5, 776:17, 777:10, 779:13, 780:5, 783:7, 814:3, 816:17, 816:19, 816:20, 817:3, 817:7
**Lehman** [1] - 815:14
**Lehtinen** [1] - 803:13
**length** [2] - 821:11, 821:14
**letter** [6] - 753:2, 753:6, 753:16, 778:17, 779:15, 779:17
**likely** [1] - 812:7
**likewise** [1] - 803:18

**line** [13] - 752:6,
759:4, 761:20,
776:13, 795:13,
797:17, 799:5,
804:23, 811:19,
815:10, 815:13,
815:24
**lines** [6] - 771:6,
811:16, 811:18,
811:23, 812:3,
815:15
**lineup** [1] - 826:9
**list** [1] - 807:19
**listed** [2] - 758:17,
802:20
**listen** [1] - 755:15
**live** [1] - 758:20
**lived** [1] - 758:21
**LLC** [7] - 761:7, 761:9,
761:11, 761:15,
762:1, 762:21,
809:19
**LLP** [2] - 749:21,
750:1
**loan** [14] - 795:16,
796:5, 796:11,
796:17, 796:22,
796:25, 797:6,
797:9, 797:14,
797:16, 798:3,
798:24, 818:14
**loans** [1] - 798:6
**locate** [1] - 759:11
**lock** [1] - 760:5
**look** [13] - 756:12,
756:16, 757:14,
757:20, 758:8,
761:18, 763:5,
764:5, 767:4,
788:18, 802:12,
802:19, 807:25
**looked** [1] - 767:6
**looking** [4] - 752:11,
753:5, 764:9, 764:11
**looks** [1] - 772:21

**M**

**ma'am** [13] - 753:4,
754:2, 755:17,
757:15, 758:8,
759:8, 760:22,
761:2, 761:6,
761:18, 762:18,
786:25, 819:20
**Magence** [1] - 805:9
**MAGENCE** [1] -
805:10
**mail** [73] - 755:16,
755:17, 755:19,

765:4, 765:21,
767:18, 767:20,
767:24, 768:3,
768:4, 768:10,
772:9, 772:11,
772:14, 772:20,
773:5, 773:7,
773:10, 773:18,
773:22, 775:21,
776:2, 776:5,
776:15, 777:9,
777:22, 777:25,
778:10, 778:18,
780:4, 780:25,
781:8, 781:14,
781:20, 782:6,
783:9, 783:22,
784:16, 784:20,
785:5, 785:6,
785:23, 786:1,
786:16, 787:1,
787:13, 788:16,
788:17, 788:19,
788:24, 789:16,
790:4, 792:15,
793:6, 793:8,
793:13, 793:16,
793:21, 800:23,
800:25, 801:7,
801:16, 805:3,
817:10, 817:15,
818:11, 818:22,
823:11
**mailing** [1] - 789:8
**mails** [16] - 755:18,
755:20, 774:18,
781:21, 783:14,
784:8, 784:24,
785:19, 786:5,
786:25, 788:13,
789:12, 809:4,
816:21, 816:23,
818:4
**main** [3] - 770:7,
770:13, 775:5
**Management** [1] -
813:12
**management** [2] -
810:11, 811:10
**managing** [7] -
806:10, 806:20,
806:21, 807:5,
809:12, 810:5, 810:9
**manner** [1] - 819:3
**March** [2] - 765:20,
812:12
**marked** [8] - 758:8,
761:2, 761:18,
763:5, 764:14,
767:4, 807:8, 819:20

**Mascarella** [2] - 825:3,
826:11
**matter** [10] - 752:25,
764:25, 766:3,
766:14, 774:1,
775:25, 784:13,
791:13, 812:3,
827:22
**Matter** [3] - 763:11,
766:25, 767:1
**maximize** [1] - 758:3
**maximum** [2] - 815:5,
815:11
**McKee** [1] - 803:11
**mean** [3] - 779:16,
817:24, 821:20
**meaning** [1] - 795:14
**means** [2] - 810:6,
810:10
**meeting** [11] - 769:11,
769:15, 769:22,
770:5, 770:8,
770:13, 771:19,
772:5, 776:23,
817:5, 821:6
**member** [5] - 806:21,
807:5, 810:5, 810:9,
810:10
**members** [3] - 751:15,
772:3, 826:2
**memorandum** [1] -
822:20
**Memorial** [1] - 749:22
**memorializing** [1] -
766:23
**memory** [2] - 752:12,
815:8
**mentioned** [5] -
779:21, 801:15,
816:22, 817:5,
822:15
**mentioning** [4] -
759:23, 771:7,
774:10, 779:7
**met** [4] - 769:5, 812:8,
812:15, 812:16
**Mexico** [6] - 755:14,
755:24, 756:10,
756:23, 816:13,
822:11
**Michael** [11] - 764:19,
765:5, 767:9,
767:13, 779:21,
802:14, 813:6,
816:4, 816:23,
817:3, 817:14
**microphone's** [1] -
790:10
**middle** [2] - 790:2,
790:3

