**HALEY WEINBLATT & CALCAGNI, LLP.**
1601 Veterans Memorial Highway, Suite 425
Islandia, New York 11749
631-582-5151

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JAN 08 2016   ★

LONG ISLAND OFFICE

January 6, 2016

Hon. Joseph F. Bianco
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      RE: <u>United States v. Phillip A Kenner and Tommy C. Constantine</u>
          Docket Number: 13-607 (JFB)

Dear Judge Bianco:

    With the consent of the government, the defendants Philip A. Kenner and Tommy C. Constantine, request that the forfeiture hearing presently scheduled to commence on January 8, 2016 be adjourned to February 12, 2016. The aforementioned date has been discussed with your courtroom clerk.

    Presently, we are awaiting the pre-sentence report and it is anticipated that the report will be submitted in advance of the February 12th hearing. Inasmuch as overlapping issues may exist with respect to the evidence adduced at the forfeiture hearing and the restitution calculation and/or Guideline calculation to be determined at time of sentence, the requested adjournment will permit the defendants' to have a complete body of knowledge regarding such matters before any evidentiary hearing is commenced. Additionally, the defendant Kenner recently received additional Rule 16 disclosure, dated December 21, 2015, on three CD discs which must be reviewed and analyzed in advance of the forfeiture hearing.

    Thank you for Your Honor's consideration of this request.

                Very truly yours,

                *Richard D. Haley*

                RICHARD D. HALEY

cc: AUSA Diane C. Leonardo via ECF
    Robert P. LaRusso, Esq. via ECF

*Request granted. The forfeiture hearing is adjourned to February 12, 2016, at 1:30 p.m.*

SO ORDERED

Joseph F. Bianco
USDJ

Dated: Jan. 8 20 16
Central Islip, N.Y



ATTORNEYS AT LAW

**Michael Morrissey**
P 602 358 0298 | M 602 828 0114
michael@mitchellsteincarey.com

One Renaissance Square, 2 North Central Ave.
Suite 1900, Phoenix, AZ 85004
P 602 358 0290 | F 602 358 0291
MitchellSteinCarey.com

November 23, 2015

<u>By ECF</u>

Honorable Joseph F. Bianco
United States District Court Judge
Eastern District of New York
100 Federal Plaza
New York, NY  11722

        Re:    United States v. Tommy Constantine
                 Criminal Docket No. 13-607 (S-I) (JFB)
                 <u>Motion for New Trial and Motion for Judgment of Acquittal</u>

Dear Judge Bianco:

        Pursuant to this Court's Order [Dkt. 343] Tommy Constantine files post trial

motions and requests oral argument.  Pursuant to Fed. R. Crim. P. 29, Constantine

respectfully moves this Court for a judgment of acquittal on all counts of conviction

based on the insufficiency of the evidence presented at trial.  Constantine also moves,

pursuant to Fed. R. Crim. P. 33, for a new trial on all counts.  This Court should enter an

acquittal on all counts because the Government did not establish that Constantine was a

member of either of the charged conspiracies (Counts 1 and 9) and insufficient evidence

supported the jury's verdict on Counts 2-6, the substantive counts of wire fraud relating

to Eufora.  In the event the Court declines to enter a judgment of acquittal, the Court

Page 1

should order a new trial because the record reflects a genuine possibility that different jurors voted to convict on the basis of different objects of the wire fraud conspiracy pled in Count 1, in addition to a genuine possibility that different jurors voted to convict on the basis of the different conspiracies pled in Count 1 and Count 9. This Court should order a new trial for Counts 2-6, charging substantive acts of wire fraud, as the prejudice resulting from jury confusion relating to Counts 1 and 9 could not be contained to those counts alone.

The jury's verdict was as follows:

Count 1 Conspiracy, Wire Fraud:  guilty as to Constantine and co-defendant Kenner ("Kenner")
Count 2 Wire Fraud: Count: guilty as to Constantine and Kenner
Count 3 Wire Fraud: guilty as to Constantine and Kenner
Count 4 Wire Fraud: guilty as to Constantine and Kenner
Count 5 Wire Fraud: guilty as to Constantine, Kenner acquitted
Count 6 Wire Fraud: guilty as to Constantine, Kenner acquitted
Count 7 Wire Fraud, Sag Harbor:  guilty as to Kenner; Constantine not named
Count 8 Wire Fraud, Sag Harbor:  guilty as to Kenner; Constantine not named
Count 9 Conspiracy, Money Laundering:  guilty as to Constantine and Kenner

