SK
F.#2013R00948

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

    - against -                 No. 13-CR-607 (S-2) (JFB)

PHILLIP A. KENNER,
      also known as
      "Philip A. Kenner," and
TOMMY C. CONSTANTINE,
      also known as
      "Tommy C. Hormovitis,"

          Defendants.

– – – – – – – – – – – – – – – – X

## THE GOVERNMENT'S RESPONSE
## TO THE DEFENDANTS' POST-TRIAL MOTIONS

ROBERT L. CAPERS
United States Attorney
Eastern District of New York

Saritha Komatireddy
Assistant U.S. Attorney
   (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

On July 9, 2015, following approximately nine weeks of trial, a jury convicted defendant Tommy C. Constantine on all seven counts with which he was charged: one count of conspiracy to commit wire fraud (Count One, 18 U.S.C. § 1349), five counts of wire fraud (Counts Two through Six, 18 U.S.C. §§ 1343), and one count of money laundering conspiracy (Count Nine, 18 U.S.C. § 1956(h)).  The jury convicted defendant Phillip A. Kenner on six of the nine counts with which he was charged: one count of conspiracy to commit wire fraud (Count One, 18 U.S.C. § 1349), four counts of wire fraud (Counts Two through Four and Seven, 18 U.S.C. §§ 1343), and one count of money laundering conspiracy (Count Nine, 18 U.S.C. § 1956(h)).  The jury acquitted Kenner on three counts of wire fraud (Counts Five, Six, and Eight, 18 U.S.C. §§ 1343).

On November 23, 2015, Constantine filed a motion requesting post-trial relief on all counts of conviction.  Specifically, Constantine requested that the Court set aside the verdict and enter a judgment of acquittal on all counts, pursuant to Federal Rule of Criminal Procedure 29, or in the alternative, vacate the judgment and grant a new trial on all counts, pursuant to Federal Rule of Criminal Procedure 33.

Earlier, on July 29, 2015, defendant Phillip A. Kenner filed a letter stating that he would not file a motion pursuant to Federal Rule of Criminal Procedure 29, but that he intended to join in Constantine's motion pursuant to Federal Rule of Criminal Procedure 33 insofar as such motion presents common issues of law and fact for the Court's consideration. ECF No. 325.

For the reasons set forth below, the government respectfully submits that the defendants' motions should be denied.

<u>BACKGROUND</u>

I.      <u>The Crimes Charged</u>

On April 22, 2015, a grand jury in the Eastern District of New York returned a superseding indictment charging both Kenner and Constantine with one count of conspiracy to commit wire fraud (18 U.S.C. § 1349), five counts of wire fraud (18 U.S.C. §§ 1343), and one count of money laundering conspiracy (18 U.S.C. § 1956(h)).  <u>See</u> ECF No. 214.  The superseding indictment separately charged Kenner with two additional counts of wire fraud (18 U.S.C. §§ 1343).  <u>Id.</u>

II.     <u>The Evidence at Trial</u>

Over the course of the trial, the government called 39 witnesses and introduced more than a thousand exhibits, including bank statements, business records, graphical charts, spreadsheets, emails, text messages, and recordings of the defendants, to show that Constantine and Kenner defrauded numerous investors.  In addition, each defendant presented his own defense case; Kenner called two witnesses, Constantine called five witnesses, and both introduced various exhibits.

Viewed in the light most favorable to the government, the evidence at trial demonstrated the following:

A.      <u>The Defendants</u>

Kenner was a financial advisor to a number of investors, including professional hockey players.  <u>See</u> Tr. at 2913-2914; <u>see, e.g.,</u> GX-726L; Tr. at 130 (Juneau). Constantine was the founder and Chief Executive Officer of Eufora, a prepaid credit card company that has never been profitable.  <u>See</u> GX-8021R at 5 (Constantine stating in a deposition that Eufora was "not worth mentioning" because "it's not a profitable endeavor"

and "it never has been to date").  Constantine also claimed to be a professional race car driver, but even that endeavor was not profitable.  See GX-8021R at 6, 13, 55 (Constantine stating in a deposition that his racing company was "basically defunct" and that he did not receive money from several of his sponsors); Tr. at 3667 (Constantine's team manager testifying that Constantine was not a professional race car driver because he did not make a living as a driver).  Constantine and Kenner were longtime business partners, since at least 2002, when both held positions as officers of Eufora.  C-265.

B.    Hawaii Project

Between approximately 2003 and 2006, Kenner led the Hawaii project -- a plan to acquire and develop several parcels of land on the Big Island of Hawaii for profit.  Tr. at 2915-2916.  Kenner was responsible for raising funds for the project.  Tr. at 2920.  Kenner approached several of the investors that he advised -- including Bryan Berard, Michael Peca, Darryl Sydor, Steve Rucchin, Owen Nolan, and Joe Juneau -- and persuaded them to invest in the Hawaii project.  In furtherance of the investment, Kenner persuaded some of the investors to transfer bonds to Northern Trust Bank and open up lines of credit secured by those bonds.  Kenner represented that investor money from the lines of credit would be used for the Hawaii project.  Tr. at 3033-3036, 349-387, 2163-2165, 2720-2723, 137-138, 2063-2067.  However, Kenner and Constantine diverted those funds for their personal benefit.  GX-CHART-1 through GX-CHART-9.  To maintain the lines of credit during the course of the conspiracy and conceal their misuse, Kenner made a series of Ponzi-like transactions, drawing from one investor's line of credit to pay the interest payments on other investors' lines of credit.  GX-20 through GX-40.  In the end, by March 2009, all of the investors' lines of credits went into default, the investors received no advance warning from Kenner of the

default, and the bank seized their collateral (the investors' bond accounts).  <u>See</u> GX-2112

through GX-2132 (default letters); GX-2162 through GX-2184 (bank statements showing

more than $7.7 million in collective losses form the lines of credit alone); GX-506A (Kenner

stating to Kristin Peca in a recorded call, "I'm saying sorry right now that you didn't get a

call before Northern Trust collapsed those lines of credit, okay?").

From December 2004 to July 2005, Kenner siphoned millions of dollars out of

the investors' lines of credit and to Kenner's and Constantine's personal benefit through the

Centrum loan.  Specifically, Kenner used approximately $3.5 million gathered from four

victims' lines of credit to purchase the Honuapo parcel of land in Hawaii.  GX-CHART-4.

He then mortgaged the land to Centrum Financial Services, stating that the proceeds of the

mortgage would go to the development of the Hawaii project.  GX-3702 (mortgage); GX-

3703 (statement of use of loan proceeds).  Instead of using the proceeds for the Hawaii

project, however, Kenner diverted the proceeds of the mortgage to Kenner's and

Constantine's personal benefit.  GX-CHART-5.  Kenner used approximately $2.4 million to

buy a personal stake in property in Mexico.  GX-2013; GX-2018.  Constantine used

approximately $650,000 to buy a personal stake in luxury condominium units at the Palms

resort in Las Vegas, Nevada.  GX-4408.

Constantine and Kenner than arranged to get a windfall from the Hawaii

project with the Urban Expansion loan.  The Urban Expansion loan was completely

unnecessary: there were sufficient funds from the investors' lines of credit and the Centrum

Loan to fund the Hawaii project, and Lehman was simultaneously offering to take a

substantial stake.  Tr. at 4307-4308.  Nevertheless, by diverting the money from the

investors' lines of credit and the Centrum Loan for their personal use and putting off the

Lehman offer by one year, Kenner and Constantine created an opportunity for self-dealing --

the Urban Expansion loan.  See GX-50.  Constantine solicited $3.5 million from another

business partner, James Grdina, and Constantine and Grdina's company -- Urban Expansion

-- loaned the money to the Hawaii project.  Tr. at 2363-2366.  Kenner agreed to the loan on

behalf of the project.  GX-3802.  The terms of the loan included a high interest rate (15%)

and a hefty prepayment penalty ($2,000,000) if the loan was paid off in less than five years.

GX-3802; Tr. at 2372 (prepayment penalty was Constantine's idea).  Of course, at the time

that the loan was entered into, Lehman had already expressed interest in investing in the

Hawaii project.  Tr. at 4307-4308.  Sure enough, approximately ten months later, Kenner

permitted Lehman to make their proposed investment and Urban Expansion received a

payout for the amount of the loan plus the prepayment penalty (approximately $7 million).

GX-2417; GX-2420.  From there, Constantine diverted money for his own and Kenner's

personal benefit.  GX-CHART-7; GX-BINDER-6.  The money diverted to pay back the

Urban Expansion loan and prepayment penalty would have otherwise been enough to

significantly pay down the investors' lines of credit and protect their bond accounts.  GX-21.

Constantine obtained a steady stream of proceeds from the Hawaii accounts

throughout the pendency of the Hawaii project.  Constantine obtained more than $1 million

in cash from withdrawals from the victims' lines of credit, approximately $650,000 from

line-of-credit money laundered through the Centrum Loan, and approximately $2 million

from line-of-credit money diverted through the Urban Expansion loan.  GX-41B; GX-

CHART-5; GX-CHART-7.  In each case, Constantine spent those funds for his own personal

benefit.

