1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                :
UNITED STATES OF AMERICA

                                    CR-13-607


            -against-            :

                                    United States Courthouse
                                    Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

    Defendants.              :
                                    April 4, 2016
- - - - - - - - - - - - - - - X    10:00 a.m.

                TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JOSEPH F. BIANCO
            UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        ROBERT CAPERS,
                           United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  DIANE LEONARDO, ESQ.
                                MADELINE O'CONNOR, ESQ.
                           Assistant United States Attorney




For the Defendants:        HALEY, WEINBLATT & CALCAGNI
                           One Suffolk Square
                           1601 Veterans Memorial Highway
                           Islandia, NY  11749
                           BY: RICHARD HALEY, ESQ.
                           For Mr. Kenner

2

For the Defendants:

                                LARUSSO & CONWAY
                                300 Old Country Road
                                Mineola, NY  11501
                                BY: JOSEPH CONWAY, ESQ.
                                For Mr. Constantine


                                ANDREW L. OLIVERAS, ESQ.
                                26 Strangford Court
                                Oceanside, NY  11572
                                For Mr. Constantine


Court Reporter:                 Mary Ann Steiger
                                100 Federal Plaza
                                Central Islip, New York 11722
                                (631) 712-6101


            Proceedings recorded by mechanical stenography.
                Transcript produced by computer.

3

1      THE CLERK:  All rise.

2      THE COURT:  Please be seated.

3      THE CLERK:  Calling case 13-CR-607, U.S.A. vs.

4  Kenner and Constantine.

5      Counsel, please state your appearances for

6  record.

7      MS. LEONARDO:  For the United States, Diane

8  Leonardo and Madeline O'Connor.

9      Good morning, your Honor.

10      THE COURT:  Good morning.

11      MR. HALEY:  Richard Haley for Phil Kenner, your

12  Honor.  Phil is, of course, to my left.

13      MR. CONWAY:  Good morning, your Honor.

14      Joseph Conway and Andrew Oliveris for Tommy

15  Constantine.

16      THE COURT:  Good morning.  Mr. Constantine is

17  present as well.

18      As you know, this is a continuation of the

19  forfeiture hearing.

20      The government rested at the last date, so is

21  the defense ready to proceed?

22      MR. HALEY:  Yes, your Honor.

23      THE COURT:  You're going to go first, Mr. Haley?

24      MR. HALEY:  If I may, Judge, yes.

25      Your Honor, before I commence the defense case

4

1    as far as the forfeiture hearing is concerned, I do have

2    an application.

3          Your Honor's determination as relates to this

4    application will necessarily determine the scope of my

5    inquiry of my client.

6          In addition, your Honor, to the forfeiture

7    aspect of this case, there has been filed a presentence

8    report which your Honor may or may not have had a chance

9    to review as yet.  I have not as yet submitted my response

10   to the presentence report, but I assure this Court as an

11   officer of the Court and as Mr. Kenner's counsel I will be

12   asserting any number of objections and demanding a Fatico

13   hearing as relates to various aspects of the presentence

14   report where there's alleged relevant conduct to be

15   included as part of the guideline analysis.

16         The reason I bring this to the attention of the

17   Court, Judge, is in the presentence report it is alleged

18   that there was additional relevant criminal conduct as

19   relates to the Palms, Los Frailes, Diamante Del Mar and

20   Cabo San Lucas.

21         As your Honor is well aware, the government,

22   now, by way of the forfeiture hearing and specifically

23   chart FORF-1 utilizes the forfeiture hearing to allege

24   additional criminal conduct as relates to those four

25   entities or those four matters involving financial

5

1    transactions between my client and various hockey player

2    clients.

3         Your Honor was astute enough at one point during

4    the government's direct case in the forfeiture hearing to

5    note that -- and I'm just paraphrasing the Court -- that

6    the Palms was not alleged to be any part of a fraudulent

7    scheme and, indeed, it's not mentioned in the indictment

8    nor is there any 404(b) representation that the Palms or

9    Frailes and Cabo San Lucas and/or Diamante Del Mar

10   involved other crimes committed by the defendant.

11        Indeed, your Honor, we did search the record

12   regarding the colloquy that occurred at sidebar with your

13   Honor.  Rather than read in the entire colleague, the end

14   result was at follows.

15        May 7, 2015, page 668, line 18, after that

16   sidebar conference dealing with questions that were asked

17   of Mr. Peca concerning the Palms, the following occurred:

18        Mr. Haley: Perhaps your Honor can give a

19   curative instruction that the Palms dispute is not part of

20   this indictment.

21        The Court: Sure.  I'll say it again, just remind

22   me.

23        Mr. Haley:  Thank you.

24        My application, Judge, and I guess in part my

25   objection is as follows:

6

1        Mr. Kenner is prepared to testify today as to

2   the financial transactions involving himself and other

3   hockey player clients regarding Palms, regarding Los

4   Frailes, regarding Diamante Del Mar, regarding Cabo San

5   Lucas.

6        However, as your Honor is well aware, when a

7   Fatico hearing is demanded, the government bears the

8   burden of going forward on those issues and bears the

9   burden of proof.

10        At the conclusion of that process the defendant

11   may then testify and address those issues as relates to

12   the guideline calculation and relevant conduct.

13        If indeed the government intends to rely upon

14   this record that's been established in the forfeiture

15   hearing for purposes of the Fatico issues, then there is

16   no issue from my perspective.

17        But Mr. Kenner ought not to be placed in a

18   position, Judge, by way of a forfeiture hearing where

19   these four events or transactions separately alleged

20   transactions involving a myriad of conversations, a myriad

21   of documents that address Palms, Los Frailes, Diamante Del

22   Mar, in part a stack perhaps six or seven inches in depth,

23   during the course of a forfeiture hearing.

24        What ought to occur is the government presents

25   its issues or its proof as relates to those four matters;

7

1   again Palms, Los Frailes, Diamante Del Mar, Cabo San Lucas

2   in the context of a forfeiture hearing, I cross-examine

3   the government's testimony in that regard and have an

4   opportunity to examine and cross-examine the documents

5   that are introduced in that regard, and then my client

6   once that's presented testifies.

7           So what's happening, Judge, to use a very trite

8   phrase, the cart is being put before the horse to the

9   prejudice of my client by way of a backdoor use of a

10  forfeiture hearing that addresses issues that will

11  undoubtedly be relevant for purposes of a Fatico hearing.

12          Now, I'm sensitive to the fact, Judge, of the

13  complexity of this case, though one government witness

14  once told the media it's not a complex case.  I choose to

15  differ.  This Court thought it was a complex case and

16  enough to declare it complex for speedy trial purposes.

17          What I'm going to suggest to the Court is as

18  follows:

19          I'm prepared to put my client on the stand to

20  testify in this forfeiture hearing as relates to those

21  matters that the government identified by way of the

22  original indictment and by way of their bill of

23  particulars that was filed prior to the commencement of

24  the trial.

25          They identified specific properties that they

8

1    sought to forfeit and they identified, by way of the

2    supplemental bill of particulars, additional properties,

3    specifically Baja Ventures 2006.

4            And from my perspective, Judge, those matters

5    are appropriate for the defense to address at this point

6    in time by way of Mr. Kenner's testimony and appropriate

7    for the Court to give consideration of that testimony when

8    the Court ultimately makes a decision as to what if any

9    forfeiture there ought to be.

10           Judge, perhaps I can focus the issue in this

11   respect.

12           In the original indictment they sought the

13   forfeiture of my client's residence at Cactus Road in

14   Arizona, and analytically I can understand that.

15           For example, they allege the Eufora fraud

16   scheme.

17           Assuming, for sake of this argument, the jury

18   convicted him on the Eufora fraud scheme, and what we have

19   is we have testimony that $100,000 came into CMG

20   Management, and the same day $100,000 went out of CMG

21   Management to a Kenner-controlled account, and to the

22   extent that that money was then used, let's say, to make a

23   mortgage payment at the Cactus Road residence or to make

24   some improvements in connection with the Cactus Road

25   residence, that is classic money laundering and indeed

9

1   that would be a forfeitable asset as I understand the law

2   under that type of analytical road if you will.

3            Cactus Road was identified in the indictment as

4   a forfeitable asset.  Again, it was the Palms, Los Frailes

5   or Diamante Cabo San Lucas nor Diamante Del Mar was in any

6   way identified by way of the indictment or the bill of

7   particulars that preceded that indictment.

8            My application, Judge, and my objection is not

9   in any way to put this Court into a quandary, but I would

10  respectfully suggest there is a solution and the solution

11  is as follows:

12           That we proceed today with the testimony of my

13  client as relates to those issues which we're prepared to

14  address concerning the properties identified in the

15  original indictment and the bill of particulars that were

16  filed prior to trial, the Court withholds a determination

17  on the forfeiture matters, we undoubtedly will be having a

18  hearing as I related to the Court, a Fatico hearing, we're

19  entitled to the Fatico hearing, I'm going to demand the

20  Fatico hearing, and then the government will put its proof

21  on to establish whether there's relevant criminal conduct

22  as relates to those other matters.  Then my client can

23  respond at that point in time and exhibits, which again

24  total approximately six or seven inches in depth, can be

25  introduced at that point in time.

1          Procedurally, the defendant's not prejudiced by

2     that procedure or process.  Your Honor then at that point

3     in time will have full and fair opportunity to reflect

4     upon a total record.

5          And to the extent that there is common issues

6     between the Fatico hearing and common issues between the

7     forfeiture hearing, your Honor will make a determination

8     as to whether there's common issues or not.

9          I'm arguing, Judge, and, frankly, and, again, to

10    use a trite expression, we're mixing apples and oranges

11    here, and then your Honor can render a determination by

12    way of the judgment of conviction that addresses not only

13    the guideline calculation, whatever your Honor determines

14    as relates to that, as well as the forfeiture

15    determination and we can address those issues in one final

16    argument or summation to the Court rather than having a

17    sequence of different submissions and different arguments,

18    Judge, that may address common issues.

19          I endeavored to make this brief, Judge, but I

20    hope you appreciate the purpose.

21          THE COURT:  I understand what you're saying.

22          My recollection is, and I'll ask Ms. Leonardo to

23    correct me if I'm wrong, is that this came up at the prior

24    date as related to the Palms and Los Frailes, and my

25    recollection is that when I asked the government about the

11

1   fact that in the trial there was no evidence of fraud, and

2   yet they were seeking to forfeit those properties, I

3   believe their answer was that they're not, that the theory

4   is the commingling of the money from the other schemes

5   with money for those properties.  Maybe my memory is

6   wrong.

7          Are you proceeding to try to forfeit those on

8   the theory that they were frauds or some other theory or

9   maybe both?

10          MS. LEONARDO:  Well, your Honor, in addition to

11  commingling, I think we discussed this on the last two

12  times, because these defendants were convicted of the

13  money laundering conspiracy, it's a very broad avenue for

14  forfeiture.

15          These issues arose I believe in the first

16  hearing on February 12th.  Your Honor asked us to brief

17  these issues.  We briefed them and counsel for the defense

18  remained silent.  They did not address these issues

19  whatsoever.

20          We submitted an eight page letter to the Court

21  laying out the case law with regard to charged conduct,

22  uncharged conduct, relevant conduct and how it's

23  applicable to the forfeiture proceedings, and counsel

24  remained silent with regard to our brief on that issue.

25          Your Honor, we also raised this issue the first

12

1     hearing or the second hearing that some of the issues are

2     going to overlap.

3          THE COURT:  I know, but I know you're not the

4     AUSA that handled the criminal part of the case, and I

5     haven't had a chance to focus on the presentence report,

6     but if in fact the government is going to be seeking for

7     relevant conduct purposes for purposes of sentencing to

8     have these investments, these properties, included as

9     relevant conduct, then Mr. Haley is right.

10         I think basically that we need another hearing

11    then because if the government is claiming that I should

12    introduce relevant conduct as a fraud, I don't think

13    that's been the focus of what you've done, so I don't know

14    if you've spoken to them about that or not.

15         MS. LEONARDO:  Well, your Honor, I believe the

16    PSR does indicate that it should be considered relevant

17    conduct.

18         I'll note that the PSR has been out since

19    February sometime, so for the first time I think it's

20    unfair to us for the first time to raise this issue two

21    months later that now a Fatico hearing is going to be

22    demanded.

23         THE COURT:  I don't know about that.  Look, they

24    came in on day one complaining procedurally how the

25    government is proceeding on the forfeiture.  They pointed

13

1    out on day one there's no evidence in their view of any

2    frauds as relates to these properties, some of these

3    properties that you're now seeking to forfeit.

4         So I don't think anybody is surprised to hear

5    that if the presentence report is considering these to be

6    relevant conduct for purposes of the fraud, that they're

7    objecting.  I'm not certainly surprised to hear that.

8         Since we started this forfeiture they were

9    surprised because Mr. Miskiewicz had a sidebar and it was

10   on more than one occasion where there was a discussion

11   where he said, no, we're not seeking, we're not arguing to

12   the jury that there was a fraud.

13        So I don't think anybody is surprised to hear

14   that they're objecting to me considering those for

15   purposes of sentencing.

16        And I'm telling you right now, if the government

17   intends on, purposes of sentencing, to have me consider

18   those as relevant conduct, fraudulent conduct, the

19   government has to put proof of that on at another hearing.

20        So in terms of how we should proceed today,

21   Mr. Haley, I'm continuing to follow the course that I

22   followed previously as relates to the forfeiture, which is

23   you reserved your procedural objections in terms of the

24   bill of particulars.  I'm reserving on that.  I want the

25   government to present its full forfeiture case, which they

14

1    did, and with respect to Mr. Kenner, I want him to speak

2    to all of the properties they're seeking to forfeit,

3    notwithstanding your continuing objections to procedural

4    and otherwise.  In terms -- so he has to cover all of the

5    properties that they're seeking to forfeit.  Whatever

6    relevant testimony he has on the forfeiture of those

7    properties you should give today.

8           As relates to sentencing and relevant conduct

9    for purposes of sentencing, the government is going to

10   have to tell me what they're going to do on that.

11          I'm not going to be happy if we have to have

12   another hearing on that, but I'll cross that bridge when I

13   get to it.

14          I just want to focus on the forfeiture.  I know

15   we have to have a hearing on the forfeiture.  If your

16   client, obviously in discussing these properties, wants to

17   explain now that he didn't make any representation with

18   respect to one or more of these other properties, he can

19   do that, because that also could be potentially relevant

20   on the forfeiture as well.

21          That's the best guidance I can give you.

22          MR. CONWAY:  Thank you, your Honor.

23          I think your Honor has hit the proverbial nail

24   on the head when your Honor said to the government a

25   moment ago, well, what's your theory here?  Are you

15

1   alleging they ought to be forfeited because it's an

2   additional fraudulent conduct, or are you alleging that

3   they ought to be forfeited because they were commingled

4   with some other event that the Court may determine was

5   fraudulent conduct which involved the original schemes

6   that were alleged in the indictment.

7           That's the real issue here, Judge.  The

8   government, I don't think, gave you an answer on that.

9           THE COURT:  Look, they put in that letter.  I

10  asked that question and they put in law that makes clear

11  the law of forfeiture is very broad, if you commingle

12  funds in terms of money laundering, for example,

13  independent of whether or not it's a separate fraud that

14  you can forfeit under the money laundering statutes, if

15  fraudulent money is being funneled through the various

16  bank accounts.  It's not they ignored my query.  They put

17  in that letter and I know you object to that but I want

18  you to proceed factually as if that's part of the hearing,

19  okay?

20          MR. HALEY:  I will, your Honor.

21          So your Honor understands so I may make my

22  record and your Honor has been extremely patient with me

23  and I want to express my appreciation.

24          I wholeheartedly agree, Judge, that if the issue

25  is simply the commingling, I can address that by way of

16

1   Mr. Kenner's testimony today in a rather confined context.

2           If the issue is oh, yeah, we say commingling,

3   but also this is separate and identifiable frauds, again

4   that's my argument now what we're doing is really using a

5   forfeiture hearing for purposes of a Fatico.  That's

6   really my objection.

7           I guess I can proceed today, Judge.  I'll make a

8   determination based upon your Honor's ruling as to what I

9   deem is relevant today and may or may not get into other

10  areas.

11          I assume, Judge, and I'll simply state for the

12  record without prejudice to put my client back on the

13  stand by way of a Fatico hearing without hearing from the

14  government or the Court, Mr. Haley, isn't this something

15  that we started to develop already in the forfeiture

16  hearing?

17          And I might say, yes, it is, Judge, but now I

18  wish to further solidify as the Court might find his

19  testimony by way of documents which are again consistent

20  with what he will testify to demonstrating that neither

21  Los Frailes or the Palms nor Diamante Del Mar nor Cabo San

22  Lucas involved fraudulent criminal activity.

23          Thank you, Judge.

24          THE COURT:  All right.

25          MS. LEONARDO:  Judge, I want to make clear our

17

1   only theory of forfeiture is not commingling.

2           I think as your Honor said, and, I don't want to

3   belabor the point, as your Honor said because it's a money

4   laundering conspiracy, it's not just a commingling theory.

5           THE COURT:  No, but correct me if I'm wrong,

6   another theory could be that independent of money

7   laundering, independent of commingling, that it's a fraud

8   in and of itself, right?

9           MS. LEONARDO:  That's correct, Judge.

10          THE COURT:  You're not pursuing that theory for

11  purposes of forfeiture, right?

12          MS. LEONARDO:  Your Honor, if it's related to

13  the scheme in which he was convicted of, but it's a

14  separate fraud related to the initial scheme, then, yes,

15  we can.

16          What our entire theory has been is that as

17  charged in the indictment, the scheme is that they take

18  money from Hawaii investors and sent it to other business

19  entities and that's charged in the indictment.

20          THE COURT:  That's money laundering, right?

21          MS. LEONARDO:  Yes, your Honor.

22          THE COURT:  So I understand, it's commingling

23  and it's money laundering, but to the extent the argument

24  would be independent of money laundering, independent of

25  commingling, that they defrauded the hockey players in

18

1    their investments in the Palms, that would be another

2    forfeitable theory which I don't think -- I know there's

3    no proof of that during the trial and I know no witness

4    came in during the forfeiture hearing to testify to that.

5           So I don't know what the basis would be for

6    arguing that those, for example the Palms, should be

7    forfeited because the hockey players were defrauded in

8    that investment.

9           What's the evidence of that based upon what you

10   submitted to me at the forfeiture hearing?

11          MS. LEONARDO:  Your Honor --

12          THE COURT:  It's one thing to say I'm going to

13   invest your money here and you invested it somewhere else.

14   I understand that.  That's the theory of forfeiture and

15   I'm considering that theory.

16          But to the extent the theory is that the Palms

17   in and of itself was a fraud, who gave that testimony?

18          MS. LEONARDO:  I would have to go back to the

19   record at the criminal trial, your Honor, because I'm not

20   as familiar with it as the Court is.

21          THE COURT:  I sat through the criminal record

22   and I'll tell you what happened in the criminal trial.

23          Mr. Miskiewicz, when the issue of the Palms came

24   up, said we don't want to go into the Palms.  Judge, we

25   don't want to discuss the Palms.  We're not alleging the

19

1    Palms was a fraud.  No hockey player went into the Palms

2    in any detail.  It was obviously referenced in some of the

3    e-mails, but everyone was purposely and I think Los

4    Frailes was under the same you umbrella of no, this is not

5    something we're trying to tell the jury was fraudulent.

6    You can go back to the transcript.  I remember that

7    distinctly because we were worried about getting into all

8    these other investments that were not named in the

9    indictment and the government -- it wasn't 404(b), so I

10   think there is nothing in the trial record that speaks to

11   misrepresentations as relates to when people put their

12   money into those investments.

13           MS. LEONARDO:  Your Honor, again, not belabor

14   the point, but if you allow Ms. O'Connor, she can point

15   that out to your Honor.

16           MS. O'CONNOR:  Your Honor, it's my understanding

17   that at trial Mr. Miskiewicz agreed that they wouldn't

18   discuss particular mortgage arrangements between defendant

19   Kenner and the hockey players, Mr. Peca in particular.

20           That's why Mr. Miskiewicz agreed they wouldn't

21   go into the Palms, but it was limited to that particular

22   transaction.  It wasn't necessarily that the whole Palms

23   arrangement didn't involve fraud.  It was just really

24   about that which may or may not have been some kind of

25   breach of contract or something like that.

20

1          Nevertheless, Mr. Peca's investment in the Palms

2    was part of an overall fraudulent execution and that's

3    what the government intends to prove during this

4    forfeiture hearing which you may do by a preponderance of

5    the evidence.

6          THE COURT:  You're talking about his direct

7    investment in the Palms or are you talking about he put

8    money into Hawaii that got directed --

9          MS. O'CONNOR:  His direct investment, your

10   Honor, that was part of the commingled money in the

11   purchase of the Palms.  So it's commingled with stolen

12   money and that's how it's encompassed as part of the money

13   laundering fraud.

14         So it's the government's theory that it's

15   entitled to seek forfeiture both of any properties that

16   were involved in the money laundering conspiracy; but

17   also, your Honor, there's case law that says that when you

18   have a substantive fraud, such as wire fraud, the

19   government's able to introduce evidence of additional

20   executions of the scheme to defraud of which the

21   defendants were found guilty.

22         That's why, your Honor, we're presenting the

23   evidence that we are.

24         THE COURT:  Again, I understand at a forfeiture

25   hearing you can present additional evidence of fraud in

21

1   addition to the other theories, but what I'm telling you

2   is I know Mr. Peca didn't testify in the forfeiture

3   hearing and I would be very, very surprised if, when I

4   went back and looked at his trial testimony, that he gave

5   any type of detailed description of his investment in the

6   Palms, any type of fraudulent conduct as related to the

7   Palms because that would have been problematic for

8   everybody and I think we stayed clear of that during the

9   trial.

10          MS. O'CONNOR:  Well, your Honor, the government

11   is able to introduce not only the evidence that was

12   presented at trial, but additional evidence which Agent

13   Wayne introduced in the form of bank records and things of

14   that nature.

15          So the government --

16          THE COURT:  How can a bank record tell me

17   whether or not Mr. Peca authorized Mr. Kenner to directly

18   invest money in the Palms?

19          The only person that can tell me that if a bank

20   record shows that $500,000 went from Mr. Peca directly to

21   the Palms, the only person that could tell me that that

22   was fraudulent would be Mr. Peca.  A bank record doesn't

23   tell me whether or not he authorized that, right?

24          MS. O'CONNOR:  Your Honor, at trial, we've shown

25   that line of credit testimony was diverted to fund the

22

1    initial purchase of the Palms.

2              THE COURT:  Isn't that something different

3    though?  That's different.

4              I understand, as I said, to the extent the

5    government is arguing that money was diverted to the

6    Palms, that's different than saying -- that's not an

7    initial investment in the Palms.  That's diversion of

8    money that he thought was being invested somewhere else.

9              But maybe some of them did both, some of these

10   hockey players did both, invested directly in the Palms

11   and had money go from Hawaii to the Palms.  I don't know.

12             MS. O'CONNOR:  It's the government's theory that

13   by using stolen funds and commingling it with legitimate

14   investments, those legitimate investments facilitate the

15   money laundering offense, made it easier to commit and

16   hard to detect and that's the theory, your Honor, that all

17   of those --

18             THE COURT:  I understand the theory.  My

19   understanding of the theory is the commingling of money

20   potentially with money that was, according to the

21   government's evidence, wrongfully diverted.  That's my

22   understanding of what you're seeking forfeiture on.

23             Mr. Haley is concerned that you're also seeking

24   forfeiture as a fraud in and of itself, not a diversion of

25   money, but a fraud with respect to direct investments in

23

1    these properties that hockey players made.

2            That's the only thing we're talking about is

3    whether or not the government is seeking forfeiture of

4    these properties based upon a direct investment that the

5    government is claiming is fraudulent.

6            MS. O'CONNOR:  Your Honor, each property that

7    the government is seeking to forfeit is in some way or

8    form an additional execution of the frauds that the

9    defendants were convicted of.

10            And the evidence as we will show and I believe

11   it will be clear in our brief when it's laid out, simply

12   is that each one of these frauds were additional

13   executions of the same frauds they were convicted of.

14            There's nothing knew and these are not separate

15   frauds that they weren't provided notice of in the

16   indictment.  It's all the same thing.  It's investor money

17   that was meant to go to one of these, whether it be the

18   Hawaii, or the Eufora, or the Global Settlement Fund, and

19   instead it was diverted elsewhere and you'll see, your

20   Honor, when we present it in a brief, that all of the

21   money was either commingled, it seemed like it was a

22   direct investment or it was stolen money and that's the

23   government's theory.

24            THE COURT:  Okay.

25            MR. HALEY:  My only point, and I'll put my

24

1   client on the stand in a moment, when the government uses

2   the blunderbuss statement this is all part of the

3   fraudulent scheme he was convicted of, nowhere within the

4   four corners of the indictment is there a hint of any

5   fraudulent activity as relates to the Palms or Los

6   Frailes, or Diamante or Cabo San Lucas, or Diamante Del

7   Mar.

8           Once again, there was no special verdict here.

9           THE COURT:  Mr. Haley, look, I don't want to get

10  started.

11          My view of what the theory of forfeiture based

12  upon what the government has said is that they're arguing

13  that money was diverted from the Hawaiian investments and

14  other investments, money laundered and placed into various

15  other properties and entities and that therefore those

16  properties and entities are forfeitable because they

17  involve at least in part a diversion, unauthorized

18  diversion, of money into these various assets.  That's the

19  theory that I understand.

20          To the extent that they're suggesting that there

21  may be some evidence of fraud in and of itself that would

22  make it independently forfeitable as an independent fraud,

23  I haven't seen that evidence.  I certainly don't believe I

24  saw that evidence at the trial and I don't believe I heard

25  it through Agent Wayne's testimony notwithstanding their

25

1    use of hearsay.

2          So that's the theory under which we're

3    proceeding at the hearing.

4          If, after they lay it out in their brief and

5    they take the position now even if it wasn't commingled,

6    even if it was diverted, there was an independent fraud

7    going on here, then it's without prejudice for you putting

8    Mr. Kenner back on the stand because assuming they're

9    unable to prove those other two theories and that simply

10   what they're relying on is some independent fraud, we

11   would have more of a discussion, okay?

12         MR. HALEY:  Thank you, your Honor.

13         One final housekeeping matter.  What I would

14   prefer, however, when you speak in terms of brief, from my

15   perspective I believe the most effective representation I

16   can provide to Mr. Kenner is to submit a brief that would

17   address within the same brief the Fatico issues as well as

18   the forfeiture issues because I believe they're

19   intertwined.

20         THE COURT:  That's fine.  I have no problem with

21   that.  Maybe when we're done with the forfeiture hearing,

22   one of the AUSAs in the criminal part of the case can be

23   here and we can talk more about that and what their

24   intention is with respect to that relevant conduct issue,

25   okay?

26

1          MR. HALEY:  Unless I misread the presentence

2    report, I think I know what their intention is.

3          Thank you.

4          THE COURT:  I had that situation where probation

5    includes that in the presentence report and after we have

6    further discussion and I explain to the government you'll

7    need a Fatico hearing for this, sometimes they say I won't

8    pursue it.  But maybe I'm wrong.

9          MR. HALEY:  I would like to be so hopeful.

10          THE COURT:  Are you ready?

11          MR. HALEY:  Yes, Judge.

12

13   PHIL KENNER,

14               called as a witness, having been first

15               duly sworn, was examined and testified

16               as follows:

17

18          THE CLERK:  Please state your name for the

19    record.

20          THE WITNESS:  Phil Kenner.

21          MR. HALEY:  Your Honor, with the Court's

22    permission, there's no jury here, I would like to address

23    my client as Phil.

24          THE COURT:  That's fine.

25

27

1    DIRECT EXAMINATION

2    BY MR. HALEY:

3    Q.    Phil, good morning.

4    A.    Good morning.

5    Q.    Phil, you're aware that the indictment of you

6    included the identification of various properties that the

7    government sought to forfeit upon your original

8    arraignment; is that correct?

9    A.    Yes, sir.

10   Q.    And you're aware, are you not, that prior to trial, a

11   supplemental or a stylized bill of particulars was filed

12   with the government identifying additional properties that

13   were not at least as alleged in the original indictment;

14   is that correct?

15   A.    Yes, I believe in late April.

16   Q.    Now, let's focus on the April 22nd bill of

17   particulars, April 22nd, 2015.

18         The government identified property known as Baja

19   Ventures 2006 as property they sought to forfeit upon your

20   conviction; is that correct?

21   A.    Yes, sir.

22   Q.    And would you kindly describe to the Court what is

23   Baja Ventures 2006?

24   A.    It is a Delaware single purpose LLC that was set up

25   in or about February 23rd, 2006, to take an equity stake

28

1    in the Diamante Cabo San Lucas project holding equity

2    investments for myself, Joseph Stumpel and Jere Lehtinen.

3    Q.   Now, to the best of your knowledge, were any of those

4    two individuals identified as victims of any fraudulent

5    scheme as set forth in the indictment?

6    A.   No, sir, they were not.

7    Q.   Well, would you describe to the Court, as best you're

8    able, the financial transactions and sequence of financial

9    transactions that led to your acquisition of your interest

10   in Baja Ventures 2006?

11   A.   I had approached both Mr. Stumpel and Mr. Lehtinen at

12   some point in and around May and June of 2005 at the

13   beginning of the commencement of the deposits made to the

14   seller of the Cabo San Lucas property, and both

15   individuals had agreed to join in an arrangement with me

16   to invest a total sum of $2.5 million thereabouts which

17   would then ultimately be held in an LLC that I would set

18   up in or about the time of closing which in fact was set

19   up as Baja Ventures 2006.

20   Q.   What, if any, consideration existed between yourself

21   and Mr. Lehtinen or Mr. Stumpel with regards to them

22   giving you their money for that purpose?

23   A.   Each of the individuals signed a promissory contract

24   with me in May and/or June of 2005, and it has been

25   honored by their ownership in Baja Ventures 2006.

29

1    Q.    Phil, I'm going to show you two documents already

2    admitted into evidence by way of stipulation, Kenner

3    Exhibit 5 and Kenner Exhibit 6.

4          Do you recognize those documents?

5    A.    Yes, sir.

6          These are the two documents I was referring to

7    from Mr. Stumpel and Mr. Lehtinen.

8          MR. HALEY:  Your Honor, may I approach and give

9    the Court a copy of the documents?

10         THE COURT:  When you say by stipulation, is that

11   during the trial or by stipulation pursuant to the

12   hearing?

13         MR. HALEY:  Pursuant to the hearing, Judge.

14         THE COURT:  Okay.

15         MR. HALEY:  There were a number of exhibits last

16   time.

17         THE COURT:  That came in.

18         MR. HALEY:  Yes.

19         THE COURT:  Okay.

20         MR. HALEY:  Indeed, I previously provided copy

21   of the documents at the commencement of the forfeiture

22   hearing to the government.

23         THE COURT:  All right.

24   BY MR. HALEY:

25   Q.    So --

1      MS. LEONARDO:  I'm sorry, counsel, which is 5

2  and which is 6?

3      MR. HALEY:  I'm sorry.  I apologize.

4      (Pause in proceedings.)

5  BY MR. HALEY:

6  Q.   Phil, would you kindly take a look at Kenner Exhibit

7  5.

8      What does that represent?

9  A.   It is a $1.5 million promissory contract between Jere

10  Lehtinen and myself with respect to Baja Ventures 2006 and

11  his debt and equity position in the LLC.

12  Q.   Well, whose signature appears on the second page of

13  the document?

14  A.   At the top it's my signature as managing member and

15  at the bottom it's Jere Lehtinen.

16  Q.   Now, with reference to Kenner Exhibit 6, would you

17  kindly describe to the Court what that document is?

18  A.   Much the same as Mr. Lehtinen's agreement, this is a

19  promissory contract between myself and Mr. Stumpel for

20  both a debt in equity position in Baja Ventures 2006.

21      On the back -- excuse me -- on page 2 at the top

22  it's my signature as the managing member of the LLC and

23  Joseph Stumpel's signature.

24  Q.   Now, as you sit here today, Phil, are these two

25  documents, from your perspective, legal enforceable

31

1    contracts?

2              MS. LEONARDO:  Objection.

3              THE COURT:  Overruled.  You can answer that.

4    A.    I certainly would hope so.

5    Q.    How is the money that you received from Mr. Lehtinen

6    and Mr. Stumpel transferred in order for you to acquire

7    your ownership interest in Baja Ventures 2006?

8    A.    Mr. Lehtinen's $1.5 million was transferred from his

9    bank account directly to Mr. Jowdy and his attorney

10   Fernando Garcia's propiedades account called DDM.

11             And Mr. Stumpel's funds were transferred on or

12   about May 16 and May 17 to an account that I had just set

13   up and then I transferred the funds from Mr. Jowdy the

14   following day.

15   Q.    Those funds went into that Ula Makika account.

16             At that point in time, what if any funds were in

17   that account that let's say derived from Eufora.

18             And we know what Eufora is; is that correct?

19   A.    Yes, I do.

20             None.

21   Q.    When those funds were transferred into the Ula Makika

22   account, what if any funds were in that account that

23   derived from let's say what we call the Global Settlement

24   Fund?

25   A.    None.

1    Q.    When the money went into that Ula Makika account,

2    before it was transferred as you testified a moment ago

3    down to Mexico, what if any funds were in that account

4    from what we will call the Sag Harbor/Ledbetter

5    accusations?

6    A.    None.

7    Q.    And with reference to the money that went into the

8    account that day, what if any monies were in that account

9    that derived from the Hawaiian land development scheme?

10   A.    There was $50 I believe that the bank had transferred

11   in at the opening of the account.

12   Q.    Now, one of the properties that was identified as

13   properties that the government sought to forfeit in the

14   April 22nd, 2015 bill of particulars was Diamante

15   Properties LLC, do you recall that?

16   A.    Yes, I do.

17   Q.    And would you describe to the Court the circumstances

18   under which Diamante Properties LLC came to be created?

19   A.    I was informed by Ken Jowdy, on or about February 19,

20   2006, that he was instructed by Lehman Brothers to

21   allocate equity in the Diamante Cabo San Lucas project a

22   certain way in order for Lehman Brothers to get the deal

23   done on Mr. Jowdy's behalf, and one of the entities that

24   was presented to me for the first time that day by e-mail

25   by Mr. Jowdy was Diamante Properties, of which Mr. Jowdy

33

1   said he was putting a number of people that he owed money

2   to in that to clear up past debts.

3   Q.   Well --

4   A.   Excuse me.

5        In addition to other employees that he wanted to

6   give a bonus to.

7   Q.   When you speak of the Lehman Brothers loan, there was

8   testimony about a Lehman Brothers loan during the course

9   of the trial; is that correct?

10  A.   Yes, there was, referencing Hawaii.

11  Q.   Would you kindly explain to the Court the two

12  different loans we're speaking of Mr. Kenner?

13  A.   Yes, sir.  I'm sorry about that.

14       There were two loans that were actually

15  completed with Lehman Brothers.  The first was on March 26

16  of 2006.  It was a $125 million acquisition in phase one

17  development loan for the Diamante Cabo San Lucas property,

18  of which approximately six-and-a-half million dollars of

19  equity was put up and Lehman Brothers financed the balance

20  of that, leaving approximately $55 million of phase one

21  horizontal and vertical infrastructure money, all under

22  Mr. Jowdy's control.

23       Approximately five months later, on August 26 of

24  2006, Lehman Brothers completed a second lending agreement

25  of approximately $105 million based on property values in

34

1   Hawaii, and that's what we had discussed during the trial.

2   Q.   Well, did the Lehman Brothers loan, with reference to

3   the development of the Cabo San Lucas property, have

4   anything to do with the Lehman Brothers loan reference the

5   development of Hawaii property?

6   A.   They were two separate and unique loans.

7        But at the conclusion of the March 26, 2006 Cabo

8   San Lucas loan with Lehman Brothers, I was approached by

9   both Mr. Jowdy and Masoud Bahti from Lehman Brothers who

10   suggested I should terminate my negotiations with the

11   lenders that Mr. Constantine had brought to the table to

12   fund a $15 million construction loan in Hawaii, and I

13   should utilize Lehman Brothers as my lending partner and

14   not only would they be able to facilitate a short-term

15   closing in Hawaii, but any other lending money, commercial

16   lending money, we would need.

17   Q.   Phil, I appreciate that observation.

18        But my question is really more simple.

19        You acquired a loan from Lehman Brothers for the

20   development of the Hawaii property.

21        That was testified to during the course of the

22   trial, correct?

23   A.   Yes, sir.

24   Q.   But the loan from Lehman Brothers as relates to the

25   development of Diamante Cabo San Lucas, those were two

35

1   separate loans, were they not?

2   A.   Yes.  I'm sorry.  I misunderstood your question.

3   They were completely separate and unique loans.

4   Q.   Was there any interaction or interplay between these

5   two transactions?

6   A.   Other than the commonality of the parties, no.

7   Q.   I want to speak to you, Phil, about property

8   identified in the bill of particulars that the government

9   seeks to forfeit located at 92-4928 Hawaii Belt Road, in

10  Na'Alehu, Hawaii, would you kindly explain to the Court

11  the circumstances under which that property came to be a

12  part?

13  A.   In or about December 2004 min conjunction with the

14  acquisition of 1500 acres of property contiguous with that

15  sugar mill property, there was approximately a $3.8

16  million transaction on the one property and approximately

17  a $380,000 transaction on the sugar mill property.

18       At the time they were split up due to some

19  remediation issues of oil petroleum in the ground, and as

20  a result the two separate transactions occurred.

21       Following the purchase of the sugar mill

22  property, our Hawaii lawyers recommended putting it into a

23  charitable not for profit entity, which we did, called

24  Na'Alehu Historical Society.

25  Q.   It's clear, however, that that particular property

36

1   and the acquisition of that property is related to the

2   Hawaii land development project; is that correct?

3   A.    Yes, sir.

4   Q.    Lot 469, Discovery Harbor in Kalehua, tell us about

5   that property?

6   A.    That was one of the lots that was acquired in the

7   early phases of the Hawaii development project where

8   originally we were on build for some small homes to test

9   the importation issue we would run into with material

10  supplies at a remote destination on the big Island of

11  Hawaii.

12  Q.    It's clear that that property is related to the

13  Hawaii land development project; is that correct?

14  A.    Yes, sir, it is.

15  Q.    I'm going to skip 1976 Falcon Airplane and move on to

16  10705 East Cactus Road, Scottsdale, Arizona.

17        Is that property familiar to you?

18  A.    Yes, sir.

19  Q.    How is it familiar to you?

20  A.    It's property that has been owned for the last

21  approximately 10 years by my ex-wife.

22  Q.    During the course -- withdrawn.

23        At various points in time, notwithstanding the

24  fact that your wife owned the property, did you assist

25  let's say in either mortgage payments or home

37

1    improvements, yes or no, by way of use of funds available

2    to you?

3    A.    Yes.

4    Q.    Are you aware, Mr. Kenner, that on August 20, 2015,

5    following the conclusion of the trial, the government

6    filed an amended bill of particulars?

7    A.    Yes, I'm aware.

8    Q.    In that amended bill of particulars they repeated

9    Baja Ventures 2006 as property they sought to forfeit,

10   correct?

11   A.    Yes, sir.

12   Q.    They also, in that amended bill of particulars

13   following the conclusion of the trial, identified KAJ

14   holdings; is that correct?

15   A.    Yes, sir.

16   Q.    Would you tell the Court what you know about KAJ

17   Holdings?

18   A.    KAJ Holdings was and/or is still a Delaware LLC to

19   the best of my knowledge established in February 2006 by

20   Ken Jowdy's attorneys to hold his equity interest in the

21   Cabo San Lucas property funded by money that he borrowed

22   from us.

23   Q.    You say money he borrowed from us.

24         What do you mean by that?

25   A.    Money that was part and parcel to the December 2004

38

1   Hawaii loan agreement with Ken Jowdy.

2   Q.   You testified during the trial quite clearly that

3   that arrangement was a loan rather than an investment;

4   isn't that correct?

5   A.   Yes, sir, it was a loan.

6   Q.   Since the commencement of the forfeiture hearing,

7   have there been what I would call additional documents

8   introduced into evidence to your knowledge that

9   corroborate the fact that it was a loan?

10  A.   Yes, sir.

11          At the last hearing Mr. Wayne substantiated the

12  fact that there are loans by a document he professed was

13  turned over to him by Mr. Jowdy and his attorney

14  confirming the fund transfers as loans.

15  Q.   That's a government's exhibit; is that correct?

16  A.   Yes, sir, I believe it was Government Forfeiture 44.

17  Q.   Without belaboring the point, because it's in

18  evidence, how did that get corroborated in that document,

19  in what respect?

20  A.   To the right of the actual date and monetary

21  transactions there was a notes column that Mr. Jowdy and

22  his attorney had represented the transactions as loans.

23          MS. LEONARDO:  Your Honor, objection.

24          I believe your Honor sustained counsel's

25  objection with regard to that notes column and said it

1   would be redacted and not considered by the Court.

2          THE COURT:  I remember that.  You want that in

3   now?

4          MR. HALEY:  I objected to a document wherein

5   they characterized these transactions as loans.

6          THE COURT:  You objected because, as you

7   remember, you had an objection about Jowdy's attorneys

8   providing these things and that last column were notes and

9   you objected because they weren't bank records or anything

10  like that, they were notes, and I sustained your objection

11  and told the government I would not consider that notes

12  column.

13         MR. HALEY:  Your Honor, we're not speaking of

14  the notes.  I'll get the exhibit.  We're talking about not

15  notes, we're talking about specific typewritten entries

16  that characterized it as a loan.

17         I understand what my objection was based on.  It

18  did not have to deal with that aspect of the document that

19  referred to them as loans.

20         I might add, Judge, you're correct.  I did have

21  an objection to documents being introduced into evidence

22  that were being provided by Mr. Jowdy's counsel.  I

23  remember that objection.

24         Frankly, once we received that document wherein

25  it was characterized as loans, if I didn't withdraw the

40

1  objection, Judge, I will now withdraw the objection.  I'll

2  find the exhibit, Judge.

3         THE COURT:  You withdraw the objection to

4  Forfeiture Exhibit 44 in its entirety.

5         (Forfeiture Exhibit 44 in evidence.)

6         MR. HALEY:  Thank you.

7  BY MR. HALEY:

8  Q.    Now, Mr. Kenner, there were various documents, bank

9  records, introduced into evidence reflecting monies going

10 from various accounts controlled or maintained by Little

11 Isle IV to entities controlled by Ken Jowdy, and then

12 money being returned to Little Isle IV.

13        Do you recall those documents?

14 A.    Yes, sir.

15 Q.    And what did those records represent in terms of the

16 financial transactions set forth in those exhibits?

17 A.    They were the loans that were made by the various

18 Hawaii entities under my control to Mr. Jowdy pursuant to

19 the December 2004 loan agreement, and they were transfers

20 by Mr. Jowdy as partial repayments of the December 2004

21 loan agreement.

22 Q.    How did you acquire your interest in Diamante Cabo

23 San Lucas, through what financial transactions?

24 A.    Through the two transactions represented on Kenner

25 Exhibit F-6 with Mr. Stumpel and Kenner Exhibit F-5 with

1   Mr. Lehtinen, and those funds are represented on the

2   Diamante Cabo San Lucas operating agreement.

3   Q.   You were present when the government delivered its

4   summation in this case; is that correct?

5   A.   Yes, sir, I was.

6   Q.   Did you hear a representation made by the government

7   to the jury during the course of its summation that you

8   acquired your interest in Diamante Cabo San Lucas by way

9   of the monies characterized as a loan flowing from Hawaii

10  to Ken Jowdy; do you recall that argument?

11  A.   Yes, I certainly do recall that argument.

12  Q.   Was there any evidence in the record to support that

13  argument before the jury?  Did you ever testify to that

14  effect; yes or no?

15  A.   No, sir.

16  Q.   Well; is that true?

17       Did you acquire your interest in Diamante Cabo

18  San Lucas by way of the loan agreement between yourself

19  and entities you controlled in the Hawaii land development

20  and Ken Jowdy and entities he controlled as relates to the

21  development of Cabo San Lucas?

22  A.   No, sir.

23  Q.   Just for purposes of clarity of the record, I'm going

24  to show you what's already in evidence as Kenner Exhibit

25  F-1.

1          What is that, to your knowledge?

2     A.   This is testimony, an excerpt of testimony, given by

3     Ken Jowdy as part of a two day deposition on January 5th,

4     and 6th, 2010, in a civil lawsuit by the investors of

5     Diamante Cabo San Lucas and Diamante Del Mar vs. Ken

6     Jowdy.

7     Q.   Though it speaks for itself, in what manner did he

8     characterize the money he received from Hawaiian

9     controlled entities to entities he controlled in Mexico?

10    A.   On approximately seven occasions during the two day

11    deposition Mr. Jowdy referred to them specifically as

12    loans.

13    Q.   I'm going to ask you to take a look at what's been

14    marked as Kenner Exhibit F-2.

15         Do you recognize that document?

16    A.   Yes, sir, I do.

17    Q.   What is it?

18    A.   These are the 3500 notes of an interview at the

19    Melville FBI office between Mr. Jowdy, his attorney

20    Mr. Harvey, Josh Wayne of the IRS and Mathew Galioto, in

21    which Mr. Jowdy confirms that the Baja Ventures 2006

22    equity was based on money that was borrowed entirely from

23    Jere Lehtinen and Joseph Stumpel.

24    Q.   Not the money loaned from Hawaii land development

25    entities and Mexico entities controlled by Mr. Jowdy,

43

1  correct?

2  A.    No, sir.

3          In fact, the date of the interview was

4  approximately six months after I was arrested on this

5  indictment.

6  Q.    Now, as relates -- I'm asking you to take a look at

7  Kenner Exhibit F-3.

8          For purposes of the record, can you identify

9  what that is?

10  A.    The October 19, 2010 FBI interview notes between

11  Mr. Galioto, Southern District Criminal Investigator Scott

12  Romanowski, and John Kaiser at his home in Setauket, New

13  York.

14  Q.    I won't belabor the point.

15          Is that the full exhibit and during the course

16  of the trial an excerpt of that exhibit was introduced?

17          Is that the full 3500 material exhibit, to your

18  knowledge?

19  A.    Yes, sir, this is the full 10-page notes.

20  Q.    I won't ask you what he told the FBI.  That was

21  covered during the course of the trial.

22          I'll ask you to take a look at Kenner Exhibit

23  F-4.  Take a look at this document.

24  A.    Yes, sir.

25  Q.    What is that?

44

1   A.   This is day five of the 2009 arbitration between

2   myself and Owen Nolan.  This is the testimony of John

3   Kaiser.

4   Q.   And, again, the document speaks for itself, but while

5   under oath during the course of that hearing how did

6   Mr. Kaiser characterize the money that was flowing from

7   the Hawaii land development project and accounts

8   controlled to Ken Jowdy in Mexico and accounts he

9   controlled?

10  A.   He characterized them as loans.

11  Q.   Would he have had personal knowledge at that time as

12  to the nature of those transactions?

13  A.   Yes, sir.

14        He had met with Mr. Jowdy on multiple occasions.

15  Q.   Was a question asked of him -- again those documents

16  speak for themselves -- as to whether he held you

17  accountable for what turned out to be a fact where Ken

18  Jowdy ultimately did not make good on the loan by way of

19  repayment?

20  A.   There is a question and answer regarding that issue.

21  Q.   And, again, it speaks for itself.

22        What was his answer?

23  A.     "QUESTION:  Do you blame Mr. Kenner for him not

24  paying the money back, referring to Ken Jowdy?

25        "ANSWER:  No."

45

1    Q.    Thank you.

2          CSL Properties identified as additional

3    properties the government sought to forfeit in its post

4    verdict bill of particulars of August 20, 2015, would you

5    tell the Judge what you know about CSL Properties?

6    A.    CSL Property was a single purpose LLC that was set up

7    in February 2006 to hold the collective investments of my

8    hockey player clients in the Diamante Cabo San Lucas

9    project.

10   Q.    What if any relationship did that have with the

11   Eufora investments?

12   A.    None.

13   Q.    What if any relationship did that have with the

14   Global Settlement Fund matter?

15   A.    None.

16   Q.    What if any relationship did that have with the Sag

17   Harbor/Ledbetter?

18   A.    None.

19   Q.    Matter.

20          And what if any relationship did that have with

21   the Hawaii land developments?

22   A.    None.

23   Q.    What is your current status, to your knowledge, with

24   reference to CSL Properties?

25   A.    I have no involvement whatsoever.

1   Q.   Are you aware of a resolution that was passed by the

2   members of CSL Properties?

3   A.   Yes, sir.

4   Q.   And what is your understanding of the nature of that

5   resolution, Mr. Kenner?

6   A.   It was subsequent to my conviction on July 9th of

7   last year.

8          Three of the members of CSL Properties took over

9   the management role for CSL Properties succeeding me.

10          MR. HALEY:  Your Honor, I had not previously

11   marked this document as a Kenner Exhibit but I would offer

12   it as Kenner Exhibit -- excuse me -- Kenner F-24.  I can

13   put a handwritten mark on it and add a sticker at a later

14   point in time.

15          THE COURT:  That's fine.

16          MR. HALEY:  I'm certain the government already

17   has in its possession this document.

18          THE COURT:  Any objection?

19          MS. LEONARDO:  No objection, your Honor.

20          THE COURT:  24 is admitted.

21          (Kenner Exhibit F-24 in evidence.)

22   BY MR. HALEY:

23   Q.   Just for purposes of clarity of the record, would you

24   kindly take a look at what's been marked as Kenner F-24.

25          (Pause in proceedings.)

47

1    A.    Yes, sir.

2    Q.    What is it?

3    A.    This is the members resolution of CSL Properties 2006

4    you were referring to.

5    Q.    In the bill of particulars of August 20, 2015,

6    property identified as Diamante Properties LLC was listed.

7          Could you tell the Judge what you know about

8    Diamante Properties LLC?

9    A.    I don't know what that is.

10   Q.    In the amended bill of particulars date August 20,

11   2015, property identified as Somerset LLC is listed.

12         Could you tell the Judge what you know about

13   Somerset LLC?

14   A.    I found out about a year after the closing that was

15   an entity set up by the individuals at Lehman Brothers to

16   acquire a secret interest in the Cabo San Lucas property,

17   of which I have no interest in.

18   Q.    Did that have anything to do with the Hawaiian land

19   development project?

20   A.    No, sir.

21   Q.    Did that have anything to do with the Eufora

22   investments?

23   A.    No, sir.

24   Q.    Did that have anything to do with the Global

25   Settlement Fund investments?

Case 2:13-cr-00607-JFB-AYS   Document 377   Filed 05/04/16   Page 48 of 184 PageID #: 9568

48

1    A.    No, sir.

2    Q.    Did that have anything to do with the Sag

3    Harbor/Ledbetter allegations set forth in the indictment?

4    A.    Nothing.

5    Q.    In the amended bill of particulars of August 20,

6    2015, Boulevard Diamante Los Congrejos, Cabo San Lucas, is

7    listed.

8          Is that property familiar to you?

9    A.    Yes.

10         The property on Los Congrejos is the project,

11   the 1500 acre project, of the Diamante Cabo San Lucas

12   project.

13   Q.    That is essentially Diamante Cabo San Lucas, correct?

14   A.    Yes, sir.

15   Q.    In the amended bill of particulars dated August 20,

16   2015, property Los Mosquito Roco, block 17, lot 30,

17   Cervada Del Mar is listed.

18         Do you recall that?

19   A.    Yes, sir.

20   Q.    What is your knowledge as to that property?

21   A.    That was a property I purchased in Cabo San Lucas,

22   Mexico, in or about 2007, December.

23   Q.    What was the source of funds by which you purchased

24   that property?

25   A.    My personal funds.

49

1    Q.   They were primarily derived from the completion of

2    the California beach house project I had done and

3    completed in approximately November of 2007.

4    Q.   Would you tell the Judge what you mean by the

5    California beach house property?

6    A.   Yes.  I'm sorry.

7         In or about November 2007, myself and John

8    Kaiser had sold a property that we had purchased and

9    renovated over the course of approximately one year, and

10   as a result of the sale of that property for

11   eight-and-a-half million dollars, I utilized my portion of

12   the funds or a portion of my portion of the funds to

13   purchase my home in Cabo San Lucas, Mexico.

14   Q.   Phil, are you familiar with FORF-1, an exhibit

15   introduced by the Government in the forfeiture hearing?

16   A.   Yes, sir.

17        MR. HALEY:  Could I have a moment, Judge?

18        THE COURT:  Let's take a short break.

19        MR. HALEY:  Very well.

20        Thank you, Judge.

21        THE COURT:  We will take 10 minutes.

22        (Recess taken.)

23        (After recess.)

24        THE COURT:  Please be seated.

25        (The witness resumes the stand.)

50

1          MR. HALEY:  Your Honor, does the Court have in

2    its possession Government's Exhibit FORF-1?

3          THE COURT:  Yes.

4          MR. HALEY:  Thank you.

5    BY MR. HALEY:

6    Q.   Phil, would you kindly take a look at Government's

7    Exhibit FORF-1.

8    A.   Yes.

9    Q.   Let's begin with the column identified as Diamante

10   Del Mar (northern property.)

11          Do you see that column?

12   A.   Yes, I do.

13   Q.   You testified previously as to your knowledge of

14   Diamante Del Mar northern property briefly, but as relates

15   to that chart would you kindly interpret for the Court

16   those numbers as set forth in the chart, the source of

17   those investments, to your knowledge?

18   A.   The total of $9.1 million may or may not be

19   completely accurate.  I don't know that because I haven't

20   been able to review bank records to substantiate that, but

21   the number is approximately that as direct investments

22   from each of the individuals with wire transfers directly

23   to a bank account controlled by Mr. Jowdy and directed by

24   Mr. Jowdy at the time.

25          This was the first property that Mr. Jowdy had

51

1   engaged with us to invest in northern Baja starting in

2   August of 2002 with the last investment sometime in or

3   about February of 2005.

4   Q.   Well, Phil, when you say direct investments, I may

5   know what you mean, but could you be more specific?

6   A.   Yes.   I apologize.

7            These were investments that were made pursuant

8   to subscription agreements that each individual signed

9   with Mr. Jowdy's attorneys prior to the wire transfer of

10  their funds directly from their bank accounts directly to

11  one of Mr. Jowdy's controlled bank accounts.

12  Q.   Well, did these funds get routed through Little Isle

13  IV or the Hawaii land development project in accounts that

14  were held in those names?

15  A.   No, sir.

16  Q.   Well, did these funds get routed in relation to any

17  accounts maintained by CMG Management or Eufora?

18  A.   No, sir.

19  Q.   Well, did these funds get routed through any accounts

20  controlled or maintained by any of the entities associated

21  with the Global Settlement Fund?

22  A.   No, sir.

23  Q.   Well, did these funds get routed or connected with

24  any accounts related to the Sag Harbor/Ledbetter aspect of

25  the indictment?

1  A.    No, sir.

2  Q.    Going to the next column identified as Palms, do you

3  see that column?

4  A.    Yes, sir, I do.

5  Q.    Would you simply explain to the Court your knowledge

6  of the monies depicted in that column?

7  A.    The first number of 500,000 which lines up with John

8  Kaiser, those are funds that he had testified -- excuse

9  me -- that he had interviewed with the FBI on October 19

10  of 2010, that he said he received $550,000 from three

11  people, Mr. Rizzi, a few doctor friends of his and I

12  believe either his mother or his handicapped brother.

13         He told the FBI that he had acquired those funds

14  for some investment in Las Vegas that I was not involved

15  with, but he subsequently used those funds to purchase

16  some land from me in Mexico and subsequent to that tried

17  to claim the same $500,000 as an investment in our Arizona

18  project.

19         So I'm not sure how that has to do anything with

20  the Palms frankly.

21         The other three individuals, Ethan Moreau, the

22  290,000 is an individual who went under contract with

23  Mr. Constantine to acquire a unit that Mr. Constantine had

24  bought on pre-development; and Mr. Moreau, through a long

25  series of e-mails and communications, decided to breach

53

1    the contract with Mr. Constantine against my judgment and

2    recommendations and ultimately settled out-of-court to

3    walkaway from that money with Mr. Constantine.

4           Mr. Peca and Mr. McKee both invested with me at

5    the time in 2008 for Mr. Peca, and early 2009 for

6    Mr. McKee as 50/50 owners in each of two separate Palms

7    penthouse units.

8           Both Mr. McKee and Mr. Peca immediately breached

9    their contracts with me despite the fact I made

10   approximately $90,000 worth of payments to Mr. Peca's

11   unit.

12   Q.   Let me stop you there, Phil.  We will get to that

13   perhaps in another proceeding.

14          As relates to the monies depicted in those, in

15   that column, the Palms, what word did you use to describe

16   the nature of those deposits?

17   A.   They were for -- I can't speak to Mr. Kaiser because

18   he triple counted the money, but with respect to Mr. Peca

19   and Mr. McKee, they deposited their money directly from

20   their own personal bank accounts into escrow accounts for

21   the closing of those particular units, and Mr. Moreau had

22   transferred his personal funds to Mr. Constantine as part

23   and parcel to his purchase contract.

24   Q.   Well, did any of those monies flow through accounts

25   controlled or maintained by any of the entities associated

1    with Hawaii land development, CMG/Eufora, Global

2    Settlement Fund and the Sag Harbor/Ledbetter?

3    A.    No, sir.

4    Q.    Just so we can understand, Phil, when you look at

5    column two, LOC, do you see that?

6    A.    Yes, sir.

7    Q.    And we see Bryan Berard, 649405, do you see that

8    number?

9    A.    Yes, sir.

10    Q.    What is your understanding as to what that number

11    represents?

12    A.    I believe that was the final balance in Mr. Berard's

13    line of credit Northern Trust at the beginning of April

14    2009 when collectively we decided to allow those loans to

15    go to the final default and the collateral to be seized in

16    lieu of continuing payments from a company in Hawaii that

17    had no more cash available to it.

18    Q.    Well, does that number in that category have any

19    relevance to the $500,000 listed under the Diamante Del

20    Mar northern property column, or jumping ahead to the

21    $500,000 identified under Frailes?

22    A.    No, sir, they're completely unique.

23    Q.    Well, to put it quite simple, did you take $500,000

24    out of Bryan Berard's line of credit and use that money to

25    invest in Diamante Del Mar on this behalf?

55

1    A.    No, sir.

2    Q.    Well, did you take $500,000 of his line of credit

3    money, 649405 and use it to invest in Frailes on his

4    behalf?

5    A.    No, sir.

6    Q.    I interrupted the questioning and your analysis, but

7    as relates to the Palms, you testified about Kaiser and

8    would you please continue as relates to the monies listed

9    in that company.

10   A.    I think we completed it.

11   Q.    I believe we have as swell.  Thank you.

12   A.    You're welcome.

13   Q.    Let's go to Frailes.

14         Do you see the Frailes column?

15   A.    Yes, sir.

16   Q.    And would you kindly identify your knowledge of the

17   monies depicted in that column?

18   A.    Although I believe a few of the numbers are

19   incorrect, the monies in the Frailes column represent

20   investments that the individuals directly made into a

21   project near San Jose Del Cabo Mexico managed by an

22   individual named Robert Gaudet.

23         Those funds are unrelated to any of the other

24   four alleged schemes in the indictment.

25   Q.    In other words, when you say unrelated, those funds

1    did not flow through any of those accounts, if I

2    understand your testimony correctly, as maintained by

3    Hawaii land development, Eufora, Global Settlement Fund or

4    Sag Harbor/Ledbetter; is that correct?

5    A.    I would say with one exception.

6    Q.    Tell the Judge what the exception is.

7    A.    The one exception, your Honor, is Steven Rucchin,

8    after the closing of the Hawaii land development deal,

9    asked for an additional $300,000 investment be made in the

10    Los Frailes project out of his line of credit balance at

11    the time.

12    Q.    As relates to Diamante Cabo San Lucas, do you see the

13    monies listed in that column?

14    A.    Yes, sir, I do.

15    Q.    And would you kindly, though it may be somewhat

16    repetitive, Phil, testify to your understanding as to the

17    monies set forth in that column?

18    A.    Yes, I will.

19              The first name is Greg DeVries, 100,000.  That

20    was a direct investment that Mr. DeVries made in the

21    Diamante Cabo San Lucas project by wire transferring the

22    funds to Mr. Jowdy's Baja Development Corporation account.

23              The $1.5 million with Mr. Lehtinen is part of

24    the Baja Ventures 2006 LLC capital contribution we

25    discussed earlier.

57

1          $100,000 for Ethan Moreau was a direct

2    investment from Mr. Moreau to one of Mr. Jowdy's

3    controlled entities at his direction and is represented by

4    CSL Properties operating agreement as such.

5          The $500,000 for Glen Murray was money that was

6    adjudicated in Nevada in 2010 for where Mr. Jowdy was

7    found guilty of stealing that money from Mr. Murray and

8    subsequently wire transferring it to an account that he

9    controlled in Mexico.

10   Q.   Well, when you say found guilty, it wasn't a criminal

11   conviction there; is that correct?

12   A.   No, sir.  Perhaps I'm using the word wrong.

13   Q.   Maybe you are.

14          What was the nature of that transaction?  What

15   was the nature of that lawsuit as you understood it?

16   A.   Mr. Murray had loaned Mr. Jowdy, in August of 2005,

17   $791,000 to purchase three residential condo units in Las

18   Vegas.

19          And 11 days later, when that deal was cancelled,

20   Mr. Jowdy subsequently stole the money from the escrow

21   accounts and wire transferred it to his own personal

22   account Baja Development Corporation and subsequently

23   within a day or two transferred 500,000 of those funds

24   down to Mexico for his personal benefit.

25   Q.   But there was a lawsuit commenced as relates to that

1    dispute, correct?

2    A.    That is correct.

3    Q.    That was a civil lawsuit; is that correct?

4    A.    That is correct.

5    Q.    Are you aware there was a judgment in that lawsuit;

6    yes or no?

7    A.    Yes, sir.

8    Q.    Was the judgment in Mr. Jowdy's favor or disfavor?

9    A.    It was his disfavor against both Mr. Murray and

10   myself as a third-party pro se defendant.

11   Q.    Incidentally, do you know -- withdrawn.

12         Continue.

13   A.    Owen Nolan, $100,000, these are actual funds that

14   Mr. Jowdy received in August of 2006 as a delayed

15   investment by Mr. Nolan.

16         Mr. Jowdy instructed us to wire the money to

17   Baja Development Corporation in August 2006 for Cabo San

18   Lucas investment, but Mr. Jowdy ultimately diverted those

19   funds for his own personal benefit, so I'm not sure why

20   it's on there.

21   Q.    What if any relationship did that transfer have with

22   reference to accounts maintained or controlled by any of

23   the four alleged fraudulent schemes set forth in the

24   indictment?

25   A.    Mrs. Nolan took care of the wire transfer. She was

1   the main person who took care of all of the family's

2   finances.

3           Next is I believe Michael Peca, $100,000.  I

4   believe Michael Peca managed to have a $200,000 investment

5   in Cabo San Lucas, so that number is wrong.  But, again,

6   it was a direct investment he made from his personal bank

7   account to one of Mr. Jowdy's controlled accounts, and it

8   ended up correct.  The $200,000 ended up correctly

9   identified on the Cabo San Lucas LLC.

10          Derrick Stevenson, 100,000.  Mr. Stevenson also

11  in or about February 2006 invested $100,000 by a wire

12  transfer to Mr. Jowdy's Baja Development Corporation

13  account and it was represented properly I believe on the

14  Cabo San Lucas LLC.

15          Mr. Stumpel of 2,036,500, $956,000 of that money

16  is attributable to the promissory contract Mr. Stumpel and

17  I have contributing to the capital contribution of Baja

18  Ventures 2006.

19          Some portion of the balance of that money is

20  related to a $1.6 million loan that Mr. Stumpel made to

21  Mr. Jowdy in Mexico, that Mr. Jowdy reneged on the loan,

22  and was subsequently sued by Mr. Jowdy -- excuse me --

23  Mr. Jowdy was sued by Mr. Stumpel in Mexico in a criminal

24  proceeding.

25  Q.   When you say a criminal proceeding, you understand

1   there's a difference between civil and criminal; is that

2   correct?

3   A.   Yes, sir, I do.

4   Q.   Here in the United States.

5        Why did you say criminal rather than civil?

6   A.   In Mexico, when you commence litigation against

7   another party for fraud, you have the choice either to

8   adjudicate via criminal or civil means, and they each have

9   a separate set of rules and evidence procedure that

10  accompanies the case protocol.

11  Q.   When you say you, you mean you as a private

12  individual without the need to let's say engage a

13  prosecutorial agency, can commence it as a criminal

14  proceeding?

15  A.   That is correct.

16       In fact, we had to do that on four separate

17  occasions versus Mr. Jowdy in Mexico, is proceed with

18  criminal prosecution of him.

19  Q.   The next 150,000 from?

20  A.   Looks like Darryl Sydor.

21       THE COURT:  There's $2 million there.  You were

22  talking about the 956.  What's the rest of that money?

23       THE WITNESS:  The rest of it is -- again, your

24  Honor, I apologize because I didn't do that calculation.

25  I don't know how they came up with $2.036,000,500 but

61

1   Mr. Stumpel has $956,000 in Baja Ventures 2006 and the

2   balance of those funds from 956 to 2.036 are part of

3   Mr. Stumpel's $1.6 million loan he made to Mr. Jowdy in

4   Mexico.

5           THE COURT:  I got it.

6           THE WITNESS:  I believe Mr. Jowdy diverted some

7   of those funds into another project that a number of us

8   investors had sued him more for criminally in Mexico as

9   well.

10          THE COURT:  Okay.

11          THE WITNESS:  I hope that was more clear.

12  A.    Lastly, Darryl Sydor, 50,000.

13          I believe Mr. Sydor is 100,000 in the Cabo San

14  Lucas LLC, so I'm not sure how they came up with the

15  50,000.

16          Again, he wired transferred the money directly

17  to a Jowdy controlled entity and the total amount that I

18  was involved with was represented properly on the CSL

19  operating agreement for Mr. Sydor.

20  Q.   Not to belabor the record, when you use the word

21  directly, do you mean -- or for purposes of this record

22  telling this Court that these are monies that are not

23  flowing through any of the entities that are controlled by

24  either the Hawaii land development project, Eufora, the

25  Global Settlement Fund and Sag Harbor/Ledbetter?

62

1  A.    That's correct.  That's what I'm referring to.

2  Q.    And that's true for all of those monies listed in the

3  column identified under Diamante Cabo San Lucas; is that

4  correct?

5  A.    I wouldn't paint it with such a broad brush just

6  because of the inaccuracies of each of the dollar amounts

7  in that column and the other related lawsuits that

8  pursued.

9  Q.    You're correct and thank you for correcting me.

10        Incidentally, with reference to those monies in

11  the column identified as Diamante Cabo San Lucas, you

12  testified to direct investors.

13        To your knowledge, did those direct investments

14  reflect some ownership interest that they acquired in this

15  Diamante Cabo San Lucas?

16  A.    Each of the direct investments that went to Mr. Jowdy

17  on behalf of my clients were properly represented on the

18  final operating agreements that were subset agreements of

19  the Diamante Cabo San Lucas project.  That is correct.

20  Although, again, these numbers are far askew.

21  Q.    I understand.

22        This is the same Diamante Cabo San Lucas that

23  was identified during the course of the trial, the ongoing

24  operational golf resort in Mexico; is that correct?

25  A.    Yes, sir.

63

1   Q.    And, parenthetically, has there been any dispute

2   between your hockey player clients and Mr. Jowdy with

3   respect to their investments and the accounting for their

4   investments?

5   A.    Yes, sir, there has continued to be.

6         Even though I was removed from the plaintiffs

7   position on behalf of my clients, after I was indicted the

8   group of investors took it upon themselves to hire new

9   counsel and continue with the same litigation versus

10  Mr. Jowdy with respect to Diamante Del Mar and Diamante

11  Cabo San Lucas.

12  Q.    Do you know, again as an aside, whether that lawsuit,

13  a component of it, is a simple request to see the books

14  and records of Diamante Cabo San Lucas?

15  A.    Yes, sir.

16        At the time that I was deposed in one of those

17  cases, that is what I understood the lawsuit to be

18  paramount to, the same as both Mr. Constantine and I

19  attempted to do years prior with Mr. Jowdy.

20  Q.    Do you know, as you sit here today, whether Mr. Jowdy

21  and/or his attorneys and/or people under his control and

22  direction have supplied the books and records to your

23  clients?

24  A.    To the best of my knowledge, I don't believe they

25  have been given the books and records.

1    Q.    Phil, I'm going to show you some documents introduced

2    into evidence by the government, not all, a select

3    portion, and ask you some very basic questions as relates

4    to these documents.

5          I'm going to show you chart 27 introduced by the

6    government into evidence.

7    A.    Yes, sir.

8    Q.    Would you explain to the judge what -- first of all,

9    are the financial transactions depicted in that chart?

10          MR. HALEY:  Judge, do you have it?

11          THE COURT:  Yes, I have it.

12   BY MR. HALEY:

13   Q.    Are they, to the best of your knowledge, accurate?

14   A.    I believe the money flow appears to be accurate in

15   each of those, correct.

16   Q.    Would you describe what these transactions represent

17   in connection with your relationship with Ken Jowdy in or

18   Little Isle IV and the Diamante Del Mar project?

19   A.    It would be related to Diamante Cabo San Lucas.

20   Q.    Excuse me.  Diamante Cabo San Lucas.

21   A.    With respect to the rest of the question, these are

22   three of the multiple investors in Diamante Cabo San Lucas

23   project through CSL Properties; Mr. Norstrom,

24   Mr. Stevenson and Mr. DeVries in February and early March

25   of 2006 prior to the closing.

1          They each transferred their $100,000 to

2    Mr. Jowdy's Baja Development account and at that point in

3    time the subsequent transfer I believe is Mr. Jowdy making

4    repayments in February and March 2006 to the Hawaiian

5    account Ula Makika with respect to his December 4th

6    Hawaiian loan to December 2004 loan with the Hawaiian

7    entities, excuse me.

8    Q.    So perhaps to state the obvious, you had access to

9    monies from the lines of credit, correct?

10   A.    No, sir.

11         These were all direct investments from their

12   individual bank accounts that they made on their own.

13         These are investments that went directly to

14   where Mr. Jowdy instructed us to send the wire transfers

15   for the Cabo San Lucas closing.

16         And subsequent to the money being in his

17   control, he made a series of payments.  These are a few of

18   the payments he made.

19         In fact, I believe he made nine payments

20   totaling $360,000 in the five weeks prior to the closing

21   up until three days before closing on the last payment he

22   made on March 23rd, 2006, and he never returned a single

23   dollar to any of us after that date.

24   Q.    Well, these payments, were they part of the -- they

25   were part of the loans that were being made to Mr. Jowdy;

66

1    is that correct?

2    A.   The repayment amounts in the right-hand column are

3    part of Mr. Jowdy's loan arrangements.

4            The left-hand column, the three $100,000

5    transfers, are individual investments in Mr. Jowdy's --

6    into Mr. Jowdy's account Baja Development Corporation of

7    which he properly allocated those funds on the operating

8    agreements.

9    Q.   I got it.  Thank you.

10           THE COURT:  You're basically saying these things

11   have nothing to do with each other, they're two totally

12   separate things?

13           THE WITNESS:  That is correct.  I apologize if

14   it wasn't clear.

15           THE COURT:  No, I was just confirming that.

16           THE WITNESS:  Your Honor, can I trouble somebody

17   for some water?

18           THE COURT:  Yes.

19           THE WITNESS:  Thank you.

20           MR. HALEY:  Your Honor, I'm going to refer to

21   FORF-52.  I have a copy for the Court.

22           THE COURT:  I think I have all of them.  52?

23           MR. HALEY:  Yes, sir.

24           THE COURT:  Actually I do need a copy of that

25   one.

67

```
 1              MR. HALEY:  May I approach, Judge?

 2              THE COURT:  Yes.

 3    BY MR. HALEY:

 4    Q.    Now, Phil, taking a look at FORF-52, this is admitted

 5    into evidence, but do you have any reason to doubt the

 6    authenticity of this e-mail?

 7    A.    No.

 8              I believe the e-mail is an accurate

 9    representation of the traffic between Robert Gaudet, the

10    manager of the Los Frailes project, and Bryan Berard.

11    Q.    Would you describe to the Court the significance of

12    this document from your perspective?

13    A.    The document, although I disagree with some of the

14    amounts and the totals, and in particular the December 7,

15    2007 date next to Mr. Kaiser's name, although that

16    represents half of his investment, not the entire $1

17    million which was invested into the company.

18              This represents the $6.05 million that was paid

19    directly to the seller through Mr. Gaudet's company in

20    Mexico with respect to the acquisition of the Los Frailes

21    project back in 2007-2008 time frame.

22    Q.    What if any relationship does that have -- what if

23    any relationship exists between the information contained

24    on that document, some of which you dispute in terms of

25    its accuracy, and the four fraudulent schemes as alleged
```

68

1    in the indictment?

2    A.    Nothing.

3    Q.    Kindly take a look at FORF-54.

4          MR. HALEY:  Again, Judge, I have a copy readily

5    available.

6          THE COURT:  Okay.  I have it.

7    BY MR. HALEY:

8    Q.    Again, Phil, these have been admitted into evidence.

9          As relates to this particular document, FORF-54,

10   what if any part of that document is relevant for the

11   purposes of this forfeiture hearing as you see it?

12   A.    The basic relevancy is that I am continuing through

13   the course of some of these e-mails to ask Mr. Jowdy for

14   funds to be repaid as he has been stretching the loan

15   amount and time period out further than it was originally

16   anticipated, and he's making promises that he's got

17   more money coming, more money coming back to us.

18         And during this time period is when Mr. Jowdy

19   did make nine payments by wire transfer from his bank

20   accounts to Ula Makika totaling $360,000 of repayments up

21   until three days before he closed on the Cabo San Lucas

22   property.

23   Q.    So, Phil, we don't dispute that the loans coming out

24   of Hawaii land development were loan monies that were

25   acquired from your hockey player clients, correct?

69

1   A.   The loans, the funds that came from Hawaii were from

2   my hockey player investors, myself and Mr. Kaiser.

3   Q.   But those loans derived in whole or in part from

4   monies that were invested in the Hawaii land development;

5   is that correct?

6   A.   Yes, sir.

7   Q.   I know at least you testified during the course of

8   the trial that those loans to Mr. Jowdy were not part of

9   some fraudulent scheme to deceive or defraud your hockey

10  player clients, correct?

11  A.   No, sir.

12       We still enjoy collecting those loans today.

13  Q.   Well who, if anyone to your knowledge, would be in a

14  position to commence litigation and collect on those loans

15  today?

16  A.   John Kaiser.

17  Q.   How so?

18  A.   John Kaiser, since December 31st of 2007, has been

19  the managing partner of Na'Alehu Ventures, which is the

20  parent company of the joint venture on behalf of myself,

21  Mr. Kaiser and Mr. Manfredi and the rest of the investors

22  that I introduced to the project.

23       So I cannot commence litigation.  I had engaged

24  some New York -- Rhode Island attorneys in 2010 who were

25  willing to begin litigation, but they needed Mr. Kaiser to

70

1   sign off and that was at about the time that he went to

2   work for Mr. Jowdy in Mexico.

3   Q.   To your knowledge, what if any efforts has John

4   Kaiser made to collect on those loan agreements?

5            MS. LEONARDO:  Objection.

6   A.   Zero.

7            THE COURT:  Overruled.

8   A.   Zero.

9   Q.   Phil, I'm going to ask you to take a look at FORF-55.

10  A.   Yes, sir.

11  Q.   Again, this is admitted into evidence so it speaks

12  for itself, but would you kindly explain to the Court from

13  your perspective what if any relevance that has in

14  connection with this forfeiture hearing?

15  A.   With respect to the Palms column on government chart

16  FORF-1, it's an e-mail from Mr. McKee to myself in October

17  2010 where he effectively misrepresents the most important

18  part of the agreement that I had made with him at the

19  Palms which led to his breach of the agreement and

20  subsequent discomfort with one another.

21  Q.   So those litany of complaints from Mr. McKee in this

22  e-mail, he neglects to mention his default; is that

23  correct?

24  A.   That's correct.

25            That's what led to the problems between us, that

1    he failed to turn over the revenues from the units but

2    expected me to uphold my end of the deal and make the

3    mortgage payments.

4            It's the same issue I ran into with

5    Mr. and Mrs. Peca.

6            MR. HALEY:  Your Honor, I'll reserve my right to

7    further develop that issue during the course of what I

8    know will be a Fatico hearing if I may.

9            THE COURT:  Okay.

10           MR. HALEY:  Thank you.

11   BY MR. HALEY:

12   Q.    I'm going to ask you to take a look at FORF-56.

13           Do you recognize that document?

14   A.    Yes, sir, I do.

15   Q.    Again, it's admitted into evidence.

16           Phil, what, if any, relevance does that document

17   have from your perspective to the issues presented in this

18   forfeiture hearing?

19   A.    With respect to the government's request to have the

20   sugar mill property on Hawaii Belt Road forfeited, again

21   the land was purchased as part and parcel to the Hawaii

22   land investments.

23           And the advice of counsel was to gift it into a

24   501(c)(3) Hawaiian not for profit entity.

25           At the close of the 2006 loan with Lehman

72

1    Brothers on August 26 of 2006, they decided not to acquire

2    this property but with a right to acquire it within a year

3    pending remediation of about a quarter million dollar

4    petroleum cleanup on the property.

5           Lehman and the joint venture partner, Alan

6    Worden of Windwalker, decided against requiring it during

7    the time period and effectively the property sat vacant

8    with the old sugar mill site on it until about 2013 when I

9    engaged one of the officers in the not for profit entity,

10   John Cross, and told him I wanted to sell the property and

11   donate the proceeds to a brain cancer research foundation

12   that I had been raising money for.

13          Mr. Cross agreed to that and I memorialized it

14   in an e-mail following our phone call.

15   Q.   You testified earlier that on advice of counsel there

16   was a recommendation that you transfer it into a

17   charitable entity?

18   A.   Yes, sir.

19   Q.   That is correct?

20   Q.   Could you elucidate what you mean by that?

21   A.   Yes.

22          In Hawaii, although real estate development is

23   real estate development everywhere, your Honor, the

24   Hawaiians are very sensitive to say the least about land,

25   historic lands, et cetera.

73

1          And since this was one of the plaintiffs, we

2     were only the second owners in the last 150 years and the

3     first change of ownership since statehood, this particular

4     10 acre parcel, which was the former site of the Kailua

5     agribusiness sugar mill which supplied all of the sugar

6     boats bound for South America, our attorney, our real

7     estate attorney, Steve Lim out of Carlsmith Ball in

8     Hawaii, suggested that as a gift to the local community in

9     Kailua District, we should set aside this 10 acre parcel

10    to develop a museum ultimately in concert with any real

11    estate development we were going to do in the area which

12    seemed like a great idea to all of us involved, but the

13    land was transferred into a 501(c)(3) that Mr. Lim's

14    business law firm set up for us.

15          And after eight years of me paying the real

16    estate taxes finally, since there was nothing else to do,

17    I just decided to collapse it and attempt to sell it in or

18    about 2013 and donate the funds to a brain cancer research

19    foundation that I had raised money for.

20    Q.    Now, we agree that this property is related to the

21    Hawaiian land development project; is that correct?

22    A.    Yes, sir.

23    Q.    I'm going to ask you to take a look at FORF-57.

24    A.    Yes, sir.

25    Q.    Again, what does that document represent to your

74

1  knowledge?

2  A.   The three documents here are two wire transfers.

3       With Mr. Peca's approval I transferred $50,000

4  on March 3 of '06, and $50,000 on March 8 of '06 for this

5  investment in Cabo San Lucas resort into Mr. Jowdy's Baja

6  Development Corporation, which I was instructed to do so.

7       And the third page is the same activity on

8  February 22nd of '06, which I believe was represented on

9  chart 27 of $100,000 wire transfer.

10       This I believe was signed directly by Mr.

11  Stevenson because he was available to sign, although these

12  are the unsigned versions.

13       As a result of any of the power of attorney

14  documents though that were signed by me, it would be

15  common practice to fax or scan and e-mail the signed

16  document for the client's records after the conclusion of

17  the transaction.

18  Q.   Does this reflect one of the direct deposits you were

19  testifying to earlier?

20  A.   Yes.

21       In fact, it represents three of them, two from

22  Mr. Peca totaling $100,000, and one from Mr. Stevenson of

23  $100,000.

24  Q.   If you could take a look at what's been admitted into

25  evidence as FORF-60.

1   A.    Yes, sir.

2   Q.    What, to your knowledge, does that e-mail represent?

3   A.    On or about February 5, '06, it's an e-mail from

4   myself to Ken Jowdy and general counsel for the Diamante

5   projects, William Najam, also Mr. Jowdy's brother-in-law.

6           These are a listing, an incomplete listing, of

7   wire transfers that had gone from either Little Isle IV or

8   Ula Makika to Mr. Jowdy with respect to the Mexican

9   projects and Mr. Najam had just on that same day sent me

10  an e-mail instructing Mr. Jowdy to get his accounting

11  straight, that Lehman Brothers had told them that all of

12  these monies that were loans had to be deemed investments

13  with respect to the final closing.

14          So Mr. Najam sent that e-mail to myself and

15  Mr. Jowdy, and Mr. Jowdy then by phone had asked me to put

16  a list together of all of these investments.

17          The two $350,000 wire transfers on May 17 and

18  May 4th, '05, and the two wire transfers of 325 and

19  $225,000 on May 17 and 18th were referenced in those two

20  Spanish promissory contractual agreements verifying the

21  December 2004 loan agreement.

22  Q.    Would that be FORF-61?

23  A.    Yes, sir.

24          And there's one more I believe perhaps 62.

25  Q.    Let me refresh your recollection.

1          FORF-61, is what you're referring to?

2    A.    Yes, sir.

3          That would be for the first two wire transfers I

4    believe of 350,000 on May 17 and 350 on May 4th.

5          Yes, sir, this is the one for Ula Makika.

6    Q.    FORF-62?

7    A.    Yes, sir, that's correct.

8          So the information on those two documents that

9    are dated in June of 2005, were actually derived from the

10   information I sent Mr. Jowdy and Mr. Najam seven months

11   later on February 5, '06.

12   Q.    Phil, you testified that there was an e-mail from Mr.

13   Najam to you telling you that for purposes of the Lehman

14   loan, which was being utilized to develop the Diamante

15   Cabo San Lucas, they wanted to characterize these loans,

16   these monies, as investments rather than loans?

17   A.    That is what Mr. Najam was instructing Mr. Jowdy and

18   myself with respect to communication he had with Lehman

19   Brothers' general counsel.

20         So Mr. Najam and Mr. Jowdy and Mr. Is a bat

21   Bahti at Lehman Brothers were crystal clearly aware of the

22   loan status between the Hawaiian project and Mr. Jowdy and

23   Mr. Najam was just clarifying they were not to be

24   represented to Lehman as loans from us to Mr. Jowdy.

25   Q.    Are you in possession of an e-mail to that effect?

77

1  A.    Yes, I am.

2  Q.    Do you know if the government is in possession of an

3  e-mail to that effect?

4  A.    Yes, sir.

5          I saw it several times on different disclosures

6  in Rule 16.

7  Q.    How much money did Lehman Brothers provide to Ken

8  Jowdy for the development of the Diamante Cabo San Lucas

9  property?

10 A.    It was $125 million acquisition and phase one

11 development loan.

12 Q.    Do you know whether or not Mr. Jowdy and/or his

13 attorney or people operating on his behalf accurately

14 characterized that money in applying for the loan as loans

15 rather than investments?

16 A.    No, sir, they did not.

17 Q.    And they got the loan, right?

18 A.    Yes, sir, they did.

19 Q.    Kindly take a look at what's been marked FORF-58,

20 again already admitted into evidence.

21 A.    Yes, sir.

22 Q.    What, to your knowledge, does that document

23 represent?

24 A.    The first one with the ending Bates stamp 771 is a

25 $1.5 million wire transfer from Mr. Lehtinen's bank

1   account to Mr. Jowdy and Mr. Garcia's bank account,

2   propiedades DDM bank account, to Mr. Jowdy and

3   Mr. Garcia's bank account in Mexico for the capital

4   contribution as represented in the promissory contract

5   between myself, Baja Ventures 2006 and Mr. Lehtinen.

6           And then Bates stamped ending 772 and 774 are

7   the two wire transfers that were made by Mr. Stumpel -- on

8   Mr. Stumpel's behalf, excuse me, for 510,000 and $450,000

9   to the Ula Makika bank account that I just established and

10  then forwarded on to Mr. Jowdy begin for capital

11  contributions to the Baja Ventures 2006 investment and 39

12  percent interest in the Cabo San Lucas project.

13  Q.   When you did that what, if any, commingling of funds

14  was there between that direct deposit and any monies

15  flowing from Little Isle IV?

16  A.   I don't believe there was any commingling.

17          The money came in on the 16th and 17th of May,

18  2005, and within 48 hours the funds were transferred out

19  to the accounts as directed by Mr. Jowdy and all of those

20  funds are represented in my capital account for Baja

21  Ventures 2006 representing myself, Mr. Stumpel and

22  Mr. Lehtinen.

23  Q.   Incidentally, Phil, I have to preface this question

24  with this remark.

25          There's a myriad of financial documents that

1    have been introduced into evidence, charts and things of

2    that nature, but have you noticed some discrepancy between

3    CSL accounts and monies that were deposited or

4    representation as relates to the amount of money that came

5    to a CSL?

6            What I'm referring to is some calculation by the

7    39 percent interest.  That's what I'm trying to get to.

8    A.   Yes.

9    Q.   Do you understand my question?

10   A.   I think I do now.

11           MR. HALEY:  It's confusing to me, Judge.

12   A.   If I can clear it up I will try to.

13           The original ownership that I negotiated with

14   Mr. Jowdy on behalf of myself, Stumpel and Lehtinen was a

15   40 percent interest in the project.

16           And via the e-mail Mr. Jowdy sent me on February

17   19 of 2006, where he reallocated the funding for the

18   project, excuse me, the equity for the project, he told me

19   I was going to have a 39 percent interest which

20   effectively calculates out to the total deposited monies

21   paid by Lehtinen and Stumpel for the Baja Ventures

22   investment.

23   Q.   So that's how it matches up, correct?

24   A.   Yes, sir, that's correct.

25           MR. HALEY:  Can I have a moment, Judge?

80

1    THE COURT:  Yes.

2    (Pause in proceedings.)

3    BY MR. HALEY:

4    Q.    I don't believe I have shown you this document as yet

5    Phil, FORF-67.

6    A.    Yes, I recall this from the Government's case.

7    Q.    Would you kindly describe your knowledge of the

8    contents of that document?

9    A.    This e-mail was one of I'll represent 50 similar

10   e-mails that I would have received from Mr. Jowdy in 2005

11   and into 2006, as he was seeking funding for the Diamante

12   Del Mar project.

13          On November 12 of 2005, he sent me a message

14   saying he had received a commitment from KSI, which

15   ultimately became the lender who put a $3 million lien on

16   the Diamante Del Mar project unknown to myself and any of

17   the other investors until about 2007 when Mr. Constantine

18   began negotiating on behalf of the investors of Mr. Jowdy

19   and disclosed it to us.

20          But effectively it was February 21st of 2006

21   that Mr. Jowdy ultimately got the KSI loan, although he

22   represents here, just like on 50 other money lenders they

23   were ready to close within 30 days.

24          So this was I believe one of a couple of e-mails

25   I heard about KSI, and the idea he was trying to push me

81

1   to get KSI to do some lending similar to what Centrum and

2   Urban Expansion had done for us in Hawaii at the same

3   time.

4           Interestingly enough, on page 2 which is Bates

5   stamped KJ 2597, Mr. Jowdy actually represents on December

6   28, my biggest concern with KSI is they have been pretty

7   strict on our use of funds and they're adamant none of the

8   funds go to the developer.

9           His biggest concern there was pursuant to the

10  December 2004 Hawaiian loan agreement, if he could not pay

11  us back in full, it was required that he pay us back at

12  least half of the money outstanding at that time.

13          So a $3 million loan from KSI would not have

14  given him enough money to even begin to pay us back, so

15  that's why he was so concerned about that, and effectively

16  telling me that he wasn't going to be able to use these

17  guys.

18          But in the same e-mail string he told me he had

19  a $75 million loan lined up for Diamante Del Mar at the

20  exact same time in his November 12th e-mail.

21          So he was trying anywhere and everywhere to get

22  financing which was hopefully to our benefit, but

23  effectively when he took out that loan on February 21st of

24  '06, he didn't notify myself or any of the other investors

25  that he had taken the $3 million loan or that he had

1    embezzled about $800,000 of the proceeds in the first

2    month after receiving the loan, and that's how we all lost

3    our investment in Diamante Del Mar based on the default of

4    that particular loan by Mr. Jowdy a few years later.

5    Q.    Phil, there was a proceeding commenced before the

6    American Arbitration Association involving you; is that

7    correct?

8    A.    Yes, sir.

9    Q.    And in connection with that proceeding, were various

10   affidavits produced and signed and executed by various

11   individuals?

12   A.    Yes, sir, there were a number of them all involved

13   with the Hawaii land development deal.

14   Q.    As relates to those affidavits, just so the Judge

15   knows, who created those affidavits?  Tell the Judge the

16   circumstances under which they came to be created?

17   A.    During the course of the five day arbitration, the

18   three judge arbitration panel told us that since we had

19   already extended the length of the hearing -- excuse me --

20   the length of the arbitration longer than they had

21   expected, in lieu of having other witnesses testify, they

22   would be willing to accept signed affidavits by any number

23   of the follow-up witnesses that were going to testify to

24   similar information in front of the three judges.

25              So Mr. Baker, who was my Arizona co-counsel at

83

1   the time, created, drafted a series of affidavits with my

2   assistance for information purposes and we sent them out

3   to about half a dozen of the investors who signed them and

4   returned them and they were all submitted to the three

5   judge panel at that time.

6          MR. HALEY:  Your Honor, again, rather than

7   belabor the record, this issue, with reference to the

8   affidavits, I would reserve my rights in connection with

9   the Fatico hearing to address those affidavits because I

10  believe in the course of the Fatico hearing, much like

11  this hearing, hearsay is admissible and we can introduce

12  documents for this Court to have a complete record in

13  terms of what if any proof of fraudulent activity

14  Mr. Kenner was engaged in.

15         THE COURT:  Okay.

16         MS. LEONARDO:  Your Honor, if I can add so

17  counsel can get this together, three of the affidavits are

18  not sworn to and the fourth affidavit that we provided is

19  not even signed by the investor.

20         MR. HALEY:  That is correct, Judge.

21         The affidavits that we have were acquired as

22  part of the search warrant.

23         The information I have is that the unsigned

24  affidavit was ultimately signed and presented before the

25  arbitration panel, and I believe the other three were

Kenner  -  Direct/Haley

84

1    subsequently executed, notarized and presented as well.

2            But counsel is correct, Judge.  I do not have

3    currently in my possession fully executed affidavits.

4            That's simply my offer of proof.

5            THE COURT:  Okay.

6            MR. HALEY:  I have no further questions.

7            THE COURT:  Let's take the lunch break and

8    reconvene at 2:00.

9            (A lunch recess is taken.)

85

1        A F T E R N O O N    S E S S I O N

2

3              THE CLERK:  All rise.

4              THE COURT:  Please be seated.

5              Okay, Mr. Kenner, please come up to the stand.

6              (The witness resumes the stand.)

7              MR. HALEY:  Your Honor, if I may, I did conclude

8      my direct of Mr. Kenner.

9              Briefly, though, I would simply like to say

10     occasionally I do get it right.

11             As relates to FORF-44, my objection to that

12     document was simply as relates to the last column where

13     there were notes.

14             I withdraw that objection.  I stand by that,

15     Judge.  The entire exhibit can go into evidence.  I did

16     not object in its totality, only the note portion.

17             THE COURT:  Go ahead, Ms. Leonardo.

18             MS. LEONARDO:  Thank you, your Honor.

19

20     CROSS-EXAMINATION

21     BY MS. LEONARDO:

22     Q.   Mr. Kenner, you've testified in a number of different

23     civil proceedings; is that correct?

24     A.   Yes.

25     Q.   You testified -- you gave deposition testimony in a

86

1    lawsuit entitled Kenner v. Myerick; is that correct?

2    A.    Can you ask the question again?

3    Q.    You gave deposition testimony in Myerick v. Kenner or

4    Kenner v. Myerick?

5    A.    I believe I did.

6    Q.    You also gave testimony during the course of an

7    arbitration proceeding with Owen Nolan; is that correct?

8    A.    I gave testimony during the arbitration.

9    Q.    That's correct?

10   A.    Yes.

11   Q.    And the arbitration proceeding was brought against

12   you with regard to whether or not you owed a fiduciary

13   duty to the Nolans; is that correct?

14   A.    I don't recall the specifics.

15   Q.    Do you recall being asked questions and giving

16   answers with regard to investments that you advised the

17   Nolans to invest in?

18   A.    I don't recall any specific questions.  If you put

19   them in front of me, I can verify it.

20   Q.    Do you recall that there was a finding by the

21   arbitration panel that you did owe a duty to the Nolans

22   and there was a judgment against you in the amount of $2.2

23   million; is that correct?

24   A.    I don't remember the specific ruling from the

25   arbitration panel as to the reasons, but I do recall that

87

1    there was a $2.2 million judgment based on Mr. Nolan's

2    representations that he had not signed up for the line of

3    credit.

4    Q.    So there is a judgment against you for $2.2 million

5    in favor of the Nolans; is that correct?

6    A.    Yes, there is.

7    Q.    And subsequent to that judgment, you testified in

8    what's called a debtor's exam; is that correct?

9    A.    Yes, I believe I did.

10   Q.    I believe that was in 2010?

11   A.    I don't recall exactly when.

12   Q.    And you understood at the time that the debtor's exam

13   was to explore any assets that you had in order to pay the

14   $2.2 million judgment; is that correct?

15   A.    I answered the questions that were asked of me that

16   day.

17   Q.    Did you understand that the Nolans' attorneys were

18   attempting to locate any assets that you had?

19   A.    I don't recall what I knew at the time.

20   Q.    Do you recall being asked whether you had ownership

21   interest in different LLCs?

22   A.    I don't recall any of the specific questions, but if

23   you put them in front of me I can verify them.

24   Q.    Do you recall also testifying in a deposition in a

25   lawsuit that you brought entitled Little Isle v. Jowdy?

88

1    A.    I remember taking a deposition.  I believe I took two

2    depositions in that case.

3    Q.    You gave depositions in that case, correct?

4    A.    I believe I did.

5    Q.    And that is a lawsuit brought by you as a managing

6    member of Little Isle IV against Ken Jowdy with regard to

7    the loan agreement; is that correct?

8    A.    That's a portion of the lawsuit, correct.

9          It was also as managing member of Ula Makika and

10   also myself individually for loans and other agreements

11   that Mr. Jowdy hadn't paid on.

12   Q.    That's the caption, the way you brought the lawsuit,

13   correct?

14   A.    I'm not sure I understood what you said.

15   Q.    The caption of the lawsuit is Little Isle, Ula Makika

16   and Phil Kenner against Ken Jowdy; is that correct?

17   A.    If you show it to me, I can verify it.

18   Q.    Basically, you are attempting to have a court enforce

19   the loan agreement that you claim Mr. Jowdy entered into;

20   is that correct?

21   A.    Once he told me he was no longer going to pay it,

22   that is correct.

23          MS. LEONARDO:  Your Honor, I move to strike the

24   unresponsive portion.

25          THE COURT:  That's okay.  Keep going.

1    BY MS. LEONARDO:

2    Q.    During the course of that lawsuit, you filed a

3    complaint, correct?

4    A.    My attorneys filed a complaint.

5    Q.    Did you review that complaint before it was filed?

6    A.    I don't believe so.

7    Q.    Did you, after that complaint was filed, you're aware

8    of course that Mr. Jowdy's attorneys moved to dismiss that

9    complaint; isn't that correct?

10   A.    I don't recall all the protocol.

11            I know Mr. Jowdy's attorneys did everything they

12   could to avoid turning over evidence in the case.

13   Q.    Well, the case was moved to dismiss by Mr. Jowdy

14   because one of diversity jurisdiction in which you claim

15   you were a citizen of Nevada or Arizona; is that correct?

16   A.    I'm having --

17            THE WITNESS: Your Honor, I'm having a hard time

18   hearing her for some reason.  I don't know if it's too

19   loud.

20            THE COURT:  I don't know if it's too loud.  Move

21   back from the microphone a little bit.

22            MS. LEONARDO:  I don't think the reporters ever

23   tell me I'm too loud.

24            THE WITNESS:  If you could ask it again.

25

90

1    BY MS. LEONARDO:

2    Q.   Mr. Jowdy's attorney moved to dismiss that first

3    complaint that you filed; isn't that correct?

4    A.   I don't recall.

5    Q.   Do you recall submitting affidavits, you, your own

6    affidavits, in support of whether or not you were a

7    citizen of Nevada or Arizona in that lawsuit?

8    A.   I recall an issue with respect to the fact that I

9    lived in Nevada.

10   Q.   Do you recall that the court in that lawsuit, which

11   was actually a federal court in Arizona, do you recall

12   that the court in that lawsuit ordered what's called

13   expedited discovery; do you remember that?

14   A.   I do recall Mr. Jowdy's attorneys requesting

15   expedited discovery.

16   Q.   Do you recall that it was before because Mr. Jowdy

17   alleged that the loan agreement you were relying upon was

18   a forgery; isn't that correct?

19   A.   Conveniently, yes.

20   Q.   It's a yes or no question, Mr. Kenner.

21           Was it because Mr. Jowdy's attorneys claimed it

22   was a forgery?

23   A.   I believe it's because Mr. Jowdy claimed it was a

24   forgery.

25   Q.   And Mr. Jowdy submitted a declaration, did he not,

91

```
1    with regard to that proceeding?

2    A.   I don't recall.  If you show it to me, I can verify

3    it.

4    Q.   I'm showing you what's marked as exhibit 46.

5             MS. LEONARDO:  Your Honor, I don't believe you

6    have a copy.

7             MR. HALEY:  Could I have a copy?

8             THE WITNESS:  What exhibit is this?

9    BY MS. LEONARDO:

10   Q.   Mr. Kenner, I'm asking if you could look at exhibit

11   46.

12            Do you recognize that?

13            (Pause in proceedings.)

14   A.   I think I've seen this before.

15   Q.   That was a declaration that Mr. Jowdy submitted in

16   the lawsuit you brought against him in Little Isle v.

17   Jowdy in Arizona Federal Court; isn't that correct?

18   A.   I recall seeing this about 10 months before he

19   testified in California, yes.

20            MS. LEONARDO:  Your Honor, I offer exhibit 76

21   into evidence.

22            MR. HALEY:  No objection.

23            MR. CONWAY:  No objection, your Honor.

24            THE COURT:  76 is admitted.

25            (Government Exhibit 76 in evidence.)
```

Kenner   -   Cross/Leonardo

92

1    BY MS. LEONARDO:

2    Q.   By the way, Mr. Kenner, prior to testifying here

3    today, did you review all of the e-mails and documents

4    that the government has offered into evidence during this

5    proceeding?

6    A.   I don't know if I've seen every single one of them or

7    not.

8    Q.   With regard to any e-mails you may have seen that

9    contain your e-mail addresses on them, are you claiming

10   that any are not authentic?

11   A.   I haven't made any such claim.

12   Q.   So, in other words, if an e-mail has your e-mail

13   address on it, then you received or sent that e-mail;

14   isn't that correct?

15   A.   If you show me the specific document, I will be able

16   to verify that.

17   Q.   Also in the Little Isle suit that was brought by you,

18   the original complaint that you filed with the Court made

19   no mention of a written agreement with Mr. Jowdy; isn't

20   that correct?

21   A.   I don't recall what my lawyers wrote.

22            MS. LEONARDO:  Your Honor, I'm going showing the

23   witness what's marked FORF-77.

24            (Pause in proceedings.)

25   A.   Okay, I reviewed it.

93

1    Q.    Your initial complaint does not make reference to a

2    written revolving line of credit agreement with Mr. Jowdy;

3    isn't that correct?

4    A.    It refers to just an agreement.

5    Q.    In fact, in response to Mr. Jowdy's motion to dismiss

6    your complaint the first time, you filed a written

7    revolving line of credit agreement with the Court; isn't

8    that correct?

9    A.    If I remember correctly, we were waiting on it to be

10   sent to us from John Kaiser who was in possession of the

11   document.

12   Q.    This is a line of credit agreement where you are --

13   it's a promissory note, correct, as you allege?

14   A.    I think the document speaks for itself.  I can

15   comment on it if you show it to me.

16   Q.    Mr. Kenner, you drafted it; isn't that correct?

17   A.    Yes, ma'am, I did draft it.

18   Q.    And in the promissory note you put in such terms as

19   interest; isn't that correct?

20   A.    Yes, I believe it was 15 percent interest.

21   Q.    And you left the original promissory note with a

22   person who had to pay the amounts due on that note; isn't

23   that correct?

24   A.    When the document was signed in Cabo San Lucas in

25   December 2004, Mr. Jowdy made a copy, handed me one copy

94

1    and he kept another copy, and I realized later that he had

2    the original, but I never thought much about it until we

3    began legal proceedings with him.

4    Q.   From the year December 2004, when you allege the note

5    was signed, up until the closing of Lehman whether in

6    Hawaii or Mexico, you never once thought to ask for the

7    original promissory note?

8    A.   I thought the original -- excuse me.  I assumed that

9    the contract that I had with Mr. Jowdy was good and

10   acceptable and Mr. Jowdy was making payments on it right

11   through the closing of March 26, 2006.

12           So it wasn't until he terminated negotiations

13   through Mr. Constantine where he had admitted to all of

14   the monies he owed us that it ever became an issue.

15   Q.   Now, you testified on direct that you were present at

16   a deposition in an action brought by Greg DeVries and a

17   number of other hockey players against Mr. Jowdy; do you

18   recall that testimony?

19   A.   I was present on January 5th and 6th in Mr. Jowdy's

20   two day telephone deposition.

21   Q.   You're also aware that Mr. Jowdy also testified at

22   that deposition that that loan document was a forgery;

23   isn't that correct?

24   A.   I remember Mr. Jowdy making that statement.

25           MS. LEONARDO:  Your Honor, I don't have copies

95

1   but I would like to offer into evidence what's marked as

2   Government's Exhibit Forfeiture-80, and I'll make copies,

3   which is an excerpt from that same deposition that

4   Mr. Kenner put in as exhibit 1 where Mr. Jowdy alleges

5   that that note is a forgery and I'll make copies.

6            THE COURT:  Okay.  Any objection?

7            MR. HALEY:  Judge, I'm sure I don't have an

8   objection.  May I just see?

9            THE COURT:  Do you want to offer 77?

10           MS. LEONARDO:  Yes, your Honor, I intend to

11   offer 77 also.

12           MR. HALEY:  Thank you, your Honor.

13           No objection.

14           MR. CONWAY:  No objection, your Honor.

15           THE COURT:  The complaint from the Arizona case,

16   is there an objection to that?

17           MR. HALEY:  No, sir.

18           MR. CONWAY:  No, your Honor.

19           THE COURT:  So 77 and 80 are admitted.

20           (Government Forfeiture Exhibits 77 and 80 in

21   evidence.)

22   BY MS. LEONARDO:

23   Q.   By the way, Mr. Kenner, you testified on direct

24   examination that John Kaiser has not taken any steps to

25   pursue Mr. Jowdy; is that what you testified to?

96

1  A.    That is correct.

2  Q.    And in the Little Isle lawsuit that you brought, that

3  suit was actually dismissed because you did not cooperate

4  with the discovery; isn't that correct?

5  A.    That's actually incorrect.

6  Q.    Are you aware of the judge's decision in that case?

7  A.    Yes, ma'am, I'm very aware of the decision in that

8  case.

9        It was erroneous and we filed an appeal even

10 though the case was dismissed with prejudice for some

11 unknown reason to my attorneys.

12 Q.    And what was that status of that appeal?

13 A.    I'm not sure what happened to it at that point.

14       That was approximately the time that the

15 California lawsuits had commenced, so we weren't as

16 concerned about it at that point.

17 Q.    This case was dismissed in March 2010 and this is

18 under case number CV-09-0142 in the District of Arizona

19 and the Judge specifically dismissed the case because of

20 your obstruction of discovery; isn't that correct?

21 A.    That's absolutely incorrect.

22       That's what the Judge suggested, but in fact I

23 attended the first day of my deposition and had to leave

24 the country to go to Mexico to re-file a case that

25 Mr. Jowdy paid to be thrown out of the Mexican court

1    system and we rescheduled our second day for my

2    deposition.

3           And prior to that deposition occurring,

4    Mr. Jowdy's attorneys went in and filed an ex parte motion

5    while my lawyers were being changed from the original

6    lawyers that were threatened by Mr. Jowdy's attorneys to

7    Mr. Tom Baker who then represented the group of us through

8    the conclusion of that case.

9           We appeared for my second day of deposition.  It

10   was only subsequent to that that the judge based on the ex

11   parte request by Jowdy's attorneys dismissed the case

12   saying I had known not shown up for the second day of my

13   deposition, which was actually incorrect.

14   Q.   Well, Mr. Kenner, notwithstanding what your belief

15   is, a federal judge --

16   A.   That's not my belief, that's what happened.

17   Q.   Notwithstanding what you think happened, a federal

18   judge dismissed your suit, didn't she?

19   A.   Yes, ma'am, the case was dismissed.

20   Q.   In addition to questions about whether or not you

21   were responding to discovery, the Court had ordered you to

22   respond to a Court order dated November 2nd, 2009, that

23   you never responded to?

24   A.   The request by the Court was for a written

25   explanation why I did not show up for the second day of

98

1    the deposition, which in fact had already occurred.

2    Q.    According to the Court, the Court concluded that you

3    failed to comply with the Court's order with regard to

4    something the Court ordered you to do; isn't that correct?

5    A.    The Court ordered me to write a response prior to the

6    second day of the deposition as to why I was delaying the

7    second day of the deposition.

8    Q.    And you didn't do that, did you?

9    A.    We had shown up for the second day of the deposition

10   and so my attorney advised me they didn't believe that it

11   was necessary to actually have to file a letter why we

12   didn't show up if in fact we already had completed the

13   deposition.

14   Q.    Again, the Court dismissed your case, correct?

15   A.    That is also correct.

16   Q.    And the Court found, whether or not you agree with

17   it, that you obstructed discovery; isn't that correct?

18   A.    That's what the Court found, and we did not agree

19   with it whatsoever.

20   Q.    And there's currently no appeal pending on this

21   matter; isn't that correct?

22   A.    There was no appeal pending because we had both the

23   California case at the time and we felt that Mr. Galioto

24   who was leading the grand jury investigation with

25   Mr. Jowdy at the time was sufficient for us to recover

99

```
1   funds and not be further burdened by financial problems by

2   Mr. Jowdy.

3          MS. LEONARDO:  Your Honor, I move to dismiss the

4   non-responsive portion.

5          THE COURT:  Mr. Kenner, as we did in the

6   criminal trial, if the question is yes or no, the question

7   was whether or not there's an appeal pending.  That's a

8   yes or no.

9          If you have a reason why you didn't appeal,

10  Mr. Haley get up after she's done and say why didn't you

11  appeal that.  Otherwise, we will be here all day, okay?

12         THE WITNESS:  Okay, your Honor.

13  BY MS. LEONARDO:

14  Q.   You were also deposed in a lawsuit brought by Glen

15  Murray v. Ken Jowdy; isn't that correct?

16  A.   Yes, I was.

17  Q.   That was a lawsuit brought by Glen Murray who was a

18  client of yours at the time; isn't that correct?

19  A.   Yes, he was.

20  Q.   You also testified during an SEC proceeding in April

21  and August 2011; isn't that correct?

22  A.   Yes, I did.

23  Q.   That investigation was in investments into Diamante

24  Del Mar and possible violations of federal security law;

25  isn't that correct?
```

Kenner  -  Cross/Leonardo

100

1   A.    That is correct.

2   Q.    Your testimony also with the SEC you also talked

3   about your investment in Cabo; isn't that correct?

4   A.    I don't recall specifically.  If you show it to me,

5   I'll be glad to verify it.

6   Q.    As part of the SEC proceeding, you were required to

7   respond to a subpoena where you produced 26,000 pages of

8   documents; isn't that correct?

9   A.    It sounds about accurate.

10  Q.    I believe there was a question last time we were here

11  as to whether or not the documents you produced were in

12  fact the ones you produced.

13          Do you recall today how your documents were

14  labeled by your attorney in his production to the SEC?

15  A.    I'm not sure I understood the question.

16  Q.    You provided documents to your attorney who represent

17  you in the SEC, correct?

18  A.    Yes, I believe so.

19  Q.    And he in turn provided documents to the SEC

20  attorney; isn't that correct?

21  A.    I believe that's correct.

22  Q.    Your attorney labeled your documents PK underscore

23  SEC 0 through 26,000; isn't that correct?

24  A.    That sounds about accurate.

25          MS. LEONARDO:  Your Honor, I'm showing the

Kenner  -  Cross/Leonardo

101

1    witness what's marked as exhibit 72.

2              (Pause in proceedings.)

3              Mr. Kenner, looking at exhibit 72, do you

4    recognize those as letters that your attorney sent to the

5    SEC?

6    A.   No, I don't recall these letters.

7    Q.   Do you have any doubt that your attorney,

8    Mr. Stolper, sent documents to the SEC numbered PK SEC, PK

9    underscore and Bates numbers following it?

10   A.   I don't doubt that.

11             MS. LEONARDO:  Your Honor, I offer exhibit 72

12   into evidence.

13             MR. HALEY:  I question materiality and/or

14   relevance to the documents, Judge, but I have no objection

15   I'll allow for the Court to determine materiality.

16             MR. CONWAY:  No objection, your Honor.

17             THE COURT:  72 is admitted.

18             I think it came up at the last hearing.  It was

19   a document that had a Bates number on it and it was a

20   question of where it came from.  But let's keep going.

21   BY MS. LEONARDO:

22   Q.   Mr. Kenner, did Joseph Stumpel also file a lawsuit

23   against you?

24   A.   Yes, Joseph Stumpel originally filed a lawsuit

25   against me.

102

1    Q.    Did you respond to that lawsuit?

2    A.    I don't recall.

3          The case was dismissed shortly thereafter.

4          MS. LEONARDO:  I'm showing the witness what's

5    marked as forfeiture exhibit 75.

6          (Pause in proceedings.)

7    BY MS. LEONARDO:

8    Q.   Mr. Kenner, is that the answer that your attorneys

9    filed for you in the case that Mr. Stumpel brought against

10   you in the Central District of California?

11   A.    It looks familiar.

12         MS. LEONARDO:  Your Honor, I offer exhibit 75.

13         MR. HALEY:  Your Honor, I question the relevance

14   and materiality of the document; but I otherwise have no

15   objection.

16         It is an answer to the lawsuit that was filed by

17   Stumpel and your Honor will make the determination as to

18   its relevance and materiality.

19         Thank you.

20         MR. CONWAY:  No objection, your Honor.

21         THE COURT:  75 is admitted.

22         (Government Forfeiture Exhibit 75 in evidence.)

23   BY MS. LEONARDO:

24   Q.   Mr. Kenner, who represented you in that lawsuit?

25   A.   It appears to be Martin Foley, Michael Pappas and

Kenner  -  Cross/Leonardo

103

1   Sonnenschein, Nath & Rosenthal.

2   Q.   Who do you know Sonnenschein, Nath & Rosenthal to be?

3   A.   Probably three very old men.

4   Q.   Are they attorneys in California?

5   A.   That's where I hired the law firm, yes.

6   Q.   You hired them to represent you in this action; isn't

7   that correct?

8   A.   Yes, I did.

9   Q.   Mr. Kenner, you testified on direct that you obtained

10  your interest in Baja Ventures by approaching Mr. Stumpel

11  and Mr. Lehtinen in the summer '05; is that correct?

12  A.   That is correct.

13  Q.   Where did you approach them?

14  A.   On the telephone.

15  Q.   Where were they located?

16  A.   I have no idea.

17  Q.   Do you know if Mr. Stumpel was out of the country?

18  A.   I have no idea where he was in the summer of '05.

19  Q.   Well, he's your client.  Wasn't he your client?

20  A.   Yes, ma'am, he was my client.

21  Q.   You previously testified that you had daily contact,

22  constant contact with your clients; isn't that correct?

23  A.   I have very high traffic contact with my client, yes.

24  Q.   Prior to approaching Mr. Stumpel in the summer of

25  2005, when is the last time you had spoken to him?

Kenner  -  Cross/Leonardo

104

1    A.    I probably spoke with Mr. Stumpel on a very, very

2    limited basis.

3    Q.    What language does Mr. Stumpel speak?

4    A.    German, Slovakian, Russian, Ukrainian and English.

5    Q.    Is he fluent in English, reading and writing?

6    A.    Yes, ma'am.

7    Q.    How do you know that?

8    A.    Because I would send him documents, he would review

9    them, he would call me with questions, specific questions

10   to less than simple documents, and we would have

11   conversations regarding those documents.

12   Q.    By the way, did you file an adversary proceeding on

13   behalf of Mr. Stumpel in Mr. Constantine's bankruptcy

14   proceeding?

15   A.    I believe so.

16   Q.    And you discussed it with him before you filed it?

17   A.    Yes, ma'am.

18   Q.    Did he sign it?

19   A.    I don't recall if Mr. Stumpel signed it or he

20   authorized me to sign it on his behalf.

21   Q.    If he authorized you to sign on his behalf, would

22   that be indicated on the document?

23   A.    I don't know if it would be or not.

24          MS. LEONARDO:  Your Honor, I'm going to show the

25   witness what's marked as exhibit 73.

Kenner  -  Cross/Leonardo

105

1          (Pause in proceedings.)

2          THE COURT:  Do you want him to focus on a

3     particular page?

4          MS. LEONARDO:  Actually, the signature page.

5          THE WITNESS:  Okay.

6     BY MS. LEONARDO:

7     Q.   Looking at the signature page, did you sign that or

8     did he sign that?

9     A.   I signed that.

10    Q.   There's no indication on that whatsoever that you

11    signed as a power of attorney for him or as anything other

12    than you representing you were Joseph Stumpel; isn't that

13    correct?

14    A.   I signed it like that after Mr. Stumpel authorized me

15    to sign his name on his behalf for filing the complaint;

16    that's correct.

17    Q.   Do you have anything in writing that he authorized

18    that?

19    A.   No.

20    Q.   Do you have any e-mails that he authorized that?

21    A.   I don't know.

22    Q.   Do you know where he was located at the time this

23    adversary proceeding was filed?

24    A.   I believe he was living in Kazakhstan.

25         MS. LEONARDO:  Your Honor, I offer exhibit 73

Kenner  -  Cross/Leonardo

106

1   into evidence.

2               MR. HALEY:  No objection.

3               MR. CONWAY:  No objection.

4               THE COURT:  73 is admitted.

5               (Government Forfeiture Exhibit 73 in evidence.)

6   BY MS. LEONARDO:

7   Q.    So you approached Mr. Stumpel in what month in 2005?

8   A.    I spoke to Mr. Stumpel on a weekly basis in 2005.

9   Q.    When did you approach him in 2005 with regard to an

10  investment in Baja Ventures?

11  A.    I don't recall.

12  Q.    Do you have any e-mails?  Do you have any calendars

13  that show when you were meeting with him or approaching

14  him?

15  A.    Not with me.

16              They were all in my office at the time of the

17  search and seizure by the FBI.

18  Q.    So you approached him in 2005, and asked him to

19  invest with you in Baja Ventures 2006; is that correct?

20  A.    In sum and substance, yes.

21  Q.    Well, the promissory note which you introduced as an

22  exhibit, Kenner Exhibit 6, is dated May 17, 2005.

23              Is that when you met with Mr. Stumpel?

24  A.    Did I meet with him on that date?  No.

25  Q.    How did he get this document?

Kenner  -  Cross/Leonardo

107

1   A.   It was probably given to him at a later date.

2   Q.   What date was that?

3   A.   I don't recall, probably the next time I saw him in

4   order to memorialize the deal.

5   Q.   How long after May 17, 2005, did you see him?

6   A.   I probably would have seen him in or about August of

7   2005 during training camp.

8   Q.   Which training camp was that?

9   A.   I don't recall.

10  Q.   You don't recall who he was playing for in August

11  2005?

12  A.   No.

13       I wasn't in charge of their schedules.

14  Q.   You went to go meet them at different areas where

15  they were playing; isn't that correct?

16  A.   Yes, ma'am.

17       I had about 135 clients.  I don't recall where

18  all of those came from.

19  Q.   It was a yes or no question, Mr. Kenner.

20       You go to meet them wherever they're playing;

21  isn't that correct?

22  A.   That is one of the ways I would go see them.

23  Q.   You meet them in their hometowns; isn't that correct?

24  A.   I met all of my clients in their hometowns.

25  Q.   In 2005, what was Mr. Stumpel's hometown in the

108

1    United States?

2    A.    If you give me access to the internet, I can tell you

3    where he was in 2005.

4    Q.    As you sit here today, you have no idea?

5    A.    I don't recall.

6           Mr. Stumpel played for five or six different

7    teams in the NHL.

8    Q.    You testified on direct that you also approached Jere

9    Lehtinen; is that correct?

10   A.    Yes, I spoke to Jere Lehtinen about it.

11   Q.    Where did you speak to him?

12   A.    I was on the phone in Las Vegas, Nevada, when I spoke

13   to him.

14   Q.    Where was Mr. Lehtinen at the time you spoke with

15   him?

16   A.    I don't recall.

17   Q.    Who was he playing with in 2005?

18   A.    The Dallas Stars.

19   Q.    Was he in Dallas in 2005?

20   A.    Yes, ma'am, Mr. Lehtinen was in Dallas in 2005.

21   Q.    During the lockout between 2004 and 2005, did

22   Mr. Lehtinen and Mr. Stumpel stay in this country?

23   A.    I think they traveled extensively during those years.

24          I don't recall if they played on European or

25   Russian teams during those years, or if they remained

109

1    behind in their non-playing cities to practice and train.

2    Q.    So with regard to Baja Ventures 2006, that was not

3    incorporated or made an LLC until February 2006; isn't

4    that correct?

5    A.    February 23rd, 2006.

6    Q.    In your promissory notes, you mention Baja Ventures

7    2006 in two promissory notes that are dated in 2005; is

8    that correct?

9    A.    That is correct.

10   Q.    So is it your testimony you thought of this name

11   before the promissory notes?

12   A.    Yes, ma'am.

13   Q.    How much money did Baja Ventures 2006 put into

14   Diamante Cabo San Lucas?

15   A.    Approximately $2.5 million.

16   Q.    What portion of that was yours?

17   A.    None.

18   Q.    You put no cash into it?

19   A.    No, ma'am.

20   Q.    Did you explain to Mr. Lehtinen and Mr. Stumpel how

21   you were becoming a partner with them for no cash?

22   A.    Yes, I did.

23   Q.    By the way, do you remember testifying at the SEC

24   that you put in $100,000 cash?

25   A.    I may have suggested to the SEC that I did, but that

Kenner   -   Cross/Leonardo

110

1    was part and parcel to the hundreds and hundreds of

2    thousands of dollars I gave Mr. Jowdy that was still being

3    settled out.

4    Q.   Well, at the SEC you unequivocally testified that you

5    put in $100,000 cash, and Mr. Lehtinen and Mr. Stumpel put

6    in the other 2.4; isn't that correct?

7    A.   In fact, Mr. Stumpel and Mr. Lehtinen put in 2.456

8    million.

9    Q.   Did you represent to them that they would have an

10   equity investment in Baja Ventures 2006?

11   A.   Both of them, yes, as was represented on the

12   promissory contract that each of them signed.

13   Q.   Did there ever come a time that you told them on the

14   closing of Diamante Cabo San Lucas, that you're listed as

15   the 100 percent owner of Baja Ventures 2006; did you ever

16   tell them that, yes or no?

17   A.   Yes, that was crystal clear.

18   Q.   Do you have any e-mails, any documents?

19   A.   Not with me today.

20   Q.   Where would they be?

21   A.   They would have been on my laptop if it existed

22   and/or on my cell phone if they existed at the time of the

23   search and seizure by the FBI.

24   Q.   Is this the laptop you claim was destroyed by TSA?

25   A.   No, ma'am.

111

1              The laptop that was destroyed by the TSA was

2    destroyed by the TSA.

3    Q.    The question is; the laptop you're talking about,

4    were there any documents you sent to Mr. Lehtinen and

5    Mr. Stumpel contained on the computer or the laptop that

6    was destroyed by the TSA?

7    A.    I'm 100 percent certain there were e-mails and other

8    documents that would have been forwarded to Mr. Stumpel

9    and Mr. Lehtinen that were destroyed on that computer.

10   Q.    And you haven't produced any of those here today,

11   have you?

12   A.    From the destroyed computer?

13   Q.    Or from what you have on your laptop before it was

14   seized or anything?

15   A.    I had no access to my laptop once it was seized.

16   Q.    Mr. Kenner, during the course of the criminal

17   proceedings, you had access to over two million documents;

18   isn't that correct?

19   A.    That is correct.

20   Q.    You knew that this proceeding was extremely important

21   because it goes to your equity or your interest in Baja

22   Ventures; isn't that correct?

23   A.    Yes.

24              There's been no contrary position by Mr. Stumpel

25   and Mr. Lehtinen that they are not partners as represented

Kenner  -  Cross/Leonardo

112

1    by the documents in Diamante Cabo San Lucas.

2    Q.   My question is, as you sit here today, you don't have

3    one document you can show the Court where you explain to

4    Mr. Stumpel and Mr. Lehtinen that they put in $2.5 million

5    and they have nothing to show for it?  You have nothing to

6    show, no documents; isn't that correct.

7              MR. HALEY:  I object.

8    A.   That's incorrect.

9              MR. HALEY:  I object.

10             THE COURT:  Sustained as to form.

11   BY MS. LEONARDO:

12   Q.   Mr. Kenner, as you sit here today, can you recollect

13   one single e-mail and the date that you sent it to

14   Mr. Stumpel or Mr. Lehtinen telling them that they no

15   longer have an interest in Baja Ventures 2006?

16   A.   I would never have sent e-mail to Mr. Stumpel or

17   Mr. Lehtinen telling them they no longer have interest in

18   Baja Ventures.

19   Q.   It's your oral promise they will some day have an

20   interest in Baja Ventures 2006?

21   A.   That's incorrect.

22             We presented two documents today that they have

23   a promissory contract with respect to Baja Ventures 2006.

24   Q.   Mr. Kenner, when you were going to the closing on

25   Diamante Cabo San Lucas, you asked that your interest be

113

1    put into GuideDog Management; isn't that correct?

2    A.    Prior to February 19, 2006, that's correct.

3    Q.    So when you were going to a closing to reflect your

4    equity share in Diamante Cabo San Lucas, you wanted it to

5    be in GuideDog Management; isn't that correct?

6    A.    That is originally correct.

7    Q.    So the two documents you gave in the summer '05

8    promising equity in Baja Ventures 2006, was a worthless

9    document, wasn't it?

10   A.    It was based on an LLC that was going to be set up at

11   the closing which in fact it was.

12   Q.    Well, prior to the closing, your intention was to put

13   it in GuideDog Management?

14   A.    At one point my intention was to put my ownership

15   interest in GuideDog.

16   Q.    At the time you -- in the time prior to the closing,

17   I think you said up until February 23rd, 2006, your

18   intention was to put it into GuideDog Management?

19   A.    Until February 19.

20   Q.    Up until February 19, 2006, your intention was to put

21   it in GuideDog Management?

22   A.    That's correct.

23         That's where I was going to hold my singular

24   interest in the company, yes.

25   Q.    If Lehman Brothers or Mr. Najam or Mr. Markowitz

114

1    hadn't told you to change your LLC, it would have been in

2    GuideDog management; isn't that correct?

3    A.   That's incorrect; neither Mr. Najam nor Mr. Markowitz

4    told me to change it.

5         Mr. Jowdy informed myself, through Mr. Najam and

6    Mr. Markowitz, he was not going to be repaying us the

7    money he promised to pay us at the closing.

8         So at that point in time we had to trigger the

9    promissory contracts and I instructed Mr. Markowitz on

10   February 23rd, 2006, to get Baja Ventures 2006 established

11   in Delaware as an entity.

12   Q.   Do you recall testifying during the course of this

13   criminal trial?

14   A.   Do I recall testifying during the trial?

15        Yes, I do.

16   Q.   You testified about three, four days; isn't that

17   right?

18   A.   At least.

19   Q.   It's your testimony here today that Mr. Stumpel and

20   Mr. Lehtinen and you formed Baja Ventures 2006, right?

21   A.   No.

22        I asked Mr. Markowitz to form Baja Ventures

23   2006.  He was the attorney for the closing.

24   Q.   Well, your promissory notes indicates there is a Baja

25   Ventures 2006.

115

1          Your promissory note is dated in 2005; is that

2     correct?

3     A.   My interpretation is it represents that they received

4     an entity, an ownership interest in that entity at the

5     closing.

6     Q.   In an entity that Mr. Markowitz didn't create until

7     February 2006, right?

8     A.   Absolutely.

9          That's when we were creating the entities that

10    are going to take ownership in the project.

11    Q.   So prior to February 2006 though, your intent was to

12    have your equity in GuideDog Management, right?

13         MR. HALEY:  Judge, it's been asked and answered

14    two or three times.

15         THE COURT:  I'll allow it.

16    A.   You're actually confusing two separate issues.

17    Q.   Mr. Kenner, you just testified --

18         MR. HALEY:  Judge, may he be allowed to finish

19    his answer?

20         THE COURT:  Yes.

21    A.   You're mixing up two very different events.

22         My ownership interest, my singular ownership

23    interest, was going to be in GuideDog.

24         At a meeting that occurred on February 19, 2006,

25    Mr. Jowdy indicated he was not going to be paying back the

116

1    different individuals that had to have equity in the Cabo

2    San Lucas project through his Hawaii loans or other

3    outstanding loans at that point in time.

4              So, at that point, on February 19, I spoke to

5    Mr. Markowitz and Mr. Najam and instructed them to

6    initiate the filings of Baja Ventures 2006, and that's

7    when they did, and the two equity positions for

8    Mr. Stumpel and Mr. Lehtinen were memorialized for our

9    closing a month later.

10   Q.    Mr. Lehtinen wasn't a Hawaii investor, was he?

11   A.    I don't recall as I sit here.

12   Q.    And Mr. Stumpel in fact wired money to your Ula

13   Makika account; isn't that correct?

14   A.    Yes.

15   Q.    So Mr. Stumpel was a Hawaii investor; isn't that

16   correct?

17   A.    I don't know if that's conjutive.

18   Q.    You described him as a Hawaii investor; isn't that

19   correct?

20   A.    Is this a separate question?  I'm not sure I'm

21   following.

22   Q.    You have described Mr. Stumpel in previous testimony

23   as a Hawaii investor; isn't that correct?

24   A.    Mr. Stumpel was an investor in the Hawaii land

25   development project.

117

1    Q.    But not for Little Isle.  He's not a member of Little

2    Isle IV; is that correct?

3    A.    I believe he's a member of Little Isle IV.

4    Q.    We also describe Mr. Kaiser as a Hawaii investor

5    also; isn't that correct?

6    A.    Mr. Kaiser is a Hawaii investor.

7    Q.    Mr. Kaiser is not a member of Little Isle IV either;

8    isn't that correct?

9    A.    He originally was a member of Little Isle IV in 2003

10   and into some period of time 2004 when himself and

11   Mr. Manfredi created an LLC called Moanna View Estates and

12   we separated out their equity from Little Isle and the

13   original investors.

14   Q.    Mr. Kenner, do you recall testifying during the

15   course of the criminal trial that Mr. Stumpel's and

16   Mr. Lehtinen's money that went to Cabo were loans to Ken

17   Jowdy; do you recall that?

18   A.    Yes, they were originally established as being loans

19   that Mr. Jowdy was going to pay back at closing, and

20   that's what I've just been testifying to, that on February

21   19, 2006, Mr. Jowdy informed me that he was not going to

22   be paying back their loans because he was going to have to

23   pay back the Hawaii loans at the closing.

24            So that's the point where the guarantees I made

25   for Mr. Stumpel and Mr. Lehtinen, they have their monies

118

1  paid back plus 15 percent would then roll into the Baja

2  Ventures 2006 equity.

3  Q.    Mr. Kenner, didn't you just testify earlier and on

4  direct that you approached Mr. Lehtinen and Mr. Stumpel to

5  have them invest with you in Baja Ventures in 2006?

6  A.    That is correct.

7  Q.    You testified during the course of the criminal trial

8  that the two-and-a-half million from Mr. Lehtinen and

9  Mr. Stumpel were loans that were made to Ken Jowdy?

10  A.    Yes, they were originally loans that were made to Ken

11  Jowdy and my personal guarantee to them was if Mr. Jowdy

12  didn't pay them back, each of them would be joining me in

13  a new entity called Baja Ventures 2006 at the closing.

14  Q.    Mr. Kenner, do you also recall testifying at trial,

15  page 4631 and 4632, that when Mr. Jowdy reneged on an

16  original loan agreement with Mr. Lehtinen in the summer of

17  2005, I signed a debt agreement with both Mr. Stumpel and

18  Mr. Lehtinen to secure their funds behind Jowdy's promise

19  to repay them.

20        Do you remember testifying to that?

21  A.    That's correct, that's exactly what I just said.

22  Q.    Do you also recall testifying during the course of

23  the criminal trial that you do own 100 percent of Baja

24  Ventures?

25  A.    I don't recall saying that I own 100 percent of Baja

Kenner    -    Cross/Leonardo

119

1  Ventures.

2  Q.    When you, upon the closing of the Lehman loan,

3  instead of Mr. Stumpel and Mr. Lehtinen having a 5 percent

4  interest in Baja Ventures, you had 100 percent, correct?

5  A.    That's what is listed on the Diamante closing

6  documents, yes.

7  Q.    It's listed on the closing documents because it was

8  your previous testimony that Lehman Brothers did not want

9  foreigners listed as part of the deal; isn't that correct?

10  A.    They were concerned and I see the e-mails in evidence

11  that anyone that had a 5 percent interest or larger in the

12  project that Lehman wanted, was going to have to do a

13  background check and they didn't want foreigners to have

14  that equity position at the closing.

15  Q.    You're familiar, of course, with CSL Properties,

16  correct?

17  A.    Yes, I am.

18  Q.    How much did Michael Peca invest into CSL Properties?

19  A.    $200,000 I believe.

20  Q.    And that gave him a 10 percent interest?

21  A.    In CSL Properties, which is 8 percent of the overall

22  corporation, which is below the 28 percent interest which

23  is below the 5 percent benchmark that Lehman represented

24  they needed to do the contracts.

25  Q.    So encouraging that your client invest in Diamante

120

1    Cabo San Lucas, you never explained to them that for $2

2    million they were putting in, they got 8 percent interest

3    and for the two-and-a-half million that you put in, you

4    got 39 percent interest.

5            You didn't explain that to them?

6    A.   No.

7            In fact, you're misstating what actually

8    happened.

9    Q.   Well, according to the closing documents, CSL

10   Properties, and as you just testified, owns 8 percent; is

11   that right?

12   A.   In fact, I can explain it if you would like me to.

13   Q.   The question is, according to the closing documents,

14   CSL Properties owns 8 percent; isn't that correct?

15   A.   Specifically according to the closing documents, yes.

16   Q.   Are there any documents that reflect a different

17   agreement after the closing with CSL Properties?

18   A.   There was an agreement with Mr. Jowdy that after the

19   closing, he would put the ownership interest back to what

20   it was originally supposed to be, which was 40 percent is

21   CSL Properties, 40 percent to my entity, and 20 percent to

22   Mr. Jowdy which he changed by e-mail confirmation to me

23   representing that Lehman Brothers demanded it on February

24   19 of 2006, but in discovery I saw e-mail traffic between

25   Mr. Jowdy and Lehman Brothers that shows that that was a

Kenner  -  Cross/Leonardo

121

1    lie by Mr. Jowdy.

2    Q.    Do you have those documents with you?

3    A.    I didn't bring them up here, but I do have them in my

4    possession.

5    Q.    The Lehman closing documents, you read them, correct?

6            MR. HALEY:  Which Lehman closing documents?

7            MS. LEONARDO: I think we're talking about

8    Mexico?

9            MR. HALEY:  Fair enough.

10   A.    I can't say for certain that I read every page of

11   every Lehman closing document for Mexico because there are

12   a lot of documents that I found in discovery that were

13   never disclosed to me by Mr. Jowdy prior to closing.

14   Q.    Mr. Kenner, you're aware that the Lehman closing

15   documents that Lehman Brothers specifically prohibited any

16   further transfers after the closing until the entire

17   amount of the loan was paid off; isn't that correct?

18   A.    I have heard that and I have not executed any

19   transfers, only Mr. Jowdy effectuated a significant series

20   of transfers of his own equity to cover debt.

21   Q.    Mr. Kenner, you just testified your intention was

22   after the closing to execute transfers; isn't that

23   correct?

24   A.    That's incorrect.  That's not what I just said.

25   Q.    Mr. Kenner, I believe you testified that after the

122

1    closing that the percentages were going to be adjusted to

2    what they were supposed to be before the closing, didn't

3    you testify to that?

4    A.    I testified that Mr. Jowdy was going to make those

5    changes.  I never testified that I was going to make the

6    changes.

7             In fact, Mr. Jowdy is the managing member, was

8    the person who had to sign off on those changes and he

9    certainly had no problems signing off on any of them that

10   he did for his own personal benefit.

11   Q.    After the closing, you haven't converted Baja

12   Ventures 2006 back to Mr. Stumpel and Mr. Lehtinen, have

13   you?

14   A.    They have the promissory contracts with the LLC and

15   they have not complained to me once since 2006 that they

16   feel unsecured.

17   Q.    Mr. Stumpel sued you, didn't he?

18   A.    Mr. Stumpel sued me because his attorneys

19   misrepresented that he had a line of credit set up in

20   Northern Trust bank, and that his funds were transferred

21   to Northern Trust bank and that I forged his signatures on

22   the transfer document, the new line of credit document,

23   and that drained his line of credit.

24             When Mr. Stumpel and I met following the filing

25   of that lawsuit, Mr. Stumpel got on the phone and called

123

1    his original bank and realized where the funds had gone.

2            Second, he called Northern Trust bank and found

3    out there was never a similar account set up by him or

4    anybody at Northern Trust bank, nor was there a line of

5    credit ever established at Northern Trust bank, nor was

6    any funds removed from the line of credit or bank account,

7    and Northern Trust had never filed, and he subsequently

8    dropped the lawsuit and filed a bar complaint against his

9    lawyer for misrepresentation and fraud.

10   Q.    When did you have this conversation with him?

11   A.    With who?

12   Q.    Mr. Stumpel?

13   A.    What conversation are we talking about?

14   Q.    The one you just testified to.

15   A.    Where did that conversation occur?

16   Q.    Correct.

17   A.    I didn't understand the question.  I apologize.

18           It took place in Nizhny Novgord, Russia.

19   Q.    Mr. Kenner, in addition to Mr. Stumpel investing in

20   property in Mexico, he also invested in a number of other

21   entities through you; isn't that correct, or with you?

22   A.    I don't know if I understood the definition through

23   me or with me.

24   Q.    Do you recall, I think it's still in front of you,

25   the adversary proceeding that you filed for Mr. Stumpel?

Kenner  -  Cross/Leonardo

124

1   A.   Yes.

2   Q.   In that, Mr. Stumpel makes allegations with regard to

3   a number of other investments that he believes were

4   stolen; isn't that correct?

5   A.   Would you like me to review the document?

6   Q.   Yes, you may.

7   A.   Okay.

8        (Pause in proceedings.)

9        THE COURT:  What's the question?

10       MR. HALEY:  Judge, is there a question or could

11  it be read back?  I can't remember what the question was.

12       (Record read.)

13  A.   That is purported in this document, yes.

14  Q.   Mr. Kenner, you wrote that document, didn't you?

15  A.   Yes, ma'am.

16  Q.   In fact, you wrote it for a number of your other

17  clients also; isn't that correct?

18  A.   Yes, ma'am, approximately 10 of them.

19  Q.   Glen Murray, Mattias Norstrom?

20  A.   I believe so, yes, and yes and yes.

21  Q.   In that document you claim that the monies they

22  invested in Eufora weren't actually invested in Eufora;

23  isn't that correct?

24  A.   I can review it again, but I believe with respect to

25  Mr. Stumpel there was a representation that he had not

Kenner  -  Cross/Leonardo

125

1    received a post-global settlement fund, a new signed

2    operating agreement or other document.

3            I believe that's what I referred to here.

4    Q.   You make allegations with regard to the Global

5    Settlement Fund in this document; isn't that correct?

6    A.   I think that's what I was just referring to.

7            MS. LEONARDO:  Your Honor, if I could have a

8    moment?

9            THE COURT:  Okay.

10           (Pause in proceedings.)

11   BY MS. LEONARDO:

12   Q.   Mr. Kenner, you recall testifying at trial when you

13   were speaking about the Global Settlement Fund, that you

14   believed there was some expenses that were not related to

15   the Global Settlement Fund?

16   A.   Originally, yes, that's what I believed.  I

17   immediately alerted all of my clients.

18   Q.   Do you recall testifying with regard to a

19   disbursement to a law firm with the name of Sonnenschein

20   that you believe to be an expense for Mr. Constantine?

21   A.   I don't recall specific testimony, but if you put it

22   in front of me I can verify it.

23   Q.   Mr. Kenner, the Sonnenschein law firm also

24   represented you; isn't that correct?

25   A.   In a completely different capacity.

126

1   Q.   Mr. Kenner, with regard to Baja Ventures 2006, do you

2   recall telling the SEC that you, Mr. Lehtinen and

3   Mr. Stumpel each owned one-third of Baja Ventures 2006?

4   A.   I do recall that testimony.  It was incorrect.

5   Q.   Did you ever go back and try to correct that

6   testimony with the SEC?

7   A.   I believe we forwarded those documents that we

8   provided today to the SEC to clear it up.

9   Q.   The promissory notes?

10  A.   Yes.

11  Q.   Do you recall also that the SEC asked you if you had

12  any documentation with regard to your agreement with

13  Mr. Lehtinen and Mr. Stumpel, and you said you don't know

14  if there was any; isn't that correct?

15  A.   I don't recall that testimony.

16  Q.   This would be a pretty important document for you to

17  give the SEC, wouldn't it?

18  A.   I believe we gave it to the SEC when we brought that

19  up.

20  Q.   And the SEC was investigating allegations of federal

21  securities law with regard to investments in Diamante Del

22  Mar, correct?

23  A.   Because of a complaint we had filed effectively.

24  Q.   Did you -- you also told the SEC that -- withdrawn.

25        Mr. Kenner, I believe you testified during the

127

1    criminal trial that in no time did you relinquish your

2    ownership of Baja Ventures 2006; is that correct?

3    A.    I believe that's correct.

4    Q.    Even though you previously testified differently to

5    that; isn't that correct?

6    A.    I don't believe I ever testified that I relinquished

7    my control of Baja Ventures 2006, but you're welcome to

8    put the Nolan debtor's exam documents up there.

9    Q.    You testified during the course of the criminal trial

10   that it was a mistake by the court reporter?

11   A.    That is in fact what happened.

12   Q.    One was conducted on one day and then there was a

13   subsequent date by telephone; is that correct?

14   A.    Yes, it is correct.

15   Q.    Mr. Kenner, I'm going to show you what is the cover

16   page of the first day of the debtor's exam.

17            Can you indicate for the Court what the date on

18   that is?

19   A.    August 11, 2010.

20   Q.    Who is the court reporting agency?

21   A.    Griffin & Associates.

22   Q.    Is there a name of a court reporter on there?

23   A.    Not that I see.

24   Q.    Does it indicate the name of somebody who took the

25   actual transcription?

128

1   A.    Pamela Griffin.

2   Q.    Mr. Kenner, isn't it true that on the second day of

3   the deposition, which was December 15, 2010, you in fact

4   testified that you no longer owned Baja Ventures 2006;

5   isn't that correct?

6   A.    I did not testify to that.

7            That's what it said on the report, but it was in

8   fact Hawaii Ventures 2006 we were referring to because

9   that's the only agreement that I ever signed with

10  Mr. Kaiser.

11  Q.    Mr. Kenner before --

12  A.    In fact, the property was pledged at that point in

13  time.  It was a pledged property that the agreement hadn't

14  concluded until July 2011.

15  Q.    Mr. Kenner, prior to your telephone deposition, you

16  were faxed by your attorney a series of documents; isn't

17  that correct?

18  A.    I don't recall.

19  Q.    You were asked to identify what was marked as Exhibit

20  E, the LLC agreement for Baja Ventures 2006, do you recall

21  that?

22  A.    I do now.

23  Q.    I think your testimony during the course of the

24  criminal trial was that the court reporter got it wrong;

25  is that correct?

Kenner  -  Cross/Leonardo

129

1    A.   That's correct.

2         We were discussing the Hawaiian Ventures 2006

3    because that's the only LLC that had an agreement with

4    Mr. Kaiser at the time.

5    Q.   Okay.

6         So let me see if this refreshes your

7    recollection.

8         The question to you is I want you to look at the

9    exhibit that I handwrote Exhibit 8 on the top right-hand

10   corner.  We're going to mark this as Exhibit 8, entitled

11   limited liability company agreement Baja Ventures 2006.

12        Do you have that in front of you?

13        "ANSWER:  Yes.

14        "QUESTION:  Are you familiar with Baja Ventures

15   2006 LLC?

16        "ANSWER:  Yes.

17        "QUESTION:  Do you own that entity?

18        "ANSWER:  I don't think I do any longer.

19        "QUESTION:  You don't think you do?

20        "ANSWER:  I don't think I do any longer.

21        "QUESTION:  When was it transferred?

22        Did you transfer your ownership in Baja Ventures

23   2006?

24        "ANSWER:  I believe I lost it."

25        So you weren't talking bought Hawaii Ventures,

130

1    you were talking about Baja Ventures.

2    A.    No, I was talking about Hawaiian Ventures 2006

3    because that's the agreement that I had Mr. Kaiser sign on

4    July 26, 2006, just prior to the closing of the Hawaii

5    deal.

6    Q.    Mr. Kenner, I'm going to show you the deposition

7    transcript.

8              It's your testimony that the court reporter got

9    it wrong; is that right?

10   A.    I believe they transposed the Baja Ventures and

11   Hawaii Ventures.

12   Q.    Because you had talked about Hawaii Ventures before

13   in the other deposition; isn't that right?

14   A.    I believe we spoke about it during that deposition.

15   Q.    I'm going to ask you to look at the exhibit that's

16   attached to the transcript that says Exhibit 8 and refers

17   to Baja Ventures 2006, doesn't it?

18   A.    That's what it says.

19   Q.    Can you flip to the first page of that deposition,

20   please.

21             Can you tell us who the court reporting agency

22   was?

23   A.    Bamford.

24   Q.    Can you tell us who the court reporter was?

25   A.    Kathy Nicholas.

Kenner  -  Cross/Leonardo

131

1   Q.   So it's a completely different court reporting agency

2   and different court reporter that took your two

3   depositions; isn't that correct?

4   A.   Yeah, three months a part.

5   Q.   They were different court reporters and a different

6   court reporting agency, correct?

7   A.   That's correct.

8   Q.   I think you testified earlier that because Mr. Jowdy

9   was not going to pay back loans, that's why you gave

10  Mr. Stumpel and Mr. Lehtinen a promissory note; is that

11  what you testified to?

12  A.   That is not what I testified to.

13  Q.   What did you testify to with regard to what you were

14  going to do when Mr. Jowdy told you he wasn't paying back

15  loans?

16  A.   I immediately told Mr. Najam and Mr. Markowitz to

17  open a new LLC in Delaware to be called Baja Ventures

18  2006.

19  Q.   Did you give promissory notes to any of your other

20  investors when Mr. Jowdy told you he wasn't going to pay

21  them back?

22  A.   With respect to what?

23  Q.   Well, you testified earlier that Mr. Lehtinen put in

24  at one point -- I'm sorry, that Mr. Stumpel sent Mr. Jowdy

25  another 1.6 million?

Kenner  -  Cross/Leonardo

132

1   A.   Separate and apart and Mr. Stumpel commencing

2   criminal litigation against Mr. Jowdy in Mexico.

3   Q.   When you say criminal litigation, that's not

4   necessarily a criminal prosecution, it's a civilian

5   bringing a case against somebody else?

6   A.   I don't know specifically.  I know he filed a

7   criminal case against Mr. Jowdy for the $1.6 million.

8   Q.   And you don't know the status of that at all, do you?

9   A.   I couldn't understand what you said.

10  Q.   You do not know the status of that or anything going

11  on in the Mexico litigation?

12  A.   No.

13            I've been in jail for two-and-a-half years.

14  Q.   By the way, you don't know, when you testified

15  earlier that that was an action brought by Baja Ventures

16  against DCSL, a books and records action, you testified to

17  that earlier?

18  A.   I don't remember.

19  Q.   You were deposed in that in jail, remember?

20  A.   I remember being deposed in jail.

21  Q.   You testified earlier today that you did not know if

22  any books and records were supplied; isn't that right?

23  A.   I testified that I was not aware of any books and

24  records that have been supplied.

25  Q.   Have you spoken to any of your former clients with

Kenner  -  Cross/Leonardo

133

1   regard to whether or not books and records had been

2   supplied?

3   A.   I had not spoken to any clients.

4          THE COURT:  Let's take a break.  How much more

5   do you have?

6          MS. LEONARDO:  Maybe an hour.

7          THE COURT:  Okay.  I want to finish this by

8   4:30, so see if you can shorten it.

9          (Recess taken.)

10         (After recess.)

11         THE CLERK:  All rise.

12         THE COURT:  Please be seated.

13         Mr. Kenner, if you could take the stand.

14         (The witness resumes the stand.)

15         THE COURT:  Go ahead, Ms. Leonardo.

16         MS. LEONARDO:  Thank you, your Honor.

17   BY MS. LEONARDO:

18   Q.   Mr. Kenner, with regard to the purchase of the

19   property at Diamante Cabo San Lucas, I believe it was your

20   testimony that $2.5 million came from Baja Ventures; is

21   that correct?

22   A.   $2.5 million came from -- actually 2.456 million came

23   from Joseph Stumpel and Jere Lehtinen on behalf of Baja

24   Ventures 2006.

25   Q.   Correct.

Kenner  -  Cross/Leonardo

134

1      And two million came from CSL Properties; is

2  that correct?

3  A.    That's correct.

4  Q.    And the remainder came from Mr. Jowdy; is that

5  correct?

6  A.    No, the remainder came from loans that we made to

7  Mr. Jowdy that he still failed to repay.

8  Q.    Those were loans that were from your Hawaii

9  investors; isn't that correct?

10 A.    Which included all of the hockey players, myself and

11 Mr. Kaiser.

12 Q.    When you say it included all of the hockey players,

13 yourself and Mr. Kaiser -- withdrawn.

14      When you say it included your hockey players,

15 that was from their investment money into Hawaii, correct?

16 A.    Into the Hawaii LLC, that's correct.

17 Q.    You never discussed with your hockey player clients,

18 did you, that you were loaning money to Ken Jowdy?

19 A.    That is absolutely incorrect.  Each and every one was

20 discussed.

21      In fact, multiple players signed affidavits,

22 several testified in front of the Southern District grand

23 jury, Mr. Kaiser and Mr. Berard testified in a 2009

24 arbitration to that extent.

25 Q.    I believe, Mr. Kenner, that there were some of your

135

1    clients who testified that they had no knowledge of loans

2    to Ken Jowdy; isn't that correct?

3    A.    I didn't understand what you just said.

4    Q.    Some of your clients who testified, testified that

5    they were not aware that all the money went to Ken

6    Jowdy;isn't that correct?

7    A.    I heard that testimony from several people, even

8    people who testified to the contrary.

9    Q.    It's your testimony here today that you discussed all

10   the loans with Ken Jowdy with all of your clients; is that

11   correct?

12   A.    That is correct.

13   Q.    You have no e-mail correspondence or written

14   correspondence with any of your clients at the time with

15   regard to these loans; isn't that correct?

16   A.    That is incorrect.  I'm sure there was e-mail traffic

17   between myself, Mr. Jowdy, my various clients, Mr. Kaiser.

18   Q.    Did you produce any of them here today?

19   A.    I do not have access to that and haven't had access

20   since November 13, 2013.

21   Q.    Mr. Kenner, since November 13, since you've been

22   incarcerated, you have testified you reviewed over two

23   million documents; isn't that correct?

24   A.    Separate and apart from the previous question, yes, I

25   have reviewed approximately two million documents.

136

1    Q.    As you sit here today, can you identify any one

2    e-mail or date or client that you e-mailed them with

3    regard to loans to Mr. Jowdy?

4    A.    In fact, I've seen almost no e-mail traffic from

5    myself out of the tens of thousands of e-mails that were

6    in my possession prior to my arrest.

7    Q.    And, Mr. Kenner, you didn't discuss each and every

8    time you made a loan to Mr. Jowdy with each client, did

9    you?

10   A.    I didn't need to.

11         I made one blanket conversation with each of the

12   investors, and the loan agreement that each of the

13   investors had seen or were discussed covered each of that.

14   Q.    So when you originally started loaning money to

15   Mr. Jowdy, it was intended to be a small loan; isn't that

16   correct?

17   A.    There was a small loan at first in November of 2004.

18   Q.    I believe in your Little Isle complaint that you

19   allege you had loaned about $416,000 to Mr. Jowdy which

20   about 25,000 had been repaid, does that sound right?

21   A.    Neither of those numbers make any sense to me.

22         I do recall in the complaint that we had

23   mentioned that I had personally loaned Mr. Jowdy about

24   $400,000 part and parcel to that complaint in addition to

25   the monies that my clients had loaned to Mr. Jowdy, all of

Kenner  -  Cross/Leonardo

137

1    which he testified to in January 5th and 6th of 2010.

2    Q.    So it was also your testimony that the initial loan

3    to Mr. Jowdy is supposed to be a small loan, correct?

4    A.    That's correct.

5    Q.    It was about $250,000?

6    A.    Sounds about accurate.

7    Q.    You never had any follow-up conversations with any of

8    your clients when the loan was approaching $5 million, did

9    you?

10   A.    That's also incorrect.

11   Q.    How often did you speak with your clients with regard

12   to the loan approaching $5 million?

13   A.    I would speak to my clients as the loan number grew

14   over periods of times, just like I would talk to them

15   about every single investment they had.

16   Q.    Did you just testify a minute ago that you would not

17   tell your client when a specific loan was being made to

18   Mr. Jowdy, that you didn't have to do that?

19   A.    It's only one loan.

20   Q.    So on each and every occasion that you made a loan to

21   Mr. Jowdy, you did not discuss it with your clients?

22   A.    I did not call all 20 clients and say, just so you

23   know, today I'm wiring $15,000 to Mr. Jowdy.

24         No, I did not.

25   Q.    Even though it was your practice to speak to your

138

1   clients on a daily basis?

2   A.   Out of my 135 clients, I did not make individual

3   phone calls each day there was a wire transaction that

4   went to Mr. Jowdy, no, but they were informed.

5   Q.   I believe you testified you met with your clients

6   often, you traveled to see them; isn't that correct?

7   A.   Very often.

8   Q.   In face-to-face meetings, did you discuss with them

9   the amount of the loan was $5 million?

10  A.   Absolutely, by the time it had reached those amounts

11  in or about the end of 2005, early 2006.

12  Q.   You never reduced any of those loan amounts with

13  promissory notes, did you?

14  A.   I didn't understand the question.

15  Q.   With regard to any of those loan amounts, you did not

16  reduce that into a promissory note like you did with

17  Mr. Stumpel and Mr. Lehtinen, did you?

18  A.   There was only one loan agreement and it was between

19  the Hawaii entities and Mr. Jowdy.

20       I don't understand what else would have been

21  reduced to a separate note.

22  Q.   My question to you, Mr. Kenner, was and I think

23  before we broke you indicated Mr. Stumpel had made an

24  additional $1.6 million loan to Mr. Jowdy; is that right?

25  A.   That is correct.

Kenner  -  Cross/Leonardo

139

1    Q.    Where is that memorialized?

2    A.    That was not memorialized.

3    Q.    So as a financial advisor, you had your clients

4    making a $1.6 million loan and you didn't memorialize it

5    anywhere; is that right?

6    A.    That is correct.

7          It was basically documented by the wire

8    transfers that went to Mr. Jowdy and Mr. Stumpel's

9    willingness to subsequently sue in him in Mexico.

10   Q.    Your only documentation is a wire transfer?

11   A.    That is correct, for that particular transaction.

12         That's the same as happened with Mr. Murray in

13   Nevada, that Mr. Murray prevailed against Mr. Jowdy in a

14   bench trial, and I prevailed against Mr. Jowdy as a pro se

15   cross-complaint third-party defendant.

16         MS. LEONARDO:  Your Honor, I move to strike the

17   non-responsive portion of the answer to the question.

18         THE COURT:  I'll let it stand.

19         Please focus on the question, Mr. Kenner.

20         THE WITNESS: Yes, your Honor.

21   BY MS. LEONARDO:

22   Q.    And Mr. Lehtinen was not part of the Hawaii loan

23   investment; is that right?

24   A.    If you have the Little Isle operating agreement, I

25   can tell you whether or not Mr. Lehtinen was part of that

140

1   investment or not.

2          I just don't recall as I sit here today.

3   Q.   Prior to coming here today, did you review all of the

4   documents that were in evidence during the course of the

5   criminal trial?

6   A.   I have reviewed upwards of two million documents.

7   Q.   Prior to coming here today, did you prepare for your

8   testimony?

9   A.   No, I did not prepare for my testimony.

10  Q.   You didn't look at any documents?

11  A.   I continue to look at documents.  Perhaps I don't

12  understand what you mean by did I prepare.

13  Q.   And I believe you testified that Mr. -- withdrawn.

14         I believe you testified that many of your Hawaii

15  investors formed a separate Hawaii investment group

16  outside of Little Isle, it was a collective group; is that

17  right?

18  A.   I don't recall testifying to that.

19  Q.   And it didn't have a specific name?

20  A.   Now, I'm really lost.

21  Q.   Do you recall testifying in your deposition in the

22  lawsuit Little Isle v. Jowdy, that Mr. Kaiser was not a

23  Little Isle member but part of the Hawaii development

24  group that was larger than Little Isle; do you recall

25  testifying to that?

141

1   A.   That makes sense because Mr. Kaiser was originally a

2   Little Isle board member in December '03, and by some

3   point, either in '04 or early '05, a number of breakouts

4   came out of the Little Isle LLC.

5   Q.   But in your testimony in Little Isle v. Jowdy, you

6   represented that there was no specific name for this

7   greater Hawaii development group; is that right?

8   A.   Not until the closing when everything fell under one

9   parent company, Na'Alehu Ventures 2006.

10  Q.   When you were determining percentage of ownership in

11  Little Isle IV, did you include Mr. Lehtinen's 1.6

12  million?

13  A.   I don't recall Mr. Lehtinen ever having a $1.6

14  million transaction.

15  Q.   He had $100,000 transaction, right?

16  A.   I don't recall.

17       If you can show me the Little Isle IV LLC, I can

18  confirm he was a member.

19  Q.   Other than Mr. Stumpel's wire transfer record, did

20  you include him in Little Isle IV or any other Hawaii

21  development group?

22  A.   Mr. Stumpel's $1.6 million wire transfer loan to

23  Mr. Jowdy in Mexico had nothing to do with the Hawaii

24  development group.

25  Q.   My question was, did you include him in any of your

142

1    other LLCs as a security or some kind of promissory

2    agreement to Mr. Stumpel?

3    A.   No, he was not.

4           Mr. Jowdy testified in June of 2010 that he had

5    received --

6           MS. LEONARDO:  I move to strike.  There's no

7    question to the witness.

8           THE COURT:  Are you clarifying something from

9    earlier?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Go ahead.

12   A.   Mr. Jowdy had testified on January 5th and 6th of

13   2010 that he did receive the $1.6 million from Mr. Stumpel

14   directly to one of his Mexican entities, and had no plans

15   to pay it back.

16   Q.   When you talk about Mr. Jowdy's Mexican entities, one

17   is Baja Development?

18   A.   That's actually a Delaware entity I believe but he

19   originally told us in 2002 or 2003 that he had established

20   that for purposes of developing the Mexican real estate

21   projects which we found out by 2007 he used for his own

22   personal account.

23   Q.   You had listed yourself in various financial

24   documents as an owner of Baja Development or part owner,

25   haven't you?

Kenner   -   Cross/Leonardo

143

1    A.   Yes, when we originally believed that was the name of

2    the investment we were investing in.  We only found out

3    later that Mr. Jowdy did not use that or document that as

4    the ownership interest in any of the Mexican properties as

5    we were originally told.

6              MS. LEONARDO:  Your Honor, again, I'm going to

7    move to strike.  There's no question on the table.

8              THE COURT:  He's elaborating on his earlier

9    answer.

10             Let's keep moving.

11   BY MS. LEONARDO:

12   Q.   Mr. Kenner, on your financial statement dated May

13   2005, you represented you're a 10 percent owner of Baja

14   Development Company; is that correct?

15   A.   Yes.

16             That is what I believe it was called at the time

17   and I found out later it was Baja Management.

18             MS. LEONARDO:  Your Honor, this is in evidence

19   as Government's Exhibit 3711.

20   BY MS. LEONARDO:

21   Q.   Mr. Kenner, looking at what's already in evidence as

22   Government's Exhibit 3711, you have various private

23   investments; is that correct?

24   A.   This is a list of private investments, yes.

25   Q.   You submitted this document for what purpose and to

144

1   whom?

2   A.   I did not prepare this document.  I don't know who it

3   was received by.

4   Q.   Well, somebody prepared this document on your behalf

5   then; is that correct?  You had input into this document?

6   A.   I would assume I had some input into this document,

7   but I don't recall this document specifically and who it

8   may have been sent to.

9   Q.   For example, the document lists that you had current

10  assets in Standard Advisors, Guide Dogs; is that correct?

11  A.   Yes, I see that on the document.

12  Q.   It also values your Scottsdale residence at $2.5

13  million?

14  A.   That's approximately what it was probably worth in

15  2005.

16  Q.   Is that the same residence you testified earlier you

17  didn't own, that your wife owned it?

18  A.   That's correct.

19  Q.   That's incorrect on the statement?

20  A.   No, it's correct on the statement.

21       I was divorced after this point in time and gave

22  it to my wife in the divorce.

23  Q.   It's held in trust in your wife's name, isn't that

24  correct?

25  A.   I don't have a trust for my wife, no.

Kenner   -   Cross/Leonardo

145

1    Q.    You lived in the house, didn't you?

2    A.    I lived in that house for a long time, yes.

3    Q.    When did you say Mr. Jowdy decided to change the name

4    from Baja Development to something else?

5    A.    Mr. Jowdy has never changed the name Baja Development

6    Corp.

7           He continued to launder money through that

8    account for years and years until 2007.

9    Q.    It was your understanding that you owned a portion of

10   it or you didn't own a portion of it?

11   A.    My first belief, based on documents that Mr. Jowdy

12   had turned over several times during various litigations

13   and prior to that through his attorney Tom Harvey, was

14   that Baja Development Corporation was the Mexican

15   development corporation that my friend and I invested in.

16          It wasn't until 2007 that I discovered through

17   Mr. Constantine's mediation with Mr. Jowdy that many of

18   the entities were not registered under Baja Development

19   Corporation, but they were registered under other Jowdy

20   controlled entities.

21   Q.    You testified earlier that it was your intention to

22   own your equity share in Diamante Cabo San Lucas and Baja

23   Ventures 2006 after; is that right?

24   A.    After I was told by Mr. Jowdy he was not repaying

25   Mr. Stumpel and Mr. Lehtinen as he previously proposed.

1    Q.    You talked about the promissory notes that reference

2    a Baja Ventures 2006 LLC, we talked about that?

3    A.    Yes, we talked about that.

4    Q.    So it's your testimony that even though you were

5    going to hold your interest in GuideDog, you gave a

6    promissory note to two other people in an entity that did

7    not exist; is that your testimony?

8    A.    Not specifically.

9    Q.    You signed those promissory notes with Mr. Lehtinen

10   and Mr. Stumpel in the summer of 2005; is that right?

11   A.    Some period of time after that when I finally met up

12   with him in person.

13   Q.    Well, you dated the documents, didn't you,

14   Mr. Kenner, in June and May 2005?

15   A.    I dated them the dates that the individuals

16   transferred the funds.

17   Q.    You dated them those dates as a promissory note that

18   you were securing their investment into Diamante Cabo San

19   Lucas, right?

20   A.    I signed those promissory notes with them months

21   later when Mr. Jowdy had defaulted on his agreement to

22   repay the two individuals, so I securitized their interest

23   and told them that if Jowdy's second promise to pay them

24   back at the close of Cabo San Lucas deal did not occur,

25   that we would owe and they would become active members in

Kenner  -  Cross/Leonardo

147

1    the LLC as they were documented by both Mr. Stumpel and

2    myself --

3    Q.    So these documents you represented to the Court are

4    now backdated?

5    A.    Yes, they are were backdated when Mr. Stumpel --

6    Q.    That's a yes or no.

7          They were backdated, correct?

8    A.    They were backdated to the date of the wire

9    transfers.

10         MS. LEONARDO:  Your Honor, I move to have them

11   stricken from the record.

12         THE COURT:  What?

13         MS. LEONARDO:  These two promissory notes,

14   they're backdated.  There's absolutely no indication of

15   when his clients signed these documents, where they were

16   when they signed them.  The second page doesn't even have

17   any reference to a promissory note on it.

18         THE COURT:  His testimony was that they signed

19   it.  So if you want to call them and say they didn't sign

20   it, that's up to you.

21         In terms of authenticating that they signed it,

22   he's authenticated them.

23   BY MS. LEONARDO:

24   Q.    Mr. Kenner, looking at what's already in evidence as

25   Government's Exhibit 4231, that's another financial

148

1   statement; is that correct?

2   A.   It's entitled personal financial statement, yes.

3   Q.   That's your financial statement; isn't that correct?

4        (Pause in proceedings.)

5   A.   I don't recall this specific personal financial

6   statement.

7   Q.   Mr. Kenner, it's already in evidence from the

8   criminal trial.

9        This was submitted by you in support of getting

10  a loan for an airplane; isn't that correct, or refinance

11  on an airplane?

12  A.   I don't recall this document.

13  Q.   Mr. Kenner, there's an e-mail and turn the page and

14  it says:

15        Greg, please let me know if there's additional

16  information necessary, and the time frame for us to

17  acquire the loan and thanks for the help in advance.  PK.

18        That would be you; isn't that correct?

19  A.   I would be me.

20  Q.   In this document you represent again that you are 10

21  percent owner of Baja Development Company; do you see

22  that?

23  A.   Yes.

24  Q.   And also 50 percent owner for Propiedades DDM?

25  A.   Yes.

Kenner - Cross/Leonardo

149

1  Q.   Which Mexican entity was that?

2  A.   The original entity that was supposed to purchase a

3  different piece of property in Cabo San Lucas, if I recall

4  correctly.

5  Q.   How did you acquire a 50 percent ownership in that

6  property?

7  A.   Mr. Jowdy was giving it to me for arranging the deal.

8  Q.   Say that again?

9  A.   Mr. Jowdy was giving it to me for arranging the deal.

10  Q.   So Mr. Jowdy gave you 50 percent of the Diamante Del

11  Mar?

12  A.   No.

13  Q.   Which property?

14  A.   It's a property that never ended up being purchased,

15  as far as I recall.

16  Q.   What was the name of that property?

17  A.   I believe it was called Coletta 308.

18  Q.   It's a property that ended up not being purchased at

19  all; is that correct?

20  A.   That's correct.

21  Q.   You represented on a financial statement that you

22  have a $3.25 million investment in that property; is that

23  right?

24  A.   That's what it says here, but I don't recall

25  preparing this statement or Greg.

150

1    Q.    Which Mexican property was Baja intended for?

2    A.    Intended for or what I found out later?

3    Q.    In 2006, what was your understanding of what Baja

4    Management was?

5    A.    By 2006, I probably believed Baja Management was the

6    equity management entity controlling Diamante Del Mar.

7    Q.    You owned a percentage of Diamante Del Mar, didn't

8    you?

9    A.    Through Baja Management, yes.

10   Q.    How did you get your ownership interest in Diamante

11   Del Mar?

12   A.    I invested with Mr. Jowdy and I worked at the

13   project.

14   Q.    How did you invest with him?

15   A.    By transferring funds to Mr. Jowdy.

16   Q.    What amount of funds and when did you transfer funds

17   to Mr. Jowdy for Diamante Del Mar?

18   A.    Approximately $350,000 was transferred to Mr. Jowdy

19   before and at the beginning of the same period of time in

20   2002 when my investors began investing with Mr. Jowdy.

21   Q.    Where did you get the $350,000 in funds?

22   A.    Savings.

23   Q.    In savings?

24   A.    Yes.

25   Q.    Didn't you tell the SEC it was an inheritance in

151

1   cash, that you inherited a $500,000 cash from a dead

2   father?

3   A.    That is in fact correct, which made it my savings at

4   that point in time.

5   Q.    But you testified to the SEC it was an inheritance

6   you received and you had cash?

7   A.    That is correct.

8   Q.    It was your testimony that you gave Mr. Jowdy

9   $250,000 in cash, right?

10  A.    That is correct.

11  Q.    You have nothing to memorialize this; isn't that

12  correct?

13  A.    I am a 10 percent owner and I saw Baja Management on

14  a promissory note from Mr. Jowdy from Baja Development

15  Corp..

16  Q.    Since you paid him in cash, you have no wire transfer

17  records; is that right?

18  A.    There would not be a wire transfer.

19  Q.    Do you have a promissory note that reflects you put

20  in $350,000 in cash?

21  A.    I did not, but I have a 10 percent interest which is

22  what Mr. Jowdy promised me and I received it so I had no

23  reason to question it.

24         MS. LEONARDO:  Your Honor, move to strike the

25  non-responsive portion.

Kenner  -  Cross/Leonardo

152

1    THE COURT: Just keep going.

2  BY MS. LEONARDO:

3  Q.   Mr. Kenner, you testified earlier with regard to

4  putting your interest into Baja Ventures 2006, and I

5  believe you testified because Mr. Najam or Mr. Markowitz

6  or Lehman told you that you had to do that.

7         Who told you that you had to do that?

8  A.   Nobody told me I had to do that.

9  Q.   GuideDog was your idea; isn't that correct?

10 A.   GuideDog was my company.

11 Q.   And weren't you asked for a tax return with regard to

12 GuideDog, which is in fact why Baja Ventures was created

13 so you didn't have to provide your tax return for

14 GuideDog?

15 A.   No, that's incorrect.

16        MS. LEONARDO:  Your Honor, I'm going to show the

17 witness a series of e-mails which are exhibits 81, 82, 83

18 and 84.

19        (Pause in proceedings.)

20 A.   I have exhibits 81 and 82 twice.

21 Q.   Here's 83 and I'll take those.

22        (Pause in proceedings.)

23 A.   Okay.

24 Q.   Mr. Kenner, looking at what's in front of you are a

25 series of e-mails, correct?

Kenner - Cross/Leonardo

153

1    A.   They are missing a significant number of e-mails

2    between these dates as well.

3    Q.   Well, Mr. Kenner, did you bring any records with you

4    or any e-mails with you to introduce into evidence on your

5    case?

6    A.   I have them on my laptop.

7    Q.   So you had an opportunity to present those also.

8         Mr. Kenner, looking at the bottom, it says PK

9    SEC 15831, do you see that e-mail?

10   A.   Yes, I do.

11   Q.   That's an e-mail from you to Mr. Najam; is that

12   correct?

13   A.   Yes, and Mr. Jowdy.

14   Q.   And Mr. Jowdy, correct.

15        In that e-mail you represent that you're taking

16   your 39 percent in Cabo and GuideDog LLC?

17   A.   That's correct, pursuant to the e-mail Mr. Jowdy sent

18   me on February 19.

19   Q.   Mr. Kenner, it was a yes or no question.  Your

20   attorney can ask you questions and follow-up if he chooses

21   to do so.

22        MR. HALEY:  Objection.

23        He ought to be permitted to testify to the

24   context in which that e-mail was --

25        THE COURT:  If he wants to offer e-mails, you

Kenner   -   Cross/Leonardo

154

1    can find the e-mails that you want to submit.  You can do

2    that, okay?

3              MR. HALEY:  Thank you.

4              THE COURT:  Let's focus on these.

5              Go ahead.

6    BY MS. LEONARDO:

7    Q.    The first e-mail is an e-mail dated February 14, do

8    you see it, from Mr. Najam to Mr. Jowdy and to you; is

9    that correct?

10   A.    Yes.

11   Q.    That e-mail is asking for you to advise Mr. Najam how

12   ownership is going to be broken up; is that correct?

13   A.    That's correct, within the LLC for the investors.

14   Q.    And that was an e-mail that you were doing; is that

15   right?

16              You were being asked by Mr. Najam to do that,

17   correct?

18   A.    Yes, which is what is represented by the CSL

19   Properties, e-mail 484.  That's what he was looking for

20   the interest in.

21   Q.    And then there's an e-mail --

22              MS. LEONARDO:  Your Honor, I'm going to offer 81

23   through 84 into evidence.

24              THE COURT:  Any objection?

25              MR. HALEY:  No, sir.

Kenner  -  Cross/Leonardo

155

1          MR. CONWAY:  No objection.

2          THE COURT:  81 through 84 admitted.

3          (Government Exhibits 81 through 84 in evidence.)

4          MS. LEONARDO:  I'm going to show the witness

5    what is marked as 85 and 86.

6          (Pause in proceedings.)

7    BY MS. LEONARDO:

8    Q.   Mr. Kenner, looking at exhibits 85 and 86, do you

9    recognize those?

10   A.   Yes.

11   Q.   Looking at --

12         MS. LEONARDO:  Your Honor, I offer 85 and 86

13   into evidence.

14         MR. HALEY:  No objection.

15         MR. CONWAY:  No objection.

16         THE COURT:  85 and 86 are admitted.

17         (Government Exhibits 85 and 86 in evidence.)

18   BY MS. LEONARDO:

19   Q.   Mr. Kenner, looking at the two page e-mail, that is

20   an e-mail from you to Mr. Jowdy; is that correct?

21   A.   Yes.

22   Q.   Attached to it is a net worth statement; is that

23   correct?

24   A.   That is correct.

25   Q.   On this statement you don't record Baja Ventures at

Kenner  -  Cross/Leonardo

156

1   all; is that correct?

2   A.    It's listed as Diamante Cabo San Lucas.

3   Q.    It doesn't say Baja Ventures 2006, does it?

4   A.    No, Baja Ventures 2006 is not listed on this.

5   Q.    And for your interest in Diamante Cabo San Lucas, you

6   take the entire two-and-a-half million; is that correct?

7   A.    Yes, because I signed a promissory contract with

8   Mr. Stumpel and Mr. Lehtinen.

9   Q.    Mr. Stumpel and Mr. Lehtinen's interest is not

10  recorded anywhere on here, is it?

11          MR. HALEY:  I'm sorry, on his personal financial

12  statement?

13          MS. LEONARDO:  I'll rephrase that.

14  BY MS. LEONARDO:

15  Q.    Mr. Lehtinen and Mr. Stumpel also have an interest in

16  the same company.  You can't have the entire 2.5 million,

17  can you?

18  A.    I have a promissory contract with them for the $2.5

19  million on February 20th, the day after Mr. Jowdy told me

20  he wasn't paying us back.

21  Q.    Mr. Kenner, the question is very simple.

22          If you put in through Mr. Lehtinen and

23  Mr. Stumpel, $2.5 million, and you're representing that

24  they're entitled to a share of that, or at least 5 percent

25  of that, that's not reflected or deducted from your

157

1    personal net worth statement, is it?

2    A.    That's if you're using the math that their equity

3    percentage has to have relative value on the cash

4    represented on an asset statement.  That was created by

5    Mr. Jowdy.

6    Q.    Well, Mr. Kenner, you apparently reviewed this

7    statement and sent it on to Mr. Jowdy and even made

8    corrections on it; isn't that correct?

9    A.    Mr. Jowdy actually sent the financial statement to me

10   and I responded to him that he may want to make a change

11   on CSL airport information.

12   Q.    And you respond everything else should be fine, PK.

13        That's you, correct?

14   A.    That's correct.

15   Q.    On this statement you take credit for the entire

16   two-and-a-half million that your clients put in here?

17   A.    That is correct.  I have a promissory contract for

18   the funds in Baja Ventures 2006.

19   Q.    By the way, how did you pay them preferred return on

20   their interest, how is that paid?

21   A.    It hadn't been paid because Mr. Jowdy hasn't

22   distributed any capital back to any of the investors.

23   Q.    So Mr. Lehtinen and Mr. Stumpel have not received

24   anything on the preferred annual interest that you

25   promised to pay them; is that right?

158

1    A.    It will be repaid when we get our money back from

2    Mr. Jowdy and Diamante Cabo San Lucas.

3    Q.    These promissory notes are just between you, Baja

4    Ventures and Mr. Lehtinen and Mr. Stumpel; isn't that

5    correct?

6    A.    That's correct.

7            Baja Ventures, I'm the managing member and

8    responsible party for the entity.

9    Q.    So to date, in the past 10 years, you haven't paid

10   anything on these promissory notes to your client?

11   A.    They have not.  They're still accruing interest as we

12   speak.

13   Q.    So what do you owe them now, Mr. Lehtinen and

14   Mr. Stumpel?

15   A.    The documents speaks for itself.

16   Q.    Calculated today, what is the interest that you owe

17   them currently?  Calculated on your annual accrued

18   interest rate that you're using, what do you owe them

19   currently?

20   A.    May I have a calculator?  Is this a guessing game for

21   me?

22           MR. HALEY:  I object.

23           THE COURT:  I don't think we need to calculate

24   the interest.

25

Kenner  -  Cross/Leonardo

159

1    BY MS. LEONARDO:

2    Q.   By the way, your personal financial statement

3    increases by $21 million from May of 2005 until February

4    2006, correct?

5    A.   Can I see the May 2005 statement you're referring to?

6              (Document handed.)

7              I can't see the totals at the bottom.  Perhaps

8    if you have a clearer copy or you can tell us what they

9    are.

10   Q.   I believe on the May 2005 statement it indicates that

11   your net worth is approximately $19 million, correct?

12   A.   I don't know.  I can't read it.

13   Q.   If you look at the February 2006 assets, your total

14   assets total $40,000,137; do you see that in the middle of

15   the document?

16   A.   40 million?  I don't see a 40 million on either

17   statement.

18             But if you want me to compare, I'm glad to

19   suggest that the Baja Development Corporation ownership of

20   10 percent was of a $53 million appraised property.

21             And in February '06, when I previously stated I

22   found out that it was Baja Management that owned the 10

23   percent, the appraised value of the property went up from

24   53 to 68 million, which is 15 million and change.

25   Q.   In your recording on your May 2005 investment, an

Kenner  -  Cross/Leonardo

160

1    investment that didn't happen yet in Baja, it hadn't been

2    bought yet; isn't that right?

3    A.    What has not been bought?

4    Q.    Baja Development.

5    A.    Baja Development, we found out later, was just a

6    money laundering company that Mr. Jowdy set up.

7              But the 10 percent ownership, to be clear, was

8    in the Diamante Del Mar project which, according to

9    Mr. Jowdy, was owned in 1999 which we later found out was

10   purchased with our money starting in 2002.

11             THE COURT:  We're going to stop for today.

12             Mr. Conway, you have cross?

13             MR. CONWAY:  I do, your Honor.

14             THE COURT:  We have to pick another day to

15   continue.

16             After Mr. Kenner, do you have any other

17   witnesses, Mr. Haley?

18             MR. HALEY:  No, your Honor.

19             THE COURT:  Right now what do you intend?

20             MR. CONWAY:  We might request to put Agent Wayne

21   back on the stand, but it would be relatively short,

22   within a half hour.

23             THE COURT:  Are you available this week?  What's

24   your schedule like this week?

25             MR. HALEY:  Yes.

161

1          THE COURT:  Is the government available this

2    week?

3          MS. LEONARDO:  Yes, your Honor.

4          THE COURT: Wednesday the 6th at 10?

5          MR. HALEY:  Your Honor, yes.

6          I have a status conference before Judge Wexler

7    at 11 a.m. on the 6th so perhaps --

8          THE COURT:  Do you want to go for an hour, take

9    a break?  I would rather not start at 11:30.

10         MR. HALEY:  That's fine.

11         MR. CONWAY:  That's good.

12         MS. LEONARDO:  That's fine, your Honor.

13         MR. HALEY:  It should be a short status

14    conference.

15         THE COURT:  Everything Judge Wexler does is

16    short.

17         Thank you.  Have a good night.

18         (Proceedings recessed until Wednesday, April 6,

19    2016, at 10 a.m..)

20

21

22

23

24

25

1                          **I N D E X**

2

3   Witnesses                                      Page

4

5   PHIL KENNER                                      26

6   DIRECT EXAMINATION

7   BY MR. HALEY                                     27

8

9   CROSS-EXAMINATION

10  BY MS. LEONARDO                                  85

11

12                      **E X H I B I T S**

13                                                  Page

14

15

16  Forfeiture Exhibit 44 in evidence               40

17  Kenner Exhibit F-24 in evidence                 46

18  Government Exhibit 76 in evidence               91

19  Government Forfeiture Exhibits 77 and 80 in evidence   95

20  Government Forfeiture Exhibit 75 in evidence    102

21  Government Forfeiture Exhibit 73 in evidence    106

22  Government Exhibits 81 through 84 in evidence   155

23  Government Exhibits 85 and 86 in evidence       155

24

25

## $

**$100,000** [14] - 8:19, 8:20, 57:1, 58:13, 59:3, 59:11, 65:1, 66:4, 74:9, 74:22, 74:23, 109:24, 110:5, 141:15
**$105** [1] - 33:25
**$125** [2] - 33:16, 77:10
**$15** [1] - 34:12
**$15,000** [1] - 137:23
**$19** [1] - 159:11
**$2.036,000,500** [1] - 60:25
**$200,000** [3] - 59:4, 59:8, 119:19
**$21** [1] - 159:3
**$225,000** [1] - 75:19
**$250,000** [2] - 137:5, 151:9
**$3.25** [1] - 149:22
**$300,000** [1] - 56:9
**$350,000** [4] - 75:17, 150:18, 150:21, 151:20
**$360,000** [2] - 65:20, 68:20
**$380,000** [1] - 35:17
**$40,000,137** [1] - 159:14
**$400,000** [1] - 136:24
**$416,000** [1] - 136:19
**$450,000** [1] - 78:8
**$50** [1] - 32:10
**$50,000** [2] - 74:3, 74:4
**$500,000** [8] - 21:20, 52:17, 54:19, 54:21, 54:23, 55:2, 57:5, 151:1
**$53** [1] - 159:20
**$55** [1] - 33:20
**$550,000** [1] - 52:10
**$6.05** [1] - 67:18
**$75** [1] - 81:19
**$791,000** [1] - 57:17
**$800,000** [1] - 82:1
**$90,000** [1] - 53:10
**$956,000** [2] - 59:15, 61:1

                 **'**

**'03** [1] - 141:2
**'05** [1] - 103:18
**'06** [4] - 74:4, 75:3, 76:11, 159:21
**'O4** [1] - 141:3
**'O5** [4] - 75:18, 103:11, 113:7, 141:3
**'O6** [3] - 74:4, 74:8, 81:24

## 0

**0** [1] - 100:23

## 1

**1** [2] - 67:16, 95:4
**1.5** [4] - 30:9, 31:8, 56:23, 77:25
**1.6** [10] - 59:20, 61:3, 131:25, 132:7, 138:24, 139:4, 141:11, 141:13, 141:22, 142:13
**10** [1] - 36:21, 49:21, 73:4, 73:9, 91:18, 119:20, 124:18, 143:13, 148:20, 151:13, 151:21, 158:9, 159:20, 159:22, 160:7, 161:4, 161:19
**10-page** [1] - 43:19
**100** [1] - 1:15, 2:20, 110:15, 111:7, 118:23, 118:25, 119:4
**100,000** [3] - 56:19, 59:10, 61:13
**102** [1] - 162:20
**106** [1] - 162:21
**10705** [1] - 36:16
**10:00** [1] - 1:9
**11** [3] - 57:19, 127:19, 161:7
**11501** [1] - 2:3
**11572** [1] - 2:7
**11722** [2] - 1:15, 2:21
**11749** [1] - 1:22
**11:30** [1] - 161:9
**12** [1] - 80:13
**12th** [2] - 11:16, 81:20
**13** [2] - 135:20, 135:21
**13-CR-607** [1] - 3:3
**135** [2] - 107:17, 138:2
**14** [1] - 154:7
**15** [4] - 93:20, 118:1, 128:3, 159:24
**150** [1] - 73:2
**150,000** [1] - 60:19
**1500** [2] - 35:14, 48:11
**155** [2] - 162:22, 162:23
**15831** [1] - 153:9
**16** [2] - 31:12, 77:6
**1601** [1] - 1:21
**16th** [1] - 78:17
**17** [7] - 31:12, 48:16, 75:17, 75:19, 76:4, 106:22, 107:5
**17th** [1] - 78:17
**18** [1] - 5:15
**18th** [1] - 75:19
**19** [12] - 32:19, 43:10, 52:9, 79:17, 113:2, 113:19, 113:20, 115:24, 116:4, 117:21, 120:24, 153:18
**1976** [1] - 36:15
**1999** [1] - 160:9

## 2

**2** [4] - 30:21, 60:21, 81:4, 120:1
**2,036,500** [1] - 59:15
**2.036** [1] - 61:2
**2.2** [4] - 86:22, 87:1, 87:4, 87:14
**2.4** [1] - 110:6
**2.456** [2] - 110:7, 133:22
**2.5** [9] - 28:16, 109:15, 112:4, 133:20, 133:22, 144:12, 156:16, 156:18, 156:23
**20** [8] - 37:4, 45:4, 47:5, 47:10, 48:5, 48:15, 120:21, 137:22
**2002** [4] - 51:2, 142:19, 150:20, 160:10
**2003** [2] - 117:9, 142:19
**2004** [12] - 35:13, 37:25, 40:19, 40:20, 65:6, 75:21, 81:10, 93:25, 94:4, 108:21, 117:10, 136:17
**2005** [35] - 28:12, 28:24, 51:3, 57:16, 76:9, 78:18, 80:10, 80:13, 103:25, 106:7, 106:8, 106:9, 106:18, 106:22, 107:5, 107:7, 107:11, 107:25, 108:3, 108:17, 108:19, 108:20, 108:21, 109:7, 115:1, 118:17, 138:11, 143:13, 144:15, 146:10, 146:14, 159:3, 159:5, 159:10, 159:25
**2006** [96] - 8:3, 27:19, 27:23, 27:25, 28:10, 28:19, 28:25, 30:10, 30:20, 31:7, 32:20, 33:16, 33:24, 34:7, 37:9, 37:19, 42:21, 45:7, 47:3, 56:24, 58:14, 58:17, 59:11, 59:18, 61:1, 64:25, 65:4, 65:22, 71:25, 72:1, 78:5, 78:11, 78:21, 79:17, 80:11, 80:20, 94:11, 106:19, 109:2, 109:3, 109:5, 109:7, 109:13, 110:10, 110:15, 112:15, 112:20, 112:23, 113:2, 113:8, 113:17, 113:20, 114:10, 114:20, 114:23, 114:25, 115:7, 115:11, 115:24, 116:6, 117:21, 118:2, 118:5, 118:13, 120:24, 122:12, 122:15, 126:1, 126:3, 127:2, 127:7, 128:4, 128:8, 128:20, 129:2, 129:11, 129:15,
129:23, 130:2, 130:4, 130:17, 131:18, 133:24, 138:11, 141:9, 145:23, 146:2, 150:3, 150:5, 152:4, 156:3, 156:4, 157:18, 159:4, 159:13
**2007** [9] - 48:22, 49:3, 49:7, 67:15, 69:18, 80:17, 142:21, 145:8, 145:16
**2007-2008** [1] - 67:21
**2008** [1] - 53:5
**2009** [5] - 44:1, 53:5, 54:14, 97:22, 134:23
**2010** [13] - 42:4, 43:10, 52:10, 57:6, 69:24, 70:17, 87:10, 96:17, 127:19, 128:3, 137:1, 142:4, 142:13
**2011** [2] - 99:21, 128:14
**2013** [3] - 72:8, 73:18, 135:20
**2015** [7] - 5:15, 27:17, 32:14, 37:4, 45:4, 47:5, 47:11, 48:6, 48:16
**2016** [2] - 1:9, 161:19
**20th** [1] - 156:19
**21st** [2] - 80:20, 81:23
**22nd** [4] - 27:16, 27:17, 32:14, 74:8
**23rd** [5] - 27:25, 65:22, 109:5, 113:17, 114:10
**24** [1] - 46:20
**25,000** [1] - 136:20
**2597** [1] - 81:5
**26** [8] - 2:7, 33:15, 33:23, 34:7, 72:1, 94:11, 130:4, 162:5
**26,000** [2] - 100:7, 100:23
**27** [3] - 64:5, 74:9, 162:7
**28** [2] - 81:6, 119:22
**290,000** [1] - 52:22
**2:00** [1] - 84:8
**2nd** [1] - 97:22

## 3

**3** [4] - 74:4, 80:15, 81:13, 81:25
**3.8** [1] - 35:15
**30** [2] - 48:16, 80:23
**300** [1] - 2:3
**308** [1] - 149:17
**31st** [1] - 69:18
**325** [1] - 75:18
**350** [1] - 76:4
**350,000** [1] - 76:4
**3500** [2] - 42:18, 43:17
**3711** [2] - 143:19, 143:22
**39** [5] - 78:11, 79:7, 79:19,

**4**

**4** [1] - 1:9
**40** [6] - 79:15, 120:20, 120:21, 159:16, 162:16
**404(b** [2] - 5:8, 19:9
**4231** [1] - 147:25
**44** [4] - 38:16, 40:4, 40:5, 162:16
**46** [3] - 91:4, 91:11, 162:17
**4631** [1] - 118:15
**4632** [1] - 118:15
**469** [1] - 36:4
**48** [1] - 78:18
**484** [1] - 154:19
**4:30** [1] - 133:8
**4th** [3] - 65:5, 75:18, 76:4

**5**

**5** [12] - 29:3, 30:1, 30:7, 75:3, 76:11, 119:3, 119:11, 119:23, 137:8, 137:12, 138:9, 156:24
**50** [5] - 80:9, 80:22, 148:24, 149:5, 149:10
**50,000** [2] - 61:12, 61:15
**50/50** [1] - 53:6
**500,000** [2] - 52:7, 57:23
**501(c)(3** [1] - 73:13
**510,000** [1] - 78:8
**52** [1] - 66:22
**53** [1] - 159:24
**5O1(c)(3** [1] - 71:24
**5th** [4] - 42:3, 94:19, 137:1, 142:12

**6**

**6** [5] - 29:3, 30:2, 30:16, 106:22, 161:18
**62** [1] - 75:24
**631** [1] - 2:21
**649405** [2] - 54:7, 55:3
**668** [1] - 5:15
**68** [1] - 159:24
**6th** [6] - 42:4, 94:19, 137:1, 142:12, 161:4, 161:7

**7**

**7** [2] - 5:15, 67:14
**712-6101** [1] - 2:21
**72** [4] - 101:1, 101:3, 101:11, 101:17

**73** [1] - 104:25, 105:25, 106:4, 106:5, 162:21
**75** [5] - 102:5, 102:12, 102:21, 102:22, 162:20
**76** [4] - 91:20, 91:24, 91:25, 162:18
**77** [5] - 95:9, 95:11, 95:19, 95:20, 162:19
**771** [1] - 77:24
**772** [1] - 78:6
**774** [1] - 78:6

**8**

**8** [8] - 74:4, 119:21, 120:2, 120:10, 120:14, 129:9, 129:10, 130:16
**80** [3] - 95:19, 95:20, 162:19
**81** [6] - 152:17, 152:20, 154:22, 155:2, 155:3, 162:22
**82** [2] - 152:17, 152:20
**83** [2] - 152:17, 152:21
**84** [5] - 152:18, 154:23, 155:2, 155:3, 162:22
**85** [7] - 155:5, 155:8, 155:12, 155:16, 155:17, 162:10, 162:23
**86** [6] - 155:5, 155:8, 155:12, 155:16, 155:17, 162:23

**9**

**9.1** [1] - 50:18
**91** [1] - 162:18
**92-4928** [1] - 35:9
**95** [1] - 162:19
**956** [2] - 60:22, 61:2
**9th** [1] - 46:6

**A**

**a.m** [2] - 1:9, 161:7
**a.m.** [1] - 161:19
**able** [7] - 20:19, 21:11, 28:8, 34:14, 50:20, 81:16, 92:15
**absolutely** [5] - 96:21, 115:8, 134:19, 138:10, 147:14
**accept** [1] - 82:22
**acceptable** [1] - 94:10
**access** [6] - 65:8, 108:2, 111:15, 111:17, 135:19
**accompanies** [1] - 60:10
**according** [6] - 22:20,

98:2, 120:9, 120:13, 120:15, 160:8
**account** [33] - 8:21, 31:9, 31:10, 31:12, 31:15, 31:17, 31:22, 32:1, 32:3, 32:8, 32:11, 50:23, 56:22, 57:8, 57:22, 59:7, 59:13, 65:2, 65:5, 66:6, 78:1, 78:2, 78:3, 78:9, 78:20, 116:13, 123:3, 123:6, 142:22, 145:8
**accountable** [1] - 44:17
**accounting** [2] - 63:3, 75:10
**accounts** [21] - 15:16, 40:10, 44:7, 44:8, 51:10, 51:11, 51:13, 51:17, 51:19, 51:24, 53:20, 53:24, 56:1, 57:21, 58:22, 59:7, 65:12, 68:20, 78:19, 79:3
**accrued** [1] - 158:17
**accruing** [1] - 158:11
**accuracy** [1] - 67:25
**accurate** [7] - 50:19, 64:13, 64:14, 67:8, 100:9, 100:24, 137:6
**accurately** [1] - 77:13
**accusations** [1] - 32:5
**acquire** [9] - 31:6, 40:22, 41:17, 47:16, 52:23, 72:1, 72:2, 148:17, 149:5
**acquired** [7] - 34:19, 36:6, 41:8, 52:13, 62:14, 68:25, 83:21
**acquisition** [6] - 28:9, 33:16, 35:14, 36:1, 67:20, 77:10
**acre** [3] - 48:11, 73:4, 73:9
**acres** [1] - 35:14
**action** [4] - 94:16, 103:6, 132:15, 132:16
**active** [1] - 146:25
**activity** [4] - 16:22, 24:5, 74:7, 83:13
**actual** [3] - 38:20, 58:13, 127:25
**adamant** [1] - 81:7
**add** [3] - 39:20, 46:13, 83:16
**addition** [7] - 4:6, 11:10, 21:1, 33:5, 97:20, 123:19, 136:24
**additional** [15] - 4:18, 4:24, 8:2, 15:2, 20:19, 20:25, 21:12, 23:8, 23:12, 27:12, 38:7, 45:2, 56:9, 138:24, 148:15
**address** [12] - 6:11, 6:21, 8:5, 9:14, 10:15, 10:18, 11:18, 15:25, 25:17, 26:22,

83:9, 92:13
**addresses** [3] - 7:10, 10:12, 92:9
**adjudicate** [1] - 60:8
**adjudicated** [1] - 57:6
**adjusted** [1] - 122:1
**admissible** [1] - 83:11
**admitted** [16] - 29:2, 46:20, 67:4, 68:8, 70:11, 71:15, 74:24, 77:20, 91:24, 94:13, 95:19, 101:17, 102:21, 106:4, 155:2, 155:16
**advance** [1] - 148:17
**adversary** [3] - 104:12, 105:23, 123:25
**advice** [2] - 71:23, 72:15
**advise** [1] - 154:11
**advised** [2] - 86:16, 98:10
**advisor** [1] - 139:3
**Advisors** [1] - 144:10
**affidavit** [2] - 83:18, 83:24
**affidavits** [13] - 82:10, 82:14, 82:15, 82:22, 83:1, 83:8, 83:9, 83:17, 83:21, 84:3, 90:5, 90:6, 134:21
**agency** [5] - 60:13, 127:20, 130:21, 131:1, 131:6
**Agent** [3] - 21:12, 24:25, 160:20
**ago** [3] - 14:25, 32:2, 137:16
**agree** [4] - 15:24, 73:20, 98:16, 98:18
**agreed** [4] - 19:17, 19:20, 28:15, 72:13
**agreement** [38] - 30:18, 33:24, 38:1, 40:19, 40:21, 41:2, 41:18, 57:4, 61:19, 70:18, 70:19, 75:21, 81:10, 88:7, 88:19, 90:17, 92:19, 93:2, 93:4, 93:7, 93:12, 118:16, 118:17, 120:17, 120:18, 125:2, 126:12, 128:9, 128:13, 128:20, 129:3, 129:11, 130:3, 136:12, 138:18, 139:24, 142:2, 146:21
**agreements** [7] - 51:8, 62:18, 66:8, 70:4, 75:20, 88:10
**agribusiness** [1] - 73:5
**ahead** [5] - 54:20, 85:17, 133:15, 142:11, 154:5
**airplane** [2] - 148:10, 148:11
**Airplane** [1] - 36:15
**airport** [1] - 157:11
**Alan** [1] - 72:5
**alerted** [1] - 125:17
**allegations** [4] - 48:3,

124:2, 125:4, 126:20
**allege** [5] - 4:23, 8:15, 93:13, 94:4, 136:19
**alleged** [10] - 4:14, 4:17, 5:6, 6:19, 15:6, 27:13, 55:24, 58:23, 67:25, 90:17
**alleges** [1] - 95:4
**alleging** [3] - 15:1, 15:2, 18:25
**allocate** [1] - 32:21
**allocated** [1] - 66:7
**allow** [4] - 19:14, 54:14, 101:15, 115:15
**allowed** [1] - 115:18
**almost** [1] - 136:4
**amended** [6] - 37:6, 37:8, 37:12, 47:10, 48:5, 48:15
**America** [1] - 73:6
**AMERICA** [1] - 1:3
**American** [1] - 82:6
**amount** [7] - 61:17, 68:15, 79:4, 86:22, 121:17, 138:9, 150:16
**amounts** [7] - 62:6, 66:2, 67:14, 93:22, 138:10, 138:12, 138:15
**analysis** [2] - 4:15, 55:6
**analytical** [1] - 9:2
**analytically** [1] - 8:14
**ANDREW** [1] - 2:6
**Andrew** [1] - 3:14
**Ann** [1] - 2:20
**annual** [2] - 157:24, 158:17
**ANSWER** [6] - 44:25, 129:13, 129:16, 129:18, 129:20, 129:24
**answer** [10] - 11:3, 15:8, 31:3, 44:20, 44:22, 102:8, 102:16, 115:19, 139:17, 143:9
**answered** [2] - 87:15, 115:13
**answers** [1] - 86:16
**anticipated** [1] - 68:16
**apart** [2] - 132:1, 135:24
**apologize** [5] - 30:3, 51:6, 60:24, 66:13, 123:17
**appeal** [7] - 96:9, 96:12, 98:20, 98:22, 99:7, 99:9, 99:11
**appearances** [1] - 3:5
**APPEARANCES** [1] - 1:13
**appeared** [1] - 97:9
**apples** [1] - 10:10
**applicable** [1] - 11:23
**application** [4] - 4:2, 4:4, 5:24, 9:8
**applying** [1] - 77:14
**appraised** [2] - 159:20, 159:23

**appreciate** [2] - 10:20, 34:17
**appreciation** [1] - 15:23
**approach** [4] - 29:8, 67:1, 103:13, 106:9
**approached** [6] - 28:11, 34:8, 106:7, 106:18, 108:8, 118:4
**approaching** [5] - 103:10, 103:24, 106:13, 137:8, 137:12
**appropriate** [2] - 8:5, 8:6
**approval** [1] - 74:3
**April** [8] - 1:9, 27:15, 27:16, 27:17, 32:14, 54:13, 99:20, 161:18
**Arbitration** [1] - 82:6
**arbitration** [11] - 44:1, 82:17, 82:18, 82:20, 83:25, 86:7, 86:8, 86:11, 86:21, 86:25, 134:24
**area** [1] - 73:11
**areas** [2] - 16:10, 107:14
**arguing** [5] - 10:9, 13:11, 18:6, 22:5, 24:12
**argument** [7] - 8:17, 10:16, 16:4, 17:23, 41:10, 41:11, 41:13
**arguments** [1] - 10:17
**Arizona** [10] - 8:14, 36:16, 52:17, 82:25, 89:15, 90:7, 90:11, 91:17, 95:15, 96:18
**arose** [1] - 11:15
**arraignment** [1] - 27:8
**arrangement** [3] - 19:23, 28:15, 38:3
**arrangements** [2] - 19:18, 66:3
**arranging** [2] - 149:7, 149:9
**arrest** [1] - 136:6
**arrested** [1] - 43:4
**aside** [2] - 63:12, 73:9
**askew** [1] - 62:20
**aspect** [3] - 4:7, 39:18, 51:24
**aspects** [1] - 4:13
**asserting** [1] - 4:12
**asset** [3] - 9:1, 9:4, 157:4
**assets** [6] - 24:18, 87:13, 87:18, 144:10, 159:13, 159:14
**assist** [1] - 36:24
**assistance** [1] - 83:2
**Assistant** [1] - 1:17
**associated** [2] - 51:20, 53:25
**Associates** [1] - 127:21
**Association** [1] - 82:6
**assume** [2] - 16:11, 144:6

**assumed** [1] - 94:8
**assuming** [2] - 8:17, 25:8
**assure** [1] - 4:10
**astute** [1] - 5:3
**attached** [1] - 130:16, 155:22
**attempt** [1] - 73:17
**attempted** [1] - 63:19
**attempting** [2] - 87:18, 88:18
**attended** [1] - 96:23
**attention** [1] - 4:16
**attorney** [21] - 31:9, 38:13, 38:22, 42:19, 73:6, 73:7, 74:13, 77:13, 90:2, 98:10, 100:14, 100:16, 100:20, 100:22, 101:4, 101:7, 105:11, 114:23, 128:16, 145:13, 153:20
**Attorney** [2] - 1:14, 1:17
**attorneys** [18] - 37:20, 39:7, 51:9, 63:21, 69:24, 87:17, 89:4, 89:8, 89:11, 90:14, 90:21, 96:11, 97:4, 97:6, 97:11, 102:8, 103:4, 122:18
**attributable** [1] - 59:16
**August** [16] - 33:23, 37:4, 45:4, 47:5, 47:10, 48:5, 48:15, 51:2, 57:16, 58:14, 58:17, 72:1, 99:21, 107:6, 107:10, 127:19
**AUSA** [1] - 12:4
**AUSAs** [1] - 25:22
**authentic** [1] - 92:10
**authenticated** [1] - 147:22
**authenticating** [1] - 147:21
**authenticity** [1] - 67:6
**authorized** [7] - 21:17, 21:23, 104:20, 104:21, 105:14, 105:17, 105:20
**available** [6] - 37:1, 54:17, 68:5, 74:11, 160:23, 161:1
**avenue** [1] - 11:13
**avoid** [1] - 89:12
**aware** [6] - 4:21, 6:6, 27:5, 27:10, 37:4, 37:7, 46:1, 58:5, 76:21, 89:7, 94:21, 96:6, 96:7, 121:14, 132:23, 135:5

## B

**backdated** [5] - 147:4, 147:5, 147:7, 147:8, 147:14
**backdoor** [1] - 7:9
**background** [1] - 119:13
**Bahti** [1] - 34:9, 76:21

**Baja** [98] - 8:3, 27:18, 27:23, 28:10, 28:19, 28:25, 30:10, 30:20, 31:7, 37:9, 42:21, 51:1, 56:22, 56:24, 57:22, 58:17, 59:12, 59:17, 61:1, 65:2, 66:6, 74:5, 78:5, 78:11, 78:20, 79:21, 103:10, 106:10, 106:19, 109:2, 109:6, 109:13, 110:10, 110:15, 111:21, 112:15, 112:18, 112:20, 112:23, 113:8, 114:10, 114:20, 114:22, 114:24, 116:6, 118:1, 118:5, 118:13, 118:23, 118:25, 119:4, 122:11, 126:1, 126:3, 127:2, 127:7, 128:4, 128:20, 129:11, 129:14, 129:22, 130:1, 130:10, 130:17, 131:17, 132:15, 133:20, 133:23, 142:17, 142:24, 143:13, 143:17, 145:4, 145:5, 145:14, 145:18, 145:22, 146:2, 148:21, 150:1, 150:3, 150:5, 150:9, 151:13, 151:14, 152:4, 152:12, 155:25, 156:3, 156:4, 157:18, 158:3, 158:7, 159:19, 159:22, 160:1, 160:4, 160:5
**baker** [1] - 82:25
**Baker** [1] - 97:7
**balance** [5] - 33:19, 54:12, 56:10, 59:6, 59:19, 61:2
**Ball** [1] - 73:7
**Bamford** [1] - 130:23
**bank** [29] - 15:16, 21:13, 21:16, 21:19, 21:22, 31:9, 32:10, 39:9, 40:8, 50:20, 50:23, 51:10, 51:11, 53:20, 59:6, 65:12, 68:19, 77:25, 78:1, 78:2, 78:3, 78:9, 122:20, 122:21, 123:1, 123:2, 123:4, 123:5, 123:6
**bankruptcy** [1] - 104:13
**bar** [1] - 123:8
**based** [12] - 16:8, 18:9, 23:4, 24:11, 33:25, 39:17, 42:22, 82:3, 87:1, 97:10, 113:10, 145:11
**basic** [2] - 64:3, 68:12
**basis** [4] - 18:5, 104:2, 106:8, 138:1
**bat** [1] - 76:20
**Bates** [5] - 77:24, 78:6, 81:4, 101:9, 101:19
**beach** [2] - 49:2, 49:5
**bears** [2] - 6:7, 6:8
**became** [2] - 80:15, 94:14

**become** [1] - 146:25
**becoming** [1] - 109:21
**BEFORE** [1] - 1:11
**began** [3] - 80:18, 94:3, 150:20
**begin** [4] - 50:9, 69:25, 78:10, 81:14
**beginning** [3] - 28:13, 54:13, 150:19
**behalf** [16] - 32:23, 54:25, 55:4, 62:17, 63:7, 69:20, 77:13, 78:8, 79:14, 80:18, 104:13, 104:20, 104:21, 105:15, 133:23, 144:4
**behind** [2] - 109:1, 118:18
**belabor** [5] - 17:3, 19:13, 43:14, 61:20, 83:7
**belaboring** [1] - 38:17
**belief** [3] - 97:14, 97:16, 145:11
**believes** [1] - 124:3
**below** [2] - 119:22, 119:23
**Belt** [2] - 35:9, 71:20
**bench** [1] - 139:14
**benchmark** [1] - 119:23
**benefit** [4] - 57:24, 58:19, 81:22, 122:10
**Berard** [3] - 54:7, 67:10, 134:23
**Berard's** [2] - 54:12, 54:24
**best** [6] - 14:21, 28:3, 28:7, 37:19, 63:24, 64:13
**between** [27] - 5:1, 10:6, 19:18, 28:20, 30:9, 30:19, 35:4, 41:18, 42:19, 43:10, 44:1, 60:1, 63:2, 67:9, 67:23, 70:25, 76:22, 78:5, 78:14, 79:2, 108:21, 120:24, 135:17, 138:18, 153:2, 158:3
**BIANCO** [1] - 1:11
**big** [1] - 36:10
**biggest** [2] - 81:6, 81:9
**bill** [17] - 7:22, 8:2, 9:6, 9:15, 13:24, 27:11, 27:16, 32:14, 35:8, 37:6, 37:8, 37:12, 45:4, 47:5, 47:10, 48:5, 48:15
**bit** [1] - 89:21
**blame** [1] - 44:23
**blanket** [1] - 136:11
**block** [1] - 48:16
**blunderbuss** [1] - 24:2
**board** [1] - 141:2
**boats** [1] - 73:6
**bonus** [1] - 33:6
**books** [7] - 63:13, 63:22, 63:25, 132:16, 132:22, 132:23, 133:1
**borrowed** [3] - 37:21,

37:23, 42:22
**bottom** [3] - 30:15, 153:8, 159:7
**bought** [4] - 52:24, 129:25, 160:2, 160:3
**Boulevard** [1] - 48:6
**bound** [1] - 73:6
**brain** [2] - 72:11, 73:18
**breach** [3] - 19:25, 52:25, 70:19
**breached** [1] - 53:8
**break** [4] - 49:18, 84:7, 133:4, 161:9
**breakouts** [1] - 141:3
**bridge** [1] - 14:12
**brief** [9] - 10:19, 11:16, 11:24, 23:11, 23:20, 25:4, 25:14, 25:16, 25:17
**briefed** [1] - 11:17
**briefly** [2] - 50:14, 85:9
**bring** [3] - 4:16, 121:3, 153:3
**bringing** [1] - 132:5
**broad** [3] - 11:13, 15:11, 62:5
**broke** [1] - 138:23
**broken** [1] - 154:12
**brother** [2] - 52:12, 75:5
**brother-in-law** [1] - 75:5
**Brothers** [24] - 32:20, 32:22, 33:7, 33:8, 33:15, 33:19, 33:24, 34:2, 34:4, 34:8, 34:9, 34:13, 34:19, 34:24, 47:15, 72:1, 75:11, 76:21, 77:7, 113:25, 119:8, 120:23, 120:25, 121:15
**Brothers'** [1] - 76:19
**brought** [14] - 34:11, 86:11, 87:25, 88:5, 88:12, 91:16, 92:17, 94:16, 96:2, 99:14, 99:17, 102:9, 126:18, 132:15
**brush** [1] - 62:5
**Bryan** [3] - 54:7, 54:24, 67:10
**build** [1] - 36:8
**burden** [2] - 6:8, 6:9
**burdened** [1] - 99:1
**business** [2] - 17:18, 73:14
**BY** [41] - 1:16, 1:22, 2:4, 27:2, 29:24, 30:5, 40:7, 46:22, 50:5, 64:12, 67:3, 68:7, 71:11, 80:3, 85:21, 89:1, 90:1, 91:9, 92:1, 95:22, 99:13, 101:21, 102:7, 102:23, 105:6, 106:6, 112:11, 125:11, 133:17, 139:21, 143:11, 143:20, 147:23, 152:2, 154:6, 155:7, 155:18,

156:14, 159:1, 162:7, 162:10

## C

**Cabo** [71] - 4:20, 5:9, 6:4, 7:1, 9:5, 16:21, 24:6, 28:1, 28:14, 32:21, 33:17, 34:3, 34:7, 34:25, 37:21, 40:22, 41:2, 41:8, 41:17, 41:21, 42:5, 45:8, 47:16, 48:6, 48:11, 48:13, 48:21, 49:13, 55:21, 56:12, 56:21, 58:17, 59:5, 59:9, 59:14, 61:13, 62:3, 62:11, 62:15, 62:19, 62:22, 63:11, 63:14, 64:19, 64:20, 64:22, 65:15, 68:21, 74:5, 76:15, 77:8, 78:12, 93:24, 100:3, 109:14, 110:14, 112:1, 112:25, 113:4, 116:1, 117:16, 120:1, 133:19, 145:22, 146:18, 146:24, 149:3, 153:16, 156:2, 156:5, 158:2
**Cactus** [5] - 8:13, 8:23, 8:24, 9:3, 36:16
**CALCAGNI** [1] - 1:20
**calculate** [1] - 158:23
**calculated** [2] - 158:16, 158:17
**calculates** [1] - 79:20
**calculation** [4] - 6:12, 10:13, 60:24, 79:6
**calculator** [1] - 158:20
**calendars** [1] - 106:12
**California** [7] - 49:2, 49:5, 91:19, 96:15, 98:23, 102:10, 103:4
**camp** [2] - 107:7, 107:8
**cancelled** [1] - 119:13
**cancer** [2] - 72:11, 73:18
**cannot** [1] - 69:23
**capacity** [1] - 125:25
**CAPERS** [1] - 1:14
**capital** [6] - 56:24, 59:17, 78:3, 78:10, 78:20, 157:22
**caption** [2] - 88:12, 88:15
**care** [2] - 58:25, 59:1
**Carlsmith** [1] - 73:7
**cart** [1] - 7:8
**case** [37] - 3:3, 3:25, 4:7, 5:4, 7:13, 7:14, 7:15, 11:21, 12:4, 13:25, 20:17, 25:22, 41:4, 60:10, 80:6, 88:2, 88:3, 89:12, 89:13, 95:15, 96:6, 96:8, 96:10, 96:17, 96:18, 96:19, 96:24, 97:8, 97:11, 97:19, 98:14,

98:23, 102:3, 102:9, 132:5, 132:7, 153:5
**cases** [1] - 63:17
**cash** [12] - 54:17, 109:18, 109:21, 109:24, 110:5, 151:1, 151:6, 151:9, 151:16, 151:20, 157:3
**category** [1] - 54:18
**cell** [1] - 110:22
**Central** [4] - 1:6, 1:15, 2:21, 102:10
**Centrum** [1] - 81:1
**certain** [4] - 32:22, 46:16, 111:7, 121:10
**certainly** [5] - 13:7, 24:23, 31:4, 41:11, 122:9
**Cervada** [1] - 48:17
**cetera** [2] - 72:25
**chance** [2] - 4:8, 12:5
**change** [6] - 73:3, 114:1, 114:4, 145:3, 157:10, 159:24
**changed** [3] - 97:5, 120:22, 145:5
**changes** [3] - 122:5, 122:6, 122:8
**characterize** [3] - 42:8, 44:6, 76:15
**characterized** [6] - 39:5, 39:16, 39:25, 41:9, 44:10, 77:14
**charge** [1] - 107:13
**charged** [3] - 11:21, 17:17, 17:19
**charitable** [2] - 35:23, 72:17
**chart** [7] - 4:23, 50:15, 50:16, 64:5, 64:9, 70:15, 74:9
**charts** [1] - 79:1
**check** [1] - 119:13
**choice** [1] - 60:7
**choose** [1] - 7:14
**chooses** [1] - 153:20
**circumstances** [3] - 32:17, 35:11, 82:16
**cities** [1] - 109:1
**citizen** [2] - 89:15, 90:7
**civil** [6] - 42:4, 58:3, 60:1, 60:5, 60:8, 85:23
**civilian** [1] - 132:4
**claim** [6] - 52:17, 88:19, 89:14, 92:11, 110:24, 124:21
**claimed** [2] - 90:21, 90:23
**claiming** [3] - 12:11, 23:5, 92:9
**clarifying** [2] - 76:23, 142:8
**clarity** [2] - 41:23, 46:23
**classic** [1] - 8:25

5

**cleanup** [1] - 72:4
**clear** [13] - 15:10, 16:25, 21:8, 23:11, 33:2, 35:25, 36:12, 61:11, 66:14, 79:12, 110:17, 126:8, 160:7
**clearer** [1] - 159:8
**clearly** [2] - 38:2, 76:21
**CLERK** [5] - 3:1, 3:3, 26:18, 85:3, 133:11
**client** [21] - 4:5, 5:1, 7:5, 7:9, 7:19, 9:13, 9:22, 14:16, 16:12, 24:1, 26:23, 99:18, 103:19, 103:20, 103:23, 119:25, 136:2, 136:8, 137:17, 158:10
**client's** [2] - 8:13, 74:16
**clients** [34] - 5:2, 6:3, 45:8, 62:17, 63:2, 63:7, 63:23, 68:25, 69:10, 103:22, 107:17, 107:24, 124:17, 125:17, 132:25, 133:3, 134:17, 135:1, 135:4, 135:10, 135:14, 135:17, 136:25, 137:8, 137:11, 137:13, 137:21, 137:22, 138:1, 138:2, 138:5, 139:3, 147:15, 157:16
**close** [3] - 71:25, 80:23, 146:24
**closed** [1] - 68:21
**closing** [46] - 28:18, 34:15, 47:14, 53:21, 56:8, 64:25, 65:15, 65:20, 65:21, 75:13, 94:5, 94:11, 110:14, 112:24, 113:3, 113:11, 113:12, 113:16, 114:7, 114:23, 115:5, 116:9, 117:19, 117:23, 118:13, 119:2, 119:5, 119:7, 119:14, 120:9, 120:13, 120:15, 120:17, 120:19, 121:5, 121:6, 121:11, 121:13, 121:14, 121:16, 121:22, 122:1, 122:2, 122:11, 130:4, 141:8
**CMG** [3] - 8:19, 8:20, 51:17
**CMG/Eufora** [1] - 54:1
**co** [1] - 82:25
**co-counsel** [1] - 82:25
**Coletta** [1] - 149:17
**collapse** [1] - 73:17
**collateral** [1] - 54:15
**colleague** [1] - 5:13
**collect** [2] - 69:14, 70:4
**collecting** [1] - 69:12
**collective** [2] - 45:7, 140:16
**collectively** [1] - 54:14
**colloquy** [1] - 5:12
**column** [24] - 38:21, 38:25,

39:8, 39:12, 50:9, 50:11, 52:2, 52:3, 52:6, 53:15, 54:5, 54:20, 55:14, 55:17, 55:19, 56:13, 56:17, 62:3, 62:7, 62:11, 66:2, 66:4, 70:15, 85:12
**coming** [5] - 68:17, 68:23, 140:3, 140:7
**commence** [5] - 3:25, 60:6, 60:13, 69:14, 69:23
**commenced** [3] - 57:25, 82:5, 96:15
**commencement** [4] - 7:23, 28:13, 29:21, 38:6
**commencing** [1] - 132:1
**comment** [1] - 93:15
**commercial** [1] - 34:15
**commingle** [1] - 15:11
**commingled** [5] - 15:3, 20:10, 20:11, 23:21, 25:5
**commingling** [13] - 11:4, 11:11, 15:25, 16:2, 17:1, 17:4, 17:7, 17:22, 17:25, 22:13, 22:19, 78:13, 78:16
**commit** [1] - 22:15
**commitment** [1] - 80:14
**committed** [1] - 5:10
**common** [5] - 10:5, 10:6, 10:8, 10:18, 74:15
**commonality** [1] - 35:6
**communication** [1] - 76:18
**communications** [1] - 52:25
**community** [1] - 73:8
**Company** [2] - 143:14, 148:21
**company** [11] - 54:16, 55:9, 67:17, 67:19, 69:20, 113:24, 129:11, 141:9, 152:10, 156:16, 160:6
**compare** [1] - 159:18
**complained** [1] - 122:15
**complaining** [1] - 12:24
**complaint** [17] - 89:3, 89:4, 89:5, 89:7, 89:9, 90:3, 92:18, 93:1, 93:6, 95:15, 105:15, 123:8, 126:23, 136:18, 136:22, 136:24, 139:15
**complaints** [1] - 70:21
**complete** [1] - 83:12
**completed** [5] - 33:15, 33:24, 49:3, 55:10, 98:12
**completely** [4] - 35:3, 50:19, 54:22, 125:25, 131:1
**completion** [1] - 49:1
**complex** [3] - 7:14, 7:15, 7:16
**complexity** [1] - 7:13

**comply** [1] - 98:3
**component** [1] - 63:13
**computer** [4] - 2:25, 111:5, 111:9, 111:12
**concern** [2] - 81:6, 81:9
**concerned** [5] - 4:2, 22:23, 81:15, 96:16, 119:10
**concerning** [2] - 5:17, 9:14
**concert** [1] - 73:10
**conclude** [1] - 85:7
**concluded** [2] - 98:2, 128:14
**conclusion** [6] - 6:10, 34:7, 37:5, 37:13, 74:16, 97:8
**condo** [1] - 57:17
**conduct** [6] - 4:14, 4:18, 4:24, 6:12, 9:21, 11:21, 11:22, 12:7, 12:9, 12:12, 12:17, 13:6, 13:18, 14:8, 15:2, 15:5, 21:6, 25:24
**conducted** [1] - 127:12
**conference** [3] - 5:16, 161:6, 161:14
**confined** [1] - 16:1
**confirm** [1] - 141:18
**confirmation** [1] - 120:22
**confirming** [2] - 38:14, 66:15
**confirms** [1] - 42:21
**confusing** [2] - 79:11, 115:16
**Congrejos** [2] - 48:6, 48:10
**conjunction** [1] - 35:13
**conjutive** [1] - 116:17
**connected** [1] - 51:23
**connection** [5] - 8:24, 64:17, 70:14, 82:9, 83:8
**consider** [2] - 13:17, 39:11
**consideration** [2] - 8:7, 28:20
**considered** [2] - 12:16, 39:1
**considering** [3] - 13:5, 13:14, 18:15
**consistent** [1] - 16:19
**conspiracy** [3] - 11:13, 17:4, 20:16
**constant** [1] - 103:22
**CONSTANTINE** [1] - 1:7
**Constantine** [15] - 2:4, 2:8, 3:4, 3:15, 3:16, 34:11, 52:23, 53:1, 53:3, 53:22, 63:18, 80:17, 94:13, 125:20
**Constantine's** [2] - 104:13, 145:17
**construction** [1] - 34:12
**contact** [3] - 103:21, 103:22, 103:23
**contain** [1] - 92:9

**contained** [2] - 67:23, 111:5
**contents** [1] - 80:8
**context** [3] - 7:2, 16:1, 153:24
**contiguous** [1] - 35:14
**continuation** [1] - 3:18
**continue** [5] - 55:8, 58:12, 63:9, 140:11, 160:15
**continued** [2] - 63:5, 145:7
**continuing** [4] - 13:21, 14:3, 54:16, 68:12
**contract** [15] - 19:25, 28:23, 30:9, 30:19, 52:22, 53:1, 53:23, 59:16, 78:4, 94:9, 110:12, 112:23, 156:7, 156:18, 157:17
**contracts** [5] - 31:1, 53:9, 114:9, 119:24, 122:14
**contractual** [1] - 75:20
**contrary** [2] - 111:24, 135:8
**contributing** [1] - 59:17
**contribution** [3] - 56:24, 59:17, 78:4
**contributions** [1] - 78:11
**control** [5] - 33:22, 40:18, 63:21, 65:17, 127:7
**controlled** [21] - 8:21, 40:10, 40:11, 41:19, 41:20, 42:9, 42:25, 44:8, 44:9, 50:23, 51:11, 51:20, 53:25, 57:3, 57:9, 58:22, 59:7, 61:17, 61:23, 145:20
**controlling** [1] - 150:6
**conveniently** [1] - 90:19
**conversation** [4] - 123:10, 123:13, 123:15, 136:11
**conversations** [3] - 6:20, 104:11, 137:7
**converted** [1] - 122:11
**convicted** [6] - 8:18, 11:12, 17:13, 23:9, 23:13, 24:3
**conviction** [4] - 10:12, 27:20, 46:6, 57:11
**CONWAY** [15] - 2:2, 2:4, 3:13, 14:22, 91:23, 95:14, 95:18, 101:16, 102:20, 106:3, 155:1, 155:15, 160:13, 160:20, 161:11
**Conway** [2] - 3:14, 160:12
**cooperate** [1] - 96:3
**copies** [3] - 94:25, 95:2, 95:5
**copy** [11] - 29:9, 29:20, 66:21, 66:24, 68:4, 91:6, 91:7, 93:25, 94:1, 159:8
**corner** [1] - 129:10
**corners** [1] - 24:4
**Corp** [1] - 145:6

**Corp.** [1] - 151:15
**Corporation** [9] - 56:22, 57:22, 58:17, 59:12, 66:6, 74:6, 145:14, 145:19, 159:19
**corporation** [2] - 119:22, 145:15
**correct** [225] - 10:23, 17:5, 17:9, 27:8, 27:14, 27:20, 31:18, 33:9, 34:22, 36:2, 36:13, 37:10, 37:14, 38:4, 38:15, 39:20, 41:4, 43:1, 48:13, 56:4, 57:11, 58:1, 58:2, 58:3, 58:4, 59:8, 60:2, 60:15, 62:1, 62:4, 62:9, 62:19, 62:24, 64:15, 65:9, 66:1, 66:13, 68:25, 69:5, 69:10, 70:23, 70:24, 72:19, 73:21, 76:7, 79:23, 79:24, 82:7, 83:20, 84:2, 85:23, 86:1, 86:7, 86:9, 86:13, 86:23, 87:5, 87:8, 87:14, 88:3, 88:7, 88:8, 88:13, 88:16, 88:20, 88:22, 89:3, 89:9, 89:15, 90:3, 90:18, 91:17, 92:14, 92:20, 93:3, 93:8, 93:13, 93:16, 93:19, 93:23, 94:23, 96:1, 96:4, 96:20, 98:4, 98:14, 98:15, 98:17, 98:21, 99:15, 99:18, 99:21, 99:25, 100:1, 100:3, 100:8, 100:17, 100:20, 100:21, 100:23, 103:7, 103:11, 103:12, 103:22, 105:13, 105:16, 106:19, 107:15, 107:21, 107:23, 108:9, 109:4, 109:8, 109:9, 110:6, 111:18, 111:19, 111:22, 112:6, 113:1, 113:2, 113:5, 113:6, 113:22, 114:2, 115:2, 116:13, 116:16, 116:19, 116:23, 117:2, 117:5, 117:8, 118:6, 118:21, 119:4, 119:9, 119:16, 120:14, 121:5, 121:17, 121:23, 123:16, 123:21, 124:4, 124:17, 124:23, 125:5, 125:24, 126:5, 126:14, 126:22, 127:2, 127:3, 127:5, 127:13, 127:14, 128:5, 128:17, 128:25, 129:1, 131:3, 131:6, 131:7, 133:21, 133:25, 134:2, 134:3, 134:5, 134:9, 134:15, 134:16, 135:2, 135:6, 135:11, 135:12, 135:15, 135:23, 136:16, 137:3, 137:4, 138:6, 138:25, 139:6, 139:11,

143:14, 143:23, 144:5, 144:10, 144:18, 144:20, 144:24, 147:7, 148:1, 148:3, 148:10, 148:18, 149:19, 149:20, 151:3, 151:7, 151:10, 151:12, 152:9, 152:25, 153:12, 153:14, 153:17, 154:9, 154:12, 154:13, 154:17, 155:20, 155:23, 155:24, 156:1, 156:6, 157:8, 157:13, 157:14, 157:17, 158:5, 158:6, 159:4, 159:11
**correcting** [1] - 62:9
**corrections** [1] - 157:8
**correctly** [4] - 56:2, 59:8, 93:9, 149:4
**correspondence** [2] - 135:13, 135:14
**corroborate** [1] - 38:9
**corroborated** [1] - 38:18
**counsel** [14] - 3:5, 4:11, 11:17, 11:23, 30:1, 39:22, 63:9, 71:23, 72:15, 75:4, 76:19, 82:25, 83:17, 84:2
**counsel's** [1] - 38:24
**counted** [1] - 53:18
**country** [3] - 96:24, 103:17, 108:22
**Country** [1] - 2:3
**couple** [1] - 80:24
**course** [29] - 3:12, 6:23, 13:21, 33:8, 34:21, 36:22, 41:7, 43:15, 43:21, 44:5, 49:9, 62:23, 68:13, 69:7, 71:7, 82:17, 83:10, 86:6, 89:2, 89:8, 111:16, 114:12, 117:15, 118:7, 118:22, 119:15, 127:9, 128:23, 140:4
**court** [17] - 53:2, 88:18, 90:10, 90:11, 90:12, 96:25, 127:10, 127:20, 127:22, 128:24, 130:8, 130:21, 130:24, 131:1, 131:2, 131:5, 131:6
**Court** [54] - 2:7, 2:20, 4:10, 4:11, 4:17, 5:5, 5:21, 7:15, 7:17, 8:7, 8:8, 9:9, 9:16, 9:18, 10:16, 11:20, 15:4, 16:14, 16:18, 18:20, 27:22, 28:7, 29:9, 30:17, 32:17, 33:11, 35:10, 37:16, 39:1, 50:1, 50:15, 52:5, 61:22, 66:21, 67:11, 70:12, 83:12, 91:17, 92:18, 93:7, 97:21, 97:22, 97:24, 98:2, 98:4, 98:5, 98:14, 98:16, 98:18, 101:15, 112:3, 127:17,

147:3
**COURT** [104] - 1:1, 3:2, 3:10, 3:16, 3:23, 10:21, 12:3, 12:23, 15:9, 16:24, 17:5, 17:10, 17:20, 17:22, 18:12, 18:21, 20:6, 20:24, 21:16, 22:2, 22:18, 23:24, 24:9, 25:20, 26:4, 26:10, 26:24, 29:10, 29:14, 29:17, 29:19, 29:23, 31:3, 39:2, 39:6, 40:3, 46:15, 46:18, 46:20, 49:18, 49:21, 49:24, 50:3, 60:21, 61:5, 61:10, 64:11, 66:10, 66:15, 66:18, 66:22, 66:24, 67:2, 68:6, 70:7, 71:9, 80:1, 83:15, 84:5, 84:7, 85:4, 85:17, 88:25, 89:20, 91:24, 95:6, 95:9, 95:15, 95:19, 99:5, 101:17, 102:21, 105:2, 106:4, 112:10, 115:15, 115:20, 124:9, 125:9, 133:4, 133:7, 133:12, 133:15, 139:18, 142:8, 142:11, 143:8, 147:12, 147:18, 152:1, 153:25, 154:4, 154:24, 155:2, 155:16, 158:23, 160:11, 160:14, 160:19, 160:23, 161:1, 161:4, 161:8, 161:15
**Court's** [2] - 26:21, 98:3
**Courthouse** [1] - 1:6
**cover** [3] - 14:4, 121:20, 127:15
**covered** [2] - 43:21, 136:13
**CR-13-607** [1] - 1:4
**create** [1] - 115:6
**created** [7] - 32:18, 82:15, 82:16, 83:1, 117:11, 152:12, 157:4
**creating** [1] - 115:9
**credit** [16] - 21:25, 54:13, 54:24, 55:2, 56:10, 65:9, 87:3, 93:2, 93:7, 93:12, 122:19, 122:22, 122:23, 123:5, 123:6, 157:15
**crimes** [1] - 5:10
**Criminal** [1] - 43:11
**criminal** [32] - 4:18, 4:24, 9:21, 12:4, 16:22, 18:19, 18:21, 18:22, 25:22, 57:10, 59:23, 59:25, 60:1, 60:5, 60:8, 60:13, 60:18, 99:6, 111:16, 114:13, 117:15, 118:7, 118:23, 127:1, 127:9, 128:24, 132:2, 132:3, 132:4, 132:7, 140:5, 148:8
**criminally** [1] - 61:8

**CROSS** [2] - 85:20, 162:9
**Cross** [1] - 72:10
**cross** [6] - 7:2, 7:4, 14:12, 72:13, 139:15, 160:12
**cross-complaint** [1] - 139:15
**CROSS-EXAMINATION** [2] - 85:20, 162:9
**cross-examine** [2] - 7:2, 7:4
**crystal** [2] - 76:21, 110:17
**CSL** [23] - 45:2, 45:5, 45:6, 45:24, 46:2, 46:8, 46:9, 47:3, 57:4, 61:18, 64:23, 79:3, 79:5, 119:15, 119:18, 119:21, 120:9, 120:14, 120:17, 120:21, 134:1, 154:18, 157:11
**curative** [1] - 5:19
**current** [2] - 45:23, 144:9
**CV-09-0142** [1] - 96:18

# D

**daily** [2] - 103:21, 138:1
**Dallas** [3] - 108:18, 108:19, 108:20
**Darryl** [2] - 60:20, 61:12
**date** [16] - 3:20, 10:24, 38:20, 43:3, 47:10, 65:23, 67:15, 106:24, 107:1, 107:2, 112:13, 127:13, 127:17, 136:2, 147:8, 158:9
**dated** [11] - 48:15, 76:9, 97:22, 106:22, 109:7, 115:1, 143:12, 146:13, 146:15, 146:17, 154:7
**dates** [3] - 146:15, 146:17, 153:2
**days** [5] - 57:19, 65:21, 68:21, 80:23, 114:16
**DCSL** [1] - 132:16
**DDM** [3] - 31:10, 78:2, 148:24
**dead** [1] - 151:1
**deal** [12] - 32:22, 39:18, 56:8, 57:19, 71:2, 82:13, 107:4, 119:9, 130:5, 146:24, 149:7, 149:9
**dealing** [1] - 5:16
**debt** [4] - 30:11, 30:20, 118:17, 121:20
**debtor's** [4] - 87:8, 87:12, 127:8, 127:16
**debts** [1] - 33:2
**deceive** [1] - 69:9
**December** [16] - 35:13, 37:25, 40:19, 40:20, 48:22,

65:5, 65:6, 67:14, 69:18, 75:21, 81:5, 81:10, 93:25, 94:4, 128:3, 141:2
**decided** [6] - 52:25, 54:14, 72:1, 72:6, 73:17, 145:3
**decision** [3] - 8:8, 96:6, 96:7
**declaration** [2] - 90:25, 91:15
**declare** [1] - 7:16
**deducted** [1] - 156:25
**deem** [1] - 16:9
**deemed** [1] - 75:12
**default** [3] - 54:15, 70:22, 82:3
**defaulted** [1] - 146:21
**defendant** [5] - 5:10, 6:10, 19:18, 58:10, 139:15
**defendant's** [1] - 10:1
**Defendants** [3] - 1:8, 1:20, 2:1
**defendants** [3] - 11:12, 20:21, 23:9
**defense** [4] - 3:21, 3:25, 8:5, 11:17
**definition** [1] - 123:22
**defraud** [2] - 20:20, 69:9
**defrauded** [2] - 17:25, 18:7
**Del** [29] - 4:19, 5:9, 6:4, 6:21, 7:1, 9:5, 16:21, 24:6, 42:5, 48:17, 50:10, 50:14, 54:19, 54:25, 55:21, 63:10, 64:18, 80:12, 80:16, 81:19, 82:3, 99:24, 126:21, 149:10, 150:6, 150:7, 150:11, 150:17, 160:6
**Delaware** [5] - 27:24, 37:18, 114:11, 131:17, 142:18
**delayed** [1] - 58:14
**delaying** [1] - 98:6
**delivered** [1] - 41:3
**demand** [1] - 9:19
**demanded** [3] - 6:7, 12:22, 120:23
**demanding** [1] - 4:12
**demonstrating** [1] - 16:20
**depicted** [4] - 52:6, 53:14, 55:17, 64:9
**deposed** [4] - 63:16, 99:14, 132:19, 132:20
**deposit** [1] - 78:14
**deposited** [3] - 53:19, 79:3, 79:20
**deposition** [27] - 42:3, 42:11, 85:25, 86:3, 87:24, 88:1, 94:16, 94:20, 94:22, 95:3, 96:23, 97:2, 97:3, 97:9, 97:13, 98:1, 98:6, 98:7, 98:9, 98:13, 128:3,

128:15, 130:6, 130:13, 130:14, 130:19, 140:21
**depositions** [3] - 88:2, 88:3, 131:3
**deposits** [3] - 28:13, 53:16, 74:18
**depth** [2] - 6:22, 9:24
**derived** [6] - 31:17, 31:23, 32:9, 49:1, 69:3, 76:9
**Derrick** [1] - 59:10
**describe** [9] - 27:22, 28:7, 30:17, 32:17, 53:15, 64:16, 67:11, 80:7, 117:4
**described** [2] - 116:18, 116:22
**description** [1] - 21:5
**despite** [1] - 53:9
**destination** [1] - 36:10
**destroyed** [6] - 110:24, 111:1, 111:2, 111:6, 111:9, 111:12
**detail** [1] - 19:2
**detailed** [1] - 21:5
**detect** [1] - 22:16
**determination** [7] - 4:3, 9:16, 10:7, 10:11, 10:15, 16:8, 102:17
**determine** [3] - 4:4, 15:4, 101:15
**determines** [1] - 10:13
**determining** [1] - 141:10
**develop** [4] - 16:15, 71:7, 73:10, 76:14
**developer** [1] - 81:8
**developing** [1] - 142:20
**development** [35] - 32:9, 33:17, 34:3, 34:5, 34:20, 34:25, 36:2, 36:7, 36:13, 41:19, 41:21, 42:24, 44:7, 47:19, 51:13, 52:24, 54:1, 56:3, 56:8, 61:24, 68:24, 69:4, 72:22, 72:23, 73:11, 73:21, 77:8, 77:11, 82:13, 116:25, 140:23, 141:7, 141:21, 141:24, 145:15
**Development** [19] - 56:22, 57:22, 58:17, 59:12, 65:2, 66:6, 74:6, 142:17, 142:24, 143:14, 145:4, 145:5, 145:14, 145:18, 148:21, 151:14, 159:19, 160:4, 160:5
**developments** [1] - 45:21
**DeVries** [4] - 56:19, 56:20, 64:24, 94:16
**Diamante** [75] - 4:19, 5:9, 6:4, 6:21, 7:1, 9:5, 16:21, 24:6, 28:1, 32:14, 32:18, 32:21, 32:25, 33:17, 34:25, 40:22, 41:2, 41:8, 41:17,

42:5, 45:8, 47:6, 47:8, 48:6, 48:11, 48:13, 50:9, 50:14, 54:19, 54:25, 56:12, 56:21, 62:3, 62:11, 62:15, 62:19, 62:22, 63:10, 63:14, 64:18, 64:19, 64:20, 64:22, 75:4, 76:14, 77:8, 80:11, 80:16, 81:19, 82:3, 99:23, 109:14, 110:14, 112:1, 112:25, 113:4, 119:5, 119:25, 126:21, 133:19, 145:22, 146:18, 149:10, 150:6, 150:7, 150:10, 150:17, 156:2, 156:5, 158:2, 160:8
**DIANE** [1] - 1:16
**Diane** [1] - 3:7
**differ** [1] - 7:15
**difference** [1] - 60:1
**different** [20] - 10:17, 22:2, 22:3, 22:6, 33:12, 77:5, 85:22, 87:21, 107:14, 108:6, 115:21, 116:1, 120:16, 125:25, 131:1, 131:2, 131:5, 149:3
**differently** [1] - 127:4
**DIRECT** [2] - 27:1, 162:6
**direct** [23] - 5:4, 20:6, 20:9, 22:25, 23:4, 23:22, 50:21, 51:4, 56:20, 57:1, 59:6, 62:12, 62:13, 62:16, 65:11, 74:18, 78:14, 85:8, 94:15, 95:23, 103:9, 108:8, 118:4
**directed** [3] - 20:8, 50:23, 78:19
**direction** [2] - 57:3, 63:22
**directly** [15] - 21:17, 21:20, 22:10, 31:9, 50:22, 51:10, 53:19, 55:20, 61:16, 61:21, 65:13, 67:19, 74:10, 142:14
**disagree** [1] - 67:13
**disbursement** [1] - 125:19
**disclosed** [2] - 80:19, 121:13
**disclosures** [1] - 77:5
**discomfort** [1] - 70:20
**discovered** [1] - 145:16
**Discovery** [1] - 36:4
**discovery** [8] - 90:13, 90:15, 96:4, 96:20, 97:21, 98:17, 120:24, 121:12
**discrepancy** [1] - 79:2
**discuss** [5] - 18:25, 19:18, 136:7, 137:21, 138:8
**discussed** [8] - 11:11, 34:1, 56:25, 104:16, 134:17, 134:20, 135:9, 136:13
**discussing** [2] - 14:16,

129:2
**discussion** [3] - 13:10, 25:11, 26:6
**disfavor** [2] - 58:8, 58:9
**dismiss** [5] - 89:8, 89:13, 90:2, 93:5, 99:3
**dismissed** [9] - 96:3, 96:10, 96:17, 96:19, 97:11, 97:18, 97:19, 98:14, 102:3
**dispute** [5] - 5:19, 58:1, 63:1, 67:24, 68:23
**distinctly** [1] - 19:7
**distributed** [1] - 157:22
**District** [5] - 43:11, 73:9, 96:18, 102:10, 134:22
**DISTRICT** [3] - 1:1, 1:1, 1:11
**diversion** [4] - 22:7, 22:24, 24:17, 24:18
**diversity** [1] - 89:14
**diverted** [8] - 21:25, 22:5, 22:21, 23:19, 24:13, 25:6, 58:18, 61:6
**divorce** [1] - 144:22
**divorced** [1] - 144:21
**doctor** [1] - 52:11
**document** [59] - 30:13, 30:17, 38:12, 38:18, 39:4, 39:18, 39:24, 42:15, 43:23, 44:4, 46:11, 46:17, 67:12, 67:13, 67:24, 68:9, 68:10, 71:13, 71:16, 73:25, 74:16, 77:22, 80:4, 80:8, 85:12, 92:15, 93:11, 93:14, 93:24, 94:22, 101:19, 102:14, 104:22, 106:25, 112:3, 113:9, 121:11, 122:22, 124:5, 124:13, 124:14, 124:21, 125:2, 125:5, 126:16, 143:3, 143:25, 144:2, 144:4, 144:5, 144:6, 144:7, 144:9, 144:11, 148:12, 148:20, 159:6, 159:15
**documentation** [2] - 126:12, 139:10
**documented** [2] - 139:7, 147:1
**documents** [67] - 6:21, 7:4, 16:19, 29:1, 29:4, 29:6, 29:9, 29:21, 30:25, 38:7, 39:21, 40:8, 40:13, 44:15, 64:1, 64:4, 74:2, 74:14, 76:8, 78:25, 83:12, 92:3, 100:8, 100:11, 100:13, 100:16, 100:19, 100:22, 101:8, 101:14, 104:8, 104:10, 104:11, 110:18, 111:4, 111:8, 111:17, 112:1, 112:6, 112:22,

113:7, 119:6, 119:7, 120:9, 120:13, 120:15, 120:16, 121:2, 121:5, 121:6, 121:12, 121:15, 126:7, 127:8, 128:16, 135:23, 135:25, 140:4, 140:6, 140:10, 140:11, 142:24, 145:11, 146:13, 147:3, 147:15, 158:15
**Dogs** [1] - 144:10
**dollar** [3] - 62:6, 65:23, 72:3
**dollars** [3] - 33:18, 49:11, 110:2
**donate** [2] - 72:11, 73:18
**done** [6] - 12:13, 25:21, 32:23, 49:2, 81:2, 99:10
**doubt** [3] - 67:5, 101:7, 101:10
**down** [2] - 32:3, 57:24
**dozen** [1] - 83:3
**draft** [1] - 93:17
**drafted** [2] - 83:1, 93:16
**drained** [1] - 122:23
**dropped** [1] - 123:8
**due** [2] - 35:18, 93:22
**duly** [1] - 26:15
**during** [44] - 5:3, 6:23, 18:3, 18:4, 20:3, 21:8, 29:11, 33:8, 34:1, 34:21, 36:22, 38:2, 41:7, 42:10, 43:15, 43:21, 44:5, 62:23, 68:18, 69:7, 71:7, 72:6, 82:17, 86:6, 86:8, 89:2, 92:4, 99:20, 107:7, 108:21, 108:23, 108:25, 111:16, 114:12, 114:14, 117:14, 118:7, 118:22, 126:25, 127:9, 128:23, 130:14, 140:4, 145:12
**duty** [2] - 86:13, 86:21

**E**

**e-mail** [44] - 32:24, 67:6, 67:8, 70:16, 70:22, 72:14, 74:15, 75:2, 75:3, 75:10, 75:14, 76:12, 76:25, 77:3, 79:16, 80:9, 81:18, 81:20, 92:9, 92:12, 92:13, 112:13, 112:16, 120:22, 120:24, 135:13, 135:16, 136:2, 136:4, 148:13, 153:9, 153:11, 153:15, 153:17, 153:24, 154:7, 154:11, 154:14, 154:19, 154:21, 155:19, 155:20
**e-mailed** [1] - 136:2
**e-mails** [19] - 19:3, 52:25,

68:13, 80:10, 80:24, 92:3, 92:8, 105:20, 106:12, 110:18, 111:7, 119:10, 136:5, 152:17, 152:25, 153:1, 153:4, 153:25, 154:1
**early** [5] - 36:7, 53:5, 64:24, 138:11, 141:3
**easier** [1] - 22:15
**East** [1] - 36:16
**EASTERN** [1] - 1:1
**effect** [3] - 41:14, 76:25, 77:3
**effective** [1] - 25:15
**effectively** [7] - 70:17, 72:7, 79:20, 80:20, 81:15, 81:23, 126:23
**effectuated** [1] - 121:19
**efforts** [1] - 70:3
**eight** [3] - 11:20, 49:11, 73:15
**eight-and-a-half** [1] - 49:11
**either** [9] - 23:21, 36:25, 52:12, 60:7, 61:24, 75:7, 117:7, 141:3, 159:16
**elaborating** [1] - 143:8
**elsewhere** [1] - 23:19
**elucidate** [1] - 72:20
**embezzled** [1] - 82:1
**employees** [1] - 33:5
**encompassed** [1] - 20:12
**encouraging** [1] - 119:25
**end** [5] - 5:13, 71:2, 138:11
**endeavored** [1] - 10:19
**ended** [4] - 59:8, 149:14, 149:18
**ending** [1] - 77:24, 78:6
**enforce** [1] - 88:18
**enforceable** [1] - 30:25
**engage** [1] - 60:12
**engaged** [4] - 51:1, 69:23, 72:9, 83:14
**English** [2] - 104:4, 104:5
**enjoy** [1] - 69:12
**entered** [1] - 88:19
**entire** [8] - 5:13, 17:16, 67:16, 85:15, 121:16, 156:6, 156:16, 157:15
**entirely** [1] - 42:22
**entirety** [1] - 40:4
**entities** [25] - 4:25, 17:19, 24:15, 24:16, 32:23, 40:11, 40:18, 41:19, 41:20, 42:9, 42:25, 51:20, 53:25, 57:3, 61:23, 65:7, 115:9, 123:21, 138:19, 142:14, 142:16, 145:18, 145:20
**entitled** [7] - 9:19, 20:15, 86:1, 87:25, 129:10, 148:2, 156:24

**entity** [19] - 35:23, 47:15, 61:17, 71:24, 72:9, 72:17, 114:11, 115:4, 115:6, 118:13, 120:21, 129:17, 142:18, 146:6, 149:1, 149:2, 150:6, 158:8
**entries** [1] - 39:15
**equity** [23] - 27:25, 28:1, 30:11, 30:20, 32:21, 33:19, 37:20, 42:22, 79:18, 110:10, 111:21, 113:4, 113:8, 115:12, 116:1, 116:7, 117:12, 118:2, 119:14, 121:20, 145:22, 150:6, 157:2
**erroneous** [1] - 96:9
**escrow** [1] - 53:20, 57:20
**ESQ** [5] - 1:16, 1:16, 1:22, 2:4, 2:6
**essentially** [1] - 48:13
**establish** [1] - 9:21
**established** [7] - 6:14, 37:19, 78:9, 114:10, 117:18, 123:5, 142:19
**estate** [6] - 72:22, 72:23, 73:7, 73:11, 73:16, 142:20
**Estates** [1] - 117:11
**et** [1] - 72:25
**Ethan** [1] - 52:21, 57:1
**Eufora** [12] - 8:15, 8:18, 23:18, 31:17, 31:18, 45:11, 47:21, 51:17, 56:3, 61:24, 124:22
**European** [1] - 108:24
**event** [1] - 15:4
**events** [2] - 6:19, 115:21
**everywhere** [2] - 72:23, 81:21
**evidence** [63] - 11:1, 13:1, 18:9, 20:5, 20:19, 20:23, 20:25, 21:11, 21:12, 22:21, 23:10, 24:21, 24:23, 24:24, 29:2, 38:8, 38:18, 39:21, 40:5, 40:9, 41:12, 41:24, 46:21, 60:9, 64:2, 64:6, 67:5, 68:8, 70:11, 71:15, 74:25, 77:20, 79:1, 85:15, 89:12, 91:21, 91:25, 92:4, 95:1, 95:21, 101:12, 102:22, 106:1, 106:5, 119:10, 140:4, 143:18, 143:21, 147:24, 148:7, 153:4, 154:23, 155:3, 155:13, 155:17, 162:16, 162:17, 162:18, 162:19, 162:20, 162:21, 162:22, 162:23
**ex** [3] - 36:21, 97:4, 97:10
**ex-wife** [1] - 36:21
**exact** [1] - 81:20

**exactly** [2] - 87:11, 118:21
**exam** [4] - 87:8, 87:12, 127:8, 127:16
**examination** [1] - 95:24
**EXAMINATION** [4] - 27:1, 85:20, 162:6, 162:9
**examine** [3] - 7:2, 7:4
**examined** [1] - 26:15
**example** [4] - 8:15, 15:12, 18:6, 144:9
**exception** [2] - 56:5, 56:6, 56:7
**excerpt** [3] - 42:2, 43:16, 95:3
**excuse** [11] - 30:21, 33:4, 46:12, 52:8, 59:22, 64:20, 65:7, 78:8, 79:18, 82:19, 94:8
**execute** [1] - 121:22
**executed** [4] - 82:10, 84:1, 84:3, 121:18
**execution** [1] - 20:2, 23:8
**executions** [2] - 20:20, 23:13
**Exhibit** [34] - 29:3, 30:6, 30:16, 40:4, 40:5, 40:25, 41:24, 42:14, 43:7, 43:22, 46:11, 46:12, 46:21, 50:2, 50:7, 91:25, 95:2, 102:22, 106:5, 106:22, 128:19, 129:9, 129:10, 130:16, 143:19, 143:22, 147:25, 162:16, 162:17, 162:18, 162:20, 162:21
**exhibit** [23] - 38:15, 39:14, 40:2, 43:15, 43:16, 43:17, 49:14, 85:15, 91:4, 91:8, 91:10, 91:20, 95:4, 101:1, 101:3, 101:11, 102:5, 102:12, 104:25, 105:25, 106:22, 129:9, 130:15
**Exhibits** [6] - 95:20, 155:3, 155:17, 162:19, 162:22, 162:23
**exhibits** [6] - 9:23, 29:15, 40:16, 152:17, 152:20, 155:8
**exist** [1] - 146:7
**existed** [3] - 28:20, 110:21, 110:22
**exists** [1] - 67:23
**Expansion** [1] - 81:2
**expected** [2] - 71:2, 82:21
**expedited** [2] - 90:13, 90:15
**expense** [1] - 125:20
**expenses** [1] - 125:14
**explain** [11] - 14:17, 26:6, 33:11, 35:10, 52:5, 64:8, 70:12, 109:20, 112:3,

120:5, 120:12
**explained** [1] - 120:1
**explanation** [1] - 97:25
**explore** [1] - 87:13
**express** [1] - 15:23
**expression** [1] - 10:10
**extended** [1] - 82:19
**extensively** [1] - 108:23
**extent** [7] - 8:22, 10:5, 17:23, 18:16, 22:4, 24:20, 134:24
**extremely** [2] - 15:22, 111:20

# F

**F-1** [1] - 41:25
**F-2** [1] - 42:14
**F-24** [4] - 46:12, 46:21, 46:24, 162:17
**F-3** [1] - 43:7
**F-4** [1] - 43:23
**F-5** [1] - 40:25
**F-6** [1] - 40:25
**face** [2] - 138:8
**face-to-face** [1] - 138:8
**facilitate** [2] - 22:14, 34:14
**fact** [34] - 7:12, 11:1, 12:6, 28:18, 36:24, 38:9, 38:12, 43:3, 44:17, 53:9, 60:16, 65:19, 74:21, 90:8, 93:5, 96:22, 98:1, 98:12, 100:12, 110:7, 113:11, 116:12, 120:7, 120:12, 122:7, 124:16, 127:11, 128:3, 128:8, 128:12, 134:21, 136:4, 151:3, 152:12
**factually** [1] - 15:18
**failed** [3] - 71:1, 98:3, 134:7
**fair** [2] - 10:3, 121:9
**Falcon** [1] - 36:15
**familiar** [8] - 18:20, 36:17, 36:19, 48:8, 49:14, 102:11, 119:15, 129:14
**family's** [1] - 59:1
**far** [3] - 4:1, 62:20, 149:15
**father** [1] - 151:2
**Fatico** [16] - 4:12, 6:7, 6:15, 7:11, 9:18, 9:19, 9:20, 10:6, 12:21, 16:5, 16:13, 25:17, 26:7, 71:8, 83:9, 83:10
**favor** [2] - 58:8, 87:5
**fax** [1] - 74:15
**faxed** [1] - 128:16
**FBI** [7] - 42:19, 43:10, 43:20, 52:9, 52:13, 106:17, 110:23

**February** [35] - 11:16, 12:19, 27:25, 32:19, 37:19, 45:7, 51:3, 59:11, 64:24, 65:4, 74:8, 75:3, 76:11, 79:16, 80:20, 81:23, 109:3, 109:5, 113:2, 113:17, 113:19, 113:20, 114:10, 115:7, 115:11, 115:24, 116:4, 117:20, 120:23, 153:18, 154:7, 156:19, 159:3, 159:13, 159:21
**federal** [5] - 90:11, 97:15, 97:17, 99:24, 126:20
**Federal** [3] - 1:15, 2:20, 91:17
**fell** [1] - 141:8
**felt** [1] - 98:23
**Fernando** [1] - 31:10
**few** [4] - 52:11, 55:18, 65:17, 82:4
**fiduciary** [1] - 86:12
**file** [4] - 96:24, 98:11, 101:22, 104:12
**filed** [24] - 4:7, 7:23, 9:16, 27:11, 37:6, 89:2, 89:4, 89:5, 89:7, 90:3, 92:18, 93:6, 96:9, 97:4, 101:24, 102:9, 102:16, 104:16, 105:23, 123:7, 123:8, 123:25, 126:23, 132:6
**filing** [2] - 105:15, 122:24
**filings** [1] - 116:6
**final** [6] - 10:15, 25:13, 54:12, 54:15, 62:18, 75:13
**finally** [2] - 73:16, 146:11
**financed** [1] - 33:19
**finances** [1] - 59:2
**financial** [20] - 4:25, 6:2, 28:8, 40:16, 40:23, 64:9, 78:25, 99:1, 139:3, 142:23, 143:12, 147:25, 148:2, 148:3, 148:5, 149:21, 156:11, 157:9, 159:2
**financing** [1] - 81:22
**fine** [6] - 25:20, 26:24, 46:15, 157:12, 161:10, 161:12
**finish** [2] - 115:18, 133:7
**firm** [4] - 73:14, 103:5, 125:19, 125:23
**first** [24] - 3:23, 11:15, 11:25, 12:19, 12:20, 26:14, 32:24, 33:15, 50:25, 52:7, 56:19, 64:8, 73:3, 76:3, 77:24, 82:1, 90:2, 93:6, 96:23, 127:16, 130:19, 136:17, 145:11, 154:7
**five** [5] - 33:23, 44:1, 65:20, 82:17, 108:6
**flip** [1] - 130:19

**flow** [3] - 53:24, 56:1, 64:14
**flowing** [4] - 41:9, 44:6, 61:23, 78:15
**fluent** [1] - 104:5
**focus** [8] - 8:10, 12:5, 12:13, 14:14, 27:16, 105:2, 139:19, 154:4
**Foley** [1] - 102:25
**follow** [4] - 13:21, 82:23, 137:7, 153:20
**follow-up** [3] - 82:23, 137:7, 153:20
**followed** [1] - 13:22
**following** [9] - 5:17, 31:14, 35:21, 37:5, 37:13, 72:14, 101:9, 116:21, 122:24
**follows** [5] - 5:14, 5:25, 7:18, 9:11, 26:16
**foreigners** [2] - 119:9, 119:13
**FORF-1** [5] - 4:23, 49:14, 50:2, 50:7, 70:16
**FORF-44** [1] - 85:11
**FORF-52** [2] - 66:21, 67:4
**FORF-54** [2] - 68:3, 68:9
**FORF-55** [1] - 70:9
**FORF-56** [1] - 71:12
**FORF-57** [1] - 73:23
**FORF-58** [1] - 77:19
**FORF-60** [1] - 74:25
**FORF-61** [2] - 75:22, 76:1
**FORF-62** [1] - 76:6
**FORF-67** [1] - 80:5
**FORF-77** [1] - 92:23
**forfeit** [14] - 8:1, 11:2, 11:7, 13:3, 14:2, 14:5, 15:14, 23:7, 27:7, 27:19, 32:13, 35:9, 37:9, 45:3
**forfeitable** [5] - 9:1, 9:4, 18:2, 24:16, 24:22
**forfeited** [4] - 15:1, 15:3, 18:7, 71:20
**Forfeiture** [10] - 38:16, 40:4, 40:5, 95:20, 102:22, 106:5, 162:16, 162:19, 162:20, 162:21
**forfeiture** [52] - 3:19, 4:1, 4:6, 4:22, 4:23, 5:4, 6:14, 6:18, 6:23, 7:2, 7:10, 7:20, 8:9, 8:13, 9:17, 10:7, 10:14, 11:14, 11:23, 12:25, 13:8, 13:22, 13:25, 14:6, 14:14, 14:15, 14:20, 15:11, 16:5, 16:15, 17:1, 17:11, 18:4, 18:10, 18:14, 20:4, 20:15, 20:24, 21:2, 22:22, 22:24, 23:3, 24:11, 25:8, 25:21, 29:21, 38:6, 49:15, 68:11, 70:14, 71:18, 102:5

**Forfeiture-80** [1] - 95:2
**forged** [1] - 122:21
**forgery** [5] - 90:18, 90:22, 90:24, 94:22, 95:5
**form** [4] - 21:13, 23:8, 112:10, 114:22
**formed** [2] - 114:20, 140:15
**former** [2] - 73:4, 132:25
**forth** [6] - 28:5, 40:16, 48:3, 50:16, 56:17, 58:23
**forward** [1] - 6:8
**forwarded** [3] - 78:10, 111:8, 126:7
**foundation** [2] - 72:11, 73:19
**four** [10] - 4:24, 4:25, 6:19, 6:25, 24:4, 55:24, 58:23, 60:16, 67:25, 114:16
**fourth** [1] - 83:18
**Frailes** [18] - 4:19, 5:9, 6:4, 6:21, 7:1, 9:4, 10:24, 16:21, 19:4, 24:6, 54:21, 55:3, 55:13, 55:14, 55:19, 56:10, 67:10, 67:20
**frame** [2] - 67:21, 148:16
**frankly** [3] - 10:9, 39:24, 52:20
**fraud** [24] - 8:15, 8:18, 11:1, 12:12, 13:6, 13:12, 15:13, 17:7, 17:14, 18:17, 19:1, 19:23, 20:13, 20:18, 20:25, 22:24, 22:25, 24:21, 24:22, 25:6, 25:10, 60:7, 123:9
**frauds** [7] - 11:8, 13:2, 16:3, 23:8, 23:12, 23:13, 23:15
**fraudulent** [18] - 5:6, 13:18, 15:2, 15:5, 15:15, 16:22, 19:5, 20:2, 21:6, 21:22, 23:5, 24:3, 24:5, 28:4, 58:23, 67:25, 69:9, 83:13
**friend** [1] - 145:15
**friends** [1] - 52:11
**front** [8] - 82:24, 86:19, 87:23, 123:24, 125:22, 129:12, 134:22, 152:24
**full** [6] - 10:3, 13:25, 43:15, 43:17, 43:19, 81:11
**fully** [1] - 84:3
**Fund** [11] - 23:18, 31:24, 45:14, 47:25, 51:21, 54:2, 56:3, 61:25, 125:5, 125:13, 125:15
**fund** [4] - 21:25, 34:12, 38:14, 125:1
**funded** [1] - 37:21
**funding** [2] - 79:17, 80:11
**funds** [52] - 15:12, 22:13, 31:11, 31:13, 31:15, 31:16,

31:21, 31:22, 32:3, 37:1, 41:1, 48:23, 48:25, 49:12, 51:10, 51:12, 51:16, 51:19, 51:23, 52:8, 52:13, 52:15, 53:22, 55:23, 55:25, 56:22, 57:23, 58:13, 58:19, 61:2, 61:7, 66:7, 68:14, 69:1, 73:18, 78:13, 78:18, 78:20, 81:7, 81:8, 99:1, 118:18, 122:20, 123:1, 123:6, 146:16, 150:15, 150:16, 150:21, 157:18
**funneled** [1] - 15:15

## G

**galiotto** [1] - 98:23
**Galiotto** [2] - 42:20, 43:11
**game** [1] - 158:20
**Garcia's** [3] - 31:10, 78:1, 78:3
**Gaudet** [2] - 55:22, 67:9
**Gaudet's** [1] - 67:19
**general** [2] - 75:4, 76:19
**German** [1] - 104:4
**gift** [2] - 71:23, 73:8
**given** [4] - 42:2, 63:25, 81:14, 107:1
**glad** [2] - 100:5, 159:18
**Glen** [4] - 57:5, 99:14, 99:17, 124:19
**global** [1] - 125:1
**Global** [11] - 23:18, 31:23, 45:14, 47:24, 51:21, 54:1, 56:3, 61:25, 125:4, 125:13, 125:15
**golf** [1] - 62:24
**government** [48] - 3:20, 4:21, 6:7, 6:13, 6:24, 7:13, 7:21, 9:20, 10:25, 12:6, 12:11, 12:25, 13:16, 13:19, 13:25, 14:9, 14:24, 15:8, 16:14, 19:9, 20:3, 21:10, 21:15, 22:5, 23:3, 23:5, 23:7, 24:1, 24:12, 26:6, 27:7, 27:12, 27:18, 29:22, 32:13, 35:8, 37:5, 39:11, 41:3, 41:6, 45:3, 46:16, 64:2, 64:6, 70:15, 77:2, 92:4, 161:1
**Government** [15] - 1:14, 38:16, 49:15, 91:25, 95:20, 102:22, 106:5, 155:3, 155:17, 162:18, 162:19, 162:20, 162:21, 162:22, 162:23
**Government's** [7] - 50:2, 50:6, 80:6, 95:2, 143:19, 143:22, 147:25

**government's** [9] - 5:4, 7:3, 20:14, 20:19, 22:12, 22:21, 23:23, 38:15, 71:19
**grand** [2] - 98:24, 134:22
**great** [1] - 73:12
**greater** [1] - 141:7
**Greg** [4] - 56:19, 94:16, 148:15, 149:25
**grew** [1] - 137:13
**Griffin** [2] - 127:21, 128:1
**ground** [1] - 35:19
**group** [8] - 63:8, 97:7, 140:15, 140:16, 140:24, 141:7, 141:21, 141:24
**guarantee** [1] - 118:11
**guarantees** [1] - 117:24
**guess** [2] - 5:24, 16:7
**guessing** [1] - 158:20
**guidance** [1] - 14:21
**Guide** [1] - 144:10
**GuideDog** [5] - 113:1, 113:5, 113:13, 113:15, 113:18, 113:21, 114:2, 115:12, 115:23, 146:5, 152:9, 152:10, 152:12, 152:14, 153:16
**guideline** [3] - 4:15, 6:12, 10:13
**guilty** [3] - 20:21, 57:7, 57:10
**guys** [1] - 81:17

## H

**HALEY** [78] - 1:20, 1:22, 3:11, 3:22, 3:24, 15:20, 23:25, 25:12, 26:1, 26:9, 26:11, 26:21, 27:2, 29:8, 29:13, 29:15, 29:18, 29:20, 29:24, 30:3, 30:5, 39:4, 39:13, 40:6, 40:7, 46:10, 46:16, 46:22, 49:17, 49:19, 50:1, 50:4, 50:5, 64:10, 64:12, 66:20, 66:23, 67:1, 67:3, 68:4, 68:7, 71:6, 71:10, 71:11, 79:11, 79:25, 80:3, 83:6, 83:20, 84:6, 85:7, 91:7, 91:22, 95:7, 95:12, 95:17, 101:13, 102:13, 106:2, 112:7, 112:9, 115:13, 115:18, 121:6, 121:9, 124:10, 153:22, 154:3, 154:25, 155:14, 156:11, 158:22, 160:18, 160:25, 161:5, 161:10, 161:13, 162:7
**Haley** [11] - 3:11, 3:23, 5:18, 5:23, 12:9, 13:21, 16:14, 22:23, 24:9, 99:10,

160:17
**half** [11] - 33:18, 49:11, 67:16, 81:12, 83:3, 118:8, 120:3, 132:13, 156:6, 157:16, 160:22
**hand** [3] - 66:2, 66:4, 129:9
**handed** [2] - 93:25, 159:6
**handicapped** [1] - 52:12
**handled** [1] - 12:4
**handwritten** [1] - 46:13
**handwrote** [1] - 129:9
**happy** [1] - 14:11
**Harbor** [1] - 36:4
**Harbor/Ledbetter** [7] - 32:4, 45:17, 48:3, 51:24, 54:2, 56:4, 61:25
**hard** [2] - 22:16, 89:17
**Harvey** [2] - 42:20, 145:13
**Hawaii** [65] - 17:18, 20:8, 22:11, 23:18, 33:10, 34:1, 34:5, 34:12, 34:15, 34:20, 35:9, 35:10, 35:22, 36:2, 36:7, 36:11, 36:13, 38:1, 40:18, 41:9, 41:19, 42:24, 44:7, 45:21, 51:13, 54:1, 54:16, 56:3, 56:8, 61:24, 68:24, 69:1, 69:4, 71:20, 71:21, 72:22, 73:8, 81:2, 82:13, 94:6, 116:2, 116:10, 116:15, 116:18, 116:23, 116:24, 117:4, 117:6, 117:23, 128:8, 129:25, 130:4, 130:11, 130:12, 134:8, 134:15, 134:16, 138:19, 139:22, 140:14, 140:15, 140:23, 141:7, 141:20, 141:23
**Hawaiian** [13] - 24:13, 32:9, 42:8, 47:18, 65:4, 65:6, 71:24, 73:21, 76:22, 81:10, 129:2, 130:2
**Hawaiians** [1] - 72:24
**head** [1] - 14:24
**hear** [4] - 13:4, 13:7, 13:13, 41:6
**heard** [4] - 24:24, 80:25, 121:18, 135:7
**hearing** [58] - 3:19, 4:1, 4:13, 4:22, 4:23, 5:4, 6:7, 6:15, 6:18, 6:23, 7:2, 7:10, 7:11, 7:20, 9:18, 9:19, 9:20, 10:6, 10:7, 11:16, 12:1, 12:10, 12:21, 13:19, 14:12, 14:15, 15:18, 16:5, 16:13, 16:16, 18:4, 18:10, 20:4, 20:25, 21:3, 25:3, 25:21, 26:7, 29:12, 29:13, 29:22, 38:6, 38:11, 44:5, 49:15, 68:11, 70:14, 71:8, 71:18, 82:19, 83:9, 83:10,

83:11, 89:18, 101:18
**hearsay** [2] - 25:1, 83:11
**held** [4] - 28:17, 44:16, 51:14, 144:23
**help** [1] - 148:17
**high** [1] - 103:23
**Highway** [1] - 1:21
**himself** [2] - 6:2, 117:10
**hint** [1] - 24:4
**hire** [1] - 63:8
**hired** [2] - 103:5, 103:6
**historic** [1] - 72:25
**Historical** [1] - 35:24
**hit** [1] - 14:23
**hockey** [18] - 5:1, 6:3, 17:25, 18:7, 19:1, 19:19, 22:10, 23:1, 45:8, 63:2, 68:25, 69:2, 69:9, 94:17, 134:10, 134:12, 134:14, 134:17
**hold** [4] - 37:20, 45:7, 113:23, 146:5
**holding** [1] - 28:1
**holdings** [1] - 37:14
**Holdings** [2] - 37:17, 37:18
**home** [3] - 36:25, 43:12, 49:13
**homes** [1] - 36:8
**hometown** [1] - 107:25
**hometowns** [2] - 107:23, 107:24
**Honor** [101] - 3:9, 3:12, 3:13, 3:22, 3:25, 4:6, 4:8, 4:21, 5:3, 5:11, 5:13, 5:18, 6:6, 10:2, 10:7, 10:11, 10:13, 11:10, 11:16, 11:25, 12:15, 14:22, 14:23, 14:24, 15:20, 15:21, 15:22, 17:2, 17:3, 17:12, 17:21, 18:11, 18:19, 19:13, 19:15, 19:16, 20:10, 20:17, 20:22, 21:10, 21:24, 22:16, 23:6, 23:20, 25:12, 26:21, 29:8, 38:23, 38:24, 39:13, 46:10, 46:19, 50:1, 56:7, 60:24, 66:16, 66:20, 71:6, 72:23, 83:6, 83:16, 85:7, 85:18, 88:23, 89:17, 91:5, 91:20, 91:23, 92:22, 94:25, 95:10, 95:12, 95:14, 95:18, 99:3, 99:12, 100:25, 101:11, 101:16, 102:12, 102:13, 102:17, 102:20, 104:24, 105:25, 125:7, 133:16, 139:16, 139:20, 143:6, 143:18, 147:10, 151:24, 152:16, 154:22, 155:12, 160:13, 160:18, 161:3, 161:5, 161:12
**Honor's** [2] - 4:3, 16:8

**HONORABLE** [1] - 1:11
**honored** [1] - 28:25
**hope** [3] - 10:20, 31:4, 61:11
**hopeful** [1] - 26:9
**hopefully** [1] - 81:22
**horizontal** [1] - 33:21
**horse** [1] - 7:8
**hour** [3] - 133:6, 160:22, 161:8
**hours** [1] - 78:18
**house** [4] - 49:2, 49:5, 145:1, 145:2
**housekeeping** [1] - 25:13
**hundreds** [2] - 110:1

**I**

**idea** [6] - 73:12, 80:25, 103:16, 103:18, 108:4, 152:9
**identifiable** [1] - 16:3
**identification** [1] - 27:6
**identified** [21] - 7:21, 7:25, 8:1, 9:3, 9:6, 9:14, 27:18, 28:4, 32:12, 35:8, 37:13, 45:2, 47:6, 47:11, 50:9, 52:2, 54:21, 59:9, 62:3, 62:11, 62:23
**identify** [4] - 43:8, 55:16, 128:19, 136:1
**identifying** [1] - 27:12
**ignored** [1] - 15:16
**immediately** [3] - 53:8, 125:17, 131:16
**important** [3] - 70:17, 111:20, 126:16
**importation** [1] - 36:9
**improvements** [2] - 8:24, 37:1
**inaccuracies** [1] - 62:6
**incarcerated** [1] - 135:22
**inches** [2] - 6:22, 9:24
**incidentally** [3] - 58:11, 62:10, 78:23
**include** [3] - 141:11, 141:20, 141:25
**included** [6] - 4:15, 12:8, 27:6, 134:10, 134:12, 134:14
**includes** [1] - 26:5
**incomplete** [1] - 75:6
**incorporated** [1] - 109:3
**incorrect** [14] - 55:19, 96:5, 96:21, 97:13, 112:8, 112:21, 114:3, 121:24, 126:4, 134:19, 135:16, 137:10, 144:19, 152:15
**increases** [1] - 159:3

**indeed** [5] - 5:7, 5:11, 6:13, 8:25, 29:20
**independent** [8] - 15:13, 17:6, 17:7, 17:24, 24:22, 25:6, 25:10
**independently** [1] - 24:22
**indicate** [3] - 12:16, 127:17, 127:24
**indicated** [3] - 104:22, 115:25, 138:23
**indicates** [2] - 114:24, 159:10
**indication** [2] - 105:10, 147:14
**indicted** [1] - 63:7
**indictment** [23] - 5:7, 5:20, 7:22, 8:12, 9:3, 9:6, 9:7, 9:15, 15:6, 17:17, 17:19, 19:9, 23:16, 24:4, 27:5, 27:13, 28:5, 43:5, 48:3, 51:25, 55:24, 58:24, 68:1
**individual** [7] - 51:8, 52:22, 55:22, 60:12, 65:12, 66:5, 138:2
**individually** [1] - 88:10
**individuals** [11] - 28:4, 28:15, 28:23, 47:15, 50:22, 52:21, 55:20, 82:11, 116:1, 146:15, 146:22
**information** [8] - 67:23, 76:8, 76:10, 82:24, 83:2, 83:23, 148:16, 157:11
**informed** [2] - 9:19, 114:5, 117:21, 138:4
**infrastructure** [1] - 33:21
**inheritance** [2] - 150:25, 151:5
**inherited** [1] - 151:1
**initial** [5] - 17:14, 22:1, 22:7, 93:1, 137:2
**initiate** [1] - 116:6
**input** [2] - 144:5, 144:6
**inquiry** [1] - 4:5
**instead** [2] - 23:19, 119:3
**instructed** [6] - 32:20, 58:16, 65:14, 74:6, 114:9, 116:5
**instructing** [2] - 75:10, 76:17
**instruction** [1] - 5:19
**intend** [2] - 95:10, 160:19
**intended** [3] - 136:15, 150:1, 150:2
**intends** [3] - 6:13, 13:17, 20:3
**intent** [1] - 115:11
**intention** [8] - 25:24, 26:2, 113:12, 113:14, 113:18, 113:20, 121:21, 145:21
**interaction** [1] - 35:4

**interest** [50] - 28:9, 31:7, 37:20, 40:22, 41:8, 41:17, 47:16, 47:17, 62:14, 78:12, 79:7, 79:15, 79:19, 87:21, 93:19, 93:20, 103:10, 111:21, 112:15, 112:17, 112:20, 112:25, 113:15, 113:24, 115:4, 115:22, 115:23, 119:4, 119:11, 119:20, 119:22, 120:2, 120:4, 120:19, 143:4, 146:5, 146:22, 150:10, 151:21, 152:4, 154:20, 156:5, 156:9, 156:15, 157:20, 157:24, 158:11, 158:16, 158:18, 158:24
**interestingly** [1] - 81:4
**internet** [1] - 108:2
**interplay** [1] - 35:4
**interpret** [1] - 50:15
**interpretation** [1] - 115:3
**interrupted** [1] - 55:6
**intertwined** [1] - 25:19
**interview** [3] - 42:18, 43:3, 43:10
**interviewed** [1] - 52:9
**introduce** [5] - 12:12, 20:19, 21:11, 83:11, 153:4
**introduced** [13] - 7:5, 9:25, 21:13, 38:8, 39:21, 40:9, 43:16, 49:15, 64:1, 64:5, 69:22, 79:1, 106:21
**invest** [2] - 18:13, 21:18, 28:16, 51:1, 54:25, 55:3, 86:17, 106:19, 118:5, 119:18, 119:25, 150:14
**invested** [12] - 18:13, 22:8, 22:10, 53:4, 59:11, 67:17, 69:4, 123:20, 124:22, 145:15, 150:12
**investigating** [1] - 126:20
**investigation** [2] - 98:24, 99:23
**Investigator** [1] - 43:11
**investing** [3] - 123:19, 143:2, 150:20
**investment** [37] - 18:8, 20:1, 20:7, 20:9, 21:5, 22:7, 23:4, 23:22, 38:3, 51:2, 52:14, 52:17, 56:9, 56:20, 57:2, 58:15, 58:18, 59:4, 59:6, 67:16, 74:5, 78:11, 79:22, 82:3, 100:3, 106:10, 110:10, 134:15, 137:15, 139:23, 140:1, 140:15, 143:2, 146:18, 149:22, 159:25, 160:1
**investments** [37] - 12:8, 18:1, 19:8, 19:12, 22:14, 22:25, 24:13, 24:14, 28:2,

45:7, 45:11, 47:22, 47:25, 50:17, 50:21, 51:4, 51:7, 55:20, 62:13, 62:16, 63:3, 63:4, 65:11, 65:13, 66:5, 71:22, 75:12, 75:16, 76:16, 77:15, 86:16, 99:23, 124:3, 126:21, 143:23, 143:24
**investor** [9] - 23:16, 83:19, 116:10, 116:15, 116:18, 116:23, 116:24, 117:4, 117:6
**investors** [21] - 17:18, 42:4, 61:8, 62:12, 63:8, 64:22, 69:2, 69:21, 80:17, 80:18, 81:24, 83:3, 117:13, 131:20, 134:9, 136:12, 136:13, 140:15, 150:20, 154:13, 157:22
**involve** [2] - 19:23, 24:17
**involved** [8] - 5:10, 15:5, 16:22, 20:16, 52:14, 61:18, 73:12, 82:12
**involvement** [1] - 45:25
**involving** [4] - 4:25, 6:2, 6:20, 82:6
**IRS** [1] - 42:20
**Island** [2] - 36:10, 69:24
**Islandia** [1] - 1:22
**Isle** [30] - 40:11, 40:12, 51:12, 64:18, 75:7, 78:15, 87:25, 88:6, 88:15, 91:16, 92:17, 96:2, 117:1, 117:2, 117:3, 117:7, 117:9, 117:12, 136:18, 139:24, 140:16, 140:22, 140:23, 140:24, 141:2, 141:4, 141:5, 141:11, 141:17, 141:20
**Islip** [3] - 1:6, 1:15, 2:21
**issue** [17] - 6:16, 8:10, 11:24, 11:25, 12:20, 15:7, 15:24, 16:2, 18:23, 25:24, 36:9, 44:20, 71:4, 71:7, 83:7, 90:8, 94:14
**issues** [20] - 6:8, 6:11, 6:15, 6:25, 7:10, 9:13, 10:5, 10:6, 10:8, 10:15, 10:18, 11:15, 11:17, 11:18, 12:1, 25:17, 25:18, 35:19, 71:17, 115:16
**itself** [10] - 17:8, 18:17, 22:24, 24:21, 42:7, 44:4, 44:21, 70:12, 93:14, 158:15
**IV** [14] - 40:11, 40:12, 51:13, 64:18, 75:7, 78:15, 88:6, 117:2, 117:3, 117:7, 117:9, 141:11, 141:17, 141:20

## J

**jail** [3] - 132:13, 132:19, 132:20
**January** [4] - 42:3, 94:19, 137:1, 142:12
**Jere** [7] - 28:2, 30:9, 30:15, 42:23, 108:8, 108:10, 133:23
**John** [10] - 43:12, 44:2, 49:7, 52:7, 69:16, 69:18, 70:3, 72:10, 93:10, 95:24
**join** [1] - 28:15
**joining** [1] - 118:12
**joint** [2] - 69:20, 72:5
**Jose** [1] - 55:21
**JOSEPH** [2] - 1:11, 2:4
**Joseph** [8] - 3:14, 28:2, 30:23, 42:23, 101:22, 101:24, 105:12, 133:23
**Josh** [1] - 42:20
**Jowdy** [185] - 31:9, 31:13, 32:19, 32:25, 34:9, 38:1, 38:13, 38:21, 40:11, 40:18, 40:20, 41:10, 41:20, 42:3, 42:6, 42:11, 42:19, 42:21, 42:25, 44:8, 44:14, 44:18, 44:24, 50:23, 50:24, 50:25, 57:6, 57:16, 57:20, 58:14, 58:16, 58:18, 59:21, 59:22, 59:23, 60:17, 61:3, 61:6, 61:17, 62:16, 63:2, 63:10, 63:19, 63:20, 64:17, 65:3, 65:14, 65:25, 68:13, 68:18, 69:8, 70:2, 75:4, 75:8, 75:10, 75:15, 76:10, 76:17, 76:20, 76:22, 76:24, 77:8, 77:12, 78:1, 78:2, 78:10, 78:19, 79:14, 79:16, 80:10, 80:18, 80:21, 81:5, 82:4, 87:25, 88:6, 88:11, 88:16, 88:19, 89:13, 90:16, 90:23, 90:25, 91:15, 91:17, 92:19, 93:2, 93:25, 94:9, 94:10, 94:17, 94:21, 94:24, 95:4, 95:25, 96:25, 98:25, 99:2, 99:15, 110:2, 114:5, 115:25, 117:17, 117:19, 117:21, 118:9, 118:11, 118:15, 120:18, 120:22, 120:25, 121:1, 121:13, 121:19, 122:4, 122:7, 131:8, 131:14, 131:20, 131:24, 132:2, 132:7, 134:4, 134:7, 134:18, 135:2, 135:10, 135:17, 136:3, 136:8, 136:15, 136:19, 136:23, 136:25, 137:3, 137:18, 137:21,

137:23, 138:4, 138:19, 138:24, 139:8, 139:13, 139:14, 140:22, 141:5, 141:23, 142:4, 142:12, 143:3, 145:3, 145:5, 145:11, 145:17, 145:19, 145:24, 146:21, 149:7, 149:9, 149:10, 150:12, 150:15, 150:17, 150:18, 150:20, 151:8, 151:14, 151:22, 153:13, 153:14, 153:17, 154:8, 155:20, 156:19, 157:5, 157:7, 157:9, 157:21, 158:2, 160:6, 160:9
**Jowdy's** [31] - 32:23, 33:22, 37:20, 39:7, 39:22, 51:9, 51:11, 56:22, 57:2, 58:8, 59:7, 59:12, 65:2, 66:3, 66:5, 66:6, 74:5, 75:5, 89:8, 89:11, 90:2, 90:14, 90:21, 93:5, 94:19, 97:4, 97:6, 97:11, 118:18, 142:16, 146:23
**Jowdy;isn't** [1] - 135:6
**judge** [14] - 8:10, 16:25, 18:24, 64:8, 64:10, 82:18, 83:5, 95:7, 97:10, 97:15, 97:18, 115:13, 115:18, 124:10
**Judge** [44] - 3:24, 4:17, 5:24, 6:18, 7:7, 7:12, 8:4, 9:8, 10:9, 10:18, 10:19, 15:7, 15:24, 16:7, 16:11, 16:17, 16:23, 17:9, 26:11, 29:13, 39:20, 40:1, 40:2, 45:5, 47:7, 47:12, 49:4, 49:17, 49:20, 56:6, 67:7, 68:4, 79:11, 79:25, 82:14, 82:15, 83:20, 84:2, 85:15, 96:19, 96:22, 101:14, 161:6, 161:15
**JUDGE** [1] - 1:11
**judge's** [1] - 96:6
**judges** [1] - 82:24
**judgment** [9] - 10:12, 53:1, 58:5, 58:8, 86:22, 87:1, 87:4, 87:7, 87:14
**July** [3] - 46:6, 128:14, 130:4
**jumping** [1] - 54:20
**June** [5] - 28:12, 28:24, 76:9, 142:4, 146:14
**jurisdiction** [1] - 89:14
**jury** [8] - 8:17, 13:12, 19:5, 26:22, 41:7, 41:13, 98:24, 134:23

## K

**Kailua** [2] - 73:4, 73:9
**Kaiser** [27] - 43:12, 44:3, 44:6, 49:8, 52:8, 53:17, 55:7, 69:2, 69:16, 69:18, 69:21, 69:25, 70:4, 93:10, 95:24, 117:4, 117:6, 117:7, 128:10, 129:4, 130:3, 134:11, 134:13, 134:23, 135:17, 140:22, 141:1
**Kaiser's** [1] - 67:15
**KAJ** [3] - 37:13, 37:16, 37:18
**Kalehua** [1] - 36:4
**Kathy** [1] - 130:25
**Kazakhstan** [1] - 105:24
**keep** [4] - 88:25, 101:20, 143:10, 152:1
**Ken** [24] - 32:19, 37:20, 38:1, 40:11, 41:10, 41:20, 42:3, 42:5, 44:8, 44:17, 44:24, 64:17, 75:4, 77:7, 88:6, 88:16, 99:15, 117:16, 118:9, 118:10, 134:18, 135:2, 135:5, 135:10
**KENNER** [3] - 1:7, 26:13, 162:5
**Kenner** [100] - 1:23, 3:4, 3:11, 6:1, 6:17, 8:21, 14:1, 19:19, 21:17, 25:8, 25:16, 26:20, 29:2, 29:3, 30:6, 30:16, 33:12, 37:4, 40:8, 40:24, 40:25, 41:24, 42:14, 43:7, 43:22, 44:23, 46:5, 46:11, 46:12, 46:21, 46:24, 83:14, 85:5, 85:8, 85:22, 86:1, 86:3, 86:4, 88:16, 90:20, 91:10, 92:2, 93:16, 95:4, 95:23, 97:14, 99:5, 101:3, 101:22, 102:8, 102:24, 103:9, 106:22, 107:19, 111:16, 112:12, 112:24, 115:17, 117:14, 118:3, 118:14, 121:14, 121:21, 121:25, 123:19, 124:14, 125:12, 125:23, 126:1, 126:25, 127:15, 128:2, 128:11, 128:15, 130:6, 133:13, 133:18, 134:25, 135:21, 136:7, 138:22, 139:19, 143:12, 143:21, 146:14, 147:24, 148:7, 148:13, 152:3, 152:24, 153:3, 153:8, 153:19, 155:8, 155:19, 156:21, 157:6, 160:16, 162:17
**Kenner's** [3] - 4:11, 8:6,

16:1
**Kenner-controlled** [1] - 8:21
**kept** [1] - 94:1
**kind** [2] - 19:24, 142:1
**kindly** [14] - 27:22, 30:6, 30:17, 33:11, 35:10, 46:24, 50:6, 50:15, 55:16, 56:15, 68:3, 70:12, 77:19, 80:7
**KJ** [1] - 81:5
**knowledge** [22] - 28:3, 37:19, 38:8, 42:1, 43:18, 44:11, 45:23, 48:20, 50:13, 50:17, 52:5, 55:16, 62:13, 63:24, 64:13, 69:13, 70:3, 74:1, 75:2, 77:22, 80:7, 135:1
**known** [2] - 27:18, 97:12
**knows** [1] - 82:15
**KSI** [6] - 80:14, 80:21, 80:25, 81:1, 81:6, 81:13

## L

**labeled** [2] - 100:14, 100:22
**laid** [1] - 23:11
**land** [23] - 32:9, 36:2, 36:13, 41:19, 42:24, 44:7, 45:21, 47:18, 51:13, 52:16, 54:1, 56:3, 56:8, 61:24, 68:24, 69:4, 71:21, 71:22, 72:24, 73:13, 73:21, 82:13, 116:24
**lands** [1] - 72:25
**language** [1] - 104:3
**laptop** [8] - 110:21, 110:24, 111:1, 111:3, 111:5, 111:13, 111:15, 153:6
**larger** [2] - 119:11, 140:24
**LARUSSO** [1] - 2:2
**Las** [3] - 52:14, 57:17, 108:12
**last** [14] - 3:20, 11:11, 29:15, 36:20, 38:11, 39:8, 46:7, 51:2, 65:21, 73:2, 85:12, 100:10, 101:18, 103:25
**lastly** [1] - 61:12
**late** [1] - 27:15
**launder** [1] - 145:7
**laundered** [1] - 24:14
**laundering** [13] - 8:25, 11:13, 15:12, 15:14, 17:4, 17:7, 17:20, 17:23, 17:24, 20:13, 20:16, 22:15, 160:6
**law** [12] - 9:1, 11:21, 15:10, 15:11, 20:17, 73:14, 75:5, 99:24, 103:5, 125:19,

125:23, 126:21
**lawsuit** [29] - 42:4, 57:15, 57:25, 58:3, 58:5, 63:12, 63:17, 86:1, 87:25, 88:5, 88:8, 88:12, 88:15, 89:2, 90:7, 90:10, 90:12, 91:16, 96:2, 99:14, 99:17, 101:22, 101:24, 102:1, 102:16, 102:24, 122:25, 123:8, 140:22
**lawsuits** [2] - 62:7, 96:15
**lawyer** [1] - 123:9
**lawyers** [4] - 35:22, 92:21, 97:5, 97:6
**lay** [1] - 25:4
**laying** [1] - 11:21
**leading** [1] - 98:24
**least** [7] - 24:17, 27:13, 69:7, 72:24, 81:12, 114:18, 156:24
**leave** [1] - 96:23
**leaving** [1] - 33:20
**led** [3] - 28:9, 70:19, 70:25
**left** [3] - 3:12, 66:4, 93:21
**left-hand** [1] - 66:4
**legal** [2] - 30:25, 94:3
**legitimate** [2] - 22:13, 22:14
**Lehman** [37] - 32:20, 32:22, 33:7, 33:8, 33:15, 33:19, 33:24, 34:2, 34:4, 34:8, 34:9, 34:13, 34:19, 34:24, 47:15, 71:25, 72:5, 75:11, 76:13, 76:18, 76:21, 76:24, 77:7, 94:5, 113:25, 119:2, 119:8, 119:12, 119:23, 120:23, 120:25, 121:5, 121:6, 121:11, 121:14, 121:15, 152:6
**Lehtinen** [56] - 28:2, 28:11, 28:21, 29:7, 30:10, 30:15, 31:5, 41:1, 42:23, 56:23, 78:5, 78:22, 79:14, 79:21, 103:11, 108:9, 108:10, 108:14, 108:20, 108:22, 109:20, 110:5, 110:7, 111:4, 111:9, 111:25, 112:4, 112:14, 112:17, 114:20, 116:8, 116:10, 117:25, 118:4, 118:8, 118:16, 118:18, 119:3, 122:12, 126:2, 126:13, 131:10, 131:23, 133:23, 138:17, 139:22, 139:25, 141:13, 145:25, 146:9, 156:8, 156:15, 156:22, 157:23, 158:4, 158:13
**Lehtinen's** [6] - 30:18, 31:8, 77:25, 117:16, 141:11, 156:9

**lender** [1] - 80:15
**lenders** [2] - 34:11, 80:22
**lending** [5] - 33:24, 34:13, 34:15, 34:16, 81:1
**length** [2] - 82:19, 82:20
**Leonardo** [4] - 3:8, 10:22, 85:17, 133:15
**LEONARDO** [77] - 1:16, 3:7, 11:10, 12:15, 16:25, 17:9, 17:12, 17:21, 18:11, 18:18, 19:13, 30:1, 31:2, 38:23, 46:19, 70:5, 83:16, 85:18, 85:21, 88:23, 89:1, 89:22, 90:1, 91:5, 91:9, 91:20, 92:1, 92:22, 94:25, 95:10, 95:22, 99:3, 99:13, 100:25, 101:11, 101:21, 102:4, 102:7, 102:12, 102:23, 104:24, 105:4, 105:6, 105:25, 106:6, 112:11, 121:7, 125:7, 125:11, 133:6, 133:16, 133:17, 139:16, 139:21, 142:6, 143:6, 143:11, 143:18, 143:20, 147:10, 147:13, 147:23, 151:24, 152:2, 152:16, 154:6, 154:22, 155:4, 155:7, 155:12, 155:18, 156:13, 156:14, 159:1, 161:3, 161:12, 162:10
**less** [1] - 104:10
**letter** [4] - 11:20, 15:9, 15:17, 98:11
**letters** [2] - 101:4, 101:6
**liability** [1] - 129:11
**lie** [1] - 121:1
**lien** [1] - 80:15
**lieu** [2] - 54:16, 82:21
**Lim** [1] - 73:7
**lim's** [1] - 73:13
**limited** [3] - 19:21, 104:2, 129:11
**line** [15] - 5:15, 21:25, 54:13, 54:24, 55:2, 56:10, 87:2, 93:2, 93:7, 93:12, 122:19, 122:22, 122:23, 123:4, 123:6
**lined** [1] - 81:19
**lines** [2] - 52:7, 65:9
**list** [2] - 75:16, 143:24
**listed** [15] - 47:6, 47:11, 48:7, 48:17, 54:19, 55:8, 56:13, 62:2, 110:14, 119:5, 119:7, 119:9, 142:23, 156:2, 156:4
**listing** [2] - 75:6
**lists** [1] - 144:9
**litany** [1] - 70:21
**litigation** [8] - 60:6, 63:9,

69:14, 69:23, 69:25, 132:2, 132:3, 132:11
**litigations** [1] - 145:12
**lived** [3] - 90:9, 145:1, 145:2
**living** [1] - 105:24
**LLC** [32] - 27:24, 28:17, 30:11, 30:22, 32:15, 32:18, 37:18, 45:6, 47:6, 47:8, 47:11, 47:13, 56:24, 59:9, 59:14, 61:14, 109:3, 113:10, 114:1, 117:11, 122:14, 128:20, 129:3, 129:15, 131:17, 134:16, 141:4, 141:17, 146:2, 147:1, 153:16, 154:13
**LLCs** [2] - 87:21, 142:1
**loan** [72] - 33:7, 33:8, 33:17, 34:2, 34:4, 34:8, 34:12, 34:19, 34:24, 38:1, 38:3, 38:5, 38:9, 39:16, 40:19, 40:21, 41:9, 41:18, 44:18, 59:20, 59:21, 61:3, 65:6, 66:3, 68:14, 68:24, 70:4, 71:25, 75:21, 76:14, 76:22, 77:11, 77:14, 77:17, 80:21, 81:10, 81:13, 81:19, 81:23, 81:25, 82:2, 82:4, 88:7, 88:19, 90:17, 94:22, 118:16, 119:2, 121:17, 136:8, 136:12, 136:15, 136:17, 137:2, 137:3, 137:8, 137:12, 137:13, 137:17, 137:19, 137:20, 138:9, 138:12, 138:15, 138:18, 138:24, 139:4, 139:22, 141:22, 148:10, 148:17
**loaned** [5] - 42:24, 57:16, 136:19, 136:23, 136:25
**loaning** [2] - 134:18, 136:14
**loans** [44] - 33:12, 33:14, 34:6, 35:1, 35:3, 38:12, 38:14, 38:22, 39:5, 39:19, 39:25, 40:17, 42:12, 44:10, 54:14, 65:25, 68:23, 69:1, 69:3, 69:8, 69:12, 69:14, 75:12, 76:15, 76:16, 76:24, 77:14, 88:10, 116:2, 116:3, 117:16, 117:18, 117:22, 117:23, 118:9, 118:10, 131:9, 131:15, 134:6, 134:8, 135:1, 135:10, 135:15, 136:3
**LOC** [1] - 54:5
**local** [1] - 73:8
**locate** [1] - 87:18
**located** [3] - 35:9, 103:15, 105:22

**lockout** [1] - 108:21
**look** [24] - 12:23, 15:9, 24:9, 30:6, 42:13, 43:6, 43:22, 43:23, 46:24, 50:6, 54:4, 67:4, 68:3, 70:9, 71:12, 73:23, 74:24, 77:19, 91:10, 129:8, 130:15, 140:10, 140:11, 159:13
**looked** [1] - 21:4
**looking** [10] - 101:3, 105:7, 143:21, 147:24, 152:24, 153:8, 154:19, 155:8, 155:11, 155:19
**looks** [2] - 60:20, 102:11
**Los** [15] - 4:19, 6:3, 6:21, 7:1, 9:4, 10:24, 16:21, 19:3, 24:5, 48:6, 48:10, 48:16, 56:10, 67:10, 67:20
**lost** [3] - 82:2, 129:24, 140:20
**loud** [3] - 89:19, 89:20, 89:23
**Lucas** [67] - 4:20, 5:9, 6:5, 7:1, 9:5, 16:22, 24:6, 28:1, 28:14, 32:21, 33:17, 34:3, 34:8, 34:25, 37:21, 40:23, 41:2, 41:8, 41:18, 41:21, 42:5, 45:8, 47:16, 48:6, 48:11, 48:13, 48:21, 49:13, 56:12, 56:21, 58:18, 59:5, 59:9, 59:14, 61:14, 62:3, 62:11, 62:15, 62:19, 62:22, 63:11, 63:14, 64:19, 64:20, 64:22, 65:15, 68:21, 74:5, 76:15, 77:8, 78:12, 93:24, 109:14, 110:14, 112:1, 112:25, 113:4, 116:2, 120:1, 133:19, 145:22, 146:19, 146:24, 149:3, 156:2, 156:5, 158:2
**lunch** [2] - 84:7, 84:9

**M**

**ma'am** [13] - 93:17, 96:7, 97:19, 103:20, 104:6, 104:17, 107:16, 108:20, 109:12, 109:19, 110:25, 124:15, 124:18
**MADELINE** [1] - 1:16
**Madeline** [1] - 3:8
**mail** [44] - 32:24, 67:6, 67:8, 70:16, 70:22, 72:14, 74:15, 75:2, 75:3, 75:10, 75:14, 76:12, 76:25, 77:3, 79:16, 80:9, 81:18, 81:20, 92:9, 92:12, 92:13, 112:13, 112:16, 120:22, 120:24, 135:13, 135:16, 136:2, 136:4, 148:13, 153:9,

153:11, 153:15, 153:17, 153:24, 154:7, 154:11, 154:14, 154:19, 154:21, 155:19, 155:20
**mailed** [1] - 136:2
**mails** [19] - 19:3, 52:25, 68:13, 80:10, 80:24, 92:3, 92:8, 105:20, 106:12, 110:18, 111:7, 119:10, 136:5, 152:17, 152:25, 153:1, 153:4, 153:25, 154:1
**main** [1] - 59:1
**maintained** [6] - 40:10, 51:17, 51:20, 53:25, 56:2, 58:22
**Makika** [11] - 31:15, 31:21, 32:1, 65:5, 68:20, 75:8, 76:5, 78:9, 88:9, 88:15, 116:13
**managed** [2] - 55:21, 59:4
**management** [3] - 46:9, 114:2, 150:6
**Management** [15] - 8:20, 8:21, 51:17, 113:1, 113:5, 113:13, 113:18, 113:21, 115:12, 143:17, 150:4, 150:5, 150:9, 151:13, 159:22
**manager** [1] - 67:10
**managing** [7] - 30:14, 30:22, 69:19, 88:5, 88:9, 122:7, 158:7
**Manfredi** [2] - 69:21, 117:11
**manner** [1] - 42:7
**Mar** [28] - 4:19, 5:9, 6:4, 6:22, 7:1, 9:5, 16:21, 24:7, 42:5, 48:17, 50:10, 50:14, 54:20, 54:25, 63:10, 64:18, 80:12, 80:16, 81:19, 82:3, 99:24, 126:22, 149:11, 150:6, 150:7, 150:11, 150:17, 160:8
**March** [9] - 33:15, 34:7, 64:24, 65:4, 65:22, 74:4, 94:11, 96:17
**mark** [2] - 46:13, 129:10
**marked** [12] - 42:14, 46:11, 46:24, 77:19, 91:4, 92:23, 95:1, 101:1, 102:5, 104:25, 128:19, 155:5
**Markowitz** [9] - 113:25, 114:3, 114:6, 114:9, 114:22, 115:6, 116:5, 131:16, 152:5
**Martin** [1] - 102:25
**Mary** [1] - 2:20
**Masoud** [1] - 34:9
**matches** [1] - 79:23

**material** [2] - 36:9, 43:17
**materiality** [4] - 101:13, 101:15, 102:14, 102:18
**math** [1] - 157:2
**Mathew** [1] - 42:20
**matter** [4] - 25:13, 45:14, 45:19, 98:21
**matters** [6] - 4:25, 6:25, 7:21, 8:4, 9:17, 9:22
**Mattias** [1] - 124:19
**McKee** [6] - 53:4, 53:6, 53:8, 53:19, 70:16, 70:21
**mean** [7] - 37:24, 49:4, 51:5, 60:11, 61:21, 72:20, 140:12
**means** [1] - 60:8
**meant** [1] - 23:17
**mechanical** [1] - 2:25
**media** [1] - 7:14
**mediation** [1] - 145:17
**meet** [4] - 106:24, 107:14, 107:20, 107:23
**meeting** [2] - 106:13, 115:24
**meetings** [1] - 138:8
**Melville** [1] - 42:19
**member** [13] - 30:14, 30:22, 88:6, 88:9, 117:1, 117:3, 117:7, 117:9, 122:7, 140:23, 141:2, 141:18, 158:7
**members** [4] - 46:2, 46:8, 47:3, 146:25
**Memorial** [1] - 1:21
**memorialize** [3] - 107:4, 139:4, 151:11
**memorialized** [4] - 72:13, 116:8, 139:1, 139:2
**memory** [1] - 11:5
**men** [1] - 103:3
**mention** [3] - 70:22, 92:19, 109:6
**mentioned** [2] - 5:7, 136:23
**message** [1] - 80:13
**met** [6] - 44:14, 106:23, 107:24, 122:24, 138:5, 146:11
**Mexican** [1] - 75:8, 96:25, 142:14, 142:16, 142:20, 143:4, 145:14, 149:1, 150:1
**Mexico** [29] - 32:3, 42:9, 42:25, 44:8, 48:22, 49:13, 52:16, 55:21, 57:9, 57:24, 59:21, 59:23, 60:6, 60:17, 61:4, 61:8, 62:24, 67:20, 70:2, 78:3, 94:6, 96:24, 121:8, 121:11, 123:20, 132:2, 132:11, 139:9,

141:23
**Michael** [4] - 59:3, 59:4, 102:25, 119:18
**microphone** [1] - 89:21
**middle** [1] - 159:14
**might** [4] - 16:17, 16:18, 39:20, 160:20
**mill** [6] - 35:15, 35:17, 35:21, 71:20, 72:8, 73:5
**million** [67] - 28:16, 30:9, 31:8, 33:16, 33:18, 33:20, 33:25, 34:12, 35:16, 49:11, 50:18, 56:23, 59:20, 60:21, 61:3, 67:17, 67:18, 72:3, 77:10, 77:25, 80:15, 81:13, 81:19, 81:25, 86:23, 87:1, 87:4, 87:14, 109:15, 110:8, 111:17, 112:4, 118:8, 120:2, 120:3, 131:25, 132:7, 133:20, 133:22, 134:1, 135:23, 135:25, 137:8, 137:12, 138:9, 138:24, 139:4, 140:6, 141:12, 141:14, 141:22, 142:13, 144:13, 149:22, 156:6, 156:16, 156:19, 156:23, 157:16, 159:3, 159:11, 159:16, 159:20, 159:24
**min** [1] - 35:13
**Mineola** [1] - 2:3
**minute** [1] - 137:16
**minutes** [1] - 49:21
**Miskiewicz** [4] - 13:9, 18:23, 19:17, 19:20
**misread** [1] - 26:1
**misrepresentation** [1] - 123:9
**misrepresentations** [1] - 19:11
**misrepresented** [1] - 122:19
**misrepresents** [1] - 70:17
**missing** [1] - 153:1
**misstating** [1] - 120:7
**mistake** [1] - 127:10
**misunderstood** [1] - 35:2
**mixing** [2] - 10:10, 115:21
**Moanna** [1] - 117:11
**moment** [6] - 14:25, 24:1, 32:2, 49:17, 79:25, 125:8
**monetary** [1] - 38:20
**money** [90] - 8:22, 8:25, 11:4, 11:5, 11:13, 15:12, 15:14, 15:15, 17:3, 17:6, 17:18, 17:20, 17:23, 17:24, 18:13, 19:12, 20:8, 20:10, 20:12, 20:16, 21:18, 22:5, 22:8, 22:11, 22:15, 22:19, 22:20, 22:25, 23:16, 23:21,

23:22, 24:13, 24:14, 24:18, 28:22, 31:5, 32:1, 32:7, 33:1, 33:21, 34:15, 34:16, 37:21, 37:23, 37:25, 40:12, 42:8, 42:22, 42:24, 44:6, 44:24, 53:3, 53:18, 53:19, 54:24, 55:3, 57:5, 57:7, 57:20, 58:16, 59:15, 59:19, 60:22, 61:16, 64:14, 65:16, 68:17, 72:12, 73:19, 77:7, 77:14, 78:17, 79:4, 80:22, 81:12, 81:14, 109:13, 114:7, 116:12, 117:16, 134:15, 134:18, 135:5, 136:14, 145:7, 158:1, 160:6, 160:10
**monies** [26] - 32:8, 40:9, 41:9, 52:6, 53:14, 53:24, 55:8, 55:17, 55:19, 56:13, 56:17, 61:22, 62:2, 62:10, 65:9, 68:24, 69:4, 75:12, 76:16, 78:14, 79:3, 79:20, 94:14, 117:25, 124:21, 136:25
**month** [3] - 82:2, 106:7, 116:9
**months** [7] - 12:21, 33:23, 43:4, 76:10, 91:18, 131:4, 146:20
**Moreau** [5] - 52:21, 52:24, 53:21, 57:1, 57:2
**morning** [6] - 3:9, 3:10, 3:13, 3:16, 27:3, 27:4
**mortgage** [4] - 8:23, 19:18, 36:25, 71:3
**Mosquito** [1] - 48:16
**most** [2] - 25:15, 70:17
**mother** [1] - 52:12
**motion** [2] - 93:5, 97:4
**move** [9] - 36:15, 88:23, 89:20, 99:3, 139:16, 142:6, 143:7, 147:10, 151:24
**moved** [3] - 89:8, 89:13, 90:2
**moving** [1] - 143:10
**MR** [89] - 3:11, 3:13, 3:22, 3:24, 14:22, 15:20, 23:25, 25:12, 26:1, 26:9, 26:11, 26:21, 27:2, 29:8, 29:13, 29:15, 29:18, 29:20, 29:24, 30:3, 30:5, 39:4, 39:13, 40:6, 40:7, 46:10, 46:16, 46:22, 49:17, 49:19, 50:1, 50:4, 50:5, 64:10, 64:12, 66:20, 66:23, 67:1, 67:3, 68:4, 68:7, 71:6, 71:10, 71:11, 79:11, 79:25, 80:3, 83:6, 83:20, 84:6, 85:7, 91:7, 91:22, 91:23, 95:7, 95:12, 95:14, 95:17, 95:18,

101:13, 101:16, 102:13, 102:20, 106:2, 106:3, 112:7, 112:9, 115:13, 115:18, 121:6, 121:9, 124:10, 153:22, 154:3, 154:25, 155:1, 155:14, 155:15, 156:11, 158:22, 160:13, 160:18, 160:20, 160:25, 161:5, 161:10, 161:11, 161:13, 162:7
**MS** [82] - 3:7, 11:10, 12:15, 16:25, 17:9, 17:12, 17:21, 18:11, 18:18, 19:13, 19:16, 20:9, 21:10, 21:24, 22:12, 23:6, 30:1, 31:2, 38:23, 46:19, 70:5, 83:16, 85:18, 85:21, 88:23, 89:1, 89:22, 90:1, 91:5, 91:9, 91:20, 92:1, 92:22, 94:25, 95:10, 95:22, 99:3, 99:13, 100:25, 101:11, 101:21, 102:4, 102:7, 102:12, 102:23, 104:24, 105:4, 105:6, 105:25, 106:6, 112:11, 121:7, 125:7, 125:11, 133:6, 133:16, 133:17, 139:16, 139:21, 142:6, 143:6, 143:11, 143:18, 143:20, 147:10, 147:13, 147:23, 151:24, 152:2, 152:16, 154:6, 154:22, 155:4, 155:7, 155:12, 155:18, 156:13, 156:14, 159:1, 161:3, 161:12, 162:10
**multiple** [3] - 44:14, 64:22, 134:21
**Murray** [9] - 57:5, 57:7, 57:16, 58:9, 99:15, 99:17, 124:19, 139:12, 139:13
**museum** [1] - 73:10
**myerick** [1] - 86:1
**Myerick** [2] - 86:3, 86:4
**myriad** [3] - 6:20, 78:25

**N**

**Na'Alehu** [4] - 35:10, 35:24, 69:19, 141:9
**nail** [1] - 14:23
**Najam** [18] - 75:5, 75:9, 75:14, 76:10, 76:13, 76:17, 76:20, 76:23, 113:25, 114:3, 114:5, 116:5, 131:16, 152:5, 153:11, 154:8, 154:11, 154:16
**name** [15] - 26:18, 56:19, 67:15, 105:15, 109:10, 125:19, 127:22, 127:24, 140:19, 141:6, 143:1,

144:23, 145:3, 145:5, 149:16
**named** [2] - 19:8, 55:22
**names** [1] - 51:14
**Nath** [2] - 103:1, 103:2
**nature** [7] - 21:14, 44:12, 46:4, 53:16, 57:14, 57:15, 79:2
**near** [1] - 55:21
**necessarily** [3] - 4:4, 19:22, 132:4
**necessary** [2] - 98:11, 148:16
**need** [7] - 12:10, 26:7, 34:16, 60:12, 66:24, 136:10, 158:23
**needed** [2] - 69:25, 119:24
**neglects** [1] - 70:22
**negotiated** [1] - 79:13
**negotiating** [1] - 80:18
**negotiations** [2] - 34:10, 94:12
**net** [3] - 155:22, 157:1, 159:11
**Nevada** [6] - 57:6, 89:15, 90:7, 90:9, 108:12, 139:13
**never** [15] - 65:22, 94:2, 94:6, 97:23, 112:16, 120:1, 121:13, 122:5, 123:3, 123:7, 134:17, 137:7, 138:12, 145:5, 149:14
**nevertheless** [1] - 20:1
**NEW** [1] - 1:1
**new** [5] - 63:8, 118:13, 122:22, 125:1, 131:17
**New** [5] - 1:6, 1:15, 2:21, 43:13, 69:24
**next** [5] - 52:2, 59:3, 60:19, 67:15, 107:3
**NHL** [1] - 108:7
**Nicholas** [1] - 130:25
**night** [1] - 161:17
**nine** [2] - 65:19, 68:19
**Nizhny** [1] - 123:18
**nobody** [1] - 152:8
**Nolan** [6] - 44:2, 58:13, 58:15, 58:25, 86:7, 127:8
**Nolan's** [1] - 87:1
**Nolans** [4] - 86:13, 86:17, 86:21, 87:5
**Nolans'** [1] - 87:17
**non** [4] - 99:4, 109:1, 139:17, 151:25
**non-playing** [1] - 109:1
**non-responsive** [3] - 99:4, 139:17, 151:25
**none** [9] - 31:20, 31:25, 32:6, 45:12, 45:15, 45:18, 45:22, 81:7, 109:17
**Norstrom** [1] - 124:19

**norstrom** [1] - 64:23
**northern** [4] - 50:10, 50:14, 51:1, 54:20
**Northern** [7] - 54:13, 122:20, 122:21, 123:2, 123:4, 123:5, 123:7
**notarized** [1] - 84:1
**note** [20] - 5:5, 12:18, 85:16, 93:13, 93:18, 93:21, 93:22, 94:4, 94:7, 95:5, 106:21, 115:1, 131:10, 138:16, 138:21, 146:6, 146:17, 147:17, 151:14, 151:19
**notes** [24] - 38:21, 38:25, 39:8, 39:10, 39:11, 39:14, 39:15, 42:18, 43:10, 43:19, 85:13, 109:6, 109:7, 109:11, 114:24, 126:9, 131:19, 138:13, 146:1, 146:9, 146:20, 147:13, 158:3, 158:10
**nothing** [10] - 19:10, 23:14, 48:4, 66:11, 68:2, 73:16, 112:5, 141:23, 151:11
**notice** [1] - 23:15
**noticed** [1] - 79:2
**notify** [1] - 81:24
**notwithstanding** [5] - 14:3, 24:25, 36:23, 97:14, 97:17
**November** [8] - 49:3, 49:7, 80:13, 81:20, 97:22, 135:20, 135:21, 136:17
**Novgord** [1] - 123:18
**nowhere** [1] - 24:3
**number** [22] - 4:12, 29:15, 33:1, 50:21, 52:7, 54:8, 54:10, 54:18, 59:5, 61:7, 82:12, 82:22, 85:22, 94:17, 96:18, 101:19, 123:20, 124:3, 124:16, 137:13, 141:3, 153:1
**numbered** [1] - 101:8
**numbers** [5] - 50:16, 55:18, 62:20, 101:9, 136:21
**NY** [3] - 1:22, 2:3, 2:7

**O**

**O'Connor** [2] - 3:8, 19:14
**O'CONNOR** [7] - 1:16, 19:16, 20:9, 21:10, 21:24, 22:12, 23:6
**oath** [1] - 44:5
**object** [5] - 15:17, 85:16, 112:7, 112:9, 158:22
**objected** [3] - 39:4, 39:6, 39:9

**objecting** [2] - 13:7, 13:14
**objection** [37] - 5:25, 9:8, 16:6, 31:2, 38:23, 38:25, 39:7, 39:10, 39:17, 39:21, 39:23, 40:1, 40:3, 46:18, 46:19, 70:5, 85:11, 85:14, 91:22, 91:23, 95:6, 95:8, 95:13, 95:14, 95:16, 101:14, 101:16, 102:15, 102:20, 106:2, 106:3, 153:22, 154:24, 155:1, 155:14, 155:15
**objections** [3] - 4:12, 13:23, 14:3
**observation** [1] - 34:17
**obstructed** [1] - 98:17
**obstruction** [1] - 96:20
**obtained** [1] - 103:9
**obvious** [1] - 65:8
**obviously** [2] - 14:16, 19:2
**occasion** [2] - 13:10, 137:20
**occasionally** [1] - 85:10
**occasions** [3] - 42:10, 44:14, 60:17
**occur** [3] - 6:24, 123:15, 146:24
**occurred** [5] - 5:12, 5:17, 35:20, 98:1, 115:24
**occurring** [1] - 97:3
**Oceanside** [1] - 2:7
**October** [3] - 43:10, 52:9, 70:16
**OF** [3] - 1:1, 1:3, 1:10
**offense** [1] - 22:15
**offer** [12] - 46:11, 84:4, 91:20, 95:1, 95:9, 95:11, 101:11, 102:12, 105:25, 153:25, 154:22, 155:12
**offered** [1] - 92:4
**office** [2] - 42:19, 106:16
**officer** [1] - 4:11
**officers** [1] - 72:9
**often** [3] - 137:11, 138:6, 138:7
**oil** [1] - 35:19
**Old** [1] - 2:3
**old** [2] - 72:8, 103:3
**OLIVERAS** [1] - 2:6
**Oliveris** [1] - 3:14
**once** [8] - 7:6, 7:14, 24:8, 39:24, 88:21, 94:6, 111:15, 122:15
**One** [1] - 1:21
**one** [57] - 5:3, 7:13, 10:15, 12:24, 13:1, 13:10, 14:18, 18:12, 23:12, 23:17, 25:13, 25:22, 32:12, 32:23, 33:16, 33:20, 35:16, 36:6, 49:9, 51:11, 56:5, 56:7, 57:2,

59:7, 63:16, 66:25, 70:20, 72:9, 73:1, 74:18, 74:22, 75:24, 76:5, 77:10, 77:24, 80:9, 80:24, 89:14, 92:6, 93:25, 107:22, 112:3, 112:13, 113:14, 123:14, 126:3, 127:12, 131:24, 134:19, 136:1, 136:11, 137:19, 138:18, 141:8, 142:14, 142:16
**one-third** [1] - 126:3
**ones** [1] - 100:12
**ongoing** [1] - 62:23
**open** [1] - 131:17
**opening** [1] - 32:11
**operating** [8] - 41:2, 57:4, 61:19, 62:18, 66:7, 77:13, 125:2, 139:24
**operational** [1] - 62:24
**opportunity** [3] - 7:4, 10:3, 153:7
**oral** [1] - 112:19
**oranges** [1] - 10:10
**order** [6] - 31:6, 32:22, 87:13, 97:22, 98:3, 107:4
**ordered** [4] - 90:12, 97:21, 98:4, 98:5
**original** [17] - 7:22, 8:12, 9:15, 15:5, 27:7, 27:13, 79:12, 92:18, 93:21, 94:2, 94:7, 94:8, 97:5, 117:13, 118:16, 123:1, 149:2
**originally** [14] - 36:8, 68:15, 101:24, 113:6, 117:9, 117:18, 118:10, 120:20, 125:16, 136:14, 141:1, 142:19, 143:1, 143:5
**otherwise** [3] - 14:4, 99:11, 102:14
**ought** [6] - 6:17, 6:24, 8:9, 15:1, 15:3, 153:23
**out-of-court** [1] - 53:2
**outside** [1] - 140:16
**outstanding** [2] - 81:12, 116:3
**overall** [2] - 20:2, 119:21
**overlap** [1] - 12:2
**overruled** [2] - 31:3, 70:7
**owe** [5] - 86:21, 146:25, 158:13, 158:16, 158:18
**owed** [3] - 33:1, 86:12, 94:14
**Owen** [3] - 44:2, 58:13, 86:7
**own** [14] - 53:20, 57:21, 58:19, 65:12, 90:5, 118:23, 118:25, 121:20, 122:10, 129:17, 142:21, 144:17, 145:10, 145:22

**owned** [9] - 36:20, 36:24, 126:3, 128:4, 144:17, 145:9, 150:7, 159:22, 160:9
**owner** [7] - 110:15, 142:24, 143:13, 148:21, 148:24, 151:13
**owners** [2] - 53:6, 73:2
**ownership** [21] - 28:25, 31:7, 62:14, 73:3, 79:13, 87:20, 113:14, 115:4, 115:10, 115:22, 120:19, 127:2, 129:22, 141:10, 143:4, 149:5, 150:10, 154:12, 159:19, 160:7
**owns** [2] - 120:10, 120:14

## P

**page** [16] - 5:15, 11:20, 30:12, 30:21, 74:7, 81:4, 105:3, 105:4, 105:7, 118:15, 121:10, 127:16, 130:19, 147:16, 148:13, 155:19
**Page** [2] - 162:3, 162:13
**pages** [1] - 100:7
**paid** [10] - 67:18, 79:21, 88:11, 96:25, 118:1, 121:17, 151:16, 157:20, 157:21, 158:9
**paint** [1] - 62:5
**Palms** [40] - 4:19, 5:6, 5:8, 5:19, 6:3, 6:21, 7:1, 9:4, 10:24, 16:21, 18:1, 18:6, 18:16, 18:23, 18:24, 18:25, 19:1, 19:21, 19:22, 20:1, 20:7, 20:11, 21:6, 21:7, 21:18, 21:21, 22:1, 22:6, 22:7, 22:10, 22:11, 24:5, 52:2, 52:20, 53:6, 53:15, 55:7, 70:15, 70:19
**Palsm** [1] - 5:17
**Pamela** [1] - 128:1
**panel** [5] - 82:18, 83:5, 83:25, 86:21, 86:25
**Pappas** [1] - 102:25
**paramount** [1] - 63:18
**paraphrasing** [1] - 5:5
**parcel** [7] - 37:25, 53:23, 71:21, 73:4, 73:9, 110:1, 136:24
**parent** [2] - 69:20, 141:9
**parenthetically** [1] - 63:1
**part** [37] - 4:15, 5:6, 5:19, 5:24, 6:22, 12:4, 15:18, 20:2, 20:10, 20:12, 24:2, 24:17, 25:22, 35:12, 37:25, 42:3, 53:22, 56:23, 61:2,

65:24, 65:25, 66:3, 68:10, 69:3, 69:8, 70:18, 71:21, 83:22, 100:6, 110:1, 119:9, 131:4, 136:24, 139:22, 139:25, 140:23, 142:24
**parte** [2] - 97:4, 97:11
**partial** [1] - 40:20
**particular** [11] - 19:18, 19:19, 19:21, 35:25, 53:21, 67:14, 68:9, 73:3, 82:4, 105:3, 139:11
**particulars** [17] - 7:23, 8:2, 9:7, 9:15, 13:24, 27:11, 27:17, 32:14, 35:8, 37:6, 37:8, 37:12, 45:4, 47:5, 47:10, 48:5, 48:15
**parties** [1] - 35:6
**partner** [4] - 34:13, 69:19, 72:5, 109:21
**partners** [1] - 111:25
**party** [4] - 58:10, 60:7, 139:15, 158:8
**passed** [1] - 46:1
**past** [2] - 33:2, 158:9
**patient** [1] - 15:22
**Pause** [12] - 30:4, 46:25, 80:2, 92:24, 101:2, 105:1, 124:8, 125:10, 148:4, 152:19, 152:22, 155:6
**pause** [2] - 91:13, 102:6
**pay** [16] - 81:10, 81:11, 81:14, 87:13, 88:21, 93:22, 114:7, 117:19, 117:23, 118:12, 131:9, 131:20, 142:15, 146:23, 157:19, 157:25
**paying** [6] - 44:24, 73:15, 115:25, 117:22, 131:14, 156:20
**payment** [2] - 8:23, 65:21
**payments** [10] - 36:25, 53:10, 54:16, 65:17, 65:18, 65:19, 65:24, 68:19, 71:3, 94:10
**Peca** [15] - 5:17, 19:19, 21:2, 21:17, 21:20, 21:22, 53:4, 53:5, 53:8, 53:18, 59:3, 59:4, 71:5, 74:22, 119:18
**Peca's** [3] - 20:1, 53:10, 74:3
**pending** [4] - 72:3, 98:20, 98:22, 99:7
**penthouse** [1] - 53:7
**people** [8] - 19:11, 33:1, 52:11, 63:21, 77:13, 135:7, 135:8, 146:6
**percent** [36] - 78:12, 79:7, 79:15, 79:19, 93:20, 110:15, 111:7, 118:1,

118:23, 118:25, 119:3, 119:4, 119:11, 119:20, 119:21, 119:22, 119:23, 120:2, 120:4, 120:10, 120:14, 120:20, 120:21, 143:13, 148:21, 148:24, 149:5, 149:10, 151:13, 151:21, 153:16, 156:24, 159:20, 159:23, 160:7
**percentage** [3] - 141:10, 150:7, 157:3
**percentages** [1] - 122:1
**perhaps** [10] - 5:18, 6:22, 8:10, 53:13, 57:12, 65:8, 75:24, 140:11, 159:7, 161:7
**period** [6] - 68:15, 68:18, 72:7, 117:10, 146:11, 150:19
**periods** [1] - 137:14
**permission** [1] - 26:22
**permitted** [1] - 153:23
**person** [6] - 21:19, 21:21, 59:1, 93:22, 122:8, 146:12
**personal** [16] - 44:11, 48:25, 53:20, 53:22, 57:21, 57:24, 58:19, 59:6, 118:11, 122:10, 142:22, 148:2, 148:5, 156:11, 157:1, 159:2
**personally** [1] - 136:23
**perspective** [7] - 6:16, 8:4, 25:15, 30:25, 67:12, 70:13, 71:17
**petroleum** [2] - 35:19, 72:4
**phase** [3] - 33:16, 33:20, 77:10
**phases** [1] - 36:7
**PHIL** [2] - 26:13, 162:5
**Phil** [28] - 3:11, 3:12, 26:20, 26:23, 27:3, 27:5, 29:1, 30:6, 30:24, 34:17, 35:7, 49:14, 50:6, 51:4, 53:12, 54:4, 56:16, 64:1, 67:4, 68:8, 68:23, 70:9, 71:16, 76:12, 78:23, 80:5, 82:5, 88:16
**PHILLIP** [1] - 1:7
**phone** [6] - 72:14, 75:15, 108:12, 110:22, 122:25, 138:3
**phrase** [1] - 7:8
**pick** [1] - 160:14
**piece** [1] - 149:3
**PK** [6] - 100:22, 101:8, 148:17, 153:8, 157:12
**place** [1] - 123:18
**placed** [2] - 6:17, 24:14
**plaintiffs** [2] - 63:6, 73:1
**plans** [1] - 142:14

**played** [2] - 108:6, 108:24

**player** [9] - 5:1, 6:3, 19:1, 45:8, 63:2, 68:25, 69:2, 69:10, 134:17

**players** [10] - 17:25, 18:7, 19:19, 22:10, 23:1, 94:17, 134:10, 134:12, 134:14, 134:21

**playing** [5] - 107:10, 107:15, 107:20, 108:17, 109:1

**Plaza** [2] - 1:15, 2:20

**pledged** [2] - 128:12, 128:13

**plus** [1] - 118:1

**point** [27] - 5:3, 8:5, 9:23, 9:25, 10:2, 17:3, 19:14, 23:25, 28:12, 31:16, 38:17, 43:14, 46:14, 65:2, 96:13, 96:16, 113:14, 114:8, 116:3, 116:4, 117:24, 128:12, 131:24, 141:3, 144:21, 151:4

**pointed** [1] - 12:25

**points** [1] - 36:23

**portion** [14] - 49:11, 49:12, 59:19, 64:3, 85:16, 88:8, 88:24, 99:4, 109:16, 139:17, 145:9, 145:10, 151:25

**position** [8] - 6:18, 25:5, 30:11, 30:20, 63:7, 69:14, 111:24, 119:14

**positions** [1] - 116:7

**possession** [8] - 46:17, 50:2, 76:25, 77:2, 84:3, 93:10, 121:4, 136:6

**possible** [1] - 99:24

**post** [2] - 45:3, 125:1

**post-global** [1] - 125:1

**potentially** [2] - 14:19, 22:20

**power** [2] - 74:13, 105:11

**practice** [3] - 74:15, 109:1, 137:25

**pre** [1] - 52:24

**pre-development** [1] - 52:24

**preceded** [1] - 9:7

**preface** [1] - 78:23

**prefer** [1] - 25:14

**preferred** [2] - 157:19, 157:24

**prejudice** [4] - 7:9, 16:12, 25:7, 96:10

**prejudiced** [1] - 10:1

**prepare** [4] - 140:7, 140:9, 140:12, 144:2

**prepared** [4] - 6:1, 7:19, 9:13, 144:4

**preparing** [1] - 149:25

**preponderance** [1] - 20:4

**present** [8] - 3:17, 13:25, 20:25, 23:20, 41:3, 94:15, 94:19, 153:7

**presented** [7] - 7:6, 21:12, 32:24, 71:17, 83:24, 84:1, 112:22

**presentence** [8] - 4:7, 4:10, 4:13, 4:17, 12:5, 13:5, 26:1, 26:5

**presenting** [1] - 20:22

**presents** [1] - 6:24

**pretty** [2] - 81:6, 126:16

**prevailed** [1] - 139:13, 139:14

**previous** [3] - 116:22, 119:8, 135:24

**previously** [8] - 13:22, 29:20, 46:10, 50:13, 103:21, 127:4, 145:25, 159:21

**primarily** [1] - 49:1

**private** [3] - 60:11, 143:22, 143:24

**pro** [2] - 58:10, 139:14

**probation** [1] - 26:4

**problem** [1] - 25:20

**problematic** [1] - 21:7

**problems** [3] - 70:25, 99:1, 122:9

**procedural** [2] - 13:23, 14:3

**procedurally** [2] - 10:1, 12:24

**procedure** [2] - 10:2, 60:9

**proceed** [6] - 3:21, 9:12, 13:20, 15:18, 16:7, 60:17

**proceeding** [20] - 11:7, 12:25, 25:3, 53:13, 59:24, 59:25, 60:14, 82:5, 82:9, 86:7, 86:11, 91:1, 92:5, 99:20, 100:6, 104:12, 104:14, 105:23, 111:20, 123:25

**PROCEEDINGS** [1] - 1:10

**proceedings** [19] - 11:23, 30:4, 46:25, 80:2, 85:23, 91:13, 92:24, 94:3, 101:2, 102:6, 105:1, 111:17, 124:8, 125:10, 148:4, 152:19, 152:22, 155:6, 161:18

**Proceedings** [1] - 2:25

**proceeds** [2] - 72:11, 82:1

**process** [2] - 6:10, 10:2

**produce** [1] - 135:18

**produced** [6] - 2:25, 82:10, 100:7, 100:11, 100:12, 111:10

**production** [1] - 100:14

**professed** [1] - 38:12

**profit** [3] - 35:23, 71:24, 72:9

**prohibited** [1] - 121:15

**project** [39] - 28:1, 32:21, 36:2, 36:7, 36:13, 44:7, 45:9, 47:19, 48:10, 48:11, 48:12, 49:2, 51:13, 52:18, 55:21, 56:10, 56:21, 61:7, 61:24, 62:19, 64:18, 64:23, 67:10, 67:21, 69:22, 73:21, 76:22, 78:12, 79:15, 79:18, 80:12, 80:16, 115:10, 116:2, 116:25, 119:12, 150:13, 160:8

**projects** [2] - 75:5, 75:9, 142:21

**promise** [3] - 112:19, 118:18, 146:23

**promised** [3] - 114:7, 151:22, 157:25

**promises** [1] - 68:16

**promising** [1] - 113:8

**promissory** [40] - 28:23, 30:9, 30:19, 59:16, 75:20, 78:4, 93:13, 93:18, 93:21, 94:7, 106:21, 109:6, 109:7, 109:11, 110:12, 112:23, 114:9, 114:24, 115:1, 122:14, 126:9, 131:10, 131:19, 138:13, 138:16, 142:1, 146:1, 146:6, 146:9, 146:17, 146:20, 147:13, 147:17, 151:14, 151:19, 156:7, 156:18, 157:17, 158:3, 158:10

**proof** [7] - 6:9, 6:25, 9:20, 13:19, 18:3, 83:13, 84:4

**properly** [4] - 59:13, 61:18, 62:17, 66:7

**Properties** [32] - 32:15, 32:18, 32:25, 45:2, 45:5, 45:24, 46:2, 46:8, 46:9, 47:3, 47:6, 47:8, 57:4, 64:23, 119:15, 119:18, 119:21, 120:10, 120:14, 120:17, 120:21, 134:1, 154:19

**properties** [24] - 7:25, 8:2, 9:14, 11:2, 11:5, 12:8, 13:2, 13:3, 14:2, 14:5, 14:7, 14:16, 14:18, 20:15, 23:1, 23:4, 24:15, 24:16, 27:6, 27:12, 32:12, 32:13, 45:3, 143:4

**property** [63] - 23:6, 27:18, 27:19, 28:14, 33:17, 33:25, 34:3, 34:5, 34:20, 35:7, 35:11, 35:14, 35:15, 35:16,

17:35:17, 35:22, 35:25, 36:1, 36:5, 36:12, 36:17, 36:20, 36:24, 37:9, 37:21, 47:6, 47:11, 47:16, 48:8, 48:10, 48:16, 48:20, 48:21, 48:24, 49:5, 49:8, 49:10, 50:10, 50:14, 50:25, 54:20, 68:22, 71:20, 72:2, 72:4, 72:7, 72:10, 73:20, 77:9, 123:20, 128:12, 128:13, 133:19, 149:3, 149:6, 149:13, 149:14, 149:16, 149:18, 149:22, 150:1, 159:20, 159:23

**Property** [1] - 45:6

**Propiedades** [1] - 148:24

**propiedades** [2] - 31:10, 78:2

**proposed** [1] - 145:25

**prosecution** [2] - 60:18, 132:4

**prosecutorial** [1] - 60:13

**protocol** [2] - 60:10, 89:10

**prove** [2] - 20:3, 25:9

**proverbial** [1] - 14:23

**provide** [3] - 25:16, 77:7, 152:13

**provided** [7] - 23:15, 29:20, 39:22, 83:18, 100:16, 100:19, 126:8

**providing** [1] - 39:8

**PSR** [2] - 12:16, 12:18

**purchase** [9] - 20:11, 22:1, 35:21, 49:13, 52:15, 53:23, 57:17, 133:18, 149:2

**purchased** [7] - 48:21, 48:23, 49:8, 71:21, 149:14, 149:18, 160:10

**purported** [1] - 124:13

**purpose** [5] - 10:20, 27:24, 28:22, 45:6, 143:25

**purposely** [1] - 19:3

**purposes** [19] - 6:15, 7:11, 7:16, 12:7, 13:6, 13:15, 13:17, 14:9, 16:5, 17:11, 41:23, 43:8, 46:23, 61:21, 68:11, 76:13, 83:2, 142:20

**pursuant** [6] - 29:11, 29:13, 40:18, 51:7, 81:9, 153:17

**pursue** [2] - 26:8, 95:25

**pursued** [1] - 62:8

**pursuing** [1] - 17:10

**push** [1] - 80:25

**put** [42] - 7:8, 7:19, 9:9, 9:20, 13:19, 15:9, 15:10, 15:16, 16:12, 19:11, 20:7, 23:25, 33:19, 46:13, 54:23, 75:15, 80:15, 86:18, 87:23, 93:18, 95:4, 109:13,

109:18, 109:24, 110:5, 110:7, 112:4, 113:1, 113:12, 113:14, 113:18, 113:20, 120:3, 120:19, 125:21, 127:8, 131:23, 151:19, 156:22, 157:16, 160:20
**putting** [5] - 25:7, 33:1, 35:22, 120:2, 152:4

## Q

**quandary** [1] - 9:9
**quarter** [1] - 72:3
**query** [1] - 15:16
**QUESTION** [5] - 44:23, 129:14, 129:17, 129:19, 129:21
**questioning** [1] - 55:6
**questions** [11] - 5:16, 64:3, 84:6, 86:15, 86:18, 87:15, 87:22, 97:20, 104:9, 153:20
**quite** [2] - 38:2, 54:23

## R

**raise** [1] - 12:20
**raised** [2] - 11:25, 73:19
**raising** [1] - 72:12
**ran** [1] - 71:4
**rate** [1] - 158:18
**rather** [9] - 5:13, 10:16, 16:1, 38:3, 60:5, 76:16, 77:15, 83:6, 161:9
**re** [1] - 96:24
**re-file** [1] - 96:24
**reached** [1] - 138:10
**read** [6] - 5:13, 121:5, 121:10, 124:11, 124:12, 159:12
**readily** [1] - 68:4
**reading** [1] - 104:5
**ready** [3] - 3:21, 26:10, 80:23
**real** [7] - 15:7, 72:22, 72:23, 73:6, 73:10, 73:15, 142:20
**realized** [2] - 94:1, 123:1
**reallocated** [1] - 79:17
**really** [5] - 16:4, 16:6, 19:23, 34:18, 140:20
**reason** [6] - 4:16, 67:5, 89:18, 96:11, 99:9, 151:23
**reasons** [1] - 86:25
**receive** [1] - 142:13
**received** [15] - 31:5, 39:24, 42:8, 52:10, 58:14, 80:10,

80:14, 92:13, 115:3, 125:1, 142:5, 144:3, 151:6, 151:22, 157:23
**receiving** [1] - 82:2
**recess** [5] - 49:22, 49:23, 84:9, 133:9, 133:10
**recessed** [1] - 161:18
**recognize** [6] - 29:4, 42:15, 71:13, 91:12, 101:4, 155:9
**recollect** [1] - 112:12
**recollection** [4] - 10:22, 10:25, 75:25, 129:7
**recommendation** [1] - 72:16
**recommendations** [1] - 53:2
**recommended** [1] - 35:22
**reconvene** [1] - 84:8
**record** [25] - 3:6, 5:11, 6:14, 10:4, 15:22, 16:12, 18:19, 18:21, 19:10, 21:16, 21:20, 21:22, 26:19, 41:12, 41:23, 43:8, 46:23, 61:20, 61:21, 83:7, 83:12, 124:12, 141:19, 147:11, 155:25
**recorded** [2] - 2:25, 156:10
**recording** [1] - 159:25
**records** [15] - 21:13, 39:9, 40:9, 40:15, 50:20, 63:14, 63:22, 63:25, 74:16, 132:16, 132:22, 132:24, 133:1, 151:17, 153:3
**recover** [1] - 98:25
**redacted** [1] - 39:1
**reduce** [1] - 138:16
**reduced** [2] - 138:12, 138:21
**refer** [1] - 66:20
**reference** [11] - 30:16, 32:7, 34:2, 34:4, 45:24, 58:22, 62:10, 83:7, 93:1, 146:1, 147:17
**referenced** [2] - 19:2, 75:19
**referencing** [1] - 33:10
**referred** [3] - 39:19, 42:11, 125:3
**referring** [9] - 29:6, 44:24, 47:4, 62:1, 76:1, 79:6, 125:6, 128:8, 159:5
**refers** [2] - 93:4, 130:16
**refinance** [1] - 148:10
**reflect** [5] - 10:3, 62:14, 74:18, 113:3, 120:16
**reflected** [1] - 156:25
**reflecting** [1] - 40:9
**reflects** [1] - 151:19
**refresh** [1] - 75:25
**refreshes** [1] - 129:6
**regard** [28] - 7:3, 7:5,

11:21, 11:24, 38:25, 86:12, 86:16, 88:6, 91:1, 92:8, 98:3, 106:9, 109:2, 124:2, 125:4, 125:18, 126:1, 126:12, 126:21, 131:13, 133:1, 133:18, 135:15, 136:3, 137:11, 138:15, 152:3, 152:11
**regarding** [7] - 5:12, 6:3, 6:4, 44:20, 104:11
**regards** [1] - 28:21
**registered** [2] - 145:18, 145:19
**related** [13] - 9:18, 10:24, 17:12, 17:14, 21:6, 36:1, 36:12, 51:24, 59:20, 62:7, 64:19, 73:20, 125:14
**relates** [30] - 4:3, 4:13, 4:19, 4:24, 6:11, 6:25, 7:20, 9:13, 9:22, 10:14, 13:2, 13:22, 14:8, 19:11, 24:5, 34:24, 41:20, 43:6, 50:14, 53:14, 55:7, 55:8, 56:12, 57:25, 64:3, 68:9, 79:4, 82:14, 85:11, 85:12
**relation** [1] - 51:16
**relationship** [8] - 45:10, 45:13, 45:16, 45:20, 58:21, 64:17, 67:22, 67:23
**relative** [1] - 157:3
**relatively** [1] - 160:21
**relevance** [6] - 54:19, 70:13, 71:16, 101:14, 102:13, 102:18
**relevancy** [1] - 68:12
**relevant** [18] - 4:14, 4:18, 6:12, 7:11, 9:21, 11:22, 12:7, 12:9, 12:12, 12:16, 13:6, 13:18, 14:6, 14:8, 14:19, 16:9, 25:24, 68:10
**relinquish** [1] - 127:1
**relinquished** [1] - 127:6
**rely** [1] - 6:13
**relying** [2] - 25:10, 90:17
**remainder** [1] - 134:4, 134:6
**remained** [3] - 11:18, 11:24, 108:25
**remark** [1] - 78:24
**remediation** [1] - 35:19, 72:3
**remember** [15] - 19:6, 39:2, 39:7, 39:23, 86:24, 88:1, 90:13, 93:9, 94:24, 109:23, 118:20, 124:11, 132:18, 132:19, 132:20
**remind** [1] - 5:21
**remote** [1] - 36:10
**removed** [2] - 63:6, 123:6
**render** [1] - 10:11

**reneged** [2] - 59:21, 118:15
**renovated** [1] - 49:9
**repaid** [3] - 68:14, 136:20, 158:1
**repay** [3] - 118:19, 134:7, 146:22
**repaying** [2] - 114:6, 145:24
**repayment** [2] - 44:19, 66:2
**repayments** [3] - 40:20, 65:4, 68:20
**repeated** [1] - 37:8
**repetitive** [1] - 56:16
**rephrase** [1] - 156:13
**report** [9] - 4:8, 4:10, 4:14, 4:17, 12:5, 13:5, 26:2, 26:5, 128:7
**Reporter** [1] - 2:20
**reporter** [6] - 127:10, 127:22, 128:24, 130:8, 130:24, 131:2
**reporters** [2] - 89:22, 131:5
**reporting** [4] - 127:20, 130:21, 131:1, 131:6
**represent** [13] - 30:8, 40:15, 55:19, 64:16, 73:25, 75:2, 77:23, 80:9, 100:16, 103:6, 110:9, 148:20, 153:15
**representation** [7] - 5:8, 14:17, 25:15, 41:6, 67:9, 79:4, 124:25
**representations** [1] - 87:2
**represented** [23] - 38:22, 40:24, 41:1, 57:3, 59:13, 61:18, 62:17, 74:8, 76:24, 78:4, 78:20, 97:7, 102:24, 110:11, 111:25, 119:23, 125:24, 141:6, 143:13, 147:3, 149:21, 154:18, 157:4
**representing** [4] - 78:21, 105:12, 120:23, 156:23
**represents** [7] - 54:11, 67:16, 67:18, 74:21, 80:22, 81:5, 115:3
**request** [5] - 63:13, 71:19, 97:11, 97:24, 160:20
**requesting** [1] - 90:14
**required** [2] - 81:11, 100:6
**requiring** [1] - 72:6
**rescheduled** [1] - 97:1
**research** [2] - 72:11, 73:18
**reserve** [2] - 71:6, 83:8
**reserved** [1] - 13:23
**reserving** [1] - 13:24
**residence** [5] - 8:13, 8:23, 8:25, 144:12, 144:16
**residential** [1] - 57:17
**resolution** [3] - 46:1, 46:5,

47:3
**resort** [2] - 62:24, 74:5
**respect** [22] - 8:11, 14:1, 14:18, 22:25, 25:24, 30:10, 38:19, 53:18, 63:3, 63:10, 64:21, 65:5, 67:20, 70:15, 71:19, 75:8, 75:13, 76:18, 90:8, 112:23, 124:24, 131:22
**respectfully** [1] - 9:10
**respond** [5] - 9:23, 97:22, 100:7, 102:1, 157:12
**responded** [2] - 97:23, 157:10
**responding** - 97:21
**response** [3] - 4:9, 93:5, 98:5
**responsible** [1] - 158:8
**responsive** [3] - 99:4, 139:17, 151:25
**rest** [4] - 60:22, 60:23, 64:21, 69:21
**rested** [1] - 3:20
**result** [4] - 5:14, 35:20, 49:10, 74:13
**resumes** [3] - 49:25, 85:6, 133:14
**return** [3] - 152:11, 152:13, 157:19
**returned** [3] - 40:12, 65:22, 83:4
**revenues** [1] - 71:1
**review** [8] - 4:9, 50:20, 89:5, 92:3, 104:8, 124:5, 124:24, 140:3
**reviewed** [5] - 92:25, 135:22, 135:25, 140:6, 157:6
**revolving** [2] - 93:2, 93:7
**Rhode** [1] - 69:24
**RICHARD** [1] - 1:22
**Richard** [1] - 3:11
**right-hand** [2] - 66:2, 129:9
**rights** - 83:8
**rise** [3] - 3:1, 85:3, 133:11
**Rizzi** [1] - 52:11
**road** [1] - 9:2
**Road** [8] - 2:3, 8:13, 8:23, 8:24, 9:3, 35:9, 36:16, 71:20
**ROBERT** [1] - 1:14
**Robert** [2] - 55:22, 67:9
**Roco** [1] - 48:16
**role** [1] - 46:9
**roll** [1] - 118:1
**Romanowski** [1] - 43:12
**Rosenthal** [2] - 103:1, 103:2
**routed** [4] - 51:12, 51:16, 51:19, 51:23

**Rucchin** [1] - 56:7
**Rule** [1] - 77:6
**rules** [1] - 60:9
**ruling** [2] - 16:8, 86:24
**run** [1] - 36:9
**Rusia** [1] - 123:18
**Russian** [2] - 104:4, 108:25

## S

**Sag** [7] - 32:4, 45:16, 48:2, 51:24, 54:2, 56:4, 61:25
**sake** [1] - 8:17
**sale** [1] - 49:10
**San** [68] - 4:20, 5:9, 6:4, 7:1, 9:5, 16:21, 24:6, 28:1, 28:14, 32:21, 33:17, 34:3, 34:8, 34:25, 37:21, 40:23, 41:2, 41:8, 41:18, 41:21, 42:5, 45:8, 47:16, 48:6, 48:11, 48:13, 48:21, 49:13, 55:21, 56:12, 56:21, 58:17, 59:5, 59:9, 59:14, 61:13, 62:3, 62:11, 62:15, 62:19, 62:22, 63:11, 63:14, 64:19, 64:20, 64:22, 65:15, 68:21, 74:5, 76:15, 77:8, 78:12, 93:24, 109:14, 110:14, 112:1, 112:25, 113:4, 116:2, 120:1, 133:19, 145:22, 146:18, 146:24, 149:3, 156:2, 156:5, 158:2
**sat** [2] - 18:21, 72:7
**savings** [3] - 150:22, 150:23, 151:3
**saw** [5] - 24:24, 77:5, 107:3, 120:24, 151:13
**scan** [1] - 74:15
**schedule** [1] - 160:24
**schedules** [1] - 107:13
**scheme** [11] - 5:7, 8:16, 8:18, 17:13, 17:14, 17:17, 20:20, 24:3, 28:5, 32:9, 69:9
**schemes** [5] - 11:4, 15:5, 55:24, 58:23, 67:25
**scope** [1] - 4:4
**Scott** [1] - 43:12
**Scottsdale** [2] - 36:16, 144:12
**se** [2] - 58:10, 139:14
**search** [5] - 5:11, 83:22, 106:17, 110:23
**seated** [4] - 3:2, 49:24, 85:4, 133:12
**SEC** [24] - 99:20, 100:2, 100:6, 100:14, 100:17, 100:19, 100:23, 101:5, 101:8, 109:23, 109:25,

110:4, 126:2, 126:6, 126:8, 126:11, 126:17, 126:18, 126:20, 126:24, 150:25, 151:5, 153:9
**second** [15] - 12:1, 30:12, 33:24, 73:2, 97:1, 97:9, 97:12, 97:25, 98:6, 98:7, 98:9, 123:2, 128:2, 146:23, 147:16
**secret** [1] - 47:16
**secure** [1] - 118:18
**securing** [1] - 146:18
**securities** [1] - 126:21
**securitized** [1] - 146:22
**security** [2] - 99:24, 142:1
**see** [26] - 23:19, 50:11, 52:3, 54:5, 54:7, 55:14, 56:12, 63:13, 68:11, 95:8, 107:5, 107:22, 119:10, 127:23, 129:6, 133:8, 138:6, 144:11, 148:21, 153:9, 154:8, 159:5, 159:7, 159:14, 159:16
**seeing** [1] - 91:18
**seek** [1] - 20:15
**seeking** [11] - 11:2, 12:6, 13:3, 13:11, 14:2, 14:5, 22:22, 22:23, 23:3, 23:7, 80:11
**seeks** [1] - 35:9
**seized** [3] - 54:15, 111:14, 111:15
**seizure** [2] - 106:17, 110:23
**select** [1] - 64:2
**sell** [2] - 72:10, 73:17
**seller** [2] - 28:14, 67:19
**send** [2] - 65:14, 104:8
**sense** [2] - 136:21, 141:1
**sensitive** [2] - 7:12, 72:24
**sent** [19] - 17:18, 75:9, 75:14, 76:10, 79:16, 80:13, 83:2, 92:13, 93:10, 101:4, 101:8, 111:4, 112:13, 112:16, 131:24, 144:8, 153:17, 157:7, 157:9
**sentencing** [5] - 12:7, 13:15, 13:17, 14:8, 14:9
**separate** [18] - 15:13, 16:3, 17:14, 23:14, 34:6, 35:1, 35:3, 35:20, 53:6, 60:9, 60:16, 66:12, 115:16, 116:20, 132:1, 135:24, 138:21, 140:15
**separated** [1] - 117:12
**separately** [1] - 6:19
**sequence** [2] - 10:17, 28:8
**series** [5] - 52:25, 65:17, 83:1, 121:19, 128:16, 152:17, 152:25

**set** [19] - 27:24, 28:5, 28:17, 28:18, 31:12, 40:16, 45:6, 47:15, 48:3, 50:16, 56:17, 58:23, 60:9, 73:9, 73:14, 113:10, 122:19, 123:3, 160:6
**Setauket** [1] - 43:12
**settled** [2] - 53:2, 110:3
**Settlement** [11] - 23:18, 31:23, 45:14, 47:25, 51:21, 54:2, 56:3, 61:25, 125:5, 125:13, 125:15
**settlement** [1] - 125:1
**seven** [4] - 6:22, 9:24, 42:10, 76:10
**several** [4] - 77:5, 134:22, 135:7, 145:12
**share** [3] - 113:4, 145:22, 156:24
**short** [5] - 34:14, 49:18, 160:21, 161:13, 161:16
**short-term** [1] - 34:14
**shorten** [1] - 133:8
**shortly** [1] - 102:3
**show** [22] - 23:10, 29:1, 41:24, 64:1, 64:5, 88:17, 91:2, 92:15, 93:15, 97:25, 98:12, 100:4, 104:24, 106:13, 112:3, 112:5, 112:6, 127:15, 130:6, 141:17, 152:16, 155:4
**showing** [1] - 91:4, 92:22, 100:25, 102:4
**shown** [4] - 21:24, 80:4, 97:12, 98:9
**shows** [2] - 21:20, 120:25
**sidebar** [3] - 5:12, 5:16, 13:9
**sign** [11] - 70:1, 74:11, 104:18, 104:20, 104:21, 105:7, 105:8, 105:15, 122:8, 130:3, 147:19
**signature** [6] - 30:12, 30:14, 30:22, 30:23, 105:4, 105:7
**signatures** [1] - 122:21
**signed** [29] - 28:23, 51:8, 74:10, 74:14, 74:15, 82:10, 82:22, 83:3, 83:19, 83:24, 87:2, 93:24, 94:5, 104:19, 105:9, 105:11, 105:14, 110:12, 118:17, 125:1, 128:9, 134:21, 146:9, 146:20, 147:15, 147:16, 147:18, 147:21, 156:7
**significance** [1] - 67:11
**significant** [2] - 121:19, 153:1
**signing** [1] - 122:9
**silent** [2] - 11:18, 11:24

**similar** [4] - 80:9, 81:1, 82:24, 123:3
**simple** [5] - 34:18, 54:23, 63:13, 104:10, 156:21
**simply** [8] - 15:25, 16:11, 23:11, 25:9, 52:5, 84:4, 85:9, 85:12
**single** [6] - 27:24, 45:6, 65:22, 92:6, 112:13, 137:15
**singular** [2] - 113:23, 115:22
**sit** [8] - 30:24, 63:20, 108:4, 112:2, 112:12, 116:11, 136:1, 140:2
**site** [2] - 72:8, 73:4
**situation** [1] - 26:4
**six** [5] - 6:22, 9:24, 33:18, 43:4, 108:6
**six-and-a-half** [1] - 33:18
**skip** [1] - 36:15
**Slovakian** [1] - 104:4
**small** [4] - 36:8, 136:15, 136:17, 137:3
**Society** [1] - 35:24
**sold** [1] - 49:8
**solidify** [1] - 16:18
**solution** [2] - 9:10
**Somerset** [2] - 47:11, 47:13
**sometime** [2] - 12:19, 51:2
**sometimes** [1] - 26:7
**somewhat** [1] - 56:15
**somewhere** [2] - 18:13, 22:8
**Sonnenschein** [4] - 103:1, 103:2, 125:19, 125:23
**sorry** [7] - 30:1, 30:3, 33:13, 35:2, 49:6, 131:24, 156:11
**sought** [7] - 8:1, 8:12, 27:7, 27:19, 32:13, 37:9, 45:3
**sound** [1] - 136:20
**sounds** [3] - 100:9, 100:24, 137:6
**source** [2] - 48:23, 50:16
**South** [1] - 73:6
**Southern** [2] - 43:11, 134:22
**Spanish** [1] - 75:20
**speaking** [3] - 33:12, 39:13, 125:13
**speaks** [7] - 19:10, 42:7, 44:4, 44:21, 70:11, 93:14, 158:15
**special** [1] - 24:8
**specific** [13] - 7:25, 39:15, 51:5, 86:18, 86:24, 87:22, 92:15, 104:9, 125:21, 137:17, 140:19, 141:6,

148:5
**specifically** [10] - 4:22, 8:3, 42:11, 96:19, 100:4, 120:15, 121:15, 132:6, 144:7, 146:8
**specifics** [1] - 86:14
**speedy** [1] - 7:16
**split** [1] - 35:18
**spoken** [4] - 12:14, 103:25, 132:25, 133:3
**Square** [1] - 1:21
**stack** [1] - 6:22
**stake** [1] - 27:25
**stamp** [1] - 77:24
**stamped** [2] - 78:6, 81:5
**stand** [12] - 7:19, 16:13, 24:1, 25:8, 49:25, 85:5, 85:6, 85:14, 133:13, 133:14, 139:18, 160:21
**Standard** [1] - 144:10
**Stars** [1] - 108:18
**start** [1] - 161:9
**started** [4] - 13:8, 16:15, 24:10, 136:14
**starting** [2] - 51:1, 160:10
**state** [4] - 3:5, 16:11, 26:18, 65:8
**statehood** [1] - 73:3
**statement** [23] - 24:2, 94:24, 143:12, 144:19, 144:20, 148:1, 148:2, 148:3, 148:6, 149:21, 149:25, 155:22, 155:25, 156:12, 157:1, 157:4, 157:7, 157:9, 157:15, 159:2, 159:5, 159:10, 159:17
**STATES** [3] - 1:1, 1:3, 1:11
**States** [6] - 1:6, 1:14, 1:17, 3:7, 60:4, 108:1
**status** [7] - 45:23, 76:22, 96:12, 132:8, 132:10, 161:6, 161:13
**statutes** [1] - 15:14
**stay** [1] - 108:22
**stayed** [1] - 21:8
**stealing** [1] - 57:7
**Steiger** [1] - 2:20
**stenography** [1] - 2:25
**steps** [1] - 95:24
**Steve** [1] - 73:7
**Steven** [1] - 56:7
**stevenson** [1] - 64:24
**Stevenson** [4] - 59:10, 74:11, 74:22
**sticker** [1] - 46:13
**still** [6] - 37:18, 69:12, 110:2, 123:24, 134:7, 158:11
**stipulation** [3] - 29:2,

29:10, 29:11
**stole** [1] - 57:20
**stolen** [4] - 20:11, 22:13, 23:22, 124:4
**Stolper** [1] - 101:8
**stop** [2] - 53:12, 160:11
**straight** [1] - 75:11
**Strangford** [1] - 2:7
**stretching** [1] - 68:14
**stricken** [1] - 147:11
**strict** [1] - 81:7
**strike** [6] - 88:23, 139:16, 142:6, 143:7, 151:24
**string** [1] - 81:18
**Stumpel** [1] - 79:14
**Stumpel** [84] - 28:2, 28:21, 29:7, 30:19, 31:6, 40:25, 42:23, 59:15, 59:16, 59:20, 59:23, 61:1, 78:7, 78:21, 79:21, 101:22, 101:24, 102:9, 102:17, 103:10, 103:17, 103:24, 104:1, 104:3, 104:13, 104:19, 105:12, 105:14, 106:7, 106:8, 106:23, 108:6, 108:22, 109:20, 110:5, 110:7, 111:5, 111:8, 111:24, 112:4, 112:14, 112:16, 114:19, 116:8, 116:12, 116:15, 116:22, 116:24, 117:25, 118:4, 118:9, 118:17, 119:3, 122:12, 122:17, 122:18, 122:24, 122:25, 123:12, 123:19, 123:25, 124:2, 124:25, 126:3, 126:13, 131:10, 131:24, 132:1, 133:23, 138:17, 138:23, 142:2, 142:13, 145:25, 146:10, 147:1, 147:5, 156:8, 156:9, 156:15, 156:23, 157:23, 158:4, 158:14
**Stumpel's** [9] - 30:23, 31:11, 61:3, 78:8, 107:25, 117:15, 139:8, 141:19, 141:22
**Stumple** [1] - 28:11
**stylized** [1] - 27:11
**submissions** [1] - 10:17
**submit** [2] - 25:16, 154:1
**submitted** [8] - 4:9, 11:20, 18:10, 83:4, 90:25, 91:15, 143:25, 148:9
**submitting** [1] - 90:5
**subpoena** [1] - 100:7
**subscription** [1] - 51:8
**subsequent** [8] - 46:6, 52:16, 65:3, 65:16, 70:20, 87:7, 97:10, 127:13

**subsequently** [8] - 52:15, 57:8, 57:20, 57:22, 59:22, 84:1, 123:7, 139:9
**subset** [1] - 62:18
**substance** [1] - 106:20
**substantiate** [1] - 50:20
**substantiated** [1] - 38:11
**substantive** [1] - 20:18
**succeeding** [1] - 46:9
**sue** [1] - 139:9
**sued** [5] - 59:22, 59:23, 61:8, 122:17, 122:18
**sufficient** [1] - 98:25
**Suffolk** [1] - 1:21
**sugar** [7] - 35:15, 35:17, 35:21, 71:20, 72:8, 73:5
**suggest** [3] - 7:17, 9:10, 159:19
**suggested** [4] - 34:10, 73:8, 96:22, 109:25
**suggesting** [1] - 24:20
**suit** [3] - 92:17, 96:3, 97:18
**sum** [2] - 28:16, 106:20
**summation** [3] - 10:16, 41:4, 41:7
**summer** [6] - 103:11, 103:18, 103:24, 113:7, 118:16, 146:10
**supplemental** [2] - 8:2, 27:11
**supplied** [5] - 63:22, 73:5, 132:22, 132:24, 133:2
**supplies** [1] - 36:10
**support** [3] - 41:12, 90:6, 148:9
**supposed** [4] - 120:20, 122:2, 137:3, 149:2
**surprised** [5] - 13:4, 13:7, 13:9, 13:13, 21:3
**sustained** [3] - 38:24, 39:10, 112:10
**swell** [1] - 55:11
**sworn** [2] - 26:15, 83:18
**Sydor** [4] - 60:20, 61:12, 61:13, 61:19
**system** [1] - 97:1

# T

**table** [2] - 34:11, 143:7
**tax** [2] - 152:11, 152:13
**taxes** [1] - 73:16
**teams** [2] - 108:7, 108:25
**telephone** [4] - 94:20, 103:14, 127:13, 128:15
**tens** [1] - 136:5
**term** [1] - 34:14
**terminate** [1] - 34:10
**terminated** [1] - 94:12

**terms** [10] - 13:20, 13:23, 14:4, 15:12, 25:14, 40:15, 67:24, 83:13, 93:18, 147:21
**test** [1] - 36:8
**testified** [64] - 26:15, 32:2, 34:21, 38:2, 50:13, 52:8, 55:7, 62:12, 69:7, 72:15, 76:12, 85:22, 85:25, 87:7, 91:19, 94:15, 94:21, 95:23, 95:25, 99:20, 103:9, 103:21, 108:8, 110:4, 114:16, 115:17, 118:7, 120:10, 121:21, 121:25, 122:4, 122:5, 123:14, 126:25, 127:4, 127:6, 127:9, 128:4, 131:8, 131:11, 131:12, 131:23, 132:14, 132:16, 132:21, 132:23, 134:22, 134:23, 135:1, 135:4, 135:8, 135:22, 137:1, 138:5, 140:13, 140:14, 142:4, 142:12, 144:16, 145:21, 151:5, 152:3, 152:5
**testifies** [1] - 7:6
**testify** [16] - 6:1, 6:11, 7:20, 16:20, 18:4, 21:2, 41:13, 56:16, 82:21, 82:23, 118:3, 122:3, 128:6, 131:13, 137:16, 153:23
**testifying** [16] - 74:19, 87:24, 92:2, 109:23, 114:12, 114:14, 117:14, 117:20, 118:14, 118:20, 118:22, 125:12, 125:18, 140:18, 140:21, 140:25
**testimony** [44] - 7:3, 8:6, 8:7, 8:19, 9:12, 14:6, 16:1, 16:19, 18:17, 21:4, 21:25, 24:25, 33:8, 42:2, 44:2, 56:2, 85:25, 86:3, 86:6, 86:8, 94:18, 100:2, 109:10, 114:19, 116:22, 119:8, 125:21, 126:4, 126:6, 126:15, 128:23, 130:8, 133:20, 135:7, 135:9, 137:2, 140:8, 140:9, 141:5, 146:4, 146:7, 147:18, 151:8
**THE** [123] - 1:11, 3:1, 3:2, 3:3, 3:10, 3:16, 3:23, 10:21, 12:3, 12:23, 15:9, 16:24, 17:5, 17:10, 17:20, 17:22, 18:12, 18:21, 20:6, 20:24, 21:16, 22:2, 22:18, 23:24, 24:9, 25:20, 26:4, 26:10, 26:18, 26:20, 26:24, 29:10, 29:14, 29:17, 29:19, 29:23, 31:3, 39:2, 39:6,

40:3, 46:15, 46:18, 46:20, 49:18, 49:21, 49:24, 50:3, 60:21, 60:23, 61:5, 61:6, 61:10, 61:11, 64:11, 66:10, 66:13, 66:15, 66:16, 66:18, 66:19, 66:22, 66:24, 67:2, 68:6, 70:7, 71:9, 80:1, 83:15, 84:5, 84:7, 85:3, 85:4, 85:17, 88:25, 89:17, 89:20, 89:24, 91:8, 91:24, 95:6, 95:9, 95:15, 95:19, 99:5, 99:12, 101:17, 102:21, 105:2, 105:5, 106:4, 112:10, 115:15, 115:20, 124:9, 125:9, 133:4, 133:7, 133:11, 133:12, 133:15, 139:18, 139:20, 142:8, 142:10, 142:11, 143:8, 147:12, 147:18, 152:1, 153:25, 154:4, 154:24, 155:2, 155:16, 158:23, 160:11, 160:14, 160:19, 160:23, 161:1, 161:4, 161:8, 161:15
**themselves** [2] - 44:16, 63:8
**theories** [2] - 21:1, 25:9
**theory** [22] - 11:3, 11:8, 14:25, 17:1, 17:4, 17:6, 17:10, 17:16, 18:2, 18:14, 18:15, 18:16, 20:14, 22:12, 22:16, 22:18, 22:19, 23:23, 24:11, 24:19, 25:2
**thereabouts** [1] - 28:16
**thereafter** [1] - 102:3
**therefore** [1] - 24:15
**third** [4] - 58:10, 74:7, 126:3, 139:15
**third-party** [2] - 58:10, 139:15
**thousands** [2] - 110:2, 136:5
**threatened** [1] - 97:6
**three** [19] - 46:8, 52:10, 52:21, 57:17, 64:22, 65:21, 66:4, 68:21, 74:2, 74:21, 82:18, 82:24, 83:4, 83:17, 83:25, 103:3, 114:16, 115:14, 131:4
**thrown** [1] - 96:25
**today** [31] - 6:1, 9:12, 13:20, 14:7, 16:1, 16:7, 16:9, 30:24, 63:20, 69:12, 69:15, 92:3, 100:13, 108:4, 110:19, 111:10, 112:2, 112:12, 112:22, 114:19, 126:8, 132:21, 135:9, 135:18, 136:1, 137:23, 140:2, 140:3, 140:7,

158:16, 160:11
**together** [2] - 75:16, 83:17
**Tom** [2] - 97:7, 145:13
**Tommy** [1] - 3:14
**TOMMY** [1] - 1:7
**took** [9] - 46:8, 58:25, 59:1, 63:8, 81:23, 88:1, 123:18, 127:24, 131:2
**top** [3] - 30:14, 30:21, 129:9
**total** [8] - 9:24, 10:4, 28:16, 50:18, 61:17, 79:20, 159:13, 159:14
**totaling** [3] - 65:20, 68:20, 74:22
**totality** [1] - 85:16
**totally** [1] - 66:11
**totals** [2] - 67:14, 159:7
**traffic** [5] - 67:9, 103:23, 120:24, 135:16, 136:4
**train** [1] - 109:1
**training** [2] - 107:7, 107:8
**transaction** [9] - 19:22, 35:16, 35:17, 57:14, 74:17, 138:3, 139:11, 141:14, 141:15
**transactions** [17] - 5:1, 6:2, 6:19, 6:20, 28:8, 28:9, 35:5, 35:20, 38:21, 38:22, 39:5, 40:16, 40:23, 40:24, 44:12, 64:9, 64:16
**TRANSCRIPT** [1] - 1:10
**transcript** [4] - 2:25, 19:6, 130:7, 130:16
**transcription** [1] - 127:25
**transfer** [17] - 51:9, 58:21, 58:25, 59:12, 65:3, 68:19, 72:16, 74:9, 77:25, 122:22, 129:22, 139:10, 141:19, 141:22, 150:16, 151:16, 151:18
**transferred** [19] - 31:6, 31:8, 31:11, 31:13, 31:21, 32:2, 32:10, 53:22, 57:21, 57:23, 61:16, 65:1, 73:13, 74:3, 78:18, 122:20, 129:21, 146:16, 150:18
**transferring** [3] - 56:21, 57:8, 150:15
**transfers** [17] - 38:14, 40:19, 50:22, 65:14, 66:5, 74:2, 75:7, 75:17, 75:18, 76:3, 78:7, 78:7, 88:1, 121:20, 121:22, 139:8, 147:9
**transposed** [1] - 130:10
**traveled** [2] - 108:23, 138:6
**trial** [40] - 7:16, 7:24, 9:16, 11:1, 18:3, 18:19, 18:22, 19:10, 19:17, 21:4, 21:9,

21:12, 21:24, 24:24, 27:10, 29:11, 33:9, 34:1, 34:22, 37:5, 37:13, 38:2, 43:16, 43:21, 62:23, 69:8, 99:6, 114:13, 114:14, 117:15, 118:7, 118:14, 118:23, 125:12, 127:1, 127:9, 128:24, 139:14, 140:5, 148:8
**tried** [1] - 52:16
**trigger** [1] - 114:8
**triple** [1] - 53:18
**trite** [2] - 7:7, 10:10
**trouble** [1] - 66:16
**true** [3] - 41:16, 62:2, 128:2
**trust** [2] - 144:23, 144:25
**Trust** [7] - 54:13, 122:20, 122:21, 123:2, 123:4, 123:5, 123:7
**try** [3] - 11:7, 79:12, 126:5
**trying** [4] - 19:5, 79:7, 80:25, 81:21
**TSA** [4] - 110:24, 111:1, 111:2, 111:6
**turn** [3] - 71:1, 100:19, 148:13
**turned** [3] - 38:13, 44:17, 145:12
**turning** [1] - 89:12
**twice** [1] - 152:20
**two** [52] - 11:11, 12:20, 25:9, 28:4, 29:1, 29:6, 30:24, 33:11, 33:14, 34:6, 34:25, 35:5, 35:20, 40:24, 42:3, 42:10, 53:6, 54:5, 57:23, 66:11, 74:2, 74:21, 75:17, 75:18, 75:19, 76:3, 76:8, 78:7, 88:1, 94:20, 109:7, 111:17, 112:22, 113:7, 115:14, 115:16, 115:21, 116:7, 118:8, 120:3, 131:2, 132:13, 134:1, 135:22, 135:25, 140:6, 146:6, 146:22, 147:13, 155:19, 156:6, 157:16
**two-and-a-half** [5] - 118:8, 120:3, 132:13, 156:6, 157:16
**type** [3] - 9:2, 21:5, 21:6
**typewritten** [1] - 39:15

# U

**U.S.A** [1] - 3:3
**Ukrainian** [1] - 104:4
**Ula** [11] - 31:15, 31:21, 32:1, 65:5, 68:20, 75:8, 76:5, 78:9, 88:9, 88:15,

116:12
**ultimately** [9] - 8:8, 28:17, 44:18, 53:2, 58:18, 73:10, 80:15, 80:21, 83:24
**umbrella** [1] - 19:4
**unable** [1] - 25:9
**unauthorized** [1] - 24:17
**uncharged** [1] - 11:22
**under** [19] - 9:2, 15:14, 19:4, 25:2, 32:18, 33:21, 35:11, 40:18, 44:5, 52:22, 54:19, 54:21, 62:3, 63:21, 82:16, 96:18, 141:8, 145:18, 145:19
**underscore** [2] - 100:22, 101:9
**understood** [6] - 57:15, 63:17, 87:12, 88:14, 100:15, 123:22
**undoubtedly** [2] - 7:11, 9:17
**unequivocally** [1] - 110:4
**unfair** [1] - 12:20
**unique** [3] - 34:6, 35:3, 54:22
**unit** [2] - 52:23, 53:11
**UNITED** [3] - 1:1, 1:3, 1:11
**United** [6] - 1:6, 1:14, 1:17, 3:7, 60:4, 108:1
**units** [4] - 53:7, 53:21, 57:17, 71:1
**unknown** [2] - 80:16, 96:11
**unless** [1] - 26:1
**unrelated** [2] - 55:23, 55:25
**unresponsive** [1] - 88:24
**unsecured** [1] - 122:16
**unsigned** [2] - 74:12, 83:23
**up** [51] - 10:23, 18:24, 27:24, 28:18, 28:19, 31:13, 33:2, 33:19, 35:18, 45:6, 47:15, 52:7, 59:8, 60:25, 61:14, 65:21, 68:20, 73:14, 79:12, 79:23, 81:19, 82:23, 85:5, 87:2, 94:5, 97:12, 97:25, 98:9, 98:12, 99:10, 101:18, 113:10, 113:17, 113:20, 115:21, 121:3, 122:19, 123:3, 126:8, 126:19, 127:8, 137:7, 146:11, 147:20, 149:14, 149:18, 153:20, 154:12, 159:23, 160:6
**uphold** [1] - 71:2
**upwards** [1] - 140:6
**Urban** [1] - 81:2
**uses** [1] - 24:1
**utilize** [1] - 34:13
**utilized** [2] - 49:11, 76:14
**utilizes** [1] - 4:23

## V

**vacant** [1] - 72:7
**value** [2] - 157:3, 159:23
**values** [2] - 33:25, 144:12
**various** [16] - 4:13, 5:1, 15:15, 24:14, 24:18, 27:6, 36:23, 40:8, 40:10, 40:17, 82:9, 82:10, 135:17, 142:23, 143:22, 145:12
**Vegas** [3] - 52:14, 57:18, 108:12
**venture** [2] - 69:20, 72:5
**Ventures** [78] - 8:3, 27:19, 27:23, 28:10, 28:19, 28:25, 30:10, 30:20, 31:7, 37:9, 42:21, 56:24, 59:18, 61:1, 69:19, 78:5, 78:11, 78:21, 79:21, 103:10, 106:10, 106:19, 109:2, 109:6, 109:13, 110:10, 110:15, 111:22, 112:15, 112:18, 112:20, 112:23, 113:8, 114:10, 114:20, 114:22, 114:25, 116:6, 118:2, 118:5, 118:13, 118:24, 119:1, 119:4, 122:12, 126:1, 126:3, 127:2, 127:7, 128:4, 128:8, 128:20, 129:2, 129:11, 129:14, 129:22, 129:25, 130:1, 130:2, 130:10, 130:11, 130:12, 130:17, 131:17, 132:15, 133:20, 133:24, 141:9, 145:23, 146:2, 152:4, 152:12, 155:25, 156:3, 156:4, 157:18, 158:4, 158:7
**verdict** [2] - 24:8, 45:4
**verify** [7] - 86:19, 87:23, 88:17, 91:2, 92:16, 100:5, 125:22
**verifying** [1] - 75:20
**versions** [1] - 74:12
**versus** [2] - 60:17, 63:9
**vertical** [1] - 33:21
**Veterans** [1] - 1:21
**via** [2] - 60:8, 79:16
**victims** [1] - 28:4
**View** [1] - 117:11
**view** [2] - 13:1, 24:11
**violations** [1] - 99:24
**vs** [2] - 3:3, 42:5

## W

**waiting** [1] - 93:9
**walkaway** [1] - 53:3

**wants** [2] - 14:16, 153:25
**warrant** [1] - 83:22
**water** [1] - 66:17
**Wayne** [4] - 21:13, 38:11, 42:20, 160:20
**Wayne's** [1] - 24:25
**ways** [1] - 107:22
**Wednesday** [2] - 161:4, 161:18
**week** [3] - 160:23, 160:24, 161:2
**weekly** [1] - 106:8
**weeks** [1] - 65:20
**WEINBLATT** [1] - 1:20
**welcome** [1] - 55:12, 127:7
**Wexler** [2] - 161:6, 161:15
**whatsoever** [4] - 11:19, 45:25, 98:19, 105:10
**wherein** [2] - 39:4, 39:24
**whole** [2] - 19:22, 69:3
**wholeheartedly** [1] - 15:24
**wife** [5] - 36:21, 36:24, 144:17, 144:22, 144:25
**wife's** [1] - 144:23
**William** [1] - 75:5
**willing** [2] - 69:25, 82:22
**willingness** [1] - 139:9
**Windwalker** [1] - 72:6
**wire** [27] - 20:18, 50:22, 51:9, 56:21, 57:8, 57:21, 58:16, 58:25, 59:11, 65:14, 68:19, 74:2, 74:9, 75:7, 75:17, 75:18, 76:3, 77:25, 78:7, 138:3, 139:7, 139:10, 141:19, 141:22, 147:8, 151:16, 151:18
**wired** [2] - 61:16, 116:12
**wiring** [1] - 137:23
**wish** [1] - 16:18
**withdraw** [4] - 39:25, 40:1, 40:3, 85:14
**withdrawn** [5] - 36:22, 58:11, 126:24, 134:13, 140:13
**withholds** [1] - 9:16
**WITNESS** [14] - 26:20, 60:23, 61:6, 61:11, 66:13, 66:16, 66:19, 89:17, 89:24, 91:8, 99:12, 105:5, 139:20, 142:10
**witness** [13] - 7:13, 18:3, 26:14, 49:25, 85:6, 92:23, 101:1, 102:4, 104:25, 133:14, 142:7, 152:17, 155:4
**Witnesses** [1] - 162:3
**witnesses** [3] - 82:21, 82:23, 160:17
**word** [3] - 53:15, 57:12, 61:20

**Worden** [1] - 72:6
**words** [2] - 55:25, 92:12
**worried** [1] - 19:7
**worth** [5] - 53:10, 144:14, 155:22, 157:1, 159:11
**worthless** [1] - 113:8
**write** [1] - 98:5
**writing** [2] - 104:5, 105:17
**written** [5] - 92:19, 93:2, 93:6, 97:24, 135:13
**wrongfully** [1] - 22:21
**wrote** [3] - 92:21, 124:14, 124:16

## Y

**year** [5] - 46:7, 47:14, 49:9, 72:2, 94:4
**years** [11] - 36:21, 63:19, 73:2, 73:15, 82:4, 108:23, 108:25, 132:13, 145:8, 158:9
**YORK** [1] - 1:1
**York** [5] - 1:6, 1:15, 2:21, 43:13, 69:24
**yourself** [4] - 28:20, 41:18, 134:13, 142:23

## Z

**zero** [2] - 70:6, 70:8