163

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                             :
UNITED STATES OF AMERICA
                                    CR-13-607


          -against-          :

                                    United States Courthouse
                                    Central Islip, New York

PHILLIP A. KENNER and
TOMMY C. CONSTANTINE,

     Defendants.             :
                                    April 6, 2015
- - - - - - - - - - - - - - - X    10:00 a.m.

               TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE JOSEPH F. BIANCO
             UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          ROBERT CAPERS
                             United States Attorney
                             100 Federal Plaza
                             Central Islip, New York 11722
                             BY:  DIANE LEONARDO, ESQ.
                                  MADELINE O'CONNOR, ESQ.
                             Assistant United States Attorney




For the Defendants:          HALEY, WEINBLATT & CALCAGNI
                             One Suffolk Square
                             1601 Veterans Memorial Highway
                             Islandia, NY  11749
                             BY: RICHARD HALEY, ESQ.
                             For Mr. Kenner

164

For the Defendants:

                                    LARUSSO & CONWAY
                                    300 Old Country Road
                                    Mineola, NY  11501
                                    BY: JOSEPH CONWAY, ESQ.
                                    For Mr. Constantine


                                    ANDREW L. OLIVERAS, ESQ.
                                    26 Strangford Court
                                    Oceanside, NY  11572
                                    For Mr. Constantine

Court Reporter:                     Mary Ann Steiger
                                    100 Federal Plaza
                                    Central Islip, New York 11722
                                    (631) 712-6101


          Proceedings recorded by mechanical stenography.
               Transcript produced by computer.

165

1          THE CLERK:  All rise

2          THE COURT:  Please be seated.

3          THE CLERK:  Calling case 13-CR-607, U.S.A. vs.

4    Kenner and Constantine.

5          Counsel, please state your appearances for the

6    record.

7          MS. LEONARDO:  For the United States, Diane

8    Leonardo and Madeline O'Connor, Assistant United States

9    Attorneys.

10          Good morning, your Honor.

11          THE COURT:  Good morning.

12          MR. HALEY:  Richard Haley, for the defendant

13    Phil Kenner.  Phil is to my left.

14          THE COURT:  Good morning.

15          MR. CONWAY:  Good morning, your Honor.

16          Joseph Conway and Andrew Oliveras for Mr. Tommy

17    Constantine, who is right here.

18          THE COURT:  Good morning.

19          Both defendants are present.

20          This is the continuation of the forfeiture

21    hearing.

22          Mr. Kenner, if you would retake the stand,

23    please.

24

25

166

1   PHIL KENNER,

2          called as a witness, having been previously

3          duly sworn, was examined and testified further

4          as follows:

5

6          THE COURT: I remind you, Mr. Kenner, that you're

7   still under oath; do you understand?

8          THE WITNESS:  Yes, sir.

9          MS. LEONARDO:  Your Honor, before I start

10  questioning Mr. Kenner, we just wanted to move into

11  evidence several of Mr. Kenner's prior deposition

12  transcripts.

13         THE COURT:  Okay.

14         MS. LEONARDO:  I believe Mr. Conway did not have

15  an objection, and Mr. Haley did have an objection to that.

16         THE COURT:  Okay.

17         These are depositions from the civil litigation?

18         MS. LEONARDO:  Yes, your Honor.

19         MR. HALEY:  Your Honor, my only objection is

20  this, and perhaps we can resolve it following my client's

21  testimony.

22         I don't know specifically what portions of the

23  deposition transcripts they wish to introduce.  There are

24  limited issues in this hearing.  To the extent they

25  address the limited issues, and I see the relevance and

167

1    materiality to it, I would have no objection.  To the

2    extent they simply want to say, here's a deposition

3    transcript of Mr. Kenner regarding prior testimony, I

4    can't commit to that at this point.

5              THE COURT:  So basically you want to reserve any

6    relevancy objection depending on what they are pointing

7    to?

8              MR. HALEY:  Yes, sir.

9              I say that, your Honor, simply based upon what

10   occurred the other day when we spoke about, at least for

11   purposes of the forfeiture hearing, what may or may not be

12   relevant issues.

13             THE COURT:  Okay.

14             I'll admit the transcripts with the

15   understanding that Mr. Haley is reserving the right to

16   make an objection to relevancy depending upon what

17   particular portion of the transcript the government either

18   questions Mr. Kenner on or refers to the Court for its

19   consideration.

20             MR. HALEY:  Thank you.

21             MS. LEONARDO:  Your Honor, just for the record,

22   what I did was made copies for counsel of the first page

23   with the exhibit number on it instead of producing

24   thousands of pages of deposition, and I did that for the

25   Court, your Honor.

168

1          For the record, your Honor, Exhibit 97 would be

2    the deposition in Kenner v. Myerick.

3          Exhibit 98 would be the deposition of Mr. Jowdy

4    in DeVries v. Jowdy.

5          Exhibit 99 is a depositions of Mr. Kenner in

6    Little Isle v. Jowdy.

7          Exhibit 100 is Mr. Kenner's testimony before the

8    SEC.

9          Exhibit 101 is Mr. Kenner's testimony in Nolan

10   v. Kenner, the arbitration proceeding.

11         Exhibit 102 is the deposition of Mr. Kenner in

12   Murray v. Jowdy.

13         And 103 is Mr. Kenner's testimony in Baja

14   Ventures v. Diamante Cabo San Lucas.

15         THE COURT:  What was 98?  I thought you said it

16   was Mr. Jowdy's deposition.  It's Mr. Kenner's deposition?

17         MS. LEONARDO:  Your Honor, I believe back on

18   March 9th, Mr. Haley introduced a portion of Mr. Jowdy's

19   deposition and your Honor indicated that you would review

20   the entire transcript under the rule of completeness.

21         THE COURT:  That is Mr. Jowdy's?

22         MS. LEONARDO:  That is, your Honor.  I have a

23   copy for your Honor.

24         MR. HALEY:  For purposes of the record, what was

25   physically handed to me prior to your Honor taking the

169

1    bench was Government's Exhibit FORF-80.  That was

2    physically handed to me about 15 minutes ago.

3          As relates to the exhibits that the government

4    now has proffered to the Court, that was just given to me

5    just this very moment.

6          So, indeed, I'm being asked -- I know your Honor

7    is allowing me to reserve my objections as to relevance

8    and materiality.

9          I would simply like to point out I'm just given

10   these exhibits now as they're being offered to the Court

11   without the chance to review them before they submit them

12   to the Court.

13         THE COURT:  I understand that.  There's no

14   authenticity issues.

15         MR. HALEY:  No, sir.

16         THE COURT:  I have only the first page of the

17   transcript.  I can't consider what's in there either.

18         So I assume at some future point, either during

19   Mr. Kenner's testimony today or in the government's

20   supplemental briefing, they're going to point to certain

21   portions of the depositions that they think are relevant

22   and I'll give you a chance to respond.

23         MR. HALEY:  Thank you.

24         MS. LEONARDO:  We have previously provided the

25   deposition transcripts to counsel.  I wanted to avoid

170

1  handing them a thousand pages in 10 binders.

2          For the record,  Forfeiture Exhibit 80 was

3  introduced in evidence on Monday and counsel had no

4  objection to that on Monday.

5          MR. HALEY:  I still have no objection to Exhibit

6  80, Judge.

7          THE COURT:  Okay.  80 is in.  Okay.  Let's

8  continue.

9          MS. LEONARDO:  Thank you, your Honor.

10          (Government Forfeiture Exhibits 97 through 103

11  in evidence.)

12

13  CROSS-EXAMINATION

14  BY MS. LEONARDO:

15  Q.    Mr. Kenner, you testified on Monday with regard to

16  your acquiring an interest in Baja Ventures; do you

17  remember that?

18  A.    Yes.

19  Q.    Could you just describe for me again the first time

20  you approached Mr. Lehtinen and Mr. Stumpel with regard to

21  this investment?

22  A.    I had spoken with both of them independently on the

23  phone, and suggested that there's an opportunity to invest

24  through a debt offering to loan money during the

25  acquisition process of the Diamante Cabo San Lucas

171

1    project, and both independently agreed to do so.

2           Shortly thereafter, Mr. Jowdy had defaulted on

3    Mr. Lehtinen's initial agreement and, at that point, I

4    contacted Mr. Lehtinen and let him know what was going on,

5    and that pursuant to the letter agreement Mr. Jowdy had

6    provided Mr. Lehtinen, I was going to include him as a

7    guarantee in the equity position that I was going to

8    acquire in the future.

9           At that point I felt it was only fair to do the

10   same to Mr. Stumpel, so I contacted him as well.

11          Mr. Jowdy did make one interest payment to

12   Mr. Stumpel, but did not fulfill his agreement with

13   Mr. Stumpel either, so we created the Baja Ventures

14   promissory contracts which then, when Mr. Jowdy, in or

15   about February 19 of 2006, informed me that he was not

16   going to be able to pay those two gentlemen back, I

17   indicated the other day that I instructed Mr. Najam and

18   Mr. Markowitz to create Baja Ventures 2006, which I

19   believe was on February 23rd, 2006, that Mr. Markowitz did

20   initiate the single purpose entity in Delaware.

21   Q.   I believe you just testified that you were going to

22   include either or both Lehtinen and Stumpel in your equity

23   position; is that what you said?

24   A.   That was my guarantee to them once Mr. Jowdy had

25   initially defaulted on his original promise.

Kenner  -  Cross/Leonardo

172

1   Q.   How were you going to acquire your equity position

2   outside of Lehtinen's and Stumpel's debt agreement, how

3   are you acquiring your interest?

4   A.   I was initially going to do it with my own cash

5   position.

6   Q.   With what?  The what? What did you say?

7           THE COURT:  With his own cash position.

8           THE WITNESS:  Yes, sir.

9   BY MS. LEONARDO:

10  Q.   What was the cash you were intending to put in?

11  A.   That hadn't been concluded yet; but, at that point,

12  it was somewhere -- I would guess it was somewhere in the

13  neighborhood of a million-and-a-half dollars.

14  Q.   Where were you getting a million-and-a-half dollars

15  cash to put in the equity interest?

16  A.   From monies owed to me.

17  Q.   From monies owed to you?

18  A.   Primarily from Mr. Jowdy.

19  Q.   And those were monies that were owed to you

20  personally?

21  A.   Yes, that is correct.

22  Q.   And Stumpel's and Lehtinen's money didn't go through

23  separate from Little Isle loans to Mr. Jowdy?

24  A.   I didn't understand what you just said.

25  Q.   Mr. Lehtinen's and Mr. Stumpel's monies were separate

Kenner - Cross/Leonardo

173

1  from Little Isle monies that went to Mr. Jowdy; is that

2  right?

3  A.   That's correct.

4  Q.   Now, I think you testified on Monday that

5  Mr. Lehtinen transferred $1.5 million directly to

6  Mr. Jowdy; is that correct?

7  A.   That is correct.

8  Q.   And that went to Propiedades, the Propiedades

9  account?

10 A.   Yes, it did.

11 Q.   Did you make that transfer on behalf of Mr. Lehtinen,

12 or did he make that transfer himself?

13 A.   I made it as an authorized transfer with my power of

14 attorney that I have on Mr. Lehtinen's account in Charles

15 Schwab at the time.

16 Q.   So you used your power of attorney authority to

17 transfer Mr. Lehtinen's money to Propiedades, correct?

18 A.   That is correct.

19 Q.   And with regard to Mr. Stumpel's 956,000, that went

20 to Ula Makika first, correct?

21 A.   Correct.

22         That was a brand-new account that was set up.

23 Q.   Ula Makika was set up to be a buffer between your

24 Little Isle clients and any loans; is that right?

25 A.   That is not correct.

174

1   Q.   It was set up as kind of some kind of buffer; is that

2   correct?

3   A.   That is also not correct.

4        Later it was suggested to me to be used as a

5   buffer.  The account was set up for me to deal with a

6   different business transaction I was looking to do.

7   Q.   Mr. Kenner, you testified at the SEC that Ula Makika

8   was specifically set up to be a buffer so your hockey

9   player clients wouldn't get involved in any kind of

10  litigation stemming from these loans; isn't that correct?

11  A.   I don't believe that is factually accurate.

12       I believe it is consistent with the fact that I

13  used Ula Makika in order to create a buffer company

14  advised by my attorney, one of my attorneys at the time,

15  in order to avoid dragging in any of the Little Isle

16  members into future litigation if not necessary.

17  Q.   Which attorney advised you to do that?

18  A.   I had several attorneys advise me; Mr. Markowitz

19  advised me, Mr. Najam advised me, the Mexican attorney,

20  Fernando Garcia also advised me.

21  Q.   Well, Larry Markowitz was your attorney; is that

22  correct?

23  A.   He represented me and all of the Hawaiian entities.

24  Q.   When Mr. Stumpel's money was transferred to Ula

25  Makika, did you do that transfer or did he do that

Kenner  -  Cross/Leonardo

175

1  transfer?

2  A.    No, I did, using my power of attorney at Charles

3  Schwab that I had at the time.

4  Q.    Did you follow-up that power of attorney transfer by

5  notifying Mr. Stumpel and Mr. Lehtinen that that was in

6  fact occurring?

7  A.    They were clearly aware that it was done because they

8  authorized me to do the transfer.

9  Q.    Did you follow it up with an e-mail or a fax to them

10 confirming that you accessed your power of attorney over

11 their accounts to transfer funds?

12 A.    Each of the power of attorney wire transfer requests,

13 after it was signed and sent to Charles Schwab, it was my

14 typical practice to forward them also on to the clients.

15 Q.    As you sit here today, do you recall if you did that?

16 A.    Absolutely.  I did that for each and every one of the

17 times I used the power of attorney for any one of my

18 clients from the time I was given power of attorney until

19 the time all the Schwab accounts were closed.

20 Q.    So are you saying every time you -- withdrawn.

21        With regard to Mr. Stumpel's money, once it went

22 to Ula Makika, then you sent it on to the seller in Cabo;

23 is that correct?

24 A.    Yes, that's correct.

25 Q.    You, in fact, were the only person on the account for

Kenner  -  Cross/Leonardo

176

1    Ula Makika, right?

2    A.    Yes, that's correct.

3    Q.    When you accessed other clients' line of credit

4    money, for example from Northern Trust, did you have power

5    of attorney on those account?

6    A.    I had written authorization that Northern Trust bank

7    had prepared and independently sent to each one of the

8    line of credit holders granting me access to transfer

9    funds from the line of credit to Little Isle IV, and the

10   use of funds was governed by the active operating

11   agreement for Little Isle IV at the time.

12   Q.    So any time you accessed a client's account, a line

13   of credit account, you didn't notify them; is that right?

14   A.    No, I wasn't required to.

15          The authorization was a blanket authorization to

16   use the funds for the investment.  The commitment of the

17   line of credit was the capital contribution investment for

18   each of the individuals into Little Isle IV.

19          There was no subsequent authorization required

20   by the client.  It was a blanket authorization that was

21   created by the back and sent to the individual client and

22   returned independently by the client to the bank.

23   Q.    So, Mr. Kenner, as your client's financial advisor,

24   you saw no need to notify them that you were accessing

25   their line of credit account for upwards of millions of

177

1    dollars?

2    A.    They were clearly aware that their accounts were

3    accessed because consistent with the subpoena that was

4    returned to us during in or about week 9 or 10 of the

5    trial, in each one of the records from Mr. Nolan, Mr. Peca

6    Mr. Rucchin, Mr. Berard, and a partial return subpoena for

7    Mr. Sydor, there are disbursement requests and

8    authorization forms that were signed at a minimum once a

9    year that showed the clients what funds had been disbursed

10   from their lines of credit and what had been used.

11          In addition, the extension of credit document

12   was signed by each of the individuals which clearly laid

13   out either that it was an investment in Little Isle IV

14   consistent with a capital contribution, and/or it was an

15   investment in quotes speculative real estate on each of

16   those documents.  Each of those were one page documents,

17   so it was very apparent when they signed the document what

18   they were signing.

19   Q.    So, Mr. Kenner, my question to you was on occasion

20   when you accessed your clients' line of credit at Northern

21   Trust, you didn't specifically tell them on that day, did

22   you?

23   A.    No, I did not.

24          I wasn't required to do so by the authorization

25   they granted me.

Kenner   -   Cross/Leonardo

178

1    Q.    My question is, you didn't do it; is that correct?

2    A.    No, ma'am, I didn't notify them because it wasn't

3    required as part of the authorization they had signed.

4            MS. LEONARDO:  Your Honor, I know you will

5    overrule me, but I would ask that the witness just answer

6    the question.

7            MR. HALEY:  The question implies some sort of

8    wrongdoing on the part of my client.

9            I respectfully suggest he's entitled to give a

10   full and complete answer.

11           THE COURT:  I'll let the answer stand.

12           I believe we covered this, so let's move on.

13   BY MS. LEONARDO:

14   Q.    When Mr. Stumpel and Lehtinen sent you the money in

15   May or June of 2005, at that time was it a loan or equity?

16   A.    Neither of the individuals sent money to me.

17   Q.    Well, Mr. Stumpel sent it to you in Ula Makika,

18   correct?

19   A.    Mr. Stumpel's money was wire transferred by me into

20   the Ula Makika account and then forwarded on to the seller

21   of Cabo San Lucas.

22   Q.    Did you tell Mr. Stumpel at that time it was intended

23   to be a loan or equity?

24   A.    It was a loan to Mr. Jowdy, just the same as

25   Mr. Lehtinen also agreed to.

**Kenner  -  Cross/Leonardo**

179

1    Q.    So both those transfers that ended up going to

2    Mr. Jowdy for the purchase of Cabo, were loans; is that

3    right?

4    A.    They were original loans to Mr. Jowdy.

5          And when Mr. Jowdy defaulted on the provisions

6    in the agreement he had forwarded to Mr. Lehtinen, that's

7    when I told each of the individuals that I would

8    personally make sure that they were covered in the deal,

9    and that's what I did with Baja Ventures 2006.

10   Q.    When did you notify them?

11   A.    Within 30 days, when Mr. Jowdy failed to fulfill his

12   obligation.

13         Mr. Jowdy had promised that he was selling one

14   of his real estate ventures in Atlanta, Georgia, called

15   Star Time, which Mr. Jowdy then also borrowed money from

16   our Hawaii loan to try and close his real estate project.

17         When that deal fell through, according to

18   Mr. Jowdy, and he was unable to pay Mr. Stumpel and

19   Mr. Lehtinen the full terms of their agreement, then I

20   covered Mr. Jowdy's position by confirming that I would

21   take care of Mr. Stumpel and Mr. Lehtinen with the Baja

22   Ventures promissory contracts which we all signed.

23   Q.    I think you testified on Monday that you don't recall

24   when you had these conversations with Mr. Lehtinen and

25   Mr. Stumpel, did you?

180

1   A.   I just described about seven conversations.  I'm not

2   sure.

3   Q.   The question was in or about the period of time, did

4   you have these conversations with them?

5   A.   All through the summer of 2005 until the fall of

6   2005.

7   Q.   And the promissory note occurred after that or during

8   that time period?

9   A.   It occurred when they got back to the United States.

10  Q.   That would be in August of 2005?

11  A.   That sounds about accurate.  It's over a decade ago,

12  but I believe that's about when it would have occurred.

13  Q.   And I think you testified on Monday that you don't

14  have any e-mails with regard to these conversations you

15  had with Mr. Lehtinen or Mr. Stumpel?

16  A.   E-mails confirming?

17  Q.   Do you have any e-mails of conversations with them

18  where you say, in accordance with our conversation, here

19  is a document, here is the promissory note.

20          Do you have any e-mails other than the

21  promissory note?  Do you have anything to reflect your

22  conversations?

23  A.   With the specific conversations, I had forwarded on

24  to Mr. Lehtinen and his attorney the signed promissory

25  contract I believe in 2011 or 2012, I forwarded along the

181

1    affidavit that Mr. Lehtinen signed, which also had

2    reflected ownership interest and agreement to be part of

3    the Diamante Cabo San Lucas project originally as a loan

4    and then subsequently as a debt in equity holder in Baja

5    Ventures in 2006, and there certainly were others with

6    Mr. Stumpel as well.

7              But as I said on Monday, since I was arrested, I

8    have not had access to the majority of my e-mails.

9    Q.   So, Mr. Kenner, in addition to Mr. Lehtinen's and

10   Mr. Stumpel's money that ended up going to Propiedades or

11   to the seller, you also transferred loan money from the

12   Centrum loan in the amount of $1.5 million to Propiedades;

13   isn't that correct?

14   A.   I don't recall if the 1.5 was sent to Propiedades or

15   LOR Management in Mexico.

16   Q.   Well, the Centrum loan money came into your account

17   Little Isle; isn't that right?

18   A.   I don't recall if it came into the Little Isle IV

19   account or into the Big Isle V Ventures account.

20   Q.   And then you sent, because you're the only signatory

21   on the Little Isle account; isn't that right?

22   A.   I am the only signature on the Little Isle IV

23   account.

24   Q.   So you sent $1.5 million to Mr. Jowdy, whether it was

25   his LOR Management account or the Propiedades account, for

Kenner   -   Cross/Leonardo

182

1    the purchase of Cabo; isn't that correct?

2    A.    I sent it to Mr. Jowdy as part and parcel to the 15

3    percent loan agreement we had signed in December 2004.

4    Q.    Because you thought that it was a good deal for your

5    Little Isle members?

6    A.    Absolutely I believe that to be the case.

7              It was a 3 percent positive cash position for

8    us.

9    Q.    Mr. Kenner, in addition to the -- well, you took a $3

10   million loan from Centrum; isn't that right?

11   A.    I believe it was $3 million.

12   Q.    Of that amount, you had to pay fees and costs; isn't

13   that correct?

14   A.    I believe there were fees and costs associated with

15   it, yes.

16   Q.    So the actual amount that Little Isle ended getting

17   was approximately 2.5 million; isn't that correct?

18   A.    Sounds about accurate.

19   Q.    And of that amount -- by the way, how much interest

20   did you expect that you were going to earn from

21   Mr. Kenner -- I mean from Mr. Jowdy?

22   A.    What was designated on the December 2004 loan

23   agreement, 15 percent.

24   Q.    At the time you took the Centrum loan, how much

25   interest did Mr. Jowdy owe you at that time?

183

1  A.   He owed us 15 percent annual interest on the

2  outstanding funds at that time.

3  Q.   As of the time you took the Centrum loan in July

4  2005, what was the outstanding amount?

5  A.   I don't recall, as I sit here today, but if you show

6  me some documents, I would be glad to tally them up for

7  you.

8  Q.   The Centrum loan was a 12 percent loan; isn't that

9  correct?

10  A.   I believe that's correct.

11  Q.   That's where you're getting a 3 percent profit for

12  your Little Isle members; isn't that right?

13  A.   I would call it a positive cash position.

14  Q.   So when you took the Centrum loan, you paid

15  approximately a half million dollars in fees and costs for

16  that loan; isn't that right?

17  A.   That is incorrect.

18  Q.   Well, the loan the amount that went into the Little

19  Isle IV account was approximately 2.5 million?

20  A.   That sounds accurate, if it was in fact the Little

21  Isle IV account.  I don't know.  I don't recall if it was

22  Little Isle IV.

23  Q.   What was the $500,000 for?

24  A.   That was a set aside for future interest payments.

25          So if the loan had been paid back by Mr. Jowdy

184

1    within 30 days, and we paid the Centrum loan during that

2    period of time, we would receive the 3 percent arbitrage

3    interest on that.

4    Q.    If he had paid you back at the time of the closing?

5    A.    We would have made a 3 percent arbitrage interest, a

6    positive benefit for the investors.

7    Q.    Well, at that point, you had sent to Mexico about 1.6

8    million; does that sound about right?

9    A.    If you show me bank records, I can sit here and

10   calculate them up for you if you would like.

11   Q.    If Mr. Jowdy paid you back in 30 days, the

12   approximate interest that you would have gained is about

13   $4,000, right?

14   A.    It would have been 3 percent positive cash flow on

15   the fund.

16   Q.    That's about $4,000?

17   A.    I don't have a calculator in front of me.

18         That's how our American banking system works.

19   Q.    So you expected Mr. Jowdy to pay back within 30 days,

20   correct?

21   A.    According to Mr. Jowdy, he was selling his real

22   estate project in Georgia and was looking for a short term

23   loan at that point, and/or he was also looking to

24   refinance or finance some development money out of

25   Diamante Del Mar that he and William Najam were working on

185

1    at the time.

2    Q.   And the Centrum loan, and I think this was discussed

3    at trial, the Centrum loan was supposed to be intended

4    solely for the purchase of property in Hawaii; isn't that

5    correct?

6    A.   The Centrum loan was to be used by Big Isle V

7    Ventures in concert with the operating agreement that had

8    been forwarded to Centrum during the loan process.

9    Q.   The Centrum loan provided it was supposed to be

10   specifically for the benefit of the purchase of the

11   property in Hawaii; isn't that correct?

12   A.   That's absolutely incorrect.

13   Q.   According to the closing statement for Centrum, the

14   Centrum loan which was in evidence in the criminal trial,

15   3717, the loan fee was approximately $220,000; does that

16   sound right?

17   A.   I don't have the document to refer to as I sit here

18   today.  That was approximately 11 years ago.

19   Q.   Showing you what's been marked in evidence as exhibit

20   3717, is that a copy of the closing statement for the

21   Centrum loan?

22   A.   This is not a closing statement from the original

23   Centrum loan, as far as I can tell.

24   Q.   Explain to us what that document is?

25   A.   I don't know what it is, but it's titled estimated

186

1   closing statement, March 31, 2006.

2   Q.   Did you sign that statement?

3   A.   Yes, that appears to be my signature.

4   Q.   As you sit here today, you don't recall what that

5   document is supposed to be representative of?

6   A.   It appears to be representative of an estimated

7   closing statement from March 31 of 2006.

8          This is not the original Centrum loan.

9   Q.   Because you couldn't pay off the Centrum loan within

10   the 6 months or so that it was supposed to be paid off in,

11   correct?

12   A.   We did not.

13          We sought an extension because we were still

14   waiting on development permitting to come through so we

15   could actually utilize the funds.

16          Raising money for the Hawaii project was very

17   difficult and after working our way through approximately

18   20 hard money lenders, it was a collective decision of

19   myself, John Kaiser and the chief operating officer, Chris

20   Manfredi, to take the Centrum loan because when they came

21   along, they were very hard to find, as we heard through

22   the criminal trial.

23   Q.   So let me back up a little bit.

24          You take the Centrum loan on or about July 19 of

25   2005; is that correct?

Kenner   -   Cross/Leonardo

187

1    A.    I couldn't understand what you said.

2    Q.    You take the Centrum loan on or about July 19, 2005,

3    correct?

4    A.    That sounds accurate, July of 2005.

5    Q.    Little Isle gets approximately 2.5 million into the

6    account as the proceeds of the loan, correct?

7    A.    I haven't seen the Little Isle bank statement, so if

8    you could show it to me.

9    Q.    Then you send, and I think you testified to this,

10   approximately 1.5 million goes to Mr. Jowdy in Mexico,

11   whether it's LOR Management or Propiedades, correct?

12   A.    I actually testified that exactly $1.5 million went

13   to Mr. Jowdy, not approximately.

14   Q.    Exactly 1.5.

15         You also sent $650,000 from Ula Makika to CMG,

16   correct?

17   A.    Are you saying that I already said that?

18   Q.    After you get the proceeds of the Centrum loan, you

19   sent $650,000 to CMG Management, correct?

20   A.    I don't know.

21         If you show me some bank statement, I can verify

22   what was sent to each and every party that we owed money

23   to at that time.

24   Q.    By the way, you got the loan on July 19 and you were

25   supposed to close on Waikapuna 11 days later; is that

188

1  right?

2  A.  I don't recall.

3       If you show me the original Waikapuna purchase

4  and sale contract, I can confirm it for you.

5  Q.  Because you didn't close, I believe you testified to

6  this at trial, because you didn't close on Waikapuna when

7  you should have, you had to get extensions from

8  Mr. Chombley; isn't that correct?

9  A.  In fact, the reason that we didn't close on Waikapuna

10  is because Lehman Brothers was supposed to close with us

11  at the end of July on the Waikapuna parcel.

12       And due to some egregious 11th hour terms by

13  Lehman Brothers, which was also documented by Mr. Manfredi

14  as being egregious, we decided to walk away from the

15  Waikapuna purchase at that point in time, which was not

16  Waikapuna.  It was an entire funding effort for all of the

17  Hawaii projects.

18       So had I taken Lehman Brothers' funding at that

19  point in time, it is 100 percent certainty we would have

20  lost the property to Lehman Brothers within two years

21  based on their egregious terms.

22  Q.  You ended up paying penalties because you couldn't

23  close on Waikapuna in the amount of $500,000; is that

24  correct?

25  A.  The penalties were negotiated by me because we felt

Kenner  -  Cross/Leonardo

189

1    it was important to still acquire that, the Waikapuna

2    parcel.

3    Q.    So you paid penalties in the amount of approximately

4    $64,000 per week for eight weeks; is that right?

5    A.    No.

6              We paid $64,400 one week extensions for seven

7    consecutive weeks until I was able to negotiate with

8    Mr. Constantine and his partner at the time to fund the

9    Waikapuna parcel purchased on its own while we still

10   sought vertical and horizontal development.

11   Q.    Mr. Kenner, you seem to remember that figure very

12   specifically.

13             Is it because you reviewed records with regard

14   to this transaction or not?

15   A.    I have reviewed some records.

16   Q.    And $64,000 for seven weeks is almost a half million

17   dollars; is that right?

18   A.    Yes, ma'am, that is correct.

19   Q.    I have a calculator if you need it.

20   A.    I would appreciate it.  I can use it.

21   Q.    So 64,000 and how much?

22   A.    I don't know where I'm supposed to see where I type

23   the number in.  I'm not sure what I'm supposed to see.

24   Q.    I think you flip the top.

25             THE COURT:  I think we can agree 64,000 times

Kenner  -  Cross/Leonardo

190

1  seven is --

2          MS. BECKMANN: Roughly half a million?

3          THE COURT:  450.

4          MR. HALEY:  So stipulated, your Honor.

5          THE WITNESS:  Sorry, your Honor.  I couldn't

6  figure out how to open the calculator.

7          THE COURT:  I don't think we need to spend the

8  time.  It's around $450,000.

9          THE WITNESS:  That sound accurate.  Thank you,

10  your Honor.

11  A.   Yes, it would be approximately $450,000 in fees.

12          And had we not acquired that parcel subsequently

13  both the individuals that I was negotiating with for

14  Mr. Constantine, Lehman Brothers would not have had any

15  interest in a future development without an ocean front

16  parcel.

17          The parcel we found out was appraised for a

18  little over $35 million under our $4.2 million purchase

19  contract that I negotiated for the property.

20  Q.   Mr. Kenner, because you didn't close on time, you

21  also incurred an additional $700,000 as part of the

22  Centrum loan; is that correct?

23  A.   Because we didn't close what on time?

24  Q.   Because you didn't close in Hawaii, you couldn't pay

25  the Centrum loan back; is that correct?

Kenner  -  Cross/Leonardo

191

1    A.    Because we didn't close what in Hawaii?

2          There were a multitude of closings.

3    Q.    You tell me.

4          Which deal is supposed to pay the Centrum loan?

5    A.    The Centrum loan was supposed to be paid off at the

6    point in time when we were able to get subdivision

7    approval on the Honu'Apo 1500 acre parcel which we had

8    been waiting for 18 months from the Cabu District and

9    Chris Hume at the planning department.

10         And upon closing of that deal, we had 26

11   pre-registered parcels with the county and we expected to

12   be selling those parcels in the neighborhood of a

13   million-and-a-half dollars each.

14         So at that point in time we believed we would

15   not just be able to pay off the loan to Centrum, but we

16   would be able to start early infrastructure and

17   engineering that we had already been paying for for about

18   12 months on the Honu'Apo parcel.

19   Q.    So from the Centrum loan, the initial loan amount of

20   2.5 million, none of that amount went to the benefit of

21   the Hawaii property?

22   A.    That's incorrect.

23   Q.    What portion went to the benefit of the Hawaii

24   property?

25   A.    If you show me the bank statements, I can tell you

192

1   specifically, but certainly each dollar that was spent was

2   related to project expenses and/or development.

3   Q.    Well, the Centrum loan, the two-and-a-half million

4   that you got, you sent 1.5 to Ken Jowdy?

5   A.    15 percent interest rate that Mr. Jowdy reneged on

6   the deal and defaulted.

7   Q.    On the 12 percent loan that you had for Centrum, you

8   had a 12 percent loan agreement with Centrum, correct?

9   A.    I had a 12 percent.

10         Are you asking me if borrowing money at 12

11  percent and loaning it at 15 percent is a bad business

12  deal for somebody?

13  Q.    That's not my question.

14  A.    You seem to be insinuating -- I'm just confused

15  because that's how our American banking system works.

16  Q.    I'm asking you a question.

17         In addition to the 12 percent Centrum loan, you

18  were also paying what percentage on the lines of credit?

19  A.    The lines of credit were the expenses of the

20  corporation that were outstanding regardless of what we

21  did with Centrum.

22  Q.    I don't care if it was for the corporation's

23  expenses, what was the percentage rate you were paying or

24  the corporation was paying on the lines of credit?

25  A.    I don't recall, as I sit here today, but if you show

Kenner  -  Cross/Leonardo

193

1   me some bank statements I'll be glad to verify it.

2   Q.   Was it 6 percent?  7 percent?  Was it lower?  Higher?

3   A.   I don't know, as I sit here today, but if you show me

4   bank statements since there were variable interest rates

5   on those loans.

6   Q.   I think you testified earlier that you just reviewed

7   the Northern Trust records that you had subpoenaed, so was

8   there any information on what the percentage amount was?

9   A.   No, not that I recall.

10  Q.   The 1.5 million you sent to Ken Jowdy, so that's

11  about a million, correct, rough math, and you sent

12  approximately --

13  A.   What is about one million?  You just said I sent 1.5

14  million.

15  Q.   One million from the Centrum loan; is that correct?

16           THE COURT:  She's saying one million left.

17           THE WITNESS:  I'm sorry, your Honor.

18           I'm having a hard time hearing her voice.

19  A.   If you could start over with that, I'm sorry.

20  Q.   You have 2.5 million, minus one-and-a-half million,

21  leaves you a million from the Centrum loan; is that right?

22  A.   Yes.

23  Q.   And the 650,000 goes to CMG Management; is that

24  right?

25  A.   That was part of the consulting payments that were

Kenner  -  Cross/Leonardo

194

1  due to Mr. Constantine I believe.

2  Q.   Sure.

3        And then you have about $350,000 left from the

4  Centrum loan, so where did that money go?

5  A.   If you show me bank statements, I'm sure I can verify

6  it for you.

7  Q.   And then the actual Centrum loan?

8  A.   Can I see the bank statements so I can answer that

9  question for you?

10  Q.   And the actual --

11        THE COURT:  If she doesn't want to cover it, she

12  can move on, okay?

13        THE WITNESS:  All right.

14  BY MS. LEONARDO:

15  Q.   The actual loan amount that you ended up paying back

16  to Centrum, you had two-and-a-half million, you paid them

17  back 3.7 million; is that right?

18  A.   It was covered in the closing costs by Lehman

19  Brothers.

20  Q.   So my question was, the actual loan amount that gets

21  paid back to Centrum is 3.7 million; is that correct?

22  A.   I believe it was in that neighborhood, yes.

23        We had negotiated in the end with Centrum for a

24  reduction of some sort, but I believe it was somewhere in

25  that neighborhood.

Kenner  -  Cross/Leonardo

195

1   Q.    The document I just showed you, Government's Exhibit

2   3717, indicates a closing statement of 3.7 million that

3   goes to Centrum; is that right?

4   A.    The statement, if you can show it to me again, I can

5   verify what's on that, but I believe that the number was

6   adjusted at the Lehman Brothers closing on August 26,

7   2006, negotiated between Lehman Brothers and Centrum just

8   like they negotiated independently with Urban Expansion.

9   Q.    I show you exhibit 3717.  It's entitled closing

10  statement, right?

11  A.    It's entitled estimated closing statement March 31st,

12  2006.

13  Q.    The amount that was due to go to Centrum was $3.7

14  million, correct?

15  A.    That's what it says on the closing statement.

16  Q.    You get two-and-a-half million in proceeds and you

17  had to pay them back 3.7 million; is that right?

18  A.    3.7 million was paid back minus whatever negotiated

19  reduction there was by Lehman Brothers approximately six

20  months after this date.

21  Q.    My question was much simpler.

22        On a $2.5 million proceeds, you had to pay back

23  3.7 million; is that right?

24  A.    I'll take your word for it.

25  Q.    You don't have to take my word for it.  It's on that

196

1    document.

2    A.    No, it's not on this document.

3           This is an estimated closing statement from the

4    extension on March 31st, 2006, after Lehman Brothers had

5    begun to get involved with financing the entire Hawaii

6    development.

7    Q.    Are you familiar with the Lehman closing documents?

8    A.    I have seen them.

9           It's approximately 1800 pages of it.

10   Q.    By the time -- there's a document in front of you

11   dated March 2006.

12          By the time Lehman Brothers closed in Hawaii,

13   the amount due to Centrum was actually more like 3.9

14   million; isn't that right?

15   A.    It's entirely possible it may have been.

16          The five month closing period with Lehman

17   Brothers was not any fault of mine or my investors.

18          It was Lehman Brothers extending the period of

19   time and they covered that as part of the proceeds of the

20   joint venture, so it doesn't cost my client anything.

21   Q.    I think this was covered during the criminal trial.

22          But your clients, after the Lehman closing, they

23   didn't get their lines of credit completely paid off, did

24   they?

25   A.    They weren't entitled to, according to the Lehman

197

1    closing.

2           It was a separate and independent and unique

3    situation what was paid back to my clients and I as part

4    of our Hawaii partnership, separate and independent from

5    what was negotiated between Urban Expansion directly with

6    Lehman Brothers, and separate from what was negotiated

7    between Centrum and Lehman Brothers, in addition to other

8    parcels that were being acquired during the joint venture

9    that were independently negotiated between Alan Worden,

10   Lehman Brothers and those other third-parties.

11   Q.    By the way, Mr. Kenner, you testified on Monday that

12   your interest in Baja Ventures capital contribution was

13   2.5 million; is that correct?

14   A.    That's what it says on Diamante Cabo San Lucas.

15   Q.    That number is not correct; is that what you're

16   saying?

17   A.    I'm saying the number that came from Lehtinen and

18   Stumpel was 2.456 million.

19   Q.    Where did the other 44,000 come from?

20   A.    Bill Najam and Ken Jowdy and Larry Markowitz filed

21   the final documents.  I didn't file those documents.

22   Q.    Did you raise any objection with Mr. Najam, Mr. Jowdy

23   and Mr. Markowitz that, hey, your actual contribution is

24   only 2.46 million?

25   A.    Yes, we did, about six months later when they

Kenner  -  Cross/Leonardo

198

1   forwarded the full package to myself and the rest of the

2   investors.

3   Q.   You're saying you were not aware of that prior to

4   getting those closing documents six months later?

5   A.   No, I had not seen the full operating agreement at

6   that time.

7            All I saw was the signature page that

8   Mr. Markowitz or Mr. Najam had forwarded to me.

9            MS. LEONARDO:  Your Honor, I'm just going to

10  show the witness what's in evidence as forfeiture exhibit

11  81.

12  BY MS. LEONARDO:

13  Q.   Mr. Kenner, looking at that exhibit, is that an

14  e-mail to you?

