SLR:LDM:MMO
F. # 2013R00948

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

           - against -

PHILLIP A. KENNER,
        also known as,
           "Philip A. Kenner," and
TOMMY C. CONSTANTINE,
        also known as
           "Tommy C. Hormovitis,"

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Crim. No. 13-607 (S-2) (JFB)

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ENTRY
OF AN ORDER OF FORFEITURE**

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

*Of Counsel:*

MADELINE O'CONNOR
DIANE LEONARDO
Assistant United States Attorneys

TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………………iii

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     STATUTORY FRAMEWORK AND AUTHORITIES ..................................... 3

     A.    Burden of Proof ................................................................................. 4

     B.    Mandatory Forfeiture of Gross Proceeds of Wire Fraud and Conspiracy to Commit Wire Fraud ........................................................ 5

     C.    Forfeiture of All Property Involved in a Money Laundering Conspiracy ...... 7

     D.    The Court May Impose a Forfeiture Money Judgment ................................. 13

     E.    Joint and Several Liability ................................................................. 14

     F.    In Calculating the Gross Proceeds, the Court May Consider Related Though Uncharged Conduct That Was Part of Defendants' Scheme to Defraud ...... 15

     G.    Forfeiture of Property Involved in the Conspiracies ..................................... 16

III.    ARGUMENT ............................................................................................. 17

     A.    Forfeitable Assets .............................................................................. 17

           1.   The Falcon 10 Airplane ......................................................... 17

           2.   Sugar Mill ......................................................................... 19

           3.   DCSL ................................................................................ 20

                 a.  The Purchase of DCSL ................................................ 21
                 b.  KAJ Holdings .......................................................... 22
                 c.  Baja Ventures 2006 ................................................. 23
                 d.  Diamante Properties .................................................. 23
                 e.  CSL Properties ........................................................ 23
                 f.  Other Sources of Funding .......................................... 24

     B.    Forfeiture Money Judgment ................................................................ 28

           1.   Frailes ............................................................................. 28

2.   **The Palms Units** ................................................................ 32

    a.   **The Peca Palms Unit** ................................................ 33

    i.   **Stolen Line of Credit Money** ............................ 33
    ii.   **Stolen Centrum Loan Money** ............................ 34
    iii.   **Additional Funds Used to Purchase the Peca Palms Unit** ............ 36
    iv.   **The Pecas' Investment Money** ............................ 38
    v.   **Mortgage Payments Made by Kenner with Stolen Money** .......... 38

    b.   **The Moreau Palms Units** ........................................ 40

    i.   **Money Diverted From LI IV Account** ................. 40
    ii.   **Stolen Centrum Loan Money** ........................... 41
    iii.   **Ethan Moreau's and Other Investors' Money** ............... 42

    c.   **The McKee Palms Unit** ........................................... 45

3.   **Del Mar** .............................................................................. 48

4.   **The Global Settlement Fund** ........................................... 53

5.   **Victims' Lines of Credit** .................................................. 53

6.   **Victims' Investment Money** ............................................. 55

7.   **Eufora Frauds** ................................................................. 57

8.   **Centrum Loan Fraud** ...................................................... 58

C.   **Kenner's Pro-Se CD Submission** ......................................... 61

IV.   **CONCLUSION** ................................................................................. 61

## **TABLE OF AUTHORITIES**

### **Cases**

*Libretti v. United States*, 516 U.S. 29 (1995)……………………………...………………….…….. 4

*United States v. Ali*, 619 F.3d 713 (7th Cir. 2010)……………………….………………….………… 5

*United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Acct.*
*No. 58-400738-1 in the Name of Ishar Abdi & Barbara Abdi,*
255 F. Supp. 2d 56 (E.D.N.Y. 2003)……………………………………………..………... 9

*United States v. Awad*, 2007 WL 3120907 (E.D.N.Y. Oct. 24, 2007)……………………….……… 13

*United States v. Bermudez*, 413 F.3d 304 (2d Cir. 2005)……………………………….... 7, 13-14

*United States v. Boesen*, 473 F. Supp. 2d 932 (S.D. Iowa 2007),
*aff'd in part and rev'd in part on other grounds*, 541 F.3d 838 (8th Cir. 2008)……………….. 16

*United States v. Bonventre*, 646 F. App'x 73 (2d Cir. 2016)……………………………..……… 6

*United States v. Bornfield*, 145 F.3d 1123 (10th Cir. 1998)……………………………….……… 11

*United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007)…………………………….………. *passim*

*United States v. Carmona*, 873 F.2d 569 (2d Cir. 1989)……………………………..………... 5

*United States v. Certain Funds on Deposit In Account No. 01–0–71417,*
*Located at the Bank of New York*, 769 F. Supp. 80 (E.D.N.Y. 1991)………..……………….. 9

*United States v. Coffman*, 859 F. Supp. 2d 871 (E.D. Ky. 2012),
*aff'd*, 574 F. App'x 541 (6th Cir. 2014)……………..……………………………….....… 7, 10, 13

*United States v. Contents of Account Nos. 208-06070 & 208-06068-1-2,*
847 F. Supp. 329 (S.D.N.Y. 1994)………………………………………………….....………. 11

*United States v. Fruchter*, 411 F.3d 377 (2d Cir. 2005)……………………….………… 4, 14

*United States v. Funds on Deposit at Bank One, Ind. Acct.,*
2010 WL 909091 (N.D. Ind. Mar. 9, 2010)…………………………………………..……. 9

*United States v. Gaskin*, 2002 WL 459005 (W.D.N.Y. Jan. 8, 2002),
*aff'd,* 364 F.3d 438 (2d Cir. 2004)……………..……………………………….…………... 4, 5

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006)……………………………….………… 15

iii

*United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012)……………………………………...… 4

*United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003)………………...……………… 16

*United States v. Hatfield*, 2010 WL 4177159 (E.D.N.Y. Oct. 18, 2010)………………………… 15

*United States v. Hatfield,* 795 F. Supp. 2d 219 (E.D.N.Y. 2011)……………………..… 4-5

*United States v. Herder,* 594 F.3d 352 (4th Cir. 2010)……………………………………… 12

*United States v. Huber*, 404 F.3d 1047 (8th Cir. 2005)…………………………………...… 8, 9, 14

*United States v. Iacaboni*, 363 F.3d 1 (1st Cir. 2004)…………………………….……… 14

*United States v. Jafari*, 85 F. Supp. 3d 679 (W.D.N.Y. Jan. 16, 2015)…………………………… 15

*United States v. Kahale*, 2010 WL 3851987 (E.D.N.Y. Sept. 27, 2010)…………………….. 4, 16

*United States v. Martinez,* 413 F.3d 239 (2d Cir. 2005)…………………………………..…. 5

*United States v. McGinty*, 610 F.3d 1242 (10th Cir. 2010)………………..…………..………… 4

*United States v. Monsanto*, 491 U.S. 600 (1989)………………………………………..…….. 4

*United States v. Myers*, 21 F.3d 826 (8th Cir. 1994)…………………………...……………… 11

*United States v. Nicolo*, 597 F. Supp. 2d 342 (W.D.N.Y. 2009)………………..……… *passim*

*United States v. Peters*, 257 F.R.D. 377 (W.D.N.Y. 2009)………………………...……………16

*United States v. Puche*, 350 F.3d 1137 (11th Cir. 2003)………………..…………………… 14

*United States v. Roberts*, 660 F.3d 149 (2d Cir. 2011)………………….………………… 13

*United States v. Schlesinger*, 261 F. App'x 355 (2d Cir. 2008)………………...………… 6, 8

*United States v. Schlesinger*, 396 F. Supp. 2d 267 (E.D.N.Y. 2005),
*aff'd*, 514 F.3d 277 (2d Cir. 2008)………………………….………………...…… 7, 10, 11

*United States v. Seher*, 562 F.3d 1344 (11th Cir. 2009)………………………………..…… 7

*United States v. Sigillito*, 899 F. Supp. 2d 850 (E.D. Mo. 2012)………………..…………….. 6

*United States v. Stathakis*, 2008 WL 413782 (E.D.N.Y. Feb. 13, 2008)…………...……….... 14

*United States v. Swank Corp.*, 797 F. Supp. 497 (E.D. Va. 1992)……………………………… 12

*United States v. Torres*, 703 F.3d 194 (2d Cir. 2012)……………………...…………....…………. 5

*United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011)…………………………………………… 13

*United States v. Uddin*, 551 F.3d 176 (2d Cir. 2009)……………………………..……... 6

*United States v. Vampire Nation*, 451 F.3d 189 (3d Cir. 2006)…………...………………… 13

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)………………..……….….…… 7, 47, 54

*United States v. Wyly*, 193 F.3d 289 (5th Cir. 1999)……………………………..……….. 10

## **Statutes**

Fed. R. Crim. P.  32.2……………………………………………………....…………... 1, 3

Fed. R. Crim. P. 32.2(b)(1)…………………………………………..…………………… *passim*

Fed. R. Crim. P. 32.2(b)(1)(B)…………………………………………………………… 4

Fed. R. Crim. P. 32.2(b)(2)(A)…………………………………………………..………… 13

Fed. R. Evid. 1101(d)(3)…………………………………………………………… 4

18 U.S.C. § 2……………………………..………………………………………….……………… 1

18 U.S.C. § 981(a)(1)(C) …………...………………………………………………….. *passim*

18 U.S.C. § 981(a)(2)(A) ……………………………………………………..……………5, 6

18 U.S.C. § 982(a)(1) …………………………………………………………… *passim*

18 U.S.C. § 983(c)(3) …………...………………………………………………... 12

18 U.S.C. § 1343 …………...………………………………………………….. 1

18 U.S.C. § 1349 …………...………………………………………..…………… 1

18 U.S.C  § 3551 ………………………………………………………………… 1

18 U.S.C. § 1956 ………………...………………………………………………… 7, 9

18 U.S.C. § 1956(a)(1)(B)(i) …………...………………………………………………... 7

18 U.S.C. § 1956(c)(7) ……..…….……..….…………………………………. 5

18 U.S.C. § 1956(c)(7)(A) …….…..………..….…………………………… 5

18 U.S.C. § 1956(h) …….…..……………………..….…………………… 1, 7

18 U.S.C. § 1957 …….….……..………..…………………………..….…….. 9

18 U.S.C. § 1961(1) …….……………………………..…..………………… 5

28 U.S.C. § 2461(c)……………………………..….……………....………… 6, 13

## I.    PRELIMINARY STATEMENT

Pursuant to Fed. R. Crim. P. 32.2, the United States of America respectfully submits this post-hearing memorandum of law and the accompanying proposed preliminary orders of forfeiture (1) to forfeit the previously restrained resort in Diamante Cabo San Lucas ("DCSL"), property located in Hawaii (the "Sugar Mill property"), and the Falcon 10 airplane (collectively "the Forfeitable Assets"); and (2) imposing a money judgment in the amount of $36,739,048.59, representing the balance of the proceeds of defendants Phillip A. Kenner, also known as "Philip A. Kenner" ("Kenner"), and Tommy C. Constantine's ("Constantine") (collectively, "defendants") wire fraud and conspiracy to commit wire fraud, and the amount involved in or traceable to defendants' money laundering conspiracy.  As set forth herein, each of the Forfeitable Assets constitutes proceeds of defendants' frauds and/or property involved in the defendant's money laundering transactions, or property traceable thereto.

On July 9, 2015, a jury found defendants guilty of: (1) wire fraud, in violation of 18 U.S.C. §§ 1343, 2 and 3551 *et seq.*; (2) conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349 and 3551 *et seq.*; and (3) money laundering conspiracy in violation of 18 U.S.C. §§ 1956(h) and 3551 *et seq.  See* DE 321.  Specifically, Kenner was found guilty of Count 1 (Wire Fraud Conspiracy); Counts 2, 3, 4 and 7 (Wire Fraud); and Count 9 (Money Laundering Conspiracy).  Constantine was found guilty of Count 1 (Wire Fraud Conspiracy); Counts 2, 3, 4, 5 and 6 (Wire Fraud); and Count 9 (Money Laundering Conspiracy).[1]  The parties agreed to waive the jury and allow the Court to determine the forfeiture.  The forfeiture hearing commenced on February 12, 2016, continued on March 9, 2016 and April 4, 2016, and concluded on April 6, 2016.

---

[1] Kenner was found not guilty on Counts 5, 6 and 8 of the second superseding indictment (the "Indictment").  Constantine was not charged on Counts 7 and 8 of the Indictment.

1

The evidence presented by the government during trial proved that Kenner and Constantine scammed victims with promises that the victims' money would be invested in Eufora, the Global Settlement Fund ("GSF"), and real estate in Hawaii.  Instead, the defendants diverted the victims' money to fund the purchases of condominium units at the Palms in Las Vegas, real estate in Sag Harbor (also known as "LedBetter"), three properties in Mexico known as Los Frailes ("Frailes"), DCSL, and Diamante Del Mar (the "Northern Property" or "Del Mar" or "El Rosario"), a Falcon 10 airplane, and the Sugar Mill property.

As established at trial, moneys from hockey player victims' lines of credit were stolen and diverted by defendants.  *See, e.g.*, Trial Tr.at 2065, 2721, 4845-56; Forfeiture Hearing Transcript April 4, 2016 ("4/4/16 Forf. Tr.") at 58.  In addition, victims' moneys that were in a bank account held by Kenner's business entity called Little Isle IV (the "LI IV account"), which was intended to fund the development of property in Hawaii, *see* Trial Tr. at 386, 389, as well as moneys in the GSF, which were supposed to be used for litigation against an individual named Kenneth Jowdy ("Jowdy"), *see* Trial Tr. at 391; 423-29; 687-88; 1815; 2175; 2749-51; 2833-36; 3052-53, were diverted to fund the purchases of the condominium units at the Palms, the LedBetter property, Frailes, DCSL, Del Mar, the Falcon 10 airplane, and the Sugar Mill property.

There are two forfeiture statutes that apply to defendants as a result of their convictions.  First, with regard to the wire fraud and conspiracy to commit wire fraud offenses set forth in Counts One through Eight of the Indictment, defendants are required, pursuant to 18 U.S.C. § 981(a)(1)(C), to forfeit all proceeds of these offenses.  Second, with regard to defendants' money laundering conspiracy conviction set forth in Count Nine of the Indictment, defendants are required, pursuant to 18 U.S.C. § 982(a)(1), to forfeit all property involved in or traceable to

their laundering of the fraud proceeds.

The evidence shows that the previously restrained DCSL resort, Falcon 10 airplane, and Sugar Mill property are forfeitable as properties traceable to defendants' wire fraud and conspiracy to commit wire fraud violations, and as properties that were involved in or are traceable to defendants' money laundering conspiracy.  Further, defendants are jointly and severally liable for a money judgment representing the balance of the proceeds of defendants' fraud offenses, as well as the amount involved in or traceable to defendants' money laundering conspiracy, as discussed below.[2]

## II.    STATUTORY FRAMEWORK AND AUTHORITIES

Rule 32.2 of the Federal Rules of Criminal Procedure governs the criminal forfeiture sought by the government in this case.  *See United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007) (citing Fed. R. Crim. P. 32.2(b)(1)).  Rule 32.2(b) provides, in relevant part:

> As soon as practicable after a verdict . . . of guilty . . . on any count in an indictment . . . regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. . . .  If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.  . . . . The court's determination may be based on evidence already in the record . . . .

Fed. R. Crim. P. 32.2(b)(1).