**might** [1] - 770:16
**migraine** [1] - 776:11
**million** [11] - 759:17,
759:21, 759:22,
760:4, 760:6, 760:7,
760:13, 760:17,
815:23, 815:24,
822:16
**mind** [7] - 765:1,
765:8, 765:12,
765:17, 766:7,
766:10, 766:17
**mine** [1] - 757:20
**mine's** [1] - 772:21
**Mineola** [1] - 750:2
**minor** [3] - 770:17,
770:20, 771:23
**minute** [4] - 799:4,
800:4, 814:2, 817:16
**minutes** [6] - 770:17,
772:16, 790:14,
800:5, 821:11, 825:6
**misappropriated** [1] -
765:3
**misappropriates** [1] -
764:20
**MISKIEWICZ** [4] -
749:17, 750:14,
751:7, 826:11
**Miskiewicz** [2] -
750:14, 800:12
**missing** [1] - 815:17
**misstates** [2] - 768:7,
794:21
**misuse** [2] - 766:4,
766:5
**misused** [1] - 766:7
**moment** [3] - 768:12,
797:20, 812:19
**Monday** [1] - 779:22
**money** [37] - 760:7,
765:14, 765:16,
765:18, 766:11,
766:21, 768:14,
773:8, 773:11,
775:14, 775:22,
776:17, 777:5,
784:14, 792:8,
792:12, 795:23,
796:13, 801:21,
801:24, 813:25,
814:2, 815:13,
816:4, 816:5, 816:9,
816:18, 817:2,
817:7, 818:17,
818:24, 819:5,
819:11, 819:24,
822:2, 822:11,
822:13
**monies** [9] - 771:25,

779:11, 782:8,
783:5, 783:25,
789:10, 792:7,
793:22, 823:19
**Monroe** [1] - 801:17
**month** [4] - 815:14,
815:20, 815:23,
815:24
**monthly** [1] - 787:19
**months** [4] - 788:10,
791:7, 819:24, 820:9
**Moreau** [3] - 771:16,
783:1, 783:19
**morning** [17] - 750:16,
750:17, 750:20,
750:21, 750:24,
750:25, 751:2,
751:3, 751:5,
751:15, 768:23,
768:24, 776:1,
778:1, 800:3, 826:5,
826:22
**mortgage** [1] - 801:6
**most** [3] - 806:24,
812:7, 816:8
**move** [3] - 789:21,
798:25, 807:9
**MR** [60] - 750:14,
750:22, 751:1,
751:7, 751:8, 751:9,
751:24, 752:3,
752:16, 764:2,
764:6, 764:13,
764:17, 765:24,
766:1, 766:24,
767:3, 768:2, 768:8,
768:12, 768:18,
768:20, 768:22,
772:16, 785:24,
792:1, 795:1,
795:10, 797:19,
798:5, 798:15,
799:3, 799:7,
800:12, 800:16,
800:21, 801:9,
807:18, 807:23,
808:4, 810:3,
812:19, 813:22,
819:9, 819:16,
819:19, 820:21,
820:23, 821:4,
824:3, 826:11,
826:21, 826:25,
827:6, 827:10,
827:15, 828:5,
828:7, 828:11,
828:13
**MS** [52] - 750:18,
755:25, 757:6,
759:25, 760:18,

762:8, 762:16,
762:22, 763:8,
764:11, 765:11,
767:15, 767:25,
768:7, 775:19,
782:10, 785:18,
785:21, 786:6,
786:18, 792:24,
793:2, 793:14,
793:18, 793:23,
794:20, 795:6,
796:18, 797:3,
797:7, 797:11,
797:17, 800:14,
801:8, 804:1,
804:22, 806:14,
806:22, 807:16,
807:21, 809:14,
810:1, 810:15,
810:21, 811:25,
812:24, 819:14,
822:8, 822:22,
823:25, 825:3, 828:9
**multiple** [4] - 775:17,
775:21, 783:15,
789:23

## N

**name** [15] - 761:25,
762:21, 767:9,
769:2, 771:12,
771:13, 780:18,
804:12, 806:13,
806:17, 807:1,
807:4, 821:17,
821:19, 821:20
**names** [2] - 771:10,
771:18
**nature** [1] - 757:5
**necessarily** [1] -
755:10
**necessary** [1] - 816:8
**need** [5] - 764:22,
765:9, 807:13,
827:14, 827:16
**needed** [1] - 814:4
**negotiated** [1] -
822:19
**negotiating** [1] -
821:24
**neighborhood** [1] -
822:16
**never** [9] - 752:9,
787:10, 795:5,
795:18, 813:24,
818:7, 818:15, 819:1
**NEW** [1] - 749:1
**New** [7] - 749:5,
749:17, 749:23,

750:2, 750:5, 750:8,
767:12
**next** [13] - 763:11,
766:25, 770:4,
777:14, 791:13,
794:7, 796:9,
797:22, 799:8,
824:9, 825:2, 826:3,
826:15
**NHL** [3] - 759:18,
760:5, 760:13
**Nolan** [2] - 771:12,
783:19
**Nolan's** [1] - 782:19
**Northern** [14] - 752:9,
752:13, 752:17,
752:20, 753:1,
753:4, 753:7, 759:3,
759:9, 811:16,
811:18, 811:19,
811:23, 826:18
**notes** [15] - 756:14,
756:19, 756:21,
814:25, 815:4,
815:8, 815:20,
819:21, 819:23,
819:25, 820:2,
820:5, 820:12,
820:15
**nothing** [3] - 754:14,
784:2, 811:23
**notice** [3] - 777:19,
812:10, 812:11
**notifications** [1] -
788:5
**Number** [1] - 751:4
**number** [3] - 773:22,
789:15, 808:5
**numbered** [1] - 808:6