## I.  **This Court Should Enter a Judgment of Acquittal Based on Insufficiency of Evidence.**

### A.  **The Conspiracies – Wire Fraud in Count 1 and Money Laundering in Count 9.**

The primary allegations against Constantine were contained in Count 1, which alleged that over an eleven-year period, from 2002 through 2013, Constantine and Kenner conspired to commit wire fraud with three objects – 1) to defraud investors with respect to Hawaii Land Developments, 2) to defraud investors in Eufora, and 3) to

Page 2

defraud investors who contributed to the Global Settlement Fund. [Dkt 1] Because as to Constantine there was insufficient evidence to sustain the jury's verdict as to any object of the conspiracy, this Court should enter an order of acquittal on Count 1. Further, because Count 9 merely re-alleged allegations from the wire fraud conspiracy, and failed to specify a single substantive crime or provide any independent evidence of a money laundering conspiracy that stood separately from the wire fraud conspiracy, the failure of the proof common to both conspiracies establishes that this Court should enter an order of acquittal on Count 9 as well.

      1.    The Hawaii Land Developments.

The Government's proof at trial was that Kenner induced investors to "wire large amounts of money… to accounts controlled by Kenner" upon a representation that investors would receive an ownership interest in Little Isle IV. [Dkt. 1 at 3] Further, the Government alleged that Kenner induced investors to establish lines of credit through misrepresentations. [Id. at 3-4]

As to the Hawaii investments, there was no evidence offered at the trial showing that Constantine had a role in causing investors to invest in the project, or in establishing the lines of credit, and indeed it was confirmed that Constantine did not meet the investors until years after the investment. [See, e.g., K. Peca, Tr. at 811; M. Peca, Tr. at 443 (met defendant twice in 2009); Mascarella, Tr. at 844, 856 (Kenner had sole control of Little Isle IV and set up lines of credit with Northern Trust); Sydor, Tr. at 2164-5 (did not know Constantine at time Kenner pitched Hawaii investment); Murray, Tr. at 3611

(Constantine had no role with line of credit); Kenner, Tr. at 4693 (Constantine had no

role with lines of credit)]  In Closing Argument, the Government noted:

> [a]nd player after player after player told you what the deal
> was as represented to them by Mr. Kenner with respect to
> investing in Hawaii.
>
> ***
>
> And let's not forget what Little Isle IV is.  Little Isle IV was
> essentially the parent of all the Hawaii LLCs, controlled by
> none other than Phillip Kenner.  The operating agreements.
> The bank accounts.  Everything.

Tr. at 5696-7.

In alleging fraud, the Government's proof was that *Kenner*, not Constantine,

diverted investor money from its purpose in Hawaii:

> No, I submit to you there is no reasonable doubt that they
> were told their money was going to Hawaii … the totality of
> the circumstances, proves there is no question these men were
> lied to *by Mr. Kenner* about what the money was for and
> where it was going.

[Tr. at 5706 (emphasis added)]  The Government argued that "there was no Ken Jowdy

loan" [Tr. at 5711] and Kenner had hidden from investors that $5 million of their money

was used to buy Kenner a 39% interest in Jowdy's Cabo San Lucas property.  [Tr. at

5711]

The Government itself recognized the lack of any evidence connecting

Constantine to Kenner's dealings with investors for the Hawaii land developments.  But

rather than acknowledge the import of its own evidence, the Government repeatedly

resorted to an argument equating mere association, or "intertwining" with guilt:

Page 4

> Now, so far I haven't said much about Mr. Constantine. But
> … I'm going to submit to you that even at this juncture, even
> in the early days of the Hawaii objective of the conspiracy,
> there is evidence that both Mr. Constantine and Mr. Kenner
> are deeply, deeply intertwined financially, and … as criminal
> partners, not just business partners.
>
> \*\*\*
>
> It shows that between December of '04, right around the time
> the Hawaii venture is getting off the ground, to March of '06,
> just the before the Lehman loan comes through, there is
> already plenty of financial evidence that Kenner and
> Constantine are financially intertwined.