Kenner and Constantine kept Constantine's receipt of Hawaii funds hidden from the investors.  See, e.g., Tr. at 2164-2165 (Sydor); Tr. at 2724 (Rucchin); Tr. at 4851-4852 (Gonchar).  However, Constantine boasted to friends in the racing community about his incoming cash.  See Tr. at 3665, 3675 (Stewart testifying that Constantine "talked about a deal that he had in Hawaii and a deal that he had in Mexico, always assuring me that when those deals came to fruition, everything was going to be great and there would be plenty of money for everybody"; testifying also that, at one point, Constantine showed him an ATM receipt reflecting a bank balance "in excess of $2 million"); Tr. at 3694 (Rosser testifying that Constantine said he "had some other deals cooking" and there "will be plenty of money").

Constantine was involved in efforts to cover up his part in the Hawaii fraud. Constantine signed consulting agreements to justify the more than $1 million he received from the victims' lines of credit.  GX-5104.  Those consulting agreements, however, were a sham: the agreements were backdated, contained forged signatures, and purported to give money to Constantine for work that he did not do.  See Tr. 4676-4677 (backdated); Tr. at 991-995, 3627 (signatures forged); Tr. at 2961-2963 (Manfredi testifying that Constantine did not work on the Hawaii project).  Constantine also took pains to avoid turning over bank records in related litigation to prevent others from discovering the true source of his funds. See GX-7450 (Constantine stating in a text message to Kenner, "You need the settlement I STOP all subpoenas for CMG records as well"); GX-8021R at 83-84 (Constantine stating in a deposition (for a lawsuit pertaining to a racing deal) that he used his CMG account for "personal use, things like that, car payments, mortgages" and denying having used it for

racing expenses); GX-8021R at 23-24, 67-68 (refusing to provide specific answers about the funds used to finance his racing activities).

     C.    <u>Eufora</u>

        In 2002, Constantine started Eufora, a prepaid credit card company.  The original operating agreement listed Constantine as the President and CEO of the company and Kenner as the Secretary.  C-265; GX-210.

        In a series of transaction from April 2008 to July 2008, Kenner solicited investments from various victims representing that the money would be used for Eufora. <u>See</u>, <u>e.g.</u>, Tr. at 470 (M. Peca testifying that Kenner told him that he "was investing in Eufora and that's where [his] money was going"); Tr. at 813 (K. Peca testifying that their "money was to be used just on some last minute filing of paperwork and legal work because they had the deal ready to go with the bank and they just needed to cover these last few costs to get everything going"); Tr. at 1913 (Nash testifying that he "was under the understanding that that money was going to be used for some upcoming commercials to finish off"); Tr. at 2171 (Sydor testifying that Kenner told him that the money would be used "for Eufora" to "get it over the hump and get everything finalized, in production").[1]  All the while, Constantine actively schemed with Kenner to use the money on themselves and their various debts.  <u>See</u>, <u>e.g.</u>, GX-203A, GX-204A (Constantine discussing, in text messages with Kenner, the allocation of Nash's $100,000 in "eufora $" to various personal expenses); GX-7401 (Kenner

---

      [1] During this time, Eufora was "desperate for funding and advertising dollars" and "needed to raise capital."  Tr. at 5190.  Internal company emails -- that included both Constantine and Kenner on the distribution list -- showed that there was a persistent negative balance in the company's operating account.  GX-4710, GX-4715 through GX-4722.  They also reflected an expectation that the individuals on the emails -- including Constantine and Kenner -- would be raising money for the company.  GX-4716 ("ETA of $200k?"); GX-4717 ("I have yet to hear from anyone on the ETA of the $200k or any other funding").

informing Constantine, in a text message, that Peca's $100,000 Eufora investment "is in your account"); GX-7416 (Constantine stating, in a text message with Kenner sent 48 hours before Sydor's and Ranford's Eufora investments, "If you can get me $ in the next 48 hours, I will go to Izbekistan on Wed."); see also GX-7401 through GX-7418 (text messages between Constantine and Kenner discussing the need to pay pending personal debts); cf. GX-7413 (Constantine stating, "Im going down in flames bro" and how he planned to use money from Eufora's value load account for personal racing expenses). All of the money was transferred directly from the investors' bank accounts to Constantine's CMG bank account, without the investors' knowledge, and with Kenner signing the wire transfers on behalf of the investors. GX-753; GX-760; GX-5004; GX-1512; Tr. at 416, 1914, 2172, 2822. Through subsequent wire transfers, Constantine then spent the money for his own and Kenner's benefit. GX-CHART-10 through GX-CHART-13; GX-BINDER-8.

Afterwards, Constantine was involved in efforts to cover up the fraudulent nature of these transactions. For example, Kenner told Nash that Eufora needed money to produce commercials and Nash invested with the understanding that his money would be put to that end. It was not. GX-CHART-11. Nevertheless, after the investment, Constantine met with Nash in Eufora's offices and "was excited to show [Nash] the commercials that were made, that were in production, and [Nash] was impressed." Tr. at 1916. Later, in 2012, when Nash persisted in questioning Constantine about obtaining documentation of his Eufora investment, Constantine met with Nash in his office and instantly provided him with a backdated transfer document stating that Nash had received a 0.5% interest directly in Eufora as of April 2008. GX-764; Tr. at 1946-1947. This transfer document was a sham: the interest was not reflected in Eufora's 2009 operating agreement, did not receive board or

membership approval, and conflicted with Kenner's documentation listing Nash as having a 0.48% interest in Eufora as part of AZ Eufora Partners I.  GX-210; K-228.  Similarly, Constantine executed additional such transfer documents purporting to transfer interest in Eufora from former business partner Dan Kennedy to Constantine's entity CMG -- presumably to later justify the wire transfers that went directly into CMG's account.  See C-266 (Kennedy's interest reduced from 10% to 8%); C-267 (Kennedy's interest reduced from 8% to 4%); Tr. at 5605-5606 (Kennedy testifying that Constantine came to him and said, "I really need to change your position once again" and that Kennedy "ended up signing or gifting another percentage" because he was not "going to see the upside" of any interest in Eufora).  However, those transfer documents were also a sham: the transfers conflicted with Eufora's filed tax returns for those years, which indicated that Kennedy (through his company C9 Consulting) retained a 9% interest in Eufora.  GX-4729; GX-4730.

        In a second series of transactions from December 2008 to May 2009 (within which fall Counts Two through Four), Kenner again solicited investments from various victims representing that the money would be used for Eufora.  See, e.g., Tr. at 2731-32 (Rucchin testifying that his "understanding it was just going to Eufora and just and into the company itself"); Tr. at 3497-98 (Murray testifying that he did not authorize any of his money to go to Kenner or Gaarn).  Again, in the time period leading up to, and during, this solicitation, Constantine actively schemed with Kenner to use the money on themselves and their various debts.  See, e.g., GX-7444 (Constantine asking Kenner in a text message around the time of Murray's Eufora investment, "Can you wire CMG a little dough?  It's -$220"); GX-CHART-14 ($1,000 from Murray's Eufora investment diverted to CMG); GX-7448, GX-7449 (Constantine asking Kenner in a text message shortly before Rucchin's Eufora

investment, "Any way to get Tom something small (like $5k) for Moreau case?"); GX-CHART-16 ($5,000 from Rucchin's Eufora investment diverted to Constantine's personal attorney Tom Baker); GX-7419 through GX-7455 (text messages between Constantine and Kenner discussing the need to pay pending personal debts). All of the money was transferred from the investors' bank accounts to Eufora's bank account (controlled in part by C.R. Gentry); the money was then transferred from Eufora's bank account to Gaarn's bank account, and onwards for Kenner's and Constantine's benefits. GX-CHART-14 through GX-CHART-19; GX-BINDER-9. In particular, the wire transfers charged in Counts Two and Three represented investor money being diverted to Kenner's and Constantine's personal benefit, and the wire transfer charged in Count Four represented Kenner's use of investor money on a personal expense (reimbursement for Kaiser's construction work on properties in Paradise Valley and Hermosa Beach).

Constantine admitted that he knew about all of the money that came directly from the investors to the Eufora bank account. GX-503.1 (stating in a recorded call, "All the money that came to Eufora on behalf of the players, came directly from the players to Eufora . . . . their money went from their bank account to Eufora, LLC's bank account. I know exactly how much money they put in."). He also spoke to Kenner about having that money be diverted for his benefit. GX-7448 ("Waiting on CR"; "Any way to get Tom something small (like $5k) for Moreau case?"); GX-7449. Constantine then obtained proceeds from this series of fraudulently-induced Eufora investments, including a $1,000 cash payment, a $15,000 payment to his creditor Gilmartin, Magence & Ross to pay down a loan in his name for his personal stake in two Palms condominium units, and a $5,000 payment to his personal attorney Tom Baker to pay down his legal fees. GX-CHART-14 through GX-CHART-16;

GX-8021R at 77-78 (Constantine stating in a deposition that Tom Baker was an attorney in Arizona that he "use[d] from time to time").  In each instance, the funds were for Constantine's personal benefit.