15           THE COURT:  Mr. Haley, do you have to be in

16  Judge Wexler at 11 or no?

17           MR. HALEY:  I do, your Honor.  Sometimes, with

18  all due respect to Judge Wexler, it's not necessarily at

19  11.  Yes, it is scheduled for 11, your Honor.  Correct.

20           THE COURT:  Do you want me to have my clerk call

21  down to see if they're ready for you?

22           MR. HALEY:  I think, rather than interrupt this

23  proceeding, I'll go whenever I'm required.  But, yes,

24  thank you.

25           THE COURT:  What's the question?

Kenner  -  Cross/Leonardo

199

1    BY MS. LEONARDO:

2    Q.   The question was, Mr. Kenner, was this an e-mail that

3    was sent to you or cc'd to you?

4    A.   It appears it was cc'd to me.

5    Q.   In the beginning of the e-mail, it's from Mr. Najam;

6    is that correct?

7    A.   I believe it's from Mr. Najam.

8    Q.   Mr. Jowdy and you're cc'd, correct?

9    A.   Yes.

10   Q.   Within that e-mail, Mr. Najam is indicating, to you

11   and Mr. Jowdy, can you and Phil breakout what is owed out

12   of the 6,625,000; do you see that?

13   A.   I do.

14   Q.   So I thought -- you testified earlier -- there was a

15   total of seven million that was put into Cabo?

16   A.   I testified that's what I was aware was put into Cabo

17   San Lucas as of the Diamante Cabo San Lucas operating

18   agreements, that's correct.

19   Q.   When you saw this e-mail where it reflects

20   $6,625,000, did you have any conversations with Mr. Jowdy

21   or Mr. Najam or Mr. Markowitz as to where the additional

22   375 was?

23   A.   No, because I didn't see those numbers until about

24   six months after this e-mail, so it would have been hard

25   to have that conversation when I received this e-mail.

Kenner  -  Cross/Leonardo

200

1    Q.    And as of February 14, 2006, Mr. Najam, in essence,

2    was telling you all the funds were to be equity?

3    A.    That's correct, on or about February 5th or 6th,

4    2006, Mr. Jowdy, for the first time, told Mr. Najam that

5    he had been borrowing the money from myself, my investors,

6    and a Hawaii entity, and Mr. Najam had forwarded an e-mail

7    at that time I believe on February 6th of 2006 instructing

8    Mr. Jowdy that all of the loans needed to be deemed

9    investments for the purpose of the closing, and I believe

10   probably eight days later he was just reiterating to

11   Mr. Jowdy that all the funds would have to be equity.

12   Q.    Well, at the time of the e-mail, had you already

13   signed the promissory note with Mr. Lehtinen and

14   Mr. Stumpel?

15   A.    Absolutely.

16          I believe that the funds from Mr. Stumpel and

17   Mr. Lehtinen were a subset of whatever number that

18   Mr. Jowdy and Mr. Najam and/or Mr. Garcia, the Mexican

19   attorney, had forwarded on to the seller in totality,

20   which I never saw any of those transactions.

21   Q.    And at this point you also knew that CSL Properties

22   had put in $2 million; is that correct?

23   A.    I believe that was about what I thought they put in,

24   correct.

25   Q.    Are you saying you were not aware that Mr. Jowdy's

201

1  contribution, at that point, was $2.5 million?

2  A.  Mr. Jowdy never made a contribution.  He borrowed

3  money from myself, my investors and my friends, and then

4  listed it as his capital contribution.

5  Q.  Right, a loan from your friends and your investors

6  from your Hawaii development properties; isn't that right?

7  A.  I don't know where he got all of his money from, but

8  I know he borrowed a significant amount from us in Hawaii.

9       He also borrowed $1.6 million from Joseph

10 Stumpel directly into Mexico.

11      He stole $500,000 from Mr. Murray's Nevada

12 proceeds as was represented in the 2010 case that

13 Mr. Murray won against Mr. Jowdy for those funds.

14      He borrowed probably close to a half million

15 dollars personally from me that was still on his books to

16 be repaid, so I don't know where his $2.5 million actually

17 came from.

18 Q.  Mr. Kenner, you previously testified that Mr. Jowdy's

19 loan came out of the Hawaii investor money.  You testified

20 to that at the SEC; do you recall that?

21 A.  There were a lot of loans that were given to

22 Mr. Jowdy, one of which was from the Hawaii investment

23 group.

24 Q.  You don't recall testifying that all five million to

25 Mr. Jowdy came out of the Hawaii investor group?

**Kenner - Cross/Leonardo**

202

1    A.    I believe I testified that there was five million

2    that came from the Hawaii investor group, but that wasn't

3    the entire universe of funds that were loaned to

4    Mr. Jowdy.

5              There was also $1.6 million to Mr. Stumpel,

6    which he had subsequently had to sue Mr. Jowdy for in

7    Mexico.

8              There was another 400,000 from Mr. Norstrom into

9    Mexico, in which he sued Mr. Jowdy for, a 2004

10   half-million dollar loan to Mr. Jowdy that he actually

11   wrote a $500,000 bad check to Mr. Norstrom, which is in

12   the government's possession.  I saw it in Rule 16.

13             There was about $400,000 outstanding still to me

14   that I sued him for in the 2008 case with Little Isle and

15   Ula Makika for the unpaid Hawaiian loans.

16             There was a $125,000 personal loan that Mr. Bach

17   (phn.) Gave to Ken Jowdy in 2005, unknown to all the rest

18   of us, and Mr. Gaudet eventually sued Mr. Jowdy in Mexico

19   for, and I know there's a few I'm leaving out.

20   Q.   Mr. Kenner, we talked about your Little Isle lawsuit

21   against Mr. Jowdy on Monday.

22             Also, as a result of that lawsuit, the Judge

23   ordered you to pay Mr. Jowdy's legal fees in the amount of

24   over $200,000; is that correct?

25   A.   Approximately $220,000 that Mr. Jowdy withdrew from

203

1    the Cabo San Lucas project to pay his legal fees in

2    Arizona against us.

3    Q.    My question was the Federal District Court Judge in

4    Arizona ordered you to pay the attorney's fees in the

5    amount of over $220,000?

6    A.    He ordered me as one of the plaintiffs, he ordered

7    Ula Makika as one of the plaintiffs, and he ordered Little

8    Isle IV as one of the plaintiffs.

9    Q.    That judgment from the Federal District Court in

10   Arizona was not appealed; isn't that correct?

11   A.    I don't recall if it was appealed or not.

12   Q.    As you sit here today, you still owe those legal

13   fees; isn't that correct?

14   A.    Yes, those legal fees are still outstanding.

15              THE COURT:   Judge Wexler said 11:30, Mr. Haley.

16              MR. HALEY:   Thank you, your Honor.

17   BY MS. LEONARDO:

18   Q.    Mr. Kenner --

19   A.    As soon as Mr. Jowdy pays back the loan to Little

20   Isle IV and the Hawaii partners, I would be glad to pay

21   his legal fees so he can return the funds he stole from

22   our Cabo San Lucas project to pay off his legal fees.

23              MS. LEONARDO:   I move to strike so we can finish

24   today.

25              MR. HALEY:   These questions are being asked by

204

1    the government and they don't like the answers.

2            As a matter of fact, Judge, I believe the

3    questions will preclude the necessity to revisit trial

4    testimony that was given weeks ago over three-and-a-half

5    day period.

6            THE COURT:  Mr. Kenner, try to focus on the

7    question.  I do think we are going over a lot.  We went

8    through the Centrum loan at the trial.  And even though it

9    was a year ago, it's all coming back to me.  I don't think

10   we covered any new ground this morning either from his

11   testimony.  You repeated a lot of the testimony from

12   Monday and he repeated the trial testimony, so I'm hoping

13   we can wrap up soon, okay?

14           MS. LEONARDO:  Yes, your Honor.

15   BY MS. LEONARDO:

16   Q.   Now, Mr. Kenner, you also transferred from Owen

17   Nolan's line of credit $350,000 to the seller of Cabo;

18   isn't that correct?

19   A.   That's actually factually incorrect.

20           I believe, after reviewing records, that part

21   and parcel to the Hawaii loan, there was a withdrawal on

22   Mr. Nolan's line of credit as part of his equity

23   contribution to the Hawaii land development project.

24           The funds were transferred as authorized to the

25   Little Isle IV bank account, and then from there those

205

1   funds were -- or a portion of those funds may have been

2   used to further the loan to Mr. Jowdy at that time.

3   Q.   Mr. Nolan didn't get any promissory note for that

4   loan to Mr. Jowdy or additional equity in Cabo for that

5   $350,000, did he?

6   A.   I don't understand why he would receive equity in

7   Cabo.

8        His contribution that was sitting in the line of

9   credit to be used by Little Isle IV was part of the 12

10  percent interest, equity interest, that he received in

11  Little Isle for his $2.2 million contribution.

12  Q.   Of which you owe him; isn't that correct?

13  A.   Pardon me?

14  Q.   Of which you personally owe him that amount, 2.2

15  million?

16  A.   I was ordered, after the arbitration, to pay him as a

17  result of him lying that he was unaware that he had a $2.2

18  million loan, despite the fact there's over 40 signatures

19  in the Northern Trust subpoena box that show Mr. Nolan

20  signed it, in addition to text messages that I recently

21  recovered that show that when Mr. Nolan asked for the

22  paperwork, which was in December 2007, I clearly outlined

23  the fact that he was signing the line of credit renewals

24  that he had physically in his possession, and we went

25  through a five day ordeal before Mr. Nolan signed the

206

1  actual documents, and he used my FedEx account to send the

2  documents to Northern Trust bank.

3       So he was clearly aware, despite his testimony

4  in the '09 arbitration and subsequently his 2015 testimony

5  here where he said he had no recollection whatsoever of

6  the $2.2 million line of credit.

7  Q.  Apparently the arbitration panel decided differently;

8  isn't that correct?

9  A.  They decide differently because there was no

10  documents provided at the trial from the 40 signatures

11  Mr. Nolan had signed over a five year period of time, in

12  addition to the approximate 10 signatures he signed on

13  behalf of Little Isle IV.

14  Q.  These were your documents that you did not produce to

15  the arbitration panel; is that right?

16  A.  It was never alleged as part of the complaint that

17  there was anything untoward with respect to his line of

18  credit.  That became a separate issue that was raised

19  during the arbitration.

20  Q.  Mr. Kenner --

21       THE COURT:  Are you saying you recently

22  recovered documents?  Are you saying since the trial you

23  recently recovered documents?

24       THE WITNESS:  The term recently may have been

25  misspoken.  I apologize, your Honor.

207

1    Out of my 89,000 text messages, I went back to

2    corroborate some of what I believe were factual

3    inaccuracies by some of the witnesses and based on some of

4    the documents that were delivered to Mr. Haley in

5    preparation for the forfeiture hearing, and I saw they

6    were going to introduce Mr. Nolan's testimony that he was

7    unaware of a line of credit, that he never signed a line

8    of credit, nor had he ever given me authorization to open

9    up a line of credit.

10    So I went back into our text message traffic

11    from December 2007 where he and I had about a five day

12    interaction over text messaging, and I found a text

13    message that I had sent to him in response to his question

14    what are the papers for, and I clearly laid it out and I

15    can provide that to the Court as well.

16    So Mr. Nolan was clearly aware, in '07 in

17    addition to '06, '05. '04 and '03 when he signed documents

18    sent directly to him.

19    And all of those documents, your Honor, were

20    delivered to us as part of the Northern Trust subpoena

21    box.

22    THE COURT:  If you have uncovered any documents

23    since the trial that you believe suggest that there is

24    something inaccurate about the testimony in the trial,

25    Mr. Haley should definitely submit them to me.

Kenner  -  Cross/Leonardo

208

1     THE WITNESS:  Yes, sir.  We will do so.

2     Thank you, your Honor.

3  BY MS. LEONARDO:

4  Q.    Mr. Kenner, I think you testified on Monday that you

5  found out on February 19, 2006, that your interest in Cabo

6  had to be in Baja Ventures 2006 or a different entity; is

7  that correct?

8  A.    No, that's not specifically what I testified to.

9  Q.    What did you testify to that you found out your

10  interest had to be in a different LLC?

11  A.    After Mr. Jowdy and I spoke on February 19, 2006, and

12  he had sent me an e-mail correspondence with respect to

13  the equity split that Lehman Brothers had allegedly told

14  him had to occur in order for the closing to happen,

15  Mr. Jowdy told me later that day, or on February 20th,

16  that he was not going to be able to pay back Mr. Stumpel

17  and Mr. Lehtinen at the time of the closing which still,

18  on February 20th, I was under the understanding was still

19  a February 27th closing a week later.

20     So at that point is when I began to speak to

21  Mr. Markowitz and I think Mr. Najam may have in fact sent

22  me an e-mail after a conversation he had with Mr. Jowdy

23  suggesting that now there is going to be a new -- he

24  needed a new entity to put it in because I told Mr. Jowdy

25  I was going to have to take care of the guarantee for both

209

1   Stumpel and Lehtinen.

2   Q.   As of February 20th, you were asking Mr. Najam to put

3   your interest in GuideDog; isn't that correct?

4   A.   I don't know, so if you have an e-mail you can show

5   me.

6        I know there were a significant amount of

7   transactions between February 19th and February 23rd when

8   I had confirmed to Mr. Markowitz to create Baja Ventures

9   2006 after Mr. Najam and I had exchanged e-mails.

10  Q.   Mr. Kenner, wasn't it more accurate that Mr. Najam

11  told you not to use GuideDog so you wouldn't have to show

12  it on all of the tax return records; isn't that right.

13  A.   That is incorrect.

14       MS. LEONARDO:  Your Honor, I'm going to show the

15  witness what's in evidence as Forfeiture Exhibit 82.

16  BY MS. LEONARDO:

17  Q.   That's dated February 20, 2006, correct?

18       Was that a yes or no?

19  A.   I didn't know there was a question pending.

20  Q.   The question was that's dated February 20th, 2006; is

21  that correct?

22  A.   This is dated February 20th, 2006.

23  Q.   In that e-mail you're still requesting that your

24  interest be put into GuideDog; is that correct?

25  A.   No, that's incorrect.

Kenner   -   Cross/Leonardo

210

1   Q.   Can you read that to us, what does it say?

2   A.   Bill -- I'm referring to William Najam -- the 8

3   percent entity is CSL Properties 2006, LLC.

4           It is a Delaware Corp., formed in 2006.  The EIN

5   is 20-4314863.

6           I am the managing member and the address of

7   record for the Corp., is:

8           10705 East Cactus Road, Scottsdale, Arizona,

9   89359.

10          More info to follow.  PK.

11          And PK is me.

12  Q.   I show you what's marked as Forfeiture Exhibit 83.

13          In this e-mail dated February 20, 2006, you're

14  still requesting your interest be put into GuideDog; is

15  that correct?

16  A.   That appears to be accurate.

17          Like I said, somewhere between February 19 when

18  Mr. Jowdy told me about the new equity allocation, in and

19  around the 20th, that is when Mr. Jowdy told me he wasn't

20  going to be paying back Mr. Stumpel and Mr. Lehtinen, so

21  by the 23rd we had exchanged a series of e-mails, which I

22  hope you have, that confirmed that Mr. Markowitz was going

23  to open up Baja Ventures 2006.

24          In fact, I saw Mr. Markowitz' billing statement

25  in Rule 16 that confirmed his work on February 23rd.

211

1      MS. LEONARDO:  Your Honor, I'm going to show the

2  witness what I have marked as Forfeiture exhibits 87 and

3  88.

4  BY MS. LEONARDO:

5  Q.    Mr. Kenner, look at exhibits 87 and 88.

6          Do you recognize those as e-mails you sent and

7  received?

8  A.    Yes.

9  Q.    Exhibit 87 has to deal with CSL Properties; is that

10  correct?

11  A.    Yes.

12          I believe this was the temporary operating

13  agreement for CSL Properties I believe because they were

14  still shooting for a February 27th closing date, but each

15  of the CSL members subsequently signed a new operating

16  agreement prepared by Mr. Markowitz prior to the extension

17  to March 26th.

18          MS. LEONARDO:  Your Honor, I offer into evidence

19  exhibits 87 and 88.

20          MR. HALEY:  Your Honor, my client authenticated

21  the exhibits.  We, of course, have no objection.

22          MR. CONWAY:  No objection, your Honor.

23          THE COURT:  87 and 88 are admitted.

24          (Government Forfeiture Exhibits 87 and 88 in

25  evidence.)

Kenner  -  Cross/Leonardo

212

1   BY MS. LEONARDO:

2   Q.   Looking at the percentage of ownership in CSL

3   Properties, have those percentages changed since on or

4   about February 23rd, 2006?

5   A.   I don't know.

6   Q.   Well, you were the managing member of CSL Properties;

7   is that correct?

8   A.   Yes, I was.

9   Q.   From the time you were the managing member, until the

10  time you were no longer the managing member, have those

11  percentages ever changed?

12  A.   I don't recall.

13  Q.   It would have to come from you as the managing

14  member?

15  A.   Yes, it would have.

16  Q.   As you sit here today, you don't recall if these ever

17  changed?

18  A.   I don't recall if they changed or not.

19  Q.   Looking at exhibit 88, the bottom portion of the

20  e-mail is from Bill Najam to you; is that correct?

21  A.   Yes, it is.

22  Q.   It says:

23          Phil, we are not going to use GuideDog, if it's

24  okay with you.

25          I'm going to have Larry create two new LLCs for

Kenner  -  Cross/Leonardo

213

1    your interest and Ken's interest.  That way, we don't have

2    to worry about tax returns or questions.  You'll control

3    your LLC and CSL, and Kenner will control his in Diamante

4    Properties LLC.

5           If you have any questions, please call me, Bill.

6           Do you see that?

7    A.    Yes.

8    Q.    There was a question about your tax return for

9    GuideDog; isn't that correct?

10   A.    That was incorrect.

11          This e-mail was as a result of Mr. Jowdy telling

12   Mr. Najam that I was going to need a new LLC to be set up.

13          And that's when I instructed him in response to

14   go ahead and create Baja Ventures 2006.

15          So Mr. Jowdy and I had several conversations

16   about him not paying Mr. Stumpel and Mr. Lehtinen back.

17          That's when I told Mr. Jowdy that he was -- I

18   was going to have to set up a new LLC to cover the

19   promissory contract with the two of them.

20   Q.    That doesn't say that anywhere in this e-mail?

21   A.    It doesn't need to.

22   Q.    All it says in this e-mail is that that way we don't

23   have to worry about tax returns or questions.

24          That's what it says in the e-mail; isn't that

25   correct?

Kenner  -  Cross/Leonardo

214

1   A.   It does, but I wasn't scripting Mr. Najam.  Those

2   were Mr. Najam's words.

3   Q.   Mr. Kenner, you responded and said, go ahead and

4   create Baja Ventures.

5        You didn't take any issue with Mr. Najam about

6   tax returns in your response, did you?

7   A.   There was no relevancy.

8        I didn't tell him what I was or wasn't eating or

9   where I was traveling to.  It had no relevancy to setting

10  up Baja Ventures 2006 operating agreement.

11       I didn't represent to him that it was as a

12  result of Mr. Jowdy not paying back Mr. Stumpel and

13  Mr. Lehtinen.

14       I didn't represent that he still owed close to

15  $7 million to the Hawaii investors.

16       I wish I had.

17  Q.   Mr. Kenner, wouldn't that have been relevant for

18  Mr. Najam to know and/or for you to respond; hey, I don't

19  have any tax returns for GuideDog.

20       There's no response to that, isn't that correct?

21  A.   Absolutely unnecessary, because we were setting up

22  the new LLC because I had to cover Mr. Stumpel and

23  Mr. Lehtinen.

24       Why would I explain anything that wasn't

25  relevant?

Kenner  -  Cross/Leonardo

215

1    Q.    You didn't explain to him in this e-mail anything

2    about Mr. Lehtinen and Mr. Stumpel with regard to setting

3    up the new Baja Ventures, did you?

4    A.    Why would I need to?

5    Q.    Why wouldn't you?

6    A.    Because it was irrelevant to the actions of the

7    e-mail.

8              This e-mail was to indicate that he had

9    obviously spoken with Mr. Jowdy and knew that a new LLC

10   had to be set up, so he was confirming that with me, that

11   we're not going to use GuideDog, if that's okay with you,

12   that we're going to set up a new one.

13             So my immediate response was go ahead, create

14   Baja Ventures 2006.

15   Q.    You have no e-mails, you have no memorialization with

16   regard to you telling Mr. Najam that there were problems

17   with Stumpel and Lehtinen and Jowdy, and why you were

18   setting up Baja Ventures; isn't that correct?

19   A.    Mr. Najam was fully aware that Mr. Jowdy had owed a

20   lot of money.

21             We already reviewed at least two documents that

22   I think I've seen in the last few days that refer to

23   Mr. Najam knowing that none of the loans can be made as

24   investments.

25   Q.    My question is, you do not have a follow-up to

Kenner  -  Cross/Leonardo

216

1   Mr. Najam's e-mail saying we don't have to worry about tax

2   returns, let's set up a new LLC.

3            You had no response to the tax return portion of

4   that?

5   A.   I don't see, as I sit here today, why I would have

6   responded to that.  It would have seemed foolish.

7   Q.   You testified on Monday that CSL Properties was

8   originally supposed to have 40 percent?

9   A.   That is correct.

10  Q.   There was nothing in writing that reflects that,

11  right?  That CSL is supposed to have 40 percent?

12  A.   I believe I saw one e-mail during Rule 16 where

13  Mr. Jowdy refers to a different equity percentage for CSL

14  Properties, but I did not see any that reflected the 40

15  percent equity.

16           What I did see and review was a February 19th

17  e-mail where Mr. Jowdy had told me, after a phone call

18  that he allegedly had with Mr. Bahti at Lehman Brothers,

19  that the equity percentages had to change so Mr. Jowdy

20  would have a controlling interest in the property because

21  Mr. Jowdy persuaded me that there was a problem with me

22  and Lehman Brothers because I walked away from their loan

23  in the summer of '05.

24  Q.   So you're saying the percentages changed so Mr. Jowdy

25  could have a controlling interest; is that what you just

217

1   said?

2   A.   That's what Mr. Jowdy told me was required by Mr.

3   Bahti at Lehman Brothers, and he memorialized it in an

4   e-mail and he was going to change it for now and

5   indicating as he did on the phone, that it would be

6   changed, it would reflect the proper equity at a future

7   date.

8   Q.   My question was much simpler.

9        Did you just testify that the percentages were

10  changed so Jowdy would have a controlling interest in the

11  Cabo project; is that what you just testified to?

12  A.   I believe I testified that Mr. Jowdy had sent me an

13  e-mail to confirm and memorialize a phone call he had with

14  me, that Lehman Brothers required him to have a management

15  controlling interest in the project and us the equity

16  position would have to be as follows.

17       And Mr. Jowdy laid that out in his e-mail on

18  February 19, 2006.

19  Q.   And that's why CSL Properties went from having 40

20  percent to having 8 percent?

21  A.   According to Mr. Jowdy's representation on the

22  February 9th e-mail, that's correct.

23  Q.   Prior to CSL Properties going down from 40 percent to

24  8 percent, there would have been some -- prior to CSL

25  Properties interest going from 40 percent to 8 percent,

Kenner   -   Cross/Leonardo

218

1    there would have been at least several members of CSL that

2    had more than a 5 percent interest in the entire Cabo

3    project; is that correct?

4    A.    That's incorrect.

5    Q.    If two of the players had a 12-and-a-half percent

6    interest, that would give them more than a 5 percent

7    interest in the entire project; isn't that right?

8    A.    I don't believe so.  I believe that would be a 5

9    percent interest.

10   Q.    So they would have a 5 percent interest?

11   A.    Yes.

12         You asked me if they would have more than 5

13   percent interest.

14   Q.    I think you said anyone who has a 5 percent interest,

15   that Lehman didn't want anyone having more than a 5

16   percent interest not being a citizen, isn't that correct?

17   A.    I believe that's exactly what I said.

18   Q.    Were there any e-mails or documents addressing the

19   issue of whether or not any of the CSL Property members

20   would have more than a 5 percent interest or had a 5

21   percent interest?

22   A.    It was a greater than 5 percent interest that Lehman

23   Brothers had told us, and I believe that's on a follow-up

24   e-mail that I had seen for the first time in discovery

25   that the government turned over for Mr. Jowdy's attorney

219

1  that confirmed to me that Mr. Jowdy's story about the

2  change in equity was from Lehman Brothers.  It confirms

3  Mr. Jowdy made up that story and that they only wanted to

4  review people with more than a 5 percent equity interest.

5  Q.   So you're saying the person had to have more than 5.1

6  percent interest in Cabo before Lehman Brothers was

7  interested in them?

8  A.   According to the e-mail that I reviewed during

9  discovery, which was from Mr. Bahti I believe to Mr. Najam

10  and Mr. Jowdy, I was never cc'd on, so I never knew

11  anything about this, but it was consistent with what I was

12  told, and that was anyone with more than 5 percent

13  interest at Lehman Brothers was going to have to do a

14  background check because they were investing money for the

15  first time in Mexico and they were concerned about Patriot

16  Act issues with foreign investors having a significant

17  portion which they considered over 5 percent.

18  Q.   CSL Properties still has a 40 percent interest.

19  Demetri Khristich would have had a 5 percent interest,

20  correct?

21            MR. HALEY:  Judge, I object.

22            For the benefit of the stenographer, I think the

23  witness needs to finish his answer.

24            THE COURT:  He hadn't finished his answer.

25            Mr. Kenner, what were you saying?

220

1    THE WITNESS:  Yes, sir.

2        I was just following up to suggest that both

3    Mr. Khristick and Mr. Tsyplakov, who had 12 percent

4    interest in CSL Properties, would have had a 5 percent

5    stake in the overall project, and Lehman Brothers was

6    concerned about anyone with greater than 5 percent

7    according to the e-mails I reviewed that were turned over

8    by Mr. Harvey during the pretrial Rule 16 production.

9    BY MS. LEONARDO:

10   Q.   Mr. Kenner, I think you testified on Monday that the

11   reason you were now the 100 percent owner of Baja Ventures

12   was because Mr. Stumpel and Lehtinen had a 5 percent

13   interest and they couldn't have a 5 percent interest in

14   Cabo; isn't that correct?

15   A.   They would not have had a 5 percent interest in Cabo.

16   Q.   Your 5 percent in Baja Ventures, didn't you testify

17   on Monday that the reason you took 100 percent of Baja

18   Ventures as your equity, was because Lehtinen and Stumpel

19   cannot be shown as being an owner because they were

20   foreigners.

21        Didn't you testify to that?

22   A.   I don't recall that testimony.  If you read it back

23   to me I can confirm it.

24   Q.   Mr. Kenner, in your testimony on Monday at page --

25        MR. HALEY:  Judge, perhaps, may I look over

221

1    counsel's shoulder?  I don't have the transcript.

2              Your Honor, it is 11:30.  This might be an

3    opportune time to break.

4              THE COURT:  Yes, let's break.

5              (Recess taken.)

6              (After recess.)

7              THE CLERK:  All rise.

8              THE COURT:  Please be seated.

9              Go ahead, Ms. Leonardo.

10             MS. LEONARDO:  Thank you, your Honor.

11   BY MS. LEONARDO:

12   Q.   Mr. Kenner, I think when we broke my question to you

13   was whether or not you had testified on Monday that anyone

14   with a 5 percent interest or greater, Lehman didn't want

15   to show as equity because they have to do a background

16   check if they're foreigners.

17             That's what you testified to?

18   A.   I believe anyone -- I was told anyone that had a

19   greater than a 5 percent interest, not 5 percent and

20   greater.

21   Q.   Well, on Monday, you testified to this at page 119:

22             They, Lehman Brothers, were concerned, and I see

23   the e-mails in evidence, that anyone that had a 5 percent

24   interest or larger in the project that Lehman wanted, was

25   going to have to do a background check and they didn't

222

1   want foreigners to have that equity position at the

2   closing.

3           Do you remember testifying to that on Monday?

4   A.   That sounds familiar.

5           And as a result of Mr. Jowdy's equity change on

6   February 19, only he and I had greater than 5 percent

7   interest, five or greater.

8   Q.   So, prior to the change in CSL Properties' interest

9   though, at least those two individuals that had a 12.5

10  percent interest would have had a greater than 5 percent

11  interest in the Cabo project; isn't that correct?

12  A.   That is incorrect.

13  Q.   You're saying they wouldn't have had a 5 percent

14  interest?

15  A.   I would agree with that.

16          What you previously said was they would have

17  greater than 5 percent, which is incorrect.

18  Q.   But your testimony is, and was earlier, that the

19  reason you put Stumpel and Lehtinen's interest into your

20  interest as 100 percent, is because they had a 5 percent

21  interest and they could not have had that per Lehman's

22  instructions; isn't that correct?

23  A.   That makes absolutely no sense, what you just said.

24          (Continued on next page.)

25

Kenner - Cross/Leonardo

223

1   BY MS. LEONARDO:

2   Q.   Well, you testified earlier that Mr. Stumpel and

3   Mr. Lehtinen each had a five-percent interest in Baha

4   Ventures; isn't that correct?

5   A.   That is correct.  That's still correct today.

6   Q.   And you testified earlier that because they had a

7   five-percent interest, they could not be reflected in the

8   Lehman paperwork because they were foreigners and Lehman

9   did not want background checks of them, right?

10  A.   They wouldn't have had the five-percent interest in

11  the 35, 39 percent or 40 percent equity position.  They

12  would not have a five-percent or a greater position in

13  that type project.

14  Q.   So why don't you take them off the agreement -- they

15  would be no reason to take them off the agreement with

16  that five percent; isn't that correct?

17  A.   Take them off what agreement?

18  Q.   There would be no reason for you to take 100 percent

19  of Baha Ventures if Lehtinen and Stumpel were not going to

20  have five percent or more in the project; isn't that

21  correct?

22  A.   Either Mr. Stumpel or Mr. Lehtinen in all the years

23  since 2005 when they signed those agreements, or the 2006

24  Diamonte Cabo San Lucas had ever raised a single issue

25  with me.

Kenner - Cross/Leonardo

224

1  Q.   Mr. Kenner, the question to you was way, way simpler

2  than that.

3          The question to you was:  There's no reason for

4  you to have 100-percent in Baja Ventures in 2006, if what

5  you just testified to is true, that Lehtinen and Stumpel

6  did not have more than a five-percent interest?

7  A.   Again, I didn't follow what you're saying.

8          MR. HALEY:  Objection.

9          THE COURT:  She wants to know why you had --

10  what was the reason that you had to have 100-percent

11  interest in Baja Ventures, and you didn't give them an

12  interest in Baja Ventures.  That's what she wants to know.

13          THE WITNESS:  They did have an interest in Baja

14  Ventures through the office of contract securities granted

15  a five-percent equity stake in a preferred debt position

16  on there.  The funds that they contributed.

17          THE COURT:  Baja Ventures?

18          THE WITNESS:  Yes, sir, they did.

19  Q.   Mr. Kenner, on the closing statement you are

20  100-percent owner of Baja Ventures on the closing

21  statement of Lehman; isn't that correct?

22  A.   Yes, that is correct.

23  Q.   Stumpel and Lehtinen's names do not appear on that,

24  do they?

25  A.   No, they do not.  But they were captioned plaintiffs

Kenner - Cross/Leonardo

225

1    in the 2009 lawsuit filed against Mr. Jowdy, so they were

2    clearly aware that they were owners.

3    Q.    My question is very simple.  Mr. Stumpel and

4    Mr. Lehtinen do not appear on the Lehman closing documents

5    as having an interest in Baha Ventures; isn't that

6    correct?

7    A.    That is absolutely correct.

8    Q.    Mr. Kenner, you represented on one of your financial

9    statements that you are a 50-percent owner of Kau

10   Holdings, K-A-U, Holdings.

11           How did you acquire interest in that?

12   A.    I don't recall.

13   Q.    Is Kau Holdings one that was completely funded by

14   Mr. Kaiser?

15   A.    No, that's incorrect.

16   Q.    Who else contributed funds to Kau Holdings?

17   A.    I don't recall the structure of Kau Holdings, as I

18   sit here today, nor do I recall what the original purpose

19   of Kau Holdings were.

20   Q.    Nonetheless, you represented on one of your financial

21   statements that you were a 50-percent owner of Kau

22   Holdings for about $16 million equity; is that right?

23   A.    If you show me a financial statement, I'll be glad to

24   verify that I did.

25   Q.    I'll show you what's already in evidence as

Kenner - Cross/Leonardo

226

1   Exhibit 85.  On the second page of that document, you

2   indicate that you are a 50-percent owner of Kau Holdings.

3            (Handing.)

4   A.    I see that on the second page, yes.

5   Q.    Okay.  How did you get an interest in Kau Holdings?

6   A.    I don't recall, as I sit here today, but it was my

7   project.

8   Q.    Well, it's a $16 million investment, and -- as you

9   sit here today, you don't recall where that came from or

10  how you got it or what it is; is that what your testimony

11  is?

12  A.    I don't recall it being a $16 million investment.

13  Q.    Well, Mr. Kenner, your financial statement says it's

14  worth $16 million, doesn't it?

15  A.    It says 50 percent or $33.165 million is $16.85

16  million, that's correct.

17  Q.    And that's your financial statement attached to this

18  e-mail where you approved everything in that financial

19  statement; isn't that correct?

20  A.    That appears to be the fact.

21  Q.    As you sit here today, you don't recall what that

22  $16 million investment is; is that your testimony?

23  A.    No.  But if you give me all the banking records from

24  all the Hawaiian bank accounts and the e-mail thread that

25  I don't have, I'd be glad to put it together for you.

Kenner - Cross/Leonardo

227

1   Q.   Mr. Kenner, you're a financial advisor, aren't you?

2   A.   No, ma'am, I'm not.

3   Q.   Well, you were a financial advisor before your

4   incarceration; is that correct?

5   A.   Actually, in and through December of 2014, when

6   Mr. Lambert identified me as his financial advisor, that's

7   correct.

8   Q.   After your incarceration in November of 2013, you

9   were a financial advisor, correct?

10  A.   Yes.

11  Q.   As you sit -- as a financial advisor, as you sit here

12  today, you can't account for or recall where your $16

13  million equity investment comes; is that what you're

14  testifying to?

15  A.   I can't recall the specifics of this February 2006.

16  Q.   Of the $16 million investment; is that what you're

17  saying?

18  A.   That's exactly what I'm saying.

19  Q.   Mr. Kenner, I think that you testified earlier that

20  you were not aware of the operating agreement, or you

21  hadn't seen the operating agreement -- withdrawn.

22          You hadn't seen the operating agreement for the

23  Diamonte project until six months after the closing; is

24  that what you testified to?

25  A.   That sounds about right.  That's when I saw the

Kenner - Cross/Leonardo

228

1    signed operating agreements.

2    Q.   Did you see unsigned agreements prior to closing or

3    immediately after the closing?

4    A.   I think there were a number of draft agreements.

5    Q.   Do you know if there were any changes in the draft

6    agreements from prior to -- withdrawn.

7            How many changes were there to the draft

8    agreements prior to closing?

9    A.   I don't recall, but I remember being sent several

10   different drafts.

11   Q.   What date was the Lehman closing for Mexico?

12   A.   March 26, 2006.

13   Q.   Were there any changes to the agreements between

14   March 6, 2006 and March 25, 2006?

15   A.   I have no idea.  I didn't deal with Lehman Brothers'

16   attorneys, nor was I dealing with Mr. Markowitz and/or

17   Mr. Najam with respect to any of those agreements or the

18   construction of them prior.

19   Q.   Now, I'm going to show the witness what's marked as

20   93.  (Handing.)

21            Mr. Kenner, do you recognize Exhibit 93?

22   A.   I've reviewed it.

23   Q.   Okay.  Mr. Kenner, those operating agreements were

24   sent to you on or about March 6, 2006; isn't that correct?

25   A.   It says that on the document.  I don't know if these

229

1   are the operating agreements that came from the e-mail.

2   Q.   Mr. Kenner, you also produced these documents to the

3   SEC, didn't you?

4   A.   Did they have BS SEC Bate stamps on them?  I guess --

5   I believe we did.

6   Q.   Okay.  So the first page of the e-mail it's Bates

7   Stamped Number 015885; do you see that?

8   A.   Yes, I do.

9   Q.   Okay.  And the operating agreement, looking at the

10  next number, is operating agreement shows the next number

11  as 86; do you see that?

12  A.   Yes, I do.

13          MS. LEONARDO:  Your Honor, I'd offer Exhibit 93

14  into evidence.

15          MR. HALEY:  Your Honor, I have no objection,

16  except for the following, and I would simply like to

17  stipulate this again involves CSL properties, one of the

18  properties that the government seeks to forfeit as a

19  result your post verdict -- I'm just repeating the

20  objection.  Otherwise I have no objection to it being

21  authenticated by my client.

22          MR. CONWAY:  No objection, Judge.

23          THE COURT:  Received.

24          (Government's Exhibit 93 in evidence.)

25  Q.   Mr. Kenner, I believe you testified on Monday that

Kenner - Cross/Leonardo

230

1  you did not know what Diamonte Properties was; isn't that

2  correct?

3  A.   Since Monday I realized which LLC that was, because I

4  think that name was used on several other occasions.

5  Q.   Well, in fact, Mr. Kenner, you are listed as a member

6  of Diamonte Properties LLC, aren't you?

7  A.   Yes.  I believe I am on the Diamonte Properties LLC.

8  Q.   And, in fact, you're listed as a 6.5-percent owner of

9  that entity; isn't that correct?

10  A.   I believe that's what it says on the Cabo

11  contribution page.

12  Q.   And that's page, Bates stamped on the bottom, 15906;

13  isn't that correct?

14  A.   Yes.

15  Q.   Mr. Kenner, you were also aware, weren't you, that

16  prior to the closing, that Lehman Brothers was not going

17  to allow any transfers until the loan was paid in full;

18  isn't that correct?

19  A.   I'm not sure if I was aware of that or not, as I sit

20  here today.

21       MS. LEONARDO:  Now, I'm going to show the

22  witness what's marked as Exhibit 92.  (Handing.)

23  A.   I have reviewed this document.

24  Q.   Mr. Kenner, that document is an e-mail sent to you,

25  correct?

Kenner - Cross/Leonardo

231

1   A.   Yes.

2          MS. LEONARDO:  Your Honor, I offer Exhibit 92 in

3   evidence.

4          MR. HALEY:  No objection, your Honor.

5          MR. CONWAY:  No objection.

6          THE COURT:  92 is admitted.

7          (Government's Exhibit 92 in evidence.)

8   Q.   Mr. Kenner, that e-mail is dated March 7, 2006; do

9   you see that?

10  A.   Yes, I do.

11  Q.   In that document Mr. Lehtinen is telling you,

12  Mr. Jowdy and Mr. Markowitz that Lehman is not allowing

13  any further transfers until Lehman is paid off in full; do

14  you see that?

15  A.   I see that it says that, but that's inaccurate.

16  Q.   When you received this on March the 1st, 2006, and

17  that was prior to the closing; isn't that correct?

18  A.   Both of those statements are correct.

19  Q.   So you're saying you didn't know prior to the closing

20  that Lehman was going to forbid any further transfers?

21  A.   Now that I have seen this document for the first time

22  in many years, I see that I was notified of that.  But

23  that's not, in fact, what has happened since Mr. Jowdy has

24  transferred at least on six separate occasions equity from

25  his Kau Holdings to other individuals with Lehman's

Kenner - Cross/Leonardo

232

1   consent --

2   Q.    Mr. Kenner --

3   A.    -- to the best of my knowledge, none of the loan --

4   the loan has not been paid off.