---

[2] Pursuant to Fed. R. Crim. P. 32.2, during the forfeiture phase of trial, the court determines whether the nexus between the property and the crimes of conviction has been shown; the issue of ownership of the property, including a third party's claim of ownership, is addressed at a subsequent date. *See De Almeida v. United States*, 459 F.3d 377, 381 (2d Cir. 2006) (criminal forfeiture is not limited to the property of the defendant; any property involved in the offense of conviction may be forfeited; it is only to protect the due process rights of third parties that there must be a post-trial ancillary proceeding; thus, the Government does not have to establish the defendant's ownership of the property to seize it pending trial or to obtain a preliminary order of forfeiture, and the third party cannot complain that he was forced to wait for the ancillary proceeding to assert his rights); *United States v. Nicolo*, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009) (in the forfeiture phase of the trial, the court "is not to consider and resolve the potentially thorny issues concerning third party ownership of property sought to be forfeited;" if the Government establishes the required nexus to the offense, the property must be forfeited; if the property used to facilitate defendant's money laundering offense belonged to his wife, she will have an opportunity in the ancillary proceeding to make that claim).

The Supreme Court has recognized that criminal forfeiture is part of a defendant's sentence, and is mandatory when the defendant has been convicted of an offense giving rise to forfeiture.  *See United States v. Monsanto*, 491 U.S. 600, 607 (1989) (stating that "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied . . . ."); *United States v. McGinty*, 610 F.3d 1242, 1246 (10th Cir. 2010) (stating that the language in the forfeiture statutes "express[es] Congress's intent that criminal forfeiture is both mandatory and broad").

### A.  **Burden of Proof**

Because forfeiture is part of defendants' sentencing, *see Libretti v. United States*, 516 U.S. 29, 38–41 (1995), the government bears the burden of proving the forfeiture by a preponderance of the evidence, *see United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) (citing *United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005)).  To establish the forfeiture, the government can rely upon the evidence presented at trial, as well the additional information and exhibits presented during the course of the forfeiture hearing.  *See* Fed. R. Crim. P. 32.2(b)(1)(B); *Capoccia*, 503 F.3d at 109-10 ("[W]here forfeiture is contested, the Court in reaching its decisions may consider not only evidence already in the record, but any additional evidence presented by the parties at a hearing" (quoting *Gaskin*, 2002 WL 459005, at *9 (W.D.N.Y. Jan. 8, 2002) (internal quotation marks omitted)); *United States v. Kahale*, 2010 WL 3851987, at *29 (E.D.N.Y. Sept. 27, 2010) ("The determination of forfeitability may be based upon the record from the guilt phase of a trial, or upon any additional reliable and relevant evidence or information submitted by the parties."), *aff'd sub nom. United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012).

Further, the rules of evidence do not apply during the forfeiture phase of trial.  *See Capoccia*, 503 F.3d at 110 (citing Fed. R. Evid. 1101(d)(3)); *United States v. Hatfield,* 795 F.

4

Supp. 2d 219, 229-30 (E.D.N.Y. 2011) (noting Federal Rules of Evidence do not apply during forfeiture hearings).

Accordingly, it is well established that hearsay is admissible during the forfeiture phase of trial provided it is sufficiently reliable. *See Capoccia,* 503 F.3d at 110 (Rule 32.2(b)(1) allows the court to consider evidence or "information," making it clear that the court may consider hearsay); *United States v. Gaskin*, 2002 WL 459005, at *9 (same), *aff'd,* 364 F.3d 438 (2d Cir. 2004); *see also United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; "the evidence need only be reliable"). In general, hearsay is considered "sufficiently reliable" where it has been corroborated by other evidence. *See United States v. Martinez,* 413 F.3d. 239, 242-43 (2d Cir. 2005); *United States v. Carmona,* 873 F.2d 569, 574 (2d Cir. 1989).

### B. Mandatory Forfeiture of Gross Proceeds of Wire Fraud and Conspiracy to Commit Wire Fraud

Title 18, United States Code, Section 981(a)(1)(C) requires forfeiture to the United States of: "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18 of the United States Code]), or a conspiracy to commit such offense." *See also United States v. Torres*, 703 F.3d 194, 197 (2d Cir. 2012).[3]

The definitions of "proceeds" for purposes of forfeiture under Section 981(a)(1)(C) are set forth in Section 981(a)(2). Section 981(a)(2)(A) provides that, "[i]n cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the

---

[3] Title 18, United States Code, Section 1956(c)(7), in turn, defines a "specified unlawful activity" as an offense listed in Title 18, United States Code, Section 1961(1). *See* 18 U.S.C. § 1956(c)(7)(A). Wire fraud is an offense listed in Title 18, United States Code, Section 1961(1). *See* 18 U.S.C. § 1961(1). Therefore, wire fraud, which is an offense of which defendants have been convicted, is a "specified unlawful activity" for purposes of 18 U.S.C. § 981(a)(1)(C).

term 'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."

In this case, the gross proceeds measurement under Section 981(a)(2)(A) should apply because defendants' crimes of misusing and misappropriating the investment funds readily fit the definition of "unlawful activities."  *See United States v. Bonventre*, 646 F. App'x 73, 90 (2d Cir. 2016) (affirming district court's order of "forfeiture based on the gross proceeds generated by defendants' fraudulent scheme"); *United States v. Sigillito*, 899 F. Supp. 2d 850, 865 (E.D. Mo. 2012) (defendant in an investment fraud scheme must forfeit the gross amount he took from investors, without credit for his use of the later investments to pay the early investors; 981(a)(2)(A) applies because the scheme was entirely unlawful).  Moreover, case law confirms that Section 981(a)(2)(A)'s definition of gross proceeds applies in cases involving wire fraud, such as the case at bar.  *See United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (forfeiture in mail and wire fraud case based on § 981(a)(1)(C) and § 2461(c) is not limited to the net gain or profit (citing § 981(a)(2)(A)); *United States v. Nicolo*, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) (finding that "a defendant may be ordered to forfeit all monies received by him as a result of the fraud, regardless of his net profits from the scheme" (citing *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009))).

In determining the forfeiture of proceeds, courts also apply a "but for" test to determine the gross proceeds subject to forfeiture.  Under this test, gross proceeds include any property defendants would not have obtained or retained but for the criminal offense.  *See United States v. Nicolo*, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009) ("Proceeds are property that a person would not have but for the criminal offense." (citation and internal quotation marks omitted)); *see also*

6

*United States v. Warshak*, 631 F.3d 266, 332-33 (6th Cir. 2010) (affirming forfeiture of all revenues, "including money generated through supposedly legitimate transactions," because those transactions "were the outgrowth of [the defendant's] fraudulent beginnings").

### C. <u>Forfeiture of All Property Involved in a Money Laundering Conspiracy</u>

Title 18, United States Code, Section 982(a)(1) provides that, "[t]he court, in imposing sentence on a person convicted of an offense in violation of section 1956 . . . , shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." *See also United States v. Bermudez*, 413 F.3d 304, 306 (2d Cir. 2005).

In this case, defendants were convicted of Count Nine of the Indictment, which charged that defendants violated 18 U.S.C. § 1956(h) by conspiring to commit concealment money laundering, as defined in 18 U.S.C. § 1956(a)(1)(B)(i). *See* DE # 214, ¶ 30. As a result, defendants "must forfeit to the government all property that [wa]s either 'involved in' that violation or traceable thereto." *United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009).

Significantly, "[m]oney laundering forfeiture pursuant to § 982(a)(1) applies to a larger class of property than proceeds forfeiture under § 981(a)(1)(C), because it applies to more than just the laundered property or proceeds from the laundered property." *United States v. Coffman*, 859 F. Supp. 2d 871, 875 (E.D. Ky. 2012), *aff'd*, 574 F. App'x 541 (6th Cir. 2014). In contrast, "[m]oney laundering forfeiture is required for all property 'involved in' the crime." *Id.* "The term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the money laundering offense." *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271-72 (E.D.N.Y. 2005), *aff'd*, 514 F.3d 277 (2d Cir. 2008); *see also Nicolo*, 597 F. Supp. 2d at 347-48.

Courts have determined that property "involved in" money laundering can take many forms. For instance, fraud proceeds that were part of a money laundering transaction are forfeitable not only as proceeds of the fraud, but also as property "involved in" money laundering. *See United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (holding that wire fraud proceeds are forfeitable both as proceeds and as property involved in separate crime of money laundering). In addition, as discussed in greater detail below, courts have also found that the following types of property constitute property "involved in" money laundering: (a) legitimate funds that were commingled with fraud proceeds during the course of a money laundering transaction and/or were commingled with fraud proceeds so as to conceal or disguise the source of proceeds; (b) any property, real or personal, that facilitated a money laundering offense; and (c) any property, real or personal, that was the subject, or corpus, of the purchase or sale for which the proceeds were wired.

First, legitimate funds that were commingled with fraud proceeds during the course of a wire transfer, and, as such, were the corpus of the money laundering transaction, are forfeitable as property "involved in" money laundering. *See United States v. Huber*, 404 F.3d 1047, 1061 n.11 (8th Cir. 2005) ("We believe that if the legitimately obtained funds are part of a transaction that also involved proceeds of a specified unlawful activity, they are forfeitable as the corpus of the money-laundering offense . . . ."). As discussed *infra*, in this case, legitimate funds were commingled with tainted funds during the course of wire transfers for the purchases of several properties, including, *inter alia*, condominium units at the Palms in Las Vegas, real estate in Sag Harbor, Frailes, and Del Mar. Accordingly, those legitimate funds are forfeitable as the corpuses of those money laundering transactions.

Moreover, legitimate funds that were commingled with fraud proceeds, either in a bank

8

account or during the course of a transaction, so as to conceal or disguise the source of the proceeds, i.e., to facilitate the laundering offense, are forfeitable as property "involved in" money laundering. *See Huber*, 404 F.3d at 1061 (stating that "facilitation under section 982(a)(1)'s 'involved in' clause is geared at the forfeitability of instrumentalities, including funds in some cases, that facilitate . . . the money-laundering transactions"); *United States v. Funds on Deposit at Bank One, Ind. Acct.,* 2010 WL 909091, *8 (N.D. Ind. Mar. 9, 2010) (following *Huber*; when defendant commingled drug proceeds with other funds in a bank account, and transferred the commingled funds to another account, and commingled them yet again before making a third transfer, all of the funds involved in the last transfer were forfeitable as property involved in violations of Sections 1956 and 1957), *aff'd*, 393 F. App'x 391 (7th Cir. 2010); *United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Acct. No. 58-400738-1 in the Name of Ishar Abdi & Barbara Abdi*, 255 F. Supp. 2d 56, 71 (E.D.N.Y. 2003) (holding that the commingling of "illegally derived proceeds with legitimate funds with the intent of concealing or disguising the source of the proceeds" renders the legitimate funds subject to forfeiture); *United States v. Certain Funds on Deposit In Account No. 01–0–71417, Located at the Bank of New York*, 769 F. Supp. 80, 85 (E.D.N.Y. 1991) ("It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue"; therefore, the legitimate money is also forfeitable). As discussed *infra*, in this case, legitimate funds were commingled with fraud proceeds in bank accounts and during the course of wire transfers so as to conceal and disguise the source of the proceeds. As a result, those legitimate funds are also forfeitable as facilitating property.

Just as the law considers any commingled funds that facilitate a laundering offense to be property "involved in" money laundering, it contemplates any other property, real or personal,

that facilitate money laundering, by making the offense less difficult or more or less free from obstruction or hindrance, to be forfeitable as property "involved in" money laundering. *See United States v. Wyly*, 193 F.3d 289, 302 (5th Cir. 1999) (holding that a facilitation theory supported the forfeiture of a prison where the defendant public official had accepted a kickback in return for steering a public construction contract for the construction of the prison to a particular contractor); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 272-73 (E.D.N.Y. 2005) (holding that a factory and the property that housed it were forfeitable as property that facilitated money laundering where defendants used the factory "to steal money from insurance companies by submitting fraudulent insurance claims for damages due to fires that occurred at the premises" and then laundered the proceeds through business accounts to, among other things, pay the taxes for the property), *aff'd*, 261 F. App'x 355 (2d Cir. 2008). As discussed *infra*, in this case, properties, including, *inter alia*, DCSL, the Falcon 10 airplane, and the Sugar Mill property, "were integral to the fraud perpetrated by the Defendants and facilitated the money laundering," and, thus, are forfeitable. *Schlesinger*, 396 F. Supp. 2d at 272.

Furthermore, courts have determined that any property, real or personal, which was the subject, or corpus, of the purchase or sale for which the proceeds were wired, even if untainted funds were also used to pay for the property, is forfeitable as property that was "involved in" money laundering. *See, e.g.*, *United States v. Coffman*, 859 F. Supp. 2d 871, 881 (E.D. Ky. 2012) (holding that condo that defendant purchased in part with proceeds of securities fraud is forfeitable both as proceeds under § 981(a)(1)(C) and as property involved in a money laundering offense), *aff'd*, 574 F. App'x 541 (6th Cir. 2014). As discussed *infra*, in this case, properties, including, *inter alia*, DCSL, the Falcon 10 airplane, and the Sugar Mill property, were the subjects of purchases or sales for which the proceeds were wired. Thus, these properties are

forfeitable as properties that were involved in money laundering offenses.

Lastly, the government may seek forfeiture of any property that is "traceable to" property that was "involved in" money laundering. "[P]roperty 'traceable to' [property involved in money laundering] means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998). "[P]roof that the proceeds of the money laundering transaction enabled the defendant to acquire the property is sufficient to warrant forfeiture as property 'traceable to' the offense." *Id.* Thus, any property, real or personal, that was the subject of the sale for which the proceeds were wired, is forfeitable as property that is traceable to property (i.e., the commingled funds) that was involved in a money laundering offense. *See United States v. Myers*, 21 F.3d 826, 831 (8th Cir. 1994) (holding that a farm was forfeitable pursuant to Section 982(a)(1) because "substantial payments on the real estate contract and improvements on the property" were paid from an account containing laundered funds); *United States v. Nicolo*, 597 F. Supp. 2d 342, 355-56 (W.D.N.Y. 2009) (holding that if funds in a commingled bank account are subject to forfeiture as property involved in money laundering, then a vehicle purchased with the commingled funds is forfeitable as property traceable to such property); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 272-73 (E.D.N.Y. 2005) (holding that because defendant's real property was forfeitable as property involved in the money laundering offense, the proceeds from the sale of such property were also forfeitable); *United States v. Contents of Account Nos. 208-06070 & 208-06068-1-2*, 847 F. Supp. 329, 335 (S.D.N.Y. 1994) (finding that money in bank account which received deposits that consisted of funds withdrawn from accounts containing commingled funds was subject to forfeiture as property traceable to property involved in money laundering transactions). As discussed *infra*, in

11

this case, properties, including, *inter alia*, DCSL, the Falcon 10 airplane, and the Sugar Mill property, are traceable to property (the commingled funds) that was involved in a money laundering offense, and, as such, are forfeitable.