## O

**oath** [2] - 751:20,
752:8
**object** [4] - 765:11,
787:7, 813:22, 819:9
**objection** [38] -
755:25, 757:6,
759:25, 760:18,
762:8, 762:16,
762:22, 764:10,
767:15, 767:25,
768:7, 775:19,
782:10, 785:18,
786:6, 786:18,
792:24, 793:2,
793:14, 793:18,
793:23, 794:20,
796:18, 797:3,
797:7, 797:11,

797:17, 801:8,
804:1, 804:22,
806:14, 809:14,
810:1, 810:15,
810:21, 811:25,
822:22, 823:25
**Objection** [1] - 822:8
**obligation** [1] - 759:17
**obtained** [1] - 778:22
**occasions** [2] - 756:9,
823:1
**occur** [2] - 760:25,
798:6
**occurred** [9] - 753:15,
769:23, 772:5,
793:1, 797:10,
798:1, 798:24,
800:1, 825:1
**Oceanside** [1] - 750:5
**October** [3] - 788:21,
789:15, 790:4
**OF** [2] - 749:1, 749:3
**offered** [5] - 764:24,
764:25, 766:16,
786:5
**offhand** [1] - 772:13
**office** [2] - 816:19,
827:12
**official** [1] - 787:9
**often** [1] - 823:11
**Ohio** [1] - 769:12
**old** [1] - 758:19
**Old** [1] - 750:1
**OLIVERAS** [1] - 750:4
**one** [38] - 754:13,
758:1, 764:3, 764:9,
766:20, 772:25,
777:10, 777:11,
778:7, 781:10,
781:13, 781:24,
782:4, 785:24,
787:11, 788:15,
788:20, 788:25,
789:1, 789:12,
789:13, 790:6,
794:12, 794:15,
797:14, 802:5,
802:16, 802:20,
803:3, 804:9, 808:6,
812:19, 816:10,
820:8, 826:11,
826:13
**One** [1] - 749:21
**ones** [3] - 752:18,
820:8, 827:12
**Open** [1] - 767:1
**open** [2] - 800:1,
826:1
**opening** [1] - 765:2
**opinion** [1] - 790:5

**opportunity** [3] -
782:1, 786:4, 807:14
**order** [1] - 816:9
**organize** [1] - 767:21
**organized** [3] -
761:16, 767:19,
767:20
**original** [1] - 785:19
**originally** [2] - 774:13,
788:10
**otherwise** [1] - 794:25
**outside** [2] - 816:14,
821:12
**outweighed** [1] -
766:12
**overruled** [8] - 762:9,
782:11, 785:22,
786:19, 806:16,
812:1, 813:23,
822:23
**own** [2] - 768:15,
821:9
**owned** [1] - 808:13
**owner** [1] - 813:16
**owners** [1] - 810:13
**ownership** [4] -
779:24, 805:22,
809:21, 810:10
**owning** [1] - 817:25
**owns** [1] - 783:1

## P

**p.m** [1] - 827:22
**pacing** [1] - 821:13
**package** [6] - 762:4,
762:6, 762:13,
762:15, 762:18,
763:1
**page** [20] - 752:5,
757:14, 758:9,
758:13, 758:17,
761:19, 763:11,
766:25, 791:13,
795:13, 797:22,
799:8, 804:4,
804:15, 804:19,
807:15, 807:17,
807:19, 808:8, 824:9
**pages** [3] - 763:2,
808:1, 808:5
**paid** [1] - 815:16
**Palm** [1] - 782:25
**Palms** [4] - 774:8,
801:6, 801:14,
801:15
**paperwork** [4] - 780:1,
787:10, 808:21,
814:3
**paragraph** [1] - 776:14

**paragraphs** [1] -
807:13
**park** [1] - 782:23
**Park** [1] - 774:7
**part** [6] - 762:6,
762:15, 765:22,
783:1, 787:9, 826:12
**participants** [3] -
787:11, 788:6, 792:4
**participate** [4] -
787:21, 787:23,
791:11, 798:13
**participated** [1] -
791:9
**participating** [1] -
781:11
**participation** [1] -
790:16
**particular** [4] - 773:10,
774:12, 777:22,
827:14
**parties** [3] - 809:10,
809:12, 814:12
**partner** [3] - 806:10,
806:20, 827:11
**Partners** [13] - 805:24,
806:3, 806:11,
806:21, 807:6,
808:14, 808:16,
809:1, 809:7,
809:13, 809:19,
810:20, 811:3
**parts** [1] - 822:4
**party** [1] - 788:6
**patent** [1] - 797:1
**patents** [11] - 794:4,
794:18, 795:4,
795:16, 796:4,
796:10, 796:16,
796:22, 797:10,
797:15, 818:13
**pay** [2] - 757:4, 815:23
**payments** [1] - 801:6
**Peca** [24] - 751:18,
751:20, 752:17,
765:19, 768:14,
768:23, 775:25,
776:13, 783:3,
794:2, 795:2,
796:15, 796:20,
797:5, 798:21,
800:22, 801:13,
802:14, 805:21,
808:2, 811:9,
812:25, 816:3, 824:4
**penny** [1] - 815:16
**people** [1] - 814:21
**percent** [2] - 780:20,
809:4
**percentage** [4] -