[Tr. at 5711-12; *see also*, Tr. at 5714 ("So it's there. They're intertwined.")] This

argument – that "intertwining" equals guilt – is expressly contrary to the legal standard

for establishing participation in a conspiracy. *See, e.g.*, *United States v. Lorenzo*, 534

F.3d 153, 159-60 (2nd Cir. 2008) (internal citations omitted), where the Court noted that:

> 'mere association with those implicated in an unlawful
> undertaking is not enough to prove knowing involvement [in
> a conspiracy] …likewise, a 'defendant's mere presence …or
> association with conspirators does not constitute intentional
> participation in the conspiracy…'

As the Court instructed the jury, "[m]ere innocent association, as for social and business

purposes…does not make a person a co-conspirator." [Dkt 289 at 62] Because the

Government's proof linking Constantine to the Hawaii object of the conspiracy was

based on exactly that premise of association, without more, it was insufficient both as a

matter of fact and a matter of law.

The Government's assertion that Constantine's association with the "Urban

Expansion Loan" was proof of fraud with respect to the Hawaii land developments [Tr. at

Page 5

5715], also failed to show any connection between Constantine and fraudulent conduct. It is undisputed that Constantine and Grdina, through Urban Expansion, invested $5 million in October 2005, in Kau Holding Company, one of the companies listed in the indictment as a Kenner entity for purchasing property in Hawaii. [Tr. at 1208 (Kaiser acknowledges funding from Constantine and Grdina); Tr. at 2368 (Grdina testimony); Dkt. 1 at p. 2] The loan had a prepayment penalty, which was paid off when the loan was repaid approximately ten months later. [Tr. at 2378-9] As part of the prepayment, which occurred when Lehman Brothers funded the project and took over the loan, Constantine received approximately $2 million, after Constantine and Grdina, through Urban Expansion, waived their rights to be part of the management of the property, including control over development. [Tr. at 2443-2445.]

In Closing Argument, the Government's painting of Constantine's conduct with Urban Expansion as part of a fraud towards the investors, was unsupported by any evidence. Given that the prepayment penalty was paid not by the investors but by Lehman Brothers, the Government argued that money came from "Lehman Brothers or whatever it was that they were looking at at the moment to develop Hawaii." [Tr at 5617-8] However, the Government also argued that somehow the prepayment penalty "diluted" the investors' interests. [Id. at 5718] But because Constantine had nothing to do with inducing the investors to invest in Hawaii developments, and merely provided financing in this instance to one of those developments, this evidence does not support any connection between Constantine and a fraud on the investors. If Kenner or Lehman Brothers had found the terms of the loan from Urban Expansion to be unacceptable, they

Page 6

would have rejected it as a funding source. That a sophisticated market participant such

as Lehman Brothers chose to go forward, and develop a Hawaii property in which

Constantine had no stake, is not evidence of his connection to a fraud.

2.    Eufora – second object of the conspiracy and Counts 2-6.

The second object alleged in the wire fraud conspiracy was that Constantine and

Kenner conspired to defraud investors in Eufora. The conspiracy section of the

indictment made specific allegations regarding conduct towards the investors, and the

indictment also pled 4 substantive counts alleging fraud towards Eufora investors.

However, because the Government's proof in the conspiracy count and in substantive

Counts 2-4 demonstrated conclusively that Kenner acted alone in dealing with the Eufora

investors, there was insufficient evidence for the jury to have found that Constantine was

a conspirator for that object of the conspiracy, and insufficient evidence to sustain the

verdict on Counts 2-4.

With the exception of Counts 5 and 6 discussed below, all of the other Eufora

allegations relating to the Eufora object in the conspiracy as described in ¶ 12-13 of the

indictment, [Dkt 1] describe actions solely by Kenner with the investors. It was Kenner,

not Constantine, who pitched to Kenner's clients the idea of investing in Eufora and

induced the investments by the investors listed in the conspiracy count. Those investors

were Mr. Peca, Mr. Sydor, Mr. Rucchin, Mr. Ranford, and Mr. Nash. [Dkt. 1 at p. 5].

Kenner, not Constantine, pitched the Eufora investment to them. [*See, e.g.,* Tr. at 441

(Peca); Tr. at 2169 (Sydor); Tr. at 2730-1 (Rucchin); Tr. at 2819-20 (Ranford); Tr. at

1912-3 (Nash)] No witness at trial ever described Constantine as acting as their financial

Page 7

advisor, or described conduct that could be characterized as aiding and abetting[1] Kenner in inducing the investments. Accordingly, there was insufficient evidence to sustain the jury's verdict in Count 1 as having been predicated on conspiratorial action by Constantine with respect to the Eufora object of the conspiracy.

The substantive Eufora counts, Counts 2-6, also do not support that the jury could have relied on those actions in finding a conspiracy with respect to Eufora, and do not stand on their own as supported by sufficient evidence.