Constantine was also involved in efforts to cover up the fraudulent nature of this second series of transactions.  In order to paper over the fraudulent nature of the transactions, Kenner backdated a Eufora transfer document to make it appear as through Gaarn owned an interest in Eufora in August 2005, so that the series of money transfers from Eufora to Gaarn in 2008 could be (falsely) explained as a selling of that interest.  GX-TG-2; Tr. at 2500.  Constantine, in tandem, backdated Eufora's 2005 tax return to mimic the same purported transfer.  GX-4728 (Eufora 2005 tax return signed by Constantine in 2009).  In his August 2010 conversation with Kenner at Home Depot, Constantine (speaking to Kenner) discussed the Eufora fraud involving Gaarn and discussed covering it up:

> What do you think is gonna happen when seven hundred thousand dollars shows up, going from the players that already bought it the first time, to the bank account, back to Tim Gaar-- to Eufora's bank account -- back to Tim Gaarn's account, to your account? Like, this is not gonna look good, right? There's so much shit that you're not thinking about in this whole equation that needs to just be put to bed and move forward productively, and I'm here to ask you to not blow, burn down the house. Don't burn down the house. It's a good thing that we have. I think it could fix everything.

GX-4500; see also GX-4500 ("Do you remember the things that happened?  I mean, you think that this is only to protect me?  I'm protecting you; I'm protecting Tim too.  I'm protecting everybody.").

In December 2009, Constantine -- then the CEO of Eufora -- solicited Privitello for an investment in Eufora.  See GX-208.1 through GX-208.11; GX-508.1, GX-

508.9 (Eufora board of managers appointing Constantine as CEO and President of Eufora in August 2009).   In doing so, Constantine represented that, "upon our receipt of $200,000, Eufora's members will formally execute a Membership Transfer Consent Form and amend the company's Operating Agreement to reflect a 1.5% Interest in Eufora, LLC which shall be held by: Nicholas L Privitello," directing Privitello to wire the money to the attorney escrow account of Ronald Richards.  GX-208.1, GX-208.7, GX-208.9.  Constantine further represented that the funds would be used for Eufora's business expenses.  Tr. at 1433.

At the time that Constantine solicited this investment from Privitello, Eufora was nearly in default with one of its suppliers (Bancorp) and lenders (Brent Nerguzian), and Constantine himself had overdue legal bills at a firm in Florida (Carey Rodriguez Greenberg) that had represented him on a personal matter.  GX-508.3 through GX-508.8 (Constantine stating in a recorded call that "we're all in a very tough time financially" (referring to Eufora), that he was not being paid anymore, and that he was seeking to raise $3-5 million for Eufora, including for a half-a-million payment to Brent Nerguzian that was "imminent"; stating also, "I'm asking for . . . the authority to do whatever it takes to pay Brent"); GX-8021R at 197-200 (Constantine stating that he had overdue legal bills, that he was broke, and that he "borrowed" money to pay prior legal bills).  Constantine exhibited haste in his conversations with Privitello and emphasized that he needed the money transfer to happen quickly.  Tr. at 1448 (Privitello testifying that, "As per Tommy it was urgent"); GX-208.6 (requesting a wire transfer or cashier's checks "or we will be delayed").

Based on Constantine's representations, Privitello wired $200,000 -- in increments of $150,000 (Count Five) and $50,000 (Count Six) -- to the Ronald Richards account.  GX-3301, GX-3302, GX-3304 through GX-3306.  The money was wired from

Privitello's accounts in Long Island, New York, to Richards' account in Los Angeles, California.  On the wire transfer, Privitello noted that the money was being wired "FOR 1.5% INTEREST/OWNERSHIP IN EUFORA LLC."  GX-3306.

Constantine interposed Richards as an intermediary in the transaction, which he later used to obfuscate whether he had received Privitello's funds in the first place or knew their purpose.  GX-208.7 and GX-208.9 (emails from Constantine directing Privitello to send wire transfers to the Law Offices of Ronald Richards); GX-503.2 (Privitello noting, in a recorded call, "I wrote right on my wire it's for 1.5 percent of the thing," and Constantine subsequently responding, "you said I even wrote it on my wire.  Who received that wire? . . . you could have wrote 'fuck you Ronnie and your mother' on that.").

Eufora did not then -- or at any time thereafter -- formally execute a Membership Transfer Consent Form or amend the company's Operating Agreement to reflect the 1.5% interest Constantine had promised Privitello.  Tr. at 1458; GX-210. Constantine subsequently disavowed any ownership interest on the part of Privitello in Eufora.  GX-503.6 (stating to Privitello in a recorded call, "You weren't shareholders.").  In addition, Constantine spent Privitello's money immediately, sending $150,000 to Bancorp for a Eufora expense and sending $15,000 to Carey Rodriguez Greenberg -- an unauthorized personal expense.  GX-CHART-20.  Both transfers were complete by December 15, 2009. During that time period, Constantine never offered to return Privitello's money to him.  Tr. at 1602-1603.

Nevertheless, several months later, after Privitello began making efforts to recoup his losses, Constantine used double-speak, evasion, and deflection of blame to deny his fraud.  GX-503.5 (asking Privitello in a recorded call, "Why didn't you take it back

before we spent it?"); GX-503.3 (stating in a recorded call that, "It was not me saying I want you to send it there.  It's, it's Johnny Kaiser who's controlling the investors and the investment saying I'm going to send it there" and explaining that "the reason that . . . your money was directed to the lawyer's office instead of to us is because if we saw how much money was going directly to us, we'd know exactly where it came from and who" but "if it goes to Ron Richards' office and then we get one wire from Ron Richards, then we have no idea who the money came from into Ron Richards"); GX-503.4 (stating in a recorded call that "when we look at the inbound wire transfers that went into Ron Richards' account, . . . [the money] came from Theodore Hughes, Bob Rizzi and you" (referring to Privitello)); GX-503.7 (stating in a recorded call, "You asked me why it went to Ron Richards' account.  I have no fucking idea.").

D.     Global Settlement Fund

In May 2009, Kenner and Constantine launched the Global Settlement Fund. Constantine and Kenner worked together in pitching the GSF to investors.  See, e.g., GX-7453, GX-7454 (discussing a GSF pitch in text messages).  Constantine induced investors to contribute money to the GSF based on oral representations at in-person meetings that the money would be used to fund litigation against Ken Jowdy to recover an investment in Mexico.  See, e.g., Tr. at 684-685 (Pecas); Tr. at 1814 (McKee); Tr. at 2749 (Rucchin); Tr. at 3545 (Murray); GX-503.8 (Constantine stating in a recorded call that the money "was for the lawsuit against Ken Jowdy").[2]  Constantine directed investors to send their money to the law firm account of Ronald Richards; Constantine did not disclose that he (Constantine) would

---

[2] Constantine's representation to Tyson Nash included that GSF money would be used to buy out the investment interests of the "bad apples" -- namely, Juneau, Moreau, Nolan, and Myrick.  Tr. at 1920-1921, 1944.

be in control of the money, rather than Richards.  See, e.g., Tr. at 688 (K. Peca); Tr. at 1815

(McKee).  Meanwhile, Constantine and Kenner schemed to use the bulk of the money on

themselves and their various debts.  See, e.g., GX-7451 (Constantine referring, in text

messages, to the negotiation of a settlement with Rick Rozenboom for the airplane loan in

Kenner's and Gonchar's names); GX-7452 (Constantine referring, in text messages, to his

home being in foreclosure, his intent to "talk each one" of the interested buyers "out of

making an offer by telling them about the pending litigation," and his plan to "sell" the home

"to Eric" Edenholm).  At the time that Constantine and Kenner were soliciting investments

for the GSF, both were in default on millions of dollars in loans.  See GX-8021R at 3-4, 8-9

(Constantine stating in a deposition that he was moving of his home due to foreclosure and

that his assets have "all been basically foreclosed upon"; "I own nothing anymore"); GX-

8021R at 169-170 (Constantine stating in a deposition that he was being sued for a personal

guaranty on a loan that he defaulted on from 82nd Street, LLC (the holding company for the

airplane hangars)); Tr. at 1697 (bills and debt on hangars past due); GX-3502 (Palms loan

three months past due in payments); Tr. at 3273 (airplane loan past due in payment).  All of

the money was transferred from the investors' bank accounts to Ronald Richards' bank

account.  GX-1102.  Constantine then directed the distribution of the funds from Richards'

bank account.  Tr. at 3806-3820.  Only $225,000 went to fund the litigation against Jowdy.

GX-RR-1.  The remaining approximately $4 million in funds went to Constantine's and

Kenner's pet projects and personal benefit, including to pay down loans for airplane hangars

(for which Constantine was borrower), airplanes (for which Kenner was guarantor), Palms

units (for which Constantine was borrower and Kenner was guarantor), and Eufora (for

which Constantine was CEO), as well as to pay off pending bills for past projects including

racecars and equipment, a tequila company in Mexico, an effort to build a helipad, and an attempted acquisition of Playboy Enterprises.  GX-80; GX-BINDER-11; GX-506B (Kenner stating in a recorded call that "Constantine fucked it up" (referring to the GSF) and "defrauded us").  Constantine later described his diversion of GSF funds for personal benefit with Kenner, including his paying down of a delinquent airplane loan with First Source Bank (Rick Rozenboom) that Kenner and Gonchar were responsible for:

> [E]verything's done and buttoned up with a bow on it.  Exactly what you want.  You -- I know you don't believe me, but the thing with First Source -- done.  You guys don't owe anything. The hundred and ten thousand dollar deficiency I got rid of. . . . the First Source thing is wrapped, done.  The airplane is fucking gone.  Done.  The building, the penthouses, everything, it's being done.