5   Q.    Mr. Kenner, the question to you is actually, again,

6   quite simple.

7           Prior to the closing you were aware, were you

8   not, that you were aware prior to the closing that Lehman

9   is going to prohibit any further transfers; isn't that

10  correct?

11  A.    According to this e-mail, I was notified by

12  Mr. Lehman that to be the fact.

13  Q.    Mr. Kenner, you testified on Monday with regard to

14  the Sugar Mill property that you've been paying the real

15  estate taxes on that property; is that right?

16  A.    I have contributed to make tax payments on that, to

17  the best of my knowledge.

18  Q.    What do you mean by that?

19  A.    Taxes had to be paid on several of the properties

20  that were not included or ultimately engaged in the joint

21  venture agreement, and I recall making several property

22  tax payments on some of the lots.

23  Q.    And what was the amount of the tax payments for the

24  Sugar Mill property?

25  A.    I don't recall, as I sit here today.

Kenner - Cross/Leonardo

233

1    Q.    You don't recall how much you paid for the Sugar --

2    the taxes on the Sugar Mill property?

3    A.    I don't recall.

4    Q.    Do you recall when was the last time that you made a

5    payment to that property?

6    A.    To the best of my recollection, payments were most

7    likely made through 2008.

8    Q.    Mr. Kenner, the property is also known as Little

9    Kamawatsu; is that correct?

10   A.    I don't believe so.

11   Q.    Mr. Kenner, you testified on Monday that you were

12   going to sell the property and donate the proceeds to a

13   charity; is that correct?

14   A.    Yes, that is correct.

15   Q.    The Sugar Mill property, though, was bought with the

16   proceeds of the Hawaii investments; isn't that correct?

17   A.    Yes, that is correct.

18   Q.    And you never had any discussions with any of your

19   investors of your intent to sell it and donate the

20   proceeds; is that correct?

21   A.    That's incorrect.

22   Q.    Which investors did you speak to?

23   A.    I don't recall.  But whatever investors I was still

24   speaking with in 2013, I notified them that I was putting

25   it for sale, and that I negotiated a tax forbearance on

Kenner - Cross/Leonardo

234

1    the property and that the proceeds pursuant to the 501c3

2    rules would need to be donated to a not-for-profit

3    charity.  And that's what I intended to do, to donate to

4    the Brain Cancer Research Foundation I was raising money

5    for.

6    Q.   As you sit here today, you don't recall which

7    investors you spoke to; isn't that correct?

8    A.   I recall speaking to a number of investors.  There

9    was a number of them that I was still dealing with --

10   Q.   Well, as you sit here today, who did you speak to

11   about selling the Sugar Mill property?

12   A.   Like I said, I spoke to a number of them.  I don't

13   recall specifically which ones.

14   Q.   As you sit here today, you cannot name one single

15   investor that you spoke to --

16   A.   Mattias Norstrum was one of the investors that I

17   spoke to -- I spoke to him regularly until it was

18   determined by Mr. Jowdy to cut off communications with me.

19   Q.   So you actually testified that you negotiated a tax

20   forbearance, right?

21   A.   I did negotiate a tax forbearance on the property.

22   Q.   You did not pay the real estate tax; isn't that

23   correct?

24   A.   I wasn't responsible for it.  The project was

25   responsible for it.  It had been managed by John Kaiser

235

1    from December 31st of 2007 forward.

2            MS. LEONARDO:  Your Honor, I'm just going to

3    show the witness what's marked as Exhibit 94.  (Handing.)

4    A.    Okay.  I've reviewed the document.

5    Q.    Mr. Kenner, you also testified on Monday that you

6    paid the real estate taxes for eight straight years

7    yourself; isn't that correct?

8    A.    I don't believe I said that.

9    Q.    Okay.  I'm going to direct your attention to page 73

10   of the transcript from Monday:

11           "And after eight years of Lehman paying the real

12   estate taxes, finally, since there was nothing else do, I

13   just decided to collapse it and attempt to sell it in or

14   about 2013, and donate the funds to a Brain Cancer

15   Research Foundation that I had raised money for."

16           That was your testimony on Monday, wasn't it?

17   A.    That sounds like it.  That was my testimony from

18   today.

19   Q.    Okay.  So let me -- the document in front of you is a

20   printout from the web site of the County of Hawaii tax

21   office; do you see that?

22   A.    Yes, ma'am, I do.

23   Q.    And the owner's name of that property is listed as

24   the Honu'apo Historical Society, H-O-N-U apostrophe A-P-O,

25   Historical Society, correct?  And the mailing address is

Kenner - Cross/Leonardo

236

1    in care of Phil Kenner; isn't that correct?

2    A.   Yes, it is.

3    Q.   And that says that your Cactur Road address is

4    Scottsdale, Arizona, correct?

5    A.   Yes, it is.

6    Q.   And this is the same property which you referred to

7    as the Sugar Mill property, correct?

8    A.   The Cactus Road property, no.

9    Q.   No.  This property is known as the Sugar Mill

10   property, correct?

11   A.   I would agree with that.

12            MS. LEONARDO:  Your Honor, I offer Exhibit 94 in

13   evidence.

14            MR. HALEY:  No objection, Judge.

15            MR. CONWAY:  No objection, your Honor.

16            THE COURT:  94 is admitted.

17            (Government's Exhibit 94 in evidence.)

18   Q.   Mr. Kenner, looking at page 3 of that document for

19   the tax period -- the very first column, it says the tax

20   period, real property tax, original due date, there are

21   penalties, there's interest, there's tax that was due, and

22   the final amount is approximately $19,000; do you see

23   that?

24   A.   Yes, I do.

25   Q.   And then there are indications of real property taxes

Kenner - Cross/Leonardo

237

1   that were due through 2012 for the period of 2012, 2013,

2   and then obviously 2014 and 2015 is when you were

3   incarcerated, correct?

4   A.    I was incarcerated in 2013.

5   Q.    Well, right.  In 2014 and 2015, you were still in

6   jail, right?

7   A.    Yes, I was.

8   Q.    And the total tax due on that property is

9   approximately $37,000; do you see that?

10  A.    Yes, I do.

11  Q.    And in 2013 when you tried to sell this property that

12  was around the same time that you were selling the

13  Discovery Harbor lots, correct?

14  A.    I believe that was in or about the same time that

15  Discovery Harbor lots were sold to raise capital to pay on

16  the Jowdy litigation behalf of the investors.

17  Q.    But it says on this property on behalf your investors

18  to raise money to fight Mr. Jowdy or the settlement; is

19  that correct?

20  A.    Yes, ma'am.

21          Inside the rules and restrictions by the

22  government 501c3 corporation, it would have been illegal

23  to take the funds and proceeds from the 501c3 and use them

24  for any purpose other than a charitable donation.

25  Q.    And your purchase of that property did not benefit

Kenner - Cross/Leonardo

238

1    your investors in Hawaii; is that correct?

2    A.    That is absolutely incorrect.

3    Q.    Now, you testified on -- I'm sorry -- withdrawn.

4          In about 2010, do you recall Mr. Constantine

5    being sued by AZ Eufora Partners, Mr. Hughes and

6    Mr. Ridley, in the Superior Court in Arizona, do you

7    recall that?

8    A.    I do.

9    Q.    Okay.  Do you recall being asked to provide

10   information for Mr. Stolper with regard to allegations in

11   the complaint?

12   A.    I do.

13   Q.    Do you recall telling Mr. Stolper in response to

14   allegations in the complaint that you were not sure

15   whether or not John Kaiser had ever signed an agreement

16   with Constantine on behalf Little Isle IV, that you were

17   the managing member of Little Isle IV, not Kaiser, and

18   Kaiser has never been a member of Little Isle IV, do you

19   recall telling Mr. Stolper that?

20   A.    I do.  And the last portion of that is inaccurate

21   because Mr. Kaiser and Mr. Manfredi were both Little

22   Isle IV members in December of 2003 -- in 2004.

23         MS. LEONARDO:  I'm going to show the witness

24   what is marked as Forfeiture Exhibit 96. (Handing.)

25   Q.    Mr. Kenner, looking at Exhibit 96, is that the e-mail

Kenner - Cross/Leonardo

239

1   you sent to Mr. Stolper?

2   A.   I don't recall specifically.

3   Q.   Let me show you what's marked as Forfeiture

4   Exhibit 95.  (Handing.)

5            THE COURT:  Ms. Leonardo, I'm just letting you

6   know, I'm giving you another 15 minutes, and then you have

7   to finish up.  I've been very generous.

8            MS. LEONARDO:  Your Honor, I should be done by

9   then.

10           THE COURT:  Okay.

11  Q.   Mr. Kenner, looking at what's marked as Exhibit 95,

12  that's the complaint against Tommy Constantine and other

13  individuals, correct?

14  A.   Yes.

15           THE WITNESS:  Your Honor, this is a large

16  document.  Do you want me to review the whole document?

17           THE COURT:  No.  She just wants know at this

18  point who brought it.

19           What's your question?

20           MS. LEONARDO:  Your Honor, my question in

21  conjunction with Exhibit 96, where Mr. Kenner is

22  responding to questions from Mr. Stolper, specifically to

23  paragraph 8 on page 12.  The allegations are that

24  Mr. Kaiser entered into consulting agreements with

25  Constantine Management Group to raise money for Little

Kenner - Cross/Leonardo

240

1   Isle IV, of which Kaiser was a member, and Mr. Kenner's

2   corresponding response in paragraph E, I'm not sure that

3   Kaiser ever signed an agreement with Constantine on behalf

4   Little Isle IV.  Kenner was a management member, and

5   Kaiser has never been a member of Little Isle IV LLC."

6          THE COURT:  Why don't you look at paragraph E of

7   Exhibit 95 with the e-mail in 96.

8          What's the question?

9          MS. LEONARDO:  Judge, the question is:  Did he

10  represent to Mr. Stolper that Kaiser has never been a

11  member of Little Isle IV.

12         THE COURT:  I think your said he did, but that

13  was inaccurate.

14         THE WITNESS:  That is correct, because when we

15  purchased the first property, your Honor, in December of

16  2003, it was originally in Mr. Kaiser and Mr. Manfredi's

17  name, and we transferred it into a purchase by Little

18  Isle IV.  So Mr. Kaiser and Mr. Manfredi were members with

19  the original purchase before we broke everybody out within

20  the next year with the individual holding companies.

21         MS. LEONARDO:  Your Honor, I offer 95 and 96

22  into evidence.

23         MR. HALEY:  No objection.

24         MR. CONWAY:  No objection.

25         THE COURT:  95 and 96 are admitted.

Kenner - Cross/Leonardo

241

1                    (Government's Exhibits 95 and 96 in evidence.)

2    Q.   Mr. Kenner, when you sent the e-mail, Exhibit 96, to

3    Mr. Stolper, did you ever correct your statement?

4    A.   I'm sure I made sure Mr. Stolper was aware of that.

5    Q.   Do you have any documents or correspondence or

6    e-mails that reflect that?

7    A.   No.  I'm sure that probably happened over a phone

8    call with Mr. Stolper.  But I'm sure Mr. Kaiser would

9    verify that in December of '03 he was a member of Little

10   Isle IV.

11   Q.   Do you know if Mr. Stolper ever changed his answer or

12   counterclaims in that lawsuit based on information that

13   you gave him?

14                    THE WITNESS:  Would you like me to review that,

15   your Honor, the counterclaim?

16   Q.   No, my question was:  Do you know if he changed the

17   responses to that in response to your e-mail and after you

18   told him things were different?

19                    THE COURT:  She wants know whether you're aware

20   of any subsequent amendment to this document that was put

21   before the Court.

22                    Are you aware that another document -- another

23   document was filed later correcting that with the Court?

24   In other words, paragraph 8, that was ever corrected in a

25   subsequent document to the Court, that you're aware of?

242

1        THE WITNESS:  Well, paragraph 8, your Honor,

2   was, I believe, part of the complaint.

3        MR. HALEY:  Yes.

4        THE COURT:  It says he was a member in

5   paragraph 8, right?

6        MR. HALEY:  Thank you.  That was going to be my

7   objection.

8        THE COURT:  So you're saying that paragraph 8 is

9   accurate in the court document?

10        THE WITNESS:  Well, I believe this is

11   Mr. Constantine's reply to the lawsuit.  So what's in here

12   is represented by Mr. Constantine, if I'm reading the

13   document correctly.  So it's Mr. Constantine's amended

14   answer.

15        THE COURT:  Okay.

16        THE WITNESS:  And I believe that he is correct

17   that Mr. Kaiser was a member, otherwise Mr. Kaiser and

18   Mr. Manfredi would have not had any equity ownership in

19   the very first property we purchased in Hawaii until a

20   year and a half later when we broke out all the LLCs.  He

21   would have been left without equity during that period of

22   time, which wouldn't make any sense.

23   Q.   Well, Mr. Kenner, my question is very simple.

24        In the e-mail you represent -- you write -- you

25   wrote that e-mail said Mr. Kaiser was never a member of

Kenner - Cross/Leonardo

243

1   Little Isle IV, didn't you write that?

2   A.   That is correct.  I did write that.

3   Q.   That is the question.

4   A.   And it was changed.

5   Q.   Mr. Kenner, you testified on Monday, that --

6            MS. LEONARDO:  And, Judge, I believe it is my

7   last exhibit.

8   Q.   You testified on Monday that Mr. Peca breached the

9   agreement that you had with him in regards to the comps;

10  is that right?

11  A.   Yes, he did.

12  Q.   When did Mr. Peca buy the unit?

13  A.   2008.

14  Q.   I'm going to show you what's been marked as

15  Forfeiture Exhibit 106.  (Handing.)

16           Is that an e-mail that you received from

17  Mr. Peca?

18  A.   It appears to be.

19  Q.   And, in fact, didn't you tell the SEC that Mr. McKee

20  and Mr. Peca owned the Palms units with Mr. Kaiser and

21  Mr. Constantine?  You told them that, didn't you?

22  A.   In or about what year?

23  Q.   In -- when you spoke to the SEC, you told them that

24  McKee and Peca owned the units with Kaiser and

25  Constantine; isn't what you testified to?

Kenner - Cross/Leonardo

244

1   A.   I'm just asking what year was the SEC.

2   Q.   2011.

3   A.   In '11.  That sounds as if it were accurate, 2011.

4   Q.   But you didn't tell the SEC at any time that you

5   owned the units or claimed to own the units along with

6   Mr. Peca, correct?

7   A.   I don't recall if they asked me prior to 2011 if I

8   had any ownership.  I don't recall if they asked me that.

9        MS. LEONARDO:  Your Honor, I'm sorry, I have one

10  more exhibit.

11       THE COURT:  Are you offering this one?

12       MS. LEONARDO:  Yes, your Honor, I'm offering

13  that into evidence.

14       MR. HALEY:  No, no, Judge.  She said she only

15  had one more exhibit.  No objection.

16       MR. CONWAY:  No objection.

17       THE COURT:  106 is admitted.

18       (Government's Exhibit 106 in evidence.)

19       MS. LEONARDO:  I'm showing the witness what is

20  marked as Exhibit 105.

21  Q.   Mr. Kenner, looking at Exhibit 105, is that a wire

22  transfer that you caused to be made on behalf of Mr. Peca,

23  or Mr. Peca sent it to you?

24  A.   This is a wire transfer that I signed on behalf -- in

25  and around September of 2005 for Mr. Peca with his

Kenner - Cross/Leonardo

245

1  authority to wire transfer funds from his Charles Schwab

2  account to Baha Development Corporation for a provision

3  for an equity stake in the CSL properties.

4  Q.   And that was the $200,000 investment, correct?

5  A.   Yes.

6  Q.   And for that he received a 10-percent interest in the

7  CSL properties, right?

8  A.   I believe he did.

9  Q.   For each $100,000, the individual got five-percent

10  interest, correct?

11  A.   That's how it worked out in the end.

12          MS. LEONARDO:  May I have one moment, your

13  Honor?

14          THE COURT:  Are you offering 105?

15          MS. LEONARDO:  Yes, I'm offering 105.

16          MR. HALEY:  No objection.

17          MR. CONWAY:  No objection.

18          THE COURT:  105 is admitted.

19          (Government's Exhibit 105 in evidence.)

20          MS. LEONARDO:  Your Honor, I have no further

21  questions.

22          THE COURT:  Do you want to take the lunch break,

23  Mr. Conway?

24          MR. CONWAY:  Yes.  I think that would be best,

25  your Honor.

Kenner - Cross/Leonardo

246

1          THE COURT:  Okay.

2          MR. CONWAY:  I don't expect to be long.

3          Mr. Oliveras is going to be doing the cross, but

4   I don't expect it to be much more than a half hour or so.

5          THE COURT:  All right.  And are you still intent

6   on calling Agent Wayne?

7          MR. CONWAY:  Briefly, yes.  It will be 15

8   minutes.

9          THE COURT:  Okay.  And that would be redirect, I

10  assume?

11         MR. HALEY:  Yes, your Honor.  That would be very

12  limited.

13         THE COURT:  1:45.  All right.

14         MR. HALEY:  Thank you.

15         (Luncheon recess taken at this point.)

16         (Continued on next page.)

17

18

19

20

21

22

23

24

25

247

1        A F T E R N O O N   S E S S I O N

2

3            THE COURT:  Please be seated.

4            (The witness resumes the stand.)

5            THE COURT:  Mr. Conway, go ahead.

6

7    CROSS-EXAMINATION

8    BY MR. OLIVERAS:

9    Q.    Good afternoon, Phil.

10   A.    Good afternoon.

11   Q.    Do you mind if I call you Phil?

12   A.    That's fine.

13   Q.    You testified that Etan Moreau sued Mr. Constantine

14   after breaching their agreement to purchase his one

15   bedroom studio at the Palms; is that correct?

16   A.    Yes, I recall that.

17   Q.    Did you have anything to do with helping

18   Mr. Constantine defend that lawsuit?

19   A.    Not that I recall.

20   Q.    Did you provide any monetary help to Mr. Constantine

21   with regards to that lawsuit?

22   A.    I think I made an initial deposit with his attorney.

23   Q.    Do you know who his attorney was?

24   A.    It was Tom Baker of Arizona.

25   Q.    Do you know how much that was for?

Kenner  -  Cross/Oliveras

248

1    A.    I believe it was $5,000.

2    Q.    When you paid Mr. Baker as his attorney, was there

3    ever a point in time when he said, hey, send me $75,000

4    from the fraud scheme?

5    A.    No.

6    Q.    It wasn't anything like that at all, was it?

7    A.    No, it was not.

8    Q.    You were simply advancing $5,000 for the lawsuit for

9    your client?

10   A.    That is correct.

11   Q.    You even notified Baker's office that you were

12   providing the payment of $5,000 specifically for the

13   Moreau case; isn't that right?

14   A.    That's correct.

15   Q.    I would like to show you what's been marked as

16   Defense Exhibit FFC-1.

17         MR. OLIVERAS:  Your Honor, may I approach?  I

18   have a copy for the Court of all of the exhibits we plan

19   on using.

20         THE COURT:  Thank you.

21   BY MR. OLIVERAS:

22   Q.    Do you recognize what's been marked as Exhibit FFC-1?

23   A.    It looks familiar, yes.

24   Q.    Do you know what it is?

25   A.    This was an e-mail I sent to Mr. Baker's assistant,

Kenner  -  Cross/Oliveras

249

1    Trish, and copied Mr. Constantine in February of '09,

2    confirming the $5,000 deposit that I previously mentioned

3    for the case between my former client, Mr. Moreau, and

4    Mr. Constantine regarding the Palms unit.

5              MR. OLIVERAS:  I would like to move this into

6    evidence.

7              THE COURT:  Any objection?

8              MS. LEONARDO:  No objection, your Honor.

9              MR. HALEY:  No, sir.

10             THE COURT:  FFC-1 is admitted.

11             (Defense Exhibit FFC-1 in evidence.)

12   BY MR. OLIVERAS:

13   Q.   Mr. Kenner, did you expect to be repaid the $5,000 by

14   Mr. Constantine?

15   A.   I don't recall.

16   Q.   Did you also pay $15,000 to Gilmartin, Magence and

17   Ross?

18   A.   Yes, I did, I believe I did on several occasions.

19   Q.   And just like with the payment to the lawyer, did

20   there ever come a time when you say, hey, let's take this

21   $15,000 and pay Gilmartin?

22   A.   No, I did not.

23   Q.   So the $700,000 alleged fraud, Mr. Constantine

24   received $500 twice directly the aforementioned $5,000

25   paid to Mr. Constantine's attorney to defend the Moreau

Kenner  -  Cross/Oliveras

250

1  lawsuit, and the $15,000 mortgage payment to Gilmartin

2  Magence & Ross; is that correct?

3  A.    That sounds accurate.

4  Q.    Did you expect to get the $15,000 repaid?

5  A.    I don't recall.

6  Q.    As a separate matter, didn't you previously also pay

7  for Mr. Constantine's defense of the lawsuit filed against

8  him by your other client, Mr. Juneau?

9  A.    In California, yes, I did.

10           I think I forwarded $20,000 to Mr. Constantine's

11  California lawyer.

12  Q.    Did you expect to have that repaid?

13  A.    I don't recall at the time.

14  Q.    I would like to show you what's been marked as

15  Exhibit FFC-2.

16           Do you recognize what's been marked as FFC-2?

17  A.    Yes, I do remember this.

18  Q.    Did you write this?

19  A.    Yeah, I wrote the bottom e-mail to my banker at Bank

20  of America for the $20,000 advance, and I wrote the top --

21  the third response -- excuse me -- the second response.

22  Q.    What was that response?

23  A.    Sorry.  I wrote the response above it to

24  Mr. Constantine about three months later just asking if I

25  could be repaid the $20,000.

Kenner - Cross/Oliveras

251

1   Q.   Have you made payments for Mr. Constantine at other

2   times for items?

3   A.   Yes, I have.

4   Q.   Did you expect to be repaid for those?

5   A.   For some of them I'm sure I did.

6   Q.   Do you find it likely that you would have been

7   expected to be repaid for the 15,000 and the $5,000

8   payments?

9   A.   It would make sense that I would.

10  Q.   So of the entire $700,000 alleged fraud, he

11  essentially received a loan for a grand total of $21,000?

12  A.   That sounds accurate.

13            MR. OLIVERAS:  I would like to move FFC-2 into

14  evidence.

15            MS. LEONARDO:  No objection, your Honor.

16            MR. HALEY:  No objection.

17            THE COURT:  FFC-2 is admitted.

18  BY MR. OLIVERAS:

19  Q.   Mr. Kenner, I would like to talk about the

20  allegations you made about Mr. Constantine regarding the

21  Global Settlement Fund.

22            You made them to your clients and in the lawsuit

23  you filed in his bankruptcy proceeding and even during

24  this trial.

25            Did you believe that those allegations were

Kenner  -  Cross/Oliveras

252

1  correct at the time you made them?

2  A.   Yes, I was, 100 percent.

3  Q.   I would like to show you what was marked by the

4  government as exhibit at trial 303

5           THE COURT:  Is that in my book here?

6           MR. OLIVERAS:  It should be in your book.

7           THE COURT:  It's 303?

8           MR. OLIVERAS:  303.  It was right before FORF-1

9  in my book.  I have it out of order.  I apologize.

10           THE COURT:  Okay.  I got it.

11           What's the question?

12  BY MR. OLIVERAS:

13  Q.   Now, the notes on the right side column of

14  Government's Exhibit 303, they're prepared by you; isn't

15  that right?

16  A.   That's correct.

17  Q.   Let's take a look at the transaction on 5/12/2009

18  labeled Sonneschein for $8,000.

19           The description in the notes column says TC LA

20  attorneys, and then has a web address; do you see that?

21  A.   Yes, I do.

22  Q.   Sonneschein refers to Sonneschein Nat & Rosenthal,

23  LLP; is that correct?

24  A.   That sounds familiar.

25  Q.   I would like to draw your attention now to what's

253

1  been marked as Defendant's Exhibit FFC-3.

2       This is an e-mail to Sonneschein; is that

3  correct, related to Sonneschein; is that correct?

4  A.   I see attorney Ross' name as part of Sonneschein,

5  yes, in the middle of the e-mail.

6  Q.   Now, as you just said, according to the e-mail, you

7  used an attorney named Rick Ross who's engaged to help

8  with the Diamante Del Mar and Cabo San Lucas project; is

9  that right?

10  A.   Yes, he was.

11       He was part of the mediation Mr. Constantine

12  undertook trying to settle out the problems we had with

13  Mr. Jowdy.

14  Q.   Would you consider that to be an authorized use of

15  the global settlement money?

16       MS. LEONARDO:  Objection.

17       THE COURT:  Overruled.  You can answer that.

18  A.   From my understanding, yes, it would be.

19  Q.   Is this the quote unrelated matter that Sonneschein

20  handled for you that you testified about on Monday during

21  cross-examination?

22  A.   No, this is different.

23  Q.   Okay.

24  A.   This is unrelated to my matter.

25  Q.   Okay.

254

1    As you sit here today, do you still believe the

2    allegations you made against Mr. Constantine with respect

3    to the Global Settlement Fund are true?

4    MS. LEONARDO:  Objection.

5    THE COURT:  I think he answered that already.

6    You can answer again.

7    A.   Now that I understand what arrangement

8    Mr. Constantine had with Mr. Gonchar and the contribution

9    of one of the deposits into the account, I think my

10   observations were incorrect when I told my clients that I

11   thought he misappropriated funds.

12   Q.   I would like to direct your --

13   THE COURT:  In every instance or in this

14   instance?

15   THE WITNESS:  Specific to this I was answering.

16   If there's another question, I'll answer it as well so

17   it's clear.

18   Thank you, your Honor.

19   THE COURT:  All right.

20   BY MR. OLIVERAS:

21   Q.   Do you have any of the allegations that you recall

22   making that you feel are still absolutely true?

23   A.   Not that I recall, off the top of my head.

24   Q.   Would you make similar accusations today if it were

25   to take -- if the situation were to take place and you had

Kenner  -  Cross/Oliveras

255

1    all of the information you had now?

2              MR. HALEY:  I object.

3              MS. LEONARDO:  Objection.

4              THE COURT:  That's no good.

5              MR. OLIVERAS:  I move FFC-3 in.

6              THE COURT:  Any objection?

7              MS. LEONARDO:  No objection, your Honor.

8              MR. HALEY:  No objection.

9              THE COURT:  FFC-3 is admitted.

10             (Defense Exhibit FFC-3 in evidence.)

11   BY MR. OLIVERAS:

12   Q.   I would like to draw your attention to Government's

13   Exhibit FORF-1.

14             What is Government's Exhibit alleging as a

15   fraud -- strike that.  Withdrawn.

16             Let's draw your attention to the column labeled

17   Diamante Del Mar.

18   A.   Yes.

19   Q.   The government's alleging a $9.1 million loss with

20   respect to that project; is that correct?

21   A.   That's what it says at the bottom, yes.

22   Q.   Isn't it true that Mr. Jowdy didn't take out the

23   default on the -- take out and default on the KSI loans he

24   secretly made for $3 million, today your client would

25   still have equity in a 60-plus million dollar free and

Kenner  -  Cross/Oliveras

256

1    clear piece of property?

2    A.    That is correct.

3    Q.    Now, just before lunch the prosecutor asked you about

4    the e-mail between you and Mr. Stolper; is that correct?

5    A.    Yes.

6    Q.    I believe that was FORF-96.

7    A.    Yes, I remember this.

8    Q.    She asked about line number 8 which states:

9              I am not sure that Kaiser ever signed an

10   agreement with Constantine on behalf of Little Isle IV.

11             Do you recall that?

12   A.    Yes, I do.

13   Q.    That was referring to the funding consulting

14   agreement; isn't that correct?

15   A.    Correct.

16   Q.    Mr. Kenner, what is the date of the e-mail?

17   A.    November 27, 2010.

18   Q.    Weren't both of these consulting agreements exhibits

19   in Mr. Nolan's 2008 arbitration?

20   A.    In the 2009 arbitration, yes, they were.

21   Q.    They're both signed by Mr. Kaiser; is that correct?

22   A.    That is correct.

23   Q.    And Mr. Kaiser testified on your behalf in that

24   arbitration?

25   A.    Yes, he did.

Kenner  -  Cross/Oliveras

257

1    Q.    Did he object to the authenticity at that time?

2    A.    Not that I'm aware of.

3    Q.    Going back to the GSF, as you sit here today knowing

4    what you know now about Mr. Constantine's arrangement with

5    Mr. Gonchar and what you now know were monies deposited by

6    Mr. Constantine into Mr. Richard's account, do you still

7    believe Mr. Constantine misappropriated any GSF funds?

8                MR. HALEY:  Objection.

9                THE COURT:  Do you understand the question?

10               THE WITNESS:  Yes, I do.

11               THE COURT:  You can answer that.

12               Go ahead.

13   A.    No.

14               Now that I know what his arrangement was with

15   Mr. Gonchar, and that he deposited funds, I have no

16   problems with what he did with the money.

17               I wasn't speaking with Mr. Gonchar about the

18   time I made the allegations.

19   Q.    Do you recall during the trial Mr. Kaiser testifying

20   about a piece of paper with his own handwritten notes on

21   it regarding monies that were advanced to Mr. Constantine?

22   A.    If you're referring to what the government referred

23   to as a shopping list and a grocery list, yes.

24   Q.    Do you recall him testifying as follows:

25               "QUESTION:  And just so the record is clear, you

Kenner - Cross/Oliveras

258

1  were testifying that it was Mr. Kenner who provided the

2  information and you wrote it down; is that right?

3          "ANSWER:  Yes, that is correct.

4          "QUESTION:  Would you take a look at Kenner's

5  Exhibit 37.

6          Do you recognize that?

7          "ANSWER:  Yes.

8          "QUESTION:  Is that the document you're

9  referring to?

10          "ANSWER:  Yes."

11          Do you recall that?

12  A.  I do recall that testimony.

13  Q.  I would like to direct you to what was labeled and

14  marked Kenner Exhibit 37.

15          MR. OLIVERAS:  I apologize.  I don't have the

16  official marked one.  I do have the actual document.  If

17  there's any question about it, we can authenticate it.

18          THE WITNESS:  No problem.

19  A.  I recall this document.

20  Q.  Now, I'm going to direct your attention to the bottom

21  right-hand corner of Kenner Exhibit 37.

22          Can you tell me what that says?

23  A.  In the box?

24  Q.  Outside the box.

25  A.  It says Hawaii 2.65 million and three numbers below

Kenner  -  Cross/Oliveras

259

1    it, 650,000, 1.5 million, 500,000.

2    Q.    Mr. Kaiser testified that he did not know about the

3    payment made to Mr. Constantine regarding Hawaii, and that

4    the signatures on the consulting agreement were forgery;

5    was that right?

6    A.    That's what I recall.

7    Q.    But according to his own handwritten notes, it

8    appears that he not only knew of the Hawaii consulting

9    agreement, but knew the exact amount of each agreement?

10             MS. LEONARDO:  Objection.

11             THE COURT:  Sustained as to form.

12   BY MR. OLIVERAS:

13   Q.    Mr. Kenner, do you know what those numbers underneath

14   the words Hawaii represent?

15   A.    Yes, I do.

16   Q.    What do they represent?

17   A.    They were the three consulting loan agreements that

18   we had done with Mr. Constantine in 2004, 2005 and 2006,

19   all three of which were signed by Mr. Kaiser.

20   Q.    Approximately, how much money has Mr. Kaiser invested

21   with you in total?

22   A.    At this point, he's been more than fully paid back

23   for everything he invested both with me as a business

24   partner and in Hawaii.  He has no funds outstanding or

25   due.

Kenner   -   Cross/Oliveras

260

1   Q.    The question was, how much did he invest with you?

2   A.    In Hawaii, on behalf of some of his friends and

3   family, I believe the total was 1.1 million and he was

4   paid back 1.176 million after the August 2006 closing.

5   It's reflect on the banking statements.

6          In California he invested approximately $1.3

7   million on our California beach house project, and he was

8   paid all of those funds back in full as verified by bank

9   statements and used in the defense of his own case in

10  Arizona, and Mr. Kaiser invested -- he purchased $500,000

11  of my ownership of a third property called Los Frailes in

12  Mexico in October of 2008.

13  Q.    He still owns that?

14  A.    He still owns that portion, yes.  Those funds are all

15  separate and apart from this document.  This document has

16  nothing to do with Mr. Kaiser or his money.

17  Q.    What was this document then?

18          MR. HALEY:  Judge, for purpose of clarity of the

19  record, I think he's referring to exhibit 37.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Yes.

22  A.    This is a document that Mr. Kaiser turned over to me

23  after he had made a transcription of the same document I

24  kept as a list of funds transfers between myself and

25  Mr. Constantine with a few other peripheral notes which

261

1    included that Hawaii consulting money.

2           And on December 6th I believe Mr. Constantine,

3    excuse me, Mr. Kaiser, while he was at my residence in

4    Arizona, copied it on to his own handwriting and faxed a

5    copy of this document and the next document in the PK home

6    Bates stamp sequence which would have been 12,010.  That

7    was my original document somewhere as evidenced by the

8    time stamp on the top left corner of this document.

9           And if I recall correctly, also PK home-12010, I

10   found out about Mr. Kaiser transposing my document into

11   his own handwriting six days later when he sent me a text

12   message asking if it was all right that he copy my

13   handwritten document.

14   Q.    I'm going to show you now what's been marked as

15   defendant's exhibit FFC-4.

16           I'll ask you to review it.

17           (Pause in proceedings.)

18   A.    Okay, I recognize these.

19   Q.    What are they?

20   A.    These are a series of text messages from June of 2010

21   through February of 2011, that I believe were all sent to

22   me by Bryan Berard.  Yes, all of them were sent to me by

23   Bryan Berard.

24   Q.    You received those messages?

25   A.    Yes, I did.

Kenner - Cross/Oliveras

262

1   Q.   Do you recall reading them when you got them?

2   A.   Yes, I do.

3   Q.   Are they a fair and accurate representation of what

4   you received back in 2010?

5   A.   And 2011, yes.

6        MR. OLIVERAS:  I would like to move these into

7   evidence.

8        MS. LEONARDO:  Your Honor, I would have an

9   objection because there's absolutely no indication on what

10  phone number these text messages are coming to or where

11  this came from in this particular format.

12       It appears somebody re-created the text messages

13  and there's absolutely no indication what number these

14  texts were sent to.

15       THE WITNESS:  I can address that, your Honor.

16       MR. HALEY:  I have no objection.

17       It's kind of like creating a chart, the

18  government takes -- they take various information from

19  various -- I have no objection.

20       THE COURT:  I think, didn't we have these in the

21  trial too?

22       MR. OLIVERAS:  Yes, your Honor.

23       THE WITNESS:  Yes, sir.

24       THE COURT:  Can you explain that?  The issue

25  that it doesn't show what number it came from or went to I

Kenner - Cross/Oliveras

263

1    guess?

2           THE WITNESS:  If you do look on the left column,

3    for example, the first one is 13,801.

4           That was the sequential text stamp that was

5    delivered to us during Rule 16 by the government after the

6    seizure of my iPhone totaling approximately 89,000 text

7    messages, so they were text delineated ASCII file.

8           THE COURT:  I remember that.

9           The objection is overruled.  FFC-4 is admitted.

10          (Defense Exhibit FFC-4 in evidence.)

11   BY MR. OLIVERAS:

12   Q.   I draw your attention to what's been marked as FFC-5.

13   A.   Yes, I recall this.

14   Q.   Can you tell us what that is?

15   A.   This is similar to the text messages from Bryan

16   Berard, but these are from Michael Peca to me in July of

17   2010.

18          It's referencing Peca telling me that if he

19   can't be part of the loan buyout at Eufora, then there's

20   going to be a lynching, meaning a lot of guys, everybody

21   should have a chance to buy the loan from Eufora that

22   Michael Stolper was dealing with at the time and being

23   headed up by Tim Gaarn and CR Gentry, and Peca is asking

24   me if the money has already been collected and whose money

25   is sitting in escrow at that point in time.

Kenner  -  Cross/Oliveras

264

1     And this is, I think I saw on the Berard texts,

2   it's the coordination of Berard and speaking to all of the

3   other investors about that money, putting money together,

4   excuse me.

5   Q.   I'm asking if you recognize it.

6   A.   Yes.

7   Q.   Thank you.

8        So you recognize it then?

9   A.   Yes, I do.

10  Q.   Do you recall receiving those?

11  A.   Yes, I do.

12  Q.   Are they fair and accurate representations of the

13  texts you had received at that time?

14  A.   Yes, they are.

15        MR. OLIVERAS:  I would like to move FFC-5 into

16  evidence.

17        MS. LEONARDO:  Judge, I have the same objection

18  that I had earlier.

19        THE COURT:  This is the way the government

20  produced these though.

21        MS. LEONARDO:  In addition, your Honor, I find

22  it difficult to believe the witness remembers this text

23  message from six years ago.

24        THE COURT:  Overruled.

25        You have no objection?

Kenner  -  Cross/Oliveras

265

1     MR. HALEY:  I don't have any objection.

2     THE COURT:  Okay.  FFC-5 is admitted.

3     (Defense Exhibit FFC-5 in evidence.)

4  BY MR. OLIVERAS:

5  Q.   Now, do you recall what the -- withdrawn.

6     Do you recall the government's theory of the

7  case changing from time to time?

8     MS. LEONARDO:  Objection.

9     THE COURT:  Let's stick to the facts.

10  BY MR. OLIVERAS:

11  Q.   When did you learn of the government's disclosure

12  problem theory?

13     MS. LEONARDO:  Objection.

14     THE COURT:  Again, sustained.

15  BY MR. OLIVERAS:

16  Q.   I would like to draw your attention to what's marked

17  as FFC-6.

18     Do you recognize that?

19  A.   Yes, I do.

20  Q.   Can you tell me what that is?

21  A.   This was a text message from Mattias Norstrom to

22  myself on March 19, 2008, as a result of Norstrom

23  investing in Eufora and buying the private stock from

24  Mr. Constantine, and I sent a fax on to Mr. Norstrom, as I

25  did with all my clients, after signing as power of

266

1    attorney.

2          Mr. Norstrom was requiring that it was

3    Constantine Management Group selling the stock and that's

4    why I respond yes, that is where the one percent is being

5    transferred from, and he responded that he sent the fax on

6    to Wells Fargo for confirmation.

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

267

1  BY MR. OLIVERAS:

2  Q.    So does this text indicate that Mr. Norstrum was made

3  aware by you that the ownership interest that he was

4  purchasing was being purchased from CMG?

5  A.    Yes.  This is the same as each of the investors from

6  me, or others, whether from CMG or from Tim Gaarns,

7  standard managers, or any of the other previous investors

8  that were being bought out of private positions.

9  Q.    And this is prior to the sale being completed?

10 A.    I believe so.

11 Q.    Why didn't you bring the text message to anyone's

12 attention at trial?

13 A.    I don't recall seeing it at my preparation for the

14 trial, but I wasn't aware that anyone was alleging that

15 the individuals were unaware of the private stock

16 purchases until trial.

17 Q.    When did you start searching for the members that had

18 to do this?

19 A.    Immediately after trial.

20 Q.    After trial?

21 A.    After trial.

22 Q.    Why not at the beginning of trial?

23 A.    I was unaware that the government was alleging the

24 individuals did not know there were private stock

25 transactions going on.

Kenner - Cross/Oliveras

268

1  Q.    Where did you get the text message from?

2  A.    It came from the government's production.

3  Q.    Was this message part of the binder that the

4  government produced and provided to the jury as part of

5  the text messages?