Where property is subject to forfeiture because it facilitated the money laundering offenses, the government must show that the degree to which the property facilitated the crime was "substantial." *See* 18 U.S.C. § 983(c)(3) ("[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense"); *United States v. Herder,* 594 F.3d 352, 364-65 (4th Cir. 2010) (the substantial connection test is satisfied "by showing that use of the property made the prohibited conduct less difficult or more or less free from obstruction or hindrance" (citation and internal quotation marks omitted)); *United States v. Swank Corp.*, 797 F. Supp. 497, 500 (E.D. Va. 1992) (facilitation requires substantial connection between criminal act and forfeited property).  In this case, the substantial connection requirement is easily satisfied for the properties at issue because the properties made the laundering offenses less difficult to commit and more or less free from obstruction, and the properties were more than incidental to the laundering offenses.  Indeed, the properties discussed *infra* provided defendants with the means to steal the investors' money, and were the very reason why defendants conspired to steal and launder the victims' money, i.e., so that defendants could use the properties that they had acquired with the stolen money for their own use and benefit.

Notably, because defendants were convicted of a money laundering conspiracy, their "conviction is not based on or limited to specific transactions, but encompasses the whole of [defendants'] scheme and [their] attempts and plans to conceal and disguise the nature, location,

12

source, ownership and control of the proceeds of the fraud." *United States v. Coffman*, 859 F. Supp. 2d 871, 879 (E.D. Ky. 2012), *aff'd*, 574 F. App'x 541 (6th Cir. 2014); *see also Nicolo*, 597 F. Supp. 2d at 351 ("The corpus of a money-laundering conspiracy is the funds that the defendant conspired to launder." (citation and internal quotation marks omitted)).

### D. **The Court May Impose a Forfeiture Money Judgment**

In addition to the forfeiture of specific assets, under Section 2461(c) and Section 981(a)(1)(C), the government is entitled to "an *in personam* forfeiture judgment . . . for the full amount of the criminal proceeds." *United States v. Vampire Nation*, 451 F.3d 189, 201-02 (3d Cir. 2006); *see also United States v. Awad*, 2007 WL 3120907, at *2 (E.D.N.Y. Oct. 24, 2007) ("Where a defendant lacks the assets to satisfy the forfeiture order at the time of sentencing, the money judgment against the defendant is effectively an *in personam* judgment in the amount of the forfeiture order"), *aff'd*, 598 F.3d 76 (2d Cir. 2010); Fed. R. Crim. P. 32.2(b)(2)(A) ("If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment . . . ."). The government is not required to provide a precise calculation of the proceeds subject to forfeiture; instead, proceeds can be reasonably estimated. *See United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) ("The court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." (citations and internal quotation marks omitted)); *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011) ("[T]he law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture.").

For the money laundering offenses, the government is entitled to seek a money judgment against the defendants for an amount equal to the value of the property that was involved in the money laundering offense. *See United States v. Bermudez*, 413 F.3d 304, 305 (2d Cir. 2005) (affirming entry of forfeiture money judgment in the amount of $14.2 million representing the

value of the funds laundered, even though the defendant forwarded the money to third parties); *United States v. Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005) ("Forfeiture under section 982(a)(1) in a money-laundering case allows the Government to obtain a money judgment representing the value of all property 'involved in' the offense, including the money or other property being laundered (the corpus), and any other property used to facilitate the laundering offense"; in a conspiracy case, the corpus is the funds the defendant conspired to launder, including commingled clean money (citation and internal quotation marks omitted)); *United States v. Iacaboni*, 363 F.3d 1, 6 (1st Cir. 2004) (entering money judgment equal to sum of money involved in all money laundering transactions comprising the conspiracy to launder gambling proceeds, including money the defendant did not retain for himself); *United States v. Puche*, 350 F.3d 1137, 1153-54 (11th Cir. 2003) (affirming money judgment equal to value of illegitimate funds as well as legitimate funds that facilitated the laundering by "acting as a 'cover' ").

### E.  Joint and Several Liability

Defendants who are convicted of a conspiracy offense are jointly and severally liable for the total proceeds of the conspiracy reasonably foreseeable to them.  *United States v. Stathakis*, 2008 WL 413782, *10 (E.D.N.Y. Feb. 13, 2008).  Proceeds are considered reasonably foreseeable to the defendant when the overt act from which the proceeds were derived was committed in furtherance of the conspiracy.  *United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir. 2005) (affirming joint and several liability where defendant was aware of the bulk of the proceeds derived from the racketeering conspiracy); *United States v. Stathakis*, 2008 WL 413782, *10 (E.D.N.Y. Feb. 13, 2008) (finding proceeds of fraudulent loans obtained by co-conspirators were reasonably foreseeable because they were part of the fraudulent loan scheme in which defendant participated).  Accordingly, a defendant may be jointly and severally liable for the full proceeds of the conspiracy regardless of whether he was charged or convicted of all

14

of the overt acts from which the proceeds were derived.  *United States v. Gotti*, 459 F.3d 296, 347 (2d Cir. 2006) (finding defendant could be jointly and severally liable for full proceeds of conspiracy, even those derived from acquitted conduct, because it was reasonably foreseeable the racketeering enterprise in which he participated would engage in the activities underlying the acquitted conduct).

F.  **In Calculating the Gross Proceeds, the Court May Consider Related Though Uncharged Conduct That Was Part of Defendants' Scheme to Defraud**

It is well settled that frauds which were not specifically proven during the guilt phase of trial, but which arose out of the same schemes as the crimes of conviction, can be considered by the Court during the forfeiture phase of trial.  S*ee United States v. Hatfield*, 2010 WL 4177159, at *6 (E.D.N.Y. Oct. 18, 2010) ("[T]he Government can also seek forfeiture of proceeds derived from 'uncharged executions' of Defendants' fraudulent schemes."); *United States v. Jafari*, 85 F. Supp. 3d 679, 688 (W.D.N.Y. Jan. 16, 2015) ("Considering uncharged conduct that is part of a fraudulent scheme is consistent with the law as articulated by courts in the Second Circuit").

In this case, defendants were charged with

devis[ing], implement[ing], supervis[ing] and execut[ing] a *scheme* to fraudulently induce the player-clients and other individuals (collectively, the "Investors"), . . . to invest money by falsely stating that the funds would be invested in real estate in Hawaii, Eufora and an entity known as the "Global Settlement Fund" (hereinafter "GSF") for the benefit of the Investors when, in truth and in fact, as KENNER and CONSTANTINE then and there well knew and believed, a substantial portion of the money would be improperly diverted to bank accounts controlled by KENNER and CONSTANTINE and used for their personal benefit, for unrelated business ventures and to conceal their *scheme* to defraud.

Indictment, DE # 214, ¶ 5 (emphasis added); *see also id.* at ¶¶ 6-10, 12-15, 21-28.

Thus, since the Indictment charged, and defendants were convicted of, a scheme to defraud, the Court may consider additional uncharged executions of the scheme to defraud during the forfeiture phase of trial.  Indeed, the "[f]orfeiture of the gross proceeds of uncharged

15

executions of the scheme" serves the purposes of "confiscat[ing] property used in violation of the law, and . . . requir[ing] disgorgement of the fruits of illegal conduct." *United States v. Boesen*, 473 F. Supp. 2d 932, 953 (S.D. Iowa 2007), *aff'd in part and rev'd in part on other grounds*, 541 F.3d 838 (8th Cir. 2008) (citation and internal quotation marks omitted).

### G.  Forfeiture of Property Involved in the Conspiracies

Defendants were convicted of conspiracy to commit wire fraud and money laundering conspiracy.  Defendants' convictions for these conspiracies encompass an even "broader category of criminal conduct [than that which is] encompassed by the overall scheme to defraud." *Kahale*, 2010 WL 3851987, at *31.  That is to say, any property that was involved in the conspiracy is subject to forfeiture.  *See United States v. Capoccia*, 503 F.3d 103, 117-18 (2d Cir. 2007) ("Where the conviction itself is for . . . engaging in a conspiracy, . . . the government need only establish that the forfeited assets have the 'requisite nexus,' Fed. R. Crim. P. 32.2(b)(1), to that . . . conspiracy . . . ."); *United States v. Hasson*, 333 F.3d 1264, 1279 n.19 (11th Cir. 2003) ("[M]oney laundering conviction in hand, the government need only prove that property was involved in or traceable to property involved in that offense by a preponderance of the evidence"); *Kahale*, 2010 WL 3851987, at *30 (stating that "where an indictment charges a conspiracy . . . , the proceeds of uncharged or acquitted conduct may become forfeitable because the government may be able to prove that money 'involved in the uncharged or acquitted [conduct] nevertheless constituted the proceeds of, or was traceable to, or was involved in, the [conspiracy . . . ] crime of conviction.' " (citation omitted)); *United States v. Peters*, 257 F.R.D. 377, 387 (W.D.N.Y. 2009) (defendant convicted of a fraud conspiracy is liable to forfeit the proceeds of the entire conspiracy, including property derived from specific acts that were alleged in the indictment as substantive counts on which the defendant was acquitted), *aff'd*, 732 F.3d 93 (2d Cir. 2013).

16

## III.   ARGUMENT

As set forth above, pursuant to 18 U.S.C. § 981(a)(1)(C), the government is seeking

forfeiture of the gross proceeds of the wire fraud and conspiracy to commit wire fraud violations

and any property traceable thereto.  Pursuant to 18 U.S.C. § 982(a)(1), the government is seeking

forfeiture of property that was involved in or is traceable to defendants' money laundering

conspiracy.  Specifically, the government is seeking (1) forfeiture of the Forfeitable Assets, i.e.,

the previously restrained resort in DCSL, the Sugar Mill property, and the Falcon 10 airplane, as

properties traceable to defendants' wire fraud and conspiracy to commit wire fraud violations,

and as properties that were involved in or are traceable to defendants' money laundering

conspiracy; and (2) a money judgment in the amount of $36,739,048.59, representing the balance

of the proceeds of defendants' wire fraud and conspiracy to commit wire fraud violations, and

the amount involved in or traceable to defendants' money laundering conspiracy.

### A.  Forfeitable Assets

#### 1.  The Falcon 10 Airplane

As established during the guilt phase of trial, and as summarized below, the Falcon 10

airplane is traceable to defendants' wire fraud and conspiracy to commit wire fraud violations,

and was involved in and is traceable to defendants' laundering of the fraud proceeds.

Diamante Air, LLC, a Delaware Limited Liability Company managed by Jowdy, had two

loans with First Source Bank: one for $500,000 and one for $700,000.  *See* Trial Tr. at 3268.

These loans were secured by two planes owned by Diamante Air, namely, the Fairchild Metro

and the Falcon 10 airplane.  *See id.*  In or around spring 2009, Diamante Air defaulted on its

loans and was sued by First Source Bank for the approximately $1.3 million outstanding loan

amount.  *See* Trial Tr. at 3290, 3292.  In June 2009, Diamante Air and First Source Bank entered

into a forbearance agreement in which First Source Bank agreed to withdraw its lawsuit.

17

Pursuant to the agreement, First Source Bank would acquire the Fairchild Metro aircraft, which it would then sell, and AZ Falcon Partners, LLC ("AZ Falcon Partners") would acquire the Falcon 10 airplane for a purchase price of $525,000.  *See* Government Exhibit at Criminal Phase of Trial ("Gov. Ex.") 4212; Trial Tr. at 3290.

AZ Falcon Partners was a Delaware Limited Liability company managed by Constantine. *See* Gov. Ex. 4218.  At Constantine's direction, attorney Ronald Richards ("Richards") made wire transfers from the First Century Bank account holding GSF funds to Aero-Space Reports, Inc. ("Aero-Space Reports"), the escrow company associated with First Source Bank, to cover the closing costs associated with the purchase of the Falcon 10 airplane.  Specifically, on June 4, 2009, Richards transferred $415,000 to Aero-Space Reports in connection with the closing transaction.  *See* Gov. Ex. 80; Gov. Ex. 1102; Gov. Ex. 4203; Gov. Ex. 4222; Trial Tr. at 3302, 3805-06, 3808.  The money in the GSF fund, however, was supposed to be used for litigation against Jowdy, not for the purchase of the Falcon 10 airplane.  *See* Trial Tr. at 391; 423-29; 687-88; 1815; 2175; 2749-51; 2833-36; 3052-53.

Following the closing, First Source Bank continued to hold a loan to AZ Falcon Partners. *See* Trial Tr. at 3304.  Wire transfer records show that between August 2009 and November 2009, Richards transferred a total of $17,260 in GSF funds to AZ Falcon Partners in connection with the First Source Bank loan.  *See* Gov. Ex. 80; Gov. Ex. 1102.  Specifically, on August 6, 2009, Richards transferred $4,065; on September 8, 2009, he transferred $4,065; on September 15, 2009, he transferred $1,000; on October 6, 2009, he transferred $4,065; and, finally, on November 6, 2009, he transferred another $4,065.  *See id.*  Richards also transferred a total of $8,130 to Richard Rozenboom in connection with the First Source Bank loan.  *See* Gov. Ex. 80; Gov. Ex. 1102; Gov. Ex. 4208; Trial Tr. at 3305-08, 3815.  Specifically, on July 6, 2009,

18

Richards transferred $4,065, and, on December 8, 2009, he transferred another $4,065.  *See* Gov.

Ex. 1102.   Rozenboom testified during the guilt phase of the trial that he did not personally

receive those payments; rather, they were credited toward the monthly loan payments.  *See* Trial

Tr. at 3306, 3307.

      Constantine also used GSF funds to pay other expenses in connection with the Falcon 10

airplane, namely, insurance premiums and renovations.  In June 2009, Richards transferred a

total of $161,426 to Cabin Crafters, a company that manufactures parts for aircraft cabins.  *See*

Gov. Ex. 80; Gov. Ex. 1102; Gov. Exs. 3941-47; Trial Tr. at 3374, 3805-06, 3808.  Specifically,

on June 8, 2009, Richards transferred $75,000 to Cabin Crafters, and, on June 30, 2009, he

transferred an additional $86,426 to the company.  *See* Gov. Ex. 1102.  Additionally, on June 11,

2009, Richards transferred $13,331 to Southwest Aviation Insurance, the company that insured

the Falcon 10 airplane.  *See* Gov. Ex. 80; Gov. Ex. 1102; Gov. Ex. 3907; Trial Tr. at 3816.

      Based upon the foregoing, the government seeks forfeiture of the Falcon 10 airplane as

property that is traceable to defendants' wire fraud and conspiracy to commit wire fraud.  Indeed,

but for the GSF funds, defendants would not have obtained and retained the Falcon 10 airplane.

In addition, the Falcon 10 airplane is forfeitable in its entirety as property that facilitated money

laundering transactions by providing a cover for the transfer of the proceeds (i.e., made the wire

transfers of tainted funds less difficult or more or less free from obstruction), was involved in a

money laundering transaction (i.e., was the subject, or corpus, of the purchase or sale for which

the proceeds and commingled funds were wired), and was involved in defendants' money

laundering conspiracy.

      **2.  Sugar Mill**

      The Sugar Mill property is located in Hawaii.  Kenner used line of credit money to

purchase the Sugar Mill property, as discussed below, but kept ownership of the property in the

name of a company that he controlled.  *See* Forfeiture Exhibit ("FORF")-3; FORF-4; FORF-56; FORF-93; FORF-94.

On February 23, 2005, Kenner transferred $400,000 from Sergei Gonchar's line of credit to the LI IV account.  *See* Gov. Ex. 2015; Gov. Ex. 2139.  Notably, during the criminal phase of trial, Gonchar testified that he was unaware of any line of credit existing in his name.  *See* Trial Tr.at 4845-4856.  On the same day that Kenner stole $400,000 from Gonchar's line of credit, February 23, 2005, he wired $380,000 from the LI IV account to Title Guaranty Escrow services. *See* Gov. Ex. 2015.  Of that $380,000, $350,000 was used to purchase the Sugar Mill property. *See* FORF-56; FORF-93; FORF-94.