U.S.A. v. KENNER and CONSTANTINE                                                                 9

778:22, 779:14, 779:19, 780:23
**percentages** [4] - 779:5, 779:8, 779:10, 808:23
**perhaps** [1] - 762:19
**period** [4] - 765:13, 811:17, 812:3, 823:15
**periodic** [1] - 793:11
**permission** [1] - 751:24
**person** [3] - 776:10, 792:12, 822:6
**personal** [3] - 801:3, 818:25, 819:12
**personally** [1] - 784:25
**perspective** [1] - 770:8
**Phil** [31] - 752:18, 753:6, 753:13, 753:15, 753:20, 754:3, 754:10, 754:15, 755:8, 755:23, 755:24, 756:9, 756:22, 757:9, 757:22, 758:24, 762:13, 762:19, 765:1, 766:5, 767:19, 767:20, 768:9, 768:14, 773:4, 776:25, 809:5, 816:15, 820:6, 820:17
**Philip** [1] - 749:6
**PHILLIP** [1] - 749:6
**Phillip** [3] - 749:21, 750:11, 752:8
**phone** [9] - 774:17, 774:20, 816:11, 816:12, 816:15, 816:18, 821:18, 822:7, 822:10
**phrase** [3] - 782:20, 810:6, 810:9
**picking** [1] - 790:10
**Place** [1] - 774:8
**place** [8] - 755:14, 755:23, 756:10, 756:22, 770:5, 785:17, 789:6, 816:12
**placed** [1] - 779:25
**plan** [1] - 785:10
**plane** [5] - 816:22, 817:18, 817:19, 817:23, 818:1
**play** [1] - 759:18

**Playboy** [1] - 819:7
**player** [2] - 802:25, 803:1
**players** [5] - 803:15, 803:17, 822:1, 822:14
**playing** [1] - 817:5
**Plaza** [1] - 749:16, 750:7
**pledged** [6] - 794:4, 794:18, 795:4, 796:10, 796:16, 797:1
**pledging** [2] - 797:9, 797:15
**point** [22] - 752:8, 754:3, 759:20, 762:3, 764:24, 765:2, 765:8, 770:15, 774:16, 779:11, 780:15, 780:22, 783:3, 784:16, 791:7, 800:8, 812:5, 812:11, 812:14, 816:10, 823:16, 823:17
**portfolio** [1] - 811:12
**portion** [2] - 770:25, 790:2
**possession** [5] - 752:10, 755:17, 755:18, 755:20, 764:7
**possible** [3] - 771:18, 771:25, 789:21
**posted** [1] - 790:1
**PR** [2] - 774:1, 805:4
**prejudice** [1] - 766:13
**present** [1] - 750:23
**presented** [2] - 766:4, 802:6
**presumably** [1] - 754:10
**pretty** [1] - 793:7
**previously** [3] - 751:22, 756:13, 764:13
**probative** [2] - 766:10, 766:12
**problem** [1] - 808:6
**problems** [1] - 827:14
**proceedings** [1] - 752:4
**produce** [1] - 793:5
**produced** [1] - 826:24
**production** [1] - 826:19
**profit** [1] - 815:21
**profitability** [4] -

757:10, 757:24, 815:5, 815:11
**profits** [1] - 758:3
**progress** [1] - 787:7
**prohibiting** [1] - 754:14
**projects** [2] - 774:7, 819:12
**proof** [1] - 796:25
**proper** [1] - 798:20
**proposal** [1] - 786:4
**proposed** [1] - 787:13
**prosecutor** [3] - 794:2, 796:15, 800:23
**prosecutor's** [1] - 798:9
**prospective** [2] - 774:3, 827:15
**provide** [1] - 821:24
**provided** [3] - 755:19, 755:20, 788:5
**providing** [6] - 776:19, 777:6, 792:4, 809:11, 809:20, 810:13
**purchase** [2] - 771:25, 816:13
**purpose** [10] - 766:16, 766:17, 770:8, 770:13, 775:5, 777:10, 782:6, 798:5, 798:16, 817:12
**purposes** [5] - 773:23, 775:1, 775:17, 775:22, 783:15
**put** [2] - 766:22, 816:8
**putting** [1] - 775:14

**Q**

**QUESTION** [2] - 752:7, 752:12
**question's** [1] - 759:24
**questioning** [8] - 753:8, 753:9, 753:10, 797:18, 799:4, 799:5, 804:24, 806:24
**questions** [25] - 751:25, 752:5, 764:7, 764:8, 770:4, 778:20, 780:5, 780:8, 789:9, 794:8, 794:23, 794:25, 795:11, 795:24, 798:4, 798:9, 801:1, 812:20, 814:15,

819:14, 819:16, 820:22, 820:23, 823:3, 824:3
**quickly** [1] - 807:10
**quite** [3] - 759:24, 784:14, 820:11
**quote** [4] - 770:24, 778:21, 785:9, 795:4

**R**

**race** [2] - 800:25, 801:24
**racing** [2] - 802:3, 818:25
**rather** [2] - 776:17, 777:4
**reaction** [1] - 756:7
**read** [27] - 751:24, 755:4, 757:19, 761:20, 763:7, 767:7, 768:1, 773:16, 775:15, 776:14, 776:20, 776:22, 777:1, 777:9, 782:4, 782:14, 783:10, 785:11, 786:23, 789:23, 790:2, 790:19, 794:23, 795:8, 795:9
**reading** [4] - 752:6, 779:21, 782:18, 807:21
**ready** [4] - 751:5, 751:16, 814:4, 826:24
**real** [3] - 757:11, 757:23, 774:7
**really** [5] - 758:12, 759:24, 779:10, 781:2, 820:11
**reason** [1] - 762:12
**recalled** [1] - 751:13
**receive** [3] - 758:18, 752:23, 775:10
**received** [29] - 753:2, 753:6, 753:16, 762:4, 762:6, 762:13, 762:19, 772:9, 772:20, 773:7, 774:11, 776:1, 776:8, 776:15, 778:12, 779:23, 780:1, 780:3, 783:4, 784:4, 784:8, 784:18, 787:10, 787:12, 788:14, 789:13, 808:20, 808:25,