### B.    Counts 2-4.

It is beyond dispute that none of the transactions in counts 2-4 involved Constantine in any way. Those transactions were a wire from Gaarn's Wachovia account to Kaiser's account (Count 2); a wire from Kaiser's account to Kenner's account (Count 3); and a wire from Kenner's account to Kaiser's account (Count 4).

Count 2 charged a $30,000 wire transfer from the Wachovia account. As Gaarn testified:

> Q.    All of the monies that went out of the [Wachovia] account were done at the direction of Mr. Kenner; is that correct?
>
> A.    Yes.
>
> Q.    Mr. Constantine had no participation, was never told about these transfers of money that were going on, is that correct, Mr. Gaarn?
>
> [Objection sustained as to form]

---

[1] The Court hypothesized that Constantine might have liability on an aiding and abetting theory, Tr. at 6012, based on a "material omission of certain details with respect to Eufora," and instructed the jury on an aiding and abetting theory for Counts 2-8. [Dkt. 289 at 63-5] However, an aiding and abetting theory could not have supported the jury's verdict for Counts 2-4 as there was no evidence that Constantine participated in the pitches made by Kenner or even knew about them. Constantine could not have "participated" or "associate[d] himself" with Counts 2-4 without knowing at least something of the acts charged in Counts 2-4, which he did not.

Page 8

Q.   As you know?

A.   As I know, yes.

[Tr. at 2632-3] Gaarn testified that he got involved with Eufora as a favor to Kenner, who had lent him money, and Gaarn felt he "owed" Kenner, so his actions were a "favor" back to Kenner. Gaarn testified that Constantine had "[n]othing to do with the favor" Gaarn was doing for Kenner. [Tr. at 2493-4, 2629] Gaarn explicitly acknowledged that the approximately $700,000 from the Wachovia account was disbursed at Kenner's direction. [Tr. at 2627]

Kaiser testified similarly to Gaarn and confirmed that Constantine had no involvement with the transactions charged as Eufora substantive counts. Kaiser testified that the wire transfer charged in Count 2 was done at Kenner's instruction. Further, Kaiser testified that Kenner told Kaiser that the Count 2 transfer related to money that Gaarn owed Kenner (corroborating Gaarn's testimony of owing money to Kenner). Kaiser testified that as a result of Kenner telling him that the wire from Gaarn was meant for him, not Kaiser, Kaiser immediately wired the $30,000 back to Kenner. [Tr. at 1046-48]

Count 3 also involved Gaarn, Kenner, and Kaiser, but not Constantine. Count 3 charged a $25,000 wire from Kaiser's account to Kenner. Kaiser testified that he wired that money to Kenner:

> [b]ecause I was directed from Phil Kenner that was – those funds weren't supposed to be used for the PV house. It was an incorrect wire from Timothy Gaarn.

Page 9

[Tr. at 1049]  The "PV house" dealt with a construction property in Paradise Valley,

Arizona, which Constantine had nothing to do with, and as to which the Court had

specifically instructed the jury there was no fraud:

> ....you may also hear some testimony regarding another piece
> of property called the Paradise Valley property.
>
> I want to emphasize there are no allegations of fraud by the
> Government with respect to either of the properties, the
> Hermosa Beach property or  the Paradise Valley property.
> They are simply offered by the Government as background to
> the crimes charged in the indictment.

[Tr. at 1040]

Count 4 charged a $25,000 wire from Kenner to Kaiser.  Kaiser testified that he

received that money from Kenner. [Tr. at 1051]  As with Count 3, this wire related to the

Paradise Valley and Hermosa Beach properties [Tr. at 1050] that Constantine had no role

in, and for which the Court had instructed the jury there was no fraud.

Despite charging in Counts 2-4 three substantive counts dealing with wire

transfers to and from Kaiser, the Government ultimately admitted at trial that "with

respect to the Eufora frauds Kaiser is not an alleged victim of the Eufora fraud." [Tr. at

1269]  Further, despite Constantine being charged in Counts 2-4, the Court noted "there

is no allegation that Mr. Constantine was involved with respect to the situation with Mr.

Gaarn, right?" [Tr. at 5211]   Yet when questioned directly by the Court about the lack of

evidence on that point, the Government retreated to its mere association theory:

> THE COURT:  In terms of Gaarn.  Is the Government going
> to argue to the jury that Mr. Constantine was involved in
> Gaarn's transactions?