GX-4500.  By the end, all of the money in the GSF was gone.  Tr. at 430; GX-767.

E.    Continuing Conspiracies

Throughout the course of their fraud, Constantine and Kenner conspired to transfer proceeds of their fraud in a manner that concealed or disguised the nature, source, and control of the proceeds.  See, e.g., GX-CHART-10 through GX-CHART-13 (after diversion of investor money to Constantine (unauthorized purpose), Constantine made multiple wire transfers to Kenner and for personal expenses); GX-CHART-14 through GX-CHART-19 (after diversion of investor money to Gaarn (unauthorized purpose), Kenner (himself and through directing Gaarn and Kaiser) made multiple wire transfers before the money was ultimately routed to personal expenses); GX-CHART-1 and GX-CHART-2 (after diversion of investor money to son's account (unauthorized purpose), Kenner made multiple wire transfers under $10,000 to direct the money to himself).

16

Constantine and Kenner also consistently failed to provide the investors with documentation of their investments.  See, e.g., Tr. at 678 (Pecas received no official paperwork of Eufora investments); Tr. at 2844 (Ranford nothing that his "biggest issue was not getting the documentation").

In August 2010, Constantine confronted Kenner in a conversation at Home Depot about their long-running, multi-faceted fraud against the investors.  During the conversation, which was recorded, Constantine stated, "It's all coming down.  And it's gonna be bad, dude.  It's gonna be bad for them; it's gonna be bad for all of us," noting subsequently that the "fucking FBI is all over this fucking thing."  GX-4500.  Constantine acknowledged that he and Kenner were "in the trenches together" and advocated working together and continuing the conspiracy so that they could "all go back to [their] lives, whatever's left of them."  GX-4500.  During the conversation, Constantine also referred to himself and Kenner as co-conspirators in a bank robbery, stating, "They're not gonna fucking pinch the guy who drove the getaway car, they're gonna pinch the guy that fucking robbed the bank."  GX-4500.

ARGUMENT

I.     The Evidence Was Sufficient

   A.     Applicable Law

Rule 29 of the Federal Rules of Criminal Procedure permits the court to set aside a verdict and "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a), (c)(2).  In order to prevail under this rule, the defendant must show that no rational trier of fact could find the essential elements of each crime beyond a reasonable doubt.  See United States v. Aguiar, 737 F.3d

17

251, 264 (2d Cir. 2013); United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001); see also United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998) ("The ultimate question is not whether we believe the evidence adduced at trial established [the] defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find." (emphasis in original)).  The Second Circuit has repeatedly characterized the defendant's burden under Rule 29 as "a heavy burden."  See, e.g., United States v. Samaria, 239 F.3d 228, 233 (2d Cir. 2001); United States v. Salameh, 152 F.3d 88, 151 (2d Cir. 1998); United States v. Nersesian, 824 F.2d 1294, 1324 (2d Cir. 1987); see also United States v. Tillem, 906 F.2d 814, 821 (2d Cir. 1990) (Rule 29 motions "rarely carry the day").

In determining the sufficiency of the evidence, the court must view the evidence in the light most favorable to the government, see Jackson v. Virginia, 443 U.S. 307, 319 (1979), and in its totality, as opposed to in isolation, Aguiar, 737 F.3d at 264.  The court must also "draw all reasonable inferences in the government's favor," United States v. Gagliardi, 506 F.3d 140, 149 (2d Cir. 2007) -- not "weigh . . . competing inferences and explanations" to determine "which explanation is more likely," United States v. Friedman, 998 F.2d 53, 56 (2d Cir. 1993) (citations omitted) -- since it "is the task of the jury, not the court, to choose among competing inferences," United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995).  Likewise, the court must "resolve all issues of credibility" in the government's favor, United States v. Khan, 787 F.2d 28, 34 (2d Cir. 1986), and defer to "the jury's resolution of conflicting testimony," United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002) (internal quotation marks and citations omitted).  Thus, a witness's direct testimony to a particular fact, so long as it is not incredible on its face, is sufficient to establish that fact and sustain a conviction.  See United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002);

United States v. Jespersen, 65 F.3d 993, 998 (2d Cir. 1995); United States v. Parker, 903 F.2d 91, 97 (2d Cir. 1990); United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).

The jury may base its verdict on circumstantial evidence alone.  Martinez, 54 F.3d at 1043; United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994); see United States v. Sureff, 15 F.3d 225, 229 (2d Cir. 1994) (circumstantial evidence is not "a disfavored form of proof").  Indeed, "as a general rule, most evidence of intent is circumstantial."  Salameh, 152 F.3d at 143; see Mallette v. Scully, 752 F.2d 26, 32 (2d Cir. 1984) ("[I]t is seldom possible to present testimonial or direct evidence of an accused's state of mind.  Intent as a separate item of proof does not commonly exist. . . . Circumstantial evidence of this subjective fact is therefore indispensable." (citations omitted)).

In addition, in fraud cases, like this one, "the government is not required to prove every allegation of fraudulent activity that appears in the indictment," but only "a sufficient number of fraudulent activities to support a jury inference that there was an overall fraudulent scheme."  United States v. Bortnick, No. CRIM.A.03-CR-0414, 2005 WL 1693924 at 21 (E.D.Pa. July 20, 2005) (citing United States v. Amrep Corp., 560 F.2d 539, 546 (2d Cir. 1977)).  By the same token, the government's "evidence need not have excluded every possible hypothesis of innocence."  United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir. 1992) (internal quotation marks omitted); see Holland v. United States, 348 U.S. 121, 140 (1954).

Finally, where, as here, the defendant presents a defense case, he "waives any claim as to the sufficiency of the Government's case considered alone."  United States v. Pui Kan Lam, 483 F.2d 1202, 1208 n.7 (2d Cir. 1973); see Tr. at 5627 (Rule 29 motions made and reserved after both defense cases and government's rebuttal case); Fed. R. Crim. P. 29(b)

("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.").  If the jury does not believe defense testimony, it may use that disbelief to "supplement" the government's case.  United States v. Stanley, 928 F.2d 575, 577 (2d Cir. 1991).  Although a conviction may not rest solely upon negative inferences from a disbelieved defense case, a jury is "entitled to conclude that [a defendant's] version of the events was false and thereby infer [a defendant's] guilt."  Friedman, 998 F.2d at 57; see also United States v. Velasquez, 271 F.3d 364, 374 (2d Cir. 2001) (finding that the government's proof was "weak," but the defendant's "incredible testimony . . . transform[ed] the evidence in this case from borderline to sufficient").

        To establish a conspiracy, the government must prove beyond a reasonable doubt the existence of the conspiracy and the defendant's knowing participation in it.  See United States v. McGinn, 787 F.3d 116, 124 (2d Cir. 2015); United States v. Story, 891 F.2d 988, 992 (2d Cir. 1989).  The government may prove the existence of the conspiratorial agreement itself by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement.  See United States v. Ojo, No. 14-635, 2015 WL 7292203 at *1 (2d Cir. Nov. 19, 2015) (citing United States v.  Desimone, 119 F.3d 217, 223 (2d Cir. 1997).  Convictions for conspiracy to commit wire fraud and conspiracy to commit money laundering do not require proof of an overt act.  See Whitfield v. United States, 543 U.S. 209, 214, 219 (2005); United States v. Roy, 783 F.3d 418, 420 (2d Cir. 2015).

        The traditional deference that is accorded to a jury's verdict is particularly important when reviewing a conviction for conspiracy because a conspiracy by its very nature is a secretive operation and "it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."  United States v. Ojo, No. 14-

635, 2015 WL 7292203 at *1 (2d Cir. Nov. 19, 2015) (internal citation and quotation marks omitted).  A defendant may be convicted of conspiracy entirely on the basis of circumstantial evidence.  See United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002).  Moreover, a defendant may be convicted of conspiracy "even if he knows only one other member of the conspiracy, and a single act may be sufficient for an inference of involvement in a criminal enterprise . . . if the act is of a nature justifying an inference of knowledge of the broader conspiracy."  United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008).  A defendant need only know the general nature and extent of the conspiracy; the government need not show that the defendant knew all of the details.  Id.  Proof of a defendant's knowledge or intent includes "evidence that the defendant participated in conversations directly related to the substance of the conspiracy," "possess[ion of] or mention[] in documents important to the conspiracy," "proof that a defendant exercised authority within the conspiracy itself," "recei[pt of] a share of the profits from the conspiracy," and a defendant's statements "explicitly confirming the nature of the activity in which the co-conspirators were engaged."  United States v. Friedman, 300 F.3d 111, 126 (2d Cir. 2002).  It also includes evidence of the defendant's "presence at critical stages of the conspiracy that could not be explained by happenstance," a "lack of surprise when discussing the conspiracy with others," and acts "exhibit[ing] a consciousness of guilt."  United States v. Blackwood, 366 F. App'x 207, 210 (2d Cir. 2010)

To establish the crime of wire fraud, the government must prove beyond a reasonable doubt: (1) a scheme to defraud; (2) by obtaining money or property; (3) furthered by the use of interstate wires.  See United States v. Dinome, 86 F.3d 277, 283 (2d Cir. 1996); Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004).  As to fraudulent intent or

21

scienter, "the proof must demonstrate that the defendant had a 'conscious, knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted).[3]  Although a defendant "cannot be guilty of wire fraud merely for breaching a contract," a defendant "can be guilty of fraud when he agrees to a contract with the present intention of not honoring the contract."  United States v. Shellef, 732 F. Supp. 2d 42, 69 (E.D.N.Y. 2010); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175-76 (2d Cir. 1993) (failure to carry out a promise is fraud if, "when the promise was made, the defendant secretly intended not to perform or knew that he could not perform").