6  A.    No, it definitely was not.

7  Q.    And isn't Mr. Norstrum's $100,000 investment listed

8  on Government Exhibit 41 listed as a loss?

9  A.    Yes, it is.  Under the Eufora CMG column.

10  Q.    Mr. Kenner, you heard Agent Wayne testify that

11  Mr. Constantine had nothing do with your client's making

12  investments in Hawaii, the lines of credit, Diamonte del

13  Mar, Diamonte Cabo San Lucas or Los Friales.

14           Do you agree with that testimony?

15  A.    No.

16  Q.    What do you disagree with?

17  A.    The initial investments in each of those properties

18  Mr. Constantine had nothing do with.  With respect to

19  Diamonte del Mar, Diamonte Cabo San Lucas, Mr. Constantine

20  mediated with Mr. Jowdy and the MI Investor Group for over

21  a year before Mr. Hardy and Mr. Jowdy and Mr. Fried

22  terminated his mediation mitigation efforts.

23  Q.    But as far as your client making the initial

24  investment, you had nothing do with that?

25  A.    Nothing to do with Diamonte del Mar or Cabo San

Kenner - Redirect/Haley

269

1    Lucas.

2            MR. OLIVERAS:  I have no further questions.

3            THE COURT:  Do you want to introduce --

4            MR. OLIVERAS:  I'm sorry.  I'll introduce FSC-6

5    in evidence.

6            MS. LEONARDO:  No objection, your Honor.

7            MR. HALEY:  No objection.

8            THE COURT:  FSC-6 is admitted.

9            (Defendant's Exhibit FSC-6 in evidence.)

10            THE COURT:  There are other exhibits in this

11    binder.

12            Do you mind introducing those?

13            MR. OLIVERAS:  No.

14            THE COURT:  All right.  Any -- Mr. Haley, do you

15    have any redirect?

16            MR. HALEY:  I will endeavor to keep it brief,

17    Judge.

18            THE COURT:  Okay.

19            MR. HALEY:  And relevant to the issues that I

20    perceive are relevant before the Court in this forfeiture

21    proceeding.

22

23    REDIRECT EXAMINATION

24    BY MR. HALEY:

25    Q.   Phil, at the conclusion of the government's

270

1    cross-examination of you approximately an hour and a half

2    ago, you were shown FOF -- FORF-55, do you recall that

3    document?

4    A.    FORF-105.

5    Q.    FORF-155.  Do you recall that document?

6    A.    Yes, I do.

7    Q.    And though it speaks for itself, that is a wire

8    transfer from what account to what account, sir?

9    A.    The funds were initially custodied at Charles Schwab

10   in the name of Michael Peca, Account 60374031.  And on

11   September 13, 2005 or thereabouts, I would have signed

12   this document with Mr. Peca's authorization and wire

13   transferred 200,000 directly to Mr. Jowdy's Baja

14   Development Corporation account.

15   Q.    What, if any --  and I'll use the word "nexus,"

16   exists between that wire transfer and any of the Hawaiian

17   land development matters involving Hawaiian land

18   development accounts or Eufora accounts or the Global

19   Settlement accounts or Sag Ledbetter accounts?

20   A.    None.

21   Q.    As relates to this particular wire transfer, were any

22   of those funds reflected in that wire transfer commingled

23   with any of the accounts controlled or operated by the

24   Hawaiian Land Development Entities, Eufora, Global

25   Settlement Fund or Sag Harbor Ledbetter?

271

1    A.    No.

2    Q.    Kindly take a look at FORF-106.  (Handing.)

3          As you read that particular e-mail, sir, it

4    refers to what specific transaction involving yourself?

5    A.    The Palms Penthouse unit with Mr. Peca.

6    Q.    What, if any, relationship or nexus exists between

7    the matters discussed in that particular e-mail and the

8    Hawaiian Land Development project, Eufora, Global

9    Settlement Fund and Sag Ledbetter?

10   A.    None.

11   Q.    Incidentally, the content of this document in

12   connection with statements and representations made to you

13   by Mr. Peca, are they all complete and accurate?

14   A.    They are almost wholly inaccurate.

15   Q.    Now, on cross-examination you were asked with

16   reference to Exhibit 73 wherein you testified that you

17   signed Stompel's -- Joseph Stompel's name to a document in

18   connection with the Constantine bankruptcy proceeding, do

19   you recall that question in that document?

20   A.    Yes, sir, I do.

21   Q.    Did you believe it to be in your client's interest,

22   Joseph Stompel, to see to it that a pleading was filed on

23   his behalf given the nature of the statements made in the

24   Constantine bankruptcy proceeding?

25   A.    Yes, sir.  Not just on Mr. Stompel, but for each of

272

1    the other individuals as well.

2    Q.    And how did you believe it was in your client's

3    interest to take that action?

4    A.    After discussions with each of the individuals,

5    including Mr. Stompel, we concluded that they were

6    interested in having an adverse proceeding filed in

7    Mr. Constantine's bankruptcy making sure that we secured

8    certain assets that we believe could be expunged during

9    the bankruptcy.

10          So each of them authorized me to prepare and

11   then in certain cases sign the complaints and then file

12   them, and each of the individuals reimbursed me for the

13   filing fees, and I recall that specifically because it was

14   turned over as part of government evidence, the transfers

15   back to me to pay for the filing fees for each of those

16   cases.  I believe they were $313 each.

17   Q.    The Ula Makika bank account, when you set up the Ula

18   Makika bank account, did it have anything do with the

19   Hawaiian Land Development project, Eufora, the Global

20   Settlement Fund or Sag Ledbetter?

21   A.    No.  It was originally set up for me personally.

22   Q.    You were asked a question on cross-examination

23   whether you believe that the purchase of the Honu'Apo

24   property benefited your investors, and I believe you gave

25   an affirmative answer.

273

1        You did believe it benefited your investors,

2   correct?

3   A.    Yes.  And, as I sit here today, I still believe that

4   it was benefited.

5   Q.    How did it benefit your -- when I say "investors," I

6   think we know -- when I speak of investors, we're talking,

7   of course, about your hockey player client investors, and

8   how with respect to the defendant would this benefit them?

9   A.    It benefited everybody involved in the Hawaii land

10  development project as a recommendation from Steve Len,

11  our attorney in -- a real estate attorney in Keylo,

12  Hawaii, because the development area in the Kabu district

13  of Hawaii was a very sensitive subject with all of the

14  locals, and my donating the 10-acre Sugar Mill property

15  which was an historic landmark to the community onto a

16  501c3, it looked like a good gesture on behalf of our

17  development group to the locals as we suggested to the

18  locals through our attorney, Steve Len, and the planning

19  director Chris Newman in Hawaii that we were going to

20  build a historical museum on the site to commemorate the

21  150 years of sugar plantation work, and the sugar mill

22  that still was erected on that property.

23  Q.    Now, I'm going to show you documents that the

24  government introduced for consideration by this court on

25  Monday, and let's take a look at FORF-76, specifically

Kenner - Redirect/Haley

274

1  paragraph 5 of that document.

2       First of all, even though the Court has the

3  document, what is this for purposes of the record?

4  A.   FORF-76 is a declaration of Kenneth Jowdy in support

5  of a motion for expedited discovery filed February 27,

6  2009.

7  Q.   And it's the document the government introduced for

8  consideration by this court; is that correct?

9  A.   Yes, sir.

10  Q.   And what does paragraph 5 of that document say?

11  A.   It's referring to Mr. Jowdy.  It says the following:

12  "The signature beneath my name on the last page of the

13  loan agreement document is not my signature.  I believe

14  that it has been forged by someone who attempted to

15  reproduce my signature."

16  Q.   In reference to FORF-80, also introduced into

17  evidence for consideration by this court, would you kindly

18  read the excerpt as provided on the document itself as

19  relates to Mr. Jowdy's answer to a particular question?

20  A.   On line 17, it says, "Answer:  The document in the

21  Arizona case, the forged document.  He has an entire

22  testimony based on a lie.  It is a forgery.  I never

23  signed the document.  I've never -- I never saw the

24  document until he produced it.  That and -- that and the

25  entire testimony that he put in front of federal court."

275

1  Q.   Now, the document we're speaking of was introduced

2  into evidence during the course of this trial as revolving

3  line of credit; is that correct?

4  A.   Yes, sir.

5  Q.   How many signatures are on that document?

6  A.   Three.

7  Q.   Whose signatures are they?

8  A.   My signature, Ken Jowdy's signature, Robert Gaudet's

9  signature.

10 Q.   In what capacity did Robert Gaudet sign that

11 document?

12 A.   He signed it as a witness.

13 Q.   At the point in time that document was executed,

14 what, if any, relationship did Robert Gaudet have to Ken

15 Jowdy?

16 A.   Robert Gaudet was facilitating the land acquisition

17 in Cabo San Lucas with Mr. Jowdy and was under an oral

18 employment agreement of four years, $2 million with

19 Mr. Jowdy, and was projected to be his director of

20 marketing and sales and director of golf as Mr. Gaudet's a

21 PGA professional.

22 Q.   When that document was signed bearing Robert Gaudet's

23 signature as witnessed, what, if any, relationship did he

24 have with you?

25 A.   None.  I had met Mr. Gaudet by that point in time

276

1    perhaps one other time prior to December of 2004.

2            MR. HALEY:  Judge, may I approach?

3            THE COURT:  Yes.

4    Q.   Phil, I'm going to ask you to take a look at Kenner

5    Exhibit F-25.  I've got to give it to you, correct?

6            (Handing.)

7    A.   Thank you.

8    Q.   What is it?

9    A.   There are two different components.  One is testimony

10   that Robert Gaudet gave on day five of the Nolan

11   arbitration on May 30th of 2009 in Arizona.  And the

12   exhibit attached to the testimony is a photocopy of the

13   revolving line of credit loan that Mr. Jowdy and I signed

14   in December of 2004.

15           MR. HALEY:  Your Honor, I'd offer Kenner Exhibit

16   F-25 in evidence.

17           MS. LEONARDO:  No objection, your Honor.

18           MR. CONWAY:  No objection, your Honor.

19           THE COURT:  It's admitted.

20           (Defendant's Exhibit F-25 in evidence.)

21           MR. HALEY:  Your Honor, though it speaks for

22   itself, I have a very brief statement I'd like to read

23   into the record.

24   Q.   Did you see where Mr. Gaudet while under oath during

25   the arbitration proceeding was asked with reference to

Kenner - Redirect/Haley

277

1    Exhibit 79, which is attached to this document, which is

2    clearly the revolving credit line agreement.

3             "Question:  Were you present when Mr. Jowdy

4    signed this credit line agreement -- this agreement,

5    forget the title, with Mr. Kenner?

6             "Answer:  Yes, I was."

7             Is that how it reads?

8    A.    Yes, sir.

9    Q.    In addition to his testimony, Robert Gaudet's

10   testimony -- by the way, is Robert Gaudet the same person

11   who signed as the witness to the revolving line of credit

12   agreement?

13   A.    Yes, he is.

14   Q.    In addition to his testimony before the American

15   Arbitration Association, was there also an instance during

16   the course of the litigation involving Glenn Murray

17   against Ken Jowdy where that particular document was

18   referenced?

19   A.    Yes, sir.

20   Q.    And would you supply to the court -- were you present

21   in court that day?

22   A.    Yes, I was, as a third-party crossover claim.

23   Q.    Would you describe to the Court, as you recall the

24   circumstances, under which that document was presented to

25   the Court?

278

1  A.   Mr. Jowdy in his defense of the lawsuit in -- his

2  counsel authenticated the document as a real document

3  contending that if Mr. Jowdy has that document and the

4  ability to borrow money, why was he borrowing separate

5  money from Mr. Murray at the time.

6  Q.   Who offered that document to the Court as an

7  authentic document during the course of that litigation?

8  A.   Mr. Jowdy's attorneys authenticated the document.

9  Q.   Phil, in connection with that proceeding, is there a

10  transcript of that proceeding reflecting the substance of

11  what you just affirmed under oath as to the manner in

12  which that document was utilized during the course of that

13  deposition -- excuse me -- during the course of that

14  trial?

15  A.   Yes, it is.

16  Q.   Is there yet a third instance where Robert Gaudet --

17  withdrawn.

18       Is there yet another instance where Robert

19  Gaudet testified in a judicial proceeding concerning his

20  signature as a witness to the loan agreement?

21  A.   Yes, sir.  There was a verification.

22  Q.   And when and where did that occur?

23  A.   Mr. Jowdy and his Arizona attorneys called him as a

24  witness to be deposed on, I believe, July 2, 2009 to

25  authenticate the revolving line of credit in the Arizona

279

1    case with Phil Kenner against Ken Jowdy.

2    Q.    Was Robert Gaudet deposed?

3    A.    Yes, sir, he was.

4    Q.    What was the name for that deposition?

5    A.    It was to -- it was part of the request for expedited

6    discovery in that case for the authentication of the line

7    of credit document.

8    Q.    Well, did that involve a videotaped deposition?

9    A.    Yes, sir.  He was video'd during that disposition.

10   Q.    Is there a transcript, to your knowledge, in

11   existence of that videotaped deposition?

12   A.    Yes, sir.  I saw both of them during the pretrial

13   exhibit production.

14   Q.    During the course of that deposition, was his

15   testimony, to your knowledge, in any way inconsistent with

16   his prior testimony in the American Arbitration

17   Association that he was a third-party witness to the

18   document signed by both you and Ken Jowdy, which we know

19   as the loan agreement?

20   A.    No, it was wholly consistent.

21   Q.    To your knowledge, these three documents, the

22   deposition testimony in the American Arbitration

23   Association matter, the deposition of the transcript

24   involving a lawsuit filed by Glenn Murray against Ken

25   Jowdy, and the deposition transcript as relates to the

280

1  proceeding involving Little Isle and other plaintiffs

2  against Ken Jowdy, have those three transcripts,

3  testimony, been in the possession of the government before

4  they introduced to this court for the Court's

5  consideration, FORF-76 and FORF-80?

6           MS. LEONARDO:  Objection.

7           THE COURT:  Overruled.

8           You can answer that if you know.

9  A.   Yes, sir.  They were in the government's possession.

10  That's how I received them during production of evidence

11  prior to the commencement of our trial.

12  Q.   Now, we can say these documents have not been offered

13  by the government up to this point.  It's not --

14           MR. CONWAY:  Objection, your Honor.

15           MR. HALEY:  Well, quick thought -- I withdraw

16  that, Judge.  I withdraw the comment.

17           Judge, may I approach?

18           THE COURT:  Go ahead.

19  Q.   Would you kindly take a look at Kenner Exhibit F-27.

20           (Handing.)

21           And what is that?

22  A.   This is the e-mail that I was referring to earlier

23  that Mr. Najam sent to myself, Mr. Jowdy, his Mexican

24  attorney, Fernando Garcia, which is the FMGC@Talmur.net,

25  as well as Mr. Jowdy's permitting specialist, the e-mail

281

1    is greg@ddmgolf.com, where Mr. Najam tells me -- tells us,

2    excuse me, on February 6th that $6.25 million had been

3    paid to the seller, which is about $400,000 short of the

4    e-mail the government showed me prior to this of $6.6

5    million.  And it confirms that all of the funds for the

6    Cabo property project had to be referred to as investments

7    and not as loans.  And I think that I referenced earlier

8    that e-mail trafficking communication between myself,

9    Mr. Najam, Mr. Jowdy occurred on February 5th and February

10   6th, at which time Mr. Najam realized that Mr. Jowdy had

11   borrowed all of the funds, so he was just relating that in

12   an e-mail since he was the only legal counsel for Lehman

13   Brothers.

14           MR. HALEY:  Judge, the contents have been

15   testified to, but I offer this e-mail as Kenner Exhibit

16   F-17.

17           MS. LEONARDO:  No objection, your Honor.

18           THE COURT:  Mr. Conway, any objection?

19           MR. CONWAY:  No objection, your Honor.

20           THE COURT:  F-27 is admitted.

21           (Defendant's Exhibit F-27 in evidence.)

22           MR. HALEY:  And I apologize to the Court and to

23   you as well, if this becomes repetitive.

24   Q.   But when he said they must be characterized as

25   investments rather than loans, what did he mean by that?

Kenner - Redirect/Haley

282

1   A.   Mr. Najam had just begun the accounting process on

2   February 5th to determine where the $6 plus million that

3   had gone to the seller, and apparently with his

4   conversations with Lehman Brothers and their attorneys

5   they needed to know the source of all of those funds.  So

6   Mr. Jowdy told Mr. Najam for the first time that he had

7   been borrowing the funds from myself, Joseph Stompel,

8   Mattias Norstrum and the Hawaiian Land Development

9   partners, and Mr. Najam wanted to clarify that with

10  respect to the equity position we were taking in the Cabo

11  San Lucas project that Mr. Jowdy needed to refer to all of

12  the loans as investments.

13  Q.   But if that reference was made in connection with the

14  loan application to the Lehman Brothers, it would have

15  been untrue, correct, that they were investments rather

16  than loans?

17          MS. LEONARDO:  Objection, your Honor.

18          THE COURT:  Overruled.

19          You can answer that.

20  A.   That is correct.  In fact, the -- if I recall

21  correctly, the January 2006 letter of intent memorandum of

22  understanding between Lehman Brothers and our purchasing

23  parties refers to the money asked to be investments, and

24  they specifically added it cannot be loans.

25  Q.   You didn't partake in the application process for the

283

1   loan to Lehman Brothers for purposes of the Mexican

2   project, did you?

3   A.   No.

4        MS. LEONARDO:  Objection.

5        THE COURT:  Overruled.

6   A.   No.  I didn't see any of those documents until after

7   I was arrested.  Seven years later.

8        (Document handed to the witness.)

9        MR. HALEY:  Again, may I approach, Judge?  I'm

10  close to finishing, your Honor.

11  Q.   Phil, kindly take a look at Kenner Exhibit F-28.

12       What is that?

13  A.   This is a Diamonte del Mar balance sheet that had

14  been turned over to us in evidence by Mr. Jowdy and his

15  attorneys in the California lawsuits.  It was a balance

16  sheet that was created by Mr. Jowdy's accountant,

17  assistant Mark Thalman on December of '09.  This was put

18  together approximately a year and a half after I filed the

19  Little Isle IV Ula Makika lawsuit in Arizona for the

20  unpaid loans, to which Jowdy's initial defense was none of

21  the money were loans.

22  Q.   What were they as you represented in that

23  transaction, in that proceeding?

24  A.   Mr. Jowdy originally in his response stated that all

25  of those monies were given to his entities were

Kenner - Redirect/Haley

284

1    investments in his shell corporations.

2    Q.    Was that a true representation on his part?

3    A.    No, sir.  In fact, when we made our first request for

4    discovery for those 10 plus or minus LLCs for K1's, tax

5    records, operating agreements representing the $5 million

6    of the outstanding funds sent to Mr. Jowdy, that's when

7    they immediately initiated their attack on us for a

8    request for a motion for expedited discovery to stall our

9    ability to ferret out the 10 corporations Mr. Jowdy

10   alleged in his defense were his -- were investments he

11   made in the shell corporations that, frankly, had no

12   assets.

13   Q.    Well, as relates to Kenner Exhibit F-28, do you see

14   the notation Little Isle and Ula Makika on that document?

15   A.    Yes, sir, I do.

16   Q.    And you interpret the -- following the numbers there

17   to be reflective of investments or loans?

18   A.    This is Mr. Jowdy's balance sheet.  This was not

19   turned over to us during the Arizona case admitting the

20   loans that were made to Diamonte del Mar.  It contradicts

21   his defense in the Arizona case.  But once that case was

22   dismissed, they turned over this document that recognizes

23   a $795,000 loan from Little Isle IV to Diamonte del Mar,

24   and a $50,000 net loan from Ula Makika to Diamonte del

25   Mar.

1    Q.   Phil, speaking of the same loans, was there ever a

2    representation made to you by Ken Jowdy as to when those

3    loans were being paid?

4    A.   Yes.  According to the revolving line of credit

5    agreement, the loans were due and payable at such time

6    that Mr. Jowdy had arranged for development financing at

7    either the Diamonte del Mar project, or the Diamonte Cabo

8    San Lucas project, whichever came first.

9         I also believe since some of the hard money

10   lenders were looking to do smaller loans that would not

11   cover our entire outstanding balance.  Mr. Jowdy had asked

12   that I put a provision in there that he could execute only

13   a repayment of half of the principal outstanding, at which

14   time he got a loan for either the Diamonte Cabo San Lucas

15   or the Diamonte del Mar project.

16        He never notified us on February 21st of 2006

17   that he had received the KSI loan for $3 million that we

18   spoke about previously, otherwise we would have demanded a

19   $3 and a half million dollar paydown to the $3 million

20   loan pursuant to the loan agreement.  We didn't find out

21   about that loan until a year later when Mr. Constantine

22   was negotiating with Mr. Jowdy.

23   Q.   Is there any e-mail in existence that references --

24   well, you've testified to it being part of the loan

25   agreement that the money would be paid back upon the Cabo

286

1    San Lucas -- or del Mar, I apologize -- I apologize.

2             Which closing are we speaking of?

3    A.   Either/or.  It was written as -- because we were

4    pursuing financing for Mr. Jowdy for both projects at the

5    same time that as a result of either of those fundings

6    occurring, that Mr. Jowdy would pay us back, and it's laid

7    out -- the document that lays it out is the loan agreement

8    that I constructed after the discussion with Mr. Jowdy how

9    he wanted to handle it.

10   Q.   Is there any e-mail in existence that makes any

11   reference to the repayment of the loan upon the closing of

12   the Lehman loan?

13   A.   No.  Not that I have seen.  But I haven't seen any of

14   my e-mails that were on my laptop since the time I was

15   arrested.  They were never turned over to me.

16   Q.   Well, let me show you what's been marked Kenner

17   Exhibit 29.

18             THE COURT:  Did you want to introduce 28?

19             MR. HALEY:  Yes, Judge, thank you.  I would

20   introduce 28.  Thank you, your Honor.  That's my

21   oversight.

22             THE COURT:  Any objection?

23             MS. LEONARDO:  No objection.

24             MR. CONWAY:  No objection.

25             THE COURT:  28 is admitted.

Kenner - Redirect/Haley

287

1          (Defendant's Exhibit 28 in evidence.)

2          MR. CONWAY:  Your Honor, I'm going to give the

3    Court a document that I will be referring to in a moment.

4    It is not in ready, readable form because of the nature in

5    which it was reproduced, but if the Court could bear

6    with me, I'm going to have my client interpret what, I

7    believe, one will be able to see if it's examined closely.

8    Q.   Mr. Kenner, would you kindly take a look at what's

9    Kenner Exhibit F-29.

10          What is that document?  (Handing.)

11   A.   This is an e-mail from myself to Bill Najam and

12   Ken Jowdy on February 23rd, 2006, which coincides with the

13   day that Mr. Markowitz formed Baja Ventures 2006, on

14   behalf myself, Mr. Stompel and Mr. Lehtinen.

15          At this point in time, Mr. Jowdy had not

16   informed us that he was not paying out the Hawaii payoffs.

17   At this point in time, he only informed us he was not

18   paying off Mr. Stompel and Mr. Lehtinen's funds.  So I

19   wrote to Bill Najam on that top line, "Bill, the managing

20   member role" --

21          MS. LEONARDO:  Objection, not in evidence.

22          MR. HALEY:  Judge, the reason that I haven't

23   offered it formally is I admit that it's not in readily

24   readable form, but I believe --

25          THE COURT:  We'll deal with the reading first in

Kenner - Recross/Leonardo

288

1    terms what authentication --

2            You sent this e-mail to Mr. Najam?

3    A.   Yes, WJN1434@AOL.com is Mr. Najam's address.

4            THE COURT:  Any objection?

5            MR. CONWAY:  No, your Honor.

6            MS. LEONARDO:  No, your Honor.

7            THE COURT:  F-29 is admitted.  And now you can

8    read it.  Go ahead.

9            (Defendant's Exhibit F-29 in evidence.)

10   A.   The top line says, "Bill:  The managing member role

11   for KJ," which is Ken Jowdy, "on Diamonte properties is

12   fine considering, quote, 'all funds will be paid,' un

13   quote.  Please make sure I see some.  Thanks."

14   Q.   And as a result of that e-mail, did you ever receive

15   a response?

16   A.   Not that I recall.

17           MR. HALEY:  Thank you.

18           THE COURT:  Okay.  Do you have any recross?

19

20   RECROSS-EXAMINATION

21   BY MS. LEONARDO:

22   Q.   Mr. Kenner, you just testified that Mr. Gaudet gave a

23   deposition in the Little Isle IV Jowdy lawsuit, correct?

24   A.   That is correct.

25   Q.   Actually, what you said in that deposition transcript

289

1  was that he remembered signing a document, but he could

2  not identify the loan document; isn't that correct?

3  A.   All I can recall from that July 2nd, 2009 deposition

4  is Mr. Gaudet confirming on approximately 10 different

5  occasions that he had signed and witnessed the loan

6  agreement between Mr. Jowdy and myself.

7  Q.   Mr. Kenner, what Mr. Gaudet actually said was he did

8  not recall that document.  He recalled seeing something,

9  but not that document; isn't that what he testified to?

10  A.   I don't believe that to be accurate.

11          MR. CONWAY:  Your Honor, if you'd like, I have

12  the deposition downstairs.  I can bring it back up and

13  submit it to the Court in writing.

14          MR. HALEY:  Judge, if I may, it is our

15  intention, I think the Court ought to have all the

16  deposition exhibits and testimony that relates to what

17  persons said about the legitimacy and authenticity of that

18  loan document for the Court's consideration, so I have no

19  objection.

20          THE COURT:  Yes, I'd like to read it.  Okay.

21          MS. LEONARDO:  I'll do that in writing,

22  your Honor.

23          MR. HALEY:  Judge, in addition, of course, we'll

24  be introducing the deposition -- well, deposition

25  transcript from the AAA proceedings has already been

290

1  introduced.  I'm just reserving my right to introduce the

2  testimony as adduced at trial that was referred to where

3  Mr. Jowdy and his attorneys introduced that document,

4  actually identified as Exhibit 89-A as an authentic

5  document.

6           THE COURT:  I'd like to see that, too, if you

7  have it.

8           MR. CONWAY:  Your Honor, I do just have one

9  other question.

10  Q.   Mr. Kenner, with regards to what is marked as Exhibit

11  F-29 --

12  A.   I'm sorry, I couldn't understand what you said.

13  Q.   With regard to what your attorney just marked as

14  Exhibit F-29, did you respond to this e-mail?  Did either

15  of you respond to this e-mail?  Where are the other

16  e-mails in this e-mail chain?

17           THE WITNESS:  Your Honor, I'm not sure what I'm

18  supposed to answer.

19           THE COURT:  She just wants to know if there are

20  other e-mails relating to this e-mail, F-29?  Are there

21  other e-mails that are related to this e-mail?

22  A.   With respect to this e-mail chain, it's a

23  never-ending e-mail chain with some of the exhibits that

24  you showed me over the last two days, and continues right

25  through the closing of the Cabo San Lucas project on

Kenner - Recross/Leonardo

291

1    behalf of state.

2    Q.    Where did you get this e-mail from?

3    A.    This was turned over by the government to us in

4    pretrial.

5    Q.    And there aren't any numbers on the bottom.  In what

6    production was that?

7    A.    I don't know.  But I didn't have any of my own

8    production.  All the production came in through the

9    government.  I haven't had access to any of my standard

10   advise of e-mails since 2007.

11   Q.    Mr. Kenner, on February 23rd, 2006, you were told

12   your clients were not going to have -- the loans were not

13   going to be part of the Mexico payout; is that right?

14   A.    No, that's incorrect.

15   Q.    Mr. Lehtinen and Stompel were not going to be part of

16   the payout in March 2006; is that correct?

17   A.    That's correct.  I was informed that on or about

18   February 20th, as I stated earlier today.

19            MS. LEONARDO:  I have no further questions,

20   your Honor.

21            THE COURT:  All right.  You can step down,

22   Mr. Kenner.  Thank you.

23            THE WITNESS:  Thank you, your Honor.

24            THE COURT:  So, Mr. Haley, other than submitting

25   these documents, you rest?

292

1          MR. HALEY:  Yes, sir.

2          THE COURT:  Okay.  And the question is the five

3   minutes with Agent Wayne?  I can't -- I don't have time to

4   do it now.

5          MR. CONWAY:  We can break at this point, Judge.

6   We've bot about 15, 20 minutes maybe.

7          THE COURT:  Okay.  So -- and then that's all you

8   have?

9          MR. CONWAY:  And then we'll rest.

10          THE COURT:  I can do it tomorrow morning, if you

11   want to get it done.

12          MR. CONWAY:  Judge, can we take a two-minute

13   break, and then we'll do some scheduling?

14          THE COURT:  Yes.  I do also at this -- and I

15   obviously note the government wants to put in something in

16   writing to summarize the forfeiture aspect, but I also do

17   want to at some point have the AUSAs that were doing the

18   criminal part of the case to discuss this issue of the

19   Fatico hearing because Mr. Kelly requested, and I think

20   it's a reasonable request that he doesn't want to have to

21   do two submissions, one on forfeiture, one on Fatico

22   hearing.  If the government intends to have a Fatico

23   hearing to try to prove up some additional fraud, I want

24   to know about that.

25          MR. CONWAY:  Your Honor, I did speak with

293

1    Ms. Komatireddy today, and she indicated that once we get

2    the objections to PSR, we will know better if we're going

3    do it -- if we can join forfeiture and Fatico briefs or

4    restitution briefs.

5                THE COURT:  No.  I don't think it makes sense.

6    I think the objection -- I mean, they may have individual

7    objections to a lot of things in the PSR.  But we know

8    what the objection is as relates to the Fatico hearing as

9    with Mr. Haley, any fraudulent scheme that was not -- that

10   is in the PSR as relevant conduct that was not proved up

11   at the trial.

12               There were three schemes that the government put

13   on evidence of during the trial.  If the government

14   intends for any other scheme, whether it be the Palms or

15   anything else be considered by me at sentencing, my view

16   is that we need a hearing.  So I don't think we need to

17   have Mr. Haley put in objections to deal with that.

18               MR. CONWAY:  I guess your Honor, then, we need

19   to schedule a conference when Ms. Komatireddy will be

20   here.  She couldn't be here today.

21               THE COURT:  Okay.  You want two minutes?

22               MR. CONWAY:  Two minutes, Judge.

23               THE COURT:  Okay.

24               (Recess taken at this point.)

25               (After recess.)

294

1        MR. CONWAY:  Your Honor, if I may, in light of

2    the testimony today and on Monday and given the inevitable

3    fact that we're probably going to have a Fatico hearing,

4    we're prepared to rest today.

5        THE COURT:  You're oh so pessimistic about that

6    I have to hear from Ms. Komatireddy.

7        Okay.  So everybody is resting on the

8    forfeiture, correct?

9        MR. CONWAY:  Correct.

10       MR. CONWAY:  Yes, sir.

11       THE COURT:  So what do you want to do?  Do you

12   want to --

13       MR. CONWAY:  I have two things, Judge.  In terms

14   of the forfeiture hearing, do you want something in

15   writing from the parties?

16       THE COURT:  Yes, I do want something in writing

17   from the parties.  I'll ask the government to submit

18   first, and you both can respond.  But I'm concerned about

19   this outstanding Fatico issue.

20       MS. LEONARDO:  My second suggestion is in the

21   absence of Ms. Komatireddy today, perhaps Mr. Haley and I

22   can talk to her in the next day or so and present

23   your Honor with a schedule.

24       MR. HALEY:  I have another suggestion.

25   Mr. Conway and I haven't spoken, but I did speak with the

295

1  government, Judge.  I believe very shortly, if it hasn't

2  occurred already, there's going to be an entry on your

3  calendar for oral argument on Mr. Constantine's Rule 29.

4  It think it's coming up in a couple of weeks.

5  Ms. Komatireddy will be here.  I will be here.  Mr. Conway

6  will be here.  I believe on that date we'll be in a better

7  position with all the parties we can look for a briefing

8  schedule thereafter.  That seems to be an opportune time

9  to do it.

10            THE COURT:  How far off is that?

11            MR. HALEY:  I think it's the time of April --

12            MR. CONWAY:  Your Honor, I believe it's the last

13  week of April.

14            MR. HALEY:  Yes.

15            THE COURT:  Okay.  I would like the government

16  -- you don't need this issue about the Fatico hearing to

17  be resolved to get the forfeiture submission.  It's

18  independent of that.

19            MS. LEONARDO:  Yes, your Honor.

20            THE COURT:  I just don't want too much time to

21  go by.

22            MR. HALEY:  Fine, Judge.  I'll show up whenever.

23            THE COURT:  How long do you need for the

24  forfeiture submission?

25            MS. LEONARDO:  45 days.

296

1          THE COURT:  Okay.  That's fine.  So, May 20th,

2     and I'm just going to leave no date for your response.

3     We'll figure out the response date once we hear from

4     Ms. Komatireddy about this Fatico issue.  Okay.

5          MR. HALEY:  That's very fair.  Thanks, Judge.

6          THE COURT:  And obviously you should start

7     preparing your objections to the PSR.  Don't wait.  Okay?

8          MR. HALEY:  I won't, your Honor.  The only thing

9     I'll say is my focus has been on other matters.  I assure

10    you I will be responding to the presentence report.

11    There's no question about that.

12         MR. CONWAY:  As we will, your Honor.

13         THE COURT:  All right.  Anything else?

14         MS. LEONARDO:  Nothing from the government,

15    your Honor.

16         THE COURT:  Okay.  Thank you.  Have a good

17    night.

18         (Matter concluded.)