As a result of the aforementioned, the government seeks forfeiture of the Sugar Mill property as property that is traceable to defendants' wire fraud and conspiracy to commit wire fraud, as well as property that facilitated money laundering transactions (i.e., made the wire transfers of tainted and commingled funds less difficult or more or less free from obstruction), was involved in a money laundering transaction (i.e., was the subject, or corpus, of the purchase or sale for which the proceeds and commingled funds were wired), was involved in defendants' money laundering conspiracy, and is traceable to funds that were involved in money laundering transactions.

### 3.  DCSL

The DCSL resort is forfeitable because it is traceable to the proceeds of defendants' wire fraud and was involved in and is traceable to defendants' laundering of the fraud proceeds. Specifically, Kenner laundered money intended for the Hawaii investments, including stolen line of credit money and stolen Centrum Loan funds, and other investments, as well as borrowed money, to bank accounts controlled by co-conspirator Jowdy in order to fund both his and Jowdy's personal interests in DCSL.  Kenner commingled these tainted funds with his clients'

investments in DCSL in order to conceal his diversion of client funds.  In addition, Kenner induced his clients to invest in DCSL while concealing that a portion of these funds would be diverted to Kenner's and Constantine's personal accounts, as well as the disproportionately small ownership interests the clients would receive in DCSL at closing.

   a.  **The Purchase of DCSL**

In or around January 2005, Kenner and Jowdy entered into a contract to purchase DCSL. The total cost of the property was $65 million, which was largely financed by a loan from Lehman Brothers; however, Kenner and Jowdy were required to make a payment of approximately $7 million, an amount that included the down payment of ten percent, and an additional approximately $500,000 in fees incurred due to a delay in closing that resulted from their struggle in raising the down payment money.  *See* FORF-36; FORF-81.  Kenner was tasked with raising the money for the payment.  *See* FORF-102 at pp. 96, 104.  The down payment had to be paid before Lehman Brothers would agree to fund the project.  *See* SEC Hearing Transcript, *In re Diamante Del Mar*, dated April 29, 2011 ("April 29 SEC Tr."), attached hereto, at 21.  Thus, but for the stolen and laundered funds that were used by defendants to fund the down payment for the purchase of DCSL, there would not have been any purchase of DCSL. *See Nicolo*, 597 F. Supp. 2d at 346.

Kenner and Jowdy subsequently created Diamante Cabo San Lucas, LLC, a Delaware corporation ("DCSL, LLC"), to facilitate the purchase of the property.  DCSL, LLC subsequently formed a Mexican subsidiary, Diamante Cabo San Lucas S. de R.L. de CV (the "Mexican Subsidiary") to acquire the rights in and to develop DCSL.  *See* FORF-41, attached hereto.  Jowdy currently serves as the managing member of the Mexican Subsidiary.  *See id.*

As of the March 10, 2006 closing, DCSL, LLC owns 99 percent of the equity of the Mexican Subsidiary while Jowdy owns the remaining one percent.  *See* FORF-93.  DCSL, LLC

in turn is owned by four Delaware limited liability companies: KAJ Holdings, LLC ("KAJ Holdings"), Baja Ventures 2006, LLC ("Baja Ventures"), Diamante Properties, LLC ("Diamante Properties") and CSL Properties 2006, LLC ("CSL Properties").  Many of these companies were created in the weeks immediately preceding the closing, following conversations between William Najam ("Najam"), Jowdy's brother-in-law, Kenner, and Jowdy, in which Najam instructed Kenner and Jowdy to assign the money for the down payment and ownership percentages to specific entities.  *See* FORF-81; FORF-83; FORF-93.  Up until February 20, 2006, the money sent to the seller of the property had not been earmarked as capital contributions for any of the LLCs that had been set up to own portions of DCSL as those LLCs had not yet been created.  *See id.*  In fact, it was not until the time of the March 2006 closing that the ownership of DCSL, LLC was assigned as follows: KAJ Holdings, 40 percent ownership; Baja Ventures 2006, 39 percent ownership; Diamante Properties, 13 percent ownership; and CSL Properties, 8 percent ownership.  *See* FORF-93.

### b.  <u>KAJ Holdings</u>

Jowdy is the sole and managing member of KAJ Holdings.  The operating agreement for KAJ Holdings shows that KAJ Holdings made a capital contribution of $2.5 million toward the purchase of DCSL.  *See* FORF-93.  However, there is no record of Jowdy making any capital contribution towards the purchase of DCSL.  *See* FORF-36.  As established at trial and during the forfeiture hearing, Kenner diverted clients' funds intended for other investments and borrowed money from clients to fund a substantial portion of what Kenner and Jowdy later determined to be KAJ Holding's capital contribution towards the purchase of DCSL.  *See* Gov. Ex. 2101; FORF-93; Kenner Forfeiture Exhibit ("Kenner Forf.") 2.

22

c. **Baja Ventures 2006**

Kenner is the sole owner and managing member of Baja Ventures. *See* FORF-93; *see also* Gov. Ex. 4502. The operating agreement for Baja Ventures suggests that it made a capital contribution of $2.5 million towards the purchase of DCSL. *See* FORF-93. However, there is no evidence that Kenner contributed any of his own money to obtain Baja Venture's interest in DCSL. On the contrary, on the eve of closing when Kenner and Jowdy created entities to own interests in DCSL, Kenner falsely claimed credit for a portion of the commingled $7 million downpayment funds so as to justify Baja Venture's ownership interest. *See* FORF-81.

d. **Diamante Properties**

Diamante Properties was created to hold the ownership interest in DCSL that belonged to employees of the resort. *See* FORF-81. Jowdy is the managing member of Diamante Properties and Kenner is a member of Diamante Properties. According to its operating agreement, Diamante Properties made a minimal capital contribution in the amount of $480 towards the purchase of DCSL. *See* FORF-93.

e. **CSL Properties**

Kenner acts as the managing member of CSL Properties while many of his clients have ownership interests in the company.[4] *See* FORF-84; FORF-93. According to CSL Properties' operating agreement, CSL Properties made a capital contribution of $2 million towards the purchase of DCSL, *see* FORF-93; however, the actual total contribution of its members was $2.3 million. *See* FORF CHART-27; FORF-43 (showing additional contributions by several

---

[4] These clients include: Dimitri Khristich, Vladimir Tsyplakov, Bryan Berard, Michael Peca, Tyson Nash, Turner Stevenson, Ethan Moreau, Steve Rucchin, Greg de Vries, Brian Campbell, Sergei Gonchar, Owen Nolan, Mattias Norstrom, and Darryl Sydor.

23

clients).[5]  Emails between Kenner and Najam detail contributions, ranging between $100,000 and $250,000, made by each individual client.  *See* FORF-44; FORF-84; FORF-105.

Despite contributing over $2 million towards the purchase of DCSL, the members of CSL Properties received a disproportionately small ownership interest in DCSL, LLC, namely, a mere eight percent.  *See* FORF-93.  By his own admission, Kenner never informed his clients that CSL Properties was receiving only an eight percent interest in DCSL.  *See* 4/4/16 Forf. Tr. at 120.

While the clients knowingly and voluntarily contributed money to CSL Properties, evidence admitted during both the guilt and forfeiture phases indicates that Kenner and Jowdy diverted a portion of the investor funds intended for CSL Properties.  Email communications between Kenner and Jowdy indicate that clients directed Kenner to transfer funds from their accounts to an account held in the name of Baja Development Corp. (the "Baja Development account"), which account was controlled by Jowdy, for the purpose of investing in CSL Properties.  *See* FORF-54.  Kenner informed Jowdy of these transfers and, in several instances, Jowdy subsequently transferred a portion of the investment funds to accounts controlled by Kenner that had nothing to do with the investment in DCSL.  *See* FORF-54.  Kenner, in turn, transferred some of this money to Constantine.  *See* FORF-44; FORF-57; FORF CHART-27; *see also* Gov. Ex. 2110.

**f.  Other Sources of Funding**

In or around December 2004, Kenner purchased property in Honu'apo, Hawaii using investors' funds as part of the Hawaii investment project.  Kenner financed the $3.5 million purchase using moneys from lines of credit he established in the names of clients: Glen Murray, Darryl Sydor, Owen Nolan, and Steve Rucchin.  *See* Gov. Ex. 2135; Gov. Ex. 2136; Gov. Ex.

---

[5] Clients Ethan Moreau, Greg de Vries, and Michael Peca each contributed an additional $100,000 that was not accounted for in the operating agreement.  *See* FORF CHART-27; FORF-43.

2137; Gov. Ex. 2133; Gov. Ex. 2021; Gov. Ex. 2422.   In or around July 2005, Kenner

mortgaged Honu'apo to secure a $3 million loan from Centrum Financial (the "Centrum Loan").

*See* Gov. Ex. 3712; Gov. Ex. 3703; Gov. Ex. 3716; Gov. Ex. 9031C; Gov. Ex. 9037C.

According to the "Statement of Use of Loan Proceeds" for the Centrum Loan, the money was to

be used "exclusively" for the development of the Hawaii property.  *See* Gov. Ex. 3703.

However, unbeknownst to defendants' Hawaii investment clients, on or about July 20, 2005,

Kenner diverted $1.5 million of the Centrum Loan money in the LI IV account to the Mexican

Subsidiary's bank account, Propiedades DDM, to fund the down payment for the purchase of

DCSL.  *See* Gov. Ex. 2013.   At trial, Kenner admitted that a portion of the Centrum Loan was

used to purchase property in Mexico.  *See* Trial Tr.  4637:9-19.

     Moreover, on or about May 4, 2005, Kenner withdrew $350,000 from the line of credit of

client Owen Nolan.  *See* Gov.  Ex.  2133.  Bank records show that this money was transferred

from the LI IV account to Atilio Colli Villarino ("Villarino"), the seller of DCSL.  *See* Gov. Ex.

2101; *see also* FORF CHART-26.  In doing so, Kenner acted without Nolan's knowledge or

consent; Nolan testified at the criminal trial that he never had a line of credit associated with

Hawaii and that he never had given Kenner permission to open a line of credit in his name.  *See*

Trial Tr. 2065:14-22.

     On or about August 23, 2005, Ethel Kaiser wired $300,000 to Kau Holding Company,

LLC ("Kau Holding") at Northern Trust Bank for the purpose of loaning money to the Hawaii

project.  *See* Gov. Ex. 2109; *see also* Trial Tr. at 932-33.  Despite the money being intended for

the Hawaii land development project, bank records indicate that Kenner diverted a portion of

these funds towards the purchase of DCSL.  On August 26, 2005, Kenner transferred $140,000

from Kau Holding to the Ula Makika account.  *See* Gov't. Exhibit 2109.  On the same day,

Kenner sent $110,000 from the Ula Makika account to the Baja Development account and

$25,000 to the DCSL Subsidiary Account, Propiedades DDM.  *See* Gov't Exhibits 2109; 2102.

Wire transfer records introduced during the forfeiture hearing show that on June 5, 2005,

$1.5 million was wired from an account owned by Jere Lehtinen to the account owned by the

Mexican Subsidiary, Propiedades DDM, which account was then used on June 6, 2005 to fund a

$2.1 million wire transfer to the seller of DCSL for part of the down payment on DCSL.  *See*

FORF-36; FORF-58.

In addition, bank records show that a total of $1.5 million of Jozef Stumpel's money was

sent to the seller of DCSL, $900,000 of which was laundered through the Ula Makika and LI IV

accounts, and $600,000 of which was laundered by Kenner through a Jowdy controlled account.

*See* FORF-36.  With regard to Stumpel's money that was laundered through the Ula Makika and

LI IV accounts, on May 16, 2005 and May 17, 2005, Kenner wired $446,000 and $510,000,

respectively, of Stumpel's money to the Ula Makika account.  *See* Gov. Ex. 2102.  On May 17,

2005, Kenner transferred $400,000 of Stumpel's money from the Ula Makika account to the LI

IV account.  *See id.*; Gov. Ex. 2101.  That same day, May 17, 2005, $350,000 was wire

transferred from the LI IV account to the seller of DCSL.  *See* Gov. Ex. 2101.  In addition, on

May 17, 2005 and May 18, 2005, Kenner wired $325,000 and $225,000, respectively, of

Stumpel's money that was in the Ula Makika account to the seller of DCSL.  *See* Gov. Ex. 2102;

*see also* FORF-36.  With regard to Stumpel's money that was laundered through the Jowdy

controlled account, $1.6 million was wired transferred by Kenner from Stumpel's account to

LOR Management, a Jowdy controlled account.  *See* FORF-36.  On May 30, 2005, $1 million of

Stumpel's money in the LOR Management account was transferred to the Propiedades DDM

account.  *See id.*   Thereafter, on June 7, 2005, $600,000 of Stumpel's money was wire

transferred from the Propiedades DDM account to the seller of DCSL as part of the $2.1 million wire transfer that included Lehntinen's money.  *See id.*

Furthermore, on or about August 29, 2005, $500,000 was transferred from the Baja Development account to Villarino.  *See* FORF-36; FORF-37.  Records admitted during the forfeiture hearing show that this money derived from a previous loan of approximately $750,000 from Glen Murray to Kenner and Jowdy.  *Id.*  The money was originally lent to finance an investment connected to the Palms Resort and Casino in Las Vegas.  *See* Forfeiture Hearing Transcript February 12, 2016 ("2/12/16 Forf. Tr.") 85:14-23.  When the Las Vegas investment fell through, Kenner, without Murray's knowledge or authorization, diverted $500,000 of the original loan amount to the Baja Development account to help finance the purchase of DCSL. *See id.*

In sum, defendants obtained approximately $7.7 million in legitimate and stolen moneys to fund the purchase of DCSL.  Despite the fact that approximately half of the $7.7 million came from Jere Lehtinen, Jozef Stumpel, Glen Murray and Ethel Kaiser, these individuals have never been given any ownership interest in DCSL.

Based upon the foregoing, the government seeks forfeiture of the DCSL property as property that is traceable to defendants' wire fraud and conspiracy to commit wire fraud.  Additionally, the DCSL property is forfeitable as property that facilitated money laundering transactions (i.e., made the wire transfers of tainted and commingled funds less difficult or more or less free from obstruction), was involved in a money laundering transaction (i.e., was the subject, or corpus, of the purchase or sale for which the proceeds and commingled funds were wired), was involved in defendants' money laundering conspiracy, and is traceable to funds that were involved in money laundering transactions.