809:6
**receiving** [1] - 784:16
**Recess** [2] - 800:8, 800:17
**recess** [2] - 800:9, 826:4
**recessed** [1] - 827:21
**recognize** [6] - 756:16, 758:11, 761:23, 772:23, 804:10, 808:8
**recollection** [12] - 757:22, 758:1, 785:14, 789:3, 792:23, 793:12, 806:20, 807:4, 807:13, 808:12, 821:21, 822:17
**recommended** [1] - 820:6
**record** [15] - 750:13, 751:25, 752:3, 754:23, 755:13, 765:24, 766:3, 766:22, 766:23, 768:7, 786:23, 794:24, 802:20, 807:17, 827:10
**recorded** [8] - 753:19, 753:20, 755:2, 755:12, 760:20, 760:22, 760:24, 814:8
**recordings** [1] - 753:17
**recordkeeping** [1] - 779:24
**recover** [1] - 822:1
**recross** [1] - 800:16
**RECROSS** [4] - 819:18, 821:3, 828:10, 828:12
**RECROSS-EXAMINATION** [4] - 819:18, 821:3, 828:10, 828:12
**redact** [2] - 764:22, 765:9
**REDIRECT** [2] - 812:23, 828:8
**redirect** [3] - 800:14, 812:21, 822:25
**reduce** [1] - 777:17
**refer** [3] - 775:21, 794:23, 807:10
**reference** [14] - 752:1, 757:11, 757:23, 762:14, 771:22, 790:3, 790:23, 791:4, 805:4,

807:23, 808:21,
812:11, 819:20,
819:21
**referencing** [2] -
823:16, 823:17
**referred** [1] - 772:11
**referring** [10] - 760:23,
767:18, 776:23,
776:25, 777:2,
779:2, 783:9, 784:1,
785:22, 807:19
**reflect** [1] - 815:20
**reflected** [3] - 752:3,
754:23, 756:21
**reflecting** [1] - 815:1
**reflects** [1] - 767:24
**refresh** [8] - 757:22,
758:1, 785:14,
789:3, 807:13,
808:12, 821:21,
822:17
**regard** [2] - 798:15,
809:1
**regarding** [13] -
771:24, 781:3,
787:2, 789:6, 789:9,
789:10, 795:3,
802:3, 802:8,
808:23, 811:18,
811:19, 822:20
**regards** [6] - 771:19,
792:6, 800:23,
802:17, 809:19,
823:7
**relates** [2] - 759:4,
765:10
**relation** [1] - 806:18
**relevance** [2] - 764:17,
766:18
**relevant** [1] - 765:13
**relying** [1] - 766:13
**remain** [1] - 821:12
**remedy** [2] - 776:19,
777:7
**remember** [39] -
756:2, 756:5,
756:11, 757:13,
770:18, 770:20,
770:25, 771:5,
771:7, 771:10,
771:24, 772:2,
772:13, 781:12,
781:14, 785:13,
789:8, 793:1,
793:25, 794:19,
795:2, 795:13,
795:19, 795:24,
800:25, 803:20,
805:3, 805:4, 805:5,
805:20, 806:12,

806:18, 808:22,
810:17, 810:25,
811:5, 822:18,
822:24
**remembered** [1] -
821:5
**remind** [1] - 751:20
**rent** [2] - 800:25,
801:5
**repeat** [3] - 790:10,
822:3, 823:2
**rephrase** [2] - 810:3,
813:17
**replied** [1] - 776:2
**reply** [1] - 776:5
**report** [1] - 792:3
**reported** [1] - 753:14
**reporter** [1] - 786:23
**Reporter** [1] - 750:7
**reporting** [1] - 789:19
**represent** [2] - 767:13,
769:2
**representation** [1] -
820:17
**representations** [4] -
765:15, 766:2,
806:23
**representing** [2] -
780:16, 780:21
**request** [13] - 753:1,
753:4, 753:5,
773:11, 774:12,
780:4, 783:4,
784:13, 784:22,
792:7, 793:22,
813:7, 813:8
**requested** [2] -
792:12, 810:14
**requesting** [1] -
752:20
**required** [1] - 763:3
**respect** [4] - 752:17,
752:25, 757:8,
823:17
**respond** [2] - 784:22,
789:20
**responded** [2] -
778:10, 816:23
**responding** [2] -
795:2, 795:4
**response** [12] -
752:23, 756:4,
777:25, 778:5,
778:6, 778:7, 778:8,
781:9, 781:14,
783:6, 784:4
**responsibility** [1] -
810:13
**responsible** [3] -
809:11, 809:18,