Page 10

Mr. MISKIEWICZ: I think it's pled in the indictment as to both of them were participating in those diversions.

*\*\**

We intend to argue that this is part and parcel of the conspiracy and given the way money flows back and forth this was essentially Mr. Constantine allowing Mr. Kenner to cash out of Eufora and make some of the money back that he shovels in the direction of Mr. Constantine.

So that's our theory. That's how it's pled in the indictment.

[Tr. at 5212]

While the Government was correct it had "pled in the indictment" that both Kenner and Constantine participated in the diversions – it still was not true, and no witness said it was. Further, the Government's fallback theory of Constantine "allowing" a benefit to Kenner – presupposes that Constantine was aware of the transactions and consciously "allowed" something to happen. But because every witness – Gaarn, Kaiser, and Kenner – acknowledged that Constantine did not know of, approve or associate himself with the transactions in Counts 2-4, the Government's repetition of the mere association theme does not support the verdicts in Count 2-4.

### C.    Counts 5-6.

In further support of the second object of the conspiracy – that Kenner and Constantine defrauded investors in Eufora – the Government charged conduct relating to Privitello both in the conspiracy section of the indictment [Dkt. 1 at 5, ¶ 14] and as substantive crimes in Counts 5-6. Those counts charged both Kenner and Constantine

Page 11

with wire fraud in connection with Privitello's two wire transfers on the same day, totaling $200,000, to an account specified by Mr. Constantine, for 1.5% of Eufora.

Significantly, the jury acquitted Kenner on Counts 5 and 6. In doing so the jury effectively rejected the theory that sufficient evidence existed as proof that Kenner and Constantine were in a conspiracy involving a criminal object relating to Privitello. Because Privitello was one of the Eufora investors whom the Government asserted that Kenner and Constantine conspired to defraud, the acquittal on those counts confirms the insufficiency of the evidence supporting any finding by the jury with respect to the second object of the conspiracy.

Indeed, the jury's rejection of the claim that Constantine and Kenner acted in concert with respect to Privitello's investment in Eufora was consistent with the proof at trial that, far from being in a conspiracy with respect to Eufora, Kenner made allegations of criminal behavior by Constantine relating to Eufora and sought to oust Constantine from any role in Eufora. [*See, e.g.* Tr. at 4368 (Kenner testimony regarding attempted "hostile takeover" of Eufora)]

### D.  Sufficiency of the evidence as to Constantine for Counts 5-6.

While the jury found insufficient evidence to convict Kenner on Counts 5-6, that same insufficiency of evidence should have resulted in an acquittal of Constantine as well. Rather than establishing fraud, the Government's proof showed a business deal gone bad, with a subsequent attempt by Constantine to unwind that deal and return an investment by a hostile investor bent on ousting Constantine from the company he founded.

Page 12

The Government presented evidence that Privitello received email confirmation from Constantine that upon receipt of $200,000, Eufora's operating agreement would be amended to reflect Privitello's 1.5 % interest in Eufora, and that Privitello in fact made the wire transfers to Richards, as directed by Constantine. [Tr. at 1440-41, 1455] Privitello testified that he did not receive the promised 1.5% interest in Eufora. [Tr. at 1480] Accordingly, in contrast to substantive Counts 2-4, there was evidence in the record linking Constantine to the acts pled in Counts 5-6. Nevertheless, the attempt by Kenner, Privitello and others to take over Eufora and oust Constantine provides context for the failure of the Privitello investment to result in a transfer of an interest in Eufora, and establishes that no evidence supported a finding that Constantine acted knowingly, willfully, and with specific intent to defraud Privitello, as required by the second element of the wire fraud instruction. [Dkt. 289 at 47]

Kenner testified that Privitello was instructed by the group seeking to oust Constantine from Eufora that he should not accept his money back from Constantine, because the Privitello investment provided leverage against Constantine. [Tr. at 4953-4] As testified to by Mr. D'Ambrosio, who worked directly with Constantine and who was a founding member of Eufora, [Tr. at 5164-5] Constantine and Eufora did in fact offer to return Privitello's investment, and Constantine made personal efforts through telephone calls and email to accomplish that purpose. [Tr. at 5257-58] Moreover, rather than profit from an investment by Privitello, Eufora listed that investment as short term debt and an obligation that needed to be returned to Privitello. [Tr. at 5357  D'Ambrosio)] Accordingly, in addition to a failure of proof as to Constantine's specific intent to defraud

Page 13

Privitello, the jury had insufficient evidence to determine, as specified in the first element of the wire fraud instruction, that Constantine's actions were part of a scheme that "contemplated depriving another of money or other property." [Dkt. 289 at 45].