Constantine was charged with wire fraud directly and on a Pinkerton theory. Under Pinkerton v. United States, 328 U.S. 640 (1946), a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator was in furtherance of a conspiracy and reasonably foreseeable to the defendant as a consequence of their criminal agreement.  See Cephas v. Nash, 328 F.3d 98, 101 n.3 (2d Cir. 2003).  Pinkerton liability extends to all foreseeable criminal conduct of a co-conspirator, including wire fraud.  See United States v. Bryser, 954 F.2d 79, 88 (2d Cir. 1992) (applying Pinkerton to theft, mail fraud, and wire fraud); United States v. Bernadel, 490 F. App'x 22, 25 (9th Cir. 2012) (applying Pinkerton to mail fraud, wire fraud, and bank fraud).

Constantine was also charged with wire fraud on an aiding and abetting theory.  See 18 U.S.C. § 2.  To convict a defendant of aiding and abetting a given crime, the

---

[3] The jury is permitted to consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  ECF No. 296 at 49-50.

government must prove that the underlying crime was committed by another person, that the defendant knew of the crime, and that "the defendant acted with the intent to contribute to the success of the underlying crime." United States v. Reifler, 446 F.3d 65, 96 (2d Cir. 2006) (internal marks omitted). On intent, "the government need not establish that [the defendant] knew all of the details of the crime, only that he joined the venture, [that he] shared in it, and that his efforts contributed towards its success." Huezo, 546 F.3d at 179-80 (internal quotation marks omitted).

B.    Argument

1.    Count One: Conspiracy to Commit Wire Fraud

Kenner and Constantine engaged in a long-running conspiracy to defraud investors by representing that the investors' money would be used to fund certain investments and then diverting that money for unauthorized purposes, including their personal benefit. The investments used as the means for carrying out the conspiracy were the Hawaii Project, Eufora, and the GSF.[4]

a.    Hawaii Project

Constantine argues that there was no evidence showing that he had a role in causing investors to invest in the Hawaii land development project or in establishing lines of credit for the project, and that Constantine did not meet the investors until years later. ECF No. 346 at 3. Constantine also argues that he did not divert investor money from its intended

---

[4] The Court charged these three aspects of the scheme as "objects" of the conspiracy. Typically, the "object" of a conspiracy is the substantive offense that the members of the conspiracy agree to commit. See generally Braverman v. United States, 317 U.S. 49 (1942). Here, the object of the conspiracy in Count One was wire fraud and the various investment vehicles were the manner and means of effecting that object. Nevertheless, the Court construed the object more narrowly (and in the defendants' favor) and charged Count One as a multi-object conspiracy. ECF No. 296 at 59.

use in Hawaii, but that Kenner did.  ECF No. 346 at 4.  However, a defendant need not

"participate in, or even agree to, every act undertaken on behalf of the alleged conspiracy in

order to be culpable as a member."  United States v. Needham, 377 F. App'x 84 (2d Cir.

2010).  Testimony and documents showed that Constantine spearheaded the creation of the

Urban Expansion Loan that permitted him and Kenner to extract millions from the Hawaii

Project; bank records and business records showed that Constantine obtained a steady stream

of proceeds from that loan and other aspects of the Hawaii Project; and testimony and

documents showed that Constantine was involved in efforts to cover up the Hawaii fraud.

See supra Part II.B.

    Constantine argues that his activities amounted to "mere association," which is

not enough to prove knowing involvement in a conspiracy.  ECF No. 346 at 5.  It is true that

"mere association" is not enough to prove membership in a conspiracy, and the Court so

instructed the jury.  ECF No. 289 at 62.  However, the government's proof was not limited to

"mere association."  In light of the above-described evidence of Constantine's active self-

dealing in relation to the Hawaii investments, receipt of millions of dollars in proceeds from

money intended to be used for the Hawaii investments, and efforts to paper over those

proceeds, the jury could reasonably infer that Constantine was knowingly involved in the

conspiracy.  See, e.g., United States v. McGinn, 787 F.3d 116, 124 (2d Cir. 2015) (evidence

sufficient for mail and wire fraud conspiracy where evidence showed "defendants' joint

efforts to divert funds, conceal losses through the creation of false accounting records, and

the submission of false documents to FINRA").

    Constantine argues that the evidence of his windfall from the Urban Expansion

loan does not support any connection between Constantine and a fraud on the investors

because the loan was paid by Lehman Brothers.  ECF No. 346 at 6.[5]  But there was a

connection: the Lehman Brothers investment represented value derived from the victims'

lines of credit.  The Lehman Brothers investment was postponed by a year to enable

Constantine's self-serving Urban Expansion loan; part of the value of the victims' lines of

credit -- as represented by the land that collateralized Lehman Brothers' investment -- was

then diverted to Constantine's benefit to pay off the Urban Expansion loan and prepayment

penalty; if it had not been so diverted, the money would have returned to the lines of credit

and remained with the Hawaii project.  Indeed, the investors' money made the Urban

Expansion loan possible in the first place -- the investors' money permitted the Hawaii

project to get off the ground, and prior diversions of the investors' money (e.g., the Centrum

loan) created the opportunity for Constantine to propose the Urban Expansion loan and the

justification for Kenner to accept it, to the benefit of the both of them.

> b.    Eufora

Constantine argues that he was not part of a conspiracy in connection with

Eufora and cannot be liable for Counts Two through Four because Kenner (not Constantine)

pitched the Eufora investment to the investors and Kenner (not Constantine) was the

investors' financial advisor.  ECF No. 346 at 7-8.  Again, a defendant need not "participate

in, or even agree to, every act undertaken on behalf of the alleged conspiracy in order to be

culpable as a member."  Needham, 377 F. App'x 84.  Bank records and business records

---

[5] Constantine states that it is "undisputed that Constantine and Grdina, through
Urban Expansion, invested $5 million in October 2005, in Kau Holding Company."  ECF
No. 346, at 6.  On the contrary, the evidence at trial showed that Constantine deceived
Grdina, Grdina invested $3.5 million towards the Urban Expansion loan, and Constantine
invested nothing.  Tr. at 2365; GX-3802.  At the time the loan was paid back, Constantine
nevertheless took a portion of the proceeds as if he had contributed to the loan in the first
place.  GX-3204.

showed that Constantine permitted his small company -- the company he founded and led -- to be used as a cover for himself and Kenner (in turn) to steal money from the investors; recordings and text messages showed that Constantine coordinated with Kenner about the timing and amount of money that needed to be raised from investors and knew about all of the money coming into the CMG and Eufora accounts; bank records showed that Constantine personally benefited from the proceeds of nearly all of the investments; and testimony and documents showed that Constantine made efforts to cover up the Eufora fraud. See supra Part II.C.; see also Blackwood, 366 F. App'x 207 ("a defendant's knowing and willing participation in a conspiracy" may be inferred from a "lack of surprise when discussing the conspiracy with others" (internal quotation marks omitted)); United States v. Kahale, No. 09-CR-159, 2010 WL 3851987, at *18 (E.D.N.Y. 2010) (Matsumoto, J.) (where no evidence showed defendant's direct participation in soliciting victim's investment, the fact that defendant "shared and enjoyed the fruits of that investment supports the jury's permissible inference" that the defendant was aware of victim's investment and intended to defraud victim).

Constantine also argues that he and Kenner were at odds over Eufora, rather than in a conspiracy, because Kenner attempted a "hostile takeover" of Eufora. ECF No. 346 at 12. However, the purported hostility did not begin until approximately 2010. During the series of transactions in 2008 and 2009, Constantine and Kenner were working harmoniously to ensure that they could use Eufora as a cover for obtaining money from the investors. Moreover, the evidence showed that even through the period of purported hostility, Constantine discussed with Kenner how to continue the conspiracy and perpetuate the fraud. GX-4500.

Constantine argues that the jury's acquittal of Kenner on Counts Five and Six "confirms the insufficiency of the evidence supporting any finding by the jury with respect to the second object of the conspiracy."  ECF No. 346 at 12.  However, the jury need not find a meeting of the minds as to every particular overt act in the conspiracy; it need only find a meeting of the minds as to the object of the conspiracy, which here was to defraud the investors and use Eufora as the means to do so.  See Huezo, 546 F.3d at 180 (the government need only prove knowledge of the general nature and extent of the conspiracy, not all its details); United States v. Blackmon, 839 F.2d 900, 909 (2d Cir. 1988) (Pinkerton liability is discretionary, not mandatory).

c.     GSF

Constantine argues that his email communications with various investors confirmed that he used GSF money for authorized purposes.  ECF No. 346 at 14.  Constantine again repeats the same arguments he made to the jury and that the jury rejected.