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3   Witnesses                                      Page

 4

 5

 6   PHIL KENNER                                     165

 7   CROSS-EXAMINATION

 8   BY MS. LEONARDO                                 170

 9   CROSS-EXAMINATION                               247

10

11   BY MR. OLIVERAS:                                247

12   REDIRECT EXAMINATION

13   BY MR. HALEY                                    269

14   RECROSS-EXAMINATION

15   BY MS. LEONARDO                                 288

16

17                      E X H I B I T S

18                                                  Page

19

20

21   Government Forfeiture Exhibits 97 through 103 in    170

22   evidence

23   Government Forfeiture Exhibits 87 and 88 in evidence   211

24   Government's Exhibit 93 in evidence            229

25   Government's Exhibit 94 in evidence            236
```

| | | |
|---|---|---|
| 1 | Government's Exhibits 95 and 96 in evidence | 241 |
| 2 | Government's Exhibit 106 in evidence | 244 |
| 3 | Government's Exhibit 105 in evidence | 245 |
| 4 | Defense Exhibit FFC-1 in evidence | 249 |
| 5 | Defense Exhibit FFC-3 in evidence | 255 |
| 6 | Defense Exhibit FFC-4 in evidence | 263 |
| 7 | Defense Exhibit FFC-5 in evidence | 265 |
| 8 | Defendant's Exhibit F-25 in evidence | 276 |
| 9 | Defendant's Exhibit F-27 in evidence | 281 |
| 10 | Defendant's Exhibit 28 in evidence | 287 |
| 11 | Defendant's Exhibit F-29 in evidence | 288 |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

## $

**$100,000** [2] - 245:9, 268:7
**$125,000** [1] - 202:16
**$15,000** [4] - 249:16, 249:21, 250:1, 250:4
**$16** [7] - 225:22, 226:8, 226:12, 226:14, 226:22, 227:12, 227:16
**$16.85** [1] - 226:15
**$19,000** [1] - 236:22
**$20,000** [3] - 250:10, 250:20, 250:25
**$200,000** [2] - 202:24, 245:4
**$21,000** [1] - 251:11
**$220,000** [3] - 185:15, 202:25, 203:5
**$313** [1] - 272:16
**$33.165** [1] - 226:15
**$35** [1] - 190:18
**$350,000** [3] - 194:3, 204:17, 205:5
**$37,000** [1] - 237:9
**$4,000** [2] - 184:13, 184:16
**$400,000** [2] - 202:13, 281:3
**$450,000** [2] - 190:8, 190:11
**$5,000** [7] - 248:1, 248:8, 248:12, 249:2, 249:13, 249:24, 251:7
**$50,000** [1] - 284:24
**$500** [1] - 249:24
**$500,000** [5] - 183:23, 188:23, 201:11, 202:11, 260:10
**$6,625,000** [1] - 199:20
**$6.25** [1] - 281:2
**$64,000** [2] - 189:4, 189:16
**$64,400** [1] - 189:6
**$650,000** [2] - 187:15, 187:19
**$700,000** [3] - 190:21, 249:23, 251:10
**$75,000** [1] - 248:3
**$795,000** [1] - 284:23
**$8,000** [1] - 252:18

## '

**'03** [2] - 207:17, 241:9
**'04** [1] - 207:17
**'07** [1] - 207:16
**'09** [2] - 249:1, 283:17
**'11** [1] - 244:3
**'all** [1] - 288:12
**'O5** [2] - 207:17, 216:23

**'O6** [1] - 207:17
**'O9** [1] - 206:4

## 0

**015885** [1] - 229:7

## 1

**1.1** [1] - 260:3
**1.176** [1] - 260:4
**1.3** [1] - 260:6
**1.5** [11] - 173:5, 181:12, 181:14, 181:24, 187:10, 187:12, 187:14, 192:4, 193:10, 193:13, 259:1
**1.6** [3] - 184:7, 201:9, 202:5
**10** [6] - 170:1, 177:4, 206:12, 284:4, 284:9, 289:4
**10-acre** [1] - 273:14
**10-percent** [1] - 245:6
**100** [9] - 163:15, 164:20, 168:7, 188:19, 220:11, 220:17, 222:20, 223:18, 252:2
**100-percent** [3] - 224:4, 224:10, 224:20
**102** [1] - 168:11
**103** [3] - 168:13, 170:10, 297:21
**105** [7] - 244:20, 244:21, 245:14, 245:15, 245:18, 245:19, 298:3
**106** [4] - 243:15, 244:17, 244:18, 298:2
**10705** [1] - 210:8
**10:00** [1] - 163:9
**11** [5] - 185:18, 187:25, 198:16, 198:19
**11501** [1] - 164:3
**11572** [1] - 164:7
**11722** [2] - 163:15, 164:21
**11749** [1] - 163:22
**119** [1] - 221:21
**11:30** [2] - 203:15, 221:2
**11th** [1] - 188:12
**12** [10] - 183:8, 191:18, 192:7, 192:8, 192:9, 192:10, 192:17, 205:9, 220:3, 239:23
**12,010** [1] - 261:6
**12-and-a-half** [1] - 218:5
**12.5** [1] - 222:9
**13** [1] - 270:11
**13,801** [1] - 263:3
**13-CR-607** [1] - 165:3
**14** [1] - 200:1

**15** [9] - 169:2, 182:2, 182:23, 183:1, 192:5, 192:11, 239:6, 246:7, 292:6
**15,000** [1] - 251:7
**150** [1] - 273:21
**1500** [1] - 191:7
**15906** [1] - 230:12
**16** [5] - 202:12, 210:25, 216:12, 220:8, 263:5
**1601** [1] - 163:21
**165** [1] - 297:6
**17** [1] - 274:20
**170** [2] - 297:8, 297:21
**18** [1] - 191:8
**1800** [1] - 196:9
**19** [10] - 171:15, 186:24, 187:2, 187:24, 208:5, 208:11, 210:17, 217:18, 222:6, 265:22
**19th** [2] - 209:7, 216:16
**1:45** [1] - 246:13
**1O1** [1] - 168:9
**1st** [1] - 231:16

## 2

**2** [3] - 200:22, 275:18, 278:24
**2.2** [4] - 205:11, 205:14, 205:17, 206:6
**2.456** [1] - 197:18
**2.46** [1] - 197:24
**2.5** [9] - 182:17, 183:19, 187:5, 191:20, 193:20, 195:22, 197:13, 201:1, 201:16
**2.65** [1] - 258:25
**20** [4] - 186:18, 209:17, 210:13, 292:6
**20-4314863** [1] - 210:5
**200,000** [1] - 270:13
**2003** [2] - 238:22, 240:16
**2004** [7] - 182:3, 182:22, 202:9, 238:22, 259:18, 276:1, 276:14
**2005** [13] - 178:15, 180:5, 180:6, 180:10, 183:4, 186:25, 187:2, 187:4, 202:17, 223:23, 244:25, 259:18, 270:11
**2006** [47] - 171:15, 171:18, 171:19, 179:9, 181:5, 186:1, 186:7, 195:7, 195:12, 196:4, 196:11, 200:1, 200:4, 200:7, 208:5, 208:6, 208:11, 209:9, 209:17, 209:20, 209:22, 210:3, 210:4, 210:13,

210:23, 212:4, 213:14, 214:10, 215:14, 217:18, 223:23, 224:4, 227:15, 228:12, 228:14, 228:24, 231:8, 231:16, 259:18, 260:4, 282:21, 285:16, 287:12, 287:13, 291:11, 291:16
**2007** [4] - 205:22, 207:11, 235:1, 291:10
**2008** [6] - 202:14, 233:7, 243:13, 256:19, 260:12, 265:22
**2009** [6] - 225:1, 256:20, 274:6, 276:11, 278:24, 289:3
**2010** [5] - 201:12, 238:4, 256:17, 261:20, 262:4, 263:17
**2011** [6] - 180:25, 244:2, 244:3, 244:7, 261:21, 262:5
**2012** [3] - 180:25, 237:1
**2013** [6] - 227:8, 233:24, 235:14, 237:1, 237:4, 237:11
**2014** [3] - 227:5, 237:2, 237:5
**2015** [4] - 163:9, 206:4, 237:2, 237:5
**20th** [8] - 208:15, 208:18, 209:2, 209:20, 209:22, 210:19, 291:18, 296:1
**211** [1] - 297:23
**21st** [1] - 285:16
**229** [1] - 297:24
**236** [1] - 297:25
**23rd** [7] - 171:19, 209:7, 210:21, 210:25, 212:4, 287:12, 291:11
**241** [1] - 298:1
**244** [1] - 298:2
**245** [1] - 298:3
**247** [2] - 297:9, 297:11
**249** [1] - 298:4
**25** [1] - 228:14
**255** [1] - 298:5
**26** [4] - 164:7, 191:10, 195:6, 228:12
**263** [1] - 298:6
**265** [1] - 298:7
**269** [1] - 297:13
**26th** [1] - 211:17
**27** [2] - 256:17, 274:5
**276** [1] - 298:8
**27th** [2] - 208:19, 211:14
**28** [5] - 286:18, 286:20, 286:25, 287:1, 298:10
**281** [1] - 298:9
**287** [1] - 298:10

**288** [2] - 297:15, 298:11
**29** [2] - 286:17, 295:3
**2nd** [1] - 289:3

## 3

**3** [12] - 182:7, 182:9, 182:11, 183:11, 184:2, 184:5, 184:14, 236:18, 255:24, 285:17, 285:19
**3.7** [7] - 194:17, 194:21, 195:2, 195:13, 195:17, 195:18, 195:23
**3.9** [1] - 196:13
**30** [4] - 179:11, 184:1, 184:11, 184:19
**300** [1] - 164:3
**303** [4] - 252:4, 252:7, 252:8, 252:14
**30th** [1] - 276:11
**31** [2] - 186:1, 186:7
**31st** [3] - 195:11, 196:4, 235:1
**35** [1] - 223:11
**37** [4] - 258:5, 258:14, 258:21, 260:19
**3717** [4] - 185:15, 185:20, 195:2, 195:9
**375** [1] - 199:22
**39** [1] - 223:11

## 4

**4.2** [1] - 190:18
**40** [10] - 205:18, 206:10, 216:8, 216:11, 216:14, 217:19, 217:23, 217:25, 219:18, 223:11
**400,000** [1] - 202:8
**41** [1] - 268:8
**44,000** [1] - 197:19
**45** [1] - 295:25
**450** [1] - 190:3

## 5

**5** [32] - 218:2, 218:6, 218:8, 218:10, 218:12, 218:14, 218:15, 218:20, 218:22, 219:4, 219:12, 219:17, 219:19, 220:4, 220:6, 220:12, 220:13, 220:15, 220:16, 221:14, 221:19, 221:23, 222:6, 222:10, 222:13, 222:17, 222:20, 274:1, 274:10, 284:5
**5.1** [1] - 219:5
**5/12/2009** [1] - 252:17

**50** [1] - 226:15
**50-percent** [3] - 225:9, 225:21, 226:2
**500,000** [1] - 259:1
**501c3** [4] - 234:1, 237:22, 237:23, 273:16
**5th** [3] - 200:3, 281:9, 282:2

## 6

**6** [6] - 163:9, 186:10, 193:2, 228:14, 228:24, 282:2
**6,625,000** [1] - 199:12
**6.5-percent** [1] - 230:8
**6.6** [1] - 281:4
**60-plus** [1] - 255:25
**60374031** [1] - 270:10
**631** [1] - 164:21
**64,000** [2] - 189:21, 189:25
**650,000** [2] - 193:23, 259:1
**6th** [5] - 200:3, 200:7, 261:2, 281:2, 281:10

## 7

**7** [3] - 193:2, 214:15, 231:8
**712-6101** [1] - 164:21
**73** [2] - 235:9, 271:16
**79** [1] - 277:1

## 8

**8** [10] - 210:2, 217:20, 217:24, 217:25, 239:23, 241:24, 242:1, 242:5, 242:8, 256:8
**80** [3] - 170:2, 170:6, 170:7
**81** [1] - 198:11
**82** [1] - 209:15
**83** [1] - 210:12
**85** [1] - 226:1
**86** [1] - 229:11
**87** [7] - 211:2, 211:5, 211:9, 211:19, 211:23, 211:24, 297:23
**88** [7] - 211:3, 211:5, 211:19, 211:23, 211:24, 212:19, 297:23
**89,000** [2] - 207:1, 263:6
**89-A** [1] - 290:4
**89359** [1] - 210:9

## 9

**9** [1] - 177:4
**9.1** [1] - 255:19

**92** [4] - 230:22, 231:2, 231:6, 231:7
**93** [5] - 228:20, 228:21, 229:13, 229:24, 297:24
**94** [5] - 235:3, 236:12, 236:16, 236:17, 297:25
**95** [7] - 239:4, 239:11, 240:7, 240:21, 240:25, 241:1, 298:1
**956,000** [1] - 173:19
**96** [9] - 238:24, 238:25, 239:21, 240:7, 240:21, 240:25, 241:1, 241:2, 298:1
**97** [3] - 168:1, 170:10, 297:21
**98** [2] - 168:3, 168:15
**99** [1] - 168:5
**9th** [2] - 168:18, 217:22

## A

**a.m** [1] - 163:9
**AAA** [1] - 289:25
**ability** [2] - 278:4, 284:9
**able** [7] - 171:16, 189:7, 191:6, 191:15, 191:16, 208:16, 287:7
**absence** [1] - 294:21
**absolutely** [11] - 175:16, 182:6, 185:12, 200:15, 214:21, 222:23, 225:7, 238:2, 254:22, 262:9, 262:13
**access** [3] - 176:8, 181:8, 291:9
**accessed** [5] - 175:10, 176:3, 176:12, 177:3, 177:20
**accessing** [1] - 176:24
**accordance** [1] - 180:18
**according** [11] - 179:17, 184:21, 185:13, 196:25, 217:21, 219:8, 220:7, 232:11, 253:6, 259:7, 285:4
**account** [31] - 173:9, 173:14, 173:22, 174:5, 175:25, 176:5, 176:12, 176:13, 176:25, 178:20, 181:16, 181:19, 181:21, 181:23, 181:25, 183:19, 183:21, 187:6, 204:25, 206:1, 227:12, 245:2, 254:9, 257:6, 270:8, 270:14, 272:17, 272:18, 273:16
**Account** [1] - 270:10
**accountant** [1] - 283:16
**accounting** [1] - 282:1

**accounts** [9] - 175:11, 175:19, 177:2, 226:24, 270:18, 270:19, 270:23
**accurate** [16] - 174:11, 180:11, 182:18, 183:20, 187:4, 190:9, 209:10, 210:16, 242:9, 244:3, 250:3, 251:12, 262:3, 264:12, 271:13, 289:10
**accusations** [1] - 254:24
**acquire** [4] - 171:8, 172:1, 189:1, 225:11
**acquired** [2] - 190:12, 197:8
**acquiring** [2] - 170:16, 172:3
**acquisition** [2] - 170:25, 275:16
**acre** [1] - 191:7
**Act** [1] - 219:16
**action** [1] - 272:3
**actions** [1] - 215:6
**active** [1] - 176:10
**actual** [8] - 182:16, 194:7, 194:10, 194:15, 194:20, 197:23, 206:1, 258:16
**added** [1] - 282:24
**addition** [12] - 177:11, 181:9, 182:9, 192:17, 197:7, 205:20, 206:12, 207:17, 264:21, 277:9, 277:14, 289:23
**additional** [4] - 190:21, 199:21, 205:4, 292:23
**address** [7] - 166:25, 210:6, 235:25, 236:3, 252:20, 262:15, 288:3
**addressing** [1] - 218:18
**adduced** [1] - 290:2
**adjusted** [1] - 195:6
**admit** [2] - 167:14, 287:23
**admitted** [16] - 211:23, 231:6, 236:16, 240:25, 244:17, 245:18, 249:10, 251:17, 255:9, 263:9, 265:2, 269:8, 276:19, 281:20, 286:25, 288:7
**admitting** [1] - 284:19
**advance** [1] - 250:20
**advanced** [1] - 257:21
**advancing** [1] - 248:8
**adverse** [1] - 272:6
**advise** [2] - 174:18, 291:10
**advised** [5] - 174:14, 174:17, 174:19, 174:20
**advisor** [6] - 176:23, 227:1, 227:3, 227:6, 227:9, 227:23
**affidavit** [1] - 181:1
**affirmed** [1] - 278:11

**aforementioned** [1] - 249:24
**afternoon** [2] - 247:9, 247:10
**Agent** [3] - 246:6, 268:10, 292:3
**ago** [7] - 169:2, 180:11, 185:18, 204:4, 204:9, 264:23, 270:2
**agree** [4] - 189:25, 222:15, 236:11, 268:14
**agreed** [2] - 171:1, 178:25
**agreement** [47] - 171:3, 171:5, 171:12, 172:2, 176:11, 179:6, 179:19, 181:2, 182:3, 182:23, 185:7, 192:8, 198:5, 211:13, 211:16, 214:10, 223:14, 223:15, 223:17, 227:20, 227:21, 227:22, 229:9, 229:10, 232:21, 238:15, 240:3, 243:9, 247:14, 256:10, 256:14, 259:4, 259:9, 274:13, 275:18, 277:2, 277:4, 277:12, 278:20, 279:19, 285:5, 285:20, 285:25, 286:7, 289:6
**agreements** [15] - 199:18, 223:23, 228:1, 228:2, 228:4, 228:6, 228:8, 228:13, 228:17, 228:23, 229:1, 239:24, 256:18, 259:17, 284:5
**ahead** [8] - 213:14, 214:3, 215:13, 221:9, 247:5, 257:12, 280:18, 288:8
**Alan** [1] - 197:9
**allegations** [8] - 238:10, 238:14, 239:23, 251:20, 251:25, 254:2, 254:21, 257:18
**alleged** [4] - 206:16, 249:23, 251:10, 284:10
**allegedly** [2] - 208:13, 216:18
**alleging** [4] - 255:14, 255:19, 267:14, 267:23
**allocation** [1] - 210:18
**allow** [1] - 230:17
**allowing** [2] - 169:7, 231:12
**almost** [2] - 189:16, 271:14
**amended** [1] - 242:13
**amendment** [1] - 241:20
**America** [1] - 250:20
**AMERICA** [1] - 163:3
**American** [5] - 184:18, 192:15, 277:14, 279:16, 279:22

**amount** [23] - 181:12, 182:12, 182:16, 182:19, 183:4, 183:18, 188:23, 189:3, 191:19, 191:20, 193:8, 194:15, 194:20, 195:13, 196:13, 201:8, 202:23, 203:5, 205:14, 209:6, 232:23, 236:22, 259:9
**ANDREW** [1] - 164:6
**Andrew** [1] - 165:16
**Ann** [1] - 164:20
**annual** [1] - 183:1
**answer** [17] - 178:5, 178:10, 178:11, 194:8, 219:23, 219:24, 241:11, 242:14, 253:17, 254:6, 254:16, 257:11, 272:25, 274:19, 280:8, 282:19, 290:18
**ANSWER** [3] - 258:3, 258:7, 258:10
**Answer** [2] - 274:20, 277:6
**answered** [1] - 254:5
**answering** [1] - 254:15
**answers** [1] - 204:1
**apart** [1] - 260:15
**APO** [1] - 235:24
**apologize** [6] - 206:25, 252:9, 258:15, 281:22, 286:1
**apostrophe** [1] - 235:24
**apparent** [1] - 177:17
**appealed** [2] - 203:10, 203:11
**appear** [2] - 224:23, 225:4
**appearances** [1] - 165:5
**APPEARANCES** [1] - 163:13
**application** [2] - 282:14, 282:25
**appraised** [1] - 190:17
**appreciate** [1] - 189:20
**approach** [4] - 248:17, 276:2, 280:17, 283:9
**approached** [1] - 170:20
**approval** [1] - 191:7
**approved** [1] - 226:18
**approximate** [2] - 184:12, 206:12
**April** [3] - 163:9, 295:11, 295:13
**arbitrage** [2] - 184:2, 184:5
**Arbitration** [3] - 277:15, 279:16, 279:22
**arbitration** [11] - 168:10, 205:16, 206:4, 206:7, 206:15, 206:19, 256:19, 256:20, 256:24, 276:11, 276:25

**area** [1] - 273:12
**argument** [1] - 295:3
**Arizona** [16] - 203:2, 203:4, 203:10, 210:8, 236:4, 238:6, 247:24, 260:10, 261:4, 274:21, 276:11, 278:23, 278:25, 283:19, 284:19, 284:21
**arranged** [1] - 285:6
**arrangement** [3] - 254:7, 257:4, 257:14
**arrested** [3] - 181:7, 283:7, 286:15
**ASCII** [1] - 263:7
**aside** [1] - 183:24
**aspect** [1] - 292:16
**assets** [2] - 272:8, 284:12
**Assistant** [2] - 163:17, 165:8
**assistant** [2] - 248:25, 283:17
**associated** [1] - 182:14
**Association** [3] - 277:15, 279:17, 279:23
**assume** [2] - 169:18, 246:10
**assure** [1] - 296:9
**Atlanta** [1] - 179:14
**attached** [3] - 226:17, 276:12, 277:1
**attack** [1] - 284:7
**attempt** [1] - 235:13
**attempted** [1] - 274:14
**attention** [8] - 235:9, 252:25, 255:12, 255:16, 258:20, 263:12, 265:16, 267:12
**attorney** [28] - 173:14, 173:16, 174:14, 174:17, 174:19, 174:21, 175:2, 175:4, 175:10, 175:12, 175:17, 175:18, 176:5, 180:24, 200:19, 218:25, 247:22, 247:23, 248:2, 249:25, 253:4, 253:7, 266:1, 273:11, 273:18, 280:24, 290:13
**Attorney** [2] - 163:14, 163:17
**attorney's** [1] - 203:4
**attorneys** [9] - 174:14, 174:18, 228:16, 252:20, 278:8, 278:23, 282:4, 283:15, 290:3
**Attorneys** [1] - 165:9
**August** [3] - 180:10, 195:6, 260:4
**AUSAs** [1] - 292:17
**authentic** [2] - 278:7, 290:4
**authenticate** [2] - 258:17,

278:25
**authenticated** [4] - 211:20, 229:21, 278:2, 278:8
**authentication** [2] - 279:6, 288:1
**authenticity** [3] - 169:14, 257:1, 289:17
**authority** [2] - 173:16, 245:1
**authorization** [10] - 176:6, 176:15, 176:19, 176:20, 177:8, 177:24, 178:3, 207:8, 270:12
**authorized** [5] - 173:13, 175:8, 204:24, 253:14, 272:10
**avoid** [2] - 169:25, 174:15
**aware** [21] - 175:7, 177:2, 198:3, 199:16, 200:25, 206:3, 207:16, 215:19, 225:2, 227:20, 230:15, 230:19, 232:7, 232:8, 241:4, 241:19, 241:22, 241:25, 257:2, 267:3, 267:14
**AZ** [1] - 238:5

**B**

**bach** [1] - 202:16
**background** [4] - 219:14, 221:15, 221:25, 223:9
**bad** [2] - 192:11, 202:11
**Baha** [4] - 223:3, 223:19, 225:5, 245:2
**Bahti** [3] - 216:18, 217:3, 219:9
**Baja** [28] - 168:13, 170:16, 171:13, 171:18, 179:9, 179:21, 181:4, 197:12, 208:6, 209:8, 210:23, 213:14, 214:4, 214:10, 215:3, 215:14, 215:18, 220:11, 220:16, 220:17, 224:4, 224:11, 224:12, 224:13, 224:17, 224:20, 270:13, 287:13
**Baker** [1] - 247:24
**baker** [1] - 248:2
**Baker's** [2] - 248:11, 248:25
**balance** [4] - 283:13, 283:15, 284:18, 285:11
**Bank** [1] - 250:19
**bank** [16] - 176:6, 176:22, 184:9, 187:7, 187:21, 191:25, 193:1, 193:4, 194:5, 194:8, 204:25, 206:2, 226:24, 260:8,

272:17, 272:18
**banker** [1] - 250:19
**banking** [4] - 184:18, 192:15, 226:23, 260:5
**bankruptcy** [5] - 251:23, 271:18, 271:24, 272:7, 272:9
**based** [5] - 167:9, 188:21, 207:3, 241:12, 274:22
**Bate** [1] - 229:4
**Bates** [3] - 229:6, 230:12, 261:6
**beach** [1] - 260:7
**bear** [1] - 287:5
**bearing** [1] - 275:22
**became** [1] - 206:18
**BECKMANN** [1] - 190:2
**becomes** [1] - 281:23
**bedroom** [1] - 247:15
**BEFORE** [1] - 163:11
**began** [1] - 208:20
**beginning** [2] - 199:5, 267:22
**begun** [2] - 196:5, 282:1
**behalf** [15] - 173:11, 206:13, 237:16, 237:17, 238:16, 240:3, 244:22, 244:24, 256:10, 256:23, 260:2, 271:23, 273:16, 287:14, 291:1
**below** [1] - 258:25
**bench** [1] - 169:1
**beneath** [1] - 274:12
**benefit** [8] - 184:6, 185:10, 191:20, 191:23, 219:22, 237:25, 273:5, 273:8
**benefited** [4] - 272:24, 273:1, 273:4, 273:9
**Berard** [6] - 177:6, 261:22, 261:23, 263:16, 264:1, 264:2
**best** [4] - 232:3, 232:17, 233:6, 245:24
**better** [2] - 293:2, 295:6
**between** [16] - 173:23, 195:7, 195:5, 197:7, 197:9, 209:7, 210:17, 228:13, 249:3, 256:4, 260:24, 270:16, 271:6, 281:8, 282:22, 289:6
**BIANCO** [1] - 163:11
**Big** [2] - 181:19, 185:6
**Bill** [7] - 197:20, 212:20, 213:5, 287:11, 287:19, 288:10
**bill** [1] - 210:2
**billing** [1] - 210:24
**binder** [2] - 268:3, 269:11
**binders** [1] - 170:1
**bit** [1] - 186:23

**blanket** [2] - 176:15, 176:20
**book** [3] - 252:5, 252:6, 252:9
**books** [1] - 201:15
**borrow** [1] - 278:4
**borrowed** [6] - 179:15, 201:2, 201:8, 201:9, 201:14, 281:11
**borrowing** [4] - 192:10, 200:5, 278:4, 282:7
**bot** [1] - 292:6
**bottom** [6] - 212:19, 230:12, 250:19, 255:21, 258:20, 291:5
**bought** [2] - 233:15, 267:8
**box** [4] - 205:19, 207:21, 258:23, 258:24
**Brain** [2] - 234:4, 235:14
**brand** [1] - 173:22
**brand-new** [1] - 173:22
**breached** [1] - 243:8
**breaching** [1] - 247:14
**break** [5] - 221:3, 221:4, 245:22, 292:5, 292:13
**breakout** [1] - 199:11
**brief** [2] - 269:16, 276:22
**briefing** [2] - 169:20, 295:7
**briefly** [1] - 246:7
**briefs** [2] - 293:3, 293:4
**bring** [2] - 267:11, 289:12
**broke** [3] - 221:12, 240:19, 242:20
**Brothers** [32] - 188:10, 188:13, 188:20, 190:14, 194:19, 195:6, 195:7, 195:19, 196:4, 196:12, 196:17, 196:18, 197:6, 197:7, 197:10, 208:13, 216:18, 216:22, 217:3, 217:14, 218:23, 219:2, 219:6, 219:13, 220:5, 221:22, 230:16, 281:13, 282:4, 282:14, 282:22, 283:1
**Brothers'** [2] - 188:18, 228:15
**brought** [1] - 239:18
**Bryan** [3] - 261:22, 261:23, 263:15
**BS** [1] - 229:4
**buffer** [5] - 173:23, 174:1, 174:5, 174:8, 174:13
**build** [1] - 273:20
**business** [3] - 174:6, 192:11, 259:23
**buy** [2] - 243:12, 263:21
**buying** [1] - 265:23
**buyout** [1] - 263:19
**BY** [37] - 163:16, 163:22,

164:4, 170:14, 172:9, 178:13, 194:14, 198:12, 199:1, 203:17, 204:15, 208:3, 209:16, 211:4, 212:1, 220:9, 221:11, 223:1, 247:8, 248:21, 249:12, 251:18, 252:12, 254:20, 255:11, 259:12, 263:11, 265:4, 265:10, 265:15, 267:1, 269:24, 288:21, 297:8, 297:11, 297:13, 297:15

# C

**Cabo** [36] - 168:14, 170:25, 175:22, 178:21, 179:2, 181:3, 182:1, 197:14, 199:15, 199:16, 199:17, 203:1, 203:22, 204:17, 205:4, 205:7, 208:5, 217:11, 218:2, 219:6, 220:14, 220:15, 222:11, 223:24, 230:10, 253:8, 268:13, 268:19, 268:25, 275:17, 281:6, 282:10, 285:7, 285:14, 285:25, 290:25
**Cabu** [1] - 191:8
**Cactur** [1] - 236:3
**Cactus** [2] - 210:8, 236:8
**CALCAGNI** [1] - 163:20
**calculate** [1] - 184:10
**calculator** [3] - 184:17, 189:19, 190:6
**calendar** [1] - 295:3
**California** [5] - 250:9, 250:11, 260:6, 260:7, 283:15
**Cancer** [2] - 234:4, 235:14
**cannot** [3] - 220:19, 234:14, 282:24
**capacity** [1] - 275:10
**CAPERS** [1] - 163:14
**capital** [5] - 176:17, 177:14, 197:12, 201:4, 237:15
**captioned** [1] - 224:25
**care** [4] - 179:21, 192:22, 208:25, 236:1
**case** [15] - 165:3, 182:6, 201:12, 202:14, 248:13, 249:3, 260:9, 265:7, 274:21, 279:1, 279:6, 284:19, 284:21, 292:18
**cases** [2] - 272:11, 272:16
**cash** [7] - 172:4, 172:7, 172:10, 172:15, 182:7, 183:13, 184:14

**caused** [1] - 244:22
**cc'd** [4] - 199:3, 199:4, 199:8, 219:10
**Central** [3] - 163:6, 163:15, 164:21
**Centrum** [47] - 181:12, 181:16, 182:10, 182:24, 183:3, 183:8, 183:14, 184:1, 185:2, 185:3, 185:6, 185:8, 185:9, 185:13, 185:14, 185:21, 185:23, 186:8, 186:9, 186:20, 186:24, 187:2, 187:18, 190:22, 190:25, 191:4, 191:5, 191:15, 191:19, 192:3, 192:7, 192:8, 192:17, 192:21, 193:15, 193:21, 194:4, 194:7, 194:16, 194:21, 194:23, 195:3, 195:7, 195:13, 196:13, 197:7, 204:8
**certain** [3] - 169:20, 272:8, 272:11
**certainly** [2] - 181:5, 192:1
**certainty** [1] - 188:19
**chain** [3] - 290:16, 290:22, 290:23
**chance** [3] - 169:11, 169:22, 263:21
**change** [5] - 216:19, 217:4, 219:2, 222:5, 222:8
**changed** [10] - 212:3, 212:11, 212:17, 212:18, 216:24, 217:6, 217:10, 241:11, 241:16, 243:4
**changes** [3] - 228:5, 228:7, 228:13
**changing** [1] - 265:7
**characterized** [1] - 281:24
**charitable** [1] - 237:24
**charity** [2] - 233:13, 234:3
**Charles** [5] - 173:14, 175:2, 175:13, 245:1, 270:9
**chart** [1] - 262:17
**check** [4] - 202:11, 219:14, 221:16, 221:25
**checks** [1] - 223:9
**chief** [1] - 186:19
**Chombley** [1] - 188:8
**Chris** [3] - 186:19, 191:9, 273:19
**circumstances** [1] - 277:24
**citizen** [1] - 218:16
**civil** [1] - 166:17
**claim** [1] - 277:22
**claimed** [1] - 244:5
**clarify** [1] - 282:9
**clarity** [1] - 260:18
**clear** [3] - 254:17, 256:1,

257:25
**clearly** [9] - 175:7, 177:2, 177:12, 205:22, 206:3, 207:14, 207:16, 225:2, 277:2
**CLERK** [3] - 165:1, 165:3, 221:7
**clerk** [1] - 198:20
**client** [14] - 176:20, 176:21, 176:22, 178:8, 196:20, 211:20, 229:21, 248:9, 249:3, 250:8, 255:24, 268:23, 273:7, 287:6
**client's** [6] - 166:20, 176:12, 176:23, 268:11, 271:21, 272:2
**clients** [11] - 173:24, 174:9, 175:14, 175:18, 177:9, 196:22, 197:3, 251:22, 254:10, 265:25, 291:12
**clients'** [2] - 176:3, 177:20
**close** [14] - 179:16, 187:25, 188:5, 188:6, 188:9, 188:10, 188:23, 190:20, 190:23, 190:24, 191:1, 201:14, 214:14, 283:10
**closed** [2] - 175:19, 196:12
**closely** [1] - 287:7
**closing** [42] - 184:4, 185:13, 185:20, 185:22, 186:1, 186:7, 191:10, 194:18, 195:2, 195:6, 195:9, 195:11, 195:15, 196:3, 196:7, 196:16, 196:22, 197:1, 198:4, 200:9, 208:14, 208:17, 208:19, 211:14, 222:2, 224:19, 224:20, 225:4, 227:23, 228:2, 228:3, 228:8, 228:11, 230:16, 231:17, 231:19, 232:7, 232:8, 260:4, 286:2, 286:11, 290:25
**closings** [1] - 191:2
**CMG** [6] - 187:15, 187:19, 193:23, 267:4, 267:6, 268:9
**coincides** [1] - 287:12
**collapse** [1] - 235:13
**collected** [1] - 263:24
**collective** [1] - 186:18
**column** [6] - 236:19, 252:13, 252:19, 255:16, 263:2, 268:9
**coming** [3] - 204:9, 262:10, 295:4
**commemorate** [1] - 273:20
**commencement** [1] - 280:11
**comment** [1] - 280:16

**commingled** [1] - 270:22
**commit** [1] - 167:4
**commitment** [1] - 176:16
**communication** [1] - 281:8
**communications** [1] - 234:18
**community** [1] - 273:15
**companies** [1] - 240:20
**company** [1] - 174:13
**complaint** [5] - 206:16, 238:11, 238:14, 239:12, 242:2
**complaints** [1] - 272:11
**complete** [2] - 178:10, 271:13
**completed** [1] - 267:9
**completely** [2] - 196:23, 225:13
**completeness** [1] - 168:20
**components** [1] - 276:9
**comps** [1] - 243:9
**computer** [1] - 164:25
**concerned** [4] - 219:15, 220:6, 221:22, 294:18
**concerning** [1] - 278:19
**concert** [1] - 185:7
**concluded** [3] - 172:11, 272:5, 296:18
**conclusion** [1] - 269:25
**conduct** [1] - 293:10
**conference** [1] - 293:19
**confirm** [3] - 188:4, 217:13, 220:23
**confirmation** [1] - 266:6
**confirmed** [4] - 209:8, 210:22, 210:25, 219:1
**confirming** [6] - 175:10, 179:20, 180:16, 215:10, 249:2, 289:4
**confirms** [2] - 219:2, 281:5
**confused** [1] - 192:14
**conjunction** [1] - 239:21
**connection** [4] - 271:12, 271:18, 278:9, 282:13
**consecutive** [1] - 189:7
**consent** [1] - 232:1
**consider** [2] - 169:17, 253:14
**consideration** [6] - 167:19, 273:24, 274:8, 274:17, 280:5, 289:18
**considered** [2] - 219:17, 293:15
**considering** [1] - 288:12
**consistent** [5] - 174:12, 177:3, 177:14, 219:11, 279:20
**Constantine** [44] - 164:4, 164:8, 165:4, 165:17, 189:8, 190:14, 194:1,

238:4, 238:16, 239:12, 239:25, 240:3, 242:12, 243:21, 243:25, 247:13, 247:18, 247:20, 249:1, 249:4, 249:14, 249:23, 250:24, 251:1, 251:20, 253:11, 254:2, 254:8, 256:10, 257:6, 257:7, 257:21, 259:3, 259:18, 260:25, 261:2, 265:24, 266:3, 268:11, 268:18, 268:19, 271:18, 271:24, 285:21
**CONSTANTINE** [1] - 163:7
**Constantine's** [8] - 242:11, 242:13, 249:25, 250:7, 250:10, 257:4, 272:7, 295:3
**constructed** [1] - 286:8
**construction** [1] - 228:18
**consulting** [8] - 193:25, 239:24, 256:13, 256:18, 259:4, 259:8, 259:17, 261:1
**contacted** [2] - 171:4, 171:10
**contending** [1] - 278:3
**content** [1] - 271:11
**contents** [1] - 281:14
**continuation** [1] - 165:20
**continue** [1] - 170:8
**continued** [3] - 222:24, 246:16, 266:7
**continues** [1] - 290:24
**contract** [5] - 180:25, 188:4, 190:19, 213:19, 224:14
**contracts** [2] - 171:14, 179:22
**contradicts** [1] - 284:20
**contributed** [3] - 224:16, 225:16, 232:16
**contribution** [12] - 176:17, 177:14, 197:12, 197:23, 201:1, 201:2, 201:4, 204:23, 205:8, 205:11, 230:11, 254:8
**control** [2] - 213:2, 213:3
**controlled** [1] - 270:23
**controlling** [4] - 216:20, 216:25, 217:10, 217:15
**conversation** [3] - 180:18, 199:25, 208:22
**conversations** [10] - 179:24, 180:1, 180:4, 180:14, 180:17, 180:22, 180:23, 199:20, 213:15, 282:4
**CONWAY** [33] - 164:2, 164:4, 165:15, 211:22,

229:22, 231:5, 236:15, 240:24, 244:16, 245:17, 245:24, 246:2, 246:7, 276:18, 280:14, 281:19, 286:24, 287:2, 288:5, 289:11, 290:8, 292:5, 292:9, 292:12, 292:25, 293:18, 293:22, 294:1, 294:9, 294:10, 294:13, 295:12, 296:12
**Conway** [7] - 165:16, 166:14, 245:23, 247:5, 281:18, 294:25, 295:5
**coordination** [1] - 264:2
**copied** [2] - 249:1, 261:4
**copies** [1] - 167:22
**copy** [5] - 168:23, 185:20, 248:18, 261:5, 261:12
**corner** [2] - 258:21, 261:8
**Corp** [2] - 210:4, 210:7
**corporation** [3] - 192:20, 192:24, 237:22
**Corporation** [2] - 245:2, 270:14
**corporation's** [1] - 192:22
**corporations** [3] - 284:1, 284:9, 284:11
**correct** [159] - 172:21, 173:3, 173:6, 173:7, 173:17, 173:18, 173:20, 173:21, 173:25, 174:2, 174:3, 174:10, 174:22, 175:23, 175:24, 176:2, 178:1, 178:18, 181:13, 182:1, 182:13, 182:17, 183:9, 183:10, 184:20, 185:5, 185:11, 186:11, 186:25, 187:3, 187:6, 187:11, 187:16, 187:19, 188:8, 188:24, 189:18, 190:22, 190:25, 192:8, 193:11, 193:15, 194:21, 195:14, 197:13, 197:15, 198:19, 199:6, 199:8, 199:18, 200:3, 200:22, 200:24, 202:24, 203:10, 203:13, 204:18, 205:12, 206:8, 208:7, 209:3, 209:17, 209:21, 209:24, 210:15, 211:10, 212:7, 212:20, 213:9, 213:25, 214:20, 215:18, 216:9, 217:22, 218:3, 218:16, 219:20, 220:14, 222:11, 222:22, 223:4, 223:5, 223:16, 223:21, 224:21, 224:22, 225:6, 225:7, 226:16, 226:19, 227:4, 227:7, 227:9, 228:24, 230:2, 230:9, 230:13,

230:18, 230:25, 231:17, 231:18, 232:10, 233:9, 233:13, 233:14, 233:16, 233:17, 233:20, 234:7, 234:23, 235:7, 235:25, 236:1, 236:4, 236:7, 236:10, 237:3, 237:13, 237:19, 238:1, 239:13, 240:14, 241:3, 242:16, 243:2, 244:6, 245:4, 245:10, 247:15, 248:10, 248:14, 250:2, 252:1, 252:16, 252:23, 253:3, 255:20, 256:2, 256:4, 256:14, 256:15, 256:21, 256:22, 258:3, 273:2, 274:8, 275:3, 276:5, 282:15, 282:20, 288:23, 288:24, 289:2, 291:16, 291:17, 294:8, 294:9