B. **Forfeiture Money Judgment**

Defendants are jointly and severally liable for a money judgment representing the balance of the proceeds of their wire fraud convictions, as well the property involved in or traceable to their money laundering conspiracy.  The chart below reflects the amount of proceeds and property involved in or traceable to the Forfeitable Assets and any deductions made so as to avoid double counting.

| Forfeitable Asset | Proceeds/ Property Involved In | Deductions to Prevent Double Counting | Money Judgment Amount |
|---|---|---|---|
| Frailes | $ 7,220,000.00 | - | $ 7,220,000.00 |
| Peca Palms Unit | $ 2,520,021.59 | - | $ 2,520,021.59 |
| Moreau Palms Units | $ 1,246,982.00 | $ 650,000.00 | $ 596,982.00 |
| McKee Palms Unit | $ 1,570,000.00 | - | $ 1,570,000.00 |
| Del Mar | $ 10,845,650.00 | - | $ 10,845,650.00 |
| GSF | $ 3,130,000.00 | $ 735,147.00 | $ 2,394,853.00 |
| Victims' Lines of Credit | $ 9,851,542.00 | $ 3,555,000.00 | $ 6,296,542.00 |
| Victims' Hawaii Investment Money | $ 2,415,000.00 | $ 45,000.00 | $ 2,370,000.00 |
| Eufora Frauds | $ 1,625,000.00 | - | $ 1,625,000.00 |
| Centrum Loan Fraud | $ 3,500,000.00 | $ 2,200,000.00 | $ 1,300,000.00 |
| **Total** | $ 43,924,195.59 | $ 7,185,147.00 | **$ 36,739,048.59** |

1. **Frailes**

Frailes is an undeveloped beach front property north of Cabo San Lucas, Mexico.  It consists of three lots.  *See* 2/12/16 Forf. Tr. at 56-57.  Kenner's business partner, Robert Gaudet ("Gaudet"), helped broker a deal for the attempted purchase of the Frailes property.  *See id.* at 88.  As discussed below, Kenner diverted money from lines of credit held in victims' names to Gaudet for the attempted purchase of the Frailes property.  *See id.* at 57; Government Chart Exhibit at Forfeiture Hearing ("FORF CHART")-23.  Kenner also directed his clients to send money to Gaudet for the attempted purchase of the Frailes property, which money was

commingled with proceeds and facilitated the money laundering.  *See* 2/12/16 Forf. Tr. at 59.

Additionally, Kenner induced other investor victims to send money to him for investments in

Frailes, but then never forwarded the victims' money to Gaudet for the investments in Frailes;

instead, he kept their money.  *See* Trial Tr. at 1534-35; 2/12/16 Forf. Tr. at 64-65, 72-73; FORF-

23; FORF-24; FORF-27; FORF-52.  Despite the more than $7 million that was stolen and

commingled by Kenner for the purchase of Frailes, the purchase was never completed because

the seller's legal title to the property was challenged by third parties.  In fact, Kenner continued

to raise money for the attempted purchase even though the seller's title to the property was in

question during that time.  The victims' money was never recovered.

In two instances, Kenner sent line of credit money to Gaudet for down payments on one

of the lots that made up Frailes.  Victim Owen Nolan testified during the criminal phase of the

trial that he never had a line of credit associated with his investment in Hawaii, and that he never

gave Kenner permission to open a line of credit in his name.  *See* Trial Tr. at 2065; 2/12/16 Forf.

Tr. at 58.  Thus, defendants fraudulently opened a line of credit in Nolan's name.

On February 20, 2007, $150,000 from the Owen Nolan line of credit was transferred by

Kenner to the LI IV account.  *See* 2/12/16 Forf. Tr. at 58; FORF CHART-23; Gov. Ex. 2101,

2133.  That same day, February 20, 2007, Kenner transferred $150,000 from the LI IV account

to an account that was supposed to be used for the Hawaii land development project, but, rather,

was used by defendants as a vehicle to launder money (the "Ula Makika account").  *See* 2/12/16

Forf. Tr. at 58; FORF CHART-23; Gov. Ex. 2008; Trial Tr. at 42771.  Again, that same day,

February 20, 2007, Kenner wired $100,000 from the Ula Makika account to Gaudet for the

purchase of Frailes.  *See* 2/12/16 Forf. Tr. at 58; FORF CHART-23; Gov. Ex. 2008.  Notably,

while $100,000 from the line of credit in Nolan's name was stolen and wired to Gaudet for the

purchase of Frailes through a series of transfers, $50,000 from Owen Nolan's line of credit was sent from the line of credit to the LI IV account, and then from the LI IV account to the Ula Makika account, which account was controlled by Kenner (*see* Gov. Ex. 2082A, 2082B).  The $50,000, however, was never forwarded by Kenner to Gaudet to be invested in Frailes.  Instead, $40,000 of that money was sent to a third party named Rich Salgado, who had nothing to do with the Hawaii project.  *See* Gov. Ex. 2102.

Similarly, on March 12, 2007, Kenner sent $300,000 from Steve Rucchin's line of credit to the LI IV account.  *See* 2/12/16 Forf. Tr. at 58; FORF CHART-23; Gov. Ex. 2101; Gov. Ex. 2136.  One day later, on March 13, 2007, Kenner transferred $300,000 from the LI IV account to the Ula Makika account.  *See* 2/12/16 Forf. Tr. at 58; FORF CHART-23; Gov. Ex. 2101.  That same day, March 13, 2007, Kenner wired $300,000 from the Ula Makika account to Gaudet for the attempted purchase of Frailes.  *See* 2/12/16 Forf. Tr. at 58; FORF CHART-23; Gov. Ex. 2102.  Importantly, Rucchin testified during defendants' criminal trial that his line of credit was to be used only for the Hawaii Venture; thus, Kenner did not have permission to use funds from Rucchin's line of credit for the purchase of Frailes.  *See* Trial Tr. at 2721.

In sum, a total of $450,000 was stolen from Nolan's line of credit and from Rucchin's line of credit.  Of the stolen line of credit money, $400,000 is directly traceable to Gaudet for the attempted purchase of Frailes; $40,000 of the stolen funds were diverted by Kenner to Salgado, a third party, for Kenner's own benefit; and $10,000 was diverted to the Ula Makika account.  Therefore, defendants are jointly and severally liable for a money judgment in the amount of $450,000, representing the lines of credit moneys that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and are property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free

from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

In furtherance of defendants' conspiracy to launder fraud proceeds, Kenner also directed some of his clients to send money to Gaudet for the attempted purchase of the Frailes property. *See* 2/12/16 Forf. Tr. at 59. The clients' investment money was then commingled with the stolen line of credit money to fund the attempted purchase of Frailes. On August 31, 2007, Brian Berard wired $500,000 to Gaudet for an investment in Frailes. *See* FORF-20; FORF-52. On July 30, 2007, Matias Norstrom wired $1,000,000 to Hermosa Ventures. That same day, Hermosa Ventures wired the $1,000,000 to Gaudet for Norstrom's investment in Frailes. *See* FORF-21; FORF-52. On August 15, 2007, Michael Peca wired $1,000,000 to Gaudet for an investment in Frailes. *See* FORF-22; FORF-52. On September 16, 2007, Tyson Nash transferred $500,000 to Gaudet for an investment in Frailes. *See* FORF-18; FORF-19; FORF-52. On September 25, 2007, Turner Stevenson wired $500,000 to Gaudet for an investment in Frailes. *See* FORF-26; FORF-52. On March 20, 2009, William Ranford wired $250,000 to Gaudet for an investment in Frailes. *See* Gov. Ex. 1525B; FORF-52. On May 6, 2008, May 8, 2008, March 2, 2009, and March 3, 2009, Vitali Yachmenev transferred a total of $550,000 to Gaudet for an investment in Frailes. *See* FORF-28; FORF-29; FORF-31. On December 7, 2007, John Kaiser invested $1,000,000 in Frailes. *See* FORF-52. On December 28, 2007, Steve Rucchin wired $500,000 to Gaudet for an investment in Frailes. Lastly, on October 23, 2007, Greg de Vries wired $500,000 to Gaudet for an investment in Frailes. *See* FORF-52; FORF-29. In total, $6,300,000 was sent to Gaudet and commingled with the line of credit proceeds for the attempted purchase of Frailes. Therefore, defendants are jointly and severally liable for a money

31

judgment in the amount of $7,300,000 representing the investment funds that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction) and were involved in defendants' money laundering conspiracy.

In addition to the foregoing, the following investors sent money to Kenner to invest in Frailes; however, the investors' money was never sent by Kenner to Gaudet for their investments and their investments in Frailes were not recognized. *See* 2/12/16 Forf. Tr. at 64-65, 72-73; FORF-52.  On January 23, 2008, Jonathan Smith wrote a check to Kenner in the amount of $100,000 for an investment in Frailes.  *See* Trial Tr. at 1535; FORF-27.  Similarly, on January 23, 2008, Nicholas Privitello wrote a check to Kenner in the amount of $250,000 for an investment in Frailes.  *See* Trial Tr. at 1534; FORF-23; FORF-27.  Further, on February 17, 2008, Frank Sconzo wrote a check in the amount of $190,000 to third-party John Kaiser for an investment in Frailes.  *See* FORF-24.  Kaiser then sent $120,000 of Sconzo's money to Kenner for Sconzo's investment in Frailes.  *See* 2/12/16 Forf. Tr. at 64-65; FORF-24; FORF-25.  As a result, defendants are jointly and severally liable for a money judgment in the amount of $470,000 representing these victims' investment funds as they constitute proceeds that Kenner would not have obtained or retained but for the Frailes money laundering and wire fraud conspiracies, and property that was involved in defendants' money laundering conspiracy.

Based upon the foregoing, defendants are jointly and severally liable for a money judgment in the amount of $7,220,000.

## 2. The Palms Units

Four units at the Palms Place in Las Vegas are traceable to defendants' wire fraud and conspiracy to commit wire fraud violations, and were involved in and are traceable to defendants' laundering of the fraud proceeds, namely, Unit 56304 (the "Peca Palms Unit"), Units

31302 and 31304 (collectively, the "Moreau Palms Units"), and Unit 55304 (the "McKee Palms Unit"). As discussed below, fraud proceeds, including, but not limited to, stolen line of credit money and Centrum Loan funds, were laundered by defendants through several bank accounts, such as the LI IV account, the Ula Makika account, the Constantine Management Group, Ltd.'s account (the "CMG account"), and Stewart Title's escrow account, and commingled with other money in those accounts, and were then used to pay down payments for the purchases of the Palms units. Accordingly, defendants are jointly and severally liable for a money judgment in the amount of the tainted funds that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud violations, were involved in and are traceable to defendants' laundering of the fraud proceeds, and were involved in defendants' money laundering conspiracy.

### a.    The Peca Palms Unit

As set forth below, the down payment for the purchase of the Peca Palms Unit was paid by Kenner using tainted funds, and, as such, the Peca Palms Unit is traceable to defendants' wire fraud and conspiracy to commit wire fraud violations, was involved in and is traceable to defendants' laundering of the fraud proceeds, and was involved in defendants' money laundering conspiracy.

### i.    Stolen Line of Credit Money

The evidence presented during the forfeiture hearing established that on January 21, 2005, $200,000 from victim Steve Rucchin's line of credit at Northern Trust Bank was sent to the LI IV account. *See* 2/12/16 Forf. Tr. at 53; FORF CHART-22; Trial Tr. 2721; Gov. Ex. 2101; Gov. Ex. 2136. That same day, $75,000 of Rucchin's line of credit money was wired from the LI IV account to the Kenner owned and controlled Guide Dog Management/GDM 33, Inc. account (the "GDM account"). *See* Gov. Ex. 2101. Similarly, on January 25, 2005, $300,000 from victim Mattias Norstrom's line of credit at Northern Trust Bank was sent to the LI IV

33

account.  *See* 2/12/16 Forf. Tr. at 51-53; FORF CHART-22; Gov. Ex. 2138; Gov. Ex. 2101.

That same day, January 25, 2005, $270,000 was wired from the LI IV account to the GDM

account, *see* 2/12/16 Forf. Tr. at 53; FORF CHART-22; Gov. Ex. 2101, and then $75,000 was

wired from the GDM account to the CMG account.  *See* Gov. Ex. 1751.  The next day, January

26, 2005, an additional $270,000 was wired from the GDM account to the CMG account.  *See id.*

On January 27, 2006, a check from the CMG account in the amount of $100,000 was written to

Stewart Title for the purchase of the Peca Palms Unit.  *See* Gov. Ex. 4408; FORF-69.

In sum, a total of $500,000 was stolen from Rucchin's line of credit and Norstrom's line

of credit.  Of those stolen funds, $100,000 is directly traceable to Stewart Title for the down

payment for the purchase of the Peca Palms Unit; $155,000 of the stolen funds was diverted to

the LI IV account; and $245,000 was diverted to the CMG account.  Therefore, defendants are

jointly and severally liable for a money judgment in the amount of $500,000, representing the

line of credit money that is proceeds of defendants' wire fraud and conspiracy to commit wire

fraud, and is property that facilitated money laundering transactions (i.e., made the wire transfers

of proceeds and commingled funds less difficult or more or less free from obstruction), was

involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of

proceeds and commingled funds) and was involved in defendants' money laundering conspiracy.

### ii.  <u>Stolen Centrum Loan Money</u>

Evidence at trial also established that defendants obtained a mortgage from Centrum

Financial Services using the Hawaii investment property to secure the loan.  *See* Gov. Ex. 3712;

Gov. Ex. 9037C.  The Centrum Loan was supposed to be used solely to fund the development of

property in Hawaii.  However, the funds from the Centrum Loan were diverted by defendants to

purchase, *inter alia*, condominium units at the Palms.  *See* Trial Tr. at 3996-98; Government

Chart Exhibit at Criminal Phase of Trial ("Tr. Chart") 5; Gov. Ex. 3703; 2/12/16 Forf. Tr. at 46.

In this regard, on July 19, 2005, $2,576,364.54 from the Centrum Loan was deposited into the LI IV account.  *See* Gov. Ex. 2013; 2/12/16 Forf. Tr. at 46; Tr. Chart 4.  On July 20, 2005 and July 21, 2005, $50,000 and $300,200, respectively, were transferred from the LI IV account to the Ula Makika account.  *See* Gov. Ex. 2013; Gov. Ex. 2102.  On July 21, 2005, $300,000 was wired from the Ula Makika account to the CMG account.  *See* Gov. Ex. 2018.  In addition, on July 22, 2005, $350,000 was transferred from the LI IV account to the Ula Makika account.  *See* Gov. Ex. 2013; Gov. Ex. 2018.  That same day, July 22, 2005, $350,000 was wired from the Ula Makika account to the CMG account, *see* Gov. Ex. 2018, and then two checks totaling $650,000 were drawn on the CMG account and sent to Stewart Title.  *See* Trial Tr. at 3997; Gov. Ex. 4408.  Of the $650,000 that was sent to Stewart Title, $274,000 was credited towards the purchase of the Peca Palms Unit.  *See* Gov. Ex. 4408.  Thus, $650,000 of the $2,576,364.54 in Centrum Loan money was fraudulently diverted by Kenner to the CMG account, and was thereafter diverted by defendants to Stewart Title's escrow account to pay, *inter alia*, a $274,000 down payment on the Peca Palms Unit.  $1,876,364.54 of the $2,576,364.54 in Centrum Loan money was transferred to the LI IV account, which account was used by defendants to launder funds, and the remaining $50,000 of the $2,576,364.54 in Centrum Loan money was transferred to the Ula Makika account, another account that was used by defendants to launder funds.

Accordingly, defendants are jointly and severally liable for a money judgment in the amount of $650,000, representing the Centrum Loan money that is proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and is property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the

subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

### iii.   Additional Funds Used to Purchase the Peca Palms Unit

In addition to the foregoing, a check in the amount of $718,970 that was paid to Stewart Title from the CMG account cleared on August 10, 2005.  *See* Gov. Ex. 1751; Gov. Ex. 4408; Gov. Ex. 1753.  Of the $718,970 paid to Stewart Title, $282,120 was credited towards the purchase of the Peca Palms Unit, and, as discussed *infra*, $121,982 was credit towards the purchase of the Moreau Palms Units ($78,284 for Unit 31302 and $43,698 for Unit 31304).  *See* Gov. Ex. 1751; Gov. Ex. 1753; Gov. Ex. 4408.  Prior to August 10, 2005, however, the CMG account was funded with proceeds and commingled funds that were laundered by defendants through several bank accounts.