809:20
**responsive** [4] -
754:4, 754:6,
754:18, 754:20
**restrict** [1] - 761:20
**result** [2] - 771:4,
815:12
**resulted** [1] - 753:20
**resume** [1] - 827:22
**retired** [2] - 800:6,
826:6
**return** [2] - 784:11,
819:21
**review** [3] - 773:14,
807:14, 808:2
**reviewed** [3] - 774:12,
783:14, 785:19
**reviewing** [1] - 758:10
**RICHARD** [1] - 749:23
**Richard** [1] - 751:1
**Richards** [5] - 780:12,
780:14, 792:13,
802:7, 805:16
**Richards'** [3] - 802:9,
804:21, 823:23
**right-hand** [1] - 802:7
**rise** [1] - 751:14
**risk** [1] - 758:2
**RMR** [1] - 750:7
**Road** [1] - 750:1
**ROBERT** [1] - 750:3
**Robert** [2] - 750:22,
769:2
**role** [1] - 817:5
**Ron** [4] - 792:13,
802:7, 802:9, 804:20
**Ronald** [1] - 780:12
**RONALD** [1] - 750:7
ronald_tolkin@nyed
.uscourts.gov [1] -
750:9
**room** [1] - 821:13
**Ross** [1] - 805:10
**rounding** [1] - 789:22
**RPR** [1] - 750:7
**ruling** [1] - 766:22
**Russo** [7] - 795:9,
798:18, 800:11,
800:20, 816:21,
819:15, 827:8
**RUSSO** [21] - 792:1,
795:1, 795:10,
797:19, 798:5,
798:15, 799:3,
799:7, 800:12,
800:21, 801:9,
807:18, 807:23,
808:4, 810:3,
812:19, 820:23,
821:4, 824:3,

827:10, 828:13

## S

**SARITHA** [1] - 749:18
**Saritha** [1] - 750:18
**satisfaction** [1] -
814:16
**saw** [8] - 766:5,
777:18, 777:20,
777:21, 813:6,
813:7, 813:8, 813:11
**schedule** [2] - 789:22,
790:16, 791:4
**scope** [1] - 766:8
**screen** [1] - 776:9
**seated** [3] - 800:10,
800:19, 826:8
**second** [4] - 794:15,
802:12, 804:4, 813:4
**Security** [1] - 805:6
**see** [26] - 755:15,
756:24, 757:15,
757:17, 758:13,
772:19, 772:22,
772:25, 773:2,
774:9, 777:17,
778:23, 781:17,
788:24, 789:7,
796:25, 802:13,
802:22, 803:8,
803:21, 804:6,
819:25, 824:7,
826:4, 827:20
**seeking** [3] - 773:22,
775:2, 778:18
**selling** [2] - 813:16,
813:20
**send** [3] - 752:13,
774:18, 793:8
**sending** [2] - 773:10,
793:12
**sense** [2] - 803:21,
817:25
**sent** [14] - 752:9,
765:4, 769:15,
769:24, 770:2,
776:6, 777:23,
778:1, 778:4, 778:6,
780:4, 781:8,
786:16, 813:6
**sentence** [2] - 757:17,
777:1
**Sergei** [1] - 802:25,
804:17
**series** [7] - 770:4,
787:5, 788:13,
794:7, 816:21,
816:22, 823:3
**served** [2] - 827:7

**service** [1] - 827:8
**set** [3] - 787:5, 806:3,
822:10
**settle** [1] - 771:4
**settled** [1] - 815:23
**settlement** [3] - 771:2,
774:4, 785:10
**Settlement** [24] -
768:16, 770:9,
771:9, 771:25,
773:8, 775:2,
775:23, 777:10,
779:12, 781:3,
782:7, 783:5,
783:15, 783:25,
787:2, 787:7,
787:12, 789:6,
792:7, 802:17,
803:24, 816:1,
816:4, 823:18
**settling** [1] - 771:20
**seven** [3] - 762:5,
762:19, 763:1
**several** [1] - 814:9
**shared** [3] - 774:21,
774:23, 818:3
**shares** [5] - 771:3,
782:19, 782:20,
783:19, 813:16
**short** [2] - 760:4,
790:15
**shorter** [1] - 785:12
**show** [11] - 761:2,
765:1, 776:8,
781:12, 781:17,
788:13, 789:12,
798:5, 798:16,
807:8, 815:19
**showed** [5] - 809:6,
814:25, 815:4,
815:19, 816:21
**showing** [2] - 764:2,
764:4
**shown** [1] - 772:14
**shows** [1] - 778:14
**side** [1] - 763:10
**Side** [1] - 764:1
**side-bar** [1] - 763:10
**Side-bar** [1] - 764:1
**sidebar** [4] - 797:19,
798:1, 824:8, 825:1
**sign** [2] - 763:3,
778:16
**signature** [3] - 758:14,
763:3, 808:11
**signed** [2] - 759:2,
759:9
**significant** [3] -
776:19, 777:6,
777:12

**silently** [1] - 763:7
**simple** [2] - 759:24, 820:11
**single** [1] - 763:2
**sitting** [1] - 798:11
**situation** [1] - 766:19
**six** [13] - 753:14, 753:18, 753:20, 753:23, 754:21, 755:12, 804:6, 815:14, 815:20, 815:23, 815:24, 819:24, 820:9
**soliciting** [1] - 770:9
**solution** [1] - 776:20
**someone** [1] - 826:18
**sometime** [4] - 769:5, 769:23, 772:5, 775:25
**somewhere** [2] - 770:17, 826:16
**son** [3] - 790:9, 790:11, 791:4
**Sonenglick** [1] - 821:20
**sorry** [10] - 777:14, 777:19, 781:6, 787:25, 789:14, 806:4, 806:20, 812:9, 812:16, 821:22
**sort** [1] - 756:7
**sound** [1] - 811:8
**sounds** [7] - 760:9, 760:10, 788:8, 806:2, 807:2, 807:7
**speaking** [4] - 754:2, 766:19, 821:15, 821:18
**specific** [7] - 752:20, 752:25, 753:1, 753:4, 772:1, 794:1, 820:8
**specifically** [1] - 765:4
**specifics** [1] - 757:13
**speculate** [1] - 819:6
**spoken** [2] - 812:14, 812:16
**Square** [1] - 749:21
**stand** [3] - 751:13, 752:8, 759:10
**start** [1] - 826:3
**state** [12] - 750:13, 754:17, 758:16, 759:2, 761:6, 765:1, 765:8, 765:12, 765:17, 766:7, 766:10, 766:17
**statement** [4] - 754:5, 764:19, 765:2,