### E.  Global Settlement Fund.

The third object of the conspiracy alleged in Count 1 asserted that for a 10-month period, between May 2009 and February 2010, Constantine and Kenner defrauded investors in the Global Settlement Fund ("GSF"). [Dkt. 1 at 6] In contrast to the other alleged objects of the conspiracy, which generally related to Kenner's conduct, for the GSF Constantine did play a significant role. However, because the proof at trial was insufficient to demonstrate that Constantine's role in the GSF was fraudulent or part of a conspiracy with Kenner, the evidence was insufficient for the jury to have found that Constantine conspired with Kenner with respect to that object of the conspiracy.

Constantine did meet with some of the investors and explain the purpose of the GSF, which was to litigate claims against Jowdy, and broadly to resolve outstanding issues that included buying out unsatisfied investors and resolving lawsuits. [*See e.g.* M. Peca, Tr. at 452; Nash, Tr. at 1919-1921] While some of their discussions regarding the GSF were conducted in person, follow up email communications confirmed the authorized uses of the money put into the GSF. None of the investors, including Pecas, Nash, Sydor, Rucchin, and Murray, disputed approving the broad purposes of the GSF. As Kristen Peca testified:

> Q:  would you agree with me that the e-mail is seeking authorization for a number of other purposes than strictly for legal fees or a suit against Mr. Jowdy?

Page 14

A:   Yes

Q:   It talks about other prospective advances and the settlement costs.

A:   Yes

Q:   It then goes on to talk about transferring interest to you in Avalon Air Park real estate projects, a Falcon 10 aircraft, and the two Palms Place condominium units. Do you see that?

A:   Yes, I do.  I do not recall him mentioning this, but yes.

Q:   At the time that you received this, and after you reviewed it, this particular request for authorization is going beyond what you had originally understood your contribution to be, is that correct?

A:   Yes.

***

Q:   Did you understand this e-mail to refer to the multiple purposes for the money you were contributing to the Global Settlement Fund?

A:   It definitely said that, yes.

***

Q:   So when you read this e-mail, you know[sic]  knew that the Global Settlement Fund had more than one purpose, legal, which you talked about, it also had another one.  And that is acquiring significant assets, is that correct?

A:   Correct

[Tr. at 773-77] Nash testified regarding his satisfaction with the open communication regarding the GSF, and the purposes to which the money was put:

A:   I had went in there to Tommy's office.  I don't recall the date.  Again, if I had an issue with anything, both him and Phil were open to sitting down and discussing any issue I had.

I remember going over to Tommy's office and going over the whiteboard where he had everything marked

Page 15

> out as to where the money went. And I think I had a
> conversation as well with his accountant.
>
> Q:    And after those conversations, you were satisfied that
>       your answers were properly responded to?
>
> A:    Yes. I didn't do much talking. I just listened. And yes,
>       I was satisfied.

[Tr. at 1995-96] Consistent with his trial testimony, Nash, in a deposition in civil

litigation, had previously described the purposes of the GSF as "very broad." [Tr. at

2003-4]

Similarly, Sydor affirmed authorizing the broad use of GSF fund money, and

meeting with Constantine after providing authorization for the purposes specified for the

GSF. Sydor did not recall the specifics of many emails and conversations, but did not

dispute his knowledge of the purposes to which GSF money was put. [Tr. at 2252-81]

Rucchin and Murray, other investors in the GSF, similarly affirmed their open

communication with Constantine about the purposes of the GSF. [Rucchin, Tr. at 2792-

3; Murray, Tr. at 3544-46 (acknowledging the confirming email related to multiple

purposes of GSF "other than taking legal action against Mr. Jowdy.")]

Defense witnesses also corroborated the appropriate use of GSF money by

Constantine. Gonchar, who contributed $250,000 to the GSF, testified, as had the other

investors, that he "acknowledged and approved" the broad purposes of the GSF,

including financing lawsuits other than the Jowdy lawsuit, and spending resources on the

Avalon Air Park real estate project, the aircraft and the Palm Place condominiums. Tr. at

4806-14. Further, Gonchar specifically approved Constantine's use of Gonchar's

deposits into Richards' account, including his $250,000 contribution to the GSF, for

Page 16

personal use, so long as he was repaid.[2] Tr. at 4817-20, 4826.      Semple, a certified public accountant hired by Gonchar to verify that the GSF money was used for its intended use, Tr. at 5427, 5433, concluded that the funds had been used for the intended purpose, though there were certain expenses for which he could not render a conclusion due to an absence of records. Tr. at 5529.