The email communications came about after the investors had already authorized the transfer of their money.  GX-1102; GX-4808.  The investors orally authorized the wiring of money to the GSF after their in-person meetings with Constantine and Kenner.  Once the money was wired, the fraud was complete.  Constantine's subsequent email communications to investors were designed to obfuscate the fraud and provide cover against future allegations.  Constantine alluded to his practice of writing such cover-up emails in his conversation with Kenner at Home Depot:

> They're not gonna fucking pinch the guy who drove the getaway car, they're gonna pinch the guy that fucking robbed the bank. And I know you think I robbed the bank, but I have

27

answers for everything. Everything. In writing, and I'm trying to
make it stop.

GX-4500.

Indeed, the emails served only as further evidence of Constantine's intent to

defraud.  For example, Kristin Peca testified that, at the time that Constantine and Kenner

were in her home pitching the GSF, they did not state that GSF money would be used to pay

for Palm units.  Tr. at 691.  That day, when the Pecas authorized their money to be

contributed to the GSF, they did not believe that any of it would be used to pay for Palms

units.  Tr. at 691.  Indeed, the Pecas were already separately invested in Palms units and

wanted nothing more to do with the property.  Tr. at 691.  Nevertheless, on May 12, 2009,

Constantine directed $45,000 from the GSF to Gilmartin, Magence & Ross to pay down the

Palms loan.  GX-1102.  This payment was purely for Constantine's and Kenner's benefit --

the $1 million Palms loan was in default at the time, and Constantine was sole borrower, with

Kenner as the guarantor.  GX-3502; GX-3507; GX-3508.  Only later, on May 18, 2009, did

Constantine and Kenner send the Pecas an email regarding the GSF, stating, in part:

> You may not recall Tommy or I mentioning the Palms units in
> our conversation.  In any case, because Moreau and Tommy
> settled that case as part of the Global Settlement, he has
> graciously elected to include you as a beneficiary in the
> significant equity that exists in those two units as part of this
> transaction.

GX-757.  This email simply represents more fraud.

In addition, in the emails, Constantine and Kenner described the additional

investment properties they mentioned as "significant assets" that the investors would acquire.

GX-757.  In reality, those properties were not significant assets: the investors were not told

that the hangars were in bankruptcy, that the planes were in repossession, that the Palms

units were in default, and that Eufora was in such a dire state that it was "not worth

mentioning" and that its patent had been pledged as collateral for a loan.  GX-8021R at 5; see

GX-769 (patent security agreement); Tr. at 817-818.  Constantine directed GSF funds to

those investments not for the investors' benefit but for his and Kenner's, as either

Constantine or Kenner or both were personally liable for loans on each one.  GX-3428

(Constantine liable for payments for hangars); GX-4212 (Kenner was liable as guarantor for

planes); GX-3507 and GX-3508 (Constantine was borrower and Kenner was guarantor on

Palms units).

   To the extent that the items mentioned in the email represented additional

assets that the investors would acquire, even that was a false promise.  The investors

acquired none of those assets; instead, Constantine and Kenner sold them off to other

unrelated individuals.  The hangars were sold off to other unrelated individuals.  GX-3434;

GX-3437.  So were the Palms condos.  GX-3503; GX-3504.  There are multiple conflicting

ownership arrangements for the Falcon 10 plane.  See GX-4218 (May 29, 2009 operating

agreement naming Constantine, Edenholm, and Sue Ellen Ferguson as owners); GX-4601

(2010 email naming Gonchar and new unrelated investors as owners); GX-4602 (June 1,

2009 operating agreement for new unrelated investors); GX-4246 (March 15, 2011 operating

agreement naming Constantine and another individual as owners); GX-8012C (Constantine's

2013 bankruptcy petition claiming that Constantine has a 50% interest).  And Eufora as a

company "is not really operational right now" and has no reliable records regarding

investors' interests.  Tr. at 5303; see Tr. at 5317 (D'Ambrosio testifying that defense color

chart C-279 accurately reflected investor interests "based on [his] memory" but later

testifying that it was not accurate because "C.R. is not on the flowchart"); see, e.g., Tr. at

548, 1844 (M. Peca and McKee testifying that they have "no idea" if they own any piece of Eufora today).

Moreover, the emails omitted Constantine's and Kenner's other personal uses of GSF money: for personal legal fees relating to a racing sponsorship lawsuit in Florida; for a plane-for-house swap providing Constantine's friend Eric Edenholm with the funds to buy Constantine's house out of foreclosure and rent it back to him; for race cars; for rent; for legal fees related to Constantine's effort to buy Playboy Enterprises; for legal fees related to Kenner's efforts to start a tequila company in Mexico; and straight cash back to Kenner. <u>See</u> GX-80.

Constantine argues that Sergei Gonchar's approval of GSF funds for various purposes, including Constantine's personal use, negates the GSF fraud. ECF No. 346 at 16-17. However, Gonchar spoke only for himself and what he authorized his money to be used for, not the other players. Tr. at 4873-4874. Even subtracting Gonchar's money, the millions of dollars contributed by other players and diverted at Constantine's direction for Constantine's and Kenner's personal benefit was more than enough to constitute fraud.

Constantine also argues that Semple "concluded that the funds had been used for the intended purpose, though there were certain expenses for which he could not render a conclusion due to an absence of records." ECF No. 346 at 17. In fact, Semple testified that he could <u>not</u> conclude that all of the GSF funds were used for their intended purpose. Tr. at 5529. Semple's testimony revealed why: he did not conduct a forensic audit, certified audit, or even a review; he did not see the actual bank statements for the account he was reviewing; he relied on what Constantine and Kenner told him regarding the use of funds, including for approximately $300,000 in legal invoices that he had no backup for; he credited money to the

defendants that he had no backup for; and he never actually finished the engagement and "hit a brick wall."  Tr. at 5438; 5520-5524; 5563.

2. Counts Two through Four: Wire Fraud

Constantine argues that none of the particular wire transfers charged in Counts Two through Four involved Constantine as he was not the specific sender or recipient of any of those wires.  ECF No. 346 at 8.  However, the government need not show that a defendant personally sent or received the charged wires.  Cf. Schmuck v. United States, 489 U.S. 705, 710-11 (1989) (mailings sent by unwitting third parties satisfied the mailing element for mail fraud).  It is sufficient for the evidence to show that the defendant acted "with knowledge that the use of the [wires] will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended."  Reifler, 446 F.3d at 96; see United States v. Price, 374 F. App'x 189, 191 (2d Cir. 2010) (where the evidence showed a continuing conspiracy between defendant and co-conspirator, transactions initiated by co-conspirator in furtherance of the conspiracy were reasonably foreseeable to defendant); cf. also Schmuck, 489 U.S. at 710-11 ("sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot" (internal marks omitted)).

In support of his argument, Constantine cites the fact that Kenner (not Constantine) directed Gaarn and Kaiser to make the respective wire transfers charged in Counts Two and Three, that Kenner himself made the wire transfer charged in Count Four, and that Gaarn and Kaiser were not aware of any participation by Constantine in those transfers.  However, the government need not prove that the defendant knew the identities of all of the other conspirators (or unwitting middlemen) involved in the conspiracy.  Huezo,

546 F.3d at 180.  Gaarn and Kaiser were not in a position to know, and testified that they did not know, whether or not Constantine was involved.

As noted above, the evidence was sufficient for a rational juror to find that Constantine knowingly participated in the overall scheme to defraud.  In particular, the evidenced showed an interdependency between Constantine and Kenner -- with Constantine providing his company Eufora as a cover for raising money, and Kenner serving as the front man who raised money from his clients.  Based on Constantine's participation in the conspiracy, under Pinkerton, he is liable for the foreseeable criminal conduct of his co-conspirator, even if he did not have direct knowledge of a particular wire transfer.  See Bernadel, 490 F. App'x at 25 (Pinkerton liability for wire fraud applied where the evidence established that there was an interdependent relationship between their fraudulent activities).

Even separate and apart from the conspiracy charge, the evidence was sufficient for a rational juror to convict Constantine of wire fraud on an aiding and abetting theory.  Constantine's use of his company and its bank accounts to further the fraud, personal benefit from proceeds of the fraud, and efforts to cover up the fraud afterwards (as discussed in the Home Depot tape and reflected in backdated tax returns), demonstrated that he joined the venture, shared in it, and made efforts to contribute to its success.

### 3.   Counts Five and Six: Wire Fraud

Constantine argues that his dealings with Privitello were "a business deal gone bad," not fraud.  ECF No. 346, at 12.  Constantine presented this same argument to the jury and the jury rejected it.  Constantine's failure to provide Privitello with any documentation of his investment, failure to transfer an interest in Eufora to Privitello (while transferring interests in Eufora to others around the same time), and misdirection of Privitello's money

(to his attorney's account instead of directly to Eufora) belie the notion that this was a legitimate business transaction.  Emails, recordings, and bank records showed that Constantine promised Privitello a 1.5% stake in Eufora in exchange for $200,000 with no intention of carrying out that promise; testimony and bank records showed that Constantine represented to Privitello that he would use the money for Eufora's business expenses but diverted part of the money elsewhere; and business records and recording showed that Constantine disavowed any notion of Privitello holding an interest in Eufora.  See supra Part II.C.