**corrected** [1] - 241:24
**correcting** [1] - 241:23
**correctly** [3] - 242:13, 261:9, 282:21
**correspondence** [2] - 208:12, 241:5
**corresponding** [1] - 240:2
**corroborate** [1] - 207:2
**cost** [1] - 196:20
**costs** [4] - 182:12, 182:14, 183:15, 194:18
**counsel** [6] - 165:5, 167:22, 169:25, 170:3, 278:2, 281:12
**counsel's** [1] - 221:1
**counterclaim** [1] - 241:15
**counterclaims** [1] - 241:12
**Country** [1] - 164:3
**county** [1] - 191:11
**County** [1] - 235:20
**couple** [1] - 295:4
**course** [9] - 211:21, 273:7, 275:2, 277:16, 278:7, 278:12, 278:13, 279:14, 289:23
**court** [8] - 242:9, 273:24, 274:8, 274:17, 274:25, 277:20, 277:21, 280:4
**COURT** [128] - 163:1, 165:2, 165:11, 165:14, 165:18, 166:6, 166:13, 166:16, 167:5, 167:13, 168:15, 168:21, 169:13, 169:16, 170:7, 172:7, 178:11, 189:25, 190:3, 190:7, 193:16, 194:11, 198:15, 198:20, 198:25, 203:15, 204:6, 206:21, 207:22, 211:23, 219:24, 221:4, 221:8, 224:9,

224:17, 229:23, 231:6, 236:16, 239:5, 239:10, 239:17, 240:6, 240:12, 240:25, 241:19, 242:4, 242:8, 242:15, 244:11, 244:17, 245:14, 245:18, 245:22, 246:1, 246:5, 246:9, 246:13, 247:3, 247:5, 248:20, 249:7, 249:10, 251:17, 252:5, 252:7, 252:10, 253:17, 254:5, 254:13, 254:19, 255:4, 255:6, 255:9, 257:9, 257:11, 259:11, 260:21, 262:20, 262:24, 263:8, 264:19, 264:24, 265:2, 265:9, 265:14, 269:3, 269:8, 269:10, 269:14, 269:18, 276:3, 276:19, 280:7, 280:18, 281:18, 281:20, 282:18, 283:5, 286:18, 286:22, 286:25, 287:25, 288:4, 288:7, 288:18, 289:20, 290:6, 290:19, 291:21, 291:24, 292:2, 292:7, 292:10, 292:14, 293:5, 293:21, 293:23, 294:5, 294:11, 294:16, 295:10, 295:15, 295:20, 295:23, 296:1, 296:6, 296:13, 296:16
**Court** [25] - 164:7, 164:20, 167:18, 167:25, 169:4, 169:10, 169:12, 203:3, 203:9, 207:15, 238:6, 241:21, 241:23, 241:25, 248:18, 269:20, 274:2, 277:23, 277:25, 278:6, 281:22, 287:3, 287:5, 289:13, 289:15
**Court's** [2] - 280:4, 289:18
**Courthouse** [1] - 163:6
**cover** [4] - 194:11, 213:18, 214:22, 285:11
**covered** [7] - 178:12, 179:8, 179:20, 194:18, 196:19, 196:21, 204:10
**CR** [1] - 263:23
**CR-13-607** [1] - 163:4
**create** [7] - 171:18, 174:13, 209:8, 212:25, 213:14, 214:4, 215:13
**created** [4] - 171:13, 176:21, 262:12, 283:16
**creating** [1] - 262:17
**credit** [31] - 176:3, 176:8, 176:9, 176:13, 176:17, 176:25, 177:10, 177:11, 177:20, 192:18, 192:19, 192:24, 196:23, 204:17,

204:22, 205:9, 205:23, 206:6, 206:18, 207:7, 207:8, 207:9, 268:12, 275:3, 276:13, 277:2, 277:4, 277:11, 278:25, 279:7, 285:4
**criminal** [4] - 185:14, 186:22, 196:21, 292:18
**CROSS** [4] - 170:13, 247:7, 297:7, 297:9
**cross** [5] - 246:3, 253:21, 270:1, 271:15, 272:22
**cross-examination** [4] - 253:21, 270:1, 271:15, 272:22
**CROSS-EXAMINATION** [4] - 170:13, 247:7, 297:7, 297:9
**crossover** [1] - 277:22
**CSL** [22] - 200:21, 210:3, 211:9, 211:13, 211:15, 212:2, 212:6, 213:3, 216:7, 216:11, 216:13, 217:19, 217:23, 217:24, 218:1, 218:19, 219:18, 220:4, 222:8, 229:17, 245:3, 245:7
**custodied** [1] - 270:9
**cut** [1] - 234:18

**D**

**date** [9] - 195:20, 211:14, 217:7, 228:11, 236:20, 256:16, 295:6, 296:2, 296:3
**dated** [6] - 196:11, 209:17, 209:20, 209:22, 210:13, 231:8
**days** [10] - 179:11, 184:1, 184:11, 184:19, 187:25, 200:10, 215:22, 261:11, 290:24, 295:25
**deal** [12] - 174:5, 179:8, 179:17, 182:4, 191:4, 191:10, 192:6, 192:12, 211:9, 228:15, 287:25, 293:17
**dealing** [3] - 228:16, 234:9, 263:22
**debt** [4] - 170:24, 172:2, 181:4, 224:15
**decade** [1] - 180:11
**December** [3] - 182:3, 182:22, 205:22, 207:11, 227:5, 235:1, 238:22, 240:15, 241:9, 261:2, 276:1, 276:14, 283:17
**decide** [1] - 206:9

**decided** [3] - 188:14, 206:7, 235:13
**decision** [1] - 186:18
**declaration** [1] - 274:4
**deemed** [1] - 200:8
**default** [2] - 255:23
**defaulted** [4] - 171:2, 171:25, 179:5, 192:6
**defend** [2] - 247:18, 249:25
**defendant** [2] - 165:12, 273:8
**Defendant's** [10] - 253:1, 269:9, 276:20, 281:21, 287:1, 288:9, 298:8, 298:9, 298:10, 298:11
**defendant's** [1] - 261:15
**defendants** [1] - 165:19
**Defendants** [3] - 163:8, 163:20, 164:1
**Defense** [9] - 248:16, 249:11, 255:10, 263:10, 265:3, 298:4, 298:5, 298:6, 298:7
**defense** [6] - 250:7, 260:9, 278:1, 283:20, 284:10, 284:21
**definitely** [2] - 207:25, 268:6
**Del** [3] - 184:25, 253:8, 255:17
**del** [10] - 268:12, 268:19, 268:25, 283:13, 284:20, 284:23, 284:24, 285:7, 285:15, 286:1
**Delaware** [2] - 171:20, 210:4
**delineated** [1] - 263:7
**delivered** [3] - 207:4, 207:20, 263:5
**demanded** [1] - 285:18
**Demetri** [1] - 219:19
**department** [1] - 191:9
**deposed** [2] - 278:24, 279:2
**deposit** [2] - 247:22, 249:2
**deposited** [2] - 257:5, 257:15
**deposition** [26] - 166:11, 166:23, 167:2, 167:24, 168:2, 168:3, 168:11, 168:16, 168:19, 169:25, 278:13, 279:4, 279:8, 279:11, 279:14, 279:22, 279:23, 279:25, 288:23, 288:25, 289:3, 289:12, 289:16, 289:24
**depositions** [3] - 166:17, 168:5, 169:21
**deposits** [1] - 254:9
**describe** [2] - 170:19,

277:23
**described** [1] - 180:1
**description** [1] - 252:19
**designated** [1] - 182:22
**despite** [2] - 205:18, 206:3
**determine** [1] - 282:2
**determined** [1] - 234:18
**Development** [6] - 245:2, 270:14, 270:24, 271:8, 272:19, 282:8
**development** [14] - 184:24, 186:14, 189:10, 190:15, 192:2, 196:6, 201:6, 204:23, 270:17, 270:18, 273:10, 273:12, 273:17, 285:6
**DeVries** [1] - 168:4
**Diamante** [9] - 168:14, 170:25, 181:3, 184:25, 197:14, 199:17, 213:3, 253:8, 255:17
**Diamonte** [19] - 223:24, 227:23, 230:1, 230:6, 230:7, 268:12, 268:13, 268:19, 268:25, 283:13, 284:20, 284:23, 284:24, 285:7, 285:14, 285:15, 288:11
**Diane** [1] - 165:7
**DIANE** [1] - 163:16
**different** [9] - 174:6, 208:6, 208:10, 216:13, 228:10, 241:18, 253:22, 276:9, 289:4
**differently** [2] - 206:7, 206:9
**difficult** [2] - 186:17, 264:22
**direct** [4] - 235:9, 254:12, 258:13, 258:20
**directly** [6] - 173:5, 197:5, 201:10, 207:18, 249:24, 270:13
**director** [3] - 273:19, 275:19, 275:20
**disagree** [1] - 268:16
**disbursed** [1] - 177:9
**disbursement** [1] - 177:7
**disclosure** [1] - 265:11
**Discovery** [2] - 237:13, 237:15
**discovery** [6] - 218:24, 219:9, 274:5, 279:6, 284:4, 284:8
**discuss** [1] - 292:18
**discussed** [2] - 185:2, 271:7
**discussion** [1] - 286:8
**discussions** [2] - 233:18, 272:4

**dismissed** [1] - 284:22
**disposition** [1] - 279:9
**District** [3] - 191:8, 203:3, 203:9
**DISTRICT** [3] - 163:1, 163:1, 163:11
**district** [1] - 273:12
**document** [86] - 177:11, 177:17, 180:19, 185:17, 185:24, 186:5, 195:1, 196:1, 196:2, 196:10, 226:1, 228:25, 230:23, 230:24, 231:11, 231:21, 235:4, 235:19, 236:18, 239:16, 241:20, 241:22, 241:23, 241:25, 242:9, 242:13, 258:8, 258:16, 258:19, 260:15, 260:17, 260:22, 260:23, 261:5, 261:7, 261:8, 261:10, 261:13, 270:3, 270:5, 270:12, 271:11, 271:17, 271:19, 274:1, 274:3, 274:7, 274:10, 274:13, 274:18, 274:20, 274:21, 274:23, 274:24, 275:1, 275:5, 275:11, 275:13, 275:22, 277:1, 277:17, 277:24, 278:2, 278:3, 278:6, 278:7, 278:8, 278:12, 279:7, 279:18, 284:14, 284:22, 286:7, 287:3, 287:10, 289:1, 289:2, 289:8, 289:9, 289:18, 290:3, 290:5
**Document** [1] - 283:8
**documented** [1] - 188:13
**documents** [27] - 177:16, 183:6, 196:7, 197:21, 198:4, 206:1, 206:2, 206:10, 206:14, 206:22, 206:23, 207:4, 207:17, 207:19, 207:22, 215:21, 218:18, 225:4, 229:2, 241:5, 273:23, 279:21, 280:12, 283:6, 291:25
**dollar** [4] - 192:1, 202:10, 255:25, 285:19
**dollars** [7] - 172:13, 172:14, 177:1, 183:15, 189:17, 191:13, 201:15
**donate** [4] - 233:12, 233:19, 234:3, 235:14
**donated** [1] - 234:2
**donating** [1] - 273:14
**donation** [1] - 237:24
**done** [4] - 175:7, 239:8, 259:18, 292:11
**down** [4] - 198:21, 217:23, 258:2, 291:21

**downstairs** [1] - 289:12
**draft** [3] - 228:4, 228:5, 228:7
**drafts** [1] - 228:10
**dragging** [1] - 174:15
**draw** [5] - 252:25, 255:12, 255:16, 263:12, 265:16
**due** [11] - 188:12, 194:1, 195:13, 196:13, 198:18, 236:20, 236:21, 237:1, 237:8, 259:25, 285:5
**duly** [1] - 166:3
**during** [30] - 169:18, 170:24, 177:4, 180:7, 184:1, 185:8, 196:21, 197:8, 206:19, 216:12, 219:8, 220:8, 242:21, 251:23, 253:20, 257:19, 263:5, 272:8, 275:2, 276:24, 277:15, 278:7, 278:12, 278:13, 279:9, 279:12, 279:14, 280:10, 284:19, 293:13

## E

**e-mail** [74] - 175:9, 198:14, 199:2, 199:5, 199:10, 199:19, 199:24, 199:25, 200:6, 200:12, 208:12, 208:22, 209:4, 209:23, 210:13, 212:20, 213:11, 213:20, 213:22, 213:24, 215:1, 215:7, 215:8, 216:1, 216:12, 216:17, 217:4, 217:13, 217:17, 217:22, 218:24, 219:8, 226:18, 226:24, 229:1, 229:6, 230:24, 231:8, 232:11, 238:25, 240:7, 241:2, 241:17, 242:24, 242:25, 243:16, 248:25, 250:19, 253:2, 253:5, 253:6, 256:4, 256:16, 271:3, 271:7, 280:22, 280:25, 281:4, 281:8, 281:12, 281:15, 285:23, 286:10, 287:11, 288:2, 288:14, 290:14, 290:15, 290:16, 290:20, 290:21, 290:22, 290:23, 291:2
**e-mails** [18] - 180:14, 180:16, 180:17, 180:20, 181:8, 209:9, 210:21, 211:6, 215:15, 218:18, 220:7, 221:23, 241:6, 286:14, 290:16, 290:20, 290:21, 291:10
**early** [1] - 191:16
**earn** [1] - 182:20

**East** [1] - 210:8
**EASTERN** [1] - 163:1
**eating** [1] - 214:8
**effort** [1] - 188:16
**efforts** [1] - 268:22
**egregious** [3] - 188:12, 188:14, 188:21
**eight** [4] - 189:4, 200:10, 235:6, 235:11
**EIN** [1] - 210:4
**either** [12] - 167:17, 169:17, 169:18, 171:13, 171:22, 177:13, 204:10, 223:22, 285:7, 285:14, 286:5, 290:14
**either/or** [1] - 286:3
**employment** [1] - 275:18
**end** [3] - 188:11, 194:23, 245:11
**endeavor** [1] - 269:16
**ended** [5] - 179:1, 181:10, 182:16, 188:22, 194:15
**ending** [1] - 290:23
**engaged** [2] - 232:20, 253:7
**engineering** [1] - 191:17
**entered** [1] - 239:24
**entire** [10] - 168:20, 188:16, 196:5, 202:3, 218:2, 218:7, 251:10, 274:21, 274:25, 285:11
**entirely** [1] - 196:15
**Entities** [1] - 270:24
**entities** [2] - 174:23, 283:25
**entitled** [4] - 178:9, 195:9, 195:11, 196:25
**entity** [6] - 171:20, 200:6, 208:6, 208:24, 210:3, 230:9
**entry** [1] - 295:2
**equity** [36] - 171:7, 171:22, 172:1, 172:15, 178:15, 178:23, 181:4, 200:2, 200:11, 204:22, 205:4, 205:6, 205:10, 208:13, 210:18, 216:13, 216:15, 216:19, 217:6, 217:15, 219:2, 219:4, 220:18, 221:15, 222:1, 222:5, 223:11, 224:15, 225:22, 227:13, 231:24, 242:18, 242:21, 245:3, 255:25, 282:10
**erected** [1] - 273:22
**escrow** [1] - 263:25
**ESQ** [5] - 163:16, 163:16, 163:22, 164:4, 164:6
**essence** [1] - 200:1
**essentially** [1] - 251:11

**estate** [9] - 177:15, 179:14, 179:16, 184:22, 232:15, 234:22, 235:6, 235:12, 273:11
**estimated** [4] - 185:25, 186:6, 195:11, 196:3
**Etan** [1] - 247:13
**Eufora** [9] - 238:5, 263:19, 263:21, 265:23, 268:9, 270:18, 270:24, 271:8, 272:19
**eventually** [1] - 202:18
**evidence** [59] - 166:11, 170:3, 170:11, 185:14, 185:19, 198:10, 209:15, 211:18, 211:25, 221:23, 225:25, 229:14, 229:24, 231:3, 231:7, 236:13, 236:17, 240:22, 241:1, 244:13, 244:18, 245:19, 249:6, 249:11, 251:14, 255:10, 262:7, 263:10, 264:16, 265:3, 269:5, 269:9, 272:14, 274:17, 275:2, 276:16, 276:20, 280:10, 281:21, 283:14, 287:1, 287:21, 288:9, 293:13, 297:22, 297:23, 297:24, 297:25, 298:1, 298:2, 298:3, 298:4, 298:5, 298:6, 298:7, 298:8, 298:9, 298:10, 298:11
**evidenced** [1] - 261:7
**exact** [1] - 259:9
**exactly** [4] - 187:12, 187:14, 218:17, 227:18
**examination** [4] - 253:21, 270:1, 271:15, 272:22
**EXAMINATION** [8] - 170:13, 247:7, 269:23, 288:20, 297:7, 297:9, 297:12, 297:14
**examined** [2] - 166:3, 287:7
**example** [2] - 176:4, 263:3
**except** [1] - 229:16
**excerpt** [1] - 274:18
**exchanged** [2] - 209:9, 210:21
**excuse** [5] - 250:21, 261:3, 264:4, 278:13, 281:2
**execute** [1] - 285:12
**executed** [1] - 275:13
**exhibit** [19] - 167:23, 168:3, 168:5, 168:9, 168:11, 185:19, 195:9, 198:10, 198:13, 211:9, 212:19, 243:7, 244:10, 244:15, 252:4, 260:19, 261:15, 276:12, 279:13

**Exhibit** [75] - 168:1, 168:7, 169:1, 170:2, 170:5, 195:1, 209:15, 210:12, 226:1, 228:21, 229:13, 229:24, 230:22, 231:2, 231:7, 235:3, 236:12, 236:17, 238:24, 238:25, 239:4, 239:11, 239:21, 240:7, 241:2, 243:15, 244:18, 244:20, 244:21, 245:19, 248:16, 248:22, 249:11, 250:15, 252:14, 253:1, 255:10, 255:13, 255:14, 258:5, 258:14, 258:21, 263:10, 265:3, 268:8, 269:9, 271:16, 276:5, 276:15, 276:20, 277:1, 280:19, 281:15, 281:21, 283:11, 284:13, 286:17, 287:1, 287:9, 288:9, 290:4, 290:10, 290:14, 297:24, 297:25, 298:2, 298:3, 298:4, 298:5, 298:6, 298:7, 298:8, 298:9, 298:11
**Exhibits** [6] - 170:10, 211:24, 241:1, 297:21, 297:23, 298:1
**exhibits** [11] - 169:3, 169:10, 211:2, 211:5, 211:19, 211:21, 248:18, 256:18, 269:10, 289:16, 290:23
**existence** [3] - 279:11, 285:23, 286:10
**exists** [2] - 270:16, 271:6
**Expansion** [2] - 195:8, 197:5
**expect** [7] - 182:20, 246:2, 246:4, 249:13, 250:4, 250:12, 251:4
**expected** [3] - 184:19, 191:11, 251:7
**expedited** [2] - 274:5, 279:5, 284:8
**expenses** [3] - 192:2, 192:19, 192:23
**explain** [4] - 185:24, 214:24, 215:1, 262:24
**expunged** [1] - 272:8
**extending** [1] - 196:18
**extension** [4] - 177:11, 186:13, 196:4, 211:16
**extensions** [2] - 188:7, 189:6
**extent** [2] - 166:24, 167:2

F

**F-17** [1] - 281:16
**F-25** [4] - 276:5, 276:16, 276:20, 298:8
**F-27** [4] - 280:19, 281:20, 281:21, 298:9
**F-28** [2] - 283:11, 284:13
**F-29** [7] - 287:9, 288:7, 288:9, 290:11, 290:14, 290:20, 298:11
**facilitating** [1] - 275:16
**fact** [19] - 174:12, 175:6, 175:25, 183:20, 188:9, 204:2, 205:18, 205:23, 208:21, 210:24, 226:20, 230:5, 230:8, 231:23, 232:12, 243:19, 282:20, 284:3, 294:3
**facts** [1] - 265:9
**factual** [1] - 207:2
**factually** [2] - 174:11, 204:19
**failed** [1] - 179:11
**fair** [4] - 171:9, 262:3, 264:12, 296:5
**fall** [1] - 180:5
**familiar** [4] - 196:7, 222:4, 248:23, 252:24
**family** [1] - 260:3
**far** [3] - 185:23, 268:23, 295:10
**Fargo** [1] - 266:6
**Fatico** [9] - 292:19, 292:21, 292:22, 293:3, 293:8, 294:3, 294:19, 295:16, 296:4
**fault** [1] - 196:17
**fax** [3] - 175:9, 265:24, 266:5
**faxed** [1] - 261:4
**February** [37] - 171:15, 171:19, 200:1, 200:3, 200:7, 208:5, 208:11, 208:15, 208:18, 208:19, 209:2, 209:7, 209:17, 209:20, 209:22, 210:13, 210:17, 210:25, 211:14, 212:4, 216:16, 217:18, 217:22, 222:6, 227:15, 249:1, 261:21, 274:5, 281:2, 281:9, 282:2, 285:16, 287:12, 291:11, 291:18
**Federal** [4] - 163:15, 164:20, 203:3, 203:9
**federal** [1] - 274:25
**FedEx** [1] - 206:1
**fee** [1] - 185:15

**fees** [13] - 182:12, 182:14, 183:15, 190:11, 202:23, 203:1, 203:4, 203:13, 203:14, 203:21, 203:22, 272:13, 272:15
**fell** [1] - 179:17
**felt** [2] - 171:9, 188:25
**Fernando** [2] - 174:20, 280:24
**ferret** [1] - 284:9
**few** [3] - 202:19, 215:22, 260:25
**FFC-1** [5] - 248:16, 248:22, 249:10, 249:11, 298:4
**FFC-2** [4] - 250:15, 250:16, 251:13, 251:17
**FFC-3** [5] - 253:1, 255:5, 255:9, 255:10, 298:5
**FFC-4** [4] - 261:15, 263:9, 263:10, 298:6
**FFC-5** [7] - 263:12, 264:15, 265:2, 265:3, 298:7
**FFC-6** [1] - 265:17
**fight** [1] - 237:18
**figure** [3] - 189:11, 190:6, 296:3
**file** [3] - 197:21, 263:7, 272:11
**filed** [10] - 197:20, 225:1, 241:23, 250:7, 251:23, 271:22, 272:6, 274:5, 279:24, 283:18
**filing** [2] - 272:13, 272:15
**final** [2] - 197:21, 236:22
**finally** [1] - 235:12
**finance** [1] - 184:24
**financial** [12] - 176:23, 225:8, 225:20, 225:23, 226:13, 226:17, 226:18, 227:1, 227:3, 227:6, 227:9, 227:11
**financing** [3] - 196:5, 285:6, 286:4
**fine** [4] - 247:12, 288:12, 295:22, 296:1
**finish** [3] - 203:23, 219:23, 239:7
**finished** [1] - 219:24
**finishing** [1] - 283:10
**first** [19] - 167:22, 169:16, 170:19, 173:20, 200:4, 218:24, 219:15, 229:6, 231:21, 236:19, 240:15, 242:19, 263:3, 274:2, 282:6, 284:3, 285:8, 287:25, 294:18
**five** [18] - 196:16, 201:24, 202:1, 205:25, 206:11, 207:11, 222:7, 223:3, 223:7, 223:10, 223:12,

223:16, 223:20, 224:6, 224:15, 245:9, 276:10, 292:2
**five-percent** [7] - 223:3, 223:7, 223:10, 223:12, 224:6, 224:15, 245:9
**flip** [1] - 189:24
**flow** [1] - 184:14
**FMGC@Talmur.net** [1] - 280:24
**focus** [2] - 204:6, 296:9
**FOF** [1] - 270:2
**follow** [6] - 175:4, 175:9, 210:10, 215:25, 218:23, 224:7
**follow-up** [3] - 175:4, 215:25, 218:23
**following** [5] - 166:20, 220:2, 229:16, 274:11, 284:16
**follows** [3] - 166:4, 217:16, 257:24
**foolish** [1] - 216:6
**forbearance** [3] - 233:25, 234:20, 234:21
**forbid** [1] - 231:20
**foreign** [1] - 219:16
**foreigners** [4] - 220:20, 221:16, 222:1, 223:8
**FORF-1** [2] - 252:8, 255:13
**FORF-105** [1] - 270:4
**FORF-106** [1] - 271:2
**FORF-155** [1] - 270:5
**FORF-55** [1] - 270:2
**FORF-76** [3] - 273:25, 274:4, 280:5
**FORF-80** [3] - 169:1, 274:16, 280:5
**FORF-96** [1] - 256:6
**forfeit** [1] - 229:18
**Forfeiture** [11] - 170:2, 170:10, 209:15, 210:12, 211:2, 211:24, 238:24, 239:3, 243:15, 297:21, 297:23
**forfeiture** [12] - 165:20, 167:11, 198:10, 207:5, 269:20, 292:16, 292:21, 293:3, 294:8, 294:14, 295:17, 295:24
**forged** [2] - 274:14, 274:21
**forgery** [2] - 259:4, 274:22
**forget** [1] - 277:5
**form** [3] - 259:11, 287:4, 287:24
**formally** [1] - 287:23
**format** [1] - 262:11
**formed** [2] - 210:4, 287:13
**former** [1] - 249:3
**forms** [1] - 177:8

**forward** [2] - 175:14, 235:1
**forwarded** [10] - 178:20, 179:6, 180:23, 180:25, 185:8, 198:1, 198:8, 200:6, 200:19, 250:10
**Foundation** [2] - 234:4, 235:15
**four** [1] - 275:18
**Frailes** [1] - 260:11
**frankly** [1] - 284:11
**fraud** [5] - 248:4, 249:23, 251:10, 255:15, 292:23
**fraudulent** [1] - 293:9
**free** [1] - 255:25
**Friales** [1] - 268:13
**Fried** [1] - 268:21
**friends** [3] - 201:3, 201:5, 260:2
**front** [5] - 184:17, 190:15, 196:10, 235:19, 274:25
**FSC-6** [3] - 269:4, 269:8, 269:9
**fulfill** [2] - 171:12, 179:11
**full** [7] - 178:10, 179:19, 198:1, 198:5, 230:17, 231:13, 260:8
**fully** [2] - 215:19, 259:22
**Fund** [5] - 251:21, 254:3, 270:25, 271:9, 272:20
**fund** [2] - 184:15, 189:8
**funded** [1] - 225:13
**funding** [3] - 188:16, 188:18, 256:13
**fundings** [1] - 286:5
**funds** [37] - 175:11, 176:9, 176:10, 176:16, 177:9, 183:2, 186:15, 200:2, 200:11, 200:16, 201:13, 202:3, 203:21, 204:24, 205:1, 224:16, 225:16, 235:14, 237:23, 245:1, 254:11, 257:7, 257:15, 259:24, 260:8, 260:14, 260:24, 270:9, 270:22, 281:5, 281:11, 282:5, 282:7, 284:6, 287:18, 288:12
**future** [6] - 169:18, 171:8, 174:16, 183:24, 190:15, 217:6

**G**

**Gaarn** [1] - 263:23
**Gaarns** [1] - 267:6
**gained** [1] - 184:12
**Garcia** [3] - 174:20, 200:18, 280:24
**Gaudet** [14] - 202:18,

275:10, 275:14, 275:16, 275:25, 276:10, 276:24, 277:10, 278:16, 278:19, 279:2, 288:22, 289:4, 289:7
**Gaudet's** [4] - 275:8, 275:20, 275:22, 277:9
**generous** [1] - 289:2
**gentlemen** [1] - 171:16
**Gentry** [1] - 263:23
**Georgia** [2] - 179:14, 184:22
**gesture** [1] - 273:16
**Gilmartin** [3] - 249:16, 249:21, 250:1
**given** [9] - 169:4, 169:9, 175:18, 201:21, 204:4, 207:8, 271:23, 283:25, 294:2
**glad** [5] - 183:6, 193:1, 203:20, 225:23, 226:25
**Glenn** [2] - 277:16, 279:24
**Global** [6] - 251:21, 254:3, 270:18, 270:24, 271:8, 272:19
**global** [1] - 253:15
**golf** [1] - 275:20
**Gonchar** [4] - 254:8, 257:5, 257:15, 257:17
**governed** [1] - 176:10
**government** [2] - 167:17, 169:3, 204:1, 218:25, 229:18, 237:22, 252:4, 257:22, 262:18, 263:5, 264:19, 267:23, 268:4, 272:14, 273:24, 274:7, 280:3, 280:13, 281:4, 291:3, 291:9, 292:15, 292:22, 293:12, 293:13, 294:17, 295:1, 295:15, 296:14
**Government** [6] - 163:14, 170:10, 211:24, 268:8, 297:21, 297:23
**government's** [8] - 169:19, 202:12, 255:19, 265:6, 265:11, 268:2, 269:25, 280:9
**Government's** [16] - 169:1, 195:1, 229:24, 231:7, 236:17, 241:1, 244:18, 245:19, 252:14, 255:12, 255:14, 297:24, 297:25, 298:1, 298:2, 298:3
**grand** [1] - 251:11
**granted** [2] - 177:25, 224:14
**granting** [1] - 176:8
**greater** [10] - 218:22, 220:6, 221:14, 221:19,

221:20, 222:6, 222:7, 222:10, 222:17, 223:12
**greg@ddmgolf.com** [1] - 281:1
**grocery** [1] - 257:23
**ground** [1] - 204:10
**Group** [3] - 239:25, 266:3, 268:20
**group** [4] - 201:23, 201:25, 202:2, 273:17
**GSF** [2] - 257:3, 257:7
**guarantee** [3] - 171:7, 171:24, 208:25
**guess** [4] - 172:12, 229:4, 263:1, 293:18
**GuideDog** [8] - 209:3, 209:11, 209:24, 210:14, 212:23, 213:9, 214:19, 215:11
**guys** [1] - 263:20

**H**

**Haley** [13] - 165:12, 166:15, 167:15, 168:18, 198:15, 203:15, 207:4, 207:25, 269:14, 291:24, 293:9, 293:17, 294:21
**HALEY** [62] - 163:20, 163:22, 165:12, 166:19, 167:8, 167:20, 168:24, 169:15, 169:23, 170:5, 178:7, 190:4, 198:17, 198:22, 203:16, 203:25, 211:20, 219:21, 220:25, 224:8, 229:15, 231:4, 236:14, 240:23, 242:3, 242:6, 244:14, 245:16, 246:11, 246:14, 249:9, 251:16, 255:2, 255:8, 257:8, 260:18, 262:16, 265:1, 269:7, 269:16, 269:19, 269:24, 276:2, 276:15, 276:21, 280:15, 281:14, 281:22, 283:9, 286:19, 287:22, 288:17, 289:14, 289:23, 292:1, 294:24, 295:11, 295:14, 295:22, 296:5, 296:8, 297:13
**half** [19] - 172:13, 172:14, 183:15, 189:16, 190:2, 191:13, 192:3, 193:20, 194:16, 195:16, 201:14, 202:10, 204:4, 242:20, 246:4, 270:1, 283:18, 285:13, 285:19
**half-million** [1] - 202:10
**hand** [1] - 258:21
**handed** [3] - 168:25, 169:2,

283:8
**handing** [5] - 170:1, 226:3, 228:20, 276:6, 280:20
**Handing** [7] - 230:22, 235:3, 238:24, 239:4, 243:15, 271:2, 287:10
**handle** [1] - 286:9
**handled** [1] - 253:20
**handwriting** [2] - 261:4, 261:11
**handwritten** [3] - 257:20, 259:7, 261:13
**Harbor** [3] - 237:13, 237:15, 270:25
**hard** [5] - 186:18, 186:21, 193:18, 199:24, 285:9
**hardy** [1] - 268:21
**Harvey** [1] - 220:8
**Hawaii** [40] - 179:16, 185:4, 185:11, 186:16, 188:17, 190:24, 191:1, 191:21, 191:23, 196:5, 196:12, 197:4, 200:6, 201:6, 201:8, 201:19, 201:22, 201:25, 202:2, 203:20, 204:21, 204:23, 214:15, 233:16, 235:20, 238:1, 242:19, 258:25, 259:3, 259:8, 259:14, 259:24, 260:2, 261:1, 268:12, 273:9, 273:12, 273:13, 273:19, 287:16
**Hawaiian** [9] - 174:23, 202:15, 226:24, 270:16, 270:17, 270:24, 271:8, 272:19, 282:8
**head** [1] - 254:23
**headed** [1] - 263:23
**hear** [2] - 294:6, 296:3
**heard** [2] - 186:21, 268:10
**hearing** [13] - 165:21, 166:24, 167:11, 193:18, 207:5, 292:19, 292:22, 292:23, 293:8, 293:16, 294:3, 294:14, 295:16
**help** [2] - 247:20, 253:7
**helping** [1] - 247:17
**higher** [1] - 193:2
**Highway** [1] - 163:21
**himself** [1] - 173:12
**historic** [1] - 273:15
**Historical** [2] - 235:24, 235:25
**historical** [1] - 273:20
**hockey** [2] - 174:8, 273:7
**holder** [1] - 181:4
**holders** [1] - 176:8
**holding** [1] - 240:20
**Holdings** [10] - 225:10, 225:13, 225:16, 225:17,

225:19, 225:22, 226:2, 226:5, 231:25
**home** [1] - 261:5
**home-12010** [1] - 261:9
**Honor** [94] - 165:10, 165:15, 166:9, 166:18, 166:19, 167:9, 167:21, 167:25, 168:1, 168:17, 168:19, 168:22, 168:23, 168:25, 169:6, 170:9, 178:4, 190:4, 190:5, 190:10, 193:17, 198:9, 198:17, 198:19, 203:16, 204:14, 206:25, 207:19, 208:2, 209:14, 211:1, 211:18, 211:20, 211:22, 221:2, 221:10, 229:13, 229:15, 231:2, 231:4, 235:2, 236:12, 236:15, 239:8, 239:15, 239:20, 240:15, 240:21, 241:15, 242:1, 244:9, 244:12, 245:13, 245:20, 245:25, 246:11, 248:17, 249:8, 251:15, 254:18, 255:7, 262:8, 262:15, 262:22, 264:21, 269:6, 276:15, 276:17, 276:18, 276:21, 280:14, 281:17, 281:19, 282:17, 283:10, 286:20, 287:2, 288:5, 288:6, 289:11, 289:22, 290:8, 290:17, 291:20, 291:23, 292:25, 293:18, 294:1, 294:23, 295:12, 295:19, 296:8, 296:12, 296:15
**HONORABLE** [1] - 163:11
**HONU** [1] - 235:24
**Honu'apo** [4] - 191:7, 191:18, 235:24, 272:23
**hope** [1] - 210:22
**hoping** [1] - 204:12
**horizontal** [1] - 189:10
**hour** [3] - 188:12, 246:4, 270:1
**house** [1] - 260:7
**Hughes** [1] - 238:5
**Hume** [1] - 191:9

**I**

**idea** [1] - 228:15
**identified** [2] - 227:6, 290:4
**identify** [1] - 289:2
**illegal** [1] - 237:22
**immediate** [1] - 215:13
**immediately** [3] - 228:3, 267:19, 284:7
**implies** [1] - 178:7

**important** [1] - 189:1
**inaccuracies** [1] - 207:3
**inaccurate** [5] - 207:24, 231:15, 238:20, 240:13, 271:14
**incarcerated** [2] - 237:3, 237:4
**incarceration** [2] - 227:4, 227:8
**incidentally** [1] - 271:11
**include** [2] - 171:6, 171:22
**included** [2] - 232:20, 261:1
**including** [1] - 272:5
**inconsistent** [1] - 279:15
**incorrect** [15] - 183:17, 185:12, 191:22, 204:19, 209:13, 209:25, 213:10, 218:4, 222:12, 222:17, 225:15, 233:21, 238:2, 254:10, 291:14
**incurred** [1] - 190:21
**indeed** [1] - 169:6
**independent** [3] - 197:2, 197:4, 295:18
**independently** [6] - 170:22, 171:1, 176:7, 176:22, 195:8, 197:9
**indicate** [3] - 215:8, 226:2, 267:2
**indicated** [3] - 168:19, 171:17, 293:1
**indicates** [1] - 195:2
**indicating** [1] - 199:10, 217:5
**indication** [2] - 262:9, 262:13
**indications** [1] - 236:25
**individual** [4] - 176:21, 240:20, 245:9, 293:6
**individuals** [16] - 176:18, 177:12, 178:16, 179:7, 190:13, 222:9, 231:25, 239:13, 267:15, 267:24, 272:1, 272:4, 272:12
**inevitable** [1] - 294:2
**info** [1] - 210:10
**information** [6] - 193:8, 238:10, 241:12, 255:1, 258:2, 262:18
**informed** [4] - 171:15, 287:16, 287:17, 291:17
**infrastructure** [1] - 191:16
**initial** [6] - 171:3, 191:19, 247:22, 268:17, 268:23, 283:20
**initiate** [1] - 171:20
**initiated** [1] - 284:7
**inside** [1] - 237:21
**insinuating** [1] - 192:14

**instance** [5] - 254:13, 254:14, 277:15, 278:16, 278:18
**instead** [1] - 167:23
**instructed** [2] - 171:17, 213:13
**instructing** [1] - 200:7
**instructions** [1] - 222:22
**intended** [3] - 178:22, 185:3, 234:3
**intending** [1] - 172:10
**intends** [2] - 292:22, 293:14
**intent** [3] - 233:19, 246:5, 282:21
**intention** [1] - 289:15
**interaction** [1] - 207:12
**interest** [77] - 170:16, 171:11, 172:3, 172:15, 181:2, 182:19, 182:25, 183:1, 183:24, 184:3, 184:5, 184:12, 190:15, 192:5, 193:4, 197:12, 205:10, 208:5, 208:10, 209:3, 209:24, 210:14, 213:1, 216:20, 216:25, 217:10, 217:15, 217:25, 218:2, 218:6, 218:7, 218:9, 218:10, 218:13, 218:14, 218:16, 218:20, 218:21, 218:22, 219:4, 219:6, 219:13, 219:18, 219:19, 220:4, 220:13, 220:15, 221:14, 221:19, 221:24, 222:7, 222:8, 222:10, 222:11, 222:14, 222:19, 222:20, 222:21, 223:3, 223:7, 223:10, 224:6, 224:11, 224:12, 224:13, 225:5, 225:11, 226:5, 236:21, 245:6, 245:10, 267:3, 271:21, 272:3
**interested** [2] - 219:7, 272:6
**interpret** [1] - 284:16, 287:6
**interrupt** [1] - 198:22
**introduce** [7] - 166:23, 207:6, 269:3, 269:4, 286:18, 286:20, 290:1
**introduced** [9] - 168:18, 170:3, 273:24, 274:7, 274:16, 275:1, 280:4, 290:1, 290:3
**introducing** [2] - 269:12, 289:24
**invest** [2] - 170:23, 260:1
**invested** [4] - 259:20, 259:23, 260:6, 260:10
**investing** [2] - 219:14,

265:23
**investment** [14] - 170:21, 176:16, 176:17, 177:13, 177:15, 201:22, 226:8, 226:12, 226:22, 227:13, 227:16, 245:4, 268:7, 268:24
**investments** [13] - 200:9, 215:24, 233:16, 268:12, 268:17, 281:6, 281:25, 282:12, 282:15, 282:23, 284:1, 284:10, 284:17
**Investor** [1] - 268:20
**investor** [4] - 201:19, 201:25, 202:2, 234:15
**investors** [25] - 184:6, 196:17, 198:2, 200:5, 201:3, 201:5, 214:15, 219:16, 233:19, 233:22, 233:23, 234:7, 234:8, 234:16, 237:16, 237:17, 238:1, 264:3, 267:5, 267:7, 272:24, 273:1, 273:5, 273:6, 273:7
**involve** [1] - 279:8
**involved** [3] - 174:9, 196:5, 273:9
**involves** [1] - 229:17
**involving** [5] - 270:17, 271:4, 277:16, 279:24, 280:1
**iPhone** [1] - 263:6
**irrelevant** [1] - 215:6
**Islandia** [1] - 163:22
**Isle** [48] - 168:6, 172:23, 173:1, 173:24, 174:15, 176:9, 176:11, 176:18, 177:13, 181:17, 181:18, 181:19, 181:21, 181:22, 182:5, 182:16, 183:12, 183:19, 183:21, 183:22, 185:6, 187:5, 187:7, 202:14, 202:20, 203:8, 203:20, 204:25, 205:9, 205:11, 206:13, 238:16, 238:17, 238:18, 238:22, 240:1, 240:4, 240:5, 240:11, 240:18, 241:10, 243:1, 256:10, 280:1, 283:19, 284:14, 284:23, 288:23
**Islip** [3] - 163:6, 163:15, 164:21
**issue** [9] - 206:18, 214:5, 218:19, 223:24, 262:24, 292:18, 294:19, 295:16, 296:4
**issues** [6] - 166:24, 166:25, 167:12, 169:14, 219:16, 269:19

**items** [1] - 251:2
**itself** [3] - 270:7, 274:18, 276:22
**IV** [29] - 176:9, 176:11, 176:18, 177:13, 181:18, 181:22, 183:19, 183:21, 183:22, 203:8, 203:20, 204:25, 205:9, 206:13, 238:16, 238:17, 238:18, 238:22, 240:1, 240:4, 240:5, 240:11, 240:18, 241:10, 243:1, 256:10, 283:19, 284:23, 288:23

## J

**jail** [1] - 237:6
**January** [1] - 282:21
**John** [3] - 186:19, 234:25, 238:15
**join** [1] - 293:3
**joint** [3] - 196:20, 197:8, 232:20
**Joseph** [5] - 165:16, 201:9, 271:17, 271:22, 282:7
**JOSEPH** [2] - 163:11, 164:4
**Jowdy** [129] - 168:3, 168:4, 168:6, 168:12, 171:2, 171:5, 171:11, 171:14, 171:24, 172:18, 172:23, 173:1, 173:6, 178:24, 179:2, 179:4, 179:5, 179:11, 179:13, 179:15, 179:18, 181:24, 182:2, 182:21, 182:25, 183:25, 184:11, 184:19, 184:21, 187:10, 187:13, 192:4, 192:5, 193:10, 197:20, 197:22, 199:8, 199:11, 199:20, 200:4, 200:8, 200:11, 200:18, 201:2, 201:13, 201:22, 201:25, 202:4, 202:6, 202:9, 202:10, 202:17, 202:18, 202:21, 202:25, 203:19, 205:2, 205:4, 208:11, 208:15, 208:22, 208:24, 210:18, 210:19, 213:11, 213:15, 213:17, 214:12, 215:9, 215:17, 215:19, 216:13, 216:17, 216:19, 216:21, 216:24, 217:2, 217:10, 217:12, 217:17, 219:3, 219:10, 225:1, 231:12, 231:23, 234:18, 237:16, 237:18, 253:13, 255:22, 268:20, 268:21, 274:4, 274:11, 275:15, 275:17, 275:19, 276:13,

277:3, 277:17, 278:1, 278:3, 278:23, 279:1, 279:18, 279:25, 280:2, 280:23, 281:9, 281:10, 282:6, 282:11, 283:14, 283:24, 284:6, 284:9, 285:2, 285:6, 285:11, 285:22, 286:4, 286:6, 286:8, 287:12, 287:15, 288:11, 288:23, 289:6, 290:3