Between August 5, 2005 and August 8, 2005, a total of $700,000, including $400,000 from victim, Ethel Kaiser, was deposited into an account that was used to receive loan proceeds for the purchase of property known as Waikapuna (the "Kau Holdings account").  *See* Gov. Ex. 2109.  The $700,000 was intended to be a loan to Kenner for the purchase of property in Hawaii, and was supposed to be repaid by Kenner with 12 percent interest; however, that money was not used for the purchase of property in Hawaii and was not repaid by Kenner, s*ee* Trial Tr. at 932-33; rather, the money was used by Kenner and Constantine to, *inter alia*, fund the purchases of units at the Palms.

On August 10, 2005, $280,000 was transferred from the Kau Holdings account to the Ula Makika account, where it commingled with line of credit and Centrum Loan funds that were already in the Ula Makika account, as discussed in Sections III(B)(2)(a)(i), III(B)(2)(a)(ii), III(B)(2)(b)(i), and III(B)(3).  *See* Gov. Ex. 2102; Gov. Ex. 2109.  That same day, August 10,

2005, $275,000 was wired from the Ula Makika account to the CMG account, where the tainted $275,000 further commingled with line of credit proceeds that were in the CMG account, as discussed in Section III(B)(2)(a)(i).  *See* Gov. Ex. 1751; Gov. Ex. 2102.  The CMG account then paid $718,970 in tainted funds to Stewart Title, of which the Peca Palms Unit received a $282,120 credit.  *See* Gov. Ex. 4408.

Accordingly, with regard to the Peca Palms Unit, defendants are jointly and severally liable for a money judgment in the amount of $282,120 representing the funds that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud, as well as the funds that facilitated money laundering transactions (i.e., were commingled with fraud proceeds to make the wire transfers of proceeds and commingled funds for the purchase of the Peca Palms Unit less difficult or more or less free from obstruction), were involved in money laundering transactions (i.e., were the subject, or corpus, of wire transfers of proceeds and commingled funds for the purchase of the Peca Palms Unit), and were involved in defendants' money laundering conspiracy.

In addition to the foregoing, on October 21, 2008 and October 30, 2008, John Kaiser wired $250,000 and $250,000, respectively, to Kenner's personal bank account at Wells Fargo Bank.  *See* Gov. Ex. 1420; Forfeiture Hearing Transcript March 9, 2016 ("3/9/16 Forf. Tr.") at 67.  Kaiser's $500,000 was then sent by Kenner to Stewart Title for the purchase of the Peca Palms Unit (a condominium unit in which John Kaiser received no ownership interest).  This is evidenced by an email correspondence between Kenner and Michael Peca.  When Michael Peca wrote an email to Kenner about his frustration with the way the transaction for the Peca Palms Unit was being handled, Kenner responded to Michael Peca's email, copying John Kaiser on same, and referenced the $500,000 investment in the Peca Palms Unit that had come from John

37

Kaiser.  *See* FORF-106.  Thus, an additional $500,000 facilitated the money laundering

transactions (i.e., was commingled with fraud proceeds to make the wire transfers of proceeds

and commingled funds for the purchase of the Peca Palms Unit less difficult or more or less free

from obstruction) and was involved in defendants' money laundering conspiracy.

### iv.   The Pecas' Investment Money

Despite the fact that the down payment money for the Peca Palms Unit was funded by

multiple individuals, as discussed above, those individuals were not given ownership interests in

the Peca Palms Unit.  On the contrary, an entity owned by Constantine, PP 56, LLC, was listed as

the purchaser on the purchase agreement for the Peca Palms Unit.  Although Constantine's entity

was the stated purchaser of the Peca Palms Unit, in or around the end of 2008, Kenner approached

victims, Michael Peca and Kristin Peca, about purchasing the Peca Palms Unit in a "Joint

Venture" between the Pecas and Kenner.  *See* FORF-15.  In an email written from Kenner to the

Pecas on October 30, 2008, Kenner outlined the terms of the Joint Venture.  *Id.*  In the email,

Kenner stated that "for approximately 2 ½ years," *he* had deposited $656,120 in the escrow

account for the purchase of the Peca Palms Unit.  *Id.*  Moreover, according to the "terms of the

Joint Venture between [Kenner] and [the Pecas]," the Pecas would be responsible for obtaining a

mortgage in their name for the Peca Palms Unit and paying $330,000 at the closing, while Kenner

would be responsible for paying all of the mortgage payments.  *Id.*; *see also* 2/12/16 Forf. Tr. at

54.  The email provided that the Peca Palms Unit would be rented, and that any rental revenue

which exceeded the monthly expenses for the unit would be split "50/50 after closing."  *See*

FORF-15.  Similarly, the email provided that upon a sale of the Peca Palm Unit, Kenner and the

Pecas would split the net revenue of the sale after they had been repaid their respective down

payments and expenses for the unit.  *Id.*  It was not until May 2009, after the purchase of the Peca

Palms Unit, and during a meeting with Constantine and Kenner in which the Pecas met

Constantine for the first time and defendants pitched the GSF to the Pecas, that the Pecas learned that Constantine was the Pecas' "partner" in the Peca Palms Unit, rather than Kenner.  *See* Trial Tr. 422, 436-39, 683.

On December 23, 2008, the Peca Palms Unit closed and the Pecas wired $1,235,000 from their bank account to Stewart Title; however, on December 30, 2008, $661,000 was wired back to the Pecas.  *See* FORF CHART-22.  All told, the Pecas paid $574,000 at closing, and they had in their name a $2.3 million mortgage for the Peca Palms Unit.  Importantly, the Pecas' $574,000 purchase money had been commingled with the other victims' moneys to fund the purchase of the Peca Palms Unit.

As a result, defendants are jointly and severally liable for a money judgment in the amount of $574,000, representing the Pecas' investment money that facilitated a money laundering transaction (i.e., was commingled with fraud proceeds to make the wire transfers of proceeds and commingled funds for the purchase of the Peca Palms Unit less difficult or more or less free from obstruction) and was involved in defendants' money laundering conspiracy.

### v.    <u>Mortgage Payments Made by Kenner with Stolen Money</u>

Subsequent to the purchase of the Peca Palms Unit on January 23, 2008, Kenner failed to pay many of the mortgage payments as required by the "Joint Venture" agreement, as well as the taxes for the Peca Palms Unit.  For those payments of the mortgage that Kenner did make, he stole other people's money to fund them.  More specifically, $100,000 of Ranford's investment in Eufora and $100,000 of de Vries's investment in Eufora were diverted to Gaarn on February 6, 2009, who, at Kenner's direction, sent a $13,901.59 payment to Waterstone Bank for the mortgage.  *See* Gov. Ex. 1513; Gov. Ex. 1907; Gov. Ex. 2213; Gov. Ex. 2302; Trial Tr. at 2501.  Accordingly, defendants are jointly and severally liable for a money judgment in the amount of $13,901.59, representing Ranford's and de Vries's investment moneys that are proceeds of

39

defendants' wire fraud and conspiracy to commit wire fraud and were involved in defendants' money laundering conspiracy.

As a result of Kenner's failure to pay the majority of the mortgage payments, the Pecas were instead forced to pay them. Although Kenner testified under oath that Constantine, Kaiser and Peca owned the Peca Palms Unit, *see* Forfeiture Hearing Transcript April 6, 2016 ("4/6/16 Forf. Tr.") at 243, and, although, in or around May 2010, Kenner began inquiring about selling the Peca Palms Unit for approximately $3.5 million, to date, the Peca Palms Unit is still owned by the Pecas, has been paid for by the Pecas, and is at risk of foreclosure.

In sum, with regard to the Peca Palms Unit, defendants are jointly and severally liable for a money judgment in the amount of $2,520,021.59, representing funds that: 1) are proceeds of defendants' wire fraud and conspiracy to commit wire fraud violations; 2) that were involved in and are traceable to defendants' laundering of the fraud proceeds, and 3) were involved in defendants' money laundering conspiracy.

### b. The Moreau Palms Units

Down payments for the purchases of the Moreau Palms Units were paid by defendants using diverted funds, and, as such, the Moreau Palms Units are traceable to defendants' wire fraud and conspiracy to commit wire fraud violations, were involved in and are traceable to defendants' laundering of the fraud proceeds, and were involved in defendants' money laundering conspiracy.

### i. Money Diverted From LI IV Account

The total purchase price for the Moreau Palms Units was $1,434,910. *See* Gov. Ex. 3505; Gov. Ex. 3506. Evidence establishes that on June 27, 2005, a check was issued from the CMG account to Stewart Title in the amount of $50,000. *See* Gov. Ex. 1753 at 21. Each of the Moreau Palms Units received credit for $25,000. *See id.*; Gov. Ex. 4408. In order to come up

with the $50,000, on June 8, 2005, Kenner transferred $38,000 from the LI IV account to the Big Isle IV account (the "BI IV account"). Notably, as discussed in Sections III(A)(2) and III(B)(2)(a)(i), at the time of the transfer, the LI IV account contained line of credit moneys that had been stolen from Rucchin, Norstrom, and Gonchar. On June 15, 2005, $27,000 was transferred from the BI IV account to the Ula Makika account, and, that same day, $25,000 was transferred from the Ula Makika account to the CMG account. *See* Gov. Ex. 1751; Gov. Ex. 2102; Gov. Ex. 2106. The $25,000 in proceeds from the Ula Makika account was commingled with funds in the CMG account, which account, as discussed in Section III(B)(2)(a)(i), also contained stolen line of credit money, and then $50,000 from the tainted CMG account was transferred to Stewart Title for the purchase of the Moreau Palms Units.

Accordingly, defendants are jointly and severally liable for a money judgment in the amount of $50,000, representing the money that was transferred to Stewart Title's escrow account for the purchase of the Moreau Palms Unit which constitutes proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

### ii.   Stolen Centrum Loan Money

As discussed in Section III(B)(2)(a)(ii), *supra*, on July 22, 2005, two checks written to Stewart Title totaling $650,000 were drawn from the CMG account, and are traceable to money stolen from the Centrum Loan. Of the $650,000 sent to Stewart Title, Unit 31302's escrow account received $74,000, and Unit 31304's escrow account received $41,000. *See* Gov. Ex. 4408.

Thus, as discussed in Section III(B)(2)(a)(ii), *supra*, defendants are jointly and severally liable for a money judgment in the amount of $650,000, representing the Centrum Loan money that is proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and is property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

### iii.   Ethan Moreau's and Other Investors' Money

Kenner approached victim Ethan Moreau about purchasing Units 31302 and 31304 from Constantine for $1,950,000.[6] *See* FORF-6. Moreau agreed to the sale. On July 27, 2005, Ethan Moreau wired $290,000 to the CMG account. *See* 2/12/16 Forf. Tr. at 45, 50; Gov. Ex. 1751. As discussed in Section III(B)(2)(a)(i), at the time of this wire transfer, the CMG account contained money that had been stolen from Rucchin's line of credit and Norstrom's line of credit. Accordingly, the government seeks a money judgment in the amount of $290,000, representing Ethan Moreau's investment money that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

In addition to Moreau's investment money, other victims' money, as discussed more fully in Section III(B)(2)(a)(iii), was deposited and commingled with the proceeds in the CMG

---

[6] Although Constantine purchased the units for $1,434,910 ($886,420 for Unit 31302 and $548,490 for Unit 31304), he wanted to sell the units to Moreau for $1.8 million so that he could make a profit on the sale to Moreau without disclosing that fact to Moreau. *See* Gov. Ex. 3505; Gov. Ex. 3506; FORF-7; FORF-6, attached hereto.

account.  The CMG account then paid $718,970 in tainted funds to Stewart Title.  Of this money, $121,982 was credit towards the purchase of the Moreau Palms Units ($78,284 towards Unit 31302 and $43,698 towards Unit 31304).  *See* Gov. Ex. 4408.  Thus, with regard to the Moreau Palms Units, defendants are jointly and severally liable for a money judgment in the amount of $121,982 representing the funds that facilitated money laundering transactions (i.e., were commingled with fraud proceeds to make the wire transfers of proceeds and commingled funds for the purchase of the Peca Palms Unit less difficult or more or less free from obstruction), were involved in money laundering transactions (i.e., were the subject, or corpus, of wire transfers of proceeds and commingled funds for the purchase of the Peca Palms Unit), and were involved in defendants' money laundering conspiracy.

In May 2008, Constantine obtained a loan in the amount of $1,000,000 from a Boston law firm, Gilmartin, Magence & Ross ("Gilmartin"), to help fund the purchase of the Moreau Palms Units.  *See* Gov. Ex. 3507.  On June 10, 2008, Gilmartin and Constantine executed a Promissory Note wherein Kenner was a Guarantor on the loan.  *See* Gov. Ex. 3508.  On September 14, 2008, Kenner emailed Ethan Moreau about closing on the units.  *See* FORF-6. On September 17, 2008, Moreau responded to Kenner's email conveying his concerns about the deal.  *Id.*  Kenner responded that Moreau should close on the sale of the Moreau Palms Units and stated that Constantine had given Moreau a good deal.  *Id.*  Moreau, however, decided not to purchase the Moreau Palms Units and was never repaid any of his $290,000.  Kenner and Constantine ultimately defaulted on the Gilmartin loan, and the two units were sold in April 2010.  Notably, however, before the units were foreclosed upon, defendants diverted $120,000 in funds from the GSF fund to pay for the Gilmartin loan.  *See* Gov. Ex. 80; Gov. Ex. 3592.  In addition, of the $200,000 invested by Ranford and de Vries in Eufora on February 6, 2009 that

43

was diverted from Eufora to Gaarn, as discussed *infra*, $15,000 was sent by Gaarn, at Kenner's direction, to pay the Gilmartin loan.  *See* Gov. Ex. 1513; Gov. Ex. 2213; Gov. Ex. 2302. Accordingly, defendants are jointly and severally liable for a money judgment in the amount of $135,000, representing the money paid towards the Gilmartin loan that constitutes proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and was involved in defendants' money laundering conspiracy.

In addition, defendants used the Moreau Palms Units to facilitate the laundering of the GSF monies.  In their efforts to convince one of the victims to contribute money to the GSF, and to further perpetuate the GSF fraud after other victims had already contributed, defendants promised the contributors that they would obtain an interest in the Moreau Palms Units, which they represented to be significant assets with significant equity.  *See* Gov. Ex. 757 (GSF email); Trial Tr. at 1921-1922 (Palms interest promised in initial pitch to Nash).  In fact, the GSF participants did not receive any such interest and the Moreau Palms Units went into foreclosure and were resold to other people.  *See* Gov. Ex. 3507 and Gov. Ex. 3508 (Moreau Palms Units' loan); Gov. Ex. 3503 and Gov. Ex. 3504 (Moreau Palms Units' resale).  Therefore, in connection with the GSF, the Moreau Palms Units constitute property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), were involved in money laundering transactions (i.e., were the subject, or corpus, of wire transfers of proceeds and commingled funds), and were involved in defendants' money laundering conspiracy.