775:16
**statements** [1] - 755:13
**STATES** [2] - 749:1, 749:3
**States** [5] - 749:12, 749:16, 750:11, 750:15, 750:19
**stating** [1] - 753:12
**status** [1] - 787:7
**stealing** [1] - 764:20
**step** [3] - 796:9, 820:22, 824:4
**stick** [1] - 826:15
**still** [3] - 751:20, 779:23, 780:1
**Stolper** [2] - 767:9, 767:13
**stop** [2] - 798:25, 825:6
**stopping** [1] - 825:6
**story** [2] - 756:6, 790:15
**Strangford** [1] - 750:4
**strategy** [2] - 776:18, 777:5
**strictly** [1] - 773:23
**stuff** [1] - 806:18
**subjects** [1] - 781:2
**subpoena** [1] - 827:13
**subpoenas** [1] - 827:17
**substance** [3] - 757:23, 774:25, 821:23
**substantially** [1] - 766:12
**sudden** [1] - 817:4
**sued** [2] - 810:19, 810:24
**Suffolk** [1] - 749:21
**suit** [4] - 771:1, 773:23, 775:12, 783:16
**Suite** [2] - 749:22, 750:2
**sum** [2] - 774:25, 821:23
**summer** [4] - 758:21, 758:23, 758:25
**supposed** [4] - 808:23, 815:14, 816:12, 820:9
**surprise** [1] - 797:5
**sustained** [16] - 760:19, 762:17, 786:7, 792:25, 793:4, 793:15, 793:19, 796:19, 797:4, 804:2,

804:23, 809:16, 810:16, 819:10, 824:1
**Sustained** [3] - 797:8, 797:12, 810:2
**switching** [1] - 804:19
**sworn** [1] - 751:23
**Sydor** [1] - 803:8

# T

**talks** [6] - 774:1, 774:3, 782:18, 782:23, 782:25, 783:2
**tape** [1] - 753:17
**tapes** [1] - 755:15
**team** [2] - 802:3, 818:25
**teams** [1] - 760:16
**telephone** [3] - 787:1, 821:7, 821:10
**telephonically** [1] - 752:20
**ten** [4] - 770:17, 773:7, 784:8, 800:4
**ten-minute** [1] - 800:4
**terms** [6] - 754:11, 766:13, 783:25, 785:10, 822:13, 822:20
**testified** [17] - 751:23, 759:10, 762:3, 765:19, 769:14, 770:7, 781:2, 792:6, 798:2, 802:8, 802:16, 808:20, 811:17, 820:24, 821:5, 822:25, 824:1
**testifying** [2] - 795:13, 797:13
**testimony** [11] - 752:7, 755:7, 755:9, 756:18, 768:18, 769:4, 770:12, 792:9, 794:8, 796:11, 808:22
**text** [1] - 752:20
**THE** [86] - 750:11, 750:17, 750:21, 750:24, 751:4, 751:10, 751:15, 752:2, 756:1, 756:3, 757:7, 760:2, 760:19, 762:9, 762:11, 762:17, 762:23, 763:9, 764:5, 764:9, 764:16, 765:25, 766:9, 767:16,

768:1, 768:13, 768:19, 772:18, 775:20, 776:12, 782:11, 785:22, 785:25, 786:2, 786:7, 786:19, 788:15, 792:25, 793:4, 793:15, 793:19, 793:24, 794:22, 795:8, 796:19, 797:4, 797:8, 797:12, 797:21, 798:2, 798:7, 798:18, 799:6, 800:3, 800:10, 800:19, 801:11, 804:2, 804:23, 806:16, 807:25, 809:16, 810:2, 810:16, 810:22, 812:1, 812:21, 813:23, 819:10, 819:15, 820:25, 822:9, 822:23, 824:1, 824:4, 824:6, 824:7, 825:2, 825:5, 826:2, 826:8, 826:17, 826:23, 827:1, 827:19, 827:20
**theme** [1] - 826:9
**theory** [1] - 814:22
**therein** [1] - 764:25
**thoroughly** [1] - 782:4
**thousand** [1] - 813:7
**three** [6] - 753:22, 753:23, 756:8, 762:6, 803:7
**throwing** [2] - 776:17, 777:4
**thrown** [1] - 779:8
**Thursday** [4] - 751:19, 752:4, 813:11, 826:10
**Tim** [2] - 806:13, 806:17
**timeframe** [2] - 806:23, 810:24
**timing** [2] - 766:9, 806:23
**title** [1] - 761:15
**Title** [1] - 805:7
**title's** [1] - 761:11
**today** [4] - 755:7, 755:9, 755:21, 797:14
**together** [2] - 791:5, 816:9
**TOLKIN** [1] - 750:7
**TOMMY** [1] - 749:7