The indictment devotes just two sentences to the GSF, and did not charge any substantive counts that might have supported the jury's verdict on the GSF object of the conspiracy. [Dkt. 1 at 6] Because the trial testimony provided insufficient evidence that Constantine conspired with Kenner with respect to the GSF, and indeed established that the investors authorized the broad purposes of the GSF, there was insufficient evidence for the jury to have found that Constantine was a conspirator for the third object of the conspiracy.

Constantine was convicted of two conspiracies in Counts 1 and 9, and of the substantive counts of wire fraud charged in Counts 2-6. Even giving permissible inferences to the Government for purposes of a Rule 29 motion, no rational jury could have found sufficient evidence that Constantine was a member of either conspiracy, or that he committed the acts charged in Counts 2-6 with the requisite criminal intent. Because of that failure of proof, this Court should enter an order of acquittal on all counts for Constantine. *See, e.g., United States v. Martinez*, 978 F. Supp.2d 177, 186 (E.D.N.Y. 2013)('court may enter a judgment of acquittal only if evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could

---

[2] Semple testified to Constantine having put $124,982 of his own money into the GSF. Tr. at 5459-60

Page 17

find guilt beyond a reasonable doubt,' quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2nd Cir. 1999)).

## II.   This Court Should Order a New Trial On All Counts Based on Jury Confusion.

### A.   It was Plain Error Not to Give a Specific Unanimity Instruction in this Complex Case.

This case was exceedingly complex.  The indictment charged two separate conspiracies and substantive counts over an eleven-year period.  The jury instructions were composed of 77 pages, and included not only the lengthy conspiracy instructions but also, for substantive counts 2-6, 6 pages of instructions devoted to Aiding and Abetting and Pinkerton theories of liability. [Dkt 289]  Trial lasted 9 weeks.  In Closing Argument, the Government referred repeatedly to the complexity of the case, and warned the jury not to follow a "hall of mirrors," or go down the "rabbit hole," or get lost in the defense case.  Tr. at 5688, 5695.

In these circumstances, the jury needed assistance to grapple with the overwhelming complexity of the facts and the law.  That assistance should have been provided in the jury instructions.  Specifically, this case required a specific unanimity instruction to ensure that the jury agreed on which object of the conspiracy in Count 1, and which conspiracy (Count 1 or Count 9) formed the basis of conviction.  In not giving assistance to the jury to ensure that Constantine's constitutional right to a unanimous jury was preserved, the Court committed plain error. *See United States v. Marcus*, 560 U.S. 258, 262 (2010)(defining plain error as clear error affecting substantial rights and seriously affecting the fairness or integrity of the proceedings).

Page 18

In declining to provide a specific unanimity instruction, the Court relied upon

*Griffin v. United States*, 502 U.S. 46 (1991). Tr. at 5681. However, the Court's reliance

on *Griffin* was misplaced, as the Court's reading of *Griffin* was:

> that in fact if the jury came back with a general verdict, if
> there was a fact that there was an evidentiary insufficiency
> that were determined by me on a Rule 29 or by Second
> Circuit later, the law, based upon the Supreme Court, is that
> the verdict still stands for the reasons they articulate in that
> case.
>
> ***
>
> But in any event I will put on the record though the request
> was withdrawn, in my discretion I was not going to do it in
> any event I just want to place it. I won't waste time now
> doing that, but I believe that to be the case so the record is
> clear.

Tr. at 5681-2. However, *Griffin* does not support that the verdict in this case should stand

in the absence of a unanimity instruction. Instead, *Griffin* supports that a specific

unanimity instruction should have been used. In *Griffin*, the Court cited the prevailing

rule that where at least one basis of a charge is supported by factually sufficient evidence,

a jury verdict may stand even if another basis was factually insufficient, as juries are well

equipped to distinguish between adequate and factually inadequate theories. 502 U.S. at

473-4. In the case at bar, however, the evidence was insufficient to sustain any of the

three objects of the conspiracy in Count 1. Based on the failure to give the unanimity

instruction, Constantine does not know which object, if any, the jury unanimously agreed

upon. As *Griffin* teaches, in a complex case, a specific unanimity instruction should be

given. As Justice Blackmun noted, in a concurring opinion:

> I would emphasize more strongly than does the Court,
> however, the danger of jury confusion that was inherent in

Page 19

> this multiple-defendant, 23-count indictment and the resulting
> 5-to 6-week trial.
>
> ***
>
> [t]he Government either could have charged the two
> objectives in separate counts, or agreed to petitioner's request
> for special interrogatories. The Court wisely rejects, albeit
> silently, the Government's argument that these practices, but
> not the complex and voluminous proof, would likely have
> confused the jury. I would go further than the Court and
> commend these techniques to the Government for use in
> complex conspiracy prosecutions.