Constantine also argues that his subsequent purported attempts to "unwind the deal" and return the investment undermines the proof of guilt.  ECF No. 346 at 12.  Specifically, he argues that "the attempt by Kenner, Privitello and others to take over Eufora and oust Constantine provides context for the failure of the Privitello investment to result in a transfer of an interest in Eufora."  ECF No. 346 at 13.  That is not true, for several reasons.  First, the fraud as to Privitello was complete as soon as the wire transfer occurred and no interest in Eufora was conveyed.  See United States v. Trudeau, No. 10-CR-234, 2016 WL 614686, at *4 (D. Conn. Feb. 16, 2016) (crime of wire fraud is complete at the time the wire is sent).  The investors' lawsuit against Constantine to recover their Eufora investments -- which Constantine describes as an attempt at a "hostile takeover" -- occurred years afterwards and cannot provide "context" for the theft of money and repudiation of interest that occurred years earlier.  Second, Constantine's contemporaneous dealings showed that Constantine (CEO and President of Eufora at the time) was able to transfer interest in Eufora unilaterally, if he wanted to, and any reason he gave for not being able to (e.g., contingencies) was disingenuous and an excuse for fraud.  For example, in August 2009, four

months before taking money from Privitello, Constantine solicited money from Gonchar for Eufora and Gonchar received a percentage interest in Eufora in return, without contingencies, questions, or excuses.

Constantine also argues that Privitello's purported decision not to accept his money back from Constantine somehow relieves Constantine of guilt. As noted above, no offer from Constantine was forthcoming. Any offer to return money years after the fraud occurred is irrelevant. Eufora's listing of Privitello's money as "short term debt" was merely a cover for the fraud and disingenuous -- after Privitello's investment, Constantine transferred interests in Eufora to individuals who were wealthier, closer-by, and more powerful that Privitello (such as Nash), while continuing to refuse to transfer an interest to Privitello. These actions after the fact serve to strengthen a finding of intent to defraud, not weaken it. Those attempts were disingenuous statements to prolong the fraud and avoid answering to Privitello. See GX-4500 (Constantine stating in a recorded conversation, "There's no way I'm coming [to New York in response to Privitello's lawsuit] -- what would you do if somebody said, "Come to Idaho, you raped this girl. Come to Idaho and deal with it right now." How fast would you go to Idaho? You'd say, "Fuck you," right? That's pretty much what I did. I'm not gonna come to some room in New York because some guy that represents some guy that supposedly represents these guys is telling me, "You better come here or else." I'm not a fucking idiot."). GX-4500.

### 4.    Count Nine: Conspiracy to Commit Money Laundering

Constantine does not elaborate on his argument that there was insufficient evidence to support Count Nine. ECF No. 346 at 17. Bank records and summary charts showed that Constantine and Kenner had at least a tacit agreement to conceal and disguise

the nature, location, source, ownership, and control of the proceeds of their wire fraud, and

Constantine actively committed overt acts in furtherance of that agreement.  See supra Part

II.E.

        For example, in connection with the Hawaii project and the Urban Expansion

loan, Constantine wired proceeds of the payout through his own account back to Kenner for

Kenner's personal benefit.  GX-CHART-7.  These transactions served to disguise the fact

that proceeds from the Urban Expansion loan were going to Kenner, unknown to the victims

and in direct contravention of the Urban Expansion settlement agreement.  GX-3824; see

United States v. Cedeno–Perez, 579 F.3d 54, 61 (1st Cir.2009) ("A rational jury could have

concluded that [defendant], in agreeing to carry out a financial transaction with [a

coconspirator], engaged in conduct that was commonly known to conceal the nature,

location, source, ownership, or control of the proceeds.")

        In connection with Eufora, during the first series of transactions, Constantine

received the proceeds of the wire fraud in his CMG account in the first instance and then

wired the money onwards for his and Kenner's personal benefit.  GX-CHART-10 through

GX-CHART-13.  For example, in April 2008, Kenner convinced Michael and Kristin Peca to

invest $100,000 in Eufora.  Instead of sending the money to Eufora, Kenner wired the money

directly to Constantine's CMG account.  Constantine then turned around and wired the

money directly to Kenner, on the same day.  GX-CHART-10.  Meanwhile, the Pecas had no

knowledge that they were essentially making a $100,000 contribution to Kenner that day.

Tr. at 675-677.  The same type of laundering occurred again with Nash's investment in

Eufora, see GX-CHART-11 (Kenner sends $100,000 to CMG, CMG sends $17,000 back to

Kenner), and Ranford's investment in Eufora, see GX-CHART-13 (Kenner sends $200,000

to CMG, CMG sends $38,000 back to Kenner).  These transactions show that Constantine

conspired with Kenner to place "the proceeds of earlier wire fraud into bank accounts" that

were not disclosed to the victims.  See Shellef, 732 F. Supp. 2d at 46.  In connection with

Eufora, during the second series of transactions, Constantine received the proceeds of wire

fraud after it had already been wired out of Eufora's account through Gaarn's and/or others'

accounts.  GX-CHART-14, GX-CHART-16.  As discussed above, Constantine knew about

the investor money coming into Eufora's account and at the same time was arranging for

Kenner to provide him with proceeds from that money to pay for his legal expenses, among

other things.  Taken together, the jury could have reasonably inferred that Constantine

conspired with Kenner to route the money through several accounts before it was transferred

to both of them for their personal benefit.

       In connection with the GSF, Constantine directed investors' money (typically

transferred by Kenner signing on behalf of the investors) to Ronald Richards' attorney trust

account on the premise that it was to be used for Richards' legal fees in litigating against Ken

Jowdy.  Constantine's subsequent direction to Richards to wire nearly all of the money out of

the attorney account to various other attorneys and other entities for his and Kenner's pet

projects and personal expenses evidenced money laundering.  Constantine's wires out of

Richards' account directly to personal expenses (rather than to Constantine's or Kenner's

own accounts first) served to conceal the fact that Constantine was in control of the funds, a

fact that the victim investors did not know.  Furthermore, Constantine's wires to other

attorney accounts served to further disguise the transactions as potentially legitimate legal

expenses and hide their true nature as unauthorized personal expenses (for example, by

listing "Sullivan & Cromwell" rather than Playboy for a payment to fund the acquisition of

Playboy Enterprises, and by listing "Ruben Carillo" rather than Mosquito Rojo Tequila for a payment to fund the creation of a tequila company in Mexico). See supra Part II.D; United States v. Monea, 376 F. App'x 531, 540 (6th Cir.2010) (holding, among other things, that "[a] rational juror could infer an intent to conceal from [defendant's] routing the money through an extra step—the IOLTA account—not integral to the sale").

   Multiple specific transactions out of the GSF further evidenced Constantine's intent to conceal and disguise the nature of the funds. For example, Constantine used $450,000 from the GSF to avoid eviction through a multi-step method that concealed the source of the funds: he first gave Edenholm $450,000 from the GSF, and Edenholm gave Constantine a plane; Edenholm then bought Constantine's house out of foreclosure and rented it back to Constantine; Constantine paid the rent using funds from the GSF. GX-1102; Tr. at 1652-1658. Constantine also used the GSF to redirect $250,000 to himself through AZ Falcon Partners, LLC by negotiating a $415,000 settlement for the airplane loan (paid out of the GSF and releasing Kenner and Gonchar as guarantors) and inserting a "Constantine Lien" of $250,000 into the settlement agreement. GX-4207.

II.  <u>There Was No Error as to the Instructions or Verdict Sheet</u>

  A.  <u>Applicable Law</u>

   Rule 33(a) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 motions are granted only in "extraordinary circumstances" and only if the district court finds that there is "a real concern that an innocent person may have been convicted." United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted); see United States v. Funaro, 222

F.R.D. 41, 45 (D. Conn. 2004) (where Rule 33 motion was based, in part, on claim of error in jury instructions, such motions should be granted "sparingly and in the most extraordinary circumstances") (internal quotation marks omitted); cf. United States v. Middlemiss, 217 F.3d 112, 122 (2d Cir. 2000) (where Rule 33 motion is based on newly discovered evidence, granting the motion "is not favored and is done with great caution"); United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992) (where Rule 33 motion is based on the identification of perjured testimony, it should be granted "only with great caution and in the most extraordinary circumstances").  "It is only when it appears that an injustice has been done that there is a need for a new trial in the interest of justice."  United States v. Bell, 584 F.3d 478, 483, 487 (2d Cir. 2009) (internal quotation marks omitted) (reversing district court's grant of a Rule 33 motion because the jury instructions at issue and the use of a general verdict form were not error).

B.    Argument

Constantine argues that the Court erred by not providing "a specific unanimity instruction to ensure that the jury agreed on which object of the conspiracy in Count 1, and which conspiracy (Count 1 or Count 9) formed the basis of conviction."  ECF No. 346 at 18. He requests that the Court grant a new trial on all counts, pursuant to Federal Rule of Criminal Procedure 33, on this basis.  ECF No. 346 at 18.  Kenner, presumably, joins in this motion.  ECF No. 325.