**Jowdy's** [19] - 168:16, 168:18, 168:21, 179:20, 200:25, 201:18, 202:23, 217:21, 218:25, 219:1, 222:5, 270:13, 274:19, 275:8, 278:8, 280:25, 283:16, 283:20, 284:18
**judge** [9] - 219:21, 220:25, 260:18, 264:17, 280:17, 281:14, 289:14, 289:23, 292:12
**JUDGE** [1] - 163:11
**Judge** [24] - 170:6, 198:16, 198:18, 202:22, 203:3, 203:15, 204:2, 229:22, 236:14, 240:9, 243:6, 244:14, 269:17, 276:2, 280:16, 283:9, 286:19, 287:22, 292:5, 293:22, 294:13, 295:1, 295:22, 296:5
**judgment** [1] - 203:9
**judicial** [1] - 278:19
**July** [9] - 183:3, 186:24, 187:2, 187:4, 187:24, 188:11, 263:16, 278:24, 289:3
**June** [2] - 178:15, 261:20
**Juneau** [1] - 250:8
**jury** [1] - 268:4

## K

**K1's** [1] - 284:4
**Kabu** [1] - 273:12
**Kaiser** [32] - 186:19, 225:14, 234:25, 238:15, 238:17, 238:18, 238:21, 239:24, 240:1, 240:3, 240:5, 240:10, 240:16, 240:18, 241:8, 242:17, 242:25, 243:20, 243:24, 256:9, 256:21, 256:23, 257:19, 259:2, 259:19, 259:20, 260:10, 260:16, 260:22, 261:3, 261:10
**Kamawatsu** [1] - 233:9
**Kau** [9] - 225:9, 225:13, 225:16, 225:17, 225:19,

225:21, 226:2, 226:5, 231:25
**KAU** [1] - 225:10
**keep** [1] - 269:16
**Kelly** [1] - 292:19
**Ken** [14] - 192:4, 193:10, 197:20, 202:17, 275:8, 275:14, 277:17, 279:1, 279:18, 279:24, 280:2, 285:2, 287:12, 288:11
**Ken's** [1] - 213:1
**Kenner** [94] - 163:23, 165:4, 165:13, 165:22, 166:6, 166:10, 167:3, 167:18, 168:2, 168:5, 168:10, 168:11, 170:15, 174:7, 176:23, 177:19, 181:9, 182:9, 182:21, 189:11, 190:20, 197:11, 198:13, 199:2, 201:18, 202:20, 203:18, 204:6, 204:16, 206:20, 208:4, 209:10, 211:5, 213:3, 214:3, 214:17, 219:25, 220:10, 220:24, 221:12, 224:1, 224:19, 225:8, 226:13, 227:1, 227:19, 228:21, 228:23, 229:2, 229:25, 230:5, 230:15, 230:24, 231:8, 232:2, 232:5, 232:13, 233:8, 233:11, 235:5, 236:1, 236:18, 238:25, 239:11, 239:21, 240:4, 241:2, 242:23, 243:5, 244:21, 249:13, 251:19, 256:16, 258:1, 258:14, 258:21, 259:13, 268:10, 276:4, 276:15, 277:5, 279:1, 280:19, 281:15, 283:11, 284:13, 286:16, 287:8, 287:9, 288:22, 289:7, 290:10, 291:11, 291:22
**KENNER** [3] - 163:7, 166:1, 297:6
**Kenner's** [8] - 166:11, 168:7, 168:9, 168:13, 168:16, 169:19, 240:1, 258:4
**Kenneth** [1] - 274:4
**kept** [1] - 260:24
**Keylo** [1] - 273:11
**Khristich** [1] - 219:19
**Khristick** [1] - 220:3
**kind** [4] - 174:1, 174:9, 262:17
**kindly** [5] - 271:2, 274:17, 280:19, 283:11, 287:8
**KJ** [1] - 288:11
**knowing** [2] - 215:23,

257:3
**knowledge** [5] - 232:3, 232:17, 279:10, 279:15, 279:21
**known** [2] - 233:8, 236:9
**Komatireddy** [6] - 293:1, 293:19, 294:6, 294:21, 295:5, 296:4
**KSI** [2] - 255:23, 285:17

# L

**LA** [1] - 252:19
**labeled** [3] - 252:18, 255:16, 258:13
**laid** [4] - 177:12, 207:14, 217:17, 286:6
**Lambert** [1] - 227:6
**land** [5] - 204:23, 270:17, 273:9, 275:16
**Land** [4] - 270:24, 271:8, 272:19, 282:8
**landmark** [1] - 273:15
**laptop** [1] - 286:14
**large** [1] - 239:15
**larger** [1] - 221:24
**Larry** [3] - 174:21, 197:20, 212:25
**LARUSSO** [1] - 164:2
**last** [7] - 215:22, 233:4, 238:20, 243:7, 274:12, 290:24, 295:12
**lawsuit** [15] - 202:20, 202:22, 225:1, 241:12, 242:11, 247:18, 247:21, 248:8, 250:1, 250:7, 251:22, 278:1, 279:24, 283:19, 288:23
**lawsuits** [1] - 283:15
**lawyer** [2] - 249:19, 250:11
**lays** [1] - 286:7
**learn** [1] - 265:11
**least** [5] - 167:10, 215:21, 218:1, 222:9, 231:24
**leave** [1] - 296:2
**leaves** [1] - 193:21
**leaving** [1] - 202:19
**Ledbetter** [4] - 270:19, 270:25, 271:9, 272:20
**left** [6] - 165:13, 193:16, 194:3, 242:21, 261:8, 263:2
**legal** [7] - 202:23, 203:1, 203:12, 203:14, 203:21, 203:22, 281:12
**legitimacy** [1] - 289:17
**Lehman** [52] - 188:10, 188:13, 188:18, 188:20, 190:14, 194:18, 195:6,

195:7, 195:19, 196:4, 196:7, 196:12, 196:16, 196:18, 196:22, 196:25, 197:6, 197:7, 197:10, 208:13, 216:18, 216:22, 217:3, 217:14, 218:15, 218:22, 219:2, 219:6, 219:13, 220:5, 221:14, 221:22, 221:24, 223:8, 224:21, 225:4, 228:11, 228:15, 230:16, 231:12, 231:13, 231:20, 232:8, 232:12, 235:11, 281:12, 282:4, 282:14, 282:22, 283:1, 286:12
**Lehman's** [2] - 222:21, 231:25
**Lehtinen** [37] - 170:20, 171:4, 171:6, 171:22, 173:5, 173:11, 175:5, 178:14, 178:25, 179:6, 179:19, 179:21, 179:24, 180:15, 180:24, 181:1, 197:17, 200:13, 200:17, 208:17, 209:1, 210:20, 213:16, 214:13, 214:23, 215:2, 215:17, 220:12, 220:18, 223:3, 223:19, 223:22, 224:5, 225:4, 231:11, 287:14, 291:15
**Lehtinen's** [10] - 171:3, 172:2, 172:22, 172:25, 173:14, 173:17, 181:9, 222:19, 224:23, 287:18
**Len** [2] - 273:10, 273:18
**lenders** [2] - 186:18, 285:10
**Leonardo** [3] - 165:8, 221:9, 239:5
**LEONARDO** [80] - 163:16, 165:7, 166:9, 166:14, 166:18, 167:21, 168:17, 168:22, 169:24, 170:9, 170:14, 172:9, 178:4, 178:13, 194:14, 198:9, 198:12, 199:1, 203:17, 203:23, 204:14, 204:15, 208:3, 209:14, 209:16, 211:1, 211:4, 211:18, 212:1, 220:9, 221:10, 221:11, 223:1, 229:13, 230:21, 231:2, 235:2, 236:12, 238:23, 239:8, 239:20, 240:9, 240:21, 243:6, 244:9, 244:12, 244:19, 245:12, 245:15, 245:20, 249:8, 251:15, 253:16, 254:4, 255:3, 255:7, 259:10, 262:8, 264:17, 264:21, 265:8,

265:13, 269:6, 276:17, 280:6, 281:17, 282:17, 283:4, 286:23, 287:21, 288:6, 288:21, 289:21, 291:19, 294:20, 295:19, 295:25, 296:14, 297:8, 297:15
**letter** [2] - 171:5, 282:21
**letting** [1] - 239:5
**lie** [1] - 274:22
**light** [1] - 294:1
**likely** [2] - 233:7, 251:6
**limited** [3] - 166:24, 166:25, 246:12
**line** [28] - 176:3, 176:8, 176:9, 176:12, 176:17, 176:25, 177:20, 204:17, 204:22, 205:8, 205:23, 206:6, 206:17, 207:7, 207:9, 256:8, 274:20, 275:3, 276:13, 277:2, 277:4, 277:11, 278:25, 279:6, 285:4, 287:19, 288:10
**lines** [6] - 177:10, 192:18, 192:19, 192:24, 196:23, 268:12
**list** [3] - 257:23, 260:24
**listed** [6] - 201:4, 230:5, 230:8, 235:23, 268:7, 268:8
**litigation** [6] - 166:17, 174:10, 174:16, 237:16, 277:16, 278:7
**LLC** [13] - 208:10, 210:3, 213:3, 213:4, 213:12, 213:18, 214:22, 215:9, 216:2, 230:3, 230:6, 230:7, 240:5
**LLCs** [3] - 212:25, 242:20, 284:4
**LLP** [1] - 252:23
**loan** [94] - 170:24, 178:15, 178:23, 178:24, 179:16, 181:3, 181:11, 181:12, 181:16, 182:3, 182:10, 182:22, 182:24, 183:3, 183:8, 183:14, 183:16, 183:18, 183:25, 184:1, 184:23, 185:2, 185:3, 185:6, 185:8, 185:9, 185:14, 185:15, 185:21, 185:23, 186:8, 186:9, 186:20, 186:24, 187:2, 187:6, 187:18, 187:24, 190:22, 190:25, 191:4, 191:5, 191:15, 191:19, 192:3, 192:7, 192:8, 192:17, 193:15, 193:21, 194:4, 194:7, 194:15,

194:20, 201:5, 201:19, 202:10, 202:16, 203:19, 204:8, 204:21, 205:2, 205:4, 205:18, 216:22, 230:17, 232:3, 232:4, 251:11, 259:17, 263:19, 263:21, 274:13, 276:13, 278:20, 279:19, 282:14, 283:1, 284:23, 284:24, 285:14, 285:17, 285:20, 285:21, 285:24, 286:7, 286:11, 286:12, 289:2, 289:5, 289:18
**loaned** [1] - 202:3
**loaning** [1] - 192:11
**loans** [25] - 172:23, 173:24, 174:10, 179:2, 179:4, 193:5, 200:8, 201:21, 202:15, 215:23, 255:23, 281:7, 281:25, 282:12, 282:16, 282:24, 283:20, 283:21, 284:17, 284:20, 285:1, 285:3, 285:5, 285:10, 291:12
**locals** [3] - 273:14, 273:17, 273:18
**look** [13] - 211:5, 220:25, 240:6, 252:17, 258:4, 263:2, 271:2, 273:25, 276:4, 280:19, 283:11, 287:8, 295:7
**looked** [1] - 273:16
**looking** [12] - 174:6, 184:22, 184:23, 198:13, 212:2, 212:19, 229:9, 236:18, 238:25, 239:11, 244:21, 285:10
**looks** [1] - 248:23
**LOR** [3] - 181:15, 181:25, 187:11
**Los** [2] - 260:11, 268:13
**loss** [2] - 255:19, 268:8
**lost** [1] - 188:20
**lower** [1] - 193:2
**Lucas** [20] - 168:14, 170:25, 178:21, 181:3, 197:14, 199:17, 203:1, 203:22, 223:24, 253:8, 268:13, 268:19, 269:1, 275:17, 282:11, 285:8, 285:14, 286:1, 290:25
**lunch** [2] - 245:22, 256:3
**luncheon** [1] - 246:15
**lying** [1] - 205:17
**lynching** [1] - 263:20

# M

**ma'am** [5] - 178:2, 189:18,

227:2, 235:22, 237:20
**MADELINE** [1] - 163:16
**Madeline** [1] - 165:8
**Magence** [2] - 249:16, 250:2
**mail** [74] - 175:9, 198:14, 199:2, 199:5, 199:10, 199:19, 199:24, 199:25, 200:6, 200:12, 208:12, 208:22, 209:4, 209:23, 210:13, 212:20, 213:11, 213:20, 213:22, 213:24, 215:1, 215:7, 215:8, 216:1, 216:12, 216:17, 217:4, 217:13, 217:17, 217:22, 218:24, 219:8, 226:18, 226:24, 229:1, 229:6, 230:24, 231:8, 232:11, 238:25, 240:7, 241:2, 241:17, 242:24, 242:25, 243:16, 248:25, 250:19, 253:2, 253:5, 253:6, 256:4, 256:16, 271:3, 271:7, 280:22, 280:25, 281:4, 281:8, 281:12, 281:15, 285:23, 286:10, 287:11, 288:2, 288:14, 290:14, 290:15, 290:16, 290:20, 290:21, 290:22, 290:23, 291:2
**mailing** [1] - 235:25
**mails** [18] - 180:14, 180:16, 180:17, 180:20, 181:8, 209:9, 210:21, 211:6, 215:15, 218:18, 220:7, 221:23, 241:6, 286:14, 290:16, 290:20, 290:21, 291:10
**majority** [1] - 181:8
**Makika** [17] - 173:20, 173:23, 174:7, 174:13, 174:25, 175:22, 176:1, 178:17, 178:20, 187:15, 202:15, 203:7, 272:17, 272:18, 283:19, 284:14, 284:24
**managed** [1] - 234:25
**Management** [7] - 181:15, 181:25, 187:11, 187:19, 193:23, 239:25, 266:3
**management** [2] - 217:14, 240:4
**managers** [1] - 267:7
**managing** [8] - 210:6, 212:6, 212:9, 212:10, 212:13, 238:17, 287:19, 288:10
**Manfredi** [4] - 186:20, 238:21, 240:18, 242:18
**manfredi** [1] - 188:13

**Manfredi's** [1] - 240:16
**manner** [1] - 278:11
**Mar** [13] - 184:25, 253:8, 255:17, 268:13, 268:19, 268:25, 283:13, 284:20, 284:23, 284:25, 285:7, 285:15, 286:1
**March** [15] - 168:18, 186:1, 186:7, 195:11, 196:4, 196:11, 211:17, 228:12, 228:14, 228:24, 231:8, 231:16, 265:22, 291:16
**Mark** [1] - 283:17
**marked** [25] - 185:19, 210:12, 211:2, 228:19, 230:22, 235:3, 238:24, 239:3, 239:11, 243:14, 244:20, 248:15, 248:22, 250:14, 250:16, 252:3, 253:1, 258:14, 258:16, 261:14, 263:12, 265:16, 286:16, 290:10, 290:13
**marketing** [1] - 275:20
**Markowitz** [15] - 171:18, 171:19, 174:18, 174:21, 197:20, 197:23, 198:8, 199:21, 208:21, 209:8, 210:22, 211:16, 228:16, 231:12, 287:13
**markowitz'** [1] - 210:24
**Mary** [1] - 164:20
**materiality** [2] - 167:1, 169:8
**math** [1] - 193:11
**matter** [5] - 204:2, 250:6, 253:19, 253:24, 279:23
**Matter** [1] - 296:18
**matters** [3] - 270:17, 271:7, 296:9
**Mattias** [3] - 234:16, 265:21, 282:8
**McKee** [2] - 243:19, 243:24
**mean** [4] - 182:21, 232:18, 281:25, 293:6
**meaning** [1] - 263:20
**mechanical** [1] - 164:25
**mediated** [1] - 268:20
**mediation** [2] - 253:11, 268:22
**member** [18] - 210:6, 212:6, 212:9, 212:10, 212:14, 230:5, 238:17, 238:18, 240:1, 240:4, 240:5, 240:11, 241:9, 242:4, 242:17, 242:25, 287:20, 288:10
**members** [9] - 174:16, 182:5, 183:12, 211:15, 218:1, 218:19, 238:22, 240:18, 267:17

**memorandum** [1] - 282:21
**Memorial** [1] - 163:21
**memorialization** [1] - 215:15
**memorialize** [1] - 217:13
**memorialized** [1] - 217:3
**mentioned** [1] - 249:2
**message** [8] - 207:10, 207:13, 261:12, 264:23, 265:21, 267:11, 268:1, 268:3
**messages** [9] - 205:20, 207:1, 261:20, 261:24, 262:10, 262:12, 263:7, 263:15, 268:5
**messaging** [1] - 207:12
**met** [1] - 275:25
**Mexican** [4] - 174:19, 200:18, 280:23, 283:1
**Mexico** [11] - 181:15, 184:7, 187:10, 201:10, 202:7, 202:9, 202:18, 219:15, 228:11, 260:12, 291:13
**MI** [1] - 268:20
**Michael** [3] - 263:16, 263:22, 270:10
**middle** [1] - 253:5
**might** [1] - 221:2
**Mill** [8] - 232:14, 232:24, 233:2, 233:15, 234:11, 236:7, 236:9, 273:14
**mill** [1] - 273:21
**million** [84] - 172:13, 172:14, 173:5, 181:12, 181:24, 182:10, 182:11, 182:17, 183:15, 183:19, 184:8, 187:5, 187:10, 187:12, 189:16, 190:2, 190:18, 191:13, 191:20, 192:3, 193:10, 193:11, 193:13, 193:14, 193:15, 193:16, 193:20, 193:21, 194:16, 194:17, 194:21, 195:2, 195:14, 195:16, 195:17, 195:18, 195:22, 195:23, 196:14, 197:13, 197:18, 197:24, 199:15, 200:22, 201:1, 201:9, 201:14, 201:16, 201:24, 202:1, 202:5, 202:10, 205:11, 205:15, 205:18, 206:6, 214:15, 225:22, 226:8, 226:12, 226:14, 226:15, 226:16, 226:22, 227:13, 227:16, 255:19, 255:24, 255:25, 258:25, 259:1, 260:3, 260:4, 260:7, 275:18, 281:2, 281:5, 282:2, 284:5, 285:17,

285:19
**million-and-a-half** [3] - 172:13, 172:14, 191:13
**millions** [1] - 176:25
**mind** [2] - 247:11, 269:12
**mine** [1] - 196:17
**Mineola** [1] - 164:3
**minimum** [1] - 177:8
**minus** [3] - 193:20, 195:18, 284:4
**minute** [1] - 292:12
**minutes** [7] - 169:2, 239:6, 246:8, 292:3, 292:6, 293:21, 293:22
**misappropriated** [2] - 254:11, 257:7
**misspoken** [1] - 206:25
**mitigation** [1] - 268:22
**moment** [3] - 169:5, 245:12, 287:3
**Monday** [30] - 170:3, 170:4, 170:15, 173:4, 179:23, 180:13, 181:7, 197:11, 202:21, 204:12, 208:4, 216:7, 220:10, 220:17, 220:24, 221:13, 221:21, 222:3, 229:25, 230:3, 232:13, 233:11, 235:5, 235:10, 235:16, 243:5, 243:8, 253:20, 273:25, 294:2
**monetary** [1] - 247:20
**money** [44] - 170:24, 172:22, 173:17, 174:24, 175:21, 176:4, 178:14, 178:16, 178:19, 179:15, 181:10, 181:11, 181:16, 184:24, 186:16, 186:18, 187:22, 192:10, 194:4, 200:5, 201:3, 201:7, 201:19, 215:20, 219:14, 234:4, 235:15, 237:18, 239:25, 253:15, 257:16, 259:20, 260:16, 261:1, 263:24, 264:3, 278:4, 278:5, 282:23, 283:21, 285:9, 285:25
**monies** [8] - 172:16, 172:17, 172:19, 172:25, 173:1, 257:5, 257:21, 283:25
**month** [1] - 196:16
**months** [9] - 186:10, 191:8, 191:18, 195:20, 197:25, 198:4, 199:24, 227:23, 250:24
**Moreau** [4] - 247:13, 248:13, 249:3, 249:25
**morning** [7] - 165:10, 165:11, 165:14, 165:15,

165:18, 204:10, 292:10
**mortgage** [1] - 250:1
**most** [1] - 233:6
**motion** [2] - 274:5, 284:8
**move** [9] - 166:10, 178:12, 194:12, 203:23, 249:5, 251:13, 255:5, 262:6, 264:15
**MR** [118] - 165:12, 165:15, 166:19, 167:8, 167:20, 168:24, 169:15, 169:23, 170:5, 178:7, 190:4, 198:17, 198:22, 203:16, 203:25, 211:20, 211:22, 219:21, 220:25, 224:8, 229:15, 229:22, 231:4, 231:5, 236:14, 236:15, 240:23, 240:24, 242:3, 242:6, 244:14, 244:16, 245:16, 245:17, 245:24, 246:2, 246:7, 246:11, 246:14, 247:8, 248:17, 248:21, 249:5, 249:9, 249:12, 251:13, 251:16, 251:18, 252:6, 252:8, 252:12, 254:20, 255:2, 255:5, 255:8, 255:11, 257:8, 258:15, 259:12, 260:18, 262:6, 262:16, 262:22, 263:11, 264:15, 265:1, 265:4, 265:10, 265:15, 267:1, 269:2, 269:4, 269:7, 269:13, 269:16, 269:19, 269:24, 276:2, 276:15, 276:18, 276:21, 280:14, 280:15, 281:14, 281:19, 281:22, 283:9, 286:19, 286:24, 287:2, 287:22, 288:5, 288:17, 289:11, 289:14, 289:23, 290:8, 292:1, 292:5, 292:9, 292:12, 292:25, 293:18, 293:22, 294:1, 294:9, 294:10, 294:13, 294:24, 295:11, 295:12, 295:14, 295:22, 296:5, 296:8, 296:12, 297:11, 297:13
**MS** [80] - 165:7, 166:9, 166:14, 166:18, 167:21, 168:17, 168:22, 169:24, 170:9, 170:14, 172:9, 178:4, 178:13, 190:2, 194:14, 198:9, 198:12, 199:1, 203:17, 203:23, 204:14, 204:15, 208:3, 209:14, 209:16, 211:1, 211:4, 211:18, 212:1, 220:9, 221:10, 221:11, 223:1, 229:13, 230:21,

231:2, 235:2, 236:12, 238:23, 239:8, 239:20, 240:9, 240:21, 243:6, 244:9, 244:12, 244:19, 245:12, 245:15, 245:20, 249:8, 251:15, 253:16, 254:4, 255:3, 255:7, 259:10, 262:8, 264:17, 264:21, 265:8, 265:13, 269:6, 276:17, 280:6, 281:17, 282:17, 283:4, 286:23, 287:21, 288:6, 288:21, 289:21, 291:19, 294:20, 295:19, 295:25, 296:14, 297:8, 297:15
**multitude** [1] - 191:2
**Murray** [5] - 168:12, 201:13, 277:16, 278:5, 279:24
**Murray's** [1] - 201:11
**museum** [1] - 273:20
**must** [1] - 281:24
**myerick** [1] - 168:2

### N

**Najam** [39] - 171:17, 174:19, 184:25, 197:20, 197:22, 198:8, 199:5, 199:7, 199:10, 199:21, 200:1, 200:4, 200:6, 200:18, 208:21, 209:2, 209:9, 209:10, 210:2, 212:20, 213:12, 214:1, 214:5, 214:18, 215:16, 215:19, 215:23, 219:9, 228:17, 280:23, 281:1, 281:9, 281:10, 282:1, 282:6, 282:9, 287:11, 287:19, 288:2
**Najam's** [3] - 214:2, 216:1, 288:3
**name** [9] - 230:4, 234:14, 235:23, 240:17, 253:4, 270:10, 271:17, 274:12, 279:4
**named** [1] - 253:7
**names** [1] - 224:23
**Nat** [1] - 252:22
**nature** [2] - 271:23, 287:4
**necessarily** [1] - 198:18
**necessary** [1] - 174:16
**necessity** [1] - 204:3
**need** [12] - 176:24, 189:19, 190:7, 213:12, 213:21, 215:4, 234:2, 293:16, 293:18, 295:16, 295:23
**needed** [4] - 200:8, 208:24, 282:5, 282:11

**needs** [1] - 219:23
**negotiate** [2] - 189:7, 234:21
**negotiated** [11] - 188:25, 190:19, 194:23, 195:7, 195:8, 195:18, 197:5, 197:6, 197:9, 233:25, 234:19
**negotiating** [2] - 190:13, 285:22
**neighborhood** [4] - 172:13, 191:12, 194:22, 194:25
**net** [1] - 284:24
**Nevada** [1] - 201:11
**never** [17] - 200:20, 201:2, 206:16, 207:7, 219:10, 233:18, 238:18, 240:5, 240:10, 242:25, 274:22, 274:23, 285:16, 286:15, 290:23
**never-ending** [1] - 290:23
**NEW** [1] - 163:1
**new** [14] - 173:22, 204:10, 208:23, 208:24, 210:18, 211:15, 212:25, 213:12, 213:18, 214:22, 215:3, 215:9, 215:12, 216:2
**New** [3] - 163:6, 163:15, 164:21
**Newman** [1] - 273:19
**next** [8] - 222:24, 229:10, 240:20, 246:16, 261:5, 266:7, 294:22
**nexus** [2] - 270:15, 271:6
**night** [1] - 296:17
**Nolan** [6] - 168:9, 177:5, 205:3, 205:19, 205:21, 205:25, 206:11, 207:16, 276:10
**Nolan's** [4] - 204:17, 204:22, 207:6, 256:19
**none** [7] - 191:20, 215:23, 232:3, 270:20, 271:10, 275:25, 283:20
**nonetheless** [1] - 225:20
**Norstrom** [4] - 202:8, 202:11, 265:21, 265:22
**norstrom** [2] - 265:24, 266:2
**Norstrum** [3] - 234:16, 267:2, 282:8
**Norstrum's** [1] - 268:7
**Northern** [7] - 176:4, 176:6, 177:20, 193:7, 205:19, 206:2, 207:20
**not-for-profit** [1] - 234:2
**notation** [1] - 284:14
**note** [6] - 180:7, 180:19, 180:21, 200:13, 205:3,

292:15
**notes** [5] - 252:13, 252:19, 257:20, 259:7, 260:25
**nothing** [8] - 216:10, 235:12, 260:16, 268:11, 268:18, 268:24, 268:25, 296:14
**notified** [2] - 231:22, 232:11, 233:24, 248:11, 285:16
**notify** [4] - 176:13, 176:24, 178:2, 179:10
**notifying** [1] - 175:5
**November** [2] - 227:8, 256:17
**number** [16] - 167:23, 189:23, 195:5, 197:15, 197:17, 200:17, 228:4, 229:10, 234:8, 234:9, 234:12, 256:8, 262:10, 262:13, 262:25
**Number** [1] - 229:7
**numbers** [5] - 199:23, 258:25, 259:13, 284:16, 291:5
**NY** [3] - 163:22, 164:3, 164:7

### O

**O'Connor** [1] - 165:8
**O'CONNOR** [1] - 163:16
**oath** [3] - 166:7, 276:24, 278:11
**object** [3] - 219:21, 255:2, 257:1
**objection** [67] - 166:15, 166:19, 167:1, 167:6, 167:16, 170:4, 170:5, 197:22, 211:21, 211:22, 224:8, 229:15, 229:20, 229:22, 231:4, 231:5, 236:14, 236:15, 240:23, 240:24, 242:7, 244:15, 244:16, 245:16, 245:17, 249:7, 249:8, 251:15, 251:16, 253:16, 254:4, 255:3, 255:6, 255:7, 255:8, 257:8, 259:10, 262:9, 262:16, 262:19, 263:9, 264:17, 264:25, 265:1, 265:8, 265:13, 269:6, 269:7, 276:17, 276:18, 280:6, 280:14, 281:17, 281:18, 281:19, 282:17, 283:4, 286:22, 286:23, 286:24, 287:21, 288:4, 289:19, 293:6, 293:8
**objections** [5] - 169:7, 293:2, 293:7, 293:17,

296:7
**obligation** [1] - 179:12
**observations** [1] - 254:10
**obviously** [4] - 215:9, 237:2, 292:15, 296:6
**occasion** [1] - 177:19
**occasions** [4] - 230:4, 231:24, 249:18, 289:5
**occur** [2] - 208:14, 278:22
**occurred** [6] - 167:10, 180:7, 180:9, 180:12, 281:9, 295:2
**occurring** [2] - 175:6, 286:6
**ocean** [1] - 190:15
**Oceanside** [1] - 164:7
**October** [1] - 260:12
**OF** [3] - 163:1, 163:3, 163:10
**offer** [7] - 211:18, 229:13, 231:2, 236:12, 240:21, 276:15, 281:15
**offered** [4] - 169:10, 278:6, 280:12, 287:23
**offering** [5] - 170:24, 244:11, 244:12, 245:14, 245:15
**office** [3] - 224:14, 235:21, 248:11
**officer** [1] - 186:19
**official** [1] - 258:16
**Old** [1] - 164:3
**OLIVERAS** [28] - 164:6, 247:8, 248:17, 248:21, 249:5, 249:12, 251:13, 251:18, 252:6, 252:8, 252:12, 254:20, 255:5, 255:11, 258:15, 259:12, 262:6, 262:22, 263:11, 264:15, 265:4, 265:10, 265:15, 267:1, 269:2, 269:4, 269:13, 297:11
**Oliveras** [2] - 165:16, 246:3
**once** [6] - 171:24, 175:21, 177:8, 284:21, 293:1, 296:3
**One** [1] - 163:21
**one** [40] - 171:11, 174:14, 175:16, 175:17, 176:7, 177:5, 177:16, 179:13, 189:6, 193:13, 193:15, 193:16, 193:20, 201:22, 203:6, 203:7, 203:8, 215:12, 216:12, 225:8, 225:13, 225:20, 229:17, 234:14, 234:16, 244:9, 244:11, 244:15, 245:12, 247:14, 254:9, 258:16, 263:3, 266:4, 276:1, 276:9, 287:7, 290:8, 292:21

**one-and-a-half** [1] - 193:20
**ones** [1] - 234:13
**open** [3] - 190:6, 207:8, 210:23
**operated** [1] - 270:23
**operating** [7] - 176:10, 185:7, 186:19, 198:5, 199:17, 211:12, 211:15, 214:10, 227:20, 227:21, 227:22, 228:1, 228:23, 229:1, 229:9, 229:10, 284:5
**opportune** [2] - 221:3, 295:8
**opportunity** [1] - 170:23
**oral** [2] - 275:17, 295:3
**ordeal** [1] - 205:25
**order** [4] - 174:13, 174:15, 208:14, 252:9
**ordered** [6] - 202:23, 203:4, 203:6, 203:7, 205:16
**original** [9] - 171:25, 179:4, 185:22, 186:8, 188:3, 225:18, 236:20, 240:19, 261:7
**originally** [5] - 181:3, 216:8, 240:16, 272:21, 283:24
**otherwise** [3] - 229:20, 242:17, 285:18
**ought** [1] - 289:15
**outlined** [1] - 205:22
**outside** [2] - 172:2, 258:24
**outstanding** [10] - 183:2, 183:4, 192:20, 202:13, 203:14, 259:24, 284:6, 285:11, 285:13, 294:19
**overall** [1] - 220:5
**overrule** [1] - 178:5
**overruled** [6] - 253:17, 263:9, 264:24, 280:7, 282:18, 283:5
**oversight** [1] - 286:21
**owe** [4] - 182:25, 203:12, 205:12, 205:14
**owed** [8] - 172:16, 172:17, 172:19, 183:1, 187:22, 199:11, 214:14, 215:19
**Owen** [1] - 204:16
**own** [10] - 172:4, 172:7, 189:9, 244:5, 257:20, 259:7, 260:9, 261:4, 261:11, 291:7
**owned** [3] - 243:20, 243:24, 244:5
**owner** [7] - 220:11, 220:19, 224:20, 225:9, 225:21, 226:2, 230:8
**owner's** [1] - 235:23

**owners** [1] - 225:2
**ownership** [6] - 181:2, 212:2, 242:18, 244:8, 260:11, 267:3
**owns** [2] - 260:13, 260:14

**P**

**package** [1] - 198:1
**page** [18] - 167:22, 169:16, 177:16, 198:7, 220:24, 221:21, 222:24, 226:1, 226:4, 229:6, 230:11, 230:12, 235:9, 236:18, 239:23, 246:16, 266:7, 274:12
**Page** [2] - 297:3, 297:18
**pages** [5] - 167:24, 170:1, 196:9
**paid** [29] - 183:14, 183:25, 184:1, 184:4, 184:11, 186:10, 189:3, 189:6, 191:5, 194:16, 194:21, 195:18, 196:23, 197:3, 230:17, 231:13, 232:4, 232:19, 233:1, 235:6, 248:2, 249:25, 259:22, 260:4, 260:8, 281:3, 285:3, 285:25, 288:12
**Palms** [5] - 243:20, 247:15, 249:4, 271:5, 293:14
**panel** [2] - 206:7, 206:15
**paper** [1] - 257:20
**papers** [1] - 207:14
**paperwork** [2] - 205:22, 223:8
**paragraph** [9] - 239:23, 240:2, 240:6, 241:24, 242:1, 242:5, 242:8, 274:1, 274:10
**parcel** [10] - 182:2, 188:11, 189:2, 189:9, 190:12, 190:16, 190:17, 191:7, 191:18, 204:21
**parcels** [3] - 191:11, 191:12, 197:8
**pardon** [1] - 205:13
**part** [26] - 178:3, 178:8, 181:2, 182:2, 190:21, 193:25, 196:19, 197:3, 204:20, 204:22, 205:9, 206:16, 207:20, 242:2, 253:4, 253:11, 263:19, 268:3, 268:4, 272:14, 279:5, 284:2, 285:24, 291:13, 291:15, 292:18
**partake** [1] - 282:25
**partial** [1] - 177:6
**particular** [7] - 167:17,

**owners** column continues:
262:11, 270:21, 271:3, 271:7, 274:19, 277:17
**parties** [5] - 197:10, 282:23, 294:15, 294:17, 295:7
**partner** [2] - 189:8, 259:24
**partners** [2] - 203:20, 282:9
**Partners** [1] - 238:5
**partnership** [1] - 197:4
**party** [3] - 187:22, 277:22, 279:17
**Patriot** [1] - 219:15
**Pause** [1] - 261:17
**pay** [24] - 171:16, 179:18, 182:12, 184:19, 186:9, 190:24, 191:4, 191:15, 195:17, 195:22, 202:23, 203:1, 203:4, 203:20, 203:22, 205:16, 208:16, 234:22, 237:15, 249:16, 249:21, 250:6, 272:15, 286:6
**payable** [1] - 285:5
**paydown** [1] - 285:19
**paying** [13] - 188:22, 191:17, 192:18, 192:23, 192:24, 194:15, 210:20, 213:16, 214:12, 232:14, 235:11, 287:16, 287:18
**payment** [7] - 171:11, 233:5, 248:12, 249:19, 250:1, 259:3
**payments** [8] - 183:24, 193:25, 232:16, 232:22, 232:23, 233:6, 251:1, 251:8
**payoffs** [1] - 287:16
**payout** [2] - 291:13, 291:16
**pays** [1] - 203:19
**Peca** [16] - 177:5, 243:8, 243:12, 243:17, 243:20, 243:24, 244:6, 244:22, 244:23, 244:25, 263:16, 263:18, 263:23, 270:10, 271:5, 271:13
**Peca's** [1] - 270:12
**penalties** [4] - 188:22, 188:25, 189:3, 236:21
**pending** [1] - 209:19
**Penthouse** [1] - 271:5
**people** [1] - 219:4
**per** [2] - 189:4, 222:21
**perceive** [1] - 269:20
**percent** [82] - 182:3, 182:7, 182:23, 183:1, 183:8, 183:11, 184:2, 184:5, 184:14, 188:19, 192:5, 192:7, 192:8, 192:9, 192:11, 192:17, 193:2,

205:10, 210:3, 216:8, 216:11, 216:15, 217:20, 217:23, 217:24, 217:25, 218:2, 218:5, 218:6, 218:9, 218:10, 218:13, 218:14, 218:16, 218:20, 218:21, 218:22, 219:4, 219:6, 219:12, 219:17, 219:18, 219:19, 220:3, 220:4, 220:6, 220:11, 220:12, 220:13, 220:15, 220:16, 220:17, 221:14, 221:19, 221:23, 222:6, 222:10, 222:13, 222:17, 222:20, 223:3, 223:7, 223:10, 223:11, 223:12, 223:16, 223:18, 223:20, 224:6, 224:15, 226:15, 245:9, 252:2, 266:4
**percentage** [1] - 192:18, 192:23, 193:8, 212:2, 216:13
**percentages** [5] - 212:3, 212:11, 216:19, 216:24, 217:9
**perhaps** [4] - 166:20, 220:25, 276:1, 294:21
**period** [11] - 180:3, 180:8, 184:2, 196:16, 196:18, 204:5, 206:11, 236:19, 236:20, 237:1, 242:21
**peripheral** [1] - 260:25
**permitting** [2] - 186:14, 280:25
**person** [3] - 175:25, 219:5, 277:10
**personal** [1] - 202:16
**personally** [5] - 172:20, 179:8, 201:15, 205:14, 272:21
**persons** [1] - 289:17
**persuaded** [1] - 216:21
**pessimistic** [1] - 294:5
**PGA** [1] - 275:21
**Phil** [13] - 165:13, 199:11, 212:23, 236:1, 247:9, 247:11, 269:25, 276:4, 278:9, 279:1, 283:11, 285:1
**PHIL** [2] - 166:1, 297:6
**PHILLIP** [1] - 163:7
**phn** [1] - 202:17
**phone** [6] - 170:23, 216:17, 217:5, 217:13, 241:7, 262:10
**photocopy** [1] - 276:12
**physically** [3] - 168:25, 169:2, 205:24
**piece** [2] - 256:1, 257:20
**PK** [4] - 210:10, 210:11,

261:5, 261:9