All told, with regard to the Moreau Palms Units, defendants are jointly and severally liable for a money judgment in the amount of $596,982, representing funds that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud violations, were involved in and

44

traceable to defendants' laundering of the fraud proceeds, and were involved in defendants' money laundering conspiracy.[7]

### c.    The McKee Palms Unit

On March 14, 2005, a third party investor, Jim Grdina, through his company Intrigue Penthouse, LLC ("IPLLC"), signed a deposit agreement for the purchase of the McKee Palms Unit for $3,243,000. *See* 2/12/16 Forf. Tr. at 43-44, 46-47. Grdina subsequently sold his membership interest in IPLLC, and, thus, the right to purchase the McKees Palms Unit, to CMG. *See id.*; FORF-11. According to the transfer agreement, CMG was required to pay Grdina the sum of $1.2 million. *Id.* Notably, as discussed below, the money CMG paid Grdina pursuant to their agreement consisted of proceeds and commingled funds.

On August 24, 2005, Constantine paid $275,000 from the CMG account to Intrigue Investments, Grdina's company. *See* Gov. Ex 1751; Gov. Ex. 1753. Prior to that payment, on August 5, 2005 and August 8, 2005, a total of $700,000 was sent from Ethel Kaiser and two other investors to the Kau Holdings account, as discussed in Section III(B)(2)(a)(iii). Further, as discussed in Section III(B)(2)(a)(iii), on August 10, 2005, $280,000 was transferred from the Kau Holdings account to the Ula Makika account, where it was commingled with line of credit proceeds and Centrum Loan funds that were already in the Ula Makika account. That same day, August 10, 2005, $275,000 was wired from the Ula Makika account to the CMG account, where the tainted $275,000 was further commingled with line of credit proceeds that were in the CMG account, as discussed in Section III(B)(2)(a)(i). *See also* Section III(B)(2)(a)(iii). The CMG account then paid $275,000 in tainted funds to Grdina on August 24, 2005. *See* Gov. Ex 1751;

---

[7] Since the government included the Centrum Loan money in its calculation for a money judgment pertaining to the Peca Palms Unit in Section III(B)(2)(a)(ii), it did not include the Centrum Loan money in its calculation here so as to avoid double counting.

45

Gov. Ex. 1753.

On November 3, 2005, Constantine paid Grdina a second payment in the amount of

$325,000.  *See* Gov. Ex. 1751; Gov. Ex. 1753.  Prior to that date, on October 28, 2005, $375,000

was wired from Sergei Gonchar's line of credit to the LI IV account.  *See* Gov. Ex. 2101; Gov.

Ex. 2139.  Notably, during the criminal phase of trial, Gonchar testified that he was unaware of

any line of credit existing in his name.  *See* Trial Tr.at 4845-4856.  On October 31, 2005, a total

of $324,000 in proceeds was transferred from the LI IV account to the Ula Makika account.  *See*

Gov. Ex. 2101.  That same day, October 31, 2005, $330,000 in tainted funds were wired from the

Ula Makika account to the CMG account, *see* Gov. Ex. 2102, and, from the CMG account,

$325,000 in tainted funds was paid to Grdina's company, Intrigue Investments, on November 3,

2005.  *See* Gov. Ex. 1751; Gov. Ex. 1753.  Thus, Constantine paid Grdina a total of $600,000 in

tainted funds to obtain the purchase agreement for the McKee Palms Unit.

On November 25, 2008, Grdina purportedly entered into an Assignment of Condominium

agreement with Jay McKee, whereby McKee would take over as the purchaser of the McKee

Palms Unit.  *See* FORF-13.  Significantly, the Assignment of Condominium listed McKee's

contact information as "Jay McKee, c/o Phil Kenner, 10705 E. Cactus Rd., Scottsdale, AZ," *see*

FORF-13, and, as Kenner testified to at the forfeiture hearing, the 10705 E. Cactus Road address

was his address (*see* 4/4/16 For. Tr. at 36), whereas McKee lived in Buffalo, New York at that

time.

In or around the end of June 2009, Kenner traveled to Florida to meet with McKee and

his wife to discuss the McKees' buying the McKee Palms Unit.  *See* FORF-55; FORF CHART-

21.  Kenner proposed the same "deal" to the McKees that he had proposed to the Pecas, namely,

that Kenner would pay the mortgage payments for the McKee Palms Unit and split the profits

from the McKee Palms Unit with the McKees, and the McKees would invest approximately $300,000 in the unit. *See* FORF-55. On July 14, 2009, the McKee Palms Unit closed, and McKee was told at the last moment that he would have to invest more than $300,000. *See id.* McKee ultimately invested $970,000 in the unit. *See* FORF CHART-21.

On October 15, 2010, McKee sent an email to Kenner titled, "Investments," wherein McKee described all of his investments and stated that none of his investments had panned out as promised by Kenner. *See* FORF-55. McKee discussed the fact that he had not wanted to invest in the McKee Palms Unit, but Kenner had told him that he would lose his deposit if he did not and that the purchase of the McKee Palms Unit was a great deal. *See* FORF-55. Notably, Kenner told McKee that the McKee Palms Unit was a great deal despite the fact that the property had appraised at approximately $400,000 *less* than the purchase price. Ultimately, McKee had to pay the mortgage payments because Kenner failed to do so. Although Kenner testified under oath that Peca, Constantine and Kaiser own the McKee Palms Unit, *see* 4/6/16 Forf. Tr. at 243, McKee alone is responsible for the mortgage payments on the McKee Palms Unit and the unit is at risk of being foreclosed upon. *See* FORF-55. But for defendants' using tainted funds to buy the purchase agreement for the McKee Palms Unit from Grdina, they would not have been able to dupe McKee into obtaining a mortgage to purchase the unit. Indeed, McKee's investment in the purchase of the McKee Palms Unit was "the outgrowth of [the defendant's] fraudulent beginnings." *Warshak*, 631 F.3d at 332.

In sum, with regard to the McKee Palms Unit, defendants are jointly and severally liable for a money judgment in the amount of $1,570,000, representing funds that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud violations, were involved in and are

traceable to defendants' laundering of the fraud proceeds, and were involved in defendants' money laundering conspiracy.

### 3.   Del Mar

Del Mar consists of ten thousand acres of land in Northern Baja, Mexico.  *See* Deposition of Jowdy, *Murray v. Jowdy*, dated April 13, 2009 ("Murray v. Jowdy Tr."), attached hereto, at p. 98; April 29 SEC Tr., Ex. 32.  An entity known as Diamante Del Mar, LLC owned the Del Mar property.  Baja Management, LLC, in turn, owned 93% of Diamante Del Mar, LLC.  *See* SEC Hearing Transcript, *In re Diamante Del Mar*, dated April 28, 2011 ("April 28 SEC Tr."), attached hereto, Ex.31; April 29 SEC Tr., Ex. 32.  As of August 21, 2004, Jowdy owned 80% of Baja Management, Bill Najam owned 5% of Baja Management, Kenner owned 5% of Baja Management, and some of Kenner's player-clients owned the remaining 10% of Baja Management.  *See* April 29 SEC Tr., Ex. 32.

As summarized below, the purchase of Del Mar is part of defendants' wire fraud and wire fraud conspiracy because Kenner used proceeds from the Hawaii fraud to partially fund the purchase of the property.  In addition, Del Mar is tied to defendants' money laundering conspiracy in that Kenner commingled proceeds from the Hawaii fraud with his clients' legitimate investments in the Del Mar project in order to conceal his misappropriation of client funds.

Kenner and Jowdy used client funds to purchase Del Mar, and served as managers of the project to build a resort on the property.  *See* Trial Tr. at 3111; April 29 SEC Tr., Ex. 32. Between August 5, 2002 and March 29, 2005, Kenner and Jowdy raised $9.1 million from Kenner's clients to cover the costs associated with the project.  *See* FORF-48; Trial Tr. at 3112. In addition, from November 2, 2004 through May 4, 2005, Kenner sent $1,580,000 from the hockey player clients' lines of credit to bank accounts established for the benefit of Del Mar.  *See*

FORF CHART-24.  However, as previously discussed, the hockey players' lines of credit were supposed to be used solely for the Hawaii land development project, and, further, some of the players did not authorize defendants to establish lines of credit in their names.  *See, e.g.*, Trial Tr.at 2065, 2721, 4845-56.  Thus, defendants are jointly and severally liable for a money judgment in the amount of $10,680,000 representing (1) the line of credit money that is proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and is property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy; and (2) the clients' investment money that was commingled with the line of credit proceeds for the attempted purchase of Del Mar, and, thus, facilitated the money laundering transactions, and was involved in defendants' money laundering conspiracy.

On April 1, 2005, KPMG, LLP appraised Del Mar at a value of $68,900,000.  *See* FORF-85; April 29 SEC Tr., Ex. 32.  Following the appraisal, Jowdy and Kenner mortgaged the Del Mar property to secure a $3 million loan from KSI Capital Corporation ("KSI Loan").  They also diverted funds intended for other projects to fund the KSI Loan.  In this regard, on July 19, 2005, Kenner transferred $110,000 of the Centrum Loan money from the LI IV account to the Ula Makika account.  *See* Gov. Ex. 2013; Gov. Ex. 2102.  That same day, July 19, 2005, Kenner wire transferred $50,000 from the Ula Makika Account to an account held in the name of Del Mar. *See* Gov. Ex. 2102.  As noted previously, the Centrum Loan money was supposed to be used solely for improvements to the Hawaii property.  *See* Gov. Ex. 3703.  Thus, defendants are jointly and severally liable for a money judgment in the amount of $50,000 representing the

49

Centrum Loan money that is proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and is property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

On November 12, 2005, Jowdy emailed Kenner informing him that they had received a commitment from KSI for the $3 million loan, but they would need to provide $40,000 by that Monday.  *See* FORF-67.  The $40,000 reportedly consisted of a $30,000 fee owed to KSI and an additional $10,000 attorney's fee.  *Id.*  Records introduced during the guilt phase of the trial reveal that Kenner and Jowdy used money intended for the Hawaii investment project to pay these fees.  Specifically, on November 15, 2005, Vitali Yachmenev's $45,000 Hawaii investment was sent from the LI IV account to the Ula Makika Account.  *See* Gov. Ex. 2101.  On that same day, $40,000 was transferred from the Ula Makika account to Del Mar's bank account.  *Id.*  On November 17, 2005, a wire transfer in the amount of $30,000 was sent from the Del Mar account to KSI, while another wire transfer in the amount of $10,000 was sent to the law firm of Wilentz, Goldman and Wallman.  *See* FORF-32.  Thus, defendants are jointly and severally liable for a money judgment in the amount of $45,000 representing Yachmenev's Hawaii investment money that is proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and is property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds),  and was involved in defendants' money laundering conspiracy.

50

The KSI loan was finalized on February 21, 2006, and Jowdy personally guaranteed the loan. Despite the November 2005 email exchange between Jowdy and Kenner, Kenner later claimed that he had not become aware of the KSI loan until 2008. *Compare* FORF-67 (email exchange between Jowdy and Kenner discussing the KSI loan) *with* April 28 SEC Tr. at pp. 243-43; April 29 SEC Tr. at p. 15 (Kenner testifies that he did not learn about the KSI loan until 2008).

Between the execution of the loan in February 2006, and August 2009, Del Mar made only interest payments on the loan using diverted funds that were intended for the DCSL project. *See* FORF-32; Trial Tr. at 581, 582, 4914. In this respect, on August 30, 2006, $650,000 from Lehman Bros., the primary lender for the DCSL project, was deposited in the Baja Development account for the purchase of DCSL. *See* FORF-107, attached hereto. Shortly thereafter, on September 5, 2006, $100,000 of those funds was transferred from the Baja Development account to Del Mar's account. *See* FORF-108, attached hereto. Three days later, on September 8, 2006, an additional $25,000 of the Lehman funds was wired to the Del Mar account. *Id.* Subsequently, three payments totaling $70,650 of the laundered funds were wired to KSI from the Del Mar account, namely, $14,950 on September 19, 2006, $27,850 on October 24, 2006, and $27,850 on December 1, 2006. *See* FORF-32; FORF-108. Accordingly, defendants are jointly and severally liable for a money judgment in the amount of $70,650, representing the Lehman funds that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of

51

proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

Following Del Mar's default on the KSI loan, Kenner's hockey-player clients sued Del Mar in June 2009.  *See* Trial Tr. at 3870-71.  The following January, KSI also sued Del Mar and Jowdy in United States District Court in New Jersey.  The parties in the KSI suit settled in November 2010.  *See* Murray v. Jowdy Tr. at p. 219.  As part of the settlement terms, Jowdy and Del Mar executed confessions of judgment for the full amount of the KSI loan.  The judgments were held in escrow until April 2011, in order to allow Del Mar time to obtain the financing needed to pay the KSI loan.  *See* FORF-33, attached hereto.

Del Mar, however, was unable to obtain the necessary financing.  Consequently, Jowdy and KSI entered into a new agreement in or around September 2013 whereby Del Mar executed documents transferring the property to KSI in lieu of KSI recording the judgment against KSI and Del Mar.  *See* FORF-33, attached hereto.  Del Mar surrendered the property to KSI in September 2013.  *See* Trial Tr. at 3113, 3228, 5057.  This transfer occurred without the knowledge of Kenner's clients, who were not informed of the agreements between KSI, Jowdy and Del Mar or the ultimate surrender of the property to KSI.  *See* Trial Tr. at 3153-54.

In total, defendants are jointly and severally liable for a money judgment in the amount of $10,845,650, representing funds that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud violations, and property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

### 4.  The Global Settlement Fund

The GSF was a fund created by Kenner and Constantine.  Victims were told by Kenner and Constantine that the money contributed to the GSF would be used as a legal defense fund for litigation against Jowdy; however, Kenner and Constantine diverted money from the GSF for unauthorized purposes and for their own benefits.  *See* Trial Tr. at 423-29, 687-88, 2175, 3052-53, 1815, 2833-36, 2749-51.  A total of $3.130 million that was contributed to the GSF by the victims was diverted by defendants for unauthorized purposes.  *See* FORF-1; Gov. Ex. 80.  As a result, defendants are jointly and severally liable for a money judgment in the amount of $2,394,853, representing the GSF money that is proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and is property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.[8]

### 5.  Victims' Lines of Credit

Kenner induced some of his investor clients to establish lines of credit that were insured by bonds and equities held in the investors' names.  A total of $9,851,542 in line of credit money was extended.  *See* FORF-1.  Specifically, $1,794,392 was loaned under Michael Peca's line of credit, *see* Gov. Ex. 2001; $2,198,910 was loaned under Owen Nolan's line of credit, *see* Gov. Ex. 2133; $649,405 was loaned under Bryan Berard's line of credit, *see* Gov. Ex. 2134;

---

[8] Although defendants stole $3.130 million from the GSF, the government deducted $735,147 from this amount in its money judgment calculation because $615,147 of these funds are already accounted for in the tracing of proceeds to the Falcon 10 airplane, and $120,000 of these funds are accounted for in the money judgment calculation for the Moreau Palms Unit.  *See* Sections III(A)(1) and III(B)(2)(b)(iii), *supra*.

$856,200 was loaned under Darryl Sydor's line of credit, *see* Gov. Ex. 2135; $1,010,645 was loaned under Steve Rucchin's line of credit, *see* Gov. Ex. 2136; $1,242,769 was loaned under Glen Murray's line of credit, *see* Gov. Ex. 2137; $1,200,000 was loaned under Mattias Norstrom's line of credit, *see* Gov. Ex. 2138; and $899,221 was loaned under Sergei Gonchar's line of credit, *see* Gov. Ex. 2139.