**Tommy** [13] - 749:8, 750:1, 750:12, 765:3, 766:5, 767:14, 767:21, 769:10, 809:5, 816:7, 816:12, 818:24, 819:6
**tomorrow** [3] - 799:2, 826:5, 827:20
**took** [3] - 766:21, 770:5, 814:25
**top** [1] - 789:13
**topic** [2] - 811:7, 814:20
**topics** [1] - 781:2
**Toronto** [1] - 760:14
**total** [2] - 753:23, 760:8, 815:12
**totals** [1] - 759:22
**touch** [1] - 827:11
**towards** [3] - 801:14, 801:17, 801:21
**transcriptions** [1] - 755:3
**transcripts** [1] - 760:25
**transfer** [10] - 769:15, 770:2, 772:6, 802:13, 802:21, 804:9, 805:6, 813:7, 813:8, 813:12
**transferred** [1] - 771:3
**transferring** [2] - 772:2, 774:6
**TREV** [1] - 790:6
**Trev** [2] - 790:6, 790:8
**trial** [3] - 751:17, 826:15, 827:1
**true** [7] - 754:15, 754:19, 754:24, 757:9, 759:11, 760:17, 820:13
**truly** [1] - 779:10
**Trust** [14] - 752:9, 752:13, 752:17, 752:21, 753:1, 753:5, 753:7, 759:3, 759:9, 811:16, 811:18, 811:19, 811:23, 826:18
**truth** [2] - 764:25, 766:13
**try** [2] - 777:17, 822:1
**trying** [9] - 790:25, 791:4, 798:11, 798:22, 807:9, 811:17, 818:1, 822:14
**Tuesday** [1] - 827:22
**turn** [3] - 776:12,

777:15, 789:14
**turned** [1] - 793:16
**TV** [1] - 772:18
**two** [15] - 751:25,
752:4, 753:24,
754:3, 754:9,
754:13, 758:9,
760:14, 761:2,
774:8, 781:21,
794:9, 814:12,
815:24, 819:16
**two-hour** [1] - 754:13
**two-page** [1] - 758:9

## U

**U.S** [2] - 749:4, 749:18
**Um-hmm** [3] - 815:7,
816:25, 817:11
**unable** [1] - 823:5
**under** [3] - 751:20,
752:8, 802:12
**understood** [8] -
773:18, 774:13,
775:15, 777:1,
779:16, 785:9,
791:1, 822:5
**undressed** [1] -
790:14
**unfair** [1] - 766:12
**unit** [2] - 801:14,
801:15
**UNITED** [2] - 749:1,
749:3
**united** [1] - 749:12
**United** [4] - 749:16,
750:11, 750:14,
750:18
**units** [1] - 774:8
**up** [17] - 752:19,
759:10, 760:6,
765:22, 766:11,
770:22, 771:18,
771:20, 772:17,
775:14, 787:5,
789:22, 790:11,
802:7, 806:4,
807:25, 812:14
**updates** [1] - 789:7

## V

**valuable** [1] - 796:4
**value** [1] - 766:10
**various** [1] - 766:2
**Veterans** [1] - 749:22
**victim** [1] - 803:24
**victims** [2] - 765:15,
765:16

## W

**wait** [1] - 798:20
**waiting** [1] - 789:20
**walk** [1] - 821:12
**warm** [1] - 772:17
**waste** [1] - 798:21
**water** [1] - 757:4
**Wednesday** [2] -
779:22, 826:16
**week** [2] - 757:7,
826:15
**weekend** [1] - 751:16
**WEINBLATT** [1] -
749:21
**wherein** [2] - 771:3,
811:3
**whole** [8] - 780:7,
797:17, 804:23,
816:13, 817:24,
818:1, 822:12,
822:14
**wire** [12] - 769:15,
769:24, 770:2,
772:6, 802:13,
802:21, 804:9,
805:6, 813:6, 813:7,
813:8, 813:11
**wired** [1] - 773:8
**wished** [1] - 754:22
**withdraw** [8] - 778:5,
793:11, 803:22,
805:15, 809:18,
810:17, 821:16
**withdrawal** [2] -
804:16, 804:25
**withdrawals** [2] -
804:5
**withdrawn** [1] -
819:22
**WITNESS** [4] - 756:3,
762:11, 786:2, 824:6
**witness** [12] - 751:10,
751:22, 752:5,
752:7, 759:10,
760:1, 798:8,
798:20, 825:2,
826:3, 826:14
**Witness** [2] - 751:13,
758:10
**witnesses** [1] - 827:16
**word** [3] - 757:15,
775:7
**wording** [1] - 770:23
**words** [2] - 776:22,
819:24
**wrap** [1] - 818:2
**writes** [1] - 785:9
**writing** [1] - 761:7
**writings** [1] - 756:13

**written** [4] - 769:24,
778:21, 783:22,
815:22

## Y

**year** [5] - 760:4, 760:6,
760:14, 760:22,
760:25
**years** [7] - 757:12,
757:24, 760:14,
760:16, 765:21,
813:9, 815:6
**YORK** [1] - 749:1
**York** [7] - 749:5,
749:17, 749:23,
750:2, 750:5, 750:8,
767:12
**yourself** [10] - 753:15,
754:10, 757:19,
761:21, 763:7,
769:15, 772:3,
788:18, 795:18

## Z

**zones** [1] - 789:23