Id. at 475. (Blackmun, J., concurring). On this record, the failure to give the jury the

tools it needed to resolve the complexity of the case prejudiced Constantine.

After *Griffin*, the Second Circuit has recognized that review of insufficient

evidence claims in conspiracies with multiple objects requires special scrutiny. As the

Court noted in *United v. Desnoyers*, 637 F.3d 105, 110 (2nd Cir. 2011):

> [o]ur Court has previously announced a "caveat" to the
> general rule that '[w]here a conspiracy has multiple
> objectives, a conviction will be upheld so as evidence is
> sufficient to show that an appellant agreed to accomplish at
> least one of the criminal objectives.' ... In *Papadakis*, we
> held that this caveat applies when an 'overwhelming amount
> of evidence relevant only to the unproved part of the
> conspiracy may have prejudiced the jury.'

The *Papadakis* caveat compels reversal of a verdict, even where one object may have

been factually supported, where arguably sufficient evidence was overwhelmed by

evidence that failed to prove an alternative object and may have prejudiced the jury. Id.

The danger recognized by the *Papadakis* Court – that an unproven allegation may have

an unfair prejudicial effect – is present in this case. On this record, the Government's

Page 20

proof linking Constantine to defrauding the investors in the Hawaii land development
was non-existent, and it is beyond dispute that Constantine did not act as a financial
advisor to Kenner's clients, and did not cause Kenner's client to invest in Eufora. The
overwhelming majority of the evidence in the 9-week trial was devoted to testimony
regarding these two objects of the wire fraud conspiracy. The spill over effect of so much
prejudicial evidence not relevant to Constantine's conduct is impossible to gauge in the
absence of a specific unanimity instruction.

Plain error occurred if there was a genuine possibility of jury confusion in
rendering its verdict among multiple conspiracies. *See, e.g., United States v. Lapier*, 796
F.3d 1090 (9th Cir. 2015). As the *Lapier* Court noted, the inquiry whether it is plain error
not to give a specific unanimity instruction is fact specific. Id. at 1096-7. Courts look to
the "text of the indictment," the "complexity of the evidence," the "clarity or ambiguity
of the jury instructions," and the "clarity and presentation of the Government's argument."
Here, these factors compel a finding of plain error. The evidence was complex, and in
tracking the indictment, took the jury on an eleven-year odyssey that dealt with arcane
topics such as financing for the Hawaii land developments, and different corporate
structures such as limited liability companies. The Government admitted over 800
exhibits. In addition to the two separate conspiracies, an entirely separate fraud – the
"Led Better Fraud Scheme" – was charged in two substantive counts and named only
Kenner. [Dkt 214 at 8-9]

To prove its case, then, the Government put on evidence of at least two different
conspiracies, with four different types of fraud alleged, as Count 1 alleged three ways of
Page 21

defrauding victims, and Counts 7-8 alleged another fraud.  Accordingly, a specific

unanimity instruction was necessary.  Not doing so was error that cannot be remedied

without a new trial, as Courts are not free to speculate whether the jury might have

returned a guilty verdict if it had been properly instructed, and Constantine need not show

that but for the error, he would have been convicted.  *See*, *Lapier*, 796 F.3d at 1098.

     In considering whether a new trial is required on these facts, the Court is not

required to view the evidence in the light most favorable to the Government.  The Court

may weigh the evidence and order a new trial in the interests of justice.  *United  States v.*

*Thomas*, 894 F. Supp. 58, 63 (N.D. N.Y. 1995).  While this discretion should be

exercised sparingly, it should be exercised here.  The jury's conviction of Constantine

was against the great weight of the evidence, and likely the result of jury confusion.  On

these facts, this Court should order a new trial.

                        Respectfully submitted,

                        MITCHELL | STEIN | CAREY, PC

               By:     *Michael Morrissey*

                        Michael Morrissey

cc:    James Miskiewicz
       Assistant United States Attorney (via ecf)

Page 22