As an initial matter, Constantine is mistaken about the content of the Court's instructions.  The Court gave a specific unanimity instruction directing that the jury must agree unanimously on the object of the wire fraud conspiracy to convict on Count 1:

> The conspiracy charged in Count One of the indictment has alleged more than one objective, that is, it alleges multiple ways in which the members conspired to execute a scheme to defraud investors.
>
> The three crimes alleged to be an object of the conspiracy in Count One involve wire fraud: the first is the alleged scheme to defraud investors related to the Hawaii Land Developments, the second is the alleged scheme to defraud investors related to the Eufora Investments, and the third is the alleged scheme to defraud investors related to the Global Settlement Fund.  I instructed you on the elements of wire fraud earlier when I instructed you about Counts Two through Eight, and those elements and instructions apply equally to this count. . . .
>
> The government need not prove that the alleged conspirators entered into an agreement to accomplish all three of the unlawful objectives alleged.  If you find unanimously that two or more persons agreed to commit any of these three objectives, then this element would be proved.  That is, it is not enough to convict if some of you find that the government has proven only an agreement to accomplish one unlawful objective while others of you find that the government has proven only an agreement to accomplish a different unlawful objective.  Thus, you must be unanimous as to the particular unlawful objective.

Tr. at 6068-6069.  The Court also gave instructions commanding the jury to consider the

conspiracies in Count 1 and Count 9 separately and explaining that the jury must agree

unanimously on the separate object of the money laundering conspiracy to convict on

Count 9.  For example, the Court instructed:

> The indictment contains nine counts, or separate charges or offenses.  They are numbered counts one through nine.  You must consider each count separately and return a verdict based only upon the evidence as it relates to that specific count.  You must also consider each defendant separately.  Whether you find a defendant not guilty or guilty as to one offense should not affect your verdict as to any other offense charged.  Your verdict as to each count and each defendant must be unanimous.

Tr. at 6046; accord Tr. at 6029-6030; see Tr. at 6090 ("I instruct you that the decision you

reach as to each element for each charge in the indictment must be unanimous, that is, all 12

of you must agree on every element in every count.  I also instruct you to consider each

count of the indictment in which each defendant is charged separately.  For example, you

may find a defendant guilty of one count and not guilty of another or you may find him

guilty of all counts or not guilty of any.  But again, the verdict on each element and each

count must be unanimous"); see also Tr. at 6047-6048 (explaining that Count 1 charges

conspiracy to commit wire fraud whereas Count 9 charges conspiracy to commit money

laundering); Tr. at 6064-6072 (explaining Count 1's charge of conspiracy to commit wire

fraud); Tr. at 6078-6088 (explaining Count 9's charge of conspiracy to commit money

laundering); Tr. at 6085 (explaining that "the illegal laundering of funds described [in Count

9] cannot occur in the same financial transaction through which those funds first became

tainted by a crime").

        To the extent that Constantine now challenges the particular wording of the

Court's unanimity instructions or its decision not to use a special verdict sheet, those

challenges are waived.  Neither Constantine nor Kenner objected to the Court's unanimity

instructions nor proposed alternative instructions.  See Tr. at 5646-5647; Shellef, 732 F.

Supp. 2d at 66 (where the defendant did not object to the Court's instruction and did not

propose an alternative instruction on the issue, the argument that the Court should have

instructed the jury otherwise is waived) (citing United States v. Javino, 960 F.2d 1137, 1144

(2d Cir. 1992), United States v. Plitman, 194 F.3d 59, 66 (2d Cir. 1999), and United States v.

Stratton, 779 F.2d 820, 826 (2d Cir. 1985)); United States v. Davis, No. S1 06 Cr. 911, 2010

WL 3306172, at *5 (S.D.N.Y. Aug. 20, 2010) (same).  Moreover, both Constantine and

Kenner affirmatively declined to request a special verdict sheet.  See Tr. at 5678 (counsel for

Constantine stating, "I am going to withdraw our request for a special verdict so that need

not be addressed" and explaining that he "did research" the night before and "after looking at it and speaking to my client, we decided to withdraw that" request); Tr. at 5666, 5679 (counsel for Kenner stating that his inclination was "to leave the charge and verdict sheet as it[] stands" and "to not request a special verdict").  "Such a strategic decision, evidenced not merely by silence but by a negative response on the record to a district court invitation to voice objection, does more than forfeit the unraised objection; it waives it" and negates even plain-error review.  United States v. Agrawal, 726 F.3d 235, 259 (2d Cir. 2013); see United States v. Quinones, 511 F.3d 289, 321 (2d Cir. 2007) (stating that true waiver can negate even plain-error review).

Even if the Court's unanimity instructions and its decision not to use a special verdict sheet were subject to review, there was no error, much less plain error.  Plain error exists only if there was an (1) error, (2) that is plain, (3) that affects substantial rights, and (4) that "seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Weintraub, 273 F.3d 139, 145 (2d Cir. 2001) (internal quotation marks and alteration omitted).

As an initial matter, as previously discussed, the government submitted an abundance of evidence from which the jury could have concluded that Constantine and Kenner were guilty on all counts of conviction.  Accordingly, any error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings.  United States v. Feliciano, 223 F.3d 102, 115 (2d Cir. 2000).

Moreover, the Court's unanimity instructions were not plainly erroneous.  A jury instruction is plainly erroneous only if it contravenes binding legal precedent. Weintraub, 273 F.3d at 152.  The instructions here did not.  The Second Circuit has "time

and again, held that a general charge regarding unanimity is ordinarily sufficient to protect

the defendant's right to a unanimous verdict." United States v. Trupin, 117 F.3d 678, 687

(2d Cir. 1997).

The Court's decision not to use a special verdict sheet also was not plainly

erroneous.  The district court "has broad discretion in determining whether to use a special

verdict sheet in a complex criminal case." United States v. Burrell, 43 F. App'x 403, 406 (2d

Cir. 2002).  The Court properly exercised that discretion here.  See, e.g., United States v.

Ogando, 968 F.2d 146, 149 (2d Cir. 1992) (affirming district court's decision not to use

special interrogatories in a complex criminal case).

Griffin does not provide otherwise.  In Griffin, the Supreme Court made clear

that although a general guilty verdict on a multiple-object conspiracy may be set aside if one

of the objects is legally inadequate, such a verdict may not be set aside where one of the

objects is merely factually inadequate.  Griffin v. United States, 502 U.S. 46, 57-58 (1991).

Notably, Constantine does not allege that any of the objects of the multiple-object conspiracy

was legally inadequate.[6]  Therefore, if the evidence is sufficient with respect to any of the

objects, the general guilty verdict stands.  There is "no exception" to this rule.  Griffin, 502

U.S. at 56-57; see also United States v. Desnoyers, 637 F.3d 105, 109-110 (2d Cir. 2011)

(declining to decide the continuing validity of the Papadakis caveat).

The Papadakis caveat, if still valid, does not apply to this case because no

single object overwhelmed the other objects discussed at trial.  Throughout the course of the

trial, the government presented evidence of each object and explained how they were

---

[6] Constantine's reliance on the concurring opinion in Griffin -- which, by its
own terms, went "further" than the Court's majority -- is unavailing.  502 U.S. at 61
(Blackmun, J., concurring).

interrelated.  Constantine appears to suggest that evidence relating solely to the Hawaii and Eufora schemes overwhelmed the evidence relating to the Global Settlement Fund.  ECF No. 346 at 20-21.  That is not true.  Nearly every victim-witness testified about the Global Settlement Fund and the government presented the testimony of at least eight non-victim witnesses that related primarily to how proceeds from the Global Settlement Fund were spent.  In addition, a significant portion of Constantine's cross-examinations of government witnesses and a significant portion of Constantine's defense case focused on the Global Settlement Fund.  See Tr. at 4804 (testimony of Sergei Gonchar explaining authorization of funds for GSF); Tr. at 5426 (testimony of Robert Semple providing accounting of GSF).  In light of the extensive evidence presented in support of each of the objects of the multi-object conspiracy, there is no basis to set aside the general guilty verdict here.[7]

---

[7] Constantine also cites United States v. Lapier, 796 F.3d 1090 (9th Cir. 2015), in support of his argument.  That case is inapposite.  Lapier addresses the jury confusion that may result when the indictment charges a single conspiracy but the trial evidence establishes multiple conspiracies.  That did not occur here.  See Tr. at 5678-5679 (counsel for Constantine and Kenner declining the Court's invitation to insert a multiple conspiracy instruction).  In this case, Count One of the indictment and the trial evidence established a single conspiracy, and the jury instructions accurately explained it to the jury as such.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court

deny the defendants' motions.

Dated:      Brooklyn, New York
            April 4, 2016

                                    Respectfully submitted,

                                    ROBERT L. CAPERS
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    Attorney for Plaintiff
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201


                          By:       /s/ Saritha Komatireddy
                                    Saritha Komatireddy
                                    Assistant United States Attorney
                                    (718) 254-6054

cc:      All counsel of record (by ECF)