**place** [1] - 254:25
**plaintiffs** [5] - 203:6, 203:7, 203:8, 224:25, 280:1
**plan** [1] - 248:18
**planning** [2] - 191:9, 273:18
**plantation** [1] - 273:21
**player** [2] - 174:9, 273:7
**players** [1] - 218:5
**Plaza** [2] - 163:15, 164:20
**pleading** [1] - 271:22
**plus** [2] - 282:2, 284:4
**point** [29] - 167:4, 169:9, 169:18, 169:20, 171:3, 171:9, 172:11, 184:7, 184:23, 188:15, 188:19, 191:6, 191:14, 200:21, 201:1, 208:20, 239:18, 246:15, 248:3, 259:22, 263:25, 275:13, 275:25, 280:13, 287:15, 287:17, 292:5, 292:17, 293:24
**pointing** [1] - 167:6
**portion** [9] - 167:17, 168:18, 191:23, 205:1, 212:19, 216:3, 219:17, 238:20, 260:14
**portions** [2] - 166:22, 169:21
**position** [15] - 171:7, 171:23, 172:1, 172:5, 172:7, 179:20, 182:7, 183:13, 217:16, 222:1, 223:11, 223:12, 224:15, 282:10, 295:7
**positions** [1] - 267:8
**positive** [4] - 182:7, 183:13, 184:6, 184:14
**possession** [4] - 202:12, 205:24, 280:3, 280:9
**possible** [1] - 196:15
**post** [1] - 229:19
**power** [10] - 173:13, 173:16, 175:2, 175:4, 175:10, 175:12, 175:17, 175:18, 176:4, 265:25
**practice** [1] - 175:14
**pre** [1] - 191:11
**pre-registered** [1] - 191:11
**preclude** [1] - 204:3
**preferred** [1] - 224:15
**preparation** [2] - 207:5, 267:13
**prepare** [1] - 272:10
**prepared** [4] - 176:7, 211:16, 252:14, 294:4
**preparing** [1] - 297:12
**present** [4] - 165:19, 277:3, 277:20, 294:22

**presented** [1] - 277:24
**presentence** [1] - 296:10
**pretrial** [3] - 220:8, 279:12, 291:4
**previous** [1] - 267:7
**previously** [7] - 166:2, 169:24, 201:18, 222:16, 249:2, 250:6, 285:18
**primarily** [1] - 172:18
**principal** [1] - 285:13
**printout** [1] - 235:20
**private** [4] - 265:23, 267:8, 267:15, 267:24
**problem** [3] - 216:21, 258:18, 265:12
**problems** [3] - 215:16, 253:12, 257:16
**proceeding** [13] - 168:10, 198:23, 251:23, 269:21, 271:18, 271:24, 272:6, 276:25, 278:9, 278:10, 278:19, 280:1, 283:23
**Proceedings** [1] - 164:25
**proceedings** [2] - 261:17, 289:25
**PROCEEDINGS** [1] - 163:10
**proceeds** [11] - 187:6, 187:18, 195:16, 195:22, 196:19, 201:12, 233:12, 233:16, 233:20, 234:1, 237:23
**process** [4] - 170:25, 185:8, 282:1, 282:25
**produce** [1] - 206:14
**produced** [5] - 164:25, 229:2, 264:20, 268:4, 274:24
**producing** [1] - 167:23
**production** [7] - 220:8, 268:2, 279:13, 280:10, 291:6, 291:8
**professional** [1] - 275:21
**proffered** [1] - 169:4
**profit** [2] - 183:11, 234:2
**prohibit** [1] - 232:9
**project** [34] - 171:1, 179:16, 181:3, 184:22, 186:16, 192:2, 203:1, 203:22, 204:23, 217:11, 217:15, 218:3, 218:7, 220:5, 221:24, 222:11, 223:13, 223:20, 226:7, 227:23, 234:24, 253:8, 255:20, 260:7, 271:8, 272:19, 273:10, 281:6, 282:11, 283:2, 285:7, 285:8, 285:15, 290:25
**projected** [1] - 275:19
**projects** [2] - 188:17, 286:4

**promise** [1] - 171:25
**promised** [1] - 179:13
**promissory** [9] - 171:14, 179:22, 180:7, 180:19, 180:21, 180:24, 200:13, 205:3, 213:19
**proper** [1] - 217:6
**Properties** [17] - 200:21, 210:3, 211:9, 211:13, 212:3, 212:6, 213:4, 216:7, 216:14, 217:19, 217:23, 217:25, 219:18, 220:4, 230:1, 230:6, 230:7
**properties** [8] - 201:6, 229:17, 229:18, 232:19, 245:3, 245:7, 268:17, 288:11
**Properties'** [1] - 222:8
**Property** [1] - 218:19
**property** [39] - 185:4, 185:11, 188:20, 190:19, 191:21, 191:24, 216:20, 232:14, 232:15, 232:21, 232:24, 233:2, 233:5, 233:8, 233:12, 233:15, 234:1, 234:11, 234:21, 235:23, 236:6, 236:7, 236:8, 236:9, 236:10, 236:20, 236:25, 237:8, 237:11, 237:17, 237:25, 240:15, 242:19, 256:1, 260:11, 272:24, 273:14, 273:22, 281:6
**Propiedades** [8] - 173:8, 173:17, 181:10, 181:12, 181:14, 181:25, 187:11
**prosecutor** [1] - 256:3
**prove** [1] - 292:23
**proved** [1] - 293:10
**provide** [3] - 207:15, 238:9, 247:20
**provided** [7] - 169:24, 171:6, 185:9, 206:10, 258:1, 268:4, 274:18
**providing** [1] - 248:12
**provision** [2] - 245:2, 285:12
**provisions** [1] - 179:5
**PSR** [4] - 293:2, 293:7, 293:10, 296:7
**purchase** [12] - 179:2, 182:1, 185:4, 185:10, 188:3, 188:15, 190:18, 237:25, 240:17, 240:19, 247:14, 272:23
**purchased** [5] - 189:9, 240:15, 242:19, 260:10, 267:4
**purchases** [1] - 267:16
**purchasing** [2] - 267:4,

282:22
**purpose** [5] - 171:20, 200:9, 225:18, 237:24, 260:18
**purposes** [4] - 167:11, 168:24, 274:3, 283:1
**pursuant** [3] - 171:5, 234:1, 285:20
**pursuing** [1] - 286:4
**put** [19] - 172:10, 172:15, 199:15, 199:16, 200:22, 200:23, 208:24, 209:2, 209:24, 210:14, 222:19, 226:25, 241:20, 274:25, 283:17, 285:12, 292:15, 293:12, 293:17
**putting** [2] - 233:24, 264:3

# Q

**QUESTION** [3] - 257:25, 258:4, 258:8
**questioning** [1] - 166:10
**questions** [10] - 167:18, 203:25, 204:3, 213:2, 213:5, 213:23, 239:22, 245:21, 269:2, 291:19
**quick** [1] - 280:15
**quite** [1] - 232:6
**quote** [3] - 253:19, 288:12, 288:13
**quotes** [1] - 177:15

# R

**raise** [4] - 197:22, 237:15, 237:18, 239:25
**raised** [3] - 206:18, 223:24, 235:15
**raising** [2] - 186:16, 234:4
**rate** [2] - 192:5, 192:23
**rates** [1] - 193:4
**rather** [3] - 198:22, 281:25, 282:15
**re** [1] - 262:12
**re-created** [1] - 262:12
**read** [7] - 210:1, 220:22, 271:3, 274:18, 276:22, 288:8, 289:20
**readable** [2] - 287:4, 287:24
**readily** [1] - 287:23
**reading** [3] - 242:12, 262:1, 287:25
**reads** [1] - 277:7
**ready** [2] - 198:21, 287:4
**real** [12] - 177:15, 179:14, 179:16, 184:21, 232:14, 234:22, 235:6, 235:11,

236:20, 236:25, 273:11, 278:2
**realized** [2] - 230:3, 281:10
**reason** [9] - 188:9, 220:11, 220:17, 222:19, 223:15, 223:18, 224:3, 224:10, 287:22
**reasonable** [1] - 292:20
**recalled** [1] - 289:8
**receive** [3] - 184:2, 205:6, 288:14
**received** [14] - 199:25, 205:10, 211:7, 229:23, 231:16, 243:16, 245:6, 249:24, 251:11, 261:24, 262:4, 264:13, 280:10, 285:17
**receiving** [1] - 264:10
**recently** [4] - 205:20, 206:21, 206:23, 206:24
**Recess** [1] - 293:24
**recess** [4] - 221:5, 221:6, 246:15, 293:25
**recognize** [9] - 211:6, 228:21, 248:22, 250:16, 258:6, 261:18, 264:5, 264:8, 265:18
**recognizes** [1] - 284:22
**recollection** [2] - 206:5, 233:6
**recommendation** [1] - 273:10
**record** [10] - 165:6, 167:21, 168:1, 168:24, 170:2, 210:7, 257:25, 260:19, 276:23
**recorded** [1] - 164:25
**records** [9] - 177:5, 184:9, 189:13, 189:15, 193:7, 204:20, 209:12, 226:23, 284:5
**recovered** [3] - 205:21, 206:22, 206:23
**recross** [1] - 288:18
**RECROSS** [2] - 288:20, 297:14
**RECROSS-EXAMINATION** [2] - 288:20, 297:14
**REDIRECT** [2] - 269:23, 297:12
**redirect** [2] - 246:9, 269:15
**reduction** [2] - 194:24, 195:19
**refer** [3] - 185:17, 215:22, 282:11
**reference** [5] - 271:16, 274:16, 276:25, 282:13, 286:11
**referenced** [2] - 277:18,

281:7
**references** [1] - 285:23
**referencing** [1] - 263:18
**referred** [4] - 236:6, 257:22, 281:6, 290:2
**referring** [8] - 210:2, 256:13, 257:22, 258:9, 260:19, 274:11, 280:22, 287:3
**refers** [5] - 167:18, 216:13, 252:22, 271:4, 282:23
**refinance** [1] - 184:24
**reflect** [4] - 180:21, 217:6, 241:6, 260:5
**reflected** [4] - 181:2, 216:14, 223:7, 270:22
**reflecting** [1] - 278:10
**reflective** [1] - 284:17
**reflects** [2] - 199:19, 216:10
**regard** [11] - 170:15, 170:20, 173:19, 175:21, 180:14, 189:13, 215:2, 215:16, 232:13, 238:10, 290:13
**regarding** [5] - 167:3, 249:4, 251:20, 257:21, 259:3
**regardless** [1] - 192:20
**regards** [3] - 243:9, 247:21, 290:10
**registered** [1] - 191:11
**regularly** [1] - 234:17
**reimbursed** [1] - 272:12
**reiterating** [1] - 200:10
**related** [3] - 192:2, 253:3, 290:21
**relates** [5] - 169:3, 270:21, 274:19, 279:25, 284:13, 289:16, 293:8
**relating** [1] - 281:11, 290:20
**relationship** [3] - 271:6, 275:14, 275:23
**relevance** [1] - 166:25, 169:7
**relevancy** [4] - 167:6, 167:16, 214:7, 214:9
**relevant** [7] - 167:12, 169:21, 214:17, 214:25, 269:19, 269:20, 293:10
**remember** [9] - 170:17, 189:11, 222:3, 228:9, 250:17, 256:7, 263:8
**remembered** [1] - 289:1
**remembers** [1] - 264:22
**remind** [1] - 166:6
**reneged** [1] - 192:5
**renewals** [1] - 205:23
**repaid** [7] - 201:16, 249:13,

250:4, 250:12, 250:25, 251:4, 251:7
**repayment** [2] - 285:13, 286:11
**repeated** [2] - 204:11, 204:12
**repeating** [1] - 229:19
**repetitive** [1] - 281:23
**reply** [1] - 242:11
**report** [1] - 296:10
**Reporter** [1] - 164:20
**represent** [6] - 214:11, 214:14, 240:10, 242:24, 259:14, 259:16
**representation** [4] - 217:21, 262:3, 284:2, 285:2
**representations** [2] - 264:12, 271:12
**representative** [2] - 186:5, 186:6
**represented** [6] - 174:23, 201:12, 225:8, 225:20, 242:12, 283:22
**representing** [1] - 284:5
**reproduce** [1] - 274:15
**reproduced** [1] - 287:5
**request** [4] - 279:5, 284:3, 284:8, 292:20
**requested** [1] - 292:19
**requesting** [2] - 209:23, 210:14
**requests** [2] - 175:12, 177:7
**required** [7] - 176:14, 176:19, 177:24, 178:3, 198:23, 217:2, 217:14
**requiring** [1] - 266:2
**Research** [1] - 234:4, 235:15
**reserve** [2] - 167:5, 169:7
**reserving** [2] - 167:15, 290:1
**residence** [1] - 261:3
**resolve** [1] - 166:20
**resolved** [1] - 295:17
**respect** [10] - 198:18, 206:17, 208:12, 228:17, 254:2, 255:20, 268:18, 273:8, 282:10, 290:22
**respectfully** [1] - 178:9
**respond** [6] - 169:22, 214:18, 266:4, 290:14, 290:15, 294:18
**responded** [3] - 214:3, 216:6, 266:5
**responding** [2] - 239:22, 296:10
**response** [17] - 207:13, 213:13, 214:6, 214:20,

215:13, 216:3, 238:13, 240:2, 241:17, 250:21, 250:22, 250:23, 283:24, 288:15, 296:2, 296:3
**responses** [1] - 241:17
**responsible** [2] - 234:24, 234:25
**rest** [5] - 198:1, 202:17, 291:25, 292:9, 294:4
**resting** [1] - 294:7
**restitution** [1] - 293:4
**restrictions** [1] - 237:21
**result** [9] - 202:22, 205:17, 213:11, 214:12, 222:5, 229:19, 265:22, 286:5, 288:14
**resumes** [1] - 247:4
**retake** [1] - 165:22
**return** [5] - 177:6, 203:21, 209:12, 213:8, 216:3
**returned** [2] - 176:22, 177:4
**returns** [5] - 213:2, 213:23, 214:6, 214:19, 216:2
**review** [7] - 168:19, 169:11, 216:16, 219:4, 239:16, 241:14, 261:16
**reviewed** [9] - 189:13, 189:15, 193:6, 215:21, 219:8, 220:7, 228:22, 230:23, 235:4
**reviewing** [1] - 204:20
**revisit** [1] - 204:3
**revolving** [6] - 275:2, 276:13, 277:2, 277:11, 278:25, 285:4
**RICHARD** [1] - 163:22
**Richard** [1] - 165:12
**richard's** [1] - 257:6
**Rick** [1] - 253:7
**Ridley** [1] - 238:6
**right-hand** [1] - 258:21
**rise** [2] - 165:1, 221:7
**Road** [4] - 164:3, 210:8, 236:3, 236:8
**ROBERT** [1] - 163:14
**Robert** [11] - 275:8, 275:10, 275:14, 275:16, 275:22, 276:10, 277:9, 277:10, 278:16, 278:18, 279:2
**role** [2] - 287:20, 288:10
**Rosenthal** [1] - 252:22
**Ross** [3] - 249:17, 250:2, 253:7
**Ross'** [1] - 253:4
**rough** [1] - 193:11
**Roughly** [1] - 190:2
**Rucchin** [1] - 177:6
**Rule** [6] - 202:12, 210:25, 216:12, 220:8, 263:5,

295:3
**rule** [1] - 168:20
**rules** [2] - 234:2, 237:21

**S**

**Sag** [4] - 270:19, 270:25, 271:9, 272:20
**sale** [3] - 188:4, 233:25, 267:9
**sales** [1] - 275:20
**San** [20] - 168:14, 170:25, 178:21, 181:3, 197:14, 199:17, 203:1, 203:22, 223:24, 253:8, 268:13, 268:19, 268:25, 275:17, 282:11, 285:8, 285:14, 286:1, 290:25
**saw** [12] - 176:24, 198:7, 199:19, 200:20, 202:12, 207:5, 210:24, 216:12, 227:25, 264:1, 274:23, 279:12
**schedule** [3] - 293:19, 294:23, 295:8
**scheduled** [1] - 198:19
**scheduling** [1] - 292:13
**scheme** [3] - 248:4, 293:9, 293:14
**schemes** [1] - 293:12
**Schwab** [4] - 173:15, 175:3, 175:13, 175:19, 245:1, 270:9
**Scottsdale** [2] - 210:8, 236:4
**scripting** [1] - 214:1
**searching** [1] - 267:17
**seated** [3] - 165:2, 221:8, 247:3
**SEC** [9] - 168:8, 174:7, 201:20, 229:3, 229:4, 243:19, 243:23, 244:1, 244:4
**second** [4] - 226:1, 226:4, 250:21, 294:20
**secretly** [1] - 255:24
**secured** [1] - 272:7
**securities** [1] - 224:14
**see** [32] - 166:25, 189:22, 189:23, 194:8, 198:21, 199:12, 199:23, 213:6, 216:5, 216:14, 216:16, 221:22, 226:4, 228:2, 229:7, 229:11, 231:9, 231:14, 231:15, 231:22, 235:21, 236:22, 237:9, 252:20, 253:4, 271:22, 276:24, 283:6, 284:13, 287:7, 288:13, 290:6

**seeing** [2] - 267:13, 289:8
**seeks** [1] - 229:18
**seem** [3] - 189:11, 192:14
**seizure** [1] - 263:6
**sell** [4] - 233:12, 233:19, 235:13, 237:11
**seller** [7] - 175:22, 178:20, 181:11, 200:19, 204:17, 281:3, 282:3
**selling** [6] - 179:13, 184:21, 191:12, 234:11, 237:12, 266:3
**send** [3] - 187:9, 206:1, 248:3
**sense** [4] - 222:23, 242:22, 251:9, 293:5
**sensitive** [1] - 273:13
**sent** [42] - 175:13, 175:22, 176:7, 176:21, 178:14, 178:16, 178:17, 181:14, 181:20, 181:24, 182:2, 184:7, 187:15, 187:19, 187:22, 192:4, 193:10, 193:11, 193:13, 199:3, 207:13, 207:18, 208:12, 208:21, 211:6, 217:12, 228:9, 228:24, 230:24, 239:1, 241:2, 244:23, 248:25, 261:11, 261:21, 261:22, 262:14, 265:24, 266:5, 280:23, 284:6, 288:2
**sentencing** [1] - 293:15
**separate** [10] - 172:23, 172:25, 197:2, 197:4, 197:6, 206:18, 231:24, 250:6, 260:15, 278:4
**September** [2] - 244:25, 270:11
**sequence** [1] - 261:6
**sequential** [1] - 263:4
**series** [2] - 210:21, 261:20
**set** [13] - 173:22, 173:23, 174:1, 174:5, 174:8, 183:24, 213:12, 213:18, 215:10, 215:12, 216:2, 272:17, 272:21
**setting** [4] - 214:9, 214:21, 215:2, 215:18
**settle** [1] - 253:12
**settlement** [2] - 237:18, 253:15
**Settlement** [6] - 251:21, 254:3, 270:19, 270:25, 271:9, 272:20
**seven** [6] - 180:1, 189:6, 189:16, 190:1, 199:15, 283:7
**several** [9] - 166:11, 174:18, 213:15, 218:1,

228:9, 230:4, 232:19, 232:21, 249:18
**sheet** [3] - 283:13, 283:16, 284:18
**shell** [2] - 284:1, 284:11
**shooting** [1] - 211:14
**shopping** [1] - 257:23
**short** [2] - 184:22, 281:3
**shortly** [2] - 171:2, 295:1
**shoulder** [1] - 221:1
**show** [36] - 183:5, 184:9, 187:8, 187:21, 188:3, 191:25, 192:25, 193:3, 194:5, 195:4, 195:9, 198:10, 205:19, 205:21, 209:4, 209:11, 209:14, 210:12, 211:1, 221:15, 225:23, 225:25, 228:19, 230:21, 235:3, 238:23, 239:3, 243:14, 248:15, 250:14, 252:3, 261:14, 262:25, 273:23, 286:16, 295:22
**showed** [4] - 177:9, 195:1, 281:4, 290:24
**showing** [2] - 185:19, 244:19
**shown** [2] - 220:19, 270:2
**shows** [1] - 229:10
**side** [1] - 252:13
**sign** [3] - 186:2, 272:11, 275:10
**signatory** [1] - 181:20
**signature** [11] - 181:22, 186:3, 198:7, 274:12, 274:13, 274:15, 275:8, 275:9, 275:23, 278:20
**signatures** [6] - 205:18, 206:10, 206:12, 259:4, 275:5, 275:7
**signed** [35] - 175:13, 177:8, 177:12, 177:17, 178:3, 179:22, 180:24, 181:1, 182:3, 200:13, 205:20, 205:25, 206:11, 206:12, 207:7, 207:17, 211:15, 223:23, 228:1, 238:15, 240:3, 244:24, 256:9, 256:21, 259:19, 270:11, 271:17, 274:23, 275:12, 275:22, 276:13, 277:4, 277:11, 279:18, 289:5
**significant** [3] - 201:8, 209:6, 219:16
**signing** [4] - 177:18, 205:23, 265:25, 289:1
**similar** [2] - 254:24, 263:15
**simple** [3] - 225:3, 232:6, 242:23
**simpler** [3] - 195:21, 217:8,

224:1

**simply** [5] - 167:2, 167:9, 169:9, 229:16, 248:8
**single** [3] - 171:20, 223:24, 234:14
**sit** [24] - 175:15, 183:5, 184:9, 185:17, 186:4, 192:25, 193:3, 203:12, 212:16, 216:5, 225:18, 226:6, 226:9, 226:21, 227:11, 230:19, 232:25, 234:6, 234:10, 234:14, 254:1, 257:3, 273:3
**site** [2] - 235:20, 273:20
**sitting** [2] - 205:8, 263:25
**situation** [2] - 197:3, 254:25
**six** [8] - 195:19, 197:25, 198:4, 199:24, 227:23, 231:24, 261:11, 264:23
**smaller** [1] - 285:10
**Society** [2] - 235:24, 235:25
**sold** [1] - 237:15
**solely** [1] - 185:4
**someone** [1] - 274:14
**sometimes** [1] - 198:17
**somewhere** [5] - 172:12, 194:24, 210:17, 261:7
**Sonneschein** [7] - 252:18, 252:22, 253:2, 253:3, 253:4, 253:19
**soon** [2] - 203:19, 204:13
**sorry** [8] - 190:5, 193:17, 193:19, 238:3, 244:9, 250:23, 269:4, 290:12
**sort** [2] - 178:7, 194:24
**sought** [2] - 186:13, 189:10
**sound** [3] - 184:8, 185:16, 190:9
**sounds** [11] - 180:11, 182:18, 183:20, 187:4, 222:4, 227:25, 235:17, 244:3, 250:3, 251:12, 252:24
**source** [1] - 282:5
**speaking** [7] - 233:24, 234:8, 257:17, 264:2, 275:1, 285:1, 286:2
**speaks** [2] - 270:7, 276:21
**specialist** [1] - 280:25
**specific** [3] - 180:23, 254:15, 271:4
**specifically** [14] - 166:22, 174:8, 177:21, 185:10, 189:12, 192:1, 208:8, 234:13, 239:2, 239:22, 248:12, 272:13, 273:25, 282:24
**specifics** [1] - 227:15

**speculative** [1] - 177:15
**spend** [1] - 190:7
**spent** [1] - 192:1
**split** [1] - 208:13
**spoken** [3] - 170:22, 215:9, 294:25
**Square** [1] - 163:21
**stake** [3] - 220:5, 224:15, 245:3
**stall** [1] - 284:8
**stamp** [3] - 261:6, 261:8, 263:4
**Stamped** [1] - 229:7
**stamped** [1] - 230:12
**stamps** [1] - 229:4
**stand** [3] - 165:22, 178:11, 247:4
**standard** [2] - 267:7, 291:9
**Star** [1] - 179:15
**start** [5] - 166:9, 191:16, 193:19, 267:17, 296:6
**state** [2] - 165:5, 291:1
**statement** [23] - 185:13, 185:20, 185:22, 186:1, 186:2, 186:7, 187:7, 187:21, 195:2, 195:4, 195:10, 195:11, 195:15, 196:3, 210:24, 224:19, 224:21, 225:23, 226:13, 226:17, 226:19, 241:3, 276:22
**statements** [12] - 191:25, 193:1, 193:4, 194:5, 194:8, 225:9, 225:21, 231:18, 260:5, 260:9, 271:12, 271:23
**STATES** [3] - 163:1, 163:3, 163:11
**states** [2] - 256:8
**States** [6] - 163:6, 163:14, 163:17, 165:7, 165:8, 180:9
**Steiger** [1] - 164:20
**stemming** [1] - 174:10
**stenographer** [1] - 219:22
**stenography** [1] - 164:25
**step** [1] - 291:21
**Steve** [2] - 273:10, 273:18
**stick** [1] - 265:9
**still** [29] - 166:7, 170:5, 186:13, 189:1, 189:9, 201:15, 202:13, 203:12, 203:14, 208:17, 208:18, 209:23, 210:14, 211:14, 214:14, 219:18, 223:5, 233:23, 234:9, 237:5, 246:5, 254:1, 254:22, 255:25, 257:6, 260:13, 260:14, 273:3, 273:22
**stipulate** [1] - 229:17

**stipulated** [1] - 190:4
**stock** [4] - 265:23, 266:3, 267:15, 267:24
**stole** [2] - 201:11, 203:21
**Stolper** [12] - 238:10, 238:13, 238:19, 239:1, 239:22, 240:10, 241:3, 241:4, 241:8, 241:11, 256:4, 263:22
**Stompel** [7] - 271:22, 271:25, 272:5, 282:7, 287:14, 287:18, 291:15
**Stompel's** [2] - 271:17
**story** [2] - 219:1, 219:3
**straight** [1] - 235:6
**Strangford** [1] - 164:7
**strike** [2] - 203:23, 255:15
**structure** [1] - 225:17
**studio** [1] - 247:15
**stumpel** [1] - 223:2
**Stumpel** [35] - 170:20, 171:10, 171:12, 171:13, 171:22, 175:5, 178:14, 178:17, 178:22, 179:18, 179:21, 179:25, 180:15, 181:6, 197:18, 200:14, 200:16, 201:10, 202:5, 208:16, 209:1, 210:20, 213:16, 214:12, 214:22, 215:2, 215:17, 220:12, 220:18, 222:19, 223:19, 223:22, 224:5, 224:23, 225:3
**Stumpel's** [8] - 172:2, 172:22, 172:25, 173:19, 174:24, 175:21, 178:19, 181:10
**subdivision** [1] - 191:6
**subject** [1] - 273:13
**submission** [2] - 295:17, 295:24
**submissions** [1] - 292:21
**submit** [4] - 169:11, 207:25, 289:13, 294:17
**submitting** [1] - 291:24
**subpoena** [4] - 177:3, 177:6, 205:19, 207:20
**subpoenaed** [1] - 193:7
**subsequent** [3] - 176:19, 241:20, 241:25
**subsequently** [5] - 181:4, 190:12, 202:6, 206:4, 211:15
**subset** [1] - 200:17
**substance** [1] - 278:10
**sue** [1] - 202:6
**sued** [5] - 202:9, 202:14, 202:18, 238:5, 247:13
**Suffolk** [1] - 163:21
**sugar** [2] - 273:21

**Sugar** [9] - 232:14, 232:24, 233:1, 233:2, 233:15, 234:11, 236:7, 236:9, 273:14
**suggest** [3] - 178:9, 207:23, 220:2
**suggested** [2] - 170:23, 174:4, 273:17
**suggesting** [1] - 208:23
**suggestion** [2] - 294:20, 294:24
**summarize** [1] - 292:16
**summer** [2] - 180:5, 216:23
**Superior** [1] - 238:6
**supplemental** [1] - 169:20
**supply** [1] - 277:20
**support** [1] - 274:4
**supposed** [13] - 185:3, 185:9, 186:5, 186:10, 187:25, 188:10, 189:22, 189:23, 191:4, 191:5, 216:8, 216:11, 290:18
**sustained** [2] - 259:11, 265:14
**sworn** [1] - 166:3
**Sydor** [1] - 177:7
**system** [2] - 184:18, 192:15

**T**

**tally** [1] - 183:6
**tax** [22] - 209:12, 213:2, 213:8, 213:23, 214:6, 214:19, 216:1, 216:3, 232:16, 232:22, 232:23, 233:25, 234:19, 234:21, 234:22, 235:20, 236:19, 236:20, 236:21, 237:8, 284:4
**taxes** [6] - 232:15, 232:19, 233:2, 235:6, 235:12, 236:25
**TC** [1] - 252:19
**temporary** [1] - 211:12
**term** [2] - 184:22, 206:24
**terminated** [1] - 268:22
**terms** [5] - 179:19, 188:12, 188:21, 288:1, 294:13
**testified** [50] - 166:3, 170:15, 171:21, 173:4, 174:7, 179:23, 180:13, 187:9, 187:12, 188:5, 193:6, 197:11, 199:14, 199:16, 201:18, 201:19, 202:1, 208:4, 208:8, 216:7, 217:11, 217:12, 220:10, 221:13, 221:17, 221:21, 223:2, 223:6, 224:5,

227:19, 227:24, 229:25, 232:13, 233:11, 234:19, 235:5, 238:3, 243:5, 243:8, 243:25, 247:13, 253:20, 256:23, 259:2, 271:16, 278:19, 281:15, 285:24, 288:22, 289:9

**testify** [5] - 208:9, 217:9, 220:16, 220:21, 268:10

**testifying** [6] - 201:24, 222:3, 227:14, 257:19, 257:24, 258:1

**testimony** [37] - 166:21, 167:3, 168:7, 168:9, 168:13, 169:19, 204:4, 204:11, 204:12, 206:3, 206:4, 207:6, 207:24, 220:22, 220:24, 222:18, 226:10, 226:22, 235:16, 235:17, 258:12, 268:14, 274:22, 274:25, 276:9, 276:12, 277:9, 277:10, 277:14, 279:15, 279:16, 279:22, 280:3, 289:16, 290:2, 294:2

**text** [19] - 205:20, 207:1, 207:10, 207:12, 261:11, 261:20, 262:10, 262:12, 263:4, 263:6, 263:7, 263:15, 264:22, 265:21, 267:2, 267:11, 268:1, 268:5

**texts** [3] - 262:14, 264:1, 264:13

**Thalman** [1] - 283:17

**THE** [157] - 163:11, 165:1, 165:2, 165:3, 165:11, 165:14, 165:18, 166:6, 166:8, 166:13, 166:16, 167:5, 167:13, 168:15, 168:21, 169:13, 169:16, 170:7, 172:7, 172:8, 178:11, 189:25, 190:3, 190:5, 190:7, 190:9, 193:16, 193:17, 194:11, 194:13, 198:15, 198:20, 198:25, 203:15, 204:6, 206:21, 206:24, 207:22, 208:1, 211:23, 219:24, 220:1, 221:4, 221:7, 221:8, 224:9, 224:13, 224:17, 224:18, 229:23, 231:6, 236:16, 239:5, 239:10, 239:15, 239:17, 240:6, 240:12, 240:14, 240:25, 241:14, 241:19, 242:1, 242:4, 242:8, 242:10, 242:15, 242:16, 244:11, 244:17, 245:14, 245:18, 245:22, 246:1, 246:5,

246:9, 246:13, 247:3, 247:5, 248:20, 249:7, 249:10, 251:17, 252:5, 252:7, 252:10, 253:17, 254:5, 254:13, 254:15, 254:19, 255:4, 255:6, 255:9, 257:9, 257:10, 257:11, 258:18, 259:11, 260:20, 260:21, 262:15, 262:20, 262:23, 262:24, 263:2, 263:8, 264:19, 264:24, 265:2, 265:9, 265:14, 269:3, 269:8, 269:10, 269:14, 269:18, 276:3, 276:19, 280:7, 280:18, 281:18, 281:20, 282:18, 283:5, 286:18, 286:22, 286:25, 287:25, 288:4, 288:7, 288:18, 289:20, 290:6, 290:17, 290:19, 291:21, 291:23, 291:24, 292:2, 292:7, 292:10, 292:14, 293:5, 293:21, 293:23, 294:5, 294:11, 294:16, 295:10, 295:15, 295:20, 295:23, 296:1, 296:6, 296:13, 296:16

**theory** [2] - 265:6, 265:12

**thereabouts** [1] - 270:11

**thereafter** [2] - 171:2, 295:8

**third** [6] - 197:10, 250:21, 260:11, 277:22, 278:16, 279:17

**third-parties** [1] - 197:10

**third-party** [2] - 277:22, 279:17

**thousand** [1] - 170:1

**thousands** [1] - 167:24

**thread** [1] - 226:24

**three** [9] - 204:4, 250:24, 258:25, 259:17, 259:19, 275:6, 279:21, 280:2, 293:12

**three-and-a-half** [1] - 204:4

**Tim** [2] - 263:23, 267:6

**title** [1] - 277:5

**titled** [1] - 185:25

**today** [34] - 169:19, 175:15, 183:5, 185:18, 186:4, 192:25, 193:3, 203:12, 203:24, 212:16, 216:5, 223:5, 225:18, 226:6, 226:9, 226:21, 227:12, 230:20, 232:25, 234:6, 234:10, 234:14, 235:18, 254:1, 254:24, 255:24, 257:3, 273:3, 291:18,

293:1, 293:20, 294:2, 294:4, 294:21

**together** [3] - 226:25, 264:3, 283:18

**Tom** [1] - 247:24

**TOMMY** [1] - 163:7

**Tommy** [2] - 165:16, 239:12

**tomorrow** [1] - 292:10

**took** [5] - 182:9, 182:24, 183:3, 183:14, 220:17

**top** [6] - 189:24, 250:20, 254:23, 261:8, 287:19, 288:10

**total** [5] - 199:15, 237:8, 251:11, 259:21, 260:3

**totaling** [1] - 263:6

**totality** [1] - 200:19

**traffic** [1] - 207:10

**trafficking** [1] - 281:8

**transaction** [5] - 174:6, 189:14, 252:17, 271:4, 283:23

**transactions** [3] - 200:20, 209:7, 267:25

**transcript** [13] - 164:25, 167:3, 167:17, 168:20, 169:17, 221:1, 235:10, 278:10, 279:10, 279:23, 279:25, 288:25, 289:25

**TRANSCRIPT** [1] - 163:10

**transcription** [1] - 260:23

**transcripts** [5] - 166:12, 166:23, 167:14, 169:25, 280:2

**transfer** [18] - 173:11, 173:12, 173:13, 173:17, 174:25, 175:1, 175:4, 175:8, 175:11, 175:12, 176:8, 244:22, 244:24, 245:1, 270:8, 270:16, 270:21, 270:22

**transferred** [10] - 173:5, 174:24, 178:19, 181:11, 204:16, 204:24, 231:24, 240:17, 266:5, 270:13

**transfers** [7] - 179:1, 230:17, 231:13, 231:20, 232:9, 260:24, 272:14

**transposing** [1] - 261:10

**traveling** [1] - 214:9

**trial** [30] - 177:5, 185:3, 185:14, 186:22, 188:6, 196:21, 204:3, 204:8, 204:12, 206:10, 206:22, 207:23, 207:24, 251:24, 252:4, 257:19, 262:21, 267:12, 267:14, 267:16, 267:19, 267:20, 267:21, 267:22, 275:2, 278:14,

280:11, 290:2, 293:11, 293:13

**tried** [1] - 237:11

**Trish** [1] - 249:1

**true** [5] - 224:5, 254:3, 254:22, 255:22, 284:2

**Trust** [7] - 176:4, 176:6, 177:21, 193:7, 205:19, 206:2, 207:20

**try** [3] - 179:16, 204:6, 292:23

**trying** [1] - 253:12

**Tsyplakov** [1] - 220:3

**turned** [9] - 218:25, 220:7, 260:22, 272:14, 283:14, 284:19, 284:22, 286:15, 291:3

**twice** [1] - 249:24

**two** [17] - 171:16, 188:20, 192:3, 194:16, 195:16, 212:25, 213:19, 215:21, 218:5, 222:9, 276:9, 290:24, 292:12, 292:21, 293:21, 293:22, 294:13

**two-and-a-half** [3] - 192:3, 194:16, 195:16

**two-minute** [1] - 292:12

**type** [2] - 189:22, 223:13

**typical** [1] - 175:14

**U**

**U.S.A** [1] - 165:3

**Ula** [17] - 173:20, 173:23, 174:7, 174:13, 174:24, 175:22, 176:1, 178:17, 178:20, 187:15, 202:15, 203:7, 272:17, 283:19, 284:14, 284:24

**ultimately** [1] - 232:20

**unable** [1] - 179:18

**unaware** [4] - 205:17, 207:7, 267:15, 267:23

**uncovered** [1] - 207:22

**under** [9] - 166:7, 168:20, 190:18, 208:18, 268:9, 275:17, 276:24, 277:24, 278:11

**underneath** [1] - 259:13

**undertook** [1] - 253:12

**unique** [1] - 197:2

**unit** [3] - 243:12, 249:4, 271:5

**UNITED** [3] - 163:1, 163:3, 163:11

**United** [6] - 163:6, 163:14, 163:17, 165:7, 165:8, 180:9

**units** [4] - 243:20, 243:24,

244:5
**universe** [1] - 202:3
**unknown** [1] - 202:17
**unnecessary** [1] - 214:21
**unpaid** [2] - 202:15, 283:20
**unrelated** [2] - 253:19, 253:24
**unsigned** [1] - 228:2
**untoward** [1] - 206:17
**untrue** [1] - 282:15
**up** [40] - 173:22, 173:23, 174:1, 174:5, 174:8, 175:4, 175:9, 179:1, 181:10, 183:6, 184:10, 186:23, 188:22, 194:15, 204:13, 207:9, 210:23, 213:12, 213:18, 214:10, 214:21, 215:3, 215:10, 215:12, 215:18, 215:25, 216:2, 218:23, 219:3, 220:2, 239:7, 263:23, 272:17, 272:21, 280:13, 289:12, 292:23, 293:10, 295:4, 295:22
**upwards** [1] - 176:25
**Urban** [2] - 195:8, 197:5
**utilize** [1] - 186:15
**utilized** [1] - 278:12

## V

**variable** [1] - 193:4
**various** [2] - 262:18, 262:19
**venture** [3] - 196:20, 197:8, 232:21
**Ventures** [32] - 168:14, 170:16, 171:13, 171:18, 179:9, 179:22, 181:5, 181:19, 185:7, 197:12, 208:6, 209:8, 210:23, 213:14, 214:4, 214:10, 215:3, 215:14, 215:18, 220:11, 220:16, 220:18, 223:4, 223:19, 224:4, 224:11, 224:12, 224:14, 224:17, 224:20, 225:5, 287:13
**ventures** [1] - 179:14
**verdict** [1] - 229:19
**verification** [1] - 278:21
**verified** [1] - 260:8
**verify** [6] - 187:21, 193:1, 194:5, 195:5, 225:24, 241:9
**vertical** [1] - 189:10
**Veterans** [1] - 163:21
**video'd** [1] - 279:9
**videotaped** [2] - 279:8,

279:11
**view** [1] - 293:15
**voice** [1] - 193:18
**vs** [1] - 165:3

## W

**Waikapuna** [10] - 187:25, 188:3, 188:6, 188:9, 188:11, 188:15, 188:16, 188:23, 189:1, 189:9
**wait** [1] - 296:7
**waiting** [2] - 186:14, 191:8
**walk** [1] - 188:14
**walked** [1] - 216:22
**wants** [6] - 224:9, 224:12, 239:17, 241:19, 290:19, 292:15
**Wayne** [3] - 246:6, 268:10, 292:3
**web** [2] - 235:20, 252:20
**week** [5] - 177:4, 189:4, 189:6, 208:19, 295:13
**weeks** [5] - 189:4, 189:7, 189:16, 204:4, 295:4
**WEINBLATT** [1] - 163:20
**Wells** [1] - 266:6
**Wexler** [3] - 198:16, 198:18, 203:15
**whatsoever** [1] - 206:5
**wherein** [1] - 271:16
**whichever** [1] - 285:8
**whole** [1] - 239:16
**wholly** [2] - 271:14, 279:20
**William** [2] - 184:25, 210:2
**wire** [10] - 175:12, 178:19, 244:21, 244:24, 245:1, 270:7, 270:12, 270:16, 270:21, 270:22
**wish** [2] - 166:23, 214:16
**withdraw** [2] - 280:15, 280:16
**withdrawal** [1] - 204:21
**withdrawn** [7] - 175:20, 227:21, 228:6, 238:3, 255:15, 265:5, 278:17
**withdrew** [1] - 202:25
**witness** [19] - 166:2, 178:5, 198:10, 209:15, 211:2, 219:23, 228:19, 230:22, 235:3, 238:23, 244:19, 247:4, 264:22, 275:12, 277:11, 278:20, 278:24, 279:17, 283:8
**WITNESS** [26] - 166:8, 172:8, 190:5, 190:9, 193:17, 194:13, 206:24, 208:1, 220:1, 224:13, 224:18, 239:15, 240:14,

241:14, 242:1, 242:10, 242:16, 254:15, 257:10, 258:18, 260:20, 262:15, 262:23, 263:2, 290:17, 291:23
**witnessed** [2] - 275:23, 289:5
**witnesses** [1] - 207:3
**Witnesses** [1] - 297:3
**WJN1434@AOL.com** [1] - 288:3
**won** [1] - 201:13
**word** [3] - 195:24, 195:25, 270:15
**Worden** [1] - 197:9
**words** [3] - 214:2, 241:24, 259:14
**works** [2] - 184:18, 192:15
**worry** [3] - 213:2, 213:23, 216:1
**worth** [1] - 226:14
**wrap** [1] - 204:13
**write** [4] - 242:24, 243:1, 243:2, 250:18
**writing** [6] - 216:10, 289:13, 289:21, 292:16, 294:15, 294:16
**written** [2] - 176:6, 286:3
**wrongdoing** [1] - 178:8
**wrote** [7] - 202:11, 242:25, 250:19, 250:20, 250:23, 258:2, 287:19

## Y

**year** [10] - 177:9, 204:9, 206:11, 240:20, 242:20, 243:22, 244:1, 268:21, 283:18, 285:21
**years** [10] - 185:18, 188:20, 223:22, 231:22, 235:6, 235:11, 264:23, 273:21, 275:18, 283:7
**YORK** [1] - 163:1
**York** [3] - 163:6, 163:15, 164:21
**yourself** [2] - 235:7, 271:4