The lines of credit were supposed to be used to fund the Hawaii land development project. *See, e.g.*, Trial Tr. at 2721. However, as discussed, *supra*, line of credit funds were diverted by defendants and used for unauthorized and fraudulent purposes. *See, e.g.*, Trial Tr. at 2065, 2721. Moreover, in the case of Sergei Gonchar, defendants established a line of credit without his knowledge, and then diverted the $899,221 in line of credit funds for fraudulent purposes. *See* Trial Tr.at 4845-56. As a result, the lines of credit funds are proceeds of defendants' wire fraud and conspiracy to commit wire fraud and were involved in defendants' money laundering conspiracy.

The line of credit funds were also commingled with other investment funds and stolen Centrum Loan funds in the LI IV and BI IV accounts. *See* Section III(b)(6), *infra*. Thus, the lines of credit funds facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), were involved in money laundering transactions (i.e., were the subject, or corpus, of wire transfers of proceeds and commingled funds), and were involved in defendants' money laundering conspiracy.

Additionally, the establishment of the lines of credit was "the outgrowth of [the defendant's] fraudulent beginnings." *Warshak*, 631 F.3d at 332-33. Even if some of the funds from the lines of credit were used for a "legitimate" purpose, i.e., to fund the Hawaii land

development project, those funds are nevertheless forfeitable because they were obtained by

defendants through their overall conspiracy to commit fraud. *Id.* at 332 ("Any money generated

through . . . potentially legitimate sales is nonetheless subject to forfeiture, as the sales all

resulted 'directly or indirectly' from a conspiracy to commit fraud." (citation omitted)).

Furthermore, even where the funds were used for a legitimate purpose (to purchase the Honu'apo

property in Hawaii), *see* Gov. Ex. 2135; Gov. Ex. 2136; Gov. Ex. 2137; Gov. Ex. 2133; Gov. Ex.

2021; Gov. Ex. 2422, that property was then used by Kenner to secure the $3 million Centrum

Loan, which loan's funds were then diverted and laundered by defendants. *See* Section III(B)(8),

*infra*. Therefore, the lines of credit moneys facilitated defendants' money laundering

transactions and were involved in defendants' money laundering conspiracy.

Based upon the foregoing, defendants are jointly and severally liable for a money

judgment in the amount of $6,296,542.00.[9]

### 6.   Victims' Investment Money

A total of $2,415,000 was invested in the Hawaii land development project from the

investor victims. *See* FORF-1; Gov. Ex. 2101; Gov. Ex. 2106. This investment money was in

the LI IV account and BI IV account. However, these accounts were used by defendants time

and again as vehicles to launder lines of credit proceeds and Centrum Loan proceeds. For

---

[9] In calculating the money judgment pertaining to the victims' line of credit money, the
government deducted $3,555,000 of line of credit money that either is included in other money judgment
calculations or was used to purchase real property that the government seeks to forfeit, namely: $350,000
of Gonchar's line of credit money that was diverted to purchase the Sugar Mill property, as discussed in
Section III(A)(2); $450,000 of Rucchin's line of credit money and Nolan's line of credit money that is
accounted for in the money judgment pertaining to Los Frailes, as discussed in Section III(B)(1);
$350,000 of Nolan's line of credit money that was diverted to purchase DCSL, as discussed in Section
III(A)(3); $500,000 of Rucchin's line of credit money and Nolan's line of credit money that is accounted
for in the money judgment pertaining to the Peca Palms Unit, as discussed in Section III(B)(2)(a)(i);
$325,000 of Gonchar's line of credit money that is accounted for in the money judgment pertaining to the
McKee Palms Units, as discussed in Section III(B)(2)(c); and $1,580,000 in line of credit money that is
accounted for in the money judgment pertaining to Del Mar, as discussed in Section III(B)(3).

instance, Gonchar's line of credit money was laundered through the LI IV account to fund the purchase of the Sugar Mill property. *See* Section III(A)(2), *supra*. Nolan's and Rucchin's line of credit money was laundered through the LI IV account to fund the purchase of Frailes. *See* Section III(B)(1), *supra*. Nolan's line of credit money was laundered through the LI IV account to fund the purchase of DCSL. *See* Section III(A)(3), *supra*. Rucchin's and Norstrom's line of credit money was laundered through the LI IV account to fund the purchase of the Peca Palms Unit. *See* Section III(B)(2)(a), *supra*. Centrum Loan funds were laundered through the LI IV account to fund the purchase of the Peca Palms Unit. *See id.* Investors' funds that were supposed to be used for the Hawaii land development project were diverted from the LI IV and BI IV accounts to fund the purchase of the Moreau Palms Units. *See* Section III(B)(2)(b)(i), *supra*. Gonchar's line of credit money was laundered through the LI IV account to fund the purchase of the McKee Palms Unit. *See* Section III(B)(2)(c), *supra*. Centrum Loan funds were laundered through the LI IV account to fund the purchase of the Del Mar property. *See* Section III(B)(3), *supra*. In addition, Vitali Yachmenev's Hawaii land development investment funds were diverted from the LI IV account to fund the purchase of the Del Mar property. *See id.*

Therefore, defendants are jointly and severally liable for a money judgment in the amount of $2,370,000 representing the investment funds that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.[10]

---

[10] The government deducted Vitali Yachmenev's $45,000 investment in its calculation for a money judgment pertaining to the victims' investment money because Yachmenev's investment is

7.     **Eufora Frauds**

Eufora, LLC ("Eufora") was a company managed by Constantine and others that purportedly sold prepaid credit cards with "credit builder[s]." *See* Gov. Ex. 210.  Defendants induced seven victims to "invest" in Eufora. *See* Trial Tr. at 671-77, 1912-18.  The victims' investment money, however, was diverted by defendants to Constantine's CMG bank account and to Kenner's personal bank account for defendants' own use and benefit. *See* Trial Tr. at 675-79; 1913-18; Gov. Ex. 760; Gov. Ex. 1706.  The victims did not receive any legal documentation reflecting their ownership interests in Eufora nor did they receive any return on their investments. *See, e.g.*, Trial Tr. at 677-79.  These seven victims include Sergei Gonchar, who invested $100,000; Mattias Norstrom, who invested $100,000; Michael Peca, who invested $100,000; Tyson Nash, who invested $100,000; Greg de Vries, who invested $75,000; Darryl Sydor, who invested $50,000; and William Ranford, who invested $200,000. *See* Government Binder at Criminal Phase of Trial ("Tr. Binder") 8; Gov. Exs. 1704-05; Gov. Ex. 1708; Trial Tr. at 414-16, 1914-17, 2170-74, 2821-22, 4852-53; Tr. Charts 10-13.

In addition to the foregoing, money belonging to four additional victims' was diverted by defendants through Tim Gaarn. *See* Trial Tr. at 2730-32; 3497-500.  In this regard, money was sent to Eufora's bank account, and, from there, was transferred to an account held in Tim Gaarn's name. *See* Trial Tr. at 2733-35, 2822-27; 3495-99; Gov. Ex. 2213; Gov. Ex. 5006; Gov. Ex. 6004.  Gaarn then sent most of the money to Kenner, or the money was used for the benefit of Kenner and/or Constantine. *See* Tr. Charts 14-19; Trial Tr. at 3497.  Victims Steve Rucchin and Glen Murray testified during the guilt phase of trial that they thought their investment money was going directly to Eufora. *See* Trial Tr. at 2731, 3496.  Rucchin further testified that, had he

---

already included in the government's calculation for a money judgment pertaining to the Del Mar transactions. *See* Section III(B)(3).

known that his investment money would go to Kenner, he would not have made the investment. *See* Trial Tr. at 2732.  Victim William Ranford testified that he did not make the investment in Eufora and that he did not know about the transfers of his money.  *See* Trial Tr. at 2823-24.  The four investor victims include Greg de Vries, who paid $100,000; Glen Murray, who paid $250,000; William Ranford, who paid $200,000; and Steve Rucchin, who paid $150,000.  *See* Tr. Binder 9; Gov. Ex. 2211; Gov. Exs. 2213-16; Trial Tr. at 2732-33, 2822-33, 3493-3500; Tr. Charts 14-19.

Victim Nicholas Privitello also invested $200,000 in Eufora.  The money for Privitello's investment was wired by Privitello to the Law Offices of Ronald Richards.  $15,000 of Privitello's investment in Eufora was ultimately sent to the law firm of Carey, Rodriguez, Greenberg & Paul, to be used for a civil lawsuit involving Constantine, which lawsuit was unrelated to Eufora.  *See* Tr. Chart 20; Tr. Binder 10.  As proven during the guilt phase of trial, Privitello never received any credit for his investment in Eufora.  *See* Trial Tr. at 1430-1461, 1475-1480, 1632-1638; Gov. Ex. 503(CD); Gov. Exs. 503.1T-503.8T; Gov. Ex. 208.1 - 208.11; Tr. Chart 20; Gov. Ex. 1101; Gov. Exs. 1201-02; Gov. Ex. 1218; Gov. Ex. 3321R; Gov. Ex. 3397; Tr. Binder 10.

In sum, defendants are jointly and severally liable for a money judgment in the amount of $1,625,000 representing the Eufora investment funds that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and property that was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

## 8.   Centrum Loan Fraud

As discussed *supra,* in or around December 2004, Kenner purchased the Honu'apo property in Hawaii using his investors' funds.  Kenner financed the $3.5 million purchase using

funds from lines of credit he established in the names of clients Glen Murray, Darryl Sydor, Owen Nolan, and Steve Rucchin.  *See* Gov. Ex. 2021; Gov. Ex. 2135; Gov. Ex. 2136; Gov. Ex. 2137; Gov. Ex. 2133; Gov. Ex. 2422; Tr. Chart 4; Tr. Binder 4.

In or around July 2005, Kenner mortgaged the Honu'apo property to secure a $3 million loan from Centrum Financial (i.e., the Centrum Loan).  *See* Gov. Ex. 3712; Gov. Ex. 3703; Gov. Ex. 3716; Gov. Ex. 9031C; Gov. Ex. 9037C.[11]  $2,576,364.54 of the Centrum Loan funds was wired into the LI IV account on July 19, 2005.  *See* Gov. Ex. 2013; 2/12/16 Forf. Tr. at 46; Tr. Chart 5. According to the "Statement of Use of Loan Proceeds" for the Centrum Loan, the loan money was to be used "exclusively" for the development of the Hawaii property.  *See* Gov. Ex. 3703.  Nevertheless, defendants diverted the Centrum Loan money to, *inter alia*, purchase DCSL, condominium units at the Palms in Las Vegas, and the Del Mar property.

As discussed in Section III(A)(3), *supra*, unbeknownst to defendants' clients, on or about July 20, 2005, Kenner diverted $1.5 million from the Centrum Loan money in the LI IV account to the Mexican Subsidiary's bank account, Propiedades DDM, for the down payment on the purchase of DCSL.  *See* Gov. Ex. 2013; Tr. Chart 5.  Indeed, Kenner admitted during the guilt phase of trial that a portion of the Centrum Loan was used to purchase property in Mexico.  *See* Trial Tr. 4637:9-19.

Moreover, between July 19, 2005 and July 26, 2005, another $905,200 of the Centrum Loan funds was transferred by defendants from the LI IV account to the Ula Makika account.  *See* Gov. Ex. 2013; Gov. Ex. 2102; Tr. Chart 5; Tr. Binder 4.  The Centrum Loan funds were then diverted and laundered by defendants to purchase condominium units at the Palms.  As discussed in Section III(B)(2)(a)(ii) *supra*, on July 21, 2005, $300,200 in Centrum Loan funds was

---

[11] Although the loan was in the amount of $3 million, approximately $500,000 in fees and expenses was paid to obtain the loan.  *See* Gov. Ex. 3716.

transferred from the LI IV account to the Ula Makika account, and, that same day, $300,000 was then wire transferred from the Ula Makika account to the CMG account. *See* Gov. Ex. 2013; Gov. Ex. 2102; Gov. Ex. 2018. In addition, on July 22, 2005, another $350,000 in Centrum Loan funds was transferred from the LI IV account to the Ula Makika account, and then wire transferred from the Ula Makika account to the CMG account, where two checks totaling $650,000 were then written to Stewart Title for the purchases of condominium units at the Palms. *See* Trial Tr. at 3997; Gov. Ex. 2013; Gov. Ex. 2102; Gov. Ex. 2018; Gov. Ex. 4408.

Likewise, $145,000 of the Centrum Loan funds in the Ula Makika account was transferred to the Baja Development account, which account was used by defendants to fund the purchases of and expenses for DCSL and Del Mar. *See* Gov. Ex. 2102. Specifically, on July 19, 2005 and July 26, 2005, $110,000 and $95,000, respectively, in Centrum Loan funds were diverted from the LI IV account to the Ula Makika account. *See* Gov. Ex. 2013; Gov. Ex. 2102. Those same days, July 19, 2005 and July 26, 2005, $50,000 and $95,000, respectively, were wired from the Ula Makika account to the Baja Development account. *See* Gov. Ex. 2102. In addition, on July 19, 2005, defendants wired $15,000 of the Centrum Loan funds that was in the LI IV account directly to the Baja Development account. *See* Gov. Ex. 2013.

Moreover, as discussed in Section III(B)(3), *supra*, on July 19, 2005, $50,000 of the Centrum Loan funds in the Ula Makika account was also wire transferred to the Del Mar account for the purchase of the Del Mar property. *See id.*

Based upon the foregoing, the defendants are jointly and severally liable for a money judgment in the amount of $1,300,000, representing the the Centrum Loan funds that are proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and constitute property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and

60

commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.[12]

### C. Kenner's Pro-Se CD Submission

Kenner provided a compact disc ("CD") to the Court consisting of thousands of pages of exhibits and documents in support of Kenner's alleged claims that witnesses lied about various topics during the course of the criminal trial.  After a review of thousands of pages of documents, it appears that much of the submission does not pertain to the forfeitability of assets.  Defense counsel offered to review these voluminous submissions with his client in an attempt to clarify the issues and provide the government with a "roadmap" regarding the CD.  *See* DE  399.  Accordingly, and to the extent that any of the clarified issues concern the forfeitability of assets, the government intends to address Kenner's purported claims in its reply memorandum.

### IV.   CONCLUSION

For the foregoing reasons, the government respectfully submits that the previously seized DCSL resort, Falcon 10 airplane, and Sugar Mill property are forfeitable as properties traceable to defendants' wire fraud and conspiracy to commit wire fraud violations, and as properties that were involved in or are traceable to defendants' money laundering conspiracy, and that defendants are jointly and severally liable for a money judgment in the amount of $36,739,048.59 representing the balance of the proceeds of defendants' wire fraud and conspiracy to commit wire fraud

---

[12] In calculating the money judgment pertaining to the Centrum Loan fraud, the government deducted $2,200,000 of Centrum Loan funds that are either included in other money judgment calculations or were used to purchase real property that the government seeks to forfeit, namely: $1,500,000 in Centrum Loan funds that were used to purchase DCSL, as discussed in Section III(A)(3); $650,000 in Centrum Loan funds that were used to purchase units at the Palms, as discussed in Section III(B)(2); and $50,000 in Centrum Loan funds that were used to purchase Del Mar, as discussed in Section III(B)(3).

violations, as well as the value of the funds that are traceable to defendants' wire fraud and conspiracy to commit wire fraud violations, and that were involved in or are traceable to defendants' money laundering conspiracy, in addition to such other and further relief as the Court deems just and proper.

Respectfully submitted,

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722


 /s/ Madeline O'Connor
MADELINE O'CONNOR
DIANE LEONARDO
Assistant United States Attorneys
(631) 715-7870